Gregg M. Galardi, Esq.
Ian S. Fredericks, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
One Rodney Square
PO Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

Dion W. Hayes (VSB No. 34304)
Douglas M. Foley (VSB No. 34364)
MCGUIREWOODS LLP
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

          - and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
333 West Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

Proposed Counsel to the Debtors
and Debtors in Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

- - - - - - - - - - - - - - x
                           :
In re:                     :    Chapter 11
                           :
CIRCUIT CITY STORES, INC., :    Case No. 08- _____ (___)
et al.,                    :
                           :
          Debtors.         :    Jointly Administered
- - - - - - - - - - - - - - x

**DEBTORS' MOTION FOR ORDER PURSUANT TO BANKRUPTCY CODE
SECTIONS 105(a), 363, 507(a), 541, 1107(a) AND 1108 AND
BANKRUPTCY RULE 6003 AUTHORIZING DEBTORS TO PAY
PREPETITION WAGES, COMPENSATION, AND EMPLOYEE BENEFITS**

The debtors and debtors in possession in the

above-captioned cases (collectively, the "Debtors")[1]

---

[1] The Debtors and the last four digits of their respective taxpayer
identification numbers are as follows: Circuit City Stores, Inc.
(3875), Circuit City Stores West Coast, Inc. (0785), InterTAN,

*(cont'd)*

hereby move this Court (the "Motion") for entry of an

order, pursuant to sections 105(a), 363, 507(a)(4),

507(a)(5), 541, 1107(a) and 1108 of title 11 of the

United States Code (the "Bankruptcy Code") and Rule 6003

of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), (a) authorizing, but not directing,

the Debtors to pay prepetition wages, salaries, bonuses,

reimbursements, and other compensation; (b) authorizing,

but not directing, the Debtors to continue the

maintenance of employee benefit programs in the ordinary

course of business; and (c) directing all banks to honor

prepetition checks for payment of prepetition employee

obligations.  In support of the Motion, the Debtors rely

upon and incorporate by reference the Declaration of

Bruce H. Besanko, Executive Vice President and Chief

Financial Officer of Circuit City Stores, Inc., in

_____
*(cont'd from previous page)*
   Inc. (0875), Ventoux International, Inc. (1838), Circuit City
   Purchasing Company, LLC (5170), CC Aviation, LLC (0841), CC
   Distribution Company of Virginia, Inc. (2821), Circuit City
   Properties, LLC (3353), Kinzer Technology, LLC (2157), Abbott
   Advertising Agency, Inc. (4659), Patapsco Designs, Inc.(6796),
   Sky Venture Corp. (0311), Prahs, Inc.(n/a), XSStuff, LLC (9263),
   Mayland MN, LLC (6116), Courchevel, LLC (n/a), Orbyx Electronics,
   LLC (3360), and Circuit City Stores PR, LLC (5512).  The address
   for Circuit City Stores West Coast, Inc. is 9250 Sheridan
   Boulevard, Westminster, Colorado 80031.  For all other Debtors,
   the address is 9950 Mayland Drive, Richmond, Virginia 23233.

Support of Chapter 11 Petitions and First Day Pleadings
(the "Besanko Declaration"), filed with the Court
concurrently herewith.  In further support of the Motion,
the Debtors respectfully represent:

### JURISDICTION AND VENUE

1.   This Court has jurisdiction to consider this
Motion under 28 U.S.C. §§ 157 and 1334.  This is a core
proceeding under 28 U.S.C. § 157(b).  Venue of these
cases and this Motion in this District is proper under
28 U.S.C. §§ 1408 and 1409.

2.   The statutory predicates for the relief
requested herein are Bankruptcy Code sections 105(a),
363, 507(a)(4), 507(a)(5), 541, 1107(a) and 1108.  Such
relief is warranted pursuant to Bankruptcy Rule 6003.

### BACKGROUND

3.   On the date hereof (the "Petition Date"), the
Debtors filed voluntary petitions in this Court for
relief under chapter 11 of the Bankruptcy Code.  The
factual background regarding the Debtors, including
their business operations, their capital and debt
structure, and the events leading to the filing of these
bankruptcy cases, is set forth in detail in the Besanko

Declaration, filed concurrently herewith and fully

incorporated herein by reference.[2]

4.    The Debtors continue to manage and operate

their businesses as debtors in possession pursuant to

Bankruptcy Code sections 1107 and 1108.

5.    No trustee or examiner has been appointed in

these chapter 11 cases, and no committees have yet been

appointed or designated.

**RELIEF REQUESTED**

6.    By this Motion, the Debtors request that this

Court enter an order, under Bankruptcy Code sections

105(a), 363, 507(a)(4), 507(a)(5), 541, 1107(a) and 1108:

(i) authorizing, but not directing, the Debtors to:

(a) continue to pay and/or perform, as applicable, all

obligations to current employees (collectively, the

"Employees"), including accrued prepetition wages,

salaries, bonuses, vacation, personal, holiday and sick

time-off and other cash and non-cash compensation claims,

except as otherwise set forth herein (collectively, the

"Employee Claims"); (b) continue to reimburse Employees

---

[2]  Capitalized terms not otherwise defined herein shall have the
     meanings ascribed to them in the Besanko Declaration.

for expenses incurred by Employees on behalf of the Debtors in the ordinary course of business, including expenses incurred prepetition (the "Employee Reimbursement Obligations"), and to pay any and all amounts due under Employees' corporate credit cards (the "Credit Card Obligations" and together with the Employee Reimbursement Obligations, the "Employee Expense Obligations"); (c) continue the Debtors' various non-working day policies and employee benefit plans and programs, including medical, dental, vision and life insurance policies, savings and retirement plans, and workers compensation programs, the most significant of which are described below, and to pay all fees and costs in connection therewith, including fees and costs incurred prepetition, except as otherwise set forth herein (collectively, the "Employee Benefit Obligations"); and (d) pay all related prepetition withholdings and payroll-related taxes (the "Employer Taxes" and, with the Employee Claims, the Employee Expense Obligations and the Employee Benefit Obligations, collectively, the "Prepetition Employee Obligations") associated with the Employee Claims and the Employee

Benefit Obligations; (ii) authorizing and directing the Debtors' banks to receive, process, honor and pay all of the Debtors' prepetition checks and fund transfers on account of any of the Prepetition Employee Obligations; (iii) prohibiting the Debtors' banks from placing any holds on, or attempting to reverse, any automatic transfers to any account of an Employee or other party for Prepetition Employee Obligations and (iv) authorizing the Debtors to issue new postpetition checks or effect new postpetition fund transfers on account of the Prepetition Employee Obligations to replace any prepetition checks or fund transfer requests that may be dishonored or rejected.

**BASIS FOR RELIEF**

**A.    Wages and Salaries.**

7.    The Debtors' workforce is comprised of full- and part-time salaried and hourly Employees and temporary employees.

8.   The Debtors employ approximately 39,600[3]
Employees, 17,400 of whom are classified as full-time[4]
Employees and 22,200 of whom are classified as part-time
Employees.  About 35,500 Employees work in the Debtors'
retail store locations.  Approximately 1,800 are
employed at the Debtors' distribution centers or in
their service department.  The remaining 2,300 are in
corporate positions.

9.   In addition, the Debtors currently employ
approximately 250 temporary Employees in their retail
stores.  The temporary Employees are hired for discrete
periods of time, usually during the high-traffic holiday
months.  Given the approaching holiday season, the
Debtors anticipate that the number of temporary
employees will increase dramatically, potentially up to
as many as 11,000 during December.  Non-temporary
Employees, i.e., Employees hired on an at-will basis,
are referred to herein as "regular" Employees.

10.   Approximately 88% of all Employees are hourly
wage earners (collectively, the "Hourly Employees") and

---

[3]  Employee and payroll numbers do not reflect changes due to recent
reductions in force.

[4]  Full-time Employees work at least thirty (30) hours per week.

the remaining 12% are salaried personnel (collectively, the "Salaried Employees").

11.   The average monthly payroll for the Debtors' Employees in the typical non-Christmas season month is approximately $86 million, including employer payroll taxes.   Employees are paid every other week.   The day of the week varies by region.   Depending on region, Employees are paid between five (5) and seven (7) days in arrears.

12.   Salaried Employees collectively are paid approximately $33 million in gross wages per month, including employer payroll taxes.   As of November 1, 2008, the most recent date for which the Debtors can obtain information, approximately $7.9 million exists in accrued but unpaid payroll for Salaried Employees.

13.   Hourly Employees are paid approximately $53 million in gross wages each month, including amounts on account of employer payroll taxes.   As of November 1, 2008, approximately $13.3 million exists in accrued but unpaid payroll for Hourly Employees.

14.   There are presently no Employees who are owed in excess of $10,950 for prepetition wages or salaries.

15.   Pursuant to this Motion, the Debtors seek entry of an order authorizing, but not directing, the Debtors to continue to pay Employee wages and salaries in the ordinary course of business, including payment of amounts outstanding as of the Petition Date for accrued and unpaid wages and salaries and amounts that the Debtors are required by law to withhold from Employee payroll checks in respect of federal, state and local income taxes, garnishment contributions, social security and Medicare taxes.

16.   Prior to the Petition Date, the Debtors notified over 700 employees (the "WARN Employees") that their employment with the Company was being terminated and in accordance with the requirements of the WARN Act, provided those employees with notice that the effective date of such termination would be 60 days from the date on which they provided such notice (the WARN Period").[5] Although there is no precedent in this district or the

_____

[5]   The notices provided that the affected Employees would be terminated 60 days in the future as required by the WARN Act. Under the above cited precedent, however, that notice is arguably nothing more that a pre-petition agreement or executory contract that could be rejected.  For the reasons set forth herein, however, the Debtors seek to continue paying the WARN Employees wages, salaries and benefits over the balance of the WARN Period.

Fourth Circuit, in two recent cases bankruptcy courts have concluded that notwithstanding the provisions of the WARN Act, in the event employees are terminated prior to the commencement of a bankruptcy case, claims based on the WARN Act are not entitled to administrative expense priority under section 503(b)(1).  See In re First Magnus Financial Corporation, 390 B.R. 667, 677 (Bankr. D. Ariz. 2008)(holding that WARN Act claims of 8 employees terminated prior to debtors' filing liquidating chapter 11 petitions were not entitled to administrative expense priority under Bankruptcy Code section 503(b)(1)); Henderson v. Powermate Holding Corp., Case No. 08-50559 (KG) (Bankr. D. Del. Oct. 15, 2008)(holding that WARN Act claims of 260 employees terminated prior to debtors' filing chapter 11 petitions were not entitled to administrative expense priority under Bankruptcy Code section 503(b)(1)).

17.  Notwithstanding the above precedent, the Debtors request authority to pay the WARN Employees the wages, salaries and benefits that they would be entitled to earn over the balance of the 60 day WARN Period, even though it is extremely unlikely that such employees will

be recalled by the Debtors as a result of the
commencement of these Chapter 11 Cases and thus will
provide no further services to the Debtors.  In that
regard, the Debtors believe that, under the
circumstances and given the Debtors' intent to attempt
to successfully reorganize or sell their business as a
going concern such authorization is critical.  In
particular, the Debtors maintain that such payments are
essential to stabilize their workforce and improve
overall Employee morale in this critical period in the
Debtors' restructuring efforts.  The Debtors estimate
that the aggregate cost associated with continuing the
payment of wages, salaries and benefits to the WARN
Employees is approximately $8 to $ 10 million, which
amount has been included in their DIP budget.

**B.    Bonuses.**

18.   In addition to regular compensation, the
Debtors currently offer a number of incentive bonuses to
Employees through various bonus plans.  In particular,
there are approximately 12 separate plans (collectively,
the "Field Bonus Plans") which provide bonuses to
Employees in the Debtors' retail stores.  The Field

Bonus Plans are designed to target improved performance by those regional and store managers, supervisors and associates who are in a position to contribute materially to the Debtors' success through store performance.  The Field Bonus Plans include, but are not limited to, regional incentive plans, store management plans and incentive plans for Employees working in the Debtors' online and technical service divisions. Approximately 12,000 Employees are eligible to participate in the Field Bonus Plans (the "Bonus Pool"). The Bonus Plans are designed to provide market-competitive cash bonus payments based on several measurements, including, among others, revenues, profits, gross margin, and shrink results.

19.  Depending on the specific Field Bonus Plan, awards are payable on a monthly, quarterly or annual basis.  The Debtors forecast that the cost of the plans in any given month is approximately $3.5 million but varies based on store performance.

20.  The Field Bonus Plans are critical to maintaining Employee morale and encouraging a high level of performance among sales personnel.  Thus, by this

Motion, the Debtors seek entry of an order authorizing, but not directing, the Debtors to continue to honor and perform all obligations under the Field Bonus Plans in the ordinary course of business, including payment of any prepetition claims on account of such Plans.

**C.    Payroll Processing.**

21.   All of the Debtors' payroll functions, as well as a number of other human resources functions, are administered by Hewitt Associates LLP ("Hewitt").  The Debtors pay Hewitt approximately $860,000 per month on account of its payroll processing and human resources services.  The Debtors seek entry of an order authorizing, but not directing, them to continue to pay the payroll processing fees owed to Hewitt in the ordinary course of business, including payment of any fees outstanding as of the Petition Date.  Without the ability to continue to pay Hewitt in the ordinary course of business, including payment of any amounts outstanding prior to the Petition Date, Hewitt may refuse to process the Debtors' payroll, thereby jeopardizing the ultimate receipt of wages and salaries by the Employees.

13

**D.    Reimbursement of Business Expenses.**

22.   The Debtors routinely reimburse Employees for certain expenses incurred within the scope of their employment, including expenses for travel, lodging, professional seminars and conventions, ground transportation, meals, supplies and miscellaneous business expenses (collectively, the "Business Expenses").  Most Employees who are reimbursed for their expenses are District Managers, Asset Protection Managers, Human Resource Managers, District and Regional Firedog Managers, Regional Operations Managers and District Operations Managers who incur Business Expenses as part of their jobs.

23.   **Corporate Credit Cards.**  The Debtors and American Express Travel Related Services Company ("American Express") have entered into an agreement (the "Corporate Card Account Agreement"), pursuant to which American Express issues corporate and travel credit cards (together, the "Corporate Cards") to certain Employees of the Debtors.  The Debtors strongly encourage, and in some cases require, Employees to pay for the Business Expenses through the use of the

Corporate Cards.  The majority of expenses incurred on the Corporate Cards are for travel, lodging, and meals.

24.  On a monthly basis, American Express sends invoices to the Employees for such charges incurred by them.  Employees then submit expense reports for the amounts incurred on the Corporate Cards.  After receipt of Employee expense reports, the Debtors remit payment directly to American Express.  The Debtors and the respective employees are jointly liable for the charges incurred on the Corporate Cards.

25.  The Debtors' Employees rely on the Corporate Cards to incur Business Expenses.  Without the ability to use the Corporate Cards, the Debtors' Employees would likely have to pay such expenses themselves and subsequently wait for reimbursement of such expenses from the Debtors.  Any payment delay could affect the Employees' ability to incur Business Expenses on the Corporate Cards.

26.  The Employees submit expense reports for charges incurred for Business Expenses either on the Corporate Cards or by other means through an expense management system.  The Debtors process expense reports

on a daily basis.  For expenses incurred on the
Corporate Cards, the Debtors pay American Express
directly for the Reimbursable Expenses included in the
expense reports.  On average, approximately $1 million
is paid to American Express with respect to the Business
Expenses each month.  As of the Petition Date, certain
Employees have not yet been reimbursed for Business
Expenses incurred directly by such Employee and American
Express has not been paid for certain Business Expenses
incurred on the Corporate Cards.  The Debtors cannot
estimate the amount of Business Expenses outstanding as
of the Petition Date because not all Employees have
submitted expense reports as of the Petition Date.

27.  Payment of the Business Expenses and the
continued availability of the Corporate Cards are
essential to maintaining Employee morale, already
adversely affected by the filing of these chapter 11
cases.  The Debtors believe Employee morale will further
erode if the Debtors are unable to provide a mechanism
for the prompt payment of expenses incurred by Employees
on the Debtors' behalf.

28.  **Relocation Expenses.**  In addition to the
Business Expenses, the Debtors reimburse certain
Employees for relocation expenses in order to spur
desirable candidates to accept positions (the
"Relocation Expenses" and, together with the Business
Expenses, the "Reimbursable Expenses").  The Relocation
Expenses include the actual out-of-pocket expenditures
incurred by individual Employees in connection with a
job-related move, as well as the costs associated with
certain relocation-related service providers employed by
the Debtors, including realtors and relocation agents.
The Relocation Expenses for which the Debtors will offer
reimbursement vary based on the type of Employee.  The
Debtors estimate that Relocation Expenses for the period
from October of 2008 until February of 2009 will total
approximately $1.7 million, including amounts owed to
third parties and to Employees.  The Debtors believe
reimbursement of the Relocation Expenses is essential in
order to encourage key Employees to move to the
geographic area where they can provide the greatest
benefit to the Debtors.

29.   Accordingly, by this Motion, the Debtors seek
entry of an order authorizing, but not directing,
payment of all Reimbursable Expenses in the ordinary
course of business, including Reimbursable Expenses
incurred prior to the Petition Date, whether payable to
an Employee or to a third party.  In particular, the
Debtors seek authority, but not direction, to pay, in
the ordinary course of business, any and all amounts due
to American Express for Reimbursable Expenses incurred
on the Corporate Cards, including expenses incurred
prepetition, in accordance with the terms of the
Corporate Card Account Agreement and regardless of
whether or not the person incurring such charge is a
current Employee of any of the Debtors.

**E.    Employee Benefit Plans.**

30.   **Medical Plans**.  The Debtors offer medical
benefits to all regular full-time and part-time
Employees and their dependents pursuant to three
(3) different medical plans (collectively, the "Medical
Plans") – a self-insured plan administered by Empire
Blue Cross Blue Shield ("Empire"), and fully-insured

plans through Kaiser Permanente ("Kaiser")[6] and Triple-S

Management Corporation ("Triple-S")[7].  Over 19,500

persons, including roughly 11,500 Employees and 8,000

Employee dependents, are covered under the Medical Plans.

31.  The Medical Plans are funded through

contributions by the Debtors and by participating

Employees.  Employee contributions are deducted from

Employees' bi-weekly paychecks to pay for that month's

coverage.

32.  The Medical Plans cost the Debtors

approximately $2.4 million each month.[8]  By this Motion,

the Debtors request entry of an order authorizing, but

not directing, the Debtors to continue to pay and remit

all amounts owed under the Medical Plans in the ordinary

course of business, including amounts outstanding as of

the Petition Date.

33.  **Dental Plan**.  The Debtors also offer their

Employees dental benefits through a self-insured plan

---

[6]  The Kaiser Medical Plan is for Employees in the Debtors' Hawaii
     stores.  There are currently about 78 Employees covered by the
     Kaiser Medical Plan.

[7]  The Triple-S Medical Plan is for Employees in the Debtors' Puerto
     Rico stores.  There are currently approximately 37 Employees
     under the Triple-S Medical Plan.

[8]  Benefits figures are based on fiscal 2008 monthly figures.

(the "Dental Plan") administered by Aetna Life Insurance Company.[9] All regular full-time and part-time Employees are eligible to receive benefits under the Dental Plan. A total of approximately 19,750 Employees and dependents participate in the Dental Plan, including about 11,650 Employees and 8,100 dependents.

34.   The Dental Plan is funded through contributions by the Debtors and by participating Employees.  Employee contributions are deducted from Employees' bi-weekly paychecks to pay for that month's coverage.

35.   The Dental Plan costs the Debtors approximately $98,000 each month.  By this Motion, the Debtors seek entry of an order authorizing, but not directing, the Debtors to continue to pay and remit all amounts owed under the Dental Plan in the ordinary course of business, including amounts outstanding as of the Petition Date.

36.   **Vision Plan**.  The Debtors also offer their Employees vision care benefits through a self-insured

---

[9]   Employees in the Debtors' Puerto Rico stores receive dental coverage through the Medical Plan provided by Triple-S.

plan (the "Vision Plan") administered by Vision Service

Plan.[10]  All regular full-time and part-time Employees

are eligible to receive benefits under the Vision Plan.

Over 14,700 Employees and dependents participate in the

Vision Plan, including approximately 8,650 Employees and

6,050 dependents.

37.   The Vision Plan is fully funded through

contributions by participating Employees.   Employee

contributions are deducted from Employees' bi-weekly

paychecks to pay for that month's coverage.[11]  By this

Motion, the Debtors seek entry of an order authorizing,

but not directing, them to continue to remit all amounts

owed under the Vision Plan in the ordinary course of

business, including amounts outstanding as of the

Petition Date.

38.  **Flexible Spending Accounts**.   In addition, the

Debtors offer their Employees the use of flexible

---

[10]  Employees in the Debtors' Puerto Rico stores receive vision
coverage through the medical plan provided by Triple-S.

[11]  The Debtors set Employee deductions based on projections as to
the cost of the Vision Plan for the current year.   Because the
Vision Plan is fully funded by participating Employees, to the
extent these forecasts prove inaccurate, the Debtors either
refund the surplus by reducing or eliminating Employees' payroll
deductions for a given period or pay the deficit by increasing
such deductions the following year.

healthcare spending accounts which allow Employees to
set aside funds on a pre-tax basis to pay for various
medical, vision, dental and drug costs not otherwise
covered or payable under the other benefit plans.  The
Company also offers a flexible dependent care spending
account (together with the flexible healthcare spending
account, the "Flexible Spending Account Plans") to allow
Employees to set aside funds on a pre-tax basis to pay
for costs associated with dependent care.  The Flexible
Spending Account Plans are administered by Hewitt.
Approximately 700 Employees are enrolled in these Plans.

39.  The Flexible Spending Account Plans are fully
funded through contributions by participating Employees.
Employee contributions are deducted from Employees' bi-
weekly paychecks.  By this Motion, the Debtors seek
entry of an order authorizing, but not directing, the
Debtors to continue to remit all amounts owed under the
Flexible Spending Account Plans in the ordinary course
of business, including amounts outstanding as of the
Petition Date.

40.  **Retiree Medical Plan.**  The Debtors offer a
retiree medical benefits plan (the "Retiree Medical

Plan"), also administered by Empire.  The Debtors froze
the Retiree Medical Plan to new entrants, effective as
of the close of business, November 1, 2008, in
accordance with the terms of the plan.  The Retiree
Medical Plan is fully funded by plan participants.[12]  By
this Motion, the Debtors seek entry of an order
authorizing, but not directing, them to continue to
provide coverage under the Retiree Medical Plan to
existing plan participants in the ordinary course of
business, including payment of any amounts outstanding
as of the Petition Date.

41.  **COBRA.**  Employees and former Employees and
their qualified beneficiaries who cease to be eligible
for the Medical, Dental or Vision or Flexible Spending
Account Plans may choose to receive an additional
eighteen (18) to thirty-six (36) months of coverage[13]

---

[12] To the extent that participant premiums do not cover the costs of
the Plan, the Debtors may be required to pay the deficit.

[13] The period for which coverage may be continued depends on the
reason that the Employee or qualified beneficiary lost
eligibility.

under those plans under Public Law 99-272 Consolidated
Omnibus Budget Reconciliation Act of 1985 ("COBRA").[14]

42.   Benefits offered through COBRA are funded
through premiums paid by participating former Employees
and contributions from the Debtors.  The COBRA benefits
cost the Debtors approximately $188,000 each month.  By
this Motion, the Debtors seek entry of an order
authorizing, but not directing, them to continue to pay
and remit all amounts owed on account of COBRA in the
ordinary course of business, including amounts
outstanding as of the Petition Date.

43.  **Life, Long-Term Disability and Short-Term
Disability Insurance.**  The Debtors' Employees also have
the option to purchase voluntary life, accidental death
and dismemberment, supplemental life, spousal life and
child life (collectively, the "Life Insurance Plans")
pursuant to policies issued by Aetna Life Insurance
Company ("Aetna").

---

[14] The coverage provided under COBRA is a continuation of the
coverage that an Employee had when he/she lost eligibility. Thus,
Employees who were covered prior to losing eligibility must be
treated the same as similarly situated eligible Employees for
that time period and may make election changes at annual
enrollment under the same conditions as eligible Employees.  If
the Employee did not have coverage at the time he/she lost
eligibility, he/she cannot enroll for the first time under COBRA.

44.   The Debtors automatically enroll all regular full-time and part-time Employees in their basic term life insurance ("Basic Life Insurance") at a value of one (1) times such Employee's base salary for full-time Employees, and $10,000 for part-time Employees.  A total of approximately 23,900 Employees are covered by the Basic Life Insurance.

45.   The Debtors also provide regular full-time and part-time Employees with the option to enroll in an accidental death and dismemberment insurance plan (the "Accidental Death and Dismemberment Insurance"), a supplemental life insurance plan (the "Supplemental Life Insurance"), a spousal life insurance plan (the "Spousal Life Insurance"), and a child life insurance plan (the "Child Life Insurance", and together with the Accidental Death and Dismemberment Insurance, the Supplemental Life Insurance, and the Spousal Life Insurance, the "Optional Life Insurance").  Roughly 5,100 Employees have elected to receive the Optional Life Insurance.

46.   The Basic Life Insurance is funded entirely by the Debtors and costs the Debtors approximately $45,000 each month.  The Optional Life Insurance is fully funded

through deductions from participating Employees'
paychecks.

47.   In addition to being able to purchase the
Optional Life Insurance, regular full-time Employees may
purchase long-term disability insurance (the "Long-term
Disability Insurance") pursuant to policies issued by
Aetna.  The Long-term Disability Insurance provides
continuous income replacement in the event that an
Employee is unable to work for an extended period due to
illness or injury.  Under the long-term disability
program, income replacement begins after twenty-six (26)
weeks of disability.  Enrolled Employees may elect
coverage which provides either 40% or 60% income
replacement, with a maximum payment in either case of
$15,000 per month.  The maximum benefit duration of
benefits under the Long-Term Disability Insurance varies
based on the Employees' age at the time of disability.[15]
As of the Petition Date, about 6,300 Employees had
elected to purchase Long-term Disability Insurance.  The

---

[15] If the Employee is under 62 years old at the time of the illness
or injury causing the disability, the Employee is eligible to
receive benefits until the age of 65.  If the Employee is 62 or
over at the time of the illness or injury, the length of
disability benefits varies.

Long-term Disability Insurance is fully funded through deductions from participating Employees' paychecks.

48.   By this Motion, the Debtors seek entry of an order authorizing, but not directing, them to continue to pay and remit all amounts owed under the Life Insurance Plans and the Long Term Disability Insurance in the ordinary course of business, including amounts outstanding as of the Petition Date.

49.   The Debtors also offer short-term disability insurance through a self-insured and administered program (the "Short-term Disability Insurance") to all regular full-time Employees.  The Short-term Disability Insurance allows eligible Employees to take paid leave in the event that they are temporarily unable to work due to illness or injury.  Under the short-term disability program, Employees who will be absent for more than five (5) consecutive work days must provide certification of their illness or injury by a doctor. Upon so certifying, eligible Salaried Employees will receive short-term disability payments retroactive to the first day of absence.  Eligible Hourly Employees will receive short-term disability payments beginning

the sixth consecutive day of absence.  The amount of the short-term disability payments and the length of the period for which the payments will be provided varies, depending upon the Employee's years of service with the Debtors and the Employee's weekly pay.[16]  As of the Petition Date, approximately 170 Employees are on a short-term disability leave and approximately 75 are receiving payments under the Short-term Disability Insurance.

50.  The Short-term Disability Insurance costs the Debtors approximately $172,000 each month, funded entirely by the Debtors.  By this Motion, the Debtors seek entry of an order authorizing, but not directing, them to continue to pay and remit all amounts owed under the Short-term Disability Insurance in the ordinary course of business, including amounts outstanding as of the Petition Date.

---

[16] Depending upon these factors, Employees may receive either 100%, 75%, or 50% of pay for a period of up to a maximum of 26 weeks. Short-term disability payments may be reduced by any amounts provided through the Debtors' workers' compensation program.

**F.    Savings and Retirement Plans.**

51.    The Debtors offer eligible Employees savings and retirement plans through which they can accumulate savings for their future.

52.    **401(k) Plan.**  First, eligible Employees[17] each year may contribute between 1% and 40% of their pre-tax compensation for investment in a 401(k) plan (the "401(k) Plan") managed by Wachovia Bank, N.A. (the "Trustee"). Employees who participate in the 401(k) Plan are eligible to receive a 100% matching contribution from the Debtors for the first 3% of salary that the Employee contributes and a 50% matching contribution for the next 2% of the Employee's salary.  Approximately 4,600 Employees have elected to participate in the 401(k) Plan.

53.    On average, the 401(k) Plan costs the Debtors $800,000 each month.  By this Motion, the Debtors seek entry of an order authorizing, but not directing, the Debtors to continue to remit all Employee contributions and to make all matching employer contributions to the

---

[17] All Employees over the age of eighteen (18) may make Employee contributions to the 401(k) Plan after three (3) months of service and may receive matching contributions after one year of service.

401(k) Plan in the ordinary course of the Debtors'
business, including amounts withheld or contributions
owed prior to the Petition Date.

54.   **Retirement Plan.**   The Debtors also have in
place a retirement plan (the "Retirement Plan") for
certain eligible Employees.   The Retirement Plan is
frozen – no new Employees may become participants in the
plan, and existing participants are not accruing any
additional benefits under the plan on account of service
or compensation.

55.   There are approximately 21,700 total
participants in the Retirement Plan, including about
6,000 current Employees, 14,000 former Employees whose
benefits are vested but not yet in payment status, and
1,700 former Employees who are currently receiving
monthly payments.   Monthly payments continue for the
lifetime of the retiree and may continue, in whole or in
part, to designated survivors, depending on the form of
payment elected by the retiree.   The Retirement Plan
assets are held in a trust with Wachovia Bank, N.A.   The
plan is sufficiently funded at this time and, therefore,

the Debtors are not currently making contributions to
the trust.

56.   By this Motion, the Debtors seek entry of an
order authorizing, but not directing, them to continue
to pay all amounts owed under the Retirement Plan in the
ordinary course of the Debtors' business, including
amounts owed as of the Petition Dates.

**G.   Workers' Compensation.**

57.   The Debtors provide workers' compensation
benefits to all Employees.   These benefits are covered
primarily under the Debtors' workers' compensation
insurance policy (the "Workers' Compensation Insurance")
with Old Republic Insurance Company ("Old Republic"),[18]
administered by Specialty Risk Services ("SRS").
Failure to maintain this insurance in the various states
in which the Debtors do business could result in
administrative or legal proceedings against the Debtors
and their officers and directors.

58.   The Debtors pay Old Republic twice
annually.   Approximately $528,500 was paid on October 1,

---

[18] The Company self-insures its workers' compensation program in
   California.   In addition, for calendar year 2008 the Company has
   reinsured the first $100,000 of its deductible with NNIL.

2008, and the second installment of $328,100 is due on April 1, 2009. In addition, the Debtors paid SRS claims service fees and charges amounting to approximately $65,000 per month. The Debtors also owe fees to certain states as part of their workers' compensation program. For the twelve months beginning October 1, 2008, the Debtors project that they will owe approximately $150,550 in fees to the state of California, $89,500 in fees to the state of Washington, and $8,500 in fees to the state of Ohio.

59. The Debtors have also provided SRS with a pre-funded loss deposit account in the amount of $175,000 (the "SRS Account").[19] The Debtors replenish the SRS Account weekly. Adjusters at SRS have authority to settle workers' compensation claims out of the SRS Account in an amount of up to $15,000. Any settlements above that amount require approval from the Debtors.

---

[19] In addition, the Debtors have provided escrow accounts to their previous workers' compensation providers, to cover any claims that remain outstanding under those plans. Specifically, the Debtors have a $600,000 escrow account with Travelers Insurance, the Debtors workers' compensation insurance provider prior to Old Republic. The Debtors also have a $250,000 escrow account with Sedgewick, the Debtors' third-party administrator prior to SRS.

60.  Additionally, the Debtors participate in
"state" workers' compensation programs in Wyoming and
Puerto Rico (together, the "State Workers' Compensation
Programs").  In both jurisdictions, the Debtors pay a
premium based upon the total amount of payroll dollars
paid to workers employed in that jurisdiction.  The
Debtors employ 67 Employees in Wyoming and 135 Employees
in Puerto Rico.  Both State Workers' Compensation
Programs are administered by the jurisdiction.

61.  As of October 15, 2008, approximately four
hundred and sixty (460) workers' compensation claims
were pending against the Debtors, amounting to roughly
$20 million in potential liability.  The cost incurred
by the Debtors on a monthly basis in connection with the
Workers' Compensation Insurance and participation in the
State Workers' Compensation Programs is approximately
$774,000.[20]

62.  Failure to maintain the Workers' Compensation
Insurance in the various states in which the Debtors
conduct business or to continue participation in the

---

[20] This amount includes anticipated future workers' compensation
claims, and the costs associated with administration of such
claims.

State Workers' Compensation Programs could result in administrative or legal proceedings against the Debtors and their officers and directors.

63.   Accordingly, by this Motion, the Debtors seek entry of an order authorizing, but not directing, the Debtors to continue paying and/or contesting in good faith, as appropriate in the Debtors' business judgment, all amounts related to the Workers' Compensation Insurance and the State Workers' Compensation Programs in the ordinary course of business, including amounts that arose prior to the Petition Date.

**H.    Other Forms of Compensation.**

64.   The Debtors offer their Employees other forms of compensation, including paid time off, overtime pay and certain other benefits.  These forms of compensation are usual, customary and necessary if the Debtors are to retain qualified employees to operate their businesses.

**(1)   Paid Time Off.**

65.   All full-time and part-time Salaried and Hourly Employees are eligible to accrue or receive paid time off (the "Paid Time Off").  This Paid Time Off may

be used by Employees for vacation, holidays, sick days, or personal days.[21]

66. **Hourly Employees' Paid Time Off Policy.** All Hourly Employees with ninety (90) days or more of service with the Debtors accrue Paid Time Off for each hour worked. The rate of accrual varies based on the length of service.

67. These accrued hours of Paid Time Off may be used for any purpose, including sick time, vacation, holidays or personal business. Hourly Employees may carry any remaining accrued Paid Time Off over into the next fiscal year. Prior to the Petition Date, any unused, accrued Paid Time Off was paid to Employees upon termination of employment.

68. As of September 30, 2008, there were approximately 713,000 hours of Paid Time Off outstanding, with an approximate value of $9.2 million.[22] By this Motion, the Debtors seek entry of an order authorizing, but not directing, them to allow Hourly Employees to use

---

[21] Employees in the Debtors' Puerto Rico stores accrue separate sick days and vacation days.

[22] Puerto Rico Employees have accrued approximately $50,000 in sick and vacation hours.

accrued and unused Paid Time Off and to continue to
accrue Paid Time Off in the ordinary course of business.
However, at this time, the Debtors are not seeking
authorization to continue to pay an Employee for accrued,
unused Paid Time Off upon termination.

69.   The Debtors anticipate that their Hourly
Employees will utilize the accrued Paid Time Off in the
ordinary course of business without resulting in any
material cash flow requirements beyond the Debtors'
normal payroll obligations.  Use of Employee Paid Time
Off remains subject to ordinary course restrictions.

70.  **Salaried Employees' Paid Time Off Policy**.
Paid Time Off does not accrue for Salaried Employees and
there is no specified allowance of Paid Time Off
available to Salaried Employees.  Salaried Employees
must request permission to take Paid Time Off from their
supervisors and may take Paid Time Off to the extent
that such permission is granted.  The appropriate amount
of Paid Time Off for each Salaried Employee depends on
certain job-related factors and, in each case, will be
dependent on a supervisor's determination that the Paid
Time Off request does not conflict with immediate

business goals.  Salaried Employees are not due any pay

for unused Paid Time Off upon termination because Paid

Time Off does not accrue.

### (2) **Other Benefits.**

71.   The Debtors offer certain other benefit

programs to various groups of Employees, including, but

not limited to, business travel accident insurance, an

employee assistance program, an education assistance

program, associate in-store discounts, a car allowance

program, an executive financial planning program and an

executive physical program.  The Debtors believe that

these programs maintain Employee morale and help retain

the Debtors' workforce.  The cost of such programs for

the Debtors each pay period is not possible to calculate,

as most programs are based on fluctuating Employee

demand.  However, the Debtors assert that failing to

honor such programs would have an adverse affect on the

Debtors' Employees far in excess of the cost of

continuing such programs.  By this Motion, the Debtors

request entry of an order authorizing, but not directing,

the Debtors to continue such programs in their sole

discretion and make payments pursuant to such programs

in the ordinary course of business, including amounts outstanding as of the Petition Date.

72.   In addition, the Debtors have in place a number of other policies and programs, including, severance policies, certain additional short-term and long-term incentive plans and a board of directors deferred compensation plan.  At this time, the Debtors are not requesting authorization to make payments on account of prepetition amounts owed in connection with such policies and plans.  The Debtors are also not seeking authorization at this time to continue such programs in the ordinary course.  The Debtors are currently evaluating their need and ability to continue such programs and will seek relief with respect to such programs in later motions, as needed.  As such, this Motion is not intended to prejudice the Debtors' right to seek such relief, or any additional relief related to any Employee payments, benefits or programs, at a later date.

73.   The Debtor also have in place an employee stock purchase plan for certain eligible employees.  The Debtors suspended employee and matching employer

contributions to the employee stock purchase plan prior
to the petition date, in accordance with the terms of
the plan.  The Debtors are not presently seeking any
relief with respect to the employee stock purchase plan.
In addition, the Debtors have suspended their benefits
restoration plan and have suspended the provision of
executive retirement benefits.  As a result, the Debtors
are likewise not seeking relief with respect to these
plans.

74.  The Debtors have also offered a supplemental
401(k) plan to a select group of management and highly-
compensated employees whose contributions to the 401(k)
Plan are capped.  Under the supplemental 401(k) plan,
eligible Employees may elect to defer a percentage of
their pre-tax compensation and are eligible to receive
matching contributions from the Debtors under the same
terms as the 401(k) Plan.  Funds contributed to the
supplemental 401(k) plan are held in a "rabbi trust" and,
as a result, are subject to the claims of the Debtors'
creditors.  Accordingly, prior to the Petition Date, the
Debtors amended this plan to (i) immediately cease the
Debtors' matching contributions and (ii) allow Employees

to cease their salary contributions at any time, in
their sole discretion.  In addition, the amendments
prohibited any further contributions to the plan by
either the Employees or the Debtors after December 31,
2008.  Participating Employees will be notified of these
amendments as soon as practicable and advised that a
decision to cease contributions prior to December 31,
2008 may have adverse tax consequences.  The Debtors are
not currently seeking any additional relief with respect
to the supplemental 401(k) plan.

**I.    Social Security, Income Taxes and Other Withholding.**

75.  The Debtors routinely withhold from Employee
paychecks amounts that the Debtors are required to
transmit to third parties.  Examples of such withholding
include, among others, social security, FICA, federal
and state income taxes, garnishments, charitable
donations and health care payments.  The Debtors believe
that such withheld funds, to the extent that they remain
in the Debtors' possession, constitute funds held in
trust and, therefore, are not property of the Debtors'
bankruptcy estates.  Thus, the Debtors believe that they
have authority to direct such funds to the appropriate

parties in the ordinary course of business.  However, to the extent court authorization is necessary, the Debtors request entry of an order authorizing, but not directing, to direct such funds to the appropriate parties.

**J.    Direction to Banks.**

76.   Finally, the Debtors seek an order authorizing and directing the Debtors' banks to receive, process, honor and pay all of the Debtors' prepetition checks and fund transfers on account of any of the Prepetition Employee Obligations, and prohibiting the Debtors' banks from placing any holds on, or attempting to reverse, any automatic transfers to any account of an Employee or other party for Prepetition Employee Obligations.

77.   The Debtors also seek an order authorizing, but not directing, them to issue new postpetition checks or effect new postpetition fund transfers on account of the Prepetition Employee Obligations to replace any prepetition checks or fund transfer requests that may be dishonored or rejected.

**APPLICABLE AUTHORITY**

**II.  PAYMENT OF THE PREPETITION EMPLOYEE OBLIGATIONS
SHOULD BE AUTHORIZED UNDER BANKRUPTCY CODE
SECTION 507(a).**

78.  Bankruptcy Code sections 507(a)(4) and
507(a)(5) require that certain claims for prepetition
wages, salaries, commissions, vacation, sick leave and
employee benefit contributions be accorded priority in
payment in an amount not to exceed $10,950 for each
employee.  Because of the number of Employees working
for the Debtors, and because some amounts are unknown
pending submission of claims, the Debtors do not know
the exact amount due each Employee for the prepetition
period.  However, an overwhelming majority of the
Debtors' Employees are owed amounts under the $10,950
cap of Sections 507(a)(4) and 507(a)(5).  Accordingly,
granting the relief requested will not adversely affect
the Debtors' other unsecured creditors.

79.  To the extent that Employees are owed in
excess of these caps, payment of the Prepetition
Employee Obligations in such higher amounts is
nonetheless justified in this case.  An insubstantial
number of Employees may have claims for payment, after

accounting for all Prepetition Employee Obligations,
that exceed the $10,950 cap.  The amount by which these
claims exceed such cap, however would be <u>de minimis</u> in
relation to the Debtors' periodic gross payroll and the
value to the Debtors' reorganization efforts of honoring
all Prepetition Employee Obligations in the ordinary
course.  Moreover, the Debtors' Employees are extremely
important in maintaining the current value of the
Debtors' estates.

80.  Additionally, the Debtors believe that all
prepetition claims exceeding $10,950 have arisen in the
ordinary course of the business of the Debtors and are
reasonable in relation to the value of the services
rendered.

**III. THE PROPOSED PAYMENTS ARE APPROPRIATE UNDER
       BANKRUPTCY CODE SECTION 363.**

81.  Under Bankruptcy Code section 363, a
bankruptcy court is empowered to authorize a chapter 11
debtor to expend funds in the bankruptcy court's
discretion outside the ordinary course of business.  <u>See</u>
11 U.S.C. § 363.  In order to obtain approval for the
use of estate assets outside the ordinary course of

business, the debtor must articulate a valid business
justification for the requested use.  See In re
Ionosphere Clubs, Inc., 98 B.R. 174, 176 (Bankr. S.D.N.Y.
1985).  The preservation and protection of a debtor's
business, the retention of a debtor's currently working
employees and the maintenance of positive employee
morale provide a sufficient business justification for
payment of prepetition wage, salary, and benefit claims,
even if such payment were deemed to be outside the
ordinary course of business.  See id. at 175.

82.  Accordingly, this Court should grant the
requested relief under Bankruptcy Code section 363.

**IV.  PAYMENT OF THE PREPETITION EMPLOYEE OBLIGATIONS IS
APPROPRIATE UNDER BANKRUPTCY CODE SECTION 541.**

83.  The payment of the employee contribution
component of the Employer Taxes and 401(k) Plan or
payment of garnished wages will not prejudice the
Debtors' estates because such withholdings are held in
trust for the benefit of the related payees and, thus,
do not constitute property of the Debtors' estates under
Bankruptcy Code section 541.  See Begier v. IRS, 496 U.S.
53 (1990).  Moreover, payments which are critical to the

retention and morale of the Debtors' workforce actually

add value to the estates because an unplanned reduction

in Employee retention or productivity could have

disastrous effects on recoveries to unsecured creditors.

**IV.   PAYMENT OF THE PREPETITION EMPLOYEE OBLIGATIONS IS
AUTHORIZED UNDER BANKRUPTCY CODE SECTIONS 1107(a)
AND 1108.**

84.   The Debtors, operating their businesses as

debtors in possession under Bankruptcy Code sections

1107(a) and 1108, are fiduciaries "holding the

bankruptcy estate[s] and operating the business[es] for

the benefit of [their] creditors and (if the value

justifies) equity owners." In re CoServ, L.L.C., 273

B.R. 487, 497 (Bankr. N.D. Tex. 2002).  Implicit in the

duties of a chapter 11 debtor in possession is the duty

"to protect and preserve the estate, including an

operating business's going-concern value." Id.

85.   At least one court has noted that there are

instances in which a debtor in possession can fulfill

its fiduciary duty "only . . . by the preplan

satisfaction of a prepetition claim." See id.  The

CoServ court specifically noted that preplan

satisfaction of prepetition claims would be a valid

exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." Id. at 498. The court provided a three-pronged test for determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

Id. at 498.

86. Payment of the Prepetition Employee Obligations meets each element of the CoServ court's standard. First, as described above, the Employees likely maintain priority claims against the Debtors for the Prepetition Employee Obligations. In addition, any failure by the Debtors to pay the Prepetition Employee Obligations would have a severe negative impact on the morale of the Debtors' Employees at a critical time for the Debtors and their businesses.

87.   Second, the potential harm and economic disadvantage that would stem from the failure to pay the Prepetition Employee Obligations is grossly disproportionate to the amount of any prepetition claim that may be paid.  Absent payment of the Prepetition Employee Obligations, Employee morale would decrease dramatically, likely leading to the loss of key Employees, lower sales, and other sever business disruptions costing far in excess of the amount of the Prepetition Employee Obligations.

88.   Third, the Debtors have examined other options short of payment of the Prepetition Employee Obligations and have determined that to avoid significant disruption of the Debtors' business operations there exists no practical or legal alternative to payment of such obligations.

89.   Therefore, the Debtors can only meet their fiduciary duties as debtors in possession under Bankruptcy Code sections 1107(a) and 1108 by payment of the Prepetition Employee Obligations.

**V.    BANKRUPTCY CODE SECTION 105 AND THE DOCTRINE OF
NECESSITY SUPPORT PAYMENT OF THE PREPETITION
EMPLOYEE OBLIGATIONS.**

90.    The proposed payments of the Prepetition Employee Obligations should be authorized pursuant to Bankruptcy Code section 105 and under the "doctrine of necessity."

91.    Bankruptcy Code section 105 authorizes this Court "to issue any order . . . necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  11 U.S.C. § 105.  For the reasons set forth herein, and in light of the critical need for the Debtors to preserve the going concern value of their businesses in order to effect a successful reorganization through, among other things, preservation of the Debtors' workforce and its morale, payment of the Prepetition Employee Obligations as requested herein is proper in accordance with Bankruptcy Code section 105.

92.    Payment of the Prepetition Employee Obligations is further supported by the doctrine of necessity.  The doctrine of necessity is a well-settled doctrine that permits a bankruptcy court to authorize payment of certain prepetition claims prior to the

completion of the reorganization process where the
payment of such claims is necessary to the
reorganization.  See In re NVR L.P., 147 B.R. 126, 127
(Bankr. E.D. Va. 1992) ("[T]he court can permit pre-plan
payment of a pre-petition obligation when essential to
the continued operation of the debtor[,]" and must show
a "substantial necessity."); see also In re Just for
Feet, Inc., 242 B.R. 821, 826 (D. Del. 1999) (stating
that where the debtor "cannot survive" absent payment of
certain prepetition claims, the doctrine of necessity
should be invoked to permit payment).

93.  The doctrine of necessity is a widely accepted
component of modern bankruptcy jurisprudence.  See In re
NVR L.P., 147 B.R. at 127 ("[T]he 'necessity of payment'
rule is a narrow exception well-established in
bankruptcy common law."); Just For Feet, 242 B.R. at 826
(approving payment of key inventory suppliers'
prepetition claims when such suppliers could destroy
debtor's business by refusing to deliver new inventory
on eve of debtor's key sales season).

94.  For the reasons discussed herein, it is
evident that payment of the Employee Obligations is

necessary to the Debtors' effective reorganization.  In

particular, without payment of the Employee Obligations,

the Debtors' businesses and operations will be

detrimentally impacted through the reduction in Employee

morale and the potential loss of key Employees during a

critical time for the Debtors and their businesses,

especially in light of the upcoming holiday season – the

peak sales period for the Debtors.  Hence, this Court

should exercise its equitable powers to grant the relief

requested in this Motion.

## VI.   PAYMENT OF THE PREPETITION EMPLOYEE OBLIGATIONS IS WARRANTED UNDER BANKRUPTCY RULE 6003.

95.  Similarly, the relief requested is warranted

under Bankruptcy Rule 6003, which provides:

> Except to the extent that relief is necessary
> to avoid immediate and irreparable harm, the
> court shall not, within 20 days after the
> filing of the petition, grant relief regarding
> the following: . . . (b) a motion to use, sell,
> lease, or otherwise incur an obligation
> regarding property of the estate, including a
> motion to pay all or part of a claim that
> arose before the filing of the petition, but
> not a motion under Rule 4001.

Fed. R. Bankr. P. 6003.

96.  No court within the Fourth Circuit has

interpreted the "immediate and irreparable harm"

language in the context of Bankruptcy Rule 6003 in any
reported decision.[23]   However, the Fourth Circuit Court
of Appeals has interpreted the same language in the
context of preliminary injunctions.   In that context,
irreparable harm has been interpreted as a continuing
harm that cannot be adequately redressed by final relief
on the merits and for which money damages cannot provide
adequate compensation.   See, e.g., Hughes Network
Systems, Inc. v. Interdigital Communications Corp., 17
F.3d 691, 694 (4th Cir. 1994).   Further, the harm must
be shown to be actual and imminent, not speculative or
unsubstantiated.   See, e.g., Scotts Co. v. United
Industries Corp., 315 F.3d 264, 283, (4th Cir. 2002)
(citing Direx Israel, Ltd. v. Breakthrough Medical Corp.,
952 F.2d 802, 812 (4th Cir. 1991)).

    97.   To the extent that the requirements of
Bankruptcy Rule 6003 are applicable to the relief
requested in the Motion, the Debtors submit that for the

---

[23] Although there is not direct authority concerning Bankruptcy Rule
6003 in the Fourth Circuit, at least one bankruptcy court,
applying Bankruptcy Rule 6003, concluded that first-day relief in
a similar context was warranted because such relief was necessary
to avoid irreparable harm.   See In re First NLC Fin. Servs., LLC,
382 B.R. 547, 549-50 (Bankr. S.D. Fla. 2008) (holding that Rule
6003 permits entry of retention orders on an interim basis to
avoid irreparable harm).

reasons already set forth herein, the relief requested
in this Motion is necessary to avoid immediate and
irreparable harm as defined by the Fourth Circuit Court
of Appeals.

98.  Accordingly, the Court should allow the
payment of the Employee Obligations as requested herein.

99.  Numerous courts, including this Court, have
permitted the postpetition payment of prepetition wage
and salary obligations on the first day or in the early
stages of other chapter 11 bankruptcy cases.  See, e.g.,
In re Movie Gallery, Inc., Case No. 07- 33849 (DOT)
(Bankr. E.D. Va. Oct. 17, 2007); In re the Rowe Cos.,
Case Nos. 06-11143 through 06-11144 (SSM)(Bankr. E.D. Va.
Sep. 20, 2006); see also In re Goody's Family Clothing,
Inc., Case No. 08-11133 (CSS)(Bankr. D. Del. Jun. 11,
2008).

100. As a precaution, the proposed Order provides
that the relief granted therein shall not constitute or
be deemed an assumption of any of the employment and
service agreements to which the Debtors are a party or
any of the Debtors' employee benefit policies, plans,

programs, practices and procedures under Bankruptcy Code section 365(a).

101. Accordingly, for all of the foregoing reasons, the Debtors submit that cause exists for granting the relief requested herein.

## NOTICE

102. Notice of this Motion will be given to: (i) the Office of the United States Trustee for the Eastern District of Virginia; (ii) counsel to the agent for Debtors' postpetition lenders; (iii) counsel to the agent for the Debtors' prepetition lenders; and (iv) the Debtors' top fifty (50) largest unsecured creditors on a consolidated basis.  The Debtors submit that, under the circumstances, no other or further notice of the Motion is required.

## WAIVER OF MEMORANDUM OF LAW

103. Pursuant to Local Bankruptcy Rule 9013-1(G), and because there are no novel issues of law presented in the Motion and all applicable authority is set forth in the Motion, the Debtors request that the requirement that all motions be accompanied by a separate memorandum of law be waived.

## NO PRIOR REQUEST

104. No previous request for the relief sought

herein has been made to this Court or any other court.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an Order, substantially in the form annexed hereto, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated: November 10, 2008
      Richmond, Virginia

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
Gregg M. Galardi, Esq.
Ian S. Fredericks, Esq.
P.O. Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

           – and –

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
Chris L. Dickerson, Esq.
333 West Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

           – and –

MCGUIREWOODS LLP

/s/ Douglas M. Foley
Dion W. Hayes (VSB No. 34304)
Douglas Foley (VSB No. 34364)
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

Proposed Counsel for Debtors and Debtors in Possession

Gregg M. Galardi, Esq.    Dion W. Hayes (VSB No. 34304)
Ian S. Fredericks, Esq.    Douglas M. Foley (VSB No. 34364)
SKADDEN, ARPS, SLATE, MEAGHER &    MCGUIREWOODS LLP
FLOM, LLP    One James Center
One Rodney Square    901 E. Cary Street
PO Box 636    Richmond, Virginia 23219
Wilmington, Delaware 19899-0636    (804) 775-1000
(302) 651-3000

       - and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
333 West Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

Proposed Counsel to the Debtors
and Debtors in Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

- - - - - - - - - - - - - - x
               :
In re:         :   Chapter 11
               :
CIRCUIT CITY STORES, INC.,  :   Case No. 08- _____ (___)
<u>et al</u>.,            :
               :
         Debtors.   :   Jointly Administered
- - - - - - - - - - - - - - x

**ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105(a), 363,
507(a), 541, 1107(a) AND 1108 AND BANKRUPTCY RULE 6003
AUTHORIZING DEBTORS TO PAY PREPETITION WAGES,
COMPENSATION, AND EMPLOYEE BENEFITS**

Upon the motion (the "Motion")[1] of the Debtors

for an order, pursuant to Bankruptcy Code sections

---

[1] Capitalized terms not otherwise defined herein shall have the
meanings ascribed to such terms in the Motion.

105(a), 363, 507(a)(4), 507(a)(5), 541, 1107(a) and 1108

and Bankruptcy Rule 6003, (a) authorizing, but not

directing, the Debtors, <u>inter alia</u>, to pay prepetition

wages, salaries, bonuses, reimbursements, and other

compensation; (b) authorizing, but not directing, the

Debtors to continue the maintenance of all employee

benefit programs in the ordinary course; and

(c) directing all banks to honor prepetition checks for

payment of prepetition employee obligations; and the

Court having reviewed the Motion and the Besanko

Declaration; and the Court having determined that the

relief requested in the Motion is in the best interests

of the Debtors, their estates, their creditors, and

other parties in interest; and it appearing that proper

and adequate notice of the Motion has been given and

that no other or further notice is necessary; and upon

the record herein; and after due deliberation thereon;

and good and sufficient cause appearing therefor, it is

hereby

**ORDERED, ADJUDGED, AND DECREED that:**

1.    The Motion is GRANTED.

2

2.    The Debtors shall be and hereby are authorized to pay (including to any third parties that provide or aid in the monitoring, processing or administration of the Prepetition Employee Obligations), in their sole discretion, the Prepetition Employee Obligations as and when such obligations are due.

3.    The Debtors shall be and hereby are authorized, in their sole discretion, to honor and continue the Employee Expense Obligations and Employee Benefit Obligations that were in effect as of the Petition Date.

4.    The Debtors shall be and hereby are authorized, in their sole discretion, to pay the payroll processing fees owed to Hewitt Associates LLP as and when such fees are due.

5.    The Debtors shall be and hereby are authorized, but not directed, to pay American Express all amounts due under the terms of the Corporate Card Account Agreement as and when such obligations are due, and irrespective of whether those employees who have incurred the expense on the Debtors' behalf are still employed by the Debtors upon entry of this Order.

3

6.   American Express is authorized and directed to rely upon the representations of the Debtors as to which payments are authorized by this Order.

7.   The Debtors' banks shall be and hereby are authorized and directed to receive, process, honor and pay all prepetition and postpetition checks and fund transfers on account of the Prepetition Employee Obligations that had not been honored and paid as of the Petition Date, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.  The Debtors' banks are prohibited from placing any holds on, or attempting to reverse, any automatic transfers to any account of an Employee or other party for Prepetition Employee Obligations.

8.   The Debtors shall be and hereby are authorized to issue new postpetition checks or effect new postpetition fund transfers on account of the Prepetition Employee Obligations to replace any prepetition checks or fund transfer requests that may be dishonored or rejected.

9.   The Debtors may pay any and all withholding, including social security, FICA, federal

4

and state income taxes, garnishments, health care
payments, retirement fund withholding and other types of
withholding, whether these relate to the period prior to
the date of the Debtors' chapter 11 filings or
subsequent thereto.  Any party receiving payment from
the Debtors is authorized and directed to rely upon the
representations of the Debtors as to which payments are
authorized by this Order.

10.  The Court finds and determines that the
requirements of Bankruptcy Rule 6003 are satisfied and
that the relief requested is necessary to avoid
immediate and irreparable harm.

11.  Nothing in the Motion or this Order or
the relief granted (including any actions taken or
payments made by the Debtors pursuant to the relief)
shall (a) be construed as a request for authority to
assume any executory contract under Bankruptcy Code
section 365; (b) waive, affect or impair any of the
Debtors' rights, claims or defenses, including, but not
limited to, those arising from Bankruptcy Code section
365, other applicable law and any agreement; (c) grant
third-party beneficiary status or bestow any additional

5

rights on any third party; or (d) be otherwise

enforceable by any third party.

12.   Authorizations given to the Debtors in

this Order empower but do not direct the Debtors to

effectuate the payments specified herein.

13.   Notwithstanding Bankruptcy Rule 6004(h),

this Order shall be effective and enforceable

immediately upon entry hereof.

14.   The requirement under Local Rule 9013-1(G)

of the Local Rules for the United States Bankruptcy

Court for the Eastern District of Virginia to file a

memorandum of law in connection with the Motion is

hereby waived.

15.   This Court shall retain jurisdiction over

any and all matters arising from or related to the

implementation or interpretation of this Order.

Dated:  Richmond, Virginia
        November 10, 2008

_____
UNITED STATES BANKRUPTCY JUDGE

WE ASK FOR THIS:

Gregg M. Galardi, Esq.
Ian S. Fredericks, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
One Rodney Square
PO Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

        - and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
333 West Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

        - and -

/s/ Douglas M. Foley
Dion W. Hayes (VSB No. 34304)
Douglas M. Foley (VSB No. 34364)
MCGUIREWOODS LLP
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

Proposed Counsel to the Debtors
and Debtors in Possession

**CERTIFICATION OF ENDORSEMENT UNDER LOCAL RULE 9022-1(C)**

    I hereby certify that notice of the Debtors' intent
to seek entry of the foregoing proposed order was
provided to the parties identified in the Motion and
copy of this proposed order was provided to the Office
of the United States Trustee for the Eastern District of
Virginia prior to submission to this Court.

                /s/ Douglas M. Foley

7