Gregg M. Galardi, Esq.               Dion W. Hayes (VSB No. 34304)
Ian S. Fredericks, Esq.              Douglas M. Foley (VSB No. 34364)
SKADDEN, ARPS, SLATE, MEAGHER &      MCGUIREWOODS LLP
FLOM, LLP                            One James Center
One Rodney Square                    901 E. Cary Street
PO Box 636                           Richmond, Virginia 23219
Wilmington, Delaware 19899-0636      (804) 775-1000
(302) 651-3000

          - and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
333 West Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

Proposed Counsel to the Debtors
and Debtors in Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

- - - - - - - - - - - - - - x
                            :
In re:                      :   Chapter 11
                            :
CIRCUIT CITY STORES, INC.,  :   Case No. 08- _____ (___)
et al.,                     :
                            :
          Debtors.          :   Jointly Administered
- - - - - - - - - - - - - - x

**DEBTORS' MOTION FOR ORDER PURSUANT TO BANKRUPTCY CODE
SECTIONS 105(a), 363, 506, 507(a), 553, 1107(a), 1108
AND 1129(b) AND BANKRUPTCY RULE 6003 AUTHORIZING
CONTINUATION OF CERTAIN CUSTOMER PRACTICES**

The debtors and debtors in possession in the

above-captioned cases (collectively, the "Debtors"),[1]

---

[1]  The Debtors and the last four digits of their respective taxpayer
     identification numbers are as follows: Circuit City Stores, Inc.
                                                        *(cont'd)*

1

hereby move (the "Motion") this Court for entry of an

order, pursuant to sections 105(a), 363, 506, 507(a)(7),

553, 1107(a), 1108 and 1129(b)(2) of title 11 of the

United States Code (the "Bankruptcy Code") and Rule 6003

of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), authorizing, but not directing, the

continuation of prepetition customer practices and

programs that the Debtors deem necessary and in the best

interests of their estates, creditors and interest

holders.  In support of the Motion, the Debtors rely

upon and incorporate by reference the Declaration of

Bruce H. Besanko, Executive Vice President and Chief

Financial Officer of Circuit City Stores, Inc., in

Support of Chapter 11 Petitions and First Day Pleadings

(the "Besanko Declaration"), filed with the Court

_____
*(cont'd from previous page)*
(3875), Circuit City Stores West Coast, Inc. (0785), InterTAN,
Inc. (0875), Ventoux International, Inc. (1838), Circuit City
Purchasing Company, LLC (5170), CC Aviation, LLC (0841), CC
Distribution Company of Virginia, Inc. (2821), Circuit City
Properties, LLC (3353), Kinzer Technology, LLC (2157), Abbott
Advertising Agency, Inc. (4659), Patapsco Designs, Inc.(6796),
Sky Venture Corp. (0311), Prahs, Inc.(n/a), XSStuff, LLC (9263),
Mayland MN, LLC (6116), Courchevel, LLC (n/a), Orbyx Electronics,
LLC (3360), and Circuit City Stores PR, LLC (5512).  The address
for Circuit City Stores West Coast, Inc. is 9250 Sheridan
Boulevard, Westminster, Colorado 80031.  For all other Debtors,
the address is 9950 Mayland Drive, Richmond, Virginia 23233.

concurrently herewith.  In further support of the Motion,
the Debtors respectfully represent:

### JURISDICTION AND VENUE

1.    This Court has jurisdiction to consider
this Motion under 28 U.S.C. §§ 157 and 1334.  This is a
core proceeding under 28 U.S.C. § 157(b).  Venue of
these cases and this Motion in this district is proper
under 28 U.S.C. §§ 1408 and 1409.

2.    The statutory predicates for the relief
requested herein are Bankruptcy Code sections 105(a),
363, 506, 507(a)(7), 553, 1107(a), 1108 and 1129(b)(2).
Such relief is warranted pursuant to Bankruptcy Rule
6003.

### BACKGROUND

3.    On the date hereof (the "Petition Date"),
the Debtors filed voluntary petitions in this Court for
relief under chapter 11 of the Bankruptcy Code.  The
factual background regarding the Debtors, including
their business operations, their capital and debt
structure, and the events leading to the filing of these
bankruptcy cases, is set forth in detail in the Besanko

Declaration, filed concurrently herewith and fully
incorporated herein by reference.[2]

4.    The Debtors continue to manage and
operate their businesses as debtors in possession
pursuant to Bankruptcy Code sections 1107 and 1108.

5.    No trustee or examiner has been appointed
in these chapter 11 cases, and no committees have yet
been appointed or designated.

## RELIEF REQUESTED

6.    By this Motion, the Debtors seek entry of
an order authorizing, but not directing, the
Debtor (a) to receive, process and honor credit card
transactions in the ordinary course of business; (b) to
honor all rewards points earned through customers' use
of the Debtors' private label credit cards; (c) to honor
all obligations associated with Warranties (as defined
herein) and Guarantees (as defined herein) established
prior to the Petition Date; (d) to honor all Gift Cards
(as defined herein) issued prior to the Petition Date;
(e) to honor all obligations associated with the Rebates

---

[2] Capitalized terms not otherwise defined herein shall have the
meanings ascribed to them in the Besanko Declaration.

(as defined herein) offered prior to the Petition Date;
(f) to provide Refunds (as defined herein) to customers
with respect to products purchased prior to the Petition
Date; (g) to honor all obligations to the Customer
Service Providers (as defined herein) and (h) to honor
all such other similar policies, programs and practices
of the Debtors (collectively, the "Customer Satisfaction
Programs") in the ordinary course of business.

    7.    The Debtors further request that all
banks and other financial institutions on which checks
to their customers are drawn be authorized and directed
to receive, process, honor and pay any and all such
checks, whether presented prior to or after the Petition
Date, upon the receipt by each such bank of notice of
such authorization.

**BASIS FOR RELIEF**

    8.    Prior to the Petition Date, in the
ordinary course of their retail store business, the
Debtors provided their customers with certain benefits
in the form of the Customer Satisfaction Programs and,
as a result thereof, received payments from customers,
including, without limitation, payments for gift or

similar certificates (including Gift Cards) that customers had not yet redeemed for goods and payments for warranties on products purchased from the Debtors (collectively, the "Customer Obligations").

9.   In addition, Customers hold contingent pre-bankruptcy claims against the Debtors for refunds, returns, exchanges, certain satisfaction guarantees and other credit balances relating to goods sold or services rendered to customers in the ordinary course of business prior to the Petition Date (collectively, the "Customer Claims").

10.   The success and viability of the Debtors' business, and ultimately the Debtors' ability to successfully reorganize, are totally dependent upon the patronage and loyalty of their customers.  In this regard, the Debtors' Customer Satisfaction Programs are critical, and any delay in honoring the Debtors' obligations thereunder will severely and irreparably impair customer relations.  Any failure to honor prepetition Customer Obligations or pay the prepetition Customer Claims, for even a brief time, may well drive

away valuable customers, thereby harming the Debtors'
efforts to reorganize.

11.   Accordingly, the Debtors seek authority,
but not direction, to continue the Customer Satisfaction
Programs, including authority to honor prepetition
claims arising therefrom, in their sole discretion.   A
summary of the significant Customer Satisfaction
Programs follows.

**A.   Credit Card Processing.**

12.   The Debtors are parties to certain
agreements with credit card companies and processors
pursuant to which the Debtors are able to accept credit
card payments, subject to certain adjustments, returns,
promotional fees and refunds.

13.   The Debtors have an agreement with Chase
Bank USA, N.A. ("Chase") that provides for private label
and co-branded Visa credit cards available to the
Debtors customers, as discussed further below.   Another
agreement with Fifth Third Bank ("Fifth Third") governs
the processing and settlement of VISA, MasterCard and
Discover transactions, both in the Debtors' physical
stores and through the Debtors' online store.   Fifth

Third also handles the processing of debit card transactions. Additionally, the Debtors are parties to an agreement with American Express, which provides for the processing and settlement of American Express cards at all Debtors' stores and online.

14. On average, approximately 75% of the products sold at the Debtors' stores or through the Debtors' online store are purchased with credit cards or debit cards. Thus, the Debtors' continued ability to honor and process credit card and debit card transactions is essential to the Debtors' reorganization efforts and continued customer loyalty. Without this ability, the Debtors would lose a major avenue for conducting sales transactions in the ordinary course of their operations. Under the terms of their agreements, the Debtors are required to pay the credit card companies and processors fees for their services, certain amounts of which may have accrued but remain unpaid as of the Petition Date.

15.    During the seven months of fiscal year 2009,[3] ending September 30, 2008, the Debtors paid approximately $56.3 million in credit and debit card processing and related fees.  The Debtors request that they be authorized, but not directed, to continue to pay these fees in the ordinary course of business, including, but not limited to, amounts related to promotional fees, returns and exchanges, regardless of whether they arose pre- or postpetition, in order to avoid interruption of these vital credit card processing services and programs.

**B.    Circuit City Rewards Program.**

16.    As noted above, in the ordinary course of their business, the Debtors offer their customers the opportunity to purchase merchandise using two Circuit City labeled credit cards:  (1) a Circuit City private label credit card for use only at the Debtors stores and website; and (2) a Circuit City VISA credit card for use at the Debtors' stores and website, as well as at any other merchant that accepts VISA transactions (together, the "Circuit City Credit Cards"), both of which are

---

[3]  The fiscal year begins March 1 and ends the last day of February of each year.

administered by Chase.  By using the Circuit City Credit
Cards, customers are offered certain benefits (the
"Circuit City Rewards Program") in the form of either
rewards points or promotional financing.  Customers who
apply for the Circuit City Credit Cards are enrolled in
the Circuit City Rewards Program.  Enrolled customers
earn five (5) rewards points for every $1 dollar spent
on eligible purchases at the Debtors' physical stores or
online store, including warranty and installation
purchases.  Enrolled customers also have the option of
foregoing the rewards points and receiving various
promotional financing offers (_e.g._ no interest for 18
months). Customers with a co-branded Visa card also earn
1 point for every $1 spent on the card anywhere else
that the card is accepted.  Rewards points expire
thirty-six (36) months from the month they were earned.

17.  Customers who have earned 500 rewards
points pursuant to the Circuit City Rewards Program are
eligible to receive a $5 gift card for use at the
Debtors' stores or online store.  As a result, customers
may hold contingent claims against the Debtors for
rewards earned prior to the Petition Date.

18.  The ability to continue the Circuit City
Rewards Program is vital to the Debtors' ongoing
relationship with their customers and provides
significant benefit to the Debtors.  Ascertaining with
precision an estimate of the aggregate amount of rewards
points earned and not yet redeemed prior to the Petition
Date is impracticable.  However, the Debtors estimate
that each month, on average, customers redeem rewards
points for gift cards worth about $400,000 to $425,000.
This amount is minimal as compared to the benefit to the
Debtors.  Approximately 18% of the Debtors' total sales
are made on the Debtors' private label and co-branded
credit cards.  In addition, the Debtors are not required
to pay any processing fees in connection with these
sales.  Overall, the Debtors estimate that the benefit
from the Circuit City Credit Cards is approximately
$86.6 million per year.

19.  Accordingly, the Debtors request that
they be authorized, but not directed, to continue to
provide the Circuit City Credit Cards and to offer the
Circuit City Rewards Program associated therewith, in
the ordinary course of business.  The Debtors further

seek authority, but not direction, to continue to honor rewards points earned through the Circuit City Rewards Program, including rewards points earned prior to the Petition Date, in the ordinary course of business.

**C.    Warranties and Guarantees.**

20.    Prior to the Petition Date, the Debtors sold various product protection plans and made various guarantees with respect to their merchandise.

21.    **Private Label Product Warranties**.  The Debtors sell a variety of private label products in their stores and through their online store under the brand names "Element", "Verge" and "NexxTech".  The Debtors provide warranties on these products (the "Private Label Product Warranties") akin to the manufacturers' warranties offered on other products sold in the Debtors' stores.  The terms of the Private Label Product Warranties varies by product.  These warranties are very important to customers' decisions to purchase the private label products.  Debtors satisfy customers' Private Label Product Warranty claims by repairing or replacing any private label product found to be defective or broken during the warranty period.

22. **Installation and Repair Warranties**.
Through Firedog, the Debtors' service and repair
division, the Debtors offer a number of warranties on
their installation and repair services (collectively,
the "Installation and Repair Warranties" and, together
with the Private Label Product Warranties and any other
similar product or installation warranties, the
"Warranties"). For example, the Debtors provide a
number of guarantees to ensure timely and reliable
installation services, including installation of home
theaters and car stereos, and also offer certain
guarantees on repairs made at their repair centers.

23. **Satisfaction Guarantees**. The Debtors
also offer a number of satisfaction guarantees. For
example, if a customer finds a lower price at another
local store on a product sold by the Debtors, the
Debtors guarantee that they will beat the local
competitor's price by 10% of the difference (the
"Unbeatable Price Guarantee"). Similarly, the Debtors
guarantee that their brick-and-mortar stores will always
match the prices offered by their online store (the "One
Price Promise"). Finally, the Debtors' allow customers

to find and purchase products online for pick-up at a
local Circuit City store.  Where customers order
products online for pick-up, the Debtors guarantee that
the products will be available at the store for pick-up
within 24 minutes of ordering or the customer will
receive a $24 gift card (the "24/24 Guarantee" and,
together with the Unbeatable Price Guarantee and the One
Price Promise, the "Guarantees").

24.   Estimating the amount of obligations that
may arise through the Debtors' various Warranties and
Guarantees is impracticable. However, the ability to
continue to provide the Warranties and Guarantees is
vital to the Debtors' ongoing relationship with their
customers.  The Debtors believe that the increase in
customer loyalty generated by the Warranties and
Guarantees far outweighs the costs of such programs.
Accordingly, the Debtors seek authorization, but not
direction, to continue to honor Customer Obligations
under the Warranties and Guarantees in the ordinary
course of business, including obligations arising prior
to the Petition Date.

**D.    Gift Cards.**

25.   Prior to the Petition Date, the Debtors
sold, in the ordinary course of business, pre-paid gift
cards for use at any of the Debtors' stores or to
purchase goods through the Debtors' online store.
Customers have the option of purchasing gift cards in
any denomination between $5 and $2,000.   The Debtors
also offered merchandise cards to customers.
Merchandise cards are cards issued to customers for no
consideration paid or other value given by the customer
and are used for promotions.   Both gift cards and
merchandise cards are referred to herein as the "Gift
Cards".

26.   The activation and tracking of the Gift
Cards is administered by IPS Card Solutions, Inc.,
d/b/a/ ValueLink.   The Debtors pay approximately $56,000
per month for ValueLink's services.   Absent these
services, the Debtors would be unable to continue their
Gift Card program.

27.   As of the Petition Date, many customers
had not yet redeemed certain of the Gift Cards.   There

is currently no expiration on the Gift Cards.[4]  Thus,
when the customers in question purchased these Gift
Cards, they had every expectation that they would be
redeemable.  The Debtors estimate that, as of September
30, 2008, the approximate amount of outstanding
obligations with respect to Gift Cards is $41.2 million.

28.   The Debtors request authority, but not
direction, to continue to honor the Gift Cards in the
ordinary course of business, in accordance with their
terms, including Gift Cards purchased prior to the
Petition Date.

**E.    Rebates.**

29.   Prior to the Petition Date, the Debtors
offered customers a number of rebates (the "Rebates") on
products sold at the Debtors stores and online.  The
Rebates are promotions that allow customers to mail in
forms (the "Rebate Forms") to receive money back on
certain products.  On average, the Debtors provide
approximately $8.1 million to customers for Rebates each
month.

---

[4]  Unlike gift cards, merchandise cards do expire.  The expiration
     date varies based on the promotion for which the card was offered.

30.   The Debtors employ Parago, Inc. ("Parago") to administer their Rebate program.  On average, the Debtors pay Parago approximately $430,000 per month.

31.   The Debtors request authority, but not direction, to continue to offer the Rebates in the ordinary course of business, including Rebates for products purchased or Rebate Forms mailed in prior to the Petition Date.  The Debtors request authority, but not direction, to pay Parago in the ordinary course of business, including payment of fees owed as of the Petition Date.

**F.    Returns, Refunds and Exchanges.**

32.   If a customer is not satisfied with merchandise purchased in the Debtors' stores, the customer has the option to return or exchange the goods within thirty (30) days after the purchase date[5] so long as the customer has a receipt or the Debtors' have a record of the sale.  Merchandise purchased from the Debtors' online stores may be returned by mail or to one

---

[5]  Computers, digital cameras, printers, camcorders, and certain other electronic devices may only be returned within fourteen (14) days of purchase.

of the Debtors' stores.  Where merchandise is returned
by mail, the customer is responsible for all shipping
costs.

33.  As a result, certain customers also hold
contingent claims against the Debtors for refunds,
returns, exchanges and other credit balances
(collectively, the "Refunds") relating to goods sold to
customers, both at Circuit City stores and online, in
the ordinary course of business prior to the Petition
Date.

34.  Ascertaining with precision an estimate
of the aggregate amount of requests for Refunds for
merchandise purchased prior to the Petition Date is
impracticable.  However, the Debtors estimate that for
the year to date, through August 31, 2008, the
approximate percent of merchandise sold that was
returned is 11%.  For that period, approximately 35% of
the merchandise that was returned was exchanged for
other merchandise.

35.  The ability to continue to provide the
Refunds to customers is vital to the Debtors' ongoing
relationship with their customers.  The Debtors believe

that, without the ability to provide the Refunds, many
customers would be unwilling to purchase merchandise
from the Debtors' stores.  Accordingly, the Debtors seek
entry of an order authorizing, but not directing, them
to continue to provide Refunds and pay Customer Claims
associated therewith in the ordinary course of business,
including claims arising prior to the Petition Date.

**G.   Customer Service Providers.**

36.   In the ordinary course of their business, the
Debtors use the services of certain individuals who:
(a) provide services to the Debtors' customers on behalf
of the Debtors under licenses or other agreements
(including, without limitation, installation and repair
technicians), (b) have direct contact with the Debtors'
customers, and/or (c) are compensated by the Debtors,
who, in turn, receive customer payments for those
services (collectively, the "Customer Service
Providers").

37.   The Debtors utilize the services of Customer
Service Providers as part of their technical and other
customer service operations.  For example, when the
Debtors sell certain products that require technical

service, in some instances, these services are provided
by contracted technicians who are not employees of the
Debtors.  The Debtors also offer installation on a
number of products purchased in their stores.  This
installation is sometimes provided by installers who are
not directly employed by the Debtors.  In addition, the
Debtors operate a network of repair centers.  Certain of
the repair technicians at the Debtors' repair centers
are not directly employed by the Debtors.  Customer
Service Providers also work in the Debtors' customer
call centers and in a number of other customer service
capacities.

38.  Due to the commencement of these chapter 11
cases, the Debtors arguably are unable to pay the
Customer Service Providers certain sums earned by them
prior to the Petition Date out of sums that the Debtors
have already collected from customers.  If these
prepetition amounts are not paid, many of the Customer
Service Providers may refuse to perform additional
services for the Debtors.  In that event, the Debtors
will incur additional expenses to replace the Customer
Service Providers, which expenses will likely exceed the

amount of unpaid obligations for the Customer Service Providers' prepetition services.  Furthermore, because many customers associate the Customer Service Providers with the Debtors, their failure to perform will reflect badly on the Debtors and will damage customer loyalty.

39.  Finally, the rendition of services by the Customer Service Providers inevitably gives rise to complaints and claims which, as a rule, customers address directly to the Debtors.  In those instances in which customer claims arise as a result of the services of the Customer Service Providers, it is imperative to the Debtors' customer relations that they have the flexibility and discretion to resolve such claims in any manner that they deem appropriate and thereby minimize inconvenience to customers and loss of good will.

40.  Accordingly, the Debtors seek authority, but not direction, to continue to pay the Customer Service Providers in the ordinary course of business, including for amounts accrued prior to the Petition Date.

APPLICABLE AUTHORITY

**I.   BANKRUPTCY CODE SECTION 507(a)(7) AUTHORIZES HONORING THE CUSTOMER CLAIMS AND OBLIGATIONS.**

41.   A portion of the obligations of the Debtors to their customers may be entitled to priority treatment pursuant to Bankruptcy Code section 507(a)(7), which grants a seventh-level priority to

> allowed unsecured claims of individuals, to the extent of $2,425 for each such individual, arising from the deposit, before the commencement of the case, of money in connection with the purchase, lease, or rental of property, or the purchase of services, for the personal, family, or household use of such individuals, that were not delivered or provided.

11 U.S.C. § 507(a)(7).  Money collected prepetition by the Debtors pursuant to the Customer Satisfaction Programs falls within this priority category.

42.   For example, the purchase of a gift card or warranty represents a "deposit . . . of money in connection with the purchase . . . of property, or the purchase of services, for the personal, family, or household use of such individual."  Furthermore, unless this motion is granted, such "deposits" will represent payment for goods or services "that were not delivered

or provided." Thus, the Debtors' customers who

participated in the Customer Satisfaction Programs

described above will likely be entitled to receive

payment in full before payment of claims of general

unsecured creditors.

**II.  HONORING CUSTOMER CLAIMS AND OBLIGATIONS IS
     APPROPRIATE UNDER BANKRUPTCY CODE SECTIONS 506, 553
     AND 1129(b)(2).**

43.  The Debtors believe that the certain of

their customers who participate in the Customer

Satisfaction Programs have outstanding accounts

receivable owed to the Debtors as of the Petition Date.

In the event that the Debtors failed to honor the valid

Customer Obligations, the Debtors believe that these

customers would assert their right to offset any amounts

owed to them by the Debtors under the Customer

Satisfaction Programs against any receivables that such

customers owed to the Debtors.

44.  To the extent that both of such

obligations arose prior to the Petition Date, Bankruptcy

Code section 553 provides that the Bankruptcy Code has

no effect on such setoff rights.  See 11 U.S.C. § 553.

Furthermore, Bankruptcy Code section 506 provides that

customers with such setoff rights would be considered
secured creditors.  See id. 11 U.S.C. § 506.  Thus,
pursuant to Bankruptcy Code section 1129(b)(2) payment
to such customers would be required under any plan of
reorganization prior to any payment to the Debtors'
unsecured creditors.  See, e.g., 11 U.S.C.
§ 1129(b)(2)(B)(ii).  Such payment does not, therefore,
prejudice the Debtors' unsecured creditors.

45.  Even if the customers cannot exercise
rights of setoff, because for example the Customer
Obligation arose only after the customer's purchase of
the Debtors' goods, the Debtors believe that a certain
of their customers with valid Customer Claims may have a
remedy for the recovery of their Customer Claims through
recoupment.  In order for recoupment to apply, the debts
owed by the Customer and by the Debtors must "arise out
of a single integrated transaction so that it would be
inequitable for the debtor to enjoy the benefits of that
transaction without also meeting its obligations."  In
re Univ. Med. Ctr., 973 F.2d 1065, 1081 (3d Cir. 1992);
see also In re Camellia Food Stores, Inc., 287 B.R. 52,
61 (Bankr. E.D. Va. 2002) (applying the Third Circuit's

"integrated transaction" test as set out in In re Univ.
Med. Ctr. and noting that the Fourth Circuit has
implicitly endorsed this test).

46. Because the customers that might not be
able to assert setoff rights, may be able to establish a
valid remedy through recoupment, such customers would be
in the same position as those customers with setoff
rights, i.e., entitled to payment in full.  Moreover,
the automatic stay of Bankruptcy Code section 362 would
not prevent such customers from exercising their valid
recoupment defenses.  See In re Univ. Med. Ctr., 973
F.2d at 1080.  Thus, the payment of such Customers'
Claims would likewise be required under any plan of
reorganization and would not prejudice the Debtors'
unsecured creditors.

47. In the event that the Customer Claims are
not paid and the customers resort to asserting setoff
rights or recoupment defenses, the Debtors would be
required to expend time, expenses, and resources either
responding to such customers' lift stay requests in
order to assert setoff rights or otherwise challenging,
to the extent appropriate, any invalid recoupment

defense asserted by the customers.  The Debtors believe
that they would thereby incur added and unnecessary
administrative expenses in addition to the ill will of
their customers, both to the detriment of the Debtors'
creditors and other parties in interest.

48.  In contrast, payment of valid Customer
Obligations and maintenance of the Customer Satisfaction
Programs as set forth herein, will (i) provide the
Debtors with a means of efficiently processing the
Customer Claims and (ii) reduce the administrative
expenses the Debtors would otherwise face if compelled
to challenge any customers' exercise of purported setoff
rights or recoupment defenses.  In addition, as noted
above, such payment will allow the Debtors to maintain
positive relations with their customers.

49.  Accordingly, the payment contemplated
hereby will not diminish the assets of the Debtors'
estates to the detriment of unsecured creditors.
Moreover, such payment is consistent with the priority
of payment of claims under the Bankruptcy Code.

### III. HONORING CUSTOMER CLAIMS AND OBLIGATIONS IS APPROPRIATE UNDER BANKRUPTCY CODE SECTION 363.

50.    Under Bankruptcy Code section 363, a bankruptcy court is empowered to authorize a chapter 11 debtor to expend funds in the bankruptcy court's discretion outside the ordinary course of business. See 11 U.S.C. § 363.  In order to obtain approval for the use of estate assets outside the ordinary course of business, the debtor must articulate a valid business justification for the requested use.  See In re Ionosphere Clubs, Inc., 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1985).  The preservation and protection of a debtor's business, the retention of a debtor's customer base and the maintenance of customer loyalty provide a sufficient business justification for payment of the Customer Obligations, even if such payment were deemed to be outside the ordinary course of business.  See id. at 175.

51.    Accordingly, this Court should grant the requested relief under Bankruptcy Code section 363.

IV.   HONORING CUSTOMER CLAIMS AND OBLIGATIONS AND
      MAINTAINING THE CUSTOMER SATISFACTION PROGRAMS IS
      APPROPRIATE UNDER SECTIONS 1107(a) AND 1108.

52.   The Debtors, operating their businesses as
debtors in possession under Bankruptcy Code sections
1107(a) and 1108, are fiduciaries "holding the
bankruptcy estate[s] and operating the business[es] for
the benefit of [their] creditors and (if the value
justifies) equity owners."  In re CoServ, L.L.C., 273
B.R. 487, 497 (Bankr. N.D. Tex. 2002).  Implicit in the
duties of a chapter 11 debtor in possession is the duty
"to protect and preserve the estate, including an
operating business's going-concern value."  Id.

53.   Courts have noted that there are
instances in which a debtor in possession can fulfill
its fiduciary duty "only . . . by the preplan
satisfaction of a prepetition claim."  Id.  The CoServ
court specifically noted that preplan satisfaction of
prepetition claims would be a valid exercise of a
debtor's fiduciary duty when the payment "is the only
means to effect a substantial enhancement of the
estate."  Id. at 498.  The court provided a three-
pronged test for determining whether a preplan payment on

account of a prepetition claim was a valid exercise of a

debtor's fiduciary duty:

> First, it must be critical that the debtor
> deal with the claimant.  Second, unless it
> deals with the claimant, the debtor risks the
> probability of harm, or, alternatively, loss
> of economic advantage to the estate or the
> debtor's going concern value, which is
> disproportionate to the amount of the
> claimant's prepetition claim.  Third, there is
> no practical or legal alternative by which the
> debtor can deal with the claimant other than
> by payment of the claim.

Id. at 498.

54.  Honoring the Customer Obligations and

maintaining the Customer Satisfaction Programs meets

each element of the CoServ court's standard.  First, as

described above, the success and ultimate viability of

the Debtors' businesses is dependent upon customer

loyalty.  In the Debtors' business judgment, the

uninterrupted maintenance of their Customer Satisfaction

Programs is essential to maintaining such loyalty.

55.  Second, the disruption and adverse

publicity that would necessarily result from the failure

to meet Customer Obligations or from discontinuing the

Customer Satisfaction Programs would threaten the

Debtors' customer base and ultimately, their ability to

successfully reorganize, thereby causing harm to the Debtors that is grossly disproportionate to the cost of the Customer Obligations and Customer Satisfaction Programs.

56.    Third, the Debtors have examined other options short of payment of the Customer Obligations and continuation of the Customer Satisfaction Programs and have determined that to avoid significant disruption of the Debtors' business operations there exists no practical or legal alternative to payment of such obligations.

57.    Therefore, the Debtors can meet their fiduciary duties as debtors in possession under Bankruptcy Code sections 1107(a) and 1108 only by maintaining the Customer Satisfaction Programs and by honoring legitimate Customer Obligations.

**V.    BANKRUPTCY CODE SECTION 105 AND THE DOCTRINE OF NECESSITY SUPPORT PAYMENT OF THE CUSTOMER CLAIMS AND OBLIGATIONS AND MAINTENANCE OF THE CUSTOMER SATISFACTION PROGRAMS.**

58.    Payment of the valid Customer Obligations and the continuation of the Customer Satisfaction Programs in the ordinary course may also be authorized

under Bankruptcy Code section 105(a) and the "doctrine

of necessity".

59.  Under Bankruptcy Code section 105, this

Court "may issue any order . . . that is necessary or

appropriate to carry out the provisions of" the

Bankruptcy Code.  11 U.S.C. § 105(a).  For the reasons

set forth above, and in light of the need for the

Debtors to preserve the going concern value of their

businesses through, among other things, the maintenance

of the Customer Satisfaction Programs, the relief

requested herein is proper and should be granted.

60.  The continuation of the Customer

Satisfaction Programs is further supported by the

doctrine of necessity.  The doctrine of necessity is a

well-settled doctrine that permits a bankruptcy court to

authorize payment of certain prepetition claims prior to

the completion of the reorganization process where the

payment of such claims is necessary to the

reorganization.  See In re NVR L.P., 147 B.R. 126, 127

(Bankr. E.D. Va. 1992) ("[T]he court can permit pre-plan

payment of a pre-petition obligation when essential to

the continued operation of the debtor[,]" and must show

a "substantial necessity."); see also In re Just for

Feet, Inc., 242 B.R. 821, 826 (D. Del. 1999) (stating

that where the debtor "cannot survive" absent payment of

certain prepetition claims, the doctrine of necessity

should be invoked to permit payment).

61.   The doctrine of necessity is a widely

accepted component of modern bankruptcy jurisprudence.

See In re NVR L.P., 147 B.R. at 127 ("[T]he 'necessity

of payment' rule is a narrow exception well-established

in bankruptcy common law."); Just For Feet, 242 B.R. at

826 (approving payment of key inventory suppliers'

prepetition claims when such suppliers could destroy

debtor's business by refusing to deliver new inventory

on eve of debtor's key sales season).

62.   For the reasons discussed herein, it is

evident that maintenance of the Customer Satisfaction

Programs, including payment of any prepetition Customer

Obligations and Customer Claims associated therewith, is

necessary to the Debtors' effective reorganization.  In

particular, absent continuation of the Customer

Satisfaction Programs, the Debtors' businesses and

operations will be detrimentally impacted due to the

resulting injury to the Debtors' reputation and loss of consumer loyalty during a critical time for the Debtors and their businesses. This impact would be magnified by the fact that it would fall during the holiday season – historically the peak sales period for the Debtors. Hence, this Court should exercise its equitable powers to grant the relief requested in this Motion.

## VI. PAYMENT OF THE CUSTOMER CLAIMS AND OBLIGATIONS IS WARRANTED UNDER BANKRUPTCY RULE 6003.

63.   Similarly, the relief requested is warranted under Bankruptcy Rule 6003, which provides:

> Except to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 20 days after the filing of the petition, grant relief regarding the following: . . . (b) a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition, but not a motion under Rule 4001.

Fed. R. Bankr. P. 6003.

64.   No court within the Fourth Circuit has interpreted the "immediate and irreparable harm" language in the context of Bankruptcy Rule 6003 in any

reported decision.[6]  However, the Fourth Circuit Court of
Appeals has interpreted the same language in the context
of preliminary injunctions.  In that context,
irreparable harm has been interpreted as a continuing
harm that cannot be adequately redressed by final relief
on the merits and for which money damages cannot provide
adequate compensation.  See, e.g., Hughes Network
Systems, Inc. v. Interdigital Communications Corp., 17
F.3d 691, 694 (4th Cir. 1994).  Further, the harm must
be shown to be actual and imminent, not speculative or
unsubstantiated.  See, e.g., Scotts Co. v. United
Industries Corp., 315 F.3d 264, 283, (4th Cir. 2002)
(citing Direx Israel, Ltd. v. Breakthrough Medical Corp.,
952 F.2d 802, 812 (4th Cir. 1991)).

    65.  The Customer Satisfaction Programs
sustain a positive reputation in the marketplace, ensure
customer loyalty and satisfaction, and prevent the

---

[6] Although there is not direct authority concerning Bankruptcy Rule
6003 in the Fourth Circuit, at least one bankruptcy court,
applying Bankruptcy Rule 6003, concluded that first-day relief in
a similar context was warranted because such relief was necessary
to avoid irreparable harm.  See In re First NLC Fin. Servs., LLC,
382 B.R. 547, 549-50 (Bankr. S.D. Fla. 2008) (holding that Rule
6003 permits entry of retention orders on an interim basis to
avoid irreparable harm).

driving away of valuable customers that would result if
the Debtors did not honor their obligations to their
customers.  Therefore, to the extent that the
requirements of Bankruptcy Rule 6003 are applicable to
the relief requested in the Motion, the Debtors submit
that for the reasons already set forth herein, the
relief requested in this Motion is necessary to avoid
immediate and irreparable harm as defined by the Fourth
Circuit Court of Appeals.

66.  Accordingly, the Court should allow the
continuation of the Customer Satisfaction Programs and
payment of valid Customer Obligations.

67.  Where retaining the loyalty of customers
is critical to the successful chapter 11 cases, courts
in this District and elsewhere have authorized debtors
to honor certain prepetition obligations to customers
and to continue customer programs.  See, e.g., In re
Movie Gallery, Inc., Case No. 07-33849 (DOT)(Bankr. E.D.
Va. Oct. 18, 2007); In re the Rowe Cos., Case No. 06-
11142 (SSM)(Bankr. E.D. Va. Sep. 20, 2006); In re US
Airways, Inc., Case No. 04-13819 (SSM)(Bankr. E.D. Va.
Sep. 14, 2004); In re Tweeter Home Entertainment Group,

<u>Inc.</u>, Case No. 07-10787 (PJW)(Bankr. D. Del. Jun. 12,
2007).

68.  Nothing herein shall be deemed an
assumption or adoption of any policy, program, practice,
contract or agreement or shall otherwise affect the
Debtors' rights under Bankruptcy Code section 365 to
assume or reject any executory contract or unexpired
lease.

69.  The Debtors do not at this time request
authorization to assume as executory contracts any
prepetition obligations to customers.  Rather, the
Debtors simply request authorization to continue the
Customer Satisfaction Programs and satisfy Customer
Obligations, as the Debtors believe, in the exercise of
their business judgment, are necessary and in their best
interests and in the best interests of their estates,
creditors and interest holders.

## NOTICE

70.  Notice of this Motion will be given to:
(i) the Office of the United States Trustee for the
Eastern District of Virginia; (ii) counsel to the agent

for Debtors' postpetition lenders; (iii) counsel to the
agent for the Debtors' prepetition lenders; and (iv) the
Debtors' top fifty (50) largest unsecured creditors on a
consolidated basis.  The Debtors submit that, under the
circumstances, no other or further notice of the Motion
is required.

### WAIVER OF MEMORANDUM OF LAW

71.  Pursuant to Local Bankruptcy Rule 9013-
1(G), and because there are no novel issues of law
presented in the Motion and all applicable authority is
set forth in the Motion, the Debtors request that the
requirement that all motions be accompanied by a
separate memorandum of law be waived.

### NO PRIOR REQUEST

72.  No previous request for the relief sought
herein has been made to this Court or any other court.

**CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court enter an Order, substantially in the form annexed hereto, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated: November 10, 2008
      Richmond, Virginia

                        SKADDEN, ARPS, SLATE, MEAGHER &
                        FLOM, LLP
                        Gregg M. Galardi, Esq.
                        Ian S. Fredericks, Esq.
                        P.O. Box 636
                        Wilmington, Delaware 19899-0636
                        (302) 651-3000

                                - and -

                        SKADDEN, ARPS, SLATE, MEAGHER &
                        FLOM, LLP
                        Chris L. Dickerson, Esq.
                        333 West Wacker Drive
                        Chicago, Illinois 60606
                        (312) 407-0700

                                - and -

                        MCGUIREWOODS LLP

                        /s/ Douglas M. Foley
                        Dion W. Hayes (VSB No. 34304)
                        Douglas Foley (VSB No. 34364)
                        One James Center
                        901 E. Cary Street
                        Richmond, Virginia 23219
                        (804) 775-1000

                        Proposed Counsel for Debtors and
                        Debtors in Possession

Gregg M. Galardi, Esq.            Dion W. Hayes (VSB No. 34304)
Ian S. Fredericks, Esq.           Douglas M. Foley (VSB No. 34364)
SKADDEN, ARPS, SLATE, MEAGHER &   MCGUIREWOODS LLP
FLOM, LLP                         One James Center
One Rodney Square                 901 E. Cary Street
PO Box 636                        Richmond, Virginia 23219
Wilmington, Delaware 19899-0636   (804) 775-1000
(302) 651-3000

                - and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
333 West Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

Proposed Counsel to the Debtors
and Debtors in Possession

              IN THE UNITED STATES BANKRUPTCY COURT
               FOR THE EASTERN DISTRICT OF VIRGINIA
                        RICHMOND DIVISION

- - - - - - - - - - - - - - x
                            :
In re:                      :   Chapter 11
                            :
CIRCUIT CITY STORES, INC.,  :   Case No. 08- _____ (____)
et al.,                     :
                            :
            Debtors.        :   Jointly Administered
- - - - - - - - - - - - - - x

      ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105(a),
      363, 506, 507(a), 553, 1107(a), 1108 AND 1129(b) AND
         BANKRUPTCY RULE 6003 AUTHORIZING CONTINUATION
               OF CERTAIN CUSTOMER PRACTICES

          Upon the motion (the "Motion")[1] of the Debtors

for an order, pursuant to Bankruptcy Code sections

---

[1]  Capitalized terms not otherwise defined herein shall have the
     meanings ascribed to such terms in the Motion.

105(a), 363, 506, 507(a)(7), 553, 1107(a) and 1108 and

Bankruptcy Rule 6003, authorizing, but not directing,

the continuation of prepetition customer practices and

programs that the Debtors deem necessary and in the best

interests of their estates, creditors and interest

holders; and the Court having reviewed the Motion and

the Besanko Declaration; and the Court having determined

that the relief requested in the Motion is in the best

interests of the Debtors, their estates, their creditors,

and other parties in interest; and it appearing that

proper and adequate notice of the Motion has been given

and that no other or further notice is necessary; and

upon the record herein; and after due deliberation

thereon; and good and sufficient cause appearing

therefor, it is hereby

   **ORDERED, ADJUDGED AND DECREED that:**

   1.    The Motion is GRANTED.

   2.    The Debtors are authorized, but not

directed, to continue those prepetition Customer

Satisfaction Programs and honor those Customer

Obligations that they deem necessary and in the best

interests of their estates, creditors and interest

holders, in the same manner as such programs and

obligations were implemented and honored before the

commencement of these chapter 11 cases.

3.    The Debtors are authorized, but not

directed, to continue, renew, replace, modify and/or

terminate such of their Customer Satisfaction Programs

as they deem appropriate, in their discretion, and in

the ordinary course of business, without further

application to the Court.

4.    The Debtors are authorized to continue to

receive, process and honor credit card transactions and

debit transactions in the ordinary course of their

business and to continue to pay processing and related

fees to credit card companies, credit card processors

and debit service providers.  The Debtors are further

authorized to pay prepetition processing and related

fees to credit card companies, credit card processors

and debit service providers.

5.    All applicable banks and other financial

institutions are hereby authorized and directed to

receive, process, honor and pay any and all checks

evidencing amounts paid by the Debtors pursuant to the

Motion, whether presented prior to or after the Petition
Date.

6.   The Court finds and determines that the
requirements of Bankruptcy Rule 6003 are satisfied and
that the relief requested is necessary to avoid
immediate and irreparable harm.

7.   Nothing in the Motion shall be deemed a
request for authority to assume, and nothing in this
Order shall be deemed to constitute postpetition
assumption or adoption of any agreement under Bankruptcy
Code section 365.

8.   Notwithstanding Bankruptcy Rule 6004(h),
this Order shall be effective and enforceable
immediately upon entry hereof.

9.   The requirement under Local Rule 9013-1(G)
of the Local Rules for the United States Bankruptcy
Court for the Eastern District of Virginia to file a
memorandum of law in connection with the Motion is
hereby waived.

10.  This Court shall retain jurisdiction over
any and all matters arising from or related to the
implementation or interpretation of this Order.

Dated:  Richmond, Virginia
        November 10, 2008


_____
UNITED STATES BANKRUPTCY JUDGE


WE ASK FOR THIS:

Gregg M. Galardi, Esq.
Ian S. Fredericks, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
One Rodney Square
PO Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

        - and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
333 West Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

        - and -

/s/ Douglas M. Foley
Dion W. Hayes (VSB No. 34304)
Douglas M. Foley (VSB No. 34364)
MCGUIREWOODS LLP
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

Proposed Counsel to the Debtors
and Debtors in Possession

**CERTIFICATION OF ENDORSEMENT UNDER LOCAL RULE 9022-1(C)**

I hereby certify that notice of the Debtors' intent
to seek entry of the foregoing proposed order was
provided to the parties identified in the Motion and
copy of this proposed order was provided to the Office
of the United States Trustee for the Eastern District of
Virginia prior to submission to this Court.

/s/ Douglas M. Foley