Gregg M. Galardi, Esq.
Ian S. Fredericks, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
One Rodney Square
PO Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

Dion W. Hayes (VSB No. 34304)
Douglas M. Foley (VSB No. 34364)
MCGUIREWOODS LLP
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

                  - and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
333 West Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

Proposed Counsel to the Debtors
and Debtors in Possession

              IN THE UNITED STATES BANKRUPTCY COURT
               FOR THE EASTERN DISTRICT OF VIRGINIA
                        RICHMOND DIVISION

- - - - - - - - - - - - - - x
In re:                      :   Chapter 11
                            :
CIRCUIT CITY STORES, INC.,  :   Case No. 08- _____ (___)
et al.,                     :
                            :
             Debtors.       :   Jointly Administered
- - - - - - - - - - - - - - x

**CORRECTED DECLARATION OF BRUCE H. BESANKO,
EXECUTIVE VICE PRESIDENT AND CHIEF FINANCIAL
OFFICER OF CIRCUIT CITY STORES, INC., IN SUPPORT
OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

        I, Bruce H. Besanko, being duly sworn, depose

and say:

        1.    I am an Executive Vice President and the

Chief Financial Officer of Circuit City Stores, Inc.

("Circuit City"), a corporation incorporated under the

laws of the Commonwealth of Virginia.  Circuit City is
the ultimate parent of each of the other entities (the
"Subsidiary Debtors," and together with Circuit City,
the "Debtors" or the "Company") that will commence
proceedings under chapter 11 of title 11, United States
Code (the "Bankruptcy Code").[1]  I am authorized to submit
this Declaration in support of the Debtors' chapter 11
petitions and the first day pleadings described herein.[2]

2.   I am familiar with the Debtors' day-to-
day operations, business affairs, and books and records.
I have also reviewed the Debtors' "First Day Motions and
Orders" and am familiar with the facts alleged therein
and relief requested.  I have personal knowledge of the
facts, circumstances and other matters set forth in the

---

[1]     The Debtors and the last four digits of their respective
taxpayer identification numbers are as follows: Circuit City
Stores, Inc. (3875), Circuit City Stores West Coast, Inc.
(0785), InterTAN, Inc. (0875), Ventoux International, Inc.
(1838), Circuit City Purchasing Company, LLC (5170), CC
Aviation, LLC (0841), CC Distribution Company of Virginia, Inc.
(2821), Circuit City Properties, LLC (3353), Kinzer Technology,
LLC (2157), Abbott Advertising Agency, Inc. (4659), Patapsco
Designs, Inc.(6796), Sky Venture Corp. (0311), Prahs,
Inc.(n/a), XSStuff, LLC (9263), Mayland MN, LLC (6116),
Courcheval, LLC (n/a), Orbyx Electronics, LLC (3360), and
Circuit City Stores PR, LLC (5512).

[2]     Unless otherwise defined, capitalized terms used herein shall
have the meanings ascribed to them in the relevant First Day
Motion (defined below).

First Day Motions and Orders and in this Declaration or
have gained knowledge of such matters from the Company's
officers, employees or retained advisers that report to
me in the ordinary course of my responsibilities as an
Executive Vice President and the Chief Financial Officer.
If called as a witness, I would testify thereto and as
follows:

**A.    The Bankruptcy Cases.**

3.    On November 10, 2008 (the "Petition
Date"), Circuit City and the Subsidiary Debtors will
each commence a bankruptcy case by filing a petition for
relief in this Court under chapter 11 of title 11 of the
United States Code, 11 U.S.C. §§ 101-1532, as amended
(the "Bankruptcy Code").

4.    On the Petition Date, InterTAN Canada,
Ltd. ("InterTAN", and collectively with all non-debtor
subsidiaries of Circuit City, the "Non-Debtor
Subsidiaries"), a direct subsidiary of Circuit City,
will also commence proceedings under The Companies'
Creditors Arrangement Act (the "CCAA") in Canada.

**B.     The Company's Corporate Structure.**

5.     Founded in 1949, Circuit City is a publicly-held Virginia corporation, whose stock is traded on the New York Stock Exchange.[3]  The Subsidiary Debtors are all privately held corporations and limited liability companies organized under the laws of Puerto Rico and the States of Virginia, Delaware, Maryland and California.  Circuit City is the direct or indirect parent or owner of all of the Subsidiary Debtors, in whole or in part with other Subsidiary Debtors.

**C.     The Company's Capital Structure.**

6.     Prior to the Petition Date, certain Debtors were parties to that certain Second Amended and Restated Credit Agreement (the "Credit Agreement") that provided for a revolving credit facility with various lenders, including Bank of America, N.A.  as agent ("Bank of America"), in the maximum amount of $1.3 billion of revolving commitments (the "Revolving Credit

---

[3]     On October 24, 2008, Circuit City received a notice from the New York Stock Exchange (the "Exchange") that the Company did not satisfy one of the Exchange's standards for continued listing applicable to its common stock.  The Company has not yet determined the specific action or response in response to the Exchange's notice.

Facility"). The Revolving Credit Facility is secured by first priority liens on and security interests in, among other things, goods, general intangibles, payment intangibles, accounts, and inventory. As of the Petition Date, the amount outstanding under the Credit Agreement is expected to be approximately $898 million.

7.   As an operator of a chain of electronic stores, online websites and a telephone product call center, the Company purchases inventory from over one thousand merchandise vendors and purchases supplies necessary to operate their business from approximately 6500 supply vendors. Historically, the Company purchases merchandise under normal purchase commitments in the ordinary course of business. As of the Petition, the Company estimates that their unsecured trade debt will total not less than approximately $650,000,000.

8.   Finally, the principal shareholders of Circuit City common stock (the "Stock") include HBK Master Fund, L.P., an investment fund holding approximately 8.7% of the Stock, First Pacific Advisors, LLC, an investment advisory firm holding approximately 7.4% of the Stock, Classic Fund Management

Aktiengesellschaft, also an investment fund holding approximately 4.8% of the Stock, and Wattles Capital Management, LLC ("Wattles Capital"), which has as its sole member, manager and owner Mark J. Wattles ("Wattles")and holds approximately 6.5% of the Stock.

**D.   The Company's Business.**

9.    Based in Richmond, Virginia, the Company is a leading specialty retailer of consumer electronics and operates large nationwide electronics stores that sell, among other things, televisions, home theatre systems, computers, camcorders, furniture, software, imaging and telecommunications products, and other audio and video electronics.   The Company's major brand names include Samsung, Apple, Panasonic, Sony, Hewlett-Packard, Toshiba, Nikon, Garmin, and Canon USA.

10.   As of the Petition Date, the Company operates approximately 712 Superstores and 9 outlet stores under the Circuit City name throughout the United States and Puerto Rico.   The Company also maintains two websites -- www.circuitcity.com and www.firedog.com -- for, among other things, online product sales, product information, customer service, and investor information,

as well as a phone-order call center -- 1 800 THE CITY -
- for, among other things, telephone product sales and
customer service.

11.   The Company operates its business through
a large, diverse workforce located throughout the
country and Puerto Rico.  This workforce, comprised of
approximately 39,600 full and part-time employees in
their stores, their corporate headquarters in Richmond
and their distribution centers, is highly trained to
manage the Company's day-to-day and long-term
operational needs and goals.  During the upcoming
Christmas shopping season, the Company anticipates
employing approximately 11,000 additional part-time
employees.  In addition, the Company uses various
independent contractors to perform, among other services,
home theater installation services through firedog[SM].

12.   Circuit City also maintains an
international presence through InterTAN.[4]  Headquartered
in Barrie, Ontario, InterTAN is engaged in the business

---

[4]   Although InterTAN is a wholly owned subsidiary, InterTAN
operates with separate officers, directors and employees in
Canada.

of selling consumer electronics in Canada under the
trade name The Source By Circuit City$^{SM}$.  InterTAN's
operations consist of 770 retail stores and dealer
outlets in Alberta, British Columbia, Manitoba,
Newfoundland, Northwest Territories, Nova Scotia,
Nunavut, Ontario, Prince Edward Island, Quebec,
Saskatchewan, and the Yukon.  Additionally, InterTAN
maintains a website -- www.thesource.ca -- to sell
products similar to those sold on the Company's site.

**E.   Recent Events.**

13.   <u>The Proxy Contest</u>.  In January 2008, the
Company received a notice from one of its largest
shareholders -- Wattles Capital.  The notice informed
the Company that Wattles Capital intended to nominate
for election to Circuit City's Board of Directors (the
"Board") five individuals Wattles Capital had selected.
The notice contemplated that the nomination would take
place during the Company's Annual Meeting of
Shareholders (the "Annual Meeting").

14.   In February 2008, the Company received an
additional notice from Wattles Capital.  In this notice,
Wattles Capital informed the Company that it intended to

8

submit two business proposals for consideration at the
Annual Meeting.  One proposal sought to remove without
cause each member of the Board (other than any directors
that Wattles Capital would nominate and shareholders
would elect at the Annual Meeting). The other proposal
sought to repeal any amendments to the Company's bylaws,
or any new bylaws, adopted by the Board between August
21, 2007, and up through and including the date of the
Annual Meeting.  Additionally, this proposal provided
that the Board may not reinstate or amend any amended
bylaw or new bylaw that is later repealed by
shareholders pursuant to the proposal.

15.  To avoid a proxy solicitation contest, on
May 8, 2008, the Company entered into an agreement with
Wattles Capital, Wattles himself, James A. Marcum,
Elliott Wahle, Don R. Kornstein, Anthony Bergamo and
Alexander M. Bond (collectively, the "Wattles Group")
pertaining to the election of directors to the Board at
the Annual Meeting and certain other proposals.  Under
the agreement, the Wattles Group agreed to withdraw its
director nominations and business proposals and cease
its solicitation efforts.  The Company agreed to select

and nominate three of Marcum, Wahle, Kornstein and

Bergamo for election to the Board at the Annual Meeting.

16.  At the Annual Meeting, Circuit City's

shareholders elected Wahle, Kornstein and Marcum to the

Board.  Wahle was elected as a director for a three-year

term; Kornstein was elected as a director for a two-year

term; and Marcum was elected as a director for a one-

year term.

17.  The Pursuit of Strategic Partners.  While

the Company was working to avoid a proxy solicitation

contest, the Company received an offer from Blockbuster,

Inc.  To assist with evaluating the offer and exploring

other strategic alternatives, in May 2008, the Company

retained Goldman, Sachs & Co.

18.  After consultation with Goldman Sachs,

and at the insistence of its largest shareholder, HBK

Investments, Circuit City allowed Blockbuster Inc. to

review due diligence materials.  In addition, Circuit

City sought to obtain competing bids from other third

parties.  After reviewing these materials, Blockbuster

eventually rescinded its offer to purchase Circuit City,

and no other third party elected to proceed with an alternate transaction.

19.   Thereafter, Goldman Sachs continued to explore strategic alternatives and otherwise assist the Company until September 2008.

20.   The Management Change.  In August 2008, after being elected to the Board, Marcum was appointed to serve as vice chairman.  Marcum was selected for the position because of his high degree of experience in retail turnaround situations.

21.   On September 22, 2008, Circuit City announced that its then present chairman, president and chief executive officer agreed to step down from his positions and resign as a director of Circuit City.  In response, the Board appointed Marcum to fill the vacant positions by serving as acting president and chief executive officer of Circuit City.

22.   Currently, Mr. Marcum is leading the Company's turnaround efforts with the assistance of the Company's senior management and advisors.

23.   Retention of Turnaround Professionals. As part of his efforts to turnaround the Company, Marcum

sought the assistance of various leading turnaround professionals, including Rothschild, FTI Consulting, Inc. and Skadden, Arps, Slate, Meagher & Flom, LLP.

**F.    The Company's Recent Performance.**

24.   Due to the substantial efforts of the Company and its employees, for the fiscal year ending February 29, 2008, Company generated revenues of approximately $11.74 billion.  However, notwithstanding these efforts, Company generated net operating losses of approximately $319.9 million.  As a result, the Company had experienced two consecutive years of losses.

25.   On September 30, 2008, the Company filed its latest 10-Q (the "September 10-Q").  In the September 10-Q, the Company stated that its books and records reflected total combined assets of approximately $3,400,080,000 (book value) and total combined liabilities of approximately $2,323,328,000.  In addition, the September 10-Q reflected that, during the six-month commencing March 1, 2008, and ending August 31, 2008, the Company experienced additional losses of approximately $403,989,000.  The largest driver of

declining performance was a double-digit decline in in-store traffic from the previous year.

**G.    The Company's Pre-Filing Turnaround Efforts.**

26.    As referenced in the September 10-Q and press releases released thereafter, to improve financial performance and to implement a global turnaround, the Company pursued three primary objectives.  First, the Company sought to restore its brand and retain existing and attract new customers.  Second, the Company sought to discontinue unprofitable or unnecessary stores and markets through store closings and layoffs.  Finally, the Company sought to preserve and, in some instances, improve vendor relations.

27.    To address the first objective -- brand restoration and customer retention and attraction, the Company determined that it was necessary to implement widespread operational changes.  These operational changes consisted of, among other things, the following: (i) differentiating their business from other electronics retailers by focusing on elevating the customer service standards in all stores; (ii) improving merchandising standards; (iii) increasing in-stock

levels on key items and advertised products; (iv)
advertising and pricing changes, including launching a
new pricing initiative -- the "One Price Promise" --
where customers pay the same price for merchandise
whether they purchase the merchandise over the internet
or in-store and increased broadcast advertising; and (v)
improving overall in-store environments.

28.   To begin to address the second objective
-- discontinuing unprofitable or unnecessary stores, in
October 2008, the Company began soliciting offers from
potential liquidation firms to conduct store closing
sales (the "Store Closing Sales") at one hundred fifty-
four stores (the "Closing Stores") and liquidate the
Company's inventory and certain other assets therein.
To that end, in or about mid-October, the Company
obtained confidentiality agreements from six (6)
national liquidation firms.

29.   After discussions with the liquidation
firms, the Company was provided initial bids from two
distinct joint ventures, neither of which proposals was
acceptable and, thus, the Company commenced negotiations
regarding revised bid structures.

30.   Again, the Company received two proposals, and began negotiating with the joint venture that provided the better of the two proposals.   These negotiations continued for two days and resulted in the terms of a formal bid in the form of a store closing agency agreement (the "Store Closing Agreement").   The Company provided the Store Closing Agreement to the other joint venture bidder with a request to submit its highest or otherwise best bid.   That joint venture declined to do so.

31.   Based on the bid submitted by the joint venture comprised of Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (the "Agent"), and with advice of its advisors and with consent of Bank of America, the Company determined that proceeding with the Store Closing Sales according to the terms of the Store Closing Agreement was in its best interest and the best interests of its stakeholders.   Accordingly, on October 31, 2008, the Agent and the Company executed the Store

Closing Agreement.[5]  Thereafter, on November 5, 2008, the

Agent began the Store Closing Sales at the Closing

Stores.  Presently, the Agent is conducting the Store

Closing Sales.

32.  As a result of the Store Closing Sales,

the Company will necessarily lay-off both during and at

the conclusion of such sale, numerous employees that are

no longer needed for continued operations.  In addition

to these layoffs, the Company determined that an overall

reduction in workforce was necessary.  Accordingly, on

November 7, 2008, the Company laid-off approximately 700

employees.

33.  Finally, to address the third objective –

- improved vendor relations, the Company sought to

maintain a transparent dialogue with various members of

its merchandise vendor community, especially its largest

vendors.  This began approximately one year ago and has

continued through all of 2008.  In recent months, the

Company has been engaged in frequent communication with

---

[5]   On November 4, 2008, the Debtors and Agent amended and
      restated the Store Closing Agreement to address certain non-
      material issues that arose following October 31, 2008.

its vendor community.  In particular, the Company has
held many face-to-face meetings with its key vendors.
During these meetings, the Company apprised vendors of
the Company's turnaround efforts, operational changes,
and long-term strategy.

**H.   Events Leading To The Filing Of The Chapter 11
Cases.**

34.  Notwithstanding the Company's efforts,
the Company will be forced to commence chapter 11
proceedings to attempt to restore positive financial
performance and continue its turnaround efforts.  In
large part, a chapter 11 filing is due to three factors,
all of which contributed to a liquidity crisis that
prevented the Company from completing its turnaround
goals outside of formal proceedings:  (i) erosion of
vendor confidence; (ii) decreased liquidity; and (iii) a
global economic crisis.

35.  Although the Company worked hard to
preserve and, in some instances, enhance vendor
relations, the Company's efforts did not instill the
widespread vendor confidence the Company needed.  Many
of the Company's merchandise and other vendors altered

17

their relationships with the Company to the Company's detriment.  Specifically, various merchandise vendors restricted the Company's available trade credit and reduced payment terms; in some instances, the Company's terms were changed to cash in advance.  These two factors alone significantly strained operations because the Company found it more difficult to sustain adequate product inventory and other store supply levels.

36.  More notably, the Company found itself with additional liquidity problems due to significantly decreased availability under the Revolving Credit Facility, which resulted from three distinct, but related factors.  First, to pay vendors, the Company was forced to fund such payments, in part, through borrowings under the Revolving Credit Facility.  Second, because the Company was unable to purchase as much inventory as it otherwise would have had vendors not restricted trade credit and terms, the Debtors' availability under the Revolving Credit Facility, which is calculated based on, among other factors, inventory levels, decreased.  Third, in October 2008, the Agent conducted a valuation of the Company's inventory.  Using

the new valuation, the calculation under the Revolving
Credit Facility resulted in further decreased
availability.

37.   Faced with these issues, the Company also
found that additional liquidity was not available
through traditional channels, such as the credit markets.
This was due to the widespread liquidity crisis among
all major banks and other lending institutions
throughout the country.  Accordingly, the Company could
not access additional liquidity from third party sources.

38.   Lastly, the Company found itself -- like
all other businesses -- entrenched in the worst economic
crisis since the Great Depression.  As fallouts from the
mortgage crisis rippled through the United States
economy, the Company witnessed firsthand the significant
negative effects.  These effects have taken many forms,
not the least of which is decreased customer traffic in
stores.  Simply stated, over the past several months,
consumers have been unable to borrow funds through
credit cards, let alone home equity loans, to purchase
household and other electronics products, which had a

drastic effect on sales because 75% of the Company's
sales are generated through credit card purchases.

39.   While these factors were all negatively
impacting the Company, the Company was expecting a
significant undisputed income tax refund of
approximately $75 million from the Internal Revenue
Service.   The Company was optimistic that if the refund
arrived promptly, the refund would address immediate
short-term liquidity needs and allow the Company to
further investigate out-of-court restructuring
alternatives.   Notwithstanding indications from the
Internal Revenue Service, the Company has not yet
received the refund.

40.   These external events, coupled with the
Company's overall poor performance, necessitated further
restructuring initiatives, which the Company determined
could only be accomplished under chapter 11 of the
Bankruptcy Code.   Without immediate relief, the Company
is concerned that it will not receive goods for Black
Friday and the upcoming holiday season, which could
cause irreparable harm to the Company and its
stakeholders.

I.    **Objectives Of The Chapter 11 Filing.**

41.    The Company commenced these Chapter 11 cases to promptly and efficiently restructure their capital structure and operational footprint.  In that regard, the Company has commenced these cases with the immediate goal of obtaining three significant types of relief designed to meet the Company's long-term turnaround and financial performance objectives: (i) approval of adequate postpetition financing to ensure a smooth transition into chapter 11; (ii) authorization to continue the Store Closing Sales; and (iii) rejection of unnecessary unexpired leases of non-residential real property and, upon conclusion of the Store Closing Sales, rejection or assume and assignment of additional leases. Additionally, the Company will commence these cases with the goal of emerging during or shortly after the first quarter of 2009.

42.    Once these initial goals are satisfied, the Company will attempt to work closely with its vendors and enhance customer relations and hopes that it will be in a position to emerge from chapter 11 in first half of 2009.

**FIRST DAY MOTIONS AND ORDERS**

43.  In furtherance of its restructuring objectives, the Company expects to file a number of first day motions (the "First Day Motions") and proposed orders (the "Proposed Orders"), each as listed on the attached Exhibit A, and respectfully request that the Court consider entering the Proposed Orders granting such First Day Motions.  I have reviewed each of the First Day Motions and Proposed Orders (including the exhibits thereto) and the facts set forth therein are true and correct to the best of my knowledge, information and belief, with appropriate reliance on corporate officers and advisors.  Moreover, I believe that the relief sought in each of the First Day Motions and Proposed Orders (a) is vital to enable the Debtors to make the transition to, and operate in, chapter 11 with a minimum interruption or disruption to their businesses or loss of productivity or value, (b) constitutes a critical element in achieving the Debtors' successful reorganization, and (c) ensures that the Company complies with applicable non-bankruptcy law,

to the extent such law remains applicable in a chapter 11 bankruptcy proceeding.

**A.    Administrative Motions.**

44.   The Company will file five "administrative" motions, which (i) request a first day hearing on the Petition Date to consider the relief requested in each of the Motions, (ii) seek to have the Debtors' bankruptcy cases jointly administered, (iii) seek retention of Kurtzman Carson Consultants, LLC as claims, noticing and balloting agent, (iv) seek approval of case management procedures, and (v) request authority to file a consolidated list of the fifty (50) largest unsecured creditors, all as more fully set forth in items 1 through 5 on Exhibit A hereto.

**B.    Motions To Continue Certain Banking And Business Practices And Continue Intercompany Transactions.**

45.   The Company will file two motions to continue their ordinary course banking and intercompany practices, as noted in items 6 and 7 on Exhibit A hereto.

46.   The Company's cash management system is comprised of numerous Bank Accounts.  Collections and disbursements are managed through well-established cash

management procedures utilized by the Company.  These
procedures constitute ordinary, usual and essential
business practices and are similar to those used by
other major corporate retail enterprises.  Through the
Company's cash management system, the Company is able to
centrally manage all of its cash flow needs and includes
the necessary accounting controls to enable the Company,
as well as creditors and the Court, to trace funds
through the system and ensure that all transactions are
adequately documented and readily ascertainable.

47.  In connection with its cash management
system and the Company's overall operations, the Company
established various banking and business practices,
including use of numerous business forms (including,
without limitation, letterhead, purchase orders,
invoices, contracts and checks) and investment practices.
These practices were tailored to the Company's day-to-
day and long-term needs and, as such, were specifically
designed and implemented for the Company.

48.  Finally, in the ordinary course of
business, the Company conducts transactions among the
members of Circuit City's corporate family, i.e.,

InterTAN, the Subsidiary Debtors and the Non-Debtor
Subsidiaries.  These transactions relate to, among other
things, intercompany loans, insurance policies and
intercompany services.  The Company engages in these
intercompany transactions for a variety of reasons, not
the least of which include tax benefits and reduced
costs.

**C.    Payment of Employee, Payroll Obligations, Certain
Taxes and Workers Compensation Insurance.**

49.  The Company will file a motion seeking
authority to continue paying various employee
obligations, as set forth in item 8 on Exhibit A hereto.

50.  To minimize the personal hardship that
the Employees will suffer if prepetition Employee-
related obligations are not paid when due, and to
maintain the Employee's morale during this critical time,
it is important to pay and/or perform, as applicable,
among other employee related obligations:
(i) prepetition obligations to current employees and to
continue certain non-working day policies, employee
benefit plans and employee programs; (ii) reimburse
Employees for prepetition expenses Employees incurred on

behalf of the Company; and (iii) pay all related
prepetition withholdings and payroll-related taxes.  In
this regard, I believe that no Employee is presently
owed in excess of $10,950 for prepetition wages or
salaries.

51.   In the motion, the Company also seeks
authority to maintain its workers' compensation
insurance programs.  Failure to maintain workers'
compensation insurance in the various states in which
the Company does business could result in administrative
or legal proceedings against the Company and its
officers and directors.

**D.   Motions for Payment of Other Critical Business
Expenditures.**

52.   The Company will also file a number of
motions seeking authority to make critical business
expenditures on account of: (i) sales, use, trust fund
and other taxes (as set forth in item 9 on Exhibit A
hereto); (ii) utility adequate assurance of payment
requirements (as set forth in item 10 on Exhibit A
hereto), honoring various customer programs and
practices (as set forth in item 11 on Exhibit A hereto),

shipping and delivery charges (as set forth in item 12

on Exhibit A hereto), liens held by third party

contractors and other service providers (as set forth in

item 13 on Exhibit A hereto), purchases from and other

transactions with foreign vendors (as set forth in item

14 on Exhibit A hereto).  The Company has likewise filed

a motion seeking to maintain existing insurance policies,

including payment of premiums, brokers fees and other

amounts due to third party service providers, and to

continue intercompany insurance related transactions (as

set forth in item 15 on Exhibit A hereto).  The Company

also filed a motion seeking certain relief related to

goods in-transit as of the Petition Date and reclamation

claims (as set forth in item 16 on Exhibit A hereto).

53.  Taxes.  In the ordinary course of

business, the Company incurs various taxes, including

state and local sales and use tax liabilities (the

"Taxes").  Prior to the Petition Date, the Company was,

for the most part, current on their obligations with

respect to these Taxes.  The only obligations

outstanding represent taxes that have accrued, but are

not yet legally due.  Withholding payment of the Taxes

likely would cause taxing and other authorities to take precipitous action, including a marked increase in state audits, a flurry of lien filings or lift stay motions, and significant administrative problems.

54. <u>Utilities</u>.  The Company received and continues to receive water, gas, electricity, telephone, and similar utility products and services (collectively, the "Utility Services") from the Utility Companies covering a number of utility accounts.  The services provided by the Utility Companies are crucial to the Company's continued operations.  I also believe that the procedures that the Company has proposed for the Utility Companies adequately protect such Utility Companies' rights, while also protecting the Company's need for continuous and uninterrupted Utility Services. Additionally, All postpetition obligations owed to the Utility Companies will be paid in a timely manner and that the Company has, or will continue to have, sufficient funds from operations and their proposed postpetition financing to satisfy such obligations.

55. <u>Customer Programs</u>.  The success and viability of the Company's business, and ultimately the

Company's ability to successfully reorganize, are totally dependent upon the patronage and loyalty of their customers.  In this regard, the Company's programs aimed at customer satisfaction, including gift cards, returns, refunds, exchanges, rebates, warranties, guarantees and reward points (collectively, the "Customer Satisfaction Programs"), are critical, and any delay in honoring the Company's obligations thereunder will severely and irreparably impair customer relations.

56.  Shippers.  In the normal course of their businesses, the Company incurs certain fees and charges to third party shippers, haulers, common carriers and other transporters (the "Shippers").  The Company is liable to various Shippers for shipment of the Company's merchandise among the Company's vendors, distribution centers and stores and from overseas.  If these claims are not paid, many of the Company's shippers may refuse to perform additional services for the Company, requiring the Company to replace such shippers, at considerable cost to the Company and its bankruptcy estate.  Moreover, because of the Company's delivery system, if the shippers refused to ship, the Company may

risk having inadequate in-store inventory, which could

be potentially devastating to the Company's

reorganization efforts.

57. Lien Claimants.  The Company utilizes

various Contractors to provide ongoing construction,

repair and maintenance work at the Company's service

centers, distribution centers and other facilities.

Although the Company has generally made timely payments

to the Contractors, as of the Petition Date, a

substantial number of the Contractors may not have been

paid for certain prepetition services provided.  As a

result, certain Contractors may refuse to perform their

ongoing obligations to the Company.  Absent such

services, the physical condition of certain of the

Company's stores, service centers, distribution centers

and other facilities would deteriorate and the Company

would be unable to complete their projects in a timely

fashion.  Moreover, failure to pay such amounts could

give rise to mechanics', artisans', repairmen's, or

other like liens or interests in property.

58.  Foreign Vendors.  The Company transacts

business with numerous Foreign Vendors in countries

including, but not limited to Brazil, Canada, China, France, Germany, Great Britain, Hong Kong, India, Ireland, Italy, Japan, Korea, Malaysia, Mexico, New Zealand, Romania, and Taiwan.  Some of the Foreign Vendors manufacture merchandise for the Company, including digital electronic devices and electronics accessories.  Others provide equipment for the stores themselves.  The Company seeks authority to pay the prepetition claims of these Foreign Vendors.  Without these vendors, the Company would likely be unable to provide merchandise to the Company's customers. Moreover, many of the Foreign Vendors are not subject to the jurisdiction of this Court, which would enable the Foreign Vendors to cease doing business with the Company.

59.  Insurance.  In connection with the operation of its businesses and management of its properties, the Company maintains various Insurance Policies and engages in intercompany insurance related transactions.  Maintenance of insurance coverage under the various Insurance Policies is essential to the operation of the Company's business and is required under the United States Trustee's Operating Guidelines

31

for Chapter 11 Cases (the "Operating Guidelines"), the laws of the various states in which the Company operates and the Company's various financial agreements.  In connection with the Insurance Policies, the Company utilizes the services of various third party services providers, including brokers and claims' consultants. Certain third parties may be owed amounts as of the Petition Date.  Failure to pay such amounts could result in loss of services, which would drastically impact the Company's ability to renew coverage and process claims. Finally, with respect to intercompany transactions, the Company, among other things, purchases Insurance Policies for all (or nearly all) Subsidiary Debtors and Non-Debtor Subsidiaries and records these transactions on the various entities' books and records.  These transactions are necessary to ensure all entities maintain adequate insurance and save the Company considerable costs.

60.   <u>Goods in Transit and Reclamation Claims</u>. The Company seeks confirmation that vendors will have administrative expense priority claims for those undisputed obligations arising from the Company's

numerous prepetition purchase orders outstanding on the

Petition Date relating to the shipments of goods

received and accepted by the Company on or after the

Petition Date and for authority to pay for such goods in

the ordinary course of business.  By confirming

administrative expense status, the Company will have the

ability to provide vendors with comfort that they will

be paid for such goods and will avoid vendors stopping

in-transit shipments before they arrived at the Company.

61.  The Motion also seeks authority to

establish certain procedures related to addressing

reclamation claims.

**E.    Approval of Debtor-in-Possession Financing.**

62.  The Company will also file a motion for

interim and final orders authorizing postpetition

financing, use of cash collateral, and provision of

adequate protection to the lenders under the prepetition

Revolving Credit Facility (the "Prepetition Lenders")

(as set forth in item 17 on Exhibit A hereto).

63.  The proposed financing arrangements

currently consist of a revolving credit facility of $1.1

billion, which amount would be reduced to $900 million

on December 29, 2008 following the holiday season (the
"DIP Facility").  As noted above, the prepetition
Revolving Credit Facility consists of a $1.3 billion
revolver, of which the Company had drawn approximately
$898 million prepetition (the "Prepetition
Indebtedness").  The DIP Facility contemplates the
repayment of outstanding amounts under the Revolving
Credit Facility (save for certain amounts owed by
InterTAN and its subsidiaries), following which Bank of
America (as agent and lender under the Revolving Credit
Facility) and certain of the other Prepetition Lenders
would become lenders under the DIP Facility.  By rolling
the Revolving Credit Facility into the DIP Facility, the
Company should be able to maintain adequate liquidity to
operate these cases through the critical holiday season.
For the reasons set forth below, it is essential that
the Court approve this motion.

64.  <u>The Immediate Need For Financing</u>.  As
discussed above, the Company has experienced operational
losses for two consecutive years.  As set forth above,
the losses experienced by the Company are attributable
to a number of factors.  As the Company continued to

operate and work through these issues, ongoing losses
have been largely funded by increased borrowings under
the Revolving Credit Facility.  These outstanding
borrowings, along with reductions in the borrowing base
under the Revolving Credit Facility, ultimately reduced
the Debtors' available funding under the Revolving
Credit Facility and jeopardized continued operations.

65.  Accordingly, the Debtors have an
immediate need to access the DIP Loans and use
collateral under the Revolving Credit Facility (the
"Prepetition Collateral"), including any cash collateral
generated thereby (the "Cash Collateral"), in order to
permit, among other things, the orderly continuation of
the operation of their businesses and the completion of
the restructuring process.  The Company's use of the
Prepetition Collateral in general and access to the Cash
Collateral specifically are necessary in order to ensure
that the Company has sufficient working capital and
liquidity to operate its businesses and thus preserve
and maintain the going concern value of the Debtors'
estates, which, in turn, is integral to maximizing
recoveries for the Company's stakeholders. This is

particularly critical as the Company approach the
crucial holiday sales period.

66.   To secure continued shipment of goods,
pay employees and maintain the operation of their
businesses as they restructure, the Company must have
immediate access to continued and additional financing
in the form of the DIP Facility.  Such financing will
enable the Company to begin restoring critical
relationships and retain employees, and maintain or
restore trade terms and obtain sufficient merchandise
for the upcoming holiday season.  Moreover, access to
such financing on an interim basis is necessary to avoid
immediate and irreparable harm to the Company pending
the Final Hearing.

67.   Entry Into The DIP Credit Agreements.  As
noted above, over the past several months the Company
has struggled in the face of continued losses and
decreasing liquidity.  In response to these challenges,
the Company instituted a restructuring plan under which
the Company began the process of closing certain
underperforming stores.  In addition, the Company, with

the assistance of its advisors, continued its search for equity investors and sources of additional financing.

68. Despite these efforts, the Company could not obtain any unsecured financing, nor could it and its advisors locate an entity willing to provide a loan that afforded the Company sufficient liquidity but was subordinated to the liens of the Prepetition Lenders. Nor could the Company obtain an additional equity investment from any potential strategic partner.

69. Faced with this situation, the Company's choices were to (a) enter into a DIP Loan with the Prepetition Lenders that rolled substantially all of the prepetition secured indebtedness into the DIP Facility and allowed them to continue to access financing similar to the Revolving Credit Facility, (b) seek a debtor in possession facility from lenders other than the Prepetition Lenders that provided sufficient liquidity to pay off the Prepetition Indebtedness and finance these cases, or (c) seek a facility that provided additional liquidity for these cases, but required the Company to secure Court approval of a non-consensual priming lien. Although the Company explored the

achievability of alternative (b), the continued
disruption in the credit markets made this option
impossible.  Due to the Company's belief that the
Prepetition Lenders would vigorously oppose a priming
lien contemplated by option (c) and that such a dispute
would be expensive, time-consuming (and possibly
carrying over into the holiday season), distracting to
the Company's management at a critical juncture, and
that the outcome would be uncertain, the Company
determined in the sound exercise of its business
judgment that option (a) provided the only real
alternative for financing these cases in chapter 11.
Moreover, the Company and its advisors conducted
numerous discussions and negotiations with other
potential postpetition lenders, none of which resulted
in any proposals for alternative postpetition financing.

70.  The Company will use a portion of the
proceeds of the DIP Facility to pay in full the
Prepetition Indebtedness, with the exception of certain
liabilities owed by the InterTAN and its subsidiaries.
In addition, letters of credit issued under the
Revolving Credit Facility will be deemed to be issued

38

under the DIP Facility.   Rolling the Prepetition
Indebtedness into the DIP Facility in this manner is
necessary because the Prepetition Lenders are unwilling
to consent to the priming of their security interests by
new debtor-in-possession financing.   Moreover, entering
into a facility with the Prepetition Lenders is
beneficial to the Company because the Prepetition
Lenders' familiarity with the Company's businesses
allowed for the expeditious completion of credit
documents as the Company prepared for chapter 11.
Bringing in new lenders and allowing for the due
diligence necessary would have likely been too time-
consuming as the Company focused on restructuring their
businesses as this critical time of the year.   A DIP
Facility with Bank of America as agent assured the
smoothest transition into chapter 11 possible.

    71.   Nonetheless, before determining to enter
into the DIP Facility, the Company conducted vigorous
and lengthy, arm's-length, and good-faith negotiations
with the Bank of America and the DIP lenders.   The
Company ultimately determined that the proposal for
debtor in possession financing provided by the DIP

Facility was the best available, fair and presented the best opportunity to finance their cases, as is contemplated by Bankruptcy Code section 364(c)(3).

72.   The Company accordingly decided, in the exercise of their sound business judgment, that the proposals for the DIP Facility provided by the DIP lenders were the most favorable under the circumstances and best addressed the Company's working capital needs. Accordingly, entry into the DIP Facility will afford the Debtors valuable additional time to pursue the process of closing underperforming stores while maintaining the value of the Company's going forward business, and that entry into the DIP Facility is in the best interests of the Debtors' estates, creditors and other parties in interest.  I would request that the Court authorize the Company to enter into the DIP Facility and immediately be permitted to borrow under it.

**F.    Rejection Of Certain Non-Residential Real Property Leases.**

73.   As set forth in item 18 on Exhibit A hereto, and discussed in more detail above, the Company seeks authority to reject leases of non-residential real

property at which the Company no longer conducts

business.  In connection with the rejection of such

leases, the Company will surrender possession of the

premises to the landlord as of the Petition Date.

Rejection of the leases will discontinue further

obligations to the landlords and save the Company's

bankruptcy estate considerable costs.

**G.    Authority To Continue Store Closing Sales.**

74.  As set forth in item 19 on Exhibit A

hereto, and discussed in more detail above, the Company

seeks authority to continue the Store Closing Sales.

The Store Closing Sales commenced on November 5, 2008

and, as of the Petition Date, are ongoing. Continuing

the Store Closing Sales will maximize value for all

stakeholders and is consistent with the Company's

overall turnaround efforts.

**H.    Procedural Motions.**

75.  The Company will also file two motions

seeking authority to implement certain procedures

concerning (i) Bankruptcy Code section 503(b)(9) claims

and a related bar date (as set forth in item 20 on

Exhibit A hereto), and (ii) trading in claims and equity

securities (as set forth in item 21 on Exhibit A hereto).
Among other things, these motions will establish orderly
processes to address various concerns of the Company and
other parties in interest that will arise early in the
Company's bankruptcy proceedings.

I swear under penalty of perjury that the facts, circumstances and other matters set forth in the First Day Motions, as well as the foregoing, is true and correct to the best of my knowledge information and belief, with appropriate reliance on the Company's officers, employees and advisors.

Dated:    Richmond, Virginia
          November 10, 2008


CIRCUIT CITY STORES, INC., et al.,
Debtors and Debtors in Possession


/s/ Bruce H. Besanko
Bruce H. Besanko
Executive Vice President and
Chief Financial Officer

**EXHIBIT A**

**List of First Day Motions**

**EXHIBIT A**

1.  Motion Of Debtors For Order Directing Joint
    Administration Pursuant To Bankruptcy Code Section
    302 And Bankruptcy Rule 1015(b) And Waiving
    Requirements Of Bankruptcy Code Sections 105 And
    342(C)(1) And Rules 1005 And 2002(n) (Docket No. __)

2.  Application Of Debtors For Order Under 28 U.S.C. §
    156(c) And Bankruptcy Rule 2002(f) Approving
    Agreement With Kurtzman Carson Consultants LLC And
    Appointing As Claims, Noticing, And Balloting Agent
    (Docket No. __)

3.  Motion Of The Debtors For An Order Pursuant To
    Bankruptcy Code Sections 102 And 105, Bankruptcy
    Rules 2002 And 9007, And Local Bankruptcy Rules
    2002-1 And 9013-1 Establishing Certain Notice, Case
    Management And Administrative Procedures (Docket No.
    __)

4.  Motion Of The Debtors, Pursuant To 11 U.S.C. §§
    105(a), 342(a) And 521, Fed. R. Bankr. P. 1007 And
    Local Bankruptcy Rule 1007-1, For Authority To (A)
    Prepare A List Of Creditors In Lieu Of Submitting A
    Formatted Mailing Matrix And (B) File A
    Consolidated List Of The Debtors' Fifty (50)
    Largest Unsecured Creditors (Docket No. __)

5.  Motion Of Debtors For Order Pursuant To 11 U.S.C.
    §§ 105(a), 363 And 364 And Fed. R. Bankr. P. 6003
    (I) Authorizing Maintenance Of Existing Bank
    Accounts, (II) Authorizing Use Of Existing Business
    Forms, (III) Authorizing Use Of Existing Cash
    Management System, (IV) Authorizing Intercompany
    Transactions And (V) Granting Superpriority Status
    To Intercompany Claims (Docket No. __)

6.  Motion of the Debtors for Interim and Final Waivers
    of Investment and Deposit Requirements Pursuant to
    Bankruptcy Code Sections 105 and 345  (Docket No.
    __)

7.    Debtors' Motion For Order Pursuant To Bankruptcy
      Code Sections 105(a), 363, 507(a), 541, 1107(a) And
      1108 And Bankruptcy Rule 6003 Authorizing Debtors
      To Pay Prepetition Wages, Compensation, And
      Employee Benefits (Docket No. __)

8.    Motion Of The Debtors For Order Pursuant To
      Bankruptcy Code Sections 105(a), 506(a), 507(a)(8),
      541 And 1129 And Bankruptcy Rule 6003 Authorizing
      The Debtors To Pay Prepetition Sales, Use, Trust
      Fund And Other Taxes And Related Obligations
      (Docket No. __)

9.    Motion Of Debtors For Order Under Bankruptcy Code
      Sections 105(a),363, And 366, And Bankruptcy Rule
      6003 (I) Approving Debtors' Adequate Assurance Of
      Payment, (II) Establishing Procedures For Resolving
      Requests By Utility Companies For Additional
      Assurance Of Payment, (III) Scheduling A Hearing
      With Respect To Contested Adequate Assurance Of
      Payment Requests, And (IV) Authorizing Debtors To
      Pay Claims Of A Third Party Vendor (Docket No. __)

10.   Debtors' Motion For Order Pursuant To Bankruptcy
      Code Sections 105(a), 363, 506, 507(a), 553,
      1107(a), 1108 And 1129(b) And Bankruptcy Rule 6003
      Authorizing Continuation Of Certain Customer
      Practices (Docket No. __)

11.   Debtors' Motion For Order Pursuant To Bankruptcy
      Code Sections 105, 362(b), 363, 503(b), 506, 546(b),
      1107(a) And 1108 And Bankruptcy Rule 6003
      Authorizing Payment Of Certain Prepetition Shipping
      And Delivery Charges (Docket No. __)

12.   Debtors' Motion For Order Pursuant To Bankruptcy
      Code Sections 105(a), 362(b), 506, 546(b), 1107(a),
      1108 And 1129 And Bankruptcy Rule 6003 Authorizing
      Payment Of Contractors In Satisfaction Of Liens
      (Docket No. __)

13.   Motion Of Debtors For Order Pursuant To Bankruptcy
      Code Sections 105, 363, 1107(a) And 1108, And
      Bankruptcy Rule 6003 Authorizing Debtors To Pay
      Prepetition Claims Of Certain Foreign Vendors And
      Service Providers (Docket No. __)

14.   Motion Of The Debtors For Order Pursuant To
      Bankruptcy Code Sections 105, 363, 364, 1107 And
      1108, And Bankruptcy Rule 6003 (I) Authorizing
      Debtors To Maintain Insurance Policies, Pay
      Insurance Obligations, And Renew Insurance Policies;
      (II) Authorizing Intercompany Transactions; And
      (III) Granting Superpriority Claim Status To
      Postpetition Intercompany Claims (Docket No. __)

15.   Motion Of Debtors For Order Under Bankruptcy Code
      Sections 105(a), 362, 503(b), 507(a), 546(c), And
      546(h) (I) Granting Administrative Expense Status
      To Obligations From Postpetition Delivery Of Goods;
      (II) Authorizing Payment Of Expenses In The
      Ordinary Course Of Business; (III) Authorizing
      Debtors To Return Goods; And (IV) Establishing
      Procedures For Reclamation Demands (Docket No. __)

16.   Debtors' Motion For Interim And Final Orders
      Pursuant To 11 U.S.C. §§ 105, 361, 362, 363 And 364
      And Federal Rules Of Bankruptcy Procedure 2002 And
      4001 (I) Authorizing Debtors (A) To Obtain
      Postpetition Financing And (B) To Utilize Cash
      Collateral; (II) Granting Adequate Protection; And
      (III) Scheduling Interim And Final Hearings (Docket
      No. __)

17.   Motion Of The Debtors For Entry Of Order Pursuant
      To Bankruptcy Code Sections 105, 363 And 365 (I)
      Assuming The Agency Agreement Among The Debtors,
      Hilco Merchant Resources, LLC And Gordon Brothers
      Retail Partners, LLC, And (II) Authorizing The
      Debtors To Continue Agency Agreement Sales Pursuant
      To Store Closing Agreement (Docket No. __)

18. Debtors' Motion For Order Pursuant To 11 U.S.C. §§ 105(a), 365(a) And 554 And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Unexpired Leases Of Nonresidential Real Property And Abandonment Of Personal Property Effective As Of The Petition Date (Docket No. __)

19. Motion Of Debtors For Order Establishing Bar Date For Filing Requests For Payment Of Administrative Expense Claims Under Bankruptcy Code Sections 105 And 503(b)(9) And Approving Form, Manner And Sufficiency Of Notice Of The Bar Date Pursuant To Bankruptcy Rule 9007

20. Motion For Order Under 11 U.S.C. §§ 105, 362 And 541 And Fed. R. Bankr. P. 3001 And 3002 Establishing Notice, Hearing, And Sell-Down Procedures For Trading In Equity Securities And Claims Against The Debtors' Estates (Docket No. __)

21. Motion to File Certain Documents Under Seal (Docket No.___)