Gregg M. Galardi, Esq.
Ian S. Fredericks, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
One Rodney Square
PO Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

Dion W. Hayes (VSB No. 34304)
Douglas M. Foley (VSB No. 34364)
MCGUIREWOODS LLP
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

- and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
333 West Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

Proposed Counsel to the Debtors
and Debtors in Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

- - - - - - - - - - - - - x
                          :
In re:                    :   Chapter 11
                          :
CIRCUIT CITY STORES, INC.,:   Case No. 08-35653 (KRH)
et al.,                   :
                          :
              Debtors.    :   Jointly Administered
- - - - - - - - - - - - - x

**AFFIDAVIT IN SUPPORT OF THE DEBTORS' APPLICATION
FOR AN ORDER AUTHORIZING EMPLOYMENT AND
RETENTION OF FTI CONSULTING, INC. AS
FINANCIAL ADVISOR FOR THE DEBTORS**

STATE OF MASSACHUSETTS  )
                        )  ss.
COUNTY OF SUFFOLK       )

I, Robert J. Duffy, being duly sworn, depose and

say:

1.   I am a Senior Managing Director with FTI
Consulting, Inc. (together with its wholly owned
subsidiaries, agents, independent contractors and
employees, "FTI"), a financial advisory services firm
with offices located at numerous locations around the
world.  I submit this Affidavit on behalf of FTI (the
"Affidavit") and in support of the application (the
"Application") of Circuit City Stores, Inc., the debtors
and debtors in possession in the above-captioned cases
(collectively, the "Debtors"), for an order authorizing
the employment and retention of FTI as Financial
Advisors under the terms and conditions set forth in the
Application. Except as otherwise noted,[1] I have personal
knowledge of the matters set forth herein.

## DISINTERESTEDNESS AND ELIGIBILITY

2.   In connection with the preparation of this
Affidavit, FTI's professionals conducted a review of its
professional contacts with the Debtors, their affiliates,
and other parties in interest that were reasonably known

---

[1]      Certain of the disclosures herein relate to matters within the
personal knowledge of other professionals at FTI and are based
on information from them.

2

to us.  Our review, completed under my supervision,

consisted of queries of an internal computer database

containing names of individuals and entities that are

present or recent former clients of FTI in order to

identify potential relationships.  FTI's search included

the following types of entities: the Debtors and its

subsidiaries, non-debtor affiliates, the Debtors'

directors and officers, secured lenders, significant

merchandise creditors, significant vendors, significant

real and personal property lessors, significant

shareholders, consignors, third party administrators,

potential liquidators, litigation parties, banks,

attorneys and professionals. A listing of the parties

reviewed is reflected on Exhibit 2 to this Affidavit.  A

summary of such relationships that FTI identified during

this process is set forth on Exhibit 3 to this Affidavit.

If any new relevant facts or relationships are

discovered or arise, FTI will promptly file a Bankruptcy

Rule 2014(a) Supplemental Affidavit.

    3.   FTI has initiated ethical walls relating to

two matters to ensure that FTI's representation of

another party does not have a materially adverse impact

on the Debtors.  First, FTI is currently engaged by
Syntax Brillian and the Debtors are a party to
litigation with Syntax Brillian.  The ethical wall was
established on September 3, 2008.  Second, FTI is
currently engaged by Magellan and Magellan is a
potential creditor of the Debtors.   The ethical wall
was established October 28, 2008.

4.   From the results of such review, we were not
made aware of any conflicts of interest or additional
relationships that we believe would preclude us from
performing our services.  No FTI personnel working on
this engagement performed any services for either Syntax
Brillian or Magellan following the date of execution of
the ethical wall agreements.  FTI personnel working
under my direction have been subject to ethical walls to
avoid any leakage of information or engagement-related
communications with FTI personnel assigned to assist
Syntax Brillian or Magellan.  These ethical walls remain
in effect as of the date of this Affidavit.  As part of
the ethical wall, FTI has instituted information
blocking systems to prevent the exchange of information

regarding the Debtors between the groups involved within
FTI.

5.     Financial Dynamics ("FD"), a division of FTI,
is employed by the Debtors to provide communications
services.   FD is not a creditor and these services are
being provided in the ordinary course of business.

6.     Otherwise, based on the results of its review
of parties-in-interest associated with the Debtors, FTI
does not have a relationship with any of the parties on
the Exhibit 2 in matters related to these proceedings.
FTI has provided and could reasonably be expected to
continue to provide services unrelated to the Debtors'
cases for the various entities shown on Exhibit 3.
FTI's assistance to these parties has been related to
providing various financial, restructuring, litigation
support and/or engineering and scientific investigation
consulting services.   To the best of my knowledge, no
services have been provided to the parties-in-interest
which involve their rights in the Debtors' cases, nor
does FTI's involvement in this case compromise its
ability to continue such consulting services.

7.    Further, as part of its diverse practice, FTI
appears in numerous cases, proceedings and transactions
that involve many different professionals, including
attorneys, accountants and financial consultants, who
may represent claimants and parties-in-interest in the
Debtors' chapter 11 cases.  Also, FTI has performed in
the past, and may perform in the future, advisory
consulting services for various attorneys and law firms,
and has been represented by several attorneys and law
firms, some of whom may be involved in these proceedings.
In addition, FTI has in the past, may currently and will
likely in the future be working with or against other
professionals involved in these cases in matters
unrelated to the Debtors and these cases. Based on our
current knowledge of the professionals involved, and to
the best of my knowledge, none of these relationships
create interests materially adverse to the Debtors in
matters upon which FTI is to be employed, and none are
in connection with these cases.

8.    FTI does not believe it is a "Creditor" of any
of the Debtors within the meaning of Bankruptcy Code
section 101(10).  Further, neither I nor any other FTI

6

partner or principal, to the best of my knowledge, is a
holder of any shares of the Debtors' stock.

9.    Based on the results of the relationship
search conducted to date as described above, FTI has no
known significant connection to the above-captioned
Debtors, their creditors, equity security holders, other
parties-in-interest (as reasonably known to us) or their
respective attorneys, except as disclosed or otherwise
described herein.  Further, to the best of my knowledge,
no one involved in this case or in FTI's practice
generally has any connection to the U.S. Trustee or any
person employed in the Office of the U.S. Trustee in
this District.

10.   As such, to the best of my knowledge, FTI is a
"disinterested person" as that term is defined in
Bankruptcy Code section 101(14), as modified by
Bankruptcy Code section 1107(b), in that FTI

       (1)    is not a creditor, equity security
            holder or insider of the Debtors;

       (2)    is not and was not within 2 years
            before the date of the filing of the
            petition, a director, officer, or
            employee of the Debtors.

In addition, to the best of my knowledge and based upon the results of the relationship search described above, FTI neither holds nor represents an interest adverse to the Debtors within the meaning of Bankruptcy Code section 327(a).

11.   It is FTI's policy and intent to update and expand its ongoing relationship search for additional parties in interest.  If any new relevant facts or relationships are discovered or arise, FTI will promptly file a Bankruptcy Rule 2014(a) Supplemental Affidavit.

### PROFESSIONAL COMPENSATION

12.   Subject to Court approval and in accordance with the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, applicable U.S. Trustee guidelines and the local rules of this District, FTI will seek payment for compensation on an hourly basis for the financial and other consulting services outlined in the application, and reimbursement of actual and necessary expenses incurred by FTI.  FTI's customary hourly rates as charged to both bankruptcy and non-bankruptcy matters of this type by the professionals assigned to this engagement are outlined in the

Application for the employment of FTI. These hourly rates are adjusted annually.

13.   Further, according to FTI's books and records, during the ninety days prior to the Debtors' petition date, FTI received $3,228,924 as set forth on Exhibit 4, which amount reflects $2,336,490 billed to the Company for professional services, $142,434 for out of pocket expense reimbursement and the $750,000 held as On-Account Cash.

14.   No commitments have been made or received by FTI, nor any partner or employee associate thereof, as to compensation or payment in connection with these cases other than in accordance with the provisions of the Bankruptcy Code.   FTI has no agreement with any other entity to share with such entity any compensation received by FTI in connection with these chapter 11 cases.

FURTHER AFFIANT SAYETH NOT.

/s/ Robert J. Dufffy
Robert J. Duffy

Subscribed and sworn to
before me this 14th day of
November 2008.


/s/ Sandra M. Raabe
Notary Public # 7045899

**Exhibit 1A & 1B**
FTI Engagement Letters

**F T I**

FTI Consulting
125 High Street
Suite 1402
Boston. MA 02110
617.897.1500 telephone
617.897.1510 facsimile
www.fticonsulting.com

PRIVATE & CONFIDENTIAL

August 15, 2008

Phil Schoonover
Chairman, President, CEO
Circuit City Stores, Inc.
9950 Mayland Drive
Richmond, VA, 23233

Re: Retention of FTI Consulting, Inc.

Dear Mr. Schoonover:

1.    **Introduction**

This letter confirms that we, FTI Consulting, Inc. ("FTI", "we" or "us"), have been retained by you, Circuit City Stores, Inc. (the "Company" or "you"), to provide certain financial advisory and consulting services (the "Services") set out below. This letter of engagement (the "Engagement" or "Engagement Letter") and the Standard Terms and Conditions attached hereto (the terms of which are incorporated herein by reference) constitute the engagement contract (the "Engagement Contract") pursuant to which the Services will be provided.

2.    **Scope of Services**

The Services, to be performed at the direction of the Executive Committee of the Company's Board of Directors (the "Executive Committee") and its management, are expected to include the following:

**Objective:**

To assist the Company, in a cost effective manner, in the planning and analysis of an "out of court" restructuring that is intended to maximize shareholder value and minimize disruption to the Company's operations.

**Phase I Scope:**

Store Footprint Analysis
- Evaluate performance of individual stores by format and region
- Analyze four wall profitability of each store
- Analyze allocated expenses such as advertising, field operations and distribution costs
- Review fixed/variable nature of non four wall costs to assess impact of potential store closings

Circuit City Stores, Inc.
August 15, 2008

- Analyze liquidity and earnings impact of store closures
    - Evaluate likely range of lease buyout costs based on situation
    - Assess impact of store closing sales on a cash and GAAP basis
- Provide assistance with contract terms for disposition of leases
- Develop informational materials to support store closing process
- Review procedure for projecting revenue, occupancy costs and inventory levels for potential closing stores
- Advise on "best practices" for drafting an agency agreement for inventory disposition and on negotiating structure for real estate disposition
- Prepare information package for landlord conference calls and participate in lease termination discussions
- Coordinate with such third party real estate advisors as may be retained by the Company in conjunction with real estate analyses and related negotiations

Liquidity Forecasting
- Evaluate the Company's current weekly forecasting models
    - Assess functionality of the model and suggest/develop enhancements
    - Create flexible model to evaluate impact on liquidity of critical assumptions
- Validate assumptions included in forecast including, without limitation:
    - Comparable store sales and margin
    - Inventory levels and trade credit support
    - Store closing impact including inventory liquidation and lease termination costs
    - Other issues as identified by the Executive Committee, management or FTI

Additional Phase I Services
- Provide weekly status and fee updates to management personnel designated by the Company
- Coordination of and participation in a "kick-off" meeting and subsequent in-person meetings at the Company's headquarters on such date as the Company determines
- Provide an initial timeline and staffing requirements within five business days of the execution date of this letter
- Provide an initial report, recommendations and a proposed work plan (including a proposed timeline and staffing requirements) on or before September 8, 2008
- Develop and present FTI's Phase I analysis and subsequent recommendations at a meeting of the Executive Committee currently scheduled for the week of September 15, 2008
- Provide other services as requested by management or the Executive Committee
- The parties agree that Phase I will be concluded in approximately 3 - 4 weeks unless the Company, in its sole discretion agrees to an alternative schedule

**Phase II Scope:**

Business/Out-of-Court Restructuring Plan
- Assist with development of an out-of-court restructuring plan and related financial projections
- Assess potential EBITDA based on store closing strategy and other restructuring initiatives
- Analyze long term capital need to effectuate potential out-of-court restructuring and capital structure alternatives
- Assist with working capital management and liquidity forecasting

-2-

Circuit City Stores, Inc.
August 15, 2008

- Participate in development of strategy to negotiate with key stakeholders in order to effectuate a potential out-of-court restructuring
- Assist management with development of employee retention and communications programs
- Assist management in developing strategy relating to merchandise and other vendors
- Assist management and, if necessary, other advisors in developing a strategy relating to landlords in conjunction with a potential out-of-court restructuring
- Assist management and, if necessary, other advisors in developing strategy relating to existing and prospective capital providers in conjunction with a potential out-of-court restructuring

Additional Phase II Services
- Provide weekly status and fee updates to management personnel designated by the Company
- Provide other services as requested by management or the Executive Committee.

Financing Services
- The Services set forth in this Engagement Contract do not include financing or capital raising activities. In the event the Company requests that FTI perform such activities, the parties agree to execute an addendum to this Engagement Contract that describes such additional services and any related fees.

Robert J. Duffy and Stephen L. Coulombe shall have primary and ongoing responsibility for all Services provided pursuant to this Engagement. Except as otherwise provided herein, the Services may be performed by FTI or by any subsidiary of FTI as FTI shall determine and FTI may also provide Services through its or its subsidiaries' agents or independent contractors. References herein to FTI and its employees shall be deemed to apply also, unless the context shall otherwise indicate, to employees of each such subsidiary and to any such agents or independent contractors and their employees.

The Services, as provided herein, are subject to change as mutually agreed by the Company and FTI.

FTI is engaged by the Company to provide financial advisory and consulting services only. Accordingly, while we may from time to time suggest options which may be available to you, and further give our professional evaluation of these options, the ultimate decision as to which, if any, of these options to implement rests with the Company, its management and the Executive Committee. FTI and its employees will not make any management decisions for the Company and will not be responsible for communicating information concerning the Company to the public, the Company's shareholders, creditors or other parties.

As part of the Services, FTI may be requested to assist the Company (and its legal or other advisors) in negotiations with the Company's shareholders, creditors or other-parties, including with respect to a potential out-of-court restructuring. In the event that we participate in such negotiations, the representations made and the positions advanced will be those of the Company and its management, not FTI or its employees.

If cases under the Bankruptcy Code, *11 U.S.C. § 101–1532 (the "Bankruptcy Code"),* are commenced and our retention is approved, our role will include serving as principal bankruptcy financial advisors to the debtors and debtors-in-possession in those cases under a

Circuit City Stores, Inc.
August 15, 2008

general retainer, subject to court approval. Our role also will encompass all out-of-court planning and negotiations attendant to these tasks.

The *Services* we will provide in connection with the Engagement will encompass all services normally and reasonably associated with this type of *Engagement* that we are requested and are able to provide and that are consistent with our ethical obligations. With respect to all matters of our Engagement, we will coordinate closely with the Company as to the nature of the services that we will render and the scope of our *Engagement*.

As usual, our Engagement is to represent the Company and not its individual directors, officers, employees or shareholders. However, we anticipate that in the course of that Engagement, we may provide information or advice to directors, officers or employees in their corporate capacities.

3.    **Fees, Expenses and Cash on Account**

**Standard Hourly Rates:**

Fees in connection with this Engagement will be based upon the time incurred providing the Services, multiplied by our standard hourly rates applicable in the United States, summarized as follows:

|  | Per Hour |
|---|---|
| Senior Managing Directors | $650 - $715 |
| Directors / Managing Directors | $475 - $620 |
| Consultants/Senior Consultants | $235 - $415 |
| Administrative / Paraprofessionals | $95 - $190 |

Hourly rates are generally revised periodically; provided that FTI shall provide the Company with at least 10 days' prior written notice of any rate adjustments (and the amount of any such rate adjustments). To the extent this Engagement requires services of our International divisions or personnel, the time incurred providing the Services will be multiplied by our standard hourly rates applicable on International engagements which rates shall be provided to the Company in writing, prior to the assignment of such divisions or personnel. Note that we do not provide any assurance regarding the outcome of our work and our fees will not be contingent on the results of such work.

**Completion Fee**

The Executive Committee, in its sole and absolute discretion, may pay FTI a fee (a "Completion Fee") in the event a restructuring or sale transaction is consummated to the satisfaction of the Company. The Completion Fee may be paid to FTI under various scenarios as follows:

- In the event a restructuring or sale transaction is completed and the Company does not file for bankruptcy protection, a Completion Fee of up to $5 million.
- In the event the Company files for bankruptcy protection and the Company consummates a plan, reorganization or sale transaction within 180 days of the filing, a Completion Fee of up to $3.5 million.
- In the event the Company completes any other restructuring, plan, reorganization or sale transaction not described above, a Completion Fee of up to $1 million.

-4-

Circuit City Stores, Inc.
August 15, 2008

**Expenses:**

In addition to the fees outlined above, FTI will bill for reasonable direct expenses which are incurred on your behalf during this Engagement provided that FTI shall present to the Company invoices and other supporting detail that may be reasonably requested by the Company. Direct expenses are reasonable and customary out-of-pocket expenses which are billed directly to the Engagement, such as certain telephone, overnight mail, messenger, travel, meals, accommodations and other out-of-pocket expenses specifically related to the Engagement. Further, if FTI and/or any of its employees are required to testify or provide evidence at or in connection with any judicial or administrative proceeding relating to the Engagement, FTI will be compensated by you at its regular hourly rates and reimbursed for reasonable direct expenses (including reasonable, documented fees of outside counsel) with respect thereto as provided herein.

**Cash on Account:**

Initially, the Company will forward to us the amount of $100,000, which funds will be held "on account" to be applied to our professional fees, expenses and disbursements for the Engagement (as replenished or supplemented from time to time, the "Initial Cash on Account"). To the extent that this amount exceeds our fees, expenses and disbursements upon the completion or termination of the Engagement, we will immediately refund to the Company any portion of the Initial Cash on Account and the Additional Cash on Account (as defined herein) in excess of all fees and expenses due FTI. The Company agrees to increase or supplement the Initial Cash on Account from time to time during the course of the Engagement in such amounts as the Company and we mutually shall agree are reasonably necessary to increase the Initial Cash on Account to a level that will be sufficient to fund Engagement fees, expenses and disbursements to be incurred.

We will send the Company periodic invoices (not less frequently than monthly) for services rendered and expenses and disbursements incurred on the basis discussed above, and in certain circumstances, an invoice may be for estimated fees, expenses and disbursements through a date certain. Each invoice constitutes a request for an interim payment against the fee to be determined at the conclusion of our Services. After 2 business days following transmittal of the invoice, we may draw upon the Initial Cash on Account in the amount of the invoice. The Company agrees upon submission of each such invoice to promptly wire the invoice amount to us as replenishment of the Initial Cash on Account (together with any supplemental amount to which we and the Company mutually agree), without prejudice to the Company's right to advise us of any differences it may have with respect to such invoice. We have the right to apply to any outstanding invoice (including amounts billed prior to the date hereof), up to the remaining balance, if any, of the Initial Cash on Account at any time subject to (and without prejudice to) the Company's opportunity to review and dispute our invoices, fees, expenses or disbursements.

Neither party shall actively solicit for employment or hire any employee of the other party during the term of this Engagement and for a period of one (1) year following the date of termination or completion of this engagement without the prior written consent of the other party.

Circuit City Stores, Inc.
August 15, 2008

In a case under the Bankruptcy Code, fees and expenses may not be paid without the express prior approval of the bankruptcy court. In most cases of this size and complexity, on request of a party in interest, the bankruptcy court permits the payment of fees and reimbursement of expenses on an interim basis during the case. The Company agrees that, if asked to do so by us, the Company will request the bankruptcy court to establish a procedure for the payment of interim fees during the case that would permit payment of interim fees. If the bankruptcy court approves such a procedure, we will submit invoices on account against our final fee. These interim invoices will be based on such percentage as the bankruptcy court allows of our internal time charges and costs and expenses for the work performed during the relevant period and will constitute a request for an interim payment against the reasonable fee to be determined at the conclusion of our representation.

In preparation for the filing of any cases under the Bankruptcy Code, we also may require an additional on account payment to supplement the Initial Cash on Account to cover fees, expenses and disbursements to be incurred during the initial phase of the chapter 11 cases (the "Additional Cash on Account"). We will hold the Additional Cash on Account, as we have the Initial Cash on Account. Of course, the reasonableness of the Additional Cash on Account remains subject to review by the court in any ensuing case.

If any of the Company's entities become a debtor in one or more cases under the Bankruptcy Code, some fees, expenses and disbursements (whether or not billed) incurred before the filing of bankruptcy petitions (voluntary or involuntary) might remain unpaid as of the date of the filing. The unused portion, if any, of the Initial Cash on Account and the Additional Cash on Account will be applied to any such unpaid pre-petition fees, expenses and disbursements. Any requisite court permission will be obtained in advance. We will then hold any portion of the Initial Cash on Account and the Additional Cash on Account not otherwise properly applied for the payment of any such unpaid pre-filing fees, expenses and disbursements (whether or not billed) as on account cash to be applied to our final invoice in any case under the Bankruptcy Code.

Post-petition fees, expenses and disbursements will be due and payable immediately upon entry of an order containing such court approval or at such time thereafter as instructed by the bankruptcy court. The Company understands that while the arrangement in this paragraph may be altered in whole or in part by the bankruptcy court, the Company shall nevertheless remain liable for payment of court approved post-petition fees and expenses. It is agreed and understood that the unused portion, if any, of the Initial Cash on Account and the Additional Cash on Account shall be held by us and applied against the final fee application filed and approved by the court.

4.    **Terms and Conditions**

The Standard Terms and Conditions set forth the duties of each party with respect to the Services. Further, this letter and the Standard Terms and Conditions comprise the entire Engagement Contract for the provision of the Services to the exclusion of any other express or implied terms, whether expressed orally or in writing, including any conditions, warranties and representations, and shall supersede all previous proposals, letters of engagement, undertakings, agreements, understandings, correspondence and other communications, whether written or oral, regarding the Services.

Circuit City Stores, Inc.
August 15, 2008

5.    **Conflicts of Interest**

Based on the list of potentially interested parties (the "Potentially Interested Parties"), provided by you, we have undertaken a limited review of our records to determine FTI's professional relationships with the Company and Bank of America, N.A., the administrative agent for the Company's existing credit facility (the "Administrative Agent"). As you may be aware, FTI is regularly retained by the Administrative Agent and/or other members of your credit facility (or law firms retained by the administrative agent or members of your credit facility). However, such representations are in matters unrelated to this Engagement.

From the results of such review, we were not made aware of any conflicts of interest or additional relationships that we believe would preclude us from performing the Services. However, as you know, we are a large consulting firm with numerous offices throughout the United States. We are regularly engaged by new clients, which may include one or more of the Potentially Interested Parties. We will not accept an engagement that directly conflicts with this Engagement without your prior written consent.

6.    **Acknowledgement and Acceptance**

Please acknowledge your acceptance of the terms of this Engagement Contract by signing both the confirmation below and the Standard Terms and Conditions and returning a copy of each to us at the above address.

If you have any questions regarding this letter or the Standard Terms and Conditions, please do not hesitate to contact Robert J. Duffy at 617-897-1501.

Circuit City Stores, Inc.
August 15, 2008

Yours faithfully,

FTI CONSULTING, INC.

By

Robert J. Duffy
Senior Managing Director

Attachment – As stated

Circuit City Stores, Inc.
August 15, 2008

Confirmation of Terms of Engagement

**We agree to engage FTI Consulting, Inc. upon the terms set forth herein and upon the Standard Terms and Conditions.**

Circuit City Stores, Inc.

By: _____
      Phil Schoonover
      Chairman, President, CEO

Date: August 27, 2008

**FTI CONSULTING, INC.**

**STANDARD TERMS AND CONDITIONS**

The following are the Standard Terms and Conditions on which we will provide the Services to you set forth within the attached letter of engagement with Circuit City Stores, Inc. dated August 15, 2008 (the "Engagement Letter"), the terms of which are incorporated herein by reference. The Engagement Letter and these Standard Terms and Conditions set forth herein (collectively, the "Engagement Contract") form the entire agreement between us relating to the Services and replace and supersede any previous proposals, letters of engagement, undertakings, agreements, understandings, correspondence and other communications, whether written or oral, regarding the Services. The headings and titles in the Engagement Contract are included to make it easier to read but do not form part of the Engagement Contract.

1.      **Reports and Advice**

1.1      **Use and purpose of advice and reports**—Any advice given or report issued by us is provided solely for your use and benefit and only in connection with the purpose in respect of which the Services are provided. Unless required by law, you shall not provide any advice given or report issued by us to any third party (other than to your attorneys, investment bankers, financial advisors, auditors and other representatives), or refer to us or the Services, without our prior written consent. In no event, regardless of whether consent has been provided, shall we assume any responsibility to any third party to which any advice or report is disclosed or otherwise made available.

2.      **Information and Assistance**

2.1      **Provision of information and assistance**—Our performance of the Services is dependent upon your providing us with such information and assistance as we may reasonably require from time to time.

2.2      **Punctual and accurate information**—You shall use reasonable skill, care and attention to ensure that all information we may reasonably require is provided on a timely basis and is accurate and complete and relevant for the purpose for which it is required. You shall also notify us if you subsequently learn that the information provided is incorrect or inaccurate or otherwise should not be relied upon.

2.3      **No assurance on financial data**—While our work may include an analysis of financial and accounting data, the Services will not include an audit, compilation or review of any kind of any financial statements or components thereof. Company management will be responsible for any and all financial information they provide to us during the course of this Engagement, and we will not examine or compile or verify any such financial information. Moreover, the circumstances of the Engagement may cause our advice to be limited in certain respects based upon, among other matters, the extent of sufficient and available data and the opportunity for supporting investigations in the time period. Accordingly, as part of this Engagement, we will not express any opinion or other form of assurance on financial statements of the Company.

2.4      **Prospective financial information**—In the event the Services involve prospective financial information, our work will not constitute an examination or compilation, or apply agreed-upon procedures, in accordance with standards established by the American Institute of Certified Public Accountants or otherwise, and we will express no assurance of any kind on such information. There will usually be differences between estimated and actual results, because events and circumstances frequently do not occur as expected, and those differences may be material. We will take no responsibility for the achievability of results or events projected or anticipated by the management of the Company.

**3.   Additional Services**

3.1     **Responsibility for other parties—**You shall be solely responsible for the work and fees of any other party engaged by you to provide services in connection with the Engagement regardless of whether such party was introduced to you by us. Except as provided in this Engagement Contract, we shall not be responsible for providing or reviewing the advice or services of any such third party, including advice as to legal, regulatory, accounting or taxation matters. Further, we acknowledge that we are not authorized under our Engagement Contract to engage any third party to provide services or advice to you, other than our agents or independent contractors engaged to provide Services, without your written authorization.

3.2     **Facilities** -- To the extent necessary to perform the services, the Company will provide FTI with the workspace, facilities and supplies reasonably required to perform the services contemplated hereunder. The Company shall have no liability for any claims, losses, damages, injuries, costs, expenses or any other liabilities of any kind or character whatsoever arising out of, resulting from or in any way connected with providing us with workspace, facilities and supplies in connection with the Services, except to the extent caused by the grossly negligent or willful acts or omissions of the Company.

**4.   Confidentiality**

4.1     **Restrictions on confidential information—**Both parties agree that any confidential information received from the other party shall only be used for the purposes of providing or receiving Services under this or any other contract between us. Except as provided below, neither party will disclose the other party's confidential information to any third party without the other party's prior written consent. Confidential information shall not include information that:

4.1.2     is or becomes generally available to the public other than as a result of a breach of an obligation under this Clause 4.1;

4.1.3     is acquired from a third party who, to the recipient party's knowledge after receiving prior advice from counsel, owes no obligation of confidence in respect of the information; or

4.1.4     is or has been independently developed by the recipient.

4.2     **Disclosing confidential information—**Notwithstanding Clause 1.1 or 4.1 above, either party will be entitled to disclose confidential information of the other to a third party to the extent that this is required by valid legal process, provided that (and without breaching any legal or regulatory requirement) where reasonably practicable not less than 2 business days' notice in writing is first given to the other party.

4.3     **Citation of Engagement—**Subject to Clause 4.1 and Clause 4.2 above, to the extent the Engagement is or becomes known to the public, we may cite the performance of the Services to our clients and prospective clients as an indication of our experience, unless we and you specifically agree otherwise in writing.

4.4     **Internal quality reviews—**Notwithstanding the above, we may disclose any information referred to in this Clause 4 to any other FTI entity or use it for internal quality reviews.

4.5     **Maintenance of workpapers—**Notwithstanding the above, we may keep one archival set of our working papers from the Engagement, including working papers containing or reflecting confidential information, in accordance with our internal policies.

**5.   Termination**

5.1     **Termination of Engagement with notice—**Either party may terminate the Engagement Contract for whatever reason upon written notice to the other party. Upon receipt of such notice, we will stop all work immediately. You will be responsible for all undisputed fees and expenses incurred by us through the date notice of termination is received.

5.2     **Effect of Termination** -- If, at any time prior to twelve months after the effective date of termination without cause of this Engagement, a restructuring or sale transaction, as described in the Engagement Letter, is consummated, the Company may pay FTI a Completion Fee subject to the terms specified in Clause 3 of the Engagement Letter. Company shall have the discretion to pay FTI a Completion Fee whether or not the Company has then engaged the services of a third party firm.

5.3     **Continuation of terms**—The terms of the Engagement that by their context are intended to be performed after termination or expiration of this Engagement Contract, including but not limited to, Clauses 3 and 4 of the Engagement Letter, and Clauses 1.1, 4, 6 and 7 of the Standard Terms and Conditions, are intended to survive such termination or expiration and shall continue to bind all parties.

6.  **Indemnification and Liability Limitation; Waiver of Jury Trial**

6.1     **Indemnification** - Each party agrees to indemnify and hold harmless the other party and any of its subsidiaries and affiliates, officers, directors, principals, shareholders, agents, independent contractors and employees (collectively "Indemnified Persons") from and against any and all claims, liabilities, damages, obligations, costs and expenses (including reasonable attorneys' fees and expenses and costs of investigation) arising out of the acts or omissions of the indemnifying party, except to the extent that any such claim, liability, obligation, damage, cost or expense shall have been determined by final non-appealable order of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of the Indemnified Person or Persons in respect of whom such liability is asserted.

6.2     **Limitation of liability**—Each party agrees that no Indemnified Person shall have any liability as a result of this Engagement, the execution and delivery of this Engagement Contract, the provision of Services or other matters relating to or arising from this Engagement Contract, other than liabilities that shall have been determined by final non-appealable order of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of the Indemnified Person or Persons in respect of whom such liability is asserted. Without limiting the generality of the foregoing, in no event shall any Indemnified Person be liable for consequential, indirect or punitive damages, damages for lost profits or opportunities or other like damages or claims of any kind.

6.3     **WAIVER OF JURY TRIAL**—TO FACILITATE JUDICIAL RESOLUTION AND SAVE TIME AND EXPENSE, YOU AND FTI IRREVOCABLY AND UNCONDITIONALLY AGREE NOT TO DEMAND A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THE SERVICES OR ANY SUCH OTHER MATTER ARISING FROM THE ENGAGEMENT CONTRACT.

6.4     **Insurance** -- FTI shall maintain the following insurance with an insurance carrier authorized to do business in the United States and having a rating of "A-" or better by A.M. Best Company and a Financial Size Category of at least Class VIII: (a) a policy of commercial general liability insurance, covering liability arising from premises, operations, independent contractors, products – completed operations, personal injury, advertising injury and liability assumed under an insured contract, with limits of not less than $2,000,000 each occurrence and at least $10,000,000 in aggregate liability; (b) commercial auto liability insurance to include all owned, non-owned and hired vehicles, with limits of liability not less than $2,000,000 each accident; (c) workers compensation insurance to the extent required by law and employer's liability insurance, with limits of at least $1,000,000 each accident/disease; and (d) professional liability insurance with limits of at least $2,000,000 per occurrence. All policies except for (b), (c) and (d) above shall name the Company as an "Additional Insured". All certificates will provide for at least thirty (30) days written notice prior to cancellation of any insurance referred to under this Engagement Contract as well as notification of "Additional Insured". A certificate of insurance meeting the above requirements will be delivered to the Company (i) upon execution of this Engagement Letter, (ii) upon renewal of the insurance policy and annually thereafter, and (iii) upon reasonable request.

6.5     **Governing Law and Jurisdiction**—The Engagement Contract shall be governed by and interpreted in accordance with the laws of the State of New York, without giving effect to the choice of law provisions thereof. The United States District Court for the Southern District of New York and the

appropriate Courts of the State of New York sitting in the Borough of Manhattan, City of New York shall have exclusive jurisdiction in relation to any claim, dispute or difference concerning the Engagement Contract and any matter arising from it; provided that if the Company or any of its affiliates has sought relief under the Bankruptcy Code, the parties consent to the exclusive jurisdiction of the bankruptcy court in which such case or cases are pending over any and all matters arising from or related to the Engagement Contract. The parties submit to the jurisdiction of such courts and irrevocably waive any right to object to any action being brought in such courts, to claim that the action has been brought in an inconvenient forum or to claim that those courts do not have jurisdiction.

7.  **Independent Contractors** — The parties to this Engagement Contract are independent of one another. This Engagement Contract does not create any relationship of franchise, joint venture, association, partnership, or any other form of business organization. Neither party shall have any right, power or authority to bind the other or to assume, create, or incur any expenses, liability or obligation, express or implied, on behalf of the other. The Company shall not be responsible for payment of FTI's employees' or contractors' salary, benefits, expenses, insurance, taxes, workers' compensation, unemployment insurance or any other employee benefits, but such responsibility shall be that of the Supplier. Furthermore, FTI shall be fully responsible for withholding any and all Federal, state or local income and employment taxes in connection with FTI's employees' and contractors compensation.

**FTI CONSULTING, INC**

**Confirmation of Standard Terms and Conditions**

We agree to engage FTI Consulting, Inc. upon the terms set forth in these Standard Terms and Conditions as outlined above.

**CIRCUIT CITY STORES, INC.**

By: _____
Phil Schoonover
Chairman, President, CEO

Date: _____
Aujust 27, 2008

F T I

PRIVATE & CONFIDENTIAL

November 05, 2008

Bruce H. Besanko
Chief Financial Officer
Circuit City Stores, Inc.
9950 Mayland Drive
Richmond, VA, 23233

     Re: Retention of FTI Consulting, Inc.

Dear Mr. Besanko:

**1.**   **Introduction**

This letter confirms that we, FTI Consulting, Inc. ("FTI", "we" or "us"), have been retained by you, Circuit City Stores, Inc. (the "Company" or "you"), to provide certain financial advisory and consulting services (the "Services") set out below. This letter of engagement (the "Engagement" or "Engagement Letter") and the Standard Terms and Conditions attached hereto (the terms of which are incorporated herein by reference) constitute the engagement contract (the "Engagement Contract") pursuant to which the Services will be provided.

**2.**   **Scope of Services**

The Services, to be performed at the direction of the Company and are expected to include the following:

**Objective:**

To assist the Company, in a cost effective manner, in the planning, analysis of and execution of a restructuring that is intended to maximize value for all constituents and minimize disruption to the Company's operations.

**Store Footprint Analysis**
- Analyze liquidity and earnings impact of potential store closures
- Provide assistance with contract terms for disposition of leases
- Develop informational materials to support store closing processes
- Review procedure for projecting revenue, occupancy costs and inventory levels for potential closing stores
- Advise on "best practices" for drafting an agency agreement for inventory disposition and on negotiating structure for real estate disposition
- Prepare information package for landlord conference calls and participate in lease termination discussions
- Coordinate with such third party real estate advisors as may be retained by the Company in conjunction with real estate analyses and related negotiations

Circuit City Stores, Inc.
November 5, 2008

**Liquidity Forecasting**
- Evaluate current liquidity position and expected future cash flows
- Assist with management and control of cash disbursements
- Advise management on cash conservation measures and assist with implementation of cash forecasting and reporting tools as requested

**Restructuring/Other Advisory Services**
- Assist with development of an out-of-court restructuring plan and related financial projections
- Assess potential EBITDA based on store closing strategy and other restructuring initiatives
- Analyze long term capital need to effectuate potential out-of-court restructuring and capital structure alternatives
- Assist with working capital management and liquidity forecasting
- Participate in development of strategy to negotiate with key stakeholders in order to effectuate a potential out-of-court restructuring
- Assist management with development of employee retention and communications programs
- Assist management in developing strategy relating to merchandise and other vendors
- Assist management and, if necessary, other advisors in developing a strategy relating to landlords in conjunction with a potential out-of-court restructuring
- Assist management and, if necessary, other advisors in developing strategy relating to existing and prospective capital providers in conjunction with a potential out-of-court restructuring
- Provide weekly status and fee updates to management personnel designated by the Company
- Provide other services as requested by management.

**Asset Sales**
- Assist management with the development and implementation of a store closing process including marketing certain stores identified by the Company for closure (including, but not limited to, inventory, real estate, furniture fixtures and equipment other tangible assets) to inventory disposition firms including conducting a 363 sale process, contacting potential buyers, facilitating due diligence requests, negotiating asset purchase agreement(s) and conducting a final auction
  - Prepare "bid packages" for Liquidators and manage selection process
  - Solicit potential inventory Liquidators for going-out-of-business sale process
  - Assist the Company in the negotiation of an Agency agreement
  - Manage the process to liquidate stores and conduct going-out-business sales in the ordinary course of business
  - Solicit bids from real estate consulting firms to evaluate lease mitigation strategies
- Assist with data collection and information gathering related to third party due diligence
- Advise and assist the Company and other professionals retained by the Company in developing, negotiating and executing plan of reorganization scenarios, 363 sales or other potential sales of assets or business units

Circuit City Stores, Inc.
November 5, 2008

**Contingency Planning**
- Assist management and the Board of Directors in contingency planning including the evaluation, planning and execution of a potential Chapter 11 filing
- Assist Company personnel with the communications and negotiations, at your request and under your guidance, with lenders, creditors, and other parties-in-interest including the preparation of financial information for distribution to such parties-in-interest
- Advise and assist the Company in the compilation and preparation of financial information necessary due to requirements of the Bankruptcy Court and/or Office of the US Trustee
- Assist the Company in the preparation of a liquidation valuation for a reorganization plan and/or negotiation purposes
- Assist the Company in managing and executing the reconciliation process involving claims filed by all creditors
- Advise and assist the Company in identifying and/or reviewing preference payments, fraudulent conveyances and other causes of action

**Financing**
- Lead efforts to arrange second lien financing and refinancing of the existing senior debt or debtor-in-possession ("DIP") financing in a Chapter 11 filing
- Advise the Company in the process of identifying and reviewing debtor in possession ("DIP") financing and assist the Company in preparing a collateral package in support of such financing

**Other**
- Assist with such other accounting and financial advisory services as requested by the Company and/or the Board of Directors consistent with the role of a financial advisor and not duplicative of services provided by other professionals.

Robert J. Duffy and Stephen L. Coulombe shall have primary and ongoing responsibility for all Services provided pursuant to this Engagement. Except as otherwise provided herein, the Services may be performed by FTI or by any subsidiary of FTI as FTI shall determine and FTI may also provide Services through its or its subsidiaries' agents or independent contractors. References herein to FTI and its employees shall be deemed to apply also, unless the context shall otherwise indicate, to employees of each such subsidiary and to any such agents or independent contractors and their employees.

The Services, as provided herein, are subject to change as mutually agreed by the Company and FTI.

FTI is engaged by the Company to provide financial advisory and consulting services only. Accordingly, while we may from time to time suggest options which may be available to you, and further give our professional evaluation of these options, the ultimate decision as to which, if any, of these options to implement rests with the Company, its management and the board of directors. FTI and its employees will not make any management decisions for the Company and will not be responsible for communicating information concerning the Company to the public, the Company's shareholders, creditors or other parties.

As part of the Services, FTI may be requested to assist the Company (and its legal or other advisors) in negotiations with the Company's shareholders, creditors or other parties,

-3-

Circuit City Stores, Inc.
November 5, 2008

including with respect to a potential out-of-court restructuring. In the event that we participate in such negotiations, the representations made and the positions advanced will be those of the Company and its management, not FTI or its employees.

If cases under the Bankruptcy Code, *11 U.S.C. § 101–1532 (the "Bankruptcy Code")*, are commenced and our retention is approved, our role will include serving as principal bankruptcy financial advisors to the debtors and debtors-in-possession in those cases under a general retainer, subject to court approval. Our role also will encompass all out-of-court planning and negotiations attendant to these tasks.

The *Services* we will provide in connection with the Engagement will encompass all services normally and reasonably associated with this type of *Engagement* that we are requested and are able to provide and that are consistent with our ethical obligations. With respect to all matters of our Engagement, we will coordinate closely with the Company as to the nature of the services that we will render and the scope of our *Engagement*.

As usual, our Engagement is to represent the Company and not its individual directors, officers, employees or shareholders. However, we anticipate that in the course of that Engagement, we may provide information or advice to directors, officers or employees in their corporate capacities.

3. **Fees, Expenses and Cash on Account**

**Standard Hourly Rates:**

Fees in connection with this Engagement will be based upon the time incurred providing the Services, multiplied by our standard hourly rates applicable in the United States, summarized as follows:

| | Per Hour |
|---|---|
| Senior Managing Directors | $650 - $715 |
| Directors / Managing Directors | $475 - $620 |
| Consultants/Senior Consultants | $235 - $415 |
| Administrative / Paraprofessionals | $95 - $190 |

Hourly rates are generally revised periodically; provided that FTI shall provide the Company with at least 10 days' prior written notice of any rate adjustments (and the amount of any such rate adjustments). To the extent this Engagement requires services of our International divisions or personnel, the time incurred providing the Services will be multiplied by our standard hourly rates applicable on International engagements which rates shall be provided to the Company in writing, prior to the assignment of such divisions or personnel. Note that we do not provide any assurance regarding the outcome of our work and our fees will not be contingent on the results of such work.

**Completion Fee**

The Company, in its sole and absolute discretion, may pay FTI a fee (a "Completion Fee") in the event a restructuring or sale transaction is consummated to the satisfaction of the Company. The Completion Fee may be paid to FTI under various scenarios as follows:

- In the event a restructuring or sale transaction is completed and the Company does not file for bankruptcy protection, a Completion Fee of up to $5 million.

-4-

Circuit City Stores, Inc.
November 5, 2008

- In the event the Company files for bankruptcy protection and the Company consummates a plan, reorganization or sale transaction within 180 days of the filing, a Completion Fee of up to $3.5 million.
- In the event the Company completes any other restructuring, plan, reorganization or sale transaction not described above, a Completion Fee of up to $1 million.

**Financing Fee**

Second Lien Financing

- A total fee of 1.0% of the commitment of second lien financing will be earned by FTI whether outside of a chapter 11 proceeding or as part of a DIP financing. Such fees will be earned and paid upon interim court approval or closing of such financing.

Senior Loan Financing

- In the event the Company seeks to refinance its existing senior debt outside of a chapter 11 proceeding or secure senior debt as part of a DIP financing, a fee of .25% of the commitment amount will be earned and paid upon interim court approval or closing of such financing.

**Expenses:**

In addition to the fees outlined above, FTI will bill for reasonable direct expenses which are incurred on your behalf during this Engagement provided that FTI shall present to the Company invoices and other supporting detail that may be reasonably requested by the Company. Direct expenses are reasonable and customary out-of-pocket expenses which are billed directly to the Engagement, such as certain telephone, overnight mail, messenger, travel, meals, accommodations and other out-of-pocket expenses specifically related to the Engagement. Further, if FTI and/or any of its employees are required to testify or provide evidence at or in connection with any judicial or administrative proceeding relating to the Engagement, FTI will be compensated by you at its regular hourly rates and reimbursed for reasonable direct expenses (including reasonable, documented fees of outside counsel) with respect thereto as provided herein.

**Cash on Account:**

The Company will forward to us a total amount of $750,000, which funds will be held "on account" to be applied to our professional fees, expenses and disbursements for the Engagement (as replenished or supplemented from time to time, the "Cash on Account"). FTI acknowledges that it is holding $200,000 Initial Cash on Account relating to its engagement letter with the Company dated August 15, 2008. To the extent that this amount exceeds our fees, expenses and disbursements upon the completion or termination of the Engagement, we will immediately refund to the Company any portion of the Initial Cash on Account and the Additional Cash on Account (as defined herein) in excess of all fees and expenses due FTI. The Company agrees to increase or supplement the Initial Cash on Account from time to time during the course of the Engagement in such amounts as the Company and we mutually shall agree are reasonably necessary to increase the Initial Cash on Account to a level that will be sufficient to fund Engagement fees, expenses and disbursements to be incurred.

We will send the Company periodic invoices (not less frequently than monthly) for services rendered and expenses and disbursements incurred on the basis discussed above, and in certain

Circuit City Stores, Inc.
November 5, 2008

circumstances, an invoice may be for estimated fees, expenses and disbursements through a date certain. Each invoice constitutes a request for an interim payment against the fee to be determined at the conclusion of our Services. After 2 business days following transmittal of the invoice, we may draw upon the Initial Cash on Account in the amount of the invoice. The Company agrees upon submission of each such invoice to promptly wire the invoice amount to us as replenishment of the Initial Cash on Account (together with any supplemental amount to which we and the Company mutually agree), without prejudice to the Company's right to advise us of any differences it may have with respect to such invoice. We have the right to apply to any outstanding invoice (including amounts billed prior to the date hereof), up to the remaining balance, if any, of the Initial Cash on Account at any time subject to (and without prejudice to) the Company's opportunity to review and dispute our invoices, fees, expenses or disbursements.

Neither party shall actively solicit for employment or hire any employee of the other party during the term of this Engagement and for a period of one (1) year following the date of termination or completion of this engagement without the prior written consent of the other party.

In a case under the Bankruptcy Code, fees and expenses may not be paid without the express prior approval of the bankruptcy court. In most cases of this size and complexity, on request of a party in interest, the bankruptcy court permits the payment of fees and reimbursement of expenses on an interim basis during the case. The Company agrees that, if asked to do so by us, the Company will request the bankruptcy court to establish a procedure for the payment of interim fees during the case that would permit payment of interim fees. If the bankruptcy court approves such a procedure, we will submit invoices on account against our final fee. These interim invoices will be based on such percentage as the bankruptcy court allows of our internal time charges and costs and expenses for the work performed during the relevant period and will constitute a request for an interim payment against the reasonable fee to be determined at the conclusion of our representation.

In preparation for the filing of any cases under the Bankruptcy Code, we also may require an additional on account payment to supplement the Initial Cash on Account to cover fees, expenses and disbursements to be incurred during the initial phase of the chapter 11 cases (the "Additional Cash on Account"). We will hold the Additional Cash on Account, as we have the Initial Cash on Account. Of course, the reasonableness of the Additional Cash on Account remains subject to review by the court in any ensuing case.

If any of the Company's entities become a debtor in one or more cases under the Bankruptcy Code, some fees, expenses and disbursements (whether or not billed) incurred before the filing of bankruptcy petitions (voluntary or involuntary) might remain unpaid as of the date of the filing. The unused portion, if any, of the Initial Cash on Account and the Additional Cash on Account will be applied to any such unpaid pre-petition fees, expenses and disbursements. Any requisite court permission will be obtained in advance. We will then hold any portion of the Initial Cash on Account and the Additional Cash on Account not otherwise properly applied for the payment of any such unpaid pre-filing fees, expenses and disbursements (whether or not billed) as on account cash to be applied to our final invoice in any case under the Bankruptcy Code.

Post-petition fees, expenses and disbursements will be due and payable immediately upon entry of an order containing such court approval or at such time thereafter as instructed by the bankruptcy court. The Company understands that while the arrangement in this paragraph

Circuit City Stores, Inc.
November 5, 2008

may be altered in whole or in part by the bankruptcy court, the Company shall nevertheless
remain liable for payment of court approved post-petition fees and expenses. It is agreed and
understood that the unused portion, if any, of the Initial Cash on Account and the Additional
Cash on Account shall be held by us and applied against the final fee application filed and
approved by the court.

**4.    Terms and Conditions**

The Standard Terms and Conditions set forth the duties of each party with respect to the
Services. Further, this letter and the Standard Terms and Conditions comprise the entire
Engagement Contract for the provision of the Services to the exclusion of any other express or
implied terms, whether expressed orally or in writing, including any conditions, warranties
and representations, and shall supersede all previous proposals, letters of engagement,
undertakings, agreements, understandings, correspondence and other communications,
whether written or oral, regarding the Services.

**5.    Conflicts of Interest**

Based on the list of potentially interested parties (the "Potentially Interested Parties"),
provided by you, we have undertaken a limited review of our records to determine FTI's
professional relationships with the Company and Bank of America, N.A., the administrative
agent for the Company's existing credit facility (the "Administrative Agent"). As you may be
aware, FTI is regularly retained by the Administrative Agent and/or other members of your
credit facility (or law firms retained by the administrative agent or members of your credit
facility). However, such representations are in matters unrelated to this Engagement.

FTI appears in numerous cases, proceedings and transactions that involve many different
professionals, including attorneys, accountants and financial consultants, who may represent
claimants and parties-in-interest. Also, FTI has performed in the past, and may perform in the
future, advisory consulting services for various attorneys and law firms, and has been
represented by several attorneys and law firms, some of whom may be involved in a potential
Chapter 11 case. In addition, FTI has in the past, may currently and will likely in the future be
working with or against other professionals involved in a potential Chapter 11 in matters
unrelated to these cases. Based on our current knowledge of the professionals involved, and to
the best of my knowledge, none of these relationships create interests materially adverse to the
Company in matters upon which FTI is to be employed, and none are in connection with these
cases.

FTI has initiated ethical walls relating to two matters to ensure that FTI's representation of
another party does not have a materially adverse impact on the Company. First, FTI is
currently engaged by Syntax Brillian and Circuit City is a party to litigation with Syntax
Brillian. Second, FTI is currently engaged by Magellan and Magellan is a potential creditor of
the Company in any Chapter 11 case.

From the results of such review, we were not made aware of any conflicts of interest or
additional relationships that we believe would preclude us from performing the Services.
However, as you know, we are a large consulting firm with numerous offices throughout the
United States. We are regularly engaged by new clients, which may include one or more of
the Potentially Interested Parties. We will not accept an engagement that directly conflicts
with this Engagement without your prior written consent.

Circuit City Stores, Inc.
November 5, 2008

6.      **Acknowledgement and Acceptance**

Please acknowledge your acceptance of the terms of this Engagement Contract by signing both the confirmation below and the Standard Terms and Conditions and returning a copy of each to us at the above address.

If you have any questions regarding this letter or the Standard Terms and Conditions, please do not hesitate to contact Robert J. Duffy at 617-897-1501.

Circuit City Stores, Inc.
November 5, 2008

Yours faithfully,

FTI CONSULTING, INC.

By:    _____
       Robert J. Duffy
       Senior Managing Director

Attachment – As stated

Circuit City Stores, Inc.
November 5, 2008

Confirmation of Terms of Engagement

**We agree to engage FTI Consulting, Inc. upon the terms set forth herein and upon the Standard Terms and Conditions.**

Circuit City Stores, Inc.

By: _____

Bruce H. Besanko
Chief Financial Officer

Date: NOV 5, 2008

FTI CONSULTING, INC.

STANDARD TERMS AND CONDITIONS

The following are the Standard Terms and Conditions on which we will provide the Services to you set forth within the attached letter of engagement with Circuit City Stores, Inc. dated November 5, 2008 (the "Engagement Letter"), the terms of which are incorporated herein by reference. The Engagement Letter and these Standard Terms and Conditions set forth herein (collectively, the "Engagement Contract") form the entire agreement between us relating to the Services and replace and supersede any previous proposals, letters of engagement, undertakings, agreements, understandings, correspondence and other communications, whether written or oral, regarding the Services. The headings and titles in the Engagement Contract are included to make it easier to read but do not form part of the Engagement Contract.

1.    **Reports and Advice**

1.1    **Use and purpose of advice and reports**—Any advice given or report issued by us is provided solely for your use and benefit and only in connection with the purpose in respect of which the Services are provided. Unless required by law, you shall not provide any advice given or report issued by us to any third party (other than to your attorneys, investment bankers, financial advisors, auditors and other representatives), or refer to us or the Services, without our prior written consent. In no event, regardless of whether consent has been provided, shall we assume any responsibility to any third party to which any advice or report is disclosed or otherwise made available.

2.    **Information and Assistance**

2.1    **Provision of information and assistance**—Our performance of the Services is dependent upon your providing us with such information and assistance as we may reasonably require from time to time.

2.2    **Punctual and accurate information**—You shall use reasonable skill, care and attention to ensure that all information we may reasonably require is provided on a timely basis and is accurate and complete and relevant for the purpose for which it is required. You shall also notify us if you subsequently learn that the information provided is incorrect or inaccurate or otherwise should not be relied upon.

2.3    **No assurance on financial data**—While our work may include an analysis of financial and accounting data, the Services will not include an audit, compilation or review of any kind of any financial statements or components thereof. Company management will be responsible for any and all financial information they provide to us during the course of this Engagement, and we will not examine or compile or verify any such financial information. Moreover, the circumstances of the Engagement may cause our advice to be limited in certain respects based upon, among other matters, the extent of sufficient and available data and the opportunity for supporting investigations in the time period. Accordingly, as part of this Engagement, we will not express any opinion or other form of assurance on financial statements of the Company.

2.4    **Prospective financial information**—In the event the Services involve prospective financial information, our work will not constitute an examination or compilation, or apply agreed-upon procedures, in accordance with standards established by the American Institute of Certified Public Accountants or otherwise, and we will express no assurance of any kind on such information. There will usually be differences between estimated and actual results, because events and circumstances frequently do not occur as expected, and those differences may be material. We will take no responsibility for the achievability of results or events projected or anticipated by the management of the Company.

**3.   Additional Services**

3.1       **Responsibility for other parties**—You shall be solely responsible for the work and fees of any other party engaged by you to provide services in connection with the Engagement regardless of whether such party was introduced to you by us. Except as provided in this Engagement Contract, we shall not be responsible for providing or reviewing the advice or services of any such third party, including advice as to legal, regulatory, accounting or taxation matters. Further, we acknowledge that we are not authorized under our Engagement Contract to engage any third party to provide services or advice to you, other than our agents or independent contractors engaged to provide Services, without your written authorization.

3.2       **Facilities** -- To the extent necessary to perform the services, the Company will provide FTI with the workspace, facilities and supplies reasonably required to perform the services contemplated hereunder. The Company shall have no liability for any claims, losses, damages, injuries, costs, expenses or any other liabilities of any kind or character whatsoever arising out of, resulting from or in any way connected with providing us with workspace, facilities and supplies in connection with the Services, except to the extent caused by the grossly negligent or willful acts or omissions of the Company.

**4.   Confidentiality**

4.1       **Restrictions on confidential information**—Both parties agree that any confidential information received from the other party shall only be used for the purposes of providing or receiving Services under this or any other contract between us. Except as provided below, neither party will disclose the other party's confidential information to any third party without the other party's prior written consent. Confidential information shall not include information that:

          4.1.2       is or becomes generally available to the public other than as a result of a breach of an obligation under this Clause 4.1;

          4.1.3       is acquired from a third party who, to the recipient party's knowledge after receiving prior advice from counsel, owes no obligation of confidence in respect of the information; or

          4.1.4       is or has been independently developed by the recipient.

4.2       **Disclosing confidential information**—Notwithstanding Clause 1.1 or 4.1 above, either party will be entitled to disclose confidential information of the other to a third party to the extent that this is required by valid legal process, provided that (and without breaching any legal or regulatory requirement) where reasonably practicable not less than 2 business days' notice in writing is first given to the other party.

4.3       **Citation of Engagement**—Subject to Clause 4.1 and Clause 4.2 above, to the extent the Engagement is or becomes known to the public, we may cite the performance of the Services to our clients and prospective clients as an indication of our experience, unless we and you specifically agree otherwise in writing.

4.4       **Internal quality reviews**—Notwithstanding the above, we may disclose any information referred to in this Clause 4 to any other FTI entity or use it for internal quality reviews.

4.5       **Maintenance of workpapers**—Notwithstanding the above, we may keep one archival set of our working papers from the Engagement, including working papers containing or reflecting confidential information, in accordance with our internal policies.

**5.   Termination**

5.1       **Termination of Engagement with notice**—Either party may terminate the Engagement Contract for whatever reason upon written notice to the other party. Upon receipt of such notice, we will stop all work immediately. You will be responsible for all undisputed fees and expenses incurred by us through the date notice of termination is received.

5.2    **Effect of Termination** -- If, at any time prior to twelve months after the effective date of termination without cause of this Engagement, a restructuring or sale transaction, as described in the Engagement Letter, is consummated, the Company may pay FTI a Completion Fee subject to the terms specified in Clause 3 of the Engagement Letter. Company shall have the discretion to pay FTI a Completion Fee whether or not the Company has then engaged the services of a third party firm.

5.3    **Continuation of terms**—The terms of the Engagement that by their context are intended to be performed after termination or expiration of this Engagement Contract, including but not limited to, Clauses 3 and 4 of the Engagement Letter, and Clauses 1.1, 4, 6 and 7 of the Standard Terms and Conditions, are intended to survive such termination or expiration and shall continue to bind all parties.

**6.   Indemnification and Liability Limitation; Waiver of Jury Trial**

6.1    **Indemnification** - Each party agrees to indemnify and hold harmless the other party and any of its subsidiaries and affiliates, officers, directors, principals, shareholders, agents, independent contactors and employees (collectively "Indemnified Persons") from and against any and all claims, liabilities, damages, obligations, costs and expenses (including reasonable attorneys' fees and expenses and costs of investigation) arising out of the acts or omissions of the indemnifying party, except to the extent that any such claim, liability, obligation, damage, cost or expense shall have been determined by final non-appealable order of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of the Indemnified Person or Persons in respect of whom such liability is asserted.

6.2    **Limitation of liability**—Each party agrees that no Indemnified Person shall have any liability as a result of this Engagement, the execution and delivery of this Engagement Contract, the provision of Services or other matters relating to or arising from this Engagement Contract, other than liabilities that shall have been determined by final non-appealable order of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of the Indemnified Person or Persons in respect of whom such liability is asserted. Without limiting the generality of the foregoing, in no event shall any Indemnified Person be liable for consequential, indirect or punitive damages, damages for lost profits or opportunities or other like damages or claims of any kind.

6.3    **WAIVER OF JURY TRIAL**—TO FACILITATE JUDICIAL RESOLUTION AND SAVE TIME AND EXPENSE, YOU AND FTI IRREVOCABLY AND UNCONDITIONALLY AGREE NOT TO DEMAND A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THE SERVICES OR ANY SUCH OTHER MATTER ARISING FROM THE ENGAGEMENT CONTRACT.

6.4    **Insurance** -- FTI shall maintain the following insurance with an insurance carrier authorized to do business in the United States and having a rating of "A-" or better by A.M. Best Company and a Financial Size Category of at least Class VIII: (a) a policy of commercial general liability insurance, covering liability arising from premises, operations, independent contractors, products – completed operations, personal injury, advertising injury and liability assumed under an insured contract, with limits of not less than $2,000,000 each occurrence and at least $10,000,000 in aggregate liability; (b) commercial auto liability insurance to include all owned, non-owned and hired vehicles, with limits of liability not less than $2,000,000 each accident; (c) workers compensation insurance to the extent required by law and employer's liability insurance, with limits of at least $1,000,000 each accident/disease; and (d) professional liability insurance with limits of at least $2,000,000 per occurrence. All policies except for (b), (c) and (d) above shall name the Company as an "Additional Insured". All certificates will provide for at least thirty (30) days written notice prior to cancellation of any insurance referred to under this Engagement Contract as well as notification of "Additional Insured". A certificate of insurance meeting the above requirements will be delivered to the Company (i) upon execution of this Engagement Letter, (ii) upon renewal of the insurance policy and annually thereafter, and (iii) upon reasonable request.

6.5    **Governing Law and Jurisdiction**—The Engagement Contract shall be governed by and interpreted in accordance with the laws of the State of New York, without giving effect to the choice of law provisions thereof. The United States District Court for the Southern District of New York and the

appropriate Courts of the State of New York sitting in the Borough of Manhattan, City of New York shall have exclusive jurisdiction in relation to any claim, dispute or difference concerning the Engagement Contract and any matter arising from it; provided that if the Company or any of its affiliates has sought relief under the Bankruptcy Code, the parties consent to the exclusive jurisdiction of the bankruptcy court in which such case or cases are pending over any and all matters arising from or related to the Engagement Contract. The parties submit to the jurisdiction of such courts and irrevocably waive any right to object to any action being brought in such courts, to claim that the action has been brought in an inconvenient forum or to claim that those courts do not have jurisdiction.

7.   **Independent Contractors** -- The parties to this Engagement Contract are independent of one another. This Engagement Contract does not create any relationship of franchise, joint venture, association, partnership, or any other form of business organization. Neither party shall have any right, power or authority to bind the other or to assume, create, or incur any expenses, liability or obligation, express or implied, on behalf of the other. The Company shall not be responsible for payment of FTI's employees' or contractors' salary, benefits, expenses, insurance, taxes, workers' compensation, unemployment insurance or any other employee benefits, but such responsibility shall be that of the Supplier. Furthermore, FTI shall be fully responsible for withholding any and all Federal, state or local income and employment taxes in connection with FTI's employees' and contractors compensation.

**FTI CONSULTING, INC**


**Confirmation of Standard Terms and Conditions**

We agree to engage FTI Consulting, Inc. upon the terms set forth in these Standard Terms and Conditions as outlined above.

**CIRCUIT CITY STORES, INC.**

By:  _____
Bruce H. Besanko
Chief Financial Officer

Date:  _____NOV 5, 2008_____

**EXHIBIT 2**
## Listing of Parties-in-Interest
## Reviewed for Current Relationships

**Debtors**
Abbott Advertising Agency, Inc.
CC Aviation, LLC
CC Distribution Company of
Virginia, Inc.
Circuit City Properties, LLC
Circuit City Purchasing Company,
LLC
Circuit City Stores PR, LLC
Circuit City Stores West Coast,
Inc.
Circuit City Stores, Inc.
Courcheval, LLC
Digital Video Express, LP
InterTAN, Inc.
Kinzer Technology, LLC
Mayland MN, LLC
Northern National Insurance, Ltd
Orbyx Electronics, LLC
Patapsco Designs, Inc.
Prahs, Inc.
Sky Venture Corporation
Tourmalet Corp.
Ventoux International, Inc.
XS Stuff, LLC

**Non-Debtor Affiliates**
587255 Ontario Ltd.
American Computer Development Inc.
Asian Sourcing & Procurement
Services Co. Ltd.
Cicuit City Global Sourcing Limited
Early Adopter Fund, LLC
InterTAN Canada, Ltd
InterTAN France SNC
InterTAN Ontario Ltd.
PlumChoice, Inc.
Sixth Street Marketplace, LP
St. Tammany Oaks Subdivision
Association LLC
Theater Xtreme Entertainment Group,
Inc.

**Current and Former Officers and
Directors**
Appleby Corporate Services, Ltd.

Lisa Baldyga
Henry P. Barretta
Bruce H. Besanko
Alan Bossin
Brian S. Bradley
Kelly E. Breitenbecher
Ronald M. Brill
Carolyn H. Byrd
Consec Services Limited (HK)
Ron Cuthbertson
Ean Daoust
Philip J. Dunn
Ursula O. Fairbairn
Timothy C. Faries
Barbara S. Feigin
Michael E. Foss
Jacqueline Grove
James F. Hardymon
John T. Harlow
Reginald D. Hedgebeth
Lyle G. Heidemann
Eric A. Jonas, Jr.
Alan Kane
John J. Kelly
Allen B. King
Don R. Kornstein
Jeric Ma
James A. Marcum
Jeffrey A McDonald
Michelle Mosier
John Mulleady
John A. Oakey, III
Linda M. Owen
Steven P. Pappas
Danny W. Ramsey
Mikael Salovaara
Philip J. Schoonover
Marlies A. Smith
J. Patrick Spainhour
Richard D. Spurling
Jeffrey S. Stone
Gerald L. Swider
Ronald L. Turner
Elliott Wahle
Mark J. Wong
Carolyn Y. Woo

## Secured Lenders
Ableco Finance LLC
Bank of America, N.A.
Burdale Finance Ltd.
Capital One Leverage Finance Corp.
Crystal Capital
Fifth Third Bank
General Electric Capital
Corporation
GMAC Commercial Finance LLC
JPMorgan Chase Bank, N.A.
National City Business Credit, Inc.
PNC Bank, N.A.
SunTrust Bank
Textron Financial Corporation
UBS Loan Finance LLC
UPS Capital Corporation
Wachovia Capital Finance
Corporation
Webster (Webster Bank/Webster
Financial Corporation)
Wells Fargo Retail Finance, LLC

## Significant Merchandise Creditors
Alliance Entertainment
Apple
Audiovox
Belkin Logistics Inc
Buena Vista Home Video
Columbia Tristar Home Video
Dlink Systems
Eastman Kodak Co
Electronic Arts
Epson America Inc
Fox Home Entertainment
Fuji Photo Film Usa
Garmin International Inc
Hewlett-Packard  US Operations
Hisense USA Corporation
Kingston Technologies
Klipsch Audio Technologies LLC
Lenovo, Inc.
Lexmark International Inc
Linksys
Logitech Inc
Magellan
Microsoft Corp
Microsoft Xbox
Mitsubishi Digital Electronics

Monster Cable Products
Nikon Inc
Olympus Corporation
Omnimount Systems Inc
Oncorp US, Inc
Onkyo USA Corp
Panasonic Company National Acct
Panasonic North America
Paramount Home Video
Pioneer Electronics (USA) Inc
Samsung Electronics Amer Inc.
Samsung Opto Electronics Inc
Sandisk Corporation
Sharp Electronics Corp
Sony Computer Entertainment
Sony Electronics Inc
Stillwater Designs Inc
THQ Inc
Tomtom Inc
Toshiba America Consumer Products
Toshiba Computer Systems Div
Universal Distribution Records
Vizio
Warner Home Video
Western Digital Technologies
Zenith Electronics Corp

## Significant Vendors
Alpha Security Products
American Systems Corp
Andrews Electronics Inc.
Bailiwick Data Systems Inc
CDW Direct LLC
Clay Inc, Bruce
Clickit Inc
Cormark Inc
Corporate Express
Corporate Facilities Group
Cosco
DC Power Solutions
Eastern Security Corp
Eleets Logistics
Ereplacements LLC
Fire Materials Group LLC
Gorilla Nation Media
Graphic Communications
Illinois Wholesale Cash Register
Innerworkings LLC
J&F Mfg Inc
JLG Industries Inc
Nextag

NFL Enterprises LLC
North American Roofing Sys Inc
Northern Wire Productions
Orbis Corporation
Pricegrabber Com LLC
PTR Compactor & Baler Co
Quebecor World KRI
Retail Maintenance Services LLC
Samsung Electronics America
Shopping.Com Inc
Shopzilla Inc
Sony
Specificmedia Inc
Standard Electric
Streater Inc
Swiff Train Company
Trane
Tremor Media
Universal Fixtures & Display
US Signs
USIS Commercial Services Inc
Vance Baldwin
Vanguard Products Group Inc
Vector Security
Virginia Electronic Components
Wayne Dalton Corp
Weather Channel Interactive, The

**Consignment Vendors**
ValuSoft (THQ, Inc.)
foneGear
INTUIT Inc.
Pinnacle Systems, Inc. (Avid Tech, Inc.)
Memorex Products, Inc.
Panasonic Consumer Electronics Company
Navarre Corporation

**5% or Greater Shareholders**
J Richard Atwood
Classic Fund Management Aktiengesellschaft
First Pacific Advisors LLC
HBK Investments LP
HBK Management LLC
HBK Master Fund
HBK Master Fund LP
HBK Partners II LP
HBK Services LLC
Robert L Rodriguez

Mark J Wattles

**Third Party Administrators**
Aetna Life Insurance Company
Alliance Entertainment Corporation
American Express Travel Related Services Co
American Express Trust Co
Aon
Assurant
Avista Advantage, Inc
Beecher Carlson Insurance Services
CTSI
E-Count
Empire Blue Cross Blue Shield
Hewitt Associates LLC
International Business Machines, Inc
Jardine Lloyd Thompson Canada
Kaiser Permanente
Marsh USA, Inc.
Medco Health Solutions
Mercer Insurance Group
Mid-Atlantic Vision Service Plan, Inc.
Navigant Consulting, Inc
Specialty Risk Services
Tangoe, Inc
Triple-S Management Corporation
Vision Service Plan
Wachovia Bank, N.A.

**Significant Real Property Lessors (Landlords)**
Benderson Development Co
Cardinal Capital Partners
Circuit Investors #2 Ltd
Developers Diversified Realty Corp
Forest City Ratner Co
Immobilien Verwaltung Gmbh
Inland American Retail Management
Kamin Realty Co
Kimco Relaty Corp
Lucknow Associates
New Plan Excel Realty Trust
One Liberty Properties
Red Mountain Retail Group
Saunders Hotel Group
Simon Property Group
Terra Enterprises
Vornado Realty Trust

Weingarten Realty Investors
Wilmington Trust Co

### Significant Personal Property Lessors
Avaya Financial Services
GE Fleet Services
IBM
Hewlett Packard Company
Service Pwer
Toshiba

### Professionals
Bingham McCutchen LLP
Ernst & Young
Goldman Sachs
Kirkland & Ellis LLP
Kurtzman Cardon Consultants LLC
LeClairRyan
McGuireWoods, LLP
Ogilvy Renault LLP
Osler, Hoskin & Hardcourt LLP
Rothschild, Inc
Schulte Roth & Zabel LLP
Skadden, Arps, Slate, Meagher & Flom, LLP
Wilmer, Cutler, Pickering Hale, & Dorr LLP

### Litigation Parties
Ada Alicea (class action)
Andrew Foss
Audiobahn
Betty Ibrahim (class action)
Christopher Murphy (class action)
Christopher Snow (class action)
Citigroup
Clayton P. Voegtle (class action)
Daniel Weidler (class action)
Davis (class action)
Dealtree
Donald Moxley
Federal Communications Commission
Floyd Edward Temple Jr. (class action)
Govani (class action)
Harper
Hernandez (class action)
Hilgenberg (class action)
Internal Revenue Service
Iowa AG

Jamal Booker (class action)
Kenneth Donnelly (class action)
Kobra Properties
Latia Holloman
Location 4500 Eastlake LA
Location 6946 Whitney Bank
Mad Rhino
Maria Moncayo (class action)
Massachusetts Department of Revenue
Mastercard
Michael Banker (class action)
Michael DiPirro (class action)
Micro Electronics
Millennium Retail Partners
Monster Cable
RealSource
Roberty Gentry (class action)
Securities and Exchange Commission
State of Iowa
Syntax Brillian
Tennesee Department of Revenue
Unical
Visa
William Harris (class action)

### Banks
American Savings
Amsouth/Regions
Banco Popular
Bank of America
Bank of America/CRP Securities, LLC
Chase
Fifth Third Bank
Fifth Third Securities, Inc.
J.P. Morgan Securities, Inc.
Lehman Brothers
Merrill Lynch Global Institutional Advisory Division
RBC Dain Rauscher
Suntrust
UBS Financial Services, Inc.
Wachovia Bank & Securities
Wells Fargo

### Potential Liquidators
Gordon Bros Retail Partners, LLC
Great American Group
Hilco Merchant Resources, LLC
Hudson Capital Partners, LLC
SB Capital Group, LLC
Tiger Capital Group, LLC

## EXHIBIT 3
### Parties-in-Interest Noted for Court Disclosure

**Current and Former Officers and Directors**
Ronald L Turner

**Secured Lenders**
Bank of America, N.A.
Fifth Third Bank
General Electric Capital Corporation
GMAC Commercial Finance LLC
JPMorgan Chase Bank, N.A.
SunTrust Bank
Textron Financial Corporation
UBS Loan Finance LLC
UBS Capital Corporation
Wachovia Capital Finance Corporation
Wells Fargo Retail Finance, LLC

**Significant Merchandise Creditors**
Belkin Logistics Inc
Eastman Kodak Co
Epson America Inc
Hewlett-Packard US Operations
Lexmark International Inc
Linksys
Microsoft Corp
Microsoft Xbox
Onkyo USA Corp
Panasonic Company National Acct
Panasonic North America
Samsung Electronics Amer Inc.
Samsung Opto Electronics Inc
Sandisk Corporation
Sharp Electronics Corp
Sony Computer Entertainment
Sony Electronics Inc
Toshiba America Consumer Products
Toshiba Computer Systems Div

**Significant Vendors**
American Express Travel Related Services Co
Corporate Express
Innerworkings LLC
Kaiser Permanente
Magellan*
Medco
Samsung Electronics America
Sony

**Significant Real Property Lessors**
Developers Diversified Realty Corp
Kimco Realty Corp
New Plan Excel Realty Trust
Vornado Realty Trust

**Significant Personal Property Lessors**
Hewlett Packard Company
Toshiba

**Professionals**
Bingham McCutcheon LLP
Ernst & Young LLP
Kirkland & Ellis LLP
LeClair Ryan
McGuire Woods
Schulte Roth & Zabel LLP
Skadden, Arps, Slate, Meagher & Flom, LLP
Wilmer, Cutler, Pickering, Hale & Dorr LLP

**Third Party Administrators**
Aon
Assurant
International Business Machines, Inc.
Jardine Lloyd Thompson Canada
Navigant Consulting
Triple-S Management Corporation

**Litigation Parties**
Citigroup
Internal Revenue Service
Keystone Automotive
Mastercard
Securities & Exchange Commission
Syntax Brillian*
Visa

**Banks**
Banco Popular
Bank of America
Bank of America/Crp Securities, LLC
Chase
Fifth Third Bank
Fifth Third Securities, Inc.
J.P. Morgan Securities, Inc.

Lehman Brothers
Suntrust
UBS Financial Services, Inc.
Wachovia Bank & Securities
Wells Fargo

*Ethical walls have been
established between these parties-
in-interest and FTI personnel
working on this engagement as
discussed in the affidavit

**EXHIBIT 4**
List of Invoices and Payments

| Invoice Date | Payment Date | Description | Fees | | Expenses | | Total Amount | |
|---|---|---|---|---|---|---|---|---|
| 8/28/08 | 9/9/08 | Invoice | $ | 76,365 | $ | 6,900 | $ | 83,265 |
| 8/31/08 | 9/17/08 | Invoice | | 95,700 | | 8,600 | | 104,300 |
| 9/12/08 | 9/17/08 | Invoice | | 130,195 | | 8,600 | | 138,795 |
| 9/18/08 | 9/23/08 | Invoice | | 149,335 | | 10,361 | | 159,696 |
| 9/26/08 | 10/2/08 | Invoice | | 162,965 | | 7,250 | | 170,215 |
| 9/30/08 | 10/8/08 | Invoice | | 183,378 | | 7,250 | | 190,628 |
| 10/9/08 | 10/22/08 | Invoice | | 173,895 | | 7,250 | | 181,145 |
| 10/17/08 | 10/27/08 | Invoice | | 187,235 | | 7,250 | | 194,485 |
| 10/23/08 | 10/30/08 | Invoice | | 262,667 | | 10,500 | | 273,167 |
| 10/28/08 | 11/4/08 | Invoice | | 263,347 | | 12,750 | | 276,097 |
| 11/5/08 | 11/7/08 | Invoice | | 334,871 | | 35,623 | | 370,494 |
| 11/5/08 | 11/7/08 | Invoice | | 316,537 | | 20,100 | | 336,637 |
| | | **Total** | $ | **2,336,490** | $ | **142,434** | $ | **2,478,924** |
| **Cash on Account:** | | | | | | | | |
| 8/27/08 | 9/9/08 | Cash on Account | $ | 100,000 | $ | - | $ | 100,000 |
| 8/27/08 | 9/22/08 | Cash on Account | | 100,000 | | - | | 100,000 |
| 10/31/08 | 11/5/08 | Cash on Account | | 550,000 | | - | | 550,000 |
| | | **Total** | $ | **750,000** | $ | **-** | $ | **750,000** |
| | | **Total** | $ | **3,086,490** | $ | **142,434** | $ | **3,228,924** |