Annemarie G. McGavin (VSB No. 39984)
Buchanan Ingersoll & Rooney PC
1700 K Street, N.W., Suite 300
Washington, DC  20006
(202) 452-7900

-and-

James D. Newell (PA ID# 51337)
Zakarij O. Thomas (PA ID# 87385)
Buchanan Ingersoll & Rooney PC
One Oxford Centre, 20th Floor
Pittsburgh, PA 15219
(412) 562-8800

Counsel to Dick's Sporting Goods, Inc.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| CIRCUIT CITY STORES, INC., et al., | Case No.  08-35653 |
| Debtors. | Jointly Administered |

**LIMITED OBJECTION TO ORDER PURSUANT TO 11 U.S.C. SECTIONS
105(a), 365(a) AND 554 AND FED. R. BANKR. P. 6006 AUTHORIZING
REJECTION OF UNEXPIRED LEASES AND SUBLEASES OF NON-
RESIDENTIAL REAL PROPERTY AND ABANDONMENT OF PERSONAL
PROPERTY EFFECTIVE AS OF THE PETITION DATE**

Dick's Sporting Goods, Inc. ("Dick's") by and through its undersigned counsel,

hereby submits this limited objection to the Debtors' Motion for Order Pursuant to 11

U.S.C. Sections 105(a), 365(a), and 554 and Fed. R. Bankr. P. 6006 Authorizing

Rejection of Unexpired Leases of Nonresidential Real Property and Abandonment of

Personal Property Effective as of the Petition Date (the "Rejection Motion") as follows:

## PROCEDURAL HISTORY

1.      On November 10, 2008 (the "Petition Date"), the above-captioned debtors-in-possession filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code.

2.      On November 10, 2008, the Debtors filed the Rejection Motion.

3.      Pursuant to the Rejection Motion, the Debtors sought, *inter alia*, authority to reject certain leases (including the subleases thereto) as of the Petition Date, subject to the rights of landlords associated with the leases to object to the rejection of the leases.

4.      On November 10, 2008, the Court entered an Order Pursuant to 11 U.S.C. Sections 105(a), 365(a), and 554 and Fed. R. Bankr. P. 6006 Authorizing Rejection of Unexpired Leases of Nonresidential Real Property and Abandonment of Personal Property Effective as of the Petition Date (the "Rejection Order").

## FACTUAL BACKGROUND

5.      Galleria Plaza, Ltd. (the "Prime Landlord") and Circuit City Stores, Inc. (the "Sublandlord") are parties to a Lease (the "Prime Lease") dated June 7, 1995, pursuant to which the Sublandlord leased non-residential real property located at a shopping center located at 13838 Dallas Parkway, Dallas, Texas (the "Prime Lease Premises").

6.      Dick's and the Sublandlord are parties to a sublease agreement dated April 1, 2007 (the "Sublease"), pursuant to which Dick's leased a portion of the Prime Lease Premises (the "Subleased Premises").  A true and correct copy of the Sublease is attached to this Objection and incorporated herein as Exhibit A.[1]

---

[1]      Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Sublease.

7.    Pursuant to the Sublease, monthly rent becomes due and payable in advance on the first day of each month.

8.    On or before November 1, 2008, Dick's paid to the Sublandlord monthly rent in the amount of $64,566.00, Dick's pro-rata share of estimated real estate taxes in the amount of $18,293.67 and Dick's pro-rata share of common area maintenance charges ("CAM Charges") in the amount of $4,232.66, for a total amount of $87,092.33 in obligations for the month of November (collectively, the "November Payments").

9.    By letter dated November 7, 2008, the Prime Landlord notified the Sublandlord that the Prime Lease was in default due to the Sublandlord's failure to timely pay November 2008 base rent and the pro-rata share of CAM Charges for November 2008.

10.    By letter dated November 13, 2008, the Prime Landlord notified Dick's that the Prime Lease is in default due to the Debtor's rejection of the Prime Lease and further notified Dick's that the Sublandlord failed to make payment to the Prime Landlord for November 2008 Rent and CAM Charges as well as for real estate taxes for 2008.    A true and correct copy of the November 13, 2008 letter is attached to this Objection and incorporated herein as Exhibit B.

11.    Pursuant to the Sublease, Dick's was obligated to make payments for real estate taxes to the Sublandlord, in advance, on a monthly basis.    During 2008, Dick's made payments to the Sublandlord for real estate taxes in the total amount of $201,230.37 (the "Tax Payments").

12.    Upon information and belief, the Sublandlord did not pass the Tax Payments through to the Prime Landlord.

3

13.    Paragraph 3(G) of the Sublease provides that:

[I]f Subtenant's payments exceed the amount of Subtenant's Pro Rata Share of actual Operating Expenses, Insurance Costs, or Taxes, Subtenant shall receive a credit toward the next installment of such Additional Rent in the amount of such overpayment (or, if the Sublease has expired, Sublandlord shall reimburse such overpayment to Subtenant within thirty (30) days after delivery of [a reconciliation of such amounts]). Subtenant's obligation to pay Subtenant's Pro Rata Share of Operating Expenses, Insurance Costs, and Taxes hereunder, and Sublandlord's obligation to reimburse overpayments, shall survive expiration or termination of this Sublease.

14.    The Rejection Order appears to provide that the actual Operating Expenses (which include CAM Charges) paid to the Prime Landlord for November will be zero.  In that event, Dick's is entitled to a refund of the CAM Charges it paid to the Sublandlord for November under paragraph 3(G) of the Sublease.

15.    Similarly, to the extent that the Sublandlord did not pass the Tax Payments through to the Prime Landlord, Dick's is entitled to a refund of the Tax Payments under paragraph 3(G) of the Sublease.[2]

## BASIS FOR OBJECTION

16.    Although Dick's does not object to the ultimate rejection of the Prime Lease and Sublease, Dick's does object to the rejection of the Prime Lease and the Sublease as of the Petition Date.

17.    Given that Dick's has already made payment for November 2008 obligations due under the Sublease, the Debtors should either: (i) reject the Prime Lease and Sublease as of November 30, 2008 and pay administrative rent for the post-petition

---

[2]    To the extent that the Sublandlord pays the November Payments to the Prime Landlord, the amount of Tax Payments refundable would be reduced by $18,293.67 to account for the portion related to November 2008.

4

period of November, or (ii) pay over to the Prime Landlord the amount of $87,092.33 already paid by Dick's for November 2008.

18.    Moreover, pursuant to paragraph 3(G) of the Sublease, Dick's is entitled to a refund of any portion of the Tax Payments not passed through to the Prime Landlord.

19.    At least one other Bankruptcy Court has entered orders providing similar relief to sublessees under facts similar to those present in this case. See, e.g., In re Kmart Corporation, et al., Case No. 02-02472 (Bankr. N.D. Ill. Feb. 15, 2002 and March 8, 2002) (Order authorizing rejection of certain unexpired leases and providing that "the Debtors shall turn over to the applicable lessor any and all rentals collected by the Debtors from the sublessee of premises subject to such Real Property Lease for rental periods arising from and after the effective date of the rejection.").

20.    In addition to the contractual rights of Dick's, to the extent that the November Payments and Tax Payments are not passed through to the Prime Landlord, the November Payments and Tax Payments are subject to a constructive trust and, therefore, are not property of the Debtors' estates.  See In re American Int'l Airways, Inc., 44 B.R. 143, 147-8 (Bankr. E.D. Pa. 1984) (sublease payments subject to constructive trust and not property of debtor-sublessor's estate); In re Mid-Atlantic Supply, Co., 790 F.2d 1121 (4th Cir. 1986).

### WAIVER OF MEMORANDUM OF LAW

21.    Pursuant to Local Bankruptcy Rule 9013-1(G), and because there are no novel issues of law presented in the Objection and all applicable authority is set forth in the Objection, Dick's respectfully requests that, to the extent applicable, the requirement that all motions be accompanied by a separate memorandum of law be waived.

5

## NO PRIOR REQUEST

22.     No previous motion for the relief sought herein has been made to this or any other Court.

WHEREFORE, Dick's Sporting Goods, Inc. respectfully requests that the Rejection Motion be denied to the extent that it seeks to reject the Prime Lease and Sublease as of the Petition Date without requiring the Debtors to pay over the November Payments and Tax Payments to the Prime Landlord.

**BUCHANAN INGERSOLL & ROONEY PC**

Dated:  November 20, 2008          By:     /s/  *Annemarie McGavin*
                                                Annemarie G. McGavin (VSB No. 39984)
                                                1700 K Street, N.W., Ste. 300
                                                Washington, DC  20006
                                                Telephone:  (202) 452-7900
                                                Facsimile:  (202) 452-7989

                                                         and

                                                James D. Newell  (PA ID# 51337)
                                                Zakarij O. Thomas (PA ID# 87385)
                                                One Oxford Centre, 20th Floor
                                                Pittsburgh, PA  15219
                                                Telephone:  (412) 562-8800

                                                Counsel to Dick's Sporting Goods, Inc.

## CERTIFICATE OF SERVICE

I certified that on the 20th day of November, 2008, I caused the Limited Objection to Debtors' Motion for Order Pursuant to 11 U.S.C. Sections 105(a), 365(a), and 554 and Fed. R. Bankr. P. 6006 Authorizing Rejection of Unexpired Leases of Nonresidential Real Property and Abandonment of Personal Property Effective as of the Petition Date to be served upon the following via First-Class U.S. Mail and, where applicable, via the electronic case filing system:

Daniel F. Blanks, Esq.
Douglas M. Foley, Esq.
McGuire Woods, LLP
9000 World Trade Ctr.
101 W. Main Street
Norfolk, VA  23510

Dion W. Hayes, Esq.
Joseph S. Sheerin, Esq.
Sarah Beckett Boehm
McGuire Woods, LLP
901 East Cary Street
Richmond, VA  23219

Robert B. Van Ardales, Esq.
Office of US Trustee
701 East Broad Street
Suite 4304
Richmond, VA  23219

Paramount Home Entertainment
Attn:  Andi Marygold
5555 Melrose Ave.
Bluhdorn #213
Hollywood, CA  90038

Hewlett-Packard Company
Attn:  Ramona Neal/Chris Patafio
11307 Chinden Blvd, MS 314
Boise, ID 83714

Samsung Electronics America, Inc.
Attn:  Joseph McNamara
105 Challenger Rd.
Ridgefield Park, NJ  07660

LG Electronics USA, Inc.
Attn;  Brian Wehr
c/o H. Jason Gold
Wiley Rein LLP
7925 Jones Branch Drive
Mclean, VA 22102

Weidler Settlement Class
Attn:  Christopher Jones and Martin Fletcher
Whiteford Taylor & Preston
3190 Fairview Park Drive, Ste. 300
Falls Church, VA  22042

Garmin International, Inc.
Attn:  Lisa Brauch
1200 East 151st Street
Olathe, KS  66062

Simon Property Group, Inc.
Attn:  Ronald M. Tucker
225 W. Washington Street
Indianapolis, IN  46204

Alliance Entertainment
Attn:  Douglas J. Bates
27500 Riverview Center Blvd.
Bonita Springs, FL  34134

Developers Diversified Realty Corp.
Attn:  Eric C. Cotton
3300 Enterprise Parkway
Beachwood, OH  44122

7

Pension Benefit Guarantee Corporation
Attn:  Sara Eagle
Office of General Counsel
1200 K. St. NW
Washington, DC  20005

Toshiba America Consumer Products, LLC
Attn: Judy Oliver and Joe Shedlock
82 Totowa Road
Wayne, NJ  07470

_/s/ Zakarij O. Thomas_____
Zakarij O. Thomas

# EXHIBIT A

EXECUTION COPY

CIRCUIT CITY STORES, INC.,

Sublandlord

TO

DICK'S SPORTING GOODS, INC

Subtenant

SUBLEASE

Dated:  April 1, 2007

Property:

13838 Dallas Parkway
Dallas, Texas

## TABLE OF CONTENTS

|   |   | Page |
|---|---|---|
| 1 | PREMISES | 1 |
| 2 | TERM | 1 |
| 3 | RENT | 2 |
| 4 | SECURITY DEPOSIT | 5 |
| 5 | CONDITION OF PREMISES | 5 |
| 6 | USE | 5 |
| 7 | PARKING AND COMMON AREAS | 6 |
| 8 | UTILITIES | 6 |
| 9 | REPAIRS AND MAINTENANCE | 6 |
| 10 | ALTERATIONS | 8 |
| 11 | SIGNS | 10 |
| 12. | ASSIGNMENT AND SUBLETING | 10 |
| 13 | ACCESS TO PREMISES | 11 |
| 14 | INDEMNITY | 12 |
| 15 | INSURANCE | 13 |
| 16 | SUBORDINATE TO PRIME LEASE | 15 |
| 17 | TERMINATION, DESTRUCTION, CONDEMNATION | 16 |
| 18 | NOTICES | 18 |
| 19 | DEFAULT | 18 |
| 20 | WAIVER OF JURY TRIAL AND RIGHT TO COUNTERCLAIM | 21 |
| 21 | END OF TERM | 22 |
| 22 | HOLDOVER | 22 |
| 23. | BROKERAGE | 22 |
| 24 | FINANCIAL STATEMENTS AND ESTOPPEL CERTIFICATES | 23 |
| 25 | AMERICANS WITH DISABILITIES ACT | 23 |
| 26 | HAZARDOUS SUBSTANCES | 23 |
| 27 | QUIET ENJOYMENT | 25 |
| 28 | SUBLANDLORD'S REPRESENTATIONS | 25 |
| 29 | MISCELLANEOUS COVENANTS | 25 |

EXHIBITS TO SUBLEASE

| EXHIBIT A | - | Premises Description |
| EXHIBIT B | - | Rules and Regulations |
| EXHIBIT C | - | Fire Monitoring Contact List |
| EXHIBIT D | - | Tenant's Work |
| EXHIBIT E | - | Sign Plan |

## SUBLEASE

THIS SUBLEASE, dated as of the 1st day of April, 2007, between CIRCUIT CITY STORES, INC., a Virginia corporation, having an office at 9950 Mayland Drive, Richmond, Virginia 23233-1464 ("Sublandlord") and DICK'S SPORTING GOODS, INC., a Delaware corporation, having an office at 300 Industry Drive, Pittsburgh, Pennsylvania 15275 ("Subtenant");

BACKGROUND INFORMATION:

A.    Sublandlord owns the first leasehold interest in certain Premises, as hereinafter defined, which first leasehold contains approximately 55,008 square feet of leasable space ("Prime Lease Premises"), under a Lease executed by and between Sublandlord, as tenant, and Galleria Plaza, Ltd , a Texas limited partnership, as landlord ("Landlord"), dated June 7, 1995, amended by First Amendment to Lease dated August 29, 1995, by Second Amendment to Lease dated July 31, 1996, and by Third Amendment to Lease dated _____ ("Prime Lease"); and,

B.    Sublandlord desires to sublease to Subtenant, and Subtenant desires to sublease from Sublandlord approximately 44,710 square feet of rentable square feet in the Prime Lease Premises, pursuant to the terms and conditions set forth in this Sublease

NOW, THEREFORE, in consideration of the foregoing, and for other valuable consideration, the amount and sufficiency of which are hereby acknowledged, Sublandlord and Subtenant agree as follows:

1.    PREMISES

Sublandlord hereby subleases to Subtenant, and Subtenant hereby subleases from Sublandlord, those certain premises ("Premises") crosshatched on Exhibit A, attached hereto and made a part hereof, consisting of approximately 44,710 rentable square feet of ground floor space in the building (the "Building") located at 13838 Dallas Parkway, Dallas, Texas, within the shopping center know as Galleria Plaza (the "Shopping Center") and being a part of the Prime Lease Premises  This Sublease does not include any right under the Prime Lease to (i) extend the term of the Prime Lease, (ii) purchase the Premises, or (iii) terminate the Prime Lease, all of which rights are reserved to Sublandlord, subject to the rights of Subtenant hereunder

2.    TERM

A.    Term  The term of this Sublease ("Term") shall be the period of approximately ten (10) years commencing on the date Sublandlord tenders possession of the Premises to Subtenant, pursuant to Section 2(B), below ("Commencement Date"), and ending at midnight on January 30, 2017 ("Expiration Date"), unless sooner terminated as herein provided

B    Possession    Sublandlord shall tender possession of the Premises to Subtenant within five (5) business days following the (i) execution and delivery of this Sublease by both parties, and (ii) the delivery by Subtenant to Sublandlord of all insurance certificates required pursuant to Section 15 hereof  If Subtenant shall fail to deliver the items required under clause (ii) above, Sublandlord shall have the right to withhold possession of the Premises until delivery by Subtenant of such items, but the Commencement Date and the Rent Commencement Date shall not be delayed

C    Agreement    Subtenant and Sublandlord shall execute and deliver to each other an agreement setting forth the Commencement Date and Rent Commencement Date within five (5) business days after either party's request therefor

D    Renewal Options    Sublandlord hereby agrees with Subtenant that Sublandlord shall not exercise any renewal options under the Prime Lease

3.    RENT

A    Base Rent    The "Rent Commencement Date" shall be September 1, 2007  Commencing on the Rent Commencement Date, Subtenant shall pay to Sublandlord rent ("Base Rent") in the amounts set forth in the Base Rent Schedule below  Base monthly installments of Base Rent shall be payable in advance on the first day of each month during the Term  In consideration for Subtenant's performance of its obligations under this Sublease, Sublandlord has conditionally agreed to abate Base Rent for the period from the Commencement Date to the day prior to the Rent Commencement Date, and for the period from February 1, 2012 to June 30, 2012 (the "Mid-Term Period")  If an Event of Default occurs at any time during the Term as a result of which this Sublease is terminated, then Base Rent shall automatically be deemed to have commenced on the Commencement Date at the rate of Sixty-four Thousand Five Hundred Sixty-six Dollars ($64,566) per month, and Base Rent for the Mid-Term Period shall be deemed to accrue or have accrued at the rate of Sixty-eight Thousand One Hundred Fifty-three Dollars ($68,153) per month, and, in addition to other remedies available to Sublandlord hereunder or under applicable law, (i) the total sum of Base Rent so conditionally abated, and (ii) the unamortized portion of the Improvement Allowance, as hereinafter defined (based on a straight line amortization from the Rent Commencement Date to the Expiration Date), shall be immediately due and payable by Subtenant to Sublandlord

Base Rent Schedule

| Period | Annual | Monthly |
|---|---|---|
| Commencement Date to August 31, 2007 | $0 00 | $0 00 |
| September 1, 2007 to January 31, 2012 | $774,792 00 | $64,566 00 |
| February 1, 2012 to June 30, 2012 | $0 00 | $0 00 |
| July 1, 2012 to January 30, 2017 | $817,836 00 | $68,153 00 |

F    Property Insurance    Beginning on the Rent Commencement Date, Subtenant shall pay to Sublandlord, as Additional Rent, on the first day of each month during the Term, Subtenant's Pro Rata Share of the cost of property insurance covering the improvements on the Shopping Center (the "Insurance Costs")  Subtenant's initial Pro Rata Share of the Insurance Costs for the first year of the Term is estimated to be Four Thousand Seven Hundred Thirty-four and 84/100 Dollars ($4,734 84), which Subtenant shall pay to Sublandlord in equal monthly installments of Three Hundred Ninety-four and 57/100 Dollars ($394 57), in advance, beginning on the Rent Commencement Date

G    Adjustment to Charges for Operating Expenses and Real Estate Taxes    Sublandlord may notify Subtenant from time to time setting forth an adjustment to estimated Operating Expenses, Insurance Costs, and Taxes, and Subtenant's Pro Rata Share thereof, if Sublandlord determines that payments are insufficient to meet estimated costs.  Within sixty (60) days after receipt of Landlord's statement of CAM Charges for each calendar year, Sublandlord shall determine the actual Operating Expenses, Insurance Costs, and Taxes for such year and shall deliver to Subtenant a statement (the "Expense Statement") detailing the amount of such Operating Expenses, Insurance Costs, and Taxes, and Subtenant's Pro Rata Share thereof.  If Sublandlord determines that Subtenant's Pro Rata Share of actual Operating Expenses, Insurance Costs, or Taxes exceeds the amount paid by Subtenant, then Subtenant shall pay the difference within thirty (30) days after Sublandlord delivers to Subtenant a statement showing such costs; if Subtenant's payments exceed the amount of Subtenant's Pro Rata Share of actual Operating Expenses, Insurance Costs, or Taxes, Subtenant shall receive a credit toward the next installment of such Additional Rent in the amount of such overpayment (or, if the Sublease has expired, Sublandlord shall reimburse such overpayment to Subtenant within thirty (30) days after delivery of such statement)  Subtenant's obligation to pay Subtenant's Pro Rata Share of Operating Expenses, Insurance Costs, and Taxes hereunder, and Sublandlord's obligation to reimburse overpayments, shall survive expiration or termination of this Sublease.

H    Subtenant's Right to Examine Sublandlord's Records    Sublandlord agrees that Subtenant shall have the same rights as Sublandlord under the Prime Lease to examine, review and make copies of Landlord's records pertaining to CAM Charges, in coordination with Sublandlord's rights to same, and Subtenant shall further have the right, within six (6) months after Subtenant's receipt of the Expense Statement, to furnish Sublandlord with written notice ("Audit Notice") that Subtenant intends to examine and make copies of Sublandlord's records pertaining to CAM Charges, for the calendar year to which the Expense Statement applies  Subtenant's right of examination shall be exercised within sixty (60) days after delivery of the Audit Notice, and during reasonable business hours at Sublandlord's principal records office within at least ten (10) days' prior notice to Sublandlord  If such examination discloses that Subtenant, after the adjustment contemplated by subsection G above, has paid more than its Pro Rata Share of Operating Expenses and Real Estate Taxes, Sublandlord shall promptly reimburse Subtenant for the amount of such overpayment  If the amount of any such overpayment is in excess of three percent (3%) of Subtenant's actual Pro Rata Share, then Sublandlord shall reimburse Subtenant for the reasonable cost of such examination; provided, however, that Sublandlord shall not be liable to Subtenant for the cost of such examination if such overpayment results from overcharges by Landlord to Sublandlord that were passed through to Subtenant without increase

B    Payments    Base Rent and all other amounts payable by Subtenant to Sublandlord under this Sublease ("Additional Rent") shall be paid when due, without notice or demand, and without deduction, abatement (except as specifically set forth in this Sublease), counterclaim or setoff, at the address of Sublandlord set forth in Section 18 or to such other person and/or at such other address as Sublandlord may from time to time designate by notice to Subtenant  No payment by Subtenant of any amount less than the amount stipulated to be paid hereunder shall be deemed other than on account of the earliest stipulated Base Rent or Additional Rent, nor shall any endorsement or statement on any check or letter be deemed an accord and satisfaction, and Sublandlord may accept any check or payment without prejudice to Sublandlord's right to recover the balance due or to pursue any other remedy available to Sublandlord

C    Subtenant's Pro Rata Share    For purposes of this Section 3, "Subtenant's Pro Rata Share" shall be 81 28%, which is calculated by taking the total square footage of the Premises, containing approximately 44,710 square feet of leasable space, as the numerator, and the total square footage of Prime Lease Premises, containing approximately 55,008 square feet of leasable space, as the denominator; provided, however, that Subtenant's Pro Rata Share shall not be subject to adjustment in the event Subtenant's measurement of the Premises, if any, reveals that the Premises contain more or less than 44,710 square feet  Subtenant's Pro Rata Share shall be equitably prorated for any partial calendar year during the Term

D    Taxes    Beginning on the Rent Commencement Date, Subtenant shall pay to Sublandlord, as Additional Rent, Subtenant's Pro Rata Share of (i) all Real Estate Taxes, as defined in the Prime Lease, charged to Sublandlord under the terms of the Prime Lease, and (ii) commercially reasonable costs, including reasonable attorneys' fees, incurred by Sublandlord to appeal, contest or reduce the Real Estate Taxes under the Prime Lease (items (i) and (ii) above being collectively referred to herein as "Taxes")  Subtenant shall have the right at Subtenant's expense to appeal the Real Estate Taxes thirty (30) days after Subtenant's written request to Sublandlord that Sublandlord appeal such Real Estate Taxes and Sublandlord's or Landlord's failure or refusal to commence such appeal within thirty (30) day period  Subtenant's initial Pro Rata Share of Real Estate Taxes for the first year of the Term is estimated to be Two Hundred Nineteen Thousand Five Hundred Twenty-four Dollars ($219,524 00), which Subtenant shall pay to Sublandlord, in twelve (12) equal monthly installments of Eighteen Thousand Two Hundred Ninety-three and 67/100 Dollars ($18,293 67), in advance, beginning on the Rent Commencement Date

E    Operating Expenses and CAM Charges    Beginning on the Rent Commencement Date, Subtenant shall pay to Sublandlord, as Additional Rent, Subtenant's Pro Rata Share of (i) all CAM Charges, as defined in the Prime Lease, charged to Sublandlord under the terms of the Prime Lease, and (ii) the cost of maintenance of the Fire Safety Systems, as defined in Section 9, incurred by Sublandlord pursuant to the terms hereof (clauses (i) and (ii) above, collectively, "Operating Expenses")  Subtenant's initial Pro Rata Share of Operating Expenses for the first year of the Term is estimated to be Fifty Thousand Seven Hundred Ninety-one and 92/100 Dollars ($50,791 92), which Subtenant shall pay to Sublandlord in equal monthly installments of Four Thousand Two Hundred Thirty-two and 66/100 Dollars ($4,232 66), in advance, beginning on the Rent Commencement Date

4    SECURITY DEPOSIT

[Intentionally Omitted]

5    CONDITION OF PREMISES

Subtenant is leasing, and hereby accepts the Premises, in their existing condition, except as hereinafter provided  Subtenant acknowledges that Sublandlord has afforded Subtenant the opportunity for, and that Subtenant has undertaken, full and complete investigations, examinations, and inspections of the Premises and has determined that the Premises are suitable for Subtenant's intended use, and represents that Subtenant shall bear full responsibility for any special requirements in connection with Subtenant's use of the Premises.  Sublandlord makes no representation or warranty that the Premises presently comply with Laws, as hereinafter defined  Notwithstanding the foregoing, Sublandlord represents and warrants that on the Commencement Date, the mechanical and utility systems, dock door, and HVAC systems, and Fire Safety Systems serving the Premises (the "Systems") shall be in good working order and repair, such condition to be deemed satisfied unless Subtenant gives Sublandlord written notice of any defect therein prior to the date that is thirty (30) days after the Commencement Date

6    USE

A    Permitted Use    Subtenant shall initially use and occupy the Premises as a retail store for the sale of (i) health, fitness and/or exercise equipment; (ii) sporting goods and sporting equipment (including, but not limited to golf equipment and accessories); hunting, camping and fishing equipment and accessories; and/or (iv) athletic footwear, and thereafter for any lawful retail use for which Subtenant has received all approvals under the Prime Lease, subject subsection B below  Subtenant shall conduct its business in a first-class and reputable manner, in keeping with good practices as established in the retail trade

B    Use Restrictions    In no event shall the Premises or more than five percent (5%) of the floor area thereof (which, for purposes of such calculation, shall include one half of the aisle adjoining any display) be used for the display, sale, service or warehousing of any form of consumer electronics, household appliances, or business electronic equipment, including but not limited to audio or video hardware, computer hardware or software, entertainment media (including, without limitation, compact discs, cassette tapes and similar media), electronic software, cellular telephones, telefax machines, or copiers  Subtenant shall not conduct its business as a clearance center or wholesale, discount, or outlet operation, or use the Premises for any auction, fire, bankruptcy or "going out of business" sales  Subtenant shall not use the name "Circuit City" or any variant or derivative thereof, in any of its advertising

C    Compliance with Laws and Rules    Subtenant at its expense shall comply with all present and future laws, statutes, ordinances, orders, rules, regulations and requirements of all federal, state and municipal governments and any instrumentality thereof, and regulations of the board of fire underwriters having jurisdiction over Subtenant's particular use of the Premises (collectively, "Laws")  Prior to opening for business in the Premises, Subtenant shall deliver to Sublandlord a copy of the certificate of occupancy or letter of substantial completion for the

Premises. Subtenant shall comply with the rules and regulations attached as Exhibit B and made a part of this Sublease

7   PARKING AND COMMON AREAS

To the extent granted to Sublandlord under the Prime Lease, Sublandlord hereby grants to Subtenant and its employees, agents, subtenants, assignees, licensees, suppliers, customers and invitees, a non-exclusive right to use and enjoy the Common Areas, as defined in Section 7 of the Prime Lease, under the same terms and conditions as those under which the Common Areas are made available to Sublandlord under the Prime Lease, including without limitation, parking, and pedestrian, service and vehicular access, ingress and egress to, from and between the Premises and Landlord's Premises, as defined in Section 1 of the Prime Lease, without payment of any fee or other charge therefor

8   UTILITIES

Subtenant shall make all necessary arrangements with all applicable utility companies and governmental authorities for, and shall pay for, all utilities supplied to the Premises  If the consumption of gas, electricity or water (and the Additional cost of sewage disposal and/or treatment) is not measured by separate meter, then Subtenant shall pay to Sublandlord, as Additional Rent, its Pro Rata Share of the cost thereof within thirty (30) days after Sublandlord delivers to Subtenant each statement of such costs  Sublandlord shall not be responsible for any failure or interruption, of any of the services or utilities supplied to the Premises, and the same shall not result in any abatement, diminution or reduction of rent, or constructive eviction, or liability on the part of Sublandlord; provided, however, if such interruption (i) arises solely from the negligent acts or intentional misconduct of Sublandlord or its employees, agents, or contractors, (ii) results in the inability of Subtenant to operate its business in the Premises or a portion thereof, and (iii) continues for more than two (2) business days after written notice from Subtenant to Sublandlord, then Base Rent shall be abated in the same proportion that the area of the portion of the Premises in which Subtenant is unable to operate bears to the total area of the Premises, such abatement to continue from the day after the end of such two (2) business day period until, but not including, the day on which such service is restored.

9   REPAIRS AND MAINTENANCE

A.   Repairs by Landlord   Sublandlord shall use commercially reasonable efforts to enforce Landlord's obligation under the Prime Lease to repair, replace, and maintain the roof, roof structure, flooring system, floor slab, and structural damage, defects, or weaknesses in load-bearing and structural walls  Upon receipt of written notice from Subtenant asserting that Landlord is not performing such obligations under the Prime Lease, Sublandlord shall promptly thereafter notify Landlord and shall use commercially reasonable efforts, not to include litigation, at Subtenant's expense to cause Landlord to perform its obligations under the Prime Lease, but Sublandlord shall not be liable to Subtenant if Landlord, despite Sublandlord's commercially reasonable efforts, continues not to perform such obligations

B.   Repairs and Maintenance by Subtenant   Except for those repairs to be performed by Landlord under Section 9(A), or by Sublandlord under Section 5 or Section 9(C),

6

and pursuant to the terms of Section 10 of the Prime Lease, Subtenant shall make all repairs, maintenance and replacements to the Premises including without limitation, the HVAC system, the doors, windows, frames, plate glass, ceiling tiles, storefront, showcases, signs and any equipment, facilities and fixtures therein, and shall keep the same clean, neat, safe, sanitary, in good order, repair and condition and free of vermin, pests, and termites.  At all times during the Term, Subtenant shall maintain a service contract with a qualified, reputable service and maintenance company, for the maintenance and repair of the heating, ventilating and air-conditioning ("HVAC") equipment servicing the Premises and shall furnish Sublandlord with true copies thereof  Subtenant shall operate the HVAC system servicing the Premises in such a manner so as to provide adequate heat, ventilation and air conditioning in and to the Premises during all business hours of the Premises, as same shall be established by Subtenant's customary business practices, and sufficient heat during all other times so as to prevent freezing of all pipes within the Premises  Consistent with Section 10 of the Prime Lease, in the event Subtenant is required to repair or replace the HVAC system during the last three (3) years of the Term, and the resulting repair or replacement cannot be fully amortized in accordance with generally accepted accounting principles, or the Internal Revenue Code and regulations, over the remainder of such Term, Sublandlord shall reimburse Subtenant, by no later than the last day of the Term, for the amount of such costs associated with the repair or replacement for the period beyond the remainder of the Term, or cause Landlord to so reimburse Subtenant within such period, pursuant to Sublandlord's rights set forth in Section 10 of the Prime Lease  Sublandlord's reimbursement obligations arising from a repair to or replacement of the HVAC system, however, shall be limited to the amount of the reimbursement received by Sublandlord from Landlord in connection with such repair or replacement  If as a result of such repairs or replacement of the HVAC, Sublandlord or Landlord would be required to reimburse Subtenant for a portion of the cost thereof, Subtenant covenants to consult with Landlord and Sublandlord prior to the repairs or replacement and purchase of any such HVAC system and give to Landlord the option, at the election of same, to repair or replace and purchase the HVAC equipment at Landlord's sole cost and expense, as per Section 10 of the Prime Lease

C.   Fire Safety System   Subtenant shall have the right to replace or modify the existing fire safety system in the Premises (the "Fire Safety System") to meet Subtenant's requirements, provided (i) such replacement and modification is performed in such a manner that the adjoining space in the building presently occupied by Lakeshore Learning (the "Adjoining Premises") continues to be served by the existing fire safety system in the Building, (ii) to the extent such replacement requires access to the Adjoining Premises, Subtenant furnishes Sublandlord with evidence that Subtenant's insurance covers Subtenant's work in the Adjoining Premises, Subtenant obtains the consent of the occupant of the Adjoining Premises prior to performing such work, and Subtenant performs all work lien-free at Subtenant's expense, and (iii) such replacement or modification, and the initial Alterations in connection therewith, are performed in such a manner that Sublandlord has continuing access at all times during the Term, and without notice, to the alarm panels serving the Premises and the Adjoining Premises  Subtenant's approval shall be required for Subtenant's Alterations to the Fire Safety System notwithstanding any provision of this Sublease that would otherwise permit Subtenant to make such Alterations with only Landlord's approval  Subtenant shall be responsible at Subtenant's expense for any modifications to the Fire Safety System or the fire safety system in the Adjoining Premises required by Sublandlord's property insurer, local codes and ordinances, or by

7

the company or companies providing fire monitoring services to the Building, arising from Subtenant's use of the Building or Subtenant's Alterations  Any cost assessed against or incurred by Sublandlord as a result of the Alterations to the Fire Safety System or the fire safety system in the Adjoining Premises shall be paid by Subtenant to Sublandlord within thirty (30) days after Sublandlord's invoice therefor accompanied by receipts and invoices reasonably satisfactory to Subtenant; provided, however, that in the event such cost is in the nature of alterations or modifications to the Fire Safety System or the fire safety system in the Adjoining Premises required to be made to conform to Laws or insurance requirements, Subtenant shall be given prompt written notice of such requirement, and shall perform such work within thirty (30) days after such notice or prior to the date such work is required to be performed by the applicable authority or insurer, whichever is first, Sublandlord agreeing not to exercise its rights under this sentence unless Subtenant fails to perform such work with such time period  Attached hereto as Exhibit C is a list of persons in Subtenant's organization to be called by the fire monitoring company in the event of an alarm from the fire monitoring system  At the beginning of each calendar quarter thereafter, Subtenant shall furnish to Sublandlord a written list identifying persons to be called by the fire monitoring company in the event of an alarm from the fire monitoring system

10   ALTERATIONS

In connection with its initial occupancy of the Premises, Subtenant has submitted to Sublandlord, and Landlord has approved the plans and specification conceptually described on Exhibit D, attached hereto and made a part hereof ("Tenant's Work"), which Sublandlord and Landlord have approved prior to the execution hereof, including but not limited to the construction of a mezzanine level within the Building of which the Premises are a part  Upon the Commencement Date, Subtenant agrees to commence and diligently complete the Tenant's Work in connection with its initial occupancy of the Premises.

Following the completion of Tenant's Work, Subtenant shall have the right, at its discretion and its sole cost, without obtaining the prior consent from Sublandlord but subject to the requirements set forth below, to make Alterations, as hereinafter defined, to the Premises that are permitted without Landlord's consent under the terms of the Prime Lease (as the same may be amended)  Where Landlord's consent is required under the terms of the Prime Lease to any proposed Alterations, then Subtenant must first obtain the consent of Landlord, as required under the Prime Lease.  So long as (X) such consent is received by Subtenant from Landlord and a copy thereof is delivered to Sublandlord, and (Y) as to those Alterations which Landlord has the right to require removal prior to the end of the term of the Prime Lease, Landlord confirms in writing to Sublandlord prior to Subtenant's commencement of such Alterations that Sublandlord shall not be required to remove Subtenant's Alterations at or prior to the expiration of the Prime Lease, no consent shall be required from Sublandlord

All alterations, additions, changes, replacements, or installations in the Premises (collectively, "Alterations") shall be performed in a good and workmanlike manner, free and clear of all mechanics' liens and encumbrances, and in compliance with all Laws, with the Prime Lease, and with all reasonable procedures and regulations prescribed by Landlord for the Shopping Center from time to time  Prior to commencing any Alterations in the Premises, Subtenant shall (i) file the requisite plans and specifications for Alterations (which shall have

8

been approved by Landlord in writing, if required under the Prime Lease) with, and obtain all requisite approvals from, all governmental departments or authorities having jurisdiction and any public utility company having an interest therein, and shall deliver a copy of such plans to Sublandlord; and (ii) deliver to Sublandlord an insurance policy or policies of worker's compensation, liability, property damage and broad form builder's risk insurance, naming Subtenant, Sublandlord and Landlord as additional insured parties with limits as provided in Section 15  Sublandlord's approval of any plans, specifications or working drawings for Alterations shall create no responsibility on the part of Sublandlord for their completeness, design sufficiency or compliance with Laws  Subtenant shall cause its contractors and subcontractors to confine their activities to the Premises or to any temporary construction easement area, which may be granted to Subtenant by Landlord pursuant to Section 6(a) of the Prime Lease

With Sublandlord's prior approval, not to be unreasonably withheld, Subtenant shall be permitted to install, maintain and/or replace any satellite dish or antennae on the roof or parapet of the Building as Subtenant deems necessary or desirable, provided same shall not adversely and materially affect the roof, parapet or the structural elements thereof or cause the breach or termination of the warranty given by the roof contractor, described in Exhibit C to the Prime Lease.  Such installation shall be deemed an "Alteration," and shall be subject to the terms and conditions of this Section 10, and shall further be subject to all of the terms and conditions in Section 12 of the Prime Lease

Sublandlord shall reimburse Subtenant for all actual costs of constructing Initial Alterations paid by Subtenant to third parties, up to a maximum amount equal to Four Hundred Seventy Three Thousand Four Hundred Eighty Four Dollars ($473,484.00) (the "Improvement Allowance")  All costs in excess of the Improvement Allowance shall be the sole responsibility of Subtenant  The Improvement Allowance shall be due and payable by Sublandlord to Subtenant within thirty (30) days following the date Subtenant has completed the Tenant's Work, opened for business in the Premises, and delivered to Sublandlord the following: (A) a requisition signed and certified by Subtenant or a corporate officer of Subtenant and Subtenant's architect certifying that (i) the Tenant's Work is substantially complete, (ii) such construction is in accordance with the approved plans, and (iii) such construction is in accordance with all Laws; (B) a copy of the final certificate of occupancy or letter of substantial completion for the Premises; and (C) a lien waiver from Subtenant's general contractor

During performance of Alterations, Sublandlord shall have the right to inspect the Premises at all reasonable times  If any lien is filed against the Premises, the Building or the Shopping Center in connection with labor or materials furnished to Subtenant, or claimed to have been furnished to Subtenant, Subtenant at its expense shall cause such lien to be discharged within ten (10) days after notice to Subtenant that such lien has been filed; or, if such lien cannot be discharged within such ten (10) day period, Subtenant shall commence proceedings to discharge such lien within such ten (10) day period and shall diligently pursue such proceedings to completion within thirty (30) days

Except in the case where Subtenant remains in possession of the Premises after the Expiration Date pursuant to an agreement with Landlord, all Alterations shall become the

9

property of Sublandlord and, except as otherwise expressly provided in this Sublease, shall remain upon and be surrendered with the Premises at the expiration of the Term; provided, however, that any Alterations required by Landlord to be removed from the Premises prior to the expiration of the Prime Lease may be removed by Subtenant prior to the Expiration Date at Subtenant's sole cost and expense, and all damage to the Premises caused by such removal shall be repaired by Subtenant.  Movable trade fixtures and other personal property which Subtenant installs at its own expense (and which expense is not reimbursed by payment of the Improvement Allowance) shall remain Subtenant's property and may be removed at the expiration or earlier termination of the Term, provided that Subtenant promptly repairs any damage caused by such removal

11.    SIGNS

Subtenant shall be permitted to install, at its expense, a sign panel on the existing pylon sign (the "Pylon Sign") of the size and in the location of the Circuit City sign panel presently existing on such Pylon Sign, and Subtenant shall be permitted to install, at its expense, and with Sublandlord's prior written approval as to the size, location, and method of attachment (but not the appearance or graphics), not to be unreasonably withheld, building signage, consistent with Sublandlord's rights under the Prime Lease, the Subtenant signs that all such signage shall (a) comply with all applicable Laws and with the Prime Lease, and any rules and regulations imposed pursuant to Section 6(g) of the Prime Lease or otherwise; and (b) be approved by Landlord pursuant to the terms of Section 8 of the Prime Lease  Sublandlord hereby approves the sign plan attached hereto as Exhibit E  Subtenant shall maintain any such sign(s) in good condition and repair, and shall remove all signs and repair all damage caused by the installation or removal thereof, at the expiration or termination of the Term  Subtenant shall pay to Sublandlord, as additional rent, the actual cost charged to and paid by Sublandlord under the Prime Lease for the operation and maintenance of the Pylon Sign  If such charge is not included with the Operating Expenses, such payment shall be due within thirty (30) days after Sublandlord delivers each statement of such costs

12    ASSIGNMENT AND SUBLETTING

A    Consent Required  Subtenant may not, by operation of law or otherwise, assign, sell, mortgage, pledge or in any manner transfer this Sublease or any interest therein, or sublet the Premises or any part thereof, or grant any concession, franchise or license or otherwise permit occupancy of all or any part of the Premises by any person or entity (collectively, "Transfer," and the recipient thereof, a "Transferee"), without first obtaining the prior written consent of Sublandlord (and, if required, Landlord), Sublandlord's consent not to be unreasonably withheld  Notwithstanding the foregoing, Sublandlord's consent shall not be required in connection with (i) grants of licenses and/or concessions within the Premises that will not result in the demising of any portion of the Premises or in the installation of a separate entrance or exterior signage for such licensee or concessionaire, (ii) an assignment or sublease of all or any portion of the Premises to (a) any parent or subsidiary company of Subtenant; (b) a Transferee or successor by merger, consolidation or acquisition of Subtenant or its parent or subsidiary; or (c) a Transferee acquiring all or substantially all of the stores of Subtenant in the State of Texas; provided in each case under clause (ii) that such Transferee shall have a net worth not less than the net worth of Subtenant as of the Commencement Date

10

---

B    Notice    If Subtenant desires to undertake any Transfer which requires Sublandlord's consent, as set forth above, Subtenant shall provide Sublandlord with notice of the proposed Transfer, which shall (i) specify the consideration for, and all material terms and conditions of the proposed Transfer, (ii) identify the proposed transferee, and (iii) set forth such transferee's business and proposed use at the Premises  Such notice shall be accompanied by a certified financial statement setting forth the financial condition of the proposed transferee in sufficient detail so as to permit Sublandlord's comprehensive assessment thereof, and any other reasonable information which Sublandlord requests of Subtenant in connection with the proposed Transfer within five (5) business days after Subtenant's request for approval of such Transfer  Upon receipt of such notice and accompanying documentation from Subtenant, Sublandlord shall, within fifteen (15) days following receipt of same, notify Subtenant in writing as to Sublandlord's consent or denial of such proposed Transfer, in accordance with the provisions of this Section 12  Subtenant shall reimburse Sublandlord upon demand, for all expenses, including reasonable attorneys' fees and any charges imposed by Landlord, incurred by Sublandlord in connection with any proposed Transfer

C    Release of Subtenant  Any assignee, sublessee, or transferee shall be bound by the terms of this Sublease, and promptly upon full execution thereof, Subtenant shall deliver to Sublandlord an instrument executed by Subtenant and the assignee, sublessee or other entity succeeding to Subtenant's interest hereunder in which such assignee, sublessee or other entity has agreed to be bound by the terms of this Sublease  Following any assignment, Subtenant shall automatically be released from any further liability arising under this Sublease on or after the effective date of the Transfer if the assignee has a net worth of Three Hundred Million Dollars ($300,000,000), as computed in accordance with generally accepted accounting principles  In no event shall Subtenant be permitted to subdivide the Premises into more than two (2) separate areas

D    Payments in Excess of Rent  If any Transfer obligates the Transferee to pay to Subtenant amounts in excess of the Base Rent and Additional Rent under this Sublease (whether by increased rent, a lump sum payment, payment for the sale, transfer or lease of Subtenant's fixtures or improvements, or any other form), then Subtenant shall pay to Sublandlord, net of all costs incurred by Subtenant in effecting such Transfer, fifty percent (50%) of any such excess, as Additional Rent, within ten (10) days after receipt by Subtenant.

E    Restrictions in Prime Lease  Notwithstanding any other provision of this Section 12, no Transfer shall be permitted in violation of the Prime Lease

13    ACCESS TO PREMISES

Landlord, as permitted under the terms of the Prime Lease, and Sublandlord shall have the right to enter upon and in the Premises at all reasonable times to examine the same as Sublandlord may deem reasonably necessary or desirable; provided, however, Sublandlord shall use reasonable efforts not to unreasonably interfere with Subtenant's business in the Premises  During the last one hundred eighty (180) days of the Term, and provided Subtenant has not entered into an agreement to remain in possession of the Premises with Landlord, Subtenant agrees to permit Landlord to place one (1) "For Rent" or "For Sale" sign, not exceeding six (6)

11

---

feet by eight (8) feet in size, on the parking lot of the Shopping Center pursuant to the terms of Section 27 of the Prime Lease  Subtenant shall further allow Landlord or its agents, accompanied by prospective tenants, purchasers, or mortgagees, access to the Premises during reasonable business hours by prior appointment, provided same does not unreasonably interfere with the conduct of Subtenant's business

14    INDEMNITY

A    Indemnification

(i)    Subtenant shall protect, indemnify, defend and hold Sublandlord harmless from and against any and all claims, damages, loss, liability (including without limitation liability under the Prime Lease), cost or expense (including without limitation reasonable attorneys' fees) (collectively, "Damages"), which Sublandlord may incur or pay out by reason of (i) any accidents, damages or injuries to persons or property occurring in, on or about the Premises, (ii) any default hereunder on Subtenant's part except to the extent of Damages paid to Sublandlord under any insurance policy carried by Sublandlord or Landlord, (iii) any work done in or to the Premises by or on behalf of Subtenant, (iv) any liens filed against the Premises or the Shopping Center on account of Subtenant and not timely removed by Subtenant pursuant to Section 10, or (v) any act, omission or negligence on the part of Subtenant and/or its employees, agents, contractors and/or invitees, or any person claiming through or under Subtenant (except to the extent of Damages paid to Sublandlord under any insurance policy carried by Sublandlord or Landlord)  Subtenant shall not be liable for any consequential damages sustained by Sublandlord under this Section 14(A)(i)

(ii)    Subject to the provisions of Section 14(B) below, Sublandlord shall protect, indemnify, defend and hold Subtenant harmless from and against any Damages which Subtenant may incur or pay out by reason of (i) any accidents, damages or injuries to persons or property occurring in, on or about the Shopping Center, but only to the extent such Damages are paid to Landlord or its insurer pursuant to the terms of the Prime Lease, (ii) any default hereunder on Sublandlord's part (except to the extent of Damages paid to Subtenant under any insurance policy carried by Subtenant), (iii) the failure by Sublandlord to pay all amounts of Base Rent, Additional Rent, and other expenses required to be paid by to Sublandlord to Landlord under the Prime Lease, prior to the date the same become due, or such other obligations of Sublandlord arising under the Prime Lease, which have not been transferred to Subtenant hereunder, (iv) any work done in or to the Premises, Building or Shopping Center by Sublandlord, (v) any liens filed against the Premises on account of Sublandlord and not timely removed by Sublandlord within thirty (30) days after receipt of notice of same, or (vi) any intentional malfeasance or gross negligence on the part of Sublandlord (except to the extent of Damages paid to Subtenant under any insurance policy carried by Subtenant)

B    Liability of Sublandlord  All property of Subtenant and its employees, agents, contractors or invitees in or about the Premises or elsewhere in the Shopping Center shall be kept and stored at Subtenant's sole risk, and Subtenant hereby releases Sublandlord from any claims for damage to, or loss of, the same  Sublandlord shall not be liable for any interruption or loss

12

---

to Subtenant's business arising from any acts or causes, or for any consequential damages sustained by Subtenant arising out of the loss of or damage to any such property.

15    INSURANCE

A    Subtenant's Insurance    Subtenant shall maintain throughout the Term (i) a policy of commercial general liability insurance insuring Subtenant for all liability arising from Premises operations, personal injury and liability and the business operated by Subtenant therein, and such policy shall (a) name Sublandlord and Landlord as additional insured parties, as primary coverage over any insurance carried by Sublandlord, Landlord or any mortgagee, and (b) have limits of not less than Three Million Dollars ($3,000,000) per occurrence, for personal or bodily injury, death and property damage; (ii) a policy of commercial property insurance covering the perils insured under the ISO "special causes of loss" form (CP 10 30), with endorsements for vandalism and malicious mischief, water damage and sprinkler leakage, for the full replacement value of Subtenant's inventory, equipment, trade fixtures and other personal property located in the Premises; (iii) worker's compensation insurance to the extent required by Laws; and (iv) such other insurance, in such amounts and against such risks as are required to be carried under the Prime Lease, or as may be reasonably required by Sublandlord, so long as same is customarily and commonly insured against by prudent owners or tenants of property similar to the Property

Subtenant's insurance coverage may be effected by a blanket policy or policies of insurance, provided that such policy or policies in all other respects comply with the provisions of this Section 15, including, but not limited to, that the policy shall contain an endorsement that names Sublandlord and Landlord as additional insured parties and that it references the Premises  An increased coverage or "excess liability" policy may be provided and utilized by Subtenant to increase the coverage provided by individual or blanket policies in lower amounts, and the aggregate coverage provided by all such policies with respect to the improvements located on the Premises, and Subtenant's liability hereunder shall be satisfactory provided that such policies otherwise comply with the provisions of this Section 15

B    Evidence of Insurance    Subtenant shall deliver to Sublandlord a certificate of insurance satisfactory to Sublandlord evidencing all coverage required under this Section 15 prior to taking possession of the Premises  If Subtenant fails to provide Sublandlord with such evidence, Sublandlord may withhold delivery of possession without delaying the Commencement Date or the Rent Commencement Date  Subtenant shall procure and pay for renewals of such insurance from time to time before the expiration thereof, and Subtenant shall deliver to Sublandlord a certificate of such insurance satisfactory to Sublandlord at least thirty (30) days before the expiration of any existing policy  All such policies shall be issued by companies rated not lower than "A-, Class VIII" by A M  Best Co  licensed to do business in the state in which the Premises are located, and all such policies shall contain a provision whereby the same cannot be cancelled or modified unless Sublandlord is given at least thirty (30) days' prior written notice by certified or registered mail of such cancellation or modification

C    Sublandlord's Insurance    Sublandlord shall maintain property insurance covering the Building for its full replacement value, exclusive of the cost of foundations, excavations and footings  All costs and expenses of such insurance incurred by Sublandlord

13

shall be included in Insurance Costs, and Subtenant shall pay Subtenant's Pro Rata Share of such costs, pursuant to the terms of Section 3 of this Sublease

D.    Subtenant's Right to Self-Insure    Notwithstanding anything to the contrary contained herein, Subtenant (but not any successor or assign of Subtenant other than a permitted by corporate merger) shall have the right to self-insure against any of the risks or portions thereof set forth in Section 15(A)(i), (ii), and (iv), above, and to the extent permitted by law, Section 15 A.(iii), provided Subtenant is then occupying the Premises and has a reported net worth, as of the end of Subtenant's most recent quarterly reporting period, of not less than Three Hundred Million Dollars ($300,000,000 00) as computed in accordance with generally accepted accounting principles consistently applied. To the extent Subtenant elects to self-insure as provided herein, Subtenant agrees to disburse funds in accordance with the terms of this Sublease in the same amounts and at such time as would be disbursed pursuant to an insurance policy which would otherwise be required to be maintained by Subtenant if Subtenant did not elect to self-insure against the aforementioned perils  If and to the extent Subtenant elects to self-insure under this Section, Subtenant hereby agrees to indemnify, hold harmless and defend Landlord from and against any and all claims, demands, suits, costs, expenses, liabilities and losses that Sublandlord may suffer or incur as a result thereof and that Sublandlord would not have incurred but for Subtenant's self-insurance, which shall be limited to the applicable required minimum insurance coverage limits required to be obtained by Subtenant in Section 15.A., above, and subject further to the waiver of subrogation rights set forth in Section 15(F), below; but such limitation shall not be deemed in any way to limit any other indemnity of Subtenant under other provisions of this Sublease  Upon such election to self-insure, Subtenant shall furnish Sublandlord with a notice of self-insurance identifying the coverages which are self-insured, and Subtenant shall maintain appropriate loss reserves which are actuarially derived in accordance with accepted standards and which are accrued (i e  charged against earnings) or otherwise funded, and shall comply with all applicable state laws or regulations governing self-insurance

E.    Contractor's Insurance    Subtenant shall require any contractor of Subtenant performing work in, on or about the Premises to obtain and keep in full force and effect, at no expense to Sublandlord, (i) a commercial general liability insurance policy for the Premises and adjacent areas, the conduct of its work therein, and the acts or omissions of such additional insured, with policy limits of not less than Two Million Dollars ($2,000,000); (ii) worker's compensation or similar insurance in form and amounts required by Laws; and (iii) Business Automobile Liability insurance including owned, non-owned and hired car coverage in an amount not less than Two Million Dollars ($2,000,000) per accident  Sublandlord, Subtenant and Landlord shall be designated as additional insured parties under the policies listed in clauses (i) and (iii) above  Subtenant shall provide certificates of such insurance to Sublandlord prior to commencing any construction in, on or about the Premises

F.    Waiver of Subrogation Rights.    Subtenant hereby releases and waives its rights of recovery against Landlord under the Prime Lease to the extent that Sublandlord is required to waive its rights of recovery against Landlord under the Prime Lease  Subtenant and Sublandlord hereby agree, to the extent that a loss is covered by insurance, or would have been covered had Tenant maintained business income coverage with a duration of six (6) months, or is

14

B.    Subtenant assumes and agrees to perform Sublandlord's obligations under the Prime Lease during the term hereof to the extent that such obligations are applicable to the Premises, except the obligation to pay rent to Landlord  Subtenant shall not commit or suffer any act or omission that will violate any of the provisions of the Prime Lease.  Subtenant shall indemnify and hold Sublandlord harmless from and against all claims of any nature whatsoever by reason of any default on the part of Subtenant that results in a default under the Prime Lease, or as a result of which the Prime Lease is terminated or forfeited

C.    Sublandlord agrees to perform Sublandlord's obligations under the Premises during the Term hereof, to the extent such obligations are applicable to the Premises and have not been transferred to Subtenant hereunder  Except with respect to a default under the Prime Lease caused by Subtenant's failure to perform its obligations under this Sublease, Sublandlord shall not commit any act or omission that will violate any of the provisions of this Sublease or the Prime Lease, and Sublandlord shall indemnify and hold Subtenant harmless from and against all claims of any nature whatsoever by reason of any default on the part of Sublandlord that results in a default under the Prime Lease, or as a result of which the Prime Lease is terminated or forfeited.

D.    Sublandlord shall use commercially reasonable efforts in attempting to cause Landlord to perform its obligations under the Prime Lease for the benefit of Subtenant  Upon receipt of written notice from Subtenant asserting that Landlord is not performing its obligations, under the Prime Lease, Sublandlord shall promptly notify Landlord of same, and Sublandlord shall use commercially reasonable efforts at Subtenant's expense, not to include litigation, to cause Landlord to perform its obligations under the Prime Lease; provided, however, Sublandlord shall not be liable to Subtenant if Landlord continues not to perform such obligations, so long as Sublandlord uses commercially reasonable efforts to cause Landlord to perform  Sublandlord agrees that, as an alternative course of action in the event of Landlord's default, Subtenant may, to the extent permitted by law, exercise at Subtenant's expense any remedy that Sublandlord may have under the terms of the Prime Lease, at law or in equity, directly against Landlord as a result of such default

E    Notwithstanding anything contained herein to the contrary, the only services or rights to which Subtenant is entitled under this Sublease are those to which Sublandlord is entitled under the Prime Lease

17    TERMINATION, DESTRUCTION, CONDEMNATION

A    Destruction and Damage    In the event the Building is damaged or destroyed by fire or other peril, and as a result thereof the Prime Lease is terminated pursuant to the terms thereof, then this Sublease shall automatically likewise terminate upon written notice from Sublandlord to Subtenant, and Base Rent and Additional Rent shall be prorated as of the date of such fire or other casualty  In the event the Prime Lease is not terminated as aforesaid, Subtenant and Sublandlord agree to the following terms and conditions with respect to damage to or destruction of the Building

    (a)    Less Than Forty percent (40%)  In the event of a fire, earthquake or other casualty causing destruction or damage to the Building, which has a repair and

16

required under this Sublease to be covered by insurance, or is self-insured by either party, to waive and release any and all rights of recovery, whether arising in contract or tort, against the other, including their employees and agents, arising during the Term for any and all loss or damage to the Premises, or the contents contained therein or the improvements and betterments thereto, or the Building of which the Premises are a part, for loss of earnings of rent or business income on account of fire or other casualty, including any deductible thereunder (whether or not the party suffering the loss or damage actually carries such insurance, covers under such insurance or self insures the loss or damage) or which right of recovery arises from loss of earnings or rents resulting from loss or damage caused by such a peril  Each party's'aforesaid policies of insurance shall contain appropriate provisions evidencing this waiver of subrogation rights  The provisions of this Section 15(F) shall not be deemed to limit the provisions of Section 14(B) of this Sublease, in the event of any conflict between such two provisions, the provisions of Section 14(B) shall control

G    Insurance Premiums    Subtenant shall not do or permit to be done any act or thing in or upon the Premises which will or may invalidate or be in conflict with fire insurance policies covering the Building, the Shopping Center or any part thereof or fixtures and property therein, and shall comply with all rules, orders, regulations or requirements of the Board of Fire Underwriters having jurisdiction over the Premises, or any other similar body, and shall not do, or permit to be done, anything in or upon the Premises, or bring or keep anything therein, which shall increase the rate of fire insurance on the Building, the Shopping Center or on the property located therein  If by reason of failure of Subtenant to comply with the provisions of this Section, the fire insurance rate shall at any time be higher than it otherwise would be, then, in addition to the right of Sublandlord to the exercise of any and all other remedies available under this Sublease, Subtenant shall reimburse Sublandlord on demand as Additional Rent for the portion of all fire insurance premiums which shall have been then or in the future charged because of such violation by Subtenant and which Sublandlord shall have, or may be required to have, paid on account of an increase in rate in its own policies of insurance  In addition to the foregoing, Subtenant will, if Sublandlord so requests, cease the operation of any action or remove any objects or improvements which have resulted in the increase to Sublandlord's insurance premiums; provided, however, nothing in this Section 15 shall require Subtenant to remove from the Premises any merchandise sold at a typical Dick's Sporting Goods store as of the date hereof

16    SUBORDINATE TO PRIME LEASE

A.    Subtenant represents that it has read and is familiar with the terms of the Prime Lease  This Sublease is subject and subordinate to Prime Lease  Prior to or contemporaneously with the execution of this Sublease, Subtenant expects to enter into a non-disturbance agreement with Landlord (provided, that such agreement is not a condition of the effectiveness of this Sublease)  Notwithstanding the forgoing, if for any reason the term of the Prime Lease shall have terminated prior to the expiration of this Sublease as a result of a default by Subtenant under this Sublease and/or the Prime Lease, or as a result of a default by Sublandlord under this Sublease and/or the Prime Lease not arising from the failure of Subtenant to perform its obligations under this Sublease, then the defaulting party shall be liable to the non-defaulting party for the direct damage suffered as a result of such termination.

15

reconstruction cost of less than forty percent (40%) of the then-total replacement cost of the Building, this Sublease shall not terminate, and Base Rent, Additional Rent, and other charges shall abate for the duration of any untenantability in proportion to the portion of the Premises made untenantable by such casualty, as determined in Subtenant's sole discretion; provided, however that for a period of six (6) months after such fire or other casualty, Subtenant shall continue to pay Base Rent and Additional Rent  Within a reasonable time after such casualty, not to exceed one hundred eighty (180) days, subject to force majeure and the availability of governmental permits and insurance proceeds, Sublandlord shall complete reconstruction of the Premises, to substantially that condition existing immediately prior to such casualty, not including Alterations performed by Subtenant  Sublandlord shall exercise commercially reasonable good faith efforts to obtain all necessary governmental permits and the insurance proceeds, and work diligently to cause the completion of such reconstruction

    (b)    Forty percent (40%) or More  In the event of a fire, earthquake or other casualty either (a) causing destruction or damage to the Building which has a repair and reconstruction cost of forty percent (40%) or more of the then-total reconstruction cost of the Building, or (b) occurring during the last two (2) years of the term of this Sublease or of any renewal term previously exercised, either party shall have the option of terminating this Sublease  If either party desires to terminate this Sublease, such party shall notify the other of the exercise of such termination option within thirty (30) days following the occurrence of such casualty, and after such a termination, neither party shall have any further liability to the other hereunder  In the event neither party elects to terminate this Sublease as set forth above, Sublandlord shall, within two hundred ten (210) days thereafter, subject to Landlord's right to terminate the Prime Lease under Section 15(b), thereof, and subject to force majeure and the availability of governmental permits and insurance proceeds, complete reconstruction of the Premises to substantially their condition existing immediately prior to such damage, not including Alterations performed by Subtenant  In such event, Base Rent and other charges shall abate for the duration of any untenantability in proportion to the portion of the Premises made untenantable by such casualty provided, however that for a period of six (6) months after such fire or other casualty, Subtenant shall continue to pay Base Rent and Additional Rent

B    Eminent Domain    A "Total Taking" shall be deemed to have occurred if during the Term of this Sublease, (i) the whole of the Premises shall be taken by eminent domain or be sold to the condemning authority in settlement of or under threat of condemnation ("Taken"), or (ii) at least ten percent (10%) of the Property or the Building is Taken and the residue is not reasonably usable for the conduct of Subtenant's business on the Premises in Subtenant's reasonable discretion  Upon a Total Taking, this Sublease and all rights of Subtenant in and to the Premises shall immediately terminate  If during the term of this Sublease a portion of the Property or the Building is Taken in a manner that is not a Total Taking, then this Sublease shall continue with a reasonable reduction of Base Rent and Additional Rent (reflecting the diminution in the value of the Premises for Subtenant's use thereof), and Sublandlord shall, at its own cost and expense, proceed with reasonable promptness, subject to delays beyond Sublandlord's control and delays in obtaining the award or purchase price, to make all repairs,

17

alterations or restorations as may be necessary to restore the Premises to substantially the same condition as existed prior to such taking or sale, taking into consideration the nature and extent of the part so taken. Notwithstanding the foregoing, Sublandlord shall not be required to expend any sums for restoration in excess of the net award or purchase price available to Sublandlord and not required to be paid to Prime Landlord or any mortgagee of the Premises. In the event the amount to be expended by Sublandlord will be insufficient to restore the Premises to a condition usable for the conduct of Subtenant's business on the Premises, then Subtenant shall have the right to terminate this Sublease upon notice to Sublandlord

To the extent that any condemnation award will not be applied as aforesaid, Sublandlord shall be entitled to the entire award; provided that Subtenant shall be entitled to make a claim to the condemning authority for damages to its personal property, unamortized tenant improvements paid for directly by Subtenant, and for expenses incurred in relocating following any such taking

18    NOTICES

Sublandlord shall have the affirmative obligation throughout the Term to provide Subtenant copies of all notices received from Landlord under the Prime Lease, and all such notices shall be delivered to Subtenant within fifteen (15) days of receipt of same. All notices, consents, approvals, demands and requests of any kind (collectively, "Notices") delivered by either party to the other hereunder shall be in writing and shall be sent either by United States registered or certified mail and deposited in a United States Post Office, return receipt requested and postage prepaid, or by reputable overnight air courier such as Federal Express. Notices which are served upon Sublandlord or Subtenant by mail in the manner provided herein shall be deemed to have been given or served for all purposes hereunder upon receipt or refusal of receipt. After delivery of possession of the Premises to Subtenant, all Notices given to Subtenant shall be addressed to Subtenant at the following address: Dick's Sporting Goods, Inc., Attention: Senior Vice President, Real Estate & Development, 300 Industry Drive, Pittsburgh, PA 15275, with a copy to Dick's Sporting Goods, Inc., Attention: Legal Department, 300 Industry Drive, Pittsburgh, PA 15275. All Notices given to Sublandlord shall be addressed to Sublandlord at its address set forth at the head of this Sublease, to the attention of Vice President - Real Estate and Construction. Sublandlord or Subtenant may from time to time change the names and/or addresses to which Notices given to either of them shall be addressed and sent as aforesaid, by designating such other names and/or addresses in a notice given to the other party in accordance with the provisions of this Section 18

19    DEFAULT

A    Event of Default    Each of the following shall be deemed to be an "Event of Default" by Subtenant and a breach by Subtenant hereunder: (i) any Transfer of this Sublease in violation of the terms hereof, (ii) the non-payment of any Base Rent or Additional Rent, or any part thereof, or any other payment herein provided for, within five (5) days after notice from Sublandlord to Subtenant that same is overdue (provided, however, that such notice shall only be required twice during any twelve (12) month period, and thereafter an Event of Default shall exist after the lapse of such five (5) day period without the necessity of such notice), or (ii) the default in the performance of any other obligation of Subtenant under this Sublease, and the

18

continuance of such default for twenty (20) days after Sublandlord shall have given to Subtenant a notice specifying the nature of such default; provided however, if said default shall be of such nature that it cannot reasonably be cured or remedied within said twenty (20) day period, same shall not be deemed an Event of Default if Subtenant shall have commenced in good faith the curing or remedying of such default within such twenty (20) day period, and Subtenant shall thereafter have such longer period as is reasonably necessary to cure the default, so long as Subtenant continuously and diligently proceeds therewith to completion

B    Remedies    In the event of Subtenant's default or the occurrence or existence of an Event of Default, Subtenant shall pay to Sublandlord, on demand, such expenses as Sublandlord may incur, including, without limitation, reasonable attorneys' fees, court costs, disbursements, and any and all other costs incurred by Sublandlord in enforcing the performance of any obligation of Subtenant under this Sublease. If an Event of Default occurs, Sublandlord shall never be entitled to dispossess Subtenant of the Premises pursuant to any "lock-out" or other non-judicial remedy. Subject thereto, Sublandlord shall have the following rights and remedies, in addition to all rights and remedies available under law or equity: (i) Sublandlord may declare this Sublease terminated upon written notice to Subtenant; and/or (ii) Sublandlord or its agents, servants, representatives, successors or assigns may, re-enter and resume possession of the Premises and remove all persons and property therefrom, either by summary proceedings or by a suitable action or proceeding at law, and no such re-entry shall be deemed an acceptance or surrender of this Sublease; and/or (iii) subject to Sublandlord's duty as set forth in Section 19.C., Sublandlord may either in its own name, but as agent for Subtenant if this Sublease is not terminated, relet the whole or any portion of the Premises for any period equal to or greater or less than the period which would have constituted the balance of the Term, for any sum which Sublandlord may deem reasonable, taking into consideration the then current market rates for similarly situated leased premises and shopping centers in the vicinity of the Shopping Center, to any tenant(s) which Sublandlord may deem appropriate, and Sublandlord may grant commercially reasonable concessions; and Sublandlord shall have the right to collect from Subtenant any deficiency between the amount of Base Rent and Additional Rent due hereunder, and the amount of rent, net of costs related thereto, actually collected by Sublandlord from such reletting. In the event of any breach or threatened breach by Subtenant of any of the covenants or provisions of this Sublease, Sublandlord shall have the right of injunction and the right to invoke any remedy allowed at law or in equity; mention in this Sublease of any particular remedy shall not preclude Sublandlord from any other remedy at law or in equity. If at any time Sublandlord elects to terminate this Sublease, Sublandlord shall be entitled to recover from Subtenant in addition to other damages recoverable hereunder or under applicable law:

(i)    the worth at the time of award of the unpaid Base Rent and Additional Rent which had been earned at the time of termination, and

(ii)    the worth at the time of award of the amount by which the unpaid Base Rent and Additional Rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Subtenant proves could have been reasonably avoided, and

19

(iii)    the worth at the time of award of the amount by which the unpaid Base Rent and Additional Rent for the balance of the Term after the time of award exceeds the fair market rental value of the Premises for the balance of the Term, as established by a reputable commercial real estate broker experienced in the handling of Class A retail properties in the Dallas, Texas metropolitan area, and taking into account an expected period of vacancy, rental concessions then standard in the market, and the expected costs incurred in reletting the Premises; and

(iv)    any other amounts necessary to compensate Sublandlord for all the detriment proximately caused by Subtenant's failure to perform its obligations under this Sublease or which in the ordinary course of events would be likely to result therefrom.

As used in clauses (i) and (ii) above, "worth at the time of award" shall be computed by allowing interest at the lesser of (a) the rate per annum set forth in Subsection D. of this Section 18 (to wit, 18% per annum), or (b) the highest rate allowed by law. As used in clause (iii) above, the "worth at the time of award" shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award, plus one percent (1%)

C    Damages    Upon Sublandlord's recovery of possession of the Premises following an Event of Default, Sublandlord agrees to list the Premises for sublease with a commercial real estate broker experienced in the leasing of retail properties in the Dallas Metropolitan Area; provided, however, that Sublandlord shall have not such duty if, in Sublandlord's sole but reasonable judgment, the remaining term of the Prime Lease at such time is of insufficient duration to make it likely that a subtenant can be secured for the remaining term of the Prime Lease. Sublandlord shall be entitled to recover from Subtenant, and Subtenant shall pay to Sublandlord immediately upon demand by Sublandlord, the amounts equal to all of the reasonable expenses incurred by Sublandlord in connection with (i) recovering possession of the Premises, (ii) any reletting(s) of the Premises and related brokerage costs, including without limitation costs for repairing or otherwise preparing the Premises for reletting, (iii) court costs, and (iv) reasonable attorneys' fees incurred in connection with any of the foregoing

D    Late Charges and Returned Check Charges    If payment of any Base Rent or Additional Rent is not made by the fifth (5th) day after the date on which such amount was due and payable, Subtenant shall pay as a late charge the greater of (i) Two Hundred Fifty and No/100 Dollars ($250.00), or (ii) five percent (5%) of the overdue payment, and interest on the amount overdue at the lesser of (a) eighteen percent (18%) per annum, or (b) the highest rate allowed by law (the "Default Rate") from the date on which such amount was due until the date of payment, as reimbursement of Sublandlord's expenses incurred as a result of Subtenant's failure to make prompt payment. In addition to any late charges or other remedies available to Sublandlord, if any check is returned to Sublandlord by Subtenant's bank by reason of insufficient funds, uncollected funds or otherwise, Subtenant shall pay to Sublandlord a return check administrative charge of Two Hundred Fifty Dollars ($250.00). Subtenant shall pay the late charges and return check administrative charges for any month as Additional Rent on the first day of the following month

20

E    Additional Right of Sublandlord to Cure Subtenant's Defaults    Sublandlord may, but shall not be obligated to, cure, at any time upon thirty (30) days notice or without notice in case of emergency, any default(s) by Subtenant under this Sublease, and Subtenant shall pay to Sublandlord all reasonable costs and expenses directly incurred by Sublandlord in curing such default(s) within thirty (30) days after notice from Landlord, together with a breakdown of any and all amounts incurred with reasonable supporting documentation thereof. If not so paid, such amounts shall bear interest at the Default Rate

F    Special Bankruptcy Provision    If Subtenant becomes a debtor within the meaning of the Bankruptcy Reform Act of 1978, as the same may be from time to time amended (the "Bankruptcy Code"), and, notwithstanding any other provision of this Sublease, this Sublease and Sublandlord's and Subtenant's rights thereunder are then made subject to the Bankruptcy Code, it is covenanted and agreed that the failure of Subtenant or its representative duly appointed in accordance with the Bankruptcy Code to (i) provide Sublandlord with adequate assurance that all of Subtenant's obligations under this Sublease shall continue to be fully complied with for the remaining Term, or (ii) furnish accurate information and adequate assurance as to the source of rent and other consideration due to Sublandlord under this Sublease, or (iii) conduct or have conducted at the Premises Subtenant's business as provided in this Sublease, shall in any of such events be deemed an Event of Default, and Sublandlord shall have all rights and remedies herein afforded it in respect of any Event of Default. It is understood and agreed that the Premises is situate in a "shopping center" as such term is used in the Bankruptcy Code

G    Default by Sublandlord    Sublandlord shall only be deemed to be in default hereunder if Sublandlord violates or fails to perform any covenant or agreement hereunder which is not observed or performed by Sublandlord within thirty (30) days after the receipt by Sublandlord of written notice from Subtenant specifically identifying such violation or failure; provided however, if said default shall be of such nature that it cannot reasonably be cured or remedied within said thirty (30) day period, same shall not be deemed a default by Sublandlord if Sublandlord shall have commenced in good faith the curing or remedying of such default within such thirty (30) day period, and Sublandlord shall thereafter have such longer period as is reasonably necessary to cure the default, so long as Sublandlord continuously and diligently proceeds therewith to completion

20    WAIVER OF JURY TRIAL AND RIGHT TO COUNTERCLAIM

SUBLANDLORD AND SUBTENANT EACH HEREBY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY SUMMARY OR OTHER ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS SUBLEASE, THE RELATIONSHIP OF SUBLANDLORD AND SUBTENANT, THE PREMISES OR THE USE AND OCCUPANCY THEREOF, OR ANY CLAIM OF INJURY OR DAMAGES. SUBTENANT ALSO HEREBY WAIVES ALL RIGHT TO ASSERT OR INTERPOSE A COUNTERCLAIM (OTHER THAN A COMPULSORY COUNTERCLAIM) IN ANY PROCEEDING OR ACTION TO RECOVER OR OBTAIN POSSESSION OF THE PREMISES

21

21   END OF TERM

At the expiration or sooner termination of the Term, unless Subtenant enters into an agreement with Landlord or its successor whereby Subtenant is permitted to retain possession of the Premises, Subtenant shall quit and surrender to Sublandlord the Premises, broom clean, free of all occupants, and in good condition, ordinary wear and tear and damage by fire and any other insured casualty excepted. At such expiration or sooner termination, Subtenant shall remove from the Premises all of its sign(s), trade fixtures, furnishings, and equipment, and Subtenant shall repair all damage to the Premises caused by any and all such removal and restore the Premises to the condition in which they were prior to the installation of the items so removed (excluding small holes caused by nails, fasteners and the like), and shall immediately make any Alterations required under the provisions of the Prime Lease to be removed. Any property of Subtenant not removed within thirty (30) days following the end of the Term may be deemed to be abandoned, or Sublandlord may remove the same and restore any damage, at Subtenant's expense

22.   HOLDOVER

If Subtenant remains in possession of the Premises after the expiration or termination of the Term, Subtenant shall be deemed to be occupying the Premises as a tenant from month to month at the sufferance of Sublandlord subject to all of the provisions of this Sublease, except that the Base Rent shall be at a monthly rate equal to the greater of (i) the rent which Sublandlord owes for such period under the Prime Lease, or (ii) one hundred fifty percent (150%) of the monthly Base Rent in effect during the last month of the Term. Subtenant shall give to Sublandlord at least thirty (30) days' prior written notice of any intention to quit the Premises

Notwithstanding the foregoing provisions of this Section 22, if Subtenant holds over after the expiration or termination of the Term and Sublandlord desires to regain possession of the Premises, then Sublandlord, at its option, may forthwith reenter and take possession of the Premises by any legal process in force in the jurisdiction in which the Shopping Center is located. Any rental amounts for such hold over period which are deposited into Sublandlord's rental account shall not be deemed accepted by Sublandlord if Sublandlord promptly returns such rental amounts to Subtenant. Nothing herein shall limit Sublandlord's right to recover damages pursuant to this Sublease and such other direct damages as are available to Sublandlord at law or in equity (including but not limited to any and all liability to Landlord or otherwise caused by such holdover)

23   BROKERAGE

Each party represents to the other that, except for Falcon Properties ("Sublandlord's Broker") and Pinpoint Real Estate Company ("Subtenant's Broker"), no broker or other person had any part, or was instrumental in any way, in bringing about this Sublease, and each shall pay, and shall indemnify, defend and hold harmless, the other from and against, any claims made by any other broker or other person for a brokerage commission, finder's fee, or similar compensation, by reason of or in connection with this Sublease, and any loss, liability, damage, cost and expense (including, without limitation, reasonable attorneys' fees) in connection with such claims if such broker or other person claims to have had dealings with the indemnifying party. Sublandlord shall pay any commission due Sublandlord's Broker, pursuant to separate

22

agreement, and Subtenant's Broker shall obtain any commission due it from Sublandlord's Broker. Neither Sublandlord's Broker nor Subtenant's Broker is a third party beneficiary of this Agreement

24   FINANCIAL STATEMENTS AND ESTOPPEL CERTIFICATES

Subtenant shall, within five (5) days after each and every request by Sublandlord, deliver to Sublandlord an annual financial statement. Subtenant and Sublandlord each shall, within twenty (20) days after each and every request by the other party, execute, acknowledge and deliver to the other party a statement in writing (i) certifying that this Sublease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified, and stating the modifications), and the Commencement Date, Rent Commencement Date and Expiration Date, (ii) specifying the dates to which the Base Rent and Additional Rent have been paid, (iii) stating whether or not, to the best knowledge of the certifying party, the other party is in default under this Sublease, and, if so, specifying each such default, (iv) stating whether or not, to the best knowledge of the certifying party, any event has occurred which with the giving of notice or passage of time, or both, would constitute a default by the other party under this Sublease, and, if so, specifying each such event, and (v) any other matter as may be reasonably requested. Any such statement delivered pursuant to this Section 24 may be relied upon by any prospective assignee or transferee of the leasehold estate under the Prime Lease

25   AMERICANS WITH DISABILITIES ACT

Sublandlord and Subtenant, as the case may be, shall supply to the other party as promptly as possible, but in any event within ten (10) days after Sublandlord or Subtenant, as the case may be, first receives or sends the same, written notice of, and copies of all applicable notices or other documentation thereof, as applicable, (i) any notices, reports or warnings made to or received from any governmental agency or entity arising out of or in connection with the ADA (as defined in this Section 25) and relating to all or any portion of the Premises, Subtenant's use or occupancy thereof, the Building or the Shopping Center, (ii) any complaints, charges, claims, or asserted violations made or threatened in writing by any person, agency or entity alleging violation of the ADA or regarding non-compliance with the ADA, and relating to all or any portion of the Premises, Subtenant's use or occupancy thereof, the Building or the Shopping Center; (iii) any enforcement or other governmental or regulatory action or investigation instituted, contemplated, or threatened pursuant to any legal requirements regarding or in connection with the ADA and relating to all or any portion of the Premises, Subtenant's use or occupancy thereof, the Building or the Shopping Center; and/or (iv) any claim made or threatened by any person against Subtenant, the Premises, the Building or the Shopping Center, relating to damage, compensation, loss or injury resulting from or claimed to result from any alleged non-compliance with the ADA. ADA shall mean the Americans with Disabilities Act of 1991, 42 U.S.C. 12 101 et seq., and all regulations and other promulgations applicable thereto, and all amendments thereto

26.   HAZARDOUS SUBSTANCES

23

A.   Hazardous Materials Subtenant shall not use, generate, manufacture, produce, store, treat, or dispose of any asbestos or any flammable, explosive, radioactive, hazardous, toxic, contaminating, polluting matter, waste, or substance or related injurious materials, whether injurious by themselves or in combination with other materials (collectively "Hazardous Materials") Further, Subtenant shall not use, generate, manufacture, produce, store, treat, or dispose of any material, substance, or chemical which is regulated by any federal, state or local law, rule, ordinance or regulation (collectively "Regulated Materials") Notwithstanding the foregoing, if Subtenant's permitted use of the Premises requires the use and/or storage of any Hazardous Materials and/or Regulated Materials on, under or about the Premises, Subtenant shall provide written notice to Sublandlord, prior to final execution of this Sublease, of the identity of such materials and Subtenant's proposed plan for the use, storage and disposal of such materials; such use, storage and disposal shall be subject to Sublandlord's written approval, in Sublandlord's sole discretion. If Sublandlord approves the proposed use, storage and disposal of specific Hazardous Materials and/or Regulated Materials in the Premises, Subtenant may use and store upon the Premises only such approved materials. Subtenant shall comply with all Laws with respect to such use and storage by Subtenant, including, without limitation, the removal and disposal of said Hazardous Materials and/or Regulated Materials at the expiration or earlier termination of the Sublease Term. At the expiration or termination of the Sublease, Sublandlord may obtain, at its cost, a Phase I environmental audit of the Premises. Subtenant shall reimburse Sublandlord for the reasonable costs of said Phase I environmental audit if Subtenant has violated any of the provisions of this Section 26 and Sublandlord may pursue any and all recommendations of said Phase I environmental audit, also at Subtenant's sole cost, to the extent caused by Subtenant, its employees, agents, contractors, or invitees. Subtenant shall defend (by counsel reasonably acceptable to Sublandlord), indemnify, protect and hold Sublandlord and each of Sublandlord's partners, employees, agents, attorneys, successors and assigns, free and harmless from and against any and all claims, liabilities, penalties, forfeitures, losses or expenses (including attorney's fees), or death of or injury to any person or damage to any property whatsoever, arising from or caused in whole or in part, directly or indirectly by:

(i)   The presence in, on, under or about the Premises, or discharge in or from the Premises of any Hazardous Materials and/or Regulated Materials introduced into the Premises by Subtenant or caused by Subtenant's or Subtenant's use, analysis, storage, removal, transportation, disposal, release, threatened release, discharge or generation of Hazardous Materials and/or Regulated Materials to, in, on, under, about or from the Premises, or;

(ii)   Subtenant's failure to comply with any federal, state, county, municipal, local or other law, rule, ordinance and regulation now or hereafter in effect relating to the industrial hygiene, environmental protection, use, analysis, generation, manufacture, purchase, transportation, storage, removal and disposal of Hazardous Materials and/or Regulated Materials by Subtenant, its employees, agents, contractors, or invitees

In connection with, or as a result of, (i) or (ii) above, Subtenant's obligations hereunder shall include, without limitation and whether foreseeable or unforeseeable, all costs of any required or necessary testing, repair, cleanup, detoxification or decontamination of or from the Premises and the preparation and implementation of any closure, remedial action, site

24

assessment costs or other required plans in connection therewith. In addition, upon request from Sublandlord at any time during the Sublease Term, Subtenant shall execute affidavits, representations, and any other similar documents concerning Subtenant's knowledge and belief regarding the presence of Hazardous Materials and/or Regulated Materials on, under or about the Premises. Further, Subtenant's obligations hereunder shall survive the expiration or earlier termination of this Sublease for two (2) years. For purposes of this Section 26, any acts or omissions of Subtenant whereby employees, agents, assignees, contractors or subcontractors of Subtenant or others are acting for or on behalf of Subtenant (whether or not they are negligent, intentional, willful or unlawful), will be strictly attributable to Subtenant. Subtenant hereby represents that, to the best of its knowledge, as of the date hereof, no Hazardous Materials and/or Regulated Materials are present in, on, or under the Premises

B.   Sublandlord's Representations Sublandlord represents and warrants that Sublandlord has not placed any Hazardous Materials or Regulated Materials in, on, or under the Premises, nor has Sublandlord authorized any other party to do so

27   QUIET ENJOYMENT

Sublandlord agrees that upon Subtenant's payment of Base Rent and Additional Rent, and performing and observing the agreements and conditions on its part to be performed and observed hereunder, Subtenant shall and may peaceably and quietly have, hold and enjoy the Premises and all rights of Subtenant hereunder during the term of this Sublease without hindrance or molestation from any person or entity claiming by, through, or under Sublandlord; subject, however, to all of the terms of Prime Lease and this Sublease

28   SUBLANDLORD'S REPRESENTATIONS

Sublandlord hereby represents and warrants to Subtenant that it has not consented or agreed with Landlord to subject the Premises to any exclusive use rights other than as set forth on Exhibit "F" to the Prime Lease

29   MISCELLANEOUS COVENANTS

A.   No Waste   Subtenant shall not commit or suffer to be committed any waste upon the Premises or any nuisance or other act or thing which may disturb the quiet enjoyment of any other tenant or occupant of the Shopping Center

B.   Trash Removal.   Subtenant shall independently contract with contractors for the regular removal of Subtenant's garbage and refuse and shall pay the cost thereof

C.   Interference   Subtenant shall take no action which would unreasonably interfere with the business of any tenant or occupant in the Shopping Center or with the rights and privileges of any customer or other person(s) lawfully in and upon said Shopping Center, nor cause the impairment of the good will of the Shopping Center; and if any action of Subtenant shall result in the occurrence of any of the foregoing, Subtenant shall immediately discontinue such action

25

D    Consents and Approvals    In any instance when Sublandlord's consent or approval is required under this Sublease, Sublandlord's refusal to consent to or approve any matter or thing shall be deemed reasonable if Landlord refuses to grant such consent or approval, so long as Sublandlord exercises commercially reasonable efforts to obtain such consent or approval from Landlord.

E    No Waiver    The failure of Sublandlord to insist in any one or more cases upon the strict performance or observance of any obligation of Subtenant hereunder or to exercise any right or option contained herein shall not be construed as a waiver or relinquishment for the future of any such obligation of Subtenant or any right or option of Sublandlord   Sublandlord's receipt and acceptance of Base Rent or Additional Rent, or Sublandlord's acceptance of performance of any other obligation by Subtenant, with knowledge of Subtenant's breach of any provision of this Sublease, shall not be deemed a waiver o f such breach   No waiver by Sublandlord of any term, covenant or condition of this Sublease shall be deemed to have been made unless expressed in writing and signed by Sublandlord

F    Successors and Assigns    The provisions of this Sublease, except as herein otherwise specifically provided, shall extend to, bind and inure to the benefit of the parties hereto and their respective personal representatives, heirs, successors and assigns   In the event of any arm's length assignment or transfer of the leasehold estate under the Prime Lease, the transferor or assignor, as the case may be, shall be and hereby is entirely relieved and freed of all obligations under this Sublease accruing from and after such transfer or assignment

G    Interpretation   This Sublease shall be governed by and construed in accordance with the laws of the state in which the Premises are located, without regard to conflicts of laws principles   If any provision of this Sublease or the application thereof to any person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, the remainder of this Sublease and the application of that provision to other persons or circumstances shall not be affected but rather shall be enforced to the extent permitted by law   The table of contents, captions, headings and titles, if any, in this Sublease are solely for convenience of reference and shall not affect its interpretation   This Sublease shall be construed without regard to any presumption or other rule requiring construction against the party causing this Sublease to be drafted   If any words or phrases in this Sublease shall have been stricken out or otherwise eliminated, whether or not any other words or phrases have been added, this Sublease shall be construed as if the words or phrases so stricken out or otherwise eliminated were never included in this Sublease and no implication shall be drawn from the fact that said words or phrases were so stricken out or otherwise eliminated.  Each covenant, agreement, obligation or other provision of this Sublease shall be deemed and construed as a separate and independent covenant of the party bound by, undertaking or making same, not dependent on any other provisions of this Sublease unless otherwise expressly provided   All terms and words used in this Sublease, regardless of the number or gender in which they are used, shall be deemed to include any other number and any other gender as the context may require.  The word "person" as used in this Sublease shall mean a natural person or persons, a partnership, a corporation or any other form of business or legal association or entity   Time shall be of the essence of each and every obligation of Subtenant under this Sublease

H    No Reservation    No employee or agent of Sublandlord, no broker, and no agent of any broker has authority to make or agree to take a sublease or any other agreement or undertaking in connection herewith, including but not limited to the modification, amendment or cancellation of a sublease   The mailing or delivery of this document by an employee or agent of Sublandlord, any broker or the agent of any broker to a potential Subtenant, its agent or attorney shall not be deemed an offer of Sublandlord or a reservation of or option for the Premises until such time as a sublease, duly executed by Sublandlord and Subtenant, is delivered to such potential Subtenant, its agent or attorney

I    No Partnership    Nothing contained in this Sublease shall be deemed or construed to create a partnership or joint venture of or between Sublandlord and Subtenant, or to create any relationship other than that of sublandlord and subtenant

J    No Representations    Neither Sublandlord nor any agent of Sublandlord has made any representations or promises with respect to the Premises, the Building or the Shopping Center except as expressly set forth in this Sublease, and no rights, privileges, easements or licenses are granted to Subtenant except as expressly set forth in this Sublease

K    Complete Agreement, Counterparts   There are no representations, agreements, arrangements or understandings, oral or written, between the parties relating to the subject matter of this Sublease which are not fully expressed in this Sublease   This Sublease cannot be changed or terminated orally or in any manner other than by a written agreement executed by both parties   This Sublease may be executed in two or more counterparts, all of which taken together shall constitute a single instrument.

26

27

IN WITNESS WHEREOF, Sublandlord and Subtenant have hereunto executed this Sublease as of the day and year first above written

SUBLANDLORD:

CIRCUIT CITY STORES, INC

By: _____
     John B. Mulleady
     Vice President
     Real Estate and Construction

SUBTENANT:

DICK'S SPORTING GOODS, INC , a
Delaware corporation

By: _____
     Douglas W  Walrod
     Senior Vice President
     Real Estate and Development

C \Client Files\Circuit City\Gaylan Property\Dallas\20965 01 06 Sublease Dallas.doc

28

29

ALPHA PARKWAY PLAZA

DALLAM PROPERTIES Dallas, Texas  Ph 972-931-1188  Fax 972-931-6532

SOUTHERN BLVD.

DALLAS PARKWAY
(DALLAS NORTH TOLLWAY)

BARTON DRIVE

ALPHA ROAD

EXHIBIT "A"

Site Plan of Shopping Center

AB Architects, Inc. – Project No. 1031 – SP1
28 FEBRUARY 2007

DALLAS, TEXAS

## EXHIBIT B

### RULES AND REGULATIONS

1    Subtenant, its employees and/or agents, shall not solicit business in the parking or other Common Areas, nor shall Subtenant, its employees or its agents, distribute any handbills or other advertising matter in or on the parking or other Common Areas, or in or on any automobiles parked therein

2    Subtenant shall not carry on any trade or occupation, or operate any insthument or apparatus or equipment which emits any odor or causes any noise or sound audible outside the Premises and/or which may be deemed offensive in nature

3    Subtenant shall not place or maintain any display of merchandise, or otherwise conduct any business (including the storage of any merchandise or other property of Subtenant), in any areas of the Shopping Center outside of the Premises

4    Subtenant shall store or stock in the Premises such and only such goods, wares, merchandise or other property as shall be reasonably required for the conduct of Subtenant's business in the Premises

5    Subtenant shall not use, permit or suffer the use of the Premises, or any part thereof, as living, sleeping or lodging quarters, or other residential purpose

6    Subtenant shall not use the plumbing facilities for any purpose other than that for which the are constructed, and no grease or foreign substance of any kind shall be disposed of therein, and the expense of any breakage, stoppage or damage (whether on or off the Premises) resulting from any breach thereof shall be borne by Subtenant

7    Subtenant shall not install or permit to be installed in, on or about the Premises any audio, video or radio transmitting equipment, diathermy equipment, x-ray equipment or any other material or equipment which would cause any interference with, or interruption of, radio or television reception or transmission anywhere in the Shopping Center

8    No loudspeakers, televisions, phonographs, radios, flashing lights or other devices shall be used in a manner so as to be heard or seen outside the Premises

9    Subtenant shall not obstruct the passageways, driveways, approachways, walks, roadways, exits and entries in, to and from and through the Common Areas and all other parts of the Shopping Center used in common with other tenants

10    Subtenant shall keep its display windows and sales areas illuminated and its signs and exterior lights lit each and every day of the Term during customary retail business hours

11.    Neither Subtenant, its agents, employees or contractors shall enter upon or have access to any roof at the Shopping Center without Sublandlord's express prior consent in each instance

12    All trash, refuse and waste materials shall be regularly removed from the Premises, and until removal shall be stored (i) in adequate containers, which such containers shall be located so

1

as not to be visible to the general public shopping in the Shopping Center, and (ii) so as not to constitute any health or fire hazard or nuisance to any other occupant of or other person in the Shopping Center  No burning of trash, refuse or waste materials shall occur  Subtenant shall not throw, discard or deposit any paper, glass or extraneous matter of any kind, except in designated receptacles, or create litter or hazards of any kind; nor deface, damage or demolish any part of the Premises or any sign, light standard or fixture, landscaping materials or other improvements within the Shopping Center, or the property of any customers, business invitees or employees situated within the Shopping Center

13    Subtenant shall cause all trucks servicing it to load and unload prior to the hours of the Shopping Center opening for business to the general public

14    All of Subtenant's window displays and other displays in or on the Premises shall be in keeping with first class standards of the retail trade

15    If the Premises be or become infested with vermin, pests or termites, Subtenant shall at Subtenant's expense cause the same to be exterminated from time to time to the satisfaction of Sublandlord and shall employ such exterminators and such exterminating company or companies as shall be approved by Sublandlord

16    Any freight handling equipment (including, without limitation, forklift trucks, tow trucks or similar machines) used by or on behalf on Subtenant in the Shopping Center shall be equipped with pneumatic rubber tires, and any such equipment which is powered shall be electrically powered

17    Subtenant shall not place a load on any floor in the Premises or the Shopping Center which shall exceed the floor load per square foot which such floor was designed to carry, and Subtenant shall install any heavy items of equipment which shall be installed or maintained in the Premises in such a manner so as to achieve a proper distribution of weight

18    Subtenant shall not install, operate or maintain in the Premises or the Shopping Center any electrical equipment which will overload the electrical system therein, or any part thereof, beyond the reasonable capacity for proper and safe operation as determined by Sublandlord in relation to the overall system and requirements therefor in the Shopping Center, or which does not bear Underwriter's approval.

19    Subtenant and its agents and employees shall park their vehicles only in areas from time to time designated by Sublandlord as the areas for employee parking.  Subtenant shall within five (5) days after written notice from Sublandlord, furnish Sublandlord, or its authorized agent, license tag number assigned to its automobiles and the automobiles of all its agents and employees working at the Premises  Sublandlord, after notice to Subtenant that Subtenant or any of its agents or employees are not parking in said designated parking areas, shall have the option to tow away such vehicles at Subtenant's expense, such towing charges to be deemed an Additional Rent Charge  Subtenant shall not at any time park or permit the parking of any truck or any delivery vehicle in the parking area  Subtenant shall require all trucks or other vehicles serving Subtenant to use the service area designated by Sublandlord  Subtenant shall cause all vehicles servicing Subtenant to be promptly loaded or unloaded and removed

2

## EXHIBIT C

### FIRE MONITORING CONTACT LIST

Herman Blatz        724-273-3487

1

EXHIBIT D

TENANT'S WORK

EXHIBIT "D"

TENANT'S WORK

SIGN PLAN

Tenant's Work shall be in accordance with Subtenant's prototype plans and specifications, dated 09/15/06, as modified by Design Revision Bulletins through the date hereof, all as prepared by JSA Architects (4.5 prototype), and as previously provided by Subtenant to Sublandlord; provided that Sublandlord acknowledges that the foregoing will be modified by (i) the site specific characteristics of the Premises, (ii) governing law, (iii) routine changes to Subtenant's prototype consistently applied to similar sized premises, and (iv) in accordance with the exterior elevations attached to this Sublease.

1

2



# Exhibit B

# Bloodworth Carroll & Banowsky, P.C.

12221 Merit Drive
Suite 1680
Dallas, Texas 75251

**LAURIE A. CARROLL**
*direct* 214.234.2723 *fax* 214.234.2727
laurie.carroll@bcblawfirm.com

November 13, 2008

Dick's Sporting Goods, Inc.
300 Industry Drive
Pittsburgh, PA 15275
Attn: Senior Vice President,
      Real Estate and Development

RECEIVED
NOV 1 7 2008
Dick's Sporting Goods, Inc
Legal Department

**Via FedEx and
Certified Mail RRR**

Dick's Sporting Goods, Inc.
300 Industry Drive
Pittsburgh, PA 15275
Attn: Legal Department

**Via FedEx and
Certified Mail RRR**

Re:    Alpha Parkway Plaza Shopping Center, Dallas, Texas (Dick's Store No. 387) --
    Agreement Regarding Lease (herein so called), dated April 3, 2007, executed by
    and between Galleria Alpha Plaza, Ltd. ("Landlord") and Dick's Sporting Goods,
    Inc. ("Dick's") covering a portion of the former Circuit City location (the
    "Subleased Premises")

Dear Sirs:

In connection with the above-referenced matter, this law firm represents Landlord. As you may be aware, effective as of November 10, 2008, the Lease dated June 7, 1995, between Circuit City Stores, Inc. ("Circuit City") and Landlord (as subsequently amended, the "Lease") and the Sublease dated April 1, 2007, between Circuit City and Dick's, both of which affect the Subleased Premises, was rejected pursuant to "Order Pursuant to 11 U.S.C. Sec. 105(a), 365(a) and 554 and Fed R. Bankr. P. 6006 Authorizing Rejection of Unexpired Leases of Nonresidential Property and Abandonment of Personal Property Effective as of the Petition Date," issued November 10, 2008 by the United States Bankruptcy Court for the Eastern District of Virginia (Richmond Division).

Therefore, pursuant to the Agreement Regarding Lease, a Direct Lease Triggering Event (as defined therein) has occurred and the Lease has automatically become a direct lease between Landlord and Dick's with respect to the Subleased Premises

Pursuant to the Agreement Regarding Lease, please immediately remit to Landlord the sum of $342,287.66, which equals the delinquent amounts payable by Circuit City with respect to the Subleased Premises for November Base Rent, pro rata share of November CAM Charges and

# Bloodworth Carroll & Banowsky, P.C.

Dick's Sporting Goods, Inc.
November 13, 2008
Page 2

Taxes for 2008, as detailed on the worksheets attached to this letter. Pursuant to Paragraph 3 of the Agreement Regarding Lease, Dick's shall cure any and all events of default under the Lease, whether or not due to Circuit City's omission, negligence or actions, that affect or relate to the Subleased Premises, including, without limitation, the payment of Base Rent, CAM Charges and any other sums with respect to the Subleased Premises which have not been paid or performed by Circuit City.

Further, Paragraph 3 of the Agreement Regarding Lease states that after a Direct Lease Triggering Event, Dick's shall thereafter pay Base Rent to Landlord with respect to the Subleased Premises at a per square foot rental amount equal to the per square foot rental amount payable by Circuit City under the terms of the Lease through the remainder of the initial term of the Lease. Therefore, on or before the first day of each month beginning from and after the date of this letter, please remit directly to Landlord at 2001 Preston Road, Plano, Texas 75093-2313, the total sum of $89,324.38, which includes $84,949.00 as Base Rent and $4,375.38 as Dick's pro rata share of CAM Charges. For your reference, enclosed please find the December invoice for these amounts that is payable on or before December 1, 2008.

Finally, please immediately provide to Landlord certificates and other evidence of insurance required by Paragraph 6 of the Agreement Regarding Lease.

Should you have any questions or comments concerning this matter, please do not hesitate to call.

Sincerely,

Laurie A. Carroll

LAC:gl
cc:   Mr. Robert Nash

## ALPHA PARKWAY PLAZA
## DALLAS, TEXAS

Dick's Sporting Goods, Inc.                                    Date:        11/13/2008
Attn: Senior Vice Prestident,
Real Estate & Development
300 Industry Drive
Pittsburgh, PA 15275

Suite Square Footage                44,710
Building Square Footage            168,049                    26.605%

Amounts billed to Circuit City (55,008sf)
November Base Rent            $104,515.20        $22.80  psf
November CAM                    $5,383.15         $1.17  psf

Amounts now due from Dicks Sporting Goods, Inc. pursuant to Agreement Regarding Lease

November Base Rent                                      $84,949.00
November CAM                                             $4,375.38
2008 Property Taxes (see separate worksheet)         $252,963.28

**Total Amount Due**                                    $342,287.66

**ALPHA PARKWAY PLAZA**
**DALLAS, TEXAS**
**PROPERTY TAX BILLING**

Dick's Sporting Goods, Inc.                          Date:        11/13/2008
Attn: Senior Vice Prestident,
Real Estate & Development
300 Industry Drive
Pittsburgh, PA 15275

Suite Square Footage          44,710
Building Square Footage       168,049              26.605%

2008 Taxes                                        $950,799.06

**Total Amount Due**                              **$252,963.28**



**David Childs**
**Dallas County**
**Tax Assessor-Collector**

500 Elm Street Dallas, Texas 75202-3304
214-653-7811
www.dallascounty.org
email: propertytax@dallascounty.org

## 2008 TAX STATEMENT

******AUTO**5-DIGIT 75093  T0089 P0001 S0000029800
GALLERIA PLAZA LTD
2001 PRESTON RD
PLANO TX 75093-2313

Commercial Property

LEGAL:  GALLERIA PLAZA
          BLK A/7003 LT 1B ACS 9.4197

          VOL98111/7948 DD06031998 CO-DC
          7003 00A  01B    3007003 00A

LOCATION:  13710 DALLAS, DA
ACCOUNT:    007003000A01B0000
Date:         10/28/2008

| Land Value | Improvement Value | Market Value |
|---|---|---|
| $14,361,270 | $23,553,460 | $37,914,730 |

| Jurisdiction | Taxable Value | Tax Rate | Tax Due |
|---|---|---|---|
| DAL CNTY | $37,914,730 | .2281000 | $86,483.50 |
| HOSP DIST | $37,914,730 | .2540000 | $96,303.41 |
| COLL DIST | $37,914,730 | .0894000 | $33,895.77 |
| SCH EQUAL | $37,914,730 | .0049280 | $1,868.44 |
| DALLAS ISD | $37,914,730 | 1.1834020 | $448,683.67 |
| DALLAS CTY | $37,914,730 | .7479000 | $283,564.27 |

 Residential Property Only
Visit our website for online credit card payments
www.dallascounty.org

Pay By January 31, 2009
$950,799.06

*Your check may be converted to electronic funds transfer*

✂------------------------------------------------------

## Return This Portion With Your Payment

Account:  007003000A01B0000

2

00000700003000000110001120000000010800950799067

| IF PAID IN | P&I | TOTAL DUE |
|---|---|---|
| FEB | 7% | $1,017,355.00 |
| MAR | 9% | $1,036,370.98 |

REMIT TO:
  DAVID CHILDS
  P O BOX 139066
  DALLAS, TEXAS 75313-9066

Pay By January 31, 2009
$950,799.06

Amount Paid $

GALLERIA PLAZA LTD
2001 PRESTON RD
PLANO TX  75093-2313



**ALPHA PARKWAY PLAZA**
**DALLAS, TEXAS**

Dick's Sporting Goods, Inc.                         Invoice Date:      11/13/2008
Attn: Senior Vice Prestident,                       Account Number:    300-Dicks
Real Estate & Development
300 Industry Drive
Pittsburgh, PA 15275

Suite Square Footage            44,710
Building Square Footage         168,049              26.605%

Amounts now due from Dicks Sporting Goods, Inc. pursuant to Agreement Regarding Lease

December Base Rent                              $84,949.00
December CAM                                     $4,375.38

**Total Amount Due this Invoice**               $89,324.38

Make check payable to:              Galleria Alpha Plaza, Ltd.
                                    2001 Preston Road
                                    Plano, TX 75093-2313