Annemarie G. McGavin (VSB No. 39984)
Buchanan Ingersoll & Rooney PC
1700 K Street, N.W., Suite 300
Washington, DC  20006
(202) 452-7900

-and-

James D. Newell (PA ID# 51337)
Zakarij O. Thomas (PA ID# 87385)
Buchanan Ingersoll & Rooney PC
One Oxford Centre, 20th Floor
Pittsburgh, PA 15219
(412) 562-8800

Counsel to Golf Galaxy, Inc.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| CIRCUIT CITY STORES, INC., et al., | Case No.  08-35653 |
| Debtors. | Jointly Administered |

## LIMITED OBJECTION TO ORDER PURSUANT TO 11 U.S.C. SECTIONS 105(a), 365(a) AND 554 AND FED. R. BANKR. P. 6006 AUTHORIZING REJECTION OF UNEXPIRED LEASES AND SUBLEASES OF NON-RESIDENTIAL REAL PROPERTY AND ABANDONMENT OF PERSONAL PROPERTY EFFECTIVE AS OF THE PETITION DATE

Golf Galaxy, Inc. ("Galaxy"), by and through its undersigned counsel, hereby submits this limited objection to the Debtors' Motion for Order Pursuant to 11 U.S.C. Sections 105(a), 365(a), and 554 and Fed. R. Bankr. P. 6006 Authorizing Rejection of Unexpired Leases of Nonresidential Real Property and Abandonment of Personal Property Effective as of the Petition Date (the "Rejection Motion") as follows:

## PROCEDURAL HISTORY

1.    On November 10, 2008 (the "Petition Date"), the above-captioned debtors-in-possession filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code.

2.    On November 10, 2008, the Debtors filed the Rejection Motion.

3.    Pursuant to the Rejection Motion, the Debtors sought, *inter alia*, authority to reject certain leases (including the subleases thereto) as of the Petition Date, subject to the rights of landlords associated with the leases to object to the rejection of the leases.

4.    On November 10, 2008, the Court entered an Order Pursuant to 11 U.S.C. Sections 105(a), 365(a), and 554 and Fed. R. Bankr. P. 6006 Authorizing Rejection of Unexpired Leases of Nonresidential Real Property and Abandonment of Personal Property Effective as of the Petition Date (the "Rejection Order").

## FACTUAL BACKGROUND

5.    Orchard Park Place Retail, LLC (the "Prime Landlord") and Circuit City Stores, Inc. (the "Sublandlord") are parties to a Lease dated September 13, 1995, by assignment dated January 30, 2002 (the "Prime Lease"), pursuant to which the Sublandlord leased non-residential real property at a shopping center located at 4831 Golf Road, Skokie, Illinois (the "Prime Lease Premises").

6.    Galaxy and the Sublandlord are parties to a sublease agreement dated October 18, 2005 (the "Sublease"), pursuant to which Galaxy leased a portion of the Prime Lease Premises (the "Subleased Premises").    A true and correct copy of the Sublease is attached to this Objection and incorporated herein as Exhibit A.[1]

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Sublease.

7.      Pursuant to the Sublease, monthly rent becomes due and payable in advance on the first day of each month.

8.      On or before November 1, 2008, Galaxy paid to the Sublandlord monthly rent in the amount of $28,477.13, Galaxy's pro-rata share of estimated real estate taxes in the amount of $3,800.00 and Galaxy's pro-rata share of common area maintenance charges ("CAM Charges") in the amount of $2,233.94, for a total amount of $34,511.07 in obligations for the month of November (collectively, the "November Payments").

9.      Upon information and belief, the Sublandlord did not pass through the November Payments to the Prime Landlord.

10.     Pursuant to the Sublease, Galaxy was obligated to make payments for real estate taxes to the Sublandlord, in advance, on a monthly basis (the "Tax Payments"). Galaxy suspects that, with respect to payment related to periods prior to November 2008, the Sublandlord paid over the CAM Charges and Tax Payments to the Prime Landlord on a monthly basis.  In the event that the Sublandlord did not pass through Tax Payments and payments for CAM Charges prior to November, Galaxy reserves its right to add to the relief sought herein those payments that were made to the Sublandlord but not passed through to the Prime Landlord.

11.     Paragraph 3(F) of the Sublease provides that:

[I]f Subtenant's payments exceed the amount of Subtenant's Pro Rata Share of actual Operating Expenses or Taxes, Subtenant shall receive a credit toward the next installment of such Additional Rent in the amount of such overpayment, or if the term of this Sublease expires or is earlier terminated and a credit accrues or remains unapplied, then Sublandlord shall pay the difference … thirty (30) days after the expiration or earlier termination of the Term of this Sublease.

3

12.     The Rejection Order appears to provide that the actual Operating Expenses (which include CAM Charges) paid to the Prime Landlord for November will be zero.  In that event, Galaxy is entitled to a refund of the CAM Charges it paid to the Sublandlord for November under paragraph 3(F) of the Sublease.

13.     Similarly, to the extent that the Sublandlord did not pass the Tax Payments and CAM Charges through to the Prime Landlord during the period prior to November 2008, Galaxy is entitled to a refund of the Tax Payments and CAM Charges under paragraph 3(F) of the Sublease.

## BASIS FOR OBJECTION

14.     Although Galaxy does not object to the ultimate rejection of the Prime Lease and Sublease, Galaxy does object to the rejection of the Prime Lease and the Sublease as of the Petition Date.

15.     Given that Galaxy has already made payment for November 2008 obligations due under the Sublease, the Debtors should either: (i) reject the Prime Lease and Sublease as of November 30, 2008 and pay administrative rent for the post-petition period of November, or (ii) pay over to the Prime Landlord the amount of $34,511.07 already paid by Galaxy for November 2008 rent.

16.     Moreover, pursuant to paragraph 3(F) of the Sublease, Galaxy is entitled to a refund of any portion of any Tax Payments or CAM Charges not passed through to the Prime Landlord.

17.     At least one other Bankruptcy Court has entered orders providing similar relief to sublessees under facts similar to those present in this case.  See, e.g., In re Kmart Corporation, et al., Case No. 02-02472 (Bankr. N.D. Ill. Feb. 15, 2002 and March 8,

2002) (Order authorizing rejection of certain unexpired leases and providing that "the Debtors shall turn over to the applicable lessor any and all rentals collected by the Debtors from the sublessee of premises subject to such Real Property Lease for rental periods arising from and after the effective date of the rejection.").

18.    In addition to the contractual rights of Galaxy, to the extent that the November Payments and any other Tax Payments and Care not passed through to the Prime Landlord, the November Payments and Tax Payments are subject to a constructive trust and, therefore, are not property of the Debtors' estates. See In re American Int'l Airways, Inc., 44 B.R. 143, 147-8 (Bankr. E.D. Pa. 1984) (sublease payments subject to constructive trust and not property of debtor-sublessor's estate); In re Mid-Atlantic Supply, Co., 790 F.2d 1121 (4th Cir. 1986).

## WAIVER OF MEMORANDUM OF LAW

19.    Pursuant to Local Bankruptcy Rule 9013-1(G), and because there are no novel issues of law presented in the Objection and all applicable authority is set forth in the Objection, Galaxy respectfully requests that, to the extent applicable, the requirement that all motions be accompanied by a separate memorandum of law be waived.

## NO PRIOR REQUEST

20.    No previous motion for the relief sought herein has been made to this or any other Court.

WHEREFORE, Golf Galaxy, Inc. respectfully requests that the Rejection Motion be denied to the extent that it seeks to reject the Prime Lease and Sublease as of the Petition Date without requiring the Debtors to pay over the November Payments and Tax Payments to the Prime Landlord.

**BUCHANAN INGERSOLL & ROONEY PC**

Dated:  November 20, 2008         By:         /s/  *Annemarie McGavin*
                                              Annemarie G. McGavin (VSB No. 39984)
                                              1700 K Street, N.W., Ste. 300
                                              Washington, DC  20006
                                              Telephone:  (202) 452-7900
                                              Facsimile:  (202) 452-7989

                                                     and

                                              James D. Newell  (PA ID# 51337)
                                              Zakarij O. Thomas (PA ID# 87385)
                                              One Oxford Centre, 20th Floor
                                              Pittsburgh, PA  15219
                                              Telephone:  (412) 562-8800

                                              Counsel to Golf Galaxy, Inc.

## CERTIFICATE OF SERVICE

      I certify that on the 20th day of November, 2008, I caused the Limited Objection to Debtors' Motion for Order Pursuant to 11 U.S.C. Sections 105(a), 365(a), and 554 and Fed. R. Bankr. P. 6006 Authorizing Rejection of Unexpired Leases of Nonresidential Real Property and Abandonment of Personal Property Effective as of the Petition Date to be served upon the following First-Class U.S. Mail and, where applicable, via the electronic case filing system:

Daniel F. Blanks, Esq.
Douglas M. Foley, Esq.
McGuire Woods, LLP
9000 World Trade Ctr.
101 W. Main Street
Norfolk, VA 23510

Dion W. Hayes, Esq.
Joseph S. Sheerin, Esq.
Sarah Beckett Boehm
McGuire Woods, LLP
901 East Cary Street
Richmond, VA 23219

Robert B. Van Ardales, Esq.
Office of US Trustee
701 East Broad Street
Suite 4304
Richmond, VA 23219

Paramount Home Entertainment
Attn: Andi Marygold
5555 Melrose Ave.
Bluhdorn #213
Hollywood, CA 90038

Hewlett-Packard Company
Attn: Ramona Neal/Chris Patafio
11307 Chinden Blvd, MS 314
Boise, ID 83714

Samsung Electronics America, Inc.
Attn: Joseph McNamara
105 Challenger Rd.
Ridgefield Park, NJ 07660

LG Electronics USA, Inc.
Attn; Brian Wehr
c/o H. Jason Gold
Wiley Rein LLP
7925 Jones Branch Drive
Mclean, VA 22102

Weidler Settlement Class
Attn: Christopher Jones and Martin Fletcher
Whiteford Taylor & Preston
3190 Fairview Park Drive, Ste. 300
Falls Church, VA 22042

Garmin International, Inc.
Attn: Lisa Brauch
1200 East 151st Street
Olathe, KS 66062

Simon Property Group, Inc.
Attn: Ronald M. Tucker
225 W. Washington Street
Indianapolis, IN 46204

Alliance Entertainment
Attn: Douglas J. Bates
27500 Riverview Center Blvd.
Bonita Springs, FL 34134

Developers Diversified Realty Corp.
Attn: Eric C. Cotton
3300 Enterprise Parkway
Beachwood, OH 44122

Pension Benefit Guarantee Corporation
Attn:  Sara Eagle
Office of General Counsel
1200 K. St. NW
Washington, DC  20005

Toshiba America Consumer Products, LLC
Attn: Judy Oliver and Joe Shedlock
82 Totowa Road
Wayne, NJ  07470


_   /s/ Zakarij O. Thomas_____
Zakarij O. Thomas

# EXHIBIT A

#161

CIRCUIT CITY STORES, INC.,

Sublandlord

TO

GOLF GALAXY, INC.,

Subtenant

SUBLEASE

Dated: October ___, 2005

Property:

4831 Golf Road
Skokie, Illinois

---

TABLE OF CONTENTS

|  | Page |
|---|---|
| 1. PREMISES. | 1 |
| 2. TERM. | 1 |
| 3. RENT. | 3 |
| 4. SECURITY DEPOSIT. | 5 |
| 5. CONDITION OF PREMISES. | 5 |
| 6. USE. | 6 |
| 7. PARKING AND COMMON AREAS. | 7 |
| 8. UTILITIES. | 7 |
| 9. REPAIRS AND MAINTENANCE. | 8 |
| 10. ALTERATIONS. | 9 |
| 11. SIGNS. | 11 |
| 12. ASSIGNMENT AND SUBLETTING. | 12 |
| 13. ACCESS TO PREMISES. | 14 |
| 14. INDEMNITY. | 15 |
| 15. INSURANCE. | 15 |
| 16. SUBORDINATE TO PRIME LEASE. | 17 |
| 17. TERMINATION, DESTRUCTION, CONDEMNATION. | 18 |
| 18. NOTICES. | 19 |
| 19. DEFAULT. | 19 |
| 20. WAIVER OF JURY TRIAL AND RIGHT TO COUNTERCLAIM. | 20 |
| 21. END OF TERM. | 23 |
| 22. HOLDOVER. | 23 |
| 23. BROKERAGE. | 23 |
| 24. ESTOPPEL CERTIFICATES. | 24 |
| 25. AMERICANS WITH DISABILITIES ACT. | 24 |
| 26. HAZARDOUS SUBSTANCES. | 25 |
| 27. MISCELLANEOUS COVENANTS. | 27 |

EXHIBITS TO SUBLEASE

EXHIBIT A    -    Property Description
EXHIBIT B    -    Rules and Regulations
EXHIBIT C    -    Fire Monitoring Contact Information
EXHIBIT D    -    Description of Initial Alterations
EXHIBIT E    -    Sign Plan

# SUBLEASE

THIS SUBLEASE, dated the ___ day of October, 2005, between CIRCUIT CITY STORES, INC., a Virginia corporation, having an office at 9950 Mayland Drive, Richmond, Virginia 23233-1464 ("Sublandlord") and GOLF GALAXY, INC., a Minnesota corporation, having an office at 7275 Flying Cloud Drive, Eden Prairie, Minnesota 55344 ("Subtenant"),

W I T N E S S E T H:

### Recitals

By Lease Agreement dated September 13, 1995 (as amended as hereinafter described, the "Prime Lease"), First Market Bank & Trust Company, as Trustee ("Original Landlord") leased to Marshall's of Skokie, IL, Inc. ("Marshall's") approximately 30,000 rentable square feet of ground floor space located in the building (the "Building") at 4831 Golf Road, Skokie, Illinois, within the shopping center known as Orchard Place Shopping Center (the "Shopping Center"). The Prime Lease was amended by First Amendment to Lease dated April 26, 1996, by Second Amendment to Lease dated January 17, 1997, and by Third Amendment to Lease dated January 30, 2002. Pursuant to the Third Amendment to Lease, among other modifications, the area of the space leased was increased to 32,156 square feet more particularly described in the Third Amendment to Lease (the "Prime Lease Premises")

Orchard Park Place Retail, LLC ("Landlord") succeeded to the rights of Original Landlord as landlord under the Prime Lease.

By Assignment and Assumption of Lease dated January 30, 2002 (the "Assignment"), Marshall's assigned its interest as tenant under the Prime Lease to Sublandlord. Sublandlord now desires to sublease a portion of the Prime Lease Premises to Subtenant, and Subtenant desires to sublease such portion of the Prime Lease Premises from Sublandlord.

### Sublease

1.    PREMISES.

Sublandlord hereby subleases to Subtenant, and Subtenant hereby subleases from Sublandlord, those certain premises ("Premises") consisting of approximately 13,401 rentable square feet of ground floor and made a part hereof, consisting of approximately 13,001 rentable square feet of ground floor space in the Building. This Sublease does not include any right under the Prime Lease to (i) extend the term of the Prime Lease, except as set forth in Section 2 below, (ii) purchase the Premises, or (iii) terminate the Prime Lease, all of which rights are reserved to Sublandlord.

2.    TERM.

A.    Term. The term of this Sublease ("Term") shall be the period of approximately sixteen (16) years and four (4) months, commencing upon the tender of delivery of the Premises

from Sublandlord to Subtenant (the date of such tender, the "Commencement Date"), and ending at midnight on January 30, 2022 ("Expiration Date"), unless sooner terminated as herein provided. The "Rent Commencement Date" shall be July 1, 2006; provided, however, that if Plan Approval, as hereinafter defined, occurs after October 15, 2005, then the Rent Commencement Date shall be delayed by the duration of the period between October 15, 2005, and the date of Plan Approval.

B.    Possession. Sublandlord shall tender possession of the Premises to Subtenant within five (5) business days following the approval by Sublandlord and Landlord of the Buildout Plans, as hereinafter defined (such approval, "Plan Approval"), provided, however, that Sublandlord shall have no obligation to tender possession of the Premises until five (5) business days following (i) the execution and delivery of this Sublease by both parties, and (ii) the delivery by Subtenant to Sublandlord of all insurance certificates requirement pursuant to Section 15 hereof. If Subtenant shall fail to deliver the items required under clauses (i) above, Sublandlord shall have the right to withhold possession of the Premises until delivery by Subtenant of such items and sums, but the Commencement Date and the Rent Commencement Date shall not be delayed. Provided that Subtenant has fully complied with (ii) above, Subtenant may terminate this Sublease if Sublandlord has not tendered possession of the Premises within thirty (30) days of Subtenant's execution and delivery of this Sublease. In the event that Plan Approval by Landlord has not been received on or before October 31, 2005, then Subtenant shall have the right to terminate this Sublease by written notice to the Sublandlord; in the event Plan Approval by Landlord has not been received on or before November 15, 2005, then either party shall have the right to terminate this Sublease by written notice to the other; such termination rights to be deemed waived if not exercised prior to the receipt of Landlord's Plan Approval.

C.    Agreement. Subtenant shall execute and deliver to Sublandlord an agreement setting forth the Commencement Date and Rent Commencement Date within five (5) business days after Sublandlord's request therefor.

D.    Delay. If Sublandlord is unable to deliver possession of the Premises to Subtenant on the date specified above notwithstanding Sublandlord's performance of the obligations set out in Subsection B above, Sublandlord shall not be liable or responsible for any claims, damages, liability or losses arising in connection with any delay in the delivery of possession, and Subtenant shall not be excused or released from any obligation under this Sublease as a result of any such delay. In such event, the Commencement Date shall be extended to the date Sublandlord delivers possession of the Premises to Subtenant, and the Rent Commencement Date shall be delayed by a like number of days.

E.    Extension of Sublease Term. Under the terms of the Prime Lease, Sublandlord has the right to extend the term of the Prime Lease for five (5) consecutive five (5) year periods ("Sublandlord's Options"). The parties acknowledge and agree that Sublandlord is under no obligation to exercise any of such rights to extend the term of the Prime Lease, and that Sublandlord has no present intention of exercising any such rights. The parties acknowledge that Sublandlord will sublease all or most of the Building not included within the Premises to Staples to which The Office Superstore East, Inc. or its affiliate ("Staples"). Sublandlord represents to Subtenant

that, if and when Sublandlord enters the Staples Sublease, Sublandlord intends to include a provision in the Staples Sublease permitting Staples to cause Sublandlord to assign Sublandlord's interest in and to the Prime Lease to Staples (the "Assignment Option").

Notwithstanding the foregoing, in the event Sublandlord (or any of its assigns that become Sublandlord hereunder) determines in its sole discretion that it wishes to exercise a Sublandlord Option, Sublandlord shall provide written notice to Subtenant contemporaneous with exercise of such Sublandlord Options ("Exercise Notice"), and Subtenant shall have a period of sixty (60) days from its receipt of an Exercise Notice to notify Sublandlord of Subtenant's intent to extend the term coterminous with the Prime Lease as extended (the term of each such extension of this Sublease shall be referred to as an "Extension Term"). The terms of this Sublease shall remain the same during each Extension Term, except that the Base Rent shall increase by One and 50/100 Dollars ($1.50) per square foot of the Premises Area at the commencement of each such Extension Term. Sublandlord agrees that, prior to the exercise by Staples of the Assignment Option, Sublandlord will not exercise any of Sublandlord's Options and Subtenant shall have the right to negotiate with Prime Landlord for an agreement allowing Subtenant's continued occupancy of the Premises after the expiration of the Term; provided, however, if (i) Sublandlord enters into the Staples Sublease, and (ii) the Staples Sublease includes the Assignment Option, then such negotiations between Subtenant and Landlord shall be subject to the rights of Staples with respect to the Assignment Option.

3.   RENT.

A.   Base Rent. Commencing on the Rent Commencement Date, Subtenant shall pay to Sublandlord rent ("Base Rent") in an annual amount equal to the rentable area of Premises, as shown on the approved Plans and as determined by the standard measurement methods of the Building Owners and Managers Association ("BOMA Standards"), in square feet (the "Premises Area," which Premises Area shall include the Building Common Area Share, as hereinafter defined,) multiplied by the annual rent per square foot shown in the Base Rent schedule below. The parties agree at least thirty (30) days prior to the Rent Commencement Date to enter into an amendment to this Sublease setting forth the Premises Area and the amount of the annual Base Rent. The "Building Common Area Share," as that term is used herein, shall mean a portion of the area labeled on Exhibit A as "Common Area" (collectively, the "Building Common Area"), such portion being equal to the area in square feet of the Building Common Area multiplied by a fraction, the numerator of which is the actual area of the Premises as determined above, and the denominator of which is the rentable area contained in the Building (excluding the Building Common Area). Base Rent for the first month for which Base Rent is due shall be payable at the time of execution of this Sublease by Subtenant prior to the Rent Commencement Date based on an assumed Premises Area of 13,401 square feet, and shall be applied to the first (and, if such payment exceeds the actual monthly payment of Base Rent required hereunder, second) full month of Base Rent due under this Sublease. In consideration of Subtenant's performance of its obligations under this Sublease, Sublandlord has agreed to abate Base Rent for the period from the Commencement Date to the day prior to the Rent Commencement Date. If an Event of Default occurs at any time during the first five (5) Sublease Years, as hereinafter defined, and as a result of such Event of Default Sublandlord exercises its right to terminate this Sublease, then, in addition to the other remedies available to Sublandlord

3

as set forth herein or under applicable law, Base Rent shall automatically be deemed to have commenced on the Commencement Date at the rate set forth below for the period commencing on the Rent Commencement Date, and the total sum of all Base Rent abated shall be immediately due and payable by Subtenant to Sublandlord. "Sublease Year," as that term is used herein, shall mean the one-year period commencing on the Rent Commencement Date, and each subsequent twelve-month period, except that if the Rent Commencement Date is other than the first day of a calendar month, the first Sublease Year shall commence on the Rent Commencement Date and shall end on the last day of the calendar month containing the first anniversary of the Rent Commencement Date. The last Sublease Year in the initial Term hereof shall expire on the Expiration Date, notwithstanding that such Sublease Year shall be less than twelve (12) months in duration.

Base Rent Schedule

| Period | Annual (approx.) | Monthly (approx.) | PSF |
|---|---|---|---|
| Rent Commencement to January 31, 2007 | $321,624.00 | $26,802.00 | $24.00 |
| February 1, 2007 to January 31, 2012 | $341,725.50 | $28,477.13 | $25.50 |
| February 1, 2012 to January 31, 2017 | $361,827.00 | $30,152.25 | $27.00 |
| February 1, 2017 to January 30, 2022 | $381,928.50 | $31,827.38 | $28.50 |

B.   Payments. Base Rent and all other amounts payable by Subtenant to Sublandlord under this Sublease ("Additional Rent") shall be paid when due, without notice or demand, and without deduction, abatement, counterclaim or setoff, at the address of Sublandlord set forth in Section 18 or to such other person and/or at such other address as Sublandlord may from time to time designate by notice to Subtenant. No payment by Subtenant of any amount less than the amount stipulated to be paid hereunder shall be deemed other than on account of the earliest stipulated Base Rent or Additional Rent; nor shall any endorsement or statement on any check or letter be deemed an accord and satisfaction, and Sublandlord may accept any check or payment without prejudice to Sublandlord's right to recover the balance due or to pursue any other remedy available to Sublandlord.

C.   Subtenant's Pro Rata Share. For purposes of this Section 3, "Subtenant's Pro Rata Share" is that fraction, the numerator of which is the Premises Area, and the denominator of which is the rentable area contained in the Building. Subtenant's Pro Rata Share shall be equitably prorated for any partial calendar year during the Term.

4

D.    Taxes.  Beginning on the Rent Commencement Date, Subtenant shall pay to Sublandlord, as Additional Rent, Subtenant's Pro Rata Share of all general real estate taxes, assessments, levies and other charges, general or special, foreseen or unforeseen however denominated (the "Taxes") imposed or assessed against Sublandlord pursuant to the terms of the Prime Lease.  "Taxes" shall include without limitation, (i) all charges designated as "Taxes" in the Prime Lease, and (ii) any costs, including attorneys' fees, incurred by Sublandlord to appeal, contest or reduce Taxes.  Sublandlord shall provide Subtenant a copy of any bill for Taxes promptly after written request by Subtenant.  Subtenant shall pay Subtenant's Pro Rata Share of Taxes in equal monthly installments, in advance, beginning on the Rent Commencement Date.

E.    Operating Expenses and CAM Charges.  Beginning on the Rent Commencement Date, Subtenant shall pay to Sublandlord, as Additional Rent, Subtenant's Pro Rata Share of (i) the CAM Charge, as defined in the Prime Lease, charged to Sublandlord under the terms of the Prime Lease, and (ii) the cost of maintenance of the Fire Safety Systems, as defined in Section 9 (collectively, "Operating Expenses").  Subtenant shall pay Subtenant's Pro Rata Share of Operating Expenses in equal monthly installments, in advance, beginning on the Rent Commencement Date.

F.    Adjustment to Charges for Operating Expenses and Taxes.  Sublandlord may notify Subtenant from time to time setting forth an adjustment to estimated Operating Expenses and Taxes, and Subtenant's Pro Rata Share thereof, if Sublandlord determines that payments are insufficient to meet estimated costs.  Following the end of each calendar year, Sublandlord shall determine the actual Operating Expenses and Taxes for such year.  If Sublandlord determines that Subtenant's Pro Rata Share of actual Operating Expenses or Taxes exceeds the amount paid by Subtenant, then Subtenant shall pay the difference within thirty (30) days after Sublandlord delivers to Subtenant a statement showing such costs; if Subtenant's payments exceed the amount of Subtenant's Pro Rata Share of actual Operating Expenses or Taxes, Subtenant shall receive a credit toward the next installment of such Additional Rent in the amount of such overpayment, or if the Term of this Sublease expires or is earlier terminated and no credit accrues or remains unapplied, then Sublandlord shall pay the difference upon the later of (i) thirty (30) days after calculating the credit, or (ii) thirty (30) days after the expiration or earlier termination of the Term of this Sublease.

4.    SECURITY DEPOSIT.  [Intentionally Omitted]

5.    CONDITION OF PREMISES.

Subtenant is leasing, and hereby accepts, the Premises "as is", "where is."  Subtenant acknowledges that Sublandlord has afforded Subtenant the opportunity for, and that Subtenant has undertaken, full and complete investigations, examinations, and inspections of the Premises and has determined that the Premises are suitable for Subtenant's intended use, and represents that Subtenant shall bear full responsibility for any special requirements in connection with Subtenant's use of the Premises.  Without limiting the foregoing, Sublandlord makes no representation or warranty that the Premises presently comply with Laws, as hereinafter defined.  Notwithstanding the foregoing, Sublandlord agrees that, on the Commencement Date, the

5

mechanical and utility systems, dock door, and HVAC systems serving the Premises (the "Systems") shall be in good working order and repair and in compliance with all local codes, such condition to be deemed satisfied unless Subtenant gives Sublandlord written notice of any defect therein prior to the date the "Defect Notice Date") thirty (30) days after the Commencement Date.  Sublandlord, upon written notice from Subtenant, agrees to repair and/or replace, at Sublandlord's expense, any defect in the Systems not caused by the abuse or neglect of the Systems by Subtenant, provided Subtenant gives Sublandlord written notice of such defect prior to the Defect Notice Date.

6.    USE.

A.    Permitted Use.  Subtenant shall initially use and occupy the Premises for retail sale of new and used golf equipment, golf accessories, and golf apparel, golf club repair, golf instruction (collectively, the "Golf Use"), and other golf- and sports-related uses, and thereafter for any first-class retail use appropriate for inclusion in a neighborhood shopping center and consistent with the requirements of the Prime Lease and with Subsection B below.  Subtenant represents to Sublandlord that Subtenant does not intend to, and shall not, use or occupy the Premises for any other purpose.  During all periods that Subtenant is open for business, Subtenant shall conduct its business in a first-class and reputable manner, in keeping with good business as established in the retail trade, maintaining, at all times an adequate staff of employees and a full and complete stock of first-quality merchandise.  Sublandlord agrees that, during the term of this Sublease, and for so long as Subtenant operates the Premises for the Golf Use, Sublandlord shall not sublease any portion of the Prime Lease Premises to a subtenant other than Subtenant that will engage in a Golf Use (provided, however, that sale of golf apparel not exceeding 2,000 square feet of floor space shall be permitted in a store primarily engaged in the retail sale of clothing).  Sublandlord represents that a Golf Use is permitted use under the Prime Lease.

B.    Use Restrictions.  In no event shall the Premises or any part thereof be used for the display, sale, service or warehousing of any form of consumer electronics, household appliances, or business electronic equipment, including but not limited to audio or video hardware, computer hardware or software (except software related to golf), entertainment media (including, without limitation, compact discs, cassette tapes and similar media), electronic software, cellular telephones, telefax machines, or copiers.  Subtenant shall not conduct its business as a clearance center or wholesale, discount, or outlet operation, or use the Premises for any auction, fire, bankruptcy or "going out of business" sales.  Subtenant shall not use the name "Circuit City" or any variant or derivative thereof, in any of its advertising, except to identify the location of the Premises as "adjacent to Circuit City".  In addition to the foregoing, the following uses shall not be permitted in the Premises without the express written consent of Sublandlord:

a)  Any restaurant or other establishment the primary business of which is the sale of beverages or prepared food.

b)  Any place of recreation or amusement, including but not limited to a billiard parlor, a theatre, skating rink, night club, or bar.

6

d) Any health club, spa, or gymnasium.

d) Any sexually oriented business, including but not limited to a massage parlor, an adult book store, or an adult video store.

e) A store engaged in the sale of drug paraphernalia.

f) Any retail store engaged primarily in the sale of second-hand or consignment goods, or any store advertising the sale of goods for a single low price, including by way of example, "Dollar General," "Dollar Tree," and retail stores with a similar concept.

g) A use that violates the Staples exclusive use covenant set forth on Exhibit F.

C. **Compliance with Laws and Rules.** Subtenant at its expense shall comply with all present and future laws, statutes, ordinances, orders, rules, regulations and requirements of all federal, state and municipal governments and any instrumentality thereof, and regulations of the board of fire underwriters having jurisdiction over the Premises (collectively, "Laws"). Prior to opening for business in the Premises, Subtenant shall deliver to Sublandlord a copy of the certificate of occupancy or letter of substantial completion for the Premises. If Subtenant does not timely deliver such certificate of occupancy or letter of substantial completion within ten (10) days after Sublandlord's written request therefor, then, in addition to any and all remedies available to Sublandlord for default, Subtenant shall pay to Sublandlord the sum of Five Hundred Dollars ($500.00) for each day after the expiration of such ten (10) day period until Subtenant delivers such certificate of occupancy or letter of substantial completion. Subtenant shall comply with the Rules and Regulations attached hereto as Exhibit B and made a part of this Sublease. Sublandlord expressly disclaims any warranty that the Premises comply with Laws.

7. **PARKING AND COMMON AREAS.**

A. **Right to Use.** Sublandlord hereby grants to Subtenant the right to use and enjoy the Building Common Areas for its intended purpose as an accessory to the Premises. To the extent granted to Sublandlord under the Prime Lease, Sublandlord hereby grants to Subtenant and its agents, employees, and customers, (X) the nonexclusive right to use and enjoy the Building Common Area serving the Premises, and (Y) a non-exclusive right to the Common Areas, as defined in the Prime Lease, of the Shopping Center. Notwithstanding the foregoing, this Sublease shall grant to Subtenant no right in and to the four (4) parking spaces identified as "Customer Pick-Up" in the Prime Lease.

B. **Common Area Maintenance.** Sublandlord shall use commercially reasonable efforts to cause Landlord to maintain the Common Areas in the manner required under the Prime Lease.

8. **UTILITIES.**

Subtenant shall make all necessary arrangements with all applicable utility companies and governmental authorities for, and shall pay for, all utilities supplied to the Premises. If the consumption of gas, electricity or water (and the attendant cost of sewage disposal and/or treatment) is not measured by separate meter, then Subtenant shall pay to Sublandlord, as

7

Additional Rent, its Pro Rata Share of the cost thereof within thirty (30) days after Sublandlord delivers to Subtenant each statement of such costs. Sublandlord shall not be responsible for any failure or interruption, for any reason whatsoever, of any of the services or utilities supplied to the Premises, and the same shall not result in any abatement, diminution or reduction of rent, or constructive eviction, or liability on the part of Sublandlord. Notwithstanding the foregoing, if utilities or services fail or are interrupted as a result of the negligent acts or willful misconduct of Sublandlord or Sublandlord's contractors, licensees, agents or employees, then all rent will abate beginning two (2) days after such interruption until such utilities or services are reasonably restored to an extent to render the Premises tenantable and open for business.

9. **REPAIRS AND MAINTENANCE.**

A. **Repairs by Sublandlord.** Sublandlord shall make necessary structural repairs and replacements to the Premises (but excluding windows and window frames, doors, plate glass, store fronts, showcases and signs) and shall keep or cause to be kept in good condition and repair, and replace as reasonably necessary, the exterior walls, foundation and roof of the Premises. Sublandlord shall not be required to commence any such repair until it receives notice from Subtenant specifying the nature of the repair. Sublandlord shall not be required to make any such repairs where the same were caused or occasioned by any act, omission or negligence of Subtenant, or its employees, agents, customers, invitees or contractors; Sublandlord may, at its option and upon five (5) days written notice to Subtenant, undertake such repairs at Subtenant's sole cost and expense, plus a ten percent (10%) administrative charge, and Subtenant shall reimburse Sublandlord, on demand, for the cost and expense of such repairs and for such administrative charge.

B. **Repairs and Maintenance by Subtenant.** Except for those repairs to be performed by Sublandlord under Section 9.A. Subtenant shall make all repairs, maintenance and replacements to the Premises including without limitation, the doors, windows, frames, plate glass, ceiling tiles, storefront, showcases, signs and any equipment, facilities and fixtures therein, and shall keep the same clean, neat, safe, sanitary, in good order, repair and condition and free of vermin, pests and termites. In making the repairs and replacements, Subtenant shall use materials equal in kind and quality to the original work. Subtenant shall repair and refurnish the Premises at reasonable intervals to assure that the Premises is kept in a first-class and attractive condition throughout the term of this Sublease and any extensions thereof.

C. **HVAC.** At all times during the Term, Subtenant shall maintain a service contract with a qualified, reputable service and maintenance company, for the maintenance and repair of the HVAC System and shall furnish Sublandlord with true copies thereof. Subtenant shall obtain Sublandlord's prior written consent to the HVAC contract and the service and maintenance company, which consent shall not be unreasonably withheld. Subtenant shall operate the HVAC System in such a manner so as to provide (i) adequate heat, ventilation and air-conditioning in and to the Premises during all business hours of the Premises and (ii) sufficient heat during all other times so as to prevent freezing of all pipes within the Premises. Subject to the provisions of Section 9 hereof, if any one or more components of the HVAC System require replacement during the Term, Sublandlord and Subtenant shall split the cost of replacement.

8

D. Fire Safety System. Subtenant shall keep in place its existing fire safety (but not its burglar alarm) monitoring contract for the Building, and shall perform all inspections and repairs of the Building sprinkler system, fire monitoring system, and other fire safety equipment and systems (collectively, the "Fire Safety System") in the Building. Subtenant shall be responsible for any modifications required to the Fire Safety System to meet applicable building codes, or required by the company providing fire monitoring services to the Building, because of Subtenant's use of the Building or Subtenant's Alterations, as hereinafter defined, to the Building. The cost to maintain and repair the Fire Safety System, including, without limitation, the cost of the telephone lines servicing the fire monitoring system, the cost of inspections and repairs, and the cost of all fees and charges incurred in connection with the fire safety monitoring contract, shall be Operating Expenses. Attached hereto as Exhibit C is a list of persons in Subtenant's organization to be called by the fire monitoring company in the event of an alarm from the fire monitoring system. At the beginning of each calendar quarter thereafter, Subtenant shall furnish to the fire monitoring company, at an address furnished by Subtenant, a written list identifying persons to be called by the fire monitoring company in the event of an alarm from the fire monitoring system. Subtenant shall furnish Subtenant with a copy of such list.

10. ALTERATIONS.

Except as otherwise provided in this Section 10, Subtenant shall not make or cause, suffer or permit the making of any alteration, addition, change, replacement, or installation ("Alterations", which term includes Initial Alterations, as defined below), in or to the Premises without obtaining the prior written consent of Sublandlord in each instance and the consent of Landlord as required under the Prime Lease. With respect to non-structural Alterations which do not affect the systems of the Building and which are not visible from the exterior of the Premises, Sublandlord's consent shall not be required. "Alterations" shall include, without limitation, all modifications and improvements to the pipes, ducts, conduits, wiring, paneling, partitions, railing, mezzanine floors, and galleries within the Premises.

Sublandlord agrees that it has reviewed and approved the drawings listed on Exhibit D attached hereto as a part hereof (such drawings, the "Buildout Plans") for Subtenant's proposed construction of a wall demising the Premises from the balance of the Prime Lease Premises, the separation of the utilities between such spaces (except that the Building's sprinkler system shall continue to be served by a single source) (such work, the "Demising Work"), and the other work described therein (collectively, the "Initial Alterations"), all at Subtenant's sole cost and expense, but subject to reimbursement for the Improvement Allowance, as hereinafter defined, upon completion of the Initial Alterations. Subtenant agrees that it will, promptly upon the execution and delivery of this Sublease by Sublandlord and Subtenant, submit the Buildout Plans to Landlord and to the City of Skokie, and shall diligently pursue the approval by Landlord and the City of Skokie of such Buildout Plans. Upon receipt of such approvals, Subtenant shall promptly commence and shall diligently pursue the completion of the Initial Alterations. If the Demising Work has not been completed on or before the date that is thirty (30) days after the issuance of such approvals, then, after ten (10) days' written notice to Subtenant and the failure of Subtenant to complete the Demising Work, Sublandlord shall have the right, but not the obligation, to perform the Demising Work, in which event, Sublandlord shall have a credit against the

9

Improvement Allowance for the cost of all work performed by Sublandlord in completing the Demising Work and, if the cost of the Demising Work exceeds the amount of the Improvement Allowance, Sublandlord shall have the right to recover from Subtenant such excess, together with an administrative fee of five percent (5%) of such excess. If the Demising Work has not been completed on or before February 28, 2006, Sublandlord shall have the right to terminate this Sublease upon written notice to Subtenant.

Sublandlord shall reimburse Subtenant for the actual costs of constructing Initial Alterations and related hard and soft costs paid by Subtenant to third parties, up to a maximum amount equal to Two Hundred Twenty Five Thousand Dollars ($225,000.00) (the "Improvement Allowance"). All costs in excess of the Improvement Allowance or not reasonably approved by Sublandlord shall be the sole responsibility of Subtenant. The Improvement Allowance shall be due and payable by Sublandlord to Subtenant within thirty (30) days following the date Subtenant has completed the Initial Alterations and delivered to Sublandlord the following: (A) a requisition signed and certified by Subtenant or a corporate officer of Subtenant and Subtenant's architect certifying that (i) the Initial Alterations are substantially complete, (ii) such construction is in accordance with the approved plans, and (iii) such construction is in accordance with all Laws; (B) a copy of the final certificate of occupancy for the Premises; and (C) affidavits from Subtenant and its general contractor that payment has been made in full to all contractors, suppliers, subcontractors and sub-suppliers, and a copy of a waiver of mechanic's liens rights with respect to the Building and the Shopping Center from the general contractor. Notwithstanding any other provision of this Sublease, no payment shall be due and payable to Subtenant if at the time of the due date Subtenant is in default under this Sublease or if, in the reasonable opinion of Sublandlord, Subtenant has not completed construction to the level certified to Sublandlord.

All Alterations shall be performed in a good and workmanlike manner, using only new materials or their equivalent, free and clear of all mechanics' liens and encumbrances, and in compliance with all Laws and all reasonable procedures and regulations prescribed by Sublandlord (and Landlord) from time to time. Prior to commencing any Alterations in the Premises, Subtenant shall (i) file the requisite plans and specifications for Alterations (which shall have been prepared in writing by Sublandlord and, if required, Landlord) with, and obtain all requisite approvals from, all governmental departments or authorities having jurisdiction and any public utility company having an interest therein and (ii) deliver to Sublandlord an insurance policy or policies of subcontractors and persons, liability, property damage and broad form builder's risk insurance, naming Sublandlord and Landlord as additional insured parties with limits as provided in Section 15. Sublandlord's approval of any plans, specifications or working drawings for Alterations shall create no responsibility on the part of Sublandlord for their completeness, design sufficiency or compliance with Laws. Alterations may be performed only by contractors or subcontractors approved by Sublandlord (and Landlord, if required). Subtenant shall cause its contractors and subcontractors to confine their activities to the Premises.

During performance of Alterations, Sublandlord shall have the right to inspect the Premises at all reasonable times. At Sublandlord or the Shopping Center in connection with labor or materials furnished to Subtenant, or claimed to have been furnished to Subtenant, Subtenant at its expense shall cause such lien to be discharged

10

within twenty (20) days after it is filed, or will contest the lien and deposit with Sublandlord, or an escrow agent or title insurance company, cash equal to 125% of the amount of the lien, or otherwise post security sufficient to release the Shopping Center from such lien. If the lien is reduced to final judgment and all appeals are exhausted or waived, Subtenant will discharge the judgment and may use any cash deposited with Sublandlord for such purpose, and Sublandlord will return all remaining cash deposited by Subtenant.

All Alterations shall become the property of Sublandlord and, except as otherwise expressly provided in this Sublease, shall remain upon and be surrendered with the Premises at the expiration or earlier termination of the Term, provided, however, that Sublandlord shall have the right to designate Alterations that must be removed by Subtenant, in which event Subtenant shall remove such designated Alterations at expiration or earlier termination of this Sublease, and shall repair any damage caused by such removal. Moveable trade fixtures and other personal property which Subtenant installs at its own expense shall remain Subtenant's property and may be removed at the expiration or earlier termination of the Term, provided that Subtenant promptly repairs any damage caused by such removal.

11.    SIGNS.

Subtenant shall be permitted to install, at its expense, a sign on the existing pylon sign serving the Shopping Center, and an identification sign on the front and on the side of the Building, all of which must comply with all applicable Laws and with the Prime Lease, and which shall be of such size, design and character as Sublandlord (and Landlord, if required) shall approve in writing. To the extent the Building is entitled under applicable ordinances or under the Prime Lease to a limited area of signage on the Building (the "Permitted Area"), the aggregate area of Subtenant's signs shall not exceed Subtenant's Pro Rata Share of the Permitted Area. Subtenant's sign plans attached hereto as Exhibit E have been approved by Subtenant, provided, however that Sublandlord's approval remains conditioned upon Subtenant obtaining the consent of Landlord and complying with all Applicable Laws. Subtenant shall request at Sublandlord's expense municipal and Landlord approval of an additional tenant need to be added to the existing pylon sign serving the Shopping Center. Subtenant agrees to apply promptly for and diligently pursue approval of such request, and Sublandlord agrees to cooperate with Subtenant's efforts, at no expense to Sublandlord. If Subtenant is successful in obtaining approval of such additional tenant panel, Subtenant shall be entitled to install and use such additional panel. If Subtenant is unsuccessful in obtaining such additional tenant panel, Subtenant shall be entitled to use one half of the tenant panel presently devoted to the Building on the pylon sign. Subtenant shall maintain all signs in good condition and repair, and shall remove all signs and repair all damage caused by the installation or removal thereof, at the expiration or termination of this Term. Subtenant shall be entitled to install such signs on the interior of the Premises as Subtenant may desire, provided, however, if any such signs are visible from the outside of the Premises, all such signs shall be prepared and installed in a professional, first-class manner; provided, however, that in no event shall Subtenant be entitled to "paint" any signage on the exterior windows of the Premises, and in no event shall more than twenty percent (20%) of the area of exterior windows of the front and/or sides of the Premises be covered with any signs at any one time. Other than such permitted sign(s), Subtenant shall not place or install, or permit or suffer to be placed or installed, or maintain, any sign within or outside of the

11

Premises in any part of the Shopping Center and in no event shall any permitted sign utilize or contain the words "wholesale", "discount", or "outlet." Subtenant shall not place, install or maintain, or permit or suffer to be placed, installed or maintained, on the exterior of the Premises, any awning, canopy, banner, flag, pennant, aerial, antenna, audio, video or radio-transmitting equipment, dish/array or x-ray equipment, or the like.

12.    ASSIGNMENT AND SUBLETTING.

A.    Consent Required. Subtenant may not, by operation of law or otherwise, assign, sell, mortgage, pledge or in any manner transfer this Sublease or any interest therein, or sublet the Premises or any part thereof, or grant any concession, franchise or license or otherwise permit occupancy of all or any part of the Premises by any person or entity (collectively, "Transfer"), without first obtaining the prior written consent of Sublandlord (and, if required, Landlord). Sublandlord's consent not to be unreasonably withheld, conditioned or delayed. Sublandlord's consent shall be deemed given if Sublandlord does not provide consent or written reasons for withholding consent within thirty (30) days of Subtenant's written request.

Notwithstanding the foregoing, Golf Galaxy, Inc. or a Golf Galaxy Affiliate, as hereinafter defined, shall have the right to assign this Sublease without Sublandlord's consent to a wholly owned subsidiary of Golf Galaxy, Inc., or to the parent corporation of Golf Galaxy, Inc. ("Parent") or to a wholly-owned subsidiary of Parent (any such subsidiary, Parent, or subsidiary of a Parent of Golf Galaxy, Inc. being referred to herein as a "Golf Galaxy Affiliate"), or to an entity that acquires substantially all of the assets of Subtenant within the State of Illinois, without the consent of Sublandlord. The immediately preceding sentence shall not be applicable to any Subtenant that is not either Golf Galaxy, Inc. or a Golf Galaxy Affiliate. For purposes of this Paragraph 12A, an "Ownership Transfer" shall mean the transfer in one or more transactions of more than fifty percent (50%) of (i) the voting stock of Subtenant, if Subtenant is a corporation, or (ii) the general partnership interest of Subtenant, if Subtenant is a general or limited partnership, or (iii) the membership interest or beneficial interest of Subtenant, if Subtenant is a limited liability company or trust. Subtenant shall be entitled to engage in an Ownership Transfer without the consent of Sublandlord, provided, however that an Ownership Transfer shall be deemed a "Transfer" and shall be subject to the provisions of this Paragraph 12A, if either (i) as a result of such Ownership Transfer and any other assignment or other reorganization of which such Ownership Transfer is a part, the entity which succeeds to the rights of Subtenant hereunder owns, leased, or otherwise controls less than all of the stores owned, leased, or controlled by Subtenant in the State of Illinois immediately prior to such Ownership Transfer and reorganization, or (ii) in connection with such Ownership Transfer, the use of the Premises will be changed to something other than the Golf Use within one (1) year after such Ownership Transfer.

B.    Notice. If Subtenant desires to undertake any Transfer that requires Sublandlord's consent, it shall provide Sublandlord with prior written notice of such desire, specifying the consideration for, and all other terms and conditions of, the proposed Transfer and identifying the proposed Transferee and the proposed use, accompanied by a certified financial statement setting forth the financial condition of the Transferee in sufficient detail so as to permit Sublandlord's comprehensive assessment thereof, and a non-refundable review fee in the amount of One Thousand Dollars ($1,000.00). Such notice shall include all information which Subtenant

12

has in its possession which may be disseminated without penalty regarding the proposed Transfer, including but not limited to information regarding the proposed Transferee, its proposed business at the Premises, financial and operating information regarding the proposed Transferee, and any other information which Subtenant reasonably requests of Subtenant in connection with the proposed Transfer. Subtenant shall be entitled to take into account any factor Subtenant shall deem relevant in exercising its right to approve or disapprove a proposed Transfer in its reasonable discretion, including, without limitation: the financial strength and working capital of the proposed Transferee, the experience of the proposed Transferee in the type and size of the business proposed; the quality of the merchandise and/or services to be offered by the proposed Transferee; the existence of exclusive rights given to other occupants of the Shopping Center; the tenant mix of the Shopping Center; and the quality of the store appearance and compatibility with other stores after any alterations in connection with the proposed Transfer.

C.    Recapture Option.  In the event Subtenant desires to assign its interest in this Sublease or to sublease all or substantially all of the Premises (either one, a "Full Interest Transfer"), Subtenant shall have the right (the "Recapture Option") to terminate this Sublease as of the "Effective Termination Date" (as defined in this Section 12.C.).  If Subtenant elects to exercise the Recapture Option, Subtenant shall deliver written notice of such election to Subtenant within thirty (30) days after Subtenant's receipt of Subtenant's notice described in Section 12.B. (the "Recapture Notice"), which notice from Subtenant shall specify the date (the "Effective Termination Date") on which such termination shall become effective; provided, however, that such date shall not be more than sixty (60) days after the date of such notice of termination.  If Subtenant fails to timely exercise the Recapture Option in accordance with these provisions, Subtenant may thereafter proceed with the Full Interest Transfer pursuant to the provisions of Section 12.B. on the same terms and conditions as set forth in said notice; provided, however, that any such Full Interest Transfer shall be expressly conditioned upon Subtenant's compliance with the provisions of Section 12.D. Subtenant may avoid termination of this Sublease pursuant to Subtenant's exercise of the Recapture Option by providing written notice to Subtenant of Subtenant's rescission of the Full Interest Transfer within ten (10) days of Subtenant's receipt of the Recapture Notice.  The term of this paragraph (c) shall not apply to any Ownership Transfer that does not require Subtenant's consent pursuant to paragraph (A) above.

D.    Payments in Excess of Rent.  If any Transfer obligates the Transferee to pay to Subtenant amounts in excess of the Base Rent and Additional Rent under this Sublease (whether by increased rent or a lump sum payment in lieu of increased rent, then Subtenant shall pay to Subtenant fifty percent (50%) of any such excess, as Additional Rent, within ten (10) days after receipt by Subtenant.

E.    Miscellaneous.  No assignment of this Sublease shall be effectuated by operation of law or otherwise without the prior written consent of Subtenant (and Landlord, if required). Notwithstanding any other provision of this Section 12, Subtenant and any proposed Transferee shall, within ten (10) days after notice from Subtenant, provide such additional information, execute and deliver to Subtenant such documents and take such further action as Subtenant may reasonably require to effect the proposed Transfer or to protect Subtenant's rights under

13

this Sublease.  The consent of Subtenant to any Transfer shall in no way be construed to relieve Subtenant of the requirement of obtaining the consent of Subtenant to any further Transfer.  If Subtenant consents to any assignment of this Sublease, the assignee shall execute and deliver to Subtenant an agreement in form and substance satisfactory to Subtenant whereby the assignee shall assume all of Subtenant's obligations under this Sublease. Notwithstanding any Transfer, the original Subtenant named herein and any other person(s) who at any time was (were) Subtenant shall remain fully liable under this Sublease as it may subsequently be amended, modified, extended or renewed.  Subtenant may collect rent from any Transferee and/or any subtenants or occupants, and apply the net amounts collected to Base Rent and Additional Rent, but no such collection shall be deemed a waiver of any of the provisions of this Section 12, or the acceptance of the Transferee, subtenant or occupant as Subtenant, or a release of any person or entity from the further performance by such person or entity of the obligations of Subtenant under this Sublease.

F.    Restrictions in Prime Lease.  Notwithstanding any other provision of this Section 12, no Transfer shall be permitted in violation of the Prime Lease.

13.    ACCESS TO PREMISES.

A.    General Access.  Subtenant shall have the right to enter upon and in the Premises at all reasonable times to examine the same and to make such repairs, replacements, alterations, improvements and additions in the Premises and the Building (including, without limitation, the installation, repair, maintenance and replacement of pipes, duct work, conduits, utility lines and wires through the column space and partitions in the Premises and beneath the lower floor slabs and above the ceiling of the Premises) as Subtenant may deem necessary or desirable, and to take all materials into and upon the Premises that may be required therefor, without the same constituting an eviction of Subtenant, and without any abatement of Base Rent or Additional Rent; provided, however, Subtenant shall use reasonable efforts not to unreasonably interfere with Subtenant's business in the Premises.  Subtenant shall also have the right to enter upon the Premises at reasonable times to show the Premises to prospective purchasers, lessors or lessees (under ground or underlying leases) and mortgagees of all or any part of the Shopping Center provided that Subtenant shall use reasonable efforts not to unreasonably interfere with Subtenant's business in the Premises.  Notwithstanding the foregoing provisions of this Section 13, during the last six (6) months of the Term of the Prime Lease, Subtenant may perform any repair or restoration work as may be required under the Prime Lease for surrender of the Prime Lease Premises, provided that Subtenant shall use reasonable efforts not to unreasonably interfere with Subtenant's business in the Premises, and further provided that such repair or restoration work shall be performed in such a manner as to minimize, to the extent reasonably practical, any adverse effect on Subtenant's business operations within the Premises.

B.    Excavation.  If an excavation or other building operation is made upon land or premises above, below or adjacent to the Premises, Subtenant shall give to the person authorized to cause such work to be done permission and a license to enter upon the Premises for the purpose of doing such work as such person deems necessary to preserve the Building from damage and to support the same with proper foundations, without the same constituting an

14



eviction of Subtenant, and without any abatement of Base Rent or Additional Rent; provided, however, Sublandlord shall use reasonable efforts not to unreasonably interfere with Subtenant's business in the Premises. Sublandlord agrees that Subtenant shall have the benefit of any protections provided under the Prime Lease with respect to such excavation or building operation.

14.    INDEMNITY.

A.    Indemnification. Subtenant shall protect, indemnify, defend and hold Sublandlord harmless from and against any and all claims, damages, loss, liability (including without limitation liability under the Prime Lease), cost or expenses (including without limitation reasonable attorneys' fees), which Sublandlord may incur or pay out by reason of (i) any accidents, damages or injuries to persons or property occurring in, on or about the Premises, (ii) any breach or default hereunder on Subtenant's part, (iii) any work done in or to the Premises, (iv) any lien filed against the Premises or the Shopping Center and not timely removed by Subtenant pursuant to Section 10, or (v) any act, omission or negligence on the part of Subtenant and/or its employees, agents, contractors and/or invitees, or any person claiming through or under Subtenant. Sublandlord agrees to indemnify, defend, and hold harmless Subtenant and its officers, directors, shareholders, partners, employees and agents from and against all third party claims of whatever nature arising from (i) any breach or default hereunder on Sublandlord's part or (ii) the negligent acts or willful misconduct of Sublandlord's contractors, licensees, officers, partners, agents or employees, including reasonable attorneys' fees.

B.    Liability of Subtenant. All property of Subtenant and its employees, agents, contractors or invitees in or about the Premises or elsewhere in the Shopping Center shall be kept and stored at Subtenant's sole risk, and Subtenant shall hold Sublandlord harmless from any claims arising out of damage to, or loss of, the same, resulting from (i) any act (including theft) or failure to act, of any other person, (ii) the leaking of the roof, (iii) the bursting, rupture, leaking or overflowing of pipes, heating or plumbing fixtures, (iv) fire or other casualty, (v) malfunction of electrical wires or fixtures, (vi) failure of HVAC systems, or (vii) other cause. Sublandlord shall not be liable for any interruption of or loss to Subtenant's business arising from any of the above-described acts or causes, or for any consequential damages sustained by Subtenant arising out of the loss of or damage to any such property.

15.    INSURANCE.

A.    Subtenant's Insurance. Subtenant shall maintain throughout the Term (i) a policy of commercial general liability insurance covering liability arising from Premises, operations, independent contractors, products-completed operations, personal injury and advertising injury, and liability assumed under an insured contract. Such policy shall name Sublandlord, Landlord and any mortgagee of the Property as additional insured parties, as primary coverage over any insurance carried by Sublandlord, Landlord or any mortgagee, with limits of not less than the greater of the limits required under the Prime Lease, or (ii) a combined minimum limits of $1,000,000.00 with respect to bodily injury, personal injury, death or property damage occurring or resulting from one occurrence and aggregate limits of less than $2,000,000; (ii) a policy of commercial property insurance covering the perils insured under the ISO "special causes of loss"

15

form (CP 10 30), with endorsements for vandalism mischief, water damage and sprinkler leakage, for the full replacement value of Subtenant's inventory, equipment, trade fixtures and other personal property located in the Premises; (iii) rent abatement insurance in the amount of six (6) months' Base Rent; (iv) worker's compensation insurance to the extent required by Laws; and (v) such other insurance, in such amounts and against such risks as are required to be carried under the Prime Lease, and as Sublandlord specifies in writing to Subtenant, as may be reasonably required by the holder of any mortgage on the Property and which is customarily and commonly insured against by prudent owners or tenants of property similar to the Property.

Subtenant's insurance coverage may be effected by a blanket policy or policies of insurance, provided that such policy or policies shall include a "per location" endorsement insuring that the coverage limits set forth above will be available with respect to the Premises, notwithstanding the occurrence of claims arising from other locations of Subtenant, and provided further that in all other respects any such policy or policies shall comply with the provisions of this Section 15, including, but not limited to, that the policy shall contain an endorsement that names Sublandlord and Landlord as additional insured parties and that it references the Premises. An increased coverage or "excess liability" policy may be provided and utilized by Subtenant to increase the coverage provided by individual or blanket policies in lower amounts, and the aggregate coverage provided by all such policies with respect to the improvements located on the Premises and Subtenant's liability hereunder shall be satisfactory provided that such policies otherwise comply with the provisions of this Section 15.

B.    Evidence of Insurance. Subtenant shall deliver to Sublandlord a certificate of insurance satisfactory to Sublandlord evidencing all coverage required under this Section 15 prior to taking possession of the Premises. If Subtenant fails to provide Sublandlord with such evidence, Sublandlord may withhold delivery of possession without delaying the Commencement Date or the Rent Commencement Date. Subtenant shall procure and pay for renewals of such insurances from time to time before the expiration thereof, and Subtenant shall deliver to Sublandlord a certificate of such insurance satisfactory to Sublandlord at least three (3) business days before the expiration of any existing policy. All such policies shall be issued by companies rated not lower than "A-, Class VIII" by A.M. Best Co. licensed to do business in the state in which the Premises are located, and all such policies shall contain a provision whereby the same cannot be cancelled or modified unless Sublandlord is given at least ten (10) days' prior written notice by certified or registered mail of such cancellation or modification.

C.    Contractor's Insurance. Subtenant shall require any contractor of Subtenant performing work in, on or about the Premises to obtain and keep in full force and effect, at no expense to Sublandlord, (i) a commercial general public liability insurance policy for the Premises and adjacent areas, the conduct of its work therein, and the acts or omissions of such additional insured, with the coverages set forth in Section 15.A.i. above; (ii) worker's compensation or similar insurance in form and amounts required by Laws; and (iii) business Automobile Liability insurance including owned, non-owned and hired car coverage in an amount not less than $1,000,000 per accident. Sublandlord, Landlord, and Landlord's mortgagee shall be designated as additional insured parties under the policies listed in clauses (i) and (iii)

16

D.  **Waiver of Subrogation Rights.** Subtenant hereby releases and waives its rights of recovery against Landlord under the Prime Lease to the extent that Subandlord waived its rights of recovery against Landlord under the Prime Lease. Subtenant and Subandlord hereby waive and release any and all right of recovery, whether arising in contract or tort, against the other, including their employees and agents, arising during the Term for any and all loss or damage to any property located within or constituting a part of the Building, which loss or damage arises from the perils that could be insured against under the ISO Causes of Loss-Special Form Coverage, including any deductible (whether or not the party suffering the loss or damage actually carries such insurance, covers under such insurance or self insures the loss or damage) to which right of recovery arises from loss of earnings or rents resulting from loss or damage caused by such a peril.

E.  **Insurance Premiums.** Subtenant shall not do or permit to be done any act or thing in or upon the Premises which will or may invalidate or be in conflict with the insurance policies covering the building, the Shopping Center or any part thereof or fixtures and property therein, and shall comply with all rules, orders, regulations or requirements of the Board of Fire Underwriters having jurisdiction, or any other similar body, and shall not do, or permit to be done, anything in or upon the Premises, or bring or keep anything therein, which shall increase the rate of fire insurance on the building, the Shopping Center or on the property located therein. If by reason of failure of Subtenant to comply with the provisions of this Section, the fire insurance rate shall at any time be higher than it otherwise would be, then, in addition to the right of Subandlord to the exercise of any and all other remedies available under this Sublease, Subtenant shall reimburse Subandlord on demand as Additional Rent for the portion of all fire insurance premiums which shall have been then or in the future charged because of such violation by Subtenant and which Subandlord shall have, or may be required to have, paid on account of an increase in rate in its own policies of insurance. In addition to the foregoing, Subtenant will, if Subandlord so requests, cease the operation of any action or remove any objects or improvements which have resulted in the increase to Subandlord's insurance premiums.

16.  SUBORDINATE TO PRIME LEASE.

A.  Subtenant represents that it has read and is familiar with the terms of the Prime Lease. This Sublease is subject and subordinate to Prime Lease. If for any reason the term of the Prime Lease shall have terminated prior to the Expiration Date of this Sublease, this Sublease shall thereupon be terminated and Subandlord shall not be liable to Subtenant by reason thereof; provided however, that if the Prime Lease terminates as a result of a default or breach by Subandlord or Subtenant under this Sublease and/or the Prime Lease, then the defaulting party shall be liable to the non-defaulting party for the damage suffered as a result of such termination. Subandlord shall not consent to any amendment or modification to the Prime Lease that would materially and adversely affect Subtenant's use and enjoyment of the Subleased Premises without the written consent of Subtenant, which consent shall not be unreasonably withheld, conditioned or delayed, and the Subandlord will furnish Subtenant with copies of any such

17

above, Subtenant shall provide certificates of such insurance to Subandlord prior to commencing any construction in, on or about the Premises.

amendments or modifications to the Prime Lease, whether or not Subtenant's consent thereto is required pursuant to this sentence.

B.  Subtenant assumes and agrees to perform the lessee's obligations under the Prime Lease during the term hereof to the extent that such obligations are applicable to the Subleased Premises, except the obligation to pay rent to Landlord and other obligations assumed by Subandlord under this Sublease. Subtenant shall not commit or suffer any act or omission that will violate any of the provisions of the Prime Lease. Subtenant shall indemnify and hold Subandlord harmless from and against all claims of any nature whatsoever by reason of any breach or default on the part of Subtenant that results in a default under the Prime Lease, or as a result of which the Prime Lease is terminated or forfeited. Subandlord shall indemnify and hold Subtenant harmless from and against all claims of any nature whatsoever by reason of any breach or default on the part of Subandlord that results in a default under the Prime Lease or as a result of which the Prime Lease is terminated or forfeited, any action or inaction by Subandlord that empowers the Landlord to terminate the Prime Lease (except in each case, however, where Subandlord's breach or default under the Prime Lease arises as a result of Subtenant's failure to perform its obligations hereunder).

C.  Subandlord shall exercise due diligence in attempting to cause Landlord and Marshall's to perform their respective obligations under the Prime Lease and Assignment for the benefit of Subtenant. Upon receipt of written notice from Subtenant asserting that Landlord or Marshall's is not performing its obligations, under the Prime Lease, Subandlord shall notify such party and shall use commercially reasonable efforts at Subtenant's expense to cause such party to perform its obligations under the Prime Lease or Assignment, as applicable, but Subandlord shall not be liable to Subtenant if Landlord or Marshall's continues not to perform such obligations. Subandlord shall use its commercially reasonable efforts to obtain, for Subtenant's benefit, a nondisturbance agreement reasonably satisfactory to Subtenant.

D.  Notwithstanding anything contained herein to the contrary, the only services or rights to which Subtenant is entitled under this Sublease are those to which Subandlord is entitled under the Prime Lease.

17.  TERMINATION, DESTRUCTION, CONDEMNATION.

A.  **Termination Prior to Expiration Date of Sublease.** If for any reason the term of the Prime Lease shall have terminated prior to the Expiration Date, this Sublease shall thereupon be terminated and Subandlord shall not be liable to Subtenant by reason thereof unless both (i) Subtenant shall not then be in default hereunder and (ii) said termination shall have been effected because of the breach or default of Subandlord as tenant under the Prime Lease.

B.  **Destruction and Damage.** In the event the Building is stamped or destroyed by fire or other peril, and as a result thereof the Prime Lease is terminated pursuant to the terms thereof, then this Sublease shall automatically likewise terminate upon written notice from Subandlord to Subtenant, and Base Rent and Additional Rent shall be prorated as of the date of such fire or other casualty. In the event the Prime Lease is not terminated as aforesaid, then the Prime Lease shall govern the reconstruction or repair of the Premises, and Base Rent and

18

Operating Expenses shall be abated for the period of repair and restoration by the Landlord, from the date of such casualty, in the proportion which the area of the Premises, if any, in which Subtenant is not able to operate bears to the total area of the Premises.

### C.    Eminent Domain.

A "Total Taking" shall be deemed to have occurred if during the term of this Sublease, (i) the whole of the Premises shall be taken by eminent domain or be sold to the conforming authority in a settlement of or under threat of condemnation ("Taking"), or (ii) at least ten percent (10%) of the Property or the Building is Taken and the residue is not reasonably usable for the conduct of Subtenant's business on the Premises, or (iii) Landlord terminates the Prime Lease pursuant to Section 12 thereof. Upon a Total Taking, this Sublease and all rights of Subtenant in and to the Premises shall immediately terminate. If during the term of this Sublease a portion of the Property or the Building is Taken in a manner that is not a Total Taking, then this Sublease shall continue with a reasonable reduction of rent (reflecting the diminution in the value of the Premises for Subtenant's use thereof), and the Prime Lease shall govern the reconstruction of the Premises. Subtenant shall have no obligation to restore fixtures and improvements owned by Subtenant. Subtenant shall not be required to expend any sums for restoration in excess of the net award or purchase price available to Subtenant and not required to be paid to Landlord or any lender; provided, however, that in the event the amount to be expended by Subleandlord will be insufficient to restore the Premises to a condition usable for the conduct of Subtenant's business on the Premises, then Subtenant shall have the right to terminate this Sublease upon notice to Subleandlord. To the extent that any condemnation award will not be applied as aforesaid, Subleandlord or Landlord, as their interests may appear, shall be entitled to the entire award; provided that Subtenant shall be entitled to make a claim to the condemning authority for damages to personal property and for expenses incurred in relocating following any such taking.

### 18.    NOTICES.

All notices, consents, approvals, demands and requests (collectively, "Notices") delivered by either party to the other hereunder shall be in wiling and shall be sent either by United States registered or certified mail and deposited in a United States Post Office, return receipt requested and postage prepaid, or by reputable overnight air courier such as Federal Express. Notices which are served upon Subleandlord or Subtenant by mail in the manner provided herein shall be deemed to have been given or served for all purposes hereunder on the third business day next following the date on which such Notice shall have been mailed as aforesaid one day after posting such Notice with an overnight courier. After delivery of possession of the Premises to Subtenant, all Notices given to Subtenant shall be addressed to Subtenant at the Premises; until such delivery, notice to Subtenant shall be given at its address set forth at the head of this Sublease. All Notices given to Subleandlord shall be addressed to Subleandlord at its address set forth at the head of this Sublease, to the attention of Assistant Vice President, Real Estate. Subleandlord or Subtenant may from time to time change the names and/or addresses to which Notices given to either of them shall be addressed and sent as aforesaid, by designating such other names and/or addresses in a notice given to the other party in accordance with the provisions of this Section 18.

19

### 19.    DEFAULT.

A.    Event of Default.  Each of the following shall be deemed to be an "Event of Default" by Subtenant and a breach by Subtenant hereunder: (i) any Transfer of this Sublease or the Premises, in violation of Section 12 hereof, (ii) Subtenant's failure to promptly begin and diligently pursue completion of the Initial Alterations, (iii) the non-payment of any Base Rent or Additional Rent or any part thereof when same is due, or failure to make any other payment herein provided for, and the continuance of such non-payment for five (5) days after Subleandlord shall have given notice of nonpayment to Subtenant, or (iv) the default in the performance of any other obligation of Subtenant under this Sublease, and the continuance of such default for twenty (20) days after Subleandlord shall have given to Subtenant a notice specifying the nature of such default, but if said default shall be of such nature that it cannot reasonably be cured or remedied within said twenty (20) day period, same shall not be deemed an Event of Default if Subtenant shall have commenced in good faith the curing or remedying of such default within such twenty (20) day period and shall thereafter continuously and diligently proceed therewith to completion.

B.    Remedies.  In the event of Subtenant's default or the occurrence or existence of an Event of Default, Subtenant shall pay to Subleandlord, on demand, such expenses as Subleandlord may incur, including, without limitation, reasonable attorneys' fees, court costs, disbursements, and any and all other costs incurred by Subleandlord in enforcing the performance of any obligation of Subtenant under this Sublease. If an Event of Default occurs, Subleandlord shall have the following rights and remedies, in addition to all rights and remedies available under law or equity: (i) Subleandlord may declare this Sublease terminated upon written notice to Subtenant; and/or (ii) Subleandlord or its agents, servants, representatives, successors or assigns may, immediately or at any time thereafter, re-enter and resume possession of the Premises and remove all persons and property therefrom, either by summary dispossess proceedings or by a suitable action or proceeding at law, or by force or otherwise, without being liable for any damages therefor, and no such re-entry shall be deemed an acceptance or surrender of this Sublease; and/or (iii) Subleandlord may, but shall have no obligation to, in its own name, but as agent for Subtenant if this Sublease is not terminated, relet the whole or any portion of the Premises for any period equal to or greater or less than the period which would have constituted the balance of the Term, for any sum which Subleandlord may deem reasonable, to any tenant(s) which Subleandlord may deem appropriate, and Subleandlord may grant concessions, including free rent; and Subleandlord shall have the right to collect from Subtenant any deficiency between the amount of Base Rent and Additional Rent due hereunder, and the amount of rent, net of costs related thereto, actually collected from such reletting. In the event of any breach or threatened breach by Subtenant of any of the covenants or provisions of this Sublease, Subleandlord shall have the right of injunction and the right to invoke any remedy allowed at law or in equity, mention in this Sublease of any particular remedy shall not preclude Subleandlord from any other remedy at law or in equity. If at any time Subleandlord elects to terminate this Sublease, Subleandlord shall be entitled to recover from Subtenant in addition to other damages recoverable hereunder or under applicable law:

(i)    the worth at the time of award of the unpaid Base Rent and Additional Rent which had been earned at the time of termination, and

20

(ii)    the worth at the time of award of the amount by which the unpaid Base Rent and Additional Rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Subtenant proves could have been reasonably avoided, and

(iii)    the worth at the time of award of the amount by which the unpaid Base Rent and Additional Rent for the balance of the Term after the time of award exceeds the amount of such rental loss that Subtenant proves could be reasonably avoided.

As used in clauses (i) and (ii) above, "worth at the time of award" shall be computed by allowing interest at the lesser of (a) the rate per annum set forth in Subsection D. of this Section 18 (to wit, the prime rate quoted by the Wall Street Journal plus six percent (6%) per annum, not to exceed fifteen percent (15%), or (b) the highest rate allowed by law. As used in clause (iii) above, the "worth at the time of award" shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award, plus one percent (1%).

C.    Damages.    Subtenant shall in no event be liable in any way whatsoever for its failure or refusal to relet the Premises or any part thereof. Subtenant shall be entitled to recover from Subtenant, and Subtenant shall pay to Subtenant immediately upon demand by Subtenant, the amounts equal to all of the expenses incurred by Subtenant in connection with (i) recovering possession of the Premises, (ii) any reletting(s) of the Premises and related brokerage costs, including without limitation costs for making alterations, repairing or otherwise preparing the Premises for reletting(s), (iii) court costs, and (iv) attorneys' fees incurred in connection with any of the foregoing (collectively "Reletting Expenses"). Landlord's right to reimbursement for Reletting Expenses is subject to offset by the increase over the Rent and Additional Rent due hereunder in the amount of rent received from the new tenant to whom the Premises, or any portion thereof, is relet. In the event of an Event of Default occurring during the last five (5) years of the Term, Tenant's liability for Reletting Expenses shall be limited to the Reletting Expenses multiplied by a fraction, the numerator of which is the number of months from the date of the new sublease through the end of the Term of this Sublease, and the denominator of which is the number of months in the term of the new sublease, including renewal options.

D.    Late Charges and Returned Check Charges.    If payment of any Base Rent or Additional Rent is not made by the fifth (5th) day after the date on which such amount was due and payable, Subtenant shall pay as a late charge the greater of (i) One Hundred Fifty Dollars ($150.00), or (ii) five percent (5%) of the overdue payment, and interest on the amount overdue at the lesser of (a) the prime rate quoted by the Wall Street Journal plus six percent (6%) per annum, not to exceed fifteen percent (15%), or (b) the highest rate allowed by law (the "Default Rate") from the date on which such amount was due until the date of payment, as reimbursement of Subtenant's expenses incurred as a result of Subtenant's failure to make prompt payment, provided, however, that on the first instance that an installment of Base Rent or Additional Rent is not received by Landlord when due in any twelve (12) month period, Landlord shall provide written notice to Tenant and five (5) days to cure before assessing the late charge.

Tenant shall only be entitled to one such notice and cure period during any twelve (12) month period. In addition to any late charges or other remedies of other remedies available to Subandlord, if any check is returned to Subandlord by Subtenant's bank by reason of insufficient funds, uncollected funds, or otherwise, Subtenant shall pay to Subandlord a return check administrative charge of One Hundred Dollars ($100.00). Subtenant shall pay the late charges and return check administrative charges for any month as Additional Rent on the first day of the following month.

E.    Additional Right of Subandlord to Cure Subtenant's Defaults.    Subandlord may, but shall not be obligated to, cure, at any time upon ten (10) days' notice or without notice in case of emergency, any default(s) by Subtenant under this Sublease, and Subtenant shall pay to Subandlord on demand all costs and expenses incurred by Subandlord in curing such default(s), including, without limitation, court costs and attorneys' fees and disbursements in connection therewith, together with interest on the amount of costs and expenses so incurred at the Default Rate.

F.    Special Bankruptcy Provision.    If Subtenant becomes a debtor within the meaning of the Bankruptcy Reform Act of 1978, as the same may be from time to time amended (the "Bankruptcy Code"), and, notwithstanding any other provision of this Sublease, this Sublease and Subandlord's and Subtenant's rights thereunder are then made subject to the Bankruptcy Code, it is covenanted and agreed that the failure of Subtenant or its representative duly appointed in accordance with the Bankruptcy Code to (i) provide Subandlord with adequate assurance that all of Subtenant's obligations under this Sublease shall continue to be fully complied with for the remaining Term, or (ii) furnish accurate information and adequate assurance as to the source of rent and other consideration due to Subandlord under this Sublease, or (iii) conduct or have conducted at the Premises Subtenant's business as provided in this Sublease, shall in any of such events be deemed an Event of Default, and Subandlord shall have all rights and remedies herein afforded it in respect of any Event of Default. It is understood and agreed that the Premises is situate in a "shopping center" as such term is used in the Bankruptcy Code.

G.    Default by Subandlord.    If Subandlord fails or neglects to keep and perform any of the covenants or agreements in this Sublease on the part of Subandlord to be kept and performed, Subtenant may notify Subandlord thereof and if Subandlord does not cure such default within thirty (30) days (or such shorter period specified by Subtenant in its notice as may be reasonable under the circumstances, in the event of an emergency identified as such in Subtenant's notice) after the date of receiving such notice (or if the default is of such a character as to require more than thirty (30) days to cure, Subandlord does not commence to cure such default within thirty (30) days and proceed with reasonable diligence), Subtenant may, in addition to all other remedies now or hereafter afforded or provided by law, perform such covenant or agreement for or on behalf of Subandlord or make good any such default, and any amount or amounts which Subtenant advances on Subandlord's behalf will be repaid by Subandlord to Subtenant on demand, together with interest thereon at the Default Rate from the date of such payment. Notwithstanding the foregoing, in the event Subandlord cures such default prior to the expiration of such thirty (30) day period because of the existence of an emergency situation (an emergency situation being defined for the purposes of this subparagraph G as a situation that, if not promptly remedied, threatens imminent

danger to persons or property, Subtenant's cure shall be the minimum reasonably necessary to alleviate the emergency situation, and Subtenant shall be entitled to proceed with a complete cure only after Subtenant's failure to cure such default within the thirty (30) day period described above (subject to extension as provided above).

H.      Notice of Defaults under Prime Lease. Sublandlord shall promptly provide written notice to Subtenant of any defaults by either Landlord or Sublandlord under the Prime Lease, together with copies any notices received or sent by Sublandlord in connection therewith.

20.     WAIVER OF JURY TRIAL AND RIGHT TO COUNTERCLAIM.

SUBLANDLORD AND SUBTENANT EACH HEREBY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY SUMMARY OR OTHER ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS SUBLEASE, THE RELATIONSHIP OF SUBLANDLORD AND SUBTENANT, THE PREMISES OR THE USE AND OCCUPANCY THEREOF, OR ANY CLAIM OF INJURY OR DAMAGES. SUBTENANT ALSO HEREBY WAIVES ALL RIGHT TO ASSERT OR INTERPOSE A COUNTERCLAIM (OTHER THAN A COMPULSORY COUNTERCLAIM) IN ANY PROCEEDING OR ACTION TO RECOVER OR OBTAIN POSSESSION OF THE PREMISES, EXCEPT, HOWEVER, ANY COUNTERCLAIM THAT IS OR MAY BE AN AFFIRMATIVE DEFENSE TO SUCH PROCEEDING OR ACTION TO RECOVER OR OBTAIN POSSESSION. THE FOREGOING SHALL NOT BE DEEMED A WAIVER OF SUBTENANT'S RIGHT TO BRING ANY COUNTERCLAIM IN A SEPARATE PROCEEDING.

21.     END OF TERM.

At the expiration or sooner termination of the Term, Subtenant shall quit and surrender to Sublandlord the Premises, broom clean, free of all occupants, and in good condition, ordinary wear and tear and damage by fire and any other insured casualty excepted. At such expiration or sooner termination, Subtenant shall remove from the Premises all property of Subtenant, including its sign(s), and, at the option of Sublandlord, shall remove all alterations and other improvements made by Subtenant to the Premises, and Subtenant shall repair all damage to the Premises caused by any and all such removal and restore the Premises to the condition in which they were prior to the installation of the items to so removed, including the areas where Subtenant affixed its sign(s). Any property of Subtenant not so removed may be deemed to be abandoned, or Sublandlord may remove the same and restore any damage, at Subtenant's expense.

22.     HOLDOVER.

If Subtenant remains in possession of the Premises after the expiration or termination of the Term, Subtenant shall be deemed to be occupying the Premises as a tenant from month to month at the sufferance of Sublandlord subject to all of the provisions of this Sublease, except that the Base Rent shall be at a monthly rate equal to the greater of (i) the rent which Sublandlord owes for such period under the Prime Lease for these Premises, or (ii) 150% of the monthly Base

23

Rent in effect during the last month of the Term. Subtenant shall give to Sublandlord at least thirty (30) days' prior written notice of any intention to quit the Premises.

Notwithstanding the foregoing provisions of this Section 22, if Subtenant holds over after the expiration or termination of the Term and Sublandlord desires to regain possession of the Premises, then Sublandlord, at its option, may forthwith reenter and take possession of the Premises by any legal process in force in the jurisdiction in which the Shopping Center is located. Any rental amounts for such hold over period which are deposited into Sublandlord's rental account shall not be deemed accepted by Sublandlord if Sublandlord promptly returns such rental amounts to Subtenant. Nothing herein shall limit Sublandlord's right to recover damages pursuant to this Sublease and such other damages as are available to Sublandlord at law or in equity (including but not limited to any and all liability to Landlord or otherwise caused by such holdover).

23.     BROKERAGE.

Subtenant represents to Sublandlord that, except for Rockwood Realty Associates, L.L.C. ("Sublandlord's Broker") and L3 Corporation and Greatstreet Realty (collectively, "Subtenant's Broker"), no broker or other person had any part, or was instrumental in any way, in bringing about this Sublease, and Subtenant shall pay, and shall indemnify, defend and hold harmless, Sublandlord from and against, any claims made by any other broker or other person for a brokerage commission, finder's fee, or similar compensation, by reason of or in connection with this Sublease, and any loss, liability, damage, cost and expense (including, without limitation, reasonable attorneys' fees) in connection with such claims if such broker or other person claims to have had dealings with Subtenant. Sublandlord shall pay a commission of $79,848 to Sublandlord's Broker, one half to be paid at execution of this Sublease, and one half to be paid within five (5) business days after Sublandlord's receipt of Subtenant's first rent payment (excluding advance rent paid hereunder). Such commission is paid pursuant to separate agreement. Subtenant's Broker shall obtain any commission due it from Sublandlord's Broker, fifty percent (50%) of which shall be paid upon execution of this Sublease, and the remaining fifty percent (50%) of which shall be paid on the Rent Commencement Date. Neither Sublandlord's Broker nor Subtenant's Broker is a third party beneficiary of this Agreement.

24.     ESTOPPEL CERTIFICATES.

A.      Subtenant shall, within ten (10) days after each and every request by Sublandlord, execute, acknowledge and deliver to Sublandlord a statement in writing (i) certifying that this Sublease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified, and stating the modifications), and the Commencement Date, Rent Commencement Date and Expiration Date, (ii) specifying the dates to which the Base Rent and Additional Rent have been paid, (iii) stating whether or not, to the best knowledge of Subtenant, Sublandlord is in default under this Sublease, and, if so, specifying each such default, (iv) stating whether or not, to the best knowledge of Subtenant, any event has occurred which with the giving of notice or passage of time, or both, would constitute a default by Sublandlord under this Sublease, and, if so, specifying each such event, (v) stating whether Subtenant has exercised any option(s) to extend the Term of this Sublease, and, if so, specifying

24

each such extension, and (vi) any other matter as may be reasonably requested. Any such statement delivered pursuant to this Section 24 may be relied upon by any prospective assignee or transferee of the leasehold estate under the Prime Lease.

B.   Subtenant shall, within ten (10) days after each and every request by Subtenant, execute, acknowledge and deliver to Subtenant a statement in writing (i) certifying that this Sublease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified, and stating the modifications), and the Commencement Date, Rent Commencement Date and Expiration Date, (ii) specifying the dates to which the Base Rent and Additional Rent have been paid, (iii) stating whether or not, to the best knowledge of Subtenant, Subtenant is in default under this Sublease, and, if so, specifying each such default, (iv) stating whether or not, to the best knowledge of Subtenant, any event has occurred which with the giving of notice or passage of time, or both, would constitute a default by Subtenant under this Sublease, and, if so, specifying each such event, (v) stating whether Subtenant has exercised any option(s) to extend the Term of this Sublease, and, if so, specifying each such extension, and (vi) any other matter as may be relied upon by any person or entity identified by Subtenant in its respect.

25.   AMERICANS WITH DISABILITIES ACT.

Sublandlord and Subtenant, as the case may be, shall supply to the other party as promptly as possible, but in any event within ten (10) days after Sublandlord or Subtenant, as the case may be, first receives or sends the same, written notice of, and copies of all applicable notices or other documentation thereof, as applicable, (i) any notices, reports or warnings made to or received from any governmental agency or entity arising out of or in connection with the ADA, (as defined in this Section 25) relating to all or any portion of the Premises, Subtenant's use or occupancy thereof, the Building or the Shopping Center; (ii) any complaints, charges, claims, or asserted violations made or threatened in writing by any person, agency or entity alleging violation of the ADA or regarding non-compliance with the ADA, and relating to all or any portion of the Premises, Subtenant's use or occupancy thereof, the Building or the Shopping Center; (iii) any enforcement or other governmental or regulatory action or investigation instituted, contemplated, or threatened pursuant to any legal requirements regarding or in connection with the ADA and relating to all or any portion of the Premises, Subtenant's use or occupancy thereof, the Building or the Shopping Center; (iv) any claim made or threatened by any person against Subtenant, the Premises, the Building or the Shopping Center, relating to damage, compensation, loss or injury resulting from or claimed to result from any alleged non-compliance with the ADA. ADA shall mean the Americans with Disabilities Act of 1991, 42 U.S.C. 12,101 et seq, and all regulations and other promulgations applicable thereto, and all amendments thereto.

26.   HAZARDOUS SUBSTANCES.

A.   Hazardous Materials. Subtenant shall not use, generate, manufacture, produce, store, release, dispose of or permit the escape of, on, under, above or from the Premises, or any part thereof, any asbestos or any flammable, explosive, radioactive, hazardous, toxic, contaminating,

23

polluting matter, waste, or substance or related injurious materials, whether injurious by themselves or in combination with other materials (collectively) "Hazardous Materials"). Further, Subtenant shall not use, generate, manufacture, produce, store, treat, dispose of or permit the escape of, on, under, above or from the Premises any material, substance, or chemical which is regulated by any federal, state or local law, rule, ordinance or regulation (collectively) "Regulated Materials"). Notwithstanding the foregoing, if Subtenant's permitted use of the Premises requires the use and/or storage of any Hazardous Materials and/or Regulated Materials on, under or about the Premises, Subtenant shall provide written notice to Sublandlord, prior to final execution of this Sublease, of the identity of such materials and Subtenant's proposed plans for the use, storage and disposal of such materials; such use, storage and disposal shall be subject to Sublandlord's written approval, in Sublandlord's sole discretion. Nothing contained herein shall prohibit Subtenant from using cleaning solutions, and solvents in customary amounts used by Subtenant for golf club repair, provided that the same are used and disposed of in accordance with applicable law. If Sublandlord approves the proposed use, storage and disposal of specific Hazardous Materials and/or Regulated Materials in the Premises, Subtenant may use and store upon the Premises only such approved materials. Subtenant shall comply with all laws with respect to such use and storage, including, without limitation, the removal and disposal of such Hazardous Materials and/or Regulated Materials at the expiration or earlier termination of the Sublease Term. At the expiration or termination of the Sublease, Sublandlord may obtain, at its cost, a Phase I environmental audit of the Premises. Subtenant shall reimburse Sublandlord for the costs of said Phase I environmental audit if Subtenant has violated any of the provisions of this Section 26 and Sublandlord may pursue any and all recommendations of said Phase I environmental audit, also at Subtenant's sole cost. Subtenant shall defend (by counsel reasonably acceptable to Sublandlord), indemnify, protect and hold Sublandlord and each of Sublandlord's partners, employees, agents, attorneys, successors and assigns, free and harmless from and against any and all claims, liabilities, penalties, forfeitures, losses or expenses (including attorney's fees), or death of or injury to any person or damage to any property whatsoever, arising from or caused in whole or in part, directly or indirectly by:

(i)   The discharge by Subtenant or its employees, agents, contractors, or invitees in or from the Premises of any Hazardous Materials and/or Regulated Materials or the use, analysis, storage, removal, transportation, disposal, release, threatened release, discharge or generation of Hazardous Materials and/or Regulated Materials to, in, on, under, about or from the Premises, by Subtenant, its employees, agents, contractors, or invitees, or;

(ii)   Subtenant's failure to comply with any federal, state, county, municipal, local or other law, rule, ordinance and regulation now or hereafter in effect relating to the industrial hygiene, environmental protection, use, analysis, generation, manufacture, purchase, transportation, storage, removal and disposal of Hazardous Materials and/or Regulated Materials.

In connection with, or as a result of, (i) or (ii) above, Subtenant's obligations hereunder shall include, without limitation and whether foreseeable or unforeseeable, all costs of any required or necessary testing, repair, cleanup, removal, detoxification or decontamination of or from the Premises and the preparation and implementation of any closure, remedial action, site assessment costs or other required plans in connection therewith. In addition, upon request from Sublandlord at any time during the Sublease Term, Subtenant shall execute affidavits,

26

representations, and any other similar documents concerning Subtenant's best knowledge and belief regarding the presence of Hazardous Materials and/or Regulated Materials on, under or about the Premises. Further, Subtenant's obligations hereunder shall survive the expiration or earlier termination of this Sublease. For purposes of this Section 26, any acts or omissions of Subtenant whereby employees, agents, assignees, contractors or subcontractors of Subtenant or others are acting for or on behalf of Subtenant (whether or not they are negligent, intentional, willful or unlawful), will be strictly attributable to Subtenant. Subtenant hereby represents that, to the best of its knowledge, as of the date hereof, no Hazardous Materials and/or Regulated Materials are present in, on, or under the Premises.

B.      Subtenant represents and warrants to Subtenant that Subtenant has not received notice of Hazardous Substances on, in, or under the Premises except as set forth in the Report, and the Subtenant has not disposed of Hazardous Substances on, in, or under the Premises. Subtenant has not authorized anyone else to do so, and the persons in Subtenant's organization responsible for the management and marketing of the Premises, without any investigation whatsoever, have no knowledge of any other disposal of Hazardous Substances on, in, or under the Premises by any other party.

27.    MISCELLANEOUS COVENANTS.

A.      No Waste. Subtenant shall not commit or suffer to be committed any waste upon the Premises or any nuisance or other act or thing which may disturb the quiet enjoyment of any other tenant or occupant of the Shopping Center.

B.      Trash Removal. Subtenant shall independently contract with contractors for the regular removal of Subtenant's garbage and refuse and shall pay the cost thereof.

C.      Interference. Subtenant shall use reasonable efforts to prevent any work stoppage, picketing, labor disruption or dispute, or any interference with the business of Subtenant or any tenant or occupant in the Shopping Center or with the rights and privileges of Subtenant or any person(s) lawfully in and upon said Shopping Center, nor cause the impairment of the good will of the Shopping Center; and if any action of Subtenant shall result in the occurrence of any of the foregoing, Subtenant shall immediately discontinue such action.

D.      Consents and Approvals. In any instance when Subtenant's consent or approval is required under this Sublease, Subtenant's refusal to consent to or approve any matter or thing shall be deemed reasonable if such consent or approval has not been obtained from the Landlord. In the event that Subtenant shall seek the approval by or consent of Subtenant and Subtenant shall fail or refuse to give such consent or approval, Subtenant shall not be entitled to any damages for any withholding or delay of such approval or consent by Subtenant, it being intended that Subtenant's sole remedy shall be an action for injunction or specific performance and that said remedy of an action for injunction or specific performance shall be available only in those cases where Subtenant shall have expressly agreed in writing not to unreasonably withhold or delay its consent.

E.      No Waiver. The failure of Subtenant to insist in any one or more cases upon the strict performance or observance of any obligation of Subtenant hereunder or to exercise any right or option contained herein shall not be construed as a waiver or relinquishment for the future of any such obligation of Subtenant or any right or option of Subtenant. Subtenant's receipt and acceptance of Base Rent or Additional Rent, or Subtenant's acceptance of performance of any other obligation by Subtenant, with knowledge of Subtenant's breach of any provision of this Sublease, shall not be deemed a waiver of such breach. No waiver by Subtenant of any term, covenant or condition of this Sublease shall be deemed to have been made unless expressed in writing and signed by Subtenant.

F.      Successors and Assigns. The provisions of this Sublease, except as herein otherwise specifically provided, shall extend to, bind and inure to the benefit of the parties hereto and their respective personal representatives, heirs, successors and permitted assigns. In the event of any assignment or transfer of the leasehold estate under the Prime Lease, the transferor or assignor, as the case may be, shall be and hereby is entirely relieved and freed of all obligations under this Sublease accruing from and after such transfer or assignment and the transferee's or assignee's assumption of the transferor's or assignor's obligations thereunder.

G.      Interpretation. This Sublease shall be governed by and construed in accordance with the laws of the state in which the Premises are located, without regard to conflicts of laws principles. If any provision of this Sublease or the application thereof to any person or circumstances shall, for any reason and to any extent, be invalid or unenforceable, the remainder of this Sublease and the application of that provision to other persons or circumstances shall not be affected but rather shall be enforced to the extent permitted by law. The table of contents, captions, headings and titles, if any, in this Sublease are solely for convenience of reference and shall not affect its interpretation. This Sublease shall be construed without regard to any presumption or other rule requiring construction against the party causing this Sublease to be drafted. If any words or phrases in this Sublease shall have been stricken out or otherwise eliminated, whether or not any other words or phrases have been added, this Sublease shall be construed as if the words or phrases so stricken out or otherwise eliminated were never included in this Sublease and no implication shall be drawn from the fact that said words or phrases were so stricken out or otherwise eliminated. Each covenant, agreement, obligation or other provision of this Sublease shall be deemed and construed as a separate and independent covenant of the party bound by, undertaking or making same, not dependent on any other provisions of this Sublease unless otherwise expressly provided. All terms and words used in this Sublease, regardless of the number or gender in which they are used, shall be deemed to include any other number and any other gender as the context may require. The word "person" as used in this Sublease shall mean a natural person or persons, a partnership, a corporation or any other form of business or legal association or entity. Time shall be of the essence of each and every obligation of Subtenant under this Sublease.

H.      No Reservation. No employee or agent of Subtenant, no broker, and no agent of any broker has authority to make or agree to take a sublease or any other agreement or undertaking in connection herewith, including but not limited to the modification, amendment or cancellation of a sublease. The mailing or delivery of this document by an employee or agent of Subtenant, any broker or the agent of any broker to a potential Subtenant, its agent or attorney

shall not be deemed an offer of Sublandlord or a reservation or an option for the Premises until such time as a sublease, duly executed by Sublandlord and Subtenant, is delivered to such potential Subtenant, its agent or attorney.

I.     No Partnership. Nothing contained in this Sublease shall be deemed or construed to create a partnership or joint venture of or between Sublandlord and Subtenant, or to create any relationship other than that of sublandlord and subtenant.

J.     No Representations. Neither Sublandlord nor any agent of Sublandlord has made any representations or promises with respect to the Premises, the Building or the Shopping Center except as expressly set forth in this Sublease, and no rights, privileges, easements or licenses are granted to Subtenant except as expressly set forth in this Sublease.

K.     Complete Agreement, Counterparts. There are no representations, agreements, arrangements or understandings, oral or written, between the parties relating to the subject matter of this Sublease which are not fully expressed in this Sublease. This Sublease cannot be changed or terminated orally or in any manner other than by a written agreement executed by both parties. This Sublease may be executed in two or more counterparts, all of which taken together shall constitute a single instrument.

L.     Sublandlord's Representations and Warranties. As a material inducement to enter into this Sublease, Sublandlord represents and warrants to Subtenant as follows:

(i)     Sublandlord has full right and lawful authority to enter into and perform Sublandlord's obligations under this Sublease for the full term hereof;

(ii)     As of the date Sublandlord delivers possession of the Premises, Sublandlord will have good and marketable leasehold interest in the Premises, free and clear of any unrecorded use or occupancy restrictions, other than applicable regulations and ordinances, that would otherwise prohibit the Subtenant's proposed use under this Sublease, subject to the Prime Lease.

(iii)     The Prime Lease is in full force and effect and Subtenant is not aware of any existing defaults thereunder or of any circumstances, with the giving of notice, or the passage of time, or both, would constitute a default thereunder.

(iv)     Sublandlord will use its best efforts to provide Subtenant with written notice of any default under the Prime Lease, but Subtenant shall not be under any obligation to cure any default under the Prime Lease except for defaults resulting from Subtenant's breach of this Sublease.

29

IN WITNESS WHEREOF, Sublandlord and Subtenant have hereunto executed this Sublease as of the day and year first above written.

SUBLANDLORD:

CIRCUIT CITY STORES, INC.

By: _____
     Steven E. Jackson
     Vice President, Real Estate

30

EXHIBIT A

PLAN OF SHOPPING CENTER SHOWING LOCATION OF PREMISES

32

SUBTENANT:

GOLF GALAXY, INC.

By: 

Its:

31