1

1          UNITED STATES BANKRUPTCY COURT

2          FOR THE EASTERN DISTRICT OF VIRGINIA

3                  RICHMOND DIVISION

4

5

6     -------------------------------

7                                      )

8                                      )

9     IN RE:                           )

10    CIRCUIT CITY, INC., et al        ) Case No.08-35653-KRH

11                                     )

12                                     )

13                                     )

14    -------------------------------

15

16          Complete transcript of the testimony and

17    other incidents in the above, when heard on November

18    10, 2008, before the Honorable Kevin R. Huennekens,

19    Judge.

20

21

22

23

24

25

2

```
 1    APPEARANCES:

 2    MCGUIREWOODS,LLP
      901 East Cary Street
 3    Richmond, Virginia 23219
      Counsel for debtors
 4    Counsel for debtors
      BY: DION W. HAYES, Esq.
 5
      SKADDEN ARPS SLATE & FLOM, LLP
 6    One Rodney Square
      P.O. Box 636
 7    Wilmington, DE 19899
      Counsel for debtors
 8    By: GREGG M. GALARDI, Esq.

 9    RUSSELL R. JOHNSON, III, Esq.
      2258 Wheatlands Drive
10    Manakin-Sabot, Virginia 23103
      Representing various utilities
11
      JOSEPH ATHANOS, Esq.
12    Counsel for Gordon Brothers and Hilco

13    BRADFORD F. ENGLANDER, Esq.
      7200 Wisconsin Avenue
14    Suite 800
      Bethesda, MD 20814-4842
15    Representing Alliance Corporation Source Interlink
      Media, LLC
16
      ROBERT L. LEHANE, Esq.
17    101 Park Avenue
      New York, NY 10178-0002
18    Representing various landlords

19    BRUCE H. MATSON, Esq.
      951 E Byrd Street
20    Richmond, Virginia 23219
      Representing Bank of America and its agent
21
      ROBERT VAN ARSDALE, Esq.
22    Assistant United States Trustee
      600 East Main Street, Suite 301
23    Richmond, Virginia 23219

24

25
```

3

```
 1    TELEPHONIC APPEARANCES:

 2    DAVID L. POLLACK, Esq.
      1735 Market Street
 3    51st Floor
      Philadelphia, PA 19103-7599
 4
      STEVEN CHURCH
 5    Bloomberg News

 6    MR. GRAFF

 7    DUSTIN P. BRANCH, Esq.
      2029 Century Park East
 8    Suite 2600
      Los Angeles, CA 90067-3012
 9    Representing various landlords

10    DAVID M. HILLMAN, Esq.
      919 Third Avenue
11    New York, New York 10022
      Representing Panasonic Corporation
12
      JOHN MCJUNKIN, Esq. and DANIEL J. CARRIGAN, Esq.
13    1900 K Street NW
      Washington, D.C. 20006-1108
14    Representing Bethesda Softworks, LLC

15    JOHN E. LUCIAN, Esq. and REGINA S. KELBON, Esq.
      130 North 18th Street
16    Philadelphia, PA 19103-6998
      Representing Verizon Wireless
17

18

19

20

21

22

23

24

25
```

```
 1                    THE CLERK:  In the matter of Circuit
 2          City Stores, Incorporated, et al, hearings,
 3          first day motions by debtors item 1 through
 4          24.
 5                    MR. HAYES:  Good afternoon, Your
 6          Honor.
 7                    THE COURT:  Good afternoon,
 8                    MR. HAYES:  Dion Hayes with McGuire
 9          Woods on behalf of the debtors.  First of
10          all, Your Honor, we want to thank the Court
11          very much for hearing these matters on an
12          expedited basis.  It is very important to the
13          company that we be able to have an
14          opportunity to speak to Your Honor as soon as
15          we could after the case was filed, and the
16          company is very appreciative.  Your Honor --
17                    THE COURT:  You're certainly
18          welcome.
19                    MR. HAYES:  Your Honor, if I could,
20          I would like to introduce to the Court
21          certain of the individuals that are in the
22          courtroom today that I think the Court will
23          be seeing more of in the future.  Your Honor,
24          first of all Mr. Reggie Hedgebeth is Circuit
25          City's general counsel.  Seated next to him
```

```
 1              is or on the same row is Bruce Besanko who is
 2              the company's chief financial officer.  Jim
 3              Marcum the acting chief executive officer,
 4              would very much like to be here but he's at
 5              headquarters spending time with the company's
 6              employees at a very critical time in the
 7              company's history.  Your Honor, with me at
 8              counsel table from Skadden Arps are Gregg
 9              Galardi from Skadden's Wilmington, Delaware
10              office, Ian Fredericks, also from Skadden's
11              Wilmington, Delaware office.  Seated next to
12              Mr. Hedgebeth is Chris Dickerson from
13              Skadden's Chicago office.  Your Honor, I'm
14              going to move for the admission pro hac of
15              Skadden's attorneys who will present the
16              first days.  Before I do that, I want to
17              address the one issue that the clerk's office
18              asked that we address with the Court this
19              morning.  In all of the first day motions we
20              indicated at the end of our proposed orders
21              the required compliance with Rule 9022-1
22              related to orders.  Your Honor, I wanted to
23              be specific as to who we sent notice to of
24              this hearing and the manner in which it was
25              sent.  As the Court is well aware the filings
```

1           commenced late last night after midnight,

2           concluded in the 3 or 4 o'clock range, and at

3           approximately 4:30 this morning faxed notice

4           of the filing of the first day and notice of

5           the two websites, both the Court's website

6           and the KCC website, who is our claims agent,

7           were sent out to that fax list.  Your Honor,

8           the entities that were on that fax list were

9           the top 50 unsecured creditors, the landlords

10          for the leases that we are proposing to

11          reject, and counsel for the prepetition

12          agent, counsel for Sony, the IRS, the SEC,

13          the secretary of treasury, the attorney

14          generals for all 50 states, the EPA, the

15          Department of Justice Civil Division, the

16          Virginia State Corporation Commission, the

17          Virginia Department of Tax, the county

18          recorder and county taxing authorities for

19          the jurisdictions in which the company would

20          propose to close stores, the governmental

21          units in those jurisdictions where the

22          company operates as well, regional and state

23          and environmental protection authority

24          offices and the state taxing authorities.  We

25          also, Your Honor, had provided draft first

```
 1          day papers on Friday to the U.S. Trustee's

 2          Office, had an opportunity to meet this

 3          morning with Mr. Van Arsdale and Mr.

 4          Whitehurst to talk about first day motions.

 5          Your Honor, we believe to all the major

 6          constituents in this case they have had as

 7          much notice as could reasonably be provided

 8          under the circumstances and what we believe

 9          to be adequate notice for the hearing on the

10          matters we're going to put before the Court.

11               Your Honor, at this time I would

12          like to move admission pro hac Gregg Galardi,

13          Chris Dickerson, Ian Fredericks with Skadden

14          Arps.  They are admitted in jurisdictions

15          which they practice and we believe well

16          qualified to practice in this Court.

17               THE COURT:  Admissions are approved.

18          Welcome to the court.

19               MR. POLLACK:  Your Honor, the

20          people on the phone are having trouble

21          hearing the speakers in the courtroom.  I

22          don't know if there is anything we can do

23          about that, but we hear you fine.

24               THE COURT:  Very good.  I will see

25          if we can't turn up the volume on the phone.
```

1          We have just moved into a new

2     courtroom, new courthouse, and we don't have

3     all of the audio systems installed yet.  So

4     we're still trying to get through that, but

5     we will try to accommodate the people on the

6     phone as much as we can.  You may proceed.

7          MR. GALARDI:  Your Honor, again, for

8     the record, Gregg Galardi, with Skadden Arps

9     on behalf of Circuit City.  Your Honor, I

10    don't know what your practice is to

11    proceed -- I know there is a number of out of

12    state counsel -- whether you would like to

13    have those admission introductions before we

14    proceed with these matters or wait until they

15    stand up.

16         THE COURT:  I think we can wait

17    until they stand up because there may be

18    people who want to speak to specific motions

19    and not others.  Do you want the people who

20    are by telephone to identify themselves

21    before we proceed with the hearing?

22         MR. GALARDI:  That would be helpful,

23    Your Honor.

24         THE COURT:  At this point I would

25    like to turn to the people participating by

1           telephonic hearing today and have each of you

2           identify yourself.

3                  Mr. Church, would you please

4           identify yourself.

5                  MR. CHURCH:  Steven Church of

6           Bloomberg News.

7                  THE COURT:  Mr. Pollack, would you

8           please identify yourself?

9                  MR. POLLACK:  Good afternoon.  David

10          Pollack, Ballard Spahr and Ingersoll on

11          behalf of certain landlords; also on the

12          phone from our Washington office is Chuck

13          Chotvacs, and I know Mr. Galardi can speak

14          louder than he is.

15                 THE COURT:  Thank you.  Ms. Graff,

16          would you identify yourself?

17                 MR. GRAFF:  Actually, Your Honor,

18          it's Mr. Graff --

19                 THE COURT:  I apologize.

20                 MR. GRAFF:  -- on behalf of

21          (inaudible).

22                 THE COURT:  Mr. Branch, would you

23          identify yourself?

24                 MR. BRANCH:  Good afternoon, Your

25          Honor.  Dustin Branch, Katten Muchin &

1           Rosenman, LLP, appearing on behalf of various

2           landlords.

3                   THE COURT:  Mr. Hillman, would you

4           identify yourself?

5                   MR. HILLMAN:  Yes, Your Honor.

6           David Hillman of Schulte, Roth and Zable on

7           behalf of Panasonic Corporation of North

8           America.

9                   THE COURT:  All right.  Thank you

10          and Mr. McJunkin, can you identify ourselves?

11                  MR. MCJUNKIN:  John McJunkin,

12          McKenna, Long and Aldridge.  Along with me is

13          Dan Carrigan.  We represent Bethesda

14          Softworks, LLC.

15                  THE COURT:  All right.  Is there

16          anybody on the phone that I have not

17          mentioned?

18                  MR. LUCIAN:  Good morning -- good

19          afternoon, Your Honor, John Lucian and Regina

20          Kelbon from Blank Rome.  We represent Verizon

21          Wireless.

22                  THE COURT:  All right.  Is there

23          anybody else?  All right.  Thank you.

24                  MR. GALARDI:  Thank you, Your Honor,

25          and I will try to speak up and not yell at

```
 1              Mr. Pollack.  Your Honor, we are here today

 2         with respect to the Circuit City filings, and

 3         what I would like to do is give Your Honor an

 4         introduction to why we are here, what the

 5         corporate structure is, and I have three

 6         handouts that we would make available to

 7         people if I might approach, Your Honor.

 8              THE COURT:  Certainly.

 9              MR. GALARDI:  Your Honor, just

10         briefly by way of introduction, Circuit City

11         was founded in 1949 here in Richmond.  It is

12         a public company with operation throughout

13         the United States, Canada and Puerto Rico.

14         What I have handed up to Your Honor is three

15         documents, and as we go through today's

16         hearings I find them -- hopefully they will

17         be useful for a person to understand where we

18         are.  One is a DIP budget and one is also a

19         timetable for where we see this case is

20         going.  The first document is the document

21         that will show the debtors that have actually

22         filed.  You should have a document that has

23         white blocks, sort of gray shade and a darker

24         gray shade.  The white blocks are the

25         debtors, the shaded ones are non-debtors, and
```

1          then the dark ones are entities that actually

2          filed in Canada today.  We do commence CCAA

3          proceedings.

4              Your Honor, Circuit City Stores is a

5          publicly held company.  It has gotten notice

6          of delisting.  It has -- everyone knows is a

7          leading retailer of consumer electronics and

8          currently operates over 700 stores throughout

9          the United States, and it has a similar

10         number of stores that it operates up in

11         Canada.  Today, as I said, they filed in

12         Canada the CCAA proceeding under InterTan and

13         another one of the companies that is on

14         during this structure is Tormelay (Ph)

15         Corporation filed a CCAA proceeding and

16         actually sought and went over to the judge

17         this morning.  I understand we will hopefully

18         have an order entered there they will

19         approve.  There is some interplay between

20         orders and financing.  We're hopeful that

21         maybe before we finish today they will have

22         an order entered in Canada with respect to

23         the CCAA proceedings.

24             Your Honor, the revenues for year

25         ending February 29, 2008, were approximately

```
 1                12 billion dollars and employed nearly 40,000

 2                people.  Your Honor, unfortunately over the

 3                last two years they have had declining

 4                performance and in the last six months ending

 5                August 31st, as we reported, they have lost

 6                over 400 million dollars.  Simply speaking,

 7                Your Honor, these losses are driven by two

 8                general factors.  First, the decreasing

 9                margins in the company's operations.  They

10                receive less margins on their sales partially

11                because they have chosen before to compete

12                with the internet such as Amazon.com;

13                therefore, in the stores they had lower

14                margins competing with the internet.  The

15                second is simply they've lost foot traffic

16                over the last two to three years resulting

17                both from -- I would say general economic

18                conditions are more pertinent perhaps today

19                than two years ago but also customer

20                dissatisfaction.  After -- back in January of

21                2008 the company received notice from its

22                largest shareholder they want to commence a

23                proxy fight from Wattles Capital.  In May the

24                management agreed to reach an agreement with

25                Wattles regarding the proxy fight and for
```

14

1          three new members for the board to be
2          appointed.  One is Mr. James Marcum, who
3          currently serves as the acting president, and
4          there were two other individuals who were
5          designated to the board who served on the
6          board through last night and are still on the
7          board today.  In addition, Your Honor, during
8          that same period one of the complaints by the
9          shareholders was that the company should be
10         shopping itself and we received an offer from
11         Blockbuster.  The company hired Goldman Sachs
12         to pursue that offer from Blockbuster.
13         Unfortunately a transaction was never
14         completed with Blockbuster.  Goldman Sachs
15         probably three, four or five weeks ago
16         continued in its efforts to try to find TG
17         partners, equity investors or other people to
18         invest in the company.  To date none of those
19         activities have in fact come to fruition.
20         Your Honor, after the proxy contest the
21         company's financial performance continued to
22         deteriorate.  The current CEO at that time
23         stepped down and Mr. Marcum, as I said, took
24         on the position of acting president and
25         chairman.  Since September, although the

1           company had already initiated various

2           restructuring efforts, at Mr. Marcum's

3           direction the company has been aggressively

4           pursuing various turnaround efforts.  They

5           have been well publicized in the media to

6           note a few.  First, the company has hired

7           various restructuring professionals to help

8           with the cash flows, to sort of monitor the

9           business and monitor the checkbook and has

10          been searching out alternative forms of

11          financing.  Second, the company began a new

12          advertising campaign and initiatives to

13          improve the customer's experience.  It used

14          to be the company competed with the internet,

15          Amazon, and, as I mentioned, the margins were

16          lower.  So we have one low price now.  We are

17          not going as low as Amazon.  It is very hard

18          to compete with the internet when you have

19          virtually more in the stores.  The company is

20          now one low price, same internet as in the

21          stores, but it is hopefully a higher market

22          product.  They have also taken on great steps

23          to try to give the customers a much better

24          experience to try to get the customers back.

25          Customer satisfaction is perhaps at an all

1       time low and they have addressed that.  Those

2       activities were announced and began in the

3       month of -- the end of September and

4       beginning of October.  The company also took,

5       as it announced in September, a look at all

6       of its assets.  In particular the company has

7       had approximately 150 leases which they have

8       not been operating in those stores for some

9       period of time.  On an annual basis they have

10      therefore been paying approximately 40

11      million dollars of an annual rent on lease

12      space that they have no longer been operating

13      stores.  Some of that was mitigated by the

14      fact that there were a couple of peas in

15      those facilities but none of the subleases

16      were greater than the market rent.  They had

17      explored the opportunity to see if they could

18      shop those leases.  Unfortunately they were

19      unable to do so.  One of the motions, Your

20      Honor, is to finally bring in for the payment

21      of that amount and to reject those leases.

22      In addition, Your Honor, they looked at a

23      four-wall analysis, a very strict analysis of

24      what of the stores that they had, at the time

25      about 175 stores.  What are the stores who

1          were best contributors?  What markets were

2          the best contributors on an economic

3          analysis.  They hired FTI, and FTI did a

4          four-wall analysis, the company did an

5          analysis of markets, and as a result of that

6          the company determined it was best to close

7          those stores and close those markets and no

8          longer operate.  Again, one of the topics for

9          the motion, although we started that process

10         prior to the filing, is to seek approval of

11         the agent who is liquidating that inventory

12         and ultimately continue those store closings.

13         That is one of the motions, but that effort

14         was undertaken, begun really in the beginning

15         of October, and we will have testimony today,

16         if Your Honor needs it, with respect to

17         efforts to come to that agency agreement, how

18         we came to that, why it is a fair agreement,

19         what's the benefit of assuming it.  But that

20         was one of the efforts undertaken pre-filing

21         again with the hopes to address our liquidity

22         concerns.

23              Finally, I think, Your Honor, most

24         familiar in people's mind, because it

25         happened only last week, the company took a

1            painful step last Thursday and Friday to have

2            a significant reduction in forces at

3            corporate headquarters.  The number is

4            approximately 700 people in the company, let

5            those people go last Thursday and Friday as

6            was well covered in the press.  Your Honor,

7            during all of this process the company was

8            soliciting offers, and Mr. Besanko can

9            testify as well as the advisors today -- we

10           can proffer or give their testimony.  The

11           company has been looking at talking with its

12           current lenders lead by the agent Bank of

13           America.  The company currently has, and,

14           again, a sign of a different time, a 1.3

15           billion dollar commitment financing from a

16           group of about 17 lenders, very well-known

17           retail lenders led by B of A, there's Wells

18           Fargo, there's GE, and then depending upon

19           whose bank is financing whose bank at any

20           given time, there are other banks within that

21           group.  We started negotiations with them

22           about both out of court financing in-court

23           financing hoping to remain, again, out of

24           court.  The company and its professional

25           advisors also went out and solicited a

```
 1          subdebt.  Your Honor may bring it up later,
 2          one of the draft papers mentioned -- there
 3          was a subdebt facility.  We will tell the
 4          story about why we do not have that facility
 5          today.  It is not that they walked away from
 6          us.  It is that we walked away from them.  We
 7          looked for subordinated debt and again trying
 8          to get and solve the liquidity problem.
 9          Notwithstanding the above, in light of the
10          quarterly announcement that came out
11          September 29th and the uncertainly in this
12          market created both in the global market as
13          well as the retail market, you can only read
14          the newspapers and see the retailers many
15          times, lenders became quite concerned about
16          the company's financial help.  As a result of
17          this we are in the oddest time of the market
18          for retailers, especially an electronics
19          retailer, as we are building up our inventory
20          right -- we should be building up our
21          inventory.  We are using more and more of our
22          credit facility.  Unfortunately, we would
23          normally get increased trade terms or we
24          would get a higher credit limit from our
25          normal vendors, but given the market that was
```

1         going on and given the fact that there was

2         press in our quarterly report announcement of

3         400 million dollars lost for six months

4         ending on August 31, what we found happened

5         is after September the company began to

6         deteriorate its liquidity position primarily

7         because, one, vendors were stopping trade

8         terms and demanding cash in advance for

9         shorter terms, and, two, unlike historical

10        limits where we could increase our trade

11        credit with respect to those lenders and

12        therefore build our borrowing base and

13        therefore have more liquidity, we were unable

14        to do so because vendors were no longer

15        willing to go at risk.  Again, the

16        traditional bankruptcy would merely remind

17        that we would only take their money, file on

18        January 1st that we were high and dry for the

19        payrolls, and so they decided not -- at least

20        we understand they decided not to continue to

21        give credit support to the company.  As a

22        result of that and as a result we just

23        couldn't get enough cost as fast as was

24        necessary.  We were required to come into

25        court and seek a filing last night and in

1          particular with the support of Bank of

2          America as it did the lending.

3              We have before Your Honor today

4          various first day motions.  What are we

5          trying to establish in this filing?  We read

6          the press this morning, Your Honor, and there

7          are experts that are saying, well, we will

8          take the fate of the lending and things of

9          every other retailer, we are going to

10         liquidate.  Actually, quite simply we are

11         trying to emerge as a going concern and to do

12         it in one of two ways, and we have very

13         limited time as we talk through this process.

14         We are trying to emerge as a going concern

15         and there two ways that reach Chapter 11

16         allows us.  One, a going concern based on a

17         particular sale to all or part of the

18         company.  We can explain.  It's just that

19         continuation in a different form from Goldman

20         Sachs.  And, two, whether or not we can do

21         this is to emerge with a standalone plan

22         hopefully supported by vendors.  As we set

23         forth in the Besanko affidavit, and as Your

24         Honor will hear as we go through the case, is

25         prior to the filing -- again, Mr. Marcum took

1          trips to Korea to try to discuss with vendors

2          whether they would support a vendor plan.

3          And the simple message is, Your Honor, the

4          company believes there is a competitive

5          market out there to Best Buy.  You don't have

6          to compete with the internet.  You provide a

7          valuable service.  And if we get vendor

8          support sufficiently, you can have a second

9          outlet for your goods.  And there are many

10         vendors that would be very much harmed should

11         Circuit City go out of business.  That's one

12         avenue.  And, two, though you have

13         significant interest during the Goldman Sachs

14         days, many of those buyers pointed to the

15         fact that we have a real estate portfolio of

16         150 leases that were debt store leases.  So

17         we had a different footprint.  So the

18         opportunity provided by Section 363, an asset

19         sale in bankruptcy, makes the company more

20         attractive to those bidders.  So, Your Honor,

21         we really do hope we can accomplish a going

22         concern and exit from bankruptcy, and we want

23         to do it in very short time frame.

24                Your Honor, the second exhibit that

25         I have handed up to Your Honor, again, it is

```
1           available to people to give you an idea of

2           the time frame I think to try to set up the

3           whole case before we go to the first day

4           motions.  Again, someone would look at our

5           DIP facility and say, my God, they have to

6           have a plan of reorganization done by March

7           and they have to do this, that and the other

8           thing.

9                THE COURT:  That was the first thing

10          that stuck out to me.

11               MR. GALARDI:  Right, exactly.  And

12          why would anybody borrow so much money on

13          such a short time frame?  Unfortunately, I

14          have done a number of retail cases, Your

15          Honor, and I would like to blame this one on

16          the banks but I really can't.  It is the

17          Bankruptcy Code that actually forces this

18          situation, it seems to me, with the BAPCPA.

19          Your Honor, in a traditional ABL loan what

20          the ABL lenders are obviously concerned about

21          is their primary collateral is the inventory

22          in the stores.  If your primary collateral is

23          the inventory in the stores, you get an

24          appraisal for inventory in the stores, and

25          the appraisal is based on the simple fact if
```

24

1          you have to liquidate, an order of

2          liquidation, how much can you get for that

3          inventory over a certain period of time.

4          That appraisal predicts essentially it will

5          take 9 to 12 weeks to liquidate the inventory

6          in the stores.  If you take the timeline,

7          Your Honor, then the bankruptcy code overlay

8          of that is simply the following: as the

9          debtor you have your first 120 days to assume

10         or reject leases.  You can get one extension

11         for 90 days, and if you get the 210 days to

12         assume or reject leases, you've got as long

13         as you can get unless you get in this

14         instance another 500 landlords to consent to

15         further extensions.  So what you have is if

16         you take 210 days as the longest period, what

17         you find -- and I now have three or four

18         cases of this sort.  Well, if you start

19         backwards from 210 days and it takes three

20         months to liquidate the inventory, well,

21         that's seven months minus three months and

22         you have a four month case because no retail

23         debtor is going to start assuming leases

24         until they know where they can exit because

25         the obvious implication is you have now

1          converted the cure claims.  You have to make

2          administrative claims.  So the time frame is

3          really not set by, I think, the lenders,

4          although I understand their concern and we

5          would love to have more time.  It is the

6          Bankruptcy Code that really sets the 100, 210

7          days.  So what you will see in a timetable

8          that we have proposed is where we see a

9          significant event over the course of this

10         case, Your Honor, is though we have the first

11         120 days -- you have 120 days, you take three

12         months.  We have one month really to get a

13         new order in this case.  So we will be filing

14         a motion which is not unheard of anymore but

15         it may not be usual for retail cases to

16         extend the 365(d)4 deadline the first month

17         of this case because if we don't, then the

18         lease reserves kick in.  So you will notice

19         the first real deadline here is by December

20         10th we will have to have an order that will

21         allow us to go through the two to take

22         advantage of the full 210 days.  The

23         landlords' counsel in the room have been with

24         me before on these matters, Mr. Pollack and

25         Mr. Hayes.  They understand that's what we

```
 1              will be doing and we will have a negotiation

 2              over that, but it is critical to these

 3              debtors that they get that extension and so

 4              we will have a hearing on that.  In addition,

 5              Your Honor, the critical deadline is the

 6              utilities.  A company that has this many

 7              leases has thousands and thousands of

 8              utilities.  The Bankruptcy Code again has

 9              made it very difficult on retail companies

10              because you have the choices of either put up

11              and then get back or not put up.  So what

12              we've done, and we will talk about this in

13              the first day motions, is we will make an

14              offer but we really need a hearing on that

15              first 30 days to have Your Honor set the

16              adequate assurance of future performance.  I

17              know the gentleman who will probably be here

18              from this area, Mr. Russ Jones, will send me

19              my e-mail and tell me I won't accept this,

20              and we understand we will have to deal with

21              that but we normally resolve it.  But that's

22              another thing that puts an incredible burden

23              on the retail lender.  Again, the lenders now

24              have stipulated this is not an uncommon

25              deadline.  They have actually given us in the
```

```
 1          area of 40 days or 45 days to get the final
 2          order on the debt.  So that is a very
 3          standard motion.
 4               Again, Your Honor, as we go through
 5          the cash flows, the other requirement that
 6          you will see is we think we have sufficient
 7          liquidity, which was a hotly negotiated
 8          issue, to make it through Black Friday back
 9          through January, but there is a January 7th
10          requirement that we obtain 75 million dollars
11          in term loan debt, essentially a second lien
12          facility to give us additional liquidity.  As
13          I see the case, Your Honor, we have a 60 day
14          period, another 60 day period, and then we
15          can maybe get to Christmas.  That's really
16          what we are looking for.  So if you think of
17          it this way, go through the Christmas period
18          to January through electronic retailers and
19          then you have to go through Super Bowl.  So
20          you have to get liquidity again, buy the
21          goods to get through the Super Bowl, which is
22          February 1st this year, to get us to March.
23          We think that whether we to do this -- and it
24          will be a topic of the motion -- to really
25          get this subfacility with a lender such as
```

```
 1              the one we mentioned in the first day papers,

 2              or another lender, or even a 363 purchaser,

 3              is a very likely possibility and we're

 4              hopeful.  But, again, to get that kind of

 5              facility most people will want to see how did

 6              you do during Christmas.  And so we thought

 7              it would be better not to take the first loan

 8              that we talked about because it wouldn't have

 9              gotten us to that point, but rather, again,

10              with B of A's cooperation managed to secure a

11              period of January 17th so we have what we

12              think is a good 60 day period to do the sort

13              of things we need.  Your Honor, then the

14              dates sort of fall in line because it will

15              need to file a plan disclosure statement by

16              March 1st.  That's right within that four

17              month time period I'm talking about.  Indeed

18              we think that it is not just that you file on

19              but we will actually have to come into the

20              court and be prepared to confirm a plan

21              somewhere in that March 1st, March 15th

22              period because when we resume the leases the

23              leases will have to be assumed or effective

24              or otherwise we face the next date which is

25              March 15th which is the lease reserve date.
```

1          And what that essentially says is if you

2          haven't come up with an exit for this

3          bankruptcy case, then they are going to force

4          us again to protect their collateral as their

5          right to do, to send out informational

6          packages, to liquidating it, to come up with

7          a 363.  It's a bridge to somewhere.  That's

8          how I see the case, a four month bridge to

9          somewhere.  Again, the last day on the

10         calendar is simply Your Honor grants us that

11         extension of the 90 days, then the date would

12         actually run out on June 10th, and that's why

13         three months later we need to get the leases

14         determined.

15              Your Honor, moving off the calendar

16         -- again, to see this case I think is to see

17         it as two bridges.  The first bridge is to

18         give us enough time to solicit interest

19         either from third parties or from the vendor

20         community.  The second thing, in July to

21         hopefully come back to this Court with either

22         a vendor supported plan, a vendor supported

23         financing, which we have been starting

24         negotiations with, or a subdebt facility from

25         some other party or a subdebt facility from a

1           potential purchaser that will allow us to

2           exit in the March time frame.  That is the

3           company's hope and goal for these cases.

4                Your Honor, moving then to the first

5           day papers, I think we will just go in the

6           order.  What I have done is I -- hopefully

7           this will be helpful to the Court and people

8           in the courtroom.  I handed out a one-page

9           budget which I'm often teased about, but we

10          hand out a one-page budget which will

11          hopefully show the first 13 weeks of the case

12          and will match up to the relief requested.

13          If you think the print is small now it gets

14          even smaller as I get longer in the case and

15          then we will put it on two pages, but most

16          people complain I can read small but I can

17          read you very well.  So it is easy for me to

18          read the small print.  Your Honor, just to

19          give you a sense of this budget, we start on

20          the week one and we said here -- we have said

21          here we have broken it down essentially to

22          mere operating expenses or cash flows which

23          is an item two.  The first item is a

24          significant one, Your Honor.  It is an

25          assumption about how this market is going to

```
 1              operate and comp store sales.  Notice it is a
 2              scary number.  It is off 35 percent.  It is
 3              off 30 percent.  It is off 25 percent.  It is
 4              off 20 percent.  So we think we have taken a
 5              conservative assumption, but no one can
 6              predict in this market and what people are
 7              saying about retail that even a negative 35,
 8              30, 25 is conservative enough.  And with a
 9              company this size there can be significant
10              variation.  But that is the assumption about
11              our performance over this 13 week period.
12              Importantly and not in here, Your Honor, is
13              through the week of January 3rd we assumed
14              absolutely no trade credit, CIA.  It is our
15              experience and hope to be able to negotiate
16              trade credit and then beginning on the week,
17              I think, of January 10th very little trade
18              credit comes in because we hopefully will be
19              in the negotiating phase and getting some
20              trade credit.
21                  The next -- in the cash flows then
22              we have what I call the bankruptcy payments,
23              and, Your Honor, those titles should seem
24              familiar to the first day papers as we either
25              -- each tagged to the amount of relief that
```

```
 1              we sought in certain of our first day papers
 2              by way of any number of arguments, these
 3              doctrine of necessity secured claims,
 4              whatever, but they are broken down into
 5              customer practices, freighter shipping,
 6              insurance, mechanic's liens, foreign vendors,
 7              and then my favorite, the other one.  And we
 8              will talk a little bit about the other, my
 9              pledge factor.
10                   Your Honor, what I think is striking
11              is the next column.  It is a column that says
12              how much is this DIP facility going to cost
13              us, all in when you pay the professionals
14              that negotiated it, when you pay the banks
15              the fees and when you pay the lenders'
16              counsel its fees, we have listed here 34
17              million dollars.  Your Honor, it is actually
18              probably two or three million dollars less,
19              not more.  So we're better.  We did put in
20              the number.  We've done the calculations.  It
21              is probably closer to 30 million dollars over
22              all.  So as I said to my board, we said -- I
23              want the Court to understand and I want you
24              to understand we're paying 30 million dollars
25              with 50 million dollars of additional
```

1           availability over this period of time.  Now

2           that's an oversimplification, but I think it

3           is a stark point that Your Honor has to hear.

4           Now we can give you all the other reasons why

5           we're getting covenant relief, we're doing

6           these things and that thing, but at the end

7           of day we are putting in basic economics.

8           You say I want to put 30 million dollars to

9           get 50 to buy the bridge to an exit.  We

10          think it is all worth it because our

11          alternatives are not, and, as the experts

12          will testify by proffer or directly, there

13          was no other option but to take this or

14          liquidate, and liquidation was not good for

15          anyone as we have determined.

16          Your Honor, next to the other budget

17          -- and I point this out because we are not

18          seeking approval of something of this budget,

19          but I do want Your Honor to understand that

20          there are two columns that will talk about --

21          under the other line there is employee

22          termination cost and employee incentive

23          plans.  Your Honor, we are not seeking

24          approval for any employee incentive plan

25          today or any employee severance or other

1          costs.  The employee motion as we go through

2          it -- we stripped it down fairly

3          significantly to pay the basics.  We do

4          believe we have one controversial issue that

5          we pointed out in a revised motion that we

6          will take up today.  But other than that we

7          think we have determined it.  We are not

8          paying severance right now.  We're leaving

9          all of that for the discretion committee to

10         be formed.  We are therefore only paying

11         those expenses to be necessary and in all of

12         our motions to avoid immediate and

13         irreparable harm.

14              Then, Your Honor, we can see that

15         the low balance as of today is about 756

16         million dollars.  And that's an estimate.

17         Your Honor, the DIP facility here is -- I

18         don't think is unique anymore in the market,

19         but it is one people can question in the

20         following way:  we are seeking -- whether you

21         call it a first day role of the entire

22         facility to convert into post petition debt

23         or as you see it as a new facility taking out

24         the old facility, the fact of the matter is

25         if Your Honor approves that facility today,

 1          the company will lose bankruptcy rights.  It

 2          will lose its right to cram down, for

 3          example, or cram up the secured lenders.  It

 4          will lose the right to reinstate those debts.

 5          It understands that.  It is asking to take

 6          the full amount of loan, pay the loan down

 7          and then start going forward.  The ironic

 8          part, Your Honor, and I think the media will

 9          pick this up but it's worth the finance,

10          although we are reducing our commitment from

11          1.3 to 1.1 down to 900 eventually, we are

12          actually increasing our availability.  That's

13          just the way an ABL loan works.  If you don't

14          have enough inventory and goods to get up to

15          that cap, you are never going to borrow the

16          1.3.  We don't have that.  We are not going

17          to get up to the 1.1 or the 900 as you see

18          through this model.  Nonetheless, what we

19          have gotten to an advantage is we're able to

20          use available collateral again through Bank

21          of America the Canadian assets.  So we get a

22          better borrowing rate which gets us to

23          greater liquidity which gets us to 50 million

24          which we believe will get us to that January

25          date.  Again, we can also think of it simply

```
 1              -- if we jettison all the stores we have
 2              jettisoned, you don't need a bigger facility
 3              to put in as much inventory.  Again, that may
 4              be an after thought as to how you describe
 5              it.  The fact of the matter is we don't have
 6              the capacity to borrow that.  It is not a bad
 7              sign that we are losing our commitments or
 8              they are being reduced.  It is an economic
 9              advantage for lenders and it's one of the
10              quid pro quo for getting this many
11              facilities, but I think the message here is
12              we're getting additional availability.
13                     Your Honor, again, at the very
14              bottom of that budget -- I point this out
15              because it becomes a topic of the first day
16              papers -- you will see that we have put in
17              what we call a utility reserve.  As the code
18              has changed through 366 there is a, you know,
19              give the money, we come up with what I will
20              say is a somewhat creative way of dealing
21              with it by making an LC landlord and then
22              they can come in and object and we'll
23              resolve, which gets me back to my other
24              budget.  Your Honor, we have set the LC
25              reserves as we said in the first day motions
```

1            by two weeks.  And Your Honor knows as

2            practice, most regulatory agencies say you

3            can ask up to two months.  Once you are a new

4            debtor, if you have no credit history or if

5            you have a credit history and it is a bad

6            credit history, they ask for a two-month

7            security deposit.  The truth lies somewhere

8            between two weeks and two months.  Probably

9            that other line frankly, Your Honor, is our

10           ability to negotiate settlements at something

11           between that two weeks and less than -- less

12           than two months, far less than two months,

13           hopefully at two weeks, and that's how we use

14           the other line.  So it is not that we have

15           some slush fund to use.  It would be part of

16           the authority that we are seeking Your Honor

17           to approve today.

18               Your Honor, I think that goes

19           through the budget.  Now, again, I will come

20           back to the DIP, but I can move on to the

21           basic first day papers if Your Honor would

22           like to do so.  Your Honor, I heard 24

23           motions.  I think I lost count because I have

24           an agenda that's 22.  Maybe there is a couple

25           of ad hocs of 24 -- okay.  I'm not sure which

1          ones.  So if I miss one, let me know where I

2          am.

3                    THE COURT:  On the Court's calendar

4          there were 23, but we have already taken care

5          of one which was the motion for you to appear

6          pro hac.

7                    MR. GALARDI:  Well, I'm glad that

8          that one was granted, Your Honor.  I think we

9          can move.  I didn't have my own appearance

10         on -- I have not yet moved my pro hac vice.

11         Your Honor, the next motion on the agenda is

12         the motion under 105 to set an expedited

13         hearing today.  I don't know if Your Honor

14         has approved that.

15                   THE COURT:  That is approved.

16                   MR. GALARDI:  Thank you.  The next

17         matter, Your Honor, is waiting requirements.

18         It is the joint administration motion.

19         Again, Mr. Besanko has set forth in the

20         affidavit, as Your Honor can see from the

21         corporate structure, each of the entities

22         that filed affiliated in either direct or

23         indirect subsidiary or wholly owned

24         subsidiary.  Your Honor, it is not subject to

25         consolidation.  It is very clear for

1          procedural purposes.  I don't know if Your

2          Honor has questions or need anymore

3          information on that motion.

4                    THE COURT:  I have read the papers.

5          I don't have any problems with it.  It would

6          be quite normal to proceed with it in this

7          fashion.

8                    Does any party present want to

9          object to the joint administration?  All

10         right.  That motion will be granted.

11                   MR. GALARDI:  Your Honor, the next

12         motion is the motion to approve the

13         application of a claims noticing agent.  I

14         don't think Your Honor's Court nor we would

15         want to take on the noticing burden that will

16         be here.  We have sought to retain Kurtzman

17         Carson Consultants.  They have done many

18         large cases for our firm and many other

19         firms.  They are listed in those matters.

20         They do the claims.  They do the noticing.

21         They have a website.  People can find out the

22         claims.  They will do the process of posting

23         our papers, and then ultimately when we come

24         to soliciting acceptance or a rejection of

25         the plan of reorganization they will

1           hopefully serve as balloting agent for this

2           purpose because they will have the claims and

3           classifications.  I don't know if Your Honor

4           has questions about that motion.

5                   THE COURT:  Again, I reviewed the

6           papers.  I find them to be in order.

7                   Does any party wish to speak in

8           opposition to the motion?  That motion will

9           be granted.

10                  MR. GALARDI:  Your Honor, I'm now on

11          number five, I believe, on my agenda.  It is

12          the motion for the debtors to set various

13          notice of case management and administrative

14          procedures.  Your Honor, it is what I

15          understand to be a fairly standard motion in

16          this jurisdiction.  I think the only thing

17          that would need to be filled in, and maybe we

18          can come back to this at a certain point, is

19          dates for omnibus hearings would be set.  I

20          gave in part the calendar to sort of talk

21          through that.  I don't know if Your Honor's

22          preference is whether to try to set those now

23          or wait and come back to that at the end of

24          the hearing.  I think there is nothing else

25          that's controversial in that motion.  Unless

1          Your Honor has questions, I would ask to be

2          granted.

3                  THE COURT:  Any parties want to

4          speak in opposition of the motion?  It will

5          be granted.

6                  Why don't we come back at the end of

7          the hearing and set the dates because of some

8          of the other motions we'll need to take into

9          consideration when we set those dates.

10                 MR. GALARDI:  Thank you, Your Honor.

11         Your Honor, the next motion is the debtor's

12         motion.  Again, these are administrative

13         motions whereby they want to prepare a list

14         of creditors and we will submit a formatting

15         or mailing matrix, file a consolidated list.

16         As the debtors we filed the 50 largest

17         creditors.  Again, KCC is in their matrix and

18         sending the notices.  I think it is fairly

19         standard.  We prepared the top list, and we

20         will be filing schedules and statements

21         against, again, with our aggressive schedules

22         with plans and disclosure statement and then

23         we set bar dates.  We will be doing that as

24         fast as we possibly can.  We ask Your Honor

25         to grant our motion number six.

1             THE COURT:  That motion will be

2        granted.

3             MR. GALARDI:  Your Honor, moving

4        down to number seven -- and I will now say

5        I'm into what I'll call the business

6        operation motions.  Again, I think I sort of

7        see these as going from administrative down

8        to business operations, from fundamental to a

9        little bit more controversial depending upon

10        what jurisdiction you're in.  Your Honor, the

11        next motion is motion number seven.  It

12        really seeks four forms of relief.  One is to

13        authorize the company to continue using its

14        existing bank accounts; two, is to use

15        existing business forms, although it is hard

16        to say in this internet age how much you

17        actually have to check in the non-debtor

18        possession but I'm sure we have some.  So I

19        think we sought to continue to use the stock.

20        More importantly and the most important is it

21        is actually required by the DIP which is to

22        continue our cash management system in that

23        payment, the checks and balance.  We have a

24        very complicated graph of disbursements.  But

25        essentially, Your Honor, all the money comes

1          in and goes out to Bank of America and it's

2          re-lent all in the same day and goes out to

3          the disbursement accounts.  We have a number

4          of separate disbursement accounts which will

5          pay down the loan we borrowed again for the

6          most part under this facility.  Again, it is

7          automated, electronic.  The company, for

8          example, can tell me one day or two days

9          later, well, how are the sales going in those

10         GOB stores.  At the store's closing they can

11         tell me the sales are up 200 percent.  It

12         would be very difficult for Mr. Besanko

13         himself to try and change that.  In addition,

14         Your Honor, we have an intercompany that we

15         would like to be able to pay some money out

16         of the debtors estate and the banks have

17         agreed to this to a Hong Kong facility

18         intercompany.  That is a servicing agent.  It

19         helps us to get contracts with our foreign

20         vendors abroad that don't have -- that are

21         not in this jurisdiction for doing business.

22         It is a small amount of money.  It is

23         essentially to payroll for those people

24         working there.  Again, the banks have

25         consented to that.  It is money that goes out

```
 1              of the system.  We would ask Your Honor -- if
 2              Your Honor has questions about it, I don't
 3              think I can to tell you every bank account or
 4              every disbursement account, Your Honor, but I
 5              can tell you Mr. Besanko has control over
 6              those funds, understands where the funds
 7              flow.  If we were in the treasury department,
 8              we would have to face substantial
 9              difficulties if we were actually to try to
10              belie closing accounts, opening accounts and
11              different accounts.  It would also be a
12              default under our DIP document and they are
13              comfortable in our system.  I don't know if
14              Your Honor has any questions about that.
15                   THE COURT:  Any party wish to speak
16              in opposition to this motion?
17                   The Court did have one question with
18              regards to the order that you sent us.
19              Apparently what I would see as a
20              typographical error as it appears on Page 6
21              at the bottom, paragraph nine is not finished
22              in the form order that was submitted to the
23              Court.
24                   MR. GALARDI:  I think we submitted a
25              revised one for exactly that reason.  We
```

1          noticed that this morning.  What we can do is

2          get you a copy of a new order and obviously

3          Your Honor can review it, and if it meets

4          Your Honor's approval we can submit that.

5                    THE COURT:  Thank you.  With that

6          change, that's approved.

7                    MR. GALARDI:  Your Honor, the next

8          motion is a motion for interim and final

9          orders of waiving of the investment and

10         deposit requirements.  Again, the Bankruptcy

11         Code under Section 345 makes sure that we put

12         our investments in safe investments.  We --

13         ordinarily because we think that the banks

14         are safe and generally in this instance

15         because it is a very much revolving line,

16         it's actually -- as I was talking with the

17         U.S. Trustee -- don't believe it is really

18         our money.  It goes down and we borrow it.

19         So it's really in their possession.

20         Nonetheless, as the U.S. Trustee pointed out,

21         Bank of America, Wachovia, I believe, were

22         already collateralized companies.  So to the

23         extent we're going to get any relief on the

24         interim relief we will -- we do in turn have

25         to let the U.S. Trustee know about the bank

1          accounts.  It is without prejudice for them

2          to get comfortable that either they need

3          these collateralization agreements or they

4          don't, but I think on an interim basis they

5          are content, and we'd ask for Your Honor to

6          waive them on an interim basis and come back

7          on a final hearing if someone should, in

8          fact, object to our continuing to be free

9          from the burden of 345.

10         THE COURT:  Anybody wish to be heard

11         on this motion?  Okay.  That will be granted

12         on an interim basis.  That would be one of

13         the hearings, I assume, you will need to set

14         as part of an ongoing series?

15         MR. GALARDI:  Yes, Your Honor.  As

16         we now get into that, that's a perfect

17         introduction to the next set of motions.

18         Again, it is my understanding and generally

19         my practice, Your Honor, that notwithstanding

20         the fact that I haven't styled the rest of

21         these first day motions where I have what I

22         will call the bankruptcy payments, that

23         notice being what it is is not absolutely

24         perfect on one day.  So -- and we have tried

25         to reach out to people we think would be on

1           the committee.  My understanding is there

2           would be pretty much interim relief and we

3           would probably talk with the U.S. Trustee

4           again in the spirit of irreparable damage or

5           harm notwithstanding the fact we are getting

6           relief.  What I would suggest with respect to

7           relief -- and we will talk about each one.

8           There is only one thing when it comes to the

9           employee one that I would like that to be

10          interim.  Otherwise with respect to the

11          motions, my understanding is it would be

12          interim, it would change the orders out, it

13          will send what I call a negative notice

14          deadline.  If you object, we'll come back to

15          the first omnibus hearing.  And if you don't

16          object, it automatically goes final.

17                  THE COURT:  That would be the

18          Court's preference.

19                  MR. GALARDI:  Okay.  That will work

20          because our budget, again, Your Honor,

21          assumes the number of payments.  Obviously we

22          are not going to push all the money out

23          because I know Your Honor has read this -- we

24          are authorized but not directed to make all

25          of these payments.  So just because it is on

1          the budget we have a disbursement covenant.

2          We want to make sure we satisfy that.  There

3          is not one's entitlement to any of this

4          money.  We will be negotiating as best we

5          can, but I think it is a good way to have us

6          come back to the Court again and put more

7          fine print on it where we stood actually if

8          someone wants to object to where the

9          committee comes and says I don't think you

10         should be making these payments which will

11         not prejudice their right on a subsequent

12         hearing.  So with that said we can make the

13         orders all have the kind of language that I

14         said, the negative notice, and we'll talk

15         about a date for objection and at the hearing

16         if there is an objection we will come back.

17         I think that makes the U.S. Trustee more

18         comfortable, and I assume it makes the Court

19         more comfortable.

20              THE COURT:  It does.

21              MR. GALARDI:  Your Honor, with

22         respect to the employee motion, I think that

23         a few things that want to -- one, I think it

24         is a fairly standard motion with maybe two

25         caveats.  First, with respect to the

1          employees we seek to pay wages, salary and

2          the ordinary health benefits.  Your Honor,

3          there is no one in this group that -- and our

4          last payroll, I believe, went out -- it was

5          either October 29th or 30th, and so, Your

6          Honor, we are actually coming up on -- the

7          next payroll would be next Wednesday.  This

8          Wednesday we will fund.  There are no

9          employees to our extent if you take the

10         strict wage and salaries that are over the

11         10,950.  So we are asking the approval of

12         that.  With respect to -- now if Your Honor

13         takes also benefits, we have asked for a

14         number of things which we think would be a

15         hardship if Your Honor does not approve.  In

16         particular we have employees that are

17         relocating.  So we have asked for relocation

18         expenses.  We have asked for business

19         expenses.  If they didn't get in their Imex

20         bill on time, it is a hardship to burden them

21         with that.  We are asking Your Honor to be

22         able to reimburse them.  We are asking Your

23         Honor to reimburse -- we have the position --

24         their health cost, those, Your Honor, are

25         fairly straight forward relief that we have

1           obtained in many courts.  Let me say the

2           hardships that we have put the employees on

3           -- we have terminated with respect to

4           retirees programs.  We are not making

5           payments to retirees given the financial

6           budget that we have.  It is just an

7           unfortunate fact between paying retirees

8           additional benefits versus having money to

9           run the operation, which I have described as

10          a 60 and not 120 day case.  We've decided to

11          terminate certain of those funds.  In

12          addition, Your Honor, we are seeking again

13          for employment moral issues to continue the

14          401(k) match for the time being, the

15          company's share of the 401(k) match.  What we

16          have stopped, Your Honor, and what we are

17          going to encourage employees to make a

18          decision about, we have a supplemental 401(k)

19          program.  The company has a match to that

20          supplemental 401(k) program and the employees

21          have to opt for tax benefits at the beginning

22          of the year to continue to make those so they

23          get tax benefits.  Unfortunately, Your Honor,

24          that's a funded plan that's in a Rabbi trust.

25          I'm not sure if Your Honor understands that

1          that's subject to the claim of general

2          creditors.  So at the very least the company

3          decided we will terminate -- we can do this

4          fix -- terminate our contribution to that

5          supplemental 401(k) as soon as possible,

6          meaning today.  With respect to the

7          employees, unfortunately -- and we've tried

8          to figure out how to stop them from making

9          those contributions.  We have decided to let

10         them have that election to do that.  However,

11         that could have tax implications if they do

12         so.  So they will have to pick between paying

13         money into a trust that will be subject to

14         the claims of unsecured creditors or taking

15         the tax implications.  We tried to explain

16         that to people but that was the best we can

17         do under the plan, and so we have asked for

18         authority and the board approved last night

19         to give them that option.  But what we also

20         did, Your Honor, is we're not allowing them

21         to make an election for 2009.  That, we could

22         do.  So that will stop in 2009.  It is just

23         an unfortunate fact that you can't stop for

24         the employees the contribution, but we will

25         try to get them and tell them to advise their

```
 1              tax advisor.  That was one thing we
 2              terminated.  We also terminated, Your
 3              Honor -- and this we can do -- is we
 4              terminated the company's stock purchase plan
 5              which the employees can do as a regular
 6              payroll.  So instead -- and they elected to
 7              do this -- and, again, Your Honor, we are in
 8              a public company.  So we can't simply say,
 9              before we filed, stop this, we have
10              information.  So we have done that because we
11              don't -- unless the employee wants to go out
12              in the market and buy the stock we think it
13              is time to terminate that and not any longer
14              have that.  We have information that they
15              don't have it and we don't want to have them
16              deduct for payroll for future stock
17              purchases.  So we have terminated that.  Your
18              Honor, there is a list of programs that we
19              have also changed.  It is histrionically the
20              case that the company has got -- the
21              employees got paid time off, and if they left
22              and they had paid time off, they would get
23              that payment.  We have changed the program
24              such that if you leave the company you do not
25              get a cash payment for the paid time off.
```

1          Again, it is an unfortunate fact, but given

2          our liquidity situation we have decided to do

3          that.  That said, those people will still be

4          able in the ordinary course of business to

5          use their paid time off as if we had not

6          filed Chapter 11.  So if they have vacation

7          time, and subject to the needs of the

8          company, and they can take that time off,

9          they can use it and be paid for that paid

10         time off in the ordinary course.  And the

11         difference between paid time off and vacation

12         is it just covers -- whether you have a

13         family day or vacation day or sick day we

14         don't ask the reason.  We give you a certain

15         amount of paid time off.  Employees are still

16         allowed to do that.  Again, you just can't

17         take the next month off.  Obviously it is

18         subject to the needs of the company.  Your

19         Honor, we have a severance plan which we have

20         made no determination, but obviously, Your

21         Honor, under the circumstances it would be

22         difficult for us to get approval ultimately

23         on a severance plan, but, again, I have put

24         money in the budget to talk about what we are

25         going to do.  It is a committee issue, not a

1          today issue.  So we have essentially punted a

2          number of what I will call the other benefits

3          for another date to come back without -- we

4          reserve all rights to come back to the Court

5          to ask for that.

6               That then brings us to probably the

7          most unfortunate, controversial part of that

8          motion.  As I mentioned in my opening

9          statement, Your Honor, on Thursday and Friday

10         we terminated nearly 700 employees at the

11         corporate level.  Since it is a one location,

12         Your Honor, we gave them a 60 days Warn Act

13         notice.  The Warn Act says you have to give

14         notice and essentially your termination is

15         effective 60 days before or you would have to

16         pay the person back wages if you didn't get

17         the notice.  Again, we gave the notice saying

18         you would be terminated 60 days hence.

19         Notwithstanding that fact, Your Honor, there

20         are two cases which we cited in our amended

21         motion that have taken under BAPCPA the case

22         that says -- well, under BAPCPA you're going

23         to have to still show administrative expenses

24         under 503(b)1, and clearly we have laid off

25         these employees.  We have no intention at the

         1          present time to recall them just to work.  It

         2          is a head count reduction.  So I can't stand

         3          before Your Honor and say we are going to get

         4          a post petition benefit from those people in

         5          particular.  The payroll that that accounts

         6          for is roughly 1.1 or 1.2 million dollars a

         7          week.  Your Honor, based upon just general

         8          -- the mood at the company, the employee

         9          moral, the need in the community, the company

        10          determined after seeing that it had in fact

        11          this option, that we would still like to pay

        12          the payroll to those people for the next

        13          eight weeks.  That said, Your Honor, as I

        14          described to the U.S. Trustee in that -- and

        15          one of the reasons that we think it is

        16          interim relief is we understand that there

        17          could be -- we're not going to be -- we will

        18          be supporting the employees to get them their

        19          wages.  We don't have a severance plan as I

        20          mentioned.  We sort of suspended it.  At the

        21          very least, Your Honor, in thinking about it

        22          what we have decided to do is ask Your Honor

        23          to have the relief to continue next week the

        24          payroll.  It would be one thing to send them

        25          home Thursday and Friday telling them you

1          have a paycheck coming and, oh, by the way,

2          we filed on Monday morning and now you have

3          no paycheck.  I think that would be

4          devastating to the community and devastating

5          to the morale of the company.  And after

6          talking -- and again Mr. Besanko can testify

7          to this -- we have asked for authority to

8          continue the payroll.  That payroll number is

9          in our payroll numbers in the DIP budget.  It

10         is in every form of DIP budget that -- we

11         haven't highlighted it as a separate line

12         item but up in the operating expenses the

13         payroll is there for the benefit of those

14         people who have always been there.  We

15         happened to find a case that came out two and

16         a half weeks ago that says we didn't have to

17         do this, and, again, we have been working

18         very hard with the employees to make sure

19         this is a smooth landing.  Indeed they were

20         very encouraged, notwithstanding being laid

21         off, and frankly very positive about the

22         company and the steps the company took.  So

23         we just couldn't see a good reason other than

24         saving money, but it is a significant amount

25         of money, other than to pay them.  So with

1          that we would ask Your Honor, again, on this

2          one part of the relief, that Your Honor

3          approve that we continue to pay the payroll,

4          but, again, it could be visited by the

5          committee two, three weeks from now and if

6          the committee wants to object to it, we will

7          defend it and they will be the person

8          objecting to so we can do the payroll.

9                    THE COURT:  That would be

10         retroactive relief.  That would be continuing

11         it out through the Warn Act period?

12                   MR. GALARDI:  Correct, Your Honor.

13         Again, our view would be, you know, see it as

14         a two week notice sort of provision.  That's

15         the worst it would be if they got cut off.

16         Again, the company feels strongly that we

17         should have the eight weeks and it should be

18         a moral issue.  Again, to put it in further

19         context we have the store closings.  We are

20         giving people warn notice there.  They just

21         happened -- they got the notice prebankruptcy

22         but they are still working post bankruptcy.

23         So they are going to get the 60 days in any

24         event because the case doesn't really apply.

25         They have provided a benefit and the

```
 1              termination does not.  So there will be

 2              disparate treatment of our employees.  So

 3              just because we could not have them not

 4              operate the store, it all seems unfair to us

 5              do that.  So, again, the company felt very

 6              strongly, and Mr. Besanko is in the

 7              courtroom, could talk about the employee

 8              moral in those matters, but we have sought

 9              that relief.  Again, at the very least we

10              would like to come back on an interim basis

11              and let the committee look at it.  We didn't

12              think it was fair to ask for the full relief

13              but the company's intention is to pursue the

14              entire eight weeks.

15                   THE COURT:  All right.  Very good.

16              Does any party wish to speak in opposition to

17              this motion?  All right.  The motion will be

18              granted and the Court will -- with the

19              proviso that the terminated 700 employees --

20              that would be on an interim basis to give the

21              community an opportunity to come in and

22              object if they wish to do so.

23                   MR. GALARDI:  Your Honor, what I

24              think we will do is we will do an employee

25              order and make it specific.  I think we call
```

1        them the warned employees in our motion.  So

2        we will say interim relief with respect to

3        the Warn Act and you will have X period of

4        time to object to that and we will come back

5        and set a hearing.  I don't want the rest of

6        the employees stuff to be seen.  Again, they

7        have --

8              THE COURT:  I understand exactly

9        what you are saying.  That will be -- that's

10       not interim relief.  That is -- it will be

11       approved today.

12             MR. GALARDI:  Thank you, Your Honor.

13       Your Honor, the next matter is a fairly

14       standard motion to pay prepetition sales use

15       and trust fund taxes.  Again, there are

16       disputes as to whether these are priority

17       claims, whether secured claims, whether they

18       are even property of the estate.  The U.S.

19       Trustee's Office wants us to pay our taxes.

20       Most people want us to pay our taxes.  We

21       don't want to incur any interest or other

22       payments on it.  Again, a lot of it is not

23       even property of the estate.  We seek the

24       relief, Your Honor.  It is basically up in

25       our standard operating expenses.  It is more

```
 1          of an accident of timing than it is that we
 2          have not paid these things at any given time.
 3          It would be hard to decipher what is pre and
 4          post, and we would ask Your Honor to approve
 5          our continuation of plain sales, use and
 6          trust fund taxes.  Again, there are often
 7          personal liabilities associated with failure
 8          to pay them.  If you don't pay them, there is
 9          also an administrative issue at the end of
10          the case if you've left them out for such a
11          long period of time.  We rather not face
12          those issues.  They are secured.  They are
13          priority.  So we would ask Your Honor to
14          approve the sales use and pay trust fund
15          taxes.
16              THE COURT:  That motion will be
17          granted.
18              MR. GALARDI:  Your Honor, we now get
19          to my procedural motion that is with respect
20          to Section 366.  Your Honor, as I described
21          at the outset the company obviously has 700
22          and some stores.  We are seeking relief with
23          respect to the utilities.  Under Section 366
24          as amended the process is essentially that
25          the debtors have to make a proposal within a
```

```
 1          certain period of time.  I believe it is 20
 2          days.  Then what a utility can do is say is,
 3          no, I don't like that proposal, and then you
 4          have to give the utility -- if you haven't
 5          resolved that issue on the 30th day, you have
 6          to give the utility what it requests.  To
 7          take account of that and not have all the
 8          money go out the door and have to pull it
 9          back and have all of those fights, what we
10          have to devise is a motion which has been
11          approved in number of jurisdiction whereby we
12          set up first day and we say here's what we
13          are prepared to give the utilities.  We are
14          prepared to give the utilities the right to a
15          blocked account at the Bank of America that
16          is a separate, segregated fund of 5 million
17          dollars.  We give them a form very much
18          styled in a letter of credit form that says
19          we say you're in default.  We draw the
20          amount.  Bank of America, just like an LC,
21          has to not inquire whatsoever.  Whether
22          there's a default or there is not, it pays
23          it.  We then, like a wrongful draw on an LC,
24          we would go back and say now that was wrong
25          but then our dispute is with the utility if
```

1           they make that wrongful draw.  We think that

2           amount of fund, two weeks for all of the

3           utilities at 5 million dollars, is

4           significant.  So we think we have given them

5           adequate protection.  It is the other

6           security element of 366.  Notwithstanding

7           that, Your Honor, they don't have to accept

8           it and that's what 366 says.  So what we try

9           to do is to say, okay, if you don't have to

10          accept it, we need you to come in and tell us

11          what form of your security we would like.  We

12          set a deadline to do so and we ask Your Honor

13          to have a hearing before that 30th day so

14          that we can resolve it.  Again, money doesn't

15          go out the door only to come back in because,

16          Your Honor, if that's two weeks and you

17          really need two months, you are talking 20

18          million dollars and that puts this case into

19          no availability in the first weeks.  Also,

20          Your Honor, we have 155 stores and we have to

21          pay utilities to all of them and we have to

22          be out of them by the end of December.  We've

23          paid them in advance for all of those months

24          and then we have to come back.  So we'd like

25          to deal with that one on one.  We don't think

1           that this prejudices the utilities because

2           they still have all of the state law rights

3           and they can still ask for two months, and,

4           Your Honor, it sounds like we'll have

5           thousands and thousands of utilities here on

6           the 29th.  Generally speaking we have

7           resolved all of these with respect to

8           stipulations.  We seek the authority to do

9           that.  And as I said, Your Honor, in all

10          candor we have an other line which where we

11          do exactly that and we can negotiate.  We

12          want to keep it to two weeks.  We may in

13          certain instances do more.  We may in certain

14          instances try to do less if we find out, but

15          we don't need to give utility deposits or if

16          we could use old security deposits in the

17          close of stores.  So we would like to have

18          the authority to implement that procedure

19          without prejudice to the utility companies

20          coming in and acting on their rights.  I can

21          give you what they will say in response to

22          this.  They will say never got a receipt.

23          And we'll have those arguments but we

24          generally have resolved it, and I think it is

25          generally a procedural motion to get us

1          through 29 days from now.

2                    THE COURT:  Does any party wish to

3          speak in opposition to this motion?  Mr.

4          Johnson.

5                    MR. JOHNSON:  Your Honor, Russell

6          Johnson here on behalf of Virginia Power and

7          several Virginia entities, Duke Energy,

8          several energies, Progress Energy,

9          Consolidated Energy Company of New York, and

10         several northeast utility companies.  Our --

11         I don't disagree that the debtors need

12         procedures here.  It is a big case and a lot

13         of utilities.  Essentially a few arguments.

14         One a legal argument and one procedural.

15         With respect to the motion to the procedural

16         objection I have, Your Honor, is that I think

17         there should be an objection deadline.  This

18         procedural -- we make a request, they get to

19         look at it and decide whether or not it is

20         okay, and then three days before the hearing

21         they'll let us know whether or not it is okay

22         and then there will be a hearing.  I just

23         don't think that is really what's proper.  I

24         think we should be able to object to this

25         motion to procedures that are set forth and

1        still be heard before the 30th day.  I think

2        if we're going to have a hearing before the

3        30th day I think that's fine.  I don't have a

4        problem with them seeking these procedures

5        but I think my client should have the right

6        to object to them.  There is nothing in this.

7        This is a final order that basically says

8        these are the procedures, you have filed

9        them, and for some unfortunate utilities that

10       don't get this notice or get it too late they

11       will be forever barred from seeking adequate

12       assurance.  I think that's improper as well.

13       I'm only representing my client that are

14       actually here.  So, Your Honor, I would

15       request that there be some deadline, maybe 10

16       days before the hearing date, that we can

17       object to these procedures.  I haven't had a

18       chance to read through the whole thing.  I

19       tried to digest as quickly as I can to get a

20       lot of the notice of this hearing this

21       morning.  So that's the first issue.

22            The legal issue, Your Honor, is

23       essentially the debtors are here under

24       Section 363(c)3.  They are under the

25       provision that says they can modify the

1          adequate assurance of the utilities as deemed

2          satisfactory under (c)2.  That's fine.

3          That's what they are here for.  If you go

4          back to (c)2, my client -- we don't want a

5          segregated deposit fund.  That's not what we

6          would choose as the form of adequate

7          assurance.  My clients would want a cash

8          deposit as the form.  So we don't think that

9          the debtors have the ability to modify the

10         form.  My clients would be asking for cash

11         deposit, and all the 366(c)3 allows them to

12         modify is the amount.  It says very

13         specifically in there that they can modify

14         the amount of the (c)2 deposit.  It does not

15         allow them to modify the form.  So my clients

16         would be fine accepting a two week or 15 day,

17         whatever it is that they are proposing, cash

18         deposit to tide this over until the matter is

19         heard, whatever the 29th or 30th day is

20         whenever the Court can schedule a final

21         hearing.  We don't want this segregated

22         account which may or may not be there at some

23         day in the future.  They even put it in their

24         motion whether or not they are going to be

25         able to fund this thing.  So we want the

1           actual cash to tide us over because that is

2           the type of adequate assurance we would

3           request.

4                    THE COURT:  Let me see if I

5           understand.  We are still dealing with 366(b)

6           thought, right?  All 366(c) is doing is

7           defining some of the terms for purposes of

8           figuring out what's adequate assurance

9           payment under 366(b).

10                   MR. JOHNSON:  No.  A chapter 11 case

11          like this it is really all 366(c).

12                   THE COURT:  I understand the

13          procedures in 366(c).  Didn't we have the

14          same liquidity in the Rowe case.

15                   MR. JOHNSON:  Well, Rowe was a cash

16          deposit.

17                   THE COURT:  I understand.  What you

18          are objecting to is that it shouldn't be a

19          draw for the most part on the letter of

20          credit.

21                   MR. JOHNSON:  It would be better if

22          there's a letter of credit than a segregated

23          bank account.

24                   THE COURT:  That's the way it is set

25          up for block account so the reserve is there

1          under the --

2                    MR. JOHNSON:  Well, they still have

3          financing.  If they lose financing, the

4          segregated account presumably would be gone

5          as well.  There is nothing said about that,

6          but I have to assume -- if they lost

7          financing or have a reduction in financing,

8          what will happen to that segregated account?

9          That has not been made clear in the motion.

10         That's why we would prefer to have cash until

11         this matter is heard on the 29th or 30th,

12         whatever day the Court schedules for this.

13                   THE COURT:  All right.  And tell me,

14         as I'm a little bit unsure about your first

15         objection to the procedures, what is it

16         procedurally that you want to object to?  You

17         don't like the fact that they are making the

18         offer and you have to then have a

19         counteroffer or do you want to object to them

20         being able to establish a procedure on first

21         day motion?

22                   MR. JOHNSON:  The objection would be

23         to the entire motion which would be, one,

24         that a segregated account can't be the proper

25         form of adequate assurance.  It's got to be

```
 1                 cash.  That would be the first thing we would
 2                 like to object to, which we all have the
 3                 opportunity.  This is the final order on the
 4                 first day of the case that they are proposing
 5                 that then sets -- requests the utilities have
 6                 to send these requests to all of these
 7                 various folks that have all of these things
 8                 in it.  We would send requests for charts and
 9                 account information with things like that
10                 anyway.  I think this goes over the top of
11                 all the stuff they are asking in there, but
12                 then they can get a period of time where they
13                 have to look at it.  Because we have five
14                 days before this determination, five business
15                 days prior, and then three business days
16                 prior they have to respond to us letting us
17                 know whether or not they agree with our
18                 adequate assurance requests and then the
19                 matter gets heard.  That seems like a pretty
20                 crazy timetable.  We would like to have an
21                 objection out there and have this Court hear
22                 our objection on all of these procedures and
23                 not have to wait and give them some request
24                 and if we don't give them the request by the
25                 proper time and deemed to have waived it.  I
```

1         just don't think that we should have to fit

2         into that whole thing and comply with their

3         procedures which aren't even set forth in the

4         statute.   The statute doesn't provide for

5         these procedures.   The statute says we make a

6         request or they can, you know, make a request

7         but -- and they can move to modify.   That's

8         all the statute provides.   And I don't have a

9         problem, as I said, with this matter being

10        heard before the 30th day, but I certainly

11        want it to be heard before the 30th day with

12        a final hearing on what their Section 366(c)3

13        motion seeking to modify our request would

14        be.   I think this throws the whole thing out.

15        If we make a request, we're -- what pleading

16        do we have before the Court?   We don't have

17        any pleading before the Court at all.   We

18        have a request that we sent to them and then

19        we will be back before this Court if we don't

20        agree on the request that we sent.   We have

21        no pleas, we have nothing before the Court at

22        all under these procedures.   The final order

23        is being entered, we get to send some

24        request, and then there is a hearing.

25                  THE COURT:  All right.  Thank you.

```
 1                    MR. GALARDI:  Your Honor, two

 2          responses.  First, I have no problem if

 3          everyone of Mr. Johnson's clients are carved

 4          out from this motion, and the reason I have

 5          no problem is that I don't need a procedure

 6          for them because the Bankruptcy Code -- all

 7          we're trying to do is actually jump the gun

 8          for the Bankruptcy Code because you start

 9          with (b), and what (b) says is that a utility

10          can terminate service or discontinue if

11          within 20 days after the day of order of

12          relief we don't furnish adequate assurance of

13          payment in the form of a deposit or other

14          security.  We're not 20 days now.  I don't

15          need this procedure.  I'm trying to jump the

16          gun to give people something.  So if every

17          one of his clients wants to step out of this

18          procedure, I will write an order today that

19          Mr. Johnson's clients don't have to comply.

20          He doesn't want that.  He wants his money

21          now.  The problem with that is the code

22          doesn't say he gets his money now.  What it

23          says is if after 20 days I make an offer of

24          form of security -- and we're basically

25          saying we're making an offer and here it is
```

```
 1            two weeks.  6(i) in (c)1(a) says other forms

 2            of security that's mutually agreeable.  We

 3            know Mr. Johnson.  I know him from good

 4            cases.  He's not going to find it acceptable.

 5            So what does the Bankruptcy Code say?  Well,

 6            in that instance you either get to an

 7            agreement, now we're in (c)2, in 30 days or

 8            they can terminate.  Fine.  Then what we do

 9            is after the 30 days is a (c)3 when we come

10            back.  What we're trying to get here is

11            before the 30 days so we can't terminate.  So

12            I have two solutions.  One, let's just carve

13            him out.  A procedural objection is therefore

14            relevant.  He wants to take an appeal on this

15            kind of order.  He's always wanted to do

16            that.  So let's carve him out, he's not

17            applicable, and he can make an offer

18            individually and he can accept it or not.

19            And as long as we agree, and I think he stood

20            up here and said 29 days is fine, let's just

21            schedule a hearing on his request for day 29

22            and he's carved that out of the motion and

23            that objection is resolved.

24                 THE COURT:  Mr. Johnson, does that

25            resolve your objection?
```

1          MR. JOHNSON:  Yes.  I love the extra

2      commentary, Judge.  But, yes.  So carve us

3      out here on the 29th day of whatever schedule

4      you have is fine.

5          THE COURT:  To make sure you stay,

6      we're going to schedule those dates at the

7      conclusion of this hearing.

8          MR. JOHNSON:  I'm here for another

9      client as well.

10          MR. GALARDI:  Can I just ask that he

11      put the name of his clients on the record.

12          MR. JOHNSON:  Yes.  Progress Energy

13      in Florida, Progress Energy in Carolina,

14      Dominion Virginia Power, Dominion East Ohio,

15      Dominion North Carolina Power, Dominion

16      Peoples, Dominion Hope, the Consolidated

17      Edison Company of New York, Yankee Gas

18      Services Company, Public Services of New

19      Hampshire, Connecticut Light and Power,

20      Western Massachusetts Electric, Duke Energy

21      Carolinas, Duke Energy Kentucky, Duke Energy

22      Indiana and Duke Energy Ohio.  I think that's

23      all.

24          THE COURT:  Thank you, sir.

25          MR. GALARDI:  And with respect to

1                that, Your Honor, at the same time I think

2                our order provides that once he's carved out

3                then we can reduce the 5 million dollars by

4                two weeks for each of those utilities so the

5                five million will come down and there will be

6                no reserve for any of those clients.

7                       THE COURT:   That's how I understand

8                it to work as well.   The motion with that

9                adjustment will be approved.

10                      MR. GALARDI:   Thank you, Your Honor.

11               Your Honor, the next matter -- and I'm glad

12               he's in Virginia and we can do that the first

13               day instead of coming back for a hearing.

14               Number 12, Your Honor, is the next motion up.

15               It is debtors' motion for an order

16               authorizing the continuation of certain

17               customer practices.   Your Honor, most of the

18               obligations that we have are not cash

19               obligations.   There's the gift cards.

20               There's the warranties.   So there is no

21               number in our budget for that, but obviously

22               we could technically under the Bankruptcy

23               Code say today, sorry you have your gift card

24               and you can't collect.   You come buy goods

25               with it.   You're not going to get a refund.

1          You're not going to get a warranty.

2          Obviously we're trying to reorganize.  Maybe

3          if we were liquidating the first day, that

4          would be the smartest relief.  In order to

5          make -- as I said in the introduction, to get

6          customers back in the store, to have the foot

7          traffic, to get the margins, we simply have

8          to honor those things.  The only cash number

9          other than honoring those kinds of things,

10         which are warranties which are often provided

11         by third parties, is the one we have -- we

12         have a weekly refund that we occasionally

13         have.  And so we're on budget for customer

14         practices.  You will see a 1.1 million dollar

15         number each week.  I can't say that that's a

16         hundred percent accurate of the refund we

17         took up a model what it is during this

18         period.  We would like to be able to refund

19         people's money if they are not happy with

20         Circuit City goods.  We think it is critical

21         to the business to have customer satisfaction

22         as I have said in the introduction.  As Mr.

23         Besanko will testify, one of the issues we

24         have is a very low customer satisfaction, and

25         our job now is to bring the customers back in

1           foot traffic.  We think it is critical to the

2           operation of the business.  I don't know if

3           you'd like to hear testimony from Mr. Besanko

4           on this or any of the other people I have

5           available, but we would ask Your Honor to

6           approve the customer practices.

7                THE COURT:  Any party wish to speak

8           in opposition of this motion?  All right.

9           This motion will be approved.

10               MR. GALARDI:  Thank you.  Your

11          Honor, I am now up to item number 13 on the

12          agenda, which again is the prepetition

13          relief.  It's prepetition shipping and

14          delivery charges.  Obviously with goods going

15          across the country through all sorts of

16          shippers and vendors, many goods will be

17          caught up currently in transit.  We may owe a

18          certain amount of shippers amounts of money.

19          Sometimes we get letters from those shippers

20          that we are not going to deliver those goods.

21          We are going to essentially get a warehouse

22          lien or other lien on those goods if you

23          don't pay us either the prepetition amount or

24          some amount.  We are not going to deliver

25          those goods.  What this motion says is we

```
 1              estimate there could be as much as 10 million
 2              dollars in transit or prepetition amounts
 3              that we might not receive goods.  We believe
 4              that we would only pay these goods -- and
 5              this again is in our discretion -- only if
 6              those shippers are owed less than the value
 7              of goods we can sell at retail.  So we have
 8              said that we could owe as much as 10 million
 9              dollars of prepetition freight.  We would ask
10              Your Honor to approve that we could make such
11              payments.  Although we can sue people on
12              state violations and all sorts of things,
13              it's probably more expensive and more time
14              assuming and too devastating to stand up on
15              those bankruptcy rights.  So we would ask
16              Your Honor to approve our ability to pay in
17              our discretion up to 10 million dollars to
18              prepetition freight to secure this.
19                   THE COURT:  Any party wish to speak
20              in opposition to this motion?  It will be
21              granted.
22                   MR. GALARDI:  Your Honor, the next
23              matter on my agenda is item number 14.
24              Again, in the normal course of business the
25              company has various contractors building
```

```
1              parts of the stores, modifying parts of the

2              stores, modifying the heating and the HVAC

3              systems in the stores.  Your Honor, as things

4              became tight we began to not pay people as

5              often or frequently as they may like.  We had

6              filed approximately about 1 million dollars

7              worth of already mechanic's liens that we

8              know of, plus when we looked at our system

9              there's probably as much as 5 or 6 million

10             dollars of potential secret liens, mechanic's

11             liens, contractors' liens that could be

12             filed.  So we have sought here again

13             authority to be able to relieve ourselves of

14             those liens in the amount of $6,500,000.

15             Again, as we sit here today we've got notice

16             of 1 million dollars.  We're not going to pay

17             people if they don't file their liens.  We

18             are not going to pay those people if they are

19             not valid, not perfected, but, again, if we

20             do have valid protected liens, rather than

21             litigate they are secured claims.  We don't

22             need to have the interest charges.  We ask

23             Your Honor to allow us to pay those even

24             though they are prepetition claims but they

25             would be secured by state law liens or
```

```
 1          otherwise and we would have to pay them by

 2          the end of the day and we would ask Your

 3          Honor to approve the authority to up 6.5

 4          million dollars.  Again, all of these are

 5          interim relief.  We can come back if we have

 6          an opposition to it.  It is only what we

 7          would have to pay in the meantime and it is

 8          close to 6.5 million dollars.

 9                   THE COURT:  Does any party wish to

10          speak in opposition to this motion?  It's

11          granted.

12                   MR. GALARDI:  Your Honor, the next

13          matter on the agenda is a motion to pay

14          various foreign vendors.  Your Honor, we

15          clearly have a lot of foreign names in

16          various pool.  We have the Samsungs, the

17          Sonys, the LGs.  That's not who we are

18          seeking to pay through these motions.

19          Instead, we are seeking to pay those people

20          who are foreign vendors that are not subject

21          to the jurisdiction of the Court and

22          enforcement of the automatic stay and whose

23          goods we actually need.  And with respect

24          that, Your Honor, again, we do have such

25          vendors.  We are asking the authority to pay
```

1          up to 6.5 million dollars to those vendors.

2          At the present time we don't know exactly how

3          much is exactly being demanded.  What we are

4          doing again is we don't have a critical

5          vendor motion here today and this is our way

6          of dealing with what we think are essentially

7          critical foreign vendors that we can't incur

8          stay violations, we can't get the goods, and

9          in the discretion of the management think

10         that we need to get those goods.  A lot of

11         these vendors often have documents and we

12         have fees remaining to pay cash at this point

13         to receive those goods, and, again, going

14         into Black Friday to the extent that we can

15         get these goods in we think it is essential

16         to our reorganization efforts, and so under

17         the Bankruptcy Code although they are

18         prepetition they are not secure.  We would

19         ask Your Honor to pay foreign vendors up to

20         the same, 6.5 million dollars.

21              THE COURT:  Anyone wishes to speak

22         in opposition to this motion?  It will be

23         granted.

24              MR. GALARDI:  Your Honor, the next

25         on the agenda is number 16 which is our

1        motion to continue our insurance policies and

2        all insurance policies, including DNO

3        insurance policies.  Your Honor, with respect

4        to the insurance we think that we are up to

5        date and all premiums are paid for the

6        prepetition period.  I don't know of

7        insurance companies that actually ever bill

8        in arrears.  In fact, they usually front load

9        it in the period.  Nonetheless, to give them

10        comfort that we have the money to pay we want

11        the authority.  As to insurance in general we

12        believe it is ordinary course type of

13        payment.  We probably don't need authority

14        but it is always good to grant this sort of

15        authority.  Your Honor, to be candid, we have

16        the DNO policy.  That's fortunate or

17        unfortunate would be -- we are in

18        negotiations with them December 1st

19        terminating obviously.  Keeping the board and

20        having people available to us is critical.  I

21        have had a lot of experiences.  I expect

22        insurance companies under the circumstances

23        will probably raise our premiums but we

24        wanted to come into court to let you know

25        that we are in fact negotiating it.  We do a

1        big number of this budget of 9 million

2        dollars.  We are hoping that we can do much

3        less than that, Your Honor, but to keep our

4        board, to keep the management and everyone

5        operating and to feel comfortable with their

6        responsibilities and not to be concerned, we

7        do think it is an ordinary course.  We will

8        try to keep the number as low as possible.

9        As I have explained to the board at times,

10       you know, once you're in bankruptcy Your

11       Honor determines the outside of the ordinary

12       course and whether it is appropriate.  It is

13       really the tail period and what's going to

14       happen here, and to keep the people who have

15       been most familiar with the company and

16       management we think it is essential to

17       approve our being able to negotiate in good

18       faith the lowest possible premium to secure

19       the insurance the company has historically

20       had.

21              THE COURT:  I agree.  I think it is

22       ordinary course.  I will certainly grant this

23       motion.

24              MR. GALARDI:  Thank you.  Your

25       Honor, the next one is, again, somewhat of a

1     procedural motion that we use.  It gives us

2     some help with respect to vendors.  It is a

3     motion seeking four forms of relief.  The

4     first form of relief is just confirm that if

5     somebody has goods in transit and they

6     deliver them post petition they will be paid

7     for those goods post petition.  It is a

8     benefit to the estate.  It is a 503(b)1, but

9     in many times in my experience that people

10    call -- if I deliver these goods today am I

11    going to get paid for them?  It is almost a

12    comfort order for the average person.  Here's

13    the order.  See the title.  The Judge says we

14    can pay this.  We've already gotten calls

15    today from vendors saying, how do I know

16    you're going to pay me tomorrow?  How do I

17    know you have the authority to pay me

18    tomorrow?  This order solves that problem and

19    we think it is an abundance of caution

20    relief.  The second part of this is to say we

21    pay in the ordinary course.  The third is if

22    we get goods that we want to return -- and

23    again it has to be something we want to

24    return.  There are buckets I believe in the

25    facility that says you can't just return

1          anything.  But if it is really stuff that's

2          better to return, we want authority to

3          return.  And finally we established

4          essentially a notice procedure for people to

5          file reclamation claims.  It is not really

6          procedure in the sense of paying and

7          reconciling it.  It is just confirming that

8          you have to give us the demand under the

9          Bankruptcy Code in 20 days.  We reserve all

10         of our rights.  You reserve all of your

11         rights.  It does not preclude people from

12         coming in.  If they want to get TRO and

13         injunction in an adversary proceeding, it

14         doesn't preclude them from doing it.  We are

15         reserving all of our rights for defenses, but

16         it is a way that we can set procedures for

17         them to file it and then start to gather

18         these claims.

19              Why is it important to the debtors

20         at this time really leads into the next

21         motion is that we need to -- actually it is

22         another motion, 503(b)9.  There's an

23         interplay as Your Honor knows from BAPCPA

24         between reclamation claims and 503(b)9

25         claims.  503(b)9 claims are not really

1           perfect reclamation claims.  They're within

2           the 20 days as opposed to the 45 days.  Those

3           are all constituting the administrative

4           claims and secure claims that we have to

5           address.  Given the time frame in which we

6           are trying to run this case we think it is

7           very advantageous to have bar dates

8           immediately with respect to periods so we can

9           start to gather the information to formulate

10          a plan and what we would have to do to exit.

11          We would ask Your Honor to approve it.  I

12          know there is a gentleman in the courtroom

13          that has a warehouse, and what we have agreed

14          is that -- and this will go to the other

15          motion.  We are not going to return his goods

16          in that sense.  He keeps his lien to the

17          extent he has a lien and we've discussed the

18          relief and this is not trying to change any

19          of his rights whether he has a warehouse lien

20          or another property in that.  I don't know if

21          there is anybody else that concern about this

22          motion.

23               THE COURT:  Does anybody wish to

24          speak to this motion?

25               MR. ENGLANDER:  Yes, Your Honor.

1          Good afternoon.  Brad Englander.  I represent

2          Alliance Entertainment Corporation Source

3          Interlink Media, LLC.  My clients basically

4          supply CDs, DVDs to the debtor and all their

5          stores and other related merchandise.  Some

6          of what my clients do is sell products.  Some

7          of it is warehouse products and provide for

8          fulfillment services.  I don't think we have

9          an opposition to the motion itself.  I think

10         we have very little opportunity to review the

11         form of the order.  I understand from Mr.

12         Galardi's comments that there is an

13         opportunity still to object to these orders

14         being entered on an interim basis and that

15         there is not an attempt here to deprive us in

16         connection with the return provision, in

17         particular substantive rights that are

18         available under applicable documents not

19         bankruptcy law or bankruptcy code.  So we

20         don't oppose the entry of the order if in

21         fact it is still subject to some sort of an

22         objection period and we can work with the

23         debtor to develop some language that gets us

24         a comfort level.

25                THE COURT:  That was certainly my

1          understanding being entered on an interim

2          basis until such time we can get any

3          objections resolved, and it's also my

4          understanding or at least my interpretation

5          what was being asked for is really to confirm

6          basically what is in the bankruptcy code and

7          really not anything -- any additional

8          substantive rights?

9                    MR. ENGLANDER:  I think mostly

10         that's correct, and I think that's what the

11         intent is.  We have concerns whether some

12         language in particular dealing with return

13         rights might leave out protections the

14         Bankruptcy Code provides us, but I think we

15         will be able to work through that.

16                   THE COURT:  Very good.  Thank you.

17                   MR. GALARDI:  And, Your Honor, I can

18         affirm I think it is the Bankruptcy Code.

19         The only language I've ever had objected to

20         is sometimes people had goods returned to

21         them objected and they actually have to

22         accept the goods, and our language may be a

23         little ambiguous on that point.  But, again,

24         we can make that in terms of we can resolve

25         it, and we are not trying to do anything but

1           to get an order to shippers to deliver goods.

2                       THE COURT:  Very good.  On that

3           basis the Court will approve the motion.

4                       MR. CARRIGAN:  Your Honor, this

5           Daniel Carrigan from McKenna, Long and

6           Aldridge on behalf of the Bethesda Office,

7           LLC, one of the debtors vendors.  I apologize

8           to the Court and counsel.  I was unable to

9           hear a good bit of what Mr. Englander and the

10          other gentleman had to say.  I suspect we

11          will come out in the same place, but if I

12          may, Your Honor, may I outline some of the

13          things we think need to be addressed in

14          connection with this motion.

15                      THE COURT:  You may.

16                      MR. CARRIGAN:  Thank you, Your

17          Honor.  The paragraph two of the proposed

18          order indicates that the vendors shall have

19          administrative expense claims with the

20          appropriate priority.  However, paragraph

21          three says -- and I'm not sure whether this

22          is contrary to counsel for the debtor had to

23          say -- but they are authorized but not

24          obligated to pay the undisputed obligation

25          arising from post petition shipment for

```
1            delivery of goods, and that would be
2            something that on a final basis would have to
3            be addressed.  Secondly, in connection with
4            the provisions for the reclamation claims and
5            the 503(b)9 claims the paragraph -- I think
6            proposed paragraph 5(d) indicates that in the
7            event the debtors and the reclamation
8            creditors agree upon and allow reclamation
9            amounts, the debtors would be authorized to
10           make payments or be required to return the
11           goods sought to be reclaimed.  If this is too
12           far down the line, the notion of an actual
13           return of goods is going to be -- or goods
14           the vendor wants to get back is going to be
15           somewhat illusionary.  So if there is a
16           relatively short time between -- and the time
17           there's a hearing perhaps on an interim
18           basis, it would work, but we would ask it is
19           not a license for the debtor to do whatever
20           it wants with products in the interim that
21           would be outside applicable law.
22                THE COURT:  All right.  Very good.
23           The Court was going to approve the order on
24           an interim basis so that these types of
25           objections could be made.  And I suppose we
```

1        would do that within the next 30 days.

2                    MR. GALARDI:  Your Honor, I was

3        thinking that all of the ones that are on

4        interim would be the first time which is

5        hopefully in the next 30 days.  So I have no

6        objection to that.

7                    THE COURT:  Were you able to hear

8        that?

9                    MR. CARRIGAN:  No, Your Honor, I was

10       not.

11                   THE COURT:  We will set that -- we

12       will approve the motion on an interim basis

13       reserving your objections as you have

14       outlined them, and we have that hearing at

15       the next omnibus hearing date which would be

16       within the next 30 days.  We will set those

17       dates at the end of this hearing.

18                   MR. CARRIGAN:  We understand.  Thank

19       you, Your Honor.

20                   THE COURT:  Thank you.

21                   MR. GALARDI:  Your Honor, I would

22       ask now to move out because they are related

23       and I looked down and I guess my agenda got

24       changed.  If we can move to item 21, which is

25       really the motion to procedures with respect

```
 1          to 503(b)9 claims.  I think it is fairly

 2          straightforward, Your Honor, and it is a

 3          procedure that we have adopted.  As Your

 4          Honor is aware, the BAPCPA changed the

 5          Bankruptcy Code to provide the claims for

 6          goods delivered to the debtor in the 20 days

 7          prior to the bankruptcy that a person may

 8          seek to file an administrative claim under

 9          503(b)9.  Your Honor, again, it is a very

10          significant change to the Bankruptcy Code

11          because it sets up administrative expenses

12          that would have to be paid to exit bankruptcy

13          because a 503(b)9 claim is a 507(a)2 claim

14          which then has to be paid under 1129(a)9.  I

15          like giving all of those numbers.  Your

16          Honor, it is important to us to set a bar

17          date for that and to give out a proof of

18          claim form so we do not let those linger.  In

19          addition, because of the language the cases

20          unfold, especially with a retail debtor, you

21          have the overlay of 526 and I have to be

22          litigating whether 502(d) is applicable,

23          whether you can then use a preference defense

24          to various circuits.  These are all

25          initiatives.  And it is just helpful to get a
```

1          bar date set for all of these so we can sort

2          of say, well, if you didn't get your

3          reclamation, congress changed that.  I

4          understand what the gentleman said, but

5          congress changed it.  Their only right right

6          now, unlike the old code, is to take back the

7          goods as secure credit.  It is no longer

8          about administrative claims they used to get.

9          This gives us administrative claims.  If you

10         fail to do certain things, gives you proper

11         demand but it is in a 20 day window.  For

12         those reasons, Your Honor, we would like to

13         establish the bar date set for in that motion

14         for people filing 503(b)9 claims.  We don't

15         think it's a hardship that -- they can

16         probably calculate what they believed they

17         delivered in the last 20 days and file a

18         proof of claim.  I think we have given 30

19         days as we've requested.  We will give notice

20         out to people, including a form of order to

21         our vendors and ask that they file a proof of

22         claim within 30 days of the entry of the

23         order for 503(b)9.  I know the official proof

24         of claim form says you don't have to file

25         administrative claims for post petition

1          claims but it still constitutes that you can

2          use administrative claims for prepetition

3          period.  I don't know if that was intentional

4          or just an action that happened to work for

5          us.  So we basically take that form and give

6          them a proof of claim form that says 503(b)9.

7          It is actually 30 days to a date of service

8          of the bar date.  That's what we ask for,

9          Your Honor.  And we think that will help

10         coordinate in all the work we have to do in

11         the first 60 days in this case to understand

12         what kind of financing we need to make a

13         hurdle in that 60 days to 120 days I

14         mentioned early on.

15              THE COURT:  Any parties wish to

16         speak in opposition of this motion?  All

17         right.  That will be approved.

18              MR. GALARDI:  And that was item 21,

19         Your Honor,

20              MR. CARRIGAN:  Your Honor, excuse

21         me.  I'm sorry.  This is Dan Carrigan again.

22         I hate to be the left wing in this

23         discussion.  May I be heard on this, please?

24              THE COURT:  Yes, you may.  This son

25         setting a bar date on reclamation claims.

1          MR. GALARDI:  On 503(b)9.

2          THE COURT:  503(b)9 claims.  I'm

3     sorry.  Thank you.

4          MR. CARRIGAN:  Yes, Your Honor.

5     There are probably a fair number of

6     reclamation creditors who are out there who

7     from past experience in the courts in

8     Delaware and New York and Florida that we

9     found that the negotiation of the terms of

10     the parties -- while we have no objection to

11     setting one and getting it under way, and

12     we're not trying to be obstructionists and be

13     a problem, I think my client and we would

14     like to be helpful in this.  I think counsel

15     for the debtor referred to it as lets get a

16     vendor before we're planning all of this and

17     we would as well as soon as possible.  But

18     perhaps the way to do this would be to give

19     people an opportunity -- set the bar date but

20     give opportunities to folks, reclamation

21     creditors in particular, and then perhaps

22     even an ad hoc group or official committee to

23     come in and ask for modification or changes

24     without prejudice at this stage instead of

25     being stuck with what I'm hearing is most

1   people have not had the opportunity to

2   review.

3   THE COURT:  I don't know if I

4   understand your objection.  Are you saying

5   that you don't think there should be a bar

6   date or do you say that the bar date being

7   suggested here is an unreasonable bar date?

8   MR. CARRIGAN:  No, Your Honor.  We

9   agree that there ought to be a bar date.  We

10   don't have an objection to setting one out in

11   the future, but as to the terms how the

12   reclamation claims are established or not

13   established, burden of proof and all that

14   sort of thing, those sorts of things are also

15   addressed in the bar date order, and that all

16   we are suggesting is those terms, not the bar

17   date itself, but the terms ought to be open

18   for some review and discussion before they're

19   fixed at the only way to get a reclamation

20   claim established.  I'm sorry, 503(b)9

21   established.  So there could be a short

22   period during which this would be sent out,

23   and if you have problems with the form and if

24   nobody objects or nobody responds, then there

25   is no need for a hearing and it can go

1          forward on the basis of here.  If people do

2          object, if people do respond, then perhaps

3          have a final hearing on the terms of the

4          503(b)9 process.

5                    THE COURT:  So what you're saying is

6          you don't have any objection to establishing

7          the bar date but that you want the approval

8          of the order on an interim basis with regards

9          to the claims procedures set forth in

10         paragraph eight of the proposed order?

11                   MR. CARRIGAN:  Yes, Your Honor.

12                   THE COURT:  Okay.  Do you wish to

13         speak to that?

14                   MR. GALARDI:  I do, Your Honor.

15         There are two problems with it.  First, I

16         don't think we change any burden.  I think

17         503 has the burden.  It is an administrative

18         claim.  I believe they have to show a -- you

19         know, they have to carry their burden to

20         satisfy this.  I also don't see this as

21         changing any burden to requesting.  And what

22         we are really requesting is to facilitate

23         this, and I think what is quite consistent is

24         proof of delivery within the 20 day period in

25         which they have to do to file a claim.  We

```
1              just made it very clear.  The only thing
2              we're doing is we're asking that we make it
3              clear in the 20 days.  I think that each
4              individual vendor -- and very much like any
5              other bar date, Your Honor, if they don't put
6              in all of this information, we have to do an
7              insufficient documentation they should not
8              have a right.  You still have a claims
9              process.  You still have a resolution.  So we
10             don't think we have done what he's objecting
11             to.  The second thing is, if we don't put
12             something in here for these kinds of
13             procedures for what's necessary to file a
14             proper claim, we can't sent the notice to set
15             the 30 days because people won't tell us the
16             information.  So it is pretty much a useless
17             process.  They can put in one piece of paper
18             that says I assert a claim for 10 million
19             dollars.  So that doesn't do us any good
20             because.  The whole purpose -- like any other
21             administrative claim they have to carry their
22             burden and show there was a delivery, where
23             it was delivered, to whom it was delivered
24             and what value was delivered, and that it was
25             delivered in the ordinary course.  And if you
```

1          go through our procedures, that's exactly

2          what it asks.  It says they must identify the

3          particular invoices very much like a

4          reclamation demand.  They have to say what

5          claims that they have reclaimed.  So if they

6          have filed both a reclamation claim in 20

7          days and 503(b)9, that's different

8          implications for a state.  One could be

9          administrative.  One, they have to show they

10         had goods on hand on the date.  503(b)9 --

11         you just don't have to be on hand.  We could

12         have sold those today and it doesn't matter.

13         So that's all you need to know.  Which one do

14         you want to assert here?  The next section

15         says must include certification that the

16         goods were sold in the ordinary course of

17         business.  That's what the statute says and

18         it has to be ordinary course of business.  So

19         it tells us it has to be ordinary course of

20         business.  It is not different than the proof

21         of claim form that filed under proof of

22         perjury.  So we think all we've done is

23         broken out what would be required to carry

24         the burden in this first instance.  And I

25         think if we take those procedures out, I

1           don't think it gets in another.  That being

2           said, if somebody doesn't satisfy this, I'm

3           sure Your Honor for excusable neglect or any

4           other OGA standard can say, okay, they didn't

5           put in a piece of paper but that's not enough

6           to disallow their claim, and that's claims

7           projection profits.  We are really trying to

8           get notice and as much information as we

9           think is legitimate in 30 days.

10              THE COURT:  Well, as I understand

11           the objection that's stated as far as the

12           terms are concerned it's not disagreeing that

13           they shouldn't be in the order but just on an

14           interim basis so they might have an

15           opportunity to study them and see if some of

16           these procedures are objectionable given the

17           fact they have only had notice of this

18           offense in this case for, you know, not even

19           10 hours and not had a chance to look at it.

20           And so if there is something in here that

21           would be for some reason burdensome or

22           something, they would have an opportunity to

23           come back and say perhaps they should get

24           some other form of relief.

25              MR. GALARDI:  And, Your Honor, I

1        have no problem with that on an individual

2        basis.  For example, this gentleman comes in

3        -- and even if it is after the 30 day bar

4        date, if someone comes in and says I didn't

5        satisfy this particular and the debtor is now

6        raising an objection past that, my

7        understanding is that they can always come

8        back and say these procedures don't bind me.

9        Just because I didn't attach invoice five

10       doesn't mean I don't have a 503(b)9 claim.

11       I'm not saying these procedures to be all and

12       end all.  Now, they don't have an invoice at

13       the end of the day.  So I don't think it is

14       precluding them.  If we put the procedures

15       in, I guess my only question is let's assume

16       we go forward, let's assume the procedures go

17       out, and let's assume 30 days from now

18       someone says I want to change the procedures.

19       Well, I have just mailed notice to a large

20       number of creditors.  What does that do?  I

21       have do another notice.  No.  I think what it

22       does is if you comply, fine.  If you don't

23       comply, Your Honor has the equitable power to

24       say, look, I remember the dialogue on the

25       record.  I remember somebody complained about

1          it.  I'm not going to live by the letter of

2          procedures.  This is not supposed to be a

3          technical hurdle.  This is supposed to be to

4          get the debtor information.

5                    THE COURT:  All right.  Counsel on

6          the phone, do you have anything further that

7          you wish to say?

8                    MR. CARRIGAN:  Just two

9          observations, Your Honor.  One is

10         establishing excusable neglect and what have

11         you.  It's a different exercise than

12         establishing that there is a special problem

13         with the -- and I'm not saying this is a

14         special problem.  Please understand that.  It

15         is just that if you're going to have -- I

16         don't know how many 503(b)9 claims they are

17         anticipating, but apparently it is a big

18         enough number that they would anticipate a

19         sort of one size fits all approach to them,

20         and given that situation and also the

21         situation that in 503(b)9 it actually says

22         after notice of a hearing there shall be

23         allowed administrative expenses for including

24         and in this case the value of the goods and

25         so forth.  They are also asking for a

```
 1              certification in here that the goods were

 2              delivered in the ordinary course of the

 3              debtors' business.  That is an easy basis for

 4              objection as to how would you know what the

 5              debtors' -- ordinary course of the debtors'

 6              business with respect to that particular

 7              vendor who is filing.  So I think it is not a

 8              question of a wholesale changes in this

 9              thing.  It may be -- if any.  But at least it

10              is an opportunity for people who have just or

11              just seeing this for the first time to say in

12              my experience this has all always led to

13              something maybe that's not even foreseeable

14              in its current form on the first day.  And in

15              virtually every other case, Fleming,

16              Ameriserv and others where we have this kind

17              of order that has taken place after a sum-up

18              to study the procedures and have an

19              opportunity to suggest changes to the debtor

20              and if not to the debtor to the Court.

21                   THE COURT:  All right.  Thank you.

22              The Court has had the opportunity to study

23              this order, and I have looked at the claims

24              procedures that are set forth in the order.

25              They appear to be very reasonable to me.  And
```

1          I understand the debtor's concern about

2          getting notice out and having to make sure

3          that that notice gets out within the time

4          frame.  So the Court is going to overrule

5          your objection to the motion, and I'm going

6          to grant the debtor's motion as it is in its

7          entirety.

8          MR. GALARDI:  Your Honor, again, you

9          can hold me to this, we are not trying to

10         hold -- change the burden.

11         THE COURT:  I understand.  I think

12         in saying that I think the Court can deal

13         with the kinds of issues that counsel has

14         raised in objection on a case by case basis

15         as they come up.  So one size doesn't fit

16         all.  The Court can certainly deal with those

17         kinds of exceptions on a case by case basis.

18         MR. CARRIGAN:  Thank you, Your

19         Honor.

20         MR. GALARDI:  Thank you, Your Honor.

21         Your Honor, now we are on 18 which Your Honor

22         is the, I guess, guard to pay all of this

23         relief that we have now asked for and Your

24         Honor has granted.  We need approval of our

25         debtor and possession financing.  Your Honor,

1          with respect to this, again, I will defer to

2          Your Honor as to the witnesses.  First of Mr.

3          Besanko is, in fact, in the courtroom today.

4          He submitted an affidavit.  I have two other

5          people that if called as witnesses could also

6          testify with respect to the findings with

7          respect to there is no other financing.  The

8          names are Mr. Robert Duffy of FTI Consulting

9          and Mr. Bernard Fountain of Rothschild . Your

10         Honor, just very briefly, again, I think in

11         stark -- to give Your Honor -- if Your Honor

12         doesn't mind, I will proffer in general the

13         testimony as to those three.

14              THE COURT:  That will be fine with

15         me.  I will let anybody who wishes to

16         cross-examine anybody, put them on as

17         witnesses if someone wants to cross-examine,

18         but otherwise I'm willing to accept the

19         proffer and I have read the affidavit.

20              MR. GALARDI:  Your Honor, thank you.

21         With respect to this, and I will tell it more

22         as a history and any of the three gentlemen

23         could be called as a witness, could testify,

24         that debtors in prepetition were in agreement

25         with the lenders lead by the agency Bank of

 1          America with respect to the 1.3 billion

 2          dollar commitment, that as debtors proceeded

 3          to have liquidity issues they began

 4          negotiations with the current bank group

 5          regarding potential financing options.  In

 6          addition, that the debtors explored through

 7          their restructuring personnel and themselves

 8          alternative types of financing, whether it be

 9          on an unsecured basis, a junior basis as well

10          as a priming basis.  Your Honor, what the

11          debtors have found is there is no other DIP

12          financing and for very good reasons.  As I

13          mentioned at the outset and as the witnesses

14          would testify, first of all, and as Your

15          Honor is well aware, the market currently for

16          getting financing has been an incredibly

17          difficult market.  Second, retail lending and

18          ABL lending is an incredibly difficult

19          market, and as we went through this and as

20          the witnesses will testify we happen to have

21          three or four major retail lenders in the

22          group already.  So in order to obtain a

23          different type of financing we would have to

24          go to a different type of lender.  We have,

25          for example, Bank of America, Wells Fargo and

```
1              GE.  And if Your Honor reads the papers and
2              sees the other debtors in possession of the
3              retail world, it's one of those three that is
4              engaging in all of the lending.  So we
5              pursued our lending with respect to other
6              potential lenders.  Rothschild is out
7              soliciting alternative lenders.  As I
8              mentioned in my presentation and as Mr.
9              Besanko will testify we did secure or have
10             commitment or a proposal to secure second
11             lien financing with a potential bank group or
12             potential lender group -- they are not banks
13             -- for second lien financing.  We have gotten
14             all the way to a commitment letter that had
15             covenants with respect to which we are still
16             open but wanted a 4 million dollar sort of
17             downstroke to keep the commitment to get to
18             the December 3rd date and we didn't know what
19             the covenants were.  We just couldn't get
20             comfortable that the covenants would be the
21             same as the ones that are in the current
22             banking facilities that we are seeking
23             approval for, and indeed we were concerned
24             the covenants would be even stricter and
25             therefore potentially cause us to default.
```

```
 1                    In addition, Your Honor, in looking for that

 2                    facility we went back and went through an

 3                    analysis with the company, and Mr. Besanko,

 4                    if called as a witness, would testify that he

 5                    considered and the board considered and the

 6                    advisors considered other forms of financing

 7                    and other restructuring alternatives.  The

 8                    company considered just simply saying it is a

 9                    Chapter 11 liquidation, let's simply go out

10                    and do all the store closings.  Fortunately

11                    or unfortunately, there are too many

12                    retailers currently right now in that

13                    process.  So you even get people to bid --

14                    for example, on our 155, all we kept hearing

15                    was there was not enough capacity in the

16                    market to have that sort of thing nor did we

17                    think it was wise.  The board has determined

18                    that there is a hope for this company to

19                    either restructure itself -- the gentleman on

20                    the phone has already said he would support a

21                    vendor plan.  And we have -- and as Mr.

22                    Rothschild would testify and as Mr. Fountain

23                    would testify Rothschild was retained to

24                    pursue strategic alternatives with respect to

25                    the 366 sales.  As we stand here today we
```

```
 1              have significant interest from a number of
 2              buyers, and some of those buyers are
 3              including possibly providing subordinated
 4              financing.  None of those buyers were
 5              prepared on this term to give us their first
 6              lien facility.  No one is prepared to prime
 7              the Bank of America, and the debtors are
 8              simply not prepared to go into a priming
 9              fight on the first day because of the kind of
10              instability that will lead to business.  Nor
11              was anybody in a secured loan facility
12              willing to step outside and do their own
13              facility.  They are right now doing all the
14              retail cases together and they are
15              particularly willing to take a greater
16              commitment to provide the financing
17              separately so one group could stay with the
18              same bank group.  There was no lender
19              prepared to do a subfacility in that group
20              that would have provided the liquidity that
21              we needed on the time we needed with the
22              covenants that we needed.  And then the
23              company considered the use of cash
24              collateral.  Your Honor, based upon a review,
25              and it makes sense in this instance, if you
```

1       look at the inventory value, we are currently

2       getting -- I think it is about 75.5 percent

3       on cost of inventory based on the appraisal.

4       Currently the company has approximately 1.2

5       or maybe even more, 1.3 billion dollars of

6       inventory.  So we believe that the lenders

7       are over secured at this particular point in

8       time -- and if called to testify -- based

9       alone on the inventory, and there are other

10       additional assets.  Your Honor, we could have

11       tried to do a priming fight for that reason,

12       but there would have been fights, fees, and,

13       as I said, re-instability of the business.

14       Nonetheless we pulled out our bankruptcy code

15       and tried to determine whether the use of

16       cash collateral can satisfy us here or

17       nonessential cash collateral.  As we explored

18       the cash lateral option originally, the cost

19       of such a cash collateral, especially in this

20       market is, one, the company was doubtful it

21       could simply live off cash collateral by

22       itself.  Though we don't get a lot of

23       availability the 20 million dollars is enough

24       to make a cushion as Your Honor sees in the

25       motion, and it get us through a time.  As we

1          go into essential cash collateral it was our

2          belief that and the company's belief that you

3          would get just as restrictive covenants as

4          you see the packages that you're getting

5          today with respect to the covenant packages.

6          Even in cash collateral you get a restrictive

7          covenant package and it is not free.  It's

8          very expensive and maybe as close.  As Mr.

9          Daunton (Ph) would testify and Mr. Duffy

10         would testify, it is not clear that the cost

11         of a consensual cash collateral be all that

12         much less than what Your Honor sees here.  We

13         also considered let's try to avoid the fees

14         altogether and let's think about

15         nonconsensual cash collateral arrangements.

16         Frankly, we threw that at the bank group and

17         that is what basically got us to the facility

18         that we have.  There was an earlier date by

19         which we would had to have a subfacility.  We

20         got that to the January 17th date.  At the

21         date that we threw that in the bank's way we

22         had four covenants.  We got down to two

23         covenants.  Again, Your Honor, to start a

24         case with a nonconsensual use of cash

25         collateral, one, we are not sure we can live

1           with cash collateral by itself, two, you

2           don't have an LC facility with cash

3           collateral, and, three, you start a case

4           telling your vendors we are going to live all

5           cash collateral.  It doesn't send a good

6           message to the vendor community, and Your

7           Honor may know the Wall Street Journal has

8           always said the reason we are here we

9           couldn't get a DIP facility.  That's not

10          true.  We could get it.  We just had to get

11          the best one we could under the market.

12              With respect to facility itself,

13          Your Honor, we did have a discussion with the

14          U.S. Trustee a little it bit about disclosing

15          the fee letters.  We have opposed and filed a

16          motion under seal to not disclose fee

17          letters.  That being said, we have disclosed,

18          as I said in a gross term, and we can use

19          gross in many ways, we have used gross in the

20          terms of the fees and advisory fees with

21          respect to this.  The number that I have

22          given you, the 30 million on that page, is

23          really 27.  Those are all fees, all expenses

24          for all the parties.  We don't think it was

25          -- we filed the motion under seal.  It is for

1          pricing for Bank of America and other

2          lenders.  We decided it was not appropriate

3          to give the specifics of those fee letters,

4          but for disclosure to the Court those numbers

5          do include all of the fees and the price tag

6          for the facility.  Your Honor, again with

7          respect to what we are obtaining for this, we

8          are obtaining, I think, in just basic --

9          obviously when you go into bankruptcy you

10         have a default.  If you have a default, you

11         cannot get a commitment to lend and lenders

12         do not have to lend to you.  We are getting

13         our commitment to lend and to continue the

14         commitments subject to the borrowing base.

15         The commitments are being reduced, but as I

16         mentioned earlier, and Mr. Besanko will

17         testify, we don't have sufficient collateral

18         to get up to the cap.  We don't expect to

19         have sufficient collateral to get up to that

20         cap.  So we don't think we are getting up to

21         anything in this term, at least with respect

22         to the short term commitment.

23                THE COURT:  Why do you have the cap

24         so high if you don't expect to get there?

25         Because you have an unused commitment fee,

1           too.

2                 MR. GALARDI:  There is a commitment

3           fee.  Well, there's two things.  One, people

4           like to see big numbers, and it is important

5           to say I have a commitment.  And if we had

6           gone to 1.3 to 900, we would have more

7           questions that I would have to answer right

8           now.  Two, if we are successful, if we get

9           vendor terms, if we get credit terms, and we

10          get the goods in, we can then borrow more.

11          We just can't be sure.  At this point on this

12          model with these conservative estimates it

13          was simply the fact.  So to pay for a fee to

14          have the luxury of having a facility, indeed

15          as Mr. Besanko will testify, when we first

16          got the 1.3, we never thought we would get

17          there.  What we got concerned about is in

18          October and given trade terms, what we

19          thought was we would actually end up getting

20          there.  So the good news is we didn't get

21          there, and the bad news is we didn't get

22          there because we didn't get enough goods in

23          to be able to borrow as much as we would like

24          to.  So, again, you like to have a nice

25          facility so you can tell the lenders in press

1          releases that we have a bank group that's

2          giving us 1.3 billion dollars.  We have a

3          bank group that's giving us 1.1 billion

4          dollars.  So we have reduced the commitments,

5          but, again, we think we are living within the

6          commitments.  And it was a significant point

7          to the bank group to reduce the commitments.

8          So although we get very close to the

9          commitment of 1.1 and eventually the 900

10         comes in the December period, it was

11         important in part of the deal that the bank

12         group wanted was they would reduce the

13         commitment.  They are financial incentives

14         for banks to not have outstanding commitments

15         in the same amount.  So it was a prid pro quo

16         in one of the terms.  In addition, as I

17         mentioned, the prid pro quo was that this

18         facility rolled on the first day or be taken

19         out on the first day.  Again, Your Honor,

20         Kirkland and Ellis, whose application will be

21         put forth, has done most of the debtor work.

22         Kirkland and Ellis has reviewed the security

23         package to the perfection of liens, believes

24         they are properly perfected liens, and as

25         Your Honor knows, that binds the debtor but

1          it doesn't bind the committee to go and

2          review that.  So we were comfortable with

3          what -- two things, one, that they were

4          properly perfected and, two, that they are

5          fully secure.  So consequently -- and given

6          that that was another term, that it is not a

7          take it or leave it.  I don't say that.  We

8          had back and forth negotiations on slow

9          rolls, fast rolls.  The problem with the slow

10         roll going into the interim hearing is it's

11         hard to figure out what's actually rolled and

12         what's not rolled.  So in this sense it is

13         almost as if a new facility is being created

14         post prepetition with a different collateral

15         package.  So we agreed to the role of the

16         facility on the first day to turn it into a

17         post petition.  Again, as I mentioned before

18         and as being advised by the board and the

19         advisors, we agreed that we would be giving

20         up certain bankruptcy types of leverage that

21         we can have.  Again, as the advisors would

22         testify to, if you're going in Bank of

23         America, GE and Wells, you have to come out

24         if you are going to come out with Bank of

25         America, GE or Wells.  So they have

1          litigation essentially between, you know,

2          exit financing as well.  So in this context

3          we thought that, you know, we are not going

4          to have a fight at the end of the case as to

5          whether I can reinstate the debtor, whether I

6          can cram up the secured lenders.  We're going

7          to need a friendly face at the end of this if

8          we can exit.  In addition, Your Honor, even

9          in a 366 sale we understand enough about the

10         retail market that there is very good

11         likelihood if somebody wants to acquire this

12         they are going to go to GE, Bank of America

13         or Wells.  So, again, it was to take an issue

14         off the table.  I understand why the banks

15         did it and these were results of

16         negotiations.  Your Honor, we started these

17         negotiations with respect to DIP financing,

18         including a subordinated financing probably

19         over a month ago, one, to keep out of

20         bankruptcy and another.  It has been

21         remarkable actually given the market.  The

22         back and forth, give or take, the

23         negotiations as I have already mentioned,

24         including the last seven or eight days when

25         people thought we would be filing a week ago,

1          there was a bank group set with a -- asserted

2          default deadlines and a void date facility by

3          December 3rd with four different covenants

4          that we were very concerned about meeting and

5          paying as I like to say 30 million dollars

6          for 50 million dollars availability for four

7          weeks just wasn't palpable to the company.

8          We then pulled out the card of the

9          nonconsensual cash lateral.  We had back and

10         forth negotiations with Bank of America whose

11         agent was helpful.  We had back and forth

12         negotiations with GE and Wells Fargo.  We

13         couldn't find another financial, but it gave

14         us the opportunity to say no to the

15         subordinated facility and essentially in the

16         company's mind buy us 60 days to come to the

17         next bridge as I like to say.  Again, nobody

18         can guarantee these projections.  No one can

19         guarantee that we make these projection but

20         we think they are reasonable under the

21         circumstances given the uncertain market.  It

22         provides us sufficient availability.  It has

23         limited covenant testing.  We are testing on

24         December 13th.  We have a minimum

25         availability that we have to maintain.  We

1          have some covenants and essentially a block

2          that we can't go below 50 million dollars,

3          and I think it's the end of December or end

4          of January.  There are step-downs as I have

5          mentioned, financial covenants, or rather we

6          go from a no covenant deal to what I will

7          call a covenant deal, but they are not that

8          aggressive covenants.  There are certain

9          clean-down provisions.  As we've said they'd

10         have to go from 50 million dollars from

11         January 4th through January 10th.  We have a

12         facility that we need to have a subordinated

13         facility.  If called to testify both Mr.

14         Daunton, Mr. Besanko and Mr. Duffy would say

15         that the negotiations with Bank of America

16         over these facilities is characterized by arm

17         strength, good faith negotiations.  Mr.

18         Besanko would testify the absence of such a

19         facility, we have not -- we have basically

20         been on freeze for the last seven days, that

21         we are beginning to go into irreparable harm

22         because we would be unable without a facility

23         to secure goods that we need to get to Black

24         Friday.  This is a critical time in the

25         business, and absent that we have had trucks

1          turned around as late as yesterday with

2          respect to this, and we need this money

3          immediately, that our business will suffer

4          irreparable harm, that we have some

5          availability but very limited cash.  Without

6          this facility we will have greater

7          uncertainty in our workforce.  We will be

8          unable to meet our payrolls as we have been

9          concerned for the last week, that we would be

10         unable to obtain goods in the short term and

11         not pay our rent and all of the expenses.  So

12         absent relief in this facility and absent

13         payment of this facility the company will

14         suffer immediate and irreparable harm.  In

15         addition, the advisors and Mr. Besanko will

16         testify the company was unable to secure

17         unsecured financing, financing on a

18         subordinated facility and indeed any other

19         alternative DIP financing.

20              Your Honor, also I just wanted to be

21         clear with respect to the motion, and I know

22         there are a couple of people in the

23         courtroom, the facility is essentially one

24         priming only itself and the prepetition debt

25         that it has.  Your Honor, there is an

1           indemnity and there is a prepetition lien,

2           and that essentially stays in case somebody

3           wants to undue the facility at a certain

4           point and say go back to the prepetition

5           position.  Your Honor, it is carved out for

6           two -- I don't know how we end up saying it,

7           but there is no nonconsensual priming of any

8           good valid first liens.  So the gentleman who

9           may have a warehouse lien, if it is a good,

10          valid perfected lien, there is no priming of

11          those liens.  We are not asking for a

12          nonconsensual prime.  To the extent that

13          we're permitted prior liens in the bankruptcy

14          document we are not priming those liens.

15          We're still permitting prior liens.  What

16          happens is the bank group's collateral

17          package now expands and by expanding that

18          package it is not priming.  It is taking a

19          second with respect to anything that has

20          previous liens.  In addition, Your Honor,

21          there are landlords here.  They are not

22          taking a first lien except to the extent

23          perhaps the leases permit them to take so or

24          the mortgages.  They are confined to their

25          state law rights.  With respect to that they

1          are not trying to prime them.  They are not

2          taking a lien on the leases themselves unless

3          they are permitted to do so and they are

4          taking a lien on the proceeds of such leases.

5          I think that is one of the concerns I had

6          heard from the lenders' counsel.  Excuse me

7          one second.  I'm sorry.  Just to clarify,

8          they are not taking any liens on any leases.

9          It's just the proceeds.  I think the language

10         says that, Your Honor.  Your Honor, I don't

11         know if anyone wants to cross-examine Mr.

12         Duffy, Mr. Daunton and Mr. Besanko.  I don't

13         know if Your Honor has questions that I can

14         answer.  Each one, in particular Mr. Besanko,

15         we have looked through the factual findings

16         that Your Honor has called upon that there

17         are stipulations.  Mr. Besanko has read that.

18         The debtor finds that they are true and

19         correct to the best of his knowledge.  To the

20         extent they are not we just conclude that

21         there are some that are legal in nature.  And

22         so we would ask Your Honor to approve the

23         financials, but I can subject any of those

24         gentlemen to cross-examination.

25                 THE COURT:  Does any party wish to

1          be heard on the motion or cross-examine any

2          of the proffered witnesses?

3               MR. POLLACK:  David Pollack.

4               THE COURT:  Mr. Pollack, hold off

5          just a minute.  I have another counsel at the

6          podium and I will come back to you.

7               MR. LEHANE:  Good morning, Your

8          Honor.  Robert LeHane, Kelley Drye and Warren

9          on behalf of landlords with approximately 80

10         locations, Developers, Diversified, General

11         Growth and Morning Garden Realty.  I believe

12         my comments will be similar to Mr. Pollack's.

13         If not, I'm sure he will follow up.  I had a

14         brief conversation with counsel for the

15         lender and counsel for the debtor before the

16         hearing.  One of the concerns the landlords

17         had in addition to the question of the direct

18         lien on the leases was lenders access to

19         store premises and collateral access in the

20         event of default under the DIP facility, and

21         the parties have agreed that the lenders

22         rights in the event of default will be

23         limited to whatever rights they have under

24         state law, whatever relief Your Honor is

25         willing to grant them on a motion on notice

1           and adequate time for landlords to respond or

2           whenever rights landlords gives them on

3           consent.  I just wanted to put that on the

4           record, Your Honor.  Thank you very much.

5                    THE COURT:  Thank you very much.

6           Any other party?  I will come back to you,

7           Mr. Pollack.  I haven't forgotten you but I

8           have other people that will speak first.

9                    MR. MATSON:  Good afternoon, Your

10          Honor.  Bruce Matson here on behalf of Bank

11          of America and its agent.  I wanted to

12          confirm the bank group is in agreement with

13          the representations regarding the lease

14          issues.

15                   THE COURT:  That were just recited?

16                   MR. MATSON:  Yes, sir.

17                   THE COURT:  Thank you, Mr. Matson.

18          Any other party?

19                   All right.  Mr. Pollack.

20                   MR. POLLACK:  Fortunately, Mr.

21          LeHane has already covered my points, Your

22          Honor.  Thank you.

23                   THE COURT:  He warned me as much.

24          All right.  Very good.

25                   MR. HILLMAN:  Your Honor, David

1           Hillman, as a housekeeping matter I would ask

2           the Court's indulgence to be heard even

3           though I haven't yet filed a pro hac vice

4           application nor have I affiliated with a

5           local firm.

6                THE COURT:  You may be heard.

7                MR. HILLMAN:  We represent Panasonic

8           Corporation of North America, and Circuit

9           City is currently in possession of products

10          that have been delivered to Circuit City by

11          Panasonic.  These goods were delivered under

12          a consignment agreement, and under the terms

13          of the agreement Panasonic, not Circuit City,

14          has title to the goods.  The goods -- excuse

15          me.  The different consignment agreement that

16          was terminated prior to the bankruptcy case.

17          So Panasonic is planning on filing an

18          adversary proceeding for the turnover of the

19          goods that belong to it as well as a TRO and

20          a preliminary injunction from preventing

21          Circuit City from selling those goods.  I

22          haven't had a chance to read every clause in

23          the DIP motion, in the DIP order in the DIP

24          credit agreement but wanted to -- I point out

25          inconsistency and to make sure that the DIP

1           credit agreement and the DIP lenders or that

2           the debtor wasn't granting liens on property

3           that it does not have title to.

4                   THE COURT:  All right.  I certainly

5           don't know how it could.

6                   MR. GALARDI:  Your Honor, that's our

7           understanding.  We can affirm that whatever

8           this order says, if we don't own the property

9           and it is true, a consignment, it is not our

10          property, we are not granting liens on it.

11                  THE COURT:  Did you hear that

12          representation, Mr. Hillman, from counsel for

13          the debtor?

14                  MR. HILLMAN:  Unfortunately I could

15          not, Your Honor.

16                  THE COURT:  All right.  He confirmed

17          what the Court had said that the debtor was

18          -- nothing in the order or in the bank

19          financing is providing any kind of lien on

20          any property that the debtor does not own.

21                  MR. HILLMAN:  Thank you.  I would

22          just ask for the debtor's counsel perhaps to

23          include that reference in his final interim

24          order that's submitted to the Court.

25                  MR. GALARDI:  We have no problem

1          with that, Your Honor.  Again, we will put in

2          a sentence that says if it's not our

3          property, we are not granting liens

4          notwithstanding anything in the order.  We

5          will be anxious to get the order entered.

6                    MR. HILLMAN:  Thank you, Your Honor.

7                    MR. LUCIAN:  Your Honor, John Lucian

8          and Regina Kelbon.  We have similar concerns.

9          If I may defer to Ms. Kelbon.  I'm a Virginia

10          attorney.  We will be pro hac her into the

11          case, Your Honor.

12                    THE COURT:  All right.  Ms. Kelbon.

13                    MS. KELBON:  Thank you, Your Honor.

14          I would like to thank you for allowing us to

15          participate telephonically.  I do appreciate

16          that courtesy.

17                    THE COURT:  You're welcome.

18                    MS. KELBON:  I must say I'm having a

19          very hard time hearing Mr. Galardi who has

20          been very faint in and out.

21                    THE COURT:  That's not Mr. Galardi's

22          fault.  That's the -- the equipment that we

23          have set up is not fully functional yet.

24          We've just moved into a new courthouse and so

25          that's the reason, but we're trying to make

1          do as best we can.

2               MS. KELBON:  Thank you, Your Honor.

3          Your Honor, if Your Honor would indulge me

4          just for one moment to sort of explain the

5          relationships with the parties.  We represent

6          Cellco, a partnership doing business as

7          Verizon Wireless, and Verizon Wireless is a

8          party to a direct sales agreement with

9          Circuit City.  The relationship between the

10         parties is that Verizon Wireless operates a

11         kiosk in the Circuit City stores which is in

12         effect a separate Verizon Wireless store

13         within a Circuit City store.  Verizon

14         Wireless has a presence and is substantially

15         in all of the stores.  There is a handful of

16         them that Verizon Wireless does not operate

17         in.  Pursuant to the agreement, Your Honor,

18         Verizon Wireless establishes and operates

19         merchandising and demonstration displays and

20         offers, sells and markets Verizon Wireless

21         services.  The relationship provides Verizon

22         Wireless with complete control over the sale

23         and marketing of its inventory and services.

24         Verizon Wireless controls the kiosks and they

25         are solely responsible for hiring, training,

1          managing and terminating the employees who

2          work at kiosks.   In effect, the kiosks are

3          manned by Verizon Wireless employees.

4          Verizon Wireless also establishes the

5          pricing, the fees for its equipment and

6          services, and Circuit City has no authority

7          to sell Verizon Wireless equipment either in

8          its stores or on its website.   So all the

9          Verizon Wireless inventory is separate and

10          apart from Circuit City and is located in

11          locked storage cages.   As Verizon sells its

12          inventory it pays commissions monthly to

13          Circuit City and it also has various charge

14          back rights under this agreement for any

15          services that are disconnected within a

16          certain limited period of time.   So I would

17          just like to have confirmation in the order

18          if Mr. Galardi would be so accommodating to

19          confirm that -- make sure that nothing in

20          this priming is impacting or affecting any of

21          the charge back rights that also --

22          recoupment rights that Verizon Wireless has

23          as well as it's clear that it's Verizon

24          Wireless inventory so there can be no liens

25          granted on Verizon Wireless property if

1          either in the DIP or through the Hilco

2          motion, which I'm not sure which one is up.

3          It is very hard to hear, but it is sounds

4          like the DIP order that you are referring to

5          right now.

6                    THE COURT:  It is the DIP order that

7          we are referring to right now, and I believe

8          Mr. Galardi has already made mention that he

9          doesn't intend to take a lien on any property

10         the debtor does not own.  I will have him

11         confirm that now.  He's at the podium.

12                   MR. GALARDI:  Your Honor, we confirm

13         again that we are not taking or granting any

14         liens on any property that is not property of

15         the estate.  I would also note, Your Honor,

16         that Verizon has a contract with the company

17         and nothing we are doing is changing the

18         rights of Verizon or any company and to

19         reserve all of our rights and they have all

20         of their rights under the contract.  But to

21         the extent they keep it in a locked area and

22         it is not our property, we are not granting

23         any liens in the DIP facility with respect to

24         Verizon property.

25                   THE COURT:  Ms. Kelbon, were you

1          able to hear that exchange?

2              MS. KELBON:  Not really, Your Honor.

3          I'm sorry.

4              THE COURT:  Again, it was

5          represented to the Court that the debtor is

6          not taking any interest in any property

7          that's not property of -- is not granting any

8          liens of any not property that's not property

9          of the debtor and to the extent Verizon

10         maintains its own inventory in locked places

11         they are not taking or granting any liens on

12         Verizon property, that they are subject --

13         that there is a contract between Verizon and

14         the debtor and that, you know, controls this

15         and they're reserving all of their rights

16         under the contract.

17             MS. KELBON:  That's fine, Your

18         Honor, if we can include something like that

19         in the order as well as that we are rightful

20         and charge backs are protected as well.

21             THE COURT:  That would be governed

22         by the contract.

23             MS. KELBON:  That is correct, Your

24         Honor.  I don't want anything in the priming

25         order to be deemed to be impacted on our

1            rights or --

2                    THE COURT:  I think we can put a

3            sentence in the order that says it is not

4            impacting your usual rights under the

5            contract.

6                    MS. KELBON:  Thank you, Your Honor.

7                    MR. CARRIGAN:  Your Honor, David

8            Carrigan.  Again, I apologize for

9            interrupting if there's anyone else that

10           needs to be heard.

11                   THE COURT:  I don't know but there

12           is nobody else at the podium right at the

13           moment.  You may proceed.

14                   MR. CARRIGAN:  Thank you, Your

15           Honor.  Ours is a two party creed.  One, is

16           this one of the motions that will be brought

17           on for the final hearing on the next omnibus

18           hearing date?

19                   THE COURT:  Most certainly this will

20           be entered -- well, the Court's understanding

21           is this will be an interim order because we

22           don't have a committee here that is able to

23           look at any of this and then we'll enter

24           another final.

25                   MR. GALARDI:  It is a financing

1           order.  So you can't get a final order for 15

2           days anyway.  Whether it is the omnibus date

3           or we talk about a separate date for final

4           hearing on DIPs, but this is an interim

5           order, Your Honor.

6                  THE COURT:  Right.

7                  MR. CARRIGAN:  The reason I asked,

8           Your Honor, is that the interim period is

9           defined as -- I think it is defined as the

10          commencement of the case through December 29,

11          2008.  I'm not sure whether that was intended

12          to be that whole period or just until the

13          next hearing, whether it is the final hearing

14          or it proves to be a jury final hearing or

15          whatever.  The second inquiry was much along

16          the lines of prior counsel was that with

17          respect to, for example, in this case our

18          interest has been in the 503(b)9 rights and

19          also in the reclamation rights.  It is not --

20          the entry of the order providing for the

21          financing is not intended to affect those

22          rights as at least subject to the final

23          hearing if we understand it correctly.

24                  MR. GALARDI:  I'm actually not sure

25          what the gentleman is asking for with respect

1         to 503(b)9 and with respect to reclamation.

2              MR. CARRIGAN:  The inquiry reports

3         in most of these cases is the effect of both

4         prepetition liens and also upon any liens

5         granted post petition upon reclamation rights

6         and that's the inquiry.  All we are saying is

7         that whatever it was on the filing date is

8         whatever it is when it is up and finally

9         approved.

10             MR. GALARDI:  We agree.  Your Honor,

11        again, I think many people are used to cases

12        where the lender has all assets and there is

13        nothing for reclamation claims.  So what the

14        gentleman is -- whatever the world was as of

15        the petition date, whether there was anything

16        that their reclamation claims could get a

17        lien for under the secured, we are preserving

18        that.  We are not trying to change what the

19        world was on the petition date.  Now that I

20        understand the question I know where he's

21        concerned about.

22             THE COURT:  All right.

23             MR. CARRIGAN:  Thank you.  Your

24        Honor, that's what we understood and thank

25        you.

1           THE COURT:  Okay.  You are welcome.

2           MR. GALARDI:  And, Your Honor, Mr.

3       Berman did point out that period, that day,

4       the interim period, but we are seeking an

5       interim period before December 29th and so

6       the order will underline itself.  Hopefully

7       we'll have a final order entered and that

8       would be a final hearing when Your Honor

9       schedules that.

10          THE COURT:  Very good.  Does anybody

11      else wish to be heard in connection with the

12      DIP financing order?  All right.  It does not

13      appear to be anybody.  At this point the

14      Court will accept now your proffer as you

15      have set forth, and with the clarifications

16      that you've made on the record the Court will

17      approve on an interim basis the DIP

18      financing.

19          MR. GALARDI:  Your Honor, what we

20      would like to do is -- fortunately we don't

21      need to borrow today.  What we would like to

22      do is give Your Honor revisions to the order.

23      We would like it to be entered today so first

24      thing -- we actually can't borrow until

25      Wednesday.  We can close on the order and

1          start borrowing as early as Wednesday

2          morning.  As I mentioned there is payroll.

3                    MR. LUCIAN:  Your Honor, John

4          Lucian.  We are having difficulty hearing Mr.

5          Galardi's comment.

6                    THE COURT:  He's asking the order be

7          entered today if at all possible because of

8          their needs to be able to draw on the

9          financing.  And the Court will certainly

10         accommodate that as soon as you can get that

11         to me.

12                   MR. GALARDI:  Thank you, Your Honor.

13                   MS. KELBON:  Your Honor, we would

14         appreciate if you could circulate it to

15         counsel because we have concerns about it so

16         we can quickly look at it.

17                   THE COURT:  Well, it is being

18         entered on an interim basis and the need for

19         the company to be able to get this done and

20         get it done within the time, because tomorrow

21         is a holiday, is going to be pressing.  So

22         I'm not going to require that counsel

23         circulate it among everybody, submit it to

24         the Court.  If for some reason it's something

25         we need to take up that we didn't get in on

1        an interim basis, we will certainly take care

2        of it when we have the next hearing when

3        everyone has had a chance to review it.

4                MR. GALARDI:  Thank you, Your Honor.

5        I think it is clear we are not putting any

6        liens on any property that is not property of

7        the estate.

8                THE COURT:  If there's anything I

9        heard today is that if you try to do that,

10       then there will certainly be protection

11       afforded.

12               MR. GALARDI:  I appreciate it.

13               MR. LUCIAN:  John Lucian.  We did

14       not catch Mr. Galardi's last statement, but I

15       assume it was along the lines they will not

16       be taking any property that belongs to the

17       debtor.

18               THE COURT:  Correct.  We have nailed

19       that.

20               MR. LUCIAN:  Thank you, Your Honor.

21               MR. GALARDI:  I will try to speak up

22       for the people.  The next matter is item 19

23       on the agenda, Your Honor, and I will say

24       that the next three matters are put after the

25       financing because I will say they are not the

1    ordinary necessarily first day.  Maybe the
2    last one is.  Your Honor, the next motion is
3    motion for the debtors to assume the agency
4    agreement that was entered into between Hilco
5    Merchant Resources and Gordon Brothers and to
6    continue to conduct the store closing sales
7    pursuant to that agency agreement and various
8    guidelines.  Your Honor, prebankruptcy -- and
9    again, with respect to this Mr. Besanko could
10   testify but also Mr. Duffy because FTI and
11   myself were very much involved in the
12   negotiations of the agreement, prior to the
13   bankruptcy, after we made an announcement on
14   September 29th, I believe, in the SEC, the
15   company was evaluating its leases, its
16   four-wall analysis, FTI conducted that
17   analysis, and it came to a determination that
18   there we're at least 155 store leases that we
19   should try to vacate and sell the inventory
20   because it didn't fit our final business
21   model.  Whether they were less profitable
22   stores or in markets that were no longer
23   performing well, we proceeded with that.  In
24   the beginning of August or the middle of
25   August we then solicited -- and as many of

1          the people in the courtroom know there are

2          essentially six liquidators that you normally

3          approach with respect to liquidating your

4          inventory and conducting store closing sales.

5          We entered into confidentiality agreements

6          with all six.  And all six confidentiality

7          agreements, much to the consternation of each

8          one of them, precluded them from forming a

9          joint venture without our consent.  We were,

10         again, hoping to get a lively auction and we

11         got a lot of push back from all of them, and

12         at the end of the day, after much back and

13         forth, all pretty much said they weren't

14         going to bid unless we let them joint

15         venture.  We then said we would allow them to

16         joint venture and to submit bids, and indeed

17         the two that actually joint ventured, the

18         Gordon Brothers and Hilco, we were trying to

19         keep apart because we brought them as the two

20         most likely to be able to put competing bids

21         and we were unable to do that, and the other

22         four formed their own joint venture.  Your

23         Honor, we were soliciting what was often

24         called an equity bid, a bid where you would

25         take -- because we wanted to get a big pop of

1           liquidity early on with respect to the early

2           part of November when we most needed it.  An

3           equity bid is essentially what we were asking

4           for with a sort of 80 percent down, buy the

5           inventory, liquidate the inventory in stores,

6           and at the back end you collect your 20

7           percent book, whatever upside.  Because of

8           the market and because of the uncertainty of

9           the market and uncertainty of the Christmas

10          period and also the cost of funds of each of

11          the liquidators themselves have to borrow to

12          pay that 80 percent we got what I would call

13          very disappointing bids with respect to an

14          equity bid.  We rejected all of those bids

15          and then went back to the liquidators and

16          asked them to provide us now with a fee deal.

17          A fee deal, as Your Honor probably knows,

18          they act as our agent and give you a straight

19          stake.  The concern about that is with all

20          the business in the world who knows how it is

21          that they will be motivated, for how long

22          they are going to be motivated and you're

23          paying the fee and as the sales wind down you

24          might not be getting your money.  So we go

25          again, very disappointing proposals with

1          respect to the fee deal.  We then said we

2          will try one more time.  I guess this is now

3          the method, the de jure of the liquidators,

4          and we got what we call a hybrid bid, which

5          is really the bid we have before us.  It

6          essentially says that they will liquidate the

7          inventory but they will not have to put cash

8          up front, so we've got the cost of capital

9          out of it, and instead that they will give us

10         a guarantee that we would get a minimum

11         recovery of -- in this case 72 cents on the

12         cost value of the inventory.  As I mentioned

13         before, that is still below our appraised

14         value, and in this market we have got

15         auctions to go very much higher than the

16         value, but in the market currently and in

17         retail in particular the bids are not coming

18         in even at the appraisal level, plus as we

19         heard over and over again, as we tried to

20         push this high as possible, from the

21         liquidators this is after all the inventory

22         in stores which are closing.  There are

23         concerns about that.  There are concerns

24         about the holiday season.  We then negotiated

25         an agency agreement with Hilco and Gordon

1          Brothers over two or three days, again, an

2          agency agreement that contemplated remaining

3          out of bankruptcy.  Again, if we could have

4          solved our liquidity problems, that would

5          have been our preference.  We negotiated a

6          collateral package for them to secure their

7          fee.  The problem in a bankruptcy is we can

8          come in and ask Your Honor to give them an

9          administrative claim for their fees.  There

10         were two concerns.  One, how do we get

11         assurance that we will get our fee because

12         you can always reject a contract?  And how

13         can we make sure that, you know, we are

14         subject to auction?  Well, we auctioned their

15         contract.  We went to the auction, and

16         eventually the other joint venture just said

17         we are not prepared to outbid.  We gave them

18         24 or 12 hours to bid after going back and

19         forth.  They decided not to bid.  So we were

20         comfortable with the price.  The security

21         issue, again with Bank of America's consent,

22         we granted them a second lien on all

23         inventory on all stores.  Again, Your Honor,

24         thinking that if we ever got to the

25         subordinated debt these may be the sales that

1        would be done by that point and we would work

2        around it.  And Hilco and Gordon Brothers

3        agreed to take that second lien, but more

4        importantly after negotiations they also

5        agreed that upon the assumption of that

6        agreement they will no longer have a second

7        lien, again freeing our inventory from the

8        second lien so we can begin our vendor

9        negotiations and our second lien financing.

10       We also agreed to seek on a first day as fast

11       as possible the assumption of that agreement.

12       It is obviously not our preference to start a

13       store closing sale beforehand and ask Your

14       Honor to approve the procedures.  We did in

15       the agency agreement and I will note -- make

16       sure that they agreed to comply with state

17       laws and store closing laws.  The biggest

18       issue is leases and the lease clauses.  We

19       then proceeded to negotiate with them the

20       deal, and one critical fact that they were

21       willing to do is as we knew that the sale

22       would be approaching we insisted, and they

23       have provided, people to come in and help as

24       we announced the store closing for SEC

25       purposes to make sure that we didn't have

1          sufficient shrink or TVs were there.  TVs

2          were in stores.  Gordon Brothers and Hilco

3          agreed to meet with us to get people in the

4          stores to make sure to avoid as much shrink

5          as possible.  They provided an incentive

6          bonus to the people that are in fact in this

7          store to sell the inventory.  Again, it is a

8          very hard decision to tell people that you

9          are going to be laying off people and store

10         closings in this market.  And they again

11         agreed to backstop with a letter of credit

12         attestable to our bank group to 72 cents on a

13         dollar.  Again, it is an urgency of our

14         agreement as set forth if we get the first 72

15         cents they get the next three and a half

16         percent and then there is a 50/50 sharing of

17         the proceeds.  So we do well on the sales.

18         The preliminary results are we are in fact

19         doing very well with the sales, then there is

20         an upside for both the company and Gordon

21         Brothers.  So we sort of met the equity idea

22         of get us some upside.  We sort of guaranteed

23         an amount but we are getting a fee.  It

24         doesn't give us the liquidity profit that we

25         wanted, but nonetheless these sales are

```
 1              expected to go in the five or six week period

 2              of time and therefore be done by December.

 3              It was also very important for us to begin

 4              these sales so that we could, if we need to,

 5              do the lease negotiations and possibly reject

 6              155 stores by the end of December and

 7              therefore incur with little rent with respect

 8              to the stores during the bankruptcy period.

 9              The reason we put it on for first day, Your

10              Honor, as I mentioned, one of the significant

11              provisions that were negotiated was the

12              security package.  From our perspective the

13              sooner that we could assume this agreement

14              the better because we could, one, relieve

15              ourselves of the lien.  With respect to the

16              other relief that we seek here, Your Honor,

17              we think it is fairly standard with respect

18              to store closing procedures, and, again, I

19              know there are landlords here.  We have

20              preserved the rights of AGs to come in and

21              complain.  We have preserved the rights of

22              landlords to come in and complain with

23              respect to the procedures.  One of the

24              choices -- and, again, these things are all

25              too common.  The landlords know Gordon
```

1          Brothers, know Hilco.  There is much

2          consternation about banners and how big the

3          banners are, whether you can put them by the

4          windows or not.  They seem to always get

5          resolved.  We know Karen Caudry (Ph) who does

6          represent a lot of the AGs.  We think we have

7          in the proposed formal order all of those

8          protections that are required for landlords

9          and for the AGs to police this process.  It

10         is a very short process.  And obviously

11         Gordon Brothers and Hilco face some risks.

12         If we tail out the assumption, it is very

13         easy to come in and say, well, don't assume

14         it now when all the work is done.  In

15         addition, Your Honor, we have provided them

16         with a 1 million dollar up-front deposit,

17         most of the costs to do these things, to buy

18         the signage, and we have worked with them. We

19         gave them that.  There is not a lot of money

20         that we know of that was paid on last Friday

21         that we know of that was outstanding.  It's

22         not as if this is a large cure here.  As I

23         said, we conducted a prebankruptcy auction.

24         We have been told by the other four

25         liquidators that this is the highest and best

1           price we can get into this market.  As more

2           retailers come on the market, who knows what

3           you can get in this market.  As we get closer

4           to Christmas, Christmas and Black Friday, one

5           of the things we heard from most liquidators

6           is it's better to do this sooner as opposed

7           to waiting for Black Friday because we get

8           ahead of Black Friday sales, and so far the

9           results have been that.  We would therefore

10          ask, Your Honor, to approve both the

11          assumption of the agency agreement as well as

12          the store closure procedures.  There is

13          counsel here for Hilco and Gordon Brothers.

14          They do have a witness if Your Honor wanted

15          to have that testimony.  I think, again, we

16          have Mr. Duffy who can testify, Mr. Besanko

17          as to the process.  It is a business judgment

18          matter to assume a contract, to conduct the

19          store closings, whether they are inside the

20          ordinary course or outside the ordinary

21          course.  We think we have taken as many steps

22          in the agreement to comply with the state law

23          which is a big concern.  We have been very

24          sensitive to advertisement in those matters,

25          plus we have taken enough of the AG's

1          language for their rights to come back and

2          complain and have a process, but we really

3          don't think we are prejudicing either the

4          landlords rights and their contract rights

5          with the leases or the AG's right to complain

6          and generally Hilco and the Gordon Brothers

7          are quite good along with us to resolve those

8          objections to come back before the Court.  So

9          we would ask Your Honor to approve the

10         assumption and the agreement and the

11         procedures.

12              THE COURT:  Very good.  Does any

13         party wish to speak to this motion?

14              MR. POLLACK:  Yes, Your Honor.  I'll

15         let you deal with anyone first in the

16         courtroom.

17              THE COURT:  Okay.  Let's take care

18         of the courtroom first and then I will come

19         back to the folks on the phone.

20              MR. LEHANE:  Good afternoon, Your

21         Honor.  Robert LeHane, Kelley, Drye and

22         Warren on behalf of landlords representing

23         approximately 80 locations.  I respect the

24         comments of counsel for the debtor and had a

25         brief conversation with him before the

1           hearing to the effect that landlords would

2           have the rights to come back and ask Your

3           Honor for relief if the proposed GOB

4           guidelines were not sufficient.  However, I

5           have had an opportunity now to go through the

6           motion and proposed order and, Your Honor,

7           this is not an interim order not with respect

8           to GOB guidelines.

9                THE COURT:  Well, we will make it

10          one and you can have an opportunity to come

11          back, and if there is a problem with the GOB

12          issues you can address those and the Court

13          can take them up.

14               MR. LEHANE:  Thank you, Your Honor.

15          I would suggest in the following motion on

16          the calendar, the rejection motion has, I

17          think, precisely the language that would do

18          the trick.  It would allow landlords X number

19          of days.  We believe 10 is probably

20          appropriate to come in and file an objection.

21          We have worked with Hilco and Gordon Brothers

22          on any number of occasions, but it would be

23          very unusual to make this a final order.

24          With that addition to these -- I also would

25          like to point out, though, that there appears

```
 1              to be two different sets of guidelines

 2              attached to the motion.  There is a set of

 3              guidelines attached to the agency agreement

 4              and there is a different set of guidelines

 5              attached as an exhibit to the order.

 6                   THE COURT:  The Court reviewed the

 7              one that was attached to the order.

 8                   MR. GALARDI:  Your Honor, again, let

 9              me address that.  To the agency agreement,

10              because we entered into an agency agreement

11              prior to the bankruptcy --

12                   THE COURT:  It is exactly what I

13              thought.

14                   MR. GALARDI:  -- there were

15              provisions then to take advantage of the

16              anti-assignment provisions of the Bankruptcy

17              Code.  We actually sought approval of

18              different procedures.  The one that Your

19              Honor reviewed, the ones attached to the

20              order are the ones that we are seeking

21              approval.  Quite honestly, as Mr. LeHane

22              knows, they are more friendly to the sorts of

23              sales and anti-assignment clauses which we

24              couldn't do in the leases prior to the

25              bankruptcy.
```

1              MR. LEHANE:  Thank you, Mr. Galardi.

2         One other point, though, in connection with

3         any GOB sale order such as this which would

4         render lease provisions unenforceable, again,

5         those are entitled to adequate protection.

6         We believe that that adequate protection

7         under these circumstances would include

8         payment of the rent that accrued from the

9         filing date through the end of the sales.  We

10        don't believe that's in the order.  We would

11        ask that be included in the order.  It does

12        look like the agency agreement provides that

13        the liquidator would cover the occupancy

14        expenses.

15             MR. GALARDI:  Your Honor, I happen

16        to disagree that landlords are entitled to

17        adequate protection, and I'm sure Mr. Pollack

18        will say the same thing as Mr. LeHane on this

19        topic.  Your Honor, we have a provision that

20        we do get reimbursed for the actual cost.  If

21        we don't pay those costs or if we have to pay

22        those costs, I understand we are in an

23        accrual state, but my understanding is that

24        even though it is an accrual state it is a

25        503(b) claim and it's paid at the end of the

```
 1          case, not necessarily at the time of this

 2          period.  So we believe that the landlords are

 3          protected.  I understand that Mr. LeHane was

 4          going to do this.  He knows I will probably

 5          take a certain view with respect to the

 6          accrual state versus billings state.  Leaving

 7          that aside, I think the simple answer is I

 8          don't believe -- I think it could be raised

 9          again in 10 days.  The 10 days is before the

10          end of the month if they want to make an

11          argument with respect to what we call the

12          subrent, let them raise an objection.  It

13          will me give an opportunity to either resolve

14          or do that.  Nothing prejudices their right

15          in the motion to go make such a request.  Mr.

16          Pollack can make a request, and they both

17          know me well enough to know we generally

18          resolve these types of objections.

19               THE COURT:  Very good.

20               MR. POLLACK:  Thank you, Your Honor.

21          I will work with counsel for the debtor after

22          the hearing to submit an order that's

23          consistent.

24               THE COURT:  So we have a 10 day

25          period which you can file objections.  It
```

1            will be an interim order in the meantime and

2            you can raise both of the issues that you

3            have raised.

4                    MR. POLLACK:  Thank you very much,

5            Your Honor.

6                    THE COURT:  All right.

7                    MR. VAN ARSDALE:  Robert Van Arsdale

8            for U.S. Trustee, Your Honor.  We would

9            simply like -- I'm not certain that the 10

10           days that we are just discussing would apply

11           to everybody.  We have not yet appointed a

12           committee in this case.  I think the

13           committee would like to be able to look at

14           this order before it gets to be a final

15           state.

16                   THE COURT:  Are you concerned that

17           the committee wouldn't be formed to be able

18           to look at it within the 10 day period?

19                   MR. VAN ARSDALE:  Your Honor, I

20           anticipate we will have a committee hopefully

21           by this Friday.  I know the solicitation went

22           out today and we need to factor through that

23           and they will need some time to actually view

24           it.  The hope being that part of the people

25           in the committee may know of some other way

1          that this -- these liquidations sales could

2          take place that would benefit the entire

3          estate.

4                    THE COURT:  I guess we've got two

5          competing interests as with the landlords if

6          they have an interest in the GOB provisions

7          not being adequate in such they would want to

8          get in more quickly, whereas the committee

9          would need more time to look at it.  So we

10         need to have some sort of balance there.

11                   MR. VAN ARSDALE:  Yes, sir.

12                   THE COURT:  I think we can do 15

13         days.

14                   MR. VAN ARSDALE:  That would be

15         adequate for the committee.

16                   THE COURT:  Okay.

17                   MR. GALARDI:  Your Honor, if I may

18         address the plan, I'm not quite sure -- look,

19         I have set interim orders for committees on

20         many cases.  I'm not quite sure -- and I will

21         let Mr. Athanos talk to this, but I don't

22         know what it is to have an interim approval

23         of an assumption.  With respect to the

24         procedures of running the store closing --

25                   THE COURT:  I was more concerned

1           about GOB.

2                 MR. GALARDI:  Right.  But, again, it

3           is hard to go back and say we are going to

4           unassume the contract.  So with respect to

5           the procedures and objections to procedures

6           themselves and how we are conducting them, I

7           have no problem with the committee.  If it is

8           with respect to the assumption of the

9           contract, then I would have a problem because

10          we have to assume and go forward over the

11          next two to three weeks in any event.  With

12          respect to the committee, I'm assuming we

13          will be completely aligned that we want the

14          most money into this estate.  I have no

15          problem with their coming up with comments

16          about, well, the store closing procedures

17          should be even better and make us more money.

18          That I certainly will endorse.

19                THE COURT:  Well, I think there are

20          two issues as I understand that we are doing

21          it on an interim basis, and it has to do with

22          raising the GOB terms and also the issue of

23          adequate protection.  We are preserving those

24          two issues.  I agree with you completely.

25          You know, you can't unassume a contract.  If

1        you are assuming it, you are assuming it.  So

2        I understand that.  That's part of it.  And

3        so for clarity I want everyone to know where

4        the Court is coming from.

5                MR. VAN ARSDALE:  Your Honor, I was

6        only speaking to the GOB part of this

7        particular order.

8                THE COURT:  All right.  Very good.

9        We have some other people that want to speak

10       to this.

11               MR. ATHANOS:  Good afternoon.  Joe

12       Athanos on behalf Hilco and Gordon Brothers.

13       I think we are all on the same page here.

14       The assumption in the existing agreement --

15       what the existing agreement says is Gordon

16       Brothers and Hilco will comply with all laws

17       and Gordon Brothers and Hilco will comply

18       with all leases.  That's the best you can do

19       outside of bankruptcy, and we understand

20       that.  I have a witness here today who will

21       testify that it is 3 million bucks to the

22       estate if we can do better which you can in

23       the bankruptcy.  You can get out of GOB laws,

24       do the supremacy clause, and you can get out

25       of the terms of leases, instead of paying the

1          bank, theaters, and having side walkers and

2          that stuff adding value to the sale, and here

3          we think it is worth 2 or 3 million dollars

4          to the debtor's estate.  We think there is a

5          huge benefit there, and we think that ought

6          to be approved.  But we understand people

7          need the opportunity to object, and we will

8          work with landlords' counsel, which every

9          single person who is here today on behalf of

10         landlords we have worked with a thousand

11         times and it's very unlikely we will be back

12         in court with respect to any of them.  We've

13         worked a very long time.  And, in addition,

14         with the AGs, the same issues.  We expect to

15         have issues but we will work them out.  If we

16         don't, we will come back to the Court and

17         that's fine but not on the original agreement

18         which is going to be assumed and that's it,

19         it is final, but on the new GOB procedures

20         that we are getting by virtue of the case

21         being made.

22              THE COURT:  That's what I understand

23         the new GOB, the ones that were attached to

24         the order, not to the original agreement that

25         I will be approving on an interim basis

1         today.

2                   MR. ATHANOS:  That's fine, Judge.

3                   THE COURT:  I'm now turning to

4         counsel on the phone to give them an

5         opportunity.

6                   Mr. Pollack, is there anything else

7         you want to raise?

8                   MR. POLLACK:  Well, Your Honor,

9         since Mr. LeHane knows most of my arguments

10        and Mr. Galardi usually reads my mind, there

11        isn't much else.  I think Mr. Athanos really

12        hit the nail on the head and that is the

13        issue, the main issue I had was that the GOB

14        contract that they were asking to assume was

15        a prepetition one which didn't have the right

16        to do certain things which now they are going

17        to have in bankruptcy, but having worked with

18        him and Mr. Klotz from Gordon and Mr. Capp

19        (Ph) from Hilco, again, I don't see there is

20        a problem we will have to come back to the

21        Court for.  We would just like that

22        opportunity in case something unusual

23        happens.

24                  THE COURT:  Very good.  Thank you.

25                  Any other counsel on the phone wish

1           to be heard on this matter?

2                MR. HILLMAN:  Yes, Your Honor.

3           David Hillman, counsel for Panasonic

4           Corporation of North America.  As I had

5           advised the Court during the discussion over

6           the DIP financing motion Panasonic owns the

7           goods that are in Circuit City's possession.

8           It is my understanding that some of those

9           consigned goods are -- may be in some of the

10          stores that are closing, the 154 stores.  The

11          consignment agreement was terminated

12          prebankruptcy.  We gave notice to Circuit

13          City, to Hilco and to Gordon Brothers that we

14          did not consent to any sale or disposition of

15          our products at any of these GOB sales.  It

16          is not clear to me whether or not that

17          request is being honored, and as I had

18          mentioned we're filing hopefully today, if

19          not tomorrow, the complaint that -- a motion

20          for a TRO and preliminary injunction.  So my

21          objection to the motion is I have no problem

22          with approval if the Court approves the

23          motion.  My problem lies within selling

24          Panasonic's product at any of those sales.

25                THE COURT:  Okay.  But which is

1          going to be subject to a separate complaint

2          and TRO which you are going to bring before

3          the Court, and I assume then we'll resolve

4          those issues at that time.

5                    MR. GALARDI:  Your Honor, we are not

6          in any way prejudicing their rights to bring

7          a complaint, to seek a TRO or to address

8          those issues in the proper form with a

9          complaint, a TRO, and now I understand I may

10         be here a couple days doing so.

11                   THE COURT:  So, Mr. Hillman, nothing

12         in this order prejudices your right to

13         proceed forward, and the Court will resolve

14         the issues that you raise in the context of

15         the TRO which I will anticipate receiving

16         shortly.

17                   MR. HILLMAN:  Thank you, Your Honor.

18                   THE COURT:  Any other?

19                   MS. KELBON:  Regina Kelbon for

20         Verizon Wireless, Your Honor.  Again, I

21         incorporate my comments that I raised in the

22         DIP.  Obviously it's Verizon's inventory,

23         can't be sold by Circuit City, have no

24         authority to sell our large inventory that's

25         specially secured in marked cages.  I do not

1          believe that is the intention since Verizon

2          was informed of Hilco's presence at the

3          property and we believe our stuff is not

4          included.  We would just like confirmation of

5          that that there was no intention of that as

6          part of this Hilco agreement.  The agreement

7          is not attached of record so we can't review

8          it to know what the actual contract says.  We

9          could not find it on our docket.

10                THE COURT:  I assume you've got

11          control over your inventory if it is in a

12          locked location?

13                MS. KELBON:  Yes, Your Honor, we do.

14                MR. GALARDI:  Mr. Athanos has just

15          confirmed they are not selling any of

16          Verizon's equipment and that's my

17          understanding, and Verizon is free to contact

18          Hilco and remove it if that's what they need

19          to do.

20                MS. KELBON:  We are in touch with

21          the Circuit City management and they are

22          discussing the exit dates of the various

23          locations that the Circuit City is closing.

24          So we just reserve all of our rights under

25          our contract, and I'm sure hopefully this

1          will be worked out amicably.

2                    THE COURT:  Yes.  So noted.  If you

3          have any problem at all, you can come back to

4          the Court and get relief?

5                    MS. KELBON:  Thank you, Your Honor.

6                    THE COURT:  All right.  I don't

7          think any other party --

8                    MR. BRANCH:  Dustin Branch,

9          representing various landlords.  I quickly

10         wanted to put an objection on the record.  My

11         issue has been pretty much laid out by Mr.

12         LeHane and Mr. Pollack and I've dealt with

13         Gordon Brothers and Mr. Galardi on numerous

14         occasions.  But at this point I couldn't

15         really hear too well as far as the timing to

16         bring objections on going out of business

17         sales.  Whether it is 10 or 15 days, I just

18         couldn't hear for sure.

19                   THE COURT:  We are going to address

20         that right now.

21                   MR. BRANCH:  Thank you, Your Honor.

22                   THE COURT:  All right.  So first the

23         Court will accept the proffer of the

24         testimony of the proffered witnesses in

25         connection with this motion.  The Court will

1         approve the assumption of the agreement and

2         then with regard to the GOB provisions and

3         the question of adequate protection of

4         landlords the Court will approve that on an

5         interim basis going forward, and it's been

6         suggested that 10 days notice and then the

7         U.S. Trustee raised a question about 15 for

8         the committee.  I'm not really sure that it

9         is a committee issue on either of these two

10        issues that we're reserving.  But, Mr.

11        Galardi, I would like your input on the

12        timing and so I would solicit that at this

13        point.

14              MR. GALARDI:  Your Honor, again, I

15        have no objection to the landlords having 10

16        days.  I have no objection to the committee

17        having 15 days if they have an objection.

18        What I expect of them is to join me in

19        opposition to any landlord objection should

20        they arise.  I think there is no problem with

21        the time frame.

22              THE COURT:  All right.  So it will

23        be 10 days for the landlords, 15 days for the

24        committee.  All right.  With that then it is

25        approved.

1          MR. GALARDI:  Thank you, Your Honor.

2     Your Honor, moving now to item number 20 on

3     the list of motions, this is the debtor's

4     motion.  As I described early on in the case,

5     Your Honor, there has been leases that the

6     debtors have vacated the premises.  Some are

7     simply barred and some are currently

8     subleased to third parties.  We filed a

9     motion last night to reject all of those

10    leases.  The carrying costs, as I mentioned

11    as, and Mr. Besanko would testify, is roughly

12    40 million dollars a year.  It is critical,

13    especially in this accrual state to get out

14    of those leases as fast as possible because

15    each day we remain in those premises arguably

16    we are accruing post petition administrative

17    expenses.  Your Honor, following sort of the

18    Delaware precedent that I actually

19    represented the landlords on, the way in

20    which we have tried to proceed to do this is

21    to give the unequivocal notice that we would

22    be out of the premises, that we don't reserve

23    any rights to go back to the premises.  So it

24    is an unequivocal objection.  Unfortunately,

25    Your Honor, we don't have a committee here

1          because if there was a committee I would have

2          them agree with us to that.

3                    And finally to return the keys to

4          the premises.  Your Honor, we have not

5          returned the keys today but we will return

6          them as soon as Your Honor blesses it,

7          because if Your Honor didn't bless the

8          rejection there was no reason to return the

9          keys.  We have made arrangements to return

10         the keys tomorrow so that we would reject.

11         So we are actually seeking rejected as of the

12         petition date so we could avoid post petition

13         administrative expenses with respect to the

14         estate.  Your Honor, again, this is a

15         business judgment decision.  It is actually

16         evidenced by the fact that we have -- as Mr.

17         Besanko will testify, we have not been

18         operating these premises for quite some time.

19         Mr. Besanko will further testify that the

20         sublease rent that we received is less than

21         the rent that was paid.  It is a drain on the

22         estate.  In addition, Mr. Besanko would

23         testify that at prior times we invited people

24         in to see if they could take the lease

25         portfolio, find the market portfolio.  We

1        have been unable to do so.  Indeed, as Mr.

2        Rothschild will be able to testify or FTI

3        would be able to testify, one of the problems

4        with the prebankruptcy liquidation sales

5        profit is we have these leases and eventually

6        you have to do something with those.  We

7        believe it is the business judgment of the

8        debtors to reject effective immediately.  Mr.

9        LeHane will get up, and we don't have a

10       problem with this, but if we don't return the

11       keys within a certain period of time and if

12       we keep occupation of the premises, it's

13       without prejudice of the landlords rights to

14       come back and say, hey, you said you were

15       doing this.  You didn't do it.  You took the

16       value of the property.  We want an

17       administrative claim.  We have no objection

18       to that, but I didn't want to see that we had

19       to have the keys today.  We would like to get

20       the keys out tonight, and hopefully we can

21       make the FedEX deadline, but no later than

22       Wednesday.  If we can have in the order that

23       we return the keys no later than Wednesday,

24       the rejection could be effective as of the

25       petition date.

1              THE COURT:  Very good.  Does any

2        party wishes to speak to this motion?

3              MR. POLLACK:  Yes, Your Honor.

4        David Pollack on the phone.  I don't know if

5        there's anyone in the courthouse.

6              THE COURT:  Yes.  We'll go to the

7        podium first.

8              MR. LEHANE:  Thank you, Your Honor.

9        Robert LeHane.  Thank you, Mr. Galardi, for

10       attempting to read my mind.  We certainly

11       appreciate that this is set up as an interim

12       motion.  There is an objection deadline for

13       landlords to object as Mr. Galardi stated,

14       but we don't know whether or not possession

15       of the premises has actually been turned over

16       to the landlords, and we would prefer that

17       the effective date of the rejection of these

18       leases be the later of today or the date that

19       the premises are actually delivered to the

20       landlords by surrender and turnover of the

21       keys.  We believe that will avoid a necessity

22       for a multitude of objections whereby maybe

23       landlords get the keys Thursday, Friday or

24       even Wednesday.  They have been in the

25       premises post petition.  We believe that

1 those landlords are set up with an

2 administrative claim for that time.  Thank

3 you, Your Honor.

4   THE COURT:  Thank you.  All right.

5 I will go to counsel on the phone.

6   MR. POLLACK:  Thank you, Your Honor.

7 David Pollack again.  Your Honor, I don't

8 have any problem with the date of rejection.

9 I have verified that our premises are vacated

10 and we only have, I believe, one on the list.

11 However, the motion goes further than just

12 rejecting the leases and wants to or ask the

13 Court to approve rejection of guarantees as

14 well.  In most cases I have been in

15 guarantees have been held to be non-executory

16 and therefore not capable of rejection under

17 Section 365, and so with regard to guarantees

18 we would ask that that issue not be granted

19 on an interim order because I don't know how

20 you undo a rejection of the guarantee but be

21 held to the final hearing on this and that

22 the interim apply only to the other relief

23 sought by the debtors.

24   THE COURT:  All right.  Thank you.

25   MR. GALARDI:  Your Honor, addressing

1          first Mr. LeHane's point, again, I think we

2          can set a hard date of Wednesday and then we

3          can have disputes.  I think we can get all of

4          the keys back.  It is just the hearing to

5          give those notice to get it out today and

6          hopefully it's going to be done.  So if we

7          can get them back on Wednesday, I would ask

8          the date to be retroactive to the petition

9          date.

10              With respect to Mr. Pollock's issue

11         on the guarantee, I actually agree with Mr.

12         Pollack that it is not in fact an executory

13         contract, but we do it out of an abundance of

14         caution because if it's not an executory

15         contribution, it's prepetition and

16         prepetition breach.  It really is much ado

17         about nothing.  If it is prepetition

18         contract, we breach it, and if it's an

19         executory contract, we reject it.  I don't

20         know what we're reserving it for.  So we have

21         no problem saying we would reject it to the

22         extent it is an executory contract and change

23         the language to reflect that, but I don't

24         want to be bound by a guarantee that I

25         believe is -- even if it's not executory, it

1          is a contract I can breach.

2                    THE COURT:  Very good.  Apparently,

3          Mr. Pollack, you win on that.  You have a

4          prepetition claim instead of an executory

5          contract.  But in any event the Court is

6          going to approve this motion and --

7                    MS. KELBON:  Your Honor.

8                    THE COURT:  Yes.

9                    MS. KELBON:  Excuse me, Your Honor.

10         Regina Kelbon.  Your Honor, with respect to

11         this motion, the motion recites that Circuit

12         City is not occupying these premises.  I have

13         not had the opportunity to confirm that with

14         the DIP list that is attached to the motion

15         with Verizon Wireless.  I'm assuming Circuit

16         City is not in the premises and Verizon

17         Wireless kiosks are not in the premises but I

18         would like to reserve my rights with that

19         just in case there is any disagreement with

20         that because I'm assuming we are out of those

21         premises as well.

22                    THE COURT:  I'm assuming so, too,

23         since you have all of your inventory locked

24         and secured.

25                    MS. KELBON:  That is correct, Your

1     Honor.  That's why we think that, but since I
2     cannot on this short notice confirm on a
3     store by store basis which was attached to
4     the list, I will have to go with the debtor's
5     representation that they are not occupying
6     the premises to reserve my rights and my
7     contract.
8           THE COURT:  Right.  If you need
9     relief, if you find out there is something
10    different, you can always come back to the
11    Court and request appropriate relief.  So it
12    will be without prejudice to that.
13          MR. GALARDI:  And, Your Honor, I
14    would only add that if they are in the
15    premises -- and most are sublessee and we're
16    rejecting all subleases.  So it doesn't mean
17    we have to stay there for their sake.  They
18    can get their property out.  And now they are
19    on notice.  Get it out.
20          THE COURT:  Exactly.  So the Court
21    is going to approve the rejection of these
22    contracts.  The Court is going to approve the
23    rejection as of the petition date with the
24    proviso that the keys be returned to the
25    landlords by Wednesday.  If that does not

1          occur, then the Court will entertain any

2          landlord motion for relief as may be

3          appropriate at that point.  It is also my

4          understanding that the landlords -- even if

5          they don't have the keys, they have the

6          premises now and can re-enter their property.

7               MR. GALARDI:  That is correct, Your

8          Honor.  Again, the key issue has become a big

9          one.  Sometimes you can't find the keys.  The

10         landlords have the key.  It is a symbolic

11         gesture more than anything else.  I want to

12         reserve.  I mean, we will try to get everyone

13         their keys on Wednesday.  If not, they

14         reserve their rights to seek an

15         administrative claim and say, hi, you didn't

16         give the keys back.  I reserve the right

17         saying you have had the occupancy.

18               THE COURT:  I understand the issue.

19         That's why I put the additional comments on

20         record, but from the Court's standpoint the

21         landlords have possession immediately and

22         they can enter this evening if they want if

23         they want to get a locksmith and go in

24         themselves.  And the keys are going to be

25         returned.  And if we have an issue about

1          whether or not you're holding the keys that

2          you actually do have or somehow using the

3          space, then I will take that up at a

4          different time.

5                    MR. LEHANE:  Thank you, Your Honor.

6          We actually agree with Mr. Galardi's comment.

7          There is just a date that would need to be

8          filled.  It's the landlord objection

9          deadline.  I would propose the same 10 days

10         that was put in the GOB motion.

11                   MR. GALARDI:  We agreed to that and

12         the committee 15.

13                   THE COURT:  Okay.  Ten days for the

14         landlords, committee 15.

15                   MR. GALARDI:  Those are both

16         weekdays.  So I think it works out, the 20th

17         and 25th.

18                   THE COURT:  I would hope so.

19                   MR. GALARDI:  Thinking about it, I

20         believe they are.

21                   THE COURT:  Okay.

22                   MR. GALARDI:  Your Honor, that then

23         brings us to the last motion on the agenda,

24         and, again, Your Honor, all of our relief has

25         been structured to try to reorganize this

1          company.  As Your Honor may know we are a

2          public company.  For better or worse we have

3          been operating losses as a result of not

4          having great performance over the number of

5          years.  That may be a very significant asset

6          for this company.  Accordingly, what has now

7          become somewhat common with public companies

8          is to seek relief to limit the trading in the

9          equity security so as to not have a change in

10         control, you know, inadvertent change in

11         control.  What we have sought -- and, again,

12         this is clearly an interim order with the

13         committee to come back to it -- is to seek an

14         order from this Court establishing procedures

15         eliminating trading and security during this

16         interim period obviously subject to people's

17         rights to come in and to object to that and

18         the committee's right to object.  It is to

19         preserve what may be a very significant asset

20         either for a potential purchaser or for a

21         standalone plan, namely the NOLs that we have

22         at the current time.  Again, Mr. Besanko is

23         in the courtroom and could testify as to the

24         size of the NOLs, our ability to use NOLs.

25         Obviously if there is a different outcome,

1          these procedures could be vacated at that

2          time, but right now, hoping to reorganize or

3          to sell and to have that as an asset, we

4          would like to do everything possible to

5          preserve that.  These procedures I understand

6          have been granted in cases in this

7          jurisdiction.  I know they have been granted

8          in cases in other jurisdictions, and we would

9          ask Your Honor to grant the relief to limit

10         the trading and notices set forth in there

11         with respect to our equity security.

12                 THE COURT:  Any party wish to be

13         heard on this motion?  Okay.  The Court has

14         reviewed the motion and I find it entirely in

15         order and will approve it on an interim

16         basis.

17                 And, Mr. Galardi, I had one other

18         motion we had to take up, which is a motion

19         to file under seal.  Are you going to speak

20         to that?

21                 MR. GALARDI:  Your Honor, I think I

22         sort of addressed it, but I probably didn't

23         get an order for it.  Those are two fee

24         letters that we discussed earlier, and I had

25         had a dialogue with the U.S. Trustee as to

1        whether those should be disclosed.  We would

2        ask Your Honor to keep those under seal, as I

3        mentioned, under record.  The total amount of

4        the fees with respect to the facility are in

5        the DIP budget.  Our DIP budget is actually

6        higher than that.  We would say because of

7        pricing issues and other issue what GE or

8        Wells or Bank of America gets is really a

9        confidential business matter.  We would ask

10       Your Honor to enter the order, again,

11       allowing us to file those fee letters under

12       seal.  We have given it to the U.S. Trustee's

13       Office.  We have given it to the Court.  If

14       there is someone who has an actual real

15       interest, we understand they can come to the

16       Court and ask for that.  We are not trying to

17       say in all circumstances, but indeed we think

18       we need to file as record and disclose

19       confidential business information of those

20       companies and we ask Your Honor to enter that

21       order.

22              THE COURT:  Very good.  Office of

23       the U.S. Trustee wish to be heard on this

24       issue?

25              MR. VAN ARSDALE:  Your Honor, we did

1        have a conversation prior to court, and the

2        resolution of it was as represented to the

3        Court, and I think that that suits fine.  And

4        it still leaves it open if someone really

5        wants to know this to come to the Court and

6        ask that it be unsealed.

7                    THE COURT:  Very good.

8                    MR. GALARDI:  And clearly, Your

9        Honor, we will give it to the committee.  We

10       know the committee will have to get the fee

11       letters and we will give it to the committee.

12       We are not going to make them come and get a

13       motion.  It is standard before we have to go

14       to a final hearing.

15                   THE COURT:  Very good.  All right.

16       The Court is going to approve the motion to

17       file the fee letters under seal subject to

18       further order of the Court.  All right.  At

19       this point I think we have taken up all the

20       motions that you have filed and we probably

21       need now to do scheduling.

22                   MR. GALARDI:  Right, the six omnibus

23       hearings and how Your Honor would like to

24       proceed with the next hearings.  I guess one

25       of the first questions for Your Honor is on

1           preference.  If we go back to my sort of

2           significant dates, December 10th is a big

3           date for us, one, with respect to trying to

4           get a motion to extend the time to assume or

5           reject leases and, two, with respect to the

6           366 deadline.  That would be one of the

7           dates.  I don't know if Your Honor's practice

8           is to have the hearing on a final DIP at the

9           same, the first omnibus or whether you wanted

10          a separate hearing on that.  Anything in that

11          pre-December 10th date as a first omnibus

12          will work well for us.

13               THE COURT:  Do you think you will

14          need any date in November or are you looking

15          at the first part of December?

16               MR. GALARDI:  Well, I know I'm going

17          to get a TRO on it.  So I'm looking -- Your

18          Honor, I think if we did it in early December

19          as opposed to -- because Thanksgiving will

20          sort of put everybody in.  We have given some

21          10 days.  So 10 days from today and 15 days

22          from today is the 20th and 25th.  That Friday

23          or Thursday.  Your Honor, unless -- I don't

24          think so.  I think probably the very first

25          week of December would be a good day that

1          will allow us to give notice.

2                    THE COURT:  How about Friday, the

3          5th of December?

4                    MR. GALARDI:  That sounds like a

5          good day.  That will give us 15 to 20 days

6          notice for the DIP.  Can we put the DIP --

7                    THE COURT:  Put everything on that

8          date.

9                    MR. GALARDI:  Okay.  Your Honor,

10         again as to practice, how does Your Honor

11         like to handle applications to employ

12         professionals?  Does that go on the first

13         omnibus date?  How would you like to do that?

14         I don't want to overload the calendar but I

15         know we will have those filed shortly.  How

16         would Your Honor like to proceed?

17                   THE COURT:  Let's put them for the

18         same date.

19                   MR. GALARDI:  Okay.  Thank you.

20                   THE COURT:  And do you want to do an

21         afternoon hour or do you prefer to do that in

22         the morning?  What is best?

23                   MR. GALARDI:  Your Honor, since that

24         may be a long day, I sort of ask that we

25         maybe get the whole day.

1          THE COURT:  You can have the whole

2          day.

3          MR. GALARDI:  Starting -- if we are

4          having the whole day, I think many of us will

5          travel in the night before.  But even if we

6          started at 10:00 -- knowing my flights from

7          the northeast, we will land at 9:00.  If we

8          start at 10:00, that still allow people to

9          come in in the morning from various

10         locations.  So starting at 10:00 I think

11         people will have the flexibility to come in

12         that morning.

13         THE COURT:  That's fine.  We will

14         start at 10:00 and you have the day.

15         MR. GALARDI:  Thank you.  Working

16         off of that, Your Honor, again if possible to

17         get two days in a month, I would say some

18         period 14 days or longer after that December

19         5th hearing.

20         THE COURT:  We can do the 19th.  We

21         can do the 22nd.  I can do the afternoon of

22         the 23rd.

23         MR. GALARDI:  I think my wife

24         doesn't want me here on the 23rd. How about

25         the 22nd?  So that gives us a little more

1           than two weeks if that works.

2                   THE COURT:  Again, I have that

3           entire day.  What kind of hour?

4                   MR. GALARDI:  Why don't we start in

5           the morning on that day, Your Honor, and,

6           again, we will try to balance the calendar.

7           If we think we need a full day, we can

8           contact.  But can we do a morning hearing.

9                   THE COURT:  Yes.  We will set it at

10          10:00.

11                  MR. GALARDI:  Thank you.  Now the

12          new year brings with it the deadline.  So

13          something close to the 17th, Your Honor,

14          would be good assuming that lawyers leave

15          everything to the last minute.  So sometime

16          around December 11th -- I mean, January 11th

17          to the 16th I think will be a helpful hearing

18          because we do have the loan commitment and

19          try to get there.  So I don't know what Your

20          Honor's availability is.

21                  THE COURT:  That week is tight, but

22          I can do the 16th.  I can give you all day on

23          the 16th or I can do the 12th.

24                  MR. GALARDI:  Your Honor, since life

25          is what it is, let's do the January 16th so I

```
 1              can meet that deadline but give myself the

 2              full time to that deadline.

 3                   THE COURT:  All right.  We will set

 4              that at 10:00 as well.

 5                   MR. GALARDI:  Thank you.  Just

 6              because there might be other matters, Your

 7              Honor, if you have anything the last week of

 8              December I think as a precaution.

 9                   THE COURT:  We're going to go back

10              to December?

11                   MR. GALARDI:  I'm sorry, the last

12              week of January.  My apologies.

13                   THE COURT:  Thursday the 29th.

14                   MR. GALARDI:  That would be fine.

15                   THE COURT:  I will set that at

16              10:00.

17                   MR. GALARDI:  Okay.  Your Honor, any

18              time in the first two -- second or third

19              week.  It looks like the week of the 9th or

20              the week of the 16th of February.  Maybe the

21              week of the 9th and then something towards

22              the end of February before my March deadline.

23                   THE COURT:  The 13th.

24                   MR. GALARDI:  That would be good.

25              10:00?
```

1                    THE COURT:  10:00.

2                    MR. GALARDI:  And though we have a

3       March deadline to file a disclosure statement

4       and plan maybe something that first week of

5       -- how many do I have now?  One, two, three,

6       four, five.  I'm going to ask for one more,

7       maybe the first week of March, Your Honor.

8                    THE COURT:  March 3rd at 10:00.

9                    MR. GALARDI:  Make that six.  Thank

10      you.

11                   THE COURT:  Yes.  That is six.

12                   MR. GALARDI:  We would just fill in

13      that, the case management order and file with

14      those dates, correct?

15                   THE COURT:  That will be fine.  And

16      then depending on where we are at that point

17      we can always set other dates beyond that.

18                   MR. GALARDI:  Yes, thank you.  Your

19      Honor, that concludes the matters again from

20      Circuit City and myself.  I truly appreciate

21      your doing this on such a short notice and

22      accommodating us and granting relief that I

23      hope sets the company on good footing going

24      forward.  Thank you.

25                   THE COURT:  I certainly wish you

183

1          luck with the case.

2                    MR. GALARDI:  Thank you.

3                    THE COURT:  We're done.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

184

```
 1

 2

 3

 4               CERTIFICATE OF COURT REPORTER

 5

 6          I, CALVIN ADDISON, a Notary Public for the

 7    State of Virginia at Large, hereby certify that I was

 8    the Court Reporter in the United States Bankruptcy

 9    Court for the Eastern District of Virginia, Richmond

10    Division, on November 10, 2008, at the time of the

11    hearing.

12          I further certify that the foregoing

13    transcript is a true and accurate record of the

14    testimony and other incidents herein.

15          Given under my hand this 25th day of November,

16    2008.

17

18

19

20               /s/ Calvin Addison

21

22

23

24

25
```