Form Draft dated 1/18/95
LOCATION: Basile Site
S. Portland, ME
DRAFT DATED: 04/15/96

**SUBLEASE**

between

**CIRCUIT CITY STORES, INC.,**

as Tenant

and

**BASILE LIMITED LIABILITY COMPANY,**

as Landlord

dated ~~April~~ *May* _13_, 1996

**555 MAINE MALL ROAD**

**SO. PORTLAND, MAINE**

[J:\O13363\155\basile6.Doc]
[April 23, 1996; DIVITA_R]



EXHIBIT

A

## TABLE OF CONTENTS

1.   Leased Property . . . . . . . . . . . . . . . . . . . . . .   1
2.   Construction of Building and Improvements . . . . . . . .   2
3.   Term . . . . . . . . . . . . . . . . . . . . . . . . . . .   3
4.   Rent. . . . . . . . . . . . . . . . . . . . . . . . . . . .   6
5.   Intentionally Omitted . . . . . . . . . . . . . . . . . .   9
6.   Intentionally Omitted . . . . . . . . . . . . . . . . . .  10
7.   Intentionally Omitted . . . . . . . . . . . . . . . . . .  10
8.   Signs and Communications Equipment . . . . . . . . . . .  10
9.   Taxes . . . . . . . . . . . . . . . . . . . . . . . . . .  10
10.  Maintenance, Repairs and Replacements . . . . . . . . .  15
11.  Payment of Utility Bills . . . . . . . . . . . . . . . .  17
12.  Alterations . . . . . . . . . . . . . . . . . . . . . . .  17
13.  Mechanics' Liens . . . . . . . . . . . . . . . . . . . .  19
14.  Insurance . . . . . . . . . . . . . . . . . . . . . . . .  20
15.  Damages by Fire or Other Casualty . . . . . . . . . . .  26
16.  Condemnation . . . . . . . . . . . . . . . . . . . . . .  28
17.  Assignment and Subletting . . . . . . . . . . . . . . .  31
18.  Use . . . . . . . . . . . . . . . . . . . . . . . . . . .  32
19.  Warranties and Representations . . . . . . . . . . . . .  33
20.  Estoppel Certificates. . . . . . . . . . . . . . . . . .  43
21.  Subordination, Non-Disturbance and Attornment . . . . .  43
22.  Change of Landlord . . . . . . . . . . . . . . . . . . .  46
23.  Tenant's Financing . . . . . . . . . . . . . . . . . . .  46
24.  Tenant's Property and Waiver of Landlord's Lien . . . .  48
25.  Memorandum of Lease; Commencement Date Agreement . . . .  48
26.  Expiration of Term and Holding Over . . . . . . . . . .  49
27.  Access / "For Rent" Signs . . . . . . . . . . . . . . .  51
28.  Force Majeure . . . . . . . . . . . . . . . . . . . . . .  53
29.  Events of Tenant's Default . . . . . . . . . . . . . . .  53
30.  Landlord's Remedies . . . . . . . . . . . . . . . . . . .  54
31.  Events of Landlord's Default; Tenant's Remedies . . . .  58
32.  Waiver . . . . . . . . . . . . . . . . . . . . . . . . . .  60

[J:\013363\155\basile6.Doc]
[April 23, 1996; DIVITA_R]

33.  Compliance with Applicable Laws . . . . . . . . . . . 60
34.  Notices . . . . . . . . . . . . . . . . . . . . . . 61
35.  Brokers . . . . . . . . . . . . . . . . . . . . . . 62
36.  Miscellaneous . . . . . . . . . . . . . . . . . . . 63
37.  Effectiveness of Lease; Tenant's Right to Terminate . . 67
38.  Confidentiality . . . . . . . . . . . . . . . . . . 72
39.  Right of First Refusal . . . . . . . . . . . . . . . 72

EXHIBITS

| | |
|---|---|
| "A" | Site Plan |
| "A-1" | Shopping Center Legal Description |
| "B" | Index of Definitions |
| "C" | Construction Provisions |
| "D" | Removable Trade Fixtures |
| "E" | Intentionally Omitted |
| "F" | Permitted Encumbrances |
| "G" | Subordination, Non-Disturbance and Attornment Agreement |
| "H" | Memorandum of Sublease |
| "I" | Commencement Date Agreement |
| "J" | Indemnification Agreement |

[J:\013363\155\basile6.Doc]
[April 23, 1996; DIVITA_R]

Basile Site
Maine Mall Road
So. Portland, Maine

<u>SUBLEASE</u>

This SUBLEASE is made as of the *13th* day of *MAY*, 1996, by
and between BASILE LIMITED LIABILITY COMPANY, a Connecticut
corporation, having an address c/o Basile Enterprises, Inc., 43
Ridgecrest Lane, Bristol, Connecticut 06010 ("Landlord"), and
CIRCUIT CITY STORES, INC., a Virginia corporation, having an
address at 9950 Mayland Drive, Richmond, Virginia 23233 ("Tenant").

W I T N E S S E T H :

That for and in consideration of the mutual covenants herein
contained and other good and valuable consideration, the receipt
and sufficiency of which are hereby acknowledged, the parties
hereto agree as follows:

1.   <u>Leased Property</u>.   Landlord demises and subleases to
Tenant and Tenant subleases and takes from Landlord, commencing on
the date of execution and delivery of this Sublease by Landlord and
Tenant (the "Commencement Date"), all those certain "Premises"
consisting of the "Building" and "Other Improvements" (both as
defined in paragraph 2), as and when same are constructed and that
approximately three and 48/100 (3.48) acre parcel (the "Land"), on
which the Building and Other Improvements will be located, as more

[J:\013363\155\basile6.Doc]
[April 23, 1996; DIVITA_R]

particularly shown (approximately) on Exhibit "A" hereto (the "Site
Plan"), known as 555 Maine Mall Road, lying and being partially in
the Town of Scarborough and partially in the City of South Portland
(collectively, the "City"), County of Cumberland, State of Maine
(the "State"), and more particularly described by metes and bounds
or platted lot legal description on <u>Exhibit "A-1"</u> attached hereto
and made a part hereof for all purposes.

2.    <u>Construction of Building and Improvements</u>.

2.1   Tenant shall, upon satisfaction of the conditions to
the effectiveness of this Sublease set forth in paragraph 37,
initially construct upon the Land a one-story retail building,
containing approximately 27,665 square feet of ground-floor gross
leasable area plus mezzanine, with provisions for customer pickup,
delivery and car stereo installation facilities, for use as a
Circuit City Superstore (the "Building"), together with loading
ramps, sidewalks, parking facilities and other site development
facilities appurtenant thereto, trash compactor, transformer pad
and other such appurtenances and improvements (collectively, the
"Other Improvements"), as more particularly set forth in the
Construction Provisions.   The Building and Other Improvements are
sometimes collectively referred to herein as the "Improvements".
The Improvements shall be constructed in accordance with the "Plans
and Specifications" to be prepared by Tenant as specified in the
"Construction Provisions" annexed hereto as Exhibit C.   Except as
otherwise provided herein, title to the Improvements shall be

[J:\013363\155\basile6.Doc]
[April 23, 1996; DIVITA_R]

transferred to Landlord by deed and bill of sale (representing only that Tenant is the sole owner of the Improvements free of claims of others, but without representations or warranties as to condition or fitness for any particular use or purpose) upon full payment of the "Tenant Improvement Allowance", as defined in the Construction Provisions.

2.2 Notwithstanding anything herein to the contrary, Tenant agrees that if Major Lessor's "Benefitted Land" (as defined in the Major Lease) is developed, Tenant shall relocate the five (5) parking spaces shown on the Site Plan adjacent to the "Car Stereo Installation Shop" and shall provide such curbing and landscaping or other screening as shall be reasonably required to screen Tenant's car stereo installation shop from the access easement reserved to Major Lessor in the Major Lease and to otherwise direct traffic between Tenant's car stereo installation shop and Major Lessor's future development. If Major Lessor's Benefitted Land is developed, Tenant shall also cause its loading dock, trash compactor and transformer to be screened from view from Major Lessor's Benefitted Land by the use of landscaping, walls or decorative fencing reasonably acceptable to Tenant and Major Lessor.

3.    Term.    The construction term (the "Construction Term") of this Sublease shall commence on the Commencement Date and shall end on the "Base Rent Date" (as defined in paragraph 4 below). The main term (the "Main Term") of this Sublease shall commence on the

3

[J:\013363\155\basile6.Doc]
[April 23, 1996; DIVITA_R]

Base Rent Date, and shall end on the last day of January following the twentieth (20th) anniversary of the Base Rent Date.

In addition to the Main Term, Tenant shall have the option, provided Tenant is not at the time of exercise of such option in default of any of the obligations on Tenant's part to be performed under this Sublease after receipt of notice thereof and expiration of any applicable cure or grace period, to renew and extend this Sublease for four (4) consecutive option periods following the Main Term (each such right referred to herein as a "Renewal Option"), the first three of which shall be for periods of five (5) years each and the last of which shall be for a period ending on January 31, 2035 (each such period referred to as an "Option Period" and collectively as the "Option Periods"), at the rent specified below. Tenant shall give Landlord written notice of its election to exercise any Renewal Option at least two hundred seventy (270) days prior to the expiration of the Main Term or any then-current Option Period, as applicable; provided, however, that in order to avoid any forfeiture or inadvertent lapse of such Renewal Option, if Tenant shall fail to give any such notice within the two hundred seventy (270) day time limit and shall not have given Landlord prior written notice of its intent not to exercise its Renewal Option, then and as often as the same shall occur, Tenant's right to exercise such Renewal Option shall nevertheless continue, as shall its tenancy hereunder (under the same terms and conditions as theretofore in effect and notwithstanding that the Main Term or then-current Option Period shall have expired), until ten (10)

4

[J:\013363\155\basile6.Doc]
[April 23, 1996; DIVITA_R]

business days after Landlord shall have given Tenant a written
notice of Landlord's election to terminate the Renewal Option,
during which period Tenant may exercise its Renewal Option at any
time prior to the expiration of such ten (10) business day period.
Upon the giving of notice of renewal and extension in accordance
with the foregoing provisions, the "Term" (defined below) of this
Sublease shall thereupon be renewed and extended in accordance with
such notice without further act by Landlord or Tenant, the same as
if such notice had been timely given hereunder, provided however,
notwithstanding anything in this Sublease to the contrary, in no
event shall this Sublease extend beyond October 30, 2035. In the
event Tenant fails to give notice extending and renewing the Term
within ten (10) business days after receipt of Landlord's written
notice of election to terminate the Renewal Option, this Sublease
shall terminate on the later of (x) the expiration of the then
existing Term, or (y) the date which is sixty (60) days after
receipt by Tenant of Landlord's written notice of election to
terminate the Renewal Option.

The Construction Term, Main Term and Option Periods are, col-
lectively, the "Term". The term "Lease Year" shall mean each
successive period of twelve (12) consecutive calendar months. The
first Lease Year shall commence on the first day of the calendar
month following the Base Rent Date.

5

4.   Rent.

4.1  (a)  <u>Construction Term</u>.    Except as hereinafter
provided, during the Construction Term, Tenant shall have no rental
obligations nor shall Tenant be responsible for any "Real Estate
Taxes" (as defined in paragraph 9) or any other costs, fees,
rentals or expenses.

(b) <u>Ground Rent</u>.    Provided the conditions to the
effectiveness of this Sublease set forth in paragraph 37 have been
satisfied, Tenant agrees to pay "Ground Rent" commencing on
November 1, 1996 through and including the date prior to the Base
Rent Date.  As use herein, the term "Ground Rent" shall mean a sum
equal to "Base Rent" (as such term is defined in the Major Lease)
payable under the Major Lease in accordance with the terms thereof
in effect on the date hereof.

4.2  <u>Base Rent</u>.    (a)  Tenant agrees to pay base rent
("Base Rent") for the Premises in the amounts and in the manner
specified hereunder, commencing on the date on which Landlord makes
payment of the Tenant Improvement Allowance as set forth in the
Construction Provisions (the "Base Rent Date").

(b)  Tenant shall pay Base Rent in equal monthly
installments, in advance on the first day of each calendar month
throughout the Term (except that if the Base Rent Date is not the
first day of a calendar month, Base Rent for the period from the
Base Rent Date to the last day of the month in which the Base Rent
Date occurs shall be apportioned on the basis of a 365-day year and

6

paid on the first day of the following month), to the address given
for Landlord in paragraph 34 hereof, unless Landlord shall give
Tenant written notice of a change of address or of the party to
whom such rents shall be payable along with written documentation
reasonably satisfactory to Tenant of such party's right to receive
payment hereunder. Base Rent shall be paid pursuant to the
following schedule:

> (i) <u>First Five Years</u>. During the first five (5)
> Lease Years, Tenant shall pay annual Base Rent in the
> amount of Four Hundred Twenty-Five Thousand and 00/100
> Dollars ($425,000.00), payable in equal monthly
> installments of Thirty-Five Thousand Four Hundred Sixteen
> and 67/100 Dollars ($35,416.67).

> (ii) <u>Increases in Base Rent</u>. Annual Base Rent shall
> increase on the first day of the sixth (6th) and every
> succeeding fifth Lease Year thereafter, over the initial
> Base Rent charged hereunder by the lesser of (x) fifteen
> percent (15%), or (y) two (2) times the percentage
> increase in the "CPI-U" (as defined below) during the
> five (5) year period ending on October 31 of the fifth
> (5th)(or, as applicable, any succeeding fifth) Lease
> Year. As used herein, the CPI-U shall be the United
> States Department of Labor, Bureau of Labor Statistics
> Consumer Price Index for All Urban Consumers, U.S. City
> Average. If at any time during the Term the CPI-U shall
> be discontinued, Landlord and Tenant shall mutually and
> reasonably agree to substitute an existing official index
> published by the Bureau of Labor Statistics or its
> successor or another similar index most nearly equivalent
> to the CPI-U. Any dispute as to the most nearly
> equivalent index shall be submitted to arbitration in
> accordance with paragraph 35(n) hereof.

If any Lease Year is other than twelve (12) months in length,
annual Base Rent during such Lease Year shall be the product of the
applicable monthly Base Rent times the number of months in such
Lease Year, with appropriate proration for any partial calendar
month therein.

7

(c) If Landlord has not tendered payment of the Tenant Improvement Allowance by the date (the "Outside Date") eight (8) months from Substantial Completion (as such term is defined in the Construction Provisions), then (i) such date shall become the Base Rent Date; (ii) Tenant shall continue to pay Ground Rent and shall have no obligation to pay Base Rent for the remainder of the Term; and (iii) this Sublease shall be converted to a ground sublease, with ownership of the Improvements remaining with Tenant, and Landlord's and any Mortgagees' names being removed as additional insureds or mortgagees on any casualty insurance described in paragraph 14.1(a) of this Sublease. Landlord and Tenant covenant and agree that upon the reasonable written request of either Tenant or Landlord, Landlord and Tenant shall execute such documentation as necessary to formalize the conversion of this Sublease to a ground sublease upon the Outside Date.

Notwithstanding the foregoing, so long as the Tenant Improvement Allowance has not been paid, at any time following the Outside Date and upon thirty (30) days prior written notice, Tenant shall have the right at Tenant's sole election, but not the obligation, in lieu of the requirement that Landlord pay to Tenant the Tenant Improvement Allowance, to mortgage, sell, convey, assign, lease or otherwise encumber (collectively, a "Transfer") Tenant's interest in the Building, the Improvements and this Sublease. Such right shall be in addition to the rights of Tenant set forth in paragraph 23 of this Sublease.

Landlord covenants to (i) execute all commercially

8

[J:\013363\155\basile6.Doc]
[April 23, 1996; DIVITA_R]

reasonable documents which do not increase Landlord's obligations under this Sublease (except as set forth in Paragraph 23) necessary to permit Tenant to effect the Transfer described herein, and (ii) cause any Mortgagee to execute and deliver a commercially reasonable agreement specifically acknowledging the rights of Tenant's lender and third parties arising as a result of such Transfer. Notwithstanding such Transfer, Tenant shall continue to pay Ground Rent in lieu of Base Rent during the remainder of the Term.

(d) In the event more than three (3) times during any 12-month period, Base Rent or Ground Rent, as is applicable, or any installment thereof, is not paid to Landlord within five (5) days after receipt of notice from Landlord to Tenant that Base Rent or Ground Rent (or installment) has not been received by Landlord on or before the due date thereof, Tenant shall pay to Landlord, as additional rent, a late charge equal to four percent (4%) of the third and subsequent overdue installments of Base Rent or Ground Rent (as is applicable) during such 12-month period.

5. INTENTIONALLY OMITTED

6. INTENTIONALLY OMITTED

7. INTENTIONALLY OMITTED

[J:\013363\155\basile6.Doc]
[April 23, 1996; DIVITA_R]

8. <u>Signs and Communications Equipment</u>.

(a) <u>Signs</u>. Tenant may, at Tenant's sole cost and expense, place or install one or more signs on the exterior walls and roof of the Building or on any other part of the Premises, including, without limitation, pylon or monument sign structure(s), which signs may be of such dimensions, design, colors and content as Tenant deems appropriate, provided, however, such signs comply with all applicable laws and governmental requirements. In the event of an assignment or subletting as a result of which Tenant is no longer occupying all or any portion of the Premises, Tenant's signs may be replaced by signs identifying the appropriate assignee or subtenant(s).

(b) <u>Communications Equipment</u>. In amplification of Tenant's rights hereunder, Tenant may, from time to time, install, maintain and/or replace any satellite dishes or antennas on the roof and/or exterior walls or parapet of the Building as Tenant deems necessary or desirable, provided same shall not adversely and materially affect the roof or the structural elements thereof. Upon removal by Tenant of any satellite dishes or antennas, Tenant shall repair any damage done in connection with such removal.

9. <u>Taxes</u>.

(a) <u>Taxes Contemplated Hereunder</u>. The term "Real Estate Taxes" shall mean all general and special real estate taxes and assessments and other ad valorem taxes, rates and levies paid upon or with respect to the Premises, for a calendar year or a portion

10

[J:\013363\155\basile6.Doc]
[April 23, 1996; DIVITA_R]

thereof to any governmental agency or authority and all charges specifically imposed in lieu of any such taxes; and all sewer, water and fire protection assessments which Landlord is required to pay as lessee under the Major Lease.  Nothing contained in this Sublease shall require Tenant to pay any local, county, municipal, state or federal income, franchise, corporate, estate, inheritance, succession, capital levy, business or transfer tax of Landlord. Except to the extent same are substituted in lieu of Real Estate Taxes, and then only to the extent same are limited to the Premises as if it were the only property owned or leased by Landlord, nothing contained in this Sublease shall require Tenant to pay any local, county, municipal, state or federal profits, gross receipts, sales or renewal tax.  Real Estate Taxes shall also include any tax which, pursuant to the wording or interpretation of the tax statute or law, is expressly imposed upon Tenant as lessee of real property and which is exclusively limited to rentals payable in respect of real property.

(b)  Payment of Real Estate Taxes.  Landlord shall cause the Premises to be designated as an independent tax lot and separately assessed for Real Estate Tax purposes.   When the Premises become separately assessed, Tenant shall pay, or cause the payment of, all Real Estate Taxes directly to the taxing authority before any fine, penalty, interest or cost may be added thereto, become due or be imposed by operation of law for the nonpayment or late payment thereof.

Until a separate assessment for the Premises is obtained,

11

Tenant shall pay to Landlord, as additional rent, a portion
("Tenant's Tax Share") of the Real Estate Taxes assessed against
the tax lot or lots of which the Premises is a part, which portion
shall be equal to the sum of (i) Real Estate Taxes assessed against
the land within said tax lot(s) multiplied by a fraction, the
numerator of which shall be the number of square feet of land area
within the Premises and the denominator of which shall be the
aggregate number of square feet of land area within said tax
lot(s), and (ii) Real Estate Taxes assessed against the
Improvements.  Tenant's Tax Share shall be paid to Landlord within
thirty (30) days after demand therefor (but not more than fifteen
(15) days prior to the due date thereof), which demand shall
include a copy of the applicable tax bill; the receipted tax bill
for the previous payment period; and a statement, certified by a
surveyor or engineer, as to the number of square feet of land area
within the Premises and the tax lots of which the Premises is a
part.   Until a separate assessment for the Premises is obtained,
Landlord shall pay, or cause the payment of, all Real Estate Taxes
affecting the tax lots of the Premises is a part before any fine,
penalty, interest or cost may be added thereto, or become due or be
imposed by operation of law for the non-payment or late payment
thereof and Landlord acknowledges that Tenant shall not be liable
for any portion of such fine, penalty, interest or cost, unless
Landlord's failure to timely pay Real Estate Taxes is due to
Tenant's failure to timely pay Tenant's Tax Share as provided
herein, in which event Tenant shall pay such interest, fine,
penalty or cost.

In the event Tenant or any assignee of this Sublease or

12

[J:\013363\155\basile6.Doc]
[April 23, 1996; DIVITA_R]

sub-subtenant of the Premises or any Facilitator becomes aware that
Landlord has failed to pay Real Estate Taxes, or any part thereof,
which Landlord is obligated to pay hereunder, on or before the due
date thereof, such party may, but shall not be obligated to, make
payment of such Real Estate Taxes remaining due directly to the
taxing authority.   In such event Landlord shall reimburse such
paying party, and Tenant may, after ten (10) days' notice to
Landlord and the continued failure of Landlord to reimburse Tenant,
deduct the paid amount, together with interest thereon, and any
expense incurred in connection therewith, from ten percent (10%) of
the next succeeding payment or payments of Base Rent payable
hereunder.   If Tenant makes payment of Real Estate Taxes which
Landlord is obligated to pay hereunder at any time after expiration
of the fifteenth (15th) Lease Year of the Term, Tenant may offset
the paid amount, together with interest thereon, and any expense
incurred in connection therewith, from twenty-five percent (25%) of
the next succeeding payment or payments Base Rent payable
hereunder, except if Tenant would not recover the full amount of
the cost thereof prior to expiration of the Term, in which event
Tenant may offset paid amount, together with interest thereon, and
any expense incurred in connection therewith, from such percentage
of next succeeding payment or payments Base Rent as necessary for
Tenant to recover said cost or amount prior to expiration of the
Term.

       Real Estate Taxes shall be prorated as of the Base Rent
Date and the expiration or earlier termination of this Sublease.
Tenant shall pay to Landlord, together with the first installment
of Base Rent, the prorated amount of Real Estate Taxes paid by

13

Landlord for the period subsequent to the Base Rent Date and prior to the next due payment of Real Estate Taxes payable directly to the taxing authority by Tenant. Landlord shall promptly return to Tenant any overpayment made by Tenant not attributable to the period of Tenant's possession of the Premises.

(c) <u>Contest of Real Estate Taxes and/or Assessed Valuation of Property</u>. Tenant shall have the right, at Tenant's sole expense, to contest the amount or validity, or otherwise seek an exemption or abatement, of any Real Estate Taxes or to seek a reduction in the valuation of the Premises assessed for Real Estate Tax purposes, by appropriate proceedings diligently conducted in good faith, provided that Tenant shall first have notified Landlord of its intent to do so and Landlord shall have failed to notify Tenant in writing, within five (5) days of receipt of Tenant's notice, that Landlord intends to contest such Real Estate Taxes or seek such a reduction. In any instance where any such action or proceeding is being undertaken by Tenant, Landlord shall cooperate with Tenant, execute any and all documents required in connection therewith and, if required by any law, rule or regulation of the taxing authority, shall join with Tenant in the prosecution thereof. Tenant shall, promptly upon demand from Landlord, reimburse Landlord any reasonable, out-of-pocket costs incurred by Landlord in connection with a contest or appeal undertaken by Tenant.

(d) <u>Payment During and Following Appeal</u>. During the pendency of any such contest or appeal, Tenant shall make all payments of Real Estate Taxes the payment of which is a prerequisite to the commencement or prosecution of such contest or

14

appeal, or which may be required to prevent a forfeiture of the
Premises for non-payment thereof.   Upon the termination of the
proceedings set forth in subparagraph (c) above, Tenant shall pay
Real Estate Taxes as finally determined in such proceedings, the
payment or partial payment of which may have been deferred during
the prosecution of such proceedings.   Tenant shall be entitled to
the entire refund paid or returned by the taxing authority as a
result of in connection with any contest or appeal of Real Estate
Taxes, whether such contest or appeal is undertaken by Landlord or
Tenant (and Landlord shall have no obligation therefor unless
Landlord actually receives the proceeds of such refund).

10.   <u>Maintenance, Repairs and Replacements</u>.   Except (i) for
costs covered by Landlord's insurance required to be maintained
hereunder, if any, (ii) for condemnation proceeds to be received by
Tenant, or (iii) for obligations arising from the negligent acts or
omissions or willful misconduct of Landlord (or its agents,
employees, contractors or other tenants), Tenant shall maintain the
Premises in good order and repair, with a neat and clean
appearance, including, but not limited to, the interior and
exterior thereof, structural and non-structural portions of the
Building, and repairs and/or replacements to plumbing, heating,
electrical and air conditioning systems which serve only the
Premises.   During the last five (5) years of the Term of this
Sublease (without consideration to the exercise of any additional
Renewal Options), if Tenant is required to repair or replace the

15

[J:\013363\155\basile6.Doc]
[April 23, 1996; DIVITA_R]

roof of the Building in satisfaction of its obligations hereunder, and such repair or replacement under generally accepted accounting principals is classified as a capital expenditure, and if said expenditure cannot be fully amortized in accordance with generally accepted accounting principles, or the Internal Revenue Code and Regulations, over the remainder of the Term (without consideration to the exercise of any additional Renewal Options unless Tenant in fact exercises one or more Renewal Options thereafter), then, promptly upon expiration or other termination of the Term of this Sublease, Tenant shall be reimbursed by Landlord by that amount of the cost associated with such repairs and/or replacement for the period beyond the remainder of the Term (without consideration to the exercise of any additional Renewal Options), and the provisions hereof, and Tenant's remedies in respect of Landlord's default hereunder, shall expressly survive the expiration or earlier termination of this Sublease.   All maintenance, repairs or replacements shall be done by Tenant lien-free and in a good and workmanlike manner at least consistent with the quality of labor and materials used in originally constructing the Improvements and in accordance with all applicable law.

11. <u>Utilities</u>.

(a)   Tenant shall have the right to enter into reasonable agreements with utility companies creating easements upon or under the Premises in favor of such companies as are required in order to service the Premises.   Landlord agrees to cause Major Lessor to

[J:\013363\155\basile6.Doc]
[April 23, 1996; DIVITA_R]

execute any and all documents, agreements and instruments in form and substance satisfactory to such utility companies and to take such other action in order to effectuate the same, all at Tenant's cost and expense.

(b) Tenant will pay directly to the appropriate utility company or governmental agency, when due, all bills for gas, water, sanitary sewer, electricity, telephone and other public or private utilities used by Tenant with regard to the Premises.

12. **Alterations.** (a) Tenant may, at any time and from time to time, make such alterations, changes, enlargements, replacements and additions to the Improvements and the remainder of the Premises, as well as reconstruction thereof, or new construction, as Tenant may deem desirable. Prior to commencing any alteration, Tenant shall submit to Landlord, for informational purposes only, a set of plans and specifications prepared by a licensed architect or engineer (if preparation of plans and specifications by an architect or engineer is required by municipal codes, or if such alteration would result in the gross leasable area on the ground-floor of the Building being increased). Prior to commencing any alteration, Tenant shall obtain any permits and approvals required therefor. Tenant shall cause all such alterations to be lien-free (in accordance with paragraph 13) and made and completed at Tenant's cost in a workmanlike manner and in compliance with the Major Lease and all applicable law. Without cost or expense to Landlord or Major Lessor, Landlord shall cooperate, and shall cause

17

[J:\013363\155\basile6.Doc]
[April 23, 1996; DIVITA_R]

Major Lessor to cooperate, with Tenant in the obtaining of any and all licenses, building permits, certificates of occupancy or other governmental approvals which may be required in connection with any such modifications or alterations, and Landlord shall execute, acknowledge and deliver, and shall cause Major Lessor to execute acknowledge and deliver, any documents reasonably required in furtherance of such purposes.

(b) In the event that as a result of any alteration by Tenant the ground-floor gross leasable area of the Building will be increased, Landlord may, upon notice to Tenant given within thirty (30) days after receipt of plans and specifications to be delivered to Landlord pursuant to subparagraph (a) above, elect to pay to Tenant an additional Building Allowance equal to Fifty-Five and 00/100 Dollars ($55.00) per square foot of ground-floor gross leasable area of the Building in excess of 27,223 square feet (up to a maximum of 33,053 square feet), payable in the same manner as the initial Tenant Improvement Allowance. From and after receipt by Tenant of said additional Building Allowance, Base Rent shall be equal to the product of (x) Base Rent calculated in accordance with Section 4.2 hereof, and (y) a fraction, the numerator of which shall be the number of square feet of ground-floor gross leasable area within the Building after completion of the alteration (but not exceeding 33,053), and the denominator of which shall be the number of square feet of ground-floor gross leasable area within the Building immediately prior to the alteration. In determining the ground-floor gross leasable area of the Building, measurement

18

[J:\013363\155\basile6.Doc]
[April 23, 1996; DIVITA_R]

shall be made from the centerline of any common walls and from the outside of any exterior walls, provided however, for purposes of calculating the additional Building Allowance and Base Rent pursuant to this Section 12(b), the ground-floor gross leasable area shall be deemed not to exceed 33,053.

13. <u>Mechanics' Liens</u>. Landlord and Tenant covenant to each other that they will not permit any lien to be filed against the Premises as a result of nonpayment for, or disputes with respect to, labor or materials furnished to the Premises for or on behalf of Tenant, Landlord or any party claiming by, through, or under Tenant or Landlord, nor shall either party permit any judgment, lien or attachment to lie, as applicable, against the Premises. Should any lien of any nature, including but not limited to the foregoing, be filed against the Premises, the party on account of whose actions such lien has been filed shall, within thirty (30) days after receipt of written notice of such lien, cause said lien to be removed, or otherwise protected against execution during good faith contest, by substitution of collateral, posting a bond therefor, escrowing of adequate funds to cover the claim and related transaction costs or such other method as may be permissible under applicable title insurance regulations and reasonably acceptable to the other party hereto.

[J:\013363\155\basile6.Doc]
[April 23, 1996; DIVITA_R]

14.   <u>Insurance</u>.

14.1 (a)   <u>Property Damage</u>.   (i) During the Construction
Term, Tenant shall keep or require its general contractor to keep,
in full force and effect, a policy of builder's risk insurance
covering loss or damage to the Improvements for the full
replacement value of all such construction.   During the Main Term
and all Option Periods, Tenant shall keep in full force and effect
a policy of fire and extended coverage insurance covering loss or
damage to the Premises in an amount not less than the reasonable
estimate of the cost of replacing the Improvements, exclusive of
excavation, footings and foundations (which amount shall initially
be not less than the Building Allowance), with   "vandalism and
malicious mischief" and "difference in conditions", "increased cost
of construction" and "demolition costs which may be necessary to
comply with building laws" endorsements, with a commercially
reasonable deductible, for which Tenant shall be fully responsible.
The estimated cost of replacing the Improvements shall be reviewed
by Tenant at least once every five (5) Lease Years, and the amount
of insurance coverage shall be adjusted as appropriate in
accordance with such review.   If the Improvements include a steam
boiler or any pressure vessel, Tenant shall also carry boiler and
machinery coverage pursuant to an endorsement or separate policy.
If owners and lessees of comparable buildings in comparable
locations do not customarily carry any of the coverages or
endorsements required pursuant to this paragraph 14.1, Tenant shall
not be required to carry the comparable coverage or endorsement

20

hereunder.

        (ii)    Landlord, Major Lessor and Landlord's first "Mortgagee" (as defined in paragraph 21 below), shall be named in such policy or policies as additional insureds as their respective interests may appear.

        (b)  <u>Liability Insurance</u>.  During the Term, Tenant shall keep in full force a policy of commercial general liability insurance with bodily injury and property damage coverage with respect to the Premises and business operated by Tenant, which shall name Landlord, Major Lessor and Landlord's first Mortgagee as additional insureds as their respective interests may appear.  The limits of such commercial general liability policy shall be not less than $5,000,000.00 combined single limit for bodily injury and property damage, with a commercially reasonable deductible.

        (c)  <u>Workers' Compensation Insurance.</u>  To the extent required by law, Tenant shall maintain workers' compensation insurance covering their respective employees in statutory limits, or maintain such alternate coverages or arrangements as legally permissible.

        (d)  <u>Self-Insurance</u>.  Notwithstanding anything to the contrary contained herein, Tenant shall have the right to self-insure against any of the risks or portions thereof set forth in subparagraphs (a) and (b) (and to the extent then permitted by law, (c)) above, provided Tenant is then occupying the Premises and has a reported net worth, as of the end of Tenant's most recent quarterly reporting period, of not less than Seventy-Five Million

[J:\013363\155\basile6.Doc]
[April 23, 1996; DIVITA_R]

Dollars ($75,000,000), as computed in accordance with generally
accepted   accounting   principles,   consistently   applied,   as
determinable from Tenant's public disclosures and/or regularly
maintained corporate balance sheets which are generally available
to shareholders (no right of Landlord to audit or conduct
independent investigations being implied by this provision).

14.2 Intentionally Omitted

14.3 Policy Provisions.  (a) All policies of insurance
(other than self-insurance) enumerated above shall be provided by
insurance carriers licensed to do business in the State of Maine,
with a Best rating of not less than B+VI and reasonably acceptable
to Major Lessor.  Any insurance coverage enumerated above may be
effected by a blanket policy or policies of insurance or under so-
called "all risk" or "multi-peril" insurance policies, provided
that the total amount of insurance available with respect to the
Premises and Tenant's liability hereunder shall be at least the
equivalent of separate policies in the amounts herein required, and
provided further that in other respects any such policy or policies
shall comply with the provisions of this paragraph 14.    An
increased coverage or "umbrella" policy may be provided and uti-
lized by either party to increase the coverage provided by indi-
vidual or blanket policies in lower amounts, and the aggregate
coverage provided by all such policies with respect to the Premises
and Tenant's liability hereunder shall be satisfactory provided
that such policies otherwise comply with the provisions of this
paragraph 14.

22

(b)  <u>Waiver of Right of Recovery and Subrogation</u>.
To the extent that insurance proceeds are actually received in
satisfaction of a loss which is covered by insurance or is self-
insured hereunder (with the deductible under any policy being
deemed to be self-insured), Landlord and Tenant hereby waive any
and all rights of recovery against each other for any loss or
damage to the Premises or the contents contained therein, for loss
of income on account of fire or other casualty, or for injury
sustained on the Premises; and each party's policies of insurance
shall contain appropriate provisions recognizing this mutual
release and waiving all rights of subrogation by the respective
insurance carriers.  The provisions of this Paragraph 14.3(b) are
not intended to waive recovery against Tenant for Tenant's breach
of its obligation, if any, to restore the Building and other
Improvements after a fire or other casualty, or for Tenant's breach
of any other obligation on Tenant's part to be performed under this
Sublease.

(c)  <u>Evidence of Insurance</u>.  Subject to Tenant's
right to self-insure hereunder, upon (x) commencement of the Main
Term (as to property insurance), (y) upon the Commencement Date (as
to liability insurance) and (z) no less than annually thereafter,
Tenant shall cause to be issued to Landlord and Major Lessor in
lieu of the original policy, an appropriate certificate of
insurance reasonably acceptable to Landlord and Major Lessor evi-
dencing compliance with the applicable covenants of this paragraph
14.  Each such certificate shall provide that no expiration,

23

[J:\013363\155\basile6.Doc]
[April 23, 1996; DIVITA_R]

cancellation or material change in the insurance evidenced thereby shall be effective unless thirty (30) days' unconditional notice of such expiration, cancellation or material change shall have been given to the certificate-holder (and any Mortgagee, if applicable).

14.4   Indemnities.   Except if arising from the negligent or willful acts of Landlord or its agents or employees (to the extent that paragraph 14.3 is inapplicable thereto), Tenant hereby agrees to indemnify, defend and hold Landlord harmless from all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring on the Premises or resulting from Tenant's use thereof, or resulting from a breach by Tenant of any of the terms, covenants or obligations on Tenant's part to be performed under this Sublease.

Except if arising from the negligent or willful acts of Tenant or its agents or employees (to the extent that paragraph 14.3 is inapplicable thereto), Landlord agrees to indemnify, defend and hold Tenant harmless from any and all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring or resulting from the use or occupancy of the Premises by Landlord, its agents or employees, or resulting from a breach by Landlord of any of the terms, covenants or obligations on Landlord's part to be performed under this Sublease.

14.5 Waiver and Release.   Tenant waives and releases all claims against Landlord, its employees and agents with respect to

24

[J:\013363\155\basile6.Doc]
[April 23, 1996; DIVITA_R]

all matters (if any) for which Landlord has disclaimed liability
pursuant to the provisions of this Sublease.  In addition, Tenant
agrees that Landlord, its agents and employees will not be liable
for any loss, injury, death or damage (including consequential
damages) to persons, property or Tenant's business occasioned by
theft; act of God; public enemy; ; riot; strike; insurrection; war;
; ; explosion; falling objects; steam, water, rain or snow; leak or
flow of water from or into the Premises or from the roof, street,
subsurface or any other place; dampness; from the breakage,
leakage, obstruction or other defects in pipes, sprinklers, wires,
appliances, plumbing, air conditioning or lighting fixtures of the
Building; or from construction, repair or alteration of the
Improvements.

15.  <u>Damages by Fire or Other Casualty</u>.

(a)  In the event of an insured fire, earthquake or other
casualty, causing destruction or damage to the Improvements, this
Sublease shall not terminate except as expressly set forth in
subparagraph (b) below, and Base Rent and other charges shall
continue to be paid by Tenant pursuant to the terms of paragraph 4
hereof.  Within ninety (90) days (subject to force majeure) after
(x) such casualty, (y) receipt of applicable governmental permits
and approvals, and (z) receipt of insurance proceeds (unless self-
insured), to the extent of the damage to the Premises, Tenant shall
commence reconstruction of the Building and Other Improvements
(including substantially equivalent value in equipment, furniture

25

and fixtures), to that condition existing immediately prior to such casualty, in Tenant's reasonable discretion, with such alterations as may be permitted under paragraph 12 hereof. In the event, subject to force majeure, the Premises are not substantially repaired and reconstructed, and equipment, furniture and fixtures restored or replaced within two hundred forty (240) days after receipt of any required governmental permits, for which permits Tenant shall make prompt application following such destruction or damage, and insurance proceeds (if not self-insured), then Landlord, at its option, by giving written notice to Tenant within thirty (30) days after the expiration of said period, may undertake completion of such reconstruction, in which event Tenant shall make available to Landlord all applicable insurance proceeds for such reconstruction (including any applicable deductible) or, if self-insured, the amount necessary for such reconstruction.

(b) Notwithstanding the foregoing, in the event of a fire, earthquake or other casualty, causing destruction or damage to the Improvements occurs within the last two (2) years of the Main Term or of any Option Period and:

> (i) the damage to the Improvements has a repair and reconstruction cost of thirty-three percent (33%) or more of the then-total reconstruction cost of the Improvements; or
>
> (ii) such damage or destruction could not, with reasonable dispatch, be repaired and the Improvements restored within sixty (60) days after such damage or destruction; or
>
> (iii) if any such damage or destruction occurs within the last year of the Main Term or of any Option Period and such damage or destruction could not, with reasonable

26

[J:\013363\155\basile6.Doc]
[April 23, 1996; DIVITA_R]

dispatch, be repaired and the Improvements restored
within thirty (30) days after such damage or destruction,

Tenant shall be under no obligation to restore the Improvements, in
which case this Sublease shall terminate at Tenant's option, such
option to be exercised by Tenant giving not less than thirty (30)
days' prior written notice to Landlord, and Landlord shall receive
the proceeds of any insurance (together with any applicable
deductible) which may be payable with regard to such destruction or
damage or, in the event Tenant self-insures, the amount necessary
for reconstruction of the Improvements.

    16.  Condemnation.

        (a)  Definition of Taking and Substantial Taking.  For
the purpose of this Sublease, a "Taking" shall mean any
condemnation or exercise of the power of eminent domain by any
authority vested with such power or any other taking for public
use, including a private purchase in lieu of condemnation by an
authority vested with the power of eminent domain; the "Date of
Taking" shall mean the earlier of the date upon which title to the
Premises, or any portion thereof so taken is vested in the
condemning authority or the date upon which possession of the
Premises, or any portion thereof is taken by the condemning
authority; and "Substantially All of the Premises" shall mean (i)
so much of the Improvements as, when taken, leaves the untaken
portion unsuitable, in Tenant's reasonable opinion, for the
continued feasible and economic operation of the Premises by Tenant

27

[J:\013363\155\basile6.Doc]
[April 23, 1996; DIVITA_R]

for the same purposes as immediately prior to such Taking or as contemplated herein, or (ii) so many of the parking spaces within the Premises as reduces the parking ratio below the greater of five (5) spaces (for full-sized automobiles) per 1000 square feet of ground-floor gross leasable area or that ratio which is required by the zoning ordinance applicable to the Premises, or (iii) access to the Premises is materially and adversely affected.

(b)   <u>Tenant's Rights Upon Taking or Substantial Taking</u>. In the event of a Taking of Substantially All of the Premises, Tenant, at its option upon thirty (30) days' written notice to Landlord, which shall be given no later than sixty (60) days following the Taking, shall have the right to terminate this Sublease.  All Base Rent and other sums payable by Tenant hereunder shall be apportioned and paid through and including the Date of Taking, and neither Landlord nor Tenant shall have any rights in any compensation or damages payable to the other in connection with such Taking.

(c)   <u>Tenant's Rights Upon Less Than Substantial Taking</u>. In the event of a Taking of less than Substantially All of the Premises, Base Rent and other charges shall be reduced fairly and equitably in accordance with the portion condemned or taken, effective as of the Date of Taking, and Tenant shall make all necessary restorations to the Improvements so that the portions of the Improvements not taken constitute a complete architectural unit, provided that the cost thereof to Tenant shall not exceed the proceeds of Tenant's condemnation award (to the extent that such

28

relates to the Improvements and not to Tenant's personal property, intangibles or out-of-pocket expenses unrelated thereto) and the portion of Landlord's award allocable to the Premises, which Landlord shall make available to Tenant for such restoration. If the Taking occurs within the last two (2) years of the Main Term or of any Option Period and has a material impact on Tenant's ability to conduct business as reasonably determined by Tenant, this Sublease shall terminate at Tenant's option, such option to be exercised by Tenant giving not less than thirty (30) days' prior written notice to Landlord.

(d) <u>Rights Upon Temporary Taking</u>. In the event of a Taking of the Premises or any portion thereof, for temporary use (specifically one not exceeding 60 days in duration), without the taking of the fee simple title thereto, this Sublease shall remain in full force and effect. All awards, damages, compensation and proceeds payable by the condemnor by reason of such Taking for periods prior to the expiration of this Sublease shall be payable to Tenant. All awards, damages, compensation and proceeds payable by the condemnor by reason of such Taking for the cost of restoration of the Premises, if any, shall be deposited with a mutually agreeable escrow agent, such as a title company or Mortgagee, which escrow agent shall disburse such proceeds to Tenant for purposes of paying the costs of restoration of the Premises. All such awards, damages, compensation and proceeds for periods after the expiration of this Sublease shall be payable to Landlord. Anything contained herein to the contrary notwith-

29

[J:\013363\155\basile6.Doc]
[April 23, 1996; DIVITA_R]

standing, a temporary Taking for any period in excess of sixty (60) days may, at Tenant's option, be deemed a permanent Taking and shall be governed by subparagraph (b) or (c) above, as applicable.

(e) <u>Tenant's Right Upon Condemnation</u>. In the event of a Taking described in subparagraph (b) or (c) above, Tenant shall be entitled to claim compensation from the condemning authority for the value of its subleasehold interest in the Premises, its unamortized leasehold improvements paid for by Tenant and not reimbursed by Landlord as part of the Tenant Improvement Allowance, relocation expenses and any other items to which Tenant is entitled under applicable law. Subject to Tenant's claim set forth in the preceding sentence, Landlord, subject to the rights of Major Lessor under the Major Lease, shall be entitled to claim compensation from the condemning authority for the reversionary interest of its leasehold estate and the value of the Improvements.

17. <u>Assignment and Subletting</u>. Tenant shall have the right to sub-sublet, assign, transfer, reassign and grant concessions or licenses (a "Conveyance") in all or any part of the Premises and any of Tenant's rights and obligations under this Sublease during the Term, without Landlord's prior consent. In the event of such a Conveyance, Tenant shall remain liable for all of Tenant's obligations to Landlord arising hereunder so long as this Sublease is not changed, modified or amended in any respect by Landlord and any transferee.

Any assignment or sub-subletting of this Sublease by

30

Tenant shall be executed by Tenant and the assignee or sub-sublessee. Each assignee or sub-sublessee, for the benefit of Landlord, shall agree to assume, be bound by, and perform all terms, covenants, and conditions of this Sublease to be kept and performed by Tenant. After execution of the assignment or sub-sublease, Tenant will forward a completed copy thereof to Landlord.

18.   Use.

(a)   Tenant shall initially maintain, use and operate the Premises as a retail store for (i) the sale of consumer, office and automotive electronics products (which include, but shall not be limited to, televisions, stereos, speakers and video recorders and players), computer hardware and software, entertainment software and entertainment media (which include, but shall not be limited to, records, game cartridges, video tapes, cassettes and compact discs), cellular telephones, household appliances (which include, but shall not be limited to, refrigerators, freezers, stoves, microwave ovens, vacuum cleaners and dishwashers) and related goods and the sale and installation of motor vehicle audio, stereo and telephone systems (all of such items being herein collectively referred to as the "Products"), and (ii) renting, servicing, repairing and warehousing of the Products.

(b)   Thereafter, Tenant shall have the right to use the Premises for any lawful retail use; provided, however, that the Premises shall not be used (i) for any illegal purpose, (ii) in violation of the Major Lease, or (iii) in violation of any

31

applicable provision of the "Permitted Encumbrances" contained in
**Exhibit "F"**. Tenant shall, at Tenant's cost and expense, obtain
any and all licenses and permits necessary for the particular use
and/or business being conducted within the Premises. Tenant shall
not use or permit the use of the Premises in any manner that would
constitute waste or a public or private nuisance.

(c) Except as may be expressly set forth in this
paragraph 18, nothing contained in this Sublease shall be construed
to require Tenant to operate the Premises continuously either for
the use first stated or for any other use.

19. **Warranties and Representations.**

(a) Landlord represents, warrants and covenants to
Tenant that:

(i) Major Lease.

1. Landlord is the lessee under that certain
Ground Lease Agreement dated as of November 1, 1995
and executed by Landlord, as lessee, and Paul Patry
and Gayle Patry, as lessor (sometimes hereinafter
referred to as "Major Lessor"), as amended by letter
agreement dated November 8, 1995, First Amendment
to Ground Lease dated December 28, 1995 and Second
Amendment to Ground Lease dated on or about the
date hereof (said Ground Lease Agreement, as
amended is herein referred to as the "Major Lease");

2. Landlord warrants and represents that (x)
Landlord has delivered a true, accurate and
complete copy of the Major Lease to Tenant and the
Major Lease has not been further modified or
amended, the Major Lease is in full force and
effect, and Landlord has not received any notice of
any default under the Major Lease, or notice of any
condition or circumstance which, with notice or the
lapse of time, or both, could become a default
under the Major Lease, (y) the initial or primary

32

term of the Major Lease shall expire on October 31, 2035.

3. Landlord covenants and agrees to pay when due all rents and other payments which become payable to Major Lessor under the Major Lease and to carry out and perform all other terms, covenants, provisions and conditions of the Major Lease on Landlord's (as lessee under the Major Lease) part to be performed.

4. Landlord shall, upon notice from Tenant, make demand upon Major Lessor to perform its obligations under the Major Lease. If, following the making of such demand (and the expiration of any grace period granted to Major Lessor under the Major Lease), the same shall not have been cured by Major Lessor, then Landlord shall, to the extent permitted by the Major Lease, cure such default on behalf of Major Lessor. In the event Landlord does not cure or commence to cure any such default on behalf of Major Lessor within ten (10) days after expiration of any grace period granted to Major Lessor under the Major Lease, Tenant shall have the right to cure defaults of Major Lessor and exercise rights of self-help to the same extent that Landlord has such rights as lessee under the Major Lease. If Tenant cures a default of Major Lessor at any time during the first fifteen (15) Lease Years of the Term, Tenant may offset the cost or amount thereof from ten percent (10%) of the next succeeding payment or payments Base Rent payable hereunder. If Tenant cures a default of Major Lessor at any time after expiration of the fifteenth (15th) Lease Year of the Term, Tenant may offset the cost or amount thereof from twenty-five percent (25%) of the next succeeding payment or payments Base Rent payable hereunder, except if Tenant would not recover the full amount of the cost thereof prior to expiration of the Term, in which event Tenant may offset the cost or amount thereof from such percentage of next succeeding payment or payments Base Rent as necessary for Tenant to recover said cost or amount prior to expiration of the Term.

5. Landlord agrees to defend and indemnify Tenant, and hold Tenant harmless, from and against any and all claims, demands, causes of actions, suits, damages, liabilities and expenses of any nature whatsoever arising out of or in connection

[J:\013363\155\basile6.Doc]
[April 23, 1996; DIVITA_R]

with the enforcement of, or a claimed breach of,
the Major Lease by Landlord, as lessee thereunder
(unless resulting from the acts or omissions of
Tenant), or any covenant, term, condition or
provision thereof.

6.  Whenever, pursuant to the Major Lease,
consent shall be required by or requested from
Landlord as lessee thereunder, or an election made
by Landlord, such consent shall not be granted nor
election made without the prior consent of Tenant,
which consent shall not be unreasonably delayed or
denied (for purposes of this Paragraph 19(a) it
shall be deemed reasonable for Tenant to deny
consent if the granting of such consent would,
directly or indirectly, result in a diminution of
Tenant's rights or remedies under this Sublease, or
would increase Tenant's obligations under this
Sublease, or would adversely affect Tenant's use of
the Premises or the conduct of Tenant's business
therein);

7. Landlord shall, immediately upon receipt,
forward to Tenant a copy of any and all notices
and/or demands received by Landlord from Major
Lessor claiming or giving notice of a failure of
Landlord to perform the obligations of Landlord (as
lessee under the Major Lease).

8. Landlord shall not amend or modify the Major
Lease without the prior consent of Tenant, which
consent shall not be unreasonably delayed or denied
(for purposes of this Paragraph 19(a) it shall be
deemed reasonable for Tenant to deny consent if the
granting of such consent would, directly or
indirectly, result in a diminution of Tenant's
rights or remedies under this Sublease, or would
increase Tenant's obligations under this Sublease,
or would adversely affect Tenant's use of the
Premises or the conduct of Tenant's business
therein).  Landlord shall not terminate the Major
Lease without the prior consent of Tenant.

9. Tenant may, but shall not be obligated to,
cure any default by Landlord under the Major Lease,
provided, except in the event of an emergency,
Tenant shall not commence to cure such default by
Landlord if Landlord commences to cure such default
and proceeds with due diligence and in good faith
to complete such cure.  Unless Landlord's default
under the Major Lease arose out of an act or

34

omission of Tenant, Landlord shall immediately reimburse Tenant for the reasonable costs incurred by Tenant in performing any of Landlord's obligations under the Major Lease, and failing such reimbursement, Tenant may, during the first fifteen (15) Lease Years of the Term, offset the cost or amount thereof from ten percent (10%) of the next succeeding payment or payments Base Rent payable hereunder. If Tenant cures a default of Landlord under the Major Lease at any time after expiration of the fifteenth (15th) Lease Year of the Term, Tenant may offset the cost or amount thereof from twenty-five percent (25%) of the next succeeding payment or payments Base Rent payable hereunder, except if Tenant would not recover the full amount of the cost thereof prior to expiration of the Term, in which event Tenant may offset the cost or amount thereof from such percentage of the next succeeding payment or payments Base Rent as necessary for Tenant to recover said cost or amount prior to expiration of the Term.

10. This Sublease is and shall be subject and subordinate to the provisions of the Major Lease, however, as between Landlord and Tenant, whenever the terms, covenants and conditions of this Sublease shall be in conflict with the terms, covenants and conditions of the Major Lease, the terms of this Sublease shall control.

11. Landlord shall designate in writing to Major Lessor, Tenant as the "primary subtenant" under the Major Lease and shall not revoke, terminate or modify such designation.

(ii) Quiet and Peaceful Enjoyment. Landlord and those persons executing this Sublease on its behalf have the right and lawful authority to enter into this Sublease and perform Landlord's obligations hereunder, and Landlord warrants, represents and covenants that, so long as Tenant is not in default hereunder beyond any applicable cure period, Tenant shall have quiet and peaceful use, enjoyment and

35

occupancy of the Premises.

(iii) <u>Title</u>.  Landlord's leasehold interest in the Shopping Center is free and clear of any mortgages, deeds, encumbrances, declarations, easements, agreements, leases, tenancies or restrictions or any other encumbrances, except the Major Lease; zoning and building codes and regulations of general application; and those matters set forth on <u>**Exhibit "F"**</u> attached hereto and entitled "Permitted Encumbrances".  Landlord represents that the existence of the instruments and agreements set forth on Exhibit F annexed hereto shall not restrict Tenant's rights under this Sublease, including but not limited to Tenant's use of the Premises for the sale of the Products; the right of Tenant, its employees, customers and invitees to use the Premises in accordance with the terms of this Sublease; or the right to operate its business in the Premises.  Landlord specifically covenants and warrants that Landlord has not granted to any third parties, by agreement, deed or otherwise, any rights to object to the execution of this Sublease, or which would allow any such third party to prohibit the selling, renting, servicing, repairing or warehousing of the Products, or grants to any such third party (other than Major Lessor pursuant to the Major Lease) the right to consent to any feature of the Improvements or Tenant's signage.  This representation and warranty is a material inducement to Tenant's execution of this Sublease.

36

[J:\013363\155\basile6.Doc]
[April 23, 1996; DIVITA_R]

(iv) <u>Certificate of Authority</u>.    Landlord
covenants that it is a duly constituted limited liability
company under the laws of the State of Connecticut, and that
its member who is acting as its signatory in this Sublease is
duly authorized and empowered to act for and on behalf of the
corporation.   Landlord has furnished Tenant prior hereto with
evidence of (a) the existence of the company, and (b) the
authority of its member who is acting as signatory to bind the
company as contemplated herein.

(v) <u>No Litigation</u>.    There are no judicial,
quasi-judicial, administrative or other orders, injunctions,
moratoria or pending proceedings against Landlord or the
Premises which preclude or interfere with, or would preclude
or interfere with, the construction contemplated in paragraph
2 hereof or the occupancy and use of the Premises for the
purposes herein contemplated.

(vi) <u>Hazardous or Toxic Materials</u>.   Landlord has
not used, discharged, dumped, spilled or stored any Hazardous
Substances (as defined in the Construction Provisions) on or
about the Premises, whether accidentally or intentionally,
legally or illegally, and has received no notice and has no
knowledge that any such condition exists at the Premises.   If
any claim is ever made against Tenant relating to Hazardous
Substances present at or around the Premises as of the date
hereof, or any Hazardous Substances are hereafter discovered
at the Premises resulting from any act or omission of

37

[J:\013363\155\basile6.Doc]
[April 23, 1996; DIVITA_R]

Landlord, its agents, employees or contractors, all costs of removal incurred by, all liability imposed upon, or damages suffered by, Tenant because of the same shall be borne by Landlord, and Landlord hereby indemnifies and agrees to defend and hold Tenant harmless from and against all such costs, losses, liabilities and damages, including, without limitation, all third-party claims (including sums paid in settlement thereof, with or without legal proceedings) for personal injury or property damage and other claims, actions, administrative proceedings, judgments, compensatory and punitive damages, lost profits, penalties, fines, costs, losses, attorneys' fees and expenses (through all levels of proceedings), consultants or experts fees and all costs incurred in enforcing this indemnity.  The representation, warranty and indemnity of Landlord described in this paragraph 19(a)(vi) shall survive the termination or expiration of this Sublease.

(vii) <u>Zoning and Subdivision</u>.  The Premises are presently properly subdivided, in conformity with all applicable laws and zoned so as to permit (A) the development and operation of the Premises in accordance with the provisions of this Sublease; and (B) the initial use of the Premises described in paragraph 18 of this Sublease.

(viii) <u>Easements</u>.  Landlord shall not subdivide, parcel or otherwise divide the Premises or create any easements affecting the Premises without Tenant's prior

38

written consent, provided however, Tenant acknowledges the easements reserved to Major Lessor pursuant to the Major Lease.

(ix) <u>Notices Affecting the Premises</u>. Landlord shall promptly forward to Tenant any notice or other communication affecting the Premises received by Landlord from any owner of property adjoining, adjacent or nearby to the Premises or from any municipal or governmental authority, in connection with any hearing or other administrative procedure relating to the use or occupancy of the Premises or any such neighboring property.

(x) <u>Constructive Trust</u>. Landlord covenants that all sums paid by Tenant to Landlord and intended for payment by Landlord to a third party are given to Landlord in trust and shall be applied only for such third-party payments, as and when due.

(b)   Tenant represents, warrants and covenants to Landlord that:

(i) <u>Tenant's Authority</u>.   Tenant is a duly constituted corporation organized under the laws of the Commonwealth of Virginia; it has the power to enter into this Sublease and perform Tenant's obligations hereunder; and the Vice President executing this Sublease on Tenant's behalf has the right and lawful authority to do so.

(ii) <u>Tenant's Warranty as to Hazardous or Toxic Materials</u>.   Tenant will not introduce, discharge, dump, spill

39

[J:\013363\155\basile6.Doc]
[April 23, 1996; DIVITA_R]

or store within the Premises any Hazardous Substances. If any
claim is ever made against Landlord relating to Hazardous
Substances present at or around the Premises resulting from any
act or omission of Tenant, its agents, employees or
contractors, all costs of removal incurred by, all liability
imposed upon, or damages suffered by, Landlord because of the
same shall be borne by Tenant, and Tenant hereby indemnifies
and agrees to defend and hold Landlord harmless from and
against all such costs, losses, liabilities and damages,
including, without limitation, all third-party claims
(including sums paid in settlement thereof, with or without
legal proceedings) for personal injury or property damage and
other claims, actions, administrative proceedings, judgments,
compensatory and punitive damages, lost profits, penalties,
fines, costs, losses, attorneys' fees and expenses (through all
levels of proceedings), consultants or experts fees and all
costs incurred in enforcing this indemnity. The
representation, warranty and indemnity of Tenant described in
this paragraph 19(b)(ii) shall survive the termination or
expiration of this Sublease.

(c) In the event there is a condition at variance with
the foregoing representations and warranties of Landlord with
respect to the Premises which prevents or in any material way
inhibits the use of the Premises or any part thereof for their
intended purposes by Tenant or Tenant's employees, licensees,
agents, suppliers, customers or invitees, or if Landlord shall

40

default in the observance or performance of any of the foregoing
representations and warranties, then, in addition to such other
remedies as may be accorded Tenant at law, in equity or under the
terms of this Sublease, Tenant may, in addition to its other
remedies under this Sublease, after thirty (30) days' notice to
Landlord, obtain an injunction or writ of specific performance to
enforce such term or covenant, the parties hereby acknowledging the
inadequacy of Tenant's legal remedy and the irreparable harm which
would be caused to Tenant by any such variance or default.    In
addition, in the event that any of the representations, warranties
and covenants set forth in this paragraph 19 are untrue or
incorrect, or in the event that Tenant suffers any loss, cost,
liability or damage as a result of the breach of any of such
covenants, representations and warranties, Landlord shall defend,
indemnify and hold Tenant harmless from any of such loss, costs,
liability or damage incurred as a result of Landlord's breach
hereunder.

   20.  <u>Estoppel Certificates.</u>  Without charge, at any time and
from time to time hereafter, within ten (10) days after receipt of
written request by either party, the other party shall certify, by
written and duly executed instrument, to any other entity
("Person") specified in such request:    (a) as to whether this
Sublease has been supplemented or amended, and, if so, the
substance and manner of such supplement or amendment; (b) as to the
validity, force and effect of this Sublease, to the certifying

41

party's best knowledge; (c) as to the existence of any default
hereunder, to the certifying party's best knowledge; (d) as to the
existence of any offsets, counterclaims, or defenses hereto on the
part of such other party, to the certifying party's best knowledge;
(e) as to the commencement and expiration dates of the Term; and
(f) as to any other matters which may reasonably be so requested.
Any such certificate may be relied upon by the party requesting it
and any Person to whom the same may be exhibited or delivered, and
the contents of such certificate shall be binding on the party
executing same.

21.   <u>Subordination, Non-Disturbance and Attornment</u>.

Simultaneously with the execution hereof, Landlord shall
deliver to Tenant with regard to the Major Lease and any and all
"Ground Leases" (as defined below) and any and all "Mortgages" (as
defined below) encumbering the Premises and placed thereon by
Landlord or Major Lessor, a non-disturbance and attornment
agreement in the form of <u>Exhibit "G"</u> hereto attached, executed by
Major Lessor and each lessor under any other Ground Lease ("Ground
Lessor") or the holder of such Mortgage ("Mortgagee"), as
applicable.   In addition, throughout the Term, Landlord shall
deliver to Tenant a non-disturbance and attornment agreement in the
form of <u>Exhibit "G"</u> executed by any Ground Lessor or Mortgagee (as
applicable) with regard to all future Ground Leases and Mortgages
and with regard to all renewals, modifications, replacements and
extensions of the Major Lease and/or any such future Ground Leases

42

or Mortgages.  Upon Tenant's receipt of the non-disturbance and attornment agreement, this Sublease shall be subordinate to the corresponding Ground Lease or Mortgage.  Notwithstanding the foregoing, Tenant acknowledges that this Sublease is subject and subordinate to the Major Lease and that in the event of any conflict between the terms of this Paragraph 21 and the terms of Section 24 of the Major Lease, the terms of Section 24 of the Major Lease shall control.

In the event of a foreclosure of any Mortgage, Tenant shall attorn to a Mortgagee or any purchaser at a foreclosure sale (any such foreclosure, or deed in lieu thereof, shall be referred to as a "Foreclosure") of a Mortgage only if such Mortgagee or purchaser executes a writing in favor of Tenant which states the following (provided Tenant is not in default beyond the expiration of any applicable grace periods): (i) this Sublease shall not terminate by reason of such Foreclosure, (ii) Tenant's possession of the Premises shall not be disturbed, (iii) the Mortgagee or purchaser upon such Foreclosure shall recognize Tenant and all its rights hereunder and shall be obligated to fully and completely perform Landlord's duties and obligations under this Sublease arising from and after the date of such Foreclosure, including but not limited to an obligation to make all payments to Tenant, (iv) Tenant shall not be named as a party in any action for foreclosure, and (v) the Mortgagee, whether or not the Mortgage is foreclosed, shall make all proceeds arising from a casualty or condemnation loss to the Premises available to Tenant for restoration of the

43

Improvements in accordance with the terms hereof. In the event of termination of any Ground Lease, Tenant shall attorn to any Ground Lessor from whom Tenant has received a non-disturbance agreement in accordance with this paragraph 21.

Landlord shall cause any present or future Mortgagee to deliver a non-disturbance and attornment agreement in accordance with this paragraph 21 at or prior to the time which the lien of the Mortgage is filed against record title to the Premises, as set forth in paragraph 37(c) below. As used in this paragraph 21, the term "Mortgage" shall mean any mortgage, deed to secure debt, deed of trust, trust deed or other collateral conveyance of, or lien or encumbrance against, the Premises, and the term "Ground Lease" shall mean any ground lease or master lease affecting the Premises.

22. <u>Change of Landlord</u>. Subject to paragraph 21 above, in the event Landlord's interest in the Premises passes to a successor (the "Successor") by sale, lease, foreclosure or in any other manner, Tenant shall be bound to the Successor under all of the terms of this Sublease for the balance of the Term with the same force and effect as if the Successor were Landlord under this Sublease, and Tenant hereby agrees to attorn to the Successor as its Landlord, such attornment to be effective upon written notice thereof given by Landlord to Tenant. In the event that Landlord's interest in the Premises passes to a Successor and such Successor is bound unto Tenant as set forth above, Landlord shall be released

44

from all obligations to Tenant hereunder arising after the date
Landlord's interest so passes, except that Landlord agrees to
indemnify, defend and hold Tenant harmless from and against all
costs, claims, loss, liability or damage suffered by Tenant as a
result of Landlord's failure to provide Tenant with notice of such
Successor.

23.  Tenant's Financing. (a) Notwithstanding any other
provisions of this Sublease, Tenant may, without Landlord's
consent, from time to time, secure financing or general credit
lines and grant the lenders thereof, as security therefor, (i) a
security interest in Tenant's movable trade fixtures, personalty,
inventory and equipment (collectively, "Personalty"), (ii) the
right to enter the Premises to realize upon any Personalty so
pledged, and/or (iii) a collateral assignment of Tenant's
subleasehold interest in the Premises, with rights of reassignment;
provided, however, such collateral assignment may be made solely
for the purpose of securing Tenant's indebtedness. Upon Tenant
providing notice of such financing to Landlord, Landlord agrees to
execute and deliver a commercially reasonable agreement evidencing
its consent to such security interest which does not increase
Landlord's obligations under this Sublease (except as set forth in
this Paragraph 23), and an agreement to give such lenders the same
notice and opportunity to cure any default of Tenant as is provided
Tenant hereunder (including time to take possession of the
Premises, if necessary to effect such cure). In addition, Landlord

45

agrees to cause any Mortgagee specifically to acknowledge the rights of Tenant's lenders described herein and in paragraph 24 below and to cause Major Lessor to acknowledge the rights of Tenant's lenders to the extent provided in the Major Lease.

(b) Notwithstanding anything contained in this Sublease to the contrary, Landlord is aware that to facilitate a leveraged construction period lease/tax ownership operating lease transaction (a "Leaseback Transfer"), Tenant may assign or transfer its interest in this Sublease to a third party (the "Facilitator"), who will then sub-sublease the Premises to Tenant. Landlord agrees that any Facilitator to whom this Sublease is assigned shall have the right (x) to sub-sublease the Premises to Tenant without Landlord's consent, and (y) to further assign its interest in this Sublease or sub-sublease the Premises in the event that the Facilitator's sub-sublease with Tenant is terminated. Landlord agrees that unless and until the Facilitator's sub-sublease with Tenant is terminated and the Facilitator takes possession of the Premises, any Facilitator to whom this Sublease is assigned shall not have any individual or personal liability hereunder or any obligation to perform the obligations of Tenant hereunder; provided, however, nothing herein shall (x) diminish in any respect the obligation to pay Base Rent, Ground Rent and all other sums due under this Sublease (either by the Facilitator subsequent to termination of the Facilitator's sub-sublease with Tenant, or by Tenant as sub-sublessee under the Facilitator's sub-sublease prior to termination thereof), nor (y) diminish in any respect the

[J:\013363\155\basile6.Doc]
[April 23, 1996; DIVITA_R]

obligations to perform all other covenants to be performed by Tenant under this Sublease (either by the Facilitator subsequent to termination of the Facilitator's sub-sublease with Tenant, or by Tenant as sub-sublessee under the Facilitator's sub-sublease prior to termination thereof), nor (z) diminish in any respect the obligation of the original Tenant under this Sublease to remain liable for all of Tenant's obligations in accordance with Paragraph 17 of this Lease; and, provided further, that Landlord shall retain any rights and remedies with respect to the maintenance, preservation or possession of the Premises that Landlord may have hereunder as a result of the occurrence of an Event of Default, including any right of termination available to Landlord under Paragraph 29 hereof.

24.   <u>Tenant's Property and Waiver of Landlord's Lien</u>.   All of the Personalty shall be and remain the personal property of Tenant. Landlord expressly waives its statutory or common law landlord's liens (as same may be enacted or may exist from time to time) and any and all rights granted under any present or future laws to levy or distrain for rent (whether in arrears or in advance) against the aforesaid property of Tenant on the Premises and further agrees to execute any reasonable instruments evidencing such waiver, at any time or times hereafter upon Tenant's request.

25.   <u>Memorandum of Lease; Commencement Date Agreement</u>. Landlord and Tenant agree, at the other's request and at the sole

47

[J:\013363\155\basile6.Doc]
[April 23, 1996; DIVITA_R]

expense of the requesting party, to execute a Memorandum of Sublease in recordable form, substantially similar to that attached hereto as Exhibit "H", setting forth such provisions hereof as may be required by State law.  In addition, Landlord and Tenant shall execute a Commencement Date Agreement in the form attached hereto as Exhibit "I", once the Base Rent Date has been established. Recording costs for either or both documents shall be borne by the party requesting recordation of the same.  The provisions of this Sublease shall control, however, with regard to any omissions from, or provisions hereof which may be in conflict with, the Memorandum of Sublease or Commencement Date Agreement.

26.  Expiration of Term and Holding Over.  All of the Personalty shall be removable by Tenant any time prior to, or within thirty (30) days after, the expiration or earlier termination of this Sublease and shall be so removed by Tenant at the request of Landlord within thirty (30) days after the expiration or termination of this Sublease.  In the event Tenant fails to remove any or all of its Personalty within the said thirty (30) day period, Landlord may remove such Personalty, or the balance thereof, cause such Personalty to be placed into storage and thereafter charge Tenant the cost of such removal and storage, together with interest thereon at the Default Rate.  Those improvements that are integrated into the physical structure of the Building, except any of Tenant's trade fixtures, shall not be removed and shall become the property of Landlord.  (A nonexclusive

48

list of Tenant's removable trade fixtures is attached hereto as
Exhibit "D".) Tenant agrees promptly to repair any damage to the
Premises occasioned by the removal of Tenant's trade fixtures,
furnishings and equipment (except for small holes caused by nails,
fasteners and the like) and to surrender the Premises broom clean,
in good condition and repair, ordinary wear and tear (so long as
the cumulative effect thereof shall not cause the Premises not to
be in good condition and repair), casualty and condemnation
excepted. Tenant agrees that at the expiration of this Sublease,
it will deliver to Landlord peaceable possession of the Premises.
No holding over by Tenant nor acceptance of Base Rent or other
charges by Landlord shall operate as a renewal or extension of this
Sublease without the written consent of Landlord and Tenant. Should
Tenant hold over without the consent of Landlord, this Sublease
shall continue in force from month to month, subject to all of the
provisions hereof except that the monthly Base Rent shall be equal
to 115% of the monthly Base Rent Tenant had been paying during the
preceding Lease Year.

27. Access/"For Rent" Signs.

A. Landlord, its agents, employees and contractors may
enter at any time, without notice, in response to an emergency, and
at other reasonable times and hours, upon not less than 48 hours
notice to Tenant, accompanied by an employee of Tenant (if Tenant
makes such employee available) to (x) inspect the Premises, (y)
exhibit the Premises to prospective purchasers and lenders, (z) to

49

[J:\013363\155\basile6.Doc]
[April 23, 1996; DIVITA_R]

determine whether Tenant is complying with its obligations under this Sublease, (xx) supply any services or perform other obligations on Landlord's part to be performed under this Sublease, (yy) post notices of non-responsibility or other similar notices, (zz) make repairs required to be made by Landlord under this Sublease; provided however, in each such instance, all work will be performed and completed as promptly as reasonably possible and so as to cause as little interference to Tenant, its employees and customers, and to the conduct of Tenant's business, as reasonably possible. Landlord may use any means reasonably necessary and proper to open doors in and to the Premises in an emergency in order to enter the Premises. Tenant waives any claim on account of reasonably unavoidable interference with Tenant's business resulting from the exercise of Landlord's rights under this Paragraph 27.A. No entry into or upon the Premises by Landlord authorized by this Paragraph 27.A. will constitute a forcible or unlawful entry, or a detainer of the Premises, or an eviction, actual or constructive, of Tenant from the Premises, or any part thereof, nor will any entry authorized under this Paragraph 27.A. entitle Tenant to damages (except if resulting from Landlord's negligence or willful misconduct, or a breach by Landlord of the provisions of this Sublease, including this Paragraph 27.A.) or an abatement of rent or other charges under this Sublease. Landlord shall repair any damage caused to the Premises in connection with the exercise of any of the rights granted Landlord pursuant to this Paragraph 27.A.

[J:\013363\155\basile6.Doc]
[April 23, 1996; DIVITA_R]