EXECUTION VERSION

SENIOR SECURED, SUPER-PRIORITY, DEBTOR-IN-POSSESSION CREDIT
AGREEMENT
dated as of

November 12, 2008
Among

CIRCUIT CITY STORES, INC.
as Lead Borrower for:

said CIRCUIT CITY STORES, INC.
CIRCUIT CITY STORES WEST COAST, INC.
CIRCUIT CITY STORES PR, LLC
as Domestic Borrowers
and
INTERTAN CANADA LTD.
as Canadian Borrower

The LENDERS Party Hereto,

BANK OF AMERICA, N.A.
as Administrative Agent and Collateral Agent

GENERAL ELECTRIC CAPITAL CORPORATION
As Co-Collateral Agent

BANC OF AMERICA SECURITIES LLC
as Lead Arranger

BANC OF AMERICA SECURITIES LLC
GE CAPITAL MARKETS, INC.
WELLS FARGO RETAIL FINANCE, LLC
as Joint Bookrunners

BANK OF AMERICA, N.A.
(acting through its Canada branch)
as Canadian Administrative Agent and Canadian Collateral Agent

WELLS FARGO RETAIL FINANCE, LLC
as Syndication Agent

GENERAL ELECTRIC CAPITAL CORPORATION
and
JPMORGAN CHASE BANK, N.A.
as Co-Documentation Agents

EXECUTION VERSION

## TABLE OF CONTENTS

Page

ARTICLE I  Definitions ....................................................................................................... 2
 SECTION 1.01. Defined Terms.......................................................................................... 2
 SECTION 1.02. Terms Generally..................................................................................... 42
 SECTION 1.03. Accounting Terms; GAAP...................................................................... 43
 SECTION 1.04. Times of Day........................................................................................ 44
 SECTION 1.05. Letter of Credit Amounts. ..................................................................... 44
 SECTION 1.06. Certifications......................................................................................... 44
 SECTION 1.07. Dollar Equivalent ................................................................................. 44
ARTICLE II  Amount and Terms of Credit......................................................................... 44
 SECTION 2.01. Commitment of the Lenders. .................................................................. 44
 SECTION 2.02. Increase of Domestic Commitments. ....................................................... 47
 SECTION 2.03. Reserves; Changes to Reserves............................................................... 47
 SECTION 2.04. Making of Loans. .................................................................................. 48
 SECTION 2.05. Overadvances. ...................................................................................... 50
 SECTION 2.06. Swingline Loans. .................................................................................. 51
 SECTION 2.07. Letters of Credit. .................................................................................. 52
 SECTION 2.08. Settlements Amongst Lenders. ............................................................... 57
 SECTION 2.09. Notes; Repayment of Loans.................................................................... 59
 SECTION 2.10. Intentionally Omitted. ........................................................................... 60
 SECTION 2.11. Interest on Loans. ................................................................................. 60
 SECTION 2.12. Default Interest..................................................................................... 61
 SECTION 2.13. Certain Fees......................................................................................... 61
 SECTION 2.14. Unused Commitment Fee........................................................................ 61
 SECTION 2.15. Letter of Credit Fees. ........................................................................... 62
 SECTION 2.16. Nature of Fees. ..................................................................................... 63
 SECTION 2.17. Termination or Reduction of Commitments. ............................................. 63
 SECTION 2.18. Alternate Rate of Interest. ..................................................................... 65
 SECTION 2.19. Conversion and Continuation of Loans. ................................................... 65
 SECTION 2.20. Mandatory Prepayment; Cash Collateral; Commitment Termination. .......... 67
 SECTION 2.21. Optional Prepayment of Loans; Reimbursement of Lenders......................... 70
 SECTION 2.22. Maintenance of Loan Account; Statements of Account. ............................. 72
 SECTION 2.23. Cash Receipts. ..................................................................................... 72
 SECTION 2.24. Application of Payments. ....................................................................... 75
 SECTION 2.25. Increased Costs. ................................................................................... 78
 SECTION 2.26. Change in Legality. ............................................................................... 79
 SECTION 2.27. Payments; Sharing of Setoff. ................................................................. 80
 SECTION 2.28. Taxes. ................................................................................................. 82
 SECTION 2.29. Security Interests in Collateral................................................................ 84
 SECTION 2.30. Mitigation Obligations; Replacement of Lenders....................................... 85

EXECUTION VERSION

ARTICLE III Representations and Warranties ................................................................ 86
  SECTION 3.01. Organization; Powers. .................................................................... 86
  SECTION 3.02. Authorization; Enforceability. ........................................................ 86
  SECTION 3.03. Governmental Approvals; No Conflicts. ......................................... 86
  SECTION 3.04. Financial Condition. ....................................................................... 87
  SECTION 3.05. Properties. ....................................................................................... 87
  SECTION 3.06. Litigation and Environmental Matters. ........................................... 87
  SECTION 3.07. Compliance with Laws and Agreements. ........................................ 88
  SECTION 3.08. Investment Company Status. ........................................................... 88
  SECTION 3.09. Taxes. .............................................................................................. 88
  SECTION 3.10. ERISA. ............................................................................................ 88
  SECTION 3.11. Disclosure. ...................................................................................... 89
  SECTION 3.12. Subsidiaries. .................................................................................... 89
  SECTION 3.13. Insurance. ........................................................................................ 89
  SECTION 3.14. Labor Matters. ................................................................................. 89
  SECTION 3.15. Security Documents. ....................................................................... 90
  SECTION 3.16. Federal Reserve Regulations. .......................................................... 91
  SECTION 3.17. Intentionally Omitted. ..................................................................... 91
  SECTION 3.18. Material Contracts. .......................................................................... 91
  SECTION 3.19. Bailees, Warehousemen, etc. .......................................................... 91
  SECTION 3.20. Consignment. .................................................................................. 91
ARTICLE IV Conditions ............................................................................................ 91
  SECTION 4.01. Closing Date. ................................................................................... 92
  SECTION 4.02. Conditions Precedent to Each Loan and Each Letter of Credit. ...... 95
ARTICLE V Affirmative Covenants ........................................................................... 95
  SECTION 5.01. Financial Statements and Other Information ................................... 96
  SECTION 5.02. Notices of Material Events. ............................................................. 99
  SECTION 5.03. Information Regarding Collateral. ................................................. 100
  SECTION 5.04. Existence; Conduct of Business. ................................................... 101
  SECTION 5.05. Payment of Obligations. ................................................................ 101
  SECTION 5.06. Maintenance of Properties. ........................................................... 101
  SECTION 5.07. Insurance. ...................................................................................... 101
  SECTION 5.08. Casualty and Condemnation. ........................................................ 103
  SECTION 5.09. Books and Records; Inspection and Audit Rights; Appraisals; Accountants;
  Physical Inventories. ............................................................................................. 103
  SECTION 5.10. Compliance with Laws. ................................................................. 105
  SECTION 5.11. Use of Proceeds and Letters of Credit. ......................................... 105
  SECTION 5.12. Future Subsidiaries. ...................................................................... 105
  SECTION 5.13. Further Assurances. (a) ................................................................. 105
  SECTION 5.14. Material Contracts ......................................................................... 106

(iii)

EXECUTION VERSION

................ ...................................................................................................... 106
SECTION 5.15. Term Loan............................................................................... 106
SECTION 5.16. Retention of Independent Consultant........................................ 106
SECTION 5.17. Performance Within Budget..................................................... 107
SECTION 5.18. Bankruptcy Related Affirmative Covenants. ............................ 107
ARTICLE V I Negative Covenants ............................................................................. 108
SECTION 6.01. Indebtedness and Other Obligations ....................................... 108
SECTION 6.02. Liens. ...................................................................................... 109
SECTION 6.03. Fundamental Changes. ............................................................ 110
SECTION 6.04. Investments, Loans, Advances, Guarantees and Acquisitions.................... 111
SECTION 6.05. Asset Sales. ............................................................................ 112
SECTION 6.06. Restricted Payments; Certain Payments of Indebtedness. ........ 113
SECTION 6.07. Transactions with Affiliates. ................................................... 114
SECTION 6.08. Amendment of Material Documents........................................ 115
SECTION 6.09. Fiscal Year. ............................................................................ 115
SECTION 6.10. Burdensome Agreements. ....................................................... 115
SECTION 6.11. Intentionally Omitted. ............................................................ 115
SECTION 6.12. Clean Down............................................................................ 115
SECTION 6.13. Bankruptcy Related Negative Covenants. ............................... 116
ARTICLE VII Events of Default............................................................................... 117
SECTION 7.01. Events of Default. ................................................................... 117
SECTION 7.02. When Continuing. ................................................................... 122
SECTION 7.03. Remedies on Default................................................................ 122
SECTION 7.04. Application of Proceeds. ......................................................... 123
ARTICLE VIII The Agents ....................................................................................... 126
SECTION 8.01. Administration by Administrative Agent................................... 126
SECTION 8.02. The Collateral Agent. .............................................................. 126
SECTION 8.03. Sharing of Excess Payments. .................................................. 128
SECTION 8.04. Agreement of Required Lenders. ............................................. 129
SECTION 8.05. Liability of Agents. ................................................................. 129
SECTION 8.06. Notice of Default..................................................................... 131
SECTION 8.07. Lenders' Credit Decisions........................................................ 131
SECTION 8.08. Reimbursement and Indemnification. ...................................... 131
SECTION 8.09. Rights of Agents. .................................................................... 132
SECTION 8.10. Notice of Transfer. .................................................................. 132
SECTION 8.11. Successor Agent....................................................................... 132
SECTION 8.12. Reports and Financial Statements. .......................................... 133
SECTION 8.13. Delinquent Lender. .................................................................. 134
SECTION 8.14. Collateral and Guaranty Matters. ............................................ 135
SECTION 8.15. Agency for Perfection. ............................................................ 136

EXECUTION VERSION

SECTION 8.16. Intentionally Omitted. ................................................................. 136
SECTION 8.17. Syndication Agent, Documentation Agents, and Arranger......................... 136
SECTION 8.18. Co-Collateral Agent Rights........................................................... 137
ARTICLE IX Miscellaneous ............................................................................... 137
SECTION 9.01. Notices ................................................................................... 137
SECTION 9.02. Waivers; Amendments.................................................................. 139
SECTION 9.03. Expenses; Indemnity; Damage Waiver................................................ 141
SECTION 9.04. Designation of Lead Borrower as Borrowers' Agent. ............................... 143
SECTION 9.05. Successors and Assigns................................................................. 145
SECTION 9.06. Survival .................................................................................. 148
SECTION 9.07. Counterparts; Integration; Effectiveness............................................. 149
SECTION 9.08. Severability. .............................................................................. 149
SECTION 9.09. Right of Setoff............................................................................ 149
SECTION 9.10. Governing Law; Jurisdiction; Consent to Service of Process...................... 149
SECTION 9.11. WAIVER OF JURY TRIAL.......................................................... 150
SECTION 9.12. Headings.................................................................................. 150
SECTION 9.13. Interest Rate Limitation. ............................................................... 150
SECTION 9.14. Joint and Several Obligations of the Loan Parties. .................................. 151
SECTION 9.15. Confidentiality. ......................................................................... 153
SECTION 9.16. Judgment Currency. .................................................................... 154
SECTION 9.17. No Advisory or Fiduciary Responsibility. ............................................ 155
SECTION 9.18. USA PATRIOT Act Notice ........................................................... 156
SECTION 9.19. Press Releases. .......................................................................... 156
SECTION 9.20. No Strict Construction. ................................................................. 156
SECTION 9.21. Relationship with DIP Orders and Initial Order. .................................... 157
SECTION 9.22. Language. ................................................................................. 157

EXECUTION VERSION

## **EXHIBITS**

| | |
|---|---|
| A. | Assignment and Assumption |
| B-1 | Domestic Borrowers Revolving Note |
| B-2 | Domestic Borrowers Swingline Note |
| B-3 | Canadian Borrower Revolving Note |
| B-4 | Canadian Borrower Swingline Note |
| C | Compliance Certificate |
| D-1 | Borrowing Base Certificate |
| D-2 | Canadian Borrowing Base Certificate |
| E | Form of Notice of Borrowing for Domestic Borrowers |
| F | Form of Notice of Borrowing for Canadian Borrower |
| G | Form of Customs Broker Agreement |
| H-1 | Form of Interim Borrowing Order |
| H-2 | Form of Initial Order |

EXECUTION VERSION

## <u>SCHEDULES</u>

| | |
|---|---|
| 1.1 | Lenders and Commitments |
| 1.2 | Budget |
| 1.3 | Facility Guarantors |
| 1.4 | Pre-Petition Letters of Credit |
| 2.23(a) | DDAs |
| 2.23(b) | Credit Card Arrangements |
| 3.05(c)(i) | Title to Properties; Real Estate Owned |
| 3.05(c)(ii) | Leased Properties |
| 3.06 | Disclosed Matters |
| 3.10 | Plans |
| 3.12 | Subsidiaries |
| 3.13 | Insurance |
| 3.14 | Labor Matters |
| 3.18 | Material Contracts |
| 5.01(A) | Financial Reporting Requirements |
| 5.01(B) | Lead Borrower's website |
| 5.18 | Identified Leases |
| 6.01 | Indebtedness |
| 6.02 | Liens |
| 6.04 | Investments |
| 6.05 | Asset Sales |

EXECUTION VERSION

SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT dated as of November 12, 2008 (this "Agreement") among

CIRCUIT CITY STORES, INC., as a debtor and a debtor-in-possession, a corporation organized under the laws of the Commonwealth of Virginia having a place of business at 9950 Mayland Drive, Richmond, Virginia 23233, as Lead Borrower for the Borrowers, being

> said CIRCUIT CITY STORES, INC., as a debtor and a debtor-in-possession,

> CIRCUIT CITY STORES WEST COAST, INC., as a debtor and a debtor-in-possession, a corporation organized under the laws of the State of California having a place of business at 680 S. Lemon Avenue, Walnut, California 91789;

> CIRCUIT CITY STORES PR, LLC, as a debtor and a debtor-in-possession, a limited liability company organized under the laws of the Commonwealth of Puerto Rico having a place of business at San Patricio Plaza 3369, Local C-02 St Ebano & Tabonuco, Guaynabo, Puerto Rico; and

> INTERTAN CANADA LTD., as a debtor company, a corporation organized under the laws of the Province of Ontario, Canada having its head office at 279 Bayview Drive, Barrie, Ontario, Canada L4M 4W5; and

the LENDERS party hereto; and

BANK OF AMERICA, N.A., as Administrative Agent and Collateral Agent for the Lenders and the Issuing Bank, a national banking association, having a place of business at 100 Federal Street, Boston, Massachusetts 02110; and

BANK OF AMERICA, N.A. (acting through its Canada branch), as Canadian Administrative Agent and Canadian Collateral Agent for Lenders having a Canadian Commitment, a banking corporation carrying on business under the *Bank Act* (Canada), having a place of business at 200 Front Street West, Toronto, Ontario, Canada M5V 3L2; and

GENERAL ELECTRIC CAPITAL CORPORATION, as Co-Collateral Agent; and

WELLS FARGO RETAIL FINANCE, LLC, as Syndication Agent; and

GENERAL ELECTRIC CAPITAL CORPORATION and JPMORGAN CHASE BANK, N.A., as Co-Documentation Agents;

in consideration of the mutual covenants herein contained and benefits to be derived herefrom.

1

EXECUTION VERSION

## W̲I̲T̲N̲E̲S̲S̲E̲T̲H̲:

WHEREAS, on November 10, 2008, the Domestic Borrowers and certain of their domestic Subsidiaries commenced Chapter 11 Case Nos. 08-35653 through 08-35670 as administratively consolidated at Chapter 11 Case No. 08-35653 (singly and collectively, the "Chapter 11 Case") by filing separate voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code, with the United States Bankruptcy Court for the Eastern District of Virginia (the "US Bankruptcy Court"). The Domestic Borrowers continue to operate their business and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code; and

WHEREAS, on November 10, 2008, the Canadian Borrower commenced court proceedings bearing Case No. 08-CV-7841 (the "Canadian Bankruptcy Case" and together with the Chapter 11 Cases, collectively, the "Cases") by filing a notice seeking an initial order under the Companies' Creditors Arrangement Act (Canada) with the Ontario Superior Court of Justice, Commercial List (the "Canadian Bankruptcy Court"). The Canadian Borrower continues to operate its business and manage its properties as a debtor company; and

WHEREAS, the Borrowers have requested that the Agents and the Lenders provide a senior secured, super-priority revolving credit facility to the Borrowers on the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual conditions and agreements set forth in this Agreement, and for good and valuable consideration, the receipt of which is hereby acknowledged, the Lenders, the Agents, and the Borrowers hereby agree as follows:

## ARTICLE I
### Definitions

SECTION 1.01. Defined Terms. As used in this Agreement, the following terms have the meanings specified below:

"ACH" shall mean automated clearing house transfers.

"Account" shall mean "accounts" as defined in the UCC (or as regards the Canadian Loan Parties, the PPSA), and also means a right to payment of a monetary obligation, whether or not earned by performance, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (b) for services rendered or to be rendered, (c) for a secondary obligation incurred or to be incurred, or (d) arising out of the use of a credit or charge card or information contained on or for use with the card.

2

EXECUTION VERSION

"Adjusted LIBO Rate" means, with respect to any LIBO Borrowing for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate. The Adjusted LIBO Rate will be adjusted automatically as to all LIBO Borrowings then outstanding as of the effective date of any change in the Statutory Reserve Rate.

"Administration Charge" has the meaning set forth in the Initial Order.

"Administrative Agent" means Bank of America, in its capacity as administrative agent for the Lenders and the Issuing Bank hereunder.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified, and, with respect to any Agent or Lender, includes any branches or Affiliates of branches of such Agent or Lender.

"Agency Agreement" means the Agency Agreement between the Lead Borrower and Hilco Merchant Resources, LLC and Gordon Brothers Merchant Partners, LLC dated October 31, 2008 for the disposition of Inventory at certain of the Domestic Borrowers' stores, as in effect on the date hereof.

"Agents" shall mean, collectively, the Administrative Agent, the Collateral Agent, and the Canadian Agent.

"Agreement" means this Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement, as modified, amended, supplemented or restated, and in effect from time to time.

"Applicable Law" means as to any Person: (i) all statutes, rules, regulations, orders, or other requirements having the force of law and (ii) all court orders and injunctions, and/or similar rulings, in each instance ((i) and (ii)) of or by any Governmental Authority, or court, or tribunal which has jurisdiction over such Person, or any property of such Person, or of any other Person for whose conduct such Person would be responsible. Without limiting the foregoing, "Applicable Law' shall include the Bankruptcy Code and the CCAA.

"Applicable Margin" means, with respect to Prime Rate Loans, LIBO Loans and BA Equivalent Loans, 4.00% per annum. Upon the occurrence and during the continuance of an Event of Default, interest shall be determined in the manner set forth in Section 2.12.

"Appraisal Percentage" means (i) from the Closing Date through December 30, 2008, 90%, (ii) from December 31, 2008 through January 17, 2009, 87.5%, and (iii) thereafter, 85%.

3

"Appraised Value" means the net cost liquidation value of the Borrowers' Inventory as set forth in the Stock Ledger (expressed as a percentage of the Cost of such Inventory) as determined from time to time by Gordon Brothers or by another independent appraiser reasonably satisfactory to the Administrative Agent, with such appraisal conducted in accordance with Section 5.09(b) hereof. Appraised Value shall be determined based upon the most recent appraisal undertaken by Gordon Brothers or such other appraiser (regardless of who bears the expense thereof under Section 5.09(b)).

"Arranger" means Banc of America Securities LLC.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 9.05), and accepted by the Administrative Agent, in the form of Exhibit A or any other form approved by the Administrative Agent.

"Availability Block" means an amount equal to the greater of (a) the lesser of (i) ten percent (10%) of the then Borrowing Base (without giving effect to clause (d) thereof) and (ii) ten percent (10%) of the Total Commitments, and (b) at any time from and including January 1 of any year to and including August 31 of such year, $60,000,000, and at any time from and including September 1 of any year to and including December 31 of such year, $75,000,000.

"Availability Reserves" means, without duplication of any other Reserves (including the Directors' Charge, the Administration Charge and the Professional Fee Carve Out) or items that are otherwise addressed or excluded through eligibility criteria or in any appraisal conducted pursuant to Section 5.09(b), such reserves as any Agent or the Co-Collateral Agent (subject in all respects to the provisions of Section 8.18) may from time to time determine in its reasonable discretion (after consultation with the Lead Borrower (whose consent to any Availability Reserve shall not be required)) are appropriate (a) to reflect the impediments to the Agents' ability to realize upon the Collateral, including, without limitation, reserves as a result of the occurrence of, and on or after, the Lease Assumption Reserve Commencement Date, (b) to reflect claims and liabilities that the Administrative Agent, the Collateral Agent, or the Canadian Agent (with respect to the Canadian Borrowing Base) or the Co-Collateral Agent (subject in all respects to the provisions of Section 8.18) determines will need to be satisfied in connection with the realization upon the Collateral (including, without limitation, on account of (i) consignment arrangements entered into by the Borrowers, (ii) wages and vacation pay, (iii) freight, shipping, freight forwarding, customs brokers, import duties and other similar charges, and (iv) with respect to the Canadian Borrowing Base only, tax withholdings and source deductions, outstanding sales and goods and services taxes, pension charges, Administration Charge, Directors' Charge, KERP Charge and statutory Liens and charges, in each case, not capable of being subordinated by an order in the Canadian Bankruptcy Case), (c) to reflect events or conditions which adversely affect the value of any assets included in the Borrowing Base, (d) to

reflect that a Default or an Event of Default then exists, (e) to establish Bank Product Reserves or Cash Management Reserves, (f) to establish the Lease Reserve, or (g) to establish any Reserve with respect to the Term Loan required by the Intercreditor Agreement. Availability Reserves shall be established and calculated in a manner and methodology consistent with the Agents' practices as of the Closing Date with other similarly situated borrowers. For the avoidance of doubt, Reserves established in connection with the Directors' Charge and the Administration Charge shall only be deducted from the calculation of the Canadian Borrowing Base.

"BA Equivalent Loan" shall mean any Loan to the Canadian Borrower in CD$ bearing interest at a rate determined by reference to the BA Rate in accordance with the provisions of Article II.

"BA Equivalent Loan Borrowing" shall mean any Borrowing comprised of BA Equivalent Loans.

"BA Rate" means, for the Interest Period of each BA Equivalent Loan, the rate of interest *per annum* equal to the annual rates applicable to CD$ bankers' acceptances having an identical or comparable term as the bankers' acceptances proposed to be issued displayed and identified as such on the display referred to as the "CDOR Page" (or any display substituted therefor) of Reuter Monitor Money Rates Service as at approximately 10:00 A.M. on such day (or, if such day is not a Business Day, as of 10:00 A.M. on the immediately preceding Business Day), provided that if such rates do not appear on CDOR Page at such time on such date, the rate for such date will be the annual discount rate (rounded upward to the nearest whole multiple of 1/100 of 1%) as of 10:00 A.M. on such day at which The Toronto-Dominion Bank is then offering to purchase CD$ bankers' acceptances accepted by it having such specified term (or a term as closely as possible comparable to such specified term). In the event that the Canadian Agent is unable to obtain any such quotation as provided above, it will be deemed that a BA Rate pursuant to a BA Equivalent Loan Borrowing cannot be obtained.

"Bank of America" means Bank of America, N.A., a national banking association.

"Bank Products" means any services or facilities provided to any Loan Party by a Lender or any of its Affiliates (but excluding Cash Management Services) on account of (a) Hedging Agreements and (b) purchase cards.

"Bank Product Reserves" means Availability Reserves established to reflect the liabilities and obligations of the Loan Parties with respect to Bank Products then provided or outstanding.

"Banker's Acceptance" means a time draft or bill of exchange relating to a Commercial Letter of Credit (other than a Canadian Commercial Letter of Credit) which has been accepted by the Issuing Bank.

5

"Bankruptcy Code" means Title 11, U.S.C., as now or hereafter in effect, or any successor thereto.

"Bankruptcy Courts" means collectively the US Bankruptcy Court and the Canadian Bankruptcy Court.

"Bankruptcy Recoveries" means any and all claims and causes of action which a Loan Party may be entitled to assert by reason of any avoidance or other power vested in or on behalf of a Loan Party or the estate of a Loan Party under Chapter 5 of the Bankruptcy Code (other than those arising under §549 of the Bankruptcy Code), the Initial Order or other Applicable Law and any and all recoveries or proceeds of any such claims or causes of action.

"Blocked Account Agreements" shall mean agency agreements with the banks maintaining deposit accounts of the Borrowers where funds from one or more DDAs are concentrated, which agreements shall be in form and substance reasonably satisfactory to the Administrative Agent, and the Canadian Agent, as applicable.

"Blocked Account Banks" shall mean the banks with whom the Borrowers have entered into Blocked Account Agreements.

"Blocked Accounts" shall mean each deposit account of the Borrowers which is the subject of a Blocked Account Agreement.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrowers" means collectively, the Domestic Borrowers and the Canadian Borrower.

"Borrowing" shall mean (a) the incurrence of Loans of a single Type, on a single date and having, in the case of LIBO Loans and BA Equivalent Loans, a single Interest Period, or (b) a Swingline Loan.

"Borrowing Base" means, at any time of calculation, an amount equal to

(a)  the Receivables Advance Rate *multiplied by* the face amount of Eligible Credit Card Receivables, plus

(b)  the Appraisal Percentage *multiplied by* (i) the Appraised Value of Eligible Inventory, *multiplied by* (ii)(x) the Cost of Eligible Inventory minus (y) Inventory Reserves; plus

(c)  with respect to any Eligible Letter of Credit, the Appraisal Percentage *multiplied by* (A) the Appraised Value of the Inventory supported by

EXECUTION VERSION

such Eligible Letter of Credit, *multiplied by* (B)(1) the Cost of such Inventory when completed minus (2) Inventory Reserves, minus

(d)    the Availability Block, minus

(e)    the then amount of all Availability Reserves established by the Administrative Agent and the Co-Collateral Agent (subject in all respects to the provisions of Section 8.18) from time to time in their Permitted Discretion, minus

(f)    the then amount of the Professional Fee Carve Out Reserve.

"Borrowing Base Certificate" has the meaning assigned to such term in Section 5.01(b)(iii).

"Borrowing Request" means a request by the Lead Borrower on behalf of the Borrowers for a Borrowing in accordance with Section 2.04.

"Breakage Costs" shall have the meaning set forth in Section 2.21(b).

"Budget" means (a) the thirteen (13) week cash flow projections for the Domestic Loan Parties and (b) the thirteen (13) week cash flow of the Canadian Loan Parties, respectively, substantially in the forms of the initial Budgets annexed hereto as Schedule 1.2, and any subsequent thirteen week cash flow projections furnished pursuant to Section 5.01(b)(i) hereof, in each case, in substance reasonably satisfactory to the Required Lenders, reflecting on a line-item basis, among other things, anticipated sales, cash receipts, inventory levels, expenditures, the Borrowing Base, the Canadian Borrowing Base (if applicable) and Excess Availability for the subject period, which Budget may be amended and modified solely with the written consent of the Required Lenders.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in Boston, Massachusetts are authorized or required by law to remain closed, provided that, when used in connection with a LIBO Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market.  Except as otherwise provided herein, if any day on which a payment is due is not a Business Day, then the payment shall be due on the next day following which is a Business Day and such extension of time shall be included in computing interest and fees in connection with such payment, provided further that when used in connection with any Loan to the Canadian Borrower, the term "Business Day" shall also exclude any day on which banks are authorized or required by law to be closed in Toronto, Ontario, Canada.

"Canadian Agent" means Bank of America, N.A. (acting through its Canada branch) having a branch in Toronto, Ontario, Canada,  or any successor appointed pursuant to the

7

provisions hereof and includes its capacity as "Canadian Administrative Agent" and "Canadian Collateral Agent".

"Canadian Appraisal Percentage" means from January 1, 2009 through the earlier of January 17, 2009 (or such later date agreed by the Canadian Lenders) and the closing and initial funding of the Term Loan, 80%, and (B) at all other times, 75%.

"Canadian Availability" means the lesser of (a)(i)(A) from January 1, 2009 through the earlier of January 17, 2009 (or such later date agreed by the Canadian Lenders) and the closing and initial funding of the Term Loan $60,000,000, and (B) at all other times, $50,000,000, minus (ii) the aggregate unpaid balance of Credit Extensions made to, or for the account of (other than with respect to Credit Extensions to the Domestic Borrowers which will be used to make intercompany loans to the Canadian Borrower as permitted in accordance with the provisions hereof) the Canadian Borrower, minus (iii) the aggregate unpaid balance of Pre-Petition Liabilities on account of credit extensions made to, or for the benefit of, the Canadian Borrower, or (b) through the earlier of January 17, 2009 (or such later date agreed by the Canadian Lenders) and the closing and initial funding of the Term Loan, the Canadian Borrowing Base.  After the earlier of January 17, 2009 (or such later date agreed by the Canadian Lenders) and the closing and initial funding of the Term Loan, Canadian Availability shall be determined based on clause (a) only.

"Canadian Bankruptcy Case" has the meaning provided in the recitals to this Agreement.

"Canadian Bankruptcy Court" has the meaning provided in the recitals to this Agreement.

"Canadian Borrower" means InterTAN Canada Ltd.

"Canadian Borrowing Base" means at any time of calculation, an amount equal to

> (a)     the Canadian Appraisal Percentage *multiplied by* (i) the Appraised Value of Eligible Inventory of the Canadian Borrower, *multiplied by* (ii)(x) the Cost of Eligible Inventory of the Canadian Borrower, minus (y) Inventory Reserves, minus

> (b)     the then amount of all Availability Reserves established by the Canadian Agent from time to time in its Permitted Discretion.

"Canadian Borrowing Base Certificate" has the meaning assigned to such term in Section 5.01(b)(ii).

"Canadian Commitment" shall mean, with respect to each Lender, the commitment of such Lender hereunder to make Credit Extensions to the Canadian Borrower in the amount set

forth opposite its name on Schedule 1.1 hereto or as may subsequently be set forth in the Register from time to time, as the same may be reduced from time to time pursuant to Section 2.17 hereof.

"Canadian Commitment Fee" has the meaning provided therefor in Section 2.14(b).

"Canadian Commitment Percentage" shall mean, with respect to each Lender, that percentage of the Canadian Commitments of all Lenders hereunder to make Credit Extensions to the Canadian Borrower in the amount set forth opposite its name on Schedule 1.1 hereto or as may subsequently be set forth in the Register from time to time, as the same may be reduced from time to time pursuant to Section 2.17 hereof.

"Canadian Creditor Charge" has the meaning given to such term in the Initial Order.

"Canadian Lenders" means the Lenders having Canadian Commitments from time to time or at any time.

"Canadian Letter of Credit" shall mean a Letter of Credit that is issued pursuant to this Agreement for the account of the Canadian Borrower.

"Canadian Letter of Credit Outstandings" shall mean, at any time, the sum of (a) with respect to Canadian Letters of Credit outstanding at such time, the aggregate maximum amount that then is or at any time thereafter may become available for drawing or payment thereunder plus (b) all amounts theretofore drawn or paid under Canadian Letters of Credit for which the Issuing Bank has not then been reimbursed.

"Canadian Liabilities" means (a) the payment by the Canadian Loan Parties of (i) the principal of, and interest on the Loans made hereunder to, or for the benefit of, the Canadian Borrower, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, (ii) each payment required to be made by the Canadian Borrower under the Credit Agreement in respect of any Letter of Credit, when and as due, including payments in respect of reimbursement of disbursements, interest thereon and obligations to provide cash collateral and (iii) all other monetary obligations, including fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise, of the Canadian Loan Parties to the Secured Parties under the Credit Agreement and the other Loan Documents, (b) the performance of all covenants, agreements, obligations and liabilities of the Canadian Loan Parties under or pursuant to this Agreement and the other Loan Documents, and (c) all Other Liabilities of the Canadian Loan Parties.

EXECUTION VERSION

"Canadian Loan Parties" means the Canadian Borrower, Tourmalet Corp. and each Subsidiary o f the Canadian Borrower which executes a Facility Guaranty and is incorporated or formed under Applicable Law of Canada or any of its provinces or territories.

"Canadian Overadvance" means, at any time of calculation, a circumstance in which the Credit Extensions to the Canadian Borrower exceed the Canadian Availability.

"Canadian Prime Rate" means the higher of (a) the rate of interest publicly announced from time to  time by Bank of America, N.A. (acting through its Canada branch) as its reference rate of interest for loans made in Canadian dollars to Canadian customers and designated as its "prime" rate.  It is a rate set by Bank of America, N.A. (acting through its Canada branch) based upon various  factors, including Bank of America, N.A. (acting through its Canada branch)'s costs and des ired return, general economic conditions and other factors and is used as a reference point for pricing some loans, and (b) the BA Rate applicable to Canadian dollar banker's acceptances having a term of one month as displayed on the "CDOR Page" or otherwise as determined pursuant to the definition of "BA Rate".  Any change in the Canadian Prime Rate due to a change in the Bank of America, N.A. (acting through its Canada branch) prime rate shall be effective o n the effective date of such change in the Bank of America, N.A. (acting through its Canada branch) prime rate.

"Canadian Security Documents" means the General Security Agreement and the deeds of hypothec charging the universality of moveable property each granted by the Canadian Loan Parties in favor of the Canadian Agent, each securing the payment and performance of the Obligations.

"Canadian Total Commitments" means the aggregate of the Canadian Commitments of all Canadian Lenders.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Cases" has the meaning provided in the recitals to this Agreement.

"Cash Collateral Account" shall mean an interest-bearing account established by the Domestic Borrowers with the Collateral Agent at Bank of America under the sole and exclusive dominion and control of the Collateral Agent designated as the "Circuit City Cash Collateral Account" and, in the case of the Canadian Borrower, an interest-bearing account established by

10

EXECUTION VERSION

the Canadian Borrower with the Canadian Agent at Bank of America, N.A. (acting through its Canada branch) under the sole and exclusive dominion and control of the Canadian Agent designated as the "InterTAN Canada Cash Collateral Account".

"Cash Management Reserves" means Availability Reserves established to reflect the reasonably anticipated liabilities and obligations of the Loan Parties with respect to Cash Management Services then provided or outstanding.

"Cash Management Services" means any one or more of the following types or services or facilities provided to any Loan Party by a Lender or any of its Affiliates: (a) ACH transactions, (b) cash management services, including, without limitation, controlled disbursement services, treasury, depository, overdraft, and electronic funds transfer services, (c) foreign exchange facilities, and (d) credit or debit cards.

"Cash Receipts" has the meaning provided therefor in Section 2.23(d).

"CCAA" means the Companies' Creditors Arrangement Act (Canada), as now or hereafter in effect, or any successor thereto.

"CD$" means Canadian dollars.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq.

"Change in Control" means, at any time, (a) occupation of a majority of the seats (other than vacant seats) on the board of directors of the Lead Borrower by Persons who were neither (i) nominated by the board of directors of the Lead Borrower nor (ii) appointed by directors so nominated; or (b) any person (within the meaning of the Securities and Exchange Act of 1934, as amended) is or becomes the beneficial owner (within the meaning of Rule 13d-3 and 13d-5 of the Securities and Exchange Act of 1934, as amended), directly or indirectly, of forty percent (40%) or more of the aggregate voting power represented by the outstanding capital stock of the Lead Borrower on a fully diluted basis, whether as a result of the issuance of securities of the Lead Borrower, any merger, consolidation, or otherwise, or (c) the failure of the Lead Borrower to own, directly or indirectly, 100% of the capital stock of all of the Subsidiary Borrowers and other Loan Parties unless pursuant to a transaction otherwise permitted hereunder.

"Change in Law" means (a) the adoption of any law, rule or regulation after the date of this Agreement, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender or the Issuing Bank (or, for purposes of Section 2.25(b), by any lending office of such Lender or by such Lender's or the Issuing Bank's holding company, if

11

any) with an y request, guideline or directive (whether or not having the force of law) of any Governmental Authority, in each case, made, issued or changed after the date of this Agreement.

"Chapter 11 Case" has the meaning provided in the recitals to this Agreement.

"Charges" has the meaning provided therefor in Section 9.13.

"Closing Date" means November 12, 2008.

"Co-Collateral Agent" means General Electric Capital Corporation.

"Code" means the Internal Revenue Code of 1986 and the rules and regulations promulgated thereunder, as amended from time to time.

"Collateral" means any and all "Collateral" as defined in any applicable Security Document, and all other property of whatever kind and nature subject or purported to be subject from time to time to a Lien under any Security Document, the DIP Orders or the Initial Order. Notwithstanding anything to the contrary contained in this definition, the term "Collateral" shall not, except as expressly provided in the DIP Orders or the Initial Order, include Bankruptcy Recoveries.

"Collateral Agent" means Bank of America, in its capacity as collateral agent under the Security Documents (other than the Canadian Security Documents).

"Commercial Letter of Credit" means any Letter of Credit issued for the purpose of providing the primary payment mechanism in connection with the purchase of any materials, goods or services by a Borrower in the ordinary course of business of such Borrower.

"Commitment" shall mean, with respect to each Lender, the commitment of such Lender hereunder to make Credit Extensions to the Borrowers in the amounts set forth opposite its name on Schedule 1.1 hereto or as may subsequently be set forth in the Register from time to time, as the same may be reduced from time to time pursuant to Section 2.17 hereof.

"Commitment Fee" has the meaning provided therefor in Section 2.14.

"Commitment Fee Percentage" means 0.75% per annum.

"Commitment Percentage" shall mean, with respect to each Lender, that percentage of the Commitments of all Lenders hereunder to make Credit Extensions to the Borrowers, in the amount set forth opposite its name on Schedule 1.1 hereto or as may subsequently be set forth in the Register from time to time, as the same may be reduced from time to time pursuant to Section 2.17 hereof.

12

EXECUTION VERSION

"Concentration Account" has the meaning provided therefor in Section 2.23(d).

"Consolidated" means, when used to modify a financial term, test, statement, or report of a Person, refers to the application or preparation of such term, test, statement or report (as applicable) based upon the consolidation, in accordance with GAAP, of the financial condition or operating results of such Person and its Subsidiaries.

"Consummation Date" means both (a) the date of substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes of this Agreement shall be no later than the effective date) of a Plan of Reorganization confirmed by a Final Order, and (b) the approval in a Final Order of, and the effectiveness of, a Plan of Compromise under the CCAA.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. The terms "Controlling" and "Controlled" have meanings correlative thereto.

"Cost" means the cost value of Inventory as reported on the Stock Ledger using the cost method of accounting based on practices which are in effect on the date of this Agreement.

"Credit Card Notification" has the meaning provided therefor in Section 2.23(c).

"Credit Extensions" as of any day, shall be equal to the sum of (a) the principal balance of all Loans then outstanding, and (b) the then amount of the Letter of Credit Outstandings.

"Creditors' Committee" means any official committee of creditors formed, appointed or approved in the Chapter 11 Case pursuant to the Bankruptcy Code.

"Customer Credit Liabilities" means, at any time, the aggregate face value at such time of (a) outstanding gift certificates and gift cards of the Borrowers, and rewards certificates issued pursuant to the Lead Borrower's rewards program entitling the holder thereof to use all or a portion of the certificate to pay all or a portion of the purchase price for any Inventory, and (b) outstanding merchandise credits of the Borrowers.

"Customs Broker Agreement" means an agreement in substantially the form attached hereto as Exhibit G among a Domestic Borrower or the Canadian Borrower, as applicable, a customs broker or other carrier, and the Collateral Agent or the Canadian Agent, as applicable, in which the customs broker or other carrier acknowledges that it has control over and holds the documents evidencing ownership of the subject Inventory for the benefit of the Collateral Agent or the Canadian Agent, as applicable, and agrees, upon notice from the Collateral Agent or the Canadian Agent, as applicable, to hold and dispose of the subject Inventory solely as directed by the Collateral Agent or the Canadian Agent, as applicable.

13

EXECUTION VERSION

"DDAs" means any checking or other demand deposit account maintained by any Loan Party into which proceeds of Collateral are deposited. All funds in such DDAs shall be conclusively presumed to be Collateral and proceeds of Collateral and the Agent and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in the DDAs.

"DDA Notification" has the meaning provided therefor in Section 2.23(c).

"Default" means any event or condition that constitutes an Event of Default or that upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Delinquent Lender" has the meaning given that term in Section 8.13.

"Delinquent Lender's Future Commitment" has the meaning provided therefor in Section 8.13.

"Deteriorating Lender" means any Delinquent Lender or any Lender as to which (a) the L/C Issuer or Swingline Lender has a good faith belief that such Lender has defaulted in fulfilling its obligations under one or more other syndicated credit facilities, or (b) a Person that Controls such Lender has been deemed insolvent or become the subject of a bankruptcy, insolvency or similar proceeding.

"DIP Orders" means and refers to the Interim Borrowing Order and the Final Borrowing Order.

"Directors' Charge" has the meaning set forth in the Initial Order.

"Disclosure Statement" means a disclosure statement filed in the Chapter 11 Case in connection with a Plan of Reorganization.

"dollars" or "$" refers to lawful money of the United States of America.

"Dollar Equivalent" of any amount means, at the time of determination thereof, (a) if such amount is expressed in Dollars, such amount and (b) if such amount is denominated in any other currency, the equivalent of such amount in Dollars as determined by Administrative Agent using the published spot rate as quoted by Bank of America or its branches or Affiliates to customers generally as its noon spot rate at which such currency is offered on such day for Dollars.

"Domestic Borrowers" means collectively, Circuit City Stores, Inc., Circuit City Stores West Coast, Inc., and Circuit City Stores PR, LLC.

14

EXECUTION VERSION

"Domestic Commitment" shall mean, with respect to each Lender, the commitment of such Lender hereunder to make Credit Extensions to the Domestic Borrowers in the amount set forth opposite its name on Schedule 1.1 hereto or as may subsequently be set forth in the Register from time to time, as the same may be reduced from time to time pursuant to Section 2.17 hereof.

"Domestic Commitment Percentage" shall mean, with respect to each Lender, that percentage of the Domestic Commitments of all Lenders hereunder to make Credit Extensions to the Domestic Borrowers, in the amount set forth opposite its name on Schedule 1.1 hereto or as may subsequently be set forth in the Register from time to time, as the same may be reduced from time to time pursuant to Section 2.17 hereof.

"Domestic Lenders" means the Lenders having Domestic Commitments from time to time or at any time.

"Domestic Loan Parties" means all Loan Parties other than the Canadian Loan Parties.

"Domestic Total Commitments" means the aggregate of the Domestic Commitments of all Domestic Lenders.

"Effect of Bankruptcy" means, with respect to any contractual obligation, contract or agreement to which a Loan Party is a party, any default or other legal consequences arising on account of the commencement or the filing of the Chapter 11 Case or the Canadian Bankruptcy Case, as applicable (including the implementation of any stay), or the rejection of any such contractual obligation, contract or agreement with the approval of the US Bankruptcy Court or the Canadian Bankruptcy Court, as applicable, if required under Applicable Law.

"Eligible Credit Card Receivables" means Accounts due to a Domestic Borrower on a non-recourse basis from Visa, Mastercard, American Express Co., Discovercard and other major credit card processors reasonably acceptable to the Administrative Agent, as arise in the ordinary course of business and which have been earned by performance. Without limiting the foregoing, none of the following shall be deemed to be Eligible Credit Card Receivables:

      (a)    Accounts that have been outstanding for more than five (5) Business Days from the date of sale;

      (b)    Accounts with respect to which a Domestic Borrower does not have good, valid and marketable title thereto, free and clear of any Encumbrance (other than (i) Liens granted to the Collateral Agent, for its benefit and the ratable benefit of the Secured Parties, pursuant to the Security Documents or the Pre-Petition Credit Documents), and (ii) Liens permitted herein which do not have priority over the Lien in favor of the Collateral Agent;

15

EXECUTION VERSION

(c)    Accounts that are not subject to a first priority security interest in favor of the Collateral Agent, for the benefit of itself and the Secured Parties;

(d)    Accounts which arise on account of any private label credit card issued by a Domestic Borrower;

(e)    Accounts which are disputed, are with recourse, or with respect to which a claim, counterclaim, offset or chargeback has been asserted (to the extent of such claim, counterclaim, offset or chargeback); or

(f)    Accounts which the Administrative Agent determines in its Permitted Discretion to be uncertain of collection.

"Eligible Inventory" shall mean, as of the date of determination thereof, without duplication of Inventory which is the subject of Eligible Letters of Credit, items of Inventory of the Domestic Borrowers (or with respect to the calculation of the Canadian Borrowing Base only, the Canadian Borrower) that are finished goods, merchantable and readily saleable to the public in the ordinary course of business. Without limiting the foregoing, none of the following shall be deemed to be Eligible Inventory:

(a)    Inventory that is not owned solely by a Domestic Borrower (or with respect to the calculation of the Canadian Borrowing Base only, the Canadian Borrower), or is leased or on consignment, or such Domestic Borrower (or with respect to the calculation of the Canadian Borrowing Base only, the Canadian Borrower) does not have good and valid title thereto;

(b)    Inventory (including any portion thereof in transit from vendors) that is not located at a warehouse facility or store that is owned or leased by a Borrower or that is located with any third party or bailee described in Section 3.19 hereof, unless an intercreditor agreement reasonably acceptable to the Agent is executed and delivered by the owner of such location;

(c)    Inventory that represents (i) goods damaged, defective or otherwise unmerchantable, (ii) goods that are obsolete or slow moving, or custom items, work-in-process, raw materials, samples, or that constitute parts, promotional, marketing, packaging and shipping materials or labels, bags, supplies or other non-merchandise categories, used or consumed in a Domestic Borrower's (or with respect to the calculation of the Canadian Borrowing Base only, the Canadian Borrower's) business, (iii) goods that do not conform in all material respects to the representations and warranties contained in this Agreement or any of the Security Documents, (iv) goods to be returned to the vendor, (v) goods not in compliance with all standards imposed by any Governmental Authority having regulatory authority over such Inventory, its use or sale, (vi) bill and hold goods or (vii) goods in the following Stock Ledger

16

EXECUTION VERSION

locations: (A) Product Return Center, (B) Service Inventory, (C) Damage Return Center, (D) Corporate Office, (E) MAC Inventory, (F) Road Support Merchandise, (G) Class 710 CCA Resource Kits, and (H) Class 800-898 Supply Merchandise;

(d)    Inventory that is not located in the United States of America (excluding territories and possessions thereof) other than Inventory supported by an Eligible Letter of Credit (or with respect to the calculation of the Canadian Borrowing Base only, is not located in Canada);

(e)    Inventory that is not subject to a perfected first-priority security interest in favor of the Collateral Agent for the benefit of the Secured Parties (or with respect to the calculation of the Canadian Borrowing Base only, in favor of the Canadian Agent) (subject only to Permitted Encumbrances having priority by operation of Applicable Law);

(f)    Inventory as to which insurance in material compliance with the provisions of Section 5.07 hereof is not in effect; or

(g)    Inventory which has been sold but not yet delivered.

"Eligible Letter of Credit" shall mean, as of any date of determination thereof, a Commercial Letter of Credit which supports the purchase of Inventory, (i) for which no documents of title have then been issued; (ii) which Inventory otherwise would constitute Eligible Inventory, (iii) which Commercial Letter of Credit has an expiry within (x) prior to the Lease Assumption Reserve Commencement Date, sixty (60) days of the date of initial issuance of such Commercial Letter of Credit, and (y) on or after the Lease Assumption Reserve Commencement Date, thirty (30) days of the date of initial issuance of such Commercial Letter of Credit, and (iv) which Commercial Letter of Credit provides that it may be drawn only after such Inventory is completed and after documents of title have been issued for such Inventory reflecting a Borrower or the Collateral Agent as consignee of such Inventory.

"Environmental Laws" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by or with any Governmental Authority, relating in any way to the environment, handling, treatment, storage, disposal, Release or threatened Release of any Hazardous Material or to health and safety matters.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, natural resource damage, costs of environmental remediation, administrative oversight costs, fines, penalties or indemnities), of any Person directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous

17

EXECUTION VERSION

Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with the Lead Borrower, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) with respect to the Domestic Borrowers, any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived) or, with respect to the Canadian Borrower, any such similar event under any other Applicable Law relating to Plans; (b) with respect to the Domestic Borrowers, the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived, and with respect to the Canadian Borrower, the existence with respect to any Plan of any unfunded contribution, special contribution, unfunded liability or solvency deficiency, whether or not waived; (c) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA or, with respect to the Canadian Borrower, any other Applicable Law, of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by the Lead Borrower or any of its ERISA Affiliates or the Canadian Borrower or any of its Related Parties of any liability under Title IV of ERISA or, with respect to the Canadian Borrower, any other Applicable Law, with respect to the termination of any Plan; (e) the receipt by the Lead Borrower or any ERISA Affiliate or the Canadian Borrower or any of its Related Parties from the PBGC, the FSCO (with respect to the Canadian Borrower) or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by the Lead Borrower or any of its ERISA Affiliates or the Canadian Borrower or any of its Related Parties of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; (g) the receipt by the Lead Borrower or any ERISA Affiliate or the Canadian Borrower or any of its Related Parties of any notice, or the receipt by any Multiemployer Plan from the Lead Borrower or any ERISA Affiliate or the Canadian Borrower or any of its Related Parties of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA or, with respect to the Canadian Borrower, any other Applicable Law; or (h) the failure by the Canadian Borrower to make any required contribution to a Plan or any Lien arises with respect to any Plan (other than contribution amounts not yet due and payable).

18

EXECUTION VERSION

"Event of Default" has the meaning assigned to such term in Section 7.01.

"Excess Availability" means, as of any date of determination, the excess, if any, of (a)(i) from the Closing Date through the earlier of January 17, 2009 (or such later date to which the Canadian Lenders may agree) or the closing and initial funding of the Term Loan, the lesser of (i) the Domestic Total Commitments, or (ii) the Borrowing Base, over (b) the outstanding Credit Extensions to or for the account of the Domestic Borrowers, and (ii) from and after the earlier of January 17, 2009 (or such later date to which the Canadian Lenders may agree) or the closing and initial funding of the Term Loan, the lesser of (i) the Total Commitments, or (ii) the Borrowing Base, over (b) the outstanding Credit Extensions.

"Excluded Taxes" means, with respect to the Agents, any Lender, the Issuing Bank or any other recipient of any payment to be made by or on account of any obligation of the Borrowers hereunder, (a) income or franchise taxes imposed on (or measured by) its gross or net income, (b) any branch profits taxes, and (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by a Borrower under Section 2.30(b)), any withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party to this Agreement (or designates a new lending office) or is attributable to such Foreign Lender's failure to comply with Section 2.28(e), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Borrowers with respect to such withholding tax pursuant to Section 2.28(a).

"Facility Guarantors" means the Subsidiaries listed on Schedule 1.3 and any other Subsidiaries which hereafter become Facility Guarantors in favor of the Agents, the Issuing Bank and the Lenders.

"Facility Guaranty" means collectively any Guaranty of any or all of the Obligations executed by the Facility Guarantors.

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by Bank of America from three Federal funds brokers of recognized standing selected by it.

"Fee Letter" means the "Fee Letter" among the Lead Borrower, Bank of America and the Arranger dated as of November 12, 2008, as such letter may from time to time be amended.

EXECUTION VERSION

"Final Borrowing Order" means an order of each of the Bankruptcy Courts which order shall be in form, scope and substance reasonably acceptable to the Required Lenders, which, among other matters but not by way of limitation, authorizes the Loan Parties to obtain credit, incur (or guaranty) Obligations, grant Liens under this Agreement, the other Loan Documents, the DIP Orders and the Initial Order, as the case may be, and provides for the super priority of the Agents' and the Lenders' claims, which order is a Final Order.

"Final Order" means an order or judgment of the US Bankruptcy Court or Canadian Bankruptcy Court, as applicable, as entered on the docket of the Clerk of the US Bankruptcy Court or issued and entered by the Canadian Bankruptcy Court, that has not been reversed, stayed, modified or amended and as to which the time to appeal or seek leave to appeal, petition for certiorari, reargue or seek rehearing has expired and no proceeding for certiorari, reargument or rehearing is pending or if an appeal, petition for certiorari, reargument, or rehearing has been sought, the order or judgment of the US Bankruptcy Court or Canadian Bankruptcy Court has been affirmed by the highest court to which the order was appealed, from which the reargument or rehearing was sought, or certiorari has been denied and the time to take any further appeal or to seek certiorari or further reargument or rehearing has expired.

"Financial Officer" means, with respect to any Loan Party, the chief financial officer, chief accounting officer, treasurer, assistant treasurer, director of treasury and risk management, or controller of such Loan Party.

"Foreign Lender" means any Lender that is organized under the laws of a jurisdiction other than the United States of America or any State thereof or the District of Columbia.

"Foreign Subsidiary" means any Subsidiary that is organized under the laws of a jurisdiction other than the United States of America or any State thereof or the District of Columbia.

"FSCO" means the Financial Services Commission of Ontario and any Person succeeding to the functions thereof and includes the Superintendent under such statute and any other Governmental Authority empowered or created by the *Pension Benefits Act* of Ontario or under any other Applicable Law related to Plans.

"Fund" shall mean any person that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"GAAP" means accounting principles which are consistent with those promulgated or adopted by the Financial Accounting Standards Board and its predecessors (or successors) in

20

effect and applicable to that accounting period in respect of which reference to GAAP is being made.

"General Security Agreement" means, collectively, the General Security Agreements dated as of the Closing Date entered into by each of the Canadian Loan Parties in favor of the Canadian Collateral Agent for the benefit of the Secured Parties thereunder, as amended and in effect from time to time.

"Gordon Brothers" means GB Asset Advisors, LLC or any Affiliate thereof.

"Governmental Authority" means the government of the United States of America, Canada, any other nation or any political subdivision thereof, whether state, provinicial, territorial, or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation, provided that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes, mold, and all other substances or wastes of any nature regulated pursuant to any Environmental Law, including any material listed as a hazardous substance under Section 101(14) of CERCLA.

"Hedging Agreement" means any interest rate protection agreement, interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, foreign currency exchange agreement, commodity price protection agreement, or other interest or currency exchange rate or

21

commodity price hedging arrangement designed to hedge against fluctuations in interest rates or foreign exchange rates.

"Identified Leases" means the Leases identified on Schedule 5.18 hereto.

"Indebtedness" of any Person means, without duplication, (a) all payment obligations of such Person for borrowed money (including any obligations which are without recourse to the credit of such Person but which are secured by a Lien on the property of such Person), (b) all payment obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all payment obligations of such Person upon which interest charges are customarily paid, (d) all payment obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all payment obligations of such Person in respect of the deferred purchase price of property or services, (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (g) all Guarantees by such Person of Indebtedness of others, (h) all Capital Lease Obligations of such Person, (i) all payment obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty (j) all payment obligations, contingent or otherwise, of such Person in respect of bankers' acceptances, (k) all Hedging Agreements, (l) the principal and interest portions of all rental obligations of such Person under any Synthetic Lease or similar off-balance sheet financing where such transaction is considered borrowed money indebtedness for tax purposes but is classified as an operating lease in accordance with GAAP, and (m) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any equity interest in such Person or any other Person, or in respect of any warrant, right or option to acquire such equity interest, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends. The Indebtedness of any Person shall (i) include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor and (ii) shall exclude current accounts payable and accrued expenses incurred in the ordinary course of business.

"Indemnified Taxes" means Taxes arising from any payment made hereunder or otherwise with respect to this Agreement, other than Excluded Taxes.

"Indemnitee" has the meaning provided therefor in Section 9.03(b).

"Independent Consultant" means FTI Consulting, Inc. (or another independent third party consultant reasonably acceptable to the Administrative Agent).

22

"Initial Order" means an order issued and entered by the Canadian Bankruptcy Court, substantially in the form of, and containing the provisions set forth in, Exhibit H-2 (or such other form and provisions as may be reasonably acceptable to the Agents and the Required Lenders), which shall stay all proceedings against the Canadian Loan Parties and which shall, inter alia, approve the Canadian Loan Parties' entering into and performing their respective obligations under this Agreement and the other Loan Documents.

"Initial Store Closing Sale" has the meaning set forth in Section 5.18.

"Initial Store Closing Sale Order" has the meaning set forth in Section 5.18.

"Intercreditor Agreement" means an intercreditor agreement between the Agents and the Term Loan Agent in form and substance reasonably satisfactory to the Agents and the Required Lenders, to be entered into contemporaneously with the closing of the Term Loan, as such intercreditor agreement may be amended, modified, supplemented and in effect from time to time.

"Interim Borrowing Order" means an order entered by the US Bankruptcy Court, substantially in the form of, and containing the provisions set forth in, Exhibit H (or such other form and provisions as may be reasonable acceptable to the Agents and the Required Lenders), approving, on an interim basis, the Domestic Loan Parties' entering into and performing their obligations under this Agreement and the other Loan Documents.

"Interest Payment Date" means (a) with respect to any Prime Rate Loan (including a Swingline Loan), the first Business Day of each calendar month, and (b) with respect to any LIBO Loan or BA Equivalent Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part.

"Interest Period" means, with respect to any LIBO Borrowing or BA Equivalent Loan Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, two, or three months thereafter, as the Lead Borrower may elect by notice to the Administrative Agent in accordance with the provisions of this Agreement, provided that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, and (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month during which such Interest Period ends) shall end on the last Business Day of the last calendar month of such Interest Period, (c) any Interest Period which would otherwise end after the Termination Date shall end on the Termination Date, and (d) notwithstanding the provisions of clause (c), no Interest Period shall

EXECUTION VERSION

have a duration of less than one month, and if any Interest Period applicable to a LIBO Borrowing or BA Equivalent Loan Borrowing would be for a shorter period, such Interest Period shall not be available hereunder. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Inventory" has the meaning assigned to such term in the Security Documents and, as regards the Canadian Borrower, includes all "inventory" as defined in the PPSA.

"Inventory Reserves" means such reserves as may be established from time to time by the Administrative Agent, the Canadian Agent (with respect to the Canadian Borrowing Base) or the Co-Collateral Agent (subject in all respects to the provisions of Section 8.18) in its Permitted Discretion (after consultation with the Lead Borrower (whose consent to any Inventory Reserve shall not be required)) with respect to the determination of the saleability, at retail, of Eligible Inventory or which reflect such other factors as affect the appraised value of Eligible Inventory. Inventory Reserves shall be established and calculated in a manner and methodology consistent with the Agents' practices as of the Closing Date with other similarly situated borrowers.

"Investment" has the meaning provided therefor in Section 6.04.

"Issuer Documents" means with respect to any Letter of Credit, the letter of credit application, and any other document, agreement and instrument entered into by the Issuing Bank and any Borrower or in favor of the Issuing Bank and relating to any such Letter of Credit.

"Issuing Bank" means Bank of America, in its capacity as the issuer of Letters of Credit hereunder, and as to the Canadian Borrower, Bank of America, N.A. (acting through its Canada branch), and any other Lender as the Administrative Agent and the Lead Borrower may agree, such agreement not to be unreasonably withheld. The Issuing Bank may, in its reasonable discretion, arrange for one or more Letters of Credit to be issued by Affiliates or branches of the Issuing Bank, in which case the term "Issuing Bank" shall include any such Affiliate or branch with respect to Letters of Credit issued by such Affiliate or branch.

"Judgment Conversion Date" has the meaning set forth in Section 9.16 hereof.

"Judgment Currency" has the meaning set forth in Section 9.16 hereof.

"KERP Charge" has the meaning given to such term in the Initial Order.

"L/C Credit Support" has the meaning set forth in Section 2.07(k) hereof.

"L/C Disbursement" means a payment made by the Issuing Bank pursuant to a Letter of Credit.

24

"Lead Borrower" means Circuit City Stores, Inc.

"Lease" means any agreement, whether written or oral, no matter how styled or structured, pursuant to which a Loan Party is entitled to the use or occupancy of any space in a structure, land, improvements or premises for any period of time.

"Lease Assumption Reserve Commencement Date" means the date that is 12 weeks (or, if longer, the length of the liquidation period assumed in the Inventory appraisals received by Agents, plus 3 weeks) prior to the end of the 120 day lease rejection/assumption period, as such period may be extended or shortened by the US Bankruptcy Court.

"Lease Reserve" means a reserve, in an amount established by the Administrative Agent or the Co-Collateral Agent (subject in all respects to the provisions of Section 8.18) in their Permitted Discretion, in respect of (i) Inventory held at any leased or rented location in the United States or Puerto Rico intended to be closed with respect to which the lease therefor is or is intended to be terminated by a Domestic Borrower, (ii) Inventory at leased locations in the United States or Puerto Rico with respect to which the lease has not been assumed commencing on the Lease Assumption Reserve Commencement Date, or with respect to any specific location, the date that is 12 weeks (or, if longer, the length of the liquidation period assumed in the Inventory appraisals received by Agents, plus 3 weeks) prior to the expiration of such period of time as shall have been consented to for rejection/assumption of such lease by the landlord for such location, or (iii) Inventory held at any leased location in the United States or Puerto Rico as to which there has been filed a motion to compel the assumption or rejection of the lease, in each case in an amount determined by the Administrative Agent or the Co-Collateral Agent (subject in all respects to the provisions of Section 8.18) in their Permitted Discretion.

"Lenders" shall mean the Persons identified on Schedule 1.1 and each assignee that becomes a party to this Agreement as set forth in Section 9.05(b).

"Letter of Credit" shall mean (a) a letter of credit that is issued pursuant to this Agreement for the account of any Borrower, including, without limitation, any Canadian Letter of Credit, and (b) any Banker's Acceptance. Without limiting the foregoing, all Pre-Petition Letters of Credit (including, without limitation, all Banker's Acceptances issued in connection therewith) shall be deemed to have been issued hereunder and shall for all purposes be deemed to be "Letters of Credit" hereunder.

"Letter of Credit Fees" shall mean the fees payable in respect of Letters of Credit pursuant to Section 2.15.

"Letter of Credit Outstandings" shall mean, at any time, the sum of (a) with respect to Letters of Credit outstanding at such time, the aggregate maximum amount that then is or at any

25

time thereafter may become available for drawing or payment thereunder plus (b) all amounts theretofore drawn or paid under Letters of Credit for which the Issuing Bank has not then been reimbursed.

"LIB O Borrowing" shall mean a Borrowing comprised of LIBO Loans.

"LIB O Loan" shall mean any Loan bearing interest at a rate determined by reference to the Adjusted LIBO Rate in accordance with the provisions of Article II.

"LIB O Rate" means, with respect to any LIBO Borrowing for any Interest Period, the rate per annum equal to the British Bankers Association LIBOR Rate ("BBA LIBOR"), as published by Reuters (or by such other commercially available source providing quotations of BBA LIBOR as may be designated by the Administrative Agent from time to time) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, for Dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period. If such rate is not available at such time for any reason, then the "LIB O Rate" for such Interest Period shall be the rate per annum determined by the Administrative Agent to be the rate at which deposits in Dollars for delivery on the first day of such Interest Period in same day funds in the approximate amount of the LIBO Borrowing being made, continued or converted and with a term equivalent to such Interest Period would be offered by Bank of America's London Branch to major banks in the London interbank eurodollar market at their request at approximately 11:00 a.m. (London time) two Business Days prior to the commencement of such Interest Period.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge, security interest, and, with respect to any Canadian Loan Party, also includes any prior claim or deemed trust in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Liquidation" means the exercise by any of the Agents of those rights and remedies accorded to such Agents under the Loan Documents and Applicable Law as a creditor of the Loan Parties (subject to the terms of the DIP Orders and the Initial Order), including (after the occurrence and during the continuation of an Event of Default) the conduct by the Borrowers, acting with the consent of the Administrative Agent, of any public, private or "Going-Out-Of-Business Sale" or other disposition of Collateral for the purpose of liquidating the Collateral. Derivations of the word "Liquidation" (such as "Liquidate") are used with like meaning in this Agreement.

EXECUTION VERSION

"Loan Account" has the meaning assigned to such term in Section 2.22(a).

"Loan Documents" means this Agreement, the Notes, the Letters of Credit, the Fee Letter, all Borrowing Base Certificates, the Blocked Account Agreements, the DDA Notifications, the Credit Card Notifications, the Security Documents, the Facility Guaranty, each Customs Broker Agreement, the Intercreditor Agreement, and any other instrument or agreement now or hereafter executed and delivered in connection herewith or therewith.

"Loan Parties" means, collectively, the Borrowers and each Person executing a Facility Guaranty.

"Loans" shall mean all loans (including, without limitation, Revolving Loans and Swingline Loans) at any time made to the Borrowers or for account of the Borrowers pursuant to this Agreement.

"Margin Stock" has the meaning assigned to such term in Regulation U.

"Material Adverse Effect" means a material adverse effect on (a) the business, operations, property, assets, or financial condition, of the Lead Borrower and its Subsidiaries taken as a whole, (b) the ability of the Loan Parties to perform any material obligation or to pay any Obligations under this Agreement or any of the other Loan Documents, or (c) the validity or enforceability of this Agreement or any of the other Loan Documents or any of the material rights or remedies of the Agents or the Lenders hereunder or thereunder, including, without limitation, with respect to the Collateral; provided that a "Material Adverse Effect shall not be deemed to exist as a result of the Effect of Bankruptcy or the events leading up to and resulting therefrom.

"Material Contract" means, with respect to any Person, each contract(other than the Loan Documents and the documents governing the Term Loan) to which such Person is a party material to the business, operations, property, assets, or financial condition of such Person, the cancellation of non-renewal of which would reasonably be expected to result in a Material Adverse Effect.

"Material Indebtedness" means Indebtedness incurred subsequent to the commencement of the Cases (other than the Loans and Letters of Credit) (including obligations in respect of one or more Hedging Agreements and obligations in respect of the Term Loan) of any one or more of the Loan Parties in an aggregate principal amount exceeding $25,000,000.

"Maturity Date" means November 10, 2009.

"Maximum Rate" has the meaning provided therefor in Section 9.13.

27

EXECUTION VERSION

"Minority Lenders" has the meaning provided therefor in Section 9.02(d).

"Monitor" means Alvarez and Marsal Canada ULC, the court appointed monitor in the Canadian Bankruptcy Case or such other Person succeeding to such position agreed to by the Canadian Agent and the Canadian Borrower.

"Moody's" means Moody's Investors Service, Inc.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Proceeds" means, with respect to any Prepayment Event, the excess, if any, of (i) the sum of cash and cash equivalents received in connection with such transaction (including any cash or cash equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (ii) the sum of (A) the principal amount of any Indebtedness that is secured by the applicable asset by a Lien permitted hereunder which is senior to the Lien of the Collateral Agent or the Canadian Agent on such asset and that is required to be repaid (or to which an escrow for the future repayment thereof is required to be established) in connection with such transaction (other than Indebtedness under the Loan Documents), (B) the reasonable and customary out-of-pocket costs, fees and expenses incurred by such Loan Party in connection with such transaction paid or reasonably estimated to be payable by any Loan Party to third parties (other than Affiliates) (including, without limitation, sales and underwriter's commissions, legal accounting, rating agency and investment banking fees and taxes), and (C) amounts provided as a cash reserve, in accordance with GAAP, or amounts placed in a funded escrow, against any liabilities under any indemnification obligations or purchase price adjustments associated with such Prepayment Event (provided that, to the extent and at the time any such amounts are released from such reserve, such amounts shall constitute Net Proceeds).

"Noncompliance Notice" has the meaning provided therefor in Section 2.06(b).

"Notes" shall mean (i) the promissory notes of the Domestic Borrowers substantially in the form of Exhibit B-1, each payable to the order of a Domestic Lender, evidencing the Revolving Loans, and (ii) the promissory note of the Domestic Borrowers substantially in the form of Exhibit B-2, payable to the Swingline Lender, evidencing the Swingline Loans made to the Domestic Borrowers, (iii) the promissory notes of the Canadian Borrower substantially in the form of Exhibit B-3 each payable to the order of a Canadian Lender, evidencing the Revolving Loans made to the Canadian Borrower, and (iv) the promissory note of the Canadian Borrower substantially in the form of Exhibit B-4, payable to the Swingline Lender, evidencing the Swingline Loans made to the Canadian Borrower.

28

EXECUTION VERSION

"Obligations" means (a) the payment by the Borrowers of (i) the principal of, and interest on the Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, (ii) each payment required to be made by the Borrowers under the Credit Agreement in respect of any Letter of Credit, when and as due, including payments in respect of reimbursement of disbursements, interest thereon and obligations to provide cash collateral and (iii) all other monetary obligations, including fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise, of the Borrowers to the Secured Parties under the Credit Agreement and the other Loan Documents, (b) the performance of all covenants, agreements, obligations and liabilities of the Borrowers under or pursuant to this Agreement and the other Loan Documents, and (c) the Other Liabilities. Without limiting the foregoing, the term "Obligations" includes all Canadian Liabilities.

"Online Services Agreement" has the meaning assigned to such term in Section 2.07(d).

"Other Liabilities" means (a) the payment and performance of any Hedging Agreements which are permitted pursuant to Section 6.01 hereof, and (b) the payment and performance of any obligations with respect to any Cash Management Services or Bank Products, in each case, in connection with this Agreement or the other Loan Documents, as each may be amended from time to time.

"Other Taxes" means any and all current or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document.

"Overadvance" means, at any time of calculation, a circumstance in which the Credit Extensions exceed the lesser of (a) the Total Commitments or (b) the Borrowing Base.

"Participant" has the meaning provided therefor in Section 9.05(e).

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Permitted Canadian Overadvance" means a Canadian Overadvance determined by the Canadian Agent, in its reasonable discretion, (a) which is made to maintain, protect or preserve the Collateral granted by the Canadian Loan Parties and/or the Canadian Agent's or Canadian Lenders' rights under the Loan Documents, or (b) which is otherwise in the Lenders' interests; provided that Permitted Canadian Overadvances shall not remain outstanding for more than forty-five (45) consecutive Business Days unless the Required Supermajority Lenders otherwise agree; and provided further that the foregoing shall not (1) modify or abrogate any of the provisions of Section 2.07(f) regarding the Lenders' obligations with respect to L/C

29

EXECUTION VERSION

Disbursements, or (2) result in any claim or liability against the Canadian Agent (regardless of the amount of any Canadian Overadvance) for "inadvertent Canadian Overadvances" (i.e. where a Canadian Overadvance results from changed circumstances beyond the control of the Canadian Agent (such as a fluctuation in the exchange rate of the CD$ against the dollar)), and further provided that in no event shall the Canadian Agent make a Canadian Overadvance, if after giving effect thereto, the principal amount of the Credit Extensions to the Canadian Borrower would exceed (A) from January 1, 2009 through the earlier of January 17, 2009 (or such later date agreed by the Canadian Lenders) and the closing and initial funding of the Term Loan $65,000,000, and (B) at all other times $55,000,000.

"Permitted Discretion" means the Administrative Agent's, Collateral Agent's, Canadian Agent's or the Co-Collateral Agent's good faith credit judgment based upon any factor or circumstance which they reasonably believe in good faith: (i) will or would reasonably be expected to adversely affect the value of the Collateral, the enforceability or priority of the Collateral Agent's or Canadian Agent's Liens thereon in favor of the Secured Parties or the amount which the Collateral Agent, the Canadian Agent and the Secured Parties would likely receive (after giving consideration to delays in payment and costs of enforcement that the Administrative Agent, Collateral Agent, Canadian Agent, and Co-Collateral Agent determine in their reasonable business judgment will need to be satisfied in connection with the realization upon any Collateral) in the liquidation of such Collateral; (ii) suggests that any collateral report or financial information delivered to the Agents by or on behalf of the Loan Parties is incomplete, inaccurate or misleading in any material respect; or (iii) creates or reasonably would be expected to create a Default or Event of Default. In exercising such judgment, the Agents, Co-Collateral Agent may consider, without limitation, any of the following factors or circumstances: (A) the financial and business climate and prospects of any Loan Party's industry; (B) changes in demand for and pricing of Inventory; (C) changes in any concentration of risk with respect to Inventory; (D) audits of books and records by third parties, history of chargebacks or other credit adjustments; and (E) any other factors that adversely change or would reasonably be expected to adversely change the credit risk of lending to the Borrowers on the security of the Accounts and Inventory.

"Permitted Encumbrances" means:

> (a)    Liens imposed by law for taxes, rates, assessments or government charges or levies that are not yet due or are being contested in compliance with Section 5.05;

> (b)    carriers', warehousemen's, mechanics', landlord's, materialmen's, repairmen's and other like Liens and imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or are being contested in compliance with Section 5.05;

30

(c)     pledges, deposits and Liens made in the ordinary course of business in compliance with workers' compensation, wages, vacation pay, unemployment insurance, old-age pension and other social security laws or regulations;

(d)     deposits, pledges and Liens to secure the performance of bids, trade contracts, leases, contracts (other than for the repayment of borrowed money), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

(e)     judgment Liens in respect of judgments that do not constitute an Event of Default under Section 7.01(h);

(f)     easements, zoning restrictions, rights-of-way, servitudes, restrictive covenants, rights of expropriation, access or use and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of the Borrowers or any Subsidiary of the Borrowers;

(g)     any interest or title of a lessor or sublessor under any Lease of Real Estate permitted hereunder;

(h)     purported Liens evidenced by the filing of precautionary UCC and PPSA financing statements relating solely to operating leases or the consignment of personal property entered into in the ordinary course of business;

(i)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods and securing obligations that are not overdue by more than 30 days or are being contested in compliance with Section 5.05;

(j)     licenses of patents, trademarks and other intellectual property rights granted by the Lead Borrower or any of its Subsidiaries in the ordinary course of business and not interfering in any respect with the ordinary conduct of the business of the Lead Borrower or such Subsidiary and which licenses would not reasonably be expected to have a Material Adverse Effect;

(k)     The Administration Charge and Directors' Charge;

(l)     Liens in favor of third party liquidators performing Permitted Sales; and

(m)     Liens existing on the Closing Date described in Schedule 6.02.

31

EXECUTION VERSION

<u>provided</u> tha**t**, except as provided in any one or more of clauses (a) through (f) above, the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness.

"<u>Permitted Investments</u>" means each of the following:

(a)    direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by the government of Canada or the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the government of Canada or the United States of America, as the case may be), in each case maturing within one year from the date of acquisition thereof;

(b)    any obligation issued, sponsored or backed by the government of Canada or the United States of America, including *Federal Agency Securities*, with a maturity of 365 days or less with a credit rating of at least "AAA" as used by S&P or "Aaa" as used by Moody's or the equivalent rating by an established national credit rating agency in Canada;

(c)    fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above (without regard to the limitation on maturity contained in such clause) and entered into with a financial institution satisfying the criteria described in clause (e) below or with one of the primary dealers regulated by the Federal Reserve that is at least 102% collateralized by U.S. government obligations;

(d)    Investments in commercial paper issued by a corporation organized under the federal laws of Canada or the laws of any province within Canada or the laws of any state of the United States of America maturing within 270 days from the date of purchase and having, at such date of purchase, a credit rating of at least "A-2" or "P-2" from S&P or from Moody's or the equivalent rating by an established national credit rating agency in Canada;

(e)    Investments in certificates of deposit, banker's acceptances and time deposits maturing within 365 days from the date of acquisition thereof issued or guaranteed by or placed with, and demand deposit and money market deposit accounts, and master notes issued or offered by, any bank to which the *Bank Act* (Canada) applies or by any company licensed to carry on the business of a trust company in one or more provinces of Canada or any domestic office of any commercial bank or financial institution organized under the laws of the United States of America or any State thereof that has a combined capital and surplus and

32

EXECUTION VERSION

undivided profits of not less than $500,000,000 (or the equivalent amount in another currency);

(f)    variable rate demand obligations or Notes which have a rating of at least "A1" by S&P or "P1" by Moody's or the equivalent rating by an established national credit rating agency in Canada or which are backed by letters of credit, liquidity facilities or special purchaser's agreement with a financial institution satisfying the criteria described in clause (e) above and maturing not later than 365 days after purchase;

(g)    money market funds which comply with the provisions of Rule 2a-7 of the Securities and Exchange Commission or any investment fund regulated and advised by a registered investment advisor under Rule 3c-7 or money market funds which comply with the provisions of Rule 3c-7 of the Securities and Exchange Commission;

(h)    Shares of mutual funds which have a rating of at least "AA" as used by S&P or "Aa" as used by Moody's or the equivalent rating by an established national credit rating agency in Canada and have a weighted average maturity of 365 days or less when purchased;

(i)    auction rate securities or auction preferred stock-ARS, SAVRS, having a rating of single A or better by one of the national credit rating agencies in Canada or the United States of America and with an auction period of no longer than 90 days;

(j)    Asset-backed commercial paper which matures not later than 270 days following the date of purchase and which certificates are rated at least "A-2" from S&P or "P-2" from Moody's or the equivalent rating by an established national credit rating agency in Canada;

(k)    Obligations of any corporation organized under the federal laws of Canada or the laws of any province within Canada or the laws of any state of the United States of America or under the laws of any other nation, payable in Canada or the United States of America, as the case may be, maturing within 365 days from the date of purchase and having a rating of at least "A" by S&P or Moody's or the equivalent rating by an established national credit rating agency in Canada at the time of purchase;

33

EXECUTION VERSION

*provided that*, (i) other than overnight Investments of excess funds in the Domestic Borrowers'
disbursement account maintained with Wachovia Bank, National Association (not to exceed
$1,000,000 in the aggregate at any time), no such Investments may be made unless there are no
Loans then outstanding, and (ii) all such Investments are pledged by the applicable Loan Party to
the Collateral Agent as additional collateral for the pursuant to such agreements, the DIP Orders
or the Initial Order as may be reasonably required by the Collateral Agent.

"Permitted Overadvance" means an Overadvance determined by the Administrative
Agent, in its reasonable discretion, (a) which is made to maintain, protect or preserve the
Collateral and/or the Lenders' rights under the Loan Documents, or (b) which is otherwise in the
Lenders' interests; provided that Permitted Overadvances shall not (i) exceed five percent (5%)
of the then Borrowing Base in the aggregate outstanding at any time or (ii) remain outstanding
for more than forty-five (45) consecutive Business Days, unless in case of clause (ii), the
Required Supermajority Lenders otherwise agree; and provided further that the foregoing shall
not (1) modify or abrogate any of the provisions of Section 2.07(f) regarding the Lender's
obligations with respect to L/C Disbursements, or (2) result in any claim or liability against the
Administrative Agent (regardless of the amount of any Overadvance) for "inadvertent
Overadvances" (i.e. where an Overadvance results from changed circumstances beyond the
control of the Administrative Agent (such as a reduction in the collateral value)), and further
provided that in no event shall the Administrative Agent make an Overadvance, if after giving
effect thereto, the principal amount of the Credit Extensions would exceed the Total
Commitments (as in effect prior to any termination of the Commitments pursuant to Section 7.01
hereof).

"Permitted Sales"  means (i) the sale of all or substantially all of the Domestic
Borrowers' and Canadian Borrower's assets as a going concern in a single transaction or series
of related transactions as approved by the US Bankruptcy Court or the Canadian Bankruptcy
Court pursuant to the applicable provisions of the Bankruptcy Code, the Initial Order and the
CCAA or other Applicable Law; provided that any such going concern sale shall be for cash
consideration in an amount in excess of all outstanding Obligations and all Pre-Petition
Liabilities, which amount shall be paid to the Administrative Agent for application to the
Obligations, or (ii) the sale of all or substantially all of the assets or equity interests in the
Canadian Borrower as a going concern as approved by the US Bankruptcy Court if required by
Applicable Law or the Canadian Bankruptcy Court pursuant to the applicable provisions of the
Bankruptcy Code, the Initial Order and the CCAA or other Applicable Law; provided that any
such going concern sale shall be for cash consideration in an amount in excess of all outstanding
Canadian Liabilities and all Pre-Petition Liabilities of the Canadian Borrower, which amount
shall be paid to the Canadian Agent for application to the Canadian Liabilities, or (iii) a
transaction or transactions combining the sale of certain of the Borrowers' business assets as a
going concern and the permanent closing of all or a portion of the Borrowers' stores and the sale
of all Collateral located therein through the retention by the Borrowers of one or more

34

EXECUTION VERSION

independent, nationally recognized, professional retail inventory liquidation firms, reasonably acceptable to the Agents, as approved by the US Bankruptcy Court or the Canadian Bankruptcy Court pursuant to the applicable provisions of the Bankruptcy Code, the Initial Order or the CCAA or other Applicable Law, which transaction or transactions shall be on terms reasonably satisfactory to the Agents and Required Lenders and shall together, be for cash consideration in excess of all outstanding Obligations and all Pre-Petition Liabilities, which amount shall be paid to the Administrative Agent for application to the Obligations, or (iv) the Initial Store Closing Sale and other sales and dispositions in connection with additional store closures through the retention by the Borrowers of one or more independent, nationally recognized, professional retail inventory liquidation firms, reasonably acceptable to the Agents, which transaction shall be on terms reasonably satisfactory to the Agents and Required Lenders and approved by the applicable Bankruptcy Courts to the extent required by Applicable Law.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" means November 10, 2008.

"Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA), or, with respect to the Canadian Borrower, any employee pension benefit plan which is considered to be a pension plan for the purposes of any applicable pension benefits standards or Applicable Law, and: (a) in respect of which the Lead Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA; or (b) in respect of the Canadian Borrower or any of its Related Parties, is a plan maintained by the Canadian Borrower or any of its Related Parties as a plan to which the Canadian Borrower or any of its Related Parties contributes or is required to contribute or any other plan with respect to which the Canadian Borrower or any of its Related Parties has incurred or may incur liability, including contingent liability, either to such plan or to any Person, administration or Governmental Authority, including the FSCO.

"Plan of Compromise" means a plan of compromise or arrangement filed in the Canadian Bankruptcy Case.

"Plan of Reorganization" means a plan filed in the Chapter 11 Case pursuant to Chapter 11 of the Bankruptcy Code.

"PPSA" means the *Personal Property Security Act* of Ontario (or any successor statute) or similar legislation of any other Canadian jurisdiction, including, without limitation, the Civil Code of Quebec, the laws of which are required by such legislation to be applied in connection

35

EXECUTION VERSION

with the issue, perfection, enforcement, opposability, priority, validity or effect of security interests.

"Prepayment Event" means (a) any sale, transfer or other disposition of any property or asset of a Loan Party, (b) any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of a Loan Party, other than proceeds therefrom required to be paid to Persons other than the Borrowers under the Agency Agreement (c) the issuance by the Lead Borrower of any equity interests, or (d) the incurrence by a Loan Party of any Indebtedness, including without limitation the Term Loan, but excluding any other Indebtedness permitted hereunder.

"Pre-Petition Credit Agreement" means that certain Second Amended and Restated Credit Agreement dated as of January 31, 2008 entered into among the Borrowers, certain of the Facility Guarantors, the Agents and the Lenders (as each of those terms is defined therein), together with all instruments, documents and agreements executed or delivered in connection therewith, in each case, as amended, modified or supplemented to the date hereof.

"Pre-Petition Letters of Credit" means each of the Letters of Credit issued under the Pre-Petition Credit Agreement and outstanding on the Closing Date, as listed on Schedule 1.4 hereto.

"Pre-Petition Liabilities" means the "Secured Obligations" as defined in the security agreement executed and delivered in connection with the Pre-Petition Credit Agreement.

"Pre-Petition Loan Documents" means the "Loan Documents" as defined in the Pre-Petition Credit Agreement.

"Prime Rate" shall mean, for any day, the highest of (a) the annual rate of interest then most recently announced by Bank of America at its head office in Charlotte, North Carolina as its "Prime Rate", (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1% (0.50%) per annum and (c) the Adjusted LIBO Rate for an Interest Period of one month; provided that for purposes of clause (a) with respect to Credit Extensions to the Canadian Borrower made in Dollars, the "Prime Rate" shall mean the "Base Rate" of interest announced by Bank of America, N.A. (acting through its Canada branch) for Loans to its Canadian customers in Dollars. The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate being charged to any customer.  If for any reason the Administrative Agent shall have determined (which determination shall be conclusive absent manifest error) that it is unable to ascertain the Federal Funds Effective Rate for any reason, including the inability or failure of the Administrative Agent to obtain sufficient quotations thereof in accordance with the terms hereof, the Prime Rate shall be determined without regard to clause (b), of the first sentence of this definition, until the circumstances giving rise to such inability no longer exist. Any change in the Prime Rate due to a change in Bank of America's Prime Rate, Adjusted LIBO

EXECUTION VERSION

Rate or the Federal Funds Effective Rate shall be effective on the effective date of such change in Bank of America's Prime Rate, the Adjusted LIBO Rate or the Federal Funds Effective Rate, respectively.

"Prime Rate Loan" shall mean any Loan bearing interest at a rate determined by reference to the Prime Rate or the Canadian Prime Rate, as the case may be, in accordance with the provisions of Article II.

"Professional Fee Carve Out" means an amount equal to $3,000,000, plus the Reported Fee Accruals for Professional Fees and Expenses, but only to the extent such Professional Fees and Expenses are allowed by the US Bankruptcy Court and subject to any limitations contained in the DIP Orders. Notwithstanding anything to the contrary contained herein, (i) so long as an Event of Default shall not have occurred and be continuing and notice of such Event of Default has not been provided to the Lead Borrower by the Administrative Agent, the Domestic Borrowers shall be permitted to pay compensation and reimbursement of expense allowed and payable under 11 U.S.C. Section 330 and 331, as the same may be due and payable, and the same shall not reduce the Professional Expense Carve Out and (ii) to the extent the $3,000,000 limitation set forth above on fees and disbursements is reduced by any amount as a result of payment of such fees and disbursements during the continuance of an Event of Default, and such Event of Default is subsequently cured or waived, then effective as of the effectiveness of such cure or waiver, such dollar limitation shall be increased by an amount equal to the amount by which it has been so reduced.

"Professional Fee Carve Out Reserve" means a Reserve equal to the maximum possible amount of the Professional Fee Carve Out.

"Professional Fees and Expenses" means, subject to any limitations contained in the DIP Orders, (a) allowed administrative expenses payable pursuant to 28 U.S.C. § 1930(a)(6), and (b) professional fees of, and expenses incurred by, attorneys, accountants, financial advisors, consultants and other professionals retained by the Domestic Loan Parties or the Creditors' Committee or other statutory committee appointed in the Cases pursuant to §§327 and 1103 of the Bankruptcy Code.

"Real Estate" means all land, together with the buildings, structures, parking areas, and other improvements thereon, now or hereafter owned by any Loan Party, including all easements, rights-of-way, servitudes and similar rights relating thereto and all leases, tenancies, and occupancies thereof.

"Receivables Advance Rate" means 90%.

"Register" has the meaning set forth in Section 9.05(c).

37

"Regulation U" means Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Regulation X" means Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Related Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate or branch of a Lender or (c) an entity or an Affiliate or branch of an entity that administers or manages a Lender.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"Release" has the meaning set forth in Section 101(22) of CERCLA.

"Reported Fee Accruals" means the amount of Professional Fees and Expenses which have been incurred, accrued or invoiced (but remain unpaid) prior to such time as the Administrative Agent notifies the Lead Borrower of the occurrence and continuation of an Event of Default.  For purposes of determining the amount of the Professional Fee Carve Out, "Reported Fee Accruals" shall be equal to the aggregate "Professional Fees" reflected in the approved Budget for the relevant time period minus any payments received on account thereof, which payments are reported to the Agents in accordance with the provisions of Section 5.01(a)(iii) hereof.  Any Professional Fees and Expenses which have been incurred, accrued or invoiced (and remain unpaid) but are in excess of the amounts reflected on the approved Budget for the relevant time period (subject to the Variance Report delivered pursuant to Section 5.01(b)(i) hereof) shall not constitute "Reported Fee Accruals."

"Required Lenders" shall mean, at any time, Lenders (other than Delinquent Lenders) having Commitments at least equal to 51% of the Total Commitments outstanding (excluding the Commitments of any Delinquent Lender), or if the Commitments have been terminated, Lenders (other than Delinquent Lenders) whose percentage of the outstanding Credit Extensions (after settlement and repayment of all Swingline Loans by the Lenders) aggregate not less than 51% of all such Credit Extensions (excluding the Credit Extensions of a Delinquent Lender).

"Required Supermajority Lenders" shall mean, at any time, Lenders (other than Delinquent Lenders) having Commitments outstanding representing at least 66 2/3% of the Total Commitments outstanding (excluding the Commitments of any Delinquent Lender) or if the Commitments have been terminated, Lenders (other than Delinquent Lenders) whose percentage of the outstanding Credit Extensions (after settlement and repayment of all Swingline Loans by

38

EXECUTION VERSION

the Lenders)  aggregate not less than 66 2/3% of all such Credit Extensions (excluding the Credit Extensions o f a Delinquent Lender).

"Reserves" means the Inventory Reserves and Availability Reserves.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any shares of any class of capital stock of any Loan Party, or any  payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such shares of capital stock or other equity interests of any Loan Party or any option, warrant or other right to acquire any such shares of capital stock or other equity interests of any Loan Party.

"Revolving Loans" means all Loans at any time made by a Lender pursuant to Section 2.01.

"S&P" means Standard & Poor's Rating Services, a division of the McGraw-Hill Companies, Inc.

"Secured Parties" has the meaning assigned to such term in the Security Agreement and the Canadian Security Documents, respectively.

"Security Agreement" means the Security Agreement dated as of the Closing Date among the Domestic Loan Parties in favor of the Collateral Agent for the benefit of the Secured Parties, as amended, restated, modified or supplemented and in effect from time to time.

"Security Documents" means the Security Agreement, the Canadian Security Documents, and each other security agreement, guaranty, or other instrument or document, in each case executed and delivered pursuant to Section 2.23, Section 5.12 or any other provision hereof or any other Loan Document, to secure any of the Obligations or the Canadian Liabilities and Other Liabilities.

"Settlement Date" has the meaning provided in Section 2.08(b).

"Shrink" means Inventory which has been lost, misplaced, stolen, or is otherwise unaccounted for.

"SPV" has the meaning set forth in Section 9.05(h).

"Standby Letter of Credit" means any Letter of Credit other than a Commercial Letter of Credit.

39

EXECUTION VERSION

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board to which the Administrative Agent is subject with respect to the Adjusted LIBO Rate, for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board). Such reserve percentages shall include those imposed pursuant to such Regulation D. LIBO Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Stock Ledger" means, without duplication, (i) the stock ledger of the Lead Borrower relating to entertainment merchandise and (ii) the proprietary merchandising stock ledger of the Lead Borrower, or any other stock ledger of the Domestic Borrowers or the Canadian Borrower as the Administrative Agent may otherwise agree.

"Subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited or unlimited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited or unlimited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent and/or one or more subsidiaries of the parent.

"Subsidiary Borrowers" means all Borrowers other than the Lead Borrower.

"Swingline Lender" means, as applicable, Bank of America, in its capacity as lender of Swingline Loans to the Domestic Borrowers hereunder, and Bank of America, N.A. (acting through its Canada branch), in its capacity as lender of Swingline Loans to the Canadian Borrower hereunder.

"Swingline Loan" shall mean a Loan made by the Swingline Lender to the Domestic Borrowers or the Canadian Borrower, as applicable, pursuant to Section 2.06 hereof.

"Syndication Agent" means Wells Fargo Retail Finance, LLC.

40

"Synthetic Lease" means any lease or other agreement for the use or possession of property creating obligations which does not appear as Indebtedness on the balance sheet of the lessee thereunder but which, upon the insolvency or bankruptcy of such Person, would be characterized as Indebtedness of such lessee without regard to the accounting treatment.

"Taxes" means any and all current or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority.

"Term Loan" means a term loan to be made to the Borrowers in a principal amount of not less than $75,000,000, which term loan shall be in amounts and on terms reasonably satisfactory in form and substance to the Administrative Agent and the Required Lenders.

"Term Loan Agent" means the administrative and collateral agent for the lenders under the Term Loan.

"Termination Date" shall mean the earliest to occur of (i) the Maturity Date, (ii) the date on which the maturity of the Loans are accelerated and the Commitments are terminated in accordance with Section 7.01, or (iii) the date on which a sale pursuant to clauses (i) or (iii) of the definition of Permitted Sales is consummated, and (iv) the Consummation Date.

"Total Commitments" shall mean, at any time, the sum of the Domestic Commitments and the Canadian Commitments at such time.

"Type", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted LIBO Rate or the Prime Rate or the BA Rate, as applicable.

"UCC" or "Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that if a term is defined in Article 9 of the Uniform Commercial Code differently than in another Article thereof, the term shall have the meaning set forth in Article 9; provided further that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection, of a security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "Uniform Commercial Code" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy, as the case may be.

"Unused Canadian Commitment" means on any day, (a) the then Canadian Total Commitments minus (b) the sum of (i) the principal amount of Loans to the Canadian Borrower then outstanding, and (ii) the then Letter of Credit Outstandings of the Canadian Borrower.

41

EXECUTION VERSION

"Unused Commitment" shall mean, on any day, (a) the then Domestic Total Commitments minus (b) the sum of (i) the principal amount of Loans of the Domestic Borrowers then outstanding, and (ii) the then Letter of Credit Outstandings of the Domestic Borrowers.

"Upfront Fee" has the meaning set forth in Section 2.13(a) hereof.

"US Bankruptcy Court" has the meaning provided in the recitals to this Agreement.

"Variance Report" means a report prepared by the Lead Borrower's management reflecting on a line-item basis the Loan Parties' actual performance compared to the Domestic Borrowers' Budget for the immediately preceding week and on a cumulative basis for the period after the Closing Date and the percentage variance of the Loan Parties' actual results from those reflected in the then extant Domestic Borrowers' Budget, along with management's explanation of such variance.

"Wachovia" means Wachovia Bank, National Association.

"Wachovia Blocked Account Agreement" shall have the meaning set forth in Section 2.23(c).

"Wachovia Concentration Account" shall have the meaning set forth in Section 2.23(c).

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

SECTION 1.02. Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, amended and restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (e) the term "security interest" shall include a

42

hypothec, (f) the term "solidary" as used herein shall be read and interpreted in accordance with the Civil Code of Québec, (g) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible, moveable and immoveable, and intangible assets and properties, including cash, securities, accounts and contract rights (h) all references to "$" or "dollars" or to amounts of money shall, unless otherwise expressly provided to be CD$, be deemed to be references to the lawful currency of the United States of America, and (i) any reference to any law shall include all statutory and regulatory provisions consolidating, amending replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time.

For purposes of any Collateral located in the Province of Quebec or charged by any deed of hypothec (or any other Loan Document) and for all other purposes pursuant to which the interpretation or construction of a Loan Document may be subject to the laws of the Province of Quebec or a court or tribunal exercising jurisdiction in the Province of Quebec, (i) "personal property" shall be deemed to include "movable property", (ii) "real property" shall be deemed to include "immovable property" and an "easement" shall be deemed to include a "servitude", (iii) "tangible property" shall be deemed to include "corporeal property", (iv) "intangible property" shall be deemed to include "incorporeal property", (v) "security interest" and "mortgage" shall be deemed to include a "hypothec", (vi) all references to filing, registering or recording under the UCC shall be deemed to include publication under the Civil Code of Quebec, and all references to releasing any Lien shall be deemed to include a release, discharge and mainlevee of a hypothec, (vii) all references to "perfection" of or "perfected" Liens shall be deemed to include a reference to the "opposability" of such Liens to third parties, (viii) any "right of offset", "right of setoff" or similar expression shall be deemed to include a "right of compensation", (ix) "goods" shall be deemed to include "corporeal movable property" other than chattel paper, documents of title, instruments, money and securities, and (x) an "agent" shall be deemed to include a "mandatary".

SECTION 1.03. <u>Accounting Terms; GAAP</u>. Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time, provided that, if the Lead Borrower notifies the Administrative Agent that the Borrowers request an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrowers that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such provision shall have been amended in accordance herewith.

43