EXECUTION VERSION

Without in any way limiting the foregoing provisions, the Administrative Agent shall, weekly or more frequently in the Administrative Agent's sole discretion, make the necessary Dollar Equivalent calculations to determine whether any such excess exists on such date.

(b)     The Revolving Loans shall be repaid daily in accordance with the provisions of said Section 2.23 and Section 2.24.

(c)     Subject to the foregoing, outstanding Prime Rate Loans shall be prepaid by the Domestic Borrowers before outstanding LIBO Loans are prepaid and outstanding Prime Rate Loans of the Canadian Borrower shall be prepaid before outstanding BA Equivalent Loans are prepaid. Each partial prepayment of LIBO Loans shall be in an integral multiple of $5,000,000. Each partial prepayment of BA Equivalent Loans shall be in an integral multiple of CD$1,000,000. No prepayment of LIBO Loans or BA Equivalent Loans shall be permitted pursuant to this Section 2.20 other than on the last day of an Interest Period applicable thereto, unless the applicable Borrowers simultaneously reimburse the applicable Lenders for all Breakage Costs associated therewith. In order to avoid such Breakage Costs, as long as no Event of Default has occurred and is continuing, at the request of the Lead Borrower, the Administrative Agent or the Canadian Agent, as applicable, shall hold all amounts required to be applied to LIBO Loans or BA Equivalent Loans, as applicable, in the applicable Cash Collateral Account and will apply such funds to the applicable LIBO Loans or BA Equivalent Loans at the end of the then pending Interest Period therefor (provided that the foregoing shall in no way limit or restrict the rights of the Administrative Agent or the Canadian Agent upon the subsequent occurrence and continuation of an Event of Default). No partial prepayment of a Borrowing of LIBO Loans or BA Equivalent Loans shall result in the aggregate principal amount of the LIBO Loans remaining outstanding pursuant to such Borrowing being less than $5,000,000 or the aggregate principal amount of the BA Equivalent Loans remaining outstanding pursuant to such Borrowing being less than CD$1,000,000 (unless all such outstanding LIBO Loans or BA Equivalent Loans are being prepaid in full). Any prepayment of the Revolving Loans shall not permanently reduce the Commitments.

(d)     All amounts required to be applied to all Loans hereunder (other than Swingline Loans) shall be applied ratably in accordance with each Domestic Lender's Domestic Commitment Percentage or Canadian Lender's Canadian Commitment Percentage, as applicable.

(e)     Upon the Termination Date, the Commitments and the credit facility provided hereunder shall be terminated in full and the Domestic Borrowers shall pay, in full and in cash, all outstanding Loans and all other outstanding Obligations owing by them and the Canadian Borrower shall pay in full and in cash, all outstanding Loans to it and all Canadian Liabilities.

EXECUTION VERSION

(f)     All Obligations shall be payable to the Administrative Agent or the Canadian Agent, as applicable, in the currency in which they are denominated.

SECTION 2.21. Optional Prepayment of Loans; Reimbursement of Lenders.

(a)     The Borrowers shall have the right at any time and from time to time to prepay outstanding Loans in whole or in part, (x) with respect to LIBO Loans or BA Equivalent Loans, upon at least two Business Days' prior written, telex or facsimile notice to the Administrative Agent prior to 11:00 a.m., Boston time, and (y) with respect to Prime Rate Loans, on the same Business Day if written, telex or facsimile notice is received by the Administrative Agent or the Canadian Agent, as applicable, prior to 1:00 p.m., Boston time, subject to the following limitations:

(i)     Outstanding Prime Rate Loans of the Domestic Borrowers shall be prepaid before outstanding LIBO Prime Rate Loans are prepaid and outstanding Prime Rate Loans of the Canadian Borrower shall be prepaid before outstanding BA Equivalent Loans are prepaid. Each partial prepayment of LIBO Loans shall be in an integral multiple of $5,000,000. Each partial prepayment of BA Equivalent Loans shall be in an integral multiple of CD$1,000,000. No prepayment of LIBO Loans or BA Equivalent Loans shall be permitted pursuant to this Section 2.21 other than on the last day of an Interest Period applicable thereto, unless the applicable Borrowers simultaneously reimburse the applicable Lenders for all "Breakage Costs" (as defined below) associated therewith. No partial prepayment of a Borrowing of LIBO Loans shall result in the aggregate principal amount of the LIBO Loans remaining outstanding pursuant to such Borrowing being less than $5,000,000 (unless all such outstanding LIBO Loans are being prepaid in full).  No partial prepayment of a Borrowing of BA Equivalent Loans shall result in the aggregate principal amount of the BA Equivalent Loans remaining outstanding pursuant to such Borrowing being less than CD$1,000,000 (unless all such outstanding BA Equivalent Loans are being prepaid in full).

(ii)     Each notice of prepayment shall specify the prepayment date, the principal amount and Type of the Loans to be prepaid and, in the case of LIBO Loans or BA Equivalent Loans, the Borrowing or Borrowings pursuant to which such Loans were made. Each notice of prepayment shall be irrevocable and shall commit the Borrowers to prepay such Loan by the amount and on the date stated therein (other than to the extent that such prepayment is in connection with a refinancing of the Obligations which is not consummated). The Administrative Agent or the Canadian Agent, as applicable, shall, promptly after receiving notice from the Borrowers hereunder, notify each Lender of the principal amount and

70

EXECUTION VERSION

Type of the Loans held by such Lender which are to be prepaid, the prepayment date and the manner of application of the prepayment.

(b)      The Domestic Borrowers shall reimburse each Domestic Lender and the Canadian Borrower shall reimburse each Canadian Lender promptly following written demand for any loss incurred or to be incurred by the Domestic Lenders or the Canadian Lenders, as applicable, in the reemployment of the funds released (i) resulting from any prepayment (for any reason whatsoever, including, without limitation, conversion to Prime Rate Loans or acceleration by virtue of, and after, the occurrence of an Event of Default) of any LIBO Loan or BA Equivalent Loan required or permitted under this Agreement, if such Loan is prepaid other than on the last day of the Interest Period for such Loan or (ii) in the event that after the Lead Borrower delivers a notice of borrowing under Section 2.04 in respect of LIBO Loans or BA Equivalent Loans, such Loans are not borrowed on the first day of the Interest Period specified in such notice of borrowing for any reason. Such loss shall be the amount as reasonably determined by such Lender as the excess, if any, of (A) the amount of interest which would have accrued to such Lender on the amount so paid or not borrowed at a rate of interest equal to the Adjusted LIBO Rate or the BA Rate, as applicable, for such Loan, for the period from the date of such payment or failure to borrow to the last day (x) in the case of a payment or refinancing of a LIBO Loan or a BA Equivalent Loan other than on the last day of the Interest Period for such Loan, of the then current Interest Period for such Loan or (y) in the case of such failure to borrow, of the Interest Period for such LIBO Loan or BA Equivalent Loan which would have commenced on the date of such failure to borrow, over (B) in the case of a LIBO Loan, the amount of interest which would have accrued to such Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the London interbank market or, in the case of a BA Equivalent Loan, the amount of interest which would have accrued to such Lender on such amount by placing such amount on deposit for a comparable period with The Toronto-Dominion Bank (collectively, "Breakage Costs"). Any Lender demanding reimbursement for such loss shall deliver to the Borrowers from time to time one or more certificates setting forth the amount of such loss as determined by such Lender and setting forth in reasonable detail the manner in which such amount was determined.

(c)      In the event the Domestic Borrowers or the Canadian Borrower, as applicable, fail to prepay any Loan on the date specified in any prepayment notice delivered pursuant to Section 2.21(a), the Domestic Borrowers or the Canadian Borrower, as applicable, promptly following written demand by any applicable Lender shall pay to the Administrative Agent or the Canadian Agent, as applicable, for the account of such Lender any amounts required to compensate such Lender for any actual loss incurred by such Lender as a result of such failure to prepay, including, without limitation, any loss, cost or expenses incurred by reason of the acquisition of deposits or other funds by such Lender to fulfill deposit obligations incurred in anticipation of such prepayment. Any such Lender demanding such payment shall deliver to the Domestic Borrowers or the Canadian Borrower, as applicable, from time to time

71

EXECUTION VERSION

one or more certificates setting forth the amount of such loss as determined by such Lender and setting forth in reasonable detail the manner in which such amount was determined.

(d)    Whenever any partial prepayment of Loans are to be applied to LIBO Loans or BA Equivalent Loans, such LIBO Loans or BA Equivalent Loans shall be prepaid in the chronological order of their Interest Payment Dates.

SECTION 2.22.  Maintenance of Loan Account; Statements of Account.

(a)    The Administrative Agent and the Canadian Agent, as applicable, shall maintain an account on its books in the name of the Borrowers (the "Loan Account") which will reflect (i) all Loans and other advances made by the Lenders to the Borrowers or for the Borrowers' account, (ii) all L/C Disbursements, fees and interest that have become payable as herein set forth, and (iii) any and all other monetary Obligations that have become payable.

(b)    The Loan Account will be credited with all amounts received by the Administrative Agent or the Canadian Agent, as applicable, from the Borrowers, including all amounts received in the Concentration Account from the Blocked Account Banks, and the amounts so credited shall be applied as set forth in Section 2.24(a) and (b). Within ten (10) Business Days after the end of each month, the Administrative Agent or the Canadian Agent, as applicable, shall send to the Domestic Borrowers or the Canadian Borrower, as applicable, a statement accounting for the charges, loans, advances and other transactions occurring among and between the Administrative Agent, or the Canadian Agent, as applicable, the Lenders and the Borrowers during that month. The monthly statements shall, absent manifest error, be presumptively correct.

SECTION 2.23.  Cash Receipts.

(a)    Annexed hereto as Schedule 2.23(a) is a list of all present DDAs maintained by the Borrowers, which Schedule includes, with respect to each depository (i) the name and address of that depository; (ii) the account number(s) maintained with such depository; and (iii) to the extent known, a contact person at such depository.

(b)    Annexed hereto as Schedule 2.23(b) is a list describing all arrangements to which any Borrower is a party with respect to the payment to any Borrower of the proceeds of all credit card charges for sales by any Borrower.

(c)    On or promptly following the Closing Date, the Borrowers shall:

(i)    deliver to each depository institution identified on Schedule 2.23(a) as of the Closing Date, a copy of the Interim Borrowing Order or Initial Order, as applicable, and cash management order entered by the US Bankruptcy

EXECUTION VERSION

Court or the Canadian Bankruptcy Court setting forth the Agents' rights in, and each such institution's obligations with respect to, each related DDA (each, a "<u>DDA Notification</u>"),

(ii)    have, in the case of the Domestic Borrowers, entered into a Blocked Account Agreement with Wachovia with respect to the Wachovia Concentration Account (Account No.2055275431509) (the "Wachovia Concentration Account") in form and substance reasonably satisfactory to the Administrative Agent (the "<u>Wachovia Blocked Account Agreement</u>"), and

(iii)    deliver to each credit card processor identified on <u>Schedule 2.23(b)</u>, a copy of the Interim Borrowing Order or Initial Order, as applicable, and cash management order entered by the US Bankruptcy Court or the Canadian Bankruptcy Court setting forth the Agents' rights in, and each such processor's obligations with respect to, credit card proceeds (each, a "<u>Credit Card Notification</u>").

(iv)    have caused the Canadian Borrower to enter into a Blocked Account Agreement with each of The Bank of Nova Scotia and Royal Bank of Canada in form and substance reasonably satisfactory to the Canadian Agent.

(d)    The DDA Notifications and the Credit Card Notifications shall require the sweep on each Business Day of all available cash receipts and other proceeds from the sale or disposition of any Collateral, including, without limitation, the proceeds of all credit card charges (all such cash receipts and proceeds, "<u>Cash Receipts</u>"), (and with respect to institutions which maintain a DDA, net of a minimum balance not to exceed $10,000) to (x) a concentration account maintained by the Administrative Agent at Bank of America (the "<u>Concentration Account</u>"), (y) the Wachovia Concentration Account, or (z) a Blocked Account, as the Administrative Agent may direct, <u>provided that</u> amounts in DDAs established by the Canadian Borrower and amounts due to the Canadian Borrower by credit card processors shall be delivered only to a Blocked Account established by the Canadian Borrower or as the Canadian Agent may otherwise direct.

(e)    Without limiting the foregoing, upon the occurrence of any Prepayment Event, all Net Proceeds received by the Borrowers on account of such Prepayment Event shall be deposited in (x) the Concentration Account, (y) the Wachovia Concentration Account, or (z) a Blocked Account, as the Administrative Agent may direct; <u>provided that</u> such Net Proceeds received upon the occurrence of a Prepayment Event arising with respect to the Canadian Borrower shall be deposited only to a Blocked Account established by the Canadian Borrower or as the Canadian Agent may otherwise direct.

73

EXECUTION VERSION

(f)    The Blocked Account Agreements shall require the sweep on each Business Day of all Cash Receipts (net of a minimum balance not to exceed $10,000) to the Concentration Account or to such other account as the Administrative Agent may direct, and with respect to the Canadian Borrower, to a Blocked Account established by the Canadian Borrower or as the Canadian Agent may otherwise direct.

(g)    If at any time any cash or cash equivalents owned by the Borrowers and constituting proceeds of Collateral are deposited to any account (other than a DDA for which a DDA Notification has been delivered), or held or invested in any manner, otherwise than in a Blocked Account that is subject to a Blocked Account Agreement as required herein, the Administrative Agent shall require the Borrowers to close such account and have all funds therein transferred to the Concentration Account, the Wachovia Concentration Account, or such other Blocked Account as the Administrative Agent may direct, and with respect to the Canadian Borrower, to a Blocked Account established by the Canadian Borrower or as the Canadian Agent may otherwise direct.

(h)    The Borrowers may close DDAs or Blocked Accounts and/or open new DDAs or Blocked Accounts, subject to the execution and delivery to the Administrative Agent or the Canadian Agent, as applicable, of appropriate DDA Notifications or Blocked Account Agreements consistent with the provisions of this Section 2.23. Unless consented to in writing by the Administrative Agent, or the Canadian Agent, as applicable, the Borrowers may not enter into any agreements with additional credit card processors unless contemporaneously therewith, a Credit Card Notification is executed and delivered to the Administrative Agent or the Canadian Agent, as applicable.

(i)    The Concentration Account and the Blocked Accounts established by the Canadian Borrower are and shall remain, under the sole dominion and control of the Administrative Agent or the Canadian Agent, as applicable. Each Borrower acknowledges and agrees that (i) such Borrower has no right of withdrawal from the Concentration Account or the Blocked Accounts established by the Canadian Borrower, (ii) the funds on deposit in the Concentration Account and the Blocked Accounts established by the Canadian Borrower shall continue to be collateral security for all of the Obligations and Other Liabilities, and (iii) the funds on deposit in the Concentration Account and the Blocked Accounts established by the Canadian Borrower shall be applied as provided in Section 2.24.

(j)    Whether or not any Obligations are then outstanding, the Borrowers shall cause the ACH or wire transfer to, upon the Administrative Agent's or the Canadian Agent's, as applicable, instruction, the Wachovia Concentration Account or a Blocked Account established by the Canadian Borrower in the case of the Canadian Borrower, or another Blocked Account, no less frequently than daily (and whether or not there is then an outstanding balance in the Loan Account, unless the Commitments have been terminated hereunder and the Obligations (other

74

than contingent indemnification Obligations for which a claim has not been asserted and not then due and owing) have been paid in full in cash) of the then contents of each DDA, each such transfer to be net of any minimum balance, not to exceed $10,000, as may be required to be maintained in the subject DDA by the bank at which such DDA is maintained.

(k)    Whether or not any Obligations are then outstanding, the Borrowers shall cause the ACH or wire transfer, upon the Administrative Agent's or the Canadian Agent's, as applicable, instruction, to the Concentration Account of the then entire ledger balance of each Blocked Account (including the Wachovia Concentration Account), net of such minimum balance, not to exceed $10,000, as may be required to be maintained in the subject Blocked Account by the bank at which such Blocked Account is maintained, provided that amounts in Blocked Accounts established by the Canadian Borrower shall be delivered only to a concentration account at Bank of America, N.A. (acting through its Canada branch) or as the Canadian Agent may otherwise direct; and provided further that excess funds in the Domestic Borrowers' disbursement account maintained with Wachovia Bank, National Association not exceeding $1,000,000 in the aggregate at any time may be retained in such account or invested in overnight Investments.

(l)    In the event that, notwithstanding the provisions of this Section 2.23, the Borrowers receive or otherwise have dominion and control of any such proceeds or collections of Collateral, such proceeds and collections shall be held in trust by the Borrowers for the Administrative Agent or the Canadian Agent, as applicable, and shall not be commingled with any of the Borrowers' other funds or deposited in any account of any Borrower other than as instructed by the Administrative Agent or the Canadian Borrower, as applicable.

SECTION 2.24. Application of Payments.

(a)    (i)    As long as no Event of Default exists, and the time for payment of the Obligations has not been accelerated (if an Event of Default shall have occurred and the Obligations have been accelerated, Section 7.04 shall apply), all amounts received in the Concentration Account from any source, including the Blocked Account Banks, and all payments made pursuant to Sections 2.21 and 2.22 hereof (in each case, other than from the Canadian Loan Parties or the Collateral of the Canadian Loan Parties) shall be applied, on the day of receipt, in the following order: first, to pay all outstanding Pre-Petition Liabilities of the Domestic Loan Parties (other than contingent indemnification obligations not then due and owing) until paid in full in cash; second, to pay fees and expense reimbursements and indemnification then due and payable to the Administrative Agent, Banc of America Securities LLC, the Issuing Bank (other than any Issuing Bank issuing Canadian Letters of Credit) and the Collateral Agent (other than fees, expense reimbursements and indemnification payable in connection with Other Liabilities); third, to pay interest due and payable on Credit Extensions to the Domestic Borrowers, fourth, to repay outstanding Swingline Loans to the Domestic

Borrowers; fifth, to repay other outstanding Revolving Loans that are Prime Rate Loans of the Domestic Borrowers and all outstanding reimbursement obligations under Letters of Credit and Banker's Acceptances other than Canadian Letters of Credit; sixth, to repay outstanding Revolving Loans that are LIBO Loans and all Breakage Costs due in respect of such repayment pursuant to Section 2.21(b) or, at the Lead Borrower's option, to fund a cash collateral deposit to the Circuit City Cash Collateral Account sufficient to pay, and with direction to pay, all such outstanding LIBO Loans on the last day of the then-pending Interest Period therefor; seventh, to fund a cash collateral deposit in the Circuit City Cash Collateral Account in an amount equal to 103% of all Letter of Credit Outstandings other than Canadian Letter of Credit Outstandings; eighth, to pay all outstanding Pre-Petition Liabilities of the Canadian Loan Parties (other than contingent indemnification obligations not then due and owing) until paid in full in cash, ninth, to pay fees and expense reimbursements and indemnification then due and payable to the Canadian Agent and any Issuing Bank issuing Canadian Letters of Credit (other than fees, expense reimbursements and indemnification payable in connection with Other Liabilities of the Canadian Borrower); tenth, to pay interest due and payable on Credit Extensions to the Canadian Borrower; eleventh, to repay outstanding Swingline Loans to the Canadian Borrower; twelfth, to repay outstanding Revolving Loans that are Prime Rate Loans of the Canadian Borrower and all outstanding reimbursement obligations under Canadian Letters of Credit; thirteenth, to repay outstanding Revolving Loans that are BA Equivalent Loans and all Breakage Costs due in respect of such repayment pursuant to Section 2.21(b) or, at the Canadian Borrower's option, to fund a cash collateral deposit to the InterTAN Canada Cash Collateral Account sufficient to pay, and with direction to pay, all such outstanding BA Equivalent Loans on the last day of the then-pending Interest Period therefore; fourteenth, to fund a cash collateral deposit in the InterTAN Canada Cash Collateral Account (as defined in "Cash Collateral Account") in an amount equal to 103% of all Canadian Letter of Credit Outstandings; fifteenth, to pay all other Obligations and all Other Liabilities of the Loan Parties that are then outstanding and then due and payable.  If all amounts set forth in clauses first through and including fifteenth above are paid, any excess amounts shall promptly be released to the Borrowers. Any other amounts received by the Administrative Agent, the Issuing Bank, the Canadian Agent, the Collateral Agent and the Co-Collateral Agent, or any Lender as contemplated by Section 2.23 shall also be applied in the order set forth above in this Section 2.24.

(ii)     As long as no Event of Default exists, and the time for payment of the Obligations has not been accelerated (if an Event of Default shall have occurred and the Obligations have been accelerated, Section 7.04 shall apply), all amounts received in the Concentration Account from any source, including the Blocked Account Banks, and all payments made pursuant to Sections 2.21 and 2.22, in each case from the Canadian Loan Parties or the Collateral of the Canadian Loan Parties, hereof shall be applied, on the day of receipt, in the following order: first, to pay all outstanding Pre-Petition Liabilities of the Canadian Loan Parties (other than contingent indemnification obligations not then due and owing) until paid in full in cash; second, to pay fees and expense reimbursements and indemnification then due and

EXECUTION VERSION

payable to the Canadian Agent and any Issuing Bank issuing Canadian Letters of Credit) (other than fees, expense reimbursements and indemnification payable in connection with Other Liabilities); third, to pay interest due and payable on Credit Extensions to the Canadian Borrower, fourth, to repay outstanding Swingline Loans to the Canadian Borrower; fifth, to repay other outstanding Revolving Loans that are Prime Rate Loans of the Canadian Borrower and all outstanding reimbursement obligations under Canadian Letters of Credit; sixth, to repay outstanding Revolving Loans that are BA Rate Loans and all Breakage Costs due in respect of such repayment pursuant to Section 2.21(b) or, at the Lead Borrower's option, to fund a cash collateral deposit to the InterTAN Canada Cash Collateral Account (as defined in "Cash Collateral Account") sufficient to pay, and with direction to pay, all such outstanding BA Rate Loans on the last day of the then-pending Interest Period therefor; seventh, to fund a cash collateral deposit in the InterTAN Canada Cash Collateral Account in an amount equal to 103% of all Canadian Letter of Credit Outstandings, eighth, at the option of the Agents, and subject to the terms of the Initial Order, (i) to pay all outstanding Pre-Petition Liabilities of the Domestic Loan Parties (other than contingent indemnification obligations not then due and owing) until paid in full in cash; (ii), to pay fees and expense reimbursements and indemnification then due and payable to the Administrative Agent, Banc of America Securities LLC, the Issuing Bank (other than any Issuing Bank issuing Canadian Letters of Credit) and the Collateral Agent (other than fees, expense reimbursements and indemnification payable in connection with Other Liabilities); (iii), to pay interest due and payable on Credit Extensions to the Domestic Borrowers, (iv), to repay outstanding Swingline Loans to the Domestic Borrowers; (v), to repay other outstanding Revolving Loans that are Prime Rate Loans of the Domestic Borrowers and all outstanding reimbursement obligations under Letters of Credit and Banker's Acceptances other than Canadian Letters of Credit; (vi), to repay outstanding Revolving Loans that are LIBO Loans and all Breakage Costs due in respect of such repayment pursuant to Section 2.21(b) or, at the Lead Borrower's option, to fund a cash collateral deposit to the Circuit City Cash Collateral Account sufficient to pay, and with direction to pay, all such outstanding LIBO Loans on the last day of the then-pending Interest Period therefor; (vii), to fund a cash collateral deposit in the Circuit City Cash Collateral Account in an amount equal to 103% of all Letter of Credit Outstandings other than Canadian Letter of Credit Outstandings; and ninth, to pay all other Obligations and all Other Liabilities of the Loan Parties that are then outstanding and then due and payable.  If all amounts set forth in clauses first through and including ninth above are paid (other than, unless the Agents otherwise elect, amounts described in clause Eighth), any excess amounts shall promptly be released to the Borrowers. Any other amounts received by the Administrative Agent, the Issuing Bank, the Canadian Agent, the Collateral Agent and the Co-Collateral Agent or any Lender as contemplated by Section 2.23 shall also be applied in the order set forth above in this Section 2.24.

       (b)     All credits against the Obligations or the Canadian Liabilities shall be effective on the day of receipt thereof, and shall be conditioned upon final payment to the Administrative Agent of the items giving rise to such credits. If any item deposited to the

EXECUTION VERSION

Concentration Account or otherwise credited to any Loan Account is dishonored or returned unpaid for any reason, whether or not such return is rightful or timely, the Administrative Agent or the Canadian Agent, as applicable, shall have the right to reverse such credit and charge the amount of such item to the Loan Account and the Borrowers shall indemnify the Agents, the Issuing Bank and the Lenders against all claims and losses resulting from such dishonor or return.

SECTION 2.25. Increased Costs.

(a)      If any Change in Law shall:

(i)      impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender or any holding company of any Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate) or the Issuing Bank; or

(ii)      impose on any Lender or the Issuing Bank or the London interbank market any other condition affecting this Agreement or LIBO Loans or BA Equivalent Loans made by such Lender or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any LIBO Loan or BA Equivalent Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to such Lender or the Issuing Bank of participating in, issuing or maintaining any Letter of Credit or to reduce the amount of any sum received or receivable by such Lender or the Issuing Bank hereunder (whether of principal, interest or otherwise) other than Taxes, which shall be governed by Section 2.28 hereof, then the Domestic Borrowers or the Canadian Borrower, as applicable, will pay to such Lender or the Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or the Issuing Bank, as the case may be, for such additional costs incurred or reduction suffered.

(b)      If any Lender or the Issuing Bank determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's or the Issuing Bank's capital or on the capital of such Lender's or the Issuing Bank's holding company, if any, as a consequence of this Agreement or the Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by the Issuing Bank, to a level below that which such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or the Issuing Bank's policies and the policies of such Lender's or the Issuing Bank's holding company with respect to capital adequacy), then from time to time the Domestic Borrowers or the Canadian Borrower, as applicable, will pay to such Lender or the

78

Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company for any such reduction suffered.

(c)    A certificate of a Lender or the Issuing Bank setting forth the amount or amounts necessary to compensate such Lender or the Issuing Bank or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section and setting forth in reasonable detail the manner in which such amount or amounts were determined shall be delivered to the Lead Borrower or the Canadian Borrower, as applicable, and shall be presumptively correct absent manifest error. The Domestic Borrowers or the Canadian Borrower, as applicable, shall pay such Lender or the Issuing Bank, as the case may be, the amount shown as due on any such certificate within ten (10) Business Days after receipt thereof.

(d)    Failure or delay on the part of any Lender or the Issuing Bank to demand compensation pursuant to this Section within three (3) months of the increased cost or reduction in return shall constitute a waiver of such Lender's or the Issuing Bank's right to demand such compensation.

SECTION 2.26.  Change in Legality.

(a)    Notwithstanding anything to the contrary contained elsewhere in this Agreement, if (x) any Change in Law shall make it unlawful for a Lender to make or maintain a LIBO Loan or BA Equivalent Loan or to give effect to its obligations as contemplated hereby with respect to a LIBO Loan or BA Equivalent Loan or (y) at any time any Lender determines that the making or continuance of any of its LIBO Loans or BA Equivalent Loan has become impracticable as a result of a contingency occurring after the date hereof which adversely affects the London interbank market or the position of such Lender in the London interbank market, then, by written notice to the Lead Borrower, such Lender may (i) declare that LIBO Loans or BA Equivalent Loans will not thereafter be made by such Lender hereunder, whereupon any request by the Borrowers for a LIBO Borrowing or BA Equivalent Loan Borrowing shall, as to such Lender only, be deemed a request for a Prime Rate Loan unless such declaration shall be subsequently withdrawn; and (ii) require that all outstanding LIBO Loans or BA Equivalent Loans made by it be converted to Prime Rate Loans, in which event all such LIBO Loans or BA Equivalent Loans shall be automatically converted to Prime Rate Loans as of the effective date of such notice as provided in paragraph (b) below. In the event any Lender shall exercise its rights under clause (i) or (ii) of this paragraph (a), all payments and prepayments of principal which would otherwise have been applied to repay the LIBO Loans or BA Equivalent Loans that would have been made by such Lender or the converted LIBO Loans or BA Equivalent Loans of such Lender shall instead be applied to repay the Prime Rate Loans made by such Lender in lieu of, or resulting from the conversion of, such LIBO Loans or BA Equivalent Loans.

EXECUTION VERSION

(b)     For purposes of this Section 2.26, a notice to the Borrowers by any Lender pursuant to paragraph (a) above shall be effective, if lawful, and if any LIBO Loans or BA Equivalent Loans shall then be outstanding, on the last day of the then-current Interest Period; and otherwise such notice shall be effective on the date of receipt by the Borrowers.

SECTION 2.27. Payments; Sharing of Setoff.

(a)     The Borrowers shall make each payment required to be made by it hereunder or under any other Loan Document (whether of principal, interest, fees or reimbursement of drawings under Letters of Credit, or of amounts payable under Section 2.21(b), Section 2.25, or Section 2.28, or otherwise) prior to 2:00 p.m., Boston time, on the date when due, in immediately available funds, without setoff or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent or the Canadian Agent, as applicable, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Administrative Agent at its offices at 100 Federal Street, Boston, Massachusetts 02110, or to the Canadian Agent, as applicable, at its offices at 200 Front Street West, Toronto, Ontario, Canada, M5V 3L2, except payments to be made directly to the Issuing Bank or Swingline Lender as expressly provided herein and except that payments pursuant to Section 2.21(b), Section 2.25, Section 2.28, and Section 9.03 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein. The Administrative Agent or the Canadian Agent, as applicable, shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. If any payment under any Loan Document (other than payments with respect to LIBO Borrowings or BA Equivalent Loan Borrowings) shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, if any payment due with respect to LIBO Borrowings or BA Equivalent Loan Borrowings shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, unless that succeeding Business Day is in the next calendar month, in which event, the date of such payment shall be on the last Business Day of subject calendar month, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments under each Loan Document shall be made in dollars.

(b)     If at any time insufficient funds are received by and available to the Administrative Agent or the Canadian Agent, as applicable, to pay fully all amounts of principal, unreimbursed drawings under Letters of Credit, interest and fees then due hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due hereunder, ratably among the Domestic Lenders or Canadian Lenders, as applicable, entitled thereto in accordance with the amounts of interest and fees then due to such Lenders, and (ii) second, towards payment of principal and unreimbursed drawings under Letters of Credit then due hereunder, ratably among

80

EXECUTION VERSION

the Domestic Lenders or Canadian Lenders, as applicable, entitled thereto in accordance with the amounts of principal and unreimbursed drawings under Letters of Credit then due to such parties.

(c)    If any Domestic Lender or Canadian Lender, as applicable, shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or participations in drawings under Letters of Credit or Swingline Loans resulting in such Domestic Lender's or Canadian Lender's receiving payment of a greater proportion of the aggregate amount of its Loans and participations in drawings under Letters of Credit and Swingline Loans and accrued interest thereon than the proportion received by any other Domestic Lender or Canadian Lender, then the Domestic Lender or Canadian Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans and participations in drawings under Letters of Credit and Swingline Loans of other Domestic Lenders or Canadian Lenders, as applicable, to the extent necessary so that the benefit of all such payments shall be shared by the Domestic Lenders and the Canadian Lenders, as applicable, ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and participations in drawings under Letters of Credit and Swingline Loans, provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Domestic Lender or Canadian Lender as consideration for the assignment of or sale of a participation in any of its Loans or participations in drawings under Letters of Credit to any assignee or participant, other than to the Borrowers or any Affiliate thereof (as to which the provisions of this paragraph shall apply). The Borrowers consent to the foregoing and agree, to the extent they may effectively do so under Applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrowers rights of setoff and counterclaim with respect to such participation as fully as if such Domestic Lender or Canadian Lender were a direct creditor of the Borrowers in the amount of such participation.

(d)    Unless the Administrative Agent or the Canadian Agent, as applicable, shall have received notice from the Borrowers prior to the date on which any payment is due to the Administrative Agent or the Canadian Agent, as applicable, for the account of the Domestic Lenders, the Canadian Lenders or the Issuing Bank hereunder that the Borrowers will not make such payment, the Administrative Agent or the Canadian Agent, as applicable, may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Domestic Lenders or the Canadian Lenders, as applicable, or the Issuing Bank, as the case may be, the amount due. In such event, if the Borrowers have not in fact made such payment, then each of the Domestic Lenders or Canadian Lenders, as applicable, or the Issuing Bank, as the case may be, severally agrees to repay to the Administrative Agent or the Canadian Agent, as applicable, forthwith on demand the amount so

81

distributed to such Domestic Lender, Canadian Lender or Issuing Bank with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, or the Canadian Agent, as applicable, at the Federal Funds Effective Rate or, with respect to the Canadian Lenders, at the Canadian Prime Rate.

(e)     If any Domestic Lender or Canadian Lender shall fail to make any payment required to be made by it pursuant to this Agreement, then the Administrative Agent or the Canadian Agent, as applicable, may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent or the Canadian Agent, as applicable, for the account of such Domestic Lender or Canadian Lender to satisfy such Lender's obligations under this Agreement until all such unsatisfied obligations are fully paid.

SECTION 2.28. <u>Taxes.</u>

(a)     Any and all payments by or on account of any obligation of the Borrowers hereunder or under any other Loan Document shall be made free and clear of and without deduction for any Indemnified Taxes or Other Taxes, <u>provided</u> that if the Borrowers shall be required to deduct any Indemnified Taxes or Other Taxes from such payments or any Lender shall be required to pay any Indemnified Taxes or Other Taxes in respect of any such payments, then (i) the sum payable by the Borrower shall be increased as necessary so that after making all required deductions or payments by any Lender (including deductions or payments by any Lender applicable to additional sums payable under this Section) the Agents, any Lender or the Issuing Bank (as the case may be) receives and maintains after any such deductions or payment by the Lender an amount equal to the sum it would have received had no such deductions or payments been made, (ii) the Borrowers shall make such deductions, and (iii) the Borrowers shall pay the full amount deducted to the relevant Governmental Authority in accordance with Applicable Law.

(b)     In addition, the Borrowers shall pay any Other Taxes to the relevant Governmental Authority in accordance with Applicable Law.

(c)     The Borrowers shall indemnify the Agents, each Lender and the Issuing Bank and the Canadian Borrower shall indemnify the Canadian Agent, each Canadian Lender and the Issuing Bank of any Letter of Credit on its behalf, within ten (10) Business Days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by such Agent, such Lender or the Issuing Bank, as the case may be, on or with respect to any payment by or on account of any obligation of the Borrowers hereunder or under any other Loan Document (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, to the extent that such penalties, interest and expenses shall not

82

EXECUTION VERSION

result from any action or inaction on the part of the Agent, the Lender or the Issuing Bank, as the case may be, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrowers by a Lender or the Issuing Bank, or by any Agent on its own behalf or on behalf of a Lender or the Issuing Bank setting forth in reasonable detail the manner in which such amount was determined, shall be presumptively correct absent manifest error.

(d)     As soon as commercially practicable after any payment of Indemnified Taxes or Other Taxes by the Borrowers to a Governmental Authority, the Borrowers shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent or the Canadian Agent, as applicable.

(e)     Any Foreign Lender other than a Canadian Lender that is entitled to an exemption from or reduction in withholding tax shall deliver to the Domestic Borrowers and the Administrative Agent two copies of either United States Internal Revenue Service Form 1001 or Form 4224, or, in the case of a Foreign Lender's claiming exemption from or reduction in U.S. Federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest", a Form W-8, or any subsequent versions thereof or successors thereto (and, if such Foreign Lender delivers a Form W-8BEN, a certificate representing that such Foreign Lender is not a bank for purposes of Section 881(c) of the Code, is not a 10-percent shareholder (within the meaning of Section 871(h)(3)(B) of the Code) of the Domestic Borrowers and is not a controlled foreign corporation related to the Domestic Borrowers (within the meaning of Section 864(d)(4) of the Code)), properly completed and duly executed by such Foreign Lender claiming complete exemption from or reduced rate of, United States federal withholding tax on payments by the Domestic Borrowers under this Agreement and the other Loan Documents. Such forms shall be delivered by each Foreign Lender other than a Canadian Lender on or before the date it becomes a party to this Agreement (or, in the case of a transferee that is a participation holder, on or before the date such participation holder becomes a transferee hereunder) and on or before the date, if any, such Foreign Lender changes its applicable lending office by designating a different lending office (a "New Lending Office"). In addition, each Foreign Lender shall deliver such forms promptly upon the obsolescence or invalidity of any form previously delivered by such Foreign Lender other than a Canadian Lender. Notwithstanding any other provision of this Section 2.28(e), a Foreign Lender shall not be required to deliver any form pursuant to this Section 2.28(e) that such Foreign Lender is not legally able to deliver.

(f)     The Borrowers shall not be required to indemnify any Foreign Lender or to pay any additional amounts to any Foreign Lender in respect of U.S. Federal withholding tax pursuant to paragraph (a) or (c) above to the extent that the obligation to pay such additional

83

amounts would not have arisen but for a failure by such Foreign Lender to comply with the provisions of paragraph (e) above. Should a Lender become subject to Taxes because of its failure to deliver a form required hereunder, the Borrowers shall, at such Lender's expense, take such steps as such Lender shall reasonably request to assist such Lender to recover such Taxes.

(g)    The Borrowers shall not be required to indemnify any Lender for any tax arising under Part XIII of the *Income Tax Act* (Canada) imposed on any payment made on an assignment or other transfer of all or any part of a Lender's interest in any Loan or Letter of Credit made to the Canadian Borrower to a non-resident of Canada (for purposes of the *Income Tax Act* (Canada)) with whom the Canadian Borrower is not dealing at arm's length.

(h)    If the Lead Borrower determines in good faith that a reasonable basis exists for contesting a Tax, the relevant Lender or the Administrative Agent, as applicable, shall cooperate with the Lead Borrower in challenging such Tax at the Lead Borrower's expense, if requested by the Lead Borrower. If any Lender or the Administrative Agent, as applicable, obtains a credit against or receives a refund or reduction (whether by way of direct payment or by offset) of any Tax for which payment has been made pursuant to this Section, which credit, refund or reduction in the good faith judgment of such Lender or the Administrative Agent, as the case may be, (and without any obligation to disclose its tax records) is allocable to such payment made under this Section, the amount of such credit, refund or reduction (together with any interest received thereon) promptly shall be paid to the Lead Borrower or Canadian Borrower, as applicable, to the extent that payment has been made by the Lead Borrower in full pursuant to this Section.

SECTION 2.29.    Security Interests in Collateral.

(a)    All of the Obligations are secured by Liens on all the assets of the Domestic Loan Parties (other than Bankruptcy Recoveries) and, at all times, shall constitute administrative expenses of the Loan Parties in the Chapter 11 Case with priority under Section 364(c)(1) of the Bankruptcy Code over any and all other administrative expenses of the kind specified in Sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, and 1114 of the Bankruptcy Code, subject only to the Professional Fee Carve Out. All Liens which secure the Obligations shall constitute first priority Liens under Section 364(d) of the Bankruptcy Code, subject only to the Liens securing the Pre-Petition Liabilities and other Permitted Encumbrances having priority under Applicable Law. No other claims or Liens having a priority superior or pari passu to that granted to or on behalf of the Agents or the Lenders shall be granted or approved while any of the Obligations or the Commitments remain outstanding.

(b)    All of the Obligations are secured by Liens on all the assets of the Canadian Loan Parties and at all times will be entitled to a super priority claim status and will be

84

EXECUTION VERSION

secured by a  first priority perfected security interest and hypothec in favor of the Canadian Agent
(in each case  subject only to (i) the Directors' Charge, (ii) the Administration Charge and (iii)
Permitted Encumbrances having priority under Applicable Law.  All Liens on the assets of the
Canadian Loan Parties which secure the Obligations shall constitute first priority Liens, subject
only to the Liens securing the Pre-Petition Liabilities and the items described in subclauses (i)
through (iv) above to the extent that such charges have priority under Applicable Law.  No other
claims or Liens having a priority superior or pari passu to that granted to or on behalf of the
Canadian Agent or the Lenders shall be granted or approved while any of the Obligations or the
Commitments remain outstanding.

SECTION 2.30.  <u>Mitigation Obligations; Replacement of Lenders.</u>

(a)     If any Lender requests compensation under Section 2.25, or if the
Borrowers are required to pay any additional amount to any Lender or any Governmental
Authority for the account of any Lender pursuant to Section 2.28, then such Lender shall use
reasonable efforts to designate a different lending office for funding or booking its Loans
hereunder or to assign its rights and obligations hereunder to another of its offices, branches or
affiliates, if, in the reasonable judgment of such Lender, such designation or assignment
(i) would eliminate or reduce amounts payable pursuant to Section 2.25 or Section 2.28, as the
case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or
expense and would not otherwise be disadvantageous to such Lender. The Borrowers (in the case
of the Canadian Borrower, only in respect of any Canadian Lender) hereby agree to pay all
reasonable costs and expenses incurred by any Lender in connection with any such designation
or assignment; <u>provided</u>, <u>however</u>, that the Borrowers shall not be liable for such costs and
expenses of a Lender requesting compensation if (i) such Lender becomes a party to this
Agreement on a date after the Closing Date and (ii) the relevant Change in Law occurs on a date
prior to the date such Lender becomes a party hereto.

(b)     If any Lender requests compensation under Section 2.25, or if the
Borrowers are required to pay any additional amount to any Lender or any Governmental
Authority for the account of any Lender pursuant to Section 2.28, or if any Lender defaults in its
obligation to fund Loans hereunder, then the Borrowers may, at their sole expense and effort,
upon notice to such Lender and the Administrative Agent, require such Lender to assign and
delegate, without recourse (in accordance with and subject to the restrictions contained in
Section 9.05), all its interests, rights and obligations under this Agreement to an assignee that
shall assume such obligations (which assignee may be another Lender, if a Lender accepts such
assignment), <u>provided</u> that (i) except in the case of an assignment to another Lender, the
Borrowers shall have received the prior written consent of the Administrative Agent, the Issuing
Bank and Swingline Lender and the Canadian Agent only in the case of a Canadian Lender,
which consent shall not unreasonably be withheld, (ii) such Lender shall have received payment
of an amount equal to the outstanding principal of its Loans and participations in unreimbursed

85

EXECUTION VERSION

drawings under Letters of Credit and Swingline Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts) and (iii) in the case of any such assignment resulting from a claim for compensation under Section 2.25 or payments required to be made pursuant to Section 2.28, such assignment will result in a reduction in such compensation or payments. A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply.

ARTICLE III
Representations and Warranties

Each Loan Party, for itself and on behalf of such Loan Party's Subsidiaries represents and warrants to the Agents and the Lenders that:

SECTION 3.01. Organization; Powers. Each Loan Party is, and each of its Subsidiaries is, duly organized, validly existing and in good standing (to the extent such concept exists) under the laws of the jurisdiction of its organization, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, and, subject to the entry of the DIP Orders and the Initial Order, each such Person has all requisite power and authority to carry on its business as now conducted and, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing (to the extent such concept exists) in, every jurisdiction where such qualification is required.

SECTION 3.02. Authorization; Enforceability. The transactions contemplated hereby and by the other Loan Documents to be entered into by each Loan Party are within such Loan Party's corporate powers and, upon the entry of the DIP Orders, as applicable, and the Initial Order, have been duly authorized by all necessary corporate, and, if required, stockholder action. This Agreement has been duly executed and delivered by each Loan Party that is a party hereto and upon entry of the DIP Orders, as applicable, and the Initial Order constitutes, and each other Loan Document to which any Loan Party is a party, when executed and delivered by such Loan Party will constitute, a legal, valid and binding obligation of such Loan Party (as the case may be), enforceable in accordance with its terms, subject to the DIP Orders, as applicable, the Initial Order and general principles of equity, regardless of whether considered in a proceeding in equity or at law.

SECTION 3.03. Governmental Approvals; No Conflicts. Subject to the entry of the DIP Orders, as applicable, and the Initial Order, the transactions to be entered into as contemplated by the Loan Documents (a) do not require any consent or approval of, registration or filing with, or

86

EXECUTION VERSION

any other action by, any Governmental Authority, except (i) for such as have been obtained or made and are in full force and effect, (ii) for those for which the failure to obtain could not be reasonably be expected to have a Material Adverse Effect, and (iii) for filings, registrations and recordings necessary to perfect and render opposable Liens created under the Loan Documents, (b) will not violate any Applicable Law or regulation or the charter, by-laws or other organizational documents of any Loan Party or any order of any Governmental Authority, except for such violation which could not reasonably be expected to have a Material Adverse Effect, (c) will not violate or result in a default under any indenture, agreement or other instrument entered into after the Petition Date binding upon any Loan Party or any of its Subsidiaries or their respective assets, except for such violation or default which could not reasonably be expected to have a Material Adverse Effect, or give rise to a right thereunder to require any payment of a material amount to be made by any Loan Party or any of its Subsidiaries, and (d) will not result in the creation or imposition of any Lien on any asset of any Loan Party or any of its Subsidiaries,  except Liens created under the Loan Documents, the DIP Orders, the Initial Order or otherwise permitted hereby or thereby.

SECTION 3.04. <u>Financial Condition</u>.  Since the Petition Date, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

SECTION 3.05. <u>Properties.</u>

(a) Each Loan Party, and each of its Subsidiaries, has good title to, or valid leasehold interests or rights in, all its real (immoveable) and personal (moveable) property material to its business, except (i) as an Effect of Bankruptcy, or (ii) for defects which could not reasonably be expected to have a Material Adverse Effect.

(b) Each Loan Party, and each of its Subsidiaries owns, or is licensed to use, all trademarks, trade names, copyrights, patents and other intellectual property material to its business, and the use thereof by such Person does not infringe upon the rights of any other Person, except for any such infringements that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(c) <u>Schedule 3.05(c)(i)</u> sets forth the address of all Real Estate that is owned by each Loan Party as of the Closing Date, together with a list of the holders of any mortgage or other Lien thereon. <u>Schedule 3.05(c)(ii)</u> sets forth the address of all Real Estate that is leased by each Loan Party as of the Closing Date, together with a list of the landlords and holders of any leasehold mortgage or hypothec thereon granted by a Loan Party.

SECTION 3.06. <u>Litigation and Environmental Matters.</u>

(a)     With the exception of the Cases, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of any Loan Party or any of its Subsidiaries, threatened against any such Person or involving any of the Loan Documents, which could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect (other than those set forth on Schedule 3.06).

(b)     Except for the matters set forth on Schedule 3.06, and except as could not reasonably be expected to have a Material Adverse Effect, no Loan Party and no Subsidiary of any Loan Party (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability.

(c)     Since the date of this Agreement, there has been no change in the status of the matters set forth on Schedule 3.06 that, individually or in the aggregate, has resulted in, or could reasonably be expected to result in, a Material Adverse Effect.

SECTION 3.07. Compliance with Laws and Agreements. Each Loan Party, and each of its Subsidiaries, is in compliance with all laws, regulations and orders of any Governmental Authority applicable to it or its property and all Material Contracts and Material Indebtedness binding upon it or its property, except (a) where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, or (b) as an Effect of Bankruptcy. No Default has occurred and is continuing, except as an Effect of Bankruptcy.

SECTION 3.08. Investment Company Status. No Loan Party nor any Subsidiary of any Loan Party is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

SECTION 3.09. Taxes. Each Loan Party, and each of its Subsidiaries, has timely filed or caused to be filed all tax returns and reports required to have been filed and has paid or caused to be paid all Taxes incurred after the Petition Date, except (a) Taxes that are being contested in good faith by appropriate proceedings, for which such Person has set aside on its books adequate reserves, and as to which no Lien has arisen, or (b) to the extent that the failure to do so could not reasonably be expected to result in a Material Adverse Effect.

SECTION 3.10. ERISA.  Except as set forth on Schedule 3.10, as of the Closing Date, none of the Loan Parties is party to a Plan. No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, could reasonably be expected to result in a Material Adverse

88

EXECUTION VERSION

Effect. Except as set forth on Schedule 3.10, the present value of all accumulated benefit obligations under each Plan (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of such Plan.

SECTION 3.11. Disclosure.  None of the reports, financial statements, certificates or other written information (other than projections, Budgets, forward looking information or general market data) furnished by or on behalf of any Loan Party or any of its Subsidiaries to the Administrative Agent or any Lender in connection with the negotiation of this Agreement or any other Loan Document or delivered hereunder or thereunder (as modified or supplemented by other information so furnished) contains (when taken as a whole) any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading, provided that with respect to projected or pro forma financial information, the Loan Parties represent only that such information was prepared in good faith.

SECTION 3.12. Subsidiaries.  Schedule 3.12 sets forth the name of each Loan Party, and the ownership interest of each Loan Party in each of its Subsidiaries, as of the Closing Date. All of the outstanding ownership interests in such Subsidiaries have been validly issued, are fully paid and non-assessable (to the extent such concept exists) and there is no other capital stock or ownership interest of any class outstanding as of the Closing Date. Except as set forth on Schedule 3.12, as of the Closing Date, the Loan Parties are not and each of their respective Subsidiaries is not party to any joint venture, general or limited partnership, or limited liability company, agreements or any other business ventures or entities.  The copies of the Organization Documents of each Loan Party and each amendment thereto provided pursuant to Section 4.01 are true and correct copies of each such document, each of which is valid and in full force and effect as of the Closing Date.

(b)     The Subsidiaries of the Lead Borrower designated with an asterisk on Schedule 3.12 do not, and will not, own any assets valued in excess of $100,000 or conduct any business operations and are and shall remain inactive.

SECTION 3.13. Insurance.  Schedule 3.13 sets forth a description of all insurance maintained by or on behalf of the Loan Parties and their respective Subsidiaries as of the Closing Date. As of the Closing Date, each of such policies is in full force and effect. As of the Closing Date, all premiums in respect of such insurance that are due and payable have been paid.

SECTION 3.14. Labor Matters.  There are no strikes, lockouts or slowdowns against any Loan Party or any of its Subsidiaries pending or, to the knowledge of the Borrowers, threatened to the extent that any such action could reasonably be expected to have a Material Adverse Effect.  The hours worked by and payments made to employees of the Loan Parties and their

89

EXECUTION VERSION

respective Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable federal, state, provincial, territorial, local or foreign law dealing with such matters to the extent that any such violation could reasonably be expected to have a Material Adverse Effect. All payments due from any Loan Party or any of its Subsidiaries, or for which any claim may be made against any such Person, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of such member, except for such payments or claims as could not reasonably be expected to have a Material Adverse Effect. The consummation of the transactions contemplated by the Loan Documents will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Loan Party or any of its Subsidiaries is bound. Except as set forth on Schedule 3.14, no Loan Party or any Subsidiary is a party to or bound by any collective bargaining agreement, management agreement, employment agreement, bonus, restricted stock, stock option, or stock appreciation plan or agreement or any similar plan, agreement or arrangement as of the Closing Date. There are no representation proceedings pending or, to any Loan Party's knowledge, threatened to be filed with the National Labor Relations Board or any other applicable Governmental Authority, and no labor organization or group of employees of any Loan Party or any Subsidiary has made a pending demand for recognition, except for such proceedings or demands that could not reasonably be expected to have a Material Adverse Effect. Except as set forth on Schedule 3.14, there are no complaints, unfair labor practice charges, grievances, arbitrations, unfair employment practices charges or any other claims or complaints against any Loan Party or any Subsidiary pending or, to the knowledge of any Loan Party, threatened to be filed with any Governmental Authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment of any employee of any Loan Party or any of its Subsidiaries, except for such complaints, charges, grievances or arbitrations that could not reasonably be expected to have a Material Adverse Effect.

SECTION 3.15. Security Documents. Upon entry of the DIP Orders and the Initial Order, the Security Documents, the DIP Orders and the Initial Order, collectively, will create in favor of the Collateral Agent or the Canadian Agent, as applicable, for the ratable benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral, subject to the DIP Orders and the Initial Order, and the Security Documents constitute, or will upon entry of the DIP Orders or the Initial Order, as applicable, and/or the filing of financing statements or other requisite registrations or assignments and the obtaining of "control", in each case with respect to the relevant Collateral as required under the applicable Uniform Commercial Code or similar legislation of any jurisdiction including, without limitation, the PPSA and the Civil Code of Québec, the creation of a fully perfected and opposable first priority Lien on, and security interest in, and hypothecation of, all right, title and interest of the Loan Parties thereunder in such Collateral, in each case prior and superior in right to any other Person, except as permitted hereunder or under any other Loan Document.

90

EXECUTION VERSION

SECTION 3.16. Federal Reserve Regulations.

(a)     Neither the Borrowers nor any of their respective Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock.

(b)     No part of the proceeds of any Loan or any Letter of Credit will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, (i) to buy or carry Margin Stock or to extend credit to others for the purpose of buying or carrying Margin Stock or to refund indebtedness originally incurred for such purpose or (ii) for any purpose that entails a violation of the provisions of the Regulations of the Board, including Regulation U or X.

SECTION 3.17. Intentionally Omitted.

SECTION 3.18. Material Contracts.

Schedule 3.18 sets forth all Material Contracts to which any Loan Party is a party or is bound as of the Closing Date.  The Loan Parties have delivered true, correct and complete copies of such Material Contracts to the Administrative Agent on or before the date hereof.  Except as an Effect of Bankruptcy, the Loan Parties are not in breach in any material respect of, or in default in any material respect under, any Material Contract and have not received any notice of the intention of any other party thereto to terminate any Material Contract.

SECTION 3.19. Bailees, Warehousemen, etc.

Except for Inventory, the value of which does not at any time exceed $50,000,000 on an aggregate basis as to all Borrowers, no Inventory is in the care or custody of any third party or stored or entrusted with a bailee or other third party and none shall hereafter be placed under such care, custody, storage, or entrustment except for goods in transit.

SECTION 3.20. Consignment.

No Borrower has, and none shall have, possession of any property on consignment, the value of which at any time exceeds $300,000,000 on an aggregate basis as to all Borrowers.

ARTICLE IV
Conditions

91

SECTION 4.01. <u>Closing Date</u>. This Agreement shall not become effective until the date on which each of the following conditions precedent have been satisfied or waived by the Administrative Agent:

(a)    The Administrative Agent (or its counsel) shall have received from each party hereto either (i) a counterpart of this Agreement and all other Loan Documents (including, without limitation, the Notes and the Security Documents) signed on behalf of such party or (ii) written evidence reasonably satisfactory to the Administrative Agent (which may include telecopy transmission of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement and all other Loan Documents.

(b)    The Administrative Agent shall have received a favorable written opinion (addressed to each Agent and the Lenders on the Closing Date and dated the Closing Date) of Kirkland and Ellis LLP, counsel for the Domestic Borrowers, covering such matters relating to the Loan Parties, the Loan Documents or the transactions contemplated thereby as the Administrative Agent shall reasonably request. The Borrowers hereby request such counsel to deliver such opinions.

(c)    The Administrative Agent shall have received such documents and certificates as the Administrative Agent or its counsel may reasonably request relating to the organization, existence and good standing of each Loan Party, the authorization of the transactions contemplated by the Loan Documents and any other legal matters relating to the Loan Parties, the Loan Documents or the transactions contemplated thereby, all in form and substance reasonably satisfactory to the Administrative Agent and its counsel.

(d)    The Administrative Agent shall have received a certificate, reasonably satisfactory in form and substance to the Administrative Agent, certifying that, as of the Closing Date, the representations and warranties made by the Loan Parties in the Loan Documents are true and complete in all material respects and that no event has occurred (or failed to occur) which is or which, solely with the giving of notice or passage of time (or both) would be a Default or an Event of Default.

(e)    All motions and other documents to be filed with and submitted to the US Bankruptcy Court and the Canadian Bankruptcy Court in connection with the DIP Orders and the Initial Order shall be in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders.  The Interim Borrowing Order and the Initial Order shall each have been entered, shall be in full force and effect, and neither shall have been reversed, vacated or stayed, or modified without the prior written consent of the Administrative Agent and the Required Lenders, and all other necessary consents and approvals to the transactions contemplated hereby shall have been obtained and shall be reasonably satisfactory to the Administrative Agent.

92

EXECUTION VERSION

(f)      The US Bankruptcy Court shall have entered an order granting the lenders under the Pre-Petition Agreement adequate protection of their interests, which order shall be in form and substance reasonably acceptable to the Administrative Agent and the Required Lenders.

(g)      The Administrative Agent shall have received (i) an appraisal, in form and substance reasonably satisfactory to the Administrative Agent, performed by an appraiser reasonably acceptable to the Administrative Agent of the Inventory of the Borrowers, and (ii) a commercial finance examination in form and substance reasonably satisfactory to the Administrative Agent relating to inspections, audits and field searches (which may include conversations with responsible officers and employees) of each Borrower's assets (including, without limitation, accounts receivable and inventory), liabilities, books and records, management information systems, cash management, vendor agreements and other material agreements.

(h)      The Administrative Agent shall be reasonably satisfied that any financial statements delivered to them fairly present the business and financial condition of the Lead Borrower and its Subsidiaries, and that, except as result of the commencement of the Cases and the events leading up to and resulting therefrom, there has been no material adverse change in the assets, business, financial condition, or income of the Lead Borrower and its Subsidiaries (taken as a whole) since the date of the most recent financial statements delivered to the Administrative Agent.

(i)      The Administrative Agent shall have received a Borrowing Base Certificate dated as of the Closing Date.

(j)      The Collateral Agent and the Canadian Agent shall have received results of searches or other evidence reasonably satisfactory to the Collateral Agent or the Canadian Agent, as applicable (in each case dated as of a date reasonably satisfactory to the Collateral Agent or the Canadian Agent, as applicable) indicating the absence of Liens on the Collateral and proceeds thereof, including without limitation, receivables from credit card processors, except for Liens for which termination statements and releases reasonably satisfactory to the Collateral Agent or the Canadian Agent, as applicable, are being tendered concurrently with such extension of credit or are otherwise permitted hereunder.

(k)      The Collateral Agent and the Canadian Agent shall be reasonably satisfied that the Liens of the Collateral Agent and the Canadian Agent on the Collateral constitute first priority perfected Liens (subject to Permitted Encumbrances having priority by operation of law or by court order).

93