EXECUTION VERSION

(l)    The Collateral Agent and the Canadian Agent, as applicable, shall have received the DDA Notifications, the Blocked Account Agreements and Credit Card Notifications required to be delivered hereunder on or before the Closing Date.

(m)    All fees due at or immediately after the Closing Date and all reasonable invoiced costs and out-of-pocket expenses incurred by the Administrative Agent, the Co-Collateral Agent and the Canadian Agent in connection with the establishment of the credit facility contemplated hereby (including the reasonable fees and out-of-pocket expenses of counsel to the Administrative Agent and the Canadian Agent and local bankruptcy counsel for each of them and local counsel in Canada, as necessary, and of the Co-Collateral Agent) shall have been paid in full in cash.

(n)    No material changes in governmental regulations or policies regulating the Loan Parties, the Agents, the Arranger or any Lender involved in this transaction shall have occurred prior to the Closing Date which could, individually or in the aggregate, materially and adversely effect the transaction contemplated by this Agreement.

(o)    After giving effect to the transactions contemplated hereby and by the other Loan Documents, there shall be no Default or Event of Default on the Closing Date.

(p)    The Collateral Agent and, in respect of the Canadian Borrower and its Subsidiaries, the Canadian Agent, shall have received, and be reasonably satisfied with, evidence of the Loan Parties' insurance, together with such endorsements as are required by the Loan Documents.

(q)    The Agents and the Lenders shall have received the initial Budget and a reasonably detailed professional fee budget, each of which shall be in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders.

(r)    All first day motions and applications and other documents to be filed with and submitted to the US Bankruptcy Court and the Canadian Bankruptcy Court in connection with this Agreement (other than the DIP Orders and the Initial Order which are subject to the provisions of Section 4.01(e)) shall be in form and substance reasonably satisfactory to the Administrative Agent.

(s)    There shall have been delivered to the Administrative Agent and/or the Canadian Agent such additional instruments and documents as the Administrative Agent or its counsel reasonably may require or request.

The Administrative Agent shall notify the Borrowers and the Lenders of the Closing Date, and such notice shall be conclusive and binding.

94

EXECUTION VERSION

SECTION 4.02. Conditions Precedent to Each Loan and Each Letter of Credit.

The obligation of the Lenders to make each Revolving Loan and of the Issuing Bank to issue each Letter of Credit, is subject to the following conditions precedent:

(a)     Notice. The Administrative Agent shall have received a notice with respect to such Borrowing or issuance, as the case may be, as required by Article II.

(b)     Representations and Warranties. All representations and warranties contained in this Agreement and any Borrowing Base Certificate shall be true and correct in all material respects on and as of the date of each Borrowing or the issuance of each Letter of Credit hereunder with the same effect as if made on and as of such date, other than representations and warranties that relate solely to an earlier date.

(c)     Intentionally Omitted.

(d)     No Default. On the date of each Borrowing hereunder and the issuance of each Letter of Credit and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing.

(e)     Borrowing Base Certificate. The Administrative Agent shall have received the most recently required Borrowing Base Certificate, with each such Borrowing Base Certificate including schedules as required by this Agreement.

The request by the respective Borrowers for, and the acceptance by the respective Borrowers of, each extension of credit hereunder shall be deemed to be a representation and warranty by the respective Borrowers that the conditions specified in this Section 4.02(b) and (d) have been satisfied at that time and that after giving effect to such extension of credit the respective Borrowers shall continue to be in compliance with the Borrowing Base.  The conditions set forth in this Section 4.02 are for the sole benefit of the Administrative Agent and each Lender and may be waived by the Administrative Agent in whole or in part without prejudice to the Administrative Agent or any Lender.

ARTICLE V
Affirmative Covenants

Until the Commitments have expired or been terminated and the principal of and interest on each Loan and all fees payable hereunder shall have been paid in full in cash and all Letters of Credit shall have expired or terminated or cash collateralized in a manner reasonably acceptable to the Issuing Bank and all L/C Disbursements shall have been reimbursed, each Loan Party covenants and agrees with the Agents and the Lenders that:

95

EXECUTION VERSION

SECTION 5.01. <u>Financial Statements and Other Information</u>

(a)    The Borrowers will furnish to the Administrative Agent for further distribution to the Lenders:

(i)    within thirty (30) days after the end of each fiscal month of the Lead Borrower, its consolidated balance and related statements of operations, stockholders' equity and cash flows as of the end of and for such fiscal month and for the elapsed portion of the current fiscal year, with comparative results to the same fiscal periods of the prior fiscal year, in each case certified by one of its Financial Officers as presenting in all material respects the financial condition and results of operations of the Lead Borrower and its Subsidiaries on a consolidated basis in accordance with GAAP, subject to normal year end audit adjustments and the absence of footnotes; and

(ii)    concurrently with any delivery of financial statements under clause (i) above, a certificate of a Financial Officer of the Lead Borrower substantially in the form of <u>Exhibit C</u> (i) certifying, to the best knowledge of such Financial Officer, as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, and (ii) stating whether any change in GAAP or in the application thereof has occurred since the date of the Lead Borrower's most recent audited financial statements, and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such certificate; and

(iii)    Contemporaneously with the delivery of the first Borrowing Base Certificate in any calendar month, a summary of the then Reported Fee Accruals as of the end of the previous calendar month (or more frequently at the Lead Borrower's election); and

(iv)    promptly after the same become publicly available, copies of all reports on Forms 10-K and 10-Q and proxy statements filed by the Lead Borrower with the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of the functions of said Commission, or with any national securities exchange, as the case may be.

(b)    The Borrowers will furnish to the Administrative Agent (for further distribution to the Lenders with respect to the items set forth in clauses (i) through (iv) and (vi) through (ix) below) and the Co-Collateral Agent:

96

EXECUTION VERSION

(i)     On Wednesday of each week (or, if Wednesday is not a Business Day, on the next succeeding Business Day), a Variance Report; and

(ii)     On the 10th day of each calendar month (or, if such day is not a Business Day, on the next succeeding Business Day), an updated Budget; and

(iii)     Daily, a certificate substantially in the form of Exhibit D-1 (a "Borrowing Base Certificate") showing the Borrowing Base as of the close of business on the immediately preceding day, each Borrowing Base Certificate to be certified as complete and correct in all material respects on behalf of the Lead Borrower by a Financial Officer of the Lead Borrower; provided that prior to December 15, 2008, the amount of Eligible Inventory shall be required to be updated only weekly, and thereafter the amount of Eligible Inventory shall be updated daily based on sales made the previous day and conformed weekly to the Stock Ledger; and

(iv)     Until the earlier of (a) January 17, 2009 (or such later date as agreed to by the Canadian Lenders) and (b) the date upon which the Term Loan is funded, daily, a certificate substantially in the form of Exhibit D-2 (a "Canadian Borrowing Base Certificate") showing the Canadian Borrowing Base as of the close of business on the immediately preceding day, each Canadian Borrowing Base Certificate to be certified as complete and correct in all material respects on behalf of the Canadian Borrower by a Financial Officer of the Lead Borrower; provided that the amount of Eligible Inventory shall be required to be updated only weekly; and

(v)     The financial and collateral reports described on Schedule 5.01(A) at the times set forth in such Schedule; and

(vi)     after the occurrence and during the continuance of an Event of Default, promptly upon receipt thereof, copies of all reports submitted to the Lead Borrower by independent certified public accountants in connection with each annual, interim or special audit of the books of the Lead Borrower and its Subsidiaries made by such accountants, including any management letter submitted by such accountants to management in connection with their annual audit, but excluding any accountant "agreed upon procedures" report; and

(vii)     promptly after the furnishing or filing thereof, copies of any statement, report or pleading furnished to or filed with the US Bankruptcy Court, the Canadian Bankruptcy Court or the Creditors' Committee in connection with the Cases, including, without limitation, all Monitor's reports in the Canadian

97

Bankruptcy Case; provided that the receipt of such documents by counsel to the Administrative Agent and the Co-Collateral Agent in accordance with normal noticing provisions and practices under the Bankruptcy Code or the CCAA shall satisfy this requirement;

(viii)    promptly after receipt thereof, copies of all reconciliations with respect to the Initial Store Closing Sale; and

(ix)    promptly following any reasonable request therefor, such other information regarding the operations, business affairs and financial condition of any Loan Party, or compliance with the terms of any Loan Document, as the Administrative Agent or any Lender may reasonably request.

Documents required to be delivered pursuant to Section 5.01 may be delivered electronically and, if so delivered, shall be deemed to have been delivered on the date (i) on which the Lead Borrower posts such documents, or provides a link thereto on the Lead Borrower's website on the Internet at the website address listed on Schedule 5.01(B); or (ii) on which such documents are posted on the Lead Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided that: (i) the Lead Borrower shall deliver paper copies of such documents to the Administrative Agent or any Lender that requests the Lead Borrower to deliver such paper copies until a written request to cease delivering paper copies is given by the Administrative Agent or such Lender and (ii) the Lead Borrower shall notify the Administrative Agent and each Lender (by telecopier or electronic mail) of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents. The Administrative Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Loan Parties with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

The Loan Parties hereby acknowledge that (a) the Administrative Agent will make available to the Lenders and the Issuing Banks materials and/or information provided by or on behalf of the Loan Parties hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "Platform") and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Loan Parties or their securities) (each, a "Public Lender"). The Loan Parties hereby agree that they will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page

EXECUTION VERSION

thereof; (x) by marking Borrower Materials "PUBLIC," the Loan Parties shall be deemed to have authorized the Administrative Agent, the Issuing Banks and the Lenders to treat such Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to the Loan Parties or their securities for purposes of United States Federal and state securities laws; (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Investor"; and (z) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Investor."

SECTION 5.02. <u>Notices of Material Events</u>. The Borrowers will furnish to the Administrative Agent prompt written notice of the following:

(a)    after a Financial Officer obtains knowledge thereof, the occurrence of any Default or Event of Default;

(b)    after a Financial Officer obtains knowledge thereof, the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against any Loan Party or any Subsidiary or any Affiliate thereof that, if adversely determined, could reasonably be expected to result in a Material Adverse Effect;

(c)    after a Financial Officer obtains knowledge thereof, the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect;

(d)    after a Financial Officer obtains knowledge thereof, any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect;

(e)    any change in any the Lead Borrower's executive officers;

(f)    after a Financial Officer obtains knowledge thereof, the filing of any Lien after the Petition Date for unpaid taxes against any Loan Party;

(g)    the discharge by any Loan Party of their present independent accountants or any withdrawal or resignation by such independent accountants;

(h)    of any material change in accounting policies or financial reporting practices by any Loan Party or any Subsidiary thereof; and

99

EXECUTION VERSION

(i)      of any collective bargaining agreement or other labor contract to which a Loan Party becomes a party, or the application for the certification of a collective bargaining agent.

Each notice delivered under this Section shall be accompanied by a statement of a Financial Officer or other executive officer of the Lead Borrower setting forth the details of the event or development requiring such notice and, if applicable, any action taken or proposed to be taken with respect thereto.

SECTION 5.03.  Information Regarding Collateral.

(a)      The Lead Borrower will furnish to the Administrative Agent prompt written notice of any change of the following (except that with respect to the events described in clauses (i), (iii) and (iv), the Lead Borrower shall provide the Administrative Agent with at least ten (10) days prior written notice of the date that any such event shall occur): (i) in any Loan Party's corporate name, (ii) in the location of any Loan Party's chief executive office or its principal place of business, (iii) in any Loan Party's identity or corporate structure, (iv) in the Canadian Borrower's or any of its Subsidiaries' jurisdictions of operation including any change in any office or store in which it maintains books or records relating to Collateral owned by it or any office, store or facility at which Collateral owned by it is located (including the establishment of any such new office or facility) or location from which Accounts are invoiced or paid, provided that such information shall be required to be furnished only quarterly with the delivery of the financial statements required pursuant to Section 5.01(a)(i) hereof except for notices of jurisdictions, provinces, territories and locations in which the Canadian Borrower or any other Canadian Loan Party was not previously operating if the Canadian Agent's Lien would not be perfected therein without additional filings or registrations, or (v) in any Loan Party's jurisdiction of incorporation, Federal Taxpayer Identification Number or organizational identification number assigned to it by its jurisdiction of organization.  Notwithstanding the foregoing, if any Loan Party's Federal Taxpayer Identification Number or organizational identification number assigned to it by its jurisdiction of organization is changed by the applicable Governmental Authority, Lead Borrower will furnish to the Administrative Agent prompt written notice of any such change not later than ten (10) days from the date such Loan Party has been notified by such Governmental Authority of such change.  The Lead Borrower also agrees promptly to notify the Administrative Agent if any material portion of the Collateral is damaged or destroyed.  In addition, the Lead Borrower will furnish to the Administrative Agent written notice promptly after the end of each fiscal quarter of any change in any office or store in which it maintains books or records relating to Collateral owned by it or any office, store or facility at which Collateral owned by it is located (including the establishment of any such new office or facility).

100

(b)    Should any of the information on any of the Schedules hereto become misleading in any material respect as a result of changes after the Closing Date, the Lead Borrower shall advise the Administrative Agent in writing of such revisions or updates as may be necessary or appropriate to update or correct the same; provided however that no update to any such Schedule shall result in the modification or expansion of any permissible transactions set forth in Article 6 hereof from those in existence immediately prior to the delivery of such updated schedules.

SECTION 5.04. Existence; Conduct of Business. Subject to the provisions of the Bankruptcy Code, the Initial Order and the CCAA and other Applicable Law, each Loan Party will, and will cause each of its Subsidiaries to, do or cause to be done all things necessary to comply with its respective charter, certificate and articles of incorporation, articles of organization, and/or other organizational documents, as applicable, and by-laws and/or other instruments which deal with corporate governance, and to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges, franchises, patents, copyrights, trademarks and trade names used in the conduct of its business, except to the extent that failure to perform such obligations would not reasonably be expected to result in a Material Adverse Effect; provided that the foregoing shall not prohibit any transaction permitted under Section 6.03 or Section 6.05 or prohibit any such Person from discontinuing any business or forfeiting any right, license, permit, privilege, franchise, patent, copyright, trademark or trade name it reasonably deems appropriate in the ordinary course of business.

SECTION 5.05. Payment of Obligations. Subject to the Effect of Bankruptcy, each Loan Party will, and will cause each of its Subsidiaries to, pay its Indebtedness and other obligations, including tax liabilities, in each case to the extent incurred after the Petition Date, before the same shall become delinquent or in default, except where (a)(i) the validity or amount thereof is being contested in good faith by appropriate proceedings, (ii) such Loan Party or such Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP, (iii) such contest effectively suspends collection of the contested obligation, and (iv) no Lien secures such obligation or (b) the failure to make payment could not reasonably be expected to result in a Material Adverse Effect. Nothing contained herein shall be deemed to limit the rights of the Administrative Agent under Section 2.03(b).

SECTION 5.06. Maintenance of Properties. Each Loan Party will, and will cause each of its Subsidiaries to, keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear, casualty and condemnation each excepted and with the exception of asset dispositions permitted hereunder.

SECTION 5.07. Insurance.

101

EXECUTION VERSION

(a)     Each Loan Party will, and will cause each of its Subsidiaries to, (i) maintain insurance with financially sound and reputable insurers having a rating of at least A- or better by A.M. Best Rating Guide (or, to the extent consistent with prudent business practice, a program of self-insurance) on such of its property and in at least such amounts and against at least such risks as is customary with companies in the same or similar businesses operating in the same or similar locations, including commercial general liability insurance against claims for personal injury or death occurring upon, in or about or in connection with the use of any properties owned, occupied or controlled by it (including the insurance required pursuant to the Security Documents); (ii) maintain such other insurance as may be required by law, except where the failure to do so would not have a Material Adverse Effect; and (iii) furnish to the Administrative Agent, promptly following written request, information as to the insurance carried. The Administrative Agent acknowledges that the current insurers of the Loan Parties are reasonably acceptable to the Administrative Agent.

(b)     Commercial property insurance policies maintained with respect to any Collateral shall be endorsed or otherwise amended to include (i) a lenders' loss payable clause, in form and substance reasonably satisfactory to the Administrative Agent, which endorsements or amendments shall provide that the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies with respect to the Collateral directly to the Administrative Agent or the Canadian Agent, as the case may be, and (ii) a provision to the effect that none of the Loan Parties, the Agents or any other party shall be a coinsurer (it being understood that the inclusion of a deductible shall not be deemed to cause the Loan Parties to be a co-insurer). Commercial general liability policies shall be endorsed to name the Agents as an additional insured. Each such policy referred to in this paragraph also shall provide that it shall not be canceled, modified or not renewed, except upon not less than 30 days' prior written notice thereof by the insurer to the Administrative Agent or the Canadian Agent, as the case may be. The Domestic Borrowers shall deliver to the Administrative Agent and the Canadian Borrower shall deliver to the Canadian Agent, prior to the cancellation, modification or nonrenewal of any such policy of insurance, evidence of a replacement policy or renewal of a policy previously delivered to the Administrative Agent or the Canadian Agent, as the case may be, together with evidence reasonably satisfactory to the Administrative Agent or the Canadian Agent, as the case may be, of payment of the premium therefor.

(c)     None of the Agents or the Lenders, or their agents or employees shall be liable for any loss or damage insured by the insurance policies required to be maintained under this Section 5.07. Each Loan Party shall look solely to its insurance companies or any other parties other than the Agents and the Lenders for the recovery of such loss or damage and such insurance companies shall have no rights of subrogation against any Agent or Lender or its agents or employees. If, however, the insurance policies do not provide waiver of subrogation rights against such parties, as required above, then the Loan Parties hereby agree, to the extent permitted by law, to waive their right of recovery, if any, against the Agents and the Lenders and

102

EXECUTION VERSION

their agents and employees. The designation of any form, type or amount of insurance coverage by any Agent under this Section 5.07 shall in no event be deemed a representation, warranty or advice by such Agent or any Lender that such insurance is adequate for the purposes of the business of the Loan Parties or the protection of their properties.

(d)     Each Loan Party will permit any representatives designated by any Agent, upon reasonable prior notice during normal business hours (unless an Event of Default then exists and is continuing, in which case no prior notice shall be required or time periods shall apply), to inspect the insurance policies maintained by or on behalf of the Loan Parties and to inspect books and records related thereto and any properties covered thereby, all at such reasonable times and as often as may be reasonably requested, provided that the business of the Loan Parties shall not be unreasonably disrupted. The Loan Parties shall pay the reasonable fees and out-of-pocket expenses of any representatives retained by the Administrative Agent, the Collateral Agent or the Canadian Agent to conduct any such inspection.

SECTION 5.08. Casualty and Condemnation. Each Loan Party will furnish to the Administrative Agent and the Lenders prompt written notice of any property or other insured damage to any material portion of the Collateral or the commencement of any action or proceeding for the taking of any material portion of the Collateral under power of eminent domain or by condemnation or similar proceeding.

SECTION 5.09. Books and Records; Inspection and Audit Rights; Appraisals; Accountants; Physical Inventories.

(a)     Each Loan Party will, and will cause each of its Subsidiaries to, keep proper books of record and account in which full, true and correct entries are made of all material dealings and transactions in relation to its business and activities. Each Loan Party will permit any representatives designated by any Agent, upon reasonable prior notice (unless an Event of Default then exists and is continuing), to visit and inspect its properties and to discuss its affairs, finances and condition with its officers, all at such reasonable times during normal business hours and as often as may be reasonably requested, provided that the business of the Loan Parties shall not be unreasonably disrupted.

(b)     Each Loan Party will, and will cause each of its Subsidiaries to, from time to time upon the reasonable request of the Administrative Agent or the Canadian Agent, as the case may be, or the Co-Collateral Agent in accordance with the provisions of Section 8.18, or the Required Lenders through the Administrative Agent or the Canadian Agent, as applicable, permit any Agent or professionals (including investment bankers, consultants, accountants, lawyers and appraisers) retained by the Agents to conduct appraisals, commercial finance examinations and other evaluations, including, without limitation, of (i) the Loan Parties' practices in the computation of the Borrowing Base and (ii) the assets included in the Borrowing Base and

103

related financial information such as, but not limited to, sales, gross margins, payables, accruals and reserves, and pay the reasonable fees and out-of-pocket expenses of the Administrative Agent, the Collateral Agent or the Canadian Agent or such professionals with respect to such evaluations and appraisals. Notwithstanding the foregoing, the Agents and the Loan Parties acknowledge and agree that so long as no Event of Default has occurred and is continuing, the Loan Parties shall only be obligated to reimburse the Agents for (i) four (4) commercial finance examinations following the Closing Date, (ii) one (1) Inventory appraisal per month following the Closing Date, provided that if, commencing five months after the Petition Date, Excess Availability is not less than (x) 35% of the lesser of the Total Commitments or the Borrowing Base for five consecutive Business Days or (y) 25% of the lesser of the Total Commitments or the Borrowing Base at any time, Inventory appraisals will only be undertaken on a quarterly basis; provided that, if any Event of Default shall have occurred and be continuing, the Loan Parties shall pay the reasonable costs of all appraisals and commercial finance examinations undertaken by the Agents during the continuation of such Event of Default, provided further that nothing contained in this sentence shall limit the right of the Agents to undertake additional appraisals and commercial finance examinations at their expense if no Event of Default then exists.

(c)    The Loan Parties shall, at all times, retain independent certified public accountants who are nationally recognized or are otherwise reasonably satisfactory to the Administrative Agent and shall instruct such accountants to cooperate with, and be available to, the Administrative Agent or its representatives to discuss the Loan Parties' financial performance, financial condition, operating results, controls, and such other matters, within the scope of the retention of such accountants, as may be raised by the Administrative Agent, provided that the Lead Borrower shall be given the opportunity to be present at any discussions with such independent accountants.

(d)    The Borrowers, at their own expense, shall cause not less than one (1) physical inventory to be undertaken in each twelve (12) month period conducted by such inventory takers as are reasonably satisfactory to the Administrative Agent or the Canadian Agent, as the case may be, and the Lead Borrower and following such methodology as is consistent with the methodology used in the immediately preceding physical inventory or as otherwise may be reasonably satisfactory to the Administrative Agent or the Canadian Agent, as the case may be, and the Lead Borrower. The Administrative Agent or the Canadian Agent, as the case may be, at the reasonable expense of the Borrowers, may participate in and/or observe each scheduled physical count of Inventory which is undertaken on behalf of any Borrower. The Lead Borrower, within seventy-five (75) days following the completion of such inventory, shall provide the Administrative Agent or the Canadian Agent, as the case may be, with a reconciliation of the results of each such inventory (as well as of any other physical inventory undertaken by any Borrower) and shall post such results to the Stock Ledger and, as applicable to the Borrowers' other financial books and records.

EXECUTION VERSION

SECTION 5.10. <u>Compliance with Laws.</u>  Each Loan Party will, and will cause each of its Subsidiaries to, comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property, except (a) as otherwise permitted under the Bankruptcy Code, the CCAA, the DIP Orders or the Initial Order, or (b) where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

SECTION 5.11. <u>Use of Proceeds and Letters of Credit</u>.  The proceeds of Loans made hereunder and Letters of Credit issued hereunder will be used only (a) to repay the Pre-Petition Liabilities, (b) to finance the acquisition of working capital assets of the Borrowers, including the purchase of inventory and equipment in the ordinary course of business, (c) to finance capital expenditures of the Borrowers, (d) to pay fees, costs and expenses in connection with the transactions contemplated hereby, and to the extent approved by the Bankruptcy Courts and as set forth in the DIP Orders and the Initial Order, in connection with the Cases, (e) for other payments permitted to be made by the DIP Orders, the Initial Order and any other order of the US Bankruptcy Court or Canadian Bankruptcy Court, and (f) for general corporate purposes, in each case to the extent expressly permitted under Applicable Law, the Loan Documents, the DIP Orders, the Initial Order and in accordance with the Budget, subject to Section 5.17.  No part of the proceeds of any Loan will be used, whether directly or indirectly, for any purpose that entails a violation of any of the Regulations of the Board, including Regulations U and X.

SECTION 5.12. <u>Future Subsidiaries</u>.  Upon the formation or acquisition, after the Closing Date, of any Subsidiary of any Loan Party, such Subsidiary shall, promptly following the request of the Administrative Agent, execute and deliver a joinder to this Agreement and the other Loan Documents as an additional "borrower" or a Guaranty of the Obligations and the Other Liabilities and a security agreement granting a Lien in such of its assets of the same nature and type as constitute Collateral, all such documents to be in form and substance reasonably satisfactory to the Administrative Agent.  Nothing contained in this Section shall permit any Loan Party to form or acquire any Subsidiary which is otherwise prohibited by this Agreement.

SECTION 5.13. <u>Further Assurances</u>.  (a)  Each Loan Party and its Subsidiaries will execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements and other documents), that may be required under any Applicable Law, or which any Agent or the Required Lenders may reasonably request, to effectuate the transactions contemplated by the Loan Documents or to grant, preserve, protect or perfect the Liens created or intended to be created by the Security Documents or the validity or priority of any such Lien, all at the expense of the Loan Parties. The Loan Parties also agree to provide to the Collateral Agent and the Canadian Agent, from time to time promptly following a reasonable request, evidence reasonably satisfactory to the Collateral Agent and the Canadian Agent as to the perfection and priority of the Liens created or intended to be created by the Security Documents.

105

(b)    Upon the reasonable request of the Administrative Agent, each Domestic Borrower shall use commercially reasonable efforts to cause each of its customs brokers to deliver a Customs Broker Agreement to the Collateral Agent covering such matters and in such form as the Administrative Agent may reasonably require.

SECTION 5.14. <u>Material Contracts</u>.

Except as otherwise permitted under the Bankruptcy Code, the CCAA, the DIP Orders, the Initial Order, or any Final Order made in the Canadian Bankruptcy Case, the Loan Parties shall perform and observe all the terms and provisions of each Material Contract to be performed or observed by them, maintain each such Material Contract in full force and effect, enforce each such Material Contract in accordance with its terms, take all such action to such end as may be from time to time reasonably requested by the Administrative Agent and, promptly following a reasonable request of the Administrative Agent, make to each other party to each such Material Contract such demands and requests for information and reports or for action as any Loan Party or any of its Subsidiaries is entitled to make under such Material Contract, and cause each of its Subsidiaries to do so, except, in each case, where the failure to do so, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

SECTION 5.15. <u>Term Loan</u>.

By no later than January 17, 2009 (or such later date to which the Loan Parties, the Administrative Agent and the Required Lenders may otherwise agree),

(a)    the Term Loan shall have closed on terms and evidenced by documents reasonably acceptable to the Administrative Agent and the Required Lenders, and

(b)    the Borrowers shall have received the Net Proceeds therefrom and such Net proceeds shall have been applied to the Pre-Petition Liabilities and the Obligations as set forth herein, in the Initial Order and in the DIP Orders; and

(c)    the Administrative Agent and the Canadian Agent shall have entered into the Intercreditor Agreement, in form and substance reasonably satisfactory to the Administrative Agent, the Canadian Agent and the Required Lenders.

SECTION 5.16. <u>Retention of Independent Consultant</u>.

Until such time as all Pre-Petition Liabilities and all Obligations have been repaid in full in cash (other than contingent indemnification Obligations for which a claim has not been asserted) and all Commitments thereunder have been terminated, the Borrowers shall continue to retain the Independent Consultant to assist the Borrowers with preparation of the Budget and the

106

EXECUTION VERSION

other financial and collateral reporting required to be delivered to the Administrative Agent pursuant to this Agreement, to assist in the consummation of any Permitted Sales, and to perform financial and restructuring services on terms reasonably satisfactory to the Agents.

SECTION 5.17. Performance Within Budget.

The Domestic Borrowers shall perform in accordance with the Budget with respect to the following: (i) the Domestic Borrowers' total cash expenditures (excluding disbursements for the purchase of Inventory) shall not be greater than 110% of the projected total amount set forth in the Budget, and (ii) the average amount of Eligible Inventory per retail store of the Domestic Borrowers shall not be less than $1,300,000.

The covenant described in (A) clause (i) shall be tested each week pursuant to the Variance Report delivered by the Lead Borrower to the Administrative Agent on Wednesday of each week for the immediately preceding week, beginning on December 13, 2008 on a cumulative basis during the period from the Petition Date to December 13, 2008 and, thereafter, on a four (4) week trailing basis, and (B) clause (ii) shall be tested each week beginning on January 10, 2009.

SECTION 5.18. Bankruptcy Related Affirmative Covenants.

(a)     Within thirty (30) days after the Petition Date (or such later date to which the Loan Parties, the Administrative Agent and the Required Lenders may otherwise agree), the Domestic Borrowers shall have obtained an order of the US Bankruptcy Court extending the time period of the Domestic Borrowers to assume or reject Leases to not less than 210 days from the Petition Date.

(b)     On or before November 14, 2008 (or such later date to which the Loan Parties, the Administrative Agent and the Required Lenders may otherwise agree), the Domestic Borrowers shall file (i) a motion seeking authority to reject the Identified Leases, and (ii) a motion seeking authority to assume the Agency Agreement for the sale of the Domestic Borrowers' Inventory, fixtures and equipment at the locations covered by the Identified Leases (the "Initial Store Closing Sale"), all of the foregoing to be on terms reasonably acceptable to the Administrative Agent.

(c)     By no later than November 24, 2008 (or such later date to which the Loan Parties, the Administrative Agent and the Required Lenders may otherwise agree), the Domestic Borrowers shall have obtained a US Bankruptcy Court order approving the assumption of the Agency Agreement (the "Initial Store Closing Sale Order"), on terms reasonably acceptable to the Administrative Agent. The Net Proceeds from the Initial Store Closing Sale shall be paid

107

EXECUTION VERSION

directly to the Administrative Agent for application to the Prepetition Liabilities and thereafter to the Obligations in accordance with the terms hereof.

(d)     By no later than the Lease Assumption Reserve Commencement Date, the Domestic Borrowers shall have prepared and distributed informational packages soliciting bids from potentially interested parties for the sale of their assets.  Prior to the Lease Assumption Reserve Commencement Date, the Domestic Borrowers (i) shall have entered into a stalking horse bid (on an equity basis) on terms reasonably acceptable to the Administrative Agent with respect to the sale of their assets, which shall be conducted pursuant to bidding procedures and agency documents, each in form and substance reasonably acceptable to Administrative Agent and the Required Lenders, and (ii) filed a motion seeking the approval of a sales procedures order in connection with such stalking horse bid and bidding procedures, in form and substance reasonably acceptable to the Administrative Agent and the Required Lenders. The Domestic Borrowers shall provide the Administrative Agent copies of any informational packages provided to potential bidders, draft agency agreements, the deadlines established as to receipt of bids and, promptly following the reasonable request of the Administrative Agent, a status report and updated information relating to the Permitted Store Closings and copies of any such bids and any updates, modifications or supplements to such information and materials

(e)     By no later than March 1, 2009, the Domestic Borrowers shall file a Plan of Reorganization and Disclosure Statement, which Plan of Reorganization provides for payment in full of the Pre-Petition Liabilities and the Obligations upon the Consummation Date and which shall otherwise be reasonably acceptable to the Required Lenders.

ARTICLE VI
Negative Covenants

Until the Commitments have expired or terminated and the principal of and interest on each Loan and all fees payable hereunder have been paid in full in cash and all Letters of Credit have expired or terminated or cash collateralized in a manner reasonably acceptable to the Issuing Bank, and all L/C Disbursements shall have been reimbursed, each Loan Party covenants and agrees with the Agents and the Lenders that:

SECTION 6.01. Indebtedness and Other Obligations. The Loan Parties will not, and will not permit any of their respective Subsidiaries to, create, incur, assume or permit to exist any Indebtedness, except:

(a)     Indebtedness created under the Loan Documents;

(b)     Indebtedness incurred prior to the Petition Date;

108

EXECUTION VERSION

(c)      Indebtedness of any Loan Party to any other Loan Party otherwise permitted hereunder; provided that the principal amount of any Indebtedness owed to the Domestic Loan Parties by the Canadian Loan Parties, together with Investments by the Domestic Loan Parties in the Canadian Loan Parties, shall not exceed $75,000,000 at any time outstanding;

(d)      Indebtedness created under the loan documents governing the Term Loan;

(e)      the Pre-Petition Liabilities;

(f)      Indebtedness under Hedging Agreements with any Lender or an Affiliate of a Lender;

(g)      Indebtedness which may be deemed to exist pursuant to any guaranties, performance, surety, statutory, appeal or similar obligations incurred in the ordinary course of business;

(h)      Indebtedness existing on the Closing Date, described in Schedule 6.01, but not any extensions, renewals or replacements of such Indebtedness (other than extensions, renewals or replacements of Indebtedness relating to Capital Lease Obligations);

(i)      Indebtedness incurred to finance insurance premiums and owing to the applicable insurance company providing the applicable policy; and

(j)      Other Indebtedness in an aggregate principal amount not to exceed $1,000,000 outstanding at any time.

SECTION 6.02. Liens.  The Loan Parties will not create, incur, or assume any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except:

(a)      Liens created under the Loan Documents;

(b)      Permitted Encumbrances;

(c)      any Lien on any property or asset of any Loan Party set forth in Schedule 6.02, provided that (i) such Lien shall not apply to any other property or asset of any Loan Party and (ii) such Lien shall secure only those obligations that it secures as of the Closing Date, and extensions, renewals and replacements thereof that do not increase the outstanding principal amount thereof; and

(d)      Liens securing the Term Loan;

(e)     Liens securing the Pre-Petition Liabilities;

(f)     Subject to the limitations contained in Section 3.20, Liens arising out of consignment arrangements for the sale of goods entered into by any Loan Party in the ordinary course of business in accordance with the past practices of such Loan Party;

(g)     Liens securing Indebtedness permitted by Section 6.01(i) (solely with respect to such insurance policies and the proceeds thereof);

(h)     Liens arising by operation of law under Article 2 of the UCC in favor of reclaiming seller of goods or buyer of goods;

(i)     Security given to a public or private utility or any governmental authority as required in the ordinary course of business;

(j)     Liens in the nature of the right of setoff in favor of counterparties (including depositories) to contractual agreements with the Loan Parties in the ordinary course of business;

(k)     Liens granted to a joint venture composed of Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC pursuant to the Agency Agreement; provided that the Collateral Agent shall have entered into an intercreditor agreement with such Persons on terms reasonably acceptable to the Collateral Agent;

(l)     Liens granted to vendors providing trade support to the Borrowers on terms and subject to requirements acceptable to the Required Lenders; and

(m)     Other Liens securing obligations in the aggregate amount not to exceed at any time $1,000,000.

After any Loan Party obtains knowledge of any Lien which has been involuntarily attached to its assets or properties, the Loan Parties shall use their best efforts to, and shall promptly seek, to cause the release or termination thereof.

SECTION 6.03. Fundamental Changes.

(a)     The Loan Parties and their respective Subsidiaries will not merge into or consolidate or amalgamate with any other Person, or permit any other Person to merge into, amalgamate, or consolidate with it, or liquidate or dissolve, except that, if at the time thereof and immediately after giving effect thereto, no Event of Default shall have occurred and be continuing, (i) any Subsidiary may merge or amalgamate with and into a Borrower in a transaction in which a Borrower is the surviving corporation, (ii) any Subsidiary that is not a

110

EXECUTION VERSION

Borrower may merge or amalgamate with and into any other Subsidiary that is not a Borrower, (iii) any Subsidiary may consummate through mergers, amalgamations or consolidations any disposition of assets permitted under Section 6.05, (iv) Facility Guarantors may merge with, or amalgamate into a Borrower so long as the Borrower is the surviving, or continuing, entity, (v) any Subsidiary of the Lead Borrower may be liquidated, wound up or dissolved, or all or any part of its business, property or assets may be conveyed, sold, leased, transferred or otherwise disposed of, in one transaction or a series of transactions, to a Borrower or Facility Guarantor, and (vi) any Foreign Subsidiary (other than the Canadian Loan Parties) may be merged with or amalgamate into any other Foreign Subsidiary (other than the Canadian Loan Parties) or be liquidated.

(b)     The Loan Parties and their respective Subsidiaries will not engage to any material extent in any business other than businesses of the type conducted by the Loan Parties and their Subsidiaries on the date of execution of this Agreement and businesses reasonably related, ancillary or complementary thereto.

SECTION 6.04. <u>Investments, Loans, Advances, Guarantees and Acquisitions.</u>  The Loan Parties and their respective Subsidiaries will not purchase, hold or acquire (including pursuant to any merger with any Person that was not a wholly owned Subsidiary prior to such merger) any capital stock, evidences of indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, guarantee any obligations of, or make or permit to exist any investment or any other interest in, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person constituting a business unit (each of the foregoing, an "Investment"), except for:

(a)     Investments by any Loan Party to any other Loan Party; <u>provided</u> that Investments by the Domestic Loan Parties in the Canadian Loan Parties, together with the principal amount of any Indebtedness owed to the Domestic Loan Parties by the Canadian Loan Parties, shall not exceed $75,000,000 at any time outstanding;

(b)     Investments existing on the Closing Date, and set forth on <u>Schedule 6.04</u>, to the extent such investments would not be permitted under any other clause of this Section;

(c)     Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

(d)     Loans or advances to employees for the purpose of travel, entertainment or relocation in the ordinary course of business in an amount not to exceed $2,000,000 in the aggregate at any time outstanding;

111

EXECUTION VERSION

(e)    Permitted Investments;

(f)    Investments deposits, prepayments and other credits to suppliers made in the ordinary course of business consistent with the past practices of Lead Borrower and its Subsidiaries;

(g)    Hedging Agreements to the extent permitted by Section 6.01;

(h)    The Loan Parties may sell or transfer amounts to other Loan Parties and acquire assets of other Loan Parties to the extent permitted by Section 6.05;

(i)    Guarantees and other Investments permitted under Section 6.01;

(j)    Investments in deposit accounts or securities accounts opened in the ordinary course of business provided such deposit accounts or securities accounts are subject to deposit account control agreements or securities account control agreement;

(k)    Capital Expenditures;

(l)    Investments in Northern National Insurance Ltd. to the extent required to support its working capital insurance obligations; and

(m)    Other Investments in an amount not to exceed $1,000,000 in the aggregate at any time outstanding.

SECTION 6.05. Asset Sales.

(a)    The Loan Parties and their respective Subsidiaries will not sell, transfer, lease or otherwise dispose of any asset, including any capital stock (other than capital stock of the Lead Borrower as long as an Event of Default does not arise therefrom), nor will the Loan Parties issue any additional shares of its capital stock or other ownership interest in such Loan Party (other than the Lead Borrower as long as an Event of Default does not arise therefrom), except:

(i)    sales and dispositions of Inventory and other assets in the ordinary course of business; and

(ii)    sales, transfers and dispositions among the Loan Parties;

(iii)    Permitted Sales; and

112

EXECUTION VERSION

(iv)    leases, subleases, licenses or sublicenses of property or abandonment of non-material intellectual property in the ordinary course of business and which do not materially interfere with the business of Lead Borrower and its Subsidiaries or would not reasonably be expected to have a Material Adverse Effect;

(v)    rejection, disclaimer and termination of leases otherwise permitted or required herein;

(vi)    Asset sales set forth on Schedule 6.05;

(vii)    Asset sales pursuant to an order approved by the Bankruptcy Courts and the Agents and Required Lenders;

(viii)    discounts or forgiveness of accounts receivables in the ordinary course of business or in connection with collection or compromise thereof so long as the applicable account debtor is not an Affiliate of the Loan Parties;

(ix)    sales not made for cash consideration in connection with the Borrowers' "Builder Install Initiative" in an amount not to exceed $10,000,000 at any time; and

(x)    any mandatory disposition of real property to a Governmental Authority as a result of a condemnation or expropriation of such real property and such disposition shall not have either (i) a Material Adverse Effect or (ii) affect a material portion of the Collateral;

provided that all sales, transfers, leases and other dispositions permitted hereby (other than sales, transfers and other disposition permitted under clauses (ii), (iv), (v), (vii), (viii) and (ix)) shall be made at arm's length and for fair value (other than with respect to store closing or similar liquidation sales) and, with respect to Inventory and Accounts, solely for cash consideration (which term shall include credit card sales).

SECTION 6.06.  Restricted Payments; Certain Payments of Indebtedness.

(a)    The Loan Parties will not, and will not permit any Subsidiaries to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, except as long as no Default or Event of Default exists or would arise therefrom (i) the Subsidiaries of the Lead Borrower may declare and pay cash dividends or other distributions with respect to their capital stock to any Domestic Loan Party; and the Subsidiaries of the Canadian Borrower may declare and pay cash dividends or other distributions with respect to their capital stock to any Canadian

113

EXECUTION VERSION

Loan Party and (ii) the Loan Parties may declare and pay dividends with respect to their capital stock payable solely in additional shares of their common stock.

(b)     The Loan Parties will not at any time, and will not permit any of their Restricted Subsidiaries to make, directly or indirectly, any payment or other distribution (whether in cash securities or other property) of or in respect of principal of or interest on any Indebtedness, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Indebtedness, except:

(i)     payment of regularly scheduled interest and principal payments as and when due in respect of any Indebtedness incurred after the Petition Date (other than the Term Loan) and permitted under Section 6.01;

(ii)     as long as no Event of Default exists or would arise therefrom and subject to the provisions of the Intercreditor Agreement, payment of regularly scheduled interest and mandatory prepayments of principal as and when due on account of the Term Loan; and

(iii)     adequate protection payments on the Pre-Petition Liabilities;

(iv)     as long as no Event of Default exists or arises therefrom, payments to Persons party to profit sharing agreements with the Canadian Loan Parties as and when due;

(v)     other payments reflected in the approved Budget; and

(vi)     refinancing, extensions and renewals of Indebtedness described in clause (i), above, to the extent permitted by Section 6.01.

SECTION 6.07. <u>Transactions with Affiliates</u>.  The Loan Parties will not at any time sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (a) transactions in the ordinary course of business that are at prices and on terms and conditions not less favorable to the Loan Parties than could be obtained on an arm's-length basis from unrelated third parties, (b) transactions between or among the Borrowers and/or the Facility Guarantors not involving any other Affiliate, which would not otherwise violate the provisions of the Loan Documents, (c) compensation arrangements for officers and other employees of Lead Borrower and its Subsidiaries entered into in the ordinary course of business, and (d) transactions otherwise permitted hereunder.

114

SECTION 6.08. <u>Amendment of Material Documents</u>.  The Loan Parties will not, and will not permit any Subsidiary to, amend, modify or waive any of its rights under its certificate of incorporation, by-laws or other organizational documents, in each case to the extent that such amendment, modification or waiver would be materially adverse to the interests of the Lenders. The Loan Parties will not, and will not permit any Subsidiary to, amend, modify or waive any of its rights under any Material Contracts, the Agency Agreement (including, without limitation the extension of the sale term beyond December 31, 2008 or of the time or manner of disposition of the proceeds from the Initial Store Sales) , or any document governing Material Indebtedness (including, without limitation, except as permitted in the Intercreditor Agreement, any documentation governing the Term Loan) without the Administrative Agent's prior written consent.

SECTION 6.09. <u>Fiscal Year</u>.  The Loan Parties shall not change their fiscal year without the prior written consent of the Administrative Agent, which consent shall not be unreasonably withheld. The Borrowers and the Lenders acknowledge that the adoption of the retail calendar for accounting purposes by the Borrowers shall not, in and of itself, be deemed a change of their fiscal year.

SECTION 6.10. <u>Burdensome Agreements</u>.  The Loan Parties shall not enter into or permit to exist any contractual obligation (other than this Agreement or any other Loan Document or documentation evidencing the Term Loan) that (a) limits the ability (i) of any Subsidiary to make Restricted Payments or other distributions to any Loan Party or to otherwise transfer property to or invest in a Loan Party, (ii) of any Subsidiary to Guarantee the Obligations, (iii) of any Subsidiary to make or repay loans to a Loan Party, or (iv) of the Loan Parties or any Subsidiary to create, incur, assume or suffer to exist Liens on property of such Person in favor of the Collateral Agent; provided, however, that this clause (iv) shall not prohibit (A) any negative pledge incurred or provided in favor of any holder of Indebtedness permitted under Section 6.01 solely to the extent any such negative pledge relates to the property financed by or the subject of such Indebtedness, (B) any limitation imposed in connection with a sale, transfer or disposition of assets permitted under Section 6.05 pending the consummation of such sale, transfer or disposition or (C) any limitation that restricts in a customary manner the assignment or transfer of any property or asset that is subject to a lease or license or the assignment or transfer of a lease, license or other contractual obligation; or (b) requires the grant of a Lien to secure an obligation of such Person if a Lien is granted to secure another obligation of such Person.

SECTION 6.11. <u>Intentionally Omitted.</u>

SECTION 6.12. <u>Clean Down.</u>

For the period (1) December 20 through December 27, 2008, the actual "Net Availability" (as calculated in accordance with the initial Budget) shall in no event be less than

115

EXECUTION VERSION

$75,000,000, (2) December 28, 2008 through January 3, 2009, the actual "Net Availability" (as calculated in accordance with the initial Budget) shall in no event be less than $50,000,000, (3) January 4, 2009 through January 10, 2009, the actual "Net Availability" (as calculated in accordance with the initial Budget) shall in no event be less than $50,000,000, and (4) January 11, 2009 through January 17, 2009, the actual "Net Availability" (as calculated in accordance with the initial Budget) shall in no event be less than $35,000,000.

SECTION 6.13. <u>Bankruptcy Related Negative Covenants</u>.

The Loan Parties will not consent to or permit to exist any of the following:

(a)    Any order which authorizes the rejection or assumption of any Leases (other than the Identified Leases) of any Domestic Loan Party without the Administrative Agent's prior consent, whose consent shall not be unreasonably withheld;

(b)    Any modification (other than extension of the Initial Order in Canada in the ordinary course with the prior written consent of the Canadian Agent), stay, vacation or amendment to the DIP Orders or the Initial Order to which the Agents and the Required Lenders have not consented in writing;

(c)    A priority claim or administrative expense or unsecured claim against any Borrower (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Agents and the Lenders in respect of the Obligations and the Pre-Petition Liabilities, except with respect to the Professional Fee Carve Out and, with respect to the Canadian Borrower, (i) statutory Liens and charges not capable of being subordinated by the entry of the Initial Order, (ii) the Directors' Charge, and (iii) the Administration Charge;

(d)    Any Lien on any Collateral having a priority equal or superior to the Lien securing the Obligations, other than with respect to (i) the Professional Fee Carve Out, (ii) Permitted Encumbrances having priority by operation of Applicable Law, (iii) with respect to the Canadian Borrower, (A) the Directors' Charge, (B) the Administration Charge, and (C) Permitted Encumbrances having priority by operation of Applicable Law, (iv) the Liens securing the Pre-Petition Liabilities, and (v) subject to the terms and conditions of the Intercreditor Agreement, the Liens securing the Term Loan;

(e)    Any order which authorizes the return of any of the Loan Parties' property pursuant to Section 546(h) of the Bankruptcy Code or any similar provision of the CCAA or Applicable Law in Canada;

116

(f)      Any order which authorizes the payment of any Indebtedness (other than the Pre-Petition Liabilities, Indebtedness reflected in the approved Budget, and other Indebtedness approved by the Agents) incurred prior to the Petition Date or the grant of "adequate protection" (whether payment in cash or transfer of property) with respect to any such Indebtedness which is secured by a Lien; or

(g)      Any order seeking authority to take any action that is prohibited by the terms of this Agreement or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents.

## ARTICLE VII
### Events of Default

SECTION 7.01. Events of Default.  If any of the following events ("Events of Default") shall occur:

(a)      the Loan Parties shall fail to pay any principal of any Loan or any reimbursement obligation in respect of any L/C Disbursement when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)      the Loan Parties shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Article) payable under this Agreement or any other Loan Document, within three (3) Business Days when the same shall become due and payable;

(c)      any representation or warranty made or deemed made by or on behalf of any Loan Party in or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect when made or deemed made;

(d)      (i) the Loan Parties shall fail to observe or perform any covenant, condition or agreement contained in Section 2.23, Section 5.01 (other than Section 5.01(a)(iv) and Section 5.01(b)(vi)), Section 5.02(a), Section 5.07, Section 5.09, Section 5.11, Section 5.15, Section 5.17, Section 5.18 or in Article VI; or (ii) the Loan Parties shall fail to observe or perform any covenant, condition or agreement contained in Sections 5.01(a)(iv), 5.01(b)(vi) or 5.16, which failure continues unremedied for a period of ten days;

117

(e)      any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in any Loan Document (other than those specified in clause (a), (b), (c), or (d) of this Article), and such failure shall continue unremedied for a period of 30 days after notice thereof from the Administrative Agent to the Lead Borrower (which notice will be given at the request of any Lender);

(f)      except as a result of the commencement of the Cases or unless payment is stayed by the US Bankruptcy Court or the Canadian Bankruptcy Court, any Loan Party shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness when and as the same shall become due and payable (after giving effect to the expiration of any grace or cure period set forth therein) and the holder of such Material Indebtedness shall have accelerated the time for, or demanded, payment thereof;

(g)      except as a result of the commencement of the Cases or unless payment is stayed by the US Bankruptcy Court or the Canadian Bankruptcy Court, any event or condition occurs (after giving effect to any grace period, waiver or amendment) that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any such Material Indebtedness or any trustee or agent on its or their behalf to cause any such Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity (other than on account of the sale of assets otherwise permitted under this Agreement which secure such Material Indebtedness);

(h)      one or more uninsured post-petition final judgments for the payment of money in an aggregate amount in excess of $5,000,000 (to the extent not covered by third party indemnities reasonably acceptable to the Administrative Agent) shall be rendered against any Loan Party or any combination thereof and the same shall remain undischarged for a period of 45 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any material assets of any Loan Party to enforce any such judgment;

(i)      (i)      any challenge in any legal proceeding by or on behalf of any Loan Party to the validity of any Loan Document or the applicability or enforceability of any Loan Document strictly in accordance with the subject Loan Document's terms or which seeks to void, avoid, limit, or otherwise adversely affect any security interest created by or in any Loan Document or any payment made pursuant thereto.

(ii)      any challenge in any legal proceeding by or on behalf of any other Person to the validity of any Loan Document or the applicability or enforceability of any Loan Document strictly in accordance with the subject Loan Document's terms or which seeks to void, avoid, limit, or otherwise adversely affect any security interest created by or in any Loan

118

EXECUTION VERSION

Document or any payment made pursuant thereto, in each case, as to which an order or judgment has been entered adverse to the Agents and the Lenders

(iii)     any Lien purported to be created under any Security Document shall cease to be, or shall be asserted by any Loan Party not to be, a valid, perfected and opposable Lien on any Collateral, with the priority required by the applicable Security Document, except (i) as a result of the sale or other disposition of the applicable Collateral in a transaction permitted under the Loan Documents, or (ii) with respect to Collateral (other than Inventory and Accounts), if the failure of the Lien relating thereto to be a valid, perfected and opposable Lien would not reasonably be expected to result in a Material Adverse Effect;

(j)     a Change in Control shall occur;

(k)     an ERISA Event shall have occurred after the Petition Date that when taken together with all such other ERISA Events that have occurred, could reasonably be expected to result in liability of the Loan Parties in an aggregate amount exceeding $5,000,000;

(l)     the occurrence of any uninsured loss to any material portion of the Collateral;

(m)     the indictment of, or institution of any legal process or proceeding against, any Loan Party, under any federal, state, provincial, municipal, and other civil or criminal statute, rule, regulation, order, or other requirement having the force of law where the relief, penalties, or remedies sought or available include the forfeiture of any material property of any Loan Party and/or the imposition of any stay or other order, the effect of which could reasonably be to restrain in any material way the conduct by the Loan Parties, taken as a whole, of their business in the ordinary course, and in each case where such indictment or institution of legal process could reasonably be expected to have a Material Adverse Effect;

(n)     except as otherwise permitted herein, the determination by any Loan Party, whether by vote of such Loan Party's board of directors or otherwise to: suspend the operation of such Loan Party's business in the ordinary course, liquidate all or a material portion of such Loan Party's assets or store locations, or employ an agent or other third party to conduct any so-called store closing, store liquidation or "Going-Out-Of-Business" sales relating to all or a substantial portion of such Loan Party's assets or store locations;

(o)     The entry of an order in the Cases which stays, modifies (other than extensions of the Interim Order in Canada with the prior written consent of the Canadian Agent), or reverses any DIP Order or the Initial Order or which otherwise materially adversely affects the effectiveness of any DIP Order or the Initial Order without the express written consent of the Agents and the Required Lenders;

119

EXECUTION VERSION

(p)     Either (i) the appointment in the Chapter 11 Case of a trustee or of any examiner having expanded powers to operate all or any part of any Loan Party's business, or (ii) the conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code, or (iii) the Canadian Loan Parties are declared bankrupt or a proceeding is taken to have a receiver, interim receiver, receiver and manager, agent, liquidator or other like Person appointed over all or any material portion of their property and assets or, except for the Monitor in the Canadian Bankruptcy Case, any such appointment is made or any creditor takes possession of all or a material portion of such property and assets or otherwise enforces any of its rights against the Canadian Loan Parties;

(q)     The failure of the US Bankruptcy Court to enter a Final Borrowing Order, in form and substance reasonably satisfactory to the Administrative Agent, within 45 days after the Petition Date;

(r)     The entry of any order without the prior written consent of the Agents and the Required Lenders which provides relief from the automatic stay otherwise imposed pursuant to Section 362 of the Bankruptcy Code or the stay made under the Initial Order or the CCAA which permits any creditor to realize upon, or to exercise any right or remedy with respect to, any asset of any Loan Party or to terminate any license, franchise, or similar agreement, where the exercise of such right or remedy or such realization or termination would reasonably be likely to have a Material Adverse Effect;

(s)     The filing of any application by any Loan Party without the express prior written consent of the Agents and the Required Lenders for the approval of any super-priority claim in the Cases which is pari passu with or senior to the priority of the claims of the Agents and the Lenders for the Obligations, or there shall arise any such super-priority claim under the Bankruptcy Code or CCAA (in each case, other than the Professional Fee Carve Out, the Administration Charge, the Directors' Charge and the claim of the lenders under the Term Loan);

(t)     The payment or other discharge by any Loan Party of any pre-petition Indebtedness, except as expressly permitted hereunder, or in the Budget or by order in the Cases to which order the Agents have provided their written consent;

(u)     The entry of any order in the Chapter 11 Case which provides adequate protection, or the granting by any Loan Party of similar relief in favor of any one or more of a Loan Party's pre-petition creditors, contrary to the terms and conditions of any DIP Order or the Initial Order;

(v)     The failure of any Loan Party (i) to comply with each and all of the terms and conditions of any DIP Order or the Initial Order, or (ii) to materially comply with any other

120

EXECUTION VERSION

order entered in the Cases, if such failure would reasonably likely result in a Material Adverse Effect;

(w)     The filing of any motion by any Loan Party or the entry of any order in the Cases: (i) (A ) permitting working capital or other financing (other than ordinary course trade credit or unsecured debt) for any Loan Party from any Person other than the Administrative Agent (unless the proceeds of such financing are used to pay in full of all Pre-Petition Liabilities, all Obligations, cash collateralization of all Letter of Credit Outstandings, and all Obligations then due and owing in connection with any Hedging Agreement, cash management, depository or similar products (collectively, the "Unliquidated Claims"), and the establishment of a reserve account for all Other Liabilities and indemnification obligations hereunder), (B) granting a Lien on, or security interest in any of the Collateral, other than with respect to this Agreement and the Term Loan or as otherwise permitted herein (unless such Liens are granted in connection with a financing, the proceeds of which are applied to the payment in full of all Pre-Petition Liabilities, all Obligations and the cash collateralization of all Letter of Credit Outstanding, other Unliquidated Claims and indemnification obligations hereunder), (C) except as permitted by this Agreement, permitting the use of any of the Collateral pursuant to Section 363(c) of the Bankruptcy Code without the prior written consent of the Administrative Agent, (iv) permitting recovery from any portion of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code or the Initial Order, or (D) dismissing any of the Cases or (ii) the filing of any motion by any Loan Party (or by any party in interest or any Creditors' Committee appointed in the Chapter 11 Case) seeking any of the matters specified in the foregoing clause (i) that is not dismissed or denied within forty-five (45) days of the date of the filing of such motion (or such later date agreed to in writing by the Agents);

(x)     The filing of a motion by any Loan Party seeking approval of a Disclosure Statement and a Plan of Reorganization or Plan of Compromise, or the entry of an order confirming a Plan of Reorganization or Plan of Compromise, that does not require repayment in full in cash of all Obligations and Pre-Petition Liabilities on the Consummation Date of such Plan of Reorganization and Plan of Compromise or such Plan of Reorganization or Plan of Compromise is defeated by the Loan Parties' creditors;

(y)     The filing of any pleading by any Person challenging the validity, priority, perfection, or enforceability of the Loan Documents (as defined in the Pre-Petition Credit Agreement), the Pre-Petition Liabilities, or any Lien granted pursuant to the Pre-Petition Loan Documents, or (b) any Lien granted pursuant to the Pre-Petition Loan Documents is determined to be null and void, invalid or unenforceable by the US Bankruptcy Court, the Canadian Bankruptcy Court or another court of competent jurisdiction in any action commenced or asserted by any other party in interest in the Cases, including, without limitation, the Creditors' Committee;

121

EXECUTION VERSION

then, subject to the terms of the DIP Orders and Initial Order, in every such event, and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Lead Borrower, take either or both of the following actions, at the same or different times: (i) terminate the Commitments, and thereupon the Commitments shall terminate immediately, and (ii) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrowers accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrowers; and (iii) require the Borrowers to furnish cash collateral in an amount equal to 103% of the Letter of Credit Outstandings.

Without limiting the foregoing, subject to the terms of the Initial Order, in every such event, and at any time thereafter during the continuance of such event, the Canadian Agent may, and at the request of the Required Lenders shall, upon five (5) days prior notice to the Canadian Borrower, take either or both of the following actions, at the same or different times: (i) terminate the Canadian Commitments, and thereupon the Canadian Commitments shall terminate immediately, and (ii) declare the Canadian Liabilities then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Canadian Liabilities so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Canadian Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrowers; and (iii) require the Canadian Borrower to furnish cash collateral in an amount equal to 103% of the Letter of Credit Outstandings of the Canadian Borrower.

SECTION 7.02. <u>When Continuing.</u>

For all purposes under this Agreement, each Default and Event of Default that has occurred shall be deemed to be continuing at all times thereafter unless it either (a) is cured or corrected, or (b) is waived in writing by the Lenders in accordance with Section 9.02.

SECTION 7.03. <u>Remedies on Default.</u>

Subject to the terms of the DIP Orders and the Initial Order, in case any one or more of the Events of Default shall have occurred and be continuing, and whether or not the maturity of the Loans shall have been accelerated pursuant hereto, the Administrative Agent or the Canadian Agent, as applicable, may (and at the direction of the Required Lenders, shall) proceed to protect and enforce its rights and remedies under this Agreement, the Notes or any of the other Loan

122

Documents by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and the other Loan Documents or any instrument pursuant to which the Obligations are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the Agents or the Lenders. No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of law.

SECTION 7.04. <u>Application of Proceeds.</u>

After the occurrence of an Event of Default and acceleration of the Obligations, the Agents shall apply the proceeds of any collection or sale of the Collateral, as well as any Collateral consisting of cash, or any Collateral granted under any other of the Security Documents as follows:

(a)    As to the Collateral of the Domestic Loan Parties:

FIRST, to the payment of all accrued and unpaid Professional Fees and Expenses up to an aggregate amount not to exceed to Professional Fee Carve Out;

SECOND, to the payment of all Pre-Petition Liabilities;

THIRD, to the payment of reasonable costs and out-of-pocket expenses incurred by the Agents in connection with such collection or sale or otherwise in connection with this Agreement or any of the Obligations, including all court costs and the reasonable fees and out-of-pocket expenses of its agents and legal counsel, the repayment of all advances made by the Agents hereunder or under any other Loan Document on behalf of any Loan Party and any other reasonable costs or out-of-pocket expenses incurred in connection with the exercise of any right or remedy hereunder, under any other Loan Document in each case to the extent required to be reimbursed hereunder;

FOURTH, to the payment of accrued and unpaid interest and principal on the Swingline Loans;

FIFTH, to the payment of accrued and unpaid interest on the Revolving Loans;

SIXTH, to the payment of outstanding principal on the Revolving Loans;

SEVENTH, to the Circuit City Cash Collateral Account and the InterTAN Canada Cash Collateral Account as collateral for Letter of Credit Outstandings, up to 103% thereof;

123

EXECUTION VERSION

EIGHTH, to the payment of all fees then due and owing to the Agents, the Lenders and the Issuing Bank under the Loan Documents (other than fees, expense reimbursements and indemnification payable in connection with Other Liabilities);

NINTH, to the payment of all Obligations on account of Cash Management Services;

TENTH, to the payment of all other Obligations and all Other Liabilities of the Borrowers then due and owing (including, without limitation, any obligations under any Hedging Agreements) and, to the extent not then due, the establishment of a reserve account for all Other Liabilities and all indemnification obligations hereunder;

ELEVENTH, to the Lead Borrower for distribution to the Loan Parties, their successors or assigns, or as a court of competent jurisdiction may otherwise direct.

Notwithstanding the foregoing, the proceeds of any collection or sale of the Collateral, as well as any Collateral consisting of cash, or any Collateral granted under any other of the Security Documents of the Domestic Loan Parties shall be first applied to the Obligations (other than the Canadian Liabilities) prior to application to the Canadian Liabilities.

(b)     As to the Collateral of the Canadian Loan Parties:

FIRST, to the payment of amounts secured by the Administration Charge, the Directors' Charge and the KERP Charge;

SECOND, to the payment of all Pre-Petition Liabilities of the Canadian Borrower;

THIRD, to the payment of reasonable costs and out-of-pocket expenses incurred by the Agents in connection with such collection or sale or otherwise in connection with any of the Loans made to the Canadian Borrower, including all court costs and the reasonable fees and out-of-pocket expenses of its agents and legal counsel, the repayment of all advances made by the Agents hereunder or under any other Loan Document on behalf of any Canadian Loan Party and any other reasonable costs or out-of-pocket expenses incurred in connection with the exercise of any right or remedy hereunder, under any other Loan Document in each case to the extent required to be reimbursed hereunder;

FOURTH, to the payment of accrued and unpaid interest and principal on the Swingline Loans made to the Canadian Borrower;

124

EXECUTION VERSION

FIFTH, to the payment of accrued and unpaid interest on the Revolving Loans made to the Canadian Borrower;

SIXTH, to the payment of outstanding principal on the Revolving Loans made to the Canadian Borrower;

SEVENTH, to the payment of amounts secured by the Canadian Creditor Charge;

EIGHTH, to the InterTAN Canada Cash Collateral Account as collateral for Canadian Letter of Credit Outstandings, up to 103% thereof;

NINTH, to the payment of accrued and unpaid interest and principal on the Swingline Loans made to the Domestic Borrowers;

TENTH, to the payment of accrued and unpaid interest on the Revolving Loans made to the Domestic Borrowers;

ELEVENTH, to the payment of outstanding principal on the Revolving Loans made to the Domestic Borrowers;

TWELFTH, to the Circuit City Cash Collateral Account as collateral for Letter of Credit Outstandings, up to 103% thereof;

THIRTEENTH, to the payment of all fees then due and owing to the Agents, the Lenders and the Issuing Bank under the Loan Documents (other than fees, expense reimbursements and indemnification payable in connection with Other Liabilities);

FOURTEENTH, to the payment of all Obligations on account of Cash Management Services;

FIFTEENTH, to the payment of all other Obligations and all Other Liabilities of the Borrowers then due and owing (including, without limitation, any obligations under any Hedging Agreements) and, to the extent not then due, the establishment of a reserve account for all Other Liabilities and all indemnification obligations hereunder;

SIXTEENTH, to the Lead Borrower for distribution to the Loan Parties, their successors or assigns, or as a court of competent jurisdiction may otherwise direct.

Upon any sale or other disposition of the Collateral by the Agents (including pursuant to a power of sale granted by statute or under a judicial proceeding), the receipt of the purchase money by the Agents or of the officer making the sale or other disposition shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold or otherwise disposed

125

of and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to the Agents or such officer or be answerable in any way for the misapplication thereof.  All amounts required to be applied to Loans hereunder (other than Swingline Loans) shall be applied ratably in accordance with each Lender's Commitment Percentage.

## ARTICLE VIII
### The Agents

SECTION 8.01. Administration by Administrative Agent.

(a)      Each Lender, the Collateral Agent and the Issuing Bank hereby irrevocably designate Bank of America as Administrative Agent under this Agreement and the other Loan Documents.  The general administration of the Loan Documents shall be by the Administrative Agent. The Lenders, the Collateral Agent and the Issuing Bank each hereby irrevocably authorizes the Administrative Agent (i) to enter into the Loan Documents to which it is a party and (ii) at its discretion, to take or refrain from taking such actions as agent on its behalf and to exercise or refrain from exercising such powers under the Loan Documents and the Notes as are delegated by the terms hereof or thereof, as appropriate, together with all powers reasonably incidental thereto. The Administrative Agent shall have no duties or responsibilities except as set forth in this Agreement and the remaining Loan Documents, nor shall it have any fiduciary relationship with any Lender, and no implied covenants, responsibilities, duties, obligations, or liabilities shall be read into the Loan Documents or otherwise exist against the Administrative Agent.

(b)      Each Lender, the Issuing Bank and each Secured Party that is owed any Canadian Liabilities hereby irrevocably designate Bank of America, N.A. (acting through its Canada branch) as the Canadian Agent under this Agreement and the other Loan Documents. The general administration of the Loan Documents with respect to the Canadian Borrower shall be by the Canadian Agent. The Lenders, the Issuing Bank and each Secured Party that is owed any Canadian Liabilities each hereby irrevocably authorizes the Canadian Agent (i) to enter into the Loan Documents to which it is a party and (ii) at its discretion, to take or refrain from taking such actions as agent on its behalf and to exercise or refrain from exercising such powers under the Loan Documents and the Notes as are delegated by the terms hereof or thereof, as appropriate, together with all powers reasonably incidental thereto. The Canadian Agent shall have no duties or responsibilities except as set forth in this Agreement and the remaining Loan Documents, nor shall it have any fiduciary relationship with any such Secured Party, and no implied covenants, responsibilities, duties, obligations, or liabilities shall be read into the Loan Documents or otherwise exist against the Canadian Agent.

SECTION 8.02. The Collateral Agent.

(a)     Each Lender, the Administrative Agent and the Issuing Bank hereby irrevocably ( i) designate Bank of America as Collateral Agent under this Agreement and the other Loan Documents, (ii) authorize the Collateral Agent to enter into the Collateral Documents and the other Loan Documents to which it is a party and to perform its duties and obligations thereunder, together with all powers reasonably incidental thereto, and (iii) agree and consent to all of the provisions of the Security Documents. All Collateral shall be held or administered by the Collateral Agent (or its duly-appointed agent) for its benefit and for the ratable benefit of the other Secured Parties. Any proceeds received by the Collateral Agent from the foreclosure, sale, lease or other disposition of any of the Collateral and any other proceeds received pursuant to the terms of the Security Documents or the other Loan Documents shall be paid over to the Administrative Agent for application as provided in Section 2.20, Section 2.24 or Section 7.04, as applicable. The Collateral Agent shall have no duties or responsibilities except as set forth in this Agreement and the remaining Loan Documents, nor shall it have any fiduciary relationship with any Lender, and no implied covenants, responsibilities, duties, obligations, or liabilities shall be read into the Loan Documents or otherwise exist against the Collateral Agent.

(b)     Each Lender, the Issuing Bank and each Secured Party that is owed any Canadian Liabilities hereby irrevocably designate Bank of America, N.A. (acting through its Canada branch) as the Canadian Agent under this Agreement and the other Loan Documents with respect to the Collateral hypothecated and granted as security by the Canadian Borrower. The Lenders, the Issuing Bank and each Secured Party that is owed any Canadian Liabilities each hereby irrevocably authorizes the Canadian Agent (i) to enter into the Security Documents to which it is a party and to perform its duties and obligations thereunder, together with all powers reasonably incidental thereto, and (ii) agree and consent to all of the provisions of the Security Documents. All Collateral from the Canadian Borrower shall be held or administered by the Canadian Agent (or its duly-appointed agent) for its benefit and for the ratable benefit of the other Secured Parties who are owed any Canadian Liabilities. Any proceeds received by the Canadian Agent from the foreclosure, sale, lease or other disposition of any of the Collateral from the Canadian Borrower and any other proceeds received pursuant to the terms of the Security Documents or the other Loan Documents from the Canadian Borrower shall be applied as provided in Section 2.20, Section 2.24 or Section 7.04, as applicable. The Canadian Agent shall have no duties or responsibilities except as set forth in this Agreement and the remaining Loan Documents, nor shall it have any fiduciary relationship with any Lender, and no implied covenants, responsibilities, duties, obligations, or liabilities shall be read into the Loan Documents or otherwise exist against the Canadian Agent.

(c)     Without limiting the generality of the foregoing, for the purposes of creating a *solidarité active* in accordance with article 1541 of the Civil Code of Québec between each Secured Party that is owed any Obligations, including the Canadian Liabilities, taken individually, on the one hand, and the Canadian Agent, on the other hand, each of the Canadian Loan Parties and each such Secured Party acknowledge and agree with the Canadian Agent that

127

EXECUTION VERSION

such Secured Party and the Canadian Agent are hereby conferred the legal status of solidary creditors of the Canadian Loan Parties in respect of all Obligations and Canadian Liabilities, present and future, owed by the Canadian Loan Parties to each such Secured Party and the Canadian Agent (collectively, for the purposes of this paragraph, the "solidary claim"). Accordingly, but subject (for the avoidance of doubt) to article 1542 of the Civil Code of Québec, the Canadian Loan Parties are irrevocably bound towards the Canadian Agent and each such Secured Party in respect of the entire solidary claim of the Canadian Agent and such Secured Party. As a result of the foregoing, the Canadian Borrower confirms and agrees that subject to subparagraph (b) above, the rights of the Canadian Agent and each of its Secured Parties who are owed the Obligations, including the Canadian Liabilities, from time to time a party to this Agreement by way of assignment or otherwise are solidary and as regards the Obligations and the Canadian Liabilities owing from time to time to each such Secured Party, each of the Canadian Agent and such Secured Party is entitled, when permitted pursuant to Section 7.02 to: (i) demand payment of all outstanding amounts from time to time in respect of the Obligations, including the Canadian Liabilities; (ii) exact the whole performance of such Obligations and Canadian Liabilities from the Canadian Borrower; (iii) benefit from the Canadian Agent's Liens and the Collateral in respect of such Obligations and Canadian Liabilities; (iv) give a full acquittance of such Obligations and Canadian Liabilities (each Secured Party that is owed Obligations, including Canadian Liabilities, hereby agreeing to be bound by any such acquittance); and (v) exercise all rights and recourses under the Loan Documents with respect to the Obligations and the Canadian Liabilities. The Obligations, including the Canadian Liabilities of the Canadian Borrower, will be secured by the Canadian Agent's Liens and the Collateral and the Canadian Agent and the Secured Parties who are owed Obligations, including the Canadian Liabilities, will have a solidary interest therein.

SECTION 8.03. <u>Sharing of Excess Payments.</u>

Each of the Lenders, the Agents and the Issuing Bank agrees that if it shall, through the exercise of a right of banker's lien, setoff or counterclaim against the Loan Parties, including, but not limited to, a secured claim under Section 506 of the Bankruptcy Code or other security or interest arising from, or in lieu of, such secured claim and received by such Lender, any Agent or the Issuing Bank under any applicable bankruptcy, insolvency or other similar law, or otherwise, obtain payment in respect of the Obligations owed it (an "excess payment") as a result of which such Lender, such Agent or the Issuing Bank has received payment of any Loans or other Obligations outstanding to it in excess of the amount that it would have received if all payments at any time applied to the Loans and other Obligations had been applied in the order of priority set forth in Section 7.04, then such Lender, Agent or the Issuing Bank shall promptly purchase at par (and shall be deemed to have thereupon purchased) from the other Lenders, such Agent and the Issuing Bank, as applicable, a participation in the Loans and Obligations outstanding to such other Persons, in an amount determined by the Administrative Agent in good faith as the amount necessary to ensure that the economic benefit of such excess payment is reallocated in such

128

EXECUTION VERSION

manner as to cause such excess payment and all other payments at any time applied to the Loans and other Obligations to be effectively applied in the order of priority set forth in Section 7.04 pro rata in proportion to its Commitment Percentages, Domestic Commitment Percentages, or Canadian Commitment Percentages, as applicable; provided, that if any such excess payment is thereafter recovered or otherwise set aside such purchase of participations shall be correspondingly rescinded (without interest). The Loan Parties expressly consent to the foregoing arrangements and agree that any Lender, any Agent or the Issuing Bank holding (or deemed to be holding) a participation in any Loan or other Obligation may exercise any and all rights of banker's lien, setoff or counterclaim with respect to any and all moneys owing by such Loan Party to such Lender, such Agent or the Issuing Bank as fully as if such Lender, Agent or the Issuing Bank held a Note and was the original obligee thereon, in the amount of such participation.

SECTION 8.04. Agreement of Required Lenders.

(a)     Upon any occasion requiring or permitting an approval, consent, waiver, election or other action on the part of only the Required Lenders, action shall be taken by the Administrative Agent or the Canadian Agent, as applicable, for and on behalf or for the benefit of all Lenders upon the direction of the Required Lenders, and any such action shall be binding on all Lenders, and (ii) upon any occasion requiring or permitting an approval, consent, waiver, election or other action on the part of the Required Supermajority Lenders, action shall be taken by the Administrative Agent or the Canadian Agent, as applicable, for and on behalf or for the benefit of all Lenders upon the direction of the Required Supermajority Lenders and any such action shall be binding on all Lenders. No amendment, modification, consent, or waiver shall be effective except in accordance with the provisions of Section 9.02. Without limiting the foregoing, upon the approval by the Required Lenders of the provisions of the Intercreditor Agreement in accordance with the Section 5.15(c) hereof, the Lenders hereby authorize the Administrative Agent and the Canadian Agent to execute such Intercreditor Agreement and agree that the terms thereof shall be binding upon all Lenders.

(b)     Upon the occurrence of an Event of Default, the Administrative Agent shall (subject to the provisions of Section 9.02) take such action with respect thereto as may be reasonably directed by the Required Lenders; provided that unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action as it shall deem advisable in the best interests of the Lenders. In no event shall the Administrative Agent be required to comply with any such directions to the extent that the Administrative Agent believes that its compliance with such directions would be unlawful.

SECTION 8.05. Liability of Agents.

129

EXECUTION VERSION

(a)      Each of the Agents, when acting on behalf of the Lenders and the Issuing Bank, may execute any of its respective duties under this Agreement by or through any of its respective officers, agents and employees, and none of the Agents nor their respective directors, officers, agents or employees shall be liable to the Lenders or the Issuing Bank or any of them for any action taken or omitted to be taken in good faith, or be responsible to the Lenders or the Issuing Bank or to any of them for the consequences of any oversight or error of judgment, or for any loss, except to the extent of any liability imposed by law by reason of such Agent's own gross negligence or willful misconduct. The Agents and their respective directors, officers, agents and employees shall in no event be liable to the Lenders or the Issuing Bank or to any of them for any action taken or omitted to be taken by them pursuant to instructions received by them from the Required Lenders, or Required Supermajority Lenders, as applicable, or in reliance upon the advice of counsel selected by it. Without limiting the foregoing, none of the Agents, nor any of their respective directors, officers, employees, or agents (A) shall be responsible to any Lender or the Issuing Bank for the due execution, validity, genuineness, effectiveness, sufficiency, opposability or enforceability of, or for any recital, statement, warranty or representation in, this Agreement, any Loan Document or any related agreement, document or order, or (B) shall be required to ascertain or to make any inquiry concerning the performance or observance by any Loan Party of any of the terms, conditions, covenants, or agreements of this Agreement or any of the Loan Documents, or (C) shall be responsible to any Lender or the Issuing Bank for the state or condition of any properties of the Loan Parties or any other obligor hereunder constituting Collateral for the Obligations of the Loan Parties hereunder or with respect to the Other Liabilities, or any information contained in the books or records of the Loan Parties; or (D) shall be responsible to any Lender or the Issuing Bank for the validity, enforceability, collectibility, effectiveness or genuineness of this Agreement or any other Loan Document or any other certificate, document or instrument furnished in connection therewith; or (E) shall be responsible to any Lender or the Issuing Bank for the validity, priority, opposability or perfection of any Lien securing or purporting to secure the Obligations or the Other Liabilities or the value or sufficiency of any of the Collateral.

(b)      The Agents may execute any of their duties under this Agreement or any other Loan Document by or through any of their Affiliates, branches or their agents or attorneys-in-fact, and shall be entitled to the advice of counsel concerning all matters pertaining to its rights and duties hereunder or under the Loan Documents.  The Agents shall not be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by them with reasonable care.

(c)      None of the Agents nor any of their respective directors, officers, employees, or agents shall have any responsibility to the Loan Parties on account of the failure or delay in performance or breach by any Lender (other than by the Agent in its capacity as a Lender) or the Issuing Bank of any of their respective obligations under this Agreement or the Notes or any of the Loan Documents or in connection herewith or therewith.

130

(d)     The Agents shall be entitled to rely, and shall be fully protected in relying, upon any notice, consent, certificate, affidavit, or other document or writing believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper person or persons, and upon the advice and statements of legal counsel (including, without, limitation, counsel to the Borrowers), independent accountants and other experts selected by the Administrative Agent. The Agents shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless they shall first receive such advice or concurrence of the Required Lenders as they deem appropriate or they shall first be indemnified to their satisfaction by the Lenders against any and all liability and expense which may be incurred by them by reason of the taking or failing to take any such action.

SECTION 8.06. <u>Notice of Default.</u>  The Agents shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless the Agents have actual knowledge of the same or have received notice from a Lender or the Borrowers referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that the Agents obtain such actual knowledge or receives such a notice, the Agents shall give prompt notice thereof to each of the Lenders. The Administrative Agent and the Canadian Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders. Unless and until the Administrative Agent or the Canadian Agent shall have received such direction, the Administrative Agent and the Canadian Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to any such Default or Event of Default as they shall deem advisable in the best interest of the Lenders.

SECTION 8.07. <u>Lenders' Credit Decisions.</u>  Each Lender acknowledges that it has, independently and without reliance upon the Agents or any other Lender, and based on the financial statements prepared by the Borrowers and such other documents and information as it has deemed appropriate, made its own credit analysis and investigation into the business, assets, operations, property, and financial and other condition of the Loan Parties and has made its own decision to enter into this Agreement and the other Loan Documents. Each Lender also acknowledges that it will, independently and without reliance upon the Agents or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in determining whether or not conditions precedent to closing any Loan hereunder have been satisfied and in taking or not taking any action under this Agreement and the other Loan Documents.

SECTION 8.08. <u>Reimbursement and Indemnification.</u>

Each Lender agrees (i) to reimburse (x) each Agent for such Lender's Commitment Percentage of any expenses and fees incurred by each such Agent for the benefit of the Lenders or the Issuing Bank under this Agreement, the Notes and any of the Loan Documents, including,

131

EXECUTION VERSION

without limitation, counsel fees and compensation of agents and employees paid for services rendered on behalf of the Lenders or the Issuing Bank, and any other expense incurred in connection with the operations or enforcement thereof not reimbursed by the Borrowers and (y) each Agent for such Lender's Commitment Percentage of any expenses of such Agent incurred for the benefit of the Lenders or the Issuing Bank that the Borrowers have agreed to reimburse pursuant to Section 9.03 and has failed to so reimburse and (ii) to indemnify and hold harmless the Agents, the Co-Collateral Agent, and any of their directors, officers, employees, or agents, on demand, in the amount of such Lender's Commitment Percentage, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against it or any of them in their capacity as such agent and in any way relating to or arising out of this Agreement, the Notes or any of the Loan Documents or any action taken or omitted by it or any of them under this Agreement, the Notes or any of the Loan Documents to the extent not reimbursed by the Borrowers (except such as shall result from their respective gross negligence or willful misconduct).  The provisions of this Section 8.08 shall survive the repayment of the Obligations and the Other Liabilities and the termination of the Commitments.

SECTION 8.09.  Rights of Agents.

It is understood and agreed that Bank of America, Bank of America, N.A. (acting through its Canada branch) and the Co-Collateral Agent shall have the same rights and powers hereunder (including the right to give such instructions) as the other Lenders and may exercise such rights and powers, as well as their rights and powers under other agreements and instruments to which they are or may be party, and engage in other transactions with the Loan Parties, as though they were not an agent of the Lenders under this Agreement.  Without limiting the foregoing, the Agents, and the Co-Collateral Agent and their Affiliates may accept deposits from, lend money to, and generally engage in any kind of commercial or investment banking, trust, advisory or other business with the Loan Parties and their Subsidiaries and Affiliates as if they were not an agent hereunder.

SECTION 8.10.  Notice of Transfer.

The Agents may deem and treat a Lender party to this Agreement as the owner of such Lender's portion of the Loans for all purposes, unless and until, and except to the extent, an Assignment and Assumption shall have become effective as set forth in Section 9.05(b).

SECTION 8.11.  Successor Agent.

Any Agent may resign at any time by giving fifteen (15) Business Days' written notice thereof to the Lenders, the Issuing Bank, the other Agents and the Lead Borrower. Upon any such resignation of any Agent, the Required Lenders shall have the right to appoint a successor

132

Agent, which so long as there is no Event of Default shall be reasonably satisfactory to the Lead Borrower (whose consent shall not be unreasonably withheld or delayed). If no successor Agent shall have been so appointed by the Required Lenders and shall have accepted such appointment, within 30 days after the retiring Agent's giving of notice of resignation, the retiring Agent may, on behalf of the Lenders, the other Agents and the Issuing Bank, appoint a successor Agent which shall be (i) with respect to the Administrative Agent or the Collateral Agent, any Lender hereunder (or Affiliate thereof) or a commercial bank (or Affiliate thereof) organized under the laws of the United States of America or of any State thereof and having a combined capital and surplus of at least $100,000,000, (ii) with respect to the Canadian Agent, any Lender hereunder (or Affiliate thereof) or a commercial bank or institutional lender (or branch or Affiliate thereof) resident in Canada (for purposes of the Income Tax Act (Canada) or otherwise not subject to withholding taxes on any interest paid by a resident of Canada) and having a combined capital and surplus of at least $100,000,000 or (iii) in either case, a Person capable of complying with all of the duties of such Agent (and the Issuing Bank), hereunder (in the opinion of the retiring Agent and as certified to the Lenders in writing by such successor Agent) which, in the case of (i), (ii) or (iii) above, so long as there is no Event of Default shall be reasonably satisfactory to the Lead Borrower (whose consent shall not be unreasonably withheld or delayed). Upon the acceptance of any appointment as Agent by a successor Agent, such successor Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent and the retiring Agent shall be discharged from its duties and obligations under this Agreement. After any retiring Agent's resignation hereunder as such Agent, the provisions of this Article VIII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was such Agent under this Agreement.

SECTION 8.12. <u>Reports and Financial Statements.</u>

(a)    Promptly after receipt thereof from the Borrowers, the Administrative Agent shall remit to each Lender copies of all financial statements and Borrowing Base Certificates required to be delivered by the Borrowers hereunder and all commercial finance examinations and appraisals of the Collateral received by the Administrative Agent.

(b)    By signing this Agreement, each Lender:

(i)    agrees to furnish the Administrative Agent at such frequency as the Administrative Agent may reasonably request with a summary of all Other Liabilities due or to become due to such Lender.  In connection with any distributions to be made hereunder, the Administrative Agent shall be entitled to assume that no amounts are due to any Lender on account of Other Liabilities unless the Administrative Agent has received written notice thereof from such Lender;

133

EXECUTION VERSION

(ii)    is deemed to have requested that the Administrative Agent furnish such Lender, promptly after they become available, copies of all financial statements and Borrowing Base Certificates required to be delivered by the Lead Borrower hereunder and all commercial finance examinations and appraisals of the Collateral received by the Administrative Agent (collectively, the "Reports");

(iii)   expressly agrees and acknowledges that the Agents make no representation or warranty as to the accuracy of the Reports, and shall not be liable for any information contained in any Report;

(iv)    expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that the Agents, the Co-Collateral Agent or any other party performing any audit or examination will inspect only specific information regarding the Loan Parties and will rely significantly upon the Loan Parties' books and records, as well as on representations of the Loan Parties' personnel;

(v)     agrees to keep all Reports confidential in accordance with the provisions of Section 9.15 hereof; and

(vi)    without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold the Agents, the Co-Collateral Agent and any such other Lender preparing a Report harmless from any action the indemnifying Lender may take or conclusion the indemnifying Lender may reach or draw from any Report in connection with any Credit Extensions that the indemnifying Lender has made or may make to the Borrowers, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a Loan or Loans; and (ii) to pay and protect, and indemnify, defend, and hold the Agents, the Co-Collateral Agent and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including attorney costs) incurred by the Agents, the Co-Collateral Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

SECTION 8.13. Delinquent Lender. If for any reason any Lender shall fail or refuse to abide by its obligations under this Agreement, including without limitation its obligation to make available to Administrative Agent or the Canadian Agent its pro rata share of any Revolving Loans, expenses or setoff or purchase its pro rata share of a participation interest in the Swingline Loans (a "Delinquent Lender") and such failure is not cured within two (2) Business Days of receipt from the Administrative Agent or the Canadian Agent of written notice thereof,

134

then, in addition to the rights and remedies that may be available to Agents, other Lenders, the Borrowers or any other party at law or in equity, and not at limitation thereof, (i) such Delinquent Lender's right to participate in the administration of, or decision-making rights related to, the Loans, this Agreement or the other Loan Documents shall be suspended during the pendency of such failure or refusal, and (ii) a Delinquent Lender shall be deemed to have assigned any and all payments due to it from the Borrowers, whether on account of outstanding Loans, interest, fees or otherwise, to the remaining non-delinquent Lenders for application to, and reduction of, their proportionate shares of all outstanding Loans until, as a result of application of such assigned payments the Lenders' respective pro rata shares of all outstanding Loans shall have returned to those in effect immediately prior to such delinquency and without giving effect to the nonpayment causing such delinquency. The Delinquent Lender's decision-making and participation rights and rights to payments as set forth in clauses (i) and (ii) hereinabove shall be restored only upon the payment by the Delinquent Lender of its pro rata share of any Loans, any participation obligation, or expenses as to which it is delinquent, together with interest thereon at the rate set forth in Section 2.12 hereof from the date when originally due until the date upon which any such amounts are actually paid.

The non-delinquent Lenders shall also have the right, but not the obligation, in their respective, sole and absolute discretion, to acquire for no cash consideration, (pro rata, based on the respective Commitments of those Lenders electing to exercise such right) the Delinquent Lender's Commitment to fund future Loans (the "Delinquent Lender's Future Commitment"). Upon any such purchase of the pro rata share of any Delinquent Lender's Future Commitment, the Delinquent Lender's share in future Loans and its rights under the Loan Documents with respect thereto shall terminate on the date of purchase, and the Delinquent Lender shall promptly execute all documents reasonably requested to surrender and transfer such interest, including, if so requested, an Assignment and Assumption. Each Delinquent Lender shall indemnify the Agents and each non-delinquent Lender from and against any and all loss, damage or expenses, including but not limited to reasonable attorneys' fees and funds advanced by any Agent or by any non-delinquent Lender, on account of a Delinquent Lender's failure to timely fund its pro rata share of a Loan or to otherwise perform its obligations under the Loan Documents.

SECTION 8.14. Collateral and Guaranty Matters. The Lenders irrevocably authorize the Administrative Agent and the Canadian Agent, at their option and in their discretion,

(a)     to release and discharge any Lien on any property granted to or held by the Collateral Agent or the Canadian Agent, as applicable, under any Loan Document (i) upon termination of the Commitments and payment in full of all Obligations (other than contingent indemnification obligations for which no claim has been asserted) and the expiration or termination of all Letters of Credit, (ii) that is sold or to be sold as part of or in connection with any sale permitted hereunder or under any other Loan Document, or

135