EXECUTION VERSION

(iii) if approved, authorized or ratified in writing by the Required Lenders in accordance with Section 9.02;

      (b)    to subordinate any Obligations or any Lien on any property granted to or held by the Collateral Agent or the Canadian Agent, as applicable, under any Loan Document to the holder of any Lien on such property to the extent otherwise permitted hereunder; and

      (c)    to release any Guarantor from its obligations under the Facility Guaranty if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder.

Upon request by any Agent at any time, the Required Lenders will confirm in writing such Agent's authority to release, discharge or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Facility Guaranty pursuant to this Section 8.14. In each case as specified in this Section 8.14, the Collateral Agent will, at the Loan Parties' expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release and discharge of such item of Collateral from the assignment, security interest or other Lien granted under the Security Documents or to subordinate its interest in such item, or to release such Guarantor from its obligations under the Facility Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 8.14.

SECTION 8.15. Agency for Perfection.

Each Lender hereby appoints each other Lender as agent for the purpose of perfecting Liens for the benefit of the Agents and the Lenders, in assets which, in accordance with Article 9 of the UCC, the PPSA or any other Applicable Law of the United States or Canada (or its provinces or territories) can be perfected only by possession. Should any Lender (other than the Agents) obtain possession of any such Collateral, such Lender shall notify the Administrative Agent thereof, and, promptly upon the Administrative Agent's or Canadian Agent's request therefor shall deliver such Collateral to the Collateral Agent or the Canadian Agent, as applicable, or otherwise deal with such Collateral in accordance with the Collateral Agent's or the Canadian Agent's, as applicable, instructions.

SECTION 8.16. Intentionally Omitted.

SECTION 8.17. Syndication Agent, Documentation Agents, and Arranger.
Notwithstanding the provisions of this Agreement or any of the other Loan Documents, except as expressly provided in this Agreement, the Syndication Agent, the Documentation Agents, and the Arranger shall have no powers, rights, duties, responsibilities or liabilities with respect to this Agreement and the other Loan Documents.

136

EXECUTION VERSION

SECTION 8.18. Co-Collateral Agent Rights.

Notwithstanding anything to the contrary contained in this Agreement or any other Loan Documents:

(a)     In the event that the Administrative Agent and the Co-Collateral Agent do not agree on the establishment or amount of Reserves to be imposed in the Borrowing Base, the Administrative Agent shall nevertheless undertake such action with respect thereto as the Co-Collateral Agent may request (as long as such action is permitted under this Agreement); provided that the amount of Reserves established or increased by the Co-Collateral Agent may not exceed $35,000,000 in the aggregate at any time outstanding.  Except as set forth in the proviso hereto, in no event shall the Co-Collateral Agent have any right to approve the exercise of or limit the discretion of the Administrative Agent to establish, change or reduce Reserves as the Administrative Agent determines; provided that Administrative Agent may not, without the prior consent of the Co-Collateral Agent, change the methodology employed by the Administrative Agent as of the Closing Date in establishing or calculating the amount of Reserves if such change would increase the amount of credit available as Revolving Loans or Letters of Credit hereunder.

(b)     The Administrative Agent agrees that (a) all commercial finance examinations shall be undertaken by Spain, Price, Reader & Thompson, P.C. and (b) all inventory appraisals shall be undertaken by Gordon Brothers or Hilco Merchant Resources, LLC or any of their Affiliates.  In the event that the Administrative Agent determines to engage any other Person for those purposes, such Person shall be subject to the approval of the Co-Collateral Agent, which approval shall not be unreasonably withheld.

(c)     The Administrative Agent agrees that if the Co-Collateral Agent so requests, the Administrative Agent shall cause inventory appraisals and/or commercial finance examinations to be undertaken at the Loan Parties' expense to the extent permitted in Section 5.09(b).

ARTICLE IX
Miscellaneous

SECTION 9.01. Notices. Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(i)     if to any Loan Party, to it at Circuit City Stores, Inc., 9954 Mayland Drive, Richmond, Virginia 23233, Attention: Treasurer and General

137

EXECUTION VERSION

Counsel, (Telecopy No. (804) 527-4113), with a copy to Kirkland & Ellis LLP, 200 East Randolph Drive, Chicago, Illinois 60601-6636, Attention: Linda K. Myers, P.C. (Telecopy No. (312) 861-2200);

(ii)     if to any Agent, or the Swingline Lender, to Bank of America, N.A., 100 Federal Street, Boston, Massachusetts 02110, Attention: Kathleen Dimock (Telecopy No. (617) 434-4312), with a copy to Riemer & Braunstein LLP, Three Center Plaza, Boston, Massachusetts 02108, Attention: David S. Berman, Esquire (Telecopy No. (617) 880-3456); and

(iii)    if to any other Lender, to it at its address (or telecopy number) set forth on the signature pages hereto or on any Assignment and Assumption for such Lender.

Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto. All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

(b)     Notices and other communications to the Lenders and the Issuing Banks hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, provided that the foregoing shall not apply to notices to any Lender or the Issuing Bank pursuant to Article II if such Lender or the Issuing Bank, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Lead Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

(c)     THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall the Agents or any of their Related Parties (collectively, the "Agent Parties") have any liability to any Loan Party, any

138

EXECUTION VERSION

Lender, the Issuing Bank or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Loan Parties' or any Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence, bad faith, or willful misconduct or breach of the contractual obligations of such Agent Party; provided, however, that in no event shall any Agent Party have any liability to any Loan Party, any Lender, the Issuing Bank or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

SECTION 9.02. Waivers; Amendments.

(a)     No failure or delay by the Agents, the Issuing Bank or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Agents, the Issuing Bank and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default, regardless of whether the Agents, any Lender or the Issuing Bank may have had notice or knowledge of such Default at the time.

(b)     Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrowers and the Required Lenders or, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent and the Loan Parties that are parties thereto, in each case with the consent of the Required Lenders, provided that, any amendment relating solely to the Canadian Liabilities may be made with the consent of the Canadian Agent and the requisite Canadian Lenders only, and further provided that no such agreement shall (i) increase the Total Commitments without the written consent of each Lender or increase the Commitment, Domestic Commitment or Canadian Commitment of any Lender without the written consent of such Lender, (ii) reduce the principal amount of any Loan or L/C Disbursement or reduce the rate of interest thereon, or reduce any fees payable hereunder, without the written consent of each Lender affected thereby (other than waiver of the accrual of interest at the default rate or the waiver of any Default or Event of Default hereunder), (iii)

139

postpone the scheduled date of payment of the principal amount of any Loan or L/C Disbursement, or any interest thereon, or any fees payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of the Commitments or the Maturity Date, without the written consent of each Lender affected thereby, (iv) change Section 2.23, or Section 2.24 or Section 7.04, without the written consent of each Lender, (v) change any of the provisions of this Section 9.02 or the definition of the term "Required Lenders" or "Required Supermajority Lenders" or any other provision of any Loan Document specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender, (vi) except as otherwise permitted hereunder, release any Loan Party from its obligations under any Loan Document, or limit its liability in respect of such Loan Document, without the written consent of each Lender, (vii) except for sales described in Section 6.05, release any material portion of the Collateral from the Liens of the Security Documents, without the written consent of each Lender, provided however that the release of a material portion of the Collateral granted by the Canadian Borrower shall require the consent of all of the Lenders having Canadian Commitments, (viii) change the definition of the term "Borrowing Base" or any component definition thereof if as a result thereof the amounts available to be borrowed by the Borrowers would be increased, without the written consent of each Lender, provided that the foregoing shall not limit the discretion of each Agent, or, to the extent permitted in this Agreement, the Co-Collateral Agent, to change, establish or eliminate any Reserves, (ix) modify the definition of Permitted Overadvance so as to increase the amount thereof or, except as provided in such definition, the time period for a Permitted Overadvance, without the written consent of each Lender, (x) subordinate the Obligations hereunder, the Other Liabilities, or the Liens granted hereunder or under the other Loan Documents, to any other Indebtedness or Lien (other than as contemplated in the Intercreditor Agreement with respect to the Term Loan and the Lien securing the Term Loan, which may be subordinated with consent of the Required Lenders), as the case may be without the prior written consent of each Lender, (xi) change the definition of the term "Canadian Availability" or any component definition thereof if as a result thereof the amounts available to be borrowed by the Canadian Borrower would be increased, without the consent of each Canadian Lender, and provided further that no such agreement shall amend, modify or otherwise affect the rights or duties of the Agents or the Issuing Bank without the prior written consent of the Agents or the Issuing Bank, as the case may be.

(c)     Notwithstanding anything to the contrary contained herein, no modification, amendment or waiver which increases the maximum amount of the Swingline Loans to the Domestic Borrowers to an amount in excess of $60,000,000 or increases the maximum amount of the Swingline Loans to the Canadian Borrower to an amount in excess of $10,000,000 (or, in each case, such greater amount to which such limit has been previously increased in accordance with the provisions of this Section 9.02(c)) shall be made without the written consent of the Required Supermajority Lenders.

140

EXECUTION VERSION

(d)    Notwithstanding anything to the contrary contained in this Section 9.02, in the event that the Borrowers request that this Agreement or any other Loan Document be modified, amended or waived in a manner which would require the consent of the Lenders pursuant to Section 9.02(b) or Section 9.02(c) and such amendment is approved by the Required Lenders, but not by the requisite percentage of the Lenders, the Borrowers, and the Required Lenders shall be permitted, within ninety (90) days thereafter, to amend this Agreement without the consent of the Lender or Lenders which did not agree to the modification or amendment requested by the Borrowers (such Lender or Lenders, collectively the "Minority Lenders") to provide for (w) the termination of the Commitment, Domestic Commitment and Canadian Commitment of each of the Minority Lenders, (x) the addition to this Agreement of one or more other financial institutions, or an increase in the Commitment, Domestic Commitment and Canadian Commitment of one or more of the Required Lenders, so that the aggregate Commitments, Domestic Commitments and Canadian Commitments, after giving effect to such amendment shall be in the same amount as the aggregate Commitments, Domestic Commitments and Canadian Commitments immediately before giving effect to such amendment, (y) if any Loans are outstanding at the time of such amendment, the making of such additional Loans by such new or increasing Lender or Lenders, as the case may be, as may be necessary to repay in full the outstanding Loans (including principal, interest, and fees) of the Minority Lenders immediately before giving effect to such amendment and (z) such other modifications to this Agreement or the Loan Documents as may be appropriate and incidental to the foregoing.

(e)    No notice to or demand on any Loan Party shall entitle any Loan Party to any other or further notice or demand in the same, similar or other circumstances. Each holder of a Note shall be bound by any amendment, modification, waiver or consent authorized as provided herein, whether or not a Note shall have been marked to indicate such amendment, modification, waiver or consent and any consent by a Lender, or any holder of a Note, shall bind any Person subsequently acquiring a Note, whether or not a Note is so marked. No amendment to this Agreement shall be effective against the Borrowers unless signed by the Borrowers.

SECTION 9.03. Expenses; Indemnity; Damage Waiver.

(a)    The Loan Parties shall jointly and severally pay (i) all reasonable out-of-pocket expenses incurred by the Administrative Agent, the Collateral Agent, the Canadian Agent, the Co-Collateral Agent and their Affiliates, including the reasonable fees, charges and disbursements of counsel for the Administrative Agent, the Canadian Agent and the Co-Collateral Agent, outside consultants for the Administrative Agent and the Canadian Agent, appraisers, and for commercial finance examinations, in connection with the arrangement of the credit facilities provided for herein, the preparation and administration of the Loan Documents or any amendments, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all reasonable out-of-pocket expenses incurred by the Issuing Bank in connection with the issuance, amendment,

141

EXECUTION VERSION

renewal or extension of any Letter of Credit or any demand for payment thereunder, and (iii) subject to the limitations set forth in Section 5.09(b), all reasonable out-of-pocket expenses incurred by the Administrative Agent, the Collateral Agent, the Canadian Agent, the Co-Collateral Agent, the Issuing Bank or any Lender, including the reasonable fees, charges and disbursements of any counsel and any outside consultants for the Administrative Agent, the Canadian Agent, the Issuing Bank or any Lender, for appraisers, commercial finance examinations, and environmental site assessments, in connection with the enforcement or protection of its rights in connection with the Loan Documents, including its rights under this Section, or in connection with the Loans made or Letters of Credit issued hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans or Letters of Credit; *provided that* the Lenders who are not the Administrative Agent, the Canadian Agent, the Co-Collateral Agent or the Issuing Bank shall be entitled to reimbursement for no more than one counsel representing all such Lenders.

(b)     The Loan Parties shall, jointly and severally, indemnify the Administrative Agent, the Co-Collateral Agent, the Canadian Agent, the Arranger, the Issuing Bank and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the reasonable and documented fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of any Loan Document or any other agreement or instrument contemplated hereby, the performance by the parties to the Loan Documents of their respective obligations thereunder or the consummation of the transactions contemplated by the Loan Documents or any other transactions contemplated hereby, (ii) any Loan or Letter of Credit or the use of the proceeds therefrom (including any refusal by the Issuing Bank to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), (iii) any actual or alleged presence or release of Hazardous Materials on or from any property currently or formerly owned or operated by any Loan Party or any of the Subsidiaries, or any Environmental Liability related in any way to any Loan Party or any of the Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto, provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses resulted from the gross negligence, bad faith, or breach of the contractual obligations of such Indemnitee or any Affiliate of such Indemnitee (or of any officer, director, employee, advisor or agent of such Indemnitee or any such Indemnitee's Affiliates), or with respect to a claim by one Indemnitee against another Indemnitee.

(c)     To the extent that any Loan Party fails to pay any amount required to be paid by it to the Administrative Agent, the Collateral Agent, the Canadian Agent or the Issuing

142

EXECUTION VERSION

Bank under paragraph (a) or (b) of this Section, each Lender severally agrees to pay to such Agents or the Issuing Bank, as the case may be, such Lender's Commitment Percentage of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against such Agents or the Issuing Bank.

(d)    To the extent permitted by Applicable Law, no Loan Party shall assert, and each hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the transactions contemplated by the Loan Documents, any Loan or Letter of Credit or the use of the proceeds thereof.

(e)    All amounts due under this Section shall be payable promptly after written demand (including documentation reasonably supporting such request) therefor.

SECTION 9.04. Designation of Lead Borrower as Borrowers' Agent.

(a)    Each Domestic Borrower hereby irrevocably designates and appoints the Lead Borrower as that Domestic Borrower's agent to obtain Loans and Letters of Credit hereunder, the proceeds of which shall be available to each Domestic Borrower for those uses as those set forth herein. As the disclosed principal for its agent, each Domestic Borrower shall be obligated to the Agents and each Lender on account of Loans so made and Letters of Credit so issued hereunder as if made directly by the Lenders to that Domestic Borrower, notwithstanding the manner by which such Loans and Letters of Credit are recorded on the books and records of the Lead Borrower and of any Domestic Borrower.

(b)    Each Borrower recognizes that credit available to it hereunder is in excess of and on better terms than it otherwise could obtain on and for its own account and that one of the reasons therefor is its joining in the credit facility contemplated herein with all other Borrowers. Consequently, each Borrower hereby assumes, guarantees, and agrees to discharge all Obligations and Other Liabilities and the Canadian Liabilities of all other Borrowers as if the Borrower so assuming and guarantying were each other Borrower.

(c)    The Lead Borrower shall act as a conduit for each Domestic Borrower (including itself, as a "Domestic Borrower") on whose behalf the Lead Borrower has requested a Loan.

(i)    The Lead Borrower shall cause the transfer of the proceeds of each Loan to the (those) Domestic Borrower(s) on whose behalf such Loan was

143

EXECUTION VERSION

obtained. Neither the Agents nor any Lender shall have any obligation to see to the application of such proceeds.

(ii)    If, for any reason, and at any time during the term of this Agreement,

(A)    any Domestic Borrower, including the Lead Borrower, as agent for the Domestic Borrowers, shall be unable to, or prohibited from carrying out the terms and conditions of this Agreement (as determined by the Administrative Agent in its reasonable judgment); or

(B)    the Administrative Agent, in its reasonable judgment, deems it inexpedient to continue making Loans and cause Letters of Credit to be issued to or for the account of any particular Domestic Borrower, or to channel such Loans and Letters of Credit through the Lead Borrower,

then the Lenders may make Loans directly to, and cause the issuance of Letters of Credit directly for the account of such of the Domestic Borrowers as the Administrative Agent determines to be expedient, which Loans may be made without regard to the procedures otherwise included in this Section 9.04.

(d)    In the event that the Administrative Agent determines under Section 9.04(c)(ii) to forgo the procedures included herein pursuant to which Loans and Letters of Credit are to be channeled through the Lead Borrower, then the Administrative Agent may designate one or more of the Domestic Borrowers to fulfill the financial and other reporting requirements otherwise imposed herein upon the Lead Borrower.

(e)    Each of the Borrowers shall remain jointly and severally liable to the Agents and the Lenders for the payment and performance of all Obligations and all Other Liabilities (which payment and performance shall continue to be secured by all Collateral granted by each of the Borrowers) notwithstanding any determination by the Administrative Agent under Section 9.04(c)(ii) to cease making Loans or causing Letters of Credit to be issued to or for the benefit of any Borrower.

(f)    The authority of the Lead Borrower to request Loans on behalf of, and to bind, the Domestic Borrowers, shall continue unless and until the Administrative Agent acts as provided in subparagraph (c), above, or the Administrative Agent actually receives

(i)    written notice of: (i) the termination of such authority, and (ii) the subsequent appointment of a successor Lead Borrower, which notice is signed by the respective Presidents of each Domestic Borrower (other than the President of

144

EXECUTION VERSION

the Lead Borrower being replaced) then eligible for borrowing under this Agreement; and

        (ii)    written notice from such successive Lead Borrower (i) accepting such appointment; (ii) acknowledging that such removal and appointment has been effected by the respective Presidents of such Domestic Borrowers eligible for borrowing under this Agreement; and (iii) acknowledging that from and after the date of such appointment, the newly appointed Lead Borrower shall be bound by the terms hereof, and that as used herein, the term "Lead Borrower" shall mean and include the newly appointed Lead Borrower.

SECTION 9.05. <u>Successors and Assigns.</u>

        (a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate or branch of the Issuing Bank that issues any Letter of Credit), except that no Borrower may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any such attempted assignment or transfer without such consent shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby (including any Affiliate or branch of the Issuing Bank that issues any Letter of Credit) and, to the extent expressly contemplated hereby, the Related Parties of each of the Agents, the Issuing Bank and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

        (b)    Any Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment, Domestic Commitment or Canadian Commitment and the Loans at the time owing to it), <u>provided</u> that (i) except in the case of an assignment to a Lender or an Affiliate, a Related Fund, or branch of a Lender, each of the Lead Borrower (but only if no Event of Default then exists), the Administrative Agent and the Issuing Bank must give their prior written consent to such assignment (which consent shall not be unreasonably withheld or delayed), (ii) except in the case of an assignment to a Lender or an Affiliate, a Related Fund, or branch of a Lender or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $5,000,000 unless the Administrative Agent otherwise consents, (iii) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations, (iv) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, and, after completion of the syndication of the Loans, together with a

EXECUTION VERSION

processing and recordation fee of $3,500.  Subject to acceptance and recording thereof pursuant to paragraph  (d) of this Section, from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 9.03). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (e) of this Section.

(c)     The Administrative Agent, acting for this purpose as an agent of the Borrowers, shall maintain at one of its offices in Boston, Massachusetts a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment, Domestic Commitment and Canadian Commitment of, and principal amount of the Loans and L/C Disbursements owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be presumptively correct absent manifest error and the Borrowers, the Administrative Agent, the Canadian Agent, the Issuing Bank and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Lead Borrower, the Issuing Bank and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)     Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(e)     Any Lender may, without the consent of the Borrowers, the Agents, and the Issuing Bank, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment, Domestic Commitment and Canadian Commitment, and the Loans owing to it), provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrowers, the Agents, the Issuing Bank and the

146

other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation in the Commitments, Domestic Commitments and Canadian Commitments, the Loans and the Letters of Credit Outstandings shall provide that such Lender shall retain the sole right to enforce the Loan Documents and to approve any amendment, modification or waiver of any provision of the Loan Documents, <u>provided</u> that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 9.02(b) that affects such Participant. Subject to paragraph (f) of this Section, the Borrowers agree that each Participant shall be entitled to the benefits of Section 2.25, Section 2.27 and Section 2.28 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.09 as though it were a Lender, <u>provided</u> such Participant agrees to be subject to Section 2.27(c) as though it were a Lender.

(f)    A Participant shall not be entitled to receive any greater payment under Section 2.25 or Section 2.28 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Lead Borrower's prior written consent. A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 2.28 unless (i) the Lead Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrowers, to comply with Section 2.28(e) as though it were a Lender and (ii) such Participant is eligible for exemption from the withholding tax referred to therein, following compliance with Section 2.28(e).

(g)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest, <u>provided</u> that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(h)    Notwithstanding any provision to the contrary, any Lender may assign to one or more special purpose funding vehicles (each, an "<u>SPV</u>") all or any portion of its funded Loans (without the corresponding Commitment), without the consent of any Person or the payment of a fee, by execution of a written assignment agreement in a form agreed to by such Lender and such SPV, and may grant any such SPV the option, in such SPV's sole discretion, to provide the Borrowers all or any part of any Loans that such Lender would otherwise be obligated to make pursuant to this Agreement.  Such SPVs shall have all the rights which a Lender making or holding such Loans would have under this Agreement, but no obligations. The Lender making such assignment shall remain liable for all its original obligations under this

Agreement, including its Commitment (although the unused portion thereof shall be reduced by the principal  amount of any Loans held by an SPV).  Notwithstanding such assignment, the Agents and Borrowers may deliver notices to the Lender making such assignment (as agent for the SPV) and not separately to the SPV unless the Agents and Borrowers are requested in writing by the SPV (or its agent) to deliver such notices separately to it.  The Borrowers shall, at the request of any such Lender, execute and deliver to such Person as such Lender may designate, a Note in the amount of such Lender's original Note to evidence the Loans of such Lender and related SPV.

(i)     The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any Applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

SECTION 9.06.  <u>Survival</u>.  All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans and issuance of any Letters of Credit, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Agents, the Issuing Bank or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid or any Letter of Credit is outstanding and so long as the Commitments have not expired or terminated, except as otherwise provided in the Security Agreement. The provisions of Section 2.25, Section 2.28 and Section 9.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Letters of Credit and the Commitments or the termination of this Agreement or any provision hereof.  In connection with the termination of this Agreement and the release, discharge and termination of the security interests in and Liens on the Collateral, the Administrative Agent may require from the Loan Parties such indemnities and collateral security as they shall reasonably deem necessary to protect the Secured Parties against (x) loss on account of credits previously applied to the Obligations that may subsequently be reversed or revoked, and (y) any obligations that may thereafter arise with respect to the Other Liabilities.

148

EXECUTION VERSION

SECTION 9.07. Counterparts; Integration; Effectiveness. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Agents and the Lenders and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of this Agreement by telecopy or electronic delivery shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 9.08. Severability. Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 9.09. Right of Setoff. If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates and branches are hereby authorized at any time and from time to time, to the fullest extent permitted by Applicable Law and subject to the terms of the DIP Orders and the Initial Order, to set off and apply any and all deposits (general or special, time or demand, provisional or final, but excluding deposits in trust, payroll and other escrow accounts) at any time held and other obligations at any time owing by such Lender or Affiliate to or for the credit or the account of the Borrowers against any of and all the obligations of the Borrowers now or hereafter existing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations may be unmatured. The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender may have.

SECTION 9.10. Governing Law; Jurisdiction; Consent to Service of Process.

(a)    THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK (WITHOUT GIVING EFFECT TO CONFLICT OF LAWS PRINCIPLES), THE BANKRUPTCY CODE AND THE CCAA.

EXECUTION VERSION

(b)      Each Loan Party agrees that any suit for the enforcement of this Agreement or any other Loan Document may be brought in the US Bankruptcy Court for the Eastern District of Virginia or in the courts of the State of New York or any federal court sitting therein (or with respect to the Canadian Loan Parties, the Ontario Superior Court of Justice (Commercial List)) and consent to the non-exclusive jurisdiction of such courts. Each Loan Party hereby waives any objection which it may now or hereafter have to the venue of any such suit or any such court or that such suit is brought in an inconvenient forum.

(c)      To the extent permitted by Applicable Law, each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01. Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

(d)      Each Loan Party agrees that any action commenced by any Loan Party asserting any claim or counterclaim arising under or in connection with this Agreement or any other Loan Document shall be brought solely in the US Bankruptcy Court for the Eastern District of Virginia or in a court of the State of New York sitting in New York City or any federal court sitting therein (or with respect to the Canadian Loan Parties, the Ontario Superior Court of Justice (Commercial List)) as the Administrative Agent may elect in its sole discretion and consents to the exclusive jurisdiction of such courts with respect to any such action.

SECTION 9.11. <u>WAIVER OF JURY TRIAL</u>. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 9.12. <u>Headings</u>. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 9.13. <u>Interest Rate Limitation.</u> Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges

150

and other amounts that are treated as interest on such Loan under Applicable Law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") that may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with Applicable Law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

SECTION 9.14. <u>Joint and Several Obligations of the Loan Parties.</u>

(a)    The Obligations are the joint and several obligations of each Loan Party. To the fullest extent permitted by Applicable Law, the obligations of each Loan Party hereunder shall not be affected by (i) the failure of any Agent or any other Secured Party to assert any claim or demand or to enforce or exercise any right or remedy against any other Loan Party under the provisions of this Agreement, any other Loan Document or otherwise, (ii) any rescission, waiver, amendment or modification of, or any release from any of the terms or provisions of, this Agreement, any other Loan Document, or any other agreement, or (iii) the failure to perfect any security interest in, or the release of, any of the security held by or on behalf of the Collateral Agent, the Canadian Agent or any other Secured Party.

(b)    The obligations of each Loan Party to pay the Obligations in full in cash hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason (other than the termination of the Commitments and the payment in full in cash of the Obligations, other than contingent indemnification Obligations for which a claim has not been asserted), including any claim of waiver, release, surrender, alteration or compromise of any of the Obligations and shall not be subject to any defense or set-off, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Obligations or otherwise. Without limiting the generality of the foregoing, the obligations of each Loan Party hereunder shall not be discharged or impaired or otherwise affected by the failure of any Agent or any other Secured Party to assert any claim or demand or to enforce any remedy under this Agreement, any other Loan Document or any other agreement, by any waiver or modification of any provision of any thereof, by any default, failure or delay, willful or otherwise, in the performance of the Obligations, or by any other act or omission that may or might in any manner or to any extent vary the risk of any Loan Party or that would otherwise operate as a discharge of any Loan Party as a matter of law or equity (other than the termination of the Commitments and the payment in full in cash of all the Obligations, other than contingent indemnification Obligations for which a claim has not been asserted).

151

EXECUTION VERSION

(c)     To the fullest extent permitted by Applicable Law, each Loan Party waives any defense based on or arising out of any defense of any other Loan Party or the unenforceability of the Obligations or any part thereof from any cause, or the cessation from any cause of the Liability of any other Loan Party, other than the termination of the Commitments and the payment in full in cash of all the Obligations, other than contingent indemnification Obligations for which a claim has not been asserted. The Collateral Agent and the other Secured Parties may, at their election, foreclose on any security held by one or more of them by one or more judicial or non-judicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Obligations, make any other accommodation with any other Loan Party, or exercise any other right or remedy available to them against any other Loan Party, without affecting or impairing in any way the liability of any Loan Party hereunder except to the extent that all the Obligations have been paid in full in cash, other than contingent indemnification Obligations for which a claim has not been asserted. Pursuant to Applicable Law, each Loan Party waives any defense arising out of any such election even though such election operates, pursuant to Applicable Law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Loan Party against any other Loan Party, as the case may be, or any security.

(d)     Upon payment by any Loan Party of any Obligations, all rights of such Loan Party against any other Loan Party arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subordinate and junior in right of payment to the termination of the Commitments and the prior payment in full in cash of all the Obligations, other than contingent indemnification Obligations for which a claim has not been asserted. In addition, any indebtedness of any Loan Party now or hereafter held by any other Loan Party is hereby subordinated in right of payment to the termination of the Commitments and the prior payment in full of the Obligations, other than contingent indemnification Obligations for which a claim has not been asserted. None of the Loan Parties will demand, sue for, or otherwise attempt to collect any such indebtedness other than the collection of any payment to be made in the ordinary course of business on account of intercompany loans. If any amount shall erroneously be paid to any Loan Party on account of (a) such subrogation, contribution, reimbursement, indemnity or similar right or (b) any such indebtedness of any Loan Party, such amount shall be held in trust for the benefit of the Secured Parties and shall forthwith be paid to the Administrative Agent or the Canadian Agent, as applicable, to be credited against the payment of the Obligations, other than contingent indemnification Obligations for which a claim has not been asserted, whether matured or unmatured, in accordance with the terms of the Loan Documents.

(e)     Each Loan Party is obligated to repay the Obligations as joint and several obligors under this Agreement. Upon payment by any Loan Party of any Obligations, all rights of such Loan Party against any other Loan Party arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be

152

EXECUTION VERSION

subordinate and junior in right of payment to the prior payment in full in cash of all the Obligations in each case other than contingent indemnification Obligations for which a claim has not been asserted and the date that the Commitments have been terminated.  In addition, any indebtedness of any Loan Party now or hereafter held by any other Loan Party is hereby subordinated in right of payment to the prior payment in full in cash of the Obligations and no Loan Party will demand, sue for or otherwise attempt to collect any such indebtedness.  If any amount shall erroneously be paid to any Loan Party on account of (i) such subrogation, contribution, reimbursement, indemnity or similar right or (ii) any such indebtedness of any Loan Party, such amount shall be held in trust for the benefit of the Secured Parties and shall forthwith be paid to the Administrative Agent to be credited against the payment of the Obligations, whether matured or unmatured, in accordance with the terms of this Agreement and the other Loan Documents.

(f)    Without limiting the generality of the foregoing, or of any other waiver or other provision set forth in this Agreement, each Loan Party hereby absolutely, knowingly, unconditionally, and expressly waives any and all claim, defense or benefit arising directly or indirectly under any one or more of Sections 2787 to 2855 inclusive of the California Civil Code or any similar law of California.

SECTION 9.15.  Confidentiality.

Each of the Lenders agrees that it will use its best efforts not to disclose without the prior consent of the Lead Borrower (other than to its employees, auditors, counsel, funding sources, or other professional advisors involved in the transactions contemplated herein (and also, with respect to any SPV, to the trustee or servicer of such SPV), to Affiliates, branches or to another Lender if the Lender or such Lender's holding or parent company in its sole discretion determines that any such party should have access to such information, provided that such party is bound by the confidentiality provisions of this Section 9.15) any information with respect to Lead Borrower or any of its Subsidiaries which is furnished pursuant to this Agreement provided that any Lender may disclose any such information (a) as has become generally available to the public, (b) as may be requested or required in any report, statement or testimony submitted to any municipal, state, provincial or federal regulatory body having or claiming to have jurisdiction over such Lender or to the Federal Reserve Board or the Federal Deposit Insurance Corporation or similar organizations (whether in the United States or elsewhere) or their successors, (c) as may be required in response to any summons or subpoena or in connection with any litigation, (d) in order to comply with any law, order, regulation or ruling applicable to such Lender, (e) in connection with the enforcement of remedies under this Agreement and the other Loan Documents, (f) to any prospective transferee in connection with any contemplated transfer of any of the Loans or Notes or any interest therein by such Lender provided that such prospective transferee agrees to be bound by the provisions of this Section and (g) to a SPV owned by a Lender in connection with the securitization of such Lender's obligations or rights

153

EXECUTION VERSION

hereunder. The Loan Parties hereby agree that the failure of a Lender to comply with the provisions of this Section 9.15 shall not relieve the Loan Parties of any of their obligations to such Lender under this Agreement and the other Loan Documents.

SECTION 9.16. Judgment Currency.

(a)     If for the purpose of obtaining or enforcing judgment against the Canadian Borrower in any court in any jurisdiction, it becomes necessary to convert into any other currency (such other currency being hereinafter in this Section 9.16 referred to as the "Judgment Currency") an amount due in Canadian dollars or United States dollars under this Agreement, the conversion will be made at the rate of exchange prevailing on the Business Day immediately preceding:

(i)     the date of actual payment of the amount due, in the case of any proceeding in the courts of the Province of Ontario or in the courts of any other jurisdiction that will give effect to such conversion being made on such date; or

(ii)     the date on which the judgment is given, in the case of any proceeding in the courts of any other jurisdiction (the date as of which such conversion is made pursuant to this Section 9.16 being hereinafter in this Section 9.16 referred to as the "Judgment Conversion Date").

(b)     If, in the case of any proceeding in the court of any jurisdiction referred to in Section 9.16(a)(ii), there is a change in the rate of exchange prevailing between the Judgment Conversion Date and the date of actual payment of the amount due, the Canadian Borrower will pay such additional amount (if any, but in any event not a lesser amount) as may be necessary to ensure that the amount paid in the Judgment Currency, when converted at the rate of exchange prevailing on the date of payment, will produce the amount of Canadian dollars or United States dollars, as the case may be, which could have been purchased with the amount of Judgment Currency stipulated in the judgment or judicial order at the rate of exchange prevailing on the Judgment Conversion Date.

(c)     Any amount due from the Canadian Borrower under the provisions of Section 9.16 will be due as a separate debt and will not be affected by judgment being obtained for any other amounts due under or in respect of this Agreement.

(d)     The term "rate of exchange" in this Section 9.16 means:

(i)     for a conversion of CD$ to the Judgment Currency, the reciprocal of the official noon rate of exchange published by the Bank of Canada for the date in question for the conversion of the Judgment Currency to Canadian dollars;

154

EXECUTION VERSION

(ii)     for a conversion of United States Dollars to the Judgment Currency when the Judgment Currency is Canadian dollars, the official noon rate of exchange published by the Bank of Canada for the date in question for the conversion of United States dollars to Canadian dollars;

(iii)     for a conversion of US dollars to the Judgment Currency when the Judgment Currency is not Canadian dollars, the effective rate obtained when a given amount of United States dollars is converted to Canadian dollars at the rate determined pursuant to Section 9.16 and the result thereof is then converted to the Judgment Currency pursuant to Section 9.16; or

(iv)     if a required rate is not so published by the Bank of Canada for any such date, the spot rate quoted by the Canadian Agent at Toronto, Canada at approximately noon (Toronto time) on that date in accordance with its normal practice for the applicable currency conversion in the wholesale market.

SECTION 9.17. <u>No Advisory or Fiduciary Responsibility.</u>

In connection with all aspects of each transaction contemplated hereby, the Loan Parties each acknowledge and agree that: (i) the credit facility provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Loan Parties, on the one hand, and the Agents and the Lenders, on the other hand, and each of the Loan Parties is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, each Agent and Lender is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Loan Parties or any of their respective Affiliates, stockholders, creditors or employees or any other Person; (iii) none of the Agents or the Lenders has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Loan Parties with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document (irrespective of whether any of the Agents or Lenders has advised or is currently advising any Loan Party or any of its Affiliates on other matters) and none of the Agents or Lenders has any obligation to any Loan Party or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (iv) the Agents and the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and none of the Agents or Lenders has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary

155

EXECUTION VERSION

relationship; and (v) the Agents and the Lenders have not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and each of the Loan Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate. Each of the Loan Parties hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against each of the Agents and Lenders with respect to any breach or alleged breach of agency or fiduciary duty.

SECTION 9.18. <u>USA PATRIOT Act Notice</u>.        Each Lender that is subject to the Act (as hereinafter defined) and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Loan Parties that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the Act. Each Loan Party is in compliance, in all material respects, with the Patriot Act. No part of the proceeds of the Loans will be used by the Loan Parties, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

SECTION 9.19. <u>Press Releases.</u>

Each Loan Party executing this Agreement agrees that neither it nor its Affiliates will in the future issue any press releases or other public disclosure using the name of the Administrative Agent or its branches or Affiliates or referring to this Agreement or the other Loan Documents without at least two Business Days' prior notice to the Administrative Agent (or such lesser notice as the Administrative Agent may agree) and without the prior written consent of the Administrative Agent unless (and only to the extent) such Loan Party or Affiliate is required to do so under Applicable Law and then, in any event, such Loan Party or Affiliate will consult with the Administrative Agent before issuing such press release or other public disclosure. Each Loan Party consents to the publication by the Administrative Agent or any Lender of advertising material relating to the financing transactions contemplated by this Agreement using any Loan Party's name, product photographs, logo or trademark. The Administrative Agent or such Lender shall provide a draft reasonably in advance of any advertising material to the Lead Borrower for review and comment prior to the publication thereof. The Administrative Agent reserves the right to provide to industry trade organizations information necessary and customary for inclusion in league table measurements.

SECTION 9.20. <u>No Strict Construction.</u>

156

EXECUTION VERSION

The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

SECTION 9.21. <u>Relationship with DIP Orders and Initial Order</u>.

In the event of any inconsistency between the terms of the DIP Orders, the Initial Order and the Loan Documents, the terms of the DIP Orders and the Initial Order, as applicable, shall control and the representations, warranties, covenants, agreements or events of default made herein and in the other Loan Documents shall be subject to the terms of the DIP Orders and the Initial Orders.

SECTION 9.22. <u>Language</u>.

The parties herein have expressly requested that this Agreement and all related documents be drawn up in the English language.  À la demande expresse des parties aux présentes, cette convention et tout document y afférent ont été rédigés en langue anglaise.

[balance of page left intentionally blank; signature pages follow]

157

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as a sealed instrument as of the day and year first above written.

CIRCUIT CITY STORES, INC.,
as Lead Borrower and Borrower

By:
Name:  Bruce H. Besanko
Title:    Executive Vice President


CIRCUIT CITY STORES WEST COAST, INC.,
as Borrower


By:
Name:    Reginald D. Hedgebeth
Title:    Chairman and Chief Executive Officer


CIRCUIT CITY STORES PR, LLC, as Borrower

By:
Name:    Bruce H. Besanko
Title:    President

*Signature Page to Credit Agreement*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as a sealed instrument as of the day and year first above written.

CIRCUIT CITY STORES, INC.,
as Lead Borrower and Borrower

By: _____
Name:    Bruce H. Besanko
Title:    Executive Vice President


CIRCUIT CITY STORES WEST COAST, INC.,
as Borrower

By: _____
Name:    Reginald D. Hedgebeth
Title:    Chairman and Chief Executive Officer


CIRCUIT CITY STORES PR, LLC, as Borrower

By: _____
Name:    Bruce H. Besanko
Title:    President


*Signature Page to Credit Agreement*

INTERTAN CANADA LTD./
INTERTAN CANADA LTÉE,
as Canadian Borrower

By: _____

Name: MARK WONG

Title: VP General Counsel and Secretary

BANK OF AMERICA, N.A.,
as Administrative Agent, as Collateral
Agent, as Issuing Bank, as Swingline Lender
to the Domestic Borrowers, and as Domestic
Lender

By: _____

    Name: Kathleen Dimock
    Title:   Managing Director
    Address:
    100 Federal Street, 9th Floor
    Boston, Massachusetts 02110
    Attn: Ms. Kathleen Dimock
    Telephone: (617) 434-3830
    Telecopy: (617) 434-6685

*Signature Page to Credit Agreement*

BANK OF AMERICA, N.A., (acting
through its Canada branch), as Canadian
Lender, as Swingline Lender and Issuing
Bank to the Canadian Borrower, and as
Canadian Administrative Agent and
Canadian Collateral Agent

By: _____

Name: MEDINA SALES DE ANDRADE

Title: _____
          VICE PRESIDENT

Address:

200 FRONT STREET WEST. SUITE 2700,

TORONTO, ONTARIO. M5V-3L2

Attn: MEDINA SALES DE ANDRADE

Telephone: 416 - 349 - 5433

Telecopy: 416 - 349 - 4283

*Signature Page to Credit Agreement*

GENERAL ELECTRIC CAPITAL
CORPORATION,
as Co-Documentation Agent, as Joint
Bookrunner, as Co-Collateral Agent
and as Domestic Lender

By: _____

Name: MARK J. FORTI

Title: Duly Authorized Signatory

Address:

135 Summer Street

Boston, MA 02110

Attn: Joseph Sacchetti

Telephone: 203-956-4406

Telecopy: 203-956-4002

*Signature Page to Credit Agreement*

WELLS FARGO RETAIL
FINANCE, LLC, as Syndication
Agent, Joint Bookrunner and
Domestic Lender
By: _Connie Liu_____
Name: Connie Liu_____
Title:  Assistant Vice President___
Address:
   One Boston Place, 18th Floor___
   Boston, MA 02108_____
Attn:   Connie Liu_____
Telephone:  617.854.7232_____

JPMORGAN CHASE BANK, N.A.
as Co-Documentation Agent and as
Domestic Lender
By: _____
Name: _____
Title: _____
Address:
120 South LaSalle St.
 Mail Code IL1-1458
Chicago, Illinois 60603
Attn:  Andrew D. Hall
Telephone: (312) 661-5630
Telecopy: (312) 661-6929

*Signature Page to Credit Agreement*

WACHOVIA CAPITAL FINANCE
CORPORATION (CENTRAL), as
Domestic Lender

By: _Laura P Wheeland_
Name: _Laura Wheeland_
Title: _Vice President_
Address:
_150 South Wacker Drive, Suite 2200_
_Chicago, IL 60606_
Attn: _Portfolio Manager_
Telephone: _312-332-0420_
Telecopy: _312-332-0424_

*Signature Page to Credit Agreement*

GMAC COMMERCIAL FINANCE
LLC, as
Domestic Lender

By: *Michael Malcangi*
Name: MICHAEL MALCANGI
Title: VICE PRESIDENT
Address:
1290 AVE of THE AMERICAS, 3rd Fl
New York, NY 10104
Attn: MICHAEL MALCANGI
Telephone: 212-884-7561
Telecopy: 212-884-7693

*Signature Page to Credit Agreement*

BURDALE FINANCIAL LTD., as
Domestic Lender

By: _____
Name:    Phillip R. Webb
Title:    Director

By: _____
Name: _____
Title:    Antimo Barbieri
Senior Vice President

Address:
300 First Stamford Place
Stamford, CT 06902
Attn:    Phillip Webb
Telephone: 203-391-5942
Telecopy: 203-353-0152

*Signature Page to Credit Agreement*

NATIONAL CITY BUSINESS
CREDIT, INC., as Domestic Lender

By: _Kathryn Ellero_
Name: _Kathryn Ellero_
Title: _Vice President_
Address:
_____ 1965 E.6th Street, 4th floor_
_____ Cleveland, OH 44114_
Attn: _Kathryn Ellero_
Telephone: _216-222-3261_
Telecopy: _216-222-9555_

*Signature Page to Credit Agreement*

TEXTRON FINANCIAL
CORPORATION, as
Domestic Lender

By: *Eric R. Hubbard*
Name: *ERIC R. HUBBARD*
Title: *DULY AUTHORIZED SIGNATORY*
Address:
*11575 GREAT OAKS WAY*
*ALPHARETTA GA 30022*
Attn: *BUSINESS CREDIT*
Telephone: *(770) 360-9600*
Telecopy: *(770) 360-1672*

*Signature Page to Credit Agreement*

SUNTRUST BANK, as
Domestic Lender

By: _____
Name: _William S. Krueger_
Title: _1st Vice President_
Address:
_401 E. Jackson St. Ste 1000_
_Tampa, FL 33602_
Attn: _William S. Krueger_
Telephone: _813-224-2279_
Telecopy: _813-224-2356_

*Signature Page to Credit Agreement*

FIFTH THIRD BANK, as Domestic
Lender

By: _____

Name: _____Randolph J. Stierer_____

Title: _____Vice President_____

Address:      Fifth Third Bank
38 FOUNTAIN SQUARE PLAZA
MD# 109055, CINCINNATI, OH 4520?

Attn: RANDOLPH J. STIERER

Telephone: 513-579-7350

Telecopy: 513-534-5947

*Signature Page to Credit Agreement*

UBS LOAN FINANCE LLC, as
Domestic Lender

By: _____
Name: _____ Richard L. Tavrow ___ Inja R. Otsa
Title: _____ Director _____ Associate Director
Address: ___ Banking Products ____ Banking Products
            Services, US _____ Services, US
_____

Attn: DANIEL GOLDENBERG
Telephone: (203) 719 - 1797
Telecopy: (203) 719 - 3888

*Signature Page to Credit Agreement*

PNC BANK, N.A., as
Domestic Lender

By: _____
Name: _W. REED PADEN_
Title: _VP_
Address: _____
_4720 PIEDMONT ROW DR. STE. 300_
_CHARLOTTE, NC 28210_
Attn: _____
Telephone: _704-551-8507_
Telecopy: _704-643-7912_

*Signature Page to Credit Agreement*

CAPITAL ONE LEVERAGE
FINANCE CORP., as
Domestic Lender

By: _____
Name: _Michael S. Burns_
Title: _Sr Vice Pres_
Address: _265 Broadhollow Road_
_____
_Melville, NY 11747_
Attn: _____
Telephone: _631 531 2775_
Telecopy: _631 531 2765_

*Signature Page to Credit Agreement*

WEBSTER BUSINESS CREDIT
CORPORATION, as
Domestic Lender

By: _C. Tonucci_
Name: _Cynthia J. Tonucci_
Title: _VP_
Address: _73 Belmont St_
_____ _S Easton MA 02375_

Attn: _C. Tonucci_
Telephone: _508-513-1253_
Telecopy: _508-513 1339_

*Signature Page to Credit Agreement*

UPS CAPITAL CORPORATION,
as
Domestic Lender

By: _____
Name: John P. Holloway
Title: Director of Portfolio Management
Address: _____
_____
_____
Attn: _____
Telephone: _____
Telecopy: _____

*Signature Page to Credit Agreement*