**LEASE AGREEMENT**

by and between

**CARROLLTON ARMS,**
a Michigan co-partnership,

(Landlord)

and

**CIRCUIT CITY STORES, INC.,**
a Virginia corporation

(Tenant)

**PREPARED BY:**

A. Jeffrey Bean, Esq.
Jackier, Gould, Bean, Upfal, Eizelman & Goldman
1533 North Woodward Avenue, Suite 250
Bloomfield Hills, Michigan 48304
(810) 642-0500

# TABLE OF CONTENTS

<u>DESCRIPTION</u>                                                                                      <u>PAGE</u>

| | | |
|---|---|---|
| 1. | DEMISE OF PREMISES | 1 |
| 2. | TERM OF LEASE | 1 |
| 3. | LANDLORD AND TENANT'S WORK | 4 |
| 4. | ANNUAL RENT | 6 |
| 5. | OPTION TO EXTEND TERM | 7 |
| 6. | REAL ESTATE TAXES | 7 |
| 7. | UTILITIES | 8 |
| 8. | USE AND OCCUPANCY | 9 |
| 9. | ALTERATIONS BY TENANT | 9 |
| 10. | TENANT'S MAINTENANCE | 10 |
| 11. | LANDLORD'S MAINTENANCE | 10 |
| 12. | TENANT'S INSURANCE | 11 |
| 13. | WAIVER OF SUBROGATION | 12 |
| 14. | ACTS OF OTHER TENANTS | 12 |
| 15. | SUBORDINATION AND ATTORNMENT | 13 |
| 16. | ASSIGNMENT | 13 |
| 17. | BANKRUPTCY OR INSOLVENCY | 13 |
| 18. | FIRE AND CASUALTY DAMAGE | 15 |
| 19. | CONDEMNATION | 17 |
| 20. | DEFAULT AND REMEDIES | 18 |

TABLE OF CONTENTS - Continued

DESCRIPTION                                                              PAGE

21.   CURING DEFAULT ............................................    20

22.   SECURITY DEPOSIT ..........................................    20

23.   NOTICES ...................................................    20

24.   ACCESS TO PREMISES ........................................    21

25.   LANDLORD'S EASEMENTS ......................................    21

26.   QUIET ENJOYMENT ...........................................    21

27.   HOLDING OVER ..............................................    21

28.   RECEIVING AND DELIVERING OF TENANT'S EQUIPMENT AND DISPOSITION
      OF REFUSE .................................................    22

29.   RESERVATION ...............................................    22

30.   SIGNS .....................................................    22

31.   DEFINITION OF LANDLORD ....................................    22

32.   TRANSFER OF PREMISES ......................................    22

33.   APPLICABLE LAW ............................................    23

34.   SUCCESSORS AND ASSIGNS ....................................    23

35.   LANDLORD'S REPRESENTATIONS ................................    23

36.   WAIVER ....................................................    23

37.   FORCE MAJEURE .............................................    23

38.   ENVIRONMENTAL INDEMNIFICATION .............................    23

39.   CORPORATE AUTHORITY .......................................    24

## TABLE OF CONTENTS - Continued

DESCRIPTION                                                              PAGE

40. SURRENDER OF PREMISES .................................................. 24

41. NO OPTION .............................................................. 25

42. MEMORANDUM OF LEASE .................................................... 25

43. LANDLORD'S REPRESENTATIONS AND WARRANTIES ..................... 25

44. TOPICAL HEADINGS ....................................................... 25

45. ENTIRE AGREEMENT; MODIFICATION; SEVERABILITY .................... 26

### EXHIBITS

EXHIBIT A  -  LEGAL DESCRIPTION OF THE PREMISES

EXHIBIT B  -  SURVEY

EXHIBIT C  -  COMMENCEMENT DATE CONFIRMATION MEMORANDUM

EXHIBIT D  -  SITE PLAN

EXHIBIT E  -  PAMA INVESTMENT AND CONTRACTING, INC. BUILDING SPECIFICATIONS

EXHIBIT F  -  PRELIMINARY BUILDING PLANS

EXHIBIT G  -  SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

# LEASE AGREEMENT

THIS LEASE is entered into and executed on the ___ day of _____, 1995, by and between Carrollton Arms, a Michigan co-partnership, whose address is 1330 Goldsmith, Plymouth, Michigan 48170, as lessor ("Landlord"), and Circuit City Stores, Inc., a Virginia corporation, whose address is 9950 Mayland Drive, Richmond, Virginia 23233-1464, as lessee ("Tenant").

1.    <u>DEMISE OF PREMISES</u>.

Landlord hereby leases to Tenant and Tenant hires from Landlord, on the terms and conditions contained in this Lease, certain Premises (as hereinafter defined) located in the Township of Canton, Wayne County, Michigan.

The Premises consists of the land ("Land") described in Exhibit "A" attached hereto and the building ("Building") and related improvements to be constructed thereon. The Land and Building are sometimes also referred to as the "Property". In addition, Landlord hereby grants to Tenant, during the Term of this Lease, for the benefit of the Premises, a non-exclusive easement for ingress and egress and for the maintenance, operation, replacement, and repair of utility lines, over, under, and through a strip of land sixty (60) feet in width in the location shown on Exhibit "B" (yellow highlight). Prior to Landlord's delivery of possession of the Premises to Tenant, Landlord shall construct a roadway within such easement not less than thirty (30) feet in width, meeting all specifications of Canton Township, Michigan and any other applicable authorities for use in servicing industrial warehouse and distribution facilities.

2.    <u>TERM OF LEASE</u>.

"Term" shall mean the initial Term of this Lease and all extensions and renewals thereof. The "initial" Term of this Lease shall mean the period beginning on the Commencement Date and continuing for a period of fifteen (15) years from and after either (a) the Commencement Date or (b) if the Commencement Date is other than the first day of a calendar month, then beginning on the first day of the first calendar month following the Commencement Date ("Anniversary Date").

The Commencement Date of this Lease shall be that date which is sixty (60) calendar days from and after the date on which possession of the Premises is delivered to Tenant.

Promptly following the Commencement Date, such Date shall be confirmed by the parties in a written memorandum which shall be attached hereto as Exhibit "C". However, the failure of one party to acknowledge the Commencement Date shall not affect any obligations of either party hereunder.

Subject to the approval of any governmental entity having jurisdiction over the Property, and provided that Tenant complies at all times with the terms and conditions of this Lease (other than the

1

obligation to pay Annual Rent) from and after the date on which possession of the Premises is delivered to Tenant, Tenant may enter into the Building to perform the Tenant's Work, as hereinafter defined.

Possession of the Premises shall be deemed delivered to Tenant on the date when all of the following shall have occurred:

(a)     Landlord's Work (as hereinafter defined), is substantially complete.  "Substantially complete" as used in this Lease shall mean the delivery by the Landlord to Tenant of a certification (i) that Landlord has inspected the Work, (ii) that the Work has been substantially completed in accordance with the plans and/or specifications attached hereto as Exhibits "D", "E" and "F", as the same may be revised as hereinafter set forth, and (iii) setting forth the items of Landlord's Work remaining to be completed before Landlord's Work is entirely complete (the "Punchlist"). Work shall not be considered incomplete if only mechanical adjustments or minor details of construction or decoration remain to be done or if because of inclement weather, the landscaping and final top coat of asphalt remain to be completed, unless such top coat and landscaping will be a condition to the issuance of a certificate of occupancy for the Building by the applicable governmental authority. If the issuance of the certificate of occupancy is conditioned upon the delivery to the applicable governmental authority of a bond securing the completion of such top coat and landscaping, then the Landlord shall promptly furnish such bond at the Landlord's expense. Landlord shall complete any landscaping and the final top coat of asphalt as soon as weather permits, but in no event later than May 1, 1996, and agrees to perform such work at such times and in such a manner so as to minimize the disruption of Tenant's business during the performance of such work. In the event Landlord's Work shall not be entirely completed on or before June 1, 1996, Tenant shall have the right to perform such work and to offset the cost thereof against the next subsequent payment or payments of rent. At such time as Landlord's Work is approximately ten (10) days from being substantially complete, Landlord shall notify Tenant of same in writing.  In the event a dispute arises between Landlord and Tenant as to whether or not Landlord's Work is substantially complete or as to whether or not the Punchlist is complete, Landlord and Tenant shall submit their dispute to Good, Fulton and Farrell, Architects (hereinafter referred to as the "Inspecting Architect"). The Inspecting Architect shall thereafter inspect Landlord's Work and shall make a determination as to whether or not Landlord's Work is substantially complete. The Inspecting Architect's decision shall be final and binding upon Landlord and Tenant.  In the event the Inspecting Architect determines that Landlord's Work is substantially complete, possession of the Premises shall be deemed to have been delivered on the date such Work was substantially complete as certified to by Landlord.  In the event the Inspecting Architect determines that Landlord's Work is not substantially complete, Landlord shall promptly complete such work that shall be deemed deficient by the Inspecting Architect and this Lease shall commence upon the date Landlord's Work is substantially complete; and

(b)     The Premises are free and clear of all tenancies, occupancies, claims, or rights to possession of persons other than the rights of Landlord and Tenant under this Lease; and

(c)     All persons furnishing labor or materials for the performance of the Landlord's Work shall have been paid in full and the Landlord shall have furnished the Tenant with adequate evidence of same.

If Landlord fails to deliver possession of the Premises to Tenant on or before June 1, 1996 ("Completion Date"), and such failure is not as a result of the acts or omissions of Tenant, Tenant shall have the right to terminate this Lease unless and until Tenant accepts delivery of possession of the Premises from the Landlord. In the event Tenant elects not to terminate this Lease during such period, this Lease shall remain in full force and effect.

If for any reason whatsoever the Commencement Date fails to occur on or before January 1, 1997, this Lease shall automatically terminate in which event neither Landlord nor Tenant shall have any further liability to one another under this Lease.

Landlord and Tenant agree that Tenant shall complete its own (i) Phase I Environmental Report (the "Phase I Report") of the Premises, said report and findings to be completed within fifteen (15) days of the execution of this Lease, and (ii) title report, said report to be completed within twenty-one (21) days after the Landlord furnishes the Tenant with an accurate legal description of the Premises. Tenant's obligations under this Lease shall be contingent upon Tenant's Phase I Environmental Report showing the Premises to be free of environmental contamination, and Tenant's title report indicating that the Premises are clear of financial encumbrances (other than those for which Landlord shall supply a recordable non-disturbance agreement reasonably acceptable to Tenant), easements, restrictions, or other encumbrances of record that will adversely affect the Tenant's proposed use of the Premises. If the Phase I Report does not meet the condition set forth above, Tenant may declare this Lease null and void by giving notice to Landlord within such fifteen (15) day period, and neither party shall have any further liability to the other. If the title report does not meet the condition set forth above, the Tenant shall report any objections in writing to the Landlord within such twenty-one (21) day period. Landlord shall have ten (10) days after receipt of such notice to either (i) agree, by written notice to Tenant, to cure such objections prior to the delivery of possession of the Premises to the Tenant ("Landlord Cure Item"), or (ii) decline, by written notice to Tenant, to cure any or all of such objections. In the event the Landlord shall decline to cure any such objections, Tenant shall, at Tenant's option, have ten (10) days to either (i) terminate this Lease by written notice to Landlord, in which event the parties shall have no further obligation to one another, or (ii) waive any such title defects. Landlord agrees to cure all Landlord Cure Items at or before the time Landlord delivers possession of the Premises to the Tenant. Landlord and Tenant acknowledge and agree that Landlord shall obtain fee title to the Property on or before February 1, 1996 and that such title shall only be subject to those financial encumbrances for which Tenant shall have received a non-disturbance agreement, reasonably acceptable to Tenant, and such other easements, restrictions and encumbrances which do not adversely affect Tenant's use of the Premises.

3

3.    LANDLORD AND TENANT'S WORK.

Landlord shall, prior to its delivery of possession of the Premises to Tenant, construct and complete the Premises in accordance with the plans and specifications set forth as follows ("Landlord's Work"):

| Exhibit "D" | - | Site Plan |
| Exhibit "E" | - | PAMA Investment and Contracting, Inc. Building Specifications |
| Exhibit "F" | - | Preliminary Building Plans, to include: |
| | | (1)    Footprint plan with column spacing plan |
| | | (2)    Building elevations |

Such work shall be fully completed, in a good and workmanlike manner and in full compliance with all applicable building, health, environmental, safety and other ordinances, codes and regulations.

Final plans and specifications for the construction of the Building shall be substantially similar to the plans and specifications utilized by Landlord in connection with the construction of the building Landlord leased to Daikin Clutch/American Yazaki at 41111-41113 Koppernick Drive, Canton, Michigan, which plans and specifications have been furnished by Landlord to Tenant.

Landlord and Tenant acknowledge and agree that the Premises to be delivered by Landlord to Tenant shall be a shell building (the "Building"), with site work, paving, and landscaping completed and finished to the level of completion set forth in Exhibit "E" attached hereto.

Any improvements to the Premises other than Landlord's Work, shall be referred to as "Tenant's Work" and shall be constructed by Tenant at Tenant's expense.

Tenant acknowledges that, except as set forth in Exhibit "E", it shall be solely responsible for building out and completing the entire interior of the Building and constructing and installing all improvements necessary therein for the conduct of Tenant's business, including but not limited to all plumbing, heating, ventilating and air conditioning equipment, lighting and other electrical and mechanical equipment. Tenant shall complete Tenant's Work as expeditiously as possible.

Within forty-five (45) days from and after the execution date of this Lease, Tenant shall deliver to Landlord plans and specifications ("Tenant Buildout Plans") for the buildout and completion of the interior of the Building. The Tenant Buildout Plans shall be substantially similar to the plans and specifications for Tenant's Albuquerque, New Mexico service center, copies of which plans and specifications have been furnished by Tenant to Landlord. The Landlord shall review and either approve the Tenant Buildout Plans or object to the Tenant Buildout Plans on the basis that they are not substantially similar to the Tenant's Albuquerque, New Mexico service center plans within fifteen (15) business days from and after its receipt of the Tenant Buildout Plans. In the event Landlord objects to the Tenant Buildout Plans, Landlord shall provide a written list of objections to be addressed by Tenant. In the event Landlord and Tenant are unable to finalize the Tenant Buildout Plans within seventy-five days (75) from and after the execution date hereof (the "Plan Approval Period"), either

4

party may terminate this Lease upon written notice unless and until such Tenant Buildout Plans shall be approved by both parties.

All Tenant's Work, if any, shall be done in a good and workmanlike manner, by contractors licensed in the State of Michigan, and in compliance with all applicable building, health, safety, and other ordinances, codes and regulations. Tenant shall be responsible for obtaining, at its sole cost and expense, all necessary governmental permits, licenses and approvals. Upon completion of construction of Tenant's Work, Tenant, at Tenant's sole cost and expense, shall be responsible for obtaining Tenant's certificate of occupancy for the Premises from the Township of Canton (unless the Township's refusal to issue such certificate of occupancy shall be as a result of flaws in the design or completion of the Landlord's Work, in which case corrective action shall be at the Landlord's cost). Landlord will assist Tenant in securing said certificate of occupancy.

Tenant shall (a) pay before delinquency all costs and expenses of work done or caused to be done by Tenant in the Premises; (b) keep the title to the Premises and every part thereof free and clear of any lien or encumbrance in respect of such work; and (c) indemnify and hold harmless Landlord against any claim, loss, cost, demand (including reasonable legal fees), whether with regard to liens or otherwise, arising out of the supply of material, services or labor for such work. Tenant shall immediately notify Landlord of any lien, claim of lien or other action of which Tenant has or reasonably should have knowledge and which affects the title to the Premises or any part thereof, and shall cause the same to be removed within thirty (30) days (or such additional time as Landlord may consent to in writing), either by paying and discharging such lien or by posting a bond or such other security as may be reasonably satisfactory to Landlord. If Tenant shall fail to remove same within said time period, Landlord may take such action as Landlord deems necessary to remove the same and the entire cost thereof shall be immediately due and payable by Tenant to Landlord.

Tenant shall receive from Landlord an allowance for the actual costs and expenses incurred by Tenant in connection with the completion of Tenant's Work in an amount not to exceed five hundred thousand dollars ($500,000.00) (the "Allowance"). Such Allowance shall be paid by Landlord to Tenant within thirty (30) days from and after the date Tenant has completed Tenant's Work and has opened the Premises for business to the general public. Such Allowance shall be repaid in full by Tenant to Landlord, as Additional Rent, in one hundred twenty (120) consecutive equal monthly installments of principal and interest. Interest shall accrue on the unreimbursed balance of the Allowance at the per annum rate of nine percent (9%). Such monthly installments shall commence on the first day of the second calendar month following the date on which the Allowance is paid by Landlord to Tenant and shall continue on the first day of each calendar month thereafter until the Allowance is repaid in full. Interest accrued for any partial month shall be prorated and paid with the initial monthly installment due from Tenant to Landlord. The cost of the Tenant's Work shall be established by a sworn statement itemizing the work done, the contractor performing each item of work, the cost to complete each item, and the total cost, certified by Tenant and its general contractor and architect (if any), and supported by evidence that the Tenant's Work has been paid for in full. The Allowance shall be used solely for improvements to the Building and not for furniture, fixtures and equipment which is removable by Tenant, or inventory.

4.    **ANNUAL RENT.**

The Rent payable under this Lease shall consist of Annual Rent and Additional Rent, as hereinafter defined.

The Tenant shall pay Annual Rent to the Landlord in the amounts specified in this Lease, in advance, on the first day of each calendar month during the Term hereof. The Tenant shall pay Additional Rent in the manner herein described. All Rent shall be paid at the address of Landlord given above or at such other place as Landlord may designate from time to time in writing, without deduction or setoff whatsoever.

The total Annual Rent to be paid by Tenant to Landlord for the initial Term of this Lease shall be the sum of three million nine hundred fifty-three thousand forty dollars ($3,953,040.00) (subject to adjustment to account for the period between the Commencement Date and the Anniversary Date, if applicable) payable in one hundred eighty (180) equal monthly installments of twenty-one thousand nine hundred sixty-one and 33/100 dollars ($21,961.33) each.

If the Commencement Date described in paragraph 2, Term of Lease, is other than the first day of a calendar month, Rent for the period from the Commencement Date to the Anniversary Date shall be prorated on a daily basis (365 day year). Prorated Annual Rent shall be payable on the Commencement Date; Prorated Additional Rent shall be payable as herein provided.

If Rent is not paid within ten (10) days following the date same is due, Tenant shall be assessed a late charge equal to two percent (2%) of the monthly installment of Rent to compensate Landlord for its fairly estimated administrative costs incurred from late payments. If Tenant fails to pay any amount payable under this Lease when due, Tenant shall pay an interest charge on the unpaid balance (excluding the late charge) at the annual rate of twelve percent (12%). Landlord may apply all or any part of subsequent payments of Rent to any accrued and unpaid late charges or interest.

"Lease Year" shall mean the consecutive twelve (12) month period following the Commencement Date or, if the Commencement Date is other than the first day of a calendar month, then the twelve (12) month period following the Anniversary Date, and each anniversary thereof. The first Lease Year shall also include the period from Commencement Date to the first Anniversary Date.

With the exception of those costs and expenses to be borne by Landlord in accordance with paragraph 11 of this Lease, Landlord and Tenant intend that the Annual Rent due hereunder, together with any adjustments during the Term of this Lease, shall be absolutely net of all costs, expenses, taxes (real and personal) and charges of every kind and nature whatsoever related to the ownership, occupancy or use of the Premises so that the Annual Rent, together with any adjustments, constitutes the minimum income realized by Landlord from the leasing of the Premises.

6

5.    OPTION TO EXTEND TERM.

Tenant shall have the option to extend the Term of this Lease for two (2) additional successive terms of five (5) years each ("Renewal Terms") on the conditions contained in this paragraph.

The Annual Rent for each Lease Year of the first Renewal Term shall be as follows:

| Year | Annual Rent | Monthly Installment |
|------|-------------|---------------------|
| 1 | $289,889.60 | $24,157.46 |
| 2 | $289,889.60 | $24,157.46 |
| 3 | $289,889.60 | $24,157.46 |
| 4 | $289,889.60 | $24,157.46 |
| 5 | $289,889.60 | $24,157.46 |

The Annual Rent for each Lease Year of the second Renewal Term shall be as follows:

| Year | Annual Rent | Monthly Installment |
|------|-------------|---------------------|
| 1 | $319,066.80 | $26,588.90 |
| 2 | $319,066.80 | $26,588.90 |
| 3 | $319,066.80 | $26,588.90 |
| 4 | $319,066.80 | $26,588.90 |
| 5 | $319,066.80 | $26,588.90 |

The Additional Rent provisions contained in this Lease shall continue in full force and effect.

Tenant shall exercise its option hereunder by giving written notice of its intent to exercise as to a given Renewal Term not less than one hundred eighty (180) days prior to the expiration of the Term (Initial or Renewal) immediately preceding that Renewal Term.  Tenant must exercise its option for the first Renewal Term before exercising its option as to the second Renewal Term.

Except as modified in this paragraph, all terms and conditions of this Lease shall continue and shall remain in full force and effect throughout the Renewal Terms.

The options granted under this paragraph shall be deemed personal to Circuit City Stores, Inc. or to any assignee (but not a sublessee) permitted under paragraph 16 hereof, but shall not be available after termination of this Lease, or after abandonment or surrender of the Premises by Tenant.

6.    REAL ESTATE TAXES.

As used herein, "Taxes" shall mean all property taxes (whether real or personal), assessments (general or special), and all other governmental impositions which may be levied during the Term of this Lease upon the Premises. In the event such taxes are eliminated or reduced by any federal, state,

7

or municipal body or governmental agency having jurisdiction thereof, and another tax or assessment is imposed by way of substitution for (or in addition thereto) all or any part of such taxes, then such substituted (or additional) tax or assessment shall be included as taxes under this Lease. Taxes shall not include any penalties or interest (unless accrued as a result of Tenant's default under this Lease), income, franchise, transfer, inheritance or capital stock taxes. If any assessment for public improvements is payable in installments, Tenant shall only be obligated to pay those installments due and payable during the Term hereof.

From and after the Commencement Date, and continuing throughout the Term of this Lease, Tenant shall pay when due, as Additional Rent, all Taxes levied upon the Premises and shall deliver written evidence to Landlord of such payment within ten (10) business days following such payment.

If this Lease shall commence on a day other than the first day of a calendar year or terminate on a day other than the last day of the calendar year, Taxes that are applicable to the calendar year in which such commencement or termination shall occur shall be prorated on the basis of the number of calendar days within such year as are within the Term. On the date Landlord delivers possession of the Premises to the Tenant, Tenant shall pay to Landlord an amount reasonably determined by Landlord to represent reimbursement to Landlord for Taxes paid by Landlord for periods from and after the date Landlord delivers possession of the Premises to Tenant.

Tenant shall have the right, at its sole cost and expense, by the appropriate proceedings diligently pursued in good faith, to contest the assessed valuation of, or the Taxes levied on, the Premises, provided that Tenant shall first pay all Taxes due unless such payment shall preclude, by law, the filing of such contest.

Tenant shall be responsible for and shall pay before delinquent all taxes assessed during the Term of this Lease against any leasehold interest or personal property of any kind, owned by or placed in, upon or about the Premises by Tenant.

Notwithstanding anything to the contrary set forth above, Tenant acknowledges that the Land and the Building and related improvements to be constructed thereon, shall initially be part of a larger parcel of land ("Tax Parcel") acquired from the Township of Canton shall not have a separate tax identification number assigned to it. Accordingly, until such time as the Township of Canton has created a separate tax parcel and assigned the Premises its own tax identification number, Tenant shall pay one hundred percent (100%) of all Taxes levied against the Building and related improvements constructed on the Land, and shall pay its proportionate share of the Taxes levied against the Land which proportionate share shall be equal to a fraction the numerator of which shall be the total number of acres contained in the Land, and the denominator of which shall be the total number of acres contained in the Tax Parcel.

7.   **UTILITIES.**

Tenant shall pay, as Additional Rent, all charges levied against the Premises for utilities, including but not limited to, gas, water, telephone, sewer, heat and electricity during the continuance of this Lease, as the same shall

8

Initial

Initial

2007 MAR 28 PM 4: 24

BERNARD J. YOUNGBLOOD
REGISTER OF DEEDS
WAYNE COUNTY, MI

## RELEASE AND DISCHARGE OF CONSTRUCTION LIEN

PCI Industries, Inc. _____ a Michigan Corporation _____ , does verify that the

Construction Lien filed by it on the __15th__ day of ___November___ , 20_06_ , in the office of the

Register of Deeds for the County of _____Wayne_____ , State of Michigan, being recorded in

Liber __45565__ , pages ___65___ , ___Wayne___ County Records, against the following

described premises:

Against
Basketball Planet
7171 Haggerty Road
Canton, MI 48187

Is released and discharged.

Dated: __28th__ day of __March__ , 20_07_

WITNESSES:

_____                    Name of Company:    PCI Industries, Inc.

Wendy Fischel                               By _____
                                           Marty Mellin, Vice President

STATE OF MICHIGAN    )
                     )SS
COUNTY OF  OAKLAND   )

On this __28th__ day of __March__ , 20_07_ , before me, a Notary Public in the

County, personally appeared ___Marty Mellin___ , on behalf of

_PCI Industries, Inc_ known to me to be the person who executed the above

instrument and acknowledged that the information contained in the instrument is true and accurate.

_____
Notary Public

__Oakland__ County, Michigan

My commission expires: __4-2-2012__

Drafted by and, when recorded, return to:                    PATRICIA M. HANLEY
                                                            NOTARY PUBLIC, STATE OF MI.
Wendy Fischel                                                 - COUNTY OF OAKLAND
                                                           MY COMMISSION EXPIRES Apr 2, 2012
PCI Industries, Inc.                                      ACTING IN COUNTY OF OAKLAND

21717 Republic

Oak Park, MI 48237

**DO NOT SIGN BLANK OR INCOMPLETE FORMS, RETAIN A COPY.**

Rel   12   6R   2P9   A   CN

become due and payable. If Tenant desires to install any equipment which shall exceed the capacity of any utility facilities or which shall require additional facilities, Tenant shall not have the right to do so without Landlord's prior written approval of Tenant's plans and specifications thereof. If such installation is approved by Landlord, and if Landlord provides such additional facilities to accommodate Tenant's installation, Tenant agrees to pay to Landlord, on demand, the cost of providing such additional utility facilities or utility facilities of a greater capacity. Tenant shall not use any of the utility facilities serving the Premises in any way which shall overload or overburden such systems.

## 8.    USE AND OCCUPANCY.

Tenant shall use and occupy the Premises during the Term of this Lease for office, service center, distribution and warehousing, and for no other purpose whatsoever.

Tenant shall not do, permit or suffer any act or thing to be done which is injurious to the Premises, which is a nuisance, contrary to any law, ordinance, rule, regulation or order, or in violation of any certificate of occupancy issued for the Premises.

At all times during the Term of this Lease, Tenant shall give prompt notice to Landlord of any notice Tenant receives of any violation of any law or requirement of a governmental authority affecting the Premises or Premises, and, at its sole cost and expense, shall comply with all laws and requirements of governmental authorities, including any violation, order or duty imposed upon Landlord or Tenant, arising from or relating to (a) Tenant's use of the Premises; (b) the manner or conduct of Tenant's business or operation of its installations, equipment or other property therein; (c) any cause or condition created by or at the insistence of Tenant; or (d) breach of any of Tenant's obligations hereunder, excluding any violations caused by the Landlord, its agents, employees or assigns. Nothing contained herein shall be deemed to obligate Tenant to take action made necessary by the Landlord's failure to design or build the Building or perform the Landlord's Work in compliance with all applicable codes, laws, and regulations in effect at the time Landlord delivers possession of the Premises to Tenant, in which case such compliance shall be the responsibility of the Landlord.

## 9.    ALTERATIONS BY TENANT.

Tenant shall not make any structural alterations, additions or improvements in or to the Premises without Landlord's prior written consent.

Tenant shall, before making any alterations, additions, installations or improvements, at its expense, obtain all permits, approvals and certificates required by any governmental or quasi-governmental bodies, and upon completion, certificates of final approval thereof, and shall deliver promptly duplicates of all such permits, approvals and certificates to Landlord, and Tenant agrees to carry, and to cause Tenant's contractors and subcontractors to carry, such workers' compensation, general liability, personal and property damage insurances as Landlord may reasonably require.

All alterations, additions and improvements installed in the Premises by either Tenant or Landlord on Tenant's behalf, shall become the property of Landlord and shall remain upon and be

surrendered with the Premises upon the termination of this Lease. Nothing in this paragraph shall be construed to give Landlord title to or to prevent Tenant's removal of trade fixtures (including shelves and counters), moveable office furniture or equipment, but upon removal of any such equipment and fixtures from the Premises, Tenant shall immediately, at its expense repair and restore the Premises to the condition existing prior to installation (subject to ordinary wear and tear) and repair any damage to the Premises due to such removal. All property that was permitted to be removed by Tenant at the end of the term but which remains in the Premises for sixty (60) days after Tenant vacates the Premises shall be deemed abandoned and may, at the election of Landlord, either be retained as Landlord's property or may be removed from the Premises by Landlord.

Except as described in the Tenant's Buildout Plans, no equipment, cranes, piping or any other item is permitted to be hanging from or to be attached to any steel joist or metal deck supported on steel beams or masonry bearing walls without the prior written approval of Landlord and the Landlord's designated structural engineer.

10.   **TENANT'S MAINTENANCE.**

Except with respect to those specific items to be repaired and maintained by Landlord as provided in paragraph 11 of this Lease, Tenant shall, during the Term of this Lease, at its sole cost and expense, maintain, repair and replace, as necessary, the entire Premises, including but not limited to, interior walls, floors and ceilings of the Building; exterior doors of, and entrances to, the Building; all windows and doors and moldings and trim of all doors and windows; all plumbing, heating, ventilating and air-conditioning equipment and lighting and other electrical and mechanical equipment serving the Building; any sprinkler system serving the Building; glass (unless broken or damaged due to the negligence or act of Landlord); partitions; all parking areas and driveways located on the Land; and all other components and systems of the Premises. Tenant shall keep, repair, and maintain, and not misuse the Premises so that it may be returned to the Landlord in as good order and condition as when delivered to Tenant, excepting ordinary wear and tear, structural repairs and replacements, damage by fire, vandalism, the elements and any other insurable casualty, and damage due to or occasioned by the negligence of Landlord. Such maintenance and repair obligations shall include items deemed to be capital improvements for tax purposes. Tenant shall perform such maintenance and repairs so as to maintain the Premises in a first-class condition. Tenant shall also maintain, at its sole cost and expense, the water, sanitary sewer, storm sewer and electric lines from their point of connection to the Building to their point of connection to the main lines of the public utility supplying same.

11.   **LANDLORD'S MAINTENANCE.**

During the Term of this Lease, Landlord shall, at its sole cost and expense, maintain and repair, as necessary, the roof, roof structure, foundation and exterior walls of the Building and make all structural repairs to the Building.

Landlord shall be solely responsible for the maintenance of the roadway constructed within the sixty (60) foot non-exclusive easement described in paragraph 1 of this Lease. In addition, the Landlord shall be responsible for repairing items arising from defects in workmanship in the Landlord's

10

construction of the Premises.  In the event Landlord shall not commence any repair required to be performed by Landlord hereunder within ten (10) days after written notice from Tenant, then Tenant shall have the right to perform such repair and recover the cost thereof from the Landlord, together with interest at the per annum rate of ten percent (10%) from the date of demand for such payment until paid.  The Landlord shall be deemed to have commenced work on any required repair if the Landlord is actively and diligently proceeding with the procurement of contracts or materials for such repair.

Notwithstanding anything to the contrary contained in paragraph 10 or this paragraph 11, in the event repairs to the Premises are necessitated by the act, omission or neglect of Landlord or Tenant, the party whose act, omission or neglect caused the need for such repairs shall be solely responsible for the performance thereof, which repairs shall be completed in a diligent and workmanlike manner at such party's sole cost and expense, even if the repairs are to a portion of the Premises which the other party is normally required to maintain.

Notwithstanding anything to the contrary contained in paragraph 10 or this paragraph 11, with respect to any repair or replacement of the parking areas which become necessary following the expiration of the tenth Lease Year, to the extent such repair or replacement is considered a capital expenditure and not an expense which can be deducted in the year in which it was made (in accordance with generally accepted accounting principles), Landlord and Tenant shall share the cost of such capital expenditure in the same proportion that the time remaining in the Term of this Lease (including any renewals which Tenant has exercised) bears to the expected useful life of the capital repair for which such capital expenditure was made.

12.   TENANT'S INSURANCE.

From and after the date possession of the Premises is delivered to Tenant, and continuing throughout the Term of this Lease, Tenant shall maintain and keep in full force and effect, at its sole cost and expense, insurance for fire and special extended coverages (as reasonably satisfactory to Landlord) for the Premises upon a full replacement cost basis, with no co-insurance requirement, and with companies and deductible(s) reasonably satisfactory to Landlord in its reasonable discretion.  Such insurance shall name Landlord and any mortgagee holding a mortgage on the Premises as additional insureds as their interest may appear.  Such insurance coverage shall include rental insurance relating the loss of Rent for a period of one (1) year resulting from the occurrence of a casualty covered by such insurance.

Tenant shall indemnify and hold Landlord harmless from any and all loss, damage, claim of damage, liability or expense, including without limitation reasonable attorney fees (collectively "Damages"), to any person or property in or on the Premises arising directly or indirectly out of or in connection with (a) the use of the Premises by Tenant, its agents, employees, contractors, licensees or invitees, or (b) the failure of Tenant to comply with any provision of this Lease, or (c) the condition of the Premises, except to the extent that such Damages are directly or indirectly caused by or attributable to the act(s) or omission(s) of Landlord, its servants or agents.

11

Tenant shall maintain and keep in full force and effect during the Term of this Lease, general liability insurance, including blanket contractual coverage in the amount of three million dollars ($3,000,000.00) for personal injury or death resulting from one occurrence and the sum of one million dollars ($1,000,000.00) for property damage resulting from any one occurrence. Tenant shall deliver to Landlord a certificate evidencing such coverage and naming Landlord as an additional insured. Such insurance policy shall provide that no cancellation shall be effective without at least thirty (30) days' prior written notice to Landlord.

At all times during the Term of this Lease, Tenant will carry and maintain, at Tenant's expense, fire and extended coverage insurance covering all leasehold improvements in the Premises and all of Tenant's equipment, trade fixtures, appliances, furniture, furnishings and personal property from time to time in, on or upon the Premises and insurance covering all plate glass located from time to time in, on or upon the Premises. This insurance will be in an amount not less than the full replacement cost without deduction for depreciation. This insurance will provide protection against all perils included within the classification of fire, extended coverage, vandalism, malicious mischief, special extended peril (all-risk), boiler, flood and sprinkler leakage. Notwithstanding anything to the contrary contained herein, Tenant may self-insure its own personal property located in the Premises. In no event, however, shall Tenant be entitled to self-insure against public liability (whether for personal injury or property damage).

13.    <u>WAIVER OF SUBROGATION</u>.

Landlord shall cause each insurance policy carried by Landlord insuring the Premises against loss by fire and causes covered by standard extended coverage, and Tenant shall cause each insurance policy carried by Tenant and insuring the Premises and its fixtures and contents against loss by fire and causes covered by standard extended coverage, to be written in a manner so as to provide that the insurance company waives all right of recovery by way of subrogation against Landlord or Tenant in connection with any loss or damage covered by any such policies. Neither party shall be liable to the other for any loss or damage caused by fire or any of the risks enumerated in standard extended coverage insurance, provided such insurance was obtainable at the time of such loss or damage. If the release of either Landlord or Tenant, as set forth in the second sentence of this paragraph, shall contravene any law with respect to exculpatory agreements, the liability of the party in question shall be deemed not released but shall be deemed secondary to the latter's insurance.

14.    <u>ACTS OF OTHER TENANTS</u>.

The Landlord shall not be responsible or liable to the Tenant for any loss or damage that may be occasioned by or through the acts or omissions of persons occupying adjoining premises or any part of the premises adjacent to or connected with the Premises hereby leased or for any loss or damage resulting to the Tenant or his property from the interruption of electrical service or the bursting, stoppage or leaking of water, gas or sewer lines, or from any other cause whatsoever, unless such loss or damage was directly caused by Landlord's, its servants' or agents', gross negligence or willful misconduct.

12

15.    SUBORDINATION AND ATTORNMENT.

Landlord shall be entitled to subject and subordinate this Lease, at all times, to the lien of any mortgage or mortgages now or hereafter placed upon the Premises or any part thereof provided that, if and when any such mortgage is placed, the mortgagee shall agree, for itself and for every subsequent holder or owner of the mortgage and for any receiver or purchaser of the Premises, that in the event of foreclosure, Tenant's quiet possession of the Premises will not be disturbed on account of said mortgage or by reason of anything done thereunder, so long as Tenant pays the Rent and keeps the other covenants on its part to be performed.  In such event, Landlord shall provide Tenant with a Subordination, Non-disturbance and Attornment Agreement executed by Landlord, the mortgagee, and any other persons claiming benefits under the Agreement, in substantially the form attached hereto as Exhibit "G".  Tenant shall execute such Subordination, Non-disturbance and Attornment Agreement.

Tenant shall at any time upon the request of Landlord, execute and deliver in recordable form and in substance satisfactory to Landlord, an estoppel certificate certifying: the date Tenant accepted occupancy of the Premises; the date to which Rent has been paid; the amount of any Security Deposit; that this Lease is in full force and effect and has not been modified or amended (or if modified or amended, describing the same) and, to the best of Tenant's knowledge and belief and without due diligence investigation, that there are no defenses or offsets thereto or defaults of Landlord under this Lease (or if any be claimed, describing the same); and such other matters as Landlord may reasonably request.  Tenant's failure to deliver such certificate within thirty (30) days of the demand therefore shall be a default hereunder.

16.    ASSIGNMENT.

Tenant shall not assign or in any manner transfer this Lease or any estate or interest therein, hypothecate or mortgage the same or sublet the Premises or any part thereof or permit the use of the Premises without the written consent of Landlord.  Any assignment, transfer, hypothecation, mortgage or subletting without such consent shall give Landlord the right to terminate this Lease and re-enter and repossess the Premises.  Consent by Landlord to one or more assignments of this Lease or to one or more sublettings of the Premises shall not operate to exhaust Landlord's rights hereunder.  The acceptance of rent from an assignee, subtenant or occupant shall not constitute a release of Tenant from the obligations and covenants in this Lease.

Notwithstanding anything to the contrary contained herein, Tenant shall have the right, without Landlord's prior written consent, to assign this Lease to any wholly-owned subsidiary or any parent corporation of Tenant.  No assignment, sublease, or other transfer of this Lease provided above shall effect a release or discharge of Tenant from any liability whatsoever under this Lease.

17.    BANKRUPTCY OR INSOLVENCY.

If the estate of Tenant created hereby shall be taken in execution or by other process of law, or if Tenant or any guarantor of Tenant's obligations hereunder shall be adjudicated insolvent pursuant to the provisions of any present or future insolvency law under state law, or if any proceedings are filed

13

by or against the guarantor under the Bankruptcy Code or any similar provisions of any future federal bankruptcy laws, and not dismissed within sixty (60) days, or if a receiver or trustee of the property of Tenant or the guarantor of Tenant shall be appointed under state law by reason of Tenant's or the guarantor's insolvency or inability to pay its debts as they become due or otherwise, or if any assignment shall be made of Tenant's or the guarantor's property for the benefit of creditors under state law, then and in such event, Landlord may, at its option, terminate this Lease and all rights of Tenant hereunder declaring an Event of Default under paragraph 20, Default and Remedies.

Neither Tenant's interest in this Lease, nor any lesser interest of Tenant herein, nor any estate of Tenant hereby created shall pass to any trustee, receiver, assignee for the benefit of creditors or other person or entity or otherwise by operation of law under the laws of any state having jurisdiction of the person or property of Tenant unless Landlord shall consent to such transfer in writing. No acceptance by Landlord of Rent or any other payment from any such trustee, receiver, assignee, person or other entity shall be deemed to have waived nor shall it waive the requirement of Landlord's consent or the right of Landlord to terminate this Lease in the absence of such consent to any transfer of Tenant's interest in this Lease.

In the event that either a voluntary petition or involuntary petition for reorganization or liquidation or adjustment of debts is filed either by or against Tenant under Chapter 7, 11 or 13 of the Bankruptcy Code, the Tenant, as debtor in possession, or the bankruptcy trustee, must elect to assume or reject this Lease within sixty (60) days after the date of filing of the petition. If the Tenant, trustee or debtor in possession shall elect to assume this Lease, whether for the purpose of assignment or otherwise, such election and assignment may only be made if all of the terms and conditions hereinafter set forth are satisfied. If the Tenant, trustee or debtor in possession shall fail to elect or assume this Lease within sixty (60) days after the date of filing the bankruptcy petition, this Lease shall be deemed to have been rejected. In the event of such rejection, Landlord shall thereupon be immediately entitled to possession of the Premises without further obligation to the Tenant, trustee or debtor in possession and this Lease shall be canceled, but Landlord's right to be compensated for damages in such proceeding shall survive.

In the event that a voluntary or involuntary bankruptcy petition is filed by or against Tenant, and Tenant, trustee or debtor in possession elects to assume this Lease, such assumption shall only be effective if each of the following conditions, which Landlord and Tenant hereby acknowledge to be commercially reasonable in the context of a bankruptcy proceeding of Tenant, have been satisfied:

(a)     The Tenant, trustee or the debtor in possession has cured or has provided Landlord adequate assurance that the Tenant, trustee or debtor in possession will cure all monetary defaults under this Lease within ten (10) days from the date of assumption of this Lease.

(b)     The Tenant, trustee or the debtor in possession has cured or has provided Landlord adequate assurance that the Tenant, trustee or debtor in possession will cure all non-monetary defaults under this Lease within thirty (30) days from the date of assumption of this Lease.

(c)     The Tenant, trustee or the debtor in possession has compensated or has provided to Landlord adequate assurance that Landlord will be compensated for any pecuniary loss incurred by Landlord arising from the default of the Tenant, trustee or debtor in possession within ten (10) days from the date of assumption of this Lease.

(d)     The Tenant, trustee or debtor in possession has provided Landlord with adequate assurance of the future performance of each of the Tenant's, trustee's or debtor in possession's obligations under this Lease; provided, however, that the Tenant, trustee or debtor in possession shall also deposit with the Landlord as security for the timely payment of rent an amount equal to two (2) months' rent accruing under this Lease.

(e)     The assumption of this Lease will not breach any provision in any other lease, mortgage, financing agreement or other agreement by which Landlord is bound relating to the Premises.

Notwithstanding any provisions of paragraph 16, Assignment, to the contrary, if this Lease is assigned to any person or entity pursuant to the provisions of the Bankruptcy Code:

(a)     Any and all monies or other considerations, payable or otherwise, to be delivered in connection with such assignment, shall be paid or delivered to Landlord, shall be and remain the exclusive property of Landlord and shall not constitute property of Tenant or the estate of Tenant within the meaning of the Bankruptcy Code. Any and all monies or other considerations constituting Landlord's property under the preceding sentence not paid or delivered to Landlord shall be held in trust for the benefit of Landlord and shall be promptly paid or delivered to Landlord; and

(b)     Any person or entity to which this Lease is assigned pursuant to the provisions of the Bankruptcy Code shall be deemed without further act or deed to have assumed all of the obligations arising under this Lease on and after the date of such assignment. Any such assignee shall upon demand execute and deliver to Landlord an instrument confirming such assumption.

## 18.    FIRE AND CASUALTY DAMAGE.

In the event the Premises is damaged or destroyed in whole or in part by fire or other casualty during the Term of this Lease, then except as otherwise provided herein, Landlord shall, following Landlord's receipt of sufficient insurance proceeds to complete the repair and restoration of same, immediately commence and diligently pursue the restoration of the damaged area(s) of the shell of the Building to good and tenantable condition.

The proceeds of all insurance paid as a result of any damage or destruction to the Premises, and the interest, if any, that may be earned thereon (herein collectively called the "Fund") shall be received and held by the holder of any first mortgage lien on the Premises ("Fund Holder"), and shall be applied by the Fund Holder in accordance with the following provisions:

15

(a)    If the amount of the Fund is not sufficient to pay the entire cost of repairing and restoring the Premises (as estimated by a registered architect or professional engineer reasonably satisfactory to Landlord), Tenant shall deposit with the Fund Holder such deficiency within ten (10) days after receipt by Tenant of a statement setting forth the amount of such deficiency.

(b)    Following the Fund Holder's receipt of sufficient proceeds to pay the entire cost of repairing and restoring the Premises Landlord shall, following receipt of sufficient proceeds to restore the shell of the Building, restore the shell of the Building to substantially the same condition as before the occurrence of such casualty. In no event shall Landlord be required to repair, replace or restore (i) Tenant's personal property: (ii) Tenant's furnishings, operating equipment, trade fixtures or merchandise: (iii) any personal property of Tenant's agents, employees, contractors, licensees or invitees; or (iv) any improvements made by Tenant as part of Tenant's Work. Landlord shall be entitled to payments out of the Fund from time to time as Landlord's work progresses in amounts equal to the cost of labor and material incorporated into and used in such work, permits and architect's and engineer's fees. Any amounts received by Landlord out of the Fund shall be held by Landlord in trust and applied only for the purpose of repairing and restoring the Premises. If Landlord fails to repair and restore the Premises as required herein, Tenant or the Fund Holder shall have the right, but not the obligation, after thirty (30) days' notice to Landlord and without waiving or releasing Landlord from any obligations of Landlord hereunder, to do the repair and restoration as may be required in which event the moneys then in the Fund and the moneys which Tenant is obligated to add to the Fund and/or pay toward any deficiency shall be made available to such entity performing such repair and restoration.

(c)    Immediately following Landlord's repair and restoration of the shell of the Building, Tenant shall repair and restore the remainder of the Building to substantially the same condition as before the occurrence of such casualty. If Tenant fails to repair and restore the Premises as required herein, Landlord or the Fund Holder shall have the right, but not the obligation, after thirty (30) days' notice to Tenant and without waiving or releasing Tenant from any obligations of Tenant hereunder, to do the repair and restoration as may be required in which event the moneys then in the Fund and the moneys which Tenant is obligated to add to the Fund and/or pay toward any deficiency shall be made available to such entity performing such repair and restoration.

(d)    Tenant shall be entitled to payments out of the Fund from time to time as Tenant's work progresses in amounts equal to the cost of labor and material incorporated into and used in such work, permits and architect's and engineer's fees, provided and upon condition that (i) the work shall have been done in accordance with the plans and specifications therefor; and (ii) the remaining amount of the Fund shall at all times pertinent thereto be sufficient to pay in full for all of the remaining work.

(e)    Any amounts received by Tenant out of the Fund shall be held by Tenant in trust and applied only for the purpose of repairing and restoring the Premises.

(f)    If any of such insurance proceeds shall remain after the full completion of such repairs and restoration, the excess shall be retained by or paid over to Tenant, unless an alternate agreement has been reached between Landlord, Tenant and the Fund Holder.

16

Initial

Initial

In the event there is no Fund Holder, all insurance proceeds shall be paid to, and held by, Landlord and Tenant jointly, and shall be used by Landlord and Tenant to repair and restore the Premises as provided herein. Tenant shall be liable for all amounts by which the cost to complete such repairs and restoration exceeds the available insurance proceeds.

To the extent Landlord receives rental interruption insurance proceeds, the Rent required under this Lease shall abate in proportion to the area of the Building which is untenantable for the period commencing with the date of casualty and ending sixty (60) days from and after the date Landlord has repaired and restored the shell of the Building as required hereunder. In the event Landlord fails to receive rental interruption insurance proceeds, unless such failure is as a direct result of (i) Landlord's wilful acts or omissions, or (ii) the insurance companies fulfillment of its obligation to pay to Landlord twelve (12) months of rental interruption insurance proceeds, Tenant shall not be entitled to an abatement of Rent, but instead shall remain liable for the payment of all Rent due under this Lease.

Notwithstanding anything to the contrary contained in this Lease, in the event the Building is damaged or destroyed by fire or other casualty during the Term hereof, Tenant shall have the right to terminate this Lease by giving written notice to Landlord if the time to complete the repairs to the shell of the Building, as reasonably estimated by Landlord within twenty-one (21) days after such casualty, will be more than one hundred twenty (120) days from and after the date adequate insurance proceeds are made available to Landlord for such restoration. Such notice of termination shall be waived by Tenant if not exercised within fourteen (14) days after Tenant's receipt of such estimate from Landlord.

19.    CONDEMNATION.

If the whole or substantially all of the Premises is taken by any public authority under the power of eminent domain, then this Lease shall terminate on the date possession of the Premises is delivered to such public authority. Annual Rent and Additional Rent shall be paid to that date and prorated accordingly.

If part of the Premises is taken by any public authority under the power of eminent domain, then, on the date possession is required by such public authority this Lease shall terminate as to the portion taken and the Rent due hereunder shall be reduced in proportion to the amount of the Building taken. In the event so much of the Building or of the driveways and parking areas serving the Building are taken that in the Tenant's reasonable judgement the remaining portion of the Premises is inadequate for the conduct of the Tenant's business, then the Tenant shall have the right to terminate this Lease by giving written notice to Landlord within fourteen (14) days after the date possession is acquired by such public authority. Except as otherwise provided herein, upon Landlord's receipt of Landlord's Condemnation Award (as hereinafter defined) Landlord shall immediately commence and diligently pursue the restoration of the remaining Building shell to the extent necessary to permit the continued use of the Premises, and shall use Landlord's Condemnation Award therefor.

During the period of making such repairs, Rent shall abate as to that portion of the (remaining) Building which is untenantable.

Landlord shall restore the shell of the Building to substantially the same condition as before the taking, if possible. In no event shall Landlord be required to repair or replace (a) Tenant's personal property; (b) Tenant's furnishings, operating equipment, trade fixtures, or merchandise; or (c) any improvements made by Tenant as part of Tenant's Work.

Notwithstanding anything to the contrary contained in this Lease, if part of the Premises is taken by any public authority under the power of eminent domain, Landlord shall have the right to terminate this Lease by written notice given to Tenant if (i) Landlord's Condemnation Award is insufficient to complete the necessary restoration; or (ii) the taking (i.e., the date possession is required by the public authority) occurs within the last two (2) years of the original Term of this Lease or any extension of such Term, provided, however, that this Lease may not be terminated under this Subsection if Tenant's option, if any, to further extend the Term of this Lease is exercised within ten (10) days after Tenant receives from Landlord the termination notice described above.

Termination of this Lease pursuant to this paragraph shall be effective as of the earlier of the date possession is required by the public authority or sixty (60) days after Tenant receives the termination notice described above.

All damages awarded for such taking shall belong to and be the property of the Landlord, whether such damages shall be awarded as compensation for diminution in value to the leasehold or to the fee of the Premises and any improvements to the Premises made by, or paid for by, Landlord. The amount received by Landlord which is allocable to the Premises shall be "Landlord's Condemnation Award". Notwithstanding the foregoing, Tenant shall be entitled to seek compensation for the value of those improvements made by Tenant as part of Tenant's Work [but in no event in an amount in excess of (i) that portion of the Allowance that has been repaid by Tenant to Landlord as required hereunder, and (ii) the amount by which the cost of the Tenant's Work exceeds the Allowance], its trade fixtures, and for loss of business and moving expenses.

20.    <u>DEFAULT AND REMEDIES</u>.

Any of the following occurrences shall constitute an Event of Default:

(a)    Tenant fails to pay any installment of Annual Rent, or Additional Rent, or any portion of either of them, within ten (10) days from and after the date same is due and payable.

(b)    Landlord declares an Event of Default as permitted in paragraph 17, Bankruptcy or Insolvency.

(c)    Tenant violates or fails to comply with or is in default in the performance of any other provision of this Lease for a period of thirty (30) days after notice from Landlord of such violation, noncompliance, or default, provided that in the case of a default which cannot with due diligence be cured within a period of thirty (30) days, Tenant shall have such additional time to cure same as may reasonably be necessary so long as Tenant commences curing such default within the thirty (30) day period and proceeds promptly,

18

effectively, continuously and with due diligence to cure such default after receipt of said notice.

Upon the occurrence of an Event of Default, and notwithstanding the fact that Landlord has or may have some other remedy under this Lease or at law or in equity, Landlord may give to Tenant written notice (the "Termination Notice") of the intention of Landlord to end the Term of this Lease, specifying a day ("Termination Date") not less than ten (10) days thereafter. Upon the giving of the Termination Notice, this Lease and the Term and estate hereby granted shall expire and terminate upon the Termination Date as fully and completely and with the same force and effect as if the Termination Date were the expiration date of this Lease and all rights of Tenant shall terminate.

From and after any date upon which Landlord is entitled to give a Termination Notice, Landlord may, without further notice, enter upon, re-enter, possess and repossess itself of the Premises, by summary proceedings, ejectment or as otherwise permitted by law, and may dispossess and remove Tenant and all other persons and property from the Premises and may have, hold and enjoy the Premises and the right to receive all rental and other income of and from the same.

Upon and after such entry into possession, Landlord, at its option, may either terminate this Lease by giving the Termination Notice described above, or, without terminating this Lease, relet the Premises or any part thereof on such terms and conditions as Landlord deems advisable in its sole discretion. The proceeds of such reletting shall be applied: (a) First, to the payment of any indebtedness of Tenant to Landlord other than Annual Rent or Additional Rent; (b) Second, to the payment of any reasonable costs of such reletting including the cost of any reasonable alterations and repairs to the Premises, brokerage fees and expenses, advertising expenses, inspection fees and attorneys fees; (c) Third, to the payment of Annual Rent and Additional Rent due and unpaid hereunder; (d) Fourth, to any damages, costs and expenses incurred by Landlord as a result of Tenant's breach; and (e) The residue, if any, shall be held by Landlord and applied in payment of future Rent as the same may become due and payable hereunder. Should the proceeds of such reletting during any month be less than the monthly installments of Annual Rent or than Additional Rent required hereunder, then Tenant shall during such month pay such deficiency to Landlord upon demand.

Each and every right, remedy and benefit provided by this Lease to Landlord shall be cumulative and shall not be exclusive of any other right, remedy or benefit allowed by law. These remedies may be exercised jointly or severally without constituting an election of remedies.

One or more waiver by Landlord of any term and condition hereunder or default by Tenant hereunder shall not be construed as a waiver of such term and condition or default in the future or any subsequent default for the same cause. Any consent or approval given by Landlord requiring such consent or approval shall not constitute consent or approval to any subsequent similar act by Tenant.

In the event Landlord elects to terminate this Lease, then Landlord shall have the right to accelerate all of the Rent (both Annual and Additional, to the extent determined) due hereunder for the balance of the Term of this Lease and Tenant shall forthwith pay to Landlord upon demand, as liquidated damages, the deficiency between the amount of said accelerated Rent and either the proceeds

19

of reletting for what would have been otherwise constituted the balance of the Lease Term or the reasonable rental value of the Premises for such balance of the Lease Term if the Premises are not relet by Landlord within thirty (30) days following the Termination Date, such difference to be discounted to present value at an interest rate of ten percent (10%). In computing such liquidated damages there shall be added to such deficiency any expenses incurred in connection with obtaining possession of and reletting the Premises, whether such reletting is successful or not, which expenses include but are not limited to attorneys fees, brokerage fees and expenses, advertising expenses, reasonable alterations and repairs to the Premises, and inspection fees.

Tenant will pay, in addition to the rentals and other sums agreed to be paid hereunder, reasonable attorneys' fees, costs and expenses in any suit or action instituted by or involving Landlord to enforce the provisions of, or the collection of the rentals due Landlord under this Lease, including any proceeding under the Federal Bankruptcy Code.

Landlord shall make diligent efforts to mitigate its damages.

### 21.   CURING DEFAULT.

If Tenant defaults in the performance of any provision of this Lease, Landlord shall have the right (but not the obligation) in addition to any and all other rights and remedies which Landlord may have at law or in equity, to cure such default for the account of Tenant, upon ten (10) days prior written notice to Tenant, except that in an emergency Landlord may cure such default without prior notice to Tenant. Upon receipt of notice of such cure and demand for payment, Tenant shall repay any payment or expenditure with the next monthly rent payment, together with interest at ten (10%) percent per annum from the date of the payment or expenditure by Landlord until the date of repayment by Tenant. Landlord's failure to exercise its right to cure such default(s) shall not be deemed a breach of this Lease nor a waiver or release of any of Tenant's obligations under this Lease.

### 22.   SECURITY DEPOSIT.

PARAGRAPH INTENTIONALLY DELETED.

### 23.   NOTICES.

Whenever under this Lease a provision is made for notice of any kind it shall be deemed sufficient notice and service thereof if such notice to the Tenant is in writing addressed to the Tenant at 9950 Mayland Drive, Richmond, Virginia 23233-1464, Attention: Vice President, Real Estate, with a copy to 9950 Mayland Drive, Richmond, Virginia 23233-1464, Attention: Corporate Secretary, with a copy of such notice to the Premises and personally delivered, delivered to a reputable overnight courier service, or deposited in the mail, certified mail, return receipt requested, with postage prepaid, and if such notice to the Landlord is in writing addressed to the address of the Landlord set forth above and personally delivered, delivered to a reputable overnight courier service, or deposited in the mail, certified mail, return receipt requested.

24.    ACCESS TO PREMISES.

The Landlord shall have the right to enter upon the Premises at all reasonable hours, following reasonable notice, for the purpose of inspecting the same. If the Landlord deems any repairs necessary and proper to maintain the integrity of the Premises, it may demand that the Tenant make the same and if the Tenant refuses or neglects forthwith to commence such repairs and complete the same with reasonable dispatch, the Landlord may make or cause to be made such repairs and shall not be responsible to the Tenant for any loss or damage that may accrue to his stock or business by reason thereof, and if the Landlord makes or causes to be made such repairs, the Tenant agrees that it will forthwith on demand pay to the Landlord the reasonable cost thereof and if it shall default in such payment the Landlord shall have the remedies provided in paragraph 20, Default and Remedies, hereof.

Within one hundred eighty (180) days prior to the expiration of the Term, including extensions hereof, Landlord may enter the Premises during Tenant's normal business hours to show the Premises to prospective tenants or purchasers. During the final ninety (90) days of the Term, including extensions hereof, Landlord and its authorized agents may erect on, or about, the Premises its customary sign advertising the property for sale or lease, provided such sign does not interfere with or create a hazard to Tenant's normal business operation.

25.    LANDLORD'S EASEMENTS.

Landlord hereby reserves the right to grant any easements Landlord deems necessary over, under, through and across the Land for vehicular and pedestrian ingress and egress, and for utilities for the benefit of any property adjacent to, or contiguous with, the Land provided that such easements shall not materially and adversely affect the Premises or Tenant's use thereof.

26.    QUIET ENJOYMENT.

The Landlord covenants that the Tenant, on payment of all aforesaid installments and performing all the covenants aforesaid, shall and may peacefully and quietly have, hold, and enjoy the Premises for the term aforesaid.

27.    HOLDING OVER.

It is hereby agreed that in the event of the Tenant herein holding over after the expiration of this Lease, thereafter the tenancy shall be from month to month in the absence of a written agreement to the contrary; the monthly Annual Rent shall be one hundred fifty (150%) percent of the monthly installment during the last year of the Term of this Lease and all other terms and conditions of this Lease, including Additional Rent, shall be applicable to the month to month tenancy.

21

28. <u>RECEIVING AND DELIVERING OF TENANT'S EQUIPMENT AND DISPOSITION OF REFUSE.</u>

PARAGRAPH INTENTIONALLY DELETED.

29. <u>RESERVATION.</u>

The Landlord reserves the right to free access at all times to the roof of the Building. The Tenant shall not erect any structures for storage or any aerial, or use the roof for any purpose without the consent in writing of the Landlord.

Landlord consents to the erection of a satellite dish on the roof of the Building, provided Tenant obtains all required permits and approvals for the erection of such satellite dish, and provided further that the Landlord approves the method of any penetration of the roof membrane, such approval not to be unreasonably withheld. Except as specifically allowed herein, Tenant shall not make any penetrations of the roof of the Building without the prior written approval of the Landlord.

30. <u>SIGNS.</u>

Tenant shall have all signage rights with regard to the Premises, subject to any and all federal, state, or local governmental laws, ordinances, codes, restrictions, rules and regulations.

31. <u>DEFINITION OF LANDLORD.</u>

As used in this Lease, the term "Landlord" shall mean only the owner, or the mortgagee in possession, for the time being, of the Premises, so that in the event of any sale of the Premises, said Landlord shall be and hereby is entirely free and relieved of all covenants and obligations of Landlord hereunder which arise subsequent to the date of such transfer, and it shall be deemed and construed without further agreement between the parties or their successors in interest, or between the parties and any such purchaser, that such purchaser has assumed and agreed to perform and observe any and all covenants and obligations of Landlord hereunder.

32. <u>TRANSFER OF PREMISES.</u>

Landlord shall have the right to sell, transfer or assign the Premises, and/or Landlord's interest under this Lease upon prior written notice of the terms and conditions of the sale, transfer or assignment to Tenant. In the event of such sale, transfer or assignment, Tenant shall attorn to the purchaser, transferee or assignee and recognize such purchaser, transferee or assignee as Landlord under this Lease and Landlord shall be relieved from all subsequent obligations and liabilities under this Lease, provided such obligations are assumed by such purchaser, transferee or assignee.

33.   APPLICABLE LAW.

This Lease shall be construed and enforced in accordance with the laws of the State of Michigan.

34.   SUCCESSORS AND ASSIGNS.

The covenants, conditions and agreements made and entered into by the parties hereto are declared binding on their respective heirs, successors, representatives and assigns.

35.   LANDLORD'S REPRESENTATIONS.

Neither Landlord nor Landlord's agents have made any representations or promises with respect to the physical condition of the Premises, permissible uses of Premises, the rents, leases, expenses of operation or any other matter or thing affecting or related to the Premises except as herein expressly set forth, and no rights, easements, or licenses are acquired by Tenant by implication or otherwise except as expressly set forth in the provisions of this Lease.

36.   WAIVER.

One or more waivers of any covenant or condition by Landlord shall not be construed as a waiver of a subsequent breach of the same covenant or condition, and the consent or approval by Landlord to or of any act by Tenant requiring Landlord's consent or approval to or of any similar act by Tenant.

37.   FORCE MAJEURE.

In the event either party shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lock-outs, labor troubles, inability to procure materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, war or other reason of a like nature beyond the reasonable control of that party, in performing work or doing acts required under the terms of this Lease, then performance of such act shall be extended for a period equivalent to the period of such delay but not to exceed thirty (30) days. Nothing contained herein shall be deemed to delay the Tenant's right to terminate this Lease in the event the Landlord has not completed the Landlord's Work on or before June 1, 1996.

38.   ENVIRONMENTAL INDEMNIFICATION.

Tenant hereby agrees to indemnify, save and hold Landlord harmless at all times subsequent to the execution date hereof from (i) any and all fines, penalties, costs and/or expenses (including reasonable attorneys' fees and costs) incurred by Landlord as a result of claims, demands, causes of action and actions, suits, rights and damages, whatsoever, whether in law or in equity ("Claim(s)") made by any party whatsoever in connection with any hazardous or toxic waste, pollutants, and/or chemicals generated, stored, leaked, spilled or otherwise disbursed by Tenant, its agents, employees, licensees or invitees, in, on, under, above or about the Premises prior to the date Landlord delivers possession of the Property to Tenant, and (ii) for injuries sustained or other tort actions brought for claims arising

23

out of Tenant's failure to remove such toxic wastes, pollutants, and/or chemicals from the Premises or the Premises. Such indemnification shall include any and all costs of removal of the toxic wastes, pollutants and/or chemicals.

Landlord hereby agrees to indemnify, save and hold Tenant harmless at all times subsequent to the execution date hereof from (i) any and all fines, penalties, costs and/or expenses (including reasonable attorneys' fees and costs) incurred by Tenant as a result of claims, demands, causes of action and actions, suits, rights and damages, whatsoever, whether in law or in equity ("Claim(s)") made by any party whatsoever in connection with any hazardous or toxic waste, pollutants, and/or chemicals generated, stored, leaked, spilled or otherwise disbursed by Landlord, its agents, employees, licensees or invitees, in, on, under, above or about the Premises or the property owned by Landlord and adjoining the Premises, prior to the date Landlord delivers possession of the Premises to Tenant, and (ii) for injuries sustained or other tort actions brought for claims arising out of Landlord's failure to remove such toxic wastes, pollutants, and/or chemicals from the Premises or the property owned by Landlord which adjoins the Premises. Such indemnification shall include any and all costs of removal of the toxic wastes, pollutants, and/or chemicals.

### 39.  CORPORATE AUTHORITY.

If Tenant signs as a corporation, each of the persons executing this Lease on behalf of Tenant does hereby covenant and warrant that (a) Tenant is a duly organized and validly existing corporation, (b) Tenant is qualified to do business in Michigan, (c) the corporation has the legal ability and authority to enter into this Lease, and (d) each person executing this Lease on behalf of the corporation is authorized to do so.

### 40.  SURRENDER OF PREMISES.

At the end of this Lease, Tenant will promptly quit and surrender the Premises in as good condition as at the completion of Tenant's Work, ordinary wear and tear and damage due to casualty covered by insurance excepted. If Tenant is not then in default, Tenant may remove from the Premises any trade fixtures, equipment and movable furniture placed in the Premises by Tenant, whether or not such trade fixtures or equipment are fastened to the Premises; Tenant will not remove any trade fixtures or equipment without Landlord's written consent if such fixtures or equipment are used in the operation of the Premises or improvements or the removal of such fixtures or equipment will result in impairing the structural strength of the Premises or improvements. Tenant will fully repair any damage occasioned by the removal of any trade fixtures, equipment, furniture, alterations, additions and improvements. All trade fixtures, equipment, furniture, inventory, effects, alterations, additions and improvements not so removed will be deemed conclusively to have been abandoned and may be appropriated, sold, stored, destroyed or otherwise disposed of by Landlord without notice to Tenant or any other person and without obligation to account for them; and Tenant will pay Landlord for all expenses incurred in connection with such property. Tenant's obligation to observe and perform this covenant will survive the expiration or other termination of this Lease.

24

41.   NO OPTION.

The submission of this Lease for examination or execution does not constitute a reservation of or option for the Premises, and this Lease becomes effective as a lease only upon execution and delivery thereof by Landlord and Tenant.

42.   MEMORANDUM OF LEASE.

Neither party shall record this Lease or any portion thereof. However, Tenant may prepare, and Landlord will execute, a Memorandum of Lease in substantially the form attached hereto, and Tenant may record same at Tenant's expense.

43.   LANDLORD'S REPRESENTATIONS AND WARRANTIES. Landlord represents and warrants to the Tenant that Landlord has, or as of the date of delivery of possession of the Premises to the Tenant, the Landlord will have good and marketable fee title to the Premises subject to building and use restrictions, easements and zoning ordinances which do not adversely affect the Tenant's use of the Property, and furthermore, to the best of Landlord's knowledge:

(a)   The Premises are in a light industrial LI-1 zoning district which allows the uses contemplated in this Lease by right without the necessity of obtaining any special or conditional use permit, variance, or rezoning. Other than applicable zoning regulations, and other governmental laws, regulations, ordinances, and statutes, the Landlord is not aware of any agreement with any governmental authority, owner's association, neighborhood group or organization, or any other party which would restrict the Tenant's use of the Premises, or would subject the Tenant to any assessment or maintenance fee not provided for in this Lease.

(b)   Water, sewer, storm drainage, electricity, gas and telephone facilities are available at the Premises and will be connected to the Building and functioning upon the Landlord's delivery of possession of the Building to the Tenant.

(c)   The Landlord has received no notice of a planned or contemplated condemnation of any portion of the Premises, or of any increase in the Taxes assessed against the Premises above those assessed for the current tax year except as may result from the construction of the Building and improvement of the Land.

(d)   Haggerty Road is a dedicated, publicly-maintained road, and the Landlord has received no notice that Haggerty Road will be widened, closed, made a limited access road, or the elevation or grade thereof changed.

44.   TOPICAL HEADINGS.

Topical headings appearing in this Lease are for convenience only. They do not define, limit or construe the contents of any paragraphs or clauses.

45.   ENTIRE AGREEMENT; MODIFICATION; SEVERABILITY.

This Lease contains the entire agreement between the parties hereto and no representations, inducements, promises or agreements, oral or otherwise, entered into prior to the execution of this Lease, will alter the covenants, agreements and undertakings herein set forth. This Lease shall not be modified in any manner, except by an instrument in writing executed by the parties. If any term or provision of this Lease or the application thereof, to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

WITNESSED BY:

LANDLORD:

Carrollton Arms, a Michigan co-partnership

By: _____
   Gabriele Paciocco
   Its: Partner

TENANT:

Circuit City Stores, Inc., a Virginia corporation

By: _____

Its: _____V.P._____