## LEASE AGREEMENT

**THIS LEASE AGREEMENT** (this "Lease"), dated as of the 7th day of September, 2007 ("Effective Date"), by and between **MANSFIELD SEQ 287 & DEBBIE, LTD.**, a Texas limited partnership ("Landlord") with an office at 2525 McKinnon Street, Suite 700, Dallas, Texas 75201, and **CIRCUIT CITY STORES, INC.**, a Virginia corporation ("Tenant") with an office at 9950 Mayland Drive, Richmond, Virginia 23233.

### W I T N E S S E T H:

In consideration of the rents and covenants set forth in this Lease, Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises (as defined in Section 1.01(P)) upon the following terms and conditions:

### ARTICLE I

### FUNDAMENTAL LEASE PROVISIONS

SECTION 1.01 Definitions:

A. **Additional Charges:**

  1. Initial CAM Costs: One and 95/100 Dollars ($1.95) per square foot of Floor Area (as defined below), which includes the initial insurance cost of thirty cents ($0.30) per square foot of Floor Area (the "Initial Insurance Cost").

  2. Initial Taxes: Estimated at Four and 30/100 Dollars ($4.30) per square foot of Floor Area.

B. **Alternative Rent:** An amount equal to fifty percent (50%) of the Annual Minimum Rent (as defined below) that would have otherwise been due during the period of time that Tenant is entitled to pay Alternative Rent, plus one hundred percent (100%) of Additional Rent.

C. **Annual Minimum Rent** (subject to adjustment pursuant to Section 2.09):

| Period | Rent p.s.f. | Annual Rent | Monthly Installments |
|---|---|---|---|
| Initial Lease Term: | | | |
| Commencement Date through end of tenth (10th) Lease Year (as defined in Section 1.01(J)) | $12.00 | $243,648.00 | $20,304.00 |

WO 696608.10

|  |  |  |  |
|---|---|---|---|
| 1st Extension Period (as defined in Section 1.01(F)): | $13.20 | $268,012.80 | $22,334.40 |
| 2nd Extension Period: | $14.52 | $294,814.08 | $24,567.84 |
| 3rd Extension Period: | $15.97 | $324,254.88 | $27,021.24 |
| 4th Extension Period: | $17.57 | $356,741.28 | $29,728.44 |
| 5th Extension Period: | $19.33 | $392,476.32 | $32,706.36 |

D. **Broker:** The Retail Connection, and Western Retail Advisors

E. **Delivery Dates:**
  1. Anticipated Possession Date: March 1, 2008.
  2. Outside Possession Date: May 1, 2008.

F. **Extension Periods:** Five (5) periods of five (5) years each.

G. **Floor Area:** The actual number of square feet of space contained on all floors within any building area in a particular leased premises (including the Premises) within the Shopping Center (as defined below), or in the Shopping Center, as applicable, and, with respect to exterior areas, including all exterior areas leased to or exclusively used by one (1) or more tenants (other than loading dock areas, trash compactor areas, and trash container areas, or temporary outdoor seating areas for restaurants, coffee shops or cafes). All measurements shall be from the exterior of outside walls or store front and/or to the centerline of any common walls, but in no event shall Floor Area include any non-selling or storage space areas within any mezzanine, lower floor, second floor or, except as set forth above, any exterior areas.

H. **Initial Lease Term:** Ten (10) Lease Years, plus the partial Lease Year commencing on the Commencement Date and ending on the January 31 immediately thereafter.

I. **Key Tenants:** Target and Bed, Bath & Beyond. For purposes of this Lease, Target shall be deemed a "Key Tenant" even though Target is located in the Adjacent Shopping Center as identified on the site plan attached hereto as Exhibit A (the "Site Plan"), and the lease and occupancy of its premises is not under the control of the Landlord.

J. **Lease Year:** Each period within the Term (as defined below) commencing on February 1 and ending the next succeeding January 31, except that Lease Year 1 shall include the partial Lease Year commencing on the Commencement Date and ending on the January 31 immediately thereafter.

K.  **Minimum Ongoing Cotenancy Percentage**: Retail tenants, open for business during normal business hours, occupying at least fifty percent (50%) of the Floor Area of the Shopping Center, exclusive of the premises occupied by the Key Tenants and the Premises.

L.  **Minimum Initial Cotenancy Percentage**: Retail tenants, open for business during normal business hours, occupying at least fifty percent (50%) of the Floor Area of the Shopping Center, exclusive of the premises occupied by the Key Tenants and the Premises.

M.  **Minimum Parking Ratios**: Four and one half (4.5) full-size parking spaces for each one thousand (1,000) square feet of Floor Area in the Shopping Center (excluding the Outparcels), and Five (5) full-size parking spaces in the Tenant's Preferred Area (as defined below) for each one thousand (1,000) square feet of Floor Area in the Premises, with each parking space being at least nine (9) feet in width and eighteen (18) feet in length and for full-sized automobiles.

N.  **Opening Requirement**: All of the Key Tenants are open for business and the Minimum Initial Cotenancy Percentage is met.

O.  **Permitted Use**: The sale, rental, installation, servicing and repairing of consumer, office and automotive electronics products (collectively, the "Products"); and/or for any other lawful retail use not specifically prohibited by the provisions of Section 8.01. The term "Products" shall include, without limitation, televisions, stereos, speakers, video and audio recorders and players and cameras; computer hardware and software and related software services (which include internet access services, entertainment software and entertainment media [such as, by way of example only, game cartridges, video tapes, cassettes, compact discs, DVD's and DVD equipment]); cellular and wireless telephones and telecommunication devices and related accessories; motor vehicle audio, stereo and telephone systems; and technological evolutions of the foregoing.

P.  **Premises**: The store building to be constructed by Tenant as part of Tenant's Work (as defined in Section 3.01), containing approximately 20,304 square feet of Floor Area, including 138 feet of frontage and a depth not to exceed 138 feet exclusive of truck docks and wells, as crosshatched on the Site Plan, in the shopping center known as Mansfield Pointe Shopping Center, containing approximately One Hundred Twenty Thousand (120,000) square feet of Floor Area and three (3) outparcels identified on the Site Plan as "Outparcel 1", "Outparcel 2" and "Outparcel 3" (collectively, the "Outparcels") and located at the southerly corner of Home Depot Drive and U.S. Highway 287 in Mansfield, Texas (the "State"), as more particularly described in Exhibit B (the "Shopping Center").

Q.  **Slack Delivery Period**: Periods of time beginning on November 1 and ending on the following March 1.

R.  **Slack Season**: The period of time beginning on November 1st and ending on the following January 1.

3

WO 696608.9

S.  **Tenant's Share**: A fraction, the numerator of which shall be the Floor Area of the Premises and the denominator of which shall be the Floor Area of all buildings in the Shopping Center, provided, however, that the denominator shall be reduced by the Floor Area of any Outparcels within the Shopping Center to the extent such owner or occupant thereof self maintains or separately maintains such parcels, but only with respect to any such portion of the CAM Charges and maintenance obligations which are assumed by and performed by such party and not incurred by the Landlord or its designee as CAM Charges hereunder. In no event shall the denominator of the fraction by which Tenant's Share is determined be less than ninety percent (90%) of the Floor Area of the building areas shown on the Site Plan, excluding the Outparcels.

T.  **Term**: The Initial Lease Term plus the Extension Periods, if the option for any such Extension Period is exercised.

## ARTICLE II

## LEASE OF PREMISES - TERM OF LEASE

SECTION 2.01 Demise.

(a) Landlord does hereby lease and demise to Tenant, and Tenant does hereby hire from Landlord, the Premises, together with the licenses, rights, privileges and easements appurtenant to the Premises.

(b) Tenant and its employees, invitees, agents, customers, concessionaires and licensees shall have the nonexclusive right, in common with Landlord and other tenants of the Shopping Center, to use all Shopping Center sidewalks, paved parking areas, paved service areas, signs, traffic controls, lighting and all means of ingress, egress, acceleration, deceleration and stacking lanes and circulation for the aforesaid parking and service areas of the Shopping Center to and from public streets and roads bordering the Shopping Center (collectively, the "Common Areas") now or hereafter made available or maintained by Landlord in the Shopping Center. Tenant's right to use the Common Areas may be subject to such reasonable regulations (consistent with Tenant's rights under this Lease) as may from time to time be imposed upon, and equally applicable to, all tenants of the Shopping Center by Landlord or its agents. Tenant shall not have any parking rights on the Outparcels, and the owners or occupants of the Outparcels shall not have any parking rights on the Shopping Center. Landlord shall provide Tenant with at least thirty (30) days prior notice of any such rules and regulations, which notice shall contain a copy of such rules and regulations.

(c) Tenant shall have the exclusive right to use, on a "24 hour a day", "365 days a year" basis and without any additional charge, the loading facilities serving the Premises, the customer pick-up area, car stereo parking areas, four (4) web order customer pick-up parking spaces, trash compactor area and transformer pad area (collectively, the "Other Improvements"), all as shown on the Site Plan and subject to applicable laws. In addition, subject to applicable laws, Landlord hereby grants to Tenant the right during the Term to install three (3) single width cart corrals (the design of which must be reasonably acceptable to Landlord) in the locations shown on the Site Plan for the storage of Tenant's shopping carts. Tenant shall have the right to

4

erect a sign identifying Tenant's customer pick-up area and/or Tenant's car stereo parking areas. Tenant shall also have the right to erect signage, stripe, and print on the four (4) web order customer pick-up parking spaces in order to so identify such parking spaces. In addition, subject to applicable laws, Tenant shall have the right to have a truck or other vehicle parked in "Tenant's Preferred Area" as shown on the Site Plan ("Tenant's Promotional Area"), for up to five (5) consecutive days in duration for each occurrence, for the purpose of promoting and displaying merchandise (each occurrence up to five [5] days in duration is referred to as a "Tenant Promotion"). Tenant may have up to six (6) Tenant Promotions during Lease Year 1, and up to five (5) Tenant Promotions for each subsequent Lease Year.

SECTION 2.02 Extension Periods. Provided Tenant is not then in default of any material terms or provisions this Lease, after the lapse of all applicable grace periods, Tenant shall have the option to extend the Term for the number of Extension Periods shown in Section 1.01(F), upon all the terms and conditions contained in this Lease. Each such option is exercisable by Tenant giving notice to Landlord (a) at least one hundred eighty (180) days prior to the expiration of the Initial Lease Term, or of the preceding Extension Period, as the case may be, or (b) if Tenant fails to give Landlord such notice, then within fifteen (15) business days after receipt of notice from Landlord that Tenant has failed to exercise its option to extend within the time period provided in (a) above.

SECTION 2.03 Commencement Date shall mean the date that is the earlier to occur of (a) two hundred and seventy (270) days after the later to occur of (i) the Possession Date (as defined in Section 2.05 below) or (ii) the date on which the Permit Condition (as defined in Section 2.12 below) is satisfied, or (b) the date on which Tenant opens for business to the public in the Premises. If, however, the Commencement Date shall occur prior to the date on which the Opening Requirement is met, and Tenant elects to delay the opening of its store, then, notwithstanding that the Commencement Date shall have occurred, Rent (as defined in Section 4.03) shall fully abate until the date on which the Opening Requirement is met. If, however, Tenant elects, at its discretion, to open for business prior to the date that the Opening Requirement is met, then Tenant shall pay, in lieu of Annual Minimum Rent, Alternative Rent until the date on which the Opening Requirement is met.

SECTION 2.04 Possession Date. "Possession Date" shall mean the date on which the last of the following conditions shall have been satisfied:

(a) Landlord shall have caused the Delivery of the Land (as defined in the Site Design Requirements attached hereto as Exhibit C ("Site Design Requirements")) to occur;

(b) Landlord shall have delivered the soils engineer's and surveyor's certifications as required by Circuit City's Specifications (as defined in the Site Design Requirements);

(c) Intentionally Omitted;

(d) The Permit Condition with respect to Tenant's Permits shall have been satisifed;

(e) The representations and warranties of Landlord set forth in Sections 9.03 and 20.02 below shall then be true and in effect in all material respects, and Landlord shall not then be in violation of any of the Site Covenants (as defined in Section 20.03);

(f) Landlord shall have delivered to Tenant a fully-executed original counterpart of a non-disturbance and/or recognition agreement, as applicable, from each Mortgagee and Ground Lessor (as such terms are defined in Section 19.01), as more fully set forth in Section 19.02;

(g) Target is open for business in the Adjacent Shopping Center (as identified on the Site Plan);

(h) Landlord shall have entered into a lease agreement with Bed Bath & Beyond which lease shall provide that Bed Bath & Beyond shall open for business for at least one (1) day in their leased premises on or before October 1, 2008, and Bed Bath & Beyond and Tenant shall have entered into a Co-Exist letter in accordance with Section 23.24 of this Lease; and

(i) Landlord shall have delivered to Tenant the W-9 form attached hereto as Exhibit D.

Landlord currently anticipates that the Possession Date will occur on the Anticipated Possession Date, subject to the provisions of Section 2.05 below. In no event shall the Possession Date occur prior to the Expected Possession Date (as defined in Section 2.05).

SECTION 2.05 Expected Possession Date.

(a) Landlord shall give Tenant no less than one hundred twenty (120) days notice of the date on which the Possession Date (including, without limitation, the Delivery of the Land) shall occur, using the form of Possession Date Notice attached hereto as Exhibit C-1 (the "Possession Date Notice"). The date specified in such notice shall be defined as the "Expected Possession Date".

(b) If Landlord fails to accomplish the Possession Date by the Expected Possession Date (subject to Force Majeure, as defined in Section 23.12, but in no event shall the aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed a period of sixty (60) days), then Landlord shall pay to Tenant on demand, as a liquidated reimbursement (and not as a penalty) for all of the damages that Tenant will suffer as a result of any such delay, an amount equal to the sum of: (i) Ten Thousand Dollars ($10,000), plus (ii) an amount equal to two (2) days of Annual Minimum Rent for each day that the Possession Date is delayed. If Landlord fails to complete any other element of Landlord's Work (as defined in Section 3.01) on or before the date required therefor in the Construction Schedule (as defined in the Site Design Requirements), subject to Force Majeure (but in no event shall the aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed a period of sixty (60) days), then Landlord shall pay to Tenant on demand, as a liquidated reimbursement (and not as a penalty) for all of the damages that Tenant will suffer as a result of any such delay, an amount equal to two (2) days of Annual Minimum Rent for each day that such component of Landlord's Work is delayed. The foregoing liquidated reimbursements represent the parties' good faith agreement as

6

WO 696608.9

to an agreed upon amount which shall have been incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment.

SECTION 2.06 Possession Date During Slack Period Delivery. Anything contained in this Lease to the contrary notwithstanding, if the Possession Date occurs during the Slack Delivery Period, then Tenant may refuse to accept the Premises. In that event, the Possession Date shall be delayed and shall not be deemed to occur until the first (1st) day following the end of the applicable Slack Delivery Period, subject to the other provisions of this Lease (including, without limitation, Sections 2.04 and 2.05).

SECTION 2.07 Delayed Possession. If the Possession Date does not occur before the Outside Possession Date (subject to Force Majeure), but in no event shall the aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed a period of sixty (60) days), then Tenant shall have the right to (a) terminate this Lease, or (b) delay opening its store facility for a period of not to exceed nine (9) months, which right shall be exercised by Tenant upon notice to Landlord at any time prior to the Possession Date. If Tenant terminates this Lease, then there shall be no further liability on the part of Landlord or Tenant, except: (i) for those obligations that expressly survive the expiration or other termination of this Lease, and (ii) Landlord shall (which obligation shall survive the termination of this Lease), within ten (10) business days following Tenant's termination notice, reimburse Tenant for all its reasonable third-party costs and out of pocket expenses incurred in connection with this Lease (including, without limitation, costs associated with the preparation and review of plans and specifications, and attorneys' fees), not to exceed Fifty Thousand Dollars ($50,000). If Tenant elects to delay opening its store facility, then Landlord shall cause the Possession Date (including, without limitation, the Delivery of the Land) to occur on the date subsequently required by Tenant, and Landlord shall pay to Tenant on demand an amount equal to all additional costs incurred by Tenant in the development of its store facility including, but not limited to, costs of materials and all engineering, architectural, legal fees, and costs of delay resulting from Landlord's failure to timely deliver.

SECTION 2.08 Early Entry. Any time prior to the Delivery of the Land, Tenant, at Tenant's risk, shall have the right to enter the Premises to (a) inspect the physical condition of the Land (as defined in the Site Design Requirements) and conduct its due diligence investigation of the Land to determine the suitability of the Land for Tenant's intended development, construction, use and operation and (b) inspect Landlord's Work; provided, however, that such entry may not unreasonably interfere with Landlord's Work and that Tenant indemnify and hold Landlord harmless from any cost, loss, injury, or damage pertaining to such early entry and due diligence investigation. Such entry shall not be construed as an acceptance of the Premises by Tenant under the provisions of this Lease or as a waiver of any of the provisions hereof. The provisions of this Section shall survive the termination of this Lease.

SECTION 2.09 Landlord Reimbursement.

(a) Upon Substantial Completion and Tenant's furnishing to Landlord (1) the certificates of insurance required under Section 11.02, (2) an indemnity in the form of Exhibit M attached to this Lease with respect to mechanics' liens arising out of Tenant's construction, and (3) a square footage building perimeter survey certified to Tenant and Landlord (the "Floor Area

7

Certification"), (items (1) through (3) above collectively, the "Reimbursement Deliverables"), Landlord shall pay to Tenant the Landlord Reimbursement. "Landlord Reimbursement" shall mean the product obtained by multiplying Seventy Five and No/100 Dollars ($75.00) by the Floor Area of the Premises as determined by the Floor Area Certification. The Landlord Reimbursement shall be payable by wire transfer of funds by Landlord to Tenant's account no later than thirty (30) days after Substantial Completion and receipt of the Reimbursement Deliverables. In no event shall Tenant's election to delay opening its store in any way delay or modify the date on which the Landlord Reimbursement is required to be paid by Landlord to Tenant. Upon payment of the Landlord Reimbursement from Landlord to Tenant, Landlord shall be the owner of the Premises (but not including any of Tenant's Property, as defined in Section 16.01) and the beneficiary of all warranties and guarantees relating to the construction of the Premises and Landlord shall be entitled to depreciate the Premises for tax purposes. Tenant shall have the right to deliver to Landlord a bill of sale and/or an assignment of warranties and guarantees evidencing the conveyance of the Premises and/or assignment of warranties and guarantees from Tenant to Landlord. Landlord shall also have the right to require Tenant to deliver to Landlord such a bill of sale and/or assignment of warranties and guarantees. The conveyance of the Premises, however, shall be deemed to have occurred notwithstanding that a bill of sale was not so delivered.

(b)     If Landlord fails to pay the Landlord Reimbursement in full on or before its due date, then Landlord shall be in default under this Lease, and Rent shall abate until the Landlord Reimbursement is paid to Tenant, together with interest, which shall accrue on the unpaid Landlord Reimbursement at the Default Rate (as defined in Section 18.01(b) below) commencing on the thirty-first (31st) day following delivery of the Reimbursement Deliverables until the date of payment of the Landlord Reimbursement in full.

SECTION 2.10 Measurement. If the Floor Area Certification shall disclose that the Premises contains more or less than the Floor Area shown in Section 1.01(P), then Landlord and Tenant agree to amend this Lease to adjust all Rent to account for the actual Floor Area of the Premises.

SECTION 2.11 Commencement Date Agreement. When the Commencement Date has been determined, Landlord and Tenant shall execute a memorandum, in the form of Exhibit E, which shall expressly confirm the Commencement Date and the expiration date of the Initial Lease Term, and which shall also ratify and affirm all of the terms and provisions of this Lease.

SECTION 2.12 Tenant's Permits Contingency.

(a)     Anything contained in this Lease to the contrary notwithstanding, if the Permit Condition (as defined below) is not satisfied on or before the earlier of the Outside Possession Date or the Expected Possession Date (the "Permit Contingency Date"), then Tenant shall have the right (at its option) to terminate this Lease at any time thereafter and prior to the satisfaction of the Permit Condition. Tenant agrees to use diligent efforts to satisfy the Permit Condition by the Permit Contingency Date; provided, however, the foregoing shall not be deemed to require Tenant to initiate litigation or agree to any condition imposed upon the issuance of any Tenant's Permits (as defined below). "Permit Condition" shall mean the final and unconditional issuance of Tenant's Permits free and clear of any governmental ban, bar or

moratorium and with all appeal periods having expired. "Tenant's Permits" shall mean any and all permits, approvals, licenses and the like necessary to perform Tenant's Work.

(b) If the Permit Condition has not been satisfied within forty five (45) days after the Permit Contingency Date for any reason other than Landlord's failure to perform or observe any of its obligations under this Lease, then Landlord shall have the option, upon notice given to Tenant prior to the satisfaction of the Permit Condition, to terminate this Lease, provided, however, Tenant shall have the right to void Landlord's termination notice by giving notice to Landlord, within fifteen (15) days after receiving Landlord's termination notice, of Tenant's waiver of its rights under Section 2.12, whereupon Landlord's termination notice shall be rendered null and void.

(c) If Tenant or Landlord terminates this Lease under this Section 2.12, then there shall be no further liability on the part of Landlord or Tenant, except for those obligations that expressly survive the expiration or other termination of this Lease.

## ARTICLE III

## INITIAL CONSTRUCTION

SECTION 3.01 Landlord's and Tenant's Work. Landlord shall perform Landlord's work in accordance with the Site Design Requirements and as otherwise required by this Lease ("Landlord's Work"). Tenant shall construct the Building and storefront sidewalk in accordance with the Site Design Requirements ("Tenant's Work") for which Landlord shall pay to Tenant the Landlord Reimbursement. Landlord and Tenant acknowledge receipt of the Site Design Requirements and each agrees to comply with the provisions thereof relating to their respective work. In connection with Tenant's performance of Tenant's Work and during any other periods of construction during the Term, Tenant shall have the right to use as a construction staging area approximately 20,000 square feet of the Common Areas in the location identified on the Site Plan as "Staging Area." On or after ninety (90) days after Tenant commences the Tenant's Work, Tenant, upon twenty (20) days prior notice from Landlord shall reduce the Staging Area to approximately 10,000 square feet and relocate its Staging Area to a mutually agreeable location, provided however that any such relocation shall not unreasonably interfere with Tenant's Work and such relocation is coordinated with Tenant's construction manager and construction site superintendent. As set forth in the Site Design Requirements, Tenant shall only be responsible for customary building and utility fees related to utility hook-up at the Premises, and Landlord shall be solely responsible for all other permit and impact fees relating to the Shopping Center. Tenant shall commence Tenant's Work within one hundred (100) days after the Possession Date.

## ARTICLE IV

## RENT

SECTION 4.01 Annual Minimum Rent. Commencing on the Commencement Date, Tenant shall pay to Landlord monthly installments of Annual Minimum Rent without setoff or deductions, except as otherwise provided for in this Lease, on the first (1st) day of each calendar

9

WO 696608.9

month during the Term. However, if the Commencement Date occurs on a day other than the first (1st) day of a calendar month, then the monthly installment of Annual Minimum Rent and other charges shall be prorated for the remaining days of that calendar month. Anything contained in this Lease to the contrary notwithstanding, if Tenant shall be paying Alternative Rent) or any other ground rent in lieu of Annual Minimum Rent as permitted under this Lease during such time as Tenant shall be entitled to an abatement of, deduction from or setoff against Annual Minimum Rent, then Tenant shall be entitled to the same abatement of, deduction from or setoff against Alternative Rent, Ground Rent or other ground rent.

SECTION 4.02 Additional Rent. The term "Additional Rent" shall mean all amounts required to be paid by Tenant under this Lease other than Annual Minimum Rent. Wherever an item of Additional Rent is payable "on demand" or no time period for payment of an item of Additional Rent is specifically provided for in this Lease, such item of Additional Rent shall be paid by Tenant within thirty (30) days after Tenant's receipt of Landlord's invoice therefor, accompanied by the appropriate back-up documentation.

SECTION 4.03 Rent; Method of Payment. The term "Rent" shall mean, collectively, Annual Minimum Rent and Additional Rent. All payments of Rent shall be made by check payable to Landlord, mailed or delivered to the address listed in Section 22.01 or to such other person or place as Landlord shall designate by notice to Tenant, or by such other reasonable method of payment (such as by wire transfer).

## ARTICLE V

## COMMON AREA MAINTENANCE AND COST

SECTION 5.01 Maintenance. Landlord shall operate, maintain, insure, repair and replace the Common Areas or cause the same to be done in a manner so as to maintain the Shopping Center in good, first class order, repair and condition similar to those of other first class shopping centers of the same character in the Dallas/Fort Worth area. Without limiting the generality of the foregoing, Landlord shall be solely responsible, and Tenant shall have no obligation (except to reimburse Landlord for Tenant's Share of the cost thereof, as provided below), for the maintenance, repair or replacement of the parking areas (including, without limitation, any necessary repaving and restriping), parking lot lighting, utility systems and connections, access ways and other Common Areas and for the clearing of snow and ice from the Common Areas. Landlord may at any time, except between October 1 and January 1, close temporarily any Common Areas to make repairs, to prevent the acquisition of public rights therein or discourage non customer parking. Between October 1 and January 1, Landlord may temporarily close parts of the Common Areas, but only to make repairs of an emergency nature. However, in any instance of such emergency repairs Landlord shall use commercially reasonable efforts to perform the necessary repairs in an expeditious manner and in such a way and at such times as are commercially reasonable so as to cause the least interference possible with ingress and egress to and from the Premises. In order to reduce interference with Tenant's business operation during such period, Landlord shall effect temporary repairs, where feasible, and complete the permanent repairs after January 1.

SECTION 5.02 <u>Construction Clean-up and Post-Possession Work</u>. Following the Possession Date, any construction by Landlord or other tenants or occupants of the Shopping Center affecting any portion of the Shopping Center shall be subject to the following terms and conditions (in addition if any other applicable provisions of this Lease, such as, by way of example only, Section 20.03(g)):

(a) staging and storage of materials and parking of construction vehicles shall not occur in Tenant's Preferred Area;

(b) Landlord shall use reasonable efforts to ensure that, from and after Tenant's opening for business to the public, no ingress, egress or passage of any construction, delivery and related vehicles engaged in the performance of such work or other construction activities shall take place except through the entrance/exit drive designated as the "<u>Construction Drive</u>" on the Site Plan;

(c) Landlord shall maintain the Shopping Center in a clean, safe, and sightly condition, (except that Landlord shall not be obligated to provide security for the Shopping Center) and shall use reasonable efforts to ensure that such construction shall not materially adversely interfere with the normal conduct of any business operations in the Premises; and

(d) Landlord shall clear all rubble and debris from the Premises and Common Areas resulting from any construction by Landlord or any other tenant or occupant of the Shopping Center.

SECTION 5.03 <u>CAM Costs</u>. "CAM Costs" shall mean the actual amount (without profit or "mark up" by Landlord or any Affiliate, as defined in Section 11.07, of Landlord) of all necessary, competitive and reasonable costs and expenses actually incurred by Landlord in operating, insuring and maintaining the Common Areas in an appropriate manner commensurate with good business practice and first-class shopping centers in the Dallas/Fort Worth Area, and, in addition thereto, in lieu of any cost(s) or expense(s) relating to the administration and management of the Common Areas, an administrative fee (the "<u>Administrative Fee</u>") equal to five percent (5%) of the CAM Costs for the calendar year in question, but excluding from the computation of such Administrative Fee the cost of any replacement or improvement of a capital nature (to the extent otherwise permitted to be included in CAM Costs), the cost of electricity and other utilities, and the cost of insurance premiums. In no event will CAM Costs include: (a) real estate taxes, (b) any costs associated with maintenance performed by another tenant or occupant of the Shopping Center on portions of the Common Areas separately maintained by such tenant or occupant; (c) any dues or charges for a merchants' or other association of occupants of the Shopping Center; (d) maintenance, repairs or replacements to the Common Areas (i) necessitated by the negligent or wrongful act of Landlord or any tenant or occupant, (ii) made to correct any construction defect, or (iii) relating to any improvements or utility systems not within the Common Areas (e.g. roofs, exterior walls, fire protection systems); (e) repairs or replacements necessitated by any governmental entity or made to correct any condition in existence prior to the Commencement Date, or to correct damage caused by subsidence or adverse or substandard soil conditions; (f) amounts reimbursable from insurance proceeds, under warranty, or by any tenant or occupant of the Shopping Center or any other third party other than pursuant to a Common Area expense provision similar to this Section 5.03; (g) premiums for

11

WO 696608.9

insurance for coverage maintained by Landlord with respect to the Shopping Center (except that premiums for Common Areas liability insurance may be included as part of CAM Costs provided the coverage provided by such liability insurance policy is not in excess of the limits established in Section 11.01), any costs resulting from insurance deductibles under any insurance policy maintained by Landlord (except that Tenant's Share of a deductible of up to Ten Thousand Dollars ($10,000) for Common Areas liability insurance which is otherwise included as part of CAM Costs may be included as CAM Cost), any costs which would have been reimbursed or paid for by insurance proceeds had Landlord maintained the insurance required under Section 11.01, and the amount of any judgment or other charge entered, or costs assessed against, Landlord in excess of the policy limits of the insurance maintained by Landlord under Section 11.01; (h) unless otherwise expressly permitted herein, the cost of any replacements or capital improvements to the Common Areas, except that the cost of repaving the parking areas of the Shopping Center may be included within CAM Costs so long as such cost is otherwise permitted to be included within CAM Costs and is amortized on a straight-line basis over the useful life thereof under generally accepted accounting principles consistently applied, and is not incurred (i) prior to the expiration of the tenth (10th) full calendar year of the Term, or (ii) more than once during each ten (10) full calendar years of the Term; (i) reserves for anticipated future expenses; (j) interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner; (k) Landlord's personnel, overhead, home office or administrative expenses, except for the Administrative Fee; (l) amounts incurred to remediate any Hazardous Materials (as defined in Section 9.03(a)); (m) any new improvements to the Shopping Center or Common Areas including, but not limited to, renovations to the facade of the Shopping Center and improvements to landscaped areas of the Shopping Center; (n) holiday or other decorations or other promotional expenses relating to the Shopping Center; or (o) any fees, costs or expenses not related to the operation, maintenance, insurance or repair of the Common Areas. Further, Landlord shall exclude from CAM Costs all costs or expenses in connection with any repairs or replacements to the Common Areas from the Commencement Date through the first (1st) anniversary of the Commencement Date, and Landlord shall also make an appropriate adjustment for the increase in CAM Costs attributable to tenants or occupants of the Shopping Center operating between the hours of 10 p.m. and 9 a.m.

SECTION 5.04  Tenant's Share of CAM Costs. Tenant shall pay to Landlord Tenant's Share of CAM Costs in each calendar year during the Term. Tenant's Share of CAM Costs shall be appropriately prorated for partial calendar years at the beginning and at the end of the Term. Notwithstanding anything contained in this Lease to the contrary, in no event shall Tenant's Share of CAM Costs in the first (1st) full calendar year of the Term in which the Shopping Center is fully operational (including the prior partial year, if any, or any period in which the Shopping Center is not yet fully operational) exceed the Initial CAM Costs, and in no event shall the component(s) thereof for Landlord's insurance obligations exceed the Initial Insurance Cost.

SECTION 5.05  Payment of CAM Costs. Tenant's Share of CAM Costs shall be payable in equal monthly installments on the first (1st) day of each month. Such monthly installments shall be at the rate of one twelfth (1/12th) of Tenant's Share of Landlord's good faith estimates of CAM Costs for the current calendar year, subject to immediate adjustment when the actual amount of CAM Costs or a change in Tenant's Share thereof is determined. Within ninety (90) days after the end of each calendar year, Landlord shall furnish Tenant with a detailed statement certified by an authorized representative of Landlord of the actual amount of CAM Costs and of

WO 696608.9

Tenant's Share thereof for the preceding calendar year (including the basis of allocation to Tenant). Within thirty (30) days after receipt of such statement by Tenant, Tenant shall pay to Landlord any deficiency due. Any surplus paid by Tenant shall, at Tenant's option, be credited against the next installment(s) of Tenant's Share of CAM Costs or be refunded to Tenant forthwith. Landlord's records of CAM Costs for each year shall be available for inspection by Tenant for a period of three (3) years after Landlord notifies Tenant of Tenant's Share of CAM Costs for the year in question. Tenant may, during such three (3) year period, upon ten (10) days' prior notice to Landlord, at Landlord's office where such records are kept, during Landlord's normal business hours, have an audit made of CAM Costs and the allocations thereof to Tenant including, without limitation, reviewing copies of paid bills and other records substantiating its expenditures ("CAM Records"). In addition, Landlord agrees to forward copies of CAM Records to Tenant or its representative within thirty (30) days of a request therefor. A copy of any such audit shall be delivered to Landlord upon request. Any overcharges shown by any such audit shall, at Tenant's option, be credited against the next installment(s) of Tenant's Share of CAM Costs or be refunded to Tenant forthwith. Any undercharges shown by any such audit shall be paid to Landlord within thirty (30) days after completion of such audit. If any such audit (the results of which are not successfully disputed by Landlord) shows that Tenant's Share of CAM Costs have been overstated by more than three percent (3%), then Landlord shall immediately pay to Tenant the reasonable cost of such audit.

SECTION 5.06 CAM Costs Increases. Notwithstanding anything contained in this Lease to the contrary, for each calendar year ("CAM Year") subsequent to the first (1st) full calendar year of the Term in which the Shopping Center is fully operational in no event shall Tenant's Share of CAM Costs increase annually, from any calendar year to the immediately succeeding calendar year, by more than five percent (5%) (the "CAM Cap") on a cumulative basis, excluding from such calculation, the costs of snow and ice removal, insurance rate increases, utility rate increases for the calendar years in question, and security services (if Landlord elects in its sole discretion to provide the same). "On a cumulative basis" shall mean that if in any CAM Year the CAM Costs increase by more than the CAM Cap and Landlord, by the terms hereof, may only charge Tenant an amount up to the CAM Cap, thereby limiting the increase, in any subsequent CAM Year(s) if the CAM Cost increase is less than the CAM Cap, Landlord may include the increases which would have been billed in prior years but for the CAM Cap; provided, the total increase in any one CAM Year shall never exceed the CAM Cap.

## ARTICLE VI

## TAXES

SECTION 6.01 Taxes. Landlord shall pay when due all real estate taxes and assessments levied and assessed against the land, improvements and buildings comprising the Shopping Center, provided, however that Landlord may cause the Outparcels to be assessed as part of a separate tax parcel. Except as hereinafter provided to the contrary, for each calendar year or part thereof during the Term, Tenant shall pay Tenant's Share of the net amount (after reflecting all discounts for early payment, refunds and credits actually received and after excluding all penalties, interest, late charges and real estate taxes and assessments levied against free-standing buildings or Outparcels which are separately assessed, (and the Floor Area of such tenant(s) or occupants(s) shall not be included in the denominator when calculating Tenant's

13

Share) of all real estate taxes and assessments (collectively, "Taxes") levied and assessed against the land, improvements and buildings comprising the Shopping Center. Tenant's Share of Taxes shall be equitably adjusted if the use or value of any portion (other than the Premises) of any buildings in the Shopping Center included in computing Tenant's allocation cause Taxes attributable to such buildings to be assessed at a disproportionately higher rate. Notwithstanding anything contained in this Lease to the contrary, in no event shall Tenant's Share of Taxes for the first (1st) full calendar year of the Term in which the Shopping Center is fully operational (including the prior partial year, if any, or any period in which the Shopping Center is not yet fully operational) exceed the Initial Taxes.

SECTION 6.02 Payment of Taxes. Tenant shall be liable for and shall pay Tenant's Share of Taxes only with respect to Taxes accruing during the Term, regardless of when such Taxes are billed or become due and payable. Tenant's Share of Taxes shall be appropriately prorated for partial fiscal tax years at the beginning and at the end of the Term. Tenant shall pay Tenant's Share of Taxes (a) within thirty (30) days after Landlord submits to Tenant proof of payment of Taxes by Landlord, a tax bill for such Taxes and a statement setting forth the manner in which Tenant's Share of Taxes is calculated, or (b) ten (10) days before the same are due and payable to obtain a discount, whichever is later. Notwithstanding the foregoing, in the event Landlord's mortgagee requires escrowing of taxes monthly, then, so long as such escrow shall be so required and all other tenants of the Shopping Center are similarly required to make monthly payments with respect to Taxes, Tenant's Share of Taxes shall be payable in equal monthly installments on the first (1st) day of each month. Such monthly installments shall be at the rate of one twelfth (1/12th) of Landlord's good faith estimate for Tenant's Share of Taxes for the current calendar year, subject to immediate adjustment when the actual amount of Taxes or a change in Tenant's Share thereof is determined. Such payments shall be held in trust to be applied towards payment of the Taxes when the same shall become due. Within thirty (30) days following the issuance by the taxing authority of the bill covering the applicable fiscal tax year, Landlord shall provide to Tenant a statement, in detail reasonably satisfactory to Tenant, of the Taxes and Tenant's Share thereof for such year (the "Tax Reconciliation Statement"). The Tax Reconciliation Statement shall be certified by Landlord as being accurate and shall be accompanied by (i) copies of the applicable tax bills, (ii) a calculation of Tenant's Share of Taxes, and (iii) payment to Tenant in the amount of any overpayment made by Tenant in respect of the applicable fiscal tax year. Within thirty (30) days after receipt of such statement by Tenant, Tenant shall pay to Landlord any deficiency due.

SECTION 6.03 Exclusions from Taxes. Notwithstanding anything contained in this Lease to the contrary with respect to betterments or other extraordinary or special assessments, Tenant's obligations shall apply only to the extent such assessments (and interest thereon) are payable in respect of the Term, and Tenant's Share of any such assessments shall be determined as if such assessments are payable in installments over the longest payment period permitted by law for the particular assessment, in which case Tenant shall pay only those installments payable in respect of the Term. Landlord represents to Tenant that, as of the Effective Date and, to the best of Landlord's knowledge, as of the Possession Date, no portion of the Shopping Center is or will be (a) subject to or the beneficiary of an abatement, exemption and/or phase-in of Taxes, (b) subject to any special assessments or similar charges, or (c) included in any special improvement district(s) which would result in higher sales taxes or other similar impositions than would exist in the absence of such district(s). Further, Taxes shall not include any: (i) income, excise,

WO 696608.9

14

margin, taxes related to Texas HB-3, profits, estate, inheritance, succession, gift, transfer, franchise, capital, or other tax or assessment upon Landlord or upon the rentals payable under this Lease; (ii) taxes on rents (other than to the extent that such taxes are customarily paid by retail tenants in the State), gross receipts or revenues of Landlord from the Premises; (iii) fine, penalty, cost or interest for any tax or assessment, or part thereof, which Landlord or its lender failed to timely pay, unless such late payment was solely attributable to late payment by Tenant of Tenant's Share of Taxes; (iv) assessment for a public improvement arising from the initial construction or expansion of the Shopping Center or the Premises; (v) Taxes resulting directly from an increase in the assessment caused by a sale or ground lease of all or any portion of the Shopping Center to an Affiliate of Landlord, or more than once every five (5) years; or (vi) fees imposed upon Landlord in connection with Landlord's development of the Shopping Center (including, without limitation, trip generation fees). All Taxes payable by Tenant pursuant to this Article VI shall be determined as if the Shopping Center was the only property owned by Landlord.

SECTION 6.04  Right to Contest. At Tenant's request, together with the request of the other tenants in the Shopping Center Center occupying in the aggregate at least 20,000 square feet of the Floor Area thereof, Landlord shall contest the amount or validity of any assessed valuation or Taxes, failing which Tenant may contest the assessed valuation or Taxes by appropriate proceedings conducted in good faith. If Tenant initiates such contest, then Landlord shall reasonably cooperate with Tenant including, without limitation, executing any and all documents reasonably acceptable to Landlord and required in connection therewith and, if required by any governmental authority having jurisdiction, joining with Tenant in the prosecution thereof. If any rebate or refund of Taxes is received as a result of any contest or otherwise, then Tenant shall be entitled to Tenant's Share thereof (after reasonable and customary expenses incurred by Landlord and/or another tenant and/or Tenant in connection with such contest are paid to the party which incurred such expense). Tenant shall have the right to defer payment of Tenant's Share of Taxes during any such Tax contest if permitted under Laws (as defined in Section 10.01) so long as Tenant complies with such Laws.

SECTION 6.05  Personal Property Taxes. Tenant shall pay when due all taxes levied against all personal property of Tenant located on the Premises plus, subject to the provisions of Section 6.03 hereof, all business, license and sales taxes levied against Tenant or Tenant's occupancy of the Premises.

## ARTICLE VII

## UTILITIES

SECTION 7.01  Utilities. Landlord covenants and agrees that the Premises shall be properly serviced with gas, electric, telephone, water, cable and, sewer and other utilities at the Possession Date (which, subject to the terms and provisions of the Site Design Requirements, may include temporary utilities) sufficient to meet Tenant's requirements in accordance with the Site Design Requirements. Landlord, as part of Landlord's Work, shall cause all such utilities to the Premises to be separately metered at Landlord's sole cost and expense. Tenant shall pay, as same become due and payable, all deposits and charges for utility services furnished to the Premises from and after the Possession Date and continuing during the Term. If at any time