during the Term, for any reason, Landlord shall provide utility service to the Premises, Tenant's cost for such utility service shall not exceed the lesser of (a) Landlord's actual cost for such utility service, or (b) the cost of the same service if Tenant had obtained such service directly from such utility provider.  In addition, Tenant shall have the right to install a test meter to verify its utility usage.  Notwithstanding anything contained in this Lease to the contrary, Tenant shall be entitled, at its sole cost, to select the utility service providers to the Premises including the telecommunication provider.  Landlord shall permit full and free access to all available conduits in the Shopping Center for the applicable utility service subject to such reasonable requirements as Landlord may impose.

SECTION 7.02  Interruption.  If utilities serving the Premises are disrupted due to the acts or omissions of Landlord, its agents, contractors, servants or employees, then Landlord shall promptly restore the affected utilities at Landlord's sole cost and expense.  If such disrupted utilities are not restored within forty-eight (48) hours after Landlord has been given written notice of such disruption and Tenant is unable to conduct its normal business in the Premises as a result of such disruption, then Rent shall be equitably abated from and after the expiration of such 48-hour period and continuing during the period of disruption.

## ARTICLE VIII

## USE OF PREMISES

SECTION 8.01  Permitted Use.  The Premises may be used and occupied for any Permitted Use.  However, Tenant shall not use the Premises for any of the Prohibited Uses (as defined in Exhibit F).

SECTION 8.02  Conduct of Operations.  Subject to the other provisions of this Lease (including, without limitation, Article II), Tenant shall initially open its store for business to the public in the Premises for at least one (1) day, not later than three hundred and sixty (360) days after the Commencement Date.  Other than as expressly set forth in the preceding sentence, Tenant shall have no obligation to open or operate any business in the Premises, and shall have the right, at any time, to cease to conduct any business operations in the Premises, and Tenant shall incur no liability to Landlord by reason thereof.  If Tenant does not operate or cause to be operated any retail business in the Premises (other than prior to the Commencement Date or during Excused Periods, as defined below) for more than two hundred seventy (270) consecutive days, then Landlord shall have the option to terminate this Lease, which option shall be exercisable by giving notice thereof to Tenant by not later than the thirtieth (30th) day after the date on which such 270-day period expires (the "Recapture Notice"), and paying to Tenant, within thirty (30) days after such notice is given, the Unamortized Costs (as defined in Section 8.04(e)).  If Landlord gives the Recapture Notice, then this Lease shall terminate upon the sixtieth (60th) day (the "Recapture Date") after the date on which Tenant receives Landlord's termination notice.  Upon termination of this Lease under this Section 8.02, there shall be no further liability on the part of Landlord or Tenant, except for obligations that expressly survive the expiration or sooner termination of this Lease.  If Landlord fails to pay to Tenant the Unamortized Costs within the thirty (30) day period provided for above and such failure to pay continues through the Recapture Date, then Tenant shall have the option of (a) treating this Lease as being terminated, in which case Landlord's obligation to pay to Tenant the Unamortized Costs

16

WO 696608.9

shall expressly survive the termination of this Lease, or (b) treating Landlord's Recapture Notice as being null and void, in which event Landlord shall be deemed to have waived Landlord's right to terminate under this Section 8.02. "Excused Period(s)" shall mean such periods during which the Premises were not open for business (i) because of alterations or renovations, damage or destruction, eminent domain proceedings or actions, Force Majeure, or any act or omission of Landlord, or its employees, agents, or contractors, or (ii) following the execution of a letter of intent for an assignment of this Lease or sublease of all or any portion of the Premises provided that the parties thereto are proceeding in good faith to enter into an assignment of this Lease or sublease and, thereafter, the assignee or sublessee proceeds with due diligence to open the Premises, or portion thereof, for business.

SECTION 8.03  Leasing Restrictions.  Landlord shall construct, lease, operate, maintain and manage the Shopping Center as a first-class shopping center comparable to other first-class shopping centers in the State.  In that regard, Landlord shall not lease, rent or occupy, or permit to be leased, rented or occupied, any portion of the Shopping Center or any Affiliated Land (as defined in Section 8.04(a)) which is adjacent to the Shopping Center for any of the Prohibited Uses.  In addition, Landlord shall not lease, rent or occupy, or permit to be leased, rented or occupied, any building within two hundred (200) feet of the Premises (but excluding from such restriction the Outparcels) for use as a restaurant; the foregoing restriction does not prohibit a National or Regional Tenant from operating a coffee shop, snack shop or other business which serves food and beverage for on-premises consumption as part of its operations provided that: (a) such activities are the same as generally exist in such tenant's other stores in the State; (b) such activities are incidental to the primary use of such tenant, and (c) such non-retail use does not have a separate or dedicated entrance to the exterior of the building.  Upon any breach of the foregoing Section 8.03, Tenant may elect to pay Alternative Rent in lieu of Annual Minimum Rent for so long as such violation shall continue.

SECTION 8.04  Tenant's Exclusive.

(a)      Landlord shall not lease, rent or occupy, or permit to be leased, rented, occupied, any other premises in the Shopping Center, or on any land owned or controlled by Landlord or any of its Affiliates within a one quarter (1/4) mile radius of the Shopping Center during the Term ("Affiliated Land") for the sale, rental, installation, servicing and/or repairing, either singly or in any combination, of the Products.  The Incidental Sale (as defined below) of the Products in connection with the overall business of another tenant shall not be deemed a violation this Section 8.04(a).  "Incidental Sale" shall mean sales in the lesser of (i) eight hundred (800) square feet, or (ii) ten percent (10%) of such tenant's or occupant's, or Landlord's or any of its Affiliate's display area.  The exclusive use rights granted to Tenant in this Section 8.04(a) (the "Exclusive Use Protection") shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of all or part of the Premises.

(b)      The Exclusive Use Protection shall also not apply to a full-line: supermarket (for example, Safeway, Winn-Dixie, or Stop & Shop), department store or discount department store (for example, Wal-Mart, K-Mart, J.C. Penney, Macy's, Kohl's or Target), or discount club (for example, Costco, BJ's Wholesale Club, or Sam's Club); provided, however, that, as to each of the foregoing, such stores (i) are National Tenants or Regional Tenants (as such terms are defined in Section 8.06), (ii) are operated in substantially the same manner as

17

WO 696608.9

same are operated as of the Effective Date, and (iii) contain at least 80,000 square feet of Floor Area.

(c)      Upon any violation of the Exclusive Use Protection, Tenant may elect to pay Alternative Rent in lieu of Annual Minimum Rent for so long as such violation shall continue. If such breach shall continue for more than thirty (30) days, then Tenant shall have the right to terminate this Lease at any time thereafter, in which event the applicable provisions of Section 8.04(e) shall control.

(d)      However, notwithstanding the provisions of Section 8.04(c) hereof, if any tenant or other occupant of the Shopping Center violates the Exclusive Use Protection and such violation also constitutes a default under its lease with Landlord, then Tenant's right to pay Alternative Rent pursuant to Section 8.04(c) shall be tolled provided that Landlord shall have promptly after receipt of notice of such violation from Tenant commenced appropriate legal proceedings against such tenant or occupant, and shall thereafter diligently prosecute such proceedings to completion so as to enjoin and prohibit any such violation or otherwise cause such violation to cease. If Landlord shall have failed to promptly commence such proceedings, or shall fail thereafter to diligently prosecute the same, or if the violation does not cease within two hundred ten (210) days after Landlord shall have received written notice of such violation, then Tenant's right to pay Alternative Rent shall apply for as long as such violation exists. In addition, Tenant shall have the right (i) to conduct and prosecute such legal proceedings (including an action for injunctive relief) in its own name, at Landlord's expense, or (ii) in the event the right set forth in clause (i) above is not permitted to be exercised under Laws, to conduct and prosecute such legal proceedings in the name of Landlord, at Landlord's expense, and Landlord shall cooperate with Tenant with respect to such prosecution (including executing any documentation or authorization reasonably required by Tenant in connection with such prosecution and by appearing at any hearing or trial with respect to such prosecution). If Tenant shall have paid Alternative Rent pursuant to this Section 8.04(d) for twenty-four (24) full consecutive months, then Tenant shall have the rights to terminate this Lease subject to and in accordance with the provisions of Section 8.04(e).

(e)      If Tenant shall have paid Alternative Rent pursuant to Sections 8.04(c) or (d) for twenty-four (24) full consecutive months, then Tenant must elect either to (i) terminate this Lease, or (ii) resume paying Annual Minimum Rent from and after the expiration of the thirty (30) day period following the end of such twenty-four (24) month period. Tenant shall make such election by notice to Landlord within thirty (30) days after the expiration of such twenty-four (24) month period. If Tenant fails to make such an election, then Tenant shall be deemed to have elected to proceed under clause (ii) above. If Tenant elects to terminate this Lease pursuant to Sections 8.04(c) or (d), then this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of Landlord or Tenant, except: (x) for those obligations which expressly survive the expiration or other termination of this Lease, (y) Landlord shall (which obligation shall survive the termination of this Lease), within ten (10) business days after receiving a statement from Tenant showing the Unamortized Costs, reimburse Tenant for the then unamortized costs (amortized on a straight-line basis over the Term) of any alterations or improvements made by Tenant to the Premises and not reimbursed to Tenant as part of the Tenant Improvement Allowance (the "Unamortized Costs"), and (z) Tenant

18

reserves all claims against Landlord for damages resulting from the violation of the Exclusive Use Protection.

SECTION 8.05 <u>Exclusives Applicable To Tenant</u>.

(a)    Tenant shall not use (or permit to be used) the Premises in violation of certain exclusives granted by Landlord to Bed Bath & Beyond, Sports Authority or Petsmart pursuant to the terms and provisions of leases or occupancy or use agreement that are executed prior to, or from and after the Effective Date (the "<u>Future Exclusive(s)</u>"), on the condition that:

(i)    The Future Exclusives shall only restrict Tenant from operating primarily for the same primary use as that engaged in by the beneficiary of the Future Exclusive (e.g., primarily as a home goods store or a sporting goods store), and shall not apply to the sale, rental, installation, servicing and/or repairing of all or any of the Products or the Ancillary Products;

(ii)    Landlord shall provide Tenant with a true and complete copy of each Future Exclusive within ten (10) business days after the execution of a lease or occupancy or use agreement containing the applicable Future Exclusive;

(iii)    Such Future Exclusive shall be substantially and in all material respects (provided, that such Future Exclusive may be less restrictive) as described on <u>Exhibit H</u>;

(iv)    Tenant shall be entitled to enter into a separate agreement with any tenant or other occupant for whose benefit the Future Exclusive is granted, which nullifies or modifies the corresponding Future Exclusive with regard to Tenant and/or the Premises;

(v)    The beneficiary of each Future Exclusive has agreed to recognize Tenant's Exclusive Use Protection; and

(vi)    Landlord and the tenant or occupant benefiting from the applicable Future Exclusive shall have entered into a lease or occupancy or use agreement for its premises within twelve (12) months after the Effective Date.

(b)    Landlord represents and warrants that, other than the Future Exclusives, there are (and will be) no exclusives or use restrictions in effect that would apply to Tenant or any other occupant of the Premises, and Landlord covenants to indemnify, defend and hold Tenant harmless from and against all loss, cost, liability or expense (including, without limitation, reasonable legal fees) incurred by Tenant by reason of the enforcement by any person or entity of such exclusive or other use restriction.

SECTION 8.06 <u>Key Tenants</u>. Landlord represents and warrants that it has entered into or will enter into within thirty (30) days of the date hereof leases and/or operating agreements with the Key Tenants, other than Target which is not located in the Shopping Center, for initial

19

WO 696608.10

terms expiring no sooner than the expiration of the Initial Lease Term. If, from and after the satisfaction of the Opening Requirement, (a) fewer than all of the Key Tenants (including Target) are open for regular business, or (b) the Minimum Ongoing Cotenancy Percentage is not met, in either instance for reasons other than temporary closure due to casualty or condemnation not to exceed three (3) months provided that such tenant or occupant is diligently and actively attempting to reopen for business (collectively, the "Cotenancy Requirements") then Tenant shall have the option to pay Alternative Rent in lieu of Annual Minimum Rent until such time as all of the Key Tenants are open for regular business and the Minimum Ongoing Cotenancy Percentage is met. If such Key Tenant(s) ceases operations for a period of twelve (12) consecutive months or more, or if the Minimum Ongoing Cotenancy Percentage is not met for a period of twelve (12) consecutive months or more, then Tenant shall have the right to terminate this Lease upon thirty (30) days notice to Landlord, such notice to be delivered within ninety (90) days after the expiration of such 12-month period but prior to the date the condition giving rise to such termination right has been satisfied. If Tenant shall elect to terminate this Lease, then this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of Landlord or Tenant, except: (a) for those obligations which expressly survive the expiration or other termination of this Lease, and (b) Landlord shall (which obligation shall survive the termination of this Lease), within thirty (30) days after receiving a statement from Tenant showing the Unamortized Costs, reimburse Tenant for the Unamortized Costs. If Tenant does not terminate this Lease within thirty (30) days after the expiration of such twelve (12) month period, then commencing on the day following the end of such thirty (30) day period, Tenant shall resume paying full Annual Minimum Rent. However, Tenant shall again be entitled to exercise its rights under this Section 8.06 each time another Key Tenant ceases operations or the number of retail tenants occupying less than the Minimum Ongoing Cotenancy Percentage worsens by more than five percent (5%). It is hereby understood and acknowledged by Landlord that a Key Tenant may only be replaced, for the purposes of this Section 8.06 only, by a National Tenant or Regional Tenant of comparable use, size and quality of merchandise. "National Tenant(s)" shall mean a tenant(s) operating, as of the applicable date, at least seventy-five (75) retail stores in the continental United States under a single trade name in first-class shopping centers, and "Regional Tenant(s)" shall mean a tenant(s) operating, as of the applicable date, at least fifty (50) retail stores in first-class shopping centers in any of the states adjoining the State and the State. It is hereby understood and acknowledged by Landlord and Tenant that Target may be located in the Adjacent Shopping Center; notwithstanding the foregoing, the terms and provisions of this Lease designating Target as a Key Tenant and the terms and provisions related thereto shall remain in full force and effect even though fee owners of the Shopping Center and the Adjacent Shopping Center are not Affiliates.

## ARTICLE IX

## REPAIRS

SECTION 9.01 Landlord Obligations. Landlord shall, at Landlord's sole expense (and not included in CAM Costs), keep and maintain (or cause to be kept and maintained) in good order, condition and repair (including replacements, if necessary) and in a safe condition (a) the roof of the Premises (to be maintained in a watertight condition at all times), all utility systems and lines (including, without limitation, electrical, plumbing, mechanical and/or alarm systems) serving the Premises (from the point of connection at the Premises to the public utility mains),

WO 696608.9

the exterior of the Premises (including, without limitation, the walls and Other Improvements, but excluding window glass, doors and frames) and the structural portions of the Premises including, without limitation, footings and foundation, floor slab, and structural walls, columns and beams, and (b) any damage to the Premises or the Shopping Center which is caused by (i) defects in Landlord's Work, or (ii) the act or omission of Landlord, its employees, agents or contractors. Landlord's obligations under this Section 9.01 shall be subject to the provisions of Articles XII and XIII. Landlord shall use commercially reasonable efforts to perform any and all repairs and replacements to be performed under this Lease without material interference with or disruption to the normal conduct of any business operations in the Premises. Landlord shall give Tenant at least five (5) days prior notice of any repairs or replacements to the Premises (except in the case of an emergency posing imminent risk of material harm to persons or property, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances). If, in Landlord's reasonable judgment, Landlord's repairs would materially interfere with or disrupt the normal conduct of any business operations in the Premises, then Landlord shall use commercially reasonable efforts to perform such repairs only after the regular hours of operation of the Premises.

SECTION 9.02 Tenant's Obligations.

(a)      Subject to Landlord's obligations under Section 9.01, Tenant shall at all times during the Term, at Tenant's sole expense, keep and maintain in good order, condition and repair and in a safe condition (i) the non-structural, interior elements of the Premises (including painting, window glass, doors and frames, and the heating, ventilation and air conditioning ["HVAC"] units, and the electrical, plumbing, mechanical, utility, and/or alarm systems located in and serving exclusively the Premises), and (ii) any damage to the Premises or the Shopping Center which is caused by the act or omission of Tenant, its employees, agents or contractors. Tenant's obligations under this Section 9.02 shall also be subject to the provisions of Articles XII and XIII and to Landlord's obligation to clear the Premises of all dirt and debris following completion of Landlord's Work pursuant to Section 5.02.

(b)      If any HVAC units or a material portion thereof must be replaced during the last five (5) years of the Term, then in light of the fact that the same will require a substantial expenditure by Tenant and will result in a benefit to Landlord following the expiration of the Term, upon the expiration or earlier termination of this Lease (unless such termination results from Tenant's default of its obligations under this Lease), Landlord shall reimburse Tenant for the unamortized portion of the reasonable expenses incurred by Tenant in connection with the replacement of such equipment during the last five (5) years of the Term, based on (i) the date of the installation of such new equipment, and (ii) the useful life of said equipment. The provisions of this Section 9.02(b) shall survive the expiration or earlier termination of this Lease.

SECTION 9.03 Hazardous Materials.

(a)      Landlord represents and warrants that, to Landlord's current actual knowledge as of the Effective Date (and as of the Possession Date), there are (and will be) no Hazardous Materials present in the Shopping Center, and Landlord agrees that the removal or neutralization of any Hazardous Materials that become present at the Shopping Center discovered during the Term shall be at no cost and expense to Tenant (and not included in CAM

21

Costs), other than Hazardous Materials introduced by Tenant or its agents, employees or contractors. "Hazardous Materials" shall mean (i) any waste, material or substance (whether in the form of a liquid, a solid, or a gas and whether or not air-borne) which is deemed to be a pollutant or a contaminant, or to be hazardous, toxic, ignitable, reactive, infectious, explosive, corrosive, dangerous, harmful or injurious to public health or to the environment, and which is now or becomes regulated in the future by or under the authority of any applicable local, state or federal laws, judgments, ordinances, orders, rules, regulations, codes or other governmental restrictions or requirements, any amendments or successor(s) thereto, replacements thereof or publications promulgated pursuant thereto (collectively, "Environmental Regulations", and individually, "Environmental Regulation"); (ii) petroleum; (iii) asbestos and asbestos containing materials; (iv) any polychlorinated biphenyl; and (v) any radioactive material. In addition to the foregoing, the term "Environmental Regulations" shall be deemed to include, without limitation, local, state and federal laws, judgments, ordinances, orders, rules, regulations, codes and other governmental restrictions and requirements, any amendments and successors thereto, replacements thereof and publications promulgated pursuant thereto, which deal with or otherwise in any manner relate to, environmental matters of any kind.

(b)    Landlord and Tenant each agree that neither Landlord nor Tenant shall cause any Hazardous Materials to exist on, or to escape, seep, leak, spill or be discharged, emitted or released from the Shopping Center during the Term in violation of any applicable Environmental Regulation.

(c)    Landlord hereby indemnifies Tenant and its successors and assigns, and agrees to hold Tenant and its successors and assigns harmless from and against any and all losses, liabilities, damages, injuries, penalties, fines, costs, expenses and claims of any and every kind whatsoever, including attorneys' fees and costs (collectively, "Environmental Liabilities") paid, incurred or suffered by, or asserted against, Tenant or its successors and assigns with respect to, or as a direct or indirect result of (i) the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission or release from the Shopping Center of any Hazardous Materials which were brought into the Shopping Center by Landlord, its agents, employees, contractors, or their respective predecessors-in-interest, or (ii) a breach by Landlord, its agents, employees, contractors or their respective predecessors-in-interest of any Environmental Regulation to which Landlord is subject.

(d)    Tenant hereby indemnifies Landlord and its successors and assigns, and agrees to hold Landlord and its successors and assigns harmless from and against any and all Environmental Liabilities paid, incurred or suffered by, or asserted against, Landlord or its successors and assigns with respect to, or as a direct or indirect result of (i) the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission or release from the Premises of any Hazardous Materials which were brought into the Premises by Tenant, its agents, employees, or contractors or (ii) a breach by Tenant, its agents or employees of any Environmental Regulation to which Tenant is subject.

(e)    With respect to Hazardous Materials which are or become present at the Shopping Center as the result of any cause whatsoever (other than Hazardous Materials which were brought into the Premises by Tenant, its agents, employees or contractors), Landlord shall, at no cost to Tenant (and not included in CAM Costs), in a good, workmanlike and expeditious

22

WO 696608.9

manner, and in compliance with Environmental Regulations, perform (or cause to be performed) all work necessary to clean-up, remove and otherwise remediate such Hazardous Materials in compliance with Environmental Regulations. Should the presence of such Hazardous Materials render the Premises Unusable (as defined below) or should Tenant be required to close during the removal or neutralization of such Hazardous Materials by Landlord, Tenant shall notify Landlord and all Rent shall be immediately equitably abated until such time as Tenant can safely resume normal business operations. If such work is not commenced within thirty (30) days after the date (the "Notification Date") that Tenant notifies Landlord of Hazardous Materials rendering the Premises Unusable (or such additional period as may be reasonably required to engage environmental consultants and/or engineers and obtain permits and licenses) or if such work is not completed within one hundred twenty (120) days after the Notification Date (or such additional period as may reasonably be required given the nature of the work, provided that Landlord diligently pursues same to completion), then Tenant shall have the right, at any time thereafter, to terminate this Lease. However, Tenant's option to terminate this Lease pursuant to this Section 9.03(e) shall cease (if not exercised prior thereto) at any time the Premises are no longer Unusable. If Tenant shall elect to terminate this Lease, then the Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of Landlord or Tenant, except: (i) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, (ii) if Tenant terminates the Lease hereunder on account of breach of representation by Landlord, or if such Hazardous Materials were introduced by Landlord or its agents, employees, or contractors, Landlord shall (which obligation shall survive the termination of this Lease), within ten (10) business days after receiving a statement from Tenant showing the Unamortized Costs, reimburse Tenant for the Unamortized Cost, and (iii) Tenant reserves all claims against Landlord for damages resulting from a default by Landlord under this Section 9.03 (but not consequential damages unless Tenant terminates the Lease hereunder on account of breach of representation by Landlord, or the act or omission of Landlord). For the purpose of this Section 9.03(e), "Unusable" means that the Tenant does not have access to at least ninety percent (90%) of the Premises because of the enforcement of any Environmental Regulation or the remediation of any Hazardous Materials, or because use of the Premises would represent a risk to the health or safety of Tenant, Tenant's employees, agents or invitees.

SECTION 9.04  Surrender of the Premises.  At the expiration or earlier termination of this Lease, Tenant shall surrender the Premises to Landlord in the same condition as it is required to be maintained by Tenant pursuant to Section 9.02 above; excepting, however, reasonable wear and tear, damage by fire or other casualty, and the effects of a Taking (as defined in Section 13.01).

**ARTICLE X**

**REQUIREMENTS OF LAW**

SECTION 10.01  Landlord's Obligations.  As part of Landlord's Work and throughout the Term, Landlord shall be responsible, at Landlord's sole cost and expense (and not included in CAM Costs), for complying with all applicable laws, statutes, ordinances and regulations of federal, state, county and municipal authorities (collectively, "Laws") affecting the Shopping

WO 696608.9

Center including, without limitation, the Premises, except as specifically provided in Section 10.02.

SECTION 10.02 <u>Tenant's Obligations</u>. From the Possession Date and throughout the Term, Tenant shall be responsible, at Tenant's sole cost and expense, for complying with all Laws affecting the Premises if such compliance is required solely as a result of Tenant's specific manner of use of the Premises (as opposed to retailers in general) or relates to the interior elements of the Premises which are neither structural nor comprise the major building systems serving the Premises (unless due to alterations, additions or improvements constructed or installed by Tenant after the Commencement Date).

SECTION 10.03 <u>Right to Contest</u>. The party responsible for compliance pursuant to Section 10.01 or 10.02 shall have the right to contest the validity of any Law at the expense of the party responsible for compliance, unless such contest would result in any criminal liability imposed upon the other party or subject such other party to any fine or penalty.

## ARTICLE XI

## INSURANCE

SECTION 11.01 <u>Landlord's Insurance</u>.

(a)    Landlord shall maintain in full force and effect from and after the Effective Date and throughout the Term:

(i)    Commercial general liability insurance with regard to the Common Areas protecting and insuring Landlord, naming Tenant as "additional insured-lessee" for claims arising out of the use or occupancy of the Common Areas and the obligations assumed by Landlord under this Lease, and having a combined single limit of liability of not less than Three Million Dollars ($3,000,000) per occurrence for bodily injury, death and property damage liability, Three Million Dollars ($3,000,000) in the aggregate; and

(ii)    Special Form (formerly known as "<u>All-Risk</u>") property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of the buildings (other than the Premises) and other insurable improvements in the Shopping Center, (exclusive of excavation, footings and foundations) including, without limitation, the Common Areas.

(b)    Landlord may carry any of its insurance under "blanket policies" covering the Shopping Center and other properties it or any Affiliate of Landlord owns, provided that: (i) the total amount of the insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article XI. Except as expressly set forth in any subordination, non-disturbance, and attornment agreement with any Mortgagee, all policies required to be maintained by Landlord pursuant to this Section 11.01 shall provide that any proceeds thereof shall be deposited with the Mortgagee, or if none, to Landlord, in either event to

24