# EXHIBIT A

LOCATION:  Auburn Hills, MI



APPROVED

**LEASE**

between

**CIRCUIT CITY STORES, INC.,**

as Tenant

and

**TAUBMAN AUBURN HILLS ASSOCIATES LIMITED PARTNERSHIP**

as Landlord

dated April ___, 2003

GREAT LAKES CROSSING SHOPPING CENTER

142857

## TABLE OF CONTENTS

**Paragraph**                                                                                          **Page**

1.   Leased Property ............................................................................................................... 1

2.   Construction of Building and Improvements; Tenant Improvement Allowance................ 1

3.   Lease Term........................................................................................................................ 2

4.   Base Rent; Ground Rent ................................................................................................... 3

5.   Operation of Shopping Center by Landlord...................................................................... 4

6.   Easements ........................................................................................................................ 5

7.   Common Areas and Common Area Maintenance. ........................................................... 7

8.   Signs and Communications Equipment. ........................................................................... 8

9.   Taxes. ............................................................................................................................... 8

10.  Maintenance, Repairs and Replacements ...................................................................... 10

11.  Utility Service Provider; Payment of Utility Bills ......................................................... 11

12.  Alterations...................................................................................................................... 12

13.  Intentionally Omitted. .................................................................................................... 12

14.  Insurance. ....................................................................................................................... 12

15.  Damages by Fire or Other Casualty. .............................................................................. 16

16.  Condemnation. ............................................................................................................... 18

17.  Assignment and Subletting ............................................................................................ 21

18.  Use. ................................................................................................................................ 23

19.  Warranties, Representations and Covenants. .................................................................. 24

20.  Estoppel Certificates ..................................................................................................... 32

21.  Subordination, Non-Disturbance and Attornment. ......................................................... 33

22.  Tenant's Financing ......................................................................................................... 34

23.  Tenant's Property and Waiver of Landlord's Lien .......................................................... 35

i

152847

24.    Memorandum of Lease; Commencement Date Agreement..................................... 35

25.    Expiration of Term and Holding Over....................................................... 35

26.    Force Majeure ............................................................................. 35

27.    Events of Tenant's Default................................................................ 36

28.    Landlord's Remedies....................................................................... 36

29.    Events of Landlord's Default; Tenant's Remedies. ......................................... 38

30.    Waiver .................................................................................... 42

31.    Compliance with Applicable Laws .......................................................... 42

32.    Notices ................................................................................... 43

33.    Brokers ................................................................................... 44

34.    Miscellaneous. ............................................................................ 44

35.    Effectiveness of Lease; Tenant's Right to Terminate ...................................... 46

36.    Tenant's Right of First Refusal .......................................................... 49

37.    Adjacent Tracts. .......................................................................... 49

38.    Cotenancy Requirement..................................................................... 49

39.    Importance of Each Covenant............................................................... 49

40.    "For Rent" Signs .......................................................................... 49

41.    Intentionally Omitted. .................................................................... 50

42.    Intentionally Omitted. .................................................................... 50

43.    Liability of Landlord..................................................................... 50

152847

## EXHIBITS

"A"    Site Plan

"A-1"  Shopping Center Legal Description

"B"    Index of Definitions

"C"    Construction Provisions

       Attachment "1" Construction Schedule

       Attachment "2" Site Delivery Work Certification

       Attachment "3" Schematic Floor Plan and Elevations

       Attachment "4" Demolition Specifications

       Attachment "5" Demising Wall Construction Specifications

       Attachment "6" Utility Specifications

"D"    Intentionally Deleted

"E"    Sign Plans

"F"    Permitted Encumbrances

"G"    Subordination, Non-Disturbance and Attornment Agreement

"H"    Memorandum of Lease

"I"    Commencement Date Agreement

"J"    Indemnification Agreement

152847

Auburn Hills, MI

## LEASE

This LEASE ("Lease") is made as of the 9TH day of ~~April~~ MAY, 2003, by and between
. **TAUBMAN AUBURN HILLS ASSOCIATES LIMITED PARTNERSHIP**, a Delaware limited
partnership, having an address at 200 East Long Lake Road, Bloomfield Hills, MI  48303-0200
("Landlord"), and **CIRCUIT CITY STORES, INC.**, a Virginia corporation, having an address at
Deep Run I, 9950 Mayland Drive, Richmond, Virginia 23233 ("Tenant").

### W I T N E S S E T H :

The parties hereto agree as follows:

1.  Leased Property.  Landlord leases to Tenant the "Premises" (as defined in paragraph 2),
when constructed or renovated on that approximately 42,729 square foot parcel (the "Land"),
outlined in heavy black on Exhibit "A" (the "Site Plan"), together with (x) the right to identify with
placards or otherwise, but excluding the right to enforce Tenant's rights in, the six (6) parking
spaces labeled "Car Stereo Parking" and two (2) automobile loading stalls labeled "Customer Pick-
Up" as shown on the Site Plan, (y) the right to install and maintain, at Tenant's sole cost and
expense, up to four (4) shopping cart corrals in the locations shown on the Site Plan, and (z) the
easements described in paragraph 6 below; all located in the Great Lakes Crossing Shopping Center
(herein referred to as the "Shopping Center"), located in the City of Auburn Hills (the "City"),
County of Oakland, State of Michigan (the "State"), shown on the Site Plan and described by metes
and bounds or platted lot legal description on Exhibit "A-1" attached hereto.  All of the Shopping
Center exclusive of the Premises is "Landlord's Premises".

Landlord may from time to time establish rules and regulations applicable to the Shopping
Center provided such rules and regulations (i) are in writing and delivered to Tenant, (ii) are
uniformly applicable to all tenants and occupants of the Shopping Center, (iii) are consistent with
shopping center industry standards and (iv) do not hinder or interfere with Tenant's intended use of
the Premises as permitted herein.

2.  Construction of Building and    Improvements;    Tenant    Improvement    Allowance.
Commencing immediately upon "Delivery of the Land" (as defined in the Construction Provisions
(herein so called) attached hereto as Exhibit "C" and incorporated herein by reference for all
purposes, which term Delivery of the Land also includes delivery of the "Shell," as defined in the
Construction Provisions), Tenant shall renovate the Shell as a one-story building, containing

approximately 42,729 square feet of ground-floor gross leasable area, of which at least 39,099 square feet shall be finished space (including retail, warehouse, car stereo installation and business office area), plus mezzanine, with provisions for customer pickup, delivery and car stereo installation facilities, initially for use as a Circuit City Superstore (the Shell, as so completed being the "Building"), together with loading ramps, sidewalks, trash compactor, transformer pad and other improvements (collectively, the "Other Improvements"), as more particularly set forth in the Construction Provisions. The Building and Other Improvements are sometimes collectively referred to herein as the "Improvements". The Improvements shall be constructed to completion with due diligence in accordance with the "Plans and Specifications" to be prepared by Tenant as specified in the Construction Provisions. Except as otherwise provided herein, title to the Improvements shall be deemed transferred to Landlord upon full payment of the "Tenant Improvement Allowance", as defined below. The Improvements and the Land are referred to herein as the "Premises".

Upon Substantial Completion (as defined in the Construction Provisions) and Tenant's furnishing to Landlord on or before December 31, 2004 (i) the certificates of insurance required under paragraph 14 of the Lease, (ii) an indemnity in the form of Exhibit "J" attached hereto against any exception in Landlord's or its Mortgagee's policy of title insurance with respect to mechanics' liens arising out of Tenant's construction, (iii) a square footage building perimeter survey certified to Tenant and Landlord, and (iv) if requested by Landlord, confirmation from Tenant that Landlord holds title to the Improvements (in form reasonably acceptable to Landlord and Tenant), Landlord shall pay to Tenant a "Tenant Improvement Allowance" in an amount equal to $1,563,960.00, payable by wire transfer of funds by Landlord to Tenant's account no later than thirty (30) days after Substantial Completion and receipt of items (i), (ii), (iii) and (iv) above.

3. Lease Term. Subject to paragraph 35, the construction term (the "Construction Term") of this Lease shall commence on June 15, 2003 and shall end on the "Commencement Date" (as defined below). The main term (the "Main Term") of the Lease shall commence on the earlier to occur of (i) the date on which Landlord makes payment of the Tenant Improvement Allowance, or (ii) the date on which Tenant is obligated to pay "Ground Rent" in lieu of Base Rent hereunder (the "Commencement Date"), and shall end on the last day of January following the fifteenth (15th) anniversary of the Commencement Date.

2

In addition to the Main Term, Tenant shall have the option (a "Renewal Option") to renew and extend the Lease for three (3) consecutive five (5) year periods (each period referred to as an "Option Period") immediately following the Main Term, at the rent specified below.  Tenant shall give Landlord written notice of its election to exercise any Renewal Option at least one hundred eighty (180) days prior to the expiration of the Main Term or any then-current Option Period.  If, during such one hundred eighty (180) day period, Tenant does not give Landlord written notice of its intent not to exercise its Renewal Option, Tenant's right to exercise such Renewal Option shall continue, as shall its tenancy hereunder, until ten (10) business days after Landlord has given Tenant written notice of Landlord's election to terminate the Renewal Option, during which ten (10) business day period Tenant may exercise its Renewal Option whereupon the Term (defined below) of this Lease shall be renewed and extended as if such notice had been given prior to such expiration of the one hundred eighty (180) day period described above.

The Construction Term, Main Term and Option Periods are, collectively, the "Term".  The term "Lease Year" shall mean each successive period of twelve (12) consecutive calendar months, commencing on the first day of each February during the Term, except that the first Lease Year shall commence on the Commencement Date and shall end on the last day of January following the first anniversary of the Commencement Date.

4.  Base Rent; Ground Rent.  During the Construction Term, Tenant shall pay no rent or Real Estate Tax or CAM Charges or any similar costs, fees, rentals or expenses, but Tenant shall pay for utilities consumed at the Premises by Tenant, its agents, employees and contractors.  Tenant agrees to pay base rent ("Base Rent") for the Premises in the amounts and manner specified hereunder, commencing on the date on which Landlord makes payment of the Tenant Improvement Allowance.  "Ground Rent," in lieu of Base Rent, shall be due under certain circumstances, as described in subparagraph 28(d) below, and when due, shall be payable in the same manner as Base Rent.  Notwithstanding the foregoing, until Landlord has completed, executed and delivered to Tenant a W-9 form (the form of which will be subject to Landlord's approval and delivered to Landlord by Tenant together with this Lease for execution), no Base Rent, Ground Rent or other sums shall be due Landlord by Tenant hereunder.

Landlord shall give Tenant written notice of a change of address or change of the party to whom such rents shall be payable provided Tenant shall have no responsibility to inquire as to the accuracy or completeness of the information contained in any such notice.  Unless adjusted as

3

142857

provided below, Base Rent shall be paid in equal monthly installments in advance on the first day of each calendar month throughout the Term, to the address given for Landlord in paragraph 32, pursuant to the following schedule:

(a) First Five Years. During the first five (5) Lease Years, Tenant shall pay annual Base Rent in the amount of Seven Hundred Twenty-three Thousand Four Hundred Ninety-one and 61/100 Dollars ($723,491.61), payable in equal monthly installments of Sixty Thousand Two Hundred Ninety and 97/100 Dollars ($60,290.97).

(b) Adjustment in Base Rent. Notwithstanding the Base Rent provisions, in the event that the ground-floor gross leasable area of the Premises when renovated does not equal 42,179 square feet (as evidenced by the square footage building perimeter survey certified to Landlord as required pursuant to paragraph 2 above), annual Base Rent during the first five (5) Lease Years shall be the product of the actual ground-floor gross leasable area of the Premises (as evidenced by the square footage building perimeter survey described in paragraph 2 above), multiplied by $16.93. In determining the ground-floor gross leasable area of the Building, measurements shall be made from the centerline of any common walls and from the outside of any exterior walls. If any Lease Year is other than twelve (12) months in length, annual Base Rent during such Lease Year shall be the product of the applicable monthly Base Rent times the number of months in such Lease Year, with appropriate proration for any partial calendar month therein.

(c) Increases in Base Rent. Annual Base Rent shall increase on the first day of the sixth and every succeeding fifth Lease Year, over the initial Base Rent by the lesser of (i) ten percent (10%) or (ii) three (3) times the percentage increase in the "CPI-U" (as defined below) during the five (5) year period ending on October 31 of the fifth (or, as applicable, any succeeding fifth) Lease Year. As used herein, the CPI-U shall be the United States Department of Labor, Bureau of Labor Statistics Consumer Price Index for All Urban Consumers, for the geographical area in which the Shopping Center is located. If at any time during the Term the CPI-U shall be discontinued, Landlord and Tenant shall mutually and reasonably agree to substitute an existing official index published by the Bureau of Labor Statistics or its successor or another similar index most nearly equivalent to the CPI-U.

5. Operation of Shopping Center by Landlord. Landlord covenants to maintain the Shopping Center in a manner consistent with the manner in which other similar "value-oriented" retail developments are maintained. For purposes of this paragraph, the term "value-oriented" shall

4

142857

describe a retail development in which the majority of the tenants and occupants are either retailers of discounted or off-price goods or are operating manufacturers' outlet stores, such as, by way of example, the developments known and operated, as of the date of this Lease, as Ontario Mills (Ontario, California), Gurnee Mills (Gurnee, Illinois) and the Shopping Center. It is acknowledged by the parties hereto that, notwithstanding the foregoing, the quality and maintenance level to which Landlord has agreed hereinabove is a minimum level and Landlord shall also have the right, in its discretion, and without violating this provision, to maintain the Shopping Center in any other manner considered to be superior to that which is consistent with the manner in which value-oriented retail developments are maintained.  Landlord shall not make any material aesthetic changes to the exterior architectural scheme of the Shopping Center except to the extent consistent with or better than the quality of such similar value-oriented developments and, to the extent any other tenant or occupant of the Shopping Center has the right to so consent, with Tenant's prior written consent.  The parking ratio for the Shopping Center shall at all times be at least as shown thereon, but in no event shall said ratio be less than the greater of (i) five (5) spaces (no less than nine (9) feet wide and for full-sized automobiles) per 1,000 square feet of gross leasable area, or (ii) that required by applicable zoning requirements, without variance, notwithstanding for the purpose of such calculation any use of parking spaces by Tenant other than for the parking of vehicles, such as for shopping cart corrals as shown on the Site Plan.  All parking shall be at ground level.  Any improvements constructed by Landlord within three hundred (300) feet of the Premises or Tenant's Preferred Area shall be constructed in a good and workmanlike manner and any construction activities by Landlord within such areas shall not interfere with the conduct of Tenant's business.  If Landlord fails to maintain the above required parking ratio, Tenant shall, in addition to any other legal or equitable remedy, including specific performance, have the right to pay Base Rent in lieu of that provided for herein at the rate of one-half (1/2) of the fixed minimum rent, together with one-half (1/2) of all other charges otherwise payable under this Lease, until such time as the above-specified parking ratio is maintained.

   6.  Easements.  Landlord also grants to Tenant the following nonexclusive leasehold easements over Landlord's Premises, which shall run as covenants with Landlord's Premises and the Premises during the Term:

      (a) Construction Easements.  During the Construction Term, any period of renovation or reconstruction thereafter, and during any period which Tenant desires to install

5

additional utility services including television cable, fiber optic line or other systems serving the Premises, Landlord grants to Tenant (i) a nonexclusive easement across a mutually agreeable designated route, providing access to and from the public roadways nearest to the Land, over the Common Areas (as defined in paragraph 7(a) below) for construction access to the Premises, as well as an exclusive easement for a construction staging area (the "Staging Area") of approximately 20,000 square feet, in a portion of the Common Areas as shown on the Site Plan, and (ii) an easement for such additional underground, public or private utility or cable, fiber optic or other easements as Tenant deems necessary, without unreasonably interfering with the use by Landlord of the Common Areas, for the benefit of the Premises. For the purpose of exercising the rights granted in this paragraph 6, Tenant and/or the utility or other service provider shall have the right to enter upon and use the Common Areas to install the utility systems, to such extent and so long as reasonably necessary to accomplish such purpose, subject to restoration of the Common Areas following such installation.

(b) Common Area Easements. Landlord grants to Tenant a non-exclusive easement (the "Common Area Easement") to use the Common Areas for their intended purposes and to permit Tenant and its employees, agents, subtenants, assignees, licensees, suppliers, customers and invitees to use the Common Areas for the purposes (without limitation) of parking and pedestrian, service and vehicular access, ingress and egress to, from and between the Premises and Landlord's Premises and the streets and highways abutting and adjacent to the Shopping Center, without payment of any fee or other charge. To the extent not prohibited by any document recorded against title to Shopping Center as of the date of this Lease, by any Lawful Requirements, or by any lease or other agreement affecting the Shopping Center described on Exhibit "F", Tenant shall also have the right to use such Common Areas immediately adjacent to Tenant's Improvements and within Tenant's Preferred Area as shown on the Site Plan for "sidewalk sales", seasonal and promotional sales and demonstrations and other sales customary to Tenant's business operations exclusively for Tenant's customers, invitees and patrons upon the following conditions: (i) Tenant may conduct no more than three (3) such events per year; (ii) Tenant must submit to Landlord thirty (30) days in advance a proposal describing the nature of the event, the exact portions of the Common Areas to be used, and the dates, time and duration of the event; (iii) no such event shall be conducted for more than fourteen (14) consecutive days; (iv) Tenant shall obtain all necessary or appropriate governmental permits and approvals; (v) Tenant shall maintain liability insurance in the same limits

6

as required hereunder with respect to each event, naming Landlord and its lender as additional insureds; (vi) such events shall be conducted in compliance with all Lawful Requirements; (vii) Tenant shall maintain the area during event clear of trash and rubbish; (viii) Tenant shall clean the area after each event is over and repair any damage to the area; (ix) Tenant shall indemnify, defend and hold Landlord harmless from losses, damages, costs, and liabilities arising in connection with such event and all activities undertaken, conducted or commissioned on behalf of Tenant in connection with such event; and (x) the right to conduct such events shall terminate during such times as the Premises are not being used for Tenant's initial use described in paragraph 18(a) herein or for any other retail use permitted herein under which Tenant is then operating in a majority of its stores.

7.  Common Areas and Common Area Maintenance.

(a) Definition of Common Areas.  The term "Common Areas" shall be defined to include the parking areas, lanes, drives, entrances, truck passageways, sidewalks, ramps, stairways, landscaped and other unpaved areas, parking lot lighting facilities and equipment, Landlord's pylon sign(s), directional, traffic and monument sign structure(s) and shared utility facilities located in all elements of the Shopping Center (including any such areas and facilities contained within outparcels and adjacent tracts but reserved for the benefit of the Shopping Center occupants) and which are intended and available for the common use of all of the tenants within the Shopping Center (including any outparcel and other adjacent occupants which contribute toward "CAM Charges" (as defined below) and which are not responsible for separate maintenance of such outparcels or tracts), their subtenants, licensees, and business invitees.  Landlord shall operate, maintain, repair and replace the Common Areas in a manner consistent with the operation of a "value-oriented" retail development or better (as provided in paragraph 5 above), including, without limitation, sweeping and cleaning, maintenance of Landlord's pylon and other sign structure(s), including traffic directional signs, markers and lines and informational signs, snow removal and ice treatment, removal of Common Area trash, debris and garbage, lighting (including lighting of signage and Common Areas), repairing, repaving and restriping the parking area, and maintaining, replanting and replacing landscaping and sprinkler systems, storm drains, sewers and other utility lines and facilities not dedicated to the public or owned by a private utility company, which are necessary for the operation of the Shopping Center, customary and reasonable security services, and

7

maintaining all insurance required under this Lease to be maintained by Landlord, all such work to be referred to collectively as "Common Area Maintenance".

(b) Intentionally Deleted.

(c) Tenant's Payments.  During each calendar year ("CAM Year"), Tenant shall make payments towards the cost of Common Area Maintenance ("CAM Charges") incurred by Landlord in equal monthly installments on the first day of each month during a CAM Year. Commencing on the Commencement Date and continuing until the expiration of the first CAM Year, Tenant shall pay to Landlord One and 50/100 Dollars ($1.50) per square foot of ground-floor gross leasable area in the Building as Tenant's contribution towards Landlord's CAM Charges. Thereafter, Tenant's contribution towards CAM Charges shall increase by the lesser of the percentage increase in the CPI-U during the previous CAM Year or five percent (5%).  For any period within the Term which is less than a full CAM Year, Tenant's contribution towards CAM Charges shall be appropriately pro rated.  The remainder of CAM Charges shall be borne by Landlord and/or other tenants.

8.  Signs and Communications Equipment.

(a) Signs.  Attached as a portion of Exhibit "E" are plans and specifications for Tenant's current prototypical face panels and for Tenant's building signage, which Landlord hereby approves.  Tenant, its successors, subtenants and assigns shall be entitled without Landlord's consent, but subject to governmental requirements, to replace all of its signs with signage consistent with Tenant's  (or its successors', subtenants' or assigns') then-current prototypical sign plans. Tenant shall be entitled to install signage identifying Tenant's store on all directional signage within the Shopping Center, in either the position occupied by the former "J. C. Penney" or such other position as Tenant shall approve.

(b) Communications Equipment.  Tenant may install, maintain and/or replace any satellite dishes, antennas, cellular and PCS towers and poles on the roof and/or exterior walls or parapet of the Building as Tenant deems necessary or desirable, provided same shall not adversely and materially affect the roof or its structural elements.

9.  Taxes.

(a) Taxes Contemplated Hereunder.  The term "Real Estate Taxes" shall mean all general real estate taxes and assessments and other ad valorem taxes, rates and levies paid upon or with respect to the Shopping Center, including the Premises, for a calendar year or a portion thereof

8

to any governmental agency or authority and all charges specifically imposed in lieu of any such taxes. Nothing contained in this Lease shall require Tenant to pay any local, county, municipal, state or federal income, franchise, corporate, estate, inheritance, succession, capital levy, business or transfer tax of Landlord, or any local, county, municipal, state or federal income, profits, gross receipts, sales or renewal tax or charge upon the rent or other charges payable by Tenant under this Lease.

(b) Payment of Real Estate Taxes. At such intervals as Landlord is required to pay the Real Estate Taxes, Tenant shall contribute towards Real Estate Taxes levied against the tax parcel or parcels comprising the Shopping Center (the "Tax Parcel"). Commencing on the Commencement Date and continuing until the expiration of the first Lease Year, Tenant shall pay to Landlord Two and 00/100 Dollars ($2.00) per square foot of ground-floor gross leasable area in the Building as Tenant's share of Real Estate Taxes. Thereafter, Tenant's contribution towards Real Estate Taxes shall increase or decrease by the percentage increase or decrease, as the case may be, of actual Real Estate Taxes for the Tax Parcel for the then-current tax year over the Real Estate Taxes for the immediately preceding tax year. Tenant's share of Real Estate Taxes shall be net of any early-payment discounts available at the time Tenant's payment is due. Tenant shall pay Tenant's contribution towards Real Estate Taxes within thirty (30) days after Tenant's receipt of Landlord's statement, accompanied by the tax bill on the basis of which such statement is rendered. In no event shall Tenant be liable for, and Landlord shall indemnify and hold Tenant harmless from and against, any discount forfeited or penalty incurred as a result of late payment by another tenant or by Landlord. Tenant's contribution towards Real Estate Taxes shall be prorated as of the Commencement Date and the expiration or earlier termination of this Lease, and Landlord shall promptly return to Tenant any overpayment made by Tenant not attributable to the period of Tenant's possession of the Premises. Landlord shall remain primarily responsible for such payment notwithstanding the fact that such payment may be made by a tenant of Landlord's Premises or other third party pursuant to an agreement to which Tenant is not a party.

(c) Contest of Real Estate Taxes and/or Assessed Valuation of Property. Tenant shall have the right to contest the amount or validity, or otherwise seek an exemption or abatement, of any Real Estate Taxes or to seek a reduction in the valuation of the Premises assessed for Real Estate Tax purposes, by appropriate proceedings diligently conducted in good faith and in accordance with all Lawful Requirements, provided that at least fifty percent (50%) of the tenants

9

142857

(including Tenant) and other occupants each leasing or occupying at least 20,000 square feet of gross leasable area within the Shopping Center join in such contest and provided further that Tenant shall first have notified Landlord of its intent to do so and Landlord shall have failed to notify Tenant in writing, within ten (10 business days of receipt of Tenant's notice, that Landlord intends to contest such Real Estate Taxes or seek such a reduction. In any instance where any such action or proceeding is being undertaken by Tenant and such other tenants or occupants in the prosecution of such contest, Landlord, at no cost to Landlord, shall cooperate as reasonably necessary to accommodate the contest, execute all documents required and, if required by any law, rule or regulation of the taxing authority, shall join in such prosecution, provided that such actions shall only be prosecuted or undertaken in such a manner as will not threaten Landlord's interest in the Shopping Center.

(d) Payment Following Appeal. Upon the termination of the proceedings set forth in subparagraph (c) above (unless the taxing authority requires that Real Estate Taxes be paid under protest prior to commencement of such proceedings), Tenant shall pay its contribution towards such Real Estate Taxes in such amount as shall be equitably adjusted to reflect the resolution of such proceedings, the payment of which may have been deferred legally during the prosecution of such proceedings. Tenant shall be entitled to a refund of any overpayment of Real Estate Taxes as a result of such re-calculation.

10. Maintenance, Repairs and Replacements. Except (i) for costs covered by Landlord's insurance required to be maintained, (ii) for condemnation proceeds to be received by Tenant, (iii) for obligations arising from the negligent acts or omissions or willful misconduct of Landlord (or its agents, employees or other tenants), or (iv) as otherwise set forth in this Lease, Tenant shall be solely responsible for maintenance of its exterior signage and entrance features, as well as all interior non-structural elements of the Building. If Tenant is required to expend any sum in satisfaction of its obligations relating to the HVAC system serving the Premises, and if the resulting improvement to the Improvements cannot be fully amortized in accordance with generally accepted accounting principles, or the Internal Revenue Code and Regulations, over the remainder of the Term, then Tenant shall be reimbursed by Landlord in an amount equal to the unamortized portion of Tenant's actual costs of such repairs, construction or alteration for the period beyond the remainder of the Term. Landlord shall maintain all structural elements of the Premises (whether or not same serve only the Premises), including, without limitation, the roof, roof structure, flooring

142857

system, floor slab, foundation, load bearing and other structural walls. In addition, Landlord agrees to maintain the Other Improvements immediately surrounding the Building, as well as sidewalks and landscaping. Should either party fail to perform its obligations under this paragraph 10, the other party may, at its option, effect such maintenance, replacements or repairs, provided that curing party shall give the non-performing party thirty (30) days' prior written notice, except in the case of emergencies (in which event only such notice as may be reasonable under the circumstances shall be required); but further provided that the thirty (30) day period (or reasonable period in event of emergencies) shall be extended in respect of any cure that cannot with reasonable diligence be accomplished within such period so long as the party required to effect such cure has commenced such cure within the thirty (30) day period (or reasonable period in event of emergencies) and thereafter diligently prosecutes such cure to completion. The non-performing party shall reimburse the other party on demand for the reasonable and actual amount expended (as evidenced by detailed invoice), plus interest at the lesser of fifteen percent (15%) per annum or the highest rate permitted by State Law (the "Default Rate"). However, in the event of emergency repairs, no interest shall accrue if reimbursed within thirty (30) days of request (including detailed invoice) for reimbursement. All maintenance, repairs or replacements shall be done by Tenant or Landlord lien-free and in a good and workmanlike manner consistent with the quality of labor and materials used in originally constructing the Improvements and in accordance with all applicable law. In order for Landlord and Tenant to effectively perform their maintenance, repair and replacement obligations, Tenant and Landlord, as applicable, shall provide to the other party all manufacturers' and contractors' warranties relating to such work performed on behalf of the other party to the party who is required to maintain same under the Lease; however, Tenant shall not be required to perform the foregoing obligation so long as the Tenant Improvement Allowance is due as provided herein, but remains unpaid.

   11. Utility Service Provider; Payment of Utility Bills. Tenant shall be entitled, subject to State law, to select the utility service provider which shall provide water, electric, gas, cable, and telecommunication services to the Premises. Tenant will pay directly to the appropriate utility company or governmental agency, when due, all bills for gas, water, sanitary sewer, electricity, telephone and other public or private utilities used by Tenant with regard to the Improvements. In the event Landlord shall fail to pay when due all utility charges incurred in the operation of the Common Areas and the Shopping Center and such failure to pay results in interruption in utility

11

142857

service to the interior retail areas of the enclosed Shopping Center or any other portion of the Common Areas and/or the Shopping Center which adversely affects Tenant's use and operation of the Premises and Tenant elects to suspend its business operations with the public as a result of such interruption, Base Rent and other charges shall be abate on a day for day basis until such time as utility service is fully restored.   Landlord shall cause, at Landlord's expense, all utilities serving the Premises to be separately metered.

12. Alterations.  During the Term, Tenant shall have the right, at its discretion and its sole cost, without Landlord's consent, to make (i) any exterior alterations or modifications to Tenant's signage and entrance features as necessary to conform the Improvements to Tenant's then-current prototype so long as the same complies with all Lawful Requirements, and (ii) any interior nonstructural alterations or modifications it may desire.  With Landlord's consent, which shall not be unreasonably withheld, conditioned or delayed, Tenant shall have the right, at its sole cost, to otherwise alter, modify or reconstruct the structure of the Building or Other Improvements. Landlord's withholding of consent as to any structural alteration or modification shall be deemed reasonable only if same is materially inconsistent with the then-existing architecture of the Shopping Center.  Should Landlord's consent be required, conceptual plans and specifications for such work shall be provided to Landlord prior to commencement of any such work.  Landlord shall be deemed to have consented to such work if written notice of disapproval, with reasons specified, is not received by Tenant within fifteen (15) days following Tenant's delivery of such plans and specifications to Landlord.  Without cost or expense to Landlord, Landlord shall cooperate with Tenant in the obtaining of any and all licenses, building permits, certificates of occupancy or other governmental approvals which may be required in connection with any such modifications or alterations, and Landlord shall execute, acknowledge and deliver any documents reasonably required in furtherance of such purposes.

13. Intentionally Omitted.

14. Insurance.

(a) Property Damage.  During the Construction Term, Tenant shall keep or require its general contractor to keep, in full force and effect, a policy of builder's risk insurance covering loss or damage to the Improvements for the full replacement value of all construction.  During the Term, Tenant shall keep the Premises insured against loss or damage by fire and the perils covered under standard "all risk" or "special form" coverage in the amount of full replacement value of the

12

142857

Building, exclusive of excavation, footings and foundations (which initial amount shall be not less than Tenant Improvement Allowance), with a commercially reasonable deductible, for which Tenant shall be fully responsible. Landlord and Landlord's first "Mortgagee" (as defined in paragraph 21 below), shall be named in such policy as additional insureds as their respective interests may appear.

(b) Liability Insurance. During the Term, Tenant shall keep in full force a policy of commercial general liability insurance with bodily injury and property damage coverage with respect to the Premises and business operated by Tenant, which shall name Landlord and Landlord's first Mortgagee as additional insureds as their respective interests may appear. The limits of such commercial general liability policy shall be not less than $3,000,000.00 combined single limit for bodily injury and property damage, with a commercially reasonable deductible.

(c) Workers' Compensation Insurance. To the extent required by law, Landlord and Tenant shall maintain workers' compensation insurance covering their respective employees in statutory limits, or maintain such alternate coverages or arrangements as legally permissible.

(d) Self-Insurance. Notwithstanding anything to the contrary contained herein, Tenant shall have the right to self-insure against any of the risks or portions thereof set forth in subparagraphs (a) and (b) (and to the extent then permitted by law, (c)) above, provided Tenant has a reported net worth, as of the end of Tenant's most recent quarterly reporting period, of not less than Two Hundred Million Dollars ($200,000,000).

(e) Common Area, Additional Area and Third Party Tenant Insurance and Insurance During Landlord's Construction. During the Term, Landlord shall keep in full force and effect, in form reasonably acceptable to Tenant, policies of (1) commercial general liability insurance, and (2) property insurance insuring against loss or damage by fire and the perils covered under standard "all risk" or "special form" coverage, with respect to the Common Areas and with respect to all other areas of the Shopping Center over which Landlord from time to time has present possessory rights (or has the right under any lease to provide insurance coverage because of a tenant's failure to maintain such required coverage) but which do not constitute a portion of the Common Areas (the "Additional Areas"). The Additional Areas shall include, without limitation: (i) constructed but unoccupied portions of the Shopping Center, (ii) vacated or otherwise uninsured tenant space, whether by reason of lease expiration, default or otherwise, and (iii) constructed and occupied portions of the Shopping Center. Said commercial general liability insurance policy shall name

13

Tenant as an additional insured to the fullest extent Tenant has an insurable interest. The limits of such policies shall be the same as those set forth in subparagraphs (a) and (b) above, as applicable. Any deductible amount for Common Area insurance coverage shall be reasonable in amount given the nature of the risk insured and probable frequency of claims made under such coverage. Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center, including the Additional Areas and areas leased to third party tenants or sold to third party occupants, are insured with substantially similar coverages to those required for the Premises and the Common Areas, such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever Tenant may be assured that the Shopping Center will be reconstructed in equal or superior condition within the time frame set forth in paragraph 15. During any period in which Landlord is conducting construction, restoration or renovation activities at the Shopping Center, Landlord shall keep, or cause its general contractor to keep, in full force and effect, with regard to the Shopping Center, in form reasonably acceptable to Tenant, at least the minimum insurance coverages set forth below:

(1)     Workers' Compensation - Statutory Limits;
        Employer's Liability - $500,000;

(2)     Automobile Liability for all vehicles with limits of $3,000,000; and

(3)     Commercial General Liability to include premises operations and products/completed operations coverage with limits of $3,000,000.

Additionally, Landlord shall keep or require its general contractor to keep in full force and effect a policy of builder's risk insurance covering loss or damage to the Shopping Center for the full replacement value of all such construction.

(f) Policy Provisions. All policies of insurance (other than self-insurance) shall be provided by insurance carriers with an A.M. Best rating of not less than A-VIII. Any insurance coverage may be effected by a blanket policy of insurance or under so-called "all risk" or "multi-peril" insurance policies, provided that the total amount of insurance available with respect to the Premises and Tenant's or Landlord's liability hereunder shall be at least the equivalent of separate policies in the amounts herein required, and provided further that in other respects any such policy shall comply with the provisions of this paragraph 14. Landlord shall be entitled to self-insure

14

against any of the risks recited herein provided Landlord has a reported net worth, as of the end of Landlord's most recent quarterly reporting period, of not less than Two Hundred Million Dollars ($200,000,000). An increased coverage or "umbrella" policy may be provided by either party to increase the coverage provided by individual or blanket policies in lower amounts, and the aggregate coverage provided by all such policies with respect to the limits required herein shall be satisfactory provided that such policies otherwise comply with the provisions of this paragraph 14.

(g) Waiver of Right of Recovery and Subrogation. To the extent of any loss which is required to be covered by insurance or is self-insured hereunder or to the extent insurance proceeds are actually received in satisfaction of any other loss, Landlord and Tenant waive any and all rights of recovery against each other for any such loss or damage to the Premises or the contents contained therein, for loss of income on account of fire or other casualty, or for injury sustained on the Premises or the Common Areas; and each party's policies of insurance shall contain provisions recognizing this mutual release and waiving all rights of subrogation by the respective insurance carriers.

(h) Evidence of Insurance.    Subject to Tenant's right to self-insure, (i) upon commencement of the Main Term (as to property insurance), (ii) upon Delivery of the Land (as to liability insurance) and (iii) prior to expiration, Tenant and Landlord shall cause to be issued to each other in lieu of the original policy, certificates of insurance reasonably acceptable to the other party and evidencing compliance with the applicable covenants of this paragraph 14.    Each such certificate shall provide that coverage shall not be cancelled without thirty (30) days notice to the certificate-holder (and any Mortgagee, if applicable).

(i) Indemnities.    Except if arising from the negligent or willful acts of Landlord or its agents or employees (to the extent that paragraph 14(g) is inapplicable), Tenant agrees to indemnify, defend and hold Landlord harmless from all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring on the Premises or resulting from Tenant's negligence or its use and occupancy of the Premises.    Tenant shall reimburse Landlord for any additional premiums in excess of commercially reasonable rates incurred by Landlord in obtaining the coverages required hereunder to the extent such additional premium is caused as a direct result of Tenant's specific use of the Premises other than as a Circuit City Superstore.

15

Except if arising from the negligent or willful acts of Tenant or its agents or employees (to the extent that paragraph 14(g) is inapplicable), Landlord agrees to indemnify, defend and hold Tenant harmless from any and all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring in, on or around the Shopping Center, exclusive of the Premises, or other buildings within Landlord's Premises or resulting from the use by Landlord, its agents or employees.

<u>15. Damages by Fire or Other Casualty.</u>

(a) <u>Restoration Obligations</u>.  In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Improvements, Common Areas and/or Additional Areas, this Lease shall not terminate except as expressly set forth herein, and Base Rent and other charges shall continue to be paid by Tenant pursuant to the terms of paragraph 4.  Within two hundred forty (240) days after such casualty, subject to force majeure, applicable building codes and the procurement of building permits, Tenant shall complete reconstruction of the Building and Other Improvements, and Landlord shall complete reconstruction of the Common Areas and Additional Areas (including substantially equivalent value in equipment, furniture and fixtures), to that condition existing immediately prior to such casualty, in the reconstructing party's reasonable discretion, with, in the event of any Tenant reconstruction, such alterations as may be permitted under paragraph 12.  If (i) more than thirty-five percent (35%) of the area of the Common Areas and/or Additional Areas shall be damaged or destroyed by fire or other casualty, or (ii) all or any material part of the Common Areas and/or Additional Areas is damaged or destroyed at any time by the occurrence of any risk not insured under the insurance required to be carried by under this Lease, then Landlord may terminate this Lease by giving written notice to Tenant of Landlord's election so to terminate, such notice to be given within ninety (90) days after the occurrence of such damage or destruction.  Landlord shall not terminate this Lease pursuant to subparts (i) or (ii) above unless Landlord also terminates the leases of all similarly affected tenants of the Shopping Center.  If (i) Landlord does not commence the repair and restoration work to the Common Areas and/or Additional Areas, as the case may be, as required pursuant to this paragraph within ninety (90) days after the date of such destruction or thereafter fails to diligently pursue the completion of such repair and restoration work, or (ii) the required repairs and restoration cannot, in the opinion of an independent licensed architect designated by Tenant, be completed by Landlord in accordance with

16

all provisions of this paragraph within a period of eighteen (18) months after the date of destruction, or (ii) the required repairs and restorations are not actually substantially completed by Landlord in accordance with all provisions of this paragraph within a period of eighteen (18) months after the date of destruction (which eighteen-month period may be extended by up to ninety (90) days by reason of force majeure), then, in any of such events, Tenant shall have the right, at its sole discretion and option, to terminate this Lease at any time prior to the substantial completion by Landlord in accordance with all provisions of this paragraph by thirty (30) days' notice to Landlord.

(b) Additional Termination Rights During Last Five Lease Years. In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Improvements, Common Areas and/or Additional Areas, during (i) the last five (5) years of the Main Term or any Option Period which would require a restoration period in excess of one hundred eighty (180) days, or (ii) the last two (2) years of the Term, regardless of the duration of restoration activities, or in the event of any uninsured casualty, Tenant and, except in the event Tenant exercises its next Renewal Option after any such casualty in the case of (i) above, Landlord, shall have the option of terminating this Lease. Each party shall notify the other of its exercise of such option within sixty (60) days following the occurrence of such casualty and Tenant shall thereupon make available to Landlord (i) all insurance proceeds paid by Tenant's insurance carrier, or (ii) if self-insured, an amount equal to the reconstruction costs of the Improvements or, if the Improvements are not being reconstructed, an amount equal to the actual value of the Improvements (not to exceed, however, an amount equal to the reconstruction costs of the Improvements), to the extent such amounts would have been payable under the insurance outlined in paragraph 14(a) above. In the event this Lease is not terminated pursuant to this Section 15(b), then, subject to force majeure, within two hundred forty (240) days after receipt by Tenant of the required governmental permits for restoration, for which permits Tenant shall make prompt application following such destruction or damage, and insurance proceeds (if not self-insured) with regard to such damage or destruction, Tenant shall complete reconstruction of the Improvements to their condition existing immediately prior to such damage, in Tenant's reasonable discretion, with such alterations as may be permitted under paragraph 12, and shall restore the Premises (including equipment, furniture and fixtures). Should this Lease remain in full force and effect, Landlord shall reconstruct all Common Areas and/or Additional Areas in the manner specified by subparagraph (a) above regardless of the amount of damage to same. Additionally, Landlord shall assure (through parallel lease provisions or

17

otherwise) that all areas of the Shopping Center leased to third party tenants or sold to third party occupants are subject to substantially similar reconstruction obligations to those of the Premises, Common Areas and Additional Areas, such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever, in the event Tenant elects to maintain this Lease in force, Tenant shall be assured that the Shopping Center as a whole will be reconstructed in accordance with this paragraph 15.

(c)    Reinstatement. In the event that Landlord exercises its right to terminate this Lease as specified in subparagraph (a) above, and thereafter, within three (3) years following the occurrence of the damage or destruction giving rise to the termination, Landlord rebuilds the Shopping Center or the Common Areas, as the case may be, with the intention of leasing the Premises to a third party for a value-oriented, retail use, then Landlord shall offer to Tenant to reinstate this Lease for the Premises for the same number of months as remained in the unexpired portion of the Term of this Lease as of the date of such damage or destruction, and upon the same terms, provisions and conditions of this Lease as shall have been in effect on the date of such damage or destruction; provided that Landlord shall not be required to make such offer to Tenant if less than thirty-six (36) months remained in the Term of this Lease as of the date of such damage or destruction, unless Tenant shall have promptly, following the occurrence of such damage or destruction, exercised its option, if any, to extend the Term of this Lease for the next Option Period, if any. In the event that Tenant shall not accept in writing the offer of reinstatement within thirty (30) days following Landlord's notice to Tenant of the offer, then the offer shall be null and void and Tenant shall have no further rights hereunder. In the event that Tenant shall accept the offer in writing within such 30-day period, the parties shall promptly enter into a written agreement reflecting such reinstatement of the Lease, and Tenant shall perform its restoration of the Improvements pursuant to plans and specifications substantially similar to the original Plans and Specifications, but with such alterations as may be permitted under paragraph 12, and shall reopen for business in the Premises within two hundred forty (240) days following delivery of possession of the Premises to Tenant in accordance with this Lease.

16. Condemnation.

(a) Definition of Taking and Substantial Taking. For the purpose of this Lease, a "Taking" shall mean any condemnation or exercise of the power of eminent domain by any

142857

authority vested with such power or any other taking for public use, including a private purchase in lieu of condemnation by an authority vested with the power of eminent domain; the "Date of Taking" shall mean the earlier of the date upon which title to the Premises, the Shopping Center or any portion so taken is vested in the condemning authority or the date upon which possession of the Premises, the Shopping Center, or any portion is taken by the condemning authority; and "Substantially All of the Premises" shall mean (i) so much of the Improvements and/or Shopping Center and Common Areas as, when taken, leaves the untaken portion unsuitable, in Tenant's reasonable opinion, for the continued feasible and economic operation of the Premises by Tenant for the same purposes as immediately prior to such Taking or as contemplated herein, (ii) so many of the parking spaces within the Shopping Center as reduces the parking ratio below the greater of five (5) spaces (no less than nine (9) feet wide for full-sized automobiles) per 1000 square feet of ground-floor gross leasable area or that ratio which is required by the zoning ordinance applicable to the Shopping Center, and Landlord's failure to provide substantially equivalent alternative parking reasonably acceptable to Tenant within sixty (60) days after such Taking, or (iii) so much of the Common Area Easement described in paragraph 6 above that access to the Premises is impeded.

(b) Tenant's Rights Upon Taking or Substantial Taking.  In the event of a Taking of Substantially All of the Premises, Tenant, at its option upon thirty (30) days' written notice to Landlord, which shall be given no later than sixty (60) days following the Taking, shall have the right to terminate this Lease. All Base Rent and other sums payable by Tenant shall be apportioned and paid through and including the Date of Taking, and neither Landlord nor Tenant shall have any rights in any compensation or damages payable to the other in connection with such Taking.

(c) Tenant's Rights Upon Less Than Substantial Taking.  In the event of a Taking of less than Substantially All of the Premises, Base Rent and other charges shall be reduced fairly and equitably in accordance with the portion condemned or taken, effective as of the Date of Taking, and Tenant shall make all necessary restorations to the Improvements so that the portions of the Improvements not taken constitute a complete architectural unit, provided that the cost to Tenant shall not exceed the proceeds of Tenant's condemnation award (to the extent that such relates to the Improvements and not to Tenant's personal property, intangibles or out-of-pocket expenses unrelated) and the portion of Landlord's award allocable to the Premises, which award, or an amount equal to such award if such proceeds are not made available by the applicable mortgagee, Landlord shall make available to Tenant for such restoration.  If the Taking occurs within the last

19

142857

two (2) years of the Term and has a material impact on Tenant's ability to conduct business as reasonably determined by Tenant, this Lease shall terminate at Tenant's option, such option to be exercised by Tenant giving not less than thirty (30) days' prior written notice to Landlord.

(d) Landlord's Rights and Obligations Upon Any Taking. In the event of a Taking of more than thirty-five percent (35%) of the Common Areas, then Landlord may terminate this Lease by giving written notice to Tenant of Landlord's election so to terminate, such notice to be given within ninety (90) days after the occurrence of such Taking. Landlord shall not terminate this Lease pursuant to the preceding sentence unless Landlord also terminates the leases of all similarly affected tenants of the Shopping Center. In the event of any Taking following which the Lease continues in effect, Landlord shall make all necessary restorations to all portions of the Common Areas and Additional Areas such that they each constitute a complete architectural unit and serve the function originally intended. Additionally, Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center leased to third party tenants or sold to third party occupants are subject to substantially similar reconstruction obligations to those of the Premises, Common Areas and Additional Areas, such that in the event of any condemnation of any portion of the Shopping Center whatsoever, and in the event Tenant elects to maintain this Lease in force, Tenant shall be assured that the Shopping Center will be reconstructed to its former condition within reasonable time. If (i) Landlord does not commence the restoration work to the Common Areas as required pursuant to this paragraph within ninety (90) days after the date of such Taking or thereafter fails to diligently pursue the completion of such restoration work, or (ii) the required restoration cannot, in the opinion of an independent licensed architect designated by Tenant, be completed by Landlord in accordance with all provisions of this paragraph within a period of eighteen (18) months after the date of Taking, or (ii) the required restorations are not actually substantially completed by Landlord in accordance with all provisions of this paragraph within a period of eighteen (18) months after the date of such Taking (which eighteen-month period may be extended by up to ninety (90) days by reason of force majeure), then, in any of such events, Tenant shall have the right, at its sole discretion and option, to terminate this Lease at any time prior to the substantial completion by Landlord of the required restorations in accordance with all provisions of this paragraph by thirty (30) days' notice to Landlord.

20

142857

(e) Rights Upon Temporary Taking.  In the event of a Taking of the Premises, the Common Areas and/or any other area within the Shopping Center, or any portion thereof, for temporary use (specifically one not exceeding sixty (60) days in duration), without the taking of the fee simple title thereto, this Lease shall remain in full force and effect.  All awards, damages, compensation and proceeds payable by the condemnor by reason of such Taking relating to the Premises, or relating to the Common Areas but reasonably attributable to the Premises, for periods prior to the expiration of the Lease, or an amount equal to such award if such proceeds are not made available by the applicable mortgagee, shall be payable to Tenant.  All such awards, damages, compensation and proceeds for periods after the expiration of the Lease shall be payable to Landlord.  Anything contained to the contrary notwithstanding, a temporary Taking for any period in excess of sixty (60) days may, at Tenant's option, be deemed a permanent Taking and shall be governed by subparagraph (b) or (c) above, as applicable.

(f) Taking of the Pylon Sign(s).  In the event of a taking, whether permanent or temporary, of any pylon or monument sign on which Tenant has installed identification panels, Landlord shall provide within ninety (90) days a substitute pylon or monument sign (reasonably acceptable to Tenant), with adequate electrical power, located so as to be visible to vehicular traffic or roadways adjacent to the Shopping Center and/or at entrances to the Shopping Center, at Landlord's sole cost.

(g) Tenant's Right Upon Condemnation.  In the event of a Taking described in subparagraph (b) or (c) above, Tenant shall be entitled to claim compensation from the condemning authority for the value of its leasehold interest in the Premises, its unamortized leasehold improvements paid for by Tenant, relocation expenses and any other items to which Tenant is entitled under applicable law.

17. Assignment and Subletting.  Tenant shall have the right to sublet, assign, transfer, reassign and grant concessions or licenses (a "Transfer") in all or any part of the Premises and any of Tenant's rights and obligations under this Lease during the Term, with Landlord's prior consent, which may be granted or withheld in Landlord's sole discretion.  If Tenant desires to effect a Transfer in Tenant's good faith business judgment of all or any part of the Premises and any of Tenant's rights and obligations under this Lease during the Term, it shall notify Landlord in writing (a "Transfer Notice") of its desire to do so and the name of the proposed transferee.  Tenant's Transfer Notice shall identify in reasonable detail the name and address of the proposed transferee

21

(which information may be disclosed conditioned upon reasonable confidentiality requirements) and such other information regarding the proposed assignee, subtenant, concessionaire or licensee, its financial and operating information regarding such entity, and any other information which Tenant may elect to release to Landlord in connection with such transaction as shall reasonably enable Landlord to assess the quality of such transferee.  In the event of such a Transfer, such Transferee shall assume in writing all of Tenant's obligations hereunder arising subsequent to the date of such Transfer and Tenant shall remain liable for all of Tenant's obligations to Landlord so long as this Lease is not changed, modified or amended in any respect by Landlord and any transferee. Notwithstanding the immediately preceding sentence, in the event any transferee subsequent to a Transfer has a net worth calculated in accordance with generally accepted accounting principles equal to or greater than Two Hundred Fifty Million and No/Dollars ($250,000,000.00), neither the consent of Landlord nor Mortgagee shall be necessary to such Transfer, and Tenant shall thereafter be relieved of any further obligation under this Lease. Transfers to "Permitted Transferees" and Transfers involving beneficial ownership interests in Tenant, shall not be deemed a Transfer hereunder and same may be effected without Landlord's knowledge or consent.  A "Permitted Transferee" shall mean (i) a purchaser of more than half of Tenant's then operating stores in the metropolitan Detroit area; (ii) a "Wholly-Owned Subsidiary" (as defined below) or "Affiliate" (as defined below) of Tenant; or (iii) a "Successor Entity" (as defined below).  A "Wholly-Owned Subsidiary" of Tenant shall mean any corporation, all of whose outstanding voting stock is owned, directly or indirectly, by Tenant or by one or more of its Wholly-Owned Subsidiaries and any partnership or other business entity, all of the parties to which consist of Tenant and one or more Wholly-Owned Subsidiaries. An "Affiliate" of Tenant shall mean any corporation or other business entity which, now or hereafter, directly or indirectly, controls or is controlled by, or is under common control with, Tenant.  For the purposes of this definition, "control" of or by such entity shall mean the power to direct or cause the direction of the management and policies of such entity, through the ownership of voting securities or partnership interests, by contract or otherwise.  A "Successor Entity" shall mean (A) a business entity into which or with which Tenant, its successors or assigns, is merged or consolidated, in accordance with applicable statutory provisions for the merger or consolidation of business entities, provided that by operation of law or by effective provisions contained in the instruments of merger or consolidation, the liabilities of the entities participating in such merger or consolidation are assumed

22

by the entity surviving same, (B) a business entity acquiring this Lease, the good will and all or substantially all of the other property and assets of Tenant, its successors or assigns, and assuming all or a substantial portion of the liabilities of Tenant, or (C) any successor to a Successor Entity becoming such by either of the methods described in clauses (A) and (B) above. The acquisition by Tenant, its successors or assigns, of all or substantially all of the assets, together with the assumption of all or substantially all of the obligations and liabilities, of any business entity shall be deemed to be a "merger" of such entity into Tenant for the purpose of this paragraph 17.

Notwithstanding anything contained herein to the contrary, with respect to any Transfer for which Landlord is entitled under the terms hereof to withhold its consent, Landlord shall elect to either grant its consent to such Transfer or terminate this Lease within forty-five (45) days of receipt of Tenant's Transfer Notice. If Landlord elects to terminate this Lease within such forty-five (45) day period, then Landlord shall pay to Tenant an amount equal to the unamortized value of Tenant's investment in its leasehold improvements to the Premises, as carried on Tenant's books as of the effective date of Lease termination, excluding the amount of the Tenant Improvement Allowance to the extent paid to Tenant (the "Unamortized Costs"). The Unamortized Costs shall be paid on the effective date of Lease termination, which shall automatically occur on the date Tenant vacates the Premises. Failure of Landlord to respond to any Transfer Notice shall be deemed to be the consent of Landlord to Tenant's proposed Transfer substantially on the terms set forth in the Transfer Notice.

18. Use.

(a) Tenant may initially use and operate the Premises only as a retail store for (i) the sale of consumer, office and automotive electronics products (which include, but shall not be limited to, televisions, stereos, speakers, video and audio recorders and players and cameras), computer hardware and software and related software services, including internet access services, entertainment software and entertainment media (which include, but shall not be limited to, records, game cartridges, video tapes, cassettes, compact discs, DVD's and DVD equipment), cellular and wireless telephones and telecommunication devices, and related goods and the sale and installation of motor vehicle audio, stereo and telephone systems and technological evolutions of the foregoing (all of such items are collectively referred to as the "Products"), and (ii) renting, servicing, repairing and warehousing of the Products.

142857

(b) If Tenant opens for business as its initial use described above, Tenant shall thereafter have the right to use the Premises for any lawful use; provided, however, that the Premises shall not be used (i) for any illegal purpose, (ii) for any use prohibited under paragraph 19(a)(viii) below, (iii) in violation of any exclusive use restriction granted a tenant or other occupant of the Shopping Center pursuant to a lease or restrictive covenants executed prior to this Lease and shown on Exhibit "F", or (iv) in violation of any other applicable provision of the "Permitted Encumbrances" contained in Exhibit "F".

(c) Nothing contained in this Lease shall be construed to require Tenant to operate the Premises continuously either for the use first stated or for any other use; provided, however, if (i) Tenant does not open for business as a Circuit City Superstore on or before December 31, 2004, Landlord may elect by written notice given to Tenant no later than January 15, 2005, unless Tenant shall have opened for business prior to such date, to terminate this Lease effective as of January 31, 2005. In addition, if Tenant changes its primary use to a use other than a retail use under which Tenant is then operating in a majority of its stores, then Landlord may elect by written notice given to Tenant during the continuation of such changed use, to terminate this Lease effective ninety (90) days after the date of Tenant's receipt of such notice. If Landlord so terminates this Lease, then Landlord shall pay to Tenant the Unamortized Costs on the effective date of Lease termination.

19. Warranties, Representations and Covenants.

(a) Landlord represents and warrants and, with respect to subparagraphs (v), (vi), (viii), (x), (xi) and (xii) below, additionally covenants, to Tenant that:

(i)      Quiet and Peaceful Enjoyment.  Provided there does not exist an Event of Default by Tenant, Tenant shall have quiet and peaceful use, enjoyment and occupancy of the Premises.

(ii)     Title.  Landlord's fee simple interest in the Shopping Center is free and clear of any mortgages, deeds, encumbrances, declarations, easements, agreements, leases, tenancies or restrictions, except those matters set forth on Exhibit "F" attached and entitled "Permitted Encumbrances".  Nothing contained in any other unrecorded agreement or instrument which encumbers Landlord or the Shopping Center shall restrict Tenant's rights under this Lease. Landlord specifically warrants that, except as provided in the Permitted Encumbrances, no third party has the right to (x) object to Tenant's tenancy, (y) prohibit the sale, rental, servicing, repair or warehousing of the Products, or (z) consent to any feature of the Improvements or Tenant's signage.

24

142857

This representation and warranty and those following are a material inducement to Tenant's execution of this Lease.

Landlord represents and warrants to Tenant the following to the best of Landlord's knowledge:

(1) Other than as may be shown on that certain ALTA/ACSM Land Title Survey – Great Lakes Crossing, prepared by Giffels-Webster Engineers, Inc., dated March 26, 1999 and last updated February 11, 2003 (the "Existing Survey"), there are no existing utility lines, easements or facilities or other easements of any kind located or proposed to be located in, on or under the Land, and no blanket easement encumbers the Land.

(2) Other than as may be shown on the Existing Survey, there are no existing or proposed easements which conflict with or which are located under any access drive or drive aisle within the Shopping Center, which would prevent or hinder the use of same for vehicular and pedestrian traffic over same.

(3) The terms and conditions of that certain Master Declaration of Easements and Restrictions, Great Lakes Crossing, dated June 11, 1997 and recorded in the land records of Oakland County, Michigan in Liber 17340, page 136, as the same may have been amended and/or supplemented from time to time as of the date hereof (the "Master Declaration") do not, and there are no laws, codes or ordinances which would, prohibit, restrict, hinder or limit Tenant's intended use of the Premises for the sale of electronic products (including the Products) or sale and installation of car stereos and other accessories, use of roof-mounted satellite equipment or installation of Tenant's proposed signage and subsequent rights to alter same to conform to Tenant's prototypical signage and/or design motif.

(4) The Building and/or Other Improvements, as shown in the Plans and Specifications pursuant to Exhibit "C", will not violate any current recorded covenants, conditions, restrictions, applicable laws, codes, ordinances or regulations with respect to building setback lines, size, floor space or gross leasable area, height restrictions, or parking ratios, and there are no encroachments onto the Land other than as may be shown on the Existing Survey. Additionally, a present or future violation on the Land of said covenants, restrictions, laws, codes, ordinances, regulations or setback lines, if any, will not result in a right of re-entry or in a forfeiture or reversion of the title to the Land.

25

142857

(5) Tenant and other occupants of the Shopping Center have rights of ingress and egress to and from North Lake Angelus Road, Baldwin Road and Joslyn Road which are publicly dedicated streets.

(6) No third party has rights to drill, mine, explore for or develop, produce or extract any minerals located on or beneath the Shopping Center and no drilling, mining, exploration for or production, development or extraction of any minerals shall be permitted on the Shopping Center.

(7) With respect to the Master Declaration Landlord is in good standing and there are no outstanding dues or assessments owing against the Land.

(8) No third party has any right of first refusal or repurchase or re-entry with respect to the Land and no third party has any prior approval of a future purchaser or tenant or occupant of the Land.

(9) Landlord has not received any notices of violations of covenants, conditions, restrictions, laws or regulations relating to environmental protection recorded or filed in the public records.

(10)   There are no mortgages encumbering the Land other than that of PNC Bank.

(11)   There are no mechanic's, laborer's or materialmen's liens or judgments encumbering the Land and Landlord has not received notice of any impending or potential such liens or judgments to be filed against the Land.

(12)   There are no delinquent taxes, assessments or utility charges or fines or penalties related thereto owning against the Land and Landlord has not received any notice thereof.

(iii)   Certificate of Authority.   Landlord covenants that it is a duly constituted limited partnership under the laws of the State of Delaware, and that the authorized signatory of its general partner is duly authorized and empowered to act on behalf of the limited partnership.   Landlord has furnished Tenant with evidence of (a) the existence of the limited partnership and (b) the authority of the signatory of its general partner to bind the limited partnership as contemplated herein.

(iv)   No Litigation.   To the best of Landlord's knowledge, there are no judicial, quasi-judicial, administrative or other orders, injunctions, moratoria or pending

26

142857

proceedings against Landlord or the Shopping Center which would preclude or interfere with, the construction, occupancy and use of the Premises for the purposes contemplated.

(v)    Hazardous or Toxic Materials.    Landlord has not used, discharged, dumped, spilled or stored any Hazardous Substances (as hereinafter defined) on or about the Shopping Center, whether accidentally or intentionally, legally or illegally, and has received no notice and has no knowledge that any such condition exists at the Shopping Center. Unless occurring as a result of the construction of the Improvements by Tenant, Tenant's use or occupancy of the Premises or otherwise introduced by Tenant, its agents, employees or contractors after the Delivery of the Land by Landlord, if any claim is ever made against Tenant relating to Hazardous Substances present at or around the Shopping Center, whether or not such substances are present as of the Effective Date, or any Hazardous Substances are discovered at the Shopping Center (unless introduced by Tenant, its agents or employees), all costs of removal incurred by, all liability imposed upon, or damages suffered by, Tenant because of the same shall be borne by Landlord, and Landlord indemnifies and agrees to defend and hold Tenant harmless from and against all such costs, losses, liabilities and damages, including, without limitation, all third-party claims (including sums paid in settlement thereof, with or without legal proceedings) for personal injury or property damage and other claims, actions, administrative proceedings, judgments, compensatory and punitive damages, lost profits, penalties, fines, costs, losses, attorneys' fees and expenses (through all levels of proceedings), consultants or experts fees and all costs incurred in enforcing this indemnity. Landlord shall deliver the Land to Tenant free of any pollution or contamination from toxic or hazardous substances, asbestos or any other chemicals or substances in amounts which exceed standards for public health or welfare as established and regulated by any local governmental authority, the State or the United States Government (herein collectively referred to as "Hazardous Substances"). Landlord hereby grants Tenant and its agent access to the Premises and Shopping Center to enable Tenant to conduct such soil and environmental tests as it deems necessary.

The representation, warranty and indemnity of Landlord described in this paragraph 19(a)(v) shall survive the termination or expiration of this Lease.

(vi)    Tenant's Exclusive Use.    So long as the Premises are used for the initial uses set forth in paragraph 18 and subject to the rights of existing tenants or occupants of the Shopping Center in effect as of the date of this Lease and described on Exhibit "F", (A) no other

27

tenant or occupant of the Shopping Center within five hundred (500) feet of Tenant's interior entrance to the Shopping Center building and (B) no other tenant or occupant leasing or occupying between 20,000 square feet and 80,000 square feet of the Shopping Center or any other property owned by Landlord or an affiliate within a one (1) mile radius of the Shopping Center, shall be entitled to sell or rent (or rent to own) any of the Products.    Neither (i) Incidental Sale (as hereinafter defined) of the Products in connection with the overall business of another occupant or tenant, nor (ii) use of the premises currently occupied by "FYE" in the Shopping Center by a replacement tenant operating under substantially the same primary use under which FYE is operating as of the date thereof, pursuant to a lease executed within one (1) year following the termination of the current FYE lease, shall be deemed a violation of the preceding sentence.  As used herein, "Incidental Sale" shall mean the lesser of (i) two hundred (200) square feet, or (ii) ten percent (10%) of such occupant's or tenant's display area.  In addition to any other remedies which Tenant may have in connection with a violation of the exclusive use right granted Tenant herein, payment of Base Rent, Ground Rent, CAM Charges, Real Estate Taxes and all other sums due Landlord hereunder shall abate (and shall not accrue) during any time in which such violation exists.

(vii)    Zoning and Subdivision.  The Premises and the Shopping Center are presently properly subdivided, in conformity with all applicable laws and zoned so as to permit (A) the development and operation of the Premises and the Shopping Center in accordance with the provisions of this Lease; and (B) the initial use of the Premises described in paragraph 18 of this Lease.

(viii)    Prohibited Activities.  Landlord shall not operate or lease (or permit to be operated or leased) any building or tenant space in the Shopping Center for use as:

(A) a bar, pub, nightclub, music hall or disco in which less than fifty percent (50%) of its space or revenue is devoted to and derived from food service in excess of 30,000 square feet or adjacent to the Premises;

(B) a bowling alley (in any portion of the Shopping Center currently occupied by Bed, Bath and Beyond);

(C) a billiard or bingo parlor;

(D) a flea market;

(E) a massage parlor;

(F) a funeral home;

(G) a facility for the sale of paraphernalia for use with illicit drugs;

(H) a facility for the sale or display of pornographic material (as determined by community standards for the area in which the Shopping Center is located);

28

142857

(I)  an off-track betting parlor;

(J)  a carnival, amusement park or circus;

(K) a gas station, car wash or auto repair or body shop (the parties specifically acknowledging that Tenant's car stereo installation facility is not included in this prohibition (K));

(L) a facility for the sale of new or used motor vehicles, trailers or mobile homes;

(M)  a facility for any use which is illegal or dangerous, constitutes a nuisance or is inconsistent with an integrated, community-oriented retail and commercial shopping center;

(N) a skating rink (in any portion of the Shopping Center currently occupied by Bed, Bath and Beyond);

(O) an arcade, pinball or computer game room within five hundred feet of the Premises (provided that retail facilities in the Shopping Center may operate no more than four (4) such electronic games incidentally to their primary operations);

(P) service-oriented offices (such as, by way of example, medical or employment offices, travel agencies, real estate agencies or dry cleaning establishments) or other non-retail uses except for offices and storage facilities incidental to a primary retail operation to the extent in excess of 10% of the gross leasable area of the Shopping Center;

(Q) a banquet hall, auditorium or other place of public assembly;

(R) a training or educational facility (including, without limitation, a beauty school, barber college, reading room, school or other facility catering primarily to students or trainees rather than customers);

(S) a theater of any kind (within five hundred feet of the Premises);

(T) a facility for the sale or rental of used goods (including thrift shops, secondhand or consignment stores) or any facility selling new or used merchandise as a wholesale operation, a liquidation operation, odd lots, lot sales, factory close-outs or imperfect goods; or

(U) a gymnasium, sport or health club or spa (in any portion of the Shopping Center currently occupied by Bed, Bath and Beyond).

In addition to the foregoing, Landlord shall not operate, lease or permit to be operated or leased within the Shopping Center any restaurant or bookstore within any building within three hundred (300) feet of the exterior entrance to the Building. In addition, no auction, fire or going-out-of-business sale shall be conducted in the Shopping Center.

(ix)   Site Covenants. Landlord makes the following covenants (the "Site Covenants"):

(A) Building Height and Location.   No building adjacent to the Premises shall exceed thirty-four (34) feet in height above finished grade, and no adjacent entrance feature shall exceed forty (40) feet, nor shall it be positioned so as to project beyond the portion of

29

the front wall of the Building immediately adjacent. No outparcels, barriers, buildings, kiosks or other structures, either temporary or permanent, shall be located within Tenant's Preferred Area, and no building or other structure shall be located within the "View Corridor" as shown on the Site Plan except for up to two (2) billboard advertising signs not to exceed twenty-four (24) square feet each and only in areas of the View Corridor located outside the Tenant's Preferred Area.

(B) Construction and Alterations.  Following Tenant's opening for business to the public at the Premises, no exterior construction and no construction staging shall be permitted in the Tenant's Preferred Area or in Common Areas located within five hundred (500) feet of exterior or interior entrances to the Premises during the months of October, November and December except for emergency repairs.  In the event of any construction within the Shopping Center, Landlord shall designate a construction access route, staging and parking areas located so as to minimize interference with customers or the operations of other occupants of the Shopping Center and shall require erection of safety barriers as necessary and an opaque wall around the site of such construction of a size necessary to screen such construction from ground level view, as requested by Tenant, in Tenant's reasonable judgment.  With regard to any construction on Landlord's Premises, Landlord shall be solely responsible for any governmentally imposed impact fees, hookup, connection, installation or tap in fees and other similar construction-related charges. Landlord shall make no changes in Tenant's Preferred Area as shown on the Site Plan (including, without limitation, construction of improvements, changes in the location of curbcuts, drive aisles, roadways, sidewalks or parking spaces or reduction of the parking ratio specified in paragraph 5) without Tenant's express written consent, which Tenant may, in its sole discretion, withhold. Landlord shall not make any other changes to the Common Areas which affect Tenant's parking, visibility or access without Tenant's consent, which may be withheld in Tenant's sole discretion.

(C) Prohibited Uses in Common Area.  Landlord covenants that it shall not, without Tenant's express written consent, permit the following uses or activities to occur in the Common Areas:  (1) advertisements or signs in the Tenant's Preferred Area except for the pylon and/or monument signs described in paragraph 8, the "for rent" signs described in paragraph 40 and traffic control signs; (2) display or sale of merchandise within the Tenant's Preferred Area or within two hundred (200) feet thereof, subject to the rights of existing tenants or occupants described on Exhibit "F"; (3) operation of loudspeakers or other sound electronically amplified so as to be heard in Tenant's Preferred Area; (4) imposition of a charge for parking other than as may

30

be required by law; or (5) operation of cellular telephone or other telecommunication tower within the View Corridor for use by any other party not an occupant of the Shopping Center. Landlord further covenants that it will not seek, nor permit any other occupant of the Shopping Center to seek, a variance or waiver from the minimum parking requirements applicable to the Shopping Center under the zoning code or other applicable ordinance establishing the ratio of parking spaces to building area or otherwise mandating the number of parking spaces required for the Shopping Center and the uses contained therein. Finally, Landlord agrees that it shall make no material changes to the interior of the enclosed portions of the Shopping Center which would interfere with the use, accessibility or visibility of the interior entrance to the Premises from the enclosed mall, including without limitation, the placement of any kiosk within thirty (30) feet of the interior entrance to the Premises, except any carts or kiosks existing within such area as of the date hereof, without Tenant's prior written consent.

(D) Easements.    Landlord shall not create any easements in the Tenant's Preferred Area without Tenant's prior written consent.

(x)    Interference with Tenant's Reception/Transmission.    Landlord shall not install or permit to be installed by any other tenant or other person anywhere in the Shopping Center, any structure or equipment which would cause any interference with satellite, radio, telecommunications or television reception or transmission in or from the Building, except any such structure or equipment existing as of the date hereof,.

(xi)    Notices Affecting the Premises.    Landlord shall promptly forward to Tenant any notice or other communication affecting the Premises or the Shopping Center received by Landlord from any owner of property adjoining, adjacent or nearby to the Premises or the Shopping Center or from any municipal or governmental authority, in connection with any hearing or other administrative procedure relating to the use or occupancy of the Premises, Shopping Center or any such neighboring property.

(b) Tenant represents and warrants and, with respect to subparagraph (ii) below also covenants, to Landlord that:

(i)    Tenant's Authority.    Tenant is a duly constituted corporation organized under the laws of the Commonwealth of Virginia; it has the power to enter into this Lease and perform Tenant's obligations; and the Vice President executing this Lease on Tenant's behalf has the right and lawful authority to do so.

31

(ii)   Tenant's Warranty as to Hazardous or Toxic Materials.  As to Tenant's use and occupancy of the Premises and use of the Common Areas, Tenant will not introduce, discharge, dump, spill or store within the Premises or the Shopping Center any Hazardous Substances; and Tenant indemnifies and agrees to hold Landlord harmless from and against all costs, liability and damages as a result thereof, to the same extent that Landlord indemnifies and holds Tenant harmless in subparagraph (a)(v) above.  The warranty and indemnity of Tenant described in this paragraph 19(b)(ii) shall survive the termination of this Lease.

(c)  In addition to such other remedies as may be accorded Tenant at law, in equity (including but not limited to an injunction or writ of specific performance) or under the terms of this Lease, (i) in the event that any of the representations, warranties and covenants made by Landlord in this paragraph 19 are untrue or incorrect, or (ii) in the event that Tenant suffers any loss, cost, liability or damage as a result of the breach of any of such covenants, representations and warranties made by Landlord, Landlord shall defend, indemnify and hold Tenant harmless from any of such loss, costs, liability or damage incurred as a result of Landlord's breach.

(d)  In addition to such other remedies as may be accorded Landlord at law, in equity (including but not limited to an injunction or writ of specific performance) or under the terms of this Lease, (i) in the event that any of the representations, warranties and covenants made by Tenant in this paragraph 19 are untrue or incorrect, or (ii) in the event that Landlord suffers any loss, cost, liability or damage as a result of the breach of any of such covenants, representations and warranties made by Tenant, Tenant shall defend, indemnify and hold Landlord harmless from any of such loss, costs, liability or damage incurred as a result of Tenant's breach.

20. Estoppel Certificates.  Without charge, at any time within thirty (30) days after receipt of written request by either party, the other party shall certify, in writing, to any other entity ("Person") specified in such request:  (a) as to whether this Lease has been supplemented or amended, and, if so, the substance and manner of such supplement or amendment; (b) as to the validity, force and effect of this Lease, to the certifying party's best knowledge; (c) as to the existence of any default, to the certifying party's best knowledge; (d) as to the existence of any offsets, counterclaims, or defenses on the part of such other party, to the certifying party's best knowledge; (e) as to the commencement and expiration dates of the Term; and (f) as to any other matters which  may reasonably be requested.  In addition, without charge, at any time within thirty (30) days after receipt of written request of Tenant, Landlord shall deliver an estoppel certificate to any Permitted

32

142857

Transferee and any of Tenant's permitted assignees or subtenants that states in the event Tenant defaults under its obligations under this Lease following the date of any assignment or subletting, Landlord will permit such assignee or subtenant to satisfy obligations of Tenant, including but not limited to the direct payment of rentals to Landlord. Any such certificate may be relied upon by the party requesting it and any Person to whom the same may be exhibited or delivered, and the contents of such certificate shall be binding on the party executing same.

   21. Subordination, Non-Disturbance and Attornment.

      (a) Throughout the Term, Landlord shall deliver to Tenant with regard to any and all Ground Leases (as defined below) and any and all Mortgages (as defined below) encumbering the Shopping Center executed after the date of this Lease and with regard to all renewals, modifications, replacements and extensions of any Ground Leases or Mortgages existing as of the date hereof, within thirty (30) days following the execution of such Ground Lease, Mortgage, renewal, modification, replacement or extension, a non-disturbance and attornment agreement in the form of Exhibit "G" executed by the landlord under any such Ground Lease ("Ground Lessor") or the holder of such Mortgage ("Mortgagee"), as applicable. Tenant agrees that it will execute such instrument within thirty (30) days following its receipt thereof from Landlord. Upon Tenant's execution of said non-disturbance and attornment agreement, this Lease shall be subordinate to the corresponding Ground Lease or Mortgage. Landlord shall cause any future Mortgagee or Ground Lessor to deliver a non-disturbance and attornment agreement in accordance with this paragraph 21 at or prior to the time the lien of the Mortgage is filed against record title to the Shopping Center or Ground Lease is executed, as applicable. As used in this paragraph 21, the term "Mortgage" shall mean any mortgage, deed to secure debt, deed of trust, trust deed or other collateral conveyance of, or lien or encumbrance against, the Shopping Center or any part thereof, and the term "Ground Lease" shall mean any ground lease or master lease affecting the Shopping Center or any part thereof. Landlord and Tenant shall pay their own costs and attorney's fees incurred in connection with the non-disturbance and attornment agreement to be issued by Landlord's current Mortgagee. Landlord agrees to pay Tenant's reasonable attorney's fees incurred in negotiating any additional non-disturbance and attornment agreements, reciprocal easement agreements or other documents required in the event Landlord sells, finances or refinances the Premises or Shopping Center, or enters into any other transaction requiring the execution of same, including the reasonable equivalent of such fees in the event Tenant elects to utilize in-house legal counsel for the provision

33

of such services, the payment of which fees shall be a condition precedent to the effectiveness of Tenant's execution of such non-disturbance and attornment agreement, reciprocal easement agreement or other document.

(b) Landlord shall, from time to time, upon the request of Tenant, enter into agreements with Tenant and its subtenants to whom Landlord has consented if Landlord's consent was required providing, in part, that, in the event of any termination of this Lease, all of the rights of any such subtenant(s) under its sublease will be recognized so long as any such subtenant is not in default under its sublease beyond notice and cure periods, provided that as a pre-condition thereto such subtenant agrees that it will attorn to Landlord and will execute and deliver such instrument as Landlord shall reasonably request to confirm such attornment.

(c) In the event of Landlord's failure to deliver to Tenant the non-disturbance and attornment agreements on a timely basis as required under paragraphs 21(a) and (b) above and in paragraph 35 hereof, Tenant shall be entitled to two (2) days' abatement of Base Rent for each day that the non-disturbance and attornment agreement is past due, notwithstanding any other remedies available to Tenant in connection therewith otherwise in this Lease.  Such rental abatement shall be applied by Tenant as Tenant so desires, and if Base Rent is not then due, abatement in the amount of the Base Rent shall be applicable to Ground Rent if Ground Rent is then due, but in the amount of Base Rent as if Base Rent were due.

22. Tenant's Financing.  Notwithstanding any other provisions of this Lease, Tenant may, without Landlord's consent, secure financing or general credit lines and grant the lenders, as security, (i) a security interest in Tenant's fixtures, personalty, inventory and equipment (collectively, "Personalty"), (ii) the right to enter the Premises at its own risk to realize upon any Personalty so pledged provided such lender agrees to hold Landlord harmless from and against any costs or liabilities incurred by such lender or a result of such entry, and/or (iii) a collateral assignment of Tenant's leasehold interest in the Premises, with rights of reassignment; provided, however, such collateral assignment may be made solely for the purpose of securing Tenant's indebtedness.  Upon Tenant providing notice of such financing to Landlord, Landlord agrees to consent in writing to such security interest and agreement and to give such lenders the same notice and opportunity to cure any default of Tenant contemporaneously with that provided Tenant hereunder (provided that such lenders shall be given such additional time to foreclose or otherwise take possession of the Premises to the extent necessary to effect such cure).  In addition, Landlord

142857

agrees to cause any Mortgagee specifically to acknowledge the rights of Tenant's lenders described in paragraph 23 below.

23. <u>Tenant's Property and Waiver of Landlord's Lien.</u> All of the Personalty shall be and remain the personal property of Tenant. Landlord expressly waives its statutory or common law landlord's liens (as same may be enacted or may exist from time to time) and any and all rights granted under any present or future laws to levy or distrain for rent against the Personalty of Tenant on the Premises and further agrees to execute any reasonable instruments evidencing such waiver, at any time upon Tenant's request. Subject to paragraph 9(a) above, Tenant shall be responsible for, and shall pay, prior to delinquency, any and all taxes, assessments, levies, fees and other governmental charges of every kind or nature levied or assessed by municipal, county, state, federal or other taxing or assessing authority upon, against or with respect to (i) Tenant's leasehold interest in the Premises and (ii) all furniture, fixtures, equipment and any personal property of any kind owned by Tenant and placed, installed or located in, within, upon or about the Premises.

24. <u>Memorandum of Lease; Commencement Date Agreement.</u> Landlord and Tenant agree, at the sole expense of the requesting party, to execute a Memorandum of Lease in recordable form, substantially similar to that attached <u>Exhibit "H"</u>, setting forth such provisions hereof as may be required by State law. In addition, Landlord and Tenant shall execute a Commencement Date Agreement in the form attached as <u>Exhibit "I"</u>, once the Commencement Date has been established. Recording costs for either or both documents shall be borne by the party requesting recordation of the same. The provisions of this Lease shall control, however, with regard to any omissions from, or provisions which may be in conflict with, the Memorandum of Lease or Commencement Date Agreement.

25. <u>Expiration of Term and Holding Over.</u> At the expiration or earlier termination of the Lease, Tenant shall surrender the Premises in a broom clean condition. Should Tenant hold over without the consent of Landlord, this Lease shall continue in force from month to month, subject to all of the provisions hereof and at one hundred fifty percent (150%) of the monthly Base Rent Tenant had been paying during the preceding Lease Year. Any holding over without Landlord's consent shall subject Tenant to all of Landlord's remedies provided in paragraph 28 of this Lease.

26. <u>Force Majeure.</u> Except as otherwise specifically contemplated in this Lease or in the Construction Provisions, in the event that Landlord or Tenant shall be delayed or prevented from, the performance of any act required (other than payment of Base Rent or Ground Rent) by reason of

35

strikes, lockouts, labor troubles, inability to procure materials, delay by the other party, failure of power or unavailability of utilities, riots, insurrection, war or other reason of a like nature not the fault of such party or not within its control, then performance of such act shall be excused for the period of delay, and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay; provided, however, that in connection with the construction of the Improvements, the consequences of delays by the other party shall be governed by paragraphs 28(d) and 29(c) and (d) of this Lease.

27. Events of Tenant's Default. Any of the following occurrences by Tenant shall constitute an "Event of Default" under this Lease:

(a) Failure to Pay Rent; Breach. (i) Tenant's failure to make any payment of money required by this Lease (including without limitation Base Rent, CAM Charges or Real Estate Taxes) (subject to Tenant's right of good faith contest) (which overdue amounts, if not paid within ten (10) days of its due date, shall bear interest from the due date until paid at the Default Rate), within ten (10) days after the receipt of written notice from Landlord to Tenant that same is overdue; or (ii) Tenant's failure to observe or perform any other provision of this Lease within thirty (30) days after receipt of written notice from Landlord to Tenant specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Tenant shall have such longer period as is reasonably necessary to cure the default, so long as Tenant proceeds promptly to commence the cure within such thirty (30) day period and diligently prosecutes the cure to completion. In the case of an emergency, Landlord shall be required to give only such notice as is reasonable under the circumstances.

(b) Bankruptcy. Tenant's adjudication as bankrupt or insolvent, or the appointment of a receiver, trustee in involuntary bankruptcy or other, similar officer to take charge of any substantial part of Tenant's property, which proceeding is not dismissed within one hundred twenty (120) days after it is begun.

28. Landlord's Remedies. After the occurrence of an Event of Default by Tenant, Landlord shall have the right to exercise the following remedies in addition to any and all other remedies which it may have at law and/or in equity, and without its actions being deemed an election of remedies:

(a) Continue Lease. Landlord may, at its option, continue this Lease in full force and effect, without terminating Tenant's right to possession of the Premises, in which event

36

142857

Landlord shall have the right to collect unpaid Base Rent and other amounts due hereunder (including interest as provided herein), as well as future Base Rent and other charges when due. Landlord shall also have the right, in Landlord's exercise of reasonable efforts to mitigate its damages (which Landlord agrees to make), at its option, from time to time, without terminating this Lease, to relet the Premises, or any part thereof, with or without legal process, as the agent, and for the account, of Tenant upon such terms and conditions as Landlord may deem advisable, in which event the rents received on such reletting shall be applied (i) first to the reasonable and actual expenses of such reletting and collection, including without limitation necessary renovation and alterations of the Premises, reasonable and actual attorneys' fees and any reasonable and actual real estate commissions paid, and (ii) thereafter toward payment of all sums due or to become due Landlord.

(b) Terminate Lease.  Landlord may terminate this Lease by written notice to Tenant specifying a date, which shall be no sooner than thirty (30) days following receipt of such notice by Tenant, and this Lease shall then terminate on the date so specified.  In the event of such termination, Landlord shall be entitled to collect Base Rent and other amounts due hereunder (including interest as provided herein), and to accelerate the Base Rent.  If Landlord does accelerate the Base Rent due hereunder, then the accelerated Base Rent shall be equal to the Base Rent which accrued prior to the date of termination plus the Base Rent that would have accrued during the balance of the Lease Term (as if this Lease had not been terminated) less the fair rental value of the Premises for the corresponding period.  The accelerated Base Rent shall be discounted to present value at an annual interest rate equal to eight percent (8%).  Upon payment to Landlord of the accelerated Base Rent discounted to present value, Tenant shall be released from all further liability under this Lease.  Landlord shall never be entitled to recover from Tenant any consequential, punitive or incidental damages (including, without limitation, lost business opportunity), or to dispossess Tenant of the Premises pursuant to any "lock-out" or other non-judicial remedy.

(c) Remedies Are Cumulative.  The various rights and remedies reserved to Landlord are cumulative, and Landlord may pursue any and all such rights and remedies, whether at the same time or otherwise (to the extent not inconsistent with specific provisions of this Lease). Notwithstanding anything to the contrary, Landlord expressly waives its right to forcibly dispossess Tenant from the Premises, whether peaceably or otherwise, without judicial process, such that Landlord shall not be entitled to any "commercial lockout" or any other provisions of applicable law

142857

which permit landlords to dispossess tenants from commercial properties without the benefit of judicial review.

(d) Additional Landlord Remedies Due to Construction Delays by Tenant. If, subject to force majeure, Tenant shall fail to achieve Substantial Completion by that date which is two hundred forty (240) days following Delivery of the Land, Landlord, at its option, upon prior written notice to Tenant, may require Tenant to commence payment of Ground Rent on the date which is two hundred forty (240) days following Delivery of the Land.

In the event, for any reason and regardless of force majeure, Tenant shall fail to achieve Substantial Completion by that date which is one (1) year following Delivery of the Land, Landlord shall be entitled to terminate this Lease upon sixty (60) days prior written notice to Tenant, during which sixty (60) day period Tenant may cure any such default.

For purposes hereof, annual Ground Rent shall equal $12.00 per square foot of ground-floor gross leasable area of the Premises, payable monthly in equal installments of 1/12 each of the amount of the annual Ground Rent, in lieu of Base Rent, for so long as Tenant's failure continues.

29. Events of Landlord's Default; Tenant's Remedies.

(a) Default by Landlord. Any of the following shall constitute an "Event of Default": (i) Landlord's failure to make any payments of money due Tenant or any third party, including but not limited to the payment of the brokerage commissions pursuant to paragraph 33, within ten (10) days after the receipt of written notice from Tenant that same is overdue (in which event the delinquent amount shall accrue interest from the due date at the Default Rate); or (ii) Landlord's failure to perform any nonmonetary obligation of Landlord within thirty (30) days after receipt of written notice from Tenant to Landlord specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Landlord shall have such longer period as may be reasonably necessary to cure the default, so long as Landlord proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion. In the case of an emergency, Tenant shall be required to give only such notice as is reasonable under the circumstances. Notwithstanding the foregoing, with respect to any event of default described in subparagraph (c) below, Tenant shall not be obligated to deliver any notice of default nor any opportunity to cure such default, it being agreed that with respect to the dates set forth time is of the essence.

38

142857

**(b) Remedies Upon Landlord's Default**  Upon the occurrence of an Event of Default by Landlord, at Tenant's option, in addition to any and all other remedies which it may have at law and/or in equity, and without its actions being deemed an election of remedies or a cure of Landlord's default, Tenant may do all or any of the following: (i) pay or perform such obligations and offset Tenant's actual cost of performance, including any and all transaction costs and attorneys' fees, plus interest at the Default Rate, against the Base Rent, CAM Charges and all other amounts and charges due Landlord, or (ii) withhold Base Rent, CAM Charges and any other payments due to Landlord under this Lease until such Event of Default, including payment of interest, transaction costs and attorney's fees, is cured by Landlord, or (iii) terminate this Lease and sue for damages, including, without limitation, interest, transaction costs and attorneys' fees.  If Landlord fails to pay Tenant the Tenant Improvement Allowance in a timely manner, Tenant shall be entitled to the rights and remedies set forth in this paragraph and the Construction Provisions; and, as to a breach of the warranties and representations contained in paragraph 19, Tenant shall be entitled to the remedies provided therein, in addition to those remedies provided herein.  All amounts, including interest, transaction costs and attorneys' fees, arising out of uncured defaults of Landlord shall constitute liens against Landlord's interest in the Shopping Center, which may be enforced by non-judicial means available under State law, or any other applicable proceedings.  The various rights and remedies reserved to Tenant are cumulative, and Tenant may pursue all rights and remedies, whether at the same time or otherwise.  Tenant shall never be entitled to recover from Landlord any consequential, punitive or incidental damages (including, without limitation, lost business opportunity).

**(c) Additional Remedies For Delays in Delivery of the Land.**  In addition to the remedies provided above, in the event, subject to force majeure, Landlord shall fail to accomplish Delivery of the Land by July 1, 2003 (the "Delivery Date"), Landlord agrees that it shall reimburse Tenant for its fixed and ascertainable costs incurred as a result thereof in the exercise of all reasonable efforts to open for business by November 1, 2003. Such costs shall be limited to Tenant's out-of-pocket expenses of construction overtime, acceleration charges and bonuses paid to Tenant's contractors or subcontractors, charges for the scheduling of construction crews on days on which work cannot be performed due to the delays by Landlord and construction period interest charges actually incurred to the extent that such charges exceed those which would have accrued without such delay.

142857

In addition to the remedies set forth hereinabove, in the event, subject to force majeure, Landlord shall fail to accomplish Delivery of the Land by the date which is fifteen (15) days following the Delivery Date, then Tenant shall receive one (1) "free" day of Base Rent for each day past said fifteenth (15th) day that Delivery of the Land occurs. Such days of "free" Base Rent shall occur at the beginning of the Lease Term.

Notwithstanding the foregoing and in addition to the remedies set forth hereinabove, in the event, for any reason whatsoever and regardless of force majeure, Landlord shall fail to complete Delivery of the Land to Tenant by August 1, 2003, Tenant shall be entitled to (i) terminate this Lease at any time prior to such delivery and, if such failure was the result of Landlord's action or inaction, receive from Landlord promptly thereafter a sum equal to the actual out-of-pocket expenses and substantiated third-party legal, architectural, engineering and other costs incurred by Tenant to the date of termination, or (ii) delay opening of its store facility for a period not to exceed nine (9) months, during which time Tenant shall pay no Ground Rent, Base Rent, Real Estate Taxes or CAM Charges, in which event Landlord shall deliver the Land and complete the Site Delivery Work on the date subsequently required by Tenant, and Landlord shall pay to Tenant on demand an amount equal to all costs incurred by Tenant in the development of its store facility, including, but not limited to, costs of materials and all engineering, architectural, legal fees, and costs of delay resulting from Landlord's failure to timely deliver.

(d) Additional Tenant Self-help, Equitable and Legal Remedies Due to Construction Delays by Landlord. In the event that Landlord defaults at any time in completion of any component of the Landlord Work (as defined in Exhibit "C" attached hereto), including, without limitation, Delivery of the Land, in addition to any other rights and remedies set forth hereinabove, Tenant shall have the right, but not the obligation, to do any or all of the following:

(i) perform at Landlord's sole cost and expense, all or any part of the Landlord Work; Tenant shall exercise this right by providing Landlord with five (5) days prior written notice thereof, which notice shall reasonably detail those portions of the Landlord Work which Tenant elects to complete, at any time following the date Landlord could reasonably have been expected to commence that portion of Landlord Work in order to complete said Landlord Work by the time required hereunder; in the event and to the extent that Tenant exercises its right hereunder, Landlord agrees to cooperate in good faith and provide Tenant with reasonable assistance so that Tenant can complete said portions of the Landlord Work; Landlord hereby grants

40

Tenant the right, as its agent, to directly contact and contract with Landlord's contractors, on behalf of Landlord, to complete such work, all at Landlord's cost and expense; Landlord covenants, upon Tenant's request, to provide Tenant with duplicate sets of all plans, specifications and contracts prepared in connection with the construction of the Shopping Center, as well as schedules of all contractors, subcontractors and suppliers; Landlord agrees to reimburse Tenant for any and all costs incurred by Tenant in connection with any portion of the Landlord Work which Tenant completes within thirty (30) days after receipt of written request therefor from Tenant, which request shall be reasonably supported by invoices and/or written description of the Landlord Work performed; in the event that Landlord does not timely reimburse Tenant as hereinabove contemplated, Tenant shall be entitled to deduct the costs of such Landlord Work from rentals and other payments due under the Lease, together with interest at the Default Rate from the date of expenditure by Tenant until paid in full;

(ii)        seek injunctive relief, specific performance or other equitable remedies against Landlord to require Landlord to perform its obligations hereunder, all costs of which litigation (including Tenant's attorneys' fees and court costs) shall be borne by Landlord; and/or

(iii)        seek legal remedies available to Tenant, the costs of which shall be borne by Landlord, including, without limitation, attorneys' fees and court costs.

(e) *Tenant Remedies Due to Landlord's Failure to Pay the Tenant Improvement Allowance*. If Landlord fails to pay the Tenant Improvement Allowance in full on or before its due date, Landlord shall be in default hereunder, and no Ground Rent, Base Rent or CAM Charges shall be due or owing to Landlord until the same is paid to Tenant, together with interest which shall accrue on the unpaid Tenant Improvement Allowance at the Default Rate commencing on the thirty-first (31st) day following *Substantial Completion* (as defined in the Construction Provisions) until the date of payment of the Tenant Improvement Allowance; provided, however, that if Landlord has not tendered payment of the Tenant Improvement Allowance and interest by that date which is one (1) year from Substantial Completion (the "Substantial Completion Anniversary"), then (i) such date shall become the *Commencement Date*; (ii) Base Rent shall be reduced to ground rent equal to Fifty Thousand and No/100 Dollars ($50,000.00) per annum during the Term of the Lease; and (iii) this Lease shall be converted to a ground lease, with ownership of the Improvements remaining with Tenant, and Landlord's and any Mortgagees' names being removed as additional

41

142857

insureds or mortgagees on any casualty insurance described in paragraph 14(a) of this Lease. Landlord and Tenant covenant and agree that upon the reasonable written request of either Tenant or Landlord, Landlord and Tenant shall execute such documentation as necessary to formalize the conversion of this Lease to a ground lease upon the Substantial Completion Anniversary.

At any time following the Substantial Completion Anniversary and upon thirty (30) days prior written notice, Tenant shall have the right at Tenant's sole election, but not the obligation, in lieu of the requirement that Landlord pay to Tenant the Tenant Improvement Allowance, to mortgage, sell, convey, assign, lease or otherwise encumber (collectively, a "Financing Transfer") Tenant's interest in the Building, the Improvements and the Lease. Such right shall be in addition to the rights of Tenant set forth in paragraph 22 of this Lease.

Landlord covenants to (i) execute all documents necessary to permit Tenant to effect the Financing Transfer described herein, and (ii) cause any Mortgagee to specifically acknowledge the rights of Tenant's lender and third parties arising as a result of such Financing Transfer. Notwithstanding such Financing Transfer, Tenant shall continue to pay the ground rentals described in this subparagraph (e) during the remainder of the Term.

(f) Exercise of Remedies. Notwithstanding the foregoing, a delay by either party in exercising its cure rights or other remedies shall not be deemed an event of force majeure for purposes of extending the date(s) established for performance by the other. All sums owing to Tenant under paragraph 29 shall, to the extent applicable, be added to the Tenant Improvement Allowance and paid simultaneously; and, if not so paid, Tenant shall be entitled to offset all such costs, plus interest at the Default Rate, against Base Rent and CAM Charges otherwise due.

(g) Time is of the Essence. Notwithstanding anything contained to the contrary, Landlord covenants that it shall complete its construction and delivery obligations in accordance with the "Completion Dates" set forth in the Construction Schedule. In the event that Landlord fails to complete its construction and delivery obligations in accordance with such Completion Dates, Tenant may, at its sole election, exercise such remedies as are set forth.

30. Waiver. If either Landlord or Tenant fails to insist on the strict observance by the other of any provisions of this Lease, neither shall be precluded from enforcing nor be held to have waived any of the obligations, past, present or future, of this Lease. Either party may accept late payment or performance by the other without waiving any Event of Default which may then have accrued.

142857

31. Compliance with Applicable Laws.  During the Term, Tenant shall comply with all lawful requirements of the local, county and state health boards, police and fire departments, municipal and state authorities and any other governmental authorities with jurisdiction over the Improvements, and of the board of fire underwriters (collectively, the "Lawful Requirements") respecting Tenant's use and occupancy of the interior of Improvements and Landlord shall comply with all Lawful Requirements relating to the exterior of the Building and Common Areas.  In the event that Tenant, after thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Landlord or any such authority ordering performance of any such work which Tenant is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Landlord may perform said work and collect the actual cost thereof plus interest at the Default Rate from Tenant with the next installment or installments of Base Rent.  In the event that Landlord, following thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Tenant or any such authority ordering performance of any such work which Landlord is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Tenant may perform said work and deduct the actual cost thereof plus interest at the Default Rate from Landlord with the next installment or installments of Base Rent.

32. Notices.  Any notice permitted or required to be given pursuant to this Lease shall be deemed to have been given three (3) business days after mailing a written notice by certified mail, postage prepaid, return receipt requested, or one (1) business day after sending by Federal Express or other comparable overnight express courier service (with proof of receipt available), addressed to the parties as follows:

If to Tenant:          CIRCUIT CITY STORES, INC.
                       Deep Run I
                       9950 Mayland Drive
                       Richmond, Virginia 23233
                       Attention:  Vice President of Real Estate

with a copy to:        CIRCUIT CITY STORES, INC.
                       Deep Run I
                       9950 Mayland Drive

142857

Richmond, Virginia 23233
Attention: Corporate Secretary

If to Landlord:      TAUBMAN    AUBURN    HILLS    ASSOCIATES    LIMITED
PARTNERSHIP
200 East Long Lake Road
P. O. Box 200
Bloomfield Hills, MI 48303-0200
Attention: Jerry Teitelbaum

or to such other addressees as any party shall from time to time give notice to the other party in accordance with this paragraph.

33. Brokers.  Landlord and Tenant each covenant that they have not dealt with any real estate broker or finder with respect to this Lease, except for Stan Bobowski of Bobowski & Associates (the "Broker"), whom shall be paid a commission by Landlord pursuant to a separate written agreement between Landlord and Broker, a copy of which Landlord agrees to deliver to Tenant on or before the Effective Date.  Landlord agrees that Broker is representing Tenant with respect to this leasing transaction, and, although Landlord is responsible for payment to Broker of the Broker's commission, the Broker owes no fiduciary's, agent's or other duty whatsoever to Landlord.  Except for the foregoing, each party shall hold the other party harmless from all damages, claims, liabilities or expenses, including reasonable and actual attorneys' fees (through all levels of proceedings), resulting from any claims that may be asserted against the other party by any real estate broker or finder with whom the indemnifying party has purported to have dealt.  If Landlord fails to timely pay the brokerage commission described above, Tenant may, at Tenant's option, elect to do so, whereupon Landlord shall reimburse to Tenant the amount so paid within fifteen (15) days following receipt from Tenant of notification thereof, together with interest at the Default Rate from the date of Tenant's payment through the date of reimbursement.  If Landlord has failed to pay such amount within such fifteen (15) day period, Tenant may, at its election, offset such amounts from its payments of Base Rent, Ground Rent, CAM Charges and other amounts due hereunder.  Landlord represents to Tenant that Landlord has entered into a binding brokerage commission agreement in writing with Broker and heretofore or simultaneously herewith delivered a copy thereof to Tenant.

34. Miscellaneous.

44

142857

(a) Headings and Gender.  All paragraph headings, titles or captions contained in this Lease are for convenience only and shall not be deemed a part of this Lease and shall not in any way limit or amplify the terms and provisions of this Lease.  The masculine, feminine or neuter gender and the singular or plural number shall be deemed to include the others whenever the context so requires or indicates.

(b) Construction.  The parties agree that all the provisions are to be construed as covenants and agreements as though the words importing such covenants and agreements were used in each separate paragraph.

(c) Waiver of Jury Trial.  In the event of any court action arising out of this Lease, each party waives its right to trial by jury.

(d) Relationship of Landlord-Tenant.  Nothing contained in this Lease shall be deemed or construed by the parties or by any third person to create the relationship of principal and agent, partnership, joint venture, or any other association between Landlord and Tenant other than the landlord-tenant relationship described herein.

(e) Entire Agreement; Merger.  This Lease, including all exhibits (which are incorporated by reference for all purposes), contains the full and final agreement between the parties concerning the subject matter of this Lease, and all preliminary negotiations and agreements between Landlord and Tenant are merged herein.  This Lease cannot be changed or modified in any manner other than by a written amendment or modification executed by Landlord and Tenant.

(f) Attorneys' Fees.  In the event either party shall be required to commence or defend any action or proceeding against any other party by reason of any breach or claimed breach of any provision of this Lease, to commence or defend any action or proceeding in any way connected with this Lease or to seek a judicial declaration of rights under this Lease, the party prevailing in such action or proceeding shall be entitled to recover from or to be reimbursed by the other party for the prevailing party's reasonable and actual attorneys' fees and costs through all levels of proceedings.

(g) Partial Invalidity.  If any provision of this Lease or the application to any person or circumstance shall be deemed invalid or unenforceable, the remainder of this Lease and its application to other persons or circumstances shall not be affected by such partial invalidity but shall be enforced to the fullest extent permitted by law as though such invalid or unenforceable provision was never a part.

45

142857

(h) Consents.  Any consent or approval granted by either party shall be deemed a consent only as to the matter on which such consent was requested and shall not waive the consenting party's right to give or withhold consent to any subsequent matter.

(i) Holidays.  If the day on which rent or any other payment due date falls on a Saturday, Sunday or on a legal holiday, it shall be payable on the following business day.

(j) Applicable Law.  This Lease shall be construed in accordance with the laws of the State, and the parties agree that jurisdiction for all actions hereunder shall lie therein.

(k) Successors and Assigns.  All rights, obligations and liabilities given to or imposed upon any party shall extend to the permitted successors and assigns of such party.

(l) Counterparts.  This Lease may be executed in one or more identical counterparts, and as so executed by all parties shall constitute a single instrument for purposes of the effectiveness of this Lease.

(m) Trademarks and Trade Names.  All trademarks, trade names, service marks, signs and all other marks of identification used by Tenant in its business shall at all times remain the exclusive property of Tenant, and Landlord shall have no right, interest in, or title to any of Tenant's trademarks, trade names, service marks, signs or other marks of identification.

(n) Exhibits.  All of the exhibits to this Lease are incorporated by reference for all purposes and are part of this Lease.

(o) No Construction Against Either Party.  This Agreement shall be interpreted to give it fair meaning and shall not be construed against either party.

(p) Transfer of Landlord's Interest.  In the event of any transfer or transfers of Landlord's interest in the Shopping Center, the transferor shall not be relieved of any obligations on the part of Landlord accruing from and after the date of such transfer unless (i) the interest of the transferor, as Landlord, in any funds in which Tenant has an interest shall be turned over, subject to such interest, to the then transferee; (ii) notice of such sale, transfer or lease shall be given to Tenant as required by law; and (iii) such transferee shall assume in writing the obligations of Landlord under this Lease and shall have demonstrated to Tenant's satisfaction its ability to pay the Tenant Improvement Allowance as required herein; provided, however, Landlord shall not in any event be relieved of any or all of its obligations hereunder in the event of a so-called sale-leaseback.

(q) Effective Date.  This Lease shall be deemed executed on the date (the "Effective Date") on which it is fully executed by all parties.

142857

35. Effectiveness of Lease; Tenant's Right to Terminate.  Notwithstanding the execution of this Lease or any provision to the contrary, the parties agree that the effectiveness of this Lease is expressly conditioned upon the complete satisfaction (or waiver) of each and all of the following conditions:

(a) Tenant's receipt of (i) a commitment for leasehold policy of title insurance for the Shopping Center, (ii) copies of all underlying documents referred to in said commitment for title insurance; and (iii) an ALTA survey of the Shopping Center certified by the surveyor to Tenant and Chicago Title Insurance Company, at Landlord's expense, in form and substance acceptable to Tenant, at a minimum identifying by metes and bounds or platted lot all of the real property within the Shopping Center, each of the parcels owned under every ground lease pertinent to the Shopping Center, and the Land, (ii) all instruments reasonably required by the title company issuing the commitment for leasehold policy of title insurance to issue a policy meeting Tenant's requirements, including, without limitation, an Owner's Affidavit and Indemnity in form acceptable to the title company; and (iii) Tenant's approval of all of the foregoing in writing within thirty (30) days after receiving all of said documents, but in any event, prior to the Delivery Date.

(b) Landlord's delivery of subordination, non-disturbance and attornment agreements and estoppel letters executed by any and all existing Mortgagees and Ground Lessors in a form satisfactory to Tenant within thirty (30) says following the execution of this Lease.

(c) Landlord's Delivery of the Land by the date and in the condition specified in the Construction Provisions.

(d) Prior to the Delivery Date, Tenant's obtaining: (i) written confirmation from appropriate local authorities that current zoning and use regulations allow construction of the Improvements on the Premises; and (ii) the required City, County, State and other necessary governmental agency permits and approvals to construct said Improvements on the Premises no later than the Delivery Date.  Tenant agrees to apply for such permits promptly as provided, to use due diligence and to expend any necessary application or other fees to secure such permits and approvals; provided, however, that the foregoing shall not be deemed to require Tenant to initiate litigation or to agree to any conditions imposed upon issuance of any such permit or approval.

(e) Landlord's representations, warranties and covenants, including but not limited to those set forth in paragraph 19, being true and accurate as of the date of Delivery of the Land (as defined in the Construction Provisions).

47

142857

(f) Prior to Delivery of the Land to Tenant, Tenant's obtaining from Landlord copies of soils (specifically, that report prepared by Soils and Materials Engineers, Inc. dated March 28, 1997) and Hazardous Substances reports satisfactory to Tenant.

(g) Prior to Delivery of the Land to Tenant, Tenant's obtaining satisfactory assurances, that adequate utility services (including gas, electricity, telephone, domestic water, fire protection water, storm sewer and sanitary sewer) are available for connection at the Premises or in close proximity in amounts sufficient to support Tenant's operations.

(h) Tenant's obtaining satisfactory assurances that all necessary approvals and consents, including approvals or consents from other tenants in the Shopping Center, planned unit developmental boards and other necessary entities, and all necessary reciprocal use and easement agreements have been obtained prior to the Delivery Date.

(i) Prior to the Delivery Date, to the extent Landlord has transferred its interest in the Shopping Center to an unrelated third party, Tenant's obtaining satisfactory written assurances that Landlord has obtained financing adequate to fund the Tenant Improvement Allowance.

(j) Intentionally deleted.

(k) Upon execution of this Lease, Landlord's delivery to Tenant of the W-9 form, completed and executed by Landlord, submitted to Landlord by Tenant with the Lease.

The existence of the foregoing conditions is solely for the benefit of Tenant, and Tenant may waive any such condition at its sole discretion by delivering to Landlord a written notice signed by Tenant which specifically states the condition(s) being waived by Tenant.

Notwithstanding any other provision in this Lease to the contrary, in the event any of the foregoing conditions shall not be met, satisfied or waived, the parties expressly agree that Tenant shall have the right to terminate this Lease in its sole and absolute discretion at anytime prior to the satisfaction or waiver of any such condition by delivering to Landlord a written notice signed by Tenant which states that Tenant is terminating this Lease on account of the failure of one or more of the foregoing conditions. In the event of any such termination, the rights and obligations of the parties shall be of no further force and effect and the parties shall have no further liability one to the other (except that the indemnifications set forth in paragraphs 14(i), 19(a)(v) and 19(b)(ii) shall survive such termination) upon Tenant's delivery of said notice to Landlord. All conditions contained in this paragraph except subparagraphs (a) and (g) unless previously waived or satisfied shall expire as of the date of Tenant's store opening.

48

142857

The delivery of this executed Lease by Tenant to Landlord constitutes the offer of Tenant to Landlord to bind Landlord and Tenant to the provisions of this Lease, subject to the conditions set forth in this paragraph 35.

36. Intentionally Deleted.

37. Intentionally Deleted.

38. Cotenancy Requirement. Landlord acknowledges and agrees that the existing occupancy levels and tenant quality at the Shopping Center are a material inducement for Tenant to enter into this Lease. If (i) less than seventy percent (70%) of the tenants occupying at least 20,000 square feet of gross leasable area (the "Anchor Tenants") or (ii) less than seventy percent (70%) of the existing inline tenants (the "Inline Tenants") are open and operating at any time during the term of this Lease, or (iii) less than seventy-five percent (75%) of the gross leasable area shown on the Site Plan is open, occupied and operating, in each case of (i), (ii) or (iii) above for six (6) consecutive months or more at any time during the term of this Lease, then Base Rent (or Ground Rent, as applicable) shall be reduced by fifty percent (50%) during such time. If, within one (1) year after the occurrence of either of the three (3) events described above, replacement national or regional retailers of comparable quality to those going dark or otherwise reasonably satisfactory to Tenant are not open and operating so as to achieve the percentages required above, Tenant shall have the right, but not the obligation, to terminate this Lease upon thirty (30) days written notice to Landlord, whereupon Landlord shall pay to Tenant on the date of termination set forth in Tenant's notice the Unamortized Costs.

39. Importance of Each Covenant  Each covenant and agreement on the part of one party hereto is understood and agreed to constitute an essential part of the consideration for each covenant and agreement on the part of the other party.

40. "For Rent" Signs.  Tenant hereby permits Landlord during the last ninety (90) days of the Main Term or of any Option Period, as the case may be (provided that no applicable Renewal Option has been exercised or deemed exercised), to place one (1) "For Rent" or "For Sale" sign, not exceeding four (4) feet by four (4) feet in size, in the parking lot portion of Tenant's Preferred Area. During said ninety (90) day period, Tenant will also allow Landlord or its agents, upon prior written notice and accompanied by a representative of Tenant designated by Tenant, to show the Premises, exterior and interior, to prospective tenants, purchasers, or mortgagees during reasonable business hours by prior appointment, provided same does not interfere with the conduct of Tenant's business.

142857