41. Intentionally Deleted.

42. Intentionally Deleted.

43. Liability of Landlord.  If Landlord shall fail to perform any covenant, term or condition of this Lease on Landlord's part to be performed, and if as a consequence of such default Tenant shall recover a money judgment against Landlord, such judgment shall be satisfied only out of the proceeds of sale received upon execution of such judgment and levied thereon against the right, title and interest of Landlord in the Shopping Center and out of net income from such property received by Landlord, or out of the consideration received by Landlord from the sale or other disposition of all or any part of Landlord's rights, title and interest in the Shopping Center, subject, nevertheless, to the rights of Landlord's mortgagee, and neither Landlord, nor the individuals or entities which constitute the partners of the partnership which is Landlord, shall be liable for any deficiency.

[SIGNATURES APPEAR ON THE NEXT PAGE]

142857

WITNESS the following signatures and seals:

<u>LANDLORD</u>:

TAUBMAN AUBURN HILLS ASSOCIATES
LIMITED PARTNERSHIP, a Delaware limited
partnership

Date: _5/9/03_

By: _____
Name: _____
Title: _____

51

142857

TENANT:

CIRCUIT CITY STORES, INC.,
a Virginia corporation

Date: 4/22/09

By: _____
    R. Bruce Lucas, Vice President

Tenant's counsel:

McGuireWoods LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219
Attn: Russell T. Aaronson, III, Esq.

Approved for Signature:

Responsible Atty.
Reviewing Atty.
RE Manager

52

142857

## EXHIBIT "A"

### SITE PLAN

Components:      Premises (outlined in heavy black) – 42,729 square feet

Tenant's Preferred Area

Permissible Building Areas

Pylon/Monument Signage

Truck Well(s)/Trash Compactor

Car Stereo Parking

Shopping Center

View Corridor

Staging Area

Customer Pick-Up

Shopping Cart Corrals

Human Resources Hiring Center

142857





192 SPACES

CIRCUIT
CITY
H1D MODIFIED
42,729 S.F.

NEW TENANT

EXHIBIT "A-1"

LEGAL DESCRIPTION

## PARCEL 1

A part of the west ½ of Section 4 and a part of Section 5, T-3-N, R-10-E, City of Auburn Hills, Oakland County, Michigan, more particularly described as:  Beginning at the East ¼ corner of said Section 5, said point also being the West ¼ corner of said Section 4; thence S 85° 30' 16" W, 487.80 feet along the East-West ¼ line of said Section 5, also being the north right-of-way line of Great Lakes Crossings Drive (width varies); thence S 04° 29' 44" E, 15.11 feet along said right-of-way line; thence S 85° 30' 16" W, 274.28 feet along said right-of-way line; thence N 04° 29' 44" W, 15.11 feet to a point on the East-West ¼ line of said Section 5, also being the North right-of-way line of Great Lakes Crossings Drive (width varies); thence S 85° 30' 16" W, 256.56 feet along said East-West ¼ line and said right-of-way line; thence along a curve to the left 6.39 feet, said curve having a radius of 45.00 feet, central angle of 08° 08' 20" and a long chord bearing of N 00° 25' 34" W, 6.39 feet; thence N 04° 29' 44" W, 101.68 feet; thence along a curve to the left 182.23 feet, said curve having a radius of 467.50 feet, central angle of 22° 20' 03" and a long chord bearing of  N 15° 39' 45" W, 181.08 feet; thence along a curve to the left 61.65 feet, said curve having a radius of 40.00 feet, central angle of 88° 18' 29" and a long chord bearing of N 70° 59' 01" W, 55.73 feet; thence along a curve to the right 169.57 feet, said curve having a radius of 1001.00 feet, central angle of 09° 42' 20" and a long chord bearing of S 69° 42' 54" W, 169.36 feet; thence S 11° 34' 58" E, 263.87 feet to a point on the East-West ¼ line of said Section 5, also being the north right-of-way line of Great Lakes Crossings Drive (width varies); thence S 85° 30' 16" W, 93.35 feet along said East-West ¼ line and said right-of-way line; thence S 04° 23' 57" E, 50.85 feet along the west right-of-way line of Great Lakes Crossings Drive to a point on the north right-of-way line of Great Lakes Crossings Drive (100 feet wide); thence the following three courses being along said north right-of-way line:  (1) S 75° 00' 00" W, 678.11 feet, and (2) along a curve to the right 519.24 feet, said curve having a radius of 1750.00 feet, central angle of 17° 00' 00" and a long chord bearing of S 83° 30' 00" W, 517.33 feet, and (3) N 88° 00' 00" W, 394.53 feet; thence along a curve to the left 22.41 feet, said curve having a radius of 45.00 feet, central angle of 28° 32' 15" and a long chord bearing of N 16° 16' 08" E, 22.18 feet; thence N 02° 00' 00" E, 133.22 feet; thence along a curve to the left 73.43 feet, said curve having a radius of 467.50 feet, central angle of 09° 00' 00" and a long chord bearing of N 02° 30' 00" W, 73.36 feet; thence N 07° 00' 00" W, 61.97 feet; thence along a curve to the left 62.83 feet, said curve having a radius of 40.00 feet, central angle of 90° 00' 00" and a long chord bearing of N 52° 00' 00" W, 56.57 feet; thence S 83° 00' 00" W, 17.50 feet; thence along a curve to the right 475.45 feet, said curve having a radius of 451.00 feet, central angle of 60° 24' 05" and a long chord bearing of N 66° 47' 58" W, 453.73 feet to the southerly line of an ingress-egress drive, the following four courses being along said southerly line:  (1) along a curve to the left 56.90 feet, said curve having a radius of 40.00 feet, central angle of 81° 30' 32" and a long

chord bearing of N 77° 21' 10" W, 52.22 feet, and (2) S 61° 53' 34" W, 166.98 feet, and (3) along a curve to the right 240.12 feet, said curve having a radius of 532.50 feet, central angle of 25° 50' 12" and a long chord bearing of S 74° 48' 40" W, 238.09 feet, and (4) S 87° 43' 46" W, 64.73 feet to a point on the easterly right-of-way line of Baldwin Road; thence N 02° 16' 14" W, 71.60 feet along said line to a point on the northerly line of an ingress-egress drive, the following five courses being along said northerly line: (1) along a curve to the left 23.30 feet, said curve having a radius of 40.00 feet, central angle of 33° 22' 19" and a long chord bearing of S 75° 35' 13" E, 22.97 feet, and (2) N 87° 43' 46" E, 42.73 feet, and (3) along a curve to the left 210.81 feet, said curve having a radius of 467.50 feet, central angle of 25° 50' 12" and a long chord bearing of N 74° 48' 40" E, 209.03 feet, and (4) N 61° 53' 34" E, 166.98 feet, and (5) along a curve to the left 56.90 feet, said curve having a radius of 40.00 feet, central angle of 81° 29' 51" and a long chord bearing of N 21° 08' 38" E, 52.22 feet; thence along a curve to the right 136.55 feet, said curve having a radius of 451.00 feet, central angle of 17° 20' 49" and a long chord bearing of N 10° 56' 35" W, 136.03 feet; thence N 02° 16' 14" W, 267.56 feet to the southerly line of an ingress-egress drive, the following three courses being along said drive: (1) along a curve to the left 62.83 feet, said curve having a radius of 40.00 feet, central angle of 90° 00' 00" and a long chord bearing of N 47° 16' 14" W, 56.57 feet, and (2) S 87° 43' 46" W, 357.00 feet, and (3) along a curve to the left 23.29 feet, said curve having a radius of 40.00 feet, central angle of 33° 22' 01" and a long chord bearing of S 71° 02' 45" W, 22.97 feet to a point on the easterly right-of-way line of Baldwin Road; thence N 02° 16' 14" W, 78.18 feet along said line to a point on the northerly line of an ingress-egress drive, the following two courses being along said northerly line: (1) along a curve to the left 23.29 feet, said curve having a radius of 40.00 feet, central angle of 33° 22' 01" and a long chord bearing of S 75° 35' 13" E, 22.97 feet, and (2) N 87° 43' 46" E, 205.50 feet; thence N 02° 16' 14" W, 151.95 feet; thence S 87° 43' 46" W, 73.50 feet; thence N 02° 16' 14" W, 299.55 feet; thence S 88° 08' 55" W, 147.04 feet to a point on the southerly line of I-75; thence the following seven courses along said southerly line: (1) N 43° 08' 55" E, 141.42 feet, and (2) N 88° 08' 55" E, 152.51 feet, and (3) N 50° 37' 03" E, 764.58 feet, and (4) N 84° 06' 59" E, 601.92 feet, and (5) N 88° 41' 25" E, 976.17 feet, and (6) along a curve to the right 2,615.78 feet, said curve having a radius of 4,480.66 feet, central angle of 33° 26' 56" and a long chord bearing of S 74° 35' 07" E, 2,578.79 feet, and (7) S 57° 51' 31" E, 213.32 feet; thence along a non-tangent curve to the right 200.00 feet, said curve having a radius of 1,835.08 feet, central angle of 06° 14' 40" and a long chord bearing of S 39° 48' 59" W, 199.90 feet; thence S 57° 42' 54" E, 50.85 feet to a point on the northwesterly line of Grand Trunk Western Railroad right-of-way; thence the following two courses along said right-of-way: (1) along a non-tangent curve to the right 279.29 feet, said curve having a radius of 1,885.08 feet, central angle of 08° 29' 20" and a long chord bearing of S 46° 53' 50" W, 279.04 feet, and (2) S 51° 08' 30" W, 1,150.19 feet to a point on the westerly line of said Section 4; thence N 03° 21' 25" W, 29.99 feet along said west line to the point of beginning.

Excepting therefrom the following described Parcels A, C & D:

**PARCEL A**
**(TAX PARCEL NO. 14-05-251-006)**

A part of the Northeast ¼ of Section 5, T-3-N, R-10-E, City of Auburn Hills, Oakland County, Michigan, more particularly described as: commencing at the East ¼ corner of said Section 5; thence the following two courses being along the East line of Section 5 as monumented: (1) N 02° 19' 13" W, 1401.10 feet, and (2) N 01° 08' 51" W, 265.64 feet to a point on the southerly line of Interstate 75, the following two courses being along said southerly line: (1) along a curve to the left 1438.16 feet, said curve having a radius of 4480.66 feet, central angle of 18° 23' 25" and a long chord bearing of N 82° 06' 53" W, 1431.99 feet, and (2) S 88° 41' 25" W, 555.27 feet; thence S 07° 00' 00" E, 389.78 feet to the point of beginning; thence N 83° 00' 00" E, 579.20 feet; thence along a curve to the right 22.69 feet, said curve having a radius of 100.00 feet, central angle of 13° 00' 10" and a long chord bearing of N 89° 30' 05" E, 22.65 feet to a point of compound curvature; thence along a curve to the right 3.05 feet, said curve having a radius of 9.00 feet, central angle of 19° 23' 04" and a long chord bearing of S 74° 18' 18" E, 3.03 feet; thence S 07° 00' 00" E, 76.43 feet; thence S 83° 00' 00" W, 74.67 feet; thence S 07° 00' 00" E, 61.17 feet; thence S 83° 00' 00" W, 0.17 feet; thence S 07° 00' 00" E, 101.17 feet; thence S 83° 00' 00" W, 505.80 feet; thence N 52° 00' 00" W, 77.02 feet; thence N 07° 00' 00" W, 31.15 feet; thence S 83° 00' 00" W, 0.90 feet; thence N 07° 00' 00" W, 95.39 feet; thence N 38° 00' 00" E, 16.26 feet; thence N 07° 00' 00" W, 30.00 feet; thence N 38° 00' 00" E, 28.28 feet to the point of beginning.

**PARCEL C**
**(TAX PARCEL NO. 14-04-152-002)**

A part of the Northwest of ¼ section 4, T-3-N, R-10-E, City of Auburn Hills, Oakland County, Michigan, more particularly described as: commencing at the East ¼ corner of section 5, said point also being the West ¼ corner of Section 4; thence N 89° 45' 15" E, 39.12 feet along the East-West ¼ line of Section 4 to a point on the northerly right-of-way line of the Grand Trunk Western Railroad; thence N 51° 08' 30" E, 206.00 feet along said northerly line; thence N 38° 51' 30" W, 93.50 feet to the point of beginning; thence continuing N 38° 51' 30" W, 163.00 feet; thence N 51° 08' 30" E, 243.00 feet; thence S 38° 51' 30" E, 163.00 feet; thence S 51° 08' 30" W, 243.00 feet to the point of beginning.

**PARCEL D**
**(TAX PARCEL NO. 14-05-251-007)**

3 - Ex. "A-1"

142857

A part of the Northeast ¼ of Section 5, T-3-N, R-10-E, City of Auburn Hills, Oakland County, Michigan, more particularly described as: commencing at the East ¼ corner of said Section 5; thence S 85° 30' 16" W, 953.16 feet along the East-West ¼ line of said Section 5 to a point on the easterly line of a proposed road, the following four courses being along said line: (1) along a curve to the right 1.39 feet, said curve having a radius of 40.00 feet, central angle of 01° 59' 31" and a long chord bearing of N 05° 29' 34" W, 1.39 feet, and (2) N 04° 29' 44" W, 106.66 feet, and (3) along a curve to the left 212.99 feet, said curve having a radius of 532.50 feet, central angle of 22° 55' 04" and a long chord bearing of N 15° 57' 16" W, 211.58 feet, and (4) along a curve to the right 58.84 feet, said curve having a radius of 40.00 feet, central angle of 84° 17' 01" and a long chord bearing of N 14° 43' 42" E, 53.68 feet; thence along a curve to the left 156.88 feet, said curve having a radius of 1,001.00 feet, central angle of 08° 58' 47" and a long chord bearing of N 52° 22' 49" E, 156.72 feet; thence N 07° 00' 00" W, 449.04 feet to the point of beginning; thence continuing N 07° 00' 00" W, 72.26 feet; thence S 83° 00' 00" W, 26.83 feet; thence N 07° 00' 00" W, 123.91 feet, thence S 83° 00' 00" W, 1.00 feet; thence N 07° 00' 00" W, 184.00 feet; thence N 83° 00' 00" E, 1.00 feet; thence N 07° 00' 00" W, 179.34 feet; thence N 83° 00' 00" E, 145.89 feet; thence along a curve to the left 4.15 feet, said curve having a radius of 16.50 feet, central angle of 14° 24' 29" and a long chord bearing of N 75° 47' 46" E, 4.14 feet; thence along a curve to the right 25.15 feet, said curve having a radius of 100.00 feet, central angle of 14° 24' 29" and a long chord bearing of N 75° 47' 46" E, 25.08 feet; thence N 83° 00' 00" E, 56.62 feet; thence along a curve to the right 31.42 feet, said curve having a radius of 20.00 feet, central angle of 90° 00' 00" and a long chord bearing of S 52° 00' 00" E, 28.28 feet; thence S 07° 00' 00" E, 529.17 feet; thence along a curve to the right 31.42 feet, said curve having a radius of 20.00 feet, central angle of 90° 00' 00" and a long chord bearing of S, 38° 00' 00" W, 28.28 feet; thence S 83° 00' 00" W, 198.67 feet; thence along a curve to the right 9.42 feet, said curve having a radius of 6.00 feet, central angle of 90° 00' 00" and a long chord bearing of N 52° 00' 00" W, 8.49 feet to the point of beginning.

PARCEL 2

A part of the South ½ of Section 5, T-3-N, R-10-E, City of Auburn Hills, Oakland County, Michigan, more particularly described as: commencing at the East ¼ corner of said Section 5; thence S 85° 30' 16" W, 1,328.12 feet along the East-West ¼ line of said Section 5; thence S 04° 23' 57" E, 152.59 feet to the point of beginning on the South right-of-way line of relocated Lake Angelus Road (100 feet wide); thence S 04° 23' 57" E, 722.55 feet; thence S 85° 30' 16" W, 132.00 feet; thence S 04° 23' 57" E, 553.34 feet; thence S 86° 33' 33" W, 1,003.43 feet; thence N 04° 51' 24" W, 228.00 feet; thence S 86° 33' 33" W, 145.06 feet; thence N 04° 51' 24" W, 114.00 feet; thence N 89° 56' 09" W, 20.06 feet to a point on the easterly line of Lake Angelus Subdivision, as recorded in Liber 48, Page 10 of Plats, Oakland County Records; thence N 04° 51' 24" W, 116.05 feet along said easterly line; thence S 69° 09' 31" W, 32.79 feet; thence S 76° 52' 30" W, 58.60 feet; thence S 54° 14' 42" W, 29.52 feet; thence S 27° 50' 56" W, 18.28 feet; thence S 49° 58' 19" W, 27.76 feet; thence S 62° 05' 59" W, 39.43 feet; thence S 69° 49' 09" W, 59.92 feet; thence N 70° 49' 36" W, 100.30 feet; thence N 39° 41' 46" W, 107.61 feet to a point on the easterly line of Lackawana Street; thence S 86° 07' 19" W, 363.51 feet across Lackawana

4 - Ex. "A-1"

142857

Street and following the northerly line of St. Lawrence Street; thence along a curve to the left 77.52 feet, said curve having a radius of 329.60 feet, central angle of 13° 28' 32" and a long chord bearing of S 79° 23' 03" W, 77.34 feet; continuing along the northerly line of St. Lawrence Street to the southeast corner of Lot 164 of said Lake Angelus Subdivision; thence N 14° 06' 19" W, 180.44 feet along said easterly lot line and the projection thereof; thence N 89° 53' 49" W, 180.25 feet; thence S 07° 03' 52" E, 40.08 feet; thence S 86° 07' 19" W, 217.10 feet to a point on the East right-of-way line of Baldwin Road; thence the following four courses along said East right-of-way line: (1) N 01° 10' 06" E, 165.74 feet, and (2) N 86° 07' 19" E, 16.00 feet, and (3) N 03° 52' 41" W, 91.53 feet, and (4) N 41° 07' 19" E, 28.28 feet to a point on the South right-of-way line of relocated Lake Angelus Road (100 feet wide); thence the following seven courses along said South right-of-way line: (1) N 86° 07' 19" E, 109.95 feet, and (2) along a curve to the left 265.04 feet, said curve having a radius of 540.00 feet, central angle of 28° 07' 19" and a long chord bearing of N 72° 03' 40" E, 262.39 feet, and (3) N 58° 00' 00" E, 303.54 feet, and (4) along a curve to the right 261.10 feet, said curve having a radius of 440.00 feet, central angle of 34° 00' 00" and a long chord bearing of N 75° 00' 00" E, 257.29 feet, and (5) S 88° 00' 00" E, 432.55 feet, and (6) along a curve to the left 548.91 feet, said curve having a radius of 1,850.00 feet, central angle of 17° 00' 00" and a long chord bearing of N 83° 30' 00" E, 546.90 feet, and (7) N 75° 00' 00" E, 659.39 feet to the point of beginning.

PARCEL 3

A part of the West ½ of Section 4, T-3-N, R-10-E, City of Auburn Hills, Oakland County, Michigan, more particularly described as: commencing at the West ¼ corner of said Section 4; thence S 03° 21' 25" E, 138.40 feet along the West line of said Section 4 (as monumented) to the point of beginning on the South right-of-way line of relocated Lake Angelus Road; thence the following four courses along said right-of-way line: (1) due East 767.58 feet, and (2) along a curve to the left 179.07 feet, said curve having a radius of 540.00 feet, central angle of 19° 00' 00" and a long chord bearing of N 80° 30' 00" E, 178.25 feet, and (3) N 71° 00' 00" E, 278.26 feet, and (4) along a curve to the right 158.08 feet, said curve having a radius of 440.00 feet, central angle of 20° 35' 04" and a long chord bearing of N 81° 17' 32" E, 157.23 feet; thence S 03° 21' 25" E, 119.78 feet; thence S 26° 55' 00" W, 764.50 feet; thence S 89° 45' 15" W, 204.70 feet; thence N 66° 32' 00" W, 872.00 feet to a point on the West line of said Section 4; thence N 03° 21' 25" W, 311.60 feet along said West line to the point of beginning.

PARCEL 4

A part of the West ½ of Section 4, T-3-N, R-10-E, City of Auburn Hills, Oakland County, Michigan, more particularly described as: commencing at the West ¼ corner of said Section 4; thence N 89° 45' 15" E, 119.24 feet along the East-West ¼ line of said Section 4 (as monumented) to the point of beginning on the southeasterly line of the Grand Trunk Western Railroad right-of-way; thence the following two courses along said right-of-way line: (1) N 51° 08' 30" E, 1039.60 feet, and (2) along a curve to the left 495.91 feet, said curve having a radius of 1935.08 feet, central angle of 14° 41' 00" and a long chord bearing of N 43° 48' 00" E, 494.55 feet to a point on the southwesterly line of Interstate 75; thence the following two courses along

5 - Ex. "A-1"

said line: (1) S 57° 51' 31" E, 23.28 feet, and (2) S 40° 51' 31" E, 1218.20 feet to a point on the North right-of-way line of relocated Lake Angelus Road; thence along the following seven courses along said right-of-way line:  (1) S 89° 45'·15" W, 292.61 feet, and (2) along a curve to the right 83.64 feet, said curve having a radius of 950.00 feet, central angle of 05° 02' 41" and a long chord bearing of N 87° 43' 24" W, 83.62 feet, and (3) N 85° 12' 04" W, 309.65 feet, and (4) along a curve to the left 224.30 feet, said curve having a radius of 540.00 feet, central angle of 23° 47' 56" and a long chord bearing of S 82° 53' 58" W, 222.69 feet, and (5) S 71° 00' 00" W, 278.26 feet, and (6) along a curve to the right 145.91 feet, said curve having a radius of 440.00 feet, central angle of 19° 00' 00" and a long chord bearing of S 80° 30' 00" W, 145.24 feet, and (7) due west 704.45 feet to a point on the southeasterly line of the Grand Trunk Western Railroad right-of-way; thence N 51° 08' 30" E, 61.65 feet along said right-of-way line to the point of beginning.

142857

## EXHIBIT "B"

## INDEX OF DEFINITIONS

| Term | Paragraph where defined |
|------|------------------------|
| Additional Areas | 14(e) |
| Affiliate | 17 |
| Anchor Tenants | 38 |
| Base Rent | 4 |
| Broker | 33 |
| Building | 2 |
| CAM Charges | 7(c) |
| CAM Year(s) | 7(c) |
| City | 1 |
| Commencement Date | 3 |
| Common Area Easement | 6(b) |
| Common Area Maintenance | 7(a) |
| Common Areas | 7(a) |
| Construction Term | 3 |
| Cotenancy Requirement | 38 |
| CPI-U | 4(c) |
| Date of Taking | 16(a) |
| Default Rate | 10 |
| Delivery Date | 29(c) |

1 - Ex. "B"

142857

| Term | Paragraph where defined |
|------|------------------------|
| Delivery of the Land | Ex. "C", para. 1(a) |
| Effective Date | 34(q) |
| Event of Default (Landlord) | 29 |
| Event of Default (Tenant) | 27 |
| Existing Survey | 19(a) |
| Financing Transfer | 29(e) |
| Ground Lease | 21(a) |
| Ground Lessor | 21(a) |
| Hazardous Substances | 19(a)(v) |
| Improvements | 2 |
| Inline Tenants | 38 |
| Land | 1 |
| Landlord | Introduction |
| Landlord Work | Ex. "C", para. 1 |
| Landlord's Premises | 1 |
| Lawful Requirements | 31 |
| Lease Year | 3 |
| Main Term | 3 |
| Master Declaration | 19(a) |
| Mortgage | 21(a) |
| Mortgagee | 21(a) |
| Offer | 36 |
| Option Period(s) | 3 |

2 - Ex. "B"

142857

| Term | Paragraph where defined |
|------|------------------------|
| Other Improvements | 2 |
| Permitted Encumbrances | Ex. "F" |
| Permitted Transferee | 17 |
| Person | 20 |
| Personalty | 22 |
| Plans and Specifications | Ex. "C", para. 2(b) |
| Premises | 2 |
| Products | 18(a) |
| Real Estate Taxes | 9(a) |
| Renewal Option | 3 |
| Schematic Floor Plan and Elevation | Ex. "C", para. 2(b) |
| Shell | Ex. "C", para. 1(b) |
| Shopping Center | 1 |
| Site Covenants | 19(a)(ix) |
| Site Plan | 1 |
| Site Delivery Work | Ex. "C", para. 1(a) |
| Staging Area | 6(a) |
| State | 1 |
| Successor Entity | 17 |
| Substantial Completion | Ex. "C", para. 2(d) |
| Substantial Completion Anniversary | 29(e) |
| Substantially All of the Premises | 16(a) |
| Taking | 16(a) |

3 - Ex. "B"

142857

| Term | Paragraph where defined |
|------|------------------------|
| Tax Parcel | 9(b) |
| Tenant | Introduction |
| Tenant Improvement Allowance | 2 |
| Tenant's Preferred Area | Ex. "A" |
| Tenant's Soils Report | Ex. "C", para. 1(a) |
| Term | 3 |
| Transfer | 17 |
| Transfer Notice | 17 |
| Unamortized Costs | 17 |
| Wholly-Owned Subsidiary | 17 |

Auburn Hills, MI

## EXHIBIT "C"

## CONSTRUCTION PROVISIONS

These CONSTRUCTION PROVISIONS are made a part of the Lease between Landlord and Tenant and are attached as Exhibit "C".

1.      Landlord's Delivery of the Land; Other Landlord Work.  All of the work set forth in subparagraphs (a), (b) and (c) below is, collectively, the "Landlord Work":

(a)      Hazardous Substances.  Landlord shall deliver the Land and Shell, as hereinafter defined, to Tenant free of any pollution or contamination from toxic or hazardous substances, asbestos or any other chemicals or substances in amounts which exceed standards for public health or welfare as established and regulated by any local governmental authority, the State or the United States Government (herein collectively referred to as "Hazardous Substances").  Landlord hereby grants Tenant and its agent access to the Premises to enable Tenant to conduct such soil, asbestos and environmental tests as its deems necessary.

(b)      Site Work.  Landlord, at its sole cost and expense, shall: (i) construct and renovate on the Land the "Shell", including, without limitation, removal of nonstructural partition walls, flooring, suspended ceilings and lighting, existing mezzanine, fire protection risers and electrical system, all in accordance with the demolition specifications therefor set forth on Attachment "4" and deliver the same to Tenant on or before July 1, 2003; (ii) deliver the roof and other building equipment and systems, other than the HVAC and other systems and equipment which are being removed by Landlord in accordance with the demolition specifications therefor set forth on Attachment "4", in good working order and condition; (iii) construct a new demising wall between the Premises and the remainder of the building of which the Premises are a part in accordance with the construction specifications therefor set forth on Attachment "5"; (iv) separate the utility systems currently serving the building of which the Premises are a part and install and deliver installation within five (5) feet of the Building, of permanent telephone service and permanent utilities, including but not limited to gas, electric, domestic water and fire protection water (in size sufficient to satisfy Tenant's fire consultant,

1 – Ex. "C"

142857

such requirement to be in compliance with all Lawful Requirements, without need for a fire pump) and sanitary sewer as described in the "Utility Specifications" set forth on Attachment "6", each at Tenant's required entry points, at depths adequate for Tenant's tie-in without additional cost above that contemplated by the Plans and Specifications; (v) relocate the existing generator and any other obstructions on the Land or in the Shell that in Tenant's sole discretion would interfere with Tenant's construction; and (vi) obtain site plan approval and conditional use approval, if any, from governmental authorities having jurisdiction over the Premises, permitting Tenant's construction of its Building in the Premises (subject to issuance of Tenant's building permit). All of the work described in (i) through (vi) above is, collectively, the "Site Work". No changes shall be made to any of the Site Work, including but not limited to any plans and specifications therefor, without Tenant's prior written consent.   The Site Work shall be performed in accordance with the Construction Schedule attached hereto as Attachment "1". Landlord specifically covenants and agrees that any problems or delays it encounters in preparing the Premises in satisfaction of the Site Work requirements set forth above in connection with the condition of the soils, including environmental or hazardous waste issues, subsidence sinking, surface waters, subsurface waters, unforeseen site conditions or the like shall be its sole responsibility, shall not cause a force majeure delay, and in no event shall the cost associated with such problems or conditions be passed on to Tenant in any manner.

Tenant shall have the right to temporarily locate a trailer on the Shopping Center Land during the eight (8) weeks prior to the store opening in a mutually agreeable location designated on the Site Plan, to be used as a Human Resource Hiring Center for Tenant's store employees.

Subject to force majeure, Landlord covenants and agrees to complete, at its sole cost and expense, each item of the Site Work (collectively, "Delivery of the Land") prior to July 1, 2003. Prior to the completion of all of the items comprising the Site Work, Landlord shall use reasonable efforts and shall cooperate with Tenant to confirm the presence of, or otherwise provide, temporary utilities to within five (5) feet of the building pad at Tenant's designated points of entry as set forth in the "Plans and Specifications", as defined in paragraph 2(b) below, to the end that no later than June 15, 2003 Tenant shall be able, subject to issuance of its building permit and matters within Tenant's control, to commence construction of the Improvements.

Landlord acknowledges that Tenant's ability to obtain a building permit for its construction may be delayed due to the failure by Landlord to obtain necessary approvals or

2 – Ex. "C"

142857

permits or to pay necessary fees for its completion of the Site Work. Landlord agrees that Delivery of the Land shall not be deemed to have occurred until all such aforesaid approvals and permits shall have been obtained and all such fees, including but not limited to impact fees and assessments, shall have been paid, if and to the extent that such approvals, permits and fees for Landlord's construction shall be prerequisites to the issuance of Tenant's building permit. In addition, Landlord shall pay all impact fees assessed with respect to Tenant's construction of the Premises. Landlord agrees to keep Tenant advised in writing on a monthly basis as to Landlord's progress in completing the Site Work. Upon Delivery of the Land, Landlord shall certify to Tenant that all elements of the Site Work have been completed in the form of the Site Work Certificate attached to Exhibit "C" as Attachment "2".

Should the Site Work require minor adjustments in order to be in accordance with Attachments "4", "5" and "6", Tenant may direct its contractor to make such adjustments, the total cost of which shall be reimbursed by Landlord to Tenant upon demand in a sum not to exceed Five Thousand Dollars ($5,000.00).

(c)    Landlord Work. All of the work described to be performed by Landlord in this paragraph 1 is collectively referred to as the "Landlord Work". All Landlord Work shall be performed in accordance with all applicable laws and this Lease, in a good and workmanlike manner, as appropriate by engineers, surveyors, architects and consultants, who carry sufficient errors and omissions coverage, and contractors, who are bondable, all licensed in the State and of good reputation. Landlord's general contractor shall be experienced in shopping center development and in phasing and coordinating construction schedules with major anchors and national retailers. All Landlord Work shall be completed in accordance with these Construction Provisions and all attachments hereto (including but not limited to the Construction Schedule). In the event that Landlord defaults at any time in completion of any component of the Landlord Work, Tenant shall have the right, but not the obligation, to perform at Landlord's sole cost and expense, all or any part of Landlord Work. Tenant shall exercise this right by providing Landlord with written notice thereof, which notice shall reasonably detail those portions of the Landlord Work which Tenant elects to complete. Tenant may exercise the rights set forth in this paragraph 1(c) from time to time so long as Tenant provides Landlord notice specified herein (i) within a reasonable amount of time prior to the date upon which Landlord would otherwise commence that portion of the Landlord Work, or (ii) at such other time where it is feasible for

3 – Ex. "C"

142857

Tenant to take over that portion of the Landlord Work from Landlord. In the event and to the extent that Tenant exercises its right hereunder, Landlord agrees to cooperate in good faith and provide Tenant with reasonable assistance so that Tenant can complete said portions of the Landlord Work. Landlord agrees to reimburse Tenant for any and all costs incurred by Tenant in connection with any portion of the Landlord Work which Tenant is in the process of completing within five (5) days after receipt of written request from Tenant, which request shall be reasonably supported by invoices and/or written description of the Landlord Work performed. In the event that Landlord does not timely reimburse Tenant as hereinabove contemplated, Tenant shall be entitled to deduct the costs of such Landlord Work from rentals and other payments due under the Lease, together with interest at the Default Rate from the date of expenditure by Tenant until paid in full.

    2.    <u>Tenant Improvements</u>.

    (a)    <u>Building Construction</u>. Upon completion of all of the Site Work, Landlord shall give Tenant written notice (which shall include any required certifications) of Delivery of the Land in the form of <u>Attachment "2"</u>. Tenant shall promptly notify Landlord if any such requirement has not been met to Tenant's reasonable satisfaction, provided Tenant does not elect its self-help remedies set forth in this Lease. Upon completion of any such previously unmet requirements, Tenant shall within a reasonable time commence and pursue to completion with due diligence the construction of the Improvements. The construction work on the Improvements shall be performed by a duly licensed contractor chosen by Tenant, shall be done in a good and workmanlike manner, in compliance with all applicable laws and in substantial accordance with the Plans and Specifications.

    (b)    <u>Plans and Specifications</u>. Tenant shall prepare and furnish to Landlord for its approval, not to be unreasonably withheld, conditioned or delayed, complete architectural drawings and specifications including building elevations (the "Plans and Specifications") for the construction of the Building and Other Improvements, incorporating therein the items specified and shown in the "Schematic Floor Plan and Elevation" (which are hereby approved by Landlord) attached to <u>Exhibit "C"</u> as <u>Attachment "3"</u>. Tenant agrees that the Plans and Specifications will include replacement of all existing HVAC units with new Lennox units and installation of such additional Lennox units as Tenant may deem necessary. Landlord agrees that it will approve the Plans and Specifications, so long as they are materially consistent with the

4 – Ex. "C"

142857

Schematic Floor Plan and Elevation, within ten (10) business days after receipt thereof. If the Plans and Specifications are not disapproved by Landlord within such 10 day period, they will be deemed approved. The Plans and Specifications shall not be substantially changed by Tenant without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed; provided, any changes made by Tenant to its prototypical store prior to commencement of construction by Tenant shall be deemed approved by Landlord. Any changes which Landlord desires to make to the Plans and Specifications (which are different than a Building based on the Schematic Floor Plan and Elevation utilizing Tenant's prototypical elevations and building materials or different from the initial plans and specifications submitted by tenant to Landlord) shall be subject to Tenant's approval, which may be withheld in Tenant's sole discretion, and made at Landlord's sole cost and expense, and Tenant shall not be required to increase the Base Rent payable hereunder, or accept a reduction in the Tenant Improvement Allowance, as a result of such changes.

(c)    <u>Permits</u>. Tenant, at its sole cost and expense, shall obtain or cause to be obtained those certain building permits, licenses, other governmental approvals and temporary and permanent certificates of occupancy which may be required for the lawful construction and occupancy of the Premises in accordance with the Plans and Specifications. Notwithstanding the foregoing, Landlord shall pay all costs necessary to satisfy conditions imposed by any governmental entity on Tenant's permit which are not the sole result of or solely related to Tenant's intended construction of the Improvements. Landlord agrees to assist and cooperate fully with Tenant in obtaining such permits, licenses, approvals and certificates. Landlord shall be responsible for any other permits necessary for the Delivery of the Land.

(d)    <u>Substantial Completion</u>. Substantial completion of the Improvements ("Substantial Completion") shall be deemed to occur when a certificate of occupancy, whether temporary and subject to minor items to be completed, or permanent, as the case may be, has been issued by the applicable governmental authority.

<u>Attachments:</u>
"1" Construction Schedule
"2" Site Work Certification
"3" Schematic Floor Plan and Elevation

5 – Ex. "C"

142857

"4" Demolition Specifications
"5" Demising Wall Construction Specifications
"6" Utility Specifications

6 – Ex. "C"

142857

Attachment "1"

Construction Schedule

| **Landlord's Task** | **Completion Date** |
|---|---|
| 1.    Landlord's Delivery of the Land to Tenant. | July 1, 2003 |

7 – Ex. "C"

142857

Attachment "2"

Site Work Certification

To:    Circuit City Stores, Inc.
Deep Run I
9950 Mayland Drive
Richmond, Virginia 23233
Attention:  Vice President-Real Estate

Re:    Circuit City Store/[Location]-Lease Agreement dated _____

Ladies and Gentlemen:

The undersigned, as Landlord under the Lease has caused "Delivery of the Land" to occur on _____, 200_, and accordingly, completion of the Site Work, all in accordance with the terms of the Lease.

All conditions precedent to issuance of your building permit have been satisfied by Landlord, and we certify that all elements of the Site Work and Delivery of the Land have been satisfied in accordance with the Lease.

[LANDLORD]

DELIVERY OF LAND ACCEPTED BY CIRCUIT CITY STORES, INC.

By:    _____

Date:  _____

8 – Ex. "C"

142857

Attachment "3"

Schematic Floor Plan and Elevations

(attached)

9 – Ex. "C"

142857





Attachment "4"

Demolition Specifications

Demolition of all existing previous tenant improvements including electrical room and
equipment, fire riser room and equipment and any mezzanine, except for existing fire protection
grid and rooftop HVAC units.  Tenant will be reimbursed by Landlord for the reasonable cost of
removal of the existing fire protection grid upon completion of Tenant's work to provide a new
fire protection grid in compliance with code and Landlord approved construction documents.
Tenant will remove the existing rooftop equipment in conjunction with Tenant's installation of
its new rooftop HVAC equipment.

9 – Ex. "C"

142857

<u>Attachment "5"</u>

Demising Wall Construction Specifications

Landlord will install a demising wall separating the Premises from adjoining vacant tenant area
to the east and the loading dock area to the west.  These demising walls will be constructed of 6"
metal studs with 2 layers of gypsum board on the opposite face of the wall in accordance with
code requirements for a two-hour rated wall construction.  Tenant will install gypsum board on
their side of the demising wall as required by code during the course of their construction.

10 – Ex. "C"

142857

<u>Attachment "6"</u>

Utility Specifications

A.    <u>Temporary Utilities</u>: Landlord will cooperate with Tenant to provide the following temporary utilities to the Staging Area shown on the Site Plan, provided Landlord shall not be obligated to excavate any paved portions of the Common Area in doing so, no later than June 15, 2003:

water (2" line, with sufficient pressure that pumping is not necessary), electric power (200 amps, 1-phase, 4-wire, 120 volts, with weatherproof and rainproof fused disconnect switch) and temporary telephone for use by Tenant in its construction of the Improvements.

B.    <u>Permanent Utilities</u>: Landlord will provide the following permanent utility connections in locations mutually agreed to by Tenant and Landlord no later than the Delivery Date:

gas (if available), telephone, permanent electricity (adequate for an 800-amp panel, 3-phase, 277/480 volt), storm sewer system, sanitary sewer (6" line), domestic water (2" line), fire protection water (8" line, 50 pounds per square inch residual pressure, 2000 gallons per minute or at least sufficient capacity to service Tenant's sprinkler system without the need for any fire pump, as approved by Tenant's fire protection consultant).

Gas utility is available at the utility company manifold located outside of the Premises in the adjoining loading dock area.

Landlord will relocate and/or remove all exterior utilities required to accommodate the construction of Tenant's storefront entrance and the Building addition housing the car stereo installation facility.

142857

## EXHIBIT "D"

### INTENTIONALLY DELETED

1 – Ex. "D"

142857

# EXHIBIT "E"

## SIGN PLANS AND CRITERIA

(attached)

142857



EXHIBIT E

16'-0"

CHANNEL LETTERS & RING ON RED BACKGROUND

17°

ALUCOBOND / E.I.F.S.
PANEL

.090 ALUM. PAINTED RED
TO MATCH PMS #485

DARK BRONZE CHANNEL
EDGES PTD. W/ MATTHEWS
#41-313

15 MM WHITE #6500 TUBING
POWERED BY 30 MA
ELECTRONIC TRANSFORMERS

3/16" WHITE #7328 ACRYLIC
BANDED W/ ONE INCH WHITE
TRIM-CAP

1/4" WEEP HOLES

TYPICAL SECTION DETAIL
THRU HOLLOW WALL

3/8" ALUMINUM ALLTHREAD
ATTACHED TO BACK OF LTR.
W/ ALUM. RIV-NUT OR
THREADED ALUM. STRAP

3" SQ. ALUM.
BACK-UP PLATES

UNISTRUT STEEL
SPANNING 6" STL.
STUDS

120 VOLT CIRCUITS
(BY OTHERS)

2" X 6" STEEL STUD
24" O/C

ALL WIRING &
ELECTRICAL COMPONENTS
TO BE U.L. APPROVED

BOTTOM ATTACHMENTS
ON LTRS. BOLTED & PLATED
TO INTERIOR OF WALL

NOTE: ALL PENETRATIONS INTO
WALL MUST BE SEALED
WITH SILICONE ADHESIVE

8"

Circuit City Stores, Inc.
Construction Department
9950 Maryland Drive
Richmond, Virginia 23233
804.527.4000

Title: ccbkgd-mounting-hollow      Date: 2-21-02      Revisions:

## EXHIBIT "F"

A.     Tenant exclusive uses:

BASS PRO:  Sale of fishing boats or recreational vehicles, or an operation whose "primary use" (i.e., more than 7,000 square feet of floor area) is the sale of fishing, hunting or camping equipment (including equipment specifically designed and utilized for fishing, hunting or camping purposes, but excluding clothing and apparel of every kind and nature), or an operation whose primary use is a full line sporting goods store (i.e., a store selling a wide range of sporting goods, sporting and leisure time equipment and supplies, sporting goods accessories, athletic footwear and athletic wearing apparel).

BED, BATH & BEYOND:  Any single premises used primarily as a linen, bath and housewares superstore (not to include any manufacturer or private-label tenants whose businesses are devoted (by at least 60% of floor area) to the sale of their own brand or label of merchandise, or any departments operated in any of the anchor stores in the regional retail development as an ancillary use (such as the linens department in Burlington, or the home furnishings department in T. J. Maxx)).

In addition, for the purpose of paragraph 6(b) of the Lease, Tenant's right to conduct "sidewalk sales" in the Common Areas is subject to Section 27.10 of Bed, Bath and Beyond's lease which prohibits Landlord from unreasonably interfering with the use of the parking areas in the "No-Build Area" (defined in Bed, Bath and Beyond's lease), which area includes the Tenant's Preferred Area.

FYE:  Operation whose primary business (i.e., at least the lesser of (i) 10% of the floor area of such store or (ii) 100 square feet then being used for the sale and display of such items) is the retail sale and/or rental of pre-recorded music and/or pre-recorded videotapes and blank video tapes and blank audio cassettes.

GAMEWORKS:  A retail facility providing technology-based interactive and non-interactive electronic entertainment for the public, which may include, without limitation, the use and/or rental of large scale attractions, ride simulators, arcade games, pinball games, computer and other internet games, redemption games, virtual reality equipment and attractions, laser equipment, computerized or other types of photographic booths, billiard tables and any new uses related to any of the foregoing games and entertainment uses which may occur or arise during the natural evolution of such business (and/or any substitutes for such items which are a technological evolution of the foregoing items), as well as the presentation of live entertainment and/or recorded music in connection therewith.

142857

JEEPERS!:   Any business operated under the name 'Chuck E. Cheese' or 'Discovery Zone".

SUPER SPORTS USA (OSHMAN'S):   A store whose principal use is that of a full-line sporting goods store (not including any store operated by Bass Pro, its affiliates, successors or transferees).

STAR THEATRE:   Operation of a motion picture theater complex.

B.   Permitted Encumbrances:

1.   Interest of Saks & Company, a New York corporation, Lessee, and Terms, Conditions and Provisions of Lease, as evidenced by Memorandum of Lease, dated November 26, 1997, recorded January 7, 1998, in Liber 17952, page 566.

2.   Interest of Bed Bath & Beyond, Inc., a New York corporation, Lessee, and Terms, Conditions and Provisions of Lease, as evidenced by Memorandum of Lease, dated April 27, 1998, recorded August 23, 1999, in Liber 20453, page 95.

3.   Mortgage, Assignment of Leases and Rents and Security Agreement in the original amount of $170,000,000.00 executed by Taubman Auburn Hills Associates Limited Partnership, a Delaware limited partnership, to PNC Bank, national association, dated March 29, 1999, recorded April 16, 1999, in Liber 19843, page 720, covers more land.

4.   Terms and Conditions contained in Consent Judgment, as disclosed by instrument recorded in Liber 11735, page 334, pursuant to Oakland County Circuit Court File No. 90-392704-CE.

5.   Terms and Conditions contained in Master Declaration of Easements and Restrictions, as disclosed by instrument recorded in Liber 17340, page 136, First Amendment to Master Declaration of Easements and Restrictions recorded in Liber 18559, page 572, Second Amendment to Master Declaration of Easements and Restrictions recorded in Liber 19342, page 502, also recorded in Liber 19381, page 703 and Liber 19783, page 41, and Third Amendment to Master Declaration of Easements and Restrictions recorded in Liber 20565, page 116.

6.   Terms and Conditions contained in Agreement of Easements and Restrictions, as disclosed by instrument recorded in Liber 18384, page 63 and Liber 18488, page 145.

7.   Terms and Conditions contained in Perpetual Circular Drive Access Easement Agreement, as disclosed by instrument recorded in Liber 18559, page 599.

142857

8.    Terms and Conditions contained in Storm Sewer Line Easement Agreement, as disclosed by instrument recorded in Liber 18559, page 615.

9.    Terms and Conditions contained in Other Utilities Easement Agreement, as disclosed by instrument recorded in Liber 18559, page 626.

10.    Terms and Conditions contained in Sanitary Sewer Utility Easement Agreement, as disclosed by instrument recorded in Liber 21221, page 225.

11.    Terms and Conditions contained in Water Line Utility Easement Agreement, as disclosed by instrument recorded in Liber 21221, page 251.

12.    Terms and Conditions contained in Easement Agreement RFW117995, as disclosed by instrument recorded in Liber 22249, page 697.

13.    Terms and Conditions contained in Notice of Auburn Hills City Council Resolution regarding connecting to the sanitary sewer system, as disclosed by instrument recorded in Liber 16090, page 746

3 – Ex. "F"

142857

## EXHIBIT "G"

After recording return to:

## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT
### (Mortgage)

This SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT, dated the _____ day of _____, _____, between _____, a _____ ("Mortgagee"), and CIRCUIT CITY STORES, INC., a Virginia corporation ("Tenant").

## WITNESSETH:

(a)     Tenant has entered into a certain lease (the "Lease") dated _____, _____ with Taubman Auburn Hills Associates Limited Partnership, a Delaware limited partnership ("Landlord"), covering premises located within that certain property known as Great Lakes Crossing Shopping Center, located in the City of Auburn Hills, Oakland County, Michigan and more particularly described in Schedule A hereto; and

(b)     Mortgagee has made a loan to Landlord as evidenced and secured by a Mortgage recorded _____, _____ in the land records of Oakland County, _____, in Liber _____ at page _____ (the "Mortgage"), encumbering the property described in Schedule A; and the parties hereto desire to set forth their agreement with regard to the priority of the Mortgage and the effect thereof on Tenant and its leasehold interest in the aforesaid premises, as set forth below.

NOW, THEREFORE, in consideration of the premises and of the sum of One Dollar ($1.00) by each party in hand paid to the other, the receipt of which is hereby acknowledged, the parties hereby agree as follows:

1.     The Lease is and shall be subject and subordinate to the lien of the Mortgage insofar as it affects the real property of which the premises form a part, and to all renewals, modifications, consolidations, replacements and extensions thereof, to the full extent of the principal sum secured thereby and interest thereon.

2.     Tenant agrees that it will attorn to and recognize any purchaser at a foreclosure sale under the Mortgage, any transferee who acquires the premises by deed in lieu of foreclosure, the successors and assigns of such purchasers, as its Landlord for the unexpired balance (and any

1 – Ex. "G"

extensions, if exercised) of the term of the Lease upon the same terms and conditions set forth in the Lease.

3.     In the event that it should become necessary to foreclose the Mortgage, Mortgagee thereunder will not terminate the Lease nor join Tenant in summary or foreclosure proceedings so long as Tenant is not in default under any of the material terms, covenants, or conditions of the Lease, beyond any applicable cure period provided in the Lease.

4.     Mortgagee consents to the application of casualty and condemnation proceeds in accordance with paragraphs 15 and 16 of the Lease between Landlord and Tenant, whether or not the Mortgage is then foreclosed.

5.     In the event that Mortgagee shall succeed to the interest of Landlord under the Lease, Mortgagee shall not be:

      (a)     liable for any act or omission of any prior lessor (including Landlord); or

      (b)     liable for the return of any security deposits unless delivered to Mortgagee; or

      (c)     bound by any rent or other periodic payments which Tenant might have paid for more than the current month to any prior lessor (including Landlord); or

      (d)     bound by any amendment or modification of the Lease made without its consent, which consent shall not be unreasonably withheld or delayed.

6.     Notwithstanding the foregoing, Mortgagee acknowledges and agrees that if Mortgagee shall succeed to the interest of Landlord under this Lease, Mortgagee shall be subject to Tenant's remedies properly exercised under the Lease, including but not limited to Tenant's rights of self-help and/or setoff for any default, obligation, act or omission of any prior lessor (including Landlord) as provided in the Lease and that such rights of Tenant are not limited or impaired in any way by the terms and provisions of this Agreement.

7.     [TO BE INCLUDED ONLY IF TENANT IMPROVEMENT ALLOWANCE HAS NOT BEEN PAID]  Notwithstanding anything contained herein to the contrary, it is expressly understood and agreed that in the event that Landlord defaults in the payment of the Tenant Improvement Allowance, as defined in the Lease, and Mortgagee acquires title to the Shopping Center by foreclosure or otherwise, Mortgagee shall become liable for payment of the Tenant Improvement Allowance to Tenant, and Tenant shall otherwise be entitled to effect a Transfer all in accordance with the terms of the Lease.

8.     Mortgagee and Tenant, respectively, represent and warrant to each other that each has the requisite power and authority to enter into this Agreement; that all necessary and

appropriate approvals, authorizations and other steps have been taken to effect the legality of this Agreement; that the signatories executing this Agreement on behalf of Mortgagee and Tenant have been duly authorized and empowered to execute this Agreement on behalf of Mortgagee and Tenant, respectively; and that this Agreement is valid and shall be binding upon and enforceable against Mortgagee and Tenant shall inure to the benefit of the parties hereto, and their successors and assigns.

9.    Tenant hereby agrees that, upon the occurrence of an Event of Default (as defined in the Lease), Mortgagee shall have the same time period for cure of such default as is given Landlord in accordance with the terms of the Lease, following notice given by Tenant to Mortgagee at the following address, in the same method for notice as is required under the Lease:

10.    All notices between the parties hereto shall be in writing and comply with the terms of paragraph 32 of the Lease.

IN WITNESS WHEREOF, the parties hereto have executed these presents the day and year first above written.

MORTGAGEE:

COMPANY NAME

ATTEST:

_____

_____
Its:

By: _____
Name: _____
Title: _____

TENANT:

CIRCUIT CITY STORES, INC.,
a Virginia corporation

ATTEST:

_____

_____
Its:

By: _____
R. Bruce Lucas, Vice President

**[Note: Attach appropriate notary blocks for the State]**

3 – Ex. "G"                                        142857

## EXHIBIT "G"

After recording return to:

## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT
### (Ground Lease)

This SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT, dated the _____ day of _____, _____, between _____, a _____ ("Ground Lessor"), and CIRCUIT CITY STORES, INC., a Virginia corporation ("Tenant").

## W I T N E S S E T H :

(a)    Tenant has entered into a certain lease (the "Lease") dated _____, _____ with Taubman Auburn Hills Associates Limited Partnership, a Delaware limited partnership ("Landlord"), covering premises located within that certain property known as Great Lakes Crossing Shopping Center, located in the City of Auburn Hills, Oakland County, Michigan, and more particularly described in Schedule A hereto; and

(b)    Ground Lessor has entered into a Lease with Landlord as evidenced and recorded _____, _____ in the land records of Oakland County, Michigan in Liber _____ at page _____ (the "Ground Lease"), covering the property described in Schedule A; and the parties hereto desire to set forth their agreement with regard to the priority of the Ground Lease and the effect thereof on Tenant and its leasehold interest in the aforesaid premises, as set forth below.

NOW, THEREFORE, in consideration of the premises and of the sum of One Dollar ($1.00) by each party in hand paid to the other, the receipt of which is hereby acknowledged, the parties hereby agree as follows:

1.    The Lease is a sublease and shall be subordinate to the Ground Lease insofar as it affects the real property of which the premises form a part thereof.

2.    Tenant agrees that it will attorn to Ground Lessor and any successor to the Ground Lessor by deed or otherwise as its Landlord for the unexpired balance (and any extensions, if exercised) of the term of the Lease upon the same terms and conditions set forth in the Lease, in the event of a termination of the Ground Lease.

3.    In the event that it should become necessary to terminate the Ground Lease, Ground Lessor thereunder will not terminate the Lease nor join Tenant in summary proceedings so long as Tenant is not in default under any of the material terms, covenants, or conditions of the Lease, beyond any applicable cure period provided in the Lease.

4 – Ex. "G"

142857

4.     Ground Lessor consents to the application of casualty and condemnation proceeds in accordance with paragraphs 15 and 16 of the Lease between Landlord and Tenant, whether or not the Ground Lease has been terminated.

5.     In the event that Ground Lessor shall succeed to the interest of Landlord under the Lease, Ground Lessor shall not be:

(a)     liable for any act or omission of any prior lessor (including Landlord); or

(b)     liable for the return of any security deposits unless delivered to Ground Lessor; or

(c)     bound by any rent or other periodic payments which Tenant might have paid for more than the current month to any prior lessor (including Landlord); or

(d)     bound by any amendment or modification of the Lease made without its consent, which consent shall not be unreasonably withheld or delayed.

Notwithstanding the foregoing, Ground Lessor acknowledges and agrees that if Ground Lessor shall succeed to the interest of Landlord under this Lease, Ground Lessor shall be subject to Tenant's remedies properly exercised under the Lease, including but not limited to Tenant's rights of self-help and/or setoff for any default, obligation, act or omission of any prior lessor (including Landlord) as provided in the Lease and that such rights of Tenant are not limited or impaired in any way by the terms and provisions of this Agreement.

6.     [TO BE INCLUDED ONLY IF TENANT IMPROVEMENT ALLOWANCE HAS NOT BEEN PAID]  Notwithstanding anything contained herein to the contrary, it is expressly understood and agreed that in the event that Landlord defaults in the payment of the Tenant Improvement Allowance, as defined in the Lease, and Ground Lessor terminates the Lease, Ground Lessor shall become liable for payment of the Tenant Improvement Allowance to Tenant, and Tenant shall otherwise be entitled to effect a Transfer all in accordance with the terms of the Lease.

7.     This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, and their successors and assigns.

8.     Tenant hereby agrees that, upon the occurrence of an Event of Default (as defined in the Lease), Ground Lessor shall have the same time period for cure of such default as is given Landlord in accordance with the terms of the Lease, following notice given by Tenant to Ground Lessor at the following address, in the same method for notice as is required under the Lease:

_____

_____

_____

5 – Ex. "G"

142857

9.      All notices between the parties hereto shall be in writing and comply with the terms of paragraph 32 of the Lease.

IN WITNESS WHEREOF, the parties hereto have executed these presents the day and year first above written.

GROUND LESSOR:

COMPANY NAME

ATTEST:

_____

_____          By: _____
Its:                             Name: _____
                                 Title: _____

TENANT:

CIRCUIT CITY STORES, INC.,
a Virginia corporation

ATTEST:

_____

_____          By: _____
Its:                             Name: _____
                                 Title:   Vice President

[Note: Attach appropriate notary blocks for the State]

## EXHIBIT "H"

After recording, return to:

## MEMORANDUM OF LEASE

This MEMORANDUM OF LEASE is made this _____ day of _____, _____, between Taubman Auburn Hills Associates Limited Partnership, a Delaware limited partnership having an address of _____ (hereinafter referred to as "Landlord"), and **CIRCUIT CITY STORES, INC.**, a Virginia corporation, having an address of Deep Run I, 9950 Mayland Drive, Richmond, Virginia 23233 (hereinafter referred to as "Tenant").

### WITNESSETH:

Landlord and Tenant have entered into a Lease (the "Lease") dated _____, _____, whereby Landlord has leased to Tenant a portion of the real property (the "Property") commonly known as the Great Lakes Crossing Shopping Center in the City of Auburn Hills, Oakland County, Michigan, the legal description of which Property is set forth on Exhibit "A-1" attached hereto, together with certain non-exclusive easements in, over, upon, across, under and through certain areas of the Property defined in the Lease as Landlord's Premises, and all easements and rights pertaining thereto. The Lease contains provisions and rights appurtenant to the Property, some of which are as follows:

I.    Term. The term of the Lease is for a period of fifteen (15) years, commencing on the Commencement Date (as established in the Lease based upon the substantial completion of the improvements upon the Property). Thereafter, Tenant has the right under the Lease to renew and extend the term of the Lease for three (3) successive periods of five (5) years each.

II.    Exclusive Use Rights. The Lease provides that so long as the Premises are used for the initial uses set forth in paragraph 18 of the Lease and subject to the rights of existing tenants or occupants of the Shopping Center in effect as of the date of the Lease, (A) no other tenant or occupant of the Shopping Center within five hundred (500) feet of Tenant's interior entrance to the Shopping Center building and (B) no other tenant or occupant leasing or occupying between 20,000 square feet and 80,000 square feet of the Shopping Center or any other property owned by Landlord or an affiliate within a one (1) mile radius of the Shopping Center, shall be entitled to sell or rent (or rent to own) any of

1 – Ex. "H"

142857

the Products (hereinafter defined).   Neither (i) Incidental Sale (as hereinafter defined) of the Products in connection with the overall business of another occupant or tenant, nor (ii) use of the premises currently occupied by "FYE" in the Shopping Center by a replacement tenant operating under substantially the same primary use under which FYE is operating as of the date thereof, pursuant to a lease executed within one (1) year following the termination of the current FYE lease, shall be deemed a violation of the preceding sentence.   As used herein, "Products" shall mean consumer, office and automotive electronics products (which include, but shall not be limited to, televisions, stereos, speakers and video and audio recorders and players and cameras), computer hardware and software and related software services, including internet access services, entertainment software and entertainment media (which include, but shall not be limited to, records, game cartridges, video tapes, cassettes, compact discs, DVD's and DVD equipment), cellular and wireless telephones and telecommunication devices and related goods, and the sale and installation of motor vehicle audio, stereo and telephone systems and technological evolutions of the foregoing.   As used herein, "Incidental Sale" shall mean the lesser of (i) two hundred (200) square feet, or (ii) ten percent (10%) of such occupant's or tenant's display area.

III.   Successors.   The covenants, conditions and agreements made and entered into by the parties hereto shall be binding upon and inure to the benefits of their respective heirs, administrators, executors, representatives, successors and assigns.

IV.   Incorporation of Lease.   All terms and conditions of the Lease are hereby incorporated herein by reference as if fully set forth herein.

V.   Conflicts with Lease.   This Memorandum of Lease is solely for notice and recording purposes and shall not be construed to alter, modify, expand, diminish or supplement the provisions of the Lease.   In the event of any inconsistency between the provisions of this Memorandum of Lease and the provisions of the Lease, the provisions of the Lease shall govern.

IN WITNESS WHEREOF, this Memorandum of Lease has been duly executed by the parties hereto as of the day and year first above written.

LANDLORD:

TAUBMAN AUBURN HILLS ASSOCIATES LIMITED PARTNERSHIP, a Delaware limited partnership

By: _____
Name: _____

2 – Ex. "H"                                   142857

Title: _____

**Note: Attach appropriate notary block for the State]**

<u>TENANT</u>:

**CIRCUIT CITY STORES, INC.,**
a Virginia corporation

By: _____
    R. Bruce Lucas, Vice President

**COMMONWEALTH OF VIRGINIA**      )
                                  ) ss.
**COUNTY OF HENRICO**             )

I certify that on _____, _____, before me, the undersigned, a Notary Public in and for said State, personally appeared R. Bruce Lucas, Vice President of **CIRCUIT CITY STORES, INC.**, a Virginia corporation, personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and on oath acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument, the person or the entity upon behalf of which he acted executed the instrument.

**WITNESS** my hand and official seal.

_____
Notary Public in and for the Commonwealth of
Virginia, residing at _____
My commission expires: _____

_____
[Type or Print Notary Name]

3 – Ex. "H"

142857

## EXHIBIT "I"

### COMMENCEMENT DATE AGREEMENT

This COMMENCEMENT DATE AGREEMENT, made as of this ____ day of _____, _____, BETWEEN TAUBMAN AUBURN HILLS ASSOCIATES LIMITED PARTNERSHIP, a Delaware limited partnership (herein called "Landlord"), and CIRCUIT CITY STORES, INC., a Virginia corporation (herein called "Tenant").

### WITNESSETH:

WHEREAS, Landlord is the owner of certain premises situated in the City of Auburn Hills, Oakland County, Michigan (herein called the "Premises"); and

WHEREAS, by that certain Lease dated _____ (herein called the "Lease"), Landlord leased the Premises to Tenant; and

WHEREAS, a memorandum or short form lease in respect of the Lease was recorded in the office of the Clerk of Oakland County, Michigan on the ____ day of _____, _____, in Liber _____ at Page ____; and

WHEREAS, Tenant is in possession of the Premises and the term of the Lease has commenced; and

WHEREAS, under Paragraph 24 of the Lease, Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease;

NOW, THEREFORE, Landlord and Tenant agree as follows:

1.      The term of the Lease commenced on, and the Commencement Date (as such term is defined in the Lease) was, _____, _____. The term of the Lease shall expire on January 31, ____ unless Tenant exercises any option to extend the term of the Lease or unless the Lease terminates earlier as provided in the Lease.

2.      The date of commencement of the first "Option Period" (as such term is defined in the Lease) shall be February 1, ____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, ____ unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

3.      The date of commencement of the second Option Period shall be February 1, ____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term

1 – Ex. "I"

of the Lease shall expire on January 31, _____ unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

4.    The date of commencement of the third Option Period shall be February 1, _____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, _____ unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed the day and year first above written.

LANDLORD:

**TAUBMAN AUBURN HILLS ASSOCIATES LIMITED PARTNERSHIP**, a Delaware limited partnership

By: _____
Name: _____
Title: _____

TENANT:

**CIRCUIT CITY STORES, INC.,**
a Virginia corporation

By: _____
        R. Bruce Lucas, Vice President

_____

2 – Ex. "I"

142857

## EXHIBIT "J"

### INDEMNIFICATION AGREEMENT

This INDEMNIFICATION AGREEMENT is made this _____ day of _____,
_____, between TAUBMAN AUBURN HILLS ASSOCIATES LIMITED PARTNERSHIP, a
Delaware limited partnership (hereinafter referred to as "Landlord") and CIRCUIT CITY
STORES, INC., a Virginia corporation (hereinafter referred to as "Tenant").

### WITNESSETH:

Landlord and Tenant have entered into a Lease (the "Lease"), dated _____
whereby Landlord has leased to Tenant a portion of the real property located in the City of
Auburn Hills, Oakland County, Michigan (the "Shopping Center") and Tenant has constructed
on such real property a store premises (the "Premises").

NOW, THEREFORE, in consideration of the payment of the Tenant Improvement
Allowance as defined in the Lease and other good and valuable consideration, the receipt of
which is hereby acknowledged, the parties hereto agree as follows:

1.     Tenant hereby indemnifies and agrees to hold Landlord harmless from any loss,
payment, claim or expense, including Landlord's attorneys' fees and expenses, as the result of
mechanics and materialmen filing liens or otherwise making claims against Landlord's interest in
the Premises and the Shopping Center as a result of any work done by or on behalf of Tenant at
the Shopping Center.  In the event that any mechanic, materialman or other claimant makes
claim against the Premises or Shopping Center based upon materials or services provided under
contract with Tenant, Tenant shall hold harmless and protect Landlord from any loss, payment,
claim or expense related thereto.

2.     Tenant reserves the right to contest in good faith the amount of any claim or lien
assessed against the Premises or the Shopping Center by any of such claimants; provided,
however, should the holder or holders of such claim or lien attempt to enforce their lien by
foreclosure or by any other means, Tenant shall bond around, pay or remove such lien by any
manner necessary to protect Landlord's interest in the Premises and the Shopping Center.  This
indemnity and hold harmless shall not apply to any liens or claims caused by Landlord or
Landlord's agents.

343956 v1 (00050-01)

EXECUTED this _____ day of _____, _____.

LANDLORD:

**TAUBMAN AUBURN HILLS ASSOCIATES
LIMITED PARTNERSHIP,** a Delaware limited
partnership

By: _____
Name: _____
Title: _____

TENANT:

**CIRCUIT CITY STORES, INC.,**
a Virginia corporation

By: _____
     R. Bruce Lucas, Vice President

2 – Ex."L"

343956 v1 (00050-01)

## MEMORANDUM OF LEASE

This **MEMORANDUM OF LEASE** is made this _9th_ day of April, 2003, between **TAUBMAN AUBURN HILLS ASSOCIATES LIMITED PARTNERSHIP**, a Delaware limited partnership, having an address of 200 East Long Lake Road, P.O. Box 200, Bloomfield Hills, Michigan 48303 (hereinafter referred to as "Landlord"), and **CIRCUIT CITY STORES, INC.**, a Virginia corporation, having an address of Deep Run I, 9950 Mayland Drive, Richmond, Virginia 23233 (hereinafter referred to as "Tenant").

### WITNESSETH:

Landlord and Tenant have entered into a Lease (the "Lease") dated as of the date hereof, whereby Landlord has leased to Tenant a portion of the real property (the "Property") commonly known as the Great Lakes Crossing Shopping Center in the City of Auburn Hills, Oakland County, Michigan, the legal description of which Property is set forth on Exhibit "A-1" attached hereto, together with certain non-exclusive easements in, over, upon, across, under and through certain areas of the Property defined in the Lease as Landlord's Premises, and all easements and rights pertaining thereto. The Lease contains provisions and rights appurtenant to the Property, some of which are as follows:

I.      <u>Term.</u> The term of the Lease is for a period of fifteen (15) years, commencing on the Commencement Date (as established in the Lease based upon the substantial completion of the improvements upon the Property). Thereafter, Tenant has the right under the Lease to renew and extend the term of the Lease for three (3) successive periods of five (5) years each.

II.     <u>Exclusive Use Rights.</u> The Lease provides that so long as the Premises are used for the initial uses set forth in paragraph 18 of the Lease and subject to the rights of existing tenants or occupants of the Shopping Center in effect as of the date of the Lease, (A) no other tenant or occupant of the Shopping Center within five hundred (500) feet of Tenant's interior entrance to the Shopping Center building and (B) no other tenant or occupant leasing or occupying between 20,000 square feet and 80,000 square feet of the Shopping Center or any other property owned by Landlord or an affiliate within a one (1) mile radius of the Shopping Center, shall be entitled to sell or rent (or rent to own) any of the Products (hereinafter defined). Neither (i) Incidental Sale (as hereinafter defined) of the Products in

connection with the overall business of another occupant or tenant, nor (ii) use of the premises currently occupied by "FYE" in the Shopping Center by a replacement tenant operating under substantially the same primary use under which FYE is operating as of the date thereof, pursuant to a lease executed within one (1) year following the termination of the current FYE lease, shall be deemed a violation of the preceding sentence.   As used herein, "Products" shall mean consumer, office and automotive electronics products (which include, but shall not be limited to, televisions, stereos, speakers and video and audio recorders and players and cameras), computer hardware and software and related software services, including internet access services, entertainment software and entertainment media (which include, but shall not be limited to, records, game cartridges, video tapes, cassettes, compact discs, DVD's and DVD equipment), cellular and wireless telephones and telecommunication devices and related goods, and the sale and installation of motor vehicle audio, stereo and telephone systems and technological evolutions of the foregoing.   As used herein, "Incidental Sale" shall mean the lesser of (i) two hundred (200) square feet, or (ii) ten percent (10%) of such occupant's or tenant's display area.

III.   Successors.  The covenants, conditions and agreements made and entered into by the parties hereto shall be binding upon and inure to the benefits of their respective heirs, administrators, executors, representatives, successors and assigns.

IV.   Incorporation of Lease.   All terms and conditions of the Lease are hereby incorporated herein by reference as if fully set forth herein.

V.   Conflicts with Lease.   This Memorandum of Lease is solely for notice and recording purposes and shall not be construed to alter, modify, expand, diminish or supplement the provisions of the Lease.  In the event of any inconsistency between the provisions of this Memorandum of Lease and the provisions of the Lease, the provisions of the Lease shall govern.

IN WITNESS WHEREOF, this Memorandum of Lease has been duly executed by the parties hereto as of the day and year first above written.

WITNESSES:

_____

*Portly Klasch*

**LANDLORD:**

**TAUBMAN AUBURN HILLS ASSOCIATES LIMITED PARTNERSHIP**, a Delaware limited partnership

By: **THE TAUBMAN REALTY GROUP LIMITED PARTNERSHIP**, a Delaware Limited partnership, General Partner

By: _____
Name: _____
Title: _____

WITNESSES:

**TENANT:**

**CIRCUIT CITY STORES, INC.**, a Virginia corporation

By: _____
R. Bruce Lucas, Vice President

3

# ACKNOWLEDGEMENT

STATE OF MICHIGAN)

                            ) ss.

COUNTY OF OAKLAND         )

On this _9TH_ day of ~~April~~ *MAY*, 2003, before me personally appeared _STEVEN EDER_, to me known to be the person who executed the foregoing instrument and acknowledged before me that he was duly authorized and did execute same on behalf of The Taubman Realty Group Limited Partnership, a Delaware limited partnership, as general partner of Taubman Auburn Hills Associates Limited Partnership, a Delaware limited partnership.

*Dsth. Klemk*

Notary Public, Oakland County, Michigan
My commission expires:_____

*DOROTHY KLUSEK*
*Notary Public, Macomb County, MI*
*Acting in Oakland County, MI*
*My Commission Expires 07-14-2005*

COMMONWEALTH OF VIRGINIA    )

                                  ) ss.

COUNTY OF HENRICO           )

I certify that on this _28th_ day of April, 2003, before me, the undersigned, a Notary Public in and for said State, personally appeared R. Bruce Lucas, Vice President of **CIRCUIT CITY STORES, INC.**, a Virginia corporation, personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and on oath acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument, the person or the entity upon behalf of which he acted executed the instrument.

**WITNESS** my hand and official seal.

*Joyce C Woodson*

Notary Public in and for the Commonwealth of
Virginia, residing at _1950 Maryland Dr._
My commission expires: _5/31/07_
*Joyce C Woodson*
[Type or Print Notary Name]

This document prepared by and
After recording return to:
Russell T. Aaronson, III, Esquire
McGuireWoods LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219

4

Exhibit "A-1"

Shopping Center Legal Description

PARCEL 1

A part of the west ½ of Section 4 and a part of Section 5, T-3-N, R-10-E, City of Auburn Hills, Oakland County, Michigan, more particularly described as: Beginning at the East ¼ corner of said Section 5, said point also being the West ¼ corner of said Section 4; thence S 85° 30' 16" W, 487.80 feet along the East-West ¼ line of said Section 5, also being the north right-of-way line of Great Lakes Crossings Drive (width varies); thence S 04° 29' 44" E, 15.11 feet along said right-of-way line; thence S 85° 30' 16" W, 274.28 feet along said right-of-way line; thence N 04° 29' 44" W, 15.11 feet to a point on the East-West ¼ line of said Section 5, also being the North right-of-way line of Great Lakes Crossings Drive (width varies); thence S 85° 30' 16" W, 256.56 feet along said East-West ¼ line and said right-of-way line; thence along a curve to the left 6.39 feet, said curve having a radius of 45.00 feet, central angle of 08° 08' 20" and a long chord bearing of N 00° 25' 34" W, 6.39 feet; thence N 04° 29' 44" W, 101.68 feet; thence along a curve to the left 182.23 feet, said curve having a radius of 467.50 feet, central angle of 22° 20' 03" and a long chord bearing of N 15° 39' 45" W, 181.08 feet; thence along a curve to the left 61.65 feet, said curve having a radius of 40.00 feet, central angle of 88° 18' 29" and a long chord bearing of N 70° 59' 01" W, 55.73 feet; thence along a curve to the right 169.57 feet, said curve having a radius of 1001.00 feet, central angle of 09° 42' 20" and a long chord bearing of S 69° 42' 54" W, 169.36 feet; thence S 11° 34' 58" E, 263.87 feet to a point on the East-West ¼ line of said Section 5, also being the north right-of-way line of Great Lakes Crossings Drive (width varies); thence S 85° 30' 16" W, 93.35 feet along East-West ¼ line and said right-of-way line; thence S 04° 23' 57" E, 50.85 feet along the west right-of-way line of Great Lakes Crossings Drive to a point on the north right-of-way line of Great Lakes Crossings Drive (100 feet wide); thence the following three courses being along said north right-of-way line: (1) S 75° 00' 00" W, 678.11 feet, and (2) along a curve to the right 519.24 feet, said curve having a radius of 1750.00 feet, central angle of 17° 00' 00" and a long chord bearing of S 83° 30' 00" W, 517.33 feet, and (3) N 88° 00' 00" W, 394.53 feet; thence along a curve to the left 22.41 feet, said curve having a radius of 45.00 feet, central angle of 28° 32' 15" and a long chord bearing of N 16° 16' 08" E, 22.18 feet; thence N 02° 00' 00" E, 133.22 feet; thence along a curve to the left 73.43 feet, said curve having a radius of 467.50 feet, central angle of 09° 00' 00" and a long chord bearing of N 02° 30' 00" W, 73.36 feet; thence N 07° 00' 00" W, 61.97 feet; thence along a curve to the left 62.83 feet, said curve having a radius of 40.00 feet, central angle of 90° 00' 00" and a long chord bearing of N 52° 00' 00" W, 56.57 feet; thence S 83° 00' 00" W, 17.50 feet; thence along a curve to the right 475.45 feet, said curve having a radius of 451.00 feet, central angle of 60° 24' 05" and a long chord bearing of N 66° 47' 58" W, 453.73 feet to the southerly line of an ingress-egress drive, the following four courses being along said southerly line: (1) along a curve to the left 56.90 feet, said curve having a radius of 40.00 feet, central angle of 81° 30' 32" and a long chord bearing of N 77° 21' 10" W, 52.22 feet, and (2) S 61° 53' 34" W, 166.98 feet, and (3) along a curve to the right 240.12 feet, said curve having a radius of 532.50 feet, central angle of 25° 50' 12" and a long chord bearing of S 74° 48' 40" W, 238.09 feet, and (4) S 87° 43' 46" W, 64.73 feet to a point on the easterly right-of-way line of Baldwin Road; thence N 02° 16' 14" W, 71.60 feet along said line to a point on the northerly line of an ingress-egress drive, the following five courses being along said northerly line: (1) along a curve to the left 23.30 feet, said curve having a radius of 40.00 feet, central angle of 33° 22' 19" and a long chord bearing of S 75° 35' 13" E, 22.97 feet, and (2) N 87° 43' 46" E, 42.73 feet, and (3) along a curve to the left 210.81 feet, said curve having a radius of 467.50 feet, central angle of 25° 50' 12" and a long chord bearing of N 74° 48' 40" E, 209.03 feet, and (4) N 61° 53' 34" E, 166.98 feet, and (5) along a curve to the left 56.90 feet, said curve having a radius of 40.00 feet, central angle of 81° 29' 51" and a long chord bearing of N 21° 08' 38" E, 52.22 feet; thence along a curve to the right 136.55 feet, said curve having a radius of 451.00 feet, central angle of 17° 20' 49" and a long chord bearing of N 10° 56' 35" W, 136.03 feet; thence N 02° 16' 14" W, 267.56 feet to the southerly line of an ingress-egress drive, the following three courses being along said drive: (1) along a curve to the left 62.83 feet, said curve having a radius of 40.00 feet, central angle of 90° 00' 00" and a long chord bearing of N

5

47° 16' 14" W, 56.57 feet, and (2) S 87° 43' 46" W, 357.00 feet, and (3) along a curve to the left 23.29 feet, said curve having a radius of 40.00 feet, central angle of 33° 22' 01" and a long chord bearing of S 71° 02' 45" W, 22.97 feet to a point on the easterly right-of-way line of Baldwin Road; thence N 02° 16' 14" W, 78.18 feet along said line to a point on the northerly line of an ingress-egress drive, the following two courses being along said northerly line:  (1) along a curve to the left 23.29 feet, said curve having a radius of 40.00 feet, central angle of 33° 22' 01" and a long chord bearing of S 75° 35' 13" E, 22.97 feet, and (2) N 87° 43' 46" E, 205.50 feet; thence N 02° 16' 14" W, 151.95 feet; thence S 87° 43' 46" W, 73.50 feet; thence N 02° 16' 14" W, 299.55 feet; thence S 88° 08' 55" W, 147.04 feet to a point on the southerly line of I-75; thence the following seven courses along said southerly line:  (1) N 43° 08' 55" E, 141.42 feet, and (2) N 88° 08' 55" E, 152.51 feet, and (3) N 50° 37' 03" E, 764.58 feet, and (4) N 84° 06' 59" E, 601.92 feet, and (5) N 88° 41' 25" E, 976.17 feet, and (6) along a curve to the right 2,615.78 feet, said curve having a radius of 4,480.66 feet, central angle of 33° 26' 56" and a long chord bearing of S 74° 35' 07" E, 2,578.79 feet, and (7) S 57° 51' 31" E, 213.32 feet; thence along a non-tangent curve to the right 200.00 feet, said curve having a radius of 1,835.08 feet, central angle of 06° 14' 40" and a long chord bearing of S 39° 48' 59" W, 199.90 feet; thence S 57° 42' 54" E, 50.85 feet to a point on the northwesterly line of Grand Trunk Western Railroad right-of-way; thence the following two courses along said right-of-way:  (1) along a non-tangent curve to the right 279.29 feet, said curve having a radius of 1,885.08 feet, central angle of 08° 29' 20" and a long chord bearing of S 46° 53' 50" W, 279.04 feet, and (2) S 51° 08' 30" W, 1,150.19 feet to a point on the westerly line of said Section 4; thence N 03° 21' 25" W, 29.99 feet along said west line to the point of beginning.

*Excepting therefrom the following described Parcels A, C & D:*

PARCEL A
(TAX PARCEL NO. 14-05-251-006)

A part of the Northeast ¼ of Section 5, T-3-N, R-10-E, City of Auburn Hills, Oakland County, Michigan, more particularly described as: commencing at the East ¼ corner of said Section 5; thence the following two courses being along the East line of Section 5 as monumented: (1) N 02° 19' 13" W, 1401.10 feet, and (2) N 01° 08' 51" W, 265.64 feet to a point on the southerly line of Interstate 75, the following two courses being along said southerly line: (1) along a curve to the left 1438.16 feet, said curve having a radius of 4480.66 feet, central angle of 18° 23' 25" and a long chord bearing of N 82° 06' 53" W, 1431.99 feet, and (2) S 88° 41' 25" W, 555.27 feet; thence S 07° 00' 00" E, 389.78 feet to the point of beginning; thence N 83° 00' 00" E, 579.20 feet; thence along a curve to the right 22.69 feet, said curve having a radius of 100.00 feet, central angle of 13° 00' 10" and a long chord bearing of N 89° 30' 05" E, 22.65 feet to a point of compound curvature; thence along a curve to the right 3.05 feet, said curve having a radius of 9.00 feet, central angle of 19° 23' 04" and a long chord bearing of S 74° 18' 18" E, 3.03 feet; thence S 07° 00' 00" E, 76.43 feet; thence S 83° 00' 00" W, 74.67 feet; thence S 07° 00' 00" E, 61.17 feet; thence S 83° 00' 00" W, 0.17 feet; thence S 07° 00' 00" E, 101.17 feet; thence S 83° 00' 00" W, 505.80 feet; thence N 52° 00' 00" W, 77.02 feet; thence N 07° 00' 00" W, 31.15 feet; thence S 83° 00' 00" W, 0.90 feet; thence N 07° 00' 00" W, 95.39 feet; thence N 38° 00' 00" E, 16.26 feet; thence N 07° 00' 00" W, 30.00 feet; thence N 38° 00' 00" E, 28.28 feet to the point of beginning.


PARCEL C
(TAX PARCEL NO. 14-04-152-002)

A part of the Northwest of ¼ section 4, T-3-N, R-10-E, City of Auburn Hills, Oakland County, Michigan, more particularly described as: commencing at the East ¼ corner of section 5, said point also being the West ¼ corner of Section 4; thence N 89° 45' 15" E, 39.12 feet along the East-West ¼ line of Section 4 to a point on the northerly right-of-way line of the Grand Trunk Western Railroad; thence N 51° 08' 30" E, 206.00 feet along said northerly line; thence N 38° 51' 30" W, 93.50 feet to the point of beginning; thence continuing N 38° 51' 30" W, 163.00 feet; thence N 51° 08' 30" E, 243.00 feet; thence S 38° 51' 30" E, 163.00 feet; thence S 51° 08' 30" W, 243.00 feet to the point of beginning.

PARCEL D
(TAX PARCEL NO. 14-05-251-007)

7

A part of the Northeast ¼ of Section 5, T-3-N, R-10-E, City of Auburn Hills, Oakland County, Michigan, more particularly described as: commencing at the East ¼ corner of said Section 5; thence S 85° 30' 16" W, 953.16 feet along the East-West ¼ line of said Section 5 to a point on the easterly line of a proposed road, the following four courses being along said line: (1) along a curve to the right 1.39 feet, said curve having a radius of 40.00 feet, central angle of 01° 59' 31" and a long chord bearing of N 05° 29' 34" W, 1.39 feet, and (2) N 04° 29' 44" W, 106.66 feet, and (3) along a curve to the left 212.99 feet, said curve having a radius of 532.50 feet, central angle of 22° 55' 04" and a long chord bearing of N 15° 57' 16" W, 211.58 feet, and (4) along a curve to the right 58.84 feet, said curve having a radius of 40.00 feet, central angle of 84° 17' 01" and a long chord bearing of N 14° 43' 42" E, 53.68 feet; thence along a curve to the left 156.88 feet, said curve having a radius of 1,001.00 feet, central angle of 08° 58' 47" and a long chord bearing of N 52° 22' 49" E, 156.72 feet; thence N 07° 00' 00" W, 449.04 feet to the point of beginning; thence continuing N 07° 00' 00" W, 72.26 feet; thence S 83° 00' 00" W, 26.83 feet; thence N 07° 00' 00" W, 123.91 feet, thence S 83° 00' 00" W, 1.00 feet; thence N 07° 00' 00" W, 184.00 feet; thence N 83° 00' 00" E, 1.00 feet; thence N 07° 00' 00" W, 179.34 feet; thence N 83° 00' 00" E, 145.89 feet; thence along a curve to the left 4.15 feet, said curve having a radius of 16.50 feet, central angle of 14° 24' 29" and a long chord bearing of N 75° 47' 46" E, 4.14 feet; thence along a curve to the right 25.15 feet, said curve having a radius of 100.00 feet, central angle of 14° 24' 29" and a long chord bearing of N 75° 47' 46" E, 25.08 feet; thence N 83° 00' 00" E, 56.62 feet; thence along a curve to the right 31.42 feet, said curve having a radius of 20.00 feet, central angle of 90° 00' 00" and a long chord bearing of S 52° 00' 00" E, 28.28 feet; thence S 07° 00' 00" E, 529.17 feet; thence along a curve to the right 31.42 feet, said curve having a radius of 20.00 feet, central angle of 90° 00' 00" and a long chord bearing of S, 38° 00' 00" W, 28.28 feet; thence S 83° 00' 00" W, 198.67 feet; thence along a curve to the right 9.42 feet, said curve having a radius of 6.00 feet, central angle of 90° 00' 00" and a long chord bearing of N 52° 00' 00" W, 8.49 feet to the point of beginning.

PARCEL 2

A part of the South ½ of Section 5, T-3-N, R-10-E, City of Auburn Hills, Oakland County, Michigan, more particularly described as: commencing at the East ¼ corner of said Section 5; thence S 85° 30' 16" W, 1,328.12 feet along the East-West ¼ line of said Section 5; thence S 04° 23' 57" E, 152.59 feet to the point of beginning on the South right-of-way line of relocated Lake Angelus Road (100 feet wide); thence S 04° 23' 57" E, 722.55 feet; thence S 85° 30' 16" W, 132.00 feet; thence S 04° 23' 57" E, 553.34 feet; thence S 86° 33' 33" W, 1,003.43 feet; thence N 04° 51' 24" W, 228.00 feet; thence S 86° 33' 33" W, 145.06 feet; thence N 04° 51' 24" W, 114.00 feet; thence N 89° 56' 09" W, 20.06 feet to a point on the easterly line of Lake Angelus Subdivision, as recorded in Liber 48, Page 10 of Plats, Oakland County Records; thence N 04° 51' 24" W, 116.05 feet along said easterly line; thence S 69° 09' 31" W, 32.79 feet; thence S 76° 52' 30" W, 58.60 feet; thence S 54° 14' 42" W, 29.52 feet; thence S 27° 50' 56" W, 18.28 feet; thence S 49° 58' 19" W, 27.76 feet; thence S 62° 05' 59" W, 39.43 feet; thence S 69° 49' 09" W, 59.92 feet; thence N 70° 49' 36" W, 100.30 feet; thence N 39° 41' 46" W, 107.61 feet to a point on the easterly line of Lackawana Street; thence S 86° 07' 19" W, 363.51 feet across Lackawana Street and following the northerly line of St. Lawrence Street; thence along a curve to the left 77.52 feet, said curve having a radius of 329.60 feet, central angle of 13° 28' 32" and a long chord bearing of S 79° 23' 03" W, 77.34 feet; continuing along the northerly line of St. Lawrence Street to the southeast corner of Lot 164 of said Lake Angelus Subdivision; thence N 14° 06' 19" W, 180.44 feet along said easterly lot line and the projection thereof; thence N 89° 53' 49" W, 180.25 feet; thence S 07° 03' 52" E, 40.08 feet; thence S 86° 07' 19" W, 217.10 feet to a point on the East right-of-way line of Baldwin Road; thence the following four courses along said East right-of-way line: (1) N 01° 10' 06" E, 165.74 feet, and (2) N 86° 07' 19" E, 16.00 feet, and (3) N 03° 52' 41" W, 91.53 feet, and (4) N 41° 07' 19" E, 28.28 feet to a point on the South right-of-way line of relocated Lake Angelus Road (100 feet wide); thence the following seven courses along said South right-of-way line: (1) N 86° 07' 19" E, 109.95 feet, and (2) along a curve to the left 265.04 feet, said curve having a radius of 540.00 feet, central angle of 28° 07' 19" and a long chord bearing of N 72° 03' 40" E, 262.39 feet, and (3) N 58° 00' 00" E, 303.54 feet, and (4) along a curve to the right 261.10 feet, said curve having a radius of 440.00 feet, central angle of 34° 00' 00" and a long chord bearing of N 75° 00' 00" E, 257.29 feet, and (5) S 88° 00' 00"

8

E, 432.55 feet, and (6) along a curve to the left 548.91 feet, said curve having a radius of 1,850.00 feet, central angle of 17° 00' 00" and a long chord bearing of N 83° 30' 00" E, 546.90 feet, and (7) N 75° 00' 00" E, 659.39 feet to the point of beginning.

## PARCEL 3

A part of the West ½ of Section 4, T-3-N, R-10-E, City of Auburn Hills, Oakland County, Michigan, more particularly described as: commencing at the West ¼ corner of said Section 4; thence S 03° 21' 25" E, 138.40 feet along the West line of said Section 4 (as monumented) to the point of beginning on the South right-of-way line of relocated Lake Angelus Road; thence the following four courses along said right-of-way line:  (1) due East 767.58 feet, and (2) along a curve to the left 179.07 feet, said curve having a radius of 540.00 feet, central angle of 19° 00' 00" and a long chord bearing of N 80° 30' 00" E, 178.25 feet, and (3) N 71° 00' 00" E, 278.26 feet, and (4) along a curve to the right 158.08 feet, said curve having a radius of 440.00 feet, central angle of 20° 35' 04" and a long chord bearing of N 81° 17' 32" E, 157.23 feet; thence S 03° 21' 25" E, 119.78 feet; thence S 26° 55' 00" W, 764.50 feet; thence S 89° 45' 15" W, 204.70 feet; thence N 66° 32' 00" W, 872.00 feet to a point on the West line of said Section 4; thence N 03° 21' 25" W, 311.60 feet along said West line to the point of beginning.

## PARCEL 4

A part of the West ½ of Section 4, T-3-N, R-10-E, City of Auburn Hills, Oakland County, Michigan, more particularly described as:  commencing at the West ¼ corner of said Section 4; thence N 89° 45' 15" E, 119.24 feet along the East-West ¼ line of said Section 4 (as monumented) to the point of beginning on the southeasterly line of the Grand Trunk Western Railroad right-of-way; thence the following two courses along said right-of-way line:  (1) N 51° 08' 30" E, 1039.60 feet, and (2) along a curve to the left 495.91 feet, said curve having a radius of 1935.08 feet, central angle of 14° 41' 00" and a long chord bearing of N 43° 48' 00" E, 494.55 feet to a point on the southwesterly line of Interstate 75; thence the following two courses along said line: (1) S 57° 51' 31" E, 23.28 feet, and (2) S 40° 51' 31" E, 1218.20 feet to a point on the North right-of-way line of relocated Lake Angelus Road; thence along the following seven courses along said right-of-way line:  (1) S 89° 45' 15" W, 292.61 feet, and (2) along a curve to the right 83.64 feet, said curve having a radius of 950.00 feet, central angle of 05° 02' 41" and a long chord bearing of N 87° 43' 24" W, 83.62 feet, and (3) N 85° 12' 04" W, 309.65 feet, and (4) along a curve to the left 224.30 feet, said curve having a radius of 540.00 feet, central angle of 23° 47' 56" and a long chord bearing of S 82° 53' 58" W, 222.69 feet, and (5) S 71° 00' 00" W, 278.26 feet, and (6) along a curve to the right 145.91 feet, said curve having a radius of 440.00 feet, central angle of 19° 00' 00" and a long chord bearing of S 80° 30' 00" W, 145.24 feet, and (7) due west 704.45 feet to a point on the southeasterly line of the Grand Trunk Western Railroad right-of-way; thence N 51° 08' 30" E, 61.65 feet along said right-of-way line to the point of beginning.

\\REA\149403.2

9