## INDUSTRIAL BUILDING LEASE
### (BOND-TYPE)

**1.**  **BASIC TERMS.**  This **Section 1** contains the Basic Terms of this Industrial Building Lease (the "**Lease**") between Landlord and Tenant, named below.  Other Sections of the Lease referred to in this **Section 1** explain and define the Basic Terms and are to be read in conjunction with the Basic Terms.

**1.1.**  Effective Date of Lease:  December 28, 2006

**1.2.**  Landlord:  FR Net Lease Co-Investment Program 13, LLC, a Delaware limited liability company

**1.3.**  Tenant:  Lenox, Incorporated, a New Jersey corporation

**1.4.**  Premises:  Approximately forty (40) acres of land on which the Building (the "**Building**") commonly known as 16507 Hunters Green Parkway, Hagerstown, Maryland, is located, which Building contains approximately 506,003 rentable square feet, as legally described on **Exhibit A** attached hereto.

**1.5.**  Guarantor:  Lenox Group Inc.

**1.6.**  Lease Term:  Fifteen (15) years ("**Term**"), commencing December 28, 2006 ("**Commencement Date**") and ending, subject to **Section 2.5** below and **Rider 1** hereof, on December 31, 2021 ("**Expiration Date**").

**1.7.**  Permitted Uses:  (See **Section 4.1**) Any lawful purposes, subject to applicable zoning restrictions, provided that Tenant's use does not otherwise violate the other terms and conditions of this Lease; provided, however, that if Tenant desires to use the Premises for any use other than warehouse, and distribution and ancillary office use, then Tenant must first obtain Landlord's consent, which consent shall not be withheld unless such use creates a nuisance (e.g., by production or emission of objectionable or unpleasant odors, smoke, dust, gas, light, noise or vibrations) or materially increases the risk of environmental contamination.

**1.8.**  Tenant's Broker:  N/A

**1.9.**  Exhibits and Riders to Lease:  The following exhibits and riders are attached to and made a part of this Lease.  **Exhibit A** (legal description); **Exhibit B** (Tenant Operations Inquiry Form); **Exhibit C** (Broom Clean Condition and Repair Requirements), **Exhibit D** (Termination Fee); **Exhibit E** (Guaranty); **Exhibit F** (Right of First Offer); and **Rider No. 1** (Tenant's Expansion Option).

**2.**  **LEASE OF PREMISES; RENT.**

**2.1.**  **Lease of Premises for Lease Term**.  Landlord hereby leases the Premises to Tenant, and Tenant hereby rents the Premises from Landlord, for the Term and subject to the conditions of this Lease.



EXHIBIT

A

2.2.   **Types of Rental Payments**.   Tenant shall pay net base rent to Landlord in monthly installments, in advance, on the first day of each and every calendar month during the Term of this Lease (the "**Base Rent**") in the amounts and for the periods as set forth below:

**Rental Payments**

| Lease Period | Annual Base Rent | Monthly Base Rent |
|---|---|---|
| 12/28/06 - 12/31/06 | Per diem | $5,268.00 |
| 1/1/07 – 12/31/07 | $1,922,820.00 | $160,235.00 |
| 1/1/08 – 12/31/08 | $1,961,268.00 | $163,439.00 |
| 1/1/09 – 12/31/09 | $2,000,496.00 | $166,708.00 |
| 1/1/10 – 12/31/10 | $2,040,504.00 | $170,042.00 |
| 1/1/11 – 12/31/11 | $2,081,316.00 | $173,443.00 |
| 1/1/12 – 12/31/12 | $2,122,944.00 | $176,912.00 |
| 1/1/13 – 12/31/13 | $2,165,400.00 | $180,450.00 |
| 1/1/14 – 12/31/14 | $2,208,708.00 | $184,059.00 |
| 1/1/15 – 12/31/15 | $2,252,880.00 | $187,740.00 |
| 1/1/16 – 12/31/16 | $2,297,940.00 | $191,495.00 |
| 1/1/17 – 12/31/17 | $2,343,900.00 | $195,325.00 |
| 1/1/18 – 12/31/18 | $2,390,784.00 | $199,232.00 |
| 1/1/19 – 12/31/19 | $2,438,604.00 | $203,217.00 |
| 1/1/20 – 12/31/20 | $2,487,372.00 | $207,281.00 |
| 1/1/21 – 12/31/21 | $2,537,124.00 | $211,427.00 |

Tenant shall also pay all Operating Expenses (defined below) and any other amounts owed by Tenant hereunder (collectively, "**Additional Rent**").  In the event any monthly installment of Base Rent or Additional Rent, or both, is not paid within 5 days of the date when due, a late charge in an amount equal to 2% of the then delinquent installment of Base Rent and/or Additional Rent (the "**Late Charge**"; the Late Charge, Default Interest, as defined in **Section 21.3** below, Base Rent and Additional Rent shall collectively be referred to as "**Rent**") shall be paid by Tenant to Landlord. Default Interest shall not be charged on the Late Charge and the Late Charge shall not be imposed on accrued Default Interest.  Tenant shall deliver all Rent payments to Landlord at [**311 South Wacker Drive, Suite 4000, Chicago, IL, 60606, Attn:  Joint Venture Accounting Group**] (or to such other entity designated as Landlord's management agent, if any, and if Landlord so appoints such a management agent, the "**Agent**"), or pursuant to such other directions as Landlord shall designate in this Lease or otherwise in writing.

2.3.   **Covenants Concerning Rental Payments; Initial and Final Rent Payments**. Tenant shall pay the Rent promptly when due, without notice or demand, and without any abatement, deduction or setoff. No payment by Tenant, or receipt or acceptance by Agent or Landlord, of a lesser amount than the correct Rent shall be deemed to be other than a payment on account, nor shall any endorsement or statement on any check or letter accompanying any payment be deemed an accord or satisfaction, and Agent or Landlord may accept such payment without prejudice to its right to recover the balance due or to pursue any other remedy available to Landlord.

2.4.   **Net Lease; Nonterminability**.

2.4.1.   This Lease is a complete "bond net lease," and Tenant's obligations arising or accruing during the Term of this Lease to pay all Base Rent, Additional Rent, and all other payments required to be made by Tenant shall be absolute and unconditional, and Tenant shall pay all Base Rent, Additional Rent and all other payments required to be made by Tenant under this Lease without notice (except as otherwise expressly and specifically set forth herein), demand, counterclaim, set-off, deduction, or defense and without abatement, suspension, deferment, diminution or reduction, free from any charges, assessments, impositions, expenses or deductions of any and every kind of and nature whatsoever.   All costs, expenses and obligations of every kind and nature whatsoever relating to the Premises and the appurtenances thereto and the use and occupancy thereof that may arise or become due prior to or during the Term (including Operating Expenses related to the period prior to the Term and payable during the Term) shall be paid by Tenant, and Landlord is not responsible for any costs, charges, expenses or outlays of any nature whatsoever arising during the Term from or relating to the Premises or the use or occupancy thereof; and Landlord, Landlord's mortgagee or lender and their respective employees, shareholders, officers, directors, members, managers, trustees, partners or principals, disclosed or undisclosed, and all of their respective successors and assigns (hereinafter collectively referred to as the "**Indemnitees**" and each individually as an "**Indemnitee**"), shall be indemnified and saved harmless as provided below.   The willful misconduct or negligence of Landlord and the Indemnitee parties of Landlord shall not be imputed to Landlord's mortgagee or lender and the Indemnitee parties of such mortgagee or lender.   Tenant assumes the sole responsibility during the Term for the condition, use, operation, repair, maintenance, replacement of any and all components and systems of, and the underletting and management of, the Premises.   Tenant shall and hereby does indemnify, defend and hold the Indemnitees harmless from and against any and all Losses (defined below) actually incurred by any or all of the Indemnitees with respect to, and to the extent of, matters that arise or accrue with respect to the Term of this Lease and in connection with any or all of the maintenance, repair and operation of the Premises (whether or not the same shall become payable during the Term); and the Indemnitees shall have no (a) responsibility in respect thereof and (b) liability for damage to the property of Tenant or any subtenant of Tenant on any account or for any reason whatsoever, except in the event of (and then only to the extent of) such Indemnitee's respective willful misconduct or negligence.   It is the purpose and intention of the parties to this Lease that the Base Rent due hereunder shall be absolutely net to the Landlord and Landlord shall have no obligation or responsibility, of any nature whatsoever, to perform any tenant improvements; to provide any services; or to perform any repairs, maintenance or replacements in, to, at, on or under the Premises, whether for the benefit of Tenant or any other party, and that Tenant has the authority to operate, maintain and repair the Premises as it deems appropriate, in its sole discretion, subject to the terms of the Lease.

2.4.2.   Except as otherwise expressly provided in **Sections 18 and 21** of this Lease, this Lease shall not terminate, nor shall Tenant have any right to terminate this Lease or to be released or discharged from any obligations or liabilities hereunder for any reason, including, without limitation:  (i) any damage to or destruction of the Premises; (ii) any restriction, deprivation (including eviction) or prevention of, or any interference with, any use or the occupancy of the Premises (whether due to any default in, or failure of, Landlord's title to the Premises or otherwise); (iii) any condemnation, requisition or other taking or sale of the use, occupancy or title of or to the Premises; (iv) any action, omission or breach on the part of Landlord under this Lease or any other agreement between Landlord and Tenant; (v) the inadequacy or failure of the description of the Premises to

demise and let to Tenant the property intended to be leased hereby; (vi) any sale or other disposition of the Premises by Landlord; (vii) the impossibility or illegality of performance by Landlord or Tenant or both; (viii) any action of any court, administrative agency or other governmental authority; or (ix) any other cause, whether similar or dissimilar to the foregoing, any present or future law notwithstanding. Nothing in this paragraph shall be construed as an agreement by Tenant to perform any illegal act or to violate the order of any court, administrative agency or other governmental authority.

      2.4.3.   Tenant will remain obligated under this Lease in accordance with its terms, and will not take any action to terminate (except in accordance with the provisions of **Section 18** of this Lease), rescind or avoid this Lease for any reason, notwithstanding any bankruptcy, insolvency, reorganization, liquidation, dissolution or other proceeding affecting Landlord or any assignee of Landlord, or any action with respect to this Lease that may be taken by any receiver, trustee or liquidator or by any court.  Tenant waives all rights at any time conferred by statute or otherwise to quit, terminate or surrender this Lease or the Premises, or to any abatement or deferment of any amount payable by Tenant hereunder, or for claims against any Indemnitee for any Losses suffered by Tenant on account of any cause referred to in this **Section 2.4** or otherwise (except claims directly arising out of the negligence or willful misconduct by such Indemnitee).

      2.5.   **Option to Renew**.

      2.5.1.   Tenant shall have the option ("**Renewal Option**") to renew this Lease for three (3) consecutive terms of five (5) years each (each, a "**Renewal Term**"), on all the same terms and conditions set forth in this Lease, except that initial Base Rent during any Renewal Term shall be equal to Fair Market Rent (as defined in **Section 2.5.2** below), and as of the first anniversary of the commencement of each Renewal Term and continuing on each anniversary thereof through the remainder of that Renewal Term, the Base Rent shall increase at the rate of two percent (2.0%), per annum, on a compounded basis. Tenant shall deliver written notice to Landlord of Tenant's election to exercise the Renewal Option ("**Renewal Notice**") not less than twelve (12) months, nor more than eighteen (18) months, prior to the expiration date of the original Term or the then-current Renewal Term, as applicable; and if Tenant fails to timely deliver a Renewal Notice to Landlord, then Tenant shall automatically be deemed to have irrevocably waived and relinquished the Renewal Option.

      2.5.2.   For the purposes of this Lease, "**Fair Market Rent**" shall be determined by Landlord, in good faith, based upon the annual base rental rates then being charged in the industrial market sector of the geographic area where the Building is situated for comparable space and for a lease term commencing on or about the commencement date of the applicable Renewal Term and equal in duration to the applicable Renewal Term, taking into consideration: the geographic location, quality and age of the Building; the location and configuration of the relevant space within the Building; the extent of service to be provided to the proposed tenant thereunder; applicable distinctions between "gross" and "net" leases; the creditworthiness and quality of Tenant; leasing commissions; and any other relevant term or condition in making such evaluation, all as reasonably determined by Landlord.  In no event, however (and notwithstanding any provision to the contrary in this **Section 2.5**), shall the Fair Market Rent be less than an amount equal to the Base Rent in effect during the one (1) year period immediately preceding the expiration date of the then-applicable term (the "**Renewal Rent Floor**").  Landlord shall notify Tenant of Landlord's determination of Fair Market Rent for any Renewal Term, in writing (the "**Base Rent Notice**") within sixty (60) days after receiving the applicable Renewal Notice.

2.5.3.    Tenant shall then have sixty (60) days after Landlord's delivery of the Base Rent Notice in which to advise Landlord, in writing (the "**Base Rent Response Notice**"), whether Tenant (i) is prepared to accept the Fair Market Rent established by Landlord in the Base Rent Notice and proceed to lease the Premises, during the Renewal Term, at that Fair Market Rent; or (ii) elects to withdraw and revoke its Renewal Notice, whereupon the Renewal Option shall automatically be rendered null and void; or (iii) elects to contest Landlord's determination of Fair Market Rent.  In the event that Tenant fails to timely deliver the Base Rent Response Notice, then Tenant shall automatically be deemed to have elected (i) above.  Alternatively, if Tenant timely elects (ii), then this Lease shall expire on the original expiry date of the initial Term or the then current Renewal Term, as applicable.  If, however, Tenant timely elects (iii), then the following provisions shall apply:

2.5.3.1.    The Fair Market Rent shall be determined by either the Independent Brokers or the Determining Broker, as provided and defined below, but in no event shall the Fair Market Rent be less than the Renewal Rent Floor.

2.5.3.2.    Within thirty (30) days after Tenant timely delivers its Base Rent Response Notice electing to contest Landlord's determination of Fair Market Rent, each of Landlord and Tenant shall advise the other, in writing (the "**Arbitration Notice**"), of both (i) the identity of the individual that each of Landlord and Tenant, respectively, is designating to act as Landlord's or Tenant's, as the case may be, duly authorized representative for purposes of the determination of Fair Market Rent pursuant to this **Section 2.5.3** (the "**Representatives**"); and (ii) a list of three (3) proposed licensed real estate brokers, any of which may serve as one of the Independent Brokers (collectively, the "**Broker Candidates**").  Each Broker Candidate:

(i)    shall be duly licensed in the jurisdiction in which the Premises is located; and

(ii)   shall have at least five (5) years' experience, on a full-time basis, leasing industrial space (warehouse/distribution/ancillary office) in the same general geographic area as that in which the Premises is located, and at least three (3) of those five (5) years of experience shall have been consecutive and shall have elapsed immediately preceding the date on which Tenant delivers the Renewal Notice.

2.5.3.3.    Within fourteen (14) days after each of Landlord and Tenant delivers its Arbitration Notice to the other, Landlord and Tenant shall cause their respective Representatives to conduct a meeting at a mutually convenient time and location.  At that meeting, the two (2) Representatives shall examine the list of six (6) Broker Candidates and shall each eliminate two (2) names from the list on a peremptory basis.  In order to eliminate four (4) names, first, the Tenant's Representative shall eliminate a name from the list and then the Landlord's Representative shall eliminate a name therefrom.  The two (2) Representatives shall alternate in eliminating names from the list of six (6) Broker Candidates in this manner until each of them has eliminated two (2) names.  The two (2) Representatives shall immediately contact the remaining two (2) Broker Candidates (the "**Independent Brokers**"), and engage them, on behalf of Landlord and Tenant, to determine the Fair Market Rent in accordance with the provisions of this **Section 2.5.3**.

2.5.3.4.    The Independent Brokers shall determine the Fair Market Rent within thirty (30) days of their appointment. Within ten (10) days after appointment of the Independent Brokers, Landlord and Tenant shall each make a written submission to the Independent Brokers advising of the rate that the submitting party believes should be the Fair Market Rate, together with whatever written evidence or supporting data that the submitting party desires in order to justify its desired rate of Fair Market Rent; provided, in all events, however, that the aggregate maximum length of each party's submission shall not exceed ten (10) pages (each such submission package, a "**FMR Submission**"). The Independent Brokers shall be obligated to choose one (1) of the parties' specific proposed rates of Fair Market Rent, without being permitted to effectuate any compromise position.

2.5.3.5.    In the event, however, that the Independent Brokers fail to reach agreement, within twenty (20) days after the date on which both Landlord and Tenant deliver the FMR Submissions to the Independent Brokers (the "**Decision Period**"), as to which of the two (2) proposed rates of Fair Market Rent should be selected, then, within five (5) days after the expiration of the Decision Period, the Independent Brokers shall jointly select a real estate broker who (x) meets all of the qualifications of a Broker Candidate, but was not included in the original list of six (6) Broker Candidates; and (y) is not affiliated with any or all of (A) either or both of the Independent Brokers and (B) the real estate brokerage companies with which either or both of the Independent Brokers is affiliated (the "**Determining Broker**"). The Independent Brokers shall engage the Determining Broker on behalf of Landlord and Tenant (but without expense to the Independent Brokers), and shall deliver the FMR Submissions to the Determining Broker within five (5) days after the date on which the Independent Brokers select the Determining Broker pursuant to the preceding sentence (the "**Submission Period**").

2.5.3.6.    The Determining Broker shall make a determination of the Fair Market Rent within twenty (20) days after the date on which the Submission Period expires. The Determining Broker shall be required to select one of the parties' specific proposed rates of Fair Market Rent, without being permitted to effectuate any compromise position.

2.5.3.7.    The decision of the Independent Brokers or the Determining Broker, as the case may be, shall be conclusive and binding on Landlord and Tenant, and neither party shall have any right to contest or appeal such decision, except in case of fraud.

2.5.3.8.    In the event that the initial Term or the then current Renewal Term, as applicable, expires and the subject Renewal Term commences prior to the date on which the Independent Brokers or the Determining Broker, as the case may be, renders their/its decision as to the Fair Market Rent, then from the commencement date of the subject Renewal Term through the date on which the Fair Market Rent is determined under this **Section 2.5.3** (the "**Determination Date**"), Tenant shall pay monthly Base Rent to Landlord at a rate equal to 102% of the most recent rate of monthly Base Rent in effect on the expiration date of the initial Term or the immediately preceding Renewal Term, as applicable (the "**Temporary Base Rent**"). Within ten (10) business days after the Determination Date, Landlord shall pay to Tenant, or Tenant shall pay to Landlord, depending on whether the Fair Market Rent is less than or greater than the Temporary Base Rent, whatever sum that Landlord or Tenant, as the case may be, owes the other (the "**Catch-Up Payment**"), based on the Temporary Base Rent actually paid and the Fair Market Rent due (as determined by the Independent Brokers or the Determining Broker, as the case may be) during that

portion of the Renewal Term that elapses before the Catch-Up Payment is paid, in full (together with interest thereon, as provided below). The Catch-Up Payment shall bear interest at the rate of Prime (defined below), plus two percent (2.0%) per annum, from the date each monthly component of the Catch-Up Payment would have been due, had the Fair Market Rent been determined prior to the commencement of the Renewal Term, through the date on which the Catch-Up Payment is paid, in full (inclusive of interest thereon). For purposes hereof, **"Prime"** shall mean the per annum rate of interest publicly announced by JPMorgan Chase Bank NA (or its successor), from time to time, as its **"prime"** or **"base"** or **"reference"** rate of interest.

2.5.3.9.   The party whose proposed rate of Fair Market Rent is not selected by the Independent Brokers or the Determining Broker, as the case may be, shall bear all costs of all counsel, experts or other representatives that are retained by both parties, together with all other costs of the arbitration proceeding described in this **Section 2.5.3**, including, without limitation, the fees, costs and expenses imposed or incurred by any or all of the Independent Brokers and the Determining Broker.

2.5.3.10.   Unless otherwise expressly agreed in writing, during the period of time that any arbitration proceeding is pending under this **Section 2.5.3**, Landlord and Tenant shall continue to comply with all those terms and provisions of this Lease that are not the subject of their dispute and arbitration proceeding under this **Section 2.5.3**, most specifically including, but not limited to, Tenant's monetary obligations under this Lease; and, with respect to the payment of Base Rent during that portion of the Renewal Term that elapses during the pendency of any arbitration proceeding under this **Section 2.5.3**, the provisions of **Section 2.5.3.8** shall apply.

2.5.4.   The Renewal Option is granted subject to all of the following conditions:

2.5.4.1.   As of the date on which Tenant delivers any Renewal Notice and continuing through the commencement date of the applicable Renewal Term, there shall not exist any uncured Default by Tenant under this Lease.

2.5.4.2.   There shall be no further right of renewal after the expiration of the third Renewal Term.

2.5.4.3.   The Renewal Option is personal to Tenant and may only be exercised by Tenant or any assignee of Tenant (provided such assignment was made with Landlord's prior written consent and otherwise in accordance with the requirements of **Section 8** or made without Landlord's consent but in accordance with **Section 8**).

2.5.4.4.   The Premises shall be delivered to Tenant during the Renewal Term(s) on an "as-is" "where-is" basis, with no obligation on the part of Landlord to perform any tenant improvements to the Premises.

2.6.   **Guaranty**.   Simultaneously with the execution and delivery of this Lease, Guarantor has executed and entered into the Guaranty Agreement in the form attached hereto as **Exhibit E** (the **"Guaranty"**), for the benefit of Landlord pursuant to which Guarantor has absolutely and unconditionally guaranteed the payment and performance of Tenant's obligations hereunder.

3.    **OPERATING EXPENSES.**

3.1.    **Definitional Terms Relating to Additional Rent.**  For purposes of this Section and other relevant provisions of the Lease:

3.1.1.    **Operating Expenses.**  The term **"Operating Expenses"** shall mean all costs, expenses and charges of every kind or nature relating to, or incurred in connection with, the maintenance and operation of the Premises, including, but not limited to the following: (i) Taxes, as hereinafter defined in **Section 3.1.2**; (ii) dues, fees or other costs and expenses, of any nature, due and payable to any association or comparable entity to which Landlord, as owner of the Premises, is a member or otherwise belongs and that governs or controls any aspect of the operation of the Premises; (iii) any so called "rent" or "revenue" taxes imposed on the Rent payable hereunder; and (iv) any real estate taxes and common area maintenance expenses due and payable under any declaration of covenants, conditions and restrictions, reciprocal easement agreement or comparable arrangement that encumbers and benefits the Premises and other real property (e.g. a business park).   Under no circumstances, however, shall Operating Expenses include: (i) depreciation or amortization on the Premises or any fixtures or equipment installed therein, (ii) federal, state, or local income, margin, franchise, gift, transfer, excise, capital stock, estate, succession, or inheritance taxes, (iii) interest on debt or amortization payments on mortgages or deeds of trust or any other debt for borrowed money and costs or any expenses incurred by Landlord in connection with such debt and liens, (iv) costs incurred because Landlord violated any governmental rule or authority or as a result of Landlord's negligence or willful misconduct; (v) costs or expenses of a partnership, or other entity, which constitutes Landlord, which costs or expenses are not directly related to the Premises (such as accounting fees, tax returns, and income taxes of such entity), (vi) any sums that Landlord is required to pay Tenant pursuant to any other written agreement between Landlord and Tenant, (vii) sums reimbursed to Landlord by a third party, (viii) remediation of Hazardous Materials if such remediation is necessitated by Landlord's acts or neglect; (ix) expenses for services provided by Landlord to the extent such expenses exceed those that would be charged by an unrelated third party charging competitive market rates, and (x) expenses incurred by Landlord that are not directly related to the Premises or its operations including, without limitation, compensation paid to employees of Landlord; however, Operating Expenses shall include those expenses, if any, incurred by Landlord in order to perform or provide any services required of Landlord under this Lease or to provide any services specifically requested by Tenant (including a portion of the compensation paid to employees performing or providing such services, pro-rated to reflect the extent of the employee's time spent performing or providing such services), subject to the limitation set forth in clause (ix) above.

3.1.2.    **Taxes.**

3.1.2.1.    The term **"Taxes"** shall mean (i) all governmental taxes, assessments, fees and charges of every kind or nature (other than Landlord's federal, state, or local income, margin, franchise, gift, transfer, excise, capital stock, estate, succession, or inheritance taxes), whether general, special, ordinary or extraordinary, due at any time or from time to time, during the Term and any extensions thereof, in connection with the ownership, leasing, or operation of the Premises, or of the personal property and equipment located therein or used in connection therewith; and (ii) any reasonable expenses incurred by Landlord in contesting such taxes or assessments and/or the assessed value of the Premises, if Landlord participates in a tax contest at Tenant's request.  For purposes hereof, Tenant shall be responsible for any Taxes that are due and

payable at any time or from time to time during the Term (including, but not limited to, those Taxes that accrued prior to the Commencement Date), and for its pro rata share of any Taxes that are assessed, become a lien, or accrue during any Operating Year but are not payable until after the Expiration Date, which obligation shall survive the termination or expiration of this Lease. Without in any way limiting Tenant's obligation to pay any and all Taxes, Tenant hereby acknowledges that Tenant shall be solely responsible for any increase in Taxes which is the result of the loss of any tax abatement owed to, or expected by, Tenant pursuant to any tax abatement agreement to which Tenant is a party. To the extent that any retroactive tax liability arises pursuant to any tax abatement agreement to which Tenant is a party, Tenant shall be and remain liable for such retroactive liability, regardless of whether said liability relates to a period of time or accrued prior to, or following, the Commencement Date. Notwithstanding the foregoing or anything to the contrary herein, Tenant shall be entitled to the benefits of all existing and future reduction or abatement of Taxes to the extent such reductions and abatements are granted by the applicable taxing authority and relate to the Term.

    3.1.2.2.    Tenant shall have the right to contest the amount or validity, in whole or in part, of any Tax or to seek a reduction in the valuation of the Premises as assessed for real estate property tax purposes by appropriate proceedings diligently conducted in good faith (but only after the deposit or payment, whether under protest or otherwise, of any amounts required by applicable law to stay or prevent collection activities). No additional deposit shall be payable to Landlord in connection with any contest. If Tenant elects to initiate any proceeding referred to in this **Section 3.1.2.2**, Tenant shall promptly so advise Landlord, but Landlord shall not be required to join such proceeding, except to the extent required by law, in which event Landlord shall, upon written request by Tenant, join in such proceedings or permit the same to be brought in its name, all at Tenant's sole expense. Landlord agrees to provide, at Tenant's expense, whatever assistance Tenant may reasonably require in connection with any such contest initiated by Tenant. Tenant covenants that Landlord shall not suffer or sustain any costs or expenses (including attorneys' fees) or any liability in connection with any such proceeding initiated by Tenant. No such contest initiated by Tenant shall subject Landlord to any civil liability or the risk of any criminal liability or forfeiture.

    3.1.3.    **Operating Year**. The term **"Operating Year"** shall mean the calendar year commencing January 1st of each year during the Term. The first Operating Year under this Lease shall begin on January 1, 2007 and end on December 31, 2007.

    3.2.    **Payment of Operating Expenses**. Tenant shall directly pay, on a timely basis and to the appropriate entity, all Operating Expenses and Taxes.

## 4.    USE OF PREMISES AND COMMON AREAS.

    4.1.    **Use of Premises**. The Premises shall be used by the Tenant for the purpose(s) set forth in Section 1.7 above and for no other purpose whatsoever. Tenant shall not, at any time, use or occupy, or suffer or permit anyone to use or occupy, the Premises, or do or permit anything to be done in the Premises, in any manner that may (a) violate any Certificate of Occupancy for the Premises; (b) cause, or be likely to cause, injury to, or in any way impair the value or proper utilization of, all or any portion of the Premises (including, but not limited to, the structural elements of the Premises); (c) constitute a violation of the laws and requirements of any public authority or the requirements of insurance bodies, or any covenant, condition or restriction affecting the Premises; (d) exceed the load bearing capacity of the floor of the Premises; (e) materially impair the appearance of

the Premises; or (f) have any detrimental environmental effect on the Premises which (i) arises out of a violation or violations of Environmental Laws or (ii) results in any material increased risk of liability to Landlord. On or prior to the date hereof, Tenant has completed and delivered for the benefit of Landlord a "Tenant Operations Inquiry Form" in the form attached hereto as **Exhibit B** describing the nature of Tenant's proposed business operations at the Premises, which form is intended to, and shall be, relied upon by Landlord. From time to time during the Term (but no more often than once in any twelve month period unless Tenant is in default hereunder beyond applicable notice and cure periods or unless Tenant assigns this Lease or subleases all or any portion of the Premises, whether or not in accordance with **Section 8**), Tenant shall provide an updated and current Tenant Operations Inquiry Form within twenty (20) days after Landlord's request therefor.

4.2.    **Signage**. Any and all signage must at all times fully comply with all applicable laws, regulations and ordinances. Tenant shall remove all signs of Tenant upon the expiration or earlier termination of this Lease and immediately repair any damage to the Premises caused by, or resulting from, such removal.

4.3.    **Liens**. During the Term, Tenant will promptly, but no later than forty-five (45) days after the date Tenant first has knowledge of the filing thereof, or such shorter period as shall prevent the forfeiture of the Premises, remove and discharge of record, by bond or otherwise, any charge, lien, security interest or encumbrance upon any of the Premises, Base Rent and Additional Rent which charge, lien, security interest or encumbrance arises for any reason (other than a result of Landlord's act), including, but not limited to, all liens that arise out of the possession, use, occupancy, construction, repair or rebuilding of the Premises or by reason of labor or materials furnished, or claimed to have been furnished, to Tenant for the Premises, but not including any encumbrances expressly permitted under this Lease or any mechanics liens created by Landlord. Nothing contained in this Lease shall be construed as constituting the consent or request of Landlord, express or implied, by inference or otherwise, to or for the performance of any contractor, laborer, materialman, or vendor of any labor or services or for the furnishing of any materials for any construction, alteration, addition, repair or demolition of or to the Premises or any part thereof. Notice is hereby given that, during the Term, Landlord will not be liable for any labor, services or materials furnished or to be furnished to Tenant, or to anyone holding an interest in the Premises or any part thereof through or under Tenant, and that no mechanics or other liens for any such labor, services or materials shall attach to or affect the interest of Landlord in and to the Premises, unless such labor, services or materials were placed in the Premises pursuant to a written agreement entered into by Landlord. In the event of the failure of Tenant to discharge any charge, lien, security interest or encumbrances as aforesaid, Landlord may, if not discharged by Tenant within ten (10) business days after written notice to Tenant, discharge such items by payment or bond or both, and **Section 23.4** hereof shall apply. Provided Tenant is diligently contesting any such lien or encumbrance in accordance with applicable law, in lieu of a bond Tenant shall have the option to deposit cash (or an irrevocable, standby letter of credit in form reasonably acceptable to Landlord) with Landlord in an amount sufficient to fully discharge such lien or encumbrance (as reasonably determined by Landlord, the "**Lien Deposit**"), which Lien Deposit may be used by Landlord to discharge, settle or otherwise satisfy the applicable lien or encumbrance at any time after the commencement of foreclosure proceedings or before forfeiture of the Premises or any portion thereof.

5.    **CONDITION AND DELIVERY OF PREMISES**. Tenant agrees that Tenant (or an affiliate thereof) is the former owner of the Premises; as a result, Tenant is familiar with the condition

of the Premises, and Tenant hereby accepts the foregoing on an "AS-IS," "WHERE-IS" basis. Tenant acknowledges that neither Landlord nor Agent, nor any representative of Landlord, has made any representation as to the condition of the foregoing or the suitability of the foregoing for Tenant's intended use. Tenant represents and warrants that Tenant has made its own inspection of the foregoing. Neither Landlord nor Agent shall be obligated to make any repairs, replacements or improvements (whether structural or otherwise) of any kind or nature to the foregoing in connection with, or in consideration of, this Lease.

6.  **SUBORDINATION; ESTOPPEL CERTIFICATES; ATTORNMENT**.

6.1.  **Subordination and Attornment**.  This Lease is and shall be subject and subordinate at all times to (a) all ground leases or underlying leases that may now exist or hereafter be executed affecting the Premises and (b) any mortgage or deed of trust that may now exist or hereafter be placed upon, and encumber, any or all of (x) the Premises; (y) any ground leases or underlying leases for the benefit of the Premises; and (z) all or any portion of Landlord's interest or estate in any of said items; provided, however, that the foregoing provision shall only be applicable with respect to those mortgages, deeds of trust, and leases as to which Tenant has been provided a reasonable, normal and customary Subordination, Non Disturbance and Attornment Agreement (the "SNDA"). No SNDA shall impose any economic obligations on Tenant in addition to those economic obligations imposed under this Lease, nor may any SNDA require any change in, or modification of, this Lease that shall impose any obligation or responsibility on Tenant. Tenant shall join with any such lessor, mortgagee or trustee and execute promptly (and, in any event, within ten (10) business days after receipt of a written request therefor) an SNDA.

6.2.  **Estoppel Certificate**.  Tenant agrees, from time to time and within 10 business days after request by the Landlord, to deliver to the Landlord, or the Landlord's designee, an estoppel certificate in reasonable, normal and customary form, as requested by Landlord, with such modifications as may be necessary to make such certificate factually accurate. Failure by Tenant to timely execute and deliver such certificate shall automatically constitute an acceptance of the Premises and acknowledgment by Tenant that the statements included therein are true and correct without exception.

6.3.  **Transfer by Landlord**.  In the event of a sale or conveyance by Landlord of the Premises, the same shall operate to release Landlord from any future liability for any of the covenants or conditions, express or implied, herein contained in favor of Tenant, and in such event Tenant agrees to look solely to Landlord's successor in interest ("**Successor Landlord**") with respect thereto and agrees to attorn to such successor.

7.  **QUIET ENJOYMENT; COVENANTS OF LANDLORD**.  Subject to the provisions of this Lease, so long as Tenant pays all of the Rent and performs all of its other obligations hereunder, subject to applicable notice and cure periods and the other provisions hereof, Tenant shall not be disturbed in its possession of the Premises by Landlord, Agent, Successor Landlord or any other person lawfully claiming through or under Landlord. Landlord hereby covenants and agrees not to subdivide the Premises, construct additional improvements thereon, or add on to the Building without the prior written consent of Tenant, which may be granted or withheld in Tenant's sole discretion.

8. **ASSIGNMENT AND SUBLETTING; LEASEHOLD MORTGAGE.**

**8.1.    Prohibition.** Tenant acknowledges that this Lease and the Rent due under this Lease have been agreed to by Landlord in reliance upon Tenant's reputation and creditworthiness and upon the continued operation of the Premises by Tenant for the particular use set forth in **Section 1.7** above; therefore, Tenant shall not, whether voluntarily, or by operation of law, or otherwise: (a) assign or otherwise transfer this Lease; (b) sublet the Premises or any part thereof, other than subleases to any party controlling, controlled by or under common control with Tenant, or allow the same to be used or occupied by anyone other than Tenant (or any other party controlling, controlled by or under common control with Tenant); or (c) mortgage, pledge, encumber, or otherwise hypothecate this Lease or the Premises, or any part thereof, in any manner whatsoever, without in each instance obtaining the prior written consent of Landlord, which consent as to assignments and subleases shall not be unreasonably withheld, conditioned or delayed, and as to mortgages and other matters described in clause (c) above may be given or withheld in Landlord's sole, but reasonable, discretion. Any purported assignment, mortgage, transfer, pledge or sublease made without the prior written consent of Landlord shall be absolutely null and void. No assignment of this Lease shall be effective and valid unless and until the assignee executes and delivers to Landlord any and all documentation reasonably required by Landlord in order to evidence assignee's assumption of all obligations of Tenant hereunder. Any consent by Landlord to a particular assignment, sublease or mortgage shall not constitute consent or approval of any subsequent assignment, sublease or mortgage, and Landlord's written approval shall be required in all such instances. No consent by Landlord to any assignment or sublease shall be deemed to release Tenant from its obligations hereunder and Tenant shall remain fully liable for performance of all obligations under this Lease.

**8.2.    Rights of Landlord.** If this Lease is assigned, or if the Premises (or any part thereof) are sublet or used or occupied by anyone other than Tenant, whether or not in violation of this Lease, Landlord or Agent may (without prejudice to, or waiver of its rights), after default by Tenant under this Lease which continues beyond applicable notice and cure periods, collect Rent from the assignee or, from the subtenant or occupant, and all amounts so collected shall be credited to any amounts due from Tenant hereunder.

**8.3.    Permitted Transfers.** Notwithstanding anything in this **Section 8** to the contrary, Tenant shall have the right, without Landlord's consent and without causing a default of Tenant under this Lease, to assign this Lease to any parent entity or wholly-owned or substantially wholly-owned direct or indirect subsidiary entity of Tenant or Guarantor, in each of which events Tenant shall give prompt written notice of such fact to Landlord and, further, Tenant shall remain fully liable for performance of all obligations and liabilities under this Lease and the assignee shall be automatically deemed to have assumed all of Tenant's obligations and liabilities under this Lease for the benefit of Landlord. Tenant may also assign this Lease, without Landlord's consent and without causing a default hereunder to any entity acquiring a majority of the voting stock of Tenant, or to any other change in voting control of Tenant (if Tenant is a corporation), or to a transfer of a majority (i.e., greater than 50% interest) of the general partnership or membership interests in Tenant (if Tenant is a partnership or a limited liability company) or managerial control of Tenant, or to any comparable transaction involving any other form of business entity, whether effectuated in one (1) or more transactions; or to any entity in connection with the sale of substantially all the Tenant's assets (where such sale of assets is for a bona fide business purpose and not primarily to transfer Tenant's interest in this Lease), and, in the case of a sale of all or substantially all of Tenant assets only, Tenant shall no

longer be liable for the obligations under this Lease arising from and after the date of transfer (such assigning Tenant remaining liable for all obligations arising prior to the date of transfer), provided, in any of such events, the successor to Tenant (or any party remaining liable for the obligations of Tenant hereunder): (i) has a net worth at least equal to the net worth of Tenant as of the Commencement Date, or (ii) if (i) above is not satisfied, such successor is capable of satisfying Tenant's obligations hereunder, in Landlord's reasonable judgment. Any such permitted transferee shall execute and deliver to Landlord any and all documentation reasonably required by Landlord in order to evidence assignee's assumption of all obligations of Tenant hereunder. Notwithstanding anything to the contrary contained in this Section 8.3, in no event may Tenant assign, mortgage, transfer, pledge or sublease this Lease to any entity whatsoever if, at the time of such assignment, mortgage, transfer, pledge or sublease, Tenant is in default under this Lease beyond applicable notice and cure periods, without the prior written consent of Landlord, which may be granted or withheld in Landlord's sole discretion for as long as such default remains uncured.

## 9.    COMPLIANCE WITH LAWS.

9.1.    **Compliance with Laws.** During the Term, Tenant shall, at its sole expense (regardless of the cost thereof), comply with all local, state and federal laws, rules, regulations and requirements now or hereafter in force, and all judicial and administrative decisions in connection with the enforcement thereof pertaining to either or both of the Premises and Tenant's use and occupancy thereof (collectively, "Laws"), whether such Laws (a) concern or address matters of an environmental nature; (b) require the making of any structural, unforeseen or extraordinary changes; and (c) involve a change of policy on the part of the body enacting the same, including, in all instances described in (a) through (c), but not limited to, the Americans With Disabilities Act of 1990 (42 U.S.C. Section 12101 et seq.). If any license or permit is required for the conduct of Tenant's business in the Premises, Tenant, at its expense, shall procure such license prior to the Commencement Date, and shall maintain such license or permit in good standing throughout the Term. Tenant shall give prompt notice to Landlord of any written notice it receives of the alleged violation of any Law or requirement of any governmental or administrative authority with respect to either or both of the Premises and the use or occupation thereof.

9.2.    **Hazardous Materials.** If, at any time or from time to time prior to or during the Term (or any extension thereof), any Hazardous Material (defined below) is (or was, as the case may be) generated, transported, stored, used, treated or disposed of at, to, from, on or in the Premises: (i) Tenant shall, at its own cost, at all times comply (and cause Tenant's Parties to comply) with all Laws relating to Hazardous Materials, and Tenant shall further, at its own cost, obtain and maintain in full force and effect at all times all permits and other approvals required in connection therewith; (ii) Tenant shall promptly provide Landlord or Agent with complete copies of all communications, permits or agreements with, from or issued by any governmental authority or agency (federal, state or local) or any private entity relating in any way to the past or current (from time to time throughout the Term) presence, release, threat of release, or placement of Hazardous Materials on or in the Premises or any portion of the Premises, or the generation, transportation, storage, use, treatment, or disposal at, on, in or from the Premises, of any Hazardous Materials; (iii) Landlord, Agent and their respective agents and employees shall have the right to either or both (x) enter the Premises (with such notice as may be required under **Section 16**, except in the event of an emergency presenting an imminent threat of bodily injury, death, or destruction of property) and (y) conduct appropriate tests for the purposes of ascertaining Tenant's compliance with all applicable Laws or permits relating in any way to the

generation, transport, storage, use, treatment, disposal or presence of Hazardous Materials on, at, in or from all or any portion of the Premises; and (iv) upon written request by Landlord or Agent if Landlord or Agent has reasonable reason to believe that Tenant is in violation of this **Section 9.2**, Tenant shall provide Landlord with the results of reasonably appropriate tests of air, water or soil to demonstrate that Tenant complies with all applicable Laws or permits relating in any way to the generation, transport, storage, use, treatment, disposal or presence of Hazardous Materials on, at, in or from all or any portion of the Premises. This **Section 9.2** does not authorize the generation, transportation, storage, use, treatment or disposal of any Hazardous Materials at, to, from, on or in the Premises in contravention of this **Section 9**. Nothing herein is intended to or shall be deemed to prohibit Tenant from using Hazardous Materials on the Premises in quantities reasonably necessary for Tenant to conduct its business therein in compliance with Laws. Tenant covenants to investigate, clean up and otherwise remediate, at Tenant's sole expense, any release of Hazardous Materials occurring in, at, on and under the Premises during the Term, as well as any release of Hazardous Materials that occurred in, at, on and under the Premises prior to the Term, but which release is identified, cited, or determined to exist at any time during the Term, unless caused by Landlord or a third party who has been determined to be responsible for such contamination by agreement or governing authority. Such investigation and remediation shall be performed only after Tenant has obtained Landlord's prior written consent, which consent shall not be unreasonably withheld. All remediation shall be performed in material compliance with Laws and to the reasonable satisfaction of Landlord (provided Landlord shall not require any remediation that is not required by applicable Laws). Tenant shall not enter into any settlement agreement, consent decree or other compromise with respect to any claims relating to any Hazardous Materials in any way connected to the Premises without first obtaining Landlord's written consent (which consent shall not be unreasonably withheld) and affording Landlord the reasonable opportunity to participate in any such proceedings. As used herein, the term, "**Hazardous Materials**," shall mean any waste, material or substance (whether in the form of liquids, solids or gases, and whether or not airborne) that is or may be deemed to be or include a pesticide, petroleum, asbestos, polychlorinated biphenyl, radioactive material, urea formaldehyde or any other pollutant or contaminant that is or may hereafter be deemed to be hazardous, toxic, ignitable, reactive, corrosive, dangerous, harmful or injurious, or that presents a risk to public health or to the environment and that is or becomes regulated by any Law. The undertakings, covenants and obligations imposed on Tenant under this **Section 9.2** shall survive the termination or expiration of this Lease for events arising during the Term.

10.    **INSURANCE.**

     10.1.    **Policies.**   Tenant shall purchase, at its own expense, and keep in force at all times during this Lease the policies of insurance set forth below (collectively, "**Tenant's Policies**"). All Tenant's Policies shall (a) be issued by an insurance company with a Best rating of A or better and otherwise reasonably acceptable to Landlord and shall be licensed to do business in the state in which the Premises is located; (b) provide that said insurance shall not be canceled or materially modified unless 30 days' prior written notice shall have been given to Landlord; (c) provide for deductible amounts that are reasonably acceptable to Landlord (and its lender, if applicable); and (d) otherwise be in such form, and include such coverages, as Landlord may reasonably require provided the same are normally and customarily required by prudent owners of industrial property or their lenders. The Tenant's Policies described in Sections 10.2(i) and 10.2(ii) below shall (1) provide coverage on an occurrence basis; (2) except as otherwise specifically provided below, name Landlord and First Industrial, L.P. (and Landlord's lender, if applicable) as additional insureds; (3) provide coverage, to

the extent insurable, for the indemnity obligations of Tenant under this Lease; (4) contain a separation of insured parties provision (under Tenant's commercial general or excess liability policy, but not under Tenant's commercial property insurance policy); (5) be primary, not contributing with, and not in excess of, coverage that Landlord may carry; and (6) provide coverage with no exclusion for a pollution incident arising from a hostile fire.  All Tenant's Policies (or, at Landlord's option, Certificates of Insurance and applicable endorsements, including, without limitation, an "Additional Insured-Managers or Landlords of Premises" endorsement) shall be delivered to Landlord prior to the Commencement Date and renewals thereof shall be delivered to Landlord's Corporate and Regional Notice Addresses at least 30 days prior to the applicable expiration date of each Tenant's Policy.  In the event that Tenant fails, at any time or from time to time, to comply with the requirements of the preceding sentence, Landlord may (i) order such insurance and charge the cost thereof to Tenant, which amount shall be payable by Tenant to Landlord upon demand, as Additional Rent or (ii) impose on Tenant, as Additional Rent, a monthly delinquency fee, for each month during which Tenant fails to comply with the foregoing obligation, in an amount equal to three percent (3%) of the Base Rent then in effect.  Tenant shall give prompt notice to Landlord and Agent of any bodily injury, death, personal injury, advertising injury or property damage occurring in and about the Premises.

10.2.    **Coverages**.    Tenant shall purchase and maintain throughout the Term, a Tenant's Policy(ies) of:

(i)    commercial property insurance covering the improvements constructed, installed or located on the Premises (but excluding Tenant's personal property).  Such property insurance policy:  (A) shall name Landlord (and its lender(s), if applicable) as mortgagee/loss payee, as its (their respective) interest(s) may appear; (B) shall, at a minimum, cover both (x) the Building and (y) all other improvements, of any nature, situated on the Premises at any time, or from time to time during the Term, including, but not limited to, parking areas and landscaping (collectively, the "**Insured Improvements**"), against direct physical loss, as would be insured against under a standard ISO Special Form ("all risk" coverage); (C) shall be for no less than 100% of the full replacement cost value of the Building and the Insured Improvements, with an "agreed amount" endorsement; (D) shall include, at a minimum, the following extensions of coverage; building ordinance, inclusive of demolition and increased cost of construction; terrorism; earthquake/earth movement; wind; flood; and boiler and machinery/equipment breakdown; (E) shall include rental interruption insurance for twelve (12) months of rent and operating expense reimbursement for that same twelve (12) month period; and (F) shall provide for a per occurrence deductible that is no greater than $100,000.00.  The policy limits and sublimits shall be acceptable to Landlord, in its reasonable discretion.  For purposes of this **Section 10.2**, "full replacement cost value" shall be interpreted to mean the cost of replacing the Premises without deduction for depreciation or wear and tear, less the cost of footings, foundations and other structures below grade, which value shall be memorialized in a letter agreement (including an ACORD Certificate evidencing such required insurance), to be executed by Landlord and Tenant not later than thirty (30) days

after the Commencement Date, and which value shall be trended-forward on each anniversary of the Commencement Date using the trending criteria generally applied by Factory Mutual or other recognized insurance consultants;

(ii)   commercial general or excess liability insurance, including personal injury and property damage, in the amount of not less than $2,000,000.00 per occurrence, and $5,000,000.00 annual general aggregate;

(iii)   comprehensive automobile liability insurance covering Tenant against any personal injuries or deaths of persons and property damage based upon or arising out of the ownership, use, occupancy or maintenance of a motor vehicle at the Premises and all areas appurtenant thereto in the amount of not less than $1,000,000, combined single limit;

(iv)   commercial property insurance covering Tenant's personal property in amounts reasonably determined by Tenant;

(v)   workers' compensation insurance per the applicable state statutes covering all employees of Tenant (it being agreed that Tenant shall have the right to self-insure its obligations under this item (v));

(vi)   if Tenant handles, stores or utilizes Hazardous Materials in its business operations, pollution legal liability insurance; and

(vii)   during any period of construction or during which any Alterations costing in excess of $150,000.00 are being made, builder's risk coverage in an amount sufficient for such Alterations or other work or improvements performed on the Premises by Tenant; provided, however, that in the event that such builder's risk coverage is required, such coverage may be provided through the so-called "course of construction" coverage provided in the property insurance policy described in **Section 10.2(i)** above, and Tenant shall cause such "course of construction" coverage to provide coverage in an amount equal to or greater than $3,000,000.00.

Notwithstanding anything to the contrary contained in this **Section 10**, upon the occurrence of a Default, Landlord shall have the right to, upon written notice to Tenant, purchase the aforementioned Tenant's Policies on Tenant's behalf and charge the cost thereof to Tenant, which amounts shall be payable by Tenant to Landlord, upon demand as Additional Rent.

**10.3.   Blanket Policies**. Notwithstanding anything to the contrary contained in this **Section 10**, Tenant's obligation to carry insurance may be satisfied by coverage under a so-called "blanket policy" or policies of insurance; provided, however, that all insurance certificates provided by Tenant to Landlord pursuant to **Section** 10.1 above shall reflect that Tenant has been afforded coverage specifically with respect to the Premises. At Tenant's option but no more than once per calendar year, Tenant may request that Landlord carry, for the benefit of Tenant, the casualty insurance required by

this Section 10 at Tenant's expense for the following calendar year provided such request is made not later than October 1 of the preceding calendar year. If Tenant makes such request, Landlord shall promptly increase its coverage accordingly, and Tenant shall pay the premiums attributable to the coverage required hereby within thirty (30) days after demand therefor.

11.   **ALTERATIONS**.

11.1.   **Non-Structural Alterations**. Tenant may, from time to time at its sole expense, make alterations or improvements in and to the Premises (hereinafter collectively referred to as "**Alterations**") provided that:

(i)   such Alterations are non-structural and, if the cost of such Alterations (whether on a single occurrence basis, or a series of two or more related occurrences or items occurring within a six (6) month period) exceeds $150,000.00, Tenant delivers prior written notice thereof to Landlord (except that notice of de minimus Alterations (costing less than $50,000.00) will not be required); and

(ii)   Tenant, in every instance, complies with the terms and conditions of **Section 11.3** below.

11.2.   **Consent to Alterations**. Landlord's consent to Alterations, when required, shall not be unreasonably withheld, conditioned or delayed, provided that: (a) the structural integrity of the Premises shall not be adversely affected; (b) the proper functioning of the mechanical, electrical, heating, ventilating, air-conditioning ("**HVAC**"), sanitary and other service systems of the Premises shall not be adversely affected and the usage of such systems by Tenant shall not be materially increased; (c) Tenant shall have appropriate insurance coverage, reasonably satisfactory to Landlord, regarding the performance and installation of the Alterations; and (d) Tenant shall have provided Landlord with reasonably detailed plans for such Alterations in advance of requesting Landlord's consent. Additionally, but subject to (a) through (d) above, Landlord shall not unreasonably withhold its consent to any Alterations: (i) reasonably required in order to accommodate a sublease or an assignment of this Lease (provided such assignment or sublease is executed in compliance with **Section 8**); or (ii) reasonably required in order to accommodate Tenant's business operations at the Premises. In each and every instance involving Alterations, the performance of the Alterations in question shall not have a material, adverse effect on the value of the Premises.

11.3.   **Other Requirements**. Before proceeding with any Alterations, Tenant shall (i) at Tenant's expense, obtain all necessary governmental permits and certificates for the commencement and prosecution of Alterations; (ii) if Landlord's consent is required for the planned Alteration, submit to Landlord, for its written approval, working drawings, preliminary plans and specifications and all permits for the work to be done and Tenant shall not proceed with such Alterations until it has received Landlord's approval (if required), which must be delivered or specifically denied within ten (10) business days after request therefor, or will be deemed granted if Landlord's consent is not expressly denied within five (5) business days after an additional written request from Tenant; and (iii) cause those contractors, materialmen and suppliers engaged to perform the Alterations to deliver to Landlord certificates of insurance (in a form reasonably acceptable to Landlord) evidencing policies of builders risk (but only if the cost of such Alterations exceeds $150,000), commercial general liability insurance

(providing the same coverages as required in **Section 10** above) and workers' compensation insurance. Such insurance policies shall satisfy the obligations imposed under **Section 10**. Tenant shall cause the Alterations to be performed in compliance with all applicable permits, Laws and requirements of public authorities. Tenant shall cause the Alterations to be diligently performed in a good and workmanlike manner, using new materials and equipment at least equal in quality and class to those existing as of the date of this Agreement. Upon the substantial completion of any Alterations, Tenant shall provide Landlord with "as built" plans, copies of all construction contracts, governmental permits and certificates and proof of payment for all labor and materials, including, without limitation, copies of paid invoices and final lien waivers, subject to Tenant's right to contest any liens as provided above. Landlord shall have the right to require that Tenant remove from the Premises, at the expiration or termination of this Lease, and at Tenant's sole cost and expense, any Alterations for which Landlord's consent is required under this **Section 11**, provided that Landlord advises Tenant, in writing, of this requirement at the time that Landlord consents to the applicable Alteration. The parties do not intend that the making of Alterations shall: (A) constitute income to Landlord; or (B) result in a deferral or denial of some or all of the federal, state or municipal income tax deductions that Landlord would otherwise be permitted to report with respect to the Premises or this Lease; or (C) cause this Lease not to be a true lease for federal income tax purposes.

12.    **LANDLORD'S AND TENANT'S PREMISES**. All trade fixtures, machinery and equipment (collectively, the "**Tenant's Property**") attached to, or built into, the Premises at the commencement of, or during the Term, whether or not placed there by or at the expense of Tenant, shall remain Tenant's Property and shall be removed by Tenant at the Expiration Date. At or before the Expiration Date, or the date of any earlier termination, Tenant, at its expense, shall remove from the Premises all of Tenant's personal property, Tenant's Property and any Alterations that Landlord requires be removed pursuant to **Section 11**, and Tenant shall repair (to Landlord's reasonable satisfaction) any damage to the Premises resulting from such installation and/or removal. Any other items of Tenant's personal property that shall remain in the Premises for more than ten (10) days after the Expiration Date, or following an earlier termination date, may, at the option of Landlord, be deemed to have been abandoned, and in such case, such items may be retained by Landlord as its property or be disposed of by Landlord, in Landlord's sole and absolute discretion and without accountability, at Tenant's expense. Notwithstanding the foregoing provisions of this **Section 12** or any other provision of this Lease to the contrary (including, without limitation, **Section 21.2**), if Landlord or Tenant terminates this Lease prior to the Expiration Date, then, provided that Tenant has paid and continues to pay, on a timely basis, all Rent due under this Lease (if any), Tenant shall have thirty (30) days from the accelerated termination date in which to remove Tenant's personal property and any Alterations that Landlord requires be removed pursuant to **Section 11**. If the foregoing sentence is applicable, then none of Tenant's personal property and equipment may be considered abandoned, nor may Landlord retain and dispose of any of such personal property and equipment until such thirty (30) day period expires.

13.    **REPAIRS AND MAINTENANCE**. Tenant acknowledges that, with full awareness of its obligations under this Lease, and in light of the fact that Landlord acquired the Premises from Tenant (or an affiliate of Tenant) as of the Commencement Date, Tenant has accepted the condition, state of repair and appearance of the Premises. Except for normal wear and tear and events of damage, destruction or casualty to the Premises (as addressed in **Section 18** below), Tenant agrees that, at its sole expense and throughout the Term, it shall put, keep and maintain the Premises, including any Alterations and any altered, rebuilt, additional or substituted building, structures and other

improvements thereto or thereon, in good order, condition, repair and appearance (allowing for normal wear and tear), and in a safe condition, repair and appearance (collectively, the "**Required Condition**") and shall make all repairs and replacements necessary to ensure compliance with the Required Condition. Without limiting the foregoing, Tenant shall promptly make all structural and nonstructural, foreseen and unforeseen, ordinary and extraordinary changes, replacements and repairs of every kind and nature, and correct any patent or latent defects in the Premises, which may be required to put, keep and maintain the Premises in the Required Condition. Tenant will keep the Premises orderly and free and clear of rubbish. Tenant covenants to perform or observe all terms, covenants and conditions of any easement, restriction, covenant, declaration or maintenance covenants of record (collectively, "**Easements**") to which the Premises are currently subject or become subject pursuant to this Lease (it being agreed that Landlord shall not amend any Easement or agree to any additional Easement in any manner that will either limit, in any adverse respect, Tenant's rights under this Lease or impose any new or increased burden, economic or otherwise, on Tenant, without Tenant's prior written consent, which consent may be withheld in Tenant's sole, but reasonable, discretion), whether or not such performance is required of Landlord under such Easements, including, without limitation, payment of all amounts due from Landlord or Tenant (whether as assessments, service fees or other charges) under such Easements. Tenant shall deliver to Landlord promptly, but in no event later than five (5) business days after receipt thereof, copies of all written notices received from any party thereto regarding the non-compliance of the Premises or Landlord's or Tenant's performance of obligations under any Easements. Tenant shall, at its expense, use reasonable efforts to enforce compliance with any Easements benefiting the Premises by any other person or entity or property subject to such Easements. Landlord shall not be required to maintain, repair or rebuild, or to make any alterations, replacements or renewals of any nature to the Premises, or any part thereof, whether ordinary or extraordinary, structural or nonstructural, foreseen or not foreseen, or to maintain the Premises or any part thereof in any way or to correct any patent or latent defect therein except to the extent such action is necessitated by Landlord's or Agent's negligence or willful misconduct or by actions taken by or on behalf of Landlord in connection with Landlord's inspection of the Premises prior to Landlord's acquisition of title thereto. Tenant hereby expressly waives any right to make repairs at the expense of Landlord which may be provided for in any Law in effect at the Commencement Date or that may thereafter be enacted. If Tenant shall abandon the Premises, it shall give Landlord immediate written notice thereof.

14.     **UTILITIES**. Tenant shall purchase all utility services and shall provide for garbage, cleaning and extermination services for service to the Premises. Tenant shall pay the utility charges for the Premises directly to the utility or municipality providing such service, all charges shall be paid by Tenant before they become delinquent. Tenant shall be solely responsible for the repair and maintenance of any meters necessary in connection with such services.

15.     **INVOLUNTARY CESSATION OF SERVICES**. If and to the extent Landlord directly provides any such services to Tenant, Landlord reserves the right, without any liability to Tenant and without affecting Tenant's covenants and obligations hereunder, to stop service of any or all of the HVAC, electric, sanitary, elevator (if any), and other systems serving the Premises, or to stop any other services provided by Landlord under this Lease, whenever and for so long as may be necessary by reason of (i) accidents, emergencies, strikes, or (ii) any other cause beyond Landlord's reasonable control. Further, it is also understood and agreed that Landlord or Agent shall have no liability or responsibility for a cessation of any services to the Premises that occurs as a result of causes beyond Landlord's or Agent's reasonable control. No such interruption of any service shall be deemed

an eviction or disturbance of Tenant's use and possession of the Premises or any part thereof, or render Landlord or Agent liable to Tenant for damages, or relieve Tenant from performance of Tenant's obligations under this Lease, including, but not limited to, the obligation to pay Rent.

16. **LANDLORD'S RIGHTS**. Upon reasonable prior notice to Tenant (which may be delivered telephonically), and as long as Landlord does not unreasonably interfere with Tenant's operations, Landlord, Agent and their respective agents, employees and representatives shall have the right to enter and/or pass through the Premises at any time or times (except in the event of emergency for which no prior notice is required) to examine and inspect the Premises and to show it to actual and prospective lenders, prospective purchasers or mortgagees of the Premises or providers of capital to Landlord and its affiliates; and in connection with the foregoing, to install a sign at or on the Premises to advertise the Premises for sale. During the period of six months prior to the Expiration Date, unless a Renewal Option has been exercised (or at any time, if Tenant has abandoned the Premises or is otherwise in default beyond applicable notice and cure periods under this Lease), Landlord and its agents may exhibit the Premises to prospective tenants. Additionally, Landlord and Agent shall have the following rights with respect to the Premises, without being deemed an eviction or disturbance of Tenant's use or possession of the Premises or giving rise to any claim for setoff or abatement of Rent: (i) to have pass keys, access cards, or both, to the Premises; and (ii) to decorate, remodel, repair, alter or otherwise prepare the Premises for reoccupancy at any time after Tenant abandons the Premises for more than 30 consecutive days.

17. **NON-LIABILITY AND INDEMNIFICATION**.

17.1. **Non-Liability**. Except (and only if and) to the extent caused by the willful misconduct or negligence of Landlord or Agent, Landlord and Agent shall not be liable to Tenant for any loss, injury, or damage, to Tenant or to any other person, or to its or their property, irrespective of the cause of such injury, damage or loss and, in no event shall any affiliates, owners, partners, directors, officers, agents or employees of Landlord or Agent ever be liable hereunder. Further, except (and only if and) to the extent caused by the willful misconduct or negligence of Landlord or Agent, none of Landlord, Agent, any other managing agent, or their respective affiliates, owners, partners, directors, officers, agents and employees shall be liable to Tenant (a) for any damage caused by other persons in, upon or about the Premises, or caused by operations in construction of any public or quasi-public work; (b) with respect to matters for which Landlord is liable, for consequential or indirect damages purportedly arising out of any loss of use of the Premises or any equipment or facilities therein by Tenant or any person claiming through or under Tenant; (c) for any defect in the Premises; (d) for injury or damage to person or property caused by fire, or theft, or resulting from the operation of heating or air conditioning or lighting apparatus, or from falling plaster, or from steam, gas, electricity, water, rain, snow, ice, or dampness, that may leak or flow from any part of the Premises, or from the pipes, appliances or plumbing work of the same.

17.2. **Tenant Indemnification**. Except (and only if and to the extent of) Landlord's or Agent's negligence or willful misconduct, Tenant hereby indemnifies, defends, and holds Landlord, Agent and the Indemnitees (collectively, "**Landlord Indemnified Parties**") harmless from and against any and all Losses arising from or in connection with any or all of: (a) Tenant's operation of the Premises during the Term; (b) Tenant's conduct or management of the Premises or any business therein, or any work or Alterations done, or any condition created by any or all of Tenant and any or all of its member, partners, officers, directors, employees, invitees, managers, contractors, and

representatives (collectively, "**Tenant's Parties**"), in or about the Premises during the Term; (c) any act, omission or negligence during the Term of any or all of Tenant and Tenant's Parties; (d) any accident, injury or damage whatsoever occurring during the Term in, at or upon the Premises and caused by any or all of Tenant and Tenant's Parties; (e) any breach by Tenant of any or all of its warranties, representations and covenants under this Lease; (f) any actions necessary to protect Landlord's interest under this Lease in a bankruptcy proceeding or other proceeding under the Bankruptcy Code relating to this Lease or Tenant; (g) Tenant's failure to comply with **Section 9.2**; and (h) any violation or alleged violation by any or all of Tenant and Tenant's Parties of any Law; and (i) any claims made against Landlord by any third party contractor engaged by Tenant (collectively, "**Tenant's Indemnified Matters**"). In case any action or proceeding is brought against any or all of Landlord and the Landlord Indemnified Parties by reason of any of Tenant's Indemnified Matters, Tenant, upon notice from any or all of Landlord, Agent or any Superior Party (defined below), shall resist and defend such action or proceeding by counsel reasonably satisfactory to Landlord. The term "**Losses**" shall mean all claims, demands, expenses, actions, judgments, damages (actual, but not consequential or punitive), penalties or fines imposed by any Law, liabilities, losses of every kind and nature (other than consequential or punitive damages), suits, administrative proceedings, costs and fees, including, without limitation, attorneys' and consultants' reasonable fees and expenses, and the costs of cleanup, remediation, removal and restoration, that are in any way related to any matter covered by the foregoing indemnity. The provisions of this **Section 17.2** shall survive the expiration or termination of this Lease.

17.3.    **Landlord Indemnification**. Landlord hereby indemnifies, defends, and holds Tenant, Guarantor, and any of their affiliates (collectively, "**Tenant Indemnified Parties**") harmless from and against any and all Losses arising from or in connection with any negligence or willful misconduct of Landlord and any or all of its member, partners, officers, directors, employees, invitees, managers, contractors, and representatives (collectively, "**Landlord's Parties**"), in or about the Premises during the Term (collectively, "**Landlord's Indemnified Matters**"). In case any action or proceeding is brought against any or all of Tenant and the Tenant Indemnified Parties by reason of any of Landlord's Indemnified Matters, Landlord, upon notice from any or all of Tenant, shall resist and defend such action or proceeding by counsel reasonably satisfactory to Tenant. Notwithstanding anything to the contrary set forth in this Lease, however, in all events and under all circumstances, the liability of Landlord to Tenant, whether under this **Section 17.3** or any other provision of this Lease, shall be limited to the interest of Landlord in the Premises, and Tenant agrees to look solely to Landlord's interest in the Premises (and the profits and proceeds thereof) for the recovery of any judgment or award against Landlord, it being intended that Landlord shall not be personally liable for any judgment or deficiency. The provisions of this **Section 17.3** shall survive the expiration or termination of this Lease.

18.    **CASUALTY AND CONDEMNATION**.

18.1.    **Casualty**. If the Building and/or other improvements on the Premises shall be damaged or destroyed by fire or other casualty (each, a "**Casualty**"), Tenant, at Tenant's sole cost and expense, shall promptly and diligently repair, rebuild or replace such Building and other improvements, so as to restore the Premises to the condition in which they were immediately prior to such damage or destruction, irrespective of whether any insurance proceeds are adequate or available to repair, rebuild or replace such Building. The net proceeds of any insurance (other than rent loss insurance) recovered by reason of such damage to, or such destruction of, the Building and/or other

improvements on the Premises in excess of the cost of adjusting the insurance claim and collecting the insurance proceeds (such excess being hereinafter called the **"net insurance proceeds"**) shall be held in trust by Landlord as loss payee or held by any holder of an interest in the Premises which may be superior to Tenant's interest under this Lease (a **"Holder"**) and released for the purpose of paying the cost of restoring such Building and other improvements. Such net insurance proceeds shall be released to Tenant or Tenant's contractors from time to time as the work progresses in accordance with the terms of a commercially reasonable construction contract requiring progress payments or payments on a monthly basis. Prior to the commencement of the work, Tenant shall deliver to Landlord reasonable proof that such net insurance proceeds are adequate to pay the cost of such restoration. If such net insurance proceeds are not adequate, Tenant shall pay, out of funds other than such net insurance proceeds, the amount by which such cost will exceed such net insurance proceeds. Notwithstanding anything to the contrary herein, no insurance proceeds paid to Tenant due to loss or damage of Tenant's furniture, fixtures, equipment or other personal property, or properly allocable to loss or damage of the same shall be paid to Landlord.

    18.2.    <u>Condemnation.</u>

        18.2.1.  <u>Condemnation of Entire Premises</u>.  If all or substantially all of the Premises is taken or condemned for a public or quasi-public use ("**Condemnation**"), the provisions of **Section 18.3** shall apply.

        18.2.2.  <u>Partial Condemnation</u>.  If less than all or substantially all of the Premises is subject to a Condemnation, Tenant shall restore the Building and other improvements upon the Premises to a condition and size as nearly comparable as reasonably possible to the condition and size thereof immediately prior to the Condemnation, and there shall be an equitable abatement of the Base Rent according to the value of the Premises before and after the Condemnation. In the event that the parties fail to agree upon the amount of such abatement, either party may submit the issue for arbitration pursuant to the rules of the American Arbitration Association and the determination or award rendered by the arbitrator(s) shall be final, conclusive and binding upon the parties and not subject to appeal, and judgment thereon may be entered in any court of competent jurisdiction.

        18.2.3.  <u>Award</u>.  Tenant shall have the right to make a claim against the condemnor for moving and related expenses that are payable to tenants under applicable law without reducing the awards otherwise payable to Landlord and the Holders.  Except as aforesaid, Tenant hereby waives all claims against Landlord and all claims against the condemnor, and Tenant hereby assigns to Landlord all claims against the condemnor including, without limitation, all claims for leasehold damages and diminution in the value of Tenant's leasehold interest, subject to the provisions of this **Section 18.2.3**.  If only part of the Premises is Condemned, the net proceeds of any Condemnation award recovered by reason of any taking or Condemnation of the Premises in excess of the cost of collecting the award and in excess of any portion thereof attributable to the then-current market value of the land taken or Condemned (such excess being hereinafter called the **"net condemnation proceeds"**) shall be held in trust by Landlord or any Holder and released for the purpose of paying the cost of restoring the Building and other improvements damaged by reason of the taking or Condemnation. Tenant shall perform such restoration, and such net Condemnation proceeds shall be released to Tenant or Tenant's contractors from time to time as the work progresses. Prior to the commencement of the work, Tenant shall deliver to Landlord reasonable proof that such net condemnation proceeds are adequate to pay the cost of such restoration. If such net condemnation

proceeds are not adequate, Tenant shall pay, out of funds other than such net condemnation proceeds, the amount by which such cost will exceed such net condemnation proceeds and shall furnish proof to Landlord of the payment of such excess for work performed. If such net condemnation proceeds are more than adequate, the amount by which such net condemnation proceeds exceed the cost of restoration will be retained by Landlord or applied to repayment of any mortgage loan secured by the Premises. In the event that the parties fail to agree upon the portion of the award attributable to the then-current market value of the land taken or Condemned, either party may submit the issue for arbitration pursuant to the rules then obtaining of the American Arbitration Association and the determination or award rendered by the arbitrator(s) shall be final, conclusive and binding upon the parties and not subject to appeal, and judgment thereon may be entered in any court of competent jurisdiction. Notwithstanding anything to the contrary herein, no condemnation proceeds paid to Tenant due to loss or damage of Tenant's furniture, fixtures, equipment or other personal property, or properly allocable to loss or damage of the same shall be paid to Landlord.

18.2.4. **Temporary Taking**. If the condemnor should take only the right to possession for a fixed period of time or for the duration of an emergency or other temporary condition (a "**Temporary Taking**"), then, notwithstanding anything hereinabove provided, this Lease shall continue in full force and effect without any abatement of rent, but the amounts payable by the condemnor with respect to any period of time prior to the expiration or sooner termination of this Lease shall be paid by the condemnor to Landlord and all such amounts shall be credited to Tenant's account up to the portion of the Rent allocable to the area that is subject to the Temporary Taking only. If the amounts payable hereunder by the condemnor are paid in monthly installments, Landlord shall apply the amount of such installments, or as much thereof as may be necessary for the purpose, toward the amount of Rent due from Tenant as rent for that period, and Tenant shall pay to Landlord any deficiency between the monthly amount thus paid by the condemnor and the amount of the Rent, while Landlord shall pay over to Tenant any excess of the amount of the award over the amount of the Rent.

18.3. **Termination of Lease Following Major Casualty of Major Condemnation**.

18.3.1. If a Casualty or Condemnation shall affect all or a substantial portion of the Premises, and:

18.3.1.1. in the case of a Casualty, (a) if such Casualty (i) occurs during the final twenty-four (24) months of the Term (as it may have been extended prior to the occurrence of the Casualty; or (ii) shall be deemed a "total loss" for insurance purposes or shall be determined to be a loss of such dimension that the Premises cannot be completely restored or rebuilt within two hundred seventy (270) days computed from the hypothetical date of the commencement of construction; or (b) under then-applicable Laws, the Premises cannot be restored to substantially the same condition as existed immediately prior to the Casualty; or (c) in the event that Landlord maintains the property insurance, rather than Tenant, and the net insurance proceeds (exclusive of the deductible, which shall be paid by Tenant) are not sufficient, in the mutual and reasonable opinions of Landlord and Tenant to restore the Premises to substantially the same condition as existed immediately prior to the Casualty (any of (a), (b) or (c), a "**Major Casualty**"); or

18.3.1.2.    in the case of a Condemnation (other than a Temporary Taking): (a) such Condemnation shall, in Tenant's and Landlord's mutual and reasonable judgment, render the Premises unsuitable for restoration for continued use and occupancy of Tenant's business; or (b) under then-applicable Laws, the Premises cannot be restored to substantially the same condition as existed immediately prior to the Condemnation; or (c) in the mutual and reasonable opinion of Landlord and Tenant, the net condemnation proceeds are insufficient to restore the Premises to a condition that will permit Tenant to continue to operate its business in the Premises in substantially the same fashion as Tenant operated immediately prior to the Condemnation (any of (a), (b) or (c), a "**Major Condemnation**");

then Tenant may, at its option, exercisable not later than sixty (60) days after the date on which the casualty or condemnation proceeds are known, deliver to Landlord each of the following: (A) notice (a "**Termination Notice**") of its intention to terminate this Lease on the next rental payment date that occurs not less than sixty (60) days after the delivery of such notice (the "**Termination Date**"); (B) in the case of a Major Condemnation, a certificate of an authorized officer of Tenant describing the event giving rise to such termination; or in the case of a Major Casualty (x) the certificate of an architect licensed in the state in which the Premises is located stating that the architect has determined, in its good faith judgment, that the Premises cannot be completely restored or rebuilt for continued use and occupancy in Tenant's business in a manner consistent with the operation of Tenant's business immediately prior to the occurrence of the Major Casualty within two hundred seventy (270) days computed from the hypothetical date of commencement of such construction or (y) written confirmation from the issuer of the applicable insurance policy that it will treat the damage to the Building as a "total loss"; and (C) an irrevocable offer (an "**Event of Loss Purchase Offer**") by Tenant to Landlord to purchase the Premises on the Termination Date.

18.4.    **Acceptance or Rejection of Event of Loss Purchase Offer.**  If Landlord shall reject the Event of Loss Purchase Offer by written notice given to Tenant not later than fifteen (15) days prior to the Termination Date, this Lease shall terminate on the Termination Date, except with respect to obligations and liabilities of Tenant or Landlord hereunder, actual or contingent, which have arisen on or prior to the Termination Date, upon payment by Tenant of all of the Base Rent, Additional Rent and other sums then due and payable or accrued hereunder to and including the Termination Date, and the net condemnation proceeds or net insurance proceeds (as the case may be) shall belong to Landlord. Tenant shall, on or before the Termination Date, execute and deliver to Landlord an outright assignment of such proceeds in form and substance reasonably acceptable to Landlord and pay to Landlord an amount equal to any applicable insurance deductible or self-insurance amounts. Unless Landlord shall have rejected the Event of Loss Purchase Offer in accordance with this **Section 18.4**, Landlord shall be conclusively considered to have accepted the Event of Loss Purchase Offer. In the event Landlord accepts (or is deemed to have accepted) the Event of Loss Purchase Offer, then, on the Termination Date (1) Tenant shall pay to Landlord a purchase price determined pursuant to **Exhibit D** attached hereto, (2) Landlord shall convey the Premises to Tenant or its designee, and (3) Landlord shall assign to Tenant or its designee all of Landlord's interest in the net condemnation proceeds or net insurance proceeds (as the case may be), by assignment in form and substance reasonably acceptable to Tenant or, if Landlord has already received all or a portion of such net condemnation proceeds or net insurance proceeds (as the case may be), then Landlord shall pay the same to Tenant or Tenant's designee after deducting Landlord's costs payable by Tenant hereunder. Such sale shall otherwise be consummated in accordance with the terms set forth in **Section 18.5** below.  In the event Tenant fails

to deliver the Termination Notice and the Event of Loss Purchase Offer in accordance with the time deadlines set forth in this **Section 18**, then, at Landlord's election, Tenant shall have no right to terminate this Lease or right to make an offer to purchase the Premises, and the Lease will continue in full force and effect.

     **18.5.**   **Closing/Conveyance Procedures.**  In the event, pursuant to the terms and conditions of **Section 18.4** above, Landlord is to convey its interest in the Premises to Tenant as a result of an Event of Loss Purchase Offer, the following provisions shall apply:

     **18.5.1.**  The purchase of the Premises contemplated herein shall be consummated at a closing ("**Loss Closing**") to take place at the offices of Landlord or Landlord's counsel. The Loss Closing shall occur on the date (the "**Loss Closing Date**") which is no later than sixty (60) days after Landlord's receipt of a timely Termination Notice or such other date as the parties shall mutually agree in writing. The Loss Closing shall be effective as of 11:59 p.m. on the Loss Closing Date. Time is of the essence.

     **18.5.2.**  The total purchase price to be paid to Landlord by Tenant at the Loss Closing for the sale hereunder shall be an amount equal to the applicable purchase price set forth on **Exhibit D** attached hereto. In the event of a Loss Closing hereunder, Tenant shall not have the right to escrow or hold back any portion of the purchase price hereunder. The purchase price shall be paid to Landlord at the Loss Closing, by federal wire transfer of immediately available funds.

     **18.5.3.**  At the Loss Closing, Landlord shall convey fee simple title to the Premises to Tenant (or its assignee or designee) pursuant to a quitclaim deed, subject to (a) Taxes; (b) those matters and exceptions shown in Landlord's existing owner's policy of title insurance dated December 28, 2006, issued by First American Title Insurance Company (File No. NCS 266083 Mpls.) and the survey prepared by Frederick, Seibert & Associates, Inc. dated December 22, 2006 as Job Number 3578; (c) those matters that may be otherwise specifically approved, in writing, by Tenant, such approval not to be unreasonably withheld, delayed or denied, or otherwise deemed approved or accepted by Tenant, or that otherwise result from the construction of any improvements or Alterations by Tenant or the construction of any Expansion Improvements by Landlord; (d) matters arising out of any act of Tenant or any or all of its affiliates, representatives, lenders, agents, contractors, employees or invitees; and (e) any lien (including, without limitation, any mortgages or deeds of trust), claim or encumbrance or other matter, except liens, claims, adverse encumbrances directly caused by any act of Landlord or its affiliates, representatives, lenders, agents, contractors or employees.

     **18.5.4.**  The sale of the Premises as provided for herein shall be made on a strictly "AS IS," "WHERE-IS" basis as of the Loss Closing Date, without any representations or warranties, of any nature whatsoever from Landlord. Landlord hereby specifically disclaims any warranty (oral or written) concerning: (i) the nature and condition of the Premises and the suitability thereof for any and all activities and uses that Tenant may elect to conduct thereon, (ii) the manner, construction, condition and state of repair or lack of repair of any improvements located thereon, (iii) the nature and extent of any right-of-way, lien, encumbrance, license, reservation, condition or otherwise, (iv) the compliance of the Premises or its operation with any laws, rules, ordinances, or regulations of any government or other body; and (v) any other matter whatsoever. Tenant expressly acknowledges that, in consideration of the agreements of Landlord herein, LANDLORD MAKES NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, OR ARISING BY OPERATION

OF LAW, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF QUANTITY, QUALITY, CONDITION, HABITABILITY, MERCHANTABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PREMISES, ANY IMPROVEMENTS LOCATED THEREON, OR ANY SOIL CONDITIONS RELATED THERETO. TENANT SPECIFICALLY ACKNOWLEDGES THAT TENANT IS NOT RELYING ON (AND LANDLORD HEREBY DISCLAIMS AND RENOUNCES) ANY REPRESENTATIONS OR WARRANTIES MADE BY OR ON BEHALF OF LANDLORD OF ANY KIND OR NATURE WHATSOEVER.

**18.5.5.** If Tenant fails to timely perform or satisfy any of its obligations imposed under this **Section 18**, including its obligation to timely close on the purchase of the Premises, then such failure shall constitute a default by Tenant under this Lease (for which there is no cure period), and Landlord shall have all rights and remedies available to it under this Lease, at law or in equity (including, without limitation the right to file an action to specifically enforce the terms of this **Section 18**), with respect to such default.

**18.5.6.** Upon the purchase of the Premises pursuant to the provisions of this **Section 18**, this Lease shall terminate except for provisions under this Lease that by their terms specifically survive.

**18.5.7.** Landlord and Tenant each hereby indemnify, protect and defend and hold the other harmless from and against all Losses resulting from the claims of any broker, finder, or other such party claiming by, through or under the acts or agreements of the indemnifying party. The obligations of the parties pursuant to this **Section 18** shall survive any termination of this Lease.

**18.5.8.** There shall be no prorations of any cost items relating to the Premises, whether Taxes, Operating Expenses or otherwise; provided, however, that if and to the extent that, as of the Loss Closing, Landlord has paid any bills for any ownership expenses incurred (prior to the Loss Closing) in connection with the ownership and operation of the Premises and, under the terms of this Lease, Tenant would be required to reimburse Landlord for some or all of such expenses, then at the Loss Closing, Tenant shall be required to pay to Landlord, in addition to the purchase price set forth above, any such accrued Operating Expenses (including, but not limited to, Taxes).

**18.5.9.** Provided the Loss Closing is consummated in accordance with this **Section 18**, Tenant shall pay for all closing costs, including, but not limited to, the cost to record the deed, any transfer taxes, any closing escrow fees, the costs of any title insurance policy, and the cost of the survey. Tenant shall be solely responsible for procuring the title insurance policy and the survey and in no event shall the procurement of those items be a condition precedent to Tenant's obligation to acquire the Premises. All other costs shall be paid in accordance with local custom. Each of Landlord and Tenant shall be responsible for their respective attorneys' fees.

**19.    SURRENDER AND HOLDOVER.** On the last day of the Term, or upon any earlier termination of this Lease, or upon any re-entry by Landlord upon the Premises: (a) Tenant shall quit and surrender the Premises to Landlord "broom-clean" (as defined by **Exhibit C**, attached hereto and incorporated herein by reference), and in a condition that would reasonably be expected with normal and customary use in accordance with prudent operating practices and in accordance with the covenants and requirements imposed under this Lease, subject only to ordinary wear and tear (as is attributable to deterioration by reason of time and use, in spite of Tenant's reasonable care) and losses

by casualty or condemnation not required to be repaired or restored by Tenant pursuant to the provisions hereof; (b) Tenant shall remove all of Tenant's personal property therefrom, except as otherwise expressly provided in this Lease, and (c) Tenant shall surrender to Landlord any and all keys, access cards, computer codes or any other items used to access the Premises. Upon prior notice (which may be delivered telephonically), Landlord shall be permitted to inspect the Premises in order to verify compliance with this **Section 19** at any time prior to (x) the Expiration Date, (y) the effective date of any earlier termination of this Lease, or (z) the surrender date otherwise agreed to in writing by Landlord and Tenant. The obligations imposed under the first sentence of this **Section 19** shall survive the termination or expiration of this Lease. If Tenant remains in possession after the Expiration Date hereof or after any earlier termination date of this Lease or of Tenant's right to possession: (i) Tenant shall be deemed a tenant-at-will;  (ii) Tenant shall pay 125% of the Base Rent last prevailing hereunder, and also shall pay all actual damages (other than consequential or punitive damages) sustained by Landlord, directly by reason of Tenant's remaining in possession after the expiration or termination of this Lease;  (iii) there shall be no renewal or extension of this Lease by operation of law; and (iv) the tenancy-at-will may be terminated by either party hereto upon 30 days' prior written notice given by the terminating party to the non-terminating party. The provisions of this **Section 19** shall not constitute a waiver by Landlord of any re-entry rights of Landlord provided hereunder or by law.

20.    **EVENTS OF DEFAULT**.

20.1.    **Bankruptcy of Tenant**.  It shall be a default by Tenant under this Lease ("**Default**" or "**Event of Default**") if Tenant or Guarantor makes an assignment for the benefit of creditors, or files a voluntary petition under any state or federal bankruptcy (including the United States Bankruptcy Code) or insolvency law, or an involuntary petition is filed against Tenant or Guarantor under any state or federal bankruptcy (including the United States Bankruptcy Code) or insolvency law that is not dismissed within 90 days after filing, or whenever a receiver of Tenant or Guarantor, or of, or for, the property of Tenant or Guarantor shall be appointed (and, in the case of an involuntary receivership, such receivership has not been vacated or set aside within sixty (60) days thereafter), or Tenant or Guarantor admits it is insolvent or is not able to pay its debts as they mature.

20.2.    **Default Provisions**.  In addition to any Default arising under **Section 20.1** above, each of the following shall constitute a Default: (a) if Tenant fails to pay Rent or any other payment when due hereunder within ten (10) days after written notice from Landlord of such failure to pay on the due date; provided, however, that if in any consecutive 12 month period, Tenant shall, on two (2) separate occasions, fail to pay any installment of Rent on the date such installment of Rent is due, then, on the third such occasion and on each occasion thereafter on which Tenant shall fail to pay an installment of Rent on the date such installment of Rent is due, Landlord shall be relieved from any obligation to provide notice to Tenant, and Tenant shall then no longer have a ten day period in which to cure any such failure; (b) if Tenant fails, whether by action or inaction, to timely comply with, or satisfy, any or all of the obligations imposed on Tenant under this Lease (other than the obligation to pay Rent) for a period of 30 days after Landlord's delivery to Tenant of written notice of such default under this **Section 20.2(b)**; provided, however, that if the default cannot, by its nature, be cured within such 30 day period, but Tenant commences and diligently pursues a cure of such default promptly within the initial 30 day cure period, then, as long as Tenant continues to diligently pursue such a cure, Landlord shall not exercise its remedies under **Section 21** unless such default remains uncured for more than 120 days after the initial delivery of Landlord's original default notice; and, at Landlord's

election; (c) if Tenant abandons the Premises during the Term; or (d) if Guarantor defaults under the Guaranty Agreement.

**20.3.** **Landlord's Default**. In the event that Landlord defaults in the observance or performance of any term or condition required to be performed by Landlord hereunder, Tenant may elect either to (i) act to cure and remedy such default hereunder by Landlord or (ii) commence an action in a court of competent jurisdiction to compel performance by Landlord hereunder; provided, however, that Tenant may not exercise either of such remedies without first providing written notice of the alleged default to Landlord, setting forth, with reasonable specificity and detail, the nature of such default, and thereafter permitting Landlord a 30 day period to cure such default (which cure period may be extended if Landlord is diligently pursuing performance of the applicable cure, but such cure is not completed within the 30 day period). Upon expiration of Landlord's cure period, Tenant shall deliver written notice to Landlord advising of Tenant's election of (i) or (ii) above. The remedies provided in (i) and (ii) are Tenant's sole and exclusive remedies, whether at law or in equity. In the event that Tenant elects alternative (i), Landlord shall reimburse Tenant for all reasonable third-party costs and expenses actually expended by Tenant to perform any obligation of Landlord actually and properly owing hereunder. In connection with the exercise of the foregoing remedies or otherwise, Tenant shall not be entitled to any abatement, deduction or set off against the Rent payable hereunder.

## 21. **RIGHTS AND REMEDIES**.

**21.1.** **Landlord's Cure Rights Upon Default of Tenant**. If a Default occurs, then Landlord may (but shall not be obligated to) cure or remedy the Default for the account of, and at the expense of, Tenant, but without waiving such Default.

**21.2.** **Landlord's Remedies**. In the event of any Default by Tenant under this Lease, Landlord, at its option, may, in addition to any and all other rights and remedies provided in this Lease or otherwise at law or in equity do or perform any or all of the following:

**21.2.1.** Terminate Tenant's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Tenant shall immediately surrender possession to Landlord. In such event, Landlord shall be entitled to recover from Tenant all of: (i) the unpaid Rent that is accrued and unpaid as of the date on which this Lease is terminated; (ii) the worth, at the time of award, of the amount by which (x) the unpaid Rent that would otherwise be due and payable under this Lease (had this Lease not been terminated) for the period of time from the date on which this Lease is terminated through the Expiration Date exceeds (y) the amount of such rental loss that could have been reasonably avoided; and (iii) any other amount necessary to compensate Landlord for all the detriment proximately caused by the Tenant's failure to perform its obligations under this Lease or which, in the ordinary course of events, would be likely to result therefrom, including but not limited to, the cost of recovering possession of the Premises, expenses of reletting, including renovation and alteration of the Premises, reasonable attorneys' fees, and that portion of any leasing commission paid by Landlord in connection with this Lease applicable to the unexpired Term (as of the date on which this Lease is terminated). The worth, at the time of award, of the amount referred to in provision (ii) of the immediately preceding sentence shall be computed by discounting such amount at the per annum discount rate of the Federal Reserve Bank of the District within which the Premises are located at the

time of award, plus one percent (1.0%) per annum. Efforts by Landlord to mitigate damages caused by Tenant's Default shall not waive Landlord's right to recover damages under this **Section 21.2**. If this Lease is terminated through any unlawful entry and detainer action, Landlord shall have the right to recover in such proceeding any unpaid Rent and damages as are recoverable in such action, or Landlord may reserve the right to recover all or any part of such Rent and damages in a separate suit; or

21.2.2. Continue the Lease and Tenant's right to possession and recover the Rent as it becomes due. Acts of maintenance, efforts to relet, and/or the appointment of a receiver to protect the Landlord's interests shall not constitute a termination of the Tenant's right to possession; or

21.2.3. Pursue any other remedy now or hereafter available under the laws of the state in which the Premises are located.

21.2.4. Without limitation of any of Landlord's rights in the event of a Default by Tenant, Landlord may also exercise its rights and remedies with respect to any security held or maintained by Landlord.

Any and all personal property of Tenant that may be removed from the Premises by Landlord pursuant to the authority of this Lease or of law may be handled, removed or stored by Landlord at the sole risk, cost and expense of Tenant, and in no event or circumstance shall Landlord be responsible for the value, preservation or safekeeping thereof. Tenant shall pay to Landlord, upon demand, any and all expenses incurred in such removal and all storage charges for such property of Tenant so long as the same shall be in Landlord's possession or under Landlord's control. Any such property of Tenant not removed from the Premises as of the Expiration Date or any other earlier date on which this Lease is terminated shall be conclusively presumed to have been conveyed by Tenant to Landlord under this Lease as in a bill of sale, without further payment or credit by Landlord to Tenant. Neither expiration or termination of this Lease nor the termination of Tenant's right to possession shall relieve Tenant from its liability under the indemnity provisions of this Lease.

21.3.   **Additional Rights of Landlord**. All sums advanced by Landlord or Agent on account of Tenant under this Section, or pursuant to any other provision of this Lease, and all Base Rent and Additional Rent, if delinquent or not paid by Tenant and received by Landlord when due hereunder, shall bear interest at the rate of 2% per annum above the "prime" or "reference" or "base" rate (on a per annum basis) of interest publicly announced as such, from time to time, by the JPMorgan Chase Bank NA, or its successor (**"Default Interest"**), from the due date thereof (provided, however, that if Tenant is entitled to notice and opportunity to cure a monetary default under **Section 20.2**, then such interest shall not accrue until expiration of such cure period) until paid, and such interest shall be and constitute Additional Rent and be due and payable upon Landlord's or Agent's submission of an invoice therefor.   The various rights, remedies and elections of Landlord reserved, expressed or contained herein are cumulative and no one of them shall be deemed to be exclusive of the others or of such other rights, remedies, options or elections as are now or may hereafter be conferred upon Landlord by law.

21.4.   **Event of Bankruptcy**. In addition to, and in no way limiting the other remedies set forth herein, Landlord and Tenant agree that if Tenant ever becomes the subject of a voluntary or involuntary bankruptcy, reorganization, composition, or other similar type proceeding under the

federal bankruptcy laws, as now enacted or hereinafter amended, then: (a) "adequate assurance of future performance" by Tenant pursuant to Bankruptcy Code Section 365 will include (but not be limited to) payment of an additional/new security deposit in the amount of three times the then current monthly Base Rent payable hereunder; (b) any person or entity to which this Lease is assigned, pursuant to the provisions of the Bankruptcy Code, shall be deemed, without further act or deed, to have assumed all of the obligations of Tenant arising under this Lease on and after the effective date of such assignment, and any such assignee shall, upon demand by Landlord, execute and deliver to Landlord an instrument confirming such assumption of liability; (c) notwithstanding anything in this Lease to the contrary, all amounts payable by Tenant to or on behalf of Landlord under this Lease, whether or not expressly denominated as "Rent", shall constitute "rent" for the purposes of Section 502(b)(6) of the Bankruptcy Code; and (d) if this Lease is assigned to any person or entity pursuant to the provisions of the Bankruptcy Code, any and all monies or other considerations payable or otherwise to be delivered to Landlord or Agent (including Base Rent, Additional Rent and other amounts hereunder), shall be and remain the exclusive property of Landlord and shall not constitute property of Tenant or of the bankruptcy estate of Tenant. Any and all monies or other considerations constituting Landlord's property under the preceding sentence not paid or delivered to Landlord or Agent shall be held in trust by Tenant or Tenant's bankruptcy estate for the benefit of Landlord and shall be promptly paid to or turned over to Landlord.

22.    **BROKER**. Each party agrees to and hereby does defend, indemnify and hold the other harmless against and from any brokerage commissions or finder's fees or claims therefor by a party claiming to have dealt with the indemnifying party and all costs, expenses and liabilities in connection therewith, including, without limitation, reasonable attorneys' fees and expenses, for any breach of the foregoing. The foregoing indemnification shall survive the termination or expiration of this Lease.

23.    **MISCELLANEOUS**.

23.1.    **Merger**. All prior understandings and agreements between the parties are merged in this Lease, which alone fully and completely expresses the agreement of the parties. No agreement shall be effective to modify this Lease, in whole or in part, unless such agreement is in writing, and is signed by the party against whom enforcement of said change or modification is sought.

23.2.    **Notices**. Any notice required to be given by either party pursuant to this Lease, shall be in writing and shall be deemed to have been properly given, rendered or made only if personally delivered, or if sent by Federal Express or other comparable commercial overnight delivery service, addressed to the other party at the addresses set forth below each party's respective signature block (or to such other address as Landlord or Tenant may designate to each other from time to time by written notice), and shall be deemed to have been given, rendered or made on the day so delivered or on the first business day after having been deposited with the courier service.

23.3.    **Non-Waiver**. The failure of either party to insist, in any one or more instances, upon the strict performance of any one or more of the obligations of this Lease, or to exercise any election herein contained, shall not be construed as a waiver or relinquishment for the future of the performance of such one or more obligations of this Lease or of the right to exercise such election, but the Lease shall continue and remain in full force and effect with respect to any subsequent breach, act or omission. The receipt and acceptance by Landlord or Agent of Base Rent or Additional Rent with

knowledge of breach by Tenant of any obligation of this Lease shall not be deemed a waiver of such breach.

**23.4.    Advances by Landlord.** If Tenant shall fail to make or perform any payment or act required by this Lease within any applicable cure period, then Landlord may at its option make such payment or perform such act for the account of Tenant, and Landlord shall not thereby be deemed to have waived any default or released Tenant from any obligation hereunder. Landlord shall give Tenant thirty (30) days written notice (except in the case of an emergency) prior to Landlord making such payment or protective advance. All amounts so paid by Landlord and all incidental costs and expenses (including reasonable attorneys' fees and expenses) actually incurred in connection with such payment or performance, together with interest at the Default Interest rate (or at the highest rate not prohibited by applicable law, whichever is less) from and including the date of the making of such payment or of the incurring of such costs and expenses to and including the date of repayment, shall be paid by Tenant to Landlord on demand.

**23.5.    Parties Bound.** Except as otherwise expressly provided for in this Lease, this Lease shall be binding upon, and inure to the benefit of, the successors and assignees of the parties hereto. Tenant hereby releases Landlord named herein from any obligations of Landlord for any period subsequent to the conveyance and transfer of Landlord's ownership interest in the Premises. In the event of such conveyance and transfer, Landlord's obligations shall thereafter be binding upon each transferee (whether Successor Landlord or otherwise). No obligation of Landlord shall arise under this Lease until the instrument is signed by, and delivered to, both Landlord and Tenant.

**23.6.    Recordation of Lease.** Landlord and Tenant agree to execute a recordable memorandum of this Lease setting forth the names and addresses of the parties, a reference to this Lease with its date of execution, specific legal descriptions of the Premises, the actual Commencement Date, the term of the Lease and any Renewal Term(s), Tenant's Right of First Offer, Tenant's Expansion Option, and Landlord's Covenants as described in **Section 7** above. Such memorandum may be recorded by Tenant at Tenant's expense or by Landlord at Landlord's expense in the real property records of the county in which the Premises are situated.

**23.7.    Governing Law; Construction.** This Lease shall be governed by and construed in accordance with the laws of the state in which the Premises is located. If any provision of this Lease shall be invalid or unenforceable, the remainder of this Lease shall not be affected but shall be enforced to the extent permitted by law. The captions, headings and titles in this Lease are solely for convenience of reference and shall not affect its interpretation. This Lease shall be construed without regard to any presumption or other rule requiring construction against the party causing this Lease to be drafted. Each covenant, agreement, obligation, or other provision of this Lease to be performed by Tenant, shall be construed as a separate and independent covenant of Tenant, not dependent on any other provision of this Lease. All terms and words used in this Lease, regardless of the number or gender in which they are used, shall be deemed to include any other number and any other gender as the context may require. This Lease may be executed in counterpart and, when all counterpart documents are executed, the counterparts shall constitute a single binding instrument.

**23.8.    Time.** Time is of the essence for this Lease. If the time for performance hereunder falls on a Saturday, Sunday or a day that is recognized as a holiday in the state in which the

Premises is located, then such time shall be deemed extended to the next day that is not a Saturday, Sunday or holiday in said state.

**23.9.** **Authority of Tenant**. Tenant and the person(s) executing this Lease on behalf of Tenant hereby represent, warrant, and covenant with and to Landlord as follows: the individual(s) acting as signatory on behalf of Tenant is(are) duly authorized to execute this Lease; Tenant has procured (whether from its members, partners or board of directors, as the case may be), the requisite authority to enter into this Lease; this Lease is and shall be fully and completely binding upon Tenant; and Tenant shall timely and completely perform all of its obligations hereunder.

**23.10.** **Authority of Landlord**. Landlord and the person(s) executing this Lease on behalf of Landlord hereby represent, warrant, and covenant with and to Tenant as follows: the individual(s) acting as signatory on behalf of Landlord is(are) duly authorized to execute this Lease; Landlord has procured (whether from its members, partners or board of directors, as the case may be), the requisite authority to enter into this Lease; this Lease is and shall be fully and completely binding upon Landlord; and Landlord shall timely and completely perform all of its obligations hereunder.

**23.11.** **WAIVER OF TRIAL BY JURY**. THE LANDLORD AND THE TENANT, TO THE FULLEST EXTENT THAT THEY MAY LAWFULLY DO SO, HEREBY WAIVE TRIAL BY JURY IN ANY ACTION OR PROCEEDING BROUGHT BY ANY PARTY TO THIS LEASE WITH RESPECT TO THIS LEASE, THE PREMISES, OR ANY OTHER MATTER RELATED TO THIS LEASE OR THE PREMISES.

**23.12.** **Financial Information**. From time to time during the Term but not more frequently than once in any consecutive twelve month period (except in the event that Tenant is in Default hereunder or in the event that Landlord is pursuing a potential sale or refinancing of the Premises), Tenant shall deliver to Landlord, within ten (10) days following Landlord's written request therefor, the most currently available audited financial statement of Tenant; and if no such audited financial statement is available, then Tenant shall instead deliver to Landlord its most currently available balance sheet, operating statement, income statement and statements of cash flow and equity. Furthermore, upon the delivery of any such financial information from time to time during the Term, Tenant shall be deemed (unless Tenant specifically states otherwise in writing) to automatically represent and warrant to Landlord that the financial information delivered to Landlord is true, accurate and complete, and at that there has been no material adverse change in the financial condition of Tenant since the date of the then applicable financial information.

**23.13.** **Submission of Lease**. Submission of this Lease to Tenant for signature does not constitute a reservation of space or an option to lease. This Lease is not effective until execution by and delivery to both Landlord and Tenant.

**23.14.** **Counterparts**. This Lease may be executed in multiple counterparts, each of which shall constitute an original, but all such counterparts shall together constitute a single, complete and fully-executed document.

**23.15.** **Right of First Offer**. Tenant shall have a one time "Right of First Offer" to purchase the Premises on and subject to the terms, conditions and limitations set forth in **Exhibit F** attached hereto

23.16.   **Expansion**.   Tenant shall have the one time to expand the Premises on and subject to the terms, conditions and limitations set forth in **"Rider 1"** to this Lease.

[Signature Page Follows]

**IN WITNESS WHEREOF,** Landlord and Tenant have duly executed this Lease as of the day and year first above written.

LANDLORD:

**FR  NET  LEASE  CO-INVESTMENT PROGRAM 13, LLC**

By:    FR Net Lease Co-Investment Manager 13, LLC, its managing member

By:    FR Net Lease Co-Investment Program Manager, LLC, its sole member

By:    First Industrial, L.P., its sole member

By:    First Industrial Realty Trust, Inc., its sole general partner

      By: _____
      Name: _____
      Its: _____

TENANT:

**LENOX, INCORPORATED,** a New Jersey corporation

By: _____
Its: _____

S-1

**IN WITNESS WHEREOF**, Landlord and Tenant have duly executed this Lease as of the day and year first above written.

                        **LANDLORD:**

                        **FR   NET   LEASE   CO-INVESTMENT PROGRAM 13, LLC**

                        By:    FR Net Lease Co-Investment Manager 13, LLC, its managing member

                        By:    FR Net Lease Co-Investment Program Manager, LLC, its sole member

                        By:    First Industrial, L.P., its sole member

                        By:    First Industrial Realty Trust, Inc., its sole general partner

                              By: _____
                              Name: _____
                              Its: _____

                        **TENANT:**

                        **LENOX, INCORPORATED,** a New Jersey corporation

                        By: _____
                        Its: _____

| Landlord's Addresses for Notices: | Tenant's Addresses for Notices: |
|---|---|
| c/o First Industrial Realty Trust, Inc.<br>311 South Wacker Drive, Suite 4000<br>Chicago, Illinois 60606<br>Attn: Executive Vice President-Operations | Lenox, Incorporated<br>6436 City West Parkway<br>Eden Prairie, MN 55344<br>Attn:   Tim Schugel |
| With a copy to:<br><br>First Industrial Realty Trust, Inc.<br>7150 Columbia Gateway Drive, Suite A<br>Columbia, Maryland 21046<br>Attention: Kevin Bauer -- Senior Property<br>                  Manager<br>Telephone: (410) 312-2900<br>Facsimile: (410) 312-2990 | With copies to:<br>Lenox Group, Inc.<br>1414 Radcliffe Street<br>Bristol, PA 19007-5496<br>Attn: L.A. Fantin<br><br>and<br><br>Dorsey & Whitney LLP<br>50 South Sixth Street<br>Suite 1500<br>Minneapolis, MN 55402<br>Attn:  Robert J. Olson |
| With a copy to:<br><br>*(On or prior to June 30, 2007):*<br>Barack Ferrazzano Kirschbaum Perlman &<br>Nagelberg LLP<br>333 West Wacker Drive<br>Suite 2700<br>Chicago, Illinois 60606<br>Attn:  Mark J. Beaubien<br><br>*(After June 30, 2007):*<br>Barack Ferrazzano Kirschbaum Perlman &<br>Nagelberg LLP<br>200 West Madison Street<br>Suite 3900<br>Chicago, Illinois 60606<br>Attn:  Mark J. Beaubien | |

## EXHIBIT A

## PREMISES

All of those lots or parcels of land located in Washington County, Maryland and more particularly described as follows:

Beginning at an iron pin and cap along the existing right of way for the cul-de-sac at Hunter's-Green Parkway, said point also being located S 23°26'32" W 64.91 feet form the most southeastem corner of the lands of Lot 1 as recorded in Washington County Plat folio 5724, thence running

1. N 61°52'12" W 357.43 feet to a point, thence
2. N 73°57'41" W 311.22 feet to a point, thence with a curve to the left having a radius of 130.00 feet, an arc length of 176.77 feet and a chord bearing and distance of
3. S 67°05'05" W 163.46 feet to a point; thence
4. S 28°07'48" W 294.58 feet to a point, thence with a curve to the left having a radius of 30 feet, an arc length of 47.12 feet and a chord bearing and distance of
5. S 16°52'12" E 42.43 feet to a point, thence
6. S 61°52'12" E 45.24 feet to a point, thence
7. S 28°07'48" W 212.00 feet to a point, thence
8. N 61°52'12" W 842.09 feet to a point, thence
9. N 33°41'02" E 554.60 feet to a point, thence
10. S 61°52'12" E 642.53 feet to a point, thence
11. N 30°14'06" E 218.22 feet to a point, thence
12. N 59°44'09" W 677.59 feet to a point, thence
13. N 26°32' 54" E 251.87 feet to a point, thence
14. N 67°56'10" W 332.65 feet to a point, thence
15. S 22°03'50" W 300.00 feet to a point, thence
16. N 54°58'15" W 142.05 feet to a point, thence
17. S 70°14'47" W 24.81 feet to a point, thence
18. S 20°56'55" W 118.29 feet to a point, thence
19. S 09°59'56" W 210.79 feet to a point, thence
20. S 18°00'23" W 18.67 feet to a point, thence
21. S 56°19'00" W 287.69 feet to a point, thence
22. N 33°41'04" E 425.87 feet to a point, thence
23. S 59°44'08" W 100.18 feet to a point, thence
24. S 33°41'02" W 185.64 feet to a point, thence
25. S 85°18'25" W 31.89 feet to a point, thence
26. S 33°41'02" W 591.12 feet to a point along the northem right-of-way line of Interstate 70, thence with said right-of-way line S 61°42'34" E 2724.62 feet to a point, thence leaving said right of way and running along the remaining lands of Grace Litton, et al, N 28°17'26" E 382.02 feet to a point, thence with said southern right-of-way line and with a curve to the right having a radius of 530.00 feet, an arc length of 279.97 feet and a chord bearing and distance of
27. N 22° 34'01" W 276.73 feet to a point, thence with a curve to the left having a radius of 470.00 feet, an arc length of 400.99 feet and a chord bearing and distance of
28. N 31°52'32" W 388.94 feet to a point; thence
29. N 56°19'02" W 445.43 feet to a point, thence running with the cul-de-sac at the end of Hunter's Green Parkway and with a curve to the left having a radius of 50 feet, an arc length of 61.51 feet and a chord bearing and distance of
30. S 88°25'06" W 57.743 feet to a point, thence running with a curve to the right having a radius of 70 feet, an arc length of 149.87 feet and a chord bearing and distance of
31. N 65°30'43" W 122.84 feet to the place of beginning.

Containing 40.00 acres of land, more or less.

Being Lot 5 as shown on a plat entitled "Final Plat of Subdivision of Lots 5 and 6 and Simplified Plat of Parcels B and C of Hunter's Green Business Park for Tiger Development II, LP", said plat being recorded at Plat folio 6647, et seq, one of the plat records in the office of the Clerk of the Circuit Court for Washington County, Maryland.