## EXHIBIT B

## TENANT OPERATIONS INQUIRY FORM

1.  Name                                                                      of
    Company/Contact_____

2.  Address/Phone_____

    _____

    _____

3.  Provide a brief description of your business and operations: _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

4.  Will you be required to make filings and notices or obtain permits as required by Federal and/or
    State regulations for the operations at the proposed facility? Specifically:

    a. SARA Title III Section 312 (Tier II) reports                    **YES   NO**
          (> 10,000lbs. of hazardous materials STORED at any one time)

    b. SARA Title III Section 313 (Tier III) Form R reports            **YES   NO**
          (> 10,000lbs. of hazardous materials USED per year)

    c. NPDES or SPDES Stormwater Discharge permit                      **YES   NO**
          (answer "No" if "No-Exposure Certification" filed)

    d. EPA Hazardous Waste Generator ID Number                         **YES   NO**

5.  Provide a list of chemicals and wastes that will be used and/or generated at the proposed
    location. Routine office and cleaning supplies are not included. Make additional copies if required.

Industrial Building Lease - Lecon - FINAL (7) (2).DOC                    B-1

| Chemical/Waste | Approximate Annual Quantity Used or Generated | Storage Container(s) (i.e. Drums, Cartons, Totes, Bags, ASTs, USTs, etc) |
|---|---|---|
| | | |
| | | |
| | | |

## EXHIBIT C

### BROOM CLEAN CONDITION AND REPAIR REQUIREMENTS

- All lighting is to be placed into good working order. This includes replacement of bulbs, ballasts, and lenses as needed.

- All truck doors and dock levelers should be serviced and placed in good operating order (including, but not limited to, overhead door springs, rollers, tracks and motorized door operator). This would include the necessary (a) repair or replacement of any significantly dented truck door panels (dents more than 1 inch deep), broken panels and cracked lumber, and (b) adjustment of door tension to insure proper operation. All door panels that are replaced shall be painted to match the building standard.

- All structural steel columns in the warehouse and office should be inspected for structural damage, and must be repaired. Repairs of this nature shall be pre-approved by the Landlord prior to implementation.

- HVAC system shall be in good working order, including the necessary replacement of any parts to return the unit to operational condition given the age of the units. Tenant shall maintain, throughout the term of the Lease and any renewals, a preventative maintenance contract on all HVAC units. The contract shall be with a reputable mechanic company, reasonably acceptable to the Landlord, and shall consist at a minimum of semiannual inspections with filter changes, twice yearly complete cleaning of fins and coils, complete cleaning of all evaporators at least once every four years, and all other necessary adjustments. Working order shall include, but is not limited to, filters, thermostats, warehouse heaters and exhaust fans. Upon move-out, Landlord will have an exit inspection performed by a certified mechanical contractor mutually and reasonably agreeable to both parties to determine the condition of the HVAC systems.

- All holes over 1/4" in diameter in the office space and in the sheet rock walls shall be repaired prior to move-out. All walls shall be clean.

- The carpets and vinyl tiles shall be in a clean condition and shall not have any holes or chips in them. Flooring shall be free of excessive dust, dirt, grease, oil and stains. Cracks in concrete and asphalt shall be acceptable as long as they are ordinary wear and tear, and are not the result of misuse.

- Facilities shall be returned in a clean condition, including, but not limited to, the cleaning of the coffee bar, restroom areas, windows, and other portions of the Premises.

- There shall be no protrusion of anchors from the warehouse floor and all holes shall be appropriately patched. If machinery/equipment is removed, the electrical lines shall be properly terminated at the nearest junction box.

- All exterior windows with cracks or breakage shall be replaced. All interior windows shall be clean.

- Tenant shall provide keys for all locks on the Premises, including front doors, rear doors, and interior doors.

- All mechanical and electrical systems shall be left in a safe condition that conforms to all codes applicable to Tenant and the Premises as of the termination of the Lease. Bare wires shall be clipped to the nearest junction box and dangerous installations shall be corrected to Landlord's reasonable satisfaction.

- All plumbing fixtures shall be in good working order, including, but not limited to, the water heater. Faucets and toilets shall not leak.

- All dock bumpers shall be left in place and well-secured.

- Drop grid ceiling shall be free of excessive dust from lack of changing filters. No ceiling tiles may be missing or damaged

- All trash shall be removed from both inside and outside of the Building.

- All signs in front of the Building and on glass entry door and rear door shall be removed.

Remove all pads for machinery and repair and seal any roof penetrations.

# EXHIBIT D

## TERMINATION FEE

In the event Tenant has the right to purchase the Premises pursuant to **Section 18**, the purchase price shall be an amount equal to the sum of (A) 1.10, <u>multiplied</u> by the amount of the current Landlord's equity investment in the Premises (including all related acquisition costs, including, but not limited to, legal fees, brokerage commissions, environmental consultants and engineering consultants and any unreimbursed improvements and capital expenditures), <u>plus</u> (B) (i) the amount of any then-outstanding debt on the Premises, and (ii) the amount of any yield maintenance or defeasance fees, costs or other fees or premiums due in connection with the pre-payment of any then-outstanding debt (the "Debt Premium"). Landlord shall provide a good faith, non-binding estimate of the Debt Premium, if any, in anticipation of the Loss Closing Date promptly after the occurrence of a Casualty or Condemnation, except Tenant acknowledges that Landlord's lender will calculate the actual Debt Premium, if any, to be paid by Tenant at the Loss Closing Date closer to such date (which lender's calculation shall be binding on Tenant).

The determination of the purchase price under this **Exhibit D** shall be determined by Landlord in its sole, but reasonable, discretion and shall be conclusive absent manifest error.

## EXHIBIT E

## GUARANTY OF LEASE

**GUARANTY OF LEASE** (this "**Guaranty**") made as of _____ ____, 2006, by **LENOX GROUP INC**, a Delaware corporation, with an address at 1414 Radcliffe Street, Bristol, PA 19007-5496 ("**Guarantor**"), to _____, a(n) _____, having an office at 311 South Wacker Drive, Suite 4000, Chicago, Illinois 60606 ("**Landlord**").

## WITNESSETH:

**WHEREAS:**

A.      Landlord has been requested by Lenox, Incorporated, a New Jersey corporation, with an office at 6436 City West Parkway, Eden Prairie, MN 55344 ("**Tenant**"), to enter into an Industrial Building Lease dated as of the date hereof (the "**Lease**"), whereby Landlord would lease to Tenant, and Tenant would rent from Landlord, all of the premises commonly known as 16507 Hunters Green Parkway, Hagerstown, Maryland, as more particularly described in the Lease (the "**Premises**").

B.      Guarantor is the parent of Tenant and will derive substantial economic benefit from the execution and delivery of the Lease.

C.      Guarantor acknowledges that Landlord would not enter into the Lease unless this Guaranty accompanied the execution and delivery of the Lease.

D.      Guarantor hereby acknowledges receipt of a copy of the Lease.

**NOW, THEREFORE**, in consideration of the execution and delivery of the Lease and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor covenants and agrees as follows:

1.      **DEFINITIONS.** Defined terms used in this Guaranty and not otherwise defined herein have the meanings assigned to them in the Lease.

2.      **COVENANTS OF GUARANTOR.**

(a)      Guarantor absolutely, unconditionally and irrevocably guarantees, as a primary obligor and not merely as a surety: (i) the full and prompt payment of all Base Rent and Additional Rent and all other rent, sums and charges of every type and nature payable by Tenant under the Lease, and (ii) the full, timely and complete performance of all covenants, terms, conditions, obligations and agreements to be performed by Tenant under the Lease (all of the obligations described in clauses (i) and (ii), collectively, the "**Obligations**"), which Obligations shall not exceed the liabilities and obligations of Tenant under the Lease. If Tenant defaults under the Lease, Guarantor will, within the notice and cure periods provided in the Lease, pay and perform all of the Obligations, and pay to Landlord, when and as due, all Base Rent and

Additional Rent payable by Tenant under the Lease, together with all damages, costs and expenses to which Landlord is entitled pursuant to the Lease.

(b)    Guarantor agrees with Landlord that (i) any action, suit or proceeding of any kind or nature whatsoever (an "**Action**") commenced by Landlord against Guarantor to collect Base Rent and Additional Rent and any other rent, sums and charges due under the Lease for any month or months shall not prejudice in any way Landlord's rights to collect any such amounts due for any subsequent month or months throughout the Term in any subsequent Action, (ii) Landlord may, at its option, without prior notice or demand, join Guarantor in any Action against Tenant in connection with or based upon either or both of the Lease and any of the Obligations, (iii) Landlord may seek and obtain recovery against Guarantor in an Action against Tenant or in any independent Action against Guarantor without Landlord first asserting, prosecuting, or exhausting any remedy or claim against Tenant or against any security of Tenant held by Landlord under the Lease, and (iv) Guarantor will be conclusively bound by a judgment entered in any Action in favor of Landlord against Tenant, as if Guarantor were a party to such Action, irrespective of whether or not Guarantor is entered as a party or participates in such Action.

(c)    Any default or failure by the Guarantor to perform any of its Obligations under this Guaranty shall be deemed an immediate default by Tenant under the Lease.

3.    **GUARANTOR'S OBLIGATIONS UNCONDITIONAL.**

(a)    This Guaranty is an absolute and unconditional guaranty of payment and of performance, and not of collection, and shall be enforceable against Guarantor without the necessity of the commencement by Landlord of any Action against Tenant, and without the necessity of any notice of nonpayment, nonperformance or nonobservance, or any notice of acceptance of this Guaranty, or of any other notice or demand to which Guarantor might otherwise be entitled, all of which Guarantor hereby expressly waives in advance.  The obligations of Guarantor hereunder are independent of the obligations of Tenant.

(b)    If the Lease is renewed, or the Term extended, for any period beyond the Expiration Date, either pursuant to any option granted under the Lease or otherwise, or if Tenant holds over beyond the Expiration Date, the obligations of Guarantor hereunder shall extend and apply to the full and faithful performance and observance of all of the Obligations under the Lease accruing during any renewal, extension or holdover period.

(c)    This Guaranty is a continuing guaranty and will remain in full force and effect notwithstanding, and the liability of Guarantor hereunder shall be absolute and unconditional irrespective of: (i) any modifications, alterations or amendments of the Lease (regardless of whether Guarantor consented to or had notice of same), (ii) any releases or discharges of Tenant other than the full release and complete discharge of all of the Obligations, (iii) Landlord's failure or delay to assert any claim or demand or to enforce any of its rights against Tenant, (iv) any extension of time that may be granted by Landlord to Tenant, (v) any assignment or transfer of all of any part of Tenant's interest under the Lease (whether by Tenant,

by operation of law, or otherwise), (vi) any subletting, concession, franchising, licensing or permitting of the Premises, (vii) any changed or different use of the Premises, (viii) any other dealings or matters occurring between Landlord and Tenant, (ix) the taking by Landlord of any additional guarantees, or the receipt by Landlord of any collateral, from other persons or entities, (x) the release by Landlord of any other guarantor, (xi) Landlord's release of any security provided under the Lease, or (xii) Landlord's failure to perfect any landlord's lien or other lien or security interest available under applicable Laws.  Without limiting the foregoing, this Guaranty shall be applicable to any obligations of Tenant arising in connection with a termination of the Lease, whether voluntary or otherwise.  Guarantor hereby consents, prospectively, to Landlord's taking or entering into any or all of the foregoing actions or omissions.  For purposes of this Guaranty and the obligations and liabilities of Guarantor hereunder, "Tenant" shall be deemed to include any and all concessionaires, licensees, franchisees, department operators, assignees, subtenants, permittees or others directly or indirectly operating or conducting a business in or from the Premises and/or the Property, as fully as if any of the same were the named Tenant under the Lease.

(d)     Guarantor hereby expressly agrees that the validity of this Guaranty and the obligations of Guarantor hereunder shall in no way be terminated, affected, diminished or impaired by reason of the assertion or the failure to assert by Landlord against Tenant, of any of the rights or remedies reserved to Landlord pursuant to the provisions of the Lease or by relief of Tenant from any of Tenant's obligations under the Lease or otherwise by (i) the release or discharge of Tenant in any state or federal creditors' proceedings, receivership, bankruptcy or other proceeding; (ii) the impairment, limitation or modification of the liability of Tenant or the estate of Tenant in bankruptcy, or of any remedy for the enforcement of Tenant's liability under the Lease, resulting from the operation of any present or future provision of the United States Bankruptcy Code (11 U.S.C. § 101 et seq., as amended), or from other statute, or from the order of any court; or (iii) the rejection, disaffirmance or other termination of the Lease in any such proceeding.  This Guaranty shall continue to be effective if at any time the payment of any amount due under the Lease or this Guaranty is rescinded or must otherwise be returned by Landlord for any reason, including, without limitation, the insolvency, bankruptcy, liquidation or reorganization of Tenant, Guarantor or otherwise, all as though such payment had not been made, and, in such event, Guarantor shall pay to Landlord an amount equal to any such payment that has been rescinded or returned if equitable and permitted by applicable law.

4.     **WAIVERS OF GUARANTOR.**

(a)     Without limitation of the foregoing, Guarantor waives (i) notice of acceptance of this Guaranty and notice of dishonor, (ii) notice of any actions taken by Landlord or Tenant under the Lease or any other agreement or instrument relating thereto, (iii) notice of any and all defaults by Tenant in the payment of Base Rent and Additional Rent or other rent, charges or amounts, or of any other defaults by Tenant under the Lease, (iv) all other notices, demands and protests, and all other formalities of every kind in connection with the enforcement of the Obligations, omission of or delay in which, but for the provisions of this **Section 4**, might constitute grounds for relieving Guarantor of its obligations hereunder, (v) any requirement that Landlord protect, secure, perfect, insure or proceed against any security interest or lien, or any

property subject thereto, or exhaust any right or take any action against Tenant or any collateral, and (vi) the benefit of any statute of limitations affecting Guarantor's liability under this Guaranty.

(b)   GUARANTOR HEREBY WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY ANY PERSON OR ENTITY WITH RESPECT TO ANY MATTER WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH: THIS GUARANTY; THE LEASE; ANY LIABILITY OR OBLIGATION OF TENANT IN ANY MANNER RELATED TO THE PREMISES AND/OR THE PROPERTY; ANY CLAIM OF INJURY OR DAMAGE IN ANY WAY RELATED TO THE LEASE, THE PREMISES AND/OR THE PROPERTY; ANY ACT OR OMISSION OF TENANT, ITS AGENTS, EMPLOYEES, CONTRACTORS, SUPPLIERS, SERVANTS, CUSTOMERS, CONCESSIONAIRES, FRANCHISEES, PERMITTEES OR LICENSEES; OR ANY ASPECT OF THE USE OR OCCUPANCY OF, OR THE CONDUCT OF BUSINESS IN, ON OR FROM THE PREMISES AND/OR THE PROPERTY. GUARANTOR SHALL NOT IMPOSE ANY COUNTERCLAIM OR COUNTERCLAIMS OR CLAIMS FOR SET-OFF, RECOUPMENT OR DEDUCTION OF RENT IN ANY ACTION BROUGHT BY LANDLORD AGAINST GUARANTOR UNDER THIS GUARANTY. GUARANTOR SHALL NOT BE ENTITLED TO MAKE, AND HEREBY WAIVES, ANY AND ALL DEFENSES AGAINST ANY CLAIM ASSERTED BY LANDLORD OR IN ANY SUIT OR ACTION INSTITUTED BY LANDLORD TO ENFORCE THIS GUARANTY OR THE LEASE, EXCEPT THE DEFENSE OF PAYMENT. IN ADDITION, GUARANTOR HEREBY WAIVES, BOTH WITH RESPECT TO THE LEASE AND WITH RESPECT TO THIS GUARANTY, ANY AND ALL RIGHTS WHICH ARE WAIVED BY TENANT UNDER THE LEASE, IN THE SAME MANNER AS IF ALL SUCH WAIVERS WERE FULLY RESTATED HEREIN. THE LIABILITY OF GUARANTOR UNDER THIS GUARANTY IS PRIMARY AND UNCONDITIONAL.

5.   **SUBROGATION**.  Guarantor shall not be subrogated, and hereby waives and disclaims any claim or right against Tenant by way of subrogation or otherwise, to any of the rights of Landlord under the Lease or otherwise, or in either or both of the Premises and the Property, which may arise by any of the provisions of this Guaranty or by reason of the performance by Guarantor of any of its Obligations hereunder. Guarantor shall look solely to Tenant for any recoupment of any payments made or costs or expenses incurred by Guarantor pursuant to this Guaranty.  If any amount shall be paid to Guarantor on account of such subrogation rights at any time when all of the Obligations shall not have been paid and performed in full, Guarantor shall hold such amount in trust for Landlord and shall pay such amount to Landlord immediately following receipt by Guarantor, to be applied against the Obligations, whether matured or unmatured, in such order as Landlord may determine. Guarantor hereby subordinates any liability or indebtedness of Tenant now or hereafter held by Guarantor to the obligations of Tenant to Landlord under the Lease.

6.   **REPRESENTATIONS AND WARRANTIES OF GUARANTOR.** Guarantor represents and warrants that:

(a)   Guarantor is a corporation; has all requisite power and authority to enter into and perform its obligations under this Guaranty; and this Guaranty is valid and binding upon and enforceable against Guarantor without the requirement of further action or condition.

(b)   The execution, delivery and performance by Guarantor of this Guaranty does not and will not (i) contravene any applicable Laws or any contractual restriction binding on or affecting Guarantor or any of its properties, or (ii) result in or require the creation of any lien, security interest or other charge or encumbrance upon or with respect to any of its properties.

(c)   There is no action, suit or proceeding pending or threatened against or otherwise affecting Guarantor before any court or other governmental authority or any arbitrator that may materially adversely affect Guarantor's ability to perform its obligations under this Guaranty.

(d)   Guarantor's principal place of business is 1414 Radcliffe Street, Bristol, PA 19007-5496.

(e)   Guarantor is the parent company of Tenant.

7.   **NOTICES.** Any consents, notices, demands, requests, approvals or other communications given under this Guaranty shall be given as provided in the Lease, and as follows:

(a)   if to Guarantor at Guarantor's address set forth on the first page of this Guaranty, Attention: L.A. Fantin; and

(b)   if to Landlord, at Landlord's address set forth on the signature page of the Lease (with a copy to Landlord's attorney as also set forth on the signature page to the Lease); or to such other addresses as either Landlord or Guarantor may designate by notice given to the other in accordance with the provisions of this **Section 7.**

8.   **CONSENT TO JURISDICTION; WAIVER OF IMMUNITIES.** The undersigned hereby (a) consents and submits to the jurisdiction of the courts of the State of Maryland and the federal courts sitting in the State of Maryland and shall be subject to service of process in the State of Maryland with respect to any dispute there arising, directly or indirectly, out of this Guaranty, (b) waives any objections which the undersigned may have to the laying of venue in any such suit, action or proceeding in either such court, (c) agrees to join Landlord in any petition for removal to either such court, (d) agrees to join Landlord in any petition for removal to either and such court, and (e) irrevocably designates and appoints Tenant as its authorized agent to accept and acknowledge on its behalf service of process with respect to any disputes arising, directly or indirectly, out of this Guaranty.   The undersigned hereby acknowledges and agrees that Landlord may obtain personal jurisdiction and perfect service of

process through Tenant as the undersigned agent, or by any other means now or hereafter permitted by applicable law. Nothing above shall limit Landlord's choice of forum for purposes of enforcing this Guaranty.

9.   **MISCELLANEOUS**.

(a)   Guarantor further agrees that Landlord may, without notice, assign this Guaranty in whole or in part, at such time and contemporaneous with the assignment by Landlord of the Lease. If Landlord disposes of its interest in the Lease, "**Landlord**," as used in this Guaranty, shall mean Landlord's successors and assigns. This Guaranty may not be assigned by Guarantor without the prior written consent of Landlord, which consent may be withheld in Landlord's sole discretion.

(b)   Guarantor promises to pay all of Landlord's expenses, including, without limitation, reasonable attorneys' fees and costs, incurred by Landlord in enforcing the terms and conditions of either or both of the Lease and this Guaranty if Landlord prevails.

(c)   Guarantor shall, from time to time within ten (10) business days after receipt of Landlord's request, execute, acknowledge and deliver to Landlord a statement certifying that this Guaranty is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating such modifications). Such certificate may be relied upon by any prospective purchaser, lessor or lender of all or a portion of the Premises and/or Property.

(d)   If any portion of this Guaranty shall be deemed invalid, unenforceable or illegal for any reason, such invalidity, unenforceability or illegality shall not affect the balance of this Guaranty, which shall remain in full force and effect to the maximum permitted extent.

(e)   The provisions, covenants and guaranties of this Guaranty shall be binding upon Guarantor and its heirs, successors, legal representatives and assigns, and shall inure to the benefit of Landlord and its successors and assigns, and shall not be deemed waived or modified unless such waiver or modification is specifically set forth in writing, executed by Landlord or its successors and assigns, and delivered to Guarantor.

(f)   Whenever the words "include", "includes", or "including" are used in this Guaranty, they shall be deemed to be followed by the words "without limitation", and, whenever the circumstances or the context requires, the singular shall be construed as the plural, the masculine shall be construed as the feminine and/or the neuter and/or vice versa. This Guaranty shall be interpreted and enforced without the aid of any canon, custom or rule of law requiring or suggesting construction against the party drafting or causing the drafting of the provision in question.

(g)   Each of the rights and remedies herein provided are cumulative and not exclusive of any rights or remedies provided by law or in the Lease or this Guaranty.

(h)     The provisions of this Guaranty shall be governed by and interpreted solely in accordance with the internal laws of the State of Maryland, without giving effect to the principles of conflicts of law.

(i)     The execution of this Guaranty prior to execution of the Lease shall not invalidate this Guaranty or lessen the Obligations of Guarantor hereunder.

(j)     Guarantor shall deliver to Landlord, upon reasonable request by Landlord, financial statements for Guarantor prepared by an independent public accountant in the ordinary course of the business and in accordance with customary accounting practices applicable to business operations similar (in terms of the entity's domicile and whether such entity is a privately held or a public company) to that of Guarantor.

[Signature Page to Follow]

**IN WITNESS WHEREOF,** Guarantor has executed this Guaranty as of the day and year first above written.

GUARANTOR:

**LENOX GROUP INC,**
a Delaware corporation

By: _____
Name: _____
Its: _____

## EXHIBIT F

## RIGHT OF FIRST OFFER

1.    **Defined Terms**. Capitalized terms used in this Addendum and not otherwise defined shall have the meanings respectively ascribed to such terms in the Lease.

2.    **GRANT**. Landlord hereby covenants and agrees that Tenant shall have, and Landlord hereby grants to Tenant, a one time "Right of First Offer" to purchase the Premises.

3.    **OFFER NOTICE**. Prior to Landlord accepting an offer for the sale of the Premises (which acceptance by Landlord shall be contingent on Tenant's rights under this Right of First Offer), Landlord shall first offer to Tenant the opportunity to purchase fee simple title to the Premises by advising Tenant, in writing (the "**Offer Notice**"), of Landlord's desire to sell the Premises. For purposes of this Lease, a sale of the Premises to which this Right of First Offer applies shall include an indirect transfer of the Premises resulting from the transfer of all or substantially all of the beneficial ownership interests in Landlord to a third party undertaken for purposes of transferring beneficial ownership of the Premises (an "**Indirect Sale**"); provided, however, that this Right of First Offer applies shall not apply to: (i) the direct or indirect transfer of, or issuance of beneficial ownership interest in, First Industrial Investment, Inc. ("**FI**"), First Industrial, L.P. ("**FILP**"), First Industrial Realty Trust, Inc. ("**FR**") or any successor-in-interest to any of the foregoing; or (ii) the transfer of less than 50% of the ownership interests in Landlord; or (iii) the transfer of ownership interests in Landlord in connection with a joint venture involving Landlord, FILP, FR or FI or the sale of all or substantially all of the assets of such a joint venture; or (iv) a transfer of the Premises (or the marketing of the Premises) in a transaction that closes essentially contemporaneously with either (A) a liquidation of Landlord, (B) a transfer like that described in clause (iii) above or (C) a transfer from one member or partner in Landlord of its entire equity interest to another member or partner in Landlord, but such Right of First Offer will survive any of the foregoing events. In the Offer Notice, Landlord shall describe, with reasonable specificity, the purchase price and other relevant terms and conditions upon which Landlord is prepared to sell its fee simple interest in the entire Premises (the "**Offer Terms**").

4.    **RESPONSE**. Upon Landlord's delivery of the Offer Notice and Offer Terms, Tenant shall have twelve (12) business days (the "**Response Period**") in which to advise Landlord, in writing (the "**Offer Response**"), whether or not Tenant desires to exercise its Right of First Offer and acquire fee simple title to the Premises on all of the Offer Terms. If Tenant fails to timely deliver an Offer Response electing to exercise its Right of First Offer, then Tenant shall have automatically, unconditionally and permanently waived its Right of First Offer with respect to the Premises (subject to **Section 6** hereof and the last sentence of this **Section 4**) such that the Right of First Offer no longer applies to the Premises. In that event, Landlord shall be free to pursue a sale of its fee simple interest in the Premises to a third party, including, but not limited to, an Indirect Sale (a "**Sale**"), on substantially the same Offer Terms as are set forth in the then-applicable Offer Notice. In the event (A) Landlord delivers an Offer Notice; (B) Tenant elects or is deemed to elect not to exercise its Right of First Offer; and (c) Landlord does not consummate a Sale within twelve (12) months after the expiration of the Response Period (such 12 month period, the "**Offer Period**"), Tenant's waiver of its Right of First Offer shall be rescinded and Landlord shall not be free to pursue a Sale of the Premises without complying with the terms of this **Exhibit F** and Tenant's Right of First Offer as to the Premises.

5.    **PURCHASE CONTRACT**. If Tenant timely delivers an Offer Response and advises Landlord of its desire to acquire Landlord's fee simple interest in the Premises, the terms and provisions of this **Section 5** shall apply.

a.    General. Simultaneously with the delivery by Tenant to Landlord of an Offer Response, Tenant shall deposit with Landlord, as its earnest money deposit, the sum of $500,000 (the "**Earnest Money**") and applied in accordance with this Exhibit. Tenant shall have no right to exercise this Right of First Offer if Tenant is in default of its obligation under the Lease to pay Base Rent or Additional Rent beyond the applicable cure period. If Tenant is and remains in default of its obligation under the Lease to pay Base Rent or Additional Rent as of the Closing (hereinafter defined), Landlord may elect, in its sole discretion, to void Tenant's exercise of this Right of First Offer by delivery of written notice to Tenant, in which event this Right of First Offer shall thereafter be forever null and void and Landlord shall be entitled to retain the Earnest Money.  Within ten (10) days after the delivery by Tenant to Landlord of an Offer Response, Tenant shall deliver to Landlord a title commitment, issued by a reputable, national title insurance company selected by Tenant (the "**Title Company**"), for an owner's title insurance policy (the "**Title Policy**") in the full amount of the Purchase Price (as hereinafter defined), together with copies of all recorded documents representing title exceptions.

b.    Purchase Price. The total purchase price to be paid by Tenant to Landlord for the Premises shall be as set forth in the Offer Terms (the "**Purchase Price**"), plus or minus any adjustments contemplated in herein. The Earnest Money shall be held in escrow by the Title Company and applied against the Purchase Price.

c.    Closing. The purchase of the Premises contemplated herein shall be consummated at a closing (the "**Closing**") to take place by mail or at the offices of the Title Company. The Closing shall occur on the sooner to occur of: (i) such date as the parties shall mutually agree in writing; and (ii) thirty (30) days after the delivery by Tenant to Landlord of an Offer Response (the "**Closing Date**"). The Closing shall be effective as of 11:59 p.m. on the Closing Date. In the event of any conflict between the Offer Terms applicable to the sale of the Premises and the terms of this **Section 5**, the terms of this **Section 5** shall control.

d.    Landlord's Closing Deliveries. At the Closing, Landlord shall deliver, or cause to be delivered, to Tenant the following duly executed by Landlord where appropriate: (i) a Special Warranty Deed, in recordable form, conveying the Premises to Tenant subject to the Permitted Exceptions (as hereinafter defined); (ii) a Quitclaim Bill of Sale conveying all of Landlord's interest in and to any tangible personal property located on the Premises which is owned by Landlord and used by Landlord solely in connection with the Premises; (iii) an Affidavit of Title in form and substance reasonably acceptable to the Title Company; (iv) a closing statement (the "**Closing Statement**") conforming to the prorations and other relevant provisions of this Addendum; (v) an Entity Transfer Certification confirming that Landlord is a "United States Person" within the meaning of Section 1445 of the Internal Revenue Code of 1986, as amended; (vi) such evidence of the authority and good standing of Landlord as the Title Company shall reasonably require as a condition to the issuance of the Title Policy, and (vii) an assignment of all leases, contracts, etc. on the or pertaining to the Premises that will survive the Closing or as otherwise requested by Tenant.

e.    <u>Tenant's Closing Deliveries</u>. At the Closing, Tenant shall deliver, or cause to be delivered, to Landlord the following duly executed by Tenant where appropriate:  (i) the Closing Statement; and (ii) the Purchase Price, plus or minus prorations and other adjustments, in immediately available funds.

f.    <u>Title Condition</u>. It shall be a condition precedent to Tenant's obligation to proceed to the Closing that, at the Closing, the Title Company shall issue the Title Policy (or a "marked" title commitment) to Tenant insuring, in the full amount of the Purchase Price, Tenant as the fee simple owner of the Premises, subject only to the Permitted Exceptions. If the foregoing condition precedent fails for any reason other than the actions of Tenant, the exercise of this Right of First Offer by Tenant shall, at Tenant's election, be null and void, in which event (i) the Earnest Money shall be returned to Tenant, and (ii) this Right of First Offer shall be irrevocably terminated and of no further force and effect. Landlord shall convey the Premises to Tenant subject to any and all liens, claims and encumbrances of record ("**Permitted Exceptions**") other than the following:  (i) the liens of any mortgage, trust deed or deed of trust evidencing an indebtedness owed by Landlord; (ii) mechanic's liens pursuant to a written agreement between the claimant and Landlord; (iii) broker's liens pursuant to a written agreement between the broker and Landlord and (iv) any other lien securing the payment of money owed by Landlord (the "**Mandatory Cure Items**"). Landlord shall, at Landlord's sole cost, cure and remove any Mandatory Cure Items on or prior to the Closing. If Landlord fails to cure and remove (whether by endorsement or otherwise) any Mandatory Cure Items on or prior to the Closing, Tenant may, at its option and as its sole remedy hereunder, at law, in equity or pursuant to the Lease, either (i) terminate its election to exercise this Right of First Offer, in which event the Earnest Money shall be returned by Landlord to Tenant and this Right of First Offer shall thereafter become forever null and void, or (ii) proceed to close with title to the Premises as it then is with the right to deduct from the Purchase Price the amount reasonably necessary to cure and remove (by endorsement or otherwise, as mutually and reasonably determined by Tenant and Landlord) those Mandatory Cure Items that Landlord has failed to cure and remove.

g.    <u>Property Transferred "As Is"</u>. The sale of the Premises pursuant to this Right of First Offer as provided for herein shall be made on a "AS IS," "WHERE-IS" basis as of the Closing Date, without any representations or warranties, of any nature whatsoever from Landlord. Landlord hereby specifically disclaims any warranty (oral or written) concerning: (i) the nature and condition of the Premises and the suitability thereof for any and all activities and uses that Tenant may elect to conduct thereon, (ii) the manner, construction, condition and state of repair or lack of repair of any improvements located thereon, (iii) the nature and extent of any right-of-way, lien, encumbrance, license, reservation, condition or otherwise, (iv) the compliance of the Premises or its operation with any laws, rules, ordinances, or regulations of any government or other body; and (v) any other matter whatsoever. Tenant expressly acknowledges that, in consideration of the agreements of Landlord herein, LANDLORD MAKES NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF QUANTITY, QUALITY, CONDITION, HABITABILITY, MERCHANTABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PREMISES, ANY IMPROVEMENTS LOCATED THEREON, OR ANY SOIL CONDITIONS RELATED THERETO. TENANT, FOR TENANT AND TENANT'S SUCCESSORS AND ASSIGNS, HEREBY RELEASES LANDLORD FROM AND WAIVES ANY AND ALL CLAIMS AND LIABILITIES AGAINST LANDLORD FOR, RELATED TO, OR IN CONNECTION WITH, ANY ENVIRONMENTAL CONDITION AT THE PREMISES (OR THE PRESENCE OF ANY

MATTER OR SUBSTANCE RELATING TO THE ENVIRONMENTAL CONDITION OF THE PREMISES), INCLUDING, BUT NOT LIMITED TO, CLAIMS AND/OR LIABILITIES RELATING TO (IN ANY MANNER WHATSOEVER) ANY HAZARDOUS, TOXIC OR DANGEROUS MATERIALS OR SUBSTANCES LOCATED IN, AT, ABOUT OR UNDER THE PREMISES, OR FOR ANY AND ALL CLAIMS OR CAUSES OF ACTION (ACTUAL OR THREATENED) BASED UPON, IN CONNECTION WITH OR ARISING OUT OF ANY AND ALL ENVIRONMENTAL LAWS.

h.    <u>Prorations</u>.  Notwithstanding any local custom to the contrary, as it relates to a purchase of the Premises, there shall be no prorations and adjustments between Landlord and Tenant at the Closing (including, but not limited to, any proration or adjustment of ad valorem real estate taxes or special assessments) except as hereinafter expressly provided.  Tenant shall receive a credit from Landlord at the Closing for that portion of any Rent paid by Tenant to Landlord for the month in which the Closing occurs (the "**Closing Month**") that is allocable to the period from and after the Closing Date.  Tenant shall provide a credit to Landlord at the Closing for:  (i) any and all Rent and other sums due and owing from Tenant to Landlord pursuant to the Lease with respect to the period prior to the Closing Date that Tenant has not previously paid to Landlord, including, but not limited to, Rent for that portion of the Closing Month occurring prior to the Closing Date to the extent not paid by Tenant prior to the Closing; (ii) any and all Operating Expenses and costs related to the Property that have been paid by Landlord and are related to the period from and after the Closing to the extent not previously reimbursed by Tenant; and (iii) any and all Taxes paid by Landlord for which Tenant has not reimbursed Landlord, whether related to the period prior to or after the Closing Date.  Landlord and Tenant hereby agree to re-prorate such amounts to the extent of any error, which obligation shall survive the Closing and the delivery of any conveyance documentation.

i.    <u>Closing Expenses</u>.  All costs in connection with the purchase of the Premises and the transactions contemplated by this **Exhibit F**, including, without limitation, any recording fees, broker fees, closing or escrow fees, title insurance premiums, survey costs and transfer taxes shall be allocated in accordance with local custom.  Each of Landlord and Tenant shall be responsible for their respective attorneys' fees.

j.    <u>Termination of Lease</u>.  Upon the Closing and the transfer to Tenant of the Premises, the Lease shall terminate except for those provisions under the Lease which by their terms specifically survive.

k.    <u>Brokerage</u>.  Each party hereto represents and warrants to the other that it has dealt with no brokers or finders in connection with this Right of First Offer.  Landlord and Tenant each hereby indemnify, protect and defend and hold the other harmless from and against all Losses resulting from the claims of any broker, finder, or other such party claiming a commission in connection with the sale of the Premises pursuant to this Right of First Offer by, through or under the acts or agreements of the indemnifying party.  The obligations of the parties pursuant to this **Section 5(k)** shall survive any transfer of the Premises and the delivery of any conveyance documentation.

l.    <u>Absence of Contingencies</u>.  Tenant acknowledges and agrees that, except for the condition precedent relative to the issuance of the Title Policy contained above, there are no conditions precedent or other contingencies to Tenant's obligation to proceed to the Closing if Tenant exercises this Right of First Offer.  Without limitation of the foregoing, Tenant shall not be entitled to the benefit

of any due diligence or other contingency period. Prior to the exercise of this Right of First Offer, Tenant may conduct normal and customary due diligence investigations and studies of the Premises (**"Tenant's Project Inspection"**) subject to the terms and conditions set forth in this Section. Tenant shall not conduct (or cause to be conducted) any physically intrusive investigation, examination or study of the Premises (any such investigation, examination or study, an **"Intrusive Investigation"**) as part of Tenant's Project Inspection without obtaining the prior written consent of Landlord, which consent shall not be unreasonably withheld. In the event Tenant desires to conduct (or cause to be conducted) any Intrusive Investigation, such as sampling of soils, other media, building materials, or the other comparable investigation, Tenant will provide a written scope of work to Landlord describing exactly what procedures Tenant desires to perform. Tenant and Tenant's consultants, agents and employees shall, in performing any Tenant's Project Inspections, comply with the agreed upon procedures and with any and all laws, ordinances, rules, and regulations applicable to such procedures or the Premises. Tenant and Tenant's consultants shall: (a) subject to Section 10 of the Lease, maintain comprehensive general liability (occurrence) insurance in an amount of not less than $2,000,000 covering any accident arising in connection with Tenant's Project Inspections, and deliver a certificate of insurance (in form reasonably acceptable to Landlord), which names Landlord as additional insured thereunder verifying such coverage, to Landlord prior to the performance of any Tenant's Project Inspections; (b) promptly pay when due any third party costs resulting from Tenant's Project Inspections; and (c) restore the Premises to the condition in which the same were found before any such Tenant's Project Inspections were undertaken and repair any damage to the Premises to the extent such condition was altered or the Premises were damaged (directly or indirectly) in connection with Tenant's Project Inspections. Tenant hereby indemnifies, protects, defends and holds Landlord, Landlord's affiliates, their respective partners, shareholders, officers and directors, and all of their respective successors and assigns, harmless from and against any and all Losses that any such party suffers or incurs as a result of, or in connection with, (i) any damage caused to, in, or at the Premises; (ii) injury or death to person; or (iii) mechanic's liens or materialmen's liens arising out of, or in connection with, Tenant's Project Inspections. Tenant's undertakings pursuant to this Section shall survive the Closing and shall not be merged into any instrument of conveyance delivered at the Closing.

m.    <u>No Assignment</u>. The rights of Tenant pursuant to this Right of First Offer are personal to Tenant and may not be assigned by Tenant, except in connection with a Permitted Transfer described in Section 8.3 of the Lease. In the event that Tenant assigns, transfers or conveys all or some portion of its interest in the Lease, this Right of First Offer shall be null, void and of no further force and effect irrespective of whether Landlord has consented to such assignment.

n.    <u>Default by Landlord</u>. If Landlord shall be in material default of its obligations pursuant to this Right of First Offer, Tenant may either (i) terminate Tenant's election to exercise this Right of First Offer by written notice to Landlord, in which event (a) the Earnest Money shall be returned to Tenant and (b) this Right of First Offer shall continue in effect; and (ii) Tenant may file an action for declaratory judgment or equitable relief, including for specific performance of Landlord's obligation to proceed to the Closing, including curing the default in question at Closing. Tenant shall have no other remedy for any default by Landlord pursuant to this **Exhibit F**, except with respect to title conditions as specifically addressed above.

o.    <u>Default by Tenant</u>. In the event Tenant defaults in its obligations to close the purchase of the Premises, or in the event Tenant otherwise defaults pursuant to this **Exhibit F**, then

Landlord shall be entitled to retain the Earnest Money as fixed and liquidated damages, this Right of First Offer shall thereafter be forever void and of no further force and effect. Landlord shall have no other remedy for any default by Tenant pursuant to this **Exhibit F**, including any right to damages or to exercise its rights pursuant to the Lease. LANDLORD AND TENANT ACKNOWLEDGE AND AGREE THAT (1) THE AMOUNT OF THE EARNEST MONEY IS A REASONABLE ESTIMATE OF AND BEARS A REASONABLE RELATIONSHIP TO THE DAMAGES THAT WOULD BE SUFFERED AND COSTS INCURRED BY LANDLORD AS A RESULT OF HAVING WITHDRAWN THE PREMISES FROM SALE AND THE FAILURE OF THE OPTION CLOSING TO HAVE OCCURRED DUE TO A DEFAULT OF TENANT UNDER THIS **EXHIBIT F**; (2) THE ACTUAL DAMAGES SUFFERED AND COSTS INCURRED BY LANDLORD AS A RESULT OF SUCH WITHDRAWAL AND FAILURE TO CLOSE DUE TO A DEFAULT OF TENANT UNDER THIS **EXHIBIT F** WOULD BE EXTREMELY DIFFICULT AND IMPRACTICAL TO DETERMINE; AND (3) THE AMOUNT OF THE EARNEST MONEY SHALL BE AND CONSTITUTE VALID LIQUIDATED DAMAGES.

6.   **CHANGE IN OFFER TERMS.**   In the event that (a) Landlord delivers an Offer Notice and Tenant fails to deliver an Offer Response electing to exercise its Right of First Offer prior to the expiration of the Response Period; and (b) therefore, Landlord has the right to, and is, marketing the Premises for a Sale or actively pursuing the negotiation of the terms and conditions of a Sale, but in the course of such pursuit Landlord desires to change or alter any of the Offer Terms in any material respect, then, during the Offer Period only, Landlord may not consummate any then-pending sale, or finalize the terms and conditions of a Sale, based on and incorporating a material change in the Offer Terms without first delivering a revised Offer Notice to Tenant, reflecting the then-applicable Offer Terms, and providing Tenant with a Tenant's Response Period during which Tenant may elect to deliver an Offer Response. For purposes of this **Section 6**, a change in the purchase price originally included in the Offer Terms shall be deemed material if that purchase price is reduced by more than ten percent (10%) and no changes to the Offer Terms shall be material other than changes in the purchase price.

7.   **EXCLUDED SALES.**   In the event that Landlord desires to transfer and convey all or any portion of its interest in the Premises to FR, FI, FILP, an affiliate of Landlord, FR, FI or FILP, to any entity controlled by, or under common control with, Landlord, FR, FI or FILP or any affiliate of Landlord, FR, FI or FILP, to any joint venture in which Landlord, FR, FI or FILP have an interest or to any other participant in such joint venture (or any affiliate of such a participant (any of the foregoing, an "**Affiliate**", and any such transfer or conveyance, an "**Affiliate Transfer**"), such Affiliate Transfer shall not trigger Tenant's Right of First Offer and, following such Affiliate Transfer, Tenant shall retain its Right of First Offer pursuant to this Agreement. In the event that Landlord desires to market, transfer and convey (any such marketing, transfer or conveyance, a "**Portfolio Transfer**") all or any portion of its interest in the Premises to a third party as part of a Portfolio Sale (as hereinafter defined) which includes the Premises, such Portfolio Transfer shall not trigger Tenant's Right of First Offer and, upon the sale of the Premises as part of any such Portfolio Transfer, Tenant's Right of First Offer shall automatically be rendered irrevocably null and void and neither party shall have any further rights or liabilities under this **Exhibit F**. For purposes of this Agreement, a "**Portfolio Sale**" shall mean the actual or proposed sale, transfer or conveyance, direct or indirect, of more than three (3) properties by Landlord, FI, FILP or FR and one or more Affiliates of Landlord, FI, FILP or FR as part of the same sale or offering package. Notwithstanding anything contained herein to the contrary, the transfer of the Premises as part of a foreclosure, a transfer in lieu of foreclosure or other comparable exercise by a

lender of its rights in connection with a loan to Landlord or an Affiliate of Landlord shall not trigger this Right of First Offer and the same shall void this Right of First Offer.

8. **TERMINATION**. If Landlord consummates a Sale (within the confines of the requirements imposed in this **Exhibit F** above), or in the event Tenant does not exercise its Right of First Offer, then from and after the date on which such Sale is consummated (unless an Affiliate Transfer), Tenant's Right of First Offer shall automatically be rendered irrevocably null and void and Tenant shall have no further rights under this **Exhibit F** or the Lease to acquire fee simple title to the Premises.

9. **BENEFIT**. This **Exhibit F** is for the benefit only of the parties hereto and no other person or entity shall be entitled to rely hereon, receive any benefit herefrom or enforce against any party hereto any provision hereof.

**RIDER 1**

**TENANT'S EXPANSION OPTION**

1.     **Tenant's Expansion Option.** Tenant shall have a one (1) time option (the "**Expansion Option**") to construct, or cause to be constructed, at Tenant's sole cost and expense, an expansion of the Premises of approximately 100,000 additional square feet (along with any related parking expansion and modification to the current Premises on and subject to the limitations herein set forth, collectively, the "**Expansion Improvements**"), by delivery of written notice to Landlord (the "**Expansion Notice**") at any time from and after the Commencement Date until the date that is two (2) years prior to the Expiration Date; provided, however, that Landlord may elect (in its sole discretion) to construct the Expansion Improvements, on behalf of Tenant and at Landlord's sole cost, in exchange for Tenant's agreement to pay the Expansion Rent (as hereinafter defined), all as more particularly described in **Section 3.4** below.  The exercise of the Expansion Option shall be made by Tenant on and subject to the terms, conditions and limitations set forth in this **Rider No. 1.**  Notwithstanding anything contained herein to the contrary, Tenant shall have no right to exercise its Expansion Option if: (i) Tenant is in default hereunder (beyond applicable notice and cure periods) at such time as Tenant delivers its Expansion Notice or the date upon which construction of the Expansion Improvements commences (such date, the "**Expansion Commencement Date**"); or (ii) Tenant does not have a tangible net worth, determined in accordance with generally accepted accounting principles (after deduction for loans to officers and directors, good will and deferred assets) as of each of the date on which Tenant delivers its Expansion Notice and the Expansion Commencement Date, in excess of $15,000,000, such tangible net worth to be evidenced to Landlord by documentation reasonably satisfactory to Landlord.

2.     **Expansion Notice; Preliminary Plans.**  The Expansion Notice shall (i) specify the size, nature and scope of the proposed Expansion Improvements; and (ii) be accompanied by preliminary plans and specifications for the construction of the desired Expansion Improvements prepared by an AIA certified architect (the "**Proposed Expansion Plans**"), which Proposed Expansion Plans shall be sufficient in scope and detail to enable Landlord to evaluate the feasibility, timing and cost to construct the Expansion Improvements.  The Expansion Improvements shall be compatible, as to design and aesthetics, with the existing Premises.  The Expansion Improvements shall not require the retrofitting or modification of any of the current Premises existing structure and systems (including, without limitation, all mechanical, electrical, plumbing, heating, ventilating and air conditioning systems), except as reasonably necessary for the proper functioning of the Expansion Improvements, and except as may be consented to by Landlord in its reasonable discretion.  The cost of any such retrofitting shall be at Tenant's sole cost and expense.  The configuration of the Expansion Improvements (including, but not limited to, the footprint thereof, the density and number of stories and the rentable square footage intended to be devoted to each of warehouse and office uses), and the composition of the rentable area therein, shall (x) conform to then-applicable zoning laws and regulations and private restrictions unless Tenant obtains a variance in form acceptable to Landlord, and (y) be subject to Landlord's approval, which approval will not be unreasonably withheld, conditioned or delayed.  Tenant shall have no right to exercise the Expansion Option if the proposed Expansion Improvements (or any expansion of the existing Premises) is not permissible or permitted pursuant to either or both: (i) any and all laws, ordinances, rules and regulations of any governmental or quasi-governmental authority, including, but not limited to, any zoning ordinances, unless Tenant

obtains a variance for the same (in form and substance reasonably acceptable to Landlord), and (ii) any private conditions, covenants or restrictions encumbering the Premises as of the date on which Tenant delivers the Expansion Notice, provided, however, Landlord shall, at no further cost to Landlord, make reasonable efforts and reasonably cooperate with Tenant to obtain the consent of any entity that has covenants or restrictions encumbering the Premises. In addition, and not as a limitation, to the foregoing, in the event that any Laws require additional parking spaces in order for the Building and/or the Expansion Improvements to be in compliance with Law after the construction of the Expansion Improvements, then as a part of the Expansion Improvements, Tenant shall cause such additional parking to be constructed at the Premises, at Tenant's sole cost and expense, except as otherwise provided in **Section 3.4** below to the extent Landlord elects (in its sole discretion) to construct the Expansion Improvements.

3.    **Review and Approval of Plans**.  Landlord shall have a period of thirty (30) days to review and approve the Proposed Expansion Plans (which approval shall not be unreasonably withheld) or to suggest reasonable modifications thereto.  If Landlord suggests any reasonable modifications to the Proposed Expansion Plans or the Expansion Improvements, Landlord and Tenant shall each act reasonably and in good faith to agree upon such proposed modifications and to finalize the Proposed Expansion Plans. Landlord's failure to act within such thirty-day period shall be deemed approval by Landlord of the Proposed Expansion Plans.  In the event Landlord and Tenant fail to agree upon the Proposed Expansion Plans within ninety (90) days after the expiration of Landlord's review period, Tenant's exercise of the Expansion Option shall automatically be rendered null and void and the Expansion Option (and this **Exhibit F**) of no further force and effect.

3.1.    **Final Plans and General Expansion Terms**.  Upon Landlord's and Tenant's agreement with respect to the Proposed Expansion Plans and the Expansion Improvements, Tenant, at its sole cost and expense, shall have a period of sixty (60) days to prepare:  (i) final plans and specifications for the proposed Expansion Improvements (the **"Final Plans"**) which shall be substantially based upon the Proposed Expansion Plans approved by both Landlord and Tenant; (ii) a proposed construction schedule for the Expansion Improvements; and (iii) a proposed budget describing estimated construction costs associated with the Expansion Improvements (the items described in (i) - (iii), the **"General Expansion Terms"**).  Tenant shall submit the General Expansion Terms to Landlord for its review and approval (which approval shall not be unreasonably withheld) or reasonable modification.  Landlord and Tenant shall act reasonably and in good faith to agree upon the Final Plans and the General Expansion Terms within thirty (30) days.  In the event Landlord and Tenant fail to agree upon the Final Plans and the General Expansion Terms within one hundred twenty (120) days, Tenant's exercise of the Expansion Option shall be automatically rendered null and void and the Expansion Option (and this **Exhibit F**) of no further force and effect.

3.2.    **Collateral Assignment of Contracts**.  Any general contractor contract, and all other contracts, designs and plans shall provide that they may be collaterally assigned to Landlord without any further consent of the contracting party thereunder.  Further, Tenant hereby collaterally assigns, transfers and sets over, to Landlord, all of Tenant's rights, benefits and privileges under, any general contractor contract, and all other contracts, designs and plans for any Expansion Improvements such that in the event of a default by Tenant hereunder, Landlord may cause any counterpart to such contracts, designs and plans to perform their obligations thereunder for the benefit of the Landlord. Tenant shall enter into such further agreements and take such further actions as may be required to

effect the provisions of the foregoing collateral assignment.   Notwithstanding the foregoing, Tenant shall continue to be liable for all covenants, agreements or obligations under such contracts, designs and plans, and Landlord shall not be deemed to have assumed any such contracts, designs or plans, except as provided in **Section 3.4** below, to the extent Landlord elects (in its sole discretion) to construct the Expansion Improvements.

3.3   **Out-of-Pocket Costs of Landlord**.   Tenant shall reimburse Landlord for Landlord's reasonable, out-of-pocket costs and expenses incurred in reviewing and negotiating the Proposed Expansion Plans, Final Plans, General Expansion Terms and overseeing any construction of the Expansion Improvements, within ten (10) days after Landlord's delivery of written demand to Tenant, together with a detailed schedule of such third-party cost and expenses, except as otherwise provided in **Section 3.4** below to the extent Landlord elects (in its sole discretion) to construct the Expansion Improvements on behalf of Tenant.

3.4   **Landlord's Construction Election**.   Within fifteen (15) business days after Landlord and Tenant have agreed upon the Final Plans and the General Expansion Terms, if at all, Landlord shall provide Tenant with a summary of the terms and conditions upon which Landlord would be willing to construct the Expansion Improvements on behalf of Tenant (and at Landlord's cost) and lease the Expansion Improvements to Tenant (the "**Landlord Expansion Terms**"), which Landlord Expansion Terms shall include, but not be limited to, the annual base rent, including, but not limited to, annual escalations thereof, that Landlord would charge Tenant for the Expansion Improvements (the "**Expansion Base Rent**"), the terms of Landlord's delivery of the Expansion Improvements and the other material terms of the proposed construction and leaseback by Landlord of the Expansion Improvements.   Landlord shall have no obligation hereunder or otherwise to construct the Expansion Improvements and the Landlord Expansion Terms and the terms of the Expansion Amendment (as hereinafter defined) shall be formulated by, and acceptable to, Landlord in its sole and absolute discretion.   Tenant shall have a period of ten (10) business days in which to accept or reject, in its sole discretion, the Landlord Expansion Terms.   If Tenant timely accepts the Landlord Expansion Terms, Landlord and Tenant shall act diligently and in good faith to negotiate, execute and enter into an amendment to the Lease and this Rider No. 1 to incorporate the Landlord Expansion Terms (the "**Expansion Amendment**") within thirty (30) days after such acceptance.   If Tenant rejects the Landlord Expansion Terms, if Landlord does not timely deliver the Landlord Expansion Terms, or if Landlord and Tenant are unable to timely negotiate, execute and enter into the Expansion Amendment on terms acceptable to Landlord and Tenant in their respective sole discretion, Tenant shall have the option to construct, or cause to be constructed, the Expansion Improvements at Tenant's sole cost and expense pursuant to, and in accordance with, this **Exhibit F**.   If Landlord and Tenant execute and enter into the Expansion Amendment, (A) Landlord shall construct the Expansion Improvements pursuant to the Final Plans and the Expansion Amendment at Landlord's sole cost; and (B) Tenant shall lease the Expansion Improvements from Landlord in exchange for the payment by Tenant to Landlord for the Expansion Base Rent from and after the substantial completion of the Expansion Improvements, all as more particularly described in the Expansion Amendment.   Without limitation of the foregoing, Tenant shall lease the Expansion Improvements from Landlord on the same general, fully triple net terms as are applicable to the Premises, and the Expansion Improvements shall be included in the Premises for all relevant purposes from and after their substantial completion by Landlord.

4.    **Commencement and Completion of Construction of Expansion Improvements.**
Provided Landlord and Tenant have not agreed upon the Landlord Expansion Terms and entered into
the Expansion Amendment, promptly after Landlord and Tenant agree upon the General Expansion
Terms, and provided Tenant elects to proceed with the construction of the Expansion Improvements,
Tenant shall commence its efforts to procure the Approvals (defined below) and to commence the
construction of the Expansion Improvements pursuant to, and in accordance with, the Final Plans.
Tenant shall furnish or obtain any and all permits, approvals and consents from any governmental or
quasi-governmental authorities (including, but not limited to, any permits or approvals pursuant to any
private conditions, covenants or restrictions or from any architectural review board) necessary as a
condition to the construction of the Expansion Improvements (the "**Approvals**"), utilities, professional
services, design, material, labor and equipment required to construct the Expansion Improvements on
the Premises pursuant to and as described by the Final Plans. The Expansion Improvements shall be
constructed in compliance with the provisions of **Sections 11.2** and **11.3** of the Lease substantially in
accordance with the Final Plans and completed in accordance with all applicable statutes, ordinances
and building codes, governmental rules, regulations and orders relating to construction of the
Expansion Improvements.

4.1    **Default Under Lease.** Prior to the completion of the Expansion Improvements
by Tenant, in the event that Tenant defaults under this Lease (and fails to timely cure such default)
after Tenant has exercised its Expansion Option, Landlord may, at its option, elect to: (a) cause Tenant
to suspend construction of the Expansion Improvements until such default is cured and in such event,
Tenant shall be responsible for, and promptly reimburse Landlord, for any and all costs incurred
resulting from such Tenant default and suspension of construction; or (b) terminate construction of the
Expansion Improvements and remove the partially constructed Expansion Improvements, in which
event Tenant shall reimburse Landlord for all costs incurred by Landlord in removing the partially
constructed Expansion Improvements, and Landlord may exercise any or all of its other rights and
remedies under this Lease; or (c) complete construction of the Expansion Improvements pursuant to
this **Rider No. 1**, and Landlord may exercise any or all of its other rights and remedies under this
Lease, including, but not limited to realizing on the Expansion Improvements Security, as hereinafter
defined. Notwithstanding any election previously made by Landlord pursuant to the prior sentence,
Landlord may, at any time until construction of the Expansion Improvements is substantially complete,
further elect to invoke any option set forth in clauses (a) or (c) of the preceding sentence in lieu of any
previously elected option. The rights and remedies of Landlord under this **Rider No. 1** are cumulative
of any other rights and remedies of Landlord elsewhere provided in this Lease, at law or in equity.

4.2.    **Changes to Final Plans.** In the event Tenant wishes to propose a modification,
adjustment or alteration to the Final Plans (a "**Change Order**"), Tenant shall promptly provide
Landlord with a reasonably detailed written description of the proposed Change Order, together with
any and all supporting documentation reasonably appropriate to understand and evaluate the proposed
Change Order. Landlord's consent to any Change Order shall be required, which consent shall not be
unreasonably withheld, conditioned or delayed. If Landlord fails to disapprove any Change Order
within five (5) business days after request for Landlord's approval, such approval shall be deemed
granted if Landlord does not deny its approval within five (5) business days after a second written
request therefore. Notwithstanding the other provisions of this paragraph, Landlord shall not be
entitled to disapprove of Change Orders submitted by Tenant to the extent such Change Orders are
necessitated by requirements of any governmental or quasi-governmental or administrative code, rule,

law, approval or other authority enacted, adopted, amended, supplemented or clarified after the date Tenant obtains the Approvals.  Prior to implementing any Change Order, Tenant shall increase the amount of the Expansion Improvements Security (as defined below) to cover the reasonably expected cost of the Change Order or otherwise cause the Expansion Improvements Security to provide adequate security for the completion of any Change Order.

      4.3.   **Substantial Completion; Commencement and Completion**.  For purposes of this Lease, the term "**Expansion Substantial Completion Date**" shall mean the date when the construction of the Expansion Improvements has been substantially completed in accordance with the requirements of the Final Plans, excepting only "punch list items."  Provided Tenant elects to proceed with the construction of the Expansion Improvements at its sole cost, Tenant shall promptly commence construction of any Expansion Improvements after the approval of Final Plans and shall diligently pursue the construction of the Expansion Improvements.  Tenant shall cause the Expansion Substantial Completion Date to occur within nine (9) months after the approval of Final Plans.  In the event the Tenant fails to complete the Expansion Improvements within a the required period of time after the approval of Final Plans, then after sixty (60) days' prior written notice to Tenant, Landlord shall have the right to cause the Expansion Improvements to be completed, whereupon Landlord shall be entitled to realize and or use any available Expansion Improvements Security and/or obtain reimbursement from Tenant within thirty (30) days after Landlord's delivery of written demand to Tenant, together with a detailed schedule of Landlord's third-party cost and expenses incurred in completing the Expansion Improvements.  When Tenant believes that the Expansion Improvements are substantially completed as provided above, Landlord and Tenant shall together walk through the Expansion Improvements and inspect them, using reasonable efforts to discover all uncompleted or defective construction in the Expansion Improvements.  After such inspection has been completed, and the "punch list" items have been agreed upon, in the parties' reasonable discretion, Tenant shall cause to be completed and/or repaired such "punch list" items within 30 days thereafter.  Upon the Expansion Substantial Completion Date, the Expansion Improvements shall be deemed to be a part of the Premises and the property of Landlord for all purposes, provided, however, that there shall not be an increase in Base Rent due to the addition of the Expansion Improvements (except as otherwise provided in an Expansion Amendment to the extent Landlord constructs the Expansion Improvements).  Tenant shall execute any and all deeds, conveyance documents or bills of sale, for no further consideration, to Landlord, conveying the Expansion Improvements to Landlord on Landlord's request.

      4.4   **Security and Cure Rights**.  Prior to commencement of construction of the Expansion Improvements by Tenant, at its sole cost, Tenant shall provide for the benefit of Landlord and any lender to Landlord security (the "**Expansion Improvements Security**") for the performance of Tenant's obligations hereunder, which Expansion Improvements Security could include, but not be limited to, a cash deposit of the cost of construction of the Expansion Improvements into a construction escrow, a letter of credit, or a payment and performance bond, which Expansion Improvements Security (a) shall be in form and substance acceptable to Landlord and its lender, and (b) be available for Landlord and/or its lender to draw upon in the event that Tenant defaults on its obligations pursuant to this **Rider No. 1**.  Upon the occurrence of the Expansion Substantial Completion Date and the completion of any "punch list items", any Expansion Improvements Security overage remaining, any letter of credit remaining or any bonds or other security shall be released to

Tenant. No Expansion Improvements Security shall be required should Landlord elect to construct the Expansion Improvements pursuant to Section 3.5 of this **Rider No. 1.**

5.   **Warranties**. After the expiration of the Lease, Tenant shall assign and shall be deemed to have assigned to Landlord any third party warranties issued to Tenant and rights under construction contracts in connection with the Expansion Improvements.

6.   **Personal to Tenant**. The Expansion Option is personal to Tenant and its affiliates, except that the Expansion Option may be transferred in connection with a Permitted Transfer described in Section 8.3 of the Lease.

7.   **Progress**. Landlord and Tenant shall hold regular meetings concerning the progress of construction of the Expansion Improvements. Landlord and Tenant shall each designate a representative for purposes of monitoring the construction of the Expansion Improvements and making day-to-day construction related decisions.

8.   **Mandatory Term Extension**. If (a) Landlord or Tenant construct the Expansion Improvements, and (b) the remaining portion of the Term of the Lease is less than five (5) years from and after the Expansion Substantial Completion Date, either by Landlord or Tenant, the Term of this Lease shall be automatically extended such that the Expiration Date occurs on the last day of the calendar month in which five (5) years anniversary of the Expansion Substantial Completion Date occurs (the portion of such extended period after the original Expiration Date, the "**Expansion Extension Period**"). During the Expansion Extension Period, Base Rent payable by Tenant to Landlord pursuant to the Lease, including, but not limited to, any Expansion Base Rent, shall continue to escalate annually by two percent (2%) per annum. Promptly after the Expansion Substantial Completion Date, Landlord and Tenant shall execute and enter into an amendment to this Lease reflecting the revised Expiration Date, the Expansion Extension Period and the Base Rent during the Expansion Extension Period.

ORDER NO.  008278632

## CREDITOR RIGHTS QUESTIONNAIRE

1.    Describe the nature of the transaction.

      Refinancing loan

2.    What is the amount of the consideration for the transfer?  $875,000.00

3.    What is the value of the land?  (If the contemplated transaction is a deed in lieu of foreclosure, we
      will need a current independent appraisal of the land)  In excess of $1,000,000.00

4.    Describe the relationship between buyer and seller.  (Answer "yes" or "no" to all  that apply):

a.    NA      Is the buyer a creditor of the seller?

b.    NA      Is the buyer related in any way to the seller?  If so, describe.

c.    NA      Is the buyer a good faith purchaser for value?

d    No      Also, is the borrower related to the lender?

5.    Are there any other related corporate transactions that are occurring prior to or at the same time as
      this transaction?  If so, describe.  No

6.    What control, if any, will the lender have over the property after this transaction is complete?  (If
      appropriate, include a copy of the loan agreement with this affidavit).

            Typical mortgagee protections

7.    (If the answer to any of the following questions is "yes" , then the transaction should be more
      fully described in question "1", above).

      Is the transaction:

   No      A. the sale of property of a corporation that is financed by a mortgage of corporate assets, the
proceeds of which are being paid to the old stockholders that are selling the corporation?

   No      B. a mortgage of partnership assets in order to repay a partner's loan to the partnership, to allow a
partner to "cash out" his share in the partnership, or to pay a cash distribution to all partners?

   No      C. a mortgage of corporate assets to pay a stockholder, possibly to either repay a stockholder's
loans to the corporation or to distribute earnings?

   No      D. a mortgage of corporate assets, with the funds being channeled to the parent corporation?

___No___ E. a mortgage of corporate assets, with the funds being channeled to a sister company, or a mortgage of the assets of a limited partnership with the loan proceeds going to another limited partnership that is controlled by the same investor(s)?

___No___ F. a mortgage of corporate assets, with the funds being channeled to a subsidiary?

___No___ G. a mortgaging of the land as security for a previously-incurred debt?

___No___ H. a deed in lieu of foreclosure of a mortgage?

___No___ I. A mortgage of corporate assets, for the purpose of buying back stock from one or more of its shareholders?

___No___ J. a partner of partnership that is lending money to the partnership?

___No___ K. a modification of an existing mortgage?

___Yes___ L. an arms length transaction for a reasonably equivalent value?

___No___ M. title coming through a mortgage foreclosure?

___Yes___ N. a refinance?

___No___ O. a purchase money mortgage, that is, a transaction where the borrower is mortgaging the land to finance its purchase?

___No___ P. a mortgage that is executed in order to indemnify another party in the event of a loss, that is, a mortgage to secure the obligation of another?

___No___ Q. a construction mortgage, with the borrower using the proceeds of the loan for the purposes of acquiring the land and paying for the costs of constructing improvements on the land?

8.      What is the present use of the land?  (For example, retail, office, industrial, manufacturing, vacant land)

        Retail store

9.      If the transaction involves a deed in lieu of foreclosure, is the cancelled indebtedness less than the fair market value of the land?        NA

10.     If the property is leased, what percentage of the property is occupied?    100%

11.     What is the approximate age of the improvements that are presently located on the land?  (Check one)

        ___X___ new construction

        _____ one year

        _____ two years

        _____ over two years

12.    If the transaction involves a purchase money mortgage, will the loan proceeds be used for any other purpose other than for the purchase of the property?  If so, describe.       NA

13.    If the transaction involves a construction mortgage, is the borrower using all of the proceeds of the loan for the purposes of acquiring the land, paying the costs of constructing improvements on the land and paying costs associated with constructing and maintaining the improvements on the land?  If not, what will the proceeds be used for?   NA

14.    If the transaction is a refinance, will all the proceeds be used to pay off the existing loan?  If there are excess loan proceeds, how will they be used?  (For example, will they be used solely for the benefit of the borrower, will they go to the parent of the mortgaging corporation, will they go to a related party of the borrower, will they pay off seller's existing creditors?)

        Any excess proceeds will be used for working capital

## SELLER INFORMATION:

Is the seller selling all of its assets?          NA

Will the selling, entity survive the sale or will it dissolve?       NA

Is the selling entity merging into the buyer?          NA

## BORROWER INFORMATION:

What other assets does the borrower have besides this land?    None

**NOTE:  The company reserves the right to either request additional materials or decline to issue creditors' rights coverage after its review of the contents of this questionnaire.**

Dated:           January, _____ 2007

Garner Property Group, L.L.C.

By:_____
      George D. Hanus, President

Signature and Title (To be signed by the party requesting the coverage)

_____
Name: (Please Print)

<u>GUARANTY OF LEASE</u>

**GUARANTY OF LEASE** (this "Guaranty") made as of <u>December 28, 2006</u>, by LENOX GROUP INC., a Delaware corporation, with an address at 1414 Radcliffe Street, Bristol, PA 19007-5496 ("**Guarantor**"), to FR NET LEASE CO-INVESTMENT PROGRAM 13, LLC, a Delaware limited liability company, having an office at 311 South Wacker Drive, Suite 4000, Chicago, Illinois 60606 ("**Landlord**").

<u>W I T N E S S E T H</u> :

WHEREAS:

A.      Landlord has been requested by Lenox, Incorporated, a New Jersey corporation, with an office at 6436 City West Parkway, Eden Prairie, MN 55344 ("**Tenant**"), to enter into an Industrial Building Lease dated as of the date hereof (the "**Lease**"), whereby Landlord would lease to Tenant, and Tenant would rent from Landlord, all of the premises commonly known as 16507 Hunters Green Parkway, Hagerstown, Maryland, as more particularly described in the Lease (the "**Premises**").

B.      Guarantor is the parent of Tenant and will derive substantial economic benefit from the execution and delivery of the Lease.

C.      Guarantor acknowledges that Landlord would not enter into the Lease unless this Guaranty accompanied the execution and delivery of the Lease.

D.      Guarantor hereby acknowledges receipt of a copy of the Lease.

NOW, THEREFORE, in consideration of the execution and delivery of the Lease and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor covenants and agrees as follows:

1.      **DEFINITIONS.** Defined terms used in this Guaranty and not otherwise defined herein have the meanings assigned to them in the Lease.

2.      **COVENANTS OF GUARANTOR.**

(a)      Guarantor absolutely, unconditionally and irrevocably guarantees, as a primary obligor and not merely as a surety: (i) the full and prompt payment of all Base Rent and Additional Rent and all other rent, sums and charges of every type and nature payable by Tenant under the Lease, and (ii) the full, timely and complete performance of all covenants, terms, conditions, obligations and agreements to be performed by Tenant under the Lease (all of the obligations described in clauses (i) and (ii), collectively, the "**Obligations**"), which Obligations shall not exceed the liabilities and obligations of Tenant under the Lease. If Tenant defaults under the Lease, Guarantor will, within the notice and cure periods provided in the Lease, pay and perform all of the Obligations, and pay to Landlord, when and as due, all Base Rent and Additional Rent payable by Tenant under the Lease, together with all damages, costs and expenses to which Landlord is entitled pursuant to the Lease.

(b)      Guarantor agrees with Landlord that (i) any action, suit or proceeding of any kind or nature whatsoever (an "**Action**") commenced by Landlord against Guarantor to collect Base Rent and Additional Rent and any other rent, sums and charges due under the Lease for any month or months shall not prejudice in any way Landlord's rights to collect any such amounts due for any subsequent month or months throughout the Term in any subsequent Action, (ii) Landlord may, at its option, without prior notice or demand, join Guarantor in any Action against Tenant in connection with or based upon either or both of the Lease and any of the Obligations, (iii) Landlord may seek and obtain recovery against Guarantor in an Action against Tenant or in any independent Action against Guarantor without Landlord first asserting, prosecuting, or exhausting any remedy or claim against Tenant or against any security of Tenant held by Landlord under the Lease, and (iv) Guarantor will be

conclusively bound by a judgment entered in any Action in favor of Landlord against Tenant, as if Guarantor were a party to such Action, irrespective of whether or not Guarantor is entered as a party or participates in such Action.

(c)      Any default or failure by the Guarantor to perform any of its Obligations under this Guaranty shall be deemed an immediate default by Tenant under the Lease.

3.      **GUARANTOR'S OBLIGATIONS UNCONDITIONAL.**

(a)      This Guaranty is an absolute and unconditional guaranty of payment and of performance, and not of collection, and shall be enforceable against Guarantor without the necessity of the commencement by Landlord of any Action against Tenant, and without the necessity of any notice of nonpayment, nonperformance or nonobservance, or any notice of acceptance of this Guaranty, or of any other notice or demand to which Guarantor might otherwise be entitled, all of which Guarantor hereby expressly waives in advance. The obligations of Guarantor hereunder are independent of the obligations of Tenant.

(b)      If the Lease is renewed, or the Term extended, for any period beyond the Expiration Date, either pursuant to any option granted under the Lease or otherwise, or if Tenant holds over beyond the Expiration Date, the obligations of Guarantor hereunder shall extend and apply to the full and faithful performance and observance of all of the Obligations under the Lease accruing during any renewal, extension or holdover period.

(c)      This Guaranty is a continuing guaranty and will remain in full force and effect notwithstanding, and the liability of Guarantor hereunder shall be absolute and unconditional irrespective of: (i) any modifications, alterations or amendments of the Lease (regardless of whether Guarantor consented to or had notice of same), (ii) any releases or discharges of Tenant other than the full release and complete discharge of all of the Obligations, (iii) Landlord's failure or delay to assert any claim or demand or to enforce any of its rights against Tenant, (iv) any extension of time that may be granted by Landlord to Tenant, (v) any assignment or transfer of all of any part of Tenant's interest under the Lease (whether by Tenant, by operation of law, or otherwise), (vi) any subletting, concession, franchising, licensing or permitting of the Premises, (vii) any changed or different use of the Premises, (viii) any other dealings or matters occurring between Landlord and Tenant, (ix) the taking by Landlord of any additional guarantees, or the receipt by Landlord of any collateral, from other persons or entities, (x) the release by Landlord of any other guarantor, (xi) Landlord's release of any security provided under the Lease, or (xii) Landlord's failure to perfect any landlord's lien or other lien or security interest available under applicable Laws. Without limiting the foregoing, this Guaranty shall be applicable to any obligations of Tenant arising in connection with a termination of the Lease, whether voluntary or otherwise. Guarantor hereby consents, prospectively, to Landlord's taking or entering into any or all of the foregoing actions or omissions. For purposes of this Guaranty and the obligations and liabilities of Guarantor hereunder, "Tenant" shall be deemed to include any and all concessionaires, licensees, franchisees, department operators, assignees, subtenants, permittees or others directly or indirectly operating or conducting a business in or from the Premises and/or the Property, as fully as if any of the same were the named Tenant under the Lease.

(d)      Guarantor hereby expressly agrees that the validity of this Guaranty and the obligations of Guarantor hereunder shall in no way be terminated, affected, diminished or impaired by reason of the assertion or the failure to assert by Landlord against Tenant, of any of the rights or remedies reserved to Landlord pursuant to the provisions of the Lease or by relief of Tenant from any of Tenant's obligations under the Lease or otherwise by (i) the release or discharge of Tenant in any state or federal creditors' proceedings, receivership, bankruptcy or other proceeding; (ii) the impairment, limitation or modification of the liability of Tenant or the estate of Tenant in bankruptcy, or of any remedy for the enforcement of Tenant's liability under the Lease, resulting from the operation of any present or future provision of the United States Bankruptcy Code (11 U.S.C. § 101 et seq., as amended), or from other statute, or from the order of any court; or (iii) the rejection, disaffirmance or other termination of the Lease in any such proceeding. This Guaranty shall continue to be effective if at any time the payment of any amount due under the Lease or this Guaranty is rescinded or must otherwise be returned by Landlord for any reason, including, without limitation, the insolvency, bankruptcy, liquidation or reorganization of Tenant, Guarantor or otherwise, all as though such payment had not been made, and, in such event, Guarantor shall

pay to Landlord an amount equal to any such payment that has been rescinded or returned if equitable and permitted by applicable law.

4.    **WAIVERS OF GUARANTOR.**

(a)    Without limitation of the foregoing, Guarantor waives (i) notice of acceptance of this Guaranty and notice of dishonor, (ii) notice of any actions taken by Landlord or Tenant under the Lease or any other agreement or instrument relating thereto, (iii) notice of any and all defaults by Tenant in the payment of Base Rent and Additional Rent or other rent, charges or amounts, or of any other defaults by Tenant under the Lease, (iv) all other notices, demands and protests, and all other formalities of every kind in connection with the enforcement of the Obligations, omission of or delay in which, but for the provisions of this Section 4, might constitute grounds for relieving Guarantor of its obligations hereunder, (v) any requirement that Landlord protect, secure, perfect, insure or proceed against any security interest or lien, or any property subject thereto, or exhaust any right or take any action against Tenant or any collateral, and (vi) the benefit of any statute of limitations affecting Guarantor's liability under this Guaranty.

(b)    GUARANTOR HEREBY WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY ANY PERSON OR ENTITY WITH RESPECT TO ANY MATTER WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH: THIS GUARANTY; THE LEASE; ANY LIABILITY OR OBLIGATION OF TENANT IN ANY MANNER RELATED TO THE PREMISES AND/OR THE PROPERTY; ANY CLAIM OF INJURY OR DAMAGE IN ANY WAY RELATED TO THE LEASE, THE PREMISES AND/OR THE PROPERTY: ANY ACT OR OMISSION OF TENANT, ITS AGENTS, EMPLOYEES, CONTRACTORS, SUPPLIERS, SERVANTS, CUSTOMERS, CONCESSIONAIRES, FRANCHISEES, PERMITTEES OR LICENSEES; OR ANY ASPECT OF THE USE OR OCCUPANCY OF, OR THE CONDUCT OF BUSINESS IN, ON OR FROM THE PREMISES AND/OR THE PROPERTY. GUARANTOR SHALL NOT IMPOSE ANY COUNTERCLAIM OR COUNTERCLAIMS OR CLAIMS FOR SET-OFF, RECOUPMENT OR DEDUCTION OF RENT IN ANY ACTION BROUGHT BY LANDLORD AGAINST GUARANTOR UNDER THIS GUARANTY. GUARANTOR SHALL NOT BE ENTITLED TO MAKE, AND HEREBY WAIVES, ANY AND ALL DEFENSES AGAINST ANY CLAIM ASSERTED BY LANDLORD OR IN ANY SUIT OR ACTION INSTITUTED BY LANDLORD TO ENFORCE THIS GUARANTY OR THE LEASE. EXCEPT THE DEFENSE OF PAYMENT. IN ADDITION, GUARANTOR HEREBY WAIVES, BOTH WITH RESPECT TO THE LEASE AND WITH RESPECT TO THIS GUARANTY, ANY AND ALL RIGHTS WHICH ARE WAIVED BY TENANT UNDER THE LEASE, IN THE SAME MANNER AS IF ALL SUCH WAIVERS WERE FULLY RESTATED HEREIN. THE LIABILITY OF GUARANTOR UNDER THIS GUARANTY IS PRIMARY AND UNCONDITIONAL.

5.    **SUBROGATION.**  Guarantor shall not be subrogated, and hereby waives and disclaims any claim or right against Tenant by way of subrogation or otherwise, to any of the rights of Landlord under the Lease or otherwise, or in either or both of the Premises and the Property, which may arise by any of the provisions of this Guaranty or by reason of the performance by Guarantor of any of its Obligations hereunder. Guarantor shall look solely to Tenant for any recoupment of any payments made or costs or expenses incurred by Guarantor pursuant to this Guaranty. If any amount shall be paid to Guarantor on account of such subrogation rights at any time when all of the Obligations shall not have been paid and performed in full, Guarantor shall hold such amount in trust for Landlord and shall pay such amount to Landlord immediately following receipt by Guarantor, to be applied against the Obligations, whether matured or unmatured, in such order as Landlord may determine. Guarantor hereby subordinates any liability or indebtedness of Tenant now or hereafter held by Guarantor to the obligations of Tenant to Landlord under the Lease.

6.    **REPRESENTATIONS AND WARRANTIES OF GUARANTOR.**  Guarantor represents and warrants that:

(a)    Guarantor is a corporation; has all requisite power and authority to enter into and perform its obligations under this Guaranty; and this Guaranty is valid and binding upon and enforceable against Guarantor without the requirement of further action or condition.

(b)      The execution, delivery and performance by Guarantor of this Guaranty does not and will not (i) contravene any applicable Laws or any contractual restriction binding on or affecting Guarantor or any of its properties, or (ii) result in or require the creation of any lien, security interest or other charge or encumbrance upon or with respect to any of its properties.

(c)      There is no action, suit or proceeding pending or threatened against or otherwise affecting Guarantor before any court or other governmental authority or any arbitrator that may materially adversely affect Guarantor's ability to perform its obligations under this Guaranty.

(d)      Guarantor's principal place of business is 1414 Radcliffe Street, Bristol, PA 19007-5496.

(e)      Guarantor is the parent company of Tenant.

7.      **NOTICES.**   Any consents, notices, demands, requests, approvals or other communications given under this Guaranty shall be given as provided in the Lease, and as follows:

(a)      if to Guarantor at Guarantor's address set forth on the first page of this Guaranty, Attention: L.A. Fantin; and

(b)      if to Landlord, at Landlord's address set forth on the signature page of the Lease (with a copy to Landlord's attorney as also set forth on the signature page to the Lease); or to such other addresses as either Landlord or Guarantor may designate by notice given to the other in accordance with the provisions of this Section 7.

8.      **CONSENT TO JURISDICTION; WAIVER OF IMMUNITIES.**   The undersigned hereby (a) consents and submits to the jurisdiction of the courts of the State of Maryland and the federal courts sitting in the State of Maryland and shall be subject to service of process in the State of Maryland with respect to any dispute there arising, directly or indirectly, out of this Guaranty, (b) waives any objections which the undersigned may have to the laying of venue in any such suit, action or proceeding in either such court, (c) agrees to join Landlord in any petition for removal to either such court, (d) agrees to join Landlord in any petition for removal to either and such court, and (e) irrevocably designates and appoints Tenant as its authorized agent to accept and acknowledge on its behalf service of process with respect to any disputes arising, directly or indirectly, out of this Guaranty. The undersigned hereby acknowledges and agrees that Landlord may obtain personal jurisdiction and perfect service of process through Tenant as the undersigned agent, or by any other means now or hereafter permitted by applicable law. Nothing above shall limit Landlord's choice of forum for purposes of enforcing this Guaranty.

9.      **MISCELLANEOUS.**

(a)      Guarantor further agrees that Landlord may, without notice, assign this Guaranty in whole or in part, at such time and contemporaneous with the assignment by Landlord of the Lease. If Landlord disposes of its interest in the Lease, "**Landlord**," as used in this Guaranty, shall mean Landlord's successors and assigns. This Guaranty may not be assigned by Guarantor without the prior written consent of Landlord, which consent may be withheld in Landlord's sole discretion.

(b)      Guarantor promises to pay all of Landlord's expenses, including, without limitation, reasonable attorneys' fees and costs, incurred by Landlord in enforcing the terms and conditions of either or both of the Lease and this Guaranty if Landlord prevails.

(c)      Guarantor shall, from time to time within ten (10) business days after receipt of Landlord's request, execute, acknowledge and deliver to Landlord a statement certifying that this Guaranty is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect

as modified and stating such modifications).  Such certificate may be relied upon by any prospective purchaser, lessor or lender of all or a portion of the Premises and/or Property.

(d)     If any portion of this Guaranty shall be deemed invalid, unenforceable or illegal for any reason, such invalidity, unenforceability or illegality shall not affect the balance of this Guaranty, which shall remain in full force and effect to the maximum permitted extent.

(e)     The provisions, covenants and guaranties of this Guaranty shall be binding upon Guarantor and its heirs, successors, legal representatives and assigns, and shall inure to the benefit of Landlord and its successors and assigns, and shall not be deemed waived or modified unless such waiver or modification is specifically set forth in writing, executed by Landlord or its successors and assigns, and delivered to Guarantor.

(f)     Whenever the words "include", "includes", or "including" are used in this Guaranty, they shall be deemed to be followed by the words "without limitation", and, whenever the circumstances or the context requires, the singular shall be construed as the plural, the masculine shall be construed as the feminine and/or the neuter and _vice versa_.  This Guaranty shall be interpreted and enforced without the aid of any canon, custom or rule of law requiring or suggesting construction against the party drafting or causing the drafting of the provision in question.

(g)     Each of the rights and remedies herein provided are cumulative and not exclusive of any rights or remedies provided by law or in the Lease or this Guaranty.

(h)     The provisions of this Guaranty shall be governed by and interpreted solely in accordance with the internal laws of the State of Maryland, without giving effect to the principles of conflicts of law.

(i)     The execution of this Guaranty prior to execution of the Lease shall not invalidate this Guaranty or lessen the Obligations of Guarantor hereunder.

(j)     Guarantor shall deliver to Landlord, upon reasonable request by Landlord, financial statements for Guarantor prepared by an independent public accountant in the ordinary course of the business and in accordance with customary accounting practices applicable to business operations similar (in terms of the entity's domicile and whether such entity is a privately held or a public company) to that of Guarantor.

[Signature Page to Follow]

**IN WITNESS WHEREOF,** Guarantor has executed this Guaranty as of the day and year first above written.

GUARANTOR:

**LENOX GROUP INC.,**
a Delaware corporation

By: _____

Name: _____

Its: _____

- S-1 -