# EXHIBIT A-2

representation and warranty and those following are a material inducement to Tenant's execution of this Lease.

To the best of Landlord's knowledge and except as provided in the Permitted Encumbrances existing as of the date of this Lease, Landlord represents and warrants to Tenant the following:

(1)     There are no existing utility lines, easements or facilities or other easements of any kind located or proposed to be located in, on or under the Land, and no blanket easement encumbers the Land.

(2)     There are no existing or proposed easements which conflict with or which are located under any access drive or drive aisle within the Shopping Center, which would prevent or hinder the use of same for vehicular and pedestrian traffic over same.

(3)     Except as expressly set forth on Exhibit F, there are no covenants or restrictions of record or laws, codes or ordinances which would prohibit, restrict, hinder or limit Tenant's intended use of the Premises for the sale, rental, servicing, repair or warehousing of electronic products (including the Products) or sale and installation of car stereos and other accessories, use of roof-mounted satellite equipment or installation of Tenant's proposed signage and subsequent rights to alter same to conform to Tenant's prototypical signage and/or design motif.

(4)     Intentionally Omitted.

(5)     Occupants of the Shopping Center have rights of ingress and egress to and from the mall ring road and the mall entrance drives, which are private streets maintained by Polaris Fashion Mall pursuant to the Reciprocal Easement Agreement for Polaris Fashion Mall.

(6)     No third party has rights to drill, mine, explore for or develop, produce or extract any minerals located on or beneath the Shopping Center and no drilling, mining, exploration for or production, development or extraction of any minerals shall be permitted on the Shopping Center.

(7)     With respect to the Protective Covenants, Landlord is in good standing and there are no outstanding dues or assessments owing against the Land.

(8)     No third party except Landlord's mortgagee, if any, has any right of first refusal or repurchase or re-entry with respect

26

to the Land and no third party has any prior approval of a future purchaser or tenant or occupant of the Land.

(9)    There are no notices of violations of covenants, conditions, restrictions, laws or regulations relating to environmental protection recorded or filed in the public records and Landlord has not received any such notices from any state, federal or local governmental or quasi-governmental authority.

(10)    There are no mortgages currently encumbering the Land.

(11)    There are no mechanic's, laborer's or materialmen's liens or judgments encumbering the Land and Landlord has not received notice of any pending or potential liens or judgments to be filed against the Land.

(12)    There are no delinquent taxes, assessments or utility charges or fines or penalties related thereto owning against the Land and Landlord has not received any notice thereof.

For purposes of this Lease, the term **"Landlord's Knowledge"** shall mean the actual knowledge of Franz A. Geiger, being the Vice President of Landlord, and being the person affiliated with Landlord that is most responsible for, and knowledgeable about, the acquisition, development and operation of the Shopping Center, with an affirmative obligation of such person to review all of Landlord's and its affiliates' files respecting the acquisition, development and operation of the Shopping Center and to inquire from other management and personnel of Landlord and its affiliates, and Landlord's management company (if any) that are likely to have knowledge about the issue for which the applicable representation, warranty or covenant is being made.

(iii)    **Certificate of Authority**.  Landlord covenants that it is a duly constituted limited liability company under the laws of the State of Ohio, and that its President, who is acting as its signatory in this Lease, is duly authorized and empowered to act on behalf of the Company. Landlord has furnished Tenant with evidence of (a) the existence of the Company, and (b) the authority of the President to bind the Company as contemplated herein.

(iv)    **No Litigation**. There are no judicial, quasi-judicial, administrative or other orders, injunctions, moratoria or pending proceedings against Landlord or the Shopping Center which would preclude or interfere with, the construction, occupancy and use of the Premises for the purposes contemplated.

(v)    **Hazardous or Toxic Materials**.    Landlord has not used, discharged, dumped, spilled or stored any Hazardous Substances (as hereinafter

--CHGO2:20156016.v9 |6/3/04

defined in this subparagraph (v)) on or about the Shopping Center, whether accidentally or intentionally, legally or illegally, and has received no notice and has no knowledge that any such condition exists at the Shopping Center. If any claim is ever made against Tenant relating to Hazardous Substances present at or around the Shopping Center, whether or not such substances are present as of the Effective Date, or any Hazardous Substances are discovered at the Shopping Center (unless introduced by Tenant, its agents, customers, invitees, representatives or employees), all costs of removal incurred by, all liability imposed upon, or damages suffered by, Tenant because of the same shall be borne by Landlord, as long as Landlord or any of the tenants or occupants of the Shopping Center (other than Tenant) is the cause of the Hazardous Substances at the Shopping Center, and Landlord indemnifies and agrees to defend and hold Tenant harmless from and against all such costs, losses, liabilities and damages, including, without limitation, all third-party claims (including sums paid in settlement thereof, with or without legal proceedings) for personal injury or property damage and other claims, actions, administrative proceedings, judgments, compensatory and punitive damages, lost profits, penalties, fines, costs, losses, attorneys' fees and expenses (through all levels of proceedings), consultants or experts fees and all costs incurred in enforcing this indemnity as long as Landlord or any of the tenants or occupants of the Shopping Center (other than Tenant) is the cause of the Hazardous Substances at the Shopping Center. Landlord shall deliver the Land to Tenant free of any pollution or contamination from toxic or hazardous substances, asbestos or any other chemicals or substances in amounts which exceed standards for public health or welfare as established and regulated by any local governmental authority, the State and/or the United States government (herein collectively referred to as "**Hazardous Substances**"). Tenant has performed a Phase 1 on the Premises and, for information purposes only, the summary of that Phase 1 is attached hereto as Attachment "3" to **Exhibit "C"**.

The representation, warranty and indemnity of Landlord described in this paragraph 19(a)(v) shall survive the termination or expiration of this Lease.

(vi)   **Tenant's Exclusive Use.** So long as the Premises are used for the initial uses set forth in paragraph 18(a), no other tenant or occupant of the Shopping Center or any adjacent parcel to the Shopping Center (including parcels separated by a public or private street from the Shopping Center) owned by Landlord or an affiliate, shall be entitled to sell or rent (or rent to own), service, repair or warehouse any of the Products, subject only to existing rights granted to Fortune V d/b/a Sofa Express and Lifeway Center, LLC, Max & Erma's and Solomon Oil Company; provided, however, that the foregoing exclusive use right shall not prohibit Incidental Sale (as hereinafter defined) of the Products in connection with the overall business of another occupant or tenant. As used herein, "**Incidental Sale**" shall mean the sale, rental, servicing, repairing or warehousing of item(s) in an area comprising the lesser of (i) one thousand (1,000) square feet, and (ii) ten percent (10%) of such occupant's or tenant's display area. In addition to any other remedies which Tenant may have in

28

connection with a violation of the exclusive use right granted Tenant herein, payment of Base Rent, Ground Rent, CAM Charges, Real Estate Taxes and all other sums due Landlord hereunder shall abate (and shall not accrue) during any time in which such violation exists.

(vii)   **Zoning and Subdivision.**  The Premises and the Shopping Center are presently properly subdivided, in conformity with all applicable laws and zoned so as to permit (A) the development and operation of the Premises and the Shopping Center in accordance with the provisions of this Lease; and (B) the initial use of the Premises described in paragraph 18(a) of this Lease.

(viii)   **Prohibited Activities.**   Landlord shall not operate or lease (or permit to be operated or leased) any building or tenant space in the Shopping Center in violation of the Declaration of Restriction or for use as:

(A)   a bar, pub, nightclub, music hall or disco in which less than fifty percent (50%) of its space or revenue is devoted to and derived from food service;

a bowling alley;

a billiard or bingo parlor;

a flea market;

a massage parlor;

(F)   a funeral home;

(G)   a facility for the sale of paraphernalia for use with illicit drugs;

(H)   a facility for the sale or display of pornographic material (as determined by community standards for the area in which the Shopping Center is located);

(I)   an off-track betting parlor;

(J)   a carnival, amusement park or circus;

(K)   a gas station, car wash or auto repair or body shop (the parties specifically acknowledging that Tenant's car stereo installation facility is not included in this prohibition (K));

(L)   a facility for the sale of new or used motor vehicles, trailers or mobile homes;

29

(M)    a facility for any use which is illegal or dangerous, constitutes a nuisance or is inconsistent with an integrated, community-oriented retail and commercial shopping center;

(N)    a skating rink;

(O)    an arcade, pinball or computer game room (provided that retail facilities in the Shopping Center may operate no more than four (4) such electronic games incidentally to their primary operations);

(P)    service-oriented offices (such as, by way of example, medical or employment offices, travel agencies, real estate agencies or dry cleaning establishments [other than a dry cleaning store with drop-off services only]) or other non-retail uses except for offices and storage facilities incidental to a primary retail operation; except that up to one such service-oriented office equal to or less than 2,000 square feet shall be permitted in the Shopping Center;

(Q)    a banquet hall, auditorium or other place of public assembly;

(R)    a training or educational facility (including, without limitation, a beauty school, barber college, reading room, school or other facility catering primarily to students or trainees rather than customers);

(S)    a theater of any kind;

(T)    a facility for the sale or rental of used goods (including thrift shops, secondhand or consignment stores) or any facility selling new or used merchandise as a wholesale operation, a liquidation operation, odd lots, lot sales, factory close-outs or imperfect goods; or

(U)    a gymnasium, sport or health club or spa, except that one of the foregoing uses, comprising 1,500 feet or less, shall be permitted in the Shopping Center.

In addition to the foregoing, Landlord shall not operate, lease or permit to be operated or leased any restaurant within the Shopping Center unless such restaurant solely provides take-out service from the restaurant and not sit-down service in the restaurant. In addition, no auction, fire or going-out-of-business sale shall be conducted in the Shopping Center.

30

(ix)    Site Covenants.  Landlord makes the following covenants (the "Site Covenants"):

(A)    **Building Height and Location**.    No building within the Shopping Center shall exceed twenty-eight (28) feet in height above finished grade, nor shall it be positioned so as to project beyond the portion of the front wall of the Building immediately adjacent.  No outparcels, barriers, buildings, kiosks or other structures, either temporary or permanent, shall be located within Tenant's Preferred Area (as depicted on the Site Plan attached hereto as Exhibit A).  No development shall occur within the Shopping Center except as shown on the Site Plan except the possibility of an ATM drive-up in the area shown on the Site Plan.

(B)    **Construction and Alterations**.    Following Tenant's opening for business to the public at the Premises, no exterior construction and no construction staging shall be permitted in the Shopping Center during the months of October, November and December except for emergency repairs.  In the event of any construction within the Shopping Center, Landlord shall designate a construction access route, staging and parking areas located so as to minimize interference with customers or the operations of other occupants of the Shopping Center and shall require erection of safety barriers as necessary and an opaque wall around the site of such construction of a size necessary to screen such construction from ground level view, as requested by Tenant, in Tenant's reasonable judgment.    With regard to any construction on Landlord's Premises, Landlord shall be solely responsible for any governmentally imposed impact fees, hookup, connection, installation or tap in fees and other similar construction-related charges.  Landlord shall make no changes in Tenant's Preferred Area as shown on the Site Plan (including, without limitation, changes in the location of curbcuts, drive aisles, roadways, sidewalks or parking spaces or reduction of the parking ratio specified in paragraph 5) without Tenant's express written consent, which Tenant may, in its sole discretion, withhold.  Landlord shall not make any other changes to the Common Areas which affect Tenant's parking, visibility or access without Tenant's consent, which may be withheld in Tenant's reasonable discretion.  Without limiting any of the express restrictions set forth in this Lease, any other changes to the Common Areas may be made without Tenant's express written consent.

(C)    **Prohibited Uses in Common Area**.    Landlord covenants that it shall not, without Tenant's express written consent, permit the following uses or activities to occur in the

31



Common Areas: (1) advertisements or signs except for the pylon and/or monument signs described in paragraph 8, the "for rent" signs described in paragraph 40 and traffic control signs; (2) display or sale of merchandise; (3) operation of loudspeakers or other sound electronically amplified so as to be heard in the Common Areas; (4) imposition of a charge for parking; or (5) operation of cellular telephone or other telecommunication tower for use by any other party not an occupant of the Shopping Center. Landlord further covenants that it will not seek, nor permit any other occupant of the Shopping Center to seek, a variance or waiver from the minimum parking requirements applicable to the Shopping Center under the zoning code or other applicable ordinance establishing the ratio of parking spaces to building area or otherwise mandating the number of parking spaces required for the Shopping Center and the uses contained therein. Parking by employees of Tenant, Landlord and other occupants of the Shopping Center shall be designated "employee parking" areas, the location of which shall be agreed upon by Landlord and Tenant.

(D)    **Easements**. Landlord shall not subdivide, parcel or otherwise divide the Shopping Center or create any easements in the Common Areas except utility easements if they do not affect Tenant's use of its Premises without Tenant's prior written consent.

(x)    **Interference with Tenant's Reception/Transmission**. Landlord shall not install or permit to be installed in any other tenant or other person anywhere in the Shopping Center, any structure or equipment which would cause any interference with satellite, radio, telecommunications or television reception or transmission in or from the Building.

(xi)    **Notices Affecting the Premises**. Landlord shall promptly forward to Tenant any notice or other communication affecting the Premises or the Shopping Center received by Landlord from any owner of property adjoining, adjacent or nearby to the Premises or the Shopping Center or from any municipal or governmental authority, in connection with any hearing or other administrative procedure relating to the use or occupancy of the Premises, Shopping Center or any such neighboring property.

(xii)    **Constructive Trust**. Landlord covenants that all sums paid by Tenant to Landlord and intended for payment by Landlord to a third party (such as, by way of example, taxes and certain elements of CAM Charges) are given to Landlord in trust and shall be applied only for such third-party payments when due.

~CHGO2:20156016.v9 |6/3/04

(b)    Tenant    represents    and    warrants    and,    with    respect    to subparagraph (ii) below also covenants, to Landlord that:

(i)    **Tenant's Authority**.    Tenant is a duly constituted corporation organized under the laws of the Commonwealth of Virginia; it has the power to enter into this Lease and perform Tenant's obligations; and the Vice President executing this Lease on Tenant's behalf has the right and lawful authority to do so.

(ii)    **Tenant's Warranty as to Hazardous or Toxic Materials**.    As to Tenant's use and occupancy of the Premises and use of the Common Areas, neither Tenant nor its agents or employees will not introduce, discharge, dump, spill or store within the Premises or the Shopping Center any Hazardous Substances; and Tenant indemnifies and agrees to hold Landlord harmless from and against all costs, liability and damages as a result thereof, to the same extent that    Landlord    indemnifies    and    holds    Tenant    harmless    in subparagraph (a)(v) above.  The warranty and indemnity of Tenant described in this paragraph 19(b)(ii) shall survive the termination of this Lease.

(c)    In addition to such other remedies as may be accorded Tenant at law, in equity (including but not limited to an injunction or writ or action of specific performance) or under the terms of this Lease, (i) in the event that any of the representations, warranties and covenants in this paragraph 19 are untrue or incorrect, or (ii) in the event that Tenant suffers any loss, cost, liability or damage as a result of the breach of any of such covenants, representations and warranties, Landlord shall defend, indemnify and hold Tenant harmless from any of such loss, costs, liability or damage incurred as a result of Landlord's breach.

20.    **Estoppel Certificates**.  Without charge, at any time within thirty (30) days after receipt of written request by either party, the other party shall certify, in writing, to any other entity ("**Person**") specified in such request:  (a) as to whether this Lease has been supplemented or amended, and, if so, the substance and manner of such supplement or amendment; (b) as to the validity, force and effect of this Lease, to the certifying party's best knowledge; (c) as to the existence of any default, to the certifying party's best knowledge; (d) as to the existence of any offsets, counterclaims, or defenses on the part of such other party, to the certifying party's best knowledge; (e) as to the commencement and expiration dates of the Term; and (f) as to any other matters which  may reasonably be requested.  In addition, without charge, at any time within thirty (30) days after receipt of written request of Tenant, Landlord shall deliver an estoppel certificate to Tenant's assignee or subtenant that states in the event Tenant defaults under its obligations under this Lease following the date of any assignment or subletting, Landlord will permit such assignee or subtenant to satisfy obligations of Tenant, including but not limited to the direct payment of rentals to Landlord.  Any such certificate may be relied upon by the party requesting it and any Person to whom the same may be exhibited or delivered, and the contents of such certificate shall be binding on the party executing same.

33

21      **Subordination, Non-Disturbance and Attornment**.

(a)     Simultaneously with the execution hereof, Landlord shall deliver to Tenant with regard to any and all Ground Leases (as defined below) and any and all Mortgages (as defined below) encumbering the Shopping Center, a subordination, non-disturbance and attornment agreement in the form and substance of **Exhibit "G"** attached, executed by the landlord under any such Ground Lease ("**Ground Lessor**") or the holder of such Mortgage ("**Mortgagee**"), as applicable. In addition, throughout the term, Landlord shall deliver to Tenant a subordination, non-disturbance and attornment agreement in the form of **Exhibit "G"** executed by Ground Lessor or Mortgagee (as applicable) with regard to all future Ground Leases and Mortgages and with regard to all renewals, modifications, replacements and extensions of such Ground Leases or Mortgages. Upon Tenant's execution of said subordination, non-disturbance and attornment agreement, this Lease shall be subordinate to the corresponding Ground Lease or Mortgage. Landlord shall cause any present or future Mortgagee or Ground Lessor to deliver a subordination, non-disturbance and attornment agreement in accordance with this paragraph 21 at or prior to the time the lien of the Mortgage is filed against record title to the Shopping Center or Ground Lease is executed, as applicable. As used in this paragraph 21, the term "**Mortgage**" shall mean any mortgage, deed to secure debt, deed of trust, trust deed or other collateral conveyance of, or lien or encumbrance against, the Shopping Center or any part thereof, and the term "**Ground Lease**" shall mean any ground lease or master lease affecting the Shopping Center or any part thereof.

(b)     Landlord shall, from time to time, upon the request of Tenant, enter into agreements with Tenant and its subtenants providing, in part, that, in the event of any termination of this Lease, all of the rights of any such subtenant(s) under its sublease will be recognized so long as any such subtenant is not in default under its sublease beyond notice and cure periods, provided that as a pre-condition thereto such subtenant agrees that it will attorn to Landlord on the terms of said sublease and will execute and deliver such instrument as Landlord shall reasonably request to confirm such attornment.

(c)     In the event of Landlord's failure to deliver to Tenant the subordination, non-disturbance and attornment agreements on a timely basis as required under paragraphs 21(a) and (b) above and in paragraph 35 hereof, Tenant shall be entitled to two (2) days' abatement of Base Rent for each day that the non-disturbance and attornment agreement is past due, notwithstanding any other remedies available to Tenant in connection therewith otherwise in this Lease. Such rental abatement shall be applied by Tenant as Tenant so desires, and if Base Rent is not then due, abatement in the amount of the Base Rent shall be applicable to Ground Rent if Ground Rent is then due, but in the amount of Base Rent as if Base Rent were due.

22.     **Tenant's Financing**. Notwithstanding any other provisions of this Lease, Tenant may, without Landlord's consent, secure financing or general credit lines and grant the lenders, as security, (i) a security interest in Tenant's fixtures, personalty, inventory and equipment (collectively, "**Personalty**"), (ii) the right to enter the Premises to realize upon any Personalty so pledged, and/or (iii) a collateral assignment of Tenant's leasehold interest in the Premises, with

34

rights of reassignment; provided, however, such collateral assignment may be made solely for the purpose of securing Tenant's indebtedness. Upon Tenant providing notice of such financing to Landlord, Landlord agrees to act in good faith, and upon reasonably customary terms, to consent in writing to such security interest and agreement and to give such lenders the same notice and opportunity to cure any default of Tenant as is provided Tenant hereunder (including time to foreclose or otherwise take possession of the Premises, if necessary to effect such cure). In addition, Landlord agrees to cause any Mortgagee specifically to acknowledge the rights of Tenant's lenders described in paragraph 23 below.

23.    **Tenant's Property and Waiver of Landlord's Lien**. All of the Personalty shall be and remain the personal property of Tenant. Landlord expressly waives its statutory or common law landlord's liens (as same may be enacted or may exist from time to time) and any and all rights granted under any present or future laws to levy or distrain for rent against the Personalty of Tenant on the Premises and further agrees to execute any reasonable instruments evidencing such waiver, at any time upon Tenant's request.

24.    **Memorandum of Lease; Commencement Date Agreement**. Landlord and Tenant agree, at the sole expense of the requesting party, to execute a Memorandum of Lease in recordable form, substantially similar to that attached **Exhibit "H"**, setting forth such provisions hereof including an automatic termination provision as may be required by State law. In addition, Landlord and Tenant shall execute a Commencement Date Agreement in the form attached as **Exhibit "I"**, once the Commencement Date has been established. Recording costs for either or both documents shall be borne by the party requesting recordation of the same. The provisions of this Lease shall control, however, with regard to any omissions from, or provisions which may be in conflict with, the Memorandum of Lease or Commencement Date Agreement.

25.    **Expiration of Term and Holding Over**. At the expiration or earlier termination of the Lease, Tenant shall surrender the Premises in a broom clean condition. Should Tenant hold over without the consent of Landlord, this Lease shall continue in force from month to month, subject to all of the provisions hereof and at one hundred twenty five percent (125%) of the monthly Base Rent Tenant had been paying during the preceding Lease Year.

26.    **Force Majeure**. Except as otherwise specifically contemplated in this Lease or in the Construction Provisions, in the event that Landlord or Tenant shall be delayed or prevented from, the performance of any non-monetary act required by reason of strikes, lockouts, labor troubles, inability to procure materials, delay by the other party, failure of power or unavailability of utilities, riots, insurrection, war or other reason of a like nature not the fault of such party or not within its control, then performance of such act shall be excused for the period of delay, and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay; provided, however, that in connection with the construction of the Improvements, the consequences of delays by the other party shall be governed by paragraphs 28(d) and 29(c) and (d) of this Lease.

27.    **Events of Tenant's Default**. Any of the following occurrences by Tenant shall constitute an "**Event of Default**" under this Lease:

35



(a)  **Failure to Pay Rent; Breach**.  (i) Tenant's failure to make any payment of money required by this Lease (including without limitation Base Rent, CAM Charges or Real Estate Taxes) (subject to Tenant's right of good faith contest), within ten (10) days after the receipt of written notice from Landlord to Tenant that same is overdue (provided, such notice shall only be required to be delivered two times in any Lease Year); or (ii) Tenant's failure to observe or perform any other material provision of this Lease within thirty (30) days after receipt of written notice from Landlord to Tenant specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Tenant shall have such longer period as is reasonably necessary to cure the default, so long as Tenant proceeds promptly to commence the cure within such thirty (30) day period and diligently prosecutes the cure to completion.  In the case of an emergency, Landlord shall be required to give only such notice as is reasonable under the circumstances.

(b)  **Bankruptcy**.  Tenant's adjudication as bankrupt or insolvent, or the appointment of a receiver, trustee in involuntary bankruptcy or other, similar officer to take charge of any substantial part of Tenant's property, including an assignment of the benefit of creditors, which proceeding is not dismissed within one hundred twenty (120) days after it is begun.

(c)  **Financial Insolvency**.  Tenant shall notify or admit in writing to Landlord that Tenant is insolvent and unable to pay its debts and has commenced or otherwise filed a petition to commence one of the insolvency or bankruptcy proceedings described in (b), above.

28.  **Landlord's Remedies**.  After the occurrence of an Event of Default by Tenant, Landlord shall have the right to exercise the following remedies:

(a)  **Continue Lease**.  Landlord may, at its option, continue this Lease in full force and effect, without terminating Tenant's right to possession of the Premises, in which event Landlord shall have the right to collect Base Rent and any other charges due Landlord as specified herein when due.  Landlord shall also have the right, in Landlord's exercise of reasonable efforts to mitigate its damages as provided herein (which Landlord agrees to make), at its option, from time to time, without terminating this Lease, to relet the Premises, or any part thereof, with or without legal process, as the agent, and for the account, of Tenant upon such terms and conditions as Landlord may deem advisable, in which event the rents received on such reletting shall be applied (i) first to the reasonable and actual expenses of such reletting and collection, including without limitation necessary renovation and alterations of the Premises, reasonable and actual attorneys' fees and any reasonable and actual real estate commissions paid, and (ii) thereafter toward payment of all sums due or to become due Landlord.

(b)  **Terminate Lease**.  Landlord may terminate this Lease by written notice to Tenant specifying a date, which shall be no sooner than thirty (30) days following receipt of such notice by Tenant, and this Lease shall then terminate on the date so specified.  In

36

the event of such termination, Landlord shall be entitled to accelerate the Base Rent. If Landlord does accelerate the Base Rent due hereunder, then the accelerated Base Rent shall be equal to the Base Rent which accrued prior to the date of termination plus the Base Rent that would have accrued during the balance of the Lease Term (as if this Lease had not been terminated) less the fair rental value of the Premises for the corresponding period (after taking into consideration reasonable assumptions concerning vacancy, reletting, abatement during tenant build out, cost of broker's commissions attributable to reletting, etc). The positive difference between the accelerated Base Rent less the fair rental value of the Premises for the corresponding period shall be discounted to present value at an annual interest rate equal to eight percent (8%). Upon payment to Landlord of such positive difference between accelerated Base Rent less the fair rental value of the Premises for the corresponding period, after being discounted to present value as provided herein, Tenant shall be released from all further liability under this Lease. Landlord shall never be entitled to recover from Tenant any consequential, punitive or incidental damages (including, without limitation, lost business opportunity), or to dispossess Tenant of the Premises pursuant to any "lock-out" or other non-judicial remedy.

(c)   **Remedies Are Cumulative; Mitigation**. The various rights and remedies reserved to Landlord are cumulative, and Landlord may pursue any and all such rights and remedies (but no others), whether at the same time or otherwise (to the extent not inconsistent with specific provisions of this Lease). Notwithstanding anything to the contrary, Landlord expressly waives its right to forcibly dispossess Tenant from the Premises, whether peaceably or otherwise, without judicial process, such that Landlord shall not be entitled to any "commercial lockout" or any other provisions of applicable law which permit landlords to dispossess tenants from commercial properties without the benefit of judicial review. Landlord further agrees to take all reasonable measures to mitigate Landlord's damages arising from an Event of Default.

Notwithstanding the foregoing, any obligation imposed by law upon Landlord to relet the Premises shall be subject to the then-existing exclusive uses and the retail nature of the Shopping Center.

(d)   **Additional Landlord Rights Due to Construction Delays by Tenant**. In the event, for any reason and regardless of *force majeure*, Tenant after diligently pursuing substantial completion, shall fail to achieve Substantial Completion by that date which is one (1) year following Delivery of the Land, then Landlord shall be entitled, as its sole remedy for Tenant's failure to so achieve Substantial Completion, to terminate this Lease upon sixty (60) days prior written notice to Tenant, during which sixty (60) day period Tenant may cure any such default provided another Tenant-default (for which Tenant has been given notice) does not then exist; in the event that Landlord so terminates this Lease, Landlord shall pay to Tenant, on or before the date of termination and as a condition to such termination, the amount of Tenant's then unamortized cost of the Improvements (based upon Tenant's records with respect thereto [which records Tenant shall make available to Landlord promptly upon demand]), provided that Tenant's

37



amortization shall be on a straight-line basis in accordance with generally accepted accounting principles.

29    Events of Landlord's Default; Tenant's Remedies.

(a)    **Default by Landlord**. Any of the following shall constitute an "**Event of Default**": (i) Landlord's failure to make any payments of money due Tenant or any third party, including but not limited to the payment of the brokerage commissions pursuant to paragraph 33, within ten (10) days after the receipt of written notice from Tenant that same is overdue (in which event the delinquent amount shall accrue interest from the due date at the Default Rate); or (ii) Landlord's failure to perform any nonmonetary obligation of Landlord within thirty (30) days after receipt of written notice from Tenant to Landlord specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Landlord shall have such longer period as may be reasonably necessary to cure the default, so long as Landlord proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion. In the case of an emergency, Tenant shall be required to give only such notice as is reasonable under the circumstances.

(b)    **Remedies Upon Landlord's Default**. Upon the occurrence of an Event of Default by Landlord, at Tenant's option, in addition to any and all other remedies which it may have at law and/or in equity, and without its actions being deemed an election of remedies or a cure of Landlord's default, Tenant may do all or any of the following:  (i) pay or perform such obligations and offset Tenant's actual cost of performance, including any and all transaction costs and attorneys' fees, plus interest at the Default Rate, against not more than 50% of the next monthly installments(s) of Base Rent, CAM Charges and all other amounts and charges due Landlord, or (ii) withhold up to 50% of Base Rent, CAM Charges and any other payments due to Landlord under this Lease until such Event of Default, including payment of interest, transaction costs and attorney's fees, is cured by Landlord, or (iii) terminate this Lease and sue for damages, including, without limitation, interest, transaction costs and attorneys' fees. If Landlord fails to pay Tenant the Tenant Improvement Allowance in a timely manner, Tenant shall be entitled to the rights and remedies set forth in this paragraph and the Construction Provisions; and, as to a breach of the warranties and representations contained in paragraph 19, Tenant shall be entitled to the remedies provided therein, in addition to those remedies provided herein. All amounts, including interest, transaction costs and attorneys' fees, arising out of uncured defaults of Landlord shall constitute liens against Landlord's interest in the Shopping Center, which may be enforced by non-judicial means available under State law, or any other applicable proceedings. The various rights and remedies reserved to Tenant are cumulative, and Tenant may pursue all rights and remedies, whether at the same time or otherwise. Wherever in this Lease Tenant's right to offset Base Rent, CAM Charges or any other amounts and charges due Landlord is limited to a percentage of such costs, Tenant may exceed such percentage if required to completely offset the entirety of the amount due Tenant prior to the expiration of the Term.

38

(c)   **Intentionally Omitted**.

(d)   **Additional Tenant Self-help, Equitable and Legal Remedies Due to Construction Delays by Landlord**.   In the event that Landlord defaults at any time in completion of any component of the Landlord Work (as defined in **Exhibit "C"** attached hereto) required for Landlord to perform Delivery of the Land when required hereunder, in addition to any other rights and remedies set forth hereinabove, Tenant shall have the right, but not the obligation, to do any or all of the following:

    (i)   Intentionally deleted;

    (ii)   seek injunctive relief, specific performance or other equitable remedies against Landlord to require Landlord to perform its obligations hereunder, all costs of which litigation (including Tenant's attorneys' fees and court costs) shall be borne by Landlord; and/or

    (iii)   seek such other legal remedies as may be available to Tenant at law and/or in equity, the costs of which shall be borne by Landlord, including, without limitation, attorneys' fees and court costs.

(e)   **Tenant Remedies Due to Landlord's Failure to Pay the Tenant Improvement Allowance**.   If Landlord fails to pay the Tenant Improvement Allowance in full on or before its due date and as provided in this Lease, Landlord shall be in default hereunder, and no Ground Rent (except for Ground Rent which has been theretofore paid pursuant to Section 4(i) above), Base Rent or CAM Charges or other amounts (including, without limitation, Real Estate Taxes) under this Lease shall be due or owing to Landlord until the same is paid to Tenant, together with interest which shall accrue on the unpaid Tenant Improvement Allowance at the Default Rate commencing on the thirty-first (31st) day following the date that the Tenant Improvement Allowance is due pursuant to the provisions of paragraph 2 above until the date of payment of the Tenant Improvement Allowance,   In addition, if Landlord has not tendered payment of the Tenant Improvement Allowance and interest by that date which is one (1) year from the date that the Tenant Improvement Allowance is due pursuant to the provisions of paragraph 2 above (the "**Allowance Due Date Anniversary**"), then (i) such date shall become the Commencement Date; (ii) Base Rent shall be reduced to ground rent equal to Fifty Thousand and No/100 Dollars ($50,000.00) per annum during the Term of the Lease; and (iii) this Lease shall be converted to a ground lease, with ownership of the Improvements remaining with Tenant, and Landlord's and any Mortgagees' names being removed as additional insureds or mortgagees on any casualty insurance described in paragraph 14(a) of this Lease.   Landlord and Tenant covenant and agree that upon the reasonable written request of either Tenant or Landlord, Landlord and Tenant shall execute such documentation as necessary to formalize the conversion of this Lease to a ground lease upon the Substantial Completion Anniversary.

If Landlord has not tendered payment of the Tenant Improvement Allowance and interest by the Allowance Due Date Anniversary, then at any time following the said

Allowance Due Date Anniversary and upon thirty (30) days prior written notice, Tenant shall have the right at Tenant's sole election, but not the obligation, in lieu of the requirement that Landlord pay to Tenant the Tenant Improvement Allowance, to mortgage, sell, convey, assign, lease or otherwise encumber (collectively, a "**Leasehold Premises Transfer**") Tenant's interest in the Building, the Improvements and the Lease. Such right shall be in addition to the rights of Tenant set forth in paragraph 22 of this Lease.

Landlord covenants to (i) execute all documents reasonably acceptable to Landlord which are necessary to permit Tenant to effect the Leasehold Premises Transfer described herein, and (ii) cause any Mortgagee to specifically acknowledge the rights of Tenant's lender and third parties arising as a result of such Leasehold Premises Transfer. Notwithstanding such Leasehold Premises Transfer, Tenant or its transferee, as the case may be, shall continue to pay the ground rentals described in this subparagraph (e) during the remainder of the Term.

(f)     **Exercise of Remedies**.  Notwithstanding the foregoing, a delay by Tenant in exercising its cure rights or other remedies shall not be deemed an event of force majeure for purposes of extending the date(s) established for performance by Landlord. All sums owing to Tenant under this paragraph 29 shall, to the extent applicable, be added to the Tenant Improvement Allowance and paid simultaneously; and, if not so paid, Tenant shall be entitled to offset all such costs, plus interest at the Default Rate, against Base Rent and CAM Charges otherwise due.

30.     **Waiver**.  If either Landlord or Tenant fails to insist on the strict observance by the other of any provisions of this Lease, neither shall be precluded from enforcing nor be held to have waived any of the obligations, past, present or future, of this Lease.  Either party may accept late payment or performance by the other without waiving any Event of Default which may then have accrued.

31.     **Compliance with Applicable Laws**.  During the Term, Tenant shall comply with all lawful requirements of the local, county and state health boards, police and fire departments, municipal and state authorities and any other governmental authorities with jurisdiction over the Improvements, and of the board of fire underwriters (collectively, the "**Lawful Requirements**") respecting Tenant's use and occupancy of the interior of Improvements and Landlord shall comply with all Lawful Requirements relating to the exterior of the Building and Common Areas.  In the event that Tenant, after thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Landlord or any such authority ordering performance of any such work which Tenant is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Landlord may perform said work and collect the reasonable cost thereof plus interest at the Default Rate from Tenant with the next installment or installments of Base Rent. In the event that Landlord, following thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Tenant or any such authority ordering performance of any such work which

40

Landlord is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Tenant may perform said work and deduct no more than fifty percent (50%) of the reasonable cost thereof plus interest at the Default Rate from Landlord with the next installment or installments of Base Rent until Tenant is fully reimbursed.

32.     **Notices**.  Any notice permitted or required to be given pursuant to this Lease shall be deemed to have been given three (3) business days after mailing a written notice by certified mail, postage prepaid, return receipt requested, or one (1) business day after sending by Federal Express or other comparable overnight express courier service (with proof of receipt available), addressed to the parties as follows:

If to Tenant:                    CIRCUIT CITY STORES, INC.
                                 Deep Run I
                                 9950 Maryland Drive
                                 Richmond, Virginia 23233
                                 Attention:  Vice President of Real Estate

with a copy to:                  CIRCUIT CITY STORES, INC.
                                 Deep Run I
                                 9950 Mayland Drive
                                 Richmond, Virginia 23233
                                 Attention:  Corporate Secretary

If to Landlord:                  Polaris Circuit City, LLC
                                 8800 Lyra Drive, Suite 550
                                 Columbus, Ohio 43240
                                 Attention:  Franz A. Geiger

or to such other addressees as any party shall from time to time give notice to the other party in accordance with this paragraph.

33.     **Brokers**.  Landlord and Tenant each covenant that they have not dealt with any real estate broker or finder with respect to this Lease, except for Millenium Retail Partners, LLC and Polaris Real Estate Company which is representing Landlord (collectively, "**Brokers**"), which shall be paid a commission by Landlord pursuant to a separate written agreement with Brokers, a copy of which Landlord agrees to deliver to Tenant on or before the Effective Date. Landlord agrees that Brokers are representing Tenant with respect to this leasing transaction, and, although Landlord is responsible for payment to Brokers of the Broker's commission, the Brokers owe no fiduciary's, agent's or other duty whatsoever to Landlord.  Except for the foregoing, each party shall hold the other party harmless from all damages, claims, liabilities or expenses, including reasonable and actual attorneys' fees (through all levels of proceedings), resulting from any claims that may be asserted against the other party by any real estate broker or finder with whom the indemnifying party has purported to have dealt.  If Landlord fails to timely pay the brokerage commissions described above, Tenant may, at Tenant's option, elect to do so,

41

whereupon Landlord shall reimburse to Tenant the amount so paid within fifteen (15) days following receipt from Tenant of notification thereof, together with interest at the Default Rate from the date of Tenant's payment through the date of reimbursement. If Landlord has failed to pay such amount within such fifteen (15) day period, Tenant may, at its election, offset such amounts from its payments of Base Rent, Ground Rent, CAM Charges and other amounts due hereunder. Landlord represents to Tenant that Landlord has entered into a binding brokerage commission agreement in writing with Brokers and heretofore or simultaneously herewith delivered a copy thereof to Tenant.

34.   **Miscellaneous**.

(a)   **Headings and Gender**.   All paragraph headings, titles or captions contained in this Lease are for convenience only and shall not be deemed a part of this Lease and shall not in any way limit or amplify the terms and provisions of this Lease. The masculine, feminine or neuter gender and the singular or plural number shall be deemed to include the others whenever the context so requires or indicates.

(b)   **Construction**. The parties agree that all the provisions are to be construed as covenants and agreements as though the words importing such covenants and agreements were used in each separate paragraph.

(c)   **Waiver of Jury Trial**. In the event of any court action arising out of this Lease, each party waives its right to trial by jury.

(d)   **Relationship of Landlord-Tenant**. Nothing contained in this Lease shall be deemed or construed by the parties or by any third person to create the relationship of principal and agent, partnership, joint venture, or any other association between Landlord and Tenant other than the landlord-tenant relationship described herein.

(e)   **Entire Agreement; Merger**. This Lease, including all exhibits (which are incorporated by reference for all purposes), contains the full and final agreement between the parties concerning the subject matter of this Lease, and all preliminary negotiations and agreements between Landlord and Tenant are merged herein. This Lease cannot be changed or modified in any manner other than by a written amendment or modification executed by Landlord and Tenant.

(f)   **Attorneys' Fees**. In the event either party shall be required to commence or defend any action or proceeding against any other party by reason of any breach or claimed breach of any provision of this Lease, to commence or defend any action or proceeding in any way connected with this Lease or to seek a judicial declaration of rights under this Lease, the party prevailing in such action or proceeding shall be entitled to recover from or to be reimbursed by the other party for the prevailing party's reasonable and actual attorneys' fees and costs through all levels of proceedings.

(g)   **Partial Invalidity**. If any provision of this Lease or the application to any person or circumstance shall be deemed invalid or unenforceable, the remainder of this

42

Lease and its application to other persons or circumstances shall not be affected by such partial invalidity but shall be enforced to the fullest extent permitted by law as though such invalid or unenforceable provision was never a part.

(h)    **Consents**.  Any consent or approval granted by either party shall be deemed a consent only as to the matter on which such consent was requested and shall not waive the consenting party's right to give or withhold consent to any subsequent matter.

(i)    **Holidays**.  If the day on which rent or any other payment due date falls on a Saturday, Sunday or on a legal holiday, it shall be payable on the following business day.

(j)    **Applicable Law**.  This Lease shall be construed in accordance with the laws of the State, and the parties agree that jurisdiction for all actions hereunder shall lie therein.

(k)    **Successors and Assigns**.  All rights, obligations and liabilities given to or imposed upon any party shall extend to the permitted successors and assigns of such party.

(l)    **Counterparts**.  This Lease may be executed in one or more identical counterparts, and as so executed by all parties shall constitute a single instrument for purposes of the effectiveness of this Lease.

(m)    **Trademarks and Trade Names**.  All trademarks, trade names, service marks, signs and all other marks of identification used by Tenant in its business shall at all times remain the exclusive property of Tenant, and Landlord shall have no right, interest in, or title to any of Tenant's trademarks, trade names, service marks, signs or other marks of identification.

(n)    **Exhibits**.  All of the exhibits to this Lease are incorporated by reference for all purposes and are part of this Lease.

(o)    **No Construction Against Either Party**.  This Agreement shall be interpreted to give it fair meaning and shall not be construed against either party.

(p)    **Transfer of Landlord's Interest**.  Landlord may not sell or transfer all or part of its ownership of the Shopping Center until and unless the Tenant Improvement Allowance is paid in full to Tenant, and thereafter, Landlord shall not transfer all or part of its ownership of the Shopping Center without first notifying Tenant of the intended purchase or assignment, and upon completion of the purchase or assignment, delivering to Tenant evidence that the purchaser or assignee has assumed all obligations of Landlord under this Lease.

43

   **(q)** **Effective Date**.  This Lease shall be deemed executed on the date (the "**Effective Date**") on which it is fully executed and delivered by all parties, and such Effective Date shall be the date set forth in the opening paragraph of this Lease.

   **(r)** **Trademark**.  The parties hereby acknowledge that the names "Polaris" and "POLARIS Centers of Commerce" (the "**Names**") are names and marks which have been (a) registered with both the State of Ohio and the U.S. Patent and Trademark Office and (b) licensed to Landlord for its limited use generally in connection with the operation of the Shopping Center.  Accordingly, other than the use of the "Polaris Circuit City" and "Polaris Shopping Center" names to identify the location of Tenant's store (in advertisements and other media), authorized users shall use no symbol, design, name, mark or insignia adopted by or identifying Landlord, including without limitation the Names, without the prior approval of Landlord, which approval shall not be unreasonably withheld.  Because of the uniqueness of the Names and the lack of any other adequate remedy at law, in the event any user fails to observe the restrictions of this provision, either or both of the Landlord and the licensor of the Names shall be entitled to a temporary restraining order, preliminary and permanent injunctions, and specific performance.

   **(s)** **Facsimile Signature**.  The use of facsimile signatures is acceptable and such signatures shall be deemed as originals.

   **(t)** **Liability of Landlord**.  If Landlord shall be in default under this Lease and if, as a consequence of such default, Tenant shall recover a money judgment against Landlord, such judgment shall be satisfied only out of the right, title and interest of Landlord in the Shopping Center as the same may then be encumbered, the Landlord's income (including all rents) from the Shopping Center and the insurance proceeds applicable to the Shopping Center, and neither Landlord nor any person or entity comprising Landlord shall be personally liable for any deficiency.  In no event shall Tenant have the right to levy execution against any property of Landlord nor any person or entity comprising Landlord other than its interest in the Shopping Center as herein expressly provided.

   **(u)** **Governing Law; Venue**.  This lease has been negotiated and executed in the State of Ohio and relates to real property located in the State of Ohio.

   All questions concerning the validity or intention of this lease shall be resolved under the laws of the State of Ohio.  The parties to this lease hereby designate the Court of Common Pleas of Delaware County, Ohio, as the court of proper jurisdiction and exclusive venue for any actions or proceedings relating to this lease; hereby irrevocably consent to such designation, jurisdiction and venue; and hereby waive any objections or defenses relating to jurisdiction or venue with respect to any action or proceeding initiated in the Court of Common Pleas of Delaware County, Ohio.

35. **Effectiveness of Lease; Tenant's Right to Terminate**.  Notwithstanding the execution of this Lease or any provision to the contrary, the parties agree that the effectiveness of

44

this Lease is expressly conditioned upon the complete satisfaction (or waiver) of each and all of the following conditions within ninety (90) days after the date of this Lease:

(a)    Tenant's receipt, simultaneously with or prior to the execution of this Lease, of (i) a commitment for leasehold policy of title insurance for the Shopping Center; (ii) copies of all underlying documents referred to in said commitment for title insurance; and (iii) an ALTA survey of the Shopping Center (to be obtained by Tenant, and the cost of which shall be reimbursed to Tenant upon delivery of an invoice therefor to Landlord), at Landlord's expense, in form and substance acceptable to Tenant, at a minimum identifying by its metes and bounds or platted lot all of the real property within the Shopping Center, each of the parcels owned under every ground lease pertinent to the Shopping Center, and the Land, (iv) all instruments reasonably required by the title company issuing the commitment for leasehold policy of title insurance to issue a policy meeting Tenant's requirements, including, without limitation, an Owner's Affidavit and Indemnity in form acceptable to the title company; and (v) Tenant's approval of all of the foregoing in writing within thirty (30) days after receiving all of said documents.

(b)    Landlord's delivery of subordination, non-disturbance and attornment agreements and estoppel letters executed by any and all existing Mortgagees and Ground Lessors in a form satisfactory to Tenant simultaneously with the execution of this Lease.

(c)    Landlord's Delivery of the Land by the Delivery Date

(d)    Tenant's obtaining: (i) written confirmation from appropriate local authorities that current zoning and use regulations allow construction of the Improvements on the Premises; and (ii) the required City, County, State and other necessary governmental agency permits and approvals to construct said Improvements on the Premises. Tenant agrees to apply for such permits promptly as provided, to use due diligence and to expend any necessary application or other fees to secure such permits and approvals; provided, however, that the foregoing shall not be deemed to require Tenant to initiate litigation or to agree to any conditions imposed upon issuance of any such permit or approval.

(e)    Landlord's representations, warranties and covenants, including but not limited to those set forth in paragraph 19, being true and accurate as of the date of Delivery of the Land (as defined in the Construction Provisions).

(f)    Tenant's obtaining, if applicable, from Landlord copies of soils and Hazardous Substances reports satisfactory to Tenant. Landlord shall not be obligated to create new soil and Hazardous Substances reports in connection with Tenant's execution of this Lease.

(g)    Tenant's obtaining satisfactory assurances, that adequate utility services (including gas, electricity, telephone, domestic water, fire protection water, storm sewer and sanitary sewer) are available for connection at the Premises or in close proximity in amounts sufficient to support Tenant's operations.

45

(h)     Tenant's obtaining satisfactory assurances that all necessary approvals and consents, including approvals or consents from other tenants in the Shopping Center, planned unit developmental boards and other necessary entities, and all necessary reciprocal use and easement agreements have been obtained.

(i)     Tenant's obtaining satisfactory written assurances that Landlord has obtained financing adequate to fund the Tenant Improvement Allowance and development of the remainder of the Shopping Center.

(j)     Intentionally Omitted.

(k)     Upon execution of this Lease, Landlord's delivery to Tenant of the W-9 form, completed and executed by Landlord, submitted to Landlord by Tenant with the Lease.

The existence of the foregoing conditions is solely for the benefit of Tenant, and Tenant may waive any such condition at its sole discretion by delivering to Landlord a written notice signed by Tenant which specifically states the condition(s) being waived by Tenant.

Notwithstanding any other provision in this Lease to the contrary, in the event any of the foregoing conditions shall not be met, satisfied or waived within the ninety (90) day period, the parties expressly agree that Tenant shall have the right to terminate this Lease in its sole and absolute discretion at anytime prior to expiration of the ninety (90) day period by delivering to Landlord a written notice signed by Tenant which states that Tenant is terminating this Lease on account of the failure of one or more of the foregoing conditions.  In the event of any such termination, the rights and obligations of the parties shall be of no further force and effect and the parties shall have no further liability one to the other (except that the indemnifications set forth in paragraphs 14(i), 19(a)(v) and 19(b)(ii) shall survive such termination) upon Tenant's delivery of said notice to Landlord.    All conditions contained in this paragraph except subparagraphs (a) and (g) unless previously waived or satisfied shall expire as of the date of Tenant's store opening.

The delivery of this executed Lease by Tenant to Landlord constitutes the offer of Tenant to Landlord to bind Landlord and Tenant to the provisions of this Lease, subject to the conditions set forth in this paragraph 35. It is a further condition to the effectiveness of this Lease that upon receipt of the executed Lease from Tenant, Landlord execute and return same to Tenant within ten (10) days following receipt by Landlord. In the event Landlord fails to execute and return the Lease within such ten (10) day period, Tenant may at any time thereafter provide written notice to Landlord that Tenant revokes its delivery of the executed Lease and Landlord shall be immediately obligated to return to Tenant all executed original counterparts as well as any copies of this Lease in the possession of Landlord, and this Lease shall be null and void.

36.   **Intentionally Omitted**.

37    **Intentionally Omitted**.

38.   **Intentionally Omitted**.

46



39.     **Importance of Each Covenant**.  Each covenant and agreement on the part of one party hereto is understood and agreed to constitute an essential part of the consideration for each covenant and agreement on the part of the other party.

40.     **"For Rent" Signs**.  Tenant hereby permits Landlord during the last ninety (90) days of the Main Term or of any Option Period, as the case may be (provided that no applicable Renewal Option has been exercised or deemed exercised), to place one (1) "For Rent" or "For Sale" sign, not exceeding four (4) feet by four (4) feet in size, in the parking lot portion of Tenant's Preferred Area.  During said ninety (90) day period, Tenant will also allow Landlord or its agents, upon prior written notice and accompanied by a representative of Tenant designated by Tenant, to show the Premises, exterior and interior, to prospective tenants, purchasers, or mortgagees during reasonable business hours by prior appointment, provided same does not interfere with the conduct of Tenant's business.

**[END OF PAGE; SIGNATURES ON FOLLOWING PAGE]**

47



**WITNESS** the following signatures and seals:

**LANDLORD**:

**POLARIS CIRCUIT CITY, LLC**, an
Ohio limited liability company

By:_____
    Name: Robert C. Echele
    Title: President

_June 8, 2004_

Landlord's counsel:

_____
_____
_____

**TENANT**:

**CIRCUIT CITY STORES, INC.**, a
Virginia corporation

By:_____
    Thomas C. Nolan, Vice President of
    Real Estate

Tenant's counsel:

Piper Rudnick LLP
203 North LaSalle Street
Chicago, Illinois 60601
Attn: Dov J. Pinchot, Esq.

Approved for Signature:

_____ Responsible Atty.
_____ Reviewing Atty.
      RE Manager

48

WITNESS the following signatures and seals:

**LANDLORD**:

**POLARIS CIRCUIT CITY, LLC**, an
Ohio limited liability company

By:_____
    Name: Robert C. Echele
    Title: President

Landlord's counsel:

_____

**TENANT**:

**CIRCUIT CITY STORES, INC.**, a
Virginia corporation

By:_____
    Thomas C. Nolan, Vice President of
    Real Estate

June 15. 2004

Tenant's counsel:

Piper Rudnick LLP
203 North LaSalle Street
Chicago, Illinois 60601
Attn:  Dov J. Pinchot, Esq.

Approved for Signature:

_____ Responsible Atty.
_____ Reviewing Atty.
_____ RE Manager

48

~CHGO2:20156016.v9 |6/3/04

## EXHIBIT "A"

## SITE PLAN

1

## EXHIBIT "A-1"

## LEGAL DESCRIPTION

**(attached)**

~CHGO2:20156016.v9 |6/3/04



### 5.090 Acres

Situated in the State of Ohio, County of Delaware, City of Columbus, Section 4, Township 3, Range 18, United States Military Lands, Farm Lots 12 and 13, and being 1.692 acres out of said Farm Lot 12 and being 3.398 acres out of Farm Lot 13 and also being 1.349 acres out of a 59.424 acre tract as conveyed to N.P. Limited Partnership (Parcel 1) of record in Deed Book 486, Page 547 and being 0.280 acres out of a 134.411 acre tract as conveyed to N.P. Limited Partnership Trustee U/A of record in Official Record 26, Page 445 and being 1.068 acres out of an original 26.928 acre tract as conveyed to N.P. Limited Partnership of record in Official Record 26, Page 439 and being 2.393 acres out of a 9.896 acre tract as conveyed to N.P. Limited Partnership of record in Deed Book 808, Page 653 (all records being of the Recorder's Office, Delaware County, Ohio) and being more particularly described as follows;

Beginning for reference at a found iron pin at the centerline intersection Lyra Drive (100.00 feet wide) as recorded in Plat Cabinet 1, Slide 632 and Polaris Parkway (164.00 feet wide) as recorded in Plat Book 24, Page 137;

Thence North 06°28'44" West crossing said Polaris Parkway and with the centerline of Lyra Drive as recorded in Plat Cabinet 2, Slide 396, a distance of 142.70 feet to a point;

Thence South 83°31'16" West crossing said Lyra Drive, a distance of 50.00 feet to a 1" iron pipe set with an EDG cap and being a point on the westerly right-of-way line of said Lyra Drive and being the true point of beginning;

Thence through said Farm Lots 12 and 13 and through said 134.411 acre tract, 59.424 acre tract, 26.928 acre tract, and 9.896 acre tract, the following nine (9) courses;

1) North 61°04'14" West, a distance of 549.92 feet to a 1" iron pipe set with an EDG cap;

2) North 33°36'16" West, a distance of 190.05 feet to a 1" iron pipe set with an EDG cap and being a point of curvature;

3) With a curve northeasterly and to the left having a radius of 1919.00 feet, a central angle of 11°10'44", a chord bearing of North 57°56'24" East, a distance of 373.82 feet to a 1" iron pipe set with an EDG cap;

4) South 83°46'24" East, a distance of 79.45 feet to a 1" iron pipe set with an EDG cap and being a point of curvature;

5) With a curve southeasterly and to the left having a radius of 263.00 feet, a central angle of 13°36'44", a chord bearing of South 54°16'02" East, a distance of 62.34 feet to a 1" iron pipe set with an EDG cap;

6) South 61°04'25" East, a distance of 200.42 feet to a 1" iron pipe set with an EDG cap;

7) South 35°54'20" East, a distance of 35.75 feet to a 1" iron pipe set with an EDG cap and being a point on a curve on the westerly right-of-way line of said Lyra Drive;



8) With said westerly right-of-way line and with a curve to the left having a radius of 750.00 feet, a central angle of 30°57'17", a chord bearing of South 08°59'55" West, a distance of 400.29 feet to a 1" iron pipe set with an EDG cap;

9) South 06°28'44" East continuing with said westerly right-of-way line, a distance of 56.75 feet to the true point of beginning and containing 5.090 acres of land more or less.

This description was prepared by Environmental Design Group Inc., Columbus, Ohio. The basis of bearing is based on the Grid Bearing of North 88°20'26" West, from the Ohio State Plane Coordinate System, North Zone, as determined between stations "11-009 and "11-0101", established by Delaware County Engineer.

Maynard H. Thompson, P.S. #7128    6/4/04    Date

1/23/01
S:\POLARIS\461601\Job_da87\survey\LEGALS\5_090.doc





Circuit City
8655 – 8671 Lyra Drive
Site Layout Plan

A-1

"5,810 s.f. Maximum"

"Permissible ATM location"

"Tenant's Pickup Shopping Center Area"

"City Stores Parking"