UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA (RICHMOND)

| | |
|---|---|
| In re:<br><br>CIRCUIT CITY STORES, INC., ET AL.,<br><br>Debtors. | Chapter 11<br><br>Case No. 08-35653<br><br>Jointly Administered |
| GREYSTONE DATA SYSTEMS, INC.<br><br>Plaintiff,<br><br>v.<br><br>CIRCUIT CITY STORES, INC.,<br><br>Defendant. | Adv. Pro. No.: |

## COMPLAINT FOR DECLARATORY JUDGMENT, IMPOSITION OF CONSTRUCTIVE TRUST AND TURNOVER OF FUNDS HELD IN TRUST

Greystone Data Systems, Inc. ("Greystone" or the "Plaintiff"), by its counsel, Nixon Peabody LLP, for its Complaint for a Declaratory Judgment, Imposition of Constructive Trust, and Turnover of Funds Held in Trust against Circuit City Stores, Inc. (the "Debtor"), respectfully represents and alleges as follows:

### NATURE OF THE ACTION

1. Greystone brings this action against the Debtor for (1) a declaration that the proceeds from certain insurance payments made to the Debtor are not property of the estate; (2) a declaration that such insurance proceeds are property of Greystone and that such proceeds are held by the Debtor in a constructive trust for Greystone's benefit; and (3) ordering the immediate turnover of such funds held in trust for the benefit of Greystone.

## THE PARTIES

2. Greystone is a business incorporated under the laws of the State of Delaware, with its principal place of business located at 40800 Encyclopedia Circle, Fremont, California 94538.

3. Upon information and belief, the Debtor is a debtor and debtor-in-possession, and has offices for its conduct at 9954 Mayland Drive, Richmond, Virginia 23233.

## JURISDICTION AND VENUE

4. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157(a) and 1334(b).

5. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

6. This action is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (E), (K), and (O)

## FACTUAL ALLEGATIONS

7. Greystone offers asset recovery services for computer products, consumer electronics, and electronic material sold and distributed by the Debtor.

8. Essentially, Greystone provides warranty repair services for customers of the Debtor.

9. The Debtor and Greystone are parties to that certain "Asset Recovery Services Agreement" dated July 6, 2006, and annexed hereto as **Exhibit A** (the "Agreement").

10. Pursuant to the Agreement, the Debtor reimburses Greystone for invoiced services performed on net forty-five (45) days term. See Agreement ¶ 4.2.

11. Upon information and belief, Assurant Solutions, Inc. ("Assurant"), and/or a similarly situated third-party payor, provides insurance coverage for the Debtor and/or the Debtor's customers.

12. Upon information and belief, Assurant, and/or a similarly situated third-party payor, reimburses or advances payments to the Debtor for itemized services provided by Greystone to the Debtor or the Debtor's customers (the "Payments") for the purpose have having the Debtor reimburse Greystone.

13. Upon information and belief, the Debtor set up this insurance arrangement for the express purpose of reimbursing Greystone for its invoiced services pursuant to the Agreement.

14. In the ordinary course of dealings between the Debtor and Greystone, the Debtor reimburses Greystone after the Payments are received from Assurant, and/or a similarly situated third-party payor.

15. In the ordinary course of dealing between the Debtor and Greystone, the parties understood that the Payments were made solely to reimburse Greystone for goods and services it provided for the benefit of the Debtor and/or its customers.

16. Upon information and belief, on November 10, 2008 (the "Petition Date"), the Debtor, and certain of its subsidiaries and affiliates (collectively, with the Debtor, the "Debtors"), filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

17. Upon information and belief, the Debtors continue to manage and operate their businesses as debtors-in-possession.

18. Upon information and belief, no trustee or examiner has been appointed in these cases.

19. The Debtor is obligated to reimburse Greystone in an amount not less than $354,436.43 for prepetition services rendered on the Debtor's behalf and for which the Debtor has received, or will receive, payment by Assurant and/or a similarly situated third-party payor.

3

## FIRST CAUSE OF ACTION

## FOR DECLARATORY JUDGMENT, IMPOSITION OF CONSTRUCTIVE TRUST, AND TURNOVER OF FUNDS

20. Greystone repeats and realleges each and every allegation set forth at paragraphs 1 through 19 above, as if fully set forth herein.

21. Greystone, at its own expense, provides warranty repair services to the Debtor.

22. Upon information and belief, the Debtor bills its third party payor, Assurant, for those services.

23. Greystone provided services to the Debtor and its customers prior to the Petition Date.

24. Upon information and belief, the Debtor has submitted requests for reimbursement to Assurant, or other third-party payors, for the prepetition services rendered by Greystone.

25. Upon information and belief, the Debtor received insurance payments for some or all of the services provided by Greystone prior to the Petition Date but has not forwarded such monies to Greystone.

26. Under the facts present here, the law imposes a constructive trust on Greystone's share of the Debtor's collections related to Greystone's repair services.

27. Section 541(d) of the Bankruptcy Code excludes property from the estate where the bankrupt entity is only a delivery vehicle and lacks any equitable interest in the property it delivers.

28. The Debtor has been reimbursed for expenses that they never incurred and services that they never provided; rather, Greystone incurred such expenses and provided such

4

services for which the Debtor billed Assurant, or other third-party payors, with the understanding that such payments would be used to reimburse Greystone for its services.

29. Accordingly, the collections allocable to Greystone are held in a constructive trust by the Debtors for Greystone and should be turned over to Greystone forthwith.

## SECOND CAUSE OF ACTION

## FOR DECLARATORY JUDGMENT, IMPOSITION OF CONSTRUCTIVE TRUST, AND TURNOVER OF FUNDS

30. Greystone repeats and realleges each and every allegation set forth at paragraphs 1 through 29 above, as if fully set forth here.

31. Upon information and belief the Debtor has not received payment for some of the services provided by Greystone prior to the Petition Date.

32. Upon information and belief, the Debtor has submitted requests to Assurant, or other third-party payors, for reimbursement for such services.

33. Upon information and belief, Assurant, or other third-party payors, will reimburse the Debtor for such claims.

34. Under the facts present here, the law imposes a constructive trust on Greystone's share of the Debtor's future collections related to Greystone's repair services.

35. Section 541(d) of the Bankruptcy Code excludes property from the estate where the bankrupt entity is only a delivery vehicle and lacks any equitable interest in the property it delivers.

36. Accordingly, any future collections allocable to Greystone should be held in a constructive trust by the Debtor for Greystone and should be turned over to Greystone forthwith.

## PRAYER FOR RELIEF

5

37. WHEREFORE, Plaintiff, Greystone, requests that the Court enter judgment granting the following relief:

(1) a declaration that:

   (A) the payments made to the Debtor as reimbursement for services provided by Greystone are held in a constructive trust by the Debtor, for the benefit of Greystone; and

   (B) that such payments are not property of the Debtor's estate; and

(2) a declaration that:

   (A) any future payments made to the Debtor as reimbursement for services provided by Greystone are held in a constructive trust by the Debtor, for the benefit of Greystone; and

   (B) that such payments are not property of the Debtor's estate; and

(3) order the immediate turnover of any funds to Greystone which are currently or ever held in a constructive trust for its benefit; and

(4) such other and further relief, at law or equity, to which Greystone is entitled.

Dated: December 4, 2008

Respectfully Submitted,

NIXON PEABODY LLP

By: /s/ Louis E. Dolan, Jr.
Louis E. Dolan, Jr. (Bar # 34437)
401 9th Street NW, Suite 900
Washington, DC 20004-2128
Tel.: (202) 585-8818
Fax: (202) 585-8080
Email: ldolan@nixonpeabody.com
*Counsel for Greystone Data Systems, Inc.*

and

6

Christopher M. Desiderio  (*pro hac vice* pending)
437 Madison Avenue
New York, New York  10022
Tel.: (212) 940-3000
Fax: (212) 940-3111
Email: cdesiderio@nixonpeabody.com
*Counsel for Greystone Data Systems, Inc.*

# EXHIBIT A

## ASSET RECOVERY SERVICES AGREEMENT

THIS ASSET RECOVERY SERVICES AGREEMENT (the "Agreement) effective as of July 6, 2006 (the "Effective Date"), is between **Greystone Data Systems, Inc.,** ("GDS"), a California Corporation, located at 40800 Encyclopedia Circle, Fremont, CA 94538 and **Circuit City Stores, Inc.,** ("Circuit City") a Virginia Corporation, located at 9950 Mayland Drive, Richmond, VA 23233.

WHEREAS, GDS offers asset recovery services for computer Product, consumer electronics, and electronic materials ("Product"), which services include, among other things, the recovery, repair, recycling, and/or disposal of computer and electronic Product and components, sub-assemblies, parts and finished goods, the disassembly of finished goods for sub-assembly reclamation, the recovery of integrated circuits from printed circuit boards, and the integration of components into kits and/or finished goods, and the related marketing, the raw material recovery and sale of Product resulting from the foregoing services (collectively "Services" all as defined in the Statement of Work attached hereto as Schedule "A"). Further, pursuant to the terms of this Agreement, GDS may purchase, for the sole purpose of resale or for any other lawful purpose, Product delivered to GDS under this Agreement (its "Resale Business");

WHEREAS, Circuit City is a seller of consumer electronics, personal computer, and electronic Product and components and has expressed a desire to engage GDS to provide Services;

WHEREAS, from time to time, Circuit City may engage GDS to provide services and Special Projects in addition to the Services, all as may be defined and described in any Statement of Work to be executed between the parties and attached to this Agreement;

WHEREAS, Circuit City and GDS desire to set forth their agreement regarding the performance of Services by GDS for Product all as set forth in the terms and conditions herein;

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, both parties enter into this Agreement and agree as follows:

ATTACHMENTS. This Agreement includes the following, which are attached and incorporated and made a part of this Agreement as though fully set forth herein:

| Attachment | Title |
|---|---|
| Schedule "A" | Statement of Work (SOW); Asset Recovery Services – Core Purchase, Depot Service, and "Buy Back" of inventory |
| Schedule "B" | Price Matrix Table |
| Schedule "C" | Top Level Flow Chart for Service and Business Model |
| Schedule "D" | Information Technology (IT) – Interface Specification for electronic connectivity between Circuit City and GDS |
| Schedule "E" | Sample reports for the reports defined in the SOW as the required reports and information deliverables for the project. |
| Schedule "F" | GDS Certificate of Insurance |
| Schedule "G" | Welcome Letter (for Package) |
| Schedule "H" | IT interface Specification |

Each Schedule is specific to the Product or project that is defined in the SOW. The base agreement or contract is used to define the basic business agreements, terms and conditions, definitions, and scope of the services being provided. The Schedule for a Product or project would be labeled as follows: "Schedule "x" – "Product / Project Name", e.g., Schedule "A" – iPods & MP3 Players, Schedule "A", Digital Cameras, Schedule "A" – Notebook Computers, etc. The basic agreement would remain unchanged unless amended by mutual consent but the Schedules could change as required to meet on going business demands and requirements. The addition of Products or projects would not impact or change this Agreement.

1.    **DEFINITIONS.** The following terms shall have the meanings below for the purposes of this Agreement and the Attachment(s) hereto:

"AS-IS" means Product sold without any functional representation as to working order where GDS will have no recourse against Circuit City for functional working order of the Product.

"Buy Back" means that Circuit City has the option to purchase or "Buy Back" Product that has been sold to GDS on confirmation of valid receipt at the GDS facility.

"Circuit City" means Circuit City Stores, Inc. and the subsidiaries and affiliates of Circuit City Stores, Inc.

"Circuit City Branded Products" means personal computer hardware and/or accessories sold, leased, or otherwise distributed under or containing a logo or brand of Circuit City Stores, Inc., a Circuit City supplier, or any of its affiliates, including related software and documentation.

"Core Purchase" means that on receipt of Product from Circuit City or direct from Circuit City customers, GDS will verify the validity of the receipt and determine the processing requirements based on the SOW. When verified as a Valid Return, GDS will purchase the Product AS-IS

1

## ASSET RECOVERY SERVICES AGREEMENT

from Circuit City. On an agreed periodic basis, GDS will issue a Purchase Order (PO) to cover the product received in that period. The period will be defined in the Agreement as a term of purchase until launch while creating seed stock. From launch going forward, Core Purchase (credit) will be populated in the claim stream for all claims, whether fulfilled by Greystone with a refurbished product or fulfilled by Gift Card through Circuit City.

"Disposal" means transfer of Product to a GDS authorized scrap, waste, or raw material processor contractor.

"Disposal Channel" means the route of End-of-Life Electronics that begins with Circuit City and ends at the End-of-Life Electronics' final disposition.

"End-of-Life Electronics" means any Product that will likely be disposed of or that contains Material that will be recycled or processed in order to reclaim a metal, or to reclaim an organic or inorganic substance for further use.

"Environmental Laws" means all federal, state and local laws, statutes, rules, regulations and ordinances in effect or subsequently enacted concerning or relating to the protection of human health and/or the environment, including Superfund and any similar law. Environmental Laws shall further include all local or regional (e.g. WEEE directive of the European Union) laws, statutes, rules, regulations and ordinances in effect or subsequently enacted in the country where Services are performed.

"Environmentally Sensitive Material" means Product that contains elements, compounds or other Materials defined as toxic, reactive, corrosive or otherwise hazardous by the U.S. Environmental Protection Agency regulations or, when more stringent, the local or national government laws of the country where the Services are performed. Typical Environmentally Sensitive Materials include but are not limited to: all batteries (lead, cadmium, and lithium), glass from cathode ray tubes (lead), LCD fluorescent bulbs (mercury), and electronic components/cards (antimony, cadmium, lead). Environmentally Sensitive Material does not include Product that is re-used without further processing.

"Product" has the meaning given in the first paragraph of the recitals. Unless otherwise stated or the context requires a contrary interpretation, the defined term "Materials" shall be deemed to be included in the defined term "Product."

"Export Laws" means the United States Export Control Administration Act of 1979 and the Export Administration Act of 1985, as those Acts may be amended from time to time (or any successor or similar legislation) and the rules and regulations promulgated there under. For Services provided or Product sold by GDS in other countries, Export Laws shall refer to those laws, rules and other regulations applicable to the export of Product pursuant to the performance of the Services hereunder.

"Material" means any new, used, defective and/or scrap Product parts, electronic Product and components, sub-assemblies and other Product and parts provided by Circuit City to GDS under the terms and conditions of this Agreement including, but not limited to, PC's, sub-assemblies and/or parts from PC's, external or peripheral PC devices (e.g. hard drives, keyboards, video cards, memory), electronic Product and components and any other surplus Product provided by Circuit City to GDS in the manner described in this Agreement.

"OEM" means the original Equipment manufacturer of Product and/or Material.

"Personal Computer" or "PC" means a desktop, portable or desk-top or side computer designed for use by one person or as a network server or file server, compatible with one or more architectures widely available for such uses.

"Re-Certification" means the scope of work performed for cleaning, repair, parts replacement and packaging that will allow for the resale of Product as specified in a Statement of Work.

"Services" means the Services set forth and described on one or more SOWs attached hereto and/or which incorporate the terms of this Agreement.

"Service Parts Re-Certification" means the scope of work performed for cleaning, repair, and parts replacement.

"Statement of Work" (SOW) means a written definition of the specific Services that are provided in the terms and conditions of this Agreement.

"Valid Return" means an order that is electronically provided to GDS by Circuit City and for which Product is received either from Circuit City or directly from a Circuit City customer. On receipt of the Product, the Product will be evaluated against the following criteria: 1.) Is the Product specified in the order the same Product that has been received? 2.) Was the Product packaged in a manner that prevented damage in shipping? 3.) Was the Product purchased with an accidental damage or extended warranty agreement? If yes to all of the above, then the Product will be considered a Valid Return. If the Product was not purchased with an accidental damage or extended warranty agreement and is severely damaged, the issue will be escalated to Circuit City and as an option may be returned to the customer rather than repaired or replaced. A Valid Return will be processed as defined in the SOW.

2.     SCOPE OF WORK.

2.1 For all Validly Returned Product, GDS will issue Circuit City a Purchase Order ("PO") to cover Product received. GDS will also perform Services as set forth herein for each item of Product contained in the shipment. GDS's Services shall be those specified in the Statement of Work or any subsequent Statement of Work entered into between the parties for such Product. Services may include

2

## ASSET RECOVERY SERVICES AGREEMENT

without limitation the separation and segregation of Product into two categories for which: Services are to be performed pursuant to GDS's obligations under this Agreement, or GDS will purchase Product for its Resale Business. No representation is made by Circuit City as to the condition of the Product as provided under the terms and conditions of this Agreement. The condition of such Product may vary from scrap, functional or non-functional, repairable or non-repairable, or any combination of unknown conditions. Product that is deemed a "Valid Return" will be received and accepted "AS-IS".

2.2     The basic business model defined in this Agreement is that on receipt of a "Valid Return" GDS will accept ownership of the Product received. GDS herein purchases all "Valid Returns" without obligation from Circuit City to re-purchase or Buy Back any Product. The Price paid for the Product is defined in Schedule "B" – Price Matrix Table for that Product. On an agreed periodic basis, GDS will issue a Purchase Order (PO) to cover the product received in that period. The period will be defined in the Agreement as a term of purchase until launch while creating seed stock. From launch going forward, Core Purchase (credit) will be populated in the claim stream for all claims, whether fulfilled by Greystone with a refurbished product or fulfilled by Gift Card through Circuit City. Optionally Circuit City has the right to "Buy Back" Products that have been provided to GDS or other Products that have been repaired and fully certified as service replacement parts.

2.3     Prices quoted in Schedule "B" – Price Matrix Table for are based on the assumptions from initial business discussions, sample lots, and a guaranteed maximum Buy Back percentage that is defined in the SOW and the Price Matrix Table. These prices are based on current market conditions, on going quantity and quality of returned Products, the cost of Product used for repair, and service processing cost. As such, these values may change from time to time based on changing requirements or market conditions. Furthermore, the prices provided for Core Purchase and Buy Back price remains fixed for one quarter (90 days) after the Effective Date. Thereafter, each quarter both Circuit City and GDS agree to review and revise pricing as appropriate to the then current business climate.

2.4     Warranty for all repair and re-certification of service parts is 90 Days after the shipment date of refurbished Product. Warranty covers labor only. Material used in the repair and re-certification of the service part is recovered from functional and or repaired components or sub-assemblies sold to GDS for repair and or recovery. New repair parts or material is added to the process only as required and only to the level to assure that the cap on guaranteed percentage of available replacement parts is met.

2.5     Products, parts, and material that remain above the guaranteed cap specified in the – Statement of Work remain the property of GDS. When the Product is non-functional or beyond economic value of repair it will be disposed of by GDS using environmentally responsible disposal and recovery processes.

2.6     For Product that GDS purchased hereunder as a part of its Resale Business, GDS may resell such selected Product without permission from Circuit City; *provided*, however, GDS must have all other necessary and proper authorizations, must be resold for a lawful purpose and in a lawful manner, and such resale must be in accordance with the terms and conditions hereof and as specified in the applicable Statement of Work.

2.7     Products that are repaired and re-certified and are sold back to Circuit City under the Core Purchase and Buy Back business model will be packaged in a manner approved by Circuit City and GDS as meeting the standards for normal transit that assures the integrity and functionality of the Product.

2.8     Product made available for Buy Back will functionally meet the original performance specification and will cosmetically meet a mutually agreed "Product Cosmetic Acceptance Specification" for recertified service parts. Should there be requirements for kitting of final Product to an acceptable level that will insure customer acceptance and use or should there be specific configuration or functionality requirements, e.g., life of battery, or other criteria for a specific Product, this requirement will be included in the SOW.

2.9 In the event of any conflict between this Agreement and any Statement of Work as described in any Attachment to this Agreement, the Statement of Work shall prevail. Unless otherwise expressly agreed in writing by the parties hereto, the terms of this Agreement shall control and supersede any preprinted or other terms in any purchase order, invoice or other document issued by either party in connection with the transactions hereunder.

3.     **TERM AND TERMINATION.**

3.1     This Agreement will commence on the Effective Date and continue thereafter for an initial term of six (6) months. At the end of the trial period of six (6) months, the Agreement will automatically terminate unless the parties mutually agree to extend the Agreement for a specified period.

3.2     If either party is in material breach under this Agreement, then the non-breaching party may terminate this Agreement on thirty (30) days advance written notice to the breaching party if the breaching party fails to remedy the breach during such thirty (30) day period. Circuit City may terminate this Agreement without cause upon ninety (90) days advance written notice to the other party.

3.3     Termination or expiration of this Agreement will not terminate any then-outstanding obligations of either party under this Agreement. Upon termination or

3

## ASSET RECOVERY SERVICES AGREEMENT

expiration, any obligations and duties which by their nature or by the terms of this Agreement would reasonably extend beyond the expiration or termination of this Agreement, shall survive and remain in effect until performed.

3.4  Upon termination of the Agreement, neither party will have any claim against the other for the investment it may have made in the relationship established hereunder, or in anticipation of the sales and other revenues and/or profit to be gained as a result of this Agreement. EXCEPT FOR LIABILITY ARISING FROM INDEMNIFICATION OBLIGATIONS WITH RESPECT TO THIRD PARTY CLAIMS AND BREACH OF CONFIDENTIALITY UNDER THE SECTION OF THE AGREEMENT DEFINING ("CONFIDENTIALITY"), NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR CONSEQUENTIAL, INCIDENTAL, SPECIAL OR INDIRECT DAMAGES (INCLUDING LOST REVENUES OR PROFITS) UNDER THIS AGREEMENT.

3.5  At the time this Agreement expires or is terminated by either party (for what ever reason) and for a reasonable period thereafter, all good faith efforts will be made to transition all Product in transit from Circuit City or Circuit customers back to the designated Circuit City location. The transition will be planned in such a manner that it does not materially impact either Circuit City or GDS. All Product that has been purchased as Core Purchases will remain the property of GDS. Upon termination GDS will define a transition period whereby Circuit City may purchase Products via the Buy Back process to satisfy its customers' requirements. Product would be available only as long as it was available.

4.  PAYMENT.

There are two types of payments in the Agreement. The first is a payment from GDS to Circuit City for the purchase of Core Products ("AS-IS" return Product) or any other Product deemed excess, obsolete, or available for purchase. The second is the payment by Circuit City for the Buy Back of Products as needed to satisfy the service needs of its customers. All payments under this Agreement shall be made in U.S. Dollars. The Buy Back price is provided by Product model and is inclusive of all receiving, processing, repair, recertification, kitting, packaging, and fulfillment services as agreed in the SOW. There is no separate service charge for Services as defined in the Agreement. There is no obligation for Circuit City to Buy Back Products.

4.1  For Resale Business, GDS agrees to make payments to Circuit City, as follows:

(a) For all items, Products, and materials purchased by GDS, GDS will deliver a Purchase Order defining the Product to be purchased and the price agreed in Section "B" – Price Matrix Table on a per model basis.

(b) Based on acceptance of the GDS Purchase Order, it is agreed that legal title of the Product moves to GDS. Acceptance of the payment via funds or credit offset in the scheduled invoice will constitute a binding and legal sale of the received Product.

(c) For amounts owed to Circuit City, GDS shall make payments to Circuit City not later than thirty (30) days after reconciliation (or following receipt of an invoice).

(d) Circuit City specifically reserves the right to offset any amounts owed by GDS under the terms of this Agreement and will provide GDS with notice of such offsetting amounts.

(e) GDS agrees to consolidate Purchase Orders on a weekly basis to Circuit City to facilitate efficient handling. It is assumed that legal title to the Product deemed as "Valid Returns" transitions to GDS on validation and not on the date of the consolidated Purchase Order date. The date of Purchase Order consolidation is used for payment of amounts due. An open Purchase Order will be provided to Circuit City on a periodic (monthly or quarterly) basis and all purchases will be made against the open Purchase Order. The open Purchase Order will have a pre-defined maximum limit that is appropriate to the level of business forecasted for that defined period.

(f) There will be no tax charged on the sale of Core Purchases to GDS.

4.2  As consideration for the Services provided by GDS, Circuit City agrees to make payments to GDS, as follows:

(a)  Following the performance of Services as defined in the Buy Back model, GDS will send an invoice detailing the Services performed and identifying the Product. The invoice for the Services will be in accordance with the prices on the Schedule "B" – Price Matrix Table for the appropriate Product.

(b) Unless otherwise agreed in writing, all payments are exclusive of applicable sales, use or similar taxes for which Circuit City shall be obligated to pay GDS (other than taxes based on GDS' income or assets, for which GDS is liable).

(c) Circuit City will have no liability for any taxes based on GDS's net assets or income or for which Circuit City has an appropriate resale or other exemption. All invoices for Services or Product purchased under the Buy Back model provided to Circuit City will be provided to the designated Circuit City payment organization. Circuit City will pay invoices net forty five (45) days. No invoice can be dated prior to the date of the Services performed on the specific Product reflected in such invoice. The date of Purchase Order consolidation is used for payment of amounts due for seed stock activity. Upon launch of the program, all claims issued are considered purchase orders and will be

4

## ASSET RECOVERY SERVICES AGREEMENT

consolidated for payment at month end. Payment for consolidated purchase orders/claims received and posted at Circuit City by month end will be issued by the 5th of the following month. Upon issuance of month end payment, Circuit City will provide Greystone with a listing of claim numbers representing claims paid from that payment. Listing of claims will be sent to GDS via already agreed upon FTP site with notification via email that the file is ready for pickup.

(d) The prices for Services or Product purchased pursuant to the Resale Business shall be those noted in the Schedule "B" – Price Matrix Table.

(e) There will be no tax charged on the Buy Back of Products by Circuit City.

(f) Circuit City will make payment for amounts due based on receiving a valid sales invoice from GDS. It is anticipated that Circuit City will provide a Purchase Order or other defined purchase mechanism that will facilitate the real time purchasing of recertified replacement service parts for exchange on receipt of a "Valid Return". Possibly an open Purchase Order not to exceed a pre-defined limit or other mechanism will be utilized.

5. **GENERAL OBLIGATIONS OF GDS.**

5.1 GDS will comply with all of the terms and conditions of this Agreement and the Statement(s) of Work. GDS agrees to exercise reasonable care in performing the Service with respect to all Product and will further perform the Services in a workmanlike manner and in compliance with the standard of practice of its industry.

5.2 GDS shall be solely responsible for the performance, supervision and direction of its Services. GDS represents, warrants and covenants that all Product that is not recovered, refurbished, repaired or recycled by GDS will be properly disposed of, and that such disposal will, at a minimum, be in compliance with and will not result in liability under all Environmental Laws and any and all other local, state or federal, regional or country laws, regulations or requirements of any kind relating to the disposal of Product. Specifically, GDS will be responsible for identification, removal, disposal and reporting of any and all hazardous waste resulting from recovery services including, but not limited to, Lithium and Cadmium containing batteries, Cathode Ray Tubes, or LCD Panels containing embedded Lead, and any other hazardous ingredients described in the Resource Conservation and Recovery Act (RCRA) as described in the Code of Federal Regulations (CFR) 40, and all other national, state and local waste disposal and waste management regulations.

5.3 If providing disposal and/or recycling Services, GDS shall comply with the following: GDS shall use best efforts to recycle all Product and any elements, chemicals and/or compounds, particularly hazardous substances thereof, and minimize disposal (landfills and/or incineration) of Product; (ii) GDS shall maintain a quality and environmental management system sufficient to insure that laws and regulations regarding disposal of Products received as Core Purchase, for repair or Services are met; (iii) GDS shall ensure that it and its subcontractors, either directly or through intermediaries, meet all applicable environmental and health regulations worldwide and prevent the shipping of Environmentally Sensitive Products to solid waste (non-hazardous waste) landfills or incinerators for disposal or energy recovery.

5.4 GDS will not represent or warrant (directly or indirectly) to any third party that warranty or technical support or other support of any kind will be provided by Circuit City in connection with the Product sold to GDS under this Agreement or by GDS in its Resale Business. Moreover, GDS will not indicate directly or indirectly that the Product ever came from Circuit City.

5.5 For all hard disk drives and electronic data storage devices (notebook and desktop computers, MP3 Players, Flash Media Products, Digital Cameras, and other Products containing digital storage devices) sent to GDS either by Circuit City or Circuit City's customers and/or subcontractors or sold by GDS, GDS agrees to take all measures reasonable and appropriate under the circumstances and in accordance with all applicable laws and regulations to ensure any and all customer or Circuit City data on such drives or devices be made as secure as possible. In addition, GDS further acknowledges that as stated in the applicable Statement of Work, all Electronic Data on Functional Storage Devices have been or will be erased by means of either a "Destructive Write Process" using a program that destroys any and all data on the drive by a single flux change to every byte on the storage media so that the only data that could be retrieved after using this program would be the data that was originally on the Product when it was shipped as new or the minimum data required for its proper operation or (3) any other process mutually agreed to in writing. For drives and storage devices that are non-functional and to be discarded, GDS ensures that the media will be destroyed or otherwise rendered inoperable prior to leaving a GDS facility for processing or raw material recovery.

5.6 GDS shall provide environmentally responsible methods for processing of non-functional Product and for the disposal of parts or Product that cannot be utilized in the recovery process.

6. **INSURANCE REQUIREMENTS; TITLE AND RISK OF LOSS.**

6.1 GDS shall obtain and at all times during the term of this Agreement maintain at its own expense, sufficient insurance to cover the loss of Products that will be maintained in stock to support commitments to Circuit City for guaranteed Buy Back levels. Any and all insurance deductibles in the above-described insurance policies shall be assumed by, for the account of, and at the sole risk of GDS.

5

## ASSET RECOVERY SERVICES AGREEMENT

6.2 Notwithstanding anything to the contrary above, GDS will at a minimum maintain the following insurance with an insurance carrier authorized to do business in the United States and having a rating of "A-" or better by A.M. Best Company and a Financial Size Category of at least Class VIII: (a) a policy of commercial general liability insurance, covering liability arising from premises, operations, independent contractors, Products – completed operations, personal injury, advertising injury and liability assumed under an insured contract, with limits of not less than $1,000,000 each occurrence and at least $2,000,000 in aggregate liability; (b) commercial auto liability insurance to include all owned, non-owned and hired vehicles, with limits of liability not less than $1,000,000 each accident; and (c) workers compensation insurance to the extent required by law and employer's liability insurance, with limits of at least $1,000,000 each accident/disease. All policies except for (c) above shall name Circuit City Stores, Inc. as an "Additional Insured". All certificates will provide for at least thirty (30) days written notice prior to cancellation of any insurance referred to under this Agreement as well as notification of "Additional Insured". A certificate of insurance meeting the above requirements will be delivered to Circuit City (i) upon execution of this Agreement, (ii) upon renewal of the insurance policy and annually thereafter, and (iii) upon reasonable request.

### 7. INTELLECTUAL PROPERTY RIGHTS.

Circuit City makes no representations or warranties, and shall have no obligations, with respect to any claim that the Product infringes a patent, copyright or any other intellectual property right in any country where GDS sells, directly or indirectly, or otherwise disposes of the Product. GDS agrees to indemnify and hold harmless Circuit City against any and all claims, causes of action, or threats thereof arising under this Section 7.

### 8. INDEMNIFICATION.

GDS agrees, at its sole expense, to indemnify, defend and hold harmless Circuit City, its affiliates and subsidiaries, and all their respective officers, directors, agents and employees (collectively, the "Circuit City Indemnified Parties"), from and against any and all actions, suits, proceedings, judgments, settlements, losses, claims, damages, costs or liabilities, including reasonable attorneys' fees and costs of suit (collectively, "Claims") which the Circuit City Indemnified Parties may incur as a result of GDS' or GDS employees' acts or omissions in the performance of Services under this Agreement.

In all cases where GDS is indemnifying Circuit City, Circuit City shall be given the opportunity to participate in the defense of any such Claims; however, it shall not have any right to control the defense, consent to judgment, or agree to settle any such Claims; except with the written consent of GDS. GDS shall reasonably apprise Circuit City of all significant developments relating to the defense of the Claims. Additionally, Circuit City shall cooperate fully in the investigation and defense of any such Claims, at GDS' expense

The following items are excluded / exempt from the defined indemnification:

a.) areas that may arise where Circuit City is in violation of its agreements with the original manufacturer
b.) areas where Circuit City may be in violation of laws regarding the sale of service agreements or products covered by the agreements
c.) taxes due by Circuit City as related to the sale of the original product, the sale of extended service agreements, or the fulfillment of service parts to satisfy obligations of extended service agreements
d.) faults or failures in products which are recertified by GDS that are clearly related to the original design by the product original manufacturer (as opposed to the work or materials supplied by GDS), e.g., firmware up-grades that may be required by use or law, mandatory up-grades by the , or product recalls for safety, health, environmental law, or for product non-functionality.

### 9. USE OF CIRCUIT CITY MARKS.

GDS may NOT use, any name, trademark, service mark or other proprietary designation owned by Circuit City or any of its subsidiaries or affiliates (collectively, "Marks") without the prior written consent of Circuit City. GDS acknowledges Circuit City's exclusive right, title and interest in and to the Marks. GDS shall not be deemed by anything contained in this Agreement or done pursuant to it to acquire any right, title or interest in or to any of the Marks or any portion thereof. Any Marks used would be so noted as the registered mark of Circuit City.

### 10. AVAILABILITY OF PRODUCT.

10.1 Circuit City makes no representation, express or implied, that any quantity of Product for processing, Purchase as Core Purchases or Product that may be available for resale by GDS to Circuit City or to other GDS customers, will be available to GDS under this Agreement. Good faith representation of historical returns will be provided as a means to evaluate the size and scope of the business and to insure that sufficient resources in labor and material are in place to that GDS can meet the commitments of this Agreement.

10.2 If Circuit City does not provide ALL Product available to support the forecasted demand for the guaranteed Buy Back percentage, GDS will not be required to meet the specified Buy Back percentage or quantity. It is

6

## ASSET RECOVERY SERVICES AGREEMENT

assumed that some percentage of Product received is damaged beyond economic repair and that the achievable yield will be determined by the quantity returned and the condition of the returns, as such sufficient "AS-IS" returns are required to meet the forecasted demand.

10.4     After a trial startup period in which the process is qualified and samples of cosmetic and functional repairs are provided to Circuit City for qualification testing and agreement to cosmetic specifications, a buffer stock inventory will be created to support the Buy Back model. The buffer inventory pool will be created from Core Purchase Product that Circuit City shall make available to GDS. GDS will purchase all Core Purchase Product in the trial startup period and make it available to Circuit City for Buy Back to support recertified service part demand for replacement.

10.5     After the buffer stock is in place, typically 4-6 weeks, built up from the Core Purchase of "AS-IS" returns, and the repair and recertification of the service parts has yielded sufficient quantity of Products to support the anticipated monthly demand specified for Buy Back by Circuit City, Circuit City will direct their customers to forward Product direct to GDS in care of Circuit City.

10.6     Once the buffer stock pool is in place and direct returns are sent to GDS, GDS will make every good faith effort to maintain an on going supply of recertified stock to support the Buy Back demand from Circuit City. Should situations arise where there is not sufficient stock to support the exchange of received Products in 4 business days, it is agreed that GDS will notify Circuit City of the situation and the cause of shortage and that Circuit City will issue their customer a gift card in lieu of an exchange recertified service part. Circuit City and GDS will work together to find alterative sources for Products older Products, legacy Products, or very low volume returns. Should these Products be outside the normal Core Purchase and Buy Back model it is understood that a solution would be provided and quoted at a separate cost if required.

10.7     New Product introductions – Where possible Circuit City will notify GDS of new Products that are being introduced in a manner and with sufficient time to insure that appropriate buffer stock inventory is in place within 30 days of the first sale of the new introduction. It is agreed that during the initial period of new Product introductions, returns will be used to stock the buffer inventory and to fill the recertified parts pipeline. During this period Circuit City and GDS will work together to find the most economical process for the Product introduction that minimizes the use of Product gift cards. Circuit City will provide as much prior notice as possible based on agreement with their suppliers.

10.8     Should Circuit City NOT purchase the guaranteed percentage or quantity of Product in the Buy Back process defined in the SOW for specified Product, GDS will insure that a 30 day rolling average quantity based on the last ninety (90) days returns is maintained in stock and available for purchase by Circuit City. All Product beyond the 30 day buffer stock will be liquidated through GDS sales channels as GDS Product and with GDS warranty to recover the processing and Core Purchase costs. Should Circuit City anticipate higher returns than normal during a calendar time period as a result increases in sales, holidays and higher than normal gift returns or other reasons, Circuit City will make every best case effort to alert GDS to increased demand and both parties will work to provide the best support plan possible to meet the service demand.

## 11. WARRANTIES; LIMITATION OF LIABILITY.

11.1     NO WARRANTIES OR REPRESENTATIONS OF ANY KIND ARE MADE BY CIRCUIT CITY WITH RESPECT TO THE PRODUCT PROVIDED UNDER THIS AGREEMENT INCLUDING, WITHOUT LIMITATION; THE WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND ALL SUCH WARRANTIES ARE EXPRESSLY DISCLAIMED BY CIRCUIT CITY. ALL PRODUCT FURNISHED HEREUNDER BY CIRCUIT CITY IS PROVIDED ON AN "AS IS" BASIS WITHOUT ANY WARRANTIES OR SUPPORT OF ANY KIND, EITHER EXPRESS OR IMPLIED.

11.2     Circuit City's entire liability arising under this Agreement shall be limited to direct damages only, which shall not exceed the amount owed under invoices for the three months immediately preceding any alleged breach pursuant to this Agreement. UNDER NO CIRCUMSTANCES SHALL CIRCUIT CITY BE LIABLE FOR LOSS OF PROFITS, BUSINESS, REVENUE, GOODWILL OR ANTICIPATED SAVINGS, OR FOR INCIDENTAL OR CONSEQUENTIAL LOSS OR DAMAGES ARISING FROM ANY CLAIM MADE BY GDS OR AGAINST GDS BY ANOTHER PERSON OR ENTITY OUT OF THE PRODUCT OR OTHERWISE HEREUNDER OR FOR ANY REASON WHATSOEVER UNDER THIS AGREEMENT OR OTHERWISE.

11.3     GDS WARRANTS THAT ITS SERVICES WILL BE PERFORMED BY GDS PERSONNEL PROMPTLY AND IN A GOOD AND WORKMANLIKE MANNER IN ACCORDANCE WITH THE STANDARD IN THE INDUSTRY, THAT GDS HAS IN FACT RECYCLED PRODUCTS THAT REQUIRE RECYCLING PURSUANT TO THIS AGREEMENT, THAT GDS PERSONNEL WILL HAVE THE REQUISITE SKILL, QUALIFICATIONS AND LICENSES NECESSARY TO PERFORM THE SERVICES AND THE SERVICES WILL BE FREE FROM DEFECTS. GDS FURTHER WARRANTS, IN TERMS OF ITS RESALE BUSINESS, THAT IT WILL NOT REFERENCE CIRCUIT CITY OR MAKE ANY STATEMENTS OR REPRESENTATIONS REGARDING CIRCUIT CITY IN THE MARKETING

7

## ASSET RECOVERY SERVICES AGREEMENT

AND/OR SALE OF PRODUCT HEREUNDER. GDS MAKES NO OTHER WARRANTIES OR REPRESENTATIONS OF ANY KIND REGARDING THE SERVICES.

12. **AUDIT AND INSPECTION.** During the term of this Agreement and for a period of two (2) years following the expiration or termination of this Agreement, both parties shall create and maintain sufficient books, records and accounts related to this Agreement according to generally accepted accounting practices. Each party shall have the right, at its own expense, to inspect or direct an independent certified public accountant to inspect and audit those books and records of the other party that are relevant to the determination of compensation payable hereunder or compliance with regulatory standards, provided, however, that such audits will be conducted no more than once in any calendar year, upon not less than thirty (30) days' notice, during regular business hours, at mutually agreeable dates and times (not to be unreasonably withheld or delayed), and provided further that such accountant, if any, executes a confidentiality agreement reasonably satisfactory to the party being audited, to protect the confidentiality of any records so audited. If the audit discloses a payment discrepancy or error, the party responsible for correcting such error shall make any undisputed payment or remittance within thirty (30) business days of the generation of the audit report. In the event an audit discloses a payment discrepancy or error of more than five (5) percent of the correct amount, the party owing such payment or remittance shall bear the cost of the audit.

13. **MUTUAL COVENANTS.**

13.1 In performing this Agreement, each party agrees that it shall comply with all applicable federal, state and local laws, and any other legal requirements and regulations applicable to the transactions contemplated herein.

13.2 The parties represent and warrant to each other that each has the power to make and carry out the terms of this Agreement and each has taken all necessary actions, corporate or otherwise, to authorize the execution, delivery and performance of their respective obligations under this Agreement. In the event GDS enters into a subcontract for performance of any of the Services described herein, GDS agrees that the terms contained in Sections 5, 6, and 11 (and any other terms which should naturally flow down based on GDS's subcontracting the performance of the Services) will be included in the terms of such subcontract.

13.3 **EXPORT REQUIREMENTS.** For the purposes of this section, the use of 'export' shall mean the transfer of Product outside of the country where the Product is located. GDS acknowledges that the exportation of Product hereunder is subject to compliance under the Export Laws and it will comply with all such laws with respect to the Services hereunder including all sales of the Product. GDS confirms that it will not export or re-export the Product directly or indirectly, either to (i) any countries that are subject to export restrictions or (ii) any end user who has been prohibited from participating in export transactions by any agency of the local government. GDS warrants that the Product will not be used to develop or produce weapons of mass destruction or sold or licensed to an end user who GDS knows or has reason to know may utilize the Product directly or indirectly in connection with weapons of mass destruction or nuclear activities (in the U.S., as listed in U.S. EAR 778.3(b)(1), (2) & (3)), whether or not the item is specifically designed or modified for such activities. GDS agrees to screen the reliability of each end user so that the Product will not be used in a manner which is prohibited. Upon Circuit City's request, GDS agrees to execute, acknowledge, delivers and to cause to be duly filed all such further instruments and documents and take actions as Circuit City may from time to time reasonably request to assure that the necessary export requirements have been met. If required, GDS will obtain prior authorization for export of the Product (in the U.S. such authorization shall be obtained in accordance with the Export Administration Regulations of the Department of Commerce). GDS or GDS's carrier will prepare export documentation necessary for shipment to GDS's specified location and GDS will be responsible for assuring that the appropriate import permits and licenses with respect to the Product, including any markings needed for import are obtained. Circuit City reserves the right to immediately terminate this Agreement if GDS fails to comply with the Export Laws.

14. **NOTICES.** Any notice permitted or required hereunder will be sent by first class mail, registered or certified mail, return receipt requested, to the respective party at the respective address. For this purpose, Circuit City and GDS's addresses are specified below:
IF TO CIRCUIT CITY:

Circuit City Stores, Inc.
Attn: Warranty Administration
9954 Mayland Dr., Richmond, VA 23233
Fax: (___) ___-____

with a copy to:

Circuit City Stores, Inc.
Attn: Legal Department--Commercial
9950 Mayland Dr., Richmond, VA 23233
Fax: (804) 418-8248

IF TO GDS:

Greystone Data Systems, Inc.
40800 Encyclopedia Circle
Fremont, CA 94538
(510) 661-2101 x 113
(510) 661-2105 fax
Attn: Ben Davidson

8

## ASSET RECOVERY SERVICES AGREEMENT

Either party may change its address for receiving notices hereunder by giving written notice of the new address to the other party at the address and in the manner provided above.

**15. FORCE MAJEURE.** Neither party shall be responsible or liable in any way for any delay or failure to perform its obligations hereunder when such delay or failure is caused by conditions or circumstances beyond its reasonable control. Such causes may include, but are not restricted to, Acts of God or of the public enemy, acts of the government in the sovereign capacity, fires, floods, epidemics, earthquakes, quarantine restrictions, strikes, freight embargoes and unusually severe weather.

**16. DISPUTE RESOLUTION.**

16.1  All claims and controversies arising out of or relating to this Agreement shall be referred for resolution immediately by each party to the person designated by their Vice President, President or Chief Executive Officers ("Representatives"). If the Representatives are unable to resolve the dispute within fifteen (15) days after it is referred to them, they shall refer the dispute to their respective Vice President's for resolution. If the Vice Presidents are unable to resolve the dispute within fifteen (15) days after it is referred to them, then either party may then proceed with other available options.

16.2  Except for negotiations conducted pursuant to Section 16.1, in any action or proceeding between the parties to enforce any terms of this Agreement, the prevailing party shall be entitled to recover its reasonable related expenses, including its reasonable attorney's fees and costs from the non-prevailing party.

**17. ASSIGNMENT.** GDS may not assign its obligations under this Agreement in whole or in part without the prior written consent of Circuit City.

**18. CONFIDENTIALITY.**

18.1  **Advertising; Publicity Release.** Neither party shall issue a press release or similar public announcement of any kind regarding the parties' relationship established hereunder without the prior written approval of the other party. Other than expressly set forth herein, neither party shall use publicly the other party's name or refer to the other party in any way in or with the media, including, but not limited to, in advertising, without the other party's prior written consent as required herein; *provided*, however, that either party may make disclosures or filings required to comply with applicable laws, including filings with regulatory agencies, such as the United States Securities and Exchange Commission, or disclosures or filings required to comply with the rules of a national securities exchange or automated quotations systems such as the National Association of Securities Dealer's Automated Quotations. A VIOLATION OF THIS PROVISION SHALL CONSTITUTE A MATERIAL BREACH OF THIS AGREEMENT.

18.2  **Confidential Information.** During the term of the Agreement, a party (the "Disclosing Party") may from time to time disclose to the other party (the "Recipient") Information (defined below) deemed as proprietary by the Disclosing Party for purposes of this Agreement. As used in this Agreement, the term "Information" will mean all information or know-how disclosed by one party under this Agreement and all other information or know-how that relates in any manner to that party's operations, future business plans, customer base, or other proprietary or confidential information. Information is disclosed for and to be used for the purposes of this Agreement only. However, Information regarding environmental records discovered during an audit or inspection pursuant to the terms in Section 12 may be disclosed if requested. The Disclosing Party warrants that it has the right to disclose the Information. In addition to the foregoing, this Agreement and all related documents are confidential and neither party will disclose any information related to this Agreement or the existence of the relationship of the parties without the prior written consent of the other.

18.3  The Recipient agrees (i) to protect the Disclosing Party's Information as it would protect its own confidential information, provided that in so doing, the Recipient will exert at least a reasonable degree of care in protecting the Disclosing Party's Information; (ii) to use the information only for the purposes stated above; and (iii) to not disclose the Information to third parties. The Recipient agrees to protect the Disclosing Party's Information for a period of three (3) years from the date of receipt by recipient.

18.4  The Recipient is not obligated by this Agreement to protect Information which: (1) is in or enters the public domain through no wrongful act by the Recipient; (2) is rightfully received from a third party without breach of this Agreement; (3) is known or has been received prior to disclosure; (4) is developed independently without breaching this Agreement; (5) is integral to a party's defense or exemption under an Environmental Law claim or (6) is provided by the Disclosing Party to a third party without a similar restriction. If the Recipient is required to disclose the Disclosing Party's Information to a Government body or court of law in any type of proceeding, the Recipient agrees to give the Disclosing Party advance notice.

**19. INDEPENDENT CONTRACTOR.** GDS and Circuit City are independent contractors. Neither party is and shall not represent itself as being an agent or representative of the other party in any manner. This Agreement shall not be construed as an agreement of fiduciary relationship, of partnership, of joint venture or of any other form of business arrangement other than as an agreement between independent contractors. GDS will not make any representations or commitments on behalf of

9

ASSET RECOVERY SERVICES AGREEMENT

Circuit City without prior written consent of a Vice President of Circuit City.

**20. SALES OF PRODUCT – RESALE BUSINESS.**

GDS may submit bids to purchase Product from Circuit City from time to time. If Circuit City accepts a bid from GDS for the purchase of Product, GDS will pay the purchase price for such Products in the amount and in accordance with the Statement of Work attached hereto. **All sales by Circuit City to GDS are "AS IS". CIRCUIT CITY DISCLAIMS ALL WARRANTIES, INCLUDING WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. GDS WILL BE RESPONSIBLE FOR ALL TAXES ON ITS PURCHASE AND WILL PROVIDE RESALE EXEMPTION CERTIFICATE(S) IF GDS CLAIMS THAT ANY SALE IS EXEMPT FROM TAX.** If GDS is purchasing Product for resale, GDS will comply with the following conditions:

(a) GDS agrees to comply with the data destruction terms contained in Section 5.5.

(b) GDS shall process and repackage Product being sold to Circuit City in the Buy Back model as defined in the SOW. Product that is recertified will be labeled on the item or as a minimum on the package as "Circuit City Recertified Service Replacement Part" or such a label as is agreed by both Circuit City and GDS.

(c) All Product sold by GDS to customers others than Circuit City shall be identified as a "Recertified Part" and is sold "AS IS, WHERE IS." This will be provided either by GDS Labels or by prominent written documentation included in the package. Moreover, GDS will not indicate directly or indirectly that the Product ever came from Circuit City. All written documentation provided to the purchaser shall be consistent with the GDS Labels and adequately notify the purchaser that there is no OEM and that the Product sold by GDS is covered by GDS' Self Warranty;

(d) Valid FCC identification numbers shall be clearly visible on all PC Product, consumer electronics, or other electronic Products sold or refurbished by GDS; and

(e) GDS hereby certifies that all sales will comply with the Export Requirements set forth in section 12.3 of this Agreement including all the United States export regulations including but not limited to anti-boycott laws and regulations as such laws and regulations relate to the Product and prior authorization, if required, will be obtained by GDS in accordance with the Export Administration Regulations of the Department of Commerce in the administration of the Act to any sale of Product to a person outside of the United States and GDS will be responsible for assuring that the appropriate export and import permits and licenses with respect to the export of the Product, and ensuring that Product is properly marked for import (i.e., "CE" marking in Europe, etc.) are obtained.

(f) GDS shall ensure that all sales of Product pursuant to this Section shall be for further Productive end use, and not for recycling or disposal. GDS shall ensure that the buyer of those Products does not have any recourse against Circuit City for any and all claims (including, without limitation, warranty claims, claims as to its function or use for a particular purpose, infringement) related to the Product; for any such claims GDS will indemnify Circuit City in accordance with Sections 7 and 8 above (Indemnification), as applicable.

**21. ENTIRE AGREEMENT.** This Agreement and Attachments hereto constitutes the entire agreement between the parties regarding the subject matter hereof and supersedes all prior oral and written proposals and communications.

**22. SEVERABILITY.** If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future law effective during the terms hereof, such provision shall be fully severable. This Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof and the remaining portions hereof shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom. Furthermore, in lieu of such illegal, invalid or unenforceable provision, there shall be added automatically as part of this Agreement, a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and be legal, valid and enforceable.

**23. AMENDMENTS; WAIVERS.** No waiver, alteration, modification or addition shall be binding on Circuit City and GDS unless in writing and signed by both parties.

**24. COUNTERPARTS.** This Agreement may be executed in two counterparts, each of which shall be deemed an original for all purposes, and all of which collectively constitute one agreement; provided, however, that in making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart.

**25. GOVERNING LAW. THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE COMMONWEALTH OF VIRGINIA, WITHOUT REGARD TO ITS CONFLICTS OF LAW RULES.**

**26. RECORD RETENTION.** GDS will maintain accurate and legible records for a period of one (1) year and will grant to Circuit City reasonable access to and copies

ASSET RECOVERY SERVICES AGREEMENT

of, any information reasonably requested by Circuit City with respect to GDS's compliance to the terms, and performance under this Agreement.

**27.    SURVIVAL.** The terms and conditions of this Agreement that by their nature are intended to survive expiration or termination of this Agreement shall so survive.

**28.    ACKNOWLEDGMENT.** Each party acknowledges that it has read this Agreement carefully, including the Attachments, and has agreed to be bound by the terms and conditions hereof.

**ASSET RECOVERY SERVICES AGREEMENT**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date stated above.

GDS:

BY: _[signature]_

NAME: Benjamin F. Davidson

TITLE: EVP Business Development

CIRCUIT CITY STORES, INC.

BY: _[signature]_

NAME: Taylor Phillips

TITLE: Director