Final Execution Draft



## LEASE AGREEMENT

by and between

### TRIANGLE EQUITIES JUNCTION LLC

as Landlord

and

### CIRCUIT CITY STORES, INC.

as Tenant

Triangle Junction
Flatbush Avenue and Avenue H
Brooklyn, New York

WO 698030.8

## Table of Contents

Page

ARTICLE I    FUNDAMENTAL LEASE PROVISIONS ...................................................................1

    Section 1.01    Definitions: ..............................................................................................1

ARTICLE II    LEASE OF PREMISES - TERM OF LEASE............................................................4

    Section 2.01    Demise. ...................................................................................................4

    Section 2.02    Extension Periods......................................................................................4

    Section 2.03    Commencement Date.................................................................................5

    Section 2.04    Possession Date.........................................................................................5

    Section 2.05    Expected Possession Date.........................................................................6

    Section 2.06    Intentionally Omitted. ..............................................................................6

    Section 2.07    Delayed Possession..................................................................................6

    Section 2.08    Early Entry ...............................................................................................7

    Section 2.09    Landlord Reimbursement..........................................................................7

    Section 2.10    Measurement.............................................................................................8

    Section 2.11    Commencement Date Agreement .............................................................8

ARTICLE III    INITIAL CONSTRUCTION .......................................................................................8

    Section 3.01    Landlord's and Tenant's Work .................................................................8

ARTICLE IV    RENT .............................................................................................................................9

    Section 4.01    Annual Minimum Rent .............................................................................9

    Section 4.02    Additional Rent.......................................................................................10

    Section 4.03    Extension Period Rent Escalation ..........................................................10

    Section 4.04    Rent; Method of Payment .......................................................................11

ARTICLE V    COMMON AREA MAINTENANCE AND COST ...................................................11

    Section 5.01    Maintenance............................................................................................11

    Section 5.02    Construction Clean-up and Post-Possession Work.................................11

    Section 5.03    CAM Costs..............................................................................................12

    Section 5.04    Tenant's Share of CAM Costs ................................................................13

    Section 5.05    Payment of CAM Costs ..........................................................................13

    Section 5.06    Intentionally Omitted. ............................................................................14

WO 698030.8

## Table of Contents
## (continued)

|  |  | Page |
|---|---|---|
| ARTICLE VI  TAXES | | 14 |
| Section 6.01 | Taxes | 14 |
| Section 6.02 | Payment of Taxes | 14 |
| Section 6.03 | Exclusions from Taxes | 15 |
| Section 6.04 | Right to Contest | 15 |
| ARTICLE VII UTILITIES | | 16 |
| Section 7.01 | Utilities | 16 |
| Section 7.02 | Interruption | 16 |
| ARTICLE VIII | USE OF PREMISES | 16 |
| Section 8.01 | Permitted Use | 16 |
| Section 8.02 | Conduct of Operations | 17 |
| Section 8.03 | Leasing Restrictions | 17 |
| Section 8.04 | Tenant's Exclusive | 17 |
| Section 8.05 | Exclusives Applicable To Tenant | 19 |
| Section 8.06 | Key Tenants | 20 |
| ARTICLE IX  REPAIRS | | 21 |
| Section 9.01 | Landlord Obligations | 21 |
| Section 9.02 | Tenant's Obligations | 21 |
| Section 9.03 | Hazardous Materials | 22 |
| Section 9.04 | Surrender of the Premises | 24 |
| ARTICLE X  REQUIREMENTS OF LAW | | 24 |
| Section 10.01 | Landlord's Obligations | 24 |
| Section 10.02 | Tenant's Obligations | 24 |
| Section 10.03 | Right to Contest | 24 |
| ARTICLE XI  INSURANCE | | 24 |
| Section 11.01 | Landlord's Insurance | 24 |
| Section 11.02 | Tenant's Insurance | 25 |
| Section 11.03 | Insurance Requirements Generally | 26 |
| Section 11.04 | Landlord's Insurance Cost | 26 |

Table of Contents
(continued)

                                                                                    Page

Section 11.05  Indemnity. ......................................................................27

Section 11.06  Mutual Waiver of Subrogation. .................................27

Section 11.07  Affiliate ........................................................................28

ARTICLE XII DAMAGE OR DESTRUCTION.........................................28

Section 12.01  Landlord's Obligation to Rebuild ..............................28

Section 12.02  Tenant's Obligation to Rebuild..................................29

Section 12.03  Termination.................................................................29

ARTICLE XIII        CONDEMNATION........................................................31

Section 13.01  Taking. .........................................................................31

Section 13.02  Restoration and Rent Adjustment .............................32

Section 13.03  Award ..........................................................................32

ARTICLE XIV        ALTERATIONS AND MECHANICS' LIENS ..............32

Section 14.01  Tenant's Alteration Rights. ........................................32

Section 14.02  Mechanics' Liens ........................................................34

ARTICLE XV SIGNS ..................................................................................34

Section 15.01  Tenant's Signs.............................................................34

Section 15.02  Pylon Signs .................................................................34

Section 15.03  Replacement................................................................35

ARTICLE XVI        TENANT'S PROPERTY................................................36

Section 16.01  Tenant's Property........................................................36

ARTICLE XVII       ASSIGNMENT AND SUBLETTING ...........................36

Section 17.01  Assignment and Subletting Rights. ...........................36

Section 17.02  Collateral Assignment................................................37

Section 17.03  Cure Rights of Original Tenant.................................37

Section 17.04  Recognition Agreement ..............................................38

ARTICLE XVIII     DEFAULT ....................................................................38

Section 18.01  Tenant's Default..........................................................38

Section 18.02  Additional Landlord Remedies Due to Construction Delays by Tenant ...39

Section 18.03  Landlord's Default.......................................................39

Table of Contents
(continued)

Page

Section 18.04  Additional Tenant Self-help, Equitable and Legal Remedies Due to Construction Delays by Landlord .................................................41

Section 18.05  Waiver; Non-Exclusive Remedies....................................................42

ARTICLE XIX      SUBORDINATION, TRANSFER OF INTEREST ..................................42

Section 19.01  Subordination.......................................................................42

Section 19.02  Existing Mortgages and Ground Leases .........................................43

Section 19.03  Transfer of Interest..............................................................43

Section 19.04  Tenant Estoppel Certificates ...................................................43

Section 19.05  Landlord Estoppel Certificates .................................................43

ARTICLE XX  LANDLORD'S REPRESENTATIONS, WARRANTIES AND COVENANTS.44

Section 20.01  Quiet Enjoyment ..................................................................44

Section 20.02  Representations, Warranties and Covenants.....................................44

Section 20.03  Site Covenants ....................................................................45

Section 20.04  Condominium Documents. ..........................................................46

ARTICLE XXI      HOLDING OVER ....................................................................47

Section 21.01  Holding Over ......................................................................47

ARTICLE XXII     NOTICE............................................................................47

Section 22.02  When Given .........................................................................48

ARTICLE XXIII    MISCELLANEOUS ..................................................................48

Section 23.01  Rent Proration ....................................................................48

Section 23.02  Construction .......................................................................48

Section 23.03  Section Headings ..................................................................49

Section 23.04  Partial Invalidity.................................................................49

Section 23.05  Waiver.............................................................................49

Section 23.06  Governing Law .....................................................................49

Section 23.07  Successors and Assigns............................................................49

Section 23.08  No Broker .........................................................................49

Section 23.09  Memorandum of Lease ...............................................................49

Section 23.10  Entire Agreement ..................................................................50

Section 23.11  Relationship of Parties ...........................................................50

SEC_HEADER

Table of Contents
(continued)

                                                                                    Page

Section 23.12  Force Majeure ...................................................................50

Section 23.13  Limitation of Landlord's Liability ...................................50

Section 23.14  Limitation of Tenant's Liability .......................................50

Section 23.15  Intentionally Omitted. .......................................................51

Section 23.16  Costs  .................................................................................51

Section 23.17  Attorneys' Fees .................................................................51

Section 23.18  Survival of Obligations .....................................................51

Section 23.19  Joint and Several Liability .................................................51

Section 23.20  Definition of Hereunder, Herein, etc. ...............................51

Section 23.21  Tenant's Trade Name.........................................................51

Section 23.22  Rent Abatement .................................................................51

Section 23.23  Counterparts ......................................................................52

ARTICLE XXIV    COURT RULING.......................................................52

Section 24.01  Mechanism for Judicial Proceedings. ...............................52

## EXHIBITS

| | |
|---|---|
| EXHIBIT A | Site Plan |
| EXHIBIT B | Legal Description of the Shopping Center |
| EXHIBIT C | Site Design Requirements |
| EXHIBIT C-1 | Possession Date Notice |
| EXHIBIT D | W-9 Form |
| EXHIBIT E | Commencement Date and Expiration Date Agreement |
| EXHIBIT F | Prohibited Uses |
| EXHIBIT G | Existing Leases |
| EXHIBIT H | Existing Exclusives |
| EXHIBIT H-1 | First Generation Exclusives |
| EXHIBIT I | Recognition Agreement |
| EXHIBIT J | Subordination, Non-Disturbance and Attornment Agreement |
| EXHIBIT J-1 | Existing Mortgagee Subordination, Non-Disturbance and Attornment Agreement |
| EXHIBIT J-2 | Condominium Association Recognition Agreement |
| EXHIBIT K | Permitted Exceptions |
| EXHIBIT L | Memorandum of Lease |
| EXHIBIT M | Intentionally Omitted |
| EXHIBIT N | Rotunda Sign Rendering |

## LEASE AGREEMENT

THIS LEASE AGREEMENT (this "Lease"), dated as of the _____ day of
_____, 2007 ("Effective Date"), by and between **TRIANGLE EQUITIES
JUNCTION LLC**, a New York limited liability company ("Landlord") with an office c/o
Triangle Equities, 30-56 Whitestone Expressway, Whitestone, New York 11354, and **CIRCUIT
CITY STORES, INC.** ("Tenant") with an office at 9950 Mayland Drive, Richmond, Virginia
23233.

## W I T N E S S E T H:

In consideration of the rents and covenants set forth in this Lease, Landlord hereby leases
to Tenant, and Tenant hereby leases from Landlord, the Premises (as defined in Section 1.01(P))
upon the following terms and conditions:

### ARTICLE I

### FUNDAMENTAL LEASE PROVISIONS

SECTION 1.01   Definitions:

A.   **Additional Charges:**

    1.   <u>Estimated Initial CAM Costs</u>: Two and 50/100 Dollars ($2.50) per square foot of
Floor Area (as defined below), which includes the estimated initial insurance cost
of Fifty Cents ($0.50) per square foot of Floor Area (the "Estimated Initial
Insurance Cost").

    2.   <u>Estimated Initial Taxes</u>: One and 00/100 Dollars ($1.00) per square foot of Floor
Area.

B.   **Alternative Rent:** An amount equal to fifty percent (50%) of the Annual Minimum Rent
(as defined below) that would have otherwise been due during the period of time that
Tenant is entitled to pay Alternative Rent.

C.   **Annual Minimum Rent** (subject to adjustment pursuant to Section 2.10):

| Period: | Rent p.s.f. | Annual Rent | Monthly Installments |
|---|---|---|---|
| Commencement Date through end of fifth (5th) Lease Year (as defined in Section 1.01(J)) | $75.00 | $1,637,475.00 | $136,456.25 |
| Sixth (6th) Lease Year through end of | $82.50 | $1,801,222.50 | $150,101.87 |

WO 698030.8

tenth (10th) Lease Year

| | | | |
|---|---|---|---|
| 1st Extension Period (as defined in Section 1.01(F)): | $90.75 | $1,981,344.70 | $165,112.05 |
| 2nd Extension Period: | 95% of Fair Market Value as determined pursuant to Section 4.03 below ("FMV") | To be determined ("TBD") | TBD |
| 3rd Extension Period: | 90% of FMV | TBD | TBD |
| 4th Extension Period: | 90% of FMV | TBD | TBD |

D.  **Brokers:** Botsaris Realty and Staubach Retail Services – New England LLC.

E.  **Condominium Documents:** The Declaration For Triangle Junction Retail Condominium by and between Landlord and Target Corporation ("Target"), as Declarants, to recorded in the Land Records of Kings County, New York, together with the requisite By-Laws relative thereto.

F.  **Delivery Dates:**   1.   Anticipated Possession Date: March 3, 2008.

        2.   Outside Possession Date: May 1, 2008.

G.  **Extension Periods:** Four (4) periods of five (5) years each.

H.  **Floor Area:**   The actual number of square feet of space contained in the Shopping Center Unit (as defined in Section 1.01R below (including the Premises) (other than loading dock areas, trash compactor areas, and trash container areas). All measurements shall be from the exterior of outside walls or store front and/or to the centerline of any common walls, but in no event shall Floor Area include any non-selling or storage space areas within any mezzanine.

I.  **Initial Lease Term:** Ten (10) Lease Years, plus the partial Lease Year commencing on the Commencement Date and ending on the January 31 immediately thereafter.

J.  **Key Tenant:** Target.

K.  **Lease Year:** Each period within the Term (as defined below) commencing on February 1 and ending the next succeeding January 31, except that Lease Year 1 shall include the partial Lease Year commencing on the Commencement Date and ending on the January 31 immediately thereafter.

WO 698030.8                                        2

L.      **Intentionally Omitted.**

M.      **Intentionally Omitted.**

N.      **Minimum Parking Requirement:**  Approximately five hundred (500) parking spaces, with each parking space being at least eight feet six inches (8' 6") in width and eighteen (18) feet in length and for full-sized automobiles.

O.      **Opening Requirement:**  The Key Tenant is open for business or otherwise actively installing fixtures and merchandising its premises in preparation of imminently opening for business.

P.      **Permitted Use:**  The sale, rental, installation, servicing and repairing of consumer, office and automotive electronics products (collectively, the "Products"); and/or for any other lawful retail use, which is standard and customary for a first class urban shopping center, and not otherwise specifically prohibited by the provisions of Section 8.01.  The term "Products" shall include, without limitation, televisions, stereos, speakers, video and audio recorders and players and cameras; computer hardware and software and related software services (which include internet access services, entertainment software and entertainment media [such as, by way of example only, game cartridges, video tapes, cassettes, compact discs, DVD's and DVD equipment]); cellular and wireless telephones and telecommunication devices and related accessories; motor vehicle audio, stereo and telephone systems; and technological evolutions of the foregoing, and as otherwise more fully set forth in Article VIII below.

Q.      **Premises:**  The store building to be constructed by Landlord as part of Landlord's Work (as such term is defined in Section 3.01), containing approximately 21,833 square feet of Floor Area, including between 98 and 110 feet of frontage (which frontage varies based on the configuration of the building), as crosshatched on the site plan attached hereto as Exhibit A (the "Site Plan"), in the Shopping Center Unit, containing approximately 65,023 square feet of Floor Area and located on the ground level at the southwest corner of Flatbush Avenue and Avenue H in Brooklyn, New York (the "State"), as more particularly described in Exhibit B (the "Shopping Center").

R.      **Shopping Center Unit:**  The unit established by the Condominium Documents as the Triangle Unit that constitute the Shopping Center, but which expressly excludes the unit established by the Condominium Documents as the Target Unit.

S.      **Substantial Completion:**  Issuance of a certificate of occupancy, either temporary or permanent, for the Premises by the appropriate governmental authority following Tenant's performance of Tenant's Work (as defined in Section 3.01).

T.      **Tenant's Share:**  A fraction, the numerator of which shall be the Floor Area of the Premises and the denominator of which shall be the Floor Area of the Shopping Center Unit of which the Premises is a part.  In no event shall the denominator of the fraction by which Tenant's Share is determined be less than ninety percent (90%) of the Floor Area of the Shopping Center Unit as shown on the Site Plan.

U.   **Term:** The Initial Lease Term plus the Extension Periods, if the option for any such Extension Period is exercised.

## ARTICLE II

## LEASE OF PREMISES - TERM OF LEASE

SECTION 2.01   Demise.

(a)   Landlord does hereby lease and demise to Tenant, and Tenant does hereby hire from Landlord, the Premises, together with the licenses, rights, privileges and easements appurtenant to the Premises.

(b)   Tenant and its employees, invitees, agents, customers, concessionaires and licensees shall have the nonexclusive right, in common with Landlord and other tenants of the Shopping Center, and their respective employees, invitees, agents, customers, concessionaires and licensees to use all Shopping Center hallways, corridors, passenger and freight elevators, escalators, loading docks and areas, lobbies, sidewalks, paved parking areas, decks or ramps, paved service areas and drives, signs, traffic controls, lighting and all means of ingress, egress, acceleration, deceleration and stacking lanes and circulation for the aforesaid parking and service areas of the Shopping Center to and from public streets and roads bordering the Shopping Center now or hereafter made available or maintained by Landlord in, adjacent to or servicing the Shopping Center including, without limitation, any and all common elements as established by the Condominium Documents (collectively, the "Common Areas"). Tenant's right to use the Common Areas may be subject to such reasonable regulations including, without limitation, those promulgated under the Condominium Documents (consistent with Tenant's rights under this Lease) as may from time to time be imposed upon, equally applicable to, and uniformly enforced against all tenants of the Shopping Center by Landlord or its agents. Landlord shall provide Tenant with at least thirty (30) days prior notice of any such rules and regulations, which notice shall contain a copy of such rules and regulations.

(c)   Subject to Laws, Tenant shall have the right to use, on a "24 hour a day," "365 day a year" basis and without any additional charge, the loading facilities serving the Shopping Center and the trash compactor area (collectively, the "Other Improvements"), all as shown on the Site Plan. Notwithstanding the foregoing, in the event that Tenant's use of the loading facilities between 8:00 p.m. and 8:00 a.m. ("After Hours") imposes any additional costs on Landlord, Tenant shall reimburse Landlord for such actual and commercially reasonable costs as Landlord incurs, to be prorated per hour of After Hours use based on the Floor Area by and among any other tenants that have also used the loading facilities After Hours; provided, however, Tenant shall only be required to so reimburse Landlord if any and all other tenants of the Shopping Center Unit that are permitted to use the loading facilities After Hours are also required by the terms of their leases to also reimburse Landlord for After Hours costs.

SECTION 2.02   Extension Periods.   Provided Tenant is not then in default of any material terms or provisions this Lease, after the lapse of all applicable grace periods, Tenant shall have the option to extend the Term for the number of Extension Periods shown in Section 1.01(G), upon all the terms and conditions contained in this Lease. Each such option is

exercisable by Tenant giving notice to Landlord on or before two hundred seventy (270) days prior to the expiration of the Initial Lease Term, or of the then-current Extension Period, as the case may be.

SECTION 2.03   Commencement Date.  "Commencement Date" shall mean the date that is the earlier to occur of (a) one hundred twenty (120) days after the Possession Date (as defined in Section 2.05 below), or (b) the date on which Tenant opens for business in the Premises (other than exclusively for Tenant's employees); provided, however, that Landlord has (y) provided permanent power to the Premises substantially in accordance with the Site Design Requirements and (z) substantially completed Landlord's Work.   If, however, the Commencement Date shall occur prior to the date on which the Opening Requirement (as defined in Section 1.01(O) is met, and Tenant elects to delay the opening of its store, then, notwithstanding that the Commencement Date shall have occurred, Rent (as defined in Section 4.03) shall fully abate until the date on which the Opening Requirement is met. If, however, Tenant elects, at its discretion, to open for business prior to the date that the Opening Requirement is met, then Tenant shall pay, in lieu of Annual Minimum Rent, Alternative Rent until the date on which the Opening Requirement is met.

SECTION 2.04   Possession Date.  "Possession Date" shall mean the date on which the last of the following conditions shall have been satisfied:

(a)   Landlord shall have caused the Delivery of Premises with the Cold Dark Shell work substantially completed (as such work is defined in the Site Design Requirements) to occur;

(b)   Intentionally Omitted;

(c)   Intentionally Omitted;

(d)   Intentionally Omitted;

(e)   The representations and warranties of Landlord set forth in Sections 9.03 and 20.02 below shall then be true and in effect in all material respects, and Landlord shall not then be in violation of any of the Site Covenants (as defined in Section 20.03);

(f)   Landlord shall have delivered to Tenant a fully-executed original counterpart of a non-disturbance and/or recognition agreement, as applicable, from each Mortgagee and Ground Lessor (as such terms are defined in Section 19.01), as more fully set forth in Section 19.02;

(g)   Intentionally omitted; and

(h)   Landlord shall have delivered to Tenant the W-9 form attached hereto as Exhibit D.

Landlord currently anticipates that the Possession Date will occur on the Anticipated Possession Date, subject to the provisions of Section 2.05 below.  In no event shall the Possession Date occur prior to March 3, 2008.

WO 698030.8                                              5

SECTION 2.05    <u>Expected Possession Date.</u>

(a)    Landlord shall give Tenant no less than thirty (30) days notice of the date on which the Possession Date (including, without limitation, the Delivery of the Premises with Cold Dark Shell work completed) shall occur, using the form of Possession Date Notice attached hereto as <u>Exhibit C-1</u> (the "<u>Possession Date Notice</u>"); provided, however, in no event shall the date specified in the Possession Date Notice be earlier than March 3, 2008. The date specified in such notice shall be defined as the "<u>Expected Possession Date.</u>"

(b)    If Landlord has failed to accomplish the Possession Date by the Expected Possession Date (subject to Force Majeure, as defined in Section 23.12, and Tenant Delay, as defined below), then, subject to receipt of a Court Ruling (as defined in Section 24.01 below) finding that Landlord has failed to accomplish the Possession Date pursuant to Section 2.04 above, Landlord shall pay to Tenant <u>within</u> ten (10) business days after written demand, as a liquidated reimbursement (and not as a penalty) for all of the damages that Tenant has suffered as a result of any such delay, an amount equal to the sum of: (i) Thirty-Five Thousand Dollars ($35,000), plus (ii) an amount equal to two (2) days of Annual Minimum Rent for each day that the Possession Date is delayed. If Landlord fails to complete any other element of Landlord's Work (as defined in Section 3.01) on or before the date required therefor in the Construction Schedule (as defined in the Site Design Requirements), subject to Force Majeure and Tenant Delay, then, subject to receipt of a Court Ruling finding that Landlord has failed to complete any other element of Landlord's Work, Landlord shall pay to Tenant on demand, as a liquidated reimbursement (and not as a penalty) for all of the damages that Tenant will suffer as a result of any such delay, an amount equal to two (2) days of Annual Minimum Rent for each day that such component of Landlord's Work is delayed. The foregoing liquidated reimbursements represent the parties' good faith agreement as to an agreed upon amount which shall have been incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment. "Tenant Delay" means those acts or omissions of Tenant that are not expressly permitted or required by the provisions of this Lease and that materially and adversely interfere with Landlord's capacity to perform Landlord's Work (as defined in Section 3.01) and that actually cause a net delay in the completion thereof, provided Landlord shall have notified Tenant in writing of such act or omission promptly after its occurrence or failure to occur.

SECTION 2.06    Intentionally Omitted.

SECTION 2.07    <u>Delayed Possession.</u> If the Possession Date does not occur before the Outside Possession Date (subject to Force Majeure and Tenant Delay), then Tenant shall have the right to terminate this Lease on fifteen (15) days notice, which right shall be exercised by Tenant upon written notice to Landlord at any time prior to the Possession Date, but in no event more than one hundred twenty (120) days after the Outside Possession Date. If Tenant terminates this Lease, then there shall be no further liability on the part of Landlord or Tenant, <u>except</u>: (i) for those obligations that expressly survive the expiration or other termination of this Lease, and (ii) Landlord shall (which obligation shall survive the termination of this Lease), within thirty (30) days following Tenant's termination notice, reimburse Tenant for all its reasonable third-party costs and expenses incurred in connection with this Lease (including, without limitation, costs associated with the preparation and review of plans and specifications, and attorneys' fees), not to exceed Seventy-Five Thousand Dollars ($75,000); <u>provided,</u>

WO 698030.8                                    6

however, that Tenant shall be required to provide reasonable written evidence of such costs and expenses, incurred, such as, by way of example, receipted bills and cancelled checks. Notwithstanding the foregoing, Landlord shall be entitled to negate Tenant's termination notice under this Section 2.07 if Landlord, on or before expiration of the aforesaid fifteen (15) day notice period, causes the Possession Date to occur.

SECTION 2.08    Early Entry.  Any time prior to the delivery of the Premises with Cold Dark Shell work completed, Tenant shall have the right, on prior, reasonable written notice to Landlord, to enter the Premises to (a) inspect the physical condition of the Premises and/or the Cold Dark Shell (as defined in the Site Design Requirements) and conduct its due diligence investigation of the Shopping Center and/or the Cold Dark Shell to determine the suitability of the Shopping Center and/or the Cold Dark Shell for Tenant's intended development, construction, use and operation and (b) inspect Landlord's Work; provided, however, that such entry may not interfere with Landlord's Work and Tenant hereby agrees to indemnify Landlord, its agents, employees and representatives for any personal injuries and/or property damage cause by reason of such entry by Tenant, its agents, employees or contractors.  Such entry shall not be construed as an acceptance of the Cold Dark Shell by Tenant under the provisions of this Lease or as a waiver of any of the provisions hereof.  Under no circumstances may Tenant perform any of Tenant's Work during any early entry unless either specifically consented to by Landlord, in writing, or otherwise expressly set forth in the Site Design Requirements.

SECTION 2.09    Landlord Reimbursement.

(a)    Upon Substantial Completion and Tenant's furnishing to Landlord (1) the certificates of insurance required under Section 11.02, (2) a square footage building perimeter survey certified to Tenant and Landlord by Landlord's architect (the "Floor Area Certification"), and (3) a copy of the Temporary Certificate of Occupancy for the Premises (items (1) through (3) collectively, the "Reimbursement Deliverables"), Landlord shall pay to Tenant the Landlord Reimbursement (as defined below).  "Landlord Reimbursement" shall mean the product obtained by multiplying Forty and No/100 Dollars ($40.00) by the Floor Area of the Premises as determined by the Floor Area Certification.  The Landlord Reimbursement shall be payable by wire transfer of funds by Landlord to Tenant's account no later than thirty (30) days after Substantial Completion and receipt of the Reimbursement Deliverables; provided, however, Landlord's obligation to pay the Landlord Reimbursement shall toll if Landlord has obtained a Court Ruling that Tenant is then in default of any of the terms, covenants, conditions or provisions of this Lease beyond the expiration of all applicable notice and cure period and shall continue to toll until such default is cured.  In no event shall Tenant's election to delay opening its store in any way delay or modify the date on which the Landlord Reimbursement is required to be paid by Landlord to Tenant.  Upon payment of the Landlord Reimbursement from Landlord to Tenant, Landlord shall be the owner of the permanent building improvements that were constructed or installed as a part of Tenant's Work (but not including any of Tenant's Property, as defined in Section 16.01) and the beneficiary of all warranties and guarantees relating to the construction of the Premises and Landlord shall be entitled to depreciate the Premises for tax purposes.  Tenant shall deliver to Landlord a bill of sale and/or an assignment of warranties and guarantees evidencing the conveyance of the Premises and/or assignment of warranties and guarantees from Tenant to Landlord.  Landlord shall also have the right to require Tenant to deliver to Landlord such a bill of sale and/or assignment.  The conveyance of the Premises,

WO 698030.8

7

however, shall be deemed to have occurred notwithstanding that a bill of sale was not so delivered.

(b)     If, upon receipt of the Reimbursement Deliverables, which shall be deemed to be notice to Landlord that the Landlord Reimbursement will become due within the aforesaid thirty (30) day period, Landlord nevertheless fails to pay the Landlord Reimbursement in full on or before its due date, then upon Tenant's receipt of a Court Ruling finding that Landlord is in default under this Lease, and notwithstanding the terms and conditions of Section 18.03 to the contrary, no Rent shall be due or owing to Landlord until and unless the Landlord Reimbursement is paid to Tenant, together with interest, which shall accrue on the unpaid Landlord Reimbursement at the Default Rate (as defined in Section 18.01(b) below) commencing on the thirty-first (31st) day following delivery of the Reimbursement Deliverables until the date of payment of the Landlord Reimbursement in full.

SECTION 2.10    Measurement.  If the Floor Area Certification shall disclose that the Premises contains more or less than the Floor Area shown in Section 1.01(P), then Landlord and Tenant agree to amend this Lease to adjust all Rent to account for the actual Floor Area of the Premises.

SECTION 2.11    Commencement Date Agreement.  When the Commencement Date has been determined, Landlord and Tenant shall execute a memorandum, in the form of Exhibit E, which shall expressly confirm the Commencement Date and the expiration date of the Initial Lease Term, and which shall also ratify and affirm all of the terms and provisions of this Lease.

## ARTICLE III

## INITIAL CONSTRUCTION

SECTION 3.01    Landlord's and Tenant's Work.

(a)     ·  Landlord shall perform Landlord's work substantially in accordance with the Site Design Requirements and as otherwise required by this Lease ("Landlord's Work"). Tenant shall perform Tenant's work in accordance with the Site Design Requirements ("Tenant's Work") for which Landlord shall pay to Tenant the Landlord Reimbursement in accordance with the terms and conditions of Section 2.09 above.  Landlord and Tenant acknowledge receipt of the Site Design Requirements and each agrees to comply with the provisions thereof relating to their respective work.  Notwithstanding the foregoing, Tenant shall submit plans and specifications for Tenant's Work ("Tenant's Plans") to Landlord for Landlord's reasonable approval within twenty (20) days following the later to occur of (i) the Effective Date, or (ii) the date on which Landlord delivers to Tenant the final plans for Landlord's Work, whereupon Landlord shall have ten (10) business days to review and approve (or disapprove, as the case may be) Tenant's Plans. Landlord shall not unreasonably withhold its consent to Tenant's Plans so long as the same (a) would not adversely affect the structural or common operating systems of the Shopping Center, if any, located within or under the Premises, and (b) do not conflict with the final plans for Landlord's Work.  In the event Landlord disapproves Tenant's Plans, Landlord shall accompany such notice of disapproval with written comments and/or reasons for disapproval, whereupon Landlord and Tenant covenant and agree to cooperate and negotiate in good faith to address

Landlord's reasonable comments to Tenant's Plans; provided, however, in no event shall Tenant be required to address or incorporate any comments by Landlord that are unreasonable. If Landlord and Tenant cannot agree on Tenant's Plans within ten (10) after Tenant's receipt of Landlord's written disapproval of Tenant's Plan, Tenant may terminate this Lease on five (5) days written notice and upon such termination there shall be no further liability on the part of Landlord or Tenant, except for: (i) those obligations that expressly survive the expiration or other termination of this Lease, and (ii) Landlord's obligation (which obligation shall survive the termination of this Lease), within thirty (30) days following Tenant's termination notice, to reimburse Tenant for all its reasonable third-party costs and expenses incurred in connection with this Lease (including, without limitation, costs associated with the preparation and review of plans and specifications, and attorneys' fees), not to exceed Seventy-Five Thousand Dollars ($75,000); provided, however, that Tenant shall be required to provide reasonable written evidence of such costs and expenses incurred, such as, by way of example, receipted bills and cancelled checks. Notwithstanding the foregoing, Landlord shall be entitled to negate Tenant's termination notice under this Section 3.01(a) if Landlord, on or before expiration of the aforesaid five (5) day notice period, unconditionally approves Tenant's Plans in the form submitted by Tenant for approval or in such other form as is acceptable to Tenant in its sole and absolute discretion.

(b)    In connection with Tenant's performance of Tenant's Work, Tenant shall engage Landlord's designated expeditor, Design 247, to work in cooperation with Tenant's internal expeditor, subject to such reasonable fees as Landlord's expeditor may assess. During the performance of Tenant's Work, Tenant shall have the right to use any or all of the Premises as a construction staging area, as well as any vacant and available floor area located in other premises immediately adjacent to the Premises on the ground level of the Shopping Center Unit, it being understood and agreed that such additional adjacent space shall only be deemed to be vacant and available if no other tenant of the Shopping Center has any right to possession or imminent right to possession of the same and/or Landlord does not require active possession of such premises in order to prepare the same for imminent occupancy by a future tenant. In that regard, Tenant covenants and agrees that within seven (7) days after Tenant's receipt of written notice from Landlord requiring Tenant to cease using any or all of such adjacent space (as so specified by Landlord in its notice) for staging purposes, Tenant shall remove all materials and supplies from such adjacent space, fully repair any temporary openings created by or on behalf of Tenant between the Premises, and return such adjacent space broom clean and in such condition as existed prior to Tenant creating such temporary opening.

## ARTICLE IV

## RENT

SECTION 4.01    Annual Minimum Rent. Commencing on the Commencement Date, Tenant shall pay to Landlord monthly installments of Annual Minimum Rent without setoff or deductions, except as otherwise provided for in this Lease, on the first (1st) day of each calendar month during the Term. However, if the Commencement Date occurs on a day other than the first (1st) day of a calendar month, then the monthly installment of Annual Minimum Rent and other charges shall be prorated for the remaining days of that calendar month. Anything contained in this Lease to the contrary notwithstanding, if Tenant shall be paying Alternative

Rent in lieu of Annual Minimum Rent as permitted under this Lease during such time as Tenant shall be entitled to an abatement of, deduction from or setoff against Annual Minimum Rent, then Tenant shall be entitled to the same abatement of, deduction from or setoff against Alternative Rent.

SECTION 4.02    Additional Rent.    The term "Additional Rent" shall mean all amounts required to be paid by Tenant under this Lease other than Annual Minimum Rent. Wherever an item of Additional Rent is payable "on demand" or no time period for payment of an item of Additional Rent is specifically provided for in this Lease, such item of Additional Rent shall be paid by Tenant within thirty (30) days after Tenant's receipt of Landlord's invoice therefor, accompanied by reasonable back-up documentation

SECTION 4.03    Extension Period Rent Escalation.    Annual Minimum Rent during each of the Extension Periods (should Tenant exercise any or all of its options to extend the Term) shall be at the rate set forth in Section 1.01(C) above, which shall be calculated based on the FMV of the Premises, on a square footage basis, as of the first day of the calendar month immediately preceding the month in which Tenant delivers its notice to Landlord, pursuant to Section 2.02 above, that Tenant is exercising the applicable Extension Period option. As a part of Tenant's written notice exercising any such Extension Period option, Tenant shall set forth Tenant's reasonable determination of FMV Annual Minimum Rent (to be calculated as described above) ("Extension and Rental Notice"), but in no event shall Tenant's Extension and Rental Notice propose Annual Minimum Rent, based on the specified percentage of FMV set forth in Section 1.01(C) above, that is less than the Annual Minimum Rent payable by Tenant during the immediately preceding Extension Period or in the case of the first Extension Period, less than the Annual Minimum Rent payable by Tenant during Lease Years 6 through 10 as set forth in Section 1.01(C) above.    Within forty-five (45) days after Landlord's receipt of Tenant's Extension and Rental Notice, Landlord, in writing, shall either accept Tenant's FMV determination or shall propose an alternative FMV amount. If Landlord proposes an alternative FMV amount, Landlord and Tenant shall negotiate in good faith for thirty (30) days following the delivery of Landlord's alternative FMV proposal to reach an agreement as to the FMV Annual Minimum Rent to be payable during the applicable Extension Period. Should Landlord and Tenant fail to reach such an agreement, the matter shall be submitted to a single independent licensed real estate broker, with at least ten (10) years of experience in retail leasing in Kings County, New York, mutually agreeable to both Landlord and Tenant, who shall determine Annual Minimum Rent based on FMV during the applicable Extension Period and whose determination of the same shall be final, conclusive, and binding on both Landlord and Tenant. Immediately on the agreement by Landlord and Tenant or the determination by an independent real estate broker of the FMV (and thereby Annual Minimum Rent based on the specified percentage thereof) during the applicable Extension Period, Landlord and Tenant shall memorialize in writing such Annual Minimum Rent based on FMV for the applicable Extension Period, which, in all events shall not be less than the Annual Minimum Rent that was payable by Tenant during the immediately preceding Extension Period or in the case of the first Extension Period, less than the Annual Minimum Rent payable by Tenant during Lease Years 6 through 10 as set forth in Section 1.01(C) above. If Annual Minimum Rent based on FMV during any Extension Period is less than the Annual Minimum Rent that was payable during the applicable preceding rental period, then the Annual Minimum Rent payable during such subsequent Extension Period shall continue at the same amount as was payable during preceding rental

period and such amount shall be deemed, for the purposes of this Lease, to be Annual Minimum Rent based on FMV for that subsequent Extension Period. Once the Annual Minimum Rent based on FMV for any Extension Period is determined and memorialized in writing as set forth above, such rental amount shall apply during the entire Extension Period without any further escalation or reduction during such Extension Period.

SECTION 4.04    <u>Rent; Method of Payment</u>.  The term "<u>Rent</u>" shall mean, collectively, Annual Minimum Rent and Additional Rent. All payments of Rent shall be made by check payable to Landlord, mailed or delivered to the address listed in Section 22.01 or to such other person or place as Landlord shall designate by notice to Tenant, or by such other reasonable method of payment (such as by wire transfer).

## ARTICLE V

## COMMON AREA MAINTENANCE AND COST

SECTION 5.01    <u>Maintenance</u>.  Landlord shall operate, maintain, insure, repair and replace the Common Areas or cause the same to be done in a manner so as to maintain the Shopping Center in good, first-class order, repair and condition. Without limiting the generality of the foregoing, unless the necessity therefore shall been caused exclusively by the negligence or willful acts of Tenant, its agents, employees or contractors, in which event Tenant shall be liable to Landlord for the costs thereof, Landlord shall be solely responsible, and Tenant shall have no obligation (except to reimburse Landlord for Tenant's Share of the cost thereof, as provided below), for the maintenance, repair or replacement of the parking areas (including, without limitation, any necessary redecking and restriping), parking lot lighting, common utility systems and connections (excluding the utility systems and connections located within the Premises, which shall be Tenant responsibility), access ways and other Common Areas and for the clearing of snow and ice from the Common Areas. Landlord may at any time, except between October 1 and January 1, close temporarily any Common Areas to make repairs, to prevent the acquisition of public rights therein or discourage non-customer parking. Between October 1 and January 1, Landlord may temporarily close parts of the Common Areas, but only to make repairs of an emergency nature or as otherwise required by Laws or a public utility to be made during such months. However, in any instance of such emergency repairs Landlord shall use reasonable efforts to perform the necessary repairs in a reasonably expeditious manner possible and in such a way and at such times as to cause the least interference reasonably possible with ingress and egress to and from the Premises. In order to reduce interference with Tenant's business operation during such period, Landlord shall effect temporary repairs, where reasonably feasible, and complete the permanent repairs after January 1.

SECTION 5.02    <u>Construction Clean-up and Post-Possession Work</u>.  Following the Possession Date, any construction by Landlord or other tenants or occupants of the Shopping Center affecting any portion of the Shopping Center shall be subject to the following terms and conditions (in addition if any other applicable provisions of this Lease, such as, by way of example only, Section 20.03(g)):

(a)    staging and storage of materials and parking of construction vehicles shall not occur in "<u>Tenant's Preferred Area</u>" (as depicted on the Site Plan);

      (b)    Landlord shall maintain the Shopping Center in a clean, safe, and sightly condition, and shall use reasonable efforts to ensure that such construction shall not materially adversely interfere with the normal conduct of any business operations in the Premises; and

      (c)    Landlord shall clear or cause to be cleared all rubble and debris from the Premises and Common Areas resulting from any construction by Landlord or any other tenant or occupant of the Shopping Center.

      SECTION 5.03   <u>CAM Costs</u>.  "CAM Costs" shall mean the actual amount (without profit or "mark up" by Landlord or any Affiliate, as defined in Section 11.07, of Landlord) of all necessary, competitive and reasonable costs and expenses actually incurred by Landlord in operating, insuring, maintaining and, as provided by this Article V, repairing, the Common Areas in an appropriate manner commensurate with good business practice and first-class shopping centers, and, in addition thereto, in lieu of any cost(s) or expense(s) relating to the administration and management of the Common Areas, an administrative fee (the "<u>Administrative Fee</u>") equal to ten percent (10%) of the CAM Costs for the calendar year in question, but excluding from the computation of such Administrative Fee the cost of any replacement or improvement of a capital nature (to the extent otherwise permitted to be included in CAM Costs), the cost of electricity and other utilities, and the cost of insurance premiums; <u>provided, however</u>, that Tenant acknowledges and agrees that Landlord's obligation to provide "competitive" CAM Costs shall not require Landlord to bid work out, but only shall require that such CAM Costs be comparable to the costs that are incurred by other landlords of comparable first-class shopping centers in the New York metropolitan area ("<u>Metropolitan Area</u>") for substantially similar work.  In no event will CAM Costs include: (a) Taxes (as defined in Section 6.01), (b) any costs associated with maintenance performed by another tenant or occupant of the Shopping Center on portions of the Common Areas separately maintained by such tenant or occupant; (c) any dues or charges for a merchants' or other association of occupants of the Shopping Center; (d) maintenance, repairs or replacements to the Common Areas (i) necessitated by the negligent or wrongful act of Landlord or any tenant or occupant, (ii) made to correct any construction defect, or (iii) relating to any improvements or utility systems not within the Common Areas (e.g. roofs, exterior walls, fire protection systems); (e) repairs or replacements necessitated by any governmental entity or made to correct any condition in existence prior to the Commencement Date, or to correct damage caused by subsidence or adverse or substandard soil conditions; (f) amounts reimbursable from insurance proceeds, under warranty, or by any tenant or occupant of the Shopping Center or any other third party other than pursuant to a Common Area expense provision similar to this Section 5.03; (g) premiums for insurance for coverage maintained by Landlord with respect to the Shopping Center (except that premiums for Common Areas insurance may be included as part of CAM Costs provided the coverage provided by such liability insurance policy is not in excess of the limits established in Section 11.01), any costs resulting from insurance deductibles under any insurance policy maintained by Landlord, any costs which would have been reimbursed or paid for by insurance proceeds had Landlord maintained the insurance required under Section 11.01, and the amount of any judgment, settlement, or other charge entered, or costs assessed against, Landlord in excess of the policy limits of the insurance maintained by Landlord under Section 11.01; (h) the cost of any replacements or capital improvements to the Common Areas, except that the cost of repairing and, to the extent required, redecking the parking areas, replacing the roof, and replacing the sidewalks immediately adjacent to the Shopping Center may be included within CAM Costs so long as such cost is otherwise permitted to be included within CAM Costs

and is amortized on a straight-line basis over the useful life thereof under generally accepted accounting principles consistently applied, and is not incurred (i) prior to the expiration of the tenth (10th) full calendar year of the Term, (ii) more than once during each ten (10) full calendar years of the Term, or (iii) otherwise covered by any applicable warranty; (i) reserves for anticipated future expenses; (j) interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner; (k) Landlord's personnel, overhead, home office or administrative expenses, except for the Administrative Fee; (l) amounts incurred to remediate any Hazardous Materials (as defined in Section 9.03(a)); (m) any new improvements to the Shopping Center or Common Areas including, but not limited to, renovations to the facade of the Shopping Center (but excluding improvements to landscaped areas, if any), of the Shopping Center; (n) holiday or other decorations or other promotional expenses relating to the Shopping Center (except to the extent that Tenant's Pro Rata Share of such cost does not exceed $3,000 annually and all other tenants of the Shopping Center also contribute to the cost of holiday decorations in an amount at least equal to that of Tenant on a per square foot basis); or (o) any fees, costs or expenses not related to the operation, maintenance, insurance or repair of the Common Areas. Further, Landlord shall exclude from CAM Costs all costs or expenses in connection with any repairs or replacements to the Common Areas from the Commencement Date through the first (1st) anniversary of the Commencement Date.

SECTION 5.04    Tenant's Share of CAM Costs. Tenant shall pay to Landlord Tenant's Share of CAM Costs in each calendar year during the Term. Tenant's Share of CAM Costs shall be appropriately prorated for partial calendar years at the beginning and at the end of the Term.

SECTION 5.05    Payment of CAM Costs. Tenant's Share of CAM Costs shall be payable in equal monthly installments on the first (1st) day of each month. Such monthly installments shall be at the rate of one-twelfth (1/12th) of Tenant's Share of CAM Costs for the preceding calendar year, subject to immediate adjustment when the actual amount of CAM Costs or a change in Tenant's Share thereof is determined. Within ninety (90) days after the end of each calendar year, Landlord shall furnish Tenant with a detailed statement certified by an authorized representative of Landlord of the actual amount of CAM Costs and of Tenant's Share thereof for the preceding calendar year (including the basis of allocation to Tenant). Within thirty (30) days after receipt of such statement by Tenant, Tenant shall pay to Landlord any deficiency due. Any surplus paid by Tenant shall, at Tenant's option, be credited against the next installment(s) of Rent or be refunded to Tenant forthwith. Landlord's records of CAM Costs for each year shall be available for inspection by Tenant on regular business days during regular business hours at Landlord's offices in the Metropolitan Area for a period of three (3) years after Landlord notifies Tenant of Tenant's Share of CAM Costs for the year in question. Tenant may, during such three (3) year period, upon ten (10) business days' prior notice to Landlord, have an audit made of CAM Costs and the allocations thereof to Tenant including, without limitation, reviewing copies of paid bills and other records substantiating its expenditures ("CAM Records"). Any overcharges or shortages shown by any such audit may be submitted, at Landlord's option to an independent third-party auditor mutually agreeable to Tenant and Landlord. Any overcharges, at Tenant's option, shall be credited against the next installment(s) of Rent or be refunded to Tenant forthwith; provided, however, if Landlord has elected to engage an independent auditor, only such overcharges as are confirmed by such independent auditor be credited or refunded to Tenant. Any shortages owed by Tenant to Landlord shall be due and payable to Landlord as Additional Rent. If any audit shows that

Tenant's Share of CAM Costs have been overstated by more than three percent (3%), then Landlord shall promptly pay to Tenant the reasonable cost of such audit including the costs of the independent auditor; provided, however, if Landlord has elected to engage an independent auditor, the costs of Tenant's auditor shall be paid by Landlord only if such independent auditor confirms an overstatement of more than three percent (3%). If Landlord has elected to engage an independent auditor who does not confirm that Tenant has been overcharged whatsoever for CAM Costs, then Tenant shall pay the cost of such independent auditor.

SECTION 5.06      Intentionally Omitted.

# ARTICLE VI

# TAXES

SECTION 6.01      Taxes.      Landlord shall pay when due all real estate taxes and assessments levied and assessed against the land, improvements and buildings comprising the Shopping Center Unit. Except as hereinafter provided to the contrary, for each calendar year or part thereof during the Term, Tenant shall pay Tenant's Share of the net amount (after reflecting all discounts for early payment, refunds and credits and after excluding all penalties, interest, late charges and real estate taxes and assessments levied against free-standing buildings which are separately assessed) of all real estate taxes and assessments (collectively, "Taxes") levied and assessed against the land, improvements and buildings comprising the Shopping Center Unit. Tenant acknowledges that the Shopping Center Unit is located within a so-called "Business Improvement District."

SECTION 6.02      Payment of Taxes.      Tenant shall be liable for and shall pay Tenant's Share of Taxes only with respect to Taxes accruing during the Term, regardless of when such Taxes are billed or become due and payable. Tenant's Share of Taxes shall be appropriately prorated for partial fiscal tax years at the beginning and at the end of the Term. Tenant shall pay Tenant's Share of Taxes (a) within thirty (30) days after Landlord submits to Tenant proof of payment of Taxes by Landlord, a tax bill for such Taxes and a statement setting forth the manner in which Tenant's Share of Taxes is calculated, or (b) ten (10) business days before the same are due and payable, whichever is later. Notwithstanding the foregoing, so long as Landlord requires that all other tenants of the Shopping Center Unit make monthly payments with respect to Taxes, Tenant shall, in lieu of making payments pursuant to the foregoing provisions of this Section 6.02, pay Landlord monthly with each installment of Annual Minimum Rent an amount equal to one-twelfth (1/12) of Tenant's Share of Landlord's (or the Mortgagee's) good faith estimate of such Taxes for the then applicable fiscal tax year(s) only. Such payments shall be held in trust to be applied towards payment of the Taxes when the same shall become due. Within thirty (30) days following the issuance by the taxing authority of the bill covering the applicable fiscal tax year, Landlord shall provide to Tenant a statement, in detail reasonably satisfactory to Tenant, of the Taxes and Tenant's Share thereof for such year (the "Tax Reconciliation Statement"). The Tax Reconciliation Statement shall be certified by Landlord as being accurate and shall be accompanied by (i) copies of the applicable tax bills, (ii) a calculation of Tenant's Share of Taxes, and (iii) payment to Tenant in the amount of any overpayment made by Tenant in respect of the applicable fiscal tax year. If Tenant's Share of the actual Taxes for a fiscal tax year shall exceed the aggregate monthly installments paid by

Tenant in respect of said fiscal tax year, then Tenant shall pay to Landlord the deficiency within thirty (30) days after receipt of such notice.

SECTION 6.03   <u>Exclusions from Taxes</u>.  Notwithstanding anything contained in this Lease to the contrary with respect to betterments or other extraordinary or special assessments, Tenant's obligations shall apply only to the extent such assessments (and interest thereon) are payable in respect of the Term, and Tenant's Share of any such assessments shall be determined as if such assessments are payable in installments over the longest payment period permitted by law for the particular assessment, in which case Tenant shall pay only those installments payable in respect of the Term.  Landlord represents to Tenant that, as of the Effective Date and, to the best of Landlord's knowledge, except as expressly set forth below, as of the Possession Date, no portion of the Shopping Center is or will be (a) subject to or the beneficiary of an abatement, exemption and/or phase-in of Taxes, (b) subject to any special assessments or similar charges, or (c) included in any special improvement district(s) which would result in higher sales taxes or other similar impositions than would exist in the absence of such district(s).  Notwithstanding the foregoing, Landlord discloses and Tenant acknowledges that the Shopping Center has been approved for participation in the Industrial and Commercial Industrial Program ("ICIP") whereby Taxes may be abated for a fixed period of the Term and thereafter phased in over the ten (10) years thereafter.  Landlord shall participate in the ICIP and it shall give Tenant written notice of the relevant dates of abatement and phasing of Taxes of Landlord's participation in the ICIP.  In no event shall Taxes including, without limitation, Taxes under the ICIP, include any: (i) income, excise, profits, estate, inheritance, succession, gift, transfer, franchise, capital, or other tax or assessment upon Landlord or upon the rentals payable under this Lease; (ii) taxes on rents (other than to the extent that such taxes are customarily paid by retail tenants in the State), gross receipts or revenues of Landlord from the Premises; (iii) fine, penalty, cost or interest for any tax or assessment, or part thereof, which Landlord or its lender failed to timely pay, unless such late payment was solely attributable to late payment by Tenant of Tenant's Share of Taxes; (iv) assessment for a public improvement arising from the initial construction or expansion of the Shopping Center or the Premises; (v) Taxes resulting directly from an increase in the assessment caused by a sale or ground lease of all or any portion of the Shopping Center to an Affiliate of Landlord; or (vi) fees imposed upon Landlord in connection with Landlord's development of the Shopping Center (including, without limitation, trip generation and impact fees).  All Taxes payable by Tenant pursuant to this Article VI shall be determined as if the Shopping Center was the only property owned by Landlord.

SECTION 6.04   <u>Right to Contest</u>.  At Tenant's written request given within thirty (30) days after Tenant's receipt from Landlord of a tax bill pursuant to the provisions of Section 6.02 above, Landlord shall contest the amount or validity of any assessed valuation or Taxes.  If any rebate or refund of Taxes is received as a result of any contest or otherwise, then Tenant shall be entitled to Tenant's Share thereof (after reasonable and customary expenses incurred by Landlord in connection with such contest are paid to the party which incurred such expense). Tenant shall have the right to defer payment of Tenant's Share of Taxes during any such Tax contest if permitted under Laws (as defined in Section 10.01).  If Tenant has requested and Landlord has agreed to contest Taxes and the result of such contest does not yield any refund, rebate or reduction of Taxes, then within thirty (30) days following Landlord's written request therefor, Tenant shall reimburse Landlord for all of the reasonable and actual out-of-pocket costs and expenses paid by Landlord to third parties in connection with contest including, without

limitation, Landlord's reasonable attorneys' fees and all other costs and expenses related thereto provided that Landlord has provided Tenant with reasonable documentation evidencing such costs and expenses.  If, as a result of any tax contest by Tenant Taxes are increased, Tenant shall be liable for the payment of any such increase in Taxes.

**ARTICLE VII**

**UTILITIES**

SECTION 7.01    <u>Utilities</u>.  Landlord covenants and agrees that the Premises shall be serviced with the utilities identified and installed in accordance with the Site Design Requirements.  Landlord, as part of Landlord's Work, shall cause all such utilities to the Premises to be separately metered or submetered at Landlord's sole cost and expense; <u>provided, however</u>, as to any utilities that are submetered, Landlord may assess, in lieu of any cost(s) or expense(s) relating to the administration and management of such utilities and/or submetering, a utilities administrative fee (the "<u>Utility Administrative Fee</u>") no greater than ten percent (10%) of the actual utility consumption charges for such submetered utilities during the calendar year in question, but excluding from the computation of such Utility Administrative Fee the cost of any replacement or improvement of any submetering equipment.  Tenant shall pay, as same become due and payable, all charges for utility services furnished to the Premises during the Term.  If at any time during the Term, for any reason, Landlord shall provide utility service to the Premises, Tenant's cost for such utility service shall not exceed the lesser of (a) Landlord's actual cost for such utility service, or (b) the cost of the same service if Tenant had obtained such service directly from such utility provider.  In addition, Tenant shall have the right to install, at its sole cost and expense, a test meter to verify its utility usage.  Notwithstanding anything contained in this Lease to the contrary, subject to Laws, Tenant shall be entitled to select the utility service providers to the Premises including the telecommunication provider.  Landlord shall permit full and free access to all available conduits in the Shopping Center for the applicable utility service subject to such reasonable requirements as Landlord may impose.

SECTION 7.02    <u>Interruption</u>.  If utilities serving the Premises are disrupted due to the acts or omissions of Landlord, its agents, contractors, servants or employees, then Landlord shall promptly restore the affected utilities at Landlord's sole cost and expense.  If such disrupted utilities are not restored within forty-eight (48) hours after the Landlord has received written notice of such disruption and Tenant is unable to conduct its normal business in the Premises as a result of such disruption, and, in fact, Tenant ceases the conduct of business in the Premises as a result of such disruption, then Rent shall be equitably abated during the period of disruption.

**ARTICLE VIII**

**USE OF PREMISES**

SECTION 8.01    <u>Permitted Use</u>.  The Premises may be used and occupied for any Permitted Use.  However, Tenant shall not use the Premises for any of the Prohibited Uses (as defined in <u>Exhibit F</u>).

16

SECTION 8.02    Conduct of Operations.  Subject to the other provisions of this Lease (including, without limitation, Article II), Tenant shall initially open its store for business to the public in the Premises for at least one (1) day, not later than the thirtieth (30th) day after the Commencement Date.  Other than as expressly set forth in the preceding sentence, Tenant shall have no obligation to open or operate any business in the Premises, and shall have the right, at any time, to cease to conduct any business operations in the Premises, and Tenant shall incur no liability to Landlord by reason thereof.  Notwithstanding the foregoing, if Tenant does not operate or cause to be operated the Premises for the Permitted Use (other than prior to the Commencement Date or during Excused Periods, as defined below) for more than one hundred eighty (180) consecutive days or one hundred eighty (180) non-consecutive days out of three hundred sixty (360) consecutive days, then Landlord shall have the option to terminate this Lease, which option shall be exercisable by giving notice thereof to Tenant by not later than the thirtieth (30th) day after the date on which such 180th day occurs (the "Recapture Notice").  If Landlord gives the Recapture Notice, then this Lease shall terminate upon the sixtieth (60th) day (the "Recapture Date") after the date on which Tenant receives Landlord's termination notice.  Upon termination of this Lease under this Section 8.02, there shall be no further liability on the part of Landlord or Tenant, except for obligations that expressly survive the expiration or sooner termination of this Lease.  "Excused Period(s)" shall mean such periods during which the Premises were not open for business (i) because of alterations or renovations (provided that Tenant has given Landlord at least thirty (30) days prior written notice of such alterations or renovations), damage or destruction, eminent domain proceedings or actions, Force Majeure, or any act or omission of Landlord, or its employees, agents, or contractors, or (ii) following the execution of a letter of intent for an assignment of this Lease or sublease of all or any portion of the Premises permitted under this Lease and delivery of a copy thereof, with any financial terms or other proprietary information redacted, to Landlord and provided that the parties thereto have entered into such permitted assignment of this Lease or sublease within ninety (90) days after the execution of the letter of intent and, thereafter, the assignee or sublessee opens the Premises, or portion thereof, for business within one hundred (120) days after the execution of such assignment or sublease.

SECTION 8.03    Leasing Restrictions.    Landlord shall construct, lease, operate, maintain and manage the Shopping Center as an urban first-class shopping center comparable to other urban first-class shopping centers in the State.  In that regard, Landlord shall not lease, rent or occupy, or consent to be leased, rented or occupied, any portion of the Shopping Center for any of the Prohibited Uses.  Upon any breach of the provisions of the immediately preceding sentence, Tenant may elect, upon at least ten (10) business days' prior written notice to Landlord, but subject to receipt of a Court Ruling finding that Landlord has breached this Section 8.03, to pay Alternative Rent in lieu of Annual Minimum Rent for so long as such violation shall continue.

SECTION 8.04    Tenant's Exclusive.

(a)    Landlord shall not lease, rent or occupy, or consent to be leased, rented, occupied, any other premises in the Shopping Center for the sale, rental, installation, servicing and/or repairing, either singly or in any combination, of the Products.  The Incidental Sale (as defined below) of the Products in connection with the overall business of another tenant shall not be deemed a violation this Section 8.04(a).  "Incidental Sale" shall mean sales in the lesser of (i)

three hundred fifty (350) square feet, or (ii) ten percent (10%) of such tenant's or occupant's, or Landlord's or any of its Affiliate's display area.  The exclusive use rights granted to Tenant in this Section 8.04(a) (the "Exclusive Use Protection") shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of all or part of the Premises.

(b)    The Exclusive Use Protection shall also not apply to a full-line: (A) supermarket (for example, Safeway, Winn-Dixie, or Stop & Shop), (B) department store or discount department store (for example, Wal-Mart, K-Mart, J.C. Penney, Macy's, Kohl's or Target), (C) discount club (for example, Costco, BJ's Wholesale Club, or Sam's Club), (D) office supply store (for example, Office Depot, Staples or OfficeMax), (E) book store (for example, Barnes & Noble or Borders), (F) home furnishing retailer (for example, Linens N' Things or Bed Bath & Beyond), (G) sporting goods retailer (for example, Sports Authority or Dick's Sporting Goods), or (H) a crafts hobby retailer (for example, A.C. Moore); provided, however, that, as to each of the foregoing, such stores (i) are National Tenants or Regional Tenants (as such terms are defined in Section 8.06), and (ii) are operated in substantially the same manner as same are operated as of the Effective Date.

(c)    Upon written notice to Landlord of any violation of the Exclusive Use Protection, but subject to receipt of a Court Ruling finding that a violation of the Exclusive Use Protection has occurred, Tenant may elect to pay Alternative Rent in lieu of Annual Minimum Rent for so long as such violation shall continue.  If such breach shall continue for more than sixty (60) consecutive days, then Tenant shall have the right to terminate this Lease upon at least thirty (30) days' prior written notice to Landlord, given at any time thereafter (provided such violation of the Exclusive Use Protections shall still be ongoing), in which event the applicable provisions of Section 8.04(e) shall control.

(d)    However, if any tenant or other occupant of the Shopping Center violates the Exclusive Use Protection, Tenant shall give Landlord written notice of such alleged violation, and if such violation also constitutes a default under its lease with Landlord, then Tenant's right to pay Alternative Rent pursuant to Section 8.04(c) shall be tolled provided that Landlord shall have promptly commenced appropriate legal proceedings against such tenant or occupant, and shall thereafter diligently prosecute such proceedings to completion so as to enjoin and prohibit any such violation.  If Landlord shall have failed to promptly commence such proceedings, or shall fail thereafter to diligently prosecute the same and the violation does not cease within one hundred eighty (180) days after Landlord shall have been made aware of such violation, then Tenant's right to pay Alternative Rent shall apply for as long as such violation exists; provided, however, if the failure of Landlord relates to Landlord's failure to promptly commence proceedings, Tenant shall be required to give Landlord written notice of Landlord's failure to promptly commence such proceedings within forty five (45) days after Tenant gave Landlord written notice of the alleged violation and Landlord thereafter failed to commence such proceedings.  In addition, if after Tenant has given Landlord the requisite notice of a violation but Landlord fails to promptly commence or diligently prosecute appropriate proceedings against the violating tenant as required above, then Tenant shall have the right (i) to conduct and prosecute such legal proceedings (including an action for injunctive relief) in its own name, at Landlord's reasonable expense, or (ii) in the event the right set forth in clause (i) above is not permitted to be exercised under Laws, to conduct and prosecute such legal proceedings in the name of Landlord, at Landlord's reasonable expense, and Landlord reasonably shall cooperate

with Tenant with respect to such prosecution (including executing any documentation or authorization reasonably required by Tenant in connection with such prosecution and by appearing at any hearing or trial with respect to such prosecution). If Tenant shall have paid Alternative Rent pursuant to this Section 8.04(d) (or shall have otherwise had the right to pay Alternative Rent hereunder but for the tolling of such right as hereinabove provided) for twenty-four (24) consecutive months, then Tenant shall have the right to terminate this Lease subject to and in accordance with the provisions of Section 8.04(e).

(e)    If Tenant shall have paid Alternative Rent pursuant to Sections 8.04(c) or (d) for twenty-four (24) full consecutive months, then Tenant must elect either to (i) terminate this Lease, or (ii) resume paying Annual Minimum Rent from and after the expiration of the thirty (30) day period following the end of such twenty-four (24) month period. Tenant shall make such election by notice to Landlord within thirty (30) days after the expiration of such twenty-four (24) month period. If Tenant fails to make such an election, then Tenant shall be deemed to have elected to proceed under clause (ii) above. If Tenant elects to terminate this Lease pursuant to Sections 8.04(c) or (d), then this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of Landlord or Tenant, except: (y) for those obligations which expressly survive the expiration or other termination of this Lease, and (z) Tenant reserves all claims against Landlord for damages resulting from the violation of the Exclusive Use Protection.

SECTION 8.05    Exclusives Applicable To Tenant.

(a)    Tenant shall not use (or permit to used) the Premises in violation of those certain exclusives granted by Landlord to certain other tenants in the Shopping Center pursuant to the terms and provisions of leases or use and occupancy agreements that have been executed prior to the Effective Date (the "Existing Exclusives"). Landlord represents and warrants that a true and complete listing and description of such Existing Exclusives is attached as Exhibit H.

(b)    Tenant shall not use (or permit to be used or sublet for use) the Premises in violation of certain exclusives granted by Landlord to certain other tenants or occupants in the Shopping Center pursuant to the terms and provisions of leases or occupancy or use agreement that are executed within one (1) year after the Effective Date (the "First Generation Exclusive(s)") provided that any such First Generation Exclusive is either expressly set forth on Exhibit H-1 attached hereto or Landlord has provided Tenant with a true and complete copy of each First Generation Exclusive within ten (10) business days after the execution of a lease or occupancy or use agreement containing the applicable First Generation Exclusive.

(c)    Tenant shall not use (or permit to be used or sublet for use) the Premises in violation of certain exclusives granted by Landlord to certain other tenants or occupants in the Shopping Center pursuant to the terms and provisions of leases or occupancy or use agreement that are executed from and after the first anniversary of the Effective Date (the "Future Exclusive(s)"), on the condition that:

(i)    The Future Exclusives shall only restrict Tenant from operating primarily for the same primary use as that engaged in by the beneficiary of the Future Exclusive (e.g., primarily as a bookstore, an office supplies store, a sporting goods store, a toy store, etc.),

and shall not apply to the sale, rental, installation, servicing and/or repairing of all or any of the Products or the Ancillary Products; and

    (ii) Landlord shall provide Tenant with a true and complete copy of each Future Exclusive within ten (10) business days after the execution of a lease or occupancy or use agreement containing the applicable Future Exclusive, and, at the time Tenant receives such notice, (y) Tenant shall not have previously entered into an assignment of this Lease or a sublease of the Premises (or any portion thereof) that specifically permits a primary use that would violate such Future Exclusive; or (z) neither Tenant nor any assignee of this Lease or subtenant of the Premises (or any portion thereof) then shall be engaged in a primary use that would violate such Future Exclusive.

    (d) Landlord represents and warrants that, other than the Existing Exclusive(s), First Generation Exclusive(s), and Future Exclusive(s), there are (and will be) no exclusives or use restrictions in effect which would apply to Tenant or any other occupant of the Premises, and Landlord covenants to indemnify, defend and hold Tenant harmless from and against all loss, cost, liability or expense (including, without limitation, reasonable legal fees) incurred by Tenant by reason of the enforcement by any person or entity of such exclusive or other use restriction, subject to Tenant's receipt of a Court Ruling so requiring such indemnification by Landlord.

    SECTION 8.06 <u>Key Tenants</u>.  If, from and after the Commencement Date through the sixth anniversary of the Commencement Date, the Key Tenant is not open for regular business (or otherwise actively installing fixtures and merchandising its store in anticipating of imminently opening for regular business) for a period of two (2) consecutive months (subject to Co-Tenancy Excused Periods), then Tenant shall have the option, to be exercised by written notice to Landlord, to pay Alternative Rent in lieu of Annual Minimum Rent until such time as the Key Tenant is open for regular business. If the Key Tenant ceases operations for a period of twelve (12) consecutive months or more, then Tenant shall have the right to terminate this Lease upon thirty (30) days notice to Landlord, such notice to be given at any time prior to the date the Key Tenant re-opens for business, but in no event later than eighteen (18) months after such cessation of operations. If Tenant shall elect to terminate this Lease, then this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of Landlord or Tenant, <u>except</u> for those obligations which expressly survive the expiration or other termination of this Lease. If Tenant does not terminate this Lease within thirty (30) days after the expiration of such twelve (12) month period, then commencing on the day following the end of such thirty (30) day period, Tenant shall resume paying full Annual Minimum Rent. However, Tenant shall again be entitled to exercise its rights under this Section 8.06 each time, prior to the sixth anniversary of the Commencement Date, that Key Tenant ceases operations for the requisite periods set forth above. It is hereby understood and acknowledged by Landlord that the Key Tenant may only be replaced, for the purposes of this Section 8.06 only, by no more than five (5) tenants or occupants that shall be National Tenant(s) or Regional Tenant(s) of comparable quality of merchandise as Key Tenant, collectively occupying not less than 60% of the premises occupied by Key Tenant as of the Commencement Date. "<u>National Tenant(s)</u>" shall mean a tenant(s) operating, as of the applicable date, at least seventy-five (75) retail stores in the continental United States under a single trade name in first-class shopping centers, and "<u>Regional Tenant(s)</u>" shall mean a tenant(s) operating, as of the applicable date, at least thirty-five (35)

retail stores in first-class shopping centers in any of the following states under a single trade name: New York, New Jersey, Pennsylvania, Connecticut and Massachusetts. "Co-Tenancy Excused Periods" shall mean periods during which the Key Tenant's premises were not open for business (i) because of alterations or renovations, Force Majeure, or any act or omission of Landlord, or its employees, agents, or contractors, or (ii) following the execution of a letter of intent for an assignment of such Key Tenant's lease or sublease of all or any portion of such Key Tenant's premises provided that the parties thereto have entered into an assignment or sublease within ninety (90) days after the execution of the letter of intent and, thereafter, the assignee or sublessee opens such Key Tenant's premises, or portion thereof, for business within one hundred (120) days after the execution of such assignment or sublease.

## ARTICLE IX

## REPAIRS

SECTION 9.01    Landlord Obligations.  Landlord shall, at Landlord's sole expense (and not included in CAM Costs), keep and maintain in good order, condition and repair (including replacements, if necessary) and in a safe condition (a) all utility systems and lines (including, without limitation, electrical, plumbing, mechanical and/or alarm systems) serving the Premises (from the point of connection at the Premises to the public utility mains or main feeder boxes), the exterior of the Premises (including, without limitation, the walls and Other Improvements, but excluding window glass, doors and frames) and the structural portions of the Premises including, without limitation, footings and foundation, floor slab, and structural walls, columns and beams, and (b) any damage to the Premises or the Shopping Center which is caused by (i) defects in Landlord's Work, or (ii) the act or omission of Landlord, its employees, agents or contractors; provided, however, if any of the foregoing repairs are necessitated solely by the acts or omissions of Tenant, its agent or employees, then, subject to receipt of a Court Ruling finding that Tenant, its agent or employees was/were the cause of such needed repair, Tenant shall reimburse the actual and reasonable costs incurred by Landlord to perform such repair. Landlord's obligations under this Section 9.01 shall be subject to the provisions of Articles XII and XIII.  Landlord shall use commercially reasonable efforts to perform any and all repairs and replacements to be performed under this Lease without material adverse interference with or disruption to the normal conduct of any business operations in the Premises. Landlord shall give Tenant at least five (5) days prior notice of any repairs or replacements to the Premises (except in the case of an emergency posing imminent risk of material harm to persons or property, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances).   If, in Tenant's reasonable judgment, Landlord's repairs would materially interfere with or disrupt the normal conduct of any business operations in the Premises, then Landlord shall perform such repairs only after the regular hours of operation of the Premises, provided that Tenant shall be liable to pay, as Additional Rent, such reasonable and actual additional costs and expenses that may be incurred as a direct result of such after hours repairs.

SECTION 9.02    Tenant's Obligations.  Subject to Landlord's obligations under Section 9.01, Tenant shall at all times during the Term, at Tenant's sole expense, keep and maintain in good order, condition and repair and in a safe condition (i) the non-structural, interior elements of the Premises (including, but not limited to, painting, window glass, doors and frames, and any heating, ventilation and air conditioning ["HVAC"] units and the electrical, plumbing,

WO 698030.8

21

mechanical, and/or alarm systems located in and serving exclusively the Premises), and (ii) any damage to the Premises or the Shopping Center which is caused by the act or omission of Tenant, its employees, agents, contractors, licensees or invitees. Tenant's obligations under this Section 9.02 shall also be subject to the provisions of Articles XII and XIII and to Landlord's obligation to clear the Premises of all dirt and debris following completion of Landlord's Work pursuant to Section 5.02.

SECTION 9.03    Hazardous Materials.

(a)    Landlord represents and warrants that, as of the Effective Date (and as of the Possession Date), to the best of Landlord's knowledge, there are (and will be) no Hazardous Materials present in the Shopping Center, and Landlord agrees that the removal or neutralization of any Hazardous Materials that become present at the Shopping Center during the Term shall be at the sole cost and expense of Landlord (and not included in CAM Costs), other than Hazardous Materials introduced by Tenant, its agents, employees and contractors, or Hazardous Materials introduced by other tenants or occupants of the Shopping Center for which such tenants or occupants are obligated and liable to remove or neutralize by Laws or under their applicable lease(s) or use or occupancy agreement(s). "Hazardous Materials" shall mean (i) any waste, material or substance (whether in the form of a liquid, a solid, or a gas and whether or not air-borne) which is deemed to be a pollutant or a contaminant, or to be hazardous, toxic, ignitable, reactive, infectious, explosive, corrosive, dangerous, harmful or injurious to public health or to the environment, and which is now or becomes regulated in the future by or under the authority of any applicable local, state or federal laws, judgments, ordinances, orders, rules, regulations, codes or other governmental restrictions or requirements, any amendments or successor(s) thereto, replacements thereof or publications promulgated pursuant thereto (collectively, "Environmental Regulations", and individually, "Environmental Regulation"); (ii) petroleum; (iii) asbestos and asbestos containing materials; (iv) any polychlorinated biphenyl; and (v) any radioactive material. In addition to the foregoing, the term "Environmental Regulations" shall be deemed to include, without limitation, local, state and federal laws, judgments, ordinances, orders, rules, regulations, codes and other governmental restrictions and requirements, any amendments and successors thereto, replacements thereof and publications promulgated pursuant thereto, which deal with or otherwise in any manner relate to, environmental matters of any kind.

(b)    Landlord and Tenant each agree that neither Landlord nor Tenant shall cause or permit any Hazardous Materials to exist on, or to escape, seep, leak, spill or be discharged, emitted or released from the Shopping Center during the Term in violation of any applicable Environmental Regulation.

(c)    Landlord hereby indemnifies Tenant and its successors and assigns, and agrees to hold Tenant and its successors and assigns harmless from and against any and all losses, liabilities, damages, injuries, penalties, fines, costs, expenses and claims of any and every kind whatsoever, including attorneys' fees and costs (collectively, "Environmental Liabilities") paid, incurred or suffered by, or asserted against, Tenant or its successors and assigns with respect to, or as a direct or indirect result of (i) the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission or release from the Shopping Center of any Hazardous Materials which were brought into the Shopping Center by Landlord, its agents, employees, contractors or their respective predecessors-in-interest, or (ii) a breach by Landlord, its agents,

employees or their respective predecessors-in-interest of any Environmental Regulation to which Landlord is subject.

(d)     Tenant hereby indemnifies Landlord and its successors and assigns, and agrees to hold Landlord and its successors and assigns harmless from and against any and all Environmental Liabilities paid, incurred or suffered by, or asserted against, Landlord or its successors and assigns with respect to, or as a direct or indirect result of (i) the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission or release from the Premises of any Hazardous Materials which were brought into the Premises by Tenant, its agents, contractors, invitees, licensees, or employees, or (ii) a breach by Tenant, its agents or employees of any Environmental Regulation to which Tenant is subject.

(e)     With respect to Hazardous Materials which are or become present at the Shopping Center as the result of any cause whatsoever (other than Hazardous Materials which were brought into the Premises by Tenant, its agents, employees or contractors), Landlord shall, at Landlord's sole cost (and not included in CAM Costs), in a good, workmanlike and expeditious manner, and in compliance with Environmental Regulations, perform all work necessary to clean-up, remove and otherwise remediate such Hazardous Materials in compliance with Environmental Regulations.  Should the presence of such Hazardous Materials render the Premises Unusable (as defined below) or should Tenant be required to close during the removal or neutralization of such Hazardous Materials by Landlord, Tenant shall notify Landlord and all Rent shall be immediately abated during the Premises Unusable period until such time as Tenant can safely resume normal business operations.  If such work is not commenced within thirty (30) days after the date (the "Notification Date") that Tenant notifies Landlord of Hazardous Materials rendering the Premises Unusable (or such additional period as may be reasonably required to engage environmental consultants and/or engineers and obtain permits and licenses) or if such work is not completed within ninety (90) days after the Notification Date (or such additional period as may reasonably be required given the nature of the work, provided that Landlord diligently pursues same to completion), subject to Force Majeure and Tenant Delay, then Tenant shall have the right, at any time thereafter, to terminate this Lease.  However, Tenant's option to terminate this Lease pursuant to this Section 9.03(e) shall cease (if not exercised prior thereto) at any time the Premises are no longer Unusable.  If Tenant shall elect to terminate this Lease, then the Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of Landlord or Tenant, except: (i) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, (ii) Landlord shall (which obligation shall survive the termination of this Lease), within thirty (30) days after receiving a statement from Tenant showing the Unamortized Costs, reimburse Tenant for the then unamortized costs (amortized on a straight-line basis over the Term) of any alterations or improvements made by Tenant to the Premises, which in no event shall exceed Two Hundred Thousand Dollars ($200,000.00) (the "Unamortized Costs"), and (iii) Tenant reserves all claims against Landlord for damages resulting from a default by Landlord under this Section 9.03.  Landlord shall have the right to inspect, at Tenant's principal accounting office, such relevant books or records of Tenant relating solely to the Unamortized Costs and as are necessary to enable Landlord or an authorized representative of Landlord, or an independent auditor mutually acceptable to Tenant and Landlord, to confirm the accuracy of Tenant's calculation of the Unamortized Costs.  Any overcharge of Unamortized Costs shown by any such independent auditor shall be reimbursed by

23

Tenant to Landlord within ten (10) business days of Tenant's receipt of such independent auditor's report. For the purpose of this Section 9.03(e), "Unusable" means that the Tenant does not have access to at least ninety percent (90%) of the Premises because of the enforcement of any Environmental Regulation or the remediation of any Hazardous Materials, or because use of the Premises would represent a risk to the health or safety of Tenant, Tenant's employees, agents or invitees.

SECTION 9.04   Surrender of the Premises.  At the expiration or earlier termination of this Lease, Tenant shall surrender the Premises to Landlord in the same condition as it is required to be maintained by Tenant pursuant to Section 9.02 above; excepting, however, reasonable wear and tear, damage by fire or other casualty, and the effects of a Taking (as defined in Section 13.01).

## ARTICLE X

## REQUIREMENTS OF LAW

SECTION 10.01   Landlord's Obligations.  As part of Landlord's Work and throughout the Term, Landlord shall be responsible, at Landlord's sole cost and expense (and not included in CAM Costs), for complying with all applicable laws, statutes, ordinances and regulations of federal, state, county and municipal authorities (collectively, "Laws") affecting the Shopping Center including, without limitation, the Premises, except as specifically provided in Section 10.02.

SECTION 10.02   Tenant's Obligations.   Throughout the Term, Tenant shall be responsible, at Tenant's sole cost and expense, for complying with all Laws affecting the Premises and the Common Areas if such compliance is required solely as a result of Tenant's specific use or manner of use of the Premises (as opposed to retailers in general) and relates to the interior elements of the Premises which are neither structural nor comprise the major building systems serving the Premises.

SECTION 10.03   Right to Contest.  The party responsible for compliance pursuant to Section 10.01 or 10.02 shall have the right to contest the validity of any Law at the expense of the party responsible for compliance, unless such contest would result in any criminal liability imposed upon the other party or subject such other party to any fine or penalty.

## ARTICLE XI

## INSURANCE

SECTION 11.01   Landlord's Insurance.

(a)     Landlord shall maintain in full force and effect from and after the Effective Date and throughout the Term:

(i)     Commercial general liability insurance with regard to the Common Areas protecting and insuring Landlord, naming Tenant as "additional insured-lessee" for claims arising out of the use or occupancy of the Common Areas and the obligations assumed by

WO 698030.8                                    24

property owned by Landlord, then Landlord shall obtain evidence reasonably satisfactory to Tenant of the cost of such insurance allocable to the Shopping Center and the amount so allocable shall be included in CAM Costs for the purposes of determining Tenant's Share of any insurance premium included in CAM Costs.

(b)    If the rates for any insurance Landlord is required to carry are increased as a result of the use or other activity of any other occupant of the Shopping Center, then the amount of such increase shall be excluded from CAM Costs.  To the extent that Landlord receives a dividend, credit, rebate or other return of a premium which had previously been included in CAM Costs, Landlord shall promptly refund to Tenant Tenant's Share of such dividend, credit, rebate, or return.

(c)    The provisions of this Section 11.04 shall survive the expiration or earlier termination of this Lease.

SECTION 11.05    Indemnity.

(a)    Except as otherwise provided in Section 11.06, Tenant covenants to defend and indemnify Landlord and hold Landlord harmless from and against any and all claims, actions, damages, liabilities and expenses, including reasonable attorneys' fees, (i) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises, or any part thereof, or (ii) within the Shopping Center and occasioned wholly or in part by any act, omission, negligence or willful misconduct of Tenant, its agents, contractors, employees, servants, or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Landlord, its agents, contractors, licensees, employees, or other tenants and occupants, or for which any of said parties may be statutorily liable.

(b)    Except as otherwise provided in Section 11.06, Landlord covenants to defend and indemnify Tenant and hold Tenant harmless from and against any and all claims, actions, damages, liabilities and expenses, including reasonable attorneys' fees, (i) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon any portion(s) of the Shopping Center (excluding the Premises), or (ii) occasioned wholly or in part by any act, omission, negligence or willful misconduct of Landlord, its agents, contractors, employees, servants, tenants (other than Tenant), occupants or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Tenant, its agents, contractors, licensees or employees, or for which any of said parties may be statutorily liable.

SECTION 11.06    Mutual Waiver of Subrogation.

(a)    Landlord and Tenant, on their own behalf and on behalf of anyone claiming under or through either one by way of subrogation, hereby release and waive all rights of recovery and causes of action against each other and their respective Affiliates arising from any and all liability for any loss or damage to property or resulting from damage to such property (and, in either case, any resulting loss of business or rental income), whether caused by the negligence or fault of the other party, which is normally insured under Special Form property

insurance (formerly known as "All-Risk") and time element insurance required to be maintained hereunder or under any other property or time element insurance maintained by either party. If either Landlord or Tenant is a self-insurer or maintains a deductible (as either may be permitted under this Lease), then the self-insuring party or the party maintaining the deductible hereby releases the other party from any liability arising from any event which would have been covered had the required insurance been obtained and/or the deductible not been maintained.

(b)     Landlord and Tenant shall cause each property insurance policy carried by either of them insuring the Premises, the contents thereof, or the Shopping Center, to provide that the insurer waives all rights of recovery by way of subrogation or otherwise against the other party hereto (and all of such other party's Affiliates) in connection with any loss or damage which is covered by such policy or that such policy shall otherwise permit, and shall not be voided by the releases provided above.

SECTION 11.07   Affiliate.  "Affiliate" shall mean a corporation, partnership, person or other entity which is controlling, controlled by, or under common control with, Landlord or Tenant, as the case may be.  As used in the definition of Affiliate, "control" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise.

## ARTICLE XII

## DAMAGE OR DESTRUCTION

SECTION 12.01   Landlord's Obligation to Rebuild.  If less than fifty percent (50%) of the Shopping Center (including, without limitation, the Premises) is damaged or destroyed by fire, the elements or other casualty, then Landlord shall promptly upon receipt of insurance proceeds repair all damage and restore the Shopping Center to its condition immediately prior to such damage or destruction. Without limiting Landlord's obligations under this Article XII, the proceeds of the policies required to be obtained and maintained by Landlord pursuant to Section 11.01 shall, to the extent necessary, be used for the performance of such rebuilding and restoration work. Notwithstanding the foregoing, Landlord's obligation to restore the Shopping Center shall be limited to restoring the (i) the Common Areas in the manner required above, and (ii) at least eighty percent (80%) of Floor Area of the Shopping Center (inclusive of the Premises), in the manner required above so that same shall be occupied or ready for occupancy following such restoration (all of the foregoing work is referred to as the "Primary Restoration"). If fifty percent (50%) or more of the Shopping Center (whether or not including the Premises) is damaged or destroyed by fire, the elements or other casualty, then Landlord and Tenant, within ninety (90) days after the date of such fire or other casualty, may each elect, by written notice given to the other, to either repair the damage as aforesaid or terminate this Lease as of the date of such fire or other casualty, in which event the provisions of Section 12.03(d) below shall apply.  With respect to buildings or improvements within the Shopping Center which are damaged by fire or other casualty but which are not required to be restored by Landlord as part of the Primary Restoration, Landlord shall promptly either (y) restore all or portions of the same to substantially the condition in which they existed immediately prior to such fire or other casualty, or (z) raze the remaining portions of such buildings or improvements not rebuilt,

remove all debris resulting therefrom and maintain such area in a sightly manner. The provisions of this Section 12.01 shall not apply if Landlord or Tenant terminates this Lease pursuant to provision this Article XII.

SECTION 12.02 <u>Tenant's Obligation to Rebuild</u>. If all or any part of the Premises is damaged or destroyed by fire, the elements or other casualty, then following Landlord's restoration of the building as required by Section 12.01 above, Tenant shall promptly repair all damage and restore the remainder of the Premises to its condition immediately prior to such damage or destruction (subject to any changes to the Premises that Tenant shall desire to make to the extent same shall otherwise be permitted under Section 14.01). Without limiting Tenant's obligations under this Article XII, the proceeds of the policies required to be obtained and maintained by Tenant pursuant to Section 11.02 shall, to the extent necessary, be used for the performance of such rebuilding and restoration work. The provisions of this Section 12.02 shall not apply if Landlord or Tenant terminates this Lease pursuant to provision this Article XII.

SECTION 12.03 <u>Termination</u>.

(a)    Tenant shall have the right to terminate this Lease:

(i)    if all or any part of the Premises is damaged or destroyed by fire, the elements or other casualty during the last two (2) years of the Term, and the restoration period is reasonably estimated by an independent third party architect mutually agreed upon by both Landlord and Tenant to be in excess of two hundred forty (240) days,

(ii)    if all or any part of the Premises is damaged or destroyed by fire, the elements or other casualty during the last year of the Term and such damage or destruction has other than a *de minimis* effect on the Premises and/or the conduct of Tenant's business therein as reasonably determined by Tenant, subject to Landlord's rights to challenge such determination as provided by Section 12.03(b) below, or

(iii)    if all or any part of the Premises is damaged or destroyed by fire, the elements or other casualty at any time during the Term and such damage or destructions is not covered under the insurance policy(ies) required to be maintained by Tenant under Sections 11.02(a)(ii) or 11.02(b).

Tenant shall notify Landlord of its exercise of such option within forty-five (45) days following the occurrence of such casualty. Notwithstanding the foregoing, in the event that Tenant would be entitled to terminate this Lease pursuant to Section 12.03(a)(i) above, but elects not to exercise its right to do within the aforesaid forty-five (45) days period, Landlord shall have an additional ten (10) days in which it may elect in writing to terminate to this Lease; <u>provided, however</u>, that Tenant may negate such termination notice by Landlord if Tenant elects, in writing, within thirty (30) days after its receipt of Landlord's termination notice, to exercise any available Extension Periods available to Tenant under this Lease.

(b)    If Tenant elects to terminate this Lease pursuant to Section 12.03(a)(ii) above and Landlord disputes Tenant's determination that the damage or destruction has had or will have an other than *de minimis* effect on Tenant's business, Landlord shall give Tenant written notice of Landlord's dispute of such determination no later than ten (10) days following

WO 698030.8

29