# EXHIBIT A

LOCATION:  Annapolis, Maryland

# LEASE

between

## CIRCUIT CITY STORES, INC.,

as Tenant

and

## WILLIAM P. BEATSON, JR. and JEROME B. TROUT, JR.
Tenants in Common

as Landlord

dated as of March 1, 1996

## ANNAPOLIS PLAZA SHOPPING CENTER

TABLE OF CONTENTS

1.   Leased Property . . . . . . . . . . . . . . . . . . . . . . .   1
2.   Construction of Building and Improvements . . . . . . .   2
3.   Lease Term . . . . . . . . . . . . . . . . . . . . . . . . .   3
4.   Rent. . . . . . . . . . . . . . . . . . . . . . . . . . . .   5
5.   Shopping Center . . . . . . . . . . . . . . . . . . . . .   11
6.   Easements . . . . . . . . . . . . . . . . . . . . . . . . .   13
7.   Common Areas and Common Area Maintenance . . . . . . . .   16
8.   Signs and Communications Equipment . . . . . . . . . . .   24
9.   Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . .   26
10.  Maintenance, Repairs and Replacements . . . . . . . . .   29
11.  Payment of Utility Bills . . . . . . . . . . . . . . . .   32
12.  Alterations . . . . . . . . . . . . . . . . . . . . . . .   32
13.  Mechanics' Liens . . . . . . . . . . . . . . . . . . . .   33
14.  Insurance . . . . . . . . . . . . . . . . . . . . . . . .   34
15.  Damages by Fire or Other Casualty . . . . . . . . . . .   41
16.  Condemnation . . . . . . . . . . . . . . . . . . . . . .   47
17.  Assignment and Subletting . . . . . . . . . . . . . . . .   51
18.  Use . . . . . . . . . . . . . . . . . . . . . . . . . . .   57
19.  Warranties and Representations . . . . . . . . . . . . .   59
20.  Estoppel Certificates . . . . . . . . . . . . . . . . . .   72
21.  Subordination, Non-Disturbance and Attornment . . . . .   72
22.  Change of Landlord . . . . . . . . . . . . . . . . . . .   74
23.  Tenant's Financing . . . . . . . . . . . . . . . . . . .   75
24.  Tenant's Property and Waiver of Landlord's Lien . . . .   76
25.  Memorandum of Lease; Commencement Date Agreement . . . .   76
26.  Expiration of Term and Holding Over . . . . . . . . . .   77
27.  "For Rent" Signs . . . . . . . . . . . . . . . . . . . .   78
28.  Force Majeure . . . . . . . . . . . . . . . . . . . . . .   79
29.  Events of Tenant's Default . . . . . . . . . . . . . . .   79
30.  Landlord's Remedies . . . . . . . . . . . . . . . . . . .   80
31.  Events of Landlord's Default; Tenant's Remedies . . . .   84
32.  Waiver . . . . . . . . . . . . . . . . . . . . . . . . . .   86
33.  Compliance with Applicable Laws . . . . . . . . . . . . .   86

34.  Notices . . . . . . . . . . . . . . . . . . . . .  87

35.  Brokers . . . . . . . . . . . . . . . . . . . . .  88

36.  Miscellaneous . . . . . . . . . . . . . . . . . .  88

37.  Effectiveness of Lease; Tenant's Right to Terminate . .  91

38.  Confidentiality . . . . . . . . . . . . . . . . .  94

39.  Lease Termination . . . . . . . . . . . . . . . .  94

40.  Landlord Exculpation . . . . . . . . . . . . . . .  95

EXHIBITS

"A"        Site Plan
"A-1"      Shopping Center Legal Description
"B"        Index of Definitions
"C"        Construction Provisions
"D"        Removable Trade Fixtures
"E"        Sign Plans
"F"        Permitted Encumbrances
"G"        Subordination,   Non-Disturbance   and   Attornment
           Agreement
"H"        Memorandum of Lease
"I"        Commencement Date Agreement
"J"        Lease Termination Agreement

ANNAPOLIS, MARYLAND

## LEASE

This LEASE is made as of the 1st day of March, 1996, by and between WILLIAM P. BEATSON, JR. and JEROME B. TROUT, JR., as tenants in common, having an address at 170 Jennifer Road, Suite 330, Annapolis, Maryland 21401 ("Landlord"), and CIRCUIT CITY STORES, INC., a Virginia corporation having an address at 9950 Mayland Drive, Richmond, Virginia 23233 ("Tenant").

W I T N E S S E T H :

That for and in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.   <u>Leased Property</u>.   Landlord demises and leases to Tenant and Tenant leases and takes from Landlord, commencing on Landlord's delivery of the "Land" as shown and described on the Site Plan referred to below to Tenant, all those certain "Premises" consisting of the "Building" and "Other Improvements" (both as defined in paragraph 2), as and when same are constructed or renovated and that approximately 33,537 square foot parcel (the "Land"), on which the Building and Other Improvements are or will be located, as more particularly shown (approximately) outlined in red on <u>Exhibit "A"</u> hereto (the "Site Plan"), together with exclusive rights in the three (3) parking spaces labelled "Customer Pick-Up" adjacent to the Building as shown on the Site Plan and

with the easements described in paragraph 6 below, all located in the "Shopping Center" (herein so called), which consists of that certain real property with buildings and improvements constructed or to be constructed thereon, located at Annapolis Plaza Shopping Center, lying and being in the County of Anne Arundel (the "County"), State of Maryland (the "State"), and more particularly shown on the Site Plan and described by metes and bounds or platted lot legal description on Exhibit "A-1" attached hereto and made a part hereof for all purposes. All of the Shopping Center exclusive of the Premises is "Landlord's Premises". The description of the Premises may be adjusted in accordance with Tenant's final bid set of Plans and Specifications as described in Exhibit "C" attached hereto, provided that the square footage of the Premises shall not be materially larger (i.e. vary by more than 1,000 square feet) than 33,537 square feet nor shall any other proposed adjustment to the Premises as same are shown on the Site Plan alter the configuration of the Premises in any material respect which would require site plan approval or the consent of any other tenants of the Shopping Center.

2.   Construction of Building and Improvements.   Following "delivery of the Land" (as defined in the Construction Provisions (herein so called) attached hereto as Exhibit "C" and incorporated herein by reference for all purposes), Tenant shall have the right to demolish all or portions of the existing building on the Land containing approximately 25,000 square feet of space. Tenant shall, at Tenant's sole option, either renovate the existing

building or, following the demolition of all or portions of the existing building, construct within the Shopping Center a new one-story retail building, containing up to approximately 33,537 square feet of ground-floor gross leasable area plus mezzanine, with provisions for customer pickup, delivery and car stereo installation facilities, in either case to be used initially as a Circuit City Store or Superstore (the "Building"), together with loading ramps, sidewalks, trash compactor, transformer pad and other such appurtenances and improvements (collectively, the "Other Improvements"), as more particularly set forth in the Plans and Specifications referred to in the Construction Provisions.  The Building and Other Improvements are sometimes collectively referred to herein as the "Improvements".  The Improvements shall be constructed in accordance with the Plans and Specifications to be prepared by Tenant as specified in the Construction Provisions.

3.  <u>Lease Term</u>.  Subject to the conditions to the effectiveness of this Lease set forth in paragraph 37, the construction term (the "Construction Term") of this Lease shall commence on the date of Landlord's delivery of the Land to Tenant in accordance with the Construction Provisions, and shall end on the "Commencement Date" (as defined in paragraph 4 below).  The main term (the "Main Term") of the Lease shall commence on the Commencement Date and shall end on the last day of January following the twentieth (20th) anniversary of the Commencement Date.

In addition to the Main Term, Tenant shall have the option (each such right referred to herein as a "Renewal Option") to renew

and extend the Lease for four (4) consecutive five (5) year periods (each such period referred to as an "Option Period" and collectively as the "Option Periods") immediately following the Main Term, at the rent specified below.  Tenant shall give Landlord written notice of its election to exercise any Renewal Option at least two hundred seventy (270) days prior to the expiration of the Main Term or any then-current Option Period, as applicable; provided, however, that in order to avoid any forfeiture or inadvertent lapse of such Renewal Option, if Tenant shall fail to give any such notice within the two hundred seventy (270) day time limit and shall not have given Landlord prior written notice of its intent not to exercise its Renewal Option, then and as often as the same shall occur, Tenant's right to exercise such Renewal Option shall nevertheless continue, as shall its tenancy hereunder (under the same terms and conditions as theretofore in effect and notwithstanding that the Main Term or then-current Option Period shall have expired), until ten (10) business days after Landlord shall have given Tenant a written notice of Landlord's election to terminate the Renewal Option, during which period Tenant may exercise its Renewal Option at any time prior to the expiration of such ten (10) business day period.  Upon the giving of notice of renewal and extension in accordance with the foregoing provisions, the "Term" (defined below) of this Lease shall thereupon be renewed and extended in accordance with such notice without further act by Landlord or Tenant, the same as if such notice had been timely given hereunder.

The Construction Term, Main Term and Option Periods are, collectively, the "Term". The term "Lease Year" shall mean each successive period of twelve (12) consecutive calendar months, commencing on the first day of each February during the Term, except that the first Lease Year shall commence on the Commencement Date and shall end on the last day of January following the first anniversary of the Commencement Date.

4. <u>Rent.</u>

(a) <u>Interim Rent.</u> During the Construction Term, Tenant shall have no obligation for the payment of Base Rent, nor shall Tenant be responsible for any "Real Estate Taxes" (as defined in paragraph 9) or "CAM Charges" (as defined in paragraph 7) or any similar costs, fees, rentals or expenses, <u>except that</u> Tenant shall pay to Landlord interim rent ("<u>Interim Rent</u>") for the Construction Term in the amount of $27,500 per month, prorated for any portion of a month. Tenant shall also pay interim rent for the period between **March 1** and the date of delivery of the Land (i.e., the beginning of the Construction Term) in an amount equal to Four Hundred Forty-Three and 55/100 ($443.55) per day.

(b) <u>Base Rent.</u> Tenant agrees to pay base rent ("Base Rent") for the Premises in the amounts and in the manner specified hereunder, commencing on the earlier to occur of (i) the date on which Tenant shall open for business to the general public in the Premises or (ii) fifteen (15) months after the date of delivery of the Land (the "Commencement Date" which shall also be the "Rent Commencement Date").

Tenant shall pay Base Rent without demand, set-off or abatement (except as expressly permitted hereby) in equal monthly installments, in advance on the first day of each succeeding calendar month throughout the Term, with appropriate proration for any partial calendar month or Lease Year, to the address given for Landlord in paragraph 34 hereof, unless Landlord shall give Tenant written notice of a change of address or of the party to whom such rents shall be payable along with written documentation reasonably satisfactory to Tenant of such party's right to receive payment hereunder.   Base Rent shall be paid pursuant to the following schedule:

(i)   <u>First Five Years</u>.   During the first five (5) Lease Years, Tenant shall pay annual Base Rent in the amount of Four Hundred Thousand Ninety-Six and 41/100 Dollars ($400,096.41), payable in equal monthly installments of Thirty-Three Thousand Three Hundred Forty-One and 37/100 Dollars ($33,341.37).

(ii)   <u>Adjustment in Base Rent</u>.   Notwithstanding the Base Rent provisions, in the event that the ground-floor gross leasable area of the Building when constructed is more or less than 33,537 square feet (provided such leasable area shall not be less than 25,000 square feet), annual Base Rent during the first five (5) Lease Years shall be either increased or decreased (as the case may be) to be the product of the actual ground-floor gross leasable area of the Building (as shown in the Plans and Specifications), multiplied by $11.93, <u>provided that</u> under no circumstances shall annual Base Rent be deemed to be less than Four Hundred Thousand

Dollars ($400,000) as increased as provided in subsection (iii) below. In determining the aforesaid ground-floor gross leasable area, measurements shall be made in accordance with the specifications set forth in paragraph 7(c) below. If any Lease Year is other than twelve (12) months in length, annual Base Rent during such Lease Year shall be the product of the applicable monthly Base Rent times the number of months in such Lease Year, with appropriate proration for any partial calendar month therein.

(iii)   <u>Increases in Base Rent</u>. Annual Base Rent shall increase on the first day of the sixth Lease Year, over the initial Base Rent charged hereunder, by ten percent (10%). Annual Base Rent shall increase on the first day of the eleventh and every succeeding fifth Lease Year, over the Base Rent in effect for the preceding five (5) Lease Year period by twelve and one-half percent (12.5%). Notwithstanding the foregoing, if the Commencement Date occurs after **February 1, 1997**, increases in annual Base Rent shall occur as aforesaid on the first day of the month following every fifth (5th) anniversary of the Commencement Date, the first such increase to be equal to ten percent (10%) of the initial Base Rent in effect hereunder and all further increases to be equal to twelve and one-half percent (12.5%) of the Base Rent in effect for the preceding five (5) year period.

(c)   <u>Percentage Rent</u>. In addition to Base Rent, commencing with the Commencement Date, Tenant shall pay to Landlord as percentage rent ("Percentage Rent") for each Lease Year an amount equal to one percent (1%) of Tenant's "Gross Sales" (as

defined below) in excess of the "Percentage Rent Breakpoint".  The
Percentage Rent Breakpoint shall initially be Forty Million Dollars
($40,000,000).   The Percentage Rent Breakpoint shall increase
simultaneously with, and by the same percentage as, Base Rent as
provided in paragraph 4(b)(iii) above.  Percentage Rent shall be
computed and payable annually on or before the ninetieth (90th) day
immediately following the end of each Lease Year.  Whether or not
Tenant's Gross Sales have reached the Percentage Rent Breakpoint,
Tenant shall make available to Landlord "flash" statements, which
need not be certified, of its monthly Gross Sales at the Premises
within approximately thirty (30) days after the end of each
calendar month.  Within ninety (90) days after the end of each
Lease Year, Tenant shall furnish to Landlord a detailed statement
(certified by an officer of Tenant) showing the Gross Sales during
such Lease Year.

          (i)   <u>Gross Sales</u>.  For purposes of this paragraph 4(c),
Gross Sales shall be defined as the selling price of all
merchandise sold and delivered in, at, on or from any part of the
Premises, whether by Tenant or any of Tenant's licensees,
subtenants, consignors or any other party selling merchandise from
the Premises, including sales and charges for cash or credit
(subject to collection, as limited by subparagraph (L) below), but
excluding or deducting therefrom, as the case may be:

          (A)  service charges paid by customers or other
     charges for extending credit to customers, and amounts in
     the nature of finance charges on Tenant's cash sales

price charged to customers on sales made on credit or under a time payment plan;

(B) sales to employees of Tenant at discount;

(C) returns to and refunds made by Tenant;

(D) exchanges of merchandise between stores or warehouses of Tenant where such exchange is made solely for the convenient operation of the business of Tenant and not for the purpose of consummating a sale which has been made at the Premises;

(E) city, county, state or federal sales, luxury or excise taxes (if otherwise included in the calculation of Gross Sales) on such sales which is both added to the selling price (or absorbed therein) and paid to the taxing authority by Tenant (but not by Tenant's vendor);

(F) sums and credits received in the settlement of claims for loss of or damage to merchandise;

(G) receipts for incidental items, such as cigarettes and candy, from snack bars, cafeterias and vending machines operated primarily for the use of Tenant's employees and receipts from public or private pay telephones;

(H) charges for repair and/or servicing of merchandise, including sales of service contracts;

(I) delivery and installation charges relating to work performed outside the Premises;

(J) exchanges of merchandise, but only to the extent of the value of the merchandise returned for exchange;

(K) sales of store fixtures and equipment used at the Premises and not sold in the ordinary course of business; and

(L) sales which are uncollectible and written off Tenant's books as uncollectible.

(ii) Books; Records; Audit. Tenant shall keep and maintain at Tenant's corporate headquarters books of accounts covering all sales of merchandise at the Premises for a period of at least thirty-six (36) months from and after the end of the month in which such transactions occur. Upon request of Landlord no more than once each Lease Year and at any reasonable time during regular business hours, and upon reasonable written notice to Tenant, the books of accounts of Tenant (as they relate to Tenant's operations at the Premises) shall be made available to Landlord or Landlord's auditor at Tenant's offices for an examination, inspection or audit; provided, however, that the maximum period which can be examined, inspected or audited shall never exceed the thirty-six (36) month period immediately preceding the month in which such examination, inspection or audit is conducted. If an audit conducted by Landlord or Landlord's auditor should determine that any previously submitted statement or statements of Tenant for the immediately preceding thirty-six (36) month period were inaccurate, and that Percentage Rent has thus been erroneously overpaid or unpaid, there shall be an adjustment to the end that the correct

amount of Percentage Rent will have been paid by Tenant.   In the event that an audit discloses an understatement of Gross Sales by Tenant in excess of five percent (5%) of the amount theretofore reported and, as a result thereof, Percentage Rent has been underpaid, Tenant shall pay the actual and reasonable out-of-pocket cost of such audit as well as interest on the unpaid amount of Percentage Rent at the "Default Rate" (as defined in paragraph 9(b) below) from the date upon which such amount should have been paid; thereafter Tenant shall pay such audit costs in the event of any future understatement of Gross Sales by Tenant in excess of three percent (3%) of the amount theretofore reported.   All reports submitted to the Landlord pursuant to this paragraph 4(c)(ii) shall be prepared in accordance with the accounting standards utilized by Tenant in connection with the preparation of its internal reports and information which shall be consistent with generally accepted accounting principles.

5.   <u>Shopping Center</u>.   Landlord covenants to maintain the Shopping Center as a first-class shopping center.   The location of buildings and other tenant space therein will only be located outside of Tenant's Preferred Area and View Corridor, as designated on the Site Plan, and the parking ratio for the Shopping Center shall in no event be less than the greater of (i) four (4) spaces per 1,000 square feet of gross leasable area or (ii) that required by applicable zoning requirements.   Any additional buildings located in the Shopping Center or on any parcels of land now or hereafter acquired by Landlord (or an entity owned or controlled by

Landlord or its principals) adjacent to the Shopping Center (including the area marked as "Parcel 2" on the Site Plan) shall be subject to the restrictions (including those in Paragraph 19(a)(vi) protecting Tenant's exclusive use) contained in this Lease.  All such parking shall be at ground level and shall be free of charge, (except that Landlord shall have the right to construct a parking structure outside of Tenant's Preferred Area and View Corridor for which Landlord may charge) within Tenant's Preferred Area and View Corridor, by patrons and employees of the Shopping Center only. Landlord shall construct or cause any future improvements in the Shopping Center to be constructed in a good and workmanlike manner, lien-free in accordance with paragraph 13 below.  Landlord shall not permit construction traffic over the Land leased to Tenant, and Landlord shall refrain from interfering with the conduct of Tenant's business.   Construction staging for any future construction activities of Landlord or other tenants within the Shopping Center shall be confined to areas outside of Tenant's Preferred Area.  Landlord shall keep and maintain or cause the improvements and the "Common Areas" (as defined in paragraph 7(a)) in the Shopping Center to be kept and maintained in good condition and repair and shall not operate, or permit to be operated, in the Shopping Center any activity which constitutes a nuisance, overburdens the available utilities, or violates any of the "Site Covenants" contained in subparagraph 19(a)(ix) or the prohibited activities set forth in subparagraph 19(a)(viii).

6.   <u>Easements</u>.   In addition to and simultaneously with the lease of the Premises, Landlord grants to Tenant certain nonexclusive leasehold easements over or upon certain areas of Landlord's Premises, as set forth below, which easements shall run as covenants with Landlord's Premises and the Premises during the Term and shall expire or terminate simultaneously with this Lease, except as provided below.

(a)   <u>Construction Easements</u>.   During the Construction Term, and any period of renovation or reconstruction thereafter, Landlord grants to Tenant a nonexclusive easement across a mutually agreeable designated route, providing access to and from the public roadways nearest to the Land, over the "Common Areas" (as defined in paragraph 7(a) below) for the purpose of construction access to the Premises.  In addition, Landlord grants to Tenant an exclusive easement for a construction staging area (the "Staging Area") of approximately 20,000 square feet, in the portion of the Common Areas designated for such purpose on the Site Plan.

(b)   <u>Footing and Foundation Easements</u>.  Landlord grants to Tenant, and Tenant grants to Landlord, easements and rights in Landlord's Premises and the Premises, as appropriate (i) for the construction and maintenance of foundations, footings, supports and demising walls; (ii) to allow their respective buildings to abut and connect (but not to bear structurally upon each other unless and except as otherwise provided herein); (iii) for roof projections, allowing the grantee to tie its building into the adjoining building by flashing and reglets; and (iv) for

200706.005 (REAL)
May 21, 1996                          - 13 -

encroachments which reasonably occur in the construction of the building components set forth in subparagraphs (i) through (iii) above. No such attachment or connection shall be made, however, unless detailed plans therefor shall have been timely submitted to and approved by either Landlord or Tenant, depending upon to whose building the attachment is to be made, which approval shall not be unreasonably withheld.

(c) <u>Utility Easements</u>. During the Term, upon prior notice to Landlord and subject to (i) Landlord's consent, not to be unreasonably withheld or delayed, (ii) the consent of any Mortgagee, if required and (iii) Tenant's obtaining of all necessary governmental or quasi-governmental permits and approvals therefor, Tenant shall have the right to obtain such underground, public or private utility easements as Tenant reasonably deems necessary for the benefit of the Premises, without unreasonably interfering with the use of the Common Areas by Landlord or other tenants. For the purpose of exercising the rights granted in this subparagraph 6(c), Tenant and/or the utility provider shall have the right to enter upon and use the Common Areas to install the utility systems, to such extent and so long as reasonably necessary to accomplish such purpose, subject to Landlord's prior reasonable consent as to the location of such installation, and to restoration of the Common Areas following such installation and any other reasonable conditions and requirements imposed by Landlord.

(d) <u>Common Area Easement</u>. During the Term, Landlord grants to Tenant, for the benefit of the Premises, the nonexclusive

right, privilege and easement (the "Common Area Easement") to use the Common Areas for their intended purposes and to permit Tenant and its employees, agents, subtenants, assignees, licensees, suppliers, customers and invitees to use the same, in common with Landlord, its successors, assigns, employees, agents, lessees, licensees, suppliers, customers and invitees and all other persons claiming by or through them, for the purposes (without limitation) of parking and pedestrian, service and vehicular access, ingress and egress to, from and between the Premises and the Landlord's Premises and the streets and highways abutting and adjacent to the Shopping Center, in accordance with the Site Covenants, without payment of any fee or other charge therefor.  Landlord shall have the right from time to time to promulgate reasonable rules and regulations governing the use of the Common Areas by all tenants and occupants of the Shopping Center, which Tenant shall observe so long as Tenant is given prior written notice of such rules and regulations, same are uniformly enforced as against all tenants and occupants of the Shopping Center in a non-discriminatory manner, and same do not conflict with any of Tenant's specific rights under this Lease.  It is specifically agreed that with respect to the parking spaces designated on the Site Plan as Tenant's "Customer Pick-Up", (i) Tenant shall have the right, from time to time, to relocate the same to other areas adjacent to the Improvements, but only with Landlord's prior written consent, which shall not be unreasonably withheld or delayed, and (ii) notwithstanding the fact the same are in, and constitute a part of, the "Common Areas", such

parking spaces shall to the extent of Landlord's ability be used exclusively by Tenant's customers, invitees and patrons. In addition, Tenant shall have the right to use the area designated on the Site Plan as Tenant's Staging Area for "sidewalk sales", seasonal and promotional sales and other sales customary to Tenant's business operations, subject to Tenant's obtaining any necessary consents from other tenants of the Shopping Center whose leases are in existence at the time of the execution of this Lease.

(e)   Non-Dedication.   None of the easements granted by the parties to this Lease is intended, nor shall any of them be construed, as a dedication of any portion of the Shopping Center for public use, and the parties will refrain from taking any action which would cause such a dedication and will take whatever steps may be necessary to avoid any such dedication, except as may be agreed upon in writing by the parties hereto or their respective successors or assigns.

7.   Common Areas and Common Area Maintenance.

(a)   Definition of Common Areas.   The term "Common Areas" shall be defined to include the parking areas, lanes, drives, entrances, truck passageways, sidewalks, ramps, stairways, landscaped and other unpaved areas, parking lot lighting facilities and equipment, Landlord's pylon sign(s) (but Tenant shall only be required to contribute to the costs relating to any such sign if Tenant has a panel thereon), directional, traffic and monument sign structure(s) and shared utility facilities located in the Shopping Center and intended and available for the common use of all of the

tenants within the Shopping Center (including any outparcel and other adjacent occupants which contribute toward "CAM Charges" (as defined below) and which are not responsible for separate maintenance of such outparcels or tracts), their subtenants, licensees, and business invitees. Landlord shall be responsible for operating, maintaining and repairing the Common Areas in a first-class manner, including the following, all of which work shall be referred to collectively as "Common Area Maintenance":

- Operating, maintaining, repairing, lighting, signing, cleaning, painting, striping, policing and providing personnel (including payment of salaries and overhead provided that such salaries and overhead are reasonable and competitive and are equitably allocated as to personnel whose work time is shared between the Shopping Center and other projects), security for the Common Areas and the cost of uniforms, equipment and employment taxes;

- Landscape alarm systems;

- Insurance for the Common Areas, including, without limitation, liability insurance for personal injury, death and property damage in the Common Areas, workmen's compensation insurance covering personnel, fidelity bonds for personnel, insurance against liability for defamation and claims of false arrest occurring on and about the Common Areas, and plate glass insurance for glass

exclusively serving the Common Areas (provided that Tenant shall not be responsible for payment of any amounts attributable to fire and extended coverage insurance as to the buildings occupied by Tenant (other than the cost of insurance to be carried by Tenant) or other tenants);

- Maintenance of the landscape sprinkler systems serving the Shopping Center and the Premises;

- Removal of snow, ice, trash and debris;

- Regulation of traffic;

- Inspecting and depreciation of machinery and equipment used in the operation and maintenance of the Common Areas;

- Personal property taxes and other charges incurred in connection with such equipment;

- Costs and expenses of repair or replacement of paving, curbs, walkways, landscaping, drainage, pipes, ducts, conduits and similar items and lighting facilities;

- Planting, replanting, replacing and watering flowers, shrubbery and planters;

- Providing energy to light the Common Areas and the maintenance and repair of such equipment;

- Cost of water services, if any, furnished by Landlord for the non-exclusive use of all tenants; and

(b)   <u>CAM Charges</u>.   For the purpose of this paragraph 7, the cost of Common Area Maintenance (the "CAM Charges") shall include (i) Landlord's reasonable and customary direct costs and expenses of operating and maintaining the Common Areas as described above and (ii) Landlord's overhead expenses for administering same (or in lieu thereof a management fee) in an amount not to exceed ten percent (10%) of the total of such costs (specifically excluding from such total the amounts paid by Landlord and Tenant for insurance, capital expenditures, Real Estate Taxes and utilities serving the Common Areas).   Notwithstanding the foregoing, the following shall not be included in the CAM Charges:

(1)   real estate taxes paid, and maintenance performed, on separately assessed and/or maintained outparcels or other adjacent tracts not reserved to the benefit of the Shopping Center occupants;

(2) any dues or charges for a merchants' or other association of the tenants in the Shopping Center;

(3) maintenance, repairs or replacements to the Common Areas (but no other portions of the Shopping Center) necessitated by the wrongful act of the Landlord or any other tenant, or to any buildings (including exterior walls thereof) or utility systems not part of the Common Areas;

(4) repairs or replacements to any buildings (as opposed to the Common Areas) necessitated by any governmental entity;

200706.005 (REAL)
May 21, 1996                          - 19 -

(5) amounts paid to entities related to Landlord in excess of the reasonable cost of such services in the vicinity of the Shopping Center;

(6) amounts reimbursed from insurance proceeds, under warranty or by Tenant, any other tenant in the Shopping Center or any other third party other than pursuant to a Common Area expense provision similar to this paragraph 7;

(7) repairs or replacements of a capital nature (whether or not capitalized), unless the costs of same are amortized over the entire useful life of such repairs or replacements or otherwise in accordance with generally accepted accounting principles ("GAAP") and provided that repairs or replacements are not the direct result of initial defects in materials or workmanship;

(8) reserves for anticipated future expenses;

(9) interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner;

(10) Landlord's personnel (however, including payment of salaries and overhead provided that such salaries and overhead are reasonable and competitive and are equitably allocated as to personnel whose work time is shared between the Shopping Center and other projects), overhead, home office or administrative

expenses except as set forth in subparagraph (b)(ii) above; or

(11) other maintenance expenses not considered normal and customary under generally accepted accounting principles or shopping center industry standards. CAM Charges shall be in an amount generally consistent with the costs incurred by other landlords of similar shopping centers in the Baltimore-Washington market (but not greater than as described in this paragraph 7(b)), and in all events such charges shall be obtained at reasonable and competitive rates pursuant to a proposed Common Area maintenance budget of estimated CAM Charges delivered to Tenant on or before the end of each CAM Year.

(c) <u>Tenant Payments</u>. Commencing on the Commencement Date and continuing until the expiration of the first Lease Year (which period shall be the first CAM Year), Tenant shall pay to Landlord a fee per square foot of ground-floor gross leasable area in the Building which shall be an estimate based upon the CAM Charges per square foot applicable to the Shopping Center for the preceding twelve (12) month period (excluding from such fee any charges for items not permitted to be passed through to Tenant as CAM Charges hereunder). Such fee shall be payable in equal monthly installments, as Tenant's estimated share of CAM Charges for the first (1st) Lease Year. Thereafter, the annual charge shall be computed on the basis of periods of twelve (12) consecutive cal-endar months, as designated by Landlord (each such period is a "CAM

Year"), and shall be paid by Tenant in equal monthly installments, in advance, on the first day of each month during such CAM Year. In no event shall such CAM Charges (excluding the amounts thereof attributable to insurance premiums and utilities) exceed by more than four percent (4%) those in effect during the preceding CAM Year (excluding the amounts thereof attributable to insurance premiums and utilities). For any period within the Term which is less than a full CAM Year, the annual charge shall be appropriately prorated. Within ninety (90) days after the end of the first CAM Year and each CAM Year thereafter, Landlord will furnish to Tenant a statement showing in detail (with such substantiating documentation as Tenant may reasonably request) the amount of the CAM Charges for the preceding CAM Year and the then-current number of square feet of ground-floor gross leasable area in the Shopping Center. Any necessary adjustment with respect to amounts owed by either party for such preceding CAM Year shall thereupon be made; and the monthly payments to be made by Tenant for the ensuing year shall be estimated according to the Common Area maintenance budget prepared by Landlord and delivered to Tenant. Subject to adjustments as herein contemplated, Tenant's share (such fraction being referred to herein as "Tenant's Pro Rata Share") of CAM Charges shall always be the product of the CAM Charges multiplied by a fraction, the numerator of which is the number of square feet of the ground-floor gross leasable area (excluding loading docks and any outside sales area exclusive to Tenant) in the Building and the denominator of which is the number of square feet of the

ground-floor gross leasable area (excluding loading docks and any outside sales area exclusive to a single occupant) in the Shopping Center. In determining the ground-floor gross leasable area of any building in the Shopping Center (including the Building), measurement shall be made from the centerline of any common walls and from the outside of any exterior walls. Changes in applicable floor areas shall result in corresponding adjustments of Tenant's Pro Rata Share, but in no event shall the denominator of the fraction by which Tenant's Pro Rata Share is determined be less than the 100,000 square feet unless as a result of condemnation. The remainder of CAM Charges shall be borne by Landlord and/or other tenants.

(d) <u>Examination of Landlord's Records</u>. Tenant shall have the right, from time to time, but not more often than once as to any CAM Year and no later than two (2) years after the end of such CAM Year, to examine and make copies of the records pertaining to CAM Charges for such CAM Year. Tenant's right of examination shall be exercised during reasonable business hours at Landlord's principal records office on reasonable prior notice to Landlord. If such examination shall disclose any overcharge by Landlord, Landlord shall promptly reimburse Tenant for any overpayment of Tenant's Pro Rata Share of CAM Charges; and if such overpayment by Tenant is in excess of five percent (5%) of the actual Tenant's Pro Rata Share of CAM Charges, Landlord shall reimburse Tenant for the reasonable cost of such examination or audit. Tenant shall

promptly reimburse Landlord for any underpayment disclosed by such examination.

8.    Signs and Communications Equipment.

(a)    Signs.  So long as the existing sign advertising the Shopping Center (as shown on the Site Plan) is not enlarged or otherwise changed to permit additional tenant panels, Tenant shall not have the right to install its panel on the existing sign structure.  If the existing sign structure is enlarged or otherwise changed or a pylon sign is erected so as to permit additional tenant panels thereon, Tenant shall have the right to install its sign panel on such sign, of a size similar in size to other major tenants and in a location mutually approved by Landlord and Tenant. Tenant shall have the right to install on any future pylon sign structure, in or on property now or hereafter acquired by Landlord adjacent to, the Shopping Center, in the second tenant position, doublesided "face panels" and a "readerboard" identifying Tenant's store, which face panels and readerboard shall be constructed and installed at Tenant's sole cost and expense.  Attached as a portion of Exhibit "E" are plans and specifications for Tenant's current prototypical face panels and for Tenant's building signage, which Landlord hereby approves upon its execution of this Lease, but Tenant's ability to install such signage remains subject to Tenant's receipt of any necessary governmental approvals and permits.  Notwithstanding the foregoing, Tenant shall be entitled without Landlord's consent, but subject to governmental requirements, as aforesaid, to replace any and all of its signs

with signage consistent with Tenant's then-current prototypical sign plans but only in locations previously approved or in another location approved by Landlord, such approval not to be unreasonably withheld.   At the expiration of the term of this Lease, Tenant shall remove all of its signage, at Tenant's sole cost and expense. In the event of an assignment or subletting as a result of which Tenant is no longer occupying any portion of the Premises, Tenant's building signs may be replaced by building signs identifying the permitted assignee or subtenant(s), provided that as to any assignee, the specific design of such signage shall be subject to Landlord's consent, which consent shall not be unreasonably withheld, conditioned or delayed and, as to any subtenant, the specific design, location and size of such signage shall be subject to Landlord's consent.   Any permitted assignee or subtenant operating in all or substantially all of the Premises shall also be entitled to install its panel on any pylon sign structure on which Tenant had previously installed its panel in the same panel position.   Any subtenant of less than substantially all of the Premises shall not be permitted to install its panel on any pylon sign structure, unless Landlord agrees otherwise.

      (b)   Communications Equipment.   Subject to applicable governmental requirements and the obtaining of any necessary permits, Tenant may, from time to time, install, maintain and/or replace any satellite dishes or antennas on the roof and/or exterior walls or parapet of the Building as Tenant deems necessary or desirable, provided same shall not adversely and materially

affect the roof or the structural elements thereof. At the expiration of the term of this Lease, Tenant shall, upon Landlord's request, remove any such satellite dishes or antennas, at Tenant's sole cost. Upon removal by Tenant of any satellite dishes or antennas, Tenant shall repair any damage done in connection with such removal. The initial and any future location of any satellite dishes or antennas shall be subject to Landlord's prior approval, which approval shall not be unreasonably withheld, conditioned or delayed.

9.   Taxes.

(a)   Taxes Contemplated Hereunder. The term "Real Estate Taxes" shall mean all general real estate taxes and assessments and other ad valorem taxes, rates and levies paid upon or with respect to the Shopping Center, including the Premises, for a calendar year or a portion thereof to any governmental agency or authority and all charges specifically imposed in lieu of any such taxes. Nothing contained in this Lease shall require Tenant to pay any local, county, municipal, state or federal income, franchise, corporate, estate, inheritance, succession, capital levy, business or transfer tax of Landlord, or any local, county, municipal, state or federal income, profits, gross receipts or sales or renewal tax. Any tax or charge upon the rent or other charges payable by Tenant under this Lease shall be included in Real Estate Taxes.

(b)   Payment of Real Estate Taxes. At such intervals as Landlord is required to pay the Real Estate Taxes, Tenant shall pay Tenant's Pro Rata Share of Real Estate Taxes (calculated in the

same manner as Tenant's Pro Rata Share of CAM Charges in paragraph 7(c)) levied against the tax parcel or parcels comprising the Shopping Center (the "Tax Parcel"). Tenant's Pro Rata Share of Real Estate Taxes shall be net of any early-payment discounts received by Landlord. Tenant shall pay Tenant's Pro Rata Share of Real Estate Taxes within thirty (30) days after Tenant's receipt of Landlord's statement therefor, accompanied by the tax bill on the basis of which such statement is rendered. Notwithstanding the foregoing, upon Landlord's prior written request and only if required by Landlord's Mortgagee, Tenant shall pay Tenant's Pro Rata Share of Real Estate Taxes in monthly installments into an escrow account established with such Mortgagee. Landlord shall pay, or cause the payment of, all Real Estate Taxes before any fine, penalty, interest or cost may be added thereto, become due or be imposed by operation of law for the nonpayment or late payment thereof. In no event shall Tenant be liable for any penalty incurred as a result of late payment by another tenant or by Landlord. Real Estate Taxes shall be prorated as of the Commencement Date and the expiration or earlier termination of this Lease, and Landlord shall promptly return to Tenant any overpayment made by Tenant not attributable to the period of Tenant's possession of the Premises. Landlord shall remain primarily responsible for such payment notwithstanding the fact that such payment may be made by a tenant of Landlord's Premises or other third party pursuant to an agreement to which Tenant is not a party. In addition, should Landlord fail to pay such Real Estate

Taxes before same become delinquent, Tenant shall have the right, at its election, to cure such failure by payment of delinquent Real Estate Taxes and any interest and penalties due thereon and in such event Tenant may deduct the cost thereof, plus interest at the lesser of fifteen percent (15%) per annum or the highest rate permitted by State law (the "Default Rate"), from the next install-ment(s) of Base Rent and other charges due hereunder.

(c)  <u>Contest of Real Estate Taxes   and/or   Assessed Valuation of Property</u>.  Provided the tenants or occupants of at least fifty percent (50%) of the gross leasable square footage of the Shopping Center (including the Premises) authorize Tenant to contest Real Estate Taxes (and with Landlord's lender's approval), Tenant shall have the right to contest unless Landlord elects to contest after twenty (20) days written notice, the amount or vali-dity, or otherwise seek an exemption or abatement, of any Real Estate Taxes or to seek a reduction in the valuation of the Premises assessed for Real Estate Tax purposes, by appropriate proceedings diligently conducted in good faith, provided that Tenant shall first have notified Landlord of its intent to do so and Landlord shall have failed to notify Tenant in writing, within five (5) days of receipt of Tenant's notice, that Landlord intends to contest such Real Estate Taxes or seek such a reduction.  In any instance where any such action or proceeding is being undertaken by Tenant, Landlord shall cooperate with Tenant, execute any and all documents required in connection therewith and, if required by any

law, rule or regulation of the taxing authority, shall join with Tenant in the prosecution thereof, at no expense to Landlord.

(d)   Payment During Appeal.   Notwithstanding the pendency of the proceedings set forth in subparagraph (c) above, Tenant shall continue to pay Tenant's Pro Rata Share of such Real Estate Taxes.   Tenant shall be entitled to a refund of the net amount of any overpayment of Real Estate Taxes relating or allocable to the Premises, after reimbursement to the appropriate parties of all costs, fees and expenses incurred in such protest or reassessment.

10.   Maintenance, Repairs and Replacements.   Except (i) for obligations arising from the negligent acts or omissions or willful misconduct of Landlord (or its agents, employees, contractors or other tenants), which have not been waived by Tenant pursuant to subparagraph (g) of Paragraph 14, or (ii) as otherwise set forth in this Lease, during the Main Term, Tenant shall be solely responsible for maintenance of the exterior and interior elements of the Building, whether structural or non-structural, including, but not limited to, repairs and/or replacements to the roof, roof structure, flooring system, floor slab, foundation, load-bearing walls and exterior structural walls, and plumbing, heating, electrical and air conditioning systems which serve only the Premises.   During the last two (2) years of any Option Period, Tenant shall be obligated to so install or construct alterations or incur expenditures pursuant to this paragraph; provided, however, that if Tenant is required to expend any sum in satisfaction of its obligations hereunder, and if the resulting improvement to the

Improvements cannot be fully amortized in accordance with generally accepted accounting principles, or the Internal Revenue Code and Regulations, over the remainder of such Option Period, then Tenant (unless such cost results from Tenant's neglect or failure to properly maintain in which event Tenant shall be responsible for the cost thereof) shall be reimbursed by Landlord for that amount of the cost associated with such repairs, construction or alteration for the period beyond the remainder of such Option Period. During the Option Periods, Tenant shall not be responsible for maintenance, repair and/or replacement of the structural elements of the Premises other than the roof and roof structure, which Tenant shall continue to be obligated to maintain. During the Option Periods, Landlord shall maintain all structural elements of the Premises (whether or not same serve only the Premises), including, without limitation, the flooring system, floor slab, foundation, load bearing walls and exterior structural walls, but excluding the roof and roof structure. Except as aforesaid, Landlord shall have no other responsibility for maintenance, repair or replacements to the Premises or any part thereof; provided, however, this provision is in no way intended to limit Landlord's obligation to maintain, repair and replace any and all elements, both structural and non-structural, of the Common Areas pursuant to the terms of this Lease. In addition to the Landlord's maintenance and repair obligations set forth herein and otherwise set forth in this Lease, Landlord agrees to maintain the Other Improvements immediately surrounding the Building, including sidewalks and

landscaping.  Should either party fail to perform its obligations under this paragraph 10, the other party may, at its option, effect such maintenance, replacements or repairs, provided that such curing party shall have given the nonperforming party thirty (30) days' prior written notice, except in the case of emergencies (in which event only such notice as may be reasonable under the circumstances shall be required); but further provided that such thirty (30) day period (or reasonable period in event of emergencies) shall be extended in respect of any cure that cannot with reasonable diligence be accomplished within such period so long as the party required to effect such cure has commenced such cure within such thirty (30) day period (or reasonable period in event of emergencies) and thereafter diligently prosecutes such cure to completion.  The nonperforming party shall reimburse the other party on demand for the reasonable and actual amount so expended (as evidenced by detailed invoice), plus interest at the Default Rate.  However, in the event of emergency repairs, no interest shall accrue if reimbursed within thirty (30) days of request (including detailed invoice) for reimbursement.  All maintenance, repairs or replacements shall be done by Tenant or Landlord lien-free and in a good and workmanlike manner consistent with the quality of labor and materials used in originally constructing the Improvements and in accordance with all applicable law.  In order for Landlord and Tenant to effectively perform their maintenance, repair and replacement obligations hereunder, Tenant and Landlord, as applicable, shall assign to the other party any

200706.005 (REAL)
May 21, 1996                          - 31 -