and all manufacturers' and contractors' warranties relating to such work performed on behalf of the other party to the party who is required to maintain same under the Lease and Tenant shall permit Landlord to have reasonable access to the portions of the Premises necessary in order for Landlord to undertake the repairs required of it pursuant to this Paragraph.

11. <u>Payment of Utility Bills</u>.  Tenant will pay directly to the appropriate utility company or governmental agency, when due, all bills for gas, sanitary sewer, electricity, telephone and other public or private utilities and any other energy from any source used by Tenant with regard to the Improvements.  Landlord shall pay when due all utility charges incurred in the operation of the Common Areas and the Shopping Center.  Water charges shall be billed pro rata as part of CAM Charges.

12. <u>Alterations</u>.  During the Term, Tenant shall have the right, at its discretion and its sole cost, without Landlord's consent, to make (i) any alterations or modifications necessary or desirable in order to bring the Premises into conformity with Circuit City's then-current prototype for similarly sized stores <u>provided</u> <u>that</u> no changes shall be made which are materially inconsistent with the then-existing architecture of the Shopping Center or to the footprint of the Building or a material change in any sign or the location thereof without Landlord's prior written consent, which shall not be unreasonably withheld, except as to any expansion or increase in the footprint or height over Tenant's initial construction which Landlord may approve in its discretion,

and (ii) any interior nonstructural alterations or modifications it may desire.   With Landlord's consent, which shall not be unreasonably withheld, conditioned or delayed, Tenant shall have the right, at its sole cost, to otherwise alter, modify or reconstruct the exterior and/or structure of the Building or Other Improvements.   Tenant shall cause all such alterations to be lien-free (in accordance with paragraph 13) and made and completed at Tenant's cost in a workmanlike manner and in compliance with all applicable law.   Should Landlord's consent be required, conceptual plans and specifications for such work shall be provided to Landlord prior to commencement of any such work.   Landlord shall be deemed to have consented to such work if written notice of disapproval, with reasons specified, is not received by Tenant within thirty (30) days following Tenant's delivery of such plans and specifications to Landlord.   Without cost or expense to Landlord, Landlord shall cooperate with Tenant in the obtaining of any and all licenses, building permits, certificates of occupancy or other governmental approvals which may be required in connection with any such modifications or alterations, and Landlord shall execute, acknowledge and deliver any documents reasonably required in furtherance of such purposes.

    13.   <u>Mechanics' Liens</u>.   Landlord and Tenant covenant to each other that they will not permit any lien to be filed against the Premises or the Shopping Center as a result of nonpayment for, or disputes with respect to, labor or materials furnished to the Premises or the Shopping Center for or on behalf of Tenant, Land-

lord or any party claiming by, through, or under Tenant or Land-lord, nor shall either party permit any judgment, lien or attachment to lie, as applicable, against the Premises or the Shopping Center.  Should any lien of any nature, including but not limited to the foregoing, be filed against the Premises or Shopping Center, the party on account of whose actions such lien has been filed shall, within thirty (30) days after receipt of written notice of such lien, cause said lien to be removed, or otherwise protected against execution during good faith contest, by substitution of collateral, posting a bond therefor, escrowing of adequate funds to cover the claim and related transaction costs or such other method as may be permissible under applicable title insurance regulations and reasonably acceptable to the other party hereto.

14. _Insurance_.

(a)  _Property Damage_.  During the Construction Term, Tenant shall keep or require its general contractor to keep, in full force and effect, a policy of builder's risk insurance covering loss or damage to the Improvements for the full replacement value of all such construction.  During the Main Term and all Option Periods, Tenant shall keep in full force and effect a policy of fire and extended coverage insurance covering loss or damage to the Premises in the amount of the full replacement value of the Building, exclusive of excavation, footings and foundations, with an agreed-value endorsement and a commercially reasonable deductible, for which Tenant shall be fully responsible.  Landlord and Landlord's first "Mortgagee" (as defined in paragraph 21

below), shall be named in such policy or policies as their respective interests may appear. Landlord shall not construct, or permit to be constructed, any improvement in the Shopping Center, nor conduct any activity, or permit the conduct of any activity, in the Shopping Center which will prevent Tenant from being able to obtain insurance coverage at commercially reasonable rates, including, without limitation, a fully-sprinklered fire insurance rate. Should Landlord cause or permit any insurance rate increase to occur, Landlord will reimburse Tenant for the additional premium required, subject to Tenant's right to self-insure (in which event Landlord will contribute to Tenant's self insurance fund to cover increased actuarial risks).

(b) <u>Liability Insurance</u>. During the Term, Tenant shall keep in full force a policy of commercial general liability insurance with bodily injury and property damage coverage with respect to the Premises and business operated by Tenant, which shall name Landlord, Landlord's managing agent, and Landlord's first Mortgagee as additional insureds. The limits of such commercial general liability policy shall be not less than $2,000,000.00 combined single limit for bodily injury and property damage, with a commercially reasonable deductible.

(c) <u>Workers' Compensation Insurance.</u> To the extent required by law, Landlord and Tenant shall maintain workers' compensation insurance covering their respective employees in statutory limits, or maintain such alternate coverages or arrangements as legally permissible.

200706.005 (REAL)
May 21, 1996

(d)  <u>Self-Insurance</u>.  Notwithstanding anything to the contrary contained herein, Tenant shall have the right to self-insure against any of the risks or portions thereof set forth in subparagraphs (a) and (b) (and to the extent then permitted by law, (c)) above pursuant to an established self-insurance program, provided Tenant is then occupying the Premises and has a reported net worth, as of the end of Tenant's most recent quarterly reporting period, of not less than Seventy-Five Million Dollars ($75,000,000), as computed in accordance with generally accepted accounting principles, consistently applied, as determinable from Tenant's public disclosures and/or regularly maintained corporate balance sheets which are generally available to shareholders (no right of Landlord to audit or conduct independent investigations being implied by this provision).

(e)  <u>Common Area, Additional Area and Third Party Tenant Insurance and Insurance During Landlord's Construction.</u>  During the Term, Landlord shall keep in full force and effect, in form reasonably acceptable to Tenant (an insurer with a Best's rating of A-VII or higher shall be deemed acceptable), policies of (1) commercial general liability insurance, and (2) fire and extended coverage insurance, with respect to the Common Areas and with respect to all other areas of the Shopping Center over which Landlord from time to time has present possessory rights (or has the right under any lease to provide insurance coverage because of a tenant's failure to maintain such required coverage) excluding areas insured by other tenants or vacant space but which do not

constitute a portion of the Common Areas (such areas here sometimes collectively referred to as the "Additional Areas"). The Additional Areas shall include, without limitation: (i) constructed but unoccupied portions of the Shopping Center, (ii) vacated or otherwise uninsured tenant space, whether by reason of lease expiration, default or otherwise, and (iii) constructed and occupied portions of the Shopping Center. The liability insurance policies required to be maintained by Landlord pursuant to (1) above shall name Tenant as an additional insured to the fullest extent Tenant shall have insurable interests. The limits of such policies shall be the same as those set forth in subparagraphs (a) and (b) above, as applicable. The cost of the premiums for coverages relating to Common Areas shall be an element of CAM Charges, provided that Tenant shall not be liable for its pro rata share of any premium for coverage in excess of that coverage which is customary among owners of like shopping centers in the Baltimore-Washington area. Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center, including the Additional Areas and areas leased to third party tenants, are insured with substantially similar coverages to those required for the Premises and the Common Areas, such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever Tenant may be assured that the Shopping Center will (subject to the requirements and approval of any Mortgagee) be reconstructed in equal or superior condition within the time frame set forth in paragraph 15. During any period in

200706.005 (REAL)
May 21, 1996                    - 37 -

which Landlord is conducting construction activities at the
Shopping Center, Landlord shall keep, or cause its general
contractor to keep, in full force and effect, with regard to the
Shopping Center, in form reasonably acceptable to Tenant, at least
the minimum insurance coverages set forth below:

1)   Workers' Compensation - Statutory Limits;
     Employers Liability - $500,000;

2)   Automotive Liability for all vehicles with limits of
     $2,000,000; and

3)   Commercial General Liability to include premises
     operations and products/completed operations coverage
     with limits of $2,000,000.

Additionally, Landlord shall keep or require its general contractor
to keep in full force and effect a policy of builder's risk
insurance covering loss or damage to the Shopping Center for the
full replacement value of all such construction exclusive of
footings and foundations.  To the fullest extent Tenant has an
insurable interest, such liability policy shall name Tenant an
additional insured and such builder's risk policy shall name Tenant
a loss payee.

(f)  Policy Provisions. All policies of insurance (other
than self-insurance) enumerated above shall be provided by insur-
ance carriers with a Best rating of not less than A-VII.  Any
insurance coverage enumerated above may be effected by a blanket
policy or policies of insurance or under so-called "all risk" or
"multi-peril" insurance policies, provided that the total amount of
insurance available with respect to the Premises and Tenant's or
Landlord's liability hereunder shall be at least the equivalent of

separate policies in the amounts herein required, and provided further that in other respects any such policy or policies shall comply with the provisions of this paragraph 14. Landlord shall not be entitled to self-insure against any of the risks recited herein, except the amount of any commercially reasonable deductible shall be deemed to be self-insurance. An increased coverage or "umbrella" policy may be provided and utilized by either party to increase the coverage provided by individual or blanket policies in lower amounts, and the aggregate coverage provided by all such policies with respect to the Premises and Tenant's or Landlord's liability hereunder shall be satisfactory provided that such policies otherwise comply with the provisions of this paragraph 14.

(g)  Waiver of Right of Recovery and Subrogation. To the extent that insurance proceeds are recoverable in satisfaction of a loss which is required to be covered by insurance or in the event of a loss which is self-insured hereunder (with the deductible under any policy being deemed to be self-insured), Landlord and Tenant hereby waive any and all rights of recovery against each other for any loss or damage to the Premises or the contents contained therein, for loss of income on account of fire or other casualty, or for injury sustained on the Premises or the Common Areas; and each party's aforesaid policies of insurance shall contain appropriate provisions recognizing this mutual release and waiving all rights of subrogation by the respective insurance carriers.

(h)   _Evidence of Insurance_.   Subject to Tenant's right to self-insure hereunder,  upon (i) commencement of the Main Term (as to property insurance), (ii) upon delivery of the Land (as to liability insurance) and (iii) no less than annually thereafter, Tenant and Landlord shall cause to be issued to each other in lieu of the original  policy,  a  duplicate  of  such  policy  or  appropriate certificates of insurance reasonably acceptable to the other party and  evidencing  compliance  with  the  applicable  covenants  of  this paragraph 14.  Each such certificate shall provide that no expiration, cancellation or material change in the insurance evidenced thereby shall  be  effective  unless  thirty  (30)  days'  unconditional notice  of  such  expiration,  cancellation  or  material  change  shall have  been  given  to  the  certificate-holder  (and  any  Mortgagee,  if applicable).

(i)   _Indemnities_.   Except  if  arising  from  the  gross negligent or willful acts of Landlord or its agents or employees (to  the  extent  that  paragraph  14(g)  is  inapplicable  thereto), Tenant  hereby  agrees  to  indemnify,  defend  and  hold  Landlord harmless  from  all  claims,  costs,  liability,  damage  or  expense, including  reasonable  attorneys'  fees,  for  any  death,  damage  or injury  to  persons  or  property  occurring  on  the  Premises  or resulting  from  Tenant's  use  thereof  or  on  the  Common  Areas  if caused by Tenant, its agents or contractors.

Except if arising from the negligent or willful acts of Tenant or its  agents  or  employees  (to  the  extent  that  paragraph  14(g)  is inapplicable  thereto),  Landlord  agrees  to  indemnify,  defend  and

hold Tenant harmless from any and all claims, costs, liability, damage or expense, including reasonable attorneys' fees, for any death, damage or injury to persons or property occurring in, on or around the Shopping Center, exclusive of the Premises, or other buildings within Landlord's Premises or resulting from the use thereof by Landlord, its agents or employees or occurring on the Premises, if caused by Landlord, its agents, employees or contractors.

15.   <u>Damages by Fire or Other Casualty</u>.

(a)   <u>During the First Fifteen (15) Lease Years</u>.   In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Improvements, Common Areas and/or Additional Areas during the first fifteen (15) Lease Years, this Lease shall not terminate except as expressly set forth herein, and Base Rent and other charges shall continue to be paid by Tenant pursuant to the terms of paragraph 4 hereof.   Within a reasonable time after such casualty, subject to force majeure, applicable building codes, the procurement of building permits and the receipt of insurance proceeds (unless self-insured) to the extent of the damage to the Premises, or the Common Areas or Additional Areas, as applicable, Tenant shall complete reconstruction of the Building and Other Improvements, and Landlord shall complete reconstruction of the Common Areas and Additional Areas (including substantially equivalent value in equipment, furniture and fixtures), to that condition existing immediately prior to such casualty, in the reconstructing party's reasonable discretion, with, in event of any

Tenant reconstruction, such alterations as may be permitted under paragraph 12 hereof. In the event, subject to force majeure, the Premises, Common Areas and/or Additional Areas, as applicable, are not substantially repaired and reconstructed, and equipment, furniture and fixtures restored or replaced, by the party with repair and restoration obligations within two hundred forty (240) days after receipt of any required governmental permits, for which permits the party with repair obligations shall make prompt application following such destruction or damage, and receipt of insurance proceeds (if not self-insured), then the other party, at its option, by giving written notice to the party with repair obligations, within thirty (30) days after the expiration of said period, may undertake completion of such reconstruction, in which event the party with repair obligations shall make available to the notifying party all applicable insurance proceeds for such reconstruction (including any applicable deductible) or, if self-insured, the amount necessary for such reconstruction. Notwith-standing the foregoing, in the event of a casualty which is not required to be insured (or self-insured) and is not insured against hereunder causing damage to Premises which has a repair and reconstruction cost of more than twenty percent (20%) of the then total replacement cost of the Premises during the first fifteen (15) years, Tenant shall have the option of terminating this Lease. Tenant shall notify Landlord of its exercise of such option within sixty (60) days following the occurrence of such casualty.

(i) <u>Application of Funds</u>.  All insurance (or self-insurance) proceeds received on account of such damage or destruction, less the cost, if any, of such recovery, shall be applied pursuant to the terms of this Lease to the payment of the cost of such restoration, repair, replacement, rebuilding, or alteration (the "Work"), including expenditures made for temporary repairs or for the protection of property pending the completion of permanent restoration (it being understood that the Subordination Non-Disturbance and Attornment Agreement among Landlord, Tenant and Landlord's Mortgagee governs the application of insurance proceeds), repair, replacement, rebuilding, or alteration, and, if required by any Mortgagee of either party as to such party's insurance proceeds, shall be held by a third-party escrow agent which is acceptable to the other party, such approval not to be unreasonably withheld (it being agreed Mercantile Bank & Trust Company of Baltimore is acceptable) (which is, for these purposes, the "Escrow Agent"), in an interest-bearing account in a federally insured financial institution or institutions such that all funds are deposit insured (or otherwise assured in a manner acceptable to the parties), to be paid out, as provided below, from time to time (but no more often than once monthly), as the Work progresses, upon Tenant's written request in event of work by Tenant, or Landlord's written request in event of work by Landlord, accompanied by a certificate of the architect or engineer in charge of the Work (the "Certificate"), dated not more than seven (7) days prior to such request, stating that the sum then requested either has been paid

by Tenant or Landlord, as applicable, or is justly due to the named contractors, subcontractors, materialmen, engineers, architects, or other persons (whose addresses shall also be stated) who have rendered services or furnished materials for certain portions of the Work.  The Certificate shall give a brief description of such services and materials, shall list the several amounts so paid or owing to each of such persons, shall state the cost of the Work at the date of the requisition, and shall state that no part of such expenditures has been or is being made the basis for any other request for payment.  The Certificate shall state also that, except for the amounts listed therein, there is no outstanding indebtedness known to such architect or engineer, after due inquiry, for labor, wages, materials, supplies, or services in connection with the Work which, if unpaid, might become the basis of a vendor's, mechanic's, laborer's, materialman's, or similar lien upon the Work or upon the Premises or any part thereof.

(ii) _Disbursement_.  Upon compliance with the foregoing provisions of paragraph 15(a)(i), the Escrow Agent shall pay, out of the escrowed funds, to the persons named in the Certificate the respective amounts stated to be due to them or shall pay to Tenant, in the event of Tenant work, or Landlord, in the event of Landlord work, the amount stated to have been paid by Tenant or Landlord, as applicable; provided, however, that such payments shall not exceed in amount the cost of the relevant Work as stated in the Certifi-cate.  If the insurance proceeds or reconstruction funds paid by Tenant or Landlord, as applicable, to the Escrow Agent exceed the

amount required to pay the total cost of the Work, the party paying such amount to the Escrow Agent, as applicable, after payment of all costs of the Work, shall be entitled to receive or retain, as applicable, such excess.

    (b)  <u>After the First Fifteen (15) Lease Years</u>. In the event of an insured (or self-insured) fire, earthquake or other casualty, causing destruction or damage to the Improvements after the first fifteen (15) Lease Years, which has a repair and reconstruction cost of forty percent (40%) or more of the then-total reconstruction cost of the Improvements or in the event of such damage to the Shopping Center that less than 100,000 square feet of leasable area within the Shopping Center will remain after any restoration which Landlord agrees to undertake, or in the event of any casualty which is not required to be insured (or self-insured) and is not insured against hereunder causing damage to the Premises which has a repair and reconstruction cost of more than twenty-five percent (25%) of the then total replacement cost of the Premises, Tenant shall have the option of terminating this Lease. Tenant shall notify Landlord of its exercise of such option within sixty (60) days following the occurrence of such casualty and, in the case of an insured (or self-insured) casualty, shall thereupon make available to Landlord all insurance proceeds or reconstruction costs as set forth in subparagraph (a) above. In the event Tenant does not have the right to terminate this Lease as aforesaid or, having such right, does not elect to terminate this Lease as set forth above, then, subject to force majeure, within two hundred

forty (240) days after receipt by Tenant of the required governmental permits for restoration, for which permits Tenant shall make prompt application following such destruction or damage, and insurance proceeds (if not self-insured) with regard to such damage or destruction, Tenant shall complete reconstruction of the Improvements to their condition existing immediately prior to such damage, in Tenant's reasonable discretion, with such alterations as may be permitted under paragraph 12, and shall restore the Premises (including equipment, furniture and fixtures). Should this Lease remain in full force and effect, Landlord shall reconstruct all Common Areas to the extent of available insurance proceeds including any deductible in the manner specified by subparagraph (a) above to the extent reasonably practicable. Additionally, Landlord shall use prudent efforts (through parallel lease provisions or otherwise) to provide that all areas of the Shopping Center leased to third party tenants are subject to substantially similar reconstruction obligations to those of the Premises, Common Areas and Additional Areas, such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever, in the event this Lease remains in force, Tenant shall be assured that to the extent reasonably practicable a whole Shopping Center will be reconstructed in accordance with this paragraph 15, subject to governmental requirements.

(c) <u>Last Two (2) Years of Main Term or Option Period</u>. Notwithstanding the foregoing, if any such damage or destruction occurs within the last two (2) years of the Main Term or of any

Option Period and has a material impact on Tenant's ability to conduct business, as reasonably determined by Tenant, Tenant shall be under no obligation to restore the Improvements, in which case this Lease shall terminate at Tenant's option, such option to be exercised by Tenant giving not less than sixty (60) days' prior written notice to Landlord, and Landlord shall receive the proceeds of any insurance (together with any applicable deductible) which may be payable with regard to such destruction or damage or, in the event Tenant self-insures, the amount necessary for reconstruction of the Improvements.

16.   <u>Condemnation</u>.

(a)   <u>Definition of Taking and Substantial Taking</u>.   For the purpose of this Lease, a "Taking" shall mean any condemnation or exercise of the power of eminent domain by any authority vested with such power or any other taking for public use, including a private purchase in lieu of condemnation by an authority vested with the power of eminent domain; the "Date of Taking" shall mean the earlier of the date upon which title to the Premises, the Shopping Center or any portion thereof so taken is vested in the condemning authority or the date upon which possession of the Premises, the Shopping Center, or any portion thereof is taken by the condemning authority; and "Substantially All of the Premises" shall mean (i) so much of the Improvements and/or Shopping Center and Common Areas as, when taken, leaves the untaken portion unsuitable, in Tenant's reasonable opinion, for the continued feasible and economic operation of the Premises by Tenant for the

same purposes as immediately prior to such Taking or as contemplated herein, (ii) so many of the parking spaces within the Shopping Center as reduces the parking ratio below the greater of four (4) spaces per 1000 square feet of ground-floor gross leasable area or that ratio which is required by the zoning ordinance applicable to the Shopping Center, and Landlord's failure to provide substantially equivalent alternative parking reasonably acceptable to Tenant within sixty (60) days after such Taking, or (iii) so much of the Common Area Easement described in paragraph 6(d) above that access to the Premises is impeded.

    (b)  <u>Tenant's Rights Upon Taking or Substantial Taking</u>. In the event of a Taking of Substantially All of the Premises, Tenant, at its option upon sixty (60) days' written notice to Landlord, which shall be given no later than sixty (60) days following the Taking, shall have the right to terminate this Lease. All Base Rent and other sums payable by Tenant hereunder shall be apportioned and paid through and including the Date of Taking, and neither Landlord nor Tenant shall have any rights in any compensation or damages payable to the other in connection with such Taking.

    (c)  <u>Tenant's Rights Upon Less Than Substantial Taking</u>. In the event of a Taking of less than Substantially All of the Premises, Base Rent and other charges shall be reduced equitably in accordance with the portion condemned or taken, effective as of the Date of Taking, and Tenant shall make all necessary restorations to the Improvements so that the portions of the Improvements not taken

constitute a complete architectural unit, provided that the cost thereof to Tenant shall not exceed the proceeds of Tenant's condemnation award (to the extent that such relates to the Improvements and not to Tenant's personal property, intangibles or out-of-pocket expenses unrelated thereto) and the portion of Landlord's award allocable to the Premises, which Landlord shall make available to Tenant for such restoration. If required by a Mortgagee of either party, such awards to such party shall be escrowed and disbursed in accordance with the procedure set forth in paragraph 15(a) above or in accordance with disbursement procedures of such Mortgagee. If the Taking occurs within the last two (2) years of the Main Term or of any Option Period and has a material impact on Tenant's ability to conduct business as reasonably determined by Tenant, this Lease shall terminate at Tenant's option, such option to be exercised by Tenant giving not less than sixty (60) days' prior written notice to Landlord.

(d) <u>Landlord's Obligations Upon Any Taking</u>. In the event of any Taking following which the Lease continues in effect, to the extent of available proceeds, Landlord shall make all necessary restorations to all portions of the Common Areas and Additional Areas such that they each constitute a complete architectural unit and serve the function originally intended. Additionally, to the extent of Landlord's receipt of condemnation awards, Landlord shall use prudent efforts to assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center leased to third party tenants are subject to

substantially similar reconstruction obligations to those of the Premises, Common Areas and Additional Areas, such that in the event of any condemnation of any portion of the Shopping Center whatsoever, and in the event Tenant elects to maintain this Lease in force, Tenant shall be assured that the Shopping Center will be reconstructed to its former condition within reasonable time subject to the rights of any Mortgagee.

(e)  Rights Upon Temporary Taking.  In the event of a Taking of the Premises, the Common Areas and/or any other area within the Shopping Center, or any portion thereof, for temporary use (specifically one not exceeding 60 days in duration), without the taking of the fee simple title thereto, this Lease shall remain in full force and effect.  All awards, damages, compensation and proceeds payable by the condemnor by reason of such Taking relating to the Premises, for periods prior to the expiration of the Lease shall be payable to Tenant.  All such awards, damages, compensation and proceeds for periods after the expiration of the Lease shall be payable to Landlord.  Anything contained herein to the contrary notwithstanding, a temporary Taking for any period in excess of sixty (60) days may, at Tenant's option, be deemed a permanent Taking and shall be governed by subparagraph (b) or (c) above, as applicable.

(f)  Taking of the Pylon Sign(s).  In the event of a taking, whether permanent or temporary, of any pylon or monument sign (as contemplated by paragraph 8) on which Tenant has installed identification panels, Landlord shall, subject to governmental

approvals, provide a substitute site (reasonably acceptable to Tenant) therefor, with adequate electrical power, located so as to be visible to vehicular traffic or roadways adjacent to the Shopping Center and/or at entrances to the Shopping Center, and Landlord shall replace and/or rebuild any of such signage so taken to the extent not covered by a condemnation award, the cost thereof may be included in CAM.

(g)   <u>Tenant's Right Upon Condemnation</u>.   In the event of a Taking described in subparagraph (b) or (c) above, Tenant shall be entitled to pursue a separate claim for compensation from the condemning authority for its unamortized costs in constructing and/or renovating the Building and other Improvements, its unamortized leasehold improvements, relocation expenses and any other items to which Tenant is entitled under applicable law, <u>provided</u> <u>that</u> Tenant shall not be entitled to the leasehold value of the Premises.

17.   <u>Assignment and Subletting</u>.

(a)   Tenant shall have the right to sublet, assign, transfer and reassign (a "Transfer") all or any part of the Premises and any of Tenant's rights and obligations under this Lease during the Term, <u>provided</u> <u>that</u>, except as otherwise provided below, Tenant first obtains Landlord's prior written consent, which shall not be unreasonably withheld, delayed or conditioned.   Tenant may also grant licenses or concessions (or subleases in the nature of same which are integrated in Tenant's store operations) without the consent of Landlord.   In the event of a Transfer, Tenant shall

remain liable for all of Tenant's obligations to Landlord arising hereunder; <u>provided</u> <u>that</u> if this Lease is changed, modified or amended in any respect by Landlord and any transferee following any such Transfer, Tenant shall not be responsible for any additional obligations undertaken by the transferee.   Any transfers to subsidiaries, affiliates, sale-leaseback parties, corporations into which or with which Tenant has merged or consolidated, or any parent or successor corporation of Tenant, following which the Premises continues to be operated as a "Circuit City" store or a store under such trade name as the majority of the Circuit City stores (excluding stores containing less than 5,000 square feet of space) in the State of Maryland are then being operated; transfers involving a controlling ownership interests in Tenant; and transfers to a purchaser of six (6) or more of Tenant's stores in the State of Maryland in connection with the sale of all or substantially all of Tenant's operating assets in that State, shall not be deemed a "Transfer" hereunder and same may be effected without Landlord's knowledge or consent (but Tenant shall notify Landlord of such transfer within a reasonable time thereafter) and without any right on the part of Landlord to terminate or recapture this Lease as provided below.

(b)   Landlord further agrees that it will not withhold its consent to any Transfer hereunder if the transferee meets the following criteria:

(i)  the transferee is a national or regional operator of a chain of at least twenty-five (25) stores; and

(ii) the transferee has a minimum net worth, exclusive of the value of the interest in the Premises being purchased or leased from Tenant, of $25 million.

Any proposed Transfer to a transferee who does not meet the criteria in (i) and (ii) above shall be subject to Landlord's termination or recapture right as provided below.

(c) In the event of any proposed Transfer, Tenant shall give written notice to Landlord either evidencing that the proposed Transfer is exempted from Landlord's consent pursuant to either subparagraph (a) above in subparagraph (b) below or identifying the proposed transferee, any information necessary to establish the satisfaction of the criteria set forth in subparagraph (b) and the proposed use of the Premises or the portion thereof intended to be subleased. Landlord shall agree to reasonable confidentiality requirements of the transferee prior to receiving such information provided Landlord shall be entitled to share such information on a confidential basis with prospective purchasers and lenders. Landlord shall have thirty (30) days after receipt of Tenant's notice within which to advise Tenant, in writing, of Landlord's approval or disapproval. Failure by Landlord to respond within said thirty (30) day period shall be deemed an approval.

(d) In the event of a proposed Transfer which is not exempted from Landlord's consent pursuant to either subparagraph (a) above or subparagraph (g) below, Landlord shall have the option, within thirty (30) days after receipt of Tenant's notice of such proposed Transfer, to advise Tenant, in writing, of Landlord's

election to terminate this Lease, in the case of an assignment, or
to recapture the portion of the Premises proposed to be subleased,
in the case of a non-exempt subletting.   Notwithstanding the
foregoing, Landlord shall not have the right to terminate this
Lease or recapture any portion of the Premises in the event of a
Transfer to a transferee who satisfies the criteria set forth in
subparagraph (b) above and intends to operate a consumer
electronics store in substantially all of the Premises.   For the
purposes hereof, "recapture" shall be defined as Landlord's right
to terminate this Lease in respect to the portion (or the entirety,
as the case may be) of the Premises for the remainder of the term
of this Lease involved in the proposed subletting.   In that case,
this Lease shall terminate as to the recaptured portion of the
Premises upon the date of the proposed assignment or subletting and
upon such termination, Tenant shall be reimbursed by Landlord for
the unamortized costs of the construction and/or renovation of the
Building and the Other Improvements and all then-existing Tenant
leasehold improvements as allocated to the portion of the Premises
recaptured, in the case of a subletting, or as to the entirety of
the Premises, in the case of an assignment, as reflected on
Tenant's financial records maintained in accordance with generally
accepted accounting principles less Termination Expenses as
hereinafter defined.   In addition, Landlord shall pay to Tenant
fifty percent (50%) of the consideration received by Landlord in
subsequent leasing(s) of the recaptured space in excess of (i) the
rents and other charges payable by Tenant during the balance of the

Term (excluding the term of any unexercised Renewal Options) had the space not been recaptured, (ii) the reimbursement paid to Tenant for its unamortized construction and renovation costs and leasehold improvements, (iii) the reasonable out-of-pocket costs and expenses of Landlord paid to unrelated third parties in making such lease(s), such as brokers' fees, attorneys' fees, consultants' fees and other professional fees, (iv) the cost of improvements or alterations made by Landlord expressly and solely for the purpose of preparing the recaptured portion of the Premises for such lease(s); and (v) any free rent or similar concessions granted by Landlord in respect of such lease(s), all of which expenses described in (iii) through (v) above (referred to collectively as "Termination Expenses") shall be amortized over the length of the term of such lease(s) in order to determine the amount to be paid to Tenant. Under no circumstances shall Tenant be entitled to any profits received by Landlord as to the recaptured space which are properly allocated to a period beyond the initial Term of this Lease. Failure by Landlord to exercise its right to terminate this Lease (in the case of an assignment only) or to recapture the portion of the Premises proposed to be sublet, as aforesaid, within the thirty (30)' day period shall be conclusively deemed to be a waiver of such right to terminate or recapture with respect to the proposed Transfer but not as to any future Transfer.

(e)   Any assignment or subletting of this Lease by Tenant shall be evidenced by a written instrument executed by Tenant and the assignee or sublessee. Each assignee or sublessee, for the

benefit of Landlord, shall agree to assume, be bound by, and perform all terms, covenants, and conditions of this Lease to be kept and performed by Tenant. After execution of the assignment or sublease, Tenant will forward a completed copy thereof to Landlord. Nothing herein shall be deemed to release Tenant from liability under this Lease.

(f)   Notwithstanding the foregoing, Tenant shall not have the right to sublet and/or subdivide the Premises, without Landlord's consent to such Transfer, into more than two (2) premises.   Tenant shall be responsible for constructing any demising wall and for all other costs related to such subletting and the dividing of the Premises.

(g)   Notwithstanding anything contained in this Lease to the contrary, Landlord is aware that to facilitate a leveraged construction period lease/tax ownership operating lease transaction (a "Leaseback Transfer") Tenant may assign or transfer its interest in this Lease to a third party (the "Facilitator") who will then sublease the Premises to Tenant.   Accordingly, Landlord hereby agrees that Tenant shall have the right throughout the Term of this Lease, without Landlord's consent, to assign or transfer this Lease to a Facilitator who Landlord acknowledges shall be the Tenant for all purposes under this Lease; provided, however, Tenant hereby agrees that (i) Circuit Court Stores, Inc. shall not be released from any liability hereunder by reason of such Leaseback Transfer and (ii) Tenant shall provide Landlord with written notice of a Leaseback Transfer at least twenty (20) days prior to completion

thereof, Landlord further agrees that any Facilitator to whom this Lease is assigned shall not have any individual or personal liability hereunder or any obligation to perform the obligations of Tenant hereunder; provided, however, that Landlord shall retain any rights and remedies with respect to the maintenance, preservation or possession of the Premises that Landlord may have hereunder as a result of the occurrence of an Event of Default, including any right of termination available to Landlord under Section 30 hereof and any and all rights against Circuit City Stores, Inc.   Any Facilitator to whom this Lease is assigned shall thereafter have the right (A) to sublease the Premises to Tenant without Landlord's consent and (B) to further assign its interest in this Lease or sublease the Premises in any event that the Facilitator's sublease with Tenant is terminated, provided that any such assignment or sublease shall be permitted by the terms of the Lease and shall be on a recourse basis as to such assignee or sublessee without limitation on the individual or personal liability of the assignee or sublessee.

18.   Use.

(a)   Tenant shall open and, for a period of at least twelve (12) consecutive months, shall maintain, use and operate the Premises as a retail store under the "Circuit City" trade name or such other trade name as Tenant is then using for the majority of its similarly-sized stores in the State of Maryland, for (i) the sale of consumer, office and automotive electronics products (which include, but shall not be limited to, televisions, stereos,

speakers and video recorders and players), computer hardware and software, entertainment software and entertainment media (which include, but shall not be limited to, records, game cartridges, video tapes, cassettes and compact discs), cellular telephones, household appliances (which include, but shall not be limited to, refrigerators, freezers, stoves, microwave ovens, vacuum cleaners and dishwashers) and related goods and the sale and installation of motor vehicle audio, stereo and telephone systems (all of such items being herein collectively referred to as the "Products"), and (ii) renting, servicing, repairing and warehousing of the Products.

(b)  Following the expiration of the twelve (12) month operating period required pursuant to subparagraph (a) above, Tenant shall have the right to use the Premises for any lawful retail use; provided, however, that the Premises shall not be used (i) for any illegal purpose, (ii) for any use prohibited under paragraph 19(a)(viii) below, (iii) in violation of any exclusive use restriction granted a tenant or other occupant of the Shopping Center pursuant to a lease or restrictive covenants executed prior to this Lease and shown on Exhibit "F", or (iv) in violation of any other applicable provision of the "Permitted Encumbrances" contained in Exhibit "F".  In addition to the foregoing restrictions on the future use of the Premises, if all or any portion of the Premises is not operated by Circuit City or another national or regional chain of consumer electronics stores, the use of such portion of the Premises shall not violate any exclusive use restriction hereafter granted to protect the primary use (only) of

a tenant or other occupant of the Shopping Center leasing or occupying 15,000 square feet or more of space in the Shopping Center, provided that no such restriction shall prevent such portion of the Premises from being used for the sale of apparel.

(c)  Except as may be expressly set forth in this paragraph 18, nothing contained in this Lease shall be construed to require Tenant to operate the Premises continuously either for the use first stated or for any other use.

19.  Warranties and Representations.

(a)  Landlord represents, warrants and covenants to Tenant that:

(i)  Quiet and Peaceful Enjoyment.  Landlord and those persons executing this Lease on its behalf have the right and lawful authority to enter into this Lease and perform Landlord's obligations hereunder, and Landlord warrants, represents and covenants that, so long as Tenant is not in default hereunder beyond any applicable cure period, Tenant shall have quiet and peaceful use, enjoyment and occupancy of the Premises.

(ii) Title.  Landlord's fee simple interest in the Shopping Center is free and clear of any mortgages, deeds, encumbrances, declarations, easements, agreements, leases, tenancies or restrictions, except those matters set forth on Exhibit "F" attached hereto and entitled "Permitted Encumbrances", or any other encumbrances which would restrict Tenant's use of the Premises for the sale of Products or would

restrict in any respect the right of Tenant, its employees, customers and invitees to use the Common Areas in accordance with the terms of this Lease. Nothing contained in this Lease (except for exclusives as to which Tenant has been informed in writing), including the Permitted Encumbrances and other matters disclosed on Exhibit "F", shall restrict Tenant's rights under this Lease, including but not limited to the right to operate the business in the Premises described in Paragraph 18(a). Landlord specifically covenants and warrants that, subject to local laws and regulations, no third party, including but not limited to any other occupant of the Shopping Center, has the right to object to Tenant's tenancy hereunder, prohibit the selling, renting, servicing, repairing or warehousing of the Products, or the right to consent to any feature of the Improvements or Tenant's signage as provided for under this Lease. This representation and warranty is a material inducement to the Tenant's execution of this Lease.

(iii)   Certificate of Authority.   Landlord covenants that the signatories to this Lease are duly authorized and empowered to enter into this Lease.

-(iv) No Litigation.   Landlord has no knowledge of any judicial, quasi-judicial, administrative or other orders, injunctions, moratoria or pending proceedings against Landlord or the Shopping Center which preclude or interfere with, or would preclude or interfere with, the construction

contemplated in paragraph 2 hereof or the occupancy and use of the Premises for the purposes herein contemplated.

(v) <u>Hazardous or Toxic Materials</u>.   Tenant has performed its own Phase I Environmental Report which is satisfactory to Tenant.   To the best of Landlord's knowledge, except for products stored in lawful containers which are customarily found in shopping centers, Landlord has not used, discharged, dumped, spilled or stored any Hazardous Substances (as defined in the Construction Provisions) on or about the Shopping Center, whether accidentally or intentionally, and has received no notice and has no knowledge that any such condition exists at the Shopping Center which is or might violate applicable environmental laws.   If any claim is ever made against Tenant relating to Hazardous Substances present at or around the Shopping Center, if such substances are present as of the date hereof, or any Hazardous Substances are hereafter discovered at the Shopping Center (unless introduced by Tenant, its agents, contractors or employees), all costs of removal incurred by, all liability imposed upon, or damages suffered by, Tenant because of the same shall be borne by Landlord, and Landlord hereby indemnifies and agrees to defend and hold Tenant harmless from and against all such costs, losses, liabilities and damages, including, without limitation, all third-party claims (including sums paid in settlement thereof, with or without legal proceedings) for personal injury or property damage and other claims, actions,

administrative proceedings, judgments, compensatory and punitive damages, lost profits, penalties, fines, costs, losses, attorneys' fees and expenses (through all levels of proceedings), consultants or experts fees and all costs incurred in enforcing this indemnity excluding special or consequential damages. The representation, warranty and indemnity of Landlord described in this paragraph 19(a)(v) shall survive the termination or expiration of this Lease.

(vi) <u>Tenant's Exclusive Use</u>. So long as at least 15,000 square feet of space in the Premises is used by Tenant or any assignee or subtenant for the initial uses set forth in paragraph 18 (including, without limitation, any period when restoration or remodelling work is being conducted), no other tenant or occupant of the Shopping Center shall be entitled to sell or rent (or rent to own) any of the following Products, subject only to rights granted any such tenants under leases in existence as of the date of this Lease and described on <u>Exhibit "F"</u>:

1.   Consumer, office and automotive electronics products (which include, but shall not be limited to, televisions, stereos, speakers and video recorders and players).

2.   Computer hardware and software.

3.   Entertainment software and entertainment media (which shall include, but shall not be limited

to, records, game cartridges, videotapes,
cassettes and compact discs).

4. Cellular telephones.

5. Household appliances (which shall include, but
shall not be limited to, refrigerators,
freezers, stoves, microwave ovens, vacuum
cleaners and dishwashers).

6. Motor vehicle, audio, stereo and telephone
systems.

Notwithstanding the foregoing, the incidental sale of such
Products by any current operator or tenant in the Shopping Center
or any successor or assignee in addition to the tenants described
on Exhibit F shall not be deemed a violation of this subparagraph.
As used herein, "incidental sale" shall mean as to any future
tenants less than as to all Products in the aggregate five percent
(5%) of such operator's or tenant's display area (inclusive of
allocable aisle space) in spaces of 15,000 square feet and over and
ten percent (10%) in spaces under 15,000 square feet.

(vii)    <u>Zoning and Subdivision</u>. The Premises and
the Shopping Center are presently properly subdivided, in
conformity with all applicable laws and zoned so as to permit,
subject to obtaining site plan approvals, building permits and
certificates of occupancy: (A) the development and operation
of the Premises and the Shopping Center in accordance with the
provisions of this Lease; and (B) the initial use of the
Premises described in paragraph 18 of this Lease.

200706.005 (REAL)
May 21, 1996                       - 63 -

(viii)  <u>Prohibited Activities</u>. Landlord shall not operate or lease (or permit to be operated or leased) any building or tenant space in the Shopping Center for use as:

(A)   a bar, pub, nightclub, music hall or disco in which less than fifty percent (50%) of its space or revenue is devoted to and derived from food service;

(B) a bowling alley;

(C) a billiard or bingo parlor;

(D) a flea market;

(E) a massage parlor;

(F) a funeral home;

(G)   a facility for the sale of paraphernalia for use with illicit drugs;

(H)   a facility for the sale or display of pornographic material (as determined by community standards for the area in which the Shopping Center is located);

(I) an off-track betting parlor;

(J) a carnival, amusement park or circus;

(K)   a gas station, car wash or auto repair or body shop (the parties specifically acknowledging that Tenant's car stereo installation facility is not included in this prohibition (K));

(L)   a facility for the sale of new or used motor vehicles, trailers or mobile homes;

(M)   a facility for any use which is illegal or dangerous, constitutes a nuisance or is inconsistent with an integrated, community-oriented retail and commercial shopping center;

(N)   a skating rink;

(O)   a laser tag or virtual reality facility, an arcade, pinball or computer gameroom (provided that retail facilities in the Shopping Center may display for sale [but not solely for entertainment purposes] electronic games incidental to their primary operations);

(P)   service-oriented offices within the stores between the Premises and in the area identified as "the Restricted Area" on the Site Plan (such as, by way of example, medical or employment offices, travel agencies, real estate agencies or dry cleaning establishments) or other nonretail uses except for offices and storage facilities incidental to a primary retail operation;

(Q)   a banquet hall, auditorium or other place of
      public assembly;
(R)   a training or educational facility (including,
      without limitation, a beauty school, barber
      college, reading room, school or other
      facility catering primarily to students or
      trainees rather than customers);
(S) a theater of any kind; or
(T) a gymnasium, sport or health club or spa.

In addition to the foregoing, except for existing
restaurants and as otherwise permitted in the areas marked as
shown on the Site Plan, Landlord shall not operate, lease or
permit to be operated or leased any restaurant within any
building on Landlord's Premises which abuts "Tenant's
Preferred Area" (as shown on the Site Plan) or within the
Restricted Area identified on the Site Plan.   In addition,
Landlord shall use reasonable efforts to prevent auction, fire
or going-out-of-business sales in the Shopping Center.
Notwithstanding the foregoing, Landlord may operate, lease or
permit the Operation of a restaurant in the location permitted
by cross-hatching on Exhibit A.

    (ix) <u>Site Covenants</u>.   With regard to the Shopping
Center and the uses and operations of the Common Areas,
Landlord makes the following representations and warranties
(the "Site Covenants"):

    (A)   <u>Building Height and Location.</u>   The
building (i.e. the leased premises immediately adjacent
next to the Tenant's Leased Premises) adjacent to the
Premises shall not exceed the height of the Building, nor
shall such adjoining leased premises be positioned so as

200706.005 (REAL)
May 21, 1996                        - 65 -

to project beyond the portion of the front wall of the Building which is immediately adjacent thereto.   No outparcels, barriers, buildings, kiosks or other structures, either temporary or permanent, shall be located within Tenant's Preferred Area or shall be constructed so as to interfere with the visibility of the Premises via Tenant's View Corridor, and no building located on an outparcel elsewhere in the Shopping Center shall exceed the size necessary for such outparcel to maintain, within its boundaries, the parking ratio required for its use under the applicable zoning code without use of parking spaces located in the Common Areas.

(B)   <u>Construction and Alterations</u>.  Following the end of the first Lease Year, no exterior construction shall be permitted in Tenant's Preferred Area of the Shopping Center during the months of October, November and December, except for interior alterations not affecting the operations of any other occupant of the Shopping Center and except for emergency repairs.  In the event of any construction within the Shopping Center, Landlord shall designate a construction access route, staging and parking areas located so as to minimize interference with customers or the operations of other occupants of the Shopping Center and shall require erection of safety barriers as necessary and a fence or