# EXHIBIT A

98102

Marshalls #698
Orchard Place Shopping Center
Skokie, Illinois

### LEASE AGREEMENT

dated as of

September 13, 1995

by and between

**FIRST BANK & TRUST COMPANY OF ILLINOIS,
AS TRUSTEE UNDER A TRUST AGREEMENT
DATED FEBRUARY 4, 1995 AND KNOWN AS
TRUST NUMBER 10-1915**

as Landlord

and

**MARSHALLS OF SKOKIE, IL., INC.**

as Tenant

8/25/95

# TABLE OF CONTENTS

## ARTICLE I

### FUNDAMENTAL LEASE PROVISIONS

SECTION 1.01.   Definitions . . . . . . . . . . . . .   1

## ARTICLE II

### LEASE OF PREMISES - TERM OF LEASE

SECTION 2.01.   Demise . . . . . . . . . . . . . . .   4
SECTION 2.02.   Extension Periods . . . . . . . . .   4
SECTION 2.03.   Commencement Date . . . . . . . .   4
SECTION 2.04.   Acceptance Date . . . . . . . . . .   5
SECTION 2.05.   Early Entry . . . . . . . . . . . . .   5
SECTION 2.06.   Delayed Possession . . . . . . . .   5
SECTION 2.07.   Commencement Date Agreement . . . .   5

## ARTICLE III

### INITIAL CONSTRUCTION

SECTION 3.01.   Landlord's Work . . . . . . . .   6
SECTION 3.02.   Tenant's Work . . . . . . . . . .   6
SECTION 3.03.   Plans and Specifications . . . . . .   6
SECTION 3.04.   Punchlist Items . . . . . . . . . .   7

## ARTICLE IV

### RENT

SECTION 4.01.   Annual Minimum Rent . . . . . . . .   7
SECTION 4.02.   Percentage Rent . . . . . . . . . .   7
SECTION 4.03.   Method of Payment . . . . . . . . .   9

## ARTICLE V

### TAXES AND OTHER CHARGES

SECTION 5.01.   Taxes . . . . . . . . . . . . . . .   9
SECTION 5.02.   Exclusions from Taxes . . . . . . . .   9
SECTION 5.03.   Right to Contest . . . . . . . . . .   9
SECTION 5.04.   Payment of Taxes . . . . . . . . .   10

## ARTICLE VI

### UTILITIES

SECTION 6.01.   Utilities . . . . . . . . . . . . .   10

## ARTICLE VII

### USE OF PREMISES

SECTION 7.01.   Permitted Use . . . . . . . . . . .   11
SECTION 7.02.   Tenant's Restrictions. . . . . . .   11
SECTION 7.03.   Operation of Business. . . . . . .   11
SECTION 7.05.   Tenant's Use of Parking. . . . . .   12

## ARTICLE VIII

### REPAIRS

SECTION 8.01.   Maintenance of Common Areas/Tenants
                Contribution. . . . . . . . . . .   13
SECTION 8.02.   Landlord Obligations. . . . . . .   14
SECTION 8.03.   Tenant's Obligations. . . . . . .   15
SECTION 8.04.   Mutual Self-Help . . . . . . . . .   15
SECTION 8.05.   Hazardous Materials . . . . . . .   16
SECTION 8.06.   Surrender of the Premises . . . .   18

## ARTICLE IX

### REQUIREMENTS OF LAW

SECTION 9.01.   Landlord's Obligations . . . . . .   19
SECTION 9.02.   Tenant's Obligations . . . . . . .   19
SECTION 9.03.   Right to Contest . . . . . . . . .   19

## ARTICLE X

### INSURANCE

SECTION 10.01.   Landlord's Liability and Property
                 Damage Insurance. . . . . . . . .   19
SECTION 10.02.   Tenant's Liability and Property
                 Damage Insurance. . . . . . . . .   20
SECTION 10.03.   Landlord's Hazard Insurance. . . .   20
SECTION 10.04.   Tenant's Proportionate Share of
                 Landlord's Insurance. . . . . . .   21
SECTION 10.05.   Tenant's Hazard Insurance. . . . .   22
SECTION 10.06.   Indemnity. . . . . . . . . . . . .   22
SECTION 10.07.   Mutual Waiver of Subrogation. . .   22

## ARTICLE XI

### DAMAGE OR DESTRUCTION

SECTION 11.01.   Landlord's Obligation to Rebuild
                 Premises. . . . . . . . . . . . .   22
SECTION 11.02.   Rent Adjustment. . . . . . . . . .   23
SECTION 11.04.   Reopening of Premises. . . . . . .   23
SECTION 11.05.   Commencement and Completion of
                 Restoration. . . . . . . . . . . .   23

SECTION 11.06.    End of Term. . . . . . . . . . . .    24

## ARTICLE XII

## CONDEMNATION

SECTION 12.01.    Taking. . . . . . . . . . . . . . .    24
SECTION 12.02.    Restoration and Rent Adjustment. .    24
SECTION 12.03.    Vacating the Premises. . . . . . .    25

## ARTICLE XIII

## ALTERATIONS AND MECHANICS' LIENS

SECTION 13.01.    Tenant's Alteration Rights . . . .    25
SECTION 13.02.    Mechanics' Liens. . . . . . . . . .    25
SECTION 13.03.    Nuisance. . . . . . . . . . . . . .    26

## ARTICLE XIV

## SIGNS

SECTION 14.01.    Tenant's Signs  . . . . . . . . . .    26
SECTION 14.02.    Sign Limitation . . . . . . . . . .    26

## ARTICLE XV

## TENANT'S PROPERTY

SECTION 15.01.    Tenant's Property . . . . . . . . .    27

## ARTICLE XVI

## ASSIGNMENT AND SUBLETTING

SECTION 16.01.    Assignment and Subletting Rights  .    27

## ARTICLE XVII

## DEFAULT

SECTION 17.01.    Tenant's Default  . . . . . . . . .    28
SECTION 17.02.    Landlord's Default  . . . . . . . .    30

## ARTICLE VIII

## SUBORDINATION, TRANSFER OF INTEREST

SECTION 18.01.    Subordination . . . . . . . . . . .    30
SECTION 18.02.    Transfer of Interest  . . . . . . .    31
SECTION 18.03.    Tenant Estoppel Certificates  . . .    31
SECTION 18.04.    Landlord Estoppel Certificates  . .    31

## ARTICLE XIX

## LANDLORD S REPRESENTATIONS AND WARRANTIES

SECTION 19.01.  Quiet Enjoyment . . . . . . . . . .  32
SECTION 19.02.  Representations and Warranties . .  32

## ARTICLE XX

## HOLDING OVER

SECTION 20.01.  Holding Over  . . . . . . . . . . .  32

## ARTICLE XXI

## NOTICE

SECTION 21.01.  Where and How Given . . . . . . . .  33
SECTION 21.02.  When Given  . . . . . . . . . . . .  33

## ARTICLE XXII

## MISCELLANEOUS

SECTION 22.01.  Construction  . . . . . . . . . . .  34
SECTION 22.02.  Section Headings  . . . . . . . . .  34
SECTION 22.03.  Partial Invalidity  . . . . . . . .  34
SECTION 22.04.  Waiver  . . . . . . . . . . . . . .  34
SECTION 22.05.  Governing Law . . . . . . . . . . .  34
SECTION 22.06.  Successors and Assigns  . . . . . .  34
SECTION 22.07.  No Broker . . . . . . . . . . . . .  34
SECTION 22.09.  Entire Agreement  . . . . . . . . .  35
SECTION 22.10.  Relationship of Parties . . . . . .  35
SECTION 22.11   Restriction. . . . . . . . . . . .  35
SECTION 22.12.  Force Majeure . . . . . . . . . . .  36
SECTION 22.13.  Satellite Dish and Equipment  . . .  36
SECTION 22.14.  Limitation of Liability . . . . . .  37
SECTION 22.15.  Attorneys' Fees . . . . . . . . . .  37
SECTION 22.16.  Tenant Allowance. . . . . . . . . .  37
SECTION 22.17.  Additional Provisions . . . . . . .  37

## EXHIBITS

| | |
|---|---|
| EXHIBIT A | Site Plan/Premises/Floor Plan |
| EXHIBIT B | Landlord's Work/Tenant's Work |
| EXHIBIT C | Intentionally Deleted |
| EXHIBIT D | Guaranty |
| EXHIBIT E | Intentionally Deleted |
| EXHIBIT F | Subordination, Non-Disturbance and Attornment Agreement |
| EXHIBIT G | Tenant Estoppel Certificate |
| EXHIBIT H | Prohibited Uses |

## LEASE AGREEMENT

**THIS LEASE AGREEMENT** (this "Lease"), dated as of the 13th day of September, 1995, by and between HSS Real Estate, Inc., as agent for the beneficiary of First Bank & Trust company of Illinois, not personally but as Trustee under Trust Agreement dated February 4, 1995, and known as Trust Number 10-1915, ("Landlord") with an office at 35 West Wacker Drive, Suite 3240, Chicago, IL 60601, and Marshalls of Skokie IL., Inc., an Illinois corporation ("Tenant") with an office at 200 Brickstone Square, Andover, Massachusetts 01810-0930.

## W I T N E S S E T H:

NOW, **THEREFORE**, in consideration of the rents and covenants hereinafter set forth, Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises (as hereinafter defined) upon the following terms and conditions:

### ARTICLE I

### FUNDAMENTAL LEASE PROVISIONS

SECTION 1.01.  Definitions:

A1.  **Premises:**  The space located in the building located at the corner of Skokie Blvd. and Golf Road in Skokie, Illinois, containing approximately 30,000 square feet of ground floor and including 200 square feet representing 50% of the dock staging area space as crosshatched on the site plan attached hereto as Exhibit A (the "Site Plan").

A2.  **Building:**  The building of which the Premises are a part, located at the corner of Skokie Blvd. and Golf Road in Skokie, Illinois, containing approximately 78,000 square feet, exclusive of the parking area and vehicle access ramps, and Common Areas as shown on the Site Plan.

B.  **Initial Lease Term:**  Twenty-Five (25) Lease Years, plus the partial Lease Year commencing on the Commencement Date and ending on the January 31 immediately thereafter.

C.  **Outside Dates:**  Final Outside Date: July 1, 1997.

D.  **Extension Periods:**  Five (5) periods of five (5) years each.

E.  **Lease Year:**  Each period within the Term commencing on February 1 and ending the next succeeding January 31.

F.  **Term:**  The Initial Lease Term plus the Extension Periods, if the option for any such Extension Periods are exercised.

1

**G.**   **Annual Minimum Rent:**

| Period | Rent psf | Annual Rent | Monthly Installments |
|---|---|---|---|
| **Initial Term:** Commencement Date through end of 60th full calendar month | $28.00 | $840,000.00 | $70,000.00 |
| 61st through 120th calendar month | $29.00 | $870,000.00 | $72,500.00 |
| 121st through 180th calendar month | $31.00[1] | $930,000.00 | $77,500.00 |
| 181st through 240th full calendar month | $33.00[2] | $990,000.00 | $82,500.00 |
| 241st through the end of the Initial Term | $35.00[3] | $1,050,000.00 | $87,500.00 |

[1]or, if less, $840,000.00 ($28.00 psf) x (1 + 2 times the change in the CPI Index from the Commencement Date through the 120th full calendar month), but in no event less than $870,000.00 ($29.00 psf).

[2]or, if less, $840,000.00 ($28.00 psf) x (1 + 2 times the change in the CPI Index from the Commencement Date through the 180th calendar month, but in no event less than $930,000.00 ($31.00 psf).   CPI Index means the Consumer Price Index for all Urban Consumers, all cities (Base Year 1982 – 1984 = 100) published by the United States Department of Labor Statistics or comparable index if the above is not available.

[3]or, if less, $840,000.00 ($28.00 psf) x (1 + 2 times time change in the CPI Index from the Commencement Date through the 240th calendar month), but in no event less than $990,000.00 ($33.00 psf).

| | | | |
|---|---|---|---|
| **1st Extension Period** First full 60 months calendar month | $37.00 | $1,110,000.00 | $92,500.00 |
| **2nd Extension Period** Second full 60 months | $39.00 | $1,170,000.00 | $97,500.00 |

**3rd Extension Period**

| | | | |
|---|---|---|---|
| Third full 60 months | $41.00 | $1,230,000.00 | $102,500.00 |
| **4th Extension Period** | | | |
| Fourth full 60 months | $43.00 | $1,290,000.00 | $107,500.00 |
| **5th Extension Period** | | | |
| Fifty full 60 months | $45.00 | $1,350,000.00 | $112,500.00 |

**H.   Additional Charges:**

1.   <u>Estimated Taxes</u>:  Approximately Five Dollars and Fifty Cents ($5.50) per square foot.

2.   <u>Estimated CAM</u>:  Approximately One Dollar and Fifty Cents ($1.50) per square foot.

**I.   Permitted Use:  Permitted Use:**  Retail sale of clothing, shoes, giftware, jewelry, luggage, domestics and gourmet foods.

**J.   Slack Season:**  Period of time beginning on November 1st and ending on February 1st and beginning on May 1st and ending on August 1st.

**K.   Broker:**  None.

**L.   Plans and Specifications:**  See Exhibit B.

**M.   Percentage Rent Rate:**  Two Percent (2%).

**N.   Percentage Rent Breakpoint:**  Annual Minimum Rent divided by the Percentage Rent Rate.

**O1.  Tenant's Proportionate Share of Taxes:**  Tenant's Proportionate Share of Taxes is the percentage obtained by dividing the leasable square footage of the Premises (approximately 30,000 square feet) by the leasable square footage of the Building (consisting of approximately 78,000 square feet) exclusive of the parking areas and vehicle access ramps.

**O2.  Tenant's Proportionate Share of Cam Charge:**  Tenant's Proportionate Share of Cam Charge is the percentage obtained by dividing the leasable square footage of the Premises (approximately 30,000 square feet) by the leasable square footage of the Building (approximately 78,000 square feet) exclusive of the parking areas and vehicle access ramps plus the square footage of any outparcel building of less than 8,000 square feet.  For any outparcel building over 8,000 square feet, an equitable portion of Cam Charge shall be apportioned to it.  Outparcel buildings shall be included in

3

this formula upon the date initially leased to a tenant or sold.

P.    **Shopping Center**: Approximately 150,000 square feet of land, including surface parking and ingress and egress, as more specifically depicted on Exhibit A.

## ARTICLE II

## LEASE OF PREMISES - TERM OF LEASE

SECTION 2.01.    <u>Demise</u>.    Landlord does hereby lease and demise to Tenant, and Tenant does hereby hire from Landlord, the Premises, together with the licenses, rights, privileges and easements appurtenant thereto.    Landlord agrees that it will not permit any projections either vertical or horizontal to be erected or maintained (other than Tenant's signs or identifications), except for projections in the area marked outlot on Exhibit A which will project along the front or rear of the Premises in such a manner as to obstruct the view of Tenant's signs or its store front.

SECTION 2.02.    <u>Extension Periods</u>.    Provided Tenant is not then in default of any material terms or provisions hereof, after the lapse of all applicable grace periods, and the store is open for business, Tenant shall have the option to extend the Term for the number of Extension Periods shown in Section 1.01(G), upon all the terms and conditions contained herein. Each such option is exercisable by Tenant giving notice to Landlord (a) at least nine (9) months prior to the expiration of the Initial Lease Term, or of the preceding Extension Period, as the case may be or (b) if Tenant fails to give Landlord such notice, within twenty (20) days after receipt of notice from Landlord that Tenant has failed to exercise its option to extend within the time period provided in (a) above.    Landlord shall be under no obligation to grant any additional extensions or renewals of the Lease without its prior written consent.

SECTION 2.03.    <u>Commencement Date</u>.    (a) "<u>Commencement Date</u>" shall mean the date which is the earlier of (i) the date on which Tenant opens the Premises for business to the public or (ii) the date which is one hundred and twenty (120) days after (A) the Acceptance Date, (B) Tenant's receipt of a fully executed copy of this Lease.    Tenant shall apply for the construction permit in a diligent manner and pursue the receipt of the construction permit in a diligent manner.

(b) Tenant is not required to open for business nor will Annual Minimum Rent commence during the Slack Season.    If Tenant elects to open during the Slack Season, Tenant shall pay the lesser of (i) Annual Minimum Rent and Additional Charges, or (ii) financing costs associated with a mortgage secured by Landlord in

the open market, plus Additional Charges only.  In addition,
Tenant is not required to open until Landlord substantially
completes all site work and the exterior of the co-tenant's
premises.  Tenant may elect to open before the site work and
exterior of the co-tenant is substantially complete or during the
Slack Season and pay two percent (2%) of Gross Sales, monthly,
plus Additional Charges, twenty days in arrears, in lieu of
Annual Minimum Rent.

SECTION 2.04.  Acceptance Date.  "Acceptance Date"
shall mean the date upon which those improvements which are to be
constructed by Landlord as part of the Premises (the
"Improvements") have been substantially completed pursuant to and
in the manner required by Article III, and the Premises is ready
for the exclusive occupancy by Tenant as certified in writing by
Landlord's architect or general contractor.  Landlord represents
that the Premises is zoned for retail use.

SECTION 2.05.  Early Entry. Any time prior to
substantial completion of the Premises by Landlord, Tenant shall
have the right to enter the Premises to install fixtures,
shelving and storage bins, to store merchandise and for any other
purpose necessary or reasonable to enable Tenant to prepare to
open for business; provided, however, that such entry may not
unreasonably interfere with the work of Landlord, Tenant shall
provide Landlord with its liability insurance certificates, and
Tenant shall indemnify Landlord against any loss or damage caused
by Tenant, its agents, servants or contractors.  Such entry shall
not be construed as an acceptance of the Premises by Tenant under
the provisions of this Lease or as a waiver of any of the
provisions hereof.

SECTION 2.06.  Delayed Possession.  The Acceptance Date
is projected to occur on or about July 1, 1996.  If the
Acceptance Date does not occur before the Final Outside Date,
Tenant shall have the right to terminate this Lease, upon thirty
(30) days notice to Landlord and failure to cure, at any time
prior to the Acceptance Date.  In addition, Tenant shall have the
right to cancel this Lease, upon thirty (30) days notice to
Landlord and failure to cure, if Landlord has not commenced
demolition of the existing structure by January 1, 1996 or if
Landlord has not commenced construction of the Premises by March
1, 1996.  Such notice may be given so long as such demolition or
construction start has not occurred.

SECTION 2.07.  Commencement Date Agreement.  When the
Commencement Date has been determined, Landlord and Tenant shall
execute a memorandum which shall expressly confirm the
Commencement Date and the expiration date of the Initial Lease
Term, and which shall also ratify and affirm all of the terms and
provisions of this Lease.  If the actual as-built measurement of
the Premises shall determine that the Premises contains more or

5

less than the size shown in Section 1.01(A), Landlord and Tenant
agree to amend this Lease to adjust all rent and related charges
to account for the actual size of the Premises.

### ARTICLE III

### INITIAL CONSTRUCTION

SECTION 3.01.  <u>Landlord's Work</u>.  Landlord shall do all
of the various items of work set forth on <u>Exhibit B</u> attached
hereto as the responsibility of Landlord ("<u>Landlord's Work</u>") for
the purpose of building-out the Premises for Tenant's occupancy.
Landlord shall be solely responsible (at its own cost and
expense, without reimbursement on account thereof by Tenant) for
clearing all rubble and debris from the Premises resulting from
Landlord's Work in a safe, neat and pleasing appearance,
consistent with accepted construction practice, during and
following any such work.  Landlord shall also provide to Tenant
roof deck parking for a minimum of 250 cars in addition to
surface parking for 110 cars in front of the Building.  The deck
will have a ramp entrance and exit.  Tenant shall have the right
to approve the design of the deck and parking configuration which
approval shall not be unreasonably withheld or delayed.

SECTION 3.02.  <u>Tenant's Work</u>.  Tenant shall do all of
the various items of work set forth on Exhibit B attached hereto
as the responsibility of Tenant ("Tenant's Work") for the purpose
of adapting the Premises to Tenant's use.  Tenant shall submit
its plans and specifications to Landlord for Landlord's approval,
which Landlord agrees not to unreasonably withhold or delay.
Tenant shall do all of such work in a manner required by
applicable codes so that, insofar as Tenant's Work is concerned,
Tenant will be able to secure for Tenant a Certificate of
Occupancy from applicable authorities to enable Tenant to open
and conduct business in the Premises.  If the Certificate of
Occupancy will not issue by reason of work done, or failed to be
done, by Landlord (and not because of the manner in which Tenant
shall have done its work), or by reason of any condition of the
Premises, then it shall be the responsibility of Landlord to
remedy the situation so as to enable Tenant to secure the
Certificate of Occupancy as to Landlord's Work only.

SECTION 3.03.  <u>Plans and Specifications</u>.  Landlord
shall perform Landlord's Work to build-out the Premises in
accordance with Exhibit "B" hereof.  Tenant shall have the right
to approve Landlord's final construction drawings, such approval
not to be unreasonably withheld.

SECTION 3.04.  <u>Punchlist Items</u>.  Tenant shall supply
Landlord with a written list of items in the Premises within
sixty (60) days after the Acceptance Date which Landlord must

correct or remedy within thirty (30) days of receipt (the
"Punchlist").

## ARTICLE IV

### RENT

SECTION 4.01.  Annual Minimum Rent.  Commencing on the
Commencement Date, Tenant shall pay to Landlord monthly
installments of Annual Minimum Rent without setoff, deductions or
counterclaim, except as expressly provided herein, each on the
first day of each calendar month during the Term, except that if
the Commencement Date occurs on a day other than the first day of
a calendar month, then the monthly installment of Annual Minimum
Rent and other charges shall be prorated for the remaining days
of that calendar month.

SECTION 4.02.  Percentage Rent.  (a) Tenant shall pay
as Percentage Rent a sum equal to (i) the amount by which
Tenant's Gross Sales (as hereinafter defined) on, at, or from the
Premises during the preceding Lease Year exceeds the Percentage
Rent Breakpoint, multiplied by (ii) the Percentage Rent Rate.  If
the period beginning on the Commencement Date and ending on the
January 31st immediately thereafter contains less than twelve
(12) full months, Tenant shall pay to Landlord as Percentage Rent
for such partial Lease Year an amount, if any, equal to the
Percentage Rent Rate applied to the Gross Sales made at the
Premises during the twelve (12) month period commencing of the
Commencement Date in excess of the Percentage Break Point and
multiplying said resulting sum by a fraction, the numerator of
which is the number of calendar days in the partial Lease Year
and the denominator of which is three hundred sixty-five (365)
days.  The foregoing provisions shall not affect the provisions
of this Lease applicable to the computation of Percentage Rent to
be paid by Tenant to Landlord for any subsequent Lease Year.

(b) "Gross Sales" shall mean the entire amount of the
actual sale price, at retail or at wholesale, made by Tenant or
any subtenant, licensee or concessionaire on, at or from the
Premises, whether sold for cash or on a charge basis, sold or
contracted to be sold at, from or through the Premises, including
any commissions, charges or fees for services performed;
provided, however, that Gross Sales shall exclude (i) receipts
from sales to Tenant's employees at a discount; (ii) credits or
refunds to customers for merchandise exchanged; (iii) receipts
from sales in the nature of a transfer to other stores operated
by Tenant or its affiliated companies; (iv) the amount of returns
to shippers and manufacturers; (v) any sales, excise or similar
tax imposed by governmental authority or retained by Tenant as a
fee for collecting such taxes; (vi) amounts received in
settlement of claims for loss or damage to merchandise; (vii)
bulk transfers not made in the ordinary course of Tenant's

7

business of Tenant's materials, supplies, merchandise or other inventory to another entity whose principal business is the sale of merchandise from stock; (viii) sales of fixtures and equipment; (ix) amounts charged to Tenant by credit card companies; (x) revenues from vending machines used solely for the benefit of employees; provided, however, that on other vending machines or amusement devices, only Tenant's net revenue shall be included in Gross Sales; and (xi) merchandise donated to charitable organizations.

(c) Tenant agrees to furnish Landlord with a statement of Gross Sales certified by an officer of Tenant and delivered to Landlord on a monthly basis within thirty (30) days of the end of the prior month and on an annual basis within thirty (30) days of end of such Lease year.  Landlord shall not, without Tenant's prior written consent, disclose any such sales information to third parties at any time, except in connection with a bonafide sale, mortgage or refinancing of the Shopping Center, or as otherwise required by law.

(d) Tenant further agrees that, for a period of three (3) years after the end of a Lease Year, it will keep separate and accurate records of all Gross Sales made during such Lease Year on, at, or from the Premises in accordance with generally accepted accounting principles and that Landlord shall have the right, upon (10) days' prior written notice to Tenant, to inspect at Tenant's principal accounting office such records and such other books or records relating solely to the Premises as are necessary to enable Landlord or an authorized representative of Landlord to make a full and proper audit of Gross Sales at the Premises for any of the preceding three (3) Lease Years; provided, however, that in no event shall Landlord have the right to inspect any books or records relating to any Lease Year previously audited by Landlord, relating to any other store operated by Tenant, or relating to Tenant's income, costs or profits.  Any surplus paid by Tenant shall, at Landlord's option, be credited against the next installment(s) of Annual Minimum Rent or other charges due from Tenant or be refunded to Tenant forthwith.  Any underpayment by Tenant shall be paid by Tenant to Landlord forthwith.  If any such audit shows that the Gross Sales for a preceding Lease Year have been understated by more than three percent (3%) resulting in additional Percentage Rent due to Landlord, then, in addition, Tenant shall immediately pay to Landlord the reasonable cost of such audit.  If Landlord does not make such an audit within three (3) years from the end of a given Lease Year, then the statement of annual Gross Sales furnished for such Lease Year shall be deemed to be correct and Landlord shall have no right thereafter to inspect, audit or contest the same.  Tenant retains the option to maintain its records of Gross Sales on microfiche, computer diskettes, or any similar type of data storage system.

8

(e) Notwithstanding anything contained in this Lease to the contrary, Tenant makes no representation or warranty as to its expected Gross Sales from the Premises.

SECTION 4.03.  <u>Method of Payment</u>.  All payments of Annual Minimum Rent or other amounts due under the terms of this Lease shall be made on the first day of each month by check payable to Landlord, mailed or delivered to the address listed in Section 22.01 or to such other person or place as Landlord shall designate by written notice to Tenant.

ARTICLE V

TAXES AND OTHER CHARGES

SECTION 5.01.  <u>Taxes</u>.  Tenant shall pay when due, Tenant's Proportionate Share of all real estate taxes and assessments (whether general or special), including sewer rents; sales, use or other taxes now or hereinafter imposed by any governmental authority upon rent received by Landlord; and other taxes, fees or assessments now or hereinafter levied by a governmental authority on the Building or its contents or on the operation or use thereof; and all fees and costs incurred in connection with the seeking of a reduction of any of the foregoing, levied and assessed against the Building (collectively, "<u>Taxes</u>").  Landlord warrants and represents to Tenant that the Building is not presently subject to any special assessments and, to the best knowledge of Landlord, there are no assessments presently contemplated to come into effect during the Term.

SECTION 5.02.  <u>Exclusions from Taxes</u>.  Tenant shall pay all personal property taxes including license expenses for its personal property located in, at or about the Premises.  Tenant shall not be charged, nor be obligated to pay, any income, profit, inheritance, estate, succession, gift, franchise, or transfer taxes which are or may be imposed upon Landlord, its successors or assigns, by any authority, howsoever imposed or designated.

SECTION 5.03.  <u>Right to Contest</u>.  Landlord shall furnish to Tenant copies of all Tax bills promptly upon receipt thereof and, in any event, in time sufficient to enable Tenant to determine whether Tenant desires to contest Taxes.  Upon Tenant's request, which request must be reasonable and made in good faith, Landlord shall contest, with all due diligence and in good faith, the validity or the amount of any Taxes levied against the Building by such appellate or other proceedings as may be appropriate in the jurisdiction in which the Building is located. A request by Tenant shall not be deemed to be reasonable if Landlord has been advised by its tax consultant that such a contest of Taxes has a likelihood to result in an increased tax

9

assessment.  If, for any reason, Landlord does contest Taxes, all
costs of Landlord's contest, up to the amount of the net savings
in Taxes, shall be included in Taxes for purposes of Tenant's
payment of Tenant's Proportionate Share.  At Landlord's election,
in the alternative, it shall permit Tenant or any other tenant of
the Building to contest Taxes and Landlord shall then cooperate
in the institution and prosecution of any such proceedings and
will execute any documents required therefor.  Tenant's
Proportionate Share of the expense of such proceedings shall be
borne by Tenant and Tenant's Proportionate Share of any refunds
or rebates secured shall belong to Tenant.  Tenant's
Proportionate Share of increase in Taxes as a result of such
contest shall be paid by Tenant.  Tenant may not defer its
obligations to pay Landlord for Tenant's Proportionate Share of
any Taxes during the pendency of such contest.

          SECTION 5.04.  <u>Payment of Taxes</u>.  Tax payments from
Tenant to Landlord shall be due and payable not later than the
last to occur of:  (i) twenty (20) days prior to the due date of
the Taxes to which such payments relate; and (ii) twenty (20)
days after Landlord shall have submitted to Tenant copies of the
applicable Tax bills together with a statement setting forth the
computation of Tenant's Proportionate Share thereof.  Tenant
shall be responsible for all penalties, late charges, etc. caused
by its failure to pay Tenant's Proportionate Share of Taxes in
accordance with the terms hereof.  A fair and equitable
adjustment shall be made with respect to any Tax payments due
from Tenant to Landlord in connection with the first and last
periods of the Term, since the same may not coincide with the Tax
years involved.  If a Tax payment for any portion of the last
year of the Term is due and payable after the Term has expired,
Tenant shall immediately pay Tenant's Proportionate Share of such
Taxes upon receipt of a bill by Landlord or conversely, any
rebate for overpayment of such Taxes by Tenant shall be refunded
by Landlord to Tenant.  This Section 5.04 shall survive the
expiration or earlier termination of this Lease.

**ARTICLE VI**

**UTILITIES**

          SECTION 6.01.  <u>Utilities</u>.  Landlord covenants and
agrees that the Premises shall be properly serviced with gas,
electric, telephone, water, sewer and other utilities sufficient
to meet Tenant's requirements at the Acceptance Date.  Landlord
shall cause all such utilities to the Premises to be separately
metered at Landlord's sole cost and expense.  Tenant shall pay
all charges for utility services furnished to the Premises during
the Term, or the date of early entry pursuant to Section 2.05.
Commencing from the earlier of the Acceptance Date, or the date
of early entry pursuant to Section 2.05, Tenant agrees to pay
promptly, as the same become due and payable, all bills for gas,

10

electricity and water for the Premises and sewer use charges for
the Premises for any period during the Term.  If at any time
during the Term, for any reason, Landlord shall provide utility
service to the Premises, Tenant's cost for such utility service
shall not exceed the lessor of Landlord's actual cost for such
utility service plus ten percent administration charge, but in no
event shall the total cost to Tenant be more than the cost if the
service were supplied by the local public utility.  In addition,
Tenant shall have the right, at its own cost and expense, to
install a test meter, at Tenant's sole cost and expense, to
verify its utility usage.

## ARTICLE VII

## USE OF PREMISES

SECTION 7.01.  <u>Permitted Use</u>.  Tenant agrees to open
for business on the Commencement Date as a "Marshalls".  However,
thereafter Tenant may use the Premises for any lawful retail
purpose except for the uses set forth on Exhibit H hereof.
Nothing contained in this Lease shall be construed as requiring
Tenant to operate at any time or to continuously operate or
otherwise remain open for the conduct of business in the
Premises.

SECTION 7.02.  <u>Tenant's Restrictions</u>.  Notwithstanding
anything to the contrary contained in this Lease, Tenant agrees
that it will not use or permit any assignee or sublessee of the
Premises to use the Premises primarily as a linens store, bed and
bath store, kitchenware store or closet/container store.  Tenant
shall not do or permit anything to be done in or about the
Premises which will in any way obstruct or interfere with the
rights of other tenants or occupants of the Building or injure or
annoy them or use or allow the Premises to be used for any
improper, immoral, unlawful or objectionable purpose; nor shall
Tenant cause, maintain or permit any nuisance in, on or about the
Premises. Tenant shall not commit or allow to be committed any
waste in or upon the Premises.

SECTION 7.03.  <u>Operation of Business</u>.  Notwithstanding
anything herein to the contrary, as long as Tenant is not in
default hereunder, should Tenant at any time discontinue the
operation of its business in the Premises, Tenant shall give to
Landlord notice in writing of such discontinuance not later than
fifteen (15) days after the date on which Tenant has so
discontinued its operation (the "Closing Date"). In such event,
Landlord shall have the option, to be exercised by written notice
to Tenant given not later than ninety (90) days after the later
of: (a) the date on which Landlord receives Tenant's notice; or
(b) the Closing Date, to cancel and terminate this Lease as of
the date (the "Termination Date") which is thirty (30) days after
the last to occur of: (i) the date on which Tenant receives

11

Landlord's termination notice; or (ii) the Closing Date;
provided, however, Landlord shall not have the option to so
cancel and terminate this Lease in the event that Tenant, within
thirty (30) days of receipt of Landlord's termination notice,
gives Landlord notice of Tenant's intention either to reopen the
Premises for business or to assign or sublet the Premises in
accordance with the provisions of Article XVI hereof. However, if
Tenant: (i) does not subsequently reopen the Premises for
business within thirty (30) days of such Tenant's notice; or (ii)
does not assign this Lease or sublet the Premises in accordance
with the provisions of Article XVI hereof, then Landlord's option
to terminate shall be reinstated. In the event Landlord's
exercise of the option to cancel and terminate is not vitiated by
Tenant's subsequent notice, this Lease shall terminate upon the
Termination Date as if such date were originally set forth herein
as the expiration date of the Term of this Lease and Landlord and
Tenant shall, upon such termination, be released from any and all
liabilities thereafter accruing hereunder. However, in the event
of such termination, and as a condition of the effectiveness of
such termination, Landlord agrees to pay, not later than the
Termination Date, an amount equal to the unamortized portion (as
of the Termination Date), with amortization to be on a
straight-line basis over twenty (20) years, of the total cost
incurred by Tenant for permanent improvements to the Premises to
open for business to the public, excluding, however, the cost of
Tenant's furniture, equipment, fixtures and inventory.

          SECTION 7.05. Tenant's Use of Parking. Tenant, for the
use and benefit of Tenant, its agents, customers, licensees and
subtenants, shall have the non-exclusive right, in common with
other tenant(s) of the Building and their agents, customers,
licensees and subtenants, to use the roof parking (along with the
ground parking) and the ramps leading thereto, during the entire
Term of this Lease, for ingress, egress and automobile parking
during Tenant's operating hours. There shall be no charge levied
against Tenant for the use of the parking areas. Tenant, in the
use of the parKing areas, agrees to comply with such reasonable
rules and regulations for parking as Landlord may from time to
time adopt for the orderly and proper operation of the parking
areas.  If requested by Tenant, Landlord will institute or
install procedures and/or mechanisms to prevent outsiders and
employees from using the parking areas during Tenant's operating
hours, such as an automatic parking gate or a security guard, the
cost of which shall be part of CAM Charge."

**ARTICLE VIII**

**REPAIRS**

          SECTION 8.01.  Maintenance of Common Areas/Tenants
Contribution.  Landlord agrees to maintain all common areas of
the Building in good order, condition and repair and in a safe,

clean, sightly and sanitary condition in accordance with good and
accepted retail practices. The term "common areas" shall
include,without limitation, parking areas, driveways, truckways,
ramps, loading and receiving areas, trash compactor areas,
freight staging areas, delivery passages, access and egress
entrances and roads, walkways, sidewalks, lobbies, landscaped and
planted areas, stairways, escalators, elevators, bus stops, fire
and service corridors, and public rest rooms, if any, and all
areas in the Building and Shopping Center, used in common by the
Tenant, their customers or employees. The common area
maintenance obligations of Landlord shall include, without
limitation, the re-striping of parking areas when required,
cleaning and removal of ice and snow, repairing of common areas,
and adequate lighting of all common areas during all hours of
darkness during which Tenant shall be open for business and for
one (1) hour thereafter.

Tenant shall pay to Landlord Tenant's Proportionate Share of
the reasonable costs of repairing, replacing and maintaining the
common areas, including the amortized cost of capital expenses
amortized over the useful life, plus applicable interest, and
providing hazard and liability insurance (as described in Article
X) for the Building (such costs are herein defined as the "CAM
Charge"). Tenant agrees to pay to Landlord an administrative
charge of five (5%) percent of Tenant's Proportionate Share of
the CAM Charge.

On the Commencement Date Landlord shall submit to Tenant a
statement of the anticipated monthly CAM Charges for the period
from the Commencement Date to the following December 31st and
Tenant shall pay these CAM Charges on a monthly basis
concurrently with the monthly installment of Annual Minimum Rent.
Tenant shall continue to make said monthly payments until
notified by Landlord of a change thereof. By March 1st of each
calendar year during the Term hereof, Landlord shall use its best
efforts to give to Tenant a statement showing the total CAM
Charge for the Shopping Center for the prior calendar year.
Landlord shall also furnish Tenant with its statement back-up
invoices, receipts and other data as shall be necessary in order
for Tenant to verify the amount of such CAM Charge. In the event
that the total of the monthly payments which Tenant has made for
the prior the calendar year are less than the Tenant's actual
Proportionate Share of such CAM Charge then Tenant shall pay the
difference in a lump sum within thirty (30) days after receipt of
such statement from Landlord and shall concurrently pay the
difference in monthly payments made in the then calendar year and
the amount of monthly payments which are then calculated as the
monthly CAM Charge based on the prior year' s experience. Any
over payment by Tenant shall be credited towards the monthly CAM
Charge payment next coming due. The actual CAM Charge for the
prior year shall be used for purposes of calculating the
anticipated CAM Charge for the then current year with actual

13

determination after each calendar year as above provided. Even though the Term of this Lease has expired and Tenant has vacated the Premises, when the final determination is made of Tenant's Proportionate Share of CAM Charge for the year in which this Lease terminates, Tenant shall immediately pay any increase due over the estimated CAM Charge previously paid and, conversely, any over payment made shall be immediately rebated by Landlord to Tenant.

Tenant will have the right to audit and inspect all of Landlord's records relating to the costs and expenses in which Tenant is required to share pursuant to this Section 8.01, not more than once per year, upon reasonable written notice, at the Landlord's principal accounting office, for any preceding three (3) calendar years; provided however, that in no event shall Tenant have the right to inspect any books or records relating to any calendar year previously audited by Tenant. Appropriate adjustments shall be made for errors in the amount of such computations revealed by such audit or inspection. If any such audit or inspection by Tenant indicates an overcharge in the amount of Tenant's Proportionate Share of such CAM Charge by more than three percent (3%), the reasonable costs of such audit or inspection shall be paid on demand to Tenant by Landlord; otherwise, the expenses of Tenant' s audit or inspection shall be borne by Tenant. If there has been an overcharge and a resulting overpayment by Tenant, such amount shall either be credited to Tenant's next payment of CAM Charge, or be promptly reimbursed by Landlord to Tenant; and if such reimbursement does not occur within forty-five (45) days after Landlord has been given notice of the overcharge established by such audit or inspection, the Tenant shall have the right to offset the amount of such overcharge from the CAM Charge thereafter accruing until, in such fashion, such overcharge shall have been recovered in full. Any underpayment by Tenant shall be paid by Tenant to Landlord forthwith. If Tenant does not make such an audit within three (3) years from the end of a given calendar year, then the statement of CAM Charges furnished for such calendar year shall be deemed to be correct and Tenant shall have no right thereafter to inspect, audit or contest same. Landlord retains the option to maintain its records of CAM Charges on microfiches, computer diskettes, or any similar type of data storage system.

SECTION 8.02. Landlord Obligations. Landlord will assign to Tenant any unexpired warranties Landlord receives from manufacturers, contractors or others with respect to the Premises or any part thereof (including, without limitation, the heating, ventilation and air conditioning equipment serving the Premises), except those unexpired warranties with respect to those portions of the Premises to be maintained by Landlord as hereinafter provided. Except as herein provided to the contrary, Landlord shall not be obligated to make repairs, replacements or improvements of any kind to the interior of the Premises or to

14

any equipment, facilities or fixtures exclusively in and serving the Premises, all of which shall be Tenant's responsibility. Landlord shall during the first ten (10) years of the Term be obligated, at its sole cost and expense, to make all repairs, replacements and improvements of any kind in order to remedy any defects in Landlord's Work resulting from Landlord's failure to complete Landlord's Work in accordance with the Plans and Specifications.

SECTION 8.03. <u>Tenant's Obligations</u>.  Except for the items Landlord is required to maintain pursuant to Sections 8.01 and 8.02, Tenant shall, at all times during the Term, at its sole expense, keep and maintain the Premises in good order, condition and repair and in a safe condition, including the roof of the Building (to be maintained in a watertight condition at all times), all utility lines serving the Premises (from the point of connection at the Premises to the public utility mains) the exterior, including without limitation, the walls and the structural portions of the Premises, including, without limitation, the walls and the structural portions of the Premises, including without limitation, footings and foundation, floor slab, sidewalk and structural walls, columns and beams, reasonable wear and tear, damage caused by casualty or by the willful misconduct or negligence of Landlord, its employees, agents or contractors or by Landlord's failure to maintain or repair the Premises in accordance with its obligations under this Lease excepted.

Tenant's obligations hereunder shall also be subject to the provisions of Article XI and XII and to Landlord's obligation to clear the Premises of all dirt and debris following completion of Landlord's Work pursuant to Section 3.01.

Tenant shall be permitted to maintain a dumpster or similar refuse container in or near the Premises, in a location to be reasonable provided by Landlord. The obligation to remove trash and cost of removal of trash from such dumpster or refuse container shall be borne by Tenant.

SECTION 8.04. <u>Mutual Self-Help</u>.  (a)  Upon reasonable advance notice, Landlord and its designees shall have the right to enter upon the Premises during normal business hours for the purpose of inspecting or making repairs to the same.  If repairs are required to be made by Tenant pursuant to the terms hereof, Landlord shall notify Tenant to make such repairs, and if Tenant refuses or neglects to commence such repairs and complete the same with reasonable dispatch after such notice, Landlord may (but shall not be required so to do) make or cause such repairs to be made.  If Landlord makes or causes such repairs to be made, Tenant agrees that it will pay to Landlord the reasonable cost thereof as Additional Rent hereunder with the next installment of Annual Minimum Rent.  Landlord agrees that any such repairs

15

shall be made at such time and in such manner as will minimize
interference with the business being conducted at the Premises.

(b) Conversely, if any repairs to the Premises or any
other obligation required by the terms hereof to be performed by
Landlord are not performed by Landlord promptly or not commenced
with reasonable diligence after prior written notice to Landlord
and to Landlord's mortgagee as set forth in Section 17.02(b),
Tenant shall have the right to perform such obligation of
Landlord.  If Tenant performs any such obligation of Landlord,
Landlord agrees that it will pay to Tenant the reasonable cost
thereof, and if Landlord shall fail to make such payment within
fifteen (15) days after Tenant's request therefor, the Tenant
shall have the right to deduct the amount thereof from the next
succeeding payment(s) of Annual Minimum Rent and Percentage Rent
next accruing hereunder, but in no event shall such deduction
exceed twenty-five percent (25%) of each monthly installment of
Annual Minimum Rent.

(c) If an emergency occurs where something is required
to be done immediately in order to avoid damage to the Premises
or lapse of insurance coverage or if snow removal is not promptly
accomplished, either party shall have the right to self-help
consistent with subsections (a) and (b) above, without the
requirement of formal notice.  However, this right of self-help,
as well as those rights set forth in subsections (a) and (b)
hereof, shall be carefully and judiciously exercised by either
party, it being understood and agreed that wherever possible, the
party initially responsible for taking such action should be
given sufficient opportunity so to do, in order to avoid any
conflict with respect to whether or not self-help should have
been availed of, or with respect to the reasonableness of the
expenses incurred.

SECTION 8.05.  Hazardous Materials.  (a) Landlord
represents and warrants that to the best of its knowledge and
belief, there are no Hazardous Materials present in the Premises,
and Landlord agrees that the removal or neutralization of any
such Hazardous Materials shall be at the sole cost and expense of
Landlord, other than Hazardous Materials installed by Tenant.
"Hazardous Materials" shall mean (i) any waste, material or
substance (whether in the form of a liquid, a solid, or a gas and
whether or not air-borne) which is deemed to be a pollutant or a
contaminant, or to be hazardous, toxic, ignitable, reactive,
infectious, explosive, corrosive, dangerous, harmful or injurious
to public health or to the environment, and which is now or
becomes regulated in the future by or under the authority of any
applicable local, state or federal laws, judgments, ordinances,
orders, rules, regulations, codes or other governmental
restrictions or requirements, any amendments or successor(s)
thereto, replacements thereof or publications promulgated
pursuant thereto (collectively "Environmental Regulations", and

individually, "Environmental Regulation"); (ii) petroleum;
(iii) asbestos and asbestos containing materials; (iv) any
polychlorinated biphenyl; and (v) any radioactive material.  In
addition to the foregoing, the term "Environmental Regulations"
shall be deemed to include, without limitation, local, state and
federal laws, judgments, ordinances, orders, rules, regulations,
codes and other governmental restrictions and requirements, any
amendments and successors thereto, replacements thereof and
publications promulgated pursuant thereto, which deal with or
otherwise in any manner relate to, environmental matters of any
kind.

    (b)   Landlord and Tenant each agree that neither
Landlord nor Tenant shall cause any Hazardous Materials to exist
on, or to escape, seep, leak, spill or be discharged, emitted or
released from the Premises during the Term in violation of any
applicable Environmental Regulation.

    (c)   Landlord hereby indemnifies Tenant and its
successors and assigns, and agrees to hold Tenant and its
successors and assigns harmless from and against any and all
losses, liabilities, damages, injuries, penalties, fines, costs,
expenses and claims of any and every kind whatsoever, including
attorney's fees and costs (collectively "Environmental
Liabilities") paid, incurred or suffered by, or asserted against,
Tenant or its successors and assigns with respect to, or as a
direct or indirect result of, the presence on or under, or the
escape, seepage, leakage, spillage, discharge, emission or
release from the Premises of any Hazardous Materials which was
brought in to the Premises by Landlord, its agents, employees or
their respective predecessors-in-interest, or caused by breach by
Landlord, its agents, employees or their respective predecessors-
in-interest of any Environmental Regulation to which Landlord is
subject.  Such indemnity does not extend to consequential
damages.

    (d)   Tenant hereby indemnifies Landlord and its
successors and assigns, and agrees to hold Landlord and its
successors and assigns harmless from and against any and all
Environmental Liabilities paid, incurred or suffered by, or
asserted against, Landlord or its successors and assigns with
respect to, or as a direct or indirect result of, the presence on
or under, or the escape, seepage, leakage, spillage, discharge,
emission or release from the Premises of any Hazardous Materials
which was brought in to the Premises by Tenant, its agents or
employees, or caused by breach by Tenant of any Environmental
Regulation to which Tenant is subject.  Such indemnity does not
extend to consequential damages.

    (e)   With respect to Hazardous Materials which are or
become present at the Premises as the result of any cause
whatsoever (other than Hazardous Material which was brought in to

17

the Premises by Tenant, its agents, employees or invitees) that
renders the Premises Unusable (as hereinafter defined), Landlord
shall, at Landlord's sole cost, in a good, workmanlike and
expeditious manner, and in compliance with Environmental
Regulations, perform all work necessary to render the Premises no
longer Unusable.   Should Tenant be required to close during the
removal or neutralization of such materials by Landlord, all rent
and related charges shall be abated until such time as Tenant can
safely resume normal business operations.   If such work is not
commenced within thirty (30) days after the date (the
"Notification Date") that Tenant notifies Landlord of Hazardous
Materials rendering the Premises Unusable (or such additional
period as may be reasonably required to engage environmental
consultants and/or engineers and obtain permits and licenses) or
if such work is not completed within ninety (90) days after the
Notification Date (or such additional period as may reasonably be
required given the nature of the work, provided that Landlord
diligently pursues same to completion), then Tenant's sole remedy
under this Lease (other than any other remedy Tenant may have
under this Lease, including, without limitation, the indemnity
provided in subsection (c) above), or otherwise at law or in
equity, shall be to terminate this Lease by giving written notice
of termination to Landlord; provided, however, that Tenant's
option to terminate this Lease pursuant to this subsection (e)
shall cease to exist at any time the Premises are no longer
Unusable.   If this Lease is terminated by Tenant pursuant to this
subsection (e), neither Landlord nor Tenant shall have any
further obligations to the other under this Lease, or otherwise
with respect to the Premises; provided, however, that nothing
herein shall be construed to release Tenant from any obligation
under the Lease accrued or payable prior to the date of
termination.   For the purpose of this subsection (e), "Unusable"
means that the Tenant does not have access to at least ninety
percent (90%) of the Premises because of the enforcement of any
Environmental Regulation or the need for the use of the Premises
for remediation of any Hazardous Materials, or because the use of
the Premises would represent a risk to the health or safety of
Tenant, Tenant's employees, agents or invitees.

     (f)   The indemnities contained in subsections (c) and
(d) above shall survive the expiration or earlier termination of
this Lease.

     SECTION 8.06.   Surrender of the Premises.   At the
expiration or earlier termination of the tenancy hereby created,
Tenant shall surrender the Premises to Landlord in the same
condition as it is required to be maintained by Tenant pursuant
to Section 8.03 above, reasonable wear and tear and damage
coverable by insurance required to maintained hereunder excepted.
Tenant shall remove all of its personal property, movable trade
fixtures and signs and repair any damage caused thereby.

## ARTICLE IX

## REQUIREMENTS OF LAW

SECTION 9.01. <u>Landlord's Obligations</u>. Except as provided in Section 9.02, Landlord shall, at its expense, comply with or cause to be complied with all insurance requirements and with all laws, statutes, ordinances and regulations of Federal, state, county and municipal authorities (collectively, "<u>Laws</u>") which shall impose any duty upon Landlord, and relating to the items Landlord is required to maintain under 8.01 hereof.

SECTION 9.02. <u>Tenant's Obligations</u>. Commencing on the Acceptance Date, Tenant, at its expense, shall comply with all Laws relating to the physical condition of the Premises (except with respect to any Hazardous Materials, in which case Section 8.04 shall govern) relating to the items Tenant is required to repair under 8.02 hereof.

SECTION 9.03. <u>Right to Contest</u>. The party responsible for compliance pursuant to Section 9.01 or 9.02 shall have the right to contest the validity of any Law at the expense of the party responsible for compliance, unless such contest would result in any criminal liability imposed upon the other party.

## ARTICLE X

## INSURANCE

SECTION 10.01. <u>Landlord's Liability and Property Damage Insurance</u>. Beginning with the commencement of Landlord's Work and thereafter continuously until the expiration of the Term, Landlord shall purchase and keep in force, or cause to be purchased and kept in force, broad form comprehensive general liability insurance, written on an occurrence and not on a claims-made basis, containing provisions adequate to protect both Landlord and Tenant from and against claims for bodily injury, including death and personal injury (and with the employee exclusion deleted as to all such claims for personal injury), and claims for property damage occurring on, in, or about the common areas of the Building and Shopping Center (and/or occurring on the Premises due to the acts, omissions or negligence of Landlord, or its employees, independent contractors, architects or engineers or due to Landlord's failure to comply with, or default or other breach of, the provisions of this Lease), such insurance having bodily injury and property damage combined limits of liability of not less than $5,000,000.00 per occurrence, which coverage may be provided by supplementing the comprehensive general liability policy with an umbrella liability policy.

19

SECTION 10.02.  <u>Tenant's Liability and Property Damage
Insurance</u>.  Beginning with the Acceptance Date and thereafter
continuously until such expiration of the Term, Tenant shall
purchase and keep in force, or cause to be kept in force, with
respect to Tenant's obligations in the Premises, comprehensive
general liability insurance in limits not less than those set
forth in Section 10.01, and Tenant shall furnish certificates
evidencing such coverage to Landlord. Tenant shall name Landlord
as an additional insured in all policies required in this Section
10.02.

SECTION 10.03.  <u>Landlord's Hazard Insurance</u>.  (a)
Beginning with the commencement of Landlord's Work and thereafter
continuously until the expiration of the Term, Landlord shall
purchase and keep in force, or cause to be purchased and kept in
force, insurance upon the Building and Shopping Center against
loss or damage by a hazard insured under a so-called All Risk
Policy and such additional insurance as would customarily be
carried by owners of buildings in the same locale as the
Building, and in all events including collapse, vandalism and
malicious mischief, water damage and sprinkler leakage,
comprehensive boiler and machinery insurance, and flood and
earthquake insurance, in amounts sufficient to prevent Landlord
or Tenant from becoming a co-insurer within the terms of the
applicable policies and in an amount equal to not less than
eighty percent (80%) of the actual replacement cost of the
improvements upon the Building, including the value of all
additions, alterations, replacements and repairs thereto, by
whomever made, as well as the machinery, equipment and their
systems forming a part thereof.  The phrase "actual replacement
cost" shall mean the actual replacement cost (excluding cost of
excavations, foundations, footings, underground pipes, conduits,
flues and drains) without diminution of such cost for
depreciation or obsolescence.  The foregoing policy shall contain
an agreed-amount clause waiving coinsurance and Landlord shall
annually update the amount of insurance coverage and arrange to
continue the agreed-amount clause.  The foregoing policy shall
also contain, to the extent applicable, endorsements providing
coverage for demolition and debris removal costs, increased cost
of construction, and contingent liability from operation of
building laws, and Landlord may provide in any policies required
by this subsection (a) that the proceeds from such policies shall
be payable to the lender having the first mortgage lien upon the
Building, provided that said mortgage expressly provides that
said proceeds shall be held in trust and released promptly by
such lender as required of Landlord by this Lease for repair and
rebuilding as contemplated by Article XI of this Lease.  Landlord
shall promptly deliver to Tenant, upon written request, a true
and correct copy of the recorded counterpart of said mortgage and
renewals or extensions thereof in the event Landlord provides in
any policy required by this Section 10.03 that the proceeds
thereof be so payable to such lender.  Any policy of insurance

20

obtained by Landlord insuring improvements of or property on the Building shall contain a waiver of subrogation in favor of Tenant.

(b) Each policy of insurance described in this Section 10.03 shall provide that it shall not be cancelable without at least thirty (30) days prior written notice to Tenant. Throughout the Term, not less than thirty (30) days prior to the expiration dates of policies to be furnished hereunder, certificates of initial or renewal policies, as the case may be, shall be delivered to Tenant by Landlord. All insurance required of Landlord by this Section 10.03 shall be effected under valid and enforceable policies issued by insurers of recognized responsibility and which are rated no lower than "A-" and a surplus rating of not less than class "X" by Best's rating service (or a comparable rating by an equivalent service if Best's shall cease to publish such ratings).

(c) Nothing contained in this Section 10.03 shall prohibit Landlord from obtaining a policy or policies of blanket insurance which may cover other property of Landlord, provided that: (i) any such blanket policy expressly allocates to the properties hereunder to be insured by Landlord not less than the amount of insurance required hereunder to be maintained by Landlord; (ii) such blanket policy shall not diminish the obligations of Landlord so that the proceeds from such policies shall be an amount no less than the amount of the proceeds that would be available if Landlord obtained the required insurance under policies separately insuring the risks which this Lease requires Landlord to insure; and (iii) Landlord shall provide evidence reasonably satisfactory to Tenant of the cost of such insurance allocable to the Building.

SECTION 10.04. _Tenant's Proportionate Share of Landlord's Insurance_. From and after the Commencement Date, Tenant agrees to pay Tenant's Proportionate Share of the reasonable annual costs incurred by Landlord in maintaining the foregoing liability and hazard insurance during the Term hereof (but in no event shall Tenant be required to pay any portion of the premiums relating to any hazardous use within the Building causing higher premium charges.

Tenant shall pay Tenant's Proportionate Share of such insurance within thirty (30) days after Landlord submits to Tenant a bill for the same along with all required supporting documentation. Irrespective of the cause thereof, Tenant shall not at any time be liable for any loss or damage to the Building or the Premises resulting from fire, explosion or any other extended coverage casualty.

SECTION 10.05. _Tenant's Hazard Insurance_. Commencing on the Acceptance Date and thereafter continuously until the

expiration of the Term, Tenant shall maintain in full force and
effect fire and extended coverage insurance covering all of
Tenant's Property (as defined in Article XV) in amounts no less
than eighty percent (80%) of the replacement value thereof;
provided, however, that Tenant's parent corporation shall have
the right to self-insure Tenant's Property.

SECTION 10.06.  <u>Indemnity</u>.  Subject to the provisions
of this Article X, during the Term, Tenant shall indemnify,
defend and hold Landlord harmless against all costs, expenses,
penalties, claims or demands of whatsoever nature arising from or
relating to Tenant' s use of the Premises, except those which
shall result from the negligence or willful misconduct of
Landlord, its agents, contractors, or employees.  Subject to the
provisions of this Article X, during the Term, Landlord shall
indemnify, defend and save Tenant harmless against all costs,
expenses, penalties, claims or demands of whatsoever nature
arising from or relating to Landlord' s or its agents',
contractors' or employees' use of the Premises, except those
which shall result from the negligence or willful misconduct of
Tenant, its agents, contractors, employees, customers, or
licensees.

SECTION 10.07.  <u>Mutual Waiver of Subrogation</u>.  Landlord
and Tenant mutually agree that, with respect to any loss which is
covered by insurance then being, or required hereunder to be,
carried by them, respectively, the one carrying or required
hereunder to be carrying such insurance and suffering said loss
releases the other of and from any and all claims with respect to
such loss; and they further mutually agree that their respective
insurance companies shall have no right of subrogation against
the other on account thereof.  In the event that extra premium is
payable by either party as a result of this provision, the other
party shall reimburse the party paying such premium the amount of
such extra premium.  If, at the written request of one party,
this release and non-subrogation provision is waived, then the
obligation of reimbursement shall cease for such period of time
as such waiver shall be effective, but nothing contained in this
Section 10.07 shall be deemed to modify or otherwise affect
releases elsewhere herein contained of either party for claims."

## ARTICLE XI

### DAMAGE OR DESTRUCTION

SECTION 11.01.  <u>Landlord's Obligation to Rebuild
Premises</u>.  If all, or any part of the Premises, Building
exterior, or common areas of the Buildings or Shopping Center is
damaged or destroyed by fire, the elements or other casualty,
then Landlord shall, at Landlord's sole cost and expense, to the
extent of the available insurance proceeds, timely repair the
damage and restore the Premises.  If Landlord fails to complete

22

such repair or restoration within three hundred and sixty (360) days thereafter, the provision of Section 11.05 herein shall control. In no event shall Landlord be required to repair or replace Tenant's stock in trade, fixtures, furriture, furnishings, floor coverings and equipment.

SECTION 11.02.  Rent Adjustment.  If Tenant is deprived of the use of all or any portion of the Premises by reason of such damage or destruction to the Premises or common areas or the repair thereof, then the Annual Minimum Rent and all other charges payable hereunder shall be abated (during such period as Tenant is open for business but is deprived of the use of any portion of the Premises in proportion to the area of the Premises which is untenantable) according to the extent of the interference with Tenant's use thereof.

SECTION 11.04.  Reopening of Premises.  It is understood and agreed that Tenant shall have thirty (30) days after the date Landlord notifies Tenant that all repairs and restoration to the Premises are completed within which to reopen the Premises and that Tenant shall have no obligation to pay any Annual Minimum Rent or any other charges payable hereunder during such thirty (30) day period unless Tenant opens the Premises for business within such thirty (30) day period.  Notwithstanding the foregoing, Tenant shall not be required to reopen the Premises, nor to pay any Annual Minimum Rent or any other charges payable hereunder during the period from November 1st through February 28th, but if Tenant elects to open during such period it shall pay full rent.

SECTION 11.05.  Commencement and Completion of Restoration.  Notwithstanding anything contained in this Article XI to the contrary and subject to Section 22.12, if Landlord is required to restore or repair hereunder, and if: (i) Landlord fails to commence in good faith such repair and restoration within ninety (90) days after any damage or destruction; or (ii) Landlord fails to timely complete such repair and restoration within three hundred and sixty (360) days after such damage or destruction or within such longer period as to which Landlord and Tenant may have agreed in writing and Landlord is not, at the expiration of such time period, continuously and diligently pursuing such repair and restoration; then Tenant shall have the option, upon seven (7) days prior written notice to Landlord and Landlord's failure to cure within said seven (7) days, to elect: (X) to complete the repair and restoration to the Premises; and (1) to receive reimbursement therefor in full from Landlord on demand and/or (2) to offset the cost and expense thereof against the payment of Annual Minimum Rent and all other charges payable by Tenant hereunder, and, at Tenant's option, to extend the Term until such time as Tenant, through such offsets, has recouped the entire cost and expense to Tenant of such repair and restoration;

23

or (Y) to terminate this Lease effective as of the date of such damage or destruction.

SECTION 11.06.   Underline{End of Term}.   Notwithstanding anything contained in this Article XI to the contrary, if Tenant is deprived of the use of all or any material portion of the Premises by reason of such damage or destruction and such damage or destruction occurs during the last three (3) years of the Term, then either party shall have the right to terminate this Lease, effective as of the date of such damage or destruction, by giving notice of such election to the other party within sixty (60) days after the occurrence of such damage or destruction.

If more than twenty-five percent (25%) in value of Tenant's Property is destroyed or rendered unusable by fire, the elements or other casualty during the last eighteen (18) months of the Term, then Tenant shall have the right to terminate this Lease, effective as of the date of such damage or destruction, by giving notice of such election to Landlord within sixty (60) days after the occurrence of such damage or destruction.

## ARTICLE XII

### CONDEMNATION

SECTION 12.01.   Underline{Taking}.   In the event of condemnation by eminent domain or similar law, including a sale in lieu thereof to an authority or other entity having the power of eminent domain (a "Taking"), of all or any portion of the Premises or the common areas which Tenant has a right to use hereunder, then Landlord or Tenant may terminate this Lease by giving notice to Landlord not more than ninety (90) days after the later of the date on which title vests in the condemning authority or the date Tenant receives notice of said vesting. Notwithstanding the above, in the event that the Taking is exclusive of the Premises, Tenant may not terminate the Lease unless the Taking would materially effect the ingress/egress of the Shopping Center or reduce the parking in the Shopping Center below 3.5 cars per 1,000 square feet of the Building, or would otherwise materially affect Tenant's operation.

SECTION 12.02.   Underline{Restoration and Rent Adjustment}.   In the event of a Taking, if this Lease is not terminated pursuant to Section 12.01, then: (a) Landlord, at its sole cost and expense, shall promptly restore the Premises and/or such common areas. as the case may be, as nearly as practicable to a complete unit of like quality and character as existed prior to the Taking to the extent such award proceeds are available; and (b) if a portion of the Premises is taken, then from and after the date on which title vests in the condemning authority, the Annual Minimum Rent and all additional rent and other charges payable hereunder shall be equitably reduced.

24

Landlord, and the amount so paid by Landlord and/or all costs and expenses including reasonable attorney's fees incurred by Landlord in procuring the discharge of such lien shall be deemed to be additional rent hereunder payable immediately.  Landlord agrees to give Tenant prompt notice of any mechanics lien. Nothing in this Lease contained shall be construed as a consent on the part of the Landlord to subject Landlord's estate in the Premises to any lien or liability under any law relating to liens.

SECTION 13.03.  <u>Nuisance</u>.  Tenant shall not do or permit anything to be done in or about the Premises or the Building which will in any way obstruct or interfere with the rights of other tenants or occupants of the Building or injure or annoy them or cause or allow the Premises to be used for any improper, immoral, unlawful or objections purpose; nor shall Tenant cause, maintain or permit any nuisance in, on or about the Premises. Tenant shall not commit or allow to be committed any waste in or upon the Premises or the Building.

## ARTICLE XIV

### SIGNS

SECTION 14.01.  <u>Tenant's Signs</u>.  Tenant shall have the right to erect in or on the Premises on all sides any signs indicated in final plans and specifications, or approved by Landlord.  Landlord's approval shall not be unreasonably withheld.  Any such sign shall be of such height and other dimensions as Tenant shall determine and shall bear such legend or inscription advertising Tenant's business as Tenant shall determine, subject to all applicable governmental laws, regulations and restrictions.  Notwithstanding anything to the contrary contained in this Section 14.01, Tenant shall only erect such signs in or on the Premises or the Building as are in such locations as are mutually agreed to by Landlord and Tenant prior to each parties approval of the plans and specifications for the Building. Any deviations from the approved initial signage plan shall require Landlord's approval, which approval shall not be unreasonably withheld or delayed. Any such sign shall be subject to all applicable governmental laws, regulations and restrictions.

SECTION 14.02.  <u>Sign Limitation</u>.  Landlord shall not, without Tenant's written consent, which Tenant may withhold in its sole discretion, display or permit to be displayed any other advertising signs, billboards or posters in, on or about the exterior wall of the Premises other than those of other tenants of the Building.  Tenant shall have the right to install its sign panel on a pylon sign (if approved by the Village of Skokie), the design of which shall be mutually agreed to by Landlord and Tenant.

26

SECTION 12.03.  Vacating the Premises.  If this Lease is terminated pursuant to this Article XII, then any Annual Minimum Rent and other charges paid in advance shall be refunded to Tenant.  In the event of any Taking, Tenant shall be entitled to file for a separate award only, in an amount equal to Tenant's unamortized cost of Tenant's leasehold improvements in the Premises, if any.  Tenant's separate award may include the right to claim and recover from the condemning authority such compensation as may be separately awarded or recoverable by Tenant on account of any and all damage to Tenant's business by reason of the condemnation and for or on account of any cost or loss to which Tenant might be put in moving Tenant's Property, or for any other damages compensable separately to Tenant.  Tenant may not share in Landlord's award.

## ARTICLE XIII

### ALTERATIONS AND MECHANICS' LIENS

SECTION 13.01.  Tenant's Alteration Rights.  Tenant shall have the right, at its own cost and expense, to make alterations to the Premises; provided, however, that (a) Tenant shall not make structural alterations, exterior alterations, alterations to the rooftop HVAC or vertical transportation to the Premises or paint the exterior without Landlord's prior written consent, which consent shall not unreasonably be withheld, conditioned or delayed and (b) such alterations shall be done lien-free and in good workmanlike manner using first-quality materials.  Tenant shall not be required to remove any alterations or restore the Premises to its original condition upon the termination of this Lease, at which time such alterations shall become the property of Landlord.  Landlord agrees to cooperate with Tenant in procuring all necessary permits for any alterations which Tenant is permitted to make. Tenant shall deliver to Landlord copies of its plans and specifications prior to making any alterations to the Premises in accordance with this Article 13.

SECTION 13.02.  Mechanics' Liens.  Tenant covenants that Tenant shall within thirty (30) days of filing promptly discharge of record (by payment, bond, order of a court of competent jurisdiction or otherwise) any mechanic's lien filed against the Premises for any work, labor, services or materials claimed to have been performed at, or furnished to, the Premises, for or on behalf of Tenant, or at the insistence of Tenant, or anyone acting for, through or under Tenant. If Tenant shall fail to cause such lien to be discharged within thirty (30) days after the filing of such lien, then, in addition to any other right or remedy of Landlord, Landlord may, but shall not be obligated to, discharge the same by paying the amount claimed to be due, by bonding or by any other proceeding deemed appropriate by

25

## ARTICLE XV

### TENANT'S PROPERTY

SECTION 15.01.  <u>Tenant's Property</u>.  All of Tenant's
movable trade fixtures, ornate light fixtures, equipment,
furniture, inventory and other property owned by Tenant and
located at, on or in the Premises, including, without limitation,
computer display and storage area showcases, partitions,
mezzanine, shelving, wall cases and signs (collectively,
"<u>Tenant's Property</u>"), shall remain the property of Tenant, exempt
from the claims of Landlord or any mortgagee or ground lessor,
without regard to the means by which or the persons by whom
Tenant's Property is installed or attached.  Tenant shall have
the right at any time and from time to time to remove Tenant's
Property, provided that if removal of any of Tenant's Property
damages any part of the Premises or the Building, Tenant shall
repair such damage.

## ARTICLE XVI

### ASSIGNMENT AND SUBLETTING

SECTION 16.01.  (a) <u>Assignment and Subletting Rights</u>.
Tenant may assign this Lease and sublet the Premises for any
retail use not prohibited by the terms of this Lease; <u>provided</u>,
<u>however</u>, that (1) Tenant and Guarantor shall remain liable under
the terms of this Lease, (2) Tenant shall provide a copy of the
basic business agreement, including the rent, with its request,
(3) Tenant shall forward a copy of all relevant assignment
documents to Landlord within a reasonable time thereafter, (4)
Use of the Premises by the proposed sub-tenant or assignee shall
be suitable for the Building and not violate or create any
potential violation of any governmental laws or regulations, (5)
the Premises shall not be used for any of the restricted uses set
forth on Exhibit E hereof, (6) the assignee or subtenant shall be
a retailer with at least a regional reputation, (7) and the
Premises may not be subdivided into more than three (3) spaces.
Except as set forth in subparagraph (b) hereof, Tenant shall give
Landlord written notice of its intent to assign the Lease or
sublet the Premises, and provide sufficient information to
Landlord regarding the proposed use of the Premises and the
reputation and financial strength of the proposed assignee or
subtenant.  Except for the transfers set forth in subparagraph
(b) and (c) hereof, Landlord shall have the right to recapture
the Premises by written notice to Tenant given within thirty (30)
days after receipt of Tenant's Notice and information regarding
the proposed assignee or subtenant.  Tenant may vitiate
Landlord's recapture right by notifying Landlord that Tenant
withdraws its intent to assign or sublet.  Such withdrawal notice
must be given within thirty (30) days after receipt of Landlord's
recapture notice.  Landlord's recapture notice shall specify a
lease termination date no earlier than sixty (60) days or later
than ninety (90) days after such notice.  Upon such lease
termination date, Tenant shall vacate the premises and Landlord,

27

Tenant, and the Guarantor shall be relieved of further
obligations hereunder, except that Landlord shall pay the
unamortized cost of Tenant's permanent improvements excluding
equipment and fixtures in excess of the amount reimbursed by
Landlord's allowance.   Such amortization shall be on a straight
line basis over twenty (20) years.   (b) Notwithstanding the
foregoing, Tenant shall have the right to transfer or assign this
Lease to any person, entity or corporation acquiring all or
substantially all of the stock or assets of Tenant by purchase,
merger, consolidation or otherwise in connection with the
transfer of substantially all of the Marshalls stores in the
state of Illinois subject to the use restrictions set forth in
(a), but the Guarantor shall remain liable hereunder (c) Tenant
may assign or sublet to any wholly owned direct or indirect
subsidiary of Melville Corporation, subject to the use
restrictions in subsection (a) hereof, provided that the
Guarantor remains liable.

## ARTICLE XVII

### DEFAULT

SECTION 17.01.   Tenant's Default.   (a) If Tenant
defaults in the payment of any installment of Annual Minimum Rent
or other charges payable hereunder by Tenant and such default is
not cured within ten (10) days after receipt of notice from
Landlord thereof or if Tenant defaults in the observance of any
other material covenant or agreement herein contained and Tenant
shall not, within thirty (30) days after receipt of notice
thereof from Landlord, cure or commence to cure such default (it
being intended in connection with a default not susceptible of
being cured with due diligence within said thirty (30) day period
that the time allowed Tenant within which to cure same shall be
extended for such period as may be necessary to complete same
with all due diligence) or if Tenant shall make an assignment of
its property for the benefit of creditors, shall be judicially
determined to be insolvent or shall be adjudged a bankrupt, then
Landlord may, by giving notice to Tenant at any time thereafter
during the continuance of such default, (i) terminate this Lease,
without any right by Tenant to reinstate its rights by payment of
Annual Minimum Rent or other amounts due or other performance of
the terms and conditions hereof and upon such termination Tenant
shall immediately surrender possession of the Premises to
Landlord, and Landlord shall immediately become entitled to
receive from Tenant, an amount equal to the difference between
the aggregate of all rentals reserved under this Lease for the
balance of the Term, and the fair rental value of the Premises
for that period, determined as of the date of such termination,
plus any other amounts necessary to compensate Landlord for all
detriment proximately caused by Tenant's defaults under this
Lease or which in the ordinary course of things would be likely
to result therefrom, including, but not limited to, brokerage
commissions, advertising, expenses, and remodeling expenses, or
(ii) with or without terminating this Lease, as Landlord may
elect, re-enter and repossess the Premises, or any part thereof,

28

and lease them to any other person upon such terms as Landlord shall deem reasonable, for a term within or beyond the Term; provided, however, that any such reletting prior to termination shall be for the account of Tenant, and Tenant shall remain liable for (A) Annual Minimum Rent, Taxes and other sums which would be payable hereunder by Tenant in the absence of such expiration, termination or repossession, less (B) the net proceeds, if any, of any reletting effected for the account of Tenant after deducting from such proceeds all of Landlord's reasonable expenses in connection with such reletting (including, without limitation, all repossession costs, reasonable brokerage commissions, reasonable attorneys' fees and expenses, reasonable alteration costs and expenses of preparation for such reletting). If the Premises is at the time of default sublet or leased by Tenant to others, Landlord may, as Tenant's agent, collect rents due from any subtenant or other tenant and apply such rents to Annual Minimum Rent and other charges due hereunder. Such agency, being given for security, is hereby declared to be irrevocable. Any monthly deficiencies payable by Tenant shall be paid monthly on the date herein provided for the payment of Annual Minimum Rent. Landlord may declare Annual Minimum Rent for the entire balance of the Term immediately due and payable as though such amount was payable in advance on the date the event of default occurred. Notwithstanding anything contained herein to the contrary, if Tenant shall file for protection pursuant to any applicable bankruptcy law but Tenant shall continue to operate the Premises and to pay all installments of Annual Minimum Rent and other charges payable hereunder by Tenant as and when the same become due and payable, then Tenant shall not be deemed to be in default pursuant to the terms of this Lease. If, after the lapse of all applicable grace periods, Landlord reasonably expends any money to cure a default by Tenant, then Tenant shall, on demand, pay Landlord the amount so paid by Landlord together with interest thereon at the rate of four percent (4%) per annum in excess of the prime rate charged by the First National Bank of Chicago to its most credit worthy customers (the "Default Rate"). Landlord shall also be entitled to any and all other rights and remedies available to Landlord at law and in equity; provided, however, that Landlord shall, in all instances, be required to mitigate damages. None of the foregoing remedies shall be exclusive.

(b) No expiration or termination of this Lease pursuant to subsection (a) above or by operation of law or otherwise (except as expressly provided herein), and no repossession of the Premises or any part thereof pursuant to subsection (a) above or otherwise shall relieve Tenant of its liabilities and obligations hereunder, all of which shall survive such expiration, termination or repossession, and Landlord may, at its option, sue for and collect rent and other charges due hereunder at any time as and when such charges accrue.

(c) The parties hereby waive trial by jury in any action, proceeding or counterclaim brought by either of them against the other on any matters arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Premises, and/or any claim of injury or damage. Tenant hereby expressly waives any and all rights of redemption granted by or under any present of future law if this Lease is terminated or Tenant is evicted or dispossessed by reason of violation by Tenant of any of the provisions of this Lease. No right or remedy herein conferred upon or reserved to Landlord is intended to be exclusive of any other right or remedy herein or by law provided, but each shall be cumulative and in addition to every other right or remedy given herein or now or hereafter existing at law or in equity or by statute.

SECTION 17.02. <u>Landlord's Default</u>. (a) If Landlord shall (i) default in the observance of any material covenant or agreement herein contained (including, without limitation, any covenants or obligations set forth in Articles VIII, IX, X or XI) or shall fail to pay insurance premiums or other charges payable by Landlord hereunder when the same become due and payable and Landlord does not cure such default within thirty (30) days after written notice thereof by Tenant (it being intended in connection with a default not susceptible of being cured with due diligence within said thirty (30) day period that the time allowed Landlord within which to cure same shall be extended for such period as may be necessary to complete same with all due diligence), then Tenant may, in addition to all other rights and remedies available to Tenant at law and in equity, cure such default on behalf of and at the expense of Landlord and do all necessary work and make all necessary payments in connection therewith to the extent necessary in Tenant's discretion, reasonably exercised, to protect Tenant's leasehold interest and continued use and occupancy of the Premises.

(b) Provided the holder of a properly recorded deed of trust or mortgage shall have notified Tenant in writing that it is the holder of such lien on the Premises and shall so request, Tenant shall (with respect to any obligations on any deed of trust, mortgage or encumbrance affecting title to the Premises and to which this Lease shall be subordinate), if Tenant shall notify Landlord to correct any default, give a similar notice to such holder and such holder shall be granted fifteen (15) days after receipt thereof to correct or remedy such default.

### ARTICLE VIII

### SUBORDINATION, TRANSFER OF INTEREST

SECTION 18.01. <u>Subordination</u>. Tenant agrees that deeds of trust or mortgages securing sums of money may

30

subsequently be executed and delivered by Landlord, and that
Tenant will, upon request, subordinate this Lease to any such
deed of trust or mortgage on the express condition that the
lender, trustee or mortgagee shall enter into an agreement with
Tenant in substance and form substantially in the form of Exhibit
"F" attached hereto providing that (a) the use and occupancy by
Tenant of the Premises shall not be disturbed and all of Tenant's
other rights under this Lease shall be recognized unless and
until Tenant shall breach any material provision hereof; (b) in
the event of any foreclosure or other suit, public or private
sale, or in the event of a sale in lieu of foreclosure, the
lender, trustee or mortgagee will hold or offer and sell the
property covered thereby subject to all of the terms and
conditions of this Lease; and (c) subject to the terms of such
deed of trust or mortgage, fire insurance proceeds and
condemnation awards will be applied towards restoration of the
Premises in any case where Landlord is required to repair or
restore same pursuant to this Lease.

SECTION 18.02.   <u>Transfer of Interest</u>.   Landlord shall
provide Tenant with notice upon or immediately after any sale or
transfer of Landlord's interest in the Premises.   Landlord shall
require the buyer or transferee to assume in writing all of the
obligations of Landlord under this Lease and Landlord shall
continue to remain liable for all accrued liability, if any, up
to the date of such sale or transfer.   Upon assumption by the
buyer or transferee, Landlord shall be released from all
obligations under this Lease.

SECTION 18.03.   <u>Tenant Estoppel Certificates</u>.   Tenant
agrees, within twenty (20) days of Landlord's request, to execute
and deliver to Landlord or any mortgagee or trustee, on a form
prepared by or on behalf of the party so requesting substantially
in the form of Exhibit "G" attached hereto, an estoppel
certificate (a) ratifying the Lease and confirming that there are
no modifications or amendments to the Lease, except as may be
stated in the certificate, (b) confirming the commencement and
expiration dates of the Lease, (c) certifying to the best of
Tenant's knowledge and belief that the Landlord is not in default
under the Lease, and that there are no offsets or defenses to
enforcement of the Lease, except as may be stated in the
certificate, and (d) stating the date through which Annual
Minimum Rent and other charges payable by Tenant have been paid.

SECTION 18.04.   <u>Landlord Estoppel Certificates</u>.
Landlord agrees, within thirty (30) days of Tenant's request, to
execute and deliver to Tenant or any assignee or transferee, on a
form prepared by or on behalf of the party so requesting, an
estoppel certificate (a) ratifying the Lease and confirming that
there are no modifications or amendments to the Lease, except as
may be stated in the certificate, (b) confirming the commencement
and expiration dates of the Lease, (c) certifying to the best of

31

Landlord's knowledge and belief that Tenant is not in default under the Lease, and that there are no offsets or defenses to enforcement of the Lease, except as may be stated in the certificate, and (d) stating the date through which Annual Minimum Rent and other charges payable by Tenant have been paid.

## ARTICLE XIX

## LANDLORD'S REPRESENTATIONS AND WARRANTIES

SECTION 19.01.  <u>Quiet Enjoyment</u>.  Landlord covenants and agrees that Tenant, during the term hereof, shall freely, peacefully, and quietly occupy and enjoy the use and possession of the Premises without disturbance, molestation, hindrance or ejectment of any kind whatsoever as a result of any act or inaction on the part of Landlord or any persons claiming through Landlord.

SECTION 19.02.  <u>Representations and Warranties</u>.  (a) Landlord represents, warrants, covenants and agrees that the fee simple title to the Premise is held by First Bank & Trust Company of Illinois, as Trustee under a Trust Agreement dated February 4, 1995 and known as Trust Number 10-1915 and HSS Real Estate Inc., is authorized to execute this Lease as agent of the beneficiary of said Trust; that the Premises, as of the date hereof, is not subject to the lien of any deed of trust, mortgage or other similar encumbering instrument (except such instruments where the lienor has entered into an agreement in favor of Tenant, as described in Section 18.01); that Landlord has the full power, right and authority to make this Lease for the term hereof without the consent, joinder, or approval of any other party; and that Landlord will put Tenant into complete and exclusive possession of the Premises.

(b)  Landlord agrees that it shall, prior to the Acceptance Date, complete the Landlord's Work, in accordance with the Plans and Specifications in accordance with the Site Plan depicted on <u>Exhibit A</u> and that cross easements with any adjoining property will insure access.

(c)  Landlord further represents, warrants, covenants and agrees that the Premises will, at the time of commencement of construction by Landlord, be properly zoned for general retail use.

## ARTICLE XX

## HOLDING OVER

SECTION 20.01.  <u>Holding Over</u>.  If Tenant remains in possession of the Premises after the expiration of the Term

without having duly exercised its right, if any, to extend or
further extend the Term, Tenant shall be a tenant at sufferance
and the Annual Minimum Rent payable shall be increased to 150% of
the last applicable Annual Minimum Rent.

## ARTICLE XXI

## NOTICE

SECTION 21.01.  _Where and How Given_.  All notices or
demands which either party hereto either is required to or may
desire to serve upon the other shall be in writing and shall be
sufficiently served upon such other party, by (a) mailing a copy
thereof by certified or registered mail, postage prepaid, return
receipt requested, addressed to the party to whom the notice is
directed at the "Notice Address" of such party or (b) by a
reliable overnight courier (such as Federal Express), all charges
prepaid, furnishing a receipt upon delivery, and addressed to the
party to whom the notice is addressed at the Notice Address of
the part.  The Notice Address of each party is:

|  |  |  |
|---|---|---|
| a) | Landlord: | HSS Real Estate, Inc., as agent for the beneficiary of First Bank & Trust Company of Illinois, and known as Trust Number 3680-AH as Trustee under a Trust Agreement dated February 4, 1995 and known as Trust Number 10-1915 35 West Wacker Drive Suite 3240 Chicago, Illinois  60601 |
| b) | Tenant: | Marshalls of Skokie, IL., Inc. 200 Brickstone Square Andover, Massachusetts  01810-0930 Att:  Property Administration |

With a copy to:              Melville Corporation
                            One Theall Road
                            Rye, New York  10580

The addresses to which notices and demands shall be delivered or
sent may be changed from time to time by notice served, as
hereinbefore provided, by either party upon the other party.

SECTION 21.02.  _When Given_.  Unless otherwise provided
for herein, notice shall be deemed to have been served at the
earlier of the date received, refused or returned as
undeliverable; _provided_, _however_, that should such notice pertain
to the change of address of either of the parties hereto, such
notice shall be deemed to have been served upon receipt thereof
by the party to whom such notice is given.

33

# ARTICLE XXII

## MISCELLANEOUS

SECTION 22.01.  Construction.  The language in all parts of this Lease shall in all cases be construed according to its fair meaning and not strictly for or against either Landlord or Tenant, and the construction of this Lease and any of its various provisions shall be unaffected by any argument or claim, whether or not justified, that it has been prepared, wholly or in substantial part, by or on behalf of Tenant.

SECTION 22.02.  Section Headings.  The section headings in this Lease are for convenience only and do not in any way limit or simplify the terms and provisions of this Lease, nor should they be used to determine the intent of the parties.

SECTION 22.03.  Partial Invalidity.  If any term, covenant, condition or provision of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, then the remainder of this Lease or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby and each term, covenant, condition and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

SECTION 22.04.  Waiver.  The failure of either party to seek redress for violation of, or to insist upon strict performance of, any term, covenant or condition contained in this Lease shall not prevent a similar subsequent act from constituting a default under this Lease.

SECTION 22.05.  Governing Law.  This Lease shall be governed and construed in accordance with the laws of the State wherein the Premises are located.

SECTION 22.06.  Successors and Assigns.  This Lease shall inure to the benefit of and be binding upon the heirs, executors, administrators, successors and assign of Landlord and the successors and assigns of Tenant.

SECTION 22.07.  No Broker.  Landlord and Tenant represent to each other that no broker or person is entitled to any commission by reason of the negotiation and execution of this Lease other than the Broker, and Landlord agrees that Landlord shall be solely responsible for the fees and commissions of the Broker.  Landlord and Tenant agree to indemnify, defend and hold each other harmless against any and all claims by any other person for brokerage commissions or fees arising out of any conversation, negotiations or other dealings held by the other party with any other broker regarding this Lease.

SECTION 22.09.   <u>Entire Agreement</u>.   This instrument contains the entire and only agreement between the parties and no oral statements or representations or written matter not contained in this instrument shall have any force or effect. This Lease shall not be amended or modified in any way except by a writing executed by both parties.

SECTION 22.10.   <u>Relationship of Parties</u>.   The relationship between the parties hereto is solely that of landlord and tenant and nothing in this Lease shall be construed as creating a partnership or joint venture between the parties hereto, it being the express intent of Landlord and Tenant that the business of Tenant on the Premises and elsewhere, and the good will thereof, shall be and remain the sole property of Tenant.   The submission of this Lease for examination does not constitute a reservation of or agreement to lease the Premises, and this Lease shall become effective and binding only upon proper execution hereof by Landlord and Tenant.

SECTION 22.11   <u>Restriction</u>.   Landlord agrees that in the current lease of the adjacent space of the Building (hereinafter referred to as the "Adjacent Floor Space") with an entity related to Tenant, Landlord included in such lease, language to the effect that such tenant will not use or permit any assignee or sublessee of the Adjacent Floor Space to use its premises ("Tenant's Use") primarily for the retail sale of brand name apparel at discount prices.   Landlord further agrees that in the event that Tenant is using the Premises for Tenant's Use, as hereinabove defined, and the hereinabove lease of the Adjacent Floor Space is terminated, then (a) if the Adjacent Floor Space is re-leased to an entity which is related to Tenant such lease will include language to the effect that such tenant will not use or permit any assignee or sublessee of the adjacent space to use the Adjacent Floor Space primarily for the retail sale of brand name apparel at discount prices; and (b) if the Adjacent Floor Space is released to an entity which is not related to Tenant or Marshalls of Skokie IL., Inc. (herein referred to as "Third Party"), such Adjacent Floor Space will include language to the effect that the use of its premises by such tenant will not allow for use of more than ten (10%) of its sales area for the retail sale of the items hereinabove defined as Tenant's Use.

In the event that such tenant of the Third Party Adjacent Space Lease uses more than 10% of its sales area for the retail sale of Tenant's Use items (as defined in this Section 22.11) hereinafter referred to as an "Competing Use"), Landlord shall promptly file a lawsuit against such tenant of the Third Party Adjacent Space Lease to enjoin or restrain such Competing Use, and Tenant agrees that if requested by Landlord, it shall join Landlord as a party in such lawsuit.

SECTION 22.12.  Force Majeure.  If either party hereto
shall be delayed or hindered in or prevented from the performance
of any act required under this Lease by reason of materially
adverse weather conditions, strikes, lockouts, labor troubles,
failure of power, restrictive governmental laws or regulations,
riots, insurrection, war or other reasons of a like nature beyond
the reasonable control of the party delayed in performing works
or doing acts required under the terms of this Lease, then
performance of such act shall be excused for the period of the
delay, and the period of the performance of any such act shall be
extended for a period equivalent to the period of such delay,
except as otherwise specifically provided herein to the contrary.
The provisions of this Section shall not (a) be applicable to
delays resulting from the inability of a party to obtain
financing or to proceed with its obligations under this Lease
because of a lack of funds, or (b) delay or postpone any of the
rights specifically granted to Tenant to terminate this Lease.

SECTION 22.13.  Satellite Dish and Equipment.
Notwithstanding anything to the contrary in this Lease, Landlord
hereby agrees that at any time during the Term, Tenant shall have
the right to install on the Premises, a satellite communications
dish and related equipment, if permitted by current law.  If
Tenant shall install such equipment, Tenant shall do so at its
own cost and expense and in accordance with all applicable laws,
rules and regulations.  Additionally, Tenant shall defend,
indemnify and hold Landlord harmless from and against any claims,
costs or expenses incurred by Landlord as a result of such
installation by Tenant.  If Tenant shall install such equipment,
Tenant shall be responsible for the maintenance and repair
thereof, at Tenant's sole cost and expense.  At the expiration or
other termination of the Lease, said equipment shall remain the
property of Tenant, and may be removed by Tenant, provided that
Tenant shall repair any and all damage caused by such removal.
The Landlord shall not be liable for any changes in laws that
would no longer permit, or would restrict the use of, the dish.
Notwithstanding anything to the contrary contained in this
Section 22.13, the installation of such satellite communications
dish and related equipment shall be in an area of the Building to
be mutually agreed upon between Landlord and Tenant in their
reasonable discretion.

SECTION 22.14.  Limitation of Liability.  From and
after completion of Landlord's Work and delivery of possession of
the Premises to Tenant, if Landlord shall fail to perform any
covenant, term or condition of this Lease upon Landlord's part to
be performed, and as a consequence of such default, Tenant shall
recover a money judgement against Landlord, such judgment shall
be satisfied solely out of (a) the proceeds of sale received upon
execution of such judgment and levy thereon against the right,
title and interest of Landlord in the buildings and improvements
from time to time on the Premises, (b) the rents or other income

36

from said property receivable by Landlord, (c) the consideration received by Landlord from the sale or other disposition of all or any part of Landlord's right, title and interest in said property, and/or (d) and condemnation awards or insurance proceeds; provided, however, that neither Landlord nor any partner or joint venturer or beneficiary of Landlord shall be personally liable for any deficiency.  The provision contained in the preceding sentence is not intended to, and shall not, (i) limit any right that Tenant might otherwise have to obtain injunctive relief or specific performance of Landlord's covenants under this Lease against Landlord or Landlord's successors in interest, or with respect to any other action or remedy (not involving the personal liability of Landlord or anyone claiming under Landlord in excess of the limits of personal liability specified in the preceding sentence) which may be accorded Tenant by Law or under the terms of this Lease, (ii) excuse any default or other breach on Landlord's part under this Lease, or (iii) render Tenant liable for the obligations or other liabilities of Landlord to others.

SECTION 22.15.  Attorneys' Fees.  Tenant shall be responsible for all of Landlord's attorneys' fees incurred as the result of any action instituted by a third party against Landlord as a result of any act or omission of Tenant, its agents, customers, employees or invitees.  Landlord shall be responsible for all of Tenant's attorneys' fees incurred as the result of any action instituted by a third party against Tenant as a result of any act or omission of Landlord, its agents, customers, employees or invitees.

SECTION 22.16.  Tenant Allowance.  When Tenant has completed Tenant's Work in accordance with the Lease and opened for business, Landlord shall pay to Tenant a construction allowance of twenty dollars ($20.00) per square foot.  Tenant shall provide an affidavit and lien waiver from its general contractor.  If Landlord has not paid the construction allowance to Tenant within thirty days after the foregoing requirements are met, rent will abate with interest at ten percent (10%) per annum until the construction allowance is paid.

SECTION 22.17.  Additional Provisions.  Notwithstanding anything to the contrary contained in this Lease, this Lease and the obligations of the parties hereto are contingent upon and conditioned upon the following:

(i) This Lease and the obligations of the parties hereto are conditioned and contingent upon Landlord securing adequate financing for the construction of the Premises.  In the event that Landlord is unable to secure adequate financing for the construction of the Premises within ninety (90) days of the full execution of this Lease, then in such an event and upon written notice given to Tenant within one hundred (100) days of

37

**IN WITNESS WHEREOF**, Landlord and Tenant have caused this Lease to be duly executed and delivered in their respective names as of the date first above written.

LANDLORD:

**HSS REAL ESTATE, INC., AS AGENT FOR THE BENEFICIARY OF FIRST BANK & TRUST COMPANY OF ILLINOIS AS TRUSTEE UNDER A TRUST AGREEMENT DATED FEBRUARY 4, 1995 AND KNOWN AS TRUST NUMBER 10-1915**

Witness:

By: _____
    Name: Mitchell Saginor
    Title: President

TENANT:

**MARSHALLS OF SKOKIE, IL., INC.**

Witness:

By: _____
    Vice President   Howard D. Grossman

Attest: _____
    Assistant Secretary

39



EXHIBIT "B"

## VANILLA BOX SPECIFICATIONS WITH MINIMAL FINISH WORK
## August 29, 1994

1. The landlord is to provide Marshalls with all structural elements of the building, including, but not limited to; the building shell, structural columns, roof steel, structural slabs and lintels.   Steel clearances should be at a minimum of 18'-0" in the sales area.  Metal studs shall be a minimum of 20 gauge with blocking as indicated in Marshalls design guidelines

2. The landlord is to provide an E.P.D.M. membrane roof by Carlisle Systems or Firestone E.P.D.M. with a 20 year labor and material warranty.  The membrane shall be 0.045 thick fully adhered or plate bonded and shall installed by an approved manufacturers representative. North American roofing systems or Centri-Mark Roofing Systems are acceptable alternates.  Roofing insulation shall be rigid type isosymurate, or EPS to comply with energy codes and in no case providing a roof assembly with a U factor less than 0.05.  Minimum R value to be 19.  No ballasted E.P.D.M. or built-up roofing system will be allowed.

3. The landlord is to provide a 6" reinforced concrete slab with 6 x 6 x 10/10 welded wire fabric and an approved vapor barrier.  The slab shall have a smooth troweled finish and be ready to accept Marshalls floor coverings.  At edges, slab shall be formed into 1'0" wide X 2'0" deep grade beam.  A trench for electrical under floor conduit shall be provided where indicated on the prototypical drawings.  Mezzanine floor slabs shall be capable of supporting a live load of 125 lbs.

4. The landlord is to provide and install CARRIER or LENNOX gas fired roof top HVAC units on manufacturers curbs and gas fired unit heaters in the stock area per Marshalls "Design and Construction Manual" and "Prototypical Drawings".  No alternates will be accepted.   Economizers and "Honeywell" Q674A1019 sub-bases shall be installed at each unit.  Security bars are required at 1'- 0" o.c. each way on all curb openings.  Marshalls will install the HVAC distribution inside the occupancy.  The landlord will provide gas service to each unit as outlined on Marshalls plans and specifications.

5. The landlord shall remove all hazardous materials from the occupancy prior to Marshalls taking possession; including, but not limited to asbestos floor tile, floor mastic, pipe wrap, insulation, roofing and wall materials.  The landlord is to remove these materials in an approved industry manner and provide proof of same to Marshalls prior to delivery of the occupancy..

6. The landlord is to provide a 2" domestic water service with a meter and 4" sanitary line tied into site sewer brought to Marshalls approved locations in the occupancy (two sets of bathrooms are indicated in our prototype).

7. The landlord is to provide an electrical service in accordance with all applicable codes, run in conduit, using a minimum of #12 gauge copper wire with THHN insulation.  Incoming service to be aluminum conductors with proper non-corroding termination's.  Service is to be 480/277-3Ø-4W-800 amp installed to Marshalls designated location in the occupancy.  Marshalls will install the electrical distribution inside the occupancy from the mains.

8. The landlord will provide an 8" fire main and minimum 6" sprinkler riser to Marshalls approved location inside the occupancy and branching through the occupancy. One 2 1/2" X 2 1/2" rough brass Fire Department Connection to be installed per local regulations. Guidelines for the installation for the sprinkler system are included in Marshalls "Design and Construction Manual". Marshalls will revise the sprinkler heads and branching as necessary to match finished ceiling heights. The system shall meet all City, State, and Insurance Rating Bureau approvals.

9. The landlord will provide a minimum 3" gas service with meter to Marshalls approved location inside the occupancy, branching as indicated on Marshalls guideline plans, and make all final connections to HVAC units.

10. The occupancy shall be left a "broom swept" condition ready to accept finishes outlined on Marshalls construction documents.

11. The landlord is to complete construction on all exterior elements of the canopy and parking lot to match Marshalls final approved plans and specifications and ready to accept tenants building signs.

12. The landlord is to provide one 2" conduit and 2 (two) 20 amp circuits to Marshalls pylon sign from a location inside the occupancy to be determined. The landlord will be responsible for building the pylon sign (with prior approval by Tenant). Marshalls will install it current logo on same. The Landlord shall be responsible for permitting all pylon work and Marshalls panel.

EXHIBIT D
GUARANTY

as Trustee under a Trust Agreement
dated February 4, 1995 and known as
Trust Number 10-1915

FOR VALUE RECEIVED, in consideration for, and as an inducement to Landlord to enter into the foregoing Lease between First Bank & Trust Company of Illinois , "Landlord" and Marshalls of Skokie, IL., Inc. , "Tenant", dated _____, the undersigned "Guarantor" hereby guarantees to Landlord, its legal representatives, successors and assignees, the full and faithful performance and observance by Tenant, its successors and assigns, of all terms, covenants, conditions, agreements, restrictions and limitations of the Lease, including without limitation the payment of all Rent, together with the payment of all costs, attorneys' fees and other expenses incurred by Landlord in enforcing such performance and observations.

Guarantor further covenants that:

1) The liability of the Guarantor is primary, shall not be subject to deduction for any claim of offset, counter claim or defense which Tenant may have against Landlord, and Landlord may proceed against Guarantor separately or jointly, before, after, or simultaneously with any proceeding against Tenant for default; and

2) This Guaranty shall not be terminated or impaired in any manner whatsoever by reason of the assertion by the Landlord against Tenant of any of the rights or remedies reserved to Landlord pursuant to the provisions of such Lease, by reason of summary or other proceedings against Tenant, by the omission of Landlord to enforce any of its rights against Tenant, or by reason of any extension of time or indulgence granted by Landlord to Tenant; and

3) Guarantor expressly waives any requirement of notice of non-payment, non-performance or non-observance, or proof of notice or demand; and

4) This Guaranty shall be absolute and unconditional and shall remain and continue in full force and effect as to any renewal, extension, amendment, additions, assignment, sublease, transfer or other modification of the Lease, whether or not Guarantor shall have knowledge of or have agreed or consented to any such renewal, extension, amendment, addition, assignment, sublease, transfer or other modification of the Lease; and

5) That in any action or proceeding brought by Landlord against Guarantor on account of this Guaranty, Guarantor shall and does hereby waive trial by jury. All obligations and liabilities of Guarantor pursuant to this Guaranty shall be binding upon the heirs, personal representatives and assigns of the Guarantor. This Guaranty shall be governed by and construed in accordance with the laws of the state of Illinois .

DATE: September 15, 1995

MELVILLE CORPORATION

BY: _____
     Daniel B. Katz

TITLE: Senior Vice President

ATTEST: _____
        Assistant Secretary

## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

THIS AGREEMENT, date this _____ day of _____, 19____ between _____, hereinafter called "Mortgagee", and _____, hereinafter called "Tenant".

## W I T N E S S E T H :

(A)  Tenant has entered into a certain lease dated _____, 19____ with _____ hereinafter called "Landlord", covering premises in a certain building known as _____ and located in _____; and

(B)  Mortgagee has agreed to make a mortgage loan of _____ ("the Mortgage") to the Landlord and the parties desire to set forth their agreement as hereinafter set forth.

NOW THEREFORE, in consideration of the premises and of the sum of One Dollar ($1.00) by each party in hand paid to the other, the receipt of which is hereby acknowledge, it is hereby agreed as follows:

1.  Said lease is and shall be subject and subordinate to the Mortgage insofar as it affects the real property of which the demised premises form a part, and to all renewals, modifications, consolidations, replacements and extensions thereof, to the full extent of the principal sum secured thereby and interest thereon.

2.  Tenant agrees that it attorn to and recognize any purchaser at a foreclosure sale under the Mortgage, any transferee who acquires the demised premises by deed in lieu of foreclosure, and the successors and assigns of such purchasers, as its Landlord for the unexpired balance (and any extensions, if exercised) of the term of said lease upon the same terms and conditions set forth in said lease.

3.  In the event that it should become necessary to foreclose the Mortgage, Mortgagee thereunder will not terminate said lease nor join Tenant in summary or foreclosure proceedings so long as Tenant is not in default under any of the terms, covenants, or conditions of said lease.

4.  In the event that Mortgagee shall succeed to the interest of Landlord under such lease, Mortgagee shall not be:
(a) liable for any act of omission of any prior landlord (including Landlord); or
(b) liable for the return of any security deposit; or
(c) subject to any offsets or defenses which Tenant might have against any prior Landlord (including Landlord); or
(d) bound by any rent or additional rent which Tenant might have paid for more than the current month to any prior landlord (including Landlord); or
(e) bound by any amendment or modification of the lease made without its consent, which reduces the rent or term.

IN WITNESS WHEREOF, the parties hereto have execute these presents the day and year as written below.

LANDLORD OR MORTGAGEE          TENANT

BY:_____          BY:_____

DATE:_____    DATE:_____

ATTEST:_____    ATTEST:_____

EXHIBIT G

## TENANT ESTOPPEL CERTIFICATE

TO:_____

THIS IS TO CERTIFY THAT:

1. The undersigned is the Lessee (Tenant) under that certain Lease dated _____ by and between_____, as Lessor (Landlord) and _____,as Lessee, covering those certain premises commonly known and designed as_____.

2. The Lease has not been modified, changed, altered or amended in any respect (except as indicated follow this sentence) and is the only Lease or agreement between the undersigned and the Lessor affecting said premises. If none, state "NONE":

_____

3. The undersigned has made no agreements with Lessor or its agents or employees concerning free rent, partial rent, rebate or rental payment or any other type of rental concession except as specifically set forth in the lease.

_____

4. The undersigned has accepted and now occupies the premises, and is and has been open for business since _____, 19____. The lease term began _____, 19____. No rent has been prepaid for more than two (2) months. The fixed Minimum Rent is $_____ per month.

5. The Lease is not in default and is in full force and effect. As of the date hereof, the undersigned is entitled to no credit, no free rent and no offset or deduction in rent.

6. The undersigned has received or will receive payment or credit for tenant improvement work in the total amount of $_____ (or if other than cash, describe below). If none, state "NONE":_____.

7. The Lease contains and the undersigned has no outstanding options except as set forth in the lease or rights of first refusal to purchase the premises or any part thereof or the real property of which the premises are a part.

8. No actions, whether voluntary or otherwise, are pending against the undersigned under the bankruptcy laws of the United State or any state thereof.

DATED THIS _____ DAY OF _____, 19____

_____, Lessee
BY:_____
ITS:_____

EXHIBIT *H*

PROHIBITED USES

ANY NON-RETAIL; PERSONAL SERVICE; GOVERNMENT AGENCY;
RESTAURANT/FOOD OPERATION - WHOLESALE OR RETAIL;
BOWLING ALLEY; BILLIARD PARLOR; NIGHT CLUB; VIDEO ARCADE;
THEATER; AUCTION; AUTOMOTIVE STORE; HEALTH SPA/CLUB;
COCKTAIL LOUNGE; BAR; ~~TOY GALLERY~~; LAUNDRY; ARTS AND CRAFTS;
CLEANER AND DRYER; VIDEO TAPE RENTALS; ~~FURNITURE STORE~~;
FIREARMS SALES; ARMY SURPLUS; OFFICE; SCHOOL (OF ANY TYPE);
CINEMA; COIN STORE; ~~LUGGAGE AND LEATHER~~; CANDLE SHOP
TOBACCO; PET SHOP; FLOWER/PLANTS; PHOTOGRAPHER; KEY SHOP;
FILM PROCESSING; PHOTOCOPY; LIQUOR STORE; CARD SHOP;
STATIONARY STORE; ~~JEWELRY STORE, CAMERA STORE~~; TELEPHONE
STORE; ~~EYEGLASSES, COSMETICS~~; SKATING RINK; AMUSEMENT PARK;
CARNIVAL; MEETING HALL; DANCE HALL; SPORTS FACILITY; SALE OF
CARS (NEW OR USED), TRAILERS, OR MOBIL HOMES; FLEA MARKET; SALE
OF PORNOGRAPHIC MATERIALS; MASSAGE PARLOR; AND SECOND HAND
STORE.

# Melville

Denise Tolles                                                    (914) 925-4258
Associate Counsel                                          Fax (914) 925-4024

                          January 4, 1996

**VIA CERTIFIED MAIL
RETURN RECEIPT REQUESTED**

HSS Real Estate Inc.
35 West Wacker Drive
Suite 3240
Chicago, Illinois  60601
Attention:  Mr. Mitchell Saywitz
            President

Gentlemen:

     Please be advised that the notice address for Marshalls of
Skokie, Il., Inc. is now:

     One Theall Road
     Rye, New York  10580

                          Yours truly,

DT/djw

cc:  Dan Mitchell

**HSS REAL ESTATE INC.**

*35 West Wacker Drive, Suite 3240*
*Chicago, Illinois 60601*
*312-849-2044  Fax 312-849-2050*



VIA FEDERAL EXPRESS

April 25, 1996

Marshalls of Skokie, IL., Inc.
One Theall Road
Rye, NY  10580

Re:    Lease dated September 13, 1995 ("Lease") by and between First
       Bank and Trust Company of Illinois, as Trustee under a Trust
       Agreement dated February 4, 1995 and known as Trust Number
       10-1915 ("Landlord") and Marshalls of Skokie, IL., Inc. ("Tenant")
       for the space located in the building commonly known as
       Orchard Place Shopping Center; Skokie, Illinois (the "Premises")

Dear Tenant:

This letter serves as notice per Section 18.02 of the Lease that
Orchard Place L.L.C., formerly the beneficial owner of First Bank and
Trust Company of Illinois as Trustee under Trust Agreement dated
February 4, 1995 and known as Trust Number 10-1915 has merged
the beneficial and legal ownership as of December 16, 1995.  Please
find enclosed a copy of the Trustee's Deed evidencing this event.

Orchard Place L.L.C. continues to be liable for all obligations of
Landlord under the Lease.

Sincerely,

For Orchard Place L.L.C.,

Mitchell Saywitz
Managing Member

Enclosure(s)
MS:mk

*The Midwest's Retail Property Specialists*

```
┌──────┬──┬───┐
│ F 33│50│ A │
├──────┼──┼───┤
│ P   │  │ P │
├──────┼──┼───┤
│ T 33│50│ V │
├──────┼──┴───┤
│ I   │      │
└──────┴──────┘
```

95-1051

| | DEPT-01 RECORDING | $33.50 |
| | T#2222 TRAN 1308 12/26/95 16:16:00 |
| | #2032 # CJ *-95-895656 |
| | COOK COUNTY RECORDER |

The above space for recorder's use only

THIS INDENTURE, made this _____16TH_____ day of _____DECEMBER_____, 19 95, between First Bank and Trust Company of Illinois (formerly known as First Bank and Trust Company, Palatine, Illinois), a corporation duly organized and existing as a banking corporation and duly authorized to accept and execute trusts within the State of Illinois, not personally but as Trustee under the provisions of a deed or deeds in trust duly recorded and delivered to said bank in pursuance of a certain Trust Agreement, dated the _____4TH_____ day of _____FEBRUARY_____, 19 95, and known as Trust Number _____10-1915_____, party of the first part, and——————————— ORCHARD PLACE, L.L.C. ————————————————————————————————————— 15 WEST WACKER DRIVE, #3240 of _CHICAGO, ILLINOIS 60601_ parties of the second part.

WITNESSETH, that said party of the first part, in consideration of the sum of _TEN AND NO/100———_ ————————————————————————————($10.00)————————————————— Dollars, and other good and valuable considerations in hand paid, does hereby grant, sell and convey unto said parties of the second part, the following described real estate, situated in _____COOK_____ County, Illinois, to wit:

   SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.


             10-16-205-027, 10-16-204-035,
             10-16-204-034, 10-16-206-001,
             10-16-206-002, 10-16-206-003
Permanent Real Estate Index No. _AND 10-16-206-042_____

together with the tenements and appurtenances thereto belonging.

   TO HAVE AND TO HOLD the same unto said party of the second part, and to the proper use, benefit and behoof, forever, of said party of the second part

   This deed is executed by the party of the first part, as Trustee, as aforesaid, pursuant to and in the exercise of the power and authority granted to and vested in it by the terms of said Deed or Deeds in Trust and the provisions of said Trust Agreement above mentioned, and of every other power and authority thereunto enabling, SUBJECT, HOWEVER, to: the liens of all trusts deeds and/or mortgages upon said real estate, if any, of record in said county; all unpaid general taxes and special assessments and other liens and claims of any kind; pending litigation, if any, affecting the said real estate; building lines; building, liquor and other restrictions of record, if any; party walls, party wall rights and party wall agreements, if any; Zoning and Building Laws and Ordinances; mechanic's lien claims, if any; easements of record, if any; and rights and claims of parties in possession.

   IN WITNESS WHEREOF, said party of the first part has caused its corporate seal to be hereunto affixed, and has caused its name to be signed to these presents by its Assistant Trust Officer and attested by its Assistant Trust Officer the day and year first above written.

                    FIRST BANK AND TRUST COMPANY OF ILLINOIS
                    as trustee, as aforesaid, and not personally

                    By: _____ Assistant Trust Officer

                    ATTEST _____ Assistant Trust Officer

Form No. 10872

COUNTY OF COOK    SS.

STATE OF ILLINOIS

I, ___DAWN M. MALACHUK___ a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY, THAT _____

___MICHAEL J. KALITOWSKI___,

Assistant Trust Officer of FIRST BANK and TRUST COMPANY OF ILLINOIS, a banking corporation, and ___MICHAEL C. WINTER___, Assistant Trust Officer of said banking corporation, personally known to me to be the same persons, whose names are subscribed to the foregoing instrument as such Assistant Trust Officer, and Assistant Trust Officer, respectively, appeared before me this day in person and acknowledged that they signed and delivered the said instrument as their own free and voluntary acts, and as the free and voluntary act of said banking corporation as Trustee, for the uses and purposes therein set forth and the said Assistant Trust Officer did also then and there acknowledge that he/she, as custodian of the corporate seal of said banking corporation, did affix the said corporate seal of said banking corporation to said instrument as his/her own free and voluntary act, and as the free and voluntary act of said banking corporation, as Trustee, for the uses and purposes therein set forth.

*Given* under my hand and Notarial Seal this __16TH__ day of __DECEMBER__, 19_95_.

_Dawn M Malachuk_

Notary Public    DAWN M. MALACHUK

**VILLAGE of SKOKIE, ILLINOIS**

Economic Development Tax
Village Code Chapter 10
EXEMPT Transaction
Chicago Office

OFFICIAL SEAL
DAWN M MALACHUK
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES:09/30/99

DEC/19/95

Exempt under provisions of Paragraph (e), Section 4,
Real Estate Transfer Tax Act.

__12/20/95__    _Charles Alexander attorney_
Date       Buyer, Seller or Representative

---

4801-4849 GOLF ROAD
SKOKIE, ILLINOIS 60077
For information only insert street
address of above described property.

_Mail to: Charles Alexander_
      _333 W. Wacker #1800_
      _Chicago, 60601_

THIS INSTRUMENT PREPARED BY:
MICHAEL J. KALITOWSKI
FIRST BANK AND TRUST COMPANY OF ILLINOIS

300 East Northwest Highway
Palatine, Illinois 60067

## EXHIBIT "A"

### LEGAL DESCRIPTION

PARCEL 1:

THAT PART OF LOTS 1 TO 7, LOTS 38 TO 55 AND LOT 60 AND
THAT PART OF VACATED LA CROSSE AVENUE AND VACATED ALLEY
FALLING WITHIN THE FOLLOWING DESCRIBED TRACT OF LAND:

BEGINNING AT THE NORTHWEST CORNER OF SAID LOT 1; THENCE
EAST ALONG THE SOUTH LINE OF SIMPSON STREET, 216.35 FEET
TO THE CENTERLINE OF VACATED LA CROSS AVENUE; THENCE
SOUTH ALONG SAID CENTERLINE, 141.00 FEET TO THE NORTH
LINE OF SAID LOT 46 EXTENDED WEST; THENCE EAST ALONG SAID
EXTENDED LINE AND THE NORTH LINE OF LOT 46, 156.14 FEET
TO THE NORTHEAST CORNER THEREOF; THENCE SOUTH ALONG THE
EAST LINE OF LOTS 38 TO 46, A DISTANCE OF 269.08 FEET TO
A LINE WHICH IS 410.08 FEET SOUTH OF AND PARALLEL TO THE
SOUTH LINE OF SIMPSON STREET; THENCE WEST ALONG SAID LINE
WHICH IS 410.08 FEET SOUTH OF AND PARALLEL TO THE SOUTH
LINE OF SIMPSON STREET, 372.25 FEET TO THE WEST LINE OF
SAID LOT 60; THENCE NORTH ALONG THE WEST LINE OF LOT 60
AND SAID WEST LINE EXTENDED AND THE WEST LINE OF LOT 1,
410.08 FEET TO THE PLACE OF BEGINNING, ALL IN TALMAN AND
THIELE'S CICERO AVENUE SIMPSON STREET SUBDIVISION OF THE
NORTH 40 RODS OF THE EAST 33 RODS OF THE NORTHEAST 1/4 OF
SECTION 16, TOWNSHIP 41 NORTH, RANGE 13 EAST OF THE THIRD
PRINCIPAL MERIDIAN IN COOK COUNTY, ILLINOIS.

PARCEL 2:

THAT PART OF THE EAST 1/2 OF THE NORTHEAST 1/4 OF SECTION
16, TOWNSHIP 41 NORTH, RANGE 13, EAST OF THE THIRD
PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE WEST LINE OF THE EAST 33 RODS
OF THE NORTHEAST 1/4 OF SAID SECTION 16, 40.00 FEET SOUTH
OF THE NORTH LINE OF SAID NORTHEAST 1/4; THENCE SOUTH ON
THE WEST LINE OF THE EAST 33 RODS OF THE NORTHEAST 1/4 OF
SAID SECTION 16, 410.08 FEET; THENCE WEST ON A LINE
PARALLEL WITH THE NORTH LINE OF SAID NORTHEAST 1/4, 12.00
FEET; THENCE NORTH ON A LINE PARALLEL WITH THE WEST LINE
OF THE EAST 33 RODS 291.77 FEET TO A POINT OF CURVE;
THENCE NORTHWESTERLY ON A CURVE CONCAVE SOUTHWESTERLY AND
HAVING A RADIUS OF 50.46 FEET, 33.84 FEET; THENCE
NORTHWESTERLY ON A LINE TANGENT TO THE LAST DESCRIBED
CURVE 53.82 FEET TO A POINT OF CURVE; THENCE NORTHERLY ON
A CURVE CONCAVE EASTERLY AND HAVING A RADIUS OF 72.12
FEET, 48.09 FEET TO A POINT ON A LINE 40.00 FEET SOUTH OF
AND PARALLEL WITH THE NORTH LINE OF SAID NORTHEAST 1/4,
72.00 FEET WEST OF THE PLACE OF BEGINNING; THENCE EAST ON
A LINE 40.00 FEET SOUTH OF AND PARALLEL WITH THE NORTH

LINE OF SAID NORTHEAST 1/4, 72.00 FEET TO THE PLACE OF
BEGINNING, IN COOK COUNTY, ILLINOIS.

PARCEL 3:

THE SOUTH 10.00 FEET OF THE NORTH 460.08 FEET OF THE EAST
12.00 FEET OF THAT PART OF THE EAST 1/2 OF THE NORTHEAST
1/4 OF SECTION 16, TOWNSHIP 41 NORTH, RANGE 13, EAST OF
THE THIRD PRINCIPAL MERIDIAN, LYING WEST OF THE WEST LINE
OF THE EAST 33 RODS OF THE NORTHEAST 1/4 OF SAID SECTION
16, IN COOK COUNTY, ILLINOIS.

PARCEL 4:

EASEMENT FOR INGRESS AND EGRESS AS CREATED BY A GRANT
FROM LASALLE NATIONAL BANK, AS TRUSTEE UNDER TRUST NUMBER
38391, DATED MAY 29, 1969 AND FILED JULY 1, 1969 IN THE
OFFICE OF THE REGISTRAR OF TITLES AS DOCUMENT LR2459484
AND REFILED MARCH 24, 1972 AS DOCUMENT LR2614018 OVER,
UNDER, UPON AND THROUGH THAT PART OF THE EAST 1/2 OF THE
NORTHEAST 1/4 SECTION 16, TOWNSHIP 41 NORTH, RANGE 13,
EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS
FOLLOWS:

COMMENCING AT A POINT ON THE WEST LINE OF THE EAST 33
RODS OF THE NORTHEAST 1/4 OF SAID SECTION 16, 40.00 FEET
SOUTH OF THE NORTH LINE OF SAID NORTHEAST 1/4; THENCE
WEST ON A LINE 40.00 FEET SOUTH OF AND PARALLEL WITH THE
NORTH LINE OF SAID NORTHEAST 1/4; 72.00 FEET TO THE PLACE
OF BEGINNING OF THIS DESCRIPTION; THENCE SOUTHERLY ON A
CURVE CONCAVE EASTERLY AND HAVING A RADIUS OF 72.12 FEET,
48.09 FEET; THENCE SOUTHEASTERLY ON A LINE TANGENT TO THE
LAST DESCRIBED CURVE 53.82 FEET TO A POINT OF CURVE;
THENCE SOUTHEASTERLY ON A CURVE CONCAVE SOUTHWESTERLY AND
HAVING A RADIUS OF 50.46 FEET, 33.84 FEET TO ITS INTER-
SECTION WITH A LINE 120 FEET WEST OF AND PARALLEL TO THE
WEST LINE OF THE EAST 3 RODS OF SAID NORTHEAST 1/4;
THENCE SOUTH ON A LINE PARALLEL WITH THE WEST LINE OF THE
EAST 33 RODS, 291.77 FEET; THENCE WEST ON A LINE PARALLEL
WITH THE NORTH LINE OF THE NORTHEAST 1/4 OF SAID SECTION
16, 12.00 FEET; THENCE NORTH ON A LINE PARALLEL WITH THE
WEST LINE OF THE EAST 33 RODS, 291.81 FEET TO A POINT OF
CURVE, THENCE NORTHWESTERLY ON A CURVE CONCAVE SOUTHWEST-
ERLY AND HAVING A RADIUS OF 38.46 FEET, 25.80 FEET;
THENCE NORTHWESTERLY ON A LINE TANGENT TO THE LAST
DESCRIBED CURVE 53.82 FEET TO A POINT OF CURVE; THENCE
NORTHERLY ON A CURVE CONCAVE EASTERLY AND HAVING A RADIUS
OF 84.12 FEET, 56.10 FEET TO A POINT ON A LINE 40.00 FEET
SOUTH OF AND PARALLEL WITH THE NORTH LINE OF SAID
NORTHEAST 1/4, 12.00 FEET WEST OF THE PLACE OF BEGINNING;
THENCE EAST ON A LINE 40.00 FEET SOUTH OF AND PARALLEL
WITH THE NORTH LINE OF SAID NORTHEAST 1/4, 12.00 FEET TO
THE PLACE OF BEGINNING, IN COOK COUNTY, ILLINOIS.

PARCEL 5:

EASEMENT FOR INGRESS AND EGRESS AS CREATED BY A GRANT
FROM LASALLE NATIONAL BANK, AS TRUSTEE UNDER TRUST NUMBER
38391, DATED MAY 29, 1969 AND FILED JULY 1, 1969, IN THE
OFFICE OF THE REGISTRAR OF TITLE AS DOCUMENT LR2459484
AND REFILED MARCH 24, 1972 AS DOCUMENT LR2614018 OVER,
UNDER, UPON AND THROUGH THE SOUTH 10.00 FEET OF THE NORTH
460.08 FEET OF THE WEST 12.00 FEET OF THE EAST 24.00 FEET
OF THAT PART OF THE EAST 1/2 OF THE NORTHEAST 1/4 OF
SECTION 16, TOWNSHIP 41 NORTH, RANGE 13 EAST OF THE THIRD
PRINCIPAL MERIDIAN, LYING WEST OF THE WEST LINE OF THE
EAST 33 RODS OF THE NORTHEAST 1/4 OF SAID SECTION 16, IN
COOK COUNTY, ILLINOIS.

PARCEL 6:

EASEMENT FOR INGRESS AND EGRESS AS CREATED BY A GRANT
FROM LASALLE NATIONAL BANK, AS TRUSTEE UNDER TRUST NUMBER
38391, DATED MAY 29, 1969 AND FILED JULY 1, 1969 AS
DOCUMENT LR2459484 AND REFILED MARCH 24, 1972 AS DOCUMENT
LR2614018 IN THE OFFICE OF THE REGISTRAR OF TITLES OVER,
UNDER, UPON AND THROUGH THAT PART OF LOTS 38, 55 AND 60
AND THAT PART OF VACATED LA CROSSE AVENUE AND VACATED
ALLEY IN TALMAN AND THIELE'S CICERO AVENUE - SIMPSON
STREET SUBDIVISION OF THE NORTH 40 RODS OF THE EAST 33
RODS OF THE NORTHEAST 1/4 OF SECTION 16, TOWNSHIP 41
NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN,
LYING NORTH OF A LINE 420.08 FEET SOUTH OF AND PARALLEL
TO THE SOUTH LINE OF SIMPSON STREET AND LYING SOUTH OF A
LINE 410.08 FEET SOUTH OF AND PARALLEL TO THE SOUTH LINE
OF SIMPSON STREET, IN COOK COUNTY, ILLINOIS.

PARCEL 7:

LOTS 8, 9, 10, 11, 12, 13, 14, 15 AND 16 IN TALMAN AND
THIELE'S CICERO AVENUE SIMPSON STREET SUBDIVISION OF THE
NORTH 40 RODS OF THE EAST 33 RODS OF THE NORTHEAST 1/4 OF
SECTION 16, TOWNSHIP 41 NORTH, RANGE 13 EAST OF THE THIRD
PRINCIPAL MERIDIAN (EXCEPT THAT PART OF SAID ABOVE
DESCRIBED PROPERTY BEGINNING AT THE NORTHEAST CORNER OF
SAID LOT 16; THEN SOUTH ALONG THE EAST LINE OF SAID LOT
16, BEING ALSO THE WEST LINE OF SKOKIE BOULEVARD, A
DISTANCE OF 125.00 FEET TO THE SOUTH LINE OF SAID LOT 16;
THENCE WEST ALONG THE SOUTH LINE OF SAID LOT 16, A
DISTANCE OF 18.00 FEET TO A POINT DISTANT 18.00 FEET WEST
MEASURED AT RIGHT ANGLES FROM SAID EAST LINE OF LOT 16;
THENCE NORTH PARALLEL WITH SAID EAST LINE OF LOT 16, A
DISTANCE OF 55.66 FEET TO A POINT; THENCE NORTHWESTERLY
ALONG A STRAIGHT LINE A DISTANCE OF 34.88 FEET TO A POINT
OF CURVATURE DISTANCE 22.27 FEET WEST, MEASURED AT RIGHT
ANGLES FROM THE EAST LINE OF SAID LOT 16; THENCE NORTH-
WESTERLY ALONG A CURVED LINE HAVING A RADIUS OF 42.00
FEET AND CONCAVE TO THE SOUTHWEST A DISTANCE OF 45.37

FEET TO A POINT 4.27 FEET SOUTH MEASURED AT RIGHT ANGLES
FROM THE SOUTH LINE OF SIMPSON STREET, AS THE SAME IS
SHOWN ON THE PLAT OF SUBDIVISION REGISTERED AS DOCUMENT
NO. 268690; THENCE NORTHWESTERLY ALONG A STRAIGHT LINE A
DISTANCE OF 34.88 FEET TO A POINT IN THE NORTH LINE OF
SAID LOT 14, DISTANT 87.34 FEET WEST FROM SAID WEST LINE
OF SKOKIE BOULEVARD, AS MEASURED ALONG SAID NORTH LINE OF
SAID LOTS 14, 15 AND 16; THENCE EAST ALONG SAID NORTH
LINE OF LOTS 14, 15 AND 16, A DISTANCE OF 87.34 FEET TO
THE POINT OF BEGINNING), TOGETHER WITH THE EAST 1/2 OF
VACATED 66.00 FEET WIDE ACROSS LA CROSSE AVENUE RECORDED
MARCH 17, 1974 AS DOCUMENT NO 2410456 LYING SOUTH OF THE
SOUTH LINE OF GOLF ROAD AND LYING NORTH OF THE SOUTH LINE
EXTENDED WEST OF THE 16.00 FOOT PUBLIC ALLEY, SOUTH OF
AND ADJOINING LOTS 8, 9, 10, 11, 12, 13, 14, 15 AND 16
AFORESAID, IN COOK COUNTY, ILLINOIS.

## STATEMENT BY GRANTOR AND GRANTEE

The grantor or his agent affirms that, to the best of his knowledge, the name of the grantee shown on the deed or assignment of beneficial interest in a land trust is either a natural person, an Illinois corporation or foreign corporation authorized to do business or acquire and hold title to real estate in Illinois, a partnership authorized to do business or acquire and hold title to real estate in Illinois, or other entity recognized as a person and authorized to do business or acquire title to real estate under the laws of the State of Illinois.

Dated December 20, 1995          Signature _____
                                                      Grantor or Agent

SUBSCRIBED AND SWORN TO BEFORE
ME BY THE SAID Mitchell Schwartz
THIS 20 DAY OF December
19 95.

NOTARY PUBLIC Jennifer McCarter

```
OFFICIAL SEAL
JENNIFER A MCCARTER
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 01/08/98
```

The grantee or his agent affirms and verifies that the name of the grantee shown on the deed or assignment of beneficial interest in a land trust is either a natural person, an Illinois corporation or foreign corporation authorized to do business or acquire and hold title to real estate in Illinois, a partnership authorized to do business or acquire and hold title to real estate in Illinois, or other entity recognized as a person and authorized to do business or acquire and hold title to real estate under the laws of the State of Illinois.

Dated December 20, 1995          Signature _____
                                                      Grantee or Agent

SUBSCRIBED AND SWORN TO BEFORE
ME BY THE SAID Mitchell Schwartz
THIS 20 DAY OF December
19 95.

NOTARY PUBLIC Jennifer McCarter

```
OFFICIAL SEAL
JENNIFER A MCCARTER
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 01/08/98
```

Note: Any person who knowingly submits a false statement concerning the identity of a grantee shall be guilty of a Class C misdemeanor for the first offense and of a Class A misdemeanor for subsequent offenses.

[Attach to deed or ABI to be recorded in Cook County, Illinois, if exempt under provisions of Section 4 of the Illinois Real Estate Transfer Tax Act.]

## ASSIGNMENT OF LEASE

For value received the undersigned, Orchard Place L.L.C., an Illinois limited liability company ("Landlord") does hereby set over, transfer and assign unto Orchard Place Retail, L.L.C., an Illinois limited liability company, all of Landlord's right, title and interest in and to that certain Lease and Amendment thereto more particularly described on Exhibit A attached hereto and made a part hereof.

Dated this _23rd_ day of September, 1996

Orchard Place L.L.C.,
an Illinois limited liability company


By: _____
Mitchell Saywitz
Managing Member


## ACCEPTANCE

Orchard Place Retail, L.L.C., an Illinois limited liability company does hereby accept the foregoing Assignment of Lease this _23rd_ day of September, 1996 and agrees to assume all of the Landlord's rights, liabilities and obligations in and to the Lease hereby assigned.

Orchard Place Retail, L.L.C.,
an Illinois liability company


By: _____
Mitchell Saywitz
President

## EXHIBIT A

Lease dated September 13, 1995 as amended by that certain First Amendment to Lease dated April 26, 1996 by and between Orchard Place L.L.C. ("Landlord") and Marshalls of Skokie, IL., Inc., ("Tenant") for the premises commonly known as the space located in the building located at the corner of Skokie Blvd. and Golf Road in Skokie, Illinois, containing approximately 30,000 square feet of ground floor and including 200 square feet representing 50% of the dock staging area space.

DEC 2 7 1996

HSS REAL ESTATE, INC.

Zenon Paul Lankowsky
Vice President and
General Counsel

**CVS/pharmacy**

**December 16, 1996**

Mr. Mitchell Saywitz
HSS Real Estate Inc.
35 West Wacker Drive
Suite 3240
Chicago, Illinois  60601

RE:  CVS Leases

Dear Mr. Saywitz:

Pursuant to your letter dated December 2, 1996 to Attorney Diane McMonagle-Glass, this letter will serve as confirmation of the fact that on November 19, 1996 at the Special Meeting of the Shareholders of Melville Corporation, the proposal to change Melville's name to CVS Corporation and to migrate the overall holding company to the State of Delaware as well as to approve various by-law and charter changes as outlined in the Proxy Information Statement was overwhelmingly approved and became effective on November 20, 1996.

If you have any further questions, please feel free to call.

Sincerely,

CVS Corporation

By: _____
Zenon P. Lankowsky
Vice President, General Counsel
and Secretary

ZPL:eep

ONE CVS DRIVE • WOONSOCKET, RHODE ISLAND 02895

## SECOND AMENDMENT TO LEASE

This Second Amendment to Lease is made as of the _17th_ day of January, 1997 by and between Orchard Place Retail, L.L.C. an Illinois limited liability company (hereinafter referred to as the "Landlord") and Filene's Basement, Inc., a Massachusetts corporation (hereinafter referred to as the "Tenant").

### R E C I T A L S:

A.   First Bank & Trust Company of Illinois, not personally, but solely as Trustee under Trust Agreement dated February 4, 1995 and known as Trust No. 10-1915 as landlord (hereinafter referred to as the "Original Landlord") and Marshalls of Skokie IL., Inc., an Illinois corporation (hereinafter referred to as the "Original Tenant") entered into that certain Lease Agreement dated as of September 13, 1995 whereby the Original Landlord leased to the Original Tenant certain premises consisting of approximately 30,000 rentable square feet of space in Orchard Place Shopping Center, Skokie, Illinois (hereinafter referred to as the "Premises").

B.   By First Amendment to Lease dated April 26, 1996, the Lease Agreement was amended to reflect modifications in the plans and specifications for the Landlord's Work as more fully described in said Amendment (the Lease Agreement as amended by the First Amendment to Lease is hereinafter referred to as the "Lease").

C.   Landlord has succeeded to all of the right, title and interest of the Original Landlord under the Lease.

D.   Tenant has succeeded to all of the right, title and interest of the Original Tenant under the Lease by virtue of that certain Assignment of Lease dated as of January _____, 1997 by and between the Original Tenant and Tenant.

E.   Landlord and Tenant now desire to further amend the Lease as hereinafter described.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein and in the Lease contained, and in further consideration of the foregoing recitals which are incorporated as though fully contained herein, the parties agree as follows:

1.   <u>Amendments</u>.  The Lease is hereby amended as follows:

A.   Section 7.01 of the Lease is amended by deleting the first sentence of said Section and inserting the following in lieu thereof:

CEA/230785.2

"Tenant covenants and agrees to open for business as a Filene's Basement store on or before June 1, 1997".

B.    Section 7.01 is further amended by amending the second sentence of said Section to provide as follows:

"However, thereafter, Tenant may use the Premises for any lawful retail purpose except for the uses set forth in Exhibit H hereof or in violation of the requirements contained in the Declaration of Covenants, Restrictions and Easements heretofore approved by the Original Tenant".

C.    Article V of the Lease is amended to provide that the term "Taxes" shall be the Taxes payable in each Lease Year of the Term notwithstanding that Taxes may have accrued in or relate to prior years.  Further, Article V is amended by deleting the term "Building" and inserting "Shopping Center" in lieu thereof throughout said Article V.

D.    Section 5.03 of the Lease is amended by inserting the following after the fourth sentence of said Section:

In the event that Landlord contests Taxes before the issuance of the initial assessment notice for the tax year in question so that an exact determination of savings cannot be made, then the reasonable costs of Landlord's contest shall be included in Taxes for the tax year being contested for the purpose of determining Tenant's Proportionate Share of Taxes.

E.    Section 21.01 of the Lease is amended to provide that notices to Tenant shall hereafter be forwarded to the following:

Marshall's of Skokie IL., Inc.
c/o CVS Corporation
One CVS Drive
Woonsocket, Rhode Island 02895
Attention:  Property Administration Department

and to:   Filene's Basement, Inc.
40 Walnut Street
Wellesley, Massachusetts 02181
Attention:  Chief Financial Officer

CBA/230785.2                   -2-

and to:   Wayne, Lazares & Chappell
          200 State Street
          Boston, Massachusetts 02109
          Attention:  Robert C. Zinnershine

F.   The following Section is hereby added to Article XVI of the Lease:

16.02    Notwithstanding anything to the contrary contained in Section 16.01 hereof, Landlord's right to recapture the Premises shall not apply to Filene's Basement, Inc. during the first ten (10) years after it receives the assignment of this Lease as successor Tenant to Marshalls of Skokie IL, Inc. provided Filene's Basement, Inc. transfers, sells or assigns this Lease to a person, entity or corporation acquiring four (4) or more stores of Filene's Basement, Inc. in the State of Illinois.  In the event of any such transfer, sale or assignment of this Lease, Filene's Basement, Inc. shall pay to Landlord any profit received from the sale of the Lease and any rent in excess of the rent required to be paid pursuant to this Lease upon receipt of such payments.  After the first ten (10) years of the tenancy of Filene's Basement, Inc. as successor Tenant under the Lease, then the Landlord's right to recapture the Premises upon a transfer or assignment shall be applicable to all such transactions.

2.   <u>Tenant Allowance</u>.  The Landlord's offset to the Tenant Allowance (described in Section 22.16 of the Original Lease as modified by the First Amendment to Lease) is hereby fixed at FOURTEEN THOUSAND TWO HUNDRED TWENTY-FIVE AND NO/100 ($14,225.00) DOLLARS.  Tenant acknowledges that it has received an assignment from the Original Tenant of all rights to the Tenant Allowance.  Tenant hereby indemnifies Landlord and agrees to hold it harmless from and against any claims of the Original Tenant arising from the payment of the Tenant Allowance to Tenant.  The foregoing indemnification shall include any fees and costs, including reasonable attorney's fees, incurred by Landlord in defending any such claim.

3.   <u>Condition Precedent</u>.  This Second Amendment to Lease shall not become effective and is contingent upon approval of this Second Amendment by the Landlord's mortgage lender.  Upon

CBA/230785.2                              -3-

satisfaction of the foregoing contingency, this Second Amendment to Lease shall be effective as of the date above first written.

4.   <u>Brokers</u>.   Tenant agrees to indemnify Landlord and hold Landlord harmless from and against any costs and expenses (including reasonable attorney's fees) resulting from the claim of any broker or other person for commissions or fees payable by reason of Tenant's assignment of the Lease from the Original Tenant or other claims for commissions or fees arising from Tenant's occupancy and tenancy in the Premises.

5.   <u>Inconsistency</u>.   Except as modified herein, the terms, conditions and covenants of the Lease shall remain unchanged and otherwise in full force and effect, and are hereby ratified and reaffirmed.   In the event of an inconsistency between this Second Amendment to Lease and the Lease, the terms herein shall control.

6.   <u>Landlord's Performance</u>.   The Tenant hereby acknowledges and agrees that to the best knowledge of Tenant (i) the Original Landlord and the Landlord have fully and faithfully performed all covenants and obligations on their part to be performed under the Lease, (ii) that the Original Landlord and the Landlord are not in default under the Lease, and (iii) that no event has occurred which, with passing of time or the giving of notice, or both, could constitute a default of the Original Landlord or the Landlord under the Lease.

7.   <u>Binding Effect</u>.   The terms hereof shall be binding upon and inure to the benefit of Landlord, Tenant and their respective permitted successors and assigns.

8.   <u>Headings.</u>   The paragraph headings herein contained are for convenience and shall not be deemed to govern or control the substance hereof.

IN WITNESS WHEREOF, the parties have executed this Second Amendment to Lease as of the date above first written.

**LANDLORD:**

ORCHARD PLACE RETAIL, L.L.C.

BY:  ORCHARD PLACE RETAIL, INC.,
     its Managing Member

By: _Mitchell Sugrue_____
     Its:  President

**TENANT:**

FILENE'S   BASEMENT,   INC.,   a
Massachusetts corporation

By:_____
     Its:_____

IN WITNESS WHEREOF, the parties have executed this Second
Amendment to Lease as of the date above first written.

**LANDLORD:**

ORCHARD PLACE RETAIL, L.L.C.

BY:  ORCHARD PLACE RETAIL, INC.,
     its Managing Member

     By:_____
        Its:  President

**TENANT:**

FILENE'S    BASEMENT,    INC.,    a
Massachusetts corporation

By:_____
   Its:  _____

## GUARANTY OF LEASE

THIS GUARANTY OF LEASE is made as of the _17th_ day of January, 1997 by Filene's Basement Corp., a Massachusetts corporation (hereinafter referred to as "Guarantor"), to and for the benefit of Orchard Place Retail, L.L.C., an Illinois limited liability company (hereinafter referred to as "Landlord").

### RECITALS:

A.    First Bank & Trust Company of Illinois, not personally, but solely as Trustee under Trust Agreement dated February 4, 1995 and known as Trust No. 10-1915 as landlord (hereinafter referred to as the "Original Landlord") and Marshalls of Skokie IL., Inc., an Illinois corporation (hereinafter referred to as the "Original Tenant") entered into that certain Lease Agreement dated as of September 13, 1995 whereby the Original Landlord leased to the Original Tenant certain premises consisting of approximately 30,000 rentable square feet of space in Orchard Place Shopping Center, Skokie, Illinois (hereinafter referred to as the "Premises").

B.    By First Amendment to Lease dated April 26, 1996, the Lease Agreement was amended to reflect modifications in the plans and specifications for the Landlord's Work as more fully described in said Amendment (the Lease Agreement as amended by the First Amendment to Lease is hereinafter referred to as the "Lease").

C.    Landlord has succeeded to all of the right, title and interest of the Original Landlord under the Lease.

D.    Filene's Basement, Inc., a Massachusetts corporation (hereinafter referred to as the "Tenant") has succeeded to all of the right, title and interest of the Original Tenant under the Lease by virtue of that certain Assignment of Lease dated as of January _17_, 1997 by and between the Original Tenant and Tenant.

E.    Tenant has requested Landlord to execute a Second Amendment to Lease amending various provisions contained in the Lease.  Tenant has also requested Landlord to waive its right to recapture the Premises upon assignment with respect to the transfer of the leasehold interest from the Original Tenant to Tenant. Landlord is unwilling to execute the Second Amendment to Lease and waive its right to recapture the Premises unless Guarantor executes a guaranty of the Tenant's obligations contained in the Lease as more fully described herein.

F.    Guarantor has a financial interest in Tenant and will benefit from the assignment of the Lease to Tenant.

NOW, THEREFORE, in consideration of the execution by Landlord of the Second Amendment to Lease and the Landlord's waiver of its

CBA/270825.2

right to recapture the Premises, and in further consideration of the foregoing recitals which are incorporated as though fully contained herein, Guarantor agrees as follows:

1.   <u>Guaranty</u>.   Guarantor does hereby unconditionally and absolutely guaranty (i) the due and punctual payment of all rental, taxes, assessments and other charges to be paid by Tenant as provided for in the Lease, (ii) the prompt payment when due and at all times thereafter of any and all existing and future liability of Tenant under the Lease of any kind, nature or character, and (iii) the due and punctual performance and observance by Tenant of all of the other terms, covenants, agreements and conditions to be performed or observed by Tenant under the Lease, throughout the term of the Lease and all extensions thereof.   The guaranty contained herein shall run for the benefit of Landlord and its successors and assigns and this Guaranty may be enforced against Guarantor without first resorting to, or exhausting any other remedy which Landlord or its successors and assigns may have against Tenant.

2.   <u>Performance by Tenant</u>.   Guarantor agrees that any modification of the Lease or waiver of the performance thereunder, or the giving by Landlord of any extension of time for the performance of any of the obligations of Tenant or any other forbearance on the part of Landlord, or any failure by Landlord to enforce any of its rights under the Lease shall not in any way release Guarantor from liability hereunder or terminate, affect or diminish the validity of this Guaranty.   Notice to Guarantor of any such modification, waiver, extension, forbearance or failure or of any default by Tenant under the terms of the Lease, is hereby waived.

3.   <u>Insolvency of Tenant</u>.   Guarantor further agrees that in the event Tenant shall become insolvent or shall be adjudicated a bankrupt, or shall file a petition for reorganization, arrangement or similar relief under any present or future provisions of the Federal Bankruptcy Code, or if such a petition filed by creditors of Tenant shall be approved by a court, or if Tenant shall seek a judicial readjustment of the right of its creditors under any present or future federal or state law or if a receiver of all or a substantial part of its property and assets is appointed by any state or federal court, and in any such proceeding the Lease shall be terminated or rejected, or the obligations of Tenant thereunder shall be modified, Guarantor agrees that it will continue to pay rents as they become due and continue to perform all obligations of Tenant under the Lease.   In the event any payment by Tenant to Landlord is held to constitute a preference under the bankruptcy laws, or if for any other reason under bankruptcy proceedings Landlord is required to refund such payment or pay the amount thereof to any other party, such payment by Tenant to Landlord shall not constitute a release of Guarantor from any liability hereunder, but Guarantor agrees to pay such amount to Landlord upon

demand. ·Guarantor's obligations to make payment in accordance with the terms of this Guaranty shall not be impaired, modified, changed, released or limited in any manner whatsoever by any impairment, modification, change, release or limitation of the liability of Tenant or its estate in bankruptcy resulting from the operation of any present or future provision of the Federal Bankruptcy Code or other statute, or from the decision of any court.

4.   _Enforcement_. Guarantor agrees that:  (a) in the event it is necessary for Landlord to place this Guaranty in the hands of any attorney for enforcement, Guarantor will reimburse Landlord for reasonable expenses incurred in the enforcement hereof and of the Lease, including reasonable attorney's fees; (b) this Guaranty shall inure to the benefit of and may be enforced by Landlord and any subsequent assignee of the Lease, and shall be binding upon and enforceable against Guarantor, its successors, assigns and legal representatives; (c) Landlord shall not be required to pursue or exhaust any other remedies before invoking the benefits of this Guaranty; provided, however, that any pursuit of any such remedies shall in no manner impair or diminish the rights of Landlord under this Guaranty; (d) this is a continuing Guaranty, and shall apply to and cover the Lease including any extensions, replacements and/or renewals thereof; and (e) this Guaranty shall be binding upon and enforceable against Guarantor, notwithstanding the occurrence of any assignment of the Lease or sublease of the Premises by Tenant, including, but not limited to, an assignment or sublease which discharges Tenant from liability under the Lease.

5.   _Construction_.  This Guaranty shall be governed by the laws of the State of Illinois and enforced in the courts of that State or in the Federal District Court of the Northern District of Illinois.

IN WITNESS WHEREOF, this Guaranty has been duly executed by the Guarantor as of the day and year first above written.

**GUARANTOR:**

Filene's    Basement    Corp.,    a
Massachusetts corporation

By: _____
     Its: _____

Attest:

By: _____
     Its: _____

## RE-AFFIRMATION OF TENANT OBLIGATIONS UNDER LEASE

TO:       Orchard Place Retail, L.L.C. (hereinafter referred to as
          the "Landlord")

RE:       Lease Agreement dated September 13, 1995 as amended by
          First Amendment to Lease dated April 26, 1996 and Second
          Amendment to Lease dated January _____ , 1997 (hereinafter
          collectively referred to as the "Lease") between Landlord
          as successor to First Bank & Trust Company of Illinois as
          Trustee under Trust No. 10-1915 (hereinafter referred to
          as the "Landlord") and Filene's Basement, Inc.
          (hereinafter referred to as the "Tenant") as successor to
          Marshalls of Skokie, IL., Inc. concerning approximately
          30,000 rentable square feet of space in Orchard Place
          Shopping Center, Skokie, Illinois (hereinafter referred
          to as the "Premises").

     Marshalls of Skokie IL., Inc., an Illinois corporation as the
Original Tenant of the Lease hereby certifies to Landlord and its
successors and assigns that notwithstanding the assignment of its
interest in the Lease to Filene's Basement, Inc., the obligations
of Marshalls of Skokie IL., Inc. as described in the Lease shall
remain in full force and effect. Further, Marshalls of Skokie IL.,
Inc. has no claims or defenses under the Lease or otherwise with
respect to its performance in full of all terms, covenants and
conditions contained in the Lease.

Dated: January 17 , 1997          TENANT:

                                  Marshalls of Skokie IL., Inc.,
                                  an Illinois corporation

                                  By: _____
                                  Its: Vice President

CRA/230861.1

## RE-AFFIRMATION OF GUARANTY

TO:      Orchard Place Retail, L.L.C. (hereinafter referred to as
         the "Landlord")

RE:      Lease Agreement dated September 13, 1995 as amended by
         First Amendment to Lease dated April 26, 1996 and Second
         Amendment to Lease dated January 17, 1997 (hereinafter
         collectively referred to as the "Lease") between Landlord
         as successor to First Bank & Trust Company of Illinois as
         Trustee under Trust No. 10-1915 (hereinafter referred to
         as the "Landlord") and Filene's Basement, Inc.
         (hereinafter referred to as the "Tenant") as successor to
         Marshalls of Skokie, IL., Inc. concerning approximately
         30,000 rentable square feet of space in Orchard Place
         Shopping Center, Skokie, Illinois (hereinafter referred
         to as the "Premises").

     CVS Corporation (successor in interest to Melville
Corporation) as Guarantor of the Lease pursuant to the Guaranty
dated September 15, 1995 (hereinafter referred to as the Guaranty")
hereby certifies to Landlord and its successors and assigns that as
of the date hereof, its guaranty of the obligations of Tenant as
described in the Guaranty is in full force and effect and has not
been modified or amended. Further, Guarantor has no claims or
defenses under the Guaranty or otherwise with respect to its
performance in full of all terms, covenants and conditions
contained in the Guaranty

Dated: January 17, 1997          GUARANTOR:

                                 CVS Corporation, a Delaware
                                 corporation

                                 By: _____
                                 Its: Executive Vice President

                                 Attest:

                                 By: _____
                                 Its: Secretary

CBA/230845.2

**SCHEDULE A**

Lease Agreement dated September 13, 1995 as amended by First
Amendment to Lease dated April 26, 1996 and Second Amendment to
Lease dated January _17_, 1997 (hereinafter collectively referred
to as the "Lease") between Orchard Place Retail, L.L.C. as
successor to First Bank & Trust Company of Illinois as Trustee
under Trust No. 10-1915 (hereinafter referred to as the
"Landlord") and Tenant concerning approximately 30,000 rentable
square feet of space in Orchard Place Shopping Center, Skokie,
Illinois (hereinafter referred to as the "Premises").

69908.1

## LANDLORD WAIVER

The undersigned person, or corporation, business trust, joint venture, association, company, partnership, government or other entity, named on the first signature page hereto on the line above the word Lessor (the "Lessor") represents and warrants that he, she or it, as the case may be, is the owner and lessor of the leased premises related to the Lease/Leases (as defined below), with the buildings thereon (the "Premises"), leased to Filene's Basement, Inc., a Massachusetts corporation (such corporation and its successors in interest being hereinafter referred to as the "Lessee") under the terms and conditions of a lease or leases identified on Schedule A attached hereto (together with all amendments thereto, the "Lease/Leases").  The Lessee has entered into a revolving credit and term loan facility (the "Credit Facility") with certain lenders (the "Lenders") under the terms of which the Lessee may grant a security interest to the Lenders in all assets of the Lessee located upon the Premises and in all proceeds and products thereof (such assets and such proceeds and products being collectively referred to as the "Collateral").  Notwithstanding anything to the contrary contained herein, Collateral shall not include leasehold improvements and fixtures (other than removable trade fixtures which can be removed without damage to the Premises).  In recognition and acknowledgement thereof, the Lessor, for good and valuable consideration, the receipt and sufficiency which are hereby acknowledged, does hereby:

(1)   Agree that any and all Collateral located upon the Premises is and will remain personal property of the Lessee or its affiliates and will not become part of the Premises; and

(2)   Waive, relinquish and release any and all rights of distraint, attachment, lien, levy or execution against or upon, or security interest in, the Collateral for any rent or other sum now or hereinafter due Lessor under the terms and conditions of the Lease/Leases or otherwise, and all claims and demands of every kind and nature whatsoever against the Collateral during the term of the Credit Facility and any renewals, restatements, amendments, extensions or modifications thereof or substitutions therefor (and the Lessor hereby represents and warrants that he, she or it, as the case may be, has not previously assigned, pledged or otherwise transferred any such rights, claims or demands).

69908.1

IN WITNESS WHEREOF, the Lessor has executed this Lessor's
Waiver as of this 17th day of January, 1997.

Signed and delivered                    Lessor:
in the presence of:
                                        Orchard Place Retail L.L.C.

                                        By: Orchard Place Retail, Inc.,
                                            its Managing Member


_____                    By: _Mitchell Saywitz_____
                                        Print Name: _Mitchell Saywitz_____
                                        Title: _President_____

69908.1

#9840, Skokie, Illinois
10/25/2001

## SUBLEASE

AGREEMENT OF SUBLEASE made this _31st_ day of _October_,
2001, by and between Marshall's of Skokie, IL., Inc., an Illinois
corporation, having its principal office at One CVS Drive,
Woonsocket, Rhode Island 02895 (hereinafter referred to as
"Sublandlord") Circuit City Stores, Inc., a Virginia corporation,
having its principal office at 9950 Mayland Drive, Deep Run I,
Richmond, Virginia 23233 (hereinafter referred to as "Subtenant").

## W I T N E S S E T H:

WHEREAS, Orchard Place Retail L.L.C. (hereinafter referred to
as "Master Landlord") leased to Sublandlord pursuant to a Lease
dated September 13, 1995 as amended by First Amendment to Lease
dated April 26, 1996, Second Amendment to Lease dated January 17,
1997 and thereafter amended by Third Amendment to Lease dated
simultaneously herewith (hereinafter collectively referred to as
the "Master Lease") certain premises containing approximately
thirty two thousand one hundred fifty six (32,156) square feet at
Golf Road and Skokie Boulevard, Skokie, Illinois, as more fully
described in the Master Lease; and

WHEREAS, the building, of which the Premises are a part,
located at the corner of Skokie Boulevard and Golf Road in Skokie,
Illinois containing approximately 78,000 square feet, exclusive of
parking area and vehicle access ramps, and common areas as more
fully described in the Master Lease is hereinafter referred to as
the "Building";

WHEREAS, Sublandlord is desirous of subleasing its premises
to Subtenant, and Subtenant is desirous of subleasing said space
from Sublandlord; and

WHEREAS, Sublandlord further represents and warrants that:
(i) the Master Lease is now in full force and effect; (ii) neither
the Master Landlord nor Sublandlord is in default of its
obligations thereunder, nor has any event occurred which with the
giving of notice and/or passage of time would be a default
thereunder; and (iii) Sublandlord has full right, power, and
authority to sublet the premises as provided below.

NOW, THEREFORE, in consideration of the Premises and the
mutual promises and covenants contained in this agreement,
Sublandlord and Subtenant mutually agree as follows:

1

SUBLEASE -

1. (a) It is understood and agreed that this Lease will be a Sublease. The Master Lease is incorporated as a part hereof except as specifically set forth herein, and Subtenant hereby acknowledges receipt of a copy of the Master Lease.

SUBORDINATION -

(b) All rights of Subtenant hereunder are subject to the terms and provisions of the Master Lease and to any termination thereof. In the event of any inconsistency between the provisions of this Sublease (hereinafter referred to as "Sublease" or "Lease") and the Master Lease, Subtenant agrees that it shall be bound by the Master Lease. In the event that the Master Lease shall expire or terminate for any reason whatsoever, then, notwithstanding anything to the contrary herein set forth, this Sublease will simultaneously and automatically terminate. Further, Subtenant agrees to indemnify Sublandlord and save it harmless from and against any and all claims, actions, damages, liability, and expenses in connection with or arising out of Subtenant's holdover after the date of termination as defined in this Sublease. In addition, Subtenant agrees that Sublandlord shall not be liable to Subtenant in damages or otherwise for any breach of the Master Landlord under the Master Lease.

OBLIGATIONS OF SUBTENANT UNDER MASTER LEASE -

(c) Subtenant agrees to perform, fulfill and observe all covenants and agreements of Sublandlord, as set forth in the Master Lease, to the extent applicable to Subtenant's Premises, except for the covenants and agreements of Sublandlord set forth therein with respect to the payment of rent and other charges to the Master Landlord, and except as specifically set forth herein. Except as set forth in this Sublease, Subtenant will have no rights with respect to the Master Lease. Notwithstanding anything contained herein to the contrary, Subtenant shall have the right to enforce all of Sublandlord's rights under the Master Lease. Subtenant acknowledges that nothing contained in this Sublease shall be deemed to create any contract or obligation between Master Landlord and Subtenant hereunder, except those rights as may be set forth in any Subordination, Non-disturbance and Attornment Agreement between Subtenant and Master Landlord.

PREMISES -

2. Sublandlord does hereby let to Subtenant and Subtenant does hereby hire from the Sublandlord, for the term and on the conditions hereinafter provided, a space consisting of approximately thirty two thousand one hundred fifty six (32,156)

2

square feet of ground floor area and including two hundred (200) square feet representing fifty (50%) percent of the dock staging area space as shown on the plan attached hereto as Exhibit A (the ``Site Plan'') (collectively, hereinafter referred to as the "Premises").

TERM -

3.    The term of this Sublease shall commence on the actual date of delivery of the Premises, which date shall be upon Subtenant obtaining all permits and approvals pursuant to Articles 40 and 41, to Subtenant in the manner and condition provided under Article 7 hereof, and said term shall expire on January 31, 2022, subject to the conditions hereinafter set forth, and subject to the provisions of the Master Lease.

OPTION -

4.    Provided that Subtenant is not then in default of any material terms or provisions of the Master Lease or this Sublease and after the lapse of all applicable cure periods under this Sublease and Subtenant's net worth is not less that Five Hundred Million and no/100 ($500,000,000.00) Dollars, then Subtenant shall be granted the right and option to extend this Sublease upon the same terms and conditions as set forth in the Master Lease, provided further, Subtenant shall give Sublandlord notice of such exercise at least sixty (60) days prior to the date Sublandlord is required to exercise any such option under the Master Lease and Sublandlord shall timely exercise its next available option to extend as set forth in the Master Lease No assignee, transferee or successor in interest to Subtenant may exercise such option.

USE -

5.    In no event shall Subtenant use the Premises for the sale of health and beauty aids, as a drugstore, or for the sale of prescription drugs. Subtenant may maintain, use and operate the Premises as a retail store for (i) the sale of consumer, office and automotive electronics products (which may include, but shall not be limited to, televisions, stereos, speakers, and video recorders and players), computer hardware and software, entertainment software and entertainment media (which include, but shall not be limited to, records, game cartridges, video tapes, cassettes and compact discs), cellular and wireless telephones and telecommunication devices, and related goods and the sale and installation of motor vehicle audio, stereo and telephone systems and technological evolutions of the foregoing (all of such items being herein collectively referred to as the ``Products''), and

3

(ii) renting, servicing, repairing and warehousing of the Products; (iii) and for any other retail purpose except those as set forth or specifically excluded by the Master Lease.

FIXED RENT -

6.  (a)  From the Date of Rent Commencement, as hereinafter defined, Subtenant shall pay to Sublandlord, at the following address care of CVS Pharmacy, Inc., Post Office Box 931979, Cleveland, Ohio 44193, without any prior demand therefor and without any deduction or set-off whatsoever, monthly installments of annual fixed rent as set forth in Article 1.01 of the Master Lease.

Said fixed rent shall be payable to Sublandlord on the first day of each month in advance.  In the event that Subtenant shall be late in its payment of fixed rent or any other charges due hereunder by more than five (5) business days, Subtenant shall pay Sublandlord a late fee in the amount of one and one half (1 1/2%) percent of the amount due.  Notwithstanding the foregoing, Subtenant shall be entitled to one late payment per twelve (12) month period without penalty.

COMMENCEMENT RENT -

(b)  It is understood and agreed that fixed rent and other charges due under this Sublease shall commence on the earlier of the date Subtenant opens for business or January 1, 2002 (hereinafter referred to as the "Date of Rent Commencement").

If the Date of Rent Commencement shall be on any day other than the first day of a calendar month, such rent and other charges for such month shall be apportioned on a per diem basis.

PERCENTAGE RENT -

(c)  In order that Sublandlord may fulfill its obligations under the Master Lease, Subtenant shall submit to Sublandlord, at the address specified in Article 19, a statement of ``Gross Sales'' certified by an officer of the Subtenant and delivered to Sublandlord on a monthly basis within twenty (20) days of the end of the prior month and on an annual basis within twenty (20) days of the end of such lease year. Subtenant's statement of "gross sales", shall be as defined in the Master Lease and related to the Premises.  Such statement shall be in accordance with the provisions of the Master Lease.  Additionally, Subtenant shall keep its records and allow inspection thereof by Master Landlord in accordance with the Master Lease, and by Sublandlord, in accordance with identical terms.

4

In the event that Subtenant's gross sales exceed the applicable breakpoint in the Master Lease, so that Percentage Rent is due under the Master Lease, Subtenant shall pay as additional rent to Sublandlord, for payment to the Master Landlord, the Percentage Rent due under the Master Lease, at least Fifteen (15) days prior to the date said payment is due from Sublandlord to Master Landlord under the Master Lease.

DELIVERY OF THE PREMISES -

7.   Sublandlord hereby covenants and agrees to deliver possession of the Premises to Subtenant in an "as is" condition on the date this Sublease is fully executed. Notwithstanding the foregoing, on the date of the delivery of the Premises by Sublandlord, the Premises shall be free of all tenancies, personal property, debris and in broom clean condition.

REPAIRS AND MAINTENANCE -

8. (a)   Except for the items Master Landlord is required to maintain pursuant to Sections 8.01 and 8.02 of the Master Lease, Subtenant shall, at all times during the Term, at its sole expense, comply with all maintenance and repair obligations of Sublandlord contained in the Master Lease, including without limitation, Subtenant shall keep and maintain the Premises in good order, condition and repair and in a safe condition, (all ⌐includin utility lines serving the Premises (from the point of connection at the Premises to the public utility mains) the exterior, including without limitation, the walls and the structural portions of the Premises, including, without limitation, the walls and the structural portions of the Premises, including without limitation, footings and foundation, floor slab, sidewalk and structural walls, columns and beams, reasonable wear and tear, damage caused by casualty or by the willful misconduct or negligence of Sublandlord, Master Landlord, their respective employees, agents or contractors or by Master Landlord's failure to maintain or repair the Premises in accordance with its obligations under this Sublease excepted. *

Subtenant shall be permitted to maintain a dumpster or similar refuse container in or near the Premises, in a location to be reasonable provided by Sublandlord. The obligation to remove trash and cost of removal of trash from such dumpster or refuse container shall be borne by Subtenant.

(b)   If Subtenant fails to make any of the repairs required to be made by Subtenant under this Sublease within Thirty (30) days after written notice from Sublandlord of the necessity therefor, Sublandlord, in addition to any other rights it may have hereunder, shall have the right, but not the obligation, to make

*Notwithstanding anything contained herein to the contrary, Sublandlord agrees to maintain the roof in accordance with the terms of the Master Lease

said repairs on behalf of Subtenant and to bill Subtenant for the entire out-of-pocket cost thereof. If, Subtenant is not operating in the Premises at the time, and in an emergency, in Sublandlord's opinion, any such repairs are immediately necessary, no prior notice shall be required, but Sublandlord shall give Subtenant whatever notice is reasonable in the circumstances and may forthwith make said repairs on behalf of Subtenant and bill Subtenant for the entire cost thereof. Subtenant will pay any amount so billed to it under this paragraph within Thirty (30) days after receiving any such bill.

(c)  At the expiration or earlier termination of the tenancy hereby created, Subtenant shall surrender the Premises to Sublandlord in the same condition as it is required to be maintained by Subtenant pursuant to subparagraph (a) above, reasonable wear and tear and damage coverable by insurance required to maintained hereunder excepted. Subtenant shall remove all of its personal property, movable trade fixtures and signs and repair any damage caused thereby.

ACCESS TO PREMISES -

9. Sublandlord, its duly authorized agents and representatives shall have the right, following reasonable written notice to Subtenant (except in the case of an emergency, and if Subtenant is not operating in the Premises, then no notice shall be necessary), to enter into and upon the Premises, or any part thereof, at any time in the event of an emergency, for the purpose of examining the same or making such repairs therein as may be necessary for the safety and preservation thereof.

FIRE -

10.  Subtenant agrees that Sublandlord shall have no obligation to repair or restore the Premises in the event that the Premises shall be damaged in whole or in part by fire, flood, tornado, or by the elements, or by act of God, or the public enemy, or otherwise. Subtenant shall notify Sublandlord promptly of any such damage and/or destruction.

To the extent that Sublandlord's rent and other charges are abated under the Master Lease, Subtenant shall be entitled to an abatement of the fixed rent and other charges payable hereunder for the period during which the Premises are rendered totally or partially untenantable or incapable of use for the normal conduct of Subtenant's business therein.

Notwithstanding the foregoing, in the event that the Premises are not restored in accordance with the terms of the Master Lease which is set forth as within Three Hundred Sixty (360) days after the damage has occurred, then Subtenant shall

have the same rights extended to the Sublandlord
under the Master Lease, including without limitation the right to
terminate this Sublease. However, if Subtenant elects to terminate
this Sublease, Subtenant must do so by giving Sublandlord written
notice of its election to do so, twenty (20) business days, prior
to the expiration of the three hundred sixty (360) day period. If
all, or any part of the Premise, Building Exterior, or common
areas of the Buildings or Shopping Center is damaged or destroyed
by fire, the elements or other casualty, then Subtenant shall have
the right on behalf of Sublandlord, to cause the Master Landlord
to restore the Premises in accordance with the Master Lease.

CONDEMNATION -

   11.  Sublandlord shall have no obligation to Subtenant in the
event that all or part of the Premises are taken in condemnation
proceedings or by any right of eminent domain or for any public or
quasi-public use.   Subtenant shall promptly notify Sublandlord of
any such taking.

     In the event of condemnation by eminent domain or similar
law, including a sale in lieu thereof to an authority or other
entity having the power of eminent domain (a "Taking"), of all or
any portion of the Premises or the common areas which Subtenant
has a right to use hereunder, then Subtenant may terminate this
Sublease by giving notice to Sublandlord not more than ninety
(90) days after the later of the date on which title vests in the
condemning authority or the date Subtenant receives notice of
said vesting.  Notwithstanding the above, in the event that the
Taking is exclusive of the Premises, Subtenant may not terminate
the Sublease unless the Taking would materially effect the
ingress/egress of the Shopping Center or reduce the parking in
the Shopping Center below 3.5 cars per 1,000 square feet of the
Building, or would otherwise materially affect Subtenant's
operation.

     In the event of a Taking, if this Sublease is not
terminated, then: (a) Sublandlord shall cause the Master Landlord
to restore the Premises in accordance with the terms of the
Master Lease.  If a portion of the Premises is taken, then from
and after the date on which title vests in the condemning
authority, the rent and all additional rent and other charges
payable hereunder shall be equitably reduced.

If this Sublease is terminated pursuant to this Paragraph, then
any rent and other charges paid in advance shall be refunded to
Subtenant. In the event of any Taking, Subtenant shall be
entitled to file for a separate award only, in an amount equal to
Subtenant's un-amortized cost of Subtenant's leasehold
improvements in the Premises, if any. Subtenant's separate award
may include the right to claim and recover from the condemning

7

authority such compensation as may be separately awarded or recoverable by Subtenant on account of any and all damage to Subtenant's business by reason of the condemnation and for or on account of any cost or loss to which Subtenant might be put in moving Subtenant's property, or for any other damages compensable separately to Subtenant. Subtenant may not share in Sublandlord or Mater Landlord's award.

ASSIGNMENT AND SUBLETTING -

12.    Subtenant may assign this Sublease and sublet the Premises for any retail use not prohibited by the terms of this Sublease and the Master Lease and in no event shall Subtenant sublet or assign the Premises for use for the sale of health and beauty aids, as a drugstore, or for the sale of prescription drugs; provided, however, that such transferee shall comply with the terms of Section 16.01 of the Master Lease. Notwithstanding the foregoing, in the event of a proposed assignment or subletting of the Premises, Sublandlord shall have the right to recapture the Premises by written notice to Subtenant given within thirty (30) days after receipt of Subtenant's notice and information regarding the proposed assignee or sub-subtenant. Subtenant may vitiate Landlord's recapture right by notifying Landlord that Subtenant withdraws its intent to assign or sublet. Such withdrawal notice must be given within thirty (30) days after receipt of Landlord's recapture notice. Landlord's recapture notice shall specify a lease termination date no earlier than sixty (60) days or later than ninety (90) days after such notice. Upon such Sublease termination date, Subtenant shall vacate the Premises and Subtenant shall be relieved of further obligations hereunder. Notwithstanding the foregoing, Subtenant shall have the right to transfer or assign this Sublease to any person, entity or corporation acquiring all or substantially all of the stock or assets of Subtenant by purchase, merger, consolidation or otherwise in connection with the transfer of substantially all of the Subtenant's stores in the state of Illinois.

For purposes of this Sublease, Subtenant shall have the right to assign this Sublease to (i) a parent, subsidiary, affiliate, division or corporation controlling, controlled by or under common control with Subtenant, or (ii) a successor corporation related to subtenant by merger, consolidation, or reorganization, provided, however, that the use is in conformance with the Master Lease and provided that subtenant and assignee shall at all times remain liable under the Sublease following any such assignment of the Sublease.

8

ALTERATIONS -

13.     Subtenant shall have the right, at its own cost and
expense, to make alterations to the Premises, which are permitted
to be made by Sublandlord under the Master Lease provided,
however, that (a) Subtenant shall not make structural alterations,
exterior alterations, alterations to the rooftop, HVAC, or
vertical transportation to the Premises or paint the Premises
(collectively, the "Restricted Alterations") without Master
Landlord's prior written consent.   (b) Such alterations shall be
done lien-free and in good workmanlike manner using first-quality
materials.   Subtenant shall remove any alterations and restore the
Premises to its original condition upon the termination of this
Sublease as required under the Master Lease.   Subtenant shall
deliver to Sublandlord copies of its plans, specifications and
other required information prior to making any alterations to the
Premises in accordance with this Article 13 and the Master Lease,
which plans and specifications Sublandlord will forward to Master
Landlord for approval.   Subtenant shall not commence to make any
such Restricted Alterations until Sublandlord shall have obtained
any required consent or approval from Master Landlord.   All such
alterations shall be made in good workmanlike manner and shall be
timely paid for by Subtenant.   Subtenant shall not allow any
mechanic's liens to attach to the Premises and shall indemnify and
hold Sublandlord harmless with respect thereto.

SIGNS -

14.     Subtenant shall have the right to erect in or on the
Premises on all sides any signs indicated in final plans and
specifications approved by Master Landlord in writing.   Any such
sign shall be of such height and other dimensions as Subtenant
shall determine and shall bear such legend or inscription
advertising Subtenant's business as Subtenant shall determine,
subject to all applicable governmental laws, regulations and
restrictions. Not withstanding anything to the contrary contained
in this Article 14, Subtenant shall only erect such signs in or on
the Premises as are in such locations as are mutually and
reasonably agreed to by Master Landlord and Subtenant prior to
each parties approval of the plans and specifications for the
Premises. Any deviations from the approved initial signage plan
shall require Master Landlord's reasonable approval.   Subtenant
shall submit all sign plans and specifications to Sublandlord and
Sublandlord will forward to Master Landlord for reasonable
approval.

14(a) Subtenant shall pay all costs with respect to obtaining
Master Landlord's consent under Articles 13 and 14 upon demand of
Sublandlord.

9

REMOVAL OF FIXTURES & SIGNS -

15.  All alterations, additions, and improvements in or upon
the Premises, made by either party (except Subtenant's signs,
inventory, intellectual property, furniture, trade fixtures, and
other equipment and shelving), shall be removed or restored to the
original condition upon the termination of this Sublease as may be
required under the Master Lease.  At the termination or other
expiration of the term hereby granted or any renewal thereof,
Subtenant shall remove the items enumerated in the parenthetical
above, as well as its signs and identification marks, from the
Premises.  Subtenant agrees to repair any and all damage caused
by such removal.

SUBLANDLORD NOT LIABLE -

16.  Sublandlord or Sublandlord's agents shall not be liable
for any injury or damage to persons or property resulting from
steam, gas, electricity, water, rain or snow or leaks from any
part of the Premises or Building, or from the pipes, appliances or
plumbing works or from the roof, street or sub-surface or from any
other place or by dampness or by any other cause of whatsoever
nature, unless caused by or due to the negligence or willful acts
of Sublandlord, its agents, servants or employees; nor shall
Sublandlord or its agents be liable for any such damage caused by
Master Landlord or other persons in the Premises or Building, or
caused by operations in construction of any private, public or
quasi-public work.

SUBROGATION -

17.  Each of the parties hereto hereby waives any and all
rights of action for negligence against the other party hereto,
which may hereafter arise for damage to the Premises or to the
personal property therein resulting from any fire or other
casualty of the kind covered by standard fire insurance policies
with extended coverage, regardless of whether or not, or in what
amounts, such insurance is now or may hereafter be carried by the
parties hereto, or either of them.

UTILITIES -

18.  Subtenant agrees to pay for all water consumed by it and
to pay for any public sewer charges applicable to the Premises.
Subtenant also agrees to pay for all other utilities, including
gas and electricity, consumed by it in the Premises and covenants
and agrees that it will keep sufficient heat in the Premises, at
all times, to prevent pipes from freezing.

10

19.    (a)    If Subtenant defaults in the payment of any installment of rent or other charges payable hereunder by Subtenant and such default is not cured within ten (10) days after receipt of notice from Sublandlord thereof or if Subtenant defaults in the observance of any other material covenant or agreement herein contained and Subtenant shall not, within twenty (20) days after receipt of notice thereof from Sublandlord, cure or commence to cure such default (it being intended in connection with a default not susceptible of being cured with due diligence within said twenty (20) day period that the time allowed Subtenant within which to cure same shall be extended for such period as may be necessary to complete same with all due diligence) or if Subtenant shall make an assignment of its property for the benefit of creditors, shall be judicially determined to be insolvent or shall be adjudged a bankrupt, then Sublandlord may, by giving notice to Subtenant at any time thereafter during the continuance of such default, (i) terminate this Sublease, without any right by Subtenant to reinstate its rights by payment of rent or other amounts due or other performance of the terms and conditions hereof and upon such termination Subtenant shall immediately surrender possession of the Premises to Sublandlord, and Sublandlord shall immediately become entitled to receive from Subtenant, an amount equal to the difference between the aggregate of all rentals reserved under this Sublease for the balance of the Term, and the fair rental value of the Premises for that period, determined as of the date of such termination, plus any other amounts necessary to compensate Sublandlord for all detriment proximately caused by Subtenant's defaults under this Sublease or which in the ordinary course of things would be likely to result therefrom, including, but not limited to, brokerage commissions, advertising, expenses, and remodeling expenses, or (ii) with or without terminating this Sublease, as Sublandlord may elect, re-enter and repossess the Premises, or any part thereof, and lease them to any other person upon such terms as Sublandlord shall deem reasonable, for a term within or beyond the Term, provided, however, that any such reletting prior to termination shall be for the account of Subtenant, and Subtenant shall remain liable for (A) rent, taxes and other sums which would be payable hereunder by Subtenant in the absence of such expiration, termination or repossession, less (B) the net proceeds, if any, of any reletting effected for the account of Subtenant after deducting from such proceeds all of Sublandlord's reasonable expenses in connection with such reletting (including, without limitation, all repossession costs, reasonable brokerage commissions, reasonable attorneys' fees and expenses, reasonable alteration costs and expenses of preparation for such reletting). If the Premises is at the time of default sublet or leased by Subtenant to others, Sublandlord may, as Subtenant's agent, collect rents due from any subtenant or other

11

Subtenant and apply such rents to rent and other charges due hereunder. Such agency, being given for security, is hereby declared to be irrevocable. Any monthly deficiencies payable by Subtenant shall be paid monthly on the date herein provided for the payment of rent. Sublandlord may declare rent for the entire balance of the Term immediately due and payable as though such amount was payable in advance on the date the event of default occurred. Notwithstanding anything contained herein to the contrary, if Subtenant shall file for protection pursuant to any applicable bankruptcy law but Subtenant shall continue to operate the Premises and to pay all installments of rent and other charges payable hereunder by Subtenant as and when the same become due and payable, then Subtenant shall not be deemed to be in default pursuant to the terms of this Sublease. If, after the lapse of all applicable grace periods, Sublandlord reasonably expends any money to cure a default by Subtenant, then Subtenant shall, on demand, pay Sublandlord the amount so paid by Sublandlord together with interest thereon at the rate of four percent (4%) per annum in excess of the prime rate charged by the First National Bank of Chicago to its most credit worthy customers (the "Default Rate"). Sublandlord shall also be entitled to any and all other rights and remedies available to Sublandlord at law and in equity; provided, however, that Sublandlord shall, in all instances, be required to mitigate damages. None of the foregoing remedies shall be exclusive.

(b) No expiration or termination of this Sublease pursuant to subparagraph (a) above or by operation of law or otherwise (except as expressly provided herein), and no repossession of the Premises or any part thereof pursuant to subsection (a) above or otherwise shall relieve Subtenant of its liabilities and obligations hereunder, all of which shall survive such expiration, termination or repossession, and Sublandlord may, at its option, sue for and collect rent and other charges due hereunder at any time as and when such charges accrue.

(c) . If Sublandlord shall default in the observance of any material covenant or agreement herein contained or the Master Lease or shall fail to pay insurance premiums or other charges payable by Sublandlord hereunder when the same become due and payable and Sublandlord does not cure such default within thirty (30) days after written notice thereof by Subtenant (it being intended in connection with a default not susceptible of being cured with due diligence within said thirty (30) day period that the time allowed Sublandlord within which to cure same shall be extended for such period as may be necessary to complete same with all due diligence), then Subtenant may, in addition to all other rights and remedies available to Subtenant at law and in equity, cure such default on behalf of and at the expense of Sublandlord and do all necessary work and make all necessary payments in connection therewith to the extent necessary in

12

Subtenant's discretion, reasonably exercised, to protect
Subtenant's leasehold interest and continued use and occupancy of
the Premises.

NOTICES -

20.  It is mutually agreed that all notices that shall be
given or served upon either party to this Sublease shall be in
writing and shall be given or served as follows: If given or
served by Subtenant, by mailing the same to Sublandlord by
registered or certified mail, return receipt requested, or by
overnight courier service which provides a receipt, addressed to
Sublandlord (No. 9840), PO Box 1376, Attention: Property
Administration Department, Woonsocket, Rhode Island 02895, or at
such other address as Sublandlord may from time to time designate
by notice given to Subtenant; and if given or served by
Sublandlord, by mailing the same to Subtenant by registered or
certified mail, return receipt requested, or by overnight courier
service which provides a receipt, addressed to Subtenant at the
address listed on Page 1 of this Sublease, to the attention of
Subtenant's corporate secretary with a copy to the Vice President
of Real Estate or at such other address as Subtenant may from time
to time designate by notice given to Sublandlord.

COMMON AREA MAINTENANCE COST -

21.  Subtenant agrees to pay common maintenance costs payable
by Sublandlord under the Master Lease.   In the event that
Subtenant shall be late in its payment of common area maintenance
costs due hereunder by more than five (5) business days, Subtenant
shall pay Sublandlord a late fee in the amount of one and one half
(1 1/2%) percent of the amount due.   Notwithstanding the
foregoing, Subtenant shall be entitled to one late payment per
twelve (12) month period without penalty.   Any sum payable to
Sublandlord under this Article 21 shall be paid by Subtenant on a
monthly basis.   Sublandlord shall have the right during the term
of this Sublease, or any extension thereof to make annual
adjustments in the monthly sum payable by Subtenant to reflect any
increases or decreases in actual costs paid by Sublandlord to the
Master Landlord under the Master Lease. Subtenant will have the
right to audit and inspect all of Master Landlord's (as
Sublandlord's agent) records relating to the costs and expenses
in which Subtenant is required to share pursuant to and in
accordance with Section 8.01 of the Master Lease.  Subtenant
agrees to indemnify Sublandlord for any expenses or liabilities
incurred with the audit.  For the first twelve (12) months, said
costs are payable hereunder, Subtenant shall pay the estimated sum
of $6,575.00 per month to Sublandlord.

13

TAXES -

22.    Subtenant agrees to pay to the local tax authorities and other governmental agencies throughout the term of this Sublease and any renewal thereof, all personal property taxes which may be levied against Subtenant's merchandise, trade fixtures and other personal property in and about the Premises.

Subtenant further agrees to pay Sublandlord, on a monthly basis any real estate taxes and assessments levied against Sublandlord under the Master Lease for each tax fiscal year, or portion thereof, of the term of this Sublease. In the event that Subtenant shall be late in its payment of real estate taxes or assessment costs due hereunder by more than five (5) business days, Subtenant shall pay Sublandlord a late fee in the amount of one and one half (1 1/2%) percent of the amount due. Notwithstanding the foregoing, Subtenant shall be entitled to one late payment per twelve (12) month period without penalty. Sublandlord shall have the right during the term of this Sublease, or any extension thereof, to make annual adjustments to the monthly tax payment made by Subtenant to reflect any increases or decreases in actual costs paid by Sublandlord. For the first twelve (12) months, said taxes and assessments are payable hereunder, Subtenant shall pay the estimated sum of $11,725.00 per month to Sublandlord.    At Subtenant's sole cost and expense, Subtenant shall have the right, to contest the amount or validity, or otherwise seek an exemption or abatement, or any taxes or to seek a reduction in the valuation of the Premises assessed for tax purposes, by appropriate proceedings in accordance with the terms of the Master Lease.

INSURANCE -

23.    Subtenant agrees to assume Sublandlord's responsibility for all insurance costs payable by Sublandlord under the Master Lease. Any sum payable to Sublandlord under this Article 23 shall be paid by Subtenant on a monthly basis. In the event that Subtenant shall be late in its payment of insurance costs due hereunder by more than five (5) business days, Subtenant shall pay Sublandlord a late fee in the amount of one and one half (1 1/2%) percent of the amount due.    Notwithstanding the foregoing, Subtenant shall be entitled to one late payment per twelve (12) month period without penalty.    Sublandlord shall have the right during the term of this Sublease, or any extension thereof to make annual adjustments to the monthly insurance payment made by Subtenant to reflect any increases or decreases in actual costs paid by Sublandlord. For the first twelve (12) months said costs are payable hereunder, Subtenant shall pay the sum of $375.00 per month to Sublandlord.

14

Subtenant agrees to keep the Premises insured under a general liability policy with combined policy limits of at least $5,000,000.00 for personal injuries and property damage, and shall deliver to Sublandlord a certificate of such insurance naming Sublandlord and Master Landlord as "additional insureds". Subtenant shall comply with the Master Lease with respect to all insurance policies and/or certificates required by the Master Landlord of Sublandlord as tenant therein.

INCREASE IN INSURANCE -

24.   The Subtenant shall not use or occupy the Premises or any part thereof or suffer or permit the same to be used or occupied for any business or purpose deemed extra hazardous on account of fire or otherwise, and if by reason of the use and occupancy of the Premises hereunder, the rate of fire insurance on the Building in which the Premises are located shall be increased; the Subtenant will, on demand, pay to the Sublandlord the amount of such increase; but such increase in the rate of insurance shall not be deemed a breach of this covenant by the Subtenant.

BROKER -

25.   Sublandlord and Subtenant each represent and warrant that it has had no dealings or conversations with any real estate broker in connection with the negotiation and execution of this Sublease other than Kevin Boyd of Interstate Commercial Real Estate, Inc., 1701 Golf Road, Tower 3, Suite 315, Rolling Meadows, Illinois 60008 and The Equity Group (who shall be paid by Interstate Commercial Real Estate, Inc.). Sublandlord and Subtenant each agree to indemnify the other against all liabilities arising from any claim of any other real estate brokers, including cost of counsel fees, resulting from their respective acts. Sublandlord warrants and agrees that it shall be solely responsible for any and all brokerage commissions owing to said broker, as a result of the negotiation and execution of this Sublease.

NO WAIVER -

26.   A waiver by either party of any breach or breaches by the other of any one or more of the covenants, agreements or conditions of this Sublease shall not bar the enforcement of any other rights or remedies for any subsequent breach of any of the same or other covenants, agreements or conditions.

SECURITY DEPOSIT -

27. Intentionally deleted.

15

SUBTENANT'S INDEMNITY -

28.   (a) Subtenant shall defend, indemnify and save harmless Sublandlord and its agents and employees against and from all costs, expenses, claims, demands or liabilities arising from the following:

(i) any willful, negligent or tortious act or omission on the part of Subtenant or any of its agents, contractors, subcontractors, servants, employees, licensees or invitees; or

(ii) any failure by Subtenant to comply with any applicable law governing its use of the Premises; or

(iii) any failure on the part of Subtenant to perform or comply with any of the covenants, agreements, terms, provisions, conditions or limitations contained in this Sublease or the Master Lease on its part to be performed or complied with, except to the extent such liability is occasioned by Sublandlord's willful, negligent or tortious act or omission.

In case any action or proceeding is brought against Sublandlord by reason of any such claim, Subtenant, upon written notice from Sublandlord, shall, at Subtenant's expense, resist or defend such action or proceeding.

SUBLANDLORD'S INDEMNITY -

29.   Sublandlord shall defend, indemnify and save harmless Subtenant and its agents and employees against and from all costs, expenses, claims, demands or liabilities arising from the following:

(i) any willful, negligent or tortious act or omission on the part of Sublandlord or any of its agents, contractors, subcontractors, servants, employees, licensees or invitees; or

(ii) any failure by Sublandlord to comply with any applicable law governing its leasing or use of the Premises; or

(iii) any failure to the part of Sublandlord to perform or comply with any of the covenants, agreements, terms, provisions, conditions or limitations contained in this Sublease or the Master Lease on its part to be performed or complied with, except to the extent such liability is occasioned by Subtenant's willful, negligent or tortious act or omission.

In case any action or proceeding is brought against Subtenant by reason of any such claim, Sublandlord, upon written notice from Subtenant, shall, at Sublandlord's expense, resist or defend such action or proceeding.

16

FORCE MAJEURE -

30.   The time of Sublandlord or Subtenant, as the case may be, to perform any of its obligations hereunder, with the exception of monetary payments due to Sublandlord hereunder, shall be extended if and to the extent that the performance thereof shall be prevented due to strikes, lockouts, civil commotion, war-like operation, invasion, rebellion, hostilities, military or usurped power, governmental regulations or controls, inability to obtain labor or materials despite due diligence, act of God, delay by the other party or other cause beyond the control of the party hereto whose performance is required.

HAZARDOUS MATERIALS -

31.   (a)   For the purposes hereof, the term "Hazardous Materials" shall include, without limitation, substances defined as "hazardous substances", "hazardous materials", or "toxic substances" in any applicable federal law, any applicable state law, and/or any rules or regulations adopted or promulgated pursuant to any of said laws.

(b) Subtenant represents and warrants that it will not use, store or dispose of any Hazardous Materials in the Premises. With regard to any Hazardous Materials caused by Subtenant, Subtenant shall remove same, in compliance with all applicable laws, and at Subtenant's sole cost and expense; and Subtenant agrees to defend, indemnify and hold Sublandlord and Master Landlord harmless from and against any and all costs, damages, expenses, and/or liabilities (including reasonable attorneys' fees) which Sublandlord or Master Landlord may suffer as a result of any claim, suit or action regarding any such Hazardous Materials introduced by Subtenant (whether alleged or real), and/or regarding the removal and clean-up of same.

(c)   Subtenant's obligations pursuant to this Article shall survive any expiration and/or termination of this Sublease.

(d)   Subtenant shall, at subtenants sole cost and expense, perform an environmental study of the Premises within forty-five (45) days of execution of this Sublease.   In the event that the study shows materials that must by law be removed, Subtenant shall notify Sublandlord of the existence of such materials and at Sublandlord's option Sublandlord shall remove the materials or terminate this Sublease.

PARKING -

32.   Intentionally deleted.

17

GOVERNING LAW -

33.   This Sublease shall be governed and construed in accordance with the laws of the State of Illinois.

ENTIRE AGREEMENT -

34.   This Sublease contains and embraces the entire agreement between the parties hereto and may not be changed or terminated orally or by any agreement unless such agreement shall be in writing and signed by the party against whom enforcement of such change or termination is sought.

SEVERABILITY -

35.   If any term or provision of this Sublease or the application thereof to any persons or circumstances shall to any extent be invalid or unenforceable, the remainder of this Sublease or the application of such term or provision to persons or circumstances other than those to which it is held invalid or unenforceable shall not be affected thereby, and each term and provision of this Sublease shall be valid and enforceable to the fullest extent permitted by law.

HEADINGS -

36.   It is agreed that the headings of the various paragraphs herein are for reference only and are not to be construed as part of this agreement.

SUCCESSORS AND ASSIGNS -

37.   This Sublease shall inure to the benefit of and be binding upon the heirs, executors, administrators, successors and assigns of Subtenant and the successors and assigns of Sublandlord.

COUNTERPARTS -

38.   This Agreement may be executed in separate counterparts each of which shall be an original and all of which shall be deemed to be one and the same instrument.

FACSIMILE SIGNATURES

39.   Subtenant and Sublandlord agree that a facsimile signature on this Agreement is as valid as an original signature.

18

CONDITIONS PRECEDENT

40.   It is agreed that this Sublease and the obligations of the parties hereunder are strictly contingent upon and subject to the following conditions:

a.   Subtenant obtaining a Subordination, Non-Disturbance and Attornment agreement with the Master Landlord and any Mortgagee.

b.   Sublandlord and Master Landlord approval of Subtenant's alteration and sign plans.

c.   Subtenant (i) obtaining written confirmation from the appropriate local authorities that current zoning and use regulations allow Subtenant's use and construction of the Premises and (ii) Subtenant making application to the appropriate governing authorities for all permits and approvals needed for operation of their business at the Premises within fourteen (14) days of execution of this Sublease and the receipt by Subtenant of all necessary permits and approvals required by the governing authorities.

d.   Sublandlord, Subtenant and Master Landlord entering into the Third Amendment to Lease to include the additional space shown on the Site Plan attached to the Third Amendment as Exhibit A.

**

The existence of the foregoing conditions are solely for the benefit of the Subtenant, and Subtenant may waive any such condition at its sole discretion by delivering to Sublandlord a written notice signed by Subtenant which specifically states the condition(s) being waived by Subtenant.

In the event any of the foregoing conditions can not be met, satisfied or waived, by February 1, 2002, the parties hereto expressly agree that Subtenant shall have the right to terminate this Sublease, or begin paying rent retroactive to January 1, 2002 as set forth in Article 6(b) of this Sublease, in its sole and absolute discretion. In the event of termination of this Sublease, Subtenant shall deliver to Sublandlord a written notice signed by Subtenant which states that Subtenant is terminating this Sublease on account of the failure of one or more of the foregoing conditions. However, Subtenant must deliver its written notice to terminate to Sublandlord by February 8, 2002 In the event of any such termination, the rights and obligations of the parties shall

19

(e)   Subtenant obtaining approval from all necessary parties to the use of the additional space, including without limitation, the amendment of the existing declaration, if required.

be of no further force and effect and the parties shall have no
further liability to one to the other upon Subtenant's delivery of
said notice to Sublandlord.

RIGHTS TO TERMINATE

41. (a) Subtenant shall conduct, at Subtenants sole cost and
expense, an environmental study of the Premises within forty-five
(45) days of execution of this Sublease.  In the event that the
study shows materials that must by law be removed, Subtenant shall
notify Sublandlord by written notice of the existence of such
materials and at Sublandlord's option, Sublandlord shall remove
the materials or terminate this Sublease.

(b) Subtenant shall make application to the appropriate
governing authorities and diligently pursue all permits and
approvals needed for operation of their business at the Premises
within fourteen (14) days of execution of this Sublease.  In the
event that Subtenant is unable to obtain all necessary permits and
approvals within one hundred and twenty (120) days of execution of
this Sublease, then Subtenant shall have the right to terminate
this Sublease.  Subtenant shall provide Sublandlord with written
notice of its intent to terminate this Sublease.

MISCELLANEOUS

42. Sublandlord and Subtenant represent, warrant and covenant
to each other that:

(i)     Subtenant shall have quiet and peaceful use,
        enjoyment and occupancy of the Premises and provided
        Subtenant is not in default beyond all applicable
        cure periods, Sublandlord shall not disturb
        Subtenant's rights hereunder;

(ii)    Sublandlord and Subtenant have the right and
        authority to enter into this Sublease;

(iii)   Sublandlord covenants that it is a duly organized
        corporation under the laws of the State of Illinois,
        and that its signatory under this Sublease is duly
        authorized and empowered to act for and on behalf of
        the corporation; Subtenant covenants that it is a
        duly organized corporation under the laws of the
        Commonwealth of Virginia, and that its signatory
        under this Sublease is duly authorized and empowered
        to act for and on behalf of the corporation;

(iv)    To the best of Sublandlord's knowledge there are no
        judicial, quasi-judicial, administrative or other
        order, injunctions, moratoria or pending proceedings

20

against Sublandlord or the Premises which preclude or interfere with, or would preclude or interfere with the construction contemplated here in or the occupancy or use of the Premises for the purposes herein contemplated; To the best of Subtenant's knowledge there are no judicial, quasi-judicial, administrative or other order, injunctions, moratoria or pending proceedings against Subtenant which preclude or interfere with, or would preclude or interfere with, the construction contemplated here in or the occupancy or use of the Premises for the purposes herein contemplated;

(v)     Sublandlord extends to Subtenant any of Sublandlord's rights contained in Article 8.05 of the Master Lease that Subtenant may find necessary to exercise during the term of this Sublease.

(vi)   <u>Hazardous or Toxic Materials</u>.  To Sublandlord's best knowledge, Sublandlord, its agents, or employees have not brought into the Premises any Hazardous Materials (as defined in the Master Lease) or breached any Environmental Regulation (as defined in the Master Lease).  If any claim is ever made against Subtenant relating to Hazardous Materials present at or around the Premises, which were brought into the Premises by Sublandlord, its agents, prior subtenants, assignees, or employees, all costs of removal incurred by, all liability imposed upon, or damages suffered by Subtenant because of the same shall be borne by Sublandlord, and Sublandlord hereby indemnifies and agrees to defend and hold Subtenant harmless from and against all such costs, losses, liabilities and damages, including, without limitation, all third-party claims (including sums paid in settlement thereof, with or without legal proceedings) for personal injury or property damage and other claims, actions, administrative proceedings, judgments, compensatory and punitive damages, penalties, fines, costs, losses, attorneys' fees and expenses (through all levels of proceedings), consultants or experts fees and all costs incurred in enforcing this indemnity.  The representation, warranty and indemnity of Sublandlord described in this paragraph shall survive the termination or expiration of this Sublease.

MASTER LEASE

43.

(i)     A true and correct copy of the Master Lease and all amendments thereto are attached hereto;

(ii)    Sublandlord shall use reasonable efforts to cause the Master Landlord to observe and/or perform the

21

IN WITNESS WHEREOF, Sublandlord and Subtenant have duly executed this Lease on the day and year first above written.

WITNESS:

~~Billy A. Webb~~
WITNESS

SUBTENANT:
CIRCUIT CITY STORES, INC.

By: _____

NAME: R. BRUCE LUCAS
TITLE: Vice President Construction/Real Estate

WITNESS:

~~Lesley A. Fredricks~~
WITNESS

SUBLANDLORD:
MARSHALL'S OF SKOKIE, IL., INC.

By: _____
NAME: Dino M DeJmo
TITLE: V.P. real Estate

CVS LEGAL APPROVAL: _____

## INDEX

**HEADINGS**                                                                                          **PAGE**

—A—

ACCESS TO PREMISES.................................5
ALTERATIONS............................................7
ASSIGNMENT AND SUBLETTING................6

—B—

BROKER...................................................11

—C—

COMMENCEMENT RENT.............................4
COMMON AREA MAINTENANCE COSTS......10
CONDEMNATION.......................................6

—D—

DEFAULTS.................................................8
DELIVERY OF THE PREMISES.....................4

—E—

ENTIRE AGREEMENT.................................14

—F—

FIRE........................................................6
FIXED RENT..............................................3
FORCE MAJEURE -...................................13

—H—

HAZARDOUS MATERIALS...........................13
HEADINGS................................................15

—I—

INCREASE IN INSURANCE..........................11
INSURANCE..............................................10

—L—

SUBLANDLORD NOT LIABLE......................7
LIMITATION OF LANDLORD'S LIABILITY -
    (EXCULPATION)...................................13

—N—

NO WAIVER...............................................12
NOTICES..................................................9

—O—

OBLIGATIONS OF SUBTENANT UNDER MASTER
    LEASE.................................................2
OPTIONS..................................................9

—P—

PARKING...................................................14
PERCENTAGE RENT....................................4
PREMISES.................................................2

—R—

REMOVAL OF FIXTURES & SIGNS................7
REPAIRS...................................................5

—S—

SEVERABILITY...........................................14
SIGNS......................................................7
SUBLANDLORD'S INDEMNITY.....................12
SUBLEASE.................................................1
SUBORDINATION.......................................2
SUBROGATION..........................................7
SUBTENANT'S INDEMNITY.........................12
SUCCESSORS AND ASSIGNS......................15

—T—

TAXES......................................................10
TERM.......................................................3

—U—

USE.........................................................3
UTILITIES.................................................8

SITE PLAN



GOLF ROAD

COLE TAYLOR BANK
12,000 SF.
( OUTLOT )

LAMON AVENUE

LINEN'S 'N THINGS

*CIRCUIT CITY*
PROTOTYPE C5
32,156 SF

SKOKIE BOULEVARD

OLSON RUG

COLOR TILE

RADIO SHACK

INTERNATIONAL
HOUSE OF PANCAKES

BARCELONA APARTMENTS
BUILDING #1

FOOTAGE    32,156 SF.

SQARE FOOTAGE    ±46,000 SF.

G SPACES REQUIRED AT 5.5/1000 PARKING RATIO

SPACES PROVIDED AT 5.5/1000 PARKING RATIO

ES PROVIDED AT 5.3/1000 PARKING RATIO

HEIGHT

NORTH

# SITE PLAN
## N.T.S.

**GRAPHIC SCALE:**

0   15'  30'      60'            120'           180'              240'

CIRCUIT CITY

IL  3791  00  1

C5

SCHEMATIC

Lease Agreement dated as of September 13, 1995
Orchard Place Shopping Center
Skokie, Illinois

| LANDLORD | TENANT |
|---|---|
| First Bank & Trust Company of Illinois, as Trustee under Trust Agreement dated February 4, 1995 | Marshalls of Skokie, IL., Inc. |
| Orchard Place, L.L.C., successor-in-interest to First Bank & Trust Company of Illinois | Filene's Basement, Inc., successor-in-interest to Marshalls of Skokie, IL., Inc. (Assignment dated January 15, 1997) |
| Orchard Place Retail, L.L.C., successor-in-interest to Orchard Place, L.L.C. (Assignment dated September 23, 1996) | Marshalls of Skokie, IL., Inc.[1], successor-in-interest to Filene's Basement, Inc., (Assignment dated January 20, 2000, approved by Bankruptcy Court on 1/20/00) |

[1]Marshalls of Skokie, IL., Inc. was originally owned by Melville Corporation, but was acquired by CVS. The latest file information from CVS (as of 1/20/2000) indicates that Marshalls of Skokie, IL., Inc. is wholly owned by CVS New York, Inc.

January 22, 2002

VIA FACSIMILE & FIRST CLASS MAIL

Mr. Robert J. Riek, Esq.
Kane, Russell, Coleman & Logan
3700 Thanksgiving Tower
1601 Elm Street
Dallas, TX 75201

Re:   Circuit City Stores, Inc. Sublease with Marshall's of Skokie, IL, Inc.

Dear Mr. Riek:

Pursuant to your request, the landlord hereby waives its right of recapture under Section 16.01 of the lease between landlord and Marshall's of Skokie, IL, Inc. as tenant, upon the assignment or sublease of the premises by tenant to Circuit City.

Landlord:

ORCHARD PLACE RETAIL, L.L.C., an Illinois limited liability company
By: Orchard Place Retail, Inc., an Illinois corporation, its managing member

By: _____
Name: Mitchell Saywitz
Title: President

## FIRST AMENDMENT TO SUBLEASE

This **FIRST AMENDMENT TO SUBLEASE** (this "Amendment") is made and entered into to as of the _24_ day of January, 2002, by and between **MARSHALL'S OF SKOKIE, IL, INC.**, an Illinois corporation ("Landlord"), as sublandlord, and **CIRCUIT CITY STORES, INC.,** a Virginia corporation ("Subtenant"), as subtenant.

### WITNESSETH:

**WHEREAS**, Sublandlord and Subtenant have entered into that certain Sublease (the "Sublease"), dated October 31, 2001, whereby Sublandlord demised and subleased to Subtenant certain premises (the "Premises"), described in the Sublease located within the Orchard Place Retail Center (the "Property"), in the City of Skokie, Illinois, the Property being more particularly described in the Sublease; and

**WHEREAS**, Sublandlord and Subtenant desire to amend the Sublease in certain respects as set forth herein;

**NOW THEREFORE**, for and in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Sublandlord and Subtenant agree as follows:

1.      Paragraph 6(b) the Sublease shall be modified and amended to add the following:

"Notwithstanding the foregoing, rent shall accrue as of January 1, 2002, but no rent shall be due and payable by Subtenant until (i) Master Landlord and Sublandlord have approved in writing, Subtenant's alterations and sign plans, (ii) subtenant has obtained all necessary permits and approvals required for its alterations and occupancy of the Premises, (iii) Sublandlord and Master Landlord have entered into the Third Amendment to Lease to include the additional space shown on the Site Plan, and (iv) Sublandlord obtaining the Amendment to the existing Declaration modifying the definition of the Common Areas to include the additional space (collectively, the "Conditions Precedent")."

2.      Paragraph 40 of the Sublease shall be modified and amended to add the following:

"(f)     Sublandlord terminating this Sublease and executing and delivering the Assignment and Assumption Agreement attached hereto as <u>Exhibit "B"</u> and incorporated herein for all purposes, which shall be done upon the satisfaction of Conditions Precedent."

3.      <u>Exhibit "B"</u> attached to this Amendment shall be added to and incorporated as Exhibit "B" in the Sublease.

328244 v2 (00051-23)[11645]

3.     Except as specifically modified by this Amendment, all of the terms and conditions of the Sublease remain in full force and effect.

4.     Sublandlord and Subtenant represent and warrant to each other respectively that they have the requisite power and authority to enter into this Amendment; that all necessary and appropriate approvals, authorizations and other steps have been taken to effect the legality of this Amendment; that the signatories executing this Amendment on behalf of Sublandlord and Subtenant have been duly authorized and empowered to execute this Amendment on behalf of Sublandlord and Subtenant, respectively; and that this Amendment is valid and shall be binding upon and enforceable against Sublandlord and Subtenant and their respective successors and assigns and shall inure to the benefit of Sublandlord and Subtenant and their respective successors and assigns.

5.     This Amendment and the Sublease cover in full, each and every final agreement of every kind or nature whatsoever between Sublandlord and Subtenant concerning the Premises, and all preliminary negotiations and agreements whatsoever of every kind or nature are merged in this Amendment and the Sublease. This Amendment and the Sublease cannot be changed or modified in any manner other than by written amendment or modification executed by Sublandlord and Subtenant.

IN WITNESS WHEREOF, the parties have executed this Amendment on the day and year first written above.

SUBLANDLORD:

MARSHALL'S OF SKOKIE, IL, INC.,
an Illinois corporation

By: _____
Name: _____
Title: _____

2

328244 v2 (00051-23)[11645]

SUBTENANT:

CIRCUIT CITY STORES, INC.,
a Virginia corporation

By:
R. Bruce Lucas,
Vice President

3

328244 v2 (00051-23)[11645]

EXHIBIT "B"

## ASSIGNMENT AND ASSUMPTION OF LEASE
(Tenant's Interest)

This **ASSIGNMENT AND ASSUMPTION OF LEASE** (this "Agreement") is made and entered into effective as of this ____ day of January, 2002 (the "Effective Date"), by and between **MARSHALL'S OF SKOKIE, IL, INC.**, an Illinois corporation ("Assignor"), whose address is One CVS Drive, Woonsocket, Rhode Island 02895 and **CIRCUIT CITY STORES, INC.** a Virginia corporation ("Assignee"), whose address is Deep Run I, 9950 Mayland Drive, Richmond, Virginia 23233.

## RECITALS

**WHEREAS**, Assignor is the tenant under that certain Lease Agreement (the "Lease") dated September 13, 1995, by and between First Bank & Trust Company of Illinois, as Trustee, under a Trust Agreement, dated February 4, 1995, and known as Trust Number 10-1915 ("Master Landlord"), as landlord, and Assignor, as tenant, covering certain premises located in the City of Skokie, Illinois, as more fully described on Exhibit "A" attached hereto and incorporated herein for all purposes (the "Premises").

**WHEREAS**, Assignor desires to sell, assign, transfer, convey, setover and deliver to Assignee all of Assignor's right, title and interest as tenant, in, to, and under the Lease relating to the Premises.

**WHEREAS**, Assignee desires to assume the performance of all obligations of Assignor under the Lease relating to the Premises.

**WHEREAS**, Assignee and Assignor agree that from and after the Effective Date of this Agreement, Assignee shall be responsible to the Master Landlord under the Lease for the performance of the obligations of "Tenant" as defined in the Lease.

**NOW, THEREFORE**, for and in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor and Assignee hereby agree as follows:

1.      Assignment.  Assignor hereby assigns, transfers and conveys unto Assignee, its successors and assigns and Assignee hereby accepts all of Assignor's right, title and interest as tenant in and to the Lease, subject to the terms hereof.

2.      Assumption.  Assignee agrees that Assignee shall assume and agree to perform all of the terms, covenants, and conditions of the Lease on the part of tenant required to be performed from and after the Effective Date, but not prior thereto, including, but not limited to, the obligation to pay

1

328244 v2 (00051-23)[11645]

all rent accruing thereunder as of January 1, 2002. Notwithstanding the foregoing, Assignor agrees, at its sole cost, to maintain the roof in accordance with the terms of this Lease. Assignor agrees that Assignor shall remain responsible for all obligations of tenant under the Lease arising prior to the Effective Date of this Agreement. Assignor warrants to Assignee that Assignor's conveyance of its right, title, interest and obligations under the Lease pursuant to this paragraph is free and clear of all security interests, liens, claims, interests, pledges or hypothecations on or of the Lease.

3.    <u>Indemnity</u>. Assignee hereby agrees to indemnify and hold Assignor harmless from any loss, liability, damage, cost or expense (including reasonable attorneys' fees) incurred by Assignor by reason of Assignee's failure to perform any term, covenant or condition of the Lease on the part of tenant therein required to be performed on or after the Effective Date, or Assignee's failure to perform under this Agreement, or arising out of Assignee's use, operation or maintenance of the Premises (excluding the repair and maintenance of the roof which shall remain Assignor's obligation). Assignor hereby agrees to indemnify and hold Assignee harmless from any loss, liability, damage, cost or expense (including reasonable attorneys' fees) incurred by Assignee by reason of Assignor's failure to perform any term, covenant or condition of the Lease on the part of tenant therein required to be performed prior to the Effective Date, or Assignor's failure to perform under this Agreement.

4.    <u>Assignor's Representations and Warranties</u>. Assignor hereby represents and warrants to Assignee (a) that it has full power and authority to assign the Lease to Assignee, (b) that the Lease is in full force and effect and has not been modified or amended in any manner whatsoever, (c) all right, title and interest of Assignor in and to the Lease is free and clear of any and all claims, liens and encumbrances whatsoever and that it does warrant and will forever defend the same against the claims or claims of all persons whomsoever, and (d) that there is no default under the Lease attributable to the act or omission of Assignor and there is not fact or circumstance that would constitute a default of Assignor upon giving of notice or the passing of time.

5.    <u>Default; Reassignment of Lease to Assignor</u>. Assignee covenants and agrees to perform the terms and conditions of the Lease on the part of tenant to be performed from and after the Effective Date. Assignee shall not do, or cause to be done, or suffer or permit any act to be done which would or might cause the Lease to be canceled, terminated, forfeited or surrendered, or which would or might cause Assignor to be liable for any cost, damage, claim or penalty.

In the event Assignee defaults in performance of any obligation of tenant to be performed under the Lease beyond any applicable notice and cure period granted in the Lease, Assignor shall have the right to cure the default of Assignee as tenant under the Lease in which event, Assignee shall reimburse to and indemnify Assignor for all costs and expenses incurred by Assignee, or Assignor may terminate this Agreement upon written notice to Assignee and this Agreement shall no longer be of any force or effect and the tenant's interest under the Lease shall be deemed automatically reassigned to, or vested in, Assignor. Assignee agrees to pay to Assignor on demand the amount of all losses and damages which Assignor may suffer by reason of Assignee's default under the Lease and Assignee shall remain liable for such losses and damages after the termination of this Assignment. In the event of such reassignment or any re-letting of the Premises to Assignor or any entity or party

2

affiliated with Assignor that occupies the Premises by virtue of an assignment or sublease or otherwise operates a business at the Premises, Assignor shall utilize reasonable efforts to mitigate damages due Assignee. Furthermore, in the event Assignor or any entity or party affiliated with Assignor takes possession of the Premises and commences to do business in the Premises, Assignee shall thereafter be released, acquitted, and forever discharged of further liability to Assignor under the Lease from and after the date of such possession and commencement of business operations with respect to any liabilities which shall accrue after the date of such possession and commencement of business operations. Notwithstanding anything contained above or in the Lease to the contrary, during any time period in which a cause of action or request for relief is pending in any court of appropriate jurisdiction regarding the alleged default of tenant under the Lease, any and all cure periods set forth in the Lease or hereinabove shall be stayed during the pendency of such cause of action.

If Assignor shall default in the performance of its obligations under this Agreement, Assignee may cure such default on behalf of Assignor, in which event, Assignor shall reimburse to Assignee all costs and expenses incurred by Assignee within fifteen (15) days after written demand therefor, or Assignee may terminate this Agreement, in which event, this Agreement shall be of no further force or effect and the tenant's interest under the Lease shall be deemed automatically reassigned to, or vested in Assignor, whereupon Assignee shall be deemed released from all liability arising under the Lease. Said reassignment and vesting of its interests in Assignor shall automatically release, acquit and forever discharge Assignee from all of tenant's obligations arising under the Lease.

6.    Notices of Default; Re-entry by Assignor. Assignor and Assignee agree to deliver a copy to the other of any notice of default under the Lease given by Master Landlord to such party, promptly upon delivery of same by Master Landlord or receipt by such party. Assignor and Assignee agree that, should Assignee not cure a default within the time period therefor granted in the Lease, Assignor may, upon five (5) days' prior written notice to Assignee, reenter the Premises to cure a default and Assignee shall reimburse to Assignor the reasonable costs incurred by Assignor in curing said default, within thirty (30) days following delivery to Assignee by Assignor of invoices supporting such costs.

7.    Notices. Any notice permitted or required to be given pursuant to this Agreement shall be in writing, and shall be deemed to have been given three (3) business days after mailing a written notice by certified mail, postage prepaid, return receipt requested, or one (1) business day after sending by Federal Express or other comparable overnight express courier service (with proof of receipt available), addressed to the parties as follows or upon receipt if delivered via hand delivery:

3

328244 v2 (00051-23)[11645]

If to Assignee:        CIRCUIT CITY STORES, INC.
                       Deep Run I
                       9950 Mayland Drive
                       Richmond, Virginia 23233
                       Attention:  Corporate Secretary
                       Phone: (804) 527-4000
                       Fax: (804) 527-4186

with a copy to:        CIRCUIT CITY STORES, INC.
                       Deep Run I
                       9950 Mayland Drive
                       Richmond, Virginia 23233
                       Attention:  Vice President of Real Estate
                       Phone: (804) 527-4000 ext. 4055
                       Fax: (804) 527-4186

If Assignor:           MARSHALL'S OF SKOKIE, IL, INC.
                       One CVS Drive
                       Woonsocket, Rhode Island  02895
                       Attention: Property Management/Store No. _____
                       Phone: (401) 765-1500
                       Fax: (401) _____

or to such other addressees as any party hereto shall from time to time give notice to the other party in accordance with this paragraph.

8.    _Amendments/Capitalized Terms._.  Except as otherwise herein modified or amended, all of the terms, covenants and conditions of the Lease are hereby ratified and confirmed and shall remain in full force and effect.  All initial-capped terms used in this Assignment shall, unless otherwise indicated, have the same meanings ascribed to them in the Lease.

9.    _Binding Effect_.  All of the covenants and agreements contained in this Assignment shall be binding upon and shall inure to the benefit of the parties hereto and their respective legal representatives, and permitted successors and assigns, to the extent that any such transfer of interest may be allowed under the Lease.

10.    _Effectiveness_.  This Assignment shall not be effective and binding unless and until fully executed by all of the parties hereto.

11.    _Further Assurances_.  Assignor covenants with Assignee and Assignee covenants with Assignor that each will execute and procure any additional documents necessary to establish the rights of the other hereunder.

4

328244 v2 (00051-23)[11645]

12. <u>Counterparts</u>. This Agreement may be executed in counterparts which taken together shall be deemed one Agreement.

This Agreement is executed effective as of the date first written above.

<u>Assignor:</u>

**MARSHALL'S OF SKOKIE, IL, INC.**
an Illinois corporation

By: _____

Name: _____

Title: _____

5

Assignor:

CIRCUIT CITY STORES, INC.,
a Virginia corporation

By: _____
R. Bruce Lucas,
Vice President

6

<u>EXHIBIT "A"</u>

<u>Legal Description of Premises</u>

7

328244 v2 (00051-23)[11645]

C:\windows\TEMP\MarshallLease Amend1.wpd
12-12-01

## THIRD AMENDMENT TO LEASE

This **THIRD AMENDMENT TO LEASE** (this "Amendment") is made and entered into to as of the 30th day of January_____, 2002, by and between **ORCHARD PLACE RETAIL L.L.C.** ("Landlord"), as landlord, and **MARSHALL'S OF SKOKIE, IL, INC.** ("Tenant"), as tenant.

## WITNESSETH:

**WHEREAS,** Tenant entered into that certain Lease (the "Lease"), dated September 13, 1995, whereby Landlord demised and leased to Tenant certain premises (the "Premises") described in the Lease located within the Orchard Place Retail Shopping Center (the "Shopping Center") in the City of Skokie, Illinois, the Shopping Center, being more particularly described in the Lease; and

**WHEREAS,** the Lease was amended by that certain First Amendment to Lease (the "First Amendment"), dated April 26, 1996; and

**WHEREAS,** the Lease was further amended by that certain Second Amendment to Lease (the "Second Amendment"), dated January 17, 1997 (the Lease as amended by the First Amendment and Second Amendment is hereinafter referred to as the "Lease"); and

**WHEREAS,** Tenant desires to sublet the Premises to Circuit City Stores, Inc. ("Subtenant") pursuant to a sublease (the "Sublease") covering the Premises; and

**WHEREAS,** Subtenant desires to expand the Premises to accommodate its business; and

**WHEREAS,** Landlord and Tenant desire to amend the Lease to (i) expand the Premises as requested by Subtenant and (ii) acknowledge Tenant's obligations with regard to said expanded Premises.

**NOW THEREFORE,** for and in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree as follows:

1.      Site Plan. The Lease shall be amended so that the Premises shall be increased in size, and accordingly, the Site Plan as set forth on Exhibit "A" of the Lease is hereby deleted in its entirety and the attached Exhibit "A" is inserted as the correct description of the Premises.

2.      Rent and Charges for Expanded Premises. Landlord hereby agrees that there shall be no base rent due for the increased portion of the Premises; provided that it is specifically agreed between Landlord and Tenant that Tenant shall be obligated, pursuant to the provisions of

the Lease, for all aspects of such increased portion of the Premises with regard to common area charges, real estate taxes, insurance, maintenance, repairs, restoration costs, restoration and all other obligations provided for under the Lease except base rent. The Tenant's obligations under this Amendment shall continue and be binding upon Tenant irrespective of the status or enforceablity of the Sublease.

The Tenant's proportionate share of common area charges, real estate taxes and insurance shall include the increased portion of the Premises. For that purpose, Landlord and Tenant agree that Tenant's proportionate share shall be based on a square footage of the Premises (including the increased portion of the Premises) of 32,156 square feet.

3.    **Restatement.** Except as specifically modified by this Amendment, all of the terms and conditions of the Lease remain in full force and effect. In the event of a conflict between the Lease and this Amendment, this Amendment shall control.

4.    **Authority.** Landlord and Tenant represent and warrant to each other respectively that they have the requisite power and authority to enter into this Amendment; that all necessary and appropriate approvals, authorizations and other steps have been taken to effect the legality of this Amendment; that the signatories executing this Amendment on behalf of Landlord and Tenant have been duly authorized and empowered to execute this Amendment on behalf of Landlord and Tenant, respectively; and that this Amendment is valid and shall be binding upon and enforceable against Landlord and Tenant and their respective successors and assigns and shall inure to the benefit of Landlord and Tenant and their respective successors and assigns.

5.    **Counterparts.** This Amendment may be executed in multiple counterparts, all of which together shall constitute an original. This Amendment may be executed by facsimile signature.

6.    **Merger.** This Amendment and the Lease cover in full, each and every final agreement of every kind or nature whatsoever between Landlord and Tenant concerning the Premises, and all preliminary negotiations and agreements whatsoever of every kind or nature are merged in this Amendment and the Lease. This Amendment and the Lease cannot be changed or modified in any manner other than by written amendment or modification executed by Landlord and Tenant.

2

IN WITNESS WHEREOF, the parties have executed this Amendment on the day and year first written above.

LANDLORD:

ORCHARD PLACE RETAIL, L.L.C., an Illinois
limited liability company
By: Orchard Place Retail, Inc., an Illinois
corporation, its managing member

By: _____
Name: Mitchell Saywitz
Title: President

TENANT:

MARSHALL'S OF SKOKIE, IL, INC.,

By: _____
Name: _____
Title: _____

3

IN WITNESS WHEREOF, the parties have executed this Amendment on the day and year first written above.

LANDLORD:

ORCHARD PLACE RETAIL, L.L.C.

By: _____
    Name: _____
    Title: _____

TENANT:

MARSHALL'S OF SKOKIE, IL, INC.,

By: _____
    Name: _____
    Title: _____

3

<u>CONSENT</u>

The undersigned (successor in interest to Melville Corporation), as guarantor pursuant to the Guaranty dated September 15, 1995 (the "Guaranty"), hereby consent to the execution of this Amendment by Tenant and agree that the Guaranty is hereby restated by this reference and deemed to be in full force and effect.

Dated:_____

CVS Corporation, a Delaware corporation

By:_____

Its:  ZENON P. LANKOWSKY
      SECRETARY

Attest:

By:_____

its:  _attny_

4

## EXHIBIT "A"

### SITE PLAN



GOLF ROAD

COLE TAYLOR BANK
12,000 S.F.
( OUTLOT )

LINEN'S 'N THINGS

CIRCUIT CITY
PROTOTYPE C6
32,156 SF

SKOKIE BOULEVARD

LINDEN AVENUE

BARCELONA APARTMENTS
BUILDING 5R

AGE : **32,156 SF.**

IE FOOTAGE : **±46,000 SF.**

ACES REQUIRED AT **5.5/1000** PARKING RATIO

SS PROVIDED AT **5.5/1000** PARKING RATIO

PROVIDED AT **5.5/1000** PARKING RATIO

NORTH

## SITE PLAN
### N.T.S.

GRAPHIC SCALE

## ASSIGNMENT AND ASSUMPTION OF LEASE
(Tenant's Interest)

This **ASSIGNMENT AND ASSUMPTION OF LEASE** (this "Agreement") is made and entered into effective as of this ___30th___ day of January, 2002 (the "Effective Date"), by and between **MARSHALL'S OF SKOKIE, IL, INC.**, an Illinois corporation ("Assignor"), whose address is One CVS Drive, Woonsocket, Rhode Island 02895 and **CIRCUIT CITY STORES, INC.** a Virginia corporation ("Assignee"), whose address is Deep Run I, 9950 Mayland Drive, Richmond, Virginia 23233.

## RECITALS

**WHEREAS**, Assignor is the tenant under that certain Lease Agreement (the "Lease") dated September 13, 1995, by and between First Bank & Trust Company of Illinois, as Trustee, under a Trust Agreement, dated February 4, 1995, and known as Trust Number 10-1915 ("Master Landlord"), as landlord, and Assignor, as tenant, covering certain premises located in the City of Skokie, Illinois, as more fully described on <u>Exhibit "A"</u> attached hereto and incorporated herein for all purposes (the "Premises").

**WHEREAS**, Assignor desires to sell, assign, transfer, convey, setover and deliver to Assignee all of Assignor's right, title and interest as tenant, in, to, and under the Lease relating to the Premises.

**WHEREAS**, Assignee desires to assume the performance of all obligations of Assignor under the Lease relating to the Premises.

**WHEREAS**, Assignee and Assignor agree that from and after the Effective Date of this Agreement, Assignee shall be responsible to the Master Landlord under the Lease for the performance of the obligations of "Tenant" as defined in the Lease.

**NOW, THEREFORE**, for and in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor and Assignee hereby agree as follows:

1.    <u>Assignment</u>.  Assignor hereby assigns, transfers and conveys unto Assignee, its successors and assigns and Assignee hereby accepts all of Assignor's right, title and interest as tenant in and to the Lease, subject to the terms hereof.

2.    <u>Assumption</u>. Assignee agrees that Assignee shall assume and agree to perform all of the terms, covenants, and conditions of the Lease on the part of tenant required to be performed from and after the Effective Date, but not prior thereto, including, but not limited to, the obligation to pay all rent accruing thereunder as of January 1, 2002. Notwithstanding the foregoing, Assignor agrees, at its sole cost, to maintain the roof in accordance with the terms of this Lease. Assignor agrees that Assignor shall remain responsible for all obligations of tenant under the Lease arising prior to the

1

330548 v3 (00051-23)[11645]

Effective Date of this Agreement. Assignor warrants to Assignee that Assignor's conveyance of its right, title, interest and obligations under the Lease pursuant to this paragraph is free and clear of all security interests, liens, claims, interests, pledges or hypothecations on or of the Lease.

3.    Indemnity. Assignee hereby agrees to indemnify and hold Assignor harmless from any loss, liability, damage, cost or expense (including reasonable attorneys' fees) incurred by Assignor by reason of Assignee's failure to perform any term, covenant or condition of the Lease on the part of tenant therein required to be performed on or after the Effective Date, or Assignee's failure to perform under this Agreement, or arising out of Assignee's use, operation or maintenance of the Premises (excluding the repair and maintenance of the roof which shall remain Assignor's obligation).   Assignor hereby agrees to indemnify and hold Assignee harmless from any loss, liability, damage, cost or expense (including reasonable attorneys' fees) incurred by Assignee by reason of Assignor's failure to perform any term, covenant or condition of the Lease on the part of tenant therein required to be performed prior to the Effective Date, or Assignor's failure to perform under this Agreement.

4.    Assignor's Representations and Warranties.  Assignor hereby represents and warrants to Assignee (a) that it has full power and authority to assign the Lease to Assignee, (b) that the Lease is in full force and effect and has not been modified or amended in any manner whatsoever, (c) all right, title and interest of Assignor in and to the Lease is free and clear of any and all claims, liens and encumbrances whatsoever and that it does warrant and will forever defend the same against the claims or claims of all persons whomsoever, and (d) that there is no default under the Lease attributable to the act or omission of Assignor and there is not fact or circumstance that would constitute a default of Assignor upon giving of notice or the passing of time.

5.    Default: Reassignment of Lease to Assignor.  Assignee covenants and agrees to perform the terms and conditions of the Lease on the part of tenant to be performed from and after the Effective Date.  Assignee shall not do, or cause to be done, or suffer or permit any act to be done which would or might cause the Lease to be canceled, terminated, forfeited or surrendered, or which would or might cause Assignor to be liable for any cost, damage, claim or penalty.

In the event Assignee defaults in performance of any obligation of tenant to be performed under the Lease beyond any applicable notice and cure period granted in the Lease, Assignor shall have the right to cure the default of Assignee as tenant under the Lease in which event, Assignee shall reimburse to and indemnify Assignor for all costs and expenses incurred by Assignee, or Assignor may terminate this Agreement upon written notice to Assignee and this Agreement shall no longer be of any force or effect and the tenant's interest under the Lease shall be deemed automatically reassigned to, or vested in, Assignor. Assignee agrees to pay to Assignor on demand the amount of all losses and damages which Assignor may suffer by reason of Assignee's default under the Lease and Assignee shall remain liable for such losses and damages after the termination of this Assignment. In the event of such reassignment or any re-letting of the Premises to Assignor or any entity or party affiliated with Assignor that occupies the Premises by virtue of an assignment or sublease or otherwise operates a business at the Premises, Assignor shall utilize reasonable efforts to mitigate damages due Assignee.  Furthermore, in the event Assignor or any entity or party

2

affiliated with Assignor takes possession of the Premises and commences to do business in the Premises, Assignee shall thereafter be released, acquitted, and forever discharged of further liability to Assignor under the Lease from and after the date of such possession and commencement of business operations with respect to any liabilities which shall accrue after the date of such possession and commencement of business operations. Notwithstanding anything contained above or in the Lease to the contrary, during any time period in which a cause of action or request for relief is pending in any court of appropriate jurisdiction regarding the alleged default of tenant under the Lease, any and all cure periods set forth in the Lease or hereinabove shall be stayed during the pendency of such cause of action.

If Assignor shall default in the performance of its obligations under this Agreement, Assignee may cure such default on behalf of Assignor, in which event, Assignor shall reimburse to Assignee all costs and expenses incurred by Assignee within fifteen (15) days after written demand therefor, or Assignee may terminate this Agreement, in which event, this Agreement shall be of no further force or effect and the tenant's interest under the Lease shall be deemed automatically reassigned to, or vested in Assignor, whereupon Assignee shall be deemed released from all liability arising under the Lease. Said reassignment and vesting of its interests in Assignor shall automatically release, acquit and forever discharge Assignee from all of tenant's obligations arising under the Lease.

6.    <u>Notices of Default; Re-entry by Assignor</u>. Assignor and Assignee agree to deliver a copy to the other of any notice of default under the Lease given by Master Landlord to such party, promptly upon delivery of same by Master Landlord or receipt by such party. Assignor and Assignee agree that, should Assignee not cure a default within the time period therefor granted in the Lease, Assignor may, upon five (5) days' prior written notice to Assignee, reenter the Premises to cure a default and Assignee shall reimburse to Assignor the reasonable costs incurred by Assignor in curing said default, within thirty (30) days following delivery to Assignee by Assignor of invoices supporting such costs.

7.    <u>Notices</u>. Any notice permitted or required to be given pursuant to this Agreement shall be in writing, and shall be deemed to have been given three (3) business days after mailing a written notice by certified mail, postage prepaid, return receipt requested, or one (1) business day after sending by Federal Express or other comparable overnight express courier service (with proof of receipt available), addressed to the parties as follows or upon receipt if delivered via hand delivery:

If to Assignee: CIRCUIT CITY STORES, INC.
            Deep Run I
            9950 Mayland Drive
            Richmond, Virginia 23233
            Attention: Corporate Secretary
            Phone: (804) 527-4000
            Fax: (804) 527-4186

3

with a copy to: CIRCUIT CITY STORES, INC.
Deep Run I
9950 Mayland Drive
Richmond, Virginia 23233
Attention: Vice President of Real Estate
Phone: (804) 527-4000 ext. 4055
Fax: (804) 527-4186

If Assignor:        MARSHALL'S OF SKOKIE, IL, INC.
One CVS Drive
Woonsocket, Rhode Island  02895
Attention: Property Management/Store No. 9840
Phone: (401) 765-1500
Fax: (401) 770-4695

or to such other addressees as any party hereto shall from time to time give notice to the other party in accordance with this paragraph.

8.    Amendments/Capitalized Terms.. Except as otherwise herein modified or amended, all of the terms, covenants and conditions of the Lease are hereby ratified and confirmed and shall remain in full force and effect.  All initial-capped terms used in this Assignment shall, unless otherwise indicated, have the same meanings ascribed to them in the Lease.

9.    Binding Effect.  All of the covenants and agreements contained in this Assignment shall be binding upon and shall inure to the benefit of the parties hereto and their respective legal representatives, and permitted successors and assigns, to the extent that any such transfer of interest may be allowed under the Lease.

10.    Effectiveness.  This Assignment shall not be effective and binding unless and until fully executed by all of the parties hereto.

11.    Further Assurances.  Assignor covenants with Assignee and Assignee covenants with Assignor that each will execute and procure any additional documents necessary to establish the rights of the other hereunder.

12.    Counterparts.  This Agreement may be executed in counterparts which taken together shall be deemed one Agreement.

4

This Agreement is executed effective as of the date first written above.

Assignor:

MARSHALL'S OF SKOKIE, IL, INC.
an Illinois corporation

By: _____
Name: _____
Title: _____

5

Assignor:

CIRCUIT CITY STORES, INC.,
a Virginia corporation

By: _____
R. Bruce Lucas,
Vice President

330548 v3 (00051-23)[11645]

EXHIBIT "A"

SITE PLAN



SITE PLAN
N.T.S.

# KANE
# RUSSELL
# COLEMAN &
# LOGAN, p.c.
ATTORNEYS & COUNSELORS

ROBERT J. RIEK

DIRECT DIAL NUMBER:
(214) 777-4259
E-Mail: riek@krcl.com

February 19, 2002

Jeffrey B. Gurian, Esq.                                            **VIA FEDEX**
Becker & Gurian
513 Central Avenue, 5th Floor
Highland Park, Illinois 60035-3264

Re:   Circuit City Stores, Inc.
      Sublease for existing building at Golf Road and Skokie Boulevard, Skokie, Illinois
      Our File No. 51-23 (11645)

Dear Jeff:

Please find enclosed a copy of the First Amendment to Sublease and Assignment and
Assumption of Lease, each executed by Marshall's of Skokie, IL, Inc. and Circuit City Stores, Inc.
for your files. Circuit City and Marshall's determined to restructure their transaction from a Sublease
to a direct Assignment in order to resolve some of Circuit City's concerns. Therefore, I am enclosing
copies of this documentation for the Landlord's files. This change in the structure does not result in
any changes in the prior discussions and agreements between your client and Circuit City.

If you have any questions or comments, please do not hesitate to contact me.

Very truly yours,

KANE, RUSSELL, COLEMAN & LOGAN, P.C.

By: _____
    Robert J. Riek

RJR/bsb
Enclosure
cc:   Scott Godino (w/o/encl.)                                    **VIA FACSIMILE**

336334 v1 (00051-23)[11645]

3700 Thanksgiving Tower • 1601 Elm Street • Dallas, Texas 75201 • Telephone (214) 777-4200 • Facsimile (214) 777-4299