

**LEASE AGREEMENT**

by and between

**RAYMOND & MAIN RETAIL, LLC,**

as Landlord

and

**CIRCUIT CITY STORES WEST COAST, INC.,**

as Tenant

Alhambra, California

Table of Contents

Page

Article I        FUNDAMENTAL LEASE PROVISIONS ........................................................ 1
    SECTION 1.01        Definitions: ...................................................................... 1
Article II        LEASE OF PREMISES - TERM OF LEASE ................................................ 3
    SECTION 2.01        Demise ............................................................................ 3
    SECTION 2.02        Extension Periods............................................................. 4
    SECTION 2.03        Commencement Date and Landlord Reimbursement.................... 5
    SECTION 2.04        Possession Date................................................................ 6
    SECTION 2.05        Expected Possession Date.................................................. 6
    SECTION 2.06        Possession Date During Slack Period Delivery ............................ 7
    SECTION 2.07        Delayed Possession .......................................................... 7
    SECTION 2.08        Early Entry ...................................................................... 8
    SECTION 2.09        Measurement ................................................................... 8
    SECTION 2.10        Commencement Date Agreement ........................................ 8
Article III        INITIAL CONSTRUCTION ........................................................................ 8
    SECTION 3.01        Landlord's and Tenant's Work ........................................... 8
Article IV        RENT ................................................................................................... 9
    SECTION 4.01        Annual Minimum Rent ..................................................... 9
    SECTION 4.02        Additional Rent................................................................ 9
    SECTION 4.03        Rent; Method of Payment ................................................ 10
Article V        COMMON AREA MAINTENANCE AND COST .......................................... 10
    SECTION 5.01        Maintenance................................................................... 10
    SECTION 5.02        Construction Clean-up and Post-Possession Work.................... 10
    SECTION 5.03        CAM Costs..................................................................... 11
    SECTION 5.04        Tenant's Share of CAM Costs ........................................... 12
    SECTION 5.05        Payment of CAM Costs ................................................... 12
    SECTION 5.06        CAM Costs Increases....................................................... 12
Article VI        TAXES................................................................................................ 13
    SECTION 6.01        Taxes............................................................................. 13
    SECTION 6.02        Payment of Taxes............................................................ 13
    SECTION 6.03        Exclusions from Taxes..................................................... 13

Table of Contents
(continued)

Page

SECTION 6.04        Right to Contest ............................................................... 14
Article VII    UTILITIES.................................................................................. 14
        SECTION 7.01        Utilities..................................................................... 14
        SECTION 7.02        Interruption .............................................................. 15
Article VIII    USE OF PREMISES ................................................................ 15
        SECTION 8.01        Permitted Use........................................................... 15
        SECTION 8.02        Conduct of Operations ............................................. 15
        SECTION 8.03        Leasing Restrictions................................................. 16
        SECTION 8.04        Tenant's Exclusive................................................... 16
        SECTION 8.05        Intentionally Omitted ............................................... 18
        SECTION 8.06        Intentionally Omitted ............................................... 18
Article IX        REPAIRS ................................................................................. 18
        SECTION 9.01        Landlord Obligations ............................................... 18
        SECTION 9.02        Tenant's Obligations ................................................ 19
        SECTION 9.03        Hazardous Materials ................................................ 20
        SECTION 9.04        Surrender of the Premises ........................................ 22
Article X        REQUIREMENTS OF LAW .................................................... 22
        SECTION 10.01        Landlord's Obligations ........................................... 22
        SECTION 10.02        Tenant's Obligations ............................................... 22
        SECTION 10.03        Right to Contest ...................................................... 22
Article XI        INSURANCE............................................................................ 22
        SECTION 11.01        Landlord's Insurance .............................................. 22
        SECTION 11.02        Tenant's Insurance .................................................. 23
        SECTION 11.03        Insurance Requirements Generally ......................... 24
        SECTION 11.04        Landlord's Insurance Cost ...................................... 24
        SECTION 11.05        Indemnity ................................................................ 25
        SECTION 11.06        Mutual Waiver of Subrogation ............................... 25
        SECTION 11.07        Affiliate ................................................................... 26
Article XII        DAMAGE OR DESTRUCTION.............................................. 26
        SECTION 12.01        Landlord's Obligation to Rebuild ........................... 26
        SECTION 12.02        Tenant's Restoration Obligations; Rent Abatement ................... 27

ii

Table of Contents
(continued)

Page

SECTION 12.03    Termination................................................ 27
Article XIII    CONDEMNATION................................................ 28
SECTION 13.01    Taking................................................ 28
SECTION 13.02    Restoration and Rent Adjustment ................. 29
SECTION 13.03    Award................................................ 30
Article XIV    ALTERATIONS AND MECHANICS' LIENS ................. 30
SECTION 14.01    Tenant's Alteration Rights......................... 30
SECTION 14.02    Mechanics' Liens .................................. 31
Article XV    SIGNS................................................ 31
SECTION 15.01    Tenant's Signs.................................... 31
SECTION 15.02    Monument Sign.................................... 32
SECTION 15.03    Replacement...................................... 32
Article XVI    TENANT'S PROPERTY................................. 32
SECTION 16.01    Tenant's Property................................. 32
Article XVII    ASSIGNMENT AND SUBLETTING ................. 33
SECTION 17.01    Assignment and Subletting Rights............... 33
SECTION 17.02    Collateral Assignment............................ 34
SECTION 17.03    Cure Rights of Original Tenant.................. 34
SECTION 17.04    Recognition Agreement ......................... 34
Article XVIII    DEFAULT ................................................ 36
SECTION 18.01    Tenant's Default.................................. 36
SECTION 18.02    Additional Landlord Remedies Due to Construction Delays
by Tenant ......................................... 37
SECTION 18.03    Landlord's Default ............................... 38
SECTION 18.04    Additional Tenant Self-help, Equitable and Legal Remedies
Due to Construction Delays by Landlord ................. 39
SECTION 18.05    Additional Tenant Remedies Due to Landlord's Failure to
Pay the Landlord Reimbursement................... 40
SECTION 18.06    Waiver; Non-Exclusive Remedies................. 40
Article XIX    SUBORDINATION, TRANSFER OF INTEREST ................. 40
SECTION 19.01    Subordination.................................... 40
SECTION 19.02    Existing Mortgages and Ground Leases ................. 41

iii

Table of Contents
(continued)

Page

SECTION 19.03     Transfer of Interest...................................................... 41

SECTION 19.04     Tenant Estoppel Certificates .......................................... 42

SECTION 19.05     Landlord Estoppel Certificates ...................................... 42

SECTION 19.06     Payments ....................................................................... 42

Article XX     LANDLORD'S REPRESENTATIONS, WARRANTIES AND
               COVENANTS .................................................................. 42

SECTION 20.01     Quiet Enjoyment ........................................................... 42

SECTION 20.02     Representations, Warranties and Covenants................... 43

SECTION 20.03     Site Covenants .............................................................. 43

Article XXI     HOLDING OVER ............................................................... 44

SECTION 21.01     Holding Over ................................................................. 44

Article XXII     NOTICE ............................................................................ 45

SECTION 22.01     When Given ................................................................... 46

Article XXIII     MISCELLANEOUS ......................................................... 46

SECTION 23.01     Rent Proration ............................................................... 46

SECTION 23.02     Construction .................................................................. 46

SECTION 23.03     Section Headings ........................................................... 46

SECTION 23.04     Partial Invalidity............................................................ 46

SECTION 23.05     Waiver............................................................................ 46

SECTION 23.06     Governing Law .............................................................. 47

SECTION 23.07     Successors and Assigns.................................................. 47

SECTION 23.08     No Broker....................................................................... 47

SECTION 23.09     Memorandum of Lease ................................................... 47

SECTION 23.10     Entire Agreement........................................................... 47

SECTION 23.11     Relationship of Parties .................................................. 47

SECTION 23.12     Force Majeure ................................................................ 47

SECTION 23.13     Limitation of Landlord's Liability .................................. 48

SECTION 23.14     Limitation of Tenant's Liability...................................... 48

SECTION 23.15     Consents ........................................................................ 48

SECTION 23.16     Costs............................................................................... 48

SECTION 23.17     Attorneys' Fees ............................................................. 49

iv

Table of Contents
(continued)

Page

SECTION 23.18      Survival of Obligations ................................................ 49

SECTION 23.19      Joint and Several Liability .......................................... 49

SECTION 23.20      Definition of Hereunder, Herein, etc. ......................... 49

SECTION 23.21      Tenant's Trade Name.................................................. 49

SECTION 23.22      Counterparts................................................................ 49

SECTION 23.23      Non-Discrimination .................................................... 49

## EXHIBITS

EXHIBIT A        Site Plan
EXHIBIT B        Legal Description of the Shopping Center
EXHIBIT C        Site Design Requirements
EXHIBIT C-1      Possession Date Notice
EXHIBIT D        W-9 Form
EXHIBIT E        Commencement Date and Expiration Date Agreement
EXHIBIT F        Prohibited Uses
EXHIBIT G        Intentionally Omitted
EXHIBIT H        Existing Exclusives/Prohibited Uses
EXHIBIT I        Recognition Agreement
EXHIBIT J        Subordination, Non-Disturbance and Attornment Agreement
EXHIBIT K        Permitted Exceptions
EXHIBIT L        Memorandum of Lease
EXHIBIT M        Indemnity Agreement
EXHIBIT N        Monument Sign Rendering
EXHIBIT N-1      Sign Program

## LEASE AGREEMENT

**THIS LEASE AGREEMENT** (this "Lease"), dated as of the 10th day of December, 2007 ("Effective Date"), by and between **RAYMOND & MAIN RETAIL, LLC,** a California limited liability company ("Landlord") with an office at c/o Panattoni Development Company, LLC, 1640 S. Sepulveda Blvd., Suite 530, Los Angeles, CA 90025, and **CIRCUIT CITY STORES WEST COAST, INC.** ("Tenant") with an office at, 9950 Mayland Drive, Richmond, Virginia 23233.

### W I T N E S S E T H:

In consideration of the rents and covenants set forth in this Lease, Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises (as defined in Section 1.01(P)) upon the following terms and conditions:

### ARTICLE I

### FUNDAMENTAL LEASE PROVISIONS

SECTION 1.01    Definitions:

A.    **Additional Charges:**

　　1.    Initial CAM Costs: Three and 00/100 Dollars ($3.00) per square foot of Floor Area (as defined below), which includes the initial insurance cost of Fifty Cents ($.50) per square foot of Floor Area (the "Initial Insurance Cost").

　　2.    Initial Taxes: Five and 50/100 Dollars ($5.50) per square foot of Floor Area.

B.    **Alternative Rent:** An amount equal to fifty percent (50%) of the Annual Minimum Rent (as defined below) that would have otherwise been due during the period of time that Tenant is entitled to pay Alternative Rent.

C.    **Annual Minimum Rent** (subject to adjustment pursuant to Section 2.09):

| Period<br>Initial Lease Term: | Rent p.s.f. | Annual Rent | Monthly Installments |
|---|---|---|---|
| Commencement Date through end of tenth (10th) Lease Year (as defined in Section 1.01(J)) | $34.00 | $685,168.00 | $57,097.33 |
| 1st Extension Period (as defined in Section 1.01(F)): | $37.40 | $753,684.80 | $62,807.07 |
| 2nd Extension Period: | $41.14 | $829,053.28 | $69,087.77 |

| | | | |
|---|---|---|---|
| 3rd Extension Period: | $45.25 | $911,878.00 | $75,989.83 |
| 4th Extension Period: | $49.78 | $1,003,166.56 | $83,597.21 |

D.     **Broker**:  Together, Western Retail Advisors, LLC and ADJG, Inc. (d.b.a. Pacific Retail Partners).

E.     **Delivery Dates (as such dates may be extended pursuant to Section 2.05(c) below)**:

          1.     Anticipated Possession Date:  April 1, 2008.

          2.     Outside Possession Date: August 30, 2008.

F.     **Extension Periods**:  Four (4) periods of five (5) years each.

G.     **Floor Area**:   The actual number of square feet of space contained on all floors within any building area in a particular leased premises (including the Premises) within the Shopping Center (as defined below) and, with respect to exterior areas, including all exterior areas leased to a tenant (other than loading dock areas, trash compactor areas, and trash container areas).  All measurements shall be from the exterior of outside walls or store front and/or to the centerline of any common walls.

H.     **Initial Lease Term**: Ten (10) Lease Years, plus the partial Lease Year commencing on the Commencement Date and ending on the January 31 immediately thereafter.

I.     **Intentionally Omitted.**

J.     **Lease Year**:  Each period within the Term (as defined below) commencing on February 1 and ending the next succeeding January 31, except that Lease Year 1 shall include the partial Lease Year commencing on the Commencement Date and ending on the January 31 immediately thereafter.  Notwithstanding the foregoing to the contrary, CAM and Tax Costs shall be based on a calendar year accounting period, and shall not be based on the Lease Year.

K.     **Intentionally Omitted.**

L.     **Intentionally Omitted.**

M.     **Minimum Parking Ratios**:  Four (4.00) parking spaces for each one thousand (1,000) square feet of Floor Area in the Shopping Center, with each parking space having dimensions at least as depicted on the Site Plan, one hundred (100) of which spaces shall be located within the Tenant's Preferred Area.

N.     **Opening Requirement**:  Thirty percent (30%) of the Floor Area of the other premises in the Shopping Center are open for business or are actively installing fixtures and merchandising their stores to open for business within sixty (60) days of the Commencement Date.

2

O.    **Permitted Use**:  The sale, rental, installation, servicing and repairing of consumer, office and automotive electronics products (collectively, the "Products"); and/or for any other lawful retail use not specifically prohibited by the provisions of Section 8.01.  The term "Products" shall include, without limitation, televisions, stereos, speakers, video and audio recorders and players and cameras; computer hardware and software and related software services (which include internet access services, entertainment software and entertainment media [such as, by way of example only, game cartridges, video tapes, cassettes, compact discs, DVD's and DVD equipment]); cellular and wireless telephones and telecommunication devices and related accessories; motor vehicle audio, stereo and telephone systems; and technological evolutions of the foregoing.

P.    **Premises**:  The store building to be constructed by Tenant as part of Tenant's Work (as defined in Section 3.01), containing approximately 20,152 square feet of Floor Area, including approximately 161 feet of frontage, as crosshatched on the site plan attached hereto as Exhibit A (the "Site Plan") in the shopping center containing approximately Forty-One Thousand Four Hundred Eighty-Six (41,486) square feet of Floor Area once fully constructed, and located at the intersection of Main Street and Raymond Street, in Alhambra, California, (the "State"), as more particularly described in Exhibit B (the "Shopping Center").

Q.    **Intentionally Omitted.**

R.    **Slack Season**:  The period of time beginning on November 1 and ending on the following January 1.

S.    **Tenant's Share**:  A fraction, the numerator of which shall be the Floor Area of the Premises and the denominator of which shall be the Floor Area of all buildings then constructed in the Shopping Center.  For purposes of determining Tenant's Share of CAM Costs, the denominator of such fraction shall be adjusted to exclude the Floor Area of any building the tenant or occupant of which is responsible for maintaining, at such tenant's or occupant's sole cost and expense, any portion of the Common Areas.

T.    **Term**:  The Initial Lease Term plus the Extension Periods, if the option for any such Extension Period is exercised.

## ARTICLE II

### LEASE OF PREMISES - TERM OF LEASE

SECTION 2.01    Demise.

(a)    Landlord does hereby lease and demise to Tenant, and Tenant does hereby lease from Landlord, the Premises, together with the rights, privileges and easements appurtenant to the Premises.

(b)    Tenant and its employees, invitees, agents, customers, concessionaires and licensees shall have the nonexclusive right, in common with Landlord and other tenants of the Shopping Center, to use all Shopping Center sidewalks, paved parking areas, paved service

3

areas, signs, traffic controls, lighting and all means of ingress, egress, acceleration, deceleration and stacking lanes and circulation for the aforesaid parking and service areas of the Shopping Center to and from public streets and roads bordering the Shopping Center (collectively, the "Common Areas") now or hereafter made available or maintained by Landlord in the Shopping Center. Tenant's right to use the Common Areas may be subject to such reasonable regulations (consistent with Tenant's rights under this Lease) as may from time to time be imposed upon, and equally applicable to, all tenants of the Shopping Center by Landlord or its agents. Landlord shall provide Tenant with at least sixty (60) days prior notice of any such rules and regulations, which notice shall contain a copy of such rules and regulations. Subject to the terms of Section 20.3, Landlord may modify the Common Areas, and may use (or permit the use of) all or any portion of the Common Areas other than that portion of the Common Areas designated as the "Tenant's Preferred Area" as shown on the Site Plan ("Tenant's Preferred Area") for retail sales or for promotional purposes, subject to Tenant's rights under Section 2.01(c), provided that any such retail sales or promotional activities are conducted in a first-class manner, the number and duration of any such retail sales or promotional activities are limited in the same manner Tenant Promotions are limited pursuant to Section 2.01(c) and the Common Areas are maintained in a neat and clean condition and appearance during all such activities. Subject to the terms of Section 20.3, Landlord may permit transmission and/or reception towers for wireless or internet communications within the Shopping Center; provided, however, no such transmission and/or reception towers shall materially interfere with Tenant's business operations at the Premises or negatively impact the appearance and esthetic quality of the Shopping Center.

(c)     Tenant, subject to all governmental requirements, shall have the exclusive right to use, on a "24 hour a day", "365 days a year" basis and without any additional charge, the loading facilities serving the Premises, the customer pick-up area, car stereo parking areas, four (4) web order customer pick-up parking spaces, trash compactor area and transformer pad area (collectively, the "Other Improvements"), all as shown on the Site Plan. Tenant shall have the right to erect a sign identifying Tenant's customer pick-up area and/or Tenant's car stereo parking areas. Tenant shall also have the right to erect signage, stripe, and print on the four (4) web order customer pick-up parking spaces in order to so identify such parking spaces. In addition, subject to the terms of Section 11.05(a) and all governmental requirements, Tenant shall have the right to have a truck or other vehicle parked in "Tenant's Promotional Area" as shown on the Site Plan ("Tenant's Promotional Area"), for up to five (5) consecutive days in duration for each occurrence, for the purpose of promoting and displaying merchandise (each occurrence up to five [5] days in duration is referred to as a "Tenant Promotion") and Tenant may have up to six (6) Tenant Promotions during Lease Year 1, and  up to five (5) Tenant Promotions for each subsequent Lease Year.

(d)     Tenant acknowledges that Tenant's agreement to have Circuit City Stores, Inc. ("Guarantor") guarantee Tenant's obligations and performance under this Lease is a material inducement for Landlord to execute the Lease. Therefore, Tenant shall cause Guarantor to execute a guaranty of lease instrument, the form of which has been approved by Landlord, and deliver such guaranty of lease to Landlord with Tenant's execution and delivery of this Lease.

SECTION 2.02     Extension Periods. Provided Tenant is not then in default of any material terms or provisions of this Lease, after the lapse of all applicable grace periods, Tenant shall have the option to extend the Term for the number of Extension Periods shown in

4

Section 1.01(F), upon all the terms and conditions contained in this Lease. Each such option is exercisable by Tenant giving written notice to Landlord ("Exercise Notice") (a) at least one hundred eighty (180) days but no more than three hundred sixty (360) days prior to the expiration of the Initial Lease Term ("Window Period"), or of the preceding Extension Period, as the case may be, or (b) if Tenant fails to give Landlord such notice, then within twenty (20) days after receipt of notice from Landlord that Tenant has failed to exercise its option to extend within the time period provided in (a) above; provided, however, that Landlord may satisfy the requirements of this subsection (b) by giving Tenant such reminder notice at any time during the Window Period prior to Landlord's receipt of the Exercise Notice.

      SECTION 2.03    Commencement Date and Landlord Reimbursement. "Commencement Date" shall mean the later of (i) the earlier of (a) one hundred eighty (180) days after the Possession Date or (b) the date Tenant opens for business at the Premises, or (ii) the date Landlord makes payment of the Landlord Reimbursement to Tenant. However, if the Commencement Date shall occur during the Slack Season or prior to the date on which the Opening Requirement is met, and Tenant elects to delay the opening of its store, then, notwithstanding that the Commencement Date shall have occurred, Rent (as defined in Section 4.03) shall fully abate until the later to occur of (i) the first (1st) day following the end of the Slack Season (unless Tenant elects, at its discretion, to open during such period), or (ii) the date on which the Opening Requirement is met (unless Tenant elects, at its discretion, to open for business prior to the date that the Opening Requirement is met). If Tenant elects to open for business during the Slack Season, then Tenant shall pay Rent in full, as and when due. However, if Tenant elects to open prior to the date that the Opening Requirement is met, then Tenant shall pay, in lieu of Annual Minimum Rent, Alternative Rent until the date on which the Opening Requirement is met. In no event shall Tenant's election to delay opening its store in any way delay or modify the date on which the Landlord Reimbursement is required to be paid by Landlord to Tenant. For purposes hereof, "Landlord Reimbursement" shall mean the product obtained by multiplying Ninety-Five and No/100 Dollars ($95.00) by the Floor Area of the Premises as determined by the Floor Area Certification (as defined below). Upon Substantial Completion (as defined in the site design requirements attached hereto as Exhibit C ["Site Design Requirements"]) and Tenant's furnishing to Landlord (a) the certificates of insurance required under Section 11.02, (b) an indemnity in the form of Exhibit M attached to this Lease with respect to mechanics' liens arising out of Tenant's construction, (c) a square footage Premises survey certified to Tenant and Landlord and acceptable to both parties (the "Floor Area Certification"), and (d) a certificate of occupancy, Landlord shall pay to Tenant the Landlord Reimbursement. The Landlord Reimbursement shall be payable by wire transfer of funds by Landlord to Tenant's account no later than thirty (30) days after Substantial Completion and Landlord's receipt of items (a) through (d) above. Upon Substantial Completion and payment of the Landlord Reimbursement from Landlord to Tenant, Landlord shall be the owner of the Building (as defined in the Site Design Requirements, but not including any of Tenant's Property, as defined in Section 16.01) and Landlord shall be entitled to depreciate the Building for tax purposes. Tenant shall have the right to deliver to Landlord, a bill of sale evidencing the conveyance of the Building from Tenant to Landlord. Landlord shall also have the right to require Tenant to deliver to Landlord such a bill of sale. However, the conveyance of the Building shall be deemed to have occurred notwithstanding that a bill of sale was not so delivered.

SECTION 2.04      Possession Date.

"Possession Date" shall mean the date on which the last of the following conditions shall have been satisfied:

(a)      Landlord shall have caused the Delivery of the Land (as defined in the Site Design Requirements) to occur;

(b)      Landlord shall have delivered the soils engineer's and surveyor's certifications as required by Circuit City's Specifications (as defined in the Site Design Requirements);

(c)      The representations and warranties of Landlord set forth in Sections 9.03 and 20.02 below shall then be true and in effect in all material respects, and Landlord shall not then be in violation of any of the Site Covenants (as defined in Section 20.03);

(d)      Landlord shall have delivered to Tenant a fully-executed original counterpart of a non-disturbance and/or recognition agreement, as applicable, from each Mortgagee (as such term is defined in Section 19.01), as more fully set forth in Section 19.02;

(e)      Landlord shall have delivered to Tenant the W-9 form attached hereto as Exhibit D; and

(f)      Landlord shall have delivered to Tenant written evidence of the release or waiver by the Alhambra Redevelopment Agency of the provisions of Section 5.7 of that certain Disposition and Development Agreement between the Alhambra Redevelopment Agency and George B. Frey dated November 23, 1987 and recorded December 14, 1987 in the Official Records of Los Angeles County, California as Instrument No. 87-1972860, as the same applies to this Lease.

Landlord currently anticipates that the Possession Date will occur on the Anticipated Possession Date, subject to the provisions of Section 2.05 below.  In no event shall the Possession Date occur prior to the Expected Possession Date (as defined in Section 2.05).

SECTION 2.05      Expected Possession Date.

(a)      Landlord shall give Tenant no less than one hundred twenty (120) days notice of the date on which the Possession Date shall occur, using the form of Possession Date Notice attached hereto as Exhibit C-1 (the "Possession Date Notice").  The date specified in such notice shall be defined as the "Expected Possession Date".

(b)      If Landlord fails to accomplish the Possession Date by the Expected Possession Date, then Landlord shall pay to Tenant on demand, as a liquidated reimbursement (and not as a penalty) for all of the damages that Tenant will suffer as a result of any such delay, an amount equal to the sum of: (i) Twenty-Five Thousand Dollars ($25,000), plus (ii) an amount equal to two (2) days of Annual Minimum Rent for each day that the Possession Date is delayed.  If Landlord fails to complete any other element of Landlord's Work (as defined in Section 3.01) on or before the date required therefor in the Construction Schedule (as defined in the Site

6

Design Requirements), then Landlord shall pay to Tenant on demand, as a liquidated reimbursement (and not as a penalty) for all of the damages that Tenant will suffer as a result of any such delay, an amount equal to two (2) days of Annual Minimum Rent for each day that such component of Landlord's Work is delayed.  The foregoing liquidated reimbursements represent the parties' good faith agreement as to an agreed upon amount which shall have been incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment.

(c)   Anything contained herein to the contrary notwithstanding, the time period for performance by Landlord under Section 2.05(b) shall be extended by one (1) day for each day that Landlord can demonstrate that it has been delayed in the performance of Landlord's Work solely on account of any Tenant Delay (as hereinafter defined) or any event constituting Force Majeure (as defined in Section 23.12), provided that in no event shall the aggregate of any and all extensions as a result of Force Majeure events exceed a period of thirty (30) days except in the event of a Catastrophic Event (as defined in Section 23.12).  As used herein, the term "Tenant Delay" shall mean any action or omission by Tenant or Tenant's authorized agents, contractors, representatives or licensees which actually delays Landlord's completion of Landlord's Work.  The foregoing notwithstanding, no Tenant Delay shall exist unless Landlord notifies Tenant in writing that an event likely to result in a Tenant Delay has occurred within three (3) days following the occurrence of such event; and Landlord's failure to raise a claim of Tenant Delay within three (3) days of the date any act or omission of Tenant which could give rise to a claim of Tenant Delay occurs shall constitute an express waiver by Landlord of its right to bring a claim for Tenant Delay on account of such event.

SECTION 2.06    Possession Date During Slack Period Delivery.  Anything contained in this Lease to the contrary notwithstanding, if the Possession Date occurs during the Slack Delivery Period, then Tenant may refuse to accept the Premises.  In that event, the Possession Date shall be delayed and shall not be deemed to occur until the first (1st) day following the end of the applicable Slack Delivery Period, subject to the other provisions of this Lease (including, without limitation, Sections 2.04 and 2.05).

SECTION 2.07    Delayed Possession.  If the Possession Date does not occur before the Outside Possession Date (subject to extension pursuant to the provisions of Section 2.05(c)), then Tenant shall have the right to delay opening its store facility for a period of not to exceed nine (9) months, which right shall be exercised by Tenant upon notice to Landlord at any time prior to the Possession Date.  In addition, if the Possession Date does not occur before the thirtieth (30th) day following the Outside Possession Date (subject to extension pursuant to the provisions of Section 2.05(c)), then Tenant shall have the right to terminate this Lease by written notice to Landlord.  If Tenant terminates this Lease, then there shall be no further liability on the part of Landlord or Tenant, except: (i) for those obligations that expressly survive the expiration or other termination of this Lease, and (ii) Landlord shall (which obligation shall survive the termination of this Lease), within thirty (30) business days following Tenant's termination notice, reimburse Tenant for all its reasonable third-party costs and expenses incurred in connection with this Lease (including, without limitation, costs associated with the preparation and review of plans and specifications, and attorneys' fees), not to exceed Twenty-Five Thousand Dollars ($25,000).  If Tenant elects to delay opening its store facility, then Landlord shall cause the Possession Date, including, without limitation, the Delivery of the Land, to occur

7

on the date subsequently required by Tenant, and Tenant shall be entitled to the damages set forth in Section 2.05(b) above.

SECTION 2.08    Early Entry. Any time prior to the Delivery of the Land, Tenant shall have the right to enter the Premises, upon 24 hours advance notice to Landlord (which may be by telephone), to (i) inspect the physical condition of the Land (as defined in the Site Design Requirements) and conduct its due diligence investigation of the Land to determine the suitability of the Land for Tenant's intended construction, use and operation and (ii) inspect Landlord's Work; provided, however, that such entry may not unreasonably interfere with Landlord's Work. Landlord reserves the right to be present during any such entry. Landlord hereby appoints John Gebhardt (phone number (310) 268-7871) as Landlord's construction representative, and directs Tenant to notify such party to coordinate any early access permitted under this paragraph. Any entry made by Tenant pursuant to the provisions of this Section 2.08 shall not be construed as an acceptance of the Premises by Tenant under the provisions of this Lease or as a waiver of any of the provisions hereof.

SECTION 2.09    Measurement. If the Floor Area Certification shall disclose that the  Premises contains more or less than the Floor Area shown in Section 1.01(P), then Landlord and Tenant agree to amend this Lease to adjust all Rent to account for the actual Floor Area of the Premises.

SECTION 2.10    Commencement    Date    Agreement.    When    the Commencement Date has been determined, Landlord and Tenant shall execute a memorandum, in the form of Exhibit E, which shall expressly confirm the Commencement Date and the expiration date of the Initial Lease Term, and which shall also ratify and affirm all of the terms and provisions of this Lease.

## ARTICLE III

## INITIAL CONSTRUCTION

SECTION 3.01    Landlord's and Tenant's Work.

(a)    Landlord shall perform Landlord's work in accordance with the Site Design Requirements and as otherwise required by this Lease ("Landlord's Work").

(b)    Tenant shall construct the Building and storefront sidewalk in accordance with the Site Design Requirements ("Tenant's Work") for which Landlord shall pay to Tenant the Landlord Reimbursement. All Tenant's Work shall be performed at Tenant's sole cost and expense, it being the intent hereof that Tenant shall be solely responsible for the cost thereof in excess of the Landlord Reimbursement.

(c)    Landlord shall be responsible, at its sole cost and expense, to the extent the same are calculated based on the acreage of the Shopping Center, for the payment of all construction related governmental fees and assessments, including, without limitation, all permit and impact fees, incurred in the performance of Landlord's Work, and Tenant shall be responsible, at its sole cost and expense, to the extent the same are calculated based on the square footage of the Building, for the payment of all construction related governmental fees and

8

assessments, including, without limitation, all building permit and impact fees incurred in the performance of Tenant's Work.  Notwithstanding the foregoing, if the construction related governmental fees and assessments payable by Tenant pursuant to this Section 3.01(c) exceed Ten Dollars ($10.00) per square foot of Floor Area of the Building, Landlord shall be solely responsible for paying such excess.  Tenant shall be responsible, at its sole cost and expense, for payment of customary permit fees related to the connection of utilities at the Premises.

(d)     Landlord and Tenant acknowledge receipt of the Site Design Requirements and each agrees to comply with the provisions thereof relating to their respective work.

(e)     In connection with Tenant's performance of Tenant's Work and during any other periods of construction during the Term, Tenant shall have the right to use as a construction staging area approximately twenty thousand (20,000) square feet of the Common Areas in the location identified on the Site Plan as the "Staging Area."

(f)     Tenant shall submit its plans and specifications for Tenant's Work to Landlord for Landlord's review and approval, and, if Landlord has not approved or disapproved Tenant's plans and specifications within fifteen (15) days after Landlord's receipt of the same, Landlord shall be deemed to have unconditionally approved the same.  Notwithstanding the foregoing approval right, Landlord acknowledges and agrees that Tenant shall have the right to construct the Building in accordance with Tenant's then current prototype design for similarly sized stores in the State.  Accordingly, Landlord further acknowledges and agrees that so long as Tenant's plans and specifications provide for construction of the Building in a manner consistent with Tenant's then current prototype design for similarly sized stores in the State and comply with all applicable building codes and other applicable requirements of the City, Landlord shall be deemed to have approved Tenant's plans and specifications upon Landlord's receipt of the same from Tenant.

## ARTICLE IV

### RENT

SECTION 4.01     Annual Minimum Rent.     Commencing on the Commencement Date, Tenant shall pay to Landlord monthly installments of Annual Minimum Rent without setoff or deductions, except as otherwise provided for in this Lease, on the first (1st) day of each calendar month during the Term.  However, if the Commencement Date occurs on a day other than the first (1st) day of a calendar month, then the monthly installment of Annual Minimum Rent and other charges shall be prorated for the remaining days of that calendar month.  Anything contained in this Lease to the contrary notwithstanding, if Tenant shall be paying Alternative Rent as permitted under this Lease during such time as Tenant shall be entitled to an abatement of, deduction from or setoff against Annual Minimum Rent, then Tenant shall be entitled to the same abatement of, deduction from or setoff against Alternative Rent.

SECTION 4.02     Additional Rent.  The term "Additional Rent" shall mean all amounts required to be paid by Tenant under this Lease other than Annual Minimum Rent.

9

Wherever an item of Additional Rent is payable "on demand" or no time period for payment of an item of Additional Rent is specifically provided for in this Lease, such item of Additional Rent shall be paid by Tenant within thirty (30) days after Tenant's receipt of Landlord's invoice therefor, accompanied by the appropriate back-up documentation.

SECTION 4.03      Rent; Method of Payment.   The term "Rent" shall mean, collectively, Annual Minimum Rent and Additional Rent.  All payments of Rent shall be made by check payable to Landlord, mailed or delivered to the address listed in Section 22.01 or to such other person or place as Landlord shall designate by notice to Tenant, or by such other reasonable method of payment (such as by wire transfer).

## ARTICLE V

## COMMON AREA MAINTENANCE AND COST

SECTION 5.01      Maintenance.   Landlord shall operate, maintain, insure, repair and replace the Common Areas or cause the same to be done in a manner so as to maintain and manage the Shopping Center in good, first-class order, repair and condition.   Without limiting the generality of the foregoing, Landlord shall be solely responsible, and Tenant shall have no obligation (except to reimburse Landlord for Tenant's Share of the cost thereof, as provided below), for the maintenance, repair or replacement of the parking areas (including, without limitation, any necessary repaving and restriping), parking lot lighting, utility systems and connections, access ways and other Common Areas and for the clearing of snow and ice from the Common Areas.  Subject to Section 5.02 below, Landlord may at any time, except between October 1 and January 1, close temporarily any Common Areas to make repairs, to prevent the acquisition of public rights therein or discourage non-customer parking.  Between October 1 and January 1, Landlord may temporarily close parts of the Common Areas, but only to make repairs of an emergency nature.  However, in any instance of such emergency repairs Landlord shall use all reasonable efforts to perform the necessary repairs in the most expeditious manner and in such a way and at such times as to cause minimal interference with ingress and egress to and from the Premises.

SECTION 5.02      Construction   Clean-up   and   Post-Possession   Work. Following the date Tenant opens for business to the public, any construction by Landlord or other tenants or occupants of the Shopping Center affecting any portion of the Shopping Center shall be subject to the following terms and conditions (in addition if any other applicable provisions of this Lease, such as, by way of example only, Section 20.03):

(a)      staging and storage of materials and parking of construction vehicles shall not occur in Tenant's Preferred Area;

(b)      Landlord shall diligently ensure that, from and after Tenant's opening for business to the public, no ingress, egress or passage of any construction, delivery and related vehicles engaged in the performance of such work or other construction activities shall take place except through the entrance/exit drive designated as the "Construction Drive" on the Site Plan;

10

(c)     Landlord shall maintain the Shopping Center in a clean, safe, and sightly condition, and shall use reasonable efforts to ensure that such construction shall not materially adversely interfere with the normal conduct of any business operations in the Premises; and

(d)     Landlord shall clear all rubble and debris from the Premises and Common Areas resulting from any construction by Landlord or any other tenant or occupant of the Shopping Center.

SECTION 5.03     CAM Costs.  "CAM Costs" shall mean the actual amount (without profit or "mark up" by Landlord or any Affiliate, as defined in Section 11.07, of Landlord) of all necessary, competitive and reasonable costs and expenses actually incurred by Landlord in:   (i) repairing, replacing, operating and maintaining the Common Areas in accordance with first-class shopping center standards; (ii) procuring liability insurance with respect to the Common Areas, all-risk insurance covering the buildings within the Shopping Center and rent loss (all pursuant to the provisions of Section 11.01(a)(i) through(iv) of this Lease); (iii) securing utility charges with respect to Common Area lighting; (iv) from and after the seventh (7th) Lease Year, painting the buildings within the Shopping Center no more frequently than every seven (7) years; and (v) in lieu of any cost(s) or expense(s) relating to the administration and management of the Common Areas, an administrative fee (the "Administrative Fee") equal to five percent (5%) of the CAM Costs for the calendar year in question, but excluding from the computation of such Administrative Fee, the cost of utility charges, insurance premiums and any improvements of a capital nature permitted to be included in CAM Costs hereunder.  Anything contained herein to the contrary notwithstanding, in no event will CAM Costs include: (a) real estate taxes, (b) any costs associated with maintenance performed by another tenant or occupant of the Shopping Center on portions of the Common Areas separately maintained by such tenant or occupant; (c) any dues or charges for a merchants' or other association of occupants of the Shopping Center; (d) maintenance, repairs or replacements to the Common Areas (i) necessitated by the negligent or wrongful act of Landlord or any tenant or occupant, (ii) made to correct any construction defect, or (iii) relating to any improvements or utility systems not within the Common Areas (e.g. roofs, exterior walls, fire protection systems); (e) repairs or replacements necessitated by any governmental entity or made to correct any condition in existence prior to the Commencement Date, or to correct damage caused by subsidence or adverse or substandard soil conditions; (f) amounts reimbursable from insurance proceeds, under warranty, or by any tenant or occupant of the Shopping Center or any other third party other than pursuant to a Common Area expense provision similar to this Section 5.03; (g) premiums for insurance for coverage maintained by Landlord with respect to the Shopping Center (provided that premiums for Common Areas liability insurance and all risk insurance covering the Shopping Center and Tenant's leasehold improvements may be included as part of CAM Costs as long as the coverages provided by such policies are not in excess of the limits established in Section 11.01 hereof), any costs resulting from insurance deductibles under any insurance policy maintained by Landlord, any costs which would have been reimbursed or paid for by insurance proceeds had Landlord maintained the insurance required under Section 11.01, and the amount of any judgment or other charge entered, or costs assessed against, Landlord in excess of the policy limits of the insurance maintained by Landlord under Section 11.01; (h) the cost of any replacements or capital improvements to the Common Areas, except that from and after the seventh (7th) Lease Year, the cost of repaving the parking areas of the Shopping Center and/or painting the buildings within the Shopping Center may be included

11

within CAM Costs so long as such cost is amortized on a straight-line basis over the useful life thereof under generally accepted accounting principles consistently applied (with only the annual portion of such amortization included in CAM Costs in any calendar year), and is not incurred more than once during each seven (7) full calendar years of the Term; (i) reserves for anticipated future expenses; (j) interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner; (k) Landlord's personnel, overhead, home office or administrative expenses, except for the Administrative Fee; (l) amounts incurred to remediate any Hazardous Materials (as defined in Section 9.03(a)); (m) any new improvements to the Shopping Center or Common Areas including, but not limited to, renovations to the facade of any buildings within the Shopping Center; or (n) any fees, costs or expenses not related to the operation, maintenance, insurance, replacement, repair or management of the Common Areas.

SECTION 5.04    Tenant's Share of CAM Costs.    Tenant shall pay to Landlord Tenant's Share of CAM Costs in each calendar year during the Term. Tenant's Share of CAM Costs shall be appropriately prorated for partial calendar years at the beginning and at the end of the Term. Notwithstanding anything contained in this Lease to the contrary, in no event shall Tenant's Share of CAM Costs in the first (1st) full calendar year of the Term (including the prior partial year, if any) exceed the Initial CAM Costs, and in no event shall the component(s) thereof for Landlord's insurance obligations exceed the Initial Insurance Cost.

SECTION 5.05    Payment of CAM Costs.    Tenant's Share of CAM Costs shall be payable in equal monthly installments on the first (1st) day of each month. Such monthly installments shall be at the rate of one-twelfth (1/12th) of Tenant's Share of CAM Costs for the preceding calendar year, subject to immediate adjustment when the actual amount of CAM Costs or a change in Tenant's Share thereof is determined. Within ninety (90) days after the end of each calendar year, Landlord shall furnish Tenant with a detailed statement certified by an authorized representative of Landlord of the actual amount of CAM Costs and of Tenant's Share thereof for the preceding calendar year (including the basis of allocation to Tenant). Within thirty (30) days after receipt of such statement by Tenant, Tenant shall pay to Landlord any deficiency due. Any surplus paid by Tenant shall be credited against the next installment(s) of Rent, provided that any surplus owing to Tenant following the expiration of the Term shall be promptly refunded to Tenant. Landlord's records of CAM Costs for each year shall be available for inspection by Tenant for a period of two (2) years after Landlord notifies Tenant of Tenant's Share of CAM Costs for the year in question. Tenant may, during such two (2) year period, upon thirty (30) days' prior notice to Landlord, have an audit made of CAM Costs and the allocations thereof to Tenant including, without limitation, reviewing copies of paid bills and other records substantiating its expenditures ("CAM Records"). Landlord agrees to provide Tenant with copies of all applicable CAM Records upon request. Any overcharges shown by any such audit shall, at Tenant's option, be credited against the next installment(s) of Rent or be refunded to Tenant forthwith. If any such audit shows that Tenant's Share of CAM Costs have been overstated by more than five percent (5%), then Landlord shall immediately pay to Tenant the reasonable cost of such audit.

SECTION 5.06    CAM Costs Increases.    Notwithstanding anything contained in this Lease to the contrary, for all calendar years subsequent to the first (1st) full calendar year of the Term, in no event shall Tenant's Share of CAM Costs increase, on a cumulative average basis, by more than five percent (5%), excluding from such calculation,

12

insurance premiums and utility charges. In the event that the actual increase in CAM Costs for any given year is less than the maximum cumulative average increase permitted for CAM Costs for such year, then the percentage difference between the actual CAM Costs increase for such year and the maximum cumulative average increase permitted for such year may be carried forward and applied to any future year(s) when the actual CAM Costs increase exceeds 5% for such year. For example, if the actual CAM Costs increased by 3% in a given year, then a 2% increase in CAM Costs may be carried forward into the next year (or subsequent years) to be applied towards the maximum cumulative average if the actual CAM Costs for any future year increase by more than 5% in a particular year.

Notwithstanding the foregoing, Tenant's Share of CAM Costs during the first year of each Extension Period shall reflect the actual CAM Costs incurred in such year and shall not be subject to the aforementioned five percent (5%) limitation on increases in Tenant's Share of CAM Costs, provided that such limitation on increases in Tenant's Share of CAM Costs shall apply to each subsequent year during any such Extension Period. However, the "carry forward" provisions set forth in the preceding paragraph shall apply during each Extension Period.

## ARTICLE VI

## TAXES

SECTION 6.01     Taxes. Landlord shall pay or cause to be paid when due all real estate taxes and assessments levied and assessed against the land, improvements and buildings comprising the Shopping Center. Except as hereinafter provided to the contrary, for each calendar year or part thereof during the Term, Tenant shall pay Tenant's Share of the net amount (after reflecting all discounts for early payment, refunds and credits and after excluding all penalties, interest, late charges and real estate taxes and assessments levied against buildings which are separately assessed) of all real estate taxes and assessments (collectively, "Taxes") levied and assessed against the land, improvements and buildings comprising the Shopping Center. Notwithstanding anything contained in this Lease to the contrary, in no event shall Tenant's Share of Taxes for the first (1st) full calendar year of the Term (including the prior partial year, if any) exceed the Initial Taxes. Moreover, Tenant shall pay when due all taxes and assessments levied and assessed against Tenant's Property and operations at the Premises.

SECTION 6.02     Payment of Taxes. Tenant shall be liable for and shall pay Tenant's Share of Taxes only with respect to Taxes accruing during the Term, regardless of when such Taxes are billed or become due and payable. Tenant's Share of Taxes shall be appropriately prorated for partial fiscal tax years at the beginning and at the end of the Term. Tenant shall pay Tenant's Share of Taxes (a) within thirty (30) days after Landlord submits to Tenant proof of payment of Taxes by Landlord, a tax bill for such Taxes and a statement setting forth the manner in which Tenant's Share of Taxes is calculated, or (b) ten (10) days before the same are due and payable, whichever is later.

SECTION 6.03     Exclusions from Taxes.     Notwithstanding anything contained in this Lease to the contrary with respect to betterments or other extraordinary or special assessments, Tenant's obligations shall apply only to the extent such assessments (and interest thereon) are payable in respect of the Term, and Tenant's Share of any such assessments

13

shall be determined as if such assessments are payable in installments over the longest payment period permitted by law for the particular assessment, in which case Tenant shall pay only those installments payable in respect of the Term.  Landlord represents to Tenant that, as of the Effective Date and, to the best of Landlord's knowledge, as of the Possession Date, no portion of the Shopping Center is or is expected to be (a) subject to or the beneficiary of an abatement, exemption and/or phase-in of Taxes, (b) subject to any special assessments or similar charges, or (c) included in any special improvement district(s) which would result in higher sales taxes or other similar impositions than would exist in the absence of such district(s), except as set forth in a current tax certificate.  Further, Taxes shall not include any: (i) income, excise, profits, estate, inheritance, succession, gift, transfer, franchise, capital, or other tax or assessment upon Landlord or upon the rentals payable under this Lease, unless such are in lieu of real estate taxes; (ii) taxes on rents (other than to the extent that such taxes are customarily paid by retail tenants in the State), gross receipts or revenues of Landlord from the Premises; (iii) fine, penalty, cost or interest for any tax or assessment, or part thereof, which Landlord or its lender failed to timely pay, unless such late payment was solely attributable to late payment by Tenant of Tenant's Share of Taxes; (iv) assessment for a public improvement arising from the initial construction or expansion of the Shopping Center or the Premises; (v) Taxes resulting directly from an increase in the assessment caused by a sale or ground lease of all or any portion of the Shopping Center to an Affiliate of Landlord, or more than three (3) times in any ten (10) year period; or (vi) fees imposed upon Landlord in connection with Landlord's development of the Shopping Center (including, without limitation, trip generation fees).  All Taxes payable by Tenant pursuant to this Article VI shall be determined as if the Shopping Center was the only property owned by Landlord.

      SECTION 6.04      Right to Contest.  At Tenant's request, Landlord shall contest the amount or validity of any assessed valuation or Taxes.  If within thirty (30) days following Tenant's request Landlord determines (based upon the advice of its tax counsel) that a contest of any assessed valuation or Taxes is not likely to be successful, then Landlord shall so advise Tenant within such thirty (30) day period.  Following receipt of such notice, Tenant shall instruct Landlord as to whether or not to proceed with the contest; and if (i) Tenant instructs Landlord to proceed, (ii) Landlord prosecutes such tax challenge using third party professionals designated or approved in writing by Tenant and (iii) if no cost savings are achieved as a result of a contest requested by Tenant, then as long as Landlord has pursued such contest diligently and in good faith, Tenant shall be solely responsible for all reasonable costs and expenses payable by Landlord to such third party professionals.  If any rebate or refund of Taxes is received as a result of any contest or otherwise, then Tenant shall be entitled to Tenant's Share thereof, net of all reasonable and customary expenses payable by Landlord to third party professionals in connection therewith.  Tenant shall have the right to defer payment of Tenant's Share of Taxes during any such Tax contest if and to the extent permitted under Laws (as defined in Section 10.01).

## ARTICLE VII

## UTILITIES

      SECTION 7.01      Utilities.  Landlord covenants and agrees that the Premises shall be properly serviced with gas, electric, telephone, water, sewer and other utilities in

accordance with the Site Design Requirements. Tenant, as part of Tenant's Work, shall cause all such utilities to the Premises to be separately metered at Tenant's sole cost and expense. Tenant shall pay, as same become due and payable, all charges for utility services furnished to the Premises during the Term. If at any time during the Term, for any reason, Landlord shall provide utility service to the Premises, Tenant's cost for such utility service shall not exceed the lesser of (i) Landlord's actual cost for such utility service, or (ii) the cost of the same service if Tenant had obtained such service directly from such utility provider. In addition, Tenant shall have the right to install a test meter to verify its utility usage. Notwithstanding anything contained in this Lease to the contrary, Tenant shall be entitled to select the telecommunication provider. Landlord shall permit full and free access to all available conduits in the Shopping Center for the applicable utility service subject to such reasonable requirements as Landlord may impose.

SECTION 7.02    Interruption. If utilities serving the Premises are disrupted due to the acts or omissions of Landlord, its agents, contractors, servants or employees, then Landlord shall promptly restore the affected utilities at Landlord's sole cost and expense. If such disrupted utilities are not restored within seventy-two (72) hours after Tenant notifies the Landlord (either via telephone or in writing) of such disruption and Tenant is unable to conduct and ceases to conduct its normal business in the Premises as a result of such disruption, then from and after the expiration of such seventy-two (72) hour period, Rent shall abate until the disrupted utility service is restored.

## ARTICLE VIII

## USE OF PREMISES

SECTION 8.01    Permitted Use. The Premises may be used and occupied for any Permitted Use. However, Tenant shall not use the Premises for any of the Prohibited Uses (as defined in Exhibit F) or for any use that violates the existing exclusives or use restrictions set forth on Exhibit H.

SECTION 8.02    Conduct of Operations.

(a)    Subject to the other provisions of this Lease (including, without limitation, Article II), Tenant shall initially open its store for business to the public in the Premises for at least one (1) day, not later than the two hundred seventieth (270th) day after the Commencement Date. Other than as expressly set forth in the preceding sentence, Tenant shall have no obligation to open or operate any business in the Premises, and shall have the right, at any time, to cease to conduct any business operations in the Premises, and Tenant shall incur no liability to Landlord by reason thereof.

(b)    Anything contained herein to the contrary notwithstanding, if Tenant does not operate or cause to be operated any retail business in the Premises (other than prior to the Commencement Date or during Excused Periods, as defined below) for more than 270 consecutive days then Landlord shall have the option to terminate this Lease, which option shall be exercisable by giving notice thereof to Tenant by not later than the ninetieth (90th) day after the date on which such 270-day period expires (the "Recapture Notice"), and paying to Tenant,

15

within thirty (30) days after such notice is given, the Unamortized Costs (as defined in Section 8.04(f)). If Landlord gives the Recapture Notice, then this Lease shall terminate upon the ninetieth (90th) day (the "Recapture Date") after the date on which Tenant receives Landlord's termination notice. Upon termination of this Lease under this Section 8.02, there shall be no further liability on the part of Landlord or Tenant, except for obligations that expressly survive the expiration or sooner termination of this Lease. If Landlord fails to pay to Tenant the Unamortized Costs within the thirty (30) day period provided for above and such failure to pay continues through the Recapture Date, then Tenant shall have the option of (a) treating this Lease as being terminated, in which case Landlord's obligation to pay to Tenant the Unamortized Costs shall expressly survive the termination of this Lease, or (b) treating Landlord's Recapture Notice as being null and void, in which event Landlord shall be deemed to have waived Landlord's right to terminate under this Section 8.02. For purposes hereof, "Excused Period(s)" shall mean such periods during which the Premises were not open for business (i) because of alterations or renovations, damage or destruction, eminent domain proceedings or actions, Force Majeure, or any act or omission of Landlord, or its employees, agents, or contractors, or (ii) following the execution of a letter of intent for an assignment of this Lease or sublease of all or any portion of the Premises provided that the parties thereto are proceeding in good faith to enter into an assignment of this Lease or sublease and, thereafter, the assignee or sublessee proceeds with due diligence to open the Premises, or portion thereof, for business no later than 180 days after the effective date of such assignment or sublease; provided, however, in no event shall the total cessation of operations exceed 365 days, unless such cessation of operations is due to Force Majeure or any act or omission of Landlord, its employees, agents or contractors.

SECTION 8.03   Leasing Restrictions.   Landlord shall construct, lease, operate, maintain and manage the Shopping Center in the same manner as Landlord's (or its Affiliates') other comparable properties in the State. Landlord shall not lease, rent or occupy, or permit to be leased, rented or occupied, any portion of the Shopping Center for any of the Prohibited Uses. In addition, Landlord shall not lease, rent or occupy, or permit to be leased, rented, or occupied, that portion of the building located adjacent to the Premises and designated on the Site Plan as "B-1" for use as a restaurant; provided, however, Landlord shall be permitted to lease up to 6,500 square feet, in the aggregate, of the remaining space in the Shopping Center for use as a restaurant. Upon any breach of the restrictions set forth in this Section 8.03, Tenant may elect to pay Alternative Rent in lieu of Annual Minimum Rent pursuant to the provisions of Section 8.04 below.

SECTION 8.04   Tenant's Exclusive.

(a)   Landlord shall not lease, rent or occupy, or permit to be leased, rented, or occupied, any other premises in the Shopping Center (except as otherwise provided below), for the sale, rental, installation, servicing and/or repairing, either singly or in any combination, of the Products. The Incidental Sale (as defined below) of the Products in connection with the overall business of another tenant shall not be deemed a violation of this Section 8.04(a). "Incidental Sale" shall mean sales in the lesser of (i) two hundred (200) square feet, or (ii) ten percent (10%) of such tenant's or occupant's, or Landlord's or any of its Affiliate's display area. The exclusive use rights granted to Tenant in this Section 8.04(a) (the "Exclusive Use Protection") shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of all or part of the Premises.

(b)     The Exclusive Use Protection shall not apply to existing tenants of the Shopping Center (and current or future assignees or sublessees of such tenants) occupying their respective premises pursuant to the terms and provisions of leases which were executed prior to the date Landlord acquired title to the Shopping Center (and current or future assignees or sublessees of such tenants). However, such existing tenants shall nevertheless be subject to the Exclusive Use Protection if any existing tenant's lease requires the consent of Landlord to any assignment or subletting or to a change in the use of the applicable premises to permit the sale, rental, installation, servicing and/or repairing of the Products and Landlord has the right to withhold its consent under such lease.

(c)     The Exclusive Use Protection shall also not apply to a full-line: supermarket (for example, Safeway, Winn-Dixie, or Stop & Shop), department store or discount department store (for example, Wal-Mart, K-Mart, J.C. Penney, Macy's, Kohl's or Target), or discount club (for example, Costco, BJ's Wholesale Club, or Sam's Club); provided, however, that, as to each of the foregoing, such stores (i) are National Tenants or Regional Tenants (as hereinafter defined), (ii) are operated in substantially the same manner as same are operated as of the Effective Date, and (iii) contain at least thirty thousand (30,000) square feet of Floor Area. For purposes hereof, "National Tenant(s)" shall mean a tenant(s) operating, as of the applicable date, at least thirty-five (35) retail stores in the continental United States under a single trade name in first-class shopping centers, and "Regional Tenant(s)" shall mean a tenant(s) operating, as of the applicable date, at least fifteen (15) retail stores under a single trade name in first-class shopping centers in the state of California.

(d)     Upon any violation of the Exclusive Use Protection by Landlord which is not cured within thirty (30) days after written notice from Tenant to Landlord, then unless the provisions of Section 8.04(e) below apply, Tenant may elect to pay Alternative Rent in lieu of Annual Minimum Rent for so long as such violation shall continue. In addition, if such breach shall continue for more than one hundred eighty (180) days, then Tenant shall have the right to terminate this Lease. If Tenant shall have paid Alternative Rent pursuant to this Section 8.04(d) for twenty-four (24) consecutive months, then the provisions of Section 8.04(f) shall control.

(e)     If any tenant or other occupant of the Shopping Center violates the Exclusive Use Protection and such violation also constitutes a default under its lease with Landlord (or its Affiliates), then Tenant's right to pay Alternative Rent pursuant to Section 8.04(d) above shall be tolled provided that Landlord (or its Affiliates) shall have promptly commenced appropriate legal proceedings against such tenant or occupant, and shall thereafter diligently prosecute such proceedings to completion so as to enjoin and prohibit any such violation. If Landlord (or its Affiliates) shall have failed to promptly commence such proceedings, or shall fail thereafter to diligently prosecute the same, or in the event the violation does not cease within one hundred eighty (180) days after Landlord shall have been made aware of such violation, then Tenant's right to pay Alternative Rent shall apply for as long as such violation exists. The foregoing one hundred eighty (180) day period shall also be tolled during any period during which the offending party is temporarily prohibited from operating its business in a manner which violates Tenant Exclusive Use Protection (such as by way of a temporary injunction) prior to a final court determination with respect to such business operations. In addition, Tenant shall have the right (i) to conduct and prosecute such legal proceedings (including an action for injunctive relief) in its own name, at Landlord's (or its Affiliates')

17

expense, or (ii) in the event the right set forth in clause (i) above is not permitted to be exercised under Laws, to conduct and prosecute such legal proceedings in the name of Landlord (or its Affiliates), at Landlord's (or its Affiliates') expense, and Landlord (or its Affiliates) shall cooperate with Tenant with respect to such prosecution (including executing any documentation or authorization reasonably required by Tenant in connection with such prosecution and by appearing at any hearing or trial with respect to such prosecution).  If Tenant shall have paid Alternative Rent pursuant to this Section 8.04(e) for twenty-four (24) consecutive months, then Tenant shall have the right to terminate this Lease subject to and in accordance with the provisions of Section 8.04(f).

(f)     If Tenant shall have paid Alternative Rent pursuant to Section 8.04(d) for twenty-four (24) full months, then Tenant must elect either to (i) terminate this Lease, or (ii) resume paying Annual Minimum Rent from and after the expiration of the thirty (30) day period following the end of such twenty-four (24) month period.  Tenant shall make such election by notice to Landlord within thirty (30) days after the expiration of such twenty-four (24) month period.  If Tenant fails to make such an election, then Tenant shall be deemed to have elected to proceed under clause (ii) above.  If Tenant elects to terminate this Lease pursuant to Sections 8.04(d) or this Section 8.04(f), then this Lease shall terminate on the date set forth in Tenant's notice of termination which shall be no less than sixty (60) nor more than ninety (90) days after the date of such notice without further liability on the part of Landlord or Tenant, except: (x) for those obligations which expressly survive the expiration or other termination of this Lease, (y) Landlord shall (which obligation shall survive the termination of this Lease), within thirty (30) days after receiving a statement from Tenant showing the Unamortized Costs, reimburse Tenant for the then unamortized costs (amortized on a straight-line basis over the Term) of any alterations or improvements made by Tenant (and paid for by Tenant without reimbursement by Landlord) to the Premises (the "Unamortized Costs"), and (z) Tenant reserves all claims against Landlord for damages resulting from the violation of the Exclusive Use Protection.

(g)     Notwithstanding the foregoing, (i) Landlord may lease premises in the Shopping Center not to exceed one thousand four hundred (1,400) rentable square feet for the sale of cellular and wireless telephones, telecommunication devices and related accessories and (ii) Landlord may lease premises in the Shopping Center to an operator of a retail office supply store, or a retail pharmacy store (for example, Walgreens) or a specialty market (for example, Tesco or Trader Joe's), provided such operator is either a National Tenant or Regional Tenant (except that, with respect to a specialty market, Tesco shall be a permitted operator even if Tesco is not otherwise a National Tenant or Regional Tenant).

SECTION 8.05     Intentionally Omitted.

SECTION 8.06     Intentionally Omitted.

## ARTICLE IX

## REPAIRS

SECTION 9.01     Landlord Obligations.  Landlord shall, at Landlord's sole expense (and not included in CAM Costs), keep and maintain in good order, condition and repair

(including replacements, if necessary) and in a safe condition (a) the roof of the Premises (to be maintained in a watertight condition at all times), all utility systems and lines (including, without limitation, electrical, plumbing, mechanical and/or alarm systems) serving the Premises (from the point of connection at the Premises to the public utility mains), the exterior of the Premises (including, without limitation, the walls and Other Improvements, but excluding window glass, doors and frames) and the structural portions of the Premises including, without limitation, footings and foundation, floor slab, and structural walls, columns and beams, and (b) any damage to the Premises or the Shopping Center which is caused by (i) defects in Landlord's Work, or (ii) the act or omission of Landlord, its employees, agents or contractors.  Landlord's obligations under this Section 9.01 shall be subject to the provisions of Articles XII and XIII.  Landlord shall use commercially reasonable efforts to perform any and all repairs and replacements to be performed under this Lease without material interference with or disruption to the normal conduct of any business operations in the Premises.  Landlord shall give Tenant at least five (5) days prior notice of any repairs or replacements to the Premises (except in the case of an emergency posing imminent risk of material harm to persons or property, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances).  If, in Tenant's reasonable judgment, Landlord's repairs would materially interfere with or disrupt the normal conduct of any business operations in the Premises, then Landlord shall perform such repairs only after the regular hours of operation of the Premises.

SECTION 9.02        Tenant's Obligations.

(a)        Subject to Landlord's obligations under Section 9.01, Tenant shall at all times during the Term, at Tenant's sole expense, keep and maintain in good order, condition and repair and in a safe condition (i) the non-structural, interior elements of the Premises (including painting, window glass, doors and frames, and the heating, ventilation and air conditioning ["HVAC"] units, and the electrical, plumbing, mechanical, and/or alarm systems located in and serving exclusively the Premises), and (ii) any damage to the Premises or the Shopping Center which is caused by the act or omission of Tenant, its employees, agents or contractors.  Tenant's obligations under this Section 9.02 shall also be subject to the provisions of Articles XII and XIII and to Landlord's obligation to clear the Premises of all dirt and debris following completion of Landlord's Work pursuant to Section 5.02.

(b)        If any HVAC units must be replaced or substantially repaired during the last five (5) years of the Term (as such Term may be extended), then in light of the fact that the same will require a substantial expenditure by Tenant and will result in a benefit to Landlord following the expiration of the Term, upon the expiration or earlier termination of this Lease (unless such termination results from Tenant's default of its obligations under this Lease), Landlord shall reimburse Tenant for the unamortized portion of the reasonable expenses incurred by Tenant in connection with the replacement of such equipment during the last five (5) years of the Term, based on (i) the date of the installation of such new equipment, and (ii) the useful life of said equipment provided that Landlord first approved such replacement prior to Tenant's expenditure, which approval shall not be unreasonably withheld, conditioned or delayed and which approval shall be deemed granted if Landlord fails to respond to a request for consent within ten (10) days following receipt of a request therefor from Tenant.  The provisions of this Section 9.02(b) shall survive the expiration or earlier termination of this Lease.

19