SECTION 9.03      Hazardous Materials.

    (a)      Except as disclosed in the Environmental Reports, Landlord represents and warrants that, as of the Effective Date (and as of the Possession Date), to Landlord's knowledge, there are no known Hazardous Materials present in the Shopping Center. The Environmental Reports are defined as (i) that certain Phase I Environmental Site Assessment prepared by AMEC Earth & Environmental, Inc., dated March 8, 2007, and entitled "Phase I Environmental Site Assessment, Family Buick Pontiac GMC, 2117 and 2121 West Main Street, Alhambra, California", (ii) that certain Phase II Environmental Site Assessment prepared by AMEC Earth & Environmental, Inc., dated March 12, 2007, and entitled "Phase II Environmental Site Assessment, Soil Gas Survey and Soil Sampling Program, 2117 and 2121 West Main Street, Alhambra, California 91801", (iii) that certain Letter Report for Los Angeles Regional Water Quality Board, dated May 23, 2007, (iv) that certain Tank Closure Report, dated July 31, 2007, and (v) that certain Asbestos/Lead Survey Report, dated July 26, 2007. Landlord covenants and agrees that if any Hazardous Materials become present at the Shopping Center at any time during the Term, Landlord shall remove or neutralize the same in full compliance with and to the extent required by all Environmental Laws at the sole cost and expense of Landlord (or any other party obligated therefore), and without charge to Tenant (and the cost thereof shall not be included in CAM Costs); provided that such obligation shall not apply with respect to Hazardous Materials introduced by Tenant, its employees, agents or contractors for which Tenant shall be responsible, at Tenant's sole cost and expense. "Hazardous Materials" shall mean (i) any waste, material or substance (whether in the form of a liquid, a solid, or a gas and whether or not air-borne) which is deemed to be a pollutant or a contaminant, or to be hazardous, toxic, ignitable, reactive, infectious, explosive, corrosive, dangerous, harmful or injurious to public health or to the environment, and which is now or hereafter regulated under the authority of any applicable local, state or federal laws, judgments, ordinances, orders, rules, regulations, codes or other governmental restrictions or requirements, any amendments or successor(s) thereto, replacements thereof or publications promulgated pursuant thereto (collectively, "Environmental Regulations", and individually, "Environmental Regulation"); (ii) petroleum; (iii) asbestos and asbestos containing materials which is required to be remediated under Environmental Regulations; (iv) any polychlorinated biphenyl; and (v) any radioactive material. In addition to the foregoing, the term "Environmental Regulations" shall be deemed to include, without limitation, local, state and federal laws, judgments, ordinances, orders, rules, regulations, codes and other governmental restrictions and requirements, any amendments and successors thereto, replacements thereof and publications promulgated pursuant thereto, which deal with or otherwise in any manner relate to, environmental matters of any kind.

    (b)      Landlord and Tenant each agree that neither Landlord nor Tenant shall cause or permit any Hazardous Materials to exist on, or to escape, seep, leak, spill or be discharged, emitted or released from the Shopping Center during the Term in violation of any applicable Environmental Regulation.

    (c)      Landlord hereby indemnifies Tenant and its successors and assigns, and agrees to hold Tenant and its successors and assigns harmless from and against any and all losses, liabilities, damages, injuries, penalties, fines, costs, expenses and claims, including attorneys' fees and costs (collectively, "Environmental Liabilities") paid, incurred or suffered by, or asserted against, Tenant or its successors and assigns with respect to, or as a direct result of (i)

20

the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission or release from the Shopping Center of any Hazardous Materials which were brought into the Shopping Center by Landlord, its agents, employees or their respective predecessors-in-interest, or (ii) a breach by Landlord, its agents, employees or their respective predecessors-in-interest of any Environmental Regulation to which Landlord is subject. The foregoing indemnification shall not apply with respect to consequential, speculative or punitive damages.

(d)      Tenant hereby indemnifies Landlord and its successors and assigns, and agrees to hold Landlord and its successors and assigns harmless from and against any and all Environmental Liabilities paid, incurred or suffered by, or asserted against, Landlord or its successors and assigns with respect to, or as a direct or indirect result of (i) the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission or release from the Premises or the Shopping Center of any Hazardous Materials which was brought into the Premises or the Shopping Center by Tenant, its agents or employees, or (ii) a breach by Tenant, its agents or employees of any Environmental Regulation to which Tenant is subject.

(e)      With respect to Hazardous Materials which are or become present at the Shopping Center as the result of any cause whatsoever (other than Hazardous Materials which were brought into the Premises or the Shopping Center by Tenant, its agents or employees), Landlord shall (at no direct or indirect cost to Tenant, and without including such costs in CAM Costs) in a good, workmanlike and expeditious manner, and in compliance with and to the extent required by Environmental Regulations, perform all work necessary to clean-up, remove and otherwise remediate such Hazardous Materials.   Should the presence of such Hazardous Materials render the Premises Unusable (as defined below) or should Tenant be required to close during the removal or neutralization of such Hazardous Materials by Landlord, Tenant shall notify Landlord and all Rent shall be immediately abated until such time as Tenant can safely resume normal business operations. If such work is not commenced within thirty (30) days after the date (the "Notification Date") that Tenant notifies Landlord of Hazardous Materials rendering the Premises Unusable (or such additional period as may be reasonably required to engage environmental consultants and/or engineers and obtain permits and licenses) or if such work is not completed within ninety (90) days after the Notification Date (or such additional period as may reasonably be required given the nature of the work, provided that Landlord diligently pursues same to completion), then Tenant shall have the right within ninety (90) days of the date that such right to terminate accrued to terminate this Lease. However, Tenant's option to terminate this Lease pursuant to this Section 9.03(e) shall cease (if not exercised prior thereto) at any time the Premises are no longer Unusable or if such notice was not given within such ninety (90) day period. If Tenant shall elect to terminate this Lease, then the Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of Landlord or Tenant, except: (i) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, (ii) Landlord shall (which obligation shall survive the termination of this Lease), within thirty (30) days after receiving a statement from Tenant showing the Unamortized Costs, reimburse Tenant for the Unamortized Cost, and (iii) Tenant reserves all claims against Landlord for damages resulting from a default by Landlord under this Section 9.03.

For the purpose of this Section 9.03(e), "Unusable" means that the Tenant does not have access to at least ninety percent (90%) of the Premises because of the enforcement of any

Environmental Regulation or the remediation of any Hazardous Materials, or because use of the Premises would represent a risk to the health or safety of Tenant, Tenant's employees, agents or invitees.

SECTION 9.04     Surrender of the Premises.   At the expiration or earlier termination of this Lease, Tenant shall surrender the Premises to Landlord in the same condition as it is required to be maintained by Tenant pursuant to Section 9.02 above; excepting, however, reasonable wear and tear, damage by fire or other casualty, and the effects of a Taking (as defined in Section 13.01).

## ARTICLE X

## REQUIREMENTS OF LAW

SECTION 10.01     Landlord's Obligations.   As part of Landlord's Work and throughout the Term, Landlord shall be responsible, at Landlord's sole cost and expense, for complying with all applicable laws, statutes, ordinances and regulations of federal, state, county and municipal authorities (collectively, "Laws") affecting the Shopping Center including, without limitation, the Premises, except as specifically provided in Section 10.02.

SECTION 10.02     Tenant's Obligations.   Throughout the Term, Tenant shall be responsible, at Tenant's sole cost and expense, for complying with all Laws affecting the Premises and pertaining either to (i) Tenant's specific use and occupancy thereof and/or (ii) the interior elements of the Premises which are neither structural nor comprise the major building systems serving the Premises.

SECTION 10.03     Right to Contest.   The party responsible for compliance pursuant to Section 10.01 or 10.02 shall have the right to contest the validity of any Law at the expense of the party responsible for compliance, unless such contest would result in any criminal liability imposed upon the other party or subject such other party to any fine or penalty.

## ARTICLE XI

## INSURANCE

SECTION 11.01     Landlord's Insurance.

(a)     Landlord shall maintain or cause to be maintained in full force and effect from and after the Effective Date and throughout the Term:

(i)     Commercial general liability insurance with regard to the Common Areas protecting and insuring Landlord, naming Tenant as "additional insured-lessee" for claims arising out of the use or occupancy of the Common Areas and the obligations assumed by Landlord under this Lease, and having a combined single limit of liability of not less than Five Million Dollars ($5,000,000) for bodily injury, death and property damage liability, plus Excess Coverage of not less than Five Million Dollars ($5,000,000);

22

(ii)    Special Form (formerly known as "All-Risk") property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of the buildings (including the Premises), all leasehold improvements constructed by Tenant (whether as a part of its initial Tenant's Work or thereafter, but exclusive of Tenant's movable trade fixtures) and other insurable improvements in the Shopping Center, (exclusive of excavation, footings and foundations) including, without limitation, the Common Areas. The foregoing notwithstanding, with respect to any alterations or other leasehold improvements not set forth in the initial plans and specifications for the Tenant's Work, Tenant shall endeavor to provide Landlord with as-built plans reflecting such improvements, together with a statement of value, within ninety (90) days following substantial completion thereof, and Landlord shall not be required to insure such additional leasehold improvements under its All-Risk policy unless and until such information is furnished.

(iii)    Rent loss or business interruption insurance in an amount not to exceed the greater of (A) estimated gross revenues from the operations of the Shopping Center over six (6) months or (B) the projected operating expenses (including stabilized management fees, applicable reserve deposits, and debt service) for the maintenance and operation of the Shopping Center over six (6) months. The perils covered by this insurance shall be the same as those accepted on Landlord's All-Risk policy.

(b)    Landlord may carry any of its insurance under "blanket policies" covering the Shopping Center and other properties it or any Affiliate of Landlord owns, provided that: (i) the total amount of the insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article XI. All policies required to be maintained by Landlord pursuant to this Section 11.01 shall provide that any proceeds thereof shall be deposited with the Mortgagee, or if none, to Landlord, in either event to be held in trust by such party and disbursed only in accordance with the provisions of, and for the purposes set forth in, Article XII.

(c)    Landlord shall be permitted to maintain a commercially reasonable deductible as a part of any insurance policy carried by it in compliance with this Section 11.01.

SECTION 11.02    Tenant's Insurance.

(a)    Tenant shall maintain in full force and effect throughout the Term:

(i)    Commercial general liability insurance (which insurance shall be primary) protecting and insuring Tenant, naming Landlord as "additional insured-lessor" for claims arising out of the use or occupancy of the Premises by Tenant and having a combined single limit of liability of not less than Five Million Dollars ($5,000,000) for bodily injury, death and property damage liability, plus Excess Coverage of Five Million Dollars ($5,000,000); and

(ii)    Special Form (formerly known as "All-Risk") property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of the Tenant's moveable trade fixtures, inventory and other items of personal property.

23

Upon Landlord's request, Tenant shall also name the Mortgagee as an additional insured, as its interest may appear, on the insurance policy described in Section 11.02(a)(i).

(b)     Tenant may carry any of its insurance under "umbrella policies" and/or "blanket policies" covering the Premises and other locations it or any Affiliate of Tenant owns or leases, provided that: (i) the total amount of the insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article XI.

(c)     All insurance required to be maintained under this Section 11.02 may be provided under a plan of self-insurance provided that Tenant maintains, during the period of such self-insurance, a tangible net worth of at least Two Hundred Million Dollars ($200,000,000). To the extent any deductible is maintained as a part of any insurance policy carried by Tenant in compliance with this Section 11.02, Tenant shall be deemed to be covering the amount of that deductible under an informal plan of self-insurance.

SECTION 11.03     Insurance Requirements Generally.

(a)     All insurance required to be maintained by Landlord and Tenant under this Lease shall be maintained with insurance companies qualified to do business in the State, and rated at least A-/VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published). Each party shall use its diligent efforts to have its insurers provide thirty (30) days (ten (10) days in the event of non-payment of premium) prior notice to the other party of cancellation or non-renewal of any policy required hereunder. Each party shall provide to the other duly executed certificates evidencing the insurance coverage described in Sections 11.01 and 11.02 above, respectively.

(b)     The liability insurance requirements under Sections 11.01(a)(i) and 11.02(a)(i) shall be reviewed by Landlord and Tenant every five (5) years for the purpose of mutually increasing (in consultation with their respective insurance advisors) the minimum limits of such insurance to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards. The replacement value of the buildings and other insurable improvements constituting the Shopping Center shall be re-evaluated from time to time at the request of either Landlord or Tenant.

SECTION 11.04     Landlord's Insurance Cost.

(a)     The insurance premiums attributable to the policies required to be maintained by Landlord pursuant to Section 11.01(a)(i) and (ii) shall be included as part of CAM Costs. If Landlord carries blanket insurance covering the Shopping Center together with other property owned by Landlord, then Landlord shall obtain evidence reasonably satisfactory to Tenant of the cost of such insurance allocable to the Shopping Center and the amount so allocable shall be included in CAM Costs for the purposes of determining Tenant's Share of any insurance premium included in CAM Costs.

(b)     If the rates for any insurance Landlord is required to carry are increased as a result of the use or other activity of any other occupant of the Shopping Center, then the

24

amount of such increase shall be excluded from CAM Costs. To the extent that Landlord receives a dividend, credit, rebate or other return of a premium which had previously been included in CAM Costs, Landlord shall promptly refund to Tenant Tenant's Share of such dividend, credit, rebate, or return.

(c)    The provisions of this Section 11.04 shall survive the expiration or earlier termination of this Lease.

SECTION 11.05    Indemnity.

(a)    Except as otherwise provided in Section 11.06, Tenant covenants to defend and indemnify Landlord and hold Landlord harmless from and against any and all claims, actions, damages, liabilities and expenses, including reasonable attorneys' fees, (i) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises, or any part thereof, or (ii) occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Landlord, its agents, contractors, licensees, employees, or other tenants and occupants, or for which any of said parties may be statutorily liable.

(b)    Except as otherwise provided in Section 11.06, Landlord covenants to defend and indemnify Tenant and hold Tenant harmless from and against any and all claims, actions, damages, liabilities and expenses, including reasonable attorneys' fees, (i) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon any portion(s) of the Shopping Center (excluding the Premises), or (ii) occasioned wholly or in part by any act or omission of Landlord, its agents, contractors, employees, or servants, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Tenant, its agents, contractors, licensees or employees, or for which any of said parties may be statutorily liable.

SECTION 11.06    Mutual Waiver of Subrogation.

(a)    Landlord and Tenant, on their own behalf and on behalf of anyone claiming under or through either one by way of subrogation, hereby release and waive all rights of recovery and causes of action against each other and their respective Affiliates arising from any and all liability for any loss or damage to property or resulting from damage to such property (and, in either case, any resulting loss of business or rental income), whether caused by the negligence or fault of the other party, which is normally insured under Special Form property insurance (formerly known as "All-Risk") and time element insurance required to be maintained hereunder or under any other property or time element insurance maintained by either party. If either Landlord or Tenant is a self-insurer or maintains a deductible (as either may be permitted under this Lease), then the self-insuring party or the party maintaining the deductible hereby releases the other party from any liability arising from any event which would have been covered had the required insurance been obtained and/or the deductible not been maintained.

(b)    Landlord and Tenant shall cause each property insurance policy carried by either of them insuring the Premises, the contents thereof, or the Shopping Center, to provide that

the insurer waives all rights of recovery by way of subrogation or otherwise against the other party hereto (and all of such other party's Affiliates) in connection with any loss or damage which is covered by such policy or that such policy shall otherwise permit, and shall not be voided by the releases provided above.

SECTION 11.07    Affiliate. "Affiliate" shall mean a corporation, partnership, person or other entity which is controlling, controlled by, or under common control with, Landlord or Tenant, as the case may be.  As used in the definition of Affiliate, "control" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise.

## ARTICLE XII

## DAMAGE OR DESTRUCTION

SECTION 12.01    Landlord's Obligation to Rebuild.

(a)    If all or any part of the Shopping Center (including, without limitation, the Premises) is damaged or destroyed by fire, the elements or other casualty, then Landlord shall promptly repair all damage and restore the Shopping Center, the Premises and Tenant's leasehold improvements, to its condition immediately prior to such damage or destruction. As noted in Section 11.01(a)(ii) above, with respect to any alterations or other leasehold improvements not set forth in the initial plans and specifications for the Tenant's Work, Tenant shall endeavor to provide Landlord with as-built plans reflecting such improvements, together with a statement of value, within ninety (90) days following substantial completion thereof, and Landlord shall not be required to insure such additional leasehold improvements under its All-Risk policy or restore such additional leasehold improvements unless and until such information is furnished. Without limiting Landlord's obligations under this Article XII, the proceeds of the policies required to be obtained and maintained by Landlord pursuant to Section 11.01 shall, to the extent necessary, be used for the performance of such rebuilding and restoration work. In the event such insurance proceeds are insufficient to complete such work, Landlord shall provide the balance of the amount necessary to rebuild or restore the Shopping Center and Premises in the manner provided herein. Landlord shall give Tenant at least sixty (60) days' prior notice of the date on which the restoration work to the Premises will be substantially completed; provided that if any restoration is expected to take less than sixty (60) days to complete, then Landlord shall provide Tenant with such notice as may be practicable under the circumstances. Notwithstanding anything contained in this Section 12.01(a) to the contrary, Landlord may elect not to restore any buildings on any of the outparcels shown on the Site Plan that may be damaged by fire or other casualty; however, if Landlord makes such election, Landlord shall promptly thereafter raze the remaining portions of any such buildings not to be rebuilt, remove all debris resulting therefrom and grade and pave such areas for parking or grade and landscape such areas in a sightly manner.

(b)    Notwithstanding the foregoing, if any portion of the Premises are so damaged or destroyed, Tenant shall have the right to require Landlord to make changes to the Premises in the course of, and as part of, such rebuilding or restoration work. If the net cost and

expense of such rebuilding or restoration work is increased solely as a result of such changes (taking into consideration any and all actual reduced and additional costs resulting from such changes and/or other cost savings arising therefrom), then Tenant shall pay to Landlord, as Additional Rent, the amount of such net increase, which amount shall be due and payable within thirty (30) days after Landlord has delivered to Tenant backup information evidencing such increase (including, without limitation, receipted invoices) as may be reasonably required by Tenant (but in no event earlier than the occurrence of the date on which possession of the restored areas of the Premises are delivered to Tenant). To the extent that Landlord's substantial completion of such rebuilding or restoration work is delayed solely as a result of such changes (taking into consideration any and all reasonable time savings to Landlord resulting from such changes), then the applicable period(s) specified in Section 12.02 below shall be appropriately adjusted to the extent of such net delay.

(c)     The provisions of this Section 12.01 shall not apply if Landlord or Tenant terminates this Lease pursuant to provision this Article XII.

SECTION 12.02     Tenant's Restoration Obligations; Rent Abatement.

(a)     If all or any part of the Premises is damaged or destroyed by fire, the elements or other casualty, then from and after the date that Landlord has completed its restoration work under Section 12.01 hereof, Tenant shall promptly proceed to install its trade fixtures. Without limiting Tenant's obligations under this Article XII, the proceeds of the policies required to be obtained and maintained by Tenant pursuant to Section 11.02 shall, to the extent necessary, be used for the performance of such rebuilding and restoration work. The provisions of this Section 12.02 shall not apply if Landlord or Tenant terminates this Lease pursuant to provision this Article XII.

(b)     If, in Tenant's reasonable judgment, any damage to the Premises renders all or any portion of the Premises unusable for the conduct of Tenant's business or, in the case of damage to any other portion of Shopping Center, materially interferes with the normal conduct of any business operations in the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business.

SECTION 12.03     Termination.

(a)     Either Landlord or Tenant shall have the right to terminate this Lease:

(i)     if all or any part of the Premises (in the case of Tenant) or the Shopping Center (in the case of Landlord) is damaged or destroyed by fire, the elements or other casualty during the last three (3) years of the Term, and the restoration period is reasonably estimated by a licensed architect and engineer to be in excess of two hundred forty (240) days,

(ii)     if all or any part of the Premises (in the case of Tenant) is damaged or destroyed by fire, the elements or other casualty during the last two (2) years of the Term, or

(iii)     if all or any part of the Shopping Center other than the outparcels shown on the Site Plan or the Premises are damaged or destroyed by fire, the elements or other

27

casualty at any time during the Term and such damage or destruction is not covered under the insurance policy(ies) required to be maintained by Landlord under Sections 11.01(a)(ii) or 11.01(b) and, in the case of the Shopping Center, the cost of repairing and restoring such portion of the Shopping Center exceeds fifty percent (50%) of the estimated replacement costs of such portion of the Shopping Center or, in the case of the Premises, the cost of repairing and restoring the Premises exceeds ten percent (10%) of the estimated replacement costs of the Premises.

Either Landlord or Tenant shall notify the other of its exercise of such option within forty-five (45) days following the occurrence of such casualty. The foregoing notwithstanding, if Landlord exercises the termination right provided in (i) or (ii) above, Tenant may render the same void, *ab initio,* by exercising any renewal option it may have within sixty (60) days following receipt of Landlord's termination notice, or

(b)     If (i) Landlord fails to commence in good faith Landlord's repair and restoration obligations within ninety (90) days after any damage or destruction (with "commence" being defined as Landlord applying for and diligently pursuing all necessary permits and inspections), or (ii) Landlord fails to timely complete such repair and restoration within two hundred forty (240) days after the date Landlord obtains all necessary permits to repair and restore such damage or destruction, then Tenant shall have the option, upon notice to Landlord (y) to complete the repair and restoration to the Premises and (1) to receive reimbursement therefor in full from Landlord on demand and/or (2) to offset the cost and expense thereof against the payment of Rent and, at Tenant's option, to extend the Term until such time as Tenant, through such offsets, has recouped the entire cost and expense to Tenant of such repair and restoration, or (z) terminate this Lease effective as of the date of such damage or destruction. The time periods referenced in this Section 12.03(b) shall be subject to Force Majeure, but in no event shall the aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed a period of ninety (90) days.

(c)     If this Lease is terminated, then this Lease shall terminate on the date set forth in Landlord's or Tenant's notice of termination without further liability on the part of either Landlord or Tenant, except for those obligations which expressly survive the expiration or other termination of this Lease.

## ARTICLE XIII

## CONDEMNATION

SECTION 13.01     Taking.

(a)     In the event of condemnation by eminent domain or similar law, including a sale in lieu thereof to an authority or other entity having the power of eminent domain (a "Taking"), of all or any portion of the Shopping Center, which (i) results in a Taking of (x) any part of the Premises, (y) more than ten percent (10%) of the Common Areas, or (z) more than five percent (5%) of the parking spaces in either Tenant's Preferred Area or more than ten percent (10%) of the parking spaces in the Shopping Center and the parking ratio decreases below a ratio of 4.00 per 1,000 square feet, (ii) materially and adversely affects ingress or egress to the Premises or the Shopping Center, or (iii) materially prohibits or inhibits Tenant's use of

the Premises for a period in excess of sixty (60) days, then Tenant may terminate this Lease by giving notice to Landlord not more than ninety (90) days after the later of the date on which possession or title vests in the condemning authority or the date Tenant receives notice of said possession or vesting.

(b)    In the event of a Taking of all of the Premises, this Lease shall terminate as of the date of vesting of title or transfer of the Premises, whichever is earlier, without further liability on the part of either Landlord or Tenant, except for those obligations which expressly survive the expiration or other termination of this Lease.

(c)    In the event of a Taking of the Premises, the Common Areas and/or any other area within the Shopping Center, or any portion thereof, for temporary use (specifically one not exceeding sixty (60) days in duration), without the taking of the fee simple title thereto, this Lease shall remain in full force and effect. All awards, damages, compensation and proceeds payable by the condemnor by reason of such Taking relating to the Premises, or relating to the Common Areas but reasonably attributable to the Premises, for periods prior to the expiration of the Lease shall be payable to Tenant. All such awards, damages, compensation and proceeds for periods after the expiration of the Lease shall be payable to Landlord. Anything contained to the contrary notwithstanding, a temporary Taking for any period in excess of sixty (60) days may, at Tenant's option, be deemed a permanent Taking and shall be governed by Section 13.01 (a) or (b), as applicable.

SECTION 13.02    Restoration and Rent Adjustment. In the event of a Taking, if this Lease is not terminated by Tenant pursuant to Section 13.01, then (a) using the award or compensation received by Landlord as a result of such Taking, Landlord shall promptly restore the Shopping Center as nearly as practicable to a complete unit of like quality and character as existed prior to the Taking, which restoration shall, as applicable, include all of Tenant's Work and all other leasehold improvements performed by Tenant, but shall not include Tenant's Property, and (b) if a portion of the Premises is Taken, then from and after the date on which title vests in the condemning authority, the Rent shall be equitably reduced in proportion to the area of the Premises subject to the Taking. If Landlord determines that the award or compensation received by Landlord as a result of such Taking is not sufficient to allow Landlord to restore the Shopping Center as provided herein, Landlord shall notify Tenant of such determination, and Landlord and Tenant shall attempt to mutually agree upon a plan for restoration of the Shopping Center given the amount of the award or compensation received by Landlord as a result of such Taking. If Landlord and Tenant are unable to mutually agree upon a plan for restoration of the Shopping Center within thirty (30) days, either party shall have the right to terminate this Lease by giving written notice to the other. If either party elects to terminate this Lease, this Lease shall terminate on the date set forth in such party's notice of termination without further liability on the part of either Landlord or Tenant, except for those obligations that expressly survive the expiration or other termination of this Lease. Notwithstanding the foregoing, if Tenant elects to terminate this Lease, Landlord shall have the option of nullifying Tenant's election to terminate this Lease if, within five (5) business days after receipt of Tenant's notice of its election to terminate this Lease, Landlord notifies Tenant that Landlord will fund any shortfall necessary to restore the Shopping Center as provided herein.

29

SECTION 13.03      Award. In the event of any Taking, Tenant shall be entitled to an amount of the award or compensation paid for such Taking equal to the Unamortized Costs, if any, and the balance shall belong to Landlord. Tenant shall also have the right to claim and recover from the condemning authority such compensation as may be separately awarded or recoverable by Tenant on account of any and all damage to Tenant's business by reason of the condemnation and for or on account of any cost or loss to which Tenant might be put in moving Tenant's Property, or for any other damages compensable separately to Tenant; provided, however, that no such award shall reduce the award payable to Landlord. The provisions of this Section 13.03 shall be subject to the provisions of Section 13.01(c) with respect to a temporary Taking.

## ARTICLE XIV

## ALTERATIONS AND MECHANICS' LIENS

SECTION 14.01      Tenant's Alteration Rights.

(a)      Tenant shall not perform any structural or exterior alterations or improvements to the Premises (except to the extent same pertain to Tenant's Work) without the prior approval of Landlord. The foregoing notwithstanding, Tenant shall be permitted to make alterations to its storefront to conform the same to Tenant's then-current prototypical elevations with Landlord's prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed and which consent shall be deemed granted if Landlord fails to respond to a request for consent within ten (10) days following receipt of a request therefor from Tenant). The provisions of this Section 14.01(a) shall not apply to Tenant's building signage, which shall be governed by the applicable provisions of Article XV.

(b)      Tenant may, from time to time, without the prior approval of Landlord, make non-structural interior alterations and improvements to the Premises as Tenant deems necessary or desirable including, but not limited to, the electrical systems, the HVAC and other mechanical systems, installation of fixtures and equipment, painting, and wall and floor coverings, provided that Landlord's consent shall be required for any alterations to the Building's main switch gear and primary electric service.

(c)      Prior to making any alterations, whether or not Landlord's consent is required, Tenant shall endeavor to provide Landlord with not less than ten (10) days' prior written notice, and Landlord shall have the right to post the Premises with a notice of non-liability of Landlord in accordance with California Mechanics' Lien laws; provided, however, that Tenant shall not be deemed in default hereunder in the event that it fails to provide Landlord with such advance notice. Tenant shall insure that such notices remain continuously posted in a conspicuous place or places in the Premises throughout the period of such alteration.

(d)      Tenant shall have the right to erect and maintain an antenna, a satellite dish and/or related equipment on the roof of the Premises for Tenant's direct business use only in a location approved by Landlord, provided that Tenant: (i) uses a contractor approved by Landlord for all roof penetrations so as not to violate or invalidate any roof warranties maintained by Landlord, (ii) repairs any damage to the roof caused by the making of the roof

30

penetrations, and (iii) erects and maintains such equipment in accordance with Laws and so as not to violate or invalidate any roof warranties maintained by Landlord.

(e)     Landlord shall reasonably cooperate with Tenant in the permitting process, at no cost or expense to Landlord.

(f)     Landlord shall not make any alterations to the Premises (including, without limitation, changing the design, color or materials of the exterior of the Premises) nor shall Landlord construct an additional floor or floors above or below the Premises. Landlord shall neither make nor permit to be made any alterations to the exterior architectural theme of the remainder of the Shopping Center which would be inconsistent with a first-class shopping center in the State (exclusive of other National Tenants' or Regional Tenants' entrance features), without the prior consent of Tenant.

(g)     With respect to alterations and other leasehold improvements implemented following completion of the Tenant's Work, Tenant shall endeavor to provide Landlord with as-built plans reflecting the same, together with a statement of value, within ninety (90) days following substantial completion thereof.

SECTION 14.02     Mechanics' Liens.   Tenant covenants that Tenant shall promptly discharge of record (by payment, bond, order of a court of competent jurisdiction or otherwise) any mechanic's lien filed against the Premises or all or any part of the Shopping Center for any work, labor, services or materials claimed to have been performed at, or furnished to, the Premises or the Shopping Center, for or on behalf of Tenant, or at the insistence of Tenant, or anyone acting for, through or under Tenant. If Tenant shall fail to cause any such lien to be bonded off the Premises and/or the Shopping Center within thirty (30) days and discharged within thirty (30) days after Landlord shall demand that Tenant remove same, then, Landlord may discharge the same by paying the amount claimed to be due, by bonding or by any other proceeding deemed appropriate by Landlord and the amount so paid by Landlord and/or all costs and expenses including reasonable attorneys' fees incurred by Landlord in procuring the discharge of such lien shall be reimbursed by Tenant upon demand. Nothing contained in this Lease shall be construed as a consent on the part of the Landlord to subject Landlord's estate in the Premises to any lien or liability under any law relating to liens.

## ARTICLE XV

## SIGNS

SECTION 15.01     Tenant's Signs.   Tenant shall have the exclusive right during the Term (except as otherwise set forth in the Sign Program) to erect, maintain, and replace on the storefront and exterior walls of the Premises, and on the side walls of any entrance design element, if any, signs (including, without limitation, under-canopy or blade signs), temporary banners placed on the storefront of the Premises and such other walls of the Premises as selected by Tenant) of such size, design and color as Tenant, from time to time, may desire, subject to compliance with Laws and the requirements of the sign program for the Shopping Center, a copy of which is attached hereto as Exhibit N-1 (the "Sign Program"). The Tenant may erect and maintain in the interior of the Premises any signs it may desire.

31

SECTION 15.02        Monument Sign.    Subject to Landlord obtaining all governmental approvals therefor, Landlord shall provide one (1) monument at the location shown on the Site Plan.  Landlord, as part of Landlord's Work, shall obtain all governmental approvals and permits for such monument.    In the event such monument includes the identification of any of the occupants of the Shopping Center (provided that there shall be no such obligation to do so), then Landlord shall obtain the approvals and permits for Tenant's sign panels on such monument.  If applicable, Tenant's sign panels shall be procured and installed at Tenant's cost, and in such case, Tenant's sign panels shall be at least as large as the sign panels of any other occupant of the Shopping Center.  A rendering of such monument showing the dimensions of the monument is attached to this Lease as Exhibit N.  Exhibit N shows the size and location of the positions where sign panels for the occupants of the Shopping Center will be displayed on such monument sign.  Landlord acknowledges and agrees that Tenant's sign panel shall be displayed in the top sign panel position closest to Main Street.  In addition, if Landlord makes available to any other tenant in the Shopping Center any other signage located in the Common Areas, then such signage shall also include Tenant's identification sign which shall be higher than and at least as large as the largest sign made available to such other tenant or tenants whose premises are equal to or smaller than the Premises.  Landlord shall not change or alter any monument bearing Tenant's sign panel(s) without obtaining Tenant's prior consent.  The cost of maintaining the monument (but not the cost of individual tenants' signs thereon or the cost of construction of the monument) and the cost of any electricity used to illuminate it, shall be includable in CAM Costs.

SECTION 15.03        Replacement.    Tenant and its subtenants shall be entitled, without Landlord's consent but subject to complying with Laws and the Sign Program, to replace all of its signs with signage consistent with Tenant's and/or its subtenant's then-current prototypical sign plans.  Any signage which is not consistent with such prototypical sign plans shall be subject to Landlord's approval.

## ARTICLE XVI

## TENANT'S PROPERTY

SECTION 16.01        Tenant's Property.    All of Tenant's movable trade fixtures, ornate light fixtures, equipment, furniture, inventory and other property owned by Tenant and located at, on or in the Premises including, without limitation, computer display and storage area showcases, partitions, mezzanine, shelving, wall cases and signs (collectively, "Tenant's Property") shall remain the property of Tenant, exempt from the claims of Landlord or any Mortgagee or Ground Lessor, without regard to the means by which or the persons by whom Tenant's Property is installed or attached.  Provided Tenant is not then in default of any of its obligations under this Lease, Tenant shall have the right at any time and from time to time to remove Tenant's Property, provided that if removal of any of Tenant's Property damages any part of the Premises, Tenant shall repair such damage.

## ARTICLE XVII

## ASSIGNMENT AND SUBLETTING

SECTION 17.01    <u>Assignment and Subletting Rights</u>.

(a)    Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet, concession or license all or any portion of the Premises, subject to all of the terms and conditions of this Lease. Unless otherwise agreed to in writing by Landlord, no assignment, subletting, licensing or concessioning by Tenant shall reduce the liability of Tenant under this Lease to the extent that such liability is not increased as a result of any amendment or modification to this Lease between Landlord and any assignee. However, in the event of an assignment by Tenant to an assignee (i) that has an Adequate Net Worth (as defined below), or to an assignee whose obligations under this Lease are unconditionally guaranteed by a guarantor that has an Adequate Net Worth, and (ii) that operates at least thirty-five (35) first-class retail stores under the same trade name and concept as the Premises will be operated following such assignment and/or that has at least five (5) years of experience operating first-class retail stores under the same trade name and concept as the Premises will be operated, then all liability of the assigning Tenant under this Lease accruing from and after the effective date of such assignment shall terminate. "<u>Adequate Net Worth</u>" shall mean a tangible net worth, determined in accordance with generally accepted accounting principles, as of the effective date of such assignment, of at least One Hundred Fifty Million Dollars ($150,000,000), excluding all contingent liabilities.

(b)    Except with respect to any transaction covered under Sections 17.01(c) or 17.02, if Tenant proposes to assign this Lease or sublet all or any portion of the Premises, it shall first give notice thereof (the "<u>Assignment/Subletting Notice</u>") to Landlord, which notice shall specify the name and address of the proposed assignee or sublessee and the proposed use of the Premises or the applicable portion thereof to be made by such assignee or sublessee, together with a statement certified by Tenant of the amount of the Unamortized Costs. Landlord shall have the right to terminate this Lease or, in the event only a portion of the Premises is to be sublet, to terminate this Lease only as to the portion of the Premises to be sublet, as the case may be, by giving notice to Tenant (the "<u>Termination Notice</u>") thereof within sixty (60) days after receipt of an Assignment/Subletting Notice from Tenant. If Landlord elects to terminate this Lease or to terminate this Lease as to the portion of the Premises to be sublet, as the case may be, then the Lease shall automatically terminate in whole or in part, as the case may be, on the ninetieth (90th) day (the "<u>Termination Date</u>") after the date on which Tenant receives Landlord's Termination Notice without further liability on the part of either Landlord or Tenant, <u>except</u>: (i) for those obligations which expressly survive the expiration or other termination of this Lease, and (ii) Landlord shall (which obligation shall survive the termination of this Lease), within thirty (30) days after receiving a statement from Tenant showing the Unamortized Costs, reimburse Tenant for the Unamortized Costs or, in the event this Lease is terminated only as to the portion of the Premises to be sublet, a pro rata share of the Unamortized Costs. If Landlord fails to pay to Tenant the Unamortized Costs or the applicable pro rata portion thereof, as the case may be, within the thirty (30) day period provided for above and such failure to pay continues through the Termination Date, then Tenant shall have the option of (y) treating this Lease as being terminated, in whole or in part, as the case may be, in which case Landlord's

obligation to pay to Tenant the Unamortized Costs or the applicable pro rata portion thereof, as the case may be, shall expressly survive the termination of this Lease, or (z) treating Landlord's Termination Notice as being null and void, in which event Landlord shall be deemed to have waived Landlord's right to terminate under this Section 17.01(b) and Tenant shall be free to assign this Lease or sublet all or any portion of the Premises, as the case may be, in accordance with the Assignment/Subletting Notice. If Landlord does not give the Termination Notice within the aforesaid sixty (60) day period, then Landlord shall conclusively be deemed to have waived its termination rights under this Section 17.01(b) with respect to such proposed assignment or subletting transaction, and Tenant may assign this Lease or sublet all or any portion of the Premises, as the case may be, in accordance with its Assignment/Subletting Notice. In the event this Lease is only partially terminated in accordance with this Section 17.01(b), Landlord and Tenant shall execute an amendment to this Lease, in a form mutually acceptable to both parties, to adequately reflect and account for the reduction in the size of the Premises.

(c)     In addition to, and not in limitation of, Tenant's other rights set forth in this Article XVII, Tenant shall have the right from time to time, without the consent of Landlord and without triggering Landlord's termination right under Section 17.01(b), to assign Tenant's interest in this Lease and/or to sublet or license all or any portion of the Premises: (i) to an Affiliate of Tenant; (ii) to any entity which purchases all or substantially all of the assets of Tenant or any of its Affiliates; (iii) to any entity which purchases Tenant's interest in the majority of stores owned or operated by Tenant or its Affiliate(s) in the State of California; (iv) in conjunction with any merger, acquisition, consolidation or public offering of stock or other interests involving Tenant or its Affiliate(s); and/or (v) as may be required by any Laws.

SECTION 17.02     Collateral Assignment. In addition to Tenant's other rights set forth in this Article XVII, a collateral assignment of Tenant's interest in this Lease by Tenant to one (1) or more Lenders (hereinafter defined), as collateral security for an indebtedness or other obligation of Tenant or its Affiliates shall be permitted and Landlord shall execute all documentation reasonably requested by Tenant or any such Lender in connection therewith. In addition, Tenant shall have the right, without Landlord's consent, to grant to an Affiliate of Tenant a license to operate all of Tenant's business operations at the Premises. "Lender" shall mean a state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender.

SECTION 17.03     Cure Rights of Original Tenant. If Tenant assigns Tenant's interest in this Lease and the assignor remains liable under this Lease following such assignment, then Landlord, when giving notice to said assignee or any future assignee in respect of any default, shall also give a copy of such notice to the Tenant originally named in this Lease or its Affiliate (collectively, the "Original Tenant"), and no notice of default shall be effective until a copy thereof is so given to Original Tenant at the last address for such Original Tenant as is set forth in Landlord's files. Original Tenant shall have the right (but not the obligation) to cure such default within the same cure period applicable to Tenant.

SECTION 17.04     Recognition Agreement. If Tenant subleases all or any portion of the Premises for a term of at least five (5) years, then, notwithstanding any other provisions of this Lease, Landlord shall, upon Tenant's request, execute and deliver an agreement among Landlord, Tenant and each such subtenant in the form of Exhibit I, in

34

recordable form (the "Recognition Agreement"), modified to reflect the provisions set forth below, other than any conditions which are fully satisfied upon execution of such agreement. However, Landlord shall not be obligated to enter into the Recognition Agreement unless the following conditions are satisfied:

       (i)     the net worth of the subtenant (or any guarantor of the subtenant's obligations under the sublease) shall be at least Fifty Million Dollars ($50,000,000.00) or the subtenant (or its parent) is a National Tenant or Regional Tenant;

       (ii)    Tenant agrees not to subdivide the Premises into more than two (2) stores;

       (iii)   the subtenant will be occupying 10,000 square feet of Floor Area or more within the Premises and the portion of the Premises not being sublet shall be in a configuration that would make same commercially leasable for retail purposes;

       (iv)   Landlord shall not be bound by any base or minimum rent or other payment payable in monthly installments which the subtenant might have paid for more than the current month to any third party (unless same was paid to Landlord);

       (v)    Landlord shall not be liable for the return of any security deposits (unless delivered to Landlord);

       (vi)   the sublease shall be expressly subject to the terms and conditions of this Lease and shall obligate the subtenant, or will obligate the subtenant upon implementation of the Recognition Agreement, to pay at least the same Annual Minimum Rent, on a square foot basis, as is payable under this Lease;

       (vii)   the sublease is, or upon implementation of the Recognition Agreement will be, on terms and conditions which are no more onerous to the sublessor thereunder than those pertaining to Landlord under this Lease and are no more beneficial to the subtenant than those pertaining to Tenant under this Lease;

       (viii)  the Tenant hereunder shall not be released from any liability under this Lease as a result of the execution of a Recognition Agreement;

       (ix)   Following the occurrence of any default hereunder which is not cured within any applicable notice and cure period provided for herein, Landlord may require the subtenant to pay all rent and additional rent due under the sublease agreement directly to Landlord, provided that once Landlord recovers all amounts due and owing under this Lease, it shall promptly remit all excess rentals to Tenant;

       (x)    The subtenant's self-help rights shall be limited to conditions pertaining to the Premises or Tenant's Preferred Area;

       (xi)   Following any termination of this Lease, the subtenant will not be permitted to exercise a termination right on account of any uncured default by Landlord;

(xii)    Landlord shall have the right to recapture the sublet premises pursuant to the provisions of Section 8.02(b) hereof if the subtenant ceases operating a business from the sublet premises for 270 consecutive days (excluding closures attributable to any Excused Periods) and, in such event, Landlord shall not be required to reimburse Tenant for any Unamortized Costs with respect to the subleased premises;

(xiii)    Upon termination of this Lease, the recognized sublease will automatically become a direct lease between Landlord and the subtenant, on the terms of the sublease, as modified by the Recognition Agreement;

(xiv)    In the event of a voluntary bankruptcy filing by Tenant, or an involuntary filing against Tenant that is not dismissed within ninety (90) days, this Lease shall be deemed to be reformed so that it only applies to the balance of the Premises that is not subject to the sublease, and the sublease will automatically become a direct lease between Landlord and the subtenant, on the terms of the sublease, as modified by the Recognition Agreement.

Tenant and/or the applicable subtenant shall be responsible for (i) providing Landlord with evidence that the foregoing conditions have been satisfied in connection with any sublease which contemplates execution of a Recognition Agreement and (ii) reimbursing Landlord for the reasonable third party fees payable to Landlord's counsel in connection therewith in an amount not to exceed $500.00.

## ARTICLE XVIII

### DEFAULT

SECTION 18.01    Tenant's Default.

(a)    If Tenant defaults in the payment of any installment of Rent and such default is not cured within ten (10) days after receipt of notice from Landlord thereof or if Tenant defaults in the observance of any other material covenant or agreement herein contained and Tenant shall not, within thirty (30) days after receipt of notice thereof from Landlord, cure or commence to cure such default (it being intended in connection with a default not susceptible of being cured with due diligence within said thirty (30) day period that the time allowed Tenant within which to cure same shall be extended for such period as may be necessary to complete same with all due diligence), then Landlord may, by giving notice to Tenant at any time thereafter during the continuance of such default:

(i)    terminate this Lease, without any right by Tenant to reinstate its rights by payment of Rent or other performance of the terms and conditions hereof and upon such termination Tenant shall immediately surrender possession of the Premises to Landlord, and Landlord shall immediately become entitled to receive from Tenant, as liquidated, agreed final damages, an amount equal to the difference between the aggregate of all rentals reserved under this Lease for the balance of the Term, and the fair rental value of the Premises for that period (both discounted to present value at an annual interest rate equal to eight percent (8%)) determined as of the date of such termination; or

36

(ii)    with or without terminating this Lease, as Landlord may elect, re-enter and repossess the Premises, or any part thereof, and lease them to any third-party upon commercially reasonable terms and conditions, for a term within or beyond the Term; provided, however, that any such reletting prior to termination shall be for the account of Tenant, and Tenant shall remain liable for (y) Annual Minimum Rent, Tenant's Share of CAM Costs, Tenant's Share of Taxes, and other sums which would be payable hereunder by Tenant in the absence of such expiration, termination or repossession, less (z) the net proceeds, if any, of any reletting effected for the account of Tenant after deducting from such proceeds all of Landlord's reasonable expenses (which expenses shall be amortized over the term of the new tenant's lease and only the portion thereof allocable to the balance of the Term shall be so deducted by Landlord hereunder) in connection with such reletting (including, without limitation, all repossession costs, reasonable brokerage commissions, reasonable attorneys' fees and expenses, reasonable alteration costs and expenses of preparation for such reletting).

(b)    If the Premises is at the time of default sublet or leased by Tenant to others, Landlord may, as Tenant's agent, collect rents due from any subtenant or other tenant and apply such rents to Rent due hereunder. Any monthly deficiencies payable by Tenant shall be paid monthly on the date herein provided for the payment of Annual Minimum Rent. If, after the lapse of all applicable grace periods, Landlord reasonably expends any money to cure a default by Tenant, then Tenant shall, on demand, pay Landlord the amount so paid by Landlord together with interest thereon at the rate of four percent (4%) per annum in excess of the Wall Street Journal prime rate (the "Default Rate").

(c)    Except as otherwise expressly set forth in this Lease, Landlord shall also be entitled to all other rights and remedies available to Landlord at law, in equity or otherwise, specifically including, without limitation, the remedies provided under Sections 1951.2 and 1951.4 of the California Civil Code. Pursuant to California Civil Code Section 1951.2, the damages Landlord may recover against Tenant include, but are not limited to, the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award, exceeds the amount of such rental loss for the same period that the Tenant proves could be reasonably avoided. Pursuant to California Civil Code Section 1951.4, Landlord may continue this Lease in effect after Tenant's breach of this Lease and abandonment of the Premises and recover rent as it becomes due, if Tenant has the right to sublet the Premises or assign this Lease, subject only to reasonable limitations. Landlord expressly waives (i) any right to accelerate any element of Rent except as expressly set forth in Section 18.01(a)(i) above and in Section 1951.2 of the California Civil Code, (ii) any right to recover consequential or punitive damages as a result of a Tenant default or any other act or omission of Tenant, and (iii) all rights to any so-called "landlord's lien" or any similar statutory lien, granting Landlord a lien on any of Tenant's Property for the performance of any obligations of Tenant. At the request of Tenant, Landlord shall promptly confirm such waiver(s) by a writing in form satisfactory to Tenant. Anything contained in this Lease to the contrary notwithstanding, Landlord shall use commercially reasonable efforts to relet the Premises or any portion thereof to mitigate Landlord's damages to which Landlord would otherwise be entitled to as a result of a Tenant default.

SECTION 18.02    Additional Landlord Remedies Due to Construction Delays by Tenant. If Tenant shall fail to achieve Substantial Completion by that date which is one (1)

37

year following Delivery of the Land, then Landlord shall be entitled to terminate this Lease upon sixty (60) days prior notice to Tenant unless Tenant, within such sixty (60) day period, achieves Substantial Completion. If Landlord terminates this Lease, then there shall be no further liability on the part of Landlord or Tenant, except for those obligations that expressly survive the expiration or other termination of this Lease.

SECTION 18.03      Landlord's Default.

(a)      If Landlord shall (i) default in the observance of any material covenant or agreement herein contained, breach any material representation or warranty under this Lease, or shall fail to pay any charges or other amounts required to be paid by Landlord under this Lease (including, without limitation, any insurance premiums or any reimbursements due to Tenant) and Landlord does not cure such default within fifteen (15) days (as to a monetary default) or thirty (30) days (as to a non-monetary default), as applicable, after notice thereof by Tenant (it being intended in connection with a non-monetary default not susceptible of being cured with due diligence within said thirty (30) day period that the time allowed Landlord within which to cure same shall be extended for such period as may be necessary to complete same with all due diligence), or (ii) fail to pay when due any Taxes, ground rent or any other charge or assessment, the lien of which is prior to the lien of this Lease, then Tenant shall have the right (but shall not be obligated) to:

(w)      give Landlord an additional written notice, and if Landlord fails to cure or diligently pursue cure of such obligation within five (5) days after receipt of such second notice, Tenant shall have the right to perform such obligation(s) of Landlord in accordance with the applicable provisions of this Lease on behalf of, and at the expense of Landlord;

(x)      bring suit for the collection of any amounts for which Landlord is in default, seek injunctive relief, or seek specific performance for any other covenant or agreement of Landlord;

(y)      offset against the Rent all amounts owed by Landlord to Tenant and/or the amounts reasonably expended by Tenant performing Landlord's obligations under this Lease, including costs and reasonable attorneys' fees, together with interest thereon at the Default Rate from the date of the outlay until paid, and, at Tenant's option, extend the Term if necessary for Tenant to fully recoup all amounts owed by Landlord to Tenant; and/or

(z)      terminate this Lease, without waiving its rights to damages for Landlord's Default, provided that: (1) Landlord's default materially interferes with the normal conduct of any business operations in the Premises, (2) Landlord's default is not reasonably capable of being cured by Tenant, and (3) subject to Section 18.02(b), Tenant gives notice of Landlord's default to any Mortgagee of whom Landlord shall have previously given Tenant notice (including its address), and such Mortgagee shall not have cured Landlord's default within the time period provided in Section 18.02(b).

38

Notwithstanding the foregoing, Tenant's right of offset under clause (y) above shall be limited to fifty percent (50%) of each installment of Rent next becoming due unless insufficient Term remains to fully recoup the amounts owed by Landlord to Tenant on the amounts expended by Tenant, together with interest as provided above, in which event the amount of Tenant's offset shall be increased so that Tenant is able to fully recoup all such amounts expended by Tenant, together with interest as aforesaid, prior to the expiration of the Term.

(b)    If a Mortgagee shall have notified Tenant in writing that it is the holder of such lien on the Shopping Center and shall so request, then Tenant shall give a similar notice to such Mortgagee and such Mortgagee shall have the same time period allowed to Landlord under this Lease to correct or remedy such default.

(c)    Tenant shall also be entitled to all other rights and remedies available to Tenant at law, in equity or otherwise, except as otherwise expressly set forth in this Lease. Tenant expressly waives any right to recover consequential or punitive damages as a result of a Landlord default or any other act or omission of Landlord.

(d)    Notwithstanding the foregoing, if, in Tenant's reasonable judgment, a condition posing imminent risk of liability or material harm to persons or property or material disruption to the normal conduct of any business operations in the Premises shall exist, then Tenant may exercise, at its election and without prior notice to Landlord, any or all of the remedies set forth in clauses (w), (x) and (y) above.

SECTION 18.04    Additional Tenant Self-help, Equitable and Legal Remedies Due to Construction Delays by Landlord.    If Landlord defaults at any time in the timely completion of any component of Landlord's Work (including, without limitation, Delivery of the Land) and Landlord does not cure such default within five (5) days after notice thereof by Tenant, then Tenant shall have the right, but not the obligation, to:

(a)    perform, at Landlord's sole cost and expense, all or any part of Landlord's Work. If and to the extent that Tenant exercises its right under this Section 18.04(a), Landlord agrees to cooperate in good faith and provide Tenant with reasonable assistance so that Tenant can complete such portions of Landlord's Work. Landlord hereby grants Tenant the right, as its agent, to directly contact and contract with Landlord's contractors, on behalf of Landlord, to complete such work, all at Landlord's cost and expense. Landlord covenants, upon Tenant's request, to provide Tenant with duplicate sets of all plans, specifications and contracts prepared in connection with the construction of Landlord's Work, as well as schedules of all contractors, subcontractors and suppliers. Landlord agrees to reimburse Tenant for any and all costs incurred by Tenant in connection with any portion of Landlord's Work which Tenant completes within ten (10) days after receipt of request therefor from Tenant, which request shall be reasonably supported by invoices and/or written description of Landlord's Work performed. If Landlord does not timely reimburse Tenant as contemplated above, then Tenant shall be entitled to deduct the costs of such work from Rent, together with interest at the Default Rate from the date of expenditure by Tenant, until paid in full;

(b)     seek injunctive relief, specific performance or other equitable remedies against Landlord to require Landlord to perform its obligations under this Lease (including, without limitation, the Site Design Requirements); and/or

(c)     exercise the remedies available to Tenant under Sections 2.05, 2.06 and/or 2.07 hereof, as applicable.

SECTION 18.05     <u>Additional Tenant Remedies Due to Landlord's Failure to Pay the Landlord Reimbursement</u>.  If Landlord fails to pay the Landlord Reimbursement in full on or before its due date (provided that all of the conditions necessary for the payment thereof have been satisfied by Tenant), then the due date shall become the Commencement Date, Landlord shall be in default under this Lease, and Rent shall accrue commencing on the Commencement Date but shall not be due or owing to Landlord until the Landlord Reimbursement is paid to Tenant, together with interest which shall accrue on the unpaid Landlord Reimbursement at the rate of eleven percent (11%) per annum commencing on the thirty-first (31st) day following Substantial Completion and continuing until the date of payment of the Landlord Reimbursement.  Within ten (10) days after receipt of payment of the Landlord Reimbursement, plus all accrued interest thereon, by Tenant, Tenant shall pay to Landlord all Rent which accrued from the Commencement Date through the date of Landlord's payment of the Landlord Reimbursement.  Landlord and Tenant covenant and agree that upon the reasonable written request of either Tenant or Landlord, Landlord and Tenant shall execute such documentation as necessary to formalize the foregoing agreement of the parties.

SECTION 18.06     <u>Waiver; Non-Exclusive Remedies</u>.  To the extent permitted by law, the parties hereby waive trial by jury in any action, proceeding or counterclaim brought by either of them against the other on any matters arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Premises, and/or any claim of injury or damage.  Tenant hereby expressly waives any and all rights of redemption granted by or under any present of future law if this Lease is terminated or Tenant is evicted or dispossessed by reason of violation by Tenant of any of the provisions of this Lease.  Except as otherwise expressly set forth in this Lease, no right or remedy herein conferred upon or reserved to Landlord or Tenant is intended to be exclusive of any other right or remedy in this Lease or by law or in equity provided, but each shall be cumulative and in addition to every other right or remedy given in this Lease or now or hereafter existing at law or in equity or otherwise.

**ARTICLE XIX**

**SUBORDINATION, TRANSFER OF INTEREST**

SECTION 19.01     <u>Subordination</u>.  Landlord reserves the right to subject and subordinate this Lease at all times to the lien of any first mortgage or deed of trust for the benefit of any Mortgagee hereafter encumbering or affecting all or any portion of the Shopping Center, as well as to any future ground or underlying leases encumbering or affecting all or any part of the Shopping Center; <u>provided</u>, <u>however</u>, that (a) each Mortgagee shall first execute and deliver to Tenant a subordination, non-disturbance and attornment agreement in substantially the form attached as <u>Exhibit J</u> hereto, or such other form as reasonably required by such Mortgagee and reasonably acceptable to Tenant, in recordable form, and (b) any Ground Lessor shall execute

(and shall obtain the written consent of any Mortgagee) and deliver to Tenant a fee owner recognition agreement in a form reasonably satisfactory to Tenant, which shall include the following provisions: (i) the Ground Lessor will not, in the exercise of any of the rights arising or which may arise out of such lease, disturb or deprive Tenant in or of its possession or its rights to possession of the Premises or of any right or privilege granted to or inuring to the benefit of Tenant under this Lease; (ii) in the event of the termination of the Ground Lease (as defined below), Tenant shall not be made a party in any removal or eviction action or proceeding, nor shall Tenant be evicted or removed of its possession or its right of possession of the Premises, and this Lease shall continue in full force and effect as a direct lease between the Ground Lessor and Tenant for the remainder of the Term and on the same terms and conditions as contained herein, without the necessity of executing a new lease; and (iii) Landlord and Tenant shall have the right to execute any amendment to this Lease which is specifically required hereunder and the Ground Lessor shall recognize and be bound thereto. "Ground Lessor" shall mean the landlord under any existing or future ground or underlying lease(s) affecting all or any part of the Shopping Center (such ground or underlying lease(s) is referred to as the "Ground Lease(s)"). "Mortgagee" shall mean any state or federally regulated bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender, which is not an Affiliate of Landlord, and which holds a mortgage on the Shopping Center or is the beneficiary under a deed of trust encumbering the Shopping Center (such mortgage or deed of trust is referred to as the "Mortgage").

SECTION 19.02    Existing Mortgages and Ground Leases. If a Mortgage or any Ground Lease encumbers the Shopping Center or any part thereof on the Effective Date, then, simultaneously with the execution of this Lease, Landlord shall deliver to Tenant, in recordable form: (a) a subordination, non-disturbance and attornment agreement substantially in the form attached as Exhibit J, or such other form as reasonably required by such Mortgagee and reasonably acceptable to Tenant, in recordable form, executed by each and every Mortgagee, and (b) a fee owner recognition agreement in the form and content described in Section 19.01(b), in recordable form, executed by any Ground Lessor (and, as may be required, consented to by the Mortgagee). Should Landlord fail to so deliver such instrument(s) as provided above, Tenant shall have the right, by notice given to Landlord at any time prior to the date on which such instrument(s) are delivered, to terminate this Lease without further liability on the part of Landlord or Tenant, except: (i) for those obligations which expressly survive the expiration or other termination of this Lease, and (ii) Landlord shall (which obligation shall survive the termination of this Lease), within thirty (30) days following Tenant's termination notice, reimburse Tenant for all of its reasonable, third-party costs and expenses incurred in connection with this Lease (including, without limitation, costs associated with the preparation and review of plans and specifications, the performance of Tenant's Work, and attorneys' fees), not to exceed Seventy-Five Thousand Dollars ($75,000).

SECTION 19.03    Transfer of Interest. Landlord shall provide Tenant with notice immediately after any sale or transfer of Landlord's interest in the Shopping Center, exclusive of the outparcels shown on the Site Plan. Landlord shall require the buyer or transferee to assume in writing all of the obligations of Landlord under this Lease. Notwithstanding Section 23.13, Landlord shall continue to remain liable for all accrued liability, if any, up to the date of such sale or transfer and written assumption, but not thereafter.

41

SECTION 19.04       Tenant Estoppel Certificates.  Tenant agrees, within thirty (30) days of Landlord's request, to execute and deliver to Landlord or any Mortgagee, on a form prepared by or on behalf of the party so requesting, an estoppel certificate (a) ratifying this Lease and confirming that there are no modifications or amendments to this Lease, except as may be stated in the certificate, (b) confirming the commencement and expiration dates of this Lease, (c) certifying to Tenant's actual knowledge and belief that the Landlord is not in default under this Lease, and that there are no offsets or defenses to enforcement of this Lease, except as may be stated in the certificate, (d) stating the date through which Annual Minimum Rent and other charges payable by Tenant have been paid, and (e) confirming such other customary and factual matters that the requesting party may reasonably request.

SECTION 19.05       Landlord Estoppel Certificates.  Landlord agrees, within thirty (30) days of Tenant's request, to execute and deliver to Tenant or any assignee, transferee, subtenant or Lender, on a form prepared by or on behalf of the party so requesting, an estoppel certificate (a) ratifying this Lease and confirming that there are no modifications or amendments to this Lease, except as may be stated in the certificate, (b) confirming the commencement and expiration dates of this Lease, (c) certifying to Landlord's actual knowledge and belief that Tenant is not in default under this Lease, and that there are no offsets or defenses to enforcement of this Lease, except as may be stated in the certificate, (d) stating the date through which Annual Minimum Rent and other charges payable by Tenant have been paid and (e) confirming such other customary and factual matters that the requesting party may reasonably request.

SECTION 19.06       Payments.  If Landlord shall request Tenant to execute more than one (1) subordination, attornment and recognition agreements or more than one (1) estoppel certificate in any twelve (12) month period, then, as a condition to Tenant's obligations under Sections 19.01 or 19.04, as the case may be, Landlord shall pay to Tenant Five Hundred Dollars ($500) for each subsequent request for a subordination, attornment and recognition agreement or an estoppel certificate within such twelve (12) month period; provided, however, that only one (1) Five Hundred Dollar ($500) payment shall be required if a subordination, attornment and recognition agreement and estoppel certificate are requested at the same time.  If Tenant shall request Landlord to execute more than one (1) estoppel certificate in any twelve (12) month period, then, as a condition to Landlord's obligations under Section 19.05, Tenant shall pay to Landlord Five Hundred Dollars ($500) for each subsequent request for an estoppel certificate within such twelve (12) month period.

## ARTICLE XX

## LANDLORD'S REPRESENTATIONS, WARRANTIES AND COVENANTS

SECTION 20.01       Quiet Enjoyment.  Landlord covenants and agrees that Tenant, during the Term, shall freely, peacefully, and quietly occupy and enjoy the use and possession of the Premises without disturbance, molestation, hindrance or ejectment of any kind whatsoever so long as Tenant is not in default of any term of this Lease beyond any applicable notice and cure periods.

SECTION 20.02    Representations, Warranties and Covenants.   In order to induce Tenant to execute this Lease and in consideration thereof, Landlord covenants, warrants and represents to Tenant as follows:

(a)    As of the Effective Date and as of the Possession Date, Landlord owns fee simple title to the Shopping Center free and clear of all easements, restrictions, liens, encumbrances, leases and the like, except as described on Exhibit K; that the Shopping Center, as of the Effective Date (and as of the Possession Date), is not (and will not be) subject to the lien of any Mortgage (except such instruments where the lienor has entered into an agreement in favor of Tenant, as described in Sections 19.01 and 19.02); that Landlord has the full power, right and authority to make this Lease for the Term without the consent, joinder, or approval of any other party; and that Landlord will put Tenant into complete and exclusive possession of the Premises free from all orders, restrictions, covenants, agreements, leases, easements, laws, codes, ordinances, regulations or decrees which would, in any way, prevent or inhibit the use of the Premises for the uses thereof by Tenant as contemplated by this Lease or prevent or restrict the use of the Common Areas or limit ingress and egress to and from Raymond Street and Main Street or any other public thoroughfares serving the Shopping Center, by Tenant, its agents, employees or invitees.

(b)    Landlord shall, on or before the Possession Date, have caused the Delivery of the Land to occur in accordance with this Lease.

SECTION 20.03    Site Covenants.   In order to induce Tenant to enter into this Lease, Landlord covenants to Tenant as follows (the "Site Covenants"):

(a)    Landlord shall not construct (or permit to be constructed) any buildings or other improvements in the area identified on the Site Plan as the "No-Build Area" (the "No-Build Area").

(b)    Landlord shall not construct (or permit to be constructed) any projections either vertical or horizontal (other than Tenant's signs or identifications) which will project along the front or rear of the building in which the Premises are situated in such a manner as to obstruct the view of Tenant's signs or its store front in any manner.

(c)    The number of paved parking spaces in the Shopping Center shall be the greater of (i) the ratio listed in Section 1.01(M) or (ii) the amount of spaces required by Laws (without variance), and, without limiting the generality of the foregoing, the number of spaces contained in Tenant's Preferred Area shall be the same number of spaces as shown on the Site Plan.

(d)    Landlord shall not erect (or permit to be erected) any building or other structures (including, without limitation, kiosks) in any outparcel except as and where shown on the Site Plan, and all outparcel buildings constructed shall (i) not materially exceed the Floor Area shown on the Site Plan and (ii) satisfy all governmental parking requirements using the parking spaces shown on the Site Plan, provided Tenant shall have the continuing right, at all times during the Term, to use the one hundred (100) spaces located in the Tenant's Preferred Area and shown on the Site Plan.  All outparcel buildings shall have a main parapet height of

43

twenty-eight (28) feet or lower. Architectural features of such buildings may extend to a height of thirty (30) feet, but shall not comprise more than twenty-five percent (25%) of the overall parapet height.

(e)    Intentionally Omitted.

(f)    Landlord shall not make (and shall not permit there to made) any changes to the No-Build Area, including, without limitation, changes in the location of curbcuts, drive aisles, entrances, access points, roadways, sidewalks or parking spaces or reduction of the parking ratio specified in Section 20.03(c), without Tenant's consent, which may be withheld in Tenant's sole discretion. Landlord shall not make (and shall not permit to be made) any other changes to the Common Areas which adversely affects Tenant's access to the Premises or the Shopping Center or the visibility of the Premises or of any of Tenant's signage, without Tenant's consent, which may be withheld in Tenant's sole discretion.

(g)    Following Tenant's opening for business at the Premises, (a) Landlord shall control any noise and dust at the Shopping Center (including, without limitation, during any periods of permitted construction within the Shopping Center) such that neither interferes with the normal operation of Tenant's business, and (b) Landlord shall not perform (and shall not permit there to be performed) any exterior construction in the Shopping Center during the months of October, November, December and January, except to the extent permitted under Section 5.01.

(h)    Landlord shall not permit any solicitation, distribution of handbills, picketing, or other public demonstration in the Common Areas, except as otherwise may be mandated by Laws.

(i)    Intentionally Omitted.

(j)    Landlord shall not knowingly install or permit to be installed by any other tenant or other person anywhere in the Shopping Center any structure or equipment which would cause any interference with satellite, radio, telecommunications or television reception or transmission in or from the Premises.

## ARTICLE XXI

## HOLDING OVER

SECTION 21.01    Holding Over.   If Tenant remains in possession of the Premises after the expiration of the Term without having duly exercised its right, if any, to extend or further extend the Term, such continuing possession shall create a month-to-month tenancy on the terms herein specified and such tenancy may be terminated at the end of any month thereafter by either party by giving at least thirty (30) days notice thereof to the other party. During such holdover and provided that Landlord and Tenant are not in good faith negotiations with regard to the renewal or extension of this Lease, Tenant shall be liable for Annual Minimum Rent on a monthly basis (or, if applicable, on a prorated daily basis) in an amount equal to (i) for the first thirty (30) days, one hundred fifteen percent (115%) of the amount thereof payable by Tenant for the month immediately preceding the last day of the Term,

44