published by Moody's Investor Services or Standard and Poor's is less than "investment grade"), then the 185 basis point spread over treasuries specified in clause (i) above shall be increased to the spread over fifteen year Treasury Notes for market rate financing obtained by Landlord to finance the Expansion Construction Costs taking into account Tenant's Duff & Phelps (or, if applicable, alternative rating agency) senior unsecured debt rating at the time such financing is obtained. "Rental Determination Date" shall mean the date on which Landlord enters into a commitment from a first mortgage lender or other source of capital for the financing of the major portion of the Expansion Construction Costs; provided, however, in no event shall such date be earlier than thirty (30) days prior to the first day of the Expansion Term or later than the Expansion Rent Commencement Date. If Landlord does not enter into such a commitment within the aforesaid time period the Rental Determination Rate shall be the first day of the Expansion Term. For the purposes of this definition, the yield on fifteen (15) year Treasury Notes shall be determined based on the rates set forth for the Rental Determination Date in the then current weekly Federal Reserve Statistical Release H.15 (519)(or if no Federal Reserve Statistical Release H.15(519) is issued for that week, then such yield maintenance shall be determined based upon the rates set forth in the Wall Street Journal for the Rental Determination Date). The yield on fifteen (15) year Treasury Notes for the Rental Determination Date shall be interpolated from the ten (10)

year and thirty (30) year Treasury Note rates for the Rental Determination Date as set forth in the publication described above. When the Rental Determination Date occurs, Landlord shall give a notice to Tenant setting forth the Rental Determination Date and Landlord's calculation of the Applicable Percentage. If Tenant objects to such calculation, it shall promptly inform Landlord and the parties shall thereafter confer to mutually establish the Applicable Percentage.

(iv) <u>Supplemental Amendment</u>. Upon the occurrence of the Expansion Rent Commencement Date the parties shall execute a supplemental amendment to the Lease (A) evidencing the Expansion Rent Commencement Date, (B) containing a new <u>Exhibit C</u> setting forth the total Basic Rent (including the Expansion Minimum Rent) payable under this Lease, and such new exhibit shall replace <u>Exhibit C</u> attached hereto, and (C) containing a new Schedule D setting forth such revisions to the Purchase Price as shall be necessary to reflect the Expansion Land Costs and the Expansion Construction Costs.

(v) <u>Taxes</u>. Landlord shall pay as and when due all real estate taxes and ad valorem taxes and all general and special assessments payable with respect to the Expansion Land for the first 120 days of the Expansion Term.

(d) <u>Other Provisions.</u> In all other respects, the Expansion Premises shall be added to and become part of the Leased Premises as of the first day of the Expansion Term and all references in the Lease to the words "Leased Premises" shall be

deemed to refer also to the Expansion Premises. Landlord shall have the same rights, and Tenant shall have the same duties and obligations with respect to the Expansion Premises as are applicable under the Lease with respect to the Leased Premises.

    (e) <u>Landlord's Default.</u>

        (i) If after Tenant's exercise of the Expansion Option, Landlord fails as required by Paragraph 36(b) to exercise Landlord's Option by the date which is five (5) days prior to the Option Expiration Date, or consummate the transaction contemplated by Landlord's Option and acquire the Expansion Land in accordance therewith as a result of a default by Landlord, as purchaser thereunder, Tenant shall have the right, as its sole and exclusive remedies (but which remedies shall be cumulative), (A) to bring an action for damages against the Landlord named herein (and not against any successor thereto), or (B) to exercise the Landlord's Option in the name of Landlord and to purchase from Landlord the Leased Premises and the Expansion Land as set forth below. Not later than twenty-five (25) days after Landlord's exercise of Landlord's Option, Landlord shall provide Tenant with evidence of Landlord's financial ability to acquire the Expansion Land and its intention to proceed to closing in a timely fashion. In no event shall Tenant have the right to offset or withhold any Basic Rent or Additional Rent payable with respect to the original Leased Premises on account of any such default by Landlord. If Landlord fails to reimburse Tenant for the Expansion Construction Costs in accordance with the terms of

this Paragraph 36, Tenant shall have no right, as a result thereof or otherwise, to offset or withhold any Basic Rent payable with respect to the original Leased Premises or any Additional Rent payable with respect to the original Leased Premises or the Expansion Premises; provided, however, nothing contained herein shall in any way obligate Tenant (x) to make any payments of interim rent for the Expansion Land during the period from and after the date Landlord was obligated to reimburse Tenant for the Expansion Construction Costs until the Expansion Rent Commencement Date occurs, or (y) to make any payments of Expansion Minimum Rent until the Expansion Rent Commencement Date occurs.

      (ii)  If Tenant elects to exercise its rights under clause (B) above, then Tenant shall so notify Landlord and any Lender within fifteen (15) days after the date Tenant exercises the Landlord's Option.  On or before the last to occur of sixty (60) days after the date Tenant gives such notice to Landlord and Lender or the date by which the Landlord's Option obligates Landlord to consummate the purchase of the Expansion Land pursuant to such option, Tenant shall purchase the Leased Premises and Expansion Land for a price (the "Default Purchase Price") equal to $9,329,494 plus that portion of the Expansion Land Costs, if any, paid by Landlord.  On the date such purchase is consummated (the "Default Closing Date"), Landlord shall convey the Leased Premises and the Expansion Land (or, if the purchase of the Expansion Land has not been consummated, all of

87

Landlord's right, title and interest in, to and under the Landlord's Option) to a special purpose entity formed by Tenant, in accordance with the third paragraph of Paragraph 13(b) hereof, mutatis mutandis; provided, however, such special purpose entity shall assume the Mortgage then encumbering the Leased Premises, shall amend such Mortgage to include the Expansion Land (or, if the purchase of the Expansion Land has not been consummated, all of the Landlord's right, title and interest in, to and under the Landlord's Option, and shall amend such Mortgage to include the Expansion Land if, as and and when such purchase is consummated) as a first mortgage thereon, and the outstanding principal amount secured by such Mortgage, and any due but unpaid interest thereon, shall be deducted from the cash portion of the Default Purchase Price payable at closing.  Landlord hereby appoints Tenant as Landlord's attorney-in-fact, coupled with an interest, for the purpose of exercising the Landlord's Option if Landlord fails to do so after Tenant's exercise of the Expansion Option and satisfaction of the other conditions set forth in Paragraph 36(b).

    (f)   Construction.

    (i)   Tenant shall bear sole responsibility for construction or development of the Expansion Premises, to include obtaining the appropriate governmental approvals, permits, licenses and to comply with all then existing laws, rules and regulations in connection with the Expansion Premises.  The building to be constructed on the Expansion Land shall be no less

than 100,000 square feet and no more than 200,000 square feet (herein, together with all ancillary improvements, the "Expansion Building") and shall substantially conform to the building standards of the Improvements as to finished floor, clear ceiling and roof heights, building components, structural characteristics and standards, appearance, quality, office build-out percentage, Tenant improvements and cost thereof per square foot and size of structural bays. Tenant shall prosecute the construction of the Expansion Building diligently to completion. In addition, Tenant agrees that in connection with the Expansion Building or its construction (i) the structural integrity of the existing building shall not be impaired, (ii) the construction shall be performed in a good and workmanlike manner, and shall be expeditiously completed in compliance with all Legal Requirements, (iv) all work done in connection with the Expansion Building shall comply with all Insurance Requirements, (v) Tenant shall promptly pay all costs and expenses of all such construction, and shall discharge all liens filed against any of the Leased Premises arising out of the same, (vi) Tenant shall procure and pay for all permits and licenses required in connection with any such construction, (vii) the Expansion Building shall be the property of Landlord, and (viii) all such construction shall be made under the supervision of an architect or engineer reasonably satisfactory to Landlord and in substantial accordance with the Approved Plans.

(ii) Tenant shall have prepared, and shall submit to Landlord for its approval plans and specifications for the construction of the Expansion Building consistent with the Preliminary Expansion Plans. Landlord shall not unreasonably withhold or delay its approval of such plans and specifications and shall be deemed to have approved same unless it gives notice specifying the reasons for such disapproval within 15 business days after the submission of such plans. Landlord shall be deemed to have unreasonably withheld its consent to such plans and specifications if they are in accordance with and merely amplifications of the approved Preliminary Expansion Plans. Tenant shall make those changes to the plans as shall have been reasonably requested by Landlord and, upon completion of such changes, shall resubmit the plans to Landlord for its approval. Landlord shall be deemed to have approved such plans as resubmitted unless within 10 business days after Landlord receives such resubmitted plans Landlord gives written notice to Tenant specifying its grounds for disapproval. At such time as Landlord approves the plans submitted (or resubmitted) by Tenant, the plans as so approved shall be initialed by Landlord and Tenant and shall be deemed the "Approved Plans."

(iii) Tenant shall submit the Approved Plans for bid with two or more reputable contractors licensed in Illinois (or, with Landlord's consent, only the contractor who constructed the Improvements). The bid prices so obtained shall be approved by Landlord and Tenant, which approval shall

not be unreasonably withheld. Landlord or Tenant shall be deemed to have unreasonably withheld their consent to any such bid price if at least three bids shall have been obtained and such price is within five percent (5%) of the lowest bid submitted by a reputable bidder.

(iv) Tenant may request substitutions, changes or extra work or materials over, above or different than that required by the Approved Plans (herein collectively referred to as "Extra Work") provided such Extra Work shall not materially change the character or usefulness of the Expansion Building and shall not result in an aggregate increase in the Expansion Construction Costs of more than $200,000.

(A) Landlord may, at its expense, inspect construction and review cost records in connection therewith throughout the construction period of the Expansion Premises. Landlord agrees to reimburse Tenant for the Expansion Construction Costs (as herein defined) within thirty (30) days after (1) the Expansion Completion Date occurs and (2) Tenant provides to Landlord a statement certified by an officer of Tenant setting forth in reasonable detail the Expansion Construction Costs incurred by Tenant.

(B) For purposes of the Expansion Amendment, the term "Expansion Construction Costs" shall mean all customary or reasonable costs incurred by Tenant in or with respect to designing, constructing or developing the Expansion Building and Expansion Premises in accordance with the Approved Plans and the

approved bid therefor; which costs may include, without limitation, financing costs, architectural, legal, engineering, environmental, consultants and any other soft costs, Tenant's internal carrying costs incurred during the construction period of the Expansion Premises (determined on the basis of Tenant's weighted average borrowing rates), costs to prepare the Expansion Land and construct the base Expansion Building, and costs to finish out the Expansion Premises in accordance with the Approved Plans.

(g) Effect. In the event the Expansion Amendment is executed, it shall provide that the terms of this Lease (as amended from time to time prior thereto) shall remain in full force and effect except as expressly provided above and that and all of the terms of this Lease with respect to the Leased Premises shall, except as otherwise expressly provided above, also apply to the Expansion Premises and, except as otherwise expressly provided to the contrary in accordance with terms of this Paragraph 36, the Expansion Premises shall be deemed to be included in the Leased Premises.

(h) No Change to Lease Until Expansion Amendment. Until the execution of the Expansion Amendment in accordance with the foregoing, this Lease shall remain in full force and effect.

37. Limitation on Right to Sell. Landlord shall not sell the Leased Premises, without the consent of Tenant, until the first to occur of the following: (i) Tenant's failure to exercise the Expansion Option on or before the Expansion Option Date; (ii)

the Expansion Rent Commencement Date, (iii) the second anniversary of the Expansion Completion Date, or (iv) the occurrence of an Event of Default under this Lease. Tenant shall not unreasonably withhold its consent to any such proposed sale of the Leased Premises, provided, however, Tenant shall be deemed to have reasonably withheld its consent to any such sale if the proposed purchaser is unable to demonstrate to the reasonable satisfaction of Tenant that such purchaser will be able to obtain financing for the Expansion Construction Costs. Notwithstanding the foregoing, this provision shall in no event require the consent of Tenant to any sale of the Leased Premises pursuant to a foreclosure of any Mortgage, a deed in lieu of such foreclosure or otherwise pursuant to the exercise of remedies under any such Mortgage, or to or by any foreclosure purchaser. From and after the first to occur of the events set forth in the first sentence of this Paragraph, Landlord shall have the right to sell all or any part of or interest in the Leased Premises without the consent of Tenant.

38. *Original Lease*. Upon the Effective Date hereof as defined in the Lease Amendment Agreement dated as of March 1, 1993 by and between Landlord and Tenant, this Lease shall supersede the Original Lease in all respects which shall thereupon be deemed terminated and of no effect.

IN WITNESS WHEREOF, Landlord and Tenant have caused this

instrument to be executed under seal as of the day and year first above written.

Signed sealed and delivered in the presence of:

*Michele M. Meade*

*Michelle R. Reese*

*S.H.M.*

*Kay Murray*

TENANT: CIRCUIT CITY STORES, INC.

By: *Philip Dunn*
Its: *Treas.*

ATTEST: *[signature]*

LANDLORD:
CIRCUIT DISTRIBUTION - ~~ILLINOIS~~ LIMITED PARTNERSHIP,
an Illinois limited partnership
BY: CIRCUIT DISTRIBUTION G.P. - ILLINOIS, INC.,
~~XXXXXXXXXX~~ an Illinois corporation, its sole general partner

By: *[signature]*
Its: *PRESIDENT*

ATTEST: *[signature]*

STATE OF *Texas* )
                 )
COUNTY OF *Dallas* )

The foregoing instrument was acknowledged before me this *21st* day of *October*, 1993, by *Gil Besing*, President of Circuit Distribution G.P. - Illinois, Inc., an Illinois corporation as a General Partner of Circuit Distribution - Illinois Limited Partnership, an Illinois limited Partnership.

My commission expires: _____.

*Kay Murray*
Notary Public



KAY MURRAY
Notary Public, State of Texas
My Commission Expires
JUNE 3, 1997

94

COMMONWEALTH OF VIRGINIA )
)
CITY OF RICHMOND )

    Before me, a notary public of the Commonwealth and City aforesaid, on this day personally appeared *Philip A. Dunn*, known to me to be the person whose name is subscribed to the foregoing Lease and known to me to be the *Treasurer* of CIRCUIT CITY STORES, INC., a Virginia corporation, and acknowledged to me that he executed said Lease for the purposes and consideration therein expressed and as the act of said corporation.

    Given under my hand and seal of office this *1* day of *April*, 1993.

(SEAL)

*Debra L. Dalton*
Notary Public
My Commission expires: *12-31-96*

u:\7712\cc\leaseb4.dci

Embossed Hereon Is My
Commonwealth of Virginia Notary Public Seal
My Commission Expires December 31, 1996
DEBRA L. DALTON

## EXHIBIT "A"

### LEGAL DESCRIPTION OF DEMISED PREMISES

#### PARCEL 1

That part of the Northwest Quarter of Section 5, Township 40 North, Range 10 East of the Third Principal Meridian, described as follows:

Commencing at the Southwest corner of said Northwest Quarter of Section 5; thence North 00 degrees 26 minutes 36 seconds East along the West line of said Northwest Quarter of Section 5 a distance of 34.06 feet to a point on the North line of a public roadway heretofore dedicated as Central Avenue, according to the Plat of Turnberry Lakes Hanover No. 2 Phase One recorded November 15, 1991 as Document No. R91-152966, for a Place of Beginning; thence continuing North 00 degrees 26 minutes 36 seconds East along said West line a distance of 935.00 feet; thence South 89 degrees 33 minutes 24 seconds East 598.00 feet; thence South 00 degrees 26 minutes 36 seconds West 655.00 feet to a point of curvature; thence Southwesterly along the arc of a curve being concave to the West, having a radius of 215.00 feet, having a chord bearing of South 11 degrees 41 minutes 36 seconds West for a distance of 84.43 feet to a point of tangency; thence South 22 degrees 56 minutes 36 seconds West 17.38 feet to a point of curvature; thence Southwesterly along the arc of a curve, being concave to the East, having a radius of 215.00 feet, having a chord bearing of South 11 degrees 41 minutes 36 seconds West for a distance of 84.43 feet to a point of tangency; thence South 00 degrees 26 minutes 36 seconds West 28.50 feet to a point of curvature; thence Southwesterly along the arc of a curve being concave to the Northwest, having a radius of 40.00 feet, having a chord bearing of South 43 degrees 44 minutes 35 seconds West for a distance of 60.46 feet to a point of tangency on said North line of Central Avenue; thence South 87 degrees 02 minutes 34 seconds West along said North line of Central Avenue a distance of 521.91 feet to the Place of Beginning; said parcel of land herein described contains 12.445 acres, more or less, all in DuPage County, Illinois.