Court File No. _____

## ONTARIO

## SUPERIOR COURT OF JUSTICE

## COMMERCIAL LIST

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED*

*AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF INTERTAN CANADA LTD. AND TOURMALET CORPORATION*

APPLICANTS

## REPORT OF ALVAREZ & MARSAL CANADA ULC

### In its Capacity as Proposed Monitor

### NOVEMBER 10, 2008

## INTRODUCTION

1.    InterTAN Canada Ltd. ("InterTAN" or the "Company") and Tourmalet Corporation ("Tourmalet" and together with InterTAN the "Applicants") have brought an application before this Honourable Court seeking various relief under the *Companies' Creditors Arrangement Act* ("CCAA").

2.    Alvarez & Marsal Canada ULC ("A&M") has consented to act as Monitor in these CCAA proceedings.  This report is prepared by A&M, as the Proposed Monitor of the Applicants, to assist this Honourable Court in considering the Applicants' requests for relief.

3.    The purpose of this report ("Report") is to provide this Honourable Court with information concerning:

- background on InterTAN's business;

- the financial position of InterTAN;

- the current secured credit facility in place for InterTAN;

- recent actions by InterTAN's trade creditors that have impacted its cash flow;

- the proposed restructuring of InterTAN and the proposed restructuring alternatives;

- the terms of the proposed Debtor-in-Possession ("DIP") financing;

- the implications of the DIP financing for InterTAN's Canadian creditors; and

- A&M's summary comments.

4.   Capitalized terms not otherwise defined in this Report are as defined in the affidavit of Mark Wong sworn November 10, 2008 (the "Wong Affidavit") in support of InterTAN's request for relief under the CCAA.

**TERMS OF REFERENCE**

5.   In preparing this Report, A&M has relied upon unaudited financial information, the Company's books and records, the financial information prepared by the Company and its advisors, and discussions with management of InterTAN. A&M has not audited, reviewed, or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, A&M expresses no opinion or other form of assurance on the information contained in this Report.

**ENGAGEMENT OF A&M**

6.   A&M was retained by InterTAN on October 31, 2008 as the Proposed Monitor. Since that date, A&M has been reviewing InterTAN's available financial information in an attempt to gain knowledge of the business and financial affairs of the Company and has been preparing for InterTAN's anticipated CCAA application.

- 3 -

**BACKGROUND**

7.   InterTAN is a company incorporated under the laws of the Province of Ontario. It is a
     leading specialty retailer of consumer electronics in Canada and is the operating
     Canadian subsidiary of the major United States based electronics retailer Circuit City
     Stores, Inc. ("Circuit City"). InterTAN operates retail stores under "The Source" brand.
     As at September 30, 2008, InterTAN had approximately 3,130 employees. Circuit City,
     based in Richmond, Virginia, is a leading specialty retailer of consumer electronics and
     operates a nationwide chain of large electronics stores that sell, among other things,
     televisions, home theatre systems, computers, camcorders, furniture, software, imaging
     and telecommunications products, and other audio and video electronics. The typical
     format for The Source is a small, strategically located store in a mall, with an average
     store size of approximately 2,100 square feet. A typical Circuit City retail store, which
     competes with such big box retailers as Best Buy, has a typical store size in the range of
     20,000 to 35,000 square feet.

8.   Tourmalet is a Nova Scotia unlimited liability company that is an indirect, wholly owned
     subsidiary of Circuit City. Tourmalet is a non-operating holding company whose sole
     asset is the preferred stock of InterTAN Inc., which is the sole shareholder of InterTAN.

9.   Circuit City is the Applicants' ultimate parent company. On November 10, 2008, Circuit
     City and certain of its affiliates (the "U.S. Debtors") filed for bankruptcy protection (the
     "Chapter 11 Proceedings") pursuant to Chapter 11 of Title 11 of the United States Code
     (the "US Bankruptcy Code") in the United States Bankruptcy Court for the Eastern
     District of Virginia (the "US Bankruptcy Court").

10.  InterTAN's sole secured credit facility was established under an agreement between
     Circuit City, certain of its U.S. affiliates and InterTAN (as borrowers), Bank of America
     N.A. ("B of A") (as agent and lender), and certain other loan parties (the "Secured Credit
     Facility"). The Secured Credit Facility consists of a US$1.25 billion commitment to the
     U.S. Debtors and a US$50 million commitment to InterTAN. InterTAN has not
     guaranteed and is not liable for the borrowings of the U.S. Debtors under the Secured
     Credit Facility. Tourmalet is not a party to the Secured Credit Facility but it has

- 4 -

guaranteed InterTAN's obligations thereunder. A&M understands that this guarantee is unsecured. Further information on the Secured Credit Facility is provided below.

11.    As a result of the commencement of the Chapter 11 Proceedings, the Secured Credit Facility was terminated and the parties to that loan agreement entered into a Debtor-in-Possession loan facility (the "DIP Facility") to replace the Secured Credit Facility. A&M understands that, unlike the Secured Credit Facility, the DIP Facility provides that credit would only be advanced to Circuit City on the condition that InterTAN become a joint and several borrower for all advances and a guarantor for the entire facility, including existing advances to the U.S. Debtors, and to have all of InterTAN's assets pledged as security for those obligations. Furthermore, A&M understands that the lenders providing the DIP Facility will only extend credit to InterTAN if the DIP Facility is approved by an Order of this Honourable Court under the CCAA with a charge over all of the assets and property of InterTAN. The priority of this proposed charge is more particularly described below.

## THE FINANCIAL POSITION OF INTERTAN

12.    As at September 30, 2008, InterTAN had total assets of approximately $370,000,000. According to its internal, unaudited financial statements at September 30, 2008, InterTAN's current assets represented $218,622,642 of its total assets, including $148,131,256 of inventory, $49,958,615 of current accounts and notes receivables and $5,798,376 in cash. Non-current assets were comprised primarily of property, plant and equipment of $44,936,936, notes receivable of $90,862,414 (representing promissory notes from InterTAN, Inc. and Tourmalet) and goodwill of $8,729,887.

13.    As at September 30, 2008, InterTAN's total liabilities were approximately $110,000,000. These liabilities consisted of current liabilities of approximately $89,465,123, miscellaneous long-term liabilities of approximately $20,222,964 and inter-company payables of $251,050. Current liabilities as at September 30, 2008 included $49,723,903 of trade accounts payable, accrued expenses of $22,215,186, deferred service contract revenue of $9,801,152 and short term bank borrowings of $7,500,000.

- 5 -

14.    In preparation for a CCAA application, the Company, with the assistance of its financial advisor FTI Consulting ("FTI"), prepared a 17-week cash flow forecast (the "Cash Flow Forecast") which is appended as Exhibit "L" to the Wong Affidavit.  A&M has reviewed and discussed the Cash Flow Forecast with InterTAN's management and FTI.  As set out in the Cash Flow Forecast, InterTAN's borrowings under the Secured Credit Facility were projected to be approximately $43.3 million through November 9, 2008.

15.    The Cash Flow Forecast projects that the Company will require further incremental funding during the forecast period of up to $19.8 million, such that cumulative credit requirements to fund InterTAN's operations are projected to peak at approximately $63.1 million during the week ending November 30, 2008 ($43.3 million of borrowings under the Secured Credit Facility plus approximately $19.8 million of incremental borrowings under the DIP Facility).

16.    Due to the seasonal nature of InterTAN's business, the credit requirements to fund its operations are projected to reduce rapidly throughout December as the Company receives the proceeds from the Christmas sale season.  Borrowings under the DIP Facility required to fund InterTAN's operations are projected to be reduced to approximately $1.0 million by January 4, 2009.  From that time forward, the Cash Flow Forecast indicates that borrowings under the DIP Facility to fund InterTAN's operations will range from approximately $600,000 to $8.6 million through the week ending March 1, 2009. However, A&M understands that the portion of the DIP Facility available to InterTAN will remain fully drawn, with the funds not needed to fund InterTAN's operations being advanced by InterTAN to the U.S. Debtors.  A&M notes that, to the best of its knowledge, there is presently no mechanism ensuring repayment of the amounts advanced by InterTAN to the U.S. Debtors and no mechanism to ensure that sufficient funds will be repaid to service InterTAN's liquidity needs.

**SECURED CREDIT FACILITY**

17.    Circuit City, as lead borrower for Circuit City, Circuit City Stores West Coast, Inc., Circuit City Stores PR, LLC (collectively, the "Circuit City Borrowers") and InterTAN (together with the Circuit City Borrowers, the "Borrowers"), entered into a Second

- 6 -

Amended and Restated Credit Agreement (the "Credit Agreement") dated as of January 31, 2008 with Bank of America, N.A. (as Administrative Agent and Collateral Agent), Banc of America Securities LLC, Wells Fargo Retail Finance, LLC, General Electric Capital Corporation, JPMorgan Chase Bank, N.A. and Wachovia Capital Finance Corporation (collectively the "Secured Lenders" and in connection with the DIP Facility described below, the "DIP Lenders").  The Credit Agreement provided the Borrowers with access to the Secured Credit Facility, a US$1.3 billion credit facility which includes a US$1.25 billion commitment for the Circuit City Borrowers (the "US Facility") and a US$50 million commitment for InterTAN (the "Canadian Facility").

18.     Under the Credit Agreement, the maximum amount of borrowings, including loans and outstanding letters of credit to or for the benefit of the Borrowers, may not exceed the lesser of (i) US$1.3 billion and (ii) a borrowing base calculated as 90% of the Circuit City Borrowers' eligible inventory and credit card receivables, less availability reserves (all as defined more particularly in the Credit Agreement).  Under the Credit Agreement, the amount available to InterTAN is not dictated by its own assets; rather, the amount available is a function of the Circuit City Borrowers' borrowing base less the credit extended to the Circuit City Borrowers, to a maximum of US$50 million.

19.     An event of default under the Credit Agreement occurs when any borrowing party files for relief under the U.S. Bankruptcy Code.  Thus, the Credit Agreement is in default as a result of the Chapter 11 Proceedings. The result of this default is the termination of the Credit Agreement, which causes all obligations under the Canadian Facility to become automatically due and payable without presentment, demand, protest or other notice of any kind.

20.     As at November 9, 2008, InterTAN had outstanding borrowings under the Secured Credit Facility of approximately $43.3 million.

21.     InterTAN's obligations under the Credit Agreement are limited to the amounts borrowed by InterTAN.  As security for these obligations, A&M understands that InterTAN has executed the following security documents (the "Security Documents") in favour of the Secured Lenders:

- 7 -

    (a)    an amended and restated general security agreement dated January 31, 2008, securing all of InterTAN's accounts receivable, inventory, cash and intangibles, but not covering its equipment or real estate; and

    (b)    a deed of hypothec on movable property dated January 31, 2008, securing all of InterTAN's accounts receivable, inventory, cash and intangibles, but not covering its equipment or real estate.

22.    As noted above, Tourmalet is not a party to the Secured Credit Facility. It has guaranteed InterTAN's obligations under the Secured Credit Facility pursuant to a guarantee agreement dated January 31, 2008. A&M understands that Tourmalet has not granted security for this guarantee.

23.    A&M has retained Goodmans LLP ("Goodmans") as its independent counsel in this matter and has asked Goodmans to provide its preliminary views on the security held by Bank of America. Goodmans' preliminary view is that Bank of America holds valid and perfected security in Ontario over the inventory, receivables and intangible assets of InterTAN described in the Security Documents. Goodmans is in the process of retaining local agents in other Canadian jurisdictions and formalizing the opinion on a national basis.

## TRADE CREDITOR ACTIONS

24.    Over the past few months, as a result of public reports concerning potential liquidity concerns at Circuit City, several of InterTAN's significant suppliers of branded products have shortened their credit terms, requiring cash in advance or on delivery, which has had the effect of increasing the exposure of the Secured Lenders and decreasing trade payables. In particular, the Company's borrowings under the Secured Credit Facility increased from $7.5 million at the end of September to $37.5 million at the end of October, while at the same time inventory increased by approximately $8.4 million and trade accounts payable decreased by approximately $13.8 million.

25.    InterTAN is now commencing its crucial sales period, which is the late-fall/early-winter holiday season. Meeting the needs of InterTAN's customers over the holiday season

- 8 -

requires significantly higher than usual stocking of inventory. It is essential that InterTAN's suppliers continue to supply InterTAN through this period and that InterTAN has access to sufficient credit to obtain holiday season levels of inventory.

26.    In order to ensure the continuity of InterTAN's supply chain from outside of North America (where the stay of proceedings under this application and the stay arising due to the commencement of the Chapter 11 Proceedings will not apply), InterTAN is proposing to continue to pay foreign trade creditors and suppliers in the ordinary course both before and after the date of filing.

27.    With respect to North American suppliers, InterTAN is proposing to freeze all pre-filing trade claims until further order of this Court, subject however to the Monitor having discretion (i) to authorize critical supplier payments for pre-filing amounts not to exceed $2 million (subject to further order of the Court) and (ii) to authorize the payment of any other costs and expenses that are deemed necessary for the preservation of InterTAN's property and business.

## RESTRUCTURING OF INTERTAN AND TERMS OF THE PROPOSED DIP RESTRUCTURING ALTERNATIVES

28.    A&M understands that one of the restructuring alternatives to be pursued by InterTAN and the U.S. Debtors is the sale of all or a portion of their respective businesses.

29.    In early 2008, Circuit City considered strategic options with respect to InterTAN. InterTAN, Inc., the shareholder of InterTAN, retained the investment banking services of Goldman, Sachs & Co. ("Goldman") to canvass the market with a view to pursuing a divestiture transaction involving InterTAN. Goldman prepared disclosure and marketing materials that were distributed to potential purchasers who entered into a confidentiality agreement with Circuit City. To date, this sales initiative has not resulted in the completion of a transaction involving InterTAN.

30.    A&M understands that on October 9, 2008 the shareholder of InterTAN, namely InterTAN, Inc., executed a unanimous shareholder's declaration wholly relieving the board of directors of InterTAN of their directorial powers.

31.     The DIP Facility requires the implementation of a court-approved sales process with respect to the assets and business of the U.S. Debtors; however, there is no specific requirement in the DIP Facility for a sale process with respect to the business and property of InterTAN.   It is InterTAN's view that a sales process ought to be pursued concurrently with other restructuring and refinancing options in an effort to maximize stakeholder value.   NM Rothschild & Sons Canada Limited ("Rothschild") has been engaged as an investment banking advisor to pursue strategic alternatives for the Company.

**KERP**

32.     InterTAN has advised A&M that it has agreed to enter into a Key Employee Retention Plan (the "KERP") with certain of its key management employees, consisting of the Chief Executive Officer, the Chief Financial Officer and three Vice Presidents. InterTAN is of the view that the retention of these employees is necessary to the preservation of InterTAN's enterprise value as it proceeds with its restructuring.

33.     While it has not seen a copy of the KERP documentation, A&M understands that the maximum amounts payable under the KERP are $838,000.   The terms of the KERP are set out in detail in the Affidavit of Mark Wong sworn November 10, 2008, in support of the Applicants' CCAA application.

**DIP FINANCING**

34.     As described herein, the financing of InterTAN's Canadian operations is intertwined with the financing of Circuit City's U.S. operations as the Canadian and U.S. entities are parties to the same Credit Agreement.

35.     The result of the commencement of the Chapter 11 Proceedings is that InterTAN no longer has access to financing under the Secured Credit Facility and would be unable to purchase inventory and discharge its obligations in the ordinary course.

36.     A&M has not been a party to what are obviously ongoing and very complex negotiations between InterTAN and the Secured Lenders.   However, the Secured Lenders have advised InterTAN that they are only willing to continue to extend credit to InterTAN

- 10 -

under the DIP Facility and as part of a CCAA filing co-ordinated with the Chapter 11 Proceedings. The DIP Facility will be available for working capital and general corporate purposes and for post-filing expenses and costs during the Chapter 11 Proceedings and these CCAA Proceedings.

37.   A&M understands that the key elements of the DIP Facility are as follows:

- the Borrowers will be the same as under the Credit Agreement;

- the DIP Lenders will be the same as the Secured Lenders under the Credit Agreement;

- the total amount of the DIP Facility will be US$1.1 billion (the "Loan Cap"), including a maximum Canadian commitment of US$50 million for InterTAN, which Canadian commitment escalates to US$60 million from December 29, 2008 to the earlier of January 17, 2009 or the closing and funding of the Junior DIP (as defined below). The Loan Cap will be reduced to US$900,000,000 on December 29, 2008;

- the DIP Facility will have a sub-limit of US$350 million for the issuance of letters of credit of which up to US$40 million may be issued for the account of InterTAN. All outstanding letters of credit issued under the Credit Agreement shall be deemed to be issued under the DIP Facility;

- the Borrowers, including InterTAN, will be jointly and severally liable for the amounts outstanding under the DIP Facility, meaning that the obligations under the DIP Facility will be cross-guaranteed and cross-collateralized as follows:

  o all U.S. subsidiaries of Circuit City will be liable for the amounts drawn under the DIP Facility by InterTAN and will pledge their assets and property as security for InterTAN's obligations; and

  o all Canadian subsidiaries of Circuit City, including InterTAN and Tourmalet, will be liable for the amounts drawn under the DIP Facility by the U.S. Debtors and will pledge their assets and property as security for the U.S. Debtors' obligations; and

- 11 -

- the Applicants will grant the DIP Lenders security to be evidenced by, *inter alia*, a court-ordered charge on the Applicants' assets and property (the "DIP Charge") such that the security over the Applicants' property and assets will rank as follows:

  o the Administration Charge (as defined in the Initial Order) in the amount of $2 million;

  o the Directors' Charge (as defined in the Initial Order) in the amount of $19.3 million;

  o the KERP Charge (as defined in the Initial Order) in the amount of $838,000;

  o the DIP Charge to the maximum amount borrowed by InterTAN under the DIP Facility;

  o a $25 million charge (the "Unsecured Creditors Charge") to secure payment of the claims of Canadian pre-filing unsecured creditors; and

  o the remainder of the DIP Charge pertaining to the guarantee liabilities of the Applicants to the DIP Lenders over and above the amount borrowed by InterTAN under the DIP Facility;

- InterTAN can borrow monies from the U.S. Debtors to the extent that direct loans to InterTAN are insufficient to meet cash requirements, provided that the aggregate loans and investments of the U.S. Debtors to the Applicants may not exceed US$75 million;

- it is the intention of DIP Lenders that InterTAN's borrowings under the DIP Facility will always remain fully drawn in the amount of US$50 million or US$60 million, as applicable;

- the U.S. Debtors will have access to the amount of borrowings not required by InterTAN, and the DIP Lenders may sweep the cash of InterTAN at any time upon five days' notice to InterTAN;

- the Borrowers are required to obtain a subordinate debtor-in-possession facility in the form of a term loan in the amount of not less than US $75 million by January 17, 2009 (the "Junior DIP");

- from the closing date of the DIP Facility until the earlier of January 17, 2009 or the closing and funding of the Junior DIP, credit extensions to InterTAN will be based on a borrowing base calculated as a percentage of the appraised value of InterTAN's eligible inventory minus any applicable reserves; and

- the DIP Facility will mature on the earlier of: (i) twelve months from the closing date; (ii) the occurrence of a specified continuing event of default; (iii) a sale of all or substantially all of the borrowers' assets or (iv) emergence from the Chapter 11 Proceedings and the effectiveness of a plan of compromise under the CCAA.

38.    As noted above, the entire amount of the DIP Facility is to be secured by a security interest on substantially all of the assets of the Borrowers and guarantors including the Applicants.    The security provided by InterTAN in connection with the DIP Facility extends, without limitation, to InterTAN's inventory, accounts, equipment, general intangibles, deposit accounts, investment property and real estate.    In addition to increasing the quantum secured, the Secured Lenders' security will be broadened to cover all assets of InterTAN, which security did not previously cover equipment or real estate assets.    The assets of Tourmalet, which did not grant security in respect of its guarantee of InterTAN's obligations under the Senior Secured Facility, will also become secured in respect of the DIP Facility.

39.    The DIP Facility will also introduce a change in the mechanics of the loan.    From and after the closing date of the DIP Facility until the earlier of January 17, 2009 or the closing and funding of the Junior DIP, credit extensions to InterTAN will be based on a declining percentage of the net cost value of InterTAN's eligible inventory (90% to December 30, 2008, 87.5% to January 17, 2009 and 85% thereafter) minus any applicable reserves.    Based on the Cash Flow Forecast it is anticipated that the proposed DIP Facility will accommodate InterTAN's liquidity requirements during the requested stay period, but only provided that amounts advanced to the U.S. Debtors by InterTAN

- 13 -

pursuant to the DIP Facility are re-advanced to InterTAN as needed.  As noted in the
Cash Flow Forecast, the availability created by the assets of InterTAN will result in
advances to the U.S. Debtors as well.

40.    It is a condition of the DIP Facility that the Court approve such funding on these terms.
The Company has advised A&M that:

- the proposed DIP Facility, while not perfect, represents the only alternative available to
  the Company;

- the DIP Facility will ensure the continuation of operations and thus employment for all of
  the current employees;

- because the approval of the DIP Facility is a condition to all lending, the entire enterprise
  and all business and jobs in the North American operations would be at risk if the DIP
  Facility is not approved; and

- the DIP Facility will ensure continued access to cash for the Company, provided that
  amounts advanced to the U.S. Debtors by InterTAN pursuant to the DIP Facility are re-
  advanced to InterTAN as needed, and will see the maximum credit available to InterTAN
  increase from US$50 million to approximately US$60 million.

**IMPLICATIONS OF DIP FINANCING FOR INTERTAN'S CANADIAN CREDITORS**

41.    InterTAN had total liabilities of approximately $120.1 million as at October 31, 2008,
which can be summarized as follows (in $000s):

| | |
|---|---:|
| Bank debt | 37,500 |
| Trade accounts payable (including outstanding cheques) | 37,249 |
| Deferred warranty revenue and other customer related liabilities | 24,873 |
| Accrued employee related liabilities | 8,330 |
| Joint venture partner deposits and other smaller liabilities | 5,913 |
| Accrued rent, utilities, freight and other smaller liabilities | 3,825 |

- 14 -

| Commodity tax liabilities | 2,459 |
|---|---|
| Total | 120,149 |

42.   Pursuant to the Initial Order, InterTAN is entitled but not required to pay various expenses payable on or after the date of the Initial Order, as well as amounts owing for certain goods and services supplied to the Company prior to the date of the Initial Order. These expenses and obligations include:   (i) outstanding employee wages, salaries, benefits, vacation pay, bonuses and expenses; (ii) amounts due to Purolator Courier and other logistics or supply chain providers and custom brokers; (iii) amounts due to trade vendors and suppliers outside of North America; and (iv) amounts related to servicing warranties and honouring gift cards and reward and loyalty programs.   As such, a significant portion of the Company's liabilities will not be affected by a CCAA stay of proceedings.   The largest of these liabilities is deferred warranty revenue which represents deferred revenue  of $21.5 million on 36-month extended warranty contracts sold through the Company's retail stores.   This liability is recorded for accounting purposes through the matching of the revenue stream to the 36-month coverage period provided for in the warranty agreements; however, the actual amount of liabilities incurred under these arrangements is dependent upon actual claims.

43.   Based on the information and analysis that has been made available to A&M to date, it is estimated that of the $120.1 million of total liabilities summarized above, approximately $26.8 million ($22.5 million of trade accounts payable, net of estimated potential set-offs, and $4.3 million of joint venture partner deposits and other smaller accrued liabilities), excluding litigation claims, would be stayed by the Initial Order.   In addition, management estimates that there will be approximately $5 million of outstanding cheques at the time of the CCAA application that may also be stayed by the Initial Order. Therefore, based on the information and analysis that has been made available to A&M to date, it is estimated that total trade creditor claims that may be stayed by the Initial Order are in the order of $26.8 million to $31.8 million, net of estimated potential set-offs.

44.   A&M has been provided with an extract of a report (the "Report Extract") prepared on behalf of the Secured Lenders to estimate the net orderly liquidation value ("NOLV") of

- 15 -

InterTAN's inventory. The Report Extract is dated November 3, 2008 and was prepared based on the Company's inventory and other records as of September 29, 2008. The NOLV of InterTAN's inventory as set out in the Report Extract far exceeds InterTAN's current borrowings under the Secured Credit Facility.

45.    In addition to the inventory assets addressed in the Report Extract, the Company also has accounts receivable, and property, plant and equipment assets, including its owned headquarters and warehouse in Barrie, Ontario. These assets had a combined net book value of approximately $80.5 million as at October 31, 2008 and can be summarized as follows (in $000s, net of accumulated depreciation where applicable):

| | |
|---|---|
| Dealer accounts receivable | 26,094 |
| Other accounts receivable, net of known potential set-offs | 12,387 |
| Land and buildings | 5,544 |
| Leasehold improvements | 13,194 |
| Furniture and fixtures | 14,618 |
| Machinery and equipment | 8,619 |
| Total | 80,456 |

46.    A&M has not conducted a detailed review of the realizable value of the accounts receivable set out above, nor has it commissioned an appraisal of the real property, leasehold improvements, furniture and fixtures, and machinery and equipment assets. However, in the view of A&M, when considered together with the NOLV of InterTAN's inventory, the value of InterTAN's combined assets in an orderly wind down of the business far exceeds the current borrowings under the Secured Credit Facility. Therefore, prior to the cross-collateralization and enhanced security provided for under the DIP Facility, as described above, it is likely that the trade creditor claims of $26.8 million to $31.8 million discussed above, would receive a meaningful recovery in an orderly wind down of the business.

47.    Further to the above, InterTAN reported EBITDA of $33.1 million for the fiscal year ended February 28, 2008 and, depending on the outcome of the critical holiday sales

- 16 -

season, it is expecting EBITDA for fiscal 2009 to be approximately $26 million. A&M has not conducted a detailed enterprise valuation of the Company and has not had the opportunity to engage in any discussions with InterTAN's newly appointed investment banking advisors; however, InterTAN's projected EBITDA results would ordinarily auger well for a potential going concern solution.

**SUMMARY COMMENTS:**

48.    A&M is of the view that:

- generally, a going concern restructuring best preserves value of a company, whereas a liquidation and wind-down generally results in a diminution in value;

- the liquidation and wind-down of InterTAN would eliminate over 3000 jobs, many of which we understand would be preserved if InterTAN were continued as a going concern;

- similarly, the liquidation and wind-down of InterTAN would detrimentally affect dealers, joint venture partners and other stakeholders whose interests we understand would be preserved in a going concern sale;

- a liquidation and wind-down of InterTAN would also result in a number of claims that would not arise in a going concern scenario, such as employee and landlord claims, which would reduce the amount of proceeds available for other unsecured creditors; and

- the proposed going concern restructuring of InterTAN would principally limit the claims that would be stayed, and potentially compromised, to trade liabilities estimated by the Company to be approximately $26.8 million to $31.8 million.

49.    In these circumstances, A&M is supportive of InterTAN's efforts to obtain interim financing so as to avoid a liquidation and facilitate a restructuring or going concern sale of the Company under the CCAA. A&M understands that the DIP Lenders are only willing to extend additional credit to InterTAN under the conditions of the DIP Facility. InterTAN has advised A&M that InterTAN does not have any alternative financing arrangements and that, without access to financing under the DIP Facility, it would face

an imminent liquidity crisis and the prospect of an immediate liquidation of its assets. Consequently, A&M understands InterTAN's desire to obtain this Honourable Court's approval of the DIP Facility as part of the Initial Order.

50.  There are certain features of the proposed DIP financing of which A&M believes the Court should be aware. A&M was provided with a draft of the DIP Facility agreement late on November 9, 2008 and has not had an opportunity to review it in any detail. In addition, A&M has not been a party to what have been lengthy and complicated negotiations in connection with the DIP Facility. The following information is based upon the advice of the Company and its advisors:

- The DIP Facility contemplates a DIP Charge that would provide the Secured Lenders with security over all of InterTAN's assets, thereby providing them with a super-priority security interest over equipment and real estate assets over which they did not previously have security. In addition, the DIP Charge would secure not just advances for InterTAN's borrowings, but also the entire amount of the borrowings of the U.S. Debtors.

- Under the Secured Credit Facility, InterTAN had dominion over its cash receipts in the ordinary course and the Secured Lenders could only sweep InterTAN's cash in certain defined circumstances. All amounts swept were applied to pay down the Canadian Facility. The DIP loan provides for new cash dominion arrangements. We understand that the cash receipts of InterTAN can be swept and used to pay down any amounts owing under the DIP Facility, including the amounts advanced to the U.S. Debtors. Again, there does not appear to be any repayment or balancing of accounts mechanism to protect InterTAN's creditors.

- The portion of the DIP Facility available to InterTAN is expected to be fully drawn at all times, with the amount of any availability not needed by InterTAN being drawn and then advanced to the U.S. Debtors by InterTAN. A&M is not aware of any mechanism to ensure that funds will be repaid or re-advanced to InterTAN as and when needed.

- The DIP Facility provides for the Junior DIP to be in place by January 17, 2008, the failure of which is an event of default under the DIP Facility.

- 18 -

- The DIP Lenders have agreed to the creation of the $25 million Unsecured Creditors Charge for the payment of pre-filing unsecured creditors.  A&M understands that the purpose of the Unsecured Creditors Charge is to provide some measure of protection for the unsecured creditors stayed during a going concern restructuring of InterTAN.  Based on information from InterTAN, these creditors are owed between $26.8 million and $31.8 million, provided that the Company achieves a going concern sale and provided that the Company or a buyer pays or honours certain other pre-filing claims as contemplated by the Initial Order.  If this occurs, the result of the Unsecured Creditors Charge would appear to be positive.  However, if no going concern outcome is achieved and there is a wind-down after the Initial Order is issued, those unsecured creditors may well receive a less meaningful recovery than they might receive in a liquidation of InterTAN today.

51.    Given the state of the credit markets and under the present circumstances, A&M appreciates InterTAN's view that the proposed DIP financing deal is the only viable financing available to the Company at the present time.  A&M recognizes the Company's need for ongoing financing and is supportive of its efforts to maintain going concern value and to protect its employees and other stakeholders.

All of which is respectfully submitted at Toronto, Ontario this 10th day of November, 2008.

**ALVAREZ & MARSAL CANADA ULC**
in its capacity as the Proposed Monitor
InterTAN Canada Ltd.

Per: _____
        Name:  Douglas McIntosh
        Title:   Managing Director
        I/We have the authority to bind the corporation

\5653482

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF INTERTAN
CANADA LTD. AND TOURMALET CORPORATION

Court File No.: _____

*ONTARIO*

**SUPERIOR COURT OF JUSTICE**

**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**FIRST MONITOR'S REPORT**

**Goodmans LLP**

Barristers & Solicitors

250 Yonge Street, Suite 2400

Toronto, Canada  M5B 2M6

Jay A. Carfagnini (LSUC#222936)

L. Joseph Latham (LSCU# 32326A)

Tel: 416.979.2211

Fax: 416.979.1234

Solicitors for the Monitor