# COVERS & INDEX

Court File No. 08-CV-7841

## ONTARIO

### SUPERIOR COURT OF JUSTICE

### COMMERCIAL LIST

*IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED*

*AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF INTERTAN CANADA LTD. AND TOURMALET CORPORATION*

APPLICANTS

## FIRST REPORT OF THE MONITOR
## ALVAREZ & MARSAL CANADA ULC
### (dated November 24, 2008)

**Goodmans LLP**
250 Yonge Street
Suite 2400
Toronto, ON    M5B 2M6

Jay A. Carfagnini  LSUC#: 222936
Fred Myers  LSUC#: 26301A
L. Joseph Latham  LSUC#: 32326A

Tel:  416.979.2211
Fax:  416.979.1234

Solicitors for the Monitor

# INDEX

1.  First Report of the Monitor Alvarez & Marsal Canada ULC dated November 24, 2008

    Appendix "A"  -  Initial Report dated November 10, 2008;

    Appendix "B"  -  InterTAN first and second press releases dated November 10, 2008;

    Appendix "C"  -  Orders dated November 10, 2008 and November 12, 2008, respectively, in the Chapter 11 Proceedings concerning inter-company transactions;

    Appendix "D"  -  US Cash Flow Forecast; and

    Appendix "E"  -  Revised draft U.S. cash flow forecasts assuming 7 day trade credit.

GOODMANS\5658387.1

Court File No.: 08-CV-7841

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF INTERTAN
CANADA LTD. AND TOURMALET CORPORATION

*ONTARIO*

**SUPERIOR COURT OF JUSTICE**

**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**FIRST REPORT OF THE MONITOR
ALVAREZ & MARSAL CANADA ULC**
(dated November 24, 2008)

**Goodmans LLP**
Barristers & Solicitors
250 Yonge Street, Suite 2400
Toronto, Canada M5B 2M6

Jay A. Carfagnini (LSUC#222936)
Fred Myers (LSUC#26301A)
L. Joseph Latham (LSCU# 32326A)

Tel: 416.979.2211
Fax: 416.979.1234

Solicitors for the Monitor

\5658462

# TAB 1

Court File No. 08-CV-7841

**ONTARIO**

**SUPERIOR COURT OF JUSTICE**

**COMMERCIAL LIST**

*IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED*

*AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF INTERTAN CANADA LTD. AND TOURMALET CORPORATION*

APPLICANTS

**FIRST REPORT OF THE MONITOR**

**ALVAREZ & MARSAL CANADA ULC**

**NOVEMBER 24, 2008**

**INTRODUCTION**

1.    By order of this Honourable Court dated November 10, 2008 (the "Initial Order"), InterTAN Canada Ltd. ("InterTAN" or the "Company") and Tourmalet Corporation ("Tourmalet" and together with InterTAN the "Applicants") obtained protection from their creditors under the *Companies' Creditors Arrangement Act* ("CCAA").

2.    Pursuant to the Initial Order, Alvarez & Marsal Canada ULC ("A&M") was appointed monitor of the Applicants during these CCAA proceedings (the "Monitor").

3.    In connection with the Applicants' application for protection under the CCAA, A&M provided this Honourable Court with an initial report in its capacity as proposed monitor (the "Initial Report") dated November 10, 2008, a copy of which is attached as **Appendix "A"**.

- 2 -

4.    Capitalized terms not otherwise defined in this Report are as defined in the Initial Order, the Initial Report, or the affidavit of Mark Wong sworn November 10, 2008 (the "Wong Affidavit") in support of the Applicants' request for relief under the CCAA.

5.    To assist the Court at the "come back hearing" scheduled for November 26, 2008 (as required by paragraph 52 of the Initial Order), the purpose of this report of the Monitor (the "First Report") is to provide this Honourable Court with an update in respect of the following:

- communications with stakeholders;

- cash flow results relative to forecast;

- the Monitor's review of the Secured Credit Facility;

- critical suppliers and pre-CCAA expenses;

- InterTAN's KERP;

- Review of material contracts;

- issues raised by the Applicants' landlords;

- the Debtor-in-Possession ("DIP") financing under the Initial Order; and

- the Applicants' proposed sales process.

**TERMS OF REFERENCE**

6.    In preparing this First Report, the Monitor has relied upon unaudited financial information, the Company's books and records, the financial information prepared by the Company and its advisors, and discussions with management of the Company. The Monitor has not audited, reviewed, or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, the Monitor expresses no opinion or other form of assurance on the information contained in this First Report.

- 3 -

7.    Certain of the information referred to in this First Report consists of forecasts and/or projections. An examination or review of financial forecasts and projections, as outlined in the Canadian Institute of Chartered Accountants Handbook, has not been performed. Future oriented financial information referred to in this First Report was prepared based on management's estimates and assumptions. Readers are cautioned that since projections are based upon assumptions about future events and conditions that are not ascertainable, actual results will vary from the projections, even if the assumptions materialize, and the variations could be significant.

8.    The Monitor has requested that management bring to its attention any significant matters which were not addressed in the course of its specific inquiries. Accordingly, this First Report is based solely on the information (financial or otherwise) made available to the Monitor.

9.    This First Report has been prepared for the use of this Court, as general information on the status of the Applicants' CCAA proceedings. Given the nature of A&M's mandate, this information is subject to change as the mandate progresses.

10.   All references to dollars in this First Report are in Canadian currency unless otherwise noted.

## BACKGROUND

11.   InterTAN is a leading specialty retailer of consumer electronics in Canada and is the operating Canadian subsidiary of the major U.S.-based electronics retailer Circuit City Stores, Inc. ("Circuit City"). Tourmalet is a Nova Scotia unlimited liability company that is an indirect, wholly-owned subsidiary of Circuit City. Tourmalet is a non-operating holding company whose sole asset is the preferred stock of InterTAN Inc., which is the sole shareholder of InterTAN. Circuit City is the Applicants' ultimate parent company. Further background to InterTAN, Tourmalet and Circuit City is contained in the materials filed relating to the Initial Order, including the Wong Affidavit. These documents, together with other information regarding this CCAA proceeding, including the Initial Order and supporting affidavit, have been posted by the Monitor on its website at www.alvarezandmarsal.com/intertan.

12.     On November 10, 2008, Circuit City and certain of its affiliates (the "U.S. Debtors") filed
        for bankruptcy protection (the "Chapter 11 Proceedings") pursuant to Chapter 11 of Title
        11 of the *United States Code* (the "U.S. Bankruptcy Code") in the United States
        Bankruptcy Court for the Eastern District of Virginia (the "U.S. Bankruptcy Court").   A
        hyperlink to information concerning the U.S. Debtors' restructuring can be found at
        www.kccllc.net.

13.     The result of the commencement of the Chapter 11 Proceedings was that InterTAN no
        longer had access to financing under its Secured Credit Facility and, absent a DIP loan, it
        would have been unable to purchase inventory and discharge its obligations in the
        ordinary course.   The lending syndicate under the Secured Credit Facility was only
        willing to advance further funds to InterTAN as part of a DIP facility negotiated by the
        U.S. Debtors which was only made available to InterTAN as part of a CCAA filing co-
        ordinated with the Chapter 11 Proceedings.   Information regarding the DIP financing is
        discussed in more detail below.

**COMMUNICATIONS WITH STAKEHOLDERS**

14.     Pursuant to paragraph 49 of the Initial Order, with the Monitor's assistance and oversight,
        InterTAN has mailed a notice and a copy of the Initial Order to every known creditor of
        InterTAN disclosed on the books and records of InterTAN as having a claim of more
        than $10,000 against InterTAN, and to all known litigation claimants with outstanding
        claims against InterTAN.   The Monitor has also posted a copy of the Notice to Creditors
        on its website.   The Monitor is not aware of any third party creditors of Tourmalet other
        than the Secured Lenders under an unsecured guarantee executed by Tourmalet as
        discussed in the Intial Report.

15.     Prior to the commencement of these CCAA proceedings and the Chapter 11 Proceedings,
        Longview Communications Inc. was engaged to assist InterTAN in communicating with
        its stakeholders.

16.     Following the filing for U.S. bankruptcy protection by Circuit City, InterTAN issued a
        press release on November 10, 2008 to announce that it intended to file for protection
        under the CCAA and that it expected that this Court would hear the application on that

- 5 -

day. Upon the granting of the Initial Order in this proceeding, InterTAN issued a second press release on November 10, 2008 to announce that it had been granted creditor protection by this Court. A copy of each press release is attached as **Appendix "B"**.

(i)    **Customers**

17.    The press releases referred to above emphasized that The Source remains open for business and will continue to honour customer programs such as returns, exchanges, warranties and gift cards.

18.    Management of InterTAN has advised the Monitor that, since the granting of the Initial Order, retail sales are continuing to grow as one would expect as the holiday season approaches and are tracking close to forecast.

(ii)    **Employees**

19.    As at September 30, 2008, InterTAN had approximately 3,130 employees, including 2,660 store employees, 345 front office employees, and 125 employees in its warehouse and distribution centre.  Of these 3,130 employees, the 125 employees in the warehouse and distribution centre are members of a labour union, the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, Local 6709 (the "Union"). Paragraph 55 of the Wong Affidavit notes that there are no registered pension plans in place for InterTAN's management or other employees.

20.    Management of InterTAN has advised the Monitor that it has had a strong relationship with the Union in the past which continues under this restructuring process.

21.    Immediately prior to and after the making of the Initial Order, Ron Cuthbertson, the President of InterTAN, telephoned John Chamelot, the Staff Representative of the Union, to advise Mr. Chamelot of the CCAA filings and to invite Mr. Chamelot to discuss any concerns that the Union may have regarding the restructuring.  Management has advised the Monitor that, to date, the Union has not communicated any concerns to InterTAN.

- 6 -

22.     Senior management convened a "town hall" style meeting with employees located at InterTAN's Barrie headquarters on November 10, 2008 to discuss the CCAA filing.

23.     Management has advised the Monitor that InterTAN continues to enjoy the support of its workforce and that InterTAN has not experienced any increase in employee turnover since the commencement of these proceedings.

(iii)    **Dealers and Joint Venture Partners**

24.     InterTAN sent letters to all of its dealers (there are 270 dealer-operated stores) and joint venture partners (there are 69 stores operated pursuant to joint venture agreements) by e-mail to advise them of the CCAA application and to emphasize that InterTAN's plan is to remain open, staffed and committed to serving customers during its restructuring process. Management has advised the Monitor that they continue to be in regular contact with InterTAN's dealers and joint venture partners and that those retail stores continue to operate in the normal fashion.

(iv)    **Landlords**

25.     InterTAN sent letters to all of its landlords by e-mail to advise them of the commencement of these CCAA proceedings and to emphasize that InterTAN's plan is to remain open, staffed and committed to serving customers during its restructuring process. While the Monitor is aware that, as discussed below, counsel for certain landlords have contacted the Company's counsel to seek changes to the Initial Order, management has advised the Monitor that InterTAN continues to enjoy normal access to all of its leased store locations.

(v)     **Suppliers and Vendors**

26.     InterTAN sent letters to all of its North American and foreign suppliers and vendors by e-mail to notify them of the CCAA application, the relevant terms of the Initial Order that would allow it to continue to pay for goods and services going forward and, for non-North American suppliers, the authority to pay for goods supplied both before and after the commencement of the CCAA proceedings.

27.  Management has advised the Monitor that, for the most part, suppliers continue to supply on the cash-in-advance and cash-on-delivery policies that they imposed prior to the CCAA proceedings.  InterTAN continues to be in contact with its key suppliers and is paying for goods in the ordinary course of business.  In general, with certain minor exceptions, suppliers have continued to supply without interruption.

## CASH FLOW RESULTS RELATIVE TO FORECAST

28.  InterTAN's cash receipts and disbursements for the one-week period to November 16, 2008 are summarized below and are compared to the comparable week of the cash flow forecast filed with this Honourable Court as Appendix L to the Wong Affidavit (the "CCAA Cash Flow Forecast").

| *(Unaudited, in $CDN 000's)* | For the Week Ended November 16, 2008 | | |
| --- | --- | --- | --- |
| | **Actual** | **Forecast** | **Variance** |
| *Receipts* | **13,586** | **5,727** | **7,859** |
| *Disbursements* | | | |
| Merchandise | (13,786) | (13,950) | 164 |
| Payroll and payroll taxes | (3,850) | (4,049) | 199 |
| Operating disbursements | (697) | (1,480) | 783 |
| Restructuring costs | (741) | (2,730) | 1,989 |
| Other | (5) | (327) | 322 |
| *Total Disbursements* | **(19,079)** | **(22,536)** | **3,457** |
| **Net Cash Flow** | **(5,493)** | **(16,809)** | **11,316** |

29.  Despite the fact that sales for the first week of post-CCAA operations were approximately 5% below management's sales forecast, receipts were approximately $7.9 million ahead of the CCAA Cash Flow Forecast.  Management advises that this was

primarily due to a one time, up-front reserve which had been built into the CCAA Cash Flow Forecast to anticipate declining cash receipts as a result of the commencement of these proceedings. Management expects that this variance is primarily a timing difference that will reverse over the coming six weeks.

30.   Disbursements for the week were approximately $3.5 million less than the CCAA Cash Flow Forecast. Management attributes this variance primarily to: (i) timing differences between actual and forecast payment of deposits; and (ii) timing differences between actual and forecast payments for advertising, utilities, logistics and other services. Management expects that these variances will reverse in the coming weeks.

31.   The ending cash balance for InterTAN as at November 16, 2008 was approximately $8.6 million, including net draws by InterTAN on the DIP facility during the week of $8.5 million.

32.   Overall, during the week ended November 16, 2008, InterTAN experienced a positive net cash flow variance of approximately $11.3 million, relative to the CCAA Cash Flow Forecast. In addition, InterTAN's opening combined net cash and loan position, before letters of credit ("LC's"), for the week was approximately $6.5 million better than forecast ($5.6 million of cash in bank, plus $832,000 lower opening loan position than forecast), primarily because management had anticipated that there would be no funds in the Company's bank accounts as at the date of the CCAA filings.

33.   At the time the CCAA Cash Flow Forecast was prepared, management anticipated that InterTAN's LC requirements would be met through the LC facility available to Circuit City as part of the DIP Facility and that InterTAN's LC's would not be included in its availability calculations under the DIP Facility. However, as management and InterTAN's advisors worked with the DIP Lenders and Circuit City to calculate the opening loan position as at the date of the CCAA filings, it was determined that InterTAN's LC's would be included in its overall loan position for purposes of calculating borrowing availability under the DIP Facility. InterTAN's outstanding LC's as at the filing date were approximately $7.7 million.

- 9 -

34.   Taking into consideration:   (i) the $11.3 million positive variance on the cash flow activity for the week; (ii) the $6.5 million of opening funds on hand that were not anticipated; and (iii) the requirement to include the $7.7 million of LC's in InterTAN's loan availability calculations, InterTAN's net availability position as at November 16, 2008 was approximately $10.1 million ahead of the CCAA Cash Flow Forecast.

35.   InterTAN's opening and closing combined net cash, loan and LC's positions for the week ended November 16, 2008 are summarized below and are compared to the comparable week of the CCAA Cash Flow Forecast.

| *(Unaudited, in $CDN 000's)* | For the Week Ended November 16, 2008 | | |
|---|---|---|---|
| | **Actual** | **Forecast** | **Variance** |
| **Opening position** | | | |
| Cash in bank (a) | 5,613 | - | 5,613 |
| Loans (b) | (42,500) | (43,332) | 832 |
| Letters of credit (c) | (7,650) | - | (7,650) |
| Combined net opening position | (44,537) | (43,332) | (1,205) |
| | | | |
| Net cash flow (see table above) | (5,493) | (16,809) | |
| Net DIP advances for week (d) | 8,500 | 16,809 | |
| Net cash inflow for week (e) | 3,007 | - | |
| **Closing position** | | | |
| Cash in bank (a+e) | 8,620 | - | 8,620 |
| Loans and LC's (b+c+d) | (58,650) | (60,140) | 1,490 |
| **Combined net closing position** | **(50,030)** | **(60,140)** | **10,110** |

36.    In summary, for the end of the first week following the date of the Initial Order
(November 16, 2008), the CCAA Cash Flow Forecast had projected a total loan position
of $60.1 million (including a DIP Loan balance of $58.8 million and a loan of $1.3
million from Circuit City), the LC's being included in the U.S. borrowing, and no cash in
InterTAN's bank accounts.  In fact, as at November 16, 2008, InterTAN had $8.6 million
in its bank accounts (due to its drawing on the DIP Facility), had not borrowed any funds
from Circuit City, and had a balance of $58.7 million outstanding under the DIP Facility
after including therein the $7.7 million of LC's and the $8.5 million draw during that
week.  On a comparable basis, InterTAN's loan position (after netting out its cash on
hand and excluding the $7.7 million of LC's that were not contemplated by the CCAA
Cash Flow Forecast) would have been approximately $42.4 million as compared to the
$60.1 million forecasted.

37.    With combined closing loan and LC balances of approximately $58.7 million, InterTAN
was close to fully drawn on its current allocation from the DIP Facility of U.S. $50
million (approximately CDN $60.6 million) as at November 16, 2008.  However, as
indicated above, it had cash on hand of approximately $8.6 million as at that date.

38.    Paragraph 5 of the Initial Order authorizes the Applicants to continue to utilize their
existing cash management practices or similar practices as may be required to facilitate
the terms of the DIP Facility.  Management has advised the Monitor that InterTAN's cash
management system continues to operate in the same manner as it had prior to the
commencement of these proceedings, subject to the changes referenced in paragraph 102
of the Wong Affidavit.

39.    In paragraphs 41 to 49 of the Initial Report, based on the information made available to
A&M at that time, it was estimated that the total pre-CCAA, unsecured trade creditor
claims that would be subject to the stay of proceedings contained in the Initial Order were
between $26.8 million to $31.8 million, net of potential set-offs, and excluding litigation
claims and excluding claims that InterTAN expects to pay while subject to these
proceedings or have assumed by a purchaser (the net amount being the "Stayed Trade
Creditor Claims").  Management has now reviewed the books and records and applied

accounting cut-off procedures as at the date of the Initial Order and has refined its estimate of the Stayed Trade Creditor Claims to approximately $29.3 million.

## THE MONITOR'S REVIEW OF THE SECURED CREDIT FACILITY

40.    At the Monitor's request, its counsel, Goodmans LLP ("Goodmans"), has completed a detailed review of the general security agreement dated January 31, 2008 (referenced in paragraph 21 of the Initial Report) in the Province of Ontario.  Goodmans has opined, subject to the usual qualifications, that B of A, as lender and agent for the syndicate of lenders under the Secured Credit Facility holds validly perfected security in Ontario over the inventory, receivables and intangible assets of InterTAN.  Goodmans has also retained BCF LLP to provide an independent opinion with respect to InterTAN's deed of hypothec in the Province of Quebec.  The Monitor expects to receive an opinion from BCF LLP shortly confirming its independent opinion concerning the Quebec security. The Monitor will report on the contents of this opinion in a subsequent Monitor's Report.

## CRITICAL SUPPLIERS AND PRE-CCAA EXPENSES

41.    Paragraph 6(d) of the Initial Order authorized the Applicants to pay amounts owing for goods and services actually supplied to the Applicants prior to the commencement of the proceedings:

   (i)    by Purolator Courier and other logistics or supply chain providers;

   (ii)    by customs brokers; and

   (iii)   with the consent of the Monitor, up to $2 million, by other North American suppliers including payments in respect of documentary credits or deposits, if, in the opinion of the Applicants the supplier is critical to the Business and ongoing operations of the Applicants.

42.    In addition, Paragraph 6(h) of the Initial Order authorizes the Applicants to pay, with the consent of the Monitor, "...any other costs and expenses that are deemed necessary for the Preservation of the Property and/or the Business by the Applicants".

43.    In order to provide oversight and meaningful review of requests for payments of pre-CCAA amounts that may be made by the Applicants and for which the Monitor's consent is required, the Monitor and the Applicants agreed to establish a process where requests to pay pre-CCAA filing obligations will first be brought to InterTAN's Chief Financial Officer for review and approval before being brought to the Monitor for its review and consent.

44.    As of the delivery of this First Report, one payment to a critical supplier for goods or services supplied prior to the CCAA proceedings in the amount of $25,100 had been made.  InterTAN has not approached the Monitor to date to seek its consent for the payment of any other pre-CCAA expenses.

**INTERTAN'S KERP**

45.    In paragraphs 32 and 33 of the Initial Report, the Monitor reported on advice that it had received concerning proposed KERP arrangements.  On November 22, 2008, InterTAN provided the Monitor with copies of five (5) letters to its senior management employees offering them bonuses, in varying amounts, if they remain employed by InterTAN and perform all of their employment duties for six, nine and twelve months from the November 19, 2008 date of the letters.  The contents of the letters are virtually identical with the exception of the employees' names and the amounts of the stay bonuses being offered to them at each milestone date.  The letters provide that no further stay bonus will be paid to an employee if the employee terminates his employment (including by a claim of constructive dismissal) prior to any milestone date or if the employee is dismissed for cause prior to a milestone date.  The stay bonuses will be paid in full to any employee whose employment is terminated without cause within the ensuing year or if there is a change of control within the meaning of the Circuit City 2003 Stock Incentive Plan as amended and restated as at December 14, 2006.  The total amount of all of the stay bonuses to be paid if all five (5) employees remain employed for the full year is $838,298.  The KERP Charge granted in the Initial Order is capped at $838,000.  None of the letters received by the Monitor had been signed by the employees as yet.

- 13 -

## REVIEW OF MATERIAL CONTRACTS

46.    The Monitor is aware of the existence of several material agreements between InterTAN and its significant suppliers.  The Monitor and its counsel are in the process of collecting and reviewing the material contracts in order to assess whether InterTAN's rights and obligations under the material contracts might have a significant impact on projected results or possible restructuring options.

## ISSUES RAISED BY THE APPLICANTS' LANDLORDS

47.    The Applicants' counsel has been contacted by counsel representing a group of the Applicants' landlords who is requesting, among other things, that certain amendments be made to the Initial Order to conform it to the most recent amendments to the standard form template CCAA Order - Long Form, as approved by the Commercial List Users' Committee on November 18, 2008.   The Monitor's counsel will participate in those discussions to the extent that it can be helpful to the parties to assist them to reach a consensus.

## THE DIP FINANCING UNDER THE INITIAL ORDER

### (i)    Description

48.    In the Initial Report, A&M described the details of the DIP Financing based on the information it had at that time.  A&M was provided with a draft of the DIP Facility agreement late on November 9, 2008 and had not had an opportunity to review it in any detail when the Initial Report was prepared.  The Monitor has now been able to confirm details and acquired new information surrounding the DIP Financing.

49.    The Monitor understands that the key elements of the DIP Facility are as follows:

- the Borrowers will be the same as under the Credit Agreement;

- the DIP Lenders will be the same as the Secured Lenders under the Credit Agreement;

- 14 -

- the total amount available under the DIP Facility is currently U.S.$1.1 billion (the **"Loan Cap"**), subject to a borrowing base calculation, and is allocated between the U.S. Debtors and InterTAN and adjusted from time to time as follows:

| Period | Loan Cap | U.S. Commitment | Canadian Commitment |
|---|---|---|---|
| to Dec. 28, 2008 | U.S.$1,100,000,000 | U.S.$1,050,000,000 | U.S.$50,000,000 |
| Dec. 29 to Dec. 31, 2008 | U.S.$900,000,000 | U.S.$850,000,000 | U.S.$50,000,000 |
| Jan. 1, 2009 to the earlier of Jan. 17, 2009 or the closing and funding of the Junior DIP (as defined below) (the **"Adjustment Date"**) | U.S.$910,000,000 | U.S.$850,000,000 | U.S.$60,000,000 |
| Thereafter | U.S.$900,000,000 | U.S.$850,000,000 | U.S.$50,000,000 |

The Loan Cap will also be reduced by the aggregate amount of the unpaid pre-petition liabilities of the U.S. Debtors to the Secured Lenders prior to the Adjustment Date and thereafter by the aggregate amount of the unpaid pre-petition liabilities of the U.S. Debtors and InterTAN to the Secured Lenders;

- from the closing date of the DIP Facility until the Adjustment Date, credit extensions to InterTAN are based on a borrowing base calculated as a percentage of the appraised value of InterTAN's eligible inventory, minus any applicable reserves. Thereafter, credit extensions to InterTAN will not be subject to a Canadian borrowing base calculation but will be limited to the unutilized amount available to the U.S. Debtors under a borrowing base calculation based on the eligible receivables and the eligible inventory of the U.S. Debtors and InterTAN;

- the U.S. Debtors will have access to the amount of borrowing base availability not utilized by InterTAN;

- 15 -

- InterTAN can borrow monies from the U.S. Debtors to the extent that direct loans to InterTAN are insufficient to meet its cash requirements, provided that the aggregate loans and investments of the U.S. Debtors to the Applicants may not exceed U.S.$75 million;

- the Borrowers, including InterTAN, will be jointly and severally liable for the amounts outstanding under the DIP Facility, meaning that the obligations under the DIP Facility will be cross-guaranteed and cross-collateralized as follows:

  o  Circuit City and all of its U.S. subsidiaries will be liable for the amounts drawn under the DIP Facility by InterTAN and will pledge their assets and property as security for InterTAN's obligations; and

  o  all Canadian subsidiaries of Circuit City, including the Applicants, will be liable for the amounts drawn under the DIP Facility by the U.S. Debtors and will pledge their assets and property as security for the U.S. Debtors' obligations;

- the Applicants will grant the DIP Lenders security to be evidenced by, among other things, a court-ordered charge on the Applicants' assets and property (the "**DIP Charge**") with the following ranking as compared to other court-ordered charges:

  o  the Administration Charge (as defined in the Initial Order) in the amount of $2 million;

  o  the Directors' Charge (as defined in the Initial Order) in the amount of $19.3 million;

  o  the KERP Charge (as defined in the Initial Order) in the amount of $838,000;

  o  the DIP Charge, to the extent of direct borrowing by InterTAN under the DIP Facility, not to exceed U.S. $60 million plus accrued and unpaid interest and allowable costs and expenses of the DIP Lenders;

- o a $25 million charge (the "Canadian Creditor Charge") to secure payment of the Canadian unsecured creditors; and

- o the remainder of the DIP Charge pertaining to the guarantee liabilities of the Applicants to the DIP Lenders over and above the amount borrowed by InterTAN under the DIP Facility;

- the DIP Lenders may sweep the cash of InterTAN for payment of the obligations of the U.S. Debtors at any time, subject to the five (5) day notice provision contained in paragraph 39 of the initial Order;

- the Borrowers are required to obtain a subordinate debtor-in-possession facility in the form of a term loan in the amount of not less than U.S. $75 million by January 17, 2009 (the "Junior DIP"); and

- the DIP Facility will mature on the earlier of: (i) November 10, 2009; (ii) the occurrence of a specified continuing event of default; (iii) a sale of all or substantially all of the borrowers' assets or (iv) emergence from the Chapter 11 Proceedings and the effectiveness of a plan of compromise under the CCAA.

50.    As noted above, the entire amount of the DIP Facility is intended to be secured by a security interest on substantially all of the assets of the Borrowers and guarantors, including the Applicants.  On November 19, 2008, the Monitor and its counsel were provided with a number of security documents under the DIP Agreement.  There was not sufficient time to fully review those documents and include a description of their scope in this First Report.

### (ii)    Matters Previously Noted by the Monitor

51.    In its Initial Report, A&M advised the Court of certain aspects of the DIP financing which it believed to be noteworthy:

- The DIP Facility contemplated a DIP Charge that would provide the Secured Lenders with security over all of InterTAN's assets, thereby providing them with a super-priority security interest over equipment and real estate assets over which they did not

previously have security. In addition, the DIP Charge would secure not just advances to InterTAN, but also the entire amount of the borrowings of the U.S. Debtors.

- Under the Secured Credit Facility, InterTAN had dominion over its cash receipts in the ordinary course and the Secured Lenders could only sweep InterTAN's cash in certain defined circumstances. All amounts swept were to be applied to pay down the Canadian Facility. The DIP loan provided for new cash dominion arrangements. Cash receipts of InterTAN that are swept under these arrangements will be first applied to InterTAN's obligations and any excess will be available to pay down any other amounts owing under the DIP Facility, including the amounts advanced to the U.S. Debtors.

- Paragraph 99(f) of the Wong Affidavit noted that it was the intention of the parties to the DIP Facility that the portion of the DIP Facility available to InterTAN was expected to be fully drawn at all times and that the U.S. Debtors would have access to the amount of borrowings not required by InterTAN at any given time. A&M expressed its concern that if inter-company advances were to be made from InterTAN to the U.S. Debtors, it did not appear that there was any mechanism provided to ensure that funds would be repaid or re-advanced to InterTAN as and when needed. This issue is addressed further below.

- The DIP Facility also introduced a change in the mechanics of the loan. From and after the closing date of the DIP Facility until the Adjustment Date, credit extensions to InterTAN will be based on a percentage of the net cost value of InterTAN's eligible inventory, minus any applicable reserves. Based on the CCAA Cash Flow Forecast, it was anticipated that the proposed DIP Facility would accommodate InterTAN's liquidity requirements during the requested stay period, but only if the amount of anticipated advances from InterTAN to the U.S. Debtors were reduced or if amounts actually advanced by InterTAN to the U.S. Debtors pursuant to the DIP Facility were to be re-paid or re-advanced to InterTAN as and when needed.

- The DIP Lenders and the Applicants agreed to the creation of the $25 million Canadian Creditor Charge for the payment of unsecured creditors. A&M reported

- 18 -

that it understood that the purpose of the Canadian Creditor Charge was to provide some measure of protection for the Stayed Trade Creditor Claims during a going concern restructuring of InterTAN.  Based on information from InterTAN as at the date of the Initial Order, the Stayed Trade Creditor Claims appeared to be valued at between $26.8 million and $31.8 million, when calculated on the assumption that InterTAN achieves a going concern sale and provided that InterTAN or a buyer pays or honours certain other pre-filing claims.

(iii)    **Update on DIP Discussions**

52.    Subsequent to the making of the Initial Order, the Monitor continued to hold discussions with the Applicants and their advisors concerning the mechanics of inter-company advances so as to attempt to ensure that: (i) the Applicants' cash requirements as disclosed in the CCAA Cash Flow Forecast would be met (i.e., liquidity issues); and (ii) funds advanced by InterTAN to the U.S. Debtors were protected so as to be available to pay Canadian creditors (i.e., protecting inter-company transfers).

53.    On November 17, 2008, counsel for the Applicants advised the Monitor's counsel that the U.S. Debtors had obtained two orders in the Chapter 11 Proceedings concerning inter-company borrowings dated November 10, 2008 and November 12, 2008, respectively, copies of which are attached as **Appendix "C"**.  Both orders authorize the U.S. Debtors to enter into inter-company borrowing transactions with non-debtor affiliates and grant the affiliated lenders administrative priority charges under section sections 503 and 507 of the U.S. Bankruptcy Code in respect of such transactions.    The Monitor his since been informed by its U.S. counsel, Allen & Overy LLP (Kenneth Coleman), that such administrative charges entitle the lenders to be re-paid prior to general unsecured creditors but behind secured creditors (who are referred to as "lien holders" in U.S. proceedings).

54.    Although the Monitor had requested and would have preferred the opportunity to review the U.S. Debtors' cash flow forecasts prior to the Chapter 11 filings, the Monitor was only able to obtain the U.S. Debtors' 13 week cash flow forecasts which had been filed with the U.S. Bankruptcy Court (the "U.S. Cash Flow Forecast") once they were posted

on the website for the Chapter 11 Proceedings.  A copy of the U.S. Cash Flow Forecast is attached as **Appendix "D"**.  The U.S. Cash Flow Forecast discloses the forecast DIP advances to the U.S. Debtors and the Applicants on a global basis and reflects anticipated credit usage and availability throughout the 13 week period.  The Monitor notes that, although the Wong Affidavit indicated an intention to fully draw InterTAN's DIP Facility throughout these proceedings, there is no entry in the U.S. Cash Flow Forecast disclosing any anticipated borrowing by the U.S. Debtors from InterTAN throughout the 13-week forecast period.  The Canadian availability limit is shown on the U.S. Cash Flow Forecast as part of the calculation of global availability under the DIP Facility.

55.    On November 19, 2008, at the request of the Monitor, representatives of the Monitor and its counsel attended the offices of the U.S. Debtors' counsel in Washington, D.C., to meet with the U.S. Debtors and their legal and financial advisors.  Also present were James Marcum, the Vice Chairman of the Board of Directors of Circuit City and its Acting President and Chief Executive Officer, Bruce Besanko, the Chief Financial Officer of Circuit City, and the Applicants' legal and financial advisors.  During the meeting, the U.S. Debtors and their representatives provided information to the Monitor, some of which was intended for disclosure to this Honourable Court and to the Applicants' stakeholders.

56.    At the November 19, 2008 meeting, the U.S. Debtors advised the Monitor that the U.S. Cash Flow Forecast was based on conservative assumptions.  The U.S. Cash Flow Forecast shows that, even under those assumptions, there is no projected need for the U.S. Debtors to borrow from InterTAN based on availability requirements.  Consistent with their comments, the U.S. Debtors advised the Monitor that, at the end of their first week of bankruptcy protection, the actual availability for the U.S. Debtors and the Applicants under the DIP Facility was approximately U.S.$200 million rather than the U.S.$56 million which they had forecasted in the U.S. Cash Flow Forecasts.  They advised that this improvement was due to: (i) sales revenues being higher than what they had projected; (ii) the early receipt of a tax refund which had been projected to be received later; (iii) a reduction of forecasted disbursements relating primarily to timing issues; and (iv) an increase in inventory due to higher than expected pre-petition receipts.

57.     The U.S. Debtors further advised the Monitor that they do not anticipate borrowing from InterTAN except in unanticipated and exigent circumstances such as to avert a covenant default under the DIP Facility or an imminent cash flow crisis.

58.     The U.S. Debtors and their financial advisors have agreed to provide to the Monitor copies of the weekly cash flow updates that they provide to the Secured Lenders so that the Monitor can confirm the cash flow status and trends on a frequent and ongoing basis.

59.     Another important piece of information that the U.S. Debtors provided to the Monitor for disclosure to the Court and stakeholders, is that they are currently in discussions with certain of their major suppliers, represented on the Unsecured Creditors' Committee (the "UCC") in the Chapter 11 Proceedings, with the goal of obtaining the agreement of certain suppliers to supply trade credit terms to the U.S. Debtors going forward.   The U.S. Debtors informed the Monitor that they believe that if they were able to obtain reasonable trade credit terms, availability under the DIP Facility would increase substantially.  Were this to occur, not only would the need for inter-company borrowing from InterTAN be that much less likely, but the U.S. Debtors are hopeful that the arrangements with their vendors would either fulfill or obviate the requirement to obtain a junior DIP loan.  This, they say, would further ease the financial pressure on the U.S. Debtors and the Applicants and would also provide some assurance that they would have sufficient time for the implementation of a value-maximizing sales process.

60.     To support this advice, the financial advisors to the U.S. Debtors have subsequently provided cash flow forecasts to the Monitor that are predicated upon the U.S. Debtors obtaining seven (7) days trade terms and suggest a potentially positive effect of trade credit being made available to the U.S. Debtors.   Copies of these further cash flow forecasts are attached as **Appendix "E"**.

61.     The Monitor raised with the U.S. Debtors the prospect of InterTAN being granted security for any intercompany advances that it makes to the U.S. Debtors.  The U.S. Debtors advised the Monitor that, if they were to provide a security interest (a "junior lien") to the Applicants in connection with potential future inter-company advances from InterTAN to the U.S. Debtors, their ability to negotiate trade credit terms with their major

suppliers would be impaired. That is, were InterTAN to demand security for inter-company advances (as contrasted with the unsecured administrative priority provided in the two U.S. orders referred to above) they would interfere with the ability of the U.S. Debtors to obtain trade credit and this would actually increase the likelihood that the U.S. Debtors would be required to draw funds from Canada. In view of the U.S. Debtors' advice that they do not currently need to borrow funds from InterTAN, it is the Monitor's view that the issue of the nature and terms of inter-company lending by InterTAN to the U.S. Debtors does not need to be resolved until such time as the U.S. Debtors advise that they anticipate that they may need to borrow from InterTAN.

62.    At the meeting, the U.S. Debtors advised the Monitor that they hope to conclude their negotiations with their trade creditors before their next scheduled hearing in U.S. Bankruptcy Court on December 5, 2008, at which time final DIP approval is currently scheduled to be heard. The U.S. Debtors have now advised us that the final DIP approval hearing in the Chapter 11 Proceedings may be rescheduled to a later date. In view of the short time frame involved, and relying on the U.S. Debtors' advice that they do not currently need or anticipate a need to borrow funds from the Applicants, the Monitor is prepared to await the outcome of the negotiations with those trade creditors and the hearing of the final U.S. DIP approval motion to see if the concerns that it noted in its Initial Report are fully addressed.

63.    The Monitor has instructed its U.S. counsel, Allen & Overy LLP, to attend the hearing before the U.S. Bankruptcy Court on December 5, 2008 in order to observe the proceedings from the perspective of the Applicants and to provide any assistance to the U.S. Court in co-ordinating with this Honourable Court as either Court may request.

## THE APPLICANTS' PROPOSED SALES PROCESS

64.    As was noted in the Wong Affidavit, InterTAN has previously restructured itself and was operating profitably as a going concern prior to the commencement of the Chapter 11 Proceedings. The approach to these proceedings and, specifically, the quantum of the Canadian Creditor Charge in the Initial Order, are premised upon the continuation of the

- 22 -

Applicants' business as a going concern including maintaining all or virtually all employment and leases.

65.    The Applicants have retained NM Rothschild & Sons Canada Limited ("Rothschild") as an investment banking advisor to pursue strategic alternatives for InterTAN. The Applicants advise that, with input that they have received from Rothschild, they will be bringing a motion seeking approval of a proposed bidding process shortly.

66.    The Applicants and Rothschild have agreed to involve the Monitor in the implementation of their proposed sales process. At the Monitor's request, Rothschild has met with the Monitor twice to date. It has provided the Monitor with a copy of the teaser document that it has prepared in order to commence marketing InterTAN's business, as well as a draft timeline, a draft non-disclosure agreement for prospective bidders, its initial contact lists, a management presentation concerning the business, an index to the secure electronic data room constructed for the sales process, and access to the secure electronic data room.

67.    The Monitor has previously noted that, particularly given that InterTAN is operating under a Unanimous Shareholders Declaration, the prospect of a single, global sale of the assets of the Applicants and the U.S. Debtors raises the potential for conflicts, purchase price allocation concerns and other issues. The Monitor has expressed to the Applicants, the U.S. Debtors and their respective advisors its view that a sales process for the Canadian assets should therefore be transparent and should be, and appear to be, independent.

68.    In order to address these concerns, the Applicants and Rothschild have advised the Monitor that there is to be a separate engagement of Rothschild for InterTAN pursuant to an engagement letter distinct from that governing the relationship between the U.S. Debtors and a U.S. affiliate of Rothschild. The Monitor has requested a copy of the Canadian engagement letter and expects to receive it as soon as it is finalized.

69.    Rothschild has also advised the Monitor that it is focused on Canada as a separate sales process from the sale of the U.S. Debtors. It is contemplated that approval will be sought, in both Courts, for a form of stalking horse bid process for the Applicants and the

U.S. Debtors.   To that end, Rothschild advises that it has already distributed teaser documents and is seeking indicative bids from potential stalking horse bidders by mid-December. It proposes that the Canadian and U.S. processes will be run in parallel to allow for the possibility of a global sale should one prove to be available, value-maximizing and practical in the circumstances.  The Monitor is advised that a sale of the Canadian business separate from the US Debtors remains a distinct option for Rothschild and the Applicants.   With the approval of the U.S. Debtors and the Applicants, Rothschild has agreed to provide the Monitor with frequent updates so as to ensure that the Monitor is fully involved throughout of the process, including the opening of bids and the finalization of the auction process.

70.    In paragraphs 44 to 47 of the Initial Report, the Monitor provided some information about the value of the Applicants' business on an assumed orderly wind down scenario. Since that time, management has retained real estate appraisers to provide preliminary advice concerning the Applicants' real estate assets and the Monitor obtained a preliminary assessment of the realization value of the Applicants' warehouse equipment. The Monitor has undertaken these preparatory valuation steps to help it to understand the restructuring alternatives available to the Applicants.

71.    The Monitor will continue to oversee the Applicants' restructuring activities and seek appropriate information so as to enable it to confirm that the proposed process is proceeding as discussed pending the motions for approval of the sales process.

## SUMMARY COMMENTS

- The Monitor is prepared to await the outcome of the U.S. proceedings on December 5, 2008 before assessing the terms of the inter-company lending required to protect Canadian creditors provided that the Applicants and the U.S. Debtors provide reasonable advance notice to the Monitor prior to making any inter-company advances from InterTAN to the U.S. Debtors.

- As discussed in the Initial Report, a key underpinning of this proceeding is the intention that InterTAN be sold as a going concern with employee, landlord, warranty and other claims being paid or assumed by a purchaser so as to avoid the

- 24 -

triggering of additional claims beyond the Stayed Trade Creditor Claims that would diminish the adequacy of the $25 million Canadian Creditor Charge to pay the claims of Canadian creditors.  The Monitor intends to continue to stay closely involved with the Applicants' sales process as it develops.

All of which is respectfully submitted at Toronto, Ontario this 24th day of November, 2008.

**ALVAREZ & MARSAL CANADA ULC**
in its capacity as Court appointed Monitor of
InterTAN Canada Ltd. and Tourmalet Corporation

Per: _____

      Name: Douglas R. McIntosh
      Title:   Managing Director
      I/We have the authority to bind the corporation

Court File No.: 08-CV-7841

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF INTERTAN
CANADA LTD. AND TOURMALET CORPORATION

*ONTARIO*

**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**MONITOR'S FIRST REPORT**

**Goodmans LLP**
Barristers & Solicitors
250 Yonge Street, Suite 2400
Toronto, Canada  M5B 2M6

Jay A. Carfagnini (LSUC#222936)
Fred Myers (LSUC#2630lA)
L. Joseph Latham (LSCU# 32326A)

Tel: 416.979.2211
Fax: 416.979.1234

Solicitors for the Monitor

\5655890

# APPENDIX "A"

Court File No. _____

## ONTARIO

## SUPERIOR COURT OF JUSTICE

## COMMERCIAL LIST

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED*

*AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF INTERTAN CANADA LTD. AND TOURMALET CORPORATION*

APPLICANTS

## REPORT OF ALVAREZ & MARSAL CANADA ULC

### In its Capacity as Proposed Monitor

### NOVEMBER 10, 2008

## INTRODUCTION

1.  InterTAN Canada Ltd. ("InterTAN" or the "Company") and Tourmalet Corporation ("Tourmalet" and together with InterTAN the "Applicants") have brought an application before this Honourable Court seeking various relief under the *Companies' Creditors Arrangement Act* ("CCAA").

2.  Alvarez & Marsal Canada ULC ("A&M") has consented to act as Monitor in these CCAA proceedings. This report is prepared by A&M, as the Proposed Monitor of the Applicants, to assist this Honourable Court in considering the Applicants' requests for relief.

3.  The purpose of this report ("Report") is to provide this Honourable Court with information concerning:

- 2 -

- background on InterTAN's business;

- the financial position of InterTAN;

- the current secured credit facility in place for InterTAN;

- recent actions by InterTAN's trade creditors that have impacted its cash flow;

- the proposed restructuring of InterTAN and the proposed restructuring alternatives;

- the terms of the proposed Debtor-in-Possession ("DIP") financing;

- the implications of the DIP financing for InterTAN's Canadian creditors; and

- A&M's summary comments.

4.    Capitalized terms not otherwise defined in this Report are as defined in the affidavit of Mark Wong sworn November 10, 2008 (the "Wong Affidavit") in support of InterTAN's request for relief under the CCAA.

**TERMS OF REFERENCE**

5.    In preparing this Report, A&M has relied upon unaudited financial information, the Company's books and records, the financial information prepared by the Company and its advisors, and discussions with management of InterTAN.  A&M has not audited, reviewed, or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, A&M expresses no opinion or other form of assurance on the information contained in this Report.

**ENGAGEMENT OF A&M**

6.    A&M was retained by InterTAN on October 31, 2008 as the Proposed Monitor.  Since that date, A&M has been reviewing InterTAN's available financial information in an attempt to gain knowledge of the business and financial affairs of the Company and has been preparing for InterTAN's anticipated CCAA application.

- 3 -

**BACKGROUND**

7.     InterTAN is a company incorporated under the laws of the Province of Ontario.  It is a leading specialty retailer of consumer electronics in Canada and is the operating Canadian subsidiary of the major United States based electronics retailer Circuit City Stores, Inc. ("Circuit City").  InterTAN operates retail stores under "The Source" brand. As at September 30, 2008, InterTAN had approximately 3,130 employees.  Circuit City, based in Richmond, Virginia, is a leading specialty retailer of consumer electronics and operates a nationwide chain of large electronics stores that sell, among other things, televisions, home theatre systems, computers, camcorders, furniture, software, imaging and telecommunications products, and other audio and video electronics.  The typical format for The Source is a small, strategically located store in a mall, with an average store size of approximately 2,100 square feet.  A typical Circuit City retail store, which competes with such big box retailers as Best Buy, has a typical store size in the range of 20,000 to 35,000 square feet.

8.     Tourmalet is a Nova Scotia unlimited liability company that is an indirect, wholly owned subsidiary of Circuit City.  Tourmalet is a non-operating holding company whose sole asset is the preferred stock of InterTAN Inc., which is the sole shareholder of InterTAN.

9.     Circuit City is the Applicants' ultimate parent company.  On November 10, 2008, Circuit City and certain of its affiliates (the "U.S. Debtors") filed for bankruptcy protection (the "Chapter 11 Proceedings") pursuant to Chapter 11 of Title 11 of the United States Code (the "US Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Virginia (the "US Bankruptcy Court").

10.    InterTAN's sole secured credit facility was established under an agreement between Circuit City, certain of its U.S. affiliates and InterTAN (as borrowers), Bank of America N.A. ("B of A") (as agent and lender), and certain other loan parties (the "Secured Credit Facility").  The Secured Credit Facility consists of a US$1.25 billion commitment to the U.S. Debtors and a US$50 million commitment to InterTAN.  InterTAN has not guaranteed and is not liable for the borrowings of the U.S. Debtors under the Secured Credit Facility.  Tourmalet is not a party to the Secured Credit Facility but it has

- 4 -

guaranteed InterTAN's obligations thereunder. A&M understands that this guarantee is unsecured. Further information on the Secured Credit Facility is provided below.

11.     As a result of the commencement of the Chapter 11 Proceedings, the Secured Credit Facility was terminated and the parties to that loan agreement entered into a Debtor-in-Possession loan facility (the "DIP Facility") to replace the Secured Credit Facility. A&M understands that, unlike the Secured Credit Facility, the DIP Facility provides that credit would only be advanced to Circuit City on the condition that InterTAN become a joint and several borrower for all advances and a guarantor for the entire facility, including existing advances to the U.S. Debtors, and to have all of InterTAN's assets pledged as security for those obligations. Furthermore, A&M understands that the lenders providing the DIP Facility will only extend credit to InterTAN if the DIP Facility is approved by an Order of this Honourable Court under the CCAA with a charge over all of the assets and property of InterTAN. The priority of this proposed charge is more particularly described below.

## THE FINANCIAL POSITION OF INTERTAN

12.     As at September 30, 2008, InterTAN had total assets of approximately $370,000,000. According to its internal, unaudited financial statements at September 30, 2008, InterTAN's current assets represented $218,622,642 of its total assets, including $148,131,256 of inventory, $49,958,615 of current accounts and notes receivables and $5,798,376 in cash. Non-current assets were comprised primarily of property, plant and equipment of $44,936,936, notes receivable of $90,862,414 (representing promissory notes from InterTAN, Inc. and Tourmalet) and goodwill of $8,729,887.

13.     As at September 30, 2008, InterTAN's total liabilities were approximately $110,000,000. These liabilities consisted of current liabilities of approximately $89,465,123, miscellaneous long-term liabilities of approximately $20,222,964 and inter-company payables of $251,050. Current liabilities as at September 30, 2008 included $49,723,903 of trade accounts payable, accrued expenses of $22,215,186, deferred service contract revenue of $9,801,152 and short term bank borrowings of $7,500,000.

- 5 -

14.   In preparation for a CCAA application, the Company, with the assistance of its financial advisor FTI Consulting ("FTI"), prepared a 17-week cash flow forecast (the "Cash Flow Forecast") which is appended as Exhibit "L" to the Wong Affidavit.  A&M has reviewed and discussed the Cash Flow Forecast with InterTAN's management and FTI.  As set out in the Cash Flow Forecast, InterTAN's borrowings under the Secured Credit Facility were projected to be approximately $43.3 million through November 9, 2008.

15.   The Cash Flow Forecast projects that the Company will require further incremental funding during the forecast period of up to $19.8 million, such that cumulative credit requirements to fund InterTAN's operations are projected to peak at approximately $63.1 million during the week ending November 30, 2008 ($43.3 million of borrowings under the Secured Credit Facility plus approximately $19.8 million of incremental borrowings under the DIP Facility).

16.   Due to the seasonal nature of InterTAN's business, the credit requirements to fund its operations are projected to reduce rapidly throughout December as the Company receives the proceeds from the Christmas sale season.  Borrowings under the DIP Facility required to fund InterTAN's operations are projected to be reduced to approximately $1.0 million by January 4, 2009.  From that time forward, the Cash Flow Forecast indicates that borrowings under the DIP Facility to fund InterTAN's operations will range from approximately $600,000 to $8.6 million through the week ending March 1, 2009. However, A&M understands that the portion of the DIP Facility available to InterTAN will remain fully drawn, with the funds not needed to fund InterTAN's operations being advanced by InterTAN to the U.S. Debtors.  A&M notes that, to the best of its knowledge, there is presently no mechanism ensuring repayment of the amounts advanced by InterTAN to the U.S. Debtors and no mechanism to ensure that sufficient funds will be repaid to service InterTAN's liquidity needs.

**SECURED CREDIT FACILITY**

17.   Circuit City, as lead borrower for Circuit City, Circuit City Stores West Coast, Inc., Circuit City Stores PR, LLC (collectively, the "Circuit City Borrowers") and InterTAN (together with the Circuit City Borrowers, the "Borrowers"), entered into a Second

- 6 -

Amended and Restated Credit Agreement (the "Credit Agreement") dated as of January 31, 2008 with Bank of America, N.A. (as Administrative Agent and Collateral Agent), Banc of America Securities LLC, Wells Fargo Retail Finance, LLC, General Electric Capital Corporation, JPMorgan Chase Bank, N.A. and Wachovia Capital Finance Corporation (collectively the "Secured Lenders" and in connection with the DIP Facility described below, the "DIP Lenders"). The Credit Agreement provided the Borrowers with access to the Secured Credit Facility, a US$1.3 billion credit facility which includes a US$1.25 billion commitment for the Circuit City Borrowers (the "US Facility") and a US$50 million commitment for InterTAN (the "Canadian Facility").

18.    Under the Credit Agreement, the maximum amount of borrowings, including loans and outstanding letters of credit to or for the benefit of the Borrowers, may not exceed the lesser of (i) US$1.3 billion and (ii) a borrowing base calculated as 90% of the Circuit City Borrowers' eligible inventory and credit card receivables, less availability reserves (all as defined more particularly in the Credit Agreement). Under the Credit Agreement, the amount available to InterTAN is not dictated by its own assets; rather, the amount available is a function of the Circuit City Borrowers' borrowing base less the credit extended to the Circuit City Borrowers, to a maximum of US$50 million.

19.    An event of default under the Credit Agreement occurs when any borrowing party files for relief under the U.S. Bankruptcy Code. Thus, the Credit Agreement is in default as a result of the Chapter 11 Proceedings. The result of this default is the termination of the Credit Agreement, which causes all obligations under the Canadian Facility to become automatically due and payable without presentment, demand, protest or other notice of any kind.

20.    As at November 9, 2008, InterTAN had outstanding borrowings under the Secured Credit Facility of approximately $43.3 million.

21.    InterTAN's obligations under the Credit Agreement are limited to the amounts borrowed by InterTAN. As security for these obligations, A&M understands that InterTAN has executed the following security documents (the "Security Documents") in favour of the Secured Lenders:

- 7 -

    (a)    an amended and restated general security agreement dated January 31, 2008, securing all of InterTAN's accounts receivable, inventory, cash and intangibles, but not covering its equipment or real estate; and

    (b)    a deed of hypothec on movable property dated January 31, 2008, securing all of InterTAN's accounts receivable, inventory, cash and intangibles, but not covering its equipment or real estate.

22.    As noted above, Tourmalet is not a party to the Secured Credit Facility. It has guaranteed InterTAN's obligations under the Secured Credit Facility pursuant to a guarantee agreement dated January 31, 2008. A&M understands that Tourmalet has not granted security for this guarantee.

23.    A&M has retained Goodmans LLP ("Goodmans") as its independent counsel in this matter and has asked Goodmans to provide its preliminary views on the security held by Bank of America. Goodmans' preliminary view is that Bank of America holds valid and perfected security in Ontario over the inventory, receivables and intangible assets of InterTAN described in the Security Documents. Goodmans is in the process of retaining local agents in other Canadian jurisdictions and formalizing the opinion on a national basis.

**TRADE CREDITOR ACTIONS**

24.    Over the past few months, as a result of public reports concerning potential liquidity concerns at Circuit City, several of InterTAN's significant suppliers of branded products have shortened their credit terms, requiring cash in advance or on delivery, which has had the effect of increasing the exposure of the Secured Lenders and decreasing trade payables. In particular, the Company's borrowings under the Secured Credit Facility increased from $7.5 million at the end of September to $37.5 million at the end of October, while at the same time inventory increased by approximately $8.4 million and trade accounts payable decreased by approximately $13.8 million.

25.    InterTAN is now commencing its crucial sales period, which is the late-fall/early-winter holiday season. Meeting the needs of InterTAN's customers over the holiday season

- 8 -

requires significantly higher than usual stocking of inventory. It is essential that InterTAN's suppliers continue to supply InterTAN through this period and that InterTAN has access to sufficient credit to obtain holiday season levels of inventory.

26.    In order to ensure the continuity of InterTAN's supply chain from outside of North America (where the stay of proceedings under this application and the stay arising due to the commencement of the Chapter 11 Proceedings will not apply), InterTAN is proposing to continue to pay foreign trade creditors and suppliers in the ordinary course both before and after the date of filing.

27.    With respect to North American suppliers, InterTAN is proposing to freeze all pre-filing trade claims until further order of this Court, subject however to the Monitor having discretion (i) to authorize critical supplier payments for pre-filing amounts not to exceed $2 million (subject to further order of the Court) and (ii) to authorize the payment of any other costs and expenses that are deemed necessary for the preservation of InterTAN's property and business.

## RESTRUCTURING OF INTERTAN AND TERMS OF THE PROPOSED DIP RESTRUCTURING ALTERNATIVES

28.    A&M understands that one of the restructuring alternatives to be pursued by InterTAN and the U.S. Debtors is the sale of all or a portion of their respective businesses.

29.    In early 2008, Circuit City considered strategic options with respect to InterTAN. InterTAN, Inc., the shareholder of InterTAN, retained the investment banking services of Goldman, Sachs & Co. ("Goldman") to canvass the market with a view to pursuing a divestiture transaction involving InterTAN. Goldman prepared disclosure and marketing materials that were distributed to potential purchasers who entered into a confidentiality agreement with Circuit City. To date, this sales initiative has not resulted in the completion of a transaction involving InterTAN.

30.    A&M understands that on October 9, 2008 the shareholder of InterTAN, namely InterTAN, Inc., executed a unanimous shareholder's declaration wholly relieving the board of directors of InterTAN of their directorial powers.

31.   The DIP Facility requires the implementation of a court-approved sales process with respect to the assets and business of the U.S. Debtors; however, there is no specific requirement in the DIP Facility for a sale process with respect to the business and property of InterTAN.  It is InterTAN's view that a sales process ought to be pursued concurrently with other restructuring and refinancing options in an effort to maximize stakeholder value.  NM Rothschild & Sons Canada Limited ("Rothschild") has been engaged as an investment banking advisor to pursue strategic alternatives for the Company.

**KERP**

32.   InterTAN has advised A&M that it has agreed to enter into a Key Employee Retention Plan (the "KERP") with certain of its key management employees, consisting of the Chief Executive Officer, the Chief Financial Officer and three Vice Presidents. InterTAN is of the view that the retention of these employees is necessary to the preservation of InterTAN's enterprise value as it proceeds with its restructuring.

33.   While it has not seen a copy of the KERP documentation, A&M understands that the maximum amounts payable under the KERP are $838,000.  The terms of the KERP are set out in detail in the Affidavit of Mark Wong sworn November 10, 2008, in support of the Applicants' CCAA application.

**DIP FINANCING**

34.   As described herein, the financing of InterTAN's Canadian operations is intertwined with the financing of Circuit City's U.S. operations as the Canadian and U.S. entities are parties to the same Credit Agreement.

35.   The result of the commencement of the Chapter 11 Proceedings is that InterTAN no longer has access to financing under the Secured Credit Facility and would be unable to purchase inventory and discharge its obligations in the ordinary course.

36.   A&M has not been a party to what are obviously ongoing and very complex negotiations between InterTAN and the Secured Lenders.   However, the Secured Lenders have advised InterTAN that they are only willing to continue to extend credit to InterTAN

- 10 -

under the DIP Facility and as part of a CCAA filing co-ordinated with the Chapter 11
Proceedings.    The DIP Facility will be available for working capital and general
corporate purposes and for post-filing expenses and costs during the Chapter 11
Proceedings and these CCAA Proceedings.

37.    A&M understands that the key elements of the DIP Facility are as follows:

- the Borrowers will be the same as under the Credit Agreement;

- the DIP Lenders will be the same as the Secured Lenders under the Credit Agreement;

- the total amount of the DIP Facility will be US$1.1 billion (the "Loan Cap"), including a
  maximum Canadian commitment of US$50 million for InterTAN, which Canadian
  commitment escalates to US$60 million from December 29, 2008 to the earlier of
  January 17, 2009 or the closing and funding of the Junior DIP (as defined below).   The
  Loan Cap will be reduced to US$900,000,000 on December 29, 2008;

- the DIP Facility will have a sub-limit of US$350 million for the issuance of letters of
  credit of which up to US$40 million may be issued for the account of InterTAN.   All
  outstanding letters of credit issued under the Credit Agreement shall be deemed to be
  issued under the DIP Facility;

- the Borrowers, including InterTAN, will be jointly and severally liable for the amounts
  outstanding under the DIP Facility, meaning that the obligations under the DIP Facility
  will be cross-guaranteed and cross-collateralized as follows:

  o all U.S. subsidiaries of Circuit City will be liable for the amounts drawn under the
    DIP Facility by InterTAN and will pledge their assets and property as security for
    InterTAN's obligations; and

  o all Canadian subsidiaries of Circuit City, including InterTAN and Tourmalet, will
    be liable for the amounts drawn under the DIP Facility by the U.S. Debtors and
    will pledge their assets and property as security for the U.S. Debtors' obligations;
    and

- 11 -

- the Applicants will grant the DIP Lenders security to be evidenced by, *inter alia*, a court-ordered charge on the Applicants' assets and property (the "DIP Charge") such that the security over the Applicants' property and assets will rank as follows:

  o the Administration Charge (as defined in the Initial Order) in the amount of $2 million;

  o the Directors' Charge (as defined in the Initial Order) in the amount of $19.3 million;

  o the KERP Charge (as defined in the Initial Order) in the amount of $838,000;

  o the DIP Charge to the maximum amount borrowed by InterTAN under the DIP Facility;

  o a $25 million charge (the "Unsecured Creditors Charge") to secure payment of the claims of Canadian pre-filing unsecured creditors; and

  o the remainder of the DIP Charge pertaining to the guarantee liabilities of the Applicants to the DIP Lenders over and above the amount borrowed by InterTAN under the DIP Facility;

- InterTAN can borrow monies from the U.S. Debtors to the extent that direct loans to InterTAN are insufficient to meet cash requirements, provided that the aggregate loans and investments of the U.S. Debtors to the Applicants may not exceed US$75 million;

- it is the intention of DIP Lenders that InterTAN's borrowings under the DIP Facility will always remain fully drawn in the amount of US$50 million or US$60 million, as applicable;

- the U.S. Debtors will have access to the amount of borrowings not required by InterTAN, and the DIP Lenders may sweep the cash of InterTAN at any time upon five days' notice to InterTAN;

- 12 -

- the Borrowers are required to obtain a subordinate debtor-in-possession facility in the form of a term loan in the amount of not less than US $75 million by January 17, 2009 (the "Junior DIP");

- from the closing date of the DIP Facility until the earlier of January 17, 2009 or the closing and funding of the Junior DIP, credit extensions to InterTAN will be based on a borrowing base calculated as a percentage of the appraised value of InterTAN's eligible inventory minus any applicable reserves; and

- the DIP Facility will mature on the earlier of: (i) twelve months from the closing date; (ii) the occurrence of a specified continuing event of default; (iii) a sale of all or substantially all of the borrowers' assets or (iv) emergence from the Chapter 11 Proceedings and the effectiveness of a plan of compromise under the CCAA.

38.    As noted above, the entire amount of the DIP Facility is to be secured by a security interest on substantially all of the assets of the Borrowers and guarantors including the Applicants.  The security provided by InterTAN in connection with the DIP Facility extends, without limitation, to InterTAN's inventory, accounts, equipment, general intangibles, deposit accounts, investment property and real estate.  In addition to increasing the quantum secured, the Secured Lenders' security will be broadened to cover all assets of InterTAN, which security did not previously cover equipment or real estate assets.  The assets of Tourmalet, which did not grant security in respect of its guarantee of InterTAN's obligations under the Senior Secured Facility, will also become secured in respect of the DIP Facility.

39.    The DIP Facility will also introduce a change in the mechanics of the loan.  From and after the closing date of the DIP Facility until the earlier of January 17, 2009 or the closing and funding of the Junior DIP, credit extensions to InterTAN will be based on a declining percentage of the net cost value of InterTAN's eligible inventory (90% to December 30, 2008, 87.5% to January 17, 2009 and 85% thereafter) minus any applicable reserves.  Based on the Cash Flow Forecast it is anticipated that the proposed DIP Facility will accommodate InterTAN's liquidity requirements during the requested stay period, but only provided that amounts advanced to the U.S. Debtors by InterTAN

- 13 -

pursuant to the DIP Facility are re-advanced to InterTAN as needed.  As noted in the Cash Flow Forecast, the availability created by the assets of InterTAN will result in advances to the U.S. Debtors as well.

40.    It is a condition of the DIP Facility that the Court approve such funding on these terms. The Company has advised A&M that:

- the proposed DIP Facility, while not perfect, represents the only alternative available to the Company;

- the DIP Facility will ensure the continuation of operations and thus employment for all of the current employees;

- because the approval of the DIP Facility is a condition to all lending, the entire enterprise and all business and jobs in the North American operations would be at risk if the DIP Facility is not approved; and

- the DIP Facility will ensure continued access to cash for the Company, provided that amounts advanced to the U.S. Debtors by InterTAN pursuant to the DIP Facility are re-advanced to InterTAN as needed, and will see the maximum credit available to InterTAN increase from US$50 million to approximately US$60 million.

## IMPLICATIONS OF DIP FINANCING FOR INTERTAN'S CANADIAN CREDITORS

41.    InterTAN had total liabilities of approximately $120.1 million as at October 31, 2008, which can be summarized as follows (in $000s):

| | |
|---|---|
| Bank debt | 37,500 |
| Trade accounts payable (including outstanding cheques) | 37,249 |
| Deferred warranty revenue and other customer related liabilities | 24,873 |
| Accrued employee related liabilities | 8,330 |
| Joint venture partner deposits and other smaller liabilities | 5,913 |
| Accrued rent, utilities, freight and other smaller liabilities | 3,825 |

- 14 -

| | |
|---|---|
| Commodity tax liabilities | <u>2,459</u> |
| Total | <u>120,149</u> |

42.    Pursuant to the Initial Order, InterTAN is entitled but not required to pay various expenses payable on or after the date of the Initial Order, as well as amounts owing for certain goods and services supplied to the Company prior to the date of the Initial Order. These expenses and obligations include:    (i) outstanding employee wages, salaries, benefits, vacation pay, bonuses and expenses; (ii) amounts due to Purolator Courier and other logistics or supply chain providers and custom brokers; (iii) amounts due to trade vendors and suppliers outside of North America; and (iv) amounts related to servicing warranties and honouring gift cards and reward and loyalty programs.    As such, a significant portion of the Company's liabilities will not be affected by a CCAA stay of proceedings.    The largest of these liabilities is deferred warranty revenue which represents deferred revenue  of $21.5 million on 36-month extended warranty contracts sold through the Company's retail stores.    This liability is recorded for accounting purposes through the matching of the revenue stream to the 36-month coverage period provided for in the warranty agreements; however, the actual amount of liabilities incurred under these arrangements is dependent upon actual claims.

43.    Based on the information and analysis that has been made available to A&M to date, it is estimated that of the $120.1 million of total liabilities summarized above, approximately $26.8 million ($22.5 million of trade accounts payable, net of estimated potential set-offs, and $4.3 million of joint venture partner deposits and other smaller accrued liabilities), excluding litigation claims, would be stayed by the Initial Order.    In addition, management estimates that there will be approximately $5 million of outstanding cheques at the time of the CCAA application that may also be stayed by the Initial Order. Therefore, based on the information and analysis that has been made available to A&M to date, it is estimated that total trade creditor claims that may be stayed by the Initial Order are in the order of $26.8 million to $31.8 million, net of estimated potential set-offs.

44.    A&M has been provided with an extract of a report (the "Report Extract") prepared on behalf of the Secured Lenders to estimate the net orderly liquidation value ("NOLV") of

InterTAN's inventory.  The Report Extract is dated November 3, 2008 and was prepared based on the Company's inventory and other records as of September 29, 2008.  The NOLV of InterTAN's inventory as set out in the Report Extract far exceeds InterTAN's current borrowings under the Secured Credit Facility.

45.    In addition to the inventory assets addressed in the Report Extract, the Company also has accounts receivable, and property, plant and equipment assets, including its owned headquarters and warehouse in Barrie, Ontario.  These assets had a combined net book value of approximately $80.5 million as at October 31, 2008 and can be summarized as follows (in $000s, net of accumulated depreciation where applicable):

| | |
|---|---:|
| Dealer accounts receivable | 26,094 |
| Other accounts receivable, net of known potential set-offs | 12,387 |
| Land and buildings | 5,544 |
| Leasehold improvements | 13,194 |
| Furniture and fixtures | 14,618 |
| Machinery and equipment | 8,619 |
| Total | 80,456 |

46.    A&M has not conducted a detailed review of the realizable value of the accounts receivable set out above, nor has it commissioned an appraisal of the real property, leasehold improvements, furniture and fixtures, and machinery and equipment assets.  However, in the view of A&M, when considered together with the NOLV of InterTAN's inventory, the value of InterTAN's combined assets in an orderly wind down of the business far exceeds the current borrowings under the Secured Credit Facility.  Therefore, prior to the cross-collateralization and enhanced security provided for under the DIP Facility, as described above, it is likely that the trade creditor claims of $26.8 million to $31.8 million discussed above, would receive a meaningful recovery in an orderly wind down of the business.

47.    Further to the above, InterTAN reported EBITDA of $33.1 million for the fiscal year ended February 28, 2008 and, depending on the outcome of the critical holiday sales

- 16 -

season, it is expecting EBITDA for fiscal 2009 to be approximately $26 million. A&M has not conducted a detailed enterprise valuation of the Company and has not had the opportunity to engage in any discussions with InterTAN's newly appointed investment banking advisors; however, InterTAN's projected EBITDA results would ordinarily auger well for a potential going concern solution.

**SUMMARY COMMENTS:**

48.    A&M is of the view that:

- generally, a going concern restructuring best preserves value of a company, whereas a liquidation and wind-down generally results in a diminution in value;

- the liquidation and wind-down of InterTAN would eliminate over 3000 jobs, many of which we understand would be preserved if InterTAN were continued as a going concern;

- similarly, the liquidation and wind-down of InterTAN would detrimentally affect dealers, joint venture partners and other stakeholders whose interests we understand would be preserved in a going concern sale;

- a liquidation and wind-down of InterTAN would also result in a number of claims that would not arise in a going concern scenario, such as employee and landlord claims, which would reduce the amount of proceeds available for other unsecured creditors; and

- the proposed going concern restructuring of InterTAN would principally limit the claims that would be stayed, and potentially compromised, to trade liabilities estimated by the Company to be approximately $26.8 million to $31.8 million.

49.    In these circumstances, A&M is supportive of InterTAN's efforts to obtain interim financing so as to avoid a liquidation and facilitate a restructuring or going concern sale of the Company under the CCAA. A&M understands that the DIP Lenders are only willing to extend additional credit to InterTAN under the conditions of the DIP Facility. InterTAN has advised A&M that InterTAN does not have any alternative financing arrangements and that, without access to financing under the DIP Facility, it would face

- 17 -

an imminent liquidity crisis and the prospect of an immediate liquidation of its assets. Consequently, A&M understands InterTAN's desire to obtain this Honourable Court's approval of the DIP Facility as part of the Initial Order.

50.     There are certain features of the proposed DIP financing of which A&M believes the Court should be aware. A&M was provided with a draft of the DIP Facility agreement late on November 9, 2008 and has not had an opportunity to review it in any detail. In addition, A&M has not been a party to what have been lengthy and complicated negotiations in connection with the DIP Facility. The following information is based upon the advice of the Company and its advisors:

- The DIP Facility contemplates a DIP Charge that would provide the Secured Lenders with security over all of InterTAN's assets, thereby providing them with a super-priority security interest over equipment and real estate assets over which they did not previously have security. In addition, the DIP Charge would secure not just advances for InterTAN's borrowings, but also the entire amount of the borrowings of the U.S. Debtors.

- Under the Secured Credit Facility, InterTAN had dominion over its cash receipts in the ordinary course and the Secured Lenders could only sweep InterTAN's cash in certain defined circumstances. All amounts swept were applied to pay down the Canadian Facility. The DIP loan provides for new cash dominion arrangements. We understand that the cash receipts of InterTAN can be swept and used to pay down any amounts owing under the DIP Facility, including the amounts advanced to the U.S. Debtors. Again, there does not appear to be any repayment or balancing of accounts mechanism to protect InterTAN's creditors.

- The portion of the DIP Facility available to InterTAN is expected to be fully drawn at all times, with the amount of any availability not needed by InterTAN being drawn and then advanced to the U.S. Debtors by InterTAN. A&M is not aware of any mechanism to ensure that funds will be repaid or re-advanced to InterTAN as and when needed.

- The DIP Facility provides for the Junior DIP to be in place by January 17, 2008, the failure of which is an event of default under the DIP Facility.

- 18 -

- The DIP Lenders have agreed to the creation of the $25 million Unsecured Creditors Charge for the payment of pre-filing unsecured creditors. A&M understands that the purpose of the Unsecured Creditors Charge is to provide some measure of protection for the unsecured creditors stayed during a going concern restructuring of InterTAN. Based on information from InterTAN, these creditors are owed between $26.8 million and $31.8 million, provided that the Company achieves a going concern sale and provided that the Company or a buyer pays or honours certain other pre-filing claims as contemplated by the Initial Order. If this occurs, the result of the Unsecured Creditors Charge would appear to be positive. However, if no going concern outcome is achieved and there is a wind-down after the Initial Order is issued, those unsecured creditors may well receive a less meaningful recovery than they might receive in a liquidation of InterTAN today.

51.   Given the state of the credit markets and under the present circumstances, A&M appreciates InterTAN's view that the proposed DIP financing deal is the only viable financing available to the Company at the present time. A&M recognizes the Company's need for ongoing financing and is supportive of its efforts to maintain going concern value and to protect its employees and other stakeholders.

All of which is respectfully submitted at Toronto, Ontario this 10th day of November, 2008.

**ALVAREZ & MARSAL CANADA ULC**
in its capacity as the Proposed Monitor
InterTAN Canada Ltd.

Per:   _____
          Name: Douglas McIntosh
          Title:   Managing Director
          I/We have the authority to bind the corporation


\5653482

Court File No.: _____

*IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF INTERTAN CANADA LTD. AND TOURMALET CORPORATION*

*ONTARIO*

SUPERIOR COURT OF JUSTICE

(COMMERCIAL LIST)

Proceeding commenced at Toronto

FIRST MONITOR'S REPORT

**Goodmans LLP**

Barristers & Solicitors

250 Yonge Street, Suite 2400

Toronto, Canada M5B 2M6

Jay A. Carfagnini (LSUC#222936)

L. Joseph Latham (LSCU# 32326A)

Tel: 416.979.2211

Fax: 416.979.1234

Solicitors for the Monitor

# APPENDIX "B"

## INTERTAN CANADA TO FILE FOR CREDITOR PROTECTION

### *- The Source by Circuit City Stores Are Open for Business –*

Barrie, ON, November 10, 2008 – InterTAN Canada Ltd. ("InterTAN"), a wholly-owned subsidiary of US-based Circuit City Stores Inc. (NYSE:CC), today announced that it intends to file for creditor protection under the Companies' Creditors Arrangement Act. InterTAN expects that the Ontario Superior Court of Justice will hear the application today.

InterTAN operates or licenses 772 neighbourhood electronics stores and dealer outlets across Canada under the trade name, The Source by Circuit City ("The Source"). These stores will remain open for business, fully staffed and the company intends to honour all customer programs such as returns, exchanges, warranties and gift cards.

### US Parent has filed for protection
InterTAN's application to seek creditor protection is a consequence of a voluntary petition for reorganization filed earlier today by Circuit City in the United States Bankruptcy Court for the Eastern District of Virginia in Richmond, VA under Chapter 11 of the United States Bankruptcy Code.

In conjunction with the US filing, Circuit City said it is seeking customary authority from the US Bankruptcy Court that will enable it to continue operating its business and serving its US customers in the ordinary course. Circuit City has negotiated a commitment for a US$ 1.1 billion debtor-in-possession (DIP) revolving credit facility to supplement its working capital and provide additional immediate liquidity while it works to reorganize the business. The new financing will enable Circuit City to pay vendors and other business partners for goods and services provided after the filing.

### Canadian subsidiary required to participate
Circuit City's filing has caused a termination of InterTAN's credit facilities. Circuit City's replacement financing is conditional upon, among other things, Court approval and the DIP lenders having security over all of InterTAN's assets. As a result, InterTAN is required to file for creditor protection under CCAA.

"We regret the necessity of this action and will be working diligently with our suppliers, employees and creditors to produce a successful holiday selling season," said Ron Cuthbertson, President of InterTAN. "*The Source* is a small-format specialty retailer with 772 stores across Canada, significant future growth potential and approximately $650 million of annual revenues. Our management is committed to working with our employees, dealers, joint-venture partners, vendors, landlords and other stakeholders to emerge from CCAA."

1

Subject to Court approval, employees of The Source will continue to be paid and receive benefits in the normal course. Vendors and other business partners will be paid for goods and services provided after the filing in Canada.

**The Source remains open for business**
"For customers, what is most important is that The Source remains open for business," said Mr. Cuthbertson, "We are preparing for what we hope will be a busy holiday season. We are focused on providing our customers with the same expert electronics advice and wide range of products that they have come to expect from Canada's leading neighbourhood electronics retailer."

**Canadian stores are delivering stable or improving financial results**
The Canadian business, which differs from Circuit City in that its stores are considerably smaller on average in terms of floor space, employ fewer staff and carry less inventory, recently delivered stable or improving performance, as noted by Circuit City in its quarterly disclosure. For the second quarter ended August 31, 2008, the Source had a profit of US$4.9 million, up 133% from US$2.1 million a year earlier. Net sales were US$147.3 million, up 11.2% from US$132.5 million.

The Source has strategically located approximately 70% of its corporate-owned stores in convenient, high traffic malls, including virtually all of the 170 major malls in Canada. Approximately 70% of all Canadian households are within five kilometres of a The Source location. Additionally, approximately one-third of the stores in the Canadian chain are owned by independent dealers. The dealer network enables InterTAN to access smaller markets that generally do not have a population base large enough to support a corporate store.

_Forward-Looking Statements_
_Statements made in this release, other than those concerning historical financial information, may be considered forward-looking statements, which are subject to risks and uncertainties, including without limitation: (1) InterTAN's expectations for its long-term viability and profitability, (2) InterTAN's expectations for the Canadian court process and the impact of that process on ongoing store operations, (3) InterTAN's expectations with respect to the upcoming holiday season, (4) Circuit City's expectations from the U.S. court process and the impact of that process on ongoing store operations, (5) Circuit City's ability to locate available sources of liquidity and to negotiate financing alternatives to address its liquidity needs and those of InterTAN, (6) the willingness and ability of vendors to ship products, and (7) any further deterioration in the macroeconomic environment or consumer confidence. Additional risk factors and uncertainties are listed in Circuit City's news release issued today with regard to its US Chapter 11 filing. Discussion of additional factors that could cause actual results to differ materially from management's projections, forecasts, estimates and expectations is set forth under Management's Discussion and Analysis of Results of Operations and Financial Condition in the Circuit City Stores, Inc. annual report on Form 10-K for the fiscal year ended February 29, 2008, the quarterly report on Form 10-Q for the fiscal quarter ended August 31, 2008, and in Circuit City's other SEC filings. A copy of the annual report is available on the Circuit City investor information Web site at http://investor.circuitcity.com._

For further information please contact:

Longview Communications Inc.
David Ryan
Phone: (604) 694-6031
Email: dryan@longviewcomms.ca

Alan Bayless
Phone: (604) 694-6035
Email: abayless@longviewcomms.ca

Saphina Benimadhu
*French Media Contact*
Phone: (604) 694-6036
Email: sbenimadhu@longviewcomms.ca

3

## INTERTAN CANADA GRANTED CREDITOR PROTECTION

### *- The Source by Circuit City Stores Are Open for Business –*

Barrie, ON, November 10, 2008 – InterTAN Canada Ltd. ("InterTAN"), a wholly-owned subsidiary of US-based Circuit City Stores Inc. (NYSE:CC), today announced that it has been granted creditor protection by the Ontario Superior Court of Justice under the Companies' Creditors Arrangement Act.

InterTAN operates or licenses 772 neighbourhood electronics stores and dealer outlets across Canada under the trade name, The Source by Circuit City ("The Source"). These stores will stay fully staffed and open for business.

The Court appointed Alvarez & Marsal to serve as monitor in the case. Also as approved by the Court:

- InterTAN will continue to pay its employees and provide employee benefits in the normal course; and

- The Source stores will stay open, and will continue to honour customer programs such as returns, exchanges, warranties and gift cards.

**Media Conference Call**
InterTAN will hold a media conference call today at 3:00pm Eastern Standard Time to discuss the impact of its filing for creditor protection. Ron Cuthbertson, President of InterTAN, will be available to respond to questions from Canadian news reporters. To access the call, please dial 416-695-9706 (in Toronto) or 1-800-952-4972 (elsewhere in Canada).

### *Forward-Looking Statements*

*Statements made in this release, other than those concerning historical financial information, may be considered forward-looking statements, which are subject to risks and uncertainties, including without limitation: (1) InterTAN's expectations for its business and store operations, (2) the willingness and ability of vendors to ship products, and (3) any further deterioration in the macroeconomic environment or consumer confidence. Additional risk factors and uncertainties are listed in news releases issued earlier today by InterTAN with regard to its Canadian CCAA filing and by Circuit City with regard to its separate filing for protection from creditors under Chapter 11 of the US Bankruptcy Code. Discussion of additional factors that could cause actual results to differ materially from management's projections, forecasts, estimates and expectations is set forth under Management's Discussion and Analysis of Results of Operations and Financial Condition in the Circuit City Stores, Inc. annual report on Form 10-K for the fiscal year ended February 29, 2008, the quarterly report on Form 10-Q for the fiscal quarter ended August 31, 2008, and in Circuit City's other SEC filings. A copy*

1

*of the annual report is available on the Circuit City investor information Web site at*
*http://investor.circuitcity.com.*

For further information please contact:

Longview Communications Inc.
David Ryan
Phone: 604-694-6031
Email: dryan@longviewcomms.ca

Alan Bayless
Phone: 604-694-6035
Email: abayless@longviewcomms.ca

Saphina Benimadhu
*French Media*
Phone: (604) 694-6036
Email: sbenimadhu@longviewcomms.ca

# APPENDIX "C"

Gregg M. Galardi, Esq.
Ian S. Fredericks, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
One Rodney Square
PO Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

          - and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
333 West Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

Proposed Counsel to the Debtors
and Debtors in Possession

Dion W. Hayes (VSB No. 34304)
Douglas M. Foley (VSB No. 34364)
McGUIREWOODS LLP
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

- - - - - - - - - - - - - x
In re:                     :    Chapter 11
                           :
CIRCUIT CITY STORES, INC., :    Case No. 08-
et al.,                    :
                           :    Jointly Administered
          Debtors.         :
- - - - - - - - - - - - - x

**ORDER PURSUANT TO 11 U.S.C. §§ 105(a) AND 363 AND FED. R.
BANKR. P. 6003 (I) AUTHORIZING CONTINUED MAINTENANCE OF
EXISTING BANK ACCOUNTS, (II) AUTHORIZING CONTINUED USE
OF EXISTING BUSINESS FORMS, (III) AUTHORIZING CONTINUED
USE OF EXISTING CASH MANAGEMENT SYSTEM, (IV) AUTHORIZING
INTERCOMPANY TRANSACTIONS AND (V) GRANTING SUPERPRIORITY
CLAIM STATUS TO ALL POSTPETITION INTERCOMPANY CLAIMS**

Upon the motion (the "Motion")[1] of the Debtors

for an Order, pursuant to Bankruptcy Code sections 105

---

[1]    Capitalized terms not otherwise defined herein shall have the
meanings ascribed to such terms in the Motion.

and 363 and Bankruptcy Rule 6003, (i) authorizing, but

not directing, continued maintenance of existing bank

accounts, and authorizing a waiver of certain operating

guidelines relating to bank accounts, (ii) authorizing,

but not directing, continued use of existing business

forms, (iii) authorizing, but not directing, continued

use of existing cash management system, (iv) authorizing,

but not directing, intercompany transactions among the

Debtors, and (v) granting superpriority administrative

expense claim status to all postpetition intercompany

transactions; and upon the Besanko Declaration; and due

and sufficient notice of the Motion having been given

under the particular circumstances; and it appearing

that no other or further notice need be provided; and it

appearing that the relief requested by the Motion is in

the best interests of the Debtors, their estates, their

creditors, and other parties in interest; and after due

deliberation thereon and sufficient cause appearing

therefor, it is hereby

   **ORDERED, ADJUDGED, AND DECREED that:**

   1.   The Motion is GRANTED as provided herein.

**A.   Maintenance of Bank Accounts.**

   2.   Pursuant to sections 105 and 363 of the

Bankruptcy Code, the Debtors are authorized and directed

2

to (i) designate, maintain, and continue to use any and
all of their respective store depository, credit card
depository, other depository, concentration,
disbursement, payment, operating, and other accounts
(collectively, the "Prepetition Bank Accounts") in
existence as of the Petition Date, with the same account
numbers, including the accounts identified in Exhibit A
annexed hereto; (ii) if necessary, open new accounts
wherever they are needed, whether or not such banks are
designated depositories in the Eastern District of
Virginia (such new accounts, together with the
Prepetition Bank Accounts, hereinafter the "Bank
Accounts"); and (iii) treat the Bank Accounts for all
purposes as accounts of the Debtors in their capacity as
debtors in possession; provided, however, that the
Debtors may only open new Bank Accounts with Banks that
agree to be bound by the terms of this Order and, in
particular, the Debtors' cash management system.

**B.   Use of Business Forms.**

3.   The Debtors are authorized to continue to
use their existing business forms and checks without
alteration or change and without the designation "Debtor
in Possession" or a "debtor in possession case number"

3

imprinted upon them.  To the extent the Debtors open or
close bank accounts, they shall provide notice to the
United States Trustee and the pre- and post-petition
lenders.  Any new check stock used by the Debtors shall
contain the designation "Debtor in Possession".

**C.   Cash Management System.**

          4.   The Debtors are authorized and directed
to continue to use their existing cash management system
and shall maintain through the use thereof detailed
records reflecting all transfers of funds under the
terms and conditions provided for by the existing
agreements with the institutions participating in the
Debtors' cash management system, except as modified by
this Order.  In connection with the ongoing utilization
of their cash management system, the Debtors shall
continue to maintain records with respect to all
transfers of cash so that all transactions may be
readily ascertained, traced, and recorded properly.

          5.   After the Petition Date, and subject to
the terms of this Order, all Banks at which the Bank
Accounts are maintained are authorized and directed to
continue to administer the Bank Accounts as such
accounts were maintained prepetition, without

4

interruption and in the usual and ordinary course, and
to pay any and all checks, wire transfers, electronic
funds transfers, or other items presented, issued, or
drawn on the Bank Accounts; provided, further, that the
Bank Accounts shall be administered in accordance with
the Debtors' obligations under debtor-in-possession
financing facility (the "DIP Facility") such that,
unless otherwise agreed to by the Debtors' postpetition
lenders, all amounts shall be upstreamed daily to Bank
of America for application against the Debtors'
postpetition obligations under and in accordance with
the DIP Facility; provided, however, that unless
otherwise ordered by the Court, no checks, drafts,
electronic funds transfers (excluding any electronic
funds transfer that the banks are obligated to settle),
or other items presented, issued, or drawn on the Bank
Accounts prior to the Petition Date shall be honored.

6.   Each Bank that maintains a disbursement
account shall implement reasonable handling procedures
designed to effectuate the terms of this Order.  No Bank
that implements such handling procedures and then honors
a prepetition check or other item drawn on any account
that is the subject of this Order either (i) at the

direction of the Debtors to honor such prepetition check or item, (ii) in the good-faith belief that the Court has authorized such prepetition check or item to be honored, or (iii) as a result of a good faith error made despite implementation of such handling procedures, shall be deemed to be liable to the Debtors or their estates or otherwise in violation of this Order.

7.     Subject to the provisions of this Order, the Banks are authorized and directed to honor all representations from the Debtors as to which checks should be honored or dishonored.

8.     To the extent applicable, the Court finds and determines that the requirements of Bankruptcy Rule 6003 are satisfied and that the relief requested is necessary to avoid immediate and irreparable harm.

D.     **Intercompany Transactions.**

9.     The Debtors and the Non-Debtor Subsidiaries are authorized to continue to engage in Intercompany Transactions necessary to execute the cash management system and manage the day-to-day operations of their businesses, and the Debtors and the Non-Debtor Subsidiaries shall continue to maintain records with respect to all transfers of cash (including pursuant to

6

such transactions) so that all Intercompany Transactions

may be readily ascertained, traced, and recorded

properly on applicable intercompany accounts.

10.   Pursuant to section 364(c)(1) of the

Bankruptcy Code all Intercompany Claims arising from

Intercompany Transactions between and among the Debtors

and the Non-Debtor Subsidiaries after the Petition Date

shall be accorded priority over any and all

administrative expenses of the kind specified in

sections 503(b) and 507(b) of the Bankruptcy Code,

subject and subordinate only to (i) other valid liens in

existence as of the Petition Date or granted in

connection with any post-petition debtor in possession

financing granted by this Court and (ii) liens and

superpriority administrative expenses granted to the

prepetiton lenders as adequate protection.

11.   The Debtors are hereby authorized to

execute any additional documents incident to the relief

granted pursuant to this Order.

12.   Notwithstanding Rule 6004 of the Federal

Rules of Bankruptcy Procedure (to the extent applicable),

this Order shall be effective and enforceable

immediately upon entry hereof.

7

13.    The Debtors shall serve a copy of this
Order on all of the Banks within five (5) business days
of the entry of this Order.

14.    The requirement under Local Bankruptcy
Rule 9013-1(G) to file a memorandum of law in connection
with the Motion is hereby waived.

15.  This Court retains jurisdiction to hear
and determine all matters arising from or related to the
implementation interpretation of this Order.

Dated:  Richmond, Virginia
        November 10, 2008


/s/ Kevin Huennekens
UNITED STATES BANKRUPTCY JUDGE


Entered on Docket:  11/10/08

8

WE ASK FOR THIS:

Gregg M. Galardi, Esq.
Ian S. Fredericks, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
One Rodney Square
PO Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

    - and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
333 West Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

    - and -

/s/ Douglas M. Foley
Dion W. Hayes (VSB No. 34304)
Douglas M. Foley (VSB No. 34364)
MCGUIREWOODS LLP
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

Proposed Counsel to the Debtors
and Debtors in Possession

## CERTIFICATION OF ENDORSEMENT UNDER LOCAL RULE 9022-1(C)

I hereby certify that notice of the Debtors' intent to seek entry of the foregoing proposed order was provided to the parties identified in the Motion and copy of this proposed order was provided to the Office of the United States Trustee for the Eastern District of Virginia prior to submission to this Court.

<u>/s/ Douglas M. Foley</u>

10

---

**EXHIBIT A**

**(List of Deposit Accounts)**

1

**Exhibit A**

List of Bank Accounts

| Bank | Debtor | Account Number | Purpose |
|---|---|---|---|
| American Savings Bank<br>**Attn:** Mel Yamamoto<br>677 Ala Noana Blvd.<br>Honolulu, HI 96813<br>Tel:    (808) 539-7811 | Circuit City Stores, Inc. | xxxxxx6380 | Store Depository |
| AmSouth/Regions<br>**Attn:** Dawn Smith<br>1900 5th Avenue, North 23rd Floor<br>Birmingham, AL 35203<br>Tel:    (205) 264-5222 | Circuit City Stores, Inc. | xxxxxx3210 | Store Depository |
| Banco Popular<br>**Attn:** Amarilis Ginnes<br>209 Ponce de Leon Ave.<br>Popular Center Building,<br>Floor 6<br>Hato Rey, Puerto Rico 00917<br>Tel:    (787) 765-9800 (ext. 5800) | Circuit City Stores Puerto Rico LLC | xxxxx5139<br>xxxxx5120<br>xxxxx5147 | Operating Account<br>Depository Account<br>Payroll Account |
| Bank of America<br>**Attn:** Jay Norris<br>101 South Tryon Street<br>Charlotte, NC 28255<br>Tel:    (704) 387-3035<br><br>Circuit City Global Sourcing Accounts<br>Attn: Darlene Holtz<br>201 East Washington<br>Collier Center, 22nd Fl<br>Phoenix, AZ 85004<br>Tel:    (602) 523-2141 | Circuit City Stores, Inc. | xxxxxx9967 | Store Depository |
|  |  | xxxxxx3301 | Credit Facility Funding Account (Z-line) |
|  |  | xxxxxx5447 | Sky Venture Account |
|  |  | xxxxxxxx1020 | Circuit City Global Sourcing U.S. Dollar Account |
|  |  | xxxxxxxx1012 | Circuit City Global Sourcing HK Dollar Account |
|  |  | xxxxxxxx1038 | Circuit City Global Sourcing HK Dollar PC Account |
|  |  | xxxxxxxx2036 | Circuit City Global Sourcing TW Dollar Account |
|  | Circuit City Stores West Coast, Inc. | xxxxxx0844 | Circuit City Datamailer (Payroll) |
|  |  | xxxxxx1029 | Concentration Account for Payroll Paychecks |

2

| Bank | Debtor | Account Number | Purpose |
|---|---|---|---|
| | | xxxxxx1034 | Operating Account |
| | | xxxxxx7748 | Payroll Account (ZBA) |
| Chase<br>**Attn:** Christie Donahue<br>50 Rowes Wharf, 4th Floor<br>Boston, MA 02110<br>Tel:  (617) 310-0766 | Circuit City Stores, Inc. | xxxxx7244 | Store Depository |
| | | xxxxx0266 | Empire Blue Cross/Payment of Medical Claims |
| FifthThird Bank<br>**Attn:** Tom Galbo<br>114 Anderson Farm Ct.<br>Charlotte, NC 28117<br>Tel:  (704) 662-9490 | Circuit City Stores, Inc. | xxxx6916 | Credit Card |
| Suntrust<br>**Attn:** Donna Smith<br>919 East Main St., 22nd Floor<br>Richmond, VA 23219<br>Tel:  (804) 782-7557 | Circuit City Stores, Inc. | xxxxxx3706 | Concentration Account |
| | | xxxxxx6660 | E/P Disbursement |
| Wachovia<br>**Attn:** Parshant Dhiman<br>301 South Tryon Street, NC 5710<br>Charlotte, NC 28288-0013<br>Tel:  (704) 383-0803 | Circuit City Stores, Inc. | xxxxxxxxx5100 | Store Depository |
| | | xxxxxxxxx9620 | American Express Credit Card |
| | | xxxxxxxxx4767 | Corporate Jet Account |
| | | xxxxxxxxx9993 | Deposit Account |
| | | xxxxxxxxx9858 | Tourmalet Corp. - LLC Tax Payments |
| | | xxxxxxxxx9528 | Ventoux International - Holding Company Tax Payments, Intercompany Interest |
| | | xxxxxxxxx0950 | Lockbox |
| | | xxxxxxxxx4038 | Direct Deposit Payroll Settlement |
| | | xxxxxxxxx5191 | Empire Blue Cross |
| | | xxxxxxxxx7073 | Extended Service Contract Warranty Payments |
| | | xxxxxxxxx4528 | Fifth Third Bankcard |
| | | xxxxxxxxx3099 | Fifth Third Check Collection – gift card purchases over the web with gift cards |
| | | xxxxxxxxx8908 | HFC third party financing sales commissions |
| | | xxxxxxxxx1509 | Main Concentration/Operating Account |
| | | xxxxxxxxx6031 | Music Payables |
| | | xxxxxxxxx9175 | Purchasing Co., LLC Main Operating Account |
| | | xxxxxxxxx0992 | Purchase Co., LLC Purchase EP disbursement |

| Bank | Debtor | Account Number | Purpose |
|---|---|---|---|
| | | xxxxxxxxx1107 | Reverse Affiliates Lockbox |
| | | xxxxxxxxx1048 | Sales Receivables Lockbox |
| | | xxxxxxxxxx6044 | Service Payables |
| | | xxxxxxxxx2189 | Payments from Sublease Tenants |
| | | xxxxxxxxx9133 | Trading Circuits – internet sales of merchandise not sold in stores |
| | | xxxxxxxxx6733 | Vendor Disbursements |
| Wells Fargo<br>**Attn:** Ryan Carlson<br>MAC N9305-052, 6th &<br>Marquette<br>Minneapolis, MN 55479<br>Tel:     (612) 667-9566 | Circuit City Stores, Inc. | xxxxxx4672 | Store Depository |

4

**EXHIBIT B**

**(Cash Management System Flow Chart)**

**EXHIBIT B**

List of Investment Accounts

| Bank | Debtor | Account Number |
|---|---|---|
| Bank of America/CRP Securities, LLC<br><br>**Attn:** Laura Bynum<br>600 Peachtree St. NE<br>4th Floor<br>Atlanta, GA  30308<br>Tel:      (404) 607-4943<br>Fax:      (404) 607-6624 | Circuit City Stores, Inc. | xx7458 |
| Fifth Third Securities, Inc.<br><br>**Attn:** J.B. Ward<br>38 Fountain Square Plaza<br>Cincinnati, OH  45263<br>Tel:      (513) 534-3072 | Circuit City Stores, Inc. | xxxxxx9774 |
| J.P. Morgan Securities, Inc.<br><br>**Attn:** James M. Griffin<br>270 Park Ave.<br>8th Floor<br>New York, NY  10117<br>Tel:      (212) 834-2300 | Circuit City Stores, Inc. | xx2526 |

2

| Bank | Debtor | Account Number |
|---|---|---|
| Merrill Lynch Global Institutional Advisory Division<br><br>**Attn:** Scott Dorsey<br>100 Jericho Quadrangle<br>P.O. Box 787<br>Jericho, NY  11753<br>Tel:     (516) 827-3283<br>Fax:     (516) 935-5330 | Circuit City Stores, Inc. | xxxx07Z07 |
| RBC Dain Rauscher<br><br>**Attn:** Paul Kitzinger<br>100 Second Ave. South<br>Suite 800<br>St. Petersburg, FL  33701<br>Tel:     (727) 502-3634 | Circuit City Stores, Inc. | xxxxxxxxx1817 |
| UBS Financial Services, Inc.<br><br>**Attn:** Steven Hayden<br>33 South 6th Street<br>Suite 3737<br>Minneapolis, MN  55402<br>Tel:     (612) 371-4129<br>Fax:     (612) 371-4117 | Circuit City Stores, Inc. | xxxx3160 |

| Bank | Debtor | Account Number |
|---|---|---|
| Wachovia Bank & Securities<br><br>**Attn:** Eddie Tugman<br>One Wachovia Center<br>NC 0602<br>Charlotte, NC  28288<br>Tel:      (704) 374-4164<br>Fax:      (704) 374-3375 | Circuit City Stores, Inc. | xxxx9008 |

Gregg M. Galardi, Esq.                Dion W. Hayes (VSB No. 34304)
Ian S. Fredericks, Esq.               Douglas M. Foley (VSB No. 34364)
SKADDEN, ARPS, SLATE, MEAGHER &       MCGUIREWOODS LLP
FLOM, LLP                             One James Center
One Rodney Square                     901 E. Cary Street
PO Box 636                            Richmond, Virginia 23219
Wilmington, Delaware 19899-0636       (804) 775-1000
(302) 651-3000

           - and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
333 West Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

Proposed Counsel to the Debtors
and Debtors in Possession

              IN THE UNITED STATES BANKRUPTCY COURT
               FOR THE EASTERN DISTRICT OF VIRGINIA
                         RICHMOND DIVISION
- - - - - - - - - - - - - - - x
                              :    Chapter 11
                              :
In re:                        :
                              :    Case No. 08-35653-KRH
CIRCUIT CITY STORES, INC.,    :
et al.,                       :    Jointly Administered
                              :
            Debtors.          :
- - - - - - - - - - - - - - - x

**ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 363, 364,
1107, AND 1108, AND BANKRUPTCY RULE 6003 (I) AUTHORIZING
 DEBTORS TO MAINTAIN INSURANCE POLICIES, PAY INSURANCE
    OBLIGATIONS, AND RENEW INSURANCE POLICIES; (II)
     AUTHORIZING INTERCOMPANY TRANSACTIONS; AND (III)
  GRANTING SUPERPRIORITY CLAIM STATUS TO POSTPETITION
                  INTERCOMPANY CLAIMS**

          Upon the motion (the "Motion")[1] of the Debtors

for an order, pursuant to Bankruptcy Code sections 105,

_____

[1]    Capitalized terms not otherwise defined herein shall have the
       meanings ascribed to such terms in the Motion.

363, 364, 1107, and 1108, and Bankruptcy Rule 6003

(i) authorizing, but not directing, the Debtors to

maintain their existing insurance policies, pay all

insurance obligations arising thereunder or in

connection therewith, and to renew existing insurance

policies, or enter into new insurance arrangements, as

may be required as the annual terms of existing

arrangements expire; (ii) authorizing, but not directing,

intercompany transactions; and (iii) granting

superpriority claim status to all postpetition

intercompany claims; and the Court having reviewed the

Motion and the Besanko Declaration; and the Court having

determined that the relief requested in the Motion is in

the best interests of the Debtors, their estates, their

creditors, and other parties in interest; and it

appearing that proper and adequate notice of the Motion

has been given and that no other or further notice is

necessary; and upon the record herein; and after due

deliberation thereon; and good and sufficient cause

appearing therefore, it is hereby

**ORDERED, ADJUDGED, AND DECREED that:**

1.   The Motion is GRANTED.

2

2.    The Debtors are authorized, but not directed, to continue their Insurance Policies, and to pay the premiums and related charges arising under or in connection with the Insurance Polices as such premiums and charges become due.  For the avoidance of doubt, this includes payment of all premiums attributable to prepetition periods.

3.    The Debtors are authorized, but not directed, to pay all brokers' fees arising under or in connection with the Insurance Policies as they become due, including, without limitation, all fees payable to Beecher Carlson Insurance Services, Inc., Aon, Marsh USA, Inc., Mercer Insurance Group, and Jardine Lloyd Thompson Canada in an amount up to $230,000.  For the avoidance of doubt, this includes payment of such fees that are attributable to prepetition periods.

4.    The Debtors are authorized, but not directed, to pay all administration fees arising under or in connection with the Insurance Policies as they become due, including, without limitation, all fees payable to Specialty Risk Services in an amount up to

$160,000. For the avoidance of doubt, this includes
payment of such fees attributable to prepetition periods.

5.    The Debtors are authorized, but not
directed, to pay all administration fees arising under
or in connection with the Insurance Policies as they
become due, including, without limitation, all fees
payable to The Travelers Company and Sedgwick Claims
Management Services in an amount up to 15,000.  For the
avoidance of doubt, this includes payment of such fees
attributable to prepetition periods.

6.    The Debtors are authorized, but not
directed, to pay all consulting fees arising under or in
connection with the Insurance Policies as they become
due, including, without limitation, all fees payable to
Navigant Consulting, Inc in an amount up to $5000.  For
the avoidance of doubt, this includes payment of such
fees attributable to prepetition periods.

7.    The Debtors' banks shall be and hereby
are authorized and directed to receive, process, honor,
and pay all prepetition and postpetition checks and fund
transfers on account of the prepetition insurance
obligations that had not been honored and paid as of the

4

Petition Date, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.

8.    Without further order of this or any other Court, the Debtors are authorized to renew existing Insurance Policies, or enter into new insurance arrangements, in the ordinary course of business, as may be required as the annual terms of existing arrangements expire.

9.    The Debtors are authorized to continue to engage in Intercompany Transactions, provided, however, that the Debtors are directed to maintain strict records of all transfers so that all transactions, including, but not limited to, Intercompany Transactions, may be readily ascertained, traced, and recorded properly on applicable accounts.

10.    Pursuant to section 364(c)(1) of the Bankruptcy Code all intercompany claims arising from Intercompany Transactions between and among the Debtors and the Non-Filing Affiliates after the Petition Date shall be accorded priority over any and all administrative expenses of the kind specified in

sections 503(b) and 507(b) of the Bankruptcy Code,
subject and subordinate only to (i) other valid liens in
existence as of the Petition Date or granted in
connection with any post-petition debtor in possession
financing granted by this Court and (ii) liens and
superpriority administrative expenses granted to the
prepetition lenders as adequate protection.

11.    Nothing in this Order or the Motion shall
be deemed to constitute postpetition assumption or
adoption of any agreement under Bankruptcy Code section
365.

12.    Neither the provisions contained herein,
nor any actions or payments made by the Debtors pursuant
to this Order, shall be deemed an admission as to the
validity of the underlying obligation or a waiver of any
rights the Debtors may have to subsequently dispute such
obligation on any ground that applicable law permits.

13.    The relief provided in this Order is
being granted on an interim basis, and to the extent no
objection is filed within fifteen (15) days of the date
of entry of this Order, this Order shall automatically

6

become final and non-appealable without further order of
this Court.

     14.  To the extent an objection is filed, a
final hearing on the Motion shall be held before this
Court on December 5, 2008, at 10:00 (Eastern).

     15.  The Court finds and determines that the
requirements of Bankruptcy Rule 6003 are satisfied and
that the relief requested is necessary to avoid
immediate and irreparable harm.

     16.  The requirement under Local Bankruptcy
Rule 9013-1(G) to file a memorandum of law in connection
with the Motion is hereby waived.

     17.  The Court shall retain jurisdiction to
hear and determine all matters arising from or related
to the implementation or interpretation of this Order.

Dated:  Richmond, Virginia
       November __, 2008

Nov 12 2008

/s/ Kevin Huennekens
UNITED STATES BANKRUPTCY JUDGE

Entered on Docket:  11/12/08

7

WE ASK FOR THIS:

Gregg M. Galardi, Esq.
Ian S. Fredericks, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
One Rodney Square
PO Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

    - and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
333 West Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

    - and -

/s/ Douglas M. Foley
Dion W. Hayes (VSB No. 34304)
Douglas M. Foley (VSB No. 34364)
MCGUIREWOODS LLP
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

Proposed Counsel to the Debtors
and Debtors in Possession

**CERTIFICATION OF ENDORSEMENT UNDER LOCAL RULE 9022-1(C)**

    I hereby certify that notice of the Debtors' intent
to seek entry of the foregoing proposed order was
provided to the parties identified in the Motion and
copy of this proposed order was provided to the Office
of the United States Trustee for the Eastern District of
Virginia prior to submission to this Court.

                    /s/ Douglas M. Foley

8

# APPENDIX "D"

**Circuit City**
**13 Week U.S. Cash Flow & Availability**
**DIP Budget – 11/9/08 5:30pm**
**($ in 000's)**

| Week Ending | Week 1 Forecast 15-Nov | Week 2 Forecast 22-Nov | Week 3 Forecast 29-Nov | Week 4 Forecast 6-Dec | Week 5 Forecast 13-Dec | Week 6 Forecast 20-Dec | Week 7 Forecast 27-Dec | Week 8 Forecast 3-Jan | Week 9 Forecast 10-Jan | Week 10 Forecast 17-Jan | Week 11 Forecast 24-Jan | Week 12 Forecast 31-Jan | Week 13 Forecast 7-Feb | Post 13 Week Forecast Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **I. Comp Sales vs. Prior Year** | -35.0% | -30.0% | -25.0% | -20.0% | -20.0% | -20.0% | -20.0% | -20.0% | -15.0% | -15.0% | -15.0% | -15.0% | -10.0% | -21.0% |
| **II. Cash Flows** | | | | | | | | | | | | | | |
| **Receipts** | | | | | | | | | | | | | | |
| Sales | 144,652 | 230,846 | 277,929 | 494,480 | 297,127 | 401,118 | 332,063 | 198,204 | 143,399 | 145,285 | 152,836 | 167,853 | 154,035 | 3,139,827 |
| Sales Tax | 9,835 | 18,029 | 33,075 | 17,044 | 20,746 | 29,276 | 17,449 | 10,430 | 8,867 | 9,994 | 10,246 | 11,721 | 9,453 | 206,165 |
| Credit Card Holdbacks | (2,800) | | | | | | | | | | | | | (2,800) |
| Other Receipts | 5,550 | 5,300 | 4,450 | 4,400 | 5,400 | 5,180 | 4,432 | 4,388 | 5,450 | 5,220 | 4,438 | 4,392 | 5,450 | 64,050 |
| Subtotal | 157,238 | 254,174 | 315,454 | 515,925 | 323,272 | 435,574 | 353,944 | 213,022 | 157,716 | 160,499 | 167,519 | 183,966 | 168,938 | 3,407,242 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Advertising | 11,515 | 11,515 | 11,515 | 11,646 | 11,646 | 11,646 | 11,646 | 11,646 | 7,245 | 7,245 | 7,245 | 7,245 | 5,500 | 127,759 |
| Merchandise (Incl. Freight) | 100,150 | 169,550 | 195,480 | 238,100 | 207,100 | 238,100 | 209,100 | 153,480 | 126,860 | 100,050 | 84,050 | 103,660 | 100,190 | 2,032,850 |
| Rent | | | | 32,250 | | | 32,250 | | | | | | 32,250 | 96,751 |
| Payroll & Payroll Taxes | 34,203 | 1,635 | 32,217 | 1,635 | 32,217 | 1,635 | 32,217 | 1,635 | 32,217 | 1,635 | 29,682 | 1,500 | 29,682 | 232,113 |
| Benefits | 1,912 | 1,427 | 1,889 | 1,427 | 1,889 | 1,427 | 1,889 | 1,427 | 1,889 | 1,427 | 1,938 | 1,131 | 2,304 | 21,974 |
| Utilities | 303 | 1,531 | 703 | 1,531 | 703 | 1,531 | 703 | 1,531 | 703 | 1,531 | 1,531 | 1,131 | 1,131 | 18,067 |
| Sales and Other Taxes | 16,040 | 4,325 | 8,321 | 8,017 | 9,928 | 33,460 | 9,928 | 8,376 | 13,574 | 45,500 | 12,268 | 23,603 | 5,837 | 199,178 |
| General Operating | 11,797 | 17,057 | 18,423 | 12,317 | 23,076 | 24,586 | 17,737 | 25,728 | 24,282 | 27,551 | 14,458 | 26,615 | 13,810 | 257,438 |
| D&O Insurance | | | | | | | | | | | | | | 3,000 |
| Subtotal | 176,901 | 206,012 | 269,397 | 315,943 | 287,408 | 312,405 | 315,320 | 209,844 | 207,718 | 185,059 | 151,292 | 165,605 | 191,226 | 2,995,128 |
| **Operating Cash Flow** | (19,663) | 48,163 | 46,057 | 199,982 | 35,864 | 123,169 | 37,624 | 3,178 | (50,002) | (24,560) | 16,227 | 18,362 | (22,288) | 412,113 |
| **Store Closing Expenses** | 5,814 | 3,614 | 8,014 | 9,860 | 8,014 | 3,614 | 8,014 | 3,614 | 2,200 | | | | | 52,759 |
| **Non Operating Disbursements** | | | | | | | | | | | | | | |
| **Bankruptcy Payments** | | | | | | | | | | | | | | |
| Customer Practices | 1,125 | 1,125 | 1,125 | 1,125 | 1,125 | | | | | | | | | 5,625 |
| Freight | | | 3,000 | 3,000 | 2,000 | 2,000 | | | | | | | | 10,000 |
| Insurance | | | 205 | 205 | | | | | | | | | | 410 |
| Mechanics Liens | | | 3,250 | 3,250 | | | | | | | | | | 6,500 |
| Foreign Vendors | | | 3,250 | 3,250 | | | | | | | | | | 6,500 |
| Other | | 2,500 | 5,000 | 5,000 | 2,500 | 2,500 | 2,500 | | | | | | | 20,000 |
| Subtotal | 1,125 | 3,625 | 15,830 | 15,830 | 5,625 | 4,500 | 2,500 | | | | | | | 49,035 |
| **Financing Expenses** | | | | | | | | | | | | | | |
| 13 Week DIP Bank Fees | 2,217 | 431 | 52 | | 108 | | 1,149 | | 466 | 6,475 | 575 | 574 | 430 | 12,477 |
| DIP Fees / Advisory Fees | 30,000 | | | | | | | | | | | | | 30,000 |
| Lender's Counsel | 2,000 | | | | | | | | | | | | | 2,000 |
| Subtotal | 34,217 | 431 | 52 | | 108 | | 1,149 | | 466 | 6,475 | 575 | 574 | 430 | 44,477 |
| **Other** | | | | | | | | | | | | | | |
| Restructuring Professionals | | | | | | | | | | 2,882 | | | | 2,882 |
| Employee Termination Costs | | | | | | | | | 5,000 | | | | | 5,000 |
| Employee Incentive Plan | | | | | | | | | | 10,000 | | | | 10,000 |
| Liquidator Fees | | | | 3,000 | | | | | | | | | | 3,000 |
| LCC | 193 | 193 | 193 | 214 | 214 | 214 | 214 | 214 | 482 | 482 | 482 | 482 | 342 | 3,919 |
| Capital Expenditures | | | | | | | | | | | | | | |
| Subtotal | 193 | 193 | 193 | 3,214 | 214 | 214 | 214 | 214 | 5,482 | 13,364 | 482 | 482 | 342 | 24,801 |
| **Total Disbursements** | 218,250 | 213,875 | 293,486 | 341,633 | 301,261 | 320,734 | 328,196 | 213,672 | 215,866 | 204,897 | 152,349 | 166,660 | 191,999 | 3,166,200 |
| **Net Cash Flow** | (61,012) | 40,300 | 21,968 | 170,969 | 22,011 | 114,840 | 25,748 | (650) | (58,149) | (44,399) | 15,171 | 17,306 | (23,061) | 241,042 |
| **III. Loan Balance – Post-Petition** | | | | | | | | | | | | | | |
| Beginning Loan - Book | 756,166 | 831,466 | 789,670 | 771,692 | 594,391 | 564,862 | 421,270 | 390,743 | 386,027 | 446,504 | 488,208 | 476,036 | 459,486 | 756,166 |
| Net Cash Flow (Increase) / Decrease | 61,012 | (40,300) | (21,968) | (170,969) | (22,011) | (114,840) | (25,748) | 650 | 58,149 | 44,399 | (15,171) | (17,306) | 23,061 | (241,042) |
| Canadian Borrowings | 14,288 | (1,497) | 3,991 | (6,331) | (7,518) | (28,752) | (14,746) | (5,366) | 2,327 | (2,694) | 2,998 | 757 | 3,052 | (29,525) |
| Ending Loan - Book | 831,466 | 789,670 | 771,692 | 594,391 | 564,862 | 421,270 | 390,743 | 386,027 | 446,504 | 488,208 | 476,036 | 459,486 | 485,599 | 485,599 |
| Total Checks Outstanding | (28,223) | (26,530) | (68,317) | (56,743) | (97,618) | (117,623) | (95,234) | (84,815) | (103,548) | (134,876) | (121,543) | (93,451) | (87,749) | (87,749) |
| Ending Balance - Bank | 803,243 | 763,140 | 703,375 | 537,648 | 457,245 | 303,647 | 295,509 | 301,212 | 342,956 | 353,332 | 354,493 | 376,035 | 397,850 | 397,850 |
| **IV. Availability Summary** | | | | | | | | | | | | | | |
| Borrowing Base Availability | 1,058,618 | 1,020,561 | 965,369 | 957,271 | 753,464 | 737,296 | 653,321 | 628,097 | 606,954 | 603,908 | 591,882 | 590,876 | 588,085 | 588,085 |
| LCL Loan Balance | (803,243) | (763,140) | (703,375) | (537,648) | (457,245) | (303,647) | (295,509) | (301,212) | (342,956) | (353,332) | (354,493) | (376,035) | (397,850) | (397,850) |
| LCC | (133,436) | (131,811) | (150,417) | (172,167) | (197,167) | (195,167) | (193,647) | (192,182) | (150,212) | (148,232) | (121,167) | (109,167) | (107,167) | (107,167) |
| Canadian Portion Borrowing Base | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 54,000 | 59,000 | 54,000 | 50,000 | 50,000 | 50,000 | 50,000 |
| Utilities Reserve | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) |
| Professional Fees Reserve | (6,640) | (6,640) | (6,640) | (10,465) | (10,465) | (10,465) | (10,495) | (10,495) | (10,278) | (10,278) | (10,278) | (10,278) | (10,279) | (10,279) |
| Minimum Availability Covenant (10%) | (105,862) | (102,096) | (96,537) | (95,727) | (75,346) | (75,000) | (75,000) | (75,000) | (60,695) | (60,391) | (60,000) | (60,000) | (60,000) | (60,000) |
| **Net Availability** | 56,438 | 62,274 | 53,400 | 186,234 | 58,211 | 197,987 | 133,151 | 103,223 | 91,758 | 76,640 | 90,844 | 80,295 | 57,689 | 57,689 |

# APPENDIX "E"

Circuit City
13 Week U.S. Cash Flow & Availability
DIP Budget - November 21, 2008 - 11am - 7 day terms
($ in 000's)

| | | | | | | | Post-Petition | | | | | | | Post |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | Week 1 Forecast 15-Nov | Week 2 Forecast 22-Nov | Week 3 Forecast 29-Nov | Week 4 Forecast 6-Dec | Week 5 Forecast 13-Dec | Week 6 Forecast 20-Dec | Week 7 Forecast 27-Dec | Week 8 Forecast 3-Jan | Week 9 Forecast 10-Jan | Week 10 Forecast 17-Jan | Week 11 Forecast 24-Jan | Week 12 Forecast 31-Jan | Week 13 Forecast 7-Feb | 13 Week Forecast Total |
| **I. Comp Sales vs. Prior Year** | -35.0% | -30.0% | -25.0% | -20.0% | -20.0% | -20.0% | -20.0% | -20.0% | -15.0% | -15.0% | -15.0% | -15.0% | -10.0% | -21.0% |
| **II. Cash Flows** | | | | | | | | | | | | | | |
| *Receipts* | | | | | | | | | | | | | | |
| Sales | 144,652 | 230,846 | 277,929 | 494,480 | 297,127 | 401,118 | 332,053 | 198,204 | 143,399 | 145,285 | 152,836 | 167,853 | 154,035 | 3,139,827 |
| Sales Tax | 9,835 | 18,029 | 33,075 | 17,044 | 20,746 | 29,276 | 17,449 | 10,430 | 8,867 | 9,994 | 10,246 | 11,721 | 9,453 | 206,165 |
| Credit Card Holdbacks | (2,060) | — | — | — | — | — | — | — | — | — | — | — | — | (2,820) |
| Other Receipts | 5,550 | 5,300 | 4,450 | 4,400 | 5,180 | 4,432 | 4,388 | 5,450 | 5,450 | 5,220 | 4,438 | 4,392 | 5,450 | 64,050 |
| Subtotal | 157,238 | 254,174 | 315,454 | 515,925 | 323,272 | 435,574 | 353,944 | 213,022 | 157,716 | 160,499 | 167,519 | 183,966 | 168,938 | 3,407,242 |
| *Operating Disbursements* | | | | | | | | | | | | | | |
| Advertising | 11,515 | 11,515 | 11,515 | 11,646 | 11,646 | 11,646 | 11,646 | 11,646 | 11,646 | — | 7,345 | 7,345 | 5,601 | 127,759 |
| Merchandise (incl. freight) | 56,410 | 84,550 | 115,480 | 161,100 | 200,000 | 238,100 | 238,100 | 238,100 | 190,480 | 142,860 | 119,050 | 119,050 | 128,050 | 2,032,850 |
| Rent | 34,203 | — | 32,259 | — | 32,217 | — | 32,217 | — | 32,217 | — | — | 29,682 | — | 96,751 |
| Payroll & Payroll Taxes | 1,912 | 1,427 | 1,889 | 1,427 | 1,889 | 1,427 | 1,635 | 1,427 | 1,889 | 1,427 | 1,938 | 1,551 | 2,304 | 232,153 |
| Benefits | 503 | 503 | 205 | 3,250 | 1,551 | 1,551 | 1,551 | 1,551 | 1,427 | 1,427 | 1,131 | 1,131 | 2,304 | 21,974 |
| Utilities | 16,538 | — | 3,250 | 3,250 | — | — | — | — | — | — | — | — | — | 18,367 |
| Sales & Other Taxes | — | — | 3,250 | 5,000 | 13,131 | 13,131 | 13,131 | 25,728 | 13,131 | 4,550 | 1,551 | 23,660 | 5,837 | 199,178 |
| General Operating | 11,797 | 17,037 | 18,423 | 12,317 | 23,076 | 24,586 | 25,728 | 25,728 | 24,282 | 27,551 | 14,458 | 26,615 | 13,810 | 257,438 |
| D&O Insurance | — | — | — | — | — | — | — | — | — | 9,000 | — | — | — | 9,000 |
| Subtotal | 132,401 | 123,001 | 189,397 | 240,943 | 280,308 | 312,405 | 345,320 | 288,464 | 271,338 | 227,869 | 186,292 | 180,795 | 219,086 | 2,995,128 |
| **Operating Cash Flow** | 24,837 | 131,173 | 126,057 | 274,982 | 42,964 | 123,169 | 8,624 | (75,442) | (113,622) | (67,370) | (18,773) | 3,172 | (50,148) | 412,113 |
| **Store Closing Expenses** | 5,814 | 3,614 | 8,014 | 9,860 | 8,014 | 3,614 | 8,014 | 3,614 | 2,200 | — | — | — | — | 52,759 |
| **Non Operating Disbursements** | | | | | | | | | | | | | | |
| *Bankruptcy Payments* | | | | | | | | | | | | | | |
| Customer Practices | 1,125 | 1,125 | 1,125 | 1,125 | 1,125 | — | — | — | — | — | — | — | — | 5,625 |
| Freight | — | — | — | 3,000 | 3,000 | 2,000 | 2,000 | — | — | — | — | — | — | 10,000 |
| Insurance | — | — | 205 | 205 | — | — | — | — | — | — | — | — | — | 410 |
| Mechanics Liens | — | — | 3,250 | 3,250 | — | — | — | — | — | — | — | — | — | 6,500 |
| Foreign Vendors | — | — | — | — | 2,500 | 2,500 | 2,500? | — | — | — | — | — | — | 6,500 |
| Other | — | — | 5,000 | 5,000 | 5,000 | 5,000 | — | — | — | — | — | — | — | 20,000 |
| Subtotal | 1,125 | 1,125 | 5,830 | 15,830 | 5,625 | 8,014 | 4,500 | 2,500 | — | — | — | — | — | 49,035 |
| *Financing Expenses* | | | | | | | | | | | | | | |
| Interest and Bank Fees | 2,217 | 431 | 52 | 52 | 214 | 214 | 214 | 214 | 108 | 4,760 | 575 | 574 | 430 | 10,403 |
| DIP Fees / Advisory Fees | 30,000 | — | — | — | — | — | — | — | — | — | — | — | — | 30,000 |
| Lender's Counsel | 2,000 | — | — | — | — | — | — | — | — | — | — | — | — | 2,000 |
| Subtotal | 34,217 | 431 | 52 | 52 | 214 | 214 | 214 | 214 | 108 | 4,760 | 575 | 574 | 430 | 42,403 |
| *Other* | | | | | | | | | | | | | | |
| Restructuring Professionals | 193 | 193 | 193 | 214 | 214 | 214 | 214 | 214 | 482 | 482 | 482 | 482 | 342 | 2,882 |
| Employee Termination Costs | — | — | — | — | — | — | — | — | 5,000 | — | — | — | — | 5,000 |
| Employee Incentive Plan | — | — | — | — | — | — | — | — | — | 10,000 | — | — | — | 10,000 |
| Liquidator Fees | — | — | — | 3,000 | — | — | — | — | — | — | — | — | — | 3,000 |
| Capital Expenditures | — | — | — | — | — | — | — | — | — | 3,919? | — | — | — | 3,919 |
| Subtotal | 193 | 193 | 193 | 3,214 | 214 | 214 | 214 | 214 | 5,482 | 13,364 | 482 | 482 | 342 | 24,801 |
| **Total Disbursements** | 173,750 | 128,375 | 203,486 | 269,955 | 294,161 | 320,734 | 357,196 | 292,292 | 279,127 | 245,992 | 187,349 | 181,850 | 219,859 | 3,164,126 |
| **Net Cash Flow** | (16,512) | 125,810 | 111,968 | 245,969 | 29,111 | 114,840 | (3,252) | (79,270) | (121,411) | (85,494) | (19,829) | 2,116 | (50,921) | 243,116 |
| **III. Loan Balance - Post-Petition** | | | | | | | | | | | | | | |
| Beginning Loan - Book | 756,166 | 786,966 | 659,070 | 561,692 | 245,969 | 272,762 | 129,170 | 127,643 | 628,097 | 606,954 | 603,908 | 591,882 | 590,876 | 756,166 |
| Net Cash Flow (Increase) / Decrease | 16,512 | (125,810) | (111,968) | (245,969) | (29,111) | (114,840) | 3,252 | 79,270 | 121,411 | 85,494 | 19,829 | (2,116) | 50,921 | (243,116) |
| Canadian Borrowings | 14,288 | (1,497) | (6,331) | (6,331) | (7,519) | (28,752) | (4,780) | (5,366) | (5,366) | (2,694) | 2,998 | 757 | 3,052 | (29,525) |
| Ending Loan - Book | 786,966 | 659,670 | 541,692 | 309,392 | 209,339 | 129,170 | 127,643 | 201,547 | 325,285 | 408,085 | 429,912 | 429,553 | 483,085 | 2,327 |
| Less: Checks Outstanding | (28,603) | (148,343) | (96,737) | (85,717) | (75,717) | (117,623) | (95,234) | (116,263) | (103,548) | (134,876) | (121,543) | (90,666) | (100,983) | (100,983) |
| Ending Balance - Bank | 758,363 | 643,827 | 513,375 | 252,648 | 167,989 | 117,621 | 32,409 | 85,284 | 221,737 | 273,209 | 309,369 | 339,887 | 382,543 | 382,543 |
| **IV. Availability Summary** | | | | | | | | | | | | | | |
| Borrowing Base Availability | 1,050,618 | 1,020,961 | 965,369 | 957,271 | 753,464 | 737,236 | 653,331 | 628,097 | 606,954 | 603,908 | 591,882 | 590,876 | 588,085 | 588,085 |
| DIP Loan Balance | (758,743) | (643,827) | (513,375) | (252,648) | (167,985) | (11,547) | (32,409) | (85,284) | (221,737) | (273,209) | (309,369) | (338,887) | (382,543) | (382,543) |
| LCs | (123,811) | (124,811) | (144,667) | (167,667) | (192,667) | (190,667) | (188,667) | (187,667) | (145,667) | (143,667) | (116,667) | (104,667) | (102,667) | (102,667) |
| Canadian Borrowing Base | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 |
| Unless Reserve | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) |
| Professional Fees Reserve | (6,640) | (6,640) | (6,440) | (10,495) | (10,495) | (10,495) | (10,495) | (10,495) | (10,378) | (10,378) | (10,378) | (10,378) | (10,379) | (10,379) |
| Interim Availability Covenant (10%) | (103,862) | (102,096) | (96,537) | (95,727) | (75,346) | (75,000) | (75,000) | (75,000) | (85,391) | (60,391) | (60,391) | (60,391) | (60,000) | (121,944) |
| Net Availability | 103,563 | 188,587 | 249,150 | 275,734 | 351,971 | 494,587 | 400,751 | 323,651 | 217,477 | 161,264 | 140,468 | 121,944 | 77,496 | 77,496 |
| Memo: Merchandise A/P Balance | 15,000 | 50,000 | 125,000 | 200,000 | 238,100 | 238,100 | 238,100 | 190,480 | 142,860 | 119,050 | 119,050 | 142,860 | 157,670 | 157,670 |
| Memo: DPO | 1 days | 3 days | 5 days | 6 days | 7 days | 7 days | 7 days | 7 days | 7 days | 7 days | 7 days | 7 days | 7 days | 7 days |