Court File No. 08-CL-7841

**ONTARIO**

**SUPERIOR COURT OF JUSTICE**

**COMMERCIAL LIST**

*IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED*

*AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF INTERTAN CANADA LTD. AND TOURMALET CORPORATION*

APPLICANTS

# SECOND REPORT OF THE MONITOR
## ALVAREZ & MARSAL CANADA ULC
### (dated December 3, 2008)

**Goodmans LLP**
250 Yonge Street
Suite 2400
Toronto, ON   M5B 2M6

Jay A. Carfagnini  LSUC#: 222936
Fred Myers  LSUC#: 26301A
L. Joseph Latham  LSUC#: 32326A

Tel:  416.979.2211
Fax:  416.979.1234

Solicitors for the Monitor

Court File No.: 08-CV-7841

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF INTERTAN
CANADA LTD. AND TOURMALET CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

**SECOND REPORT OF THE MONITOR**
**ALVAREZ & MARSAL CANADA ULC**
(dated December 3, 2008)

Goodmans LLP
Barristers & Solicitors
250 Yonge Street, Suite 2400
Toronto, Canada M5B 2M6

Jay A. Carfagnini (LSUC#22936)
Fred Myers (LSUC#26301A)
L. Joseph Latham (LSUC#32326A)

Tel: 416.979.2211
Fax: 416.979.1234

Solicitors for the Monitor

\5662376

## LIST OF APPENDICES

1.    Second Report of the Monitor Alvarez & Marsal Canada ULC dated December 3, 2008

   Appendix "A"    -    U.S. Flash Report as of November 22, 2008; and

   Appendix "B"    -    Draft Amended and Restated Initial Order.

GOODMANS\5662091.1

Court File No. 08-CL-7841

**ONTARIO**

**SUPERIOR COURT OF JUSTICE**

**COMMERCIAL LIST**

*IN THE MATTER OF THE COMPANIES' CREDITORS
ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED*

*AND IN THE MATTER OF A PLAN OF COMPROMISE OR
ARRANGEMENT OF INTERTAN CANADA LTD. AND
TOURMALET CORPORATION*

APPLICANTS

**SECOND REPORT OF THE MONITOR**

**ALVAREZ & MARSAL CANADA ULC**

**DECEMBER 3, 2008**

**INTRODUCTION**

1.  By order of this Honourable Court dated November 10, 2008 (the "Initial Order"), InterTAN Canada Ltd. ("InterTAN") and Tourmalet Corporation ("Tourmalet" and together with InterTAN the "Applicants") obtained protection from their creditors under the *Companies' Creditors Arrangement Act* ("CCAA").

2.  Pursuant to the Initial Order, Alvarez & Marsal Canada ULC ("A&M") was appointed monitor of the Applicants during these CCAA proceedings (the "Monitor").

3.  In connection with the Applicants' application for protection under the CCAA, A&M provided this Honourable Court with an initial report in its capacity as proposed monitor (the "Initial Report") dated November 10, 2008.

4.  The Monitor delivered its first report dated November 24, 2008 (the "First Report") in connection with the "come back hearing" that was returnable on November 26, 2008 under paragraph 52 of the Initial Order. At that time, the Court adjourned the motion to December 5, 2008, at 3:00 p.m. on the basis that, in the meantime, the Applicants agreed that they would not exercise the restructuring powers contained in paragraph 11 of the

- 2 -

Initial Order. In connection therewith, the Monitor's counsel advised the Court that, consistent with paragraphs 61 and 62 of the First Report and the Monitor's Summary Comments at the conclusion of the First Report, the Monitor was content with such an adjournment provided that the Applicants and the U.S. Debtors provide reasonable advance notice to the Monitor prior to making any inter-company advances from InterTAN to the U.S. Debtors. The Applicants' counsel did not object to the statements made by the Monitor's counsel on that issue.

5.    The Applicants have brought a motion that is also returnable December 5, 2008, in which they seek an extension of the stay of proceedings under the CCAA and approval of a sales process for the business and assets of InterTAN. In support of this motion, the Applicants have delivered a further Affidavit of Mark Wong sworn December 3, 2008 (the "Second Wong Affidavit").

6.    Capitalized terms not otherwise defined in this Report are as defined in the Initial Order, the Initial Report, the First Report, the affidavit of Mark Wong sworn November 10, 2008 (the "Initial Wong Affidavit") in support of the Applicants' request for relief under the CCAA or the Second Wong Affidavit.

7.    To assist the Court at hearing of the "come back hearing" and the Applicants' motion, the purpose of this report of the Monitor (the "Second Report") is to provide this Honourable Court with an update in respect of the following:

- cash flow results relative to forecast;

- the Monitor's review of the Secured Credit Facility;

- critical suppliers and pre-CCAA expenses;

- the Debtor-in-Possession ("DIP") financing under the Initial Order;

- the Applicants' proposed sale process;

- the Applicants' draft Amended and Restated Initial Order; and

- the Applicants' motion to extend the stay of proceedings.

- 3 -

**TERMS OF REFERENCE**

8.    In preparing this report, the Monitor has relied upon unaudited financial information, InterTAN's books and records, financial information prepared by InterTAN and its advisors, and discussions with management of InterTAN and its advisors. The Monitor has not audited, reviewed, or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, the Monitor expresses no opinion or other form of assurance on the information contained in this report.

9.    Certain of the information referred to in this report consists of forecasts and/or projections. An examination or review of financial forecasts and projections, as outlined in the Canadian Institute of Chartered Accountants Handbook, has not been performed. Future oriented financial information referred to in this report was prepared based on management's estimates and assumptions. Readers are cautioned that since projections are based upon assumptions about future events and conditions that are not ascertainable, actual results will vary from the projections, even if the assumptions materialize, and the variations could be significant.

10.    The Monitor has requested that management bring to its attention any significant matters which were not addressed in the course of its specific inquiries. Accordingly, this report is based solely on the information (financial or otherwise) made available to the Monitor.

11.    This report has been prepared for the use of this Court and InterTAN's stakeholders on the status of the Applicants' CCAA proceedings. Given the nature of the Monitor's mandate, this information is subject to change as the mandate progresses.

12.    All references to dollars in this report are in Canadian currency unless otherwise noted.

**BACKGROUND**

13.    InterTAN is a leading specialty retailer of consumer electronics in Canada and is the operating Canadian subsidiary of the major U.S.-based electronics retailer Circuit City Stores, Inc. ("Circuit City"). Tourmalet is a Nova Scotia unlimited liability company that is an indirect, wholly-owned subsidiary of Circuit City. Tourmalet is a non-operating holding company whose sole asset is the preferred stock of InterTAN Inc., which is the

- 4 -

sole shareholder of InterTAN. Circuit City is the Applicants' ultimate parent company. Further background to InterTAN, Tourmalet and Circuit City is contained in the materials filed relating to the Initial Order, including the Initial Wong Affidavit. These documents, together with other information regarding these CCAA proceedings, including the Initial Order and supporting affidavit, have been posted by the Monitor on its website at www.alvarezandmarsal.com/intertan.

14.    On November 10, 2008, Circuit City and certain of its affiliates (the "U.S. Debtors") filed for bankruptcy protection (the "Chapter 11 Proceedings") pursuant to Chapter 11 of Title 11 of the *United States Code* (the "U.S. Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Virginia (the "U.S. Bankruptcy Court"). A hyperlink to information concerning the U.S. Debtors' restructuring can be found at www.kccllc.net.

15.    Additional background information can be found in both the Initial Report and the First Report.

**CASH FLOW RESULTS RELATIVE TO FORECAST**

16.    As at the time of writing this Second Report, InterTAN's cash flow variance reporting for the three-week period ended November 30, 2008 had not yet been finalized. Accordingly, InterTAN's cash receipts and disbursements for the two-week period (from commencement of these proceedings) to November 23, 2008 are summarized below and are compared to the comparable period of the cash flow forecast filed with this Honourable Court as Appendix L to the Initial Wong Affidavit (the "CCAA Cash Flow Forecast").

| *(Unaudited, in $CDN 000's)* | For the Week Ended November 23, 2008 | | |
| --- | --- | --- | --- |
| | **Actual** | **Forecast** | **Variance** |
| *Receipts* | 29,732 | 23,720 | 6,012 |
| *Disbursements* | | | |
| Merchandise | (33,856) | (27,900) | (5,956) |
| Payroll and payroll taxes | (3,876) | (4,049) | 173 |
| Operating disbursements | (2,560) | (2,737) | 177 |
| Restructuring costs | (2,067) | (3,230) | 1,163 |
| Other | (93) | (852) | 759 |
| *Total Disbursements* | (42,452) | (38,768) | (3,684) |
| **Net Cash Flow** | (12,720) | (15,048) | 2,328 |

17.    Despite the fact that sales for the first two weeks of post-CCAA operations were approximately 4% below management's sales forecast, receipts were approximately $6.0 million ahead of the CCAA Cash Flow Forecast. Management advises that this was due primarily to a one time, up-front reserve (referred to in the First Report) which had been built into the CCAA Cash Flow Forecast to anticipate declining cash receipts as a result of the commencement of these proceedings. Management continues to expect that this variance is primarily a timing difference that will reverse over the coming five weeks.

18.    Disbursements for the two-week period were approximately $3.7 million more than the CCAA Cash Flow Forecast. Management attributes this variance primarily to timing differences resulting from higher than forecast inventory purchases, partially offset by timing differences between actual and forecast payments for logistics, utilities and other

- 6 -

services. Management continues to expect that these variances will reverse in the coming weeks.

19.    InterTAN's ending cash balance as at November 23, 2008 was approximately $5.4 million, net of outstanding cheques of approximately $2.1 million. This ending cash balance included cumulative net draws by InterTAN on the DIP facility during the two-week period of $12.5 million.

20.    Overall, during the two-week period ended November 23, 2008, InterTAN experienced a positive net cash flow variance of approximately $2.3 million relative to the CCAA Cash Flow Forecast. In addition, as described in the First Report, InterTAN's opening combined net cash and loan position, before letters of credit ("LC's"), at the commencement of these proceedings was approximately $6.5 million better than forecast ($5.6 million of cash in bank, plus $832,000 lower opening loan position than forecast), primarily because management had anticipated that there would be no funds in the Company's bank accounts as at the date of the CCAA filings.

21.    As described in the First Report, at the time the CCAA Cash Flow Forecast was prepared, management anticipated that InterTAN's LC requirements would be met through the LC facility available to Circuit City as part of the DIP Facility and that InterTAN's LC's would not be included in its availability calculations under the DIP Facility. However, as management and InterTAN's advisors worked with the DIP Lenders and Circuit City to calculate the opening loan position as at the date of the CCAA filings, it was determined that InterTAN's LC's would be included in its overall loan position for purposes of calculating borrowing availability under the DIP Facility. InterTAN's outstanding LC's as at the filing date were approximately $7.7 million.

22.    Taking into consideration: (i) the $2.3 million positive variance on the cash flow activity for the two-week period; (ii) the $6.5 million of opening funds on hand that were not anticipated; and (iii) the requirement to include LC's (approximately $7.9 million as at November 23, 2008) in InterTAN's loan availability calculations, InterTAN's net availability position as at November 23, 2008 was approximately $887,000 ahead of the CCAA Cash Flow Forecast.

- 7 -

23.   InterTAN's opening and closing combined net cash, loan and LC's positions for the two-week period ended November 23, 2008 are summarized below and are compared to the comparable period of the CCAA Cash Flow Forecast.

| *(Unaudited, in $CDN 000's)* | For the Week Ended November 23, 2008 | | |
|---|---|---|---|
| | **Actual** | **Forecast** | **Variance** |
| **Opening position** | | | |
| Cash in bank (a) | 5,613 | - | 5,613 |
| Loans (b) | (42,500) | (43,332) | 832 |
| Letters of credit (c) | (7,650) | - | (7,650) |
| Combined net opening position | (44,537) | (43,332) | (1,205) |
| **Activity during the period** | | | |
| Net cash flow (see above) (d) | (12,720) | (15,048) | 2,328 |
| Net change in LC's (e) | (236) | - | |
| Net DIP advances (f) | 12,500 | 15,048 | |
| **Closing position** | | | |
| Cash in bank (a+d-f) | 5,393 | - | 5,393 |
| Loans and LC's (b+c+e-f) | (62,886) | (58,380) | (4,506) |
| **Combined net closing position** | **(57,493)** | **(58,380)** | **887** |

24.   In summary, for the end of the second week following the date of the Initial Order (November 23, 2008), the CCAA Cash Flow Forecast had projected a total loan position of $58.4 million, the LC's being included in the U.S. borrowings and no cash in InterTAN's bank accounts.   In fact, as at November 23, 2008, InterTAN had approximately $5.4 million in its bank accounts (due to its drawing on the DIP Facility), had not borrowed any funds from Circuit City, and had a balance of $62.9 million outstanding under the DIP Facility after including therein the $7.9 million of LC's and the $12.5 million of cumulative draws during the two-week period.   On a comparable basis, InterTAN's loan position (after netting out its cash on hand and excluding the $7.9 million of LC's that were not contemplated by the CCAA Cash Flow Forecast) would

- 8 -

have been approximately $49.6 million as compared to the $58.4 million forecasted
(before any advances to Circuit City).

25.   With combined closing loan and LC balances of approximately $62.9 million (U.S. $48.6
       million), InterTAN was close to fully drawn on its current allocation from the DIP
       Facility of U.S.$50 million as at November 23, 2008.  However, as indicated above, it
       had cash on hand of approximately $5.4 million.

## THE MONITOR'S REVIEW OF THE SECURED CREDIT FACILITY

26.   In the First Report, the Monitor advised that its counsel, Goodmans LLP ("Goodmans"),
       has opined, subject to the usual assumptions and qualifications, that B of A, as lender and
       agent for the syndicate of lenders under the Secured Credit Facility, holds validly
       perfected security in Ontario over the inventory, receivables and intangible assets of
       InterTAN.  Since that time, Goodmans has received an opinion from its Quebec counsel,
       BCF LLP, which provides the opinion that, pursuant to InterTAN's deed of hypothec and
       subject to the usual assumptions and qualifications, the syndicate of lenders under the
       Secured Credit Facility holds valid and enforceable security over the inventory,
       receivables and intangible assets of InterTAN in Quebec.

## CRITICAL SUPPLIERS AND PRE-CCAA EXPENSES

27.   Since the delivery of the First Report, InterTAN sought the consent of the Monitor for
       payments to one critical supplier for goods or services supplied prior to the CCAA
       proceedings in the aggregate amount of $134,172.  The Monitor carefully reviewed the
       facts supporting each request and was satisfied that each was appropriate.  Therefore the
       Monitor provided its consent to these payments as sought.

## THE DIP FINANCING UNDER THE INITIAL ORDER

28.   The Monitor has received from the advisors to the U.S. Debtors an updated form of
       statement of receipts and disbursements for the U.S. Debtors as of November 22, 2008, a
       copy of which is attached as Appendix "A" (the "U.S. Flash Report").  The U.S. Flash
       Report reflected that the U.S. Debtors' net cash flow was approximately U.S.$70 million
       worse than had been projected for the first two (2) weeks, but indicated that the U.S.

- 9 -

Debtors had DIP availability as at November 22, 2008 of approximately U.S.$29.1 million more than what they projected at the outset. The Monitor understands that these variances may largely be attributed to higher than anticipated inventory levels.

29.    The Monitor reported in its First Report that the U.S. Debtors have advised that they no longer foresee the need to borrow funds from InterTAN barring exigent circumstances. The Monitor also reported in the First Report that the U.S. Debtors advised that they were in discussions with certain of their major suppliers, represented on the Unsecured Creditors' Committee (the "UCC") in the Chapter 11 Proceedings, with the goal of obtaining the agreement of certain suppliers to supply trade credit terms to the U.S. Debtors going forward. The U.S. Debtors informed the Monitor that they believe that if they were to obtain a reasonable amount of trade credit, availability under the DIP Facility would increase substantially. Were this to occur, they said, the need for inter-company borrowing from InterTAN would be that much less likely.

30.    The Monitor previously raised with the U.S. Debtors the prospect of InterTAN being granted security for any intercompany advances that it makes to the U.S. Debtors in order to ensure that InterTAN has the liquidity that it requires in accordance with its CCAA Cash Flow Forecast and to protect InterTAN's unsecured creditors. The U.S. Debtors advised the Monitor that, if they were to provide a security interest to the Applicants in connection with potential future inter-company advances from InterTAN to the U.S. Debtors, their ability to negotiate trade credit terms with their major suppliers would be impaired. That is, were InterTAN to demand security for inter-company advances it would interfere with the ability of the U.S. Debtors to obtain trade credit and this would actually increase the likelihood that the U.S. Debtors would be required to draw funds from Canada. On this basis, it was the Monitor's view as expressed in the First Report that the issue of the mechanics (including the nature and terms) of any inter-company lending by InterTAN to the U.S. Debtors did not need to be resolved until such time as the U.S. Debtors advise that they anticipate that they may need to borrow from InterTAN.

31.    As noted above, the "come back hearing" was adjourned to December 5, 2008 to allow for discussions among several parties to occur and to await developments in the Chapter 11 Proceedings. At the November 26, 2008 hearing before the Court, the Applicants

- 10 -

acknowledged that pending the hearing on December 5, 2008, they would not undertake any restructuring steps under paragraph 11 of the Initial Order. In connection therewith, the Monitor's counsel advised the Court that, consistent with paragraphs 61 and 62 of the First Report and the Monitor's Summary Comments at the conclusion of the First Report, the Monitor was content with an adjournment to December 5, 2008 provided that the Applicants and the U.S. Debtors provide reasonable advance notice to the Monitor prior to making any inter-company advances from InterTAN to the U.S. Debtors. The Applicants' counsel did not object to the statements made by the Monitor's counsel on that issue.

32.  The U.S. Debtors had advised that they hoped to conclude their negotiations with their trade creditors before the hearing in the U.S. Bankruptcy Court of their motion for final DIP approval. This motion was originally scheduled to be heard on December 5, 2008. However, the U.S. Debtors advise that the final DIP approval motion in the Chapter 11 Proceedings has now been re-scheduled to December 22, 2008.

33.  Since November 24, 2008, the Monitor has not been advised of an arrangement concerning the receipt of trade credit by the U.S. Debtors having being concluded with trade creditors in the Chapter 11 Proceedings.

34.  The Applicants continue to advise that they have not advanced any funds drawn on the DIP Facility to the U.S. Debtors during these proceedings.

35.  The Monitor is meeting management of InterTAN on a daily basis to review InterTAN's cash position and near-term disbursements requirements. The Monitor is also receiving weekly financial information from the advisors to the U.S. Debtors that, as noted previously, appears to continue to support the expressed intention of the U.S. Debtors that there is no foreseeable need for them to borrow from InterTAN. The Monitor believes that the status quo appears to be working on both sides of the border and is currently ensuring that InterTAN receives sufficient liquidity to meet its forecasted needs. Therefore, the Monitor is content that the current status continue on the basis that the Applicants and the U.S. Debtors provide reasonable advance notice to the Monitor prior to making any inter-company advances from InterTAN to the U.S. Debtors. The

- 11 -

Applicants' counsel have advised the Monitor's counsel that the Applicants have agreed that they will not make any advances from InterTAN to the U.S. Debtors without reasonable advance notice to the Monitor.

## THE APPLICANTS' PROPOSED SALES PROCESS

36.    As was noted in the Initial Wong Affidavit, InterTAN has previously restructured itself and was operating profitably as a going concern prior to the commencement of the Chapter 11 Proceedings.    The approach to these proceedings and, specifically, the quantum of the Canadian Creditor Charge in the Initial Order, are premised upon the continuation of InterTAN's business as a going concern, including maintaining all or virtually all employment and leases so as to maximize recovery on Canadian assets and to avoid increasing the quantum of claims against the Canadian Creditor Charge.    As discussed in the First Report, the Monitor has advised the Applicants and the U.S. Debtors that, in view of the circumstances, it is important that the process for the sale of the business and assets of InterTAN be, and be seen to be, transparent and independent.

37.    As noted in the First Report, the Applicants have retained NM Rothschild & Sons Canada Limited ("Rothschild") as an investment banking advisor to pursue strategic alternatives for InterTAN.    The Monitor has received a draft of the Canadian engagement letter for Rothschild on December 3, 2008 but has not yet had an opportunity to review same.

38.    InterTAN is seeking approval of a proposed sales process that has been developed by them with Rothschild.    The background facts concerning InterTAN's efforts to sell its business to date and the purpose and structure of the proposed sales process are detailed in the Second Wong Affidavit.

39.    In summary, in light of the activities already undertaken as discussed in the Second Wong Affidavit and noted in the First Report, the Applicants propose a process governed by the following schedule:

(i)    preliminary non-binding indications of interest shall be provided by potential purchasers by no later than 5:00 pm Toronto time on December 17, 2008;

- 12 -

(ii)   potential purchasers who are invited to participate in the next phase of the sale process, and wish to proceed, shall provide firm proposals, together with a mark-up of the draft purchase and sale agreement, by no later than 5:00 pm Toronto time January 15, 2009; and

(iii)   the Applicants will then seek any further relief necessary from this Court to implement any sale transaction.

40.   As reported in the First Report, with the approval of the U.S. Debtors and the Applicants, Rothschild agreed to provide the Monitor with frequent updates so as to ensure that the Monitor is fully involved throughout the sales process, including the evaluation of bids and the finalization of any applicable auction process.   The Applicants propose to formalize the role of the Monitor in their draft sales process order.

41.   The Applicants propose to advise potential bidders of the details of their proposed sales process by a letter from Rothschild, a copy of which is attached as exhibit "G" to the Second Wong Affidavit (the "Rothschild Letter").   The Rothschild Letter notes specifically that there remains a possibility of a buyer seeking an *en bloc* purchase of the assets of both InterTAN and the U.S. Debtors, and that any sale of the business or assets of InterTAN would require approval of this Honourable Court.

42.   Rothschild is administering the InterTAN secure electronic data room.   Therefore, any parties with an interest in an en bloc purchase of all of the assets on both sides of the border must deal with both Rothschild and Rothschild U.S.

43.   The Monitor has reviewed the proposed sales process as set out in the Rothschild Letter and the draft order appended to the Applicants' motion record.   The Monitor has considered the proposed sales process in light of the goals of transparency and independence.   It also notes the efforts made prior to these proceedings to seek to sell InterTAN's business.   Although the time milestones proposed are relatively short, the Monitor is of the view that, in the circumstances and based on its discussions with Rothschild, the proposed sales process is consistent with the goals expressed by the Monitor and are supported by the substantial sales efforts already made both before and since the commencement of these proceedings.   The Monitor therefore recommends that

- 13 -

this Honourable Court approve the sales process proposed by the Applicants as set out in the Second Wong Affidavit, the Rothschild Letter and the draft order appended to the Applicants' motion record.

**APPLICANTS' DRAFT AMENDED AND RESTATED INITIAL ORDER**

44.    In the days leading up to the November 26, 2008 "come back hearing", counsel for certain of InterTAN's landlords provided the Applicants' counsel, as well as counsel for the Monitor and the DIP Lenders, a number of requested changes to the Initial Order. On November 26, 2008, those landlords' counsel handed up to the Court a copy of the proposed draft order which they had circulated to counsel.

45.    Since that time, the Monitor has engaged in discussions with the landlords' counsel, counsel to the DIP Lenders, and the Applicants' counsel. The Monitor has also been advised by each of these parties of further discussions that have been held between and among them.

46.    The Applicants have responded to concerns raised by several of the parties and have proposed terms for an Amended and Restated Initial Order, the current version of which, blacklined against the Initial Order, is attached as Appendix "B".    The Monitor understands that there appears to be a concensus among all interested parties to the terms of the Amended and Restated Initial Order as currently proposed.  Certain of the more salient changes are commented on below.

47.    Several of the proposed changes to the Initial Order (in paragraph 9, part of 11(c), and paragraphs 12 and 14) are designed to bring it into conformity with the revisions to the CCAA Template Order – Long Form as approved by the Commercial List Users Committee subsequent to the commencement of these proceedings.

48.    The Applicants have agreed to move employee wages from paragraph 6 of the Initial Order to paragraph 8 under which the payment of wages will be made mandatory rather than discretionary, subject only to there being sufficient availability under the DIP Facility. The Monitor understands that the Applicants have always intended to pay their

- 14 -

employees their wages and benefits in full and the Applicants built into the CCAA Cash Flow Forecast sufficient funds to ensure that they were able to do so.

49.    The Applicants have proposed a new paragraph 11A that will provide that the Applicants will obtain the approval of the Monitor prior to disclaiming or repudiating any material contracts, specifically including real property leases, under sub-paragraphs 11(c) and (d) of the Initial Order. In addition, the Applicants seek to amend the preamble to paragraph 11 to clarify that the limitations on repudiating or disclaiming real property leases in sub-paragraph 11(c) will apply regardless of any covenants in the DIP Facility. A wording change to conform to these changes is also proposed for paragraph 13. The Monitor advised in the First Report that it is prepared to take on oversight and supervision duties as desired by the Court and the stakeholders. As well, given the similarities between the proposed paragraph 11A and the pending amendments to the CCAA in relation to contract repudiations, the Monitor believes that language to be appropriate.

50.    The Applicants propose to amend paragraph 19 of the Initial Order to clarify the effect of the stay of proceedings that limits third parties from enforcing their rights against others who have agreements with those third parties (such as InterTAN dealers who may have leases) to limit the scope of the third party stay so that it applies only where the third parties' rights arise due to the bringing of these CCAA proceedings or the making of the Initial Order.

51.    The Applicants propose to amend paragraph 39 of the Initial Order to clarify that it requires that DIP Lenders provide notice only where they propose to sweep InterTAN's cash in payment of obligations of the U.S. Debtors and it does not require notice of daily cash sweeps to meet the Applicants' DIP obligations. The Monitor understands that amounts deposited into InterTAN's bank accounts in Canada are generally swept to the DIP Lender for application to InterTAN's credit facility, and agrees with that amendment to paragraph 39.

52.    In both the Initial Report and the First Report, the Monitor noted the concern that, in view of the $25 million cap on the quantum of the Canadian Creditor Charge, the recovery of known unsecured trade creditors would risk dilution if damages claims were to arise on

- 15 -

the disclaimer of contracts or leases or the termination of employees' employment in these proceedings. The Applicants and the DIP Lenders have agreed to allow the Canadian unsecured creditors to access any amounts of the Directors' Charge which is not utilized by the beneficiaries of that charge. Therefore, to the extent that claims may not be asserted under the Directors' Charge (because they are paid in the ordinary course or as part of a sale), there could be an additional $19.3 million of recovery for Canadian unsecured creditors, meaning that the aggregate maximum amount of the Canadian Creditor Charge is now proposed to be $44.3 million. The Monitor views this as a positive development and is supportive of the language proposed by the Applicants.

53.    An amendment is proposed to paragraph 44 of the Initial Order to clarify that no cash sweeps from InterTAN directly to the U.S. affiliates will be made unless the full amount of the sum of the Administration Charge, the Directors' Charge, the KERP Charge and the Canadian Creditor Charge is reserved and remains in the possession of or is transferred to the Applicants. This amendment, together with paragraph 39 of the Initial Order, helps to provide comfort that cash of InterTAN will not be swept to the U.S. Debtors without protections for the Canadian creditors. The Monitor views this as a positive development and is supportive of the language proposed by the Applicants.

## APPLICANTS' STAY EXTENSION REQUEST

54.    The Applicants have requested an extension of the stay to January 30, 2009. In light of the time frames for the Sales Process and the progress made to date, the Monitor believes this to be a reasonable date by which the Applicants will need to return to this Honourable Court to seek directions or relief concerning the disposition of assets. The Monitor believes that the Applicants have been working with due diligence and in good faith to achieve an expeditious restructuring of their business. Accordingly, the Monitor recommends that this Honourable Court grant the extension requested by the Applicants.

All of which is respectfully submitted at Toronto, Ontario this 3rd day of December, 2008.

**ALVAREZ & MARSAL CANADA ULC**
in its capacity as Court appointed Monitor of
InterTAN Canada Ltd. and Tourmalet Corporation

Per: _____

        Name:  Douglas R. McIntosh
        Title:   Managing Director
        I/We have the authority to bind the corporation

Circuit City
Weekly Cash Flow Flash Report
($ in 000's)

| | | Current Week Forecast Variance | | | | Filing to Date Forecast Variance | | | |
| | | 1 Week Ending | | | | 2 Weeks Ending | | | |
| | | 22-Nov Actual | 22-Nov Forecast | Variance $ Fav / (Unfav) | Variance % Fav / (Unfav) | 22-Nov Actual | 22-Nov Forecast | Variance $ Fav / (Unfav) | Variance % Fav / (Unfav) |
|---|---|---|---|---|---|---|---|---|---|
| **I.** Memo (Comp sales) | | -38.4% | -30.0% | | (8.4%) | -34.3% | -31.8% | | (2.5%) |
| **II. Cash Flows** | | | | | | | | | |
| Cash Receipts | [1] | 178,857 | 254,174 | (75,318) | (29.6%) | 366,625 | 411,412 | (44,788) | (10.9%) |
| Operating Disbursements | | | | | | | | | |
| Advertising | [2] | 5,127 | 11,515 | 6,388 | 55.5% | 5,127 | 23,030 | 17,903 | 77.7% |
| Merchandise (incl. freight) | [3] | 210,416 | 169,550 | (40,866) | (24.1%) | 317,389 | 270,480 | (46,909) | (17.3%) |
| Rent | | - | - | - | 0.0% | - | - | - | 0.0% |
| Payroll & Payroll Taxes | | 2,542 | 1,635 | (907) | (55.5%) | 34,855 | 35,838 | 983 | 2.7% |
| Benefits | | 1,779 | 1,427 | (353) | (24.7%) | 3,535 | 3,339 | (196) | (5.9%) |
| Utilities | | 26 | 503 | 477 | 94.7% | 26 | 1,006 | 980 | 97.4% |
| Sales and Other Taxes | [4] | 24,685 | 4,325 | (20,360) | (470.7%) | 25,777 | 20,366 | (5,412) | (26.6%) |
| General Operating | | 17,132 | 17,057 | (75) | (0.4%) | 29,989 | 28,854 | (1,135) | (3.9%) |
| D&O Insurance | | - | - | - | 0.0% | - | - | - | 0.0% |
| Subtotal | | 261,707 | 206,012 | (55,696) | (27.0%) | 416,659 | 382,912 | (33,782) | (8.8%) |
| Operating Cash Flow | | (82,851) | 48,163 | (131,014) | (272.0%) | (50,074) | 28,500 | (78,574) | (275.7%) |
| Other Disbursements | | | | | | | | | |
| Store Closing Expenses | [5] | 3,937 | 3,614 | (323) | (8.9%) | 7,841 | 9,429 | (1,588) | (16.8%) |
| Bankruptcy Payments | | - | 3,625 | 3,625 | 100.0% | - | 4,750 | 4,750 | (100.0%) |
| Financing Expenses | | 2,750 | 431 | (2,319) | (538.0%) | 32,834 | 34,648 | 1,814 | 5.2% |
| Other | | 86 | 193 | 107 | 55.7% | 93 | 366 | 292 | 79.8% |
| Other Disbursements | | 6,773 | 7,863 | 1,091 | 13.9% | 40,768 | 49,212 | 8,446 | 17.2% |
| Net Cash Flow | | (89,623) | 40,300 | (129,923) | (322.4%) | (90,842) | (20,713) | (70,130) | (338.6%) |
| **III. Loan Balance** | | | | | | | | | |
| Beginning Loan - Book | | 781,996 | 831,466 | 49,470 | 5.9% | 781,388 | 755,166 | (25,222) | (3.3%) |
| Net Cash Flow (Increase) / Decrease | | 89,623 | (40,300) | (129,923) | (322.4%) | 90,842 | 20,713 | (70,130) | (338.6%) |
| Change in Cash | | (138) | 138 | 138 | 0.0% | (12,419) | - | (12,419) | 0.0% |
| Change in Borrowings | | (35,161) | (4,467) | 3,964 | (244.8%) | (6,509) | 12,791 | 6,282 | 49.1% |
| Ending Loan - Book | | 836,320 | 789,670 | (76,651) | (9.7%) | 816,320 | 789,970 | (76,506) | (9.7%) |
| Total Checks Outstanding | | (31,685) | (26,530) | 5,155 | 19.4% | (31,685) | (26,530) | 5,155 | 19.4% |
| Ending Balance - Bank | | 834,635 | 763,140 | (71,496) | (9.4%) | 834,635 | 763,140 | (71,495) | (9.4%) |
| **IV. Availability Summary** | | | | | | | | | |
| Borrowing Base Availability | [6] | 1,126,962 | 1,020,961 | 106,002 | 10.4% | 1,126,962 | 1,020,961 | 106,002 | 10.4% |
| Loan Balance | | (834,635) | (763,140) | (71,495) | (9.4%) | (834,635) | (763,140) | (71,495) | (9.4%) |
| Canadian Portion Borrowing Base | | (134,429) | (131,811) | (2,618) | (2.0%) | (134,429) | (131,811) | (2,618) | (2.0%) |
| Utilities Reserve | | 50,000 | 50,000 | - | 0.0% | 50,000 | 50,000 | - | 0.0% |
| Professional Fees Reserve | | (5,000) | (5,000) | - | 100.0% | (5,000) | (5,000) | - | 100.0% |
| Minimum Availability Covenant (10%) | [7] | (4,213) | (6,640) | 2,427 | (36.5%) | (4,213) | (6,640) | 2,427 | (36.5%) |
| | | (112,275) | (102,096) | (10,179) | (10.0%) | (112,275) | (102,096) | (10,179) | (10.0%) |
| Net Availability | | 91,410 | 62,274 | 29,136 | 46.8% | 91,410 | 62,274 | 29,136 | 46.8% |

Notes:
[1] Underestimated shift in sales due to timing of Thanksgiving week by approximately $40M. Comp sales for the week were -38.4% vs. a forecast of -30% negatively impacting cash receipts by $25M. Cash receipts over the past 2 weeks (filing to date) are $45M or 11% unfavorable to fcst.
[2] Advertising is favorable to forecast due to timing of payments.
[3] Merchandise is $41M unfavorable to forecast due to additional CIA spend of $40M for Black Friday goods.
[4] Sales and Other Taxes were unfavorable to forecast by $20M due to timing of payments. Total sales and other tax payments for the 2 weeks were only $5M or 26% higher than forecast. The Company expects this variance to even out over the next couple weeks.
[5] Bankruptcy payments are favorable to forecast due to timing.
[6] Higher inventory levels over the past two weeks ($100M) and lower customer deposits ($25M)
[7] Agreement with utility vendors not complete

DRAFT - Subject to Change
Privileged and Confidential

Court File No. 08-CL-7841

***ONTARIO***

**SUPERIOR COURT OF JUSTICE**

**COMMERCIAL LIST**

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | MONDAY, THE 10th DAY |
| | ) | |
| JUSTICE MORAWETZ | ) | OF NOVEMBER, 2008 |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,* R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF INTERTAN CANADA LTD. AND TOURMALET CORPORATION

APPLICANTS

## AMENDED AND RESTATED INITIAL ORDER

THIS APPLICATION, made by the Applicants, pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA") was heard this day at 330 University Avenue, Toronto, Ontario.

ON READING the affidavit of Mark J. Wong sworn November 10, 2008  and the Exhibits thereto (the "Wong Affidavit") and on hearing the submissions of counsel for the Applicant, Alvarez & Marsal Canada ULC, Bank of America, N.A. (Canadian Branch) in its capacity as a lender and Canadian agent (the "Canadian Agent"), and on reading the consent of Alvarez & Marsal Canada ULC to act as the Monitor.

**SERVICE**

1.    THIS COURT ORDERS that the time for service of the Notice of Application and the Application Record is hereby abridged so that this Application is properly returnable today and hereby dispenses with further service thereof.

**APPLICATION**

2.    THIS COURT ORDERS AND DECLARES that the Applicants are companies to which the CCAA applies.

**PLAN OF ARRANGEMENT**

3.    THIS COURT ORDERS that the Applicants shall have the authority to file and may, subject to further order of this Court, file with this Court a plan of compromise or arrangement (hereinafter referred to as the "Plan") between, *inter alia*, the Applicants and one or more classes of its secured and/or unsecured creditors as it deems appropriate.

**POSSESSION OF PROPERTY AND OPERATIONS**

4.    THIS COURT ORDERS that the Applicants shall remain in possession and control of their current and future assets, undertakings and properties of every nature and kind whatsoever, and wherever situate including all proceeds thereof (the "Property").  Subject to this and any further Order of this Court, the Applicants shall continue to carry on business in a manner consistent with the preservation of its business (the "Business") and Property.  The Applicants shall be authorized and empowered to continue to retain and employ the employees, consultants, agents, experts, accountants, counsel and such other persons (collectively "Assistants") currently retained or employed by it, with liberty to retain such further Assistants as it deems reasonably necessary or desirable in the ordinary course of business or for the carrying out of the terms of this Order.

5.    THIS COURT ORDERS that the Applicants shall be directed to continue to utilize the central cash management system currently in place as described in the Wong Affidavit or replace it with another substantially similar central cash management system as necessary to facilitate the DIP Facility approved herein (the "Cash Management System") and that any present or future bank providing the Cash Management System shall not be under any

obligation whatsoever to inquire into the propriety, validity or legality of any transfer, payment, collection or other action taken under the Cash Management System, or as to the use or application by the Applicants of funds transferred, paid, collected or otherwise dealt with in the Cash Management System, shall be entitled to provide the Cash Management System without any liability in respect thereof to any Person (as hereinafter defined) other than the Applicants, pursuant to the terms of the documentation applicable to the Cash Management System, and shall be, in its capacity as provider of the Cash Management System, an unaffected creditor under the Plan with regard to any claims or expenses it may suffer or incur in connection with the provision of the Cash Management System.

6.     THIS COURT ORDERS that, subject to availability under the DIP Facility (as hereinafter defined), the Applicants shall be entitled but not required to pay the following expenses whether incurred prior to or after this Order:

(a) ~~*all outstanding and future wages, salaries, employee and pension benefits, vacation pay, bonuses and *expenses* payable on or after the date of this Order, in each case incurred in the ordinary course of business and consistent with existing compensation policies and arrangements;*~~

(a)     (b) the fees and disbursements of any Assistants retained or employed by the Applicants in respect of these proceedings, at their standard rates and charges;

(b)     (c) payments in respect of the key employee retention program (the "KERP") as described in the Wong Affidavit;

(c)     (d) amounts owing for goods or services actually supplied to the Applicants prior to the date of this order:

        (i)     by Purolator Courier and other logistics or supply chain providers;

        (ii)    by custom brokers; and

        (iii)   with the consent of the Monitor, up to $2 million, by other North American suppliers, including payments in respect of outstanding documentary credits or deposits, if, in the opinion of the Applicants, the

supplier is critical to the Business and ongoing operations of the
Applicants;

(d)    (e) goods and services actually supplied to the Applicants prior to the date of this
order, including payments in respect of outstanding documentary credits or
deposits, by trade vendors and suppliers outside of North America;

(e)    (f) the JV Manager Share to the JV Managers (both as defined in the Wong
Affidavit);

(f)    (g) all amounts related to servicing warranties and honouring gift cards and
reward and loyalty programs issued before or after the date of this Order; and

(g)    (h) any other costs and expenses that are deemed necessary for the preservation of
the Property and/or the Business by the Applicants with the consent of the
Monitor.

7.    THIS COURT ORDERS that, except as otherwise provided to the contrary herein, the
Applicants shall be entitled but not required to pay all reasonable expenses incurred by the
Applicants in carrying on the Business in the ordinary course after this Order, and in carrying
out the provisions of this Order, which expenses shall include, without limitation:

(a)    all expenses and capital expenditures reasonably necessary for the preservation of
the Property or the Business including, without limitation, payments on account
of insurance (including directors and officers insurance), maintenance and
security services; and

(b)    payment for goods or services actually supplied to the Applicants following the
date of this Order.

8.    THIS COURT ORDERS that the Applicants shall remit, in accordance with legal
requirements, or pay:

(a)    subject to availability under the DIP Facility, *all outstanding and future wages,
salaries, employee and pension benefits, vacation pay, bonuses and *reasonable

expenses payable to employees* payable on or after the date of this Order, in each case incurred in the ordinary course of business and consistent with existing compensation policies and arrangements;*

(b)   (a) any statutory deemed trust amounts in favour of the Crown in right of Canada or of any Province thereof or any other taxation authority which are required to be deducted from employees' wages, including, without limitation, amounts in respect of (i) employment insurance, (ii) Canada Pension Plan, (iii) Quebec Pension Plan, and (iv) income taxes;

(c)   (b) all goods and services or other applicable sales taxes (collectively, "Sales Taxes") required to be remitted by the Applicants in connection with the sale of goods and services by the Applicants, but only where such Sales Taxes are accrued or collected after the date of this Order, or where such Sales Taxes were accrued or collected prior to the date of this Order but not required to be remitted until on or after the date of this Order, and

(d)   (c) any amount payable to the Crown in right of Canada or of any Province thereof or any political subdivision thereof or any other taxation authority in respect of municipal realty, municipal business or other taxes, assessments or levies of any nature or kind which are entitled at law to be paid in priority to claims of secured creditors and which are attributable to or in respect of the carrying on of the Business by the Applicants.

9.     THIS COURT ORDERS that until such time as an Applicant delivers a notice in writing to repudiate a real property lease in accordance with paragraph 11(c) of this Order (a "Notice of Repudiation"), such Applicant shall pay all amounts constituting rent or payable as rent under real property leases (including, for greater certainty, common area maintenance charges, utilities and realty taxes and any other amounts payable to the landlord under the lease) or as otherwise may be negotiated by between such Applicant and the relevant landlord from time to time ("Rent"), for the period commencing from and including the date of this Order, bi-weekly twice-monthly in equal payments on the first and fifteenth day of each month, in advance (but not in arrears). On the date of the first of such payments, any arrears

relating to the period commencing from and including the date of this Order shall also be paid. Upon delivery of a Notice of Repudiation, such Applicant shall pay all Rent due for the notice period stipulated in paragraph 11(c) of this Order, to the extent that Rent for such period has not already been paid.

10.    THIS COURT ORDERS that, except as specifically permitted herein, the Applicants are hereby directed, until further Order of this Court: (a) to make no payments of principal, interest thereon or otherwise on account of amounts owing by the Applicants to any of their creditors as of this date; (b) to grant no security interests, trusts, liens, charges or encumbrances upon or in respect of any of its Property; and (c) to not grant credit or incur liabilities except in the ordinary course of the Business.

**RESTRUCTURING**

11.    THIS COURT ORDERS that the Applicants shall, subject to such covenants as may be contained in the DIP Facility (as hereinafter defined), (other than sub-section 11(c) which shall apply regardless of the covenants* contained in the DIP Facility*), have the right to:

    (a)    permanently or temporarily cease, downsize or shut down any of their businesses or operations and to dispose of redundant or non-material assets not exceeding $500,000 in any one transaction or $1,000,000 in the aggregate, subject to paragraph 11(c), if applicable;

    (b)    terminate the employment of such of their employees or temporarily lay off such of their employees as they deems appropriate on such terms as may be agreed upon between the Applicants and such employee, or failing such agreement, to deal with the consequences thereof in the Plan;

    (c)    subject to paragraph 11A herein, in accordance with paragraphs 12 and 13, vacate, abandon or quit the whole but not any part of any leased premises and/or repudiate any real property lease and any ancillary agreements relating to any leased premises, on not less than sevenfourteen (714) days' notice in writing to the relevant landlord on such terms as may be agreed upon between the

Applicants and such landlord, or failing such agreement, to deal with the consequences thereof in the Plan;

(d) subject to paragraph 11A herein, repudiate such of their arrangements or agreements of any nature whatsoever, whether oral or written, as the Applicants deem appropriate on such terms as may be agreed upon between the Applicants and such counter-parties, or failing such agreement, to deal with the consequences thereof in the Plan;

(e) pursue all avenues of refinancing and offers for material parts of their Business or Property, in whole or part, subject to prior approval of this Court being obtained before any material refinancing or any sale (except as permitted by subparagraph (a), above); and

(f) apply to this Court for such approval, vesting or other Orders as may be necessary to consummate sale transactions.

all of the foregoing to permit the Applicants to proceed with an orderly restructuring of the Business (the "Restructuring").

11A    THIS COURT ORDERS that the Applicants shall obtain the approval of the Monitor prior to the Applicants repudiating or disclaiming any material agreements, which shall include real property leases, in accordance with paragraphs 11(c) or 11(d) herein. If the Monitor does not provide such approval, the Applicants shall be entitled to apply to the Court on no less than seven (7) days' notice to the Monitor and the co-contracting party for an order that the agreement be repudiated or disclaimed.

12.    THIS COURT ORDERS that the Applicants shall provide each of the relevant landlords with notice of an Applicant's intention to remove any fixtures from any leased premises at least seven (7) days prior to the date of the intended removal. The relevant landlord shall be entitled to have a representative present in the leased premises to observe such removal and, if the landlord disputes the Applicant's entitlement to remove any such fixture under the provisions of the lease, such fixture shall remain on the premises and shall be dealt with as agreed between any applicable secured creditors, such landlord and the

Applicant, or by further Order of this Court upon application by the Applicants on at least two (2) days' notice to such landlord and any such secured creditors. If an Applicant repudiates the lease governing such leased premises in accordance with paragraph 11(c) of this Order, it shall not be required to pay Rent under such lease pending resolution of any such dispute (other than Rent payable for the notice period provided for in paragraph 11(c) of this Order), and the repudiation of the lease shall be without prejudice to the Applicant's claim to the fixtures in dispute.

13.    THIS COURT ORDERS that if a ~~lease is repudiated by an Applicant in accordance with paragraph 11(c) of this Order~~Notice of Repudiation is delivered, then: (a) during the notice period prior to the effective time of the repudiation, the landlord may show the affected leased premises to prospective tenants during normal business hours, on giving the Applicant and the Monitor 24 hours' prior written notice, and (b) at the effective time of the repudiation, the relevant landlord shall be entitled to take possession of any such leased premises without waiver of or prejudice to any claims or rights such landlord may have against the Applicant in respect of such lease or leased premises and such landlord shall be entitled to notify the Applicant of the basis on which it is taking possession and to gain possession of and re-lease such leased premises to any third party or parties on such terms as such landlord considers advisable, provided that nothing herein shall relieve such landlord of its obligation to mitigate any damages claimed in connection therewith.

14.    THIS COURT ORDERS that~~, subject to the other provisions of this Order (including the payment of Rent as herein provided and the covenants that may be~~*~~contained in the DIP Facility*  (as hereinafter defined)) and any further Order of this Court, the Applicants  shall be permitted to dispose of any or all of the Property located (or formerly located) at such leased premises without any interference of any kind from landlords (notwithstanding the terms of any leases) and, for greater certainty, the Applicants shall have the right to realize upon the Property and other assets in such manner and at such locations, including leased premises, as they deem suitable or desirable for the purpose of maximizing the proceeds and recovery therefrom.~~ any Charge (as defined below) created by this Order over leases of real property in Canada shall only be a Charge in the Applicants' interest in such real property leases.

15.    THIS COURT ORDERS that notwithstanding anything to the contrary in any agreement providing for the liquidation of assets from any leased premises, but subject to: (a) any written agreement between an Applicant, a liquidator and any landlord; or (b) a further Order of this Court:

    (i)    the Applicants shall at all times abide by and be subject to the terms of all real property leases (collectively, the "Leases") and shall cause any liquidator to abide by the terms of the Leases, and the Applicant and the liquidator shall obtain the applicable landlord's approval for all signage and promotional advertising for sales to be conducted by the liquidator pursuant to the agreement with the Applicant in any of the leased premises to the extent otherwise not permitted by the applicable Lease; and

    (ii)    neither the Applicants nor any liquidator shall augment the merchandise in any leased premises unless otherwise permitted by the applicable Lease or approved by the applicable landlord.

## NO PROCEEDINGS AGAINST THE APPLICANTS OR THE PROPERTY

16.    THIS COURT ORDERS that, with the exception of the remedies (other than any steps to seize, possess or foreclose, or such other like remedy, on its own behalf or through any agent on the Property) pursuant to the DIP Facility and the terms of this or any other Order of this Court, until and including December 9, 2008, or such later date as this Court may order (the "Stay Period"), no proceeding or enforcement process in any court or tribunal (each, a "Proceeding") shall be commenced or continued against or in respect of the Applicants or the Monitor, or affecting the Business or the Property, except with the written consent of the Applicants and the Monitor, or with leave of this Court, and any and all Proceedings currently under way against or in respect of the Applicants or affecting the Business or the Property are hereby stayed and suspended pending further Order of this Court.

## NO EXERCISE OF RIGHTS OR REMEDIES

17.    THIS COURT ORDERS that during the Stay Period, all rights and remedies of any individual, firm, corporation, governmental body or agency, or any other entities (all of the foregoing, collectively being "Persons" and each being a "Person") against or in respect of the

Applicants or the Monitor, or affecting the Business or the Property, are hereby stayed and suspended except with the written consent of the Applicants and the Monitor, or leave of this Court, provided that nothing in this Order shall (i) empower the Applicants to carry on any business which the Applicants are not lawfully entitled to carry on, (ii) exempt the Applicants from compliance with statutory or regulatory provisions relating to health, safety or the environment, (iii) prevent the filing of any registration to preserve or perfect a security interest, or (iv) prevent the registration of a claim for lien.

## NO INTERFERENCE WITH RIGHTS

18.    THIS COURT ORDERS that during the Stay Period, no Person shall discontinue, fail to honour, alter, interfere with, repudiate, terminate or cease to perform any right, renewal right, contract, agreement, licence or permit in favour of or held by the Applicants, except with the written consent of the Applicants and the Monitor, or leave of this Court.

19.    THIS COURT ORDERS that during the Stay Period, no Person (other than the Applicants) having any agreement, arrangement, licence or lease with any dealer of the Applicants in connection with the supply of goods or services or the lease of premises at the retail locations at which products of the Applicants are sold, may take any Proceeding or ~~exercise any right under such agreement, arrangement, licence or lease*~~ *as a result of the ~~filing of this Application*,*~~ ~~the making of this Order*~~ ~~or the taking of any steps by the Applicants pursuant to this Order and,~~ ~~without limiting the generality of the foregoing, no Person (other than the Applicants) shall~~ exercise any right (including but not limited to a right to terminate, accelerate, suspend, modify or cancel ~~any~~) under such agreement, arrangement, licence or lease~~,~~ solely* as a result of the filing of this Application* or* the making of this Order*.

## CONTINUATION OF SERVICES

20.    THIS COURT ORDERS that during the Stay Period, all Persons having oral or written agreements with the Applicants or statutory or regulatory mandates for the supply of goods and/or services, including without limitation all computer software, communication and other data services, centralized banking services, payroll services, insurance, transportation, services, utility or other services to the Business or the Applicants, are hereby restrained until

further Order of this Court from discontinuing, altering, interfering with or terminating the supply of such goods or services as may be required by the Applicants, and that the Applicants shall be entitled to the continued use of its current premises, telephone numbers, facsimile numbers, internet addresses and domain names, provided in each case that the normal prices or charges for all such goods or services received after the date of this Order are paid by the Applicants in accordance with normal payment practices of the Applicants or such other practices as may be agreed upon by the supplier or service provider and each of the Applicants and the Monitor, or as may be ordered by this Court.

## NON-DEROGATION OF RIGHTS

21.     THIS COURT ORDERS that, notwithstanding anything else contained herein, no creditor of the Applicants shall be under any obligation after the making of this Order to advance or re-advance any monies or otherwise extend any credit to the Applicants.  Nothing in this Order shall derogate from the rights conferred and obligations imposed by the CCAA.

## PROCEEDINGS AGAINST DIRECTORS AND OFFICERS

22.     THIS COURT ORDERS that during the Stay Period, and except as permitted by subsection 11.5(2) of the CCAA, no Proceeding may be commenced or continued against any of the former, current or future directors or officers of the Applicants with respect to any claim against the directors or officers that arose before the date hereof and that relates to any obligations of the Applicants whereby the directors or officers are alleged under any law to be liable in their capacity as directors or officers for the payment or performance of such obligations, until a compromise or arrangement in respect of the Applicants, if one is filed, is sanctioned by this Court or is refused by the creditors of the Applicants or this Court.

## DIRECTORS' AND OFFICERS' INDEMNIFICATION AND CHARGE

23.     THIS COURT ORDERS that InterTAN hereby indemnifies its directors and officers from all claims, costs, charges and expenses relating to the failure of InterTAN, after the date hereof, to make payments of the nature referred to in subparagraphs 6(a), 8(a), 8(b), 8(c) and 8(ed) of this Order which they sustain or incur by reason of or in relation to their respective capacities as directors and/or officers of InterTAN except to the extent that, with respect to

any officer or director, such officer or director has actively participated in the breach of any related fiduciary duties or has been grossly negligent or guilty of wilful misconduct.

24.    THIS COURT ORDERS that the directors and officers of InterTAN shall be entitled to the benefit of and are hereby granted a charge (the "Directors' Charge") on the Property, which charge shall not exceed an aggregate amount of $19.3 million, as security for the indemnity provided in paragraph 23 of this Order. The Directors' Charge shall have the priority set out in paragraphs 44 and 46 herein.

25.    THIS COURT ORDERS that, notwithstanding any language in any applicable insurance policy to the contrary, (a) no insurer shall be entitled to be subrogated to or claim the benefit of the Directors' Charge, and (b) InterTAN's directors and officers shall only be entitled to the benefit of the Directors' Charge to the extent that they do not have coverage under any directors' and officers' insurance policy, or to the extent that such coverage is insufficient to pay amounts indemnified in accordance with paragraph 23 of this Order.

## APPOINTMENT OF MONITOR

26.    THIS COURT ORDERS that Alvarez & Marsal Canada ULC is hereby appointed pursuant to the CCAA as the Monitor, an officer of this Court, to monitor the Property and the Applicants' conduct of the Business with the powers and obligations set out in the CCAA or set forth herein and that the Applicants and their shareholders, officers, directors, and Assistants shall advise the Monitor of all material steps taken by the Applicants pursuant to this Order, and shall co-operate fully with the Monitor in the exercise of its powers and discharge of its obligations.

27.    THIS COURT ORDERS that the Monitor, in addition to its prescribed rights and obligations under the CCAA, is hereby directed and empowered to:

(a)    monitor the Applicants' receipts and disbursements;

(b)    liaise with the Applicants' financial advisor and investment bankers with respect to all matters relating the Property, the Business and such other matters as may be relevant to the proceedings herein;

- 13 -

(c)    report to this Court at such times and intervals as the Monitor may deem appropriate with respect to matters relating to the Property, the Business, and such other matters as may be relevant to the proceedings herein;

(d)    assist the Applicants, in their dissemination, to the Canadian Agent and its counsel on a regular basis of financial and other information as agreed to between the Applicants and the Canadian Agent;

(e)    advise the Applicants and their financial advisor in the preparation of the Applicants' cash flow statements and reporting required by the Canadian Agent, which information shall be reviewed with the Monitor and delivered to the Canadian Agent and its counsel;

(f)    advise the Applicants in their development of the Plan and any amendments to the Plan;

(g)    assist the Applicants, to the extent required by the Applicants, with the establishment of a claims process and the holding and administering of creditors' meetings for voting on the Plan;

(h)    have full and complete access to the books, records and management, employees, advisors and investment bankers of the Applicants and to the Business and the Property to the extent required to perform its duties arising under this Order;

(i)    be at liberty to engage independent legal counsel or such other persons as the Monitor deems necessary or advisable respecting the exercise of its powers and performance of its obligations under this Order;

(j)    consider, and if deemed advisable by the Monitor, prepare a report and assessment on the Plan; and

(k)    perform such other duties as are required by this Order or by this Court from time to time.

28.     THIS COURT ORDERS that the Monitor shall not take possession of the Property and shall take no part whatsoever in the management or supervision of the management of the Business and shall not, by fulfilling its obligations hereunder, be deemed to have taken or maintained possession or control of the Business or Property, or any part thereof.

29.     THIS COURT ORDERS that nothing herein contained shall require the Monitor to occupy or to take control, care, charge, possession or management (separately and/or collectively, "Possession") of any of the Property that might be environmentally contaminated, might be a pollutant or a contaminant, or might cause or contribute to a spill, discharge, release or deposit of a substance contrary to any federal, provincial or other law respecting the protection, conservation, enhancement, remediation or rehabilitation of the environment or relating to the disposal of waste or other contamination including, without limitation, the *Canadian Environmental Protection Act*, the Ontario *Environmental Protection Act*, the *Ontario Water Resources Act*, or the Ontario *Occupational Health and Safety Act* and regulations thereunder and any other similar legislation and regulations of other provinces or territories in which the Applicants carry on business operations (the "Environmental Legislation"), provided however that nothing herein shall exempt the Monitor from any duty to report or make disclosure imposed by applicable Environmental Legislation. The Monitor shall not, as a result of this Order or anything done in pursuance of the Monitor's duties and powers under this Order, be deemed to be in Possession of any of the Property within the meaning of any Environmental Legislation, unless it is actually in possession.

30.     THIS COURT ORDERS that that the Monitor shall provide any creditor of the Applicants and the Canadian Agent with information provided by the Applicants in response to reasonable requests for information made in writing by such creditor addressed to the Monitor. The Monitor shall not have any responsibility or liability with respect to the information disseminated by it pursuant to this paragraph. In the case of information that the Monitor has been advised by the Applicants is confidential, the Monitor shall not provide such information to creditors unless otherwise directed by this Court or on such terms as the Monitor and the Applicants may agree.

- 15 -

31.     THIS COURT ORDERS that, in addition to the rights and protections afforded the
Monitor under the CCAA or as an officer of this Court, the Monitor shall incur no liability or
obligation as a result of its appointment or the carrying out of the provisions of this Order,
save and except for any gross negligence or wilful misconduct on its part. Nothing in this
Order shall derogate from the protections afforded the Monitor by the CCAA or any
applicable legislation.

32.     THIS COURT ORDERS that the Monitor, counsel to the Monitor and counsel to the
Applicants shall be paid their reasonable fees and disbursements, in each case at their standard
rates and charges, by the Applicants as part of the costs of these proceedings. The Applicants
are hereby authorized and directed to pay the accounts of the Monitor, counsel for the Monitor
and counsel for the Applicants on a regular basis and, in addition, the Applicants are hereby
authorized to pay to the Monitor and counsel to the Applicants, retainers in the amounts of
$100,000 and $200,000 respectively to be held by them as security for payment of their
respective fees and disbursements outstanding from time to time

33.     THIS COURT ORDERS that the Monitor and its legal counsel shall pass their
accounts from time to time, and for this purpose the accounts of the Monitor and its legal
counsel are hereby referred to a judge of the Commercial List of the Ontario Superior Court of
Justice.

34.     THIS COURT ORDERS that the Monitor, counsel to the Monitor, the financial
advisors to InterTAN and the Applicants' counsel shall be entitled to the benefit of and are
hereby granted a charge (the "Administration Charge") on the Property, which charge shall not
exceed an aggregate amount of $2 million, as security for their professional fees and
disbursements incurred at the standard rates and charges of the Monitor and such counsel,
both before and after the making of this Order in respect of these proceedings. The
Administration Charge shall have the priority set out in paragraphs 44 and 46 hereof.

**DIP FINANCING**

35.     THIS COURT ORDERS that the Applicant InterTAN Canada Ltd. ("InterTAN") is
hereby authorized and empowered to obtain funding and borrow and become a joint and
several obligor with other borrower affiliates which have filed petitions for reorganization

under Chapter 11 of the U.S. Bankruptcy Code (the "U.S. Chapter 11 Debtors") under a credit facility between InterTAN and the U.S. Chapter 11 Debtors, as joint and several borrowers, and the Canadian Agent and other lenders (collectively, the "DIP Lenders") on the terms and subject to the conditions set forth in the Senior Secured, Super Priority, Debtor-in-Possession Credit Agreement among, InterTAN (as Canadian Borrower), the U.S. Chapter 11 Debtors and the DIP Lenders dated as of November 7, 2008 (the "DIP Facility"), attached as Exhibit "K" to the Wong Affidavit, in order to finance InterTAN's and the other loan parties' working capital requirements and other general corporate purposes and capital expenditures, provided that borrowings under such credit facility by InterTAN shall not exceed US$60 million unless permitted by further Order of this Court or otherwise permitted under the DIP Facility.

36.    THIS COURT ORDERS that the Applicants are hereby authorized and empowered to execute and deliver such credit agreements, mortgages, charges, hypothecs and Definitive Documents, guarantees and other documents, including confirmations of existing liens and charges in favour of the DIP Lenders, as are contemplated by the DIP Facility or as may be reasonably required by the DIP Lenders pursuant to the terms thereof (collectively, with the DIP Facility the "Definitive Documents"), and the Applicants are hereby authorized and directed to pay and perform all of their indebtedness, interest, fees, liabilities and obligations to the DIP Lenders under and pursuant to the Definitive Documents as and when the same become due and are to be performed, notwithstanding any other provision of this Order.

37.    THIS COURT ORDERS that the Canadian Agent on behalf of the DIP Lenders shall be entitled to the benefit of and is hereby granted a charge (the "DIP Lenders' Charge") on the Property, which charge shall not exceed the aggregate amount owed to the DIP Lenders under the DIP Facility. The DIP Lenders' Charge shall have the priority set out in paragraphs 44 and 46 hereof.

38.    THIS COURT ORDERS that subject to the provisions of this Order:

    (a)    the Canadian Agent may take such steps from time to time as it may deem necessary or appropriate to file, register, record or perfect the DIP Lenders' Charge or any of the Definitive Documents;

(b)     upon the occurrence of an event of default under the Definitive Documents, the Canadian Agent, upon five days notice to the Applicants and the Monitor (or such shorter period as may be ordered by the Court), may exercise any and all of its rights and remedies on behalf of the DIP Lenders against the Applicants or the Property under or pursuant to the Definitive Documents and the DIP Lenders' Charge, including without limitation, to cease making advances to the Applicants and set off and/or consolidate any amounts owing by the DIP Lenders to the Applicants against the obligations of the Applicants to the DIP Lenders under the Definitive Documents, to make demand, accelerate payment and give other notices, or to apply to this Court for the appointment of a receiver, receiver and manager or interim receiver, or for a bankruptcy order against the Applicants and for the appointment of a trustee in bankruptcy of the Applicants, and upon the occurrence of an event of default under the terms of the DIP Facility, the Canadian Agent shall be entitled to seize and retain proceeds from the sale of the Property and the cash flow of the Applicants to repay amounts owing to the DIP Lenders in accordance with the DIP Facility and the Definitive Documents and the DIP Lenders' Charge, but subject to the priorities as set out in paragraphs 44 and 46 of this Order; and

(c)     the foregoing rights and remedies of the DIP Lenders shall be enforceable against any trustee in bankruptcy, interim receiver, receiver or receiver and manager of the Applicants or the Property.

39.     THIS COURT ORDERS that, notwithstanding anything contained in the Definitive Documents to the contrary, other than with respect to credit extensions made directly to the Applicants, the Canadian Agent and the DIP Lenders shall not, without first providing five days' notice to the Applicants and the Monitor (or such shorter period as may be ordered by the Court), apply any amounts received in the Blocked Accounts of InterTAN or any collateral of InterTAN to payment of any of the obligations of the U.S. debtor affiliates of the Applicants under the DIP Facility.

40.    THIS COURT ORDERS that, notwithstanding anything contained in the Definitive
Documents to the contrary, the Canadian Agent and the DIP Lenders shall not, without first
providing five days' notice to the Applicants and the Monitor (or such shorter period as may
be ordered by the Court), cease making extensions of credit to InterTAN pursuant to the terms
of the DIP Facility unless (a) InterTAN has failed to make any payments to the DIP Lenders
under the DIP Facility; (b) InterTAN does not have borrowing availability for such extensions
of credit as required by the DIP Facility; (c) there is any variation or change to this Order
which is materially adverse to the DIP Lenders without the Canadian Agent's consent; or (d)
InterTAN is declared bankrupt.

41.    THIS COURT ORDERS AND DECLARES that the DIP Lenders shall be treated as
unaffected in any plan of arrangement or compromise filed by the Applicants under the
CCAA, or any proposal filed by the Applicants under the *Bankruptcy and Insolvency Act* of
Canada (the "BIA"), with respect to any advances made under the DIP Facility.

42.    THIS COURT ORDERS that the Applicants are hereby authorized and empowered to
obtain and make inter-company loans from and to its U.S. Chapter 11 debtor affiliates as
described in paragraph 99 of the Wong Affidavit.

43.    THIS COURT ORDERS that, notwithstanding anything contained in the Definitive
Documents to the contrary:

(a)    unsecured creditors of the Applicants (including, without limitation, all landlord
creditors and creditors with restructuring claims under paragraph 11 of this Order,
but not including claims by corporate entities related to the Applicants) shall be
entitled to the benefit of and isare hereby granted a charge (the "Canadian
Creditor Charge") on the Property in the amount of $25 million to secure claims
owing by the Applicants to such creditors; and. To the extent that the Directors'
Charge is not realized upon or utilized by the beneficiaries of the Directors'
Charge after the passage of a claims bar date in respect of claims against the
beneficiaries of the Directors' Charge, then, subject to a reserve for claims
(including a reserve for reasonable expenses and defence costs in respect of such
claims) (the "Reserve") against the beneficiaries of the Directors' Charge that

remain outstanding pending the final determination of such claims, the Canadian Creditor Charge shall increase dollar for dollar by the amount of the Directors' Charge, less the Reserve, until there are no claims against the beneficiaries of the Directors' Charge that have been advanced and remain outstanding, at which time any unutilized portion of the Reserve shall also be used to increase the Canadian Creditor Charge dollar for dollar, meaning that the maximum amount of the Canadian Creditor Charge shall be $44.3 million; and

(b)    the key employees referred to in the KERP shall be entitled to the benefit and isare hereby granted a charge (the "KERP Charge") on the Property in the amount of $838,000 to secure amounts owing to such key employees under the KERP.

## VALIDITY AND PRIORITY OF CHARGES CREATED BY THIS ORDER

44.    THIS COURT ORDERS that the priorities of the Directors' Charge, the Administration Charge, the KERP Charge, the Canadian Creditor Charge and the DIP Lenders' Charge, as among them, shall be as follows:

First – Administration Charge;

Second – Directors' Charge;

Third – KERP Charge;

Fourth – DIP Lenders' Charge in an amount equal to the obligations of InterTAN under the Definitive Documents with respect to direct advances made to InterTAN thereunder, which amount shall not exceed US$60 million plus accrued and unpaid interest, allowable costs and expenses payable by InterTAN; provided that, an amount equal to the sum of the Administration Charge, the Directors' Charge, the KERP Charge and the Canadian Creditor Charge shall be reserved and remain in the possession of or be transferred to the Applicants before and when the Canadian Agent or the DIP Lenders apply any amounts received in the Blocked Accounts of InterTAN to obligations of the U.S. debtor affiliates of the Applicants under the DIP Facility. Pursuant to the terms of and in accordance

with the DIP Facility and this Order, nothing herein shall prevent the Canadian Agent or the DIP Lenders from applying amounts received in the Blocked Accounts of InterTAN or that they otherwise receive, to repay direct advances made by the DIP Lenders to InterTAN;

Fifth – Canadian Creditor Charge; and

Six – DIP Lenders' Charge.

45.    THIS COURT ORDERS that the filing, registration or perfection of the Directors' Charge, the Administration Charge, the KERP Charge, the Canadian Creditor Charge, or the DIP Lenders' Charge (collectively, the "Charges") shall not be required, and that the Charges shall be valid and enforceable for all purposes, including as against any right, title or interest filed, registered, recorded or perfected subsequent to the Charges coming into existence, notwithstanding any such failure to file, register, record or perfect.

46.    THIS COURT ORDERS that each of the Directors' Charge, the Administration Charge, the KERP Charge, the Canadian Creditor Charge and the DIP Lenders' Charge shall constitute a charge on the Property and such Charges shall rank in priority to all other security interests, trusts, liens, charges and encumbrances, statutory or otherwise (collectively, "Encumbrances") in favour of any Person, other than claims which may be asserted under Sections 81.3, 81.4, 81.5 and 81.6 of the BIA or other statutory liens and deemed trusts which cannot by law be subordinated to the Charges.

47.    THIS COURT ORDERS that except as otherwise expressly provided for herein, or as may be approved by this Court, the Applicants shall not grant any Encumbrances over any Property that rank in priority to, or *pari passu* with, any of the Charges, unless the Applicants also obtain the prior written consent of the Monitor, the Canadian Agent and the beneficiaries of the Directors' Charge, the Administration Charge and the KERP Charge, or further Order of this Court.

48.    THIS COURT ORDERS that the Directors' Charge, the Administration Charge, the KERP Charge, the Canadian Creditor Charge, the Definitive Documents and the DIP Lenders' Charge shall not be rendered invalid or unenforceable and the rights and remedies of

the chargees entitled to the benefit of the Charges (collectively, the "Chargees") and/or the DIP Lenders thereunder shall not otherwise be limited or impaired in any way by (a) the pendency of these proceedings and the declarations of insolvency made herein; (b) any application(s) for bankruptcy order(s) issued pursuant to the BIA, or any bankruptcy order made pursuant to such applications; (c) the filing of any assignments for the general benefit of creditors made pursuant to the BIA; (d) the provisions of any federal or provincial statutes; or (e) any negative covenants, prohibitions or other similar provisions with respect to borrowings, incurring debt or the creation of Encumbrances, contained in any existing loan documents, lease, sublease, offer to lease or other agreement (collectively, an "Agreement") which binds the Applicants, and notwithstanding any provision to the contrary in any Agreement:

(a)    neither the creation of the Charges nor the execution, delivery, perfection, registration or performance of the Definitive Documents shall create or be deemed to constitute a breach by an Applicant of any Agreement to which it is a party;

(b)    none of the Chargees shall have any liability to any Person whatsoever as a result of any breach of any Agreement caused by or resulting from InterTAN entering into the DIP Facility, the creation of the Charges, or the execution, delivery or performance of the Definitive Documents; and

(c)    the payments made by the Applicants pursuant to this Order or the Definitive Documents, the granting of the Charges and the entering into by the Applicants of the Definitive Documents, do not and will not constitute fraudulent preferences, fraudulent conveyances, oppressive conduct, settlements, transactions under value or other challengeable, voidable or reviewable transactions under any applicable law.

## SERVICE AND NOTICE

49.    THIS COURT ORDERS that the Applicants shall, within ten (10) business days of the date of entry of this Order, send a copy of this Order to the Applicants' landlords or property managers and known creditors, other than employees and creditors to which the Applicants

TOR_A2G:3377028.53/24177.3

owe less than $10,000, at their addresses as they appear on the Applicants' records, and shall promptly send a copy of this Order (a) to all parties filing a Notice of Appearance in respect of this Application, and (b) to any other interested Person requesting a copy of this Order, and the Monitor is relieved of its obligation under Section 11(5) of the CCAA to provide similar notice, other than to supervise this process.

50.    THIS COURT ORDERS that the Applicants and the Monitor be at liberty to serve this Order, any other materials and orders in these proceedings, any notices or other correspondence, by forwarding true copies thereof by prepaid ordinary mail, courier, personal delivery or electronic transmission to the Applicants' creditors or other interested parties at their respective addresses as last shown on the records of the Applicants and that any such service or notice by courier, personal delivery or electronic transmission shall be deemed to be received on the next business day following the date of forwarding thereof, or if sent by ordinary mail, on the third business day after mailing.

51.    THIS COURT ORDERS that the Applicants, the Monitor, and any party who has filed a Notice of Appearance may serve any court materials in these proceedings by e-mailing a PDF or other electronic copy of such materials to counsels' email addresses as recorded on the Service List from time to time, in accordance with the E-filing protocol of the Commercial List to the extent practicable, and the Monitor may post a copy of any or all such materials on its website at www.alvarezandmarsal.com/intertan.

**GENERAL**

52.    THIS COURT ORDERS that a further hearing in this Application shall be held at 9:00 a.m. on November 26, 2008 or such alternate date as this Court may fix, at which time this Order may be supplemented or otherwise varied.  The Applicants and the Monitor shall serve their materials for this further hearing on all parties who serve a Notice of Appearance on the Applicants and the Monitor, such materials to be served no later than 3 days prior to the date scheduled for the further hearing.

53.    THIS COURT ORDERS that the Applicants or the Monitor may from time to time apply to this Court for advice and directions in the discharge of their powers and duties hereunder.

54.    THIS COURT ORDERS that nothing in this Order shall prevent the Monitor from acting as an interim receiver, a receiver, a receiver and manager, or a trustee in bankruptcy of the Applicants, the Business or the Property.

55.    THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada or in the United States of America, including the United States Bankruptcy Court for the Eastern District of Virginia, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order.  All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

56.    THIS COURT ORDERS that the Applicants and the Monitor all be at liberty and are hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

57.    THIS COURT ORDERS that any interested party (including the Applicants and the Monitor) may apply to this Court to vary or amend this Order on not less than seven (7) days' notice to any other party or parties likely to be affected by the order sought or upon such other notice, if any, as this Court may order.

58.    THIS COURT ORDERS that this Order and all of its provisions are effective as of 12:01 a.m. Eastern Standard Time on the date of this Order.

JUSTICE MORAWETZ