shall also give a copy of such notice to the Tenant originally named in this Lease or its Affiliate (collectively, the "Original Tenant"), and no notice of default shall be effective until a copy thereof is so given to Original Tenant. Original Tenant shall have the right (but not the obligation) to cure such default, which cure period shall be thirty (30) days longer than the cure period applicable to Tenant.

SECTION 17.04  Recognition Agreement.  If Tenant subleases all or any portion of the Premises for a term of at least five (5) years, then, notwithstanding any other provisions of this Lease, Landlord shall, upon Tenant's request, execute and deliver an agreement among Landlord, Tenant and each subtenant in the form of Exhibit I, in recordable form (the "Recognition Agreement").

## ARTICLE XVIII

## DEFAULT

SECTION 18.01  Tenant's Default.

(a)    If Tenant defaults in the payment of any installment of Rent and such default is not cured within fifteen (15) days after receipt of notice from Landlord thereof or if Tenant defaults in the observance of any other material covenant or agreement herein contained and Tenant shall not, within thirty (30) days after receipt of notice thereof from Landlord, cure or commence to cure such default (it being intended in connection with a default not susceptible of being cured with due diligence within said thirty (30) day period that the time allowed Tenant within which to cure same shall be extended for such period as may be necessary to complete same with all due diligence), then Landlord may, by giving notice to Tenant at any time thereafter during the continuance of such default:

(i)    terminate this Lease, without any right by Tenant to reinstate its rights by payment of Rent or other performance of the terms and conditions hereof and upon such termination Tenant shall immediately surrender possession of the Premises to Landlord, and Landlord shall immediately become entitled to receive from Tenant, as liquidated, agreed final damages, an amount equal to the difference between the aggregate of all rentals reserved under this Lease for the balance of the Term, and the fair rental value of the Premises for that period (both discounted to present value at an annual interest rate equal to eight percent (8%)), determined as of the date of such termination; or

(ii)    with or without terminating this Lease, as Landlord may elect, re-enter and repossess the Premises, or any part thereof, and lease them to any third-party upon commercially reasonable terms and conditions, for a term within or beyond the Term; provided, however, that any such reletting prior to termination shall be for the account of Tenant, and Tenant shall remain liable for (y) Annual Minimum Rent, Tenant's Share of CAM Costs, Tenant's Share of Taxes, and other sums which would be payable hereunder by Tenant in the absence of such expiration, termination or repossession, less (z) the net proceeds, if any, of any reletting effected for the account of Tenant after deducting from such proceeds all of Landlord's reasonable expenses (which

expenses shall be amortized over the term of the new tenant's lease and only the portion thereof allocable to the balance of the Term shall be so deducted by Landlord hereunder) in connection with such reletting (including, without limitation, all repossession costs, reasonable brokerage commissions, reasonable attorneys' fees and expenses, reasonable alteration costs and expenses of preparation for such reletting).

(b)    If the Premises is at the time of default sublet or leased by Tenant to others, Landlord may, as Tenant's agent, collect rents due from any subtenant or other tenant and apply such rents to Rent due hereunder. Any monthly deficiencies payable by Tenant shall be paid monthly on the date herein provided for the payment of Annual Minimum Rent. If, after the lapse of all applicable grace periods, Landlord reasonably expends any money to cure a default by Tenant, then Tenant shall, on demand, pay Landlord the amount so paid by Landlord together with interest thereon at the rate of two percent (2%) per annum in excess of the rate charged to Tenant for short-term borrowings by any bank with which Tenant regularly transacts business (the "Default Rate").

(c)    Landlord shall also be entitled to all other rights and remedies available to Landlord at law, in equity or otherwise, except as otherwise expressly set forth in this Lease. Landlord expressly waives (i) any right to accelerate any element of Rent except as expressly set forth in Section 18.01(a)(i) above, (ii) any right to recover consequential or punitive damages as a result of a Tenant default or any other act or omission of Tenant, and (iii) all rights to any so-called "landlord's lien" or any similar statutory lien, granting Landlord a lien on any of Tenant's Property for the performance of any obligations of Tenant. At the request of Tenant, Landlord shall promptly confirm such waiver(s) by a writing in form satisfactory to Tenant. Anything contained in this Lease to the contrary notwithstanding, Landlord shall use all reasonable efforts to relet the Premises or any portion thereof to mitigate Landlord's damages to which Landlord would otherwise be entitled to as a result of a Tenant default.

SECTION 18.02  Additional Landlord Remedies Due to Construction Delays by Tenant.

(a)    If Tenant shall fail to achieve Substantial Completion by that date which is two hundred forty (240) days following Delivery of the Land, then Landlord, at its option, upon prior notice to Tenant, may require Tenant to commence payment of Ground Rent (as defined below) on the date which is two hundred forty (240) days following Delivery of the Land. "Ground Rent" shall mean $113,702.40 annually, shall be payable in lieu of Annual Minimum Rent, and shall be payable in equal monthly installments of 1/12 each and in the same manner as Annual Minimum Rent.

(b)    If Tenant shall fail to achieve Substantial Completion by that date which is one (1) year following Delivery of the Land, then Landlord shall be entitled, as its sole remedy, to terminate this Lease upon sixty (60) days prior notice to Tenant unless Tenant, within such sixty (60) day period, achieves Substantial Completion. If Landlord terminates this Lease, then there shall be no further liability on the part of Landlord or Tenant, except for those obligations that expressly survive the expiration or other termination of this Lease.

SECTION 18.03 <u>Landlord's Default</u>.

(a)     If Landlord shall (i) default in the observance of any material covenant or agreement herein contained, breach any material representation or warranty under this Lease, or shall fail to pay any charges or other amounts required to be paid by Landlord under this Lease (including, without limitation, any insurance premiums or any reimbursements due to Tenant) and Landlord does not cure such default within fifteen (15) days (as to a monetary default) or thirty (30) days (as to a non-monetary default), as applicable, after notice thereof by Tenant (it being intended in connection with a non-monetary default not susceptible of being cured with due diligence within said thirty (30) day period that the time allowed Landlord within which to cure same shall be extended for such period as may be necessary to complete same with all due diligence), or (ii) fail to pay when due any Taxes, ground rent or any other charge or assessment, the lien of which is prior to the lien of this Lease, then Tenant shall have the right (but shall not be obligated) to:

(w)     perform such obligation(s) of Landlord in accordance with the applicable provisions of this Lease on behalf of, and at the expense of Landlord;

(x)     bring suit for the collection of any amounts for which Landlord is in default, seek injunctive relief, or seek specific performance for any other covenant or agreement of Landlord;

(y)     offset against the Rent all amounts owed by Landlord to Tenant and/or the amounts reasonably expended by Tenant performing Landlord's obligations under this Lease, including costs and reasonable attorneys' fees, together with interest thereon at the Default Rate from the date of the outlay until paid, and, at Tenant's option, extend the Term if necessary for Tenant to fully recoup all amounts owed by Landlord to Tenant; and/or

(z)     terminate this Lease, without waiving its rights to damages for Landlord's Default, provided that: (1) Landlord's default materially interferes with the normal conduct of any business operations in the Premises, (2) Landlord's default is not reasonably capable of being cured by Tenant, and (3) subject to Section 18.02(b), Tenant gives notice of Landlord's default to any Mortgagee of whom Landlord shall have previously given Tenant notice (including its address), and such Mortgagee shall not have cured Landlord's default within the time period provided in Section 18.02(b).

Notwithstanding the foregoing, Tenant's right of offset under clause (y) above shall be limited to fifty percent (50%) of each installment of Rent next becoming due unless insufficient Term remains to fully recoup the amounts owed by Landlord to Tenant on the amounts expended by Tenant, together with interest as provided above, in which event the amount of Tenant's offset shall be increased so that Tenant is able to fully recoup all such amounts expended by Tenant, together with interest as aforesaid, prior to the expiration of the Term.

(b)     If a Mortgagee shall have notified Tenant in writing that it is the holder of such lien on the Shopping Center and shall so request, then Tenant shall give a similar notice to such Mortgagee and such Mortgagee shall have the same time period allowed to Landlord under this Lease to correct or remedy such default.

(c)     Tenant shall also be entitled to all other rights and remedies available to Tenant at law, in equity or otherwise, except as otherwise expressly set forth in this Lease. Tenant expressly waives any right to recover consequential or punitive damages as a result of a Landlord default or any other act or omission of Landlord, except with respect to a Landlord default relating to Tenant's Exclusive Use Protection or Hazardous Materials.

(d)     Notwithstanding the foregoing, if, in Tenant's reasonable judgment, a condition posing imminent risk of liability or material harm to persons or property or material disruption to the normal conduct of any business operations in the Premises shall exist, then Tenant may exercise, at its election and without prior notice to Landlord, any or all of the remedies set forth in clauses (w), (x) and (y) above.

SECTION 18.04  <u>Additional Tenant Self-help, Equitable and Legal Remedies Due to Construction Delays by Landlord</u>.  If Landlord defaults at any time in the timely completion of any component of Landlord's Work (including, without limitation, Delivery of the Land) and Landlord does not cure such default within five (5) business days after notice thereof by Tenant, then Tenant shall have the right, but not the obligation, to:

(a)     perform, at Landlord's sole cost and expense, all or any part of Landlord's Work.  If and to the extent that Tenant exercises its right under this Section 18.04(a), Landlord agrees to cooperate in good faith and provide Tenant with reasonable assistance so that Tenant can complete such portions of Landlord's Work.  Landlord hereby grants Tenant the right, as its agent, to directly contact and contract with Landlord's contractors, on behalf of Landlord, to complete such work, all at Landlord's cost and expense.  Landlord covenants, upon Tenant's request, to provide Tenant with duplicate sets of all plans, specifications and contracts prepared in connection with the construction of the Shopping Center, as well as schedules of all contractors, subcontractors and suppliers.  Landlord agrees to reimburse Tenant for any and all costs incurred by Tenant in connection with any portion of Landlord's Work which Tenant completes within ten (10) days after receipt of request therefor from Tenant, which request shall be reasonably supported by invoices and/or written description of Landlord's Work performed.  If Landlord does not timely reimburse Tenant as contemplated above, then Tenant shall be entitled to deduct the costs of such work from Rent, together with interest at the Default Rate from the date of expenditure by Tenant, until paid in full;

(b)     seek injunctive relief, specific performance or other equitable remedies against Landlord to require Landlord to perform its obligations under this Lease (including, without limitation, the Site Design Requirements), the costs of which litigation shall be borne by Landlord including, without limitation, attorneys' fees and court's costs; and/or

(c)     seek legal remedies available to Tenant, the costs of which shall be borne by Landlord, including, without limitation, attorneys' fees and court costs.

SECTION 18.05  <u>Additional Tenant Remedies Due to Landlord's Failure to Pay the Landlord Reimbursement</u>.

(a)     If Landlord fails to pay the Landlord Reimbursement in full on or before its due date, then Landlord shall be in default under this Lease, and no Rent shall be due or owing to Landlord until the Landlord Reimbursement is paid to Tenant, together with interest

which shall accrue on the unpaid Landlord Reimbursement at the Default Rate commencing on the thirty-first (31st) day following Substantial Completion until the date of payment of the Landlord Reimbursement. However, if Landlord has not tendered payment of the Landlord Reimbursement and interest by that date which is one (1) year from Substantial Completion (the "Substantial Completion Anniversary"), then (i) such date shall become the Commencement Date; (ii) Annual Minimum Rent shall be reduced to ground rent equal to Fifty Thousand and No/100 Dollars ($50,000.00) per annum during the Term; and (iii) this Lease shall be converted to a ground lease, with ownership of the Building remaining with Tenant, and Landlord's and any Mortgagees' names being removed as additional insureds or mortgagees on any casualty insurance described in Section 11.02. Landlord and Tenant covenant and agree that upon the reasonable written request of either Tenant or Landlord, Landlord and Tenant shall execute such documentation as necessary to formalize the conversion of this Lease to a ground lease upon the Substantial Completion Anniversary.

       (b)    At any time following the Substantial Completion Anniversary and upon thirty (30) days prior notice, Tenant shall have the right at Tenant's sole election, but not the obligation, in lieu of the requirement that Landlord pay to Tenant the Landlord Reimbursement, to mortgage, sell, convey, assign, lease or otherwise encumber (collectively, a "Financing Transfer") Tenant's interest in the Building and this Lease. Landlord covenants to (i) execute all documents necessary to permit Tenant to effect the Financing Transfer described herein, and (ii) cause any Mortgagee to specifically acknowledge the rights of Tenant's lender and third parties arising as a result of such Financing Transfer. Notwithstanding such Financing Transfer, Tenant shall continue to pay the ground rentals described in Section 18.05(a) during the remainder of the Term.

    SECTION 18.06  Waiver; Non-Exclusive Remedies.  The parties hereby waive trial by jury in any action, proceeding or counterclaim brought by either of them against the other on any matters arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Premises, and/or any claim of injury or damage. Tenant hereby expressly waives any and all rights of redemption granted by or under any present of future law if this Lease is terminated or Tenant is evicted or dispossessed by reason of violation by Tenant of any of the provisions of this Lease. Except as otherwise expressly set forth in this Lease, no right or remedy herein conferred upon or reserved to Landlord or Tenant is intended to be exclusive of any other right or remedy in this Lease or by law or in equity provided, but each shall be cumulative and in addition to every other right or remedy given in this Lease or now or hereafter existing at law or in equity or otherwise.

## ARTICLE XIX

## SUBORDINATION, TRANSFER OF INTEREST

    SECTION 19.01  Subordination.  Landlord reserves the right to subject and subordinate this Lease at all times to the lien of any first mortgage or deed of trust for the benefit of any Mortgagee hereafter encumbering or affecting all or any portion of the Shopping Center, as well as to any future ground or underlying leases encumbering or affecting all or any part of the Shopping Center; provided, however, that (a) each Mortgagee shall first execute and deliver to Tenant a subordination, non-disturbance and attornment agreement in substantially the form

attached as Exhibit J hereto, in recordable form, and (b) any Ground Lessor shall execute (and shall obtain the written consent of any Mortgagee) and deliver to Tenant a fee owner recognition agreement in a form reasonably satisfactory to Tenant, which shall include the following provisions: (i) the Ground Lessor will not, in the exercise of any of the rights arising or which may arise out of such lease, disturb or deprive Tenant in or of its possession or its rights to possession of the Premises or of any right or privilege granted to or inuring to the benefit of Tenant under this Lease; (ii) in the event of the termination of the Ground Lease (as defined below), Tenant shall not be made a party in any removal or eviction action or proceeding, nor shall Tenant be evicted or removed of its possession or its right of possession of the Premises, and this Lease shall continue in full force and effect as a direct lease between the Ground Lessor and Tenant for the remainder of the Term and on the same terms and conditions as contained herein, without the necessity of executing a new lease; and (iii) Landlord and Tenant shall have the right to execute any amendment to this Lease which is specifically required hereunder and the Ground Lessor shall recognize and be bound thereto. "Ground Lessor" shall mean the landlord under any existing or future ground or underlying lease(s) affecting all or any part of the Shopping Center (such ground or underlying lease(s) is referred to as the "Ground Lease(s)"). "Mortgagee" shall mean any state or federally regulated bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender, which is not an Affiliate of Landlord, and which holds a mortgage on the Shopping Center or is the beneficiary under a deed of trust encumbering the Shopping Center (such mortgage or deed of trust is referred to as the "Mortgage").

SECTION 19.02  Existing Mortgages and Ground Leases.  If a Mortgage or any Ground Lease encumbers the Shopping Center or any part thereof on the Effective Date, then, simultaneously with the execution of this Lease, Landlord shall deliver to Tenant, in recordable form: (a) a subordination, non-disturbance and attornment agreement substantially in the form attached as Exhibit J, in recordable form, executed by each and every Mortgagee, and (b) a fee owner recognition agreement in the form and content described in Section 19.01(b), in recordable form, executed by any Ground Lessor (and, as may be required, consented to by the Mortgagee). Should Landlord fail to so deliver such instrument(s) as provided above, Tenant shall have the right, by notice given to Landlord at any time prior to the date on which such instrument(s) are delivered, to terminate this Lease without further liability on the part of Landlord or Tenant, except: (i) for those obligations which expressly survive the expiration or other termination of this Lease, and (ii) Landlord shall (which obligation shall survive the termination of this Lease), within three (3) business days following Tenant's termination notice, reimburse Tenant for all its reasonable, third-party costs and expenses incurred in connection with this Lease (including, without limitation, costs associated with the preparation and review of plans and specifications, the performance of Tenant's Work, and attorneys' fees), not to exceed Seventy-Five Thousand Dollars ($75,000).

SECTION 19.03  Transfer of Interest.  Landlord shall provide Tenant with notice upon or immediately after any sale or transfer of Landlord's interest in the Shopping Center. Landlord shall require the buyer or transferee to assume in writing all of the obligations of Landlord under this Lease. Notwithstanding Section 23.13, Landlord shall continue to remain liable for all accrued liability, if any, up to the date of such sale or transfer. Notwithstanding anything contained herein to the contrary, Landlord shall continue to remain liable hereunder after such

sale or transfer unless the buyer or transferee has expressly assumed in writing all of the obligations of Landlord under this Lease.

SECTION 19.04 <u>Tenant Estoppel Certificates</u>. Tenant agrees, within thirty (30) days of Landlord's request, to execute and deliver to Landlord or any Mortgagee, on a form prepared by or on behalf of the party so requesting, an estoppel certificate (a) ratifying this Lease and confirming that there are no modifications or amendments to this Lease, except as may be stated in the certificate, (b) confirming the commencement and expiration dates of this Lease, (c) certifying to Tenant's actual knowledge and belief that the Landlord is not in default under this Lease, and that there are no offsets or defenses to enforcement of this Lease, except as may be stated in the certificate, and (d) stating the date through which Annual Minimum Rent and other charges payable by Tenant have been paid.

SECTION 19.05 <u>Landlord Estoppel Certificates</u>. Landlord agrees, within thirty (30) days of Tenant's request, to execute and deliver to Tenant or any assignee, transferee, subtenant or Lender, on a form prepared by or on behalf of the party so requesting, an estoppel certificate (a) ratifying this Lease and confirming that there are no modifications or amendments to this Lease, except as may be stated in the certificate, (b) confirming the commencement and expiration dates of this Lease, (c) certifying to Landlord's actual knowledge and belief that Tenant is not in default under this Lease, and that there are no offsets or defenses to enforcement of this Lease, except as may be stated in the certificate, and (d) stating the date through which Annual Minimum Rent and other charges payable by Tenant have been paid.

SECTION 19.06 Payments. If Landlord shall request Tenant to execute more than one (1) subordination, attornment and recognition agreement in any twelve (12) month period, then, as a condition to Tenant's obligations under Sections 19.01 or 19.04, as the case may be, Landlord shall pay to Tenant One Thousand Dollars ($1,000) for each subsequent request for a subordination, attornment and recognition agreement within such twelve (12) month period.

## ARTICLE XX

## LANDLORD'S REPRESENTATIONS, WARRANTIES AND COVENANTS

SECTION 20.01 <u>Quiet Enjoyment</u>. Landlord covenants and agrees that Tenant, during the Term, shall freely, peacefully, and quietly occupy and enjoy the use and possession of the Premises without disturbance, molestation, hindrance or ejectment of any kind whatsoever.

SECTION 20.02 <u>Representations, Warranties and Covenants</u>. In order to induce Tenant to execute this Lease and in consideration thereof, Landlord covenants, warrants and represents to Tenant as follows:

(a)    As of the Effective Date and as of the Possession Date, Landlord owns the fee simple title to the Shopping Center free and clear of all easements, restrictions, liens, encumbrances, leases and the like, except as described on <u>Exhibit K</u>; that the Shopping Center, as of the Effective Date (and as of the Possession Date), is not (and will not be) subject to the lien of any Mortgage (except such instruments where the lienor has entered into an agreement in favor of Tenant, as described in Sections 19.01 and 19.02); that Landlord has the full power,

right and authority to make this Lease for the Term without the consent, joinder, or approval of any other party; and that Landlord will put Tenant into complete and exclusive possession of the Premises free from all orders, restrictions, covenants, agreements, leases, easements, laws, codes, ordinances, regulations or decrees (including, without limitation, those matters described on Exhibit K) which would, in any way, prevent or inhibit the use of the Premises for the uses thereof by Tenant as contemplated by this Lease, or prevent or restrict the use of the Common Areas or limit ingress and egress to and from Hwy 69 and FM 365, the public thoroughfares shown on the Site Plan, by Tenant, its agents, employees or invitees.

(b)    Landlord shall, on or before the Possession Date, have caused the Delivery of the Land to occur in accordance with this Lease.

(c)    The Shopping Center shall, at the time of commencement of construction by Landlord, be properly zoned for the operation and maintenance of a store similar to other stores operated by Tenant and for its contemplated use, and that all necessary governmental consents, permits and approvals allowing for the Premises to be occupied for such use shall have been obtained by Landlord.

SECTION 20.03  Site Covenants.  In order to induce Tenant to enter into this Lease, Landlord covenants to Tenant as follows (the "Site Covenants"):

(a)    Landlord shall not construct (or permit to be constructed) any buildings or other improvements in the area identified on the Site Plan as the "No-Build Area" (the "No-Build Area").

(b)    Landlord shall not construct (or permit to be constructed) any projections either vertical or horizontal (other than Tenant's signs or identifications) which will project along the front or rear of the building in which the Premises are situated in such a manner as to obstruct the view of Tenant's signs or its store front in any manner.

(c)    The number of paved, full-size parking spaces in the Shopping Center shall be the greater of (i) the ratio listed in Section 1.01(M) or (ii) the amount of spaces required by Laws (without variance), and, without limiting the generality of the foregoing, the number of spaces contained in Tenant's Preferred Area shall be the same number of spaces as shown on the Site Plan.

(d)    Landlord shall not erect (or permit to be erected) any building or other structures (including, without limitation, kiosks) in any outparcel except as and where shown on the Site Plan, and all outparcel buildings constructed shall (i) not be exceed a height of twenty-four (24) feet above the finished floor of the Premises (inclusive of all roof top mechanicals, all projections and all architectural treatments and embellishments), (ii) not exceed the Floor Area shown on the Site Plan, (iii) satisfy all parking requirements (without variance) using the parking spaces located within each such outparcel, and (iv) be used solely for retail purposes and other uses typically situated in shopping centers.

(e)    Landlord shall not use (or permit the use of) all or any portion of the Common Areas for retail sales or for promotional purposes, subject to Tenant's rights under Section 2.01(c).

(f)    Landlord shall not make (and shall not permit there to be made) any changes to those Common Areas identified as "No-Change Area" on the Site Plan (the "No-Change Area") including, without limitation, changes in the location of curbcuts, drive aisles, entrances, access points, roadways, sidewalks or parking spaces or reduction of the parking ratio specified in Section 20.03(c), without Tenant's consent, which may be withheld in Tenant's sole discretion. Landlord shall not make (and shall not permit to be made) any other changes to the Common Areas which adversely affects Tenant's access to the Premises or the Shopping Center or the visibility of the Premises or of any of Tenant's signage, without Tenant's consent, which may be withheld in Tenant's sole discretion.  Any other changes to the Common Areas may be made without Tenant's consent.

(g)    Following Tenant's opening for business at the Premises, (a) Landlord shall use reasonably efforts to control any noise and dust at the Shopping Center (including, without limitation, during any periods of permitted construction within the Shopping Center) such that neither interferes with the normal operation of Tenant's business, and (b) Landlord shall not perform (and shall not permit there to be performed) any exterior construction in the Shopping Center during the months of October, November, December and January, except to the extent permitted under Section 5.01.

(h)    Landlord shall not permit any solicitation, distribution of handbills, picketing, or other public demonstration in the Common Areas, except as otherwise may be mandated by Laws.

(i)    No transmission and/or reception towers for wireless telephone or internet communications shall be permitted within the Shopping Center.

(j)    Landlord shall not knowingly install or permit to be installed by any other tenant or other person anywhere in the Shopping Center any structure or equipment which would cause any interference with satellite, radio, telecommunications or television reception or transmission in or from the Building.

SECTION 20.04  Intentionally Deleted.

## ARTICLE XXI

## HOLDING OVER

SECTION 21.01  Holding Over.  If Tenant remains in possession of the Premises after the expiration of the Term without having duly exercised its right, if any, to extend or further extend the Term, such continuing possession shall create a month-to-month tenancy on the terms herein specified and such tenancy may be terminated at the end of any month thereafter by either party by giving at least thirty (30) days notice thereof to the other party.  During such holdover and provided that Landlord and Tenant are not in good faith negotiations with regard to the renewal or extension of this Lease or the entering into a new lease for premises within the Shopping Center, Tenant shall be liable for Annual Minimum Rent on a monthly basis (or, if applicable, on a prorated daily basis) in an amount equal to one hundred twenty-five percent

(125%) of the amount thereof payable by Tenant for the month immediately preceding the last day of the Term, as well as for all Additional Rent payable by Tenant under this Lease.

## ARTICLE XXII

### NOTICE

SECTION 22.01  <u>Where and How Given</u>.  All notices or demands which either party hereto either is required to or may desire to serve upon the other shall be in writing and shall be sufficiently served upon such other party, by (a) mailing a copy thereof by certified or registered mail, postage prepaid, return receipt requested, addressed to the party to whom the notice is directed at the "Notice Address" of such party, or (b) by a reliable overnight courier (such as Federal Express), all charges prepaid, furnishing a receipt upon delivery, and addressed to the party to whom the notice is addressed at the Notice Address of the part.  The Notice Address of each party is:

|     |     |     |
| --- | --- | --- |
| a) | Landlord: | PORT ARTHUR HOLDINGS III, LTD.<br>c/o SDI Realty, Ltd.<br>712 Main Street<br>Houston, Texas 77002 |
| b) | Tenant: | CIRCUIT CITY STORES, INC.<br>9954 Mayland Drive<br>Richmond, Virginia 23233<br>Attention: Vice President of Real Estate |
| | with a copy to: | CIRCUIT CITY STORES, INC.<br>9950 Mayland Drive<br>Richmond, Virginia 23233<br>Attention:  General Counsel |
| | with a copy to: | Kostas & Birne, LLP<br>530 One Turtle Creek Village<br>3878 Oak Lawn Avenue<br>Dallas, Texas  75219<br>Attention:  Pamela G. Kostas |

The addresses to which notices and demands shall be delivered or sent may be changed from time to time by notice served, as hereinbefore provided, by either party upon the other party.

SECTION 22.02  <u>When Given</u>.  Unless otherwise provided for herein, notice shall be deemed to have been served at the earlier of the date received, refused or returned as undeliverable.  However, if such notice pertains to the change of address of either of the parties hereto, then such notice shall be deemed to have been served upon receipt thereof by the party to whom such notice is given.

## ARTICLE XXIII

## MISCELLANEOUS

SECTION 23.01 <u>Rent Proration</u>. If this Lease is terminated prior to its natural expiration date for any reason other than a Tenant default, then Landlord shall promptly reimburse Tenant for any Rent prepaid by Tenant for periods subsequent to such termination date. This Section 23.01 shall survive the termination of this Lease.

SECTION 23.02 <u>Construction</u>. In construing this Lease, feminine or neuter pronouns shall be substituted for those masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place in which the context so requires. This Lease shall be construed without regard to: (a) the identity of the party who drafted the various provisions hereof, and (b) the addition or deletion of text made during the negotiation of this Lease. Moreover, each and every provision of this Lease shall be construed as though all parties hereto participated equally in the drafting thereof. As a result of the foregoing, any rule or construction that a document is to be construed against the drafting party shall not be applicable hereto.

SECTION 23.03 <u>Section Headings</u>. The section headings in this Lease are for convenience only and do not in any way limit or simplify the terms and provisions of this Lease, nor should they be used to determine the intent of the parties.

SECTION 23.04 <u>Partial Invalidity</u>. If any term, covenant, condition or provision of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, then the remainder of this Lease or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby and each term, covenant, condition and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

SECTION 23.05 <u>Waiver</u>. The failure of either party to seek redress for violation of, or to insist upon strict performance of, any term, covenant or condition contained in this Lease shall not prevent a similar subsequent act from constituting a default under this Lease.

SECTION 23.06 <u>Governing Law</u>. This Lease shall be governed and construed in accordance with the laws of the State.

SECTION 23.07 <u>Successors and Assigns</u>. This Lease shall inure to the benefit of and be binding upon the heirs, executors, administrators, successors and assigns of Landlord and the successors and assigns of Tenant.

SECTION 23.08 <u>No Broker</u>. Landlord and Tenant represent to each other that no broker or person is entitled to any commission by reason of the negotiation and execution of this Lease, other than the Broker identified in Section 1.01(D), and Landlord agrees that Landlord shall be solely responsible for the fees and commissions of the Broker. Landlord and Tenant agree to indemnify, defend and hold each other harmless against any and all claims by any other person for brokerage commissions or fees arising out of any conversation, negotiations or other dealings held by the other party with any other broker regarding this Lease.

SECTION 23.09  Memorandum of Lease.  Landlord and Tenant agree to execute a Memorandum of Lease in recordable form, substantially similar to that attached as Exhibit L, setting forth such provisions hereof as may be required by State law.  If so requested by Tenant, Landlord shall execute such Memorandum of Lease simultaneously with the execution of this Lease. Recording costs shall be borne by the party requesting recordation of same; however, any transfer taxes or other fees charged by any local or state governmental authorities in connection with such recordation shall be paid by Landlord.  The provisions of this Lease shall control with regard to any omissions from, or provisions which may be in conflict with, the Memorandum of Lease.

SECTION 23.10  Entire Agreement.  This instrument contains the entire and only agreement between the parties and no oral statements or representations or written matter not contained in this instrument shall have any force or effect.  This Lease shall not be amended or modified in any way except by a writing executed by both parties.  All of the exhibits attached to this Lease are incorporated into this Lease by reference and for all purposes are a part of this Lease.

SECTION 23.11  Relationship of Parties.  The relationship between the parties hereto is solely that of landlord and tenant and nothing in this Lease shall be construed as creating a partnership or joint venture between the parties hereto, it being the express intent of Landlord and Tenant that the business of Tenant on the Premises and elsewhere, and the good will thereof, shall be and remain the sole property of Tenant.

SECTION 23.12  Force Majeure.  If either party hereto shall be delayed or hindered in, or prevented from, the performance of any act required under this Lease by reason of strikes, lockouts, labor troubles, failure of power, riots, insurrection, war or other reasons of a like nature beyond the reasonable control of the party delayed in performing works or doing acts required under the terms of this Lease (any such delay, hindrance or prevention is referred to as "Force Majeure"), then performance of such act shall be excused for the period of the delay, and the period of the performance of any such act shall be extended for a period equivalent to the period of such delay, except as otherwise specifically provided herein to the contrary.  The provisions of this Section 23.12 shall not be applicable to delays resulting from the inability of a party to obtain financing or to proceed with its obligations under this Lease because of a lack of funds.

SECTION 23.13  Limitation of Landlord's Liability.  Except with respect to (a) insurance proceeds or condemnation awards received by Landlord which are required by the terms of this Lease to be applied to the repair or restoration of the Premises or the Shopping Center, (b) Landlord's failure to pay the Landlord Reimbursement in accordance with this Lease, and (c) any monies owed by Landlord to Tenant in connection with Landlord's default in performing Landlord's Work, Tenant shall, on and after the Commencement Date, look only to Landlord's estate and property in the Shopping Center (or the proceeds from the sale, financing or refinancing of all or any portion thereof) and net income derived from the Shopping Center for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord hereunder, and no other property or assets of Landlord, its officers, directors, stockholders, members or partners shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease.  Except with respect to the limitation on personal liability hereinabove set

forth, the provisions of this Section 23.13 shall not be deemed or construed to limit Tenant's rights and remedies pursuant to this Lease or which may be available at law, in equity or otherwise.

SECTION 23.14    Limitation of Tenant's Liability.    Landlord, its successors and assigns, shall look solely to the assets, if any, of Tenant and its successors and assigns, for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director, member or employee of Tenant or any of its Affiliates.

SECTION 23.15    Consents.    Except as may be otherwise expressly set forth in this Lease, whenever under this Lease provision is made for either party's securing the consent or approval of the other party, (a) such consent or approval shall be in writing and shall not be unreasonably withheld, delayed or conditioned, and (b) in all matters contained herein, both parties shall have an implied obligation of reasonableness.

SECTION 23.16    Costs.    Whenever this Lease requires the performance of an act by a party, such party shall perform the act at its own cost and expense, unless otherwise expressly provided to the contrary in this Lease.

SECTION 23.17    Attorneys' Fees.    In any action or proceeding hereunder (whether to enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall be entitled to recover from the other party the prevailing party's reasonable costs and expenses in such action or proceeding, including reasonable attorneys' fees, costs and expenses. Except as otherwise set forth herein, if either party is sued by a third party as a result of a violation of a covenant, representation or warranty herein contained by the other party hereto, then the party who has violated the covenant, representation or warranty shall be responsible for the reasonable costs and expenses in such action or proceeding against the non-violating party, including reasonable attorneys' fees, costs and expenses.

SECTION 23.18    Survival of Obligations.    The obligation to pay any sums due to either party from the other that by the terms herein would not be payable, or are incapable of calculation, until after the expiration or sooner termination of this Lease shall survive and remain a continuing obligation until paid. All indemnity obligations under this Lease shall survive the expiration or earlier termination of this Lease.

SECTION 23.19    Joint and Several Liability.    If either party consists of more than one person, then the persons constituting such party shall be jointly and severally liable hereunder.

SECTION 23.20    Definition of Hereunder, Herein, etc..    Unless the context clearly indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar import refer to this Lease and all of the Exhibits attached hereto as a whole and not to any particular section, subsection, or paragraph hereof.

SECTION 23.21    Tenant's Trade Name.    Landlord shall not make use of Tenant's trade name (*i.e.*, "Circuit City"®) in any advertising or marketing material including, without limitation, on any internet website, without obtaining Tenant's prior written approval, which may be withheld in Tenant's sole and absolute discretion. Notwithstanding the foregoing, Landlord

may use Tenant's trade name on Landlord's website and in informational brochures, but only for the purposes of identifying Tenant as a tenant of the Shopping Center.

SECTION 23.22 <u>Counterparts</u>. This instrument may be executed in several counterparts, each of which shall be deemed an original. The signatures to this instrument may be executed and notarized on separate pages, and when attached to this instrument, shall constitute one complete document.

[Signature page follows]

IN WITNESS WHEREOF, Landlord and Tenant have caused this Lease to be duly executed and delivered in their respective names as of the date first above written.

LANDLORD:

**PORT ARTHUR HOLDINGS III, LTD.,**
a Texas limited partnership

By:    Port Arthur Holdings Management, LLC,
       its general partner

Date:  12-22-06

By:
Name: Charles W. Shears
Title:  Manager

TENANT:

**CIRCUIT CITY STORES, INC.**, a Virginia corporation

Date: _12/7/06._  By: _____

~~John B. Mulleady~~
Vice President, Real Estate and Construction

Approved for Signature:

Tenant's counsel:

Pamela G. Kostas
Kostas & Birne, LLP
530 One Turtle Creek Village
3878 Oak Lawn Avenue
Dallas, Texas 75219

_PMK_ Responsible Atty.

_____ RE Manager

# EXHIBIT A

## Site Plan

Premises – crosshatched, with Floor Area and frontage thereof (Section 1.01P)
All buildings within the Shopping Center and Floor Area thereof (Section 1.01S)
Customer Pick-Up Areas (Section 2.01(c))
Car Stereo Parking Areas (Section 2.01(c))
Trash Compactor Area (Section 2.01(c))
Web Order Pick-Up Parking Spaces (Section 2.01(c))
Transformer Pad Area (Section 2.01(c))
Tenant's Preferred Area (Section 2.01(c))
Staging Area (Section 3.01)
Construction Drive (Section 5.02(b))
Primary Restoration Area (Section 12.01(a))
Pylon Sign(s) (Section 15.02)
Public Thoroughfares (Section 20.02(a))
No Build Area (Section 20.03(a))
Parking Spaces In Tenant's Preferred Area (Section 20.03(c))
Landlord's permitted outparcel build-out area (Section 22.03(d))
No-Change Area (Section 20.03(f))
Tenant's Trailer (Section E of Exhibit C)



**EXHIBIT B**

Legal Description of the Shopping Center

Legal Description:      10.2154 Acre Tract or Parcel of Land
Out of and Part of Lots 63, 64, 65, 66, 67, 68,
69, 70, 71, 72 and 73, Block 6
All of Lots 8, 9, 10, 11, 12 and 13
and Out of and Part of Lot 14, Block 8
Hillcrest Second Revised Addition
Volume 7, Page 6, Map Records
Out of and Part of Lot 22, Block 6
Hillcrest Second Addition "Acres"
A Portion of El Paso Street
Volume 4, Page 106, Map Records
Wm. McFaddin Survey, Abstract No. 417
T. & N.O.R.R. Survey, Section No. 11, Abstract No. 243
Jefferson County, Texas

**BEING** a 10.2154 acre tract or parcel of land situated in the Wm. McFaddin Survey, Section No. 11, Abstract No. 243 and the T. & N.O.R.R. Survey, Section No. 11, Abstract No. 243, Jefferson County, Texas and being out of and part of Lots 63, 64, 65, 66, 67, 68, 69, 70, 71, 72 and 73, Block 6, All of Lots 8, 9, 10, 11, 12 and 13, and Out of and Part of Lot 14, Block 8 of the Hillcrest Second Revised Addition, a subdivision of the City of Port Arthur, Jefferson County, Texas, according to the plat thereof recorded in Volume 7, Page 6, Map Records, Jefferson County, Texas and also being out of and Part of Lot 22, Block 6 of the Hillcrest Second Addition "Acres", a subdivision of the City of Port Arthur, Jefferson County, Texas, according to the plat thereof recorded in Volume 4, Page 106, Map Records, Jefferson County, Texas, and being a portion of El Paso Street (previously dedicated)(based on a width of 50') and also being all of that certain tract of land of land, identified as TRACT II, being called all of Lots 63,64 and 65, Block 6 of the said Hillcrest Second Revised Addition, save and except that certain tract conveyed to the State of Texas recorded in Volume 1210, Page 434, Deed Records, Jefferson County, Texas, as described in a "Warranty Deed" from McPhillips Tire and Auto, Inc. to Larry McPhillips as recorded in Clerk's File No. 9607726, Official Public Records of Real Property, Jefferson County, Texas and also being all of that certain tract of land being called all of Lots 66-70, Block 6 of the said Hillcrest Second Revised Addition as described in a "Warranty Deed with Vendor's Lien" from James E. Rainey, Sr. to Larry McPhillips and wife, Ileana McPhillips as recorded in Clerk's File No. 2003001893, Official Public Records of Real Property, Jefferson County, Texas, save and except that certain tract of land as conveyed to the State of Texas as recorded in Volume 1254, Page 145, Deed Records, Jefferson County, Texas and being all of that certain tract called 0.9243 acre tract of land as described in a "Special Warranty Deed with Vendor's Lien" from Robert Q. Keith and Port Arthur Land Company, Ltd. to Larry McPhillips and wife, Ileana McPhillips as recorded in Clerk's File No. 2003048087, Official Public Records of Real Property, Jefferson County, Texas, and also being all of that certain tract of land being called the North 154 feet of Lot 22, Block 6 of the Hillcrest Second Addition "Acres" as described in a deed from Luke Greene and wife, Laura Belle Greene to John Earl Greene as

recorded in Volume 1703, Page 236, Deed Records, Jefferson County, Texas and all of that certain tract of land as described in a "Warranty Deed" from Luke Greene and wife, Laura Belle Greene to John Earl Greene as recorded in Volume 1816, Page 499, Deed Records, Jefferson County, Texas, and all of that certain tract of land identified as TRACT I, TRACT II, and TRACT III as described in a "Warranty Deed" from John Earl Greene and David L. Greene, Co-Independent Executors of the Estate of Luke Greene, Deceased, to the Greene Family Trust as recorded in Clerk's File No. 2001010571, Official Public Records of Real Property, Jefferson County, Texas, and also being out of and part of that certain tract of land as described in a "Warranty Deed" from Steven Kemp and Debra Allison Kemp to John Earl Greene, Sr. as recorded in Clerk's File No. 9720993, Official Public Records of Real Property, Jefferson County, Texas and also all of that certain tract of land as described in a "Warranty Deed" from Harold W. Gardenhire, Sr., et al. to John Earl Greene as recorded in Clerk's File No. 2003018965, Official Public Records of Real Property, Jefferson County, Texas said 10.2154 acre tract being more particularly described as follows:

*NOTE: All bearings are based on the Southwesterly right-of-way line of El Paso Street as SOUTH 48°47'00" EAST.*

**BEGINNING** at a 1/2" iron rod found for most Westerly corner of the said Lot 22 and the most Westerly corner of the said John Earl Greene tract as recorded in Volume 1703, Page 236, Deed Records, Jefferson County, Texas and also being the most Southerly corner of Lot 80, Block 6 of the Hillcrest Second Revised Addition, a subdivision of the City of Port Arthur, Jefferson County, Texas, according to the plat thereof recorded in Volume 7, Page 6, Map Records, Jefferson County, Texas and also being the most Southerly corner of that certain tract of land as described in a "Substitute Trustee's Deed" to Excavators and Constructors, Inc. as recorded in Clerk's File No. 9439142, Official Public Records of Real Property, Jefferson County, Texas and said corner being in the Northeasterly right-of-way line of El Paso Street (based on a width of 50 feet);

**THENCE** NORTH 41°22'29" EAST, for the boundary between the tract herein described and the said Excavators and Constructors, Inc. tract and that certain called 0.5936 acre tract of land as described in a "Warranty Deed with Vendor's Lien" from Excavators and Constructors, Inc. to Ernest Parker as recorded in Clerk's File No. 2000024148, Official Public Records of Real Property, Jefferson County, Texas, for a distance of 275.00 feet to a 5/8" iron rod set for corner, said corner being the most Northerly corner of the said Lot 22 and the common corner of Lots 59, 60 and 80, Block 6 of the above referenced Hillcrest Second Revised Addition, said corner also being the most Westerly corner of that certain tract of land being part of Lots 60, 61 and 62, Block 6 of the above referenced Hillcrest Second Revised Addition identified by Jefferson County Tax Appraisal District Account No. 029001-000-004300-00000-5 owned by Mini Serve Inc. (unable to locate deed reference) and from said corner a 3/4" iron pipe found for the most Easterly corner of the said 0.5936 acre Parker tract bears NORTH 41°22'29" EAST a distance of 70.42 feet;

**THENCE** SOUTH 48°37'55" EAST, for the boundary between the tract herein described and the Southwesterly line of the said Mini Serve Inc. tract, the same being the common line between the said Lot 22 and Lots 60, 61 and 62, for a distance of 154.03 feet to a punch mark in concrete found for corner, said corner being the most Northerly corner of that certain called 0.9243 acre tract of land as described in a "Special Warranty Deed with Vendor's Lien" from Robert Q. Keith

and Port Arthur Land Company, Ltd. to Larry McPhillips and wife, Ileana McPhillips as recorded in Clerk's File No. 2003048087, Official Public Records of Real Property, Jefferson County, Texas and also being the most Easterly corner of the said John Earl Greene tract;

**THENCE** SOUTH 49°32'09" EAST, for the boundary between the tract herein described and the said Mini Serve Inc. tract, the same being the common line between the said Lot 62 and Lot 22, for a distance of 12.45 feet to a 2" iron pipe in concrete found for corner, said corner being the most Southerly corner of the said Mini Serve Inc. tract, the same being the most Southerly corner of the said Lot 22 and the most Westerly corner of the said Lot 63, the same being the most Westerly corner of the said McPhillips tract recorded in Clerk's File No. 9607726, Official Public Records of Real Property, Jefferson County, Texas;

**THENCE** NORTH 41°16'43" EAST, for the boundary between the tract herein described and the said Mini Serve Inc. tract, the same being the common line between the said Lots 62 and 63 and also being the Northwesterly line of the said McPhillips tract recorded in Clerk's File No. 9607726, for a distance of 51.06 feet to a scribed "X" in concrete set for corner, said corner being in the Southwesterly right-of-way line of U.S. Highway 69, 96 and 287 (width varies);

**THENCE** SOUTH 44°38'53" EAST, along and with the Southwesterly right-of-way line of U.S. Highway 69, 96 and 287, for a distance of 149.62 feet to a 1/2" iron rod found for corner, said corner being in the common line between the said Lots 65 and 66 and also being the most Easterly corner of the said McPhillips tract recorded in Clerk's File No. 9607726 and the most Northerly corner of the said McPhillips tract recorded in Clerk's File No. 2003001893, Official Public Records of Real Property, Jefferson County, Texas;

**THENCE** SOUTH 48°41'16" EAST, continuing along and with the Southwesterly right-of-way line of U.S. Highway 69, 96 and 287, for a distance of 250.94 feet to a 5/8" iron rod set for corner, said corner being in the common line between the said Lots 70 and 71 and being the most Easterly corner of the said McPhillips tract recorded in Clerk's File No. 2003001893 and an exterior ell corner of the said 0.9243 acre McPhillips tract;

**THENCE** SOUTH 37°58'58" EAST, continuing along and with the Southwesterly right-of-way line of U.S. Highway 69, 96 and 287, for a distance of 101.86 feet to a Texas Department of Transportation concrete monument found for corner, said corner being the intersection of the Southwesterly right-of-way line of U.S. Highway 69, 96 and 287 and the Northwesterly right-of-way line of State Highway No. 365 (based on a width of 200') and also being the most Easterly corner of the said 0.9243 acre McPhillips tract;

**THENCE** SOUTH 21°41'22" WEST, along and with the Northwesterly right-of-way line of State Highway No. 365, passing at a distance of 96.23 feet a Texas Department of Transportation concrete monument found the most Southerly corner of the said 0.9243 acre McPhillips tract and the most Easterly corner of that certain tract of land identified as TRACT I as described in a "Warranty Deed" from John Earl Greene and David L. Greene, Co-Independent Executors of the Estate of Luke Greene, Deceased, to the Greene Family Trust as recorded in Clerk's File No. 2001010571, Official Public Records of Real Property, Jefferson County, Texas, and continuing with the Northwesterly right-of-way line of State Highway No. 365 for a total distance of 139.83 feet to a 5/8" iron rod found for corner, said corner being an angle point in the Northwesterly right-of-way line of State Highway No. 365;

**THENCE** SOUTH 41°54'39" WEST, along and with the Northwesterly right-of-way line of State Highway No. 365, passing at a distance of 163.76 feet a cotton picker spindle found for corner at the intersection of the Northwesterly right-of-way line of State Highway No. 365 and the Northeasterly right-of-way line of El Paso Street, and continuing over and across El Paso Street passing at a distance of 213.87 feet a 5/8" iron rod set for the intersection of the Northwesterly right-of-way line of State Highway No. 365 and the Southwesterly right-of-way line of El Paso Street, and continuing along and with the Northwesterly right-of-way line of State Highway No. 365, for a total distance of 489.31 feet to a 5/8" iron rod set for corner, said corner being the intersection of the Southwesterly line of the said Lot 14, the same being the Northeasterly line of Lot 17, Block 8 of Hillcrest Second Addition "Acres", a subdivision of the City of Port Arthur, Jefferson County, Texas, according to the plat thereof recorded in Volume 4, Page 106, Map Records, Jefferson County, Texas and the Northwesterly right-of-way line of State Highway No. 365;

**THENCE** NORTH 48°46'38" WEST, for the boundary between the tract herein described and the said Lot 17, Block 8 of Hillcrest Second Addition "Acres", the same being the Southwesterly line of the said Lots 8 -14, Block 8 of Hillcrest Second Revised Addition, for a distance of 708.46 feet a 40d nail in a cut off fence post found for the common corner of the Lots 2 and 17, Block 8 of the said Hillcrest Second Addition "Acres" and the Lots 7 and 8, Block 8 of the said Hillcrest Second Revised Addition;

**THENCE** NORTH 41°15'19" EAST, for the boundary between the said Lots 7 and 8, Block 8 of the Hillcrest Second Revised Addition, for a distance of 275.34 feet to a 1" iron pipe found for corner, said corner being the most Easterly corner of the said Lot 7 and the most Northerly corner of the said Lot 8, Block 8 of the Hillcrest Second Revised Addition and said corner being in the Southwesterly right-of-way line of El Paso Street;

**THENCE** NORTH 41°09'11" EAST, over and across the El Paso Street right-of-way, for a distance of  50.11 feet to the **POINT OF BEGINNING** and containing 10.2154 ACRES, more or less.

**EXHIBIT C**

<u>Site Design Requirements</u>

**PORT ARTHUR, TX**



# SITE DESIGN
# REQUIREMENTS

Dated _____, 2006

Shopping Center:  SHOPPES AT PORT ARTHUR

## TABLE OF CONTENTS

1.  Content ............................................................................................................. 1

2.  Definitions ....................................................................................................... 1

3.  Landlord Responsibilities .............................................................................. 3

4.  Circuit City Improvements. .......................................................................... 6

5.  Sign Plans ........................................................................................................ 7

6.  Survey .............................................................................................................. 7

Attachments:

"1"  Circuit City Specifications

"2"  Construction Schedule

"3"  Site Delivery Work Certification

"4"  Floor Plan and Elevation

"5"  Sign Plans

"6"  Survey Criteria

"7-A"  Geotechnical Reliance Letter

"7-B"  Environmental Reliance Letter

WO 460674.5

1.    Content. The information included is subject to revision from time to time by Circuit City Stores, Inc. ("Circuit City").    Nothing in this document shall be construed as a representation or warranty of any sort by Circuit City or any agent of Circuit City that the specifications and details set forth herein or in the prototypical drawings and specifications attached hereto or provided by Circuit City satisfy and/or comply with applicable laws, statutes, ordinances, codes or regulations, and it shall be the responsibility of each respective party to confirm that the final construction documents for any improvements to the Shopping Center comply with all such applicable laws, statutes, ordinances, codes and regulations.

All items in this document are critical to Circuit City and cannot be omitted, limited or altered in any way without prior review and written approval by Circuit City. All approvals, governmental or otherwise (including, but not limited to, permits, variances, and certificates of occupancy) shall be obtained after and based upon full clear disclosure to the approving agency of all applicable use, operational, or physical characteristics of the Circuit City store. Any landlord or other person or entity who obtains these approvals shall be responsible for such disclosure.

2.    Definitions. In addition to other terms that may be defined herein, the following terms shall have the meanings set forth below for purposes of this document:

(a)    Building. The term "Building" shall mean the one-story retail building with provisions for car stereo installation facilities to be constructed for operation as a Circuit City store, to be located generally within the cross-hatched area shown on the Site Plan.

(b)    Building Pad. The term "Building Pad" shall mean (a) that portion of the land upon which the Building is to be constructed including, without limitation, the footprint of the store and a minimum of fifteen (15) feet beyond such footprint, and (b) the area to be occupied by loading docks, truck loading wells, sidewalks and trash compactor pads.

(c)    Circuit City Project Manager. The term "Project Manager" shall mean Circuit City's Architectural Project Manager designated as having primary responsibility within the Circuit City organization for supervision, monitoring and/or oversight of construction of the Building.

(d)    Circuit City Specifications. The term "Circuit City's Specifications" shall mean those specifications set forth on Attachment "1" attached hereto.

(e)    Civil Engineer. The term "Civil Engineer" shall be defined as the entity from which construction drawings are provided to develop the Shopping Center.

(f)    Civil Plans. The term "Civil Plans" shall mean the final plans prepared by Landlord's Civil Engineer, which are subject to Circuit City's written approval.

(g)    Construction Schedule. The term "Construction Schedule" shall mean a schedule for development, planning and construction of the Shopping Center and the Building Pad (including, without limitation, scheduling of information gathering and permitting and of deadlines for performance by all parties, including, Landlord, of their various responsibilities related to the Shopping Center) attached hereto as Attachment "2".

(h)    Contractor.  The term "Contractor" shall mean the person or entity providing construction services to perform all necessary site/building aspects of the Shopping Center and shall include suppliers, sub-contractors and vendors.

(i)    Delivery of the Land.  The term "Delivery of the Land" shall mean the completion of all Site Delivery Work, and, as more particularly set forth in Paragraph 3(b) below, the obtaining of all approvals and permits and the payment of all fees such that Circuit City shall be able to commence its construction.

(j)    Floor Plans and Elevations.  The term "Floor Plans and Elevations" shall mean the floor plans and elevations for the Building attached hereto as Attachment "4".

(k)    Environmental Report.  The term "Environmental Report" shall mean the environmental report(s), including, without limitation, the Phase I Environmental Site Assessment, and, if necessary, Phase II Environmental Site Assessment and asbestos survey, generated for Landlord or Circuit City, at Landlord's cost, with respect to environmental characteristics of the Land upon which the Shopping Center is to be developed. The Environmental Report shall be a product of the environmental consultant's efforts, investigation, testing and evaluation, and shall be prepared in accordance with the requirements of American Society for Testing and Materials (ASTM) E 1527-05. The Environmental Report shall set forth and establish the requirements and criteria associated with and relating to the performance of further environmental testing and proposed environmental clean-up and remediation work by Circuit City or Landlord.  The date of the Environmental Report shall be no older than thirteen (13) months prior to the date of the Lease.  Circuit City shall have no liability in favor of said environmental consultant in connection with the issuance of the Environmental Report.

(l)    Geotechnical Report.  The term "Geotechnical Report" shall mean the report generated by Carney Engineering Company dated May 12, 2006, and boring logs dated July 17, 2006 for Landlord, at Landlord's cost, with respect to geotechnical characteristics of the Land upon which the Shopping Center is to be developed and may also be referred to as the "Soils Report." The Geotechnical Report shall be a product of the geotechnical engineer's efforts, investigation, testing and evaluation.  The Geotechnical Report shall set forth and establish the requirements and criteria associated with and relating to the performance of earthwork and geotechnical-related work by Circuit City or Landlord.  The date of the Geotechnical Report shall be no older than eight (8) months prior to the date of the Lease.  Circuit City shall have no liability in favor of said geotechnical engineer in connection with the issuance of the Geotechnical Report.

(m)    Land.  The term "Land" shall mean the parcel or parcels of land on which the Building Pad is located and upon which the Building is to be constructed.

(n)    Land Plan.  The term "Land Plan" shall mean the Land Plan for the Shopping Center and the surround shopping center Land, if applicable, prepared and/or approved by Circuit City.

WO 460674.5

(o)   Landlord's Work. The term "Landlord's Work " shall mean all of the work required to be completed by Landlord pursuant to Paragraph 3 of these Site Design Requirements and as otherwise required by the Lease.

(p)   Lease. The term "Lease" shall mean the lease agreement entered into between Landlord and Circuit City relating to the Land and the Building.

(q)   Plans and Specifications. The term "Plans and Specifications" shall mean the complete architectural drawings and specifications of the Building, including elevations.

(r)   Staging Area. The term "Staging Area" shall mean the 20,000 square foot area immediately in front of and adjacent to the Land as shown on the Site Plan. Landlord to provide concrete paving for staging area. Tenant's contractor responsible for maintenance and protection of this concrete surface throughout Tenant's construction

Except as otherwise defined herein, all capitalized terms shall have the same meaning ascribed to them in the Lease.

3.   Landlord Responsibilities.   In connection with planning, permitting and development of the Shopping Center, Landlord shall be responsible for the following work, absent express written agreement to the contrary by Circuit City:

(a)   Site Delivery Work. Landlord acknowledges receipt of, and covenants to comply with the Circuit City Specifications attached hereto as Attachment "1" in the completion of Landlord's Work. Landlord, at its sole cost and expense, shall:

(i)   In the event the Geotechnical Report is not made for and certified to Circuit City, Landlord shall cause Landlord's geotechnical engineer preparing the Geotechnical Report to provide Circuit City a "Geotechnical Reliance Letter" in the same form attached hereto as Attachment "7-A", but in no event shall the issuance of any such letter result in liability on the part of Circuit City in favor of said geotechnical engineer.

(ii)   In the event the Environmental Report is not made for and certified to Circuit City, Developer shall cause Developer's environmental consultant preparing the Environmental Report to provide Circuit City an "Environmental Reliance Letter" in the same form attached hereto as Attachment "7-B", but in no event shall the issuance of any such letter result in liability on the part of Circuit City in favor of said environmental consultant.

(iii)   Verify that its proposed development of the Shopping Center and its Civil Plans comply with the Soils Report and with the Circuit City Specifications;

(iv)   Cause the Land to be free and clear of any known or unknown (which, but for Landlord's failure to discover same, should be removed prior to Delivery of the Land to Circuit City) obstructions, foundations, footings, rock, utilities, easements, improvements and tenancies;

(v)   Cause the Land to be delivered free of any Hazardous Materials;

WO 460674.5

(vi)    Complete grading of the Land and the Common Areas in accordance with the Soils Report, and the Circuit City Specifications and the Civil Plans;

(vii)    Complete the Building Pad strictly in accordance with the Soils Report and the Circuit City Specifications (including, without limitation, providing Circuit City with the certifications required by the Circuit City Specifications);

(viii)    Obtain approvals for all curbcuts indicated on the Civil Plans and all on and off-site permits required for any work to be performed by Landlord necessary to develop the Shopping Center which permits may be a prerequisite for issuance of Circuit City's building permit;

(ix)    Complete (A) all curbcuts for Tenant's Preferred Area, (B) 20,000 square feet of Staging Area outside of but adjacent to the Building Pad to be concrete pavement to provide for all weather use, and (C) an all-weather construction access road to the Land and around the Building Pad no less than twenty-four (24) feet in width, connecting the existing dedicated roadway adjacent to the Shopping Center with the Land, to be maintained by Landlord in good condition throughout the construction of the Common Areas; and

(x)    Obtain Land Plan approval and conditional use approval, if any, from governmental authorities having jurisdiction over the Shopping Center, permitting Circuit City's construction of the Building (subject to issuance of Circuit City's building permit).

All of the work described in (i) through (x) above is herein collectively referred to as the "Site Delivery Work". No changes shall be made to any of the Site Delivery Work without Circuit City's prior written consent. The Site Delivery Work shall be performed in accordance with the Construction Schedule. Landlord specifically covenants and agrees that any problems or delays it encounters in grading the Building Pad in satisfaction of the Site Delivery Work requirements set forth above in connection with the condition of the soils, including environmental or hazardous waste issues, subsidence sinking, surface waters, subsurface waters, unforeseen site conditions or the like shall be its sole responsibility, shall not cause a force majeure delay, and in no event shall the cost associated with such problems or conditions be passed on to Circuit City in any manner.

If the items of Site Delivery Work are completed earlier than forty-five (45) days prior to Circuit City's scheduled commencement of construction of the Building, the Land shall be overbuilt and sloped to drain and, within such forty-five (45) day period, shall be regraded and recompacted.

Subject to force majeure, Landlord covenants and agrees to complete, at its sole cost and expense, each item of the Site Delivery Work and to provide temporary utilities to within five (5) feet of the Building Pad at Circuit City's designated points of entry as set forth in the Plans and Specifications, and temporary telephone service to the Building and the Staging Area, in accordance with the dates established therefor in the Construction Schedule, to the end that promptly upon completion of such requirements, Circuit City shall be able, subject to issuance of its building permit and matters within Circuit City's control, to commence construction of the Building.

WO 460674.5

Should the Site Delivery Work require minor adjustments in order to be in accordance with the Circuit City Specifications or the Civil Plans, Circuit City may direct its contractor to make such adjustments, the total cost of which shall be reimbursed by Landlord to Circuit City upon demand in a sum not to exceed Five Thousand and No/100 Dollars ($5,000.00), provided that Circuit City provides supporting documentation of the costs incurred.

(b)     Payment of Fees and Permits.  Landlord agrees that Delivery of the Land shall not be deemed to have occurred until all approvals and permits shall have been obtained and all fees, including but not limited to impact fees and assessments, shall have been paid, if and to the extent that such approvals, permits and fees for Landlord's construction shall be prerequisites to the issuance of Circuit City's building permit.  In addition, Landlord shall pay all impact fees assessed with respect to Circuit City's construction of the Building.  Upon Delivery of the Land, Landlord shall certify to Circuit City that all elements of the Site Delivery Work have been completed in the form of the Site Delivery Work Certificate attached hereto as Attachment "3".

(c)     Civil Plans.  Landlord shall promptly deliver to Circuit City full and complete Civil Plans, which Civil Plans shall be subject to Circuit City's approval.  Circuit City's approval of the Civil Plans shall be for compliance with the Circuit City Specifications only and shall not be deemed to be an approval of the content of the Civil Plans.  Landlord expressly agrees that it will retain the risk if its Civil Plans do not conform to applicable laws, rules and regulations and/or contain errors, defects or omissions.  To the extent there is a conflict between the Circuit City Specifications and the Civil Plans, the Circuit City Specifications shall prevail.

(d)     Paving, Lighting, Utilities, Landscaping and Drainage.  Landlord, at its sole cost and expense, and in accordance with and on the date set forth in the Construction Schedule, shall cause its Contractor to complete:

(i)     Installation of temporary utilities, as described in the Circuit City Specifications;

(ii)     The construction and installation within five (5) feet of the Building Pad, of permanent telephone service and permanent utilities, including but not limited to gas, electric, cable tv, domestic water and fire protection water (in size sufficient to satisfy Circuit City's fire consultant, without need for a fire pump) and sanitary sewer as described in the Circuit City Specifications, each at Circuit City's required entry points, at depths adequate for Circuit City's tie-in without additional cost above that contemplated by the Plans and Specifications;

(iii)     The construction and installation of the storm water drainage system at Circuit City's required locations;

(iv)     The construction and installation of paving (including heavy-duty paving), and curbing for parking areas (including sidewalk curb in front of the Building), vehicular access and service roads, and driveways, in accordance with the Circuit City Specifications;

(v)    The completion of landscaping at the Shopping Center in accordance with Landlord's governmentally approved landscaping plan;

(vi)    The construction and installation of lighting in the Shopping Center to standards no less than those set forth in the "Shopping Center Lighting Specifications" as described in the Circuit City Specifications; and

(vii)    Landlord's installation of the pylon sign(s) identifying the Shopping Center, all no later than the dates established therefor in the Construction Schedule.

(e)    Landlord's Work. All of the work described to be performed by Landlord in this paragraph 4 is collectively referred to as the "Landlord's Work". All Landlord's Work shall be performed in accordance with all applicable laws, these Site Design Requirements, the Construction Schedule, and the Civil Plans in a good and workmanlike manner, as appropriate by engineers, surveyors, architects and consultants and contractors, who are bondable, all licensed in the state where the Shopping Center is situated and of good reputation. Landlord's Contractor shall be experienced in shopping center development and in phasing and coordinating construction schedules with major anchors and national retailers.

4.    Circuit City Improvements.

(a)    Building Construction. Upon completion of all of the Site Delivery Work, Landlord shall give Circuit City written notice (which shall include any required certifications, including but not limited to those required by the Circuit City Specifications) of Delivery of the Land. Circuit City shall promptly notify Landlord if any such requirement has not been met to Circuit City's reasonable satisfaction, provided Circuit City does not elect to exercise its self-help remedies set forth in the Lease. Upon the later to occur of (a) the completion of any such previously unmet requirements, or (b) the Possession Date, Circuit City shall within a reasonable time commence and pursue to completion with due diligence the construction of the Building and storefront sidewalk. The construction work on the Improvements and storefront sidewalk shall be performed by a duly licensed contractor chosen by Circuit City, shall be done in a good and workmanlike manner, in compliance with all applicable laws and in substantial accordance with the Plans and Specifications.

(b)    Plans and Specifications. Circuit City shall prepare and furnish to Landlord for its approval, not to be unreasonably withheld, conditioned or delayed, the Plans and Specifications for the construction of the Building incorporating therein the items shown on the Floor Plans and Elevations. Landlord agrees that it will approve the Plans and Specifications, so long as they are materially consistent with Circuit City's then-current prototype, within ten (10) business days after receipt thereof. If the Plans and Specifications are not disapproved by Landlord within such 10-day period, they will be deemed approved. The Plans and Specifications shall not be substantially changed by Circuit City without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed; provided, any changes made by Circuit City to its prototypical store prior to commencement of construction by Circuit City shall be deemed approved by Landlord. Any changes which Landlord desires to make to the Plans and Specifications which are different than a Building based on Circuit City's prototypical elevations and building materials or different from the initial

Plans and Specifications submitted by Circuit City to Landlord shall be subject to Circuit City's approval, which may be withheld in Circuit City's sole discretion, and made at Landlord's sole cost and expense.

(c)    Permits.  Circuit City shall obtain or cause to be obtained those certain building permits, licenses, other governmental approvals and temporary and permanent certificates of occupancy which may be required for the lawful construction and occupancy of the Building in accordance with the Plans and Specifications including water meter and associated meter fees.  Landlord agrees to assist and cooperate fully with Circuit City in obtaining such permits, licenses, approvals and certificates.  Landlord shall be responsible for any other permits necessary for the development of the Shopping Center.

(d)    Substantial Completion.    Substantial completion of the Building ("Substantial Completion") shall be deemed to occur when a certificate of occupancy, whether temporary or permanent, as the case may be, has been issued by the applicable governmental authority.

5.    Sign Plans.  Landlord shall submit to Circuit City plans and specifications for the pylon sign(s) contained or to be constructed within the Shopping Center (including colors, design, dimensions, type of lighting and position of Circuit City's panels) prior to construction and installation thereof for Circuit City's written approval, which shall not be unreasonably withheld or delayed.  Landlord shall submit to Circuit City any sign criteria that may impact Circuit City's building or pylon signs.  Attached hereto as Attachment "5" are plans and specifications for Circuit City's current prototypical face panels for pylon signs and for Circuit City's building signage, which Landlord hereby approves.

6.    Survey.  Landlord shall provide Circuit City with a current ALTA survey of the Shopping Center, at Landlord's expense, in form and substance acceptable to Tenant, meeting the survey criteria attached hereto as Attachment "6".

These Site Design Requirements shall only become binding upon Circuit City and Landlord upon the execution of the Lease and the attachment of these Site Design Requirements as an exhibit to the Lease.

Approved By:

LANDLORD:

By:    _____
        Name: _____

Dated:  _____

Attachment "1"

CIRCUIT CITY SPECIFICATIONS

I.    STANDARDS FOR GRADING WORK

 A.    Grading Requirements:  The Land and the Shopping Center shall be graded in accordance with the following:

  1.    The Civil Plans shall show contours in accordance with standard engineering practice and these contours shall be shown with the existing (shown as a dashed line) and final (shown as a solid line) elevations. Whether existing or proposed, all buildings, improvements, roads and highways, including those adjacent to the Shopping Center, shall be shown in their true locations.

  2.    The Building will be accessible by grade level parking only.  Steps and stairs are not permitted.

  3.    Sidewalk at the Building will slope away from the Building with grade of no less than 1.5% and no more than 3.0%.  All water shall be sheet drained away from Circuit City's doors.

  4.    Asphalt paving areas will be graded to avoid ponding water with slopes no less than 1.5% and no more than 4.0%.  Entrances and access drives shall have a maximum slope of 6.0%.

  5.    Surface drainage swales will not be allowed without prior approval of Circuit City.  Such swales must have a grade of not less than 0.5% and no more than 3.5% and shall be constructed of concrete.

  6.    The cut and fill on the Shopping Center land should be balanced, if practical.  All fill material must be of a select grade and sources for acquisition of fill material, as well as locations for cut material, must be identified.

  7.    No retaining walls or embankments causing breaks in grade shall be permitted unless specifically approved by Circuit City.

 B.    Building Pad:  Landlord's Work shall comply with the following additional requirements:

  1.    Landlord shall be responsible for preparing the Building Pad subgrades to within plus or minus one-tenth of a foot as set by Circuit City's architect. Circuit City's subgrades are 8" below finished floor elevation. Landlord will complete compaction in accordance with the appropriate engineering standards and building code requirements, but in no event less than ninety-five percent (95%) of the standard proctor soil test for water content and

WO 460674.5

compaction levels ("Standard Proctor") on the Land, so as to enable Circuit City to perform construction work necessary to provide completed Improvements in accordance with the Plans and Specifications, with drilled piers footings and without the necessity of pilings or other extraordinary foundation work. Circuit City's minimum slab thickness and under slab fill will be established in accordance with the Soils Report. All compacted areas of the Land shall be verified by an independent professional soils engineering test laboratory and a certificate from such independent laboratory indicating compliance with the Soils Report and shall be furnished to Circuit City upon completion of the Site Delivery Work.

2.  The Building Pad soil shall have a minimum bearing capacity of 2,500 pounds per square foot. Earth stabilization and/or replacement shall be performed by Landlord as necessary to meet this minimum requirement.

3.  During the preparation of the Building Pad, Landlord shall at its expense have an independent professional soils engineering test laboratory monitor and certify the preparation of the Building Pad in accordance with the Soils Report. Landlord shall perform one in-place compaction test per 5,000 square feet of pad area per lift.

4.  On or before the date of Delivery of the Land, Landlord shall provide Circuit City with:

    (a)  An independent soils engineer's written certification that all pad work was completed in accordance with the Soils Report, the Civil Plans and the Plans and Specifications. This report shall include the results of all compaction and other tests performed during the pad preparation phase and any tests performed prior to the date of such certification. A copy of such certification shall be delivered to Circuit City's Vice President-Construction at Circuit City's address.

    (b)  A surveyor's written elevation certification stating that the Building Pad is at the prescribed elevation within the stated tolerance of plus or minus one-tenth of a foot. This certification shall be based upon an "as-prepared" survey that shall accompany such certification and shall show thereon elevation shots taken on a 50-foot-grid minimum including pad perimeter and building corners. Promptly upon completion of the Site Delivery Work, Landlord shall cause its surveyor or engineer to designate the corners of the Building Pad by means of standard surveying markers.

5.  Landscaping slopes and berms shall be set by Landlord to preserve the integrity of the slopes as determined by an independent soils engineer.

However, in no case may the slope of a landscaping berm exceed 3 to 1 in turf areas, or 2 to 1 in ground cover and shrub areas.

6.      Top soil excavated during grading of the Shopping Center shall be stockpiled by Landlord and made available for use during final landscaping operations including landscaping inside perimeter sidewalks around the Building, if found agronomically suitable by an independent soils analysis lab. Other excavated soil material shall be stockpiled and made available for use as backfill if required, but only if a soil report indicates it is suitable.

7.      All material, including native and fill, within 5 feet of any surface of the Building including foundation concrete, shall be non-expansive with a plasticity index of 12 or less. The material shall also have sufficient cohesion to stand vertically for 3 feet. No oversize material or lumps greater than 6" in diameter will be allowed and not more than 15% of the material shall be greater than 2-1/2" diameter. Any existing rock within 5 feet of Circuit City's proposed foundations must be removed by Landlord prior to pad delivery, so that construction of the Building can be completed without any rock excavation by Circuit City.

8.      The Civil Plans shall not be materially changed by Landlord without the prior consent of Circuit City, which consent shall not be unreasonably withheld or delayed.

9.      All outlots or future building areas shall be rough graded and planted with grass seed.

## II.     UTILITIES SPECIFICATIONS

A.      Temporary Utilities: Landlord will provide the following temporary utilities to the Staging Area in a location selected by Circuit City no later than the date for completion of such temporary utilities set forth in the Construction Schedule:

water (2" line, with sufficient pressure that pumping is not necessary), electric power (200 amps, 1-phase, 4-wire, 120 volts, with weatherproof and rainproof fused disconnect switch) and temporary telephone for use by Circuit City in its construction of the Building.

B.      Permanent Utilities: Landlord will provide the following permanent utilities to within five (5) feet of the Building (unless otherwise noted) or the sidewalk at Circuit City's identified entry points (but in any event the stub point of such utilities shall not be covered by paving) no later than the date for completion of such permanent utilities set forth in the Construction Schedule:

gas (if available), telephone, cable tv, secondary electrical service to Circuit City's designated point of termination within the Building (adequate for an 600-amp panel, 3-phase, 277/480 volt), storm sewer

system (in accordance with Civil Plans), sanitary sewer (6" line), domestic water (2" line), fire protection water (8" line, 50 pounds per square inch residual pressure, 2000 gallons per minute or at least sufficient capacity to service Circuit City's sprinkler system without the need for any fire pump, as approved by Circuit City's fire protection consultant).

III.   PAVING SPECIFICATIONS

    A.   <u>Parking Area and Roadway Surfacing</u>:

        1.   Pavement design shall be based on a "Design Period" of twenty (20) years for the traffic indices specified by an independent civil engineer approved by Circuit City and compensated by Landlord.

        2.   All pavement design shall be subject to review and approval by Circuit City, and shall conform to the recommendations of the Soils Report.

        3.   Heavy duty paving must be used in main drives and service areas as required by the Soils Report.

    B.   <u>Sidewalks and Curbs</u>:

        1.   Landlord shall provide and install all curbs and sidewalks including perimeter curbs and sidewalks, except for sidewalks in front of the Building.

        2.   All sidewalks and curbs shall be constructed of concrete and shall have a minimum slope of 1.5% and a maximum slope of 3.0% away from the Building. All sidewalks and curbs shall be a minimum of four (4) inches thick, with a rough non-skid texture (as approved by Landlord's architect with respect to the Common Areas), over a suitable granular base. Salt finish is not acceptable.

        3.   Entrance and access roads and other areas as required for suitable drainage, shall have six (6) inch curbs with 18-inch gutters; however, next to sidewalks and buildings when drainage is not a factor a straight curb six (6) inches (without gutters) above the finished paving shall be permitted. Parking lot islands and landscape enclosures shall be vertical barrier-type curbs and all integral-type curbs and gutters and vertical barrier-type curbs shall be concrete. Extruded asphalt or concrete curbing may not be used.

        4.   Curbs at all non-parking areas shall be painted red with an exterior flat red latex paint, receive a trowel finish and be designated "No Parking" by a contrasting paint color.

IV.   SHOPPING CENTER LIGHTING SPECIFICATIONS

    A.   <u>Design Standards for Lighting of the Shopping Center</u>:

1.  Landlord shall prepare and submit plans showing the location and height of all light poles, fixtures, type of fixture shielding (if any), circuiting and details of the complete lighting arrangement and equipment.

2.  Illumination as measured at pavement shall be:

    (a)  6.0 foot candles minimum maintained within 50' of the Building's entry.

    (b)  6.0 foot candles minimum maintained throughout, measured at grade.

    (c)  Entry canopy soffit: 40.0 foot candles.  Circuit City will illuminate the entry tower with 2 – 1000 watt metal halide light fixtures mounted on a 25' high metal pole on a 3' high 24" diameter concrete pedestal located on the center line of Circuit City's entry approximately 100' away.

3.  Twenty-five percent (25%) of the overall lighting shall be designated as security lighting (i.e., remains on from dusk to dawn).  The security lighting layout and pattern shall be subject to Circuit City's approval.

4.  Selection of fixture types shall be subject to Circuit City's review and approval prior to design and circuiting.

5.  Landlord shall install a seven-day time switch to control all parking area lighting wired to a common house panel.  All security lighting shall be placed on photo-cell switching.

6.  The control of parking area lights shall be accessible to Circuit City's local store management due to late-night and holiday sales.