# EXHIBIT A

Store # 4,95



**LEASE AGREEMENT**

by and between

**ARBORETUM OF SOUTH BARRINGTON, LLC**

as Landlord

and

**CIRCUIT CITY STORES, INC.**

as Tenant

Arboretum of South Barrington Shopping Center
South Barrington, Illinois

CH3 1111236.2 / 39769-000031
889821-8  11028.0008000

Table of Contents

Page

**ARTICLE I  FUNDAMENTAL LEASE PROVISIONS** .............................................. 1

   *SECTION 1.01   Definitions* ............................................................................. 1

**ARTICLE II  LEASE OF PREMISES - TERM OF LEASE** ....................................... 4

   *SECTION 2.01   Demise* ................................................................................. 4

   *SECTION 2.02   Extension Periods* ............................................................... 5

   *SECTION 2.03   Commencement Date and Landlord Reimbursement* ............. 5

   *SECTION 2.04   Possession Date* .................................................................. 6

   *SECTION 2.05   Expected Possession Date* .................................................. 7

   *SECTION 2.06   Possession Date During Slack Delivery Period* ................... 8

   *SECTION 2.07   Delayed Possession* ............................................................ 8

   *SECTION 2.08   Early Entry* ......................................................................... 8

   *SECTION 2.09   Measurement* ....................................................................... 8

   *SECTION 2.10   Commencement Date Agreement* ........................................ 9

   *SECTION 2.11   Intentionally Omitted* .......................................................... 9

   *SECTION 2.12   Tenant's Permits Contingency* ............................................ 9

**ARTICLE III  INITIAL CONSTRUCTION** ............................................................ 10

   *SECTION 3.01   Landlord's and Tenant's Work* ........................................... 10

   *SECTION 3.02   Premises* ............................................................................. 10

**ARTICLE IV RENT** .............................................................................................. 10

   *SECTION 4.01   Annual Minimum Rent* ....................................................... 10

   *SECTION 4.02   Additional Rent* .................................................................. 10

   *SECTION 4.03   Rent; Method of Payment* ................................................... 10

**ARTICLE V  COMMON AREA MAINTENANCE AND COST** ................................ 11

   *SECTION 5.01   Maintenance* ....................................................................... 11

   *SECTION 5.02   Construction Clean-up and Post-Possession Work* .............. 12

   *SECTION 5.03   CAM Costs* .......................................................................... 12

   *SECTION 5.04   Tenant's Share of CAM Costs* ............................................ 13

   *SECTION 5.05   Payment of CAM Costs* ...................................................... 13

   *SECTION 5.06   CAM Costs Increases* ......................................................... 14

**ARTICLE VI TAXES** ............................................................................................ 15

## Table of Contents

|  |  | Page |
|---|---|---|
| *SECTION 6.01* | *Taxes* | *15* |
| *SECTION 6.02* | *Payment of Taxes* | *15* |
| *SECTION 6.03* | *Exclusions from Taxes* | *15* |
| *SECTION 6.04* | *Right to Contest* | *16* |
| *SECTION 6.05* | *Other Taxes* | *16* |
| **ARTICLE VII  UTILITIES** | | **17** |
| *SECTION 7.01* | *Utilities* | *17* |
| *SECTION 7.02* | *Interruption* | *17* |
| **ARTICLE VIII  USE OF PREMISES** | | **17** |
| *SECTION 8.01* | *Permitted Use* | *17* |
| *SECTION 8.02* | *Conduct of Operations* | *17* |
| *SECTION 8.03* | *Leasing Restrictions* | *18* |
| *SECTION 8.04* | *Tenant's Exclusive* | *19* |
| *SECTION 8.05* | *Exclusives Applicable To Tenant* | *21* |
| *SECTION 8.06* | *Key Tenants* | *22* |
| **ARTICLE IX REPAIRS** | | **22** |
| *SECTION 9.01* | *Landlord's Obligations* | *22* |
| *SECTION 9.02* | *Tenant's Obligations* | *23* |
| *SECTION 9.03* | *Hazardous Materials* | *23* |
| *SECTION 9.04* | *Surrender of the Premises* | *25* |
| **ARTICLE X REQUIREMENTS OF LAW** | | **25** |
| *SECTION 10.01* | *Landlord's Obligations* | *25* |
| *SECTION 10.02* | *Tenant's Obligations* | *26* |
| *SECTION 10.03* | *Right to Contest* | *26* |
| **ARTICLE XI INSURANCE** | | **26** |
| *SECTION 11.01* | *Landlord's Insurance* | *26* |
| *SECTION 11.02* | *Tenant's Insurance* | *27* |
| *SECTION 11.03* | *Insurance Requirements Generally* | *28* |
| *SECTION 11.04* | *Landlord's Insurance Cost* | *28* |

CH3 11112362 / 39769-000031
889821-8  11028.0008000

ii

Table of Contents

Page

SECTION 11.05    Indemnity ........................................................................ 28

SECTION 11.06    Mutual Waiver of Subrogation ........................................ 29

SECTION 11.07    Affiliate .......................................................................... 29

ARTICLE XII DAMAGE OR DESTRUCTION ............................................ 30

SECTION 12.01    Landlord's Obligation to Rebuild .................................... 30

SECTION 12.02    Tenant's Obligation to Rebuild ....................................... 30

SECTION 12.03    Termination ..................................................................... 30

ARTICLE XIII CONDEMNATION ............................................................. 32

SECTION 13.01    Taking .............................................................................. 32

SECTION 13.02    Restoration and Rent Adjustment .................................... 33

SECTION 13.02    Award .............................................................................. 33

ARTICLE XIV ALTERATIONS AND MECHANICS' LIENS ..................... 33

SECTION 14.01    Tenant's Alteration Rights .............................................. 33

SECTION 14.02    Mechanics' Liens ............................................................ 35

ARTICLE XV SIGNS .................................................................................. 35

SECTION 15.01    Tenant's Signs ................................................................. 35

SECTION 15.02    Pylon Signs ..................................................................... 36

SECTION 15.03    Replacement .................................................................... 36

ARTICLE XVI TENANT'S PROPERTY ...................................................... 36

SECTION 16.01    Tenant's Property ............................................................ 36

ARTICLE XVII ASSIGNMENT AND SUBLETTING ................................. 37

SECTION 17.01    Assignment and Subletting Rights ................................. 37

SECTION 17.02    Collateral Assignment .................................................... 38

SECTION 17.03    Cure Rights of Original Tenant ...................................... 38

SECTION 17.04    Recognition Agreement .................................................. 38

ARTICLE XVIII DEFAULT ........................................................................ 39

SECTION 18.01    Tenant's Default .............................................................. 39

SECTION 18.02    Additional Landlord Remedies Due to Construction Delays by Tenant ..... 41

SECTION 18.03    Landlord's Default .......................................................... 41

Table of Contents

Page

*SECTION 18.04    Additional Tenant Self-help, Equitable and Legal Remedies Due to Construction Delays by Landlord*........................................................................ 42

*SECTION 18.06    Waiver; Non-Exclusive Remedies*.............................................. 43

**ARTICLE XIX SUBORDINATION, TRANSFER OF INTEREST** .......................... **44**

*SECTION 19.01    Subordination* .................................................................... 44

*SECTION 19.02    Existing Mortgages and Ground Leases* .............................. 44

*SECTION 19.03    Transfer of Interest* ............................................................ 45

*SECTION 19.04    Tenant Estoppel Certificates* ............................................... 45

*SECTION 19.05    Landlord Estoppel Certificates* ........................................... 45

*SECTION 19.06    Payments* ............................................................................ 45

**ARTICLE XX LANDLORD'S REPRESENTATIONS, WARRANTIES AND COVENANTS** ........................................................................................ **46**

*SECTION 20.01    Quiet Enjoyment* ................................................................ 46

*SECTION 20.02    Representations, Warranties and Covenants* ....................... 46

*SECTION 20.03    Site Covenants* .................................................................... 47

*SECTION 20.04    OEA* .................................................................................... 48

**ARTICLE XXI HOLDING OVER** .................................................................. **50**

*SECTION 21.01    Holding Over* ...................................................................... 50

**ARTICLE XXII NOTICE** .............................................................................. **50**

*SECTION 22.01    Where and How Given* ........................................................ 50

*SECTION 22.02    When Given* ......................................................................... 52

**ARTICLE X MISCELLANEOUS** ................................................................... **52**

*SECTION 23.01    Rent Proration* .................................................................... 52

*SECTION 23.02    Construction* ....................................................................... 52

*SECTION 23.03    Section Headings* ................................................................ 52

*SECTION 23.04    Partial Invalidity* ................................................................ 52

*SECTION 23.05    Waiver* ................................................................................ 52

*SECTION 23.06    Governing Law* .................................................................... 52

*SECTION 23.07    Successors and Assigns* ....................................................... 53

*SECTION 23.08    No Broker* ............................................................................ 53

## Table of Contents

|  |  | Page |
|---|---|---|
| *SECTION 23.09* | *Memorandum of Lease* | *53* |
| *SECTION 23.10* | *Entire Agreement* | *53* |
| *SECTION 23.11* | *Relationship of Parties* | *53* |
| *SECTION 23.12* | *Force Majeure* | *53* |
| *SECTION 23.13* | *Limitation of Landlord's Liability* | *54* |
| *SECTION 23.14* | *Limitation of Tenant's Liability* | *54* |
| *SECTION 23.15* | *Consents* | *54* |
| *SECTION 23.16* | *Costs* | *54* |
| *SECTION 23.17* | *Attorneys' Fees* | *54* |
| *SECTION 23.18* | *Survival of Obligations* | *54* |
| *SECTION 23.19* | *Joint and Several Liability* | *55* |
| *SECTION 23.20* | *Definition of Hereunder, Herein, etc.* | *55* |
| *SECTION 23.21* | *Tenant's Trade Name* | *55* |
| *SECTION 23.22* | *Counterparts* | *55* |

Table of Contents

Page

## EXHIBITS

| | |
|---|---|
| EXHIBIT A | Site Plan |
| EXHIBIT B | Legal Description of the Shopping Center |
| EXHIBIT C | Site Design Requirements |
| EXHIBIT C-1 | Possession Date Notice |
| EXHIBIT D | W-9 Form |
| EXHIBIT E | Commencement Date and Expiration Date Agreement |
| EXHIBIT F | Prohibited Uses |
| EXHIBIT G | Existing Leases |
| EXHIBIT H | Existing Exclusives |
| EXHIBIT I | Recognition Agreement |
| EXHIBIT J | Subordination, Non-Disturbance and Attornment Agreement |
| EXHIBIT K | Permitted Exceptions |
| EXHIBIT L | Memorandum of Lease |
| EXHIBIT M | Indemnity Agreement |
| EXHIBIT N | Monument Sign Rendering |
| EXHIBIT N-1 | Landlord's Sign Criteria |
| EXHIBIT O | Initial Rules and Regulations |

## LEASE AGREEMENT

**THIS LEASE AGREEMENT** (this "Lease"), dated as of the _____ day of
_____, 2007 ("Effective Date"), by and between **ARBORETUM OF SOUTH
BARRINGTON, LLC,** a Delaware limited liability company ("Landlord") with an office at 400
Skokie Boulevard, Suite 405, Northbrook, Illinois 60062, and **CIRCUIT CITY STORES, INC.**
("Tenant") with an office at 9950 Mayland Drive, Richmond, Virginia 23233.

## W I T N E S S E T H:

In consideration of the rents and covenants set forth in this Lease, Landlord hereby leases
to Tenant, and Tenant hereby leases from Landlord, the Premises (as defined in Section 1.01(Q))
upon the following terms and conditions:

## ARTICLE I

## FUNDAMENTAL LEASE PROVISIONS

SECTION 1.01    Definitions:

A.    **Additional Charges:**

1.    Initial CAM Costs:  Three and 75/100 Dollars ($3.75) per square foot of Floor
Area (as defined below), which includes the initial insurance cost of Twenty-Five
Cents ($0.25) per square foot of Floor Area (the "Initial Insurance Cost").

2.    Initial Taxes: Estimated to be Eight and 50/100 Dollars ($8.50) per square foot of
Floor Area.

B.    **Alternative Rent:**  An amount equal to fifty percent (50%) of the Annual Minimum Rent
(as defined below) plus one hundred percent (100%) of the Additional Charges that
would have otherwise been due during the period of time that Tenant is entitled to pay
Alternative Rent.

C.    **Annual Minimum Rent** (subject to adjustment pursuant to Section 2.09):

| Period | Rent p.s.f. | Annual Rent | Monthly Installments |
|---|---|---|---|
| Initial Lease Term: | | | |
| Commencement Date through end of fifth (5th) Lease Year (as defined in Section 1.01(K)) | $19.00 | $397,860.00 | $33,155.00 |
| Commencement of sixth (6th) Lease Year through end of tenth (10th) Lease Year | $20.00 | $418,800.00 | $34,900.00 |

| | | | |
|---|---|---|---|
| 1st Extension Period (as defined in Section 1.01(F)): | $21.00 | $439,740.00 | $36,645.00 |
| 2nd Extension Period: | $22.00 | $460,680.00 | $38,390.00 |
| 3rd Extension Period: | $23.00 | $481,620.00 | $40,135.00 |
| 4th Extension Period: | $23.00 | $481,620.00 | $40,135.00 |

D.  **Broker:** Collectively, Great Street Realty Partners, LLC ("GSRP") and Metro Commercial Real Estate, Inc. ("Metro").

E.  **Delivery Dates:**   1.   Anticipated Possession Date: March 1, 2008.

2.   Outside Possession Date: September 1, 2008.

F.  **Extension Periods:** Four (4) periods of five (5) years each.

G.  **Floor Area:**   The actual number of square feet of space contained on all floors within any building area in a particular leased premises (including the Premises) within the Shopping Center (as defined below), or in the Shopping Center, as applicable, and, with respect to exterior areas, including all enclosed exterior areas leased to or exclusively used by one (1) or more tenants (other than loading dock areas, trash compactor areas, sidewalk sales areas and trash container areas).   All measurements shall be from the exterior of outside walls or store front and/or to the centerline of any common walls, but in no event shall Floor Area include any non-selling or storage space areas within any mezzanine, lower floor, second floor or, except as set forth above, any exterior areas.

H.  **Initial Lease Term:** Ten (10) Lease Years, plus the partial Lease Year commencing on the Commencement Date and ending on the January 31 immediately thereafter.

I.  **Key Tenants:** LL Bean, Gold Class Cinema, Arhaus, XSports Fitness or other full service health club, DSW, Chico's, Coldwater Creek, Ann Taylor Loft, Talbot's, Victoria's Secret, White House/Black Market, Limited Too, Bath & Body Works, Swoozie's, Jos. A. Banks, Sur La Table, Champps Americana, Biaggi's, Daily Grill, Brio Tuscan Grille, PF Chang's or Ruth's Chris Steakhouse, or suitable replacement tenants typically found in lifestyle centers in the Chicago market.

J.  **Land:** The land on which the Shopping Center is or will be situated.

K.  **Lease Year:** Each period within the Term (as defined below) commencing on February 1 and ending the next succeeding January 31, except that Lease Year 1 shall include the partial Lease Year commencing on the Commencement Date and ending on the January 31 immediately thereafter.

L.  **Intentionally Omitted.**

CH3 1111236.2 / 39769-000031
889821-8 11028.0008000

Tenant shall use good faith efforts to cause its officers, agents, employees, contractors, licensees and concessionaires to park their cars in such areas as the Landlord designates on prior written notice to Tenant, provided, however, that any such area designated by Landlord shall be sufficient to accommodate such parties parking needs, and in reasonable proximity to the Premises.

(c)     Tenant shall have (i) the exclusive right to use, on a "24 hour a day", "365 days a year" basis and without any additional charge, the loading facilities serving the Premises, trash compactor area and transformer pad area, and (ii) the non-exclusive right to use, on a "24 hour a day", "365 days a year" basis, and without any additional charge, the customer pick-up area, car stereo parking areas, four (4) web order customer pick-up parking spaces (collectively, the "Other Improvements"), all as shown on the Site Plan. Tenant shall have the right to erect a sign identifying Tenant's customer pick-up area and/or Tenant's car stereo parking areas. Tenant shall also have the right to erect signage, stripe, and print on the four (4) web order customer pick-up parking spaces in order to so identify such parking spaces. In addition, Tenant shall have the right to have a truck or other vehicle parked in "Tenant's Preferred Area" (as shown on the Site Plan, the "Tenant's Preferred Area") in the location designated "Vehicle Promotion Area" on the Site Plan, for up to five (5) consecutive days in duration for each occurrence, for the purpose of promoting and displaying merchandise (each occurrence up to five [5] days in duration is referred to as a "Tenant Promotion"). Tenant may have up to six (6) Tenant Promotions during Lease Year 1, and up to five (5) Tenant Promotions for each subsequent Lease Year; provided, however, that in no event shall Tenant conduct any Tenant Promotions between October 1 and January 1.   The rights of Tenant set forth in this Section 2.01(c) shall be subject to applicable Laws, including, without limitation, any restrictions imposed by the Village of South Barrington (the "City").

SECTION 2.02   Extension Periods.   Provided Tenant is not then in default of any material terms or provisions this Lease after the lapse of all applicable grace periods, Tenant shall have the option to extend the Term for the number of Extension Periods shown in Section 1.01(F), upon all the terms and conditions contained in this Lease. Each such option is exercisable by Tenant giving notice to Landlord (a) at least two hundred ten (210) days prior to the expiration of the Initial Lease Term, or of the preceding Extension Period, as the case may be, or (b) if Tenant fails to give Landlord such notice, then within twenty (20) days after receipt of notice from Landlord that Tenant has failed to exercise its option to extend within the time period provided in (a) above.

SECTION 2.03   Commencement   Date   and   Landlord   Reimbursement. "Commencement Date" shall mean the earlier to occur of (i) one hundred eighty (180) days after the Possession Date, subject to delays due to Force Majeure (as defined in Section 23.12 below), or (ii) the date Tenant opens for business to the general public; provided, however, that if Landlord fails to (y) provide permanent power to the Premises within ninety (90) days after the Possession Date in accordance with the Site Design Requirements, or (z) complete Landlord's Work (as hereinafter defined) and satisfy all other conditions necessary for Tenant to obtain a certificate of occupancy for the Premises (subject only to the performance of Tenant's Work) prior to the one hundred eightieth (180th) day after the Possession Date, then the aforesaid one hundred eighty (180) day period described in item (i) above shall be extended one (1) day for each such day of delay by Landlord.   "Landlord Reimbursement" shall mean the product

5

obtained by multiplying Eighty-Five Dollars ($85.00) by the Floor Area of the Premises as determined by the Floor Area Certification (as defined below). Upon Substantial Completion and Tenant's furnishing to Landlord (a) the certificates of insurance required under Section 11.02, (b) an indemnity in the form of Exhibit M attached to this Lease with respect to mechanics' liens arising out of Tenant's construction, (c) a copy of a temporary or permanent certificate of occupancy for the Premises, and (d) a square footage building perimeter survey certified to Tenant and Landlord (the "Floor Area Certification"), Landlord shall pay to Tenant the Landlord Reimbursement. The Landlord Reimbursement shall be payable by wire transfer of funds by Landlord to Tenant's account no later than thirty (30) days after Substantial Completion and receipt of items (a), (b), (c) and (d) above. If Landlord fails to pay the Landlord Reimbursement to Tenant within such thirty (30) day period, Tenant's obligation to pay Rent (as defined in Section 4.03) shall fully abate until such time as the Landlord Reimbursement has been paid to Tenant in full. In addition to the foregoing, Tenant agrees to use commercially reasonable efforts to obtain final lien waivers from Tenant's general contractor and all subcontractors performing work in excess of Twenty-Five Thousand Dollars ($25,000.00) and deliver copies of the same to Landlord; provided, however, that obtaining such lien waivers shall not be a condition to the payment of the Landlord Reimbursement nor shall Tenant's inability to obtain such lien waivers constitute a default by Tenant under this Lease. Notwithstanding anything to the contrary contained herein, if the Commencement Date shall occur prior to the date on which the Opening Requirement is met, and Tenant elects to delay the opening of its store, then, notwithstanding that the Commencement Date shall have occurred, Rent shall fully abate until the date on which the Opening Requirement is met. However, if Tenant elects, at its discretion, to open for business prior to the date that the Opening Requirement is met, then Tenant shall pay, in lieu of Annual Minimum Rent, Alternative Rent until the date on which the Opening Requirement is met. In no event shall Tenant's election to delay opening its store in any way delay or modify the date on which the Landlord Reimbursement is required to be paid by Landlord to Tenant. Upon Substantial Completion and payment of the Landlord Reimbursement from Landlord to Tenant, Landlord shall be the owner of the Building (as defined in the Site Design Requirements, but not including any of Tenant's Property, as defined in Section 16.01) and Landlord shall be entitled to depreciate the Building for tax purposes. Tenant shall have the right to deliver to Landlord, a bill of sale evidencing the conveyance of the Building from Tenant to Landlord. Landlord shall also have the right to require Tenant to deliver to Landlord such a bill of sale. However, the conveyance of the Building shall be deemed to have occurred notwithstanding that a bill of sale was not so delivered.

SECTION 2.04    Possession Date. "Possession Date" shall mean the date on which the last of the following conditions shall have been satisfied:

(a)    Landlord shall have caused the Delivery of the Land (as defined in the Site Design Requirements) to occur;

(b)    Landlord shall have delivered the soils engineer's and surveyor's certifications as required by Circuit City's Specifications (as defined in the Site Design Requirements);

(c)    Intentionally Omitted;

6

(d)        Intentionally Omitted;

(e)        The representations and warranties of Landlord set forth in Sections 9.03 and 20.02 below shall then be true and in effect in all material respects, and Landlord shall not then be in violation of any of the Site Covenants (as defined in Section 20.03);

(f)        Landlord shall have delivered to Tenant a fully-executed original counterpart of a non-disturbance and/or recognition agreement, as applicable, from each Mortgagee and Ground Lessor (as such terms are defined in Section 19.01), as more fully set forth in Section 19.02;

(g)        Landlord shall have entered into valid, unconditional leases with at least eight (8) of the Key Tenants or suitable replacements thereof (as described in Section 8.06 below) for the operation of their typical retail stores, and shall have provided satisfactory evidence of the same to Tenant; and

(h)        Landlord shall have delivered to Tenant the W-9 form attached hereto as Exhibit D.

Landlord currently anticipates that the Possession Date will occur on the Anticipated Possession Date, subject to the provisions of Section 2.05 below.  In no event shall the Possession Date occur prior to the Expected Possession Date (as defined in Section 2.05).

SECTION 2.05    Expected Possession Date.

(a)        Landlord shall give Tenant no less than one hundred twenty (120) days notice of the date on which the Possession Date (including, without limitation, the Delivery of the Land) shall occur, using the form of Possession Date Notice attached hereto as Exhibit C-1 (the "Possession Date Notice").  The date specified in such notice shall be defined as the "Expected Possession Date".

(b)        If Landlord fails to accomplish the Possession Date by the Expected Possession Date (subject to Force Majeure, as defined in Section 23.12, but in no event shall the aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed a period of thirty (30) days, and to any "Tenant Delay" (as hereinafter defined)), then Landlord shall pay to Tenant on demand, as a liquidated reimbursement (and not as a penalty) for all of the damages that Tenant will suffer as a result of any such delay, an amount equal to the sum of: (i) Tenant's actual costs and expenses (such delay, not to exceed Thirty-Five Thousand Dollars ($35,000), plus (ii) an amount equal to two (2) days of Annual Minimum Rent for each day that the Possession Date is delayed.  If Landlord fails to complete any other element of Landlord's Work (as defined in Section 3.01) on or before the date required therefor in the Construction Schedule (as defined in the Site Design Requirements), subject to Force Majeure and Tenant Delay (but in no event shall the aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed a period of thirty (30) days), then Landlord shall pay to Tenant on demand, as a liquidated reimbursement (and not as a penalty) for all of the damages that Tenant will suffer as a result of any such delay, an amount equal to two (2) days of Annual Minimum Rent for each day that such component of Landlord's Work is delayed.  The foregoing liquidated reimbursements represent the parties' good faith agreement as to an agreed upon amount which

7

shall have been incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment. "Tenant Delay" shall mean any delay in the completion of the Landlord's Work or in Landlord's failure to accomplish the Possession Date by the Expected Possession Date resulting from any act or failure to act by Tenant, Tenant's employees, agents, architects, independent contractors, consultants and/or any other person performing or required to perform services on behalf of Tenant that actually causes a net delay in the completion of Landlord's Work or in Landlord's Delivery of the Land by the Expected Possession Date, provided Landlord shall have notified Tenant in writing of such act or omission promptly after its occurrence or failure to occur.

SECTION 2.06    Possession Date During Slack Delivery Period. Anything contained in this Lease to the contrary notwithstanding, if the Possession Date occurs during the Slack Delivery Period, then unless the reason for the delay is solely attributable to Tenant Delay, Tenant may refuse to accept the Premises, whereupon the liquidated reimbursement/damages referenced in Section 2.05(b) above shall immediately cease accruing. If the Possession Date occurs during the Slack Delivery Period and Tenant refuses to accept the Premises, the Possession Date shall be delayed and shall not be deemed to occur until the first (1st) day following the end of the applicable Slack Delivery Period, subject to the other provisions of this Lease (including, without limitation, Sections 2.04 and 2.05).

SECTION 2.07    Delayed Possession. If the Possession Date does not occur before the Outside Possession Date (subject to Force Majeure, but in no event shall the aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed a period of thirty (30) days), then Tenant shall have the right to (a) terminate this Lease, or (b) delay opening its store facility for a period of not to exceed six (6) months, which right shall be exercised by Tenant upon notice to Landlord at any time prior to the Possession Date. If Tenant terminates this Lease, then there shall be no further liability on the part of Landlord or Tenant, except: (i) for those obligations that expressly survive the expiration or other termination of this Lease, and (ii) Landlord shall (which obligation shall survive the termination of this Lease), within three (3) business days following Tenant's termination notice, reimburse Tenant for all its reasonable third-party costs and expenses incurred in connection with this Lease (including, without limitation, costs associated with the preparation and review of plans and specifications, and attorneys' fees), not to exceed Fifty Thousand Dollars ($50,000), which shall be Tenant's sole right and remedy.

SECTION 2.08    Early Entry. Any time prior to the Delivery of the Land, Tenant shall have the right to enter the Premises to (a) inspect the physical condition of the Land and conduct its due diligence investigation of the Land to determine the suitability of the Land for Tenant's intended development, construction, use and operation and (b) inspect Landlord's Work; provided, however, that such (x) entry may not unreasonably interfere with Landlord's Work, and (y) Tenant shall indemnify, defend and hold harmless Landlord from and against all losses, claims and damages resulting from such early entry. Such entry shall not be construed as an acceptance of the Premises by Tenant under the provisions of this Lease or as a waiver of any of the provisions hereof.

SECTION 2.09    Measurement. If the Floor Area Certification shall disclose that the Premises contains more or less than the Floor Area shown in Section 1.01(Q), then Landlord and

8

Tenant agree to amend this Lease to adjust all Rent and the Landlord Reimbursement figure to account for the actual Floor Area of the Premises.

SECTION 2.10    Commencement Date Agreement.    When the Commencement Date has been determined, Landlord and Tenant shall execute a memorandum, in the form of Exhibit E, which shall expressly confirm the Commencement Date and the expiration date of the Initial Lease Term, and which shall also ratify and affirm all of the terms and provisions of this Lease. The failure of the parties, however, to execute said statement shall not affect the validity of this Lease, nor shall it affect the Commencement Date.

SECTION 2.11    Intentionally Omitted.

SECTION 2.12    Tenant's Permits Contingency.

(a)    Anything contained in this Lease to the contrary notwithstanding, if the Permit Condition (as defined below) is not satisfied on or before March 1, 2008 (the "Permit Contingency Date"), then Tenant shall have the right (at its option) to terminate this Lease at any time thereafter and prior to the satisfaction of the Permit Condition. Tenant agrees to use diligent efforts to satisfy the Permit Condition by the Permit Contingency Date; provided, however, the foregoing shall not be deemed to require Tenant to initiate litigation or agree to any condition imposed upon the issuance of any Tenant's Permits (as defined below). "Permit Condition" shall mean the final and unconditional issuance of Tenant's Permits free and clear of any governmental ban, bar or moratorium and with all appeal periods having expired. "Tenant's Permits" shall mean any and all permits, approvals, licenses and the like necessary to perform Tenant's Work. Tenant's rights under this Section 2.12 are conditioned upon Tenant's submission to Landlord, on or before November 1, 2007, of a complete set of plans for construction of the Premises consistent with the Site Design Requirements. Tenant shall submit a complete set of plans for the construction of the Premises to the City within five (5) business days after receipt of notice of Landlord's approval of such plans. Notwithstanding anything to the contrary contained herein, if the Possession Date occurs prior to the Permit Contingency Date, then Tenant may refuse to accept the Premises. In that event, the Possession Date shall be delayed and shall not be deemed to occur until the Permit Condition is satisfied, subject to Tenant's right to terminate this Lease prior to the satisfaction of the Permit Condition set forth above and Landlord's right to terminate this Lease set forth in Section 2.12(b) below.

(b)    If the Permit Condition has not been satisfied within sixty (60) days after the Permit Contingency Date for any reason other than Landlord's failure to perform or observe any of its obligations under this Lease, then Landlord shall have the option, upon notice given to Tenant prior to the satisfaction of the Permit Condition, to terminate this Lease, provided, however, Tenant shall have the right to void Landlord's termination notice by giving notice to Landlord, within fifteen (15) days after receiving Landlord's termination notice, of Tenant's waiver of its rights under Section 2.12, whereupon Landlord's termination notice shall be rendered null and void.

(c)    If Tenant or Landlord terminates this Lease under this Section 2.12, then there shall be no further liability on the part of Landlord or Tenant, except for those obligations that expressly survive the expiration or other termination of this Lease.

9

## ARTICLE III

### INITIAL CONSTRUCTION

SECTION 3.01    Landlord's and Tenant's Work.  Landlord shall perform Landlord's work in accordance with the Site Design Requirements and as otherwise required by this Lease ("Landlord's Work").  Tenant shall construct the Building and storefront sidewalk in accordance with the Site Design Requirements ("Tenant's Work") for which Landlord shall pay to Tenant the Landlord Reimbursement.  Landlord and Tenant acknowledge receipt of the Site Design Requirements and each agrees to comply with the provisions thereof relating to their respective work.  In connection with Tenant's performance of Tenant's Work and during any other periods of construction during the Term, Tenant shall have the right to use as a construction staging area approximately 20,000 square feet of the Common Areas in the location identified on the Site Plan as "Staging Area."  Prior to the commencement of Tenant's Work, Landlord may relocate the Staging Area at Landlord's cost and expense, upon reasonable prior written notice to Tenant, provided such new area is in reasonable proximity to the Premises.

SECTION 3.02    Premises.  Tenant acknowledges that the Shopping Center may be developed in two (2) phases.  Tenant acknowledges that Phase II may not be developed at the same time as Phase I, which contains the Premises.

## ARTICLE IV

### RENT

SECTION 4.01    Annual Minimum Rent.  Commencing on the Commencement Date, Tenant shall pay to Landlord monthly installments of Annual Minimum Rent without notice, demand, setoff or deductions, except as otherwise provided for in this Lease, on the first (1st) day of each calendar month during the Term.  However, if the Commencement Date occurs on a day other than the first (1st) day of a calendar month, then the monthly installment of Annual Minimum Rent and other charges shall be prorated for the remaining days of that calendar month.  Anything contained in this Lease to the contrary notwithstanding, if Tenant shall be paying Alternative Rent, Ground Rent (as defined in Section 18.02(a)) or any other ground rent in lieu of Annual Minimum Rent as permitted under this Lease during such time as Tenant shall be entitled to an abatement of, deduction from or setoff against Annual Minimum Rent, then Tenant shall be entitled to the same abatement of, deduction from or setoff against Alternative Rent, Ground Rent or the other ground rent.

SECTION 4.02    Additional Rent.  The term "Additional Rent" shall mean all amounts required to be paid by Tenant under this Lease other than Annual Minimum Rent.  Wherever an item of Additional Rent is payable "on demand" or no time period for payment of an item of Additional Rent is specifically provided for in this Lease, such item of Additional Rent shall be paid by Tenant within thirty (30) days after Tenant's receipt of Landlord's invoice therefor, accompanied by the appropriate back-up documentation.

SECTION 4.03    Rent; Method of Payment.  The term "Rent" shall mean, collectively, Annual Minimum Rent and Additional Rent.  All payments of Rent shall be made by check

CH3 1111236.2 / 39769-000031
889821-8  11028.0008000

payable to Landlord, mailed or delivered to the address listed in Section 22.01 or to such other person or place as Landlord shall designate by notice to Tenant, or by such other reasonable method of payment (such as by wire transfer). In the event Tenant fails to pay to Landlord (more than once in any twelve (12) month period) any installment of Rent which is due and payable, by the fifth (5th) business day of the month in which such amounts shall be due and owing, such unpaid amounts shall bear interest thereafter at the "Default Rate" (as hereinafter defined) until paid by Tenant.

## ARTICLE V

## COMMON AREA MAINTENANCE AND COST

SECTION 5.01    <u>Maintenance</u>.  Landlord shall operate, maintain, insure, repair and replace the Common Areas or cause the same to be done in a manner so as to maintain the Shopping Center in good, first-class order, repair and condition. Without limiting the generality of the foregoing, Landlord shall be solely responsible, and Tenant shall have no obligation (except to reimburse Landlord for Tenant's Share of the cost thereof, as provided below), for the maintenance, repair or replacement of the parking areas (including, without limitation, any necessary repaving and restriping), parking lot lighting, utility systems and connections, access ways and other Common Areas and for the clearing of snow and ice from the Common Areas. Landlord may at any time, except between October 1 and January 1, close temporarily any Common Areas to make repairs, to prevent the acquisition of public rights therein or discourage non-customer parking. Between October 1 and January 1, Landlord may temporarily close parts of the Common Areas, but only to make repairs of an emergency nature, or during initial Shopping Center construction (which shall be deemed to include both Phase I and Phase II); <u>provided, however</u>, that during such initial Shopping Center construction Landlord shall not close any portion of Tenant's Preferred Area or the No-Change Area (as hereinafter defined) after Tenant has opened for business. In any instance of emergency repairs Landlord shall use all reasonable efforts to perform the necessary repairs in the most expeditious manner possible and in such a way and at such times as to cause the least interference possible with ingress and egress to and from the Premises. In order to reduce interference with Tenant's business operation during such period, Landlord shall effect temporary repairs, where feasible, and complete the permanent repairs after January 1.

Landlord reserves the right to expand, reduce, reconfigure or modify the Shopping Center and the Common Areas, change the uses thereof, and to designate portions of the Common Areas as areas for the exclusive use of one or more occupants or one or more uses, and may do such other acts in and to the Common Areas as in its judgment may be desirable to improve the convenience thereof to all tenants in the Shopping Center; <u>provided, however</u>, in making any such changes to the Shopping Center and/or Common Areas, Landlord agrees (i) all such changes shall be at Landlord's sole cost and expense, and shall not be included in CAM Costs, (ii) the cost to operate, maintain, insure, repair or replace any areas designated for the exclusive use of one or more occupants or one or more users shall be excluded from CAM Costs, (iii) any such changes shall not be within Tenant's Preferred Area, the No-Build Area, or the No-Change Area designated on the Site Plan, (iv) any such changes shall not adversely affect the access and visibility of the Premises, and (v) any such changes shall not reduce the Floor Area of the Shopping Center below three hundred fifty thousand (350,000) square feet. Except

11

as otherwise specifically contemplated herein, Tenant agrees to keep the Common Areas free and clear of any obstructions created or permitted by Tenant or resulting from Tenant's operation and to use the Common Areas only for normal activities: parking, shopping cart storage, Tenant Promotions, and ingress and egress by Tenant and its employees, agents, representatives, licensees and invitees to and from the Premises and Shopping Center.

SECTION 5.02    Construction Clean-up and Post-Possession Work.    Any construction by Landlord or other tenants or occupants of the Shopping Center affecting any portion of the Shopping Center in reasonable proximity to the Premises shall be subject to the following terms and conditions (in addition if any other applicable provisions of this Lease, such as, by way of example only, Section 20.03(g)):

(a)    staging and storage of materials and parking of construction vehicles shall not occur in Tenant's Preferred Area from and after Tenant's opening for business to the public;

(b)    Landlord shall diligently ensure that, from and after Tenant's opening for business to the public, any ingress, egress or passage of any construction, delivery and related vehicles engaged in the performance of such work or other construction activities shall enter/exit the Shopping Center via the entrance/exit designated "Construction Drive" on the Site Plan and shall not utilize the driveway in front of the Premises designated "Construction Drive (Restricted per B4 of the SDR)" on the Site Plan;

(c)    Landlord shall maintain the Shopping Center in a clean, safe, and sightly condition, and shall use reasonable efforts to ensure that such construction shall not materially adversely interfere with the normal conduct of any business operations in the Premises; and

(d)    From and after the Possession Date Landlord shall clear all rubble and debris from the Premises and Common Areas resulting from any construction by Landlord or any other tenant or occupant of the Shopping Center.

SECTION 5.03    CAM Costs.    "CAM Costs" shall mean the actual amount (without profit or "mark up" by Landlord or any Affiliate, as defined in Section 11.07, of Landlord) of all necessary, competitive and reasonable costs and expenses actually incurred by Landlord in operating, insuring and maintaining the Common Areas in an appropriate manner commensurate with good business practice and first-class shopping centers, and, in addition thereto, in lieu of any cost(s) or expense(s) relating to the administration and management of the Common Areas, an administrative fee (the "Administrative Fee") equal to five percent (5%) of the CAM Costs for the calendar year in question, but excluding from the computation of such Administrative Fee the cost of any replacement or improvement of a capital nature (to the extent otherwise permitted to be included in CAM Costs), the cost of electricity and other utilities, and the cost of insurance premiums. In no event will CAM Costs include: (a) real estate taxes, (b) any costs associated with maintenance performed by another tenant or occupant of the Shopping Center on portions of the Common Areas separately maintained by such tenant or occupant; (c) any dues or charges for a merchants' or other association of occupants of the Shopping Center; (d) maintenance, repairs or replacements to the Common Areas (i) necessitated by the negligent or wrongful act of Landlord or any tenant or occupant, (ii) made to correct any construction defect, or (iii) relating to any improvements or utility systems not within the Common Areas

12

(e.g. roofs, exterior walls, fire protection systems); (e) repairs or replacements necessitated by any governmental entity or made to correct any condition in existence prior to the Commencement Date, or to correct damage caused by subsidence or adverse or substandard soil conditions; (f) amounts actually reimbursed from insurance proceeds, under warranty, or by any tenant or occupant of the Shopping Center or any other third party other than pursuant to a Common Area expense provision similar to this Section 5.03; (g) premiums for insurance for coverage maintained by Landlord with respect to the Shopping Center (except that premiums for Common Areas liability insurance may be included as part of CAM Costs provided the coverage provided by such liability insurance policy is not in excess of the limits established in Section 11.01), any costs resulting from insurance deductibles under any insurance policy maintained by Landlord, any costs which would have been reimbursed or paid for by insurance proceeds had Landlord maintained the insurance required under Section 11.01, and the amount of any judgment or other charge entered, or costs assessed against, Landlord in excess of the policy limits of the insurance maintained by Landlord under Section 11.01; (h) the cost of any replacements or capital improvements to the Common Areas, except that the cost of repaving the parking areas of the Shopping Center may be included within CAM Costs so long as such cost is otherwise permitted to be included within CAM Costs and is amortized on a straight-line basis over the useful life thereof under generally accepted accounting principles consistently applied, and is not incurred (i) prior to the expiration of the tenth (10th) full calendar year of the Term, or (ii) more than once during each ten (10) full calendar years of the Term; (i) reserves for anticipated future expenses; (j) interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner; (k) Landlord's personnel above the grade of Shopping Center manager (provided any personnel below such grade shall be limited to those persons dedicated solely to the Shopping Center but if such persons work in other shopping centers owned by Landlord then their time shall be equitably allocated), overhead, home office or administrative expenses, except for the Administrative Fee; (l) amounts incurred to remediate any Hazardous Materials (as defined in Section 9.03(a)); (m) any new improvements to the Shopping Center or Common Areas including, but not limited to, renovations to the facade of the Shopping Center and improvements to landscaped areas of the Shopping Center; (n) holiday or other decorations or other promotional expenses relating to the Shopping Center; or (o) any fees, costs or expenses not related to the operation, maintenance, insurance or repair of the Common Areas. Further, Landlord shall exclude from CAM Costs all costs or expenses in connection with any repairs or replacements to the Common Areas from the Commencement Date through the first (1st) anniversary date of the Commencement Date to the extent the cost of the same is covered by a warranty or insurance. Landlord shall also make an appropriate adjustment for the increase in CAM Costs attributable to tenants or occupants of the Shopping Center, including Tenant, operating between the hours of 10 p.m. and 9 a.m.

SECTION 5.04   Tenant's Share of CAM Costs. Tenant shall pay to Landlord Tenant's Share of CAM Costs in each calendar year during the Term. Tenant's Share of CAM Costs shall be appropriately prorated for partial calendar years at the beginning and at the end of the Term. Notwithstanding anything contained in this Lease to the contrary, in no event shall Tenant's Share of CAM Costs in the first (1st) full calendar year of the Term (including the prior partial year, if any) exceed the Initial CAM Costs.

SECTION 5.05   Payment of CAM Costs. Tenant's Share of CAM Costs shall be payable in equal monthly installments on the first (1st) day of each month. Such monthly

13

installments shall be at the rate of one-twelfth (1/12th) of Tenant's Share of CAM Costs for the preceding calendar year, subject to prompt adjustment when the actual amount of CAM Costs or a change in Tenant's Share thereof is determined.  Within one hundred twenty (120) days after the end of each calendar year, Landlord shall furnish Tenant with a detailed statement certified by an authorized representative of Landlord of the actual amount of CAM Costs and of Tenant's Share thereof for the preceding calendar year (including the basis of allocation to Tenant), but failure to render such statement shall not relieve Tenant of its obligation to pay CAM Costs. Within thirty (30) days after receipt of such statement by Tenant, Tenant shall pay to Landlord any deficiency due.  Any surplus paid by Tenant shall be credited against the next installment(s) of Rent or be refunded to Tenant forthwith.  Landlord's records of CAM Costs for each year shall be available for inspection by Tenant for a period of two (2) years after Landlord notifies Tenant of Tenant's Share of CAM Costs for the year in question.  Tenant may, during such two (2) year period, upon thirty (30) days' prior notice to Landlord, subject to the terms and conditions below, have an audit made of CAM Costs and the allocations thereof to Tenant including, without limitation, reviewing copies of paid bills and other records substantiating such expenditures ("CAM Records").  In addition, Landlord agrees to forward copies of CAM Records to Tenant or its representative within ten (10) days of a request therefor.  Any overcharges shown by any such audit shall, at Tenant's option, be credited against the next installment(s) of Rent or be refunded to Tenant forthwith.

Tenant shall conduct its audit upon at least thirty (30) days' prior written notice to Landlord, within sixty (60) days following Tenant's notice of intent to audit.  Except as set forth below, the audit shall be conducted by Tenant at its sole cost and expense at Landlord's designated offices.  Tenant and its auditors shall hold the information disclosed in strict confidence.  If any such audit accurately discloses that the CAM Costs (and therefore Tenant's Share thereof) were overstated by Landlord, Landlord shall promptly refund or credit to Tenant any such excess, and if it is determined that Tenant has overpaid its share of CAM Costs by more than five percent (5%), then Landlord shall also pay the reasonable and actual costs of Tenant's audit.  This provision shall not, however, be deemed to give Tenant the right to offset or deduct or withhold payment of Tenant's Share of CAM Costs or any other item of Rent, unless Landlord shall fail to promptly reimburse Tenant for any amounts required herein, after advance written notice to Landlord.  If Tenant's auditors conclude that Tenant was overbilled for CAM Costs and expenses, such determination shall be promptly made known to Landlord, and Landlord shall have the right within sixty (60) days thereafter to have its auditors review Tenant's auditor's conclusions.  In the event Landlord's auditors disagree with Tenant's auditors, the parties shall select a third auditor reasonably acceptable to both parties within ten (10) days of Landlord's notice of disagreement, who shall review the positions of Landlord and Tenant and render a final and binding decision within fifteen (15) days of receipt of each party's position.  The cost for such third party auditor shall be shared equally by Landlord and Tenant.  Any audit performed by Tenant may not be compensated on a contingency basis.  Tenant acknowledges and agrees that neither Tenant nor Tenant's lease auditor shall have the right to review any income tax returns of Landlord or leases of other tenants in the Shopping Center.

SECTION 5.06    CAM Costs Increases.  Notwithstanding anything contained in this Lease to the contrary, for all calendar years subsequent to the first (1st) full calendar year of the Term, in no event shall Tenant's Share of CAM Costs increase, from any calendar year to the immediately succeeding calendar year, by more than five percent (5%), excluding from such

14

calculation, the costs of snow removal, security, insurance and utility increases for the calendar years in question.

## ARTICLE VI

## TAXES

SECTION 6.01    <u>Taxes</u>.    Landlord shall pay when due all real estate taxes and assessments, ad valorem taxes, rates and levies and other governmental charges levied and assessed against the land, improvements and buildings comprising the Shopping Center. Except as hereinafter provided to the contrary, for each calendar year or part thereof during the Term, Tenant shall pay Tenant's Share of the net amount (after reflecting all discounts for early payment, refunds and credits and after excluding all penalties, interest, late charges and real estate taxes and assessments levied against free-standing buildings which are separately assessed) of all real estate taxes and assessments (collectively, "<u>Taxes</u>") levied and assessed against the land, improvements and buildings comprising the Shopping Center.

SECTION 6.02    <u>Payment of Taxes</u>.    Tenant shall be liable for and shall pay Tenant's Share of Taxes only with respect to Taxes payable during the Term, on a cash basis. Tenant's Share of Taxes shall be appropriately prorated for partial fiscal tax years at the beginning and at the end of the Term. Tenant shall pay Tenant's Share of Taxes (a) within thirty (30) days after Landlord submits to Tenant proof of payment of Taxes by Landlord, a tax bill for such Taxes and a statement setting forth the manner in which Tenant's Share of Taxes is calculated, or (b) thirty (30) days before the same are due and payable, whichever is later. Without limiting the generality of the foregoing, if any portion of Taxes are paid in installments, including estimates to Landlord's Mortgagee as hereinafter provided, then Tenant shall pay Landlord Tenant's Share in the same installments and estimated payments. In furtherance of the foregoing, in the event that the Mortgagee shall require Landlord to escrow monthly payments for Taxes, then, so long as such escrow shall be so required and all other tenants of the Shopping Center are similarly required to make monthly payments with respect to Taxes, Tenant shall, in lieu of making payments pursuant to the foregoing provisions of this Section 6.02, pay Landlord monthly with each installment of Annual Minimum Rent an amount equal to one-twelfth (1/12) of Tenant's Share of Landlord's (or the Mortgagee's) good faith estimate of such Taxes for the then applicable fiscal tax year(s) only. Such payments shall be held in trust to be applied towards payment of the Taxes when the same shall become due. Within thirty (30) days following the issuance by the taxing authority of the bill covering the applicable fiscal tax year, Landlord shall provide to Tenant a statement, in detail reasonably satisfactory to Tenant, of the Taxes and Tenant's Share thereof for such year (the "<u>Tax Reconciliation Statement</u>"). The Tax Reconciliation Statement shall be certified by Landlord as being accurate and shall be accompanied by (i) copies of the applicable tax bills, (ii) a calculation of Tenant's Share of Taxes, and (iii) payment to Tenant in the amount of any overpayment made by Tenant in respect of the applicable fiscal tax year. If Tenant's Share of the actual Taxes for a fiscal tax year shall exceed the aggregate monthly installments paid by Tenant in respect of said fiscal tax year, then Tenant shall pay to Landlord the deficiency within thirty (30) days after receipt of such notice.

SECTION 6.03    <u>Exclusions from Taxes</u>.    Notwithstanding anything contained in this Lease to the contrary with respect to betterments or other extraordinary or special assessments,

15

Tenant's obligations shall apply only to the extent such assessments (and interest thereon) are payable in respect of the Term, and Tenant's Share of any such assessments shall be determined as if such assessments are payable in installments over the longest payment period permitted by law for the particular assessment, in which case Tenant shall pay only those installments payable in respect of the Term.  Landlord represents to Tenant that, as of the Effective Date and, to the best of Landlord's knowledge, as of the Possession Date, no portion of the Shopping Center is or will be (a) subject to or the beneficiary of an abatement, exemption and/or phase-in of Taxes, (b) subject to any special assessments or similar charges, or (c) included in any special improvement district(s) which would result in higher sales taxes or other similar impositions than would exist in the absence of such district(s).  Further, Taxes shall not include any: (i) income, excise, profits, estate, inheritance, succession, gift, transfer, franchise, capital, or other tax or assessment upon Landlord or upon the rentals payable under this Lease; (ii) taxes on rents (unless the present system of ad valorem taxation of real property shall be changed so that in lieu of ad valorem taxes there shall be assessed on Landlord a capital levy or other tax on the rents received with respect to the Shopping Center, then any such taxes shall be deemed to be included in Taxes, provided such taxes are paid by all tenants in the Shopping Center), gross receipts or revenues of Landlord from the Premises; (iii) fine, penalty, cost or interest for any tax or assessment, or part thereof, which Landlord or its lender failed to timely pay, unless such late payment was solely attributable to late payment by Tenant of Tenant's Share of Taxes; (iv) assessment for a public improvement arising from the initial construction or expansion of the Shopping Center or the Premises; or (v) fees imposed upon Landlord in connection with Landlord's development of the Shopping Center (including, without limitation, trip generation fees).  All Taxes payable by Tenant pursuant to this Article VI shall be determined as if the Shopping Center was the only property owned by Landlord.

SECTION 6.04    Right to Contest.  At Tenant's request, Landlord shall contest the amount or validity of any assessed valuation or Taxes, failing which Tenant may contest the assessed valuation or Taxes by appropriate proceedings conducted in good faith.  If Tenant initiates such contest, then Landlord shall cooperate with Tenant including, without limitation, executing any and all documents required in connection therewith and, if required by any governmental authority having jurisdiction, joining with Tenant in the prosecution thereof.  If any rebate or refund of Taxes is received as a result of any contest or otherwise, then Tenant shall be entitled to Tenant's Share thereof (after reasonable and customary expenses incurred by Landlord and/or Tenant in connection with such contest are paid to the party which incurred such expense).  Tenant shall have the right to defer payment of Tenant's Share of Taxes during any such Tax contest if permitted under Laws (as defined in Section 10.01).  Tenant's rights under this Section 6.04 shall apply only if Tenant's request to contest Taxes is joined by at least one (1) other National Tenant or Regional Tenant (as such terms are defined in Section 8.06) occupying 25,000 square feet of Floor Area or more in the Shopping Center.

SECTION 6.05    Other Taxes.  Tenant shall pay all taxes which may be lawfully charged, assessed, or imposed upon all fixtures and equipment of Tenant of every type in the Premises, and also upon all personal property of Tenant in the Premises, and Tenant shall pay all license fees and other charges with may lawfully be imposed upon the business of Tenant conducted in the Premises.

CH3 1111236.2 / 39769-000031
889821-3  11028.0008000

## ARTICLE VII

## UTILITIES

SECTION 7.01    Utilities.  Landlord covenants and agrees that the Premises shall be properly serviced with gas, electric, telephone, water, sewer and other utilities sufficient to meet Tenant's requirements in accordance with the Site Design Requirements.  Landlord, as part of Landlord's Work, shall cause all such utilities to the Premises to be separately metered at Landlord's sole cost and expense.  Tenant shall pay, as same become due and payable, all charges for utility services furnished to the Premises during the Term.  If at any time during the Term, for any reason, Landlord shall provide utility service to the Premises, Tenant's cost for such utility service shall not exceed Landlord's actual cost for such utility service.  In addition, Tenant shall have the right to install a test meter to verify its utility usage.  Notwithstanding anything contained in this Lease to the contrary, Tenant shall be entitled to select the utility service providers to the Premises including the telecommunication provider.  Landlord shall permit full and free access to all available conduits in the Shopping Center for the applicable utility service subject to such reasonable requirements as Landlord may impose.

SECTION 7.02    Interruption.  If utilities serving the Premises are disrupted due to the negligence or willful misconduct of Landlord, its agents, contractors, servants or employees, then Landlord shall promptly restore the affected utilities at Landlord's sole cost and expense.  If such disrupted utilities are not restored within seventy-two (72) hours after the Landlord has knowledge of such disruption and Tenant was open and is consequently unable to conduct its normal business in the Premises as a result of such disruption, then Rent shall be equitably abated during the period of disruption.

## ARTICLE VIII

## USE OF PREMISES

SECTION 8.01    Permitted Use.  The Premises may be used and occupied for any Permitted Use.  However, Tenant shall not use the Premises for any of the Prohibited Uses (as defined in Exhibit F) or the Existing Exclusives (as defined in Section 8.05(a)), to the extent then applicable.

SECTION 8.02    Conduct of Operations.  Subject to the other provisions of this Lease (including, without limitation, Article II), Tenant shall initially open its store for business to the public in the Premises, fully stocked, staffed and fixtured, for at least one (1) day, not later than ninety (90) days after the later to occur of (i) the Commencement Date or (ii) the date the Opening Requirement is met.  Other than as expressly set forth in the preceding sentence, Tenant shall have no obligation to open or operate any business in the Premises, and shall have the right, at any time, to cease to conduct any business operations in the Premises, and Tenant shall incur no liability to Landlord by reason thereof.  If Tenant does not operate or cause to be operated any retail business in the Premises (other than prior to the Commencement Date or during Excused Periods, as defined below) for more than one hundred eighty (180) consecutive days, then Landlord shall have the option to terminate this Lease, which option shall be exercisable by giving written notice to Tenant by not later than the thirtieth (30th) day after the date on which

17

such one hundred eighty (180) day period expires (the "Recapture Notice"), and paying to Tenant, within thirty (30) days after such notice is given, the Unamortized Costs (as defined in Section 8.04(f), provided, however, that in no event shall the Unamortized Costs include any portion of the Landlord Reimbursement received by Tenant from Landlord) (the "Recapture Payment"). If Landlord gives the Recapture Notice, then this Lease shall terminate upon the sixtieth (60th) day (the "Recapture Date") after the date on which Tenant receives Landlord's termination notice. Upon termination of this Lease under this Section 8.02, there shall be no further liability on the part of Landlord or Tenant, except for obligations that expressly survive the expiration or sooner termination of this Lease. If Landlord fails to pay to Tenant the Recapture Payment within the thirty (30) day period provided for above and such failure to pay continues through the Recapture Date, then Tenant shall have the option of (a) treating this Lease as being terminated, in which case Landlord's obligation to pay to Tenant the Recapture Payment shall expressly survive the termination of this Lease, or (b) treating Landlord's Recapture Notice as being null and void, in which event Landlord shall be deemed to have waived Landlord's right to terminate under this Section 8.02. "Excused Period(s)" shall mean such periods during which the Premises were not open for business (i) because of alterations or renovations, damage or destruction, eminent domain proceedings or actions, Force Majeure, or any act or omission of Landlord, or its employees, agents, or contractors, or (ii) following the execution of a letter of intent for an assignment of this Lease or sublease of all or any portion of the Premises provided that the parties thereto are proceeding in good faith to enter into an assignment of this Lease or sublease and, thereafter, the assignee or sublessee proceeds with due diligence to open the Premises, or portion thereof, for business.

SECTION 8.03    Leasing Restrictions.    Landlord shall construct, lease, operate, maintain and manage the Shopping Center as a first-class shopping center comparable to other first-class shopping centers in the State. In that regard, Landlord shall not lease, rent or occupy, or permit to be leased, rented or occupied, any portion of the Shopping Center for any of the Prohibited Uses. In addition, Landlord shall not lease, rent or occupy, or permit to be leased, rented or occupied, any building within three hundred (300) feet of the front entrance of the Premises for use as a restaurant; provided, however, that (i) the foregoing restriction shall not apply to the northerly one-half of the building area designated "L" on the Site Plan (provided, however, that, except as hereinafter specifically set forth, no sit down restaurant may be located in the building area designated "L-70" on the Site Plan, however, a fast food or fast casual restaurant without full table service shall be permitted and a first class specialty breakfast restaurant with table service such as, for example, Le Peep, but specifically excluding high volume more casual restaurants such as, for example, IHOP and Waffle House, shall be permitted), (ii) one (1) restaurant containing no more than 3,000 square feet of Floor Area may be located in the southerly one-half of the building area designated "L" on the Site Plan and one (1) restaurant containing no more than 2,500 square feet of Floor Area may be located in the northerly one-half of the building area designated "K-20" on the Site Plan, and (iii) the foregoing restriction shall not be deemed to prohibit the operation of a coffee or tea shop such as those operated under the tradename "Starbucks" or "Caribou" as of the Effective Date, ice cream parlor or yogurt shop, doughnut shop, bakery, candy store or other business of similar type and size; provided, however, that no such business in southerly one-half of the building area "K-20" shall be located immediately adjacent to the Premises. In addition to the foregoing, it is specifically understood and agreed that the restriction prohibiting a restaurant within three hundred (300) feet of the front entrance of the Premises shall not apply to the building areas labeled "H-10", "N-1",

18

"J-50", "J-60" and "J-70" on the Site Plan. Upon any breach of the foregoing Section 8.03, Tenant may elect to pay Alternative Rent in lieu of Annual Minimum Rent for so long as such violation shall continue. Should Tenant pay Alternative Rent for one (1) continuous year, Tenant shall, within thirty (30) days after the expiration of said one (1) year period, elect to either return paying full Annual Minimum Rent, or terminate this Lease on thirty (30) days notice to Landlord.

SECTION 8.04    Tenant's Exclusive..

(a)    Landlord shall not lease, rent or occupy, or permit to be leased, rented, occupied, any other premises in the Shopping Center, or on any land owned or controlled by Landlord or any of its Affiliates within a one (1) mile radius of the Shopping Center, during the Term ("Affiliated Land") for the sale, rental, installation, servicing and/or repairing, either singly or in any combination, of the Products. The Incidental Sale (as defined below) of the Products in connection with the overall business of another tenant shall not be deemed a violation this Section 8.04(a). "Incidental Sale" shall mean sales in the lesser of (i) three hundred fifty (350) square feet, or (ii) ten percent (10%) of such tenant's or occupant's, or Landlord's or any of its Affiliate's, display area. The exclusive use rights granted to Tenant in this Section 8.04(a) (the "Exclusive Use Protection") shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of all or part of the Premises. If at any time following the date Tenant opens for business in the Premises to the public, Tenant ceases the sale, rental, installation, servicing and/or repairing of the Products in their entirety for more than one hundred eighty (180) consecutive days (other than during Excused Periods), then Landlord shall have the right to notify Tenant in writing that Tenant's Exclusive Use Protection shall cease unless Tenant engages in the sale, rental, installation, servicing and/or repairing of any of the Products within sixty (60) days following the date of Landlord's notice. In the event Tenant fails to engage in the sale, rental, installation, servicing and/or repairing of any of the Products within such sixty (60) day period, Tenant shall be deemed to have waived its Exclusive Use Protection from the date of expiration of such notice until Tenant again engages in the sale, rental, installation, servicing and/or repairing of any of the Products in the Premises. In the event Tenant engages in the sale, rental, installation, servicing and/or repairing of any of the Products in the Premises within such sixty (60) day period, Tenant's Exclusive Use Protection shall continue in full force and effect. If Tenant engages in the sale, rental, installation, servicing and/or repairing of any of the Products after such sixty (60) day period, Tenant's Exclusive Use Protection shall again apply, provided, however, that it shall be subject to any fully executed leases, assignments or subleases of any leases, and amendments to leases or subleases entered into by Landlord during the period Tenant's Exclusive Use Protection was not in effect, which leases, amendments to leases or subleases, assignments of leases or subleases expressly allow for a use otherwise prohibited by Tenant's Exclusive Use Protection or which do not require the Landlord's consent to any change in use.

(b)    The Exclusive Use Protection shall not apply to existing tenants of the Shopping Center or the Affiliated Land (and current or future assignees or sublessees of such tenants) occupying their respective premises pursuant to the terms and provisions of leases which have been executed prior to the Effective Date (which leases are referenced on Exhibit G). However, such existing tenants shall nevertheless be subject to the Exclusive Use Protection if: (i) any existing tenant's lease requires the consent of Landlord to any assignment or subletting or

19

to a change in the use of the applicable premises to permit the sale, rental, installation, servicing and/or repairing of the Products; or (ii) Landlord permits or agrees to an expansion of the applicable premises for the sale, rental, installation, servicing and/or repairing of the Products. With respect to the provisions of this Section 8.04 regarding Affiliated Land: (x) a Mortgagee of Landlord with respect to the Shopping Center, and any persons or entities claiming under them or acquiring fee simple title pursuant to foreclosure or deed in lieu thereof, and their successors, shall only be bound with respect to the Shopping Center and not with respect to any Affiliated Land; (y) such provisions shall only apply to any Affiliated Land owned or leased by Landlord or an Affiliate during such time as Landlord or such Affiliate owns or leases such property; and (z) the Exclusive Use Protection shall not apply to any premises within Affiliated Land that are demised pursuant to a lease existing, in full force and effect, and binding on the owner of such premises when such premises becomes Affiliated Land, or to any extensions or renewals thereof, and which does not require the landlord's consent for any change in use; provided, however, that the premises demised pursuant to such lease shall be exempted only so long as such lease remains in effect and binding on such owner.

(c)    The Exclusive Use Protection shall also not apply to: (i) a department store or discount department store (for example, Wal-Mart, K-Mart, J.C. Penney, Macy's, Kohl's or Target), or a discount club (for example, Costco, BJ's Wholesale Club, or Sam's Club); (ii) an office supply store that is a National Tenant (as hereinafter defined) (for example, Staples or OfficeMax, but specifically excluding Office Depot); (iii) a bookstore that is a National Tenant (for example, Borders or Barnes & Noble); (iv) a branded electronics specialty boutique occupying less than 5,000 square feet of Floor Area that is a National Tenant (for example, Apple Store, Sony Store, Bose Store or Sony Style); (v) a mobile phone provider, or cellular phone store (for example, TMobile, Verizon or Sprint); (vi) a supermarket (for example, Safeway or Stop & Shop); (vii) a computer superstore that is a National Tenant (for example, CompUSA or Micro Center); (viii) intentionally omitted; (ix) a game store (for example, EB Games or GameStop); (x) a video/DVD store that is a National Tenant (for example, Blockbuster Video); (xi) a movie theater or entertainment complex; or (xii) a music store that is a National Tenant (for example, Sam Goody) provided that no less than ninety percent (90%) of its Floor Area is dedicated to the sale of media content; provided, however, that, as to each of the foregoing, such stores (x) are National Tenants or, except with respect to the stores described in items (ii), (iii), (iv), (vii), (x) and (xii), Regional Tenants (as such terms are defined in Section 8.06), and (y) are operated in substantially the same manner as same are operated as of the Effective Date.  Notwithstanding anything to the contrary contained herein, in no event shall any general electronics retail store (for example, Best Buy, ABT, Tweeter, Radio Shack or HH Gregg) be permitted to operate in the Shopping Center or on any Affiliated Land.

(d)    Upon any violation of the Exclusive Use Protection, Tenant may elect to pay Alternative Rent in lieu of Annual Minimum Rent for so long as such violation shall continue.  If such breach shall continue for more than one hundred eighty (180) days, then Tenant shall have the right to terminate this Lease at any time thereafter, in which event the applicable provisions of Section 8.04(f) shall control.

(e)    However, if any tenant or other occupant of the Shopping Center violates the Exclusive Use Protection and such violation also constitutes a default under its lease with Landlord, then Tenant's right to pay Alternative Rent in lieu of Annual Minimum Rent pursuant

20

to Section 8.04(d) shall be tolled provided that Landlord shall have promptly commenced appropriate legal proceedings against such tenant or occupant, and shall thereafter diligently prosecute such proceedings to completion so as to enjoin and prohibit any such violation. If Landlord shall have failed to promptly commence such proceedings, or shall fail thereafter to diligently prosecute the same, or if the violation does not cease within two hundred seventy (270) days after Landlord shall have been made aware of such violation, then Tenant shall have the right to commence payment of Alternative Rent in lieu of Annual Minimum Rent for as long as such violation exists. In addition, Tenant shall have the right (i) to conduct and prosecute such legal proceedings (including an action for injunctive relief) in its own name, at Landlord's expense, or (ii) in the event the right set forth in clause (i) above is not permitted to be exercised under Laws, to conduct and prosecute such legal proceedings in the name of Landlord, at Landlord's expense, and Landlord shall cooperate with Tenant with respect to such prosecution (including executing any documentation or authorization reasonably required by Tenant in connection with such prosecution and by appearing at any hearing or trial with respect to such prosecution). If Tenant shall have paid Alternative Rent pursuant to this Section 8.04(e) for fifteen (15) consecutive months, then Tenant shall have the right to terminate this Lease subject to and in accordance with the provisions of Section 8.04(f).

(f)      If Tenant shall have paid Alternative Rent pursuant to Section 8.04(d) for twenty-four (24) full consecutive months, or Section 8.04(e) for fifteen (15) consecutive months, then Tenant must elect either to (i) terminate this Lease, or (ii) resume paying Annual Minimum Rent from and after the expiration of the thirty (30) day period following the end of such twenty-four (24) or fifteen (15) month period, as applicable. Tenant shall make such election by notice to Landlord within thirty (30) days after the expiration of such twenty-four (24) or fifteen (15) month period, as applicable. If Tenant fails to make such an election, then Tenant shall be deemed to have elected to proceed under clause (ii) above. If Tenant elects to terminate this Lease pursuant to Sections 8.04(d) or (e), then this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of Landlord or Tenant, except: (x) for those obligations which expressly survive the expiration or other termination of this Lease, (y) Landlord shall (which obligation shall survive the termination of this Lease), within ten (10) business days after receiving a statement from Tenant showing the Unamortized Costs, reimburse Tenant for the then unamortized costs (amortized on a straight-line basis over the Term) of any alterations or improvements made by Tenant to the Premises, less the amount of any Landlord Reimbursement previously received and applied by Tenant (the "Unamortized Costs"), up to a maximum amount of Two Hundred Thousand Dollars ($200,000.00), and (z) Tenant reserves all claims against Landlord for damages resulting from the violation of the Exclusive Use Protection. Landlord and Tenant agree that the remedies set forth in sub-sections (y) and (z) of this Section 8.04(f) shall not apply if the violation of Tenant's Exclusive Use Protection also constituted a default under such tenant's lease with Landlord, and Landlord promptly commenced and diligently pursued appropriate legal proceedings against such tenant or occupant to enjoin and prohibit such violation.

SECTION 8.05    Exclusives Applicable To Tenant.

(a)      Tenant shall not use (or permit to be used) the Premises in violation of those certain exclusives granted by Landlord to certain other tenants in the Shopping Center pursuant to the terms and provisions of leases which have been executed prior to the Effective

21

Date (the "Existing Exclusives"). Landlord represents and warrants that a true and complete listing and description of such Existing Exclusives is attached as Exhibit H. Notwithstanding the foregoing, Tenant shall be entitled to enter into a separate agreement with any tenant or other occupant for whose benefit the Existing Exclusive is granted which nullifies or modifies the corresponding Existing Exclusive with regard to the Premises.

      (b)     Landlord represents and warrants that, other than the Existing Exclusive(s) there are (and will be) no exclusives or use restrictions in effect which would apply to Tenant, and Landlord covenants to indemnify, defend and hold Tenant harmless from and against all loss, cost, liability or expense (including, without limitation, reasonable legal fees) incurred by Tenant by reason of the enforcement by any person or entity of such exclusive or other use restriction.

      SECTION 8.06   Key Tenants.   Landlord represents and warrants that prior to the Delivery of the Land it will enter into leases and/or operating agreements with at least eight (8) of the Key Tenants or suitable replacements thereof.   It is hereby understood and acknowledged by Landlord that a Key Tenant may only be replaced by a National Tenant or Regional Tenant of comparable size and quality of merchandise typically found in lifestyle centers in the metropolitan Chicago, Illinois area. "National Tenant(s)" shall mean a tenant(s) operating, as of the applicable date, at least seventy-five (75) retail stores in the continental United States under a single trade name in first-class shopping centers, and "Regional Tenant(s)" shall mean a tenant(s) operating, as of the applicable date, at least thirty-five (35) retail stores in first-class shopping centers in any of the following states under a single trade name: Illinois, Indiana, Wisconsin and Missouri.

## ARTICLE IX

## REPAIRS

      SECTION 9.01   Landlord Obligations. Landlord shall, at Landlord's sole expense (and not included in CAM Costs unless such expenses are specifically permitted to be included in CAM Costs by the provisions of Section 5.03 above), keep and maintain in good order, condition and repair (including replacements, if necessary) and in a safe condition (a) the roof of the Premises (to be maintained in a watertight condition at all times), all utility systems and lines (including, without limitation, electrical, plumbing, mechanical and/or alarm systems) serving the Premises (from the point of connection at the Premises to the public utility mains), the exterior of the Premises (including, without limitation, the walls and Other Improvements, but excluding window glass, doors and frames) and the structural portions of the Premises including, without limitation, footings and foundation, floor slab, and structural walls, columns and beams, and (b) any damage to the Premises or the Shopping Center which is caused by (i) defects in Landlord's Work if within two (2) years following the Possession Date, or (ii) the act or omission of Landlord, its employees, agents or contractors. Landlord's obligations under this Section 9.01 shall be subject to the provisions of Articles XII and XIII. Landlord shall perform any and all repairs and replacements to be performed under this Lease without material interference with or disruption to the normal conduct of any business operations in the Premises. Landlord shall give Tenant at least five (5) days prior notice of any repairs or replacements to the Premises (except in the case of an emergency posing imminent risk of material harm to persons

22

or property, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances). If, in Tenant's reasonable judgment, Landlord's repairs would materially interfere with or disrupt the normal conduct of any business operations in the Premises, then Landlord shall perform such repairs only after the regular hours of operation of the Premises.

SECTION 9.02    Tenant's Obligations.

(a)    Subject to Landlord's obligations under Section 9.01, Tenant shall at all times during the Term, at Tenant's sole expense, keep and maintain in good order, condition and repair (including replacement, if necessary), and in a safe condition (i) the non-structural, interior elements of the Premises (including painting, window glass, doors and frames, and the heating, ventilation and air conditioning ["HVAC"] units, and the electrical, plumbing, mechanical, and/or alarm systems located in and serving exclusively the Premises), and (ii) any damage to the Premises or the Shopping Center which is caused by the act or omission of Tenant, its employees, agents or contractors. Tenant's obligations under this Section 9.02 shall also be subject to the provisions of Articles XII and XIII and to Landlord's obligation to clear the Premises of all dirt and debris following completion of Landlord's Work pursuant to Section 5.02.

(b)    If any HVAC units must be replaced during the last two (2) years of the Term, and prior to such replacement Landlord agrees that such units should be replaced, then in light of the fact that the same will require a substantial expenditure by Tenant and will result in a benefit to Landlord following the expiration of the Term, upon the expiration or earlier termination of this Lease (unless such termination results from Tenant's default of its obligations under this Lease), Landlord shall reimburse Tenant for the amount agreed upon by Landlord and Tenant prior to the replacement of such units for the installation of such new equipment. Following any such agreement by Landlord and Tenant, the provisions of this Section 9.02(b) shall survive the expiration or earlier termination of this Lease. If any repairs, replacements or maintenance required by Tenant are not accomplished within thirty (30) days after written notice to Tenant from Landlord (or for such longer period so long as Tenant has commenced the required repairs or maintenance within such thirty (30) day period, and is diligently and in good faith pursuing the completion thereof), Landlord may, at its option, perform such repairs, replacements or maintenance, and Tenant shall pay Landlord within thirty (30) days after receipt of request therefore accompanied by reasonable back-up documentation, the cost of such repairs, replacements or maintenance.

SECTION 9.03    Hazardous Materials.

(a)    Except as may be disclosed in that certain (i) Environmental Site Assessment dated February 11, 2005 prepared by Testing Service Corporation and (ii) Phase I Environmental Site Assessment dated July 13, 2005 prepared by Testing Service Corporation, full and complete copies of which have been provided by Landlord to Tenant prior the Effective Date (the "Reports"), Landlord represents and warrants to its knowledge that, as of the Effective Date (and as of the Possession Date), there are no Hazardous Materials present in the Shopping Center in violation of Environmental Regulations (as hereinafter defined), and Landlord agrees that the removal or neutralization of any Hazardous Materials that are present prior to the

23

Effective Date or become present after the Effective Date shall be at the sole cost and expense of Landlord (and not included in CAM Costs), other than Hazardous Materials introduced by Tenant. "Hazardous Materials" shall mean (i) any waste, material or substance (whether in the form of a liquid, a solid, or a gas and whether or not air-borne) which is deemed to be a pollutant or a contaminant, or to be hazardous, toxic, ignitable, reactive, infectious, explosive, corrosive, dangerous, harmful or injurious to public health or to the environment, and which is now or becomes regulated in the future by or under the authority of any applicable local, state or federal laws, judgments, ordinances, orders, rules, regulations, codes or other governmental restrictions or requirements, any amendments or successor(s) thereto, replacements thereof or publications promulgated pursuant thereto (collectively, "Environmental Regulations", and individually, "Environmental Regulation"); (ii) petroleum; (iii) asbestos and asbestos containing materials; (iv) any polychlorinated biphenyl; and (v) any radioactive material. In addition to the foregoing, the term "Environmental Regulations" shall be deemed to include, without limitation, local, state and federal laws, judgments, ordinances, orders, rules, regulations, codes and other governmental restrictions and requirements, any amendments and successors thereto, replacements thereof and publications promulgated pursuant thereto, which deal with or otherwise in any manner relate to, environmental matters of any kind.

(b)     Landlord and Tenant each agree that neither Landlord nor Tenant shall cause or permit any Hazardous Materials to exist on, or to escape, seep, leak, spill or be discharged, emitted or released from the Shopping Center during the Term in violation of any applicable Environmental Regulation.

(c)     Landlord hereby indemnifies Tenant and its successors and assigns, and agrees to hold Tenant and its successors and assigns harmless from and against any and all losses, liabilities, damages, injuries, penalties, fines, costs, expenses and claims of any and every kind whatsoever, including attorneys' fees and costs (collectively, "Environmental Liabilities") paid, incurred or suffered by, or asserted against, Tenant or its successors and assigns with respect to, or as a direct or indirect result of (i) the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission or release from the Shopping Center of any Hazardous Materials which were brought into the Shopping Center by Landlord, its agents or employees, or (ii) a breach by Landlord, its agents or employees of any Environmental Regulation to which Landlord is subject.

(d)     Tenant hereby indemnifies Landlord and its successors and assigns, and agrees to hold Landlord and its successors and assigns harmless from and against any and all Environmental Liabilities paid, incurred or suffered by, or asserted against, Landlord or its successors and assigns with respect to, or as a direct or indirect result of (i) the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission or release from the Premises of any Hazardous Materials which was brought into the Premises by Tenant, its agents or employees, or (ii) a breach by Tenant, its agents or employees of any Environmental Regulation to which Tenant is subject.

(e)     With respect to Hazardous Materials which are or become present at the Shopping Center as the result of any cause whatsoever (other than Hazardous Materials which were brought into the Premises by Tenant, its agents or employees), Landlord shall, if Landlord is required by Environmental Regulations, at Landlord's sole cost (and not included in

24

CAM Costs), in a good, workmanlike and expeditious manner, and in compliance with Environmental Regulations, perform all work necessary to clean-up, remove and otherwise remediate such Hazardous Materials in compliance with Environmental Regulations. Should the presence of such Hazardous Materials render the Premises Unusable (as defined below) or should Tenant be required to close during the removal or neutralization of such Hazardous Materials by Landlord, Tenant shall notify Landlord and all Rent shall be immediately abated until such time as Tenant can safely resume normal business operations. If such work is not commenced within one hundred twenty (120) days after the date (the "Notification Date") that Tenant notifies Landlord of Hazardous Materials rendering the Premises Unusable (or such additional period as may be reasonably required to engage environmental consultants and/or engineers and obtain permits and licenses) or if such work is not completed within ninety (90) days after the Notification Date (or such additional period as may reasonably be required given the nature of the work, provided that Landlord diligently pursues same to completion), then Tenant shall have the right, at any time thereafter, to terminate this Lease. However, Tenant's option to terminate this Lease pursuant to this Section 9.03(e) shall cease (if not exercised prior thereto) at any time the Premises are no longer Unusable. If Tenant shall elect to terminate this Lease, then the Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of Landlord or Tenant, except: (i) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, (ii) Landlord shall (which obligation shall survive the termination of this Lease), within ten (10) business days after receiving a statement from Tenant showing the Unamortized Costs, reimburse Tenant for the Unamortized Cost, and (iii) Tenant reserves all claims against Landlord for damages resulting from a default by Landlord under this Section 9.03. For the purpose of this Section 9.03(e), "Unusable" means that the Tenant does not have access to at least ninety percent (90%) of the Premises because of the enforcement of any Environmental Regulation or the remediation of any Hazardous Materials, or because use of the Premises would represent a risk to the health or safety of Tenant, Tenant's employees, agents or invitees.

SECTION 9.04    Surrender of the Premises. At the expiration or earlier termination of this Lease, Tenant shall surrender the Premises to Landlord in the same condition as it is required to be maintained by Tenant pursuant to Section 9.02 above free of any Hazardous Materials in violation of any Environmental Regulations which were brought into the Premises by Tenant, its agents or employees; excepting, however, reasonable wear and tear, damage by fire or other casualty, and the effects of a Taking (as defined in Section 13.01).

## ARTICLE X

## REQUIREMENTS OF LAW

SECTION 10.01    Landlord's Obligations. As part of Landlord's Work and throughout the Term, Landlord shall be responsible, at Landlord's sole cost and expense (and not included in CAM Costs), for complying with all applicable laws, statutes, ordinances and regulations of federal, state, county and municipal authorities (collectively, "Laws") affecting the Shopping Center including, without limitation, the Premises, except as specifically provided in Section 10.02.

25

SECTION 10.02  Tenant's Obligations.    Throughout the Term, Tenant shall be responsible, at Tenant's sole cost and expense, for complying with all Laws affecting the Premises if such compliance is required solely as a result of (a) Tenant's specific manner of use of the Premises (as opposed to retailers in general) and relates to the interior elements of the Premises which are neither structural nor comprise the major building systems serving the Premises, or (b) any alterations to the Premises by Tenant, or (c) any failure of Tenant's Work to comply with all Laws affecting the Premises.

SECTION 10.03  Right to Contest.  The party responsible for compliance pursuant to Section 10.01 or 10.02 shall have the right to contest the validity of any Law at the expense of the party responsible for compliance, unless such contest would result in any criminal liability imposed upon the other party or subject such other party to any fine or penalty.

## ARTICLE XI

## INSURANCE

SECTION 11.01  Landlord's Insurance.

(a)    Landlord shall maintain in full force and effect from and after the Effective Date and throughout the Term:

(i)    Commercial general liability insurance with regard to the Common Areas protecting and insuring Landlord, naming Tenant as "additional insured-lessee" as its interests may lie for claims arising out of the use or occupancy of the Common Areas and the obligations assumed by Landlord under this Lease, and having a combined single limit of liability of not less than Five Million Dollars ($5,000,000) for bodily injury, death and property damage liability; and

(ii)    Special Form (formerly known as "All-Risk") property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of the buildings (other than the Premises) and other insurable improvements in the Shopping Center, (exclusive of excavation, footings and foundations) including, without limitation, the Common Areas.

(b)    Landlord may carry any of its insurance under "blanket policies" covering the Shopping Center and other properties it or any Affiliate of Landlord owns, provided that: (i) the total amount of the insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article XI.  All policies required to be maintained by Landlord pursuant to this Section 11.01 shall provide that any proceeds thereof shall be deposited with the Mortgagee, or if none, to Landlord, in either event to be held in trust by such party and disbursed only in accordance with the provisions of, and for the purposes set forth in, Article XII.

(c)    Landlord shall be permitted to maintain a deductible as a part of any insurance policy carried by it in compliance with this Section 11.01.  However, in no event shall

26

any deductible with regard to the insurance described in Sections 11.01(a)(i) or 11.01(a)(ii) exceed Twenty-Five Thousand Dollars ($25,000), without Tenant's consent.

SECTION 11.02    <u>Tenant's Insurance</u>.

(a)    Tenant shall maintain in full force and effect throughout the Term:

(i)    Commercial general liability insurance protecting and insuring Tenant, naming Landlord as "additional insured-lessor" for claims arising out of the use or occupancy of the Premises by Tenant and having a combined single limit of liability of not less than Five Million Dollars ($5,000,000) for bodily injury, death and property damage liability;

(ii)    Special Form (formerly known as "All-Risk") property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of the Premises, exclusive of excavation, footings and foundations, naming Landlord as "additional insured-lessor" (Tenant shall be responsible for payment of all deductibles); and

(iii)    Worker's compensation insurance as required by law.

Upon Landlord's request, Tenant shall also name the Mortgagee as an additional insured, as its interest may appear, on the insurance policies described in Section 11.02(a).

(b)    Tenant may carry any of its insurance under "umbrella policies" and/or "blanket policies" covering the Premises and other locations it or any Affiliate of Tenant owns or leases, provided that: (i) the total amount of the insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article XI.

(c)    From and after the date that Landlord shall have caused the Delivery of the Land to occur and until such time as the Tenant's Work is complete substantially in accordance with the Site Design Requirements, Tenant shall maintain or require its general contractor to maintain, in full force and effect:

(i)    A policy of builder's risk insurance covering loss or damage to the Tenant's improvements for the full amount of the work the contractor is performing; and

(ii)    Commercial general liability insurance protecting and insuring Tenant, naming Landlord as "additional insured-lessor" for claims arising out of the work the contractor is performing on the Premises and having a combined single limit of liability of not less than Five Million Dollars ($5,000,000.00) for bodily injury, death and property damage liability.

(d)    All insurance required to be maintained under this Section 11.02 may be provided under a plan of self-insurance provided that Tenant maintains, during the period of such self-insurance, a tangible net worth of at least One Hundred Million Dollars ($100,000,000). To the extent any deductible is maintained as a part of any insurance policy carried by Tenant in

27

compliance with this Section 11.02, Tenant shall be deemed to be covering the amount of that deductible under an informal plan of self-insurance.

SECTION 11.03    Insurance Requirements Generally.

(a)    All insurance required to be maintained by Landlord and Tenant under this Lease shall be maintained with insurance companies qualified to do business in the State, and rated at least A-/VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published).  Each party shall use its diligent efforts to have its insurers provide thirty (30) days (ten (10) days in the event of non-payment of premium) prior notice to the other party of cancellation or non-renewal of any policy required hereunder.  Each party shall provide to the other duly executed certificates evidencing the insurance coverage described in Sections 11.01 and 11.02 above, respectively.

(b)    The liability insurance requirements under Sections 11.01(a)(i) and 11.02(a)(i) shall be reviewed by Landlord and Tenant every five (5) years for the purpose of mutually increasing (in consultation with their respective insurance advisors) the minimum limits of such insurance to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards. The replacement value of the buildings and other insurable improvements constituting the Shopping Center shall be re-evaluated from time to time at the request of either Landlord or Tenant.

SECTION 11.04    Landlord's Insurance Cost.

(a)    The insurance premiums attributable to the policies required to be maintained by Landlord pursuant to Section 11.01(a)(i) shall be included as part of CAM Costs. If Landlord carries blanket insurance covering the Shopping Center together with other property owned by Landlord, then Landlord shall obtain evidence reasonably satisfactory to Tenant of the cost of such insurance allocable to the Shopping Center and the amount so allocable shall be included in CAM Costs for the purposes of determining Tenant's Share of any insurance premium included in CAM Costs.

(b)    If the rates for any insurance Landlord is required to carry are increased as a result of the use or other activity of any other occupant of the Shopping Center, then the amount of such increase shall be excluded from CAM Costs.  To the extent that Landlord receives a dividend, credit, rebate or other return of a premium which had previously been included in CAM Costs, Landlord shall promptly refund to Tenant Tenant's Share of such dividend, credit, rebate, or return.

(c)    The provisions of this Section 11.04 shall survive the expiration or earlier termination of this Lease.

SECTION 11.05    Indemnity.

(a)    Except as otherwise provided in Section 11.06, Tenant covenants to defend and indemnify Landlord and hold Landlord harmless from and against any and all claims, actions, damages, liabilities and expenses, including reasonable attorneys' fees, (i) in connection

28

with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises, or any part thereof, or (ii) occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Landlord, its agents, contractors, licensees, employees, or other tenants and occupants, or for which any of said parties may be statutorily liable.

(b)    Except as otherwise provided in Section 11.06, Landlord covenants to defend and indemnify Tenant and hold Tenant harmless from and against any and all third party claims, actions, damages, liabilities and expenses, including reasonable attorneys' fees, (i) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon any portions of the Shopping Center (excluding the Premises), or (ii) occasioned wholly or in part by any act or omission of Landlord, its agents, contractors, employees, servants, tenants (other than Tenant), occupants or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Tenant, its agents, contractors, licensees or employees, or for which any of said parties may be statutorily liable.

SECTION 11.06    Mutual Waiver of Subrogation.

(a)    Landlord and Tenant, on their own behalf and on behalf of anyone claiming under or through either one by way of subrogation, hereby release and waive all rights of recovery and causes of action against each other and their respective Affiliates arising from any and all liability for any loss or damage to property or resulting from damage to such property (and, in either case, any resulting loss of business or rental income), whether caused by the negligence or fault of the other party, which is normally insured under Special Form property insurance (formerly known as "All-Risk") and time element insurance required to be maintained hereunder or under any other property or time element insurance maintained by either party. If either Landlord or Tenant is a self-insurer or maintains a deductible (as either may be permitted under this Lease), then the self-insuring party or the party maintaining the deductible hereby releases the other party from any liability arising from any event which would have been covered had the required insurance been obtained and/or the deductible not been maintained.

(b)    Landlord and Tenant shall cause each property insurance policy carried by either of them insuring the Premises, the contents thereof, or the Shopping Center, to provide that the insurer waives all rights of recovery by way of subrogation or otherwise against the other party hereto (and all of such other party's Affiliates) in connection with any loss or damage which is covered by such policy or that such policy shall otherwise permit, and shall not be voided by the releases provided above.

SECTION 11.07    Affiliate.    "Affiliate" shall mean a corporation, partnership, person or other entity which is controlling, controlled by, or under common control with, Landlord or Tenant, as the case may be.    As used in the definition of Affiliate, "control" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise.

29

CH3 1111236.2 / 39769-000031
889821-8  11028.0008000

## ARTICLE XII

## DAMAGE OR DESTRUCTION

SECTION 12.01  Landlord's Obligation to Rebuild.  If during the Term hereof the Shopping Center shall be damaged or destroyed by fire or casualty, the risk of which is covered by the Landlord's insurance, this Lease shall, except as hereinafter provided, remain in full force and effect, and the Landlord shall promptly after such damage and the determination of the net amount of insurance proceeds available to the Landlord, except as hereinafter provided, expend so much as may be necessary of such net amount to restore the Shopping Center as Landlord deems appropriate, provided that the following conditions shall govern reconstruction of the Shopping Center: (i) Tenant's Preferred Area shall remain intact; (ii) the visibility and access of the Premises shall not be materially, adversely affected; and (iii) the Floor Area of the Shopping Center, as reconstructed, shall not be less than three hundred thousand (300,000) square feet of Floor Area with at least two hundred fifty thousand (250,000) square feet being located in Phase I of the Shopping Center (collectively, the "Required Reconstruction").  With respect to buildings or improvements within the Shopping Center which are damaged by fire or other casualty but which are not required to be restored by Landlord as part of the Required Reconstruction, Landlord shall promptly either (y) restore all or portions of the same to a comparable or better condition than its condition immediately prior to such damage or destruction, or (z) raze the remaining portions of such buildings or improvements not rebuilt, remove all debris resulting therefrom, and pave such areas or landscape such areas in a sightly manner.  Should the net amount of insurance proceeds available to the Landlord be insufficient to cover the cost of restoring the Shopping Center, in the reasonable estimate of the Landlord, the Landlord may, but shall have no obligation to, supply the amount of such insufficiency and restore the Shopping Center with all reasonable diligence or the Landlord may terminate this Lease by giving notice to the Tenant not later than a reasonable time after the Landlord has determined the estimated net amount of insurance proceeds available to the Landlord and the estimated cost of such restoration.  In case of substantial damage or destruction, as a result of a risk which is not covered by the Landlord's insurance, the Landlord shall likewise be obligated to rebuild the Shopping Center, all as aforesaid, unless the Landlord, within a reasonable time after the occurrence of such event, gives written notice to the Tenant of the Landlord's election to terminate this Lease.  If the Landlord shall elect to terminate this Lease, as aforesaid, this Lease and the term hereof shall cease and come to an end as of the date of said damage or destruction.

SECTION 12.02  Tenant's Obligation to Rebuild.  If all or any part of the Premises is damaged or destroyed by fire, the elements or other casualty, then Tenant shall promptly repair all damage and restore the Premises to its condition immediately prior to such damage or destruction (subject to any changes to the Premises that Tenant shall desire to make to the extent same shall otherwise be permitted under Section 14.01).  Without limiting Tenant's obligations under this Article XII, the proceeds of the policies required to be obtained and maintained by Tenant pursuant to Section 11.02 shall, to the extent necessary, be used for the performance of such rebuilding and restoration work.  The provisions of this Section 12.02 shall not apply if Landlord or Tenant terminates this Lease pursuant to provision this Article XII.

SECTION 12.03  Termination.

30

(a)    Tenant shall have the right to terminate this Lease:

(i)    if all or any part of the Premises is damaged or destroyed by fire, the elements or other casualty during the last two (2) years of the Term, and the restoration period is reasonably estimated by Tenant to be in excess of two hundred seventy (270) days, or

(ii)    if all or any part of the Premises is damaged or destroyed by fire, the elements or other casualty at any time during the Term and such damage or destructions is not covered under the insurance policy(ies) required to be maintained by Tenant under Sections 11.02(a)(ii) or 11.02(b)

Tenant shall notify Landlord of its exercise of such option within forty-five (45) days following the occurrence of such casualty.

(b)    Intentionally Omitted.

(c)    If (i) Tenant fails to commence in good faith Tenant's repair and restoration obligations within ninety (90) days after any damage or destruction, or (ii) Tenant fails to timely complete such repair and restoration within two hundred seventy (270) days after such damage or destruction, then Landlord shall have the option, upon notice to Tenant, to elect to complete the repair and restoration to the Premises and to receive reimbursement therefor in full from Tenant on demand.  The time periods referenced in this Section 12.03(c) shall be subject to Force Majeure, but in no event shall the aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed a period of ninety (90) days.

(d)    If this Lease is terminated, then this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of either Landlord or Tenant, except: (i) for those obligations which expressly survive the expiration or other termination of this Lease, and (ii) only in the case where Tenant terminates this Lease, Tenant shall thereupon make available to Landlord (1) all insurance proceeds paid by Tenant's insurance carrier, or (2) if self-insured, an amount equal to the reconstruction costs of the Premises or, if the Premises are not being reconstructed, an amount equal to the actual value of the Premises (not to exceed, however, an amount equal to the reconstruction costs of the Premises), to the extent such amounts would have been payable under the insurance outlined in Section 11.02(a)(ii).

(e)    If the balance of Phase I of the Shopping Center, exclusive of the Premises, is substantially destroyed by fire, the elements or other casualty during the last two (2) years of the Term to the extent that the required repairs and restorations to Phase I of the Shopping Center cannot be completed by Landlord in accordance with the provisions of this Section within two hundred seventy (270) days after the date of destruction (which period may be extended by reason of Force Majeure), Landlord shall have the right to terminate this Lease by giving notice to Tenant within thirty (30) days following such damage or destruction; provided, however, any such termination right shall be expressly conditioned upon Landlord (i) also terminating all other leases within Phase I of the Shopping Center, and (ii) paying Tenant the Unamortized Costs. If Landlord fails to send Tenant such termination notice within such 30-

31

day period, then Landlord shall be deemed to have waived such termination right, in which event Landlord shall be obligated to repair and restore the Shopping Center as provided herein.

(f)     If (i) Landlord terminates this Lease pursuant to and in accordance with Section 12.03(e) and (ii) Landlord, or any Affiliate of Landlord (as defined in Section 11.07), begins, within the "Reinstatement Period" (as defined below), to repair and restore the damaged portions of Phase I of the Shopping Center or to construct new buildings that will be used, in full or in part, for commercial retail purposes, then Landlord shall so notify (or cause to be notified) Tenant (which notice shall contain a site plan and such other information reasonably requested by Tenant regarding the scope of such reconstruction or construction). Tenant shall have the right (but not the obligation) to reinstate this Lease by giving notice of reinstatement to Landlord within sixty (60) days after Tenant's receipt of Landlord's restoration notice. As used herein, the "Reinstatement Period" shall be the period between the date that this Lease is terminated and the second (2nd) anniversary of such termination. If Tenant delivers to Landlord its notice of reinstatement, then this Lease shall be reinstated on all of its terms and conditions, except that all time periods shall be deemed to have tolled for the period of time between the termination of this Lease and its reinstatement. Without limiting the generality of the foregoing, the Term of this Lease, as reinstated, shall be equal to the portion of the Term hereof which remained prior to the termination of this Lease by Landlord, with Tenant having the same Extension Periods available to it that it had available as of Landlord's termination of this Lease and with the time periods for the exercise of such extension options also being tolled as aforesaid. The term of such reinstated Lease shall commence on the earlier to occur of the following: (i) ninety (90) days after the date that Landlord shall have (a) delivered possession of Premises (or comparable premises in the reconstructed or new commercial space) to Tenant in substantially the same condition as existed immediately prior to the damage or destruction (excluding Tenant's trade fixtures, inventory and equipment), (b) repaired and restored, or constructed, the Shopping Center as shown on such revised site plan, (c) satisfied the Possession Date requirements set forth in Section 2.04 hereof as to the reconstructed or newly constructed Shopping Center, and (d) otherwise satisfied the governmental authorities to enable Landlord to secure a final certificate of occupancy for Tenant and all other governmental and quasi-governmental approvals, consents and permits to enable Tenant to reopen for business to the public for the normal conduct of Tenant's business operations at the Premises, or (ii) the date that Tenant opens for business. The provisions of this Section 12.03(f) shall survive a termination of this Lease pursuant to Section 12.03(e).

## ARTICLE XIII

## CONDEMNATION

SECTION 13.01    Taking.

(a)     In the event of condemnation by eminent domain or similar law, including a sale in lieu thereof to an authority or other entity having the power of eminent domain (a "Taking"), of all or any portion of the Shopping Center, which (i) results in a Taking of (x) any part of the Premises, (y) more than twenty-five percent (25%) of the Common Areas, or (z) more than ten percent (10%) of the parking spaces in either Tenant's Preferred Area or more than fifteen percent (15%) of the parking spaces in the Shopping Center, (ii) materially and adversely affects ingress or egress to the Premises or the Shopping Center, or (iii) materially

32

prohibits or inhibits Tenant's use of the Premises for a period in excess of one hundred twenty (120) days, then Tenant may terminate this Lease by giving notice to Landlord not more than ninety (90) days after the later of the date on which title vests in the condemning authority or the date Tenant receives notice of said vesting.

(b)    In the event of a Taking of all of the Premises, this Lease shall terminate as of the date of vesting of title or transfer of the Premises, whichever is earlier, without further liability on the part of either Landlord or Tenant, except for those obligations which expressly survive the expiration or other termination of this Lease.

(c)    In the event of a Taking of the Premises, the Common Areas and/or any other area within the Shopping Center, or any portion thereof, for temporary use (specifically one not exceeding sixty (60) days in duration), without the taking of the fee simple title thereto, this Lease shall remain in full force and effect. All awards, damages, compensation and proceeds payable by the condemnor by reason of such Taking relating to the Premises, or relating to the Common Areas but reasonably attributable to the Premises, for periods prior to the expiration of the Lease shall be payable to Tenant. All such awards, damages, compensation and proceeds for periods after the expiration of the Lease shall be payable to Landlord. Anything contained to the contrary notwithstanding, a temporary Taking for any period in excess of sixty (60) days may, at Tenant's option, be deemed a permanent Taking and shall be governed by Section 13.01 (a) or (b), as applicable.

SECTION 13.02   Restoration and Rent Adjustment.   In the event of a Taking, if this Lease is not terminated by Tenant pursuant to Section 13.01, then (a) Landlord shall promptly restore the Shopping Center as nearly as practicable to a complete unit of like quality and character as existed prior to the Taking, which restoration shall, as applicable, include all of Tenant's Work and all other leasehold improvements performed by Tenant, but shall not include Tenant's Property, and (b) if a portion of the Premises is Taken, then from and after the date on which title vests in the condemning authority, the Rent shall be equitably reduced in proportion to the area of the Premises subject to the Taking.

SECTION 13.03   Award.   In the event of any Taking, Tenant shall be entitled to an amount of the award or compensation paid for such Taking equal to the Unamortized Costs, if any, and the balance shall belong to Landlord. Tenant shall also have the right to claim and recover from the condemning authority such compensation as may be separately awarded or recoverable by Tenant on account of any and all damage to Tenant's business by reason of the condemnation and for or on account of any cost or loss to which Tenant might be put in moving Tenant's Property, or for any other damages compensable separately to Tenant; provided, however, that no such award shall reduce the award payable to Landlord for its fee interest in the Premises. The provisions of this Section 13.03 shall be subject to the provisions of Section 13.01(c) with respect to a temporary Taking.

## ARTICLE XIV

## ALTERATIONS AND MECHANICS' LIENS

SECTION 14.01   Tenant's Alteration Rights.

33

(a)    Tenant shall not perform any structural or exterior alterations or improvements to the Premises (except to the extent same pertain to Tenant's Work) without the prior approval of Landlord (including submission of full plans and specifications); provided, however, that Tenant's alteration of the exterior of the Premises to conform to Tenant's (or any subtenant's) then-current prototypical elevation shall not require Landlord's consent, but in no event shall Tenant (i) change the footprint of the Building, (ii) increase the height of the Building or (iii) adversely affect the Building's roof, structural elements or Building systems. The provisions of this Section 14.01(a) shall not apply to Tenant's building signage, which shall be governed by the applicable provisions of Article XV.

(b)    Tenant may, from time to time, without the prior approval of Landlord, make non-structural interior alterations and improvements to the Premises as Tenant deems necessary or desirable including, but not limited to, the electrical systems, the HVAC and other mechanical systems, installation of fixtures and equipment, painting, and wall and floor coverings. All of Tenant's Work shall be performed in compliance with Laws and the terms of this Lease.

(c)    Tenant shall have the right to erect and maintain an antenna, a satellite dish and/or related equipment on the roof of the Premises (collectively, the "Dish"), provided that Tenant abides by the following terms and conditions: (i) Tenant must obtain the approval of any governmental authority having jurisdiction thereof; (ii) the maximum size and location of the Dish shall be designated by the Landlord (not to exceed 2' in diameter) and shall be subject to Landlord's reasonable criteria with respect thereto; (iii) Landlord may require that the Dish be covered by a "shield" so as not to be noticeable by the general public; (iv) Tenant and its agents shall be prohibited from entering upon the roof without Landlord's supervision; (v) Tenant may not make any roof penetrations without Landlord's express written consent and only with a roofing contractor approved by Landlord in Landlord's sole discretion; (vi) Tenant shall be required, at its sole cost and expense, to install the Dish and to make any necessary hook-ups and connections; and (vii) Tenant shall immediately cease and desist from utilizing the Dish if the transmission signals are discovered to be hazardous or in violation of any applicable governmental authority (including, but not limited to the FCC or the FTC) or disruptive of any other communication signals.

Notwithstanding anything to the contrary contained herein, as a condition to Landlord's consent to the foregoing installation, Landlord may require that Tenant remove the Dish (and repair any damage incurred as a result thereby) at the expiration of the Term. The foregoing condition shall survive the expiration or sooner termination of this Lease.

(d)    Landlord shall execute and return to Tenant all appropriately completed building department or equivalent applications within thirty (30) days after Tenant's request therefor, and will reasonably cooperate with Tenant in the permitting process. If any violation of Laws which is noted against the Shopping Center or the Premises (other than a violation caused by Tenant) prevents Tenant from obtaining a building permit for any alterations or a certificate of occupancy, then, upon request by Tenant, Landlord shall promptly and diligently cause such violation to be cured to the extent required to permit Tenant to obtain its building permit or certificate of occupancy, as the case may be. However, if the violation was not caused by Landlord (or any of Landlord's agents, contractors, employees or invitees), then Landlord's

34

any component of Landlord's Work (including, without limitation, Delivery of the Land) and Landlord does not cure such default within thirty (30) days after notice thereof by Tenant (provided, however, such thirty (30) day notice shall be reduced to ten (10) days in the event the default relates to any element of the Site Delivery Work), then Tenant shall have the right, but not the obligation, to:

(a)    seek injunctive relief, specific performance or other equitable remedies against Landlord to require Landlord to perform its obligations under this Lease (including, without limitation, the Site Design Requirements), the costs of which litigation shall be borne by Landlord including, without limitation, attorneys' fees and court's costs; and/or

(b)    seek legal remedies available to Tenant, the costs of which shall be borne by Landlord, including, without limitation, reasonable attorneys' fees and court costs.

SECTION 18.05    Additional Tenant Remedies Due to Landlord's Failure to Pay the Landlord Reimbursement.  If Landlord fails to pay the Landlord Reimbursement in full on or before its due date, then Landlord shall be in default under this Lease, and no Rent shall be due or owing to Landlord until the Landlord Reimbursement is paid to Tenant, together with interest which shall accrue on the unpaid Landlord Reimbursement at the Default Rate commencing on the thirty-first (31st) day following Substantial Completion until the date of payment of the Landlord Reimbursement.  However, if Landlord has not tendered payment of the Landlord Reimbursement and interest by that date which is one (1) year from Substantial Completion (the "Substantial Completion Anniversary"), then (i) such date shall become the Commencement Date; (ii) Annual Minimum Rent shall be reduced to ground rent equal to Fifty Thousand and No/100 Dollars ($50,000.00) per annum during the Term; and (iii) this Lease shall be converted to a ground lease, with ownership of the Building remaining with Tenant, and Landlord's and any Mortgagees' names being removed as additional insureds or mortgagees on any casualty insurance described in Section 11.02.  Landlord and Tenant covenant and agree that upon the reasonable written request of either Tenant or Landlord, Landlord and Tenant shall execute such documentation as necessary to formalize the conversion of this Lease to a ground lease upon the Substantial Completion Anniversary.

SECTION 18.06    Waiver; Non-Exclusive Remedies.  The parties hereby waive trial by jury in any action, proceeding or counterclaim brought by either of them against the other on any matters arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Premises, and/or any claim of injury or damage.  Tenant hereby expressly waives any and all rights of redemption granted by or under any present of future law if this Lease is terminated or Tenant is evicted or dispossessed by reason of violation by Tenant of any of the provisions of this Lease.  Except as otherwise expressly set forth in this Lease, no right or remedy herein conferred upon or reserved to Landlord or Tenant is intended to be exclusive of any other right or remedy in this Lease or by law or in equity provided, but each shall be cumulative and in addition to every other right or remedy given in this Lease or now or hereafter existing at law or in equity or otherwise.

43

## ARTICLE XIX

## SUBORDINATION, TRANSFER OF INTEREST

SECTION 19.01  Subordination.  Landlord reserves the right to subject and subordinate this Lease at all times to the lien of any first mortgage or deed of trust for the benefit of any Mortgagee hereafter encumbering or affecting all or any portion of the Shopping Center, as well as to any future ground or underlying leases encumbering or affecting all or any part of the Shopping Center; provided, however, that (a) each Mortgagee shall first execute and deliver to Tenant a subordination, non-disturbance and attornment agreement in substantially the form attached as Exhibit J hereto, in recordable form, and (b) any Ground Lessor shall execute (and shall obtain the written consent of any Mortgagee) and deliver to Tenant a fee owner recognition agreement in a form reasonably satisfactory to Tenant, which shall include the following provisions: (i) the Ground Lessor will not, in the exercise of any of the rights arising or which may arise out of such lease, disturb or deprive Tenant in or of its possession or its rights to possession of the Premises or of any right or privilege granted to or inuring to the benefit of Tenant under this Lease; (ii) in the event of the termination of the Ground Lease (as defined below), Tenant shall not be made a party in any removal or eviction action or proceeding, nor shall Tenant be evicted or removed of its possession or its right of possession of the Premises, and this Lease shall continue in full force and effect as a direct lease between the Ground Lessor and Tenant for the remainder of the Term and on the same terms and conditions as contained herein, without the necessity of executing a new lease; and (iii) Landlord and Tenant shall have the right to execute any amendment to this Lease which is specifically required hereunder and the Ground Lessor shall recognize and be bound thereto.  "Ground Lessor" shall mean the landlord under any existing or future ground or underlying lease(s) affecting all or any part of the Shopping Center (such ground or underlying lease(s) is referred to as the "Ground Lease(s)"). "Mortgagee" shall mean any state or federally regulated bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender, which is not an Affiliate of Landlord, and which holds a mortgage on the Shopping Center or is the beneficiary under a deed of trust encumbering the Shopping Center (such mortgage or deed of trust is referred to as the "Mortgage").

SECTION 19.02  Existing Mortgages and Ground Leases.  If a Mortgage or any Ground Lease encumbers the Shopping Center or any part thereof on the Effective Date, then Landlord shall deliver to Tenant, in recordable form: (a) a subordination, non-disturbance and attornment agreement substantially in the form attached as Exhibit J, or such other form as is reasonably acceptable to Tenant, in recordable form, executed by each and every Mortgagee, and (b) a fee owner recognition agreement in the form and content described in Section 19.01(b), in recordable form, executed by any Ground Lessor (and, as may be required, consented to by the Mortgagee).  Should Landlord fail to so deliver such instrument(s) as provided above, Tenant shall have the right, by at least fifteen (15) days prior notice given to Landlord at any time prior to the date on which such instrument(s) are delivered, to terminate this Lease without further liability on the part of Landlord or Tenant, except: (i) for those obligations which expressly survive the expiration or other termination of this Lease, and (ii) Landlord shall (which obligation shall survive the termination of this Lease), within three (3) business days following Tenant's termination notice, reimburse Tenant for all its reasonable, third-party costs and expenses incurred in connection with this Lease (including, without limitation, costs associated

44

with the preparation and review of plans and specifications, the performance of Tenant's Work, and attorneys' fees), not to exceed Seventy-Five Thousand Dollars ($75,000).

SECTION 19.03   Transfer of Interest.  Landlord shall provide Tenant with notice upon or immediately after any sale or transfer of Landlord's interest in the Shopping Center.  Landlord shall require the buyer or transferee to assume in writing all of the obligations of Landlord under this Lease.  Notwithstanding Section 23.13, Landlord shall continue to remain liable for all accrued liability, if any, up to the date of such sale or transfer, but shall be relieved of all liability for obligations accruing after the date of such transfer.  Notwithstanding anything contained herein to the contrary, Landlord shall continue to remain liable hereunder after such sale or transfer unless the buyer or transferee has expressly assumed in writing all of the obligations of Landlord under this Lease.

SECTION 19.04   Tenant Estoppel Certificates.  Tenant agrees, within twenty (20) days of Landlord's request, to execute and deliver to Landlord or any Mortgagee, on a form prepared by or on behalf of the party so requesting, an estoppel certificate (a) ratifying this Lease and confirming that there are no modifications or amendments to this Lease, except as may be stated in the certificate, (b) confirming the commencement and expiration dates of this Lease, (c) certifying to Tenant's actual knowledge and belief that the Landlord is not in default under this Lease, and that there are no offsets or defenses to enforcement of this Lease, except as may be stated in the certificate, (d) stating the date through which Annual Minimum Rent and other charges payable by Tenant have been paid, and (e) any other reasonable matter pertaining to this Lease requested by such party.

SECTION 19.05   Landlord Estoppel Certificates.  Landlord agrees, within twenty (20) days of Tenant's request, to execute and deliver to Tenant or any assignee, transferee, subtenant or Lender, on a form prepared by or on behalf of the party so requesting, an estoppel certificate (a) ratifying this Lease and confirming that there are no modifications or amendments to this Lease, except as may be stated in the certificate, (b) confirming the commencement and expiration dates of this Lease, (c) certifying to Landlord's actual knowledge and belief that Tenant is not in default under this Lease, and that there are no offsets or defenses to enforcement of this Lease, except as may be stated in the certificate, (d) stating the date through which Annual Minimum Rent and other charges payable by Tenant have been paid, and (e) any other reasonable matter pertaining to this Lease requested by such party.

SECTION 19.06   Payments.  If Landlord shall request Tenant to execute more than one (1) subordination, attornment and recognition agreement or more than two (2) estoppel certificates in any twelve (12) month period, then, as a condition to Tenant's obligations under Sections 19.01 or 19.04, as the case may be, Landlord shall pay to Tenant One Thousand Dollars ($1,000) for each subsequent request for a subordination, attornment and recognition agreement or an estoppel certificate within such twelve (12) month period.  If Tenant shall request Landlord to execute more than one (1) estoppel certificate in any twelve (12) month period, then, as a condition to Landlord's obligations under Section 19.05, Tenant shall pay to Landlord One Thousand Dollars ($1,000) for each subsequent request for an estoppel certificate within such twelve (12) month period.

CIB 1111236.2 / 39769-000031
889821-8 11028.0008000

## ARTICLE XX

### LANDLORD'S REPRESENTATIONS, WARRANTIES AND COVENANTS

SECTION 20.01   Quiet Enjoyment.   Provided Tenant is not in material default of its obligations under this Lease beyond any applicable notice and cure periods, Landlord covenants and agrees that Tenant, during the Term, shall freely, peacefully, and quietly occupy and enjoy the use and possession of the Premises without disturbance, molestation, hindrance or ejectment of any kind whatsoever by Landlord or persons claiming through Landlord.

SECTION 20.02   Representations, Warranties and Covenants.   In order to induce Tenant to execute this Lease and in consideration thereof, Landlord covenants, warrants and represents to Tenant as follows:

(a)   As of the Effective Date and as of the Possession Date, Landlord owns fee simple title to the Shopping Center, free and clear of all easements, restrictions, liens, encumbrances, leases and the like, except as described on Exhibit K; that the Shopping Center, as of the Effective Date (and as of the Possession Date), is not (and will not be) subject to the lien of any Mortgage (except such instruments where the lienor has entered into an agreement in favor of Tenant, as described in Sections 19.01 and 19.02); that Landlord has the full power, right and authority to make this Lease for the Term without the consent, joinder, or approval of any other party; and that Landlord will put Tenant into complete and exclusive possession of the Premises to the best knowledge of Landlord free from all orders, restrictions, covenants, agreements, leases, easements, laws, codes, ordinances, regulations or decrees (including, without limitation, those matters described on Exhibit K) which would, in any way, prevent or materially inhibit the use of the Premises for the sale, rental, installation, servicing and repairing of the Products and the Ancillary Products, as defined below) or prevent or restrict the use of the Common Areas or limit ingress and egress to and from Highway 59, Higgins Road (Highway 72) and Bartlett Road, the public thoroughfares shown on the Site Plan, by Tenant, its agents, employees or invitees.   The term "Ancillary Products" shall mean furniture and appliances (including, without limitation, household appliances such as, by way of example only, ovens, refrigerators, freezers, dishwashers, washers, dryers, microwave ovens, toasters and blenders).

(b)   Landlord shall, on or before the Possession Date, have caused the Delivery of the Land to occur in accordance with this Lease.

(c)   The Shopping Center shall, at the time of commencement of construction by Landlord, be properly zoned for the operation and maintenance of a store similar to other stores operated by Tenant and for its contemplated use, and that all necessary governmental consents, permits and approvals allowing for the Premises to be occupied for such use shall have been obtained by Landlord (but all business permits, licenses and the like shall be Tenant's obligation to obtain).

(d)   As of the Effective Date there is no Affiliated Land in existence and as of the Possession Date there will not be any Affiliated Land in existence (or, if there shall be Affiliated Land in existence, Landlord shall promptly notify Tenant thereof and promptly

46

execute any recordable instrument reasonably requested by Tenant which memorializes the provisions of this Lease pertaining to or otherwise affecting Affiliated Land).

SECTION 20.03 <u>Site Covenants</u>. In order to induce Tenant to enter into this Lease, Landlord covenants to Tenant as follows (the "<u>Site Covenants</u>"):

(a)    Except as provided in Section 20.03(d) below, Landlord shall not construct (or permit to be constructed) any buildings or other improvements (excluding landscaping, lighting, cart corals) in the area identified on the Site Plan as the "No-Build Area" (the "<u>No-Build Area</u>").

(b)    Landlord shall not construct (or permit to be constructed) any projections either vertical or horizontal (other than Tenant's signs or identifications) which will project along the front or rear of the building in which the Premises are situated in such a manner as to obstruct the view of Tenant's signs or its store front in any manner.

(c)    The number of paved, full-size parking spaces in the Shopping Center shall be the greater of (i) the number of parking spaces required by Section 1.01(N) or (ii) the amount of spaces required by Laws (without variance), and, without limiting the generality of the foregoing, the number of spaces contained in Tenant's Preferred Area shall be the same number of spaces as shown on the Site Plan.

(d)    Landlord shall not erect (or permit to be erected) any building or other structures (including, without limitation, kiosks) in any outparcel located within the "No-Build Area" except as and where shown on the Site Plan, and all outparcel buildings so constructed within the No-Build Area shall (i) except with respect to building area "Y", not exceed the Floor Area shown on the Site Plan, (ii) satisfy all parking requirements (without variance) using the parking spaces located within each such outparcel, and (iii) with respect to building area "Z", not exceed a height of forty (40) feet (inclusive of all roof top mechanicals, all projections and all architectural treatments and embellishments).

(e)    Landlord shall not use (or permit the use of) all or any portion of Tenant's Preferred Area for retail sales or for promotional purposes, subject to Tenant's rights under Section 2.01(c). However, tenants of the Shopping Center (including Tenant) shall be permitted to conduct sidewalk sales in front of their respective stores only, provided that such sales shall: (i) be conducted in a manner consistent with sidewalk sales in first-class shopping centers in the State, (ii) not materially interfere with normal pedestrian access over the sidewalks, and (iii) not materially interfere with the normal business operations of Tenant in the Premises or materially impair the visibility of Tenant's signage.

(f)    Landlord shall not make (and shall not permit there to made) any changes to those Common Areas identified as "No-Change Area" on the Site Plan (the "<u>No-Change Area</u>") including, without limitation, changes in the location of curbcuts, drive aisles, entrances, access points, roadways, sidewalks or parking spaces or reduction of the parking ratio specified in Section 20.03(c), without Tenant's consent, which may be withheld in Tenant's reasonable discretion. Landlord shall not make (and shall not permit to be made) any other changes to the Common Areas which adversely affects Tenant's access to the Premises or the Shopping Center

47

or the visibility of the Premises or of any of Tenant's signage, without Tenant's consent, which may be withheld in Tenant's sole discretion. Any other changes to the Common Areas may be made only upon receipt of Tenant's consent, not to be unreasonably withheld, conditioned or delayed.

(g)    Following Tenant's opening for business at the Premises, (a) Landlord shall use commercially reasonable efforts to control any noise and dust at the Shopping Center (including, without limitation, during any periods of permitted construction within the Shopping Center) such that neither interferes with the normal operation of Tenant's business, and (b) Landlord shall not perform (and shall not permit there to be performed) any exterior construction in the Shopping Center during the months of October, November, December and January, except to the extent permitted under Section 5.01.

(h)    Landlord shall not permit any solicitation, distribution of handbills, picketing, or other public demonstration in the Common Areas, except as otherwise may be mandated by Laws.

(i)    No transmission and/or reception towers for wireless telephone or internet communications shall be permitted within the Shopping Center.

(j)    Landlord shall not knowingly install or permit to be installed by any other tenant or other person anywhere in the Shopping Center or any Affiliated Land any structure or equipment which would cause any interference with satellite, radio, telecommunications or television reception or transmission in or from the Building.

SECTION 20.04    Restrictive Covenants .

(a)    The term "Declaration" shall mean that certain proposed Declaration of Covenants, Conditions, Restrictions and Easements to be recorded in the Recorder's Office for Cook County, State of Illinois. As of the Effective Date, the Declaration is in nearly final form, subject only to the finalizing the exhibits to be attached thereto. The latest version of the Declaration reviewed by Tenant is version nine (9) dated on or about July 9, 2007. Any revisions made to the Declaration after such date which could diminish the rights or increase the obligations of Tenant under the Declaration or under this Lease, or could adversely affect Tenant's use or occupancy of the Premises or the conduct of Tenant's business therein, shall be subject to Tenant's prior written approval. Landlord shall record the Declaration in the aforesaid records on or before December 31, 2007. The Shopping Center is also affected by that certain (i) Development, Operation and Restriction Agreement dated April 22, 2004, recorded as Document No. 0411932014, aforesaid records (as the same has been amended, the "DORA"), and (ii) Declaration of Covenants, Restrictions and Easements for Woods of South Barrington Community Detention Area dated July 28, 2005, recorded as Document No. 0521027049, aforesaid records (as the same has been amended, the "DCRE"). The Declaration, DORA and DCRE are sometimes hereinafter collectively referred to herein as the "Restrictive Covenants."

(b)    Except for the Declaration, which has not yet been finalized, Landlord covenants, represents and warrants to Tenant that: (i) the Restrictive Covenants have not been modified, amended or terminated; (ii) the Restrictive Covenants are currently in full force and

48