EXECUTION COPY



**LEASE AGREEMENT**

by and between

**SPRING HILL DEVELOPMENT PARTNERS, GP**

as Landlord

and

**CIRCUIT CITY STORES, INC.**

as Tenant

The Crossings of Spring Hill Shopping Center
Spring Hill (Maury County), Tennessee



WO 729984.13

Table of Contents

Page

ARTICLE I    FUNDAMENTAL LEASE PROVISIONS ...........................................................1
    Section 1.01    Definitions: ...........................................................................1

ARTICLE II    LEASE OF PREMISES - TERM OF LEASE ..................................................4
    Section 2.01    Demise ...................................................................................4
    Section 2.02    Extension Periods....................................................................5
    Section 2.03    Commencement Date and Landlord Reimbursement.................5
    Section 2.04    Possession Date.......................................................................6
    Section 2.05    Fixed Possession Date.............................................................7
    Section 2.06    Possession Date During Slack Period Delivery .........................8
    Section 2.07    Delayed Possession.................................................................8
    Section 2.08    Early Entry ..............................................................................8
    Section 2.09    Measurement............................................................................8
    Section 2.10    Commencement Date Agreement .............................................9
    Section 2.11    Tenant's Permits Contingency.................................................9

ARTICLE III    INITIAL CONSTRUCTION ...........................................................................9
    Section 3.01    Landlord's and Tenant's Work ................................................9

ARTICLE IV    RENT ............................................................................................................10
    Section 4.01    Annual Minimum Rent ...........................................................10
    Section 4.02    Additional Rent.......................................................................10
    Section 4.03    Rent; Method of Payment .......................................................10
    Section 4.04    Late Charge and Interest .........................................................10

ARTICLE V    COMMON AREA MAINTENANCE AND COST ...........................................11
    Section 5.01    Maintenance............................................................................11
    Section 5.02    Construction Clean-up and Post-Possession Work...................11
    Section 5.03    CAM Costs...............................................................................12
    Section 5.04    Tenant's Share of CAM Costs .................................................13
    Section 5.05    Payment of CAM Costs ...........................................................13
    Section 5.06    CAM Costs Increases...............................................................13

ARTICLE VI    TAXES...........................................................................................................14

Table of Contents
(continued)

Page

Section 6.01    Taxes ................................................................................14

Section 6.02    Payment of Taxes................................................................14

Section 6.03    Exclusions from Taxes........................................................14

Section 6.04    Right to Contest .................................................................14

ARTICLE VII UTILITIES................................................................................15

Section 7.01    Utilities................................................................................15

Section 7.02    Interruption .........................................................................15

ARTICLE VIII      USE OF PREMISES...........................................................16

Section 8.01    Permitted Use......................................................................16

Section 8.02    Conduct of Operations .......................................................16

Section 8.03    Leasing Restrictions............................................................16

Section 8.04    Tenant's Exclusive...............................................................17

Section 8.05    Exclusives Applicable To Tenant .......................................19

Section 8.06    Key Tenants ........................................................................19

ARTICLE IX  REPAIRS .................................................................................19

Section 9.01    Landlord Obligations ..........................................................19

Section 9.02    Tenant's Obligations ...........................................................20

Section 9.03    Hazardous Materials ...........................................................20

Section 9.04    Surrender of the Premises ...................................................23

ARTICLE X   REQUIREMENTS OF LAW ....................................................23

Section 10.01 Landlord's Obligations .......................................................23

Section 10.02 Tenant's Obligations ...........................................................23

Section 10.03 Right to Contest ..................................................................23

ARTICLE XI INSURANCE.............................................................................23

Section 11.01 Landlord's Insurance ..........................................................23

Section 11.02 Tenant's Insurance ..............................................................24

Section 11.03 Insurance Requirements Generally.......................................25

Section 11.04 Landlord's Insurance Cost ...................................................25

Section 11.05 Indemnity.............................................................................26

ii

Table of Contents
(continued)

Page

Section 11.06  Mutual Waiver of Subrogation ................................................................26

Section 11.07  Affiliate ..................................................................................................27

ARTICLE XII DAMAGE OR DESTRUCTION..................................................................27

Section 12.01  Landlord's Obligation to Rebuild ..........................................................27

Section 12.02  Tenant's Obligation to Rebuild..............................................................27

Section 12.03  Termination............................................................................................27

ARTICLE XIII          CONDEMNATION..................................................................29

Section 13.01  Taking ....................................................................................................29

Section 13.02  Restoration and Rent Adjustment .........................................................29

Section 13.03  Award .....................................................................................................30

ARTICLE XIV          ALTERATIONS AND MECHANICS' LIENS .......................30

Section 14.01  Tenant's Alteration Rights.....................................................................30

Section 14.02  Mechanics' Liens ...................................................................................31

ARTICLE XV          SIGNS .....................................................................................31

Section 15.01  Tenant's Signs.........................................................................................31

Section 15.02  Pylon Signs ............................................................................................31

Section 15.03  Replacement...........................................................................................32

ARTICLE XVI          TENANT'S PROPERTY..........................................................32

Section 16.01  Tenant's Property....................................................................................32

ARTICLE XVII          ASSIGNMENT AND SUBLETTING .....................................32

Section 17.01  Assignment and Subletting Rights.........................................................32

Section 17.02  Collateral Assignment............................................................................33

Section 17.03  Cure Rights of Original Tenant..............................................................33

Section 17.04  Recognition Agreement .........................................................................33

Section 17.05  Recapture ...............................................................................................33

ARTICLE XVIII          DEFAULT ..............................................................................34

Section 18.01  Tenant's Default......................................................................................34

Section 18.02  Additional Landlord Remedies Due to Construction Delays by Tenant ...36

iii

Table of Contents
(continued)

Page

Section 18.03  Landlord's Default ................................................................36

Section 18.04  Additional Tenant Self-help, Equitable and Legal Remedies Due to
Construction Delays by Landlord ..................................37

Section 18.05  Additional Tenant Remedies Due to Landlord's Failure to Pay the
Landlord Reimbursement..............................................38

Section 18.06  Waiver; Non-Exclusive Remedies...............................................38

ARTICLE XIX        SUBORDINATION, TRANSFER OF INTEREST ...................38

Section 19.01  Subordination ....................................................................38

Section 19.02  Existing Mortgages and Ground Leases ....................................39

Section 19.03  Transfer of Interest..............................................................39

Section 19.04  Tenant Estoppel Certificates ..................................................40

Section 19.05  Landlord Estoppel Certificates ...............................................40

Section 19.06  Payments ...........................................................................40

ARTICLE XX LANDLORD'S REPRESENTATIONS, WARRANTIES AND COVENANTS.40

Section 20.01  Quiet Enjoyment .................................................................40

Section 20.02  Representations, Warranties and Covenants................................40

Section 20.03  Site Covenants ...................................................................41

Section 20.04  OEA   .................................................................................42

ARTICLE XXI        HOLDING OVER ..................................................43

Section 21.01  Holding Over .....................................................................43

ARTICLE XXII       NOTICE.............................................................44

Section 22.01  Where and How Given..........................................................44

Section 22.02  When Given .......................................................................44

ARTICLE XXIII      MISCELLANEOUS ...............................................45

Section 23.01  Rent Proration ...................................................................45

Section 23.02  Construction.......................................................................45

Section 23.03  Section Headings ................................................................45

Section 23.04  Partial Invalidity.................................................................45

Section 23.05  Waiver..............................................................................45

iv

Table of Contents
(continued)

Page

Section 23.06  Governing Law ......................................................................................45

Section 23.07  Successors and Assigns............................................................................45

Section 23.08  No Broker...............................................................................................45

Section 23.09  Memorandum of Lease ...........................................................................46

Section 23.10  Entire Agreement....................................................................................46

Section 23.11  Relationship of Parties ...........................................................................46

Section 23.12  Force Majeure ........................................................................................46

Section 23.13  Limitation of Landlord's Liability ...........................................................46

Section 23.14  Limitation of Tenant's Liability...............................................................47

Section 23.15  Consents.................................................................................................47

Section 23.16  Rent Abatement .....................................................................................47

Section 23.17  Costs  ....................................................................................................47

Section 23.18  Attorneys' Fees ......................................................................................47

Section 23.19  Survival of Obligations ...........................................................................47

Section 23.20  Joint and Several Liability .......................................................................47

Section 23.21  Definition of Hereunder, Herein, etc. ....................................................47

Section 23.22  Tenant's Trade Name..............................................................................48

Section 23.23  Counterparts...........................................................................................48

Section 23.24  Patriot Act ..............................................................................................48

## EXHIBITS

EXHIBIT A         Site Plan
EXHIBIT B         Legal Description of the Shopping Center
EXHIBIT C         Site Design Requirements
EXHIBIT C-1       Possession Date Notice
EXHIBIT D         W-9 Form
EXHIBIT E         Commencement Date and Expiration Date Agreement
EXHIBIT F         Prohibited Uses
EXHIBIT G         Height Restrictions
EXHIBIT H         Existing Exclusives
EXHIBIT I         Recognition Agreement
EXHIBIT J         Subordination, Non-Disturbance and Attornment Agreement
EXHIBIT K         Permitted Exceptions

WO 729984.7
WO 729984.13

Table of Contents
(continued)

Page

| EXHIBIT L | Memorandum of Lease |
| EXHIBIT M | Indemnity Agreement |
| EXHIBIT N | Pylon Sign Rendering |
| EXHIBIT O | Third Party Approvals |

WO 729984.7
WO 729984.13

## LEASE AGREEMENT

**THIS LEASE AGREEMENT** (this "Lease"), dated as of the 26th day of October, 2007 ("Effective Date"), by and between **SPRING HILL DEVELOPMENT PARTNERS, GP,** a Georgia general partnership ("Landlord") with an office at c/o GBT Realty Corporation, 201 Summit View Drive, Suite 110, Brentwood, Tennessee 37027, and **CIRCUIT CITY STORES, INC.,** a Virginia corporation ("Tenant") with an office at 9950 Mayland Drive, Richmond, Virginia 23233.

## W I T N E S S E T H:

In consideration of the rents and covenants set forth in this Lease, Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises (as defined in Section 1.01(Q)) upon the following terms and conditions:

### ARTICLE I

### FUNDAMENTAL LEASE PROVISIONS

SECTION 1.01  Definitions:

A.  **Additional Charges**:

    1.    Initial CAM Costs:  Not to exceed One and 70/100 Dollars ($1.70) per square foot of Floor Area (as defined below) (subject to adjustment pursuant to Section 5.06).

    2.    Initial Taxes: Estimated at One and 25/100 Dollars ($1.25) per square foot of Floor Area.

B.  **Alternative Rent**:  An amount equal to fifty percent (50%) of the Annual Minimum Rent (as defined below) that would have otherwise been due during the period of time that Tenant is entitled to pay Alternative Rent which Alternative Rent, therefore, is payable in lieu of Annual Minimum Rent.

C.  **Annual Minimum Rent** (subject to adjustment pursuant to Section 2.09):

| Period | Rent p.s.f. | Annual Rent | Monthly Installments |
|---|---|---|---|
| Initial Lease Term: | | | |
| Commencement Date through end of tenth (10th) Lease Year (as defined in Section 1.01(J)) | $13.85 | $281,584.35 | $23,465.36 |

| | | | |
|---|---|---|---|
| 1st Extension Period (as defined in Section 1.01(F)): | $14.85 | $301,915.35 | $25,159.61 |
| 2nd Extension Period: | $15.85 | $322,246.35 | $26,853.86 |
| 3rd Extension Period: | $16.85 | $342,577.35 | $28,548.11 |
| 4th Extension Period: | $17.85 | $362,908.35 | $30,242.36 |
| 5th Extension Period: | $18.85 | $383,239.35 | $31,936.61 |

D.   **Broker**:  Baker Storey McDonald Properties.

E.   **Delivery Dates**:       1.      Fixed Possession Date: October 31, 2007.

                                          2.      Outside Possession Date:  November 5, 2007.

F.   **Extension Periods**:  Five (5) periods of five (5) years each.

G.   **Floor Area**:   The actual number of square feet of space contained on all floors within any building in a particular leased premises (including the Premises) within the Shopping Center (as defined below), or in the Shopping Center, as applicable, and, with respect to exterior areas, including all exterior areas leased to or exclusively used by a particular tenant (other than loading dock areas, trash compactor areas, trash container areas, cart corrals, the Other Improvements, drive-thru areas and Common Outdoor Seating Areas [as defined in the OEA]). All measurements shall be from the exterior of outside walls or store front and/or to the centerline of any common walls, but in no event shall Floor Area include any non-selling or storage space areas within any mezzanine, lower floor, second floor or, except as set forth above, any exterior areas.

H.   **Initial Lease Term**: Ten (10) Lease Years, plus the partial Lease Year commencing on the Commencement Date and ending on the January 31 immediately thereafter.

I.    **Key Tenants**:       Target, Bed Bath & Beyond plus two (2) of any of the following: Books-A-Million, Kohl's, Marshalls (or TJ Maxx), Dick's Sporting Goods and/or Ross. For purposes hereof, a Key Tenant may be replaced by a National Tenant or Regional Tenant pursuant to the terms and provisions of Section 8.06.

J.    **Lease Year**:  Each period within the Term (as defined below) commencing on February 1 and ending the next succeeding January 31, except that Lease Year 1 shall include the partial Lease Year commencing on the Commencement Date and ending on the January 31 immediately thereafter.

WO 729984.13

K.  **Minimum Ongoing Cotenancy Percentage**:  Retail tenants open for business during normal business hours, occupying at least seventy percent (70%) of the Floor Area of the Shopping Center, exclusive of the premises occupied by the Key Tenants and the Premises.

L.  **Minimum Initial Cotenancy Percentage**:  Retail tenants, open for business during normal business hours, occupying at least sixty percent (60%) of the Floor Area of the Shopping Center, exclusive of the Premises.

M.  **Minimum Parking Ratios**:  At least one hundred (100) full size parking spaces (a "full size parking space" shall mean a parking space nine and one-half feet [9.5'] wide by eighteen feet [18'] deep) shall be within Tenant's Preferred Area (as identified on the Site Plan), with each parking space for full-sized automobiles.  The North Parking Area, as crosshatched on the site plan attached hereto as <u>Exhibit A</u> (the "<u>Site Plan</u>"), shall have a parking ratio of four (4) full size parking spaces for each one thousand (1,000) square feet of Floor Area in the buildings within the tax parcels of which the North Parking Area are a part and shall be in compliance with the OEA (as defined herein).  Further, the South Parking Area, as crosshatched on the Site Plan, shall have a parking ratio of five (5) full size parking spaces for each one thousand (1,000) square feet of Floor Area in the buildings within the tax parcels of which the South Parking Area is a part. Notwithstanding the foregoing, the Shopping Center may include compact parking spaces if permitted by applicable governmental requirements and such spaces shall be included in satisfying the Minimum Parking Ratio and shall be in compliance with the OEA. Notwithstanding the foregoing, the parties acknowledge and agree that per Section 3.2.5(B) of the OEA, in the event any Building (as defined in the OEA) on the Kohl's Tract (as defined in the OEA) is expanded, the parking area on the Kohl's Tract shall only be required to contain four (4.0) parking spaces for each one thousand (1,000) square feet of Floor Area (as defined in the OEA).

N.  **North Parking Area:**  The parking area designated on the Site Plan as "North Parking Area".

O.  **Opening Requirement:**  Target, Bed Bath & Beyond, and any two (2) of the other Key Tenants are open for business, and the Minimum Initial Cotenancy Percentage is met.

P.  **Permitted Use:**  The sale, rental, installation, servicing and repairing of consumer, office and automotive electronics products (collectively, "Products"), and/or for any other lawful retail use not specifically prohibited by the provisions of the terms and provisions of the Lease, including Section 8.01 of Lease.  "Products" shall include, without limitation, televisions, stereos, speakers, video and audio recorders and players and cameras; computer hardware and software and related software services (which include internet access services, entertainment software and entertainment media [such as, by way of example only, game cartridges, video tapes, cassettes, compact discs, DVD's and DVD equipment]; cellular and wireless telephones and telecommunication devices and related accessories; motor vehicle audio, stereo and telephone systems; and technological evolutions of the foregoing.

WO 729984.13

Q.  **Premises:**  The store building to be constructed by Tenant as part of Tenant's Work (as defined in Section 3.01), containing approximately 20,331 square feet of Floor Area, including 138 feet of frontage and a depth not to exceed 138 feet exclusive of truck docks and wells, in the shopping center to be known as The Crossings of Spring Hill Shopping Center, containing approximately four hundred sixty-two thousand nine hundred seventy three (462,973) square feet of Floor Area and located at the northeast corner of Main Street (Highway 31) and Saturn Parkway in Spring Hill (Maury County), Tennessee (the "State"), as more particularly described in Exhibit B and also consisting of the Developer Tract (as defined in the OEA), the Target Tract (as defined in the OEA and as shown on Exhibit G), the Kohl's Tract (as defined in the OEA and as shown on Exhibit G) (the "Shopping Center").  The Shopping Center includes the "Outparcels" (as defined in the OEA and shown on the Site Plan).  As used herein, the phrase "Landlord Tract" shall mean the Developer Tract, excluding the Outparcels.

R.  **Slack Delivery Period:**  Periods of time beginning on May 5 and ending on the following July 5, and November 30 and ending on the following February 1.

S.  **Slack Season:**  The period of time beginning on November 1st and ending on the following January 1.

T.  **South Parking Area:**  The parking area designated on the Site Plan as "South Parking Area".

U.  **Tenant' s Share:**  A fraction, the numerator of which shall be the Floor Area of the Premises and the denominator of which shall be the Floor Area of all buildings in the Shopping Center (including the Target Tract, Kohl's Tract and the Outparcels), provided, however, that the denominator shall be reduced by the Floor Area of any parcels within the Shopping Center to the extent such owner or occupant thereof self maintains or separately maintains such parcels, but only with respect to any such portion of the CAM Charges and maintenance obligations which are assumed by and performed by such party and not incurred by the Landlord or its designee as CAM Charges hereunder.  With respect to any calculations attributable to the Landlord Tract, in no event shall the denominator of the fraction by which Tenant's Share is determined be less than 160,000 square feet of Floor Area.  Landlord and Tenant acknowledge and agree that the Target Tract, the Kohl's Tract and the Outparcels may be separately maintained from the Landlord Tract pursuant to the terms and provisions of the OEA.  Landlord and Tenant agree that the Outparcels are currently separately maintained.

V.  **Term:**  The Initial Lease Term plus the Extension Periods, if the option for any such Extension Period is exercised.

WO 729984.13

## ARTICLE II

## LEASE OF PREMISES - TERM OF LEASE

SECTION 2.01 <u>Demise</u>.

(a)     Landlord does hereby lease and demise to Tenant, and Tenant does hereby hire from Landlord, the Premises, together with the licenses, rights, privileges and easements appurtenant to the Premises.

(b)     Tenant and its employees, invitees, agents, customers, concessionaires and licensees shall have the nonexclusive right, in common with Landlord and other tenants, occupants and/or owners of the Shopping Center and their respect agents, employees and contractors, to use all "Common Areas" (as defined in Section 1.4 of the OEA) in the Shopping Center provided for in the OEA. Tenant's right to use the Common Areas may be subject to such reasonable regulations (consistent with Tenant's rights under this Lease) as may from time to time be imposed upon, and equally applicable to, all tenants of the Shopping Center by Landlord or its agents, as provided for in the OEA. Landlord shall provide Tenant with at least sixty (60) days prior notice of any such rules and regulations, which notice shall contain a copy of such rules and regulations.

(c)     Subject to the terms and provisions of the OEA (which does not prohibit any of the rights granted to Tenant under this Section 2.01(c)), and applicable Laws (as defined in Section 15.01), Tenant shall have the non-exclusive right to use, on a "24 hours a day", "365 days a year" basis and without any additional charge (other than ordinary CAM Costs and Taxes for such areas which shall be governed in accordance with the provisions set forth in Article 5 below), the loading facilities serving the Premises, trash compactor area and transformer pad area, car stereo parking areas, three (3) the customer pick-up spaces, and four (4) web order customer pick-up parking spaces (collectively, the "<u>Other Improvements</u>"), all as shown on the Site Plan. In addition, Landlord hereby grants to Tenant the right during the Term to install three (3) single width cart corrals (the design of which must be reasonably acceptable to Landlord) in the locations shown on the Site Plan for the storage of Tenant's shopping carts. Tenant shall have the right to erect a sign identifying Tenant's customer pick-up area and/or Tenant's car stereo parking areas. Tenant shall also have the right to erect signage, stripe, and print on the four (4) web order customer pick-up parking spaces in order to so identify such parking spaces.

(d)     In addition, subject to the approval of the Approving Parties under the OEA, Tenant shall have the right to have a truck or other vehicle parked in the "Tenant's Promotion Area" as shown on the Site Plan ("<u>Tenant's Promotion Area</u>"), for up to five (5) consecutive days in duration for each occurrence, for the purpose of promoting and displaying merchandise (each occurrence up to five [5] days in duration is referred to as a "<u>Tenant Promotion</u>"). Subject to the approval of the Approving Parties under the OEA, Tenant may have up to six (6) such promotions during Lease Year 1, and up to five (5) such promotions for each subsequent Lease Year. In the event that a party objects to Tenant's use of such rights granted pursuant to <u>Section 2.01(d)</u>, Landlord grants Tenant the right to pursue and obtain any necessary or appropriate consents under the OEA, at no cost to Landlord other than nominal out-of-pockets costs. In addition, Landlord, as the Approving Party with respect to the Developer Tract, hereby

5

provides its consent and approval to Tenant's use of such areas, and that unless another party claiming under the OEA so demands enforcement of the OEA, Landlord shall not disturb the Tenants rights granted to Tenant pursuant to pursuant to Section 2.01(d).

SECTION 2.02    Extension Periods. Provided Tenant is not then in default of any material terms or provisions of this Lease, after the lapse of all applicable notice and grace periods, Tenant shall have the option to extend the Term for the number of Extension Periods shown in Section 1.01(F), upon all the terms and conditions contained in this Lease. Each such option is exercisable by Tenant giving notice to Landlord (a) at least two hundred forty (240) days prior to the expiration of the Initial Lease Term, or of the then-current Extension Period, as the case may be, or (b) if Tenant fails to give Landlord such notice or has not given Landlord such notice, then within twenty (20) days after receipt of notice from Landlord that Tenant has failed to exercise its option to extend within the time period provided in (a) above (which notice to Tenant, notwithstanding the foregoing, may be sent not more than two hundred sixty (260) days prior to the expiration of the Initial Lease Term, or of the then-current Extension Period).

SECTION 2.03    Commencement Date and Landlord Reimbursement.

(a)    "Commencement Date" shall mean the earlier to occur of: (i) one hundred and eighty (180) days after the Possession Date, subject to extension for Force Majeure, or (ii) the date Tenant initially opens its store for business to the public in the Premises, provided, however that notwithstanding the occurrence of either of the foregoing, the Commencement Date shall be delayed one (1) day for each day of Landlord Delay.  For purposes of this Lease, "Landlord Delay" shall be deemed to have occurred if: (i) following the Possession Date, Landlord or its agents, employees or contractors fail to complete any element of Landlord's Work (as defined in Section 3.01) on or before the date required therefor in the Construction Schedule (as defined in the Site Design Requirements) or there are otherwise delays caused by the acts or omissions of Landlord, subject, however, to Force Majeure (but in no event shall the aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed a period of sixty (60) days), and provided further that this requirement shall not include any portion of Landlord's Work to be performed on any Outparcels in the Shopping Center; (ii) Landlord does not provide permanent electrical service to within five feet (5') of the Build Pad in accordance with the Site Design Requirements within ninety (90) days of the Possession Date, provided, however, that Landlord shall not be considered to have caused a delay if Tenant has not submitted application for its electric service requirements to the local utility provider on or before the Possession Date and such failure results in a delay hereunder, or if Landlord is unable to provide such permanent electrical service due to requirements of the electrical service provider beyond the reasonable control of Landlord, or (iii) Landlord does not complete all of Landlord's Work (excluding any portion of Landlord's Work to be performed on the Outparcels) and otherwise satisfy all conditions (other than Tenant's Work) necessary for Tenant to obtain a certificate of occupancy within one hundred and eighty (180) days after the Possession Date. The foregoing shall not otherwise limit Tenant's rights and remedies set forth in this Lease.

(b)    If the Commencement Date shall occur during the Slack Season or prior to the date on which the Opening Requirement is met, and Tenant elects to delay the opening of its store, then, notwithstanding that the Commencement Date may have occurred, Rent (as defined in Section 4.03) shall fully abate until the earlier to occur of (i) the date Tenant opens for

6

business to the public, and (ii) the later to occur of (a) the first (1st) day following the end of the Slack Season, or (b) the date on which the Opening Requirement is met. However, if Tenant elects, at its discretion, to open for business during the Slack Season or prior to the date that the Opening Requirement is met, then Tenant shall pay, in lieu of Annual Minimum Rent, Alternative Rent until the later to occur of (i) the first (1st) day following the end of the Slack Season, or (ii) the date on which the Opening Requirement is met. In no event shall Tenant's election to delay opening its store in any way delay or modify the date on which the Landlord Reimbursement is required to be paid by Landlord to Tenant.

(c)    "Landlord Reimbursement" shall mean the product obtained by multiplying Seventy Five Dollars ($75.00) by the Floor Area of the Premises as determined by the Floor Area Certification (as defined below), subject to the measurement provisions of Section 2.09. Upon Substantial Completion (as defined in the Site Design Requirements attached hereto as Exhibit C ["Site Design Requirements"]) and Tenant's furnishing to Landlord (a) the certificates of insurance required under Section 11.02, (b) an indemnity in the form of Exhibit M attached to this Lease with respect to mechanics' liens arising out of Tenant's construction, (c) a square footage building perimeter survey certified to Tenant and Landlord (the "Floor Area Certification"), and (d) a copy of the temporary or final certificate of occupancy for the Premises properly issued by the governmental body having jurisdiction thereof, provided however that if Tenant provides a temporary certificate of occupancy, Tenant shall diligently pursue receipt of a final certificate of occupancy, Landlord shall pay to Tenant the Landlord Reimbursement. The Landlord Reimbursement shall be payable by wire transfer of funds by Landlord to Tenant's account no later than thirty (30) days after Substantial Completion and receipt of items (a), (b), (c), and (d) above and Tenant's wiring instructions or other payment instructions (collectively, the "Landlord Reimbursement Deliverables").

(d)    Upon Substantial Completion and payment of the Landlord Reimbursement from Landlord to Tenant (the "Transfer Date"), Landlord shall be the owner of the Building (as defined in the Site Design Requirements, but not including any of Tenant's Property, as defined in Section 16.01) and Landlord shall be entitled to depreciate the Building for tax purposes. Tenant shall have the right to deliver to Landlord, a bill of sale evidencing the conveyance of the Building from Tenant to Landlord and an assignment of warranties evidencing the assignment of all construction warranties from Tenant to Landlord. Landlord shall also have the right to require Tenant to deliver to Landlord such a bill of sale and/or such assignment of warranties. However, the conveyance of the Building and/or the assignment of warranties shall be deemed to have occurred as of the Transfer Date notwithstanding that a bill of sale and/or assignment of warranties was not so delivered. Notwithstanding the foregoing, upon request by Landlord, Tenant shall execute all documents necessary to effectuate assignment of the foregoing warranties to Landlord.

SECTION 2.04 Possession Date. "Possession Date" shall mean the date on which the last of the following conditions shall have been satisfied:

(a)    Landlord shall have caused the Delivery of the Land to occur. The term "Delivery of the Land" shall mean the completion of all Site Delivery Work (as defined in the Site Design Requirements).

(b)    Landlord shall have delivered the soils engineer's and surveyor's certifications as required by Circuit City's Specifications (as defined in the Site Design Requirements), that parties acknowledging and agreeing that Landlord has satisfied this requirement as of the date hereof;

(c)    Landlord has obtained all third party approvals (other than with regard to governmental approvals which shall be obtained by Tenant, and Kohl's and Target's consent as Approving Parties under the OEA, to Tenant's rights under section 2.01(d) of the Lease) of Tenant's detailed plans of the exterior of the Building as shown on Exhibit O attached hereto required under the OEA and in accordance with the provisions of Section 20.04(i) below, but excluding all consent that may be required under Section 2.01(d) of this Lease.  The parties acknowledge and agree that Exhibit O has been approved by all required parties under the OEA.

(d)    Landlord owns fee simple title to the Landlord Tract;

(e)    The applicable representations and warranties of Landlord set forth in Sections 9.03 and 20.02 below shall then be true and in effect in all material respects, and Landlord shall not then be in violation of any of the Site Covenants (as defined in Section 20.03);

(f)    Landlord shall have delivered to Tenant a fully-executed original counterpart of a non-disturbance and/or recognition agreement, if applicable, from each Mortgagee and Ground Lessor (as such terms are defined in Section 19.01), as more fully set forth in Section 19.02;

(g)    Landlord shall have delivered to Tenant the W-9 form attached hereto as Exhibit D.

In no event shall the Possession Date occur prior to the Fixed Possession Date.

SECTION 2.05  Fixed Possession Date.

(a)    Landlord shall cause the Possession Date to occur on the Fixed Possession Date.

(b)    If Landlord fails to accomplish the Possession Date by the Fixed Possession Date (subject to Force Majeure, as defined in Section 23.12, but in no event shall the aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed a period of sixty (60) days) and any delays caused by Tenant, its agents, employees or contractors ("Tenant Delay"), then Landlord shall pay to Tenant on demand, as a liquidated reimbursement (and not as a penalty) for all of the damages that Tenant will suffer as a result of any such delay, an amount equal to the sum of: (i) Ten Thousand Dollars ($10,000), plus (ii) an amount equal to two (2) days of Annual Minimum Rent for each day that the Possession Date is delayed.  If Landlord fails to complete any other element of Landlord's Work (as defined in Section 3.01) on or before the date required therefor in the Construction Schedule (as defined in the Site Design Requirements), subject to Force Majeure (but in no event shall the aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed a period of sixty (60) days) and Tenant Delay, then Landlord shall pay to Tenant on demand, as a liquidated reimbursement (and not as a penalty) for all of the damages that Tenant will suffer as a result of any such delay, an amount

8

equal to two (2) days of Annual Minimum Rent for each day that such component of Landlord's Work is delayed. The foregoing liquidated reimbursements represent the parties' good faith agreement as to an agreed upon amount which shall have been incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment. The foregoing liquidated reimbursements represent the parties' good faith agreement as to an agreed upon amount which shall have been incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment.

SECTION 2.06 <u>Possession Date During Slack Delivery Period</u>. Anything contained in this Lease to the contrary notwithstanding, if the Possession Date occurs during the Slack Delivery Period, then Tenant may refuse to accept the Premises. In the event that Tenant so refuses to accept delivery of the Premises, the Possession Date shall be delayed and shall not be deemed to occur until the first (1st) day following the end of the applicable Slack Delivery Period, subject to the other provisions of this Lease (including, without limitation, Sections 2.04 and 2.05). No damages shall accrue to Tenant in accordance with Section 2.05(b) if the Possession Date falls within the Slack Delivery Period and as a result thereof Tenant elects not to take possession of the Premises.

SECTION 2.07 <u>Delayed Possession</u>. If the Possession Date does not occur before the Outside Possession Date (subject to Force Majeure, but in no event shall the aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed a period of sixty (60) days and any Tenant Delay), then Tenant shall have the right to (a) terminate this Lease, or (b) delay opening its store facility for a period of not to exceed nine (9) months, which right shall be exercised by Tenant upon notice to Landlord at any time prior to the Possession Date. If Tenant terminates this Lease, then there shall be no further liability on the part of Landlord or Tenant, <u>except</u>: (i) for those obligations that expressly survive the expiration or other termination of this Lease, and (ii) Landlord shall (which obligation shall survive the termination of this Lease), within three (3) business days following Tenant's termination notice, reimburse Tenant for all its reasonable third-party costs and expenses incurred in connection with this Lease (including, without limitation, costs associated with the preparation and review of plans and specifications, and attorneys' fees), not to exceed Fifty Thousand Dollars ($50,000). If Tenant elects to delay opening its store facility as permitted in this Section 2.07, then Landlord shall cause the Possession Date (including, without limitation, the Delivery of the Land) to occur on the date subsequently required by Tenant, and Landlord shall pay to Tenant on demand an amount equal to all additional costs incurred by Tenant in the development of its store facility including, but not limited to, costs of materials and all engineering, architectural, legal fees, and costs of delay resulting from Landlord's failure to timely deliver.

SECTION 2.08 <u>Early Entry</u>. Any time prior to the Delivery of the Land, but upon at least twenty-four (24) hours notice to Landlord, Tenant shall have the right to enter the Premises to (a) inspect the physical condition of the Land (as defined in the Site Design Requirements) and conduct its due diligence investigation of the Land to determine the suitability of the Land for Tenant's intended development, construction, use and operation and (b) inspect Landlord's Work; <u>provided</u>, <u>however</u>, that such entry may not interfere with Landlord's Work. Such entry shall not be construed as an acceptance of the Premises by Tenant under the provisions of this Lease or as a waiver of any of the provisions hereof.

9

SECTION 2.09 <u>Measurement</u>. If the Floor Area Certification shall disclose that the Premises contains more or less than the Floor Area shown in Section 1.01(Q), then Landlord and Tenant agree to amend this Lease to adjust all Rent to account for the actual Floor Area of the Premises. Notwithstanding the foregoing, prior to making any adjustment in Rent Landlord may have the Floor Area of the Premises verified by Landlord's architect. In the event that such verification reveals a discrepancy between the measured floor area of the Premises and the floor area set forth in Section 1.01 (Q) of this Lease, and Landlord and Tenant are unable to agree upon the Floor Area of the Premises for purposes of this Lease, an independent architect acceptable to Landlord and Tenant (the cost of which shall be divided equally between Landlord and Tenant) shall measure the Premises. In the event that Tenant's architect, Landlord or its architect, and the independent architect are unable to agree upon the Floor Area of the Premises for purposes of this Lease, the Floor Area of the Premises shall be deemed to be the average Floor Area of the two (2) closest of the three (3) measurements.     Notwithstanding anything to the contrary stated in this Section 2.09, in no event shall the Floor Area of the Premises be deemed to contain fewer than Twenty Thousand Three Hundred (20,300) Square Feet.

SECTION 2.10 <u>Commencement Date Agreement</u>. When the Commencement Date has been determined, Landlord and Tenant shall execute a memorandum, in the form of <u>Exhibit E</u>, which shall expressly confirm the Commencement Date and the expiration date of the Initial Lease Term.

SECTION 2.11 <u>Tenant's Permits Contingency.</u>

(a)     Anything contained in this Lease to the contrary notwithstanding, if the Permit Condition (as defined below) is not satisfied on or before November 15, 2007 (the "Permit Contingency Date") (provided Tenant applies for Permits on or before the Possession Date), then Tenant shall have the right (at its option) to terminate this Lease at any time thereafter and prior to the satisfaction of the Permit Condition, which termination notice shall be effective (60) days following receipt thereof by Landlord. Landlord, at Landlord's sole cost and expense, shall have the right but not the obligation to obtain the Tenant's Permits on Tenant's behalf during such 60-day period, provided, however, that such Tenant' permits shall be subject to Tenant's approval which shall not be unreasonably withheld. Notwithstanding the foregoing, Tenant may withhold its consent if such Tenant's Permits contain condition(s) that (i) materially increase the cost of Tenant's Work or operation of the retail store (unless Landlord agrees to reimburse Tenant for such increased costs), (ii) cause delays in the Tenant's construction schedule, (iii) reduce the permitted building area of the Building to less than 20,300 square feet of Floor Area or reduce the hours of operation of the Tenant's store to less than Tenant's typical hours of operation for stores in the State, or (iv) are otherwise onerous or detrimental to Tenant in the construction or operation of Tenant's store. In the event that the Landlord obtains the Tenant's Permits acceptable to Tenant in accordance with the terms hereof, and the Permit Conditions (as set forth below) is otherwise satisfied, Tenant's termination notice shall be rendered null and void. Subject to extensions on a day-for-day basis for Landlord Delay and Force Majeure events, Tenant shall submit its application(s) to all proper governmental authorities for Tenant's Permits (as defined below) which shall include all necessary plans and specifications required to obtain such permits on or before the date hereof and simultaneously shall provide Landlord with complete copies thereof. Tenant agrees to use diligent efforts to satisfy the Permit Condition by the Permit Contingency Date; provided, however, the foregoing

10

shall not be deemed to require Tenant to initiate litigation or agree to any condition imposed upon the issuance of any Tenant's Permits (as defined below) except as set forth in this Section 2.11(a). "Permit Condition" shall mean the final and unconditional issuance of Tenant's Permits free and clear of any governmental ban, bar or moratorium and with all appeal periods having expired. "Tenant's Permits" shall mean any and all permits, approvals, licenses and the like necessary to perform Tenant's Work.

(b)    If the Permit Condition has not been satisfied within thirty (30) days after the Permit Contingency Date for any reason other than Landlord's failure to perform or observe any of its obligations under this Lease, then Landlord shall have the option, upon notice given to Tenant prior to the satisfaction of the Permit Condition, to terminate this Lease, provided, however, Tenant shall have the right to void Landlord's termination notice by giving notice to Landlord, within fifteen (15) days after receiving Landlord's termination notice, of the satisfaction of the Permit Condition, whereupon Landlord's termination notice shall be rendered null and void and Tenant shall have no further right to terminate pursuant to Section 2.11.

(c)    If Tenant or Landlord terminates this Lease under this Section 2.11, then there shall be no further liability on the part of Landlord or Tenant, except for those obligations that expressly survive the expiration or other termination of this Lease.

## ARTICLE III

## INITIAL CONSTRUCTION

SECTION 3.01  Landlord's and Tenant's Work.    Landlord shall perform Landlord's work in accordance with the Site Design Requirements and as otherwise required by this Lease ("Landlord's Work"). Tenant shall construct the Building and storefront sidewalk in accordance with the Site Design Requirements ("Tenant's Work") for which Landlord shall pay to Tenant the Landlord Reimbursement.  Landlord and Tenant acknowledge receipt of the Site Design Requirements and each agrees to comply with the provisions thereof relating to their respective work.  In connection with Tenant's performance of Tenant's Work and during any other periods of construction during the Term, Tenant shall have the right to use as a construction staging area approximately 20,000 square feet of the Common Areas in the location identified on the Site Plan as "Staging Area."  On or after eighty (80) days after Tenant commences the Tenant's Work, Tenant, upon twenty (20) days prior notice from Landlord shall relocate its Staging Area, provided however that any such relocation shall not unreasonably interfere with Tenant's Work and such relocation is coordinated with Tenant's construction manager and construction site superintendent.  Tenant agrees to repair any damage to the Staging Area caused by Tenant's or its contractors use of same.  Tenant shall only be responsible for customary fees related to utility hook-up at the Premises and fees related to construction Tenant's Work, but excluding any impact fees related to Tenant's Work or the Shopping Center, and Landlord shall be solely responsible for all other permit or impact fees relating to the development of the Shopping Center site and Improvements, exclusive of Tenant's Work.

11

## ARTICLE IV

### RENT

SECTION 4.01 <u>Annual Minimum Rent</u>.  Commencing on the Commencement Date, Tenant shall pay to Landlord monthly installments of Annual Minimum Rent without prior notice, demand, setoff or deductions, except as otherwise provided for in this Lease, on the first (1st) day of each calendar month during the Term.  However, if the Commencement Date occurs on a day other than the first (1st) day of a calendar month, then the monthly installment of Annual Minimum Rent and other charges shall be prorated for the remaining days of that calendar month.  Anything contained in this Lease to the contrary notwithstanding, if Tenant shall be paying Alternative Rent in lieu of Annual Minimum Rent as permitted under this Lease during such time as Tenant shall be entitled to an abatement of, deduction from or setoff against Annual Minimum Rent, then Tenant shall be entitled to the same abatement of, deduction from or setoff against Alternative Rent.

SECTION 4.02 <u>Additional Rent</u>.  The term "<u>Additional Rent</u>" shall mean all amounts required to be paid by Tenant under this Lease other than Annual Minimum Rent.  Wherever an item of Additional Rent is payable "on demand" or no time period for payment of an item of Additional Rent is specifically provided for in this Lease, such item of Additional Rent shall be paid by Tenant within thirty (30) days after Tenant's receipt of Landlord's invoice therefor, accompanied by the appropriate back-up documentation.

SECTION 4.03 <u>Rent; Method of Payment</u>.  The term "<u>Rent</u>" shall mean, collectively, Annual Minimum Rent and Additional Rent.  All payments of Rent shall be made by check payable to Landlord, mailed or delivered to the address listed in Section 22.01 or to such other person or place as Landlord shall designate by notice to Tenant, or by such other reasonable method of payment (such as by wire transfer).

SECTION 4.04 <u>Late Charge and Interest</u>.  If Tenant fails to pay any installment of Rent or other amounts due hereunder when due, Tenant shall pay to Landlord a late charge equal to five percent (5%) of such overdue amount within ten (10) business days after Landlord's written demand therefor.  Notwithstanding the foregoing, with respect to the first two (2) times in any calendar year that Tenant fails to timely pay the monthly installment of Annual Minimum Rent, the aforementioned late charge shall not apply unless Tenant also fails to make such payment within ten (10) business days after receipt of Landlord's written notice of such failure.  Landlord shall not be required to give Tenant such notice more than twice in any calendar year prior to assessing such late charge.  In addition to the aforesaid late charge, any payment of Annual Minimum Rent or Alternative Rent which is not made within ten (10) days of the date when due shall accrue interest at the Default Rate (as defined in Section 18.01(b)) from the due date through the date when paid; any payment of Additional Rent or other amounts due hereunder which is not made within twenty (20) days of the date when due shall accrue interest at the Default Rate (as defined in Section 18.01(b)) from the date which is ten (10) business days after Landlord's written demand therefor through the date when paid.

12

## ARTICLE V

## COMMON AREA MAINTENANCE AND COST

SECTION 5.01 <u>Maintenance</u>.  Landlord shall operate, maintain, insure, repair and replace the Common Areas or cause the same to be done in a manner so as to maintain the Shopping Center in good, first class, repair and condition.  Without limiting the generality of the foregoing, Landlord shall be solely responsible, and Tenant shall have no obligation (except to reimburse Landlord for Tenant's Share of CAM Costs, as provided below), for the maintenance, repair or replacement of the parking areas (including, without limitation, any necessary repaving and restriping), parking lot lighting, utility systems and connections, access ways and other Common Areas and for the clearing of snow and ice from the Common Areas.  Landlord may at any time, except between October 1 and January 1, close temporarily any Common Areas to make repairs, to prevent the acquisition of public rights therein or discourage non-customer parking.  Between October 1 and January 1, Landlord may temporarily close parts of the Common Areas, but only to make repairs of an emergency nature.  However, in any instance of such emergency repairs Landlord shall use all reasonable efforts to perform the necessary repairs in the most expeditious manner possible and in such a way and at such times as to cause the least interference possible with ingress and egress to and from the Premises.

SECTION 5.02 <u>Construction Clean-up and Post-Possession Work</u>.  Following the Possession Date (or such later date as may be set forth below, as applicable), any construction by Landlord or other tenants or occupants of the Landlord Tract affecting any portion of the Shopping Center shall be subject to the following terms and conditions (in addition if any other applicable provisions of this Lease, such as, by way of example only, Section 20.03(g)):

(a)  staging and storage of materials and parking of construction vehicles shall not occur in Tenant's Preferred Area;

(b)  Landlord shall diligently ensure that, from and after Tenant's opening for business to the public, no ingress, egress or passage of any construction, delivery and related vehicles engaged in the performance of such work or other construction activities shall take place except through the entrance/exit drive designated as the "<u>Construction Drive</u>" on the Site Plan;

(c)  Landlord shall maintain the Landlord Tract, and to the extent required under the OEA, the remainder of the Shopping Center in a clean, safe, and sightly condition, provided, however, that with respect to such portions of the Shopping Center which Landlord is not maintaining, Landlord shall demand compliance with any similar provisions in the OEA which govern the condition thereof; furthermore, Landlord shall use reasonable efforts to ensure that such construction shall not materially adversely interfere with the normal conduct of any business operations in the Premises; and

(d)  Landlord shall, in a reasonable period of time, clear all rubble and debris from the Premises (unless attributable to Tenant's Work) and Common Areas resulting from any construction by Landlord or any other tenant or occupant of the Landlord Tract and shall demand compliance with any similar provisions in the OEA which govern the condition of the Target Tract, the Kohl's Tract or the Outparcels.

13

SECTION 5.03  <u>CAM Costs</u>.  "CAM Costs" shall mean the actual amount (without profit or "mark up" by Landlord or any Affiliate, as defined in Section 11.07, of Landlord) of all necessary, competitive and reasonable costs and expenses actually incurred by Landlord in operating, repairing, insuring and maintaining the Common Areas on the Shopping Center (subject to <u>Section 1.01(T)</u> hereinabove) in an appropriate manner commensurate with good business practice and first-class shopping centers, and, in addition thereto, in lieu of any cost(s) or expense(s) relating to the administration and management of such portions of the Common Areas, an administrative fee (the "<u>Administrative Fee</u>") equal to five percent (5%) of the CAM Costs for the calendar year in question, but excluding from the computation of such Administrative Fee the cost of any replacement or improvement of a capital nature (to the extent otherwise permitted to be included in CAM Costs), the cost of electricity and other utilities, and the cost of insurance premiums.  In no event will CAM Costs include: (a) real estate taxes, (b) any costs associated with maintenance performed by another tenant or occupant of the Shopping Center on portions of the Common Areas separately maintained by such tenant or occupant (Tenant acknowledges that the OEA grants the owner of the Target Tract and the Kohl's Tract the right to maintain their own tract); (c) any dues or charges for a merchants' or other association of occupants of the Shopping Center; (d) maintenance, repairs or replacements to the Common Areas (i) necessitated by the negligent or wrongful act of Landlord or any tenant or occupant, (ii) made to correct any construction defect, or (iii) relating to any improvements or utility systems not within the Common Areas (e.g. roofs, exterior walls, fire protection systems); (e) repairs or replacements necessitated by any governmental entity or made to correct any condition in existence prior to the Commencement Date, or to correct damage caused by subsidence or adverse or substandard soil conditions; (f) amounts reimbursable from insurance proceeds, under warranty, or by any tenant or occupant of the Shopping Center or any other third party other than pursuant to a Common Area expense provision similar to this Section 5.03; (g) premiums for insurance for coverage maintained by Landlord with respect to the Shopping Center (except that premiums for Common Areas liability insurance may be included as part of CAM Costs provided the coverage provided by such liability insurance policy is not in excess of the limits established in Section 11.01), any costs resulting from insurance deductibles under any insurance policy maintained by Landlord, any costs which would have been reimbursed or paid for by insurance proceeds had Landlord maintained the insurance required under Section 11.01, and the amount of any judgment or other charge entered, or costs assessed against, Landlord in excess of the policy limits of the insurance maintained by Landlord under Section 11.01; (h) the cost of any replacements or capital improvements to the Common Areas, except that the cost of repaving the parking areas of the Shopping Center (but not the Target Tract or the Kohl's Tract which repaving and resurfacing shall be the sole responsibility of the owner of such parcel) may be included within CAM Costs so long as such cost is otherwise permitted to be included within CAM Costs and is amortized on a straight-line basis over the useful life thereof under generally accepted accounting principles consistently applied, and is not incurred (i) prior to the expiration of the tenth (10th) full calendar year of the Term, or thereafter (ii) more than once during each seven (7) full calendar years of the Term; (i) reserves for anticipated future expenses; (j) interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner; (k) Landlord's personnel, overhead, home office or administrative expenses, except for the Administrative Fee; (l) amounts incurred to remediate any Hazardous Materials (as defined in Section 9.03(a)) not caused by Tenant; (m) any new improvements to the Shopping Center or Common Areas including, but not limited to, renovations to the facade of the Shopping Center

14

and improvements to landscaped areas of the Shopping Center; (n) holiday or other decorations or other promotional expenses relating to the Shopping Center; or (o) any fees, costs or expenses not related to the operation, maintenance, insurance or repair of the Common Areas. Further, Landlord shall exclude from CAM Costs all costs or expenses in connection with any repairs or replacements to the Common Areas from the Commencement Date through the first (1st) anniversary of the Commencement Date, and Landlord shall also make an appropriate adjustment for the increase in CAM Costs attributable to tenants or occupants of the Shopping Center open for business between the hours of 11 p.m. and 7 a.m.

SECTION 5.04  Tenant's Share of CAM Costs.  Tenant shall pay to Landlord Tenant's Share of CAM Costs in each calendar year during the Term.  Tenant's Share of CAM Costs shall be appropriately prorated for partial calendar years at the beginning and at the end of the Term. Notwithstanding anything contained in this Lease to the contrary, in no event shall Tenant's Share of CAM Costs in the first (1st) full calendar year of the Term (and for any prior partial year of the Term, if any) exceed the Initial CAM Costs set forth in Section 1.01.

SECTION 5.05  Payment of CAM Costs.  Tenant's Share of CAM Costs shall be payable in equal monthly installments on the first (1st) day of each month.  Such monthly installments shall be at the rate of one-twelfth (1/12th) of Tenant's Share of CAM Costs for the preceding calendar year, subject to immediate adjustment when the actual amount of CAM Costs or a change in Tenant's Share thereof is determined.  Within ninety (90) days after the end of each calendar year, Landlord shall furnish Tenant with a detailed statement certified by an authorized representative of Landlord of the actual amount of CAM Costs and of Tenant's Share thereof for the preceding calendar year (including the basis of allocation to Tenant).  Within thirty (30) days after receipt of such statement by Tenant, Tenant shall pay to Landlord any deficiency due.  Any surplus paid by Tenant shall, at Tenant's option, be credited against the next installment(s) of Rent or be refunded to Tenant forthwith.  Landlord's records of CAM Costs for each year shall be available for inspection by Tenant for a period of three (3) years after Landlord notifies Tenant of Tenant's Share of CAM Costs for the year in question.  Tenant may, during such three (3) year period, upon ten (10) days' prior notice to Landlord, have an audit made of CAM Costs and the allocations thereof to Tenant including, without limitation, reviewing copies of paid bills and other records substantiating its expenditures ("CAM Records").  In addition, Landlord agrees to forward copies of CAM Records to Tenant or its representative within ten (10) days of a request therefor.  Any overcharges shown by any such audit shall, at Tenant's option, be credited against the next installment(s) of Rent or be refunded to Tenant forthwith.  If any such audit shows that Tenant's Share of CAM Costs have been overstated by more than three percent (3%), then Landlord shall immediately pay to Tenant the reasonable cost of such audit.

SECTION 5.06  CAM Costs Increases.  Notwithstanding anything contained in this Lease to the contrary, for all calendar years subsequent to the first (1st) full calendar year of the Term, in no event shall Tenant's Share of CAM Costs increase, from any calendar year to the immediately succeeding calendar year, by more than five percent (5%), excluding from such calculation, the costs of snow and ice removal, insurance rate increases and utility rate increases for the calendar years in question.

15

## ARTICLE VI

## TAXES

SECTION 6.01 <u>Taxes</u>.    Landlord shall pay or caused to be paid (by a tenant or otherwise) when due all real estate taxes and assessments levied and assessed against the land, improvements and buildings comprising the Landlord Tract and any other portions of the Shopping Center owned by Landlord.    Except as hereinafter provided to the contrary, for each calendar year or part thereof during the Term, Tenant shall pay Tenant's Share of the net amount (after reflecting all discounts for early payment, refunds and credits and after excluding all penalties, interest, late charges and real estate taxes and assessments levied against free-standing buildings which are separately assessed) of all real estate taxes and assessments (collectively, "<u>Taxes</u>") levied and assessed against the land, improvements and buildings comprising the Landlord Tract.    Tenant's Share of Taxes shall be equitably adjusted if the use or value of any portion (other than the Premises) of any buildings in the Landlord Tract included in computing Tenant's allocation cause Taxes attributable to such buildings to be assessed at a disproportionately higher rate.

SECTION 6.02 <u>Payment of Taxes</u>.    Tenant shall be liable for and shall pay Tenant's Share of Taxes only with respect to Taxes accruing during the Term, regardless of when such Taxes are billed or become due and payable. Tenant's Share of Taxes shall be appropriately prorated for partial fiscal tax years at the beginning and at the end of the Term.    Tenant shall pay Tenant's Share of Taxes (a) within thirty (30) days after Landlord submits to Tenant, a tax bill for such Taxes and a statement setting forth the manner in which Tenant's Share of Taxes is calculated, or (b) thirty (30) days before the same are due and payable, whichever is later.

SECTION 6.03 <u>Exclusions from Taxes</u>.    Notwithstanding anything contained in this Lease to the contrary with respect to betterments or other extraordinary or special assessments, Tenant's obligations shall apply only to the extent such assessments (and interest thereon) are payable in respect of the Term, and Tenant's Share of any such assessments shall be determined as if such assessments are payable in installments over the longest payment period permitted by law for the particular assessment, in which case Tenant shall pay only those installments payable in respect of the Term.    Landlord represents to Tenant that, as of the Effective Date and, to the best of Landlord's knowledge, as of the Possession Date, no portion of the Shopping Center is or will be (a) subject to or the beneficiary of an abatement, exemption and/or phase-in of Taxes, (b) subject to any special assessments or similar charges, or (c) included in any special improvement district(s) which would result in higher sales taxes or other similar impositions than would exist in the absence of such district(s).    Further, Taxes shall not include any: (i) income, excise, margin, profits, estate, inheritance, succession, gift, transfer, franchise, capital, or other tax or assessment upon Landlord or upon the rentals payable under this Lease; (ii) taxes on rents (other than to the extent that such taxes are customarily paid by retail tenants in the State and are actually paid by all the other tenants of the Landlord Tract), gross receipts or revenues of Landlord from the Premises; (iii) fine, penalty, cost or interest for any tax or assessment, or part thereof, which Landlord or its lender failed to timely pay, unless such late payment was solely attributable to late payment by Tenant of Tenant's Share of Taxes; (iv) assessment for a public improvement arising from the initial construction or expansion of the Shopping Center or the Premises; (v) Taxes resulting directly from an increase in the assessment caused by a sale or

16

ground lease of all or any portion of the Shopping Center to an Affiliate of Landlord, or more than once every five (5) years; or (vi) fees imposed upon Landlord in connection with Landlord's development of the Shopping Center (including, without limitation, trip generation fees). All Taxes payable by Tenant pursuant to this Article VI shall be determined as if the Shopping Center was the only property owned by Landlord.

SECTION 6.04  Right to Contest.  At Tenant's request, Landlord shall contest the amount or validity of any assessed valuation or Taxes attributable to the Landlord Tract, failing which, Tenant may contest the assessed valuation or Taxes by appropriate proceedings conducted in good faith. If Tenant initiates such contest, then Landlord shall cooperate, at no cost or expense to Landlord (except as set forth below), with Tenant including, without limitation, executing any and all documents required in connection therewith and, if required by any governmental authority having jurisdiction, joining with Tenant in the prosecution thereof. If any rebate or refund of Taxes is received as a result of any contest or otherwise, then Tenant shall be entitled to Tenant's Share thereof (after reasonable and customary expenses incurred by Landlord, Tenant and/or other tenants or occupants joining therein in connection with such contest are paid to the party which incurred such expense). Tenant shall have the right to defer payment of Tenant's Share of Taxes during any such Tax contest if permitted under Laws (as defined in Section 10.01) and so long as deferral will not result in penalties, interest and/or late charges on such Taxes if the Tax contest is unsuccessful. Unless such tax contest is joined by at least two other National Tenants and/or Regional Tenants, Tenant shall indemnify, defend and hold Landlord harmless from all loss, cost and/or expense incurred by Landlord as a result of any unsuccessful Tax contest initiated by Tenant. Tenant's rights under this Section 6.04 shall only apply if Tenant's request to contest Taxes is joined by at least one (1) other National Tenant or Regional Tenant (as such terms are defined in Section 8.06) occupying 20,000 square feet of Floor Area or more in the Landlord Tract.

## ARTICLE VII

## UTILITIES

SECTION 7.01  Utilities.  Landlord covenants and agrees that the Premises shall be properly serviced with gas, electric, telephone, water, sewer and other utilities sufficient to meet Tenant's requirements in accordance with the Site Design Requirements. Tenant, as part of Tenant's Work, shall cause all such utilities to the Premises to be separately metered at Tenant's sole cost and expense. Tenant shall pay, as same become due and payable, all customary tap and meter fees and all charges for utility services furnished to the Premises during the Term. If at any time during the Term, for any reason, Landlord shall provide utility service to the Premises, Tenant's cost for such utility service shall not exceed the lesser of (a) Landlord's actual cost for such utility service, or (b) the cost of the same service if Tenant had obtained such service directly from such utility provider. In addition, Tenant shall have the right to install a test meter to verify its utility usage. Notwithstanding anything contained in this Lease to the contrary, Tenant shall be entitled to select the utility service providers to the Premises including the telecommunication provider. In the event Tenant shall select any utility service provider, Tenant shall be responsible for paying all tap-in fees, connection fees and any other fees or charges associated with any such utility provider. In addition, in no event shall any such utility provider be permitted to perform any work within the Shopping Center that is not otherwise permitted

17

under the OEA, without Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned and/or delayed or without the consent of the Approving Parties under the OEA, if applicable as permitted under the OEA. Landlord shall permit full and free access to all available conduits in the Shopping Center for the applicable utility service subject to such reasonable requirements as Landlord may impose.

SECTION 7.02 <u>Interruption</u>. If utilities serving the Premises are disrupted due to the acts or omissions of Landlord, its agents, contractors, servants or employees, then Landlord shall promptly restore the affected utilities at Landlord's sole cost and expense. If such disrupted utilities are not restored within twenty-four (24) hours after the Landlord has knowledge of such disruption and Tenant is unable to conduct its normal business in the Premises as a result of such disruption, then Rent shall be equitably abated during the period of disruption.

## ARTICLE VIII

## USE OF PREMISES

SECTION 8.01 <u>Permitted Use</u>. The Premises may be used and occupied for any Permitted Use. However, Tenant shall not use the Premises for any of the Prohibited Uses (as defined in <u>Exhibit F</u>) set forth in <u>Exhibit F</u> attached hereto and incorporated herein.

SECTION 8.02 <u>Conduct of Operations</u>. Subject to the other provisions of this Lease (including, without limitation, Article II), Tenant shall initially open for business with the public in the Premises as a so-called standard "Circuit City" in a manner that is substantially similar with Tenant's other new Circuit City store(s) in Tennessee for at least one (1) day (the "Opening Date"), not later than the three hundredth (300th) day after the Possession Date. Other than as expressly set forth in the preceding sentence, Tenant shall have no obligation to open or operate any business in the Premises, and shall have the right, at any time, to cease to conduct any business operations in the Premises, and Tenant shall incur no liability to Landlord by reason thereof. If following the Opening Date (other than during Excused Periods, as defined below) Tenant does not operate or cause to be operated any Permitted Use in the Premises for more than one hundred eighty (180) consecutive days, then Landlord shall have the option to terminate this Lease, which option shall be exercisable by giving notice thereof to Tenant (the "<u>Recapture Notice</u>"), and paying to Tenant, within thirty (30) days after such notice is given, the Unamortized Costs (as defined in Section 8.04(f)). If Landlord gives the Recapture Notice, then this Lease shall terminate upon the sixtieth (60th) day (the "<u>Recapture Date</u>") after the date on which Tenant receives Landlord's termination notice. Upon termination of this Lease under this Section 8.02, there shall be no further liability on the part of Landlord or Tenant, <u>except</u> for obligations that expressly survive the expiration or sooner termination of this Lease. If Landlord fails to pay to Tenant the Unamortized Costs within the thirty (30) day period provided for above and such failure to pay continues through the Recapture Date, then Tenant shall have the option of (a) treating this Lease as being terminated, in which case Landlord's obligation to pay to Tenant the Unamortized Costs shall expressly survive the termination of this Lease, or (b) treating Landlord's Recapture Notice as being null and void, and the Lease shall continue in full force and effect. "Excused Period(s)" shall mean such periods during which the Premises were not open for business (i) because of alterations or renovations, damage or destruction, eminent domain proceedings or actions, Force Majeure, or any act or omission of Landlord, or its

employees, agents, or contractors, or (ii) following the execution of a letter of intent for an assignment of this Lease or sublease of all or any portion of the Premises provided that the parties thereto have entered into an assignment of this Lease or sublease within ninety (90) days after the execution of the letter of intent and, thereafter, the assignee or sublessee opens the Premises, or portion thereof, for business within one hundred (120) days after the execution of such assignment or sublease.

SECTION 8.03 Leasing Restrictions. Landlord shall construct, lease, operate, maintain and manage the Shopping Center as a first-class shopping center comparable to other first-class shopping centers in the State. In that regard, Landlord shall not lease, rent or occupy, or permit to be leased, rented or occupied, any portion of the Developer Tarct or any Affiliated Land (as defined in Section 8.04(a)) which is adjacent to the Shopping Center for any of the Prohibited Uses. In addition, Landlord shall not lease, rent or occupy, or permit to be leased, rented or occupied, any building within three hundred (300) feet of the front entrance of the Premises for use as a restaurant; provided, however, the foregoing restriction does not apply to the Target Tract or Kohl's Tract and does not prohibit a National or Regional Tenant from operating a coffee shop, snack shop or other business which serves food and beverage for on-premises consumption as part of its operations provided that: (a) such activities are the same as generally exist in such tenant's other stores in the State; (b) such activities are incidental to the primary use of such tenant, and (c) such non-retail use does not have a separate or dedicated entrance to the exterior of the building. Upon any breach of the foregoing Section 8.03, Tenant may elect to pay Alternative Rent in lieu of Annual Minimum Rent for so long as such violation shall continue.

SECTION 8.04 Tenant's Springing Exclusive.

(a)    Landlord represents that as of the date hereof, Landlord has not granted to any tenants or occupants of the Shopping Center any exclusive rights with respect to their use or sale of certain items, other than restrictions granted in favor of Target, Kohl's, and, only with respect to a specific restaurant use (such restaurant use does not conflict with Tenant's Permitted Use) on the Outparcels (the "Existing Exclusives"). Landlord represents and warrants that a true and complete listing and description of such Existing Exclusives is attached as Exhibit H. Notwithstanding the foregoing, Tenant shall be entitled to enter into a separate agreement with any tenant or other occupant for whose benefit the Existing Exclusive is granted which nullifies or modifies the corresponding Existing Exclusive with regard to the Premises.

(b)    Landlord shall not hereafter grant to any tenants or occupants in the Shopping Center, and Tenant, its successors or assigns, subtenants, subsidiaries or affiliates shall not be subject to, any exclusive rights of other tenants or occupants of the Shopping Center; Tenant's sole remedy in the event Landlord breaches the foregoing covenant shall be the triggering of Tenant's Exclusive Use Protection (as defined below) as set forth hereinbelow in Section 8.04, provided, however that if the Use Trigger Event (as defined below) is a grant of an exclusive use right which would otherwise violate the Tenant's Exclusive Use Protection (as defined below), Tenant may also exercise any other remedies that Tenant may have under Section 18.03 of this Lease (in addition to the remedy set forth in Section 8.04).

(c)    If Landlord hereafter grants to any tenant or occupant of the Developer Tract, other than restaurants on Outparcels for specific restaurant uses only, an exclusive with

19

respect to such tenant's or occupant's use or the sale of any items (the "Use Trigger Event"), then, from and after the date of such grant, the Exclusive Use Protection shall apply to all tenants of the Developer Tract or the Affiliated Land (and current or future assignees or sublessees of such tenants) occupying their respective premises pursuant to the terms and provisions of leases and occupancy agreements affecting the Developer Tract. Upon the occurrence of a Use Trigger Event, Landlord shall not thereafter enter into any leases or occupancy agreements (including the lease containing such other tenant's or occupant's exclusive which triggered the effectiveness of Tenant's Exclusive Use Protection herein) which would permit any other premises in the Developer Tract or the Affiliated Land to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, for any use which otherwise violates or conflicts with the Tenant's Exclusive Use Protection. Notwithstanding the foregoing, Tenant acknowledges that a Use Trigger Event shall not include the granting of a springing exclusive right.

(d)    Upon the occurrence of a Use Trigger Event, Landlord shall not lease, rent or occupy, or permit to be leased, rented, occupied, any other premises in the Developer Tract (other than as expressly excluded hereinabove), or on any land owned or controlled by Landlord or any of its Affiliates located within a one (1) mile radius of the Developer Tract during the Term ("Affiliated Land") for the sale, rental, installation, servicing and/or repairing, either singly or in any combination, of the Products. The Incidental Sale (as defined below) of the Products in connection with the overall business of another tenant shall not be deemed a violation this Section 8.04(d). "Incidental Sale" shall mean sales in the lesser of (i) two hundred (200) square feet of a tenant's or occupant's floor area, or (ii) ten percent (10%) of such tenant's or occupant's, or Landlord's or any of its Affiliate's display area. The exclusive use rights granted to Tenant in this Section 8.04(d) (the "Exclusive Use Protection") shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of all or part of the Premises.

(e)    The Exclusive Use Protection shall not apply to a full-line: supermarket (for example, Safeway, Winn-Dixie, or Stop & Shop), department store or discount department store (for example, Wal-Mart, K-Mart, J.C. Penney, Macy's, Kohl's or Target), a national toy store chain containing 15,000 square feet or greater of Floor Area (for example, Toys R Us, Babies R Us) or discount club (for example, Costco, BJ's Wholesale Club, or Sam's Club); provided, however, that, as to each of the foregoing, such stores (i) are National Tenants or Regional Tenants (as such terms are defined in Section 8.06), (ii) are operated in substantially the same manner as same are operated as of the Effective Date, and (iii) contain at least 80,000 square feet of Floor Area. In addition, the Exclusive Use Protection shall also not apply up to (i) one video store such as Blockbuster or Hollywood Video not larger than 5,000 square feet of Floor Area and located at least two hundred fifty (250) feet from the front entrance of the Building, and (ii) one video game store not larger than 3,000 square feet of Floor Area and located at least two hundred fifty (250) feet from the front entrance of the Building.

(f)    Upon any violation of the Exclusive Use Protection, Tenant may elect, upon notice of such violation, to pay Alternative Rent in lieu of Annual Minimum Rent for so long as such violation shall continue. If such breach shall continue for more than ninety (90) days, then Tenant shall have the right to terminate this Lease at any time thereafter, in which event the applicable provisions of Section 8.04(h) shall control.

20

(g)    However, if any tenant or other occupant of the Developer Tract violates the Exclusive Use Protection and such violation also constitutes a default under its lease with Landlord, then Tenant's right to pay Alternative Rent pursuant to Section 8.04(f) shall be tolled provided that Landlord shall have promptly commenced appropriate legal proceedings against such tenant or occupant, and shall thereafter diligently prosecute such proceedings to completion so as to enjoin and prohibit any such violation.  If Landlord shall have failed to promptly commence such proceedings, or shall fail thereafter to diligently prosecute the same, or if the violation does not cease within one hundred eighty (180) days after Landlord shall have been made aware of such violation, then Tenant's right to pay Alternative Rent shall apply for as long as such violation exists.  In addition, Tenant shall have the right (i) to conduct and prosecute such legal proceedings (including an action for injunctive relief) in its own name, at Landlord's expense, or (ii) in the event the right set forth in clause (i) above is not permitted to be exercised under Laws, to conduct and prosecute such legal proceedings in the name of Landlord, at Landlord's expense, and Landlord shall cooperate with Tenant with respect to such prosecution (including executing any documentation or authorization reasonably required by Tenant in connection with such prosecution and by appearing at any hearing or trial with respect to such prosecution).  If Tenant shall have paid Alternative Rent pursuant to this Section 8.04(g) for twenty-four (24) consecutive months, then Tenant shall have the rights to terminate this Lease subject to and in accordance with the provisions of Section 8.04(h).

(h)    If Tenant shall have paid Alternative Rent pursuant to Sections 8.04(f) or (g) for twenty-four (24) full consecutive months, then Tenant must elect either to (i) terminate this Lease, or (ii) resume paying Annual Minimum Rent from and after the expiration of the thirty (30) day period following the end of such twenty-four (24) month period.  Tenant shall make such election by notice to Landlord within thirty (30) days after the expiration of such twenty-four (24) month period.  If Tenant fails to make such an election, then Tenant shall be deemed to have elected to proceed under clause (ii) above.  If Tenant elects to terminate this Lease pursuant to Sections 8.04(f) or (g), then this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of Landlord or Tenant, except: (x) for those obligations which expressly survive the expiration or other termination of this Lease, (y) Landlord shall (which obligation shall survive the termination of this Lease), within three (3) business days after receiving a statement from Tenant showing the Unamortized Costs, reimburse Tenant for the then unamortized costs (amortized on a straight-line basis over the Term) less the Landlord Reimbursement actually delivered to Tenant of any alterations or improvements made by Tenant to the Premises (the "Unamortized Costs"), and (z) Tenant reserves all claims against Landlord for damages resulting from the violation of the Exclusive Use Protection.

SECTION 8.05  Exclusives Applicable To Tenant.  Landlord represents and warrants that, other than the Existing Exclusives, there are (and will be) no exclusives or use restrictions in effect which would apply to Tenant or any other occupant of the Premises, and Landlord covenants to indemnify, defend and hold Tenant harmless from and against all loss, cost, liability or expense (including, without limitation, reasonable legal fees) incurred by Tenant by reason of the enforcement by any person or entity of such exclusive or other use restriction.

SECTION 8.06  Key Tenants.  Landlord represents, warrants and covenants that it has entered into or will enter into leases and/or operating agreements with such of the Key Tenants

21

(other than Target and Kohl's) as is required by the Opening Requirement, and with respect to such leases for the Key Tenants (other than Target and Kohl's) such leases shall have an initial term of at least ten (10) years. If, from and after the satisfaction of the Opening Requirement, Tenant is open for business, and (a) Target and any two (2) of the Key Tenants are not open for regular business, or (b) the Minimum Ongoing Cotenancy Percentage is not met (as the case may be, a "Cotenancy Failure"), and such Cotenancy Failure continues for more than ninety (90) days (subject to Force Majeure, but in no event shall the aggregate of any and all extensions as a result of a Force Majeure exceed a period of sixty (60) days), then Tenant shall have the option to pay Alternative Rent in lieu of Annual Minimum Rent until such time as the Cotenancy Failure no longer exists. If such Cotenancy Failure continues for a period of twelve (12) consecutive months or more, then Tenant shall have the right to terminate this Lease upon thirty (30) days notice to Landlord, such notice to be given at any time prior to the date the condition giving rise to such termination right has been satisfied. If Tenant shall elect to terminate this Lease, then this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of Landlord or Tenant, except: (x) for those obligations which expressly survive the expiration or other termination of this Lease, and (y) Landlord shall (which obligation shall survive the termination of this Lease), within three (3) business days after receiving a statement from Tenant showing the Unamortized Costs, reimburse Tenant for the Unamortized Costs. If Tenant does not terminate this Lease within thirty (30) days after the expiration of such twelve (12) month period, then commencing on the day following the end of such thirty (30) day period, Tenant shall resume paying full Annual Minimum Rent. However, Tenant shall again be entitled to exercise its rights under this Section 8.06 each time (i) another Cotenancy Failure occurs, (ii) if the prior to the cure of the Cotenancy Failure under subitem (a) in the second sentence of this Section 8.06 above (even if Tenant has resumed paying full Annual Minimum Rent hereunder), another Key Tenant ceases operations, or (iii) if the prior to the cure of the Cotenancy Failure under subitem (b) in the second sentence of this Section 8.06 above (even if Tenant has resumed paying full Annual Minimum Rent hereunder), the number of retail tenants occupying less than the Minimum Ongoing Cotenancy Percentage worsens by more than five percent (5%). It is hereby understood and acknowledged by Landlord that a Key Tenant may only be replaced, for the purposes of this Section 8.06 only, by a National Tenant or Regional Tenant of comparable use, size and quality of merchandise. "National Tenant(s)" shall mean a tenant(s) operating, as of the applicable date, at least seventy-five (75) retail stores in the continental United States under a single trade name in first-class shopping centers, and "Regional Tenant(s)" shall mean a tenant(s) operating, as of the applicable date, at least twenty-five (25) retail stores in first-class shopping centers in the State. Notwithstanding the above, Tenant hereby acknowledges and agrees that following the satisfaction of the Opening Requirement, Dick's Sporting Goods, Barnes & Noble, Old Navy, Academy Sports, Petsmart and Stein Mart are hereby approved by Tenant as replacement tenants for the replacement of any Key Tenants, excluding Target, Kohl's and Bed Bath and Beyond (the exclusion of which hereunder does not prohibit the replacement of the foregoing in accordance with the terms and provisions of this Section 8.06 before or after the satisfaction of the Opening Requirement), regardless of size and quality of merchandise.

22

## ARTICLE IX

## REPAIRS

SECTION 9.01 <u>Landlord Obligations</u>. Landlord shall, at Landlord's sole expense (and not included in CAM Costs), keep and maintain in good order, condition and repair (including replacements, if necessary) and in a safe condition (a) the roof and roof membrane of the Premises (to be maintained in a watertight condition at all times), all utility systems and lines (including, without limitation, electrical, plumbing, mechanical and/or alarm systems) serving the Premises (from five feet (5') from the point of connection at the Premises to the public utility mains), the exterior of the Premises (including, without limitation, the walls and Other Improvements, but excluding window glass, doors and frames), and the structural portions of the Premises including, without limitation, footings and foundation, floor slab, and structural walls, columns and beams, and (b) any damage to the Premises or the Shopping Center which is caused by (i) defects in Landlord's Work, or (ii) the act or omission of Landlord, its employees, agents or contractors. Landlord's obligations under this Section 9.01 shall be subject to the provisions of Articles XII and XIII. Landlord shall use commercially reasonable efforts to perform any and all repairs and replacements to be performed under this Lease without material interference with or disruption to the normal conduct of any business operations in the Premises. Landlord shall give Tenant at least three (3) days prior notice of any repairs or replacements to the Premises (except in the case of an emergency posing imminent risk of material harm to persons or property, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances). If, in Tenant's reasonable judgment, Landlord's repairs would materially interfere with or disrupt the normal conduct of any business operations in the Premises, then Landlord shall perform such repairs only after the regular hours of operation of the Premises.

SECTION 9.02 <u>Tenant's Obligations</u>.

(a)     Subject to Landlord's obligations under Section 9.01, Tenant shall at all times during the Term, at Tenant's sole expense, keep and maintain in good order, condition and repair and in a safe condition (i) the non-structural, interior elements of the Premises (including painting, window glass, doors and frames, and the heating, ventilation and air conditioning ["<u>HVAC</u>"] units, and the electrical, plumbing, mechanical, and/or alarm systems located in or within 5 feet of the Premises and serving exclusively the Premises), and (ii) any damage to the Premises or the Shopping Center which is caused by the act or omission of Tenant, its employees, agents or contractors. Tenant's obligations under this Section 9.02 shall also be subject to the provisions of Articles XII and XIII and to Landlord's obligation to clear the Premises of all dirt and debris following completion of Landlord's Work pursuant to Section 5.02.

(b)     If any HVAC units must be repaired or replaced during the last three (3) years of the Term, then in light of the fact that the same will require a substantial expenditure by Tenant and will result in a benefit to Landlord following the expiration of the Term, upon the expiration or earlier termination of this Lease (unless such termination results from Tenant's default of its obligations under this Lease), Landlord shall reimburse Tenant for the unamortized portion of the reasonable expenses incurred by Tenant in connection with the replacement of

23

such equipment during the last three (3) years of the Term, based on (i) the date of the installation of such new equipment, and (ii) the useful life of said equipment. The provisions of this Section 9.02(b) shall survive the expiration or earlier termination of this Lease.

SECTION 9.03 Hazardous Materials.

(a)     Landlord represents and warrants that, to the best of Landlord's knowledge, based solely on and except as disclosed in the Phase I Environmental Assessment dated October 2006 and prepared by Gresham, Smith and Partners, as of the Effective Date (and as of the Possession Date), there are (and will be) no Hazardous Materials present in the Shopping Center at levels that would violate Environmental Regulations (defined below), and Landlord agrees that the removal or neutralization of any Hazardous Materials that become present at the Shopping Center during the Term shall be at the sole cost and expense of Landlord (and not included in CAM Costs), other than Hazardous Materials introduced by Tenant, its agents, employees and/or contractors. "Hazardous Materials" shall mean (i) any waste, material or substance (whether in the form of a liquid, a solid, or a gas and whether or not air-borne) which is deemed to be a pollutant or a contaminant, or to be hazardous, toxic, ignitable, reactive, infectious, explosive, corrosive, dangerous, harmful or injurious to public health or to the environment, and which is now or becomes regulated in the future by or under the authority of any applicable local, state or federal laws, judgments, ordinances, orders, rules, regulations, codes or other governmental restrictions or requirements, any amendments or successor(s) thereto, replacements thereof or publications promulgated pursuant thereto (collectively, "Environmental Regulations", and individually, "Environmental Regulation"); (ii) petroleum; (iii) asbestos and asbestos containing materials; (iv) any polychlorinated biphenyl; and (v) any radioactive material. In addition to the foregoing, the term "Environmental Regulations" shall be deemed to include, without limitation, local, state and federal laws, judgments, ordinances, orders, rules, regulations, codes and other governmental restrictions and requirements, any amendments and successors thereto, replacements thereof and publications promulgated pursuant thereto, which deal with or otherwise in any manner relate to, environmental matters of any kind.

(b)     Landlord and Tenant each agree that neither Landlord nor Tenant shall cause or permit any Hazardous Materials to exist on, or to escape, seep, leak, spill or be discharged, emitted or released from the Shopping Center during the Term in violation of any applicable Environmental Regulation.

(c)     Landlord hereby indemnifies Tenant and its successors and assigns, and agrees to hold Tenant and its successors and assigns harmless from and against any and all losses, liabilities, damages, injuries, penalties, fines, costs, expenses and claims of any and every kind whatsoever, including reasonable attorneys' fees and costs (collectively, "Environmental Liabilities") paid, incurred or suffered by, or asserted against, Tenant or its successors and assigns with respect to, or as a direct or indirect result of (i) the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission or release from the Shopping Center of any Hazardous Materials which were brought into the Shopping Center by Landlord, its agents, employees or their respective predecessors-in-interest, or (ii) a breach by Landlord, its agents, employees or their respective predecessors-in-interest of any Environmental Regulation to which Landlord is subject.

24

(d)    Tenant hereby indemnifies Landlord and its successors and assigns, and agrees to hold Landlord and its successors and assigns harmless from and against any and all Environmental Liabilities paid, incurred or suffered by, or asserted against, Landlord or its successors and assigns with respect to, or as a direct or indirect result of (i) the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission or release from the Premises of any Hazardous Materials which were brought into the Shopping Center by Tenant, its agents or employees, or (ii) a breach by Tenant, its agents or employees and/or contractors of any Environmental Regulation to which Tenant is subject.

(e)    With respect to Hazardous Materials which are or become present at the Shopping Center as the result of any cause whatsoever (other than Hazardous Materials which were brought into the Shopping Center by Tenant, its agents, employees and/or contractors), Landlord shall, at Landlord's sole cost (and not included in CAM Costs), in a good, workmanlike and expeditious manner, and in compliance with Environmental Regulations, perform all work necessary to clean-up, remove and otherwise remediate such Hazardous Materials in compliance with Environmental Regulations. Should the presence of such Hazardous Materials render the Premises Unusable (as defined below) or should Tenant be required to close during the removal or neutralization of such Hazardous Materials by Landlord, its agents, employees or contractors, Tenant shall notify Landlord and all Rent shall be immediately abated until such time as Tenant can safely resume normal business operations. If such work is not commenced within thirty (30) days after the date (the "Notification Date") that Tenant notifies Landlord of Hazardous Materials rendering the Premises Unusable (or such additional period as may be reasonably required to engage environmental consultants and/or engineers and obtain permits and licenses) or if such work is not completed within one hundred twenty (120) days after the Notification Date (or such additional period as may reasonably be required given the nature of the work, provided that Landlord diligently pursues same to completion), then Tenant shall have the right, at any time thereafter, to terminate this Lease. However, Tenant's option to terminate this Lease pursuant to this Section 9.03(e) shall cease (if not exercised prior thereto) at any time the Premises are no longer Unusable. If Tenant shall elect to terminate this Lease, then the Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of Landlord or Tenant, except: (i) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, (ii) Landlord shall (which obligation shall survive the termination of this Lease), within three (3) business days after receiving a statement from Tenant showing the Unamortized Costs, reimburse Tenant for the Unamortized Cost, and (iii) Tenant reserves all claims against Landlord for damages resulting from a default by Landlord under this Section 9.03. For the purpose of this Section 9.03(e), "Unusable" means that the Tenant does not have access to at least ninety percent (90%) of the Premises because of the enforcement of any Environmental Regulation or the remediation of any Hazardous Materials, or because use of the Premises would represent a risk to the health or safety of Tenant, Tenant's employees, agents or invitees.

(f)    With respect to Hazardous Materials at levels that would violate Environmental Regulations which are or become present at the Shopping Center which were brought into the Shopping Center by Tenant, its agents, contractors and/or employees, Tenant shall, at Tenant's sole cost, in a good, workmanlike and expeditious manner, and in compliance with Environmental Regulations, perform all work necessary to clean-up, remove and otherwise remediate such Hazardous Materials in compliance with Environmental Regulations. If such

25

work is not commenced within thirty (30) days after the date (the "Landlord Notification Date") that Landlord notifies Tenant of the existence of such Hazardous Materials (or such additional period as may be reasonably required to engage environmental consultants and/or engineers and obtain permits and licenses) or if such work is not completed within one hundred twenty (120) days after the Landlord Notification Date (or such additional period as may reasonably be required given the nature of the work, provided that Tenant diligently pursues same to completion), then Landlord shall have the right, at any time thereafter, to (i) terminate this Lease or (ii) cure such breach by Tenant and declare Tenant in default of the terms and conditions of this Lease.

SECTION 9.04  Surrender of the Premises.  At the expiration or earlier termination of this Lease, Tenant shall surrender the Premises to Landlord in the same condition as it is required to be maintained by Tenant pursuant to Section 9.02 above; excepting, however, reasonable wear and tear, damage by fire or other casualty, and the effects of a Taking (as defined in Section 13.01).

## ARTICLE X

## REQUIREMENTS OF LAW

SECTION 10.01  Landlord's Obligations.  As part of Landlord's Work and throughout the Term, Landlord shall be responsible, at Landlord's sole cost and expense (and not included in CAM Costs), for complying with all applicable laws, statutes, ordinances and regulations of federal, state, county and municipal authorities (collectively, "Laws") affecting the Shopping Center including, without limitation, the Premises, except as specifically provided in Section 10.02.

SECTION 10.02  Tenant's Obligations.  Throughout the Term, Tenant shall be responsible, at Tenant's sole cost and expense, for complying with all Laws affecting the Premises if such compliance is required solely as a result of (a) Tenant's specific manner of use of the Premises (as opposed to retailers in general) and relates to the interior elements of the Premises which are neither structural nor comprise the major building systems serving the Premises, or (b) alterations to the Premises performed by, or on behalf of Tenant after the Commencement Date.

SECTION 10.03  Right to Contest.  The party responsible for compliance pursuant to Section 10.01 or 10.02 shall have the right to contest the validity of any Law at the expense of the party responsible for compliance, unless such contest would result in any criminal liability imposed upon the other party or subject such other party to any fine or penalty.

## ARTICLE XI

## INSURANCE

SECTION 11.01  Landlord's Insurance.

(a)     Landlord shall maintain (or cause to be maintained) in full force and effect from and after the Effective Date and throughout the Term:

26

(i)    Commercial general liability insurance with regard to the Common Areas on the Landlord Tract protecting and insuring Landlord, naming Tenant as "additional insured-lessee" for claims arising out of the use or occupancy of the Common Areas on the Landlord Tract and the obligations assumed by Landlord under this Lease, and having a combined single limit of liability of not less than Five Million Dollars ($5,000,000) for bodily injury, death and property damage liability; and

(ii)    Special Form (formerly known as "All-Risk") property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of the buildings (other than the Premises) and other insurable improvements on the Landlord Tract (exclusive of excavation, footings and foundations) including, without limitation, the Common Areas on the Landlord Tract.

(b)    Landlord may carry any of its insurance under "blanket policies" covering the Shopping Center and other properties it or any Affiliate of Landlord owns, provided that: (i) the total amount of the insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article XI. All policies required to be maintained by Landlord pursuant to this Section 11.01 shall provide that any proceeds thereof shall be deposited with the Mortgagee, or if none, to Landlord, in either event to be held in trust by such party and disbursed only in accordance with the provisions of, and for the purposes set forth in, Article XII.

(c)    Landlord shall be permitted to maintain a commercially reasonable deductible as a part of any insurance policy carried by it in compliance with this Section 11.01.

(d)    With respect to the Target Tract, the Kohl's Tract and the Outparcels, Landlord shall maintain, or cause to be maintained, such insurance coverage(s) as is required to be maintained pursuant to the terms and provisions of the OEA; if Landlord is not the fee owner of such Tract and is not otherwise obligated to maintain the insurance with respect to such Tract, Landlord, upon actual knowledge of non-compliance with the insurance coverage requirements set forth in the OEA, shall demand that the Party (as defined in the OEA) comply with the applicable insurance coverage requirements set forth in the OEA.

SECTION 11.02  Tenant's Insurance.

(a)    Tenant shall maintain in full force and effect throughout the Term:

(i)    Commercial general liability insurance protecting and insuring Tenant, naming Landlord as "additional insured-lessor" for claims arising out of the use or occupancy of the Premises by Tenant having a combined single limit of liability of not less than Three Million Dollars ($3,000,000) for bodily injury, death and property damage liability; and

(ii)    Special Form (formerly known as "All-Risk") property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of the Premises, exclusive of excavation, footings and foundations, naming Landlord as "additional insured-lessor".

27

Upon Landlord's request, Tenant shall also name the Mortgagee as an additional insured, as its interest may appear, on the insurance policies described in Section 11.02(a).

(b)    Tenant may carry any of its insurance under "umbrella policies" and/or "blanket policies" covering the Premises and other locations it or any Affiliate of Tenant owns or leases, provided that: (i) the total amount of the insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article XI.

(c)    From and after the date that Landlord shall have caused the Delivery of the Land to occur and until such time as the Tenant's Work is complete substantially in accordance with the Site Design Requirements, Tenant shall maintain or require its general contractor to maintain, in full force and effect:

(i)    A policy of builder's risk insurance covering loss or damage to the Tenant's improvements for the full amount of the work the contractor is performing; and

(ii)    Commercial general liability insurance protecting and insuring Tenant, naming Landlord as "additional insured-lessor" for claims arising out of the work the contractor is performing on the Premises and having a combined single limit of liability of not less than Three Million Dollars ($3,000,000.00) for bodily injury, death and property damage liability.

(d)    All insurance required to be maintained under Section 11.02 may be provided under a plan of self-insurance provided that Tenant maintains, during the period of such self-insurance, a tangible net worth of at least One Hundred Fifty Million Dollars ($150,000,000). To the extent any deductible is maintained as a part of any insurance policy carried by Tenant in compliance with this Section 11.02, Tenant shall be deemed to be covering the amount of that deductible under an informal plan of self-insurance.

SECTION 11.03  Insurance Requirements Generally.

(a)    Except as set forth in Section 11.02(d), all insurance required to be maintained by Landlord and Tenant under this Lease shall be maintained with insurance companies qualified to do business in the State, and rated at least A-/VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published). Each party shall use its diligent efforts to have its insurers provide thirty (30) days (ten (10) days in the event of non-payment of premium) prior notice to the other party of cancellation or non-renewal of any policy required hereunder. Each party shall provide to the other duly executed certificates evidencing the insurance coverage described in Sections 11.01 and 11.02 above and obtained from an independent, third party insurer, respectively.

(b)    The liability insurance requirements under Sections 11.01(a)(i) and 11.02(a)(i) shall be reviewed by Landlord and Tenant every five (5) years for the purpose of mutually increasing (in consultation with their respective insurance advisors) the minimum limits of such insurance to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards. The

28

replacement value of the buildings and other insurable improvements constituting the Shopping Center shall be re-evaluated from time to time at the request of either Landlord or Tenant.

SECTION 11.04  Landlord's Insurance Cost.

(a)    The reasonable insurance premiums attributable to the policies required to be maintained by Landlord pursuant to Section 11.01(a)(i) shall be included as part of CAM Costs. If Landlord carries blanket insurance covering the Shopping Center together with other property owned by Landlord, then Landlord shall obtain evidence reasonably satisfactory to Tenant of the cost of such insurance allocable to the Shopping Center and the amount so allocable shall be included in CAM Costs for the purposes of determining Tenant's Share of any insurance premium included in CAM Costs.

(b)    If the rates for any insurance Landlord is required to carry are increased as a result of the use or other activity of any other occupant of the Shopping Center, then the amount of such increase shall be excluded from CAM Costs. To the extent that Landlord receives a dividend, credit, rebate or other return of a premium which had previously been included in CAM Costs, Landlord shall promptly refund to Tenant Tenant's Share of such dividend, credit, rebate, or return.

(c)    The provisions of this Section 11.04 shall survive the expiration or earlier termination of this Lease.

SECTION 11.05  Indemnity.

(a)    Except as otherwise provided in Section 11.06, Tenant covenants to defend and indemnify Landlord and hold Landlord harmless from and against any and all claims, actions, damages, liabilities and expenses, including reasonable attorneys' fees, (i) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises, or any part thereof, or (ii) occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Landlord, its agents, contractors, licensees, employees, or other tenants and occupants, or for which any of said parties may be statutorily liable.

(b)    Except as otherwise provided in Section 11.06, Landlord covenants to defend and indemnify Tenant and hold Tenant harmless from and against any and all claims, actions, damages, liabilities and expenses, including reasonable attorneys' fees, (i) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon any portion(s) of the Shopping Center (excluding the Premises), or (ii) occasioned wholly or in part by any act or omission of Landlord, its agents, contractors, employees, servants, tenants (other than Tenant), occupants or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Tenant, its agents, contractors, licensees or employees, or for which any of said parties may be statutorily liable.

29

SECTION 11.06  Mutual Waiver of Subrogation.

(a)    Landlord and Tenant, on their own behalf and on behalf of anyone claiming under or through either one by way of subrogation, hereby release and waive all rights of recovery and causes of action against each other and their respective Affiliates arising from any and all liability for any loss or damage to property or resulting from damage to such property (and, in either case, any resulting loss of business or rental income), whether caused by the negligence or fault of the other party, which is normally insured under Special Form property insurance (formerly known as "All-Risk") and time element insurance required to be maintained hereunder or under any other property or time element insurance maintained by either party.  If either Landlord or Tenant is a self-insurer or maintains a deductible (as either may be permitted under this Lease), then the self-insuring party or the party maintaining the deductible hereby releases the other party from any liability arising from any event which would have been covered had the required insurance been obtained and/or the deductible not been maintained.

(b)    Landlord and Tenant shall cause each property insurance policy carried by either of them insuring the Premises, the contents thereof, or the Shopping Center, to provide that the insurer waives all rights of recovery by way of subrogation or otherwise against the other party hereto (and all of such other party's Affiliates) in connection with any loss or damage which is covered by such policy or that such policy shall otherwise permit, and shall not be voided by the releases provided above.

SECTION 11.07  Affiliate.  "Affiliate" shall mean a corporation, partnership, person or other entity which is controlling, controlled by, or under common control with, Landlord or Tenant, as the case may be.  As used in the definition of Affiliate, "control" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise.

## ARTICLE XII

## DAMAGE OR DESTRUCTION

SECTION 12.01  Landlord's Obligation to Rebuild.

Subject to the provisions hereinbelow, if all or any part of the Landlord Tract (including, without limitation, the Premises) is damaged or destroyed by fire, the elements or other casualty, then Landlord shall promptly repair all damage and restore the Landlord  Tract, other than the Premises, to its condition immediately prior to such damage or destruction.  Without limiting Landlord's obligations under this Article XII, the proceeds of the policies required to be obtained and maintained by Landlord pursuant to Section 11.01 shall, to the extent necessary, be used for the performance of such rebuilding and restoration work.  The provisions of this Section 12.01 shall not apply if Landlord or Tenant terminates this Lease pursuant to provision this Article XII. With respect to buildings or improvements within the Target Tract or the Kohl's Tract which are

30