damaged by fire or other casualty Landlord shall promptly demand compliance with Section 4.3.2 of the OEA.

SECTION 12.02 Tenant's Obligation to Rebuild. If all or any part of the Premises is damaged or destroyed by fire, the elements or other casualty, then Tenant shall promptly repair all damage and restore the Premises to its condition immediately prior to such damage or destruction (subject to any changes to the Premises that Tenant shall desire to make to the extent same shall otherwise be permitted under Section 14.01). Without limiting Tenant's obligations under this Article XII, the proceeds of the policies required to be obtained and maintained by Tenant pursuant to Section 11.02 shall, to the extent necessary, be used for the performance of such rebuilding and restoration work. The provisions of this Section 12.02 shall not apply if Landlord or Tenant terminates this Lease pursuant to provision this Article XII.

SECTION 12.03 Termination.

(a)    Tenant shall have the right to terminate this Lease:

(i)    if at least fifty percent (50%) of the Premises is damaged or destroyed by fire, the elements or other casualty during the last five (5) years of the Term, and the restoration period is reasonably estimated by Landlord and Tenant to be in excess of two hundred ten (210) days,

(ii)    if all or any part of the Premises is damaged or destroyed by fire, the elements or other casualty (other than in a *de minimis* manner) during the last two (2) years of the Term, or

(iii)    if all or any part of the Premises is damaged or destroyed by fire, the elements or other casualty at any time during the Term and such damage or destructions is not covered under the insurance policy(ies) required to be maintained by Tenant under Sections 11.02(a)(ii) or 11.02(b) and the cost to repair such damage would exceed ten percent (10%) of the full replacement cost of the Premises.

Tenant shall notify Landlord of its exercise of such option within forty-five (45) days following the occurrence of such casualty.

(b)    If (i) Landlord fails to commence in good faith Landlord's repair and restoration obligations within ninety (90) days after any damage or destruction, or (ii) Landlord fails to timely complete such repair and restoration within two hundred seventy (270) days after such damage or destruction, then Tenant shall have the option, upon notice to Landlord, to elect (y) to complete the repair and restoration to the Landlord Tract, or any portion thereof, and (1) to receive reimbursement therefor in full from Landlord on demand and/or (2) to offset the cost and expense thereof against the payment of Rent and, at Tenant's option, to extend the Term until such time as Tenant, through such offsets, has recouped the entire cost and expense to Tenant of such repair and restoration, or (z) to terminate this Lease effective as of the date of such damage or destruction. The time periods referenced in this Section 12.03(b) shall be subject to Force Majeure, but in no event shall the aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed a period of sixty (60) days.

31

(c)    If (i) Tenant fails to commence in good faith Tenant's repair and restoration obligations within ninety (90) days after any damage or destruction, or (ii) Tenant fails to timely complete such repair and restoration within two hundred seventy (270) days after such damage or destruction, then Landlord shall have the option, upon notice to Tenant, to elect to complete the repair and restoration to the Premises and to receive reimbursement therefor in full from Tenant on demand.  The time periods referenced in this Section 12.03(c) shall be subject to Force Majeure, but in no event shall the aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed a period of sixty (60) days.

(d)    Landlord shall have the right to terminate this Lease by written notice to Tenant within sixty (60) days after any damage or destruction to the Shopping Center if:

(i)    more than seventy-five percent (75%) of the Floor Area of the Developer Tract (excluding the Premises and any Outparcels) is destroyed or damaged such that it is rendered uninhabitable or unusable for at least thirty (30) days and Landlord reasonably estimates that it will take longer than two hundred seventy (270) days from the date of casualty to complete repair and restoration;

(ii)    Landlord does not intend to rebuild the Landlord Tract; and

(iii)    Landlord reimburses Tenant for (A) the Unamortized Costs effective as of the day prior to the date of the casualty, and (B) any costs or expenses incurred by Tenant in rebuilding, repairing or restoring the Premises after the event of casualty and prior to the termination of this Lease by Landlord.

(e)    If this Lease is terminated, then this Lease shall terminate on the date set forth in the notice of termination without further liability on the part of either Landlord or Tenant, except: (i) for those obligations which expressly survive the expiration or other termination of this Lease, and (ii) only in the case where Tenant terminates this Lease, Tenant shall thereupon make available to Landlord (1) all insurance proceeds paid by Tenant's insurance carrier, or (2) if self-insured, an amount equal to the reconstruction costs of the Premises or, if the Premises are not being reconstructed, an amount equal to the actual value of the Premises (not to exceed, however, an amount equal to the reconstruction costs of the Premises), to the extent such amounts would have been payable under the insurance outlined in Section 11.02(a)(ii).

## ARTICLE XIII

## CONDEMNATION

SECTION 13.01  Taking.

(a)    In the event of condemnation by eminent domain or similar law, including a sale in lieu thereof to an authority or other entity having the power of eminent domain (a "Taking"), of all or any portion of the Shopping Center, which (i) results in a Taking of (x) any part of the Premises, (y) more than ten percent (10%) of the Common Areas, or (z) reduces the available parking spaces on the date of such Taking to less than the applicable ratios that are required pursuant to the Minimum Parking Ratios for the Tenant's Preferred Area and/or the

32

Shopping Center, (ii) materially and adversely affects ingress or egress to the Premises or the Shopping Center, or (iii) materially prohibits or inhibits Tenant's use of the Premises for a period in excess of sixty (60) days, then Tenant may terminate this Lease by giving notice to Landlord not more than ninety (90) days after the later of the date on which title vests in the condemning authority or the date Tenant receives notice of said vesting.

(b)    In the event of a Taking of all of the Premises, this Lease shall terminate as of the date of vesting of title or transfer of the Premises, whichever is earlier, without further liability on the part of either Landlord or Tenant, except for those obligations which expressly survive the expiration or other termination of this Lease.

(c)    In the event of a Taking of the Premises, the Common Areas and/or any other area within the Shopping Center, or any portion thereof, for temporary use (specifically one not exceeding sixty (60) days in duration), without the taking of the fee simple title thereto, this Lease shall remain in full force and effect. All awards, damages, compensation and proceeds payable by the condemnor by reason of such Taking relating to the Premises, or relating to the Common Areas but reasonably attributable to the Premises, for periods prior to the expiration of the Lease shall be payable to Tenant. All such awards, damages, compensation and proceeds for periods after the expiration of the Lease shall be payable to Landlord. Anything contained to the contrary notwithstanding, a temporary Taking for any period in excess of sixty (60) days may, at Tenant's option, be deemed a permanent Taking and shall be governed by Section 13.01 (a) or (b), as applicable.

SECTION 13.02 Restoration and Rent Adjustment. In the event of a Taking, if this Lease is not terminated by Tenant pursuant to Section 13.01, then (a) Landlord shall promptly restore the Shopping Center as nearly as practicable to a complete unit of like quality and character as existed prior to the Taking, which restoration shall, as applicable, include all of Tenant's Work and all other leasehold improvements performed by Tenant, but shall not include Tenant's Property, and (b) if a portion of the Premises is Taken, then from and after the date on which title vests in the condemning authority, the Rent shall be equitably reduced in proportion to the area of the Premises subject to the Taking.

SECTION 13.03 Award. In the event of any Taking, Tenant shall be entitled to an amount of the award or compensation paid for such Taking equal to the Unamortized Costs, if any, and the balance shall belong to Landlord. Tenant shall also have the right to claim and recover from the condemning authority such compensation as may be separately awarded or recoverable by Tenant on account of any and all damage to Tenant's business by reason of the condemnation and for or on account of any cost or loss to which Tenant might be put in moving Tenant's Property, or for any other damages compensable separately to Tenant; provided, however, that no such award shall reduce the award payable to Landlord for its fee interest in the Premises. The provisions of this Section 13.03 shall be subject to the provisions of Section 13.01(c) with respect to a temporary Taking.

## ARTICLE XIV

## ALTERATIONS AND MECHANICS' LIENS

SECTION 14.01    Tenant's Alteration Rights.

(a)    Tenant shall not perform any structural or exterior alterations or improvements to the Premises (except to the extent same pertain to Tenant's Work) without the prior approval of Landlord; provided, however, that Tenant's alteration of the exterior of the Premises to conform to Tenant's (or any subtenant's) then-current prototypical elevation shall not require Landlord's consent. Any such alteration of the exterior of the Premises to conform to Tenant's (or any subtenant's) then-current prototypical elevation shall be subject to the terms and provisions of the OEA, however, Landlord, at no cost to Tenant, agrees to use commercially reasonable efforts in assisting and cooperating with Tenant with any consents or approval required pursuant to the OEA. The provisions of this Section 14.01(a) shall not apply to Tenant's building signage, which shall be governed by the applicable provisions of Article XV.

(b)    Tenant may, from time to time, without the prior approval of Landlord, make non-structural interior alterations and improvements to the Premises as Tenant deems necessary or desirable including, but not limited to, the electrical systems, the HVAC and other mechanical systems, installation of fixtures and equipment, painting, and wall and floor coverings.

(c)    Tenant shall have the right to erect and maintain an antenna, a satellite dish and/or related equipment on the roof of the Premises, provided that Tenant: (i) uses a contractor approved by Landlord for all roof penetrations so as not to violate or invalidate any roof warranties maintained by Landlord, (ii) repairs any damage to the roof caused by the making of the roof penetrations and the removal of same, and (iii) erects and maintains such equipment in accordance with Laws, and (iv) removes such equipment upon written notice from Landlord within thirty (30) days following the expiration of the Term or earlier termination of this Lease.

(d)    Landlord shall execute and return to Tenant at no cost or expense to Landlord all appropriately completed building department or equivalent applications within ten (10) days after Tenant's request therefor, and will reasonably cooperate with Tenant in the permitting process. If any violation of Laws which is noted against the Shopping Center or the Premises (other than a violation caused by Tenant) prevents Tenant from obtaining a building permit for any alterations or a certificate of occupancy, then, upon request by Tenant, Landlord shall promptly and diligently cause such violation to be removed of record to the extent required to permit Tenant to obtain its building permit or certificate of occupancy, as the case may be. However, if the violation was not caused by Landlord (or any of Landlord's agents, contractors, employees or invitees), then Landlord's obligations under this Section 14.01(d) shall be satisfied by Landlord using diligent, good faith and commercially reasonable efforts to have the responsible party remove such violation of record.

(e)    Landlord shall not make any alterations to the Premises (including, without limitation, changing the design, color or materials of the exterior of the Premises) nor

34

shall Landlord construct an additional floor or floors above or below the Premises. Landlord shall neither make nor permit to be made any alterations to the exterior architectural theme of the remainder of the Developer Tract which would be inconsistent with a first-class shopping center in the State (exclusive of other National Tenants' or Regional Tenants' entrance features), without the prior consent of Tenant.

SECTION 14.02 <u>Mechanics' Liens</u>.    Tenant covenants that Tenant shall promptly discharge of record (by payment, bond, order of a court of competent jurisdiction or otherwise) any mechanic's lien filed against the Premises or all or any part of the Shopping Center for any work, labor, services or materials claimed to have been performed at, or furnished to, the Premises or the Shopping Center, for or on behalf of Tenant, or at the insistence of Tenant, or anyone acting for, through or under Tenant. Similarly, Landlord covenants that Landlord shall promptly discharge of record (by payment, bond, order of a court of competent jurisdiction or otherwise) any mechanic's lien filed against the Premises or all or any part of the Shopping Center for any work, labor, services, materials claimed to have been performed at, or furnished to, the Premises or the Shopping Center, for or on behalf of Landlord, or at the insistence of Landlord, or anyone acting for, through or under Landlord. If either party shall fail to cause any such lien to be discharged within thirty (30) days after the other party shall demand that the former party remove same, then, the demanding party may discharge the same by paying the amount claimed to be due, by bonding or by any other proceeding deemed appropriate by such demanding party, and the amount so paid by such demanding party and/or all costs and expenses including reasonable attorneys' fees incurred by such demanding party in procuring the discharge of such lien shall be reimbursed by the other party upon demand. Nothing contained in this Lease shall be construed as a consent on the part of the Landlord to subject Landlord's estate in the Premises to any lien or liability under any law relating to liens.

**ARTICLE XV**

**SIGNS**

SECTION 15.01 <u>Tenant's Signs</u>. Tenant shall have the exclusive right during the Term to erect, maintain, and replace on the storefront and exterior walls of the Premises, and on the side walls of any entrance design element, if any, signs (including, without limitation, under-canopy or blade signs), banners (including temporary banners placed on the storefront of the Premises and such other walls of the Premises as selected by Tenant), awnings, and flags of such size, design and color as Tenant, from time to time, may desire, subject to compliance with Laws and the OEA (the "Sign Criteria"). Tenant may erect and maintain in the interior of the Premises any signs it may desire.

SECTION 15.02 <u>Pylon Signs</u>. Landlord shall provide the pylon at the location shown on the Site Plan. Landlord, as part of Landlord's Work, shall obtain all governmental approvals and permits for such pylons and monuments (including Tenant's sign panels on all sides of such pylon). Tenant's sign panels shall be procured and installed at Tenant's cost. A rendering of such pylon showing the dimensions of the pylon and the size and position of all panels to be installed thereon, including Tenant's panel, is attached to this Lease as <u>Exhibit N</u>. Tenant's panel shall be at least as large as any other tenant other than Target, Kohl's and any other retailer occupying at least Twenty Five Thousand (25,000). In addition, if Landlord makes available to

35

any other tenant of the Developer Tract any other signage located in the Common Areas, then such signage shall also include Tenant's identification sign which shall be at least as large as the largest sign made available to such other tenant or tenants whose premises are equal to or smaller than the Premises. Landlord shall not change or alter the pylons or monuments bearing Tenant's sign panel(s) without obtaining Tenant's prior consent which shall not be unreasonably withheld, delayed or conditioned. The cost of maintaining all pylons and monuments bearing Tenant's sign panel(s) (but not the cost of individual tenants' signs thereon or the cost of the construction of the pylons and monuments) and the cost of any electricity used to illuminate them, shall be paid pro ratably (based on panel size) by the tenants located thereon within thirty (30) days of invoice by Landlord. If at any time during the Term there becomes available a face panel on any of the Shopping Center pylon or monument signs which would permit Tenant's presence in the Shopping Center to be designated in a higher pylon or monument panel position, then Tenant shall have the right to relocate its pylon or monument sign panel to such higher sign position; provided, however, Tenant shall not be permitted to move to any position reserved for the Target Tract or Kohl's Tract or any other position reserved for a tenant whose premises in the Shopping Center exceeds Twenty-Five thousand (25,000).

SECTION 15.03 Replacement. Without Landlord's consent, but subject to complying with Laws and the OEA, Tenant and its subtenants shall be entitled to replace all of its signs with signage consistent with Tenant's and/or its subtenant's then-current prototypical sign plans, provided that Tenant and/or its subtenant is a National or Regional Tenant. Any signage that is not consistent with such prototypical sign plans shall be subject to Landlord's approval.

## ARTICLE XVI

## TENANT'S PROPERTY

SECTION 16.01 Tenant's Property. All of Tenant's movable trade fixtures, ornate light fixtures, equipment, furniture, inventory and other property owned by Tenant and located at, on or in the Premises including, without limitation, computer display and storage area showcases, partitions, mezzanine, shelving, wall cases and signs (collectively, "Tenant's Property") shall remain the property of Tenant, exempt from the claims of Landlord or any Mortgagee or Ground Lessor, without regard to the means by which or the persons by whom Tenant's Property is installed or attached. Tenant shall have the right at any time and from time to time to remove Tenant's Property, provided that if removal of any of Tenant's Property damages any part of the Premises, Tenant shall repair such damage. Any of Tenant's Property remaining in the Premises for more than thirty (30) days following the expiration or earlier termination of this Lease shall be deemed abandoned by Tenant become the property of Landlord and Landlord may retain or dispose of same in its sole discretion without the necessity of further documentation from Tenant

## ARTICLE XVII

## ASSIGNMENT AND SUBLETTING

SECTION 17.01 Assignment and Subletting Rights. Subject to the Prohibited Uses, and all of the terms and conditions of this Lease, Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet,

36

concession or license all or any portion of the Premises.  Unless otherwise agreed to in writing by Landlord, no assignment, subletting, licensing or concessioning by Tenant shall reduce the liability of Tenant under this Lease, however, Tenant's liability shall not be increased as a result of any amendment or modification to this Lease between Landlord and any assignee.  However, in the event of an assignment by Tenant to an assignee having an Adequate Net Worth (as defined below), or to an assignee whose obligations under this Lease are unconditionally guaranteed by a guarantor having an Adequate Net Worth, all liability of the assigning Tenant under this Lease accruing from and after the effective date of such assignment shall terminate.  "Adequate Net Worth" shall mean a tangible net worth, as of the effective date of such assignment, of at least Two Hundred Million Dollars ($200,000,000).

SECTION 17.02  Collateral Assignment.  In addition to Tenant's other rights set forth in this Article XVII, a collateral assignment of Tenant's interest in this Lease by Tenant to one (1) or more Lenders (hereinafter defined), as collateral security for an indebtedness or other obligation of Tenant or its Affiliates shall be permitted and Landlord shall execute all documentation reasonably requested by Tenant or any such Lender in connection therewith.  In addition, Tenant shall have the right, without Landlord's consent, to grant to an Affiliate of Tenant a license to operate all of Tenant's business operations at the Premises, without such Affiliate having assumed any liability for the performance of Tenant's obligations under this Lease.  "Lender" shall mean a state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender.

SECTION 17.03  Cure Rights of Original Tenant.  If Tenant assigns Tenant's interest in this Lease and the assignor remains liable under this Lease following such assignment, then Landlord, when giving notice to said assignee or any future assignee in respect of any default, shall also give a copy of such notice to the Tenant originally named in this Lease or its Affiliate (collectively, the "Original Tenant"), and no notice of default shall be effective until a copy thereof is so given to Original Tenant.  Original Tenant shall have the right (but not the obligation) to cure such default, which cure period shall be twenty (20) days longer than the cure period applicable to Tenant.

SECTION 17.04  Recognition Agreement.  In the event Tenant subleases all of the Premises or any portion of the Premises containing not less than ten thousand (10,000) square feet of Floor Area, for a term of at least five (5) years,  and the subtenant thereunder has a tangible net worth of at least fifty million dollars ($50,000,000), then, notwithstanding any other provisions of this Lease, Landlord shall, upon Tenant's request, execute and deliver an agreement among Landlord, Tenant and each such subtenant in the form of Exhibit I hereto, in recordable form (the "Recognition Agreement").  In the event Tenant subleases any portion of the Premises, for a term of at least five (5) years, to a subtenant to whom Landlord is not required to execute and deliver the Recognition Agreement described in this Section 17.04, then, following Landlord's receipt of notice from Tenant setting forth the name and address of such subtenant, Landlord shall (i) simultaneously with any notice of default thereafter delivered to Tenant under this Lease, deliver a full and complete copy thereof to such subtenant, and (ii) permit such subtenant to cure such default on behalf of Tenant within the same applicable cure period as allowed Tenant under the Lease.

37

## ARTICLE XVIII

## DEFAULT

SECTION 18.01 <u>Tenant's Default</u>.

(a)      If Tenant defaults in the payment of any installment of Rent and such default is not cured within ten (10) business days after receipt of notice from Landlord thereof [provided, however, such notice and such grace period shall be required to be provided by Landlord and shall be accorded Tenant, if necessary, only two (2) times during any twelve (12) consecutive month period of the Term, and a default by Tenant shall be deemed to have immediately occurred upon the third (3rd) failure by Tenant to make a timely payment as aforesaid within any twelve (12) consecutive month period of the Lease Term, it being intended by the parties hereto that such notice and such grace period shall protect against infrequent unforeseen clerical errors beyond the control of Tenant, and shall not protect against Tenant's lack of diligence or planning] or if Tenant defaults in the observance of any other covenant or agreement herein contained and Tenant shall not, within thirty (30) days after receipt of notice thereof from Landlord, cure or commence to cure such default (it being intended in connection with a default not susceptible of being cured with due diligence within said thirty (30) day period that the time allowed Tenant within which to cure same shall be extended for such period as may be necessary to complete same with all due diligence so long as Tenant promptly commences cure and prosecutes such cure to completion), then Landlord may, by giving notice to Tenant at any time thereafter during the continuance of such default:

(i)      terminate this Lease, without any right by Tenant to reinstate its rights by payment of Rent or other performance of the terms and conditions hereof and upon such termination Tenant shall immediately surrender possession of the Premises to Landlord, and Landlord shall immediately become entitled to receive from Tenant, as liquidated, agreed final damages, an amount equal to the difference between the aggregate of all rentals reserved under this Lease for the balance of the Term, and the fair rental value of the Premises for that period (both discounted to present value at an annual interest rate equal to eight percent (8%)), determined as of the date of such termination; or

(ii)      with or without terminating this Lease, as Landlord may elect, re-enter and repossess the Premises, or any part thereof, and lease them to any third-party upon commercially reasonable terms and conditions, for a term within or beyond the Term; <u>provided</u>, <u>however</u>, that any such reletting prior to termination shall be for the account of Tenant, and Tenant shall remain liable for (y) Annual Minimum Rent, Tenant's Share of CAM Costs, Tenant's Share of Taxes, and other sums which would be payable hereunder by Tenant in the absence of such expiration, termination or repossession, less (z) the net proceeds, if any, of any reletting effected for the account of Tenant after deducting from such proceeds all of Landlord's reasonable expenses (which expenses shall be amortized over the term of the new tenant's lease and only the portion thereof allocable to the balance of the Term shall be so deducted by Landlord hereunder) in connection with such reletting (including, without limitation, all repossession costs,

reasonable brokerage commissions, reasonable attorneys' fees and expenses, reasonable alteration costs and expenses of preparation for such reletting).

(iii)    with respect to any non-monetary default that if uncured would materially diminish the value of the improvements on the Premises, or impair the structural integrity of the improvements on the Premises, and which remains uncured beyond the applicable notice and cure period, Landlord, may send an additional notice to Tenant setting forth (A) the nature of the uncured default(s), (B) Landlord intends to cure such default, and (C) the actions that Landlord intends to undertake in curing such default. In the event that Tenant has not cured or commenced to cure such default, Landlord may cure such default(s) of Tenant in accordance with the applicable provisions of this Lease on behalf of, and at the expense of Tenant. Upon completion of any such work by Landlord hereunder, Landlord shall send written notice to Tenant with invoices, proof of payment (if already paid by Landlord) and other supporting documentation thereof, and Tenant shall reimburse Landlord (or pay the applicable contractor directly) within thirty (30) days of receipt of such notice at which time any sums owed to Landlord shall accrue interest at the Default Rate.

(b)    If the Premises is at the time of default sublet or leased by Tenant to others, Landlord may, as Tenant's agent, collect rents due from any subtenant or other tenant and apply such rents to Rent due hereunder. Any monthly deficiencies payable by Tenant shall be paid monthly on the date herein provided for the payment of Annual Minimum Rent. If, after the lapse of all applicable grace periods, Landlord reasonably expends any money to cure a default by Tenant, then Tenant shall, on demand, pay Landlord the amount so paid by Landlord together with interest thereon at the rate of two percent (2%) per annum in excess of the rate charged to Tenant for short-term borrowings by any bank with which Tenant regularly transacts business (the "Default Rate").

(c)    Landlord shall also be entitled to all other rights and remedies available to Landlord at law, in equity or otherwise, except as otherwise expressly set forth in this Lease. Landlord expressly waives (i) any right to accelerate any element of Rent except as expressly set forth in Section 18.01(a)(i) above, (ii) any right to recover consequential or punitive damages as a result of a Tenant default or any other act or omission of Tenant, and (iii) all rights to any so-called "landlord's lien" or any similar statutory lien, granting Landlord a lien on any of Tenant's Property for the performance of any obligations of Tenant. At the request of Tenant, Landlord shall promptly confirm such waiver(s) by a writing in form reasonably satisfactory to Landlord and Tenant. Anything contained in this Lease to the contrary notwithstanding, Landlord shall use all reasonable efforts to relet the Premises or any portion thereof to mitigate Landlord's damages to which Landlord would otherwise be entitled to as a result of a Tenant default. Tenant hereby agrees that Landlord's agreement to use reasonable efforts to relet the Premises shall not be deemed to impose any obligation on Landlord to relet the Premises (i) for any purpose which would be inconsistent with the uses customarily found in first-class shopping centers or which would breach any covenant of Landlord respecting radius, or exclusivity in any other lease or agreement relating to the Shopping Center, provided, however, Landlord is not in any event required to buy out another lease in an effort to mitigate damages pursuant to this paragraph or (ii) to any lessee who is not reputable or who is not financially capable of performing the duties and obligations imposed upon such lessee under the applicable lease or who does not have

39

experience in successfully operating a business of the type and size which such lessee proposes to conduct in the Premises, provided, any National or Regional Tenant shall be deemed to be acceptable pursuant to this subitem (ii). Tenant further agrees that the agreement by Landlord to use reasonable efforts to relet the Premises shall not impose any obligation on Landlord to relet the Premises in preference to the leasing by Landlord of any other property or premises by Landlord.

SECTION 18.02  Additional Landlord Remedies Due to Construction Delays by Tenant. If Tenant shall fail to achieve Substantial Completion by that date which is one (1) year following Delivery of the Land, provided that such one (1) year period shall be extended on a day for day basis to the extent Tenant incurs any delay on account of Force Majeure events or any Landlord Delay, then Landlord shall be entitled to terminate this Lease upon sixty (60) days prior notice to Tenant unless Tenant, within such sixty (60) day period, achieves Substantial Completion. If Landlord terminates this Lease, then there shall be no further liability on the part of Landlord or Tenant, except for those obligations that expressly survive the expiration or other termination of this Lease.

SECTION 18.03  Landlord's Default.

(a)    If Landlord shall (i) default in the observance of any material covenant or agreement herein contained, breach any material representation or warranty under this Lease, or shall fail to pay any charges or other amounts required to be paid by Landlord under this Lease (including, without limitation, any insurance premiums or any reimbursements due to Tenant) and Landlord does not cure such default within fifteen (15) days (as to a monetary default) or thirty (30) days (as to a non-monetary default), as applicable, after notice thereof by Tenant (it being intended in connection with a non-monetary default not susceptible of being cured with due diligence within said thirty (30) day period that the time allowed Landlord within which to cure same shall be extended for such period as may be necessary to complete same with all due diligence), or (ii) fail to pay when due any Taxes, ground rent or any other charge or assessment, the lien of which is prior to the lien of this Lease, then Tenant shall have the right (but shall not be obligated) to:

(w)    perform such obligation(s) of Landlord in accordance with the applicable provisions of this Lease on behalf of, and at the expense of Landlord;

(x)    bring suit for the collection of any amounts for which Landlord is in default, seek injunctive relief, or seek specific performance for any other covenant or agreement of Landlord;

(y)    offset against the Rent all amounts owed by Landlord to Tenant and/or the amounts reasonably expended by Tenant performing Landlord's obligations under this Lease, including costs and reasonable attorneys' fees if such amount has not been reimbursed by Landlord within thirty (30) days of demand by Tenant, together with interest thereon at the Default Rate from the date of the outlay until paid, and, at Tenant's option, extend the Term if necessary for Tenant to fully recoup all amounts owed by Landlord to Tenant; and/or

(z)    terminate this Lease, without waiving its rights to damages for Landlord's Default, provided that: (1) Landlord's default materially interferes with the

40

normal conduct of any business operations in the Premises, (2) Landlord's default is not reasonably capable of being cured by Tenant, and (3) subject to Section 18.03(b), Tenant gives notice of Landlord's default to any Mortgagee of whom Landlord shall have previously given Tenant notice (including its address), and such Mortgagee shall not have cured Landlord's default within the time period provided in Section 18.03(b).

Notwithstanding the foregoing, Tenant's right of offset under clause (y) above shall be limited to forty percent (40%) of each installment of Rent next becoming due unless insufficient Term remains to fully recoup the amounts owed by Landlord to Tenant on the amounts expended by Tenant, together with interest as provided above, in which event the amount of Tenant's offset shall be increased so that Tenant is able to fully recoup all such amounts expended by Tenant, together with interest as aforesaid, prior to the expiration of the Term.

(b)     If a Mortgagee shall have notified Tenant in writing that it is the holder of such lien on the Shopping Center and shall so request, then Tenant shall give a similar notice to such Mortgagee and such Mortgagee shall have the same time period allowed to Landlord under this Lease to correct or remedy such default.

(c)     Tenant shall also be entitled to all other rights and remedies available to Tenant at law, in equity or otherwise, except as otherwise expressly set forth in this Lease. Tenant expressly waives any right to recover consequential or punitive damages as a result of a Landlord default or any other act or omission of Landlord.

(d)     Notwithstanding the foregoing, if, in Tenant's reasonable judgment, a condition posing imminent risk of liability or material harm to persons or property or material disruption to the normal conduct of any business operations in the Premises shall exist, then Tenant may exercise, at its election and without prior notice to Landlord, any or all of the remedies set forth in clauses (w), (x) and (y) above.

SECTION 18.04 <u>Additional Tenant Self help, Equitable and Legal Remedies Due to Construction Delays by Landlord</u>. If Landlord defaults at any time in the timely completion of any component of Landlord's Work (including, without limitation, Delivery of the Land) and Landlord does not cure such default within five (5) days after notice thereof by Tenant (provided, however, such five (5) day notice shall be reduced to one (1) day in the event the default relates to any element of the Site Delivery Work), then Tenant shall have the right, but not the obligation, to:

(a)     perform, at Landlord's sole cost and expense, all or any part of Landlord's Work. If and to the extent that Tenant exercises its right under this Section 18.04(a), Landlord agrees to cooperate in good faith and provide Tenant with reasonable assistance so that Tenant can complete such portions of Landlord's Work. Landlord hereby grants Tenant the right, as its agent, to contact and contract directly with Landlord's contractors, on behalf of Landlord, to complete such Landlord's Work, all at Landlord's cost and expense. Landlord covenants to provide Tenant, upon Tenant's request, duplicate sets of all plans, specifications and contracts prepared in connection with the construction of the Shopping Center, as well as schedules of all contractors, subcontractors and suppliers. Landlord agrees to reimburse Tenant for any and all costs incurred by Tenant in connection with any portion of Landlord's Work that Tenant completes within ten (10) days after Landlord's receipt of request therefor from Tenant, which

41

request reasonably shall be supported by invoices and/or written description of Landlord's Work performed by Tenant. If Landlord does not reimburse Tenant timely as contemplated above, then Tenant shall be entitled to deduct the costs of such work from Rent, together with interest at the Default Rate from the date of expenditure by Tenant, until paid in full;

(b)    seek injunctive relief, specific performance or other equitable remedies against Landlord to require Landlord to perform its obligations under this Lease (including, without limitation, the Site Design Requirements), the costs of which litigation shall be borne by Landlord including, without limitation, reasonable attorneys' fees and court's costs; and/or

(c)    seek legal remedies available to Tenant, the costs of which shall be borne by Landlord, including, without limitation, reasonable attorneys' fees and court costs.

SECTION 18.05 Additional Tenant Remedies Due to Landlord's Failure to Pay the Landlord Reimbursement. If Landlord fails to pay the Landlord Reimbursement within thirty (30) days after Substantial Completion and Landlord's receipt of the Landlord Reimbursement Deliverables, then Landlord shall be in default under this Lease, and no Rent shall be due or owing to Landlord until the Landlord Reimbursement is paid to Tenant, together with interest which shall accrue on the unpaid Landlord Reimbursement at the Default Rate commencing on the thirty-first (31st) day following the date of substantial completion of Premises and Landlord's receipt of the Landlord Reimbursement Deliverables.

SECTION 18.06 Waiver; Non-Exclusive Remedies. The parties hereby waive trial by jury in any action, proceeding or counterclaim brought by either of them against the other on any matters arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Premises, and/or any claim of injury or damage. Tenant hereby expressly waives any and all rights of redemption granted by or under any present of future law if this Lease is terminated or Tenant is evicted or dispossessed by reason of violation by Tenant of any of the provisions of this Lease. Except as otherwise expressly set forth in this Lease, no right or remedy herein conferred upon or reserved to Landlord or Tenant is intended to be exclusive of any other right or remedy in this Lease or by law or in equity provided, but each shall be cumulative and in addition to every other right or remedy given in this Lease or now or hereafter existing at law or in equity or otherwise.

## ARTICLE XIX

## SUBORDINATION, TRANSFER OF INTEREST

SECTION 19.01 Subordination. Landlord reserves the right to subject and subordinate this Lease at all times to the lien of any first mortgage or deed of trust for the benefit of any Mortgagee hereafter encumbering or affecting all or any portion of the Shopping Center, as well as to any future ground or underlying leases encumbering or affecting all or any part of the Shopping Center; provided, however, that (a) each Mortgagee shall first execute and deliver to Tenant a subordination, non-disturbance and attornment agreement in substantially the form attached as Exhibit J hereto, in recordable form, and (b) any Ground Lessor shall execute (and shall obtain the written consent of any Mortgagee) and deliver to Tenant a fee owner recognition agreement in a form reasonably satisfactory to Tenant, which shall include the following

42

provisions: (i) the Ground Lessor will not, in the exercise of any of the rights arising or which may arise out of such lease, disturb or deprive Tenant in or of its possession or its rights to possession of the Premises or of any right or privilege granted to or inuring to the benefit of Tenant under this Lease (except as set forth in this Lease following Tenant's default under the Lease); (ii) in the event of the termination of the Ground Lease (as defined below), Tenant shall not be made a party in any removal or eviction action or proceeding, nor shall Tenant be evicted or removed of its possession or its right of possession of the Premises, and this Lease shall continue in full force and effect as a direct lease between the Ground Lessor and Tenant for the remainder of the Term and on the same terms and conditions as contained herein, without the necessity of executing a new lease; and (iii) Landlord and Tenant shall have the right to execute any amendment to this Lease which is specifically required hereunder and the Ground Lessor shall recognize and be bound thereto. "Ground Lessor" shall mean the landlord under any existing or future ground or underlying lease(s) affecting all or any part of the Shopping Center (such ground or underlying lease(s) is referred to as the "Ground Lease(s)"). "Mortgagee" shall mean any state or federally regulated bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender, which is not an Affiliate of Landlord, and which holds a mortgage on the Shopping Center or is the beneficiary under a deed of trust encumbering the Shopping Center (such mortgage or deed of trust is referred to as the "Mortgage").

SECTION 19.02 Existing Mortgages and Ground Leases. If a Mortgage or any Ground Lease encumbers the Shopping Center or any part thereof on the Effective Date, then, simultaneously with the execution of this Lease, Landlord shall deliver to Tenant, in recordable form: (a) a subordination, non-disturbance and attornment agreement substantially in the form attached as Exhibit J, in recordable form, executed by each and every Mortgagee, and (b) a fee owner recognition agreement in the form and content described in Section 19.01(b), in recordable form, executed by any Ground Lessor (and, as may be required, consented to by the Mortgagee). Should Landlord fail to so deliver such instrument(s) as provided above within thirty (30) days following execution of this Lease, Tenant shall have the right, by notice given to Landlord at any time prior to the date on which such instrument(s) are delivered, to terminate this Lease without further liability on the part of Landlord or Tenant, except: (i) for those obligations which expressly survive the expiration or other termination of this Lease, and (ii) Landlord shall (which obligation shall survive the termination of this Lease), within three (3) business days following Tenant's termination notice, reimburse Tenant for all its reasonable, third-party costs and expenses incurred in connection with this Lease (including, without limitation, costs associated with the preparation and review of plans and specifications, the performance of Tenant's Work, and attorneys' fees), which amount shall not exceed Seventy-Five Thousand Dollars ($75,000).

SECTION 19.03 Transfer of Interest. Landlord shall provide Tenant with notice upon or immediately after any sale or transfer of Landlord's interest in the Shopping Center. Landlord shall require the buyer or transferee to assume in writing all of the obligations of Landlord under this Lease. Notwithstanding Section 23.13, Landlord shall continue to remain liable for all accrued liability, if any, up to the date of such sale or transfer, unless such obligations are specifically assumed by any such transferee. Notwithstanding anything contained herein to the contrary, Landlord shall continue to remain liable hereunder after such sale or transfer unless the

43

buyer or transferee has expressly assumed in writing all of the obligations of Landlord under this Lease.

SECTION 19.04  Tenant Estoppel Certificates.  Tenant agrees, within twenty (20) days of Landlord's request, to execute and deliver to Landlord or any Mortgagee, on a form prepared by or on behalf of the party so requesting, an estoppel certificate (a) ratifying this Lease and confirming that there are no modifications or amendments to this Lease, except as may be stated in the certificate, (b) confirming the commencement and expiration dates of this Lease, (c) certifying to Tenant's actual knowledge and belief that the Landlord is not in default under this Lease, and that there are no offsets or defenses to enforcement of this Lease, except as may be stated in the certificate, (d) stating the date through which Annual Minimum Rent and other charges payable by Tenant have been paid and (e) such other information as Landlord and such Mortgagee may reasonably require.

SECTION 19.05  Landlord Estoppel Certificates.  Landlord agrees, within twenty (20) days of Tenant's request, to execute and deliver to Tenant or any assignee, transferee, subtenant or Lender, on a form prepared by or on behalf of the party so requesting, an estoppel certificate (a) ratifying this Lease and confirming that there are no modifications or amendments to this Lease, except as may be stated in the certificate, (b) confirming the commencement and expiration dates of this Lease, (c) certifying to Landlord's actual knowledge and belief that Tenant is not in default under this Lease, and that there are no offsets or defenses to enforcement of this Lease, except as may be stated in the certificate, (d) stating the date through which Annual Minimum Rent and other charges payable by Tenant have been paid and (e) such other information as Landlord and such Mortgagee may reasonably require.

SECTION 19.06  Payments.  If Landlord shall request Tenant to execute more than one (1) subordination, attornment and recognition agreement or more than one (1) estoppel certificate in any twelve (12) month period, then, as a condition to Tenant's obligations under Sections 19.01 or 19.04, as the case may be, Landlord shall pay to Tenant Five Hundred Dollars ($500) for each subsequent request for a subordination, attornment and recognition agreement or an estoppel certificate within such twelve (12) month period.  If Tenant shall request Landlord to execute more than one (1) estoppel certificate in any twelve (12) month period, then, as a condition to Landlord's obligations under Section 19.05, Tenant shall pay to Landlord Five Hundred Dollars ($500) for each subsequent request for an estoppel certificate within such twelve (12) month period.

## ARTICLE XX

## LANDLORD'S REPRESENTATIONS, WARRANTIES AND COVENANTS

SECTION 20.01  Quiet Enjoyment.  Landlord covenants and agrees that so long as Tenant is not in default of any of the terms and conditions of this Lease beyond any applicable notice and cure period, Tenant, during the Term, shall freely, peacefully, and quietly occupy and enjoy the use and possession of the Premises without disturbance, molestation, hindrance or ejectment of any kind whatsoever.

44

WO 729984.13

SECTION 20.02 <u>Representations, Warranties and Covenants</u>. In order to induce Tenant to execute this Lease and in consideration thereof, Landlord covenants, warrants and represents to Tenant as follows:

(a)     Landlord holds fee simple title to the Landlord Tract free and clear of all easements, restrictions, liens, encumbrances, leases and the like, except as described on <u>Exhibit K</u> and any exceptions recorded after the date of this Lease which do not contravene, hinder or impair, except to a de minimus extent, any right or privilege granted to Tenant in this Lease or result in the imposition of any cost or expense upon Tenant; that the Shopping Center, as of the Possession Date, will not be subject to the lien of any Mortgage (except such instruments where the lienor has entered into an agreement in favor of Tenant, as described in Section 19.02); that Landlord has the full power, right and authority to make this Lease for the Term without the consent, joinder, or approval of any other party. Landlord shall, on or before the Possession Date, Landlord will put Tenant into complete and exclusive possession of the Premises. Landlord shall deliver the Premises free from all orders, restrictions, covenants, agreements, leases, easements, laws, codes, ordinances, regulations or decrees (including, without limitation, those matters described on <u>Exhibit K</u>) which would, in any way, prevent or inhibit the use of the Premises for the sale, rental, installation, servicing and repairing of the Products and the Ancillary Products, as defined  below) or prevent or restrict the use of the Common Areas or limit ingress and egress to and from U.S. Highway 31, the public thoroughfares shown on the Site Plan, by Tenant, its agents, employees or invitees.  The term "<u>Ancillary Products</u>" shall mean furniture and appliances (including, without limitation, household appliances such as, by way of example only, ovens, refrigerators, freezers, dishwashers, washers, dryers, microwave ovens, toasters and blenders).

(b)     Landlord shall, on or before the Possession Date, have caused the Delivery of the Land to occur in accordance with this Lease.

(c)     The Shopping Center shall, at the time of commencement of construction by Landlord, be properly zoned for the operation and maintenance of a store similar to other stores operated by Tenant and for its contemplated use, and that all necessary governmental consents, permits and approvals allowing for the Premises to be occupied for such use shall have been obtained by Landlord (except for Tenant's Permits).

(d)     As of the Effective Date there is no Affiliated Land in existence and as of the Possession Date there will not be any Affiliated Land in existence (or, if there shall be Affiliated Land in existence, Landlord shall promptly notify Tenant thereof and promptly execute any recordable instrument reasonably requested by Tenant which memorializes the provisions of this Lease pertaining to or otherwise affecting Affiliated Land).

SECTION 20.03 <u>Site Covenants</u>.  In order to induce Tenant to enter into this Lease, Landlord covenants to Tenant as follows (the "<u>Site Covenants</u>"):

(a)     Landlord shall not construct (or permit to be constructed) any buildings or other structures outside the area identified on the Site Plan as the "Buildable Area" (the "<u>No-Build Area</u>").

45

(b)    Landlord shall not construct (or permit to be constructed) any projections either vertical or horizontal (other than Tenant's signs or identifications) which will project along the front or rear of the building in which the Premises are situated in such a manner as to obstruct the view of Tenant's signs or its store front in any manner.

(c)    The number of paved, full-size parking spaces in the Shopping Center shall be the greater of (i) the ratio listed in Section 1.01(M) or (ii) the amount of spaces required by Laws, and, without limiting the generality of the foregoing, the number of spaces contained in Tenant's Preferred Area shall be at least ninety percent (90%) of the number of spaces as shown on the Site Plan.

(d)    Landlord shall not erect (or permit to be erected) any building or other structures (including, without limitation, kiosks) in any Outparcel except as and where shown on the Site Plan, and all outparcel buildings constructed shall (i) not exceed the height requirements of the OEA which are set forth on Exhibit G attached hereto (the "Height Restrictions"), (ii) not exceed the Floor Area or other restrictions on the building footprint set forth in the OEA, (iii) satisfy all parking requirements (without variance) using the parking spaces located within each such outparcel, and (iv) be used solely for retail or restaurant purposes (or such other purposes as permitted in the OEA).

(e)    Except (i) with respect to the Outside Sales Area (as defined in the OEA) for the Target Tract, or (ii) as expressly permitted by the OEA with respect to the Target Tract or Kohl's Tract, Landlord shall not use (or permit the use of) all or any portion of the Common Areas for retail sales or for promotional purposes, subject to Tenant's rights under Section 2.01(d).

(f)    Landlord shall not make (and shall not permit there to made) any material changes to those Common Areas identified as "No-Change Area" on the Site Plan (the "No-Change Area") including, without limitation, changes in the location of curbcuts, drive aisles, entrances, access points, roadways, sidewalks or parking spaces or reduction of the parking ratio below the ratios identified in Section 20.03(c) without Tenant's consent, which may be withheld in Tenant's sole discretion. Landlord shall not make (and shall not permit to be made) any other changes to the Common Areas which adversely affects Tenant's access to the Premises or the Shopping Center or the visibility of the Premises or of any of Tenant's signage, without Tenant's consent, which may be withheld in Tenant's sole discretion. Any other changes to the Common Areas may be made only upon receipt of Tenant's consent which may withheld in Tenant's reasonable discretion. Notwithstanding the foregoing to the contrary, Landlord shall have the right within the No-Change Area to (i) install landscaping/hardscaping per Landlord's landscape/hardscape plan as approved by local jurisdiction and to replace then existing trees and other growing plants, (ii) construct other items or amenities customary in a first-class retail centers which are not intended for occupancy by any tenant or occupant and may be located in any area where a building is restricted hereunder, including, without limitation lights, benches and directional signage.

(g)    Following Tenant's opening for business at the Premises, (a) Landlord shall use reasonable efforts to control any noise and dust at the Shopping Center (including, without limitation, during any periods of permitted construction within the Shopping Center)

46

such that neither materially interferes with the normal operation of Tenant's business, (b) Landlord shall not perform (and shall not permit there to be performed) any exterior construction in the Developer's Tract during the months of October, November, December and January, except to the extent permitted under Section 5.01, and (c) upon any notice of violation thereof, Landlord shall demand compliance with Section 3.2.6(E) and 4.2.2 of the OEA.

(h)    Landlord shall not permit any solicitation, distribution of handbills, picketing, or other public demonstration in the Common Areas, except as otherwise may be mandated by Laws.

(i)    No transmission and/or reception towers for wireless telephone or internet communications shall be permitted within the Developer Tract.

(j)    Landlord shall not knowingly install or knowingly permit to be installed by any other tenant or other person anywhere in the Shopping Center or any Affiliated Land any structure or equipment which would cause any interference with satellite, radio, telecommunications or television reception or transmission in or from the Building, and in the event that another tenant or occupant of the Shopping Center or Affiliated Land installs any structure or equipment that actually causes interference with the satellite, radio, telecommunications or television reception or transmission in or from the Building, Landlord shall provide reasonable cooperation to Tenant is resolving the foregoing.

SECTION 20.04 OEA.

(a)    The term "OEA" shall mean that certain Operation and Easement Agreement by and between Target Corporation; Kohl's Department Stores, Inc.; Spring Hill Development Partners, GP; Dickson Management Associates, LLC; and Gallatin Management Associates, LLC, dated as of February 23, 2007 and recorded on February 27, 2007 in Maury County, State of Tennessee in Book R1969 at page 1366, as amended by the amendment contemplated in Section 20.04(b) below.

(b)    Landlord covenants, represents and warrants to Tenant that: (i) the OEA has not been modified, amended or terminated (except as contemplated by that certain proposed amendment, a copy of which has been provided to Tenant, the final version of which shall be subject to Tenant's consent which shall not be unreasonably withheld, delayed or conditioned); (ii) the OEA is currently in full force and effect; (iii) to its actual knowledge as of the Effective Date, no default under the OEA exists beyond any applicable notice and cure period; and (iv) the OEA is, and shall remain, superior in lien to all mortgages and related liens affecting the Shopping Center and all other land which is encumbered by the OEA. Landlord and Tenant each acknowledge that this Lease is made and shall continue to be subject and subordinate to the OEA, subject to the provisions of this Section 20.04. Tenant shall comply with the terms and conditions of the OEA to the extent same affects the Premises.

(c)    Landlord shall, during the Term: (i) perform and observe all of the terms, covenants, provisions and conditions of the OEA on Landlord's part to be performed and observed; (ii) defend, indemnify and hold harmless Tenant from and against any and all claims, demands, causes of action, suits, damages, liabilities, and expenses of any nature arising out of or

47

in connection with the enforcement of, or a claimed breach by, Landlord of any covenant, term, condition, or provision of the OEA; and (iii) diligently enforce, at its sole expense, the covenants, agreements, and obligations of the OEA.

(d)    Whenever, pursuant to the OEA, the consent or approval of Landlord shall be required or requested, and such consent or approval could materially diminish the rights or materially increase the obligations of Tenant under the OEA or under this Lease, or could materially and adversely affect Tenant's use or occupancy of the Premises, or the conduct of Tenant's business therein, such consent or approval shall not be granted without the prior consent of Tenant, which consent may be withheld in its sole and absolute discretion.

(e)    Landlord shall, immediately upon receipt, forward to Tenant and Tenant's leasehold mortgagee, if any, a copy of any and all notices and/or demands received by Landlord under or pursuant to the OEA, which relate to, or could adversely affect, Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or Tenant's rights pursuant to this Lease.

(f)    Without the prior consent of Tenant (which consent may not be unreasonably withheld, conditioned or delayed, but which may be withheld in Tenant's reasonable business judgment), Landlord shall not amend or modify (or permit an amendment to or modification of) the OEA if such amendment or modification could materially diminish the rights or materially increase the obligations of Tenant under the OEA or under this Lease, or could materially adversely affect Tenant's use or occupancy of the Premises or the conduct of Tenant's business therein, nor shall Landlord terminate the OEA.

(g)    In the event Landlord defaults in the performance of any of its obligations under the OEA or fails to enforce the obligations of any other obligee under the OEA, and such default or failure to enforce materially and adversely affects Tenant's rights under the OEA or under this Lease, Tenant's Work, Tenant's use or occupancy of the Premises or the conduct of Tenant's business therein, Tenant may, but shall not be obligated to, after thirty (30) days notice (except in the event of emergency, in which case no notice shall be required) cure any default by Landlord under the OEA and/or enforce, in its own name, at Landlord's expense, the obligations of any other obligee under the OEA. Landlord shall, upon demand, reimburse Tenant for the reasonable costs incurred by Tenant in performing any of Landlord's obligations under the OEA or enforcing the obligations of any obligee under the OEA, together with interest thereon at the Default Rate from the date of such demand.

(h)    As between Landlord and Tenant, in the event of any conflict between the OEA and this Lease, this Lease shall in all respects control.

(i)    Landlord represents and warrants that no third-party approvals are required under the OEA, except as set forth on Exhibit O, all of which have been obtained by Landlord prior to the Effective Date (except as set forth in Section 2.04(c) of the Lease).

(j)    Landlord hereby warrants, covenants and represents to Tenant that Landlord shall not assign its rights as an "Approving Party" under the OEA separate and apart from its interest as Landlord under this Lease. Landlord further warrants, covenants and

48

represents to Tenant that any assignment of its rights as an Approving Party under the OEA shall be set forth in a written instrument.

## ARTICLE XXI

## HOLDING OVER

SECTION 21.01 Holding Over. If Tenant remains in possession of the Premises after the expiration of the Term without having duly exercised its right, if any, to extend or further extend the Term, such continuing possession shall create a tenancy at sufferance on the terms herein specified and such tenancy may be terminated at the end of any month thereafter by either party by giving at least thirty (30) days notice thereof to the other party. During such holdover, Tenant shall be liable for Annual Minimum Rent on a monthly basis (or, if applicable, on a prorated daily basis) in an amount equal to one hundred twenty-five percent (125%) of the amount thereof payable by Tenant for the month immediately preceding the last day of the Term, as well as for all Additional Rent payable by Tenant under this Lease.

## ARTICLE XXII

## NOTICE

SECTION 22.01 Where and How Given. All notices or demands which either party hereto either is required to or may desire to serve upon the other shall be in writing and shall be sufficiently served upon such other party, by (a) mailing a copy thereof by certified or registered mail, postage prepaid, return receipt requested, addressed to the party to whom the notice is directed at the "Notice Address" of such party, or (b) by a reliable overnight courier (such as Federal Express), all charges prepaid, furnishing a receipt upon delivery, and addressed to the party to whom the notice is addressed at the Notice Address of the part. The Notice Address of each party is:

a) Landlord:                SPRING HILL DEVELOPMENT PARTNERS, GP
                            C/O GBT Realty Corporation
                            201 Summit View Drive
                            Suite 110
                            Brentwood, Tennessee
                            Attn: George Tomlin

with a copy to:             Hartman, Simons, Spielman & Wood, LLP
                            6400 Powers Ferry Road, N.W.
                            Suite 400
                            Atlanta, Georgia 30339
                            Attn: Peter M. Hartman, Esq.

b) Tenant:                  CIRCUIT CITY STORES, INC.
                            9950 Mayland Drive
                            Richmond, Virginia 23233
                            Attention: Vice President of Real Estate

49

with a copy to:            CIRCUIT CITY STORES, INC.
9950 Mayland Drive
Richmond, Virginia 23233
Attention:  General Counsel

with a copy to:            Sutherland Asbill & Brennan LLP
1114 Avenue of the Americas
40th Fl.
New York, NY 10036
Attn:  David J. Rabinowitz, Esq.

The addresses to which notices and demands shall be delivered or sent may be changed from time to time by notice served, as hereinbefore provided, by either party upon the other party.

SECTION 22.02  <u>When Given</u>.  Unless otherwise provided for herein, notice shall be deemed to have been served at the earlier of the date received, refused or returned as undeliverable.  However, if such notice pertains to the change of address of either of the parties hereto, then such notice shall be deemed to have been served upon receipt thereof by the party to whom such notice is given.

### ARTICLE XXIII

### MISCELLANEOUS

SECTION 23.01  <u>Rent Proration</u>.  If this Lease is terminated prior to its natural expiration date for any reason other than a Tenant default, then Landlord shall promptly reimburse Tenant for any Rent prepaid by Tenant for periods subsequent to such termination date.  This Section 23.01 shall survive the termination of this Lease.

SECTION 23.02  <u>Construction</u>.  In construing this Lease, feminine or neuter pronouns shall be substituted for those masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place in which the context so requires.  This Lease shall be construed without regard to: (a) the identity of the party who drafted the various provisions hereof, and (b) the addition or deletion of text made during the negotiation of this Lease.  Moreover, each and every provision of this Lease shall be construed as though all parties hereto participated equally in the drafting thereof.  As a result of the foregoing, any rule or construction that a document is to be construed against the drafting party shall not be applicable hereto.

SECTION 23.03  <u>Section Headings</u>.   The section headings in this Lease are for convenience only and do not in any way limit or simplify the terms and provisions of this Lease, nor should they be used to determine the intent of the parties.

SECTION 23.04  <u>Partial Invalidity</u>.  If any term, covenant, condition or provision of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, then the remainder of this Lease or the application of such term or provision to

WO 729984.13

persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby and each term, covenant, condition and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

SECTION 23.05 <u>Waiver</u>. The failure of either party to seek redress for violation of, or to insist upon strict performance of, any term, covenant or condition contained in this Lease shall not prevent a similar subsequent act from constituting a default under this Lease.

SECTION 23.06 <u>Governing Law</u>.   This Lease shall be governed and construed in accordance with the laws of the State.

SECTION 23.07 <u>Successors and Assigns</u>. This Lease shall inure to the benefit of and be binding upon the heirs, executors, administrators, successors and assign of Landlord and the successors and assigns of Tenant.

SECTION 23.08 <u>No Broker</u>. Landlord and Tenant represent to each other that no broker or person is entitled to any commission by reason of the negotiation and execution of this Lease, other than the Broker identified in Section 1.01(D), and Landlord agrees that Landlord shall be solely responsible for the fees and commissions of the Broker pursuant to a separate agreement with Broker.  Landlord and Tenant agree to indemnify, defend and hold each other harmless against any and all claims by any other person for brokerage commissions or fees arising out of any conversation, negotiations or other dealings held by the other party with any other broker regarding this Lease.

SECTION 23.09 <u>Memorandum of Lease</u>.   Landlord and Tenant agree to execute a Memorandum of Lease in recordable form, substantially similar to that attached as <u>Exhibit L</u>, setting forth such provisions hereof as may be required by State law.  If so requested by Tenant, Landlord shall execute such Memorandum of Lease simultaneously with the execution of this Lease. Recording costs shall be borne by the party requesting recordation of same; however, any transfer taxes or other fees charged by any local or state governmental authorities in connection with such recordation shall be paid by Landlord.  The provisions of this Lease shall control with regard to any omissions from, or provisions which may be in conflict with, the Memorandum of Lease.

SECTION 23.10 <u>Entire Agreement</u>.   This instrument contains the entire and only agreement between the parties and no oral statements or representations or written matter not contained in this instrument shall have any force or effect.  This Lease shall not be amended or modified in any way except by a writing executed by both parties.  All of the exhibits attached to this Lease are incorporated into this Lease by reference and for all purposes are a part of this Lease.

SECTION 23.11 <u>Relationship of Parties</u>.  The relationship between the parties hereto is solely that of landlord and tenant and nothing in this Lease shall be construed as creating a partnership or joint venture between the parties hereto, it being the express intent of Landlord and Tenant that the business of Tenant on the Premises and elsewhere, and the good will thereof, shall be and remain the sole property of Tenant.

WO 729984.13

SECTION 23.12 Force Majeure. If either party hereto shall be delayed or hindered in, or prevented from, the performance of any act required under this Lease by reason of strikes, lockouts, labor troubles, failure of power, riots, insurrection, war or other reasons of a like nature beyond the reasonable control of the party delayed in performing works or doing acts required under the terms of this Lease (any such delay, hindrance or prevention is referred to as "Force Majeure"), then performance of such act shall be excused for the period of the delay, and the period of the performance of any such act shall be extended for a period equivalent to the period of such delay, except as otherwise specifically provided herein to the contrary. The provisions of this Section 23.12 shall not be applicable to delays resulting from the inability of a party to obtain financing or to proceed with its obligations under this Lease because of a lack of funds.

SECTION 23.13 Limitation of Landlord's Liability. Except with respect to (a) insurance proceeds or condemnation awards received by Landlord which are required by the terms of this Lease to be applied to the repair or restoration of the Premises or the Shopping Center, and (b) Landlord's failure to pay the Landlord Reimbursement in accordance with this Lease, and (c) any monies owed by Landlord to Tenant in connection with Landlord's default in performing Landlord's Work, Tenant shall, on and after the Possession Date, look only to Landlord's estate and property in the Shopping Center (or the proceeds from the sale, financing or refinancing of all or any portion thereof) and net income derived from the Shopping Center for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord hereunder, and no other property or assets of Landlord, its officers, directors, stockholders, members or partners shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease. Except with respect to the limitation on personal liability hereinabove set forth, the provisions of this Section 23.13 shall not be deemed or construed to limit Tenant's rights and remedies pursuant to this Lease or which may be available at law, in equity or otherwise.

SECTION 23.14 Limitation of Tenant's Liability. Landlord, its successors and assigns, shall look solely to the assets, if any, of Tenant and its successors and assigns, for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director, member or employee of Tenant or any of its Affiliates.

SECTION 23.15 Consents. Except as may be otherwise expressly set forth in this Lease, whenever under this Lease provision is made for either party's securing the consent or approval of the other party, (a) such consent or approval shall be in writing and shall not be unreasonably withheld, delayed or conditioned, and (b) in all matters contained herein, both parties shall have an implied obligation of reasonableness.

SECTION 23.16 Rent Abatement. Whenever under this Lease a provision is made for Rent or any installment, category or denomination thereof to abate, such amount so abated shall neither accrue nor ever become payable at any time during the Term, it being acknowledged and agreed that an abatement of Rent (or any installment, category or denomination thereof) shall mean the annulment of the stated Rent obligation during the stated period of abatement.

SECTION 23.17 Costs. Whenever this Lease requires the performance of an act by party, such party shall perform the act at its own cost and expense, unless otherwise expressly provided to the contrary in this Lease.

WO 729984.13

SECTION 23.18 <u>Attorneys' Fees</u>. In any action or proceeding hereunder (whether to enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall be entitled to recover from the other party the prevailing party's reasonable costs and expenses in such action or proceeding, including reasonable attorneys' fees, costs and expenses. Except as otherwise set forth herein, if either party is sued by a third party as a result of a violation of a covenant, representation or warranty herein contained by the other party hereto, then the party who has violated the covenant, representation or warranty shall be responsible for the reasonable costs and expenses in such action or proceeding against the non-violating party, including reasonable attorneys' fees, costs and expenses.

SECTION 23.19 <u>Survival of Obligations</u>. The obligation to pay any sums due to either party from the other that by the terms herein would not be payable, or are incapable of calculation, until after the expiration or sooner termination of this Lease shall survive and remain a continuing obligation until paid. All indemnity obligations under this Lease shall survive the expiration or earlier termination of this Lease.

SECTION 23.20 <u>Joint and Several Liability</u>. If either party consists of more than one person, then the persons constituting such party shall be jointly and severally liable hereunder.

SECTION 23.21 <u>Definition of Hereunder, Herein, etc.</u>. Unless the context clearly indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar import refer to this Lease and all of the Exhibits attached hereto as a whole and not to any particular section, subsection, or paragraph hereof.

SECTION 23.22 <u>Tenant's Trade Name</u>. Landlord shall not make use of Tenant's trade name (*i.e.*, "Circuit City"®) in any advertising or marketing material including, without limitation, on any internet website, without obtaining Tenant's prior written approval, which may be withheld in Tenant's sole and absolute discretion. Notwithstanding the foregoing, Landlord may use Tenant's trade name on Landlord's website and in informational brochures, but only for the purposes of identifying Tenant as a tenant of the Shopping Center.

SECTION 23.23 <u>Counterparts</u>. This instrument may be executed in several counterparts, each of which shall be deemed an original. The signatures to this instrument may be executed and notarized on separate pages, and when attached to this instrument, shall constitute one complete document.

SECTION 23.24 <u>Patriot Act</u>. Each party hereto represents and warrants to the other that such party (which for this purpose includes its partners, members, principal stockholders and any other constituent entities) is not named as a "specially designated national and blocked person" (as defined in Presidential Executive Order 13224) on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control. Each party also represents and warrants to the other that neither such party nor its constituents or affiliates are in violation of any laws relating to terrorism or money laundering, including the aforesaid Executive Order and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56), as amended. Each party hereby agrees to defend, indemnify and hold harmless the other party from and against any and all claims, damages, losses, risks, liabilities and expenses (including reasonable attorneys' fees and costs)

53

arising from or related to any breach of the foregoing representations and warranties by the indemnifying party.

[Signature page follows]

WO 729984.13

IN WITNESS WHEREOF, Landlord and Tenant have caused this Lease to be duly executed and delivered in their respective names as of the date first above written.

LANDLORD:

**SPRING HILL DEVELOPMENT PARTNERS, GP**, a Georgia general partnership

Attest:

By:_____
Name:
Title:

TENANT:

**CIRCUIT CITY STORES, INC.**, a Virginia corporation

By:_____
Name:
Title:

Error! Unknown document property name.

IN WITNESS WHEREOF, Landlord and Tenant have caused this Lease to be duly executed and delivered in their respective names as of the date first above written.

LANDLORD:

**SPRING HILL DEVELOPMENT PARTNERS, GP**, a Georgia general partnership

Attest:

_____

By: _____
Name:
Title:

TENANT:

**CIRCUIT CITY STORES, INC.**, a Virginia corporation

By: _____
Name:        John B. Mulleady
Title:        Vice President
             Real Estate & Construction

55

## EXHIBIT A

### Site Plan

Tenant's Preferred Area (Section 1.01(M))
North Parking Area (Section 1.01(M))
South Parking Area (Section 1.01 (M))
Premises – crosshatched, with Floor Area and frontage thereof (Section 1.01P)
Outparcels (Section 1.01P)
All buildings within the Shopping Center and Floor Area thereof (Section 1.01S)
Customer Pick-Up Areas (Section 2.01(c))
Car Stereo Parking Areas (Section 2.01(c))
Trash Compactor Area (Section 2.01(c))
Web Order Pick-Up Parking Spaces (Section 2.01(c))
Transformer Pad Area (Section 2.01(c))
Tenant's Promotion Area (Section 2.01(d))
Staging Area (Section 3.01)
Construction Drive (Section 5.02(b))
Pylon Sign(s) (Section 15.02)
Public Thoroughfares (Section 20.02(a))
Buildable Area (Section 20.03(a))
Parking Spaces In Tenant's Preferred Area (Section 20.03(c))
Landlord's permitted outparcel build-out area (Section 22.03(d))
No-Change Area (Section 20.03(f))
Tenant's Trailer (Section E of Exhibit C)

#959803 v8

A-1

WO 729984.13



OVERALL SITE PLAN – EXHIBIT "A"



CAR STEREO
PARKING AREA
(6) SPACES

LOADING
FACILITIES

TRASH
COMPACTOR
AREA

TRANSFORMER
PAD AREA

HC PARKING
(3) SPACES

CUSTOMER
PICK-UP
(3) SPACES

WEB ORDER
(4) SPACES

TENANT
PROMOTION
AREA

CART
CORRAL
(3) SPACES

**TARGET**

**ANCHOR A**

178,598 sf

ST04SSv06B (Enhanced - Side Stock)

Shops 3
5,200 sf

city
H-20
20,591 S.F.

Shops 2
±5,200 s.f.

Shops 5
24,800 s.f.

**Outparcels A&B**
**±1.7 ACRES**

**Outparcel C**
**±1.4 ACRES**

**SITE PLAN - EXHIBIT "A1"**
1"=100'

CONSTRUCTION DRIVE

TENANT PREFERRED AREA
(117 PARKING SPACES)

SECONDARY STAGING AREA
5,263 SF

PRIMARY STAGING AREA
20,593 SF

PREMISES

CIRCUIT CITY STORES INC.
9950 MAYLAND DRIVE RICHMOND, VA. 23233
804-527-4000

circuit **city**

EXHIBIT "A1"

PHASE

State No.
TN  3823

Prototype
H20

10/15/07

Market/Project Name
SPRING HILL, TN

Trade Area/Market
CROSSINGS OF SPRING HILL

Site Name/County, State
MAURY COUNTY - SPRING HILL, TN

Drawing Description
EXHIBIT "A1"

# EXHIBIT B

## Legal Description of the Shopping Center (Target Tract, Kohl's Tract and Developer Tract)

### LEGAL DESCRIPTION OF TARGET TRACT
### (LOT 14)

Lot 14 of The Crossings of Spring Hill, as shown on subdivision plat of record in Plat Book *P17*, Page *113*, in the Register's Office of Maury County, Tennessee.

Being a portion of the property conveyed to Spring Hill Development Partners, GP, a Georgia general partnership, by General Warranty Deed from Don Adams, Alan D. Adams, Steve E. Adams, and Larry Adams of record in Book R1902, Page 971, in the Register's Office of Maury County, Tennessee; and being a portion of the property conveyed to Gallatin Management Associates, LLC, a Georgia limited liability company, Dickson Management Associates, LLC, a Georgia limited liability company, and Spring Hill Development Partners, GP, a Georgia general partnership, by General Warranty Deed from Don Adams, Alan D. Adams, Steve E. Adams, and Larry Adams of record in Book R1923, Page 35, in the Register's Office of Maury County, Tennessee

### LEGAL DESCRIPTION OF DEVELOPER TRACT
### (LOTS 1, 2, 3, 4, 5, 6, 7, 8, 10, 11, 12, 13, 15 AND 16)

Lots 1, 2, 3, 4, 5, 6, 7, 8, 10, 11, 12, 13, 15 and 16 of The Crossings of Spring Hill, as shown on subdivision plat of record in Plat Book *P17*, Page *113*, in the Register's Office of Maury County, Tennessee.

Being a portion of the property conveyed to Spring Hill Development Partners, GP, a Georgia general partnership, by General Warranty Deed from Don Adams, Alan D. Adams, Steve E. Adams, and Larry Adams of record in Book R1902, Page 971, in the Register's Office of Maury County, Tennessee; and being a portion of the property conveyed to Gallatin Management Associates, LLC, a Georgia limited liability company, Dickson Management Associates, LLC, a Georgia limited liability company, and Spring Hill Development Partners, GP, a Georgia general partnership, by General Warranty Deed from Don Adams, Alan D. Adams, Steve E. Adams, and Larry Adams of record in Book R1923, Page 35, in the Register's Office of Maury County, Tennessee

## LEGAL DESCRIPTION OF KOHL'S TRACT
### (LOT 9)

Lot 9 of The Crossings of Spring Hill, as shown on subdivision plat of record in Plat Book*P17*, Page*113*, in the Register's Office of Maury County, Tennessee.

Being a portion of the property conveyed to Spring Hill Development Partners, GP, a Georgia general partnership, by General Warranty Deed from Don Adams, Alan D. Adams, Steve E. Adams, and Larry Adams of record in Book R1902, Page 971, in the Register's Office of Maury County, Tennessee; and being a portion of the property conveyed to Gallatin Management Associates, LLC, a Georgia limited liability company, Dickson Management Associates, LLC, a Georgia limited liability company, and Spring Hill Development Partners, GP, a Georgia general partnership, by General Warranty Deed from Don Adams, Alan D. Adams, Steve E. Adams, and Larry Adams of record in Book R1923, Page 35, in the Register's Office of Maury County, Tennessee

## EXHIBIT C

Site Design Requirements

**[Note: EXHIBIT C – SITE DESIGN REQUIREMENTS has been distributed to Landlord's construction department for review and will be inserted and incorporated into the executed Lease as Exhibit C.]**

#959803 v8
WO 729984.13

| Site Design Requirements | | Reverse Build to Suit Deals | |
|---|---|---|---|
| Circuit City Stores, Inc. | Spring Hill, TN | Store #3823 | 9/25/2007 |

These Site Design Requirements (SDR's) are attached to and made part of the Lease Agreement. These SDR's are intended to allocate responsibility between Landlord and Circuit City for the work needed to prepare the Premises for Circuit City's occupancy. Terms with capital letters which are defined in the Lease Agreement and used in the SDR's shall have the same meaning. Not withstanding anything contained herein, should there be a difference or conflict described herein between the Civil Plans prepared by Gresham Smith & Partners dated June 4, 2007 and the SDR 's or Circuit City Specifications the Civil Plans shall govern.

# 1. Landlord's Work

Landlord shall be responsible for all work as described in Section 1, "Landlord's Work". Landlord's Work shall be performed in a good and workmanlike manner. Landlord's engineers, surveyors, architects, consultants and contractors shall be bondable, all licensed in the state where the shopping center is located, and of good reputation. Landlord's Work shall be performed at Landlord's sole cost and expense, and in accordance with all applicable laws and regulations, these SDR's, the Construction Schedule (Attachment 2), and the Civil Plans (Attachment 7).

In the event that any portion of the Landlord's Work requires minor adjustments in order to satisfy the requirements of these SDR's, Circuit City is to give notification to the Developer. If the Developer has not commenced work within 48 hours of notification, Circuit City may direct its contractor to make such minor adjustments, the total cost of which shall be reimbursed by Landlord to Circuit City upon demand in a sum not to exceed Five Thousand and no/100 Dollars ($5,000.00) in the aggregate.

**A. Site Delivery Work**   - All of the Landlord Work described in one (1) though twelve (12) below is referred to collectively as the "Site Delivery Work". Upon completion of the Site Delivery Work, Landlord shall deliver to Circuit City the "Site Work Certificate" (Attachment "3"), at which time "Delivery of Land" as described in the Lease shall be deemed to have occurred. If any portion of the Site Delivery Work has not been completed to Circuit City's satisfaction, Circuit City shall notify Landlord within 5 days of the delivery of land, and Landlord shall be obligated to correct any incomplete or unacceptable work as a condition precedent to Delivery of the Land.

1. Provide the Geotechnical Report and Geotechnical Reliance Letter (Attachment "8"). The Geotechnical Investigation Report by Geosciences Design Group, LLC, dated_September 8, 2006__ shall be referenced as the Geotechnical Report, henceforth.
2. Provide the Environmental Reports and Environmental Reliance Letter (Attachment "9").
3. Cause the proposed development of the Shopping Center and its Civil Plans to comply with the Geotechnical Report.
4. Cause the land upon which the Circuit City building will be constructed (which includes the areas occupied by the Building, loading dock well, trash compactor, and sidewalks) to be free and clear of all obstructions, foundations, rock, footings, utilities, easements, improvements, and tenancies. Any rock removal performed by the Landlord must be completed as described in the Circuit City Specifications. The Circuit City Specifications shall take precedent over the Geotechnical Report with regards to rock removal.
5. Cause the land on which the Shopping Center is situated, including the Building Pad, to be delivered free of all Hazardous Materials.
6. Cause the land on which the Shopping Center is situated, including the Building Pad, to be graded in accordance with the Geotechnical Report and the Civil Plans, exclusive of the outparcel areas.
7. Complete the Building Pad in accordance with the Geotechnical Report and the Civil Plans. If there are discrepancies between the Circuit City Specifications and the Geotechnical Report or Civil Plans, the Geotechnical Report shall take precedent. The term "Building Pad" shall mean the footprint of the Circuit City Building plus a minimum of fifteen (15) feet beyond such footprint (except when the fifteen feet falls within the building pad of an adjacent tenant and public access or R.O.W., and the areas occupied by the loading dock well, trash compactor, and sidewalks.

| Site Design Requirements | Reverse Build to Suit Deals | | |
|---|---|---|---|
| Circuit City Stores, Inc. | Spring Hill, TN | Store #3823 | 9/25/2007 |

8.  Obtain governmental approvals necessary to complete all on-site and off-site work shown on the Civil Plans, including all site work approvals which must be obtained as a condition precedent to approval of Circuit City's building permit. Notwithstanding the preceding statement, Landlord shall not be required to provide Circuit City's building construction documents or pay Circuit City's permit fees. Landlord is responsible for the development of the shopping center, exclusive of Tenant's work. Circuit City shall be responsible for customary fees related to utility hook-up at Tenant's premises and fees related to the construction of Tenant's work.

9.  Obtain all planning and zoning approvals, if any, from governmental authorities having jurisdiction over the Shopping Center which are necessary to allow the construction of Circuit City's building and the completion of the Circuit City building. Circuit City shall be responsible for building permit related to Tenant's premises.

10. Complete: (a) all curb cuts for the Tenant's Preferred Area, (b) 20,000 square feet of Staging Area outside of but adjacent to the Building Pad, to either be paved or stone to provide for all weather use, and (c) a twenty four (24) foot wide all-weather construction access road connecting the existing adjacent roadway to the Building Pad, to be maintained by the Landlord in good condition throughout the construction of the Common Areas.

11. Provide temporary utilities as described in the Circuit City Specifications to within five (5) feet of the Staging Area, at a mutually agreeable location, in accordance with the dates on the Construction Schedule.

12. Satisfy the additional requirements set forth in "Approvals and Payment of Fees" below.

**B. Additional Landlord's Work.**   - In addition to the Site Delivery Work, Landlord shall complete the following as part of Landlord's Work:

1.  The construction and installation of Circuit City's permanent utilities in accordance with the Circuit City Specifications and Civil Plans dated June 4, 2007.

2.  The construction and installation of paving, (light duty and heavy duty), sidewalks (except that sidewalk adjacent to the front of Circuit City's building), curbing, landscaping, and exterior lighting (except that lighting attached to Circuit City's building) in accordance with the Geotechnical Report and the Civil Plans.

3.  The construction and installation of the pylon signs in accordance with the Civil Plans and OEA.

**C. Approvals and Payment of Fees**   - As a condition of completing the Site Delivery Work, Landlord shall be obligated (a) to obtain all governmental and third party approvals, site permits, and authorizations for Landlord's work which must be obtained prior to the issuance of a building permit for the construction of the Circuit City building and (b) pay all fees and assessments, including building permit impact fees and utility tap fees (regardless of how such fees may be defined or described) which must be paid as a condition to issuance of a building permit for the construction of the Circuit City building.  Circuit City shall pay building permit fees and fees related to utility connection at Tenant's premises.

**D. Survey**   - Landlord shall provide Circuit City with a current ALTA survey, and provide the ALTA survey Certificate (Attachment "6") in accordance with the Construction Schedule.

**E. Civil Plans**   - Landlord shall deliver to Circuit City full and complete Civil Plans in accordance with the Construction Schedule. The Civil Plans will be attached to these SDR's as Attachment "7". Circuit City's review of the Civil Plans shall be for compliance with the Circuit City Specifications only, and for no other purpose. Civil Plans by Gresham Smith and Partners, as revised  June 4, 2007 are currently under LL revision, and are to be presented to CC for revision and approval.

**F. Sign Plans**   - Landlord shall submit to Circuit City all plans and specifications for the pylon signs contained or to be constructed within the Shopping Center, for Circuit City's review. Landlord shall submit to Circuit City any signage plans and design criteria that may impact Circuit City's building signs, and the pylon signs. Attached as Attachment "5" are the Sign Plans and Specifications plans for Circuit City's building and pylon signage, which Landlord hereby approves.

**Site Design Requirements      Reverse Build to Suit Deals**
Circuit City Stores, Inc.                Spring Hill, TN          Store #3823          9/25/2007

**G. Landlord Deliverables**   - The Landlord shall provide the deliverables as described in the Circuit City Development Process (Attachment "10").

## 2. Circuit City's Work

**A. Building Construction**   - Following Delivery of the Land, Circuit City shall commence and pursue to completion the construction of the Circuit City building described in the Lease as the "Premises". Except as otherwise expressly provided in the SDR's or the Lease, and subject to the terms of the Lease regarding payment of the Landlord Reimbursement, all costs and expenses incurred by Circuit City in connection with constructing the Premises shall be borne by Circuit City.

**B. Plans and Specifications**   - Circuit City shall prepare plans and specifications for the construction of the Premises which shall be submitted to the Landlord for its approval in accordance with the OEA and these SDR's. Landlord shall respond to Circuit City's request for approval within twenty (20) business days, and shall be obligated to approve Tenant's plans and specifications so long as they are consistent with the architectural theme detailed in the OEA, Circuit City's current prototype, and the Floor Plans and Elevations to be revised as noted on attachment (Attachment "4"), all subject to the OEA. In the event that the Landlord does not notify Circuit City that it disapproves the plans and specifications within twenty (20) business days, the plans and specifications shall be deemed approved. Circuit City's plans and specifications shall not be changed by Circuit City without the prior written consent of Landlord, per the OEA and code requirements.  Changes made by Circuit City to the interior of its prototypical store design shall not be subject to Landlord prior approval, and shall be deemed approved by the Landlord.  Following Landlord's approval of the Circuit City's plans and specifications, any changes requested by Landlord shall be subject to Circuit City's approval, which approval may be withheld in Circuit City's sole discretion for any reason or no reason, and if approved by Circuit City, any incremental costs associated with such changes shall be made at Landlord's sole cost and expense.

**C. Permits**   - At Circuit City's sole cost and expense, Circuit City shall obtain those certain building permits, licenses, other governmental approvals, and temporary and permanent certificates of occupancy which may be required for the lawful construction of the Premises (excluding Landlord's Work) in accordance with these SDR's. Landlord shall be obligated to assist and cooperate fully with Circuit City in obtaining such permits, licenses, approvals and certificates. Landlord shall be responsible for all other permits necessary for the development of the Shopping Center.

## 3. Attachments

**A. Attachments**   - The following are attached to these SDR's and made a part hereof for all purposes.

1.  Circuit City Specifications
2.  Construction Schedule
3.  Site Work Certificate
4.  Floor Plan and Elevations
5.  Sign Plans and Specifications
6.  ALTA Survey Certificate
7.  Civil Plans
8.  Geotechnical Reliance Letter
9.  Environmental Reliance Letter
10. Circuit City Development Process

| Site Design Requirements | Reverse Build to Suit Deals | | |
|---|---|---|---|
| Circuit City Stores, Inc. | Spring Hill, TN | Store #3823 | 9/25/2007 |

## Attachment "1" – Circuit City Specifications

1. **Grading Specifications**
2. **Utility Specifications**
3. **Paving and Lighting Specifications**



**Site Design Requirements    Reverse Build to Suit Deals**
Circuit City Stores, Inc.        Spring Hill, TN    Store #3823    9/25/2007

# GRADING SPECIFICATIONS – REVERSE BUILD TO SUIT DEALS

**GRADING SPECIFICATIONS:    Grading Requirements:**

- The Civil Plans shall show contours in accordance with standard engineering practice and these contours shall be shown with the existing and final elevations.

- The Building will be accessible by grade level parking only. Steps and stairs are not permitted.

- Sidewalk at the Building will slope away from the Building with grade of no less than 1.5% and no more than 3.0%. All Water shall be sheet drained away from the Circuit City doors.

- Asphalt paving areas will be graded to avoid ponding water, with slopes of no less than 1.5% and no more than 4.0%. Entrances and access drives shall have a maximum slope of 6.0%.

- Surface drainage swales will not be allowed without prior approval of Circuit City. Such swales must have a grade of no more than 3.5% and shall be constructed of concrete.

**GRADING SPECIFICATIONS:    Building Pad**

- Landlord shall be responsible for preparing the Building Pad subgrades to within plus or minus one-tenth of a foot as set by Civil Plans. Circuit City's subgrades are 8" below finished floor elevation.

- Compaction of the building pad shall be no less than ninety-five percent (95%) of the Standard proctor soil test for water content and compaction levels (Standard Proctor) on the Land, so as to enable Circuit City to perform construction work necessary to provide improvements in accordance with the Plans and Specifications with standard spread footings and without the necessity of pilings or other extraordinary foundation work.

- All compacted areas of the Land shall be verified by an independent professional soils engineering test laboratory and a certificate from such independent laboratory indicating compliance with Landlord's Geotech Report shall be furnished to Circuit City upon completion of the Site Delivery Work.

- The Building Pad soil shall have a minimum bearing capacity of 2,500 pounds per square foot. Earth stabilization and/or replacement shall be performed by the Landlord as necessary to meet this minimum requirement.

- During the preparation of the Building pad, Landlord shall at its expense have an independent professional soils engineering laboratory monitor and certify the preparation of the Building Pad in accordance with Landlord's Geotech Report. Landlord shall perform one in-place compaction test per 5,000 square feet of pad area per lift.

- No oversize material or lumps greater than 6" in diameter will be allowed and not more than 15% of the material shall be greater than 2 ½" diameter. Landlord must remove any existing rock within five feet of Circuit City's proposed foundation prior to pad delivery, so that construction of the Building can be completed without any rock excavation by Circuit City.

- The Civil Plans shall not be materially changed by Landlord without the prior consent of Circuit City, which consent shall not be unreasonably withheld or delayed.

- All outlots or future building areas shall be rough graded and planted with grass seed. Topsoil may be stockpiled on outlots.

K\\CCSN

(In figure labels: CAR STEREO PARKING AREA (6) SPACES, LOADING FACILITIES, TRASH COMPACTOR AREA, TRANSFORMER PAD AREA, HC PARKING (3) SPACES, CUSTOMER PICKUP (3) SPACES, WEB ORDER (4) SPACES, CART CORRAL (3) SPACES)



**Site Design Requirements** | Reverse Build to Suit Deals
Circuit City Stores, Inc. | Spring Hill, TN | Store #3823 | 9/25/2007

# UTILITIES SPECIFICATIONS – REVERSE BUILD TO SUIT DEALS

Temporary Utilities:

Landlord will provide the following temporary utilities to the Staging Area, in a location selected by Circuit City. ~~(utilities shall be onsite for completion of such temporary utilities set forth in the Construction~~
Schedule (Attachment "2"):

- ~~2" water line per Civil drawings with sufficient pressure that pumping is not necessary~~

- 200 amps, 1 phase, 4 wire, 120 volt electric power, with weatherproof and rainproof disconnect switch.

- Telephone service

Permanent Utilities:

Landlord will provide the following permanent utilities to within five (5) feet of the Building (unless noted otherwise below), at Circuit City's designated entry points as shown on this drawing. Paving shall not cover the stub points for these utilities. All utilities will be provided no later than the date set forth on the Construction Schedule (Attachment "2"):

- 2" Gas Service

- 4" Telephone Conduit

- Cable TV

- Primary electric service to Circuit City's designated point of termination, adequate for a 600 amp panel, 3-phase, 277/480 volt service.

- Storm Sewer System to locations as shown on the Civil Plans

- 6" Sanitary Sewer line

- 2" Domestic Water line

- 8" fire protection water line with a minimum of 50 pounds per square inch residual pressure at 1490 gallons per minute flow, with sufficient capacity to service Circuit City's sprinkler system without the need for a fire pump, as approved by Circuit City's fire protection consultant. The line should be provided within 5 feet of the Building. The line shall have a flanged and capped outlet located 12" above the finished floor and 18" from the pipe's centerline to the inside face of the exterior wall. The location shall be coordinated with Circuit City's sprinkler contractor and shall conform to the requirements of all authorities having jurisdiction.

K:\CCSR

Site Design Requirements | Reverse Build to Suit Deals
Circuit City Stores, Inc. | Spring Hill, TN | Store #1821 | 01/24/2007

# PAVING AND LIGHTING SPECIFICATIONS – REVERSE BUILD TO SUIT DEALS



PAVING SPECIFICATIONS: Parking Area and Roadway Surfacing

• Paving design shall be based on the Geotechnical Report.

• All pavement design shall conform to the recommendations of Landlord's Geotechnical Report and the Civil Plans.

• Heavy duty paving must be used in the main drives and service areas as required by Landlord's Geotechnical Report.

PAVING SPECIFICATIONS: Sidewalks and Curbs

• Landlord shall provide and install all curbs and sidewalks including perimeter curbs and sidewalks, except for the sidewalk directly in front of the Building.

• All sidewalks and curbs shall be constructed of concrete and shall have a minimum slope of 1.5% and a maximum slope of 3.0% away from the Building. All sidewalks and curbs shall be a minimum of four (4) inches thick, with a rough non-skid texture, over a suitable granular base. Salt finish is not acceptable.

• Entrance and access roads shall have six (6) inch curbs with eighteen (18) inch gutters. However, next to sidewalks and buildings when drainage is not a factor a straight six (6) inch curb without gutters shall be permitted. Parking lot islands and landscape enclosures shall have vertical type curbs. All curbs, and curb and gutters shall be concrete. Extruded asphalt curbing shall not be used.

SHOPPING CENTER LIGHTING SPECIFICATIONS: Design Standards

• Landlord shall prepare and submit plans to Circuit City that show the photometrics, location and height of all light poles, type of fixtures, fixture shielding (if any), circuiting, and details of the complete lighting arrangement and equipment.

• Illuminations as measured at the pavement shall be:
  8.0 foot candles minimum maintained within 50 feet of the Building entry
  5.0 foot candles minimum maintained throughout the parking lot and drives

• Landlord shall allow Circuit City to illuminate the entry fascia up to a minimum of 40 foot candles.

• Twenty-five percent (25%) of the overall lighting shall be designated as security lighting, and shall remains on from dusk until dawn. The security lighting layout and pattern shall be subject to Circuit City's approval.

• Selection of fixture types for both the parking lot lights and the building facades shall be as shown in the Civil Drawings.

• Landlord shall install a seven-day time switch to control all parking lot lighting wired to a common house panel. All security lighting shall be placed on photo-cell switching.

• The control of parking area lights shall be accessible to Circuit City's local store management due to late-night and holiday sales subject to the OEA and local codes. Circuit City shall be responsible for costs associated with such extended hours.

CAR STEREO PARKING AREA (6) SPACES
LOADING FACILITIES
TRASH COMPACTOR AREA
TRANSFORMER PAD AREA
HC PARKING (3) SPACES
CUSTOMER PICK-UP AREA
WEB ORDER (4) SPACES
CART CORRAL (3) SPACES

K3/CCS1

| Site Design Requirements | Reverse Build to Suit Deals | | |
|---|---|---|---|
| Circuit City Stores, Inc. | Spring Hill, TN | Store #3823 | 9/25/2007 |

## Attachment "2" – Construction Schedule

| | |
|---|---|
| Landlord's delivery of the Environmental Report. | 10/31/2007 |
| Landlord's delivery of the Geotechnical Reliance Letter (Attachment "8"). | 10/31/2007 |
| Landlord's delivery of the Environmental Reliance Letter (Attachment "9"). | 10/31/2007 |
| Landlord's delivery of Civil Plans. | 10/31/2007 |
| Landlord's completion of the Site Work including delivery of the Site Work Certificate (Attachment "3"); construction of staging area, all-weather construction access road, and installation of temporary utilities. | 8/30/07  10/31/2007 |
| II   ADDITIONAL LANDLORD'S WORK | |
| Construction and installation of permanent utilities. | 1/7/2008 |
| Construction and installation of: paving, curbing, sidewalks, landscaping, and exterior lighting. | 3/1/2008 |
| Construction and installation of pylon and monument signs identifying the Shopping Center. | 11/1/2007 |

| Site Design Requirements | Reverse Build to Suit Deals | | |
|---|---|---|---|
| Circuit City Stores, Inc. | Spring Hill, TN | Store #3823 | 9/25/2007 |

## Attachment "3" – Site Work Certificate

To:   Circuit City Stores, Inc.
      Deep Run I
      9950 Maryland Drive
      Richmond, Virginia  23233
      Attention: Vice President-Construction

      Re:    Circuit City Store/[Location]

Ladies and Gentlemen:

       The undersigned, as Landlord has completed all Site Work and has caused "Delivery of the Land" to occur on _____, _____, all in accordance with the terms of the Site Design Requirements dated _____, _____. Specifically, the undersigned hereby certifies that:

- Grading of the Land and the Common Areas has occurred in accordance with the Site Design Requirements.

- Landlord has provided an independent soils engineer's written certification that all pad work was completed in accordance with the Geotechnical Report, the Civil Plans, and Circuit City's Plans and Specifications. This report shall include the results of all compaction and other tests performed during the pad preparation phase, and any tests performed prior to the date of such certification. A copy of such certification shall be delivered to Circuit City's Vice President – Construction at Circuit City's address.

- Landlord has provided a surveyor's written certification stating that the Building Pad is at the prescribed elevation within the stated tolerance of plus or minus one-tenth of a foot. This certification shall be based upon an "as-prepared" survey that shall accompany such certification and shall show thereon elevation shots taken on a 50 foot grid minimum, including pad perimeter and building corners. Promptly upon completion of the Site Delivery Work, Landlord shall cause its surveyor to designate the corners of the Building Pad by means of standard surveying markers.

- The finished floor elevation is 725.33'. The pad elevation is 724.66'.

- The Staging Area has been completed.

- An all-weather construction access road to the Land no less than 24' in width has been prepared and is ready for use.

       All site-related conditions precedent to issuance of your building permit have been satisfied by Landlord, and we certify that all elements of the Site Delivery Work and Delivery of the Land have been satisfied in accordance with the Site Design Requirements.

                         LANDLORD:   _____,

                                   a _____


By:      _____
Name:  _____
Title:   _____

| Site Design Requirements | Reverse Build to Suit Deals | | |
|---|---|---|---|
| Circuit City Stores, Inc. | Spring Hill, TN | Store #3823 | 9/25/2007 |

## Attachment "4" – Floor Plan and Elevations



CIRCUIT CITY STORES, INC.
#3823 – SPRING HILL, TN.
06/19/07

# Site Design Requirements    Reverse Build to Suit Deals

| Circuit City Stores, Inc. | Spring Hill, TN | Store #3823 | 9/25/2007 |
|---|---|---|---|



**WEST ELEVATION**



**SOUTH ELEVATION**

CIRCUIT CITY STORES, INC.
#3823 – SPRING HILL, TN.
06/19/07

**NORTH ELEVATION**

**EAST ELEVATION**

CIRCUIT CITY STORES, INC.
#3823 – SPRING HILL, TN.
06/19/07

| Site Design Requirements | Reverse Build to Suit Deals | | |
|---|---|---|---|
| Circuit City Stores, Inc. | Spring Hill, TN | Store #3823 | 9/25/2007 |

## Attachment "5" – Sign Plans and Specifications



## Site Design Requirements    Reverse Build to Suit Deals

| Circuit City Stores, Inc. | Spring Hill, TN | Store #3823 | 9/25/2007 |



**LOGO LAYOUT - SIGN 1 ( FRONT - WEST ELEVATION )**
Scale 1/4" = 1'-0"

**END ELEVATION :**
Scale 1/4" = 1'-0"

**GENERAL SPECIFICATIONS**
*Illuminated single-sided logo.*
Fabricated aluminum construction cabinet with zero bleed retaining system. Painted matte white # N-202 acrylic polyurethane from Matthews paint. Translucent white flexible substrate (3M Panaflex or equal) with digitally printed graphics. Internally illuminated with H.O. fluorescent lamps. Logo to be flush mounted to building fascia with fasteners & mounting hardware as req'd.
* (1) Sign req'd.

*109943-C City #3823 Spring Hill TN*

# Site Design Requirements    Reverse Build to Suit Deals

| Circuit City Stores, Inc. | Spring Hill, TN | Store #3823 | 9/25/2007 |
|---|---|---|---|



**LOGO LAYOUT - SIGN 2 { SIDE - SOUTH ELEVATION }**
Scale 1/4" = 1'-0"

**END ELEVATION :**
Scale 1/4" = 1'-0"

### GENERAL SPECIFICATIONS
*Illuminated single-sided logo.*
Fabricated aluminum construction cabinet with zero bleed retaining system. Painted matte white # N-202 acrylic polyurethane from Matthews paint. Translucent white flexible substrate (3M Panaflex or equal) with digitally printed graphics. Internally illuminated with H.O. fluorescent lamps. Logo to be flush mounted to building fascia with fasteners & mounting hardware as req'd.
* (1) Sign req'd.

# Site Design Requirements    Reverse Build to Suit Deals

| Circuit City Stores, Inc. | Spring Hill, TN | Store #3823 | 9/25/2007 |
|---|---|---|---|



# Site Design Requirements    Reverse Build to Suit Deals

| Circuit City Stores, Inc. | Spring Hill, TN | Store #3823 | 9/25/2007 |
|---|---|---|---|



| Site Design Requirements | | Reverse Build to Suit Deals | |
|---|---|---|---|
| Circuit City Stores, Inc. | Spring Hill, TN | Store #3823 | 9/25/2007 |

## Attachment "6" – ALTA Survey Certificate

Certified to Circuit City Stores, Inc., a Virginia corporation ("Landlord"), _____, a _____ ("Title Company"), and _____, a _____ corporation ("Title Agent"). The undersigned _____ (the "Surveyor") hereby certifies that (a) the Survey Plat dated _____, 20____, prepared by the undersigned, of that certain tract of land consisting of _____ sq. ft., or _____ acres, in the _____ _____, in the City of _____, County of _____, State of _____, and the metes and bounds description set forth thereon are true and correct and prepared from an actual on-the-ground survey of the real property (the "Property") shown thereon and has been made in accordance with "Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys", jointly established and adopted by ALTA and ACSM in 2005, and includes items 1, 2, 3, 4, 8, 10, 11a, and 14 of Table A thereof, and pursuant to the Accuracy Standards (as adopted by ALTA and ACSM and in effect on the date of this certification) of an Urban Survey; (b) such survey was conducted by the Surveyor or under his supervision; (c) all monuments shown thereon actually exist, and the location and type of material thereof are correctly shown; (d) the location of all streets, roads, highways and easements are as shown thereon; (e) except as shown thereon, there are no encroachments onto the Property or protrusions there from, there are no improvements on the Property, there are no visible easements or rights-of-way on the Property, there are no visible discrepancies, conflicts, shortages in area or boundary line conflicts; (f) the distance from the nearest intersection street or road is as shown; (g) all recorded easements have been correctly platted thereon; (h) the boundaries, dimensions and other details shown thereon are true and correct; and (i) the Property is not located in a 100-year flood plain as presently designated by the U.S. Corps of Engineers, or in an identified "flood prone area" as defined by the U.S. Department of Housing and Urban Development, pursuant to the Flood Disaster Protection Act of 1973, as amended, except as shown. **[Note: If no portion of the Property is in a flood plain, delete "except as shown" and put a period after "amended".]**

EXECUTED this _____ day of _____, 20_____

Signature _____

Printed Name: _____

R.P.L.S. No. _____

**Site Design Requirements       Reverse Build to Suit Deals**

Circuit City Stores, Inc.            Spring Hill, TN        Store #3823        9/25/2007

# Attachment "7" Civil Plans

Gresham Smith and Partners
1400 Nashville City Center
911 Union Street
Nashville, TN  37219

| REVISION NO. | REVISION DATE | DRAWING NO. | TITLE |
|---|---|---|---|
| 1 | 12/20/06 | CO.1 | COVER SHEET & SHEET INDEX |
| 0 | 12/11/06 | CO.2 | GENERAL NOTES |
| 0 | 12/11/06 | C1.0 | EXISTING CONDITIONS |
| 0 | 12/11/06 | C1.1 | DEMOLITION PLAN |
| 7 | 6/4/07 | C1.2 | STAGING AREAS PLAN |
| 7 | 6/4/07 | C1.2A | STAGING AREAS PLAN |
| 0 | 12/11/06 | C1.3 | PHASE ONE DETAILED EROSION AND SEDIMENTATION CONTROL PLAN/SITE MAP |
| 0 | 12/11/06 | C1.3A | PHASE ONE DETAILED EROSION AND SEDIMENTATION CONTROL PLAN/SITE MAP |
| 7 | 6/4/07 | C1.4 | PHASE TWO DETAILED EROSION AND SEDIMENTATION CONTROL PLAN/SITE MAP |
| 7 | 6/4/07 | C1.4A | PHASE TWO DETAILED EROSION AND SEDIMENDATION CONTROL PLAN/SITE MAP |
| 0 | 12/11/06 | C1.5 | EROSION AND SEDIMENTATION CONTROL NOTES AND DETAILS |
| 0 | 12/11/06 | C1.6 | EROSION AND SEDIMENTATION CONTROL DETAILS |
| 7 | 6/4/07 | C2.0 | OVERALL SITE PLAN |
| 7 | 6/4/07 | C2.1 | DETAILED LAYOUT PLAN |
| 7 | 6/4/07 | C2.2 | DETAILED LAYOUT PLAN |
| 7 | 6/4/07 | C2.3 | CROSSINGS BOULEVARD ROADWAY PLAN AND PROFILE |
| 7 | 6/4/07 | C2.4 | "CROSSINGS BOULEVARD" AND "CROSSINGS CIRCLE" ROADWAY PLAN AND PROFILES |
| 0 | 12/11/06 | C2.5 | "CROSSINGS BOULEVARD" ROADWAY SECTIONS |
| 0 | 12/11/06 | C2.6 | "CROSSINGS BOULEVARD" & ROUNDABOUT ROADWAY SECTIONS |
| 0 | 12/11/06 | C2.7 | "CROSSINGS CIRCLE" ROADWAY SECTIONS |
| 7 | 6/4/07 | C3.0 | OVERALL GRADING & DRAINAGE PLAN |
| 7 | 6/4/07 | C3.1 | DETAILED GRADING & DRAINAGE PLAN |

# Site Design Requirements    Reverse Build to Suit Deals

Circuit City Stores, Inc.    Spring Hill, TN    Store #3823    9/25/2007

| REVISION NO. | REVISION DATE | DRAWING NO. | TITLE |
|---|---|---|---|
| 6 | 5/1/07 | C3.2 | DETAILED GRADING & DRAINAGE PLAN |
| 2 | 1/2/07 | C3.3 | DETAIL SPOT ELEVATION EXHIBIT |
| 2 | 12/20/06 | C3.4 | STORMWATER STRUCTURE CHART |
| 7 | 6/4/07 | C3.5 | STORMWATER STRUCTURE CHART |
| 0 | 12/11/06 | C3.6 | RETAINING WALL LAYOUT PLAN AND DETAILS |
| 0 | 12/11/06 | C3.7 | RETAINING WALL LAYOUT PLAN GENERAL NOTES |
| 6 | 5/1/07 | C3.8 | KOHL'S ENLARGED SITE PLAN |
| 2 | 4/12/07 | C4.0 | OVERALL SITE UTILITES PLAN |
| 0 | 12/11/06 | C4.0A | FIRE SERVICE COVERAGE PLAN |
| 0 | 12/11/06 | C4.0B | KOHL'S FIRE SERVICE COVREAGE PLAN |
| 2 | 1/2/07 | C4.1 | DETAILED SITE UTILITIES PLAN |
| 6 | 5/1/07 | C4.2 | DETAILED SITE UTILITIES PLAN |
| 3 | 4/12/07 | C4.3 | DETAILED SITE UTILTIIES PLAN |
| 2 | 1/5/07 | C4.4 | DETAILED SITE UTILTIES PLAN |
| 0 | 12/11/06 | C4.5 | SANITARY SEWER LINE "A" PLAN AND PROFILE |
| 1 | 2/28/07 | C4.6 | SANITARY SEWER LINE "A" PLAN AND PROFILE |
| 0 | 12/11/06 | C4.7 | SANITARY SEWER LINE "A" PLAN AND PROFILE |
| 0 | 12/11/06 | C4.8 | SANITARY SEWER LINE "B" PLAN & PROFILE |
| 0 | 12/11/06 | C4.9 | SANITARY SEWER LINE "B" PLAN AND PROFILE |
| 0 | 12/11/06 | C4.10 | SANITARY SEWER LINE "B" PLAN AND PROFILE |
| 0 | 12/11/06 | C4.11 | SANITARY SEWER LINES "C", "D", & "E" |
| 0 | 12/11/06 | C6.1 | SITE DETAILS |
| 0 | 12/11/06 | C6.2 | SITE DETAILS |
| 0 | 12/11/06 | C6.3 | SITE DETAILS |
| 0 | 12/11/06 | C6.4 | SITE DETAILS |
| 0 | 12/11/06 | C6.5 | SITE DETAILS |
| 0 | 12/11/06 | C6.6 | SITE DETAILS |
| 0 | 12/11/06 | C6.7 | SITE DETAILS |
| 6 | 5/4/07 | L2.3 | KOHL'S LANDSCAPE SPECIFICATIONS |
| 2 | 4/13/07 | L2.4 | HARDSCAPE AMENTIES PLAN |
| 1 | 4/26/07 | L6.1 | LANDSCAPE AND HARDSCAPE DETAILS |

| Site Design Requirements | Reverse Build to Suit Deals | | |
|---|---|---|---|
| Circuit City Stores, Inc. | Spring Hill, TN | Store #3823 | 9/25/2007 |

## Attachment "8" Geotechnical Reliance Letter

### GEOSCIENCES DESIGN GROUP
a *TTL* company

[address block]

May 23, 2007

Circuit City Stores, Inc.
Deep Run 1
9950 Maryland Drive
Richmond, VA 23233

Attention: Vice President – Real Estate

*Re:*    ***Geotechnical Investigation - Reliance Letter***
***Circuit City-Proposed Crossings at Spring Hill***
***Spring Hill, Tennessee***
***GDG Project No. 26175***

Gentlemen,

Pursuant to your request we have reviewed the referenced geotechnical study as it relates to the development of the proposed Circuit City Store. The purposes of the original geotechnical study were to obtain information regarding subsurface conditions within the areas proposed for construction and to develop recommendations regarding the geotechnical aspects of site preparation and foundation design. Based on the available soil data we expect that the proposed construction will be relatively straight forward and the developer can rely on the data presented in the report *Crossings at Spring Hill* prepared by Geosciences Design Group, LLC dated September 8, 2006. Accordingly, the in-place soil and newly placed fill are expected to provide an allowable bearing capacity of 3,000 psf.

The report describes the subsurface conditions encountered at select locations explored across the subject site on the dates of our field exploration, and it is possible that different conditions could exist between the explored locations. In any event, our personnel are currently on-site providing construction monitoring and testing services. The monitoring services include assessment of the soil subgrade by observing proofrolling operations and directing remedial treatment of any unstable areas exposed. Services also include observations and periodic testing of soil fill being placed across the site

We trust that this letter meets your immediate needs. If you have any questions, please feel free to contact Geosciences Design Group at (615) 331-7770.

Sincerely,

Geosciences Design Group

Daniel D. Terranova, PE

| Site Design Requirements | Reverse Build to Suit Deals | | |
|---|---|---|---|
| Circuit City Stores, Inc. | Spring Hill, TN | Store #3823 | 9/25/2007 |

## Attachment "9"   -   Environmental Reliance Letter



GRESHAM
SMITH AND
PARTNERS

May 18, 2007

Circuit City Stores, Inc.
Deep Run 1
9950 Mayland Drive
Richmond, VA  23233
Attn: Vice President – Real Estate

To Whom It May Concern:

Subject:      Environmental Reliance Letter
               Circuit City Store
               The Crossings of Spring Hill
               Map 28, Parcel 16
               Springhill, Tennessee
               GS&P Project No. 24991.00

This will serve to confirm that Gresham, Smith and Partners ("Consultant") will allow Circuit City Stores, Inc. ("Circuit City") to rely on Consultant's Report, dated October 2006, in connection with the assessment and evaluation of the subject property as fully and completely as if the Report had been prepared for and was addressed to Circuit City.  This reliance shall be subject to the terms and conditions contained in the Report and the Consultant's professional services agreement with its primary client, Spring Hill Development Partners, GP, including all limits of liability.  Consultant acknowledges that Consultant shall not look to Circuit City for any liability of Consultant's primary client under their April 14, 2006, agreement.

This reliance letter is given in consideration of the sum of Ten Dollars ($10.00) and other valuable consideration, receipt of which is hereby acknowledged.  Please indicate your acceptance of these terms by signing in the space provided below and returning a copy to me.

Sincerely,                                      Circuit City Stores, Inc.

Michael D. Hunkler, P. E.                       Signature: _____
Principal                                       Print Name: _____
Land Planning and Design Services               Title: _____
                                                Date: _____

crs

Copy   Michael Jenkinson - GS&P          Jay Cameli - GS&P

Design Services For The Built Environment
1400 Nashville City Center / 511 Union Street / Nashville, Tennessee 37219 / Phone 615.770.8100 / www.gspnet.com

## Attachment "10" – Circuit City Development / Design Process

# Site Design Requirements    Reverse Build to Suit Deals

| Circuit City Stores, Inc. | Spring Hill, TN | Store #3823 | 9/25/2007 |



| CIRCUIT CITY DEVELOPMENT PROCESS | LANDLORD DELIVERABLES |
|---|---|
| SCHEMATIC SITE PLAN | • Information as required to complete Circuit City's Project Information Sheet.<br>• Work with Circuit City's design staff to develop the schematic site plan. |
| DUE DILIGENCE INVESTIGATION | • Meet on site with Circuit City's Development Manager and architect to provide information as required to complete Circuit City's Feasibility Report |
| DESIGN DEVELOPMENT | • ALTA Survey and Surveyor's Certificate<br>• Geotechnical Report and Geotechnical Reliance Letter.<br>• Environmental Report and Environmental Reliance Letter.<br>• Civil Plans<br>• All approvals that may be a pre-requisite for Circuit City's permits.<br>• Shopping Center building elevations, material boards and design requirements.<br>• Signage drawings and signage design guidelines.<br>• Schedules and updates for all Landlord Work.<br>• Schedules and updates for all planning and zoning approvals and permits.<br>• Information about governmental conditions or restrictions that impact permits.<br>• Help with coordination between utility companies and Circuit City.<br>• ~~Help in pursuing local incentive programs.~~ |
| SITE DELIVERY WORK | • Site Work Certificate<br>• Circuit City's staging area<br>• All weather construction access road to Circuit City's building pad<br>• Circuit City's temporary utilities |
| REMAINDER OF LANDLORD WORK | • Circuit City's permanent utilities<br>• Paving, curbing and sidewalks<br>• Exterior lighting<br>• Landscaping<br>• Pylon and monument signs |