# EXHIBIT A



**LEASE AGREEMENT**

by and between

**P/A-ACADIA PELHAM MANOR, LLC**

as Landlord

and

**CIRCUIT CITY STORES, INC.**

as Tenant

Pelham Manor Shopping Plaza

| Legal | |
| Leasing | |

Table of Contents

                                                                                                                          Page

ARTICLE I        FUNDAMENTAL LEASE PROVISIONS ................................................... 1
    Section 1.01       Definitions: ........................................................................... 1
ARTICLE II       LEASE OF PREMISES - TERM OF LEASE ............................................... 4
    Section 2.01       Demise ................................................................................ 4
    Section 2.02       Extension Periods .................................................................. 5
    Section 2.03       Commencement Date and Landlord Reimbursement .......................... 5
    Section 2.04       Possession Date ..................................................................... 6
    Section 2.05       Expected Possession Date ......................................................... 6
    Section 2.06       Possession Date During Slack Period Delivery ................................ 7
    Section 2.07       Delayed Possession ................................................................ 7
    Section 2.08       Early Entry .......................................................................... 7
    Section 2.09       Measurement ........................................................................ 8
    Section 2.10       Commencement Date Agreement ................................................ 8
    Section 2.11       Intentionally Omitted .............................................................. 8
    Section 2.12       Road Shop Approval ............................................................... 8
ARTICLE III      INITIAL CONSTRUCTION ................................................................. 8
    Section 3.01       Landlord's and Tenant's Work ................................................... 8
ARTICLE IV       RENT ......................................................................................... 8
    Section 4.01       Annual Minimum Rent ............................................................ 8
    Section 4.02       Additional Rent ..................................................................... 9
    Section 4.03       Rent; Method of Payment ......................................................... 9
ARTICLE V        COMMON AREA MAINTENANCE AND COST ....................................... 9
    Section 5.01       Maintenance ......................................................................... 9
    Section 5.02       Construction Clean-up and Post-Possession Work ............................ 9
    Section 5.03       CAM Costs ......................................................................... 10
    Section 5.04       Tenant's Share of CAM Costs .................................................. 11
    Section 5.05       Payment of CAM Costs .......................................................... 11
    Section 5.06       CAM Costs Increases ............................................................ 12
ARTICLE VI       TAXES ...................................................................................... 12
    Section 6.01       Taxes ................................................................................ 12
    Section 6.02       Payment of Taxes ................................................................. 13

Table of Contents
(continued)

Page

Section 6.03        Exclusions from Taxes.................................................................. 13

Section 6.04        Right to Contest .......................................................................... 13

ARTICLE VII        UTILITIES............................................................................ 14

Section 7.01        Utilities...................................................................................... 14

Section 7.02        Interruption ............................................................................... 14

ARTICLE VIII        USE OF PREMISES........................................................... 14

Section 8.01        Permitted Use............................................................................ 14

Section 8.02        Conduct of Operations ............................................................. 15

Section 8.03        Leasing Restrictions.................................................................. 16

Section 8.04        Tenant's Exclusive.................................................................... 16

Section 8.05        Exclusives Applicable To Tenant ............................................ 18

Section 8.06        Key Tenants .............................................................................. 18

ARTICLE IX        REPAIRS ................................................................................ 19

Section 9.01        Landlord Obligations ................................................................ 19

Section 9.02        Tenant's Obligations ................................................................ 20

Section 9.03        Hazardous Materials ................................................................ 20

Section 9.04        Surrender of the Premises ........................................................ 22

ARTICLE X        REQUIREMENTS OF LAW ................................................ 22

Section 10.01        Landlord's Obligations ............................................................. 22

Section 10.02        Tenant's Obligations ................................................................ 22

Section 10.03        Right to Contest ....................................................................... 23

ARTICLE XI        INSURANCE........................................................................... 23

Section 11.01        Landlord's Insurance ................................................................ 23

Section 11.02        Tenant's Insurance ................................................................... 24

Section 11.03        Insurance Requirements Generally .......................................... 24

Section 11.04        Landlord's Insurance Cost ........................................................ 25

Section 11.05        Indemnity ................................................................................. 25

Section 11.06        Mutual Waiver of Subrogation ............................................... 26

Section 11.07        Affiliate .................................................................................... 26

ARTICLE XII        DAMAGE OR DESTRUCTION.......................................... 26

WO 445485.5

Table of Contents
(continued)

Page

Section 12.01    Landlord's Obligation to Rebuild ....................................................... 26

Section 12.02    Tenant's Obligation to Rebuild........................................................... 27

Section 12.03    Termination........................................................................................ 27

ARTICLE XIII    CONDEMNATION ................................................................................ 28

Section 13.01    Taking ................................................................................................ 28

Section 13.02    Restoration and Rent Adjustment ..................................................... 29

Section 13.03    Award................................................................................................. 29

ARTICLE XIV    ALTERATIONS AND MECHANICS' LIENS ......................................... 29

Section 14.01    Tenant's Alteration Rights................................................................. 29

Section 14.02    Mechanics' Liens .............................................................................. 30

ARTICLE XV    SIGNS.................................................................................................... 31

Section 15.01    Tenant's Signs.................................................................................... 31

Section 15.02    Pylon Signs ....................................................................................... 31

Section 15.03    Replacement....................................................................................... 32

ARTICLE XVI    TENANT'S PROPERTY......................................................................... 32

Section 16.01    Tenant's Property............................................................................... 32

ARTICLE XVII    ASSIGNMENT AND SUBLETTING ..................................................... 32

Section 17.01    Assignment and Subletting Rights..................................................... 32

Section 17.02    Collateral Assignment........................................................................ 34

Section 17.03    Cure Rights of Original Tenant.......................................................... 35

Section 17.04    Recognition Agreement ..................................................................... 34

ARTICLE XVIII    DEFAULT .......................................................................................... 35

Section 18.01    Tenant's Default................................................................................. 35

Section 18.02    Additional Landlord Remedies Due to Construction Delays by
                Tenant ................................................................................................ 36

Section 18.03    Landlord's Default ............................................................................. 36

Section 18.04    Intentionally Omitted ........................................................................ 37

Section 18.05    Intentionally Omitted ........................................................................ 37

Section 18.06    Waiver; Non-Exclusive Remedies ..................................................... 37

ARTICLE XIX    SUBORDINATION, TRANSFER OF INTEREST ..................................... 38

WO 445485.5

Table of Contents
(continued)

Page

Section 19.01    Subordination ................................................................. 38
Section 19.02    Existing Mortgages and Ground Leases ........................................ 398
Section 19.03    Transfer of Interest ......................................................... 39
Section 19.04    Tenant Estoppel Certificates ................................................. 39
Section 19.05    Landlord Estoppel Certificates ............................................... 39
Section 19.06    Payments ..................................................................... 39
ARTICLE XX    LANDLORD'S REPRESENTATIONS, WARRANTIES AND
              COVENANTS ...................................................................... 40
Section 20.01    Quiet Enjoyment .............................................................. 40
Section 20.02    Representations, Warranties and Covenants .................................... 40
Section 20.03    Site Covenants ............................................................... 41
Section 20.04    Intentionally Omitted ........................................................ 42
Section 20.05    Ground Lease ................................................................. 42
ARTICLE XXI    HOLDING OVER ................................................................. 42
Section 21.01    Holding Over ................................................................. 42
ARTICLE XXII    NOTICE ...................................................................... 43
Section 22.01    Where and How Given .......................................................... 43
Section 22.02    When Given ................................................................... 43
ARTICLE XXIII    MISCELLANEOUS .............................................................. 44
Section 23.01    Rent Proration ............................................................... 44
Section 23.02    Construction ................................................................. 44
Section 23.03    Section Headings ............................................................. 44
Section 23.04    Partial Invalidity ........................................................... 44
Section 23.05    Waiver ....................................................................... 44
Section 23.06    Governing Law ................................................................ 44
Section 23.07    Successors and Assigns ....................................................... 45
Section 23.08    No Broker .................................................................... 45
Section 23.09    Memorandum of Lease .......................................................... 45
Section 23.10    Entire Agreement ............................................................. 45
Section 23.11    Relationship of Parties ...................................................... 45

WO 445485.5

Table of Contents
(continued)

Page

Section 23.12    Force Majeure ........................................................................ 45

Section 23.13    Limitation of Landlord's Liability ..................................... 46

Section 23.14    Limitation of Tenant's Liability ......................................... 46

Section 23.15    Consents ................................................................................ 46

Section 23.16    Costs ...................................................................................... 47

Section 23.17    Attorneys' Fees ................................................................... 47

Section 23.18    Survival of Obligations ...................................................... 47

Section 23.19    Joint and Several Liability ................................................. 47

Section 23.20    Definition of Hereunder, Herein, etc. ............................. 47

Section 23.21    Tenant's Trade Name .......................................................... 47

Section 23.22    Counterparts ......................................................................... 47

Section 23.23    Landlord's Permits .............................................................. 47

Section 23.24    Tenant's Work ....................................................................... 48

## EXHIBITS

| | |
|---|---|
| EXHIBIT A | Site Plan |
| EXHIBIT B | Legal Description of the Shopping Center |
| EXHIBIT C | Site Design Requirements |
| EXHIBIT C-1 | Possession Date Notice |
| EXHIBIT D | W-9 Form |
| EXHIBIT E | Commencement Date and Expiration Date Agreement |
| EXHIBIT F | Prohibited Uses |
| EXHIBIT G | Existing Leases |
| EXHIBIT H | Existing Exclusives |
| EXHIBIT I | Recognition Agreement |
| EXHIBIT J | Subordination, Non-Disturbance and Attornment Agreement |
| EXHIBIT J-1 | Non-Disturbance Agreement |
| EXHIBIT K | Permitted Exceptions |
| EXHIBIT L | Memorandum of Lease |
| EXHIBIT M | Intentionally Omitted |
| EXHIBIT N | Vertical Tenant Signs |
| EXHIBIT O | Sign Criteria |
| EXHIBIT P | Rules and Regulations |

v

## LEASE AGREEMENT

**THIS LEASE AGREEMENT** (this "Lease"), dated as of the 3rd day of August, 2007 ("Effective Date"), by and between P/A-ACADIA PELHAM MANOR, LLC, a Delaware limited liability company ("Landlord") with an office at c/o Acadia Realty Trust, 1311 Mamaroneck Avenue, Suite 260, White Plains, NY 10605, and CIRCUIT CITY STORES, INC. ("Tenant") with an office at, 9950 Mayland Drive, Richmond, Virginia 23233.

### W I T N E S S E T H:

In consideration of the rents and covenants set forth in this Lease, Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises (as defined in Section 1.01(P)) upon the following terms and conditions:

### ARTICLE I

### FUNDAMENTAL LEASE PROVISIONS

SECTION 1.01 Definitions:

A.  **Additional Charges:**

1.  Initial CAM Costs: Estimated at Two and 40/100 Dollars ($2.40) per square foot of Floor Area (as defined below), which includes the initial insurance cost of thirty-two Cents ($0.32) per square foot of Floor Area (the "Initial Insurance Cost").

2.  Initial Taxes: Estimated at Four and 50/100 Dollars ($4.50) per square foot of Floor Area.

B.  **Alternative Rent:** An amount equal to sixty-five percent (65%) of the Annual Minimum Rent (as defined below) that would have otherwise been due during the period of time that Tenant is entitled to pay Alternative Rent.

C.  **Annual Minimum Rent** (subject to adjustment pursuant to Section 2.09):

| Period | Rent p.s.f. | Annual Rent | Monthly Installments |
|---|---|---|---|
| Initial Lease Term: | | | |
| Commencement Date through end of fifth Lease Year (as defined in Section 1.01(J)) | $32.00 | $650,592.00 | $54,216.00 |

| | | | |
|---|---|---|---|
| Sixth Lease Year through tenth Lease Year: | $35.20 | $715,651.20 | $59,637.60 |
| 1st Extension Period (as defined in Section 1.01(F)): | $38.72 | $787,216.32 | $65,601.36 |
| 2nd Extension Period: | $42.59 | $865,897.29 | $72,158.11 |
| 3rd Extension Period: | $46.85 | $952,507.35 | $79,375.61 |

D.     **Broker:** Metro Commercial Real Estate, Inc. and Robert Futterman & Associates, LLC

E.     **Delivery Dates:**     1.     Anticipated Possession Date: September 1, 2008.

2.     Outside Possession Date: June 1, 2009.

F.     **Extension Periods:** Three (3) periods of five (5) years each.

G.     **Floor Area:**   The actual number of square feet of space contained on all floors within any building area in a particular leased premises (including the Premises) within the Shopping Center (as defined below) and all permanent exterior sales areas leased to or exclusively used by one (1) or more tenants.  All measurements shall be from the exterior of outside walls or store front and/or to the centerline of any common walls, but in no event shall Floor Area include any non-selling or storage space areas within any mezzanine, lower floor, second floor or, except as set forth above, any exterior areas.

H.     **Initial Lease Term:**  Ten (10) Lease Years, plus the partial Lease Year commencing on the Commencement Date and ending on the January 31 immediately thereafter.

I.     **Key Tenants:** Home Depot and PetSmart, or another National or Regional Tenant, or their "Acceptable Replacement Tenants", as herein defined.

J.     **Lease Year:** Each period within the Term (as defined below) commencing on February 1 and ending the next succeeding January 31, except that Lease Year 1 shall include the partial Lease Year commencing on the Commencement Date and ending on the January 31 immediately thereafter.

K.     **Minimum Ongoing Cotenancy Percentage:** Home Depot, or its "Acceptable Replacement Tenant", is open for business in at least seventy percent (70%) of Home Depot's demised premises other than allowable periods for remodeling or reconstruction.

L.     **Minimum Initial Cotenancy Percentage:**   Intentionally omitted.

M.     **Minimum Parking Ratios:** The Shopping Center parking ratios shall comply with all Laws and Landlord shall not request any variance after the Effective Date which shall

decrease the parking ratio in existence as of the Effective Date without Tenant's prior written consent, not to be unreasonably withheld, conditioned or delayed.

N.    **Opening Requirement:** The Key Tenants are open for business.

O.    **Permitted Use:** The sale, rental, installation, servicing and repairing of consumer, office and automotive electronics products (collectively, the "Products"); and/or for any other lawful retail use not specifically prohibited by the provisions of Section 8.01 including subject to Prohibited Uses and Existing Exclusives (hereinafter defined). Tenant shall be permitted an installation facility for automotive electronic products, provided such facility not be used for general automobile maintenance and repairs or as a body shop, but only for the installation of Products. The term "Products" shall include, without limitation, televisions, stereos, speakers, video and audio recorders and players and cameras; computer hardware and software and related software services (which include internet access services, entertainment software and entertainment media [such as, by way of example only, game cartridges, video tapes, cassettes, compact discs, DVD's and DVD equipment]); cellular and wireless telephones and telecommunication devices and related accessories; motor vehicle audio, stereo and telephone systems; and technological evolutions of the foregoing.

P.    **Premises:** Approximately 20,331 square feet of Floor Area, having a width across of 138 feet and a depth not to exceed 138 feet, as shown on the site plan attached hereto as Exhibit A (the "Site Plan"), in the shopping center known as Pelham Manor Shopping Plaza, and located at the southeast corner of Pelham Parkway and Secor Lane in Pelham, New York (the "State"), as more particularly described in Exhibit B (the "Shopping Center").

Q.    **Site Design Requirements:** The site design requirements attached hereto as Exhibit C.

R.    **Slack Delivery Period:** Periods of time beginning November 15 and ending on the following February 1.

S.    **Slack Season:** Intentionally omitted.

T.    **Substantial Completion:** Issuance of a certificate of occupancy, either temporary or permanent, for the Premises by the appropriate governmental authority, to Landlord with respect to Landlord's Work and to Tenant with respect to Tenant's Work.

U.    **Tenant's Share:** A fraction, the numerator of which shall be the Floor Area of the Premises and the denominator of which shall be the Floor Area of all buildings in the Shopping Center.

For so long as the portion of the Shopping Center consisting of self-storage units is used for a self-storage business (hereinafter referred to as the "Self-Storage Portion"), then for purposes of the calculation of Tenant's Share of CAM Costs, the Floor Area of the Self-Storage Portion shall be excluded from the denominator of this calculation. Instead, the Self-Storage Portion shall initially be allocated $0.35 per square foot of Floor Area therein for its share of CAM Costs (the "Self-Storage CAM Allocation"), and the total

WO 445485.5

CAM Costs payable for the Shopping Center used to determine Tenant's Share of CAM Costs shall be reduced by the Self-Storage CAM Allocation. After the Fifth Lease Year, the Self-Storage CAM Allocation shall increase each year thereafter by the percentage increase in CPI during such period. For purposes of this Lease, CPI means the United States Department of Labor, Bureau of Labor Statistics Consumer Price Index for All Urban Consumers, U.S. City Average, Subgroup "All Items" (1982-84=100). If the foregoing CPI is not available, then the successor or substitute index published by the Bureau of Labor Statistics shall be used by Landlord as the CPI. If the Bureau of Labor Statistics does not publish such successor or substitute CPI, a reliable governmental or other non-partisan publication evaluating substantially the same consumer information shall be used by Landlord for the CPI. If Landlord uses any substitute or successor index or other publication, the same shall be converted to a basis of 100 if the basis used for such other index or publication is less than 100.

For purposes of calculating Tenant's Share of Taxes, Landlord shall have the right to exclude from the denominator the Floor Area of any other tenant in the Shopping Center that is separately assessed and such tenant pays the taxes for such parcel, provided such separately assessed parcel is substantially equal to the amount of Floor Area such tenant occupies in the Shopping Center. In addition, Tenant acknowledges that the Landlord may establish condominium units for the Shopping Center, subject to the terms of this Lease. In the event that occurs, Landlord at its option may bill Tenant for Tenant's Share of Taxes based upon a fraction, the numerator being the square footage of the Premises and the denominator being the total Floor Area of all buildings located within the same condominium unit as the Premises, multiplied by the total Taxes assessed or allocated with respect to such condominium unit.

For purposes of calculating Tenant's Share of Operating Costs, Landlord shall have the right to exclude from the denominator the Floor Area of any other tenant in the Shopping Center to the extent that such tenant maintains a portion of the Common Area at such other tenant's expense, provided that such portion of the Common Area as is separately maintained by any tenant is not significantly less than actually used by such tenant and its customers, employees and agents.

Except as provided above with respect to the Self-Storage CAM Allocation or with respect to calculations of Tenant's Share of Taxes in the event Landlord creates a condominium unit as described above, in no event shall the denominator of the fraction by which Tenant's Share is determined be less than eighty percent (80%) of the Floor Area of the building areas shown on the Site Plan.

V.    **Term:** The Initial Lease Term plus the Extension Periods, if the option for any such Extension Period is exercised.

W.    **Pelham Ground Lease:** The Ground Lease dated as of October 1, 2004, as amended by First Amendment to Ground Lease dated June 28, 2006, between Rusciano and Son Corp. and Secor Lane Corp. (together as landlord) (the "Ground Landlord"), and Landlord (as tenant), under which Ground Landlord ground leases the land on which the Shopping Center is located to Landlord.

4

## ARTICLE II

## LEASE OF PREMISES – TERM OF LEASE

SECTION 2.01 <u>Demise</u>.

(a)    Landlord does hereby lease and demise to Tenant, and Tenant does hereby hire from Landlord, the Premises, together with the licenses, rights, privileges and easements appurtenant to the Premises. This Lease is, and shall be deemed, a lease of the Premises and not a ground lease or ground sublease.

(b)    Tenant and its employees, invitees, agents, customers, concessionaires and licensees shall have the nonexclusive right, in common with Landlord and other tenants of the Shopping Center, to use all Shopping Center sidewalks, paved parking areas, paved service areas, signs, traffic controls, lighting and all means of ingress, egress, acceleration, deceleration and stacking lanes and circulation for the aforesaid parking and service areas of the Shopping Center to and from public streets and roads bordering the Shopping Center (collectively, the "<u>Common Areas</u>") now or hereafter made available or maintained by Landlord in the Shopping Center. Tenant's right to use the Common Areas may be subject to such reasonable regulations (consistent with Tenant's rights under this Lease) as may from time to time be imposed upon, and equally applicable to, all tenants of the Shopping Center by Landlord or its agents. Landlord shall provide Tenant with at least sixty (60) days prior notice of any such rules and regulations, which notice shall contain a copy of such rules and regulations. The existing Rules and Regulations for the Shopping Center are attached as <u>Exhibit P</u>.

(c)    Subject to all Laws and the Permitted Exceptions, Tenant shall have the exclusive right to use, on a "24 hour a day", "365 days a year" basis (subject to the terms of the Resolution, as defined below) and without any additional charge, the loading facilities serving the Premises and trash compactor area, all as shown on the Site Plan and subject to applicable Laws and at Tenant's sole cost and expense (subject to the terms of this Lease). Tenant shall also have the non-exclusive right to use the car stereo parking areas (seven (7) spaces), four (4) web order customer pick-up parking spaces, and (subject to the terms of this Lease and the Site Design Requirements) the transformer pad area serving the Premises (collectively, together with the loading facilities and trash compactor area, the "<u>Other Improvements</u>"). Subject to applicable laws, Tenant shall have the right to erect a sign identifying Tenant's customer pick up area and/or Tenant's car stereo parking areas. Tenant shall also have the right, in accordance with applicable Laws, to erect signage, stripe and print on the four (4) web order customer pick-up parking spaces, in the location shown on the Site Plan, in order to so identify such parking spaces. Landlord shall have no obligation to enforce or police Tenant's web order customer pick-up parking spaces or the car stereo parking areas. Notwithstanding the foregoing, in the event Tenant's signage referred to in this Section 2.01 shall constitute a breach of Landlord's obligations under existing leases with tenants in the Shopping Center and the tenant(s) of such lease(s) shall give written notice to Landlord of the breach of Landlord's obligations under such lease(s), Tenant agrees to remove such signage or modify such signage as necessary to prevent default by Landlord under such lease(s).

SECTION 2.02 <u>Extension Periods</u>.  Provided Tenant is not then in monetary default or in default of any material terms or provisions this Lease, after the lapse of all applicable grace periods, at the time of exercising any option herein or at the time of the commencement of any Extension Period, Tenant shall have the option to extend the Term for the number of Extension Periods shown in Section 1.01(F), upon all the terms and conditions contained in this Lease. Each such option is exercisable by Tenant giving irrevocable notice to Landlord (a) at least two hundred seventy (270) days prior to the expiration of the Initial Lease Term, or of the preceding Extension Period, as the case may be, or (b) if Tenant fails to give Landlord such notice, then within twenty (20) days after receipt of notice from Landlord that Tenant has failed to exercise its option to extend within the time period provided in (a) above.

SECTION 2.03 <u>Commencement Date and Landlord Reimbursement</u>.  "<u>Commencement Date</u>" shall mean the date which is the earlier to occur of (a) Tenant's opening for business, or (b) 90 days following the Possession Date.  Tenant shall be responsible for all costs of Tenant's Work.  Tenant shall remove any mechanic's liens filed against the Premises or the Shopping Center as a result of Tenant's Work in accordance with the procedures and time guidelines as provided in the Lease.  However, if the Commencement Date shall occur prior to the date on which the Opening Requirement is met, then, notwithstanding that the Commencement Date shall have occurred, then Tenant shall pay, in lieu of Annual Minimum Rent, Alternative Rent until the date on which the Opening Requirement is met.  Upon Substantial Completion, Landlord shall be the owner of the Building (as defined in the Site Design Requirements), but not including any of Tenant's Property, as defined in Section 16.01) and Landlord shall be entitled to depreciate the Building for tax purposes.

SECTION 2.04 <u>Possession Date</u>.  "<u>Possession Date</u>" shall mean the date on which the last of the following conditions shall have been satisfied:

(a)    Landlord shall have caused delivery of the Premises (as defined in the Site Design Requirements) to occur;

(b)    Landlord shall have delivered the soils engineer's certification as required by the Site Design Requirements;

(c)    Intentionally omitted;

(d)    Intentionally omitted;

(e)    The representations and warranties of Landlord set forth in Sections 9.03 and 20.02 below shall then be true and in effect in all material respects, and Landlord shall not then be in violation of any of the Site Covenants (as defined in Section 20.03);

(f)    Landlord shall have delivered to Tenant a fully-executed original counterpart of a non-disturbance and/or recognition agreement, as applicable, from each Mortgagee and Ground Lessor (as such terms are defined in Section 19.01), as more fully set forth in Section 19.02;

(g)    Intentionally Omitted; and

(h)      Landlord shall have delivered to Tenant the W-9 form attached hereto as
Exhibit D.

Landlord currently anticipates that the Possession Date will occur on or about the Anticipated
Possession Date, subject to the provisions of Section 2.05 below.  In no event shall the
Possession Date occur prior to the Expected Possession Date (as defined in Section 2.05).

SECTION 2.05  Expected Possession Date.

(a)      Landlord shall give Tenant no less than one hundred twenty (120) days
notice of the date on which the Possession Date shall occur, using the form of Possession Date
Notice attached hereto as Exhibit C-1 (the "Possession Date Notice").  The date specified in such
notice shall be defined as the "Expected Possession Date".

(b)      If Landlord fails to accomplish the Possession Date within five (5) days
of the Expected Possession Date (subject to Force Majeure, as defined in Section 23.12, but in no
event shall the aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed
a period of thirty (30) days), then Landlord shall pay to Tenant on demand, as a liquidated
reimbursement (and not as a penalty) for all of the damages that Tenant will suffer as a result of
any such delay, an amount equal to the sum of an amount equal to two (2) days of Annual
Minimum Rent for each day that the Possession Date is delayed beyond the Expected Possession
Date.  The foregoing liquidated reimbursements represent the parties' good faith agreement as to
an agreed upon amount which shall have been incurred by Tenant and which shall otherwise not
be susceptible of exact ascertainment.

SECTION 2.06  Possession Date During Slack Period Delivery.  Anything contained in
this Lease to the contrary notwithstanding, if the Possession Date occurs during the Slack
Delivery Period, then Tenant may refuse to accept the Premises.  In that event, the Possession
Date shall be delayed and shall not be deemed to occur until the first (1st) day following the end
of the applicable Slack Delivery Period, subject to the other provisions of this Lease (including,
without limitation, Sections 2.04 and 2.05).

SECTION 2.07  Delayed Possession.  If the Possession Date does not occur before the
Outside Possession Date (subject to Force Majeure, but in no event shall the aggregate of any
and all extensions as a result of a Force Majeure delay(s) exceed a period of thirty (30) days),
then Tenant shall have the right to (a) terminate this Lease by written notice to Landlord (the
"Termination Notice"), or (b) delay opening its store facility for a period of not to exceed six (6)
months, which right shall be exercised by Tenant upon notice to Landlord at any time prior to the
Possession Date.  If Tenant terminates this Lease, then there shall be no further liability on the
part of Landlord or Tenant, except: (i) for those obligations that expressly survive the expiration
or other termination of this Lease, and (ii) Landlord shall (which obligation shall survive the
termination of this Lease), within ten (10) business days following Tenant's Termination Notice,
reimburse Tenant for all its reasonable third-party costs and expenses incurred in connection
with this Lease (including, without limitation, costs associated with the preparation and review
of plans and specifications, and attorneys' fees), not to exceed Seventy-Five Thousand Dollars
($75,000).  If Tenant elects to delay opening its store facility, then Landlord shall cause the
Possession Date to occur on the date subsequently required by Tenant, as required above, and

Landlord shall pay to Tenant on demand an amount equal to all additional reasonable costs, not to exceed Seventy-Five Thousand Dollars ($75,000), incurred by Tenant in the development of its store facility including, but not limited to, costs of materials and all engineering, architectural, legal fees, and costs of delay resulting from Landlord's failure to timely deliver. Tenant shall provide Landlord reasonable documentation of all such costs to be paid by Landlord. However, Landlord may nullify such termination by sending Tenant notice within ten (10) days after Landlord's receipt of the Termination Notice confirming that landlord will deliver possession within thirty (30) days after its receipt of the Termination Notice.

SECTION 2.08  Early Entry.  Any time prior to the Possession Date, Tenant shall have the right to enter the Premises to (a) inspect the physical condition of the Premises and (b) inspect Landlord's Work; provided, however, that such entry may not unreasonably interfere with Landlord's Work. Such entry shall not be construed as an acceptance of the Premises by Tenant under the provisions of this Lease or as a waiver of any of the provisions hereof.

SECTION 2.09  Measurement.  Tenant shall within thirty (30) days after the Possession Date have the Premises remeasured by a registered architect ("Floor Area Certification"). Tenant shall deliver a copy to Landlord. If the parties disagree as to the size of the Premises, the parties shall mutually select an independent, registered architect to make a final determination of the square footage and both parties shall be bound by such determination. Landlord and Tenant shall share equally the cost of such architect. If the Floor Area Certification shall disclose that the Premises contains more or less than the Floor Area shown in Section 1.01(P), then Landlord and Tenant agree to amend this Lease to adjust all Rent to account for the actual Floor Area of the Premises.

SECTION 2.10  Commencement Date Agreement.  When the Commencement Date has been determined, Landlord and Tenant shall execute a memorandum, in the form of Exhibit E, which shall expressly confirm the Commencement Date and the expiration date of the Initial Lease Term, and which shall also ratify and affirm all of the terms and provisions of this Lease.

SECTION 2.11  Intentionally Omitted.

SECTION 2.12  Road Shop Approval.  Notwithstanding anything in this Lease to the contrary, Tenant's obligations under this Lease are and shall be subject to full and final approval by the Town of Pelham, New York and/or its applicable agencies (the "Town"), of the car stereo installation facility generally known as the "road shop" (and the ramp thereto), currently contemplated at the Premises and described in this Lease and in the Site Design Requirements (the "Car Facility"). In the event that the Town does not issue a full and final approval of the Car Facility (as contemplated by this Lease and the Site Design Requirements, including without limitation the ramp thereto) within one hundred twenty (120) days following the date this Lease is fully executed by Landlord and Tenant, then Tenant, in its sole discretion, shall within 15 days after the expiration of such 120-day period, either (i) waive the requirement described in this Section 2.12 in writing and proceed under the terms of this Lease, or (ii) terminate this Lease upon written notice to Landlord, whereupon neither party shall have any further obligations or liabilities hereunder, except as otherwise expressly set forth herein. Landlord shall have the right, upon receipt of a termination notice from Tenant delivered under this Section 2.12, to pursue approval of the Car Facility with the Town for a period of sixty (60) days. If, prior to the

8

expiration of such 60-day period, the Car Facility is fully and finally approved by the Town as contemplated hereunder, Tenant's termination notice shall be deemed revoked and this Lease shall continue in full force and effect.  Landlord and Tenant shall use good faith and diligent efforts to have the Car Facility approved by the Town within 120 days following the effective date of this Lease, and each party agrees to provide such reasonable cooperation as may be necessary to achieve such approval.

## ARTICLE III

## INITIAL CONSTRUCTION

SECTION 3.01  Landlord's and Tenant's Work.  Landlord shall perform Landlord's work in accordance with the Site Design Requirements and as otherwise required by this Lease ("Landlord's Work").  Tenant shall construct all improvements to the Premises in accordance with Tenant's Plans (as hereafter defined) and with the Site Design Requirements ("Tenant's Work").  Landlord and Tenant acknowledge receipt of the Site Design Requirements and each agrees to comply with the provisions thereof relating to their respective work.  In connection with Tenant's performance of Tenant's Work and during any other periods of construction during the Term, Tenant shall have the right to use as a construction staging area a portion of the Common Areas in the location identified on the Site Plan as "Staging Area."  During the course of Tenant's Work, Tenant shall not make changes to the storefront or the front elevations of the Premises, except to the extent expressly provided in the Site Design Requirements.  Thereafter, Tenant may make such changes provided the same are made in accordance with Section 14.01 below.

## ARTICLE IV

## RENT

SECTION 4.01  Annual Minimum Rent.  Commencing on the Commencement Date, Tenant shall pay to Landlord monthly installments of Annual Minimum Rent without setoff or deductions, except as otherwise provided for in this Lease, on the first (1st) day of each calendar month during the Term.  However, if the Commencement Date occurs on a day other than the first (1st) day of a calendar month, then the monthly installment of Annual Minimum Rent and other charges shall be prorated for the remaining days of that calendar month.  Anything contained in this Lease to the contrary notwithstanding, if Tenant shall be paying Alternative Rent in lieu of Annual Minimum Rent as permitted under this Lease during such time as Tenant shall be entitled to an abatement of, deduction from or setoff against Annual Minimum Rent, then Tenant shall be entitled to the same abatement of, deduction from or setoff against Alternative Rent.

SECTION 4.02  Additional Rent.  The term "Additional Rent" shall mean all amounts required to be paid by Tenant under this Lease other than Annual Minimum Rent.  Wherever an item of Additional Rent is payable "on demand" or no time period for payment of an item of Additional Rent is specifically provided for in this Lease, such item of Additional Rent shall be paid by Tenant within thirty (30) days after Tenant's receipt of Landlord's invoice therefore, accompanied by appropriate, reasonable back-up documentation.

WO 445485.5

SECTION 4.03  Rent; Method of Payment.  The term "Rent" shall mean, collectively, Annual Minimum Rent and Additional Rent.  All payments of Rent shall be made by check payable to Landlord, mailed or delivered to the address listed in Section 22.01 or to such other person or place as Landlord shall designate by notice to Tenant, or by such other reasonable method of payment (such as by wire transfer).

## ARTICLE V

## COMMON AREA MAINTENANCE AND COST

SECTION 5.01  Maintenance.  Landlord shall operate, maintain, insure, repair and replace the Common Areas or cause the same to be done in a manner so as to maintain the Shopping Center in good, first-class order, repair and condition.  Without limiting the generality of the foregoing, Landlord shall be solely responsible, and Tenant shall have no obligation (except if caused by Tenant or its agent, employee or contractor and except to reimburse Landlord for Tenant's Share of the cost thereof, as provided below), for the maintenance, repair or replacement of the parking areas (including, without limitation, any necessary repaving and restriping), parking lot lighting, utility systems and connections, access ways and other Common Areas and for the clearing of snow and ice from the Common Areas.  Except as provided below, Landlord may at any time close temporarily any Common Areas to make repairs, to prevent the acquisition of public rights therein or discourage non-customer parking.  Between October 25 and January 1, Landlord may only temporarily close parts of the Common Areas on weekdays between Monday and Thursday as necessary to perform tenant fit-up work or necessary exterior repairs, provided, however, that on weekends between Friday and Sunday, Landlord shall not close any part of Tenant's Preferred Area, except to make repairs of an emergency nature.  However, in any instance of such emergency repairs Landlord shall use all reasonable efforts to perform the necessary repairs in the most expeditious manner possible and in such a way and at such times as to cause the least interference possible with ingress and egress to and from the Premises.  In order to reduce interference with Tenant's business operation during such period, Landlord shall effect temporary repairs, where feasible, and complete the permanent repairs after January 1.

SECTION 5.02  Construction Clean-up and Post-Possession Work.  Following the Possession Date, any construction by Landlord or other tenants or occupants of the Shopping Center affecting any portion of the Shopping Center shall be subject to the following terms and conditions (in addition if any other applicable provisions of this Lease, such as, by way of example only, Section 20.03(g)):

(a)      staging and storage of materials and parking of construction vehicles shall not occur in Tenant's Preferred Area; provided, however, that for a period of seventy-five (75) days after the Possession Date, Landlord may utilize portions of the Tenant's Preferred Area for staging and storage of materials and parking of construction vehicles, so long as such usage of Tenant's Preferred Area does not interfere with Tenant's Work or materially and adversely interfere with Tenant's use of the Staging Area;

(b)      Landlord shall use reasonable efforts to ensure that, from and after Tenant's opening for business to the public, no ingress, egress or passage of any construction,

10

delivery and related vehicles engaged in the performance of such work or other construction activities shall take place through the entrance shown as Access Drive "B" on the Site Plan;

      (c)    Landlord shall maintain the Shopping Center in a clean, safe, and sightly condition, and shall use reasonable efforts to ensure that such construction shall not materially adversely interfere with the normal conduct of any business operations in the Premises; and

      (d)    Landlord shall clear all rubble and debris from the Premises and Tenant's Preferred Area resulting from any construction by Landlord; with respect to the Landlord's Work performed by Landlord pursuant to this Lease, such clearing shall be performed within forty-five (45) days after the Possession Date.

    SECTION 5.03  <u>CAM Costs</u>. "<u>CAM Costs</u>" shall mean the actual amount (without profit or "mark up" by Landlord or any Affiliate, as defined in Section 11.07, of Landlord) of all necessary, competitive and reasonable costs and expenses actually incurred by Landlord in operating, insuring, maintaining, repairing or replacing portions of the Common Areas in an appropriate manner commensurate with good business practice and first-class shopping centers, and, in addition thereto, in lieu of any cost(s) or expense(s) relating to the administration and management of the Common Areas, an administrative fee (the "<u>Administrative Fee</u>") equal to seven percent (7%) of the CAM Costs for the operating year in question, the cost of electricity and other utilities, and the cost of insurance premiums.  In no event will CAM Costs include: (a) real estate taxes, (b) any costs associated with maintenance performed by another tenant or occupant of the Shopping Center on portions of the Common Areas separately maintained by such tenant or occupant; (c) any dues or charges for a merchants' or other association of occupants of the Shopping Center; (d) maintenance, repairs or replacements to the Common Areas (i) necessitated by the negligent or wrongful act of Landlord or any tenant or occupant, (ii) made to correct any construction defect, or (iii) relating to any improvements or utility systems not serving the Common Areas (e.g. roofs and exterior walls) except for fire life safety systems and cleaning and painting of exterior walls; (e) repairs or replacements made to correct any condition in existence prior to the Commencement Date; (f) amounts reimbursable from insurance proceeds, under warranty, or by any tenant or occupant of the Shopping Center or any other third party other than pursuant to a Common Area expense provision similar to this Section 5.03; (g) premiums for insurance for coverage maintained by Landlord with respect to the Shopping Center (except that premiums for Common Areas liability insurance may be included as part of CAM Costs provided the premiums are commercially reasonable for a Shopping Center of substantially similar size, quality and location), any costs resulting from insurance deductibles under any insurance policy maintained by Landlord, any costs which would have been reimbursed or paid for by insurance proceeds had Landlord maintained the insurance required under Section 11.01, and the amount of any judgment or other charge entered, or costs assessed against, Landlord in excess of the policy limits of the insurance maintained by Landlord under Section 11.01; (h) the cost of any replacements or capital improvements to the Common Areas, except any expense which would be classified as a capital expenditure in accordance with generally accepted accounting principles shall be amortized over its useful life and such annual amount included in CAM Costs and, except that the cost of repaving the parking areas of the Shopping Center may be included within CAM Costs so long as such cost is otherwise permitted to be included within CAM Costs and is amortized on a straight-line basis over the useful life thereof under generally accepted accounting principles consistently applied, and is not incurred

11

(i) prior to the expiration of the seventh (7th) full operating year of the Term, or (ii) more than once during each ten (10) full operating years of the Term; (i) reserves for anticipated future expenses; (j) interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner; (k) Landlord's personnel, overhead, home office or administrative expenses, except for the Administrative Fee; (l) amounts incurred to remediate any Hazardous Materials (as defined in Section 9.03(a)); (m) the cost to construct any new buildings in the Shopping Center or Common Areas including, but not limited to, renovations to the façade of the Shopping Center; (n) holiday or other decorations or other promotional expenses relating to the Shopping Center; or (o) any fees, costs or expenses not related to the operation, maintenance, insurance, repair or replacement of the Common Areas. Notwithstanding the foregoing, CAM Costs shall include painting and/or cleaning (including powerwashing) of the exterior of the buildings, as well as fire life safety systems that service the buildings.

SECTION 5.04  Tenant's Share of CAM Costs. Tenant shall pay to Landlord Tenant's Share of CAM Costs in each operating year during the Term. Tenant's Share of CAM Costs shall be appropriately prorated for partial operating years at the beginning and at the end of the Term. Operating year shall be the 12-month period selected by Landlord for billing of CAM Costs, currently the operating year is January 1 – December 31.

SECTION 5.05  Payment of CAM Costs. Tenant's Share of CAM Costs shall be payable in equal monthly installments on the first (1st) day of each month. Such monthly installments shall be at the rate of one-twelfth (1/12th) of Tenant's Share of CAM Costs for the preceding operating year, subject to adjustment when the actual amount of CAM Costs or a change in Tenant's Share thereof is determined. Within ninety (90) days after the end of each operating year, Landlord shall furnish Tenant with a detailed statement certified by an authorized representative of Landlord of the actual amount of CAM Costs and of Tenant's Share thereof for the preceding operating year (including the basis of allocation to Tenant). Within thirty (30) days after receipt of such statement by Tenant, Tenant shall pay to Landlord any deficiency due. Any surplus paid by Tenant shall be credited against the next installment(s) of Rent, however, if the Term has been terminated or has expired then refunded to Tenant forthwith. Landlord's records of CAM Costs for each year shall be available for inspection by Tenant for a period of three (3) years after Landlord notifies Tenant of Tenant's Share of CAM Costs for the year in question. Tenant may, during such three (3) year period, upon ten (10) days' prior notice to Landlord, have an audit made of CAM Costs and the allocations thereof to Tenant including, without limitation, reviewing copies of paid bills and other reasonable records substantiating its expenditures ("CAM Records"). In addition, Landlord agrees to forward copies of CAM Records to Tenant or its representative within ten (10) days of a request therefore. Any overcharges shown by any such audit shall, at Tenant's option, be credited against the next installment(s) of Rent, however, if the Term has been terminated or has expired then refunded to Tenant forthwith. If any such audit shows that Tenant's Share of CAM Costs have been overstated by more than three percent (3%), then Landlord shall pay to Tenant the reasonable out of pocket costs of such audit within ten (10) days of request thereof.

Tenant shall have the right to examine Landlord's CAM Records as provided above provided all of the following conditions are satisfied:  (a) the examination is conducted at Landlord's home office during Landlord's normal business hours; (b) the examination occurs no more than one (1) time each year; and (c) each year of CAM Costs can only be examined one (1)

time during the entire term of the Lease. Promptly upon completion of such examination, Tenant must provide Landlord with a copy of the examination report. Tenant agrees that all the information, data and documents pertaining to any examination and the examination process (including, but not limited to, any discussions, negotiations, interpretations of this Lease or proposals or positions taken by Landlord) are confidential information and will be used solely by Tenant and its authorized representatives for the purpose of conducting the examination and Tenant and its representatives shall not disclose or disseminate any such information pertaining to the examination or the examination process.

SECTION 5.06 CAM Costs Increases. Notwithstanding anything contained in this Lease to the contrary, for all operating years subsequent to the first (1st) full operating year of the Term, in no event shall Tenant's Share of CAM Costs increase, from any operating year to the immediately succeeding operating year, by more than seven percent (7%) on a cumulative basis, excluding from such calculation, the costs of snow and ice removal, sanding, insurance costs and utility costs for the operating years in question for which Tenant shall pay its full Tenant's Share. As way of illustration of the 7% cap on CAM Costs on a cumulative basis, if Tenant's Share of CAM Costs for the 1st full operating year is $1.00 per square foot, then Tenant's Share of Cam Costs shall not exceed $1.07/sf in the 2nd operating year, $1.145 in the 3rd operating year and $1.23 in the 4th operating year, and the compounding of the 7% shall continue for the remainder of the Term.

Notwithstanding anything contained herein to the contrary, in the event Tenant exercises its option to extend the Term as provided in Section 2.02, Tenant's Share of the CAM Costs for the first full operating year of each Extension Period shall be its full Tenant's Share, without any cap, based on CAM Costs for that year, and in no event shall Tenant's Share of CAM Costs increase in any operating year thereafter by more than seven percent (7%) on a cumulative basis as provided in the paragraph above.

## ARTICLE VI

## TAXES

SECTION 6.01 Taxes. Landlord shall pay when due all real estate taxes and assessments levied and assessed against the land, improvements and buildings comprising the Shopping Center. Except as hereinafter provided to the contrary, for each fiscal tax year or part thereof during the Term, Tenant shall pay Tenant's Share of the net amount (after reflecting all discounts for early payment, if any, refunds and credits that are applicable to a fiscal tax year during the Term and after excluding all penalties, interest, late charges and real estate taxes and assessments levied against free-standing buildings which are separately assessed but only to the extent that the occupant(s) of such buildings is responsible to pay for such taxes directly to the taxing authority) of all real estate taxes and assessments (collectively, "Taxes") levied and assessed against the land, improvements and buildings comprising the Shopping Center. The Initial Taxes are an estimate of Tenant's Share of Taxes for the first (1st) full calendar year (including the prior partial year, if any).

SECTION 6.02 Payment of Taxes. Tenant shall be liable for and shall pay Tenant's Share of Taxes only with respect to Taxes accruing during the Term, regardless of when such Taxes are billed or become due and payable. Tenant's Share of Taxes shall be appropriately

13

prorated for partial fiscal tax years at the beginning and at the end of the Term.  Tenant shall pay Tenant's Share of Taxes (a) within thirty (30) days after Landlord submits to Tenant a tax bill for such Taxes and a statement setting forth the manner in which Tenant's Share of Taxes is calculated, or (b) ten (10) days before the same are due and payable, whichever is later.

SECTION 6.03  Exclusions from Taxes.  Notwithstanding anything contained in this Lease to the contrary with respect to betterments or other extraordinary or special assessments, Tenant's obligations shall apply only to the extent such assessments (and interest thereon) are payable in respect of the Term, and Tenant's Share of any such assessments shall be determined as if such assessments are payable in installments over the longest payment period permitted by law for the particular assessment, in which case Tenant shall pay only those installments payable in respect of the Term.  Landlord represents to Tenant that, as of the Effective Date and, to the best of Landlord's knowledge, no portion of the Shopping Center is or will be (a) subject to or the beneficiary of an abatement, exemption and/or phase in of Taxes, (b) subject to any special assessments or similar charges, other than the "County Solid Waste District" and the "Hutchinson Valley Sewer District" assessments, or (c) included in any special improvement district(s) which would result in higher sales taxes or other similar impositions than would exist in the absence of such district(s).  Further, Taxes shall not include any: (i) income, excise, profits, estate, inheritance, succession, gift, transfer, franchise, capital, or other tax or assessment upon Landlord or upon the rentals payable under this Lease; (ii) taxes on rents (other than to the extent that such taxes are customarily paid by retail tenants in the State), gross receipts or revenues of Landlord from the Premises; (iii) fine, penalty, cost or interest for any tax or assessment, or part thereof, which Landlord or its lender failed to timely pay, unless such late payment was solely attributable to late payment by Tenant of Tenant's Share of Taxes; (iv) assessment for a public improvement arising from the initial construction of the Shopping Center; (v) Taxes resulting directly from an increase in the assessment caused by a sale or ground lease of all or any portion of the Shopping Center to an Affiliate of Landlord; or (vi) fees imposed upon Landlord in connection with Landlord's development of the Shopping Center (including, without limitation, trip generation fees).  All Taxes payable by Tenant pursuant to this Article VI shall be determined as if the Shopping Center was the only property owned by Landlord.

SECTION 6.04  Right to Contest.  At Tenant's request, Landlord shall contest the amount or validity of any assessed valuation of Taxes provided Landlord has not done so within the last 12-month period.  Tenant shall cooperate with Landlord including, without limitation, executing any and all documents required in connection therewith and, if required by any governmental authority having jurisdiction, joining with Landlord in the prosecution thereof.  If any rebate or refund of Taxes is received as a result of any contest or otherwise, then Tenant shall be entitled to Tenant's Share thereof, but only to the extent applicable to Taxes that accrued during the Term (after reasonable and customary expenses incurred by Landlord and/or Tenant in connection with such contest are paid to the party which incurred such expense).

14

## ARTICLE VII

## UTILITIES

SECTION 7.01 Utilities. Landlord covenants and agrees that the Premises shall be properly serviced with gas, electric, telephone, water, sewer, and other utilities sufficient to meet Tenant's requirements in accordance with the Site Design Requirements. Landlord, as part of Landlord's Work, shall cause all such utilities to be brought to the Premises as shown on and in the Site Design Requirements at Landlord's sole cost and expense, subject to the terms of the Site Design Requirements. Tenant shall pay, as same become due and payable, all charges for utility services furnished to the Premises during the Term. If at any time during the Term, for any reason, Landlord shall provide utility service to the Premises, Tenant's cost for such utility service shall not exceed the lesser of (a) Landlord's actual cost for such utility service, or (b) the cost of the same service if Tenant had obtained such service directly from such utility provider. In addition, Tenant shall have the right to install a test meter to verify its utility usage. Notwithstanding anything contained in this Lease to the contrary, Tenant shall be entitled to select the utility service providers to the Premises including the telecommunication provider. After prior notice to Landlord, Landlord shall permit full and free access to all available conduits in the Shopping Center for the applicable utility service subject to such reasonable requirements as Landlord may impose, including that Tenant shall repair any damaged caused thereby, and at Tenant's sole cost and expense.

SECTION 7.02 Interruption. If utilities serving the Premises are disrupted due to the acts or omissions of Landlord, its agents, contractors, servants or employees, then Landlord shall promptly restore the affected utilities at Landlord's sole cost and expense. If such disrupted utilities are not restored within twenty-four (24) hours after the Landlord has knowledge of such disruption and Tenant is unable to conduct its normal business in the Premises as a result of such disruption, then Rent shall be equitably abated during the period of disruption.

## ARTICLE VIII

## USE OF PREMISES

SECTION 8.01 Permitted Use. The Premises may be used and occupied for any Permitted Use. However, Tenant shall not use the Premises for any of the Prohibited Uses (as defined in Exhibit F) or the Existing Exclusives (as defined in Section 8.05(a)) or in violation of any use restrictions under the Pelham Ground Lease, or in violation of the Resolution of Approval for Site Development Plan and Special Permit for Pelham Manor Shopping Plaza passed by the Board of Trustees, Village of Pelham Manor on August 14, 2006, the Resolution of Approval for Local Law 2 of 2006 (August 14, 2006) or Resolution of Approval for Local Law 3 of 2006 (the "Resolution"), to the extent then applicable. Tenant acknowledges receipt of the Resolution.

SECTION 8.02 Conduct of Operations. Subject to the other provisions of this Lease (including, without limitation, Article II), Tenant shall initially open its store for business to the public in the Premises for at least one (1) day, not later than the two hundred fortieth (240th) day after the Possession Date. Other than as expressly set forth in the preceding sentence, Tenant

15

shall have no obligation to operate any business in the Premises, and shall have the right, at any time, to cease to conduct any business operations in the Premises, and Tenant shall incur no liability to Landlord by reason thereof. If Tenant does not operate or cause to be operated any retail business in the Premises (other than prior to the Commencement Date or during Excused Periods, as defined below) for more than two hundred seventy (270) consecutive days, then Landlord shall have the option to terminate this Lease, which option shall be exercisable by Landlord at any time after the date on which such 270-day period expires (the "Recapture Notice"), and paying to Tenant, within thirty (30) days after such notice is given, the Unamortized Costs (as defined in Section 8.04(f)). Notwithstanding the foregoing, if Tenant shall notify Landlord, prior to receipt of Landlord's Recapture Notice, of Tenant's intent to re-open business operations at the Premises, Tenant shall have ninety (90) days from the date of such notification to re-open for business at the Premises, and Landlord's right to recapture the Premises shall be tolled during such 90-day period. If Landlord gives the Recapture Notice, then this Lease shall terminate upon the sixtieth (60th) day (the "Recapture Date") after the date on which Tenant receives Landlord's termination notice. Upon termination of this Lease under this Section 8.02, there shall be no further liability on the part of Landlord or Tenant, except for obligations that expressly survive the expiration or sooner termination of this Lease. If Landlord fails to pay to Tenant the Unamortized Costs within the thirty (30) day period provided for above, Tenant shall notify Landlord of such failure and Landlord shall have ten (10) days in which to pay Tenant the Unamortized Costs. If such failure to pay continues through the Recapture Date, then Tenant shall have the option of (a) treating this Lease as being terminated, in which case Landlord's obligation to pay to Tenant the Unamortized Costs shall expressly survive the termination of this Lease, or (b) treating Landlord's Recapture Notice as being null and void, in which event Landlord shall be deemed to have waived Landlord's right to terminate under this Section 8.02. "Excused Period(s)" shall mean such periods during which the Premises were not open for business (i) because of alterations or renovations, damage or destruction, eminent domain proceedings or actions, Force Majeure, or any act or omission of Landlord, or its employees, agents, or contractors, such period(s) not to exceed six (6) months or such longer period(s) provided Tenant is diligently pursuing such work to completion, or (ii) following the execution of a letter of intent for an assignment of this Lease or sublease of all or any portion of the Premises provided that the parties thereto are proceeding in good faith to enter into an assignment of this Lease or sublease and, thereafter, the assignee or sublessee proceeds with due diligence to open the Premises, or portion thereof, for business, such period(s) not to exceed six (6) months.

Tenant's cessation of business in the Premises shall not relieve Tenant of its obligations under the Lease, including, but not limited to Tenant's obligation (a) to pay Rent, (b) to insure the Premises, and (c) to maintain utility services, specifically including adequate heat to keep the pipes from freezing and adequate electric and security measures so as to prevent vandalism and keep the Shopping Center well lit and attractive in appearance.

SECTION 8.03 Leasing Restrictions. Landlord shall construct, lease, operate, maintain and manage the Shopping Center as a first-class shopping center comparable to other first-class shopping centers in the State. In that regard, subject to the rights of tenants with leases in effect as of the Effective Date and any assignees, subtenants or successors by merger thereof (provided Landlord agrees not to approve a change in use (where Landlord's approval is required) so as to

16

violate the prohibited uses in this Section, Landlord shall not lease, rent or occupy, or permit to
be leased, rented or occupied, any portion of the Shopping Center for any of the Prohibited Uses.
In addition, subject to the rights of tenants with leases in effect as of the Effective Date and any
assignees, subtenants or successors by merger thereof, Landlord shall not lease, rent or occupy,
or permit to be leased, rented or occupied, any building within one hundred forty (140) feet of
the Premises for use as a restaurant, except as may be currently leased as of the Effective Date
hereof, except for primarily a takeout style eating establishment under 2,500 square feet. Upon
any breach of the foregoing Section 8.03(a), Tenant shall provide Landlord with notice of such
default. If the default is not cured within sixty (60) days after Landlord's receipt of such notice,
then Tenant may elect to pay Alternative Rent in lieu of Annual Minimum Rent for so long as
such violation shall continue. If such breach shall continue for more than one hundred eighty
(180) days, then Tenant shall have the right to terminate this Lease at any time thereafter, prior to
the time such violation is cured. Notwithstanding the foregoing, Tenant's right to pay
Alternative Rent pursuant to this section and Tenant's right to terminate shall be tolled provided
that Landlord shall have promptly commenced appropriate legal proceedings against such tenant
or occupant, and shall thereafter diligently prosecute such proceedings to completion so as to
enjoin and prohibit any such violation. If Landlord shall have failed to promptly commence such
proceedings, or shall fail thereafter to diligently prosecute the same, then Tenant's right to pay
Alternative Rent or terminate the Lease shall be as set forth above.

SECTION 8.04 <u>Tenant's Exclusive</u>.

(a)     Landlord shall not hereafter lease, rent or occupy, or permit to be leased,
rented, occupied, any other premises in the Shopping Center, for the sale, rental, installation,
servicing and/or repairing, either singly or in any combination, of the Products. The Incidental
Sale (as defined below) of the Products in connection with the overall business of another tenant
shall not be deemed a violation this Section 8.04(a). "<u>Incidental Sale</u>" shall mean sales in the
lesser of (i) five hundred (500) square feet, or (ii) ten percent (10%) of such tenant's or
occupant's, or Landlord's or any of its Affiliate's display area. Landlord shall have the right to
lease to a gaming store (i.e. by way of example- Gamestop) no larger than 2,500 square feet.
Tenant's exclusive shall be enforceable unless and until Tenant is in default beyond any
applicable cure periods or no longer occupies the Premises for the principal use of the sale of the
Products. The exclusive use rights granted to Tenant in this Section 8.04(a) (the "<u>Exclusive Use
Protection</u>") shall inure to the benefit of any assignee of Tenant's interest in this Lease and to
any sublessee of all or more than 18,750 square feet of the Premises, provided the principal use
is for the sale of the Products.

(b)     The Exclusive Use Protection shall not apply to existing tenants of the
Shopping Center (and current or future successors by merger, assignees or sublessees of such
tenants) occupying their respective premises pursuant to the terms and provisions of leases which
have been executed prior to the Effective Date (which leases are referenced on <u>Exhibit G</u>).
However, such existing tenants shall nevertheless be subject to the Exclusive Use Protection if:
(i) any existing tenant's lease requires the consent of Landlord to any assignment or subletting or
to a change in the use of the applicable premises to permit the sale, rental, installation, servicing
and/or repairing of the Products; or (ii) Landlord permits or agrees to an expansion of the
applicable premises for the sale, rental, installation, servicing and/or repairing of the Products.

17

      (c)     The Exclusive Use Protection shall also not apply to a full-line: supermarket (for example, Safeway, Winn-Dixie, or Stop & Shop), department store or discount department store (for example, Wal-Mart, K-Mart, J.C. Penney, Macy's, Kohl's or Target), full line sporting goods store (for example, Dicks Sporting Goods), a nationally recognized office supply superstore such as Staples or OfficeMax, or discount club (for example, Costco, BJ's Wholesale Club, or Sam's Club); provided, however, that, as to each of the foregoing, such stores (i) are National Tenants or Regional Tenants (as such terms are defined in Section 8.06), (ii) are operated in substantially the same manner as same are operated as of the Effective Date, and (iii) the supermarket contains at least 40,000 square feet of Floor Area and the department, discount department store, and discount club contains at least 60,000 square feet of Floor Area.

      (d)     Upon any violation of the Exclusive Use Protection, Tenant must provide Landlord with notice of the proposed violation. If the violation is not cured within sixty (60) days after Landlord's receipt of such notice, then Tenant may elect to pay Alternative Rent in lieu of Annual Minimum Rent for so long as such violation shall continue. If such breach shall continue for more than one hundred eighty (180) days, then Tenant shall have the right to terminate this Lease at any time thereafter, but prior to the time such violation is cured, in which event the applicable provisions of Section 8.04(f) shall control.

      (e)     Notwithstanding anything contained in subparagraph (d) above, if any tenant or other occupant of the Shopping Center violates the Exclusive Use Protection and such violation also constitutes a default under its lease with Landlord, then Tenant's right to pay Alternative Rent pursuant to Section 8.04 (d) shall be tolled provided that Landlord shall have promptly commenced appropriate legal proceedings against such tenant or occupant, and shall thereafter diligently prosecute such proceedings to completion so as to enjoin and prohibit any such violation. If Landlord shall have failed to promptly commence such proceedings, or shall fail thereafter to diligently prosecute the same, then Tenant's right to pay Alternative Rent shall apply for as long as such violation exists, and, in such event, Tenant shall have the right (i) to conduct and prosecute such legal proceedings (including an action for injunctive relief) in its own name, at Landlord's expense (such obligation limited to Tenant's reasonable actual out of pocket expenses only), or (ii) in the event the right set forth in clause (i) above is not permitted to be exercised under Laws, to conduct and prosecute such legal proceedings in the name of Landlord, at Landlord's expense (such indemnification limited to Tenant's reasonable actual out of pocket expenses only), and Landlord shall cooperate with Tenant with respect to such prosecution (including executing any documentation or authorization reasonably required by Tenant in connection with such prosecution and by appearing at any hearing or trial with respect to such prosecution). If Tenant shall have paid Alternative Rent pursuant to this Section 8.04(e) for twenty-four (24) consecutive months, then Tenant shall have the rights to terminate this Lease subject to and in accordance with the provisions of Section 8.04(f).

      (f)     If Tenant shall have paid Alternative Rent pursuant to Sections 8.04(d) or (e) for twenty-four (24) full consecutive months, then Tenant must elect either to (i) terminate this Lease, or (ii) resume paying Annual Minimum Rent from and after the expiration of the thirty (30) day period following the end of such twenty-four (24) month period. Tenant shall make such election by notice to Landlord within thirty (30) days after the expiration of such twenty-four (24) month period. If Tenant fails to make such an election, then Tenant shall be deemed to have elected to proceed under clause (ii) above. If Tenant elects to terminate this

18

Lease pursuant to Sections 8.04(d) or (e), then this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of Landlord or Tenant, except: (x) for those obligations which expressly survive the expiration or other termination of this Lease, (y) Landlord shall (which obligation shall survive the termination of this Lease), within ten (10) business days after receiving a statement from Tenant showing the Unamortized Costs, reimburse Tenant for the then unamortized costs (amortized on a straight-line basis over the Term) of any alterations or improvements made by Tenant to the Premises (the "Unamortized Costs"), and (z) Tenant reserves all claims against Landlord for damages resulting from the violation of the Exclusive Use Protection.

SECTION 8.05  Exclusives Applicable To Tenant.

(a)     Tenant shall not use (or permit to used) the Premises in violation of those certain use restrictions and exclusives granted by Landlord to certain other tenants in the Shopping Center pursuant to the terms and provisions of leases which have been executed prior to the Effective Date (the "Existing Exclusives"). Landlord represents and warrants that a true and complete listing and description of such Existing Exclusives is attached as Exhibit H. Notwithstanding the foregoing, Tenant shall be entitled to enter into a separate agreement with any tenant or other occupant for whose benefit the Existing Exclusive is granted which nullifies or modifies the corresponding Existing Exclusive with regard to the Premises, provided Landlord receives a fully executed copy of such agreement.

(b)     Intentionally omitted.

(c)     Landlord represents and warrants that, other than the Existing Exclusives and Permitted Exceptions, there are (and will be) no exclusives or use restrictions in effect which would apply to Tenant or any other occupant of the Premises, and Landlord covenants to indemnify, defend and hold Tenant harmless from and against all loss, cost, liability or expense (including, without limitation, reasonable legal fees) incurred by Tenant by reason of the enforcement by any person or entity of such exclusive or other use restriction.

SECTION 8.06  Key Tenants. Landlord represents and warrants that it has entered into a lease with Home Depot for an initial term expiring no sooner than the expiration of the Initial Lease Term. If, from and after the satisfaction of the Opening Requirement, Home Depot, or its Acceptable Replacement Tenant(s), is not open for regular business in at least seventy percent (70%) of the Home Depot premises, then Tenant shall have the option to pay Alternative Rent in lieu of Annual Minimum Rent until such time as the Minimum Ongoing Cotenancy Percentage is met. If the Minimum Ongoing Cotenancy Percentage is not met for a period of eighteen (18) consecutive months or more, then Tenant shall have the right to terminate this Lease upon ninety (90) days notice to Landlord, such notice to be given at any time prior to the date the condition giving rise to such termination right has been satisfied. If Tenant shall elect to terminate this Lease, then this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of Landlord or Tenant, except: (a) for those obligations which expressly survive the expiration or other termination of this Lease, and (b) Landlord shall (which obligation shall survive the termination of this Lease), within ten (10) business days after receiving a statement from Tenant showing the Unamortized Costs, reimburse Tenant for the Unamortized Costs. If Tenant does not terminate this Lease within ninety (90) days after the

19