# EXHIBIT A - PART 2

expiration of such eighteen (18) month period, then commencing on the day following the end of such ninety (90) day period, Tenant shall resume paying full Annual Minimum Rent. However, Tenant shall again be entitled to exercise its rights under this Section 8.06 whenever the Minimum Ongoing Cotenancy Percentage is not met. It is hereby understood and acknowledged by Landlord that Home Depot may only be replaced, for the purposes of this Section 8.06 only, by a National Tenant or Regional Tenant (or combination of no more than three of such National or Regional Tenants) of comparable size (meaning at least 70% of the size of Home Depot's premises) and having similar quality of merchandise, hereinafter referred to as an "Acceptable Replacement Tenant". "National Tenant(s)" shall mean a tenant(s) operating, as of the applicable date, at least sixty-five (65) retail stores in the continental United States under a single trade name in first-class shopping centers, and "Regional Tenant(s)" shall mean a tenant(s) operating, as of the applicable date, at least twenty (20) retail stores in first-class shopping centers in any of the following states under a single trade name:  New York, New Jersey, Massachusetts, Pennsylvania and Connecticut.

## ARTICLE IX

## REPAIRS

SECTION 9.01  Landlord Obligations.  Landlord shall, at Landlord's sole expense (and not included in CAM Costs), keep and maintain in good order, condition and repair (including replacements, if necessary) and in a safe condition (a) the roof of the Premises (to be maintained in a watertight condition at all times), all utility systems and lines (including, without limitation, electrical, plumbing and mechanical) serving the Premises (but only to the point of exclusively serving the Premises), the exterior of the Premises including, without limitation, the walls and Other Improvements (but excluding storefront, Tenant's signs, exterior and interior of all windows, plate glass, doors, frames and bucks, the loading dock and truck well serving the Premises, and the interior of all walls), and the structural portions of the Premises including, without limitation, footings and foundation, floor slab, and structural walls, columns and beams, and (b) any damage to the Premises or the Shopping Center which is caused by (i) defects in Landlord's Work, or (ii) the act or omission of Landlord, its employees, agents or contractors. Landlord's obligations under this Section 9.01 shall be subject to the provisions of Articles XII and XIII.  Landlord shall use reasonable efforts to perform any and all repairs and replacements to be performed under this Lease without material interference with or disruption to the normal conduct of any business operations in the Premises.  Landlord shall give Tenant at least five (5) days prior notice of any repairs or replacements to the Premises (except in the case of an emergency posing imminent risk of material harm to persons or property, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances).  If, in Tenant's reasonable judgment, Landlord's repairs would materially interfere with or disrupt the normal conduct of any business operations in the Premises, then Landlord shall perform such repairs only after the regular hours of operation of the Premises.

SECTION 9.02  Tenant's Obligations.

(a)      Subject to Landlord's obligations under Section 9.01, Tenant shall at all times during the Term, at Tenant's sole expense, keep and maintain in good order, condition and repair and in a safe condition (i) the non-structural, interior elements of the Premises including

WO 445485.5

painting, plate glass, doors, frames and bucks, storefront, Tenant's signs, exterior and interior of all windows, plate glass, doors, frames and bucks, the loading dock and truck well serving the Premises and the heating, ventilation and air conditioning ["HVAC"] units, and the electrical, plumbing, mechanical, and/or alarm systems from the point exclusively the Premises, (ii) any damage to the Premises or the Shopping Center which is caused by the act or omission of Tenant, its employees, agents or contractors, and (iii) Tenant's Property (as hereafter defined). Tenant's obligations under this Section 9.02 shall also be subject to the provisions of Articles XII and XIII and to Landlord's obligation to clear the Premises of all dirt and debris following completion of Landlord's Work pursuant to Section 5.02. At all times during the term, Tenant shall have a maintenance and service contract in effect for the HVAC system with a reputable and licensed HVAC contractor.

(b)     Provided Tenant has maintained the HVAC system in accordance with Section 9.02(a), if any HVAC units must be repaired or replaced during the last three (3) years of the Term, then in light of the fact that the same will require a substantial expenditure by Tenant and will result in a benefit to Landlord following the expiration of the Term, upon the expiration or earlier termination of this Lease (unless such termination results from Tenant's default of its obligations under this Lease), Landlord shall reimburse Tenant within thirty (30) days after receipt of invoice and documentation from Tenant for the unamortized portion of the reasonable expenses incurred by Tenant in connection with the replacement of such equipment during the last three (3) years of the Term, based on (i) the date of the installation of such new equipment, and (ii) the useful life of said equipment. The provisions of this Section 9.02(b) shall survive the expiration or earlier termination of this Lease.

(c)     Tenant shall be responsible, at its sole cost and expense, to obtain its own trash containers and/or compactor. Tenant's compactor shall be accessed by a chute system from inside the store. In addition, Tenant hereby covenants and agrees, at its sole cost and expense, to cause its garbage and refuse to be removed from the Shopping Center by a reputable contractor. Tenant's trash containers/compactors shall be located in the area shown on the Site Plan. Landlord may, but shall not be required to, furnish garbage and refuse removal services to Tenant. In the event Landlord elects to provide or contract for garbage and refuse removal services at the Shopping Center, Tenant shall comply with all such reasonable rules and regulations regarding such service and such charges shall be included in CAM Costs.

SECTION 9.03  Hazardous Materials.

(a)     Landlord represents and warrants that, as of the Effective Date (and as of the Possession Date), the Shopping Center shall comply with all Environmental Regulations, and Landlord agrees that the removal or neutralization of any Hazardous Materials that become present at the Shopping Center during the Term shall be at the sole cost and expense of Landlord (and not included in CAM Costs) and shall be remediated to the extent required by Environmental Regulations, other than Hazardous Materials introduced by Tenant or its employees, agents or contractors. "Hazardous Materials" shall mean (i) any waste, material or substance (whether in the form of a liquid, a solid, or a gas and whether or not air-borne) which is deemed to be a pollutant or a contaminant, or to be hazardous, toxic, ignitable, reactive, infectious, explosive, corrosive, dangerous, harmful or injurious to public health or to the environment, and which is now or becomes regulated in the future by or under the authority of

21

any applicable local, state or federal laws, judgments, ordinances, orders, rules, regulations, codes or other governmental restrictions or requirements, any amendments or successor(s) thereto, replacements thereof or publications promulgated pursuant thereto (collectively, "Environmental Regulations", and individually, "Environmental Regulation"); (ii) petroleum; (iii) asbestos and asbestos containing materials; (iv) any polychlorinated biphenyl; and (v) any radioactive material.  In addition to the foregoing, the term "Environmental Regulations" shall be deemed to include, without limitation, local, state and federal laws, judgments, ordinances, orders, rules, regulations, codes and other governmental restrictions and requirements, any amendments and successors thereto, replacements thereof, which deal with or otherwise in any manner relate to, environmental matters of any kind.

      (b)    Landlord and Tenant each agree that neither Landlord nor Tenant or their respective agents, employees or contractors shall cause or permit any Hazardous Materials to exist on, or to escape, seep, leak, spill or be discharged, emitted or released from the Shopping Center during the Term in violation of any applicable Environmental Regulation.

      (c)    Landlord hereby indemnifies Tenant and its successors and assigns, and agrees to hold Tenant and its successors and assigns harmless from and against any and all losses, liabilities, damages, injuries, penalties, fines, costs, expenses and claims of any and every kind whatsoever, including reasonable attorneys' fees and costs (collectively, "Environmental Liabilities") paid, incurred or suffered by, or asserted against, Tenant or its successors and assigns with respect to, or as a result of (i) the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission or release from the Shopping Center of any Hazardous Materials which were brought into the Shopping Center by Landlord, its agents, employees or their respective predecessors-in-interest, or (ii) a breach by Landlord, its agents, employees or their respective predecessors-in-interest of any Environmental Regulation to which Landlord is subject.

      (d)    Tenant hereby indemnifies Landlord and its successors and assigns, and agrees to hold Landlord and its successors and assigns harmless from and against any and all Environmental Liabilities paid, incurred or suffered by, or asserted against, Landlord or its successors and assigns with respect to, or as a direct or indirect result of (i) the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission or release in the Shopping Center of any Hazardous Materials which was brought into the Shopping Center by Tenant, its agents or employees, or (ii) a breach by Tenant, its agents or employees of any Environmental Regulation to which Tenant is subject.

      (e)    With respect to Hazardous Materials which are or become present at the Shopping Center as the result of any cause whatsoever (other than Hazardous Materials which were brought into the Premises by Tenant, its agents or employees), Landlord shall, at Landlord's sole cost (and not included in CAM Costs), in a good, workmanlike and expeditious manner, and in compliance with Environmental Regulations, perform all work necessary to clean-up, remove and otherwise remediate such Hazardous Materials in compliance with Environmental Regulations.  Should the presence of such Hazardous Materials render the Premises Unusable (as defined below) or should Tenant be required to close during the removal or neutralization of such Hazardous Materials by Landlord, Tenant shall notify Landlord and all Rent shall be immediately abated until such time as Tenant can safely resume normal business

22

operations. If such work is not commenced within thirty (30) days after the date (the "Notification Date") that Tenant notifies Landlord of Hazardous Materials rendering the Premises Unusable (or such additional period as may be reasonably required to engage environmental consultants and/or engineers and obtain permits and licenses) or if such work is not completed within ninety (90) days after the Notification Date (or such additional period as may reasonably be required given the nature of the work, provided that Landlord diligently pursues same to completion), then Tenant shall have the right, at any time thereafter, to terminate this Lease. However, Tenant's option to terminate this Lease pursuant to this Section 9.03(e) shall cease (if not exercised prior thereto) at any time the Premises are no longer Unusable. If Tenant shall elect to terminate this Lease, then the Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of Landlord or Tenant, except: (i) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, (ii) Landlord shall (which obligation shall survive the termination of this Lease), within ten (10) business days after receiving a statement from Tenant showing the Unamortized Costs, reimburse Tenant for the Unamortized Cost, and (iii) Tenant reserves all claims against Landlord for damages resulting from a default by Landlord under this Section 9.03. For the purpose of this Section 9.03(e), "Unusable" means that the Tenant does not have access to at least ninety percent (90%) of the Premises because of the enforcement of any Environmental Regulation or the remediation of any Hazardous Materials, or because use of the Premises would represent a material adverse risk to the health or safety of Tenant, Tenant's employees, agents or invitees.

SECTION 9.04  Surrender of the Premises. At the expiration or earlier termination of this Lease, Tenant shall surrender the Premises to Landlord broom clean with all of Tenant's personal moveable property removed and repair any damage caused by such removal, and otherwise deliver to the Premises to Landlord in the same condition as it is required to be maintained by Tenant pursuant to Section 9.02 above; excepting, however, reasonable wear and tear, damage by fire or other casualty, and the effects of a Taking (as defined in Section 13.01).

## ARTICLE X

## REQUIREMENTS OF LAW

SECTION 10.01  Landlord's Obligations. As part of Landlord's Work and throughout the Term, Landlord shall be responsible, at Landlord's sole cost and expense (and not included in CAM Costs, except as otherwise permitted by the Lease), for complying with all applicable laws, statutes, ordinances and regulations of federal, state, county and municipal authorities (collectively, "Laws") affecting the Shopping Center including, without limitation, the Premises, except as specifically provided in Section 10.02.

SECTION 10.02  Tenant's Obligations. Throughout the Term, Tenant shall be responsible, at Tenant's sole cost and expense, for complying with all Laws affecting the Premises if such compliance is required solely as a result of: (a) Tenant's specific manner of use of the Premises (as opposed to retailers in general), (b) Tenant's Work or any other alterations or repairs performed by Tenant, (c) Tenant's Property, and (d) Tenant's operation of its business in the Premises, such as, any special licenses and recycling requirements.

SECTION 10.03  Right to Contest.  The party responsible for compliance pursuant to Section 10.01 or 10.02 shall have the right to contest the validity of any Law at the expense of the party responsible for compliance, unless such contest would result in any criminal liability imposed upon the other party or subject such other party to any fine or penalty.

## ARTICLE XI

## INSURANCE

SECTION 11.01  Landlord's Insurance.

(a)      Landlord shall maintain in full force and effect from and after the Effective Date and throughout the Term:

(i)      Commercial general liability insurance with regard to the Common Areas protecting and insuring Landlord, naming Tenant as "additional insured-lessee" for claims arising out of the use or occupancy of the Common Areas and the obligations assumed by Landlord under this Lease, and having a combined single limit of liability of not less than Five Million Dollars ($5,000,000) for bodily injury, death and property damage liability; and

(ii)      Special Form (formerly known as "All-Risk") property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of the buildings (other than the Premises) and other insurable improvements in the Shopping Center, (exclusive of excavation, footings and foundations) including, without limitation, the Common Areas.

(b)      Landlord may carry any of its insurance under "umbrella policies" and/or "blanket policies" covering the Shopping Center and other properties it or any Affiliate of Landlord owns, provided that: (i) the total amount of the insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article XI.  All policies required to be maintained by Landlord pursuant to this Section 11.01 shall provide that any proceeds thereof shall be deposited with the Mortgagee, or if none, to Landlord, in either event to be held in trust by such party and disbursed only in accordance with the provisions of, and for the purposes set forth in, Article XII.

(c)      Landlord shall be permitted to maintain a deductible as a part of any insurance policy carried by it in compliance with this Section 11.01.  However, in no event shall any deductible with regard to the insurance described in Sections 11.01(a)(i) or 11.01(a)(ii) exceed Two Hundred Thousand Dollars ($200,000), with higher deductibles permitted for catastrophic incidents, without Tenant's consent.

SECTION 11.02  Tenant's Insurance.

(a)      Tenant shall maintain in full force and effect throughout the Term:

24

(i)   Commercial general liability insurance protecting and insuring Tenant, naming Landlord, its mortgagee and/or ground lessor, as their respective interests may appear, as "additional insured-lessor" for claims arising out of the use or occupancy of the Premises by Tenant and having a combined single limit of liability of not less than Four Million Dollars ($4,000,000) for bodily injury, death and property damage liability; and

(ii)   Special Form (commonly known as "All-Risk") property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of the Premises, exclusive of excavation, footings and foundations, naming Landlord as "Loss Payee".

Upon Landlord's request, Tenant shall also name the Mortgagee and ground lessors as an additional insured or Loss Payee, as its interest may appear, on the insurance policies described in Section 11.02(a).

(b)   Tenant may carry any of its insurance under "umbrella policies" and/or "blanket policies" covering the Premises and other locations it or any Affiliate of Tenant owns or leases, provided that: (i) the total amount of the insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article XI.

(c)   All insurance required to be maintained under this Section 11.02 may be provided under a plan of self-insurance provided that Tenant maintains, during the period of such self-insurance, a tangible net worth of at least One Hundred Million Dollars ($100,000,000). To the extent any deductible is maintained as a part of any insurance policy carried by Tenant in compliance with this Section 11.02, Tenant shall be deemed to be covering the amount of that deductible under an informal plan of self-insurance.

SECTION 11.03  Insurance Requirements Generally.

(a)   All insurance required to be maintained by Landlord and Tenant under this Lease shall be maintained with insurance companies qualified to do business in the State, and rated at least A-/VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published).  Each party shall have its insurers provide thirty (30) days (ten (10) days in the event of non-payment of premium) prior notice to the other party of cancellation or non-renewal of any policy required hereunder.  Each party shall provide to the other duly executed certificates evidencing the insurance coverage described in Sections 11.01 and 11.02 above, respectively.

(b)   The liability insurance requirements under Sections 11.01(a)(i) and 11.02(a)(i) shall be reviewed by Landlord and Tenant every five (5) years for the purpose of mutually increasing (in consultation with their respective insurance advisors) the minimum limits of such insurance to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards.  The

25

replacement value of the buildings and other insurable improvements constituting the Shopping Center shall be re-evaluated from time to time at the request of either Landlord or Tenant.

SECTION 11.04  Landlord's Insurance Cost.

(a)     The reasonable insurance premiums attributable to the policies required to be maintained by Landlord pursuant to Section 11.01(a)(i) shall be included as part of CAM Costs.  If Landlord carries blanket insurance covering the Shopping Center together with other property owned by Landlord, then Landlord shall obtain evidence reasonably satisfactory to Tenant of the cost of such insurance allocable to the Shopping Center and the amount so allocable shall be included in CAM Costs for the purposes of determining Tenant's Share of any insurance premium included in CAM Costs.

(b)     If the rates for any insurance Landlord is required to carry are increased as a result of the use or other activity of any other occupant of the Shopping Center which is not a typical shopping center use, then the amount of such increase shall be excluded from CAM Costs.  To the extent that Landlord receives a dividend, credit, rebate or other return of a premium which had previously been included in CAM Costs, Landlord shall promptly refund to Tenant Tenant's Share of such dividend, credit, rebate, or return.

(c)     The provisions of this Section 11.04 shall survive the expiration or earlier termination of this Lease.

SECTION 11.05  Indemnity.

(a)     Except as otherwise provided in Section 11.06, Tenant covenants to defend and indemnify Landlord and hold Landlord harmless from and against any and all claims, actions, damages, liabilities and expenses, including reasonable attorneys' fees, (i) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises, or any part thereof, or (ii) occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Landlord, its agents, contractors, licensees, employees, or other tenants and occupants.

(b)     Except as otherwise provided in Section 11.06, Landlord covenants to defend and indemnify Tenant and hold Tenant harmless from and against any and all claims, actions, damages, liabilities and expenses, including reasonable attorneys' fees, (i) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon any portion(s) of the Shopping Center (excluding the Premises), or (ii) occasioned wholly or in part by any act or omission of Landlord, its agents, contractors, employees, servants, tenants (other than Tenant), occupants or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Tenant, its agents, contractors, licensees or employees.

SECTION 11.06  Mutual Waiver of Subrogation.

(a)     Landlord and Tenant, on their own behalf and on behalf of anyone claiming under or through either one by way of subrogation, hereby release and waive all rights

26

of recovery and causes of action against each other and their respective Affiliates arising from any and all liability for any loss or damage to property or resulting from damage to such property (and, in either case, any resulting loss of business or rental income), whether caused by the negligence or fault of the other party, which is normally insured under Special Form property insurance (formerly known as "All-Risk") and time element insurance required to be maintained hereunder or under any other property or time element insurance maintained by either party. If either Landlord or Tenant is a self-insurer or maintains a deductible (as either may be permitted under this Lease), then the self-insuring party or the party maintaining the deductible hereby releases the other party from any liability arising from any event which would have been covered had the required insurance been obtained and/or the deductible not been maintained.

(b)     Landlord and Tenant shall cause each property insurance policy carried by either of them insuring the Premises, the contents thereof, or the Shopping Center, to provide that the insurer waives all rights of recovery by way of subrogation or otherwise against the other party hereto (and all of such other party's Affiliates) in connection with any loss or damage which is covered by such policy or that such policy shall otherwise permit, and shall not be voided by the releases provided above.

SECTION 11.07  Affiliate.  "Affiliate" shall mean a corporation, partnership, person or other entity which is controlling, controlled by, or under common control with, Landlord or Tenant, as the case may be.  As used in the definition of Affiliate, "control" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise.

## ARTICLE XII

## DAMAGE OR DESTRUCTION

SECTION 12.01  Landlord's Obligation to Rebuild.  If all or any part of the Shopping Center (including, without limitation, the Premises) is damaged or destroyed by fire, the elements or other casualty, then Landlord shall promptly repair all damage and restore the Shopping Center, other than the Premises, to its condition immediately prior to such damage or destruction. Without limiting Landlord's obligations under this Article XII, the proceeds of the policies required to be obtained and maintained by Landlord pursuant to Section 11.01 shall, to the extent necessary, be used for the performance of such rebuilding and restoration work. The provisions of this Section 12.01 shall not apply if Landlord or Tenant terminates this Lease pursuant to provision this Article XII.  Landlord shall have the right to terminate the Lease if more than fifty percent (50%) of the Floor Area of the Shopping Center is damaged or destroyed by fire, the elements, or other casualty during the last five (5) years of the Term, and the restoration period is reasonably estimated by Landlord to be in excess of two hundred forty (240) days.  Landlord shall notify Tenant of its exercise of such option to terminate within forty-five (45) days following the occurrence of such casualty.  If Tenant has not exercised its option to extend the Term of the Lease and any such extension periods remain, Tenant may exercise such option within thirty (30) days after receipt of Landlord's termination notice and Landlord's termination notice shall be nullified and Landlord shall be obligated to rebuild in accordance with the terms of the Lease.

27

SECTION 12.02 <u>Tenant's Obligation to Rebuild</u>.  If all or any part of the Premises is damaged or destroyed by fire, the elements or other casualty, then Tenant shall promptly repair all damage and restore the Premises to its condition immediately prior to such damage or destruction (subject to any changes to the Premises that Tenant shall desire to make to the extent same shall otherwise be permitted under Section 14.01).  Without limiting Tenant's obligations under this Article XII, the proceeds of the policies required to be obtained and maintained by Tenant pursuant to Section 11.02 shall, to the extent necessary, be used for the performance of such rebuilding and restoration work.  The provisions of this Section 12.02 shall not apply if Landlord or Tenant terminates this Lease pursuant to provision this Article XII.

SECTION 12.03 <u>Termination</u>.

(a)    Tenant shall have the right to terminate this Lease:

(i)    if all or any part of the Premises is damaged or destroyed by fire, the elements or other casualty during the last three (3) years of the Term, and the restoration period is reasonably estimated by Tenant to be in excess of one hundred eighty (180) days,

(ii)    if all or more than fifteen percent (15%) of the Premises is damaged or destroyed by fire, the elements or other casualty during the last two (2) years of the Term, or

(iii)    if all or more than ten percent (10%) of the Premises is damaged or destroyed by fire, the elements or other casualty at any time during the Term and such damage or destructions is not covered under the insurance policy(ies) required to be maintained by Tenant under Sections 11.02(a)(ii) or 11.02(b)

Tenant shall notify Landlord of its exercise of such option to terminate within forty-five (45) days following the occurrence of such casualty.

(b)    If (i) Landlord fails to commence in good faith Landlord's repair and restoration obligations in Tenant's Preferred Area within one hundred twenty (120) days after any damage or destruction, or (ii) Landlord fails to timely complete such repair and restoration within two hundred forty (240) days after such damage or destruction, then Tenant shall have the option, upon notice to Landlord, to elect (y) to complete the repair and restoration to the Tenant's Preferred Area and (1) to receive reimbursement therefore in full from Landlord of the reasonable costs incurred by Tenant within thirty (30) days after Landlord's receipt of an invoice together with reasonable documentation of such expenses or (2) if Landlord has not reimbursed Tenant within such thirty (30) day period, to offset the cost and expense thereof against the payment of Rent and, if necessary to recoup such cost and expense through offset, at Tenant's option, to extend the Term until such time as Tenant, through such offsets, has recouped the entire cost and expense to Tenant of such repair and restoration (provided, however, that Landlord may, upon receipt of notice of Tenant's intent to offset, reimburse Tenant as provided in (1) above), or (z) to terminate this Lease effective as of the date of such damage or destruction.  The time periods referenced in this Section 12.03(b) shall be subject to Force

28

Majeure, but in no event shall the aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed a period of ninety (90) days.

(c)     If (i) Tenant fails to commence in good faith Tenant's repair and restoration obligations within ninety (90) days after any damage or destruction, or (ii) Tenant fails to timely complete such repair and restoration within two hundred forty (240) days after such damage or destruction, then Landlord shall have the option, upon notice to Tenant, to elect to complete the repair and restoration to the Premises and to receive reimbursement therefore in full from Tenant on demand. The time periods referenced in this Section 12.03(c) shall be subject to Force Majeure, but in no event shall the aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed a period of ninety (90) days.

(d)     If this Lease is terminated, then this Lease shall terminate on the date set forth in Tenant's or Landlord's notice of termination without further liability on the part of either Landlord or Tenant, except: (i) for those obligations which expressly survive the expiration or other termination of this Lease, and (ii) Tenant shall thereupon make available to Landlord (1) all insurance proceeds paid by Tenant's insurance carrier and pay Landlord any deductible or self-insured retention amount, or (2) if self-insured, an amount equal to the full replacement cost of the Premises, to the extent such amounts would have been payable under the insurance outlined in Section 11.02(a)(ii), or (3) assign its interest in the insurance claim to Landlord, pay Landlord the insurance deductible or self-insured retention amount associated with such claim, and assist Landlord in collecting on such claim to the extent assistance is reasonably required.

## ARTICLE XIII

## CONDEMNATION

SECTION 13.01 Taking.

(a)     In the event of condemnation by eminent domain or similar law, including a sale in lieu thereof to an authority or other entity having the power of eminent domain (a "Taking"), of all or any portion of the Shopping Center, which (i) results in a Taking of (x) any part of the Premises, (y) more than ten percent (10%) of Tenant's Preferred Area, or (z) more than five percent (5%) of the parking spaces in either Tenant's Preferred Area or more than ten percent (10%) of the parking spaces in the Shopping Center, unless Landlord provides replacement parking spaces elsewhere which are, in Tenant's reasonable judgment, as accessible to the Premises and as usable as the spaces lost, (ii) materially and adversely affects ingress or egress to the Premises or the Shopping Center, or (iii) materially prohibits or inhibits Tenant's use of the Premises for a period in excess of one hundred twenty (120) days, then Tenant may terminate this Lease by giving notice to Landlord not more than ninety (90) days after the later of the date on which title vests in the condemning authority or the date Tenant receives notice of said vesting.

(b)     In the event of a Taking of all of the Premises, this Lease shall terminate as of the date of vesting of title or transfer of the Premises, whichever is earlier, without further liability on the part of either Landlord or Tenant, except for those obligations which expressly survive the expiration or other termination of this Lease.

29

(c)     In the event of a Taking of the Premises, the Common Areas and/or any other area within the Shopping Center, or any portion thereof, for temporary use (specifically one not exceeding one hundred twenty (120) days in duration), without the taking of the fee simple title thereto or all of Landlord's leasehold interest in the Shopping Center, this Lease shall remain in full force and effect. All awards, damages, compensation and proceeds payable by the condemnor by reason of such Taking relating to Tenant's loss of its trade fixtures, removal and relocation expenses, or to Tenant's use of the Premises, for periods prior to the expiration of the Lease shall be payable to Tenant. All other awards, damages, compensation and proceeds shall be payable to Landlord. Anything contained to the contrary notwithstanding, a temporary Taking for any period in excess of one hundred twenty (120) days may, at Tenant's option, be deemed a permanent Taking and shall be governed by Section 13.01 (a) or (b), as applicable.

SECTION 13.02  Restoration and Rent Adjustment. In the event of a Taking, if this Lease is not terminated by Tenant pursuant to Section 13.01, then (a) Landlord shall promptly restore the Shopping Center as nearly as practicable to a complete unit of like quality and character as existed prior to the Taking, which restoration shall, as applicable, include all of Tenant's Work and all other leasehold improvements performed by Tenant, but shall not include Tenant's Property, and (b) if a portion of the Premises is Taken, then from and after the date on which title vests in the condemning authority, the Rent shall be equitably reduced in proportion to the area of the Premises subject to the Taking.

SECTION 13.03  Award. In the event of any Taking, if Landlord fails to restore any portion of the Premises as required under the terms of the Lease, Tenant shall be entitled to an amount of the award or compensation paid for such Taking equal to the Unamortized Costs of such portion of the Premises not restored by Landlord, if any, and the balance shall belong to Landlord. Tenant shall also have the right to claim and recover from the condemning authority such compensation as may be separately awarded or recoverable by Tenant on account of any and all damage to Tenant's business by reason of the condemnation and for or on account of any cost or loss to which Tenant might be put in moving Tenant's Property, or for any other damages compensable separately to Tenant; provided, however, that no such award shall reduce the award payable to Landlord for its leasehold interest in the Premises. The provisions of this Section 13.03 shall be subject to the provisions of Section 13.01(c) with respect to a temporary Taking.

## ARTICLE XIV

## ALTERATIONS AND MECHANICS' LIENS

SECTION 14.01  Tenant's Alteration Rights.

(a)     Tenant shall not perform any structural or exterior alterations or improvements to the Premises (except to the extent same pertain to Tenant's Work) without the prior approval of Landlord; provided, however, that Tenant's alteration of the exterior of the Premises to conform to Tenant's (or any subtenant's) then-current prototypical elevation shall not require Landlord's consent, provided, however, that if such subtenant or assignee is not a National Tenant, Landlord's consent shall be required, not to be unreasonably withheld, conditioned, or delayed. The provisions of this Section 14.01(a) shall not apply to Tenant's building signage, which shall be governed by the applicable provisions of Article XV.

(b)     Tenant may, from time to time, without the prior approval of Landlord, make non-structural interior alterations and improvements to the Premises as Tenant deems necessary or desirable including, but not limited to, the electrical systems, the HVAC and other mechanical systems, installation of fixtures and equipment, painting, and wall and floor coverings.

(c)     Tenant shall have the right to erect and maintain an antenna, a satellite dish and/or related equipment on the roof of the Premises, provided that Tenant: (i) uses a contractor approved by Landlord for all roof penetrations so as not to violate or invalidate any roof warranties maintained by Landlord, (ii) repairs any damage to the roof caused by the making of the roof penetrations, (iii) erects and maintains such equipment in accordance with Laws, (iv) Landlord, in its reasonable discretion, approves the location and method of installation, and (v) at the expiration or sooner termination of this Lease, Tenant shall remove the antenna from the building at Tenant's sole cost and expense. Tenant shall restore the area and leave it in good order and repair. If Tenant does not remove the antenna as and when required, Landlord may remove and dispose of the antenna and charge Tenant for all reasonable costs and expenses incurred in connection therewith.

(d)     Landlord shall, at no cost to Landlord, execute and return to Tenant all appropriately completed building department or equivalent applications within ten (10) days after Tenant's request therefore, and will reasonably cooperate with Tenant in the permitting process. If any violation of Laws which is noted against the Shopping Center or the Premises (other than a violation caused by Tenant) prevents Tenant from obtaining a building permit for any alterations or a certificate of occupancy, then, upon request by Tenant, Landlord shall promptly and diligently cause such violation to be removed of record to the extent required to permit Tenant to obtain its building permit or certificate of occupancy, as the case may be. However, if the violation was not caused by Landlord (or any of Landlord's agents, contractors, employees or invitees), then Landlord's obligations under this Section 14.01(d) shall be satisfied by Landlord using diligent, good faith and commercially reasonable efforts to have the responsible party remove such violation of record.

(e)     Landlord shall not make any alterations to the Premises (including, without limitation, changing the design, color or materials of the exterior of the Premises) nor shall Landlord construct an additional floor or floors above or below the Premises. Landlord shall neither make nor permit to be made any alterations to the exterior architectural theme of the remainder of the Shopping Center which would be inconsistent with a first-class shopping center in the State of New York (exclusive of other National Tenants' or Regional Tenants' façade, storefront and entrance features), without the prior consent of Tenant.

SECTION 14.02 Mechanics' Liens. Tenant covenants that Tenant shall promptly discharge of record (by payment, bond, order of a court of competent jurisdiction or otherwise) within twenty (20) days after receipt of notice of same or request by Landlord, any mechanic's lien filed against the Premises or all or any part of the Shopping Center for any work, labor, services or materials claimed to have been performed at, or furnished to, the Premises or the Shopping Center, for or on behalf of Tenant, or at the insistence of Tenant, or anyone acting for, through or under Tenant. Similarly, Landlord covenants that Landlord shall within twenty (20) days after receipt of notice of same or request by Tenant, promptly discharge of record (by

31

payment, bond, order of a court of competent jurisdiction or otherwise) any mechanic's lien filed any lien against the Premises or all or any part of the Shopping Center for any work, labor, services, materials claimed to have been performed at, or furnished to, the Premises or the Shopping Center, for or on behalf of Landlord, or at the insistence of Landlord, or anyone acting for, through or under Landlord. If either party shall fail to cause any such lien to be discharged within thirty (30) days after the other party shall demand that the former party remove same, then, the demanding party may discharge the same by paying the amount claimed to be due, by bonding or by any other proceeding deemed appropriate by such demanding party, and the amount so paid by such demanding party and/or all costs and expenses including reasonable attorneys' fees incurred by such demanding party in procuring the discharge of such lien shall be reimbursed by the other party upon demand. Nothing contained in this Lease shall be construed as a consent on the part of the Landlord to subject Landlord's estate in the Premises to any lien or liability under any law relating to liens.

**ARTICLE XV**

**SIGNS**

SECTION 15.01  Tenant's Signs. Tenant shall have the exclusive right during the Term to erect, maintain, and replace on the storefront and exterior walls of the Premises, and on the side walls of any entrance design element, if any, signs (including, without limitation, under-canopy or blade signs), awnings, and flags of such size, design and color as Tenant, from time to time, may desire, consistent with Tenants current prototypical sign plans attached hereto as Exhibit Q and in compliance with Landlord's Sign Criteria as attached on Exhibit P, subject to compliance with Laws. Tenant may erect and maintain in the interior of the Premises any signs it may desire subject to Laws and provided they are maintained in good condition and repair.

In addition, Tenant shall have the right to install and maintain Tenant's customary "Grand Opening" banner on the storefront of the Premises for one (1) week prior to Tenant's initial opening for business in the Premises and one (1) week after Tenant's initial opening for business, and a "Now Hiring" banner for one (1) month prior to Tenant's initial opening for business in the Premises and one (1) month after Tenant's initial opening for business, provided same is in compliance with all Laws. The location of such banners shall be on the storefront of the Premises. Tenant agrees not to affix any banners in any way that will cause damage to the fascia or soffit and furthermore agrees to repair any and all damage caused by its installation and removal of any banners.

SECTION 15.02  Pylon Signs. Landlord shall provide vertical tenant signs and monuments at the locations shown on the Site Plan. Landlord, as part of Landlord's Work, shall obtain all governmental approvals and permits for such vertical tenant signs and monuments. Tenant's sign panels shall be procured and installed at Tenant's cost. A rendering of such vertical tenant signs showing the dimensions of the vertical tenant signs and the size and position of Tenant's panel is attached to this Lease as Exhibit O. In addition, if Landlord makes available to any other tenant in the Shopping Center any other signage located in the Common Areas, then Tenant shall have the option to include Tenant's identification sign of a size at least as large as the largest sign made available to such other tenant or tenants whose premises are equal to or smaller than the Premises. Landlord shall not change or alter the vertical tenant signs bearing

32

Tenant's sign panel(s) without obtaining Tenant's prior consent. The cost of maintaining vertical tenant signs and monuments (but not the cost of individual tenants' signs thereon or the cost of the construction of the pylons and monuments) and the cost of any electricity used to illuminate them, shall be includable in CAM Costs.

SECTION 15.03 Replacement. Tenant and its subtenants shall be entitled, without Landlord's consent but subject to complying with Laws and with Landlord's Sign Criteria attached hereto, to replace all of its signs with signage consistent with Tenant's and/or its subtenant's then-current prototypical sign plans, provided, however, that if such subtenant or assignee is not a National Tenant or Regional Tenant, then such signage shall be subject to Landlord's approval, not to be unreasonably withheld, conditioned or delayed. Any signage which is not consistent with such prototypical sign plans shall be subject to Landlord's approval.

## ARTICLE XVI

## TENANT'S PROPERTY

SECTION 16.01 Tenant's Property. All of Tenant's movable trade fixtures, ornate light fixtures, equipment, furniture, inventory and other property owned by Tenant and located at, on or in the Premises including, without limitation, computer display and storage area showcases, partitions, mezzanine, shelving, wall cases and signs (collectively, "Tenant's Property") shall remain the property of Tenant, exempt from the claims of Landlord or any Mortgagee or Ground Lessor, without regard to the means by which or the persons by whom Tenant's Property is installed or attached. Tenant shall have the right at any time and from time to time to remove Tenant's Property, provided that if removal of any of Tenant's Property damages any part of the Premises, Tenant shall repair such damage.

## ARTICLE XVII

## ASSIGNMENT AND SUBLETTING

SECTION 17.01 Assignment and Subletting Rights.

(a) Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet, concession or license all or any portion of the Premises, subject to all of the terms and conditions of this Lease and the Pelham Ground Lease, provided (i) at the time of any proposed subletting or assignment, Tenant shall not be in monetary default or in default of a material term, provision or condition of this Lease, (ii) prior to occupancy, Tenant and its assignee or sublessee shall execute, acknowledge and deliver to Landlord a fully executed counterpart of a written assignment of lease or sublease, as the case may be, by the terms of which:  (x) in case of an assignment, the assignee will accept said assignment and assume and agree to perform, directly for the benefit of Landlord, all of the terms, covenants and conditions of this Lease; or (y) in the case of a subletting, the sublease in all respects will be subject and subordinate to all of the terms, covenants and conditions of this Lease, (iii) the proposed assignee's or subtenant's use complies with the Permitted Use and does not constitute a Prohibited Use or violate the Existing Exclusives, (iv) violate any applicable Permitted Exception including but not limited to any reciprocal easement agreement or operating

33

and easement agreement applicable to the Shopping Center, and (v) the Premises are not subdivided into more than two (2) separate premises, both of which must meet defined parameters of usable, marketable space. Unless otherwise agreed to in writing by Landlord, no assignment, subletting, licensing or concessioning by Tenant shall reduce the liability of Tenant under this Lease to the extent that such liability is not increased as a result of any amendment or modification to this Lease between Landlord and any assignee. However, in the event of an assignment by Tenant to an assignee having an Adequate Net Worth (as defined below), or to an assignee whose obligations under this Lease are guaranteed by a guarantor having an Adequate Net Worth, all liability of the assigning Tenant under this Lease accruing from and after the effective date of such assignment shall terminate. "Adequate Net Worth" shall mean a tangible net worth, as of the effective date of such assignment, of at least Two Hundred Million Dollars ($200,000,000).

(b)     Except with respect to any transaction covered under Sections 17.01(c) or 17.02, if Tenant proposes to assign this Lease or sublet all or part of the Premises, it shall first give notice thereof (the "Assignment/Subletting Notice") to Landlord, which notice shall specify the name and address of the proposed assignee or sublessee and the proposed use of the Premises to be made by such assignee or sublessee, together with a statement certified by Tenant of the amount of the Unamortized Costs. Landlord shall have the right to terminate this Lease by giving notice to Tenant ("Landlord's Termination Notice") thereof within sixty (60) days after receipt of an Assignment/Subletting Notice from Tenant. If Landlord elects to terminate this Lease, then the Lease shall automatically terminate on the ninetieth (90th) day (the "Termination Date") after the date on which Tenant receives Landlord's Termination Notice without further liability on the part of either Landlord or Tenant, except: (i) for those obligations which expressly survive the expiration or other termination of this Lease, and (ii) Landlord shall (which obligation shall survive the termination of this Lease), within thirty (30) days after receiving a statement from Tenant showing the Unamortized Costs, reimburse Tenant for the Unamortized Costs. If Landlord fails to pay to Tenant the Unamortized Costs within the thirty-day period provided for above and such failure to pay continues through the Termination Date, then Tenant shall have the option of (y) treating this Lease as being terminated, in which case Landlord's obligation to pay to Tenant the Unamortized Costs shall expressly survive the termination of this Lease, or (z) treating Landlord's Termination Notice as being null and void, in which event Landlord shall be deemed to have waived Landlord's right to terminate under this Section 17.01(b) and Tenant shall be free to assign this Lease or sublet the entire Premises in accordance with the Assignment/Subletting Notice. If Landlord does not give the Landlord's Termination Notice within the aforesaid sixty (60) day period, then Landlord shall conclusively be deemed to have waived its termination rights under this Section 17.01(b) with respect to such proposed assignment or subletting transaction, and Tenant may assign this Lease or sublet the entire Premises in accordance with its Assignment/Subletting Notice.

(c)     In addition to, and not in limitation of, Tenant's other rights set forth in this Article XVII, Tenant shall have the right from time to time, without the consent of Landlord and without triggering Landlord's termination right under Section 17.01(b), to assign Tenant's interest in this Lease and/or to sublet or license all or any portion of the Premises: (i) to an Affiliate of Tenant; (ii) to any entity which purchases all or substantially all of the assets of Tenant or any of its Affiliates; (iii) to any entity which purchases Tenant's interest in the majority of stores owned or operated by Tenant or its Affiliate(s) in the New York metropolitan

area; (iv) in conjunction with any merger, acquisition, consolidation or public offering of stock or other interests involving Tenant or its Affiliate(s); and/or (v) as may be required by any Laws.

SECTION 17.02  Collateral Assignment.  In addition to Tenant's other rights set forth in this Article XVII, a collateral assignment of Tenant's interest in this Lease by Tenant to one (1) or more Lenders (hereinafter defined), as collateral security for an indebtedness or other obligation of Tenant or its Affiliates shall be permitted and Landlord shall, at no cost to Landlord, execute all documentation reasonably requested by Tenant or any such Lender in connection therewith.  In addition, Tenant shall have the right, without Landlord's consent, to grant to an Affiliate of Tenant a license to operate all of Tenant's business operations at the Premises, without such Affiliate having assumed any liability for the performance of Tenant's obligations under this Lease.  "Lender" shall mean a state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender.

SECTION 17.03  Cure Rights of Original Tenant.  If Tenant assigns Tenant's interest in this Lease and the assignor remains liable under this Lease following such assignment, then Landlord, when giving notice to said assignee or any future assignee in respect of any default, shall also give a copy of such notice to the Tenant originally named in this Lease (the "Original Tenant"), and no notice of default shall be effective until a copy thereof is so given to Original Tenant.  Original Tenant shall have the right (but not the obligation) to cure such default, which cure period shall be the same cure period as applicable to Tenant.

SECTION 17.04  Recognition Agreement.  If Tenant subleases all or 10,000 square feet or more of the Premises for a term of at least five (5) years, then, notwithstanding any other provisions of this Lease, Landlord shall, upon Tenant's request, execute and deliver an agreement among Landlord, Tenant and each such subtenant in the form of Exhibit I, in recordable form (the "Recognition Agreement").

## ARTICLE XVIII

## DEFAULT

SECTION 18.01  Tenant's Default.

(a)  If Tenant defaults in the payment of any installment of Rent and such default is not cured within fifteen (15) days after receipt of notice from Landlord thereof or if Tenant defaults in the observance of any other material covenant or agreement herein contained and Tenant shall not, within thirty (30) days after receipt of notice thereof from Landlord, cure or commence to cure such default (it being intended in connection with a default not susceptible of being cured with due diligence within said thirty (30) day period that the time allowed Tenant within which to cure same shall be extended for such period as may be reasonably necessary to complete same with all due diligence), then Landlord may, by giving notice to Tenant at any time thereafter during the continuance of such default:

(i)  terminate this Lease, without any right by Tenant to reinstate its rights by payment of Rent or other performance of the terms and conditions hereof and

35

upon such termination Tenant shall immediately surrender possession of the Premises to Landlord, and Landlord shall immediately become entitled to receive from Tenant, as liquidated, agreed final damages, an amount equal to the difference between the aggregate of all rentals reserved under this Lease for the balance of the Term, and the fair rental value of the Premises for that period (both discounted to present value at an annual interest rate equal to eight percent (8%)), determined as of the date of such termination; or

(ii)    with or without terminating this Lease, as Landlord may elect, re-enter and repossess the Premises, or any part thereof, and lease the Premises to any third-party upon commercially reasonable terms and conditions, for a term within or beyond the Term; provided, however, that any such reletting prior to termination shall be for the account of Tenant, and Tenant shall remain liable for (y) Annual Minimum Rent, Tenant's Share of CAM Costs, Tenant's Share of Taxes, and other sums which would be payable hereunder by Tenant in the absence of such expiration, termination or repossession, less (z) the net proceeds, if any, of any reletting effected for the account of Tenant after deducting from such proceeds all of Landlord's reasonable expenses (which expenses shall be amortized over the term of the new tenant's lease and only the portion thereof allocable to the balance of the Term shall be so deducted by Landlord hereunder) in connection with such reletting (including, without limitation, all repossession costs, reasonable brokerage commissions, reasonable attorneys' fees and expenses, reasonable alteration costs and expenses of preparation for such reletting).

(b)    If the Premises is at the time of default sublet or leased by Tenant to others, Landlord may, as Tenant's agent, collect rents due from any subtenant or other tenant and apply such rents to Rent due hereunder. Any monthly deficiencies payable by Tenant shall be paid monthly on the date herein provided for the payment of Annual Minimum Rent. After the lapse of all applicable grace periods, Landlord may cure any Tenant defaults (at Tenant's expense) and if Landlord reasonably expends any money to cure a default by Tenant, then Tenant shall, on demand, pay Landlord the amount so paid by Landlord together with interest thereon at the rate of two percent (2%) per annum in excess of the Prime Rate as established by the Wall Street Journal (the "Default Rate").

(c)    Landlord shall also be entitled to all other rights and remedies available to Landlord at law, in equity or otherwise, except as otherwise expressly set forth in this Lease. Landlord expressly waives (i) any right to accelerate any element of Rent except as expressly set forth in Section 18.01(a)(i) above, (ii) any right to recover consequential or punitive damages as a result of a Tenant default or any other act or omission of Tenant, and (iii) all rights to any so-called "landlord's lien" or any similar statutory lien, granting Landlord a lien on any of Tenant's Property for the performance of any obligations of Tenant. At the request of Tenant, Landlord shall promptly confirm such waiver(s) by a writing in form satisfactory to Tenant. Anything contained in this Lease to the contrary notwithstanding, Landlord shall use all reasonable efforts to relet the Premises or any portion thereof to mitigate Landlord's damages to which Landlord would otherwise be entitled to as a result of a Tenant default. However, Landlord shall not be obligated to (a) lease the Premises to a tenant for a rent that is less than prevailing market rates, (b) lease to a tenant whose use, reputation, experience or financial status Landlord deems

36

undesirable, (c) re-let the Premises in preference to leasing other stores Landlord may have available, or (d) re-let the Premises on terms which are not satisfactory to Landlord.

SECTION 18.02   Additional Landlord Remedies Due to Construction Delays by Tenant.

(a)   Intentionally Omitted.

(b)   If Tenant shall fail to achieve Substantial Completion by that date which is one (1) year following the Possession Date, then Landlord shall be entitled to terminate this Lease upon sixty (60) days prior notice to Tenant unless Tenant, within such sixty (60) day period, achieves Substantial Completion. If Landlord terminates this Lease, then there shall be no further liability on the part of Landlord or Tenant, except for those obligations that expressly survive the expiration or other termination of this Lease.

SECTION 18.03   Landlord's Default.

(a)   If Landlord shall (i) default in the observance of any material covenant or agreement herein contained, breach any material representation or warranty under this Lease, or shall fail to pay any charges or other amounts required to be paid by Landlord under this Lease (including, without limitation, any insurance premiums or any reimbursements due to Tenant) and Landlord does not cure such default within fifteen (15) days (as to a monetary default) or thirty (30) days (as to a non-monetary default), as applicable, after notice thereof by Tenant (it being intended in connection with a non-monetary default not susceptible of being cured with due diligence within said thirty (30) day period that the time allowed Landlord within which to cure same shall be extended for such period as may be necessary to complete same with all due diligence), or (ii) fail to pay when due any Taxes, ground rent or any other charge or assessment, the lien of which is prior to the lien of this Lease, then Tenant shall have the right (but shall not be obligated) to:

(w)   perform such obligation(s) of Landlord in accordance with the applicable provisions of this Lease on behalf of, and at the expense of Landlord, provided such work shall be done by either Tenant or an independent third party at commercially reasonable rates and Tenant provides Landlord with copies of invoices and other documentation Landlord reasonably requests;

(x)   bring suit for the collection of any amounts for which Landlord is in default, seek injunctive relief, or seek specific performance for any other covenant or agreement of Landlord;

(y)   offset against the Annual Minimum Rent only all amounts owed by Landlord to Tenant and/or the amounts reasonably expended by Tenant performing Landlord's obligations under this Lease, including costs and reasonable attorneys' fees, together with interest thereon at the Default Rate from the date of the outlay until paid, and, at Tenant's option, extend the Term if necessary for Tenant to fully recoup all amounts owed by Landlord to Tenant, provided that prior to Tenant offsetting against any Annual Minimum Rent, Tenant has demanded payment from Landlord and delivered to Landlord copies of invoices and other reasonable documentation of such amounts and Landlord has not paid same within thirty (30) days after receipt from Tenant; and/or

37

(z)    terminate this Lease, without waiving its rights to damages for Landlord's Default, provided that: (1) Landlord's default materially interferes with the normal conduct of any business operations in the Premises, (2) Landlord's default is not reasonably capable of being cured by Tenant, and (3) subject to Section 18.03(b), Tenant gives notice of Landlord's default to any Mortgagee of whom Landlord shall have previously given Tenant notice (including its address), and such Mortgagee shall not have cured Landlord's default within the time period provided in Section 18.03(b).

Notwithstanding the foregoing, Tenant's right of offset under clause (y) above shall be limited to fifty percent (50%) of each installment of Annual Minimum Rent next becoming due unless insufficient Term remains to fully recoup the amounts owed by Landlord to Tenant on the amounts expended by Tenant, together with interest as provided above, in which event the amount of Tenant's offset shall be increased so that Tenant is able to fully recoup all such amounts expended by Tenant, together with interest as aforesaid, prior to the expiration of the Term.

(b)    If a Mortgagee shall have notified Tenant in writing that it is the holder of such lien on the Shopping Center and shall so request, then Tenant shall give a similar notice to such Mortgagee and such Mortgagee shall have the same time period allowed to Landlord under this Lease to correct or remedy such default.

(c)    Tenant shall also be entitled to all other rights and remedies available to Tenant at law, in equity or otherwise, except as otherwise expressly set forth in this Lease. Tenant expressly waives any right to recover consequential or punitive damages as a result of a Landlord default or any other act or omission of Landlord.

(d)    Notwithstanding the foregoing, if, in Tenant's reasonable judgment, a condition posing imminent risk of liability or material harm to persons or property or material disruption to the normal conduct of any business operations in the Premises shall exist, then Tenant may exercise, at its election and without prior notice to Landlord, any or all of the remedies set forth in clauses (w), (x) and (y) above, provided, however, that Tenant shall use best efforts to contact Landlord or Landlord's property manager within 24 hours of the occurrence of such condition prior to Tenant attempting to cure or remedy such problem.

SECTION 18.04    Intentionally omitted.

SECTION 18.05    Intentionally omitted.

SECTION 18.06    Waiver; Non-Exclusive Remedies. The parties hereby waive trial by jury in any action, proceeding or counterclaim brought by either of them against the other on any matters arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Premises, and/or any claim of injury or damage. Tenant hereby expressly waives any and all rights of redemption granted by or under any present of future law if this Lease is terminated or Tenant is evicted or dispossessed by reason of violation by Tenant of any of the provisions of this Lease. Except as otherwise expressly set forth in this Lease, no right or remedy herein conferred upon or reserved to Landlord or Tenant is intended to be exclusive of any other right or remedy in this Lease or by law or in equity

38

provided, but each shall be cumulative and in addition to every other right or remedy given in this Lease or now or hereafter existing at law or in equity or otherwise.

## ARTICLE XIX

## SUBORDINATION, TRANSFER OF INTEREST

SECTION 19.01 Subordination. Landlord reserves the right to subject and subordinate this Lease at all times to the lien of any first mortgage or deed of trust for the benefit of any Mortgagee hereafter encumbering or affecting all or any portion of the Shopping Center, as well as to any future ground or underlying leases encumbering or affecting all or any part of the Shopping Center; provided, however, that (a) each Mortgagee shall first execute and deliver to Tenant a subordination, non-disturbance and attornment agreement in substantially the form attached as Exhibit J hereto, in recordable form, and (b) any Ground Lessor shall execute (and shall obtain the written consent of any Mortgagee) and deliver to Tenant a fee owner recognition agreement in a form reasonably satisfactory to Tenant, which shall include the following provisions: (i) provided that Tenant is not in default of any terms pursuant to this Lease, the Ground Lessor will not, in the exercise of any of the rights arising or which may arise out of such lease, disturb or deprive Tenant in or of its possession or its rights to possession of the Premises or of any right or privilege granted to or inuring to the benefit of Tenant under this Lease; (ii) in the event of the termination of the Ground Lease (as defined below), Tenant shall not be made a party in any removal or eviction action or proceeding, nor shall Tenant be evicted or removed of its possession or its right of possession of the Premises, and this Lease shall continue in full force and effect as a direct lease between the Ground Lessor and Tenant for the remainder of the Term and on the same terms and conditions as contained herein, without the necessity of executing a new lease; and (iii) Landlord and Tenant shall have the right to execute any amendment to this Lease which is specifically required hereunder and the Ground Lessor shall recognize and be bound thereto. "Ground Lessor" shall mean the landlord under any existing or future ground or underlying lease(s) affecting all or any part of the Shopping Center (such ground or underlying lease(s) is referred to as the "Ground Lease(s)"). "Mortgagee" shall mean any state or federally regulated bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender, which is not an Affiliate of Landlord, and which holds a mortgage on the Shopping Center or is the beneficiary under a deed of trust encumbering the Shopping Center (such mortgage or deed of trust is referred to as the "Mortgage").

SECTION 19.02 Existing Mortgages and Ground Leases. If a Mortgage or any Ground Lease encumbers the Shopping Center or any part thereof on the Effective Date, then, within sixty (60) days after the Effective Date, Landlord shall deliver to Tenant, in recordable form: (a) a subordination, non-disturbance and attornment agreement substantially in the form attached as Exhibit J, in recordable form, executed by each and every Mortgagee, and (b) a fee owner recognition agreement in the form and content described in Section 19.01(b), in recordable form, executed by any Ground Lessor (and, as may be required, consented to by the Mortgagee), and otherwise in substantially the form and substance attached hereto as Exhibit J-1. Should Landlord fail to so deliver such instrument(s) as provided above, provided Tenant shall have negotiated in good faith, Tenant shall have the right, by notice given to Landlord at any time prior to the date on which such instrument(s) are delivered, to terminate this Lease without

further liability on the part of Landlord or Tenant, <u>except</u>: (i) for those obligations which expressly survive the expiration or other termination of this Lease, and (ii) Landlord shall (which obligation shall survive the termination of this Lease), within ten (10) business days following Tenant's termination notice, reimburse Tenant for all its reasonable, third-party costs and expenses incurred in connection with this Lease (including, without limitation, costs associated with the preparation and review of plans and specifications, the performance of Tenant's Work, and attorneys' fees), not to exceed Seventy-Five Thousand Dollars ($75,000).

SECTION 19.03  <u>Transfer of Interest</u>. Landlord shall provide Tenant with notice upon or immediately after any sale or transfer of Landlord's interest in the Shopping Center. Landlord shall require the buyer or transferee to assume in writing all of the obligations of Landlord under this Lease. Notwithstanding Section 23.13, Landlord shall continue to remain liable for all accrued liability, if any, up to the date of such sale or transfer. Notwithstanding anything contained herein to the contrary, Landlord shall continue to remain liable hereunder after such sale or transfer unless the buyer or transferee has expressly assumed in writing all of the obligations of Landlord under this Lease.

SECTION 19.04  <u>Tenant Estoppel Certificates</u>. Tenant agrees, within thirty (30) days of Landlord's request, to execute and deliver to Landlord, proposed purchaser or any Mortgagee, on a form prepared by or on behalf of the party so requesting, an estoppel certificate (a) ratifying this Lease and confirming that there are no modifications or amendments to this Lease, except as may be stated in the certificate, (b) confirming the commencement and expiration dates of this Lease, (c) certifying to Tenant's actual knowledge and belief that the Landlord is not in default under this Lease, and that there are no offsets or defenses to enforcement of this Lease, except as may be stated in the certificate, and (d) stating the date through which Annual Minimum Rent and other charges payable by Tenant have been paid.

SECTION 19.05  <u>Landlord Estoppel Certificates</u>. Landlord agrees, within thirty (30) days of Tenant's request, to execute and deliver to Tenant or any assignee, transferee, subtenant or Lender, on a form prepared by or on behalf of the party so requesting, an estoppel certificate (a) ratifying this Lease and confirming that there are no modifications or amendments to this Lease, except as may be stated in the certificate, (b) confirming the commencement and expiration dates of this Lease, (c) certifying to Landlord's actual knowledge and belief that Tenant is not in default under this Lease, and that there are no offsets or defenses to enforcement of this Lease, except as may be stated in the certificate, and (d) stating the date through which Annual Minimum Rent and other charges payable by Tenant have been paid.

SECTION 19.06  <u>Payments</u>. If Landlord shall request Tenant to execute more than one (1) subordination, attornment and recognition agreement and more than one (1) estoppel certificate in any twelve (12) month period, then, as a condition to Tenant's obligations under Sections 19.01 or 19.04, as the case may be, Landlord shall pay to Tenant Five Hundred Dollars ($500) for each subsequent request for a subordination, attornment and recognition agreement or an estoppel certificate within such twelve (12) month period. If Tenant shall request Landlord to execute more than one (1) estoppel certificate in any twelve (12) month period, then, as a condition to Landlord's obligations under Section 19.05, Tenant shall pay to Landlord Five Hundred Dollars ($500) for each subsequent request for an estoppel certificate within such twelve (12) month period.

## ARTICLE XX

## LANDLORD'S REPRESENTATIONS, WARRANTIES AND COVENANTS

SECTION 20.01 <u>Quiet Enjoyment</u>. Landlord covenants and agrees that Tenant, upon paying the Rent reserved hereunder and performing and observing all of the other terms, covenants and conditions of this Lease on Tenant's part to be performed and observed hereunder during the Term, shall freely, peacefully, and quietly occupy and enjoy the use and possession of the Premises without disturbance, molestation, hindrance or ejectment of any kind whatsoever subject, nevertheless, to the terms of this Lease and to the Permitted Exceptions.

SECTION 20.02 <u>Representations, Warranties and Covenants</u>. In order to induce Tenant to execute this Lease and in consideration thereof, Landlord covenants, warrants and represents to Tenant as follows:

(a)    As of the Effective Date and as of the Possession Date, Landlord has a valid leasehold interest in the Shopping Center under the terms of the Pelham Ground Lease, and Landlord's leasehold interest is free and clear of all easements, restrictions, liens, encumbrances, leases and the like, except as described on <u>Exhibit K</u> and Existing Exclusives and that Landlord's leasehold interest the Pelham Ground Lease is for a term not less than the expiration of the Initial Lease Term; that the Shopping Center, as of the Effective Date (and as of the Possession Date), is not (and will not be) subject to the lien of any Mortgage (except such instruments where the lienor has entered into an agreement in favor of Tenant, as described in Sections 19.01 and 19.02); that Landlord has the full power, right and authority to make this Lease for the Term without the consent, joinder, or approval of any other party; and that Landlord, to Landlord's knowledge, will put Tenant into complete and exclusive possession of the Premises free from all Legal Impediments which would, in any way, prevent or materially and adversely affect the use of the Premises for the uses thereof by Tenant as contemplated by this Lease, or materially and adversely prevent or restrict the use of the Common Areas or materially and adversely affect ingress and egress to and from Pelham Parkway and Secor Lane, the public thoroughfares shown on the Site Plan, by Tenant, its agents, employees or invitees. "Legal Impediments" shall mean any executive order, directive or other requirement or limitation applying to this Shopping Center (as opposed to being applicable to property generally within a jurisdiction or zoning classification), but excluding the Resolution. Landlord covenants and agrees to cause the Pelham Ground Lease to be renewed and/or extended for a period of not less than the expiration of the last Extension Period which becomes effective under this Lease.

(b)    To Landlord's knowledge, the Shopping Center shall, as of the Effective Date, be properly zoned for retail operations and Tenant's contemplated use of the Premises does not violate any provisions of the Pelham Ground Lease.

SECTION 20.03 <u>Site Covenants</u>. In order to induce Tenant to enter into this Lease, Landlord covenants to Tenant as follows (the "Site Covenants"):

(a)    Landlord shall not hereafter construct (or permit to be constructed) any buildings or other structures in the area identified on the Site Plan as the "No-Build Area" (the "<u>No-Build Area</u>").

41

(b)      Landlord shall not construct (or permit to be constructed) any projections either vertical or horizontal (other than tenant signs or identifications) which will project along the front or rear of the building in which the Premises are situated in such a manner as to materially and adversely obstruct the view of Tenant's signs or its store front in any manner.

(c)      The number of paved, full-size parking spaces in the Shopping Center shall be the amount of spaces required by Laws, and, without limiting the generality of the foregoing, the number of spaces contained in Tenant's Preferred Area shall not be reduced by more than five (5) spaces from the number of spaces shown on the Site Plan, except as maybe required by Laws.

(d)      Landlord shall not erect (or permit to be erected) any building or other structures (including, without limitation, kiosks) in any outparcel except as and where shown on the Site Plan, and all outparcel buildings constructed shall (i) not exceed a height of twenty-eight (28) feet (inclusive of all roof top mechanicals, all projections and all architectural treatments and embellishments), except for all buildings existing as of the Effective Date, and (ii) not exceed the Floor Area shown on the Site Plan, and (iii) not be used for any Prohibited Uses.

(e)      Landlord shall not use (or permit the use of) all or any portion of the Tenant's Preferred Area for retail sales or for promotional purposes, subject to Tenant's rights under Section 2.01(c) and the rights of existing tenants.

(f)      Except as may be required by Laws, Landlord shall not make (and shall not permit there to made) any changes to those Common Areas identified as "No-Change Area" on the Site Plan (the "No-Change Area") including, without limitation, changes in the location of curbcuts, drive aisles, entrances, access points, roadways, sidewalks or parking spaces or reduction of the parking ratio specified in Section 20.03(c), without Tenant's consent, which may be withheld in Tenant's sole discretion; provided, however, that Landlord may relocate the curbcuts and access drives to Pelham Parkway, except for the curbcut and access drive closest to Circuit City identified as Access Drive "B" on the Site Plan, up to thirty (30) feet in either direction, so long as during the period of any such relocation, no other drive aisle, entrance or access point is under construction..

(g)      Following Tenant's opening for business at the Premises, (a) Landlord shall use reasonable efforts to control any noise and dust at the Shopping Center (including, without limitation, during any periods of permitted construction within the Shopping Center) such that neither materially and adversely interferes with the normal operation of Tenant's business, and (b) Landlord shall not perform (and shall not permit there to be performed) any exterior construction in the Shopping Center between October 25 and January 1, except to the extent permitted under Section 5.01.

(h)      Landlord shall not knowingly permit any solicitation, distribution of handbills, picketing, or other public demonstration in the Common Areas, except as otherwise may be mandated by Laws.

(i)      Landlord shall not knowingly install or permit to be installed by any other tenant or other person anywhere in the Shopping Center or any structure or equipment which

42

would cause any interference with satellite, radio, telecommunications or television reception or transmission in or from the Building.

SECTION 20.04  Intentionally Omitted.

SECTION 20.05  Ground Lease.

(a)     Landlord shall not modify, amend or supplement the terms of the Pelham Ground Lease in any manner which would materially or adversely affect Tenant's use of the Premises or Tenant's obligations under this Lease without the prior written consent of Tenant, which consent shall not be unreasonably withheld, conditioned or delayed.  Tenant may withhold its consent or approval of an amendment which would shorten the term, increase Tenant's rent under this Lease, or increase in any material respect any other obligations Tenant may have under the Pelham Ground Lease.

(b)     Landlord and Tenant shall each deliver to the other copies of all notices or other correspondence received by such party related to the Pelham Ground Lease promptly after such party's receipt of the same.

(c)     Tenant shall comply with the terms and provisions of the Ground Lease affecting Tenant's use and occupancy of the Premises under this Lease.

## ARTICLE XXI

## HOLDING OVER

SECTION 21.01  Holding Over.  If Tenant remains in possession of the Premises after the expiration of the Term without having duly exercised its right, if any, to extend or further extend the Term, such continuing possession shall create a month-to-month tenancy on the terms herein specified and such tenancy may be terminated at the end of any month thereafter by either party by giving at least thirty (30) days notice thereof to the other party.  During such holdover and provided that Landlord and Tenant are not in good faith negotiations with regard to the renewal or extension of this Lease or the entering into a new lease for premises within the Shopping Center, Tenant shall be liable for Annual Minimum Rent on a monthly basis (or, if applicable, on a prorated daily basis) in an amount equal to one hundred fifty percent (150%) of the amount thereof payable by Tenant for the month immediately preceding the last day of the Term, as well as for all Additional Rent payable by Tenant under this Lease.

## ARTICLE XXII

## NOTICE

SECTION 22.01  Where and How Given.  All notices or demands which either party hereto either is required to or may desire to serve upon the other shall be in writing and shall be sufficiently served upon such other party, by (a) mailing a copy thereof by certified or registered mail, postage prepaid, return receipt requested, addressed to the party to whom the notice is directed at the "Notice Address" of such party, or (b) by a reliable overnight courier (such as Federal Express), all charges prepaid, furnishing a receipt upon delivery, and addressed to the

43

party to whom the notice is addressed at the Notice Address of the part. The Notice Address of each party is:

a) Landlord:

P/A-ACADIA PELHAM MANOR, LLC
c/o Acadia Realty Trust
1311 Mamaroneck Avenue, Suite 260
White Plains, NY 10605
Attention: Legal Department

Payments to be addressed to:

c/o Acadia Realty Trust
1311 Mamaroneck Avenue, Suite 260
White Plains, NY 10605
Attention: Lease Administration

b) Tenant:

CIRCUIT CITY STORES, INC.
9954 Mayland Drive
Richmond, Virginia 23233
Attention: Vice President of Real Estate

with a copy to:

CIRCUIT CITY STORES, INC.
9950 Mayland Drive
Richmond, Virginia 23233
Attention: General Counsel

The addresses to which notices and demands shall be delivered or sent may be changed from time to time by notice served, as hereinbefore provided, by either party upon the other party.

SECTION 22.02  When Given. Unless otherwise provided for herein, notice shall be deemed to have been served at the earlier of the date received, refused or returned as undeliverable. However, if such notice pertains to the change of address of either of the parties hereto, then such notice shall be deemed to have been served upon receipt thereof by the party to whom such notice is given.

## ARTICLE XXIII

## MISCELLANEOUS

SECTION 23.01  Rent Proration. If this Lease is terminated prior to its natural expiration date for any reason other than a Tenant default, then Landlord shall promptly reimburse Tenant for any Rent prepaid by Tenant for periods subsequent to such termination date. This Section 23.01 shall survive the termination of this Lease.

SECTION 23.02  Construction. In construing this Lease, feminine or neuter pronouns shall be substituted for those masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place in which the context so requires. This

44