# EXHIBIT A - PART 3

Lease shall be construed without regard to: (a) the identity of the party who drafted the various provisions hereof, and (b) the addition or deletion of text made during the negotiation of this Lease. Moreover, each and every provision of this Lease shall be construed as though all parties hereto participated equally in the drafting thereof. As a result of the foregoing, any rule or construction that a document is to be construed against the drafting party shall not be applicable hereto.

SECTION 23.03  Section Headings.  The section headings in this Lease are for convenience only and do not in any way limit or simplify the terms and provisions of this Lease, nor should they be used to determine the intent of the parties.

SECTION 23.04  Partial Invalidity.  If any term, covenant, condition or provision of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, then the remainder of this Lease or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby and each term, covenant, condition and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

SECTION 23.05  Waiver.  The failure of either party to seek redress for violation of, or to insist upon strict performance of, any term, covenant or condition contained in this Lease shall not constitute a waiver to exercise any right or remedy with respect thereto nor prevent a similar subsequent act from constituting a default under this Lease.  The receipt by Landlord of Rent with knowledge of a breach of any provision of this Lease shall not be deemed a waiver of such breach.  No payment by Tenant or receipt by Landlord of a lesser amount than the Rent hereby reserved shall be deemed to be other than on account of the earliest rent then unpaid, nor shall any endorsement or statement on any check or any letter accompanying any check or payment by Tenant be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such rent due or Landlord may pursue any other remedy in this Lease provided or by law permitted, and no waiver by Landlord in favor of any other tenant or occupant of the Shopping Center shall constitute a waiver in favor of the Tenant herein.

SECTION 23.06  Governing Law.  This Lease shall be governed and construed in accordance with the laws of the State.

SECTION 23.07  Successors and Assigns.  This Lease shall inure to the benefit of and be binding upon the heirs, executors, administrators, successors and assign of Landlord and the successors and assigns of Tenant.

SECTION 23.08  No Broker.  Landlord and Tenant represent to each other that no broker or person is entitled to any commission by reason of the negotiation and execution of this Lease, other than the Brokers identified in Section 1.01(D), and Tenant agrees that Tenant shall be solely responsible for the fees and commissions of Metro Commercial Real Estate, and Landlord agrees that Landlord shall be solely responsible for the fees and commissions of Robert Futterman & Associates, LLC.  Landlord and Tenant agree to indemnify, defend and hold each other harmless against any and all claims by any other person for brokerage commissions or fees

45

arising out of any conversation, negotiations or other dealings held by the other party with any other broker regarding this Lease.

SECTION 23.09  Memorandum of Lease.  Landlord and Tenant agree to execute a Memorandum of Lease in recordable form, substantially similar to that attached as Exhibit L, setting forth such provisions hereof as may be required by State law.  Either party may record such Memorandum of Lease simultaneously with the execution of this Lease. Recording costs shall be borne by the party requesting recordation of same; in addition, any transfer taxes or other fees charged by any local or state governmental authorities in connection with such recordation shall be paid by the party recording same.  The provisions of this Lease shall control with regard to any omissions from, or provisions which may be in conflict with, the Memorandum of Lease.

SECTION 23.10  Entire Agreement.  This instrument contains the entire and only agreement between the parties and no oral statements or representations or written matter not contained in this instrument shall have any force or effect.  This Lease shall not be amended or modified in any way except by a writing executed by both parties.  All of the exhibits attached to this Lease are incorporated into this Lease by reference and for all purposes are a part of this Lease.

SECTION 23.11  Relationship of Parties.  The relationship between the parties hereto is solely that of landlord and tenant and nothing in this Lease shall be construed as creating a partnership or joint venture between the parties hereto, it being the express intent of Landlord and Tenant that the business of Tenant on the Premises and elsewhere, and the good will thereof, shall be and remain the sole property of Tenant.

SECTION 23.12  Force Majeure.  If either party hereto shall be delayed or hindered in, or prevented from, the performance of any act required under this Lease by reason of strikes, lockouts, labor troubles, failure of power, riots, insurrection, war or other reasons of a like nature beyond the reasonable control of the party delayed in performing works or doing acts required under the terms of this Lease (any such delay, hindrance or prevention is referred to as "Force Majeure"), then performance of such act shall be excused for the period of the delay, and the period of the performance of any such act shall be extended for a period equivalent to the period of such delay, except as otherwise specifically provided herein to the contrary.  Notwithstanding the foregoing, Tenant's obligation to pay Rent shall not be excused by reason of Force Majeure, except as otherwise set forth in this Lease.  The provisions of this Section 23.12 shall not be applicable to delays resulting from the inability of a party to obtain financing or to proceed with its obligations under this Lease because of a lack of funds.

A Tenant Delay (as defined herein) shall be deemed Force Majeure with regards to any work, obligation or responsibility of Landlord to be performed hereunder, including Landlord's Work.  However, in the event of a Tenant Delay there shall be no cap or limit on the number of days for Landlord's failure to perform such work or obligation.

"Tenant Delays" shall mean:

(i) delays in the submission of "Tenant's Plans" (hereinafter defined) and delays beyond the time period permitted in this Lease for the resubmission

46

and final completion of Tenant's Plans (if required by changes or comments made to the Tenant's Plans originally submitted):

        (ii) delays caused by changes to Tenant's Plans after their approval by Landlord; and,

        (iii) delays resulting from interference by Tenant or any agent or supplier of Tenant in the performance of any aspect of Landlord's Work.

    SECTION 23.13  Limitation of Landlord's Liability.  Except with respect to (a) insurance proceeds or condemnation awards received by Landlord which are required by the terms of this Lease to be applied to the repair or restoration of the Premises or the Shopping Center, and (b) any monies owed by Landlord to Tenant in connection with Landlord's default in performing Landlord's Work, Tenant shall, on and after the Commencement Date, look only to Landlord's estate and property in the Shopping Center (or the proceeds from the sale, financing or refinancing of all or any portion thereof) and net income derived from the Shopping Center for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord hereunder, and no other property or assets of Landlord, its officers, directors, stockholders, employees, members or partners shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease.  Except with respect to the limitation on personal liability hereinabove set forth, the provisions of this Section 23.13 shall not be deemed or construed to limit Tenant's rights and remedies pursuant to this Lease or which may be available at law, in equity or otherwise.

    SECTION 23.14  Limitation of Tenant's Liability.  Except with respect to insurance proceeds or condemnation awards received by Tenant which are required by the terms of this Lease to be applied to the repair or restoration of the Premises or the Shopping Center, Landlord, its successors and assigns, shall look solely to the assets, if any, of Tenant and its successors and assigns, for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director, member or employee of Tenant or any of its Affiliates.  Except with respect to the limitation on personal liability hereinabove set forth, the provisions of this Section 23.14 shall not be deemed or construed to limit Landlord's rights and remedies pursuant to this Lease or which may be available at law, in equity or otherwise.

    SECTION 23.15  Consents.  Except as may be otherwise expressly set forth in this Lease, whenever under this Lease provision is made for either party's securing the consent or approval of the other party, (a) such consent or approval shall be in writing and shall not be unreasonably withheld, delayed or conditioned, and (b) in all matters contained herein, both parties shall have an implied obligation of reasonableness.

    SECTION 23.16  Costs.  Whenever this Lease requires the performance of an act by party, such party shall perform the act at its own cost and expense, unless otherwise expressly provided to the contrary in this Lease.

    SECTION 23.17  Attorneys' Fees.  In any action or proceeding hereunder (whether to enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall be entitled to recover from the other party the prevailing party's reasonable costs and expenses in

47

such action or proceeding, including reasonable attorneys' fees, costs and expenses. Except as otherwise set forth herein, if either party is sued by a third party as a result of a violation of a covenant, representation or warranty herein contained by the other party hereto, then the party who has violated the covenant, representation or warranty shall be responsible for the reasonable costs and expenses in such action or proceeding against the non-violating party, including reasonable attorneys' fees, costs and expenses.

SECTION 23.18  Survival of Obligations.  The obligation to pay any sums due to either party from the other that by the terms herein would not be payable, or are incapable of calculation, until after the expiration or sooner termination of this Lease shall survive and remain a continuing obligation until paid. All indemnity obligations under this Lease shall survive the expiration or earlier termination of this Lease.

SECTION 23.19  Joint and Several Liability.  If either party consists of more than one person or entity, then the persons or entities constituting such party shall be jointly and severally liable hereunder.

SECTION 23.20  Definition of Hereunder, Herein, etc..  Unless the context clearly indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar import refer to this Lease and all of the Exhibits attached hereto as a whole and not to any particular section, subsection, or paragraph hereof.

SECTION 23.21  Tenant's Trade Name.  Landlord shall not make use of Tenant's trade name (i.e., "Circuit City"®) in any advertising or marketing material including, without limitation, on any internet website, without obtaining Tenant's prior written approval, which may be withheld in Tenant's sole and absolute discretion. Notwithstanding the foregoing, Landlord may use Tenant's trade name on Landlord's website and in informational brochures, but only for the purposes of identifying Tenant as a tenant of the Shopping Center.

SECTION 23.22  Counterparts.  This instrument may be executed in several counterparts, each of which shall be deemed an original. The signatures to this instrument may be executed and notarized on separate pages, and when attached to this instrument, shall constitute one complete document.

SECTION 23.23  Landlord's Permits.  Landlord shall obtain all permits and approvals necessary to perform Landlord's Work ("Landlord's Permits"). If Landlord does not receive such Landlord's Permits within two hundred seventy (270) days after the Effective Date, then both Landlord and Tenant shall have the right to terminate this Lease upon notice to the other party.

SECTION 23.24  Tenant's Work.

(a)    Except for Landlord's Work, Tenant shall perform all work necessary to complete a "Circuit City" store including but not limited to installing its fixtures, furniture and equipment and exterior signage. Within sixty (60) days of the Effective Date, Tenant shall prepare plans and specifications for Tenant's Work and submit them to Landlord for its review and approval in accordance with the Site Design Requirements. Plans and specs approved by Landlord pursuant to the Site Design Requirements shall be deemed "Tenant's Plans". Tenant shall construct all

48

improvements to the Premises according to Tenant's Plans. No work shall commence until Tenant has received written approval from Landlord. All of Tenant's Work on the Premises shall be union labor.

(b)     Tenant's Plans shall not be materially changed without the prior written approval of Landlord in each instance, which approval shall not be unreasonably withheld or delayed. No structural or exterior changes shall be made without Landlord's prior written consent, not to be unreasonably withheld, conditioned or delayed. Landlord's approval of Tenant's Plans shall not constitute an opinion or agreement by Landlord that the same are structurally sufficient or that they are in compliance with Laws. Tenant shall be responsible to obtain all approvals and permits necessary to permit Tenant's Work and to operate the Premises ("Tenant's Permits"). Once Tenant's Plans are approved by Landlord, Tenant shall promptly apply for Tenant's Permits and diligently pursue issuance of same. Except as expressly provided as Landlord's Work, Landlord is not obligated to make any improvements, changes, installations, alterations, repairs or replacements to the Premises or any portion of the Shopping Center to either put Tenant in possession or to permit Tenant to open for business. However, Landlord shall cooperate with Tenant, at no cost to Landlord, in connection with Tenant's obtaining its permits and approvals.

(c)     All of Tenant's Work shall be completed using new, first class materials, in a good and workmanlike manner in accordance with Tenant's Plans, all applicable provisions of the Lease, and all Laws. Tenant warrants that Tenant's Work, upon completion, will comply with all Laws and that the Shopping Center shall not violate any Laws as a result of Tenant's Work. During the performance of Tenant's Work, Tenant's equipment, materials and supplies shall be kept and stored only within the "Staging Area"

(d) Other than Tenant's Work described herein, Tenant shall not physically affect any other part of the Shopping Center nor impair the structural integrity of any building nor affect the proper functioning of any systems of the Shopping Center. In addition, Tenant agrees that all of Tenant's Work shall be performed in a manner which will not create any work stoppage, labor disruption or dispute and Tenant shall use commercially reasonable efforts not to interfere with the business of Landlord, or with any other tenant or occupant of the Shopping Center, provided that Landlord acknowledges that Tenant's Work will necessarily cause some noise, vibrations, dust, and other disruption inherent to construction work, and that Tenant will use commercially reasonable efforts to limit the duration and extent of such disruption.

(e)     If Tenant shall cause any damage to any portion of the Shopping Center during the performance of Tenant's Work, Tenant shall promptly repair and restore such damage. Tenant hereby agrees to defend, pay, indemnify and save free and harmless Landlord from and against any and all claims, demands, liabilities, fines, suits, actions, proceedings, orders, decrees and judgments of any kind or nature by or in favor of anyone and from and against any and all costs and expenses, including reasonable attorneys' fees, resulting from or in connection with loss of life, bodily or personal injury or damage to property arising out of or from or on account of Tenant's Work, excluding matters caused by the negligence of Landlord, its employees, contractors or agents.

(f)     Promptly following the completion of Tenant's Work, and as soon as reasonably feasible, Tenant shall obtain and furnish to Landlord all appropriate certifications from all authorities having jurisdiction (including a certificate of occupancy or permanent certificate of

49

occupancy, as the case may be) to the effect that Tenant's Work has been performed and completed in accordance with Tenant's Plans and with all Laws.

(g)    During the course of Tenant's Work, Tenant (and all of its contractors and subcontractors) will carry or cause to be carried adequate Worker's Compensation Insurance, Builders Risk, Comprehensive General Liability and such other insurance as may be required by law to be carried by Landlord or Tenant and such insurance (except the Worker's Compensation Insurance) shall name Landlord, Acadia Realty Trust, Acadia Realty Limited Partnership and all mortgagees as additional insureds.

(h)    Before commencing Tenant's Work, Tenant will obtain the following, at its sole costs and expense, and deliver evidence thereof to Landlord: (a) Comprehensive general liability insurance with a combined single limit of not less than $4,000,000.00 per occurrence for bodily injury and property damage, automobile liability coverage including owned and hired vehicles with a combined single limit of not less than $2,000,000 for bodily injury and damage to property for each occurrence, naming Landlord, Acadia Realty Limited Partnership, Acadia Realty Trust and Landlord's mortgagee as additional insureds, and (b) Landlord's Hold Harmless Agreement signed by all contractors or subcontractors whereby they agree to indemnify, save and hold harmless Landlord, its agents, employees, and assigns from all liabilities, claims, losses, liens, damages and suits of whatsoever nature for personal injury, death or property damage alleged to arise out of the work performed under the contract, whether by the contractor or by any subcontractor, and whether asserted against Landlord or the contractor/subcontractor.

[Signature page follows]

WO 445485.5

IN WITNESS WHEREOF, Landlord and Tenant have caused this Lease to be duly executed and delivered in their respective names as of the date first above written.

<u>LANDLORD:</u>

P/A-ACADIA PELHAM MANOR, LLC

Attest

By: _____
Name:
Title:       Kenneth F. Bernstein
             President

<u>TENANT:</u>

CIRCUIT CITY STORES, INC.

By: _____
Name:    John B. Mulleady
Title:    Vice President, Real Estate & Construction

51

WO 445485.5

## EXHIBIT A

### Site Plan

Premises – crosshatched, with Floor Area and frontage thereof (Section 1.01P)
All buildings within the Shopping Center and Floor Area thereof (Section 1.01S)
Construction Drive (Section 5.02(b))
Car Stereo Parking Areas (Section 2.01(c))
Trash Compactor Area (Section 2.01(c))
Web Order Pick-Up Parking Spaces (Section 2.01(c))
Transformer Pad Area (Section 2.01(c))
Tenant's Preferred Area (Section 2.01(c))
Staging Area (Section 3.01)
Public Thoroughfares (Section 20.02(a))
No Build Area (Section 20.03(a))
Parking Spaces In Tenant's Preferred Area (Section 20.03(c))
Landlord's permitted outparcel build-out area (Section 22.03(d))
No-Change Area (Section 20.03(f))

#959803 v8

WO 445485.5



**EXHIBIT B**

<u>Legal Description of the Shopping Center</u>

[See Attached]

BLANKET DESCRIPTION

ALL THAT CERTAIN plot, piece or parcel of land, situate, lying and being in
the Village of Pelham Manor, Town of Pelham, County of Westchester and State
of New York, more particularly bounded and described as follows:

BEGINNING at a point on the southerly sideline of Secor Lane, said point
being at the northeasterly terminus of a curve connecting the southerly
sideline of Secor Lane with the easterly sideline of Pelham Parkway (a/k/a
C.R.70) and from said beginning point running thence:

1.  along the southerly sideline of Secor Lane, North 63 degrees 57 minutes
    50 seconds East, a distance of 374.53 feet to a point of non-tangent
    curvature; the following three (3) courses along the common dividing
    line between lot 8 and lot 10, block 1:

2.  along a curve to the left, having a radius of 20.00 feet, turning a
    central angle of 90 degrees 00 minutes 00 seconds with an arc length of
    31.42 feet, the chord of which bears South 18 degrees 57 minutes 50
    seconds West, a chord distance of 28.28 feet to a point of tangency,
    thence:

3.  South 26 degrees 02 minutes 10 seconds East, a distance of 80.00 feet
    to a point, thence:

4.  North 63 degrees 57 minutes 50 seconds East, a distance of 100.00 feet
    to a point, thence:

5.  along the common dividing line between lot 9 and lot 10, block 1, North
    26 degrees 02 minutes 10 seconds West, a distance of 100.00 feet to a
    point on the aforementioned southerly sideline of Secor Lane, thence:

6.  continuing along said southerly sideline, north 63 degrees 57 minutes 50
    seconds East, a distance of 626.89 feet to a point of curvature, thence:

7.  continuing along the same, along a curve to the right, having a radius
    of 650.00 feet, turning a central angle of 11 degrees 45 minutes 00
    seconds, with an arc length of 133.30 feet, the chord of which bears
    North 69 degrees 50 minutes 19 seconds East, a chord distance of 133.06
    feet to a point, thence; the following seven (7) courses along the
    dividing line between lot 8, block 1 and the westerly sideline of the
    Hutchinson River Parkway:

continued........

8. South 10 degrees 37 minutes 00 seconds East, a distance of 406.03 feet
   to a point, thence;

9. South 8 degrees 04 minutes 18 seconds East, a distance of 152.58 feet to
   a point, thence;

10. South 81 degrees 55 minutes 42 seconds West, a distance of 125.00 feet
    to a point, thence;

11. South 08 degrees 04 minutes 18 seconds East, a distance of 350.40 feet
    to a point of non-tangent curvature, thence;

12. along a curve to the left having a radius of 375.00 feet, turning a
    central angle of 15 degrees 22 minutes 08 seconds, with an arc length of
    100.59 feet, the chord of which bears South 72 degrees 19 minutes 21
    seconds West, a chord distance of 100.29 feet to a point of tangency,
    thence;

13. South 63 degrees 57 minutes 50 seconds West, a distance of 4.45 feet to
    a point, thence;

14. South 26 degrees 04 minutes 30 seconds East, a distance of 188.85 feet
    to a point, thence;

15. along the common dividing line between lot 8 and lot 5, block 1 and the
    westerly sideline of the Hutchinson River Parkway, South 63 degrees 55
    minutes 30 seconds West, a distance of 156.73 feet to a point, thence;
    the following eight (8) courses along the dividing line between lot 8
    and lot 3, block 1:

16. North 26 degrees 04 minutes 30 seconds West, a distance of 82.31 feet to
    a point, thence;

17. North 63 degrees 55 minutes 30 seconds East, a distance of 10.33 feet to
    a point, thence;

18. North 26 degrees 04 minutes 30 seconds West, a distance of 19.84 feet to
    a point, thence;

19. South 63 degrees 55 minutes 30 seconds West, a distance of 10.33 feet to
    a point, thence;

continued........

20.  North 26 degrees 04 minutes 30 seconds West, a distance of 90.59 feet to
     a point, thence;

21.  North 63 degrees 55 minutes 30 seconds East, a distance of 4.05 feet to
     a point, thence;

22.  North 26 degrees 04 minutes 30 seconds West, a distance of 9.55 feet to
     a point, thence;

23.  South 63 degrees 55 minutes 30 seconds West, a distance of 227.32 feet
     to a point on the aforementioned easterly sideline of Pelham Parkway,
     thence;

24.  North 26 degrees 04 minutes 30 seconds West, a distance of 296.81 feet
     to a point, thence;

25.  continuing along the easterly sideline of Pelham Parkway, North 62
     degrees 43 minutes 40 seconds West, a distance of 609.10 feet to a point
     of curvature, thence;

26.  along a curve to the right, having a radius of 20.00 feet, turning a
     central angle of 126 degrees 41 minutes 30 seconds, with an arc length
     of 44.22 feet to a point, the chord of which bears north 00 degrees 37
     minutes 24 seconds East, a chord distance of 35.75 feet to the point or
     place of beginning.

continued........

Parcel A - (Lot 8)

ALL THAT CERTAIN plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Village of Pelham Manor, Town of Pelham, Westchester County of Westchester and State of New York, being more particularly known, shown and designated as Lots 1 through 36 inclusive in Block A; Lots 1 through 46 inclusive in Block B; Lot 2 in Block C; Lots 1 through 24 inclusive in Block D; Lots 1 through 32 inclusive in Block #; Lots 6 through 40 in Block F; Lots 1 through 30 in Block G and Lots 1 through 27 in Block H.

Together with the land in the beds of the following roads: Bridge Road Short Road, Hillside Road south of Secor Lane, Center Road, West Road, South Road and Sheep Lane.

All on a certain map entitled "Property of Secor Realty Company on Hutchinson River in the Village of Pelham Manor, Town of Pelham, Westchester County, N.Y." made by William A. Smith, dated December 10, 1928 and filed in the Office of the County Clerk of Westchester on May 26, 1935 as Map No. 3958.

continued........

Parcel B - (Lot 9)

ALL THAT CERTAIN plot, piece or parcel of land, situate, lying and being in
the Village of Pelham Manor, Town of Pelham, Westchester County of
Westchester and State of New York, being more particularly bounded and
described as follows:

BEGINNING at a point on the southerly side of Secor Lane distant easterly as
measured along the same 454.525 feet from the northeasterly end of a curve
having a radius of 20.00 feet and a length of 44.22 feet connecting said
southerly side of Secor Lane with the northeasterly side of Pelham Parkway;

RUNNING THENCE south 26 degrees 02 minutes 10 seconds east, 221.90 feet to a
corner;

RUNNING THENCE north 63 degrees 57 minutes 50 seconds east, 176.92 feet to
another corner;

RUNNING THENCE north 26 degrees 02 minutes 10 seconds west, 221.90 feet to
the southerly side of Secor Lane;

RUNNING THENCE along the southerly side of Secor Lane, south 63 degrees 57
minutes 50 seconds west, 176.92 feet to the point or place of BEGINNING.

**Parcel C:**

ALL THAT CERTAIN plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Village of Pelham Manor, Town of Pelham, County of Westchester and State of New York, bounded and described as follows:

BEGINNING at a point on the southerly side of Secor Lane distant 414.37 feet easterly from the corner formed by the intersection of the said southerly side of Secor Lane and the easterly side of Pelham parkway and which point of beginning is also at the easterly end of a curve connecting the said southerly side of Secor Lane and the Easterly side of a proposed street;

THENCE RUNNING along the said southerly side of Secor Lane, North 63 degrees 57 minutes 50 seconds east 80 feet to a corner;

THENCE RUNNING south 26 degrees 02 minutes 10 seconds east along land now or formerly of William B. Cray 100 feet to another corner;

RUNNING THENCE south 63 degrees 57 minutes 50 seconds west along land now or formerly of Secor Realty Company 100 feet to another corner and the easterly side of a proposed street;

THENCE RUNNING along the easterly side of said proposed street, north 26 degrees 02 minutes 10 seconds west 80 feet to the southerly end of a curve connecting the said easterly side of the proposed street with the southerly side of Secor Lane;

THENCE RUNNING on a curve to the right having a radius of 20 feet a distance of 31.42 feet to the aforesaid southerly side of Secor Lane to the point or place of BEGINNING.

For information only:  Said Parcel C is known as 23 Secor Lane, Pelham, NY, and designated as Section 166.26 Block 1 Lot 10 on the Westchester County Land and Tax Map.

**EXHIBIT C**

<u>Site Design Requirements</u>

[See Attached]

#959803 v8
WO 445485.5

## Site Design Requirements

### Shell Deal

Circuit City Stores, Inc.         Pelham Manor, NY         Store #4326         07/11/07

These Site Design Requirements (SDR's) are attached to and made part of the Lease Agreement. These SDR's are intended to allocate responsibility between Landlord and Circuit City for the work needed to prepare the Premises for Circuit City's occupancy. Terms with capital letters which are defined in the Lease Agreement and used in the SDR's shall have the same meaning.

# 1. Landlord's Work

Landlord shall be responsible for all work as described in Section 1, "Landlord's Work". Landlord's Work shall be preformed in a good and workmanlike manner. Landlord's engineers, surveyors, architects, consultants and contractors shall be all licensed in the state where the shopping center is located, and of good reputation. Landlord's Work shall be performed at Landlord's sole cost and expense, and in accordance with all applicable laws and regulations, these SDR's, the Construction Schedule (Attachment 2), and the Civil Plans (Attachment 6).

**A. Site Delivery Work** - All of the Landlord Work described in one (1) through nine (9) below is referred to collectively as the "Site Delivery Work". Upon substantial completion (defined for the purposes of these SDR's as having caused all of the Site Delivery Work to be completed except for the Punch List Items (defined below), which shall be limited to minor details of construction or decoration or mechanical adjustments which do not substantially interfere with Tenant's occupancy of the Premises, or Tenant's ability to complete any improvements to the Premises to be made by Tenant) of the Site Delivery Work, Landlord shall deliver to Circuit City the "Site Work Certificate" (Attachment "3"), at which time "Delivery of the Premises " as described in the Lease shall be deemed to have occurred. If any portion of the Site Delivery Work has not been substantially completed to Circuit City's reasonable satisfaction, Circuit City shall promptly notify Landlord pursuant to paragraph 1(C)(2) of the SDRs, and Landlord shall be obligated to correct any incomplete or unacceptable work as provided in paragraph 1(C)(2) of the SDRs.

1.  Provide the Geotechnical Reliance Letter (Attachment "7").
2.  Provide the Environmental Reliance Letter (Attachment "8").
3.  Cause the proposed development of the Shopping Center and its Civil Plans to comply with the Geotechnical Report.
4.  Cause the land on which the Shopping Center is situated, including the Premises, to be delivered in compliance with all laws applicable to the removal of hazardous materials.
5.  Cause the Premises, the finished floor elevations, and the access drives at the rear of the premises to be constructed in accordance with the Civil Plans, the Shell Plans, Circuit City's Floor Plan (Attachment "4"), and Car Stereo Installation Shop Ramp Plan (Attachment "12").
6.  Obtain governmental approvals necessary to complete all on-site and off-site work shown on the Civil Plans.
7.  Obtain all planning and zoning approvals, if any, from governmental authorities having jurisdiction over the Shopping Center which are necessary for Landlord's Work.
8.  Complete: (a) all curb cuts for the Tenant's Preferred Area, (b) 10,000 square feet of staging area outside of but adjacent to the Premises, to either be paved or stone to provide for all weather use, and (c) an all-weather access road of sufficient width for the passage of construction vehicles connecting the existing adjacent roadway to the Premises, to be maintained by the Landlord in good condition throughout the performance of Tenant's Work.
9.  Provide permanent utilities to within five (5) feet of the Building (unless noted otherwise in these SDRs), at Circuit City's designated entry points as shown on the utility drawing in Attachment 1. The stub points for these utilities shall not be covered by paving.

# Site Design Requirements                                   Shell Deal
**Circuit City Stores, Inc.**          **Pelham Manor, NY**      **Store #4326**          **07/11/07**

**B. Additional Landlord's Work.**    - In addition to the Site Delivery Work, Landlord shall substantially complete the following as part of Landlord's Work:

1.  The construction and installation of Circuit City's permanent utilities to the Building Shell in accordance with the Circuit City's locations shown on Attachment "1" and the Landlord's Civil Plans.
2.  The construction and installation of paving, (light duty and heavy duty), sidewalks, curbing, landscaping, and exterior lighting in accordance with the Geotechnical Report and the Civil Plans.
3.  The construction and installation of the monument signs in accordance with the Civil Plans.

**C. Building Shell Work**   -   Landlord shall complete the followings as part of Landlord's Work:

1. Landlord shall construct the Building Shell in accordance with the Shell Plans and Specifications and the Construction Schedule.  When the Landlord has Substantially Completed the construction of the Building Shell in accordance with the Shell Plans and Specifications, Landlord shall deliver to Circuit City the Building Shell Certificate (Attachment "11"). Circuit City shall notify Landlord within five (5) days of delivery if any such requirement has not been met to Circuit City's reasonable satisfaction. Upon completion of any such previously unmet requirements, Circuit City shall commence construction of the Building Fit Out Construction. Any increase in cost to Landlord's Work resulting from a change order requested by Tenant shall be paid by Tenant

2. On or before the Possession Date, Landlord's and Circuit City's representatives together shall conduct a walk-through of the Premises to compile a punch list of the Punch List Items. Circuit City shall deliver to Landlord a copy of said punch list within five (5) days after the walk-through.  Landlord shall complete any Punch List Items within ten (10) days after delivery of a copy of said punch list (provided, however, that if such item can not reasonably be completed with the ten (10) days, then Landlord must commence to  cure within ten (10) days and diligently pursue to completion).  If Landlord fails to complete any item on said punch list or fails to commence to cure within such 10-day period, then Circuit City may complete such item(s) using its own contractors at Landlord's expense, provided that Tenant gives Landlord notice that such item has not been completed and Landlord shall have another three (3) days to cure or commence to cure as provided above.  Landlord shall only be responsible to reimburse Tenant for reasonable costs and expenses incurred by Tenant and only after Landlord receives a statement and reasonable documentation.  Notwithstanding the foregoing to the contrary, in the event that any Punch List Items are not completed within the above-mentioned 10-day period, and the failure by Landlord to complete such items within such time period interferes with Tenant's ability to perform its work hereunder or under the Lease, then the Commencement Date under the Lease shall be delayed by one (1) day for each day of delay in completion of the Punch List Items beyond such 10-day period.

**D. Approvals and Payment of Fees**   - Landlord shall be obligated (a) to obtain all governmental and third party approvals, permits, and authorizations which must be obtained for Landlord's work and (b) to pay all initial fees and assessments, including initial impact fees (regardless of how such fees may be defined or described) which must be paid as a condition for Landlord's Work.

**E. Civil Plans**   - Landlord shall deliver to Circuit City full and complete Civil Plans in accordance with the Construction Schedule. A list of The Civil Plans will be attached to these SDR's as Attachment "6".

**F. Shell Plans and Specifications**   -    Landlord shall deliver to Circuit City full and complete Shell Plans and Specifications. A list of The Shell Plans and Specifications will be attached to these SDR's as Attachment "10".

## Site Design Requirements

## Shell Deal

| Circuit City Stores, Inc. | Pelham Manor, NY | Store #4326 | 07/11/07 |

**G. Sign Plans**  - Landlord hereby approves any and all potential Circuit City signage on Circuit City's exterior walls and on the bottom half (5' X 6' panel) of both sides of Vertical Tenant Sign #2, as shown on the Site-Plan (Exhibit "A"), provided that all such wall signs and monument panel signs are subject to all laws and regulations including but not limited to Village zoning regulations. Tenant is responsible to obtain all sign permits and shall adhere to all laws and regulations including but not limited to, the local sign ordinance and the Resolution (as defined in the Lease) or any amendment thereof.

## 2. Circuit City's Work

**A. Building Fit Out Construction**  - Following the Landlord's completion of the Building Shell Work, as defined in Attachment "1", Circuit City shall commence and pursue to completion the Building Fit Out Construction for the Circuit City building described in the lease as the "Premises". All costs and expenses incurred by Circuit City in connection with Building Fit Out Construction shall be borne by Circuit City.

**B. Building Fit Out Plans and Specifications**  - Circuit City shall prepare plans and specifications for the Building Fit Out Construction, which shall be submitted to the Landlord for its approval in accordance with these SDR's. Landlord shall respond to Circuit City's request for approval within ten (10) business days, and shall be obligated to approve Tenant's plans and specifications so long as they are consistent with Circuit City's current interior prototype and the Floor Plans (Attachment "4"). In the event that the Landlord does not notify Circuit City that it disapproves the Building Fit Out Plans and Specifications within ten (10) business days, the plans and specifications shall be deemed approved. Circuit City's Building Fit Out Plans and Specifications shall not be changed by Circuit City without the prior written consent of Landlord, provided that any changes made by Circuit City to its interior prototypical store design shall not be subject to Landlord's prior approval and shall be deemed approved by the Landlord. Following Landlord's approval of the Building Fit Out Plans and Specifications, any changes requested by Landlord shall be subject to Circuit City's approval, which approval may be withheld in Circuit City's sole discretion for any reason or no reason, and if approved by Circuit City, any incremental costs associated with such changes shall be made at Landlord's sole cost and expense.

**C. Permits**  - Circuit City shall obtain, at its sole cost and expense, those certain building permits, licenses, other governmental approvals, and temporary and permanent certificates of occupancy which may be required for Circuit City's Building Fit Out Construction in accordance with these SDR's. Landlord shall, at no cost to Landlord, assist and cooperate fully with Circuit City in obtaining such permits, licenses, approvals and certificates. Landlord shall be responsible for all other permits necessary for the development of the Shopping Center and the Building Shell.

## Site Design Requirements                    **Shell Deal**

**Circuit City Stores, Inc.**        **Pelham Manor, NY**        **Store #4326**        **07/11/07**

---

### 3. Attachments

**A. Attachments**  - The following are attached to these SDR's and made a part hereof for all purposes.

1. Circuit City Specifications
2. Construction Schedule
3. Site Work Certificate
4. Floor Plan and Elevations
5. (Intentionally Deleted)
6. Civil Plans
7. Geotechnical Reliance Letter
8. (Intentionally Deleted)
9. (Intentionally Deleted)
10. Shell Plans and Specifications
11. Building Shell Work Certificate
12. Car Stereo Installation Shop Ramp Plan

# Site Design Requirements                    Shell Deal

**Circuit City Stores, Inc.**        **Pelham Manor, NY**        **Store #4326**        **07/11/07**

## Attachment "1" – Circuit City Specifications

   A. **Utility Specifications**

   B. **Building Shell Specifications**

(to be attached)

# 1.A. UTILITIES SPECIFICATIONS – SHELL DEAL

## Date: 07/11/07

Permanent Utilities:  Landlord will provide the following permanent utilities to within five (5) feet of the Building (unless notes otherwise below), at Circuit City's designated entry points as shown on this drawing. The stub points for these utilities shall not be covered by paving. All utilities will be provided no later than the date set forth on the Construction Schedule (Attachment "2"):

- 2" Gas Service

- 4" Telephone (Conduit only)

- Cable TV (Conduit only)

- Secondary electric service to Circuit City's designated point of termination within Building, adequate for 600 amp, 3 phase, 277/480 volt service. Secondary electrical service to be installed by Tenant. Landlord to reimburse Tenant for reasonable cost of the installation of secondary line up to a length of 50'. Tenant shall provide Landlord with reasonable documentation of such cost.

- Storm Sewer System to locations as shown on Civil Plans and Tenant's utility plans

- 6" Sanitary Sewer line (one entry point)

- 2" Domestic Water line (one entry point)

- 6" fire protection water line with a minimum of 50 pounds per square inch residual pressure at 2000 gallons per minute flow, with sufficient capacity to service Circuit City's sprinkler system without the need for a fire pump, as approved by Circuit City's fire protection consultant.



PELHAM MANOR, NY
CIRCUIT CITY
FLOOR PLAN WITH UTILITIES
07-09-07
NOT TO SCALE

# 1.B. BUILDING SHELL SPECIFICATIONS – SHELL DEAL

Date: 07/11/07

## CONCRETE

- Slab Concrete – Provide curbs and walks around the building, compactor pad, loading dock and retaining walls, concrete ramp at car stereo installation (per Attachment "12"), and concrete landings at exterior doors, (per Civil Plans).

- Foundation System – Provide the foundations to meet Civil Plans.

- Floor Slab – Provide all floor slabs in accordance with Tenant's Floor Plan (Attachment "4"), 250 psf can not exceed 3,000 sf of the Premises, the remaining slab to be at 125 psf.

- Ramp – Provide (21'-0" wide x 20'-0" long) ramp for exterior access to the Car Stereo Installation Center as indicated on Attachment 12

## MASONRY

- Masonry – Provide exterior masonry walls per Landlord's Shell Plans and state building codes.

## STEEL

- Provide steel columns, joist girders and joists per Landlord's Shell Plans.

## WOOD AND MOISTURE PREVENTION

- Provide rigid roof insulation with an "R" value of 18.

- Provide a single ply membrane roof system with a minimum 10 year warranty.

- Provide all necessary flashing, copings, etc. per Landlord's Shell Plans.

## FINISHES

- Provide all exterior finishes (paint, EIFS, etc.) per Landlord's Shell Plans.

## DOORS, WINDOWS, GLASS

- Provide temporary plywood seal at the main entry in order to allow Tenant to install their own Besam door system

- Provide all exterior hollow metal doors, frame, and hardware per Landlord's Shell Plans, except as noted otherwise.

- Install the trash compactor frame, Tenant to provide Landlord with the frame.

- Provide the storefront per the Landlord's Shell Plans.

- Allow Tenant to provide its own interior security grille in storefront system per Tenant's prototypical specifications.

## EQUIPMENT

- Provide and install the overhead door for the loading dock

- Allow Tenant to provide its own dock seals, bumpers, and metal hood, per the approved elevation (to be attached).

- Provide the cut-out for the loading dock's mechanical leveler. The dock leveler platform is 6'-0" wide by 8'-0" long with a capacity of 30,000 lbs. (Tenant to provide the complete system including the leveler and frame). Landlord will install frame, Tenant to provide Landlord with frame timely so as not to delay Landlord's Work.

## VERTICAL TRANSPORTATION

- The following items should be provided:

  Stairs to meet building code requirements, except as noted otherwise as being provided by Tenant.

## MECHANICAL

- Plumbing – Per Landlord's Shell and Civil Plans

## ELECTRICAL

- Provide the secondary electrical service conduit stubbed through the floor slab to Tenant's required entry point within the building (at one location only).

- Provide the 4" telephone conduit stubbed through the floor slab to Tenant's required entry point within the building (at one location only).

## Site Design Requirements                    Shell Deal

Circuit City Stores, Inc.          Pelham Manor, NY          Store #4326          07/11/07

## Attachment "2" – Construction Schedule

| Landlord's Tasks | Completion Date |
|---|---|
| **I  SITE DELIVERY WORK** | |
| Landlord's delivery of the Civil Plans. | 03-02-07 |
| Landlord's delivery of the Shell Plans and Specifications. | 04-02-07 |
| Landlord's delivery of the Geotechnical Report. | 05-07-07 |
| Landlord's delivery of the Geotechnical Reliance Letter (Attachment "8"). | 03-31-08 |
| Landlord's completion of the Site Work including delivery of the Site Work Certificate (Attachment "3"); construction of staging area, all-weather construction access road, and installation of temporary utilities. | 03-31-08 |
| **II  ADDITIONAL LANDLORD'S WORK** | |
| Construction and installation of permanent utilities. | Within 30 days of delivery of Premises to Tenant |
| Construction and installation of paving, curbing, sidewalks, landscaping, and exterior lighting. | 02/01/08 |
| Construction and installation of vertical tenant and monument signs identifying the Shopping Center. | 04/01/08 |
| Completion/modification of the four traffic light signals at the nearby roadway intersections and shopping center entrances. | 02/1/08 |
| **III  BUILDING SHELL WORK** | |
| Landlord's completion of the Building Shell Work including delivery of the Building Shell Work Certificate (Attachment "12"); | 04/01/08 |

*These dates are anticipated dates, and Tenant shall have no remedies if Landlord misses such dates except for Tenant's remedies provided in Sections 2.05, 2.06 and 2.07 of the Lease.*

SDR Text.doc                                                        6