CIRCUIT CITY STORES, INC.,

Sublandlord

TO

DHL EXPRESS (USA), INC.,

Subtenant

SUBLEASE

Dated: March 1, 2006

Property:
208 Maurin Road
Chehalis, Washington



# TABLE OF CONTENTS

Page

1.  PREMISES. ...............................................................................................................1
2.  TERM. ......................................................................................................................1
3.  RENT. .......................................................................................................................2
4.  SECURITY DEPOSIT. ............................................................................................5
5.  CONDITION OF PREMISES. ................................................................................6
6.  USE. ..........................................................................................................................7
7.  APPURTENANT RIGHTS. .....................................................................................7
8.  UTILITIES. ...............................................................................................................8
9.  REPAIRS AND MAINTENANCE. ..........................................................................8
10. ALTERATIONS. .....................................................................................................10
11. SIGNS. .....................................................................................................................11
12. ASSIGNMENT AND SUBLETTING. ....................................................................11
13. ACCESS TO PREMISES. .......................................................................................14
14. INDEMNITY. ..........................................................................................................14
15. INSURANCE. ..........................................................................................................15
16. SUBORDINATE TO PRIME LEASE. ....................................................................17
17. DAMAGE, EMINENT DOMAIN. ..........................................................................19
18. NOTICES. ................................................................................................................21
19. DEFAULT. ...............................................................................................................21
20. WAIVER OF JURY TRIAL AND RIGHT TO COUNTERCLAIM. .....................24
21. END OF TERM. .......................................................................................................25
22. HOLDOVER. ...........................................................................................................25
23. BROKERAGE. .........................................................................................................25
24. FINANCIAL STATEMENTS AND ESTOPPEL CERTIFICATES. ......................26
25. AMERICANS WITH DISABILITIES ACT. ...........................................................26
26. HAZARDOUS SUBSTANCES. ...............................................................................27
27. SUBLANDLORD'S LIEN. .......................................................................................28
28. MISCELLANEOUS COVENANTS. ........................................................................29

EXHIBITS TO SUBLEASE

EXHIBIT A  -  Plan of Property Showing Location of Premises
EXHIBIT B  -  Rules and Regulations
EXHIBIT C  -  List of Fire Monitoring Contacts
EXHIBIT D  -  Prime Lease



## SUBLEASE

THIS SUBLEASE, dated as of the 1st day of March, 2006, between CIRCUIT CITY STORES, INC., a Virginia corporation, having an office at 9954 Mayland Drive, Richmond, Virginia 23233-1464, Attn: Vice President, Real Estate ("Sublandlord") and DHL EXPRESS (USA), INC., an Ohio corporation, having an office at, 1200 Pine Island Road, Plantation, Florida 33324 Attn: Suite 850 Real Estate and Suite 600 Legal ("Subtenant").

### W I T N E S S E T H :

1.    PREMISES.

A.    Sublandlord hereby subleases to Subtenant, and Subtenant hereby subleases from Sublandlord, approximately 13.875 acres of real property described on Exhibit A attached hereto and made a part hereof, together with all improvements thereon (collectively, the "Improvements"), including the warehouse and industrial building containing approximately 172,875 rentable square feet of floor space (the "Building") located at 208 Maurin Road, Chehalis, Washington (collectively, the "Premises") which Premises were leased to Sublandlord under the Prime Lease dated June 29, 1995, as amended (the "Prime Lease") between Chehalis Hawaii Partners, LLC, successor to Bond C.C. I Delaware Business Trust, a Delaware business trust, as landlord ("Landlord") and Sublandlord, as tenant; together with all easements, licenses, and other rights appurtenant to the Premises pursuant to the terms of the Prime Lease.

B.    Sublandlord furthermore transfers, sells, and conveys to Subtenant, for and in consideration of the sum of $1.00, the receipt of which is acknowledged by Sublandlord, all interest of Sublandlord in and to the fixtures, improvements, and betterments to the Premises previously made by Sublandlord in and to the Premises, such conveyance being WITHOUT WARRANTY OF ANY KIND, INCLUDING WITHOUT WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE.

2.    TERM.

A.    Term. The term of this Sublease ("Term") shall be the period of five (5) years commencing March 1, 2006 (the "Commencement Date"), and ending at midnight on February 28, 2011 (the "Expiration Date"), unless sooner terminated as herein provided. The "Rent Commencement Date," as that term is used herein, shall be the Commencement Date. If Subtenant exercises the Option to Extend (as defined in subsection E below), the Term shall include the Extension Period (as defined in subsection C below).

B.    Possession. The parties acknowledge that Subtenant is presently in possession of a portion of the Premises. Sublandlord shall tender possession of the balance of the Premises (the "Premises Balance") to Subtenant within five (5) business days following the (i) execution and delivery of this Sublease by both parties, (ii) the delivery by Subtenant to Sublandlord of all insurance certificates required pursuant to Section 15 hereof, and (iii) payment by Subtenant of the Base Rent for March, 2006 and April, 2006. If Subtenant shall fail to deliver the items required under clauses (ii) and (iii) above within such five (5) business day period, Sublandlord shall have the right to withhold possession of the Premises until delivery by Subtenant of such items and sums, in which event the Commencement Date shall not be delayed, or, if such failure

1



continues three (3) business days after written notice to Subtenant, to declare this Sublease terminated and to exercise any right Sublandlord may have under the agreement or agreements pursuant to which Subtenant took possession of the Premises or a portion thereof.

C.  Option to Extend.  Provided that an Event of Default under any of the terms or provisions of this Sublease has not occurred and is continuing (and provided further that if a default that has not matured into an Event of Default has occurred, Subtenant's notice of its exercise of the Option to Extend, as hereinafter defined, shall not be deemed to have been delivered until such default has been cured) and that there has been no Transfer of this Sublease other than a Permitted Transfer, Subtenant shall have one (1) option to extend ("Option to Extend") the Term for a period commencing the day after the originally scheduled Expiration Date and continuing until June 29, 2017 (such period, the "Extension Period"). Subtenant may exercise the Option to Extend only by delivering written notice of exercise to Sublandlord no less than twelve (12) months prior to the Expiration Date. Subtenant agrees that it shall have forever waived its right to exercise the Option to Extend if it does not timely deliver such notice to Sublandlord, whether such failure is inadvertent or intentional, time being of the essence. If Subtenant exercises the Option to Extend, the Term shall be automatically extended for the Extension Period, and June 29, 2017 shall be the Expiration Date for all purposes under this Sublease. The Extension Period shall be upon the same terms and conditions as set forth herein, except that Subtenant shall have no further option to extend the Term, and the Base Rent payable pursuant to Section 3 of this Sublease shall be increased annually by three percent (3%) on March 1 of each calendar year of the Term in accordance with Section 3 below. Any termination, expiration, cancellation or surrender of the Prime Lease or this Sublease shall terminate the Option to Extend. The Option to Extend may not be severed from this Sublease or separately sold, assigned or otherwise transferred.

3.  RENT.

A.  Base Rent.  Commencing on the Rent Commencement Date, Subtenant shall pay to Sublandlord rent ("Base Rent") in the amount of (i) Thirty Two Thousand Dollars ($32,000.00) per month for the period from March 1, 2006 to August 31, 2006, (ii) Forty Two Thousand Dollars ($42,000.00) per month for the period from September 1, 2006 to February 28, 2007, (iii) Fifty Two Thousand Dollars ($52,000.00) per month for the period from March 1, 2007 to February 29, 2008. During each Sublease Year thereafter (a "Sublease Year" being the period from March 1 of a calendar year until the last day of February in the following calendar year), monthly Base Rent shall be one and three hundredths (1.03) multiplied by the monthly Base Rent in effect during the preceding Sublease Year. Each monthly installment of Base Rent shall be payable in advance on the first day of each calendar month during the Term. Base Rent for the first full calendar month shall be payable at the time of execution of this Sublease by Subtenant.

B.  Payments.  Base Rent and all other amounts payable by Subtenant to Sublandlord under this Sublease ("Additional Rent," and together with "Base Rent," "Rent") shall be paid when due, without notice or demand, and without deduction, abatement, counterclaim or setoff, except as otherwise expressly set forth herein, at the address of Sublandlord set forth in Section 19 or to such other person and/or at such other address as Sublandlord may from time to time designate by notice to Subtenant. Rent for any partial calendar month during the Term shall

2

be prorated on the basis of the actual number of days in such month. No payment by Subtenant of any amount less than the amount stipulated to be paid hereunder shall be deemed other than on account of the earliest stipulated Base Rent or Additional Rent; nor shall any endorsement or statement on any check or letter be deemed an accord and satisfaction, and Sublandlord may accept any check or payment without prejudice to Sublandlord's right to recover the balance due or to pursue any other remedy available to Sublandlord.

C.     Subtenant's Pro Rata Share. For purposes of this Section 3, "Subtenant's Pro Rata Share" shall be (i) during the first Sublease Year, sixty two and 47/100 percent (62.47%), and during the balance of the Term, one hundred percent (100%). Subtenant's Pro Rata Share shall be equitably prorated for any partial calendar year during the Term.

D.     Taxes. Beginning on the Commencement Date, Subtenant shall pay to Sublandlord, as Additional Rent, Subtenant's Pro Rata Share of all real estate taxes, assessments, levies and other charges, general or special, foreseen or unforeseen (the "Taxes") imposed or assessed against the Premises or the land upon which it is situated (the "Land") under the current or any future taxation or assessment system or modification of, supplement or substitute for such system, and whether or not based on or measured by the receipts or revenues from the Premises. "Taxes" shall also (i) include reasonable costs, including reasonable attorneys' fees, incurred by Sublandlord to appeal, contest or reduce Taxes, and (ii) exclude any taxes excluded from the definition of "Taxes" under the Prime Lease. Sublandlord shall provide Subtenant a copy of any bill for Taxes promptly after written request by Subtenant. Subtenant's initial Pro Rata Share of Taxes for the first year of the Term is estimated to be $62,637, which Subtenant shall pay to Sublandlord, in equal monthly installments of $5,219.78 in advance, beginning on the Commencement Date.

E.     Operating Expenses and CAM Charges. Beginning on the Commencement Date, Subtenant shall pay to Sublandlord, as Additional Rent, Subtenant's Pro Rata Share of (i) any operating expenses, operating costs, common area maintenance charges, owners' association or tenants' association charges, or similar charges, however denominated in the Prime Lease, payable by Sublandlord to Landlord under the Prime Lease, (ii) Sublandlord's reasonable cost to maintain the property insurance required to be maintained by Sublandlord hereunder, (iii) an administrative fee equal to five percent (5%) of the Taxes and the items listed in clauses (i) through (iii) above, and (v) monthly amortization of the cost (or portion thereof paid by Sublandlord) of (1) capital improvements pursuant to Section 6(C) hereof, or (2) capital repairs or replacements pursuant to Section 9(D) hereof; provided in either case that the cost of any such capital repair or improvement (or Sublandlord's portion thereof) shall be amortized on a straight line basis over the useful life of such item, and Operating Expenses shall only include the amortized portion of such cost and provided further that Sublandlord shall not be required to amortize the cost of such repairs or replacements if such repairs or replacements are required due to the misuse or abuse of such components by Subtenant, its employees, agents or contractors (all of the foregoing, collectively, "Operating Expenses"). Subtenant's initial Pro Rata Share of the items listed in clauses (i) through (iii) above is estimated to be $20,519, which Subtenant shall pay to Sublandlord, in equal monthly installments of $1,710 in advance, beginning on the Commencement Date. Subtenant shall pay other amounts reimbursable hereunder to Sublandlord within thirty (30) days after Sublandlord's written request therefor accompanied by documentation of such costs reasonably acceptable to Subtenant. Sublandlord reserves the right

to collect such amounts in equal monthly installments with prior written notice to Subtenant if Sublandlord determines that such payments will occur on a regular and recurring basis.

F.     Exclusions from Operating Expenses. To the extent any Operating Expenses are not direct pass throughs of costs from the Landlord under the Prime Lease, such Operating Expenses shall expressly exclude the following: (1) any administrative or management fee except as expressly set forth in Section 3(E) above; (2) costs incurred by reason of the violation by Sublandlord of any law; (3) any costs or expenses attributable to a breach by Sublandlord of any covenants, conditions, obligations and duties under this Sublease, the Prime Lease or any other agreement in connection to the Premises; (4) any costs to bring the Premises or Building into compliance with all applicable Laws to the extent such non-compliance existed as of the Commencement Date; (5) any costs associated with Sublandlord's ongoing maintenance and repair responsibilities that Sublandlord and Subtenant have expressly agreed to exclude from Operating Expenses pursuant to Section 9(B) hereof; and (6) any increases in Sublandlord's insurance premiums resulting directly from the negligent activities of Sublandlord.

G.     Adjustment to Charges for Operating Expenses and Taxes. Sublandlord may notify Subtenant from time to time setting forth an adjustment to estimated Operating Expenses and Taxes and Subtenant's Pro Rata Share thereof, if Sublandlord determines that payments are insufficient to meet estimated costs. Within one hundred eighty (180) days after the end of each calendar year, Sublandlord shall determine the actual Operating Expenses and Taxes for such year and shall deliver to Subtenant a reasonably detailed statement thereof (the "Reconciliation"). If Sublandlord determines that Subtenant's Pro Rata Share of actual Operating Expenses or Taxes exceeds the amount paid by Subtenant, then Subtenant shall pay the difference within thirty (30) days after Subtenant's receipt of the Reconciliation; if Subtenant's payments exceed the amount of Subtenant's Pro Rata Share of actual Operating Expenses or Taxes, Subtenant shall receive a credit toward the next installment of such Additional Rent in the amount of such overpayment, or if this Sublease shall have expired at such time, a refund of such overpayment. Subtenant's obligation to pay Subtenant's Pro Rata Share of Operating Expenses and Taxes hereunder, and Sublandlord's obligation to credit or refund overpayment, shall survive expiration or termination of this Sublease.

H.     Audit Rights. Subtenant shall have the right, at its expense and upon written notice given to Sublandlord no later than thirty (30) days after receipt of the Reconciliation, to make an audit of all of Sublandlord's bills, records, insurance certificates and policies relating to Operating Expenses and Taxes for the immediately preceding calendar year, such audit to be performed within sixty (60) days after Sublandlord's receipt of such notice. Upon such written request of Subtenant, Sublandlord shall make available to Subtenant, during normal business hours, at the location where Sublandlord's books and records are kept, Sublandlord's records pertaining to Operating Expenses and Taxes for the calendar year in question. Sublandlord shall cooperate with Subtenant in its explanation of its bills and records. Subtenant reserves the right to retain the services of an independent certified public accountant for such audit, which accountant shall not be paid by a contingent or percentage based fee. Subtenant shall diligently complete any such audit of Operating Expenses and Taxes and shall deliver to Sublandlord the written results of such audit within five (5) business days after Subtenant receives the same. If such audit discloses an overpayment by Subtenant, Sublandlord shall credit such amount against Subtenant's future obligations for Operating Expenses and Taxes, except if the Sublease has

terminated or expired, then Sublandlord shall pay such amount to Subtenant within thirty (30)
days. If such audit discloses a discrepancy in the amount of Operating Expenses and Taxes
charged to Subtenant that is in excess of five percent (5%), Sublandlord shall reimburse
Subtenant for the reasonable costs of the audit, not to exceed $1,500; provided, however, that
Sublandlord shall in no event be responsible for Prime Lease charges passed through to
Subtenant without adjustment by Sublandlord. If such audit discloses additional amounts due
from Subtenant, Subtenant shall pay such amounts within fifteen (15) business days of
completion of such audit. Should Sublandlord disagree with the results of Subtenant's audit,
Sublandlord and Subtenant shall refer the matter to a mutually acceptable independent certified
public accountant, who shall work in good faith with Sublandlord and Subtenant to resolve the
discrepancy. The fees and costs of such independent accountant to which such dispute is
referred shall be borne by the unsuccessful party and shall be shared pro rata to the extent each
party is unsuccessful as determined by such independent certified public account, whose decision
shall be final and binding.

4.     SECURITY DEPOSIT.

        Upon or prior to execution of this Sublease by Subtenant and Sublandlord, Subtenant
shall deposit with Sublandlord the sum of $185,000.00 (the "Security Deposit") as security for
the payment and performance by Subtenant of Subtenant's obligations under this Sublease.
Subject to all Laws and to the reductions provided for below in this Section 4, Sublandlord shall
have the right, upon notice to Subtenant, and regardless of the exercise of any other remedy
Sublandlord may have by reason of an Event of Default, to apply all or any part of the Security
Deposit to cure any Event of Default of Subtenant, and, if Sublandlord does so, Subtenant shall
upon demand deposit with Sublandlord the amount applied so that Sublandlord shall have the
full amount of the then applicable Security Deposit at all times during the Term. If Subtenant
fails to make such deposit, Sublandlord shall have the same remedies for such failure as
Sublandlord has for a default in the payment of Base Rent. If an Event of Default on the part of
Subtenant occurs under this Sublease, the Security Deposit shall not be deemed liquidated
damages and Sublandlord may apply the Security Deposit to reduce Sublandlord's damages, and
such application of the Security Deposit shall not preclude Sublandlord from recovering from
Subtenant all additional damages incurred by Sublandlord. The Security Deposit shall not bear
interest. Sublandlord and Subtenant agree that, provided no Event of Default shall have occurred
and be continuing hereunder at the time of the credits hereinafter described, Subtenant shall
receive a credit against Base Rent in the amount of $37,000.00 for each of the months of March
2007, March 2008, March 2009, March 2010, and April 2011, and the amount of Security
Deposit held by Sublandlord at any time shall be deemed to be only the portion of the Security
Deposit as to which such credits have not been applied. In the event this Sublease is terminated
(i) by Subtenant pursuant to Section 17 hereof, prior to its receipt of all credits against Base Rent
provided for in this Section 4, then Sublandlord may retain the then remaining portion of the
Security Deposit as a termination fee, (ii) by Sublandlord in accordance with Section 19, prior to
Subtenant's receipt of all credits against Base Rent provided for in this Section 4, then
Sublandlord may retain the then remaining portion of the Security Deposit, (iii) by Sublandlord
in accordance with Section 6C or 9D hereof, prior to Subtenant's receipt of all credits against
Base Rent provided for in this Section 4, then Sublandlord may retain one half of the then
remaining portion of the Security Deposit and the other one half of the then remaining portion of
the Security Deposit shall be paid to Subtenant; and (iv) for any other reason prior to Subtenant's



receipt of all credits against Base Rent provided for in this Section 4, then Sublandlord shall
return the then remaining portion of the Security Deposit to Subtenant. Notwithstanding the
provisions of this Section 4, Subtenant shall have no duty to replenish the Security Deposit
following such Base Rent credits, but the foregoing shall not be deemed to relieve Subtenant of
the obligation to replenish the Security Deposit to the then applicable amount following the
application of a portion thereof to cure an Event of Default by Subtenant as set forth above.

5.    CONDITION OF PREMISES.

Subtenant is presently in occupancy of the Premises and Subtenant is leasing, and hereby
accepts, the Premises "as is", "where is." Subtenant acknowledges that Subtenant has had the
opportunity to make, and that Subtenant has undertaken, full and complete investigations,
examinations, and inspections of the Premises and has determined that the Premises are suitable
for Subtenant's intended use. Notwithstanding the foregoing, Sublandlord agrees that, on the
Commencement Date, (i) the mechanical and utility systems, dock door, and HVAC systems,
and Fire Safety Systems serving the Premises Balance (the "Systems") and the roof shall be in
good working order and repair, and (ii) Sublandlord will have replaced or caused to be replaced
the water damaged ceiling tiles in the Premises Balance, and will have secured or caused to be
secured the loose insulation in the Premises Balance; such conditions to be deemed satisfied
unless Subtenant gives Sublandlord written notice of any defect therein prior to the date that is
thirty (30) days after the Commencement Date. Subtenant shall bear full responsibility for any
special requirements in connection with Subtenant's use of the Premises. Sublandlord expressly
disclaims any warranty or representation that the Premises comply with laws, codes, ordinances
and regulations applicable thereto; however, Sublandlord represents to Subtenant that
Sublandlord has not received any written notice that the Premises or any portion thereof is in
violation of any laws, codes, ordinances, or regulations.

6.    USE.

A.    Permitted Use. Subtenant shall use and occupy the Premises for distribution and
warehousing with appurtenant offices, and for no other purpose. Such use shall be allowed
twenty four (24) hours per day, seven (7) days per week, if permitted by Laws. Subtenant
represents to Sublandlord that Subtenant does not intend to, and shall not, use or occupy the
Premises for any other purpose.

B.    Compliance with Laws and Rules. Subtenant at its expense shall comply with all
present and future laws, statutes, ordinances, orders, rules, regulations and requirements of all
federal, state and municipal governments and any instrumentality thereof, and regulations of the
board of fire underwriters having jurisdiction over the Premises (collectively, "Laws").
Subtenant shall comply with the rules and regulations for the use of the Premises attached as
Exhibit B and made a part of this Sublease.

C.    Capital Improvements. Notwithstanding the foregoing, unless required due to
Subtenant's particular use of the Premises, as opposed to uses by tenants in general, Sublandlord
shall be responsible for making any capital improvements to the Premises due to a change in
Laws after the Commencement Date, subject to amortized reimbursement as part of Operating

6



Expenses in accordance with <u>Section 3(E)</u> above.  Notwithstanding the foregoing, in the event the cost of any such capital improvement, when aggregated with the cost of previous capital improvements, repairs, or replacements performed pursuant to this Section 6(C) or Section 9(D), will exceed will exceed $52,000, Sublandlord shall have the right to terminate this Sublease six (6) months after written notice to Subtenant unless Subtenant agrees within thirty (30) days after receipt of such notice to pay any excess of the cost of such capital improvement over $52,000.

7.    <u>APPURTENANT RIGHTS.</u>

Sublandlord hereby grants to Subtenant and its agents, employees, and customers, the exclusive right to use and enjoy the Premises, and, to the extent reasonably necessary for the use and enjoyment of the Premises, a non-exclusive right to use and enjoy all parking areas, roadways, sidewalks, loading areas, and driveways appurtenant to the Premises to the extent granted to Sublandlord under the Prime Lease.

8.    <u>UTILITIES.</u>

Subtenant shall make all necessary arrangements with all applicable utility companies and governmental authorities for, and shall pay for, all utilities supplied to the Premises. Sublandlord shall not be responsible for any failure or interruption, for any reason whatsoever, of any of the services or utilities supplied to the Premises, and the same shall not result in any abatement, diminution or reduction of rent, or constructive eviction, or liability on the part of Sublandlord ; provided, however, that in the event any such failure or interruption results from the negligence or intentional misconduct of Sublandlord, its agents or employees, and such failure or interruption renders all or a portion of the Premises unusable for Subtenant's intended purposes, then Rent hereunder shall abate for the period commencing two (2) business days after notice from Subtenant to Sublandlord of such failure or interruption, and ending when such service is restored.

9.    <u>REPAIRS AND MAINTENANCE.</u>

A.    Except as provided in subsections (B) and (D) below or in Section 6(C) above, Subtenant shall, at all times during the Term of this Sublease, and at its own cost and expense, keep and maintain or cause to be kept and maintained in good repair and condition (ordinary wear and tear excepted), including replacement if necessary, the Premises, interior and exterior, and shall use all reasonable precaution to prevent waste, damage or injury to the Premises. Subtenant's maintenance of the Premises shall include, without limitation, (i) maintenance of landscaping, gardening and plantings; (ii) prompt removal of all snow, trash, garbage and other refuse; (iii) maintenance, repair, and replacement of all utility systems, mechanical systems, loading docks and doors, and drainage systems serving the Premises, (iv) paving of all parking areas, (v) maintenance and replacement of all Building glass in the Premises, and (vi) cleaning, painting, decorating and repairing the interior of the Building and all other Improvements. Throughout the term of this Sublease, Subtenant shall procure and keep in force a maintenance agreement with a reputable service company for all HVAC equipment on the Premises, and shall provide Sublandlord with a copy of such maintenance agreement annually, and upon request of

Sublandlord from time to time. Sublandlord shall and does hereby assign to Subtenant, to the extent that same are assignable, all warranties, if any run to the benefit of Sublandlord, with respect to the Premises from the general contractor who constructed the same and all subcontractors, equipment vendors and materialmen; provided, however, that such assignment shall not include any warranties relating to the portions of the Building required to be maintained by Sublandlord as set forth below.

B.      Sublandlord shall keep and maintain, or cause to be kept and maintained in good repair and condition, at Sublandlord's own cost and expense, the roof (including roof membrane and structures), structural walls (excluding glass), and slab and foundation of the Building. Subtenant shall promptly notify Sublandlord of the need for any repair or maintenance that is the responsibility of the Sublandlord hereunder. If Sublandlord fails to commence such repair within thirty (30) days after Subtenant's notice and to diligently pursue such repair to completion, then, unless such failure to perform arises from circumstances beyond Sublandlord's control, Subtenant shall have the right, upon written notice of Subtenant's intention to do so and Sublandlord's failure to complete such repair within ten (10) days after such second notice, to perform such repair, and Sublandlord shall reimburse Subtenant for the cost of such repair within fifteen (15) business days after Subtenant's written demand therefore accompanied by supporting invoices or receipts reasonably satisfactory to Sublandlord. In the event the repair or maintenance that is the responsibility of Sublandlord as set forth above is an Emergency Repair, as defined below, then Sublandlord shall commence such repair within two (2) business days after receipt of Subtenant's notice. In the case of an Emergency Repair, such notice ("Emergency Repair Notice") shall prominently state that the requested maintenance or repair is an Emergency Repair, shall state the nature of the emergency, and shall state that Subtenant is entitled under the terms of the Sublease to take action if Sublandlord fails to commence such repair or maintenance within two (2) business days after receipt of the Emergency Repair Notice. Upon commencement of such repair or maintenance, Sublandlord shall diligently pursue such repair or maintenance to completion. In the case of an Emergency Repair, (X) Subtenant shall have the right at Subtenant's expense immediately upon issuing the Emergency Repair Notice to perform the minimum repairs or maintenance in connection therewith as is necessary to protect Subtenant's property or personnel, or (Y) if Sublandlord fails to commence such Emergency Repair within such two (2) day period, Subtenant shall have thereafter have the right at Sublandlord's expense to perform the minimum repairs or maintenance in connection therewith as is necessary to protect Subtenant's property or personnel, in which event Sublandlord shall reimburse Subtenant for the cost thereof within fifteen (15) business days after Subtenant's written demand therefore accompanied by supporting invoices or receipts reasonably satisfactory to Sublandlord. The foregoing provisions regarding Emergency Repairs shall not limit the right of Subtenant to perform more extensive repairs or maintenance in accordance with the provisions set forth above after the giving of the appropriate notices and the passing of the time periods described above. "Emergency Repairs," as that term is used herein, shall mean repairs or maintenance the failure to perform which threatens imminent harm to Subtenant's personnel, threatens imminent damage to Subtenant's equipment, inventory, or other personal property, or will cause imminent cessation of operations by Subtenant. Notwithstanding any of the foregoing, in the event any repair or replacement is made necessary by the abuse or neglect of Subtenant, its employees, agents, invitees, or contractors, then Subtenant shall make such repair or replacement at its sole cost and expense.

C.    Sublandlord shall keep in place its existing fire safety (but not its burglar alarm) monitoring contract for the Building. Subtenant shall perform all inspections and repairs of the Building sprinkler system, fire monitoring system, and other fire safety equipment and systems (collectively, the "Fire Safety System") in the Building. Subtenant shall be responsible for any modifications required to the Fire Safety System by Sublandlord's property insurer, or by the company providing fire monitoring services to the Building, because of Subtenant's particular use of the Building as opposed to use by tenants in general or Subtenant's Alterations, as hereinafter defined, to the Building. Attached hereto as Exhibit C is a list of persons in Subtenant's organization to be called by the fire monitoring company in the event of an alarm from the fire monitoring system. At the beginning of each calendar quarter thereafter, Subtenant shall furnish to the fire monitoring company, at an address furnished by Sublandlord, a written list identifying persons to be called by the fire monitoring company in the event of an alarm from the fire monitoring system. Subtenant shall furnish Sublandlord with a copy of such list.

D.    Sublandlord shall be responsible for the cost of any capital replacement or repair of the Building Systems (including without limitation the Fire Safety System) or components not thereof, the need for which does not arise from Subtenant's particular requirements or from Subtenant's abuse or neglect of such items, subject to amortized reimbursement as part of Operating Expenses in accordance with Section 3(E) above. Notwithstanding the foregoing, in the event the cost of any such capital repair or replacement, when aggregated with the cost of previous capital repairs or replacements performed pursuant to this Section 9(D) or capital improvements performed pursuant to Section 6(C) will exceed $52,000, Sublandlord shall have the right to terminate this Sublease six (6) months after written notice to Subtenant, unless Subtenant agrees within thirty (30) days after receipt of such notice to pay any excess of the cost of such capital repair or replacement over $52,000.

10.    ALTERATIONS.

A.    Subtenant shall not make or cause, suffer or permit the making of any alteration, addition, change, replacement, or installation, whether structural or non-structural ("Alterations"), in or to the Premises without obtaining the prior written consent of Sublandlord in each instance and the consent of Landlord as required under the Prime Lease. With respect to non-structural alterations which do not affect the systems of the Building and which are not visible from the exterior of the Premises, Sublandlord's consent shall not be unreasonably withheld, conditioned or delayed, provided that Sublandlord in its reasonable discretion may require Subtenant to deposit with Sublandlord the funds reasonably estimated by Sublandlord as the cost to remove such Alterations from the Premises, if Subtenant is required to remove such Alterations pursuant to the terms of this Sublease. "Alterations" shall include, without limitation, all pipes, ducts, conduits, wiring, paneling, partitions, railing, mezzanine floors, galleries and the like. All Alterations shall be performed in a good and workmanlike manner, using only new materials or their equivalent, free and clear of all mechanics' liens and encumbrances, and in compliance with all Laws and all reasonable procedures and regulations prescribed by Sublandlord (and Landlord) from time to time. Prior to commencing any Alterations in the Premises, Subtenant shall (i) file the requisite plans and specifications for Alterations (which shall have been approved in writing by Sublandlord and Landlord, if required) with, and obtain all requisite approvals from, all governmental departments or authorities having jurisdiction and any public utility company having an interest therein and (ii)

deliver to Sublandlord evidence that any contractor performing such Alterations carries an insurance policy or policies of worker's compensation, liability, property damage and broad form builder's risk insurance, naming Sublandlord and Landlord as additional insured parties with limits as provided in Section 15. Sublandlord's approval of any plans, specifications or working drawings for Alterations shall create no responsibility on the part of Sublandlord for their completeness, design sufficiency or compliance with Laws. Alterations may be performed only by contractors or subcontractors approved by Sublandlord (and Landlord, if required), Sublandlord's approval not to be unreasonably withheld or delayed. Subtenant shall cause its contractors and subcontractors to confine their activities to the Premises.

  B. During performance of Alterations, Sublandlord shall have the right to inspect the Premises at all reasonable times. If any lien is filed against the Premises or the Building in connection with labor or materials furnished to Subtenant, or claimed to have been furnished to Subtenant, Subtenant at its expense shall commence action to cause such lien to be discharged within ten (10) days after notice that it has been filed, and shall diligently pursue such discharge and shall effect such discharge within thirty (30) days after notice that such lien has been filed.

  C. All Alterations shall become the property of Sublandlord and, except as otherwise expressly provided in this Sublease, shall remain upon and be surrendered with the Premises at the expiration or earlier termination of the Term; provided, however that Sublandlord shall have the right to designate, at the time of approval of the plans therefor, any Alterations that must be removed prior to expiration or earlier termination of this Sublease, in which event Subtenant agrees to remove such designated Alterations prior to the expiration or earlier termination of this Sublease and to repair any damage caused by such removal. Movable trade fixtures and other personal property which Subtenant installs at its own expense shall remain Subtenant's property and may be removed at the expiration or earlier termination of the Term, provided that Subtenant is not in default under this Sublease, and further provided that Subtenant promptly repairs any damage caused by such removal.

11. <u>SIGNS.</u>

  Subtenant shall be permitted to install, at its expense, signs advertising Subtenant's business, which signs must comply with all applicable Laws, and which shall be of such size, design and character as Sublandlord (and Landlord, if required) shall approve in writing, Sublandlord's approval not to be unreasonably withheld. Subtenant shall maintain any such sign(s) in good condition and repair, and shall remove all signs and repair all damage caused by the installation or removal thereof, at the expiration or termination of the Term.

12. <u>ASSIGNMENT AND SUBLETTING.</u>

  A. <u>Consent Required</u>.  Except as set forth in Section 12(G) below, Subtenant may not, by operation of law or otherwise, assign, sell, mortgage, pledge or in any manner transfer this Sublease or any interest therein, or sublet the Premises or any part thereof, or grant any concession, franchise or license or otherwise permit occupancy of all or any part of the Premises by any person or entity (collectively, "Transfer," and the recipient of such Transfer, the "Transferee"), without first obtaining the prior written consent of Sublandlord (and Landlord, if required under the Prime Lease), which consent of Sublandlord shall not be unreasonably

withheld or delayed, so long as: (i) the net worth of the proposed Transferee at the time of the proposed Transfer is not less than that of Subtenant as of the Commencement Date (such standard not to be applicable to a Transfer to a wholly-owned subsidiary of Deutsche Post), (ii) no Event of Default is continuing under this Sublease (and provided further that if a default that has not matured into an Event of Default has occurred, Subtenant's no Transfer shall be effective until such default has been cured), (iii) the permitted use by the proposed Transferee is consistent with the uses permitted on the Premises under the Prime Lease and applicable Laws, (iv) the Transferee's proposed use of the Premises does not create an undue risk of casualty or environmental contamination, and (v) the proposed subtenant is not someone with whom Sublandlord has had unfavorable leasing experience in the past or a competitor of Sublandlord whose primary business is the retail sale of consumer electronics (including, by way of example only, Best Buy, Good Guys, and Conn's). Sublandlord acknowledges that Subtenant will sublease a portion of the Premises, and Sublandlord agrees that it will not withhold its consent to a sublease or subleases in the aggregate of less than half of the Premises provided the requirements set forth in clauses (i) through (v) of the preceding sentence are met.

B.      Notice. If Subtenant desires to undertake any Transfer other than an assignment to a wholly-owned subsidiary of Deutsche Post (such an assignment, a "Permitted Transfer"), it shall provide Sublandlord with prior written notice of such desire, specifying the consideration for, and all other terms and conditions of, the proposed Transfer and identifying the proposed Transferee and the proposed use, accompanied by a certified financial statement setting forth the financial condition of the proposed Transferee in sufficient detail so as to permit Sublandlord's comprehensive assessment thereof, and a non-refundable review fee in the amount of One Thousand Dollars ($1,000.00) (the "Review Fee"). Such notice shall include all information which Subtenant has in its possession which may be disseminated without penalty regarding the proposed Transfer, including but not limited to information regarding the proposed Transferee, its proposed business at the Premises, financial and operating information regarding the proposed Transferee, and any other information which Sublandlord requests of Subtenant in connection with the proposed Transfer.

C.      Recapture Option. Sublandlord shall have the right (the "Recapture Option"), in the event of a proposed Transfer other than a Permitted Transfer, to terminate this Sublease as of the "Effective Termination Date" (as defined in this Section 12.C.) as to the portion of the Premises to be sublet. If Sublandlord elects to exercise the Recapture Option, Sublandlord shall deliver written notice of such election to Subtenant within thirty (30) days after Sublandlord's receipt of Subtenant's notice described in Section 12.B., which notice from Sublandlord shall specify the date (the "Effective Termination Date") on which such termination shall become effective; provided, however, that such date shall not be more than sixty (60) days after the date of such notice of termination. If Sublandlord fails to timely exercise the Recapture Option in accordance with these provisions, Subtenant may thereafter proceed with the Transfer pursuant to the provisions of Section 12.B. on the same terms and conditions as set forth in said notice; provided, however, that any such Transfer shall be expressly conditioned upon Subtenant's compliance with the provisions of Section 12.D. Sublandlord shall be entitled to take into account any factor Sublandlord shall deem relevant in exercising its right to approve or disapprove a proposed Transfer including, without limitation: the financial strength and working capital of the proposed Transferee; the experience of the proposed Transferee in the type and size

11

of the business proposed; the quality of the merchandise and/or services to be offered by the proposed Transferee; and any alterations proposed in connection with the proposed Transfer.

D.     Payments in Excess of Rent.  If any Transfer obligates the Transferee to pay to Subtenant amounts in excess of the Base Rent and Additional Rent under this Sublease (whether by increased rent, a lump sum payment, payment for the sale, transfer or lease of Subtenant's fixtures or improvements, or any other form), net of Subtenant's reasonable costs in connection with such Transfer, then Subtenant shall pay to Sublandlord one half (1/2) of any such excess, as Additional Rent, within ten (10) days after receipt by Subtenant.

E.     Miscellaneous.  Notwithstanding any other provision of this Section 12, (i) Subtenant shall reimburse Sublandlord upon demand, for all expenses, including reasonable attorneys' fees and any charges imposed by Landlord or incurred by Sublandlord in connection with any proposed Transfer (the Review Fee to be credited against such costs), and (ii) Subtenant and any proposed Transferee shall, within ten (10) days after notice from Sublandlord, provide such additional information, execute and deliver to Sublandlord such documents and take such further action as Sublandlord may reasonably require to effect the proposed Transfer or to protect Sublandlord's rights under this Sublease.  The consent of Sublandlord to any Transfer shall in no way be construed to relieve Subtenant of the requirement of obtaining the consent of Sublandlord to any further Transfer.  If Sublandlord consents to any assignment of this Sublease, the assignee shall execute and deliver to Sublandlord an agreement in form and substance satisfactory to Sublandlord whereby the assignee shall assume all of Subtenant's obligations under this Sublease.  Notwithstanding any Transfer, the original Subtenant named herein and any other person(s) who at any time was or were Subtenant shall remain fully liable under this Sublease as it may subsequently be amended, modified, extended or renewed.  Sublandlord may collect rent from any Transferee and/or any subtenants or occupants, and apply the net amounts collected to Base Rent and Additional Rent, but no such collection shall be deemed a waiver of any of the provisions of this Section 12, or the acceptance of the Transferee, subtenant or occupant as Subtenant, or a release of any person or entity from the further performance by such person or entity of the obligations of Subtenant under this Sublease.

F.     Restrictions in Prime Lease.  Notwithstanding any other provision of this Section 12, no Transfer shall be permitted in violation of the Prime Lease without the express written consent of Landlord.

G.     Permitted Transfer.  Notwithstanding the foregoing or anything in this Sublease to the contrary, but subject to Section 12(F), Sublandlord hereby agrees that Subtenant may, without the prior notice to or consent of Sublandlord, assign this Sublease to:  (i) an entity controlled by, controlling or under common control of Subtenant's parent corporation, Deutsche Post (the "Parent"); or (ii) an entity acquiring or succeeding to substantially all of Subtenant's business operations in the State of Washington by merger, spin-off, reorganization, consolidation, acquisition (of assets or equity) or otherwise; provided in each case that the entity succeeding to Subtenant's estate hereunder (when aggregated with any entity guaranteeing such entities obligations) shall have a net worth at the time of such assignment at least equal to the net worth of Subtenant as the Commencement Date.  Subtenant hereby agrees that, unless such

12



Transfer occurs as a matter of law, such Transfer shall be in the form of a written agreement, and Subtenant shall provide Sublandlord with a copy of such agreement. Regardless of such assignment, unless expressly agreed otherwise, Subtenant shall remain primarily liable under this Sublease.

13.     ACCESS TO PREMISES.

        A.      General Access. Sublandlord shall have the right with reasonable prior notice except in the case of an emergency, to enter upon and in the Premises at all reasonable times to examine the same and to make such repairs, replacements, alterations, improvements and additions in the Premises and the Building (including, without limitation, the installation, repair, maintenance and replacement of pipes, duct work, conduits, utility lines and wires through the column space and partitions in the Premises and beneath the lower floor slabs and above the ceiling of the Premises) as Sublandlord may deem necessary or desirable, and to take all materials into and upon the Premises that may be required therefor, without the same constituting an eviction of Subtenant, and without any abatement of Base Rent or Additional Rent except as expressly set forth below; provided, however, Sublandlord shall use reasonable efforts not to unreasonably interfere with Subtenant's business in the Premises. Sublandlord shall also have the right upon reasonable prior notice to enter upon the Premises at reasonable times to show the Premises to prospective purchasers, lessors or lessees (under ground or underlying leases) and mortgagees of all or any part of the Premises. During the twelve (12) months prior to the expiration of the Term, Sublandlord may show the Premises to prospective tenants of the Premises, and Sublandlord may also place upon the Premises a "For Rent" sign, which sign shall not be removed, obliterated or hidden by Subtenant; provided the placements of such sign does not materially interfere with Subtenant's use of the Premises. During the last six (6) months of the term of the Prime Lease, Sublandlord may perform any repair or restoration work as may be required under the Prime Lease for surrender of the Prime Lease Premises; provided such work does not at any time materially interfere with Subtenant's use of the Premises. If at any time Sublandlord's exercise of its rights hereunder materially interfere with Subtenant's use of the Premises, and such interference continues for a period in excess of forty eight (48) hours after Sublandlord has notice of such interference, then Subtenant may thereafter abate the Rent due hereunder on a per diem basis until such interference ceases.

14.     INDEMNITY.

        A.      Subtenant's Indemnification. Except to the extent caused by the gross negligence or intentional misconduct of Sublandlord or its employees or agents, or, subject to Section 14C below, by an Event of Default, as defined in the Prime Lease, by Sublandlord under the Prime Lease (provided such Event of Default does not arise from Subtenant's failure to perform its obligations hereunder), Subtenant shall protect, indemnify, defend and hold Sublandlord harmless from and against any and all claims, damages, loss, liability (including without limitation liability under the Prime Lease), cost or expense (including without limitation reasonable attorneys' fees), which Sublandlord may incur or pay out by reason of (i) any accidents, damages or injuries to persons or property occurring in, on or about the Premises, (ii) any breach or default hereunder on Subtenant's part, (iii) any work done in or to the Premises by or for Subtenant, (iv) any liens filed against the Premises due to the act or failure to act of Subtenant and not timely removed by Subtenant, or (v) any act, omission or negligence on the

13

part of Subtenant and/or its employees, agents, contractors and/or invitees, or any person claiming through or under Subtenant.

B.    Sublandlord's Indemnification. Sublandlord shall protect, indemnify, defend and hold Subtenant harmless from and against any and all claims, damages, loss, liability, cost or expense (including without limitation reasonable attorneys' fees), which Subtenant may incur or pay out by reason of the gross negligence or intentional misconduct on the part of Sublandlord and/or its employees, agents, or contractors, or, subject to Section 14C below, by reason of an Event of Default, as defined in the Prime Lease, by Sublandlord under the Prime Lease (provided such Event of Default does not arise from Subtenant's failure to perform its obligations hereunder).

C.    Liability of Sublandlord. Except for damage cause by the gross negligence or intentional misconduct of Sublandlord or its employees or agents, all property of Subtenant and its employees, agents, contractors, shipping customers, or invitees in or about the Premises shall be kept and stored at Subtenant's sole risk, and Subtenant shall hold Sublandlord harmless from any claims arising out of damage to, or loss of, the same, resulting from (i) any act (including theft) or failure to act, of any other person, (ii) the leaking of the roof, (iii) the bursting, rupture, leaking or overflowing of pipes, heating or plumbing fixtures, (iv) fire or other casualty, (v) malfunction of electrical wires or fixtures, (vi) failure of HVAC systems, or (vii) other cause. Sublandlord shall not be liable for any interruption of or loss to Subtenant's business arising from any of the above-described acts or causes, or for any consequential damages sustained by Subtenant arising out of the loss of or damage to any such property.

15.    INSURANCE.

A.    Subtenant's Insurance. Subtenant shall maintain throughout the Term (i) a policy of commercial general liability insurance covering liability arising from Premises, operations, independent contractors, products-completed operations, personal injury and advertising injury, and liability assumed under an insured contract. Such policy shall name Sublandlord, Landlord and any mortgagee of the Premises as additional insured parties, as primary coverage over any insurance carried by Sublandlord, Landlord or any mortgagee, with limits of not less than the greater of the limits required under the Prime Lease, or $3,000,000 per occurrence, for personal or bodily injury, death and property damage, endorsed to provide coverage for fire legal liability; (ii) Business Automobile Liability insurance including owned, non-owned and hired car coverage in an amount of not less than $3,000,000; (iii) worker's compensation insurance to the extent required by Laws; and (iv) such other insurance, in such amounts and against such risks as are required to be carried under the Prime Lease, and as Sublandlord specifies in writing to Subtenant, as may be reasonably required by the holder of any mortgage on the Premises and which is customarily and commonly insured against by prudent owners or tenants of property similar to the Premises.

Subtenant's insurance coverage may be effected by a blanket policy or policies of insurance or under so-called "all risk" or "multi-peril" insurance policies, provided that the total amount of insurance available with respect to the improvements located on the Premises and Subtenant's liability hereunder shall be at least the equivalent of separate policies in the amounts herein required, and provided further that in all other respects any such policy or policies shall

comply with the provisions of this Section 15, including, but not limited to, that the policy shall contain an endorsement that names Sublandlord and Landlord as additional insured parties (for liability policy only) and that it references the Premises. An increased coverage or "umbrella" policy may be provided and utilized by Subtenant to increase the coverage provided by individual or blanket policies in lower amounts, and the aggregate coverage provided by all such policies with respect to the improvements located on the Premises and Subtenant's liability hereunder shall be satisfactory provided that such policies otherwise comply with the provisions of this Section 15.

B.     Subtenant shall deliver to Sublandlord a certificate of insurance reasonably satisfactory to Sublandlord evidencing all coverage required under this Section 15 prior to taking possession of the Premises. If Subtenant fails to provide Sublandlord with such evidence in a timely manner, Sublandlord may declare an Event of Default, as hereinafter defined, upon notice hereunder without the need for any cure period that may otherwise be applicable to Events of Default hereunder. Subtenant shall procure and pay for renewals of such insurance from time to time before the expiration thereof, and Subtenant shall deliver to Sublandlord a certificate of such insurance satisfactory to Sublandlord not more than fifteen (15) days after the expiration of any existing policy. All such policies shall be issued by companies rated not lower than "A, Class XIII" by A.M. Best Co. licensed to do business in the state in which the Premises are located, and all such policies shall contain a provision whereby the same cannot be cancelled or the coverage thereunder reduced below the requirements hereunder, unless Sublandlord is given at least thirty (30) days' prior written notice by certified or registered mail of such cancellation or modification.

C.     Sublandlord's Insurance. Sublandlord shall maintain property insurance covering the Building for at least eighty percent (80%) of replacement value, or such higher amount as may be required under the Prime Lease, exclusive of the cost of foundations, excavations and footings. All reasonable costs and expenses of insurance incurred by Sublandlord shall be subject to reimbursement by Subtenant pursuant to Section 3 of the Sublease.

D.     Contractor's Insurance. Subtenant shall require any contractor of Subtenant performing work in, on or about the Premises to obtain and keep in full force and effect, at no expense to Sublandlord, (i) a commercial general public liability insurance policy for the Premises and adjacent areas, the conduct of its work therein, and the acts or omissions of such additional insured, with the coverages set forth in Section 15.A.i. above; (ii) worker's compensation or similar insurance in form and amounts required by Laws; and (iii) Business Automobile Liability insurance including owned, non-owned and hired car coverage in an amount not less than $1,500,000 per accident. Sublandlord, Landlord, and Landlord's mortgagee shall be designated as additional insured parties under the policies listed in clauses (i) and (iii) above. Subtenant shall provide certificates of such insurance to Sublandlord prior to commencing any construction in, on or about the Premises.

E.     Insurance Premiums. Subtenant shall not do or permit to be done any act or thing in or upon the Premises which will or may invalidate or be in conflict with fire insurance policies covering the Building or the Premises or any part thereof or fixtures and property therein, and shall comply with all rules, orders, regulations or requirements of the Board of Fire Underwriters having jurisdiction, or any other similar body, and shall not do, or permit to be done, anything in

or upon the Premises, or bring or keep anything therein, which shall increase the rate of fire insurance on the Building or the Premises. If by reason of failure of Subtenant to comply with the provisions of this Section, Sublandlord is affirmatively able to show that the fire insurance rate shall at any time be higher than it otherwise would be, then, in addition to the right of Sublandlord to the exercise of any and all other remedies available under this Sublease, Subtenant shall reimburse Sublandlord on demand as Additional Rent for the portion of all fire insurance premiums which shall have been then or in the future charged because of such violation by Subtenant and which Sublandlord shall have, or may be required to have, paid on account of an increase in rate in its own policies of insurance. In addition to the foregoing, Subtenant will, if Sublandlord so requests, cease the operation of any action or remove any objects or improvements which have resulted in the increase to Sublandlord's insurance premiums.

F.      Release of Right of Recovery. Subtenant hereby releases and waives its rights of recovery against Landlord under the Prime Lease to the extent that Sublandlord waived its rights of recovery against Landlord under the Prime Lease. Subtenant and Sublandlord hereby waive and release any and all right of recovery, whether arising in contract or tort, against the other, including their employees and agents, arising during the Term for any and all loss or damage to any property located within or constituting a part of the Building, which loss or damage arises from the perils that could be insured against under the ISO Causes of Loss-Special Form Coverage, including any deductible thereunder (whether or not the party suffering the loss or damage actually carries such insurance, covers under such insurance or self insures the loss or damage) or which right of recovery arises from loss of earnings or rents resulting from loss or damage caused by such a peril.

16.     SUBORDINATE TO PRIME LEASE.

A.      Termination of Prime Lease. Subtenant represents that it has read and is familiar with the terms of the Prime Lease. This Sublease is subject and subordinate to Prime Lease. If for any reason the term of the Prime Lease shall have terminated prior to the Expiration Date of this Sublease, this Sublease shall thereupon be terminated and Sublandlord shall not be liable to Subtenant by reason thereof; provided however, that if the Prime Lease terminates as a result of a default or breach by Subtenant under this Sublease and/or the Prime Lease, or as a result of a default or breach by Sublandlord under this Sublease and/or the Prime Lease (unless such default or breach was caused by Subtenant's failure to perform its obligations hereunder), then the defaulting party shall be liable to the nondefaulting party for the damage suffered as a result of such termination.

B.      Performance of Prime Lease Obligations. To the extent that Subtenant has not agreed to perform any such obligations on Sublandlord's behalf in accordance with the terms and provisions of this Sublease, Sublandlord shall perform its obligations under the Prime Lease in accordance with the terms and provisions thereof. Except as hereinafter set forth, Subtenant assumes and agrees to perform the "Tenant's" obligations under the Prime Lease during the term hereof to the extent that such obligations are applicable to the Premises and to the extent such obligations are not inconsistent with the obligations of Subtenant under this Sublease. Subtenant shall indemnify and hold Sublandlord harmless from and against all claims of any nature whatsoever by reason of any breach or default on the part of Subtenant hereunder that results in a

default under the Prime Lease, or as a result of which the Prime Lease is terminated or forfeited. Notwithstanding the foregoing, the following provisions of the Prime Lease shall not be applicable to Subtenant's occupancy hereunder, and the terms of this Sublease shall control with respect to the subject matter of such portions of the Prime Lease: Sections 3 (Term), Section 4 (Rent), 9 (Maintenance and Repair), 12 (Condemnation), 13(a)(i), and (b) (Insurance), 14 (Damage, Destruction), 15 (Restoration), 19 (Events of Default; provided, however, that inclusion of Section 19 in this list shall not be deemed to release Subtenant from its obligations under the Sublease if Subtenant causes an Event of Default as defined in the Prime Lease), 20 (Landlord's Remedies), 21 (Notices), 28 (Financial Statements so long as Subtenant is a wholly owned subsidiary of Deutsche Post), 30 (Brokerage), and 43 (Substitution of Property). All rights under Section 12 (Condemnation) to terminate the Prime Lease under certain conditions are hereby reserved to Sublandlord. Subtenant hereby agrees that Section 25 of the Prime Lease shall apply to this Sublease but only to the extent such limits the liability of Landlord, and the parties agree that as between themselves the provisions contained in the body of this Sublease shall control to as to any limits on liability. The terms and provisions of Section 34 of the Prime Lease shall apply to this Sublease only to the extent such set forth the indemnity and release obligations of Subtenant to Landlord, and the parties agree that as between themselves the provisions contained in the body of this Sublease shall control to as to any indemnities and releases. All rights under the Prime Lease to extend or renew the term of the Prime Lease are reserved to Sublandlord.

C.      Prime Landlord Performance. Sublandlord shall use commercially reasonable efforts in attempting to cause Landlord to perform its obligations under the Prime Lease for the benefit of Subtenant. Upon receipt of written notice from Subtenant asserting that Landlord is not performing its obligations, under the Prime Lease, Sublandlord shall notify Landlord and shall use commercially reasonable efforts at Subtenant's expense to cause Landlord to perform its obligations under the Prime Lease, but Sublandlord shall not be liable to Subtenant if Landlord continues not to perform such obligations.

D.      No Privity with Prime Landlord. Nothing contained in this Sublease shall be construed to create privity of estate or of contract between Subtenant and Landlord.

E.      Sublandlord's Representations.

(i)      Sublandlord represents and warrants to Subtenant that the Prime Lease is in full force and effect without amendment or modification except as attached hereto as Exhibit D, and the documents attached hereto as Exhibit D constitute the entire lease between Landlord and Sublandlord for the Premises.

(ii)      To Sublandlord's knowledge, there exists no (1) current default under the Prime Lease, (2) event that if known to the Landlord would be a default by Sublandlord under the Prime Lease, or (3) event that with the passage of time would be a default under the Prime Lease. "Sublandlord's knowledge," is limited to the current actual knowledge of Tom Maroney, Sublandlord's Manager of Surplus Dispositions, without inquiry of Landlord or any other investigation.

17

   (iii) Sublandlord represents that so long as Subtenant performs its obligations hereunder, Subtenant shall have quiet enjoyment of the Premises, subject to the terms of the Prime Lease, but otherwise free from claims of any parties claiming by, through, or under Sublandlord.

  F. Preservation of Prime Lease. Sublandlord agrees not to enter into an agreement with Landlord amending the Prime Lease or terminating the Prime Lease; provided, however, that the foregoing shall not be deemed to prevent Sublandlord from exercise any termination right that may exist under the Prime Lease should the conditions giving rise to such termination right arise. If the Landlord should deliver to Sublandlord any notice of default under the Prime Lease, Sublandlord shall promptly deliver a copy of such notice to Subtenant. If Sublandlord has defaulted in any of its obligations under the Prime Lease, excepting defaults caused by a default of Subtenant under this Sublease, Subtenant may cure those defaults with notice to Sublandlord of its intentions to do so, and may recover the cost of such cure from Sublandlord.

## 17. DAMAGE, EMINENT DOMAIN.

  A. Destruction and Damage. In the event the Building is damaged or destroyed by fire or other peril, and as a result thereof the Prime Lease is terminated pursuant to the terms thereof, then this Sublease shall automatically likewise terminate upon written notice from Sublandlord to Subtenant, and Base Rent and Additional Rent shall be prorated as of the date of such fire or other casualty. In the event the Prime Lease is not terminated as aforesaid, Subtenant and Sublandlord agree to the following terms and conditions with respect to damage to or destruction of the Building.

   (i) Restoration Notice. In the event of a fire, earthquake or other casualty causing destruction or damage to the Building (any of the foregoing, a "Casualty"), within thirty (30) days of the Casualty, Sublandlord shall notify Subtenant in writing of its reasonable estimate of how long it will take to completely restore the Premises (the "Restoration Notice").

   (ii) Premises Usable or Restorable. If the Casualty occurs prior to the last two (2) years of the term of the Prime Lease, and in Sublandlord's reasonable estimation, repair and restoration is capable of being completed within two hundred seventy (270) days after the date of the Casualty including time required to prepare plans for reconstruction, to obtain building permits, weather conditions, and to complete the likely contract bidding process and all other relevant factors, (the "Restoration Period"), then, this Sublease shall not terminate, and Base Rent and other charges shall continue to be due and payable as set forth herein. Within the Restoration Period Sublandlord shall complete reconstruction of the Building, to substantially that condition existing immediately prior to such casualty, not including Alterations performed by Subtenant. If such restoration is not completed within the Restoration Period, Subtenant may terminate this Sublease with written notice to Sublandlord. If, during the period that begins one hundred eighty (180) days after the date of the Casualty (the "Abatement Period"), Subtenant is unable to use all or a portion of the Premises due to such Casualty and/or the restoration work, then from such date until the completion of the restoration work Subtenant may abate the Rent due hereunder proportionally in the same proportion as the rentable floor area of the Premises which Subtenant (or any sub-subtenants) is unable to use to conduct its business bears to the total rentable area of the Premises. Notwithstanding the foregoing, if in Subtenant's reasonable



opinion (taking into account its ability to process the volume of cargo needed to meet its published customer standards) Subtenant is unable to use the Premises to conduct its business during the Abatement Period, and Subtenant does in fact cease operating at the Premises during the Abatement Period, then Rent shall be abated in its entirety until the restoration of the Premises has been completed or Subtenant resumes operating at the Premises, whichever occurs first.

(iii)    Premises Not Usable and Not Restorable. In the event of a Casualty occurring during the last two (2) years of the term of the Prime Lease, or, in the event of a Casualty occurring prior to the last two (2) years of the term of the Prime Lease but, in Sublandlord's reasonable estimation, repair and restoration of the Premises is not capable of being completed within the Restoration Period, then Sublandlord may terminate this Sublease with written notice given in the Restoration Notice and Subtenant may terminate this Sublease with written notice given within thirty (30) days after its receipt of the Restoration Notice. In the event neither party elects to terminate this Sublease as set forth above, Sublandlord shall, within a reasonable time after such casualty, subject to force majeure, applicable building codes, the procurement of building permits and the receipt of insurance proceeds, complete reconstruction of the Premises to substantially their condition existing immediately prior to the Casualty, not including Alterations performed by Subtenant. In such event, Base Rent and other charges shall continue to be due and payable as set forth herein, provided if, during the Abatement Period Subtenant is unable to use all or a portion of the Premises due to such Casualty and/or the restoration work, then from such date until the completion of the restoration work Subtenant may abate the Rent due hereunder proportionally in the same proportion as the rentable floor area of the Premises which Subtenant (or any sub-subtenants) is unable to use to conduct its business bears to the total rentable area of the Premises. Notwithstanding the foregoing, if in Subtenant's reasonable opinion (taking into account its ability to process the volume of cargo needed to meet its published customer standards) Subtenant is unable to use the Premises to conduct its business during the Abatement Period, and Subtenant does in fact cease operating at the Premises during the Abatement Period, then Rent shall be abated in its entirety until the restoration of the Premises has been completed or Subtenant resumes operating at the Premises, whichever occurs first.

(iv)    Application of Funds. In the event Prime Landlord or any mortgagee (a "Lender") entitled to receive payment of insurance proceeds does not make all of such proceeds available for the restoration of the Premises, Sublandlord shall have the right to terminate this Sublease upon notice to Subtenant, unless Subtenant (i) agrees to fund the amount of such insurance proceeds retained by Prime Landlord or such Lender, and (ii) provides Sublandlord with evidence reasonably acceptable to Sublandlord of Subtenant's ability to fund the amount of such proceeds.

B.    Eminent Domain.

(i)    A "Total Taking" shall be deemed to have occurred if during the term of this Sublease, (1) the whole of the Premises shall be taken by eminent domain or be sold to the condemning authority in settlement of or under threat of condemnation ("Taken"), or (2) a portion of the Premises or the Building is Taken and the residue is not reasonably usable for the conduct of Subtenant's business on the Premises. Upon a Total Taking, this Sublease and all

rights of Subtenant in and to the Premises shall immediately terminate. If during the Term of this Sublease a portion of the Premises or the Building is Taken in a manner that is not a Total Taking, then this Sublease shall continue with a reasonable reduction of Base Rent and Additional Rent (reflecting the diminution in the value of the Premises for Subtenant's use thereof), and Sublandlord shall, at its own cost and expense, proceed with reasonable promptness, subject to delays beyond Sublandlord's control and delays in obtaining the award or purchase price, to make all repairs, alterations or restorations as may be necessary to restore the Premises to substantially the same condition as existed prior to such taking or sale, taking into consideration the nature and extent of the part so taken. Sublandlord shall have no obligation to restore fixtures and improvements owned by Subtenant. Notwithstanding the foregoing, Sublandlord shall not be required to expend any sums for restoration in excess of the net award or purchase price available to Sublandlord and not required to be paid to Prime Landlord or any Lender; provided, however, that in the event the amount to be expended by Sublandlord will be insufficient to restore the Premises to a condition usable for the conduct of Subtenant's business on the Premises, then Subtenant shall have the right to terminate this Sublease upon notice to Sublandlord.

(ii)     To the extent that any condemnation award will not be applied as aforesaid, Sublandlord shall be entitled to the entire award; provided that Subtenant shall be entitled to make a claim to the condemning authority for damages to its personal property and for expenses incurred in relocating following any such taking.

18.    NOTICES.

All notices, consents, approvals, demands and requests (collectively, "Notices") delivered by either party to the other hereunder shall be in writing and shall be sent either by United States registered or certified mail and deposited in a United States Post Office, return receipt requested and postage prepaid, or by reputable overnight air courier. Notices which are served upon Sublandlord or Subtenant by mail in the manner provided herein shall be deemed to have been given or served for all purposes hereunder on the third business day next following the date on which such Notice shall have been mailed as aforesaid. Notices given to Subtenant shall be addressed to Subtenant at its address set forth at the head of this Sublease, with a copy to the same address, Attention: Suite 600 Legal. All Notices given to Sublandlord shall be addressed to Sublandlord at its address set forth at the head of this Sublease, to the attention of Vice President - Real Estate. Sublandlord or Subtenant may from time to time change the names and/or addresses to which Notices given to either of them shall be addressed and sent as aforesaid, by designating such other names and/or addresses in a notice given to the other party in accordance with the provisions of this Section 18.

19.    DEFAULT.

A.    Event of Default. Each of the following shall be deemed to be an "Event of Default" by Subtenant and a breach by Subtenant hereunder: (i) the assignment of this Sublease or the subletting of the Premises, other than a Permitted Transfer, whether by operation of the law or otherwise, without the prior written consent of Sublandlord, (ii) the non-payment of any Base Rent or Additional Rent charges or any part thereof when same is due, or failure to make any other payment herein provided for, and the continuance of such non-payment for five (5)

days after Sublandlord shall have given notice of nonpayment to Subtenant, or (iii) the default in the performance of any other obligation of Subtenant under this Sublease, and the continuance of such default for twenty (20) days after Sublandlord shall have given to Subtenant a notice specifying the nature of such default, but if said default shall be of such nature that it cannot reasonably be cured or remedied within said twenty (20) day period, same shall not be deemed an Event of Default if Subtenant shall have commenced in good faith the curing or remedying of such default within such twenty (20) day period and shall thereafter continuously and diligently proceed therewith to completion within sixty (60) days from the date of Sublandlord's notice; provided, however, that if Subtenant diligently and continuously proceeds with such cure and is unable to complete such cure because of force majeure or other causes beyond the control of Subtenant, Subtenant shall be permitted such additional time, not to exceed the shorter of (i) an additional sixty (60) days as is necessary to effect such cure, provided that Subtenant provides Sublandlord during the initial sixty (60) day period with written notice of the condition or occurrence preventing Subtenant from completing such cure, and Subtenant provides written reports thereafter not less often than bi-weekly informing Sublandlord of the progress of such cure and its expected completion date, or (ii) the period ending ten (10) days prior to the date such uncured default would ripen into an event of default under the Prime Lease.

B.    Remedies.  In the event of Subtenant's default or the occurrence or existence of an Event of Default, Subtenant shall pay to Sublandlord, on demand, such expenses as Sublandlord may incur, including, without limitation, attorneys' fees, court costs, disbursements, and any and all other costs incurred by Sublandlord in enforcing the performance of any obligation of Subtenant under this Sublease.  If an Event of Default occurs, Sublandlord shall have the following rights and remedies, in addition to all rights and remedies available under law or equity: (i) Sublandlord may declare this Sublease terminated upon written notice to Subtenant; and/or (ii) Sublandlord or its agents, servants, representatives, successors or assigns may, immediately or at any time thereafter, re-enter and resume possession of the Premises and remove all persons and property therefrom, either by summary dispossess proceedings or by a suitable action or proceeding at law, or by force or otherwise, without being liable for any damages therefor, and no such re-entry shall be deemed an acceptance or surrender of this Sublease; and/or (iii) Sublandlord may, but shall have no obligation to, in its own name, but as agent for Subtenant if this Sublease is not terminated, relet the whole or any portion of the Premises for any period equal to or greater or less than the period which would have constituted the balance of the Term, for any sum which Sublandlord may deem reasonable, to any tenant(s) which Sublandlord may deem appropriate, and Sublandlord may grant concessions, including free rent; and Sublandlord shall have the right to collect from Subtenant any deficiency between the amount of Base Rent and Additional Rent due hereunder, and the amount of rent, net of costs related thereto, actually collected by Sublandlord from such reletting.  In the event of any breach or threatened breach by Subtenant of any of the covenants or provisions of this Sublease, Sublandlord shall have the right of injunction and the right to invoke any remedy allowed at law or in equity; mention in this Sublease of any particular remedy shall not preclude Sublandlord from any other remedy at law or in equity.  If at any time Sublandlord elects to terminate this Sublease, Sublandlord shall be entitled to recover from Subtenant in addition to other damages recoverable hereunder or under applicable law:

(i)    the worth at the time of award of the unpaid Base Rent and Additional Rent which had been earned at the time of termination, and

21

(ii)    the worth at the time of award of the amount by which the unpaid Base Rent and Additional Rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Subtenant proves could have been reasonably avoided, and

(iii)    the worth at the time of award of the amount by which the unpaid Base Rent and Additional Rent for the balance of the Term after the time of award exceeds the amount of such rental loss that Subtenant proves could be reasonably avoided, and

(iv)    any other amounts necessary to compensate Sublandlord for all the detriment proximately caused by Subtenant's failure to perform its obligations under this Sublease or which in the ordinary course of events would be likely to result therefrom.

As used in clauses (i) and (ii) above, "worth at the time of award" shall be computed by allowing interest at the lesser of (a) the rate per annum set forth in Subsection D. of this Section 19 (to wit, 12% per annum), or (b) the highest rate allowed by law.  As used in clause (iii) above, the "worth at the time of award" shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award, plus one percent (1%).

C.    Damages.  Sublandlord shall in no event be liable in any way whatsoever for its failure or refusal to relet the Premises or any part thereof.  However, Sublandlord agrees after recovery of possession of the Premises, to list the Premises for sublease with a commercial broker experienced in the marketing of industrial property in the market in which the Premises are located unless Sublandlord determines in its reasonable business judgment that the remaining term of the Prime Lease is not of sufficient duration to make it reasonably likely that a subtenant for the remaining term can be secured.  Sublandlord shall be entitled to recover from Subtenant, and Subtenant shall pay to Sublandlord immediately upon demand by Sublandlord, the amounts equal to all of the expenses incurred by Sublandlord in connection with (i) recovering possession of the Premises, (ii) any reletting(s) of the Premises and related brokerage costs, including without limitation costs for making alterations, repairing or otherwise preparing the Premises for reletting(s), (iii) court costs, and (iv) attorneys' fees incurred in connection with any of the foregoing.  Subtenant hereby expressly waives any and all rights of redemption granted by or under any present or future laws in the event of this Sublease being terminated and/or Sublandlord obtaining possession of the Premises pursuant to the provisions of this Section 18.

D.    Late Charges and Returned Check Charges.  If payment of any Base Rent or Additional Rent is not made by the fifth (5th) day after the date on which such amount was due and payable, Subtenant shall pay as a late charge the greater of (i) Two Hundred Fifty and No/100 Dollars ($250.00), or (ii) five percent (5%) of the overdue payment, and interest on the amount overdue at the lesser of (a) twelve percent (12%) per annum, or (b) the highest rate allowed by law (the "Default Rate") from the date on which such amount was due until the date of payment, as reimbursement of Sublandlord's expenses incurred as a result of Subtenant's failure to make prompt payment. In addition to any late charges or other remedies available to Sublandlord, if any check is returned to Sublandlord by Subtenant's bank by reason of insufficient funds, uncollected funds or otherwise, Subtenant shall pay to Sublandlord a return check administrative charge of Two Hundred Fifty Dollars ($250.00).  Subtenant shall pay the

late charges and return check administrative charges for any month as Additional Rent on the first day of the following month.

   E.  Additional Right of Sublandlord to Cure Subtenant's Defaults. Sublandlord may, but shall not be obligated to, cure, at any time upon ten (10) days notice or without notice in case of emergency, any Events of Default(s) by Subtenant under this Sublease, and Subtenant shall pay to Sublandlord on demand all reasonable costs and expenses incurred by Sublandlord in curing such default(s), including, without limitation, court costs and reasonable attorneys' fees and disbursements in connection therewith, together with interest on the amount of costs and expenses so incurred at the Default Rate.

   F.  Special Bankruptcy Provision. If Subtenant becomes a debtor within the meaning of the Bankruptcy Reform Act of 1978, as the same may be from time to time amended (the "Bankruptcy Code"), and, notwithstanding any other provision of this Sublease, this Sublease and Sublandlord's and Subtenant's rights thereunder are then made subject to the Bankruptcy Code, it is covenanted and agreed that the failure of Subtenant or its representative duly appointed in accordance with the Bankruptcy Code to (i) provide Sublandlord with adequate assurance that all of Subtenant's obligations under this Sublease shall continue to be fully complied with for the remaining Term, or (ii) furnish accurate information and adequate assurance as to the source of rent and other consideration due to Sublandlord under this Sublease, or (iii) conduct or have conducted at the Premises Subtenant's business as provided in this Sublease, shall in any of such events be deemed an Event of Default, and Sublandlord shall have all rights and remedies herein afforded it in respect of any Event of Default.

   G.  Default by Sublandlord. Sublandlord shall only be deemed to be in default hereunder if Sublandlord violates or fails to perform any covenant or agreement hereunder which is not observed or performed by Sublandlord within thirty (30) days after the receipt by Sublandlord of written notice from Subtenant specifically identifying such violation or failure. Sublandlord shall not be considered in default so long as Sublandlord commences to cure the violation within said thirty (30) day period and diligently pursues the completion of such cure.

20.  WAIVER OF JURY TRIAL AND RIGHT TO COUNTERCLAIM.

   TO THE EXTENT ALLOWED UNDER APPLICABLE LAWS, SUBLANDLORD AND SUBTENANT EACH HEREBY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY SUMMARY OR OTHER ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS SUBLEASE, THE RELATIONSHIP OF SUBLANDLORD AND SUBTENANT, THE PREMISES OR THE USE AND OCCUPANCY THEREOF, OR ANY CLAIM OF INJURY OR DAMAGES. SUBTENANT ALSO HEREBY WAIVES ALL RIGHT TO ASSERT OR INTERPOSE A COUNTERCLAIM (OTHER THAN A COMPULSORY COUNTERCLAIM) IN ANY PROCEEDING OR ACTION TO RECOVER OR OBTAIN POSSESSION OF THE PREMISES.

21.  END OF TERM.

At the expiration or sooner termination of the Term, Subtenant shall quit and surrender to Sublandlord the Premises, broom clean (including removal of all odors resulting from Subtenant's use of the Premises), free of all occupants, and as good condition as on the Commencement Date, ordinary wear and tear and damage by fire and any other insured casualty excepted. At such expiration or sooner termination, Subtenant shall remove from the Premises all property of Subtenant, including its sign(s), and, at the option of Sublandlord, shall remove all alterations and other improvements made by Subtenant to the Premises, and Subtenant shall repair all damage to the Premises caused by any and all such removal and restore the Premises to the condition in which they were prior to the installation of the items so removed, including the areas where Subtenant affixed its sign(s). Any property of Subtenant not so removed may be deemed to be abandoned, or Sublandlord may remove the same and restore any damage, at Subtenant's expense.

## 22.   HOLDOVER.

If Subtenant remains in possession of the Premises after the expiration or termination of the Term, Subtenant shall be deemed to be occupying the Premises as a tenant from month to month at the sufferance of Sublandlord subject to all of the provisions of this Sublease, except that the Base Rent shall be at a monthly rate equal to the greater of (i) the rent which Sublandlord owes for such period under the Prime Lease, or (ii) one hundred fifty percent (150%) of the monthly Base Rent in effect during the last month of the Term. Subtenant shall give to Sublandlord at least thirty (30) days' prior written notice of any intention to quit the Premises.

Notwithstanding the foregoing provisions of this Section 22, if Subtenant holds over after the expiration or termination of the Term and Sublandlord desires to regain possession of the Premises, then Sublandlord, at its option, may forthwith reenter and take possession of the Premises without process, or by any legal process in force in the jurisdiction in which the Premises is located. Any rental amounts for such hold over period which are deposited into Sublandlord's rental account shall not be deemed accepted by Sublandlord if Sublandlord promptly returns such rental amounts to Subtenant. Nothing herein shall limit Sublandlord's right to recover damages pursuant to this Sublease and such other damages as are available to Sublandlord at law or in equity (including but not limited to any and all liability to Landlord or otherwise caused by such holdover).

## 23.   BROKERAGE.

Each party represents to the other that, except for CB Richard Ellis and GVA Kidder Mathews, no broker or other person had any part, or was instrumental in any way, in bringing about this Sublease, and each party agrees to pay, and shall indemnify, defend and hold harmless the other from and against, any claims made by any other broker or other person for a brokerage commission, finder's fee, or similar compensation, by reason of or in connection with this Sublease, and any loss, liability, damage, cost and expense (including, without limitation, reasonable attorneys' fees) in connection with such claims if such broker or other person claims to have had dealings with the indemnifying party. Sublandlord shall pay any commission due to the broker(s) named herein in respect of this Sublease, pursuant to separate agreement.

## 24.   FINANCIAL STATEMENTS AND ESTOPPEL CERTIFICATES.



Subtenant shall, within fifteen (15) business days after each and every request by Sublandlord, execute, acknowledge and deliver to Sublandlord either or both of the following: (a) an annual financial statement (provided, however, that for so long as Subtenant is a wholly-owned subsidiary of Deutsche Post, such financial statement shall not be required), and (b) a statement in writing (i) certifying that this Sublease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified, and stating the modifications), and the Commencement Date and Expiration Date, (ii) specifying the dates to which the Base Rent and Additional Rent have been paid, (iii) stating whether or not, to the best knowledge of Subtenant, Sublandlord is in default under this Sublease, and, if so, specifying each such default, (iv) stating whether or not, to the best knowledge of Subtenant, any event has occurred which with the giving of notice or passage of time, or both, would constitute a default by Sublandlord under this Sublease, and, if so, specifying each such event, (v) stating whether Subtenant has exercised any option(s) to extend the Term of this Sublease, and, if so, specifying each such extension, and (vi) any other matter as may be reasonably requested. Any such statement delivered pursuant to this Section 24 may be relied upon by any prospective assignee or transferee of the leasehold estate under the Prime Lease.

25.   AMERICANS WITH DISABILITIES ACT.

Sublandlord and Subtenant, as the case may be, shall supply to the other party as promptly as possible, but in any event within ten (10) days after Sublandlord or Subtenant, as the case may be, first receives or sends the same, written notice of, and copies of all applicable notices or other documentation thereof, as applicable, (i) any notices, reports or warnings made to or received from any governmental agency or entity arising out of or in connection with the ADA (as defined in this Section 25) and relating to all or any portion of the Premises, Subtenant's use or occupancy thereof, or the Building; (ii) any complaints, charges, claims, or asserted violations made or threatened in writing by any person, agency or entity alleging violation of the ADA or regarding non-compliance with the ADA, and relating to all or any portion of the Premises, Subtenant's use or occupancy thereof, the Building or the Premises; (iii) any enforcement or other governmental or regulatory action or investigation instituted, contemplated, or threatened pursuant to any legal requirements regarding or in connection with the ADA and relating to all or any portion of the Premises, Subtenant's use or occupancy thereof, the Building or the Premises; (iv) any claim made or threatened by any person against Subtenant, the Premises or the Building, relating to damage, compensation, loss or injury resulting from or claimed to result from any alleged non-compliance with the ADA. ADA shall mean the Americans with Disabilities Act of 1991, 42 U.S.C. 12.101 et seq., and all regulations and other promulgations applicable thereto, and all amendments thereto.

26.   HAZARDOUS SUBSTANCES.

A.    Hazardous Materials. Subtenant shall not use, generate, manufacture, produce, store, treat, dispose of or permit the escape of, on, under, about or from the Premises, or any part thereof, any asbestos or any flammable, explosive, radioactive, hazardous, toxic, contaminating, polluting matter, waste, or substance or related injurious materials, whether injurious by themselves or in combination with other materials (collectively "Hazardous Materials"). Further, Subtenant shall not use, generate, manufacture, produce, store, treat, dispose of or permit the escape of, on, under, about or from the Premises any material, substance, or chemical which is

regulated by any federal, state or local law, rule, ordinance or regulation (collectively "Regulated Materials"). Notwithstanding the foregoing, if Subtenant's permitted use of the Premises requires the use and/or storage of any Hazardous Materials and/or Regulated Materials on, under or about the Premises, Subtenant shall provide written notice to Sublandlord, prior to final execution of this Sublease, of the identity of such materials and Subtenant's proposed plan for the use, storage and disposal of such materials; such use, storage and disposal shall be subject to Sublandlord's written approval, in Sublandlord's sole discretion. Notwithstanding the foregoing, the shipment of Hazardous Materials or Regulated Materials in closed containers and in compliance with all applicable laws, rules, ordinances, and regulations is permitted hereunder without prior notice to Sublandlord or the identity of such materials, provided Subtenant shall remain responsible hereunder for any release or improper disposal of any such Hazardous Materials or Regulated Materials. If Sublandlord approves the proposed use, storage and disposal of specific Hazardous Materials and/or Regulated Materials in the Premises, Subtenant may use and store upon the Premises only such approved materials. Subtenant shall comply with all Laws with respect to such use and storage, including, without limitation, the removal and disposal of such Hazardous Materials and/or Regulated Materials at the expiration or earlier termination of the Sublease Term. Notwithstanding anything to the contrary contained in this Sublease. At the expiration or termination of the Sublease, Sublandlord may obtain, at its cost, a Phase I environmental audit of the Premises. Subtenant shall reimburse Sublandlord for the costs of said Phase I environmental audit if Subtenant has violated any of the provisions of this Section 26 and Sublandlord may pursue any and all recommendations of said Phase I environmental audit, also at Subtenant's sole cost. Subtenant shall defend (by counsel reasonably acceptable to Sublandlord), indemnify, protect and hold Sublandlord and each of Sublandlord's partners, employees, agents, attorneys, successors and assigns, free and harmless from and against any and all claims, liabilities, penalties, forfeitures, losses or expenses (including attorney's fees), or death of or injury to any person or damage to any property whatsoever, arising from or caused in whole or in part, directly or indirectly by:

(i)    The presence in, on, under or about the Premises, or discharge in or from the Premises of any Hazardous Materials and/or Regulated Materials introduced into the Premises by Subtenant or caused by Subtenant or Subtenant's use, analysis, storage, removal, transportation, disposal, release, threatened release, discharge or generation of Hazardous Materials and/or Regulated Materials to, in, on, under, about or from the Premises, or;

(ii)    Subtenant's failure to comply with any federal, state, county, municipal, local or other law, rule, ordinance and regulation now or hereafter in effect relating to the industrial hygiene, environmental protection, use, analysis, generation, manufacture, purchase, transportation, storage, removal and disposal of Hazardous Materials and/or Regulated Materials.

In connection with, or as a result of, (i) or (ii) above, Subtenant's obligations hereunder shall include, without limitation and whether foreseeable or unforeseeable, all costs of any required or necessary testing, repair, cleanup, removal, detoxification or decontamination of or from the Premises and the preparation and implementation of any closure, remedial action, site assessment costs or other required plans in connection therewith. Subtenant's indemnities under this Section 26 shall not, however, apply with respect to any Hazardous Materials or Regulated Materials present in, on, or under the Premises at the time Subtenant took possession of the

Premises under this Sublease or under any other previous agreement. In addition, upon request from Sublandlord at any time during the Sublease Term, Subtenant shall execute affidavits, representations, and any other similar documents concerning Subtenant's best knowledge and belief regarding the presence of Hazardous Materials and/or Regulated Materials on, under or about the Premises. Further, Subtenant's obligations hereunder shall survive the expiration or earlier termination of this Sublease. For purposes of this <u>Section 26</u>, any acts or omissions of Subtenant whereby employees, agents, assignees, contractors or subcontractors of Subtenant or others are acting for or on behalf of Subtenant (whether or not they are negligent, intentional, willful or unlawful), will be strictly attributable to Subtenant.

B.     Sublandlord represents to Subtenant that Sublandlord has not used, generated, manufactured, produced, stored, treated, disposed of or permitted the escape of, on, under, about or from the Premises of any Hazardous Materials or Regulated Materials, and has not authorized any other person or entity to do so.

C.     Sublandlord hereby agrees that Subtenant may, at its sole cost and expense, conduct a Phase I or similar environmental report on the Premises, provided Subtenant repairs any damages to the Premises caused by such investigation, if any

27.    <u>SUBLANDLORD'S LIEN.</u>

Sublandlord hereby waives any and all rights it may have to a statutory or common law landlord's lien with respect to packages on or about the Premises that are not owned by Subtenant but are being shipped by Subtenant under contract with the owners of such packages. Sublandlord furthermore hereby subordinates any and all rights it may have to a statutory or common law landlord's lien on Subtenant's equipment and trade fixtures ("Personal Property"), to the lien of any institutional lender ("Lender") of Subtenant, and further agrees to execute any reasonable instruments evidencing such subordination, at any time or times hereafter, upon Subtenant's request; provided that such subordination is conditioned upon Lender maintaining a perfected lien on or security interest in the Personal Property. The foregoing subordination is to Lender and its successors and assigns only and not to any third party or any intervening lienors.

28.    <u>MISCELLANEOUS COVENANTS.</u>

A.     <u>No Waste</u>. Subtenant shall not commit or suffer to be committed any waste upon the Premises or any nuisance or other act or thing which may disturb the quiet enjoyment of any other tenant or occupant of the Premises.

B.     <u>Trash Removal</u>. Subtenant shall independently contract with contractors for the regular removal of Subtenant's garbage and refuse and shall pay the cost thereof.

C.     <u>Consents and Approvals</u>. In any instance when Sublandlord's consent or approval is required under this Sublease, Sublandlord's refusal to consent to or approve any matter or thing shall be deemed reasonable if such consent or approval has not been obtained from the Landlord, provided Sublandlord has used commercially reasonable efforts, not to include litigation, to obtain such consent. In the event that Subtenant shall seek the approval by or consent of Sublandlord and Sublandlord shall fail or refuse to give such consent or approval, Subtenant shall not be entitled to any damages for any withholding or delay of such approval or

consent by Sublandlord, it being intended that Subtenant's sole remedy shall be an action for injunction or specific performance and that said remedy of an action for injunction or specific performance shall be available only in those cases where Sublandlord shall have expressly agreed in writing not to unreasonably withhold or delay its consent.

D.    No Waiver. The failure of either party to insist in any one or more cases upon the strict performance or observance of any obligation hereunder or to exercise any right or option contained herein shall not be construed as a waiver or relinquishment for the future of any such obligation or any right or option. Sublandlord's receipt and acceptance of Base Rent or Additional Rent, or either party's acceptance of performance of any other obligation by the other party, with knowledge of the other party's breach of any provision of this Sublease, shall not be deemed a waiver o f such breach. No waiver by either party of any term, covenant or condition of this Sublease shall be deemed to have been made unless expressed in writing and signed by the party against whom such waiver is claimed.

E.    Successors and Assigns. The provisions of this Sublease, except as herein otherwise specifically provided, shall extend to, bind and inure to the benefit of the parties hereto and their respective personal representatives, heirs, successors and permitted assigns. In the event of any assignment or transfer of the leasehold estate under the Prime Lease, the transferor or assignor, as the case may be, shall be and hereby is entirely relieved and freed of all obligations under this Sublease.

F.    Interpretation. This Sublease shall be governed by and construed in accordance with the laws of the state in which the Premises are located, without regard to conflicts of laws principles. If any provision of this Sublease or the application thereof to any person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, the remainder of this Sublease and the application of that provision to other persons or circumstances shall not be affected but rather shall be enforced to the extent permitted by law. The table of contents, captions, headings and titles, if any, in this Sublease are solely for convenience of reference and shall not affect its interpretation. This Sublease shall be construed without regard to any presumption or other rule requiring construction against the party causing this Sublease to be drafted. If any words or phrases in this Sublease shall have been stricken out or otherwise eliminated, whether or not any other words or phrases have been added, this Sublease shall be construed as if the words or phrases so stricken out or otherwise eliminated were never included in this Sublease and no implication shall be drawn from the fact that said words or phrases were so stricken out or otherwise eliminated. Each covenant, agreement, obligation or other provision of this Sublease shall be deemed and construed as a separate and independent covenant of the party bound by, undertaking or making same, not dependent on any other provisions of this Sublease unless otherwise expressly provided. All terms and words used in this Sublease, regardless of the number or gender in which they are used, shall be deemed to include any other number and any other gender as the context may require. The word "person" as used in this Sublease shall mean a natural person or persons, a partnership, a corporation or any other form of business or legal association or entity. Time shall be of the essence of each and every obligation of the parties under this Sublease. This Sublease may be executed and delivered in two or more counterparts, all of which taken together shall constitute a single instrument.

G.    No Reservation. No employee or agent of Sublandlord, no broker, and no agent of any broker has authority to make or agree to take a sublease or any other agreement or undertaking in connection herewith, including but not limited to the modification, amendment or cancellation of a sublease. The mailing or delivery of this document by an employee or agent of Sublandlord, any broker or the agent of any broker to a potential Subtenant, its agent or attorney shall not be deemed an offer of Sublandlord or a reservation of or option for the Premises until such time as a sublease, duly executed by Sublandlord and Subtenant, is delivered to such potential Subtenant, its agent or attorney.

H.    No Partnership. Nothing contained in this Sublease shall be deemed or construed to create a partnership or joint venture of or between Sublandlord and Subtenant, or to create any relationship other than that of sublandlord and subtenant.

I.    No Representations. Neither party or its agent has made any representations or promises with respect to the Premises or the Building except as expressly set forth in this Sublease, and no rights, privileges, easements or licenses are granted to Subtenant except as expressly set forth in this Sublease.
J. Complete Agreement. There are no representations, agreements, arrangements or understandings, oral or written, between the parties relating to the subject matter of this Sublease which are not fully expressed in this Sublease. This Sublease cannot be changed or terminated orally or in any manner other than by a written agreement executed by both parties.

K.    Further Assurances. Each party to this Sublease will at its own cost and expense execute and deliver such further documents and instruments and will take such other actions as may be reasonably required or appropriate to evidence or carry out the intent and purposes of this Sublease.

L.    Incorporation. The Exhibits attached hereto are hereby incorporated by into this Sublease.

M.    Authority. Each individual executing this Sublease on behalf of his or her respective party represents and warrants that he or she is duly authorized to execute and deliver this Sublease on behalf of said entity in accordance with the governing documents of such entity, and that upon full execution and delivery this Sublease is binding upon said entity in accordance with its terms.

IN WITNESS WHEREOF, Sublandlord and Subtenant have hereunto executed this Sublease as of the day and year first above written.

SUBLANDLORD:

CIRCUIT CITY STORES, INC.

By: _____

Its: VICE PRESIDENT REAL ESTATE
     AND CONSTRUCTION

SUBTENANT:

DHL EXPRESS (USA), INC.

By: _____

Its: ACTING VICE PRESIDENT
     CORPORATE REAL ESTATE

30

## EXHIBIT A

[PLAN OF PROPERTY SHOWING LOCATION OF PREMISES]

Chehalis, WA

**EXHIBIT A**

## LEGAL DESCRIPTION
### AF NO. 9409586, VOL. 607, PG. 343

PARCEL A

That part of the northeast quarter of the southwest quarter of
Section 10, Township 13 North, Range 2 West, W.M., Lewis County,
Washington lying south of Maurin Road, described as follows:
COMMENCING at the northeast corner of said subdivision; thence
South 00°17'25" West along the east line of said subdivision
for 70.0 feet to a point on the southerly right of way of Maurin
Road and the True Point of Beginning; thence continuing South
00°17'25" West along said east line for 814.02 feet; thence South
89°53'33" West parallel with the north line of said subdivision
for 745.0 feet; thence North 00°06'27" West perpendicular to
said north line for 814.0 feet to the southerly line of Maurin
Road, thence North 89°53'33" East along said southerly line for
750.65 feet to the True Point of Beginning.
TOGETHER WITH an easement for drainage; being a part of the
northeast quarter of the southwest quarter of Section 10, Township
13 North, Range 2 West, W.M., Lewis County, Washington; a strip
20 feet in width, as measured perpendicular to and parallel with
the southerly right of way of Maurin Road; the north line being
congruent with the following described line:
COMMENCING at the northeast corner of said subdivision; thence
South 00°17'25" West along the east line of said subdivision
for 70.0 feet to the south line of Maurin Road; thence South
89°53'33" West along said south line for 750.65 feet to the
True Point of Beginning; thence South 89°53'33" West for
220.0 feet to the terminus, as set out under that certain Drainage
Easement and Agreement between The Port of Chehalis and CC
Distribution Company of Virginia, Inc., recorded on June 3, 1994 as
Document No. 9409116;  and Surface Water Runoff Easement and Agreement
between The Port of Chehalis and CC Distribution Company of Virginia,
Inc., recorded on June 3, 1994 as Document No. 9409118.


PARCEL B

The right to use for the purposes of ingress and egress: An
easement 80.0 feet in width, being the north 70.0 feet as
measured perpendicular to the north line of the northeast quarter
of the southwest quarter, and the south 10.0 feet as measured
perpendicular to the south line of the southeast quarter of the
northwest quarter of Section 10, Township 13 North, Range 2
West, W.M., Lewis County, Washington.   Except therefrom that
portion lying with the current Maurin Road, as set out under that
certain Access Agreement between The Port of Chehalis and CC
Distribution Company of Virginia, Inc., recorded on June 3, 1994 as
Document No. 9409117.

Chehalis, WA Cont'd

## EXHIBIT A

**PARCEL C (RETENTION POND EASEMENT)**
That part of the northeast quarter of the southwest quarter of
Section 10, Township 13 North, Range 2 West, Willamette Meridian,
Lewis County, Washington, lying south of Maurin Road, described
as follows:
Commencing at the northwest corner of said subdivision:   thence
South 00°16'41" West along the west line of said subdivision for
70.00 feet to a point on the southerly right of way of Maurin
Road and the True Point of Beginning:   thence North 89°53'33"
East along the southerly line of Maurin Road for 416.63 feet to
the intersection of said southerly line and the easterly limit of
Bonneville transmission line right of way:   thence South 25°40'09"
West along said easterly limit for 471.96 feet:   thence South
89°53'33" West for 214.25 feet to the west line of said
subdivision:   thence North 00°16'41" East along the west line of
said subdivision for 425.01 feet to the True Point of Beginning,
containing 134061.17 square feet, 3.078 acres.
Except therefrom that portion lying within the current Maurin Road.

EXHIBIT B

RULES AND REGULATIONS

1.     Subtenant shall not carry on any trade or occupation, or operate any instrument or apparatus or equipment which emits any odor or causes any noise or sound audible outside the Premises and/or which may be deemed offensive in nature.

2.     Subtenant shall not use, permit or suffer the use of the Premises, or any part thereof, as living, sleeping or lodging quarters, or other residential purpose.

3.     Subtenant shall not use the plumbing facilities for any purpose other than that for which the are constructed, and no grease or foreign substance of any kind shall be disposed of therein, and the expense of any breakage, stoppage or damage (whether on or off the Premises) resulting from any breach thereof shall be borne by Subtenant.

4.     Subtenant shall not obstruct the passageways, driveways, approachways, walks, roadways, exits and entries in, to and from the Premises.

5.     Neither Subtenant, its agents, employees or contractors shall enter upon or have access to any roof at the Premises without Sublandlord's express prior consent in each instance.

6.     All trash, refuse and waste materials shall be regularly removed from the Premises, and until removal shall be stored (i) in adequate containers, which such containers shall be located so as not to be visible to the general public, and (ii) so as not to constitute any health or fire hazard or nuisance to any other occupant of or other person in the Premises. No burning of trash, refuse or waste materials shall occur. Subtenant shall not throw, discard or deposit any paper, glass or extraneous matter of any kind, except in designated receptacles, or create litter or hazards of any kind; nor deface, damage or demolish any part of the Premises or any sign, light standard or fixture, landscaping materials or other improvements within the Premises, or the Premises of any customers, business invitees or employees situated within the Premises.

7.     If the Premises be or become infested with vermin, pests or termites, Subtenant shall at Subtenant's expense cause the same to be exterminated from time to time to the reasonable satisfaction of Sublandlord and shall employ such exterminators and such exterminating company or companies as shall be approved by Sublandlord.

8.     Subtenant shall not install, operate or maintain in the Premises any electrical equipment which will overload the electrical system therein, or any part thereof, beyond its reasonable capacity for proper and safe operation as determined by Sublandlord in relation to the overall system and requirements therefor in the Premises, or which does not bear Underwriter's approval.

EXHIBIT C

FIRE MONITORING CONTACT LIST

EXHIBIT C
LIST OF FIRE MONITORING CONTACTS

Upon sublease execution, fax this form directly to:
ADT Security Service, Inc. - Fax No. 1-888-303-4395

Effective Date: 4/15/06
Subtenant: DHL Express
Location Name: Chehalis WA (Distribution Center)
Location Address: 208 Mauro Rd
Location No. #6028
Location Type:

☐ Store
☒ Roadshop
☐ Service Center
☐ Distribution Facility
☐ Office

Call list information (in order of notification):

| Contact: | Position: | Work Phone: | Pager: | Cell Phone: | Home Phone: |
|---|---|---|---|---|---|
| Johnson Controls | Monitoring Facility | 866-662-6498 | | | |
| | | | | | |
| | | | | | |
| | | | | | |

This service monitors all locations for DHL.

C-1

# EXHIBIT D

## PRIME LEASE

LOCATION:       208
191 Maurin Road
Chehalis, WA 75605
(Lewis County)

**LEASE**

between

**CIRCUIT CITY STORES, INC.,**

as Tenant

and

**BOND C.C. I DELAWARE BUSINESS TRUST**

as Landlord

dated June 29, 1995

MWBB 6/26/95
\circuit\inland\lease.wa

## Table of Contents

1. Certain Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2. Demise of Premises . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

3. Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

4. Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

5. Net Lease; True Lease . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

6. Title and Condition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

7. Taxes; Insurance and Legal Requirements . . . . . . . . . . . . . . . . . . . . . . 10

8. Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

9. Maintenance and Repair . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

10. Liens . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

11. Alterations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

12. Condemnation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

13. Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

14. Damage, Destruction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

15. Restoration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

16. Subordination to Financing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

17. Assignment, Subleasing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

18. Permitted Contests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

19. Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

20. Landlord's Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

MWBB 6/26/95
\circuit\inland\lease.wa

i

21. Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

22. Memorandum of Lease; Estoppel Certificates . . . . . . . . . . . . . . . . . . . . . . . 33

23. Surrender and Holding Over . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

24. No Merger of Title . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

25. Landlord Exculpation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

26. Hazardous Substances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

27. Entry by Landlord . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

28. Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

29. No Usury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

30. Broker . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

31. Waiver of Landlord's Lien . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

32. No Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

33. Separability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

34. Indemnification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

35. Tenant to Comply With Reciprocal Easement Agreement . . . . . . . . . . . . . . . . . 41

36. Headings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

37. Modifications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

38. Successors, Assigns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

39. Counterparts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

40. Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

41. Lender as Third Party Beneficiary . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

MWBB 6/26/95
\circuit\inland\lease.wa

ii



**42.** <u>Exculpation of Trustee</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **42**

**43.** <u>Substitution of Property</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **43**

MWBB 6/26/95
\circuit\inland\lease.wa

iii



THIS LEASE AGREEMENT is made as of this ___ day of June, 1995, by and between **BOND C.C. I DELAWARE BUSINESS TRUST**, a Delaware business trust, having an office at c/o Bond C.C. Limited Partnership, 2901 Butterfield Road, Oak Brook, Illinois 60521 ("Landlord"), and **CIRCUIT CITY STORES, INC.**, a Virginia corporation, having its principal office at 9950 Mayland Drive, Richmond, Virginia 23233-1464 ("Tenant").

In consideration of the rents and provisions herein stipulated to be paid and performed, Landlord and Tenant hereby covenant and agree as follows:

1.      <u>Certain Definitions</u>.

(a)      "Additional Rent" shall mean all sums required to be paid by Tenant to Landlord hereunder other than Basic Rent, which sums shall constitute rental hereunder.

(b)      "Adjoining Property" shall mean all sidewalks, curbs, gores and vault spaces adjoining any of the Leased Premises.

(c)      "Alteration" or "Alterations" shall mean any or all changes, additions, improvements, reconstructions or replacements of any of the Improvements, both interior or exterior, and ordinary and extraordinary.

(d)      "Basic Rent" shall mean Basic Rent as defined in Paragraph 4.

(e)      "Basic Rent Payment Dates" shall mean the Basic Rent Payment Dates as defined in Paragraph 4.

(f)      "Commencement Date" shall mean the Commencement Date as defined in Paragraph 3.

(g)      "Condemnation" shall mean a Taking and/or a Requisition.

(h)      "Default Rate" shall mean an annual rate of interest equal to two (2%) percent per annum above the therein current Prime Rate.

(i)      "Event of Default" shall mean an Event of Default as defined in Paragraph 19.

(j)     "Insurance Requirement" or "Insurance Requirements" shall mean, as the case may be, any one or more of the terms of each insurance policy required to be carried by Tenant under this Lease and the requirements of the issuer of such policy, and whenever Tenant shall be engaged in making any Alteration or Alterations, repairs or construction work of any kind (collectively, "Work"), the term "Insurance Requirement" or "Insurance Requirements" shall be deemed to include a requirement that Tenant obtain or cause its contractor to obtain completed value builder's risk insurance when the estimated cost of the Work in any one instance exceeds the sum of One Hundred Thousand ($100,000.00) Dollars and that Tenant or its contractor shall obtain worker's compensation insurance or other adequate insurance coverage covering all persons employed in connection with the Work, whether by Tenant, its contractors or subcontractors and with respect to whom death or bodily injury claims could be asserted against Landlord.

(k)     "Law" shall mean any constitution, statute or rule of law.

(l)     "Legal Requirement" or "Legal Requirements" shall mean, as the case may be, any one or more of all present and future laws, codes, ordinances, orders, judgments, decrees, injunctions, rules, regulations and requirements, even if unforeseen or extraordinary, of every duly constituted governmental authority or agency (but excluding those which by their terms are not applicable to and do not impose any obligation on Tenant, Landlord or the Leased Premises) and all covenants, restrictions and conditions now or hereafter of record which may be applicable to Tenant, to Landlord or to any of the Leased Premises, or to the use, manner of use, occupancy, possession, operation, maintenance, alteration, repair or reconstruction of any of the Leased Premises, even if compliance therewith (i) necessitates structural changes or improvements (including changes required to comply with the "Americans with Disabilities Act") or results in interference with the use or enjoyment of any of the Leased Premises or (ii) requires Tenant to carry insurance other than as required by the provisions of this Lease.

MWBB 6/26/95
\circuit\inland\lease.wp

2

(m)     "Lender" shall mean the entity identified to Tenant as such in writing, which makes a Loan to Landlord, secured by a Mortgage and evidenced by a Note or which is the holder of a Mortgage and Note as a result of an assignment thereof.

(n)     "Loan" shall mean a loan made by a Lender to Landlord secured in whole or in part by a Mortgage and evidenced by a Note.

(o)     "Mortgage" shall mean a first priority mortgage or similar security instrument hereafter executed covering the Leased Premises from Landlord to Lender.

(p)     "Net Award" shall mean the entire award payable to Landlord by reason of a Condemnation, less any actual and reasonable expenses incurred by Landlord in collecting such award.

(q)     "Net Proceeds" shall mean the entire proceeds of any property casualty insurance required under Paragraph 13.(a), less any actual and reasonable expenses incurred by Landlord in collecting such proceeds.

(r)     "Note" or "Notes" shall mean a promissory note or notes hereafter executed from Landlord to Lender, which Note or Notes will be secured in whole or in part by a Mortgage and an assignment of leases and rents.

(s)     "Permitted Encumbrances" shall mean those covenants, restrictions, reservations, liens, conditions, encroachments, easements and other matters of title that affect the Leased Premises as of Landlord's acquisition thereof, excepting, however, any such matters arising from the acts of Landlord (such as liens arising as a result of judgments against Landlord).

(t)     "Prime Rate" shall mean the rate of interest announced publicly by Citibank, N.A. or its successor, from time to time, as Citibank, N.A.'s or such successor's base rate, or if there is no such base rate, then the rate of interest charged by Citibank, N.A. or such successor to its most creditworthy customers on commercial loans having a ninety (90) day duration.

(u)     "Requisition" shall mean any temporary condemnation or confiscation of the use or occupancy of any of the Leased Premises by any governmental

authority, civil or military, whether pursuant to an agreement with such governmental authority in settlement of or under threat of any such requisition or confiscation, or otherwise.

(v)     "Restoration" shall mean the restoration of the Leased Premises after any Taking or damage by casualty as nearly as possible to their value, condition and character existing immediately prior to such Taking or damage.

(w)     "State" shall mean the State or Commonwealth in which the Leased Premises are situate.

(x)     "Taking" shall mean any taking of any of the Leased Premises in or by condemnation or other eminent domain proceedings pursuant to any law, general or special, or by reason of any agreement with any condemnor in settlement of or under threat of any such condemnation or other eminent domain proceedings or by any other means, or any *de facto* condemnation.

(y)     "Taxes" shall mean taxes of every kind and nature (including real, *ad valorem* and personal property, income, franchise, withholding, profits and gross receipts taxes), all charges and/or taxes for any easement or agreement maintained for the benefit of any of the Leased Premises, all general and special assessments, levies, permits, inspection and license fees, all utility charges, all ground rents, and all other public charges and/or taxes whether of a like or different nature, even if unforeseen or extraordinary, imposed upon or assessed, prior to or during the Term, against Landlord, Tenant or any of the Leased Premises as a result of or arising in respect of the occupancy, leasing, use, maintenance, operation, management, repair or possession thereof, or any activity conducted on the Leased Premises, or the Basic Rent or Additional Rent, including without limitation, any gross income tax, sales tax, occupancy tax or excise tax levied by any governmental body on or with respect to such Basic Rent or Additional Rent.

(aa)    "Term" shall mean the initial term of this Lease, as extended pursuant to any renewal that has become effective.

(bb)    "Termination Date" shall mean the Termination Date as defined in Paragraph 12.(b).

MWBB 6/26/95
\circui\Inland\lease.wn

4

(cc)    "Trade Fixtures" shall mean all warehouse racking systems, counters, cases, shelving and similar fixtures, which are owned by Tenant and used in the operation of the business conducted on the Leased Premises.

2.    Demise of Premises. Landlord hereby demises and lets to Tenant and Tenant hereby takes and leases from Landlord for the Term and upon the provisions hereinafter specified the following described property (collectively, the "Leased Premises"):   (i) the premises described in Exhibit "A" attached hereto and made a part hereof together with the easements, rights and appurtenances thereunto belonging or appertaining (collectively, the "Land"); (ii) the buildings, structures, fixtures and other improvements constructed and to be constructed on the Land (collectively, the "Improvements"), together with all additions and accessions thereto, substitutions therefor and replacements thereof permitted by this Lease excepting therefrom Tenant's Trade Fixtures.

3.    Term. Tenant shall have and hold the Leased Premises for an initial term commencing on June 29, 1995 (the "Commencement Date") and ending on June 30, 2017 (the "Expiration Date").   Provided the Lease shall not have been terminated pursuant to the provisions hereof, this Lease and the term thereof shall be automatically extended for two (2) renewal terms of ten (10) years each upon condition that (a) at the commencement of each renewal term, no Event of Default shall exist, and (b) Tenant may cancel any renewal term by giving notice, in accordance with the provisions of Paragraph 21, to Landlord at least twelve (12) months prior to the expiration of the then current Term.   Upon the giving of such notice this Lease and the term thereof shall terminate and come to an end on the Expiration Date of the then current Term.   Any such extension or renewal of the Term shall be subject to all of the provisions of this Lease, and all such provisions shall continue in full force and effect, except that the Basic Rent for each renewal term shall be the amounts determined in accordance with the schedule set forth in Exhibit "B" attached hereto and made a part hereof.   In the event that Tenant exercises its option to cancel any renewal Term as hereinabove provided, then Landlord shall have the right in addition to any rights granted in Paragraph 27, during the remainder of the Term then in effect to (i) advertise the availability of the Leased Premises for sale or for



reletting, and (ii) show the Leased Premises to prospective purchasers, lenders or tenants at such reasonable times during normal business hours as Landlord may select.  If Tenant shall timely give such notice of its election to cancel any renewal option, then all options with regard to subsequent extensions or renewals of the Term shall expire and be null and void.

      4.    <u>Rent</u>.

      (a)    Tenant shall pay to Landlord or Lender, if directed by Landlord, as annual rent for the Leased Premises during the Term, the amounts determined in accordance with the schedule set forth in Exhibit "B" attached hereto and made a part hereof ("Basic Rent"), which rent shall be paid in equal monthly installments commencing on the last day of the first month next following the Commencement Date and continuing on the last day of each month thereafter during the Term (the said days being called the "Basic Rent Payment Dates"), and shall pay the same at Landlord's address set forth below, or at such other place or to such other person or persons (not exceeding four (4) in number) and in such proportions as Landlord from time to time may designate to Tenant in writing, in funds which at the time of such payment shall be legal tender for the payment of public or private debts in the United States of America and if required by Lender by wire transfer in immediately available federal funds to such account in such bank as Lender shall designate from time to time.  Pro rata Basic Rent for the period from the Commencement Date to the first day of the month next following the Commencement Date shall be computed as set forth in Exhibit "B" and shall be paid in advance on the Commencement Date, except that if the Commencement Date shall occur on the first day of a calendar month, the full monthly installment of Basic Rent shall be paid on the last day of the month in which the Commencement Date shall occur.

      (b)    If any installment of Basic Rent is not paid on the date due, Tenant shall pay Landlord interest on such overdue payment at the Default Rate, accruing from the due date of such payment until the same is paid.

      (c)    Tenant shall pay and discharge before the imposition of any fine, lien, interest or penalty may be added thereto for late payment thereof, as Additional Rent, all other amounts and obligations which Tenant assumes or agrees to pay or discharge pursuant to



this Lease, together with every fine, penalty, interest and cost which may be added by the party to whom such payment is due for nonpayment or late payment thereof. In the event of any failure by Tenant to pay or discharge any of the foregoing, Landlord shall have all rights, powers and remedies provided herein, by law or otherwise, in the event of nonpayment of Basic Rent.

        5.      Net Lease; True Lease. (a) It is the intention of the parties hereto that the obligations of Tenant hereunder shall be separate and independent covenants and agreements, and that Basic Rent, Additional Rent and all other sums payable by Tenant hereunder shall continue to be payable in all events, and that the obligations of Tenant hereunder shall continue unaffected, unless the requirement to pay or perform the same shall have been terminated pursuant to an express provision of this Lease. This is a net Lease and Basic Rent, Additional Rent and all other sums payable hereunder by Tenant shall be paid without notice or demand, and without setoff, counterclaim, recoupment, abatement, suspension, deferment, diminution, deduction, reduction or defense. This Lease shall not terminate and Tenant shall not have any right to terminate this Lease, during the Term (except as otherwise expressly provided herein). Tenant agrees that, except as otherwise expressly provided herein, it shall not take any action to terminate, rescind or avoid this Lease notwithstanding (i) the bankruptcy, insolvency, reorganization, composition, readjustment, liquidation, dissolution, winding-up or other proceeding affecting Landlord, (ii) the exercise of any remedy, including foreclosure, under the Mortgage, or (iii) any action with respect to this Lease (including the disaffirmance hereof) which may be taken by Landlord under the Federal Bankruptcy Code or by any trustee, receiver or liquidator of Landlord or by any court under the Federal Bankruptcy Code or otherwise. Tenant waives all rights which are not expressly stated herein but which may now or hereafter otherwise be conferred by law to quit, terminate or surrender this Lease or any of the Leased Premises; to any setoff, counterclaim, recoupment, abatement, suspension, deferment, diminution, deduction, reduction or defense of or to Basic Rent, Additional Rent or any other sums payable under this Lease, except as otherwise expressly provided herein; and for any statutory lien or offset right against Landlord or its property.

MWBB 6/26/95
\circui\Inland\lease.wa

7