Gregg M. Galardi, Esq.
Ian S. Fredericks, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
One Rodney Square
PO Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

Dion W. Hayes (VSB No. 34304)
Douglas M. Foley (VSB No. 34364)
MCGUIREWOODS LLP
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

           - and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
333 West Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

Counsel to the Debtors and
Debtors in Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | | |
|---|---|---|
| - - - - - - - - - - - - - - x | | |
| In re: | : | Chapter 11 |
| | : | |
| CIRCUIT CITY STORES, INC., | : | Case No. 08-35653 (KRH) |
| et al., | : | |
| | : | |
| Debtors. | : | Jointly Administered |
| - - - - - - - - - - - - - - x | | |

**DEBTORS' MOTION FOR ORDERS PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 363 AND 364 (I)(A) APPROVING PROCEDURES IN CONNECTION WITH SALE OF ALL OR SUBSTANTIALLY ALL OF THE BUSINESS OR ADDITIONAL POST-PETITION FINANCING FOR THE BUSINESS, (B) AUTHORIZING DEBTORS TO ENTER INTO STALKING HORSE OR FINANCING AGREEMENTS IN CONNECTION WITH GOING CONCERN TRANSACTIONS OR STALKING HORSE AGREEMENTS IN CONNECTION WITH STORE CLOSING AND MISCELLANEOUS ASSET SALES, (C) APPROVING THE PAYMENT OF TERMINATION FEES IN CONNECTION THEREWITH, AND (D) SETTING AUCTION AND HEARING DATES, (II) APPROVING SALE OF DEBTORS' ASSETS FREE AND CLEAR OF ALL INTERESTS AND (III) GRANTING RELATED RELIEF**

The debtors and debtors in possession in the above-captioned jointly administered cases (collectively, the "Debtors")[1] hereby move (the "Motion"), pursuant to sections 105, 363 and 364 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 4001, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of orders (I)(A) approving procedures in connection with soliciting bids for a sale of all or substantially all of the business or additional post-petition financing for the business, (B) authorizing the Debtors to enter into stalking horse or financing agreements in connection with Going Concern Transactions (as defined below) or stalking horse agreements in connection with Store Closing and Miscellaneous Asset Sales (each as defined below) and,

---

[1]   The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Circuit City Stores, Inc. (3875), Circuit City Stores West Coast, Inc. (0785), InterTAN, Inc. (0875), Ventoux International, Inc. (1838), Circuit City Purchasing Company, LLC (5170), CC Aviation, LLC (0841), CC Distribution Company of Virginia, Inc. (2821), Circuit City Properties, LLC (3353), Kinzer Technology, LLC (2157), Abbott Advertising Agency, Inc. (4659), Patapsco Designs, Inc.(6796), Sky Venture Corp. (0311), PRAHS, INC. (n/a), XSStuff, LLC (9263), Mayland MN, LLC (6116), Courchevel, LLC (n/a), Orbyx Electronics, LLC (3360), and Circuit City Stores PR, LLC (5512).  The address for Circuit City Stores West Coast, Inc. is 9250 Sheridan Boulevard, Westminster, Colorado 80031.  For all other Debtors, the address is 9950 Mayland Drive, Richmond, Virginia 23233.

(C) approving the Debtors' payment of a Termination Fee
(as defined below) in connection therewith, and (D)
scheduling Auction and Hearing Dates (as defined below),
(II) approving the sale of the Debtors' assets free and
clear of all interests, and (III) granting related
relief.  In support of the Motion, the Debtors
respectfully represent as follows:

### JURISDICTION AND VENUE

1.    This Court has jurisdiction to consider
this Motion under 28 U.S.C. §§ 157 and 1334.  This is a
core proceeding under 28 U.S.C. § 157(b).  Venue of
these cases and this Motion in this District is proper
under 28 U.S.C. §§ 1408 and 1409.

2.    The statutory predicates for the relief
requested herein are Bankruptcy Code sections 105, 363
and 364 and Bankruptcy Rules 4001, 6004 and 6006.

### BACKGROUND

3.    On November 10, 2008 (the "Petition
Date"), the Debtors filed voluntary petitions in this
Court for relief under chapter 11 of the Bankruptcy Code.

4.     The Debtors continue to manage and operate their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.

5.     On November 12, 2008, the Office of the United States Trustee for the Eastern District of Virginia appointed a statutory committee of unsecured creditors (the "Creditors' Committee").  To date, no trustee or examiner has been appointed in these chapter 11 cases.

6.     Based in Richmond, Virginia, the Debtors constitute a leading specialty retailer of consumer electronics and operate large nationwide electronics stores throughout the United States and Puerto Rico that sell, among other things, televisions, home theatre systems, computers, camcorders, furniture, software, imaging and telecommunications products, and other audio and video electronics.

## RELIEF REQUESTED

7.     By this Motion, the Debtors seek (I) entry of an order, substantially in the form attached hereto (the "Bidding Procedures Order") (A) approving procedures for (i) submitting bids for any or all of the

4

Debtors' assets or businesses or submitting financing

alternatives (the "Bids"), (ii) conducting an auction

(the "Auction") with respect to any assets or businesses

on which the Debtors receive more than one Bid

("Competing Bids"); (B) authorizing, but not requiring,

the Debtors to (i) enter into a "stalking horse"

agreement(s) (each a "Stalking Horse Agreement") with a

bidder (the "Stalking Horse Bidder") for the purpose of

establishing a minimum acceptable bid at which to begin

the Going Concern Auction and, if in the best interests

of the Debtors' estates, Store Closing and Miscellaneous

Asset Auctions (each as defined below); (ii) provide a

Stalking Horse Bidder with a fee (the "Termination Fee")

up to, but not greater than 2.0%, of the cash purchase

price set forth in the Stalking Horse Agreement and (iii)

enter into financing agreements; and (C) scheduling the

Auctions for January 13, 2009 (and, if necessary,

January 14, 2009) and a hearing (the "Hearing") with

respect to any Bid(s) or proposals accepted by the

Debtors for January 16, 2009, (II) entry of one or more

orders approving the sale of the Debtors or all or

certain of the Debtors' assets free and clear of all

interests and/or additional post-petition financing for the business, and (III) entry of one or more orders granting related relief.

## BASIS FOR RELIEF

### A.    The Debtors' Pre-petition Restructuring Efforts.

8.    As of the end of the Debtors' last fiscal year, the Debtors had experienced two consecutive years with operational losses.  These losses were attributable to a number of factors similarly affecting retailers across the United States and Canada, including tightening of and disruption in credit markets and the resulting impact on consumer spending, as well as the continuing decline in margins for consumer electronic products and competition from other retailers like Amazon.com, Best Buy and Wal-Mart.

9.    Prior to the Petition Date, these losses were funded by increased borrowings under the Debtors' pre-petition secured revolving credit facility, leading to outstanding borrowings as of the Petition of not less than $898 million.  These outstanding borrowings, along with reductions in the borrowing base under the

6

prepetition facility, ultimately reduced the Debtors'
available liquidity and jeopardized continued operations.

10.    In response, the Debtors developed and
began to institute an aggressive program designed to
improve operating performance and address liquidity
concerns.  As part of this program, the Debtors began
the process of conducting sales at and closing 155 of
their stores (the "Initial Store Closing Sales").  In
addition, the Debtors and their advisors aggressively
pursued various restructuring alternatives, including an
equity investment, a refinancing of their prepetition
secured credit facility, additional financing, and a
sale of some or all of the Debtors' assets.

11.    To this end, the Debtors retained
Rothschild Inc. ("Rothschild") as their investment
banker and FTI Consulting, Inc. ("FTI") as their
financial advisor.

12.    Before Rothschild was retained, the
Debtors had retained Goldman Sachs & Co. to assist the
Debtors with evaluating a proposal from Blockbuster, Inc.
After the Blockbuster proposal was rescinded, Goldman

Sachs continued to explore strategic alternatives and
otherwise assist the Company until September 2008.

13.    Thereafter, Rothschild was retained to
continue to pursue strategic alternatives, including
sources of equity investment capital, as well as
strategic partners or going concern purchasers.  Prior
to the Petition Date, Rothschild actively marketed the
Debtors' businesses and operations and compiled a list
of potential purchasers and strategic partners for the
Debtors businesses or any portion thereof.  Additionally,
Rothschild's affiliate has been actively marketing the
Debtors' Canadian businesses and assets.

14.    FTI was retained as the Debtors'
financial advisor and to assist the Debtors with
financing alternatives, including efforts to obtain
alternate financing or refinance the Debtors'
prepetition secured indebtedness and obtaining
additional sources of financing.

15.    Although the Debtors attempted to
accomplish their restructuring objectives out-of-court,
they were unsuccessful.  Therefore, the Debtors filed
these chapter 11 cases.

8

**B.    The DIP Facility And The DIP Amendment.**

16.    As part of their restructuring, with
FTI's assistance, the Debtors obtained post-petition
financing (the "DIP Facility") from certain of their
prepetition lenders (the "DIP Lenders"), including Bank
of America, N.A., as agent (the "DIP Agent").   The DIP
Facility was comprised of two parts -- refinancing of
prepetition secured debt and provision for additional
borrowings.

17.    The DIP Facility also contained certain
restructuring milestones.   Among others, the DIP
Facility required that the Debtors obtain a Term Loan
(as defined in the DIP Credit Agreement[2]) in an amount
not less than $75 million by January 17, 2009.   See DIP
Credit Agreement § 5.15.   Additionally, the DIP Facility
required that the Debtors solicit bids and obtain a
stalking horse bid for the liquidation sale of their
assets by early March 2009.   See DIP Credit Agreement §
5.18(d).

---

[2]    "DIP Credit Agreement" means the Senior Secured, Super Priority,
    Debtor-In-Possession Credit Agreement dated as of November 12,
    2008.

9

18.   Before the Debtors proceeded with
approval of the DIP Facility on a final basis, the
Creditors' Committee informally objected to the DIP
Facility.  Thereafter, the DIP Agent and Lenders, the
Creditors' Committee, and the Debtors engaged in
extensive negotiations over various terms of the DIP
Facility.  As part of a resolution with the Creditors'
Committee, the DIP Agent and Lenders and the Debtors
agreed to amend the DIP Facility by, among other things,
deleting DIP Credit Agreement § 5.15 and substantially
modifying § 5.18(d) (the "DIP Amendment").  See DIP
Amendment at 3, ¶4.

19.   Pursuant to the DIP Amendment, the DIP
Agent and Lenders increased the Debtors availability by
removing certain reserves and relaxing minimum
availability requirements.  Additionally, the DIP Agent
and Lenders also removed the requirement that the
Debtors obtain a Term Loan and altered the bid
requirements for a sale of the Debtors' assets.

20.   The DIP Amendment altered the sale
process by requiring that the Debtors adhere to a
revised and expedited process.  Specifically, the

Debtors were required to distribute information packets
and file this Motion by no later than January 5, 2009.
The Amendment also set the January 16, 2009 hearing as
the outside date by which this Court must approve a sale
of the Debtors' business and assets.

**C.    The Debtors' Marketing Efforts.**

21.    Using the DIP Facility to backstop their
operations, since the Petition Date, the Debtors
continued to pursue various restructuring alternatives,
including a stand-alone plan, transactions with
strategic partners and sales of all or certain aspects
of their business.

22.    Since the Petition Date, Rothschild has
been actively contacting strategic partners, industry
leaders, and other potential purchasers concerning a
going concern sale of the Debtors.  Rothschild's efforts
resulted in interest from multiple third parties.
Indeed, various third parties signed confidentiality
agreements and conducted due diligence.

23.    Although the Debtors have not received a
formal offer, over the past several days, the Debtors
have been engaged in significant discussions, meetings,

11

and negotiations with two highly motivated and
interested parties concerning the terms of a Going
Concern Transaction.  Specifically, the interested
parties are considering additional financing to allow
the Debtors to sustain operations and move forward with
a subsequent restructuring through a stand-alone plan
and/or purchasing the Debtors or all or substantially
all of the Debtors' assets pursuant to Bankruptcy Code
section 363 or as part of a plan transaction.

   24.    In addition to ongoing communications
with the Debtors, at least one interested party has been
involved in face-to-face meetings and negotiations with
the DIP Agent and certain DIP Lenders, as well as some
of the Debtors' largest merchandise vendors.  Following
these meetings, the Debtors received positive feedback
from all parties involved in such meetings.

   25.    Based on the foregoing, the Debtors
remain hopeful that they will receive a Bid
contemplating a Going Concern Transaction.

   26.    In addition to these efforts, the
Debtors also retained DJM Realty Services, Inc. as their
real estate consultant to develop and implement an

action plan with respect to owned and lease real
property.

**D.    Need For Expedited Relief.**

27.   The Debtors seek approval of an
expedited process for two primary reasons.

28.   First, under the DIP Facility, as
amended by the DIP Amendment, the Debtors are required
to seek approval of the expedited process described in
this Motion.

29.   Second, the Debtors (and the retail
industry as a whole) are facing macro-economic
conditions that are among the worst in history.  Poor
macro-economic conditions have caused declines in
consumer confidence and consumer spending, both of which
directly and significantly impact the Debtors'
businesses.  Indeed, notwithstanding conservative
revenue projections at the outset of these cases, the
Debtors' revenues have been below their projections.
Similarly, revenue generated from the Initial Store
Closing Sales was sluggish and did not generate the
liquidity infusion projected by the Debtors and the
agent conducting the Initial Store Closing Sales.

However, management has been able to manage expenses in
a manner that has resulted in the Debtors exceeding
their availability and liquidity forecasts.

      30.   Poor macro-economic conditions and the
Debtors' worse than anticipated performance also
contributed to further erosion of vendor confidence.  As
a result, many vendors, including some of the Debtors'
key merchandise vendors, were unwilling to relax strict
trade terms or provide meaningful trade credit.  Indeed,
many vendors continued to provide goods or services only
on cash in advance terms.

      31.   In light of the foregoing and in
particular the results of the Initial Store Closing
Sales, the Debtors, the DIP Agent and Lenders, and the
Creditors' Committee grew increasingly concerned that
future appraisals of DIP Lenders' collateral would be
lower than expected.  A lower than expected appraisal
would directly impact the Debtors' availability under
DIP Facility, which, in turn, could strangle the Debtors
ability to continue to operate.

      32.   Faced with these conditions, the Debtors,
after consultation with their advisors, as well as the

Creditors' Committee and the DIP Agent, determined that

an immediate sale of their business as a going concern

or additional financing to facilitate a successful

restructuring was in the best interests of creditors and

other parties in interest.

33.   Thus, the Debtors filed this Motion

seeking approval of a process, including bid procedures,

pursuant to which the Debtors will solicit a Stalking

Horse Bidder or Bidders for all or part of their

business.  As part of the process, the Debtors will

solicit offers for a sale of some or all of the Debtors'

assets as a going concern, a proposal for a sale or

other transaction under a plan, or a financing proposal

that will provide the Debtors with additional liquidity

to complete a stand-alone restructuring, a going concern

sale, or a plan transaction (the "Going Concern

Transactions") under Bankruptcy Code sections 105, 363

and 364.  Additionally, to ensure compliance with their

obligations under the DIP Facility, the Debtors will

solicit offers for (1) a sale of the Debtors' inventory

through store closings and liquidations (the "Store

Closing Sales") and (2) a sale of certain of the

15

Debtors' assets such as any inventory at any stores,
store, warehouse, and distribution center leases, owned
real property, the firedog$^{SM}$ assets, including related
internet operations conducted through www.firedog.com,
the Debtors other internet operations, including
operations conducted through www.circuitcity.com,
corporate airplanes, and other miscellaneous assets (the
"Miscellaneous Asset Sales") under Bankruptcy Code
sections 105 and 363.  Although the Debtors are seeking
any and all proposals related to their businesses and
assets, as discussed above, the Debtors remain hopeful
that they will receive a proposal for a Going Concern
Transaction that will be the highest or otherwise best
proposal.

        34.   As part of a Going Concern Transaction,
the Debtors may receive a proposal for all or portions
of their Canadian operations or assets.  Because the
process by which the Debtors will sell their Canadian
operations and assets is being managed by the Canadian
court, if the Debtors receive such a proposal, the
Debtors will coordinate with the monitor and other

parties involved in the Canadian restructuring process
and the Canadian court.

35.    The Debtors believe that conducting an
auction with respect to each of Going Concern
Transaction, Store Closing Sale, and Miscellaneous Asset
Sale (each an "Auction") and a final auction (the "Final
Auction", and collectively with each Auction, the
"Auctions") among the bidders submitting the highest or
otherwise best offers will enable them to best assess
their restructuring alternatives and maximize value and
minimize expenses incurred.

36.    To help ensure the Debtors receive the
highest or otherwise best proposal for their businesses
and assets, the Debtors developed the Bidding Procedures.

**BIDDING PROCEDURES**[3]

**A.    The Auctions.**

37.    **The Bid Deadline and the Auctions**.    The
Debtors propose that all proposals must be submitted on
or before January 10, 2009 at 5:00 p.m. (Eastern) (the
"Bid Deadline").   The Debtors propose that on January 13,
2009, and, if necessary, January 14, 2009, they will
hold the Auctions among those bidders that have
submitted qualified proposals for any of the Auctions in
accordance with the Bidding Procedures (collectively,
the "Qualified Bidders").   The Auctions will take place
at the offices of Skadden, Arps, Slate, Meagher & Flom,
LLP at 4 Times Square, New York, NY 10036 beginning at
10:00 a.m. (Eastern).   The Qualified Bidders who wish to
participate in an Auction, or their authorized
representative, must be present, in person or by phone,
for the Auctions.

38.    By agreement with the DIP Agent and the
Creditors' Committee, the Debtors are only permitted to

---

[3]    This section of the Motion constitutes a summary of the Bidding
Procedures.   In the event there is a conflict between the Motion
and the Bidding Procedures, the Bidding Procedures shall control.

18

extend the Bid Deadline and the start of any Auction

after consultation with counsel to the Creditors'

Committee and counsel to the DIP Agent.  However, the

Debtors are not permitted to extend the Bid Deadline

beyond January 12, 2008 without DIP Agent's and the

Creditors' Committee's consent or further order of the

Court.

39.  **Going Concern Auction**.  The Debtors will

tentatively commence the first auction (the "Going

Concern Auction") on January 13, 2009, or, if necessary,

January 14, 2009, at 10:00 a.m. (Eastern) among those

Qualified Bidders that submit qualified proposals for

the Going Concern Auction in accordance with the Bidding

Procedures (the "Qualified Going Concern Bidders").

During the Going Concern Auction the Debtors will accept

competing proposals to purchase some or all of the

Debtors' assets as a going concern, a proposal for a

sale or other transaction under a plan, or a financing

proposal that will provide the Debtors with additional

liquidity to complete a stand-alone restructuring, a

going concern sale, or a plan transaction.  Bidding in

the Going Concern Auction will remain open until all

19

Qualified Going Concern Bidders who opt to bid have
submitted their highest or otherwise best proposal for a
Going Concern Transaction.

40.   **Store Closing Auction**.  The Debtors will
tentatively commence the second auction (the "Store
Closing Auction") on January 13, 2009 at 1:00 p.m.
(Eastern) or following the close of bidding in the Going
Concern Auction among those Qualified Bidders that
submit qualified proposals for the Store Closing Auction
in accordance with the Bidding Procedures (the
"Qualified Store Closing Bidders").  During the Store
Closing Auction the Debtors will accept competing
proposals to conduct Store Closing Sales with respect to,
among other things, the inventory and fixtures and
equipment located at some or all of the Debtors' retail
stores and distribution centers.  Bidding in the Store
Closing Auction will remain open until all Qualified
Store Closing Bidders who opt to bid have submitted
their highest or otherwise best proposals for the Store
Closing Sales.

41.   **Miscellaneous Asset Auction**.  The
Debtors will tentatively commence the third auction (the

Miscellaneous Asset Auction) on January 13, 2009 at 4:00 p.m. (Eastern) or following the close of bidding in the Store Closing Auction among those Qualified Bidders that submit qualified proposals for the Miscellaneous Asset Auction in accordance with the Bidding Procedures (the "Qualified Miscellaneous Asset Bidders").  During the Miscellaneous Asset Auction, the Debtors will accept competing proposals to purchase any or all of the Debtors' assets, including, for example, any inventory, store, warehouse and distribution center leases, owned real property, the firedog$^{SM}$ assets, including related internet operations conducted through www.firedog.com, the Debtors other internet operations, including operations conducted through www.circuitcity.com, corporate airplanes, and other miscellaneous assets. The Miscellaneous Asset Auction will be conducted with respect to each asset on which the Debtors receive a proposal.  Bidding in the Miscellaneous Asset Auction will remain open until all Qualified Miscellaneous Asset Bidders who opt to bid have submitted their highest or otherwise best proposal for the Miscellaneous Asset Sales.

21

42.  **Final Auction**.  Finally, upon the conclusion of bidding in the Going Concern Auction, the Store Closing Auction, and the Miscellaneous Asset Auction, the Debtors, after consultation with counsel to the DIP Agent and counsel to the Creditors' Committee, will determine which proposal or combination of proposals provides the Debtors, their estates and creditors with the highest or otherwise best offer(s). Upon such announcement, the Debtors will then commence an auction (the "Final Auction") in which the successful bidders at the Going Concern, the Store Closing, and Miscellaneous Asset Auctions may participate.  Bidding at the Final Auction will continue until such time as each bidder or combination of bidders has submitted its highest or otherwise best proposal.

43.  At the conclusion of the Final Auction, the Debtors, after consultation with counsel to the DIP Agent and counsel to the Creditors' Committee, will announce the bidder or bidders submitting the proposal(s) that they have determined constitute the highest or otherwise best proposals (each such proposal, a "Successful Bid" and each party submitting each

22

Successful Bid, a "Successful Bidder")and close the
Auctions.

**B.    The Bidding Procedures.**

44.   The Debtors intend to implement
procedures substantially similar to the procedures (the
"Bidding Procedures") attached as Exhibit A to the
Bidding Procedures Order with respect to the Qualified
Bidders and conducting the Going Concern, Store Closing,
Miscellaneous Asset and Final Auctions.  The Debtors
reserve their right to modify such procedures as
necessary or as they deem appropriate, in consultation
with counsel to the DIP Agent and counsel to the
Creditors' Committee, to maximize value for their
estates and creditors.  In addition, the Debtors, in
consultation with counsel to the DIP Agent and counsel
to the Creditors' Committee, reserve their right to
withdraw certain assets that do not constitute a
material portion of the business from the Auctions at
any time prior to Court approval of any proposal
concerning such assets.  However, the Debtors have
agreed that they will not move the date of the Hearing
absent approval from the DIP Agent and the Creditors'

23

Committee or further order of the Court.  The Debtors

believe that such procedures are appropriate and will

maximize the recovery for the Debtors and their estates

in connection with the various Auctions.

**C.    Termination Fees.**

45.  The Debtors believe that in order to

entice potential bidders to establish a floor price for

any asset or business and the terms of such offer, they

should be authorized (after consultation with counsel to

the DIP Agent and counsel to the Creditors' Committee)

to offer bidders a fee in the event that a bidder is

chosen as a Stalking Horse Bidder but is ultimately

outbid at an Auction (a "Termination Fee").  Accordingly,

the Debtors request that the Bankruptcy Court approve a

Termination Fee of no more than 2% of the cash purchase

price payable on such terms and conditions as set forth

in any Stalking Horse Agreement that the Debtors enter

into on or prior to January 13, 2009.  In addition, any

Termination Fee will only be paid if (1) the Stalking

Horse Bidder is not the Successful Bidder at the Final

Auction, (2) the Stalking Horse Bidder agrees to serve

as a back-up bidder and close the transaction

24

contemplated by the Stalking Horse Agreement (as may be
modified, including, without limitation, modifications
as to price, as of the Stalking Horse Bidder's last
proposal at any Auction) in the event the transaction
with the Successful Bidder does not close, and (3) the
transaction proposed by the Successful Bidder actually
closes.  In the event the Successful Bidder does not
close, the Stalking Horse Bidder will be deemed to be
the Successful Bidder.

46.  In no event shall any Termination Fee be
payable if the Stalking Horse Agreement contains a "due
diligence" or financing contingency, and the Debtors
shall not be permitted to offer two Termination Fees
with respect to any proposal covering the same assets.

**D.    Assumption And Assignment Of Contracts And Leases.**

47.  The Debtors will file a schedule of cure
amounts (the "Cure Schedule") due to counterparties to
Contracts and Leases (as defined herein) on or before
January 7, 2009.  The Debtors propose that unless a
party to a Contract or Lease files an objection on or
before January 15, 2009 at 12:00 noon (ET) to the Motion
asserting a different cure amount than that listed on

the Cure Schedule, then, except to the extent expressly set forth in the Bidding Procedures Order, such party should be forever barred from asserting a cure amount different from that set forth on the Cure Schedule.

48.   To ensure that the counterparties to Contracts and Leases receive advance notice of the assumption and assignment of any Contracts and Leases, on or before January 13, 2009, the Debtors will provide the counterparty to any Contracts and Leases sought to be assumed and assigned pursuant to a Going Concern Transaction or a Store Closing or Miscellaneous Asset Sale with a notice of potential purchaser substantially in the form attached to the Bidding Procedures Order as Exhibit B.   The Debtors will concurrently post a list of those Contracts and Leases subject to Potential Purchaser Notices on the website for the Debtors' claims and noticing agent, www.kccllc.net/circuitcity.

49.   The Potential Purchaser Notice will identify any potential transaction party as potential parties to which the Contracts and Leases would be assigned.   In addition, the Potential Purchaser Notice would provide a means by which the counterparties to the

26

Contracts and Leases to be assigned could obtain

information related to adequate assurance of future

performance.

50.   Finally, the Debtors propose that the

counterparties to any such Contract or Lease be required

to file an objection to the assumption and/or assignment

of the Contracts and Leases by January 15, 2008 at 12:00

noon (ET), and such parties would be required to state,

with specificity, the legal and factual basis of any

objection.

## APPLICABLE AUTHORITY

## I.   THE BIDDING PROCEDURES ARE REASONABLE AND APPROPRIATE.

51.   Bankruptcy Code section 363(b)(1)

provides that "[t]he trustee, after notice and a hearing,

may use, sell, or lease, other than in the ordinary

course of business, property of the estate."  11 U.S.C.

§ 363(b)(1).  Moreover, Bankruptcy Code section 105(a)

provides that "[t]he Court may issue any order, process,

or judgment that is necessary or appropriate to carry

out the provisions of this title."  11 U.S.C. § 105(a).

27

52.   The Debtors believe that the Bidding
Procedures are appropriate under Bankruptcy Code
sections 105 and 363 to ensure that the bidding and
process is fair and reasonable and will yield the
maximum value for their estates and creditors.
Initially, the Bidding Procedures permit the Debtors to
maximize the value of their assets by allowing three
auctions, the Going Concern Auction, the Store Closing
Auction, and the Miscellaneous Asset Auction.  At the
Final Auction, the Debtors will potentially be able to
further increase the recovery for their estates by
combining the proposals received in the prior auctions
and permitting additional bidding by parties that were
successful in such prior auctions.  In addition, the
Bidding Procedures set deadlines for obtaining a
Stalking Horse Bidder or Bidders, conducting an auction
and holding a hearing with respect to the transactions
proposed herein.

53.   As set forth above, the Debtors presently
face the possibility of continued financial
deterioration.  The Debtors have managed to obtain
sufficient liquidity to conduct the process proposed

28

herein.  However, under the terms of the DIP Facility,
the Debtors are (i) required to complete the sale
process as requested herein and (ii) may not have
sufficient liquidity to operate much beyond the dates
established thereby.  Thus, the Debtors believe that
they must be permitted to conduct the process in the
manner and on the timetable set forth herein and in the
Bidding Procedures.

54.   Accordingly, the Debtors believe the
Court should approve the Bidding Procedures, including
the dates established thereby for, inter alia, the
Auctions and the Hearing.  Similar procedures have been
previously approved by this Court in other cases.  See,
e.g., In re Ceyoniq, Inc., Case No. 02-85887 (RGM)
(Bankr. E.D. Va. Jan. 30, 2003); In re The Rowe
Companies, Case No. 06-11142 (SSM) (Bankr. E.D. Va. Dec.
20, 2006).

## II.  APPROVAL OF GOING CONCERN TRANSACTIONS OR STORE CLOSING AND MISCELLANEOUS ASSET SALES IS WARRANTED UNDER BANKRUPTCY CODE SECTIONS 105(A) AND 363(B)(1).

55.   As set forth above, Bankruptcy Code
section 363(b)(1) authorizes a  trustee to "use, sell,
or lease" property of the estate with the Court's

29

approval.  11 U.S.C. § 363(b)(1).  Assets of the Debtors

may be sold outside of the ordinary course of business,

pursuant to Bankruptcy Code section 363(b)(1), if a

sound business purpose exists for doing so.  In re WBQ

P'ship, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995)(citing

Stephens Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th

Cir. 1986)); see also In re W.A. Mallory Co., Inc., 214

B.R. 834, 836 (Bankr. E.D. Va. 1997).

56.  To satisfy the "sound business purpose

test," the debtor must demonstrate that (1) a sound

business reason or emergency justifies a pre-

confirmation sale; (2) the sale was proposed in good

faith; (3) the purchase price is fair and reasonable;

and (4) adequate and reasonable notice of the sale has

been provided.  In re WBQ P'ship, 189 B.R. at 102.

57.  Based upon the results of their

exhaustive analysis of the Debtors' ongoing and future

business prospects, the Debtors' management and advisors

have concluded that the sale of all or substantially all

of their assets and businesses in accordance with the

procedures set forth in the Bidding Procedures is one

alternative that will maximize recoveries to the estates

30

and stop further deterioration of the Debtors'
businesses.  Maximizing asset value and preventing
further business deterioration are sound business
purposes that warrant authorizing the proposed Sale.

58.  First, as set forth herein, a process is
required by the DIP Facility and is necessary to enable
the Debtors to maximize value for the estates given
their liquidity situation.

59.  Second, by permitting proposals for
substantially all of the Debtors' assets or for certain
specific assets, whether for sale as a going concern or
for liquidation, the Debtors believe that they will be
afforded the necessary flexibility and thereby will have
the greatest potential of maximizing the value of their
businesses.

60.  Third, the sale of any of the Debtors'
assets or businesses will be subject to competing bids,
thereby enhancing the Debtors' ability to receive the
highest or otherwise best value for their businesses.
Consequently, the fairness and reasonableness of the
consideration to be received by the Debtors will
ultimately be demonstrated by a "market check" through

31

the auction process, which is the best means for
establishing whether a fair and reasonable price is
being paid.

61.    Fourth, and finally, all creditors and
parties in interest will receive adequate notice under
the circumstances of the Bidding Procedures and the
Hearing as set forth below.  In light of the
circumstances, such notice is reasonably calculated to
provide timely and adequate notice to the Debtors' major
creditor constituencies, those parties most interested
in these cases, those parties potentially interested in
bidding on the Debtors' assets and businesses and others
whose interests are potentially implicated by the
proposed Sales.

**III. APPROVAL OF ASSUMPTION AND ASSIGNMENT OF THE
     DEBTORS' CONTRACTS AND LEASES IS WARRANTED UNDER
     BANKRUPTCY CODE SECTION 365.**

62.    Bankruptcy Code section 365(a) provides
that a debtor, "subject to the court's approval, may
assume or reject any executory contract or unexpired
lease."  11 U.S.C. § 365(a).  A debtor's determination
to assume and assign or reject an executory contract or
unexpired lease is governed by the "business judgment"

32

standard.  See Lubrizol Enterprises, Inc. v. Richmond

Metal Finishers, Inc., 756 F.2d 1043, 1046-47 (4th Cir.

1985), cert. denied sub nom., Lubrizol Enters., Inc. v.

Canfield, 475 U.S. 1057 (1986); In re Extraction

Technologies of VA, L.L.C., 296 B.R. 393, 399 (Bankr.

E.D. Va. 2001).

        63.  Once the Debtors articulate a valid

business justification, "[t]he business judgment rule

'is a presumption that in making a business decision the

directors of a corporation acted on an informed basis,

in good faith and in the honest belief that the action

taken was in the best interests of the company.'"

Official Comm. Of Subordinated Bondholders v. Integrated

Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992); ; see In

re HQ Global Holdings, Inc., 290 B.R. 507, 511 (Bankr. D.

Del. 2003) (stating that a debtor's decision to reject

an executory contract is governed by the business

judgment standard and can only be overturned if the

decision was the product of bad faith, whim, or caprice)

        64.  The business judgment rule has vitality

in chapter 11 cases and shields a debtor's management

from judicial second-guessing.  See Comm. Of Asbestos-

33

Related Litigants and/or Creditors v. Johns-Manville

Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he

Code favors the continued operation of a business by a

debtor and a presumption of reasonableness attaches to a

debtor's management decisions.").

65. As set forth above, the Debtors have

clearly articulated a sound business purpose for seeking

the relief sought in the Motion and have thus satisfied

the business judgment test.  The assumption and

assignment of the Debtors' executory contracts and

unexpired leases (the "Contracts and Leases") at the

Auctions and the accompanying proposed Bidding

Procedures are clearly designed to maximize the value of

the Contracts and Leases for the Debtors' estates.

66. Additionally, section 365(b)(1) of the

Bankruptcy Code, in turn, codifies the requirements for

assuming an unexpired lease or executory contract of a

debtor.  It provides:

> (b)(1)    If there has been a default in an
> executory contract or unexpired lease of the
> debtor, the trustee may not assume such
> contract or lease unless, at the time of the
> assumption of such contract or lease, the
> trustee –

(A)  cures, or provides adequate
assurance that the trustee will promptly
cure, such default;

(B)  compensates, or provides adequate
assurance that the trustee will promptly
compensate, a party other than the debtor
to such contract or lease, for any actual
pecuniary loss to such party resulting
from such default; and

(C)  provides adequate assurance of
future performance under such contract or
lease.

11 U.S.C. § 365(b)(1).

67.  Courts give the phrase "adequate
assurance of future performance" a "practical, pragmatic
construction." EBG Midtown S. Corp. v. Mcharen/Hart
Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139
B.R. 585, 592 (S.D.N.Y. 1992), aff'd, 993 F.2d 300 (2d
Cir. 1993) (presence of adequate assurance should be
"determined under the facts of each particular case").

68.  To the extent that any defaults exist
under any of the Contracts and Leases that are to be
assumed and assigned in connection with a Going Concern
Transaction or Store Closing or Miscellaneous Asset Sale,
the Debtors or the counterparty to such transaction

35

would cure any default required to be cured under
Bankruptcy Code section 365.

69.   The Bidding Procedures are also designed
to ensure that any potential transaction party has the
financial resources to perform under the Contracts and
Leases and are required under the Bidding Procedures to
provide adequate assurance of future performance under
any Contracts and Leases for which they render a bid.
Moreover, if necessary, the Debtors will adduce facts at
the Hearing demonstrating the financial wherewithal of
any transaction party, and their willingness and ability
to perform under the Contracts and Leases to be assumed
and assigned to them.

70.   Accordingly, the Debtors have determined
that the relief requested in the Motion is in their best
interests and the best interests of their estates,
creditors and parties in interest.

## IV.   THE TERMINATION FEE REQUESTED HEREIN IS REASONABLE AND SHOULD BE APPROVED.

71.   In connection with Going Concern
Transactions or Store Closing or Miscellaneous Asset

Sales, the Court should authorize the Debtors to pay the Termination Fee identified herein.

72.   Agreements to provide break-up fees are designed to compensate a potential acquirer who serves as a catalyst that may attract higher and better offers, and have been approved in bankruptcy to encourage bidding. See In re Ryan, 261 B.R. 867, 870 (Bankr. E.D. Va. 2001).  Break-up fees can be advantageous to both buyers and sellers because they encourage bidding to ensure that sellers receive the highest or otherwise best offer for sellers while compensating the buyer for the risk of being outbid.  See id.

73.   Break-up fees are allowed as an administrative expense claim against the estate if they satisfy the standard of section 503(b)(1).  In re Tropea, 352 B.R. 766, 768 (Bankr. N.D.W.Va. 2006).  Thus, the fee must reflect the actual and necessary cost of preserving the estate.  See 11 U.S.C. § 503(b)(1).  See also In re Tropea, 352 B.R. at 768.  In Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527 (3d Cir. 1999), the United States Court of Appeals for the Third Circuit expanded on the

application of the section 503(b)(1) standard to break-up fees.  The Third Circuit Court of Appeals held that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context.  Accordingly, to be approved, bidding incentives must provide some postpetition benefit to the debtor's estate.  See id. at 533; see also In re Lamb, 2002 WL 31508913 (Bankr. D. Md. 2002) (implicitly adopting the administrative expense standard set forth in O'Brien).

74.  The O'Brien Court identified at least two instances in which bidding incentives may provide benefit to the estate.  First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited."  Id. at 537.  Second, when the availability of bidding incentives induce a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders

38

can rely, "the bidder may have provided a benefit to the

estate by increasing the likelihood that the price at

which the debtor is sold will reflect its true worth."

Id.

75.   The proposed Termination Fee is

appropriate under Bankruptcy Code section 503.   The

Termination Fee is fair and reasonable in amount,

particularly in view of the efforts that will have to be

expended by the stalking horse bidder.   Moreover, the

Termination Fee will enable the Debtors to secure an

adequate floor for the Auctions and, thus, insist that

competing bids be materially higher or otherwise better

than the Stalking Horse Bid, a clear benefit to the

Debtors' estates.

76.   In sum, the Debtors' ability to offer the

Termination Fee enables them to ensure the sale of the

Debtors' assets to a contractually-committed bidder at a

price that they believe to be fair while, at the same

time, providing them with the potential of even greater

benefit to the estates.   Thus, the Termination Fee

should be approved.

39

V.    **ANY PURCHASER SHOULD BE GRANTED THE PROTECTION OF**
**BANKRUPTCY CODE SECTION 363(m).**

77.    The disposition of the Debtors'
businesses or assets pursuant to the terms reflected in
any purchase agreement (a "Purchase Agreement") or store
closing agency agreement (a "Store Closing Agency
Agreement") that results from the bids submitted for or
at the Auctions, pursuant to the Bidding Procedures,
represents an accepted method for the sale of retail
merchandise that has been approved in numerous chapter
11 cases of retailers.    See, e.g., In re The Rowe
Companies, Case No. 06-11142 (SSM)(Bankr. E.D. Va. Dec.
20, 2006); In re Tweeter Home Entertainment Group, Inc.,
Case No. 07-10787 (PJW) (Bankr. D. Del. Jun. 27, 2007);
In re Ultimate Electronics, Case No. 05-10104
(PJW)(Bankr. D. Del. Mar. 8, 2005).    Under the Bidding
Procedures, any Purchase Agreement would be negotiated
at arm's-length.    Similarly, a Store Closing Agency
Agreement would be negotiated at arm's-length between
the Debtors and the store closing agent.    These
negotiations will likely involve substantial time and
energy by the parties and their professionals, and any

40

Purchase Agreement or Store Agency Agreement will
undoubtedly reflect give-and-take and compromises by
both sides.

78.   Accordingly, the Debtors should be
permitted to enter into any Purchase Agreement(s) with
any purchaser(s) or any Store Closing Agency Agreement(s)
with the selected store closing agent(s).

79.   At the Hearing, the Debtors intend to
present evidence that a Store Agency Agreement and/or
Purchase Agreement were negotiated at arm's-length and
in good faith, after other parties and their
qualifications and proposals were considered, and after
the Auction process.   Thus, the Debtors will seek and
respectfully request that this Court find that any
purchaser and/or store closing agent acted in good faith
within the meaning of Bankruptcy Code section 363(m).

80.   Specifically, Bankruptcy Code section
363(m) provides that:

> [t]he reversal or modification on appeal
> of an authorization under subsection (b)
> or (c) of this section of a sale or lease
> of property does not affect the validity
> of a sale or lease under such author-
> ization to an entity that purchased or
> leased such property in good faith,

41

> whether or not such entity knew of the
> pendency of the appeal, unless such
> authorization and such sale or lease were
> stayed pending appeal.

11 U.S.C. § 363(m).

81.  While the Bankruptcy Code does not define "good faith", the Fourth Circuit Court of Appeals has "adopt[ed] the traditional equitable definition that has been adopted by various courts of appeal: 'one who purchases the assets for value, in good faith, and without notice of adverse claims.'"  Willemain v. Kivitz, 764 F.2d 1019, 1023 (4th Cir. 1985)(citations omitted).

82.  Additionally, the Bidding Procedures ensure that a prospective purchaser or store closing agent will not be able to exert any undue influence over the Debtors.  Under the circumstances, and after considering the record to be presented by the Debtors at the Hearing, this Court should find that (i) the sale of the Debtors' assets, whether pursuant to a Purchase Agreement, Store Agency Agreement, or otherwise, is the result of good faith arm's-length negotiations, and (ii) the ultimate purchaser is entitled to all of the protections of Bankruptcy Code section 363(m).

42

VI. **ASSETS SOLD PURSUANT TO ANY GOING CONCERN
TRANSACTION, STORE CLOSING SALE, OR MISCELLANEOUS
ASSET SALE SHOULD BE FREE AND CLEAR OF CLAIMS,
LIENS, AND ENCUMBRANCES UNDER BANKRUPTCY CODE
SECTION 363(f).**

83. To facilitate a going concern sale, a
sale of store inventory or a sale of miscellaneous
assets, the Debtors request authorization to sell such
property free and clear of any and all interests,
including claims, liens, and encumbrances that may be
asserted against such property.

84. Under section 363(f) of the Bankruptcy
Code, a debtor in possession may sell property free and
clear of any interest in such property if, among other
things:

> (1) applicable nonbankruptcy law permits
> sale of such property free and clear of
> such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price
> at which such property is sold is greater
> than the aggregate value of all liens on
> such property;
>
> (4) such interest is in bona fide
> dispute; or
>
> (5) such entity could be compelled, in a
> legal or equitable proceeding, to accept
> a money satisfaction of such interest.

43

11 U.S.C. § 363(f).

85.   Section 363(f) permits the sale of estate
property free and clear of interests if any one of the
five conditions above is met.  See, e.g., In re Laines,
352 B.R. 410, 414-15 (Bankr. E.D. Va. 2005).

86.   Courts have held that the authority of a
debtor to sell assets free and clear of interests is
broad and should be read expansively.  See In re TWA,
Inc., 322 F.3d 283, 289 (3d Cir. 2003); see also United
Mine Workers of Am. 1992 Benefit Plan v. Leckie
Smokeless Coal Co. (In re Leckie Smokeless Coal Co.), 99
F.3d 573, 582 (4th Cir. W. Va. 1996) (holding that the
phrase "any interest in property" includes more than
just in rem interests); In re P.K.R. Convalescent
Centers, Inc., 189 B.R. 90, 94 (Bankr. E.D. Va.
1995)("As the plain meaning of the statute demonstrates,
§ 363 covers more situations than just sales involving
liens."). Moreover, courts have noted that the purpose
of the "free and clear" language is to allow the debtor
to obtain a maximum recovery on its assets in the

44

marketplace.  See In re TWA, Inc., 2001 Bankr. LEXIS 723,

at *8-*10 (Bankr. D. Del. Mar. 27, 2001).

87.  Accordingly, this Court should authorize

the Debtors to sell their inventory, assets or

businesses free and clear of any and all interests,

including claims, liens, and encumbrances, that may be

asserted by any parties, with any such claims, liens,

and encumbrances attaching to the net proceeds of the

Going Concern Transactions, Store Closing Sales, or

Miscellaneous Asset Sales in the same order and priority

as they exist against the such inventory, assets or

businesses and in accordance with the terms and

provisions of the DIP Facility.

**VII. THE COURT SHOULD INVALIDATE ANY RESTRICTIONS IN
     RESTRICTIVE DOCUMENTS THAT MAY IMPAIR THE DEBTORS'
     ABILITY TO CONDUCT STORE CLOSING SALES.**

88.  In addition, any Store Closing Sales

should be free from various restrictions that would

impair such sales.  The Debtors' stores are located on

properties that are owned and leased by the Debtors.

Thus, a Store Closing Sale may be inconsistent with

certain provisions of such leases or other documents

(the "Restrictive Documents") with respect to any of

45

such leased premises (the "Premises") that are intended

to protect the image of a shopping center or mall or

avoid disruption of normal commerce, including

provisions purporting to restrict or prohibit the

Debtors from conducting store closing, going out of

business, inventory liquidation, or similar sales (the

"Anti-Alienation Provisions").

89.   Store closing or liquidation sales, such

as the sales described herein, are a routine part of

chapter 11 cases involving retail debtors.  Such sales

are consistently approved by courts, despite provisions

of recorded documents or agreements purporting to forbid

such sales in the ordinary course of business.  Indeed,

Anti-Alienation Provisions in leases have been deemed

unenforceable in other chapter 11 cases as impermissible

restraints on a debtor's ability to maximize the value

of its assets under Bankruptcy Code section 363.  <u>See</u> <u>In</u>

<u>re R.H. Macy & Co.</u>, 170 B.R. 69, 77 (Bankr. S.D.N.Y.

1994); <u>In re Ames Dep't Stores, Inc.</u>, 136 B.R. 357, 359

(Bankr. S.D.N.Y. 1992) (finding that "to enforce the

anti-GOB sale clause of the [l]ease would contravene

overriding federal policy requiring Debtors to maximize

estate assets by imposing additional constraints never
envisioned by Congress"); see also In re Tobago Bay
Trading Co., 112 B.R. 463, 467 (Bankr. N.D. Ga. 1990)
(finding anti-going-out-of-business sales clause in
lease unenforceable); In re Lisbon Shops, Inc., 24 B.R.
693, 695 (Bankr. E.D. Mo. 1982) (same).

90.   Thus, the Court should ensure that no
clause in any of the Restrictive Documents for the
Premises is an impediment to a Store Closing Sale, the
associated store closures, or the activities connected
therewith.  To the extent that such Anti-Alienation
Provisions exist in any Restrictive Documents, they
should not be permitted to interfere with, or otherwise
restrict the Debtors or the store closing agent from
conducting a Store Closing Sale or the associated
closing of stores.

**VIII.     STORE CLOSING SALES SHOULD BE EXEMPT FROM
            CERTAIN FEDERAL, STATE, AND LOCAL LAWS,
            STATUTES, RULES AND ORDINANCES RELATED TO
            STORE CLOSING SALES.**

91.   The states in which any Store Closing
Sales will or may take place may have certain
requirements governing the conduct of store closing,

47

liquidation or other inventory clearance sales,
including, but not limited to, state and local statutes
and regulations regarding bulk sale restrictions,
augmentation limitations that would otherwise apply to a
Store Closing Sale and consumer fraud laws, with the
exception of deceptive advertising laws (the
"Liquidation Sale Laws").  Typical statutes and
regulations provide that if a liquidation or bankruptcy
sale is court authorized, however, a company need not
comply with these Liquidation Sale Laws.  Moreover,
pursuant to Bankruptcy Code section 105, the Court has
the authority to permit a Store Closing Sale to proceed
notwithstanding contrary Liquidation Sale Laws.  See 11
U.S.C. § 105.

        92.   The Debtors, therefore, request that,
pursuant to Bankruptcy Code § 105(a), this Court
authorize the Debtors to conduct a Store Closing Sale
without the necessity of, and the delay associated with,
complying with the Liquidation Sale Laws.

        93.   Because the Debtors and their assets are
subject to this Court's jurisdiction, this Court will be
able to supervise a Store Closing Sale and the

48

liquidation of store inventory.  A Store Closing Sale is

a legitimate method by which the Debtors can maximize

the return from the sale of store inventory for the

benefit of their estates and creditors.  Moreover,

creditors are adequately protected by the notice of this

Motion and the jurisdiction and supervision of this

Court.  Accordingly, this Court should dispense with any

requirement that the Debtors comply with technical

requirements that are not intended to curtail persons

from conducting store closing sales with bankruptcy

court supervision, including bulk sales laws.

94.   Moreover, 28 U.S.C. § 959, which requires

trustees (and, thus, debtors in possession) to otherwise

comply with state and other laws in performance of their

duties, does not apply to a Store Closing Sale.  Courts

have held that 28 U.S.C. § 959 does not apply to debtors

or their agents when they are liquidating assets.  See,

e.g., Cal. State Bd. of Equalization v. Goggin, 191 F.2d

726 (9th Cir. 1951) (holding that 28 U.S.C. § 959 does

not apply to transactions that are in the nature of

liquidation), cert. denied, 342 U.S. 909 (1952); see

also In re Borne Chem. Co., Inc., 54 B.R. 1260, 135

49

(Bankr. D.N.J. 1984) (holding that 28 U.S.C. § 959(b) is

applicable only when property is being managed or

operated for purpose of continuing operations).

          95.   Even if state or local law does not

expressly except bankruptcy sales from its ambit, the

Debtors submit, to the extent that such state or local

law conflicts with federal bankruptcy laws, that such

state or local law is preempted by the Supremacy Clause

of the United States Constitution.  To hold otherwise

would severely impair the relief otherwise available

under Bankruptcy Code section 363.  In concert with this

premise, bankruptcy courts have consistently recognized

that federal bankruptcy law preempts state and local

laws that contravene the underlying policies of the

Bankruptcy Code.  See, e.g., In re Shenango Group, Inc.,

186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and

debtors-in-possession have unique fiduciary and legal

obligations pursuant to the bankruptcy code . . . . [A]

state statute [] cannot place burdens on them where the

result would contradict the priorities established by

the federal bankruptcy code.").  While preemption of

state law is not always appropriate, as when the

protection of public health and safety is involved, it
is appropriate when, as here, the only state laws
involved concern economic regulation.  In re Baker &
Drake, 35 F.3d 1348, 1353 (9th Cir. 1994)("[F]ederal
bankruptcy preemption is more likely . . . where a state
statute is concerned with economic regulation rather
than with protecting the public health and safety.").

96.  Here, Bankruptcy Code section 363, which
requires debtors to operate their businesses in a way
that maximizes recoveries for creditors, will be
severely undermined if the Court does not provide for
the waiver of the Liquidation Sale Laws.  Similar relief
has been granted in other bankruptcy cases.  See, e.g.,
In re FAO, Inc., Case No. 03-61826 (LK) (Bankr. D. Del.);
In re Golf Am. Stores, Inc., Case No. 02-12313 (PJW)
(Bankr. D. Del.); In re Bradlees, Inc., Case No. 00-
16033 (BRL) (Bankr. S.D.N.Y.); In re Big V Stores, Case
No. 00-4372 (PJW) (Bankr. D. Del.).

97.  Importantly, given the supervision of
this Court, the requested waiver will not unduly
undermine state and local requirements that would
otherwise apply to a Store Closing Sale.  The Debtors

51

only request that this Court authorize the Debtors
and/or the store closing agent to conduct a Store
Closing Sale without the necessity of, and the delay
associated with, obtaining various state licenses or
permits, observing state and local waiting periods or
time limits, and/or satisfying any additional
requirements with respect to advertising, conducting a
Store Closing Sale as store closings or similar type
sales, or transferring merchandise to or between stores.
The Debtors fully intend to be bound by and comply with
remaining statutes and regulations, such as health and
safety laws.

98.   The Debtors also request that no other
person or entity, including (but not limited to) any
lessor or federal, state, or local agency, department or
governmental authority, be allowed to take any action to
prevent, interfere with, or otherwise hinder
consummation of a Store Closing Sale, or the advertising
and promotion (including through the posting of signs)
of such Store Closing Sale.

IX.  **WAIVER OF THE TEN-DAY STAYS PROVIDED BY BANKRUPTCY RULES 6004 AND 6006 SHOULD BE WAIVED FOR ANY AND ALL ORDERS APPROVING SALE(S) OF THE DEBTORS' ASSETS.**

99.  Bankruptcy Rule 6004(h) provides that: "[a]n order authorizing the use, sale, or lease of property is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Similarly, Bankruptcy Rule 6006(d) provides that: "[a]n order authorizing the trustee to assign an executory contract or unexpired lease under Sec. 365(f) is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6006(d).

100. The Debtors request that the Court waive the ten-day stays of Bankruptcy Rules 6004 and 6006 with respect to the Going Concern Transactions or the Store Closing and Miscellaneous Asset Sales following entry of this any and all orders approving such transactions.  By waiving such requirements, the Debtors and any purchaser will be able to immediately close the transactions approved by such orders, which will in turn save the Debtors continued accrual of administrative expenses and thereby benefit the Debtors' estates.

53

X.   **APPROVAL OF A GOING CONCERN TRANSACTION WHEREBY THE
     DEBTORS WILL OBTAIN ADDITIONAL POST-PETITION
     FINANCING IS WARRANTED UNDER BANKRUPTCY CODE
     SECTIONS 105 AND 364**

101. As part of the process described herein,
the Debtors are in discussion with interested parties
over the terms of Going Concern Transactions, including
additional post-petition financing.  If these
discussions are successful, the Debtors may obtain a
proposal for additional financing that could enable the
Debtors to reorganize under a stand-alone plan or as
part of a Bankruptcy Code sale or plan transaction.

102. Bankruptcy Code section 364 authorizes
the Debtors to obtain financing.  In particular, if a
debtor is unable to obtain unsecured credit allowable as
an administrative expense under Bankruptcy Code section
503(b)(1), then the Court, after notice and a hearing,
may authorize the debtor to obtain credit or incur debt.
11 U.S.C. § 364(c). Moreover, Bankruptcy Code section
105(a) authorizes the Court to enter any orders
necessary or appropriate in aid of reorganization.  11
U.S.C. § 105(a).

103. Pursuant to Bankruptcy Code section
364(c), a debtor's decision to incur secured debt is
governed by the business judgment standard.  See, e.g.,
In re Ames Dept. Stores, 115 B.R. 34, 38 (Bankr. S.D.N.Y.
1990)(noting that, with respect to post-petition credit,
courts "permit debtors in possession to exercise their
best business judgment consistent with their fiduciary
duties"); see also 3 Collier on Bankruptcy ¶ 364.03, at
364-7-18 (15th ed. rev. 1999).

104. Should the Debtors receive and determine
that a Going Concern Transaction for financing is the
highest or otherwise best proposal, the Debtors should
be authorized to enter into such financing on terms
agreed to among the Debtors and any purchaser that are
negotiated in good faith.  Such financing would be in
the best interests of the Debtors and their estates,
creditors, and other parties in interest because the
financing would permit the Debtors to continue as a
going concern and realize the highest or otherwise best
value for their businesses.

105. The Debtors also request that this Court
schedule interim and final hearings on any such

financing proposal.  Bankruptcy Rules 4001(b) and (c)

provide that a final hearing on a motion to obtain

credit under Bankruptcy Code section 364 may not be

commenced earlier than 15 days after the service of such

motion.  Fed. R. Bankr. P. 4001(b), (c).  Upon request,

however, the Court is empowered to conduct a preliminary

expedited hearing on the motion and authorize the

obtaining of credit to the extent necessary to avoid

immediate and irreparable to the debtor's estate.  Id.

106. Here, the Debtors are requesting that

this Court hold an interim hearing on any Going Concern

Transaction that provides financing to the Debtors on

January 16, 2009.  Thereafter, the Debtors will obtain a

subsequent hearing date for final approval of any such

financing.

## NOTICE

107. Notice of this Motion to the extent it

seeks entry of the Bidding Procedures Order has been

provided to those parties who have requested notice

pursuant to Bankruptcy Rule 2002 and the Core Group (as

defined in the Order Pursuant to Bankruptcy Code

Sections 102 and 105, Bankruptcy Rules 2002 and 9007,

56

and Local Bankruptcy Rules 2002-1 and 9013-1

Establishing Certain Notice, Case Management, and

Administrative Procedures (Docket No. 130; the "Case

Management Order")). Notice of the Motion and entry of

the Bidding Procedures Order will be provided to those

parties entitled to notice under the Case Management

Order, as well as (a) all entities known to have

expressed an interest in a transaction regarding the

debtors' assets, stores or inventory during the past

three (3) months; (b) all landlords and entities known

to have an interest in any of the assets to be sold; and

(c) all federal, state, and local regulatory or taxing

authorities or recording offices that have a reasonably

known interest in the relief requested through the

Motion. The Debtors submit that, under the

circumstances, no other or further notice need be given.

### WAIVER OF MEMORANDUM OF LAW

108. Pursuant to Local Bankruptcy Rule 9013-
1(G), and because there are no novel issues of law

presented in the Motion and all applicable authority is

set forth in the Motion, the Debtors request that the

57

requirement that all motions be accompanied by a

separate memorandum of law be waived.

### NO PRIOR REQUEST

109. No previous request for the relief sought

herein has been made to this Court or any other court.

561337-Wilmington Server 1A - MSW

**CONCLUSION**

WHEREFORE, the Debtors respectfully request

that the Court (i) enter an Order, substantially in the

form annexed hereto, granting the relief requested

herein, (ii) enter one or more orders approving any and

all sales following completion of the Auctions, and (iii)

such other and further relief as may be just and proper.

Dated: January 9, 2009    SKADDEN, ARPS, SLATE, MEAGHER &
       Richmond, Virginia  FLOM, LLP
                              Gregg M. Galardi, Esq.
                              Ian S. Fredericks, Esq.
                              P.O. Box 636
                              Wilmington, Delaware 19899-0636
                              (302) 651-3000
                                  - and -
                              SKADDEN, ARPS, SLATE, MEAGHER &
                              FLOM, LLP
                              Chris L. Dickerson, Esq.
                              333 West Wacker Drive
                              Chicago, Illinois 60606
                              (312) 407-0700

                                  - and -

                              MCGUIREWOODS LLP

                              /s/ Douglas M. Foley     .
                              Dion W. Hayes (VSB No. 34304)
                              Douglas M. Foley (VSB No. 34364)
                              One James Center
                              901 E. Cary Street
                              Richmond, Virginia 23219
                              (804) 775-1000
                              Counsel for Debtors and Debtors
                              in Possession