# EXHIBIT A

**LEASE AGREEMENT**

by and between

**MORGAN HILL RETAIL VENTURE, LP**

as Landlord

and

**CIRCUIT CITY STORES WEST COAST, INC.**

as Tenant

for

Shopping Center

Located at NEC of Hwy 101 and Cochrane Road

Morgan Hill, California

# TABLE OF CONTENTS

Page

ARTICLE I FUNDAMENTAL LEASE PROVISIONS ................................................................... 1

   SECTION 1.01   Definitions: ................................................................................. 1

ARTICLE II LEASE OF PREMISES - TERM OF LEASE ........................................................... 4

   SECTION 2.01   Demise ........................................................................................ 4

   SECTION 2.02   Extension Periods ...................................................................... 5

   SECTION 2.03   Commencement Date and Landlord Reimbursement ................ 6

   SECTION 2.04   Possession Date ......................................................................... 6

   SECTION 2.05   Expected Possession Date ......................................................... 7

   SECTION 2.06   Intentionally Omitted ................................................................ 8

   SECTION 2.07   Delayed Possession ................................................................... 8

   SECTION 2.08   Early Entry ................................................................................ 8

   SECTION 2.09   Measurement ............................................................................. 8

   SECTION 2.10   Commencement Date Agreement .............................................. 8

   SECTION 2.11   Early Termination ..................................................................... 9

   SECTION 2.12   Tenant's Permit Contingency .................................................... 9

ARTICLE III INITIAL CONSTRUCTION ................................................................................... 9

   SECTION 3.01   Landlord's and Tenant's Work .................................................. 9

ARTICLE IV RENT ..................................................................................................................... 10

   SECTION 4.01   Annual Minimum Rent ............................................................ 10

   SECTION 4.02   Additional Rent ....................................................................... 10

   SECTION 4.03   Rent; Method of Payment ....................................................... 11

ARTICLE V COMMON AREA MAINTENANCE AND COST ................................................ 11

   SECTION 5.01   Maintenance ............................................................................ 11

SECTION 5.02    Construction Clean-up and Post-Possession Work ......................... 11

SECTION 5.03    CAM Costs ........................................................................................ 12

SECTION 5.04    Tenant's Share of CAM Costs ......................................................... 14

SECTION 5.05    Payment of CAM Costs ................................................................... 14

SECTION 5.06    Cost Pooling ..................................................................................... 14

ARTICLE VI TAXES ............................................................................................................. 15

SECTION 6.01    Taxes ................................................................................................. 15

SECTION 6.02    Payment of Taxes ............................................................................ 16

SECTION 6.03    Exclusions from Taxes .................................................................... 16

SECTION 6.04    Right to Contest ............................................................................... 17

SECTION 6.05    Personal Property Taxes ................................................................. 17

ARTICLE VII UTILITIES ...................................................................................................... 17

SECTION 7.01    Utilities ............................................................................................. 17

SECTION 7.02    Interruption ...................................................................................... 18

ARTICLE VIII USE OF PREMISES ...................................................................................... 18

SECTION 8.01    Permitted Use ................................................................................... 18

SECTION 8.02    Conduct of Operations .................................................................... 18

SECTION 8.03    Leasing Restrictions ........................................................................ 19

SECTION 8.04    Tenant's Exclusive ........................................................................... 19

SECTION 8.05    Exclusives Applicable To Tenant .................................................... 21

SECTION 8.06    Intentionally Omitted ...................................................................... 21

ARTICLE IX REPAIRS .......................................................................................................... 22

SECTION 9.01    Landlord Obligations ...................................................................... 22

SECTION 9.02    Tenant's Obligations ....................................................................... 22

SECTION 9.03    Hazardous Materials ....................................................................... 23

SECTION 9.04    Surrender of the Premises ...................................................25

ARTICLE X REQUIREMENTS OF LAW..........................................................25

SECTION 10.01    Landlord's Obligations ....................................................25

SECTION 10.02    Tenant's Obligations ......................................................25

SECTION 10.03    Right to Contest ..........................................................25

ARTICLE XI INSURANCE .............................................................................26

SECTION 11.01    Landlord's Insurance......................................................26

SECTION 11.02    Tenant's Insurance .......................................................27

SECTION 11.03    Insurance Requirements Generally ..................................29

SECTION 11.04    Landlord's Insurance Cost .............................................29

SECTION 11.05    Indemnity ..................................................................29

SECTION 11.06    Mutual Waiver of Subrogation .......................................30

SECTION 11.07    Affiliate ....................................................................30

ARTICLE XII DAMAGE OR DESTRUCTION ...................................................31

SECTION 12.01    Landlord's Obligation to Rebuild ...................................31

SECTION 12.02    Tenant's Obligation to Rebuild......................................31

SECTION 12.03    Termination................................................................32

ARTICLE XIII CONDEMNATION ...................................................................32

SECTION 13.01    Taking .....................................................................32

SECTION 13.02    Restoration and Rent Adjustment ..................................33

SECTION 13.03    Award .....................................................................34

ARTICLE XIV ALTERATIONS AND MECHANICS' LIENS ................................34

SECTION 14.01    Tenant's Alteration Rights.............................................34

SECTION 14.02    Mechanics' Liens .......................................................36

ARTICLE XV SIGNS ...................................................................................36

SECTION 15.01    Tenant's Signs ...................................................................36

SECTION 15.02    Pylon Signs ......................................................................37

SECTION 15.03    Replacement ......................................................................37

ARTICLE XVI TENANT'S PROPERTY .................................................................37

SECTION 16.01    Tenant's Property ................................................................37

ARTICLE XVII ASSIGNMENT AND SUBLETTING .................................................38

SECTION 17.01    Assignment and Subletting Rights ...............................................38

SECTION 17.02    Collateral Assignment ...........................................................39

SECTION 17.03    Cure Rights of Original Tenant ..................................................39

SECTION 17.04    Recognition Agreement ..........................................................39

ARTICLE XVIII DEFAULT .................................................................................40

SECTION 18.01    Tenant Default ...................................................................40

SECTION 18.02    Additional Landlord Remedies Due to Construction Delays
by Tenant .........................................................................42

SECTION 18.03    Landlord's Default ...............................................................42

SECTION 18.04    Additional Tenant Self-help, Equitable and Legal Remedies
Due to Construction Delays by Landlord ........................................43

SECTION 18.05    Intentionally Omitted. ..........................................................44

SECTION 18.06    Waiver; Non-Exclusive Remedies ...............................................44

ARTICLE XIX SUBORDINATION, TRANSFER OF INTEREST ...................................45

SECTION 19.01    Subordination ....................................................................45

SECTION 19.02    Existing Mortgages and Ground Lease ...........................................45

SECTION 19.03    Transfer of Interest ..............................................................46

SECTION 19.04    Tenant Estoppel Certificates ....................................................46

SECTION 19.05    Landlord Estoppel Certificates ..................................................46

ARTICLE XX LANDLORD'S REPRESENTATIONS, WARRANTIES

AND COVENANTS ............................................................................................46

    SECTION 20.01    Quiet Enjoyment ...........................................................46

    SECTION 20.02    Representations, Warranties and Covenants....................47

    SECTION 20.03    Site Covenants.................................................................47

    SECTION 20.04    OEA ................................................................................48

ARTICLE XXI HOLDING OVER .......................................................................49

    SECTION 21.01    Holding Over...................................................................49

ARTICLE XXII NOTICE .....................................................................................50

    SECTION 22.01    Where and How Given....................................................50

    SECTION 22.02    When Given ....................................................................51

ARTICLE XXIII MISCELLANEOUS ..................................................................51

    SECTION 23.01    Rent Proration ................................................................51

    SECTION 23.02    Construction....................................................................51

    SECTION 23.03    Section Headings............................................................51

    SECTION 23.04    Partial Invalidity.............................................................51

    SECTION 23.05    Waiver.............................................................................51

    SECTION 23.06    Governing Law ...............................................................52

    SECTION 23.07    Successors and Assigns...................................................52

    SECTION 23.08    No Broker........................................................................52

    SECTION 23.09    Memorandum of Lease ...................................................52

    SECTION 23.10    Entire Agreement ...........................................................52

    SECTION 23.11    Relationship of Parties ...................................................52

    SECTION 23.12    Force Majeure ................................................................53

    SECTION 23.13    Limitation of Landlord's Liability .................................53

SECTION 23.14    Limitation of Tenant's Liability.......................................................53

SECTION 23.15    Consents.............................................................................................54

SECTION 23.16    Intentionally Omitted. .....................................................................54

SECTION 23.17    Attorneys' Fees .................................................................................54

SECTION 23.18    Survival of Obligations ....................................................................54

SECTION 23.19    Joint and Several Liability ................................................................54

SECTION 23.20    Definition of Hereunder, Herein, etc ...............................................54

SECTION 23.21    Tenant's Trade Name.........................................................................55

SECTION 23.22    Default Rate .......................................................................................55

SECTION 23.23    Counterparts.......................................................................................55

## EXHIBITS

EXHIBIT A    Site Plan
EXHIBIT B    Legal Description of the Shopping Center
EXHIBIT C    Site Design Requirements
EXHIBIT C-1 Possession Date Notice
EXHIBIT D    W-9 Form
EXHIBIT E    Commencement Date and Expiration Date Agreement
EXHIBIT F    Intentionally Omitted
EXHIBIT G    Intentionally Omitted
EXHIBIT H    Existing Exclusives
EXHIBIT I    Recognition Agreement
EXHIBIT J    Subordination, Non-Disturbance and Attornment Agreement
EXHIBIT K    Permitted Exceptions
EXHIBIT L    Memorandum of Lease
EXHIBIT M    Indemnity Agreement
EXHIBIT N    Pylon Sign Rendering
EXHIBIT O    Intentionally Omitted
EXHIBIT P    Signage Criteria

## LEASE AGREEMENT

**THIS LEASE AGREEMENT** (this "Lease"), dated as of the _6_ day of September 2007 ("Effective Date"), by and between **MORGAN HILL RETAIL VENTURE, LP**, a California limited partnership ("Landlord") with an office at c/o Browman Development Company, 100 Swan Way, Suite 206, Oakland, CA 94621-1459, and **CIRCUIT CITY STORES WEST COAST, INC.**, a California corporation ("Tenant") with an office at 9950 Mayland Drive, Richmond, Virginia 23233.

## W I T N E S S E T H:

In consideration of the rents and covenants set forth in this Lease, Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises (as defined in Section 1.01(P)) upon the following terms and conditions:

## ARTICLE I

## FUNDAMENTAL LEASE PROVISIONS

SECTION 1.01        Definitions:

A.    **Additional Charges**:

1.    Initial CAM Costs:  Initial CAM Costs and Initial Insurance Costs are estimated to be Three Dollars ($3.00) per square foot of Floor Area (as defined below) for the first Lease Year; provided, however, that Tenant hereby acknowledges that the foregoing is only an estimate and that the actual Initial CAM Costs and Initial Insurance Costs for the first lease year may equal, exceed or be less than such estimate.

2.    Initial Taxes: Initial Taxes are estimated to be Three Dollars ($3.00) per square foot of Floor Area for the first Lease Year; provided, however, that Tenant hereby acknowledges that the foregoing is only an estimate and that the actual Initial Taxes for the first lease year may equal, exceed or be less than such estimate.

B.    Intentionally Omitted.

C.    **Annual Minimum Rent*** (subject to adjustment pursuant to Section 2.09):

| Period | Rent p.s.f. (Fixed Based on 20,533 square feet) | Annual Rent | Monthly Installments |
|---|---|---|---|
| Initial Lease Term: | | | |
| Commencement Date | $20.35 | $417,846.55 | $34,820.55 |

| | | | |
|---|---|---|---|
| through end of the Fifth (5th) Lease Year (as defined in Section 1.01(J)) | | | |
| Sixth (6th) Lease Year through end of the Tenth (10th) Lease Year | $21.77 | $447,003.41 | $37,250.28 |
| Eleventh (11th) Lease Year through end of the Fifteenth (15th) Lease Year | $23.95 | $491,765.35 | $40,980.45 |
| First Extension Period (Annual Minimum Rent increased by ten percent 10%) | $26.35 | $541,044.55 | $45,087.05 |
| Second Extension Period (First Extension Period Annual Minimum Rent increased by ten percent 10%) | $28.99 | $595,251.67 | $49,604.31 |
| Third Extension Period (Second Extension Period Annual Minimum Rent increased by ten percent 10%) | $31.89 | $637,549.00 | $53,129.08 |

*Notwithstanding anything to the contrary, Landlord and Tenant acknowledge and agree that Annual Minimum Rent shall be fixed at the amounts listed above, based on a Floor Area of 20,533 square feet; provided, however, in the event the Premises contains more than 20,733 or less than 20,333 square feet of Floor Area (as reflected by the Floor Area Certification (as hereinafter defined)), Annual Minimum Rent (together with any other terms hereof based on Floor Area) shall be re-calculated to reflect the actual Floor Area as set forth in the Floor Area Certification.

D.    **Broker**:  Western Retail Advisors, LLC and Sierra Pacific Realty.

E.    **Delivery Dates**:    1.    Anticipated Possession Date: The date that is three (3) weeks after the Effective Date.

2

2.      Outside Possession Date:  The date that is six (6) weeks after the Effective Date.

F.      **Extension Periods**:  Three (3) periods of five (5) years each.

G.      **Floor Area**:  The aggregate of the actual number of square feet of space (i) contained on all floors within any building area in a particular leased premises (including the Premises) within the Shopping Center (as defined below) (including any mezzanine or basement space), as measured from the exterior faces of outside walls or store front and/or to the centerline of any common wall; provided, however, that the following areas shall not be included in such calculation: the upper level space attributable to any multi-deck, platform, rack or other multi-level system used solely for the storage of merchandise which is located above ground floor; any space used solely for building utilities or mechanical equipment; (ii) exceeding fifteen thousand (15,000) square feet within an outside sales area; and (iii) used as outdoor seating for customers of restaurants and/or other food services business and exceeding fifteen percent (15%) of the leaseable floor area of the building occupied by the occupant primarily benefiting from the outdoor seating.  Landlord hereby represents and warrants to Tenant that Landlord's leases with each of (i) Staples and (ii) Petco contain the foregoing definition of Floor Area.

H.      **Initial Lease Term**: Fifteen (15) Lease Years, plus the partial Lease Year commencing on the Commencement Date and ending on the January 31 immediately thereafter.

I.      **Key Tenant**:  Target

J.      **Lease Year**:  Each period within the Term (as defined below) commencing on February 1 and ending the next succeeding January 31, except that Lease Year 1 shall include the partial Lease Year commencing on the Commencement Date and ending on the January 31 immediately thereafter.

K.      **Intentionally Omitted**.

L.      **Minimum Initial Cotenancy Requirement**:  The Floor Area of the premises designated (x) as "Major 3" and "Major 4," as shown on the Site Plan, is initially constructed in the Shopping Center and the tenants occupying such Floor Area are either (i) fixturing and preparing to open for business or (ii) actually open for business and (y) as "Shops A," as shown on the Site Plan, is initially constructed in the Shopping Center and ready for delivery to tenants for the installation of tenant improvements.

M.      **Minimum Parking Ratios**:   The Minimum Parking Ratios shall be as set forth in the OEA (as defined in Section 20.04).

N.      **Opening Requirement**:  The Key Tenant is open for business and the Minimum Initial Cotenancy Requirement is met.

O.      **Permitted Use**:  The sale, rental, installation, servicing, warehousing and repairing of consumer, office and automotive electronics products (collectively, the "Products"); and/or for any other lawful retail use primarily operated by a National Tenant or Regional Tenant  (as defined in Section 6.04) shopping centers in Central California that is not specifically prohibited

3

by the provisions of Section 8.01 or by the provisions of the OEA, as defined in Section 20.04 herein.  The term "Products" shall include, without limitation, televisions, stereos, speakers, video and audio recorders and players and cameras; computer hardware and software and related software services (which include internet access services, entertainment software and entertainment media [such as, by way of example only, game cartridges, video tapes, cassettes, compact discs, DVD's and DVD equipment]); cellular and wireless telephones and telecommunication devices and related accessories; motor vehicle audio, stereo and telephone systems; and technological evolutions of the foregoing.

P.    **Premises:**  The store building to be constructed by Tenant as part of Tenant's Work (as defined in Section 3.01), containing approximately twenty thousand five hundred thirty-three (20,533) square feet of Floor Area, including approximately one hundred thirty eight (138) feet of frontage, as crosshatched on the site plan attached hereto as Exhibit A (the "Site Plan"), in the shopping center located at the northeast corner of Highway 101 and  Cochrane Road in Morgan Hill, California (the "State"), as more particularly described in Exhibit B (the "Shopping Center").

Q.    Intentionally Omitted.

R.    **Slack Season:**  The period of time beginning on November 1st and ending on the following January 1.

S.    **Tenant's Share:**  A fraction, the numerator of which shall be the Floor Area of the Premises and the denominator of which shall be the Floor Area of all buildings in the Shopping Center constructed from time to time (which denominator shall in no event be less than 166,370 square feet of Floor Area during the Term of this Lease).

T.    **Term:**  The Initial Lease Term plus the Extension Periods, if the option for any such Extension Period is exercised.

## ARTICLE II

### LEASE OF PREMISES - TERM OF LEASE

SECTION 2.01        Demise.(a)      Subject to this Lease and the OEA, Landlord does hereby lease and demise to Tenant, and Tenant does hereby hire from Landlord, the Premises. Tenant and its employees, invitees, agents, customers, concessionaires and licensees shall have the nonexclusive right, in common with Landlord and other tenants of the Shopping Center, to use all Shopping Center sidewalks, paved parking areas, paved service areas, traffic controls, lighting and all means of ingress, egress, acceleration, deceleration and stacking lanes and circulation for the aforesaid parking and service areas of the Shopping Center to and from public streets and roads bordering the Shopping Center (collectively, the "Common Areas") now or hereafter made available or maintained by Landlord in the Shopping Center.  Tenant's right to use the Common Areas may be subject to such reasonable regulations (consistent with Tenant's rights under this Lease) as may from time to time be imposed upon, and equally applicable to, all tenants of the Shopping Center by Landlord or its agents.  Landlord shall provide Tenant with at

least sixty (60) days prior notice of any such rules and regulations, which notice shall contain a copy of such rules and regulations.

(b)    Subject to the terms of the OEA (including any required approvals by Target Corporation) and the requirements of any applicable governmental authorities, Tenant shall have the exclusive right to use, on a "24 hour a day", "365 days a year" basis and without any additional charge, the loading facilities serving the Premises, the customer pick-up area, car stereo parking areas, four (4) web order customer pick-up parking spaces, trash compactor area and transformer pad area (collectively, the "Other Improvements"), all to be located adjacent to the back of the Building as shown on the Site Plan.  Subject to the terms of the OEA (including any required approvals by Target Corporation) and the requirements of any applicable governmental authorities, Tenant shall have the right to erect a sign identifying Tenant's customer pick-up area and/or Tenant's car stereo parking areas, subject to Landlord's prior written approval of the design and location of such sign.  Tenant shall also have the right to erect signage, stripe, and print on the four (4) web order customer pick-up parking spaces in order to so identify such parking spaces, subject to Landlord's prior written approval of the design and location of same.  Landlord's consent, with respect to the foregoing rights of Tenant, shall not be unreasonably withheld, and shall be granted to the extent Tenant's signage, striping and/or printing (as applicable) is substantially consistent with such signage, striping and or printing utilized in the majority of Tenant's stores in central California.

(c)    Subject to Section 20.04 hereof, Tenant acknowledges the Shopping Center is subject and subordinate to that certain OEA (as defined in Section 20.04).  Tenant further acknowledges that portions of the Shopping Center are owned by Target Corporation (the "Target Tract"), and that, notwithstanding anything contained in this Lease to the contrary, the Target Tract is not subject to the terms of this Lease but is subject to the terms of the OEA; in addition, Landlord will not be liable for non-compliance with obligations of this Lease to the extent such obligations would require performance on the Target Tract, unless such obligations can be performed or enforced by Landlord without restriction as a result of its rights under the OEA.  Subject to the terms of the OEA (including any required approvals by Target Corporation) and the requirements of any applicable governmental authorities, Tenant shall have the right to have a truck or other vehicle parked in "Tenant's Preferred Area" as Shown on the Site Plan ("Tenant's Preferred Area"), for no more than five (5) consecutive days for each occurrence, for the purpose of promoting and displaying merchandise (each such occurrence shall be referred to as a "Tenant Promotion").  Tenant may have no more than six (6) Tenant Promotions during the first Lease Year, and no more than five (5) Tenant Promotions for each subsequent Lease Year.  The portion of the Shopping Center currently owned by Landlord is identified on the Site Plan and hereinafter referred to as the "Landlord Tract".

SECTION 2.02    Extension Periods.  Provided Tenant is not then in default of any material terms or provisions of this Lease, after the lapse of all applicable grace periods, Tenant shall have the option to extend the Term for the number of Extension Periods shown in Section 1.01(F), upon all the terms and conditions contained in this Lease.  Each such option is exercisable by Tenant giving notice to Landlord (a) at least two hundred seventy (270) days prior to the expiration of the Initial Lease Term, or of the preceding Extension Period, as the case may be, or (b) if Tenant fails to give Landlord such notice, then within twenty (20) days after receipt

of notice from Landlord that Tenant has failed to exercise its option to extend within the time period provided in (a) above.

SECTION 2.03        Commencement Date and Landlord Reimbursement.

(a)        "Commencement Date" shall mean the date on which Landlord makes payment of the Landlord Reimbursement in accordance with the terms of this Lease and the Opening Requirement has been met.

(b)        "Landlord Reimbursement" shall mean the product obtained by multiplying Eighty Five Dollars ($85.00) by 20,533 (subject to the last paragraph of the "Annual Minimum Rent" provision, above).  The Landlord Reimbursement shall be payable by wire transfer of funds by Landlord to Tenant's account no later than thirty (30) days after (i) Substantial Completion (as defined in the site design requirements attached hereto as Exhibit C ["Site Design Requirements"]) and (ii) Tenant's furnishing to Landlord of the following: (a) the certificates of insurance required under Section 11.02, (b) an indemnity in the form of Exhibit M attached to this Lease with respect to mechanics' liens arising out of Tenant's construction and (c) a Certificate of Occupancy from the City of Morgan Hill and (d) a square footage building perimeter survey certified to Tenant and Landlord (the "Floor Area Certification").  At the time Landlord pays to Tenant the Landlord Reimbursement, Landlord shall also reimburse Tenant for any building and other governmental permitting fees, impact fees (if any) and any utility hook-up fees incurred by Tenant, exceeding Sixty Thousand Dollars ($60,000) (the "Permit Reimbursement").  The Permit Reimbursement shall be paid to Tenant in addition to the Landlord Reimbursement.

(c)        If the Commencement Date shall occur during the Slack Season or prior to the date on which the Opening Requirement is met, Tenant may elect to delay the opening of the Premises for business.  In the event of such a delay, notwithstanding that the Commencement Date shall have occurred, Rent (as defined in Section 4.03) shall fully abate until the later to occur of (i) the first (1st) day following the end of the Slack Season, or (ii) the date on which the Opening Requirement is met.  However, if Tenant elects, at its discretion, to open for business during the Slack Season or prior to the date that the Opening Requirement is met, then Tenant shall pay Annual Minimum Rent and all other amounts due under this Lease, beginning on the date the Tenant opens the Premises for business.  If the Opening Requirement is not satisfied within eighteen (18) months of the Commencement Date, and Tenant has not opened for business, then Tenant shall either open the Premises for business and commence the payment of full Annual Minimum Rent or terminate this Lease within thirty (30) days after the expiration of such eighteen (18) month anniversary of the Commencement Date.

(d)        Upon payment of the Landlord Reimbursement from Landlord to Tenant, Landlord shall be the owner of the Building (as defined in the Site Design Requirements, but not including any of Tenant's Property, as defined in Section 16.01) and Landlord shall be entitled to depreciate the Building for tax purposes. Tenant shall have the right to deliver to Landlord, a bill of sale evidencing the conveyance of the Building from Tenant to Landlord.  Landlord shall also have the right to require Tenant to deliver to Landlord such a bill of sale.  However, the conveyance of the Building shall be deemed to have occurred notwithstanding that a bill of sale was not so delivered.

SECTION 2.04        Possession Date. "Possession Date" shall mean the date on which the last of the following conditions shall have been satisfied:

(a)     Landlord shall have caused the Delivery of the Land (as defined in the Site Design Requirements) to occur;

(b)     Landlord shall have delivered the soils engineer's and surveyor's certifications as required by Circuit City's Specifications (as defined in the Site Design Requirements);

(c)     Intentionally Omitted;

(d)     Intentionally Omitted;

(e)     The representations and warranties of Landlord set forth in Sections 9.03 and 20.02 below shall then be true and in effect in all material respects, and Landlord shall not then be in violation of any of the Site Covenants (as defined in Section 20.03); and

(f)     Landlord shall have delivered to Tenant a fully-executed original counterpart of a non-disturbance and/or recognition agreement in the form of Exhibit J hereto, as applicable, from each Mortgagee and Ground Lessor (as such terms are defined in Section 19.01), as more fully set forth in Section 19.02;

(g)     Intentionally Omitted; and

(h)     Landlord shall have delivered to Tenant the W-9 form attached hereto as Exhibit D.

Landlord currently anticipates that the Possession Date will occur on the Anticipated Possession Date (as defined in Section 1.01(E)), subject to the provisions of Section 2.05 below.  In no event shall the Possession Date occur prior to the Expected Possession Date (as defined below).

SECTION 2.05        Expected Possession Date. (a)        Landlord shall give Tenant no less than ten (10) days notice of the date on which the Possession Date (including, without limitation, the Delivery of the Land) shall occur, using the form of Possession Date Notice attached hereto as Exhibit C-1 (the "Possession Date Notice"). The date specified in such notice shall be defined as the "Expected Possession Date".

(b)     If Landlord fails to accomplish the Possession Date by the Expected Possession Date (subject to Force Majeure, as defined in Section 23.12 (provided, however, that in no event shall the aggregate of any and all extensions as a result of Force Majeure delay(s) exceed a period of one hundred twenty (120) days) or delays caused by Tenant), then Landlord shall pay to Tenant on demand, as a liquidated reimbursement (and not as a penalty) for all of the damages that Tenant will suffer as a result of any such delay, an amount equal to two (2) days of Annual Minimum Rent for each day that the Possession Date is delayed.  If Landlord fails to substantially complete any other element of Landlord's Work (as defined in Section 3.01) on or before the date required therefor in the Construction Schedule (as defined in the Site Design Requirements), subject to Force Majeure (provided, however, that in no event shall the aggregate

7

of any and all extensions as a result of Force Majeure delay(s) exceed a period of one hundred twenty (120) days) or delays caused by Tenant, then Landlord shall pay to Tenant on demand, as a liquidated reimbursement (and not as a penalty) for all of the damages that Tenant will suffer as a result of any such delay, an amount equal to one (1) day of Annual Minimum Rent for each day that such component of Landlord's Work is delayed.    The foregoing liquidated reimbursements represent the parties' good faith agreement as to an agreed upon amount which shall have been incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment.

SECTION 2.06        Intentionally Omitted.

SECTION 2.07        Delayed Possession.    If the Possession Date does not occur before the Outside Possession Date (subject to Force Majeure (provided, however, that in no event shall the aggregate of any and all extensions as a result of Force Majeure delay(s) exceed a period of one hundred twenty (120) days) or delays caused by Tenant), then Tenant shall have the right to (a) terminate this Lease within sixty (60) days after the Outside Possession Date, or (b) delay opening its store facility for a period not to exceed six (6) months, which right shall be exercised by Tenant upon notice to Landlord at any time prior to the Possession Date.  If Tenant terminates this Lease, then there shall be no further liability on the part of Landlord or Tenant, except: (i) for those obligations that expressly survive the expiration or other termination of this Lease, and (ii) Landlord shall (which obligation shall survive the termination of this Lease), within three (3) business days following Tenant's termination notice, reimburse Tenant for all its reasonable third-party costs and expenses incurred in connection with this Lease (including, without limitation, costs associated with the preparation and review of plans and specifications, and attorneys' fees), not to exceed Seventy-Five Thousand Dollars ($75,000) in the aggregate.

SECTION 2.08        Early Entry. Any time prior to the Delivery of the Land, Tenant shall have the right to enter the Premises to (a) inspect the physical condition of the Land (as defined in the Site Design Requirements) and conduct its due diligence investigation of the Land to determine the suitability of the Land for Tenant's intended development, construction, use and operation and (b) inspect Landlord's Work; provided, however, that such entry may not unreasonably interfere with Landlord's Work; provided further that Landlord or its representative(s) shall have the right to accompany Tenant on any such entry.  Tenant covenants to defend and indemnify Landlord and hold Landlord harmless from and against any and all claims, actions, damages, liabilities and expenses, including reasonable attorneys' fees, (i) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises during such early entry by Tenant, or any part thereof, or (ii) occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, or licensees during any such early entry, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Landlord, its agents, contractors, licensees, employees, relate to pre-existing conditions or for which any of said parties may be statutorily liable.  Such entry shall not be construed as an acceptance of the Premises by Tenant under the provisions of this Lease or as a waiver of any of the provisions hereof.

SECTION 2.09        Intentionally Omitted.

8

SECTION 2.10        Commencement Date Agreement. When the Commencement Date has been determined, Landlord and Tenant shall execute a memorandum, in the form of Exhibit E, which shall expressly confirm the Commencement Date and the expiration date of the Initial Lease Term, and which shall also ratify and affirm all of the terms and provisions of this Lease.

SECTION 2.11        Early Termination.  Anything contained in this Lease to the contrary notwithstanding, Tenant may (at its option) elect to terminate this Lease upon notice ("Special Termination Notice") given to Landlord at any time during the first six (6) months of the tenth (10th) Lease Year. If Tenant sends the Special Termination Notice as provided above, then this Lease shall terminate on the date which is the one hundred eightieth (180th) day ("Early Termination Date") following the giving of the Special Termination Notice as if such date were the natural expiration date of the  Initial Lease Term, provided that (a) Tenant shall pay to Landlord a termination fee in the amount of One Million Dollars ($1,000,000.00) and (b) Tenant shall be liable for Annual Minimum Rent through the end of the tenth (10th) Lease Year to the extent not previously paid by Tenant (the aggregate sum of the amounts set forth in clauses (a) and (b) is referred to as the "Early Termination Fee"). The Early Termination Fee shall be paid by Tenant on or before the Early Termination Date by way of check made payable to Landlord or by wire transfer in accordance with instructions to be provided by Landlord to Tenant. If Tenant fails to pay the Early Termination in accordance with this Section 2.11, Landlord, at its sole discretion, can elect to nullify and extinguish Tenant's right to terminate this Lease under this Section.

SECTION 2.12        Tenant's Permit Contingency. Anything contained in this Lease to the contrary notwithstanding, if Tenant has not obtained Tenant's Permits (as defined below) within ninety (90) days of the Effective Date (the "Permit Contingency Date"), then Tenant shall have the right (at its option) to terminate this Lease by notice to Landlord delivered within thirty (30) days after the Permit Contingency Date (and if Landlord or Tenant does not deliver such a notice within said 30-day period, then such party shall be deemed to have waived its right to terminate this Lease pursuant to this Section 2.12); provided, however, at Landlord's election, any election to terminate by Tenant shall not be effective until sixty (60) days after Landlord's receipt of such notice during which time Landlord may obtain any required Tenant's Permits. If Landlord is able to obtain Tenant's Permits within such 60-day period, Tenant's termination notice shall be deemed rescinded and of no further force and effect. If Landlord fails to obtain Tenant's Permits within such 60-day period, this Lease shall terminate. Tenant agrees to use diligent efforts to obtain Tenant's Permits by the Permit Contingency Date; provided, however, the foregoing shall not be deemed to require Tenant to initiate litigation or agree to any unreasonable condition imposed upon the issuance of any Tenant's Permits (as defined below). If this Lease terminates under this Section 2.12, then there shall be no further liability on the part of Landlord or Tenant, except for those obligations that expressly survive the expiration or other termination of this Lease. "Tenant's Permits" shall mean any and all governmental permits and approvals necessary to perform Tenant's Work.

## ARTICLE III

## INITIAL CONSTRUCTION

SECTION 3.01    Landlord's and Tenant's Work.    Landlord shall perform Landlord's work in accordance with the Site Design Requirements and as otherwise required by this Lease ("Landlord's Work").

Following substantial completion of Landlord's Work, Tenant shall promptly commence and diligently pursue to completion the construction of the Building, storefront sidewalk and all work located within the construction limit lines as shown on the Site Plan in accordance with the Site Design Requirements and in accordance with Tenant's plans for configuration and design of the Premises ("Tenant's Plans") (collectively, "Tenant's Work") for which Landlord shall pay to Tenant the Landlord Reimbursement.    Landlord and Tenant acknowledge that Landlord shall have the right to approve Tenant's Plans, which approval shall not be unreasonably withheld or delayed.    Landlord and Tenant further acknowledge receipt of the Site Design Requirements and each agrees to comply with the provisions thereof relating to their respective work.

Subject to the last sentence of Section 2.03(b), Tenant shall obtain all required governmental permits and approvals for Tenant's Work and all Tenant's Work shall be performed strictly in accordance with all applicable laws, ordinances, rules or regulations of any public authority, in a good and workmanlike manner and diligently prosecuted to completion.    In connection with Tenant's performance of Tenant's Work and during any other periods of construction during the Term, Tenant shall have the right to use as a construction staging area approximately twenty thousand (20,000) square feet of the Common Areas in the location identified on the Site Plan as "Staging Area." To the extent there are any defects in construction solely related to or arising out of Tenant's Work, Tenant shall repair and be responsible for same, at Tenant's sole cost and expense.

## ARTICLE IV

## RENT

SECTION 4.01    Annual Minimum Rent.    Commencing on the Commencement Date, Tenant shall pay to Landlord monthly installments of Annual Minimum Rent without notice, setoff or deductions, except as otherwise expressly provided for in this Lease, on the first (1st) day of each calendar month during the Term.    However, if the Commencement Date occurs on a day other than the first (1st) day of a calendar month, then the monthly installment of Annual Minimum Rent and other charges shall be prorated for the remaining days of that calendar month.    Anything contained in this Lease to the contrary notwithstanding, if Tenant shall be paying any form of reduced Rent, Ground Rent (as defined in Section 18.02(a)) or any other ground rent in lieu of Annual Minimum Rent as permitted under this Lease during such time as Tenant shall be entitled to an abatement of, deduction from or setoff against Annual Minimum Rent, then Tenant shall be entitled to the same abatement of, deduction from or setoff against the applicable reduced Rent, Ground Rent or the other ground rent.

SECTION 4.02        Additional Rent.    The term "Additional Rent" shall mean all amounts required to be paid by Tenant under this Lease other than Annual Minimum Rent. Wherever an item of Additional Rent is payable "on demand" or no time period for payment of an item of Additional Rent is specifically provided for in this Lease, such item of Additional Rent shall be paid by Tenant within thirty (30) days after Tenant's receipt of Landlord's invoice therefor, accompanied by the appropriate back-up documentation.

SECTION 4.03        Rent; Method of Payment.    The term "Rent" shall mean, collectively, Annual Minimum Rent and Additional Rent.  All payments of Rent shall be made by check payable to Landlord, mailed or delivered to the address listed in Section 22.01 or to such other person or place as Landlord shall designate by notice to Tenant, or by such other reasonable method of payment (such as by wire transfer).

# ARTICLE V

## COMMON AREA MAINTENANCE AND COST

SECTION 5.01        Maintenance.  Landlord shall operate, maintain, insure, repair and replace the Common Areas owned by Landlord or cause the same to be done in a manner so as to maintain the portions of the Shopping Center owned by Landlord in a good, first-class order, repair and condition.  Without limiting the generality of the foregoing, Landlord shall be solely responsible, and Tenant shall have no obligation (except to reimburse Landlord for Tenant's Share of the cost thereof, as provided below), for the operation, maintenance, management, repair or replacement of the parking areas (including, without limitation, any necessary slurry coating, repaving and restriping), parking lot lighting, utility systems and connections, security (if Landlord elects), access ways and other Common Areas owned by Landlord, capital improvements (provided, however, that in the event of a capital improvement, the cost of such capital improvement shall be amortized on a straight -line basis over five (5) years) and for the clearing of snow and ice from such Common Areas.  Landlord may at any time close temporarily for reasonable periods any Common Areas to make repairs, to prevent the acquisition of public rights therein or discourage non-customer parking (which periods Landlord shall give advance notice of (except in the event of emergency) and use commercially reasonable, good faith and diligent efforts to minimize); provided, however, that, except in the event of emergency, Landlord shall not perform any non-routine repair, maintenance or other work in the Common Areas or Tenant's Preferred Area from November 1 through January 1 of any Lease Year. Landlord shall use all reasonable efforts to perform any necessary repairs in the most expeditious manner possible and in such a way and at such times as to cause the least interference possible with ingress and egress to and from the Premises.

Tenant acknowledges and agrees that this Lease is an absolute "net" lease, and that all revenues received by Landlord hereunder shall be received by Landlord without any deduction or offset whatsoever by Tenant, foreseeable or unforeseeable except as specifically permitted by the terms of this Lease; provided, however, that in the event of a conflict between this provision and the other provisions of this Lease, such other provisions shall control.

SECTION 5.02        Construction Clean-up and Post-Possession Work.  Following the Possession Date, any construction by Landlord or other tenants or occupants of the Shopping Center affecting any portion of the Shopping Center shall be subject to the following terms and conditions:

(a)        Staging and storage of materials and parking of construction vehicles shall not occur in Tenant's Preferred Area as shown on the Site Plan;

(b)        Landlord shall diligently ensure that, from and after Tenant's opening for business to the public, any construction activities (including the ingress and egress of construction and delivery vehicles engaged in the performance of such work) shall not cause a material, adverse reduction of or impact to the access to Tenant's Preferred Area or the Premises;

(c)        Landlord shall maintain the Shopping Center in a clean, safe, and sightly condition, and shall use reasonable efforts to ensure that such construction shall not materially adversely interfere with the normal conduct of any business operations in the Premises; and

(d)        Landlord shall clear all rubble and debris from the Premises and Common Areas resulting from any construction by Landlord or any other tenant or occupant of the Shopping Center.

SECTION 5.03        CAM Costs. "CAM Costs" shall mean the amount (without profit or "mark up" by Landlord or any Affiliate, as defined in Section 11.07, of Landlord) of all reasonable costs and expenses incurred by Landlord (x) in managing, operating, insuring, securing (if Landlord so elects), repairing or replacing and maintaining the Common Areas owned and maintained by Landlord, and (y) as an owner under the OEA (but only to the extent such costs and expenses relate to the operation, maintenance, management, repair or replacement of the Common Areas), all in a manner commensurate with first-class shopping centers, and, in addition thereto, in lieu of any cost(s) or expense(s) relating to the administration and management of the Common Areas owned and maintained by Landlord, an administrative fee (the "Administrative Fee") equal to ten percent (10%) of the CAM Costs (as defined above) for the calendar year in question, but excluding from the computation of such Administrative Fee the cost of utilities and the cost of insurance premiums.  In no event will CAM Costs include: (a) real estate taxes; (b) any costs associated with maintenance performed by another tenant or occupant of the Shopping Center on portions of the Common Areas separately maintained by such tenant or occupant; (c) any dues or charges for a merchants' or other association of occupants of the Shopping Center; (d) maintenance, repairs or replacements to the Common Areas (i) necessitated by the gross negligence or wrongful act of Landlord or by the negligent or wrongful act of any tenant or occupant, (ii) made to correct any construction defect, or (iii) relating to any improvements or utility systems not within the Common Areas (e.g. roofs, exterior walls, fire protection systems) (unless serving the Common Areas, including, but not limited to, transformers and conduits); (e) repairs or replacements necessitated by any governmental entity or made to correct any condition in existence prior to the Commencement Date or to correct damage caused by subsidence or adverse or substandard soil conditions; provided, however, in all events (but subject to the remaining provisions of this Section) CAM Costs shall include costs of any repairs or replacement required as a result of new laws, regulations and/or orders enacted or becoming effective after the Commencement Date and/or

changes in laws, governmental regulations and/or orders, or different interpretations of same, after the Commencement Date; (f) amounts reimbursed or reimbursable from insurance proceeds, under warranty, or by any tenant or occupant of the Shopping Center or any other third party (which amounts Landlord shall use reasonable efforts to collect), other than pursuant to a Common Area expense provision similar to this Section 5.03; (g) premiums for insurance for coverage maintained by Landlord with respect to the Shopping Center (except that premiums for Common Areas liability insurance, property insurance and other insurance maintained by Landlord pursuant to Article 11, to the extent any of the foregoing relate to the Common Areas may be included as part of CAM Costs provided the coverage provided by such liability insurance policy is not in excess of the limits established in Section 11.01), any costs resulting from insurance deductibles under any commercially reasonable and available insurance policy maintained by Landlord, and any costs which would have been reimbursed or paid for by insurance proceeds had Landlord maintained the insurance required under Section 11.01; (h) capital improvements with respect to the initial construction of the Shopping Center (as opposed to the replacement or repair of capital items within the Common Area that, in Landlord's reasonable judgment, have worn out, become obsolete or no longer reasonably serve their intended functions, which such costs (even if constituting capital expenditures) shall be included in CAM Costs, subject to the following provisions of this clause), which under generally accepted accounting principles are properly classified as capital improvements; provided, however, in all events CAM Costs shall include the costs (including financing or an equivalent interest rate based on Landlord's commercially reasonable cost of money) of capital repairs and replacements of capital items within the Common Area, although the costs of same shall amortized over a seven (7) year period (Landlord hereby representing to Tenant that each tenant of the Shopping Center is bound by the same [or longer] amortization period, and upon request of Tenant in connection with the exercise of audit rights, Landlord will evidence same by delivering to Tenant for review redacted copies of applicable leases), and only such amortization shall be included within CAM Costs for each calendar year; (i) reserves for anticipated future expenses; (j) interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner (provided that such failure is not is due to Tenant's failure to pay Landlord in a timely manner); (k) Landlord's personnel, overhead, home office or administrative expenses, except for the Administrative Fee; (l) amounts incurred to remediate any Hazardous Materials (as defined in Section 9.03(a)), other than amounts incurred in the clean up of ordinary, day to day oil spills from cars and similar items; (m) any new improvements to the Shopping Center or Common Areas including, but not limited to, renovations to the facade of the Shopping Center and improvements to landscaped areas of the Shopping Center (provided that replacements of existing landscaping within the Common Areas shall be included in CAM Costs) or (n) promotional expenses relating to the Shopping Center (provided, however, costs for the purchasing, installing, maintaining, removing and storing of holiday and/or seasonal lighting and decorations for the Shopping Center shall be included in CAM Costs; provided further, however, in no event shall Tenant be required to contribute to the cost of holiday and/or seasonal decorations unless Target shall also contribute towards same. Notwithstanding the foregoing, Tenant shall reimburse for Tenant's Share of Landlord costs for any graffiti removal performed by Landlord on the Premises within thirty (30) days of Tenant's receipt of an invoice or other reasonable evidence of the amount of such costs and/or, shall reimburse Landlord, as part of Tenant's Share of CAM Costs, for any graffiti removal performed by Landlord on other structures within the Common Areas owned and maintained by Landlord. Further, Tenant shall

reimburse Landlord for Tenant's Share of Landlord's reasonable costs for any periodic painting of the exterior of the Premises performed by Landlord (or at Landlord's direction) within thirty (30) days of Tenant's receipt of an invoice or other reasonable evidence of the amount of such costs; provided, however, that in no event shall Tenant be required to contribute to such costs with respect to any other buildings within the Shopping Center, or more than once every seven (7) years.

SECTION 5.04       Tenant's Share of CAM Costs.   Tenant shall pay to Landlord Tenant's Share of CAM Costs in each calendar year during the Term.  Tenant's Share of CAM Costs shall be appropriately prorated for partial calendar years at the beginning and at the end of the Term.

SECTION 5.05       Payment of CAM Costs.  Tenant's Share of CAM Costs shall be payable in equal monthly installments on the first (1st) day of each month.  Such monthly installments shall be at the rate of one-twelfth (1/12th) of Tenant's Share of CAM Costs for the preceding calendar year, subject to immediate adjustment when the actual amount of CAM Costs or a change in Tenant's Share thereof is determined.  Within one hundred twenty (120) days after the end of each calendar year, Landlord shall furnish Tenant with a detailed statement certified by an authorized representative of Landlord of the actual amount of CAM Costs and of Tenant's Share thereof for the preceding calendar year (including the basis of allocation to Tenant). Within thirty (30) days after receipt of such statement by Tenant, Tenant shall pay to Landlord any deficiency due.  Any surplus paid by Tenant shall, at Tenant's option, be credited against the next installment(s) of Rent or be refunded to Tenant forthwith.  Landlord's records of CAM Costs for each year shall be available for inspection by Tenant for a period of three (3) years after Landlord notifies Tenant of Tenant's Share of CAM Costs for the year in question.  Tenant may, during such three (3) year period, upon thirty (30) days' prior notice to Landlord, have an audit made of CAM Costs and the allocations thereof to Tenant including, without limitation, reviewing copies of paid bills and other records substantiating its expenditures ("CAM Records").  In addition, Landlord agrees to forward copies of CAM Records to Tenant or its representative within thirty (30) days of a request therefor.  Tenant agrees to keep such CAM Records confidential, except that Tenant may disclose the same to its attorneys, accountants or agents and/or in connection with the judicial or quasi-judicial resolution of a dispute between Landlord and Tenant regarding CAM Costs, or except as otherwise required by law.  Any overcharges shown by any such audit shall, at Tenant's option, be credited against the next installment(s) of Rent or be refunded to Tenant within thirty (30) days of written notice and/or proof of such overcharges, and any undercharges shown by any such audit shall be paid by Tenant to Landlord within thirty (30) days of written notice and/or proof of such under charges. If any such audit shows that Tenant's Share of CAM Costs have been overstated by more than five percent (5%), or that the CAM Costs have been overstated by more than four percent (4%), then Landlord shall immediately pay to Tenant the reasonable cost of such audit. Notwithstanding anything to the contrary contained herein, in no event shall Tenant engage or permit a contingency fee auditor or an auditor whose fee is dependent upon the amount or number of CAM Costs discrepancies discovered to review or audit Landlord's books, records or other information relating to CAM Costs.

SECTION 5.06       Cost Pooling. Notwithstanding anything contained in this Article 5 to the contrary, at Landlord's option:  (i) Landlord shall have the right to allocate certain CAM

Costs to less than all of the occupants in the Shopping Center, in which event Tenant's share of such costs (the "Cost Pool") shall be as follows:  (A) in the event Tenant is one of the occupants participating in such Cost Pool, its share of such CAM Costs shall be calculated in the manner set forth in Section 1.01(S), but the denominator used to determine such share shall exclude the Floor Area attributable to those occupants not participating in such Cost Pool, and such CAM Costs shall only be attributable to those occupants participating in the Cost Pool (*i.e.*, in no event shall any participant in a Cost Pool bear any costs attributable to occupants not participating in the pool) ; or (B) in the event Tenant is not one of the occupants participating in such Cost Pool, all costs associated with such Cost Pool shall be excluded from the definition of CAM Costs prior to Landlord determining Tenant's Share thereof.   In the event that Tenant requests that Landlord provide it with any extraordinary services (i.e., services not generally chargeable to CAM Costs or costs attributable solely to Tenant or the Premises), Tenant shall (within thirty (30) days following written notice) directly reimburse Landlord for any actual, reasonable expenses incurred by Landlord in connection with the provision of such services.

## ARTICLE VI

## TAXES

SECTION 6.01        Taxes.   Landlord shall pay, or cause to be paid, when due all general and special real estate taxes and assessments levied and assessed against the land, improvements and buildings comprising the Landlord Tract.   Except as hereinafter provided to the contrary, for each calendar year or part thereof during the Term, Tenant shall pay Tenant's Share of the net amount (after reflecting all discounts for early payment, refunds and credits and after excluding all penalties, interest, late charges and real estate taxes and assessments levied against free-standing buildings which are separately assessed) of all general and special real estate taxes and assessments (collectively, "Taxes") levied and assessed against the land, improvements and buildings comprising the Landlord Tract.   The term "Taxes" shall also include any tax, fee, levy, assessment or charge (i) in substitution, partially (but only to the extent) or totally, of any tax, fee, levy, assessment or charge now or previously included within the definition of Taxes including, without limitation, those imposed or required by any governmental authority to increase tax increments to governmental authorities and for services such as fire protection, street, sidewalk and road maintenance, refuse removal or other governmental services formerly provided without charge to property owners or occupants; or (ii) the nature of which was hereinbefore included within the definition of Taxes.   Tenant's Share of Taxes shall be calculated in the manner set forth in Section 1.01(S), but the denominator used to determine such share shall exclude the Floor Area attributable to any free-standing buildings within the Landlord Tract which are separately assessed, the Taxes on which are not paid by Landlord.   Tenant's Share of Taxes shall be equitably adjusted if the use or value of any portion (including the Premises) of any buildings in the Landlord Tract included in computing Tenant's allocation cause Taxes attributable to such buildings to be assessed at a disproportionately higher rate.

Landlord shall endeavor to create a separate tax parcel which shall include the Premises, the land underlying the Building and approximately Tenant's pro rata share of the parking areas and Common Area, subject to Tenant's reasonably approval (as so approved by Tenant,

"Tenant's Tax Parcel"). If Tenant's Tax Parcel is segregated for tax purposes to permit a single, separate tax bill for Tenant's parcel as described in the preceding sentence, then Tenant shall, prior to delinquency, pay all Taxes levied or assessed during the term hereof against its parcel directly to the taxing authority and provide Landlord with written evidence of such payment. If any such tax bill is sent to Landlord, then Landlord shall, at least sixty (60) days prior to delinquency, forward the tax bill to Tenant.

SECTION 6.02    Payment of Taxes.    Tenant shall be liable for and shall pay Tenant's Share of Taxes only with respect to Taxes accruing during the Term, regardless of when such Taxes are billed or become due and payable. Tenant's Share of Taxes shall be appropriately prorated for partial fiscal tax years at the beginning and at the end of the Term. Tenant shall pay Tenant's Share of Taxes ten (10) days before the same are due and payable, provided that Landlord has provided Tenant with a copy of a tax bill for such Taxes and a statement setting forth the manner in which Tenant's Share of Taxes is calculated not less than thirty (30) days prior to the date such Taxes are due and payable.

SECTION 6.03    Exclusions from Taxes.    Notwithstanding anything contained in this Lease to the contrary with respect to betterments or other extraordinary or special assessments, Tenant's obligations shall apply only to the extent such assessments (and interest thereon) are payable in respect of the Term, and Tenant's Share of any such assessments shall be determined as if such assessments are payable in installments over the longest payment period permitted by law for the particular assessment (but only if there is no additional cost to Landlord for payment in installments), in which case Tenant shall pay only those installments payable in respect of the Term.  Further, Taxes shall not include any: (i) income, excise, profits, estate, inheritance, succession, gift, documentary, transfer, franchise, capital, or other tax or assessment upon Landlord or upon the rentals payable under this Lease (except that any such amount shall be included in Taxes to the extent that such tax is in substitution or is an alternative for or in lieu of Taxes that otherwise would be paid by Tenant under the terms of this Lease); (ii) taxes on rents (other than to the extent that such taxes are customarily paid by retail tenants in the applicable jurisdiction), gross receipts or revenues of Landlord from the Premises (except that any such amount shall be included in Taxes to the extent that such tax is in substitution or is an alternative for or in lieu of Taxes that otherwise would be paid by Tenant under the terms of this Lease); (iii) fine, penalty, cost or interest for any tax or assessment, or part thereof, which Landlord or its lender failed to timely pay, unless such late payment was attributable to late payment by Tenant of Tenant's Share of Taxes (in which event such fine, penalty, cost or interest shall be paid jointly (and proportionately) by Tenant and all other tenants that failed to make timely payment, if any); (iv) assessments assessed prior to the Commencement Date or assessments used to pay for or finance a public improvement specifically and solely required as a result of the initial construction or expansion of the Shopping Center or the Premises, provided, however, and notwithstanding anything herein to the contrary, in all events Taxes shall include special assessments subsequent to the Commencement Date relating  solely to costs for maintenance (but not capital repair or replacement) of on-site and/or off-site improvements serving the Shopping Center,  including, but not limited to, the landscaping, lighting and a detention pond; (v) from and after the second (2nd) sale or ground lease during the Term, Taxes resulting directly from an increase in the assessment caused by a sale or ground lease of all or any portion of the Shopping Center to an Affiliate of Landlord, or more than once every four (4) years; or (vi) fees imposed upon Landlord in connection with Landlord's development of the

Shopping Center (including, without limitation, trip generation fees). All Taxes payable by Tenant pursuant to this Article VI shall be determined as if the Shopping Center was the only property owned by Landlord.

SECTION 6.04        Right to Contest. Provided that Tenant has paid any Taxes as and when required, at Tenant's request, Landlord, without cost or expense to Landlord, shall contest the amount or validity of any assessed valuation or Taxes, failing which Tenant may contest the assessed valuation or Taxes by appropriate proceedings conducted in good faith. If Tenant initiates such contest, then Landlord, without cost or expense to Landlord, shall cooperate with Tenant including, without limitation, executing any and all documents required in connection therewith and, if required by any governmental authority having jurisdiction, joining with Tenant in the prosecution thereof. If any rebate or refund of Taxes is received as a result of any contest or otherwise, then Tenant shall be entitled to Tenant's Share thereof (after reasonable and customary expenses incurred by Landlord and/or Tenant in connection with such contest are paid to the party which incurred such expense). Notwithstanding the foregoing, if the Premises is not separately assessed as contemplated in Section 6.01 and is included in an assessment covering all or any other portions of the Shopping Center, then Tenant's rights under this Section 6.04 shall only apply if Tenant's request to contest Taxes is joined by at least one (1) other National Tenant or Regional Tenant occupying 25,000 square feet of Floor Area or more in the Shopping Center. As used in this Lease, "National Tenant(s)" shall mean a tenant(s) operating, as of the applicable date, at least seventy-five (75) retail stores in the continental United States under a single trade name in first-class shopping centers, and "Regional Tenant(s)" shall mean a tenant(s) operating, as of the applicable date, at least thirty-five (35) retail stores in first-class shopping centers in the State of California under a single trade name.

SECTION 6.05        Personal Property Taxes. Tenant shall pay before delinquency all taxes, assessments, license fees and public charges levied, assessed or imposed upon its business operation, as well as upon its trade fixtures, merchandise and other personal property in or upon the Premises. In the event any such items of property are assessed with property of Landlord, such assessment shall be divided between Landlord and Tenant to the end that Tenant shall pay only its equitable portion of such assessment. No taxes, assessments, fees or charges referred to in this paragraph shall be considered as Real Estate Taxes under the provisions of this Article 6.

## ARTICLE VII

## UTILITIES

SECTION 7.01        Utilities. Landlord covenants and agrees that the Premises shall be properly serviced with gas, electric, telephone, water, sewer and other utilities sufficient to meet Tenant's requirements in accordance with the Site Design Requirements. Tenant, as part of Tenant's Work, shall cause all such utilities to the Premises to be separately metered at Tenant's sole cost and expense. Tenant shall pay, as same become due and payable, all charges for utility services furnished to the Premises during the Term. If at any time during the Term, for any reason, Landlord shall provide utility service to the Premises, Tenant's cost for such utility service shall not exceed the lesser of (a) Landlord's actual cost for such utility service, or (b) the

17

cost of the same service if Tenant had obtained such service directly from such utility provider. In addition, Tenant shall have the right to install a test meter to verify its utility usage. Notwithstanding anything contained in this Lease to the contrary, Tenant shall be entitled to select the utility service providers to the Premises including the telecommunication provider. Landlord shall permit full and free access to all available conduits in the Shopping Center for the applicable utility service subject to such reasonable requirements as Landlord may impose.

SECTION 7.02    Interruption. If utilities serving the Premises are disrupted due to the negligence or willful misconduct of Landlord, its agents, contractors, servants or employees, then Landlord shall promptly restore the affected utilities at Landlord's sole cost and expense. If such disrupted utilities are not restored within seventy-two (72) hours after Landlord has knowledge of such disruption and Tenant is unable to conduct its normal business in the Premises as a result of such disruption, then Rent shall be equitably abated during the period of disruption.

# ARTICLE VIII

## USE OF PREMISES

SECTION 8.01    Permitted Use. The Premises may be used and occupied for any Permitted Use. However, Tenant shall not use the Premises for any of the Prohibited Uses or the Existing Exclusives (as defined in Section 8.05(a)), to the extent then applicable. "Prohibited Uses" shall mean any of the uses restricted under Section 5.1 of the OEA (as defined in Section 20.04 below). Subject to the foregoing, Tenant may use a portion of the Premises for a food and beverage service operation (such as a café or coffee bar) incidental to any Permitted Use.

SECTION 8.02    Conduct of Operations. Subject to the other provisions of this Lease (including, without limitation, Article II and Section 23.12), Tenant shall initially open its store for business to the public in the Premises for at least one (1) day, not later than the two hundred seventieth (270th) day after the Commencement Date. Other than as expressly set forth in the preceding sentences, Tenant shall have no obligation to open or operate any business in the Premises, and shall have the right, at any time, to cease to conduct any business operations in the Premises ("Go Dark"), and Tenant shall incur no liability to Landlord by reason thereof.   In the event Tenant elects to Go Dark (other than due to Permitted Closures), Tenant shall give ten (10) days prior written notice to Landlord of such election to Go Dark.  Following Tenant's election to Go Dark, Tenant shall continue to (a) pay to Landlord Annual Minimum Rent, Additional Rent and all other charges in the amounts and at the times due and payable as provided in the Lease, and (b) comply with all other obligations and provisions of this Lease. In the event that Tenant has notified Landlord of its election to Go Dark, or in fact goes dark, and Tenant remains closed for business for a period of two hundred seventy (270) consecutive days (the "Go Dark Period"), then Landlord may elect to terminate this Lease on sixty (60) days prior written notice to Tenant (the "Recapture Notice) and payment to Tenant of the then unamortized costs (amortized on a straight-line basis over the initial Term) of any alterations or improvements made by Tenant to the Premises (the "Unamortized Costs") (provided, however, with respect to

18

the Go Dark Period only, Landlord's payment of Unamortized Costs shall be limited to those incurred by Tenant as a result of legally-mandated upgrades or improvements to the Premises). In the event Landlord delivers the Recapture Notice to Tenant, this Lease shall terminate sixty (60) days after the date of such delivery and payment of the Unamortized Costs with no further liability to either party.  If this Lease is terminated as set forth herein, Tenant shall deliver the Premises to Landlord in a broom-clean condition, free and clear of all signs, movable trade fixtures, liens, leases and other encumbrances made or suffered by Tenant, unless Landlord consents to any such trade fixtures remaining in or on the Premises.  Upon written request from Landlord (but not more than once in any calendar year), Tenant shall provide Landlord with the then current Unamortized Costs of the Tenant's leasehold improvements as described in the immediately preceding sentence.

"Permitted Closure(s)" shall mean (i) any temporary closures for Force Majeure, reconstruction following casualty or condemnation or permitted active and continuously pursued alterations or remodeling (not to exceed two hundred seventy (270) days in the aggregate per alteration/remodeling event), which prevent Tenant from conducting its normal business operations in the Premises; provided, however, that a Permitted Closure shall only continue for so long as Tenant is diligently working to reopen the Premises for business and (ii) any period following the execution of a letter of intent for an assignment of this Lease or a sublease of the entire Premises provided that (x) the parties thereto are proceeding diligently and in good faith to enter into an assignment of this Lease or sublease, (y) the parties enter into an executed lease assignment or sublease within one hundred eighty (180) days following the date of execution of the letter of intent, and (z) such assignee or sublessee opens for business from the entirety of the Premises within three hundred sixty (360) days after the date of execution of such assignment or sublease.

SECTION 8.03    Leasing Restrictions.  Landlord shall construct, lease, operate, maintain and manage the Shopping Center as a first-class shopping center comparable to other first-class shopping centers in central California.  In that regard, Landlord shall not lease, rent or occupy, or permit to be leased, rented or occupied, any portion of the Landlord Tract for any of the Prohibited Uses.  In addition, Landlord shall not lease, rent or occupy, or permit to be leased, rented or occupied, any building within three hundred (300) feet of the front entrance of the Premises for use as a restaurant (including a so-called "quick service" restaurant or take-out operation); provided however, not withstanding Exhibit H to the contrary, Tenant shall be permitted to operate a café or coffee bar ("Coffee Bar") for the preparation and sale of food and beverages provided that the sales and display area devoted to the food and beverages do not exceed ten percent (10%) of the floor area of the Premises, and provided that sales for such incidental use as a Coffee Bar shall not exceed ten percent (10%) of gross sales made in the Premises.  Notwithstanding the foregoing, in the eastern half of the building labeled "Shops A" on the Site Plan, Landlord may lease up to 4000 square feet of Floor Area for "quick service" restaurant use (which may include a lease to Chipotle for up to 2,600 square feet of Floor Area).

SECTION 8.04    Tenant's Exclusive.

(a)    Landlord shall not lease, rent or occupy, or permit to be leased, rented, or occupied, any other premises in the Landlord Tract (from time to time) for the sale, rental, installation, servicing and/or repairing, either singly or in any combination, of the Products.  The

19

Incidental Sale (as defined below) of the Products in connection with the overall business of another tenant shall not be deemed a violation this Section 8.04(a). The exclusive use rights granted to Tenant in this Section 8.04(a) (the "Exclusive Use Protection") shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of all or part of the Premises. Notwithstanding anything to the contrary contained in this Section 8.04, other than for Permitted Closures as defined in Section 8.02, if Tenant fails to use the Premises as a consumer electronics superstore for a continuous period of three hundred sixty five (365) days, Tenant shall lose the Exclusive Use Protection described above.

(b)    The Exclusive Use Protection shall not apply to:

(i)    Staples, Radio Shack and Game Stop (and their successors and assigns), provided if Landlord ever recovers control of the existing tenant's premises or if Landlord has the right to consent to any use by an assignee or transferee of the existing tenant, or to a change in the existing tenant's permitted use, then Tenant's Exclusive Use Protection shall apply to the existing tenant's premises; or

(ii)    the occupancy by up to two (2) cell phone retailers (one of which occupying up to 3000 square feet of Floor Area and located in "Phase 1" of the Shopping Center, and the other occupying up to 1800 square feet of Floor Area and located in "Phase 2" of the Shopping Center); or

(iii)    the incidental sale of the Products in connection with the overall business of another retailer, where such sales are the lesser of (A) five hundred (500) square feet, or (B) twenty percent (20%) of such retailer's display area; or

(iv)    a supermarket (for example, Safeway, Winn-Dixie, or Stop & Shop), department store or discount department store (for example, Wal-Mart, K-Mart, J.C. Penney, Macy's, Kohl's, Gottschalk's or Target), or discount club (for example, Costco, BJ's Wholesale Club, or Sam's Club); provided, however, that, as to each of the foregoing, such stores (y) are National Tenants or Regional Tenants (as such terms are defined in Section 6.04) and (z) contain at least forty-five thousand (45,000) square feet of Floor Area; or

(v)    a toy superstore or baby superstore such as Babies R Us or Toys R Us, as such stores are typically operated in the Western United States.

(c)    Tenant shall give Landlord written notice of any alleged violation of the Exclusive Use Protection, which notice shall include a description of the violation. If Landlord has failed to cure such violation within sixty (60) days from the date of Landlord's receipt of such notice, then Tenant may elect to pay an amount equal to fifty percent (50%) of the Annual Minimum Rent that would have otherwise been due during such period in lieu of Annual Minimum Rent, retroactive to the initial date of the violation, for so long as such violation by Landlord shall continue ("Exclusive Violation Alternative Rent"). If such breach shall continue for more than three hundred sixty (360) days, then Tenant shall have the right to terminate this Lease within thirty (30) days after the end of such three hundred sixty (360) day period. If Tenant elects to terminate this Lease pursuant to this Sections 8.04(c), then this Lease shall

terminate on the date set forth in Tenant's notice of termination without further liability on the part of Landlord or Tenant, except for those obligations which expressly survive the expiration or other termination of this Lease, and except as set forth in the last sentence of this subsection. If Tenant does not exercise its right to terminate this Lease within the thirty (30) day period described above, Tenant's right to terminate the Lease under this Section 8.04(c) shall be deemed waived and Tenant shall resume making payments of Annual Minimum Rent when due. Notwithstanding any of the foregoing to the contrary, Tenant shall have all rights available to it at law or in equity as a result of a violation by Landlord of the Exclusive Use Protection. The provisions of this Section 8.04(c) shall survive the termination of this Lease.

        (d)    If any tenant or other occupant of the Landlord Tract violates the Exclusive Use Protection and such violation also constitutes a default under its lease with Landlord, then Landlord shall use commercially reasonable efforts to prohibit any such violation (i.e., send a letter demanding compliance to the relevant party, or where Landlord deems necessary in its sole business judgment, the commencement of legal proceedings against such tenant or occupant) within a reasonable period not to exceed sixty (60) days, after receiving the notice of violation described in Section 8.04(c). If Landlord shall have failed to use commercially reasonable efforts within such period to prohibit any such violation, or if the violation does not cease within one hundred eighty (180) days after Landlord shall have been made aware of such violation, then Tenant shall have the right (y) to conduct and prosecute such legal proceedings (including an action for injunctive relief) in its own name, at Tenant's expense, or (z) in the event the right set forth in clause (y) above is not permitted to be exercised under Laws, to conduct and prosecute such legal proceedings in the name of Landlord, at Tenant's expense, and Landlord shall cooperate with Tenant with respect to such prosecution (including executing any documentation or authorization reasonably required by Tenant in connection with such prosecution and by appearing at any hearing or trial with respect to such prosecution); provided, however, that in the event Tenant prevails, Landlord shall reimburse Tenant for any reasonable costs and expenses incurred by Tenant in prosecuting such legal proceedings under subsections (y) or (z) above. If such violation shall continue for more than three hundred sixty (360) days after Landlord shall have been made aware of such violation, then, provided Tenant has not been in default of any of its obligations (including its obligation to pay Annual Minimum Rent) under this Lease beyond any applicable notice and cure periods, Tenant shall have the right to terminate this Lease within thirty (30) days after the end of such three hundred sixty (360) day period. If Tenant elects to terminate this Lease pursuant to this Section 8.04(d), then this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of Landlord or Tenant, except for those obligations which expressly survive the expiration or other termination of this Lease. If Tenant does not exercise its right to terminate this Lease within the thirty (30) day period described above, Tenant's right to terminate the Lease under this Section 8.04(d) shall be deemed waived.

SECTION 8.05      Exclusives Applicable To Tenant.

        (a)    Tenant shall not use (or permit to used) the Premises in violation of those certain exclusives granted by Landlord to certain other tenants in the Shopping Center pursuant to the terms and provisions of leases which have been executed prior to the Effective Date (the "Existing Exclusives"). Landlord represents and warrants that a true and complete listing and description of such Existing Exclusives is attached as Exhibit H. Notwithstanding the foregoing,

Tenant shall be entitled to enter into a separate agreement with any tenant or other occupant for whose benefit the Existing Exclusive is granted which nullifies or modifies the corresponding Existing Exclusive with regard to the Premises.

(b)    Landlord represents and warrants that, other than the Existing Exclusive(s), there are (and will be) no exclusives or use restrictions in effect, other than the Prohibited Uses, which would apply to Tenant or any other occupant of the Premises.

SECTION 8.06        Intentionally Omitted.


# ARTICLE IX

# REPAIRS

SECTION 9.01        Landlord Obligations.    Except for obligations arising from the negligent acts or omissions or willful misconduct of Tenant, its agents, employees or contractors, Landlord shall, at Landlord's sole expense (and not included in CAM Costs  except as noted below), keep, maintain and repair (including replacements, if necessary) (a) the roof of the Premises (to be maintained in a watertight condition at all times), all utility systems and lines (including, without limitation, electrical, plumbing, mechanical and/or alarm systems) serving the Premises (from the point of connection at the Premises to the public utility mains), the exterior of the Premises (including, without limitation, the walls and Other Improvements, but excluding window glass, the storefront, doors and frames) and the structural portions of the Premises including, without limitation, footings and foundation, floor slab, and structural walls, columns and beams, and (b) any damage to the Premises or Landlord's Tract which is caused by (i) defects in Landlord's Work, or (ii) the act or omission of Landlord, its employees, agents or contractors.  Landlord's obligations under this Section 9.01 shall be subject to the provisions of Articles XII and XIII. Landlord shall perform any and all repairs and replacements to be performed under this Lease without material interference with or disruption to the normal conduct of any business operations in the Premises.  Landlord shall give Tenant at least five (5) days prior notice of any repairs or replacements to the Premises (except in the case of an emergency posing imminent risk of material harm to persons or property, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances).  If, in Tenant's reasonable judgment, Landlord's repairs would materially interfere with or disrupt the normal conduct of any business operations in the Premises, then, other than in case of an emergency, Landlord shall perform such repairs only after the regular hours of operation of the Premises.

SECTION 9.02        Tenant's Obligations.

(a)    Subject to Landlord's obligations under Section 9.01, and except for obligations arising from the negligent acts or omissions or willful misconduct of Landlord, its agents, employees or contractors, Tenant shall at all times during the Term, at Tenant's sole expense, keep and maintain in good order, condition and repair (including replacements, if necessary) and in a safe condition (i) the non-structural, interior elements of the Premises

(including painting, window glass, the non-structural portion of storefront, doors and frames, the heating, ventilation and air conditioning ("HVAC") units, the trash compactor (if serving the Premises exclusively), and the electrical, plumbing, mechanical, and/or alarm systems located in and serving exclusively the Premises), and (ii) any damage to the Premises or the Shopping Center which is caused by the act or omission of Tenant, its employees, agents or contractors. All such maintenance, repairs or replacements shall be done in a good and workmanlike manner and shall be reasonably consistent with the quality of labor and materials originally used in the Premises. Tenant's obligations under this Section 9.02 shall also be subject to the provisions of Articles XII and XIII and to Landlord's obligation to clear the Premises of all dirt and debris following completion of Landlord's Work pursuant to Section 5.02.

(b)    If any HVAC units must be repaired or replaced during the last two (2) years of the Term, then in light of the fact that the same will require a substantial expenditure by Tenant and will result in a benefit to Landlord following the expiration of the Term, upon the expiration or earlier termination of this Lease (unless such termination results from Tenant's default of its obligations under this Lease), Landlord shall reimburse Tenant for the unamortized portion of the reasonable expenses incurred by Tenant in connection with the replacement of such equipment during the last two (2) years of the Term, based on (i) the date of the installation of such new equipment, and (ii) a ten (10) year amortization period. The provisions of this Section 9.02(b) shall survive the expiration or earlier termination of this Lease.

SECTION 9.03    Hazardous Materials.

(a)    Based on Landlord's actual knowledge as of the Effective Date, which knowledge is solely based on its review of the "Phase I and Limited Phase II Environmental Site Assessment," prepared by The Twining Laboratories, Inc. (April 3, 2006), and except as disclosed therein, as of the Possession Date, there are (and will be) no Hazardous Materials present in the Shopping Center which are required to be remediated under, or otherwise exist in violation of, applicable Environmental Regulations (as hereinafter defined). Landlord agrees that the removal or neutralization of any Hazardous Materials that become present at the Shopping Center during the Term shall be at the sole cost and expense of Landlord (and not included in CAM Costs) (provided, however, that Landlord's indemnification obligations shall be limited to those listed in Section 9.03(c) below); except, that Tenant shall be solely responsible for the removal and remediation, at Tenant's sole cost and expense, of any Hazardous Materials introduced by Tenant or its agents, contractors or employees in violation of Environmental Regulations. "Hazardous Materials" shall mean (i) any waste, material or substance (whether in the form of a liquid, a solid, or a gas and whether or not air-borne) which is deemed to be a pollutant or a contaminant, or to be hazardous, toxic, ignitable, reactive, infectious, explosive, corrosive, dangerous, harmful or injurious to public health or to the environment, and which is now or becomes regulated in the future by or under the authority of any applicable local, state or federal laws, judgments, ordinances, orders, rules, regulations, codes or other governmental restrictions or requirements, any amendments or successor(s) thereto, replacements thereof or publications promulgated pursuant thereto (collectively, "Environmental Regulations", and individually, "Environmental Regulation"); (ii) petroleum; (iii) asbestos and asbestos containing materials; (iv) any polychlorinated biphenyl; and (v) any radioactive material. In addition to the foregoing, the term "Environmental Regulations" shall be deemed to include, without limitation, local, state and federal laws, judgments, ordinances,

23

orders, rules, regulations, codes and other governmental restrictions and requirements, any amendments and successors thereto, replacements thereof and publications promulgated pursuant thereto, which deal with or otherwise in any manner relate to, environmental matters of any kind.

(b)     Landlord and Tenant each agree that neither Landlord nor Tenant shall cause any Hazardous Materials to exist on, or to escape, seep, leak, spill or be discharged, emitted or released from the Shopping Center during the Term in violation of any applicable Environmental Regulation.

(c)     Landlord hereby indemnifies Tenant and its successors and assigns, and agrees to hold Tenant and its successors and assigns harmless from and against any and all losses, liabilities, damages, injuries, penalties, fines, costs, expenses and claims of any and every kind whatsoever, including attorneys' fees and costs (collectively, "Environmental Liabilities") paid, incurred or suffered by, or asserted against, Tenant or its successors and assigns with respect to, or as a direct or indirect result of (i) the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission or release from the Shopping Center of any Hazardous Materials which were brought into the Shopping Center by Landlord, its agents, employees, contractors, or (ii) a breach by Landlord, its agents, employees, contractors of any Environmental Regulation to which Landlord is subject.

(d)     Tenant hereby indemnifies Landlord and its successors and assigns, and agrees to hold Landlord and its successors and assigns harmless from and against any and all Environmental Liabilities paid, incurred or suffered by, or asserted against, Landlord or its successors and assigns with respect to, or as a direct or indirect result of (i) the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission or release from the Premises of any Hazardous Materials which was brought into the Premises or the Shopping Center by Tenant, its agents, employees or contractors, or (ii) a breach by Tenant, its agents, employees or contractors of any Environmental Regulation to which Tenant is subject.

(e)     With respect to Hazardous Materials which are or become present at the Shopping Center as the result of any cause whatsoever (other than Hazardous Materials which were brought into the Premises by Tenant, its agents, employees or contractors), Landlord shall, at Landlord's sole cost (and not included in CAM Costs), in a good, workmanlike and expeditious manner, and in compliance with Environmental Regulations, perform all work necessary to clean-up, remove and otherwise remediate such Hazardous Materials in compliance with Environmental Regulations. Should the presence of such Hazardous Materials (other than Hazardous Materials which were brought into the Premises by Tenant, its agents, employees or contractors) render the Premises Unusable (as defined below) or should Tenant be required to close during the removal or neutralization of such Hazardous Materials by Landlord, Tenant shall notify Landlord and all Rent shall be immediately abated until such time as the Premises are not Unusable. If such work is not commenced within ninety (90) days after the date (the "Notification Date") that Tenant notifies Landlord of Hazardous Materials rendering the Premises Unusable (or such additional period as may be reasonably required to engage environmental consultants and/or engineers and obtain permits and licenses), or if such work is not completed within three hundred sixty (360) days after the Notification Date (or such additional period as may reasonably be required given the nature of the work, provided that Landlord diligently pursues same to completion), then Tenant shall have the right, at any time

thereafter, to terminate this Lease. However, Tenant's option to terminate this Lease pursuant to this Section 9.03(e) shall cease (if not exercised prior thereto) at any time the Premises are no longer Unusable. If Tenant shall elect to terminate this Lease, then the Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of Landlord or Tenant, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease. For the purpose of this Section 9.03(e), "Unusable" means that the Tenant does not have access to and is unable to customarily operate its business in at least ninety percent (90%) of the Premises because of the enforcement of any Environmental Regulation or the remediation of any Hazardous Materials, or because use of the Premises would represent a risk to the health or safety of Tenant, Tenant's employees, agents or invitees.    Notwithstanding the foregoing, if any Hazardous Materials become present in violation of Environmental Regulations because they were brought into the Premises by Tenant, its agents, employees or contractors, Tenant shall, at Tenant's sole cost and expense, in a good, workmanlike and expeditious manner, and in compliance with Environmental Regulations, perform all work necessary to clean-up, remove and otherwise remediate such Hazardous Materials in compliance with Environmental Regulations.    Tenant shall provide to Landlord a copy of all reports and inquires related to any such release of Hazardous Materials and the subsequent clean-up and removal of same.

SECTION 9.04        Surrender of the Premises.  At the expiration or earlier termination of this Lease, Tenant shall surrender the Premises to Landlord in the same condition as it is required to be maintained by Tenant pursuant to Section 9.02 above; excepting, however, reasonable wear and tear, damage by fire or other casualty, and the effects of a Taking (as defined in Section 13.01).

## ARTICLE X

## REQUIREMENTS OF LAW

SECTION 10.01        Landlord's Obligations.  Throughout the Term, Landlord shall be responsible, at Landlord's sole cost and expense (and not included in CAM Costs), for complying with all applicable laws, statutes, ordinances and regulations of federal, state, county and municipal authorities (collectively, "Laws") affecting the Shopping Center including, without limitation, the Premises, except as specifically provided in Section 10.02; provided, however that any costs or expenses incurred by Landlord in complying with any Laws affecting the Common Areas shall be included in CAM Costs, subject to the provisions of Section 5.03.

SECTION 10.02        Tenant's Obligations.  Throughout the Term, Tenant shall be responsible, at Tenant's sole cost and expense, for complying with all Laws affecting the Premises if and to the extent such compliance is required as a result of Tenant's specific use of the Premises (as opposed to retailers in general) or relates to the interior elements of the Premises which are neither structural nor comprise the major building systems serving the Premises (unless the same is necessitated by Tenant's Work, alterations, or repairs in the Premises, or Tenant's particular use or occupancy of the Premises and/or the negligence, fault or default of Tenant, its agents, employees, customers or contracts (in which event Tenant (at Tenant's sole cost and expense) shall be solely responsible for same).  Tenant shall give Landlord immediate written notice upon Tenant's becoming aware that the use or condition of the Premises is in

violation of any Laws with which Tenant is required to comply pursuant to this Section 10.02. The final, unappealed (or unappealable) judgment of any court of competent jurisdiction or the admission of Tenant in any action or proceeding against Tenant (regardless of whether Landlord be a party thereto) of any violation of Laws relating to such use or condition shall be conclusive fact as between Landlord and Tenant.

SECTION 10.03    Right to Contest.  The party responsible for compliance pursuant to Section 10.01 or 10.02 shall have the right to contest the validity of any Law at the expense of the party responsible for compliance, unless such contest would result in any criminal liability imposed upon the other party or subject such other party to any fine or penalty.

## ARTICLE XI

## INSURANCE

SECTION 11.01    Landlord's Insurance.(a)    Landlord shall maintain in full force and effect from and after the Effective Date and throughout the Term:

(i)    Commercial general liability insurance with regard to the Common Areas protecting and insuring Landlord, naming Tenant as "additional insured-lessee" for claims arising out of the use or occupancy of the Common Areas and the obligations assumed by Landlord under this Lease, and having a combined single limit of liability of not less than Five Million Dollars ($5,000,000) for bodily injury, death and property damage liability; and

(ii)    Special Form (formerly known as "All-Risk") property insurance , on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of the buildings (other than the Premises) and other insurable improvements on Landlord's Tract (exclusive of excavation, footings and foundations). The types and coverages of insurance maintained by Landlord hereunder shall be subject to such further requirements as may be imposed by Landlord's lender.  Landlord shall also have the right to maintain such additional types and coverages of insurance as Landlord deems customary, prudent or reasonable for commercial developments similar to the Shopping Center including, without limitation insurance covering risks of rental loss, floods and earthquakes. Landlord may permit other tenants of the Shopping Center to self-insure casualties to their respective premises, provided the protection afforded Tenant shall be the same as if provided by a third-party insurer as required under this Article 11(a)(ii).; and

(iii)    Workers' compensation insurance as required by any applicable law or regulation; and

(iv)    Employer's liability insurance in the amount of $1,000,000 each accident for bodily injury, $1,000,000 policy limit for bodily injury by disease and $1,000,000 each employee for bodily injury by disease; and

(v)    Automobile liability insurance for owned, hired and non-owned automobiles.  The limits of liability shall not be less than $1,000,000 combined single limit each accident for bodily injury and property damage.

(b)    Landlord may carry any of its insurance under "blanket policies" covering the Shopping Center and other properties it or any Affiliate of Landlord owns, provided that: (i) the total amount of the insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article XI.  All policies required to be maintained by Landlord pursuant to this Section 11.01 shall provide that any proceeds thereof shall be deposited with the Mortgagee if required by any such loan, or if none, to Landlord, in either event to be held in trust by such party and disbursed only in accordance with the provisions of, and for the purposes set forth in, Article XII.

(c)    Landlord shall be permitted to maintain a deductible as a part of any insurance policy carried by it in compliance with this Section 11.01.  However, in no event shall any deductible with regard to the insurance described in Sections 11.01(a)(i) or 11.01(a)(ii) exceed Fifty Thousand Dollars ($50,000), without Tenant's consent.

SECTION 11.02    Tenant's Insurance.

(a)    Tenant shall maintain in full force and effect throughout the Term:

(i)    Commercial general liability insurance protecting and insuring Tenant, naming Landlord as "additional insured-lessor" for claims arising out of the use or occupancy of the Premises by Tenant and having a combined single limit of liability of not less than Five Million Dollars ($5,000,000) for bodily injury, death and property damage liability; and

(ii)    Special Form (formerly known as "All-Risk") property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of the Premises, exclusive of excavation, footings and foundations, naming Landlord as "additional insured-lessor".  Tenant shall also maintain insurance covering risks of rental loss, floods and earthquakes.

Upon Landlord's request, Tenant shall also name the Mortgagee as an additional insured, as its interest may appear, on the insurance policies described in Section 11.02(a).  Further, all such insurance shall include, but not be limited to, blanket contractual, cross-liability, and severability of interest clauses, products/completed operations, broad form property damage, independent contractors, and, if alcoholic beverages are served, sold, consumed, or obtained in the Premises, liquor liability.  Tenant shall also during the Term and after receipt of possession of the Premises keep in full force and effect workers' compensation insurance as required by law, together with employer's liability coverage in an aggregate amount of not less than one million dollars ($1,000,000.00) or any greater amount required by applicable laws, and commercial automobile liability and property insurance insuring all owned, non-owned, and hired vehicles in an amount of not less than one million dollars ($1,000,000.00).  The insurance limits set forth herein shall be subject to increase as Landlord may reasonably require (as demonstrated by

reasonable documentation) from time to time (but not more frequently than every five (5) years). All of Tenant's insurance policies shall contain commercially reasonable deductibles and any insurance carried by Landlord shall not be contributing with such policies.

(b)    Tenant may carry any of its insurance under "umbrella policies" and/or "blanket policies" covering the Premises and other locations it or any Affiliate of Tenant owns or leases, provided that: (i) the total amount of the insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article XI.

(c)    From and after the date that Landlord shall have caused the Delivery of the Land to occur and until such time as the Tenant's Work is complete substantially in accordance with the Site Design Requirements, Tenant shall maintain or require its general contractor to maintain, in full force and effect:

(i)    A policy of builder's risk insurance covering loss or damage to the Tenant's improvements for the full amount of the work the contractor is performing; and

(ii)    Commercial general liability insurance protecting and insuring Tenant, naming Landlord as "additional insured-lessor" for claims arising out of the work the contractor is performing on the Premises and having a combined single limit of liability of not less than Five Million Dollars ($5,000,000.00) for bodily injury, death and property damage liability.

(d)    All insurance required to be maintained under this Section 11.02 may be provided under a plan of self-insurance provided that Tenant maintains, during the period of such self-insurance, a tangible net worth of at least Two Hundred Fifty Million Dollars ($250,000,000). To the extent Tenant elects to provide such insurance under a plan of self-insurance, Tenant shall have all of the obligations and liabilities of an insurer, and the protection afforded Landlord (and Mortgagee if applicable) shall be the same as if provided by a third-party insurer as required under this Article 11. To the extent any deductible is maintained as a part of any insurance policy carried by Tenant in compliance with this Section 11.02, Tenant shall be deemed to be covering the amount of that deductible under an informal plan of self-insurance. Unless such information is already generally available to the public, or Tenant is a publicly traded entity, Tenant shall upon Landlord's reasonable request (which request shall be made no more than once per year) provide Landlord a financial statement, prepared in accordance with generally accepted accounting principles, showing the required net worth.

(e)    Tenant shall provide Landlord with certificates evidencing the coverages required hereunder when requested by Landlord. Tenant shall provide such certificates prior to the Commencement Date or Tenant's possession of the Premises, whichever occurs first. Such certificates shall state that the coverage may not be changed or canceled without at least thirty (30) days' prior written notice to the Landlord. Tenant shall provide Landlord with an endorsement to each of Tenant's insurance policies, appropriately issued by Tenant's insurance company to the effect that:

28

(1)    the insurance is primary, and any insurance carried by Landlord shall not be contributing with such policies;

(2)    Landlord, Landlord's property manager with respect to the Premises, and Landlord's mortgagee(s) or beneficiary(ies) are named as additional insureds or loss payees, as applicable; and

(3)    the insurer will give Landlord at least thirty (30) days' written notice in advance of any cancellation or lapse, or of the effective date of any reduction in the amounts, of insurance.

SECTION 11.03    Insurance Requirements Generally.

(a)    All insurance required to be maintained by Landlord and Tenant under this Lease shall be maintained with insurance companies qualified to do business in the State, and rated at least A-/VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published). Each party shall use its diligent efforts to have its insurers provide thirty (30) days (ten (10) days in the event of non-payment of premium) prior notice to the other party of cancellation or non-renewal of any policy required hereunder. Each party shall provide to the other duly executed certificates evidencing the insurance coverage described in Sections 11.01 and 11.02 above, respectively.

(b)    The liability insurance requirements under Sections 11.01(a)(i) and 11.02(a)(i) shall be reviewed by Landlord and Tenant every five (5) years for the purpose of mutually increasing (in consultation with their respective insurance advisors) the minimum limits of such insurance to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards. The replacement value of the buildings and other insurable improvements constituting the Shopping Center shall be re-evaluated from time to time at the request of either Landlord or Tenant.

SECTION 11.04    Landlord's Insurance Cost.

(a)    The reasonable insurance premiums attributable to the policies required to be maintained by Landlord pursuant to Section 11.01(a)(i) shall be included as part of CAM Costs. If Landlord carries blanket insurance covering the Shopping Center together with other property owned by Landlord, then Landlord shall obtain evidence reasonably satisfactory to Tenant of the cost of such insurance allocable to the Shopping Center and the amount so allocable shall be included in CAM Costs for the purposes of determining Tenant's Share of any insurance premium included in CAM Costs.

(b)    If the rates for any insurance Landlord is required to carry are materially increased as a result of the use or other activity of any other occupant of the Shopping Center (as demonstrated by reasonable documentation), then the amount of such increase shall be excluded from CAM Costs (and if the rates for any insurance Landlord is required to carry are materially increased as a result of the use by Tenant at the Premises (as demonstrated by reasonable documentation), Tenant shall be solely responsible for the amount of such increase). To the extent that Landlord receives a dividend, credit, rebate or other return of a premium which had

previously been included in CAM Costs, Landlord shall promptly refund to Tenant Tenant's Share of such dividend, credit, rebate, or return.

(c)    The provisions of this Section 11.04 shall survive the expiration or earlier termination of this Lease.

SECTION 11.05    Indemnity.

(a)    Except as otherwise provided in Section 11.06, Tenant covenants to defend and indemnify Landlord and hold Landlord harmless from and against any and all claims, actions, damages, liabilities and expenses, including reasonable attorneys' fees, (i) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises, or any part thereof, or (ii) occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, licensees, or customers while in the Premises, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Landlord, its agents, contractors, licensees, employees, or other tenants and occupants, or for which any of said parties may be statutorily liable.

(b)    Except as otherwise provided in Section 11.06, Landlord covenants to defend and indemnify Tenant and hold Tenant harmless from and against any and all claims, actions, damages, liabilities and expenses, including reasonable attorneys' fees, (i) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon any portion(s) of Landlord's Tract (excluding the Premises), or (ii) occasioned wholly or in part by any act or omission of Landlord, its agents, contractors or employees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Tenant, its agents, contractors, licensees or employees, or for which any of said parties may be statutorily liable.

SECTION 11.06    Mutual Waiver of Subrogation.(a)    Landlord and Tenant, on their own behalf and on behalf of anyone claiming under or through either one by way of subrogation, hereby release and waive all rights of recovery and causes of action against each other and their respective Affiliates arising from any and all liability for any loss or damage to property or resulting from damage to such property (and, in either case, any resulting loss of business or rental income), whether caused by the negligence or fault of the other party, which is normally insured under Special Form property insurance (formerly known as "All-Risk") and time element insurance required to be maintained hereunder or under any other property or time element insurance maintained by either party. If either Landlord or Tenant is a self-insurer or maintains a deductible (as either may be permitted under this Lease), then the self-insuring party or the party maintaining the deductible hereby releases the other party from any liability arising from any event which would have been covered had the required insurance been obtained and/or the deductible not been maintained.

(b)    Landlord and Tenant shall cause each property insurance policy carried by either of them insuring the Premises, the contents thereof, or the Shopping Center, to provide that the insurer waives all rights of recovery by way of subrogation or otherwise against the other party hereto (and all of such other party's Affiliates) in connection with any loss or damage

which is covered by such policy or that such policy shall otherwise permit, and shall not be voided by the releases provided above.

SECTION 11.07    Affiliate.  "Affiliate" shall mean a corporation, partnership, person or other entity which is controlling, controlled by, or under common control with, Landlord or Tenant, as the case may be.  As used in the definition of Affiliate, "control" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise.

## ARTICLE XII

## DAMAGE OR DESTRUCTION

SECTION 12.01    Landlord's Obligation to Rebuild.  If all or any part of the premises designated as "Major 3," "Major 4" and "Major 5" on the Site Plan, together with the Common Areas within Tenant's "quadrant" as shown on the Site Plan, is damaged or destroyed by fire, the elements or other casualty, then Landlord shall promptly repair all damage and restore substantially all of such area, to its condition immediately prior to such damage or destruction. Without limiting Landlord's obligations under this Article XII, the proceeds of the policies required to be obtained and maintained by Landlord pursuant to Section 11.01 shall, to the extent necessary, be used for the performance of such rebuilding and restoration work.

If (i) Landlord fails to commence in good faith Landlord's drawings and plans for its repair and restoration obligations within ninety (90) days after any damage or destruction, or (ii) Landlord fails to timely complete such repair and restoration (such that any of the occupants in the affected premises are open for business or fixturing in preparation to open for business) within three hundred (300) days after permits are issued for the repair of such damage or destruction (Landlord hereby covenanting to diligently pursue such permits), then Tenant shall have the option, upon notice to Landlord, to elect (y) to complete the repair and restoration (after providing Landlord ten (10) days written notice (and Landlord's continued failure to cure or commence to cure within such ten (10) day period and, thereafter, diligently pursue such cure to completion), and to receive reimbursement for all reasonable third party, out-of-pocket expenses reasonably incurred by Tenant, to the extent supported by reasonable documentation, or (z) to terminate this Lease by written notice to Landlord in accordance with the provisions of Section 12.03.  The time periods referenced in this Section shall be subject to Force Majeure, but in no event shall the aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed a period of one hundred twenty (120) days.  The provisions of this Section 12.01 shall not apply if Landlord or Tenant terminates this Lease pursuant to provision this Article XII.  Tenant acknowledges that Tenant's right to complete the repair and restoration as set forth above shall be subject to the OEA and the rights of the various parties thereunder.  With respect to buildings or improvements within the Shopping Center which are damaged by fire or other casualty but which are not required to be restored by Landlord as set forth above, Landlord shall promptly either (y) restore all or portions of the same to substantially the condition in which they existed immediately prior to such fire or other casualty, or (z) raze the remaining portions of such

buildings or improvements not rebuilt, remove all debris resulting therefrom, and pave such areas for parking or landscape such areas in a sightly manner.

SECTION 12.02      Tenant's Obligation to Rebuild.  If all or any part of the Premises is damaged or destroyed by fire, the elements or other casualty, then Tenant shall promptly repair all damage and restore the Premises to its condition immediately prior to such damage or destruction (subject to any changes to the Premises that Tenant shall desire to make to the extent same shall otherwise be permitted under Section 14.01).  Without limiting Tenant's obligations under this Article XII, the proceeds of the policies required to be obtained and maintained by Tenant pursuant to Section 11.02 shall, to the extent necessary, be used for the performance of such rebuilding and restoration work.

If (i) Tenant fails to commence in good faith Tenant's repair and restoration obligations within ninety (90) days after any damage or destruction, or (ii) Tenant fails to timely complete such repair and restoration within two hundred seventy (270) days after such damage or destruction, then Landlord shall have the option, upon notice to Tenant, to elect to complete the repair and restoration to the Premises and to receive reimbursement therefor in full from Tenant on demand.  The time periods referenced in this Section shall be subject to Force Majeure, but in no event shall the aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed a period of ninety (90) days.  The provisions of this Section 12.02 shall not apply if Landlord or Tenant terminates this Lease pursuant to provision this Article XII.

SECTION 12.03      Termination.

(a)      Landlord or Tenant shall have the right to terminate this Lease if all or any part of the Building is damaged or destroyed by fire, the elements or other casualty during the last eighteen (18) months of the Term.

(b)      Landlord or Tenant, as applicable, shall notify the other party in writing of its exercise of such election to terminate within forty-five (45) days following the occurrence of such casualty ("Landlord's Termination Notice" or "Tenant's Termination Notice", respectively).  The failure of either Landlord or Tenant to timely and properly exercise the foregoing rights to terminate the Lease shall result in the subject rights to terminate being null and void.

(c)      Notwithstanding anything to the contrary, Tenant may elect, upon written notice to Landlord which must be given within thirty (30) days following Landlord's Termination Notice, to nullify Landlord's election to terminate this Lease under this Section 12.03 by exercising its option for an Extension Period pursuant to Section 2.02.

(d)      Intentionally Omitted.

(e)      If this Lease is terminated, then this Lease shall terminate on the date set forth in Landlord's or Tenant's Termination Notice, as applicable, without further liability on the part of either Landlord or Tenant, except: (i) for those obligations which expressly survive the expiration or other termination of this Lease, and (ii) only in the case where Tenant terminates this Lease, Tenant shall thereupon make available to Landlord (1) all insurance proceeds paid by Tenant's insurance carrier, or (2) if self-insured, an amount equal to the reconstruction costs of

the Premises or, if the Premises are not being reconstructed, an amount equal to the actual value of the Premises (not to exceed, however, an amount equal to the reconstruction costs of the Premises), to the extent such amounts would have been payable under the insurance outlined in Section 11.02(a)(ii).

**ARTICLE XIII**

**CONDEMNATION**

SECTION 13.01    Taking.

(a)    In the event of condemnation by eminent domain or similar law, including a sale in lieu thereof to an authority or other entity having the power of eminent domain (a "Taking"), of all or any portion of the Shopping Center, which (i) results in a Taking of (x) any part of the Building, (y) more than fifteen percent (15%) of the Common Areas within Tenant's Preferred Area, where reasonably comparable areas are not provided in lieu thereof within one hundred eighty (180) days of such Taking, or (z) more than five percent (5%) of the parking spaces in either Tenant's Preferred Area or more than fifteen percent (15%) of the parking spaces in the quadrant in which the Premises is located, where such parking spaces are not replaced with parking spaces in a reasonably comparable area for such use within one hundred eighty (180) days of such Taking, (ii) materially and adversely affects ingress or egress to the Premises or the Shopping Center, where reasonably comparable ingress or egress is not provided in lieu thereof within one hundred eighty (180) days of such Taking, or (iii) materially prohibits or inhibits Tenant's use of the Premises for a period in excess of one hundred eighty (180) days, then Tenant may terminate this Lease by giving notice to Landlord not more than one hundred eighty (180) days after the later of the date on which title vests in the condemning authority or the date Tenant receives notice of said vesting.

(b)    In the event of a Taking of all of the Premises, this Lease shall terminate as of the date of vesting of title or transfer of the Premises, whichever is earlier, without further liability on the part of either Landlord or Tenant, except for those obligations which expressly survive the expiration or other termination of this Lease.

(c)    In the event of a Taking of the Premises, the Common Areas and/or any other area within the Shopping Center, or any portion thereof, for temporary use (specifically one not exceeding one hundred eighty (180) days in duration), without the taking of the fee simple title thereto, this Lease shall remain in full force and effect. All awards, damages, compensation and proceeds payable by the condemnor by reason of such Taking relating to the Premises, or relating to the Tenant's Preferred Area, for periods prior to the expiration of the Lease shall be payable to Tenant. All such awards, damages, compensation and proceeds for periods after the expiration of the Lease shall be payable to Landlord. Anything contained to the contrary notwithstanding, a temporary Taking for any period in excess of one hundred eighty (180) days may, at Tenant's option, be deemed a permanent Taking and shall be governed by Section 13.01 (a) or (b), as applicable.

SECTION 13.02    Restoration and Rent Adjustment. In the event of a Taking, if this Lease is not terminated by Tenant pursuant to Section 13.01, then (a) Landlord shall promptly

restore the Shopping Center (including the Premises) as nearly as practicable to a complete unit of like quality and character as existed prior to the Taking (but only to the extent of any condemnation proceeds received, provided however, if such proceeds are not sufficient to permit restoration of the Shopping Center [including the Premises] in accordance with the foregoing standard, Tenant may terminate this Lease by written notice to Landlord) and (b) if a portion of the Premises is Taken, then from and after the date on which title vests in the condemning authority, the Rent shall be equitably reduced in proportion to the area of the Premises subject to the Taking.

SECTION 13.03      Award.  In the event of any Taking, Tenant shall be entitled to an amount of the award or compensation paid for such Taking equal to the Unamortized Costs, if any, and the balance shall belong to Landlord.  Tenant shall also have the right to claim and recover from the condemning authority such compensation as may be separately awarded or recoverable by Tenant on account of any and all damage to Tenant's business by reason of the condemnation and for or on account of any cost or loss to which Tenant might be put in moving Tenant's Property, or for any other damages compensable separately to Tenant.  Notwithstanding the foregoing, no award to Tenant contemplated by this Section 13.03 shall reduce the award payable to Landlord for its fee interest in the Premises (including the on- and off-site improvements and Building thereon).  The provisions of this Section 13.03 shall be subject to the provisions of Section 13.01(c) with respect to a temporary Taking.


**ARTICLE XIV**

**ALTERATIONS AND MECHANICS' LIENS**

SECTION 14.01      Tenant's Alteration Rights.

(a)      Tenant shall not perform any structural or exterior alterations or improvements to the Premises after the completion of Tenant's Work } without the prior approval of Landlord; provided, however, that Landlord's approval of Tenant's alteration of the exterior of the Premises to conform to Tenant's then-current prototypical elevation (which alteration(s) shall be harmonious with the architectural theme of the Shopping Center and shall comply with all applicable legal requirements and with the OEA (including, without limitation, receipt of any necessary approvals required from Target, the City of Morgan Hill and/or other necessary parties)) shall be approved.  The provisions of this Section 14.01(a) shall not apply to Tenant's building signage, which shall be governed by the applicable provisions of Article XV.

(b)      Tenant may, from time to time, without the prior approval of Landlord, but subject to approval by the City of Morgan Hill (if applicable), make non-structural interior alterations and improvements to the Premises as Tenant deems necessary or desirable including, but not limited to, the electrical systems, the HVAC and other mechanical systems, installation of fixtures and equipment, painting, and wall and floor coverings; provided that any such alterations or improvements do not impair the structural integrity of the Premises, diminish the value of the Premises or materially alter the Floor Area of the Premises.

       (c)    Tenant shall have the right, at its sole cost and expense, to erect and maintain, as it deems necessary, an antenna, a satellite dish and/or related equipment for Tenant's sole use on the roof of the Premises, provided that Tenant: (i) uses a contractor approved by Landlord for all roof penetrations so as not to violate or invalidate any roof warranties maintained by Landlord, (ii) further ensures that any such roof equipment is designed, installed, used and operated so as not to materially and adversely affect or impact the structural, mechanical, electrical or other systems of or serving the Premises or the Shopping Center; (iii) repairs any damage to the roof caused by the making of the roof penetrations or subsequent removal of any such roof equipment; (iv) ensures that any such roof equipment is not visible to the public from the Common Areas; and (v) erects and maintains such equipment in accordance with Laws. If Tenant shall install such roof equipment, then Tenant shall be solely responsible for the maintenance and repair thereof at Tenant's sole cost and expense. Tenant shall (except for the negligence or willful misconduct of Landlord, its agent, employees or contractors) defend, indemnify, and hold Landlord harmless from and against any and all liability, loss, damage or cost suffered or incurred by Landlord as a result of the installation, operation , maintenance or use of such roof equipment. In no event shall Tenant or any other tenant or occupant of the Shopping Center have the right to install, license or permit to be installed any transmission and/or reception towers for wireless telephone or internet communications. The foregoing right to erect and maintain an antenna, a satellite dish and/or related equipment shall be personal to the original Tenant signatory to this Lease and shall not be exercisable by or for the benefit of any assignee or subtenant of Tenant without the approval of Landlord, not to be unreasonably withheld in the case of an assignee or subtenant of the Premises.

       (d)    All alterations requiring Landlord's approval shall be made in accordance with plans and specifications with respect thereto, approved in writing by Landlord before the commencement of work, which approval shall not be unreasonably withheld.

       (e)    Tenant shall provide Landlord with not less than thirty (30) days prior written notice of the commencement of any alterations in the Premises and Landlord shall have the right to enter upon the Premises to post customary notices of non-responsibility with respect thereto. Tenant, at its cost, shall obtain all required governmental permits and approvals for all alterations and all such alterations shall be performed strictly in accordance with all applicable Laws, in a good and workmanlike manner and diligently prosecuted to completion. Construction work in connection with any alterations shall be performed in such manner as not to materially interfere with the operation of business by any other occupant of the Shopping Center. Landlord shall have the right to notify Tenant at the time such alterations are made to the Premises that Tenant must remove any or all such alterations upon the expiration of the Lease Term or earlier termination of this Lease (provided, however, if Tenant does not notify Landlord of the nature and extent of such alterations before they are installed, Landlord shall have the right to cause Tenant to remove such alterations upon the expiration of the Lease Term upon notice to Tenant to this effect within thirty (30) days of the expiration of the Lease Term). Notwithstanding anything to the contrary in this Lease, to the extent any alterations or improvements performed by Tenant result in or necessitate additional alterations or improvements in the Shopping Center (i.e., code upgrades), then Tenant shall undertake and perform such work in accordance with this Section 14.01.

(f)     Landlord shall execute and return to Tenant all appropriately completed building department or equivalent applications within thirty (30) days after Tenant's request therefor, and will reasonably cooperate with Tenant in the permitting process.  If any violation of Laws which is noted against the Shopping Center or the Premises (other than a violation caused by Tenant) prevents Tenant from obtaining a building permit for any alterations or a certificate of occupancy, then, upon request by Tenant, Landlord shall promptly and diligently cause such violation to be removed of record to the extent required to permit Tenant to obtain its building permit or certificate of occupancy, as the case may be.  However, if the violation was not caused by Landlord (or any of Landlord's agents, contractors, employees or invitees), then Landlord's obligations under this Section 14.01(f) shall be satisfied by Landlord using diligent, good faith and commercially reasonable efforts to have the responsible party remove such violation of record.

(g)     Landlord shall not make any alterations to the Premises (including, without limitation, changing the design, color or materials of the exterior of the Premises) nor shall Landlord construct an additional floor or floors above or below the Premises without Tenant's prior consent.

SECTION 14.02     Mechanics' Liens.   Tenant covenants that Tenant shall within thirty (30) days discharge of record (by payment, bond, order of a court of competent jurisdiction or otherwise) any mechanic's lien filed against the Premises or all or any part of the Shopping Center for any work, labor, services or materials claimed to have been performed at, or furnished to, the Premises or the Shopping Center, for or on behalf of Tenant, or at the insistence of Tenant, or anyone acting for, through or under Tenant.  Similarly, Landlord covenants that Landlord shall promptly discharge of record (by payment, bond, order of a court of competent jurisdiction or otherwise) any mechanic's lien filed against the Premises or the Landlord Tract for any work, labor, services, materials claimed to have been performed at, or furnished to, the Premises or the Landlord Tract, for or on behalf of Landlord, or at the insistence of Landlord, or anyone acting for, through or under Landlord.  If either party shall fail to cause any such lien to be discharged within sixty (60) days after the other party shall demand that the former party remove same, then, the demanding party may discharge the same by paying the amount claimed to be due, by bonding or by any other proceeding deemed appropriate by such demanding party, and the amount so paid by such demanding party and/or all costs and expenses including reasonable attorneys' fees incurred by such demanding party in procuring the discharge of such lien shall be reimbursed by the other party upon demand.  Notwithstanding the foregoing, Landlord shall have the right to contest any such lien filed in connection with any work, labor, services or materials claimed to have been performed at, or furnished to, the Premises, for or on behalf of Landlord, or at the insistence of Landlord, or anyone acting for, through or under Landlord by posting a bond.  Nothing contained in this Lease shall be construed as a consent on the part of the Landlord to subject Landlord's estate in the Premises to any lien or liability under any law relating to liens.

## ARTICLE XV

## SIGNS

SECTION 15.01      Tenant's Signs. Tenant shall have the exclusive right during the Term, subject to complying with the Laws, the OEA and with the "Signage Criteria" for the Shopping Center (attached hereto as Exhibit P), to erect, maintain, and replace on the storefront and exterior walls of the Premises, and on the side walls of any entrance design element, if any, signs and banners. Tenant may erect and maintain in the interior of the Premises any signs it may desire. Landlord hereby acknowledges that the building signage depicted on Exhibit N-1 complies with the OEA and the Signage Criteria and is hereby approved by Landlord.

SECTION 15.02      Pylon Signs. Tenant shall have the right to include Tenant's sign panels on one of the two pylons (being the 68-foot pylon) as indicated on the Site Plan. Landlord, as part of Landlord's Work, shall obtain all governmental approvals and permits for such pylons (including Tenant's sign panels on all sides of the pylon on which Tenant's sign panels are located). Tenant's sign panels shall be procured and installed at Tenant's cost. A rendering of such pylon showing the dimensions of the pylon and the size and position of all panels to be installed thereon, including Tenant's panel, is attached to this Lease as Exhibit N-2. Landlord shall not change or alter the pylon bearing Tenant's sign panel(s) without obtaining Tenant's prior consent, which consent shall not be unreasonably withheld, except that Tenant's consent shall not be required where such change or alteration is required to comply with Laws or will not materially affect Tenant's sign panel(s) (including the visibility thereof) or the positions of Tenant's sign panel(s) on the pylon (but in such events, Tenant shall be given prior notice). Tenant shall pay to Landlord its pro rata share of the cost of designing, permitting and constructing (including electrical connectivity for) the pylon sign bearing Tenant's sign panel(s), up to a maximum of $31,000.00. The cost of maintaining the pylon bearing Tenant's sign panel(s) (but not the cost of individual tenants' signs thereon) and the cost of any electricity used to illuminate them, shall be, at Landlord's discretion, includable in CAM Costs or paid pro-rata by Tenant (provided all tenants or occupants having a panel on such pylon are similarly obligated to pay their pro-rata share). For purposes of this Article 15, Tenant's pro rata share shall be a fraction, the numerator of which shall be the square footage of Tenant's sign panel(s) and the denominator of which shall be the total square footage of the sign panels on the pylon on which Tenant's sign is located.

SECTION 15.03      Replacement. Tenant and its subtenants shall be entitled, without Landlord's consent but subject to complying with Laws and with the Signage Criteria, at Tenant's sole cost and expense, to replace all of its signs with signage consistent with Tenant's and/or its subtenant's then-current prototypical sign plans. Any signage which is not consistent with such prototypical sign plans shall be subject to Landlord's approval.

## ARTICLE XVI

## TENANT'S PROPERTY

SECTION 16.01      Tenant's Property. All of Tenant's movable trade fixtures, ornate light fixtures, equipment, furniture, inventory and other property owned by Tenant and located

at, on or in the Premises including, without limitation, computer display and storage area showcases, partitions, mezzanine, shelving, wall cases and signs (collectively, "Tenant's Property") shall remain the property of Tenant, exempt from the claims of Landlord or any Mortgagee or Ground Lessor, without regard to the means by which or the persons by whom Tenant's Property is installed or attached. Tenant shall have the right at any time and from time to time to remove Tenant's Property, provided that if removal of any of Tenant's Property damages any part of the Premises, Tenant shall repair such damage.

## ARTICLE XVII

## ASSIGNMENT AND SUBLETTING

SECTION 17.01        Assignment and Subletting Rights.

(a)        Subject to <u>Section 17.01(c)</u> below, Tenant shall have the right from time to time to assign Tenant's interest in this Lease and/or to sublet, concession or license ("Transfer") all or any portion of the Premises, subject to all of the terms and conditions of this Lease (i) for any lawful retail use primarily operated by a National Tenant or Regional Tenant  (as defined in Section 6.04) and customarily found in comparable shopping centers in central California, without the consent of Landlord (but with sixty (60) days prior written notice to Landlord), and (ii) for any other use, with the prior written consent of Landlord, not to be unreasonably withheld, conditioned or delayed, which consent shall be requested from Landlord at least sixty (60) days prior to the proposed transfer.  At no time shall Tenant's Transfer result in the existence of (x) more than two (2) stores at the Premises or (y) a store occupying less than 5,000 square feet of Floor Area.  No assignment, subletting, licensing or concessioning by Tenant shall reduce the liability of Tenant under this Lease to the extent that such liability is not increased as a result of any amendment or modification to this Lease between Landlord and any assignee. However, in the event of an assignment by Tenant to an assignee having an Adequate Net Worth (as defined below), or to an assignee whose obligations under this Lease are guaranteed by a guarantor having an Adequate Net Worth, all liability of the assigning Tenant under this Lease accruing from and after the effective date of such assignment shall terminate.  "<u>Adequate Net Worth</u>" shall mean a tangible net worth, as of the effective date of such assignment, of at least Seven Hundred Fifty Million Dollars ($750,000,000).

(b)        In addition to, and not in limitation of, Tenant's other rights set forth in this Article XVII, Tenant shall have the right from time to time to assign Tenant's interest in this Lease and/or to sublet or license all or any portion of the Premises without Landlord's consent (but with prior written notice to Landlord): (i) to an Affiliate of Tenant; (ii) to any entity which purchases all or substantially all of the assets of, or interests in, Tenant or any of its Affiliates (which purchase must include the purchase of not less than fifty percent (50%) of all of Tenant's stores in central California); (iii) in conjunction with any merger, acquisition, consolidation or public offering of stock or other interests involving Tenant or its Affiliate(s); and/or (iv) as may be required by any Laws.

(c)    If Tenant proposes to assign this Lease or sublet, in a single transaction, the whole of the Premises or a portion thereof, other than in connection with a Transfer pursuant to Section 17.01(b) above, it shall first give notice thereof (the "Assignment/Subletting Notice") to Landlord, which notice shall specify the name and address of the proposed assignee or sublessee and the proposed use of the Premises to be made by such assignee or sublessee. Landlord shall have the right to terminate this Lease (or only as to the portion of the Premises being subleased) by giving notice to Tenant (the "Termination Notice") thereof, and reimbursing Tenant for its Unamortized Costs, within thirty (30) days after receipt of an Assignment/Subletting Notice from Tenant. If Landlord elects to terminate this Lease (or only as to the portion of the Premises being subleased), then the Lease shall automatically terminate on the ninetieth (90th) day (the "Termination Date") after the date on which Tenant receives Landlord's Termination Notice and payment of the Unamortized Costs without further liability on the part of either Landlord or Tenant, except for those obligations which expressly survive the expiration or other termination of this Lease. If Landlord does not give the Termination Notice and makes payment of the Unamortized Costs within the aforesaid thirty (30) day period, then Landlord shall conclusively be deemed to have waived its termination rights under this Section 17.01(c) with respect to such proposed assignment or subletting transaction. In connection with a recapture by Landlord of less than all of the Premises pursuant to this Article, Tenant shall be responsible, at Tenant's sole cost and expense, for all work (including the construction of demising walls and separation and installation of utilities) necessary to separately demise the recaptured portion of the Premises from the remainder of the Premises, which work shall be performed pursuant to detailed plans and specifications and a construction schedule prepared by Tenant and reasonably approved by Landlord.

(d)    Notwithstanding the foregoing, Tenant shall not assign Tenant's interest in this Lease or sublet all or any portion of the Premises to any person or entity whose use of the Premises would be in violation of any of the then effective Existing Exclusives or the Prohibited Uses.

SECTION 17.02    Collateral Assignment.    In addition to Tenant's other rights set forth in this Article XVII, a collateral assignment of Tenant's interest in this Lease by Tenant to one (1) or more Lenders (hereinafter defined), as collateral security for an indebtedness or other obligation of Tenant or its Affiliates shall be permitted and Landlord shall execute all documentation reasonably requested by Tenant or any such Lender in connection therewith. In addition, Tenant shall have the right, without Landlord's consent, to grant to an Affiliate of Tenant a license to operate all of Tenant's business operations at the Premises, without such Affiliate having assumed any liability for the performance of Tenant's obligations under this Lease; provided, however, that Tenant shall only have such right where Tenant grants such licenses to operate to an Affiliate the majority of its stores in central California. "Lender" shall mean a state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender.

SECTION 17.03    Cure Rights of Original Tenant.    If Tenant assigns Tenant's interest in this Lease and the assignor remains liable under this Lease following such assignment, then Landlord, when giving notice to said assignee or any future assignee in respect of any default, shall also give a copy of such notice to the Tenant originally named in this Lease or its Affiliate (collectively, the "Original Tenant"), and no notice of default shall be effective until a

copy thereof is so given to Original Tenant.  Original Tenant shall have the right (but not the obligation) to cure such default, which cure period shall be co-terminus with the cure period applicable to Tenant.

SECTION 17.04      Recognition Agreement.  If Tenant subleases all or any portion of the Premises for a term of at least five (5) years, then, notwithstanding any other provisions of this Lease, Landlord shall, upon Tenant's request, execute and deliver an agreement among Landlord, Tenant and each such subtenant in the form of  Exhibit I, in recordable form (the "Recognition Agreement"); provided, however, that at no time shall Tenant's sublease or assignment of the Premises result in the existence of more than two (2) stores at the Premises, and provided further that the following conditions are satisfied:

> (a) Landlord shall not be bound by any payment by such subtenant under the sublease made more than thirty (30) days in advance;

> (b) the subtenant is not then in default under the sublease at time of recognition;

> (c) the per square foot fixed rent paid by the subtenant under the sublease equals or exceeds the per square foot fixed rent paid by Tenant  hereunder (or Tenant guarantees any difference);

> (d) Landlord shall not be liable for the payment of any  security deposit not paid to  Landlord;

> (e) Landlord shall not be bound to any provision in the  sublease which creates any rights or  remedies in the subtenant which are greater than the rights of Tenant under this Lease;

> (f) Landlord shall not be bound to any provision in the  sublease which creates obligations (on a  proportionate basis, if appropriate) upon  the landlord thereunder which are greater than Landlord's obligations under this Lease; and

> (g) the non-subleased space, if any, within the Premises remains a commercially reasonably  leaseable space.

## ARTICLE XVIII

## DEFAULT

SECTION 18.01      Tenant Default.

(a)      Any of the following shall constitute a "Tenant Default" under this Lease: (i) Tenant's failure to make any payment of Annual Minimum Rent, Additional Rent or any other amount due under this Lease where such failure is not cured within ten (10) days after receipt of notice from Landlord thereof, or (ii) Tenant's failure to observe any other material provision, covenant or agreement under this Lease where Tenant shall have failed, within thirty

(30) days after receipt of notice thereof from Landlord, to cure or commence to cure such default (provided, however, if the default cannot be rectified or cured within such thirty (30) day period, the default shall be deemed to be rectified or cured if Tenant, within such thirty (30) day period, shall have commenced to rectify or cure the default and shall thereafter diligently and continuously prosecute same to completion).

(b)     After the occurrence of a Tenant Default, in addition to any or all other rights or remedies of Landlord provided by the Laws, Landlord shall have the right, at Landlord's option, without further notice or demand of any kind to Tenant or any other person, (i) to declare the Term ended and to re-enter and take possession of the Premises and remove all persons therefrom, or (ii) without declaring this Lease terminated and without terminating Tenant's right to possession, to re-enter the Premises and occupy the whole or any part for and on account of Tenant and to collect any unpaid rental and other charges which have become payable or which may thereafter become payable, or (iii) even though it may have re-entered the Premises as provided in subsection (b)(ii) above, to thereafter elect to terminate this Lease and all of the rights of Tenant in or to the Premises. In any case in which Landlord shall lawfully re-enter and occupy the whole or any part of the Premises, by unlawful detainer proceedings or otherwise, Landlord, at its option, may repair, alter, subdivide or change the character of the Premises from time to time in such manner as Landlord deems best, may relet the Premises or any part thereof and receive the rents therefor, and none of such actions shall constitute a termination of this Lease, a release of Tenant from any liability hereunder, or result in the release or exoneration of a guarantor, if any.  Landlord shall not be deemed to have terminated this Lease or the liability of Tenant to pay any Annual Minimum Rent, Additional Rent or other charges later accruing by any re-entry of the Premises pursuant to subsection (b)(ii) above, or by any lawful action in unlawful detainer or otherwise to obtain possession of the Premises, unless Landlord shall have notified Tenant in writing that it has so elected to terminate this Lease.

(c)     Should Landlord elect to terminate this Lease pursuant to the provisions of Sections 18.01(b)(i) or (iii) above, Landlord may recover from Tenant, as damages, the following: (i) the worth at the time of award of any unpaid rental which had been earned at the time of the termination, plus (ii) the worth at the time of award of the amount by which the unpaid rental which would have been earned after termination until the time of award exceeds the amount of rental loss Tenant proves could have been reasonably avoided, plus (iii) a monthly amount for the duration of the Term (not including any unexercised Extension Periods) equal to the amount, if any, of (A) the Annual Minimum Rent and additional charges that would have been payable by Tenant but for such termination of this Lease by Landlord, in excess of (B) the amount of rental and additional charges received, or that Tenant proves could have been reasonably avoided; plus (iv) any other amounts necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which, in the ordinary course of things, would be likely to result therefrom.  Except as expressly set forth in subsection (c)(iii) above and as expressly provided below, Landlord hereby waives any rights it may have pursuant to California Civil Code Section 1951.2 to claim any additional or alternative award based on the amount by which the unpaid rent for the balance of the Term after the time of award exceeds the amount of such rental loss that Tenant proves could be reasonably avoided.  As used in subsections (c)(i) and (ii) above, the "worth at the time of award" is computed by allowing interest at the Default Rate, as defined in Section 23.23.  In the event Tenant fails to make the payment set forth in clause (c)(iii) above within ten (10) days after

notice that the same has become due, Landlord, at Landlord's election, shall be entitled to a present value acceleration (at a per annum interest rate of eight percent (8%)) of the amount, if any, of (x) the Annual Minimum Rent and additional charges payable by Tenant hereunder which would have been payable by Tenant for the immediately subsequent one year of the Term (commencing with the date the payment was to have been made) or the remainder of the Term after such earlier termination of this Lease, whichever is shorter, in excess of (y) the amount of rental and additional charges received, or that could reasonably be avoided, by Landlord by reletting the Premises for the same period. Upon one year after Landlord's acceleration of rent as set forth above, Landlord may again commence collection of amounts due pursuant to clause (c)(iii) above, subject again to the preceding sentence.

(d)     For purposes of this Article 18, the term "rental" shall be deemed to be Annual Minimum Rent, Additional Rent and all other sums required to be paid by Tenant pursuant to the terms of this Lease. All sums, other than Annual Minimum Rent, shall, for the purpose of calculating any amount due under the provisions of Section 18.01(c)(iii) above, be computed on the basis of the average monthly amount accruing during the immediately preceding twenty-four (24) month period, except that if it becomes necessary to compute these sums before the twenty-four (24) month period has occurred, then these sums shall be computed on the basis of the average monthly amount accruing during the shorter period.

(e)     In the event of a monetary default by Tenant hereunder beyond any applicable notice and cure periods, Tenant hereby grants to and confers upon Landlord the right, power and authority, at Landlord's sole option and without affecting any of Landlord's other rights or remedies hereunder, to collect all rents and profits received by Tenant as a result of the possession by Tenant of the Premises. Such amounts shall include, but shall not be limited to, amounts due under sublease, license or concession arrangements. Upon any such default, Landlord shall have the right to collect such rents and profits, including those past due and unpaid. The collection of such rents and profits shall not cure, waive or satisfy any default or notice of default hereunder but shall be deemed to have mitigated Landlord's damages in the event of such default to the extent of payments received in connection with any such sublease, license or concession arrangements.

(f)     The various rights and remedies reserved to Landlord under this Article 18 are cumulative, and Landlord may pursue any and all such rights and remedies, whether at the same time or otherwise (to the extent not inconsistent with specific provisions of this Lease). Notwithstanding anything to the contrary, Landlord expressly waives (i) any right to accelerate any element of Rent except as expressly set forth in this Lease and (ii) any right to recover consequential or punitive damages as a result of a Tenant default under this Lease. Landlord further agrees that it shall subordinate all rights to any so-called "landlord's lien" or any similar statutory lien, granting Landlord a lien on any of Tenant's Property for the performance of any obligations of Tenant.

SECTION 18.02     Additional Landlord Remedies Due to Construction Delays by Tenant. Subject to the other provisions of this Lease (including, without limitation, Article II and Section 23.12), if Tenant shall fail to achieve Substantial Completion by that date which is three hundred sixty (360) days following Delivery of the Land, then Tenant shall commence payment of Annual Minimum Rent as of such date.

SECTION 18.03    Landlord's Default.

(a)    If Landlord shall default in the observance of any material covenant or agreement herein contained, breach any material representation or warranty under this Lease, or shall fail to pay any charges or other amounts required to be paid by Landlord under this Lease (including, without limitation, any insurance premiums or any reimbursements due to Tenant) and Landlord does not cure such default within thirty (30) days after notice thereof by Tenant (it being intended in connection with a non-monetary default not reasonably susceptible of being cured with due diligence within said thirty (30) day period that the time allowed Landlord within which to cure same shall be extended for such period as may be necessary to complete same with due diligence), then Tenant shall have the right (but shall not be obligated):

(i)    to cure such default, and Landlord shall reimburse Tenant for the reasonable cost of such cure within thirty (30) days following Tenant's submission of invoices or other reasonable evidence of the amount of such costs.  In the event Landlord fails to make such reimbursement within such thirty (30) day period, Tenant shall have the right to offset such unreimbursed amount from Tenant's Rent obligations next coming due under this Lease; provided, however, that Tenant's right of offset shall be limited to twenty five percent (25%) of each installment of Rent next becoming due unless an insufficient amount of the Term remains to fully recoup the amounts owed by Landlord to Tenant on the amounts expended by Tenant, in which event the amount of Tenant's offset shall be increased so that Tenant is able to fully recoup all such amounts expended by Tenant, together with interest as aforesaid, prior to the expiration of the Term.  The foregoing remedy of Tenant is cumulative of, and in addition to, any other remedies provided for herein, or allowed by law or in equity, and may be exercised separately or concurrently, or in combination, and Tenant's pursuing of any one or more of such remedies shall not constitute an election of remedies which shall exclude any other remedy available to Tenant; or

(ii)    to terminate this Lease, without waiving its rights to damages for Landlord's default, provided that:  (1) Landlord's default materially interferes with the normal conduct of any business operations in the Premises, (2) Landlord's default is not reasonably capable of being cured by Tenant.

(b)    If a Mortgagee shall have notified Tenant in writing that it is the holder of such lien on the Shopping Center and shall so request, then Tenant shall give a similar notice to such Mortgagee and such Mortgagee shall have the same time period allowed to Landlord under this Lease to correct or remedy such default.

(c)    Tenant shall also be entitled to all other rights and remedies available to Tenant at law, in equity or otherwise, except as otherwise expressly set forth in this Lease. Tenant expressly waives (i) any right to recover consequential or punitive damages as a result of a Landlord default or any other act or omission of Landlord and (ii) any right to withhold any element of Rent except as expressly set forth in this Lease.

(d)    Notwithstanding the foregoing, if, in Tenant's reasonable judgment, a condition posing imminent risk of liability or material harm to persons or property or material disruption to the normal conduct of any business operations in the Premises shall exist, then

Tenant may exercise, at its election and without prior notice to Landlord, any or all of the remedies set forth above (other than the termination right set forth above).

SECTION 18.04    Additional Tenant Self-help, Equitable and Legal Remedies Due to Construction Delays by Landlord. If Landlord defaults at any time in the timely completion of any component of Landlord's Work (including, without limitation, Delivery of the Land) and Landlord does not cure such default within ten (10) days after notice thereof by Tenant (provided, however, such five (5) day notice shall be reduced to three (3) days in the event the default relates to any element of the Site Delivery Work), then Tenant shall have the right, but not the obligation, to: (a)    perform, at Landlord's sole cost and expense, all or any part of Landlord's Work. If and to the extent that Tenant exercises its right under this Section 18.04(a), Landlord agrees to cooperate in good faith and provide Tenant with reasonable assistance so that Tenant can complete such portions of Landlord's Work. Landlord hereby grants Tenant the right, as its agent, to directly contact and contract with Landlord's contractors, on behalf of Landlord, to complete such work, all at Landlord's cost and expense. Landlord covenants, upon Tenant's request, to provide Tenant with duplicate sets of all plans, specifications and contracts prepared in connection with the construction of the Shopping Center, as well as schedules of all contractors, subcontractors and suppliers. Landlord agrees to reimburse Tenant for any and all reasonable, documented costs incurred by Tenant in connection with any portion of Landlord's Work which Tenant completes within thirty (30) days after receipt of request therefor from Tenant, which request shall be reasonably supported by invoices and/or written description of Landlord's Work performed. If Landlord does not timely reimburse Tenant as contemplated above, then Tenant shall be entitled to deduct the costs of such work from Rent, together with interest at the Default Rate from the date of expenditure by Tenant, until paid in full. However, notwithstanding anything to the contrary contained in the foregoing, in the event Landlord in good faith disputes its failure to complete any component or Landlord's Work and/or Landlord's failure to cure such condition within the time period set forth herein, Landlord shall have the right to institute a reference proceeding in accordance with the provisions of Section 23.20 to resolve such dispute, and pending the resolution of such dispute, Tenant shall not be entitled to offset any such unreimbursed amount from Tenant's Rent obligations. Following the resolution of such dispute pursuant to such reference proceeding, the parties shall make such appropriate reconciliation payments of Rents and/or reimbursements, as are determined to be due pursuant to such reference proceeding, together with interest thereon at the Default Rate from the date such payment should have been made until such payment is actually made. If it is determined in such reference proceeding that Landlord owes any amounts to Tenant and Landlord fails to pay such amounts to Tenant within thirty (30) days of such determination, Tenant shall have the right to offset such amounts with interest from Tenant's Rent obligations next coming due under this Lease. The foregoing remedy of Tenant is cumulative of, and in addition to, any other remedies provided for herein, or allowed by law or in equity, and may be exercised separately or concurrently, or in combination, and Tenant's pursuing of any one or more of such remedies shall not constitute an election of remedies which shall exclude any other remedy available to Tenant;

(b)    seek injunctive relief, specific performance or other equitable remedies against Landlord to require Landlord to perform its obligations under this Lease (including,

without limitation, the Site Design Requirements), the costs of which litigation shall be borne by Landlord including, without limitation, attorneys' fees and court's costs; and/or

    (c)  seek legal remedies available to Tenant, the costs of which shall be borne by Landlord, including, without limitation, attorneys' fees and court costs.

    SECTION 18.05  Failure to pay Landlord Reimbursement.  In the event Landlord fails to pay the Landlord Reimbursement in full on or before its due date as set forth in Section 2.03(b) of the Lease, then Landlord, subject to any applicable notice and/or cure period, shall be in default of this Lease, and no Rent shall be due or owing to Landlord until the Landlord Reimbursement is paid to Tenant, together with interest which shall accrue on the unpaid Landlord Reimbursement at the Default Rate commencing on the thirty-first (31st) day following Tenant's satisfaction of the requirements for such payment as set forth in Section 2.03(b) until the date of payment of the Landlord Reimbursement.

    SECTION 18.06  Waiver; Non-Exclusive Remedies.  To the extent permitted by the Laws, the parties hereby waive trial by jury in any action, proceeding or counterclaim brought by either of them against the other on any matters arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Premises, and/or any claim of injury or damage.  Tenant hereby expressly waives any and all rights of redemption granted by or under any present of future law if this Lease is terminated or Tenant is evicted or dispossessed by reason of violation by Tenant of any of the provisions of this Lease. Except as otherwise expressly set forth in this Lease, no right or remedy herein conferred upon or reserved to Landlord or Tenant is intended to be exclusive of any other right or remedy in this Lease or by law or in equity provided, but each shall be cumulative and in addition to every other right or remedy given in this Lease or now or hereafter existing at law or in equity or otherwise.


## ARTICLE XIX

## SUBORDINATION, TRANSFER OF INTEREST

    SECTION 19.01  Subordination.  Landlord reserves the right to subject and subordinate this Lease at all times to the lien of any first mortgage or deed of trust for the benefit of any Mortgagee hereafter encumbering or affecting all or any portion of the Shopping Center, as well as to any future ground or underlying leases encumbering or affecting all or any part of the Shopping Center; provided, however, that (a) each Mortgagee shall first execute and deliver to Tenant a subordination, non-disturbance and attornment agreement in substantially the form attached as Exhibit J hereto, in recordable form, or in such form with changes reasonably acceptable to Lender, Landlord and Tenant and (b) any Ground Lessor shall execute (and shall obtain the written consent of any Mortgagee) and deliver to Tenant a fee owner recognition agreement in a form reasonably satisfactory to Tenant, which shall include the following provisions: (i) the Ground Lessor will not, in the exercise of any of the rights arising or which may arise out of such lease, disturb or deprive Tenant in or of its possession or its rights to possession of the Premises or of any right or privilege granted to or inuring to the benefit of Tenant under this Lease; (ii) in the event of the termination of the Ground Lease (as defined

below), Tenant shall not be made a party in any removal or eviction action or proceeding, nor shall Tenant be evicted or removed of its possession or its right of possession of the Premises, and this Lease shall continue in full force and effect as a direct lease between the Ground Lessor and Tenant for the remainder of the Term and on the same terms and conditions as contained herein, without the necessity of executing a new lease; and (iii) Landlord and Tenant shall have the right to execute any amendment to this Lease which is specifically required hereunder and the Ground Lessor shall recognize and be bound thereto.  "Ground Lessor" shall mean the landlord under any existing or future ground or underlying lease(s) affecting all or any part of the Shopping Center (such ground or underlying lease(s) is referred to as the "Ground Lease(s)"). "Mortgagee" shall mean any state or federally regulated bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender, which is not an Affiliate of Landlord, and which holds a mortgage on the Shopping Center or is the beneficiary under a deed of trust encumbering the Shopping Center (such mortgage or deed of trust is referred to as the "Mortgage").

SECTION 19.02    Existing Mortgages and Ground Lease.  If a Mortgage or any Ground Lease encumbers the Shopping Center or any part thereof on the Effective Date, then, simultaneously with the execution of this Lease, Landlord shall deliver to Tenant, in recordable form: (a) a subordination, non-disturbance and attornment agreement substantially in the form attached as Exhibit J, in recordable form, or in such form as may be reasonably acceptable to Landlord and Tenant, executed by each and every Mortgagee, and (b) a fee owner recognition agreement in the form and content described in Section 19.01(b), in recordable form, or in such form as may be acceptable to Tenant, executed by any Ground Lessor (and, as may be required, consented to by the Mortgagee).  Should Landlord fail to so deliver such instrument(s) as provided above, Tenant shall provide Landlord notice of same within ten (10) days following the Effective Date, providing Landlord with a thirty (30) day period to deliver the documents required under this Section 19.02.  Should Landlord fail to so deliver such instrument(s) prior to the expiration of  the thirty (30) day period,  Tenant shall have the right, by notice given to Landlord at any time prior to the date on which such instrument(s) are delivered, to terminate this Lease without further liability on the part of Landlord or Tenant, except: (i) for those obligations which expressly survive the expiration or other termination of this Lease, and (ii) Landlord shall (which obligation shall survive the termination of this Lease), within thirty (30) days following Tenant's termination, reimburse Tenant for all of its reasonable, third-party, out of pocket costs and expenses incurred in connection with this Lease (including, without limitation, costs associated with the preparation and review of plans and specifications, the performance of Tenant's Work, and attorneys' fees), not to exceed Fifty Thousand Dollars ($50,000).  If Tenant fails to exercise its right to terminate within the time period and in the manner described in the foregoing sentence, Tenant's right to terminate under this Section 19.02 shall be deemed waived.

SECTION 19.03    Transfer of Interest.  Landlord shall provide Tenant with notice upon or immediately after any sale or transfer of Landlord's interest in the Shopping Center. Landlord shall require the buyer or transferee to assume in writing all of the obligations of Landlord under this Lease accruing after the date of such sale or transfer.  Notwithstanding Section 23.13, Landlord shall continue to remain liable for all accrued liability, if any, up to the date of such sale or transfer.  Notwithstanding anything contained herein to the contrary,

Landlord shall continue to remain liable hereunder after such sale or transfer unless the buyer or transferee has expressly assumed in writing all of the obligations of Landlord under this Lease.

SECTION 19.04    Tenant Estoppel Certificates.    Tenant agrees, within thirty (30) days of Landlord's request, to execute and deliver to Landlord or any Mortgagee, on a form prepared by or on behalf of the party so requesting, an estoppel certificate (a) ratifying this Lease and confirming that there are no modifications or amendments to this Lease, except as may be stated in the certificate, (b) confirming the commencement and expiration dates of this Lease, (c) certifying to Tenant's actual knowledge and belief that the Landlord is not in default under this Lease, and that there are no offsets or defenses to enforcement of this Lease, except as may be stated in the certificate, and (d) stating the date through which Annual Minimum Rent and other charges payable by Tenant have been paid.

SECTION 19.05    Landlord Estoppel Certificates.    Landlord agrees, within thirty (30) days of Tenant's request, to execute and deliver to Tenant or any assignee, transferee, subtenant or Lender, on a form prepared by or on behalf of the party so requesting, an estoppel certificate (a) ratifying this Lease and confirming that there are no modifications or amendments to this Lease, except as may be stated in the certificate, (b) confirming the commencement and expiration dates of this Lease, (c) certifying to Landlord's actual knowledge and belief that Tenant is not in default under this Lease, and that there are no offsets or defenses to enforcement of this Lease, except as may be stated in the certificate, and (d) stating the date through which Annual Minimum Rent and other charges payable by Tenant have been paid.

## ARTICLE XX

## LANDLORD'S REPRESENTATIONS, WARRANTIES AND COVENANTS

SECTION 20.01    Quiet Enjoyment.    Subject to the terms and conditions contained in this Lease, and provided that Tenant has performed all of its obligations under the Lease and is not in default under the terms of this Lease beyond any applicable notice and cure period, Landlord covenants and agrees that Tenant, during the Term, shall freely, peacefully, and quietly occupy and enjoy the use and possession of the Premises without disturbance, molestation, hindrance or ejectment of any kind whatsoever.

SECTION 20.02    Representations, Warranties and Covenants.    In order to induce Tenant to execute his Lease and in consideration thereof, Landlord covenants, warrants and represents to Tenant that as of the Effective Date and as of the Possession Date, Landlord has the full power, right and authority to make this Lease for the Term without the consent, joinder or approval of any other party.

SECTION 20.03    Site Covenants.    In order to induce Tenant to enter into this Lease, Landlord covenants to Tenant as follows (the "Site Covenants"):

(a)    Landlord shall not construct (or permit to be constructed) any buildings or other improvements in Tenant's Preferred Area without Tenant's prior consent, which consent may be withheld in Tenant's sole discretion.

(b)    Landlord shall not construct (or permit to be constructed) any projections either vertical or horizontal (other than Tenant's signs or identifications) which will project along the front or rear of the building in which the Premises are situated in such a manner as to materially obstruct the view of Tenant's signs or its store front in any manner.

(c)    The number of paved, full-size parking spaces in the Shopping Center shall be the greater of (i) the ratio listed in Section 1.01(M) or (ii) the amount of spaces required by Laws (without variance), and, without limiting the generality of the foregoing, the number of spaces contained in Tenant's Preferred Area shall be the same number of spaces as shown on the Site Plan and will not be reduced without Tenant's prior written consent, which consent may be withheld in Tenant's sole discretion.

(d)    Except pursuant to and  in accordance with the terms of the OEA, Landlord shall not erect (or permit to be erected) any building or other structures (including, without limitation, kiosks) in any outparcel except as and where shown on the Site Plan, and all outparcel buildings constructed shall (i) not exceed the height requirements set forth in the OEA (inclusive of all roof top mechanicals, all projections and all architectural treatments and embellishments), (ii) not exceed the Floor Area shown on the Site Plan, (iii) satisfy all parking requirements (without variance) using the parking spaces located within each such outparcel, and (iv) be used solely for retail or restaurant purposes.

(e)    Landlord shall not use (or permit the use of) all or any portion of the Common Areas for retail sales or for promotional purposes, subject to Tenant's rights under Section 2.01(c) and the terms of the OEA.

(f)    Landlord shall not make (and shall not permit there to made) any changes to those Common Areas identified as "No-Change Area" on the Site Plan (the "No-Change Area") including, without limitation, changes in the location of curbcuts, drive aisles, entrances, access points, roadways, sidewalks or parking spaces or reduction of the parking ratio specified in Section 1.1(M) (except for de minimis or immaterial changes and except for a temporary (i.e., not to exceed thirty (30) days) reduction of the parking ratio due to the maintenance, repair or replacement of the parking areas), without Tenant's consent, which may be withheld in Tenant's sole discretion.  Landlord shall not make (and shall not permit to be made) any other changes to the Common Areas which materially and adversely affects Tenant's access to the Premises or the Shopping Center or the visibility of the Premises or of any of Tenant's signage, without Tenant's consent., which may be withheld in Tenant's sole discretion.

(g)    Following Tenant's opening for business at the Premises, except in the event of an emergency Landlord shall not perform (and shall not permit there to be performed), any exterior construction in the Tenant's Preferred Area during the months of November and December (through January 5).

(h)    Landlord shall not knowingly permit any solicitation, distribution of handbills, picketing, or other public demonstration in the Common Areas, except as otherwise may be mandated by Laws.

(i)    No transmission and/or reception towers for wireless telephone or internet communications shall be permitted within the Shopping Center, except pursuant to the terms of the OEA.

(j)    Landlord shall not knowingly install or permit to be installed by any other tenant or other person anywhere in the Shopping Center any structure or equipment which would cause any interference with satellite, radio, telecommunications or television reception or transmission in or from the Building.

SECTION 20.04    Operating and Easement Agreement.

(a)    The term "OEA" shall mean that certain Operation and Easement Agreement by and between Target Corporation and Morgan Hill Retail Venture, LP, dated as of August 31, 2006 and recorded on August 31, 2007 in the Santa Clara County Recorder's Office, State of California, as Instrument No. 19087322, as amended by that certain First Amendment of Operating and Easement Agreement dated June 4, 2007 and recorded on June 6, 2007 in the Santa Clara County Recorder's Office, State of California, as Instrument No. 19461381, and that certain proposed Second Amendment of Operating and Easement Agreement in a form substantially as attached hereto as Exhibit Q. Landlord acknowledges that it has obtained all required consents under the OEA with respect to the rights granted Tenant hereunder, including, without limitation, Target's approval of Tenant's building  elevation, signage, promotional rights, and web-order and customer pick up parking spaces.

(b)    Landlord covenants, represents and warrants to Tenant that: (i) the OEA has not been modified, amended or terminated; (ii) the OEA is currently in full force and effect; (iii) to its actual knowledge as of the Effective Date, no default under the OEA exists beyond any applicable notice and cure period; and (iv) the OEA is, and shall remain, superior in lien to all mortgages and related liens affecting the Shopping Center and all other land which is encumbered by the OEA.  Landlord and Tenant each acknowledge that this Lease is made and shall continue to be subject and subordinate to the OEA, subject to the provisions of this Section 20.04.

(c)    Landlord shall, during the Term, use commercially reasonable efforts to: (i) perform and observe all of the terms, covenants, provisions and conditions of the OEA on Landlord's part to be performed and observed and (ii) diligently enforce the covenants, agreements, and obligations of the OEA.  To the extent the same would materially interfere with Tenant's operations within the Premises and/or Tenant's use of the Common Areas located within Tenant's Preferred Area and/or any of Tenant's signage, Landlord shall not, without the prior consent of Tenant (which consent shall not be unreasonably withheld), execute, or otherwise agree to, any modification of the OEA, nor waive any of its rights thereunder, nor grant any consents or approvals thereunder.  [Landlord shall, within a reasonable time upon receipt of same, forward to Tenant, a copy of any and all notices and/or demands received by Landlord under or pursuant to the OEA, which could materially interfere with Tenant's operations within the Premises and/or Tenant's use of the Common Areas located within Tenant's Preferred Area and/or any of Tenant's signage.

(d)    Landlord shall not amend or modify (or permit an amendment to or modification of) the OEA if such amendment or modification could materially diminish the rights or materially increase the obligations of Tenant under the OEA or under this Lease, or could adversely affect Tenant's use or occupancy of the Premises or the conduct of Tenant's business therein, nor shall Landlord terminate the OEA without Tenant's prior written consent.

(e)    In the event Landlord defaults in the performance of any of its obligations under the OEA or fails to enforce the obligations of any other obligee under the OEA, and such default or failure to enforce could materially and adversely affect Tenant's use or occupancy of the Premises or the conduct of Tenant's business therein, Tenant may, but shall not be obligated to, after thirty (30) days notice to Landlord (except in the event of emergency, in which case no notice shall be required) cure any default by Landlord under the OEA and/or enforce, in its own name, at Landlord's expense, the obligations of any other obligee under the OEA. Landlord shall, upon demand, reimburse Tenant for the reasonable costs incurred by Tenant in performing any of Landlord's obligations under the OEA or enforcing the obligations of any obligee under the OEA, together with interest thereon at the Default Rate. Any dispute with regard to any reimbursements requested by Tenant under this <u>Section 20.03(e)</u> shall be resolved pursuant to a reference proceeding in accordance with the provisions of <u>Section 23.20.</u>

(f)    As between Landlord and Tenant, in the event of any conflict between the OEA and this Lease, this Lease shall in all respects control, except for those matters herein that are expressly subject and subordinate to the OEA.

## ARTICLE XXI

## HOLDING OVER

SECTION 21.01    <u>Holding Over.</u> If Tenant remains in possession of the Premises after the expiration of the Term without having duly exercised its right, if any, to extend or further extend the Term, such continuing possession shall create a month-to-month tenancy on the terms herein specified and such tenancy may be terminated at the end of any month thereafter by either party by giving at least thirty (30) days notice thereof to the other party. During such holdover and provided that Landlord and Tenant are not in good faith negotiations with regard to the renewal or extension of this Lease or the entering into a new lease for premises within the Shopping Center, Tenant shall be liable for Annual Minimum Rent on a monthly basis (or, if applicable, on a prorated daily basis) in an amount equal to one hundred twenty five percent (125%) of the amount thereof payable by Tenant for the month immediately preceding the last day of the Term, as well as for all Additional Rent payable by Tenant under this Lease. If Tenant fails to remove any of its trade fixtures, furniture and other personal property upon expiration or the sooner termination of this Lease, Landlord may, at Landlord's option after sixty (60) days written notice to Tenant, (i) retain all or any of such property, and title thereto shall thereupon automatically vest in Landlord, or (ii) Landlord may remove same from the Premises and dispose of all or any portion of such property, in which latter event Tenant shall, upon demand, pay to Landlord the actual expense of such removal and disposition together with the reasonable cost of repair of any and all material damage to the Premises resulting from or caused by such removal. Tenant waives any and all rights it may have under California Civil Code §1980 et seq. and any successor statutes.

## ARTICLE XXII

## NOTICE

SECTION 22.01    Where and How Given.  All notices or demands which either party hereto either is required to or may desire to serve upon the other shall be in writing and shall be sufficiently served upon such other party, by (a) mailing a copy thereof by certified or registered mail, postage prepaid, return receipt requested, addressed to the party to whom the notice is directed at the "Notice Address" of such party, or (b) by a reliable overnight courier (such as Federal Express), all charges prepaid, furnishing a receipt upon delivery, and addressed to the party to whom the notice is addressed at the Notice Address of the part.  The Notice Address of each party is:

|   | | |
|---|---|---|
| a)  Landlord: | Morgan Hill Retail Venture, LP<br>c/o Browman Development Company<br>100 Swan Way, Suite 206<br>Oakland, California  94621<br>Attention: Darryl Browman, President | |
| with a copy to: | Morgan Hill Retail Venture, LP<br>c/o Browman Development Company<br>100 Swan Way, Suite 206<br>Oakland, California  94621<br>Attention: Mario Albert, General Counsel | |
| b)  Tenant: | CIRCUIT CITY STORES WEST COAST, INC.<br>9954 Mayland Drive<br>Richmond, Virginia 23233<br>Attention: Vice President of Real Estate | |
| with a copy to: | CIRCUIT CITY STORES WEST COAST, INC.<br>9950 Mayland Drive<br>Richmond, Virginia 23233<br>Attention:  General Counsel | |
| with a copy to: | Sutherland Asbill & Brennan LLP<br>1114 Avenue of the Americas<br>40th Floor<br>New York, NY 10036<br>Attn:  Eric L. Sidman, Esq. | |

The addresses to which notices and demands shall be delivered or sent may be changed from time to time by notice served, as hereinbefore provided, by either party upon the other party.

SECTION 22.02      When Given.  Unless otherwise provided for herein, notice shall be deemed to have been served at the earlier of the date received, refused or returned as undeliverable.  However, if such notice pertains to the change of address of either of the parties hereto, then such notice shall be deemed to have been served upon receipt thereof by the party to whom such notice is given.

## ARTICLE XXIII

## MISCELLANEOUS

SECTION 23.01      Rent Proration.  If this Lease is terminated prior to its natural expiration date for any reason other than a Tenant default, then Landlord shall promptly reimburse Tenant for any Rent prepaid by Tenant for periods subsequent to such termination date.  This Section 23.01 shall survive the termination of this Lease.

SECTION 23.02      Construction.  In construing this Lease, feminine or neuter pronouns shall be substituted for those masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place in which the context so requires.  This Lease shall be construed without regard to: (a) the identity of the party who drafted the various provisions hereof, and (b) the addition or deletion of text made during the negotiation of this Lease.  Moreover, each and every provision of this Lease shall be construed as though all parties hereto participated equally in the drafting thereof.  As a result of the foregoing, any rule or construction that a document is to be construed against the drafting party shall not be applicable hereto.

SECTION 23.03      Section Headings.  The section headings in this Lease are for convenience only and do not in any way limit or simplify the terms and provisions of this Lease, nor should they be used to determine the intent of the parties.

SECTION 23.04      Partial Invalidity.  If any term, covenant, condition or provision of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, then the remainder of this Lease or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby and each term, covenant, condition and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

SECTION 23.05      Waiver.  The failure of either party to seek redress for violation of, or to insist upon strict performance of, any term, covenant or condition contained in this Lease shall not prevent a similar subsequent act from constituting a default under this Lease.

SECTION 23.06      Governing Law.  This Lease shall be governed and construed in accordance with the laws of the State of California.

SECTION 23.07      Successors and Assigns.  This Lease shall inure to the benefit of and be binding upon the heirs, executors, administrators, successors and assign of Landlord and the successors and assigns of Tenant.

SECTION 23.08    No Broker. Landlord and Tenant represent to each other that no broker or person is entitled to any commission by reason of the negotiation and execution of this Lease, other than the Broker identified in Section 1.01(D), and Landlord agrees that Landlord shall be solely responsible for the fees and commissions of the Broker. Landlord and Tenant agree to indemnify, defend and hold each other harmless against any and all claims by any other person for brokerage commissions or fees arising out of any conversation, negotiations or other dealings held by the other party with any other broker regarding this Lease.

SECTION 23.09    Memorandum of Lease. Landlord and Tenant agree to execute a Memorandum of Lease in recordable form, substantially similar to that attached as Exhibit L, setting forth such provisions hereof as may be required by State law. If so requested by Tenant, Landlord shall execute such Memorandum of Lease simultaneously with the execution of this Lease. Recording costs shall be borne by the party requesting recordation of same; however, any transfer taxes or other fees charged by any local or state governmental authorities in connection with such recordation shall be paid by Landlord. The provisions of this Lease shall control with regard to any omissions from, or provisions which may be in conflict with, the Memorandum of Lease.

SECTION 23.10    Entire Agreement. This instrument contains the entire and only agreement between the parties and no oral statements or representations or written matter not contained in this instrument shall have any force or effect. This Lease shall not be amended or modified in any way except by a writing executed by both parties. All of the exhibits attached to this Lease are incorporated into this Lease by reference and for all purposes are a part of this Lease.

SECTION 23.11    Relationship of Parties. The relationship between the parties hereto is solely that of landlord and tenant and nothing in this Lease shall be construed as creating a partnership or joint venture between the parties hereto, it being the express intent of Landlord and Tenant that the business of Tenant on the Premises and elsewhere, and the good will thereof, shall be and remain the sole property of Tenant.

SECTION 23.12    Force Majeure. If either party hereto shall be delayed or hindered in, or prevented from, the performance of any act required under this Lease by reason of strikes, lockouts, labor troubles, failure of power, riots, insurrection, war or other reasons of a like nature beyond the reasonable control of the party delayed in performing works or doing acts required under the terms of this Lease (any such delay, hindrance or prevention is referred to as "Force Majeure"), then performance of such act shall be excused for the period of the delay, and the period of the performance of any such act shall be extended for a period equivalent to the period of such delay, except as otherwise specifically provided herein to the contrary; provided, that the party delayed, hindered or prevented shall have given the other party written notice thereof within thirty (30) days of its knowledge of such event causing the delay, hindrance or prevention. The provisions of this Section 23.12 shall not be applicable to delays resulting from the inability of a party to obtain financing or to proceed with its obligations under this Lease because of a lack of funds.

SECTION 23.13    Limitation of Landlord's Liability. Tenant shall, on and after the Commencement Date, look only to Landlord's estate and property in the Shopping Center (or the

proceeds from the sale, financing or refinancing of all or any portion thereof) and net income derived from the Shopping Center for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord hereunder, and no other property or assets of Landlord, its officers, directors, stockholders, members or, partners or employees shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease.   Tenant and all its successors and assigns agree that the obligations of Landlord under this Lease do not constitute personal obligations of the individual partners, whether general or limited, directors, officers or shareholders of Landlord, and Tenant shall not seek recourse against the individual partners, directors, officers or shareholders of Landlord or any of their personal assets for satisfaction of any liability with respect to this Lease.  Except with respect to the limitation on personal liability hereinabove set forth, the provisions of this Section 23.13 shall not be deemed or construed to limit Tenant's rights and remedies pursuant to this Lease or which may be available at law, in equity or otherwise.

SECTION 23.14     Limitation of Tenant's Liability.   Landlord, its successors and assigns, shall look solely to the assets, if any, of Tenant and its successors and assigns, for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director, member or employee of Tenant or any of its Affiliates.

SECTION 23.15     Consents.  Except as may be otherwise expressly set forth in this Lease, whenever under this Lease provision is made for either party's securing the consent or approval of the other party, (a) such consent or approval shall be in writing and shall not be unreasonably withheld, delayed or conditioned, and (b) in all matters contained herein, both parties shall have an implied obligation of reasonableness.

SECTION 23.16     Intentionally Omitted.

SECTION 23.17     Attorneys' Fees.  In any action or proceeding hereunder (whether to enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall be entitled to recover from the other party the prevailing party's reasonable costs and expenses in such action or proceeding, including reasonable attorneys' fees, costs and expenses.  Except as otherwise set forth herein, if either party is sued by a third party as a result of a violation of a covenant, representation or warranty herein contained by the other party hereto, then the party who has violated the covenant, representation or warranty shall be responsible for the reasonable costs and expenses in such action or proceeding against the non-violating party, including reasonable attorneys' fees, costs and expenses.

SECTION 23.18     Survival of Obligations.  The obligation to pay any sums due to either party from the other that by the terms herein would not be payable, or are incapable of calculation, until after the expiration or sooner termination of this Lease shall survive and remain a continuing obligation until paid.  All indemnity obligations under this Lease shall survive the expiration or earlier termination of this Lease.

SECTION 23.19     Joint and Several Liability.  If either party consists of more than one person, then the persons constituting such party shall be jointly and severally liable

hereunder. Notwithstanding the foregoing, Tenant and all its successors and assigns agree that the obligations of Landlord under this Lease do not constitute personal obligations of the individual partners, whether general or limited, directors, officers or shareholders of Landlord, and Tenant shall not seek recourse against the individual partners, directors, officers or shareholders of Landlord or any of their personal assets for satisfaction of any liability with respect to this Lease.

SECTION 23.20    Definition of Hereunder, Herein, etc. Unless the context clearly indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar import refer to this Lease and all of the Exhibits attached hereto as a whole and not to any particular section, subsection, or paragraph hereof.

SECTION 23.21    Tenant's Trade Name. Landlord shall not make use of Tenant's trade name (i.e., "Circuit City"®) in any advertising or marketing material including, without limitation, on any internet website, without obtaining Tenant's prior written approval, which may be withheld in Tenant's sole and absolute discretion. Notwithstanding the foregoing, Landlord may use Tenant's trade name on Landlord's website and in informational brochures, but only for the purposes of identifying Tenant as a tenant of the Shopping Center.

SECTION 23.22    Default Rate. Except where another rate of interest is specifically provided for in this Lease, any amount due from either party to the other under this Lease which is not paid when due, shall bear interest at the rate per annum ("Default Rate") equal to the prime interest rate published from time to time by the Wall Street Journal plus two (2) percentage points (but in no event to exceed the maximum lawful rate) from the date such amount was originally due to and including the date of payment.

SECTION 23.23    Counterparts. This instrument may be executed in several counterparts, each of which shall be deemed an original. The signatures to this instrument may be executed and notarized on separate pages, and when attached to this instrument, shall constitute one complete document.

[Signature page follows]

IN WITNESS WHEREOF, Landlord and Tenant have caused this Lease to be duly executed and delivered in their respective names as of the date first above written.

**LANDLORD:**

Attest:

**MORGAN HILL RETAIL VENTURE, LP**

By:    Browman Development Company, Inc., a California corporation

_____

By:_____
       Darryl Browman, President

By:    J.P. DiNapoli Company, Inc.,
       a California corporation
Its:     General Partner

By:_____
Name:_____
Title:_____

**TENANT:**

**CIRCUIT CITY STORES WEST COAST, INC.,**

By:_____
Name:
Title:

IN WITNESS WHEREOF, Landlord and Tenant have caused this Lease to be duly executed and delivered in their respective names as of the date first above written.

**LANDLORD:**

**MORGAN HILL RETAIL VENTURE, LP**

By:   Browman Development Company, Inc., a California corporation


By:_____
     Darryl Browman, President


By:   J.P. DiNapoli Company, Inc.,
      a California corporation
      Its:   General Partner


By:      _____
Name:    _____
Title:   _____


**TENANT:**

**CIRCUIT CITY STORES WEST COAST, INC.,**

By:_____
Name:
Title:      John B. Mulleady
            Vice President
            Real Estate & Construction