Cottonwood Corners
Albuquerque, New Mexico


# LEASE

Between

## CIRCUIT CITY STORES WEST COAST, INC.,

as Tenant

and

## RSF LAND AND CATTLE COMPANY, LLC,

**a New Mexico Limited Liability Company,**

as Landlord


dated February 1, 2004


COTTONWOOD CORNERS III SHOPPING CENTER



## TABLE OF CONTENTS

Page

1. Leased Property .................................................................................... 1
2. Construction Of Building And Improvements.......................................... 2
3. Lease Term............................................................................................ 3
4. Base Rent .............................................................................................. 4
5. Development Of Shopping Center By Landlord .................................... 5
6. Easements ............................................................................................ 5
7. Common Areas And Common Area Maintenance .............................. 8
8. Signs And Communications Equipment............................................. 12
9. Taxes................................................................................................... 13
10. Maintenance, Repairs And Replacements ........................................ 15
11. Utility Service Provider:  Payment Of Utility Bills............................. 17
12. Alterations.......................................................................................... 17
13. Mechanics' Liens ............................................................................... 18
14. Insurance............................................................................................ 18
15. Damages By Fire Or Other Casualty ................................................ 23
16. Condemnation .................................................................................... 25
17. Assignment And Subletting ............................................................... 27
18. Use ..................................................................................................... 29
19. Warranties, Representations And Covenants..................................... 31
20. Estoppel Certificates .......................................................................... 39
21. Subordination, Non-Disturbance And Attornment .............................. 40
22. Tenant's Financing.............................................................................. 42
23. Tenant's Property And Waiver Of Landlord's Lien .............................. 42
24. Memorandum Of Lease; Commencement Date Agreement................ 42
25. Expiration Of Term And Holding Over................................................ 43
26. Force Majeure ..................................................................................... 43

-i-

## TABLE OF CONTENTS
(continued)

Page

27.  Events Of Tenant's Default ................................................................. 43

28.  Landlord's Remedies ........................................................................ 44

29.  Events Of Landlord's Default; Tenant's Remedies ........................................... 47

30.  Waiver ...................................................................................... 50

31.  Compliance With Applicable Laws ............................................................. 50

32.  Notices ..................................................................................... 51

33.  Brokers ..................................................................................... 52

34.  Miscellaneous ............................................................................... 52

35.  Effectiveness Of Lease; Tenant's Right To Terminate ........................................ 54

36.  Confidentiality ............................................................................. 57

37.  Intentionally Deleted ....................................................................... 57

38.  "For Rent" Signs ............................................................................ 57

## EXHIBITS

| | |
|---|---|
| "A" | Site Plan |
| "A-1" | Shopping Center Legal Description |
| "A-2" | Initial Common Area |
| "B" | Index of Definitions |
| "C" | Construction Provisions |
| "C-1" | Standard Design and Construction Specifications |
| "D" | Removable Trade Fixtures |
| "E" | Sign Plans and Criteria |
| "F" | Permitted Encumbrances |
| "G" | Subordination, Non-Disturbance and Attornment Agreement |
| "H" | Memorandum of Lease |
| "I" | Commencement Date Agreement |
| "J" | Indemnification Agreement |
| "K" | Lease Guaranty |

Cottonwood Corners
Albuquerque, NM

LEASE

This LEASE is made as of the 1st day of February, 2004, by and between **RSF LAND AND CATTLE COMPANY, LLC**, a New Mexico Limited Liability Company, having an address at 10200 Corrales Road NW, Suite B-3 Albuquerque, New Mexico 87114 ("Landlord"), and **CIRCUIT CITY STORES WEST COAST, INC.**, a California corporation, having an address at Deep Run I, 9950 Mayland Drive, Richmond, Virginia 23233 ("Tenant").

WITNESSETH:

The parties hereto agree as follows:

1.    Leased Property.  Landlord leases to Tenant all those certain "Premises" (as defined in paragraph 2), when same are constructed or renovated on that approximately 33,749 square foot parcel (the "Land"), outlined on Exhibit "A" (the "Site Plan"), together with exclusive rights in the area labeled "Customer Pick-Up" adjacent to the Premises as shown on the Site Plan, and with the easements described in paragraph 6 below; all located in the Cottonwood Corners III Shopping Center (herein referred to as the "Shopping Center"), located at the northeast corner of the intersection of Coors Boulevard Bypass N.W. and Ellison Drive N.W., in the City of Albuquerque (the "City"), County of Bernalillo, State of New Mexico (the "State"), shown on the Site Plan and more particularly described on Exhibit "A-1" attached hereto.  All of the Shopping Center exclusive of the Premises is "Landlord's Premises".  Landlord hereby grants to Tenant all of those certain rights, in common with others, granted Landlord under that certain Common Area Maintenance And Reciprocal Easement Agreement dated May 7, 1996, and executed by Landlord's predecessor in interest and Cottonwood Corners, LLC, and recorded on May 14, 1996, in Book 96-13, Page 6531-6551, in the office of the County Clerk for Bernalillo County, New Mexico, as amended to date (the "CAMREA"). Landlord agrees that it will not consent to, approve, or otherwise agree to any modification of the CAMREA at any time during the term of this Lease in a manner which is inconsistent with the terms of this Lease, and will exercise all approval rights

granted Landlord under the CAMREA in favor of enforcement of the terms hereof. Landlord shall have the right to establish and modify from time to time reasonable rules and regulations consistent with the operation of a first class shopping center in Albuquerque, New Mexico, which shall be applied uniformly to all tenants within the Shopping Center, provided, however, that (i) any such rules and regulations shall not encroach upon, limit or adversely affect Tenant's ability to operate its business in the Premises in its usual and customary manner, and (ii) in the event of a conflict or inconsistency between such rules and regulations and the provisions of the Lease, the provisions of the Lease shall control.

2.    Construction of Building and Improvements.    Commencing immediately upon "Delivery of the Land" (as defined in the Construction Provisions (herein so called) attached hereto as Exhibit "C" and incorporated herein by reference for all purposes), Tenant shall construct within the Shopping Center a one-story retail building, containing approximately 33,749 square feet (but not to exceed 34,000 square feet without Landlord's prior approval as set forth below) of ground-floor gross leasable area including at Tenant's election, a non-sales area mezzanine, with provisions for customer pickup, delivery and car stereo installation facilities, initially for use as a Circuit City Superstore (the "Building"), together with loading ramps, sidewalks, trash compactor, transformer pad and other such appurtenances and improvements (collectively, the "Other Improvements"), as more particularly set forth in the Construction Provisions. The Building and Other Improvements are sometimes collectively referred to herein as the "Improvements". The Improvements shall be constructed to completion with due diligence in accordance with the "Plans and Specifications" to be prepared by Tenant as specified in the Construction Provisions. Except as otherwise provided herein, title to the Improvements shall be deemed transferred to Landlord upon full payment of the "Tenant Improvement Allowance", as defined in the Construction Provisions. Notwithstanding the foregoing, Tenant shall have the right to (i) decrease the size of the Building (and the Land) by up to five hundred (500) feet or (ii) increase the size of the Building, not to exceed 34,000 square feet of ground-floor gross leasable area without Landlord's prior written approval, which approval shall not be unreasonably withheld, conditioned or

delayed (the "Adjusted Building Size").  The Improvements and the Land are referred to herein as the "Premises".

    3.    <u>Lease Term</u>.  Subject to paragraph 35, the construction term (the "Construction Term") of this Lease shall commence on the date of Landlord's Delivery of the Land to Tenant in accordance with, and in the condition specified in, the Construction Provisions, and shall end on the "Commencement Date" (as defined in paragraph 4 below).  The main term (the "Main Term") of the Lease shall commence on the Commencement Date and shall end on the last day of January following the fifteenth (15th) anniversary of the Commencement Date.

    In addition to the Main Term, Tenant shall have the option (each such right referred to herein as a "Renewal Option") to renew and extend the Lease for five (5) consecutive five (5) year periods (each such period referred to as an "Option Period" and collectively as the "Option Periods") immediately following the Main Term, at the rent specified below.  Tenant shall give Landlord written notice of its election to exercise any Renewal Option at least one hundred eighty (180) days prior to the expiration of the Main Term or any then-current Option Period, as applicable, provided, however, if, during the aforementioned one hundred eighty (180) day period, Tenant does not give Landlord written notice of its intent not to exercise its Renewal Option, Tenant's right to exercise such Renewal Option shall continue, as shall its tenancy hereunder, until one hundred eighty (180) days after Landlord has given Tenant written notice of Landlord's election to terminate the Renewal Option, unless within ten (10) business days of Tenant's receipt of such notice, Tenant exercises its Renewal Option, whereupon the Term (defined below) of this Lease shall be renewed and extended as if such notice had been given prior to such expiration of the one hundred eighty (180) day period described above.  No such extension of Tenant's tenancy shall delay the date of any adjustment to Base Rent provided for in Paragraph 4(b) below.

    The Construction Term, Main Term and Option Periods are, collectively, the "Term".  The term "Lease Year" shall mean each successive period of twelve (12) consecutive calendar months, commencing on the first day of each February during the Term, except that the first Lease Year shall commence on the Commencement Date and

LA/830663.10

02/04/04

3

shall end on the last day of January following the first anniversary of the Commencement Date.

4.    Base Rent.  During the Construction Term, Tenant shall pay no rent or Real Estate Tax or CAM Charges or any similar costs, fees, rentals or expenses. Tenant agrees to pay base rent ("Base Rent") for the Premises in the amounts and in the manner specified hereunder, commencing (subject to paragraph 3 of the Construction Provisions) on the date on which Landlord makes payment of the Tenant Improvement Allowance as set forth in the Construction Provisions (the "Commencement Date"); provided, however, that notwithstanding the foregoing, if Tenant is not then required to commence the payment of Base Rent as set forth above, the Commencement Date (and the commencement of Tenant's obligation to pay Base Ground Rent (as defined in paragraph 28(e) below)) shall be the date which is the earlier of (i) 210 days following Delivery of the Land or (ii) the date on which Tenant opens for business to the public.

Landlord shall give Tenant written notice of a change of address or change of the party to whom such rents shall be payable along with written documentation reasonably satisfactory to Tenant of such party's right to receive payment hereunder.  Unless adjusted as provided below or in paragraph 3 of the Construction Provisions, Base Rent shall be paid in equal monthly installments in advance on the first day of each succeeding calendar month throughout the Term, to the address given for Landlord in paragraph 32, pursuant to the following schedule:

(a)    First Five Years.  During the first five (5) Lease Years, Tenant shall pay annual Base Rent in the amount of Four Hundred Seventy-Eight Thousand Five Hundred Sixty and 82/100 Dollars ($478,560.82), payable in equal monthly installments of Thirty-Nine Thousand Eight Hundred Eighty and 07/100 Dollars ($39,880.07).

(b)    Adjustment in Base Rent.    Notwithstanding the Base Rent provisions, in the event that the ground-floor gross leasable area of the Building when constructed does not equal 33,749 square feet, annual Base Rent during the first five (5) Lease Years shall be the product of the actual ground-floor gross leasable area of the Building (as shown on the as-built survey in the Plans and Specifications), multiplied by Fourteen and 18/100 Dollars ($14.18).  In determining the ground-floor gross leasable area, measurements shall be made in accordance with the specifications set forth in

LA/830663.10

paragraph 7(c) below.  If any Lease Year is other than twelve (12) months in length, annual Base Rent during such Lease Year shall be the product of the applicable monthly Base Rent times the number of months in such Lease Year, with appropriate proration for any partial calendar month therein.

       (c)   <u>Increases in Base Rent</u>.  Annual Base Rent shall increase on the first day of the sixth and every succeeding fifth Lease Year such that the Base Rent shall equal the product of the actual ground-floor gross leasable area of the Building multiplied by:

       (i)    Years 6 – 10:   $15.18

       (ii)   Years 11 – 15:  $16.18

       (iii)  First Option:    $17.18

       (iv)  Second Option: $18.18

       (v)   Third Option:    $19.18

       (vi)  Fourth Option:  $20.18

       (vii) Fifth Option:     $21.18.

     5.   <u>Development of Shopping Center by Landlord</u>.   Landlord covenants to construct, develop and operate a first-class shopping center.  The location of buildings and other tenant space therein will only be within the "Permissible Building Areas" designated on the Site Plan, <u>Exhibit "C"</u> (Construction Provisions) and <u>Exhibit "C-1"</u> (Standard Design and Construction Specifications).  The parking ratio for the Shopping Center shall be at least as shown thereon, but in no event shall said ratio be less than the greater of (i) 4.8 spaces per 1,000 square feet of gross leasable area or (ii) that required by applicable zoning requirements.  All parking shall be at ground level.  Landlord shall construct or cause such improvements to be constructed in a good and workmanlike manner, lien-free and Landlord agrees to indemnify, defend and hold Tenant harmless from any loss or damage suffered by Tenant as a result of Landlord's construction.  Landlord's construction shall not interfere with the conduct of Tenant's business.

     6.   <u>Easements</u>.  Landlord also grants to Tenant those nonexclusive leasehold easements which shall run as covenants with Landlord's Premises and the Premises during the Term, over Landlord's Premises, which are useful and appropriate for the construction, operation and maintenance of the Premises, including but not limited to:

LA/830663.10

     (a)    <u>Construction Easements</u>.  During the Construction Term, and any period of renovation or reconstruction thereafter, Landlord grants to Tenant (i) a nonexclusive easement across a mutually agreeable designated route, providing access to and from the public roadways nearest to the Land, over the Common Areas (as defined in paragraph 7(a) below) for construction access to the Premises, as well as an exclusive easement for a construction staging area (the "Staging Area") of approximately 20,000 square feet, in a portion of the Common Areas at a mutually agreeable location within a reasonable distance of the Land for Tenant's use in constructing the Improvements; provided that Tenant shall cooperate with Landlord to relocate the Staging Area one (1) time, on thirty (30) days prior notice, to enable Landlord to finish the site work in the Common Areas, (ii) an easement to permit the Building to abut adjacent buildings, constructed upon zero lot line footings, and roof and canopy projections to encroach into the sidewalk areas, (iii) an easement for such additional underground, public or private utility easements as Tenant deems necessary, without unreasonably interfering with the use by Landlord of the Common Areas, for the benefit of the Premises.  For the purpose of exercising the rights granted in this paragraph 6, Tenant and/or the utility provider shall, with the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed, have the right to enter upon and use the Common Areas to install the utility systems, to such extent and so long as reasonably necessary to accomplish such purpose, subject to restoration of the Common Areas following such installation and any other reasonable conditions and requirements imposed by Landlord for the benefit of the Premises.  To the extent any such utility systems shall be located in portions of the Common Areas of the Shopping Center which constitute a protected area or critical area for other tenants or occupants of the Shopping Center, Landlord shall have the right to review and approve Tenant's plans therefor, which approval shall not be unreasonably withheld, delayed or conditioned, provided, however, that it shall be reasonable for Landlord to impose upon Tenant and/or Tenant's utility provider such conditions as may be necessary to obtain the consent or approval of such tenant or other occupant to the installation by Tenant or its utility provider of utility systems within such other tenant's or occupant's protected area or critical area.

(b)    <u>Common Area Easements</u>.    Landlord does hereby additionally grant to Tenant an easement (the "Common Area Easement") to use the Common Areas for their intended purposes and to permit Tenant and its employees, agents, subtenants, assignees, licensees, suppliers, customers and invitees to use the Common Areas for the purposes (without limitation) of parking and pedestrian, service and vehicular access, ingress and egress to, from and between the Premises and Landlord's Premises and the streets and highways abutting and adjacent to the Shopping Center, without payment of any fee or other charge therefor.    It is specifically agreed that with respect to the automobile loading stalls designated on the Site Plan as Tenant's "Customer Pick-Up", (i) Tenant shall have the right, from time to time, to relocate the same to other areas adjacent to the Improvements and (ii) notwithstanding the fact the same are in, and constitute a part of, the "Common Areas", such automobile loading stalls shall be used exclusively by Tenant's customers, invitees and patrons.    Tenant shall also have the right to use such Common Areas located in front of the Building and within Tenant's Protected Area as shown on the Site Plan for promotional sales and demonstrations and other events customary to Tenant's business operations, and for Tenant's "Customer Pick Up" used exclusively for Tenant's customers, invitees and patrons; provided that Tenant shall not conduct any such sales or demonstrations more than four (4) times per year, and for not more than one (1) week each time, during any twelve (12) month period and provided further (i) during the course of any such promotional sales, Tenant shall clean up the portion of the Common Areas affected thereby on a daily basis, (ii) Tenant shall maintain the liability insurance required by this Lease with respect to the portions of the Common Areas on which such promotional sales are being conducted during the course of such promotional sales, and (iii) the conduct of such promotional sales shall not unreasonably interfere with vehicular or pedestrian traffic within the Shopping Center.    In addition, subject to Landlord's prior written approval, which approval shall not be unreasonably withheld, delayed or conditioned, Tenant shall have the right to install up to four (4) cart corrals within the parking area located in front of the Building and within the Tenant's Protected Area (or other mutually agreeable location), and Tenant shall be permitted to store its shopping carts outside of the Premises in such cart corrals; provided, however, that (1) it shall be reasonable for Landlord to withhold its approval if the conversion of

LA/830663.10



parking spaces to cart corrals would reduce the number of parking spaces in the Shopping Center to below that required by applicable zoning requirements, and (2) Tenant shall be responsible for all costs and expenses related to the collection and maintenance of such cart corrals and shopping carts, including without limitation, the obligation to carry liability insurance with respect to same.

       7.     Common Areas and Common Area Maintenance.

       (a)     Definition of Common Areas.  The term "Common Areas" shall be defined to include the parking areas, lanes, drives, entrances, truck passageways, sidewalks, ramps, stairways, landscaped and other unpaved areas, parking lot lighting facilities and equipment, Landlord's pylon sign(s), directional, traffic and monument sign structure(s) and shared utility facilities located in all elements of the Shopping Center (including any such areas and facilities contained within outparcels and adjacent tracts but reserved to the benefit of the Shopping Center occupants) and which are intended and available for the common use of all of the tenants within the Shopping Center (including any outparcel and other adjacent occupants which contribute toward "CAM Charges" (as defined below) and which are not responsible for separate maintenance of such outparcels or tracts), their subtenants, licensees, and business invitees.  Landlord shall be responsible for operating, maintaining, repairing and replacing the Common Areas in a first-class manner, including cleaning, maintenance of Landlord's pylon and other sign structure(s), snow removal and ice treatment, removal of Common Area trash and garbage, lighting, repairing, repaving and restriping the parking area, and maintaining, replanting and replacing landscaping, all such work to be referred to collectively as "Common Area Maintenance".  Notwithstanding the foregoing, Tenant shall be solely responsible to maintain Tenant's storefront signs and panel sign inserts.  Security costs for the Common Areas shall be included within the definition of CAM Charges so long as Tenant approves, in its reasonable discretion, the appropriate level, if any, of such security services and the cost thereof; provided, however, that if the level of security services and the cost thereof is consistent with that of other comparable first class shopping centers in Albuquerque, New Mexico, then the such level and cost shall be deemed to be reasonable.



(b)    CAM Charges.  For the purpose of this paragraph 7, the cost of Common Area Maintenance (the "CAM Charges") shall include (i) Landlord's reasonable and proper direct costs and expenses of operating and maintaining the Common Areas and (ii) Landlord's overhead expenses for administering same (or in lieu thereof a management fee) which shall not exceed seven percent (7%) of the total of such costs (specifically excluding from such total the amounts paid by Landlord and Tenant for insurance, capital expenditures, Real Estate Taxes and utilities serving the Common Areas).  Notwithstanding the foregoing, the following shall not be included in the CAM Charges:

(i)    real estate taxes paid, and maintenance performed, on separately assessed and/or maintained outparcels or other adjacent tracts not reserved to the benefit of the Shopping Center occupants;

(ii)    any dues or charges for a merchants' or other association of the tenants in the Shopping Center;

(iii)    maintenance, repairs or replacements to the Common Areas (but no other portions of the Shopping Center), necessitated by the negligent or wrongful act of Landlord or made to correct any construction, defect, or condition, to any interior mall space or to any buildings (including the roof or exterior walls thereof) or utility systems not part of the Common Areas; provided, however, that the foregoing exclusion does not apply with respect to those portions of the Common Areas constructed by Tenant pursuant to Exhibit "C" attached hereto (e.g., sidewalks adjacent to the Building);

(iv)    repairs or replacements necessitated by the negligence or the wrongful action of Landlord (including failure to construct any portion of the Shopping Center in accordance with plans or specifications) or any other tenant, or made to correct any initial construction defect or condition in existence prior to the Commencement Date of this Lease or to correct damage caused by subsidence or adverse or substandard soil conditions, or required by any governmental entity as a result of new construction in the Shopping Center requiring issuance of any governmental permit or approval, or a particular tenant's use or occupancy of its premises, which results in the imposition of government-mandated alterations or modifications to the Common Areas (including ADA compliance);

LA/830663.10



(v)    amounts paid to entities related to Landlord in excess of the cost of such services from any competitive source;

(vi)    amounts reimbursable from insurance proceeds, under warranty or by Tenant, any other tenant in the Shopping Center or any other third party other than pursuant to a Common Area expense provision similar to this paragraph 7;

(vii)    premiums for Common Area liability insurance for coverage in excess of the limits established in paragraph 14(e) below;

(viii)    repairs or replacements of a capital nature (whether or not capitalized); except if Landlord incurs a capital expenditure relating to a replacement to the Common Areas not required as a result of the negligence or willful misconduct of Landlord, after the first three (3) years after the Commencement Date, the same may be amortized in accordance with generally accepted accounting principles ("GAAP"), at the time such expenditures are incurred, over the useful life of the item so amortized, and only the amortized portion applicable to each year shall be included in CAM Charges for such year and then only to the extent the capital expenditure is for a replacement similar in nature and quality to the improvement replaced; and provided that (A) any repaving of the parking areas may not be included to the extent incurred more often than once every seven (7) Lease Years and (B) Tenant's obligation to pay the same shall in no event exceed Ten Thousand and No/100 Dollars ($10,000.00) in any single Lease Year;

(ix)    [intentionally deleted];

(x)    reserves for anticipated future expenses;

(xi)    interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner;

(xii)    Landlord's personnel, overhead, home office or administrative expenses except as set forth in subparagraph (b)(ii) above;

(xiii)    amounts incurred to remediate any Hazardous Substances (as defined in the Construction Provisions);

(xiv)    any new improvements to the Shopping Center or Common Areas, including but not limited to renovations to the facade of the Shopping Center and improvements to landscaped areas of the Shopping Center;



(xv)    amounts incurred to monitor or maintain fire protection systems in the Shopping Center if Tenant separately monitors and maintains its own premises; or

(xvi)    other maintenance expenses not considered normal and customary under generally accepted accounting principles or shopping center industry standards. CAM Charges shall be in an amount consistent with the costs incurred by other landlords of similar shopping centers in the City (but not greater than as described in this paragraph 7(b)), and in all events such charges shall be obtained at competitive rates pursuant to a proposed Common Area maintenance budget for Tenant's informational purposes only delivered to Tenant on or before the end of each CAM Year.

(c)    <u>Tenant Payments</u>. Commencing on the Commencement Date and continuing until the expiration of the first Lease Year, Tenant shall pay to Landlord $2.50 per square foot of ground-floor gross leasable area in the Building per annum, payable in equal monthly installments, as its estimated share of CAM Charges. Thereafter, the annual charge shall be computed on the basis of periods of twelve (12) consecutive calendar months, as designated by Landlord (each such period, including the first Lease Year, is a "CAM Year"), and shall be paid by Tenant in equal monthly installments, on the first day of each month during such CAM Year. Beginning in the third (3rd) CAM Year, CAM Charges (excluding amounts paid by Landlord for Taxes, insurance premiums, utilities serving the Common Areas, security costs and any non-recurring expenses that cannot reasonably be put out to competitive bidding) shall not exceed by more than five percent (5%) those in effect during the preceding CAM Year. For any period within the Term which is less than a full CAM Year, the annual charge shall be appropriately prorated. Within sixty (60) days after the end of the first CAM Year and each CAM Year thereafter, Landlord will furnish to Tenant a statement showing in detail (with such substantiating documentation as Tenant may reasonably request) the amount of the CAM Charges for the preceding CAM Year and the then-current number of square feet of ground-floor gross leasable area in the Shopping Center. Any necessary adjustment with respect to amounts owed by either party for such preceding CAM Year shall be made; and the monthly payments to be made by Tenant for the ensuing year shall be estimated according to the Common Area maintenance budget prepared by Landlord

LA/830663.10

and delivered to Tenant.  Subject to adjustments as herein contemplated, Tenant's share (such fraction being referred to herein as "Tenant's Pro Rata Share") of CAM Charges shall always be the product of the CAM Charges multiplied by a fraction, the numerator of which is the number of square feet of the ground-floor gross leasable area in the Building and the denominator of which is the number of square feet of the ground-floor gross leasable area (including the area of any outside sales area exclusive to a single occupant) in the Shopping Center.  In determining the ground-floor gross leasable area of any building in the Shopping Center (including the Building), measurement shall be made from the centerline of any common walls and from the outside of any exterior walls.  The gross leasable area of any outside sales area shall be measured from the outside of the exterior wall of any adjacent building to the actual exterior perimeters of such outside sales area, including any aisles, fences or walls included therein.  Changes in applicable floor areas shall result in corresponding adjustments of Tenant's Pro Rata Share, but in no event shall the denominator of the fraction by which Tenant's Pro Rata Share is determined be less than 62,500 square feet.  The remainder of CAM Charges shall be borne by Landlord and/or other tenants.  Notwithstanding the foregoing to the contrary, until such time as additional buildings are constructed in the Shopping Center, i.e., Tenant is the only tenant or occupant in the Shopping Center, Tenant's Pro Rata Share shall be deemed to be one hundred percent (100%) of the CAM Charges, based on expenses related to that portion of the Common Area outlined on Exhibit "A-2" (the "Initial Common Area").

(d)      Examination of Landlord's Records.  Tenant shall have the right, but not more often than once as to any CAM Year and no later than two (2) years after the end of such CAM Year, to examine and make copies of the records pertaining to CAM Charges for such CAM Year.  If the examination discloses any overcharge by Landlord, Landlord shall reimburse Tenant within ten (10) days for any overpayment of Tenant's Pro Rata Share of CAM Charges; and if such overpayment by Tenant is in excess of three percent (3%) of the actual Tenant's Pro Rata Share of CAM Charges, Landlord shall reimburse Tenant for the reasonable out-of-pocket, non-contingent cost of such examination or audit.

8.      Signs and Communications Equipment.

LA/830663.10

02/04/04

12



(a)     Signs. Landlord, at its sole cost and expense, no later than the date set forth on Attachment "1" to the Construction Provisions, shall construct and install upon the Common Areas at the location so shown on the Site Plan, a pylon sign structure (with electrical wired box installed) having sufficient space thereon, in accordance with, and in the position shown on, Exhibit "E-1" attached hereto, for inclusion of doublesided "face panels" identifying Tenant's store, which face panels shall be constructed and installed at Tenant's sole cost and expense. Landlord shall submit to Tenant plans and specifications for such pylon sign (including colors, design, dimensions, type of lighting and position of tenant panels) prior to construction and installation thereof for Tenant's written approval, which shall not be unreasonably withheld or delayed. Attached as a portion of Exhibit "E" are plans and specifications for Tenant's current prototypical face panels and for Tenant's building signage, which Landlord hereby approves upon its execution of this Lease. Notwithstanding the foregoing, Tenant, its successors, subtenants and assigns shall be entitled without Landlord's consent, but subject to governmental requirements, as aforesaid, to replace any and all of its signs with signage consistent with Tenant's (or its successors' subtenants' or assigns') then-current prototypical sign plans.

(b)     Communications Equipment. Tenant may install, maintain and/or replace small satellite dishes on the roof of Tenant's Premises for Tenant's sole and exclusive use with Landlord's prior written consent, which shall not be unreasonably withheld, conditioned or delayed, provided that Tenant shall not adversely and materially affect the roof or any structural elements of the Premises.

9.     Taxes.

(a)     Taxes Contemplated Hereunder. The term "Real Estate Taxes" shall mean all general real estate taxes and assessments and other ad valorem taxes, rates and levies paid upon or with respect to the Shopping Center, including the Premises, for a calendar year or a portion thereof to any governmental agency or authority and all charges specifically imposed in lieu of any such taxes. Nothing contained in this Lease shall require Tenant to pay any local, county, municipal, state or federal income, franchise, corporate, estate, inheritance, succession, capital levy, business or transfer tax of Landlord, or any local, county, municipal, state or federal income, profits, gross

LA/830663.10



receipts, sales or renewal tax or charge upon the rent or other charges payable by Tenant under this Lease.

      (b)    <u>Payment of Real Estate Taxes</u>.  At such intervals as Landlord is required to pay the Real Estate Taxes, Tenant shall pay Tenant's Pro Rata Share of Real Estate Taxes (calculated in the same manner as Tenant's Pro Rata Share of CAM Charges in paragraph 7(c)) levied against the tax parcel or parcels comprising the Shopping Center (the "Tax Parcel"). Tenant's Pro Rata Share of Real Estate Taxes shall be net of any early-payment discounts available at the time Tenant's payment is due. Tenant shall pay Tenant's Pro Rata Share of Real Estate Taxes within thirty (30) days after Tenant's receipt of Landlord's statement therefor, accompanied by the tax bill on the basis of which such statement is rendered. Landlord shall pay, or cause the payment of, all Real Estate Taxes before any fine, penalty, interest or cost may be added thereto, become due or be imposed by operation of law for the nonpayment or late payment thereof. In no event shall Tenant be liable for any discount forfeited or penalty incurred as a result of late payment by another tenant or by Landlord. In the event Tenant is late in the payment of Tenant's Pro Rata Share of Real Estate Taxes, such payment shall bear interest at the lesser of twelve percent (12%) per annum or the highest rate permitted by State law (the "Default Rate") from the date such payment was due until the date paid by Tenant. Real Estate Taxes shall be prorated as of the Commencement Date and the expiration or earlier termination of this Lease, and Landlord shall promptly return to Tenant any overpayment made by Tenant not attributable to the period of Tenant's possession of the Premises. Landlord shall remain primarily responsible for such payment notwithstanding the fact that such payment may be made by a tenant of Landlord's Premises or other third party pursuant to an agreement to which Tenant is not a party.

      (c)    <u>Contest of Real Estate Taxes  and/or  Assessed  Valuation  of Property</u>. Tenant shall have the right, at Tenant's sole expense, to contest the amount or validity, or otherwise seek an exemption or abatement, of any Real Estate Taxes or to seek a reduction in the valuation of the Premises assessed for Real Estate Tax purposes, by appropriate proceedings diligently conducted in good faith, provided that Tenant shall first have notified Landlord of its intent to do so and Landlord shall have failed to notify Tenant in writing, within five (5) days of receipt of Tenant's notice, that Landlord intends

LA/830663.10



to contest such Real Estate Taxes or seek such a reduction. In any instance where any such action or proceeding is being undertaken by Tenant, Landlord shall cooperate with Tenant, execute any and all documents reasonably required in connection therewith and, if required by any law, rule or regulation of the taxing authority, shall join with Tenant in the prosecution thereof.

(d)    <u>Payment Following Appeal</u>.    Upon the termination of the proceedings set forth in subparagraph (c) above (unless the taxing authority requires that Real Estate Taxes be paid under protest prior to commencement of such proceedings), Tenant shall pay Tenant's Pro Rata Share of such Real Estate Taxes as finally determined in such proceedings, the payment or partial payment of which may have been deferred during the prosecution of such proceedings. Tenant shall be entitled to seek a refund of any overpayment of Real Estate Taxes relating or allocable to the Premises, as well as a reimbursement from the appropriate taxing authority of all costs, fees and expenses it incurs in such protest or reassessment.

10.    <u>Maintenance, Repairs and Replacements</u>.    Except (i) for costs covered by Landlord's insurance required to be maintained hereunder, (ii) for condemnation proceeds to be received by Tenant, (iii) for obligations arising from the negligent acts or omissions or willful misconduct of Landlord (or its agents, employees or other tenants), or (iv) as otherwise set forth in this Lease, Tenant shall be solely responsible for maintenance of the exterior and interior non-structural elements of the Building, including, without limitation, the HVAC, flashing surrounding the HVAC and the utilities within the Premises. Notwithstanding the foregoing, Tenant shall have no obligation to install or construct alterations or incur expenditures pursuant to this paragraph during the last five (5) years of the Lease Term; provided, however, if during the last five (5) years of the Lease Term Tenant elects to make any such replacement of a capital nature in satisfaction of its obligations hereunder, and if the resulting improvement to the Improvements cannot be fully amortized in accordance with generally accepted accounting principles, or the Internal Revenue Code and Regulations, over the remainder of the Term, then Tenant shall be reimbursed by Landlord, within thirty (30) days following the expiration of the Lease Term, by that amount of the cost associated with such replacements of a capital nature for the period beyond the remainder

LA/830663.10



of the Term, so long as any replacements of a capital nature are first approved by
Landlord, who has the right to require Tenant to repair said item rather than replace it, if
repair is reasonably possible. Landlord shall maintain all structural elements of the
Premises (whether or not same serve only the Premises), including, without limitation,
the roof, roof structure, initial structural flooring system (excluding floor coverings),
floor slab, foundation, load bearing walls and exterior structural walls; except to the
extent the roof membrane is damaged due to penetrations arising from the negligent acts
or omissions or willful misconduct of Tenant (or its agents, employees or contractors). In
addition, Landlord agrees to maintain the Other Improvements immediately surrounding
the Building, as well as sidewalks, the Customer Pick-Up area and landscaping, except
for the loading bay, leveling system and loading dock, which shall be maintained by
Tenant; provided, however, that notwithstanding the foregoing, maintenance to the
Customer Pick-Up area required as a result of unusual or extraordinary use thereof by
Tenant's customers shall be Tenant's responsibility. Should either party fail to perform
its obligations under this paragraph 10, the other party may, at its option, effect such
maintenance, replacements or repairs, provided that such curing party shall have given
the nonperforming party thirty (30) days' prior written notice, except in the case of
emergencies (in which event only such notice as may be reasonable under the
circumstances shall be required); but further provided that such thirty (30) day period (or
reasonable period in event of emergencies) shall be extended in respect of any cure that
cannot with reasonable diligence be accomplished within such period so long as the party
required to effect such cure has commenced such cure within such thirty (30) day period
(or reasonable period in event of emergencies) and thereafter diligently prosecutes such
cure to completion. The nonperforming party shall reimburse the other party on demand
for the reasonable and actual amount so expended (as evidenced by detailed invoice),
plus interest at the Default Rate. However, in the event of emergency repairs, no interest
shall accrue if reimbursed within thirty (30) days of request (including detailed invoice)
for reimbursement. All maintenance, repairs or replacements shall be done by Tenant or
Landlord lien-free and in a good and workmanlike manner consistent with the quality of
labor and materials used in originally constructing the Improvements and in accordance
with all applicable law. In order for Landlord and Tenant to effectively perform their

LA/830663.10



maintenance, repair and replacement obligations hereunder, Tenant and Landlord, as applicable, shall provide to the other party any and all manufacturers' and contractors' warranties relating to such work performed on behalf of the other party to the party who is required to maintain same under the Lease.

11.    <u>Utility Service Provider:    Payment of Utility Bills</u>.    Tenant shall be entitled, subject to State law, to select the utility service provider which shall provide water, electric, gas, cable, and telecommunication services to the Premises.  Tenant will pay directly to the appropriate utility company or governmental agency, when due, all bills for gas, water, sanitary sewer, electricity, telephone and other public or private utilities used by Tenant with regard to the Improvements.  Landlord shall pay when due all utility charges incurred in the operation of the Common Areas and the Shopping Center.

12.    <u>Alterations</u>.    During the Term, subject to approval by all applicable governmental agencies with approval rights thereover, Tenant shall have the right, at its discretion and its sole cost, without Landlord's consent, to make (i) any alterations or modifications necessary or desirable in order to bring the Premises into conformity with Tenant's then-current prototype for similarly sized stores, provided that any such alterations or modifications affecting the exterior or structural elements of the Building shall be consistent with the colors and design of the then existing architecture of the Shopping Center and shall not impair the structural integrity, or materially diminish the value, of the Building, and (ii) any interior nonstructural alterations or modifications it may desire.  With Landlord's consent, which shall not be unreasonably withheld, conditioned or delayed, Tenant shall otherwise have the right, at its sole cost, to otherwise alter, modify or reconstruct the exterior and/or structure of the Building or Other Improvements. Landlord's withholding of consent as to any exterior or structural alteration or modification shall be deemed reasonable only if same is materially inconsistent with the then-existing architecture of the Shopping Center.  Should the consent of any governmental agency, conceptual plans and specifications for such work required to be submitted to such governmental agency shall be provided to Landlord prior to commencement of any such work.  In addition, should Landlord's consent be required for such work, conceptual plans and specifications for such work shall also be provided

LA/830663.10



to Landlord prior to commencement of any such work. Landlord shall be deemed to have consented to such work if written notice of disapproval, with reasons specified, is not received by Tenant within fifteen (15) days following Tenant's delivery of such plans and specifications to Landlord. Without cost or expense to Landlord, Landlord shall cooperate with Tenant in the obtaining of any and all licenses, building permits, certificates of occupancy or other governmental approvals which may be required in connection with any such modifications or alterations, and Landlord shall execute, acknowledge and deliver any documents reasonably required in furtherance of such purposes. Following completion of any such alterations or modifications performed by Tenant hereunder, Tenant shall deliver to Landlord any and all as-built plans and specifications pertaining thereto, but only if and to the extent that same are prepared.

13.    Mechanics' Liens. Landlord and Tenant covenant to each other that they will not permit any lien to be filed against the Premises or the Shopping Center as a result of nonpayment for, or disputes with respect to, labor or materials furnished to the Premises or the Shopping Center for or on behalf of Tenant, Landlord or any party claiming by, through, or under Tenant or Landlord, nor shall either party permit any judgment, lien or attachment to lie, as applicable, against the Premises or the Shopping Center. Should any lien of any nature, including but not limited to the foregoing, be filed against the Premises or Shopping Center, the party on account of whose actions such lien has been filed shall, within thirty (30) days after receipt of written notice of such lien, cause said lien to be removed, or otherwise protected against execution during good faith contest, by substitution of collateral, posting a bond therefor, escrowing of adequate funds to cover the claim and related transaction costs or such other method as may be permissible under applicable title insurance regulations and reasonably acceptable to the other party hereto.

14.    Insurance.

(a)    Property Damage. During the Construction Term, Tenant shall keep or require its general contractor to keep, in full force and effect, a policy of builder's risk insurance covering loss or damage to the Improvements for not less than eighty percent (80%) of the replacement value of all such construction. During the Main Term and all Option Periods, Tenant shall keep the Premises insured against loss or damage by

LA/830663.10

fire and the perils covered under standard "all risk" or "special form" coverage in the amount of full replacement value of the Building, with a commercially reasonable deductible, for which Tenant shall be fully responsible.  Landlord and Landlord's first "Mortgagee" (as defined in paragraph 21 below), shall be named in such policy or policies as additional insureds as their respective interests may appear.  Landlord shall not construct, or permit to be constructed, any improvement in the Shopping Center, nor conduct any activity, or permit the conduct of any activity, in the Shopping Center which will prevent Tenant from being able to obtain insurance coverage at commercially reasonable rates.

     (b)    <u>Liability Insurance</u>.  During the Term, Tenant shall keep in full force a policy of commercial general liability insurance with bodily injury and property damage coverage with respect to the Premises and business operated by Tenant, which shall name Landlord and Landlord's first Mortgagee as additional insureds as their respective interests may appear.  The limits of such commercial general liability policy shall be not less than $3,000,000.00 combined single limit for bodily injury and property damage, with a commercially reasonable deductible.

     (c)    <u>Workers' Compensation Insurance</u>.  To the extent required by law, Landlord and Tenant shall maintain workers' compensation insurance covering their respective employees in statutory limits, or maintain such alternate coverages or arrangements as legally permissible.

     (d)    <u>Self-Insurance</u>.    Notwithstanding anything to the contrary contained herein, Tenant shall have the right to self-insure against any of the risks or portions thereof set forth in subparagraphs (a) and (b) (and to the extent then permitted by law, (c)) above, provided Tenant has a reported net worth, as of the end of Tenant's most recent quarterly reporting period, of not less than One Hundred Fifty Million Dollars ($150,000,000).

     (e)    <u>Common Area, Additional Area and Third Party Tenant Insurance and Insurance During Landlord's Construction</u>. During the Term, Landlord shall keep in full force and effect, in form reasonably acceptable to Tenant, policies of (1) commercial general liability insurance, and (2) property insurance insuring against loss or damage by fire and the perils covered under standard "all risk" or "special form" coverage, with

LA/830663.10

19

respect to the Common Areas and with respect to all other areas of the Shopping Center over which Landlord from time to time has present possessory rights (or has the right under any lease to provide insurance coverage because of a tenant's failure to maintain such required coverage) but which do not constitute a portion of the Common Areas (such areas here sometimes collectively referred to as the "Additional Areas"). The Additional Areas shall include, without limitation: (i) as yet unconstructed portions of the Shopping Center intended for tenant occupancy, (ii) constructed but unoccupied portions of the Shopping Center, (iii) vacated or otherwise uninsured tenant space, whether by reason of lease expiration, default or otherwise, and (iv) constructed and occupied portions of the Shopping Center. Said policies shall name Tenant, and any lender, investor or other stakeholder which is designated by Tenant from time to time, as an additional insured to the fullest extent Tenant and such stakeholder have insurable interests. The limits of such policies shall be the same as those set forth in subparagraphs (a) and (b) above, as applicable. The cost of the premiums for coverages relating to Common Areas shall be an element of CAM Charges, provided that Tenant shall not be liable for its pro rata share of any premium for coverage in excess of that coverage which is customary among owners of like shopping centers in the City. Any deductible amount for Common Area insurance coverage shall be reasonable in amount given the nature of the risk insured and probable frequency of claims made under such coverage, but in no event shall such deductible amount exceed $10,000 for Common Area liability coverage during the Main Term or $15,000 during the Option Periods. Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center, including the Additional Areas and areas leased to third party tenants or sold to third party occupants, are insured with substantially similar coverages to those required for the Premises and the Common Areas, such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever Tenant may be assured that the Shopping Center will be reconstructed in equal or superior condition within the time frame set forth in paragraph 15. During any period in which Landlord is conducting construction activities at the Shopping Center, Landlord shall keep, or cause its general contractor to keep, in full force and effect, with regard to the Shopping Center, in form reasonably acceptable to Tenant, at least the minimum insurance coverages set forth below:

LA/830663.10

1)      Workers' Compensation – Statutory Limits;
        Employers Liability – $500,000;

2)      Automobile Liability for all vehicles with limits of
        $3,000,000; and

3)      Commercial General Liability to include premises
        operations and products/completed operations
        coverage with limits of $3,000,000.

Additionally, Landlord shall keep or require its general contractor to keep in full force and effect a policy of builder's risk insurance covering loss or damage to the Shopping Center for the full replacement value of all such construction. To the fullest extent Tenant has an insurable interest, such liability policy shall name Tenant an additional insured and such builder's risk policy shall name Tenant a loss payee.

(f)     Policy Provisions.   All policies of insurance (other than self-insurance) enumerated above shall be provided by insurance carriers with a Best rating of not less than A-VIII. Any insurance coverage enumerated above may be effected by a blanket policy or policies of insurance or under so-called "all risk" or "multi-peril" insurance policies, provided that the total amount of insurance available with respect to the Premises and Tenant's or Landlord's liability hereunder shall be at least the equivalent of separate policies in the amounts herein required, and provided further that in other respects any such policy or policies shall comply with the provisions of this paragraph 14. Landlord shall not be entitled to self-insure against any of the risks recited herein, except the amount of any commercially reasonable deductible shall not be deemed to be self-insurance. An increased coverage or "umbrella" policy may be provided and utilized by either party to increase the coverage provided by individual or blanket policies in lower amounts, and the aggregate coverage provided by all such policies with respect to the limits required herein shall be satisfactory provided that such policies otherwise comply with the provisions of this paragraph 14.

(g)     Waiver of Right of Recovery and Subrogation.   To the extent that insurance proceeds are actually received in satisfaction of a loss which is required to be covered by insurance or is self-insured hereunder (with the deductible under any policy being deemed to be self-insured), Landlord and Tenant hereby waive any and all rights of



recovery against each other for any loss or damage to the Premises or the contents contained therein, for loss of income on account of fire or other casualty, or for injury sustained on the Premises or the Common Areas; and each party's aforesaid policies of insurance shall contain appropriate provisions recognizing this mutual release and waiving all rights of subrogation by the respective insurance carriers.

(h)    Evidence of Insurance.    Subject to Tenant's right to self-insure hereunder, (i) upon commencement of the Main Term (as to property insurance), (ii) upon Delivery of the Land (as to liability insurance) and (iii) prior to expiration thereof, Tenant and Landlord shall cause to be issued to each other in lieu of the original policy, a duplicate of such policy or appropriate certificates of insurance reasonably acceptable to the other party and evidencing compliance with the applicable covenants of this paragraph 14. Each such certificate shall provide that coverage shall not be cancelled without thirty (30) days notice to the certificate-holder (and any Mortgagee, if applicable).

(i)    Indemnities.    Except if arising from the negligent or willful acts of Landlord or its agents or employees (to the extent that paragraph 14(g) is inapplicable thereto), Tenant hereby agrees to indemnify, defend and hold Landlord harmless from all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring on the Premises or resulting from Tenant's use thereof, to the extent of Tenant's liability insurance coverage required to be carried hereunder or actually carried by Tenant.

Except if arising from the negligent or willful acts of Tenant or its agents or employees (to the extent that paragraph 14(g) is inapplicable thereto), unless covered by insurance maintained by Tenant under this Lease, Landlord agrees to indemnify, defend and hold Tenant harmless from any and all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring in, on or around the Common Areas of the Shopping Center or resulting from the use thereof by Landlord, its agents or employees, to the extent of Landlord's liability coverage required to be carried hereunder or actually carried by Landlord.

15.    Damages by Fire or Other Casualty.

(a)    Less Than Twenty-Five Percent (25%).  In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Improvements, Common Areas and/or Additional Areas, which has a repair and reconstruction cost of less than twenty-five percent (25%) of the then-total replacement cost of any of the Improvements, Common Areas and/or Additional Areas, this Lease shall not terminate except as expressly set forth herein, and Base Rent and other charges shall continue to be paid by Tenant pursuant to the terms of paragraph 4 hereof.  Within a reasonable time after such casualty, subject to force majeure, applicable building codes, the procurement of building permits and the receipt of insurance proceeds (unless self-insured) to the extent of the damage to the Premises, or the Common Areas or Additional Areas, as applicable, Tenant shall complete reconstruction of the Building and Other Improvements, and Landlord shall complete reconstruction of the Common Areas and Additional Areas (including substantially equivalent value in equipment, furniture and fixtures), to that condition existing immediately prior to such casualty, in the reconstructing party's reasonable discretion, with, in event of any Tenant reconstruction, such alterations as may be permitted under paragraph 12 hereof.  In the event, subject to force majeure, the Premises, Common Areas and/or Additional Areas, as applicable, are not substantially repaired and reconstructed, and equipment, furniture and fixtures restored or replaced, by the party with repair and restoration obligations within two hundred forty (240) days after receipt of any required governmental permits, for which permits the party with repair obligations shall make prompt application following such destruction or damage, and insurance proceeds (if not self-insured), then the other party, at its option, by giving written notice to the party with repair obligations, within thirty (30) days after the expiration of said period, may undertake completion of such reconstruction, in which event the party with repair obligations shall make available to the notifying party all insurance proceeds received by the non-performing party for such reconstruction (including any applicable deductible) or, if self-insured, the amount necessary for such reconstruction.

(b)    Twenty-Five Percent (25%) or More.  In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Improvements,

LA/830663.10

02/04/04                                     23                          

Common Areas and/or Additional Areas, which has a repair and reconstruction cost of twenty-five percent (25%) or more of the then-total reconstruction cost of any of said areas, or in the event of any uninsured casualty, Tenant shall have the option of terminating this Lease. Tenant shall notify Landlord of its exercise of such option within sixty (60) days following the occurrence of such casualty and shall thereupon make available to Landlord (i) all insurance proceeds paid by the insurance carrier issuing the policy of insurance required to be maintained pursuant to paragraph 14(a) above, or (ii) if self-insured, an amount equal to the reconstruction costs of the Improvements or, if the Improvements are not being reconstructed, an amount equal to the actual value of the Improvements (not to exceed, however, an amount equal to the reconstruction costs of the Improvements), to the extent such amounts would have been payable under the insurance outlined in paragraph 14(a) above.  In the event Tenant does not elect to terminate this Lease as set forth above, then, subject to force majeure, within two hundred forty (240) days after receipt by Tenant of the required governmental permits for restoration, for which permits Tenant shall make prompt application following such destruction or damage, and insurance proceeds (if not self-insured) with regard to such damage or destruction, Tenant shall complete reconstruction of the Improvements to their condition existing immediately prior to such damage, in Tenant's reasonable discretion, with such alterations as may be permitted under paragraph 12, and shall restore the Premises (including equipment, furniture and fixtures).  Should Tenant elect to maintain this Lease in full force and effect, Landlord shall reconstruct all Common Areas and Additional Areas in the manner specified by subparagraph (a) above regardless of the amount of damage to same.  Additionally, Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center leased to third party tenants or sold to third party occupants are subject to substantially similar reconstruction obligations to those of the Premises, Common Areas and Additional Areas, such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever, in the event Tenant elects to maintain this Lease in force, Tenant shall be assured that the Shopping Center as a whole will be reconstructed in accordance with this paragraph 15.

  (c) <u>Last Two (2) Years of Main Term or Option Period</u>.
Notwithstanding the foregoing, if any such damage or destruction occurs within the last
two (2) years of the Main Term or of any Option Period and has a material impact on
Tenant's ability to conduct business, as reasonably determined by Tenant, Tenant shall be
under no obligation to restore the Improvements, in which case this Lease shall terminate
at Tenant's option, such option to be exercised by Tenant giving not less than thirty (30)
days' prior written notice to Landlord, and Landlord shall receive (i) the proceeds of any
insurance (together with any applicable deductible) which are paid by the insurance
carrier issuing the policy of insurance required to be maintained pursuant to paragraph
14(a) above, or (ii) if self-insured, an amount equal to the reconstruction costs of the
Improvements or, if the Improvements are not being reconstructed, an amount equal to
the actual value of the Improvements (not to exceed, however, an amount equal to the
reconstruction costs of the Improvements), to the extent such amounts would have been
payable under the insurance outlined in paragraph 14(a) above.

  16. <u>Condemnation</u>.

  (a) <u>Definition of Taking and Substantial Taking</u>.  For the purpose of
this Lease, a "Taking" shall mean any condemnation or exercise of the power of eminent
domain by any authority vested with such power or any other taking for public use,
including a private purchase in lieu of condemnation by an authority vested with the
power of eminent domain; the "Date of Taking" shall mean the earlier of the date upon
which title to the Premises, the Shopping Center or any portion thereof so taken is vested
in the condemning authority or the date upon which possession of the Premises, the
Shopping Center, or any portion thereof is taken by the condemning authority; and
"Substantially All of the Premises" shall mean (i) so much of the Improvements and/or
Shopping Center and Common Areas as, when taken, leaves the untaken portion
unsuitable, in Tenant's reasonable opinion, for the continued feasible and economic
operation of the Premises by Tenant for the same purposes as immediately prior to such
Taking or as contemplated herein, (ii) so many of the parking spaces within the Shopping
Center as reduces the parking ratio below the greater of five (5) spaces (for full-sized
automobiles) per 1000 square feet of ground-floor gross leasable area or that ratio which
is required by the zoning ordinance applicable to the Shopping Center, and Landlord's

LA/830663.10

failure to provide substantially equivalent alternative parking reasonably acceptable to Tenant within sixty (60) days after such Taking, or (iii) so much of the Common Area Easement described in paragraph 6 above that access to the Premises is impeded.

(b)    Tenant's Rights Upon Taking or Substantial Taking.  In the event of a Taking of Substantially All of the Premises, Tenant, at its option upon thirty (30) days' written notice to Landlord, which shall be given no later than sixty (60) days following the Taking, shall have the right to terminate this Lease.  All Base Rent and other sums payable by Tenant hereunder shall be apportioned and paid through and including the Date of Taking, and neither Landlord nor Tenant shall have any rights in any compensation or damages payable to the other in connection with such Taking.

(c)    Tenant's Rights Upon Less Than Substantial Taking.  In the event of a Taking of less than Substantially All of the Premises, Base Rent and other charges shall be reduced fairly and equitably in accordance with the portion condemned or taken, effective as of the Date of Taking, and Tenant shall make all necessary restorations to the Improvements so that the portions of the Improvements not taken constitute a complete architectural unit, provided that the cost thereof to Tenant shall not exceed the proceeds of Tenant's condemnation award (to the extent that such relates to the Improvements and not to Tenant's personal property, intangibles or out-of-pocket expenses unrelated thereto) and the portion of Landlord's award allocable to the Premises, which Landlord shall make available to Tenant for such restoration.  If the Taking occurs within the last two (2) years of the Main Term or of any Option Period and has a material impact on Tenant's ability to conduct business as reasonably determined by Tenant, this Lease shall terminate at Tenant's option, such option to be exercised by Tenant giving not less than thirty (30) days' prior written notice to Landlord.

(d)    Landlord's Obligations Upon Any Taking.  In the event of any Taking following which the Lease continues in effect, Landlord shall make all necessary restorations to all portions of the Common Areas and Additional Areas such that they each constitute a complete architectural unit and serve the function originally intended. Additionally, Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center leased to third party tenants or sold to third party occupants are subject to substantially similar reconstruction obligations to those of the



Premises, Common Areas and Additional Areas, such that in the event of any condemnation of any portion of the Shopping Center whatsoever, and in the event Tenant elects to maintain this Lease in force, Tenant shall be assured that the Shopping Center will be reconstructed to its former condition within reasonable time.

    (e)   <u>Rights Upon Temporary Taking</u>.  In the event of a Taking of the Premises, the Common Areas and/or any other area within the Shopping Center, or any portion thereof, for temporary use (specifically one not exceeding sixty (60) days in duration), without the taking of the fee simple title thereto, this Lease shall remain in full force and effect.  All awards, damages, compensation and proceeds payable by the condemnor by reason of such Taking relating to the Premises, or relating to the Common Areas but reasonably attributable to the Premises, for periods prior to the expiration of the Lease shall be payable to Tenant.  All such awards, damages, compensation and proceeds for periods after the expiration of the Lease shall be payable to Landlord.  Anything contained herein to the contrary notwithstanding, a temporary Taking for any period in excess of sixty (60) days may, at Tenant's option, be deemed a permanent Taking and shall be governed by subparagraph (b) or (c) above, as applicable.

    (f)   <u>Taking of the Pylon Sign(s)</u>.  In the event of a taking, whether permanent or temporary, of any pylon or monument sign (as contemplated by paragraph 8) on which Tenant has installed identification panels, Landlord shall provide within ninety (90) days a substitute site (reasonably acceptable to Tenant and as permitted by applicable governmental authorities) therefor, with adequate electrical power, located so as to be visible to vehicular traffic or roadways adjacent to the Shopping Center and/or at entrances to the Shopping Center, and Landlord shall replace and/or rebuild any of such signage so taken at its sole cost.

    (g)   <u>Tenant's Right Upon Condemnation</u>.  In the event of a Taking described in subparagraph (b) or (c) above, Tenant shall be entitled to claim compensation from the condemning authority for the value of its leasehold interest in the Premises, its unamortized leasehold improvements paid for by Tenant, relocation expenses and any other items to which Tenant is entitled under applicable law.

    17.   <u>Assignment and Subletting</u>.  Tenant shall have the right to sublet, assign, transfer reassign and grant concessions or licenses (a "Transfer") in all or any part of the

LA/830663.10

Premises and any of Tenant's rights and obligations under this Lease during the Term, without Landlord's prior consent. In the event of such a Transfer, Tenant shall remain liable for all of Tenant's obligations to Landlord arising hereunder so long as this Lease is not changed, modified or amended in any respect by Landlord and any transferee. Transfers to subsidiaries, affiliates, or related parties, and Transfers involving beneficial ownership interests in Tenant, shall not be deemed a Transfer hereunder and same may be effected without Landlord's knowledge or consent; provided that within a reasonable period of time following such a Transfer, Tenant shall provide Landlord with the name and address of the transferee.

Notwithstanding anything hereinabove to the contrary, if Tenant gives notice to Landlord that Tenant desires to assign this Lease or to sublet all or any part of the Premises to an unaffiliated third party (or parties) for all or substantially all of the then remaining Term of this Lease, then Landlord may elect to cancel this Lease as to that portion of the Premises which is the subject of such Transfer. For purposes of the foregoing, the granting of licenses or concessions by Tenant or the creation of departments by Tenant (as described below) shall not be deemed to be a Transfer. In order to exercise its election to cancel, Landlord shall provide a written notice to Tenant, which notice shall be given no later than ninety (90) days after Landlord's receipt of Tenant's notice of such Transfer. In the event of any such election to cancel by Landlord, Tenant may elect to either (a) nullify such cancellation by giving notice to Landlord within sixty (60) days after Tenant's receipt of Landlord's notice of cancellation that Tenant withdraws its intent to such proposed Transfer; or (b) require that such cancellation be effective as to all of the Premises. If Landlord's election to cancel is not vitiated by Tenant, then such cancellation shall be effective on the effective date of Tenant's proposed Transfer; provided that if such cancellation follows an election by Tenant under clause (b) in the preceding sentence, Landlord may elect to withdraw its election to cancel this Lease by providing written notice of such election to Tenant within five (5) business days of Landlord's receipt of written notice from Tenant of Tenant's requirement that the cancellation be effective as to all of the Premises and, in such event, this Lease shall not be cancelled and Landlord shall be deemed to have waived its cancellation right as to such Transfer. In the event of any such cancellation of this Lease,

if the rental rate payable to Tenant by the assignee or sublessee pursuant to the terms of the proposed Transfer would have exceeded the Base Rent payable by Tenant under this Lease (the "Rent Differential"), then Landlord shall reimburse Tenant for the unamortized cost of the Improvements, including without limitation any alterations or additions thereto (or portion thereof as to which such cancellation is effective), in excess of the Tenant Improvement Allowance paid by Landlord attributable thereto, amortized in accordance with generally accepted accounting principles, but in no event greater than the "UTI Cap" (defined below). Upon written request from Landlord (but not more than twice in any calendar year), Tenant shall provide Landlord with the then current unamortized cost of the Improvements as described in the immediately preceding sentence. Notwithstanding the foregoing, for purposes of this paragraph 17, in no event shall Landlord's reimbursement obligation herein exceed the net present value (using a discount rate of ten percent (10%)) of the Rent Differential, calculated over the remaining term of the Lease, excluding any unexercised option terms (the "UTI Cap"). By way of illustration, if Tenant proposed a Transfer with four (4) years remaining in the term, and the Rent Differential is One Dollar ($1.00) per square foot of gross leasable area within the Building (i.e., $33,749.00 per year assuming that the Building contains 33,749 square feet), then the UTI Cap would be $111,337.11.

Notwithstanding the foregoing provisions of this paragraph 17, Tenant shall (without being subject to Landlord's cancellation right as set forth above) have the right, on prior written notice to Landlord and without Landlord's consent, (x) to license a portion of or a department in the Premises to a licensee or concessionaire doing business within the Building under Tenant's trade name and without a separate building entrance, provided that the total space so licensed shall not exceed thirty-five percent (35%) of the gross leasable area of the Building; (y) to assign this Lease to a purchaser of all or substantially all of Tenant's stores in the States of Arizona, New Mexico and Texas. No license or concession pursuant to the provisions of clause (x) of this subparagraph or assignment of this Lease pursuant to the provisions of clause (y) of this subparagraph shall release Tenant from its continuing liability under this Lease.

18.    Use.



(a)    Tenant may initially maintain, use and operate the Premises as a retail store for (i) the sale of consumer, office and automotive electronics products (which include, but shall not be limited to, televisions, stereos, speakers and video recorders and players), computer hardware and software, entertainment software and entertainment media (which include, but shall not be limited to, records, game cartridges, video tapes, cassettes and compact discs), cellular and wireless telephones and telecommunication devices, and related goods and the sale and installation of motor vehicle audio, stereo and telephone systems and technological evolutions of the foregoing (all of such items being herein collectively referred to as the "Products"), and (ii) renting, servicing, repairing and warehousing of the Products.

(b)    Tenant shall also have the right to use the Premises for any lawful use; provided, however, that the Premises shall not be used (i) for any illegal purpose, (ii) for any use prohibited under paragraph 19(a)(viii) below, (iii) in violation of the initial exclusive use restriction granted hereafter to the occupant of the premises identified on the Site Plan as "Major 1" (the "Post-Execution Exclusive"), provided that (1) Tenant receives written notice of the Post-Execution Exclusive, (2) Tenant will be subject to the Post-Execution Exclusive only for so long as it remains in force and effect in the Shopping Center and (3) in no event will the Post-Execution Exclusive prevent Tenant from displaying or selling any of the Products, or (iv) in violation of any other applicable provision of the "Permitted Encumbrances" contained in Exhibit "F".

(c)    Subject to the other provisions of this Lease, Tenant shall initially open its store for business to the public in the Premises as a Circuit City store for at least one (1) day no later than the date which is one hundred eighty (180) days following the completion of the Building.  Other than as expressly set forth in the preceding sentence, Tenant shall have no obligation to open or operate any business in the Premises, and shall have the right, at any time, to cease to conduct any business operations in the Premises, and Tenant shall incur no liability to Landlord or any other party by reason thereof.

(d)    Notwithstanding anything contained herein to the contrary, in the event that Tenant has failed to open for business within the period referenced in paragraph 18(c) above, or has opened for business within the 180-day period referenced in paragraph 18(c) above but has thereafter ceased operations at the Premises for a period

LA/830663.10

of nine (9) consecutive months, in either case without excuse of (1) force majeure, (2) permitted alterations or reconstruction following casualty or condemnation, which alterations or reconstruction Tenant shall diligently and in good faith commence and pursue to completion, or (3) any assignment or subletting, then Landlord may elect to terminate this Lease on ninety (90) days prior written notice, which may be given no earlier than the sixth (6th) month following such failure to open or cessation of operations, as the case may be. Such election to terminate shall, however, be of no force and effect if Tenant opens for business or resumes operations at the Premises, as the case may be, prior to the end of the 90 day period referenced above. In the event such election to terminate is effective, then Landlord shall pay to Tenant on or before the termination date (x) the Tenant Improvement Allowance (if same has not theretofore been paid to Tenant) plus (y) the unamortized costs and expenses of the Improvements, including without limitation the costs of alterations and additions thereto, paid for by Tenant and not reimbursed by Landlord, either through the Tenant Improvement Allowance or otherwise, excluding, however, the costs of the initial construction by Tenant regardless of whether Tenant's initial construction costs exceeded the Tenant Improvement Allowance. Upon written request from Landlord (but not more than twice in any calendar year), Tenant shall provide Landlord with the then current unamortized cost of the Improvements as described in the immediately preceding sentence. Notwithstanding the foregoing, in no event shall Landlord be required to pay the foregoing amounts to Tenant if Landlord has elected to terminate this Lease within the first four (4) Lease Years.

     19.   <u>Warranties, Representations and Covenants.</u>

       (a)   Landlord represents, warrants and covenants to Tenant that:

        (i)   <u>Quiet and Peaceful Enjoyment.</u> Tenant shall have quiet and peaceful use, enjoyment and occupancy of the Premises.

        (ii)   <u>Title.</u> Landlord's fee simple interest in the Shopping Center is free and clear of any mortgages, deeds, encumbrances, declarations, easements, agreements, leases, tenancies or restrictions, except those matters set forth on <u>Exhibit "F"</u> attached hereto and entitled "Permitted Encumbrances", or any other encumbrances which would restrict Tenant's use of the Premises for the sale of Products

or would restrict in any respect the right of Tenant, its employees, customers and invitees to use the Common Areas in accordance with the terms of this Lease. Nothing contained in this Lease, including the Permitted Encumbrances and other matters disclosed on Exhibit "F", shall restrict Tenant's rights under this Lease, including but not limited to the right to operate its business in the Premises. Landlord specifically covenants and warrants that no third party, including but not limited to any other occupant of the Shopping Center, has the right to object to Tenant's tenancy hereunder, prohibit the selling, renting, servicing, repairing or warehousing of the Products, or the right to consent to any feature of the Improvements or Tenant's signage. This representation, warranty and covenant is a material inducement to Tenant's execution of this Lease.

(iii)    Certificate of Authority. Landlord covenants that it is a duly constituted limited liability company under the laws of the State of New Mexico, and that its managing member, who is acting as its signatory in this Lease, is duly authorized and empowered to act for and on behalf of the limited liability company. Landlord has furnished Tenant prior hereto with evidence of (a) the existence of the limited liability company, and (b) the authority of the managing member to bind the limited liability company as contemplated herein.

(iv)    No Litigation. There are no judicial, quasi-judicial, administrative or other orders, injunctions, moratoria or pending proceedings against Landlord or the Shopping Center which preclude or interfere with, or would preclude or interfere with, the construction contemplated herein or the occupancy and use of the Premises for the purposes herein contemplated.

(v)    Hazardous or Toxic Materials. To the best of Landlord's knowledge and belief, except as may be disclosed in that certain Phase I Environmental Site Assessment report prepared by Mactec Engineering and Consulting of Georgia, Inc., dated May 15, 2003 (the "Environmental Report"), Landlord has not used, discharged, dumped, spilled or stored any Hazardous Substances (as defined in the Construction Provisions) on or about the Shopping Center, whether accidentally or intentionally, legally or illegally, and has received no notice and has no knowledge that any such condition exists at the Shopping Center. If any claim is ever made against Tenant relating to Hazardous Substances present at or around the Shopping Center, whether or

LA/830663.10



not such substances are present as of the date hereof, or any Hazardous Substances are hereafter discovered at the Shopping Center (unless introduced by Tenant, its agents or employees), all costs of removal incurred by, all liability imposed upon, or damages suffered by, Tenant because of the same shall be borne by Landlord, and Landlord hereby indemnifies and agrees to defend and hold Tenant harmless from and against all such costs, losses, liabilities and damages, including, without limitation, all third-party claims (including sums paid in settlement thereof, with or without legal proceedings) for personal injury or property damage and other claims, actions, administrative proceedings, judgments, compensatory and punitive damages, lost profits, penalties, fines, costs, losses, attorneys' fees and expenses (through all levels of proceedings), consultants or experts fees and all costs incurred in enforcing this indemnity. Notwithstanding the foregoing, with respect to Hazardous Substances which are introduced to the Shopping Center or the Premises after the date hereof by any party other than Landlord or any party related to Landlord or any contractor, employee, agent or representative of Landlord, and should the introduction of such Hazardous Substances as aforesaid materially interfere with the normal conduct of Tenant's business in the Premises, its use and enjoyment of the Common Areas or its other rights and benefits under this Lease, then Tenant shall be entitled to an equitable abatement of Base Rent and all other charges hereunder, and, in the event such material interference continues for a period of one hundred eighty (180) days after discovery of such Hazardous Substances and Landlord is unable to remediate (or cause the remediation of) such Hazardous Substances as required by law within such period of one hundred eighty (180) days, then Tenant shall be entitled to terminate this Lease at any time prior to the completion of such remediation upon thirty (30) days prior notice to Landlord. The representation, warranty and indemnity of Landlord described in this paragraph 19(a)(v) shall survive the termination or expiration of this Lease.

(vi)    Tenant's Exclusive Use. So long as the Premises are used for the initial uses set forth in paragraph 18, no other tenant or occupant of the Shopping Center shall be entitled to sell or rent (or rent to own) any of the Products, subject only to rights granted any such tenants under leases in existence as of the date of this Lease and described on Exhibit "F". Notwithstanding the foregoing, Tenant hereby agrees that the foregoing restriction shall not prevent a tenant from devoting up to the lesser of five



percent (5%) or two hundred (200) square feet of the sales area of its premises to the display and sale of the Products as an incidental use to its primary use.

    (vii)   <u>Zoning and Subdivision</u>.  The Premises and the Shopping Center are presently properly subdivided, in conformity with all applicable laws and zoned so as to permit (A) the development and operation of the Premises and the Shopping Center in accordance with the provisions of this Lease; and (B) the initial use of the Premises described in paragraph 18 of this Lease.

    (viii)   <u>Prohibited Activities</u>.  Landlord shall not operate or lease (or permit to be operated or leased) any building or tenant space in the Shopping Center for use as:

    (A)   a bar, pub, nightclub, music hall or disco in which less than fifty percent (50%) of its space or revenue is devoted to and derived from food service;

    (B)   a bowling alley;

    (C)   a billiard or bingo parlor;

    (D)   a flea market;

    (E)   a massage parlor;

    (F)   a funeral home;

    (G)   a facility for the sale of paraphernalia for use with illicit drugs;

    (H)   a facility for the sale or display of pornographic material (as determined by community standards for the area in which the Shopping Center is located);

    (I)   an off-track betting parlor;

    (J)   a carnival, amusement park or circus;

    (K)   a gas station, car wash or auto repair or body shop (the parties specifically acknowledging that Tenant's car stereo installation facility is not included in this prohibition (K));

    (L)   a facility for the sale of new or used motor vehicles, trailers or mobile homes (provided that a new car showroom, but no parking lot

storage or sales, may be permitted so long as same is not located within the premises identified on the Site Plan as "Major 1";

(M)    a facility for any use which is illegal or dangerous, constitutes a nuisance or is inconsistent with an integrated, community-oriented retail and commercial shopping center;

(N)    a skating rink;

(O)    an arcade, pinball or computer gameroom (provided that retail facilities in the Shopping Center may operate no more than four (4) such electronic games incidentally to their primary operations);

(P)    service-oriented offices (such as, by way of example, medical or employment offices, travel agencies, real estate agencies or dry cleaning establishments) or other nonretail uses, except for offices and storage facilities incidental to a primary retail operation and except that service-oriented offices may be permitted so long as same are not located within the premises identified on the Site Plan as "Major 1";

(Q)    a banquet hall, auditorium or other place of public assembly;

(R)    a training or educational facility (including, without limitation, a beauty school, barber college, reading room, school or other facility catering primarily to students or trainees rather than customers);

(S)    a theater of any kind;

(T)    a facility for the sale or rental of used goods (including thrift shops, secondhand or consignment stores) or any facility selling new or used merchandise as a wholesale operation, a liquidation operation, odd lots, lot sales, factory close-outs or imperfect goods; or

(U)    a gymnasium, sport or health club or spa, except that one (1) sport or health club or spa may be permitted so long as same is not located within the premises identified on the Site Plan as "Major 1".

In addition to the foregoing, Landlord shall not operate, lease or permit to be operated or leased any restaurant or bookstore within the premises identified on the Site



Plan as "Major 1". In addition, no auction, fire or going-out-of-business sale shall be conducted in the Shopping Center.

(ix)   Site Covenants.   With regard to the development of the Shopping Center and the uses and operations of the Common Areas, Landlord makes the following representations, warranties and covenants (the "Site Covenants"):

(A)   Building Height and Location.   No building adjacent to the Premises shall exceed the heights shown on the building elevations attached to Exhibit "C", nor shall it be positioned so as to project beyond the portion of the front wall of the Building immediately adjacent thereto. No outparcels, barriers, buildings, kiosks or other structures, either temporary or permanent, shall be located within Tenant's Protected Area, and no building located on an outparcel in the Shopping Center shall exceed the heights shown on the building elevations attached to Exhibit "C", nor shall it exceed the size necessary for such outparcel to maintain, within its boundaries, the parking ratio required for its use under the applicable zoning code without use of parking spaces located in the Common Areas. No development shall occur within the Shopping Center except as shown on the Site Plan.

(B)   Construction and Alterations.   Following the end of the first Lease Year, no exterior construction and no construction staging shall be permitted in the Shopping Center during the months of October, November and December except for emergency repairs. In the event of any construction within Landlord's Premises, Landlord shall designate a construction access route, staging and parking areas located so as to minimize interference with customers or the operations of other occupants of the Shopping Center and shall require erection of safety barriers as necessary and an opaque wall around the site of such construction of a size necessary to screen such construction from ground level view. With regard to any construction on Landlord's Premises, Tenant shall not be responsible for any governmentally imposed impact fees, hookup, connection, installation or tap-in fees and other similar construction-related charges. Landlord shall make no changes (other than immaterial or de minimis changes, e.g., replacing landscaping) in Tenant's Protected Area as shown on the Site Plan



(including, without limitation, changes in the location of curbcuts, drive aisles, roadways, sidewalks or parking spaces or reduction of the parking ratio specified in paragraph 5) without Tenant's express written consent, which Tenant may, in its sole discretion, withhold. Landlord shall not make any other changes to the Common Areas which affect Tenant's parking, visibility or access without Tenant's express written consent, which consent shall not be unreasonably withheld, delayed or conditioned.

(C)    Prohibited Uses in Common Area.    Landlord covenants that it shall not, without Tenant's express written consent, permit the following uses or activities to occur in the Common Areas: (1) advertisements or signs except for the pylon and/or monument signs described in paragraph 8, the "for rent" signs described in paragraph 38 and traffic control signs; (2) display or sale of merchandise; (3) operation of loudspeakers or other sound electronically amplified so as to be heard in the Common Areas; (4) imposition of a charge for parking; or (5) operation of cellular telephone or other telecommunication tower for use by any other party not an occupant of the Shopping Center; provided, however, that Landlord shall have the right to operate one (1) such telephone or telecommunication tower, provided that there is no interference with Tenant's showroom reception or communications equipment, and the location of such tower shall be subject to Tenant's prior written approval, which approval shall not be unreasonably withheld, delayed or conditioned, provided, further, that in no event shall such tower be located within Tenant's Protected Area. Landlord further covenants that it will not seek, nor permit any other occupant of the Shopping Center to seek, a variance or waiver from the minimum parking requirements applicable to the Shopping Center under the zoning code or other applicable ordinance establishing the ratio of parking spaces to building area or otherwise mandating the number of parking spaces required for the Shopping Center and the uses contained therein. Parking by employees of Tenant, Landlord and other occupants of the Shopping Center shall be designated "employee parking" areas, the location of which shall be agreed upon by Landlord and Tenant.

LA/830663.10

02/04/04

37

(D)    Easements.  Landlord shall not subdivide, parcel or otherwise divide the Shopping Center or create any easements in the Common Areas (other than in connection with (i) this Lease and other leases of space within the Shopping Center, (ii) conditions imposed by applicable governmental agencies with respect to design and conditional use approval, or (iii) other easements necessary for the development or construction of the Shopping Center as contemplated herein, in any case so long as Tenant's Common Area easement rights are not adversely affected) without Tenant's prior written consent (which consent shall not be unreasonably withheld so long as Tenant's Common Area easement rights are not materially adversely affected), except that Landlord shall have the right to subdivide, parcel or otherwise divide the Shopping Center or grant easements for utilities and the like which are typically granted in shopping centers comparable to the Shopping Center without Tenant's consent, so long as (x) there is no material impairment to access, ingress or egress to or from, or visibility of, the Premises and (y) Tenant's Common Area easement rights are not materially and adversely affected.

(x)    Interference  with  Tenant's  Reception/Transmission. Landlord shall not install or permit to be installed by any other tenant or other person anywhere in the Shopping Center, any structure or equipment which would cause any interference with satellite, radio or television reception or transmission in or from the Building.

(xi)    Notices Affecting the Premises.  Landlord shall promptly forward to Tenant any notice or other communication affecting the Premises or the Shopping Center received by Landlord from any owner of property adjoining, adjacent or nearby to the Premises or the Shopping Center or from any municipal or governmental authority, in connection with any hearing or other administrative procedure relating to the use or occupancy of the Premises, Shopping Center or any such neighboring property.

(xii)    Constructive Trust.  Landlord covenants that all sums paid by Tenant to Landlord and intended for payment by Landlord to a third party (such as, by way of example, taxes and certain elements of CAM Charges) are given to Landlord in trust and shall be applied only for such third-party payments, as and when due.

LA/830663.10



(b)    Tenant represents, warrants and covenants to Landlord that:

(i)    Tenant's Authority.    Tenant is a duly constituted corporation organized under the laws of the state of California; it has the power to enter into this Lease and perform Tenant's obligations hereunder; and the Vice President executing this Lease on Tenant's behalf has the right and lawful authority to do so.

(ii)    Tenant's Warranty as to Hazardous or Toxic Materials.    As to Tenant's use and occupancy of the Premises and use of the Common Areas, Tenant will not introduce, discharge, dump, spill or store within the Premises or the Shopping Center any Hazardous Substances; and Tenant indemnifies and agrees to hold Landlord harmless from and against all costs, liability and damages as a result thereof, to the same extent that Landlord indemnifies and holds Tenant harmless in subparagraph (a)(v) above. The warranty and indemnity of Tenant described in this paragraph 19(b)(ii) shall survive the termination of this Lease.

(c)    In addition to such other remedies as may be accorded Tenant and Landlord at law, in equity (including but not limited to an injunction or writ of specific performance) or under the terms of this Lease, in the event that any of the representations, warranties and covenants set forth in this paragraph 19 are untrue or incorrect (with the exception of those set forth in paragraphs 19(a)(v) and (b)(ii), which are governed as set forth therein), or in the event that either Landlord or Tenant suffers any loss, cost, liability or damage as a result of the breach of any of such covenants, representations and warranties, then (i) Landlord shall defend, indemnify and hold Tenant harmless from any of such loss, costs, liability or damage incurred as a foreseeable result of Landlord's breach hereunder (excluding, however, special or consequential damages), and (ii) Tenant shall defend, indemnify and hold Landlord harmless from any of such loss, costs, liability or damage (excluding, however, special or consequential damages) incurred as a foreseeable result of Tenant's breach hereunder.

20.    Estoppel Certificates.    Without charge, at any time and from time to time hereafter, within thirty (30) days after receipt of written request by either party, the other party shall certify, by written and duly executed instrument, to any other entity ("Person") specified in such request:  (a) as to whether this Lease has been supplemented or amended, and, if so, the substance and manner of such supplement or amendment;

LA/830663.10

(b) as to the validity, force and effect of this Lease, to the certifying party's best knowledge; (c) as to the existence of any default hereunder, to the certifying party's best knowledge; (d) as to the existence of any offsets, counterclaims, or defenses hereto on the part of such other party, to the certifying party's best knowledge; (e) as to the commencement and expiration dates of the Term; and (f) as to any other matters which may reasonably be so requested.  In addition, without charge, at any time and from time to time hereafter, within thirty (30) days after receipt of written request of Tenant, Landlord shall deliver an estoppel certificate to Tenant's assignee or subtenant that states in the event Tenant defaults under any of its obligations under this Lease following the date of any assignment or subletting hereunder, Landlord will permit such assignee or subtenant to satisfy obligations of Tenant hereunder, including but not limited to the direct payment of rentals to Landlord.  Any such certificate may be relied upon by the party requesting it and any Person to whom the same may be exhibited or delivered, and the contents of such certificate shall be binding on the party executing same.

    21.   Subordination, Non-Disturbance and Attornment.

    (a)    Simultaneously with the execution hereof, Landlord shall deliver to Tenant with regard to any and all Ground Leases (as defined below) and any and all Mortgages (as defined below) encumbering the Shopping Center and placed thereon by Landlord, a non-disturbance and attornment agreement in the form of Exhibit "G" hereto attached, executed by Landlord under any such Ground Lease ("Ground Lessor") or the holder of such Mortgage ("Mortgagee"), as applicable.  In addition, throughout the term, Landlord shall deliver to Tenant a non-disturbance and attornment agreement in the form of Exhibit "G" executed by Ground Lessor or Mortgagee (as applicable) with regard to all future Ground Leases and Mortgages and with regard to all renewals, modifications, replacements and extensions of such Ground Leases or Mortgages.  Such Agreement shall contain, at a minimum, the following:  (i) the Lease shall not terminate by reason of a foreclosure or deed in lieu thereof ("Foreclosure"), (ii) Tenant's possession of the Premises shall not be disturbed, (iii) the Mortgagee or purchaser upon such Foreclosure shall recognize Tenant and all its rights hereunder and shall be obligated to fully and completely perform Landlord's duties and obligations under the Lease arising from and after the date of such Foreclosure, including but not limited to an obligation to make all

LA/830663.10

payments to Tenant and satisfy all construction obligations set forth in this Lease, (iv) Tenant shall not be named as a party in any action for foreclosure, and (v) the Mortgagee, whether or not the Mortgage is foreclosed, shall make all proceeds arising from a casualty or condemnation loss to the Shopping Center available for restoration of the Improvements in accordance with the terms hereof. Upon Tenant's receipt and execution of said non-disturbance and attornment agreement, this Lease shall be subordinate to the corresponding Ground Lease or Mortgage. Landlord shall cause any present or future Mortgagee or Ground Lessor to deliver a non-disturbance and attornment agreement in accordance with this paragraph 21 at or prior to the time which the lien of the Mortgage is filed against record title to the Shopping Center, as set forth in paragraph 35(b) below, or Ground Lease is executed, as applicable. As used in this paragraph 21, the term "Mortgage" shall mean any mortgage, deed to secure debt, deed of trust, trust deed or other collateral conveyance of, or lien or encumbrance against, the Shopping Center or any part thereof, and the term "Ground Lease" shall mean any ground lease or master lease affecting the Shopping Center or any part thereof. After the delivery by Landlord of the non-disturbance and attornment agreement issued by the Mortgagee providing the Tenant Improvement Allowance, Landlord agrees to pay Tenant's reasonable attorneys' fees incurred in negotiating any additional non-disturbance and attornment agreements, reciprocal easement agreements or other documents required in the event Landlord sells, finances or refinances the Premises or Shopping Center, or enters into any other transaction requiring the execution of same, including the reasonable equivalent of such fees in the event Tenant elects to utilize in-house legal counsel for the provision of such services, the payment of which fees shall be a condition precedent to the effectiveness of Tenant's execution of such non-disturbance and attornment agreement, reciprocal easement agreement or other document; provided, however, that no such fee shall be payable with respect to the first such transaction in any three (3) year period.

(b)    Landlord shall, from time to time, upon the request of Tenant, enter into agreements with Tenant and its subtenants providing, in part, that, in the event of any termination of this Lease, all of the rights of any such subtenant(s) under its sublease will be recognized so long as any such subtenant is not in default under its sublease beyond notice and cure periods, provided that as a pre-condition thereto such

LA/830663.10

subtenant agrees that it will attorn to Landlord and will execute and deliver such instrument as Landlord shall reasonably request to confirm such attornment.

22.    Tenant's Financing.  Notwithstanding any other provisions of this Lease, Tenant may, without Landlord's consent, from time to time, secure financing or general credit lines and grant the lenders thereof, as security therefor, (i) a security interest in Tenant's fixtures, personalty, inventory and equipment (collectively, "Personalty"), (ii) the right to enter the Premises to realize upon any Personalty so pledged for a period ending thirty (30) days following the lender's receipt of written notice from Landlord of the termination or expiration of this Lease and provided that such lender agrees to repair any damage to the Premises resulting from such removal, and/or (iii) a collateral assignment of Tenant's leasehold interest in the Premises, with rights of reassignment by such lender; provided, however, such collateral assignment may be made solely for the purpose of securing Tenant's indebtedness.  Upon Tenant providing notice of such financing to Landlord, Landlord agrees to evidence its consent in writing to Tenant's grant of such security interest and right of entry and to give such lenders the same notice and opportunity to cure any default of Tenant as is provided Tenant hereunder.

23.    Tenant's Property and Subordination of Landlord's Lien.  All of the Personalty shall be and remain the personal property of Tenant and shall be removable by Tenant any time prior to, or within thirty (30) days after, the expiration or earlier termination of this Lease.  (A nonexclusive list of Tenant's removable trade fixtures is attached hereto as Exhibit "D".)  Landlord expressly subordinates its statutory or common law landlord's liens (as same may be enacted or may exist from time to time) and any and all rights granted under any present or future laws to levy or distrain for rent (whether in arrears or in advance) against the aforesaid property of Tenant on the Premises to any Tenant lender described in paragraph 22 above and further agrees to execute any reasonable instruments evidencing such waiver, at any time or times hereafter upon Tenant's request.

24.    Memorandum of Lease; Commencement Date Agreement.  Landlord and Tenant agree, at the other's request and at the sole expense of the requesting party, to execute a Memorandum of Lease in recordable form, substantially similar to that attached hereto as Exhibit "H", setting forth such provisions hereof as may be required by State

LA/830663.10

law. In addition, Landlord and Tenant shall execute a Commencement Date Agreement in the form attached hereto as Exhibit "I", once the Commencement Date has been established. Recording costs for either or both documents shall be borne by the party requesting recordation of the same. The provisions of this Lease shall control, however, with regard to any omissions from, or provisions hereof which may be in conflict with, the Memorandum of Lease or Commencement Date Agreement.

25. Expiration of Term and Holding Over. At the expiration or earlier termination of the Lease, Tenant shall surrender the Premises in a broom clean condition. Should Tenant hold over without the consent of Landlord, this Lease shall continue in force from month to month, subject to all of the provisions hereof and at one hundred fifteen percent (115%) of the monthly Base Rent Tenant had been paying during the preceding Lease Year.

26. Force Majeure. Except as otherwise specifically contemplated in this Lease or in the Construction Provisions, in the event that Landlord or Tenant shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, delay by the other party, failure of power or unavailability of utilities, riots, insurrection, war or other reason of a like nature not the fault of such party or not within its control, then performance of such act shall be excused for the period of delay, and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay; provided, however, that in connection with the construction of the Improvements, the consequences of delays by the other party shall be governed by paragraphs 28(d) and 29(c) of this Lease.

27. Events of Tenant's Default. Any of the following occurrences, conditions or acts by Tenant shall constitute an "Event of Default" under this Lease:

(a) Failure to Pay Rent; Breach. (i) Tenant's failure to make any payment of money required by this Lease (including without limitation Base Rent, CAM Charges or Real Estate Taxes) (subject to Tenant's right of good faith contest), within ten (10) days after the receipt of written notice from Landlord to Tenant that same is overdue (in which event the delinquent amount shall thereafter accrue interest at the Default Rate; provided, however, that notwithstanding the foregoing, no interest shall be due with

LA/830663.10

respect to any late payment unless Tenant shall have had at least one (1) prior late payment within the immediately preceding 24-month period; or (ii) Tenant's failure to observe or perform any other material provision of this Lease within thirty (30) days after receipt of written notice from Landlord to Tenant specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Tenant shall have such longer period as is reasonably necessary to cure the default, so long as Tenant proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion. In the case of an emergency, Landlord shall be required to give only such notice as is reasonable under the circumstances.

(b)    Bankruptcy. Tenant's adjudication as bankrupt or insolvent, or the appointment of a receiver, trustee in involuntary bankruptcy or other, similar officer to take charge of any substantial part of Tenant's property, which proceeding is not dismissed within one hundred twenty (120) days after it is begun.

28.    Landlord's Remedies. After the occurrence of an Event of Default by Tenant, Landlord shall have the right to exercise the following remedies:

(a)    Continue Lease. Landlord may, at its option, continue this Lease in full force and effect, without terminating Tenant's right to possession of the Premises, in which event Landlord shall have the right to collect Base Rent and other charges when due. Landlord shall also have the right, in Landlord's exercise of reasonable efforts to mitigate its damages (which Landlord hereby agrees to make), at its option, from time to time, without terminating this Lease, to relet the Premises, or any part thereof, with or without legal process, as the agent, and for the account, of Tenant upon such terms and conditions as Landlord may deem advisable, in which event the rents received on such reletting shall be applied (i) first to the reasonable and actual expenses of such reletting and collection, including without limitation necessary renovation and alterations of the Premises, reasonable and actual attorneys' fees and any reasonable and actual real estate commissions paid, and (ii) thereafter toward payment of all sums due or to become due Landlord hereunder.

(b)    Terminate Lease. Landlord may terminate this Lease by written notice to Tenant specifying a date therefor, which shall be no sooner than thirty (30) days

following receipt of such notice by Tenant, and this Lease shall then terminate on the date so specified as if such date had been originally fixed as the expiration date of the Term. In the event of such termination, Landlord shall be entitled to recover from Tenant all of the following:

(i)    The "worth at the time of the award" (defined below) of any obligation which has accrued prior to the date of termination; and

(ii)    The "worth at the time of the award" of the amount by which the unpaid Base Rent and all other charges which would have accrued after termination until the time of award exceeds the amount of any sums which Landlord has received in mitigation; provided that Landlord has exercised reasonable efforts to mitigate its damages.

As used in this paragraph 28(b), the term, "worth at the time of the award", shall be computed by allowing simple interest at the Default Rate for past due obligations, and a discount rate to net present value of ten percent (10%) on anticipated future obligations, on the amount of the obligations payable on the date of such calculation. In the event this Lease shall be terminated as provided above, by summary proceedings or otherwise, Landlord, its agents, servants or representatives may immediately or at any time thereafter peaceably re-enter and resume possession of the Premises and remove all persons and property therefrom, by summary dispossession proceedings. Landlord shall never be entitled to dispossess Tenant of the Premises pursuant to any "lock-out" or other nonjudicial remedy.

(c)    <u>Remedies Are Cumulative</u>. The various rights and remedies reserved to Landlord herein are cumulative, and Landlord may pursue any and all such rights and remedies (but no others), whether at the same time or otherwise (to the extent not inconsistent with specific provisions of this Lease). Notwithstanding anything herein to the contrary, Landlord expressly waives its right to forcibly dispossess Tenant from the Premises, whether peaceably or otherwise, without judicial process, such that Landlord shall not be entitled to any "commercial lockout" or any other provisions of applicable law which permit landlords to dispossess tenants from commercial properties without the benefit of judicial review.

(d)    Additional Landlord Remedies Due to Construction Delays by Tenant. If, subject to force majeure, Tenant shall fail to commence its construction by that date which is ninety (90) days following Delivery of the Land, Landlord at its option, upon prior written notice to Tenant, may require Tenant to proceed with its construction and Tenant shall commence payment of Base Ground Rent on the date which is two hundred ten (210) days following Delivery of the Land.

If, subject to force majeure, Tenant shall fail to achieve Substantial Completion by that date which is two hundred ten (210) days following Delivery of the Land, Landlord, at its option, upon prior written notice to Tenant, may require Tenant to proceed with its construction, commence payment of Base Ground Rent on the date which is two hundred ten (210) days following Delivery of the Land.

In the event, for any reason whatsoever and regardless of force majeure, Tenant shall fail to achieve Substantial Completion by that date which is one (1) year following Delivery of the Land, Landlord shall be entitled to terminate this Lease upon sixty (60) days prior written notice to Tenant, during which sixty (60) day period Tenant may cure any such default hereunder.

Notwithstanding any other provision of this Lease regarding the commencement of rent, if Tenant is not then required to commence the payment of Base Rent pursuant to Paragraph 4 above, Tenant's obligation to pay Base Ground Rent shall commence on the date which is the earlier of (i) 210 days following Delivery of the Land or (ii) the date on which Tenant opens for business to the public.

(e)    For purposes of this Lease, "Base Ground Rent" shall mean an annual amount equal to the product of the actual ground-floor gross leasable area of the Building (which, for purposes of calculating Base Ground Rent, shall in no event be less than 33,749 square feet) multiplied by Six and 30/100 Dollars ($6.30) during the first five (5) Lease Years. By way of illustration, if the Building is comprised of 33,749 square feet, then Base Ground Rent would equal Two Hundred Twelve Thousand Six Hundred Eighteen and 70/100 Dollars ($212,618.70) (i.e., the product of 33,749 square feet multiplied by Six and 30/100 Dollars ($6.30)), payable in equal monthly installments of Seventeen Thousand Seven Hundred Eighteen and 23/100 Dollars ($17,718.23). If applicable, Base Ground Rent shall increase on the first day of the sixth and every

LA/830663.10

succeeding fifth Lease Year such that the Base Ground Rent shall equal the product of the actual ground-floor gross leasable area of the Building multiplied by:

    (i)    Years 6 – 10:    $7.30

    (ii)    Years 11 – 15:    $8.30

    (iii)    First Option:    $9.30

    (iv)    Second Option:  $10.30

    (v)    Third Option:    $11.30

    (vi)    Fourth Option:  $12.30

    (vii)  Fifth Option:    $13.30.

29.    Events of Landlord's Default; Tenant's Remedies.

(a)    Default by Landlord.    Any of the following occurrences, conditions or acts by Landlord shall constitute an "Event of Default": (i) Landlord's failure to make any payments of money due Tenant or the payment of the brokerage commissions pursuant to paragraph 33 hereof, within ten (10) days after the receipt of written notice from Tenant that same is overdue (in which event the delinquent amount shall accrue interest from the due date at the Default Rate); or (ii) Landlord's failure to perform any nonmonetary obligation of Landlord hereunder within thirty (30) days after receipt of written notice from Tenant to Landlord specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Landlord shall have such longer period as may be reasonably necessary to cure the default, so long as Landlord proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion and provided further that in the case of an emergency, Tenant shall be required to give only such notice as is reasonable under the circumstances. Notwithstanding the foregoing, with respect to any event of default described in subparagraph (c) below, Tenant shall not be obligated to deliver any notice of default nor any opportunity to cure such default, it being agreed that with respect to the dates set forth therein time is of the essence.

(b)    Remedies Upon Landlord's Default.  Upon the occurrence of an Event of Default by Landlord, at Tenant's option, in addition to any and all other remedies which it may have at law and/or in equity, and without its actions being deemed

LA/830663.10



an election of remedies or a cure of Landlord's default, Tenant may do all or any of the following: (i) pay or perform such obligations and offset Tenant's actual cost of performance, including any and all transaction costs and attorneys' fees, plus interest at the Default Rate, against the Base Rent, CAM Charges and any and all other amounts and charges due Landlord hereunder, or (ii) terminate this Lease and sue for damages, including interest, transaction costs and attorneys' fees as specified in subsection (i) above, provided that Tenant shall not have the right to terminate this Lease unless Landlord's first Mortgagee (if Tenant has received notice of such Mortgagee) has had at least thirty (30) days in which to cure the Event of Default following receipt of written notice from Tenant. If Landlord fails to pay Tenant the Tenant Improvement Allowance in a timely manner, Tenant shall be entitled to the rights and remedies set forth in this paragraph and the Construction Provisions; and, as to a breach of the warranties and representations contained in paragraph 19, Tenant shall be entitled to the remedies provided therein, in addition to those remedies provided herein. All amounts, including interest, transaction costs and attorneys' fees, arising out of uncured defaults of Landlord shall constitute liens against Landlord's interest in the Shopping Center, which may be enforced by non-judicial means available under State law, or any other applicable proceedings. The various rights and remedies reserved to Tenant herein are cumulative, and Tenant may pursue any and all rights and remedies, whether at the same time or otherwise. Notwithstanding the foregoing to the contrary, Tenant agrees that its right to offset its costs due hereunder shall be limited (the "Offset Limitation") to twenty-five percent (25%) of the Base Rent and one hundred percent (100%) of the CAM Charges and any and all other amounts and charges due Landlord hereunder, provided that such limitation on offsetting under this Lease shall not apply (1) to the Tenant Improvement Allowance or (2) if Tenant has obtained a judgment against Landlord and Landlord has failed to pay such judgment within ten (10) days thereafter.

(c)    Additional Tenant Remedies Due to Construction Delays by Landlord. In the event, subject to force majeure, Landlord shall fail to complete the Site Work and accomplish Delivery of the Land in the condition specified herein by the date specified in Attachment No. 1 to Exhibit "C" (the "Delivery Date"), Landlord agrees that without notice or opportunity to cure, and in addition to any other rights and remedies set

LA/830663.10

forth herein, Tenant shall receive two (2) days of free Base Rent for each one (1) day beyond the Delivery Date until Landlord has completed the Site Work and accomplished Delivery of the Land in the condition specified herein.

In the event, subject to force majeure, Landlord shall fail to accomplish Delivery of the Land by the date which is fifteen (15) days following the Delivery Date, or to complete any subsequent element of the Landlord Work by the completion date established therefor in Attachment "1" of Exhibit "C" attached hereto (the Construction Schedule), Tenant, at its option and upon five (5) days' prior written notice to Landlord, which notice may be given prior to or at any time after the applicable date for performance, may in addition to any other rights and remedies set forth herein, enter the Shopping Center and perform any task required for Delivery of the Land or, as applicable, any element of the Landlord Work which has not been timely completed, and Landlord shall reimburse Tenant for its actual costs thereof, including interest on such costs at the Default Rate. Landlord hereby grants Tenant the right, as its agent, to directly contact and contract with Landlord's contractors, on behalf of Landlord, to complete such work, all at Landlord's cost and expense. Landlord covenants, upon Tenant's request, to provide Tenant with duplicate sets of all plans, specifications and contracts prepared in connection with the construction of the Shopping Center, as well as schedules of all contractors, subcontractors and suppliers. If such costs are not reimbursed to Tenant prior to the Commencement Date, Tenant may offset such amounts against Base Rent and CAM Charges otherwise due until such costs and accrued interest are reimbursed in full, subject to the Offset Limitation.

In the event, for any reason whatsoever and regardless of force majeure, Landlord shall fail to complete Delivery of the Land to Tenant by the date which is thirty (30) days from the Delivery Date, Tenant shall be entitled to terminate this Lease at any time prior to such delivery and receive from Landlord promptly thereafter a sum equal to the actual out-of-pocket expenses and substantiated third-party legal, architectural and engineering costs incurred by Tenant to the date of termination, not to exceed One Hundred Thousand and No/100 Dollars ($100,000.00) or Tenant may elect to delay opening of its store facility for a period not to exceed nine (9) months, during which time Tenant shall pay no Ground Rent, Base Rent, Real Estate Taxes or CAM Charges.

LA/830663.10

02/04/04                                   49

(d)    Exercise of Remedies.  Notwithstanding the foregoing, a delay by Tenant in exercising its cure rights or other remedies hereunder shall not be deemed an event of force majeure for purposes of extending the date(s) established for performance by Landlord.  All sums owing to Tenant under paragraph 29 hereof shall, to the extent applicable, be added to the Tenant Improvement Allowance and paid simultaneously therewith; and, if not so paid, Tenant shall be entitled to offset all such costs, plus interest at the Default Rate, against Base Rent and CAM Charges otherwise due hereunder.

(e)    Time is of the Essence.  Notwithstanding anything contained herein to the contrary, Landlord covenants that it shall complete its construction and delivery obligations in accordance with the "Completion Dates" set forth in the Construction Schedule.  In the event that Landlord fails to complete its construction and delivery obligations in accordance with such Completion Dates, Tenant may, at its sole election, exercise such remedies as are set forth herein.

30.    Waiver.  If either Landlord or Tenant fails to insist on the strict observance by the other of any provisions of this Lease, neither shall thereby be precluded from enforcing nor be held to have waived any of the obligations, past, present or future, of this Lease.  Either party may accept late payment or performance by the other without waiving any Event of Default which may then have accrued.

31.    Compliance with Applicable Laws.  During the Term, Tenant shall comply with all lawful requirements of the local, county and state health boards, police and fire departments, municipal and state authorities and any other governmental authorities with jurisdiction over the Improvements, and of the board of fire underwriters (collectively, the "Lawful Requirements") respecting Tenant's use and occupancy of the Improvements, and Landlord shall comply with all Lawful Requirements otherwise relating to the Improvements.  In the event that Tenant, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Landlord or any such authority ordering performance of any such work which Tenant is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Landlord may perform said work and collect the reasonable cost thereof plus interest at the Default Rate

LA/830663.10

from Tenant with the next installment or installments of Base Rent. In the event that Landlord, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Tenant or any such authority ordering performance of any such work which Landlord is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Tenant may perform said work and deduct the reasonable cost thereof plus interest at the Default Rate from Landlord with the next installment or installments of Base Rent.

32.    Notices. Any notice permitted or required to be given pursuant to this Lease shall be deemed to have been given three (3) business days after mailing a written notice by certified mail, postage prepaid, return receipt requested, or one (1) business day after sending by Federal Express or other comparable overnight express courier service (with proof of receipt available), addressed to the parties as follows:

If to Tenant:          CIRCUIT CITY STORES WEST COAST, INC.
                       Deep Run I
                       9950 Mayland Drive
                       Richmond, Virginia 23233
                       Attention: Corporate Secretary

with a copy to:        CIRCUIT CITY STORES WEST COAST, INC.
                       Deep Run I
                       9950 Mayland Drive
                       Richmond, Virginia 23233
                       Attention: Vice President of Real Estate

If to Landlord:        RSF LAND AND CATTLE COMPANY, LLC
                       10200 Corrales Road NW, Suite B-3
                       Albuquerque, New Mexico 87114
                       Attention: David S. Smoak, President or Manager

with a copy to:        Hatch, Allen & Shepherd, P.A.
                       P.O. Box 30488
                       Albuquerque, New Mexico 87107
                       Attn: Stanley N. Hatch

or to such other addressees as any party hereto shall from time to time give notice to the other party in accordance with this paragraph.

LA/830663.10

02/04/04                              51

33.    <u>Brokers</u>. Landlord and Tenant each covenant that they have not dealt with any real estate broker or finder with respect to this Lease, except for The Equity Group and Coldwell Banker Commercial – Las Colinas (together, "Brokers"), each of which shall be paid a commission by Landlord pursuant to their separate written agreement. Landlord agrees that, if Landlord fails to pay either of such Brokers its commission when due, Tenant may pay same and offset such amount against the amounts then next becoming due from Tenant to Landlord hereunder.  Landlord agrees that Brokers are representing Tenant with respect to this leasing transaction, and, although Landlord is responsible for payment to Brokers of the Broker's commission, the Brokers owe no fiduciary's, agent's or other duty whatsoever to Landlord.  Except for the foregoing, each party shall hold the other party harmless from all damages, claims, liabilities or expenses, including reasonable and actual attorneys' fees (through all levels of proceedings), resulting from any claims that may be asserted against the other party by any real estate broker or finder with whom the indemnifying party either has or is purported to have dealt.

34.    <u>Miscellaneous</u>.

(a)    <u>Headings and Gender</u>.  All paragraph headings, titles or captions contained in this Lease are for convenience only and shall not be deemed a part of this Lease and shall not in any way limit or amplify the terms and provisions of this Lease. The masculine, feminine or neuter gender and the singular or plural number shall be deemed to include the others whenever the context so requires or indicates.

(b)    <u>Construction</u>.  The parties hereto agree that all the provisions hereof are to be construed as covenants and agreements as though the words importing such covenants and agreements were used in each separate paragraph hereof.

(c)    [Intentionally Deleted.]

(d)    <u>Relationship of Landlord–Tenant</u>. Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent, partnership, joint venture, or any other association between Landlord and Tenant other than the landlord-tenant relationship described herein.



(e)    Entire Agreement; Merger.  This Lease, including all exhibits hereto (which are hereby incorporated herein by reference for all purposes), contains the full and final agreement of every kind and nature whatsoever between the parties hereto concerning the subject matter of this Lease, and all preliminary negotiations and agreements of whatsoever kind or nature between Landlord and Tenant are merged herein.  This Lease cannot be changed or modified in any manner other than by a written amendment or modification executed by Landlord and Tenant.

(f)    Attorneys' Fees.  In the event either party shall be required to commence or defend any action or proceeding against any other party by reason of any breach or claimed breach of any provision of this Lease, to commence or defend any action or proceeding in any way connected with this Lease or to seek a judicial declaration of rights under this Lease, the party prevailing in such action or proceeding shall be entitled to recover from or to be reimbursed by the other party for the prevailing party's reasonable and actual attorneys' fees and costs through all levels of proceedings.

(g)    Partial Invalidity.  If any provision of this Lease or the application thereof to any person or circumstance shall be deemed invalid or unenforceable, the remainder of this Lease and its application to other persons or circumstances shall not be affected by such partial invalidity but shall be enforced to the fullest extent permitted by law as though such invalid or unenforceable provision was never a part hereof.

(h)    Consents.  Any consent or approval granted by either party hereunder shall be deemed a consent only as to the matter on which such consent was requested and shall not waive the consenting party's right to give or withhold consent to any subsequent matter.

(i)    Holidays.  If the day on which rent or any other payment due hereunder is payable falls on a Saturday, Sunday or on a legal holiday, it shall be payable on the following business day.

(j)    Applicable Law.  This Lease shall be construed in accordance with the laws of the State of New Mexico, and the parties agree that jurisdiction for all actions hereunder shall lie therein.

(k)　　Successors and Assigns. All rights, obligations and liabilities herein given to or imposed upon any party hereto shall extend to the permitted successors and assigns of such party.

(l)　　Counterparts. This Lease may be executed in one or more identical counterparts, and as so executed by all parties hereto shall constitute a single instrument for purposes of the effectiveness of this Lease.

(m)　　Trademarks and Trade Names. All trademarks, trade names, service marks, signs and all other marks of identification used by Tenant in its business shall at all times remain the exclusive property of Tenant, and Landlord shall have no right, interest in, or title to any of Tenant's trademarks, trade names, service marks, signs or other marks of identification.

(n)　　Exhibits. All of the exhibits to this Lease are hereby incorporated herein by reference for all purposes and are part of this Lease.

(o)　　No Construction Against Either Party. This Agreement shall be interpreted to give it fair meaning and shall not be construed against either party.

(p)　　Effective Date. This Lease shall be deemed executed on the date (the "Effective Date") on which it is fully executed by all parties.

35.　　Effectiveness of Lease; Tenant's Right to Terminate. Notwithstanding the execution of this Lease or any provision hereof to the contrary, the parties agree that the effectiveness of this Lease is expressly conditioned upon the complete satisfaction (or waiver) of each and all of the following conditions:

(a)　　Tenant's receipt, simultaneously with or prior to the execution hereof (except for the survey), of (i) a commitment for leasehold policy of title insurance for the Shopping Center; (ii) copies of all underlying documents referred to in said commitment for title insurance; and (iii) within thirty (30) days of execution hereof, an ALTA survey of the Shopping Center, at Landlord's expense, in form and substance acceptable to Tenant, at a minimum identifying by metes and bounds or platted lot all of the real property within the Shopping Center, each of the parcels owned under every ground lease pertinent to the Shopping Center, and the Land, (iv) all instruments reasonably required by the title company issuing the commitment for leasehold policy of title insurance to issue a policy meeting Tenant's requirements, including, without

LA/830663.10

limitation, an Owner's Affidavit and Indemnity in form acceptable to the title company; and (v) Tenant's approval of all of the foregoing in writing within thirty (30) days after receiving all of said documents.

(b)   Landlord's delivery of subordination, non-disturbance and attornment agreements and estoppel letters executed by any and all existing Mortgagees and Ground Lessors in a form satisfactory to Tenant simultaneously with the execution hereof.

(c)   Landlord's Delivery of the Land by the date and in the condition specified in the Construction Provisions.

(d)   Tenant's obtaining: (i) written confirmation from appropriate local authorities that current zoning and use regulations allow construction of the Improvements on the Premises; and (ii) the required City, County, State and other necessary governmental agency permits and approvals to construct said Improvements on the Premises no later than the Delivery Date.  Tenant agrees to apply for such permits promptly as provided herein, to use due diligence and to expend any necessary application or other fees to secure such permits and approvals; provided, however, that the foregoing shall not be deemed to require Tenant to initiate litigation or to agree to any conditions imposed upon issuance of any such permit or approval.

(e)   Landlord's representations, warranties and covenants, including but not limited to those set forth in paragraph 19 herein, being true and accurate as of the date of Delivery of the Land (as defined in the Construction Provisions).

(f)   Prior to Delivery of the Land to Tenant, Tenant's obtaining from Landlord copies of soils and Hazardous Substances reports satisfactory to Tenant.

(g)   Tenant's obtaining satisfactory assurances, prior to execution hereof, that adequate utility services (including gas, electricity, telephone, domestic water, fire protection water, storm sewer and sanitary sewer) are available for connection at the Premises or in close proximity thereto in amounts sufficient to support Tenant's operations.

(h)   Tenant's obtaining satisfactory assurances that all necessary approvals and consents, including approvals or consents from other tenants in the Shopping Center, planned unit developmental boards and other necessary entities, and all

LA/830663.10



necessary reciprocal use and easement agreements have been obtained prior to the date of execution hereof.

(i)    Tenant's obtaining satisfactory written assurances that Landlord has obtained financing adequate to fund the Tenant Improvement Allowance and development of the remainder of the Shopping Center.

The existence of the foregoing conditions is solely for the benefit of Tenant, and Tenant may waive any such condition at its sole discretion by delivering to Landlord a written notice signed by Tenant which specifically states the condition(s) being waived by Tenant.

Notwithstanding any other provision in this Lease to the contrary, in the event any of the foregoing conditions shall not be met, satisfied or waived, the parties hereto expressly agree that Tenant shall have the right to terminate this Lease in its sole and absolute discretion at anytime prior to the satisfaction or waiver of any such condition by delivering to Landlord a written notice signed by Tenant which states that Tenant is terminating this Lease on account of the failure of one or more of the foregoing conditions. In the event of any such termination, the rights and obligations of the parties shall be of no further force and effect and the parties shall have no further liability one to the other (except that the indemnifications set forth in paragraphs 14(i), 19(a)(v) and 19(b)(ii) hereof shall survive such termination) upon Tenant's delivery of said notice to Landlord. All conditions contained in this paragraph except subparagraphs (a) and (g) unless previously waived or satisfied shall expire as of the date of Tenant's store opening.

The delivery of this executed Lease by Tenant to Landlord constitutes the offer of Tenant to Landlord to bind Landlord and Tenant to the provisions of this Lease, subject to the conditions set forth in this paragraph 35. It is a further condition to the effectiveness of this Lease that upon receipt of the executed Lease from Tenant, Landlord execute and return same to Tenant within ten (10) days following receipt thereof by Landlord. In the event Landlord fails to execute and return the Lease within such ten (10) day period, Tenant may at any time after delivery of the Lease provide written notice to Landlord that Tenant revokes its delivery of the executed Lease and thereupon Landlord shall be immediately obligated to return to Tenant all executed original



counterparts as well as any copies of this Lease in the possession of Landlord, and this Lease shall thereafter be null and void.

36.   Confidentiality.   The parties hereto, including, but not limited to, their heirs, successors, assigns and legal representatives, agree that this Lease may not be recorded and that all such parties hereby agree to use their best reasonable efforts to preserve the confidentiality of this transaction.  This confidentiality agreement extends to any developers, bankers, lawyers, accountants, employees, agents or any other persons acting on behalf of the parties hereto.  Any breach of this confidentiality agreement shall constitute an automatic Event of Default without notice or cure provided, for which either party may recover damages as their sole remedy and for which neither party can terminate this Lease.

37.   Intentionally Deleted.

38.   "For Rent" Signs.  Tenant hereby permits Landlord during the last ninety (90) days of the Main Term or of any Option Period, as the case may be (provided that no applicable Renewal Option has been exercised or deemed exercised), to place one (1) "For Rent" or "For Sale" sign for the Building, not exceeding four (4) feet by four (4) feet in size, in the parking lot of the Shopping Center.  During said ninety (90) day period, Tenant will also allow Landlord or its agents, upon prior written notice and accompanied by a representative of Tenant designated by Tenant, to show the Premises, exterior and interior, to prospective tenants, purchasers, or mortgagees during reasonable business hours by prior appointment, provided same does not interfere with the conduct of Tenant's business.

LA/830663.10

02/04/04                                    57                         

WITNESS the following signatures and seals:

LANDLORD

RSF LAND AND CATTLE COMPANY,
LLC,
a New Mexico limited liability company

By: _____
Name: David S. Smoak
Title:   President

TENANT

CIRCUIT CITY STORES WEST COAST,
INC., a California corporation

By:_____
      Thomas C. Nolan, Vice President

WITNESS the following signatures and seals:

LANDLORD

RSF LAND AND CATTLE COMPANY,
LLC,
a New Mexico limited liability company

By:_____
Name: David S. Smoak
Title:   President

TENANT

CIRCUIT CITY STORES WEST COAST,
INC., a California corporation

By:_____
Thomas C. Nolan, Vice President

EXHIBIT "A"

SITE PLAN

Components:          Premises (cross-hatched)

                     Tenant's Protected Area

                     Permissible Building Areas

                     Customer Pick-Up

                     Pylon/Monument Signage

                     Truck Well(s)/Trash Compactor

                     Car Stereo Parking

                     Shopping Center

LA/830663.10

02/04/04