

EXHIBIT "A-1"

SHOPPING CENTER LEGAL DESCRIPTION

(attached)

LA/830663.10

02/04/04

THE LAND REFERRED TO IN THIS COMMITMENT IS SITUATED IN THE COUNTY OF BERNALILLO
STATE OF NEW MEXICO, AND DESCRIBED AS FOLLOWS:

That certain parcel of land situate within the Town of Alameda Grant in projected
Sections 5 and 6, Township 11 North, Range 3 East, New Mexico, City of
Albuquerque, Bernalillo County, New Mexico, being and comprising Tract B-3-D,
Cottonwood Corners as the same is shown and designated on the plat entitled "PLAT
OF TRACTS B-3-A, B-3-B, B-3-C and B-3-D COTTONWOOD CORNERS (being a replat of
Tract B-3, Cottonwood Corners) CITY OF ALBUQUERQUE, BERNALILLO COUNTY, NEW
MEXICO", filed in the office of the County Clerk of Bernalillo County, New Mexico,
on July 3, 2002, in Volume 2002C, folio 225.

EXHIBIT "A-2"

INITIAL COMMON AREA

(attached)



LA/830663.10

02/04/04

EXHIBIT "B"

INDEX OF DEFINITIONS

| Term | Paragraph where defined |
|------|------------------------|
| Additional Areas | 14(e) |
| Base Ground Rent | 28(e) |
| Base Rent | 4 |
| Building | 2 |
| CAM Charges | 7(b) |
| CAM Year(s) | 7(c) |
| City | 1 |
| Civil Plans | Ex. "C", para. 1(b) |
| Commencement Date | 4 |
| Common Area Easement | 6(b) |
| Common Area Maintenance | 7(a) |
| Common Areas | 7(a) |
| Construction Term | 3 |
| CPI-U | 4(c) |
| Date of Taking | 16(a) |
| Default Rate | 9(b) |
| Delivery Date | 29(c) |
| Delivery of the Land | Ex. "C", para. 1(b) |
| Effective Date | 34(p) |
| Event of Default (Landlord) | 29 |
| Event of Default (Tenant) | 27 |
| Foreclosure | 21(a) |
| Ground Lease | 21(a) |
| Ground Lessor | 21(a) |
| Hazardous Substances | Ex. "C", para. 1(a) |
| Improvements | 2 |
| Land | 1 |

LA/830663.10

02/04/04



| Term | Paragraph where defined |
|------|------------------------|
| Landlord | Introduction |
| Landlord Work | Ex. "C", para. 1(d) |
| Landlord's Premises | 1 |
| Lawful Requirements | 31 |
| Lease Year | 3 |
| Main Term | 3 |
| [Modified Proctor | Ex. "C-1", I-B(1)] |
| Mortgage | 21(a) |
| Mortgagee | 21(a) |
| Offer | 37 |
| Option Period(s) | 3 |
| Other Improvements | 2 |
| Permissible Building Areas | Ex. "A" |
| Permitted Encumbrances | Ex. "F" |
| Person | 20 |
| Personalty | 22 |
| Plans and Specifications | Ex. "C", para. 2(b) |
| Premises | 2 |
| Products | 18(a) |
| Real Estate Taxes | 9(a) |
| Renewal Option | 3 |
| Schematic Floor Plan and Elevation | Ex. "C", para. 2(b) |
| Shopping Center | 1 |
| Site Covenants | 19(a)(ix) |
| Site Plan | 1 |
| Site Work | Ex. "C", para. 1(b) |
| Staging Area | 6(a) |
| Standard Specifications | Ex. "C", para. 1(b) |
| State | 1 |

LA/830663.10

02/04/04

2

| Term | Paragraph where defined |
|---|---|
| Substantial Completion | Ex. "C", para. 2(d) |
| Substantial Completion Anniversary | Ex. "C", para. 3 |
| Substantially All of the Premises | 16(a) |
| Taking | 16(a) |
| Tax Parcel | 9(b) |
| Tenant | Introduction |
| Tenant Improvement Allowance | Ex. "C", para. 3 |
| Tenant's Protected Area | Ex. "A" |
| Tenant's Pro Rata Share | 7(c) |
| Tenant's Soils Report | Ex. "C", para. 1(b) |
| Term | 3 |
| Transfer | Ex. "C", para. 3 |
| worth at the time of the award | 28(b) |

Cottonwood Corners
Albuquerque, NM

EXHIBIT "C"

CONSTRUCTION PROVISIONS

These CONSTRUCTION PROVISIONS are made a part of the Lease between Landlord and Tenant and are attached as Exhibit "C".

1.    Landlord's Delivery of the Land; Other Landlord Work.  All of the work set forth in subparagraphs (a), (b) and (c) below is, collectively, the "Landlord Work":

(a)    Hazardous Substances.  Landlord shall deliver the Land to Tenant free of any pollution or contamination from toxic or hazardous substances, asbestos or any other chemicals or substances in amounts which exceed standards for public health or welfare as established and regulated by any local governmental authority, the State or the United States Government (herein collectively referred to as "Hazardous Substances"). Landlord hereby grants Tenant and its agent access to the Premises and Shopping Center to enable Tenant to conduct such soil and environmental tests as its deems necessary.

(b)    Site Work.  Landlord acknowledges receipt of, and covenants to comply with, Circuit City Stores West Coast, Inc. Standard Design and Construction Specifications (the "Standard Specifications") attached hereto as Exhibit "C-1" in the completion of the Landlord Work. Landlord, at its sole cost and expense, shall: (i) verify that its proposed development of the Shopping Center and its civil engineering plans comply with Tenant's geotechnical evaluation of the Land dated April 30, 2003 and prepared by MACTEC Engineering and Consulting, Inc. (the "Tenant's Soils Report") and with the Standard Specifications; (ii) cause the Land to be free and clear of any known or unknown (which, but for Landlord's failure to discover same, should be removed prior to Delivery of the Land to Tenant) obstructions, foundations, footings, utilities, easements, improvements and tenancies; (iii) complete grading of the Land and the Common Areas in accordance with Tenant's Soils Report and the "Standard Specifications", and with the final plans prepared by Landlord's civil engineer, which are subject to Tenant's written approval (the "Civil Plans"); (iv) complete Tenant's building pad strictly in accordance with Tenant's Soils Report and the Standard Specifications; (v)

LA/830663.10

02/04/04

obtain approvals for all curbcuts indicated on the Civil Plans and all on and off-site permits required for any work to be performed by Landlord necessary to develop the Shopping Center which permits may be a prerequisite for issuance of Tenant's building permit; (vi) complete (A) all curbcuts for Tenant's Protected Area, (B) 20,000 square feet of Staging Area outside of but adjacent to Tenant's building pad to either be paved or stone to provide for all weather use, and (C) an all-weather construction access road to the Land and around Tenant's building pad no less than twenty-four (24) feet in width, connecting the existing dedicated roadway adjacent to the Shopping Center with the Land, all in accordance with the Civil Plans; and (vii) obtain site plan approval and conditional use approval, if any, from governmental authorities having jurisdiction over the Shopping Center, permitting Tenant's construction of the Premises (subject to issuance of Tenant's building permit). All of the work described in (i) through (vii) above is, collectively, the "Site Work". No changes shall be made to any of the Site Work, including but not limited to any plans and specifications therefor, without Tenant's prior written consent. The Site Work shall be performed in accordance with the Construction Schedule attached hereto as Attachment "1". Landlord specifically covenants and agrees that any problems or delays it encounters in grading the Premises in satisfaction of the Site Work requirements set forth above in connection with the condition of the soils, including environmental or hazardous waste issues, subsidence sinking, surface waters, subsurface waters, unforeseen site conditions or the like shall be its sole responsibility, shall not cause a force majeure delay, and in no event shall the cost associated with such problems or conditions be passed on to Tenant in any manner.

Tenant shall have the right to temporarily locate a trailer in the Shopping Center during the eight (8) weeks prior to the store opening in a mutually agreeable location designated on the Site Plan, to be used as a Human Resource Hiring Center for Tenant's store employees.

Landlord will maintain the construction access road in good condition throughout the construction of the Common Areas. If the items of Site Work to be performed on the Land are completed earlier than forty-five (45) days prior to Tenant's scheduled commencement of construction of the Improvements (as provided below), the Land shall be overbuilt and sloped to drain and, within such forty-five (45) day period, shall be

LAJ830663.10

regraded and recompacted and new pad certifications provided as described in Exhibit "C-1", paragraph 1(B)(4).

Subject to force majeure, Landlord covenants and agrees to complete, at its sole cost and expense, each item of the Site Work and to provide temporary utilities to within five (5) feet of the building pad at Tenant's designated points of entry as set forth in the Plans and Specifications, as contemplated in paragraph 1(c) below, and temporary telephone service to the Premises and the Staging Area, in accordance with the dates established therefor in the Construction Schedule, to the end that promptly upon completion of such requirements (collectively, "Delivery of the Land"), Tenant shall be able, subject to issuance of its building permit and matters within Tenant's control, to commence construction of the Improvements.

Landlord acknowledges that Tenant's ability to obtain a building permit for its construction may be delayed due to the failure by Landlord to obtain necessary approvals or permits or to pay necessary fees for its construction and development of the Shopping Center. Landlord agrees that Delivery of the Land shall not be deemed to have occurred until all such aforesaid approvals and permits shall have been obtained and all such fees, including but not limited to impact fees and assessments, shall have been paid, if and to the extent that such approvals, permits and fees for Landlord's construction shall be prerequisites to the issuance of Tenant's building permit. In addition, Landlord shall pay all impact fees assessed with respect to Tenant's construction of the Premises. Landlord agrees to keep Tenant advised in writing on a monthly basis as to Landlord's progress in completing the Site Work. Upon Delivery of the Land, Landlord shall certify to Tenant that all elements of the Site Work have been completed in the form of the Site Work Certificate attached to Exhibit "C" as Attachment "2".

Should the Site Work require minor adjustments in order to be in accordance with the Standard Specifications or the Civil Plans, Tenant may direct its contractor to make such adjustments, the total cost of which shall be reimbursed by Landlord to Tenant upon demand in a sum not to exceed Five Thousand Dollars ($5,000.00).

(c)    Paving, Lighting, Utilities, Landscaping and Drainage.    Landlord shall deliver to Tenant full and complete civil engineering plans on or before the date set forth in Attachment "1". Landlord, at its sole cost and expense, and in accordance with

LA/830663.10

Attachment "1", shall cause a contractor licensed in the State to complete (i) installation of temporary utilities, as described in the Standard Specifications; (ii) the construction and installation within five (5) feet of the Building, of permanent telephone service and permanent utilities, including but not limited to gas, electric, domestic water and fire protection water (in size sufficient to satisfy local fire codes) and sanitary sewer as described in the Standard Specifications, each at Tenant's required entry points shown in the Civil Plans, at depths adequate for Tenant's tie-in without additional cost above that contemplated by the "Plans and Specifications" (as defined in paragraph 2(b) below); (iii) the construction and installation of the storm water drainage system at Tenant's required location shown in the Civil Plans; (iv) the construction and installation of paving (including heavy-duty paving), and curbing for parking areas (including sidewalk curb in front of the Building), vehicular access and service roads, and driveways, in accordance with the Standard Specifications; (v) the completion of landscaping at the Shopping Center in accordance with Landlord's governmentally approved landscaping plan which shall be subject to Tenant's approval, not to be unreasonably withheld; (vi) the construction and installation of lighting in the Shopping Center to standards no less than those set forth in the "Shopping Center Lighting Specifications" as described in the Standard Specifications; and (vii) Landlord's installation of the pylon sign(s) identifying the Shopping Center as described in paragraph 8 of the Lease, all no later than the dates established therefor in the Construction Schedule.

(d)    Landlord Work. All of the work described to be performed by Landlord in this paragraph 1 is collectively referred to as the "Landlord Work". All Landlord Work shall be performed in accordance with all applicable laws and this Lease, in a good and workmanlike manner, as appropriate by engineers, surveyors, architects and consultants, who carry sufficient errors and omissions coverage, and contractors, who are bondable, all licensed in the State and of good reputation. Landlord's general contractor shall be experienced in shopping center development and in phasing and coordinating construction schedules with major anchors and national retailers. All Landlord Work shall be completed in accordance with these Construction Provisions and all attachments hereto and the Civil Plans. In the event that Landlord defaults at any time in completion of any component of the Landlord Work, Tenant shall have the right, but

LA/830663.10

not the obligation, to perform at Landlord's sole cost and expense, all or any part of Landlord Work. Tenant shall exercise this right by providing Landlord with written notice thereof, which notice shall reasonably detail those portions of the Landlord Work which Tenant elects to complete. Tenant may exercise the rights set forth in this paragraph 1(d) from time to time so long as Tenant provides Landlord notice specified herein (i) within a reasonable amount of time prior to the date upon which Landlord would otherwise commence that portion of the Landlord Work, or (ii) at such other time where it is feasible for Tenant to take over that portion of the Landlord Work from Landlord. In the event and to the extent that Tenant exercises its right hereunder, Landlord agrees to cooperate in good faith and provide Tenant with reasonable assistance so that Tenant can complete said portions of the Landlord Work. Landlord agrees to reimburse Tenant for any and all costs incurred by Tenant in connection with any portion of the Landlord Work which Tenant is in the process of completing within five (5) days after receipt of written request from Tenant, which request shall be reasonably supported by invoices and/or written description of the Landlord Work performed. In the event that Landlord does not timely reimburse Tenant as hereinabove contemplated, Tenant shall be entitled to deduct the costs of such Landlord Work from rentals and other payments due under the Lease, together with interest at the Default Rate from the date of expenditure by Tenant until paid in full.

2.     Tenant Improvements.

(a)     Building Construction.     Upon completion of all requirements therefor, Landlord shall give Tenant written notice (which shall include any required certifications, including but not limited to those required by the Standard Specifications) of Delivery of the Land in the form of Attachment "2". Tenant shall promptly notify Landlord if any such requirement has not been met to Tenant's reasonable satisfaction, provided Tenant does not elect its self-help remedies set forth in this Lease. Upon completion of any such previously unmet requirements, Tenant shall within a reasonable time commence and pursue to completion with due diligence the construction of the Improvements and storefront sidewalk. The construction work on the Improvements and storefront sidewalk shall be performed by a duly licensed contractor chosen by Tenant,

shall be done in a good and workmanlike manner, in compliance with all applicable laws and in substantial accordance with the "Plans and Specifications" (defined below).

    (b)   Plans and Specifications.  Tenant shall prepare and furnish to Landlord for its approval, not to be unreasonably withheld, conditioned or delayed, complete architectural drawings and specifications including building elevations (the "Plans and Specifications") for the construction of the Building and Other Improvements, incorporating therein the items specified and shown in the "Schematic Floor Plan and Elevation" (which are hereby approved by Landlord) attached to Exhibit "C" as Attachment "3". Landlord agrees that it will approve the Plans and Specifications, so long as they are materially consistent with the Schematic Floor Plan and Elevation, within ten (10) business days after receipt thereof. If the Plans and Specifications are not disapproved by Landlord within fifteen (15) days of delivery thereof to Landlord, they will be deemed approved. The Plans and Specifications shall not be substantially changed by Tenant without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed. Any changes which Landlord desires to make to the Plans and Specifications (which are different than a Building based on the Schematic Floor Plan and Elevation utilizing Tenant's prototypical elevations and building materials) shall be at Landlord's sole cost and expense, and Tenant shall not be required to increase the Base Rent payable hereunder, or accept a reduction in the Tenant Improvement Allowance, as a result of such changes.

    (c)   Permits. Tenant, at its sole cost and expense, shall obtain or cause to be obtained those certain building permits, licenses, other governmental approvals and temporary and permanent certificates of occupancy which may be required for the lawful construction and occupancy of the Premises as a retail shopping facility in accordance with the Plans and Specifications. Landlord agrees to assist and cooperate fully with Tenant in obtaining such permits, licenses, approvals and certificates. Landlord shall be responsible for any other permits necessary for the development of the Shopping Center.

    (d)   Substantial Completion.  Substantial completion of the Improvements ("Substantial Completion") shall be deemed to occur when a certificate of occupancy, whether temporary and subject to minor items to be completed, or permanent, as the case may be, has been issued by the applicable governmental authority.



3.    Costs. Upon Substantial Completion and Tenant's furnishing to Landlord
(i) the certificates of insurance required under paragraph 14 of the Lease, (ii) an
indemnity in the form of Exhibit "J" attached hereto against any exception in Landlord's
or its Mortgagee's policy of title insurance with respect to mechanics' liens arising out of
Tenant's construction, and (iii) if requested by Landlord, confirmation from Tenant that
Landlord holds title to the Improvements (in form reasonably acceptable to Landlord and
Tenant), Landlord shall pay to Tenant a "Tenant Improvement Allowance" in an amount
equal to Seventy-Three and No/100 ($73.00) per square foot of gross leasable area of the
Building (which shall be conclusively determined by the amount of gross leasable area
shown in Tenant's as-built survey), payable by wire transfer of funds by Landlord to
Tenant's account no later than thirty (30) days after Substantial Completion and receipt
of items (i), (ii) and (iii) above.   Until such time as Landlord has paid the Tenant
Improvement Allowance, Tenant shall only be required to pay Base Ground Rent in lieu
of Minimum Rent, commencing as of the date set forth in paragraph 28(d) of the Lease.
In addition, if Landlord fails or is unable to pay the Tenant Improvement Allowance in
full within two (2) years after Substantial Completion and receipt of items (i), (ii) and (iii)
above, such failure shall not constitute a default hereunder but Tenant shall have the
option (the "Purchase Option"), exercisable in its sole and absolute discretion within
sixty (60) days following the expiration of such two (2) year period, to notify Landlord of
Tenant's intent to purchase an approximately three (3) acre parcel of land, the exact size
and dimension of which shall be determined by the parties in good faith (the "Purchase
Parcel") and concurrently therewith terminate this Lease; provided that such purchase
shall be consummated on or before the date which is six (6) months following the
expiration of such two (2) year period. The Purchase Parcel shall be fully improved (i.e.,
all Site Work shall have been completed) and shall be comprised, at a minimum, of the
entire Premises (with ownership of the Improvements remaining with Tenant), all or
substantially all of Tenant's Protected Area and a portion of Cottonwood Drive.   In
connection with the sale of the Purchase Parcel, Landlord and Tenant shall enter into and
record a reciprocal easement agreement, in form and substance reasonably satisfactory to
Landlord and Tenant, providing Tenant with the Common Area Easement rights and
pylon signage rights set forth in paragraphs 6 and 8 of this Lease, respectively, and

LA/830663.10



otherwise in accordance with the terms and conditions of this Lease. The Purchase Parcel shall be conveyed to Tenant free and clear of any and all mortgages, liens and encumbrances not approved by Tenant, which approval shall not be unreasonably withheld. The purchase price for the Purchase Parcel shall be Two Million One Hundred Fifty Thousand and No/100 Dollars ($2,150,000.00), inclusive of any and all special assessments (e.g., SAD). Landlord and Tenant covenant and agree to cooperate in good faith and execute such documentation as necessary to formalize the purchase and sale of the Purchase Parcel and the termination of this Lease as contemplated herein, in order to consummate such transaction within such six (6) month period referenced above. Following its acquisition of the Purchase Parcel, Tenant shall have the right at its sole election to mortgage, sell, convey, assign, lease or otherwise encumber its interest in the Building, the Improvements and/or the Purchase Parcel. If Tenant elects not to purchase the Purchase Parcel within the sixty (60) day period referenced above, then Tenant's Purchase Option shall thereafter be null and void and this Lease shall continue in full force and effect on the terms and conditions set forth herein.

Attachments:

"1" Construction Schedule

"2" Site Work Certification

"3" Schematic Floor Plan and Elevation



Attachment "1"

Construction Schedule

| Landlord's Task | Completion Date |
|---|---|
| 1. | Landlord's delivery of full and complete civil engineering plans for the Shopping Center and architectural scale building elevations for the remainder of the Shopping Center. | Completed |
| 2. | Landlord's Delivery of the Land to Tenant with pad certification; construction of all-weather construction access road to the Premises, staging area and curbcuts in Tenant's Protected Area; installation of temporary utilities; and completion of Site Delivery Work, including approval for all curbcuts. | 60 days following the Effective Date |
| 3. | Construction and installation of: permanent utilities including permanent telephone service and storm water drainage. | 105 days following the Effective Date |
| 4. | Construction and installation of: paving (including heavy-duty paving), off-site road improvements, curbing and exterior lighting. | 165 days following the Effective Date |
| 5. | Construction and installation of: landscaping and pylon sign(s) identifying the Shopping Center. | 165 days following the Effective Date |

Attachment "2"

Site Work Certification

To:    Circuit City Stores West Coast, Inc.
Deep Run I
9950 Mayland Drive
Richmond, Virginia 23233
Attention: Vice President-Real Estate

Re:    Circuit City Store/Albuquerque, NM-Lease Agreement dated _____, 2004

Ladies and Gentlemen:

The undersigned, as Landlord under the Lease has caused "Delivery of the Land" to occur on _____, 2004, and accordingly, completion of the Site Work, all in accordance with the terms of the Lease. Specifically the undersigned hereby certifies that: (i) the grading of the Land and Common Areas has occurred in accordance with the Standard Specifications, attached to the Lease, and Tenant's building pad has been prepared strictly in accordance with Tenant's Soils Report; (ii) the Staging Area has been completed and (iii) an all-weather construction access road to the Land no less than 24 feet width has been prepared and is ready for your use.

Landlord has completed all of the Site Work drawings and municipal site plan related approvals that are necessary for Tenant to obtain its building permit, and we certify that all elements of the Site Work and Delivery of the Land have been satisfied in accordance with the Lease.

[LANDLORD]




Attachment "3"

Schematic Floor Plan and Elevations

(attached)





EXHIBIT "C-1"

## STANDARD DESIGN AND CONSTRUCTION SPECIFICATIONS

for a proposed

Circuit City Superstore

Cottonwood Corners III Shopping Center

Albuquerque, New Mexico

to be developed by

RSF Land and Cattle Company, LLC, a New Mexico limited liability company

Dated February __/__, 2004

I.    STANDARDS FOR GRADING WORK

    A.    Grading Requirements. The Land and the Shopping Center shall be graded in accordance with the following:

        1.    The Civil Plans shall show contours in accordance with standard engineering practice and these contours shall be shown with the existing (shown as a dashed line) and final (shown as a solid line) elevations. Whether existing or proposed, all buildings, improvements, roads and highways, including those adjacent to the Shopping Center, shall be shown in their true locations.

        2.    The Building will be accessible by grade level parking only. Steps and stairs are not permitted.

        3.    Sidewalk at the Building will slope away from the Building with grade of no less than 1.5% and no more than 3.0%. All water shall be sheet drained away from Tenant's doors.

        4.    Asphalt paving areas will be graded to avoid ponding water with slopes no less than 1.5% and no more than 4.0%. Entrances and access drives shall have a maximum slope of 6.0%.

        5.    Surface drainage swales will not be allowed without prior approval of Tenant. Such swales must have a grade of not less than 0.5% and no more than 3.5% and shall be constructed of concrete.

        6.    The cut and fill on the Shopping Center site should be balanced, if practical. All fill material must be of a select grade and sources for acquisition of fill material, as well as locations for cut material, must be identified.

        7.    No retaining walls or embankments causing breaks in grade shall be permitted unless specifically approved by Tenant.

    B.    Tenant's Pad Area: "Tenant's Pad Area" shall be defined as the area extending five (5) feet beyond the Building walls, truck dock and ramp area and the Customer Pick Up and Car Stereo Installation areas, or to the back of curbing around the Building, whichever is further. The Site Work shall comply with the following additional requirements:

        1.    Landlord shall be responsible for preparing Tenant's Pad Area subgrades to within plus or minus one-tenth of a foot as set by Tenant's architect. Tenant's subgrades are 8" below finished floor elevation. Landlord will complete compaction in accordance with the appropriate engineering standards and building code requirements, but in no event less than ninety-five percent (95%)

LA/830663.10

02/04/04

of the modified proctor soil test for water content and compaction levels ("Modified Proctor") on the Land, so as to enable Tenant to perform construction work necessary to provide completed Improvements in accordance with the "Plans and Specifications" (defined in the Construction Provisions), with standard spread footings and without the necessity of pilings or other extraordinary foundation work. Tenant's minimum slab thickness and under slab fill will be established in accordance with Tenant's Soil Report. All compacted areas of the site shall be verified by an independent professional soils engineering test laboratory and a certificate from such independent laboratory indicating compliance with Tenant's Soils Report and shall be furnished to Tenant upon completion of the Site Work.

2. Tenant's Pad Area soil shall have a minimum bearing capacity of 2,500 pounds per square foot. Earth stabilization and/or replacement shall be performed by Landlord as necessary to meet this minimum requirement.

3. During the preparation of Tenant's Pad Area, Landlord shall at its expense have an independent professional soils engineering test laboratory monitor and certify the preparation of Tenant's Pad Area in accordance with Tenant's Soils Report. Landlord shall perform one in-place compaction test per 5,000 square feet of pad area per lift.

4. On or before the date of Delivery of the Land, Landlord shall provide Tenant with:

a. An independent soils engineer's written certification that all pad work was completed in accordance with Tenant's Soils Report, Civil Plans and the Plans and Specifications. This report shall include the results of all compaction and other tests performed during the pad preparation phase and any tests performed prior to the date of such certification. A copy of such certification shall be delivered to Tenant's Vice President-Construction at Tenant's address set forth in paragraph 32.

b. A surveyor's written elevation certification stating that Tenant's Pad Area is at the prescribed elevation within the stated tolerance of plus or minus one-tenth of a foot. This certification shall be based upon an "as-prepared" survey which shall accompany such certification and shall show thereon elevation shots taken on a 50-foot-grid minimum including pad perimeter and building corners. Promptly upon completion of the Site Work, Landlord shall cause its

surveyor or engineer to designate the corners of the Land by means of standard surveying markers.

5. Landscaping slopes and berms shall be set by Landlord to preserve the integrity of the slopes as determined by an independent soils engineer. However, in no case may the slope of a landscaping berm exceed 3 to 1 in turf areas, or 2 to 1 in ground cover and shrub areas.

6. Top soil excavated during grading of the Shopping Center shall be stockpiled by Landlord and made available for use during final landscaping operations including landscaping inside perimeter sidewalks around the Building, if found agronomically suitable by an independent soils analysis lab. Other excavated soil material shall be stockpiled and made available for use as backfill if required, but only if a soil report indicates it is suitable.

7. All material, including native and fill, within 5 feet of any surface of the building including foundation concrete, shall be nonexpansive with a plasticity index of 12 or less. The material shall also have sufficient cohesion to stand vertically for 3 feet. No oversize material or lumps greater than 6" in diameter will be allowed and not more than 15% of the material shall be greater than 2-1/2" diameter.

8. The Civil Plans shall not be materially changed by Landlord without the prior consent of Tenant, which consent shall not be unreasonably withheld or delayed.

9. All outlots or future building areas shall be rough graded and planted with grass seed.

II.    UTILITIES SPECIFICATIONS

A.    <u>Temporary Utilities</u>: Landlord will provide the following temporary utilities to the Staging Area in a location selected by Tenant no later than the date for completion of such temporary utilities set forth in the Construction Schedule:

water (2" line, with sufficient pressure that pumping is not necessary), electric power (200 amps, 1-phase, 4-wire, 120 volts, with weatherproof and rainproof fused disconnect switch) and temporary telephone for use by Tenant in its construction of the Improvements.

B.    <u>Permanent Utilities</u>: Landlord will provide the following permanent utilities to within five (5) feet of the Premises or the sidewalk at Tenant's identified entry points (but in any event the stub point of such utilities

shall not be covered by paving) no later than the date for completion of such permanent utilities set forth in the Construction Schedule:

> gas (if available), telephone, permanent electricity (adequate for an 800-amp panel), 3-phase, 277/480 volt), storm sewer system (in accordance with Civil Plans), sanitary sewer (6" line), domestic water (2" line), fire protection water (8" line, 50 pounds per square inch residual pressure, 2000 gallons per minute or at least sufficient capacity to service Tenant's sprinkler system without the need for any fire pump, as approved by Tenant's fire protection consultant).

III.    PAVING SPECIFICATIONS

A.    <u>Parking Area and Roadway Surfacing</u>:

1.    Pavement design shall be based on a "Design Period" of twenty (20) years for the traffic indices specified by an independent civil engineer approved by Tenant and compensated by Landlord.

2.    All pavement design shall be subject to review and approval by Tenant, and shall conform to the recommendations of Tenant's Soils Report.

3.    Heavy duty paving must be used in main drives and service areas as required by Tenant's Soils Report.

B.    <u>Sidewalks and Curbs</u>:

1.    Landlord shall provide and install all curbs and sidewalks including perimeter curbs and sidewalks except for sidewalks in front of the Building.

2.    All sidewalks and curbs shall be constructed of concrete and shall have a minimum slope of 1.5% and a maximum slope of 3.0% away from the Building. All sidewalks and curbs shall be a minimum of four (4) inches thick, with a rough non-skid texture (as approved by Landlord's architect with respect to the Common Area), over a suitable granular base. Salt finish is not acceptable.

3.    Entrance and access roads and other areas as required for suitable drainage, shall have six (6) inch curbs with 18-inch gutters; however, next to sidewalks and buildings when drainage is not a factor a straight curb six (6) inches (without gutters) above the finished paving shall be permitted. Parking lot islands and landscape enclosures shall be vertical barrier-type curbs and all integral-type curbs and gutters and vertical barrier-type curbs shall



be concrete. Extruded asphalt or concrete curbing may not be used.

4.  Curbs at all non-parking areas shall be painted red with an exterior flat red latex paint, receive a trowel finish and be designated "No Parking" by a contrasting paint color.

## IV.  SHOPPING CENTER LIGHTING SPECIFICATIONS

A.  <u>Design Standards for Lighting of the Shopping Center</u>:

1.  The Developer shall prepare and submit plans showing the location and height of all light poles, fixtures, type of fixture shielding (if any), circuiting and details of the complete lighting arrangement and equipment.

2.  Illumination provided by metal halide parking lot, driveway and sidewalk lighting, as measured at pavement: 7 foot candles minimum maintained within 50 feet of Tenant's entry and at all entrances to the parking lot; 7 foot candles averaged over the entire parking lot with a maximum uniformity ratio of 4:1. Entry canopy soffit: 40.0 foot candles. Landlord to provide (2) 1000 w. spot lights focused on Tenant's entry canopy.

3.  Twenty-five percent (25%) of the overall lighting shall be designated as security lighting (i.e., remains on from dusk to dawn). The security lighting layout and pattern shall be subject to Tenant's approval.

4.  Selection of fixture types shall be subject to Tenant's review and approval prior to design and circuiting.

5.  Landlord shall install a seven-day time switch to control all parking area lighting wired to a common house panel. All security lighting shall be placed on photo-cell switching.

6.  The control of parking area lights shall be accessible to Tenant's local store management due to late-night and holiday sales.



## EXHIBIT "D"

### REMOVABLE TRADE FIXTURES

STORE FIXTURES
ALL STORAGE RACKING
ALL SECURITY SYSTEM ITEMS
TELEPHONES AND PAGING SYSTEMS
COMPUTER SYSTEM
OFFICE FURNITURE AND TRASH RECEPTACLES
BATTERY CHARGER
TRASH COMPACTOR
SIGNS (INTERIOR/EXTERIOR)
ANTENNA SYSTEM
ELECTRONIC SWITCHING
AIR COMPRESSOR (ROADSHOP)
SAFE
CONVEYOR
MEDECO CYLINDER LOCKS (5)
REFRIGERATOR AND MICROWAVE USED BY EMPLOYEES
TACK BOARDS
WATER COOLER
FIRE EXTINGUISHERS
AUDIO ROOM FIXTURES AND SWITCHGEAR
PICTURES
WAREHOUSE AND MATERIAL HANDLING EQUIPMENT (MOVABLE
LADDERS, DOLLIES, ETC.)
TRACK      LIGHTS      (CANS      ONLY,      NOT      TRACKS)

EXHIBIT "E"

SIGN PLANS AND CRITERIA

(attached)











TBD

TBD

TENANT PANEL APPLICATION
Digitally printed translucent vinyl decal to be
overlaid onto PC3 face. Decal background
to match PMS 130 gold. Logo with fade and
glow and copy to match 3630-33 red vinyl.

EXHIBIT "E-1"

PYLON SIGN EXHIBIT

(attached)

LA/830663.10

02/04/04







## EXHIBIT "F"

A.    Tenant exclusive uses:        None

B.    Permitted Title Exceptions.

      1.    Common Area Maintenance And Reciprocal Easement Agreement dated May 7, 1996, and executed by Landlord's predecessor in interest and Cottonwood Corners, LLC, and recorded on May 14, 1996, in Book 96-13, Page 6531-6551, in the office of the County Clerk for Bernalillo County, New Mexico, as amended to date.

      Notwithstanding anything contained in this Exhibit "F" to the contrary, nothing contained herein shall be construed to prohibit the exercise of the rights and privileges granted to Tenant under the Lease, including but not limited to Tenant's exclusive use rights set forth in paragraph 18 of the Lease.

LA/830663.10

02/04/04



EXHIBIT "G"

Prepared by and after recording return to:
Paul, Hastings, Janofsky & Walker LLP
Twenty-Fifth Floor
515 South Flower Street
Los Angeles, CA  90071-2371
Attention:  Matthew I. Lamishaw, Esq.

## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

(Mortgage)

This **SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT**, dated the _____ day of _____, 200_, between _____, a _____ ("Mortgagee"), and CIRCUIT CITY STORES WEST COAST, INC., a California corporation ("Tenant"), having an address of Deep Run I, 9950 Mayland Drive, Richmond, Virginia 23233.

WITNESSETH:

(a)    Tenant has entered into a certain lease (the "Lease") dated February _____, 2004 with RSF Land and Cattle Company, LLC, a New Mexico limited liability company ("Landlord"), covering premises located within that certain property known as Cottonwood Corners III Shopping Center, located in the City of Albuquerque, Bernalillo County, New Mexico, and more particularly described in Schedule A hereto; and

(b)    Mortgagee has made a loan to Landlord as evidenced and secured by a Deed of Trust recorded _____, 200_ in the land records of Bernalillo County, New Mexico, in Book _____ at page _____ (the "Mortgage"), encumbering the property described in Schedule A; and the parties hereto desire to set forth their agreement with regard to the priority of the Mortgage and the effect thereof on Tenant and its leasehold interest in the aforesaid premises, as set forth below.

LA/830663.10

02/04/04

NOW, THEREFORE, in consideration of the premises and of the sum of One Dollar ($1.00) by each party in hand paid to the other, the receipt of which is hereby acknowledged, the parties hereby agree as follows:

1.   The Lease is and shall be subject and subordinate to the lien of the Mortgage insofar as it affects the real property of which the premises form a part, and to all renewals, modifications, consolidations, replacements and extensions thereof, to the full extent of the principal sum secured thereby and interest thereon.

2.   Tenant agrees that it will attorn to and recognize any purchaser at a foreclosure sale under the Mortgage, any transferee who acquires the premises by deed in lieu of foreclosure, the successors and assigns of such purchasers, as its Landlord for the unexpired balance (and any extensions, if exercised) of the term of the Lease upon the same terms and conditions set forth in the Lease.

3.   In the event that it should become necessary to foreclose the Mortgage, Mortgagee thereunder will not terminate the Lease nor join Tenant in summary or foreclosure proceedings so long as Tenant is not in default under any of the material terms, covenants, or conditions of the Lease, beyond any applicable cure period provided in the Lease.

4.   Mortgagee consents to the application of casualty and condemnation proceeds in accordance with paragraphs 15 and 16 of the Lease between Landlord and Tenant, whether or not the Mortgage is then foreclosed.

5.   In the event that Mortgagee shall succeed to the interest of Landlord under the Lease, Mortgagee shall not be:

   (a)   liable for any act or omission of any prior lessor (including Landlord); or

   (b)   liable for the return of any security deposits unless delivered to Mortgagee; or



     (c)     bound by any rent or other periodic payments which Tenant might have
paid for more than the current month to any prior lessor (including
Landlord); or

     (d)     bound by any amendment or modification of the Lease made without its
consent, which consent shall not be unreasonably withheld or delayed.

6.     Notwithstanding the foregoing, Mortgagee acknowledges and agrees that if
Mortgagee shall succeed to the interest of Landlord under this Lease, Mortgagee
shall be subject to Tenant's remedies properly exercised under the Lease,
including but not limited to Tenant's rights of self-help and/or setoff for any
default, obligation, act or omission of any prior lessor (including Landlord) as
provided in the Lease and that such rights of Tenant are not limited or impaired in
any way by the terms and provisions of this Agreement.

7.     Notwithstanding anything contained herein to the contrary, it is expressly
understood and agreed that in the event that Landlord defaults in the payment of
the Tenant Improvement Allowance, as defined in the Lease, and Mortgagee
acquires title to the Shopping Center by foreclosure or otherwise, Mortgagee shall
become liable for payment of the Tenant Improvement Allowance to Tenant, and
Tenant shall otherwise be entitled to effect a Transfer all in accordance with the
terms of the Lease.

8.     Mortgagee, Landlord and Tenant, respectively, represent and warrant to each
other that each has the requisite power and authority to enter into this Agreement;
that all necessary and appropriate approvals, authorizations and other steps have
been taken to effect the legality of this Agreement; that the signatories executing
this Agreement on behalf of Mortgagee, Landlord and Tenant have been duly
authorized and empowered to execute this Agreement on behalf of Mortgagee,
Landlord and Tenant, respectively; and that this Agreement is valid and shall be
binding upon and enforceable against Mortgagee, Landlord and Tenant shall inure



to the benefit of the parties hereto, and their successors and assigns and shall inure to the benefit of Mortgagee.

9.  Tenant hereby agrees that, upon the occurrence of an Event of Default (as defined in the Lease), Mortgagee shall have the same time period for cure of such default as is given Landlord in accordance with the terms of the Lease, following notice given by Tenant to Mortgagee at the following address, in the same method for notice as is required under the Lease:

_____

_____

_____

10. All notices between the parties hereto shall be in writing and comply with the terms of paragraph 34 of the Lease.

IN WITNESS WHEREOF, the parties hereto have executed these presents the day and year first above written.

CIRCUIT CITY STORES WEST COAST, INC.,
a California corporation

Witnesses:

_____    By:_____

Printed Name:_____

Vice President

MORTGAGEE NAME

Witnesses:

_____    By:_____

Printed Name:_____    Name:_____

Title:_____

**[Note:  Attach appropriate notary block for the State]**

LA/830663.10

02/04/04                                    4

COMMONWEALTH OF VIRGINIA        )
                               ) ss.
COUNTY OF HENRICO              )

    I certify that on _____, 200__, before me, the undersigned, a Notary Public in and for said State, personally appeared _____, Vice President of CIRCUIT CITY STORES WEST COAST, INC., a California corporation, personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and on oath acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument, the person or the entity upon behalf of which he acted executed the instrument.

    WITNESS my hand and official seal.

                        _____

                        Notary Public in and for the Commonwealth of Virginia, residing at _____
My commission expires:_____

                        _____

                        [Type or Print Notary Name]

EXHIBIT "G"

Prepared by and after recording return to:
Paul, Hastings, Janofsky & Walker LLP
Twenty-Fifth Floor
515 South Flower Street
Los Angeles, CA  90071-2371
Attention: Matthew I. Lamishaw, Esq.

**SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT**

(Ground Lease)

This **SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT**, dated the _____ day of _____, 200_, between _____, a _____ ("Ground Lessor"), and CIRCUIT CITY STORES WEST COAST, INC., a California corporation ("Tenant"), having an address of Deep Run I, 9950 Mayland Drive, Richmond, Virginia 23233.

W I T N E S S E T H:

(a)    Tenant has entered into a certain lease (the "Lease") dated February ____, 2004 with RSF Land and Cattle Company, LLC, a New Mexico Limited Liability Company ("Landlord"), covering premises located within that certain property known as Cottonwood Corners III Shopping Center, located in the City of Albuquerque, Bernalillo County, New Mexico, and more particularly described in Schedule A hereto; and

(b)    Ground Lessor has entered into a Lease with Landlord as evidenced and recorded _____, 200_ in the land records of _____ County, _____, in Book _____ at page _____ (the "Ground Lease"), covering the property described in Schedule A; and the parties hereto desire to set forth their agreement with regard to the priority of the Ground Lease and the effect thereof on Tenant and its leasehold interest in the aforesaid premises, as set forth below.

LA/830663.10

02/04/04



NOW, THEREFORE, in consideration of the premises and of the sum of One Dollar ($1.00) by each party in hand paid to the other, the receipt of which is hereby acknowledged, the parties hereby agree as follows:

1.   The Lease is a sublease and shall be subordinate to the Ground Lease insofar as it affects the real property of which the premises form a part thereof.

2.   Tenant agrees that it will attorn to Ground Lessor and any successor to the Ground Lessor by deed or otherwise as its Landlord for the unexpired balance (and any extensions, if exercised) of the term of the Lease upon the same terms and conditions set forth in the Lease, in the event of a termination of the Ground Lease.

3.   In the event that it should become necessary to terminate the Ground Lease, Ground Lessor thereunder will not terminate the Lease nor join Tenant in summary proceedings so long as Tenant is not in default under any of the material terms, covenants, or conditions of the Lease, beyond any applicable cure period provided in the Lease.

4.   Ground Lessor consents to the application of casualty and condemnation proceeds in accordance with paragraphs 15 and 16 of the Lease between Landlord and Tenant, whether or not the Ground Lease has been terminated.

5.   In the event that Ground Lessor shall succeed to the interest of Landlord under the Lease, Ground Lessor shall not be:

   (a)   liable for any act or omission of any prior lessor (including Landlord); or

   (b)   liable for the return of any security deposits unless delivered to Ground Lessor; or

   (c)   bound by any rent or other periodic payments which Tenant might have paid for more than the current month to any prior lessor (including Landlord); or

LA/830663.10

02/04/04                                2

(d)    bound by any amendment or modification of the Lease made without its consent, which consent shall not be unreasonably withheld or delayed.

6.    Notwithstanding the foregoing, Ground Lessor acknowledges and agrees that if Ground Lessor shall succeed to the interest of Landlord under this Lease, Ground Lessor shall be subject to Tenant's remedies properly exercised under the Lease, including but not limited to Tenant's rights of self-help and/or setoff for any default, obligation, act or omission of any prior lessor (including Landlord) as provided in the Lease and that such rights of Tenant are not limited or impaired in any way by the terms and provisions of this Agreement.

7.    Notwithstanding anything contained herein to the contrary, it is expressly understood and agreed that in the event that Landlord defaults in the payment of the Tenant Improvement Allowance, as defined in the Lease, and Ground Lessor terminates the Lease, Ground Lessor shall become liable for payment of the Tenant Improvement Allowance to Tenant, and Tenant shall otherwise be entitled to effect a Transfer all in accordance with the terms of the Lease.

8.    This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, and their successors and assigns.

9.    Tenant hereby agrees that, upon the occurrence of an Event of Default (as defined in the Lease), Ground Lessor shall have the same time period for cure of such default as is given Landlord in accordance with the terms of the Lease, following notice given by Tenant to Ground Lessor at the following address, in the same method for notice as is required under the Lease:

_____

_____

_____

10.    All notices between the parties hereto shall be in writing and comply with the terms of paragraph 34 of the Lease.

LA/830663.10

IN WITNESS WHEREOF, the parties hereto have executed these presents the day and year first above written.

CIRCUIT CITY STORES WEST COAST,
INC.,
a California corporation

Witnesses:

_____        By:_____

Printed Name:_____                _____
                                                         Vice President


COMPANY NAME

Witnesses:

_____        By:_____

Printed Name:_____                Name:_____
                                                         Title:_____


**[Note:  Attach appropriate notary block for the State]**

COMMONWEALTH OF VIRGINIA                )
                                        ) ss.
COUNTY OF HENRICO                       )

      I certify that on _____, 200__, before me, the undersigned, a Notary Public in and for said State, personally appeared _____, Vice President of CIRCUIT CITY STORES WEST COAST, INC., a California corporation, personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and on oath acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument, the person or the entity upon behalf of which he acted executed the instrument.

      WITNESS my hand and official seal.


                                    _____
                                    Notary Public in and for the Commonwealth
                                    of Virginia, residing at _____
                                    My commission expires:_____

                                    _____
                                    [Type or Print Notary Name]

EXHIBIT "H"

Prepared by and after recording return to:
Paul, Hastings, Janofsky & Walker LLP
Twenty-Fifth Floor
515 South Flower Street
Los Angeles, CA 90071-2371
Attention: Matthew I. Lamishaw, Esq.

## MEMORANDUM OF LEASE

This MEMORANDUM OF LEASE is made this _____ day of February, 2004, between RSF LAND AND CATTLE COMPANY, LLC, a New Mexico Limited Liability Company (hereinafter referred to as "Landlord"), and CIRCUIT CITY STORES WEST COAST, INC., a California corporation (hereinafter referred to as "Tenant").

### W I T N E S S E T H:

Landlord and Tenant have entered into a Lease (the "Lease") dated February ___, 2004, whereby Landlord has leased to Tenant a portion of the real property (the "Property"), commonly known as the Cottonwood Corners III Shopping Center located in the City of Albuquerque, Bernalillo County, New Mexico, the legal description of which Property is set forth on Exhibit "A-1" attached hereto, together with certain non-exclusive easements in, over, upon, across, under and through certain areas of the Property defined in the Lease as Landlord's Premises, and those certain rights and non-exclusive easements granted to or inuring to the benefit of Landlord under that certain (REA or OEA and other easement estates of record) recorded in Book _____, beginning at Page _____ of the real property records of Bernalillo County, New Mexico, in, over, upon, across, under and through the land described therein. The Lease contains provisions and rights appurtenant to the Property, some of which are as follows:

I.    Term. The term of the Lease is for a period of fifteen (15) years, commencing on the Commencement Date (as established in the Lease based upon the substantial completion of the improvements upon the Property). Thereafter, Tenant has the right under the Lease to renew and extend the term of the Lease for five (5) successive periods of five (5) years each.

II.   Exclusive Use Rights. The Lease provides that Tenant shall enjoy the sole and exclusive privilege within the Property to sell, rent, service, repair or rent to own consumer, office and automotive electronics products (which include, but shall not be limited to, televisions, stereos, speakers and video recorders and players), computer hardware and software, entertainment software and entertainment media (which include, but shall not be limited to, records, game cartridges, video tapes,



cassettes and compact discs), cellular and wireless telephones, telecommunication devices, and related goods, and the sale and installation of motor vehicle audio, stereo and telephone systems and technological evolutions of the foregoing (all of such items being herein collectively referred to as the "Products"), and the renting, servicing, repairing and warehousing of the Products.

III.    Successors.  The covenants, conditions and agreements made and entered into by the parties hereto shall be binding upon and inure to the benefits of their respective heirs, administrators, executors, representatives, successors and assigns.

IV.    Incorporation of Lease.    All terms and conditions of the Lease are hereby incorporated herein by reference as if fully set forth herein.

V.    Conflicts with Lease.    This Memorandum of Lease is solely for notice and recording purposes and shall not be construed to alter modify, expand, diminish or supplement the provisions of the Lease.    In the event of any inconsistency between the provisions of this Memorandum of Lease and the provisions of the Lease, the provisions of the Lease shall govern.

IN WITNESS WHEREOF, this Memorandum of Lease has been duly executed by the parties hereto as of the day and year first above written.

RSF LAND AND CATTLE COMPANY, LLC,
a New Mexico limited liability company

By:_____
Name: David S. Smoak
Title:  President

CIRCUIT CITY STORES WEST COAST, INC., a California corporation

By:_____
Name: Thomas C. Nolan
Title:  Vice President

**[Note:  Attach appropriate notary block for the State]**



EXHIBIT "I"

COMMENCEMENT DATE AGREEMENT

This COMMENCEMENT DATE AGREEMENT, made as of this _____ day of _____, 2004, between RSF LAND AND CATTLE COMPANY, LLC, a New Mexico Limited Liability Company (herein called "Landlord"), and CIRCUIT CITY STORES WEST COAST, INC. (herein called "Tenant").

W I T N E S S E T H:

WHEREAS, Landlord is the owner of certain premises situated in Albuquerque, Bernalillo County, New Mexico (herein called the "Premises"); and

WHEREAS, by that certain lease dated February _____, 2004 (herein called the "Lease"), Landlord leased the Premises to Tenant; and

WHEREAS, a memorandum or short form lease in respect of the Lease was recorded in the office of the Clerk of Bernalillo County, New Mexico, on the _____ day of _____, 2004, in Book _____ at Page _____; and

WHEREAS, Tenant is in possession of the Premises and the term of the Lease has commenced; and

WHEREAS, under Paragraph 25 of the Lease, Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease;

NOW, THEREFORE, Landlord and Tenant agree as follows:

1.     The term of the Lease commenced on, and the Commencement Date (as such term is defined in the Lease) was, _____, 200_. The term of the Lease shall expire on January 31, _____ unless Tenant exercises any option to extend the term of the Lease or unless the Lease terminates earlier as provided in the Lease.

2.     The date of commencement of the first "Option Period" (as such term is defined in the Lease) shall be February 1, _____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, _____ unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

LA/830663.10

02/04/04

3.     The date of commencement of the second Option Period shall be February 1, _____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, _____ unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

4.     The date of commencement of the third Option Period shall be February 1, _____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, _____ unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

5.     The date of commencement of the fourth Option Period shall be February 1, _____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, _____ unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

6.     The date of commencement of the fifth Option Period shall be February 1, _____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, _____ unless the Lease terminates earlier as provided in the Lease.



IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed the day and year first above written.

RSF LAND AND CATTLE COMPANY, LLC,
a New Mexico limited liability company

By:_____
Name: David S. Smoak
Title:  President


CIRCUIT CITY STORES WEST COAST, INC., a California corporation

By:_____
Thomas C. Nolan
Vice President

## EXHIBIT "J"

### INDEMNIFICATION AGREEMENT

This INDEMNIFICATION AGREEMENT is made this _____ day of _____, 200_, between RSF LAND AND CATTLE COMPANY, LLC, a New Mexico Limited Liability Company (hereinafter referred to as "Landlord") and CIRCUIT CITY STORES WEST COAST, INC., a California corporation (hereinafter referred to as "Tenant").

### W I T N E S S E T H:

Landlord and Tenant have entered into a Lease (the "Lease") dated February ____, 2004 whereby Landlord has leased to Tenant a portion of the real property located in Albuquerque, Bernalillo County, New Mexico (the "Shopping Center") and Tenant has constructed on such real property a store premises (the "Premises").

NOW, THEREFORE, in consideration of the payment of the Tenant Improvement Allowance as defined in the Lease and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.       Tenant hereby indemnifies and agrees to hold Landlord harmless from any loss, payment, claim or expense as the result of mechanics and materialmen filing liens or otherwise making claims against Landlord's interest in the Premises and the Shopping Center. In the event that any mechanic, materialman or other claimant makes claim against the Premises or Shopping Center based upon materials or services provided under contract with Tenant, Tenant shall hold harmless and protect Landlord from any loss, payment, claim or expense related thereto.

2.       Tenant reserves the right to contest in good faith the amount of any claim or lien assessed against the Premises or the Shopping Center by any of such claimants; provided, however, should the holder or holders of such claim or lien attempt to enforce their lien by foreclosure or by any other means, Tenant shall bond around, pay or remove such lien by any manner reasonably necessary to protect Landlord's interest in the Premises and the Shopping Center. This indemnity and hold harmless shall not apply to any liens or claims caused by Landlord or Landlord's agents.

LA/830663.10

02/04/04                                        4

EXECUTED this _____ day of _____, 200_.

LANDLORD

RSF LAND AND CATTLE COMPANY,
LLC,
a New Mexico limited liability company


By:_____
Name: David S. Smoak
Title:  President

TENANT

CIRCUIT CITY STORES WEST COAST,
INC., a California corporation


By:_____
     Thomas C. Nolan
     Vice President

## EXHIBIT "K"

### LEASE GUARANTY

Reference is hereby made to a Lease dated February ____, 2004 by and between RSF LAND AND CATTLE COMPANY, LLC, a New Mexico Limited Liability Company (herein called "Landlord") and CIRCUIT CITY STORES WEST COAST, INC., a California corporation (herein called "Tenant") (the "Lease").

In consideration of Landlord's agreement to lease the premises described in the Lease to Tenant on the terms and conditions set forth in the Lease, Circuit City Stores, Inc., a Virginia corporation ("Guarantor"), the sole shareholder of Tenant, hereby guarantees the full and timely performance by Tenant of its obligations under the Lease.

Notwithstanding anything set forth herein to the contrary:

(a)    Following a sublease or assignment in accordance with Paragraph 14 of the Lease, Landlord shall give Guarantor prompt written notice at the address set forth below of any failure by Tenant to perform its obligations under the Lease. Failure to provide such notice to Guarantor within thirty (30) days after such failure becomes known to Landlord shall relieve Guarantor of any obligation hereunder.

(b)    The following shall be conditions of Guarantor's obligations hereunder: (i) all notices required to be given to Tenant in respect of the failure or breach by Tenant at issue have been given or waived in writing by Tenant and Guarantor, and (ii) any grace period in respect of such obligation by Tenant has expired or been waived in writing by Tenant and Guarantor.

(c)    Following a sublease or assignment in accordance with Paragraph 14 of the Lease, no alteration, modification or amendment of the Lease, either by agreement or course of conduct, or extension or renewal of the Lease (collectively, "Alteration"), shall be binding upon Guarantor if such Alteration would enlarge, increase or otherwise negatively impact Guarantor's obligations hereunder, without Guarantor's written consent thereto, which consent may be withheld in Guarantor's sole and absolute discretion.

IN WITNESS WHEREOF, Guarantor has caused this Guaranty to be executed by its duly authorized officer as of this     day of February, 2004.

LA/830663.10

02/04/04                                    6

CIRCUIT CITY STORES, INC.,

a Virginia corporation


By:_____

Name:_____

Title_____

Approved By: Amy Flores _____

## COLDWELL BANKER COMMERCIAL - LEASE ABSTRACT

### RECITALS

PROPERTY NAME: _____
ADDRESS: _____
CITY/STATE/ZIP: _____
LANDLORD/OWNER: _____
TENANT NAME: _____
dba: _____
TENANT ADDRESS: _____
CITY/STATE/ZIP: _____
COUNTY: _____
LEASE GUARANTOR: _____
GUARANTOR ADDRESS: _____
CITY/STATE/ZIP: _____
COUNTY: _____
NOTICE ADDRESS: _____
CITY/STATE/ZIP: _____

LEASE TYPE:  [ ] NET    [ ] GROSS    [ ] BASE YEAR

RENT DUE: _____    LATE FEE: _____
HOLDOVER: _____    RENT/PSF: _____
DEFAULT: 10 days after LL NOTXE

### BASIC PROVISIONS

SUITE: 10500
SQUARE FEET: 33934
LEASE DATE: 9/4/2006
LEASE TERM: 15 yrs
RENT START DATE: _____    LEASE EXPIRATION DATE: 01/31/2020
SECURITY DEPOSIT: _____    ADVANCE RENTAL: _____
COMMENTS: _____
LEASING AGENT: _____

### RENT/NUMBERS

| TERM | ANNUAL AMOUNT | MONTHLY AMOUNT | PER SQ. FT. |
|------|---------------|----------------|-------------|
| 01/17/2007 - 01/31/2010 | 481,184.12 | 40,098.68 | 14.18 |
| 02/01/2010 - 01/31/2020 | 515,118.10 | 42,926.51 | 15.18 |
| | | | |

FREE RENT / ABATEMENT:  [ ] YES  [ ] NO    Lease Pg: _____

| BEGINNING | ENDING | AMOUNT |
|-----------|--------|--------|

TENANT IMPROVEMENTS:  [ ] YES  [ ] NO    Lease Pg: _____

AMOUNT

CPI/RENT ESCALATION:  [ ] YES  [ ] NO    Lease Pg: _____

INDEX    ANNIVERSARY DATE

PERCENTAGE RENT:  [ ] YES  [ ] NO    Lease Pg: _____
SALES REPORTING:  [ ] YES  [ ] NO    Due Date: _____

| BEGINNING | ENDING | BREAKPOINT AMT |
|-----------|--------|----------------|

FINANCIAL STATEMENTS:  [ ] YES  [ ] NO    Due Date: _____

u:\users\amy\propmgmt\forms\abstract3