EXHIBIT A

TRACT I:

Lot 2-A-1, a replat of Lots 1-A and 2-A, save and except the South Four Hundred Seventy-Five (475) Feet thereof, FIESTA AUTOLAND CENTER an Addition to the City of Lubbock, Lubbock County, Texas, according to the map, plat, and or dedication deed thereof, recorded in Volume 4321, Page 183, Real Property Records of Lubbock County, Texas, being further described as follows:

BEGINNING at a concrete nail found at the Northeast corner of this lot, which bears S. 89° 56' E. a distance of 658.80 feet and South a distance of 52.75 feet from the Northwest corner of Section 10, Block E-2.

THENCE South, a distance of 226.03 feet to a cross cut in concrete at the Easternmost Southeast corner of this lot;

THENCE West, a distance of 272.00 feet to a concrete nail found at an interior corner of this lot;

THENCE South, a distance of 42.9 feet to a concrete nail found at the Southernmost, Southeast corner of this lot;

THENCE West, a distance of 162.49 feet to a cross cut in concrete at the Southernmost Southwest corner of this lot;

THENCE North, a distance of 213.93 feet to a 60 penny nail found at an interior corner of this lot;

THENCE West a distance of 149.52 feet to a 1/2" iron rod with cap found in the East right-of-way line of Slide Road, at the Westernmost corner of this lot;

THENCE Northeasterly, along said East right-of-way line of Slide Road, around a curve to the right, said curve having a radius of 215.00 feet, a central angle of 39° 43' 01", tangent lengths of 77.65 feet and a chord distance of 146.07 feet to a crow's foot cut in concrete for a corner of this lot in the South right-of-way line of Loop 289;

THENCE S. 89° 56' E., along said South right-of-way line of Loop 289, a distance of 242.10 feet to a 1/2" iron rod with cap set for a corner of this lot;

THENCE S. 77° 44' E. along said South right-of-way line a distance of 249.60 feet to the Point of Beginning.

TRACT II:

All perpetual, mutual, reciprocal and non-exclusive easements, rights, licenses and privileges for vehicular and pedestrian, access, ingress and egress, vehicular parking and construction,

installation, maintenance and use of utility services as described in and conveyed by that certain Reciprocal Easement and Operation Agreement dated September 1, 1993 by and between Maclay Development Company, Inc., Circuit City Stores, Inc. and Pacific Industrial Properties Holding, Inc., as recorded in Volume 4321, page 307, and Volume 4611, page 1, of the Real Property Records of Lubbock County, Texas.

TRACT III:

All easements as described in and conveyed by that certain Consent and Easement Agreement dated as of February 23, 1995, to be recorded in the Real Property Record of Lubbock County, Texas.

\circuit\staubach\legal.ltx

## EXHIBIT B

1. Basic Rent for the initial term shall be at the annual rate of THREE HUNDRED SEVENTY ONE THOUSAND SIX HUNDRED EIGHTY-FIVE DOLLARS ($371,685.00).

2. Basic Rent for the first renewal term shall be at the annual rate of FOUR HUNDRED EIGHT THOUSAND EIGHT HUNDRED FIFTY-THREE AND 50/100 DOLLARS ($408,853.50).

3. Basic Rent for the second renewal term shall be at the annual rate of FOUR HUNDRED FORTY-SIX THOUSAND TWENTY-TWO DOLLARS ($446,022.00).

Rejectable Offer Schedule-Lubbock

| COLUMN A MONTHS | COLUMN B PRINCIPAL BALANCE |
|---|---|
| 1 | $3,550,000 |
| 2 | $3,545,711 |
| 3 | $3,541,389 |
| 4 | $3,537,035 |
| 5 | $3,532,648 |
| 6 | $3,528,228 |
| 7 | $3,523,775 |
| 8 | $3,519,289 |
| 9 | $3,514,768 |
| 10 | $3,510,214 |
| 11 | $3,505,626 |
| 12 | $3,501,003 |
| 13 | $3,496,345 |
| 14 | $3,491,652 |
| 15 | $3,486,924 |
| 16 | $3,482,161 |
| 17 | $3,477,361 |
| 18 | $3,472,526 |
| 19 | $3,467,654 |
| 20 | $3,462,746 |
| 21 | $3,457,801 |
| 22 | $3,452,818 |
| 23 | $3,447,798 |
| 24 | $3,442,741 |
| 25 | $3,437,645 |
| 26 | $3,432,511 |
| 27 | $3,427,339 |
| 28 | $3,422,127 |
| 29 | $3,416,876 |
| 30 | $3,411,586 |
| 31 | $3,406,257 |
| 32 | $3,400,887 |
| 33 | $3,395,476 |
| 34 | $3,390,026 |
| 35 | $3,384,534 |
| 36 | $3,379,001 |
| 37 | $3,373,426 |
| 38 | $3,367,809 |
| 39 | $3,362,150 |
| 40 | $3,356,449 |
| 41 | $3,350,705 |
| 42 | $3,344,917 |
| 43 | $3,339,086 |
| 44 | $3,333,211 |
| 45 | $3,327,292 |
| 46 | $3,321,329 |
| 47 | $3,315,321 |
| 48 | $3,309,267 |
| 49 | $3,303,168 |
| 50 | $3,297,024 |
| 51 | $3,290,833 |
| 52 | $3,284,595 |
| 53 | $3,278,311 |
| 54 | $3,271,979 |
| 55 | $3,265,600 |
| 56 | $3,259,173 |
| 57 | $3,252,697 |
| 58 | $3,246,173 |
| 59 | $3,239,600 |
| 60 | $3,232,977 |
| 61 | $3,226,305 |

Exhibit C
Rejectable Offer Schedule-Lubbock

| COLUMN "A" MONTHS | COLUMN "B" PRINCIPAL BALANCE |
|---|---|
| 62 | $3,219,583 |
| 63 | $3,212,809 |
| 64 | $3,205,985 |
| 65 | $3,199,110 |
| 66 | $3,192,183 |
| 67 | $3,185,204 |
| 68 | $3,178,173 |
| 69 | $3,171,088 |
| 70 | $3,163,951 |
| 71 | $3,156,760 |
| 72 | $3,149,514 |
| 73 | $3,142,215 |
| 74 | $3,134,860 |
| 75 | $3,127,450 |
| 76 | $3,119,985 |
| 77 | $3,112,463 |
| 78 | $3,104,885 |
| 79 | $3,097,249 |
| 80 | $3,089,557 |
| 81 | $3,081,806 |
| 82 | $3,073,998 |
| 83 | $3,066,130 |
| 84 | $3,058,204 |
| 85 | $3,050,218 |
| 86 | $3,042,172 |
| 87 | $3,034,065 |
| 88 | $3,025,897 |
| 89 | $3,017,668 |
| 90 | $3,009,378 |
| 91 | $3,001,025 |
| 92 | $2,992,609 |
| 93 | $2,984,130 |
| 94 | $2,975,587 |
| 95 | $2,966,980 |
| 96 | $2,958,308 |
| 97 | $2,949,571 |
| 98 | $2,940,768 |
| 99 | $2,931,899 |
| 100 | $2,922,964 |
| 101 | $2,913,961 |
| 102 | $2,904,891 |
| 103 | $2,895,752 |
| 104 | $2,886,545 |
| 105 | $2,877,269 |
| 106 | $2,867,923 |
| 107 | $2,858,506 |
| 108 | $2,849,019 |
| 109 | $2,839,461 |
| 110 | $2,829,830 |
| 111 | $2,820,127 |
| 112 | $2,810,352 |
| 113 | $2,800,503 |
| 114 | $2,790,580 |
| 115 | $2,780,582 |
| 116 | $2,770,509 |
| 117 | $2,760,360 |
| 118 | $2,750,135 |
| 119 | $2,739,834 |
| 120 | $2,729,454 |
| 121 | $2,718,997 |

*Rejectable Offer Schedule-Lubbock*

| COLUMN "A" MONTHS | COLUMN "B" PRINCIPAL BALANCE |
|---|---|
| 122 | $2,708,461 |
| 123 | $2,697,846 |
| 124 | $2,687,152 |
| 125 | $2,676,376 |
| 126 | $2,665,520 |
| 127 | $2,654,582 |
| 128 | $2,643,562 |
| 129 | $2,632,460 |
| 130 | $2,621,273 |
| 131 | $2,610,003 |
| 132 | $2,598,648 |
| 133 | $2,587,207 |
| 134 | $2,575,681 |
| 135 | $2,564,068 |
| 136 | $2,552,367 |
| 137 | $2,540,579 |
| 138 | $2,528,702 |
| 139 | $2,516,736 |
| 140 | $2,504,680 |
| 141 | $2,492,533 |
| 142 | $2,480,295 |
| 143 | $2,467,965 |
| 144 | $2,455,542 |
| 145 | $2,443,026 |
| 146 | $2,430,416 |
| 147 | $2,417,711 |
| 148 | $2,404,910 |
| 149 | $2,392,014 |
| 150 | $2,379,020 |
| 151 | $2,365,929 |
| 152 | $2,352,739 |
| 153 | $2,339,450 |
| 154 | $2,326,061 |
| 155 | $2,312,572 |
| 156 | $2,298,981 |
| 157 | $2,285,288 |
| 158 | $2,271,492 |
| 159 | $2,257,593 |
| 160 | $2,243,588 |
| 161 | $2,229,479 |
| 162 | $2,215,264 |
| 163 | $2,200,941 |
| 164 | $2,186,512 |
| 165 | $2,171,973 |
| 166 | $2,157,326 |
| 167 | $2,142,568 |
| 168 | $2,127,699 |
| 169 | $2,112,719 |
| 170 | $2,097,626 |
| 171 | $2,082,419 |
| 172 | $2,067,098 |
| 173 | $2,051,662 |
| 174 | $2,036,110 |
| 175 | $2,020,442 |
| 176 | $2,004,655 |
| 177 | $1,988,750 |
| 178 | $1,972,725 |
| 179 | $1,956,579 |
| 180 | $1,940,313 |
| 181 | $1,923,924 |

Exhibit "C"
*Rejectable Offer Schedule-Lubbock*

| COLUMN "A" MONTHS | COLUMN "B" PRINCIPAL BALANCE |
|---|---|
| 182 | $1,907,412 |
| 183 | $1,890,775 |
| 184 | $1,874,014 |
| 185 | $1,857,127 |
| 186 | $1,840,112 |
| 187 | $1,822,970 |
| 188 | $1,805,699 |
| 189 | $1,788,298 |
| 190 | $1,770,767 |
| 191 | $1,753,103 |
| 192 | $1,735,307 |
| 193 | $1,717,377 |
| 194 | $1,699,313 |
| 195 | $1,681,112 |
| 196 | $1,662,775 |
| 197 | $1,644,300 |
| 198 | $1,625,686 |
| 199 | $1,606,932 |
| 200 | $1,588,037 |
| 201 | $1,569,000 |
| 202 | $1,549,820 |
| 203 | $1,530,496 |
| 204 | $1,511,026 |
| 205 | $1,491,410 |
| 206 | $1,471,647 |
| 207 | $1,451,735 |
| 208 | $1,431,674 |
| 209 | $1,411,462 |
| 210 | $1,391,097 |
| 211 | $1,370,580 |
| 212 | $1,349,909 |
| 213 | $1,329,082 |
| 214 | $1,308,098 |
| 215 | $1,286,957 |
| 216 | $1,265,657 |
| 217 | $1,244,197 |
| 218 | $1,222,576 |
| 219 | $1,200,792 |
| 220 | $1,178,844 |
| 221 | $1,156,731 |
| 222 | $1,134,452 |
| 223 | $1,112,006 |
| 224 | $1,089,391 |
| 225 | $1,066,606 |
| 226 | $1,043,649 |
| 227 | $1,020,520 |
| 228 | $997,218 |
| 229 | $973,740 |
| 230 | $950,085 |
| 231 | $926,253 |
| 232 | $902,242 |
| 233 | $878,050 |
| 234 | $853,676 |
| 235 | $829,119 |
| 236 | $804,378 |
| 237 | $779,450 |
| 238 | $754,335 |
| 239 | $729,032 |
| 240 | $703,538 |
| 241 | $677,852 |

Rejectable Offer Schedule-Lubbock

| COLUMN "A" MONTHS | COLUMN "B" PRINCIPAL BALANCE |
|---|---|
| 242 | $651,974 |
| 243 | $625,901 |
| 244 | $599,632 |
| 245 | $573,165 |
| 246 | $546,500 |
| 247 | $519,634 |
| 248 | $492,566 |
| 249 | $465,295 |
| 250 | $437,819 |
| 251 | $410,136 |
| 252 | $382,245 |
| 253 | $354,144 |
| 254 | $325,833 |
| 255 | $297,308 |
| 256 | $268,569 |
| 257 | $239,614 |
| 258 | $210,442 |
| 259 | $181,050 |
| 260 | $151,437 |
| 261 | $121,601 |
| 262 | $91,542 |
| 263 | $61,256 |
| 264 | $30,743 |
| 265 | $0 |

Case 08-35653-KRH    Doc 1550-3    Filed 01/13/09    Entered 01/15/09 13:28:04    Desc
Exhibit(s)    Page 8 of 19
Rejectable Offer Schedule-Lubbock

COLUMN "A" MONTHS

COLUMN "B" PRINCIPAL BALANCE

## EXHIBIT D

List of Properties Subject to Cross Defaulted Leases

Location

### LUBBOCK

6701 Slide Street
Lubbock, TX 79424
(Lubbock County)

### CLACKAMAS

10722 SE 82nd Avenue
Portland, OR 97266
(Clackamas County)

### TYLER/BROADWAY

4910 S. Broadway
Tyler, TX 75603
(Smith County)

### LONGVIEW

406 N. Loop 281
Longview, TX 75605
(Gregg County)

### MIAMI WAREHOUSE

3245 Meridian Parkway
Ft. Lauderdale, FL 33331
(Broward County)

### CARMAX-COBB

1215 Ernest Barrett Parkway
Marietta, GA
(Cobb County)

LOCATION: 4910 S. Broadway
Tyler, Texas 75603
(Smith County)

# LEASE

between

## CIRCUIT CITY STORES, INC.,

as Tenant

and

## WOLVERINE EQUITIES COMPANY 95A L. P.,

as Landlord

dated February 24, 1995

Table of Contents

| | | |
|---|---|---|
| 1. | Certain Definitions | 1 |
| 2. | Demise of Premises | 5 |
| 3. | Term | 5 |
| 4. | Rent | 6 |
| 5. | Net Lease; True Lease | 7 |
| 6. | Title and Condition | 8 |
| 7. | Taxes; Insurance and Legal Requirements | 9 |
| 8. | Use | 10 |
| 9. | Maintenance and Repair | 11 |
| 10. | Liens | 13 |
| 11. | Alterations | 13 |
| 12. | Condemnation | 13 |
| 13. | Insurance | 17 |
| 14. | Damage, Destruction | 20 |
| 15. | Restoration | 21 |
| 16. | Subordination to Financing | 22 |
| 17. | Assignment, Subleasing | 24 |
| 18. | Permitted Contests | 27 |
| 19. | Default | 28 |
| 20. | Landlord's Remedies | 29 |
| 21. | Notices | 31 |

i

22. Memorandum of Lease; Estoppel Certificates . . . . . . . . . . . . . . . . . . . 32
23. Surrender and Holding Over . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
24. No Merger of Title . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
25. Landlord Exculpation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
26. Hazardous Substances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
27. Entry by Landlord . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
28. Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
29. No Usury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
30. Broker . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
31. Waiver of Landlord's Lien . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
32. No Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
33. Separability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
34. Indemnification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
35. Lender as Third Party Beneficiary . . . . . . . . . . . . . . . . . . . . . . . 39
36. Tenant to Comply With Reciprocal Easement Agreement . . . . . . . . . . . 39
37. Headings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
38. Modifications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
39. Successors, Assigns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
40. Counterparts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
41. Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
42. Transfer of Landlord's Interest . . . . . . . . . . . . . . . . . . . . . . . . 40
43. Attorneys' Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

THIS LEASE AGREEMENT is made as of this 24th day of February, 1995, by and between WOLVERINE EQUITIES COMPANY 95A L. P., a Texas limited partnership ("Landlord"), and CIRCUIT CITY STORES, INC., a Virginia corporation, having its principal office at 9950 Mayland Drive, Richmond, Virginia 23233-1464 ("Tenant").

In consideration of the rents and provisions herein stipulated to be paid and performed, Landlord and Tenant hereby covenant and agree as follows:

1. Certain Definitions.

(a) "Additional Rent" shall mean all sums required to be paid by Tenant to Landlord or Lender hereunder other than Basic Rent, which sums shall constitute rental hereunder.

(b) "Adjoining Property" shall mean all sidewalks, curbs, gores and vault spaces adjoining any of the Leased Premises.

(c) "Alteration" or "Alterations" shall mean any or all changes, additions, improvements, reconstructions or replacements of any of the Improvements, both interior or exterior, and ordinary and extraordinary.

(d) "Basic Rent" shall mean Basic Rent as defined in Paragraph 4.

(e) "Basic Rent Payment Dates" shall mean the Basic Rent Payment Dates as defined in Paragraph 4.

(f) "Claim Deadline" shall mean the Claim Deadline as defined in paragraph 34.

(g) "Commencement Date" shall mean the Commencement Date as defined in Paragraph 3.

(h) "Condemnation" shall mean a Taking and/or a Requisition.

(i) "Cross Defaulted Leases" shall be those leases with Landlord dated as of the date hereof affecting the premises (other than the Leased Premises) listed on Exhibit D attached hereto and made a part hereof.

(j)    "Default Rate" shall mean an annual rate of interest equal to two (2%) percent per annum above the therein current Prime Rate.

(k)    "Event of Default" shall mean an Event of Default as defined in Paragraph 19.

(l)    "Insurance Requirement" or "Insurance Requirements" shall mean, as the case may be, any one or more of the terms of each insurance policy required to be carried by Tenant under this Lease and the requirements of the issuer of such policy, and whenever Tenant shall be engaged in making any Alteration or Alterations, repairs or construction work of any kind (collectively, "Work"), the term "Insurance Requirement" or "Insurance Requirements" shall be deemed to include a requirement that Tenant obtain or cause its contractor to obtain completed value builder's risk insurance when the estimated cost of the Work in any one instance exceeds the sum of One Hundred Thousand ($100,000.00) Dollars and that Tenant or its contractor shall obtain worker's compensation insurance or other adequate insurance coverage covering all persons employed in connection with the Work, whether by Tenant, its contractors or subcontractors and with respect to whom death or bodily injury claims could be asserted against Landlord.

(m)    "Law" shall mean any constitution, statute or rule of law.

(n)    "Leased Premises" shall mean the Leased Premises as defined in Paragraph 2.

(o)    "Legal Requirement" or "Legal Requirements" shall mean, as the case may be, any one or more of all present and future laws, codes, ordinances, orders, judgments, decrees, injunctions, rules, regulations and requirements, even if unforeseen or extraordinary, of every duly constituted governmental authority or agency (but excluding those which by their terms are not applicable to and do not impose any obligation on Tenant, Landlord or the Leased Premises) and all covenants, restrictions and conditions (including, without limitation, reciprocal easement agreements) now or hereafter of record which may be applicable to Tenant, to Landlord or to any of the Leased Premises, or to the ownership, use, manner of use, occupancy, possession, operation, maintenance, alteration, repair or reconstruction of any of the Leased Premises, even if compliance therewith (i) necessitates structural changes or improvements (including changes required to comply with the "Americans with Disabilities Act")

2

or results in interference with the use or enjoyment of any of the Leased Premises or (ii) requires Tenant to carry insurance other than as required by the provisions of this Lease.

(p) "Lender" shall mean the entity identified from time to time, to Tenant as such in writing, which makes a Loan to Landlord, secured by a Mortgage and evidenced by a Note or which is the holder of a Mortgage and Note as a result of an assignment thereof.

(q) "Loan" shall mean a loan made by a Lender to Landlord secured by a Mortgage and evidenced by a Note.

(r) "Mortgage" shall mean a first priority mortgage, deed of trust or similar security instrument hereafter executed covering the Leased Premises from Landlord to Lender.

(s) "Net Award" shall mean the entire award payable to Landlord by reason of a Condemnation, less any actual and reasonable expenses incurred by Landlord in collecting such award.

(t) "Net Proceeds" shall mean the entire proceeds paid as a result of any property casualty payable under insurance required under Paragraph 13.(a), less any actual and reasonable expenses incurred by Landlord in collecting such proceeds.

(u) "Note" or "Notes" shall mean a promissory note or notes hereafter executed from Landlord to Lender, which Note or Notes will be secured by a Mortgage and an assignment of leases and rents.

(v) "Permitted Encumbrances" shall mean Taxes, Legal Requirements, any matters consented to by Tenant, those covenants, restrictions, reservations, liens, conditions, encroachments, easements and other matters of title that affect the Leased Premises as of Landlord's acquisition thereof, whether recorded or unrecorded excepting, however, any such matters arising from the acts of Landlord (such as liens arising as a result of judgments against Landlord) unless consented to by Tenant or requested by Tenant under Section 6(d).

(w) "Prime Rate" shall mean the rate of interest announced publicly by Citibank, N.A. or its successor, from time to time, as Citibank, N.A.'s or such successor's base rate, or if there is no such base rate, then the rate of interest charged by Citibank, N.A. or such successor to its most creditworthy customers on commercial loans having a ninety (90) day duration.

3

(x)    "Rent" shall mean Basic Rent and Additional Rent, collectively.

(y)    "Requisition" shall mean any temporary condemnation or confiscation of the use or occupancy of any of the Leased Premises by any governmental authority, civil or military, whether pursuant to an agreement with such governmental authority in settlement of or under threat of any such requisition or confiscation, or otherwise.

(z)    "Restoration" shall mean the restoration of the Leased Premises after any Taking or damage by casualty, as nearly as possible to their value, condition and character immediately prior to such Taking or damage.

(aa)    "State" shall mean the State or Commonwealth in which the Leased Premises are situate.

(ab)    "Taking" shall mean any taking of any of the Leased Premises in or by condemnation or other eminent domain proceedings pursuant to any law, general or special, or by reason of any agreement with any condemnor in settlement of or under threat of any such condemnation or other eminent domain proceedings or by any other means, or any *de facto* condemnation.

(ac)    "Taxes" shall mean taxes of every kind and nature (including real, *ad valorem* and personal property, income, franchise, withholding, profits and gross receipts taxes), all charges and/or taxes for any easement or agreement maintained for the benefit of any of the Leased Premises, all general and special assessments, levies, permits, inspection and license fees, all water and sewer rents and other utility charges, all ground rents, and all other public charges and/or taxes whether of a like or different nature, even if unforeseen or extraordinary, imposed upon or assessed, prior to or during the Term, against Landlord, Tenant or any of the Leased Premises as a result of or arising in respect of the ownership, occupancy, leasing, use, maintenance, operation, management, repair or possession thereof, or any activity conducted on the Leased Premises, or the Basic Rent or Additional Rent, including without limitation, any gross income tax, sales tax, occupancy tax or excise tax levied by any governmental body on or with respect to such Basic Rent or Additional Rent.

(aa)    "Term" shall mean the initial term of this Lease, as extended pursuant to any renewal that has become effective.

4

(bb) "Termination Date" shall mean the Termination Date as defined in Paragraph 12.(b).

(cc) "Trade Fixtures" shall mean all warehouse racking systems, counters, cases, shelving and similar fixtures, which are owned by Tenant and used in the operation of the business conducted on the Leased Premises.

2. <u>Demise of Premises</u>. Landlord hereby leases, demises and lets to Tenant and Tenant hereby takes and leases from Landlord for the Term or terms and upon the provisions hereinafter specified the following described property (collectively, the "Leased Premises"): (i) the premises described in Exhibit "A" attached hereto and made a part hereof together with the easements, rights and appurtenances thereunto belonging or appertaining (collectively, the "Land"); (ii) the buildings, structures, fixtures and other improvements constructed and to be constructed on the Land (collectively, the "Improvements"), together with all Alterations and other additions and accessions thereto, substitutions therefor and replacements thereof permitted by this Lease excepting therefrom Tenant's Trade Fixtures.

3. <u>Term</u>. Tenant shall have and hold the Leased Premises for an initial term commencing on February 24, 1995 (the "Commencement Date") and ending on February 28, 2017 (the "Expiration Date"). Provided the Lease shall not have been terminated pursuant to the provisions hereof, this Lease and the Term thereof shall be automatically extended for two (2) renewal terms of ten (10) years each upon condition that (a) at the commencement of each renewal term, no Event of Default shall exist (provided, that, Landlord may, in its sole discretion, waive the conditions of this Section 3(a)) and (b) Tenant may cancel any renewal term by giving notice to Landlord in writing at least twelve (12) months prior to the expiration of the then current Term. Upon the giving of such notice this Lease and the Term thereof shall terminate and come to an end on the expiration date of the then current Term. Any such extension or renewal of the Term shall be subject to all of the provisions of this Lease, and all such provisions shall continue in full force and effect, except that the Basic Rent for each renewal term shall be the amounts determined in accordance with the schedule set forth in Exhibit "B" attached hereto and made a part hereof. In the event that Tenant exercises its option to cancel any renewal Term as hereinabove provided, then Landlord shall have the right during the remainder of the Term then in effect to (i) advertise the availability of the Leased Premises

5

for sale or for reletting, and (ii) show the Leased Premises to prospective purchasers, lenders or tenants at such reasonable times during normal business hours as Landlord may select. If Tenant shall timely give such notice of its election to cancel any renewal option, then all options with regard to subsequent extensions or renewals of the Term shall expire and be null and void.

4.  Rent.

(a)  Tenant shall pay to Landlord or Lender, if directed by Landlord or Lender, as annual rent for the Leased Premises during the Term, the amounts determined in accordance with the schedule set forth in Exhibit "B" attached hereto and made a part hereof ("Basic Rent"), which rent shall be paid in equal monthly installments commencing on the last day of the first month next following the Commencement Date and continuing on the last day of each month thereafter during the Term (the said days being called the "Basic Rent Payment Dates"), and shall pay the same at Landlord's address set forth below, or at such other place or to such other person or persons (not exceeding four (4) in number) and in such proportions as Landlord from time to time may designate to Tenant in writing, in funds which at the time of such payment shall be legal tender for the payment of public or private debts in the United States of America and if required by Landlord or Lender by wire transfer in immediately available federal funds to such account in such bank as Landlord or Lender shall designate from time to time. Pro rata Basic Rent shall be due for the period from and including the Commencement Date to the first day of the month next following the Commencement Date computed as set forth in Exhibit "B" and shall be paid in advance on the Commencement Date, except that if the Commencement Date shall occur on the first day of a calendar month, the full monthly installment of Basic Rent for such first month shall be paid on the last day of the month in which the Commencement Date shall occur.

(b)  If any installment of Basic Rent is not paid on the date due, Tenant shall pay Landlord interest on such overdue payment at the Default Rate, accruing from the due date of such payment until the same is paid.

(c)  Tenant shall pay and discharge before the imposition of any fine, lien, interest or penalty may be added thereto for late payment thereof, as Additional Rent, all other amounts and obligations which Tenant assumes or agrees to pay or discharge pursuant to this Lease, together with every fine, penalty, interest and cost which may be added by the party

6

to whom such payment is due for nonpayment or late payment thereof. In the event of any failure by Tenant to pay or discharge any of the foregoing, Landlord shall have all rights, powers and remedies provided herein, by law or otherwise, in the event of nonpayment of Basic Rent.

5.  Net Lease; True Lease. (a) It is the intention of the parties hereto that the obligations of Tenant hereunder shall be separate and independent covenants and agreements, and that Basic Rent, Additional Rent and all other sums payable by Tenant hereunder shall continue to be payable in all events, and that the obligations of Tenant hereunder shall continue unaffected, unless the requirement to pay or perform the same shall have been terminated pursuant to an express provision of this Lease. This is a net Lease and Basic Rent, Additional Rent and all other sums payable hereunder by Tenant shall be paid without notice or demand, and without setoff, counterclaim, recoupment, abatement, suspension, deferment, diminution, deduction, reduction or defense, except as otherwise specifically set forth herein. Tenant shall pay all operating expenses related to the leasing, use, occupancy, management, maintenance, repair, operation or possession of the Leased Premises, and to the extent required hereunder, Taxes and insurance costs. This Lease shall not terminate and Tenant shall not have any right to terminate this Lease, during the Term (except as otherwise expressly provided herein). Tenant agrees that, except as otherwise expressly provided herein, it shall not take any action to terminate, reject, rescind or avoid this Lease, notwithstanding (i) the bankruptcy, insolvency, reorganization, composition, readjustment, liquidation, dissolution, winding-up or other proceeding affecting Landlord, Tenant or any assignee or subtenant of Tenant, (ii) the exercise of any remedy, including foreclosure, under the Mortgage, or (iii) any action with respect to this Lease (including the disaffirmance hereof) which may be taken by Landlord under the Federal Bankruptcy Code or by any trustee, receiver or liquidator of Landlord or by any court under the Federal Bankruptcy Code or otherwise, or (iv) the conditions of the Leased Premises. Tenant waives all rights which are not expressly stated herein but which may now or hereafter otherwise be conferred by law to quit, terminate or surrender this Lease or any of the Leased Premises; to any setoff, counterclaim, recoupment, abatement, suspension, deferment, diminution, deduction, reduction or defense of or to Basic Rent, Additional Rent or any other sums payable

7