UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA


IN RE:                      .    Case No. 08-35653(KRH)
                            .
                            .
                            .
CIRCUIT CITY STORES         .    701 East Broad Street
INC.,                       .    Richmond, VA 23219
                            .
                            .
         Debtor.            .    January 16, 2009
. . . . . . . . . . . . ..        11:00 a.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE KEVIN R. HUENNEKENS
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:            McGuireWoods LLP
                           By:  DOUGLAS FOLEY, ESQ.
                           9000 World Trade Center
                           101 W. Main St.
                           Norfolk, VA  23510

                           Skadden Arps Slate Meagher & Flom LLP
                           By:  GREGG M. GALARDI
                           One Rodney Sq.
                           Wilmington, DE 19899

For the Creditors          Pachulski Stang Ziehl & Jones
Committee:                 By:  JEFF N. POMERANTZ, ESQ.
                           10100 Santa Monica Boulevard
                           11th Floor
                           Los Angeles, CA  90067



Proceedings recorded by electronic sound recording, transcript
produced by transcription service
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311   Fax No. (609) 587-3599**

2

**APPEARANCES (CONT'D):**

For Greystone Data          Nixon Peabody, LLP
Systems:                    By:  CHRISTOPHER M. DESIDERIO, ESQ.
                            437 Madison Avenue
                            New York, NY  10022

For TomTom:                 Nixon Peabody, LLD
                            By:  DENNIS J. DREBSKY, ESQ.
                                 CHRISTOPHER M. DESIDERIO, ESQ.
                            437 Madison Avenue
                            New York, NY  10022

For Pratt Center, LLC,      Sands Anderson
Valley Corners, LLC,        By:  LISA TAYLOR HUDSON, ESQ.
Mansfield SEQ287, WLTD,     801 East Main Street
No. Plainfield VF, LLC,     Suite 1800
Marlton VF, LLC:            Richmond, VA  23219

For Schimenti              LeClairRyan
Construction:              By:  TARA ELGIE, ESQ.
                           225 Reinekers Lane
                           Suite 700
                           Alexandria, VA 22314

                           Thelen, LLP
                           By:  PATRICK M. BIRNEY, ESQ.
                                PETER E. STRNISTE, ESQ.
                           185 Asylum Street
                           Cityplace II, 10th Floor
                           Hartford, CT  06103

For Verizon Wireless:      Blank Rome, LLP
                           By:  REGINA STANGO KELBON, ESQ.
                           One Logan Square
                           130 North 18th Street
                           Philadelphia, PA  19103

For Madison Waldorf,       Bean, Kinney & Korman, P.C.
LLC:                       By:  MITCHELL B. WEITZMAN, ESQ.
                           2300 Wilson Boulevard
                           Suite 700
                           Arlington, VA  22201

For James Stacia:          CowanGates
                           By:  FRANK F. RENNIE, IV, ESQ.
                           1930 Huguenot Road
                           P.O. Box 35655
                           Richmond, VA  23235

**J&J COURT TRANSCRIBERS, INC.**

3

**APPEARANCES (CONT'D):**

For Savitri Cohen:          Christian & Barton, LLP
                            By:  MICHAEL MUELLER, ESQ.
                            909 East Main Street
                            Suite 1200
                            Richmond, VA  23219

For ESI:                    Seyfarth Shaw
                            By:  RHETT E. PETCHER, ESQ.
                            975 F Street, N.W.
                            Washington, D.C.  20004

1          THE CLERK:  In the matter of Circuit City Stores,

2    Incorporated.  Case Number 08-35653.  Hearing on Items one

3    through 32 as set out on today's amended agenda.

4          MR. FOLEY:  Good morning, Your Honor.

5          THE COURT:  Good morning, Mr. Foley.

6          MR. FOLEY:  Doug Foley with McGuireWoods on behalf of

7    Circuit City.  With me at counsel table is Gregg Galardi from

8    Skadden Arps.  Your Honor, we're here on the agenda that we

9    filed this morning.  We thank the Court for allowing us to

10   start at 11 rather than ten.  As I explained to chambers

11   earlier this morning, there's been a lot of work over the last

12   several days in New York and a lot of the constituencies needed

13   time to get down here, so we appreciate the Court for

14   accommodating the schedule change.

15         Your Honor, the agenda that we filed this morning, we

16   would propose to go through that, the first six items are

17   matters that have been resolved and I'll briefly go through

18   those and then matters seven through 13 are either matters that

19   have been adjourned by agreement to a future hearing date or

20   are otherwise resolved.  And then matters 14 through 21 are

21   uncontested matters.  And then the contested matters,

22   potentially contested matters are Items 22 through 32.

23         THE COURT:  Very good, Mr. Foley.

24         MR. FOLEY:  Your Honor, the first matter is the

25   complaint for declaratory judgment regarding a constructive

**J&J COURT TRANSCRIBERS, INC.**

1  trust by Greystone Data Systems.  Your Honor is aware we filed

2  a Rule 12(b)(6) motion with respect to that adversary

3  proceeding and complaint.  We've agreed with counsel for the

4  plaintiff to have a briefing schedule that would run 15 days

5  from today to file a responsive pleading and then a ten-day

6  period to file a reply pleading and then have a hearing on that

7  Rule 12(b)(6) motion on the February 13th hearing docket.  So

8  that would put the response date of February 2nd, and then a

9  reply brief date of February 12th with a hearing on February

10 13th.  I believe counsel for Greystone is here.

11             THE COURT:  All right.

12             MR. DESIDERIO:  Good morning.  Chris Desiderio from

13 Nixon Peabody on behalf of Greystone Data Systems.   What

14 counsel's represented, we've agreed to and that briefing

15 schedule is acceptable.

16             THE COURT:  All right.  It's satisfactory to the

17 Court, so that will be fine.

18             MR. DESIDERIO:  Thank you.

19             THE COURT:  It's approved.

20             MR. FOLEY:  Thank, Your Honor.  With respect to Item

21 Number 2, Your Honor, this is a motion under 365(d)(3) and

22 503(b) by Pratt Center Valley and Valley Corner Shopping

23 Center.  That has been resolved and can be removed from the

24 docket.

25             MS. HUDSON:  Your Honor, Lisa Hudson here for Pratt

6

1    Center and Valley Corners.  And Mr. Foley's representation is

2    correct.  We believe the forthcoming order will adequately

3    resolve our concerns.

4              THE COURT:  Very good.  Thank you.

5              MS. HUDSON:  Thank, Your Honor.

6              MR. FOLEY:  Item Number 3 on the docket is a motion

7    for filing a certain document under seal by Alliance

8    Entertainment and we have consented to an order in that regard

9    and I believe it has been submitted to chambers.

10             THE COURT:  That will be granted.

11             MR. FOLEY:  Thank you, Your Honor.  Item Number 4,

12   this is a motion under 365(d)(3) and 503(b) filed by Acadia

13   Realty, Limited Partnership.  This one has also been resolved,

14   Your Honor and can be removed from the docket.

15             THE COURT:  It will be removed.

16             MR. FOLEY:  Your Honor, Number 5 is the motion to

17   compel payment of the administrative post-petition rent by

18   Madison Waldorf, LLC.  Your Honor, this matter has also been

19   resolved.

20             MR. WEITZMAN:  Mitchell Weitzman, counsel for Madison

21   Waldorf, LLC.  It's resolved.  This landlord stipulates that

22   the Court's prior rulings with respect to stub rent would be

23   applicable to this motion with the reservation that we can seek

24   reconsideration along with the other landlords, and we have

25   joined in that motion for reconsideration.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  All right.  Thank you, sir.

2          MR. FOLEY:  Thank, Your Honor.  Item Number 6 is

3   motion by Port Authority Holdings III, Ltd., for an order also

4   under 365(d)(3) and 503(b).  This matter's also been resolved

5   and can be removed from the docket.

6          THE COURT:  All right.

7          MR. FOLEY:  Your Honor, Item Number 7 is a motion

8   from relief of stay filed by Mansfield SEQ 287WLTD.  And we

9   have agreed with opposing counsel to adjourn this matter,

10  preliminary hearing on this matter to the January 29th hearing

11  date.

12         MS. HUDSON:  Your Honor, Lisa Hudson of Sands

13  Anderson here on behalf of Mansfield SEQ287 and WLTD, and Mr.

14  Foley's presentation is correct.  We've agreed to adjourn this

15  to January 29th at ten.

16         THE COURT:  All right, so it will be heard on the

17  29th.

18         MS. HUDSON:  Yes, Your Honor.

19         MR. FOLEY:  Thank, Your Honor.  Item Number 8 is

20  Navarre Distribution Services motion for adequate protection.

21  Your Honor, this matter we have agreed with opposing counsel to

22  adjourn to the February 13th omnibus hearing date.

23         THE COURT:  It will be continued to the 13th.

24         MR. FOLEY:  Thank, Your Honor.  Matter Number 9, Your

25  Honor, is the motion by Motorola for allowance and payment of

8

1 administrative expense claim under 503(b)(9) and we have agreed

2 with opposing counsel to adjourn this matter to the January

3 29th hearing date.

4          THE COURT:  It will be continued to the 29th.

5          MR. FOLEY:  Thank, Your Honor.  Item Number 12, Your

6 Honor, is our continued motion to establish notice hearing and

7 sell down procedures for trading and equity securities and

8 claims against the debtor's estates.  In consultation with the

9 Committee, we have agreed to adjourn that motion  until the

10 January 29th hearing date.

11          THE COURT:  That's Item Number 12?

12          MR. FOLEY:   Yes, Your Honor.

13          THE COURT:  What did we do with Item Number 11?

14          MR. FOLEY:  I apologize for skipping that one, Your

15 Honor.  That one is --

16          THE COURT:  You're just trying to make sure I'm

17 awake.

18          MR. FOLEY:  No, I skipped over it.  Your Honor, this

19 is our motion to assume and assign a lease to Maryland

20 Acquisition Corp.   ACDI, American Computer Development Inc.,

21 filed a response.  We're trying to see if we can resolve that,

22 so we've also agreed to adjourn that motion until the January

23 29th hearing date.

24          THE COURT:  Okay.  And Number 10?

25          MR. FOLEY:  Your Honor, that one is also a motion for

**J&J COURT TRANSCRIBERS, INC.**

1 payment of administrative claim under 503(b)(9) by General

2 Instruments Corporation doing business as Home and Networks

3 Mobility Business.  We have also agreed with opposing counsel

4 to adjourn that matter to the January 29th hearing date.

5          THE COURT:  All right.  All right, then we're back up

6 to Number 13.

7          MR. FOLEY:  Back up to Number 13, Your Honor.  If you

8 recall at the last hearing Your Honor entered an order, a

9 stipulated order that we agreed to with the Committee with

10 respect to certain taxing jurisdictions as to whether or not we

11 had authority under the first day order to pay pre-petition

12 taxes as trust funds.  Your Honor entered an order, made

13 certain findings with respect to those jurisdictions, required

14 us to serve them, which we did.  The certificate of service is

15 listed on the agenda.  We have received no objections by any of

16 those taxing authorities and jurisdictions to Your Honor's

17 stipulated order.  So there's nothing really to do other to

18 announce that that order is now final with respect to those

19 parties.

20          THE COURT:  All right.

21          MR. FOLEY:  Your Honor, Items 14 and 15 are the

22 Committee's employment papers.  I'll have Mr. Pomerantz address

23 the Court on that.

24          MR. POMERANTZ:  Thank you, Your Honor.  Jeff

25 Pomerantz of Pachulski, Stang, Zeil and Jones on behalf of the

**J&J COURT TRANSCRIBERS, INC.**

1  Committee.  Item Number 14 is the Committee's application to

2  employ my firm as general bankruptcy counsel.  We have not

3  received any opposition and an order has been BOP'd.

4           THE COURT:  That employment will be approved.

5           MR. POMERANTZ:  Thank, Your Honor.

6           MR. FOLEY:  And Number 15 is the application of the

7  Committee to employ Tabner and Baron as local counsel, and no

8  objections have been made to that application, and that order

9  has also been BOP'd.

10          THE COURT:  And that employment will also be

11 approved.

12          MR. FOLEY:  Your Honor, I think that brings us to

13 Item Number 16 on the agenda and 17, which go together.  This

14 is a motion to approve a settlement between Verizon Wireless

15 and the debtors, the result of which is to essentially net out

16 and set off certain commissions, charge back, service fees, and

17 the net result of all of the setoffs is that payment coming to

18 the estate of $1,858,084.76.  We have not received any

19 opposition to the motion.  We've asked the Court to approve it.

20          THE COURT:  Does any party wish to be heard in

21 connection with the motion for the approval of the settlement

22 agreement with Verizon?

23          MS. KELBON:  Good morning, Your Honor.  Regina Stango

24 Kelbon, Blank Rome on behalf of Verizon Wireless.  I wanted to

25 start off by thanking Your Honor for times in the past which

**J&J COURT TRANSCRIBERS, INC.**

1  you've allowed me to participate telephonically.  It was very

2  courteous of Your Honor.  But I'm glad I can finally get to

3  meet Your Honor face to face.  I really have nothing further to

4  add, but that we've worked very cooperatively with the debtors

5  in reaching a resolution of our issues that are set forth in

6  the stipulation.

7              THE COURT:  All right.

8              MS. KELBON:  Thank, Your Honor.

9              THE COURT:  Thank you very much.  And the Court will

10 approve the stipulation and approve the settlement.

11             MR. FOLEY:  Thank, Your Honor.  That brings us to

12 Items Number 18 and 19, which is a similar motion that we were

13 seeking relief with respect to IBM.  Your Honor, in

14 consultation with the Committee who filed an informal response

15 -- the agenda is incorrect, it should say informal response by

16 the Committee since this is our motion -- we have agreed to

17 adjourn this matter until the January 29th hearing date to see

18 if we can resolve the Committee's response to that motion.

19             THE COURT:  All right.  It will be continued to the

20 29th.  Is that both 18 and 19, Mr. Foley?

21             MR. FOLEY:  Well, 18 was decided for an expedited

22 hearing, so we would ask the Court to technically grant that

23 and then have the substantive hearing on Number 19 be heard on

24 the 29th.

25             THE COURT:  That makes more sense.  So the Court will

**J&J COURT TRANSCRIBERS, INC.**

1  grant the motion for the expedited hearing in Number 18 and

2  then we'll set the hearing for the 29th of January.

3       MR. FOLEY:  Thank, Your Honor.  Your Honor, that

4  brings us to Items Number 20 and 21, which are items related to

5  a substantive motion that will be argued later in the agenda.

6  This is an expedited hearing request and a motion to seal a

7  certain document by TomTom.  And we have no opposition to

8  either of the motions and we would ask the Court to grant them.

9       THE COURT:  All right.

10      MR. DESIDERIO:  Chris Desiderio from Nixon Peabody on

11 behalf of TomTom Inc.

12      THE COURT:  Could you just state your name?  I'm

13 worried that we didn't get it on the record.

14      MR. DESIDERIO:  Sure, yes.  Chris Desiderio.

15      THE COURT:  Thank you.

16      MR. DESIDERIO:  From Nixon Peabody.  There have been

17 no oppositions received, we just seek to seal the exhibits the

18 debtor's filed.

19      THE COURT:  So the request in Item Number 20 is for

20 the motion to seal the exhibit and the Court will grant that.

21 And in 21, that's to seal the other exhibits?

22      MR. DESIDERIO:  No, actually one was just to grant an

23 expedited hearing.  We've noticed this on Wednesday, so it's

24 only being heard on three days, I think three days notice.

25      THE COURT:  I understand, okay.  So the expedited

**J&J COURT TRANSCRIBERS, INC.**

1   hearing is granted and the Court will grant the relief to place

2   the exhibit under seal.

3          MR. DESIDERIO:  Thank you, Your Honor.

4          MR. FOLEY:  Okay, that brings us to Item Number 22 on

5   the agenda.  If Your Honor recalls at the last hearing, Your

6   Honor heard a motion to reject certain executory contracts with

7   employees.  Some of the parties received late notice and Your

8   Honor gave them additional time to file oppositions.  There

9   were three filed, one by Mr. Stacia and one by Mr. Riches and

10  one by Ms. Cohen.  And I believe their counsel are here, Your

11  Honor.  There was one gentleman, Patrick Longgood that Mr. Shai

12  represented.  I spoke to him and concluded that he did not, he

13  decided not to file anything, but he appreciated the Court

14  giving him additional time to do so.

15         THE COURT:  All right, thank you, Mr. Foley.

16         MR. RENNIE:  Frank Rennie from CowanGates Law Firm

17  here in Richmond.  Good to see you, Your Honor.  I'm here on

18  behalf of Mr. James Stacia who has filed an objection to

19  Circuit City's motion to reject his separation agreement and

20  release of claims that he filed that he signed with Circuit

21  City in September of 2008.  A long term employee, Your Honor,

22  similar to the situations that you heard in last month's

23  hearing.  Sixteen-year employee, had received notice in early

24  September that he was going to be laid off.  He signed a

25  separation agreement and release of claims, and in return

                    **J&J COURT TRANSCRIBERS, INC.**

1  received a six-month severance package.  He had one of those

2  months of the six-month severance paid and he would like to

3  enforce the remaining five months of that severance package.

4         Your Honor, unlike some of the severance packages for

5  long term employees, this is one where I believe that there was

6  some quid pro quo in signing the release with Circuit City.

7  Mr. Stacia gave up rights to potentially file any claims that

8  he may have against Circuit City for discrimination under the

9  veterans' statutes.  He's a member of the reserve component of

10 the United States military, served in Iraq for a year, came

11 back, resumed his employment with Circuit City, but still

12 maintained a reserve status and was gone for weeks at a time

13 fulfilling that reserve status.  So when his employment was

14 terminated and he signed a release, he was giving up the right

15 to file anything that he may want to file claiming that Circuit

16 City discriminated against him as a member of the reserve

17 forces of the U.S. military.

18        So, Your Honor, under the Countryman test that was

19 brought to the Court's attention during the last hearing, we

20 feel like Mr. Stacia had performed his part of the bargain and

21 had completed his part of the contract by signing that release

22 in September, and the only party then to perform under the

23 contract was Circuit City, and they performed one out of six

24 months of his severance package.  And we would, for that

25 reason, say that the contract was not executory and that he had

15

1  fulfilled his part of the contract and would like for the Court

2  to reject that.

3          THE COURT:  All right.  If it's not an executory

4  contract, doesn't that just make him a creditor of the estate?

5  And then he would have a right to be able to file a claim

6  against this estate.

7          MR. RENNIE:  Yes, Your Honor.

8          THE COURT:  I mean, you're either one or the other.

9  Either you're a party to an executory contract or if there's

10  been performance, then you're a creditor.  And so I think that

11  Mr. Stacia certainly can file claims and if he has entered into

12  a release, you may very well have arguments that if there's

13  been a brief by the debtor, that would allow him to assert the

14  claims and then the debtor can defend against it as the debtor

15  sees fit, obviously.  So I would certainly encourage Mr. Stacia

16  to file his claim in the court, but if it's not an executory

17  contract, then he would be a creditor.  So in either event he

18  gets to assert his claims in this case.  Mr. Foley, do you wish

19  to be heard?

20          MR. FOLEY:  The arguments made by Mr. Stacia are very

21  similar to Mr. Wimmer and Mr. Leopold last time.  In fact, the

22  pleading is very similar.  And as Your Honor ruled last time

23  with respect to Mr. Miller's argument, this is an executory

24  contract and it should be, we're seeking to reject it and the

25  effective 365(g)(1) and 502(g)(1) is it's a pre-petition claim.

**J&J COURT TRANSCRIBERS, INC.**

1  We're obviously not seeking to have our cake and eat it too,

2  we're not seeking to enforce any release.  Whatever claims he

3  has, he has.  Whatever priority he wants to assert to have he

4  can assert them and we'll defend them in due course.  But all

5  the employees of this company have gone through a lot of

6  problems and they're not over yet, and so we just, we can't

7  treat people dissimilarly, so we think, Your Honor, that with

8  respect to Mr. Stacia's contracts, you should grant our motion

9  to reject them.

10        THE COURT:  Thank you, Mr. Foley.  Mr. Rennie, I am

11 going to find that this is an executory contract, I am going to

12 allow the debtor to reject the contract.  Of course, that just

13 gives rise to a breach and Mr. Stacia can file whatever claims

14 that he wants, and whatever level of priority that you deem

15 appropriate under the bankruptcy code and then we'll hear those

16 matters at a separate time.  I am sympathetic to all of the

17 employees of this company, but I think that Mr. Foley makes the

18 good point that everyone needs to be treated the same.  Thank

19 you.

20        MR. RENNIE:  Yes, Your Honor.  Thank you for your

21 time, sir.

22        MR. FOLEY:  Your Honor, the next respondent was Mr.

23 Jonathan Riches.  I don't know if, I believe he's incarcerated

24 so I don't know if he's represented or his -- but I'm not

25 exactly sure, I believe his claim in his handwritten letter

**J&J COURT TRANSCRIBERS, INC.**

1  says that if he objects to a settlement offer, he's a former

2  Circuit City employee of 2002 before he went to federal prison

3  for computer fraud he worked in the electronics department and

4  is vested in 401K plan and bought stock options and he says

5  some issues about his pension.  I'm not sure this is really, I

6  guess our motion was seeking to reject employment agreements,

7  not seeking to affect his rights under a 401K plan or whether

8  stock options have any value, whether his pension is being

9  affected at all.  None of that's being affected, so we would

10  ask the Court to grant a motion with respect to the contract

11  rejection aspect of the relief sought and he could reserve all

12  rights with respect to claims or anything else with respect to

13  the claim.

14          THE COURT:  The contract rejection aspect of the

15  claim will be granted and the contract will be deemed rejected.

16          MR. FOLEY:  Your Honor, I believe that leaves the

17  last respondent as Savitri Cohen, and I don't know if counsel

18  is here for --

19          THE COURT:  I think Mr. Mueller's here on behalf of

20  Ms. Cohen.

21          MR. MUELLER:  Good morning, Your Honor.  Michael

22  Mueller as local counsel for Mr. Cohen.  Mr. Cohen's counsel in

23  New York has asked me to tell you that they submit their

24  objection and offer their papers to the Court.  I have no

25  argument, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  All right.  Thank you, Mr. Mueller.  The

2     Court will approve the rejection of this contract as well

3     reserving the right of Mr. Cohen to file any claims in whatever

4     priority he deems appropriate with the Court.

5          MR. FOLEY:  Thank, Your Honor.  That brings us to

6     Item Number 23 on the agenda which is TomTom's motion for

7     relief from the automatic stay.

8          THE COURT:  All right, thank you.

9          MR. DREBSKY:  Good morning, Your Honor.

10          THE COURT:  Good morning.

11          MR. DREBSKY:  Dennis Drebsky from Nixon Peabody on

12     behalf of TomTom.  This motion, the facts surrounding this

13     motion are really not in dispute.  The legal result of those

14     facts are what we're here for this morning.  There is no

15     dispute that there was a letter agreement on October 17th for

16     the purchase of units, 125,000 TomTom units Model 125 which

17     gave rise to a claim of somewhat over $8.4 million.  Along with

18     that was a promotion to Circuit City that if they sold, for

19     every unit they sold they would get a certain number of dollars

20     back, it was Christmas type promotions that you see.  And

21     assuming, and we're assuming for the purposes of this motion

22     that they sold all the 125,000 units, this would give them a

23     credit of approximately $5.4 million.  What we're seeking here

24     this morning is the right to set off the $5.4 million credit

25     against the $8.4 million liability.

**J&J COURT TRANSCRIBERS, INC.**

1          The two basic arguments, and I'll get to it in a

2  moment, are, it's either an appropriate set off or recoupment.

3  I'll take the second of those first.  In one aspect of it, I

4  would only accept my colleague's argument.  Their view of this

5  transaction is that they're two separate contracts and

6  therefore you can't have recoupment.  Our view is under either

7  test, this is an integrated contract.  In fact, the letter

8  agreement, which is attached both to our papers and to Circuit

9  City's papers, in the purchase order, makes reference to the

10  promotion, and it says, you get the sell through credit program

11  and it says it's separately documented.

12          Clearly at the time, this was an integrated

13  transaction.  You buy the stuff, whatever you sell you get X

14  dollars back.  And under the <u>Grady</u> test, we became obligated,

15  and I know something about <u>Grady</u> having argued that, under the

16  <u>Grady</u> test, once you become obligated, that's the real point,

17  the fact that Mrs. Grady manifested her illness sometime after

18  the petition didn't make that a post-petition obligation over

19  the A.H. Robins Company.  This was, you know, fully integrated

20  to buy and to sell.

21          Interestingly, because in Paragraph 37, Circuit City

22  says they're two separate agreements.  Well, if they are two

23  separate agreements, then quite frankly, they don't get any

24  (indiscernible) of credit because they never signed the

25  promotion agreement.  And that was a term, that's why it was a

1    separate document.  You say I agree to sell these units and get

2    it back.  So if they're two separate agreements, then frankly

3    I'm arguing against the pecuniary interest of TomTom, but

4    TomTom has always viewed with all of its vendors as this was an

5    integrated thing.  It's done very Christmas, done every, you

6    know, at various times of the year.  As such, we clearly have

7    the right to recoupment.

8         Again, two separate agreements, they owe us $8

9    million, we don't owe them anything.  But we're not taking that

10   view frankly, because that's not the way we've ever viewed it,

11   we're not seeking to take advantage of that today.

12        Alternatively, the setoff argument, the pre-petition

13   obligations, they clearly signed the agreement prior, we were

14   to the extent, and we'll assume just for the moment, for the

15   sake of argument that the promotional agreement was also in

16   effect pre-petition.  The fact that there was a condition

17   subsequent that they had to sell the units in order to, doesn't

18   make it a post-petition obligation, it just doesn't do it.  I

19   mean, and the cases cited herein in our papers clearly show

20   that and the test of this circuit, as well as several others

21   are in agreement.

22        The kind of smokescreen, I'll just, I'm not going to

23   repeat every argument I put in my papers, I'm sure there are

24   other matters that are on today, is this 502 argument that

25   there might be a preference out there, we don't know, we

**J&J COURT TRANSCRIBERS, INC.**

1  haven't -- so you can't grant any relief.  If that were the law

2  that the mere allegation, not even put into papers so that it

3  would be Rule 11 is enough, it would eviscerate the setoff

4  provisions of 553, because traditionally, you don't know when

5  there's going to be an allegation of a preference.  It can be

6  at the end of the case, five years later, three years later in

7  the case.  You've got to have a lot more, and that's what the

8  case is, it should be a declaratory judgment by the Court or a

9  finding of the Court that there is preference liability here.

10 And that's what, that's in fact what Colliers, the very section

11 cited Circuit City says.  Because otherwise, it's so open to

12 abuse, you know, that there would never be a setoff right.

13        I know that, just to sum up, in the course of

14 recoupment doesn't need this Court's permission, there is no

15 automatic stay for recoupment, but we don't want to take any

16 actions here that could deem later to be violative of anything.

17 We think we have both setoff rights and recoupment rights and

18 that an appropriate order should be granted to that effect.

19        THE COURT:  Thank you very much.

20        MR. GALARDI:  Good morning, Your Honor.

21        THE COURT:  Good morning.

22        MR. GALARDI:  For the record, Gregg Galardi on behalf

23 of the Circuit City debtors.  Your Honor, I'd like to start in

24 response at the end.  First, if it is a recoupment, as I think

25 the gentleman just mentioned, he does not need an order.  If he

1  thinks it's recoupment, he doesn't have to come into the Court

2  and get an order.  And frankly, on a preliminary motion for a

3  lift stay, where I will list some disputed or questionable

4  facts, it's not appropriate to get a comfort order on a

5  recoupment.

6       So I think Your Honor first has to determine whether

7  our argument is that there is not a valid setoff is correct,

8  because if there is a valid setoff, then he's entitled to lift

9  stay.  Your Honor, he starts with the assumption that they

10 sold all goods.  We don't know if we sold all goods.  He starts

11 with the assumption that he has an allowed claim for the

12 amount.  We don't know whether he has an allowed claim to be

13 setoff or a claim to setoff.  That's another factual issue

14 based on that assumption.

15      So, Your Honor, and he starts with the fact that it's

16 a pre-petition contract that only earns value on a post-

17 petition basis.  So it's clear that the earning of whatever it

18 is to setoff was a post-petition event on a pre-petition.  So I

19 don't think it is a setoff, it's a pre-petition contract with a

20 post-petition event, we think it's a claim.  Maybe it's a valid

21 claim, who knows what claim, but it's not a setoff at all.

22 That's why we argued recoupment.  If it's recoupment, he

23 doesn't need an order.

24      Now we go back to the other arguments that we made,

25 Your Honor.  What we have though is we also have an executory

**J&J COURT TRANSCRIBERS, INC.**

1   contract under his interpretation.  His interpretation is that

2   a pre-petition contract that gave us post-petition rights which

3   on the petition date were there for an executory contract.  So

4   there is the procedural problem that we think we have in the

5   first instance, but there is no motion.  Three-sixty-five with

6   respect to executory contracts applies in the first instance

7   and we have cited Your Honor the case law that the appropriate

8   vehicle to proceed on this matter is first to proceed with a

9   motion to assume or reject the contract.  It's been neither

10  assumed nor rejected nor has even moved to assume or reject.

11          If the contract is rejected, then there will be a

12  damage claim and we can talk about what the valid amount of

13  that damage claim.  If the contract is assumed, then he may

14  have a claim for the credits, or we may have a claim for the

15  rebate.  It's simply premature in this procedural history to

16  make that determination.

17          Finally, Your Honor, it's again, a motion to lift

18  stay filed as Your Honor granted 20 and 21 on an expedited

19  basis.  They clearly received pre-petition amounts.  To set off

20  against a pre-petition claim, you have to have an allowed

21  pre-petition claim.  We believe they have preferences.  We have

22  not taken the time yet to file a complaint.  We have not even

23  taken time to file an objection.  But the supreme court has

24  said, and if you look at Section 502(d) that if you file an

25  objection he doesn't have an allowed claim and there's a

1 dispute with respect to Courts and Your Honor will see numerous

2 of these, that if you have an objection and you validly pled

3 it, the claim is neither allowed nor disallowed until such time

4 as the Court rules on that preference.

5          So, Your Honor, it seems first, premature to go

6 forward on this matter.  Two, there is evidentiary issues.

7 Three, if he's very comfortable with his recoupment, he needs

8 no order.  And the Court should not enter an abundance of

9 caution order that could prejudice our rights on the money.

10 And four, Your Honor, we think we would be deprived because

11 you're essentially saying there's an allowed claim on an

12 assumed amount that could be recouped for all time, and that

13 can have prejudicial effects on our 503(d) argument.  So we

14 would at least say, Your Honor, that there is no basis on this

15 preliminary transcript to grant the relief.  If they want to

16 schedule it for an evidentiary hearing on the lift stay, we're

17 prepared to do that.  But in any event, we think on a

18 procedural matter, the proper course for him to proceed on is

19 to seek to assume or reject the contract, because I don't think

20 the facts, even as he set them forth, show anything other than

21 this was an executory contract on the petition date.  Thank

22 you.

23          THE COURT:  Thank you, Mr. Galardi.  Mr. Drebsky, do

24 you wish to reply?

25          MR. DREBSKY:  Yes, just briefly.  First, as to the

1  amount we'll call the give give --

2          THE COURT:  Why isn't this an executory contract?

3          MR. DREBSKY:  Because it's been fully performed.

4          THE COURT:  But there's still performance that may or

5  may not be going on now as they still sell your units if they

6  have not all been sold.

7          MR. DREBSKY:  We've given them, no, the 5.4 is the

8  maximum.  We've assumed that, we've given them credit for every

9  unit.  We've assumed that the --

10          THE COURT:  You've assumed that the contract's been

11  fully performed, but the debtor could be still performing.

12          MR. DREBSKY:  If the debtor hasn't sold the units,

13  then the 5.4 would be less than -- we've given them that

14  assumption.  That's it.  You know, we assume that during the

15  Christmastime you've sold 125,000 units.  So they're getting

16  the full benefit, assuming that there is a give-give here, of

17  the give-give program.  What we're seeking is that we have the

18  right to setoff, the 8.4 which is a contract amount.

19          THE COURT:  Right.

20          MR. DREBSKY:  Against that under either theory that

21  we've put forward.  There's no, you know, this is smoke and

22  mirrors to delay.  We want to make sure that they don't get a

23  windfall here.  We want, we have fully performed this

24  agreement, we shipped the goods, we've given them full credit

25  for the give-give program.  This is an accounting, that's all,

1 we're not talking, no party has to do anything that changed

2 money here.  That's all.  And that's not an executory contract.

3 It's just the payment of money, or the reconciling, if you

4 will, of debts against credits.  I mean, accounting 101, that's

5 all that's left and that doesn't make it executory.

6        THE COURT:  All right.  Thank you.  The Court's

7 going to set this down for a final hearing.  I do think we need

8 to have evidence on a number of these points, and I'll set the

9 final hearing for the, February 13th is one of our omnibus

10 dates?  We'll set it down for February 13 and I'll hear

11 evidence on this at that time and make a ruling on that day.

12        MR. DREBSKY:  Okay.  And I guess what we'll try to do

13 before them is stipulate to the facts that we can stipulate to

14 so --

15        THE COURT:  Obviously as many facts as you can

16 stipulate to, the Court would welcome that.

17        MR. DREBSKY:  Yes, because I think 90 percent of, at

18 least, we can stipulate to.

19        THE COURT:  Very good.  Thank you, Mr. Drebsky.

20        MR. DREBSKY:  Thank you very much.

21        MR. GALARDI:  And, Your Honor, I seem to remember a

22 section of the Bankruptcy Code that the final hearing has to be

23 within 30 days.  To the extent that this is not within that 30

24 days, we'll concede an extension.

25        THE COURT:  I'm extending the stay.

1          MR. GALARDI:  Thank you.

2          MR. DREBSKY:  Yes.  No problem with that.

3          MR. FOLEY:  Your Honor, the next matter on the

4   agenda, I believe, is Number 24, which is the motion to

5   terminate the stay by Engineered Construction.

6          MR. PETCHER:  Good morning, Your Honor.  Rhett

7   Petcher from Seyfarth Shaw on behalf of Engineered Structures

8   Inc.  Your Honor, we're here today with respect to ESI's motion

9   for relief from stay to allow prosecution of the statutory

10  mechanics' liens, foreclosure actions and then subsequent

11  foreclosure on the real property.

12          ESI is a general contractor that provided goods and

13  services to Circuit City in connection with new construction

14  and remodeling at four sites, Store Number 3878 in Brea,

15  California, Store Number 4313 in LaHabra, California, Store

16  Number 3745 in Santa Clarita, and Store Number 3396 in Palm

17  Desert.  It's our understanding, Your Honor, that Circuit City

18  is not opposing our motion with respect to the last two stores

19  I listed because they've been closed and the leases have been

20  rejected.  It's my understanding that they have indicated they

21  will work with us for a stipulated order which we'll then

22  present to the Court.

23          With that in mind, Your Honor, I'm just going to

24  focus today on the two stores which I'll call the going forward

25  stores, where Circuit City has indicated they at least have not

 1  yet decided whether to assume or reject the leases.

 2          Your Honor, the liens came about as a result of

 3  contracts that were signed to remodel the relevant properties

 4  in February of 2008.  The premium notices were served on April

 5  of 2008 and then as of the petition date, ESI was owed on the

 6  Brea property, approximately $119,000 and on the LaHabra

 7  property, approximately $247,000.  ESI filed its claim of lien

 8  on the Brea property on November 10th, which is the petition

 9  date and would need to foreclose on pursuant to California law

10  by not later than February 6th.  With respect to the LaHabra

11  property, the lien was, the claim of lien was filed on November

12  12th.

13          With respect to the timing of those liens, under

14  California code and the Bankruptcy Code, it's California Code

15  Section 3134 and Bankruptcy Code Sections 362 and 546.  Those

16  liens relate back to the start of work and so should be treated

17  as perfected despite the fact they were filed post-petition.

18          I think, Your Honor, based on my understanding of

19  Circuit City's objection to our motion that the issue really

20  comes down to whether or not there is cause for relief from the

21  stay with respect to these two properties and whether the

22  balance of prejudice weighs in favor of ESI or Circuit City.

23  We acknowledge, Your Honor, that the burden is initially on ESI

24  as the movant to establish that we have cause from relief from

25  the stay and that the burden then shifts to Circuit City to

1  rebut any finding of cause.

2          Under In re Borage, which is out of the Eastern

3  District of Pennsylvania and as supported by -- I apologize,

4  Your Honor -- as supported by In re Robins of the Fourth

5  Circuit, essentially the duty of the Court is to balance the

6  potential prejudice of the bankruptcy estate versus the

7  hardships that ESI may suffer if the stay is not lifted and

8  grant relief on that basis.  This Court has indicated in the

9  In re Robinson case that there are usually about four factors

10 that are considered in this, including whether the issues

11 relating to the action that is stayed are state law versus

12 bankruptcy issues or that modifying the stay will promote

13 judicial economy, whether the bankruptcy case will be disrupted

14 in the event that the stay is not lifted, and then finally

15 whether the estate will be prejudiced as it relates to, as

16 compared to the movant.

17         Your Honor, here I think the balance of harm weighs

18 heavily in favor of ESI.  First, Your Honor, as Circuit City

19 has pointed out, there are two separate interests that the lien

20 has been placed on.  The first is the fee simple interest of

21 the landlord, which is not subject to the bankruptcy estate,

22 and the second is the lease hold interest of Circuit City with

23 respect to its interest, its own interest in the property.  We

24 acknowledge that that's a property right that they have in

25 these properties.  And the problem, Your Honor, is that the

1   stay doesn't apply as to the running of the statute of

2   limitations for the fee simple interest of the landlords.  And

3   so ESI is forced to move forward with respect to any

4   foreclosure proceeding despite the fact that it is not allowed

5   to do so with respect to the lease hold interest.

6        This is problematic for a couple of reasons, Your

7   Honor.  First, Circuit City, first, Your Honor, the uneven

8   application is going to result in, potentially result in ESI

9   forfeiting some of the value of this lien because it's moving

10  forward on a foreclosure on a partial basis, and under

11  California law that could be problematic in that it could

12  forfeit the remaining value of its lien to the extent that it

13  doesn't move forward and foreclose on all of the interest at

14  the same time.

15        Second, Your Honor, even if the interest isn't

16  extinguished, Circuit City's interest wasn't extinguished, it

17  would result in piecemeal litigation for ESI, because we would

18  first have to litigate, liquidate, litigate and foreclose upon

19  the fee simple interests and then would have to come back and

20  re-litigate those issues, those identical issues again against

21  Circuit City at a later date.  This is going to cause multiple

22  actions on the same issues and is going to result in

23  duplicative litigation.

24        Additionally, Your Honor, ESI will be subject to

25  continued claims of the subcontractors to the extent it's not

1 allowed to continue pursuing these litigations.  We've

2 submitted an affidavit that shows that there have been a number

3 of subcontractors who have made claims directly against ESI as

4 opposed to the bankruptcy estate.  These are claims that would

5 normally need to be paid out of the monies due to ESI from the

6 estate and the stay has placed ESI in a position where they

7 would, as the claims continue to come in, would need to be

8 paying the bankruptcy estate's obligations out of their own

9 money because the stay is currently in place as to these

10 foreclosure proceedings.

11        Finally, Your Honor, we believe that this could

12 actually result in a net positive for the bankruptcy estate to

13 the extent that these actions are allowed to go forward

14 together, you can see a situation where the landlord satisfies

15 these obligations which would essentially eliminate some of

16 these claims from the need for the estate to ultimately satisfy

17 them.

18        Finally, Your Honor, it's our belief that Circuit

19 City has not yet made any sufficient allegation relating to

20 their own prejudice.  They've raised two primary issues.  One

21 of them is that the foreclosure actions would harm the

22 negotiations with the owners of the properties as they're

23 negotiating these, renegotiating some of these leases.  Your

24 Honor, frankly, they're going to need to, if they're going to

25 assume these leases, they're going to need to sure any liens or

1  any other deficiencies here which means that this is part of

2  those negotiations whether the foreclosure action is proceeding

3  or not.

4          Second, Your Honor, they argue that the lien could

5  hurt their operation of the stores.  However, this is an in rem

6  proceeding, it's against the property itself. It wouldn't

7  affect their ability to continue to operate those stores until

8  such relief was granted.  Even then there's numerous ways to

9  resolve this that involve non-estate property which could

10 ultimately result in a resolution without affecting their

11 ability to continue operations of these stores.

12         THE COURT:  These leases, the debtor has a very short

13 time within which it has to make a decision whether it's going

14 to assume or reject these leases, and that time is fast

15 approaching in this case.  If we didn't grant your motion until

16 that time so the debtor had an opportunity to fully analyze its

17 situation, what is the prejudice to you by delaying it for just

18 that period of time?

19         MR. PETCHER:  Your Honor, I believe that the

20 prejudice there is the fact that the lease rejection dates

21 happen after the statutory period for foreclosing upon these

22 liens and the prejudice the prejudice then at that point would

23 result from the fact that these liens would expire as to, if we

24 were required to do them piecemeal, in other words, we would

25 have to move forward against the landlord themselves and

1 potentially extinguish the, in that foreclosure proceeding,

2 potentially extinguish our rights to recover against the

3 Circuit City portion of the lien.

4       THE COURT:  And if you're stayed by this Court, you

5 would still lose your right under California law to pursue your

6 mechanics' lien?

7       MR. PETCHER:  Your Honor, there's some concern about,

8 the concern is the all or nothing approach.  There's some --

9       THE COURT:  It's the piecemeal aspect of it that

10 you're worried about.

11       MR. PETCHER:  It's the piecemeal aspect of it which

12 we're worried about and it's not completely clear, Your Honor,

13 that we would not lose that.  There's certainly arguments on

14 both sides there, Your Honor, but we're concerned about that.

15 But we're also concerned about the piecemeal aspect.  I mean,

16 the prejudice is also the fact that this litigation would have

17 to happen twice when it could very easily happen once.  It's a

18 state law action which is something that again is supposed to

19 weigh in favor of lifting the stay.  And based on those, those

20 are the two primary issues that with respect to the prejudice

21 there.

22       THE COURT:  And what do you have to do under

23 California law to perfect your lien or to go forward with it as

24 this point?  In Virginia we have to file a lawsuit within a

25 certain period of time.  Is that what you have to do in

1 California?

2        MR. PETCHER:  I believe that is correct, Your Honor,

3 yes.

4        THE COURT:  And what if I was to grant you limited

5 relief to allow you to file your lawsuit, but not to pursue it

6 until such time as the debtor makes a decision about whether

7 it's going to assume or reject the contract.

8        MR. PETCHER:  Your Honor, to be perfectly honest, I

9 can't answer that question today.  I am not sure if just

10 initiating a lawsuit, I believe that the law is the same, but I

11 cannot with certainty state that to you today.

12        THE COURT:  All right, thank you.  Let me hear from

13 Mr. Galardi.

14        MR. GALARDI:  Your Honor, now I'm to the place that I

15 think we were going to suggest, Your Honor.  One, we have a

16 hearing, I think it's January 29th.  We're concerned about two

17 aspects.  One is if there's a foreclosure to be dispossessed

18 and then the landlord also seeking claims against us as an

19 administrative expense where this in our view is a pre-petition

20 expense even it's an obligation under the lease.  Two is that

21 we haven't actually had the opportunity to review the lease to

22 see if such a foreclosure action is a grounds to have us taken

23 out of the property.  What I was going to suggest, since I

24 understand that there's a February 6th date, was to simply move

25 this over.  Again, we would have no problem if all they had to

1  do was file a complaint and stay that action until the decision

2  to assume or reject these leases is determined.

3           THE COURT:  That's how we handle it in Virginia.

4           MR. GALARDI:  And so we would be perfectly fine with

5  that.  And if they had to actually pursue it, I think we could

6  work out something so long as we don't get dispossessed until

7  we make a decision and as long as there's no claims against us

8  or no expenses incurred by us, then I think we can work that

9  through, I think that so as a preliminary matter, what I'd ask

10  is to move it over to the 29th to try to work exactly on that

11  stipulation.  No time period would run by that time period.

12  Then we can see if we can do a stipulation where they can file

13  a complaint, familiarize ourselves with what other steps have

14  to do the lease.  And I don't think there's any prejudice

15  because the date that seems to be driving this is, again, the

16  February 6th date, and we have a hearing before then.

17           THE COURT:  All right.  That's what the Court's going

18  to do.  I'm going to set it down for a final hearing on the

19  29th of this month and I would encourage counsel to get

20  together and see if you can fashion some limited relief that

21  would allow you not to be prejudice on your claim.  That's

22  quite normal in mechanics' lien situations, at least in this

23  state and states around here.  We can fashion the same relief

24  under California law.  That would be the Court's hope.

25           MR. PETCHER:  Your Honor, may I approach?


**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Yes, you may.

2          MR. PETCHER:  One other thing, Your Honor, I just

3    want to seek permission from the Court to also, to submit a

4    separate order with respect to the two of the closed stores.

5    The reason for that is there are actual litigation filed

6    against ESI and we'd like to go ahead and get that moving

7    forward more quickly.

8          THE COURT:  And that one I understand, there's no

9    objection and the Court will grant that relief.

10          MR. GALARDI:  That's correct, Your Honor.  We've

11    rejected those leases.

12          MR. PETCHER:  Thank you, Your Honor.  We'll submit an

13    order.

14          THE COURT:  Okay.  Ms. Hudson.

15          MS. HUDSON:  Your Honor, are we on Number 25?

16          THE COURT:  We're just about to be on 25.

17          MS. HUDSON:  Okay.  Lisa Hudson here on behalf of

18    North Plainfield VF LLC and Marlton VF LLC here on the motion

19    to compel debtor's performance with post-petition obligations

20    under 365(d)(3), another mechanics' lien issue, Your Honor.  We

21    filed this motion to compel on behalf of two New Jersey stores,

22    North Plainfield and Marlton, and it involves post-petition

23    obligations that are not limited to rent, rent for December and

24    January, but also a mechanics' liens, to remove those liens

25    that exist and to keep the property free and clear of liens.

1  We're looking at approximately 1.7 million in liens with

2  respect to those two stores in New Jersey, Your Honor, and also

3  the post-petition rents in the amount of $173,000

4  approximately.

5          As Your Honor may recall, you entered after first --

6          THE COURT:  Is this stub rent or is this other kind

7  of rent?

8          MS. HUDSON:  This is other rent, Your Honor.

9          THE COURT:  Okay.

10         MS. HUDSON:  With respect to first day motions, Your

11 Honor entered an order that allowed debtors to satisfy liens to

12 prevent contractors from walking off job and refusing further

13 services and to prevent jeopardizing relationships with

14 landlords.  So we have that order in place, and I don't believe

15 from reading Mr. Foley's response, that there are any facts in

16 dispute, but it is going to come down to mechanics lien law in

17 here, New Jersey.  So we have Store 4142 at issue and Store

18 4133, and there were approximately a million dollars in

19 mechanics lien leases at the time we filed this motion.

20         Since we filed Schimenti, I believe I'm pronouncing

21 it correctly, on January 8th or 9th also filed theirs for an

22 excess of 600,000.  So we're just over 1.7 million now for

23 those two stores.  And as I spoke before, we're seeking relief

24 under 365(d)(3) to perform all post-petition obligations under

25 the lease which not be limited just to rent.  And where we come

**J&J COURT TRANSCRIBERS, INC.**

1 into play with all obligations is citing at least the <u>Genex</u>

2 case of the District of Maryland that says things like in

3 enumeration, utilities, CAM, rent, attorneys fees, all of those

4 things are loaded into all post-petition obligations, not just

5 rent.  And then --

6          THE COURT:  The claim was, the mechanics' lien claim

7 was asserted post-petition, but did the claim arise

8 post-petition?

9          MS. HUDSON:  Were it performed pre-petition, Your

10 Honor, filed post-petition and the actual leases at issue here

11 for both of those are identical because they're under the same

12 landlord group and that's another kind of layer here, because

13 Paragraph 13 of those leases say that the landlord and the

14 tenant are going to covenant, that if there are any liens there

15 that they will be removed and that that will be done within 30

16 days after receipt of written notice.  So there's another

17 layer, if you will, of analysis here that an obligation arises

18 at the time the debtor's given notice, and those notices all

19 occurred post-petition as well.  So --

20          THE COURT:  But if I compel the debtor to do this, I

21 would be compelling the debtor to be paying a pre-petition

22 obligation?

23          MS. HUDSON:  Well, the facts are a little bit, the

24 facts further enumerate a different result, I think, Your

25 Honor.  With respect to the first property in Marlton, there

1 was five liens and then with respect to the second one, there

2 was a Maglio lien and that's since been discharged after we

3 filed the motion by Maglio.  And then there was the Schimenti

4 lien that added onto North Plainfield.  But debtor's papers say

5 that if they record it post-petition, that that is a violation

6 of the stay and it's void ab initio.  Well, we're not going to

7 obviously argue if those liens are void ab initio to the extent

8 that the debtors have no obligation so long as that relief also

9 protects us.  The problem here is the one lien, Train, in the

10 Marlton property was pre-petition work and recorded

11 pre-petition, but because I had explained to you that Paragraph

12 13 in the lease says the debtor's obligation arises at the time

13 they get that 30 days notice, that occurred

14 post-petition.

15          So it's our argument that under 365(d), to the extent

16 that any of those liens are not bound to, are not void ab

17 initio by the violation of the automatic stay, namely the

18 Train, that that lease provision is an overlap and that 30-day

19 notice requires that to be characterized as a post-petition

20 obligation and 365(d) would pick up there.  So we would like

21 relief for them to be compelled to remove that lien and for us

22 to have an administrative expense claim.  And if this Court

23 would not grant that relief, that we would reserve the right to

24 later, in State court remedies and mechanics liens laws under

25 New Jersey contest that and be indemnified for having to remove

1 it.

2         THE COURT:  Let me ask you the same question I asked

3 Mr. Petcher that was here just a moment ago and arguing about

4 the California Mechanics' lien laws -- excuse me just a minute.

5 Would all the parties on the phone please set your phones to

6 mute -- I'm sorry, Ms. Hudson.  And that question is, why don't

7 we set this over until such time as the debtor is going to have

8 to make their determination whether to assume your lease or

9 reject it, because if they're going to, if they decide to

10 assume the lease, then they're going to be have to, this would

11 be one of the cure components of their obligation to enable

12 them to assume the lease.

13         MS. HUDSON:  Well, Your Honor, I guess in one

14 instance, I mean we have the rents of $173,000 compounding and

15 even post-petition we have more of these liens globbing onto

16 the process.  They're enjoying the benefit of the space and

17 time is money and the landlord is prejudiced.  But secondly,

18 one of our leases, North Plainfield, is up today later on the

19 agenda in the docket of the Court for rejection.  So absolutely

20 up to the point of rejection, if this Court were to enter that

21 order today, hopefully that time line wouldn't be nunc pro tunc

22 or retroactive or anything, we need that relief with respect to

23 that property immediately.  For Marlton, arguably, Your Honor,

24 relief as quickly as possible would be acceptable.  But for

25 North Plainfield, we have a pending motion to reject.

1          THE COURT:  All right, thank you.

2          MS. ELGIE:  Good morning, Your Honor.  Tara Elgie

3    here on behalf of Schimenti Construction Company.  Also on the

4    phone are Peter Strniste and Patrick Birney, motions for

5    appearance pro hac vice have been filed for them.  Schimenti

6    has joined in the North Plainfield motion.  We did file one of

7    the liens.  We would distinguish what the debtor argued with

8    respect to the void ab initio argument for a post-petition

9    liens, because what we did was file the lien against the ground

10   lease and the land only.  This does not affect the debtor's

11   property.  But we would join in the motion to have the

12   365(d)(3) obligations paid.

13         THE COURT:  All right, thank you.  Anybody else?  All

14   right, Mr. Galardi, you wish to respond?

15         MR. GALARDI:  Your Honor, first let me take the

16   construction company's lien.  I think it's the same situation

17   that we have just dealt with.  If it's only an against the

18   ground lease and it doesn't affect the foreclosure, I have no

19   objection to that.  I don't know, and there is case law that

20   says even if you go even against the ground lease, as the

21   gentleman acknowledges, that can be an actual violation of the

22   stay because it could have an effect on our possessory right

23   with respect to the property.  So I would suggest that we

24   resolve that one on a separate lift stay at some point when

25   they do it and we reserve all our rights with respect to the

1  construction company.

2          Your Honor, I think it's uncontested, and I think

3  this actually goes back to the billing date and accrual

4  approach, because, and it's complicated by a lien approach.

5  Basically I think all of the work was done pre-petition.  The

6  contract says, let's assume the contract says it's due 30 days

7  when the lien arises.  But it's still just very much like the

8  taxes that arisen pre-petition or anything else.  Under the

9  accrual method, they're trying to squeeze a 365(d)(3) billing

10 date approach to get us to pay these liens.  That's not how the

11 law works under the accrual method.  If the work was done

12 pre-petition, even if was a payment obligation under this, the

13 accrual method says these are the obligations that arose during

14 that period of time that had to arise after the case.

15         So we would argue that, first, Your Honor, that these

16 bills, as she admits are pre-petition obligations, so even if

17 they come under the timely payment 30 days later or 40 days

18 later, it's only for that which is post-petition, so we would

19 suggest, Your Honor, it's really a cure issue as Your Honor has

20 pointed out.

21         Your Honor, also, again, just because the liens

22 relate back, the only reason the perfection happens is the

23 liens relate back to the post-petition.  So again, it's

24 pre-petition claims, but they're being elevated.  We don't

25 think it's a 365(d)(3) obligation under the accrual method.  I

**J&J COURT TRANSCRIBERS, INC.**

1  think one even is in the stub rent period.  So it's again, goes

2  to the reconsideration motion even if it was perfected and even

3  due, it's probably in that stub rent period as I recall, and we

4  would argue that that's not necessarily payable at this

5  particular time.  So, Your Honor, we would ask that Your Honor

6  not grant the motion to have us pay these at this time.  That

7  this way of either assumption or rejection under the accrual

8  method and under the, that these are simply pre-petition

9  obligations that the landlord is trying to elevate to a

10 post-petition obligation.  But all rights reserved, if it's a

11 post-petition obligation, then it's simply an accrual issue or

12 it's an administrative expense, perhaps, in the stub rent

13 period.

14        THE COURT:  Thank you, sir.  Ms. Hudson, do you wish

15 to reply?

16        MS. HUDSON:  Your Honor, only with respect to a

17 clarification under the lease.  It says it better than I could.

18 In Paragraph 13 on this issue of the notice period, it says

19 expressly that should a lien be filed, the party whose

20 nonpayment of the contract or causes the lien to be filed shall

21 within 30 days after receipt of written notice of the lien

22 cause it to be removed.  So we admit for the Train lien that it

23 was pre-petition work and it was recorded pre-petition, but

24 that notice, all of it occurred unarguably and undisputedly

25 post-petition and that notice is when the obligation arose by

1  the parties in the contracting language.

2           THE COURT:  I understand that.  But speak to Mr.

3  Galardi's argument about the accrual method and the way that we

4  do that as opposed to the billing method.  I mean, I understand

5  that the obligation said it was to be paid at that particular

6  time.  But the debt accrued pre-petition.

7           MS. HUDSON:  That's ignoring New Jersey Mechanics

8  Lien Law.  All the case law on bankruptcy says you look to the

9  underlying state law, and New Jersey is not a lease like

10 Virginia or Arizona, in New Jersey it's at the time of

11 recording, it's at the time of perfection.  When the work is

12 performed is irrelevant.  It is not a relation back state.

13 Because New Jersey is different, their Designer Doors case in

14 Arizona is inapposite.  Designer Doors is an Arizona/Virginia

15 case that says you do relate back.  But New Jersey is not a

16 relate back, it is at the time that that lien is recorded or

17 perfected and filed.  It is not at the time that the underlying

18 work was performed.

19          THE COURT:  Then it would be a post-petition matter

20 that would be stayed by the automatic stay.

21          MS. HUDSON:  Void ab initio.  Yes, Your Honor.  So it

22 would not be an obligation with respect to the debtors, and

23 we'd like that relief to apply to us as well.

24          THE COURT:  Is that what your motion says?

25          MS. HUDSON:  Our motion says to the extent that any

**J&J COURT TRANSCRIBERS, INC.**

45

1   of these obligations are found to exist, that we would like the

2   debtors to be compelled under 365(d)(3), and then their reply

3   stated argument about the void ab initio under the automatic

4   stay, and we just join in that relief, and to the extent that

5   any are found not void ab initio, just echo our 365(d)(3)

6   argument.

7               THE COURT:  All right, thank you.

8               MR. GALARDI:   Your Honor, may I just add something?

9               THE COURT:  Yes.

10              MR. GALARDI:  I'm going to try to -- with respect to,

11  and we've cited a case, with respect to the landlord and us,

12  our argument is essentially it's not a 365(d)(3) timely payment

13  obligation which is why we get treated differently than the

14  landlord.  We're not trying to superceded New Jersey lien law.

15  New Jersey lien law applies to, between the two parties behind

16  me, the lien arises against the owner of the property at that

17  time.  So I think the stay only applies to us.  Obviously third

18  parties don't get the stay, and our argument is essentially,

19  this shows it's not a 365(d)(3) timely payment obligation under

20  the accrual method.  And I think that's how we've tried to

21  simplify the analysis.

22              THE COURT:  Thank you.

23              MS. HUDSON:  Your Honor, I just have one point of

24  follow up.  With respect to the question of whether these are

25  all pre-petition obligations, factually I'm not sure with

1 respect to all of the Schimenti claims.  However, I would point

2 out that some of the matters at issue are retainage, and that's

3 not property of the estate either, Your Honor.  So we would

4 argue that that affects the analysis.  Furthermore, I think

5 there was a comment made about the Maglio lien.  While that

6 lien was released, it's actually subsequently been re-filed,

7 and that is subsumed within the Schimenti lien.

8        THE COURT:  All right.  Well, don't I have to analyze

9 your claim in the context of a motion for relief from stay as

10 opposed to a joinder in the debtor's motion to compel payment?

11        MS. HUDSON:  Well, Your Honor, you know, we certainly

12 join in the motion, we can bring a subsequent motion for relief

13 from stay if Your Honor thinks that that would allow you to

14 resolve the lien specific issues.

15        THE COURT:  Well I'm not telling you how to practice,

16 I'm just saying that I think that the kind of relief that

17 you're asking for is more appropriate in that kind of a

18 context.  The motion as I understand that before me is a motion

19 to compel the debtors to perform a specific provision under a

20 lease.

21        MS. HUDSON:  And we would join in that, Your Honor.

22 Thank you.

23        THE COURT:  Okay, thank you.  All right.  Any other

24 party wish to be heard?  All right, Ms. Hudson, I'm going to

25 deny your motion to compel.  I think that for reasons that Mr.

1 Galardi just stated, I don't think that the stay extends to the

2 landlord, it's for the benefit of the debtor.  And to the

3 extent that it was a pre-petition obligation, the accrual

4 method would not obligate the debtors to make the payment.

5          MS.  HUDSON:  Your Honor, can we ask that proposed

6 findings of fact and conclusions of law be prepared?

7          THE COURT:  Yes.  Mr. Galardi, if you could submit

8 proposed findings of fact and conclusions of law for the

9 Court's consideration.  And, Ms. Hudson, you can submit your

10 own as well.

11          MS. HUDSON:  Thank, Your Honor.

12          MR. GALARDI:  Your Honor, when would you like those,

13 Your Honor?  Ten days?

14          THE COURT:  Ten days.

15          MR. GALARDI:  Thank you.

16          MR. POMERANTZ:  Good morning again, Your Honor.  Jeff

17 Pomerantz from Pachulski, Stang, Ziehl and Jones on behalf of

18 the Creditors' Committee.  Item 26 on Your Honor's agenda is

19 the Creditors' Committee's application to employ Protiviti as

20 financial advisor.  At the time that the agenda was prepared

21 there were discussions going on between the debtor and the

22 Committee which have been resolved and we have BOP'd the order

23 on that application.

24          THE COURT:  I saw the order there, I was wondering if

25 that had been resolved.  So that order will be entered.  Do you

1  wish to be heard on that?

2      MR. GALARDI:  Your Honor, yes.  That's been resolved.

3  I just, when we get to the next financial advisor, one of our

4  concerns was two financial advisors given subsequent events, I

5  just wanted to put that on the record when we get.

6      THE COURT:  All right, thank you, sir.  All right.

7  So the application to employ Protiviti will be approved.

8      MR. POMERANTZ:  Your Honor, Item Number 27 on Your

9  Honor's agenda is the Committee's application to employ

10  Jeffries and Company as the Committee's investment banker and

11  financial advisor.  We've had discussions with the debtor with

12  respect to the Committee's retention of Jeffries.  I believe in

13  concept the debtor had no opposition to the Committee's

14  retention of Jeffries and we've worked out the compensation

15  arrangements which turned on the application of the transaction

16  fee provided in there, and that has been resolved.  I think

17  we've also resolved that the Committee should be authorized to

18  employ Jeffries through the, at least the end of the month, and

19  we have an order that has circulated that would involve the

20  Committee's application being granted, Jeffries being employed

21  through the end of the month on the transaction fee schedule

22  that is contained in that order.

23      Mr. Galardi raised to the Committee several days ago

24  the concern that depending upon the outcome of his case, it may

25  be that Jeffries' employment should not continue beyond a

1  certain period of time and that the Committee should not have

2  two financial advisors.  The Committee is very mindful of it's

3  duty to only employ financial advisors and professionals that

4  make sense and to keep costs down and given the uncertainty,

5  though, surrounding the case the last couple of weeks we

6  believe that the best approach was to continue to January 29th

7  solely the issue of the extent to which Jeffries would be

8  continued to be employed after that period of time.  The

9  Committee will consider that issue in light of events how

10 they've turned out the last few days.  We'll meet and hopefully

11 we'll reach a resolution with the Debtor.  If for some reason

12 we can't reach a resolution we would be back here, Your Honor,

13 on January 29th arguing the continued employment which may

14 contain modified terms based upon changed circumstances.

15          THE COURT:  All right.  Thank you.

16          MR. POMERANTZ:  Thank you.

17          THE COURT:  Mr. Galardi?

18          MR. GALARDI:  Your Honor, Mr. Pomerantz has described

19 the discussion.  As yesterday was the sale transaction day and

20 we hope to approve a transaction, we would be attaining the

21 position as with our own financial advisors that investment

22 bankers are probably no longer necessary after the end of the

23 month and that's really the reason I rose both with respect to

24 productivity and Jeffries I think we'll be down to one and we

25 think they should be down to one so to speak by that time.

1  But, let's see how the facts and circumstances go and we've

2  agreed to adjourn that particular issue until the 29th.

3          THE COURT:  Thank you, sir.  And, so as I understand

4  it then I'm going to approve the employment of January and then

5  we'll consider on the 29th of this month the role of this

6  professional going forward past January?

7          MR. GALARDI:  Yes, Your Honor, you'll approve it

8  through January.  They were hired immediately after the

9  appointment of the Committee in November, so it would be

10  November through January.  Your Honor would also be approving

11  the transaction fee as agreed to by the Debtor and the

12  Committee with the sole issue remaining is the continued

13  employment if, in fact, that is something that Your Honor needs

14  to address that can't be resolved.

15          THE COURT:  Thank you.  That will be approved.

16          MR. GALARDI:  Thank you, Your Honor.  Item Number 28

17  on Your Honor's agenda is the Committee's application to employ

18  the law firm of Gowling, Lafleur, Henderson as Canadian

19  counsel.  As Your Honor is aware there's a Canadian proceeding

20  pending in Canada and the Committee had believed it necessary

21  to retain counsel.  Initially, there was an objection by the

22  Debtor to the Committee's authority and appropriateness of them

23  retaining Canadian counsel.  We have since resolved that and

24  that order has been BOP'd to Your Honor.

25          THE COURT:  And that will be approved.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. GALARDI:  Thank you, Your Honor.  Your Honor, I

2     think we go to the jury box for Number 29 if I'm not mistaken.

3     I think it's the landlord's motion for rehearing and

4     reconsideration.

5          THE COURT:  All right.  Thank you.

6          MR. EPPS:  Good afternoon, Your Honor.

7          THE COURT:  Good afternoon, Mr. Epps.

8          MR. EPPS:  A.C. Epps, Jr. on behalf of the landlord's

9     who have filed Docket Number 1347, also clients who our firm

10    have joined in docket Numbers 1363 and 1375.  There are other

11    landlords represented by other counsel who have also joined,

12    but those are our three items.

13         Your Honor, I appear fairly certain that the Court

14    felt that it had dispensed with me once before on this issue

15    and for that I apologize, but I'm afraid it hasn't and I'd like

16    to explain why we're back in the procedure which we're back in

17    if you don't mind.  The Court may recall that we've brought

18    this motion --- these various motions for a payment and they

19    were in front of the Court originally on its docket for the 5th

20    of December which was, in fact, the first Omnibus hearing in

21    this case.

22         UNIDENTIFIED ATTORNEY:  Your Honor?

23         MR. EPPS:  This --

24         UNIDENTIFIED ATTORNEY:  Excuse me.

25         THE COURT:  Is there someone on the phone who wishes

52

1  to speak?

2           UNIDENTIFIED ATTORNEY:  I'm sorry.  I think that I

3  just -- somebody has obviously put the call on hold and I could

4  not hear the Court through the classical music playing.  It

5  just went off.

6           UNIDENTIFIED ATTORNEY:  No, it's still on.

7           UNIDENTIFIED ATTORNEY:  It is, Your Honor, if you --

8           UNIDENTIFIED ATTORNEY:  Could everyone just hang up

9  and call back in so we can lose whoever is not on the phone and

10 we could hear the hearing?

11          THE COURT:  I think in light of the circumstances

12 that makes good sense.  If everyone would please --

13          UNIDENTIFIED ATTORNEY:  And hopefully -- or could you

14 disconnect -- you might have to disconnect that person somehow

15 after we've all hung up and called back in like five minutes.

16          THE COURT:  I can do a lot of things, but I don't

17 know if I can disconnect --

18                     (Laughter)

19          MR. CLARK:  My name is John Clark.  I just talked to

20 technical services.  They're looking into it and they're going

21 to try and disconnect that person.

22          THE COURT:  Okay.  Thank you.  And then I would ask

23 everyone else to please just be patient and -- until we can get

24 that done and then set your phone to mute.  Thank you.

25          UNIDENTIFIED ATTORNEY:  Okay.


                    **J&J COURT TRANSCRIBERS, INC.**

53

1          UNIDENTIFIED ATTORNEY:  Thank Your Honor

2          UNIDENTIFIED ATTORNEY:  Your Honor, would you like to

3   wait for five minutes or should we proceed?

4          UNIDENTIFIED ATTORNEY:  It sounds like they got it

5   done.

6          THE COURT:  I think that --

7          UNIDENTIFIED ATTORNEY:  Your Honor, it appears to

8   have cleared up.

9          THE COURT:  All right.  Thank you.

10          UNIDENTIFIED ATTORNEY:  I was just telling this

11   person who just got back from being on hold you had music

12   playing.

13          MR. EPPS:  In any case, Your Honor, we were here on

14   the 5th of December which was the first Omnibus hearing -- the

15   first hearing other than the first day hearings.  Discussions

16   with Mr. Galardi on that day resulted in an agreed postponement

17   of the hearing until the 22nd with our treating it as though

18   you were hearing it on the 1st for the promptness question

19   purposes.

20          At the hearing on the 22nd, the Court heard me out.

21   It then decided that it was not going to order the Court to

22   make -- order the Debtors to make the payments that we had

23   requested at that time.  The Court's ruling on the record which

24   I will point out in a second was quite sketchy and I had

25   requested that the -- there would be findings and conclusions.

**J&J COURT TRANSCRIBERS, INC.**

1          Later in the hearing, the Court pointed out to

2    Debtors' counsel that it would like the Debtors' counsel to

3    produce findings and conclusions.  That has not happened.

4    There are no findings and conclusions submitted to the Court,

5    at least, as of ten o'clock last night.  What there is is a

6    docket entry from a day or so later from, I believe, made by

7    Ms. Fathergill that says that you have denied our motion.

8          Now, personally, I am pretty comfortable that in a

9    Fourth Circuit that doesn't have any effect.  Other places in

10   the country that may not be the case and certain of our clients

11   who are very, very nervous about that.  And, furthermore, to

12   add confusion to the situation already somewhat confused we

13   inferred correctly or incorrectly from something that was

14   discussed at one point with the Debtor that perhaps the Debtor

15   was going to take that position that our ten days had started

16   to run.

17          THE COURT:  For mostly an appeal?

18          MR. EPPS:  Yes, sir.

19          THE COURT:  That's from the date of the entry of the

20   order --

21          MR. EPPS:  That's my understanding, too.

22          THE COURT:  -- and I have not entered an order.

23          MR. EPPS:  But, we were -- that was my feeling, too.

24   I, certainly, did not want to be tripped up by an interim

25   discussion on the other issue.  But, at that point we still had

55

1    no findings and, indeed, as I say we still have no findings.

2           Now, the case will never get appealed if we never

3    have any findings.  We did not know what --

4           THE COURT:  Or I could authorize you to submit

5    findings.

6           MR. EPPS:  You could, Your Honor, and I would be

7    willing to do that.  I don't know whether the Court -- the

8    Court's oral record on this consists of about four lines of the

9    Court's discussion which, I think, is not what either the Court

10   or any of us want to have as our record to go up.  And my main

11   purpose to be here is if I cannot persuade the Court that it

12   would -- made a mistake is to have something to take up because

13   it's of particular importance to us and we do need to take it

14   up.

15          THE COURT:  I know you want to take it up.

16          MR. EPPS:  And while I -- the Court is familiar with

17   me, and knows that I believe in what I argue before the Court,

18   and I really believe this, and I really believe that we should

19   win, and I'm perfectly happy that we argue it today, and

20   although I think our papers say it quite well, what I really

21   need is a record to take it up on.

22          THE COURT:  And the Court certainly would welcome

23   guidance from the appellate courts, as well, on this issue.

24   But, you know, I did find that the stub rent requests are going

25   to be accorded priority treatment under Section 503(b)(3) and

56

1  that the Debtors were not obligated to pay the stub rent

2  immediately pursuant to Section 365(d)(3).  That was what I

3  held and I was following Judge Adam's <u>Track Auto</u> (phonetic)

4  case as I read that and, so it's not any mystery that's what

5  I -- the decision that I made and I think that you are entitled

6  to an order that says that so that you can appeal that and go

7  up.

8          Now, Mr. Galardi, maybe you can enlighten us --

9          MR. GALARDI:  Sure.

10         THE COURT:  -- on where we are on the findings of

11 fact and provings of law.

12         MR. GALARDI:  Your Honor, I will take 100 percent

13 responsibility.  I put my final comments on it on Monday, got

14 trapped in the auction and did not circulate it.  I will have

15 it circulated before the end of today to Mr. Epps.  I welcome

16 his comments.  I understood he filed it and I do apologize for

17 that fact, but it says exactly what Your Honor just said.  No

18 mystery, and we understood and another counsel took an appeal.

19 I understand the uncertainty we were creating and I apologize.

20         MR. EPPS:  Mr. Galardi has considerably more that I

21 could ever get done and I certainly am not criticizing on that.

22 I just need this issue to move along, so if the Court would ask

23 that we exchange and try to get a unified findings and

24 conclusions.  And if we don't we'll submit our own in the same

25 ten days that you were discussing with other people, is that

57

1  good?

2         MR. GALARDI:  And that is fine, Your Honor.  I -- we

3  were, again, no excuse.  We could have filed it today, but I

4  though we'd give Mr. Epps an opportunity since he had filed the

5  reconsideration.  Part of mine was a little premature since I

6  didn't have an order.  I didn't even realize there was another

7  proposed denial.  My apologies.  He will have it today by five.

8  We will have it submitted with comments or a competing order by

9  Monday.

10         THE COURT:  That'll be fine.  Monday's a federal

11  holiday --

12         MR. GALARDI:  Tuesday.

13         THE COURT:  -- so I'm told.  I'm still getting used

14  to this, too.  But, so by Tuesday I would like the findings

15  filed and then Mr. Epps, you would, certainly, have ten days

16  from that date to file a competing version of the findings and

17  conclusions if you wish to do so.

18         MR. EPPS:  Your Honor, I would hope that we would

19  have findings and conclusions would have my signature on them

20  and we'll try to do that.

21         THE COURT:  If they have your signature then I'll --

22         MR. EPPS:  If we -- if that doesn't happen then I'll

23  take the ten days and I thank you.

24         THE COURT:  You're welcome.

25         MR. GALARDI:  Yeah, I hope so, as well, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

58

1              THE COURT:  All right.  And, so for purposes of Item

2  Number 29, it's denied.

3              MR. EPPS:  Thank you.

4              MR. GALARDI:  Your Honor, that brings us to Matter 30

5  on the agenda which is the Debtors' second Omnibus motion for

6  an order authorizing rejection of certain executory contracts.

7  My understanding is that there are no objections to that

8  motion.  We'd ask for an order to be entered on Item Number 30.

9              THE COURT:  That will be granted.

10             MR. GALARDI:  Your Honor, the next matter on the

11 agenda is the Debtors' second Omnibus objection authorizing the

12 rejection of certain unexpired leases or non-residential real

13 property.  There are two objections.  One is North Plainfield.

14 Again, I know from the other hearing that this now motion is

15 now up for rejection as opposed to the issue of open

16 assumption.

17             And then there is the objection of Verizon Wireless.

18 I don't know if they have -- if they're opposing the objection

19 or they want to have -- I think Plainfield wanted to have the

20 payment of the contractor's liens.  I think that issue has been

21 dealt with and I think Verizon wanted to say something about

22 it's property.

23             THE COURT:  All right.  Very good.

24             MR. KELBON:  Thank you, Mr. Galardi.  Your Honor,

25 Regina Kelbon on behalf of Verizon Wireless again.  Your Honor,

**J&J COURT TRANSCRIBERS, INC.**

59

1 as you know we have kiosks in each of these locations.  They're

2 called SWAS, store within a store, and when the Debtor closed

3 down the first 154 stores we worked very cooperatively and we

4 coordinated that exit very well.

5          However, there were like 12 store that were never

6 open, but our kiosks were already placed in there because they

7 were ready to be opened for the grand opening and apparently

8 the Debtor has given the keys back to -- on four of the

9 locations prior to our ability to get the kiosks out.  So, we

10 have just requested that the order provide that the landlords

11 make a reasonable opportunity for us to get out -- get our

12 stuff out of their stores.  We have contacted the landlords so

13 far.  We do not anticipate any problems from them.  The ones we

14 have reached out to and have made contact with have been

15 cooperative, but we -- out of an abundance of caution just want

16 to make sure we can get our kiosks and our property out.

17          THE COURT:  All right.  Thank you.

18          MR. KELBON:  Thank you, Your Honor.

19          MS. HUDSON:  Your Honor, Lisa Hudson, again, on

20 behalf of North Plainfield VF, LLC.  We realize Your Honor has

21 denied our 365(d)(3) and we would just ask that any rejection

22 not be earlier, nunc pro tunc or retroactive then the date of

23 any order from today's hearings and that any post-petition

24 obligations not be relieved in that order up to the time of

25 rejection.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  The rejection is not going to be nunc pro

2    tunc.  Mr. Galardi, you're not asking for nunc pro tunc relief

3    on this?

4          MR. GALARDI:  Actually -- well, nunc pro tunc to the

5    date that we have actually surrendered the property, Your

6    Honor.  We have given back the keys.  We've given possession.

7    She would like it at the order we had done that prior to the

8    filing of the motion my understanding is, so we actually would

9    like the date to be as of the filing of the motion as opposed

10   to the date of the order under the idea -- and we have done

11   this in the first day of the case that we had actually

12   surrendered the premises, turned over the keys.  I have no

13   problem with respect to her.  To the extent there's a factual

14   issue as to whether we had actually done that and given

15   possession for her to reserve all rights on any administrative

16   claim, but our -- I was just trying to decrease our

17   administrative expenses.  If there was a surrender I'd like to

18   have the date of the surrender and we can just say date of

19   surrender with all parties reserving their rights on that date.

20         But, the order is always -- when Your Honor has a

21   hearing as opposed to necessarily when we surrender the

22   premises and we try to get out as soon as we can and surrender

23   the keys.

24         THE COURT:  All right.  Thank you.

25         MR. GOLD:  Good afternoon, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Good afternoon.

2          MR. GOLD:  Ivan Gold of Allen Matkins for GMS Golden

3   Valley Ranch.  We're one of the construction leases that's

4   subject to the motion located in Santa Clarita, California.  I

5   just wanted to let the Court know that we started an informal

6   dialogue after this motion was filed because it certainly --

7   the rejection of partially completed store that was sitting

8   vacant was not that controversial apart from the lien issue.

9   And we've been working with the Debtor on consensual language

10  in the order that will reserve all the respective parties'

11  rights with respect to the liens and I think that will solve,

12  you know, any potential problems resulting from the rejection

13  of the leases.

14          It provides that, you know, this doesn't affect any

15  defenses the Debtor or a landlord might have to a third party

16  lien claim.  The third party claimants have their rights.  As

17  Mr. Galardi says everybody's rights are reserved apart from the

18  fact of rejection of these leases which, at least, returns

19  control they can be -- the properties could be stabilized.  So,

20  but I did want Your Honor to know that there had been quite a

21  bit of -- in addition to the filed rejections, quite a bit of

22  give and take and we hope to present an order to you that

23  resolves those issues.

24          THE COURT:  Thank you, Mr. Gold.  Ms. Hudson, you

25  don't have any problem with the date of surrender being the

1 | date for the rejection?

2 |         MS. HUDSON:  No, Your Honor.

3 |         THE COURT:  Okay.  Very good, so we will put that in

4 | the order then.

5 |         MR. GOLD:  Thank you, Your Honor.

6 |         MR. GALARDI:  Your Honor, I guess that goes to what

7 | probably many of the people in the courtroom have waited for

8 | which is the motion of the Debtors, Number 32, to sell,

9 | substantially, all of their assets.

10 |         Your Honor, the three main management people, Mr.

11 | Marcum, Mr. Hedgebeth and Mr. Besanko are actually back at the

12 | company addressing the employees, so I'm going to take -- and

13 | many people in the courtroom think I've taken way too much

14 | liberty by testifying myself, but I will go through some facts

15 | as to how we got here just for the background because I think

16 | it is both a very sad and tragic day, actually, in Circuit

17 | City's history.

18 |         Your Honor, before we ever commenced this case Mr.

19 | Marcum who had taken over as CEO and the testimony, I think, is

20 | in the record in parts had tried to get some support from the

21 | vendors going into the Christmas season to get vendor's support

22 | taken a trip to Korea and seen vendors.  Unfortunately, he was

23 | unable to get the vendor's support pre-bankruptcy and we

24 | filed -- and I told Your Honor, at the first day which was

25 | November 10th that we were trying to build the bridge to a

1 going concern transaction of some sort, that the financing that

2 I emphasized was 30 million for -- we're paying roughly 25

3 million for 50 million of availability to get what, I think, is

4 today the most critical date which was the January 16th

5 hearing.  And as we went through this case with respect to the

6 DIP proceedings, Your Honor, we had had objections from the

7 Committee with respect to the DIP that we had resolved.

8         And throughout this process the Debtors and the

9 management team, in particular, have gone through extraordinary

10 efforts to find a going concern transaction.  Indeed, we had

11 even a gentleman who had bought, substantially -- I think it's

12 28 percent now, of the stock of the company, Mr. Salinas, who

13 we've been entertaining negotiations with and discussions with

14 since the day he bought -- started to buy that stock,

15 Rothchild, FTI, Scadon (phonetic), have been dealing with their

16 professionals to try to get to a going concern transaction.

17         Your Honor may also recall that on December 22nd we

18 settled the Committee's objection to the proposed DIP financing

19 and, again, modified those dates to say that there had to be in

20 some sense a determination to this case by this day whether we

21 were going to go going concern transaction or whether we were

22 going to end up in a full store liquidation.  Your Honor, that

23 motion and the amendment which we then unsealed after filing a

24 sale motion, the amendment to the DIP provided that we would

25 file a motion on January 5th which we did under seal.  We

1  unsealed it and that today would be the sale hearing.

2       Your Honor, very importantly and I think it is

3  notwithstanding the efforts of management the company has been

4  pursuing through Rothchild through management a going concern

5  transaction well before the case was commenced, but during the

6  case and even as late as last night had believed that there

7  would be some going concern transaction.  I say that this is a

8  somewhat tragic situation because I think it's brought upon by

9  the fact that financing is in this market is extremely

10  difficult.  Retail is extremely difficult and vendor

11  uncertainty has created much of a problem.

12       We had gone forward with trying to sell the business

13  as a 500 and roughly 75 store chain.  We had put up a

14  permutation for Mr. Salinas and other bidders of a 300 to 350

15  store chain and we put up a permutation for a chain with

16  respect to 180 store in the Northeast.  As people who are --

17  many of whom are in the courtroom today attended the auction

18  that was more on-the-record/off-the-record, they could

19  understand that it lasted -- an after consultation with the

20  Committee and the bank we actually began the process, I think,

21  it was Monday or Tuesday and continued that process until after

22  midnight last night in our offices in New York trying to

23  negotiate, essentially, two major transactions.

24       The first was the full store liquidation which is

25  approximately 575 stores, a full store liquidation of the

1  Circuit City chain.   And second was one of those permutation

2  transactions which eventually because of the financing markets

3  at best this company could afford a $600 million facility in

4  these times which then dictated the size of the transaction as

5  I said down to 350 and down to 180.

6          Your Honor, we had Mr. Marcum, Mr. Besanko, there was

7  the consumer electronics meetings in Las Vegas, I guess, it was

8  about two weeks ago.   They flew out there.   They met vendors.

9  We have letters of support from such vendors, but those letters

10 of support are all dependant upon financing and getting a

11 transaction.   We still were running up against that January

12 16th date.

13         Your Honor, what we had said on the first day and I

14 think what has come true is the following.   We really need in

15 this consumer market and in this consumer electronics and the

16 retail you really need two things.   You need an adequate DIP

17 facility or a facility and you need adequate trade/vendor

18 support.   To their credit the banks want to put in money,

19 except to be secure you need trade support.   You need consumer

20 credit.

21         To the credit of certain vendors they met with our

22 two buyers and to the credit of our buyers at their own expense

23 no expense reimbursements have been paid.   No expense amounts

24 have been paid.   They met and they flew both from Mexico to New

25 York to Las Vegas and then Goldgate flew from -- to Las Vegas

66

1 to meet the vendors.  Notwithstanding the support that they say

2 in those meetings, unfortunately, I have -- I'm, unfortunately,

3 have to announce that we had no going concern transaction as I

4 stand here today.

5          Your Honor, we had though no written proposals for a

6 going concern transaction we had hours and hours of

7 negotiations.  I would say one of the proposals did put in an

8 indication of interest.  Both of the going concern vendors

9 needed to critical things, financing and trade support and the

10 financing needed trade support.  Your Honor, we have a

11 Committee of 11 individuals on the Creditors' committee.  Six

12 or seven of them are trade vendors.  Your Honor,

13 notwithstanding that fact we could not muster before we went to

14 the sale process, before we commenced this bankruptcy to

15 convince them to take the risk and to supply us with trade

16 credit.

17          Your Honor, as seeing the DIP model which assumed

18 that we would be able to get trade credit.  And notwithstanding

19 letters which I can't say were commitments by any vendor to

20 supply trade credit, we could not get trade credit from a

21 Committee that has a majority of members of trade credit.

22 Indeed, Your Honor, we went so far as yesterday to ask for a

23 three day extension, but in light of the fact that we had no

24 written letter or proposal we were not granted the three day

25 extension to adjourn this hearing to Tuesday which is the day

1    after the holiday.

2           So, Your Honor, notwithstanding the fact that we had

3    a vendor committee and landlords that we thought would be

4    supportive of all of these transactions I think they just said

5    it was now to either liquidate and realize the greatest value

6    in their view for the unsecured creditors and opposed to extend

7    this time deadline and give us any further time.  There were

8    discussions about putting in bridge financing.  I think the

9    request to put in bridge financing had to be at risk money and

10   people were simply not, without vendor support, prepared to put

11   in that trade risk money.  Consequently, we were forced last

12   evening to go to an auction with respect to the full store

13   liquidation of the Circuit City chain.

14          Your Honor, we conducted that through, essentially, a

15   four-day process.  Although we started it with information we

16   looked for full store liquidations from, essentially, two

17   chains -- two joint ventures.  One we called the Great American

18   SV Capital Tiger Hudson.  And the other we called Hilco

19   (phonetic) Gordon Brothers.  Your Honor, both of those joint

20   ventures worked significantly over the last three to four days

21   giving us form agency agreements.  We said that those for

22   agency agreements were unacceptable at one point because they

23   didn't provide sufficient value.  We consulted with the

24   Committee.  We consulted with the banks.  We went back with a

25   proposal.  They refused to meet our proposal in this difficult

1 time.

2       We then went back with one more proposal and as a

3 result of the back and forth negotiations in which the

4 Committee participated, in which the banks participated, in

5 which we shared information, we came to simply one offer from

6 Great American and I wanted to read some of the substantial

7 terms of that agreement.

8       Your Honor, for those people familiar or not familiar

9 with an agency agreement you bid on the value of the inventory.

10 The Great American bid or the Great American consortium has a

11 guaranteed amount of 70.5 on the cost value of inventory.  And

12 inventory is to range somewhere we believe 1.1 billion to $1.3

13 billion.  Your Honor, in addition, this Great American bid met

14 our demands for a certain part of sharing of value.  In

15 particular, and after you collect or after the estate collects

16 the 70.5 guaranteed amount on the cost value of inventory the

17 agent, that consortium, will receive a one percent fee.

18       So, then as you go through those proceeds roughly

19 after 71.5 for those keeping the math, the proceeds in addition

20 to that are split by the Great American bid, 70 percent to the

21 company, 30 percent to the agent.  Again, after much

22 negotiations -- and there are persons in the courtroom that

23 could testify, but I'll take license unless people want to make

24 me make a proffer, the -- once they got to three percent fee

25 they then modified their bid again to now give us 90 percent of

1 the proceeds.  So, after three percent which is roughly a 74.5

2 percent bid and ten percent for the estate.  In exchange for

3 all of that, Your Honor, Great American insisted for us to get

4 that form bid to be the stalking horse bid that we would agree

5 to a breakup fee of $7.5 million.

6         Your Honor, after discussions, again, with the bank

7 group, with the Committee, with the Committee's financial

8 advisors, FTI who is represented by Mr. Cashman in the

9 courtroom today, we ran numbers.  We ran the permutations.  We

10 also received a bid from the Gordon Brothers Hilco.  We simply

11 determined that this bid was far better than the other bid by

12 tens -- at least, $10 million.  So, therefore, we accepted this

13 bid after negotiating back and forth with respect to the

14 breakup fee.  It was higher.  We asked for less. It was -- we

15 asked for less again and we eventually agreed to the 7.5 fee

16 given that this set such a significant floor for the estate.

17         Great American agreed to execute that agreement and

18 we started the auction with that as our stalking horse bid.

19 Your Honor, we then had further discussions with Gordon

20 Brothers and Hilco and I say we're probably at midnight last

21 night.  And after going back and forth with them they were

22 unable to submit a topping bid on that basis.  Your Honor,

23 under those circumstances back and forth and with the

24 Committees' advisors, the bank's counsel, myself, FTI,

25 management's input, we believe that the highest and best offer

1  for the assets we have as we stand here today is the full store

2  liquidation of the Circuit City stores whereby Great American

3  would conduct such store closings and those store closings will

4  commence tomorrow, January 17th, should Your Honor approve that

5  store closing.

6          Your Honor, with respect to the agency agreement it's

7  very much like the form of the agency agreement.  I think we

8  have filed it today.  We've had it in the courtroom.  It is

9  very much like the agency agreement we filed with respect to

10 the 155 stores.  The bid -- the sale guidelines which people

11 are concerned about are very much the same as the sale

12 guidelines Your Honor has approved.  Obviously, there is now

13 the use of the phrase going out of business sales.

14         I know already that this morning and last night

15 counsel for the Great American Group is already been in contact

16 with many of the landlords to resolve all of those issues.  We

17 believe that these guidelines are compliant with the attorney

18 general's --

19         UNIDENTIFIED ATTORNEY:  I'm on mute, I just can't

20 hear anything that's being said.

21         THE COURT:  I'm sorry.  Would everybody on the phone

22 please set there phone to mute.  We're getting feedback in the

23 courtroom.  Please set your phones to mute.

24         UNIDENTIFIED ATTORNEY:  Is there a way to identify

25 that individual and drop them as we did before?

**J&J COURT TRANSCRIBERS, INC.**

1              THE COURT:  Somebody's on a cell phone it sounds

2   like.

3              MR. GALARDI:  If you're on a car phone -- thank you.

4              THE COURT:  Okay.  Thank you.

5              MR. GALARDI:  Your Honor, going back to the

6   agreement, again, Mr. Cashman of FTI is in the courtroom today.

7   Mr. Cashman from a distance we -- actually, we're trying to

8   coordinate with the bidder right now.  Mr. Cashman is aware of

9   and can testify to the back and forth, the bids, the analysis

10  of the bids with respect to FTI and it's conduct.  I know

11  Jeffries is in the courtroom today.  The counsel's in the

12  courtroom today.  It was really a professional effort to

13  reevaluate all of these things.

14             The sadness is, Your Honor, I think as management

15  sits here today and has to explain to all of the employees over

16  the next 60 to 90 days is they were going to be let go and

17  given WARN Act notices today.  Unfortunately, there will not be

18  a Circuit City after today and the management still believes in

19  its heart that with some additional time there would be a going

20  concern of 180 stores.  There would be a going concern of 350

21  stores.  I think this is simply a retailer that had a problem

22  at the wrong time in this economy and with the wrong vendors to

23  give the no support and they decided that they simply didn't

24  want number two to exist any longer.  It is an unfortunate

25  circumstance, but it is a fact of this company.

1           Your Honor, we would ask Your Honor and I'll let

2   people take testimony if they want with respect to the side --

3   sale guidelines, Your Honor, as I said we believe that they are

4   consistent with what we have done before.  We understand and

5   I'll leave to Your Honor that we have not given much notice of

6   the sale guidelines or the agency agreements.  If Your Honor

7   wanted to take a break, obviously, for people to review that.

8   I know we've had some of the landlords -- as I called in the

9   landlord cabal, has reviewed it.  I know they may have

10  comments.  I don't know what Your Honor's preference is as to

11  the testimony or whether we want testimony.

12          I think the Committee supports the entry of the

13  agency agreement being approved immediately.  It is,

14  unfortunately, two weeks before Super Bowl, so that also drives

15  a lot of the decision that are made, when you can maximize

16  value.  I will say again, Your Honor, one of the bidders we had

17  discussions and I give them much credit that they were willing

18  to split a deal into the 200 400.  Unfortunately, we just

19  couldn't get enough trade vendor support for this proposal.

20          I will leave it to Your Honor how you would like to

21  proceed, but we would ask Your Honor at the end of the hearing

22  to enter with great reluctance the approval of the agency

23  agreement which will have the liquidation of 567 retail stores.

24          THE COURT:  Thank you, Mr. Galardi.  I'd like to hear

25  from the Committee.

**J&J COURT TRANSCRIBERS, INC.**

1           MR. POMERANTZ:  Your Honor, Joe Pomerantz from

2   Pachulski, Stang, Ziehl and Jones on behalf of the Committee.

3   It's with a deep sense of sadness that the Committee which is

4   comprised as Mr. Galardi said of trade vendors, landlords,

5   litigation creditors appears before Your Honor seeking

6   supporting the approval of the store closing sale.  We share

7   the Debtors' profound disappointment in the inability to

8   consummate a transaction with a going concern buyer.  It is

9   unfortunate when a bankruptcy, especially of an iconic retailer

10  such as Circuit City, fails and the company's thrust into

11  liquidation with the attendant loss of jobs, trading

12  relationships and the profound effect on this community and

13  communities through the United States.

14          From the commencement of the case, Your Honor, the

15  Creditors' committee was supportive of the Debtor locating a

16  going concern buyer for Circuit city.  The Creditors' committee

17  fought hard to obtain modification to the DIP financing that

18  would enable the Debtors to have sufficient liquidity to seek a

19  going concern buyer to save the company and maximize value,

20  maximize jobs.  Notwithstanding the Creditors' committee's

21  efforts, the bank's efforts and the dedication of the Debtor,

22  its management and professionals, there were several factors

23  that ultimately led to the Debtors' failure.

24          First, Your Honor, the company's spiraling sales and

25  deteriorating financial performance resulted in the Debtors'

**J&J COURT TRANSCRIBERS, INC.**

1  experiencing massive losses especially since the filing date

2  that the Debtors could not recover from.  Same store sale

3  plummeted over 33 percent from last year and the Debtors,

4  despite their best efforts, consistently failed during the

5  post-petition period to meet the projections.

6          Second, as Your Honor's fully aware the world

7  wide recession, continuing softness in retail sector,

8  especially in high end discretionary items such as electronics,

9  the lack of any stability in the credit markets and the short

10 term economic outlook foreshadowed bleak results for the

11 company as it desperately tried to restructure its operations.

12 Against this backdrop and hundreds of millions of dollars of

13 pre-filing trade to (indiscernible) losses the trade creditors

14 were generally reluctant to extent credit unless and until the

15 Debtors could stabilize their operations and demonstrate to the

16 Committee that the company was a viable and continuing

17 enterprise.

18        The trade creditors were experiencing and are

19 experiencing challenges of their own.  As a result of the world

20 wide recession and the pressures in their company and that made

21 these Creditors cautious in willing to put out more trade

22 credit.  As a result of the foregoing events that were

23 developing during the first six weeks of the case, finally in

24 December all constituents, the Debtors, the banks, the

25 Creditors' committee agreed that it is prudent in the exercise

1  of their respective fiduciary duties to their clients to

2  accelerate the process by which the Debtors would attempt to

3  attract new capital or a going concern buyer.

4       From the outset of the case the Committee offered its

5  services of its legal, financial advisory and investment

6  banking professionals to the Debtors in any way possible in

7  efforts to avoid a total liquidation of the chain.  To that

8  end, Jeffries offered the Debtors approximately 100 suggestions

9  of additional parties that Rothchild might contact to see if

10  they might be willing to buy the whole chain, to buy pieces.

11       The professionals stayed in close contact with the

12  Debtors' professionals throughout the process offering input

13  and advice of what progress the Committee needed to see in

14  order to support the process and what concerns the Committee

15  had with the business, with the process to enable it to support

16  a going concern bid.  Notwithstanding these efforts and based

17  upon a variety of factors, potential white knights began to

18  pull out of the process thereby reducing the Debtors' chances

19  of a going concern sale.  The reasons often cited for the

20  deteriorating financial performance, the lack of financing and

21  the challenging economy.

22       As the case progressed to early January, the Debtors'

23  options to choosing the going concern sale were essentially

24  narrowed to two parties as Mr. Galardi mentioned, one, the

25  Salinas Group, a strategic buyer, and one Goldengate, a

**J&J COURT TRANSCRIBERS, INC.**

1 financial buyer.  Salinas had been reportedly conducting due

2 diligence since the petition date and the Committee was

3 informed early on that Salinas might be interested in acquiring

4 the whole chain.  The Committee understood from the get go that

5 Salinas had, as anyone would have, two threshold issues in

6 order to get into a position to be able to buy the company as a

7 going concern, financing and trade creditor support.

8         As to the financing, the strategic buyer faced what

9 turned out to be insurmountable challenges.  The Committee was

10 in close contact with the bank counsel on, virtually, a daily

11 basis to find out how this bank group felt with respect to the

12 Salinas Group.  It was early told to the Committee that at the

13 level needed to finance a 500 store chain this bank group could

14 not get sufficient financing and that a maximum amount of

15 financing it would get would be substantially less than the

16 financing the company went into the bankruptcy case with.

17         Despite continued optimism from the Debtors to the

18 Committee about the ability of Salinas Group to obtain

19 financing, the conversations the Committee had consistently

20 with the bank did not pretend such optimism.  The message the

21 Committee consistently received that it was impossible to find

22 the full level of financing and, ultimately, that and that the

23 buyer faced substantial challenges to any sort of financing

24 from this bank group.  Prior to the auction this bank group

25 informed the Committee that they would not be in a position to

1  provide any financing to this buyer.

2       The Debtors informed the Committee that it was

3  exploring financing from lenders outside existing syndicate to

4  support a transaction.  The Debtors also explained that it was

5  developing alternative business plans which required less

6  financing.  Despite repeated requests the Creditors' committee

7  never received any commitment letter from any lender indicating

8  a willingness or desire to finance the buyer at any level.

9  Accordingly, there was never presented any evidence that the

10 Committee found credible other than the Debtors' optimism when

11 we understand why the Debtors would try to be optimistic and

12 try to save the company, but the Committee never received any

13 evidence that this buyer could obtain the financing necessary

14 to consummate the transaction.

15      On a parallel track here, Your Honor, the buyer is

16 attempting to obtain sufficient commitment from trading

17 partners to provide unsecured credit.  As to discussed above

18 the trade creditors because of their own situations and because

19 of the massive losses of hundreds of millions of dollars they

20 had a pre-petition claims were very cautious in their approach.

21 We understood that the buyer met with several trade vendors,

22 some who were on the Committee, some who weren't, in Las Vegas

23 at the Consumer Electronics Convention to discuss the buyers

24 ideas for the business and credit requirements.

25      Importantly, throughout the process the Committee

**J&J COURT TRANSCRIBERS, INC.**

1  told the Debtor that the Committee needed certain information

2  to enable the Committee to evaluate the request for trade

3  credit, request for support of the continued support of the

4  process.  First, the Committee needed a copy of the buyer's

5  business plan.  Second, the Committee asked many times for a

6  term sheet from a buyer outlining the structure of a

7  transaction.  Third, term sheets were indication of interest

8  from financing sources that would be sufficient to support a

9  business plan and fourth, Your Honor, a realistic time line for

10  consummating a transaction and what were the conditions that

11  would have to be met in order to get to a transaction.

12       Incredulously, Your Honor, notwithstanding the

13  Committee's repeated request for information and access to the

14  buyer, the buyer, virtually, ignored -- this is Salinas we're

15  talking about -- Salinas, virtually, ignored the Committee.

16  After the Committee's urging, the Debtor put the Committee's

17  investment banker in touch with the buyer's investment banker

18  right before the holiday season.  The Creditors' committee

19  investment banker, Jeffries, reiterated to Salinas' bankers the

20  desire to work with the buyer and provided the buyer with a

21  roadmap.  This is what you need to do in order to get Committee

22  support for a going concern.

23       The Committee asked for access to the buyer's

24  principles to make a presentation and then that caller was told

25  they were not available.  Never were the principles or anyone

1  on behalf of the Salinas Group did they ever ask for a forum

2  with the Committee as an entity.  On January 5th, the Committee

3  did hear back from the buyer -- the Committee didn't hear back

4  from the buyer and didn't receive any information as requested

5  up to that point.  At the Committee's insistence a second call

6  happened between Jeffries and the banker.  Again, reiteration

7  of request for the information that had now been out for three

8  weeks.

9         On January 8th, the Debtors provided the Committee

10  with a copy of the presentation that had been made to certain

11  of the vendors in Las Vegas.  Through all this time no contact

12  other than a couple of calls with the buyer which led the

13  Committee to form -- start forming certain conclusions on the

14  process and the ability of this buyer to, ultimately,

15  consummate a transaction.  There was a third call on January

16  9th after the motion was unsealed and the Committee was told

17  that the Salinas Group would not be submitting a bid by the

18  January 10th deadline, that the unsealing of the motion had

19  caused them to potentially rethink their strategy.  They were

20  going to work over the weekend and they were going to come back

21  and let the Committee and the Debtor know where they stood, but

22  that they would not be submitting a bid.

23         The communication between our firm as counsel to the

24  Committee and Salinas' counsel was even more overwhelming.  We

25  reached out to Salinas' counsel before the trade show

1 convention.  Told counsel, "This is what you need to do to get

2 the Committee's support."  It was a five minute conversation.

3 No conversations followed.  Not once were we called by counsel

4 to talk about the structure of a transaction, to talk through

5 ideas, to let us know what they were thinking, what they were

6 working through, to give the Committee something to hold its

7 hand upon when the Debtor would come back and seek an extension

8 of the process which the Committee expected.  The Committee

9 wanted to support a transaction.  The Committee's always to

10 support a transaction and is deeply saddened that the

11 transaction hasn't occurred.

12        At the same time as the lack of communication between

13 the Committee and Salinas, the Debtors advised the Committee

14 that they were running numbers on alternative models which they

15 could believe could possibly financed.  First, there was a 306

16 store chain model, then there was 180 store chain concept the

17 last one of which surfaced in the day or hours before the

18 auction.

19        Importantly, as far as the Committee is concerned

20 this was not a buyer coming to the Committee and saying this is

21 our proposal.  This was the Debtor trying desperately and I say

22 this with great respect.  The work that the Debtors'

23 professionals and the Debtors' management put in to try to make

24 this happen deserves a lot of accommodation.  They did

25 everything they could, but this was the Debtors' proposal.  We

**J&J COURT TRANSCRIBERS, INC.**

1  never once heard that this buyer was supportive of this

2  proposal.  We heard what the Debtor was saying.  We were

3  hearing this from the buyer.

4        And to this day even after the auction or even during

5  the auction when we were in the same building for virtually

6  three days, did Salinas' counsel representatives come and

7  approach us and say, "This is a plan that could work.  This is

8  what we need.  Here's a structure.  Here's terms."  And to this

9  day we haven't received the signed term sheet.  We haven't

10  received a financing commitment, at all.  We haven't received a

11  critical path to a plan and we haven't received the conditions

12  that were necessary to get there.

13        We understand that the expedited nature of this

14  process, and the complexity of the Debtor's business operations

15  and the thought and effort required to consummate a

16  transaction.  This is one of the biggest companies in the

17  United States.  This has a lot of aspects.  We appreciate that

18  these transactions are not put together overnight.

19        However, this buyer was involved from the get go of

20  the case.  There's been eight weeks from what we've been told.

21  There's been substantial time and effort both by business

22  people and financial professionals conducting due diligence.

23  It's a little incredulous that they have not been able to put

24  pen to paper to provide us, at least, a roadmap, to provide us,

25  at least, an idea of how they get to Point A to Point B.  And

1  every time the Committee was informed by the Debtor that

2  Salinas might do this or might do that we appreciated that.  We

3  expected that to come.  It never came.

4         Your Honor, Goldengate was the other buyer and we

5  understand it's been on the scene off and on over the last few

6  weeks.  They were well regarded, well respected financial

7  buyer.  As with the strategic buyer, the communication between

8  Goldengate and the Committee was virtually nonexistent.

9  Counsel has never spoken.  Counsel for one of the buyers trying

10 to take the chain out of a bankruptcy who's serious and they

11 spend time and money we understand has never picked up the

12 telephone to call the Committee counsel and say, "What do you

13 need to support this transaction?"

14        There's been one form of communication between the

15 investment advisors.  We received an indication of interest

16 that was two pages that, basically, was as vague as could be.

17 They were in.  They were out over the last couple of weeks.  We

18 heard that they were even going to be showing up yesterday.

19 Didn't show up to the auction, at least, they didn't come to

20 speak to us.

21        What the Committee did know about the Goldengate

22 transaction and, in fact, the Salinas transaction was that --

23 well, first the Goldengate transaction.  We were told by the

24 Goldengate transaction there would be no cash to pay

25 administrative claims or unsecured claims and, potentially,

1  some paper given to the estate.  Clearly inferior to a

2  liquidation which would have produced more value under the

3  terms negotiated with the Great American Group.

4          With respect to Salinas, there was some idea of some

5  type of cash.  Wasn't clear it was going to be sufficient to

6  pay administrative claims.  There was some thought about some

7  type of payment to unsecureds which would have had problems in

8  not paying administrative claims in full.  So, from a value

9  standpoint which is not the only thing the Committee looked at,

10  but from a value standpoint contrary to a typical going concern

11  transaction which produces more value it was blatantly clear

12  that either of these transactions would produce meaningful less

13  value.

14          As discussed above, Your Honor, with the exception of

15  somewhat an encouraging week of financial performance, the

16  performance has been dismal and the Committee's financial

17  advisors continued -- and there's the Committee's financial

18  advisors expected there to be a continued financial drain on

19  this estate if the process was prolonged.  It's against that

20  back up, Your Honor, that the Debtors' asked the Committee to

21  agree to a four-day continuance of the process.

22          The Committee has, from the commencement of the case,

23  Your Honor, continues to take its fiduciary duty very

24  seriously.  It also takes the effect that its actions would

25  have on this community very seriously and has been supportive

1   for Your Honor at the hearings notwithstanding the concerns

2   that have been addressed privately, but we believe it as

3   important in a public manner given the scrutiny that this case

4   has experienced to be supportive of the Debtor and try to work

5   out our issues and concerns with the Debtor separately.  And

6   they've given us access, and we've had discussions with them,

7   and they've been very good in the consultation process, no

8   complaints there.

9           We spent a lot of time evaluating the Debtors'

10  business, evaluating business plans, evaluating options,

11  evaluating the prospects for completing a sound transaction and

12  the deterioration of business.  What the Committee's had to do

13  is attempt to balance the goals and the responsibilities of

14  achieving the going concern transaction and maximizing value

15  for unsecured creditors.  This is a difficult job in any case

16  made more difficult in this case by the composition of the

17  Committee which included varying different types of creditors

18  with varying different types of interests and views.

19          Based upon the perceived progress of the buyers, Your

20  Honor, the continued deterioration and the likelihood that a

21  going concern transaction would produce less value the

22  Committee determined that continued prolongation of the process

23  was unlikely to bear any fruit and would just lead to continued

24  erosion of the Debtors' business.  If the Committee thought

25  that there was any reasonable chance that there would be a

**J&J COURT TRANSCRIBERS, INC.**

1 transaction that could occur the Committee would have

2 authorized the Debtor to go another few days.  The Committee

3 saw nothing near the process.

4          As I hope my presentation demonstrates, Your Honor,

5 the Committee's decision in this case was not an easy one.  In

6 refusing to consent to more time the Committee was mindful of

7 what the result would be, that would be a global liquidation

8 of the company and the hardship that would reverberate through

9 the employees -- the loyal employees of the company,

10 management, vendors, this community, the communities around the

11 country and is not a decision that was made lightly.  The

12 Committee wishes that circumstances were different, Your Honor,

13 but, unfortunately, in this case it made the decision based

14 upon the foregoing factors and the exercise of it's fiduciary

15 duty.  Thank you, Your Honor.

16          THE COURT:  Thank you, sir.  Mr. Galardi?

17          MR. GALARDI:  Yes.  Your Honor, may I make one

18 comment?  It's not global.  I -- Your Honor has been called by

19 Canada before and I don't want anyone to think Canada is still

20 proceeding as a going concern and there are going concern bids

21 with Canada, so I didn't want that comment to suggest that

22 there is still not a going concern in the Canada business

23 because I know we've been very sensitive about Canada.

24          THE COURT:  Thank you for that clarification.  My

25 question to you is, is there any reasonable chance a going

**J&J COURT TRANSCRIBERS, INC.**

1 concern sale can be achieved if you have an additional four

2 days?

3        MR. GALARDI:  Your Honor, I couldn't say that we

4 could consummate a transaction.  That's, I think, where the

5 Committee is in those four days.  We were hopeful that with the

6 extra time for those three -- actually, the three days, I

7 think, we -- four days with the weekend, Your Honor, was that

8 we would hopefully achieve what the Committee has insisted on

9 whether it was -- we couldn't have financing commitments.

10 We've been told that.  Well, we were told by one party is they

11 may be able to raise a certain amount of money for that period

12 of time, but it was not enough to offset what they believed the

13 deterioration of the collateral was.  We had tried to put the

14 money in in a position that would be below the banks, above the

15 vendors, but then you have the subordination issue which only

16 exacerbates the situation if you don't close.

17        Does the management team believe that there is a

18 viable business somewhere whether it's 305 or 180?  Absolutely,

19 Your Honor.  Do we be able to achieve that in three days?  No,

20 we could not achieve that closing in three days.  Do we

21 believe -- and I'm sure everybody here is investment bankers

22 and management teams, if I only knew I could, I should have had

23 three more days I could've achieved something.  I think we

24 could've achieved something, but Your Honor -- and I think the

25 Committee it's a hollow victory what we would achieve because

1  what is absolutely clear and we make such about not having

2  pieces of paper.  It's hard to have pieces of paper that say,

3  "I will have 400 million of trade vendor support," and have a

4  Committee composed of six vendors reject that because those six

5  vendors are there for a reason.  They're our top ten creditors.

6  If they're not giving trade support how can somebody be taken

7  seriously.

8        So, it's a chicken and egg problem that we have dealt

9  with since the very day I got -- came to the company that the

10  banks have dealt with.  The banks will say, "Well, you need

11  trade support.  That means you need letters."  Do I have

12  commitments from the vendors?  Well, if the Committee wouldn't

13  give a four-day extension why should be believe you'll even get

14  there?

15        We have the Las Vegas letters, but they're not

16  commitments, Your Honor.  They're not lawyer letters that saw,

17  "I will commit to $100 million of financing."  We need that

18  financing and when it Committee that has vendors, as many

19  vendors as a majority are unprepared to extend that says

20  something.  It says that those vendors who this business would

21  be dependant on are not yet prepared for good business or other

22  reasons.  They are not prepared in three days to say they're

23  going to have trade credit and a buyer's not going to waste

24  their time continuing this if you don't get trades abetted.

25  This company as all retailers greatly depend, if not entirely

1  depend, of the continued support and trade credit of vendors.

2      So, the simply answer, no, Your Honor, I can't

3  consummate a sale in four days.  I don't even know if I could

4  get firm commitments because the commitments are going to have

5  outs that you're going to have to have trade credit.  And I've

6  got a Committee that consists of six members who have, at

7  least, as a majority -- maybe there are some supporters, will

8  not give that trade credit two of whom are not even vulnerable

9  for any liability because they have credit insurance and we

10  were unable to get credit insurance.

11     So, that's our problem, so I can't say to you today

12  we could do that.  Hope springs eternal, but we actually had

13  people that were still interested even interested that sat

14  through the three days that we sat through in those conference

15  rooms, people that said we put 50 million and the Committee

16  says, "Put it below us in a non-refundable deposit."  That's

17  not going to happen when the Committee doesn't even want to bet

18  on themselves.

19     So, I think the simple answer is do we believe with

20  30 days could we get there?  Sure.  That's they proposal we had

21  made.  We can't say we can compensate people for the

22  deterioration.  That's the fiduciary duty issue that we all

23  faced and I can't say I can get bank commitments because I

24  can't bet a bank commitment without trade vendors and I can't

25  get trade vendors without some bank commitment.

**J&J COURT TRANSCRIBERS, INC.**

1          So, again, that's my dilemma.  Three days would not

2   do it, Your Honor, but three days may have gotten us that much

3   closer to give people confidence, but I just can't do it and I

4   am in default under the DIP.  And I understand why lenders

5   don't lend without trade support when it Committee doesn't

6   support.  I understand why trade support doesn't give trade

7   support if they don't see a business plan.  It's just a very

8   unfortunate fact because there is, I think, a profitable

9   business within the 574 chain stores.

10          THE COURT:  Thank you.  The Court's going to take a

11  30 minutes recess.  We'll come back at 1:30, actually, a 25

12  minutes recess, so people in the courtroom can look at the

13  guidelines that Mr. Galardi has circulated.

14          UNIDENTIFIED ATTORNEY:  Your Honor?

15          MR. GALARDI:  Post order and guidelines here, Your

16  Honor, for people.

17          THE COURT:  Thank you.

18          UNIDENTIFIED ATTORNEY:  Your Honor?

19          THE CLERK:  All rise.  The Court is now in recess.

20                         (Recess)

21          THE CLERK:  Please be seated and come to order.

22          MR. GALARDI:  Your Honor, I'll look for guidance to

23  you as to how you would proceed.  I don't -- we have a number

24  of objections.  I think one thing I have to say on the record

25  so that it may help with some people in the courtroom and also

90

1  on the phone because they'll ask.  It may be obvious to some of

2  us.  There's noting to assume any contracts under this

3  agreement.  So, there is no attempt to assume contracts.  It

4  will still be the Debtors' obligation until there's a lease.

5  It's still the Debtors' obligation with respect to executory

6  contract, with respect to performing of services, with respect

7  to utilities.  We have a pass through or we're getting

8  reimbursed for those expenses, but it is literally an agency

9  agreement and all of the rights and remedies of any contract

10  party including these parties are to be exercised against the

11  Debtors with respect to their leases.  If there are issues and

12  I know we'll have issues with perhaps sale guidelines and other

13  sorts of issues, but with respect to contracts none are being

14  assumed and assigned today, none are being rejected today and

15  we are not trying to delegate our responsibility to the agent.

16  It is still a Debtor obligation.

17         With that, Your Honor, I'd ask you how you would like

18  to proceed?  I don't know if parties wanted to have evidence or

19  question the evidence or we go through objections to the sale,

20  however you would like to proceed.

21         THE COURT:  All right.  Thank you.  I've read the

22  agency agreement and I read it exactly the way that you

23  represented it on the record, Mr. Galardi.  What I would like

24  to do is hear any objections that any party has to the agency

25  agreement.  Does any party wish to be heard?  Maybe this is

1  easier than you --

2        MS. ANDERSON:  Your Honor, Margaret Anderson on

3  behalf of Old Republic Insurance Company.

4        THE COURT:  We'll take objections in the courtroom

5  first and then I'll hear objections on the phone.

6        MS. ANDERSON:  Thank you, Your Honor.

7        THE COURT:  Thank you.

8        MR. GALARDI:  Your Honor, would it be best if we just

9  go from A through and just through them as a housekeeping

10 matter instead of just doing it that way we can keep track.

11       THE COURT:  That will be fine.  That makes good

12 sense, so we'll hear first the --

13       MR. GALARDI:  Your Honor, what I have is on actually

14 Page 25 of my amended agenda and the first one that I have is

15 response to  an partial objection by Children's Discovery

16 Centers of America, Inc. and --

17       THE COURT:  All right.  Does anybody wish to be heard

18 in connection with the objection of Children's Discovery

19 Centers of America?

20       THE COURT:  All right.  Let's move on then.

21       MR. GALARDI:  Your Honor, the joint objection of the

22 taxing authorities -- Texas taxing authorities.  It's probably

23 Michael Reed and Beth Weller (phonetic).  I understand what

24 they want.  We will -- we're going to talk about segregating

25 funds.  I know they have legal counsel.  Maybe I'm wrong which

1 taxing authority.

2        MR. CHARBONEAU:  I believe he is, Your Honor.  Joel

3 Charboneau, C-h-a-r-b as in boy, o-n-e-a-u, here on behalf of

4 Arlington ISD and related parties and then Louisville

5 Independent School District.  On the phone are Elizabeth Banda

6 and Andrea Sheehan (phonetic) and I know that they wanted to

7 take this opportunity to address the Court.

8        THE COURT:  Okay.  Those parties on the phone may

9 address the Court.

10        MS. ANDERSON:  Margaret Anderson, Your Honor, on

11 behalf of Old Republic Insurance Company.  I'm sorry.  I --

12        THE COURT:  We're going to get to Old Republic in

13 just a minute.

14        MS. ANDERSON:  I'm sorry.

15        THE COURT:  I think we're looking for the Texas

16 Taxing Authorities counsel on the phone.

17        MS. BANDA:  Yes, Your Honor, Elizabeth Banda on

18 behalf of Arlington Independent School District, et al. and as

19 Mr. Galardi mentioned if he is going to be segregating those

20 funds I believe that maybe we can discuss further with him that

21 segregation.

22        MR. GALARDI:  Your Honor, with respect to taxes

23 having done these sales before with those jurisdictions.  There

24 are a few of them that have secured.  We'll enter into separate

25 stipulations where we can reserve funds to determine the

1  priority and extent of the liens and it's just easier to take

2  that out of the proceeds.  What we'll do is enter into

3  stipulations myself and Mr. Fredericks will contact them or

4  they should contact us and deal with that by separate

5  stipulation.

6        THE COURT:  All right.  So, that will be dealt with

7  by separate stipulations, is that satisfactory?

8        MS. BANDA:  That is satisfactory to Arlington ISD, et

9  al.,  Your Honor.

10        THE COURT:  All right.

11        MR. GALARDI:  I just got the Texas Taxing Authority

12  incorrect, but --

13        THE COURT:  All right.

14        MR. GALARDI:  -- I've done it a few times.

15        MS. ROMERO:  Your Honor, that would be the same for

16  Martha Romero who's representing the Riverside County taxing

17  authority.

18        THE COURT:  All right.  Which letter objection is

19  yours?

20        MR. CHARBONEAU:  On the docket, Your Honor, Joel

21  Charboneau, it is Letter R.  And Joel Charboneau here again.

22  Local counsel for Riverside County, California, and I filed a

23  motion to have Martha Romero admitted pro hac vice and we would

24  request that the court enter that order.  It was submitted, but

25  returnee.  There were some confusion about the motion being

1 filed and it was.

2          THE COURT:  All right.  Very good.  The motion pro

3 hac will be granted and then the objection of Riverside County

4 will be resolved through separate stipulation.

5          MR. CLARK:  Your Honor, this is Robert Clark,

6 assistant Douglas County attorney.  That's Douglas County,

7 Colorado.  We filed objections on January 12th, but for some

8 reason they don't show up on the agenda for today.  I think our

9 treatment would want to be the same as for the other taxing

10 authorities and we can work that out separately as long we have

11 a fair crack at the proceeds according to our lien.

12          THE COURT:  All right.  Is that acceptable, Mr.

13 Galardi?

14          MR. GALARDI:  That's acceptable, Your Honor.  We're

15 going to try to resolve all of those, but as long as they

16 attach to the kinds of proceeds we get here because there's

17 some confusion sometimes.  If they attach to the personal

18 properties as being sold and then as long as Mr. Burman's

19 (phonetic) clients and we and the Committee all have a fair

20 crack at whether those are, in fact, secured proceeds I think

21 it's the way that we'll have to do it here.

22          THE COURT:  All right.

23          MR. GALARDI:  And it will not be an immediate.  I

24 want to make clear though to people we don't receive under this

25 agency agreement immediate proceeds.  There's not a guaranteed

1  amount.  It's not an equity bid.  It comes in over time, so it

2  will have to be funded over time in accordance with -- what

3  with a budget, but we will be doing that and we'll work those

4  stipulations out.  But, it's not as if we get cash tomorrow and

5  all of a sudden can fund hundreds of million, you know hundreds

6  of thousands and I think it's going to be in the millions of

7  dollars of proceeds we going to have to work out.  Just like

8  Mr. Burman's client is going to await a pay down on its

9  facility, other lien creditors are going to have to wait for

10 that as the sale proceeds, but that's exactly what I think all

11 of the State laws require anyway.  So, we'll have a timing by

12 which it has to be done by in accordance with the proceeds and

13 how we expect them to come in.

14         THE COURT:  Very good.  Does that resolve Items J and

15 K, as well?  That's the Palm Beach County tax collector and

16 another local Texas taxing authority?

17         MR. REED:  Your Honor, this is Michael Reed.  I

18 represent other Texas tax authorities and we are fine with

19 segregated funds being put apart.  We'll have to work with Mr.

20 Galardi to see how that will come out of the proceeds in what

21 sort of order these things will be funded, but I think we

22 should be able to go forward from there.  My question, Your

23 Honor, is whether all the aspects of the sale agreement are

24 being -- are subject to approval today, or whether it is the

25 agency agreement and the authorization to proceed with the

1  liquidation sale that's going to be approved.

2          MR. GALARDI:  Your Honor, we are seeking approval of

3  the agency agreement, the order, and the sale guidelines.  I

4  know that there may be concerns by some agencies or other

5  authorities with respect to the sale guidelines and I'll

6  address those as we go through the objections, but we're

7  seeking full authority to proceed with the sale starting

8  tomorrow according to the guidelines and then to work with the

9  proceeds as if we were liquidating -- that we are liquidating

10 the inventory in the various jurisdictions; Colorado, Texas,

11 whatever the state is, and segregate out of the proceeds from

12 those jurisdictions in a mechanism that is acceptable to those

13 authorities and to the -- our current DIP lender.

14          THE COURT:  All right.  Thank you, Mr. Galardi.

15          MR. REED:  Your Honor, in that case, you know, there

16 has been no form of order circulated that would approve it in

17 some of the -- some aspects of the motion itself held

18 provisions that would be compromising to the position of these

19 tax authorities, vis-a-vis, rights that are granted in the DIP,

20 what it says regarding proceeds as they'll all be handled

21 regarding the DIP, but the Texas taxing jurisdictions reserve

22 the right to object at this time to the establishment of that

23 escrow and it would need to be clear in the order that this was

24 going to happen.

25          THE COURT:  Mr. Galardi is going to enter into

                    **J&J COURT TRANSCRIBERS, INC.**

1  separate stipulations we're the taxing authorities on that.

2  Obviously, if you don't feel that your concerns are getting

3  proper treatment you can always come back to this Court, you

4  know, on an emergency basis or whatever, you know, basis you

5  need to get relief from the Court.  But, I think that separate

6  stipulations will address the issues, at least as they've been

7  presented to me today.

8          MR. GALARDI:  And, Your Honor, I do want to make

9  clear to the taxing authorities that there's the sale of the

10  inventory.  There is not at this time other personal property

11  that's being sold.  And there's only an option to sell the

12  furniture, fixtures and equipment, which a lot of their liens

13  may attach to, and that's not going to happen for a month or

14  two from what I understand.  It's the process.

15          So, I want to be clear that when we're granting this

16  relief we want to make sure, 1) that their lien actually

17  attaches to the stuff, the inventory that they're selling.

18  That'll be the funding mechanism, and then 2) is, we sell

19  proceeds.  It will attach to that.  So, that's why I want to

20  work it out if -- but we will work it out.  I know most of the

21  taxing authorities and I'm sure we'll be able to address it.

22          THE COURT:  All right.  Very good.

23          MR. CHARBONEAU:  Your Honor, really quickly.  Joel

24  Charboneau here on behalf of Palm Beach County Tax Collector.

25  We filed a motion in pro hac vice to get Ben -- I'm sorry --

1   Brian Hamlin admitted before the Court.  I ask the Court to

2   grant that order and it's been submitted to the Court.  I know

3   Brian is on the phone and the Court addressed Letter J which

4   was that objection and I'll let Mr. Hamlin speak to that.

5             THE COURT:  Mr. Hamlin?

6             MR. HAMLIN:  Yes, Your Honor.  Thank you for the

7   Court's courtesy and time this afternoon.  I've heard all the

8   prior arguments and I agree, Your Honor.  I just wanted to

9   bring to the Court's attention, I know we heard a lot of

10  concern about the loss of jobs and it's a concern here in Palm

11  Beach County, as well.  And the aspect of the taxes are 2008

12  pre-petition taxes become delinquent on April 1 and we are

13  still providing, you know, the public safety and welfare on

14  behalf of the buildings and the assets of the debtor.  I'll

15  work with debtor's counsel and see if we can work something

16  out.

17            And we have the second aspect or second factor issue

18  with respect to our taxes of 2009 taxes which are now

19  post-petition. I just wanted to let debtor's counsel know we'll

20  work with them and let the Court know that these are the issues

21  that we're concerned about and we'd like to get these taxes

22  paid because we are providing these services right now whether

23  we want to or not.  And in addition to the loss of the tax base

24  itself in the community and the loss of jobs in the community,

25  we'd like to be as aggressive possible to see what we can do to

1  get these uncontested tax amounts paid.  They're secured by a

2  statutory first lien.

3           I believe most of the ad valorem tax issues around

4  the country are similar in nature, and it is on tangible

5  property.  It is not on the inventory.  So, we look forward to

6  working with counsel and see if we can do this as efficiently

7  as possible rather than waiting for claims objections down the

8  road because I think our facts are relatively uncontested.

9  Thank you very much, Your Honor.  And we'll work with a

10 separate order.

11          THE COURT:  Thank you, Mr. Hamlin.  Yes, ma'am?

12          MS. SOUTH:  Your Honor, Rhysa South with Henrico

13 County Attorney's Office.  You had asked about Item K.

14          THE COURT:  Yes.

15          MS. SOUTH:  That is the County's objection.  We've

16 spoken with debtor's counsel and we're amenable to the

17 segregation of funds.  I've also spoken with Mr. Feldman about

18 an issue on the going out of business sale which I think he'll

19 address in a moment.

20          THE COURT:  All right.  Thank you.

21          MS. SOUTH:  Thank you.

22          THE COURT:  All right.  So, I think that we've

23 addressed all of the taxing authorities.  That, I guess, takes

24 us up to Item C.

25          MR. GALARDI:  C.  And, Your Honor --

**J&J COURT TRANSCRIBERS, INC.**

1          MS. ROMERO:  Your Honor, can the taxing

2   authorities -- Martha Romero from Riverside County,

3   California -- be excused then?

4          THE COURT:  Yes.  The taxing authorities may be

5   excused if they wish.

6          MS. ROMERO:  Thank you.

7          THE COURT:  Okay.  Item C is the D.L. Peterson Trust.

8   Is counsel here?

9          MS. BRAUCHER:  Good afternoon.  Ann Braucher, DLA

10  Piper.  It's B-r-a-u-c-h-e-r, on behalf of D.L. Peterson Trust.

11  Our objection was limited to the facts that our equipment which

12  is leased to the debtors is not addressed specifically in the

13  sale motion, and it seems since I stood up that that is not an

14  issue anymore, that the equipment will not be sold immediately,

15  and also we're happy to hear that no leases are being assumed

16  or rejected today.  So, I just state my appearance.

17         THE COURT:  So, your objection is withdrawn then?

18         MS. BRAUCHER:  I think so.

19         THE COURT:  Okay.  Thank you.

20         MS. BRAUCHER:  Thank you.

21         MR. GALARDI:  And if it's a lease, Your Honor, I

22  don't think we can sell their property, though we might try at

23  times.  The next one is CIM Birch Street, Your Honor.  I think

24  it's a statement of cure.  I think it's a lease issue, so I'm

25  not sure.  I think that's probably a non-issue, but --

                    **J&J COURT TRANSCRIBERS, INC.**

1            THE COURT:  All right.  Is counsel here for CIM Birch

2       Street?  Okay.  I agree that it's a cure issue under a lease

3       and so that would be denied to the extent.

4            MR. GALARDI:  Your Honor, the nest matter is the

5       objection of objecting landlords to motion to sell

6       substantially assets.  I don't know if there's an outstanding

7       objection.  That was Docket 1569.  I don't have a much more

8       specific -- there could be many objecting landlords, Your

9       Honor, so -- that would cover by the title.

10            MR. NEWMAN:  Your Honor, Kevin --

11            THE COURT:  Mr. Epps, are you responsible for this

12       one?

13            MR. NEWMAN:  Yes, Your Honor.  Kevin Newman, Mentner,

14       Rudin & Trivelpiece, P.C. for each of the objecting landlords

15       noted in Docket 1569.  I'm happy to report that that

16       objection's been resolved.

17            THE COURT:  Okay.  Be so noted on the docket.  Thank

18       you.

19            MR. NEWMAN:  You're welcome.

20            THE COURT:  Okay.  The Item Number F is the limited

21       objection of Henrico County.  We just heard that one with Ms.

22       South.  And then next --

23            MR. GALARDI:  Is -- I have objection of Business

24       Objects Americas to debtor's motion found at Docket Number

25       1573.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. HAGGERTY:  Good afternoon, Your Honor.  Richard

2    Haggerty by phone on behalf of Business Objects Americas.  I'm

3    also here on behalf of SAP Retail which is Item H.  These are

4    related objections.  And based upon representations by Mr.

5    Galardi today, it doesn't sound like, at least immediately, the

6    debtors intend to assign or sell any licenses, leases, or

7    things like that.  These objections had to do with the possible

8    assignment of software licenses that are held by my respective

9    clients, and provided that that's not in the offing, I think

10   our objections have been resolved.

11         THE COURT:  All right.  They'll be so noted as

12   resolved on the docket.  Thank you, Mr. Haggerty.

13         MR. GALARDI:  And I can confirm for the gentleman

14   that those licenses and intellectual property, none are being

15   assumed and assigned or rejected today pursuant to this motion.

16         MR. HAGGERTY:  Thank you, Mr. Galardi.

17         THE COURT:  All right.

18         MR. GALARDI:  Your Honor, the next one is FM Facility

19   Management.  I know the counsel --

20         MR. PERKINS:  Good afternoon, Your Honor.  Chris

21   Perkins from LeClair Ryan on behalf of FM Facility Maintenance.

22   I'm joined by my co-counsel, Nancy Washington of the Saiber

23   firm in New Jersey.  A motion to admit her pro hac vice is

24   currently pending.  She'd like to be heard on the objection.

25         THE COURT:  She may.  And your motion pro hac will be

 1 | granted.

 2 |         MS. WASHINGTON:  Thank you, Your Honor.  Good

 3 | afternoon.

 4 |         THE COURT:  Welcome to the court.

 5 |         MS. WASHINGTON:  Thank you, Your Honor.  My client,

 6 | FM Facility Maintenance, provides nationwide maintenance

 7 | services to all of Circuit City's retail locations.  I just

 8 | received the agency agreement today.  I wasn't involved in the

 9 | negotiations, not for lack of trying to get into the mix as

10 | this was unfolding for the last few days.  I am advised by Mr.

11 | Galardi that the expenses that relate to my client are

12 | pass-through expenses.  I don't necessarily read the agency

13 | agreement that way, but Mr. Galardi is way smarter than I am,

14 | so I'm going to take him on his word and then look to work with

15 | Mr. Galardi to get the necessary assurances that I need so that

16 | my client can continue to perform under the contract, or at the

17 | very minimum, I am assured that the contact isn't being

18 | rejected today and that I have a reservation of all of my

19 | rights under the contract, as well as my right to payment and

20 | for my post-petition administrative priority claim, which, by

21 | the way, Your Honor, is accruing at a pretty rapid clip given

22 | the nationwide services that we provide.

23 |         THE COURT:  All right.  Very good.

24 |         MR. GALARDI:  I agree with everything except --

25 |         THE COURT:  The -- nothing in the agency agreement

1 relieves the debtor's responsibility for administrative

2 expenses that your client is -- would incur.

3          MS. WASHINGTON:  Thank you, Your Honor.

4          MR. GALARDI:  I agree, but you're far smarter.  Going

5 to J, I think we have dealt with J which is the objection of

6 Palm Beach County.

7          THE COURT:  Yes.

8          MR. GALARDI:  Again, objection K is a local taxing

9 authority.  I think we've objected -- I mean I think we

10 resolved that.  And now we come to the L which is the Old

11 Republic Insurance Company objection.

12          THE COURT:  And counsel's tried to speak to several

13 times on that already, so counsel on the phone for Old

14 Republic.

15          MS. ANDERSON:  Yes, sir.  Margaret Anderson on behalf

16 of Old Republic Insurance Company.

17          THE COURT:  Okay.  And it looks like your local

18 counsel, Kevin Lake, is here, as well.

19          MR. LAKE:  For the record, Your Honor, Kevin Lake on

20 behalf of Old Republic.  And, Your Honor, I filed a pro hac

21 motion for Ms. Anderson last night.

22          THE COURT:  Okay.  And that pro hac motion will be

23 granted.

24          MR. LAKE:  Thank you, Your Honor.

25          THE COURT:  Ms. Anderson, you may proceed.

1          MS. ANDERSON:  Your Honor, we have objected to the

2    proposed sale and the agency agreement because we view it as a

3    substantial increase and the risk being insured by Old Republic

4    Insurance Company.  And, in effect, a defacto assumption of the

5    workers compensation policy.  Under the workers compensation

6    policy we insure employees of the debtor.  We never meant to

7    underwrite the risk of insuring employees controlled by a third

8    party which would be what would be happening here.

9          Although technically the retained employees remain as

10   employees of the debtor, they are effectively under the control

11   of the agent and we believe that the facts and circumstances of

12   the going out of business sale substantially increased the risk

13   being incurred by Old Republic, and that we should not be

14   forced through the agency agreement to effectively be forced to

15   enter into a defacto assumption agreement of the policies that

16   the party we never agreed to underwrite.

17         This is particularly a concern of Old Republic

18   because the policy issued by Old Republic to the debtors is

19   loss-sensitive which means that the debtors and their estates

20   are obligated to reimburse Old Republic for deductible payments

21   under the policy, and the deductible here is significant in

22   size.  And those payments to injured workers could go on for

23   years if not decades, and Old Republic effectively is being

24   forced to provide insurance with no assurance that it will be

25   paid.

**J&J COURT TRANSCRIBERS, INC.**

1              THE COURT:  All right.  Thank you.  Mr. Galardi, do

2  you wish to respond?

3              MR. GALARDI:  Yes, Your Honor.  First, the agency

4  agreement is not an assumption, it is actually just what it

5  says.  It is the appointment of an agent.  We are still liable

6  for the control of our employees.  Yes, the agent can go in and

7  help liquidate the stores and help direct that, Your Honor, and

8  I think this comes down to 1) we're not assuming and assigning

9  that contract, 2) there's not a date facto assumption.  I don't

10 think that concept's in the bankruptcy code, and 3) if there's

11 a basis on which Old Republic wants to move to compel or were

12 not performing, it has its contract rights under 365 and it can

13 come in and do so.  I think this is a concern that we can

14 address, but it's not right for an objection to the sale when

15 it's not a sale of their contract, and there is no showing or

16 evidence and we'll put it on an expedited basis that somehow

17 we've increased our risk or not still supervising on employee,

18 so I'd ask that it be overruled.

19             THE COURT:  Ms. Anderson, I'm going to overrule your

20 objection, but it's without prejudice to you being able to

21 bring an appropriate motion before the Court under Section 365

22 if you are not adequately protected because of the increase

23 risk or for any other reason.

24             MS. ANDERSON:  Thank you, Your Honor.  We will try to

25 work with the debtors to reach a business solution, but if

1  we're unable to do so we'll be filing the appropriate motion

2  for relief from stay to abolish -- to terminate the policies.

3          THE COURT:  Thank you, Ms. Anderson.

4          MS. ANDERSON:  Thank you.

5          MR. GALARDI:  Your Honor, that brings us to objection

6  of Cormark Inc. to the debtor's proposed sale.

7          MR. McCULLAGH:  Good afternoon, Your Honor.  My name

8  is Neil McCullagh.  I'm here on behalf of Cormark Inc.  Your

9  Honor, the purpose of Cormark's objection is to preserve its

10 reclamation rights.  Your Honor, Cormark is a company based in

11 Illinois that manufactures, among other things, display

12 equipment for the debtor's products.  In the latter half of

13 2008, Cormark sold the debtor approximately a million dollars

14 of cabinets and other equipment that is used by the debtor to

15 display its inventory to the public.  Specifically, it's used

16 to display MP3 players and related items to the public.  So, I

17 think this product sold by Cormark qualifies as FF&E as opposed

18 to inventory.  Cormark filed a timely reclamation demand in

19 late November in the amount of $205,574.28.

20         THE COURT:  And how does the agency agreement affect

21 your rights for reclamation --

22         MR. McCULLAGH:  Your Honor, I've reviewed it briefly

23 this morning before I came to the hearing.  As I understand it,

24 and as I believe Mr. Galardi said, at this point the liquidator

25 is only going to sell inventory --

1          THE COURT:  Right.

2          MR. McCULLAGH:   -- but has an option to sell FF&E at

3    a later time.   The point of my objection and what I would ask

4    the Court to provide in the motion is that Cormark's

5    reclamation rights are not deemed compromised by the agency

6    agreement or the sale.   My concern, Your Honor, is that either

7    through the -- well, through the agency agreement in

8    particular, the liquidator might deem themself a good faith

9    purchaser of Cormark's assets and sell those and claim that

10   they have the right to those funds, thereby effectively wiping

11   out Cormark's reclamation rights.   Cormark can file a prompt

12   TRO and bring this matter before the Court, but I'm concerned

13   that this sale order could be used by the debtor or by the

14   liquidating agent to claim that those reclamation rights have

15   simply been run over.

16          THE COURT:  All right.   Thank you.   Mr. Galardi?

17          MR. GALARDI:  Your Honor, I have no objection

18   preserving whatever reclamation rights they have, Your Honor,

19   and I have been through the reclamation.   I actually believe

20   that they have no reclamation rights based on their demand.

21   But, leaving that aside, they can take whatever.   As I said

22   when the reclamation motion was on, they should take whatever

23   procedure because I believe with the change in the bankruptcy

24   code, they actually had to file a TRO probably a month and a

25   half ago.

**J&J COURT TRANSCRIBERS, INC.**

1          So, I don't believe they have reclamation rights, but

2    if that's the action they have to take.  I don't want to invite

3    somebody to do it, but I did it before and I'll do it again.

4    So, whatever rights they have, nothing in this order will

5    affect those, but I actually wanted counsel to understand, we

6    don't believe they have any reclamation claims or rights.

7          THE COURT:  So, we're not preserving -- we're not

8    creating a right here --

9          MR. GALARDI:  We're not creating a right here.

10   That's what we wanted to make sure.

11         THE COURT:  -- but to the extent that there is one,

12   it's preserved.

13         MR. GALARDI:  That's correct.

14         THE COURT:  Okay.

15         MR. McCULLAGH:  Thank you.

16         THE COURT:  Thank you.  All right.  The next one is

17   Hagan Properties, Inc.

18         MR. LAKE:  For the record, Your Honor, Kevin Lake on

19   behalf of Hagan Properties, a landlord.  Your Honor, this

20   morning we entered into an agreement with the liquidator

21   evidenced by an exchange of e-mails which slightly tweaks the

22   sale guidelines as to this particular landlord at its location,

23   and based on that we will withdraw the objection.

24         THE COURT:  All right.  It will be withdrawn.

25         MR. LAKE:  Thank you, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. GALARDI:  Your Honor, and as is standard, there

2     are very many side agreements, and this order approves the

3     entering into such side agreements.

4          THE COURT:  All right.  The next one is the objection

5     of TJ Maxx.

6          MR. GALARDI:  Your Honor, I have -- am I wrong?  Is

7     it -- I'm up to O, Cellco.

8          THE COURT:  Oh, I'm sorry.  I skipped O.  I

9     apologize.  Cellco Partnership.

10         MR. GALARDI:  Since she sat with us at the auction

11    for a part of the day I thought I'd remember Verizon, Your

12    Honor.

13         THE COURT:  Okay.

14         MS. KALBON:  Thank you, Gregg.  Thank you, Your

15    Honor.  Regina Kalbon again, for the record, for Verizon

16    Wireless.  Your Honor, just a couple conceptual comments and

17    then I had some problems with the order, so I'm not sure how

18    you wanted to handle that.  But, conceptually, I guess first

19    and foremost, you know, we are -- it's really unfortunate that

20    the debtor finds itself in this situation, and given the

21    magnitude of this liquidation, we want to make sure that we are

22    coordinated with the debtor.  And so, we have asked for a point

23    person, at least from the debtor's business side, as well as

24    from the liquidator.

25         I have spoken to Mr. Docksdeal (phonetic) of SB

**J&J COURT TRANSCRIBERS, INC.**

1  Capital and he is coordinating and heading the liquidation

2  efforts and has assured me that he will get me a coordination

3  person for Verizon so that we're not tripping over each other

4  and we can make an orderly exit from each of these 545 stores.

5  And so, and I -- but I do still need a contact person from the

6  debtor.  I still have not gotten that since the last hearing of

7  someone who will coordinate our efforts and our exit from --

8  and our kiosk removal from each of the locations.  I don't

9  think it's an issue.  I think by now everybody knows that we

10  own the kiosks and we own the inventory that's in the cages.

11           THE COURT:  Which is locked up separately.

12           MS. KALBON:  It's locked up and I keep describing it,

13  but I went in and made sure I told the liquidator that so

14  that -- but there are four liquidation companies, so again, the

15  concept of being coordinated and making sure that all four of

16  them know that and so we don't have them selling the FF&E, and

17  that is one of the concerns about this agreement.  Unlike

18  Hilco, this one does extend to the FF&E, and I just want to

19  make sure that they are aware that the kiosks are property of

20  Verizon and put that on the record and make that part of this

21  record.

22           Having said that, there are then a couple other

23  things that I need to point out.  We ran into one issue with

24  the Hilco liquidation and that is in the print ads.  The debtor

25  still has to comply with consumer protection laws and, you

**J&J COURT TRANSCRIBERS, INC.**

1  know, not having any ads that are misleading, and of course the

2  debtor doesn't intentionally do -- would never do that.  But,

3  we did have a run-in with the State of Arizona that they want

4  to make sure that the disclaimers, when they say everything on

5  sale except for Verizon Wireless products, that it's big

6  enough.  So, they -- our argument requires that before the

7  debtor use Verizon Wireless' name in any ad or in any manner

8  that it has pre-approval with Verizon.  Verizon Wireless turns

9  around that advertising process pre-approval almost

10 instantaneously, so it doesn't hold up any process.

11         So, we just have to make sure that that is complied

12 with, that it's in our agreement.  We have to make sure if --

13 in any print ads that they make sure that they're complying

14 with the consumer protection laws.  Then there is some language

15 in the order that gave me some pause on that, so if I could

16 turn to that at the appropriate time I'd like to do that.

17         One more comment.  The liquidator's going to be in

18 through March 30th.  That is the exit date.  There is a ten-day

19 provision where they will give ten days notice to the debtor of

20 an early exit, whether it be the end of January or February,

21 whatever.  The liquidator has agreed to add Verizon Wireless to

22 that ten-day early exit notice, so I'd like that included in

23 the order as well since we do have that agreement.  So, then,

24 Your Honor, if I may turn to the order that I've tried to

25 absorb because it is a lot to absorb in one sitting.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  What are you going to be doing on behalf

2   of Verizon?  Are you just going to remove all of your inventory

3   from the stores at this point and your kiosk, or do you plan to

4   actually do business and continue to sell during the going out

5   of business sale?

6          MS. KALBON:  Well, Your Honor, the way we did it with

7   Hilco was, we continued to operate and sell product, and then

8   at the point in time where it didn't make sense for us to

9   remain in the store because either traffic wasn't enough or

10  whatever, we came upon a mutual schedule that was -- that we

11  agreed with the debtor and we exited those stores.  Was

12  envisioning we'd do the same kind of coordination effort.  If

13  we want an earlier exit I guess we can always come to Your

14  Honor if we can't agree with the debtor and file an emergency

15  motion to have our contract rejected.  But, at this point we've

16  just been agreeing on the appropriate exit to dates for each of

17  the locations and staying in for the sales.  At the same time,

18  the debtor earned commissions on that, so it has been

19  beneficial to both parties.

20          Mr. Galardi has suggested that with respect to our

21  issues that we do a separate stipulation regarding the

22  procedures and the mechanisms and things that we are concerned

23  about with respect to it which is fine.  They generally refer

24  to the -- where the order is requiring the transfer of assets

25  or gives the agent the ability to transfer assets, they're not

1  going to be transferring our assets.  It uses the word assets,

2  the trademark issue that I mentioned and the sale of the FF&E,

3  so -- the coordination and the advertising issue.  So, I would

4  like to just make sure if we can do that in a side letter or

5  stipulation, however that is appropriate.  I'm happy to

6  expedite that along that way.

7           THE COURT:  And I think that's the best relief you

8  can get because then you'll be able to tailor it to your needs.

9  If you do have a problem you know you can come back to this

10  Court and get the relief that you need.

11          MS. KALBON:  I thank Your Honor.  We'll work

12  diligently with the debtor to do that quickly so that we're

13  not -- we're all in sync.  Take care.

14          THE COURT:  So now we're up to P, is that right?

15          MR. GALARDI:  Yes, Your Honor, and that's an

16  objection of TJ Maxx for adequate protection.  I think that's

17  resolved, but --

18          MS. HUDSON:  Good afternoon, Your Honor.  Lisa Hudson

19  on behalf of TJ Maxx of California, LLC here with Steven T.

20  Hoort.  I moved for his admission pro hac vice along with

21  Heather Zelevinsky yesterday and that order is pending, but Mr.

22  Hoort would like to be heard.

23          THE COURT:  All right.  And the motion for pro hac

24  will be granted.

25          MS. HUDSON:  Thank you, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. HOORT:  Thank you, Your Honor.

2          THE COURT:  Welcome to the court.

3          MR. HOORT:  Steven Hoort, Your Honor, Ropes & Gray.

4   Mr. Galardi represented that he is not now -- the debtor's not

5   now seeking authorization to assume, reject, or sell free and

6   clear of leases or subleases, and based on that representation,

7   TJ Maxx of California, LLC is withdrawing its objection.

8          THE COURT:  Thank you very much, sir.

9          MR. HOORT:  Thank you.

10         MR. GALARDI:  Your Honor, I'm up to Objection Q which

11  is the joint objection by landlords and --

12         MR. PERKINS:  Your Honor, Chris Perkins on behalf of

13  various landlords too numerous to list, but it is Docket Number

14  1590, and that objection is withdrawn.

15         THE COURT:  Okay.  Thank you.  And R we've already

16  taken care of.  That's --

17         MR. GALARDI:  And R we've already taken care of, Your

18  Honor.  I don't know, again, given the notice period, whether

19  there are other parties in the courtroom whose objections we

20  need to address.

21         THE COURT:  Is there any party -- other party --

22         MR. GALARDI:  Not that I will invite them.

23         THE COURT:  We'll hear from Ms. Pierro first.

24         MS. PIERRO:  Good afternoon, Your Honor.  Kimberly

25  Pierro here on behalf of Chase Bank USA National Association,

**J&J COURT TRANSCRIBERS, INC.**

1    and I have my co-counsel, Weil, Gotshal & Manges on

2    telephonically who may jump in with some details.  The issue we

3    have involves a stipulation that was approved by this Court on

4    December 24th and was negotiated between Chase and Circuit

5    City.

6         Paragraph 9 of this stipulation provides for what

7    happens when a liquidation happens and the effect of this.  In

8    particular, there is a withholding of daily settlements

9    provision upon the liquidation up to the amount of $3 million

10   on notice that there would, in fact, be a liquidation.  I

11   understand that today Chase received written notice of the

12   complete liquidation of the stores, and so that is going to go

13   into effect immediately and I wanted to get that on the record

14   that it was going to go into effect immediately and would

15   object to anything in the sale order that would contradict that

16   provision of the stipulation.

17        THE COURT:  Is there anything in the sale order that

18   contradicts your -- that provision?

19        MS. PIERRO:  Not that I've seen, but in the sale

20   order that is entered.  In addition, under the stipulation

21   Circuit City was required to provide three business days notice

22   to Chase of -- prior to the announcement of a complete

23   liquidation.  And as notice was just received today -- it was

24   just announced today -- that provision -- they are in violation

25   of this provision of this stipulation as a result of the

1  notice.   There are issues involved in that violation of the

2  stipulation, including a right to set off.

3          There are certain amounts that are owed both ways;

4  Circuit City to Chase and Chase to Circuit City, and in

5  particular, some deadlines for payment are forthcoming and we

6  would ask that the rights to set off that are triggered by a

7  violation of the stipulation and ultimately default of the

8  program agreement be preserved,  specifically with these

9  upcoming dates.  I understand that we are going to be working

10 with the debtor with regard to rejection of that agreement

11 because it's not an agreement that can be assumed and we would

12 file a motion to compel rejection should we not be able to

13 reach and we would want to get that expedited in front of the

14 Court as soon as possible to wrap that up.

15         But, in the meantime, as these payments are coming

16 due to Chase we would ask for authority to withhold payments

17 due to be able to assert out setoff rights that would be

18 upcoming and that we believe we would be entitled to that is

19 all being triggered from the liquidation.

20         THE COURT:  So -- but, this you would have to bring

21 on in a separate motion.  I mean, you're not objecting to the

22 agency agreement or to the liquidation sale itself, are you?

23         MS. PIERRO:  No.  No, we are not.  We are just

24 getting on the record the effect of the liquidation that's been

25 announced today.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Okay.  Well, I'll take notice of that,

2    but I think you need to file an appropriate motion.  You can

3    certainly bring it on on an expedited basis and the Court will

4    hear that, you know, to the extent you're not able to resolve

5    the issue consensually with the debtor, okay?

6          MR. GALARDI:  And, Your Honor, we'd -- I have had

7    contact with the lawyers from Weil Gotshal.  There was,

8    obviously, the obvious problem of giving three days notice

9    before this because there was that concern.  We'll work with

10   them to try to resolve that three-day issue.  We're not trying

11   to prejudice them with that.  And then with respect to the

12   other relief, I think, Your Honor, we would support their

13   having to file a separate motion for setoffs and those kinds of

14   things because it could actually damage our cash flow and all

15   the parties that are interested in paying their secured liens

16   and everything else as pay well, that would have a great effect

17   on us.

18         THE COURT:  Yes.  Very good.

19         MR. HOLTZER:  Yes, Your Honor.  It's Gary Holtzer,

20   Weil Gotshal.  Thank you very much for allowing us to

21   participate by phone.  Just so the record is clear, the

22   stipulation that this Court has signed already grants JPMorgan

23   Chase relief from the automatic stay to effectuate the setups.

24   We'll work with Mr. Galardi to come up with any additional

25   documents in order to finalize the result of the failure to

1   give the three days notice which, as Mr. Galardi indicates,

2   there wasn't time to give.  And if it requires, for example, a

3   motion to compel rejection of our agreement, which is incapable

4   of being assumed now that the stores are being liquidated,

5   we'll file that very quickly, Your Honor, and bring it on in an

6   expedited fashion so that it doesn't cause any interruption

7   with respect to payments that are potentially going back and

8   forth.  I think the next one in question is on the 26th.  We

9   will file something early in the  week if we need to to make

10  sure Your Honor can hear it and resolve it before that's to

11  occur.

12          THE COURT:  And the Court will accommodate you in

13  that regard, sir.

14          MR. HOLTZER:  Thank you very, very much.

15          THE COURT:  You're welcome.  All right.  Thank you,

16  Ms. Pierro.  Now, Mr. Epps?

17          MR. EPPS:  Good afternoon, Your Honor.  A.C. Epps,

18  Jr. on behalf of a number of landlords as the Court is aware.

19  Your Honor, this is -- we have disseminated this order and the

20  procedures to our landlord clients.  We don't know offhand if

21  there are any particular problems.  We do notice that there is

22  a procedure for a resolution for the Court.  What we have

23  discussed with the debtors, and I believe we reached agreement

24  upon, is if a particular landlord cannot work things out with

25  Great American or with the debtor, that they would be entitled

1 to come in, as it says, on an expedited notice, but the next

2 omnibus hearing date would be acceptable to the debtor for that

3 expedited notice.  And in that -- in connection therewith we

4 would ask that if that is what our landlord wants to do that

5 they be allowed to dispense with the motion and order for an

6 expedited hearing if the actual hearing is that date.

7          THE COURT:  Of course.  Yes, we can do that.  If it's

8 going to be on the next omnibus date then we can do that.

9          MR. EPPS:  Yes, sir.  That's the date we're

10 discussing.

11          THE COURT:  Yes.

12          MR. GALARDI:  And since they can arise at any time as

13 long as we're going to be here, Your Honor, I don't -- as far

14 as we know we're going to be addressing an issue, that's fine.

15 I'm not -- I don't need a minimum notice or anything of that

16 sort.

17          MR. EPPS:  Thank you, Your Honor, that's all.

18          THE COURT:  All right.  Thank you.

19          MR. LEHANE:  Good afternoon, Your Honor.  Robert

20 Lehane from Kelley, Drye & Warren on behalf of a number of

21 landlords, and also speaking for some of my brethren in the

22 landlord cabal.  Commend the very hard work of the estate, the

23 committee, and all the parties over the last several days.

24 Very difficult process.

25          We had a couple minor comments to the order that we

**J&J COURT TRANSCRIBERS, INC.**

1 just wanted to point out that the estate has agreed to.  One is

2 with respect to the abandonment of property, and the property

3 left in the premises pursuant to the automatic rejection in

4 this order is deemed abandoned to the landlords and they can

5 dispose of that property without liability to any third

6 parties.  And there is other -- some side agreements with

7 landlords as were noted to the extent there's a rejection.  If

8 there's not a rejection -- if there's a rejection effectuated

9 by this and there's abandonment issues then that would be

10 abandon and the landlords could dispose of --

11            THE COURT:  And this is just liquidation?

12            MR. LEHANE:  Right.

13            THE COURT:  Right.  We're going to take care of

14 rejection at a later date.

15            MR. LEHANE:  Right.  To the extent of side agreements

16 with landlords, there's just one or two spots in the order

17 where we wanted to clarify that the conduct of the sales is

18 also subject to those side agreements and so those comments

19 have been dealt with.  Thank you very much, Your Honor.

20            THE COURT:  Thank you, sir.  Anybody else wish to be

21 heard?

22            MS. HERSHEY LORD:  Your Honor?

23            MR. FALZONE:  Your Honor --

24            THE COURT:  Let me hear from Mr. Falzone first.

25            MR. FALZONE:  Good afternoon, Judge.  Michael Falzone

**J&J COURT TRANSCRIBERS, INC.**

1  for 50212 A6 Street, LLC and various other landlords.  Judge,

2  we have a couple of concerns about the sale guidelines.  I

3  didn't know if you wanted to take those up now or -- we're

4  still doing the order, but I wanted to make sure that I had a

5  chance to be heard on that.

6          THE COURT:  You can be heard.  You don't think you

7  can work out those -- your concerns with the sale guidelines?

8          MR. FALZONE:  I would like to try to work those out

9  with Mr. Galardi.  Let me just for the record state that my

10  concerns have to do with -- first of all with the landlords not

11  having access to the premises during the sale.  We would like

12  to have the opportunity to show the premises to potential

13  tenants in the event the leases are rejected and to be able to

14  do that during the sale.  And the second point is that we would

15  like to have some proof of insurance from the agent in the

16  event that there is damage to the premises during the sale.

17  But, I will talk with Mr. Galardi about those issues.

18          THE COURT:  All right.  Thank you.  All right.  Now,

19  the person that was on the phone that wanted to raise an

20  objection.

21          MS. HERSHEY LORD:  Good afternoon, Your Honor.  My

22  name is Nancy Hershey Lord.  I'm an assistant attorney general

23  with the State of New York.

24          THE COURT:  Okay.

25          MS. HERSHEY LORD:  Your Honor, I think that we do not

**J&J COURT TRANSCRIBERS, INC.**

1  have -- you do not have written objections from any of the

2  states.  I think that was primarily because of the fact that

3  this became a store closing situation with certainty, I guess,

4  midnight last night.  Typically the debtors who are seeking to

5  have going out of business or store closing sales know and

6  circulate to the states by e-mail -- they have particular

7  people that they do circulate it to -- the proposed order and

8  the sale guidelines with respect to store closing sales,

9  particularly with respect to the issues of consumer protection

10  and the terms of sales to consumers and the -- and customers --

11  and the terms of returns and exchanges and refunds and gift

12  cards and other consumer-related issues.  We did not get such

13  an e-mail midnight last night or since.

14        I think I got on the phone and several of the sister

15  states got on the phone when we saw a press release issued a

16  little while ago during this hearing and I guess before this

17  aspect of the hearing that the stores were going to be

18  liquidating.  I speak with concern with respect to the fact

19  that the sale guidelines do not contain any of the typical

20  provisions that we do negotiate in these cases with the

21  liquidators and with the debtors and they're silent.  I don't

22  know what the proposed order includes.

23        Typically there are provisions that delineate between

24  liquidation laws and other state laws.  They provide a period

25  of time by which the states can come in with respect to

1  objections, with respect to liquidation laws, and they also

2  state that there is -- that the order does not affect the

3  states with respect to their other laws of the police and

4  regulatory-type laws.  I don't know if any of that is in there.

5  Again, the states have not seen that proposed order.

6          There are also issues with respect to privacy that we

7  ordinarily seek provisions on, and again, the debtors and the

8  liquidators know all of this.  With respect to this agency

9  agreement which I have read, I see that the exchanges and

10 refunds are specifically detailed, and instead of a 30-day

11 return policy, which was typical for Circuit City, they have

12 reduced that to 14 days.  And presumably notice of that will go

13 out to consumers.

14         With respect to gift cards, gift certificates and

15 rebates for which this Court earlier in the case issued an

16 order authorizing the debtor to, if it so desired, to continue

17 all of those gift card programs, and I understand the debtor

18 has.  And, in fact, the debtor has continued post-petition to

19 sell gift cards.  Just a few minutes ago I went on the website

20 and I think I'm still able to buy a gift card if I so choose.

21         We don't know what the debtor is going to be doing.

22 The section of the agency agreement that I'm looking at at

23 9.2(b) says as directed by merchant.  Agent will accept

24 merchant's gift certificates, gift cards and rebates prior to

25 the sale commencement date.  But, we don't know from this what

**J&J COURT TRANSCRIBERS, INC.**

1  the merchant's position is going to be.  So, we don't even have

2  the knowledge to provide to consumers as to what they're to do

3  with the gift cards.  These are priority claims or

4  administrative expense claims if they were sold since the

5  petition.

6         So, 1) again, we don't know the answer to that, so I

7  don't know whether to be talking about terms of an objection

8  with respect to gift cards.  I've got questions about the

9  website, the e-gift cards, the warranties and guarantees and

10 other customer programs that were in effect before and during

11 this case.  So, I would state the objection in that way, say we

12 have not had an opportunity and then we want an opportunity to

13 negotiate the consumer-related issues on the sale guidelines

14 and on the order once we --

15        THE COURT:  All right.  Thank you.  Mr. Galardi, do

16 you wish to respond?

17        MR. GALARDI:  Yes, Your Honor.  Going through 92 and

18 understanding the sensitive nature of all of this, maybe our

19 language, it says as directed by a merchant on gift cards and

20 rebate we have directed the agent to accept the gift cards, so

21 I think that clarifies that issue.  We've had discussions,

22 obviously, to honor those, especially pre-petition ones, is to

23 decrease the recovery, but after conversations with the

24 committee and how the best way to get the sales and also get

25 people in the stores still, we are honoring those gift

1   certificates.

2           Your Honor, we were not sure that it was a 30 or 14

3   days, but when we talk about the return of merchandise, and

4   more importantly the refunds, refunds is cash out of the

5   company, so we are giving notice that the refund policy will be

6   14 days whether or not it was 14 or 30 and I think that's

7   always complied with most of the AGs.  Returns of merchandise,

8   again, we put the 14 days because when you return the

9   merchandise it's going to be difficult to sell again, so we put

10  the 14-day terms on.  Again, all of that, we believe is clear

11  from the agreement and consistent with the many, many retail

12  cases that we've done.

13          We also had, and I think it's important to point out

14  in Paragraph 13 of the sale order, that actually, you know,

15  maybe it's not -- we think it's the state of the art which has

16  been approved in Delaware and New York recently and all the

17  retail provisions.  It may not be consistent with every single

18  order, but I think it's important to point out that all of the

19  rights are reserved the governmental units to raise all of

20  these kinds of issues to come in here and to have this Court

21  resolve these matters.  We think this language is more than

22  adequate to address it.

23          Obviously, as counsel concedes, both debtor's

24  counsel, committee counsel and the liquidator's counsel, as

25  well as the bank counsel have done this a couple times before,

**J&J COURT TRANSCRIBERS, INC.**

1  know the issues and think we've resolved them all.  I don't

2  think I've ever had in my experience, actually, a governmental

3  unit actually show up in court within that 14-day period.  But,

4  they're certainly welcome to look at these.  What I would ask

5  Your Honor is to prove this, and if they need to have expedited

6  relief because we submit something, I know Your Honor is

7  available.

8          But, if there's not a need for expedited relief and

9  there are open issues, again, like we did with the landlords on

10 the sale guidelines, whatever day they want to give notice, if

11 they want to be here on the 29th hearing arguing about those

12 issues, we'll be here, make ourselves available to address

13 them.  But, it's at least been my historical experience that

14 between us, the liquidators and the other parties of interest,

15 we've been able to resolve these and not have to come to court

16 on that.  I hope that gives the state attorney generals some

17 comfort, and I do apologize for not sending the e-mail at

18 two-thirty last night.

19          THE COURT:  All right.  Thank you, Mr. Galardi.  I

20 think that that would be satisfactory.  Does any of the state

21 attorneys general have a problem with their rights being

22 reserved?  They can come into this court on an expedited basis

23 or on a non-expedited basis just by noticing up any difficulty

24 you'd have for the next omnibus hearing on the 29th?

25          MS. HERSHEY LORD:  Your Honor, I'd like -- I would

**J&J COURT TRANSCRIBERS, INC.**

1 like a commitment from the debtor's attorney if I can have it

2 that he will allow the states to get on a conference call with

3 him so that we could add some sale guidelines that I don't

4 think are going to be objectionable and that we have -- and

5 typically in all the sales.  And again, I did not -- I have not

6 seen the proposed order.  I looked on PACER and could not find

7 it.

8         THE COURT:  All your rights are reserved under this

9 order, and so -- and I realize you haven't seen it, but nothing

10 in the order is going to prejudice any right that you have.

11 And if you need to come to the court, you know, on an expedited

12 basis because of some problem you can, but I think Mr. Galardi

13 has represented that he will resolve all of your issues with

14 you, but if for some reason you can't, then this Court will be

15 available to address any concern you have either on an

16 expedited basis or a non-expedited basis.

17         MR. GALARDI:  And, Your Honor, and I give her my

18 commitment, and I'm going to also commit the Gordon Brothers

19 agents and their counsel because, really, this always comes

20 down to their helping to resolve -- not Gordon Brothers.

21 That's the last thing they want to do.

22                     (Laughter)

23         MR. GALARDI:  The great American --

24         THE COURT:  Great American.  Thank you.

25         MR. GALARDI:   -- SB Capital, and my apologies, Your

**J&J COURT TRANSCRIBERS, INC.**

1  Honor -- to get on a conference call.  We have their e-mails.

2  We know the counsel who normally does this.  So, we will get

3  that, and if they wanted to schedule a time sometime early next

4  week after they have an opportunity the weekend to review, I'm

5  sure we can have a conference call and try to resolve those

6  issues.

7          MS. HERSHEY LORD:  Your Honor, we appreciate that,

8  and I thank Mr. Galardi for that commitment, and we will do

9  that on Tuesday if possible, or earlier.  I just want to just

10 clarify that the agent on the merchant's direction will be

11 accepting gift cards, gift certificates and rebates throughout

12 the entire sale.

13         THE COURT:  Yes.  That's what the representation was.

14         MS. HERSHEY LORD:  Thank you.  And, Your Honor, there

15 are some other states on the phone.  I don't know if any of

16 them will want to speak up.

17         THE COURT:  Well, this goes for every state.  No

18 state is being prejudiced by the entry of the order.

19         MS. HERSHEY LORD:  Thank you, Your Honor.

20         THE COURT:  Thank you.

21         MS. WAIT:  Your Honor, Carolyn Wait here for the

22 State of Oregon.  I had one tiny question.  If the

23 determination is to stop accepting gift cards, would it be

24 possible to include in the order a provision that notice would

25 be given to the states of that change?

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Well, what I would prefer is that you

2    talk to Mr. Galardi about this at the conversation on Tuesday

3    or Wednesday of next week whenever that conversation occurs so

4    that there'd be some sort of a uniform provision that is

5    acceptable to the states.  If you can't get agreement, then by

6    all means come back here and I will order it.

7          MS. WAIT:  Thank you, Your Honor.

8          MS. HERSHEY LORD:  Your Honor, it's Ms. Lord again.

9    I failed to mention something.  Is the debtor going to be

10   taking down its website and it will, I assume, cease selling

11   gift cards as of today?

12         MR. GALARDI:  Your Honor, we're going to work with --

13   I believe we are going to cease selling gift cards today.  As

14   to taking down the website and the timing of that, that's

15   another issue because that does have an impact on -- we think

16   it's a valuable website.  It may be an asset we want to sell

17   and we wanted to coordinate.  The agency agreement actually

18   allows certain access subject to reasonable agreements, I

19   believe, between the parties.  So, I can't say today we're

20   taking down the website, and indeed -- and those markets should

21   close faster, people can use their gift cards.  So, it does

22   have an advantage to many of the states where you have closed

23   stores, for example, when we closed Regents.  So, I don't think

24   it's -- we haven't made a decision yet to close the website

25   down.

**J&J COURT TRANSCRIBERS, INC.**

1        MS. HERSHEY LORD:  But, you'll stop selling gift

2   cards?

3        MR. GALARDI:  Yes.  I believe that's unwise for us to

4   do so, yes.

5        MS. HERSHEY LORD:  Thank you.

6        THE COURT:  All right.  Any other party wish to be

7   heard?

8        MR. BERLIN:  Your Honor, Brett Berlin from Jones Day

9   appearing telephonically on behalf of Jantzen, J-a-n-t-z-e-n,

10  Dynamic Corporation, one of the debtor's landlords.  I

11  appreciate very much the opportunity to appear telephonically.

12  Thank you.  I will speak briefly.

13       I just wanted to make what I hope is a clarification

14  for the record with respect to my landlord client which is for

15  similar relief to -- the relief that came up a few minutes ago

16  with one of the other attorneys in the courtroom who was

17  speaking for a group of landlords that under the circumstances

18  my client has not really had any opportunity to review the

19  store closing sale guidelines, and that we would do so and try

20  to work with the debtors.  If we have any concerns about them,

21  to resolve those concerns as promptly as possible, but that in

22  the absence of any resolution we would be able to come back

23  before Your Honor, perhaps on January 29th or soon thereafter

24  as possible to get a resolution of any concerns that we cannot

25  resolve with the debtors and the liquidator.

1          THE COURT:  Yes.  That applies to all landlords,

2     including your client.

3          MR. BERLIN:  Thank you very much for the

4     clarification, Your Honor.  One last point which is just to

5     inquire of the debtors whether -- is there a particular

6     representative of the liquidator J.V. whose name and number you

7     could announce now on the record for us to contact, or do you

8     want me to just contact you separately to gain that information

9     from you?

10          MR. GALARDI:  I'm going to keep Mr. Raskin's e-mail

11    and phone number confidential, but if you send us an e-mail we

12    will -- we'll give it out unless you think it's wise to give it

13    out.

14          MR. BERLIN:  No, that's fine.  I can get in touch

15    with you, Mr. Galardi, and --

16          MR. GALARDI:  And we'll give the -- just give it to

17    us and we'll also go through Wachtell who is representing the

18    Great American Joint Venture.  So, they will coordinate the

19    name of the person.

20          MR. BERLIN:  That's fine.  I'll contact -- I'll make

21    that contact if I need to do so after my client review the

22    guidelines.

23          MR. GALARDI:  Thank you.

24          MR. BERLIN:  Thank you.

25          THE COURT:  Is there any other party that wish to be

**J&J COURT TRANSCRIBERS, INC.**

1  heard?

2          MR. BILLOWS:  Your Honor, Pete Billows on behalf of

3  five of the debtor's landlords.  I have had an opportunity to

4  look at the sale guidelines, but I, like most, just received it

5  this morning and haven't had a chance to talk with my clients

6  about them.  And certainly we would welcome having a discussion

7  with Great American or whoever we need to discuss a possible

8  resolution to them.

9          But, I did want to put on the record and note my

10 objection to a couple of the provisions of the sale guidelines,

11 notwithstanding Your Honor's courtesy reservation of rights

12 with respect to them only because the sale is to begin tomorrow

13 and I think that there are a couple of these that are going to

14 affect my clients most immediately.  And in looking at the sale

15 guidelines, Your Honor, Letter D of the sale guidelines which

16 is Exhibit 2 to the agency agreement, there is a statement that

17 the merchant and agent shall be permitted to utilize sign

18 walkers.  While it's not unusual to see sign walkers in the

19 sale guidelines, I think it is a little unusual to have no

20 limitation on that.  And normally we'd come to an agreement

21 that the sign walkers will not be on the shopping center

22 property.  Obviously, that raises certain liability issues.

23          I think if the liquidator were to agree to indemnify

24 for any loss with respect to any liability that a sign walker

25 may cause or may himself or herself incur or damage that they

**J&J COURT TRANSCRIBERS, INC.**

1  may incur, that we have that agreement today on the record or

2  that with respect to my client's properties, that that piece of

3  the sale guidelines will not be effective until we can come to

4  some resolution.

5          With respect to exterior banners which is, again,

6  part of Letter D in the sale guidelines, we certainly have an

7  issue with respect to how the exterior banners may be affixed,

8  and really in cases of liquidations, how they are normally

9  affixed to the building.  And notwithstanding the

10 representations that the agent will not make alterations to the

11 store front and exterior walls, we have had experience with --

12 bad experiences with exterior banners that do cause significant

13 damage to the facade.

14         And again, we'd want at least today on the record, an

15 agreement from the liquidator that they will pay for any

16 damages caused by the affixation of the exterior banners or in

17 the absence of that a -- again, a carve out of that piece of

18 the sale guidelines with respect to my client's properties.

19 We'd also like, I think, contact people who are on the ground

20 that are at the various locations.

21         In addition to talking with the representative of

22 Great America, I think it makes sense if Mr. Galardi would be

23 kind enough to pass along or someone from his office would be

24 kind enough to pass along contact people at the various

25 locations where my clients can more immediately register or

1  issue -- register issues or complaints with them.

2         Finally, Your Honor, in addition to the objection of

3  the sale guidelines, I do want to not ask the Court to

4  reconsider as some of the landlords have done, your decision of

5  a couple of weeks ago regarding the stub rent, but rather renew

6  our motion which we had filed back in December on the stub rent

7  issue based on as you put it, I think, in the order, Your

8  Honor, changed circumstances.  The first round of store

9  closings as Your Honor may be aware, there were issues of

10 payment of stub rent under 365(d)(3), and my understanding from

11 conversations before that last hearing with debtor's counsel

12 was that with respect to store closing agreements were being

13 reached by which -- or through which stub rent would be paid.

14        We also heard earlier, Your Honor, from Mr. Foley

15 with respect to some of the landlord objections or motions to

16 compel pursuant to 365(d)(3) that those motions had been

17 resolved, although we didn't get any specifics about how those

18 were resolved.  I don't know whether those were leases that

19 were leases for some of the ongoing store closings or whether

20 they were leases that were similar to the leases of my clients

21 which were -- which are now, you know, subject to the second

22 round of store closings.

23        So, I'd like to renew that motion only because I

24 think that given the changed circumstances that to the extent

25 that stub rent's been paid for some landlords that there needs

**J&J COURT TRANSCRIBERS, INC.**

136

1   to be equitable treatment.  I think, Your Honor, when you made

2   your decision which was really based on not giving superior

3   priority to landlords, that that wasn't a decision that you

4   were making by which you were handing to the debtors discretion

5   to give super priority or not.  I think it was what it was

6   which was you were not going to make a decision that was going

7   to permit stub rent to be -- or to compel stub rent to be paid

8   immediately.

9        So, to the extent that the debtors have chosen to pay

10  stub rent, I think that there needs to be equitable treatment

11  at this point for all landlords given that we really are all in

12  the same boat, assuming that Your Honor approves this agency

13  agreement, and we're talking about a company-wide liquidation.

14  Thank you, Your Honor.

15        THE COURT:  All right.  Thank you.  All right.  With

16  regard to the objection to the sale guidelines regarding

17  exterior banners and sign walkers, those objections are

18  overruled without prejudice to counsel being able to renew

19  those either on the 29th or if for some reason on an expedited

20  basis between now and then, and I would like you to direct

21  those concerns to counsel for Great American and get those

22  issues resolved consensually, and if you cannot, then you can

23  come back before this Court.  And the motion to reconsider the

24  stub rent issue is also denied.  Is there any other party that

25  wishes to be heard in connection with the order or the agency

1 | agreement or the guidelines?  Yes, sir.

2 | MR. FELTMAN:  Good afternoon, Your Honor.  Josh

3 | Feltman from Wachtell Lipton on behalf of the Joint Venture,

4 | sometimes referred to as the liquidator.  I just wanted to

5 | address a couple points.  Agree with everything that's been

6 | said and I think we've reached reasonable resolutions of every

7 | issue that's been raised.

8 | Very early on in the hearing Mr. Galardi described

9 | the fundamental economics of the transaction.  I just want it

10 | to be clear that before either the agent or the company will

11 | share in the upside of revenues above the guaranteed amount,

12 | part of the guaranteed amount is expenses, and expenses get

13 | paid first.  Lest it go on the record, otherwise we need to pay

14 | from proceeds the expenses of the sale.

15 | Second point to address, the attorney general who I

16 | have sympathy for having not seen a lot of what we would've

17 | liked for them to have seen had there been time, I think they

18 | will find that a lot of the modern "technology" from recent

19 | sales and comparable unfortunate situations of liquidating

20 | retailers are built in.  The distinction between a safety law

21 | and a general law being absolutely required to be followed and

22 | not at all affected by this Court versus a GOB sale related law

23 | where there's some relief being given, but the states still

24 | have the right to come in, object, expedite a notice and so

25 | forth.

**J&J COURT TRANSCRIBERS, INC.**

138

1          So, I think they will be content with that.  Also was

2    not mentioned that there is in the order and in the agreement

3    itself restrictions on the use of confidential information.

4    Let me make it clear that we're not buying any confidential

5    information.  We're not buying any customer lists.  We're not

6    selling any customer lists and so forth.

7          The Verizon representative was here from Verizon who

8    we spoke to.  We certainly absolutely acknowledge that we are

9    not selling inventory that does not belong to the company and

10   that belongs to Verizon.  We absolutely will not use their name

11   in any type of advertising that we may due jointly with the

12   debtor.  We will, of course, comply with consumer protection

13   laws, and if it is such that you have to say excludes Verizon,

14   we will make every endeavor to cooperate both before -- not

15   before the sale begins because that's basically now, but as

16   soon as possible to figure out in advance how to make that

17   work.

18         I don't want to promise right now that every single

19   ad that may be subject to such a consumer protection law we

20   will run by them ahead of time, but comparable to our

21   commitment to work with the landlords, to work the attorney

22   general, I'm very confident that we'll make this work, and we

23   will talk to you about protocols and principles, and any

24   standards you've learned from your prior experience we will

25   apply as a general matter.  But, I just don't -- I just want to

**J&J COURT TRANSCRIBERS, INC.**

1   be clear that it's not probably going to be functional to show

2   every single ad that may have this ahead of time, and I

3   understood counsel to say that they will be considerate and

4   expeditious and considering, but the truth is, these sales, the

5   prices change all the time.  The discounts change and the

6   process is very quick and we just wanted to --

7           MS. KALBON:  Your Honor, then maybe we can work out a

8   form of that of some sort.  We'll try to work --

9           THE COURT:  That's what I was thinking.

10          MS. KALBON:  We'll work something out.

11          THE COURT:  All right.

12          MS. KALBON:  Or else be back before Your Honor.

13  Thank you, Your Honor.

14          MR. FELTMAN:  And that was really it.  One of the

15  landlords or one the last landlord representatives to speak

16  raised concerns about sign walkers not on the properties.  It

17  is our policy not to have the sign walkers on the shopping

18  center properties.  We don't -- it was raised.  I just want to

19  say we're not committing to indemnify anybody for any damage.

20  A landlord would clearly have under its lease claims as

21  administrative expenses for damages and whatever other rights

22  it has under its lease because those leases have not been

23  rejected and the debtor may have rights against us if we're

24  negligent and so forth, so the landlord, I'm sure, would have

25  some rights.  I just want to be clear that we are not as such

1 indemnifying.

2          That being said, we have every intention of putting

3 up signs consistent with both the sale order, with the

4 guidelines, with all the side agreements and technical

5 provisions that the idiosyncratic -- that the landlord's

6 idiosyncratically have and -- but I just wanted to leave it at

7 that.  And that's it.  We are sorry the company's in the

8 situation it is.  We hope that we can bring some return for the

9 remaining stakeholders.  Thank you.

10          THE COURT:  All right.  Thank you.  It has been the

11 Court's experience that while these issues are raised such as

12 sign walkers and banners and such at the front end as grave

13 concerns that they almost always get resolved consensually.

14 But, again, any party that needs to can come back to the Court

15 if that's not the case in this circumstance.  All right, Mr.

16 Galardi.

17          MR. GALARDI:  Your Honor, I guess we sadly and

18 reluctantly actually ask that you approve the sale to the Great

19 American Group and allow them to go forward with the agency

20 agreement, the sale guidelines and the proposed form of order.

21          THE COURT:  Thank you.  It is indeed unfortunate that

22 the debtor finds itself in the situation that it's in today.

23 This is a very sad day for management, for the employees, for

24 the customers and for the community.  Circuit City has been a

25 very good corporate citizen in this community for many years,

141

1  and this is probably one of the most difficult things I've been

2  asked to do since I've been on the bench.  And I will

3  reluctantly grant your motion and enter that order.  Any

4  further business today?

5         MR. KAPLAN:  Your Honor?

6         THE COURT:  I'm sorry.  Who's on the phone?

7         MR. KAPLAN:  I'm sorry, Your Honor.  This is Gary

8  Kaplan from the Howard Rice law firm in San Francisco.  We

9  represent one of the landlords named Eel McKee.  And I

10 apologize since this has been gone over already, but is there a

11 proposal as to when the debtors propose to reject the various

12 leases and surrender the premises?

13        THE COURT:  No release is being rejected by the

14 Court's order today.

15        MR. GALARDI:  Just for the information.  We intend to

16 do a lease procedure that will -- that'll address that issue in

17 short order, Your Honor.

18        THE COURT:  I assumed that you would.  Is there any

19 further business then, Mr. Galardi?

20        MR. GALARDI:  No, Your Honor.  We'll try to finish up

21 the order before we leave here today or have it submitted as

22 soon as possible.

23        THE COURT:  All right.  Thank you.

24        THE CLERK:  All rise.  The court is now adjourned.

25                    *  *  *  *  *


**J&J COURT TRANSCRIBERS, INC.**

1                           **C E R T I F I C A T I O N**

2               We, Rita Bergen, Amy Rentner and Kathleen Betz, court

3    approved transcribers, certify that the foregoing is a correct

4    transcript from the official electronic sound recording of the

5    proceedings in the above-entitled matter, and to the best of

6    our ability.

7

8    /s/ Rita Bergen

9    RITA BERGEN

10

11   /s/ Amy Rentner

12   AMY RENTNER

13

14   /s/ Kathleen Betz                     DATE:   January 19, 2009

15   KATHLEEN BETZ

16   J&J COURT TRANSCRIBERS, INC.

**J&J COURT TRANSCRIBERS, INC.**