# EXHIBIT D

LOCATION:  Wayne, New Jersey

## GROUND LEASE

between

### CIRCUIT CITY STORES, INC.,

as Tenant

and

### STAR UNIVERSAL L.L.C.

as Landlord

dated August 5, 1997

H:\KANER\CORR\88170_3\54\44 (5295)



# TABLE OF CONTENTS

1.   Leased Property  . . .   . . . . . . . .   . . .   . . .   . . .   1

2    Construction of Improvements and Site Work   . . .   . .   . . .   1

3    Lease Term   . . .   . .   . . .   . . .   . .   . .   . .   3

4    Base Rent   . .   . .   . . . . . . . .   . .   . . .   . .   5

5.   Development of Shopping Center by Landlord . . . . . . . . .   6

6.   Easements . . . .   . . .   . .   . . . . . .   . . .   6

7    Common Areas and Common Area Maintenance . .   . . .   .   .   .   7

8    Signs and Communications Equipment . . . . . .   . .   . .   . .   . . .   12

9.   Taxes . . .   . .   . .   . . . . .   . . .   . .   . . .   . . .   14

10   Store Repair and Operations . . . . .   . . . . .   . .   . .   . .   16

11   Utilities   . .   . . .   . . . . .   . .   . .   . .   . .   18

12   Alterations . . . . . .   . . . . . .   . .   . .   . .   18

13.  Mechanics' Liens . . .   . . . . . . . . . . . . . . . . . .   . .   19

14   Insurance   . .   . . . . . . . . . . . . . . . . . .   . . . . . .   19

15   Damages by Fire or Other Casualty . . .   . .   . . . . . .   . .   24

16   Condemnation . . . . .   . . . . . .   . . .   . . . . .   . .   26

17.  Assignment and Subletting . .   . . . . .   . . . . . . . .   . .   28

18   Use . . . . . . . . . . . . .   . . .   . . .   . . . . . . . . .   31

19.  Warranties and Representations . . . . . .   . . . . . .   . . .   32

20   Estoppel Certificates . . .   . . . . . .   . . .   . .   . .   39

21   Subordination, Non-Disturbance and Attornment . . . .   . . .   39

22   Change of Landlord   . .   . . . . .   . . . . . . . . .   . .   40

i

H:\KANER\CORR\88170_3\54/44 (5295)

VN0000000004

| 23 | Tenant's Financing | 40 |
| 24 | Tenant's Property and Waiver of Landlord's Lien | 43 |
| 25 | Memorandum of Lease: Commencement Date Agreement | 43 |
| 26 | Expiration of Term and Holding Over | 43 |
| 27 | "For Rent" Signs | 44 |
| 28. | Force Majeure | 44 |
| 29 | Events of Tenant's Default | 44 |
| 30 | Landlord's Remedies | 45 |
| 31 | Events of Landlord's Default: Tenant's Remedies | 48 |
| 32. | Waiver | 50 |
| 33. | Compliance with Applicable Laws | 50 |
| 34. | Notices | 51 |
| 35 | Brokers | 52 |
| 36 | Miscellaneous | 52 |
| 37. | Effectiveness of Lease; Tenant's Right to Terminate | 54 |
| 38. | Confidentiality | 55 |
| 39. | Continuous Use Recapture | 55 |
| 40. | Liability of Landlord | 55 |
| 41 | Liability of Tenant | 56 |
| 42 | Operating Statements | 57 |
| 43. | No Offset | 57 |
| 44 | Entry | 57 |
| 45 | INTENTIONALLY OMITTED | 58 |
| 46. | Interest | 58 |

H:\KANER\CORR\68170_3\54\44 (5295)

VN0000000005

| 47 | Consequential Damages | 58 |
| 48. | Additional Charges | 58 |
| 49 | Financial Statements | 58 |
| 50 | Unamortized Costs | 59 |
| 51 | Electrical Lines | 59 |
| 52 | Emergency Repairs | 59 |
| 53 | Relocation of Premises | 59 |
| 54 | Existing Tenants | 61 |
| 55 | Authorized Signatory | 62 |

iii

H:\KANER\CORR\88170_9\54\44 (6285)

VN0000000006

## EXHIBITS

| | |
|---|---|
| "A" | Site Plan |
| "A-1" | Shopping Center Legal Description |
| "A-2" | Land Legal Description |
| "B" | Sign Plans |
| "C" | Permitted Encumbrances |
| "D" | Subordination, Non-Disturbance and Attornment Agreement |
| "E" | Memorandum of Lease |
| "F" | Commencement Date Agreement |
| "G" | Removable Trade Fixtures |
| "H" | Existing Mortgage Subordination, Non-Disturbance and Attornment Agreement |
| "I" | Index of Definitions |

H:\KANER\CORR\88170_3\54/44 (5295)

VN0000000007

Wayne, New Jersey

## GROUND LEASE

This Ground Lease ("Lease") is made as of the 5th day of August, 1997, by and between STAR UNIVERSAL L.L.C., a New Jersey limited liability company, having an address c/o Vornado Realty Trust, Park 80 West, Plaza II, Saddle Brook, New Jersey 07663 ("Landlord"), and CIRCUIT CITY STORES, INC., a Virginia corporation, having an address at Deep Run I, 9950 Mayland Drive, Richmond, Virginia 23233 ("Tenant")

### W I T N E S S E T H

That for and in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows.

1      Leased Property.   Landlord demises and leases to Tenant and Tenant leases and takes from Landlord, all that certain plot, piece or parcel of land located in Wayne, New Jersey (the "State") and consisting of approximately four (4) acres of ground area (the "Land") together with the "Improvements" (as hereinafter defined) including, but not limited to the building consisting of approximately 45,759 square feet of ground floor area ("Building") to be erected on the portion of the Land designated as "Building Pad" on Exhibit A attached hereto and made a part hereof and is designated as "Premises" on Exhibit A (collectively, the "Premises"). The Premises includes any alterations, additions or repairs made thereto. The Land is part of a larger parcel which may be further developed by Landlord (such larger parcel is referred to in this Lease as the "Shopping Center"). A legal description of the Shopping Center is annexed hereto as Exhibit A-1 and a legal description of the Land is annexed hereto as Exhibit A-2 "Improvements" means the Building and improvements, including, but not limited to, utilities and sidewalks, at any time constructed on the Land after demolition of the existing buildings and any replacements thereof.  Improvements also includes the "Additional Installation" (as hereinafter defined) and any and all other installations and improvements constructed by Tenant anywhere in the Shopping Center, other than the "Site Work" (as hereinafter defined) which shall not be included within the definition of

1

H:\KANER\CORR\88170_3\54/44 (5295)



Improvements   Notwithstanding anything to the contrary herein contained, title to the Building and Improvements shall be vested in Tenant until the expiration or earlier termination of this Lease, at which time title to the Building and Improvements shall vest in Landlord, without compensation to Tenant.

2.   Construction of Improvements and Site Work.   (a)   Tenant has submitted to Landlord plans and specifications ("Tenant's Plans") for the construction of the site work to be performed by Tenant on the Premises ("Site Work") and the Improvements (collectively, "Tenant's Work"). Landlord agrees that Tenant's Work shall be constructed by Tenant, so as to substantially conform to Tenant's Plans. Tenant may make minor variations from Tenant's Plans, provided such variations conform to the provisions of paragraphs 12(b), (c), (d), (e), (f), (g), (h) and (i). In all other respects, Tenant's Work shall be performed in accordance with the provisions of this paragraph 2

(b)   Promptly after Tenant obtains its building permits and after "Delivery of Possession" (as hereinafter defined), Tenant shall commence the performance of Tenant's Work and, subject to events of Force Majeure including, without limitation, weather delays, shall diligently prosecute Tenant's Work to completion.

(c)   Tenant shall perform all of Tenant's Work in accordance with the provisions of paragraphs 12(c), (d), (h) and (i), as if such paragraphs were applicable to Tenant's Work.

(d)   Provided Tenant, at its sole cost and expense, has applied for and received any and all permits and licenses which may be required from the applicable governmental authorities and public utility companies having jurisdiction, Tenant may install utility lines, feeders, conduits and waste lines running through the "Common Areas" (as hereinafter defined) of the Shopping Center (as shown on Tenant's Plans) and into the Building for the sole and exclusive use of Tenant and for the sole benefit of the Premises. If Landlord's joinder is required, Landlord will sign applications for such permits and any required utility easements in form and location reasonably satisfactory to Landlord and Tenant.

Prior to doing any work relating to the installation of said utility lines, feeders, conduits and waste lines (such work and installation are hereinafter referred to as "Additional Installations"), Tenant shall submit to Landlord for Landlord's written

2

VN0000000009

approval (which approval shall not be unreasonably withheld, conditioned or delayed) detailed plans and specifications relating to such Additional Installations, including the area where work is to be performed. The Additional Installations including all equipment, labor, and materials shall be at Tenant's sole cost and expense and shall be performed in conformity with said approved plans and specifications and with all applicable laws, rules, and regulations of governmental authorities and public utility companies having jurisdiction and with all rules and regulations of the Board of Fire Underwriters. All costs and expenses in connection with the repair, replacement, operation, and maintenance of such Additional Installations shall be borne solely by Tenant, including, but not limited to, repairs to all portions of the Common Areas required as a result of Tenant's Work in the Common Areas. All of the provisions of this Lease shall apply to the Additional Installations, including, by way of example, but not limited to, Tenant's duty to comply with all laws, Tenant's indemnification of Landlord for liability in regard thereto, and Tenant's duty to carry insurance and Tenant's duty to make repairs.

(e)   If any governmental authority requires that a certificate of occupancy be issued with respect to the Premises, Tenant shall apply for, and obtain a certificate of occupancy. Landlord shall fully cooperate and assist Tenant in obtaining any necessary permits and/or certificates of any kind, provided that Landlord is reimbursed for all reasonable out-of-pocket expenses incurred in connection therewith, except for costs incurred in connection with Landlord's Work, and further provided that such cooperation shall not require the performance of work to be performed outside of the Premises nor impose any restriction(s) on Landlord's use of any portion(s) of the Shopping Center, except as set forth in this Lease to the contrary.

(f)   Tenant shall, as part of Tenant's Work, demolish the existing buildings located in the Shopping Center ("Existing Buildings").

(g)   Tenant hereby agrees to indemnify, defend and hold Landlord harmless from any loss or damage suffered by Landlord as a result of Tenant's Work.

3.   <u>Lease Term</u>  (a)  The term of this Lease ("Term") shall commence on the earlier to occur of (i) the 210th day next following Delivery of Possession, or (ii) the date Tenant opens the Premises for business. The Term shall expire on the date designated

3

H\KANER\CORR\65170_3\54\44 (5295)

VN0000000010

as "Expiration Date" (as hereinafter defined).   The date upon which the Term commences is referred to in this Lease as the "Commencement Date"

(b)   "Delivery of Possession" shall be deemed to have occurred upon the last to occur of the following (each of which shall be conditions precedent to the effectiveness of this Lease):

(i)   Landlord's notice to Tenant delivering actual possession of the Land which notice shall contain a statement (which shall be deemed to be a representation) that the Existing Buildings are free and clear of the "Existing Tenants" (as hereinafter defined),

(ii)   Landlord's notice (which notice shall be accompanied by the certification (as to such removal) of the contractors that performed such removal and any certification(s) required by the governmental authority(s) having jurisdiction) to Tenant that the Existing Buildings are free of asbestos, and

(iii) Landlord's notice (which notice shall be accompanied by the certification (as to such removal) of the contractors that performed such removal and any certification(s) required by the governmental authority(s) having jurisdiction) to Tenant that the "Report Substances" (as hereinafter defined) have been removed from the Shopping Center and that any replacement soil has been installed in accordance with the following specifications: (x) eight (8) inch lifts; (y) 95% Modified Proctor; and (z) 2,500 psf bearing capacity.

(c)   The Term shall be for a period of twenty (20) years plus the partial month, if any, from the Commencement Date to the last day of the month in which the Commencement Date occurs, if the Commencement Date is not the first day of a month The Term shall expire on the twentieth (20th) anniversary of the last day of the month in which the Commencement Date occurs ("Expiration Date"), unless sooner terminated as hereinafter provided.

(d)   The term "Lease Year" shall mean each successive period of twelve (12) consecutive calendar months, commencing on the first day of each February during the Term, except that the first Lease Year shall commence on the Commencement Date and shall end on the last day of January following the first anniversary of the Commencement Date

4

H KANER\CORR\68170_3\54\44 (5295)

(e)    (i)    Provided Tenant is not in default under the terms of this Lease and provided further that this Lease has not been terminated pursuant to the provisions hereof, Tenant shall have the option to renew this Lease for one additional period of five (5) years (the "First Renewal Term")  Said option shall expire and be of no force or effect unless exercised by Tenant giving notice thereof to Landlord sent not later than the 270th day immediately preceding the Expiration Date of the original Term.

(ii)    All of the terms, conditions and provisions of this Lease shall remain in full force and effect during the First Renewal Term, except that the Base Rent shall be increased to the sum of $841,857.50 per annum during the First Renewal Term

(f)    (i)    If Tenant shall have exercised the aforesaid first renewal option, then provided Tenant is not in default under the terms of this Lease and provided further that this Lease has not been terminated pursuant to the provisions hereof, Tenant shall have the option to renew this Lease for a second additional period of five (5) years (the "Second Renewal Term").  Said option shall expire and be of no force or effect unless exercised by Tenant giving notice thereof to Landlord sent not later than the 270th day immediately preceding the Expiration Date of the First Renewal Term.

(ii)    All of the terms, conditions and provisions of this Lease shall remain in full force and effect during the Second Renewal Term, except that the Base Rent shall be increased to the sum of $926,043.25 per annum during the Second Renewal Term

(g)    (i)    If Tenant shall have exercised the aforesaid second renewal option, then provided Tenant is not in default under the terms of this Lease and provided further that this Lease has not been terminated pursuant to the provisions hereof, Tenant shall have the option to renew this Lease for a third additional period of five (5) years (the "Third Renewal Term").  Said option shall expire and be of no force or effect unless exercised by Tenant giving notice thereof to Landlord sent not later than the 270th day immediately preceding the Expiration Date of the Second Renewal Term.

(ii)    All of the terms, conditions and provisions of this Lease shall remain in full force and effect during the Third Renewal Term, except that the Base Rent shall be increased to the sum of $1,018,647.57 per annum during the Third Renewal Term.

(h)    (i)    If Tenant shall have exercised the aforesaid third renewal option, then provided Tenant is not in default under the terms of this Lease and provided further

H\KANER\CORR\83170_3\54\44 (5295)

VN0000000012

that this Lease has not been terminated pursuant to the provisions hereof, Tenant shall have the option to renew this Lease for a fourth additional period of five (5) years (the "Fourth Renewal Term"). Said option shall expire and be of no force or effect unless exercised by Tenant giving notice thereof to Landlord sent not later than the 270th day immediately preceding the Expiration Date of the Third Renewal Term.

(ii)     All of the terms, conditions and provisions of this Lease shall remain in full force and effect during the Fourth Renewal Term, except that the Base Rent shall be increased to the sum of $1,120,512.33 per annum during the Fourth Renewal Term.

(i)     Neither the foregoing options granted to Tenant to renew this Lease, nor the exercise thereof by Tenant, shall prevent Landlord from exercising any right granted or reserved to Landlord in this Lease or which Landlord may have by virtue of any law to terminate this Lease, either during the original Term or during the Renewal Terms. Any termination of this Lease shall serve to terminate the renewal options whether or not Tenant shall have exercised same. The foregoing options granted to Tenant to renew this Lease shall not be deemed to give Tenant any further option to renew this Lease.

4     Base Rent. Tenant agrees to pay base rent ("Base Rent") for the Premises in the amounts and in the manner specified hereunder, commencing on the Commencement Date

Tenant shall pay Base Rent in equal monthly installments, in advance on the first day of each succeeding calendar month throughout the Term, with appropriate proration for any partial calendar month or Lease Year, to the address given for Landlord in paragraph 34 hereof, unless Landlord shall give Tenant written notice of a change of address or of the party to whom such rents shall be payable along with written documentation reasonably satisfactory to Tenant of such party's right to receive payment hereunder. Base Rent shall be paid pursuant to the following schedule: (i) the sum of $565,000.00 per annum ($47,083.33 monthly) during the first five (5) Lease Years of the Term, (ii) the sum of $632,500.00 per annum ($52,708.33 monthly) during the sixth (6th) through the tenth (10th) Lease Years of the Term; (iii) the sum of $695,750.00 per annum ($57,979.16 monthly) during the eleventh (11th) through the fifteenth (15th) Lease Years of the Term; and (iv) the sum of $765,325.00 per annum ($63,777.08 monthly) during the balance of the Lease Years of the Term.

H:\KANER\CORR\86170_3\54/44 (5295)

VN0000000013

5.    Development of Shopping Center by Landlord.  If Landlord develops the Shopping Center, which Landlord is under no obligation to do, Landlord covenants to operate a first-class shopping center  The parking ratio for the Shopping Center shall not be less than the greater of (i) 4.0 spaces (for full sized automobiles and those number of compact parking spaces as permitted by applicable law, provided that such compact spaces shall in no event exceed twenty percent (20%) of the total number of parking spaces located in the Shopping Center, and such compact spaces shall be evenly distributed throughout the parking areas of the Shopping Center) per 1,000 square feet of gross leasable area or (ii) that required by applicable zoning requirements Landlord may not change or alter the portion of the Common Areas designated as "Tenant's Preferred Area" on Exhibit A ("Tenant's Preferred Area") without Tenant's prior written consent which Tenant may, at its sole discretion, withhold.  Landlord hereby agrees to indemnify, defend and hold Tenant harmless from any loss or damage suffered by Tenant as a result of Landlord's construction and/or development  Landlord shall not permit construction traffic over the Premises, and Landlord's construction shall not unreasonably interfere with the conduct of Tenant's business.  Landlord shall keep and maintain or cause the Shopping Center and the Common Areas in the Shopping Center to be kept and maintained in good condition and repair and shall not operate, or permit to be operated, in the Shopping Center any activity which overburdens the available utilities, or violates any of the "Site Covenants" contained in subparagraph 19(a)(ix) or the prohibited activities set forth in subparagraph 19(a)(viii).

6.    Easements.  In addition to and simultaneously with the lease of the Premises, Landlord grants to Tenant certain nonexclusive leasehold easements over or upon certain areas of Landlord's Premises, as set forth below, which easements shall run as covenants with Landlord's Premises and the Premises during the Term and shall expire or terminate simultaneously with this Lease, except as provided below.

        (a)    Construction Easements  During the performance of Tenant's Work, and any period of renovation or reconstruction thereafter, Landlord grants to Tenant a nonexclusive easement across a mutually agreeable designated route, providing access to and from the public roadways nearest to the Premises, over the Common Areas (as defined in paragraph 7(a) below) for the purpose of construction access to the Premises.

H \KANER\COR\R188170_3\54\44 (5295)

VN0000000014

Tenant consents to the grant by Landlord of easements for construction staging areas to other occupants of the Shopping Center, provided that same are located immediately in the rear of such other tenants' premises.

(b) <u>Common Area Easement</u>    During the Term, Landlord grants to Tenant, for the benefit of the Premises, the nonexclusive right, privilege and easement (the "Common Area Easement") to use the Common Areas for their intended purposes and to permit Tenant and its employees, agents, subtenants, assignees, licensees, suppliers, customers and invitees to use the same, in common with Landlord, its successors, assigns, employees, agents, lessees, licensees, suppliers, customers and invitees and all other persons claiming by or through them, for the purposes (without limitation) of parking and pedestrian, service and vehicular access, ingress and egress to, from and between the Premises and all of the Shopping Center exclusive of the Premises ("Landlord's Premises") and the streets and highways abutting and adjacent to the Shopping Center, in accordance with the Site Covenants, without payment of any fee or other charge therefor.    In addition, Tenant shall have the right to use such Common Areas as are immediately adjacent to Tenant's Improvements and within the Tenant's Preferred Area as shown on the Site Plan for promotional demonstrations customary to Tenant's business operations, provided same do not occur more than four (4) times annually, each lasting not longer than one (1) week.

(c) <u>Non-Dedication</u>    None of the easements granted by the parties to this Lease is intended, nor shall any of them be construed, as a dedication of any portion of the Shopping Center for public use, and the parties will refrain from taking any action which would cause such a dedication and will take whatever steps may be necessary to avoid any such dedication, except as may be agreed upon in writing by the parties hereto or their respective successors or assigns.

7. <u>Common Areas and Common Area Maintenance.</u>

(a) <u>Definition of Common Areas.</u>  The term "Common Areas" shall be defined to include any parking facility dedicated for use by occupants of the Shopping Center, lanes, drives, entrances, truck passageways, sidewalks, elevators, escalators, ramps, stairways, landscaped and other unpaved areas, parking lot lighting facilities and equipment, Landlord's directional, traffic and monument sign structure(s), such other

8

H:\KANER\CORP\68170_3\5444 (5295)



VN0000000015

portions of the Shopping Center in which the Premises is located, that are not leased to other tenants and generally open to the public and shared utility facilities located in the Shopping Center (including any such areas and facilities contained within outparcels and adjacent tracts but reserved to the benefit of the Shopping Center occupants) and intended and available for the common use by more than one of the tenants within the Shopping Center and such other similar areas in the Shopping Center which benefit the occupants of the Shopping Center designated by the Landlord from time to time, their subtenants, licensees, and business invitees.   Landlord shall be responsible for operating, maintaining and repairing the Common Areas in a first-class manner, including cleaning, maintenance of Landlord's sign structure(s), snow removal and ice treatment, removal of Common Area trash and garbage, lighting, repairing, repaving and restriping the parking area, and maintaining, replanting and replacing landscaping, all such work to be referred to collectively as "Common Area Maintenance".

(b)   CAM Charges.   For the purpose of this paragraph 7, the cost of Common Area Maintenance (the "CAM Charges") shall include all reasonable and competitive costs and expenses of every kind and nature paid or incurred by Landlord or its designees in connection with the following:

(i)   the operation, replacement, maintenance, repair, redecorating, refurbishing, conforming with rules and regulations of authorities having jurisdiction and the Fire Insurance Rating Organization and Board of Fire Underwriters; utilities and other services and all other direct costs and expenses of every kind and nature, foreseeable or unforeseeable, required or desired, suggested or recommended for the operation, maintenance or otherwise with respect to the Common Areas in a manner reasonably determined by Landlord (exercised in accordance with sound shopping center management practice consistent with the operation and management of first-class shopping centers in northern New Jersey), to be appropriate for the best interests of the Shopping Center, as determined by Landlord in accordance with Landlord's method of accounting (provided same is a generally accepted method), including the supply by Landlord of electricity and other utilities to the Common Areas; and the compensation of security and other on site personnel who implement the aforesaid maintenance, security, operation, replacement, etc of the Common Areas and related costs;

9

(ii)    the maintenance of all fire insurance with standard "All Risk" coverage (including, without limitation, flood insurance) and liability insurance carried by and in the discretion of Landlord or its designees (exercised in accordance with sound shopping center management practice consistent with the operation and management of first-class shopping centers in northern, New Jersey) covering the Shopping Center, buildings and improvements, the Common Areas (excluding the Premises as to fire and casualty insurance and all leasable buildings in the Shopping Center) and every other facility or property used or required or deemed necessary in connection with any of them; provided however, that Tenant's share of the cost of any umbrella coverage carried by the Landlord shall be assessed to the Tenant at the actual cost thereof, not to exceed five cents (.05¢) per square foot of leasable area in the Premises, which amount may be increased in accordance with subparagraph (7) below.

(iii)    the maintenance, repair and replacement (except to the extent of Landlord's receipt of the proceeds of insurance therefor) of all common facilities of the Shopping Center not already provided for in paragraph 7(b)(i), whether located in the Common Area or in the buildings and improvements within the Shopping Center Examples of such common facilities are common sprinklers, pipes, cables, conduits, plumbing, ducts, wires and other common utility lines. Common Area expenses shall not include, however, any expenses incurred by Landlord in performing maintenance repairs or replacements on the interior of any leasable premises, except if performed in connection with common facilities in the Shopping Center; and

(iv)    Landlord's overhead expenses for administering same (or in lieu thereof, a management fee) in an amount equal to ten percent (10%) of the total of such costs (specifically excluding from such total the amounts paid by Landlord and Tenant for insurance, capital expenditures, Real Estate Taxes and utilities serving such areas).

Notwithstanding the foregoing, the following shall not be included in the CAM Charges·

(1) real estate taxes paid, and maintenance performed, on separately assessed and/or maintained outparcels or other adjacent tracts not reserved to the benefit of the Shopping Center occupants;

H\KANER\CORR\88170_3\54\44 (5295)

VN0000000017

(2) any dues or charges for a merchants' or other association of the tenants in the Shopping Center;

(3) maintenance, repairs or replacements to the Common Areas, (but no other portions of the Shopping Center), necessitated by the negligent or wrongful act of the Landlord or made to correct any construction, defect or condition (except with respect to the Site Work, unless such construction defect or condition is not discovered within one (1) year following the original installation thereof, or one (1) year following Landlord's delivery of the Premises, whichever is later), or utility systems not part of the Common Areas;

(4) repairs or replacements necessitated by any governmental entity which solely benefit or burden particular tenants because of the use of such tenant premises or by the negligence or the wrongful action of Landlord (including failure to construct any portion of the Shopping Center in accordance with plans or specifications therefor) or any other tenant or made to correct any initial construction defect or condition in existence due to Landlord's failure to construct initially in accordance with all legal requirements in existence prior to the Commencement Date of this Lease (except with respect to the Site Work, unless such construction defect or condition is not discovered within one (1) year following the original installation thereof, or one (1) year following Landlord's delivery of the Premises, whichever date is later) or to correct damage caused by subsidence or adverse or substandard soil conditions;

(5) amounts paid to entities related to Landlord in excess of the cost of such services from any competitive source,

(6) amounts reimbursable from insurance proceeds required to be carried hereunder, under warranty or by Tenant, any other tenant in the Shopping Center or any other third party other than pursuant to a Common Area expense provision similar to this paragraph 7;

(7) premiums for Common Area liability insurance for coverage in excess of the limits set forth in subparagraph (b)(ii) above; provided,

11

however, the Landlord may increase the cost allocation to the Tenant of any umbrella coverage in excess of the amount set forth in subparagraph (b)(ii) above by an amount equal to one cent (.01¢) per square foot of gross leasable area in the Premises per each five (5) year period during the Term;

(8) repairs or replacements of a capital nature (whether or not capitalized) unless the costs of same are amortized over the entire useful life of such repairs or replacements, plus the annual cost of interest carry thereon at the Prime Rate, and provided that repairs or replacements are not the direct result of initial defects in materials or workmanship (unless such construction defect or condition is not discovered within one (1) year following the original installation thereof, or one (1) year following Landlord's delivery of the Premises, whichever is later);

(9) resurfacing (other than patching and other periodic maintenance of the paved surfaces) of any paved areas during the first seven (7) "CAM Years" (as defined below);

(10) reserves for anticipated future expenses.

(11) interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner;

(12) Landlord's home office, personnel, overhead or administrative expenses except for the ten percent (10%) charge set forth in subparagraph (b)(vi) above;

(13) amounts incurred to remediate any "Hazardous Substances" (as hereinafter defined); or

(14) other maintenance expenses not considered normal and customary under generally accepted accounting principles or shopping center industry standards in northern New Jersey. CAM Charges shall be in an amount consistent with the costs incurred by other landlords of similar shopping centers in northern New Jersey (but not greater than as described in this paragraph 7(b)), and in all events such charges shall be obtained at competitive rates.

H:\KANER\CORR\68170_3\54/44 (5285)

VN0000000019

(c)    Tenant's Contribution. "Tenant's Contribution" means "Tenant's Pro Rata Share" of all CAM Charges.  Subject to adjustments as herein contemplated, "Tenant's Pro Rata Share" means the proportion that the floor area of the Premises (excluding any non-selling mezzanine(s) consisting of not more than 7,500 square feet of floor area in the aggregate) bears to the floor area of all the rentable space (excluding non-selling mezzanines) of the buildings comprising the Shopping Center. The floor area shall be computed to the outside faces of exterior walls and the center line of party walls Tenant acknowledges that Tenant's Pro Rata Share may change during the Term and that Landlord has made no representations regarding same, but in no event shall Tenant's Pro Rata Share increase by more than five percent (5%) during the Term

(d)    Tenant Payments. Commencing on the Commencement Date and continuing until the expiration of the first Lease Year, Tenant shall pay to Landlord a fee (which Landlord estimates to be $2.00 per square foot of gross leasable area in the Premises per annum, subject to the reconciliation provided by Landlord below), payable in equal monthly installments at the same time as payments of Base Rent, as its Tenant's Contribution. Thereafter, the annual charge shall be computed on the basis of periods of twelve (12) consecutive calendar months, as designated by Landlord (each such period is a "CAM Year"), and shall be paid by Tenant in equal monthly installments, in advance, on the first day of each month during such CAM Year. Monthly payments of Tenant's Contribution shall be adjusted pursuant to the reconciliation provided by Landlord pursuant to this subparagraph (d), and until receipt of such reconciliation, Tenant may pay Tenant's Contribution based upon the prior year payment amounts  For any period within the Term which is less than a full CAM Year, the annual charge shall be appropriately prorated. Within one hundred twenty (120) days after the end of the first CAM Year and each CAM Year thereafter, Landlord will furnish to Tenant a statement showing in detail (with such substantiating documentation as Tenant may reasonably request) the amount of Tenant's Contribution for the preceding CAM Year and the then-current number of square feet of gross leasable area in the Shopping Center and the third floor of the Building  Any necessary adjustment with respect to amounts owed by either party for such preceding CAM Year shall thereupon be made; and the monthly payments to be made by Tenant for the ensuing year shall be the same

13                    H \KANER\CORR\68170_3\54\44 (5295)

as Tenant's Contribution for CAM Charges as reconciled. The Landlord shall have up to one (1) year after delivery of any CAM Charges reconciliation to reissue any correction bills for which the Tenant shall be responsible for its share thereof calculated in accordance with the provisions of this subparagraph (d); provided, however, that the Landlord shall pay to the Tenant any costs which the Tenant incurs in researching the validity of such reissued billing, including but not limited to any time incurred by employees of the Tenant in connection with such research. The gross leasable area of any outside sales area shall be measured from the outside of the exterior wall of any adjacent building to the actual exterior perimeters of such outside sales area, including any aisles, fences or walls included therein. Changes in applicable floor areas shall result in corresponding adjustments of Tenant's Pro Rata Share, provided that in no event shall the denominator used to determine either amount increase by more than five percent (5%). The remainder of CAM Charges shall be borne by Landlord and/or other tenants.

(e)    Examination of Landlord's Records. Tenant shall have the right, from time to time, but not more often than once as to any CAM Year and no later than one (1) year after the receipt of the annual reconciliation statement after the end of such CAM Year, to examine and make copies of the records pertaining to CAM Charges for such CAM Year. Tenant's right of examination shall be exercised during reasonable business hours at Landlord's principal records office on reasonable prior notice to Landlord. If such examination shall disclose any overcharge by Landlord, Landlord shall promptly reimburse Tenant for any overpayment of Tenant's Contribution, and if such overpayment by Tenant is in excess of five percent (5%) of the actual Tenant's Pro Rata Share, Landlord shall reimburse Tenant for the reasonable cost of such examination or audit. Tenant shall promptly reimburse Landlord for any underpayment disclosed by such examination.

(f)    Initially No Common Areas. Notwithstanding the foregoing provisions, the Shopping Center shall not initially contain Common Areas, provided however, that Landlord shall be obligated to maintain and Tenant shall pay its Pro Rata Share of the costs of premiums for the liability insurance carried pursuant to paragraph 7 (b)(ii). If, as and when Landlord elects to construct additional building(s) in the

14

H:\KANER\CORR\68170_3\54/44 (5295)



Shopping Center, either (i) the Premises shall be reduced to the Building Pad and the balance of the Land shall be Common Areas (and/or shall contain additional building(s)), or (ii) Landlord may elect to relocate the Premises as provided in paragraph 53, in which event the Land in its entirety shall be Common Areas (and/or contain additional buildings) and the Premises shall be reduced to the Building Pad   Any such future development shall be subject to the provisions of paragraphs 5, 19(a)(ix)(E) and 53   if, as, and when Landlord adds Common Areas and additional building(s) to the Shopping Center, Landlord, on thirty (30) days notice to Tenant, shall commence performing Common Area Maintenance and Tenant shall commence paying Tenant's Contribution   Prior to any reduction in the size of the Premises to the Building Pad, Tenant shall, at its expense, maintain the Premises (other than the Building Pad) in a first-class manner and in accordance with the standards required of Landlord in its performance of Common Area Maintenance.

8.     **Signs and Communications Equipment**

(a)     **Signs.**  Tenant shall have the right to install and maintain a pylon sign on the Premises and signs affixed to the exterior of the Building, subject to (i) the written approval of Landlord as to dimensions, material, content, location and design, which approval shall not be unreasonably withheld or delayed provided such signs are architecturally compatible with the Building and the Shopping Center, and (ii) applicable legal requirements.   Tenant shall obtain and pay for all required permits and licenses relating to such signs.   Copies of all such permits and licenses shall be delivered to Landlord upon request. Upon Landlord's development of the Shopping Center, Landlord may add tenant designations to Tenant's pylon sign provided Tenant's sign panel remains in the top position.   Each tenant occupying a position on such pylon shall (i) reimburse Tenant for its pro rata share of the cost of construction thereof and (ii) bear the entire expense of its panel installation and maintenance.

(b)     Landlord agrees that Tenant may install signs on the exterior of the Building substantially similar to the signs shown on Exhibit B.   In all other respects, Tenant's signs shall conform to the provisions of this paragraph.   In addition, so long as the Tenant in possession of the Premises is Circuit City Stores, Inc., Tenant may, without Landlord's consent, install its then current sign(s) on the exterior of the Building,

VN0000000022

provided that such signs are architecturally compatible with the Building and the *Shopping Center.*

      (c)     Tenant shall not have the right to maintain or install any other signs in or at the Shopping Center or visible from the outside of the Building (other than as set forth in (a) and (b) above), other than neatly lettered professionally made signs located inside the Building and directional signs located on the exterior of the Building

      (d)     Tenant may not install signs, lamps or other illumination devices in or upon the Premises if the lamps, signs or devices flash or go on and off intermittently

      (f)     Unless Tenant maintains its own pylon sign, Tenant shall have the right to install its sign in the top position on the Shopping Center pylon, subject to legal requirements and in accordance with the following provisions.

          (i)     Tenant's sign shall be subject to (y) the written reasonable approval of Landlord as to dimensions, material, content, location and design, provided however, that Tenant shall not be prohibited from using its logo, and (z) applicable legal requirements   Tenant shall obtain and pay for all required permits and licenses relating to such sign.   Copies of all such permits and licenses shall be delivered to Landlord within a reasonable time after they are issued.

          (ii)     If Tenant installs a sign on the Shopping Center pylon (other than the pylon sign described in (a) above), Tenant shall reimburse Landlord for a fraction of the cost of repairing, maintaining, replacing, altering and furnishing electric current to the sign pylon.   The numerator of the fraction shall be the area of the face of the sign installed by Tenant, and the denominator shall be the combined area of the face of the sign installed by Tenant and any other signs installed on the sign pylon   The reimbursement shall be paid promptly after Landlord renders bills with respect thereto.

          (iii)     Tenant shall, at its sole cost and expense, keep its sign located on the pylon in good order and repair.

      (b)     <u>Communications Equipment</u>.  Tenant may for its own use, from time to time, install, maintain and/or replace any satellite dishes or antennas on the roof of the Building as Tenant deems necessary or desirable, provided same shall not adversely and materially affect the roof or the structural elements thereof.   Upon removal by

16

Tenant of any satellite dishes or antennas, Tenant shall repair any damage done in connection with such removal.

9    **Taxes**

(a)    <u>Taxes Contemplated Hereunder</u>    The term "Real Estate Taxes" shall mean all general real estate taxes and assessments and other ad valorem taxes, rates and levies paid upon or with respect to the Shopping Center, including the Premises, for a tax fiscal year or a portion thereof to any governmental agency or authority and all charges specifically imposed in lieu of any such taxes.  Nothing contained in this Lease shall require Tenant to pay any local, county, municipal, state or federal income, franchise, corporate, estate, inheritance, succession, capital levy, business or transfer tax of Landlord, or any local, county, municipal, state or federal income, profits, gross receipts, sales or renewal tax or charge upon the rent or other charges payable by Tenant under this Lease, unless same is levied as a substitute tax for any Real Estate Taxes then currently imposed upon the Shopping Center.

(b)    <u>Payment of Real Estate Taxes</u>.  At such intervals as Landlord is required to pay the Real Estate Taxes, Tenant shall pay Tenant's Pro Rata Share of Real Estate Taxes (calculated in the same manner as Tenant's Pro Rata Share of CAM Charges in paragraph 7(c)) levied against the tax parcel or parcels comprising the Shopping Center (the "Tax Parcel").  Tenant's Pro Rata Share of Real Estate Taxes shall be net of any early-payment discounts realized by Landlord through its payment of Real Estate Taxes, provided that the Landlord shall be under no obligation to obtain the benefit of any early payment discounts nor shall the Tenant be liable for any penalty incurred by the Landlord due to its late payment of Real Estate Taxes.  Tenant shall pay Tenant's Pro Rata Share of Real Estate Taxes within thirty (30) days after Tenant's receipt of Landlord's statement therefor   Upon request Landlord shall furnish Tenant with a copy of the most recent tax bill on the basis of which such statement is rendered.  Landlord shall pay, or cause the payment of, all Real Estate Taxes before any fine, penalty, interest or cost may be added thereto, become due or be imposed by operation of law for the nonpayment or late payment thereof   In no event shall Tenant be liable for any penalty incurred as a result of late payment by another tenant or by Landlord Real Estate Taxes shall be prorated as of the Commencement Date and the expiration

H \KANER\CORR\83170_3\54/44 (5295)

VN0000000024

or earlier termination of this Lease, and Landlord shall promptly return to Tenant any overpayment made by Tenant not attributable to the period of Tenant's possession of the Premises.   Landlord shall remain primarily responsible for such payment notwithstanding the fact that such payment may be made by a tenant of Landlord's Premises or other third party pursuant to an agreement to which Tenant is not a party. In addition, should Landlord fail to pay such Real Estate Taxes before same become delinquent, which failure in the reasonable judgment of Tenant's counsel would result in an imminent adverse effect on the leasehold estate granted to Tenant hereunder, Tenant shall have the right, at its election, to cure such failure, following five (5) days written notice thereof to Landlord, by payment of delinquent Real Estate Taxes and any interest and penalties due thereon and in such event Tenant may deduct the cost thereof, plus interest at the lesser of the prime rate of interest most recently published in the Wall Street Journal (the "Prime Rate"), plus two (2) percentage points, or the highest rate permitted by State law (such lesser rate referred to herein as the "Default Rate"), from the next installment(s) of Base Rent and other charges due hereunder.

(c)     Contest of Real Estate Taxes and/or Assessed Valuation of Property. Tenant shall have the right, at Tenant's sole expense, to contest the amount or validity, or otherwise seek an exemption or abatement, of any Real Estate Taxes or to seek a reduction in the valuation of the Premises assessed for Real Estate Tax purposes, by appropriate proceedings diligently conducted in good faith, provided that Tenant shall first have notified Landlord of its intent to do so and Landlord shall have failed to notify Tenant in writing, within ten (10) days of receipt of Tenant's notice, that Landlord intends to contest such Real Estate Taxes or seek such a reduction.  In any instance where any such action or proceeding is being undertaken by Tenant, Landlord shall cooperate with Tenant, execute any and all documents required in connection therewith and, if required by any law, rule or regulation of the taxing authority, shall join with Tenant in the prosecution thereof.

(d)     Payment Following Appeal.  Upon the termination of the proceedings set forth in subparagraph (c) above (unless the taxing authority requires that Real Estate Taxes be paid under protest prior to commencement of such proceedings), Tenant shall pay Tenant's Pro Rata Share of such Real Estate Taxes as finally determined in such

18.

proceedings, the payment or partial payment of which may have been deferred during the prosecution of such proceedings. Tenant shall be entitled to a refund of any overpayment of Real Estate Taxes relating or allocable to the Premises, as well as a reimbursement from the appropriate taxing authority of all costs, fees and expenses it incurs in such protest or reassessment

(e)     Construction in Progress.   If during the course of construction impositions are assessed, levied or imposed with respect to Tenant's Work, the entire amount of such impositions shall be paid by Tenant until Tenant's Work is substantially completed and such impositions are included in the calculation of Tenant's Pro Rata Share of Real Estate Taxes.

(f)     Notwithstanding the foregoing, Tenant may, in its sole discretion, seek to have the Building and the Building Pad separately assessed. If Tenant is successful in obtaining same, in lieu of Tenant's Pro Rata Share of Real Estate Taxes attributable to the leasable buildings in the Shopping Center, Tenant shall pay the entire amount of Real Estate Taxes attributable to the Building and the Building Pad, which payments shall be made in the same manner and subject to the same provisions as are set forth in this paragraph 9 with respect to Tenant's Pro Rata Share of Real Estate Taxes attributable to the entire Shopping Center.   In addition, Tenant shall continue to pay its Pro Rata Share of Real Estate Taxes attributable to the land comprising the Shopping Center (other than the Building Pad) and to the common improvements and facilities of the entire Shopping Center.   All future references in this Lease to "Tenant's Pro Rata Share of Real Estate Taxes" shall be deemed to include Tenant's payment of Real Estate Taxes pursuant to this paragraph 9(f).

(g)     If any premises (other than the Premises) in the Shopping Center is assessed as part of a separate tax lot from the tax lot of which the Premises is a part, at Landlord's election, for the purpose of calculating Tenant's Pro Rata Share of Real Estate Taxes, the floor area of the building located on such premises and the Real Estate Taxes attributable to such other premises shall be excluded.

10.     Store Repair and Operations.

(a)     Maintenance, Repairs and Replacements.   Tenant at its sole cost and expense, will take good care of the Premises, the Improvements and the sidewalks

19

VW000000026

and curbs adjoining the Premises and will keep the same in good order and condition, and make all necessary repairs thereto, interior and exterior, structural and nonstructural, ordinary and extraordinary, and unforeseen and foreseen.  When used in this Article, the term "repairs" shall include all necessary replacements, renewals, alterations, additions and betterments.  All repairs made by Tenant shall be equal in quality and class to the original work.  Tenant will do or cause others to do all necessary shoring of foundations and walls of the buildings or other improvements and every other act or thing for the safety and preservation thereof which may be necessary by reason of any excavation or other building operation upon any adjoining property or street, alley or passageway.  Tenant shall keep the Premises in a clean and sanitary condition, free from vermin and escaping offensive odors.  During the last five (5) years of the Term of the Lease Tenant shall be obligated to so install or construct alterations or incur expenditures pursuant to this paragraph; provided, however, that if Tenant is required to expend any sum in satisfaction of its obligations hereunder, and if the resulting improvement to the Improvements cannot be fully amortized in accordance with generally accepted accounting principles, or the Internal Revenue Code and Regulations, over the remainder of the Term, then Tenant shall be reimbursed by Landlord by that amount of the cost associated with such repairs, construction or alteration for the period beyond the remainder of the Term, not to exceed Seventy-Five Thousand and 00/100 Dollars ($75,000.00) in the aggregate.  Landlord shall not be required to furnish any services or facilities or to make any repairs or alterations in or to the Premises or the Improvements.  Tenant hereby assumes the full and sole responsibility for the condition, operation, repairs, replacement, maintenance and management of the Premises and the Improvements.  Should Tenant fail to perform its obligations under this paragraph 10, Landlord may, at its option, effect such maintenance, replacements or repairs, provided that Landlord shall have given Tenant thirty (30) days' prior written notice, except in the case of emergencies (in which event only such notice as may be reasonable under the circumstances shall be required); but further provided that such thirty (30) day period (or reasonable period in event of emergencies) shall be extended in respect of any cure that cannot with reasonable diligence be accomplished within such period so long as the party required to effect such cure has commenced such cure within such thirty (30) day

H\KANER\CORR\8170_3\54/44 (5295)

VN0000000027

period (or reasonable period in event of emergencies) and thereafter diligently prosecutes such cure to completion. Subject to the limitations set forth in paragraph 30 on the right to recover the cost of self-help repairs, Tenant shall reimburse Landlord on demand for the reasonable and actual amount so expended (as evidenced by detailed invoice), plus interest at the Default Rate. However, in the event of emergency repairs, no interest shall accrue if reimbursed within thirty (30) days of request (including detailed invoice) for reimbursement. All maintenance, repairs or replacements shall be done by Tenant lien-free and in a good and workmanlike manner consistent with the quality of labor and materials used in originally constructing the Improvements and in accordance with all applicable law. In order for Tenant to effectively perform its maintenance, repair and replacement obligations hereunder, Landlord shall assign to Tenant any and all manufacturers' and contractors' warranties relating to such work performed on behalf of Tenant to Tenant.

(b)    Garbage.  Tenant agrees not to permit the accumulation (unless in concealed metal containers) or burning of any rubbish or garbage in, on or about any part of the Shopping Center.  Tenant shall cause and pay for all rubbish and garbage to be collected and disposed of from the Premises.

(c)    Loud Speaker Use.  Tenant shall not use any advertising medium which may be heard outside the Premises.

(d)    Plumbing Facility Use.  Tenant shall not use the plumbing facilities of the Premises for any purpose other than the purpose for which they are intended. Accordingly, Tenant may not dispose of any substances there which may clog, erode or damage the pipelines and conduits of the Building.

(e)    Freight Handling Equipment.  Tenant shall not use any non-rubber wheeled or gasoline powered forklift truck, tow truck or any other non-rubber wheeled or gasoline powered machine for handling freight except as may be approved by Landlord.  Landlord hereby approves Tenant's use of "Durometer" non-marking, hard poly tires on its freight handling machines.

(f)    Mezzanines.  Tenant may not use any mezzanine located within the Premises for selling purposes (any such mezzanine shall be used solely for storage, preparation of merchandise and clerical purposes).

21                    H\KANER\CORR\88170_3\54/44 (5295)

VN0000000028

11    Utilities.  Tenant agrees to make its own arrangements, at Tenant's sole cost and expense, for any gas, electricity and any other utility required in connection with the use and operation of the Premises .  Tenant shall pay directly to the appropriate company or governmental agency, all charges for all utilities consumed on the Premises.

12.    Alterations.  After completion of Tenant's Work (as that term is defined in the Construction Provisions), Tenant may make alterations to the Premises, subject to the following provisions:

(a)    Tenant shall give Landlord prompt notice of any alteration permitted to be performed by Tenant under any provision of this Lease if the reasonable cost of the alteration exceeds $50,000 00,

(b)    such alterations shall be conducted with due diligence and in good and workmanlike manner in accordance with all applicable legal requirements and insurance requirements;

(c)    such alterations shall be promptly and fully paid for by Tenant;

(d)    any alterations to the plumbing, mechanical, electrical, sewerage, sprinkler or HVAC system which adversely affect other premises in the Shopping Center or which substantially change the capacity of any such system, shall be done in accordance with plans, specifications approved by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed, provided that Tenant remedies the adverse effect of such alteration;

(e)    Tenant may perform structural alterations without obtaining Landlord's prior written consent, provided: (i) such alteration is architecturally compatible with the other buildings, if any, in the Shopping Center; (ii) such alteration does not increase or decrease the size of the floor area of the Premises, by more than five (5%) percent of the size of the Building as originally constructed; and (iii) such alteration does not change the height of the Building, nor results in there being more than three (3) separate premises within the Premises;

(g)    Tenant may perform any non-structural interior alterations within the Premises without obtaining Landlord's consent, except as otherwise expressly set forth herein to the contrary;

22                    H KANER\CORR\65170_3\54\44 (5295)

28

(h)    Tenant shall, within a reasonable time after completion of any alteration which required the preparation of plans and specifications, furnish Landlord with a set of construction plans and specifications or "record drawings" therefor, if same are required to be submitted to applicable governmental authority;

(i)    Notwithstanding anything to the contrary contained herein, Tenant may not construct a mezzanine in the Premises without obtaining Landlord's consent, which consent may not be unreasonably withheld, conditioned or delayed, except that Tenant may construct non-selling mezzanine(s) consisting of not more than 7,500 square feet of floor area in the aggregate.

13.    Mechanics' Liens.  Landlord and Tenant covenant to each other that they will not permit any lien to be filed against the Premises or the Shopping Center as a result of nonpayment for, or disputes with respect to, labor or materials furnished to the Premises or the Shopping Center for or on behalf of Tenant, Landlord or any party claiming by, through, or under Tenant or Landlord, nor shall either party permit any judgment, lien or attachment to lie, as applicable, against the Premises or the Shopping Center  Should any lien of any nature, including but not limited to the foregoing, be filed against the Premises or Shopping Center, the party on account of whose actions such lien has been filed shall, within thirty (30) days after receipt of written notice of such lien, cause said lien to be removed, or otherwise protected against execution during good faith contest, by substitution of collateral, posting a bond therefor, escrowing of adequate funds to cover the claim and related transaction costs or such other method as may be permissible under applicable title insurance regulations and reasonably acceptable to the other party hereto

14    Insurance.

(a)    Tenant's Property Damage.  During any time construction is being performed, Tenant shall keep or require its general contractor to keep, in full force and effect, a policy of builder's risk insurance covering loss or damage to the Improvements for the full replacement value of all such construction including all of the coverages listed in subparagraph (e) below  During the Term, Tenant shall keep in full force and effect a policy of fire and extended coverage insurance insuring against fire and other casualties and risks covered by "All Risk" insurance covering loss or damage to the

23                    H KANER\CORR\88170_3\54/44 (5255)

VN0000000030

Improvements in the amount of full replacement value of the Improvements, with a commercially reasonable deductible, for which Tenant shall be fully responsible Landlord and Landlord's first "Mortgagee" (as defined in paragraph 21 below), shall be named in such policy or policies as additional insureds as their respective interests may appear. Tenant shall also carry business interruption insurance (the proceeds of which shall be payable to Tenant) in at least the amount of one (1) year's Base Rent and estimated Tenant's Contribution and Tenant's Pro Rata Share of Real Estate Taxes Landlord shall not construct, or permit to be constructed, any Improvement in the Shopping Center, nor conduct any activity, or permit the conduct of any activity, in the Shopping Center which will prevent Tenant from being able to obtain insurance coverage at commercially reasonable rates, including, without limitation, a fully-sprinkiered fire insurance rate. Should Landlord cause or permit any insurance rate increase to occur, then provided Landlord receives a statement from Tenant or Tenant's insurance carrier setting forth the reason therefor, Landlord shall pay to Tenant on demand, the portion of the premiums for all insurance policies applicable to Tenant's property as shall be attributable to the higher rates or cease the activity which caused the higher rates  For the purposes of this paragraph, any finding of Tenant's insurance carrier shall be deemed to be conclusive unless Landlord's insurance consultant disagrees with the finding of Tenant's insurance carrier by notice to Tenant within fifteen (15) days after Landlord receives said statement from Tenant's insurance carrier  If Landlord's insurance consultant notifies Tenant that it disagrees with the opinion of Tenant's insurance carrier, and Landlord's insurance consultant and Tenant's insurance carrier cannot come to an agreement within fifteen (15) days thereafter, they shall select a third impartial insurance consultant whose decision shall be binding on the parties  If Tenant's insurance carrier and Landlord's consultant cannot agree on the choice of the third impartial insurance consultant, either party shall have the right to apply to the county court of the county in which the Premises is located to select a third impartial insurance consultant.

(b)    Liability Insurance  During the Term, Tenant shall keep in full force a policy of commercial general liability insurance with bodily injury and property damage coverage with respect to the Premises and business operated by Tenant, which shall

24                    H\KANER\CORR\88170_3\54\44 (5295)


VN0000000081

name Landlord and Landlord's Mortgagees and any "Ground Lessors" (as hereinafter defined) as additional insureds as their respective interests may appear. The policy shall protect Landlord, Tenant, Landlord's Mortgagees and any Ground Lessors against any liability arising from any of the items or occurrences against which Tenant is required to indemnify Landlord pursuant to paragraph 14(i)(2). The limits of such commercial general liability policy shall be not less than $3,000,000.00 combined single limit for bodily injury and property damage, with a commercially reasonable deductible.

(c)    Workers' Compensation Insurance: To the extent required by law, Landlord and Tenant shall maintain workers' compensation insurance covering their respective employees in statutory limits, or maintain such alternate coverages or arrangements as legally permissible.

(d)    Self-Insurance. Notwithstanding anything to the contrary contained herein, Tenant shall have the right to self-insure against any of the risks or portions thereof set forth in subparagraphs (a) and (b) (and to the extent then permitted by law, (c)) above, provided Tenant is then occupying the Premises and has a reported net worth, as of the end of Tenant's most recent quarterly reporting period, of not less than Seventy-Five Million Dollars ($75,000,000.00) with respect to casualty insurance and business interruption insurance and Two Hundred Fifty Million Dollars ($250,000,000.00) with respect to liability insurance, as computed in accordance with generally accepted accounting principles, consistently applied, as determinable from Tenant's public disclosures and/or regularly maintained corporate balance sheets which are generally available to shareholders (no right of Landlord to audit or conduct independent investigations being implied by this provision)

(e)    Shopping Center, Common Area and Third Party Tenant Insurance and Insurance During Landlord's Construction. During the Term, Landlord shall keep in full force and effect, policies of (1) commercial general liability insurance, which shall name Tenant as an additional insured as its interests may appear, which policy shall protect Tenant against any liability arising from any of the items or occurrences against which Landlord is required to indemnify Tenant pursuant to paragraph 14(i)(3), and (2) fire and extended coverage insurance, insuring against fire and other casualties and risks covered by "All Risk" insurance, covering loss or damage to the Shopping Center,

H\KANER\CCRR\58170_3\54\44 (5295)

VN0000000032

in the amount of the full replacement value of the entire Shopping Center, including the Common Areas, excluding the Improvements, provided, however, at Landlord's option, such coverage may exclude excavations, foundations and leasehold improvements constructed by tenants in the Shopping Center    The limits of such policies shall be at least the same as those set forth in subparagraphs (a) and (b) above, as applicable    The cost of the premiums for coverages relating to Common Areas shall be an element of CAM Charges, provided that Tenant shall not be liable for its pro rata share of any premium for coverage in excess of that coverage which is customary among owners of like shopping centers in northern New Jersey.    Any deductible amount for Shopping Center insurance coverage shall be reasonable in amount given the nature of the risk insured and probable frequency of claims made under such coverage, but in no event shall such deductible amount exceed $5,000 for liability coverage.    During any period in which Landlord or Tenant are conducting construction activities at the Shopping Center, Landlord or Tenant, as applicable shall keep, or cause their general contractor to keep, in full force and effect, with regard to the Shopping Center, at least the minimum insurance coverages set forth below:

1)    Workers' Compensation - Statutory Limits;
      Employers Liability - $500,000;

2)    Automotive Liability for all vehicles with limits of $3,000,000; and

3)    Commercial General Liability with limits of $3,000,000

Additionally, Landlord shall keep or require its general contractor to keep in full force and effect a policy of builder's risk insurance covering loss or damage to the Shopping Center for the full replacement value of all such construction

   (f)    Policy Provisions    All policies of insurance (other than self-insurance) enumerated above shall be provided by insurance carriers with a Best rating of not less than A-VII    Any insurance coverage enumerated above may be effected by a blanket policy or policies of insurance or under so-called "all risk" or "multi-peril" insurance policies, provided that the total amount of insurance available with respect to the Premises and Tenant's or Landlord's liability hereunder shall be at least the equivalent of separate policies in the amounts herein required, and provided further that in

26

VN0000000033

other respects any such policy or policies shall comply with the provisions of this paragraph 14  Landlord shall not be entitled to self-insure against any of the risks recited herein, except the amount of any commercially reasonable deductible shall not be deemed to be self-insurance.  An increased coverage or "umbrella" policy may be provided and utilized by either party to increase the coverage provided by individual or blanket policies in lower amounts, and the aggregate coverage provided by all such policies with respect to the Premises and Tenant's or Landlord's liability hereunder shall be satisfactory provided that such policies otherwise comply with the provisions of this paragraph 14

(g)     Waiver of Right of Recovery and Subrogation.  Landlord and Tenant each hereby releases the other, its officers, directors, employees and agents, from liability or responsibility (to the other or anyone claiming through or under them by way of subrogation or otherwise) for any loss or damage to property which could be covered by valid and collectible fire insurance with standard "All Risk" coverage which could be maintained by Landlord as to the Shopping Center or by Tenant as to the Premises, the Improvements and Tenant's personal property and such release shall not be negated or diminished if Landlord or Tenant self-insure or carry deductibles with respect to such coverage, even if such fire or other casualty shall have been caused by the fault or negligence of the other party, or anyone for whom such party may be responsible However, if the releasor does not elect to self-insure, as aforesaid, this release shall apply only to loss or damage occurring during such time as the releasor's fire or extended coverage insurance policies could contain a clause or endorsement to the effect that any such release shall not adversely affect or impair such policies or prejudice the right of the releasor to recover thereunder. Landlord and Tenant each agrees that any fire and extended coverage insurance policies carried by each of them respectively and covering the Premises or their contents will include a waiver of subrogation as long as the same shall be obtainable

(I)     Tenant agrees to comply with all commercially reasonable insurance requirements promulgated by a governmental agency or other entity with jurisdiction over the Shopping Center of which Tenant has notice relating to or affecting the Premises or Tenant's activities at the Shopping Center.  If the insurance rates

27                    H XANER\CORR\83170_3\54\44 (5295)

applicable to the Shopping Center are raised as a result of, or in connection with, (x) any failure by Tenant to comply with such insurance requirements, or (y) the manner of use of the Premises, then provided Tenant receives a statement from Landlord or the insurance carrier setting forth the reason therefor, Tenant shall pay to Landlord on demand, the portion of the premiums for all insurance policies applicable to the Shopping Center as shall be attributable to the higher rates or cease the activity which caused the higher rates. For the purposes of this paragraph, any finding of Landlord's insurance carrier shall be deemed to be conclusive unless Tenant's insurance consultant disagrees with the finding of Landlord's insurance carrier by notice to Landlord within fifteen (15) days after Tenant receives said statement from Landlord's insurance carrier. If Tenant's insurance consultant or risk manager notifies Landlord that it disagrees with the opinion of Landlord's insurance carrier within said fifteen (15) day period, and if said insurance carrier and consultant cannot come to an agreement within fifteen (15) days thereafter, they shall select a third impartial insurance consultant whose decision shall be binding on the parties. If Landlord's insurance carrier and Tenant's consultant cannot agree on the choice of the third impartial consultant either party shall have the right to apply to the county court of the county in which the Premises is located to select a third impartial consultant

(ii)     Tenant's Contribution shall not include any increases in premiums resulting from increases in the insurance rates applicable to the Shopping Center which are attributable to any failure by any other tenant to comply with such insurance requirements relating to such tenant's activities at the Shopping Center

(h)     Evidence of Insurance   Subject to Tenant's right to self-insure hereunder,  upon (i) commencement of the Term (as to property insurance), (ii) upon delivery of the Premises (as to liability insurance) and (iii) no less than annually thereafter, Tenant and Landlord shall cause to be issued to each other in lieu of the original policy, a duplicate of such policy or appropriate certificates of insurance reasonably acceptable to the other party and evidencing compliance with the applicable covenants of this paragraph 14  Each such certificate shall provide that no expiration, cancellation or material change in the insurance evidenced thereby shall be effective unless thirty (30) days' (except ten (10) days for cancellation due to non-payment of

H\KANER\CORR\88170_3\54/44 (5235)

VN0000000035

premiums), unconditional notice of such expiration, cancellation or material change shall have been given to the certificate-holder (and any Mortgagee, if applicable).

   (i) <u>Indemnities.</u>

    (1) Within the meaning of this paragraph, "Claims" means any claims, suits, proceedings, actions, causes of action, responsibility, liability, demands, judgments, and executions, including costs of defense and other related costs

    (2) Subject to the provisions of subparagraph (g) above, Tenant hereby indemnifies and agrees to defend and save harmless Landlord, Ground Lessors and Mortgagees from and against any and all Claims, which either (i) arise from or are in connection with the possession, use, occupation, management, repair, maintenance or control of the Premises, or any portion thereof by Tenant and/or Tenant's agents, employees, licensees, assigns, concessionaires, subtenants and contractors ("Tenant's Agents"), (ii) arise from or are in connection with any act or omission of Tenant and/or Tenant's Agents, (iii) result from any default, breach, violation or non-performance of this Lease or any provision therein by Tenant and/or Tenant's Agents; or (iv) result in injury to person or property or loss of life sustained in the Premises, except if caused by the negligence, acts or omissions of Landlord, its agents, contractors or employees  Tenant shall defend any actions, suits and proceedings which may be brought against Landlord, any Mortgagee with respect to the foregoing or in which they may be impleaded. Tenant shall pay, satisfy and discharge any judgments, orders and decrees which may be recovered against Landlord or Mortgagee in connection with the foregoing  *Subro*

    (3) Subject to the provisions of subparagraph (g) above, Landlord hereby indemnifies and agrees to defend and save harmless Tenant, from and against any and all Claims, which either (i) arise from or are in connection with the possession, use, occupation, management, repair, maintenance or control of the Shopping Center, or any portion thereof by Landlord, its agents, contractors or employees; (ii) arise from or are in connection with any act or omission of Landlord, its agents, contractors or employees, (iii) result from any default, breach, violation or non-performance of this Lease or any provision therein by Landlord, or (iv) result in an injury to person or property or loss of life sustained in the Common Areas, unless caused by the negligence, acts or omissions of Tenant or Tenant's Agents.  Landlord shall defend any



H\KANER\CORR\88170_3\54\44 (5295)



VN0000000036

actions, suits and proceedings which may be brought against Tenant with respect to the foregoing or in which Tenant may be impleaded. Landlord shall pay, satisfy and discharge any judgments, orders and decrees which may be recovered against Tenant in connection with the foregoing

15    Damages by Fire or Other Casualty

(a)    Tenant's Restoration.    If, at any time during the Term, the Improvements or any part thereof shall be damaged or destroyed by fire or other casualty of any kind or nature, ordinary or extraordinary, foreseen or unforeseen, Tenant shall notify Landlord and promptly proceed with due diligence (subject to reasonable time allowance to adjust the insurance loss, to obtain necessary permits and for unavoidable delay) to repair, replace or rebuild the Improvements as nearly as possible to their value, condition and character immediately prior to such damage or destruction, with such alterations as may be permitted hereby ("Tenant's Restoration Work")    Notwithstanding the foregoing, Tenant may elect, in its sole discretion, not to repair, replace or rebuild the Improvements following a fire or other casualty, in which event, Tenant shall raze the Improvements, remove all rubble and debris and, at Tenant's option, lay sod (in which event Tenant shall mow and maintain same in a first-class manner) or surface and stripe the Land so that it matches and is integrated into the parking area of the Shopping Center

(b)    Termination    Notwithstanding the provisions of subparagraph (a) to the contrary, if the Improvements are "Substantially Damaged" (as hereinafter defined) during the last three (3) years of the Term, Tenant may terminate this Lease by notice to Landlord within thirty (30) days after such occurrence.    "Substantially Damaged" means a fire or other casualty resulting in damage to the Improvements, the "Architect" (as hereinafter defined) certifies, cannot be repaired within one hundred twenty (120) days after the commencement of Tenant's Restoration Work

(c)    Substantial Shopping Center Damage.    Notwithstanding anything to the contrary contained herein, in the event that all or a portion of the Shopping Center shall be damaged or destroyed by fire or other cause, to the extent of at least fifty percent (50%) of the insured value thereof, notwithstanding that the Premises may be unaffected by such fire or other casualty and if as a result thereof all of the other leases,

30

H \KANER\CORR\88170_3\54/44 (5295)

if any, in the Shopping Center are terminated, Landlord shall have the right, to be exercised by notice to Tenant within ninety (90) days from and after said occurrence, to cancel and terminate this Lease   Upon the giving of such notice to Tenant, the Term shall expire by lapse of time upon the ninetieth (90th) day after such notice is given and Tenant shall vacate the Premises and surrender the same to Landlord and thereupon this Lease shall terminate and be null and void as if such date were the date originally set forth herein for the expiration of the Term and, except for accrued liabilities, neither Landlord or Tenant shall have any further obligations to each other pursuant to this Lease   Upon the surrender of the Premises to Landlord, Landlord shall pay to Tenant the then "Unamortized Costs" (as hereinafter defined) and the proceeds collected under any policy(s) of insurance covering the Improvements shall be paid to Landlord

(d)   Payment of Insurance Proceeds   All insurance proceeds from policies of insurance maintained by Tenant payable and received at any time, or from time to time, as a result of casualty to the Improvements shall be payable in trust to Tenant for Tenant's Restoration Work, except as may be otherwise expressly provided herein

In the event of a casualty to the Improvements in which the proceeds of insurance do not exceed $50,000 00, such proceeds shall be payable directly to Tenant, in trust, to be applied for Tenant's Restoration Work.  Such funds shall be used only for such purposes until the Tenant's Restoration Work is completed and any excess proceeds shall be retained by Tenant.

In the event that the Tenant's insurance proceeds covering the Improvements is equal to or exceeds the sum of $50,000 00, such proceeds shall be deposited in an escrow account with an escrow agent mutually agreeable to Landlord and Tenant ("Insurance Trustee"), in trust, for the purposes of Tenant's Restoration Work, and shall be disbursed from such account from time to time in progress payments proportionate to the percentage of completion of Tenant's Restoration Work, with retainage provisions. Any excess proceeds shall be retained by the Tenant

In addition, if Tenant has self insured the Improvements, Tenant shall be obligated to comply with the foregoing provisions of this paragraph 15(f) by holding in trust or depositing an amount with the Insurance Trustee, as aforesaid, equal in amount to the

H \KANER\CORR\58170_3\54/44 (5295)

VN0000000038