Court File No. 08-CL-7841

## ONTARIO

## SUPERIOR COURT OF JUSTICE

## COMMERCIAL LIST

*IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED*

*AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF INTERTAN CANADA LTD. AND TOURMALET CORPORATION*

APPLICANTS

## THIRD REPORT OF THE MONITOR

## ALVAREZ & MARSAL CANADA ULC

## JANUARY 10, 2009

## INTRODUCTION

1.    By order of this Honourable Court dated November 10, 2008, InterTAN Canada Ltd. ("InterTAN") and Tourmalet Corporation ("Tourmalet" and together with InterTAN the "Applicants") obtained protection from their creditors under the *Companies' Creditors Arrangement Act* ("CCAA"). These proceedings are referred to herein as the "CCAA Proceedings".

2.    Pursuant to the Initial Order in the CCAA Proceedings, Alvarez & Marsal Canada ULC ("A&M") was appointed monitor of the Applicants during these CCAA proceedings (the "Monitor").

3.    Concurrently with the commencement of the CCAA Proceedings, the Applicants' ultimate parent company, Circuit City Stores, Inc. ("Circuit City") and certain of its U.S. affiliates (collectively the "U.S. Debtors") commenced proceedings under Chapter 11, Title 11 of the *United States Code* (the "U.S. Bankruptcy Code"). These proceedings are referred to herein as the "Chapter 11 Proceedings".

4.      In connection with the Applicants' application for protection under the CCAA, A&M provided this Honourable Court with an initial report in its capacity as proposed monitor (the "Initial Report") dated November 10, 2008.

5.      The Monitor delivered its first report dated November 24, 2008 (the "First Report") in connection with the "come back" hearing that was returnable on November 26, 2008 under paragraph 52 of the Initial Order. On November 26, 2008, the Court adjourned the "come back" hearing to December 5, 2008.

6.      The Monitor delivered its second report dated December 3, 2008 (the "Second Report") in connection with the hearing on December 5, 2008. At that hearing, this Honourable Court granted an extension of the stay of proceedings under the CCAA and approval of a sale process for the business and assets of InterTAN. The Order issued on November 10, 2008 was also amended and restated on December 5, 2008. A copy of the Amended and Restated Initial Order is attached hereto as Appendix "A" (the "Initial Order").

7.      As discussed in more detail below, on November 10, 2008, the U.S. Debtors filed a motion for interim and final Orders of the U.S. Court approving a DIP Facility. The U.S. Debtors' motion for final approval of the DIP Facility was scheduled to be heard by the U.S. Court on December 22, 2008. On December 21, 2008, the Monitor received a draft Second Amendment to the Senior Secured Super-Priority Debtor-in Possession Credit Agreement (the "Draft Second Amendment"). Upon review, the Monitor was concerned that the Draft Second Amendment impacted the Canadian proceedings and Canadian stakeholders. Accordingly, counsel for the Monitor requested a 9:30 a.m. appointment before this Honourable Court on December 23, 2008. As a result of that appointment, it was agreed that the matters raised ought to be dealt with more fully and a hearing was scheduled for January 14, 2009 to address those matters. In the meantime, the Applicants and the Monitor agreed to undertake further discussions with the U.S. Debtors and other relevant participants to attempt to better understand the issues and the impact on Canada. The Court also issued an interim Order on December 24, 2008 prohibiting the distribution of proceeds of the Applicants' Property and any intercompany advances from the Applicants to any of its U.S. affiliates pending the return date before the Court on January 14, 2009 (the "Status Quo Order").

8.  Cognizant of its role as an Officer of the Court and not adverse in interest to the Applicants, the Monitor has filed a motion returnable January 14, 2009 to address these outstanding matters.  The Monitor seeks directions from the Court as to the fair and appropriate outcome, balancing the interests of all stakeholders of the Applicants, including as among possible available relief the following:

(i)  An Order extending the Status Quo Order so that, until further Order of this Court, the Applicants shall not:

(a)  distribute or otherwise permit the payment of any of the Applicants' property, assets and undertaking to any of their affiliates or lenders, provided that nothing herein prevents the distribution or payment of such proceeds to the DIP Lenders in accordance with the Initial Order, and the DIP Agreement (defined therein) on account of direct indebtedness owing by the Applicants to the DIP Lenders; or

(b)  make any advances to any of its U.S. affiliates;

(ii)  An Order directing that, notwithstanding anything contained in the Initial Order, no amount shall be paid to the DIP Lenders pursuant to the DIP Lenders' Charge listed as item number "six" in paragraph 44 of the Initial Order (the "Sixth Charge") unless and to the extent that this Honourable Court is satisfied that the DIP Lenders have exhausted all recourse that they may have to realize proceeds from all other sources of recovery that may be available to them from the property and assets of the borrowers other than the property and assets of the Applicants;

(iii)  An Order that the claims of the DIP Lenders under the Sixth Charge shall be reduced by the amount of the proceeds of the furniture, fixtures and equipment of the U.S. Debtors and by an amount equal to the value or proceeds of any assets of the U.S. Debtors that were encumbered in the initial proposed DIP Facility which may be no longer subject to the DIP Facility approved in the U.S. Bankruptcy Court by Order dated December 23, 2008; and

(iv)  An Order pursuant to the Final Second Amendment (as defined herein) and, in particular, paragraph 7(b) thereof, that, until such time, if ever, as this Honourable Court orders otherwise, this Honourable Court has made no determination to allow any payment to be made pursuant to the Sixth Charge to be paid directly or indirectly to the estates of any of the U.S. affiliates of the Applicants or to any of the creditors of those estates.

- 4 -

9.    The Monitor notes that it is not a stakeholder of the Applicants with an economic interest in these proceedings.  The Monitor seeks to bring forward issues to assist the Court and those parties with cognizable interests to determine an appropriate outcome to protect the best interests of the Applicants and their stakeholders, consonant with the due and fair operation of the processes of this Honourable Court.

10.    The purpose of this report (the "Third Report") is to assist the Court with its consideration of the motion returnable January 14, 2009 and to provide the Court and stakeholders with a status report on the proceedings.  In particular, the Third Report provides this Honourable Court with an update in respect of the following:

- cash flow results relative to forecast;

- DIP financing under the Initial Order;

- the status of the Sale Process (as defined below);

- the resignation of Ronald Cuthbertson as President of InterTAN; and

- the status of the Chapter 11 Proceedings and Implications on the CCAA Proceedings.

**TERMS OF REFERENCE**

11.    In preparing this report, the Monitor has relied upon unaudited financial information, InterTAN's books and records, financial information prepared by InterTAN and its advisors, and discussions with management of InterTAN and its advisors.  The Monitor has not audited, reviewed, or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, the Monitor expresses no opinion or other form of assurance on the information contained in this report.

12.    Certain of the information referred to in this report consists of forecasts and/or projections.  An examination or review of financial forecasts and projections, as outlined in the Canadian Institute of Chartered Accountants Handbook, has not been performed.  Future-oriented financial information referred to in this report was prepared based on management's estimates and assumptions.  Readers are cautioned that since projections

are based upon assumptions about future events and conditions that are not ascertainable, actual results will vary from the projections, even if the assumptions materialize, and the variations could be significant.

13.    The Monitor has requested that management bring to its attention any significant matters that were not addressed in the course of its specific inquiries. Accordingly, this report is based solely on the information (financial or otherwise) made available to the Monitor.

14.    All references to dollars in this report are in Canadian currency unless otherwise noted.

## BACKGROUND

15.    InterTAN is a leading specialty retailer of consumer electronics in Canada and is the operating Canadian subsidiary of the major U.S.-based electronics retailer Circuit City. Tourmalet is a Nova Scotia unlimited liability company that is an indirect, wholly-owned subsidiary of Circuit City. Tourmalet is a non-operating holding company whose sole asset is the preferred stock of InterTAN Inc., which is the sole shareholder of InterTAN. Circuit City is the Applicants' ultimate parent company. Further background to InterTAN, Tourmalet and Circuit City is contained in the materials filed relating to the Initial Order, including the Initial Wong Affidavit. These documents, together with other information regarding the CCAA Proceedings, including the Initial Order and supporting affidavit, have been posted by the Monitor on its website at www.alvarezandmarsal.com/intertan.

16.    On November 10, 2008, the U.S. Debtors commenced the Chapter 11 Proceedings in the United States Bankruptcy Court for the Eastern District of Virginia (the "U.S. Bankruptcy Court"). A hyperlink to information concerning the Chapter 11 Proceedings and the U.S. Debtors' restructuring can be found at www.kccllc.net.

17.    Additional background information can be found in the Initial Report, the First Report and the Second Report.

## CASH FLOW RESULTS RELATIVE TO FORECAST

18.    InterTAN's cash receipts and disbursements for the eight-week period ended January 4, 2009 are summarized below and are compared to the comparable period of the cash flow forecast filed with this Honourable Court as Appendix L to the Initial Wong Affidavit (the "CCAA Cash Flow Forecast"):

| *(Unaudited, in $CDN 000's)* | For the Week Ended January 4, 2009 | | |
| --- | --- | --- | --- |
| | Actual | Forecast | Variance |
| *Receipts* | 172,849 | 173,673 | (824) |
| | | | |
| *Disbursements* | | | |
| Merchandise | (90,425) | (86,650) | (3,775) |
| Payroll and payroll taxes | (15,736) | (16,814) | 1,078 |
| Operating disbursements | (19,706) | (18,424) | (1,282) |
| Restructuring costs | (5,046) | (6,907) | 1,861 |
| Other | (2,547) | (2,566) | 19 |
| *Total Disbursements* | (133,460) | (131,361) | (2,099) |
| **Net Cash Flow** | 39,389 | 42,312 | (2,923) |

19.    Receipts for the eight-week period were consistent with the CCAA Cash Flow Forecast with only a small cumulative negative variance of approximately $824,000 during the period.

20.    Disbursements for the eight-week period were approximately $2.1 million more than the CCAA Cash Flow Forecast.  Management attributes this variance primarily to timing differences resulting from higher than forecast disbursements for inventory purchases and sales and other taxes, partially offset by timing differences between actual and forecast payments for employee benefits, utilities and professional fees.  Management anticipates that these variances will reverse in the coming weeks.

21. InterTAN's ending cash balance as at January 4, 2009 was approximately $13.0 million. This ending cash balance takes into account the cumulative net repayment by InterTAN of $32.0 million in respect of amounts borrowed under its debtor-in-possession credit facility (the "DIP Facility").

22. Overall, during the eight-week period ended January 4, 2009, InterTAN experienced a negative net cash flow variance of approximately $2.9 million relative to the CCAA Cash Flow Forecast.  In addition, as described in the First Report, InterTAN's opening combined net cash and loan position, before letters of credit ("LC's"), at the commencement of these proceedings was approximately $6.5 million better than forecast ($5.6 million of cash in bank, plus $832,000 lower opening loan position than forecast), primarily because management had anticipated that there would be no funds in the Company's bank accounts as at the date of the CCAA filings.

23. As described in the First Report, at the time the CCAA Cash Flow Forecast was prepared, management anticipated that InterTAN's LC requirements would be met through the LC facility available to Circuit City as part of the DIP Facility and that InterTAN's LC's would not be included in its availability calculations under the DIP Facility.  However, as management and InterTAN's advisors worked with the DIP Lenders and Circuit City to calculate the opening loan position as at the date of the CCAA filings, it was determined that InterTAN's LC's would be included in its overall loan position for purposes of calculating borrowing availability under the DIP Facility.  InterTAN's outstanding LC's as at the filing date were approximately $7.7 million.

24. InterTAN's opening and closing combined net cash, loan and LC positions for the eight-week period ended January 4, 2009 are summarized below and are compared to the comparable period of the CCAA Cash Flow Forecast:

| *(Unaudited, in $CDN 000's)* | For the Week Ended January 4, 2009 | | |
| --- | --- | --- | --- |
| | **Actual** | **Forecast** | **Variance** |
| **Opening position** | | | |
| Cash in bank (a) | 5,613 | - | 5,613 |
| Loans (b) | (42,500) | (43,332) | 832 |
| Letters of credit (c) | (7,650) | - | (7,650) |
| Combined net opening position | (44,537) | (43,332) | (1,205) |
| **Activity during the period** | | | |
| Net cash flow (see above) (d) | 39,389 | 42,312 | (2,923) |
| Net change in LC's (e) | (3,439) | - | |
| Net DIP repayments (f) | (32,000) | (42,312) | |
| **Closing position** | | | |
| Cash in bank (a+d-f) | 13,005 | - | 13,005 |
| Loans and LC's (b+c-e-f) | (14,711) | (1,019) | (13,692) |
| **Combined net closing position** | **(1,706)** | **(1,019)** | **(687)** |

25.    In summary, through the end of the eighth week following the date of the Initial Order
(January 4, 2009), the CCAA Cash Flow Forecast had projected a net loan position of
$1,019,000, the LC's being included in the U.S. borrowings and no cash in InterTAN's
bank accounts.  In fact, as at January 4, 2009, InterTAN had approximately $13.0 million
in its bank accounts and had a balance of $14.7 million outstanding under the DIP
Facility after including therein $4.2 million of LC's.  On a comparable basis, InterTAN's
cash/loan position (after netting out its cash on hand and excluding the $4.2 million of
LC's that were not contemplated by the CCAA Cash Flow Forecast) would have been a
combined positive position of approximately $2.5 million, as compared to a forecast
loan/negative position of $1,019,000 (before any advances to Circuit City).

26.    With combined closing loan and LC balances of approximately $14.7 million (U.S.$12.1
million), InterTAN had substantial availability on its current allocation from the DIP

Facility of U.S.$60 million as at January 4, 2009.  Further, as indicated above, it also had cash on hand of approximately $13.0 million.

## DIP FINANCING UNDER THE INITIAL ORDER

27.    The Monitor has received from the advisors to the U.S. Debtors an updated form of statement of receipts and disbursements for the U.S. Debtors as of January 3, 2009, a copy of which is attached as Appendix "B" (the "U.S. Flash Report").  The U.S. Flash Report reflected that, as at January 3, 2009, the U.S. Debtors' borrowings under the DIP Facility were approximately U.S. $438.6 million, as compared to the forecast of U.S. $743.1 million (including outstanding cheques).  As well, the U.S. Debtors' net excess DIP availability at that date was approximately U.S.$147.8 million more than projected at the outset.

28.    The Monitor reported in its First Report and its Second Report that, although the U.S. Debtors initially advised that they contemplated the need to borrow funds from InterTAN to satisfy their liquidity needs, they subsequently advised that no such borrowing would be necessary barring exigent circumstances.

29.    The Monitor also reported in the First Report that the U.S. Debtors advised that they were in discussions with certain of their major suppliers (as represented by the official committee of unsecured creditors appointed in the U.S. proceedings (the "UCC")) with the goal of obtaining the agreement of certain suppliers to supply trade credit terms to the U.S. Debtors going forward.    The U.S. Debtors had informed the Monitor that they believed that, if they were to obtain a reasonable amount of trade credit, availability under the DIP Facility would increase substantially.  Were this to occur, they said, the need for inter-company borrowing from InterTAN would be that much less likely.

30.    As reported in the Second Report, the Monitor previously raised with the U.S. Debtors the prospect of InterTAN being granted security for any intercompany advances that it makes to the U.S. Debtors in order to ensure that InterTAN has the liquidity that it requires in accordance with its CCAA Cash Flow Forecast and to protect InterTAN's unsecured creditors. The U.S. Debtors advised the Monitor that, if they were to provide a security interest to the Applicants in connection with potential future inter-company

- 10 -

advances from InterTAN to the U.S. Debtors, their ability to negotiate trade credit terms with their major suppliers would be impaired. On this basis, it was the Monitor's view, as expressed in the First Report and the Second Report, that the issue of the mechanics (including the nature and terms) of any inter-company lending by InterTAN to the U.S. Debtors did not need to be resolved until such time as the U.S. Debtors advise that they anticipate that they may need to borrow from InterTAN.

31.    The Monitor has not been advised of an arrangement concerning the receipt of trade credit by the U.S. Debtors having being concluded with trade creditors in the Chapter 11 Proceedings.

**STATUS OF THE SALE PROCESS**

32.    On December 5, 2008, this Honourable Court issued an Order (the "Sale Process Order") authorizing a process for the sale of the assets and business of the Applicants (the "Sale Process") to be carried out in accordance with the following schedule:

  (i)    preliminary non-binding indications of interest from potential purchasers were to be delivered by 5:00 pm Toronto time on December 17, 2008;

  (ii)    potential purchasers who are invited to participate in the next phase of the sale process, and wish to proceed, shall provide firm proposals, together with a mark-up of the draft purchase and sale agreement, by no later than 5:00 pm Toronto time on January 15, 2009; and

  (iii)    the Applicants will then seek any further relief necessary from this Court to implement any sale transaction.

33.    As discussed in the Second Report, the approach to the CCAA Proceedings and, specifically, the quantum of the Canadian Creditor Charge in the Initial Order, is premised upon the continuation of InterTAN's business as a going concern, including maintaining all or virtually all employment, leases or other contracts so as to maximize recovery on Canadian assets and to avoid increasing the quantum of claims against the Canadian Creditor Charge. As discussed in the First Report, the Monitor has advised the

Applicants and the U.S. Debtors that, in view of the circumstances, it is important that the Sale Process be transparent and independent.

34.     As noted in the First Report, the Applicants retained NM Rothschild & Sons Canada Limited ("Rothschild Canada") as an investment banking advisor to pursue strategic alternatives for InterTAN.  With the prior review of the Monitor, the Applicants signed an engagement letter formally setting out the terms of Rothschild Canada's mandate for InterTAN with effect as of October 13, 2008.

35.     The Monitor understands that the activities taken to date with respect to the Sale Process include the following:

(i)     the Applicants, with the assistance of Rothschild Canada, have canvassed the market for potential buyers and to solicit interest in the purchase of the Applicants' business and assets.  This canvassing included parties which had been contacted in the prior process run by Goldman Sachs, as well as additional parties, including parties expressing an interest in the assets of Circuit City;

(ii)    Rothschild Canada has advised potential bidders of the details of the Sale Process by way of a letter sent after the Sale Process Order;

(iii)   the Applicants and Rothschild Canada prepared and distributed a 'teaser' document to potential purchasers to solicit interest in the acquisition opportunity;

(iv)    potential purchasers that have signed a confidentiality agreement have been provided access to an electronic data room maintained by Rothschild Canada containing confidential information about the Applicants and their business to assist potential purchasers in formulating indicative bids;

(v)     upon notice to all potential bidders, the Applicants and Rothschild Canada extended the deadline for the delivery of indicative bids until 5:00 p.m. on December 19, 2008 in an effort to maximize the number of potential purchasers submitting indicative bids;

(vi)    Rothschild Canada and the Applicants received a total of 10 indicative bids by the extended deadline.  A summary of those bids, together with copies thereof, were provided by Rothschild Canada to the Monitor on December 21, 2008, and Rothschild Canada held discussions with the Monitor on December 22, 2008 and provided Rothschild Canada's analysis of the indicative bids and its proposed manner of proceeding to the next phase of the Sale Process;

(vii)    the Applicants, Rothschild Canada and the Monitor have worked together to develop a template asset purchase agreement which Rothschild Canada delivered on January 9, 2009 to the bidders invited to participate in the second phase of the Sale Process, together with a cover letter confirming the manner in which the Sale Process will continue; and

(viii)    Rothschild Canada has contacted a number of the bidders to invite them to participate in the second phase of the Sale Process and to discuss the manner in which the second phase would unfold, including the need for each such bidder to submit their binding offer by January 15, 2009, together with a mark-up of the template asset purchase agreement.

36.    Rothschild Canada has been providing the Monitor with frequent updates and information on the Sale Process on a current basis, and they and the Applicants have provided the Monitor an opportunity to comment on various aspects of the indicative bids, the template asset purchase agreement and responses to enquiries from bidders as to the Sale Process.

37.    The sale process being run in the Chapter 11 Proceedings could impact the Sale Process, for example, if an *en bloc* bid is received in the Chapter 11 Proceedings.  As a result of the unanimous shareholders' declaration executed by InterTAN's parent, there is no independent stakeholder voice at the negotiating table representing the Canadian stakeholders in connection with the U.S. sale process.  In light of the potential impact of the U.S. sale process, as well as issues in the Sale Process relating to allocation of price among InterTAN's assets and certain trademarks or other assets owned by certain U.S. Debtors, the Monitor wants to ensure that the interests of InterTAN and its stakeholders

are being effectively protected in the sale process in the Chapter 11 Proceedings and in the Sale Process.

38.    The Monitor met with the legal and financial advisors to the U.S. Debtors on January 7, 2009 and was provided, on a confidential basis, information concerning the status of the sale process in the Chapter 11 Proceedings.

39.    The Monitor notes that, in paragraph 4 of the Sale Process Order, it is to fully participate in the Sale Process.  In particular, the Monitor is directed and empowered to...

> (e)    assist in negotiations and discussions between the Applicants (or its U.S. debtor affiliates) and potential purchasers regarding the negotiation and execution of a definitive purchase and sale agreement in respect of the Applicants' assets or the shares of the Applicants.

40.    Accordingly, the Monitor expects to participate with the Applicants, any relevant U.S. Debtors and all prospective purchasers in any and all discussions or negotiations relating to either (i) any sale by InterTAN or the U.S. Debtor owners of the trademarks or other assets used by InterTAN in its business, or (ii) any transaction in the Chapter 11 Proceedings which would have the effect of conveying the shares in the Applicants or effect a change of control in the ownership of the Applicants.  The Monitor has communicated this expectation to the Applicants and to counsel for the U.S. Debtors.

41.    The Monitor will report further on the Sale Process at a later date.

**RESIGNATION OF RONALD CUTHBERTSON AS PRESIDENT OF INTERTAN**

42.    On December 15, 2008, the Monitor was informed by counsel for the Applicants that Ronald Cuthbertson had advised them that he was considering becoming a bidder.  On December 17, 2008, Mr. Cuthbertson resigned as the President of InterTAN effective that day.

43.    During that time period, the Monitor was involved in discussions with both the Applicants' counsel and Rothschild Canada to assess the impact of the resignation of Mr. Cuthbertson on the Sale Process and the business of InterTAN.  After a careful review of

the situation, and in an effort to provide timely disclosure of this information to potential bidders and to minimize any potential negative impact of Mr. Cuthbertson's resignation on the Sale Process, one of the Applicants' principal advisors at Rothschild Canada contacted all of the potential purchasers by telephone on or about December 17, 2008 to inform them of this development, and to advise of the extension of the deadline to submit indicative bids.

44.    Mr. Cuthbertson's responsibilities as President of the Applicants have been assumed and are presently being carried out by a team of senior management of InterTAN.

45.    To date, the Monitor is satisfied that the Applicants and Rothschild Canada have managed the resignation of Mr. Cuthbertson and maintained the integrity of the Sale Process.

## STATUS OF THE CHAPTER 11 PROCEEDINGS AND IMPLICATIONS ON THE CCAA PROCEEDINGS

46.    This Court has requested that the Monitor periodically provide information as to the status of the Chapter 11 Proceedings.  The following is a brief summary of the primary developments in the Chapter 11 Proceedings to date.

47.    The Monitor has retained Allen & Overy LLP to act as its U.S. counsel to ensure that the interests of the Applicants and their respective stakeholders are represented in the Chapter 11 Proceedings.  Kenneth Coleman of Allen & Overy LLP has appeared before the U.S. Court on behalf of the Monitor.

**(a)    Overview**

48.    Having been unable to complete a successful out-of-court restructuring, the U.S. Debtors commenced the Chapter 11 Proceedings on November 10, 2008 in order to obtain post-petition financing and to continue pre-petition restructuring initiatives, including store closures.  A statutory unsecured creditors committee (the "UCC") was appointed on November 12, 2008 by the Office of the United States Trustee; however, no trustee or examiner has yet been appointed.  To date, the U.S. Debtors continue to manage and operate their businesses as debtors in possession.

49.     The U.S. Debtors have stated that they hope to emerge from Chapter 11 protection in the first half of 2009. To that end, the U.S. Court has established January 30, 2009 as the general bar date for the filing of claims against the U.S. Debtors.

50.     Since the commencement of the Chapter 11 Proceedings, the U.S. Court has held two omnibus hearings on December 5, 2008 and December 22, 2008. The primary focus of these omnibus hearings was the resolution of certain objections to the U.S. Debtors' motions in the Chapter 11 Proceedings.

51.     The vast majority of the objections to the U.S. Debtors' motions in the Chapter 11 Proceedings have been raised by landlords from whom the U.S. Debtors lease retail store locations. As these matters are particular to the U.S. and do not impact the Canadian proceedings, the Monitor has not provided a detailed summary.

**(b)     The DIP Motion**

52.     On November 10, 2008, the U.S. Debtors filed a motion for interim and final Orders of the U.S. Court authorizing post-petition financing under the DIP Facility (the "DIP Motion"). The U.S. Court granted an interim order approving the DIP Facility on November 10, 2008, with a view to hearing additional objections with respect to the DIP Facility before granting a final Order with respect to the DIP Motion at a later date. The terms of the DIP Facility are summarized in detail in the First Report.

53.     A number of objections to final approval of the DIP Facility were subsequently filed in the Chapter 11 Proceedings. In particular, the landlords filed certain objections to the DIP Motion relating largely to the concern that the DIP Facility would grant a security interest in the U.S. Debtors' leases contrary to the terms of the leases. These objections were withdrawn or resolved in the context of settlements reached with the landlords on other issues.

54.     In addition, the Monitor understands that the UCC raised a number of objections to final approval of the DIP Facility.

55.     In the week preceding the December 22, 2008 hearing in the Chapter 11 Proceedings, counsel for the Applicants advised the Monitor that there were settlement discussions

relating to the UCC's objections, but they were not aware of all of the details or terms. Accordingly, the Monitor requested its U.S. counsel to seek to obtain from counsel for the U.S. Debtors information as to the status of the DIP Motion.

56.    On Saturday, December 20, 2008, counsel for the U.S. Debtors advised the Monitor's U.S. counsel by email that the UCC's objections to the DIP Motion had been settled.

57.    On Sunday, December 21, 2008, the Monitor was provided with the Draft Second Amendment dated as of December 19, 2008 intended to be executed by the U.S. Debtors, the DIP Lenders and InterTAN. A copy of the Draft Second Amendment is attached as Appendix "C". The Monitor was advised that the U.S. Debtors were seeking approval of the U.S. Bankruptcy Court for the Draft Second Amendment on Monday, December 22, 2008. Paragraph 5 of the Draft Second Amendment provides, in part, as follows:

> 5.    Amendment to DIP Orders and Initial Orders - The Borrowers and the Required Lenders hereby agree that the terms of the DIP Orders and the Initial Order may be amended as follows:
>
> ...
>
> (b)  to provide that the Liens granted under the Initial Order with respect to the Property may be limited to provide that after payment of clauses one through five of Section 44 of the Initial Order, fifty (50%) percent of the remaining proceeds of such Property shall be used to pay the DIP Lenders' Charge set forth in clause six of Section 44 of the Initial Order, and the balance shall be available to be distributed to the Domestic Loan Parties (to the extent allowed by the Canadian bankruptcy court) and retained by the estate and not applied in reduction of the Obligations.
>
> (c)  to permit the proceeds from the Domestic Loan Parties' furniture, Fixtures and Equipment to be retained by the estate and not applied in reduction of the Obligations.
>
> ...

58.    In the circumstances, the Monitor had insufficient time and facts to assess the full impact of the Draft Second Amendment. However, based on the Monitor's initial review, the Monitor concluded that the Draft Second Amendment would impact the Canadian proceedings and Canadian stakeholders.

59.    On Monday, December 22, 2008, the Monitor scheduled an urgent scheduling motion returnable before this Honourable Court at 9:30 a.m. on Tuesday, December 23, 2008. At that hearing, counsel for the Applicants advised the Court they understood that amendments were contemplated to the Draft Second Amendment. During a brief re-attendance on December 24, 2008, counsel for the Applicants provided the Court with an unsigned copy of the Final Second Amendment and a copy of the Final U.S. DIP Order (referred to below). The Court scheduled the hearing of this motion and indicated that in the interim it intended to make an order prohibiting the distribution of proceeds of the Applicants' Property and any intercompany advances from the Applicants to any of its U.S. affiliates. This resulted in the Status Quo Order, a copy of which is attached as Appendix "D".

60.    By Order dated December 23, 2008, the U.S. Bankruptcy Court granted final approval of the Applicants' DIP borrowing. A copy of this Order is attached as Appendix "E". Paragraph 2(e) of the operative provisions of this Order provides, in part:

> Notwithstanding the grant of the DIP Liens (a) the net proceeds, if any, realized after the date of this Final Order from the disposition of the Debtors' Equipment and Fixtures shall be paid to the Debtors' estates and not applied in reduction of the DIP Obligations or the Pre-Petition Debt; and (b) fifty percent (50%) of the net proceeds, if any, received by the DIP Lenders under the DIP Lenders' Charge set forth in clause six of Section 44 of the Initial Order (as amended and in effect) entered into in the CCAA proceedings of InterTAN Canada Ltd. (as ameded [sic] and in effect, the "CCAA Initial Order") shall be paid to the Debtors' estates and not applied in reduction of the DIP Obligations or the Pre-Petition Debt. For the avoidance of doubt, nothing in this Final Order, the DIP Credit Agreement, or any amendment thereto, including without limitation, the prior DIP Amendments, shall amend or modify the terms and conditions of the CCAA Initial Order in any respect. In the event of any inconsistency between the terms and conditions of the Final Order and the CCAA Initial Order with respect to (i) InterTAN Canada Ltd. and any other Canadian Subsidiary of Circuit City Stores, Inc., which are debtor companies in the Canadian Bankruptcy Case (collectively, the "Canadian Debtors") or (ii) the assets of the Canadian Debtors, the CCAA Initial Order shall control.

61.    The Monitor has been provided with a copy of the executed, finalized Second Amendment to Senior Secured, Super-Priority, Debtor-In-Possession Credit Agreement (the "Final Second Amendment") a copy of which is attached as Appendix "F". Although InterTAN is recited as a party to the Final Second Amendment, it is not a signatory on the document.

62.    Paragraph 7 of the Final Second Amendment provides, in part:

> 7.    <u>Amendment to DIP Orders</u> - Th e Borrowers and the Required Lenders hereby agree that the terms of the DIP Orders may be amended as follows:
>
> ...
>
> (b)  to provide that fifty percent (50%) of the net proceeds, if any, received by the DIP Lenders under the DIP Lenders' Charge set forth in clause six of Section 44 of the Initial Order (as amended and in effect) entered into [sic] the CCAA proceedings of InterTAN Canada Ltd. shall be paid to the Debtors' estates (to the extent allowed by the Canadian bankruptcy court) and not applied in reduction of the DIP Obligations or the Pre-Petition Debt,
>
> (c)   to permit the proceeds from the Domestic Loan Parties furniture, Fixtures and Equipment to be retained by the estate and not applied in reduction of the Obligation.
>
> ...

63.    The Monitor notes the following:

- Prior to these proceedings, the Applicants were not liable to their secured lenders for the indebtedness of their U.S. affiliates (all as noted in paragraph 38 of the Initial Report). At that time, neither the secured nor the unsecured creditors of the U.S. Debtors had any entitlement to share in the proceeds of the Applicants' assets as a means to realize their claims against the U.S. Debtors, other than through the U.S. Debtors as equity holders after the payment of all creditors of the Applicants.

- As set out in paragraph 40 of the Initial Report, the Applicants advised the Monitor that: the proposed DIP Facility, while not perfect, was the only alternative available to them; that the DIP Facility must be approved on the terms presented; and that the

entire enterprise and all business and jobs in the North American operations of the Applicants and the U.S. Debtors would be at risk if the DIP Facility was not approved on those terms.

- The Applicants adduced evidence, in paragraph 98 of the Wong Affidavit, that the financial circumstances of the Applicants and its U.S. affiliates were such that it was the intention of those parties and the DIP Lenders to keep the Canadian portion of the DIP Facility available to InterTAN fully drawn at all times, and that the U.S. Debtors would have access to any such funds not needed by InterTAN for its operations.

64.    As a result of these facts, this Honourable Court accepted the *ex parte* request of the Applicants to grant a Court-ordered super-priority charge over the assets of the Applicants in favour of the DIP Lenders so as to as to assure them of the security of their proposed advances to the Applicants and to guarantee payment of advances by the DIP Lenders to the U.S. Debtors, in order to keep the businesses from failing both in the U.S. and Canada.

65.    The DIP Charge was extraordinary both because it was broader in scope (i.e. it charges more assets) than the lenders' pre-existing security and because it gave priority claims to the DIP Lenders against the assets of the Applicants in respect of amounts owed by the U.S. Debtors ahead of the pre-existing claims of unsecured creditors of the Applicants.  This reversed the normal operation of legal priorities under which the creditors of the Applicants would normally be entitled to be re-paid in full prior to money being distributed by InterTAN to its parent company as equity.

66.    As a result of the potential for prejudice to pre-existing trade creditors, the Applicants proposed a multi-tiered structure under which, in simple terms, the DIP Lenders would have first priority for the re-payment of direct borrowings by InterTAN; then the pre-existing trade creditors of InterTAN would have priority over the next $25 million recovered from InterTAN's assets; and thereafter, the DIP Lenders would have priority for any DIP borrowings that remained due to them from U.S. Debtors. (This last priority has previously been defined in this report as the Sixth Charge.)[1]

---

[1] As the Court is aware, to the extent that the Directors' Charge granted in the Initial Order is not realized upon or utilized by the beneficiaries thereof, subject to certain conditions, the unutilized amount will be used to increase the Canadian Creditor Charge.

67.    In paragraph 98 of the Wong Affidavit, Mr. Wong testified,

> The amount of the proposed Canadian Creditor Basket has been determined by the
> Applicants, in consultation with their financial advisors, as an estimate of the
> unsecured trade debt that may be impacted by these proceedings while InterTAN
> [sic] a going concern restructuring, after taking into account set-offs and other
> adjustments.

68.    The DIP priorities granted in the Initial Order were premised upon the DIP Lenders'
requirement for cross-guarantees and cross-collateralization as a condition of lending.
The Canadian Creditor Charge was based upon an estimate prepared by the Applicants
and their financial advisors as to the amount of the pre-existing trade debt, net of set-offs
and other adjustments, and premised on a going concern restructuring or sale of the
Applicants with no lease, contract or employee terminations.

69.    Paragraph 44 of the Initial Order reflects a distinction between the direct advances to the
Applicants and the DIP Lenders' advances to the U.S. Debtors, for which the Applicants
only became obligated as a result of the Initial Order.  The Sixth Charge only addresses
the latter amount, being the DIP Lenders' advances to the U.S. Debtors.   Given the
waterfall of priorities in Paragraph 44 of the Initial Order, the DIP Lender is
appropriately given a higher priority to assure payment of its direct advances to the
Applicants, and the treatment of the Sixth Charge confirms that it is effectively a
guarantee in the event of a shortfall on lending to the U.S. Debtors.  Accordingly, if the
DIP Lenders are paid in full on their lending to the U.S. Debtors, there would be no need
for them to access the Sixth Charge.

70.    The Monitor also notes the following:

- After the granting of the Initial Order, the Monitor was advised by the Applicants
  and reported that the initial cash flow statements delivered by the U.S. Debtors to the
  U.S. Bankruptcy Court at the time of the first day hearings did not anticipate any
  borrowing by the U.S. Debtors from the Applicants.  The U.S. Debtors confirmed to
  the Monitor that absent, exigent circumstances, they did not in fact anticipate the
  need to borrow funds from InterTAN (see paragraph 54 to 57 of the First Report).  In
  fact, to date in these proceedings, the U.S. Debtors have required no advances from

InterTAN to support their operations and they appear to have significant availability under the DIP.

- In addition, the Monitor was advised by the U.S. Debtors that the discussions that were under way with the UCC could result in additional credit being made available from certain trade creditors with security being granted to those U.S. trade creditors in exchange for trade credit terms for the U.S. Debtors, which would decrease the likelihood of funds being required from Canada to support the Applicants' U.S. affiliates.

- From the Final Second Amendment, it now appears that the UCC raised concerns with respect to, among other things, the widening of the scope of the security covered by the DIP Facility to include assets that were not previously encumbered under pre-existing security. However, unlike the situation in Canada, the DIP Lenders and the U.S. Debtors have effectively agreed with the UCC to exclude the pre-petition unencumbered furniture, fixtures and equipment from the scope of the DIP security in the U.S.

- The Final Second Amendment provides that:

    (a)    the proceeds from the furniture, fixtures and equipment of the U.S. Debtors are to be retained by the U.S. estate for the benefit of the U.S. unsecured creditors rather than being used by the DIP Lenders to reduce the obligations owing to them by the U.S. Debtors; and

    (b)    half of all amounts paid under the Sixth Charge, if any, are to be paid to the U.S. estate for the benefit of the U.S. unsecured creditors and will not reduce amounts owing to the DIP Lenders.

71.    Therefore, the security that the Monitor and this Court were advised was a non-negotiable condition precedent to the DIP Lenders' provision of the DIP Facility, without which the Applicants and the U.S. Debtors would fail, has been bartered away by the U.S. Debtors and the DIP Lenders to unsecured creditors of the U.S. Debtors to settle their complaints as to the proposed terms of the DIP Facility. That is, rather than simply supporting the

need for the DIP Lenders to be re-paid amounts advanced to the U.S. Debtors, the Sixth

Charge has been used as a form of value or currency in negotiations with the UCC.

72.     By enabling the DIP Lenders to share half of the Sixth Charge with the unsecured

creditors of the U.S. Debtors, the Final Second Amendment makes proceeds of the assets

of the Applicants available to unsecured creditors of the U.S. Debtors without any

assurances that the unsecured creditors of the Applicants will be paid in full.  This was

not what the Monitor understood to be the purpose of the granting of the Sixth Charge to

the DIP Lenders and is not consistent with the purposes of the accommodation that the

Court was asked to grant.  Rather than protecting the DIP Lenders' ability to be re-paid

from Canadian assets for U.S. lending while protecting Canadian unsecured creditors and

supporting the North American operations, the Final Second Amendment potentially

allows unsecured creditors of the U.S. Debtors, which have no claims against the

Applicants, to have access to the Applicants' assets and achieve recoveries ahead of the

unsecured creditors of the Applicants.  Therefore, the Monitor is of the view that the

Final Second Amendment could have an unfair and inequitable impact on the unsecured

creditors of the Applicants.

73.     The Monitor notes that paragraph 7(b) of the Final Second Amendment provides that any

proposed sharing of the Sixth Charge is only available "to the extent allowed by the

Canadian bankruptcy court".  The Monitor submits that it would be appropriate, fair and

reasonable for this Honourable Court to make directions to govern the determination

whether this Honourable Court is willing to allow any such sharing of the Sixth Charge.

74.     The Monitor had been advised by the U.S. Debtors that the purpose of negotiations with

the UCC was to obtain further credit that would decrease the likelihood of claims being

made into Canada.  In fact, by allowing the U.S. estate to access the value of the furniture,

fixtures and equipment of the U.S. Debtors, the Final Second Amendment would

potentially reduce the recoveries by the DIP Lenders in the Chapter 11 Proceedings and

thus *increase* the likelihood that the DIP Lenders will need to have recourse to the Sixth

Charge.  Accordingly, the Monitor submits that, to the extent that any proceeds of the

U.S. Debtors' assets are ultimately not used to repay the DIP Lenders, the equivalent

amount ought to be deducted from the obligations owing by the Applicants to the DIP Lenders and the Sixth Charge should be likewise reduced.

75.    During the 9:30 hearing on December 23, 2008 this Honourable Court was advised that the intention of parties to the Draft Second Amendment was that it would not allow a "double dip" (i.e. to the extent the DIP Lenders either shared the proceeds of the DIP Lenders' Charge or did not claim the proceeds of the U.S. Debtors' furniture, fixtures and equipment, there would be a corresponding reduction in the DIP Obligations) and that the DIP Lenders were prepared to confirm this in writing.  However, the Final Second Amendment and the U.S. Court Order of December 23, 2008 (which are quoted above in paragraphs 60 and 62 above) do not reflect this, nor does the letter dated January 8, 2009 from Canadian counsel for the DIP Lenders to the Monitor's counsel.  A copy of this letter is attached as Appendix "G".

76.    Until Canadian creditors' recovery is better particularized and until there is better clarity as to whether access to Canadian realization is required to protect the DIP Lenders from suffering a shortfall on their advances to the U.S. Debtors, if ever, the Monitor recommends that the Court make the following directions:

  (i)    An Order extending the Status Quo Order so that, until further Order of this Court, the Applicants shall not:

      (a)    distribute or otherwise permit the payment of any of the Applicants' property, assets and undertaking to any of their affiliates or lenders, provided that nothing herein prevents the distribution or payment of such proceeds to the DIP Lenders in accordance with the Initial Order and the DIP Agreement (defined therein) on account of direct indebtedness owing by the Applicants to the DIP Lenders; or

      (b)    make any advances to any of its U.S. affiliates;

  (ii)    An Order directing that, notwithstanding anything contained in the Initial Order, no amount shall be paid to the DIP Lenders pursuant to the DIP Lenders' Charge listed as item number "six" in paragraph 44 of the Initial Order (the "Sixth Charge") unless and to the extent that this Honourable Court is satisfied that the DIP Lenders have exhausted all recourse that they may have to realize proceeds from all other sources of recovery that may be available to them from the property and assets of the borrowers other than the property and assets of the Applicants;

(iii)   An Order that the claims of the DIP Lenders under the Sixth Charge shall be reduced by the amount of the proceeds of the furniture, fixtures and equipment of the U.S. Debtors and by an amount equal to the value or the proceeds of any assets of the U.S. Debtors that were encumbered in the initial proposed DIP Facility which may be no longer subject to the DIP Facility approved in the U.S. Bankruptcy Court by Order dated December 23, 2008; and

(iv)   An Order pursuant to the Final Second Amendment (as defined herein) and, in particular, paragraph 7(b) thereof, that, until such time, if ever, as this Honourable Court orders otherwise, this Honourable Court has made no determination to allow any payment to be made pursuant to the Sixth Charge to be paid directly or indirectly to the estates of any of the U.S. affiliates of the Applicants or to any of the creditors of those estates.

77.   In effect, the Monitor proposes that the property and assets of the U.S. Debtors should be applied first to repay direct advances by the DIP Lenders to the U.S. Debtors and only once this is completed would the Court determine the extent to which resort would be had to the Applicants' property and assets under the Sixth Charge. At that time, in accordance with the right given to this Court by the parties in paragraph 7(b) of the Final Second Amendment, the Court can determine if it will allow any sharing under the Final Second Amendment.   With respect, it is the Monitor's view that this recommendation is consistent with the pre-filing state of affairs between Canada and the U.S. and their respective creditors; respects the basic concepts of the Initial Order; is responsive to the present circumstances; and allows the Sale Process and restructurings both in Canada and the U.S. to proceed with the least amount of disruption.

78.   Finally, in light of: (a) the fact the U.S. Debtors do not anticipate requiring advances from InterTAN; (b) there have been no discussions with the U.S. Debtors since November 19, 2008 as to the nature of the security to be provided to ensure the re-payment to InterTAN of any such advances in the event that they do seek to borrow from InterTAN; and (c) the concerns expressed above that access by creditors of the Applicants' affiliates to Canadian distributions should await realization on the property of all of the affiliates in any event, the Monitor therefore recommends that the Status Quo Order be extended pending further Order of this Honourable Court.

- 25 -

All of which is respectfully submitted at Toronto, Ontario this 10th day of January, 2009.


**ALVAREZ & MARSAL CANADA ULC**
in its capacity as Court appointed Monitor of
InterTAN Canada Ltd. and Tourmalet Corporation

Per:  _____

    Name: Douglas R. McIntosh
    Title:  Managing Director
    I/We have the authority to bind the corporation

Court File No.: 08-CL-7841

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF INTERTAN
CANADA LTD. AND TOURMALET CORPORATION

*ONTARIO*
*SUPERIOR COURT OF JUSTICE*
*(COMMERCIAL LIST)*

Proceeding commenced at Toronto

**THIRD REPORT OF THE MONITOR**

**Goodmans LLP**
*Barristers & Solicitors*
*250 Yonge Street, Suite 2400*
*Toronto, Canada M5B 2M6*

*Jay A. Carfagnini (LSUC#22936)*
*Fred Myers (LSUC#26301A)*
*L. Joseph Latham (LSCU# 32326A)*

*Tel: 416.979.2211*
*Fax: 416.979.1234*

*Solicitors for the Monitor*

\5667937
\5667937



Court File No. 08-CL-7841

**_ONTARIO_**

**SUPERIOR COURT OF JUSTICE**

**COMMERCIAL LIST**

THE HONOURABLE MR.       )           MONDAY, THE 10th DAY

                           )

JUSTICE MORAWETZ         )            OF NOVEMBER, 2008

IN THE MATTER OF THE _COMPANIES' CREDITORS
ARRANGEMENT ACT,_ R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR
ARRANGEMENT OF INTERTAN CANADA LTD. AND
TOURMALET CORPORATION

                                  **APPLICANTS**

**AMENDED AND RESTATED INITIAL ORDER**

THIS APPLICATION, made by the Applicants, pursuant to the _Companies' Creditors
Arrangement Act,_ R.S.C. 1985, c. C-36, as amended (the "CCAA") was heard this day at 330
University Avenue, Toronto, Ontario.

ON READING the affidavit of Mark J. Wong sworn November 10, 2008  and the
Exhibits thereto (the "Wong Affidavit") and on hearing the submissions of counsel for the
Applicant, Alvarez & Marsal Canada ULC, Bank of America, N.A. (Canadian Branch) in its
capacity as a lender and Canadian agent (the "Canadian Agent"), and on reading the consent
of Alvarez & Marsal Canada ULC to act as the Monitor.

**SERVICE**

1.      THIS COURT ORDERS that the time for service of the Notice of Application and the Application Record is hereby abridged so that this Application is properly returnable today and hereby dispenses with further service thereof.

**APPLICATION**

2.      THIS COURT ORDERS AND DECLARES that the Applicants are companies to which the CCAA applies.

**PLAN OF ARRANGEMENT**

3.      . THIS COURT ORDERS that the Applicants shall have the authority to file and may, subject to further order of this Court, file with this Court a plan of compromise or arrangement (hereinafter referred to as the "Plan") between, *inter alia*, the Applicants and one or more classes of its secured and/or unsecured creditors as it deems appropriate.

**POSSESSION OF PROPERTY AND OPERATIONS**

4.      THIS COURT ORDERS that the Applicants shall remain in possession and control of their current and future assets, undertakings and properties of every nature and kind whatsoever, and wherever situate including all proceeds thereof (the "Property"). Subject to this and any further Order of this Court, the Applicants shall continue to carry on business in a manner consistent with the preservation of its business (the "Business") and Property. The Applicants shall be authorized and empowered to continue to retain and employ the employees, consultants, agents, experts, accountants, counsel and such other persons (collectively "Assistants") currently retained or employed by it, with liberty to retain such further Assistants as it deems reasonably necessary or desirable in the ordinary course of business or for the carrying out of the terms of this Order.

5.      THIS COURT ORDERS that the Applicants shall be directed to continue to utilize the central cash management system currently in place as described in the Wong Affidavit or replace it with another substantially similar central cash management system as necessary to facilitate the DIP Facility approved herein (the "Cash Management System") and that any present or future bank providing the Cash Management System shall not be under any

obligation whatsoever to inquire into the propriety, validity or legality of any transfer, payment, collection or other action taken under the Cash Management System, or as to the use or application by the Applicants of funds transferred, paid, collected or otherwise dealt with in the Cash Management System, shall be entitled to provide the Cash Management System without any liability in respect thereof to any Person (as hereinafter defined) other than the Applicants, pursuant to the terms of the documentation applicable to the Cash Management System, and shall be, in its capacity as provider of the Cash Management System, an unaffected creditor under the Plan with regard to any claims or expenses it may suffer or incur in connection with the provision of the Cash Management System.

6.      THIS COURT ORDERS that, subject to availability under the DIP Facility (as hereinafter defined), the Applicants shall be entitled but not required to pay the following expenses whether incurred prior to or after this Order:

(a)     the fees and disbursements of any Assistants retained or employed by the Applicants in respect of these proceedings, at their standard rates and charges;

(b)     payments in respect of the key employee retention program (the "KERP") as described in the Wong Affidavit;

(c)     amounts owing for goods or services actually supplied to the Applicants prior to the date of this order:

(i)     by Purolator Courier and other logistics or supply chain providers;

(ii)    by custom brokers; and

(iii)   with the consent of the Monitor, up to $2 million, by other North American suppliers, including payments in respect of outstanding documentary credits or deposits, if, in the opinion of the Applicants, the supplier is critical to the Business and ongoing operations of the Applicants;

- 4 -

(d)    goods and services actually supplied to the Applicants prior to the date of this order, including payments in respect of outstanding documentary credits or deposits, by trade vendors and suppliers outside of North America;

(e)    the JV Manager Share to the JV Managers (both as defined in the Wong Affidavit);

(f)    all amounts related to servicing warranties and honouring gift cards and reward and loyalty programs issued before or after the date of this Order; and

(g)    any other costs and expenses that are deemed necessary for the preservation of the Property and/or the Business by the Applicants with the consent of the Monitor.

7.    THIS COURT ORDERS that, except as otherwise provided to the contrary herein, the Applicants shall be entitled but not required to pay all reasonable expenses incurred by the Applicants in carrying on the Business in the ordinary course after this Order, and in carrying out the provisions of this Order, which expenses shall include, without limitation:

(a)    all expenses and capital expenditures reasonably necessary for the preservation of the Property or the Business including, without limitation, payments on account of insurance (including directors and officers insurance), maintenance and security services; and

(b)    payment for goods or services actually supplied to the Applicants following the date of this Order.

8.    THIS COURT ORDERS that the Applicants shall remit, in accordance with legal requirements, or pay:

(a)    subject to availability under the DIP Facility, all outstanding and future wages, salaries, employee and pension benefits, vacation pay, bonuses and reasonable expenses payable to employees payable on or after the date of this Order, in each case incurred in the ordinary course of business and consistent with existing compensation policies and arrangements;

(b)   any statutory deemed trust amounts in favour of the Crown in right of Canada or of any Province thereof or any other taxation authority which are required to be deducted from employees' wages, including, without limitation, amounts in respect of (i) employment insurance, (ii) Canada Pension Plan, (iii) Quebec Pension Plan, and (iv) income taxes;

(c)   all goods and services or other applicable sales taxes (collectively, "Sales Taxes") required to be remitted by the Applicants in connection with the sale of goods and services by the Applicants, but only where such Sales Taxes are accrued or collected after the date of this Order, or where such Sales Taxes were accrued or collected prior to the date of this Order but not required to be remitted until on or after the date of this Order, and

(d)   any amount payable to the Crown in right of Canada or of any Province thereof or any political subdivision thereof or any other taxation authority in respect of municipal realty, municipal business or other taxes, assessments or levies of any nature or kind which are entitled at law to be paid in priority to claims of secured creditors and which are attributable to or in respect of the carrying on of the Business by the Applicants.

9.     THIS COURT ORDERS that until such time as an Applicant delivers a notice in writing to repudiate a real property lease in accordance with paragraph 11(c) of this Order (a "Notice of Repudiation"), such Applicant shall pay all amounts constituting rent or payable as rent under real property leases (including, for greater certainty, common area maintenance charges, utilities and realty taxes and any other amounts payable to the landlord under the lease) or as otherwise may be negotiated between such Applicant and the relevant landlord from time to time ("Rent"), for the period commencing from and including the date of this Order, twice-monthly in equal payments on the first and fifteenth day of each month, in advance (but not in arrears). On the date of the first of such payments, any arrears relating to the period commencing from and including the date of this Order shall also be paid. Upon delivery of a Notice of Repudiation, such Applicant shall pay all Rent due for the notice

period stipulated in paragraph 11(c) of this Order, to the extent that Rent for such period has not already been paid.

10.    THIS COURT ORDERS that, except as specifically permitted herein, the Applicants are hereby directed, until further Order of this Court: (a) to make no payments of principal, interest thereon or otherwise on account of amounts owing by the Applicants to any of their creditors as of this date; (b) to grant no security interests, trusts, liens, charges or encumbrances upon or in respect of any of its Property; and (c) to not grant credit or incur liabilities except in the ordinary course of the Business.

**RESTRUCTURING**

11.    THIS COURT ORDERS that the Applicants shall, subject to such covenants as may be contained in the DIP Facility (as hereinafter defined), (other than sub-section 11(c) which shall apply regardless of the covenants contained in the DIP Facility), have the right to:

(a)    permanently or temporarily cease, downsize or shut down any of their businesses or operations and to dispose of redundant or non-material assets not exceeding $500,000 in any one transaction or $1,000,000 in the aggregate, subject to paragraph 11(c), if applicable;

(b)    terminate the employment of such of their employees or temporarily lay off such of their employees as they deems appropriate on such terms as may be agreed upon between the Applicants and such employee, or failing such agreement, to deal with the consequences thereof in the Plan;

(c)    subject to paragraph 11A herein, in accordance with paragraphs 12 and 13, vacate, abandon or quit the whole but not any part of any leased premises and/or repudiate any real property lease and any ancillary agreements relating to any leased premises, on not less than fourteen (14) days' notice in writing to the relevant landlord on such terms as may be agreed upon between the Applicants and such landlord, or failing such agreement, to deal with the consequences thereof in the Plan;

(d)     subject to paragraph 11A herein, repudiate such of their arrangements or agreements of any nature whatsoever, whether oral or written, as the Applicants deem appropriate on such terms as may be agreed upon between the Applicants and such counter-parties, or failing such agreement, to deal with the consequences thereof in the Plan;

(e)     pursue all avenues of refinancing and offers for material parts of their Business or Property, in whole or part, subject to prior approval of this Court being obtained before any material refinancing or any sale (except as permitted by subparagraph (a), above); and

(f)     apply to this Court for such approval, vesting or other Orders as may be necessary to consummate sale transactions.

all of the foregoing to permit the Applicants to proceed with an orderly restructuring of the Business (the "Restructuring").

11A     THIS COURT ORDERS that the Applicants shall obtain the approval of the Monitor prior to the Applicants repudiating or disclaiming any material agreements, which shall include real property leases, in accordance with paragraphs 11(c) or 11(d) herein. If the Monitor does not provide such approval, the Applicants shall be entitled to apply to the Court on no less than seven (7) days' notice to the Monitor and the co-contracting party for an order that the agreement be repudiated or disclaimed.

12.     THIS COURT ORDERS that the Applicants shall provide each of the relevant landlords with notice of an Applicant's intention to remove any fixtures from any leased premises at least seven (7) days prior to the date of the intended removal. The relevant landlord shall be entitled to have a representative present in the leased premises to observe such removal and, if the landlord disputes the Applicant's entitlement to remove any such fixture under the provisions of the lease, such fixture shall remain on the premises and shall be dealt with as agreed between any applicable secured creditors, such landlord and the Applicant, or by further Order of this Court upon application by the Applicants on at least two (2) days' notice to such landlord and any such secured creditors. If an Applicant repudiates the lease governing such leased premises in accordance with paragraph 11(c) of this Order, it shall

- 8 -

not be required to pay Rent under such lease pending resolution of any such dispute (other than Rent payable for the notice period provided for in paragraph 11(c) of this Order), and the repudiation of the lease shall be without prejudice to the Applicant's claim to the fixtures in dispute.

13.    THIS COURT ORDERS that if a Notice of Repudiation is delivered, then: (a) during the notice period prior to the effective time of the repudiation, the landlord may show the affected leased premises to prospective tenants during normal business hours, on giving the Applicant and the Monitor 24 hours' prior written notice, and (b) at the effective time of the repudiation, the relevant landlord shall be entitled to take possession of any such leased premises without waiver of or prejudice to any claims or rights such landlord may have against the Applicant in respect of such lease or leased premises and such landlord shall be entitled to notify the Applicant of the basis on which it is taking possession and to gain possession of and re-lease such leased premises to any third party or parties on such terms as such landlord considers advisable, provided that nothing herein shall relieve such landlord of its obligation to mitigate any damages claimed in connection therewith.

14.    THIS COURT ORDERS that any Charge (as defined below) created by this Order over leases of real property in Canada shall only be a Charge in the Applicants' interest in such real property leases.

15.    THIS COURT ORDERS that notwithstanding anything to the contrary in any agreement providing for the liquidation of assets from any leased premises, but subject to: (a) any written agreement between an Applicant, a liquidator and any landlord; or (b) a further Order of this Court:

(i)    the Applicants shall at all times abide by and be subject to the terms of all real property leases (collectively, the "Leases") and shall cause any liquidator to abide by the terms of the Leases, and the Applicant and the liquidator shall obtain the applicable landlord's approval for all signage and promotional advertising for sales to be conducted by the liquidator pursuant to the agreement with the Applicant in any of the leased premises to the extent otherwise not permitted by the applicable Lease; and

    (ii)    neither the Applicants nor any liquidator shall augment the merchandise in any leased premises unless otherwise permitted by the applicable Lease or approved by the applicable landlord.

## NO PROCEEDINGS AGAINST THE APPLICANTS OR THE PROPERTY

16.    THIS COURT ORDERS that, with the exception of the remedies (other than any steps to seize, possess or foreclose, or such other like remedy, on its own behalf or through any agent on the Property) pursuant to the DIP Facility and the terms of this or any other Order of this Court, until and including December 9, 2008, or such later date as this Court may order (the "Stay Period"), no proceeding or enforcement process in any court or tribunal (each, a "Proceeding") shall be commenced or continued against or in respect of the Applicants or the Monitor, or affecting the Business or the Property, except with the written consent of the Applicants and the Monitor, or with leave of this Court, and any and all Proceedings currently under way against or in respect of the Applicants or affecting the Business or the Property are hereby stayed and suspended pending further Order of this Court.

## NO EXERCISE OF RIGHTS OR REMEDIES

17.    THIS COURT ORDERS that during the Stay Period, all rights and remedies of any individual, firm, corporation, governmental body or agency, or any other entities (all of the foregoing, collectively being "Persons" and each being a "Person") against or in respect of the Applicants or the Monitor, or affecting the Business or the Property, are hereby stayed and suspended except with the written consent of the Applicants and the Monitor, or leave of this Court, provided that nothing in this Order shall (i) empower the Applicants to carry on any business which the Applicants are not lawfully entitled to carry on, (ii) exempt the Applicants from compliance with statutory or regulatory provisions relating to health, safety or the environment, (iii) prevent the filing of any registration to preserve or perfect a security interest, or (iv) prevent the registration of a claim for lien.

## NO INTERFERENCE WITH RIGHTS

18.    THIS COURT ORDERS that during the Stay Period, no Person shall discontinue, fail to honour, alter, interfere with, repudiate, terminate or cease to perform any right, renewal

right, contract, agreement, licence or permit in favour of or held by the Applicants, except with the written consent of the Applicants and the Monitor, or leave of this Court.

19.    THIS COURT ORDERS that during the Stay Period, no Person (other than the Applicants) having any agreement, arrangement, licence or lease with any dealer of the Applicants in connection with the supply of goods or services or the lease of premises at the retail locations at which products of the Applicants are sold, may take any Proceeding or exercise any right (including but not limited to a right to terminate, accelerate, suspend, modify or cancel) under such agreement, arrangement, licence or lease solely as a result of the filing of this Application or the making of this Order.

## CONTINUATION OF SERVICES

20.    THIS COURT ORDERS that during the Stay Period, all Persons having oral or written agreements with the Applicants or statutory or regulatory mandates for the supply of goods and/or services, including without limitation all computer software, communication and other data services, centralized banking services, payroll services, insurance, transportation, services, utility or other services to the Business or the Applicants, are hereby restrained until further Order of this Court from discontinuing, altering, interfering with or terminating the supply of such goods or services as may be required by the Applicants, and that the Applicants shall be entitled to the continued use of its current premises, telephone numbers, facsimile numbers, internet addresses and domain names, provided in each case that the normal prices or charges for all such goods or services received after the date of this Order are paid by the Applicants in accordance with normal payment practices of the Applicants or such other practices as may be agreed upon by the supplier or service provider and each of the Applicants and the Monitor, or as may be ordered by this Court.

## NON-DEROGATION OF RIGHTS

21.    THIS COURT ORDERS that, notwithstanding anything else contained herein, no creditor of the Applicants shall be under any obligation after the making of this Order to advance or re-advance any monies or otherwise extend any credit to the Applicants. Nothing in this Order shall derogate from the rights conferred and obligations imposed by the CCAA.

- 11 -

## PROCEEDINGS AGAINST DIRECTORS AND OFFICERS

22.    THIS COURT ORDERS that during the Stay Period, and except as permitted by subsection 11.5(2) of the CCAA, no Proceeding may be commenced or continued against any of the former, current or future directors or officers of the Applicants with respect to any claim against the directors or officers that arose before the date hereof and that relates to any obligations of the Applicants whereby the directors or officers are alleged under any law to be liable in their capacity as directors or officers for the payment or performance of such obligations, until a compromise or arrangement in respect of the Applicants, if one is filed, is sanctioned by this Court or is refused by the creditors of the Applicants or this Court.

## DIRECTORS' AND OFFICERS' INDEMNIFICATION AND CHARGE

23.    THIS COURT ORDERS that InterTAN hereby indemnifies its directors and officers from all claims, costs, charges and expenses relating to the failure of InterTAN, after the date hereof, to make payments of the nature referred to in subparagraphs 8(a), 8(b), 8(c) and 8(d) of this Order which they sustain or incur by reason of or in relation to their respective capacities as directors and/or officers of InterTAN except to the extent that, with respect to any officer or director, such officer or director has actively participated in the breach of any related fiduciary duties or has been grossly negligent or guilty of wilful misconduct.

24.    THIS COURT ORDERS that the directors and officers of InterTAN shall be entitled to the benefit of and are hereby granted a charge (the "Directors' Charge") on the Property, which charge shall not exceed an aggregate amount of $19.3 million, as security for the indemnity provided in paragraph 23 of this Order. The Directors' Charge shall have the priority set out in paragraphs 44 and 46 herein.

25.    THIS COURT ORDERS that, notwithstanding any language in any applicable insurance policy to the contrary, (a) no insurer shall be entitled to be subrogated to or claim the benefit of the Directors' Charge, and (b) InterTAN's directors and officers shall only be entitled to the benefit of the Directors' Charge to the extent that they do not have coverage under any directors' and officers' insurance policy, or to the extent that such coverage is insufficient to pay amounts indemnified in accordance with paragraph 23 of this Order.

- 12 -

## APPOINTMENT OF MONITOR

26.      THIS COURT ORDERS that Alvarez & Marsal Canada ULC is hereby appointed pursuant to the CCAA as the Monitor, an officer of this Court, to monitor the Property and the Applicants' conduct of the Business with the powers and obligations set out in the CCAA or set forth herein and that the Applicants and their shareholders, officers, directors, and Assistants shall advise the Monitor of all material steps taken by the Applicants pursuant to this Order, and shall co-operate fully with the Monitor in the exercise of its powers and discharge of its obligations.

27.      THIS COURT ORDERS that the Monitor, in addition to its prescribed rights and obligations under the CCAA, is hereby directed and empowered to:

    (a)    monitor the Applicants' receipts and disbursements;

    (b)    liaise with the Applicants' financial advisor and investment bankers with respect to all matters relating the Property, the Business and such other matters as may be relevant to the proceedings herein;

    (c)    report to this Court at such times and intervals as the Monitor may deem appropriate with respect to matters relating to the Property, the Business, and such other matters as may be relevant to the proceedings herein;

    (d)    assist the Applicants, in their dissemination, to the Canadian Agent and its counsel on a regular basis of financial and other information as agreed to between the Applicants and the Canadian Agent;

    (e)    advise the Applicants and their financial advisor in the preparation of the Applicants' cash flow statements and reporting required by the Canadian Agent, which information shall be reviewed with the Monitor and delivered to the Canadian Agent and its counsel;

    (f)    advise the Applicants in their development of the Plan and any amendments to the Plan;

- 13 -

(g)     assist the Applicants, to the extent required by the Applicants, with the establishment of a claims process and the holding and administering of creditors' meetings for voting on the Plan;

(h)     have full and complete access to the books, records and management, employees, advisors and investment bankers of the Applicants and to the Business and the Property to the extent required to perform its duties arising under this Order;

(i)     be at liberty to engage independent legal counsel or such other persons as the Monitor deems necessary or advisable respecting the exercise of its powers and performance of its obligations under this Order;

(j)     consider, and if deemed advisable by the Monitor, prepare a report and assessment on the Plan; and

(k)     perform such other duties as are required by this Order or by this Court from time to time.

28.     THIS COURT ORDERS that the Monitor shall not take possession of the Property and shall take no part whatsoever in the management or supervision of the management of the Business and shall not, by fulfilling its obligations hereunder, be deemed to have taken or maintained possession or control of the Business or Property, or any part thereof.

29.     THIS COURT ORDERS that nothing herein contained shall require the Monitor to occupy or to take control, care, charge, possession or management (separately and/or collectively, "Possession") of any of the Property that might be environmentally contaminated, might be a pollutant or a contaminant, or might cause or contribute to a spill, discharge, release or deposit of a substance contrary to any federal, provincial or other law respecting the protection, conservation, enhancement, remediation or rehabilitation of the environment or relating to the disposal of waste or other contamination including, without limitation, the *Canadian Environmental Protection Act*, the Ontario *Environmental Protection Act*, the *Ontario Water Resources Act*, or the Ontario *Occupational Health and Safety Act* and regulations thereunder and any other similar legislation and regulations of other provinces or territories in which the Applicants carry on business operations (the "Environmental

- 14 -

Legislation"), provided however that nothing herein shall exempt the Monitor from any duty
to report or make disclosure imposed by applicable Environmental Legislation. The Monitor
shall not, as a result of this Order or anything done in pursuance of the Monitor's duties and
powers under this Order, be deemed to be in Possession of any of the Property within the
meaning of any Environmental Legislation, unless it is actually in possession.

30.     THIS COURT ORDERS that that the Monitor shall provide any creditor of the
Applicants and the Canadian Agent with information provided by the Applicants in response
to reasonable requests for information made in writing by such creditor addressed to the
Monitor. The Monitor shall not have any responsibility or liability with respect to the
information disseminated by it pursuant to this paragraph. In the case of information that the
Monitor has been advised by the Applicants is confidential, the Monitor shall not provide such
information to creditors unless otherwise directed by this Court or on such terms as the
Monitor and the Applicants may agree.

31.     THIS COURT ORDERS that, in addition to the rights and protections afforded the
Monitor under the CCAA or as an officer of this Court, the Monitor shall incur no liability or
obligation as a result of its appointment or the carrying out of the provisions of this Order,
save and except for any gross negligence or wilful misconduct on its part. Nothing in this
Order shall derogate from the protections afforded the Monitor by the CCAA or any
applicable legislation.

32.     THIS COURT ORDERS that the Monitor, counsel to the Monitor and counsel to the
Applicants shall be paid their reasonable fees and disbursements, in each case at their standard
rates and charges, by the Applicants as part of the costs of these proceedings. The Applicants
are hereby authorized and directed to pay the accounts of the Monitor, counsel for the Monitor
and counsel for the Applicants on a regular basis and, in addition, the Applicants are hereby
authorized to pay to the Monitor and counsel to the Applicants, retainers in the amounts of
$100,000 and $200,000 respectively to be held by them as security for payment of their
respective fees and disbursements outstanding from time to time

33.     THIS COURT ORDERS that the Monitor and its legal counsel shall pass their
accounts from time to time, and for this purpose the accounts of the Monitor and its legal

- 15 -

counsel are hereby referred to a judge of the Commercial List of the Ontario Superior Court of Justice.

34.    THIS COURT ORDERS that the Monitor, counsel to the Monitor, the financial advisors to InterTAN and the Applicants' counsel shall be entitled to the benefit of and are hereby granted a charge (the "Administration Charge") on the Property, which charge shall not exceed an aggregate amount of $2 million, as security for their professional fees and disbursements incurred at the standard rates and charges of the Monitor and such counsel, both before and after the making of this Order in respect of these proceedings. The Administration Charge shall have the priority set out in paragraphs 44 and 46 hereof.

## DIP FINANCING

35.    THIS COURT ORDERS that the Applicant InterTAN Canada Ltd. ("InterTAN") is hereby authorized and empowered to obtain funding and borrow and become a joint and several obligor with other borrower affiliates which have filed petitions for reorganization under Chapter 11 of the U.S. Bankruptcy Code (the "U.S. Chapter 11 Debtors") under a credit facility between InterTAN and the U.S. Chapter 11 Debtors, as joint and several borrowers, and the Canadian Agent and other lenders (collectively, the "DIP Lenders") on the terms and subject to the conditions set forth in the Senior Secured, Super Priority, Debtor-in-Possession Credit Agreement among, InterTAN (as Canadian Borrower), the U.S. Chapter 11 Debtors and the DIP Lenders dated as of November 7, 2008 (the "DIP Facility"), attached as Exhibit "K" to the Wong Affidavit, in order to finance InterTAN's and the other loan parties' working capital requirements and other general corporate purposes and capital expenditures, provided that borrowings under such credit facility by InterTAN shall not exceed US$60 million unless permitted by further Order of this Court or otherwise permitted under the DIP Facility.

36.    THIS COURT ORDERS that the Applicants are hereby authorized and empowered to execute and deliver such credit agreements, mortgages, charges, hypothecs and Definitive Documents, guarantees and other documents, including confirmations of existing liens and charges in favour of the DIP Lenders, as are contemplated by the DIP Facility or as may be reasonably required by the DIP Lenders pursuant to the terms thereof (collectively, with the DIP Facility the "Definitive Documents"), and the Applicants are hereby authorized and

directed to pay and perform all of their indebtedness, interest, fees, liabilities and obligations to the DIP Lenders under and pursuant to the Definitive Documents as and when the same become due and are to be performed, notwithstanding any other provision of this Order.

37.    THIS COURT ORDERS that the Canadian Agent on behalf of the DIP Lenders shall be entitled to the benefit of and is hereby granted a charge (the "DIP Lenders' Charge") on the Property, which charge shall not exceed the aggregate amount owed to the DIP Lenders under the DIP Facility. The DIP Lenders' Charge shall have the priority set out in paragraphs 44 and 46 hereof.

38.    THIS COURT ORDERS that subject to the provisions of this Order:

(a)    the Canadian Agent may take such steps from time to time as it may deem necessary or appropriate to file, register, record or perfect the DIP Lenders' Charge or any of the Definitive Documents;

(b)    upon the occurrence of an event of default under the Definitive Documents, the Canadian Agent, upon five days notice to the Applicants and the Monitor (or such shorter period as may be ordered by the Court), may exercise any and all of its rights and remedies on behalf of the DIP Lenders against the Applicants or the Property under or pursuant to the Definitive Documents and the DIP Lenders' Charge, including without limitation, to cease making advances to the Applicants and set off and/or consolidate any amounts owing by the DIP Lenders to the Applicants against the obligations of the Applicants to the DIP Lenders under the Definitive Documents, to make demand, accelerate payment and give other notices, or to apply to this Court for the appointment of a receiver, receiver and manager or interim receiver, or for a bankruptcy order against the Applicants and for the appointment of a trustee in bankruptcy of the Applicants, and upon the occurrence of an event of default under the terms of the DIP Facility, the Canadian Agent shall be entitled to seize and retain proceeds from the sale of the Property and the cash flow of the Applicants to repay amounts owing to the DIP Lenders in accordance with the DIP Facility and the Definitive Documents and

the DIP Lenders' Charge, but subject to the priorities as set out in paragraphs 44 and 46 of this Order; and

(c)   the foregoing rights and remedies of the DIP Lenders shall be enforceable against any trustee in bankruptcy, interim receiver, receiver or receiver and manager of the Applicants or the Property.

39.   THIS COURT ORDERS that, notwithstanding anything contained in the Definitive Documents to the contrary, other than with respect to credit extensions made directly to the Applicants, the Canadian Agent and the DIP Lenders shall not, without first providing five days' notice to the Applicants and the Monitor (or such shorter period as may be ordered by the Court), apply any amounts received in the Blocked Accounts of InterTAN or any collateral of InterTAN to payment of any of the obligations of the U.S. debtor affiliates of the Applicants under the DIP Facility.

40.   THIS COURT ORDERS that, notwithstanding anything contained in the Definitive Documents to the contrary, the Canadian Agent and the DIP Lenders shall not, without first providing five days' notice to the Applicants and the Monitor (or such shorter period as may be ordered by the Court), cease making extensions of credit to InterTAN pursuant to the terms of the DIP Facility unless (a) InterTAN has failed to make any payments to the DIP Lenders under the DIP Facility; (b) InterTAN does not have borrowing availability for such extensions of credit as required by the DIP Facility; (c) there is any variation or change to this Order which is materially adverse to the DIP Lenders without the Canadian Agent's consent; or (d) InterTAN is declared bankrupt.

41.   THIS COURT ORDERS AND DECLARES that the DIP Lenders shall be treated as unaffected in any plan of arrangement or compromise filed by the Applicants under the CCAA, or any proposal filed by the Applicants under the *Bankruptcy and Insolvency Act* of Canada (the "BIA"), with respect to any advances made under the DIP Facility.

42.   THIS COURT ORDERS that the Applicants are hereby authorized and empowered to obtain and make inter-company loans from and to its U.S. Chapter 11 debtor affiliates as described in paragraph 99 of the Wong Affidavit.

43.    THIS COURT ORDERS that, notwithstanding anything contained in the Definitive Documents to the contrary:

    (a)    unsecured creditors of the Applicants (including, without limitation, all landlord creditors and creditors with restructuring claims under paragraph 11 of this Order, but not including claims by corporate entities related to the Applicants) shall be entitled to the benefit of and are hereby granted a charge (the "Canadian Creditor Charge") on the Property in the amount of $25 million to secure claims owing by the Applicants to such creditors.  To the extent that the Directors' Charge is not realized upon or utilized by the beneficiaries of the Directors' Charge after the passage of a claims bar date in respect of claims against the beneficiaries of the Directors' Charge, then, subject to a reserve for claims (including a reserve for reasonable expenses and defence costs in respect of such claims) (the "Reserve") against the beneficiaries of the Directors' Charge that remain outstanding pending the final determination of such claims, the Canadian Creditor Charge shall increase dollar for dollar by the amount of the Directors' Charge, less the Reserve, until there are no claims against the beneficiaries of the Directors' Charge that have been advanced and remain outstanding, at which time any unutilized portion of the Reserve shall also be used to increase the Canadian Creditor Charge dollar for dollar, meaning that the maximum amount of the Canadian Creditor Charge shall be $44.3 million; and

    (b)    the key employees referred to in the KERP shall be entitled to the benefit and are hereby granted a charge (the "KERP Charge") on the Property in the amount of $838,000 to secure amounts owing to such key employees under the KERP.

## VALIDITY AND PRIORITY OF CHARGES CREATED BY THIS ORDER

44.    THIS COURT ORDERS that the priorities of the Directors' Charge, the Administration Charge, the KERP Charge, the Canadian Creditor Charge and the DIP Lenders' Charge, as among them, shall be as follows:

    First – Administration Charge;

Second – Directors' Charge;

Third – KERP Charge;

Fourth – DIP Lenders' Charge in an amount equal to the obligations of InterTAN under the Definitive Documents with respect to direct advances made to InterTAN thereunder, which amount shall not exceed US$60 million plus accrued and unpaid interest, allowable costs and expenses payable by InterTAN, provided that, an amount equal to the sum of the Administration Charge, the Directors' Charge, the KERP Charge and the Canadian Creditor Charge shall be reserved and remain in the possession of or be transferred to the Applicants before and when the Canadian Agent or the DIP Lenders apply any amounts received in the Blocked Accounts of InterTAN to obligations of the U.S. debtor affiliates of the Applicants under the DIP Facility. Pursuant to the terms of and in accordance with the DIP Facility and this Order, nothing herein shall prevent the Canadian Agent or the DIP Lenders from applying amounts received in the Blocked Accounts of InterTAN or that they otherwise receive, to repay direct advances made by the DIP Lenders to InterTAN;

Fifth – Canadian Creditor Charge; and

Six – DIP Lenders' Charge.

45.    THIS COURT ORDERS that the filing, registration or perfection of the Directors' Charge, the Administration Charge, the KERP Charge, the Canadian Creditor Charge, or the DIP Lenders' Charge (collectively, the "Charges") shall not be required, and that the Charges shall be valid and enforceable for all purposes, including as against any right, title or interest filed, registered, recorded or perfected subsequent to the Charges coming into existence, notwithstanding any such failure to file, register, record or perfect.

46.    THIS COURT ORDERS that each of the Directors' Charge, the Administration Charge, the KERP Charge, the Canadian Creditor Charge and the DIP Lenders' Charge shall constitute a charge on the Property and such Charges shall rank in priority to all other security interests, trusts, liens, charges and encumbrances, statutory or otherwise (collectively,

"Encumbrances") in favour of any Person, other than claims which may be asserted under Sections 81.3, 81.4, 81.5 and 81.6 of the BIA or other statutory liens and deemed trusts which cannot by law be subordinated to the Charges.

47.    THIS COURT ORDERS that except as otherwise expressly provided for herein, or as may be approved by this Court, the Applicants shall not grant any Encumbrances over any Property that rank in priority to, or *pari passu* with, any of the Charges, unless the Applicants also obtain the prior written consent of the Monitor, the Canadian Agent and the beneficiaries of the Directors' Charge, the Administration Charge and the KERP Charge, or further Order of this Court.

48.    THIS COURT ORDERS that the Directors' Charge, the Administration Charge, the KERP Charge, the Canadian Creditor Charge, the  Definitive Documents and the DIP Lenders' Charge shall not be rendered invalid or unenforceable and the rights and remedies of the chargees entitled to the benefit of the Charges (collectively, the "Chargees") and/or the DIP Lenders thereunder shall not otherwise be limited or impaired in any way by (a) the pendency of these proceedings and the declarations of insolvency made herein; (b) any application(s) for bankruptcy order(s) issued pursuant to the BIA, or any bankruptcy order made pursuant to such applications; (c) the filing of any assignments for the general benefit of creditors made pursuant to the BIA; (d) the provisions of any federal or provincial statutes; or (e) any negative covenants, prohibitions or other similar provisions with respect to borrowings, incurring debt or the creation of Encumbrances, contained in any existing loan documents, lease, sublease, offer to lease or other agreement (collectively, an "Agreement") which binds the Applicants, and notwithstanding any provision to the contrary in any Agreement:

(a)    neither the creation of the Charges nor the execution, delivery, perfection, registration or performance of the Definitive Documents shall create or be deemed to constitute a breach by an Applicant of any Agreement to which it is a party;

(b)    none of the Chargees shall have any liability to any Person whatsoever as a result of any breach of any Agreement caused by or resulting from InterTAN entering

into the DIP Facility, the creation of the Charges, or the execution, delivery or performance of the Definitive Documents; and

(c)    the payments made by the Applicants pursuant to this Order or the Definitive Documents, the granting of the Charges and the entering into by the Applicants of the Definitive Documents, do not and will not constitute fraudulent preferences, fraudulent conveyances, oppressive conduct, settlements, transactions under value or other challengeable, voidable or reviewable transactions under any applicable law.

## SERVICE AND NOTICE

49.    THIS COURT ORDERS that the Applicants shall, within ten (10) business days of the date of entry of this Order, send a copy of this Order to the Applicants' landlords or property managers and known creditors, other than employees and creditors to which the Applicants owe less than $10,000, at their addresses as they appear on the Applicants' records, and shall promptly send a copy of this Order (a) to all parties filing a Notice of Appearance in respect of this Application, and (b) to any other interested Person requesting a copy of this Order, and the Monitor is relieved of its obligation under Section 11(5) of the CCAA to provide similar notice, other than to supervise this process.

50.    THIS COURT ORDERS that the Applicants and the Monitor be at liberty to serve this Order, any other materials and orders in these proceedings, any notices or other correspondence, by forwarding true copies thereof by prepaid ordinary mail, courier, personal delivery or electronic transmission to the Applicants' creditors or other interested parties at their respective addresses as last shown on the records of the Applicants and that any such service or notice by courier, personal delivery or electronic transmission shall be deemed to be received on the next business day following the date of forwarding thereof, or if sent by ordinary mail, on the third business day after mailing.

51.    THIS COURT ORDERS that the Applicants, the Monitor, and any party who has filed a Notice of Appearance may serve any court materials in these proceedings by e-mailing a PDF or other electronic copy of such materials to counsels' email addresses as recorded on the Service List from time to time, in accordance with the E-filing protocol of the Commercial

- 22 -

List to the extent practicable, and the Monitor may post a copy of any or all such materials on its website at www.alvarezandmarsal.com/intertan.

**GENERAL**

52.    THIS COURT ORDERS that a further hearing in this Application shall be held at 9:00 a.m. on November 26, 2008 or such alternate date as this Court may fix, at which time this Order may be supplemented or otherwise varied.  The Applicants and the Monitor shall serve their materials for this further hearing on all parties who serve a Notice of Appearance on the Applicants and the Monitor, such materials to be served no later than 3 days prior to the date scheduled for the further hearing.

53.    THIS COURT ORDERS that the Applicants or the Monitor may from time to time apply to this Court for advice and directions in the discharge of their powers and duties hereunder.

54.    THIS COURT ORDERS that nothing in this Order shall prevent the Monitor from acting as an interim receiver, a receiver, a receiver and manager, or a trustee in bankruptcy of the Applicants, the Business or the Property.

55.    THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada or in the United States of America, including the United States Bankruptcy Court for the Eastern District of Virginia, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order.  All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

56.    THIS COURT ORDERS that the Applicants and the Monitor all be at liberty and are hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative

- 23 -

body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

57.    THIS COURT ORDERS that any interested party (including the Applicants and the Monitor) may apply to this Court to vary or amend this Order on not less than seven (7) days' notice to any other party or parties likely to be affected by the order sought or upon such other notice, if any, as this Court may order.

58.    THIS COURT ORDERS that this Order and all of its provisions are effective as of 12:01 a.m. Eastern Standard Time on the date of this Order.

ENTERED AT / INSCRIT À TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

**DEC 0 5 2008**

**PER / PAR:** *TV*

TOR_A2G:3424177.3

Court File No: 08-CL-7851

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF INTERTAN CANADA LTD. AND TOURMALET CORPORATION

APPLICANTS

*Ontario*
**SUPERIOR COURT OF JUSTICE
COMMERCIAL LIST**

Proceeding commenced at Toronto

**ORDER**
**(December 5, 2008)**

**OSLER, HOSKIN & HARCOURT LLP**
P.O. Box 50
1 First Canadian Place
Toronto, ON  M5X 1B8

Edward Sellers (LSUC #30110F)
Tel: (416) 862-5959

Jeremy Dacks (LSUC #41851R )
Tel: (416) 862-4923

Marc Wasserman (LSUC #44066M )
Tel: (416) 862-4908

F# 1113457

TOR_P2Z3715584.1

**Circuit City**
**Weekly Cash Flow Flash Report**
**($ in 000's)**

| | Ref | Current Week Forecast Variance | | | | Filing to Date Forecast Variance | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | **1 Week Ending** | | | | **4 Weeks Ending** | | | |
| | | 3-Jan Actual | 3-Jan Forecast | Variance $ Fav/(Unfav) | Variance % Fav/(Unfav) | 3-Jan Actual | 3-Jan Forecast | Variance $ Fav/(Unfav) | Variance % Fav/(Unfav) |
| **I. Memo (Comp sales)** | [1] | -16.8% | -30.0% | - | 13.2% | -34.0% | -33.2% | - | (0.8%) |
| **II. Cash Flows** | | | | | | | | | |
| Cash Receipts | [1] | 268,773 | 194,162 | 74,611 | 38.4% | 1,049,983 | 1,137,244 | (87,260) | (7.7%) |
| Operating Disbursements | | | | | | | | | |
| Advertising | [2] | 2,310 | 6,712 | 4,402 | 65.6% | 23,086 | 36,716 | 13,630 | 37.1% |
| Merchandise (incl. freight) | [3] | 89,184 | 159,480 | 70,296 | 44.1% | 465,631 | 768,780 | 303,149 | 39.4% |
| Rent | [4] | 29,782 | - | (29,782) | 0.0% | 34,455 | 28,900 | (5,555) | (19.2%) |
| Payroll & Payroll Taxes | [5] | 1,857 | 1,635 | (222) | (13.6%) | 80,008 | 71,205 | (8,803) | (12.3%) |
| Benefits | | 1,161 | 1,427 | 266 | 18.6% | 5,445 | 6,631 | 1,186 | 17.9% |
| Utilities | | 1,343 | 1,551 | 208 | 13.4% | 5,559 | 6,204 | 645 | 10.4% |
| Sales and Other Taxes | [6] | 3,167 | 4,373 | 1,206 | 27.6% | 57,911 | 73,884 | 15,973 | 21.6% |
| General Operating | [7] | 24,185 | 24,228 | 43 | 0.2% | 53,144 | 83,043 | 29,899 | 36.0% |
| Subtotal | | 152,990 | 199,406 | 46,416 | 23.3% | 725,318 | 1,075,363 | 350,045 | 32.6% |
| Operating Cash Flow | | 115,783 | (5,244) | 121,027 | n/a | 324,665 | 61,881 | 262,784 | 424.7% |
| Other Disbursements | | | | | | | | | |
| Store Closing Expenses | [8] | 40 | 5,814 | 5,774 | 99.3% | 10,000 | 23,258 | 13,258 | 57.0% |
| Bankruptcy Payments | [9] | 1 | 3,625 | 3,624 | 100.0% | 1,075 | 33,425 | 32,350 | 96.8% |
| Financing Expenses | | 580 | - | (580) | N/A | 3,553 | 2,915 | (638) | (21.9%) |
| Other | [10] | 732 | 714 | (18) | (2.5%) | 6,085 | 4,356 | (1,729) | (39.7%) |
| Other Disbursements | | 773 | 10,153 | 9,380 | 92.4% | 20,713 | 63,854 | 43,241 | 67.6% |
| Net Cash Flow | | 115,009 | (15,398) | 130,407 | n/a | 303,952 | (2,073) | 306,026 | (14759.7%) |
| **III. Loan Balance** | | | | | | | | | |
| Beginning Loan - Book | | 553,028 | 722,725 | 174,697 | 24.0% | 762,749 | 762,747 | (2) | (0.0%) |
| Net Cash Flow (Increase) / Decrease | | (115,009) | 15,398 | 130,407 | N/A | (303,952) | 2,073 | 306,026 | (14759.7%) |
| Change in Cash | | 580 | - | (580) | 0.0% | (541) | - | 541 | 0.0% |
| Canadian Borrowings | | (13,254) | (5,406) | 7,848 | 145.2% | (32,911) | (27,103) | 5,808 | 21.4% |
| Ending Loan - Book | | 425,345 | 737,717 | 312,372 | 42.3% | 425,345 | 737,717 | 312,372 | 42.3% |
| Total Checks Outstanding | [11] | (56,063) | (83,170) | (27,106) | (32.6%) | (56,063) | (83,170) | (27,106) | (32.6%) |
| Ending Loan - Bank | | 369,281 | 654,547 | 285,266 | 43.6% | 369,281 | 654,547 | 285,266 | 43.6% |
| **IV. Availability Summary** | | | | | | | | | |
| Borrowing Base Availability - US | [12] | 745,733 | 927,944 | (182,211) | (19.6%) | 745,733 | 927,944 | (182,211) | (19.6%) |
| Borrowing Base Availability - Canada | [13] | 44,696 | 54,000 | (9,304) | (17.2%) | 44,696 | 54,000 | (9,304) | (17.2%) |
| Subtotal | | 790,429 | 981,944 | (191,515) | (19.5%) | 790,429 | 981,944 | (191,515) | (19.5%) |
| Total Loan Balance | | (369,281) | (654,547) | 285,266 | 43.6% | (369,281) | (654,547) | 285,266 | 43.6% |
| LCs | [14] | (95,428) | (133,263) | 37,835 | 28.4% | (95,428) | (133,263) | 37,835 | 28.4% |
| Utilities Reserve | | (5,000) | (5,000) | - | 0.0% | (5,000) | (5,000) | - | 0.0% |
| Professional Fee Reserve | | (10,495) | (10,495) | - | 0.0% | (10,495) | (10,495) | - | 0.0% |
| Tax Lien | | (1,558) | - | (1,558) | 0.0% | (1,558) | - | (1,558) | 0.0% |
| Minimum Availability Covenant (10%) | | (73,524) | (91,245) | 17,721 | 19.4% | (73,524) | (91,245) | 17,721 | 19.4% |
| Net Availability | | 235,143 | 87,394 | 147,749 | 169.1% | 235,143 | 87,394 | 147,749 | 169.1% |

**Notes:**
[1] Comp sales for the week were -16.8% versus forecast of -30%, positively impacting cash receipts by $25M.
    As noted in the prior week, the remainder of the variance due to timing of cash receipts ($50M).
[2] Favorable $4.4M timing variance due to nominal terms from advertising vendors and managing the spend to remain below budget.
[3] Merchandise favorable due to reduced spend.
[4] Timing of rent payment (paid the week of 1/3 versus the forecast of 12/27).
[5] Four week variance unfavorable due to higher store manager bonus payout ($0.5M) and higher than forecast increase in seasonal workers and overtime.
[6] Four week variance due to lower sales.
[7] Four week variance includes lower warranty payments ($11M), store supplies ($6M), additional cost savings ($6M) and service payables ($3M).
[8] Lower store closing expenses due to ending the merchandise sale 12/22/08.
[9] Variance due to lower payments for other ($2.5M) and customer practices ($1.1M).
    Four week variance includes lower payments for other ($10M), liens ($5M), freight ($5M), customer practices ($4M), utility ($3M), and timing of foreign vendors payments ($4M).
[10] Cumulative to date increase due to reclass of interest and bank fees of $3.6M for the week ended 12/13/08.
[11] Four week variance due to $303M favorable spend on merchandise combined with $30M fewer outstanding checks, as merchandise vendors continue to request wires.
[12] Eligible inventory $190M lower than forecast due to lower inventory receipts as a result of lower inventory purchases.
[13] Canadian borrowing base lower due to lower inventory.
[14] Fewer trade LCs requested than forecast, instead requesting CIA.

DRAFT - Subject to Change
Privileged and Confidential

## SECOND AMENDMENT TO SENIOR SECURED, SUPER-PRIORITY, DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This Second Amendment to Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement (the "Second Amendment") is made as of the 19th day of December, 2008 by and among

CIRCUIT CITY STORES, INC., as debtor and debtor-in-possession, a corporation organized under the laws of the State of Virginia having a place of business at 9950 Mayland Drive, Richmond, Virginia, as Lead Borrower for the Borrowers, being

said CIRCUIT CITY STORES, INC., as debtor and debtor-in-possession;

CIRCUIT CITY STORES WEST COAST, INC., as debtor and debtor-in-possession, a corporation organized under the laws of the State of California having a place of business at 680 S. Lemon Avenue, Walnut, California 91789;

Circuit City Stores PR, LLC, as debtor and debtor-in-possession, a limited liability company organized under the laws of the Commonwealth of Puerto Rico having a place of business at San Patricio Plaza 3369, Local C-02 St Ebano & Tabonuco, Guaynabo, Puerto Rico;

InterTAN Canada Ltd., as a debtor company, a corporation organized under the laws of the Province of Ontario, Canada, having its head office at 279 Bayview Drive, Barrie, Ontario, Canada L4M 4W5;

the LENDERS party hereto;

Bank of America, N.A., as Administrative Agent and Collateral Agent for the Lenders and the Issuing Bank, a national banking corporation, having its principal place of business at 100 Federal Street, Boston, Massachusetts 02110;

BANK OF AMERICA (acting through its Canada branch), as Canadian Administrative Agent and Canadian Collateral Agent for Lenders having a Canadian Commitment, a banking corporation carrying on business under the *Bank Act* (Canada), having a place of business at 200 Front Street West, Toronto; Ontario, Canada M5V 3L2;

GENERAL ELECTRIC CAPITAL CORPORATION, N.A., as Co-Collateral Agent;

WELLS FARGO RETAIL FINANCE, LLC, as Syndication Agent; and

GENERAL ELECTRIC CAPITAL CORPORATION and JPMORGAN CHASE BANK, N.A., as Co-Documentation Agents;

in consideration of the mutual covenants herein contained and benefits to be derived herefrom.

1

## WITNESSETH

WHEREAS, the Lead Borrower and the other Borrowers, the Agents, the Lenders, the Issuing Bank, the Co-Collateral Agent, the Syndication Agent, the Co-Documentation Agents have entered into a Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement dated as of November 12, 2008 (as amended, modified or supplemented prior to the date hereof, the "DIP Credit Agreement");

WHEREAS, the Lead Borrower and the other Borrowers, the Agents, the Lenders, the Issuing Bank, the Co-Collateral Agent, the Syndication Agent, and the Co-Documentation Agents have agreed to amend certain provisions of the Credit Agreement, on the terms and conditions set forth herein; and

WHEREAS, the Agents, the Lenders, the Issuing Bank, the Co-Collateral Agent, the Syndication Agent, and the Co-Documentation Agents have agreed to consent to (i) terms and conditions of that certain stipulation (the "Stipulation") amending the Consumer Credit Card Program Agreement, dated as of January 16, 2004 by and among Chase Bank USA, N.A. and the Lead Borrower and (ii) entry of the Stipulation by the US Bankruptcy Court, on the terms and conditions set forth herein.

NOW THEREFORE, it is hereby agreed as follows:

1.   <u>Definitions</u>: All capitalized terms used herein and not otherwise defined shall have the same meaning herein as in the DIP Credit Agreement.

2.   <u>Amendments to Article I</u>  The provisions of Article I of the DIP Credit Agreement are hereby amended as follows:

    a.   The definition of "Borrowing Base" is hereby amended by adding the words "and the then amount of the Other Carve Out Amounts" at the end of clause (f) thereof.

    b.   The following new definition is hereby added in appropriate alphabetical order:

        "<u>Other Carve Out Amounts</u>" means the "Carve Out" as defined in the Interim Borrowing Order or Final Borrowing Order, as applicable, but without duplication of the Professional Fee Carve Out.

3.   <u>Amendments to Article V</u>.  The provisions of Article V of the DIP Credit Agreement are hereby amended as follows:

    a.   Section 5.15 of the DIP Credit Agreement is hereby deleted in its entirety and the following substituted in its stead:

    SECTION 5.15 <u>Intentionally Omitted</u>.

b.  Section 5.18(d) of the DIP Credit Agreement is hereby deleted in its entirety and the following substituted in its stead:

(d)  The Domestic Borrowers shall take the actions set forth in a certain side letter dated as of December 19, 2008 by and among the Domestic Borrowers and the Administrative Agent and submitted to the U.S. Bankruptcy Court, in each case on or before the dates set forth in such side letter.

4.  <u>Amendments to Article VI</u>.  The provisions of Section 6.12 of the DIP Credit Agreement are hereby deleted in their entirety and the following substituted in their stead:

SECTION 6.12  <u>Intentionally Omitted</u>.

5.  <u>Amendment to DIP Orders and Initial Order</u>.  The Borrowers and the Required Lenders hereby agree that the terms of the DIP Orders and the Initial Order may be amended as follows:

a.  to extend the Challenge Period Termination Date (as defined in the DIP Orders) until March 1, 2009.

b.  to provide that the liens granted under the Initial Order with respect to the Property may be limited to provide that after payment of clauses one through five of Section 44 of the Initial Order, fifty (50%) percent of the remaining proceeds of such Property shall be used to pay the DIP Lenders' Charge set forth in clause six of Section 44 of the Initial Order, and the balance shall be available to be distributed to the Domestic Loan Parties (to the extent allowed by the Canadian bankruptcy court) and retained by the estate and not applied in reduction of the Obligations.

c.  to permit the proceeds from the Domestic Loan Parties' furniture, Fixtures and Equipment to be retained by the estate and not applied in reduction of the Obligations.

d.  to provide that the Administrative Agent and the Required Lenders may agree in their discretion to amendments consisting of changes to the DIP Orders which are not material, including, without limitation, the granting of adequate protection to certain creditors which have filed objections to the DIP Orders.

6.  <u>Consent</u>.  The Required Lenders hereby consent to the (i) terms and conditions of the Stipulation and (ii) entry of the Stipulation by the US Bankruptcy Court.

7.  <u>Conditions to Effectiveness</u>.  This Second Amendment shall not be effective until each of the following conditions precedent have been fulfilled or waived to the satisfaction of the Agents:

3

a.   This Second Amendment shall have been duly executed and delivered by the Loan Parties, the Agents and the Required Lenders.  The Administrative Agent shall have received a fully executed copy hereof and of each other document required hereunder.

b.   All action on the part of the Loan Parties necessary for the valid execution, delivery and performance by the Borrowers of this Second Amendment shall have been duly and effectively taken (including, without limitation, entry of the Final Borrowing Order).

c.   No Default or Event of Default shall have occurred and be continuing.

d.   All conditions to effectiveness of this Second Amendment shall have been satisfied on or before December 22, 2008.

8.   <u>Miscellaneous</u>.

a.   Except as provided herein, all terms and conditions of the DIP Credit Agreement and the other Loan Documents remain in full force and effect.  The Borrowers each hereby ratify, confirm, and reaffirm all of the representations, warranties and covenants therein contained.

b.   The Borrowers shall pay all reasonable out-of-pocket costs and expenses incurred by the Agent in connection with this Second Amendment, including, without limitation, all reasonable attorneys' fees.

c.   This Second Amendment may be executed in several counterparts and by each party on a separate counterpart, each of which when so executed and delivered, each shall be an original, and all of which together shall constitute one instrument. Delivery of an executed counterpart of a signature page hereto by telecopy or electronic delivery shall be effective as delivery of a manually executed counterpart hereof.

d.   This Second Amendment expresses the entire understanding of the parties with respect to the matters set forth herein and supersedes all prior discussions or negotiations hereon.

4

IN WITNESS WHEREOF, the parties hereto have caused this Second Amendment to be executed and their seals to be hereto affixed as the date first above written.

CIRCUIT CITY STORES, INC.,
("**Lead Borrower**")

By_____
Print Name:_____
Title:_____

**"The Borrowers"**

CIRCUIT CITY STORES WEST COAST, INC.

By_____
Print Name:_____
Title:_____

CIRCUIT CITY STORES PR, LLC

By_____
Print Name:_____
Title:_____

INTERTAN CANADA LTD.

By_____
Print Name:_____
Title:_____

5

BANK OF AMERICA, N.A.

By_____
Print Name:_____
Title:_____

BANK OF AMERICA, N.A. (acting
through its Canada branch)

By_____
Print Name:_____
Title:_____

WACHOVIA CAPITAL FINANCE
CORPORATION (CENTRAL)

By_____
Print Name:_____
Title:_____

GENERAL ELECTRIC CAPITAL
CORPORATION

By_____
Print Name:_____
Title:_____

JPMORGAN CHASE BANK, N.A.

By_____
Print Name:_____
Title:_____

NATIONAL CITY BUSINESS CREDIT,
INC.

By_____
Print Name:_____
Title:_____

6

GMAC COMMERCIAL FINANCE, LLC


By_____
Print Name:_____
Title:_____

WELLS FARGO RETAIL FINANCE, LLC


By_____
Print Name:_____
Title:_____

BURDALE FINANCIAL, LTD.



By_____
Print Name:_____
Title:_____

FIFTH THIRD BANK


By_____
Print Name:_____
Title:_____

MERRILL LYNCH CAPITAL, a Division
of Merrill Lynch Business Financial
Services, Inc.


By_____
Print Name:_____
Title:_____

TEXTRON FINANCIAL CORPORATION


By_____
Print Name:_____
Title:_____


7

SUNTRUST BANK

By_____
Print Name:_____
Title:_____

UPS CAPITAL CORPORATION

By_____
Print Name:_____
Title:_____

WEBSTER BUSINESS CREDIT
CORPORATION

By_____
Print Name:_____
Title:_____

PNC BANK, N.A.

By_____
Print Name:_____
Title:_____

UBS LOAN FINANCE LLC

By_____
Print Name:_____
Title:_____

CAPITAL ONE LEVERAGE FINANCE
CORP.

By_____
Print Name:_____
Title:_____

8

Court File No. 08-CL-7841

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### COMMERCIAL LIST

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | WEDNESDAY, THE 24th DAY |
| | ) | |
| JUSTICE MORAWETZ | ) | OF DECEMBER, 2008 |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF INTERTAN CANADA LTD. AND TOURMALET CORPORATION

APPLICANTS

### ORDER

1.        THIS COURT ORDERS that, until the earlier of January 14, 2009 or further order of this Court, the Applicants shall not:

(a)     distribute or otherwise permit the payment of any proceeds of any of the Applicants' property, assets and undertaking to any of their affiliates or lenders, provided that nothing herein prevents the distribution or payment of such proceeds to the DIP Lender in accordance with the Amended and Restated Initial Order and the DIP Agreement on account of direct indebtedness owing by the Applicants to the DIP Lender; or

(b)     make any advances to any of its U.S. debtor affiliates.

ENTERED AT / INSCRIT À TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

DEC 2 4 2008

PER / PAR:

**Joanne Nicoara**
Registrar, Superior Court of Justice

TOR_A2G:3498645.2

Court File No: 08-CL-7851

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF INTERTAN CANADA LTD. AND TOURMALET CORPORATION

APPLICANTS

*Ontario*
**SUPERIOR COURT OF JUSTICE
COMMERCIAL LIST**

Proceeding commenced at Toronto

**ORDER**

**OSLER, HOSKIN & HARCOURT LLP**
P.O. Box 50
1 First Canadian Place
Toronto, ON   M5X 1B8

Edward Sellers (LSUC #30110F)
Tel: (416) 862-5959

Jeremy Dacks (LSUC #41851R )
Tel: (416) 862-4923

Marc Wasserman (LSUC #44066M )
Tel: (416) 862-4908

F# 1113457

TOR_P2253755584.1

Gregg M. Galardi, Esq.
Ian S. Fredericks, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
One Rodney Square
PO Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

Dion W. Hayes (VSB No. 34304)
Douglas M. Foley (VSB No. 34364)
MCGUIREWOODS LLP
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

- and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
333 West Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

Counsel to the Debtors and Debtors in Possession

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

----------------------------------------------------------- :

In re:                                                     :   Chapter 11
                                                          :
CIRCUIT CITY STORES, INC., et al.                         :   Case Nos. 08-35653 through 08-35670
Debtors                                                    :   Jointly Administered
                                                          :
                                                          :
                                                          :
----------------------------------------------------------- :

**FINAL ORDER PURSUANT TO 11 U.S.C. SECTIONS 105, 361, 362, 363 AND 364 AND RULES 2002, 4001 AND 9014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (1) AUTHORIZING INCURRENCE BY THE DEBTORS OF POST-PETITION SECURED INDEBTEDNESS WITH PRIORITY OVER ALL SECURED INDEBTEDNESS AND WITH ADMINISTRATIVE SUPERPRIORITY, (2) GRANTING LIENS, (3) AUTHORIZING USE OF CASH COLLATERAL BY THE DEBTORS PURSUANT TO 11 U.S.C. SECTION 363 AND PROVIDING FOR ADEQUATE PROTECTION AND (4) MODIFYING THE AUTOMATIC STAY**

THIS MATTER having come before this Court upon the motion (the "**DIP Motion**") by

Circuit City Stores, Inc. and its affliated debtors, each as debtors and debtors-in-possession

(collectively, the "**Debtors**"), in the above captioned chapter 11 cases (collectively, the

"**Cases**"), seeking, among other things, entry of a final order (this "**Final Order**") authorizing

the Debtors to:

(i)      Obtain credit and incur debt, pursuant to Sections 363, 364(c) and 364(d) of the Bankruptcy Code, on a final basis up to the aggregate committed amount of (A) $1,100,000,000 (consisting of $1,050,000,000 for the Debtors and $50,000,000 for InterTAN Canada Ltd. (to be guaranteed by the Debtors)) through and including December 29, 2008, (B) up to the aggregate committed amount of $900,000,000 (consisting of $850,000,000 for the Debtors and $50,000,000 for borrowings by InterTAN Canada Ltd. (to be guaranteed by the Debtors)) on December 30, 2008 and December 31, 2008, (C) up to the aggregate committed amount of $910,000,000 (consisting of $850,000,000 for the Debtors and $60,000,000 for borrowings by InterTAN Canada Ltd. (to be guaranteed by the Debtors)) for the period January 1, 2009 through and including January 17, 2009, and (D) thereafter up to the aggregate committed amount of $900,000,000 (consisting of $850,000,000 for the Debtors and $50,000,000 for borrowings by InterTAN Canada Ltd. (to be guaranteed by the Debtors)) (each on terms and conditions more fully described herein) secured by first priority, valid, priming, perfected and enforceable liens (as defined in section 101(37) of chapter 11 of title 11 of the United States Code, as amended (the "**Bankruptcy Code**"), subject to the Carve-Out and Permitted DIP Prior Liens (as each of those terms is defined herein) on property of the Debtors' estates pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, and with priority, as to administrative expenses, as provided in section 364(c)(1) of the Bankruptcy Code, subject to the terms and conditions contained herein;

(ii)     (a) Establish that financing arrangement (the "**DIP Facility**") pursuant to (I) that certain Debtor-In-Possession Credit Agreement (as amended, modified or supplemented prior to entry of, and in accordance with the terms of, this Final Order (including, without limitation pursuant to that certain letter agreement dated as of December 4, 2008 and the Second

Amendment to Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement dated as

of December 19, 2008, collectively, the "**Prior DIP Amendments**") and as hereafter amended,

modified or supplemented and in effect from time to time, the "**DIP Credit Agreement**")[1],

substantially in the form filed of record in the Cases and introduced into evidence at the interim

hearing on the DIP Motion, by and between, among others, Circuit City Stores, Inc., Circuit City

Stores West Coast, Inc., Circuit City Stores PR, LLC, and InterTAN Canada Ltd. (collectively,

the "**Borrowers**"), Bank of America, N.A., as administrative agent and collateral agent (the

"**U.S. DIP Agent**"), Bank of America, N.A. (acting through its Canada branch) as Canadian

administrative agent ("**Canadian DIP Agent**") (collectively with the U.S. DIP Agent, the "**DIP

Agents**"), and the Lenders party thereto (the "**DIP Lenders**," collectively with the DIP Agents,

the "**DIP Secured Parties**"), and (II) all other agreements, documents, notes, certificates, and

instruments executed and/or delivered with, to, or in favor of the DIP Secured Parties, including,

without limitation, security agreements, pledge agreements, notes, guaranties, mortgages, and

Uniform Commercial Code ("**UCC**") financing statements and all other related agreements,

documents, notes, certificates, and instruments executed and/or delivered in connection therewith

or related thereto (collectively, as may be amended, modified or supplemented and in effect from

time to time, the "**DIP Financing Agreements**"); and (b) incur the "**Obligations**" under and as

defined in the DIP Credit Agreement (collectively, the "**DIP Obligations**");

> (iii)    Authorize the use of the proceeds of the DIP Facility (net of any amounts

used to pay fees, costs and expenses under the DIP Financing Agreements) in each case in a

manner consistent with the terms and conditions of the DIP Financing Agreements, and in

accordance with the Budget (as defined below) (subject to any variances thereto permitted under

---

[1] Capitalized terms used in this Final Order but not defined herein shall have the meanings ascribed to such terms in
the DIP Financing Agreements.