# CONSIGNMENT AGREEMENT

**THIS CONSIGNMENT AGREEMENT** ("Agreement") is made effective as of the 3rd day of November, 2008 ("Effective Date"), between **CIRCUIT CITY STORES, INC.,** a Virginia corporation, having its principal place of business at 9950 Mayland Drive, Richmond, Virginia 23233-1464 and its affiliates and subsidiaries in the United States (collectively, "Circuit City") and **LEXAR MEDIA, INC.,** a Delaware corporation, having its principal place of business at 47300 Bayside Parkway, Fremont, California 94538 ("Lexar").

## 1.    CONSIGNMENT PROGRAM.

(a)    <u>Consigned Products</u>. Lexar hereby appoints Circuit City as authorized retailer of certain products under the consignment program described in this Agreement ("Consignment Program"). Such consigned products are listed on **Exhibit A** hereto ("Consigned Products"). Lexar may delete, add to, or otherwise change the Consigned Products covered by the Consignment Program with prior written notice, except that Lexar will undertake commercially reasonable efforts to give Circuit City at least thirty (30) calendar days prior written notice of the discontinuance of any Consigned Product model ("End of Model Life") or other discontinuance of any Consigned Products from the Consigned Program. Circuit City may delete any of the Consigned Products covered by the Consignment Program at any time with thirty (30) calendar days' prior written notice. Upon receipt of notice of removal of any Consigned Product from the Consignment Program by either party, all forecasting and any orders of such deleted Consigned Products shall be cancelled immediately.

(b)    <u>Consignment Program</u>. Lexar shall provide Circuit City with Consigned Products in accordance with the order procedures set forth herein. Title to the Consigned Products shall remain in Lexar until such time as the products are sold by Circuit City to its customers ("Customers"). At the point of sale to Customers, title to the Consigned Products first shall pass to Circuit City and then to the Customer as part of a simultaneous transaction. Circuit City shall be responsible to pay Lexar for such Consigned Products after sale to Customers, in accordance with Section 10 of this Agreement. The parties acknowledge that Circuit City intends to sell the Consigned Products primarily to consumers through its retail locations and its Internet web site.

(c)    <u>Financing Statements</u>. Circuit City agrees to cooperate with Lexar in effecting the protections afforded Lexar under the applicable sections of the Uniform Commercial Code ("UCC") as adopted and in effect in all states where the Consigned Products provided pursuant to this Agreement are located, to the extent consistent with such laws and the structure of the transactions described in this Agreement. Circuit City agrees to execute UCC-1 financing statements to protect Lexar's ownership interest in the Consigned Products upon request, provided, however, that Lexar shall be responsible for (i) preparation of such financing statements for Circuit City's review and signature, and (ii) the filing of any such financing statements and payment of all applicable filing and preparation costs. Circuit City makes no representations or warranties as to the enforceability of such financing statements prepared or filed by or on behalf of Lexar. Circuit City agrees that it will not permit any lien or encumbrance to be created or executed against any of the Consigned Products, and Circuit City will not represent or authorize the representation of the Consigned Products as property of Circuit City or as potential collateral to any creditor or prospective creditor of Circuit City. Circuit City warrants and represents that no part of this Agreement constitutes a violation of the terms of, or default under, any other agreement it may have with suppliers, creditors or otherwise.

(d)    <u>Purchase Program</u>. This Agreement shall not preclude Circuit City from purchasing from Lexar, and Lexar from selling to Circuit City, other products on a traditional purchase and sale (i.e. non-consignment) basis not subject to the terms and conditions of this Agreement ("Purchase Program"). Circuit City shall assign separate internal vendor numbers for Lexar relating to the Consignment Program and the Purchase Program, and all orders issued and shipments made of Consigned Products hereunder shall be processed separately from any orders and shipments of products under a Purchase Program. At no time shall the same product models be subject to this Consignment Program and simultaneously be sold by Lexar to Circuit City under a Purchase Program. The parties acknowledge

CC LD Ref. #4240

**EXHIBIT**

**A**

and agree that this prohibition serves the best interests of both parties in order to avoid the potential of error relating to inventory tracking and accounting.

2. **TERM.** The term of the Consignment Program and this Agreement shall commence on the Effective Date, and shall continue for one year (the "Initial Term"). Thereafter, the term of the Consignment Program and this Agreement shall automatically renew for one (1) year as of each anniversary of the Effective Date (each, a "Renewal Term"), unless either party provides the other written notice of intent not to renew at least sixty (60) days prior to commencement of such Renewal Term. The Initial Term and any Renewal Terms hereunder, shall be collectively referred to herein as the "Term." At any time during the Term, either party may terminate the Consignment Program and this Agreement in accordance with Section 22 hereof.

3. **ORDERS FOR CONSIGNED PRODUCTS.**

(a)    Forecasts. During the term of this Agreement, Circuit City shall use reasonable efforts to supply Lexar on a weekly basis during the Term hereof with rolling six (6) month forecasts for orders of Consigned Products at least six (6) weeks in advance of the expected date for delivery to Circuit City. Forecasts will itemize at the individual Stock Keeping Unit (SKU) level. The initial twenty (20) days of each such forecast shall be fixed and binding on Circuit City (such twenty (20) day period being referenced as the "Fixed Portion"). Lexar shall have seventy-two (72) hours from the delivery of each such forecast to accept or reject each such Fixed Portion. Upon Lexar's acceptance of a Fixed Portion, Lexar shall be bound thereby. Upon Lexar's rejection of a Fixed Portion, neither Lexar nor Circuit City will have any further obligation with respect thereto. Except with respect to a Fixed Portion accepted by Lexar, Circuit City shall not be obligated to issue Purchase Orders for, or to otherwise purchase, and Lexar shall not be obligated to deliver or sell, any Products as a result of Circuit City's delivery of any such forecast or update thereto to Lexar.

(b)    Purchase Orders. Circuit City shall place orders for Consigned Products by issuing a purchase order ("Purchase Order") to Lexar via the Electronic Data Interchange ("EDI") Purchase Order Transaction 850. All Purchase Orders are subject to acceptance by Lexar via EDI 855, and Lexar shall have no liability to Circuit City with respect to Purchase Orders that are not accepted. Lexar shall have no liability to Circuit City to pay financial assessments for not accepting weekly Purchase Orders as set forth in Circuit City's Supply Chain Standards ("Supply Chain Standards"), a copy of which Lexar acknowledges receipt as of the Effective Date. No partial acceptance of a Purchase Order shall constitute acceptance of an entire Purchase Order. Circuit City and Lexar will work together in good faith to determine mutually acceptable inventory levels of Consigned Products and to determine whether any adjustments are necessary with respect to any previously accepted Purchase Orders. Circuit City shall submit Purchase Orders to Lexar at least fourteen (14) days in advance of the Circuit City "Do Not Deliver After Date" specified in the Purchase Order. If Circuit City desires to cancel or change a Purchase Order it must submit notice of such cancellation or change to Lexar via EDI no later than ten (10) days prior to the delivery date specified for such Consigned Products.

(c)    Dealer's Price. Circuit City's Purchase Orders for Consigned Products issued via EDI will be written for a purchase price of one cent (1¢). Notwithstanding the price terms listed on any such Purchase Order issued via EDI, the Consigned Product pricing shall not bind Lexar. In lieu thereof, Lexar shall provide to Circuit City a dealer's price list ("Dealer's Price List") which sets forth the price to be paid by Circuit City to Lexar for each SKU of the Consigned Products. The Dealer's Price List as of the Effective Date of this Agreement is set forth on **Exhibit B** attached. During the Term of this Agreement, Lexar shall at its discretion make changes to the Dealer's Price List with written notice delivered at least three (3) business days prior to the effective date of any change. Circuit City shall make payment to Lexar for each unit of Consigned Product sold to Customers in the amount stated on the Dealer's Price List effective as of the date of such sale, as more particularly set forth in Section 10 of this Agreement.

(d)    Freight Terms. Notwithstanding the terms of a Purchase Order issued by Circuit City via EDI, any Consigned Product freight terms listed on such Purchase Order shall not bind the parties. The freight terms for Consigned Products shall be as set forth in Section 4 of this Agreement.

CC LD Ref. #4240

4.     <u>**SHIPMENTS OF CONSIGNED PRODUCTS TO CIRCUIT CITY**</u>.

(a)     <u>Terms</u>.  Except as otherwise set forth by express written agreement of the parties, Lexar shall ship all Consigned Products FOB Destination to Circuit City's Distribution Center identified in the applicable Purchase Order, Freight Prepaid.  All incoming shipments of Consigned Products shall be paid for by Lexar.  Further, Lexar shall be responsible for making all outbound shipping arrangements, filing applicable shipping claims, and maintaining insurance against loss or damage while the Consigned Products are in transit.  Lexar shall comply with the Supply Chain Standards with respect to shipments of Consigned Products; provided, however, that notwithstanding anything in the Supply Chain Standards that would provide otherwise, Circuit City shall not assess any financial penalties against Lexar for failure to comply with the Supply Chain Standards in any respect with respect to the Consigned Products, including, without limitation, the failure to deliver the Consigned Products by the required delivery date.

(b)     <u>Receiving Process</u>.  Circuit City anticipates that the Consigned Products shall be managed in accordance with **Process Flow Appendix 1** attached hereto.  Lexar shall schedule a shipping appointment with Circuit City and notify Circuit City via EDI (EDI 856, Advance Ship Notice) when Lexar's carrier has picked up a Consigned Product shipment for delivery to Circuit City's location.  Upon receipt of the Consigned Products from Lexar's carrier, Circuit City will issue an Inbound Confirmation Report via EDI (EDI 861) detailing the quantity of products received at the applicable Distribution Center or other location.  The EDI 861 shall include all inbound receipts of Lexar-owned Consigned Products from Lexar to Circuit City.  Any Consigned Product refused due to damage or any other reason as provided in Section 4(c) below will not be reflected on the EDI 861.  Any missing Consigned Products from the shipment also will not be reflected on the EDI 861.  The EDI 861 transaction will be generated on a daily basis and transmitted to Lexar reflecting the prior day's receipts.  Circuit City will provide the following information in the EDI 861 Receiving Advice to Lexar on a daily basis:

- **Bill of Lading** - from the Advance Ship Notice (this will be the key into the Lexar SAP system)
- **PO number**- Circuit City Purchase Order Number
- **Model number** – Circuit City model number
- **Quantity** – Actual quantity received by Circuit City and entered into the Circuit City system for tracking Lexar's Consigned Product inventory
- **Ship Date** – Date order was shipped by Lexar
- **Receipt Date** – Date order was received by Circuit City Distribution Center or other location

(c)     <u>Refused Consigned Product</u>.  Circuit City may refuse any Consigned Products which are (i) nonconforming with the applicable Purchase Order or that are shipped contrary to or not in accordance with the terms of the Purchase Order; (ii) shipped in excess of or not covered by the Purchase Order; (iii) not shipped in standard packaging or containers; or (iv) damaged prior to Circuit City's receipt.  The quantity appearing on the EDI 861 will reflect the actual quantity received and accepted by Circuit City into its possession -- any Consigned Product refused due to damage or any other reason as provided herein will not be reflected on the EDI 861.  If the Consigned Products are unloaded upon arrival, any refused Consigned Products or shortages will be indicated as such on the receiving paperwork and returned to Lexar with the carrier.  If the Consigned Product load is dropped off at the Circuit City location, any refused Consigned Products will be moved to a damage location and Circuit City will return to vendor ("RTV").

5.     <u>**CIRCUIT CITY'S RESPONSIBILITY FOR CONSIGNED PRODUCTS**</u>.

(a)     <u>Risk of Loss and Damage</u>.  All risk of loss and damage in connection with the Consigned Products shall transfer to Circuit City upon (1) delivery by Lexar's freight carriers to the designated point of delivery; (2) Circuit City's breaking the container seal and physical inspection of the load; *and* (3) confirmation of receipt by Circuit City in accordance with Section 4(b) above; provided, however, that Circuit City shall be responsible for any loss or damage to the Consigned Products caused by Circuit City after Circuit City's receipt of the Consigned Products but prior to Circuit City's confirmation of receipt in accordance with Section 4(b) above, unless such loss or damage by

CC LD Ref. #4240



Circuit City was due to nonstandard or damaged packaging. While Consigned Products are in Circuit City's possession, Circuit City shall, at its own expense, use all commercially reasonable efforts to maintain the Consigned Products in the same condition as when received. Circuit City shall provide a safe, secure, and physically segregated storage area at the Distribution Center locations, and shall provide a safe and secure storage area at any retail outlets to which Circuit City transfers the Consigned Products (at its risk and expense) suitable for safeguarding of consignment inventory. Upon at least five (5) business days' advance written notice to Circuit City, Lexar may (i) access any Distribution Center or any Retail Store to inspect Consigned Products during normal working hours or (ii) retrieve all or a portion of the Consigned Products from any Distribution Center or Retail Store at any time in its discretion and at its expense.

(b)    Insurance.  Circuit City agrees to maintain the following:
1.  All-risk property insurance in an amount adequate to fully insure all Consigned Products for physical loss or damage including earthquake, flood, theft and mysterious disappearance at the most recent agreed upon cost per unit or full replacement cost value whichever is higher, in the care, custody or control of Circuit City, wherever located, and will name Lexar as additional insured and loss payee on such policy where Lexar's interest appears.
2.  Circuit City agrees to maintain a Commercial General Liability Policy in an amount of not less than $5,000,000 and will name Lexar as an additional insured on such policy.
3. Workers' Compensation Insurance in statutory amounts and Employer's Liability Insurance in an amount not less than $1,000,000 per occurrence.

Circuit City will provide certificates of insurance to Lexar evidencing the above required insurance within ten (10) business days of the execution of this Agreement and agrees to maintain in full force and effect at all times while it has any obligations under this Agreement, policies of insurance written as primary coverage and not contributing with or in excess of any coverage which Lexar may carry. These policies will be issued by an insurance carrier acceptable to Lexar with an A.M. Best rating of at least "A-", with a Financial Size Category rating of at least Class VIII.

(c)    Separate Account.  Circuit City will keep an accurate and complete separate account of all Consigned Products delivered to it under this Consignment Program. Circuit City shall maintain detailed records of the Consigned Products received on consignment and the disposition thereof. Such records shall clearly set forth that the Consigned Products are being held on consignment until they are sold or returned to Lexar under the terms of this Agreement. Such records shall also clearly set forth an accurate accounting of the location where the Consigned Products are being held, as evidenced by the Location Report described in Section 11(e). Circuit City shall report sales, returns and any loss or damage to Consigned Products in accordance with this Agreement and the data reports described herein.

## 6.    CIRCUIT CITY'S SALE OF CONSIGNED PRODUCTS TO CUSTOMERS.

(a)    Retail Price; No Minimum Sales Volumes.  Circuit City has sole discretion to determine the retail price and terms for the sale of the Consigned Products to its Customers, notwithstanding Lexar's product price to Circuit City as stated on the Dealer's Price List. Circuit City shall exert commercially reasonable efforts to sell the Consigned Products consistent with its usual course of business as a retailer of consumer electronics and related products. Notwithstanding anything to the contrary herein, this Agreement is not intended to express or imply that Circuit City is required to make any minimum sales volumes of Consigned Products during the Term.

(b)    Sales Reporting.  On each Sunday during the Term of the Consignment Program, Circuit City shall send Lexar the following reports for the preceding week validating the sales of Consigned Products for that week (only): (i) Consignment Sales, Returns and Adjustments Payment Support Data/Weekly Agent Sales report in the format described in Section 11 hereof; and (ii) Consignment Sales Summary report in the format described in Section 11 hereof. Circuit City will transmit these weekly reports to Lexar each Sunday during the Term. Lexar shall utilize these reports to reconcile payments from Circuit City for sales of Consigned Products as more particularly provided in Section 10 hereof.

CC LD Ref. #4240



(c)     POS Data (EDI 852).  Circuit City also shall provide point of sale ("POS") data to Lexar via an EDI 852 Sales and Inventory report for each Circuit City location on a weekly basis, as more particularly set forth in Section 11 hereof.

(d)     Dealer Price.  For each sale of a unit of Consigned Products by Circuit City to its Customers, Circuit City shall pay Lexar the price for such Consigned Product as designated in the then-current Dealer's Price List as of the date of sale ("Dealer Price"), as more particularly described in Section 10 below.  Any difference between the retail sales price for a unit of Consigned Product and the Dealer Price paid by Circuit City to Lexar for such Consigned Product shall be retained by Circuit City.

(e)     End of Model Life Sales; Sealed Box Inventory of Consigned Products.  Lexar shall provide written notice of discontinuation of any model at least thirty (30) calendar days prior to the End of Model Life, as more particularly set forth in Section 1(a) hereof.  Upon End of Model Life for any model (SKU) of Consigned Product hereunder, Lexar at its sole discretion will either (i) authorize the return of the "Sealed Box" (i.e. new, factory fresh) Consigned Product inventory from Circuit City to Lexar, or (ii) provide a mutually-agreed upon allowance on the "Sealed Box" (i.e. new, factory fresh) Consigned Product model and adjust the Dealer Price for such model by an amount representing the reduction of the saleable value of such Consigned Products ("End of Life Discount").  Circuit City shall use commercially reasonable efforts to sell End of Model Life "Sealed Box" (i.e. new, factory fresh) Consigned Products, including without limitation through Circuit City sales channels such as "Trading Circuit" (eBay), Outlet Store(s), or through a third party discounter.  Upon sale, Circuit City shall report such sale to Lexar as provided in Section 6(b) above, except that the Dealer Price shall have been adjusted by Lexar's End of Life Discount.  If Lexar authorizes the return of such "Sealed Box" Consigned Product inventory in lieu of applying an End of Life Discount, such returns shall be returned in accordance with the return procedures set forth in Section 15 hereof.

**7.     CUSTOMER RETURNS.**  Circuit City shall return to Lexar any Consigned Products sold to Circuit City's Customers which are returned in accordance with Circuit City's return policies as they may exist from time to time relating to a claim that the product (i) infringes on any patent, design, trademark, trade secret, copyright, right of privacy or publicity, or any other tangible or intangible proprietary or intellectual property rights; or (ii) are not manufactured, packaged and labeled in accordance with industry standards and/or all applicable laws, ordinances, rules and regulations by governmental departments, bodies and agencies governing and/or restricting the sale of the Consigned Products.  Such Consigned Products shall be returned in accordance with the return procedures set forth in Section 15 hereof.  Circuit City shall receive a credit or refund from Lexar for all such returned Consigned Products in an amount equal to 100% of the Dealer Price currently in effect for such Consigned Product(s) on the date of the return.  This amount will be taken as a deduction from amounts payable to Lexar for Consigned Product sales and shall be specified in the reports provided to Lexar as referenced in Section 10 below.  For clarity, upon Circuit City's acceptance of returns of Consigned Products from its Customers which do not qualify for return to Lexar as described in this Section 7 but which are "Sealed Box" Consigned Products, title to such "Sealed Box" Consigned Products shall vest in Lexar and such "Sealed Box" Consigned Products shall again qualify as Consigned Product hereunder.

**8.     LOSS OR DAMAGE TO CONSIGNED PRODUCTS; SHRINK.**

(a)     Shrink; Circuit City Internal Reconciliation.  Circuit City shall report any confirmed loss or damage to Consigned Products ("Shrink") to Lexar in accordance with Circuit City's internal inventory cycle count processes for Circuit City store locations as more particularly illustrated in **Process Flow Appendix 2** attached hereto and for Circuit City Distribution Centers as more particularly illustrated in **Process Flow Appendix 3** attached hereto.  Any Shrink discovered in the ordinary course during such cycle counts which Circuit City can confirm is a result of either physical damage to or theft of the Consigned Products shall be referred to hereunder as "Known Shrink."  Circuit City will confirm the identification of any Known Shrink no later than thirty (30) days after the completion of the cycle count in which the Shrink was discovered.  Known Shrink shall be included in the Consignment Sales, Returns and Adjustments Payment Support Data/Weekly Agent Sales Report as more particularly described in Section 11 hereof.  Any Shrink discovered in the ordinary course during such cycle counts which Circuit City cannot confirm is a result of either physical damage to or theft of the Consigned Products (referred to hereunder as "Known Variance") shall be



treated as "variance" until Circuit City performs an internal physical inventory count of the Consigned Products. Circuit City shall perform an internal physical inventory count no less than once every twelve (12) months during the Term. Shrink which is only discovered upon periodic physical inventory, together with any Known Variance, shall be referred to hereunder as "Unknown Shrink." Any Unknown Shrink shall be treated as "variance" until such time as the loss or damage is confirmed by Circuit City in accordance with its standard operating procedures, which confirmation shall be no later than thirty (30) days after completion of such physical inventory count. Unknown Shrink shall be included in the Consignment Sales, Returns and Adjustments Payment Support Data/Weekly Agent Sales Report after confirmation of the loss or damage. Circuit City agrees to use commercially reasonable efforts to discover Shrink as soon as possible during the Term of this Agreement. Within thirty (30) days of the completion of any such internal physical count, Circuit City shall deliver a detailed report to Lexar setting forth a clear and accurate accounting of the Unknown Shrink discovered in the physical count. Lexar shall have up to thirty (30) days to dispute the Unknown Shrink accounting set forth in such report or to accept the Unknown Shrink accounting. If Lexar disputes the Unknown Shrink accounting, the parties shall work in good faith to promptly resolve such dispute and agree upon a mutually acceptable Unknown Shrink accounting. After Lexar accepts the Unknown Shrink accounting or the parties resolve any dispute, Lexar shall submit an invoice to Circuit City of payment of any Consigned Product included in the Unknown Shrink for which Circuit City has not already made payment. Such invoice shall be payable within five (5) days of Circuit City's receipt of such invoice.

(b)    Consigned Product Inventory Reporting. Circuit City shall send Lexar the following reports for purposes of reconciling and adjusting Consigned Product inventory counts: (i) End of Month (EOM) Tax Report in the format described in Section 11 hereof; and (ii) Consignment Sales, Returns and Adjustments Payment Support Data/Weekly Agent Sales report in the format described in Section 11 hereof. Based on such reports and documents, Circuit City and Lexar shall work in good faith to promptly reconcile any discrepancies to assure that the parties agree to the correct count of Consigned Products held by Circuit City. Circuit City assumes responsibility and shall be liable for all non-reconciled discrepancies that are in favor of Lexar. Lexar assumes responsibility and shall be liable for all non-reconciled discrepancies that are in favor of Circuit City. Any positive or negative Consigned Product inventory adjustments shall include date of adjustment, quantity of adjustment, inventory balance qualifier adjusted, and reason for adjustment. Payment for such adjustments shall be made in accordance with Section 10 hereof.

**9.    MARKETING FUNDS.** Lexar shall provide Circuit City with an amount representing marketing funding in connection with the sale of the Consigned Products described in this Agreement and the purchase and sale of other products under a Purchase Program ("Marketing Funds"). The Marketing Funds for the Initial Term are specified in **Exhibit C** attached. The Marketing Funds specified in **Exhibit C** are for the Initial Term only and are not applicable to any Renewal Term. At least thirty (30) days prior to any Renewal Term, Lexar and Circuit City shall negotiate in good faith with respect to the amount of the Marketing Funds to be applicable to any Renewal Term.

**10.    PAYMENT TERMS.**

(a)    Payment. During the Term of the Consignment Program, Circuit City shall issue weekly reports and make payments on a daily basis for sales of Consigned Products as more particularly illustrated in **Process Flow Appendix 5** attached hereto. Circuit City shall send Lexar the Consignment Sales, Returns and Adjustments Payment Support Data/Weekly Agent Sales Report and Consignment Sales Summary Report referenced in Section 11(a) hereof. Circuit City will transmit these weekly reports to Lexar on each Sunday during the Term. Within five (5) business days from the date of each sales day covered by the applicable report, Circuit City will make payment to Lexar of (i) the Dealer Price for Consigned Products sold for such sales day; *minus* (ii) a credit at the Dealer Price in effect on the date of the return by a Customer for any Customer returns accepted for such sales day; *plus* (iii) the Dealer Price for any Shrink reported as adjustments to Consigned Product inventory count as of such sales day for the week covered by such reports. Payment will be made by check with the payment stub referring to the date of the transactions identified in the supporting weekly reports.

(b)    Late Payment. On any amount not paid within twenty-one (21) days of the due date thereof, Lexar may, in its sole discretion, charge interest on such overdue amount, from the due date of such past-due payment through the date

of payment, at a rate not in excess of one and one-half percent (1 1/2%) per month (eighteen percent (18%) per annum) unless a lower rate is required under applicable law, in which event Lexar may charge such lower rate. In addition, Circuit City agrees to pay all costs of collection, including costs of litigation and reasonable attorneys' fees. Lexar may accept payment in an amount less than the full amount of any invoice, but such acceptance shall not constitute a waiver of Lexar's right to collect the balance or accord and satisfaction notwithstanding Lexar's endorsement of a check or other instrument. If Circuit City is adjudicated bankrupt or a petition for winding up or judicial management is made against Circuit City or corporate reorganization under any bankruptcy or similar laws is filed by or against Circuit City, or Circuit City makes a general assignment for the benefit of creditors or a receiver and/or manager for Circuit City is appointed, Lexar may, to the extent allowed by applicable law, cancel any unfilled Purchase Order.

(c)     Credit Approval.  All shipments, deliveries, and performance of work hereunder shall at all times be subject to credit approval or review by Lexar.  Circuit City shall provide such credit information, references, and assurances as are requested by Lexar at any time.  Lexar, in its sole discretion and judgment, may discontinue credit at any time.

**11.     REPORTING.**  Lexar will not have direct access to Circuit City's systems.  Circuit City will provide data, information, and reports to Lexar as provided below.  As applicable, the data will be transmitted in an electronic format under a secure file transfer protocol as mutually agreed between Lexar and Circuit City.  All such reports shall be prepared and distributed by Circuit City to Lexar as illustrated in **Process Flow Appendix 6**.

(a)     Consignment Sales, Returns and Adjustments Payment Support Data Report/Weekly Agent Sales Report.  The "Consignment Sales, Returns and Adjustments Payment Support Data Report", also sometimes referred to as the "Weekly Agent Sales Report," will be transmitted weekly and reflects the prior week's activity at the national level. This data will be transmitted as a flat, comma delimited file. Data reflected will be for a single week.  Only records containing data appear on the file.  If there are no sales or returns for a model (SKU) during a particular week, then that model (SKU) will not appear on that week's transmission.

The following data shall be included in the Consignment Sales, Returns and Adjustments Payment Support Data Report/Weekly Agent Sales Report (See attached Sample Report under **Exhibit D**):
*   **Period** – Sunday to Saturday of the week reflected in the report
*   **Invoice Number** – This is a unique reference number generated by Circuit City's systems.  It does not match to any data in Lexar's system.  It is to be used as a reference number when reviewing or researching information with Circuit City.
*   **Invoice Date** – The date of the invoice number transaction.
*   **Brand** – Abbreviation of the Lexar Brand: "LXR"
*   **Model** – Circuit City's model number for Lexar's product (This is typically Lexar's model number)
*   **Description** – Brief description of the product
*   **Type** – Transaction Type; i.e., Sales, Returns, Adjustments
    o  Sales – Gross Point of Sale (will have a positive value)
    o  Returns – Customer Returns (will have a negative value and appear inside of parentheses)
    o  Adjustments
        ▪  Known Shrink – will be applied as soon as it is discovered. (has a positive value)
        ▪  Unknown Shrink – will be applied at the time of a physical inventory (has a positive value)
*   **Invoiced Units** – Quantity for the transaction type
*   **Unit Price** – Lexar's Dealer Price for the model
*   **Extended Price** – Invoiced Units  x  Unit Price

(b)     Weekly Consignment Sales Summary Report.  The "Weekly Consignment Sales Summary Report" will be transmitted weekly and reflects the prior week's activity at the national level as a summary of the activity reported in the Consignment Sales, Returns and Adjustments Payment Support Data Report/Weekly Agent Sales Report. This data will be transmitted as a flat, comma delimited file.  Data reflected will be for a single week.  Only records

CC LD Ref. #4240

containing data appear on the file. If there are no sales or returns for a model (SKU) for a particular week, then that model (SKU) will not appear on that week's transmission. The Consignment Sales Returns and Adjustments Payment Support Data Report/Weekly Agent Sales Report contains the detail of the sales activity and should agree with this summary report.

The following data shall be included in the Weekly Consignment Sales Summary Report (See attached Sample Report under **Exhibit D**):

- **Period** – Sunday to Saturday of the week for the data reflected in the report
- **Start Date** – First date for the period is the same as the Period date
- **End Date** – Last date for the period is the last day of the week (Saturday)
- **Brand** – Abbreviation of the Lexar Brand: "LXR"
- **Model** – Circuit City's model number for Lexar's product (This is typically Lexar's model number)
- **Description** – Brief description of the product
- **Invoiced Units** – Net unit quantity for all transactions for the period
- **Unit Price** – Lexar's Dealer Price for the model
- **Extended Price** – Net Extended Price; i.e., Invoiced Units x Unit Price

(c)    POS Data (EDI 852). Circuit City shall provide point of sale ("POS") data to Lexar via an EDI 852 Sales and Inventory report for each Circuit City location. The EDI 852 shall contain data by Circuit City location regarding: (i) sales of Consigned Products from the location; and (ii) total Consigned Products at the location. Circuit City will provide the EDI 852 reports to Lexar on a weekly basis. The EDI 852 will not be used by Lexar in the process of reconciling payments or Consigned Products in Circuit City's possession.

(d)    End of Month (EOM) Tax Report: The "EOM Tax Report" will be transmitted monthly and reflects inventory balances at the beginning and end of each calendar month as well as inventory activity occurring during the month by Circuit City location (Distribution Centers and Store locations). Circuit City will send the EOM Tax Report to Lexar no later than five (5) business days from the end of each calendar month. This data will be transmitted as a flat, comma delimited file. Corresponding location addresses will be contained in the Location Report (see Section 11(e) below). Transfers between Circuit City locations will not be reflected on the EOM Tax Report; therefore, the ending Consigned Product inventory balances by location cannot be derived arithmetically from the beginning Consigned Product inventory balance and reported activity. However, this calculation will reconcile at the national level. Consigned Product inventory that is in transit at the time the EOM Tax Report is generated will be reflected in the balance of the destination location. Lexar shall have up to thirty (30) days to dispute or accept the amounts set forth in each EOM Tax Report, including, without limitation, the Known Shrink. If Lexar disputes any amount set forth in the EOM Tax Report, the parties shall work in good faith to promptly resolve such dispute and agree upon a mutually acceptable resolution. After resolution of any dispute, Lexar shall invoice Circuit City for any amounts for which Circuit City has not already made payment. Such invoice shall be payable within five (5) days.

The following data shall be included in the monthly EOM Tax Report (See attached Sample Report under **Exhibit D**):

- **Report Date** – Month of the data reflected in the report (same as calendar month)
- **Location number** – Code assigned to Circuit City facility, Store, Distribution Center, or other
- **Brand** – Abbreviation of the Lexar Brand: "LXR"
- **Model** – Circuit City's model number for Lexar's product (This is typically Lexar's model number)
- **Description** – Brief description of the product
- **Month/Year** – Month of the data reflected in the report (same as calendar month
- **Beginning Inventory Balance** – Total of units at beginning of the month for the location
- **Receipts** – Total quantity received from Lexar to Circuit City location for the month
- **Net Sales** – Total Customer sales for the month for the Location
- **Adjustments**- Total Known Shrink applied for the month
- **Return to Vendor**– When applicable to Lexar



- **Ending Inventory Balance** – The month ending inventory balance for the location as recorded by the Circuit City system of record

(e)     Location Report:  The "Location Report" will be transmitted monthly and contains a list of Circuit City locations including the names and addresses of each store location as well as which Distribution Center services each store.  This report corresponds to the End of Month (EOM) Tax Report which only provides location numbers.  Both reports are required for tax reporting.  Circuit City will send the Location Report to Lexar no later than five (5) business days from the end of each calendar month.

The following data shall be included in the monthly Location Report (See attached Sample Report under **Exhibit D**):
- **Location number** – Unique number assigned to the location by Circuit City
- **Type** – The type of facility, e.g., store, Distribution Center, etc.
- **Address** – Street address of location
- **City** – City of the location
- **ST** – State of the location
- **Zip** – Zip code for the location
- **Phone #** – Phone number of the location
- **Conveyable DC**- location number of the Distribution Center for items that can be moved on a conveyor belt
- **Non-Conveyable DC**- location number of the Distribution Center for items that cannot be moved on a conveyor belt

## 12.     **AUDIT RIGHTS.**

(a)     Physical Audit of Consigned Products.  With at least five (5) business days' advance notice, Lexar may audit Consigned Products in Circuit City's possession consistent with the process flows for physical inventory counts and cycle counts in Circuit City's store locations and Distribution Centers, in order to count and inspect the Consigned Products to determine whether they have been subject to any loss or damage.  Upon receipt of such notice from Lexar, Circuit City shall promptly arrange with Lexar a schedule of visits to the Distribution Centers and various store locations; provided, however, that if Circuit City does not respond to Lexar's notice within five (5) business days of Circuit City's receipt of such notice, Lexar or its representatives shall be immediately entitled to reasonable access to store locations and Distribution Centers to conduct the audit during normal business hours.  As soon as practicable after completion of the physical inventory, any differences between Circuit City's records/reports and the actual physical counts shall be discussed between representatives of Lexar and Circuit City and the parties will work in good faith to promptly resolve such differences.  Lexar shall have the right to use a third party subcontractor to conduct the audit in whole or in part, subject to prior written approval from Circuit City (which shall not be unreasonably withheld or delayed) and provided that such third party subcontractor is held to substantially the same requirements of confidentiality as bind Lexar hereunder.  Costs of the audit shall be borne by Lexar.

(b)     Books and Records.  Lexar may audit Circuit City's books and records pertaining solely to the subject matter of this Agreement, provided that Circuit City shall be given at least five (5) business days' advance written notice, and further provided that the audit shall take place at Circuit City's facilities during normal business hours.  Lexar shall have the right to use a third party to help with the audit provided it gives Circuit City reasonable written notice and provided that such third party is held to substantially the same requirements of confidentiality as bind Lexar hereunder.  Costs of the audit shall be borne by Lexar.

(c)     Internal Controls.  Lexar shall also have the right to review the internal control methodology of Circuit City a minimum of once per year.  Circuit City is responsible for notifying Lexar of changes in their internal control processes of Lexar's Consigned Products.

## 13.     **TAXES.**

CC LD Ref. #4240

(a)    Sales and Income Taxes.  Circuit City will be responsible for the collection and remittance of the appropriate sales tax to the proper tax authorities in connection with its sales of Consigned Products.  Circuit City will provide state resale tax certificates to Lexar upon request.  Each party shall be responsible for reporting its own income derived from this Agreement and for payment of its own income taxes.

(b)    Property Taxes.  Lexar will report, file and remit payment for property tax on Consigned Products in Circuit City's possession based on reports provided by Circuit City to Lexar hereunder.

**14.    OVER STOCK SITUATIONS.**  Lexar in conjunction with Circuit City will monitor on a weekly basis the actual sales vs. the sales budget that will be mutually agreed upon quarterly and adjusted quarterly by Circuit City's Distribution Centers.  If after any three (3) week period a trend of slower sales is determined in any specific Circuit City Distribution Center, Circuit City and Lexar will use commercially reasonable efforts to create a mutually agreeable "sell to the plan" promotion to speed up the sales of the models below plan on a regional Distribution Center basis (i.e. Circuit City stores associated with that Distribution Center).  Circuit City and Lexar will share equally the expense of the "sell to the plan" promotion.  Lexar may, in its discretion, reduce all future incoming Consigned Products to that Distribution Center until the stock is in balance again.

**15.    RETURN PROCEDURES.**  Circuit City shall return to Lexar (i) any "Sealed Box" Consigned Product inventory upon End of Model Life as provided in Section 6(e) hereof if authorized by Lexar; (ii) any "Sealed Box" Consigned Product inventory remaining in Circuit City's possession upon expiration or earlier termination of this Agreement; and/or (iii) Consigned Products returned by Circuit City customers as referenced in Section 7 hereof.  All such Consigned Products will be returned at Lexar's expense in accordance with Circuit City's standard procedures, including but not limited to procedures for resolution of discrepancies in quantity and models.  Circuit City shall request a RMA number from Lexar prior to returning any Consigned Products to Lexar; provided, however, that Circuit City shall be entitled to return Consigned Products returned by Circuit City customers as referenced in Section 7 hereof without an RMA number in the event Lexar does not issue an RMA number for such Consigned Products within five (5) business days of receipt of Circuit City's request therefor.

**16.    LEXAR REPRESENTATIONS AND WARRANTIES.**

(a)    General.  Lexar represents and warrants that (i) Lexar has good and marketable title to the Consigned Products, free and clear of all liens, charges and other encumbrances; and (ii) all merchandise delivered hereunder will have been manufactured, packaged, and labeled in accordance with all applicable U.S. federal, state and local laws and all ordinances, rules, and regulations promulgated thereunder.

(b)    Disclaimer.  EXCEPT AS EXPRESSLY SET FORTH HEREIN, TO THE MAXIMUM EXTENT PERMITTED BY LAW, LEXAR SPECIFICALLY DISCLAIMS ANY AND ALL WARRANTIES, WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF NONINFRINGEMENT, FITNESS FOR A PARTICULAR PURPOSE OR MERCHANTABILITY.  LEXAR'S LIABILITY UNDER THIS SECTION 16 IS LIMITED TO REPAIR OR REPLACEMENT OF THE DEFECTIVE MERCHANDISE OR CREDIT OR REFUND OF THE PURCHASE PRICE OF THE DEFECTIVE MERCHANDISE.

**17.    LEXAR PRODUCT WARRANTIES.**  Lexar agrees to comply in all respects with the Magnuson-Moss Warranty Act [15 U.S.C. Sections 2301, et seq.] and the regulations issued thereunder, as the same may be amended from time to time.  Prior to the initial delivery of each Consigned Product under this Agreement, Lexar agrees to deliver to Circuit City at least one copy of all written warranty documents covering each Consigned Product.  In the event any existing Consigned Product warranty is amended, updated or modified, Lexar agrees to deliver to Circuit City at least one copy of any amended, updated or modified warranty document within a reasonable time prior to the effective date of the change.

CC LD Ref. #4240



18.    **INDEMNIFICATION.**

(a)    <u>By Lexar</u>.  Lexar agrees to defend (through counsel reasonably satisfactory to Circuit City), indemnify and hold harmless Circuit City and its respective officers, directors, employees, agents, successors and assigns (each a "CC Indemnified Person") from and against all losses, damages, costs and expenses (including reasonable attorneys' fees and costs and expenses of defense) arising from any and all claims, suits and demands by any third party relating to (i) any actual or alleged infringement, misappropriation or other violation by Lexar of the copyright, trademark, patent, trade secret, intellectual property, performance or broadcast rights, property or contract rights respecting all Consigned Products for sale, distribution and/or promotional purposes, including the advertising and merchandising of same (except to the extent any such claims arise from the activities or conduct of the Circuit City or its agents); (ii) liability based upon death or injury to any person (including Circuit City employees) or damage to property resulting or arising from or alleged to result or arise from a defect in materials and workmanship of the Consigned Products; (iii) Lexar's actual or alleged violation of any applicable laws of any U.S. federal, state, or local governmental entity with respect to the Consigned Products; or (iv) any representations made by Lexar to Circuit City which Circuit City uses or incorporates into its advertising or upon which Circuit City relies when selling the Consigned Products to its customers.  Circuit City agrees to provide Lexar notice of any such third-party claim no later than ten (10) business days after learning of such claim (whether or not litigation or other proceeding has been filed or served),.  Circuit City agrees that Lexar shall have the right to control the defense and/or settlement of all such claims, in litigation or otherwise, and Circuit City shall provide Lexar with reasonable assistance and cooperation in the defense of any such claim or suit.  Notwithstanding the foregoing, in the event that both Lexar and Circuit City are named and remain a party to any such claim at the time of settlement discussions, and such claim or settlement may result in indemnification by one or both of the parties in an amount which exceeds the limitation of liability set in Section 20, Lexar cannot enter into a settlement agreement with the third party unless approved in writing by Circuit City.  Lexar shall bear all reasonable attorneys' fees and costs in defending such claims; provided, however, that Circuit City may participate in the defense at its own expense.

Lexar's liability and defense liability under this Section 18 shall be limited as follows:  Lexar shall not be required to defend or indemnify any CC Indemnified Person with respect to any losses or expenses arising from:

(i)      Any CC Indemnified Person's own gross negligence, or willful misconduct;

(ii)     Any CC Indemnified Person's breach of this Agreement;

(iii)    Trademark infringements involving any marking or branding applied by Circuit City or involving any marking or branding applied by Lexar at Circuit City's written request; or

(iv)    Trademark infringement with respect to any Consigned Product purchased hereunder:  (a) if such Consigned Product has been modified by Circuit City without the express, written authorization of Lexar if the claim of infringement arises from such modification; (b) if such claim of infringement would have been avoided but for Circuit City's combining such Consigned Product with any system, circuitry, hardware, software or other component, method or process not supplied by Lexar; or (c) if such claim arises from Lexar's compliance with designs, specifications or instructions requested in writing by Circuit City.

(b)    <u>By Circuit City</u>.  Circuit City agrees to defend (through counsel reasonably satisfactory to Lexar), indemnify and hold harmless Lexar and its respective officers, directors, employees, agents, successors and assigns from and against all losses, damages, costs and expenses (including reasonable attorneys' fees and costs and expenses of defense) arising from any and all claims, suits and demands by any third party relating to (i) any actual or alleged infringement, misappropriation or other violation by Circuit City of the copyright, trademark, patent, trade secret, intellectual property, performance or broadcast rights, property or contract rights respecting all Consigned Products for sale, distribution and/or promotional purposes, including the advertising and merchandising of same (but only to the extent any such claims arise from the activities or conduct of Circuit City or its agents); (ii) Circuit City's gross negligence or willful misconduct; or (iii) Circuit City's actual or alleged violation of any of the laws of any governmental entity.  Lexar agrees to provide Circuit City notice of any such third-party claim no later than ten (10)

CC LD Ref. #4240

business days after learning of such claim (whether or not litigation or other proceeding has been filed or served),. Lexar agrees that Circuit City shall have the right to control the defense and/or settlement of all such claims, in litigation or otherwise, and Lexar shall provide reasonable assistance and cooperation to Circuit City in the defense of such claim or suit.  Notwithstanding the foregoing, in the event that both Lexar and Circuit City are named and remain a party to any such claim at the time of settlement discussions, and such claim or settlement may result in indemnification by one or both of the parties in an amount which exceeds the limitation of liability set in Section 20, Circuit City cannot enter into a settlement agreement with the third party unless approved in writing by Lexar.  Circuit City shall bear all reasonable attorneys' fees and costs in defending such claims; provided, however, that Lexar may participate in the defense at its own expense.

**19.    LEXAR'S INSURANCE.**  During the term of this Agreement, Lexar will maintain a policy of commercial general liability insurance, including products – completed operations coverage, with an insurance carrier authorized to do business in the United States and having a rating of "A-" or better by A.M. Best Company and a Financial Size Category rating of at least Class VIII, with limits of no less than ████████ per occurrence and ████████ aggregate.  Products – completed operations coverage will be maintained for the time period covered by this Agreement and for at least two (2) years after the Consigned Products to be delivered under this Agreement have been sold by Circuit City to its customers.  Such policies will name "Circuit City Stores, Inc." as an additional insured.  All certificates will provide for at least thirty (30) days written notice prior to cancellation of any insurance referred to under this Agreement.  A certificate of insurance meeting this above requirements will be delivered to Circuit City (i) prior to the initial delivery of the Consigned Products, (ii) upon renewal of the insurance policy and annually thereafter, and (iii) upon reasonable request.

**20.    LIMITATION OF LIABILITY**.  IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR ANY PARTY CLAIMING THROUGH THE OTHER FOR ANY LOSS OF PROFITS OR REVENUE OR FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES RESULTING FROM ANY PERFORMANCE, NON-PERFORMANCE, BREACH OR TERMINATION OF THIS AGREEMENT OR THE FURNISHING, PERFORMANCE OR USE OF ANY CONSIGNED PRODUCTS, GOODS OR SERVICES SOLD PURSUANT HERETO, WHETHER DUE TO A BREACH OF CONTRACT, BREACH OF WARRANTY, NEGLIGENCE, STRICT LIABILITY OR OTHERWISE.    TO THE MAXIMUM EXTENT PERMITTED BY LAW, IN NO EVENT SHALL EITHER PARTY'S LIABILITY TO THE OTHER PARTY ARISING OUT OF BREACH OF CONTRACT (EXCEPT WITH RESPECT TO A BREACH OF CIRCUIT CITY'S OBLIGATION TO PAY LEXAR FOR THE CONSIGNED PRODUCTS AS PROVIDED HEREUNDER), BREACH OF WARRANTY, NEGLIGENCE, INFRINGEMENT OF INTELLECTUAL PROPERTY RIGHTS, STRICT LIABILITY, OR OTHERWISE IN CONNECTION WITH THIS AGREEMENT OR THE CONSIGNED PRODUCTS PURCHASED HEREUNDER, EXCEED THE TOTAL PURCHASE PRICE PAID TO LEXAR BY CIRCUIT CITY UNDER THIS AGREEMENT DURING THE TWENTY-FOUR (24) MONTH PERIOD IMMEDIATELY PRECEDING THE MAKING OF THE CLAIM IN CONNECTION WITH SUCH LIABILITY. EACH PARTY'S REMEDIES SET FORTH HEREIN ARE EXCLUSIVE AND IN LIEU OF ANY OTHER REMEDIES AVAILABLE TO SUCH PARTY, WHETHER AT LAW, EQUITY OR OTHERWISE.

**21.    LEXAR-CIRCUIT CITY RELATIONSHIP.**  The parties do not intend to form a partnership or joint venture, principal-agent, employer-employee, or any other relationship other than that of consignor-consignee, and, where appropriate, licensor-licensee.  It is fully understood that each party is an independent contractor hereunder, and each will exercise full power and authority, except for as specifically provided otherwise in writing and signed by both parties, to select the means, method and manner of performing all obligations required under this Agreement. Except as provided herein, neither party will have any right or authority and will not attempt to enter into any contract or commitment, or incur any debt or liability of any nature in the name of or on behalf of the other party.

CC LD Ref. #4240

22.    **TERMINATION.**

(a)    Without Cause. This Agreement and the Consignment Program hereunder may be terminated without cause by either party without liability or obligation upon not less than sixty (60) calendar days' written notice to the other party.

(b)    With Cause. Either party may terminate this Agreement and the Consignment Program hereunder immediately upon notice to the other party if the other party (i) materially breaches any term of this Agreement and fails to cure the breach within ten (10) business days following receipt of notice of such breach, (ii) becomes insolvent, files (or has filed against it) a petition in bankruptcy, makes an assignment for the benefit of creditors or ceases normal business operations, (iii) assigns or attempts to assign this Agreement or any of the rights and obligations under this Agreement without first obtaining consent as required under this Agreement, or (iv) ceases to function as a going concern or to conduct operations in the normal course of business.

23.    **EFFECT OF TERMINATION OR EXPIRATION.**    Upon expiration or earlier termination of this Agreement and the Consignment Program hereunder, the parties will wind up their consignment relationship by conducting an account reconciliation to reach a final settlement. In the event the parties agree that Circuit City's records accurately and properly reflect a debit balance with Lexar (defined as any amount owed by Lexar to Circuit City), Lexar will remit payment in the form of cash or check within thirty (30) days of settlement. In the event the parties agree that Lexar's records accurately and properly reflect a debit balance with Circuit City (defined as any amount owed by Circuit City to Lexar), Circuit City will remit payment in the form of cash or check within thirty (30) days of settlement. Further, upon expiration or earlier termination of this Agreement Circuit City shall be obligated to return to Lexar all "Sealed Box" (i.e. new, factory-fresh) Consigned Products that Circuit City has not sold from inventory. All such returns on expiration or earlier termination shall be made at Lexar's expense as provided in Section 15 hereof within thirty (30) days from the effective date of termination; provided, however, that in the event Lexar terminates this Agreement pursuant to Section 22(b), all returns shall be made at Circuit City's expense, or Lexar may, at its election, retrieve the Consigned Products or have any subcontractor or agent retrieve the Consigned Products at Circuit City's expense.

24.    **CONFIDENTIALITY.**    Circuit City and Lexar's parent company Micron Technology, Inc., ("Parent") entered into that certain Mutual Non-Disclosure Agreement dated September 19, 2008 ("NDA"). Lexar agrees to be bound by the terms of the NDA as fully as if Lexar were a named party thereto. Each party hereto agrees that pricing, sales programs, terms, forecasts, inventory levels, sell through data, product introduction and discontinuation dates, new product information, advertising plans, marketing plans, work flow processes, and this Agreement (including its exhibits, sample reports and process flow attachments) shall be deemed confidential and shall be subject to the provisions of the NDA, the terms and conditions of which are incorporated by reference herein. If the NDA is terminated or expires and is not replaced, then the NDA shall continue to govern the confidentiality and non-disclosure obligations between the parties with respect to the information and materials provided or disclosed in connection with this Agreement, notwithstanding such termination or expiration, for the duration of the term of this Agreement. In the event of any conflict between any term(s) of this Agreement and any term(s) of the NDA, the terms(s) of this Agreement shall govern.

25.    **ASSIGNMENT.**    Neither party may assign this Agreement without first obtaining the written consent of the other party; provided, however, that a party may assign this Agreement, without the consent of the other party, to (a) a purchaser of all or substantially all of the assigning party's assets or a majority or controlling interest in the assigning party's voting stock, provided that the purchaser's net worth at the time of purchase is equal to or greater than that of the assigning party, and further provided that the purchaser is not a competitor of the other party to this Agreement; or (b) to a present or future subsidiary or affiliate of the assigning party.

26.    **FORCE MAJEURE.**    Neither party will be liable to the other party for failure or delay in performance under this Agreement due in whole or in part to an act of God, strike, lockout or other labor dispute, civil commotion, sabotage, fire, flood, explosion, acts of any government, unforeseen shortages or unavailability of fuel, power,

CC LD Ref. #4240

transportation, or supplies, inability to obtain or delay in obtaining governmental approvals, permits, licenses, or allocations, and any other causes which are not within such party's reasonable control, whether or not of the kind specifically enumerated above.

**27.    GOVERNING LAW.** This Agreement shall be governed and controlled in all respects by the laws of the State of New York, excluding its conflict of law rules.

**28.    ENTIRE AGREEMENT.** This Agreement, along with the Exhibits attached hereto, contain all the terms and conditions with respect to the subject matter hereof. No modification of these terms and conditions shall be of any force unless such modification is reduced to writing and signed by the undersigned Lexar and Circuit City. However, the parties may by mutual written agreement from time to time amend the Exhibits without necessarily amending this Agreement. In the event of any conflict between the terms and conditions of this Agreement and the terms and conditions contained in Circuit City's Vendor Operating Guidelines, Circuit City's Supply Chain Standards or any relevant sales invoice of Lexar, the terms and conditions of this Agreement shall prevail.

**29.    NOTICES.** Except as otherwise expressly permitted herein, any notice required or permitted hereunder shall be given by addressing it to the other party at the addresses set forth at the addresses below (or at such other addresses as may be designated by written notices given in the manner designated herein) by: (a) personal delivery; (b) commercial overnight courier with written verification of actual receipt; or (c) registered or certified mail. Such notices shall be deemed and presumed to have been given on the earlier of the date of actual receipt or three (3) days after mailing or authorized form of delivery.

| **LEXAR:** | **CIRCUIT CITY:** |
|---|---|
| Lexar Media, Inc. | Circuit City Stores, Inc. |
| 47300 Bayside Parkway | 9950 Mayland Drive |
| Fremont, CA 94538 | Richmond, VA 23233-1464 |
| Attention: V.P. Sales | Attention: Assistant Treasurer |
| | |
| With a copy to: | With a copy to: |
| Micron Technology, Inc. | Circuit City Stores, Inc. |
| 8000 S. Federal Way | 9950 Mayland Drive |
| Boise, ID 83716-9632 | Richmond, VA 23233-1464 |
| Attention: Legal Department – DMG Sales | Legal Dept., Commercial Team |

**30.    SURVIVAL.** The provisions of Sections 6 through 20, 23 through 25, and 27 through 31 shall survive the expiration or termination of this Agreement.

**31.    MISCELLANEOUS.** Neither party will be deemed to have waived any right, power, privilege or remedy unless the waiver is in writing and duly executed by it. If any provision of this Agreement is determined by a court of competent jurisdiction to be unenforceable, the provision will be deemed to be severed, and the remaining provisions of this Agreement will remain in full force and effect. The headings in this Agreement are for convenience of reference only and will not affect its interpretation or construction. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement may be signed by facsimile signatures.

[Signatures appear on the following page.]

CC LD Ref. #4240



IN WITNESS WHEREOF, the parties have executed this Consignment Agreement on the date written below:

**Lexar:**

**LEXAR MEDIA, INC.**

By: _____
Name: _Gregory S. Rhine_
Title: _VP Sales and Marketing_
Date: _Nov. 6 2008_

REVIEWED
MTI Legal

_ROP_

**Circuit City:**

**CIRCUIT CITY STORES, INC.**

By: _Elliot Becker_
Name: _Elliot Becker_
Title: _Vice President_
Date: _11-5-08_

CC LD Ref. #4240

**EXHIBIT A**
**TO CONSIGNMENT AGREEMENT**

**Consigned Products**

| Lexar Model |
|---|
| LXR CF4GBDRBNA233 |
| LXR CF8GB300381 |
| LXR KPSD2GBCNA |
| LXR KPSD4GBCNA |
| LXR KPSD8GBCNA |
| LXR SDMI8GB-695 |
| LXR SD4GB133381 |
| LXR SD8GB133381 |
| LXR SDMI2GB695 |
| LXR SDMI4GB695 |
| JDFF2GB |
| JDFF4GB |
| JDFF8GB |
|  |

**EXHIBIT B**
**TO CONSIGNMENT AGREEMENT**

**Dealer's Price List**

| Lexar Model | Price to Circuit City |
|---|---|
| LXR CF4GBDRBNA233 | $ |
| LXR CF8GB300381 | $ |
| LXR KPSD2GBCNA | $ |
| LXR KPSD4GBCNA | $ |
| LXR KPSD8GBCNA | $ |
| LXR SDMI8GB-695 | $ |
| LXR SD4GB133381 | $ |
| LXR SD8GB133381 | $ |
| LXR SDMI2GB695 | $ |
| LXR SDMI4GB695 | $ |
| JDFF2GB | $ |
| JDFF4GB | $ |
| JDFF8GB | $ |

**EXHIBIT C**
**TO CONSIGNMENT AGREEMENT**

**Marketing Funds**

**Marketing Development Funds**.  During the Initial Term of the Agreement, Lexar will provide Circuit City with marketing development funds ("MDF") in an amount equal to ▮▮▮▮▮▮▮▮▮▮▮.  The MDF shall be due and payable in four (4) equal installments of ▮▮▮▮▮▮▮▮▮▮ each on each of the following dates:  November 30, 2008; December 31, 2008; January 31, 2009; and February 28, 2009.  Circuit City shall deduct the MDF from amounts owed by Circuit City to Lexar on its account balance with Lexar as of the applicable payment date and shall issue a billing memorandum in conjunction with, and documenting, the deduction.   In the event the MDF due from Lexar create a debit balance and such balance persists for a forty-five (45) day period, such amounts will be payable via check within thirty (30) days of demand from Circuit City.  The MDF will not be repaid upon the return of any Consigned Product hereunder; provided, however, as the MDF represent payment for marketing activities to be conducted throughout the Initial Term of the Agreement, in the event the Agreement is terminated prior to the expiration of the Initial Term, Circuit City shall refund to Lexar a pro rata portion of the MDF previously paid by Lexar to Circuit City.

**Slotting Fees**.  During the Initial Term of the Agreement, Lexar will provide Circuit City with slotting fees in an amount equal to ▮▮▮▮▮▮▮▮▮▮▮▮, which is equal to ▮▮▮▮▮▮▮▮▮▮ per SKU of Lexar's ten (10) non-USB Consigned Product models and ▮▮▮▮▮▮▮▮▮▮ per SKU of Lexar's three (3) USB Consigned Products to be displayed by Circuit City.  The Slotting Fees shall be due and payable in four (4) equal installments of ▮▮▮▮▮▮▮▮▮▮ each on each of the following dates:  November 30, 2008; December 31, 2008; January 31, 2009; and February 28, 2009.  Circuit City shall deduct the Slotting Fees from amounts owed by Circuit City to Lexar on its account balance with Lexar as of the applicable payment date and shall issue a billing memorandum in conjunction with, and documenting, the deduction.  In the event the Slotting Fees due from Lexar create a debit balance and such balance persists for a forty-five (45) day period, such amounts will be payable via check within thirty (30) days of demand from Circuit City.  The Slotting Fees will not be repaid upon the return of any Consigned Product hereunder; provided, however, as the Slotting Fees represent payment for slotting usage throughout the Initial Term of the Agreement, in the event the Agreement is terminated prior to the expiration of the Initial Term, Circuit City shall refund to Lexar a pro rata portion of the Slotting Fees previously paid by Lexar to Circuit City.

**EXHIBIT D**
**TO CONSIGNMENT AGREEMENT**

**Sample Reports**

See Attached

## Consignment Sales, Returns and Adjustments Payment Support Data Report/
## Weekly Agent Sales Report

| Invoice Number | Invoice Date | Brand | Model | Description | Type | Invoiced Units | Unit Price | Extended Price |
|---|---|---|---|---|---|---|---|---|
| CNS05072401SL | 7/24/2005 | ABC | 123456789 | Any Description Second Item | Sales | 83 | $2.05 | $170.15 |
| CNS05072401SL | 7/24/2005 | EFG | 234567890 | Any Description First Item | Sales | 200 | $1.99 | $398.00 |
| CNS05072401SL | 7/24/2005 | XYZ | 345678901 | Any Description Third Item | Sales | 16 | $5.49 | $87.84 |
| CNS05072402RT | 7/24/2005 | ABC | 123456789 | Any Description Second Item | Returns | (4) | $2.05 | ($8.20) |
| CNS05072402RT | 7/24/2005 | EFG | 234567890 | Any Description First Item | Returns | (3) | $1.99 | ($5.97) |
| CNS05072403AD | 7/24/2005 | EFG | 234567890 | Any Description First Item | Adjustments | 7 | $1.99 | $13.93 |
| CNS05072501SL | 7/24/2005 | ABC | 123456789 | Any Description Second Item | Sales | 26 | $2.05 | $53.30 |
| CNS05072501SL | 7/24/2005 | EFG | 234567890 | Any Description First Item | Sales | 86 | $1.99 | $171.14 |
| CNS05072601SL | 7/24/2005 | ABC | 123456789 | Any Description Second Item | Sales | 18 | $2.05 | $36.90 |
| CNS05072601SL | 7/24/2005 | EFG | 234567890 | Any Description First Item | Sales | 98 | $1.99 | $195.02 |
| CNS05072701SL | 7/24/2005 | ABC | 123456789 | Any Description Second Item | Sales | 35 | $2.05 | $71.75 |
| CNS05072701SL | 7/24/2005 | EFG | 234567890 | Any Description First Item | Sales | 112 | $1.99 | $222.88 |
| CNS05072801SL | 7/24/2005 | ABC | 123456789 | Any Description Second Item | Sales | 48 | $2.09 | $100.32 |
| CNS05072801SL | 7/24/2005 | EFG | 234567890 | Any Description First Item | Sales | 105 | $1.99 | $208.95 |
| CNS05072802RT | 7/24/2005 | ABC | 123456789 | Any Description Second Item | Returns | (2) | $2.09 | ($4.18) |
| CNS05072901SL | 7/24/2005 | ABC | 123456789 | Any Description Second Item | Sales | 45 | $2.09 | $94.05 |
| CNS05072901SL | 7/24/2005 | EFG | 234567890 | Any Description First Item | Sales | 143 | $1.99 | $284.57 |
| CNS05072902AD | 7/24/2005 | EFG | 234567890 | Any Description First Item | Adjustments | 3 | $1.99 | $5.97 |
| CNS05073001SL | 7/24/2005 | ABC | 123456789 | Any Description Second Item | Sales | 97 | $2.09 | $202.73 |
| CNS05073001SL | 7/24/2005 | EFG | 234567890 | Any Description First Item | Sales | 237 | $1.99 | $471.63 |
| CNS05073001SL | 7/24/2005 | XYZ | 345678901 | Any Description Third Item | Sales | 29 | $5.49 | $159.21 |

Circuit City/Lexar
Consignment Agreement

CC LD Ref. #4240



## Daily Consignment Sales Summary Report

| Start Date | End Date | Brand | Model | Description | Invoiced Units | Unit Price | Extended Price |
|---|---|---|---|---|---|---|---|
| 7/24/2005 | 7/24/2005 | ABC | 123456789 | Any Description Second Item | 158 | 2.05 | 323.9 |
| 7/24/2005 | 7/24/2005 | ABC | 123456789 | Any Description Second Item | 188 | 2.09 | 392.92 |
| 7/24/2005 | 7/24/2005 | EFG | 234567890 | Any Description First Item | 988 | 1.99 | 1,966.12 |
| 7/24/2005 | 7/24/2005 | XYZ | 345678901 | Any Description Third Item | 45 | 5.49 | 247.05 |
| | | | | | | | |
| | | | | | | | |

Circuit City/Lexar
Consignment Agreement

CC LD Ref. #4240

# End of Month (EOM) Tax Report

| LOCNBR | BRAND | MODEL | DESC | BEG_BALANC | REC_UNITS | GROSS_SALE | RETURNS | NET_SALES | ADJMT | SHK | RTV | END_BALANC | START_DATE | END_DATE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 46 | XXX | 123456 | Widget | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1/1/2006 | 1/31/2006 |
| 47 | XXX | 123456 | Widget | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1/1/2006 | 1/31/2006 |
| 72 | XXX | 123456 | Widget | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1/1/2006 | 1/31/2006 |
| 110 | XXX | 123456 | Widget | 0 | 0 | 0 | 0 | 0 | 0 | -1 | 0 | 1 | 1/1/2006 | 1/31/2006 |
| 111 | XXX | 123456 | Widget | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1/1/2006 | 1/31/2006 |
| 200 | XXX | 123456 | Widget | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 1/1/2006 | 1/31/2006 |
| 209 | XXX | 123456 | Widget | 0 | 0 | 0 | 0 | 0 | 0 | -16 | 0 | 5 | 1/1/2006 | 1/31/2006 |
| 222 | XXX | 123456 | Widget | 3 | 0 | 0 | 0 | 0 | 0 | -3 | 0 | 2 | 1/1/2006 | 1/31/2006 |
| 230 | XXX | 123456 | Widget | 8 | 0 | -1 | 0 | -1 | 0 | 2 | 0 | 9 | 1/1/2006 | 1/31/2006 |
| 231 | XXX | 123456 | Widget | 6 | 0 | -1 | 0 | -1 | 0 | 0 | 0 | 6 | 1/1/2006 | 1/31/2006 |
| 232 | XXX | 123456 | Widget | 5 | 0 | -3 | 1 | -2 | 0 | 4 | 0 | 9 | 1/1/2006 | 1/31/2006 |
| 233 | XXX | 123456 | Widget | 8 | 0 | -1 | 0 | -1 | 0 | 0 | 0 | 8 | 1/1/2006 | 1/31/2006 |
| 234 | XXX | 123456 | Widget | 8 | 0 | -1 | 0 | 0 | 0 | 0 | 0 | 8 | 1/1/2006 | 1/31/2006 |
| 235 | XXX | 123456 | Widget | 8 | 0 | -1 | 0 | -1 | 0 | 0 | 0 | 8 | 1/1/2006 | 1/31/2006 |
| 236 | XXX | 123456 | Widget | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 1/1/2006 | 1/31/2006 |
| 237 | XXX | 123456 | Widget | 8 | 0 | -3 | 0 | -3 | 0 | 0 | 0 | 8 | 1/1/2006 | 1/31/2006 |
| 238 | XXX | 123456 | Widget | 7 | 0 | -1 | 0 | -1 | 0 | -1 | 0 | 6 | 1/1/2006 | 1/31/2006 |
| 239 | XXX | 123456 | Widget | 8 | 0 | -3 | 0 | -3 | 0 | 0 | 0 | 8 | 1/1/2006 | 1/31/2006 |
| 240 | XXX | 123456 | Widget | 8 | 0 | -2 | 0 | -2 | 0 | 0 | 0 | 6 | 1/1/2006 | 1/31/2006 |
| 241 | XXX | 123456 | Widget | 6 | 0 | -2 | 0 | -2 | 0 | 0 | 0 | 6 | 1/1/2006 | 1/31/2006 |
| 242 | XXX | 123456 | Widget | 8 | 0 | -2 | 1 | -1 | 0 | -2 | 0 | 6 | 1/1/2006 | 1/31/2006 |
| 249 | XXX | 123456 | Widget | 8 | 0 | -1 | 0 | -1 | 0 | -2 | 0 | 6 | 1/1/2006 | 1/31/2006 |
| 250 | XXX | 123456 | Widget | 8 | 0 | -1 | 0 | -1 | 0 | -1 | 0 | 8 | 1/1/2006 | 1/31/2006 |
| 251 | XXX | 123456 | Widget | 9 | 0 | -3 | 0 | -3 | 0 | 0 | 0 | 8 | 1/1/2006 | 1/31/2006 |
| 252 | XXX | 123456 | Widget | 6 | 0 | -4 | 0 | -4 | 0 | 0 | 0 | 6 | 1/1/2006 | 1/31/2006 |
| 253 | XXX | 123456 | Widget | 18 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 17 | 1/1/2006 | 1/31/2006 |
| 265 | XXX | 123456 | Widget | 460 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10 | 1/1/2006 | 1/31/2006 |
| 266 | XXX | 123456 | Widget | 6 | 0 | -1 | 0 | -1 | 0 | -1 | 0 | 1 | 1/1/2006 | 1/31/2006 |
| 270 | XXX | 123456 | Widget | 6 | 0 | -1 | 1 | 0 | 0 | 0 | 0 | 8 | 1/1/2006 | 1/31/2006 |
| 271 | XXX | 123456 | Widget | 8 | 0 | -1 | 1 | 0 | 0 | 0 | 0 | 9 | 1/1/2006 | 1/31/2006 |
| 272 | XXX | 123456 | Widget | 6 | 0 | -2 | 0 | -2 | 0 | 0 | 0 | 6 | 1/1/2006 | 1/31/2006 |

Circuit City/Lexar
Consignment Agreement

CC LD Ref. #4240

# Location Report

| LOC NO | LOC NAME | LOC TYPE | MANAGER | STREET ADD | MAIL ADD | CITY | STATE | ZIP | ZIP4 | PHONE | NON CNVBL | CONVEYABLE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 545 | HULEN SS | CCSS | A_0546 LOCKHART | 4820 SW LOOP 820B | 4820 SW LOOP 820B | FORT WORTH | TX | 76109 | 4420 | 8173351796 | 567 | 567 |
| 546 | MESQUITE SS | CCSS | 0_0546 MILLER,RI | 3733 W EMPORIUM CIR | 3733 W EMPORIUM CIR | MESQUITE | TX | 75150 | 6509 | 9726860099 | 567 | 567 |
| 559 | PHILA XDOCK | CC | | 400 CROSSING DRIVE | 400 CROSSING DRIVE | BRISTOL | PA | 19007 | 4737 | 2157852752 | 335 | 255 |
| 563 | MAIL ORDER E COMM | HOLD | | 9950 MAYLAND DR | 9950 MAYLAND DR | RICHMOND | VA | 23233 | 0 | | 0 | 0 |
| 564 | ARDMORE PRC 567 | PSC | | 1901 COOPER DR | 1901 COOPER DR | ARDMORE | OK | 73401 | 0 | 4052253260 | 0 | 0 |
| 565 | BAYBROOK SS | CCSS | 0566 HANDY,JIM | 18800 GULF FREEWAY | 18800 GULF FREEWAY | FRIENDSWOOD | TX | 77546 | 2715 | 2812860358 | 567 | 567 |
| 567 | ARDMORE DC | WHSE | | 1901 COOPER DR | 1901 COOPER DR | ARDMORE | OK | 73401 | 9025 | 5802263260 | 0 | 0 |
| 569 | CEDAR HILL_SS | CCSS | D_0569 BELL,BEVE | 731 NORTH HIGHWAY 67 | 731 NORTH HIGHWAY 67 | CEDAR HILL | TX | 75104 | 3901 | 9722911038 | 567 | 567 |
| 570 | SAVANNAH SS | CCSS | E_0570 TROTTER,M | 8106 G ABERCORN ST | 8106 G ABERCORN ST | SAVANNAH | GA | 31406 | 2826 | 9129250198 | 775 | 775 |
| 571 | BRANDON SS | CCSS | F_0571 BELLUSO,J | 10277 ADAMO DR | 10277 ADAMO DR | TAMPA | FL | 33619 | 2664 | 8136511300 | 775 | 775 |
| 574 | WALNUT XDOCK | CC | | 505 S CHERYL LANE | 505 S CHERYL LANE | WALNUT | CA | 91789 | 0 | 9095945684 | 353 | 353 |
| 575 | LIVERMORE XDOCK | CC | E_0576 FREEMAN,J | 400 LONGFELLOW ST #B | 400 LONGFELLOW ST #B | LIVERMORE | CA | 94550 | 0 | 9254491587 | 344 | 346 |
| 576 | READING SS | CCSS | | 1101 WOODLAND RD | 1101 WOODLAND RD | WYOMISSING | PA | 19610 | 1214 | 6103766650 | 335 | 335 |
| 579 | INDUSTRY TR 353 | DLVR | | 680 S LEMON AVE | 680 S LEMON AVE | WALNUT | CA | 91789 | 0 | | 0 | 0 |
| 582 | OLYMPIC SVC CTR | SRVC | | 505 S CHERYL LANE DOOR 46 | 505 S CHERYL LANE DOOR 46 | WALNUT | CA | 91789 | 0 | 9094680033 | 353 | 353 |

Circuit City/Lexar
Consignment Agreement

CC LD Ref #4240

# PROCESS FLOW APPENDIX 1
## TO CONSIGNMENT AGREEMENT

This Appendix is solely for the reference of the parties and does not contain any binding terms between the parties.



**Inbound DC from Vendor**

Circuit City/Lexar
Consignment Agreement

CC LD Ref. #4240

**PROCESS FLOW APPENDIX 2**
**TO CONSIGNMENT AGREEMENT**

This Appendix is solely for the reference of the parties and does not contain any binding terms between the parties.

# Physical Inventory Counts
## (Store Level)

**Stores**

| Physical Inventory |

Contracted 3rd party conducts double blind detailed piece count

↓

**Back 10**

Store personnel reviews the 1st 10 or last 10 items scanned within a section.

**Detail Audit –**

A print out a section of the store with inventory to be counted and validates the brand/model and quantity counted by the vendor to that shown on the printed sheet

**Piece Count Audit –**

Circuit City personnel randomly count a section in the store and ties its item count quantities to those that the vendor records on the item tags

↓

Results are compared with perpetual inventory

↓

Store mgmt reconciles any variances/DMs approve

↓

Inventory Accounting audits, approves and updates the ledger, perpetual inventory and

---

# Cycle Counts
## (Store Level)

Cycle count items determined by LP depending on $ value and propensity for shrink

↓

Count compared to Inv Record in DPS/Magellan

↓

Quantity Variance?

→ Quantity moved to 'variance bucket'

↓

AS400 systematically adjusts

↓

Inventory variance sent corporate loss prevention

---

**PROCESS FLOW APPENDIX 3
TO CONSIGNMENT AGREEMENT**

This Appendix is solely for the reference of the parties and does not contain any binding terms between the parties.

## Physical Inventory Counts
## (DC Level)





## Cycle Counts
## (DC Level)



PROCESS FLOW APPENDIX 4
TO CONSIGNMENT AGREEMENT

This Appendix is solely for the reference of the parties and does not contain any binding terms between the parties.

# Consignment – Vendor Reconciliation

## PROCESS FLOW APPENDIX 5
## TO CONSIGNMENT AGREEMENT

This Appendix is solely for the reference of the parties and does not contain any binding terms between the parties.

# Consignment – Accounts Payable



Circuit City/Lexar
Consignment Agreement

CC LD Ref #4240



**PROCESS FLOW APPENDIX 6**
**TO CONSIGNMENT AGREEMENT**

This Appendix is solely for the reference of the parties and does not contain any binding terms between the parties.

# Consignment – Reporting