# EXHIBIT A

ROCKVILLE, MARYLAND

**LEASE**

between

**CIRCUIT CITY STORES, INC.,**

as Tenant

and

**CONGRESSIONAL NORTH ASSOCIATES LIMITED PARTNERSHIP,**

as Landlord

dated December 13 , 1995

**CONGRESSIONAL NORTH SHOPPING CENTER**

## TABLE OF CONTENTS

1.  Leased Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

2.  Construction of Building and Improvements . . . . . . . . . . . . . . .   2

3.  Lease Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

4.  Base Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

5.  Development of Shopping Center . . . . . . . . . . . . . . . . . . . . . . .   4

6.  Easements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

7.  Common Areas and Common Area Maintenance . . . . . . . . . . . . .   6

8.  Signs and Communications Equipment . . . . . . . . . . . . . . . . . . .   8

9.  Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

10.  Maintenance, Repairs and Replacements . . . . . . . . . . . . . . . . .  13

11.  Payment of Utility Bills . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

12.  Alterations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

13.  Mechanics' Liens . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

14.  Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

15.  Damages by Fire or Other Casualty . . . . . . . . . . . . . . . . . . . . .  19

16.  Condemnation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

17.  Assignment and Subletting . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

18.  Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

19.  Covenants, Warranties and Representations . . . . . . . . . . . . . . .  26

20.  Estoppel Certificates. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

21.  Subordination, Non-Disturbance and Attornment . . . . . . . . . . .  31

22.  Change of Landlord . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

23.  Tenant's Financing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

24.  Tenant's Property and Waiver of Landlord's Lien . . . . . . . . . . .  33

MWBB 12/5/95
7716U:\1097\Circuit\midad\rock\lease.012

25.    Memorandum of Lease; Commencement Date Agreement . . . . . . . . . . . . . . . . . . .    33

26.    Expiration of Term and Holding Over . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    34

27.    "For Rent" Signs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    34

28.    Force Majeure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    34

29.    Events of Tenant's Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    35

30.    Landlord's Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    35

31.    Events of Landlord's Default; Tenant's Remedies . . . . . . . . . . . . . . . . . . . . . .    39

32.    Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    40

33.    Compliance with Applicable Laws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    40

34.    Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    41

35.    Brokers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    41

36.    Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    42

37.    Effectiveness of Lease; Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    43

38.    Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    46

39.    Hazardous Substances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    46

40.    Limitation of Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    48

MWBB 12/5/95

7716U:\1097\Circuit\midatl\rocky\lease.012

## EXHIBITS

"A"          Site Plan

"A-1"        Shopping Center Legal Description

"B"          Index of Definitions

"C"          Construction Provisions

"D"          Removable Trade Fixtures

"E"          Sign Plans

"F"          Permitted Encumbrances

"F-1"        List of "Exclusives" Reserved by Landlord

"G"          Subordination, Non-Disturbance and Attornment Agreement

"H"          Memorandum of Lease

"I"          Commencement Date Agreement

"J"          Indemnification Agreement

MWBB 12/5/95
7716U:\1097\Circuit\midad\rockv\lease.012

ROCKVILLE, MD

### LEASE

This LEASE is made as of the 13 day of Dec, 1995, by and between CONGRESSIONAL NORTH ASSOCIATES LIMITED PARTNERSHIP c/o RONALD COHEN MANAGEMENT, 6500 Rock Spring Drive, Suite 302, Bethesda, Maryland 20817, ("Landlord"), and CIRCUIT CITY STORES, INC., a Virginia corporation having an address at 9950 Mayland Drive, Richmond, Virginia 23233 ("Tenant").

W I T N E S S E T H :

That for and in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    <u>Leased Property</u>.  Landlord demises and leases to Tenant and Tenant leases and takes from Landlord, commencing on Landlord's delivery of the "Land" (as defined below) to Tenant, all those certain "Premises" consisting of the "Building" and "Other Improvements" (both as defined in paragraph 2), as and when same are constructed or renovated and that approximately 43,915 square foot parcel (the "Land"), on which the Building and Other Improvements are or will be located, as more particularly shown (approximately) outlined in red on <u>Exhibit "A"</u> hereto (the "Site Plan"), ~~together with rights to the four (4) parking spaces labelled "Customer Pick-Up" adjacent to the~~ Building as shown on the Site Plan and with the easements described in paragraph 6 below, all located in the "Shopping Center" (herein so called), which consists of that certain real property with buildings and improvements constructed or to be constructed thereon, located at Rockville Pike and Congressional Lane, lying and being in the City of Rockville (the "City"), County of Montgomery (the "County"), State of Maryland (the "State"), and more particularly shown on the Site Plan and described by metes and bounds or platted lot legal description on <u>Exhibit "A-1"</u> attached hereto and made a part hereof for all purposes.  All of the Shopping Center exclusive of the Premises is "Landlord's Premises".  The description of the Premises may be adjusted in accordance with Tenant's final bid set of Plans and Specifications as described in <u>Exhibit "C"</u> attached hereto.  Landlord hereby grants to Tenant all of those certain rights, in common with others, granted Landlord under that certain Declaration of Easements, Covenants and Related Agreements to be executed by Landlord and 121 Associates and to be recorded against record title of the Shopping Center (the "REA"), to the extent that the same benefits the Premises.  Landlord covenants that it will not modify or amend, or permit the modification or amendment of, the REA without

the written consent of Tenant.  The form of the REA shall be identical to the form delivered to Tenant before the execution of this Lease.

By serving upon Tenant written notice of its election to do so on or before May 31, 1996, (the "Site Plan Date") Landlord may substitute a new site plan for the Site Plan attached hereto if the changes reflected on such new site plan are required by the appropriate governmental authorities for the approval of Landlord's site plan for the construction or completion of the Shopping Center substantially in accordance with the initial Site Plan attached hereto.  Any notice by Landlord of its election to change the Site Plan shall be accompanied by a written identification of the changes to the Site Plan and the reason for each change.  Upon such substitution in accordance with the foregoing restriction, such new site plan shall be the "Site Plan" hereunder.

2.    <u>Construction of Building and Improvements</u>.  Commencing immediately upon "delivery of the Land" (as defined in the Construction Provisions (herein so called) attached hereto as <u>Exhibit "C"</u> and incorporated herein by reference for all purposes), Tenant shall have the right and obligation to construct within the Shopping Center a one-story retail building, containing approximately 43,915 square feet of ground-floor gross leasable area, ~~with provisions for customer pickup, delivery and on-store installation facilities,~~ initially for use as a Circuit City Superstore and certain space to be subleased to other users (the "Building"), together with loading ramps, sidewalks, trash compactor, transformer pad and other such appurtenances and improvements (collectively, the "Other Improvements"), as more particularly set forth in the Construction Provisions.  The Building and Other Improvements are sometimes collectively referred to herein as the "Improvements".  The Improvements shall be constructed in accordance with the "Plans and Specifications" to be prepared by Tenant as specified in the Construction Provisions.  Except as otherwise provided herein, title to the Improvements shall be deemed transferred to Landlord upon full payment of the "Tenant Improvement Allowance", as defined in the Construction Provisions.

3.    <u>Lease Term</u>.  Subject to the conditions to the effectiveness of this Lease set forth in paragraph 37, the construction term (the "Construction Term") of this Lease shall commence on the date of Landlord's delivery of the Land to Tenant in accordance with, and in the condition specified in, the Construction Provisions, and shall end on the "Commencement Date" (as defined in paragraph 4 below).  The main term (the "Main Term") of the Lease shall commence on the Commencement Date and shall end on the last day of January following the twentieth (20th) anniversary of the Commencement Date.

In addition to the Main Term, Tenant shall have the option (each such right referred to herein as a "Renewal Option") to renew and extend the Lease for four (4) consecutive five (5) year periods (each such period referred to as an "Option Period" and collectively as the "Option Periods") immediately following the Main Term, at the rent specified below.  Tenant shall give Landlord written notice of its

election to exercise any Renewal Option at least two hundred seventy (270) days prior to the expiration of the Main Term or any then-current Option Period, as applicable; provided, however, that in order to avoid any forfeiture or inadvertent lapse of such Renewal Option, if Tenant shall fail to give any such notice within the two hundred seventy (270) day time limit and shall not have given Landlord prior written notice of its intent not to exercise its Renewal Option, then and as often as the same shall occur, Tenant's right to exercise such Renewal Option shall nevertheless continue, as shall its tenancy hereunder (under the same terms and conditions as theretofore in effect and notwithstanding that the Main Term or then-current Option Period shall have expired), until ten (10) business days after Landlord shall have given Tenant a written notice of Landlord's election to terminate the Renewal Option, during which period Tenant may exercise its Renewal Option at any time prior to the expiration of such ten (10) business day period.  Upon the giving of notice of renewal and extension in accordance with the foregoing provisions, the Term (defined below) of this Lease shall thereupon be renewed and extended in accordance with such notice without further act by Landlord or Tenant, the same as if such notice had been timely given hereunder.

The Construction Term, Main Term and Option Periods are, collectively, the "Term". The term "Lease Year" shall mean each successive period of twelve (12) consecutive calendar months with the first Lease Year beginning on the Commencement Date and ending twelve (12) full calendar months after the Commencement Date.  Thereafter, each Lease Year shall commence on the day following the expiration of the preceding Lease Year and shall end at the expiration of twelve (12) calendar months thereafter, except that the final Lease Year shall terminate on the last day of January following the anniversary of the first day of the final Lease Year.

4.    Base Rent.  During the Construction Term, Tenant shall have no rental obligations nor shall Tenant be responsible for any Real Estate Taxes (as defined in paragraph 9) or CAM Charges (as defined in paragraph 7) or any similar costs, fees, rentals or expenses.  Notwithstanding the foregoing, however, if Landlord makes timely delivery of the Land in accordance with the terms hereof, and the Construction Term has not ended by the 210th day after such timely delivery, Tenant shall pay rent in the amount of $54,167.00 per month during that portion of the Construction Term commencing with the date that is 210 days after such timely delivery of the Land and ending on the last day of the Construction Term and shall commence payment of CAM charges and Taxes on the date such reduced rent commences.  Tenant agrees to pay base rent ("Base Rent") for the Premises in the amounts and in the manner specified hereunder, in equal monthly installments, without notice or demand, and without set-off, deduction or abatement of any kind, except as specifically permitted by this Lease, commencing (subject to the provisions of paragraph 4 of Exhibit C) on the date on which Landlord makes payment of the

MWBB 12/5/95

7716U:\1097\Circuit\midatl\rockv\lease.012

Tenant Improvement Allowance as set forth in the Construction Provisions (the "Commencement Date").

Tenant shall pay Base Rent in equal monthly installments, in advance on the first day of each succeeding calendar month throughout the Term, with appropriate proration for any partial calendar month or Lease Year, to the address given for Landlord in paragraph 34 hereof, unless Landlord shall give Tenant written notice of a change of address or of the party to whom such rents shall be payable along with written documentation reasonably satisfactory to Tenant of such party's right to receive payment hereunder.  Unless adjusted as provided in paragraph 3 of the Construction Provisions, Base Rent shall be paid pursuant to the following schedule:

(i) During the first five (5) Lease Years, Tenant shall pay annual Base Rent in the amount of Eight Hundred Thirteen Thousand Three Hundred Five and 80/100 Dollars ($ 813,305.80), payable in equal monthly installments of Sixty Seven Thousand Seven Hundred Seventy Five and 48/100 Dollars ($ 67,775.48).

(ii) Notwithstanding the Base Rent provisions, in the event that the ground-floor gross leasable area of the Building when constructed does not equal 37,915 square feet, annual Base Rent during the first five (5) Lease Years shall be the product of the actual ground-floor gross leasable area of the Building (as shown in the Plans and Specifications), multiplied by $ 18.52 per square foot.  In determining the aforesaid ground-floor gross leasable area, measurements shall be made in accordance with the specifications set forth in paragraph 7(c) below.  If any Lease Year is other than twelve (12) months in length, annual Base Rent during such Lease Year shall be the product of the applicable monthly Base Rent times the number of months in such Lease Year, with appropriate proration for any partial calendar month therein.  This provision shall in no event work to reduce the rental due hereunder.

(iii) Annual Base Rent shall increase on the first day of the sixth and every succeeding fifth Lease Year of the Term, over the initial Base Rent charged hereunder by the lesser of ten percent (10%) or the percentage increase in the "CPI-U" (as defined below) during the five (5) year period ending on October 31 of the fifth (or, as applicable, any succeeding fifth) Lease Year.  As used herein, the CPI-U shall be the United States Department of Labor, Bureau of Labor Statistics Consumer Price Index for All Urban Consumers, U.S. City Average, 1982-1984=100.  If at any time during the Term the CPI-U shall be discontinued, Landlord and Tenant shall mutually and reasonably agree to substitute an existing official index published by the Bureau of Labor Statistics or its successor or another similar index most nearly equivalent to the CPI-U.

5.    Development of Shopping Center.  Subject to the provisions of paragraph 37, Landlord covenants to construct and develop a first-class shopping center.  The location of buildings and other tenant space therein will only be within the "Permissible Building Areas" designated on the Site Plan as

building footprints, and the parking ratio for the Shopping Center shall be at least as shown thereon, but in no event shall said ratio be less than the greater of (i) four (4.0) spaces (for full-sized automobiles) per 1,000 square feet of gross leasable area or (ii) that required by applicable zoning requirements. Except for the parking structure shown on the Site Plan, all such parking shall be at ground level. Landlord shall construct or cause such improvements to be constructed in a good and workmanlike manner, lien-free in accordance with paragraph 13 below. Each of Landlord and Tenant hereby agrees to indemnify, defend and hold the other harmless from any loss or damage suffered as a result of the indemnifying party's construction. ███████████████████████████████████████████████████ Landlord shall keep and maintain or cause the improvements and the "Common Areas" (as defined in paragraph 7(a)) in the Shopping Center to be kept and maintained in good condition and repair and shall not operate, or permit to be operated, in the Shopping Center any activity which constitutes a nuisance, overburdens the available utilities, or violates any of the "Site Covenants" contained in subparagraph 19(a)(vii) or the prohibited activities set forth in subparagraph 19(a)(vi).

6.    Easements. In addition to and simultaneously with the lease of the Premises, Landlord grants to Tenant certain nonexclusive leasehold easements over or upon certain areas of Landlord's Premises, as set forth below, which easements shall run as covenants with Landlord's Premises and the Premises during the Term and shall expire or terminate simultaneously with this Lease, except as provided below.

(a)    Construction Easements. During the Construction Term, and any period of renovation or reconstruction thereafter, Landlord grants to Tenant a nonexclusive easement across a mutually agreeable designated route, providing access to and from the public roadways nearest to the Land, over the Common Areas (as defined in paragraph 7(a) below) for the purpose of construction access to the Premises. In addition, Landlord grants to Tenant an exclusive easement for a construction staging area (the "Staging Area") as reflected on the Site Plan.

(b)    Footing and Foundation Easements. Landlord grants to Tenant, and Tenant grants to Landlord, easements and rights in Landlord's Premises and the Premises, as appropriate (i) for the construction and maintenance of foundations, footings, supports and demising walls; (ii) to allow their respective buildings to abut and connect (but not to bear structurally upon each other unless and except as otherwise provided herein); (iii) for roof projections, allowing the grantee to tie its building into the adjoining building by flashing and reglets; and (iv) for encroachments which reasonably occur in the construction of the building components set forth in subparagraphs (i) through (iii) above. No such attachment or connection shall be made, however, unless detailed plans therefor shall have been timely

submitted to and approved by the party to whose building the attachment is to be made, which approval shall not be unreasonably withheld.

(c)   <u>Utility Easements</u>.   During the Term, upon prior reasonable request of Tenant (following the initial "Landlord Work" as set forth in the Construction Provisions), Landlord agrees to obtain such underground, public or private utility easements as Tenant deems necessary, without unreasonably interfering with the use by Landlord of the Common Areas, for the benefit of the Premises. For the purpose of exercising the rights granted in this subparagraph 6(c), Tenant and/or the utility provider shall have the right to enter upon and use the Common Areas to install the utility systems, to such extent and so long as reasonably necessary to accomplish such purpose, subject to restoration of the Common Areas following such installation and any other reasonable conditions and requirements imposed by Landlord.

(d)   <u>Common Area Easement</u>.   During the Term, Landlord grants to Tenant, for the benefit of the Premises, the nonexclusive right, privilege and easement (the "Common Area Easement") to use the Common Areas for their intended purposes and to permit Tenant and its employees, agents, subtenants, assignees, licensees, suppliers, customers and invitees to use the same, in common with Landlord, its successors, assigns, employees, agents, lessees, licensees, suppliers, customers and invitees and all other persons claiming by or through them, for the purposes (without limitation) of parking and pedestrian, service and vehicular access, ingress and egress to, from and between the Premises and the Landlord's Premises and the streets and highways abutting and adjacent to the Shopping Center, in accordance with the Site Covenants, without payment of any fee or other charge therefor.

(e)   <u>Non-Dedication</u>.   None of the easements granted by the parties to this Lease is intended, nor shall any of them be construed, as a dedication of any portion of the Shopping Center for public use, and the parties will refrain from taking any action which would cause such a dedication and will take whatever steps may be necessary to avoid any such dedication, except as may be agreed upon in writing by the parties hereto or their respective successors or assigns.

7.   <u>Common Areas and Common Area Maintenance</u>.

(a)   <u>Definition of Common Areas</u>.   The term "Common Areas" shall be defined to include the parking areas, lanes, drives, entrances, truck passageways, sidewalks, elevators, escalators, ramps, stairways, landscaped and other unpaved areas, parking lot lighting facilities and equipment,

Landlord's pylon and/or monument sign(s), directional, traffic and monument sign structure(s) and shared utility facilities located in the Shopping Center (including any such areas and facilities contained within outparcels and adjacent tracts but reserved to the benefit of the Shopping Center occupants) and intended and available for the common use of all of the tenants within the Shopping Center (including any outparcel and other adjacent occupants which contribute toward "CAM Charges" (as defined below) and which are not responsible for separate maintenance of such outparcels or tracts), their subtenants, licensees, and business invitees.  Landlord shall be responsible for operating, maintaining and repairing the Common Areas in a first-class manner, including cleaning, maintenance of Landlord's pylon and/or monument and other sign structure(s), snow removal and ice treatment, removal of Common Area trash and garbage, lighting, repairing, repaving and restriping the parking area, and maintaining, replanting and replacing landscaping, all such work to be referred to collectively as "Common Area Maintenance".

(b)    CAM Charges.  For the purpose of this paragraph 7, the cost of Common Area Maintenance (the "CAM Charges") shall include (i) Landlord's direct costs and expenses of operating and maintaining the Common Areas and (ii) Landlord's overhead expenses for administering same.  CAM Charges for utilities, snow removal and the cost of one full-time security officer shall be "Non-Controllable CAM Charges."  Non-Controllable CAM Charges shall be in an amount consistent with the costs incurred by other landlords of similar shopping centers in the City (but not greater than as described in this paragraph 7(b)), and in all events such charges shall be obtained at competitive rates pursuant to a proposed Common Area maintenance budget delivered to Tenant on or before the end of each CAM Year.

(c)    Tenant Payments.  For the first Lease Year, Tenant shall pay to Landlord a fee of $1.70 per square foot of ground-floor gross leasable area in the Building payable in equal monthly installments, as its share of CAM Charges.  Such fee shall increase each year over that in effect during the preceding CAM Year in the same proportion as any increase in the CPI-U during the same period.  In addition, as part of its share of CAM Charges, Tenant shall pay its share of any increase over the increase in the CPI-U for any year with respect to Non-Controllable CAM Charges.  Within sixty (60) days after the end of the first Lease Year and each Lease Year thereafter, Landlord will furnish to Tenant a statement showing in detail (with such substantiating documentation as Tenant may reasonably request) the amount of the Non-Controllable CAM Charges for the preceding Lease Year and the then-current number of square feet of ground-floor gross leasable area in the Shopping Center.  Any necessary adjustment with respect to amounts owed by either party for such preceding Lease Year shall thereupon be made; and the monthly payments to be made by Tenant for the ensuing year shall be estimated according to the Common Area maintenance budget prepared by Landlord and delivered to Tenant.

Subject to adjustments as herein contemplated, Tenant's share (such fraction being referred to herein as "Tenant's Pro Rata Share") of increases over the increase in the CPI-U of Non-Controllable CAM Charges after the first Lease Year shall always be the product of such excess increase in Non-Controllable CAM Charges multiplied by a fraction, the numerator of which is the number of square feet of the ground-floor gross leasable area in the Building and the denominator of which is the number of square feet of the ground-floor gross leasable area (including the area of any outside sales area exclusive to a single occupant) in the Shopping Center.  In determining the ground-floor gross leasable area of any building in the Shopping Center (including the Building), measurement shall be made from the centerline of any common walls and from the outside of any exterior walls.  The gross leasable area of any outside sales area shall be measured from the outside of the exterior wall of any adjacent building to the actual exterior perimeters of such outside sales area, including any aisles, fences or walls included therein. Changes in applicable floor areas shall result in corresponding adjustments of Tenant's Pro Rata Share, but in no event shall the denominator of the fraction by which Tenant's Pro Rata Share is determined be less than the gross leasable area of the Shopping Center as shown on the Site Plan.  The remainder of CAM Charges shall be borne by Landlord and/or other tenants.

(d)     Examination of Landlord's Records.  Tenant shall have the right, from time to time, but not more often than once as to any Lease Year and no later than two (2) years after the end of such Lease Year, to examine and make copies of the records pertaining to Non-Controllable CAM Charges for such Lease Year.  Tenant's right of examination shall be exercised during reasonable business hours at Landlord's principal records office on reasonable prior notice to Landlord.  If such examination shall disclose any overcharge by Landlord, Landlord shall promptly reimburse Tenant for any overpayment of Tenant's Pro Rata Share of Non-Controllable CAM Charges; and if such overpayment by Tenant is in excess of three percent (3%) of the actual Tenant's Pro Rata Share of Non-Controllable CAM Charges, Landlord shall reimburse Tenant for the reasonable cost of such examination or audit.  Tenant shall promptly reimburse Landlord for any underpayment disclosed by such examination.

8.     Signs and Communications Equipment.

(a)     Tenant, with respect to the Premises, and Landlord, with respect to the buildings on the other parts of the Shopping Center, agree that no sign will be installed on the roof of any such building and that no sign will project above the top of any parapet wall or above the roof line if it is to be affixed to the side of a building not having a parapet wall, but Landlord and Tenant each only with the other's consent, which consent shall not be unreasonably withheld, shall have the right to erect parapets in connection with the installation of signs.  Landlord hereby grants to Tenant the right at

Tenant's sole cost and expense to install a sign panel on each side of the Shopping Center monument sign if one is erected by Landlord. Landlord shall use reasonable efforts to obtain the approval of Red Lobster for Tenant to install its sign panel on the existing pylon or its replacement. Tenant shall have no lower than the third position on any sign erected by Landlord. Tenant's panel shall be below those of "Red Lobster" and "Bed, Bath and Beyond." Unless Landlord is required to do so under a currently existing lease at the Shopping Center, Landlord shall not allow the sign panel of any tenant or occupant at the Shopping Center to be placed in a position above Tenant's panel if such tenant or occupant operates less square footage area at the Shopping Center than Tenant. The size of Tenant's sign shall be that proportion of the remaining allowable sign space after excluding the Red Lobster (or any assignee, subtenant, or replacement of Red Lobster) sign on said pylon and/or monument dedicated to tenant signs that the relationship of Tenant's leasable Floor area bears to the total leasable Floor Area of all tenants having a sign on the pylon and/or monument including Tenant. No tenant of the Office Building shall have its name or logo on the pylon and/or monument. Tenant shall obtain all permits and approvals required for the installation of Tenant's signs. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬ Tenant agrees to maintain all signs (including the pylon and/or monument panel) that it shall install in good repair, order and condition. Tenant shall not attach nor place any signs on or within twelve inches of the windows or doors of the Premises which are not professionally prepared and maintained. All exterior building signs will be hooked to the utility meter for the Building and the costs of electricity will be paid by Tenant. Landlord shall submit to Tenant plans and specifications for such monument sign (including colors, design, dimensions, type of lighting and position of tenant panels) prior to construction and installation thereof for Tenant's written approval, which shall not be unreasonably withheld or delayed. Attached as a portion of <u>Exhibit "E"</u> are plans and specifications for Tenant's current prototypical face panels and for Tenant's building signage, which Landlord hereby approves upon its execution of this Lease subject to obtaining governmental permits. Notwithstanding the foregoing, Tenant shall be entitled without Landlord's consent, but subject to governmental requirements, as aforesaid, to replace any and all of its signs with signage consistent with Tenant's then-current prototypical sign plans; provided, however, that if this Lease has been assigned and the Tenant hereunder is not the operator of at least fifty retail outlets having a net worth of at least $50,000,000 (any such operator being a "Major Retailer"), any such change of signage shall be subject to Landlord's written approval, which shall not be unreasonably withheld or delayed. Tenant may install exterior signage at the Shop Space consistent with the first sentence of this paragraph and consistent with applicable governmental requirements.

MWBB 12/5/95

7716U:\1097\Circuit\midat\rock\lease.012

(b)    Communications Equipment. ██████████████████████████████
██████████████████████████████████████████████████████████████████
████████ (the "Satellite Installation") for Tenant's sole use only, as long as such installation and the maintenance and use of the Satellite Installation is in accordance with all terms of this Lease. To the extent the same are not included in the Plans and Specifications referred to in the Construction Provisions, Tenant shall submit written plans for the installation, maintenance and use of the Satellite Installation to Landlord for Landlord's review and consent which consent shall not be unreasonably withheld or delayed. Tenant acknowledges that Landlord has made no representation as to the utility to Tenant of the Satellite Installation. Tenant shall be responsible for the cost of installation, maintenance and removal of all rooftop equipment. Tenant's Satellite Installation shall be considered Tenant's property under this Lease. Tenant's installation of the Satellite Installation shall be made in accordance with the Tenant's approved plans and specifications. Any damage by fire or any other casualty to the Satellite Installation shall be at Tenant's sole risk and expense, and any such damage, whether partial or complete, shall in no way operate to terminate this Lease or affect Tenant's obligations hereunder. In no event shall Tenant assign, transfer, mortgage, encumber, sublet, rent or otherwise alienate the appurtenant right described in this subparagraph (b) to install, maintain and use the Satellite Installation, except in favor of a party to whom Tenant's other interests under this Lease are assigned, transferred, mortgaged, encumbered, sublet, rented or alienated. Tenant agrees to pursue receipt of all approvals from all governmental authorities and to assume the costs of securing such approvals.

9.    Taxes.

(a)    Taxes Contemplated Hereunder. For purposes of this paragraph 9, the term "Shopping Center" shall include, in addition to the premises described in paragraph 1, the land, and improvements located thereon, identified as the "Office Building" on Exhibit "A" attached hereto. The term "Real Estate Taxes" shall mean all general and special real estate taxes and assessments and other ad valorem taxes, rates and levies paid upon or with respect to the Shopping Center, including the Premises, for a calendar year or a portion thereof to any governmental agency or authority. If at any time during the Term of this Lease, under the laws of the State or any political subdivision thereof in which the Premises are situated, a tax or excise on, or measured in whole or in part by, rents or gross receipts of any other tax, however characterized, is levied or assessed by the said state or political subdivision against Landlord with respect to the Premises, or with respect to the basic rent expressly reserved hereunder, in addition to or as a substitute in whole or in part for taxes assessed or imposed by said state or political subdivision on land and/or buildings, the same shall be included within the term "Real Estate Taxes," and Tenant covenants to pay such tax or excise on, or measured by, rents or gross

receipts or other tax, but only to the extent of the amount thereof which is lawfully assessed or imposed upon the Landlord and which was so assessed or imposed as a direct result of Landlord's ownership of the Shopping Center, or of this Lease or of the rentals accruing under this Lease provided that each tenant occupying at least 10,000 square feet in the Shopping Center, is obligated under its lease to pay such rent tax. In addition to the foregoing payments for taxes and impositions, Tenant further agrees to pay any tax which may be levied or otherwise imposed on or against the Premises or the use and occupancy thereof in addition to or in substitution for any of the "Real Estate Taxes" described above. Nothing contained in this Lease shall require Tenant to pay any local, county, municipal, state or federal income, franchise, corporate, estate, inheritance, succession, capital levy, business, profits, gross receipts (except as set forth above) or transfer tax of Landlord. Tenant shall, however, pay any "rent tax" (such as the rent tax currently imposed on rents in the State of Florida) imposed upon the rents payable hereunder. In addition, Real Estate Taxes shall not include, and Tenant shall not be required to pay any portion of any other capital expenditure relating to construction of improvements on any part of the Leased Premises or Shopping Center or off-site improvements the net effect of which is to fund or finance or perform construction or other projects for or on behalf of Landlord (including as may be required of Landlord by governmental authorities), whether or not the same are paid for or financed by Landlord or others through any impact fee, assessment, special assessment district or other program authorized by law.

(b)    Payment of Real Estate Taxes. At such intervals as Landlord is required to pay the Real Estate Taxes, Tenant shall pay Tenant's Pro Rata Share of Real Estate Taxes (calculated in the same manner as Tenant's Pro Rata Share of excess Non-Controllable CAM Charges in paragraph 7(c)), including in the numerator and the denominator of the fraction referred to therein all leasable area within the Shopping Center (as opposed to ground floors only, but excluding basement and mezzanine areas used for office, storage or equipment), and taking into account that, for purposes of this paragraph 9, the term "Shopping Center" includes the land, and improvements located thereon, identified as the "Office Building" on Exhibit "A" attached hereto) levied against the tax parcel or parcels comprising the Shopping Center (the "Tax Parcel"). Tenant's Pro Rata Share of Real Estate Taxes shall be net of any early-payment discounts available at the time Tenant's payment is due. Tenant shall pay Tenant's Pro Rata Share of Real Estate Taxes within thirty (30) days after Tenant's receipt of Landlord's statement therefor, accompanied by the tax bill on the basis of which such statement is rendered. Landlord shall pay, or cause the payment of, all Real Estate Taxes before any fine, penalty, interest or cost may be added thereto, become due or be imposed by operation of law for the nonpayment or late payment thereof. In no event shall Tenant be liable for any discount forfeited or penalty incurred as a result of late payment by another tenant or by Landlord. Real Estate Taxes shall be prorated as of the

MWBB 12/5/95

7716U:\1097\Circuit\midatl\rocky\lease.012

Commencement Date and the expiration or earlier termination of this Lease, and Landlord shall promptly return to Tenant any overpayment made by Tenant not attributable to the period of Tenant's possession of the Premises. Landlord shall remain primarily responsible for such payment notwithstanding the fact that such payment may be made by a tenant of Landlord's Premises or other third party pursuant to an agreement to which Tenant is not a party. In addition, should Landlord fail to pay such Real Estate Taxes before same become delinquent, Tenant shall have the right, at its election, to cure such failure by payment of delinquent Real Estate Taxes and any interest and penalties due thereon and in such event Tenant may deduct the cost thereof, plus interest at the rate (the "Default Rate") of four percentage points over the stated prime or base rate of Chase Manhattan Bank in effect on the date such interest is calculate from the next installment(s) of Base Rent and other charges due hereunder. Notwithstanding anything above to the contrary, in the event the parking deck identified on <u>Exhibit "A"</u> attached hereto (the "Deck") is ever separately assessed, then commencing with the tax bill based on such separate tax assessment for the Deck, and continuing as long as the Deck is separately assessed, (i) all references to the Office Building shall be deemed deleted from the definition of Real Estate Taxes, (ii) the Shopping Center, for purposes of computing Real Estate Taxes, shall be deemed to exclude 2/3rds of the tax bill for the Deck, and (iii) Tenant's Share of Real Estate Taxes shall be a fraction, the numerator of which fraction shall be the leasable Floor Area of the Premises and the denominator of which fraction shall be the leasable Floor Area in the Shopping Center (excluding the Office Building).

(c)    <u>Contest of Real Estate Taxes and/or Assessed Valuation of Property</u>. Tenant shall have the right, at Tenant's sole expense, to contest the amount or validity, or otherwise seek an exemption or abatement, of any Real Estate Taxes or to seek a reduction in the valuation of the Premises assessed for Real Estate Tax purposes, by appropriate proceedings diligently conducted in good faith, provided that Tenant shall first have notified Landlord of its intent to do so and Landlord shall have failed to notify Tenant in writing, within five (5) days of receipt of Tenant's notice, that Landlord intends to contest such Real Estate Taxes or seek such a reduction. Tenant shall coordinate any such contest with any other occupant of the Shopping Center then contesting the same tax. In any instance where any such action or proceeding is being undertaken by Tenant, Landlord shall cooperate with Tenant, execute any and all documents required in connection therewith and, if required by any law, rule or regulation of the taxing authority, shall join with Tenant in the prosecution thereof at no cost to Landlord.

(d)    <u>Payment Following Appeal</u>. Upon the termination of the proceedings set forth in subparagraph (c) above (unless the taxing authority requires that Real Estate Taxes be paid under protest prior to commencement of such proceedings), Tenant shall pay Tenant's Pro Rata Share of such Real Estate Taxes as finally determined in such proceedings, the payment or partial payment of which

may have been deferred during the prosecution of such proceedings. Tenant shall be entitled to a refund of any overpayment of Real Estate Taxes relating or allocable to the Premises as previously paid by Tenant, as well as a reimbursement (not to exceed the amount of $5,000, however in respect of any protest or reassessment proceeding) of all costs, fees and expenses it incurs in such protest or reassessment.

10.   <u>Maintenance, Repairs and Replacements</u>.   Except as otherwise set forth in this Lease, Tenant shall be solely ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~ including, but not limited to, repairs and/or replacements to plumbing, heating, electrical and air conditioning systems which serve only the Premises. Upon Landlord's request, Tenant shall deliver to Landlord copies of all Tenant's maintenance records relating to the HVAC system at the Premises. If during the last five (5) years of the Term of the Lease (after giving consideration to any Renewal Options which have been exercised) Tenant shall make any repair or replacement to the Improvements, and the resulting improvement to the Improvements cannot be fully amortized in accordance with generally accepted accounting principles, or the Internal Revenue Code and Regulations, over the remainder of the Term (giving consideration to any additional Renewal Options which have been exercised), then Tenant shall be reimbursed by Landlord for the reasonable amount of the cost associated (based upon the useful life of such repair or replacement) with such repairs, construction or alteration for the period beyond the remainder of the Term (except for improvements made in respect of condemnation or casualty damage). Such reimbursement shall be due from Landlord to Tenant at the expiration of the Term. Tenant shall serve written notice (and opportunity to perform the same as set forth below) to Landlord at least thirty days (30) in advance before making any repair or replacement costing more than $25,000 for which Tenant intends to seek reimbursement hereunder. Any such notice from Tenant to Landlord shall contain a good faith estimate of the amounts to be expended by Tenant in performing such repair or alteration. Tenant's failure to deliver such notice shall not affect Tenant's entitlement to reimbursement as set forth above, but Tenant shall be responsible for any damages to Landlord in respect of Tenant's failure to so notify Landlord. If Landlord so desires, Landlord may perform, or have performed, the designated repair or alteration, and Tenant shall, upon the completion of such repair alteration, pay to Landlord the amount of the estimates supplied with Tenant's notice (which amount shall be deemed, for purposes of the reimbursement to be made from Landlord to Tenant at the end of the Term, the amount of costs associated with such repairs). ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~, but shall have no other responsibility for maintenance, repair or replacements to the Premises or any part thereof; provided, however, this provision is in no way intended to limit Landlord's obligation to maintain, repair

MWBB 12/5/95

7716U:\1097\Circuit\midatl\rockv\lease.012

and replace any and all elements, both structural and non-structural, of the Common Areas pursuant to the terms of this Lease. Tenant shall not do any action that violates the warranty relating to the roof (which Tenant shall assign to Landlord in accordance with the Construction Provisions). In addition to the Landlord's maintenance and repair obligations set forth herein and otherwise set forth in this Lease, Landlord agrees to maintain the Other Improvements immediately surrounding the Building, including sidewalks and landscaping. ~~Should~~ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓which event only such notice as may be reasonable under the circumstances shall be required, but neither party shall make any such repair upon less than 30 days' notice based upon such repair's being an "emergency" repair if such repair adversely affects the value of the Premises or the Shopping Center); ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ~~emergencies)~~ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ~~accomplished within such period so long as the~~ party required to effect such cure has commenced such ▓▓▓▓▓▓▓▓▓▓▓thirty (30) day period (or reasonable period in event of emergencies) ▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓The nonperforming party shall reimburse the other party on demand for the reasonable and actual amount so expended (as evidenced by detailed invoice), plus interest at the Default Rate. However, in the event of emergency repairs, no interest shall accrue if reimbursed within thirty (30) days of request (including detailed invoice) for reimbursement. All maintenance, repairs or replacements shall be done by Tenant or Landlord lien-free and in a good and workmanlike manner consistent with the quality of labor and materials used in originally constructing the Improvements and in accordance with all applicable law. In order for Landlord and Tenant to effectively perform their maintenance, repair and replacement obligations hereunder, Tenant and Landlord, as applicable, shall assign to the other party any and all manufacturers' and contractors' warranties relating to such work performed on behalf of the other party to the party who is required to maintain same under the Lease. Subject to Paragraph 14 (g), if any repair obligated to be performed by a party ("Obligated Party") under this Lease was caused by the negligence of the other ("Negligent Party"), the Obligated Party shall make such repair but the Negligent Party shall reimburse the Obligated Party for the cost of such repair to the extent that the same exceeds any insurance proceeds recoverable by the Obligated Party.

    11.   <u>Payment of Utility Bills</u>. Tenant will pay directly to the appropriate utility company or governmental agency, when due, all bills for gas, water, sanitary sewer, electricity, telephone and other

public or private utilities used by Tenant with regard to the Improvements. Landlord shall pay when due all utility charges incurred in the operation of the Common Areas and the Shopping Center.

12.   Alterations. During the Term, Tenant shall have the right, at its discretion and its sole cost, without Landlord's consent, to make (i) any alterations or modifications necessary or desirable in order to bring the Premises into conformity with Tenant's then-current prototype for similarly sized stores if, but only if, Tenant is a Major Retailer, (ii) any interior nonstructural alterations or modifications it may desire; and (iii) any interior alterations necessary to accommodate subtenants, from time to time, of that portion (the "Shop Space") of the Premises not initially shown as being a Circuit City Superstore in the Plans and Specifications, as defined below; provided, however that no such alteration shall increase the gross leasable area within the Premises. With Landlord's consent, which shall not be unreasonably withheld, conditioned or delayed, Tenant shall have the right, at its sole cost, to alter, modify or reconstruct the exterior and/or structure of the Building or Other Improvements. Landlord's withholding of consent as to any structural alteration or modification shall be deemed reasonable only if same is materially inconsistent with the then-existing architecture of the Shopping Center or if the same is not structurally sound or will cause damage to the Shopping Center. Tenant shall cause all such alterations to be lien-free (in accordance with paragraph 13) and made and completed at Tenant's cost in a workmanlike manner and in compliance with all applicable law. Should Landlord's consent be required, conceptual plans and specifications for such work shall be provided to Landlord prior to commencement of any such work. Landlord shall be deemed to have consented to such work if Tenant's notice to Landlord conspicuously states that failure to respond will be a deemed approval and if written notice of disapproval, with reasons specified, is not received by Tenant within fifteen (15) days following Tenant's delivery of such plans and specifications to Landlord. Without cost or expense to Landlord, Landlord shall cooperate with Tenant in the obtaining of any and all licenses, building permits, certificates of occupancy or other governmental approvals which may be required in connection with any such modifications or alterations, and Landlord shall execute, acknowledge and deliver any documents reasonably required in furtherance of such purposes.

13.   Mechanics' Liens. Landlord and Tenant covenant to each other that they will not permit any lien to be filed against the Premises or the Shopping Center as a result of nonpayment for, or disputes with respect to, labor or materials furnished to the Premises or the Shopping Center for or on behalf of Tenant, Landlord or any party claiming by, through, or under Tenant or Landlord, nor shall either party permit any judgment, lien or attachment to lie, as applicable, against the Premises or the Shopping Center. Should any lien of any nature, including but not limited to the foregoing, be filed against the Premises or Shopping Center, the party on account of whose actions such lien has been filed shall, within

thirty (30) days after receipt of written notice of such lien, cause said lien to be removed, or otherwise protected against execution during good faith contest, by substitution of collateral, posting a bond therefor, escrowing of adequate funds to cover the claim and related transaction costs or such other method as may be permissible under applicable title insurance regulations and reasonably acceptable to the other party hereto.  If the party required to remove or otherwise protect against any such lien fails to do so within the time set forth above, the other party may perform such obligation on behalf of the defaulting party, whereupon the defaulting party shall promptly reimburse the performing party from all expenses (including reasonable attorneys' fees) incurred in such performance, in accordance with an itemized bill (together with evidence of payment therefor) for such costs provided by the performing party.

      14.    <u>Insurance</u>.

      (a)    <u>Property Damage</u>.  During the Construction Term, Tenant shall keep or require its general contractor to keep, in full force and effect, a policy of builder's risk insurance covering loss or damage to the Improvements for the full replacement value of all such construction.  During the Main Term and all Option Periods, Tenant shall keep in full force and effect a policy of fire and extended coverage insurance covering loss or damage to the Premises in the amount of full replacement value of the Building, exclusive of excavation, footings and foundations (which initial amount shall be not less than the Tenant Improvement Allowance), with a commercially reasonable deductible, for which Tenant shall be fully responsible.  Landlord and Landlord's first "Mortgagee" (as defined in paragraph 21 below), shall be named in such policy or policies as their respective interests may appear; however, all proceeds shall be paid to Tenant to enable Tenant to discharge its repair obligations under paragraph 15.  Landlord shall not construct, or permit to be constructed, any improvement in the Shopping Center, nor conduct any activity, or permit the conduct of any activity, in the Shopping Center which will prevent Tenant from being able to obtain insurance coverage at commercially reasonable rates, including, without limitation, a fully-sprinklered fire insurance rate.  Should Landlord cause or permit any insurance rate increase to occur, Landlord will reimburse Tenant for the additional premium required, subject to Tenant's right to self-insure (in which event Landlord will contribute to Tenant's self insurance fund to cover increased actuarial risks).

      (b)    <u>Liability Insurance</u>.  During the Term, Tenant shall keep in full force a policy of commercial general liability insurance with bodily injury and property damage coverage with respect to the Premises and business operated by Tenant, which shall name Landlord as an additional insured.  The limits of such commercial general liability policy shall be not less than $3,000,000.00 combined single limit for bodily injury and property damage, with a commercially reasonable deductible.

MWBB 12/5/95

7716U:\1097\Circuit\midath\rockv\lease.012

(c)    <u>Workers' Compensation Insurance.</u> To the extent required by law, Landlord and Tenant shall each maintain workers' compensation insurance covering their respective employees in statutory limits, or maintain such alternate coverages or arrangements as are legally permissible.

(d)    <u>Self-Insurance.</u> Notwithstanding anything to the contrary contained herein, Tenant shall have the right to self-insure against any of the risks or portions thereof set forth in subparagraphs (a) and (b) (and to the extent then permitted by law, (c)) above, provided Tenant is then occupying the Premises and has a reported net worth, as of the end of Tenant's most recent quarterly reporting period, of not less than Seventy-Five Million Dollars ($75,000,000), as computed in accordance with generally accepted accounting principles, consistently applied, as determinable from Tenant's public disclosures and/or regularly maintained corporate balance sheets which are generally available to shareholders (no right of Landlord to audit or conduct independent investigations being implied by this provision).

(e)    <u>Common Area, Additional Area and Third Party Tenant Insurance and Insurance During Landlord's Construction.</u> During the Term, Landlord shall keep in full force and effect, in form reasonably acceptable to Tenant, policies of (1) commercial general liability insurance, and (2) fire and extended coverage insurance, with respect to the Common Areas and with respect to all other areas of the Shopping Center over which Landlord from time to time has present possessory rights (or has the right under any lease to provide insurance coverage because of a tenant's failure to maintain such required coverage) but which do not constitute a portion of the Common Areas (such areas here sometimes collectively referred to as the "Additional Areas"). The Additional Areas shall include, without limitation: (i) as yet unconstructed portions of the Shopping Center intended for tenant occupancy, (ii) constructed but unoccupied portions of the Shopping Center, (iii) vacated or otherwise uninsured tenant space, whether by reason of lease expiration, default or otherwise, and (iv) constructed and occupied portions of the Shopping Center. Said policies shall name Tenant, and any lender, investor or other stakeholder which is designated by Tenant from time to time, as an additional insureds to the full extent Tenant and such stakeholder have insurable interests. The limits of such policies shall be the same as those set forth in subparagraphs (a) and (b) above, as applicable. The cost of the premiums for coverages relating to Common Areas shall be an element of CAM Charges, provided that Tenant shall not be liable for its pro rata share of any premium for coverage in excess of that coverage which is customary among owners of like shopping centers in the City. Landlord shall assure (with respect to areas controlled by Landlord, and, with respect to other areas, shall use diligent efforts, consistent with first class shopping center management standards, to ensure through parallel lease provisions or otherwise) that all areas of the Shopping Center, including the Additional Areas and areas leased to third party tenants or sold to third party occupants, are insured with substantially similar coverages to those required for the Premises

MWBB 12/5/95

7716U:\1097\Circuit\midatl\rockv\lease.012

and the Common Areas, such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever Tenant may be assured that the Shopping Center will be reconstructed in equal or superior condition within the time frame set forth in paragraph 15.  During any period in which Landlord is conducting construction activities at the Shopping Center, Landlord shall keep, or cause its general contractor to keep, in full force and effect, with regard to the Shopping Center, in form reasonably acceptable to Tenant, at least the minimum insurance coverages set forth below:

1)    Workers' Compensation - Statutory Limits;
       Employers Liability - $500,000;

2)    Automotive Liability for all vehicles with limits of $3,000,000; and

3)    Commercial General Liability to include premises operations and products/completed
       operations coverage with limits of $3,000,000.

Additionally, Landlord shall keep or require its general contractor to keep in full force and effect a policy of builder's risk insurance covering loss or damage to the Shopping Center for the full replacement value of all such construction.  To the fullest extent Tenant has an insurable interest, such liability policy shall name Tenant an additional insured and such builder's risk policy shall name Tenant a loss payee.

(f)    Policy Provisions.   All policies of insurance (other than self-insurance) enumerated above shall be provided by insurance carriers with a Best rating of not less than B+VI.  Any insurance coverage enumerated above may be effected by a blanket policy or policies of insurance or under so-called "all risk" or "multi-peril" insurance policies, provided that the total amount of insurance available with respect to the Premises and Tenant's or Landlord's liability hereunder shall be at least the equivalent of separate policies in the amounts herein required, and provided further that in other respects any such policy or policies shall comply with the provisions of this paragraph 14.  Landlord shall not be entitled to self-insure against any of the risks recited herein, except the amount of any commercially reasonable deductible shall be deemed to be self-insurance.  An increased coverage or "umbrella" policy may be provided and utilized by either party to increase the coverage provided by individual or blanket policies in lower amounts, and the aggregate coverage provided by all such policies with respect to the Premises and Tenant's or Landlord's liability hereunder shall be satisfactory provided that such policies otherwise comply with the provisions of this paragraph 14.

(g)    Waiver of Right of Recovery and Subrogation.   To the extent that insurance proceeds are actually received in satisfaction of a loss which is required to be covered by insurance or is self-insured hereunder (with the deductible under any policy being deemed to be self-insured), Landlord and Tenant each hereby waives any and all rights of recovery against the other for any loss or damage

MWBB 12/5/95

7716U:\1097\Circuit\midatl\rockv\lease.012

to the Premises or the contents contained therein, for loss of income on account of fire or other casualty to the Premises or other improvements within the Shopping Center, or for injury sustained on the Premises or the Common Areas; and each party's aforesaid policies of insurance shall contain appropriate provisions recognizing this mutual release and waiving all rights of subrogation by the respective insurance carriers.

(h) <u>Evidence of Insurance</u>.  Subject to Tenant's right to self-insure hereunder, upon (i) commencement of the Main Term (as to property insurance), (ii) upon delivery of the Land (as to liability insurance) and (iii) no less than annually thereafter, Tenant and Landlord shall cause to be issued to each other in lieu of the original policy, a duplicate of such policy or appropriate certificates of insurance reasonably acceptable to the other party and evidencing compliance with the applicable covenants of this paragraph 14.  Each such certificate shall provide that no expiration, cancellation or material change in the insurance evidenced thereby shall be effective unless thirty (30) days' unconditional notice of such expiration, cancellation or material change shall have been given to the certificate-holder (and any Mortgagee, if applicable).

(i) <u>Indemnities</u>.  Subject to the provisions of subparagraph (g) above, each party (in the capacity of "Indemnitor") shall indemnify the other, its agents, contractors, employees (in the capacity of "Indemnitee") and save the Indemnitee harmless from and against any and all claims, actions, damages, liability and expense in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in, upon or at the Premises (in the case of Tenant), or in other portions of the Shopping Center or the Common Areas (in the case of Landlord), or the occupancy or use by Indemnitor of the Premises or any part thereof, (in the case of Tenant), or in other portions of the Shopping Center or the Common Areas (in the case of Landlord) or occasioned wholly or in part by the default under this Lease or any act or omission of Indemnitor, its agents, contractors and employees. In case the Indemnitee shall, without fault on its part, be made a party to any litigation commenced by or against Indemnitor, then Indemnitor shall protect and hold the Indemnitee harmless and shall pay all costs, expenses and reasonable attorney's fees incurred or paid by the Indemnitee in connection with such litigation.  Indemnitor shall also pay all costs, expenses and reasonable attorney's fees that may be incurred or paid by Indemnitee in enforcing the covenants and agreements in this Lease.

15.    <u>Damages by Fire or Other Casualty</u>.

(a) <u>Damages for which Tenant May Not Terminate</u>.  In the event of a fire, earthquake or other casualty, causing destruction or damage to the Improvements, Common Areas and/or Additional Areas occurring before the last five (excluding any unexercised renewal option) Lease Years, this Lease shall not terminate except as expressly set forth herein, and Base Rent and other charges shall continue

to be paid by Tenant pursuant to the terms of paragraph 4 hereof. Within a reasonable time after such casualty, subject to force majeure, applicable building codes, the procurement of building permits to the extent of the damage to the Premises, or the Common Areas or Additional Areas, as applicable, Tenant shall complete reconstruction of the Building and Other Improvements, and Landlord shall complete reconstruction of the Common Areas and Additional Areas (including substantially equivalent value in equipment, furniture and fixtures), to that condition existing immediately prior to such casualty, in the reconstructing party's reasonable discretion, with, in event of any Tenant reconstruction, such alterations as may be permitted under paragraph 12 hereof. In the event, subject to force majeure, the Premises, Common Areas and/or Additional Areas, as applicable, are not substantially repaired and reconstructed, and equipment, furniture and fixtures restored or replaced, by the party with repair and restoration obligations within two hundred forty (240) days after receipt of any required governmental permits, for which permits the party with repair obligations shall make prompt application following such destruction or damage, then the other party, at its option, by giving written notice to the party with repair obligations, within thirty (30) days after the expiration of said period, may undertake completion of such reconstruction, in which event the party with repair obligations shall make available to the notifying party all applicable insurance proceeds for such reconstruction (including any applicable deductible) or, if self-insured, the amount necessary for such reconstruction. There shall be no rent abatement as a result of casualty damage to the Premises.

(b)    Other Casualty Damage. In the event of a fire, earthquake or other casualty, occurring within the last five Lease Years (excluding any unexercised renewal options) causing destruction or damage to the Improvements, Common Areas and/or Additional Areas, which has a repair and reconstruction cost of fifty percent (50%) or more of the then-total reconstruction cost of any of said areas, or in the event of any uninsured casualty materially adversely affecting Tenant's ability to operate its business at the Premises, Tenant shall have the option of terminating this Lease. Tenant shall notify Landlord of its exercise of such option within sixty (60) days following the occurrence of such casualty and shall thereupon make available to Landlord all reconstruction costs as set forth in subparagraph (a) above. In the event Tenant does not elect to terminate this Lease as set forth above, then, subject to force majeure, within two hundred forty (240) days after receipt by Tenant of the required governmental permits for restoration, for which permits Tenant shall make prompt application following such destruction or damage, and Tenant shall complete reconstruction of the Improvements to their condition existing immediately prior to such damage, in Tenant's reasonable discretion, with such alterations as may be permitted under paragraph 12, and shall restore the Premises (including equipment, furniture and fixtures). Should Tenant elect to maintain this Lease in full force and effect, Landlord shall reconstruct

all Common Areas and Additional Areas in the manner specified by subparagraph (a) above regardless of the amount of damage to same. Additionally, Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center leased to third party tenants or sold to third party occupants are subject to substantially similar reconstruction obligations to those of the Premises, Common Areas and Additional Areas, such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever, in the event Tenant elects to maintain this Lease in force, Tenant shall be assured that the Shopping Center as a whole will be reconstructed in accordance with this paragraph 15.

(c)    Lease Continuation. In the event of total or partial destruction of the Premises, for any reason whatsoever, the obligations and rights of Landlord and Tenant shall be governed by the terms of this Lease. In the event that any law or statute, present or future, provides different rights or obligations, the terms of this Lease shall control to the extent permitted by law.

16.    Condemnation.

(a)    Definition of Taking and Substantial Taking. For the purpose of this Lease, a "Taking" shall mean any condemnation or exercise of the power of eminent domain by any authority vested with such power or any other taking for public use, including a private purchase in lieu of condemnation by an authority vested with the power of eminent domain; the "Date of Taking" shall mean the earlier of the date upon which title to the Premises, the Shopping Center or any portion thereof so taken is vested in the condemning authority or the date upon which possession of the Premises, the Shopping Center, or any portion thereof is taken by the condemning authority; and "Substantially All of the Premises" shall mean (i) so much of the Improvements are when taken, leaves the untaken portion unsuitable, in Tenant's reasonable opinion, for the continued feasible and economic operation of the Premises by Tenant for the same purposes as immediately prior to such Taking or as contemplated herein, (ii) any portion of the area identified as the "No-Take Area" on Exhibit "A" is taken. or (iii) so many of the parking spaces within the Shopping Center as reduces the parking ratio below the greater of four (4.0) spaces (for full-sized automobiles) per 1000 square feet of ground-floor gross leasable area or that ratio which is required by the zoning ordinance applicable to the Shopping Center, and Landlord's failure to provide substantially equivalent alternative parking reasonably acceptable to Tenant within sixty (60) days after such Taking.

(b)    Tenant's Rights Upon Taking or Substantial Taking. In the event of a Taking of Substantially All of the Premises, Tenant, at its option upon thirty (30) days' written notice to Landlord, which shall be given no later than sixty (60) days following the Taking, shall have the right to terminate this Lease. All Base Rent and other sums payable by Tenant hereunder shall be apportioned and paid

MWBB 12/5/95

7716U:\1097\Circuit\midatl\rockv\lease.012

through and including the Date of Taking, and neither Landlord nor Tenant shall have any rights in any compensation or damages payable to the other in connection with such Taking.

(c)    Tenant's Rights Upon Less Than Substantial Taking.    In the event of a Taking of less than Substantially All of the Premises, Base Rent and other charges shall be reduced fairly and equitably in accordance with the portion condemned or taken, effective as of the Date of Taking, and Tenant shall make all necessary restorations to the Improvements so that the portions of the Improvements not taken constitute a complete architectural unit, provided that the cost thereof to Tenant shall not exceed the proceeds of Tenant's condemnation award (to the extent that such relates to the Improvements and not to Tenant's personal property, intangibles or out-of-pocket expenses unrelated thereto) and the portion of Landlord's award allocable to the Improvements, which Landlord shall make available to Tenant for such restoration.    If the Taking occurs within the last two (2) years of the Main Term or of any Option Period and has a material impact on Tenant's ability to conduct business as reasonably determined by Tenant, this Lease shall terminate at Tenant's option, such option to be exercised by Tenant giving not less than thirty (30) days' prior written notice to Landlord.

(d)    Landlord's Obligations Upon Any Taking.    In the event of any Taking following which the Lease continues in effect, Landlord shall make all necessary restorations to all portions of the Common Areas and Additional Areas such that they each constitute a complete architectural unit and serve the function originally intended.    Additionally, Landlord shall assure (with respect to areas controlled by Landlord, and, with respect to other areas, shall use diligent efforts, consistent with first class shopping center management standards, to ensure through parallel lease provisions or otherwise) that all areas of the Shopping Center leased to third party tenants or sold to third party occupants are subject to substantially similar reconstruction obligations to those of the Premises, Common Areas and Additional Areas, such that in the event of any condemnation of any portion of the Shopping Center whatsoever, and in the event Tenant elects to maintain this Lease in force, Tenant shall be assured that the Shopping Center will be reconstructed to its former condition within reasonable time.

(e)    Taking of the Pylon and/or Monument Sign(s).    The provisions of this subparagraph (e) shall apply only if Tenant has installed its sign panel on a pylon and/or monument sign on the monument sign for the Shopping Center.    In the event of a taking, whether permanent or temporary, of any pylon and/or monument sign (as contemplated by paragraph 8) on which Tenant has installed identification panels, Landlord, upon obtaining any necessary governmental permits, which Landlord shall use all reasonable efforts to obtain, shall provide a substitute site (reasonably acceptable to Tenant) therefor, with adequate electrical power, located so as to be visible to vehicular traffic or

MWBB 12/5/95

7716U:\1097\Circuit\midatl\rockv\lease.012

roadways adjacent to the Shopping Center and/or at entrances to the Shopping Center, and Landlord shall replace and/or rebuild any of such signage so taken at its sole cost.

      (f)    Tenant's Right Upon Condemnation.  In the event of a Taking described in subparagraph (b) or (c) above, Tenant shall be entitled to claim compensation from the condemning authority for the value of its leasehold interest in the Premises, its unamortized leasehold improvements paid for by Tenant, relocation expenses and any other items to which Tenant is entitled under applicable law.

      17.    Assignment and Subletting.  Tenant shall serve written notice (an "Assignment Notice") upon Landlord of Tenant's intent to assign this Lease, or of Tenant's intent to sublease space (excluding the Shop Space) within the Premises that would result in more than one-half of the gross leasable area of the Premises' being subleased, which notice shall be accompanied by Tenant's representation of the amount expended by Tenant for any leasehold improvements at the Premises (which notice shall contain backup information in reasonable detail, which shall be subject to audit by Landlord) to the extent that the same (i) are not incurred for Tenant's interior finishes (such as floor and wall coverings) or trade fixtures, (ii) have not been reimbursed by Landlord, and (iii) have not been fully amortized on Tenant's books and records (the same being Tenant's "unamortized improvements" for purposes of this provision). Tenant's Assignment Notice shall also include the name of the proposed assignee or subtenant with respect to which the Assignment Notice is given, and shall include the use to which such assignee or subtenant intends to put the Premises, to the extent known by Tenant and copies of all subleases then in existence. Tenant shall not modify any subleases affecting the Premises after the date Tenant serves an Assignment Notice unless Landlord does not exercise its right to terminate this Lease in response to such notice. Landlord may terminate this Lease by serving written notice upon Tenant, within fifteen (15) days of the service of an Assignment Notice, of Landlord's election to so terminate this Lease. If Landlord serves written notice to Tenant of Landlord's election to terminate this Lease, this Lease shall terminate and neither party shall have any further right or obligation hereunder except for indemnification obligations and other rights and obligations accrued at the time of such termination and Tenant shall have vacated and left the Premises in the condition required by this Lease. The effective date of such termination shall be the 60th day after Landlord serves its notice of election to terminate. By such 60th day, Landlord shall pay for Tenant's unamortized improvements and Tenant shall have vacated and left the Premises in the condition required by this Lease. Subject to the foregoing, Tenant shall have the right to sublet, assign, transfer reassign and grant concessions or licenses (a "Transfer") in all or any part of the Premises and any of Tenant's rights and obligations under this Lease during the Term, without Landlord's prior consent, but Tenant may assign this Lease (or sublease space in the Premises that results

in more than one-half of the gross leasable area of the Premises' being subleased) only to a party with respect to which Tenant shall have served notice as provided above. In the event of such a Transfer, Tenant shall remain liable for all of Tenant's obligations to Landlord arising hereunder except to the extent that this Lease is changed, modified or amended in any respect by Landlord and any transferee. Transfers to subsidiaries, affiliates, or related parties, and transfers involving beneficial ownership interests in the Tenant, shall not be deemed a "Transfer" hereunder and same may be effected without Landlord's knowledge or consent. If Tenant is not publicly traded corporation, the transfer of the control of Tenant (by the transfer of voting securities of Tenant or by contract) shall be deemed a "Transfer" for purposes hereof. Any assignment or subletting of this Lease by Tenant shall be executed by Tenant and the assignee or sublessee. Each assignee, for the benefit of Landlord, shall agree, from and after the date of the assignment, to assume, be bound by, and perform all terms, covenants, and conditions of this Lease to be kept and performed by Tenant. If Landlord terminates this Lease upon the Tenant's service of an Assignment Notice relating to the proposed sublease affecting the Premises (as opposed to a proposed assignment of this Lease) Landlord's termination will apply to the Lease as a whole, and not in part, and Landlord shall, before such termination becomes effective, execute a non-disturbance agreement in favor of any sublessees under subleases at the Premises in existence as the date of Tenant's Assignment Notice, pursuant to which the Landlord agrees not disturb possession of such sublessees under their respective subleases unless and until such subleases become terminable as a result of the default of the subleases thereunder. For purposes of this paragraph 17, any license or concession with respect to the Premises pursuant to which a separate exterior entrance is created shall be deemed a "sublease" herein. After execution of any assignment or sublease, Tenant will forward a completed copy thereof to Landlord.

     18.   <u>Use</u>.

     (a)   <u>Initial Use</u>. Tenant shall initially maintain, use and operate the Premises, except for the Shop Space, as a retail store for (i) the sale of consumer, office and automotive electronics products (which include, but shall not be limited to, televisions, stereos, speakers and video recorders and players), computer hardware and software, entertainment software and entertainment media (which include, but shall not be limited to, records, game cartridges, video tapes, cassettes and compact discs), cellular telephones, household appliances (which include, but shall not be limited to, refrigerators, freezers, stoves, microwave ovens, vacuum cleaners and dishwashers) and related goods and the sale and installation of motor vehicle audio, stereo and telephone systems (all of such items being herein collectively referred to as the "Products," and all of the Products other than music software, entertainment

MWBB 12/5/95

7716U:\1097\Circuit\midat\rockv\lease.012

software and computer software being hereinafter referred to as the "Exclusive Products"), and (ii) renting, servicing, repairing and warehousing of the Products.

(b)    Subsequent Use.  Thereafter, Tenant shall have the right to use the Premises for any lawful retail use; provided, however, that the Premises shall not be used (i) for any illegal purpose, (ii) for any use prohibited under paragraph 19(a)(vi) below, (iii) in violation of any exclusive use restriction granted a tenant or other occupant of the Shopping Center pursuant to a lease or restrictive covenants executed prior to this Lease and shown on Exhibit "F", (iv) in violation of any other applicable provision of the "Permitted Encumbrances" contained in Exhibit "F," or (v) in violation of the restrictions set forth on Exhibit "F-1," which constitutes a list of "exclusive uses" that Landlord reserves the right to grant to future occupants at the Shopping Center.  Notwithstanding the foregoing, (x) if any tenant or other occupant that is the beneficiary of an exclusive use restriction described on Exhibit "F" ceases to use its premises for such use (or any portion of such use) for a period of one year (except as a result of casualty) consecutively, Tenant shall cease to be prevented from using the Premises for such use (or portion of such use), and (y) if Tenant commences use of the Premises for any of the uses listed on Exhibit "F-1" with respect to which Landlord has reserved the right to grant an "exclusive use" to future occupants at the Shopping Center before Landlord has entered into a lease (or operating agreement) granting such "exclusive use" to any such tenant or occupant, Tenant shall cease to be prevented from using the Premises for such use.

(c)    Opening Covenants; No Operating Covenant.  Promptly after Substantial Completion, Tenant agrees to open its fully staffed, fixtured and stocked store.  Nothing contained in this Lease shall be construed to require Tenant to operate the Premises continuously either for the use first stated or for any other use.  Upon Tenant's cessation of operation at the Premises for a consecutive period of one year or more, Landlord may serve written notice (an "Operation Recapture Notice") upon Tenant requesting Tenant's Operation Recapture Response, as defined below; provided, however, that Landlord may in no event serve an Operation Recapture Notice within one year of Tenant's service of an Assignment Notice pursuant to paragraph 17 above.  Within fifteen (15) business days of Landlord's service of an Operation Recapture Notice, Tenant shall serve a written notice (an "Operation Recapture Response") upon Landlord containing Tenant's representation of the amount expended by Tenant for any leasehold improvements at the Premises (which notice shall contain backup information in reasonable detail, which shall be subject to audit by Landlord) to the extent that the same (i) are not incurred for Tenant's interior finishes (such as floor and wall coverings) or trade fixtures, (ii) have not been reimbursed by Landlord, and (iii) have not been amortized  on Tenant's books and records (the same being Tenant's "unamortized improvements" for purposes of this provision).  Within fifteen (15) days

MWBB 12/5/95

7716U:\1097\Circuit\midatl\rockv\lease.012

of the service of Tenant's Operation Recapture Response, Landlord may terminate this Lease by delivering to Tenant Landlord's notice of its election to so terminate this Lease.  If Landlord serves written notice to Tenant of Landlord's election to terminate this Lease, this Lease shall terminate and neither party shall have any further right or obligation hereunder except for indemnification obligations and other rights and obligations accrued at the time of such termination.  The effective date of such termination shall be the 60th day after Landlord serves its notice of election to terminate.  By such 60th day, Landlord shall pay for Tenant's unamortized improvements and Tenant shall have vacated and left the Premises in the condition required under the Lease.

      19.    <u>Covenants, Warranties and Representations</u>.

      (a)    <u>Landlord's Covenants</u>.  Landlord covenants to Tenant that:

      (i)    Landlord and those persons executing this Lease on its behalf have the right and lawful authority to enter into this Lease and perform Landlord's obligations hereunder, and Landlord covenants that, so long as Tenant is not in default hereunder beyond any applicable cure period, Tenant shall have quiet and peaceful use, enjoyment and occupancy of the Premises.

      (ii)    Except for any Mortgage pursuant to which Tenant has received nondisturbance in accordance with paragraph 21 below, Landlord's fee simple interest in the Shopping Center will, as of the date of delivery of the Land, be free and clear of any mortgages, deeds, encumbrances, declarations, easements, agreements, leases, tenancies or restrictions, except the REA and those matters set forth on <u>Exhibit "F"</u> attached hereto and entitled "Permitted Encumbrances", or any other encumbrances which would restrict Tenant's use of the Premises for the sale of Products or would restrict in any respect the right of Tenant, its employees, customers and invitees to use the Common Areas in accordance with the terms of this Lease.  Nothing contained in this Lease, including the Permitted Encumbrances and other matters disclosed on <u>Exhibit "F"</u>, shall restrict Tenant's rights under this Lease, including but not limited to the right to operate its business in the Premises.  Landlord specifically covenants that no third party, including but not limited to any other occupant of the Shopping Center, has the right to object to Tenant's tenancy hereunder, prohibit the selling, renting, servicing, repairing or warehousing of the Products, or the right to consent to any feature of the Improvements or Tenant's signage.  This covenant is a material inducement to the Tenant's execution of this Lease.

      (iii)    Landlord covenants that it is a duly constituted limited partnership under the laws of the State of Maryland, and that its general partner who is acting as its signatory in this Lease is duly authorized and empowered to act for and on behalf of the partnership.  Landlord has furnished Tenant prior hereto with evidence of (a) the existence of the partnership, and (b) the authority of the general partner to bind the limited partnership as contemplated herein.

(iv)   There are no judicial, quasi-judicial, administrative or other orders, injunctions, moratoria or pending proceedings against Landlord or the Shopping Center which preclude or interfere with, or would preclude or interfere with, the construction contemplated in paragraph 2 hereof or the occupancy and use of the Premises for the purposes herein contemplated.

(v)   So long as the Premises are used for the initial uses set forth in paragraph 18, Landlord shall use diligent efforts, consistent with first class shopping center management standards, to ensure that no other tenant or occupant of the Shopping Center shall sell or rent (or rent to own) any of the Exclusive Products, subject only to rights granted any such tenants under existing or proposed leases described on <u>Exhibit "F"</u>. Upon Tenant's failure to use the Premises for the sale or display of any Exclusive Product for a period of one year consecutively (except for any lapse in such use as a result of condemnation or casualty), Landlord's obligation hereunder to prevent the use of the remainder of the Shopping Center for the sale or rental of such Exclusive Product shall terminate. The foregoing restriction shall not be deemed to prevent any sale or display of one or more Exclusive Products by any tenant or other occupant at the Shopping Center so long as such tenant or other occupant use no more than the lesser of ten percent (10%) or 2500 square feet, in the aggregate, of its gross leasable area for the sale or display of Exclusive Products.

(vi)   Landlord shall not operate or lease (and shall use diligent efforts, consistent with first class shopping center management standards, to ensure that no other tenant or occupant of the Shopping Center shall operate or lease) any building or tenant space in the Shopping Center for use as:

(A) a bar, pub, nightclub, music hall or disco in which less than fifty percent (50%) of its space or revenue is devoted to and derived from food service;

(B) a bowling alley;

(C) a billiard or bingo parlor;

(D) a flea market;

(E) a massage parlor;

(F) a funeral home;

(G) a facility for the sale of paraphernalia for use with illicit drugs;

(H) a facility for the sale or display of pornographic material (as determined by community standards for the area in which the Shopping Center is located);

(I) an off-track betting parlor;

(J) a carnival, amusement park or circus;

MWBB 12/5/95
7716U:\1097\Circuit\midad\rockv\lease.012

(K) a gas station, car wash or auto repair or body shop (the parties specifically acknowledging that Tenant's car stereo installation facility is not included in this prohibition (K));

(L) a facility for the sale of new or used motor vehicles, trailers or mobile homes;

(M) a facility for any use which is illegal or dangerous, constitutes a nuisance or is inconsistent with an integrated, community-oriented retail and commercial shopping center;

(N) a skating rink;

(O) an arcade, pinball or computer gameroom (provided that retail facilities in the Shopping Center may operate no more than four (4) such electronic games incidentally to their primary operations);

(P) service-oriented offices (such as, by way of example, medical or employment offices, travel agencies, real estate agencies or dry cleaning establishments) or other nonretail uses except for offices and storage facilities incidental to a primary retail operation or service-oriented office space within the area designated as "Office Area" on Exhibit "A" attached hereto;

(Q) a banquet hall, auditorium or other place of public assembly;

(R) a training or educational facility (including, without limitation, a beauty school, barber college, reading room, school or other facility catering primarily to students or trainees rather than customers);

(S) a theater of any kind;

(T) a gymnasium, sport or health club or spa;

(U) a restaurant (except in areas shown to be used for restaurants currently on the Site Plan); or

(V) any auction, fire or going-out-of-business sale.

(vii)    With regard to the development of the Shopping Center and the uses and operations of the Common Areas, Landlord makes the following covenants (the "Site Covenants"):

(A)    Building Height and Location.    No building within the area delineated on the Site Plan as the "Adjacent Area" shall exceed twenty-eight (28) feet in height above the finished grade of the Premises at Tenant's Building, nor shall any such building be positioned so as to project beyond the line, as extended, of the front wall of the Building. No outparcels, barriers, buildings, kiosks or other structures, either temporary or permanent, shall be located within Tenant's Preferred Area, and except to the extent presently existing buildings exceed such limitations, no building located on an outparcel as designated on the Site Plan elsewhere in the Shopping Center shall exceed one story,

MWBB 12/5/95

7716U:\1097\Circuit\midatl\rocky\lease.012

twenty-three (23) feet in height, nor shall it exceed the size necessary for such outparcel to maintain, within its boundaries, the parking ratio required for its use under the applicable zoning code without use of parking spaces located in the Common Areas.  Landlord shall, however, be entitled to construct buildings within the Permissible Building Area subject to the other limitations set forth hereby.  No other development shall occur within the Shopping Center except as shown on the Site Plan.

(B)    Construction and Alterations.  Following the end of the first Lease Year, no construction shall be permitted in the Shopping Center during the months of October, November and December, except for interior alterations not affecting the operations of any other occupant of the Shopping Center and except for emergency repairs.  In the event of any construction within the Shopping Center, Landlord shall designate a construction access route, staging and parking areas located so as to minimize interference with customers or the operations of other occupants of the Shopping Center and shall require erection of safety barriers as necessary and an opaque wall around the site of such construction of a size necessary to screen such construction from ground level view.  With regard to any construction on Landlord's Premises, Landlord shall be solely responsible for any governmentally imposed impact fees, hook-up, connection, installation or tap-in fees and other, similar construction-related charges.  Landlord shall make no changes in the Common Areas (including, without limitation, changes in the location of curbcuts, drive aisles, roadways, sidewalks or parking spaces or reduction of the parking ratio specified in paragraph 5) without Tenant's express written consent, which Tenant may, in its sole discretion, withhold.

(C)    Prohibited Uses in Common Areas.  Landlord covenants that it shall not, without Tenant's express written consent, permit the following uses or activities to occur in the Common Areas:  (1) advertisements or signs except for any pylon and/or monument signs described in paragraph 8, the "for rent" signs described in paragraph 27 and traffic control signs; (2) display or sale of merchandise; (3) operation of loudspeakers or other sound electronically amplified so as to be heard in the Common Areas; or (4) imposition of a charge for parking.  Landlord further covenants that it will not seek, nor permit any other occupant of the Shopping Center to seek, a variance or waiver from the minimum parking requirements applicable to the Shopping Center under the zoning code or other applicable ordinance establishing the ratio of parking spaces to building area or otherwise mandating the number of parking spaces required for the Shopping Center and the uses contained therein.

(D)    Easements.  Landlord shall not subdivide, parcel or otherwise divide the Shopping Center or create any easements in the Common Areas without Tenant's prior written consent.

(E)    Customer Pick-Up. Landlord shall erect and maintain signs at the location of the spaces delineated on the Site Plan as the "CPU Spaces" identifying such spaces as "Customer Pick-Up Spaces."

(viii)    Landlord shall promptly forward to Tenant any notice or other communication affecting the Premises or the Shopping Center received by Landlord from any owner of property adjoining, adjacent or nearby to the Premises or the Shopping Center or from any municipal or governmental authority, in connection with any hearing or other administrative procedure relating to the use or occupancy of the Premises, Shopping Center or any such neighboring property.

(ix)    Landlord covenants that all sums paid by Tenant to Landlord and intended for payment by Landlord to a third party (such as, by way of example, taxes and certain elements of CAM Charges) are given to Landlord in trust and shall be applied only for such third-party payments, as and when due.  The foregoing provision shall not be deemed to impose any fiduciary obligations upon Landlord with respect to the handling or accounting for such funds.

(b)    Tenant's Covenants.  Tenant covenants to Landlord that Tenant is a duly constituted corporation organized under the laws of the Commonwealth of Virginia; it has the power to enter into this Lease and perform Tenant's obligations hereunder; and the Vice President executing this Lease on Tenant's behalf has the right and lawful authority to do so.

(c)    Inhibition of Use.  In the event there is a condition at variance with the foregoing covenants of Landlord with respect to the Premises or the Shopping Center which prevents or in any material way inhibits the use of the Premises or any part thereof or the Common Areas for their intended purposes by Tenant or Tenant's employees, licensees, agents, suppliers, customers or invitees, or if Landlord shall default in the observance or performance of any of the foregoing covenants, then, in addition to such other remedies as may be accorded Tenant at law, in equity or under the terms of this Lease, Tenant may, in addition to its other remedies under this Lease, after thirty (30) days' notice to Landlord, obtain an injunction or writ of specific performance to enforce such term or covenant, the parties hereby acknowledging the inadequacy of Tenant's legal remedy and the irreparable harm which would be caused to Tenant by any such variance or default.

20.    Estoppel Certificates.  Without charge, at any time and from time to time hereafter, within thirty (30) days after receipt of written request by either party, the other party shall certify, by written and duly executed instrument, to any other entity ("Person") specified in such request:  (a) as to

whether this Lease has been supplemented or amended, and, if so, the substance and manner of such supplement or amendment; (b) as to the validity, force and effect of this Lease, to the certifying party's best knowledge; (c) as to the existence of any default hereunder, to the certifying party's best knowledge; (d) as to the existence of any offsets, counterclaims, or defenses hereto on the part of such other party, to the certifying party's best knowledge; (e) as to the commencement and expiration dates of the Term; and (f) as to any other matters which may reasonably be so requested. Any such certificate may be relied upon by the party requesting it and any Person to whom the same may be exhibited or delivered, and the contents of such certificate shall be binding on the party executing same.

21.    <u>Subordination, Non-Disturbance and Attornment</u>.  Landlord shall deliver to Tenant with regard to any and all Ground Leases (as defined below) and any and all Mortgages (as defined below) (except those removed or released of record before April 30, 1996) encumbering the Premises and placed thereon by Landlord, a subordination non-disturbance and attornment agreement in the form of <u>Exhibit "G"</u> hereto attached, executed by the Landlord under any such Ground Lease ("Ground Lessor") or the holder of such Mortgage ("Mortgagee"), as applicable or in such other form as may be mutually agreeable to the Mortgagee or Ground Lessor, as applicable and the Tenant.  In addition, throughout the term, Landlord shall deliver to Tenant a subordination non-disturbance and attornment agreement in the form of <u>Exhibit "G"</u> executed by Ground Lessor or Mortgagee (as applicable) with regard to all future Ground Leases and Mortgages and with regard to all renewals, modifications, replacements and extensions of such Ground Leases or Mortgages or in such other form as may be mutually agreeable to the Mortgagee or Ground Lessor, as applicable and the Tenant.  Upon Tenant's receipt of the non-disturbance and attornment agreement, this Lease shall be subordinate to the corresponding Ground Lease or Mortgage and Tenant shall execute and deliver a Subordination, Non-disturbance and Attornment Agreement in the form of <u>Exhibit "G"</u> within ten (10) days of Landlord's request therefor.  Should any holder of an existing Mortgage request that this Lease be made superior, rather than subordinate, to such Mortgage then Tenant, within ten (10) days following Landlord's written request therefor, agrees to execute and deliver, without charge, any and all documents necessary to effectuate such priority in a form reasonably acceptable to Tenant and the holder of such Mortgage.

Except as agreed by Tenant in an agreement executed subsequent to this Lease, in the event of a foreclosure of any Mortgage, Tenant shall attorn to a Mortgagee or any purchaser at a foreclosure sale (any such foreclosure, or deed in lieu thereof, shall be referred to as a "Foreclosure") of a Mortgage only if such Mortgagee or purchaser executes a writing in favor of Tenant which states the following (provided Tenant is not in uncured material default beyond the expiration of any applicable grace periods): (i) this Lease shall not terminate by reason of such Foreclosure, (ii) Tenant's possession of the Premises shall

not be disturbed, (iii) the Mortgagee or purchaser upon such Foreclosure shall recognize Tenant and all its rights hereunder and shall be obligated to fully and completely perform Landlord's duties and obligations under the lease arising from and after the date of such Foreclosure, including but not limited to an obligation to make all payments to Tenant and satisfy all construction obligations set forth in this Lease, (iv) Tenant shall not be named as a party in any action or foreclosure, and (v) the Mortgagee, whether or not the Mortgage is foreclosed, shall make all proceeds arising from a casualty or condemnation loss to the Premises available to Tenant for restoration of the Improvements in accordance with the terms hereof.  In the event of termination of the Ground Lease, Tenant shall attorn to any Ground Lessor from whom Tenant has received a non-disturbance agreement in accordance with this paragraph 21.

Landlord shall cause any present or future Mortgagee to deliver a Subordination Non-disturbance and Attornment Agreement in accordance with this paragraph 21 at or prior to the time which the lien of the Mortgage is filed against record title to the Premises, as set forth in paragraph 37 below.  Tenant shall execute a Subordination Non-disturbance and Attornment Agreement with any Lender or Ground Lessor in the form attached as Exhibit "G," or other form mutually acceptable to Tenant and such Lender, and, if requested by such lender or Ground Lessor, shall acknowledge in writing that this Lease has become subordinate to the lien of the Mortgage by operation of the provisions set forth above.  As used in this paragraph 21, the term "Mortgage" shall mean any mortgage, deed to secure debt, deed of trust, trust deed or other collateral conveyance of, or lien or encumbrance against, the Premises, and the term "Ground Lease" shall mean any ground lease or master lease affecting the Premises.

22.    Change of Landlord.  Subject to paragraph 21 above, in the event Landlord's interest in the Premises passes to a successor (the "Successor") by sale, lease, foreclosure or in any other manner, Tenant shall be bound to the Successor under all of the terms of this Lease for the balance of the Term with the same force and effect as if the Successor were the landlord under the Lease, and Tenant hereby agrees to attorn to the Successor as its Landlord, such attornment to be effective upon written notice thereof given by Landlord to Tenant.  In the event that Landlord's interest in the Premises passes to a Successor and such Successor is bound unto Tenant as set forth above, Landlord shall be released from all obligations to Tenant hereunder arising after the date Landlord's interest so passes, except that Landlord agrees to indemnify, defend and hold Tenant harmless from and against all costs, claims, loss, liability or damage suffered by Tenant as a result of Landlord's failure to provide Tenant with notice of Landlord's transfer of its interest in the Premises.

23.    Tenant's Financing.  Notwithstanding any other provisions of this Lease, Tenant may, without Landlord's consent, from time to time, secure financing or general credit lines and grant the

MWBB 12/5/95
7716U:\1097\Circuit\midatl\rockv\lease.012

lenders thereof, as security therefor, (i) a security interest in Tenant's fixtures, personalty, inventory and equipment (collectively, "Personalty"), (ii) the right to enter the Premises to realize upon any Personalty so pledged, and/or (iii) a collateral assignment of Tenant's leasehold interest in the Premises, with rights of reassignment; provided, however, such collateral assignment may be made solely for the purpose of securing Tenant's indebtedness.  Upon Tenant providing notice of such financing to Landlord, Landlord agrees to evidence its consent in writing to such security interest and agreement and to give such lenders the same notice and opportunity to cure any default of Tenant as is provided Tenant hereunder (including time to foreclose or otherwise take possession of the Premises, if necessary to effect such cure); provided the lender agrees: (a) to repair any damage occasioned by such removal at its sole cost and expense; (b) not to sell, auction or dispose of any collateral from the Premises; (c) that, after the Landlord has given lender written notice of the termination of Tenant's right to possession, lender shall diligently, within a reasonable period of time not to exceed fourteen (14) days, remove the collateral from the Premises; (d) to otherwise comply with the restrictions of the Lease, as modified herein, as they may apply to the collateral; and (e) that any improvements which are permanently attached to the Premises shall not be removed and shall not be deemed to be part of the collateral.  In addition, Landlord agrees to use all reasonable efforts (without the payment of any fee) to cause any Mortgagee specifically to acknowledge the rights of Tenant's lenders described herein and in paragraph 24 below.

24. Tenant's Property and Waiver of Landlord's Lien.  All of the Personalty shall be and remain the personal property of Tenant.  Landlord expressly waives its statutory or common law landlord's liens (as same may be enacted or may exist from time to time) and any and all rights granted under any present or future laws to levy or distrain for rent (whether in arrears or in advance) against the aforesaid property of Tenant on the Premises and further agrees to execute any reasonable instruments evidencing such waiver, at any time or times hereafter upon Tenant's request.

25. Memorandum of Lease; Commencement Date Agreement.  Landlord and Tenant agree, at the other's request and at the sole expense of the requesting party, to execute a Memorandum of Lease in recordable form, substantially similar to that attached hereto as Exhibit "H", setting forth such provisions hereof as may be required by State law.  In addition, Landlord and Tenant shall execute a Commencement Date Agreement in the form attached hereto as Exhibit "I", once the Commencement Date has been established.  Recording costs for either or both documents shall be borne by the party recording the same.  The provisions of this Lease shall control, however, with regard to any omissions from, or provisions hereof which may be in conflict with, the Memorandum of Lease or Commencement Date Agreement.

26.    <u>Expiration of Term and Holding Over</u>.  All of the Personalty shall be removable by Tenant any time prior to the expiration or earlier termination of this Lease and shall be so removed by Tenant at the request of Landlord by the expiration or termination of this Lease.  In the event Tenant fails to remove any or all of its Personalty by such date, Landlord may remove such Personalty, or the balance thereof, cause such Personalty to be placed into storage and thereafter charge Tenant the cost of such removal and storage, together with interest thereon at the Default Rate.  Those improvements that are integrated into the physical structure of the Building, except any of Tenant's trade fixtures, shall not be removed and shall become the property of Landlord.  (A nonexclusive list of Tenant's removable trade fixtures is attached hereto as <u>Exhibit "D"</u>.)  Tenant agrees promptly to repair any damage to the Premises occasioned by the removal of Tenant's trade fixtures, furnishings and equipment (except for small holes caused by nails, fasteners and the like) and to surrender the Premises broom clean, in as good condition as on the date of Tenant's opening for business therein, ordinary wear and tear, casualty and condemnation excepted.  Tenant agrees that at the expiration of this Lease, it will deliver to Landlord peaceable possession of the Premises.  No holding over by Tenant nor acceptance of Base Rent or other charges by Landlord shall operate as a renewal or extension of the Lease without the written consent of Landlord and Tenant. Should Tenant hold over without the written consent of Landlord, this Lease shall continue in force from month to month, subject to all of the provisions hereof and at one hundred fifty percent (150%) of the monthly Base Rent Tenant had been paying during the preceding Lease Year.

27.    <u>"For Rent" Signs</u>.  Tenant hereby permits Landlord during the last ninety (90) days of the Main Term or of any Option Period, as the case may be (provided that no applicable Renewal Option has been exercised or deemed exercised), to place one (1) "For Rent" or "For Sale" sign, not exceeding four (4) feet by four (4) feet in size, on the parking lot of the Shopping Center.  Tenant will also allow Landlord or its agents, upon prior written notice and accompanied by a representative of Tenant designated by Tenant, to show the Premises, exterior and interior, to prospective tenants, purchasers, or mortgagees during reasonable business hours by prior appointment, provided same does not interfere with the conduct of Tenant's business.

28.    <u>Force Majeure</u>.  Except as otherwise specifically contemplated in this Lease or in paragraph 4 of the Construction Provisions, in the event that Landlord or Tenant shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, delay by the other party, failure of power or unavailability of utilities, riots, insurrection, war or other reason of a like nature not the fault of such party or not within its control, then performance of such act shall be excused for the period of delay, and the period for the performance of any such act shall be extended for a period equivalent to the period of

MWBB 12/5/95

7716U:\1097\Circuit\midatl\rockv\lease.012

such delay; provided, however, that in connection with the construction of the Improvements, the consequences of delays by the other party shall be governed by paragraph 4 of the Construction Provisions. Lack of funds or financing shall under no circumstances excuse either party hereto for any failure or delay in performance hereunder; the provisions of this Paragraph shall not operate to excuse payment of any rent or other payments to be made pursuant to this Lease as provided herein. Neither party shall be entitled to claim or take advantage or seek benefits from any cause set forth in this paragraph 28 unless, within five (5) days after notice of default is served with respect to the failure or resulting from a delay for which excuse is available hereunder, the party failing in performance notifies the other thereof in writing.

29.   Events of Tenant's Default.

(a)   Failure to Pay Rent; Breach. (i) Tenant's failure to make any payment of money required by this Lease (including without limitation Base Rent, CAM Charges or Real Estate Taxes) (subject, with respect to items Tenant is specifically allowed to contest hereunder and which are actually being contested), within ten (10) days after the receipt of written notice from Landlord to Tenant that same is overdue; or

(b)   Bankruptcy. Tenant's adjudication as bankrupt or insolvent, or the appointment of a receiver, trustee in involuntary bankruptcy or other, similar officer to take charge of any substantial part of Tenant's property, which proceeding is not dismissed within one hundred twenty (120) days after it is begun.

30.   Landlord's Remedies.

(a)   Continue Lease. After the occurrence of an Event of Default by Tenant, Landlord may, at its option, continue this Lease in full force and effect, without terminating Tenant's right to possession of the Premises, in which event Landlord shall have the right to collect Base Rent and other charges when due, including any sums due for any Option Period for which a Renewal Option has been exercised. In the alternative, Landlord shall have the right to peaceably re-enter the Premises on the

terms set forth in subparagraph (b) below, without such re-entry being deemed a termination of the Lease or an acceptance by Landlord of a surrender thereof. Landlord shall also have the right, at its option, from time to time, without terminating this Lease, to relet the Premises, or any part thereof, with or without legal process, as the agent, and for the account, of Tenant upon such terms and conditions as Landlord may deem advisable, in which event the rents received on such reletting shall be applied (i) first to the reasonable and actual expenses of such reletting and collection, including without limitation necessary renovation and alterations of the Premises, reasonable and actual attorneys' fees and any reasonable and actual real estate commissions paid, and (ii) thereafter toward payment of all sums due or to become due Landlord hereunder. If a sufficient amount to pay such expenses and sums shall not be realized or secured, in Landlord's exercise of reasonable efforts to mitigate its damages (which Landlord hereby agrees to make), then Tenant shall pay Landlord any such deficiency monthly, and Landlord may bring an action therefor as such monthly deficiency shall arise. Landlord shall not, in any event, be required to pay Tenant any sums received by Landlord on a reletting of the Premises in excess of the rent provided in this Lease, but such excess shall reduce any accrued present or future obligations of Tenant hereunder. Landlord's re-entry and reletting of the Premises without termination of this Lease shall not preclude Landlord from subsequently terminating this Lease as set forth below.

(b)    Terminate Lease. After the occurrence of an Event of Default by Tenant, Landlord may terminate this Lease by written notice to Tenant specifying a date therefor, which shall be no sooner than thirty (30) days following receipt of such notice by Tenant, and this Lease shall then terminate on the date so specified as if such date had been originally fixed as the expiration date of the Term. In the event of such termination, Landlord shall be entitled to recover from Tenant all of the following:

(i)    The "worth at the time of the award" (defined below) of any obligation which has accrued prior to the date of termination; and

(ii)    The "worth at the time of the award" of the amount by which the unpaid Base Rent and all other charges which would have accrued after termination until the original expiration date of the Term exceeds the amount of any sums which Landlord has (or Tenant proves that Landlord could have) received in mitigation. As used in this paragraph 30(b), the term, "worth at the time of the award", shall be computed by allowing simple interest at an accrual rate equal to the Default Rate for past due obligations, and applying a discount rate to net present value equal to the Discount Rate (as defined below) on anticipated future obligations, on the amount of the obligations payable on the date of such calculation. The "Discount Rate" shall at any time be an annual rate equal to the "discount rate" then most recently announced by the Board of Governors for the Federal Reserve Bank, plus four percent.

MWBB 12/5/95

7716U:\1097\Circuit\midatl\rockv\lease.012

In the event this Lease shall be terminated as provided above, by summary proceedings or otherwise, Landlord, its agents, servants or representatives may immediately or at any time thereafter peaceably re-enter and resume possession of the Premises and remove all persons and property therefrom, by summary dispossession proceedings. Landlord shall never be entitled to dispossess the Tenant of the Premises pursuant to any "lock-out" or other nonjudicial remedy.

(c)     Reimbursement of Landlord's Costs in Exercising Remedies. Regardless whether Landlord terminates this Lease for Tenant's default, Landlord may recover from Tenant, and Tenant shall pay to Landlord upon demand, such reasonable and actual expenses as Landlord may incur in recovering possession of the Premises, placing the same in good order and condition and repairing the same for reletting, and all other reasonable and actual expenses, commissions and charges incurred by Landlord in exercising any remedy provided herein or as a result of any Event of Default by Tenant hereunder (including without limitation attorneys' fees).

(d)     Remedies Are Cumulative. The various rights and remedies reserved to Landlord herein are cumulative, and Landlord may pursue any and all such rights and remedies (but no others), whether at the same time or otherwise (to the extent not inconsistent with specific provisions of this Lease).

(e)     Landlord's Right to Perform. In addition to the foregoing rights of Landlord, upon the occurrence of an Event of Default by Tenant hereunder, Landlord shall have the right (but not the obligation) (i) if no emergency exists, to perform the same after giving notice to Tenant; and (ii) in any emergency situation (i.e., a situation imposing imminent danger to persons or property), to perform the same immediately without notice or delay. For the purpose of rectifying Tenant's defaults as aforesaid, Landlord shall have the right to enter the Premises. Tenant shall, within thirty (30) days after written demand, reimburse Landlord as Additional Rent for the reasonable costs and expenses incurred by Landlord in rectifying Tenant's defaults as aforesaid, including reasonable attorneys' fees and interest at the Default Rate. Except for negligence by Landlord or Landlord's agents, employees, licensees or invitees, Landlord shall not be liable or in any way responsible for any loss, inconvenience, annoyance, or damage resulting to Tenant or anyone holding under Tenant for any action taken by Landlord pursuant to this Paragraph.

(f)     Injunctive Relief. In the event of a breach or threatened breach by Tenant of any of the covenants or provisions of this Lease, Landlord shall have the right of injunction.

(g)     Mitigation. Notwithstanding anything in the foregoing to the contrary, Landlord agrees that, in the event of a default by Tenant and its subsequent eviction from the Premises, Landlord shall use commercially reasonable efforts to mitigate its damages and relet the Premises, provided that

MWBB 12/5/95

7716U:\1097\Circuit\midatl\rockv\lease.012

Landlord shall not be obligated to give preference to the Premises over other vacant space in the Shopping Center. In the event of any litigation between the parties regarding mitigation, the burden of proof as to the reasonableness of Landlord's efforts shall be borne by Tenant. Notwithstanding anything in this Lease to the contrary, in no event shall Tenant ever be liable to Landlord for any speculative or consequential or punitive damages. Notwithstanding anything herein to the contrary, Landlord expressly waives its right to forcibly dispossess Tenant from the Premises, whether peaceably or otherwise, without judicial process, such that Landlord shall not be entitled to any "commercial lockout" or any other provisions of applicable law which permit landlords to dispossess tenants from commercial properties without the benefit of judicial review.

        (h)     <u>Bankruptcy</u>. Neither Tenant's interest in this Lease, nor any estate hereby created in Tenant nor any interest herein or therein shall pass to any trustee or receiver or assignee for the benefit of creditors or otherwise by operation of law except as may specifically be provided pursuant to the Federal Bankruptcy Code. In the event the interest or estate created in Tenant hereby shall be taken in execution or by other process of law or if Tenant is adjudicated insolvent by a Court of competent jurisdiction other than the United States Bankruptcy Court, or if a receiver or trustee of the property of Tenant shall be appointed by reason of the insolvency or inability of Tenant to pay its debts or if any assignment shall be made of all or any portion of the property of Tenant for the benefit of creditors, and the same is not vacated, set aside, dismissed, removed or terminated within one hundred twenty (120) days, then and in any such event, this Lease and all rights of Tenant hereunder shall automatically cease and terminate with the same force and effect as though the date of such event were the date originally set forth herein and fixed for the expiration of this Lease, and Tenant shall vacate and surrender the Premises. Upon the filing of a petition by or against Tenant under the Federal Bankruptcy Code, Tenant, as debtor and as debtor in possession, and any trustee who may be appointed agree as follows: (1) to perform each and every obligation of Tenant under this Lease until such time as this Lease is either rejected or assumed by order of the United States Bankruptcy Court or operation of law; and (2) to pay monthly in advance on the first day of each month as reasonable compensation for use and occupancy of the Premises an amount equal to the monthly rent and other charges otherwise due for such month pursuant to this Lease; and (3) to reject or assume this Lease within sixty (60) days of the filing of such petition under Chapter 7 of the Federal Bankruptcy Code or within one hundred twenty (120) days of the filing of a petition under any other Chapter; and (4) to give Landlord written notice of any proceeding relating to any assumption of this Lease as required by applicable law; and (5) to give written notice of any abandonment of the Premises as required by applicable law; and (6) to do all other things of benefit to Landlord otherwise required under the Federal Bankruptcy Code. No default of this Lease by Tenant,

either prior to or subsequent to the filing of such a petition, shall be deemed to have been waived unless expressly done so in writing by Landlord. It is understood and agreed that this is a Lease of real property in a shopping center as such a lease is described in Section 365(b)(3) of the Federal Bankruptcy Code. In addition to any other conditions or obligations imposed upon Tenant or its successor by this Lease in the event of assumption and/or assignment pursuant to this paragraph, the Tenant or its assignee shall: (1) cure any monetary defaults within not more than thirty (30) days of assumption and/or assignment; and (2) demonstrate in writing that it has sufficient background including, but not limited to, adequate retailing experience and financial ability, to operate a retail establishment out of the Premises in the manner contemplated in this Lease and meet all other reasonable criteria of Landlord as did Tenant upon execution of this Lease; and (4) keep the Premises, at all times, as a single store without any physical changes (unless in compliance with the applicable provisions of this Lease).

    31.    <u>Events of Landlord's Default; Tenant's Remedies</u>. Any of the following occurrences, conditions or acts by Landlord shall constitute an "Event of Default": (a) Landlord's failure to make any payments of money due Tenant hereunder within ten (10) days after the receipt of written notice from Tenant that same is overdue (in which event the delinquent amount shall accrue interest at the Default Rate); or (b) Landlord's failure to perform any nonmonetary obligation of Landlord hereunder within thirty (30) days after receipt of written notice from Tenant to Landlord specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Landlord shall have such longer period as may be reasonably necessary to cure the default, so long as Landlord proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion and provided further that in the case of an emergency, Tenant shall be required to give only such notice as is reasonable under the circumstances.

    Upon the occurrence of an Event of Default by Landlord, at Tenant's option, in addition to any and all other remedies which it may have at law and/or in equity, and without its actions being deemed an election of remedies or a cure of Landlord's default, Tenant may pay or perform such obligations and offset Tenant's reasonable and actual cost of performance, including any and all transaction costs and attorneys' fees, plus interest at the Default Rate, against the Base Rent, CAM Charges and any and all other amounts and charges due Landlord hereunder or sue for damages, including interest, transaction costs and attorneys' fees as specified above. If Landlord fails to pay Tenant the Tenant Improvement Allowance in a timely manner, Tenant shall be entitled to the rights and remedies set forth in the Construction Provisions in addition to those provided herein; and, as to a breach of the covenants contained in paragraph 19, Tenant shall be entitled to the remedies provided therein, in addition to those

remedies provided herein. All amounts, including interest, transaction costs and attorneys' fees, arising out of uncured defaults of Landlord shall constitute liens against Landlord's interest in the Shopping Center, which shall attach as of the date of such default (or, if a cure period is allowed for the cure of such default, the day after such cure period lapses, in the absence of cure), but which may be enforced only by judicial process available under State law. The various rights and remedies reserved to Tenant herein are cumulative, and Tenant may pursue any and all rights and remedies, whether at the same time or otherwise. Notwithstanding anything in this Lease to the contrary, in no event shall Landlord ever be liable to Tenant for any speculative or consequential or punitive damages.

    32.    <u>Waiver</u>. If either Landlord or Tenant fails to insist on the strict observance by the other of any provisions of this Lease, neither shall thereby be precluded from enforcing nor be held to have waived any of the obligations, past, present or future, of this Lease. Either party may accept late payment or performance by the other without waiving any Event of Default which may then have accrued.

    33.    <u>Compliance with Applicable Laws</u>. During the Term, Tenant shall comply with all lawful requirements of the local, county and state health boards, police and fire departments, municipal and state authorities and any other governmental authorities with jurisdiction over the Improvements, and of the board of fire underwriters, respecting Tenant's use and occupancy of the Improvements (collectively, "Legal Requirements"), all to the extent that such requirements relate to the interior nonstructural components of the Building or to the HVAC system or relate to the activities or operational practices of Tenant or its agents, employees, invitees or contractors. Tenant shall also comply with all Legal Requirements related to the use, handling or disposal of freon. During the Term, Landlord shall comply with all Legal Requirements other than those required to be complied with by Tenant as set forth above. Notwithstanding the foregoing, Landlord shall not be required to comply with any Legal Requirements for which it would otherwise be responsible, if the Legal Requirements have been imposed or are applicable as a result of Tenant's negligence, Tenant's particular and specific use of the Premises as distinguished from Legal Requirements applicable to retail use in general, Tenant's failure to make repairs required of Tenant hereunder, alterations or improvements made by Tenant, or as a result of Tenant's failure to comply with any of its obligations under this Lease. In the event that Tenant, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Landlord or any such authority ordering performance of any such work which Tenant is required to perform in order to remain in, or come into, compliance with any such Legal Requirement, fails to perform or diligently commence performance of same with reasonable promptness, Landlord may perform said work and collect the reasonable cost

thereof plus interest at the Default Rate from Tenant with the next installment or installments of Base Rent. In the event that Landlord, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Tenant or any such authority ordering performance of any such work which Landlord is required to perform in order to remain in, or come into, compliance with any such Legal Requirement, fails to perform or diligently commence performance of same with reasonable promptness, Tenant may perform said work and deduct the reasonable cost thereof plus interest at the Default Rate from Landlord with the next installment or installments of Base Rent.

34.    Notices.  Any notice permitted or required to be given pursuant to this Lease shall be deemed to have been given when received, or when receipt is refused, (or upon the day of attempted delivery upon the failure of delivery due to the party upon whom delivery is attempted but not being found) and shall be given by certified mail, postage prepaid, return receipt requested, or one (1) business day after sending by Federal Express or other comparable overnight express courier service (with proof of receipt available), addressed to the parties as follows:

If to Tenant:   CIRCUIT CITY STORES, INC.
       9950 Mayland Drive
       Richmond, Virginia 23233
       Attention:  Corporate Secretary

with a copy to:   CIRCUIT CITY STORES, INC.
       9950 Mayland Drive
       Richmond, Virginia 23233
       Attention:  Vice President of Real Estate

If to Landlord:   CONGRESSIONAL NORTH ASSOCIATES
       c/o Ronald Cohen Management Company
       500 Rock Spring Drive, Suite 302
       Bethesda, Maryland 20817
       Attention:  Director, Property

with a copy to:   HIRSCHEL, SAVITZ, PARKER & HOLLMANN, P.A.
       481 N. Frederick Avenue, Suite 200
       Gaithersburg, MD  20877
       Attention:  Mr. Ron Hirschel

or to such other addressees as any party hereto shall from time to time give notice to the other party in accordance with this paragraph.

35.    Brokers.  Landlord and Tenant each covenant that they have not dealt with any real estate broker or finder with respect to this Lease, except for Trout, Segall & Doyle, P.C. who shall be paid a

commission by Landlord pursuant to their separate written agreement. Except for the foregoing, each party shall hold the other party harmless from all damages, claims, liabilities or expenses, including reasonable and actual attorneys' fees (through all levels of proceedings), resulting from any claims that may be asserted against the other party by any real estate broker or finder with whom the indemnifying party either has or is purported to have dealt.

36.   Miscellaneous.

(a)   Headings and Gender.  All paragraph headings, titles or captions contained in this Lease are for convenience only and shall not be deemed a part of this Lease and shall not in any way limit or amplify the terms and provisions of this Lease.  The masculine, feminine or neuter gender and the singular or plural number shall be deemed to include the others whenever the context so requires or indicates.

(b)   Construction.  The parties hereto agree that all the provisions hereof are to be construed as covenants and agreements as though the words importing such covenants and agreements were used in each separate paragraph hereof.

(c)   Waiver of Jury Trial.  In the event of any court action arising out of this Lease, each party hereby expressly waives its right to trial by jury.

(d)   Relationship of Landlord-Tenant.   Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent, partnership, joint venture, or any other association between Landlord and Tenant other than the landlord-tenant relationship described herein.

(e)   Entire Agreement; Merger.  This Lease, including all exhibits hereto (which are hereby incorporated herein by reference for all purposes), contains the full and final agreement of every kind and nature whatsoever between the parties hereto concerning the subject matter of this Lease, and all preliminary negotiations and agreements of whatsoever kind or nature between Landlord and Tenant are merged herein.  This Lease cannot be changed or modified in any manner other than by a written amendment or modification executed by Landlord and Tenant.

(f)   Attorneys' Fees.  In the event either party shall be required to commence or defend any action or proceeding against any other party by reason of any breach or claimed breach of any provision of this Lease, to commence or defend any action or proceeding in any way connected with this Lease or to seek a judicial declaration of rights under this Lease, the party prevailing in such action or proceeding shall be entitled to recover from or to be reimbursed by the other party for the prevailing party's reasonable and actual attorneys' fees and costs through all levels of proceedings.

(g)     Partial Invalidity.  If any provision of this Lease or the application thereof to any person or circumstance shall be deemed invalid or unenforceable, the remainder of this Lease and its application to other persons or circumstances shall not be affected by such partial invalidity but shall be enforced to the fullest extent permitted by law as though such invalid or unenforceable provision was never a part hereof.

(h)     Consents.  Any consent or approval granted by either party hereunder shall be deemed a consent only as to the matter on which such consent was requested and shall not waive the consenting party's right to give or withhold consent to any subsequent matter.

(i)     Holidays.  If the day on which rent or any other payment due hereunder is payable falls on a Sunday or on a legal holiday, it shall be payable on the following business day.

(j)     Applicable Law.  This Lease shall be construed in accordance with the laws of the State, and the parties agree that jurisdiction for all actions hereunder shall lie therein.

(k)     Successors and Assigns.  All rights, obligations and liabilities herein given to or imposed upon any party hereto shall extend to the permitted successors and assigns of such party.

(l)     Counterparts.  This Lease may be executed in one or more identical counterparts, and as so executed by all parties hereto shall constitute a single instrument for purposes of the effectiveness of this Lease.

(m)     Trademarks and Trade Names.  All trademarks, trade names, service marks, signs and all other marks of identification used by Tenant in its business shall at all times remain the exclusive property of Tenant, and Landlord shall have no right, interest in, or title to any of Tenant's trademarks, trade names, service marks, signs or other marks of identification.

37.     Effectiveness of Lease; Conditions.

(a)     Tenant's Conditions.  Notwithstanding the execution of this Lease or any provision hereof to the contrary, the parties hereto agree that the effectiveness of this Lease is expressly conditioned upon the complete satisfaction (or waiver) of each and all of the following conditions:

(i)     Tenant's obtaining at its own cost of a commitment for leasehold policy of title insurance for the Shopping Center and copies of all underlying documents referred to in said commitment for title insurance; Landlord's providing to Tenant the most current survey of the Shopping Center by November 30, 1995; and Tenant's approval of all of the foregoing in writing within thirty (30) days after receiving all of said documents.

(ii)     Landlord's delivery of subordination, non-disturbance and attornment agreements executed by any and all then existing Mortgagees and Ground Lessors in a form satisfactory to Tenant by April 30, 1996.

(iii)    Landlord's delivery of the Land by the date and in the condition specified in the Construction Provisions.

(iv)    Tenant's obtaining: (A) written confirmation from appropriate local authorities, within thirty (30) days of the approval by the appropriate governmental authorities of Landlord's Site Plan, that current zoning and use regulations allow construction of the Improvements on the Premises; and (B) the required City, County and State permits and approvals to construct said Improvements on the Premises no later than the date that is one hundred twenty (120) days after the date Landlord obtains its Site Plan approval.  If Tenant does not receive its building permit within sixty (60) days after the date Landlord receives approval of its Site Plan, Landlord may assume control of Tenant's building permit application process, but Landlord shall not make any changes to Tenant's building plans or specifications without Tenant's written approval.  Tenant agrees to apply for such permits as promptly as possible, to  use due diligence and to expend any necessary application or other fees to secure such permits and approvals; provided, however, that the foregoing shall not be deemed to require Tenant to initiate litigation or to agree to any conditions imposed upon issuance of any such permit or approval.

(v)    Tenant's obtaining satisfactory assurances, within thirty (30) days of execution hereof, that adequate utility services (including gas, electricity, telephone, domestic water, fire protection water, storm sewer and sanitary sewer) are available for connection at the Premises or in close proximity thereto in amounts sufficient to support Tenant's operations.

(vi)    Landlord's obtaining a loan commitment for financing adequate to fund the Tenant Improvement Allowance and development of the remainder of the Shopping Center and Landlord's providing to Tenant any other evidence reasonably required by Tenant that Landlord has obtained financing adequate to fund the Tenant Improvement Allowance and development of the remainder of the Shopping Center, each by May 31, 1996.

(vii)    If Landlord shall have availed itself of its right to substitute a new Site Plan, as described in paragraph 1, Tenant shall have approved the same in writing within fifteen (15) days of receipt of Landlord's notice of the substitution.  Tenant shall give its approval of such substituted Site Plan unless the changes proposed thereon (that is, changes from the Site Plan as originally attached hereto at the execution of this Lease) adversely affect Tenant's use or operation of the Premises.

(viii)    Landlord's providing evidence reasonably satisfactory to Tenant, by May 31, 1996, that Landlord has obtained Site Plan approval with respect to the Site Plan from all applicable governmental agencies.

Each of the foregoing conditions shall be deemed to have been satisfied (for purposes of Tenant's right to terminate this Lease under subparagraph (b) below) if Tenant does not deliver written notice to

Landlord, by the day that is five (5) business days after the date set forth above for satisfaction of such condition, that such condition has not been satisfied. The existence of the foregoing conditions is solely for the benefit of Tenant, and Tenant may waive any such condition at its sole discretion by delivering to Landlord a written notice signed by Tenant which specifically states the condition(s) being waived by Tenant.

(b)    Failure of Tenant's Conditions. Notwithstanding any other provision in this Lease to the contrary, in the event any of the conditions listed in subparagraph (a) above shall not be met, satisfied, deemed satisfied or waived, the parties hereto expressly agree that Tenant shall have the right to terminate this Lease in its sole and absolute discretion by delivering to Landlord a written notice signed by Tenant which states that Tenant is terminating this Lease on account of the failure of one or more of such conditions. In the event of any such termination, the rights and obligations of the parties shall be of no further force and effect and the parties shall have no further liability one to the other (except that the indemnifications set forth herein shall survive such termination) upon Tenant's delivery of said notice to Landlord.

(c)    Landlord's Conditions. Notwithstanding the execution of this Lease or any provision hereof to the contrary, the parties hereto agree that the effectiveness of this Lease is expressly conditioned upon the complete satisfaction (or waiver) of each and all of the following conditions:

(i) Landlord's obtaining financing and permits to construct the improvements shown on the Site Plan by November 30, 1996.

(ii)    Tenant's agreement, by May 31, 1996, to execute a subordination, non-disturbance and attornment agreement reasonably requested by Landlord's Lender by May 1, 1996.

(iii) Landlord's obtaining Site Plan approval from all applicable governmental agencies by November 30, 1996.

Each of the foregoing conditions shall be deemed to have been satisfied (for purposes of Landlord's right to terminate this Lease under subparagraph (d) below) if Landlord does not deliver written notice to Tenant, by the day that is five (5) business days after the date set forth above for satisfaction of such condition, that such condition has not been satisfied. The existence of the foregoing conditions is solely for the benefit of Landlord, and Landlord may waive any such condition at its sole discretion by delivering to Tenant a written notice signed by Landlord which specifically states the condition(s) being waived by Landlord.

(d)    Failure of Landlord's Conditions. Notwithstanding any other provision in this Lease to the contrary, in the event any of the conditions listed in subparagraph (c) shall not be met, satisfied, deemed satisfied or waived, the parties hereto expressly agree that Landlord shall have the right

45

to terminate this Lease in its sole and absolute discretion by delivering to Tenant a written notice signed by Landlord which states that Landlord is terminating this Lease on account of the failure of one or more of such conditions.  Landlord will not terminate the Lease for the contingencies set forth in paragraph (c)(i) or (c)(iii) above unless Landlord terminates the leases of all other tenants in the Shopping Center.  In the event of any such termination, the rights and obligations of the parties shall be of no further force and effect and the parties shall have no further liability one to the other (except that the indemnifications set forth herein shall survive such termination) upon Landlord's delivery of said notice to Tenant.

       (e)     Delivery of Lease.  The delivery of this executed lease by Tenant to Landlord constitutes the offer of the Tenant to the Landlord to bind Landlord and Tenant to the provisions of this Lease, subject to the conditions set forth in this paragraph 37.  It is a further condition to the effectiveness of this Lease that upon receipt of the executed Lease from Tenant, the Landlord, without delay, execute and return same to the Tenant in accordance with any instructions delivered by Tenant or its legal counsel.  In the event the Landlord fails to immediately execute and return the Lease, the Tenant may at any time after delivery of the Lease provide written notice to the Landlord that Tenant revokes its delivery of the executed Lease and thereupon the Landlord shall be immediately obligated to return to the Tenant all executed original counterparts as well as any copies of this Lease in the possession of the Landlord, and this Lease shall thereafter be null and void.

     38.   Confidentiality.  The parties hereto, including, but not limited to, their heirs, successors, assigns and legal representatives, agree that this Lease may not be recorded and that all such parties hereby agree to use their best reasonable efforts to preserve the confidentiality of this transaction.  This confidentiality agreement extends to any assignees, subtenants, developers, bankers, lawyers, accountants, employees, agents or any other persons acting on behalf of the parties hereto.  The parties hereto agree to use their best reasonable efforts to avoid discussing with, or disclosing to, any third parties (except those parties listed above) any of the terms, conditions or particulars in connection with this transaction.  It is specifically agreed by way of illustration, but not by limitation, that the covenant of confidentiality set forth herein shall not be breached if such information is disclosed in connection with or due to any governmental law or ordinance, but this covenant of confidentiality shall be breached if Landlord, or any of Landlord's developers, bankers, accountants, agents, lenders, lawyers or other similar parties, discloses the content of, or delivers a copy of this Lease to, any third party (except as may be reasonably required in connection with the development sale or financing of the Shopping Center) without the express written consent of all parties to this Lease.

     39.   Hazardous Substances.

MWBB 12/5/95

7716U:\1097\Circuit\midatl\rockv\lease.012

(a)    Landlord's Obligations.  Landlord represents that it has not used, discharged, dumped, spilled or stored any Hazardous Substances (as defined in the Construction Provisions) on or about the Shopping Center, whether accidentally or intentionally, legally or illegally, and has received no notice and has no knowledge that any such condition exists at the Shopping Center.  Landlord hereby indemnifies and agrees to defend and hold Tenant harmless from and against all costs, losses, liabilities and damages, including, without limitation, all third-party claims (including sums paid in settlement thereof, with or without legal proceedings) for personal injury or property damage and other claims, actions, administrative proceedings, judgments, compensatory and punitive damages, lost profits, penalties, fines, costs, losses, attorneys' fees and expenses (through all levels of proceedings), consultants or experts fees and all costs incurred in enforcing this indemnity, to the extent any such costs, losses, liabilities claims or damages arise as a result of the existence of any fact or circumstance rendering the foregoing representation of Landlord false or from the existence upon the Premises of any Hazardous Substance that was discharged or placed upon the Premises before the date hereof.  The obligations of Landlord described in this paragraph 39(a) shall survive the termination or expiration of this Lease.

(b)    Tenant's and Landlord's Obligations.  Each of Tenant and Landlord, and the agents, contractors and employees of each agrees not to introduce, discharge, dump, spill or store within the Premises or the Shopping Center any Hazardous Substances; and each party indemnifies and agrees to hold the other harmless from and against all costs, liability and damages as a result of the breach of its obligations hereunder.  The warranty and indemnity of the parties described in this paragraph 39(b) shall survive the termination of this Lease.

(c)    Remediation.  Landlord and Tenant hereby agree that if any Hazardous Substances are introduced upon the Shopping Center during the Term other than as a result of any action or circumstance for which Tenant is required to indemnify Landlord under subparagraph (b) above, or for which Landlord is required to indemnify Tenant under subparagraph (a) above, then the following provisions shall apply:

(i) If the cost to remove such Hazardous Substances in compliance with applicable Environmental Laws shall be less than or equal to $50,000.00 (as reasonably estimated by Landlord's environmental consultants), then Landlord shall remove such Hazardous Substances in compliance with applicable Environmental Laws at its sole cost and expense (and Tenant shall provide Landlord reasonable access to the Premises for such purpose, and Landlord shall use commercially reasonable efforts to minimize disruption of or interference with Tenant's business during such work).  Upon completion of such work, Landlord shall deliver to Tenant reasonable evidence of such removal or remediation (such as a copy of an inspection report or completion sign-off from Landlord's environmental consultants),

MWBB 12/5/95
7716U:\1097\Circuit\midatl\rockv\lease.012

together with any compliance certificate or document of release or approval from any applicable governmental entity (to the extent such a certificate or document is legally required).

(ii) If the cost to remove such Hazardous Substances in compliance with applicable Environmental Laws (as reasonably estimated by Landlord's environmental consultants) will exceed $50,000.00, then, unless either Landlord or Tenant agrees (each in its sole discretion) to pay the amount in excess of $50,000.00, (in which case, this Lease shall continue in full force and effect and, if applicable, Tenant shall reimburse Landlord, promptly upon Landlord's request therefor, for the portion of any such expenses which Tenant has agreed to pay, with Landlord responsible for the payment of the first $50,000.00 of such cost), either party shall, if such environmental problem materially adversely affects such party's use or enjoyment of the Shopping Center or its ability to perform its obligations hereunder have the right to terminate this Lease and all of its rights and obligations hereunder by delivering written notice of such election to the other party (and if neither party has so terminated this Lease within thirty (30) days after the discovery of such condition and Landlord's determination of the removal costs therefor, then this Lease shall remain in full force and effect, with neither party being obligated under this Lease to remove such Hazardous Substances).  Landlord's obligation and liabilities under this Paragraph (c) shall survive the expiration of this Lease.

40.    <u>Limitation of Liability</u>.  Tenant shall neither assert nor seek to enforce any claim for breach of this Lease against any of Landlord's assets other than Landlord's interest in the Shopping Center, or any portion thereof, and all leases, rents, profits and other proceeds thereof, and Tenant agrees to look solely to such interest for the satisfaction of any liability of Landlord under this Lease, it being specifically agreed that in no event shall Landlord (or any of the officers, trustees, directors, partners, beneficiaries, joint venturers, members, stockholders, or other principals or representatives, disclosed or undisclosed) ever be personally liable for any such liability other than their interest in the Shopping Center. This section shall not limit any right that Tenant might otherwise have to obtain injunctive relief against Landlord.

WITNESS the following signatures and seals:

LANDLORD

CONGRESSIONAL NORTH ASSOCIATES
LIMITED PARTNERSHIP
a Maryland limited partnership

ATTEST:

By:   RJC   Congressional   Associates   Limited
Partnership, General Partner

By:   Ronald J. and Dana Cohen
Family Partnership, General Partner

By:   CASCO America Two,
L.L.C., General Partner

By: _____
Alan D. Cohen
General Manager

TENANT

CIRCUIT CITY STORES, INC.,
a Virginia corporation

ATTEST:

Its: Assistant Secretary

By: _____
Name:   Benjamin B. Cummings, Jr.
Title:   Vice President

MWBB 12/2/93
7716U:\109J\Casco\cninc\trv\trv\lease.012

## EXHIBIT "A"

### SITE PLAN

Components:    Premises (outlined in red)

Office Building

Adjacent Area

Deck

Tenant's Preferred Area

Permissible Building Areas

Customer Pick-Up

Pylon and/or monument/Monument Signage

Truck Well(s)/Trash Compactor

No-Take Area

Office Area of Shopping Center

Currently Existing Restaurants

Staging Area

Outparcel



## EXHIBIT "A-1"

All of that piece or parcel of land situate, lying and being in the City of Rockville, Rockville Election District No. 4, Montgomery County, Maryland, being all of Lots 9 and 10 as shown on a Plat of Subdivision entitled "Lots 9 and 10 - Block O, a Resubdivision of Lot 7, Block O, "MONTROSE" recorded among the Land Records of Montgomery County, Maryland in Plat Book 111 as Plat No. 12989, and also all of Lot 8 as shown on a Plat of Subdivision entitled "Lots 7 and 8, Block "O", a Resubdivision of Parcel "C", Block "O", "Hyde's Subdivision" and Lot 5, Block "O", "MONTROSE" recorded among said Records in Plat Book 94 as Plat No. 10296, and also part of a tract of land called "Token of Love", "Conjurer Detected", and "Dann" as described in a deed from Arthur C. Hyde to Congressional North Limited Partnership recorded among said Records in Liber 7469 at folio 329 and as shown on a plat attached to a deed from Nicholas U. Wagner and Helen W. Wagner to Arthur C. Hyde, dated June 28, 1979 and recorded among said Records in Liber 5357 at folio 757, and being further described in a deed from William V. Bouio, Trustee, to Nicholas U. Wagner and Helen W. Wagner, dated January 13, 1969, and recorded among said Records in Liber 3833 at folio 817 and also part of the lands dedicated and shown as Wagner Road on a Plat of Subdivision entitled "Parcel 'C' Street Dedication, HYDE'S SUBDIVISION," recorded among the Land Records of Montgomery County, Maryland in Plat Book 44 as Plat No. 3304; said Wagner Road having been duly closed and abandoned by Ordinance No. 5-84 to Grant Street Closing and Abandonment Application No. SCA-47-83, dated February 27, 1984 and recorded among the aforesaid Land Records in Liber 8164 at folio 156; all of said land being more particularly described in WSSC Datum, as follows:

BEGINNING for the same at the northernmost corner of aforesaid Lot 10, said point also lying on the southwest right-of-way line the following two courses and distances

Rockville Pike, Maryland Route 355 (150 feet wide); thence running with said right-of-way line the following two courses and distances

i.    442.28 feet along an arc of a curve to the right having a radius of 17128.74 feet and a chord bearing and distance of South 32°01'17" East, 442.26 feet to a point; thence

ii.   South 31°16'54" East, 113.69 feet to a point on the truncation of said Rockville Pike and Congressional Airport Lane (70 feet wide); thence running along said truncation line

iii.  South 07°57'00" West, 54.15 feet to a point on the northwesterly right-of-way line of said Congressional Airport lane; thence running with said right-of-way line

iv.    South 52°28'00" West, 454.33 feet to a point; thence leaving said line of Congressional Airport Lane and running with the outline of aforesaid Lot 9 the following seven courses and distances

v.    North 27°32'00" West, 400.68 feet to a point; thence

vi.    South 52°28'00" West, 137.81 feet to a point on the northeast right-of-way lien of Wagner Road (60 feet wide - now Abandoned); thence running in, through, over and across said abandoned Wagner Road and following three courses and distances

vii.    South 57°16'05" West, 30.00 feet to a point; thence

viii.    South 32°43'55" East, 226.54 feet to a point; thence

ix.    South 57°16'05" West, 30.00 feet to a point on the southwest right-of-way line of said abandoned Wagner Road, said point also lying on the outline of Lot 9; thence running with the outline of said Lot 9

x.    South 59°39'00" West, 150.15 feet to a point; thence

xi.    North 32°43'55" West, 451.59 feet to a point; thence, running still with said Lot 9 for the first 657.09 feet of length, and thereafter with the north line of Liber 7469 at folio 329, aforesaid

xii.    North 46°59'05" East, 755.50 feet to a point; thence running with the outline of said Liber 7469 at folio 329

xiii.    South 33°57'40" East, 120.61 feet to a point on the northwest lot line of aforesaid Lot 10; thence running with the outline of said Lot 10

xiv.    North 56°31'35" East, 131.33 feet to the place of beginning, containing a total record area of 480.588 square feet or 11.03278 acres of land

SAVINGS AND EXCEPTING THEREFROM, however, that certain right-of-way described in the aforementioned land Records in Liber 3833 at folio 817, being a right-of-way fifteen feet wide leading from the above lot to the Rockville Pike along part of the first line of the conveyance from Wagner to Wagner recorded in Liber 1015 at folio 113. The aforesaid land is part of the land conveyed by Urban H. Wagner and wife to the said Nicholas U. Wagner and wife by deed dated the 11th day of May, 1946 and recorded among said land Records in Liber 1015 at folio 113.

TOGETHER WITH All of Lot 8, Block "O", "MONTROSE" and part of abandoned Wagner Road, as previously referenced herein, and being more particularly described in WSSC Datum, as follows:

BEGINNING for the same at the southerly corner of said Lot 8, said point also lying at the intersection of northwest right-of-way line of aforesaid Congressional

Airport Lane and the northeast right-of-way line of aforementioned Wagner Road, now abandoned; and thence running with the outline of abandoned Wagner Road the following two courses and distances:

1.      South 41°51'09" West, 62.23 feet to a point; thence

2.      North 32°43'55" West, 115.76 feet to a point; thence leaving said outline of Wagner Road and running

3.      North 57°16'05" East, 60.00 feet to a point on the outline of said Lot 8; thence running with said outline

4.      North 52°28'00" East, 63.16 feet to a point; thence

5.      South 37°32'00" East, 98.92 feet to a point on the aforesaid right-of-way line of Congressional Airport Lane; thence running with said line

6.      South 52°28'00" West, 71.46 feet to the place of beginning containing a total record area of 13.110 square feet or 0.30094 of an acre of land.

NOTE:  The total record area of all of the above property combined is 493.698 square feet or 11.33375 acres of land

TOGETHER WITH all the rights and benefits of that twenty foot easement for storm drain and sanitary sewer as shown on plat recorded at Plat Book 89, Plat Number 9533:

SAVING AND EXCEPTING THEREFROM, the Office Building.

EXHIBIT "B"

INDEX OF DEFINITIONS

| **Term** | **Paragraph where defined** |
|---|---|
| Assessment(s) | Ex. "C", para. 1(a) |
| Base Rent | 4 |
| Building | 2 |
| CAM Charges | 7(b) |
| CAM Year | 7(c) |
| City | 1 |
| Commencement Date | 4 |
| Common Area Easement | 6(d) |
| Common Area Maintenance | 7(a) |
| Common Areas | 7(a) |
| Construction Term | 3 |
| CPI-U | 4(iii) |
| Date of Taking | 16(a) |
| Default Rate | 9(b) |
| Delivery of the Land | Ex. "C", para. 1(b) |
| Event of Default (Landlord) | 31 |
| Event of Default (Tenant) | 29 |
| Foreclosure | 21 |
| Grading Plans | Ex. "C", para. 1(b) |
| Ground Lessor | 21 |
| Hazardous Substances | Ex. "C", para. 1(a) |
| Improvements | 2 |
| Land | 1 |
| Landlord | Introduction |
| Landlord's Premises | 1 |
| Landlord Work | Ex. "C", para. 1(d) |