| | |
|---|---|
| Lease Year | 3 |
| Main Term | 3 |
| Modified Proctor | Ex. "C", para. 2(a) |
| Mortgage | 21 |
| Mortgagee | 21 |
| Option Periods | 3 |
| Other Improvements | 2 |
| Permissible Building Areas | Ex. "A" |
| Permitted Encumbrances | Ex. "F" |
| Person | 20 |
| Personalty | 23 |
| Plans and Specifications | Ex. "C", para. 2(b) |
| Premises | 1 |
| Real Estate Taxes | 9(a) |
| Renewal Option | 3 |
| Schematic Floor Plan and Elevation | Ex. "C", para. 2(b) |
| Shopping Center | 1 |
| Site Covenants | 19(a)(ix) |
| Site Work | Ex. "C", para. 1(b) |
| Site Plan | 1 |
| Soils Report | Ex. "C", para 1(b) |
| Staging Area | 6(a) |
| State | 1 |
| Substantial Completion | Ex. "C", para. 2(e) |
| Substantially All of the Premises | 16(a) |
| Successor | 22 |
| Taking | 16(a) |
| Tax Parcel | 9(b) |
| Tenant Improvement Allowance | Ex. "C", para. 3 |
| Tenant's Preferred Area | Ex. "A" |
| Tenant's Pro Rata Share | 7(c) |
| Term | 3 |

MWBB 12/5/95

7716U:\1097\Circuit\midatl\rocky\lease.012

| **Term** | **Paragraph where defined** |
| --- | --- |
| Transfer | Ex. "C", para. 3 |
| Worth at the time of the award | 30(b) |

MWBB 12/5/95

7716U:\1097\Circuit\midas\rockv\lease.012

ROCKVILLE, MARYLAND

EXHIBIT "C"

CONSTRUCTION PROVISIONS

THESE CONSTRUCTION PROVISIONS (herein so called) are hereby made a part of the Lease between Landlord and Tenant to which these Construction Provisions are attached as Exhibit "C". All defined terms shall have the meanings attributed to them in the Lease unless otherwise specifically defined in these Construction Provisions.

1.    Landlord's Delivery of the Land; Other Landlord Work.

All of the work set forth in subparagraphs (a), (b) and (c) below is, collectively, the "Landlord Work":

(a)    Hazardous Substances.  Landlord shall deliver the Land to Tenant free of any pollution or contamination from toxic or hazardous substances, asbestos or any other chemicals or substances in amounts which exceed standards for public health or welfare as established and regulated by any local governmental authority, the State or the United States Government (herein collectively referred to as "Hazardous Substances")(which, but for Landlord's failure to discover same, should be removed prior to delivery of the Land to Tenant).  Landlord hereby grants Tenant and its agent access to the Premises and Shopping Center to enable Tenant to conduct such soil and environmental tests as its deems necessary.

Landlord, at its sole cost and expense, shall provide a copy of Landlord's environmental site assessment(s) (the "Assessment(s)") of the Premises, prepared by a qualified third-party environmental engineer, in the form commonly known as a "Phase I" or "Phase II" assessment, as appropriate, including a concise presentation of all information gathered during the investigation and organized in a logical progression, as well as a description of the methodology used by the preparer.  The Assessment shall summarize the significant findings and shall identify and evaluate actual and potential environmental impairment, risks and liabilities.  Landlord shall cause the preparer of the Assessment to provide a certification to Tenant substantially in the form attached hereto as Attachment "1", on or before the Site Plan Date.  If such certification is not timely received by Tenant, Tenant may obtain same at Landlord's expense.  At Tenant's election, Tenant may obtain an environmental assessment of the Premises and Landlord shall reimburse Tenant the cost thereof.

(b)    Site Work.  Landlord, at its sole cost and expense, shall: (i) verify its proposed development of the Shopping Center and compliance of its civil engineering plans with Tenant's geotechnical evaluation of the Land dated May 30, 1995 and prepared by Law Engineering and Environmental Services (the "Soils Report") with the "Scope of Geotechnical Evaluation" shown on

Attachment "2" attached hereto; (ii) cause the Land to be free and clear of any known or unknown (which, but for Landlord's failure to discover same, should be removed prior to delivery of the Land to Tenant) obstructions, foundations, footings, utilities, easements, improvements and tenancies; (iii) complete grading of the Land in accordance with the Soils Report and the "Standards for Grading Work" attached hereto as Attachment "3", and with the final plans prepared by the civil engineer (the "Grading Plans"), which Grading Plans shall be agreed by the parties and attached hereto as Attachment "4"; (iv) completion of Tenant's building pad strictly in accordance with Tenant's geotechnical report; (v) obtain approvals for all curbcuts indicated on the Site Plan and all on and off-site permits required for any work to be performed by Landlord necessary to develop the Shopping Center which permits may be a prerequisite for issuance of Tenant's building permit; (vi) complete (A) all temporary curbcuts for Tenant's Preferred Area, (B) 20,000 square feet of Staging Area as shown on the Site Plan outside of but adjacent to the building pad area to either be paved or stone to provide for all weather use, and (C) a shared all-weather construction access road to the Land and around the Building no less than twenty (20) feet in width, connecting the existing dedicated roadway adjacent to the Shopping Center with the Land, all in accordance with the Grading Plans; and (vii) obtain site plan approval and conditional use approval, if any, from governmental authorities having jurisdiction over the Shopping Center, permitting Tenant's construction of the Premises (subject to issuance of Tenant's building permit). All of the work described in (i) through (vii) above is, collectively, the "Site Work". No changes shall be made to any of the Site Work, including but not limited to any plans and specifications therefor, without Tenant's prior written consent, which consent shall not be unreasonably withheld or delayed, to the extent changes are related to areas other than the Land. The Site Work shall be performed in accordance with the construction schedule attached hereto as Attachment "5" (sometimes referred to herein as the "Construction Schedule"). Landlord specifically covenants and agrees that any problems or delays it encounters in grading the Premises in satisfaction of the Site Work requirements set forth above in connection with the condition of the soils, including environmental or hazardous waste issues, subsidence sinking, surface waters, subsurface waters, unforeseen site conditions or the like shall be its sole responsibility, shall not cause a force majeure delay, and in no event shall the cost associated with such problems or conditions be passed on to Tenant in any manner.

Landlord will maintain the construction access road in good condition throughout the construction of the Common Areas. If the items of Site Work to be performed on the Land are completed earlier than forty-five (45) days prior to Tenant's scheduled commencement of construction of the Improvements (as provided below), the Land shall be overbuilt and sloped to drain and, within such forty-five (45) day period, shall be regraded and recompacted.

Subject to force majeure, Landlord covenants and agrees to complete, at its sole cost and expense, each item of the Site Work and to provide temporary water service to within fifty (50), and other utilities to within five (5) feet of the building pad at Tenant's designated points of entry as set forth in the Plans and Specifications, as contemplated in paragraph 1(c) below, and temporary telephone service to the Premises and the Staging Area, in accordance with the dates established therefor in Attachment "5", to the end that promptly upon completion of such requirements (collectively "delivery of the Land"), Tenant shall be able, subject to issuance of its building permit and matters within Tenant's control, to commence construction of the Improvements.

Landlord acknowledges that Tenant's ability to obtain a building permit for its construction may be delayed due to the failure by Landlord to obtain necessary approvals or permits or to pay necessary fees for its construction and development of the Shopping Center. Landlord agrees that delivery of the Land shall not be deemed to have occurred until Landlord has in writing waived, or confirmed the satisfaction of, all conditions listed in paragraph 37(d), and until all aforesaid approvals and permits shall have been obtained and all such fees, including but not limited to impact fees and assessments, shall have been paid, if and to the extent that such approvals, permits and fees for Landlord's construction shall be prerequisites to the issuance of Tenant's building permit. Landlord agrees to keep Tenant advised in writing on a monthly basis as to Landlord's progress in completing the Site Work. Upon the delivery of the Land, Landlord shall certify to Tenant that all elements of the Site Work have been completed in the form of the Site Work Certificate attached hereto as Attachment "6".

Should the Site Work require minor adjustments in order to be in accordance with Attachments "3" and/or "4", Tenant may direct its contractor to make such adjustments, the total cost of which shall be reimbursed by Landlord to Tenant upon demand in a sum not to exceed Five Thousand Dollars ($5,000.00).

(c)    Paving, Lighting, Utilities, Landscaping and Drainage. Landlord, at its sole cost and expense, and in accordance with Attachment "5", shall cause a contractor licensed in the State to complete (i) installation of temporary utilities, as described in the "Utilities Specifications" attached hereto as Attachment "7"; (ii) the construction and installation within five (5) feet of the Building, of permanent telephone service and permanent utilities, including but not limited to gas, electric, domestic water and fire water (in size sufficient to satisfy local fire codes), each at Tenant's required entry points shown in the "Utility and Drainage Plan" to be described on Attachment "8" hereto (the "Utility and Drainage Plan"), which the parties agree shall be mutually agreed between them and attached hereto by February 28, 1996, at depths adequate for Tenant's tie-in without additional cost above that contemplated by the "Plans and Specifications" (as defined in paragraph 2(b) below); (iii) the construction and

installation of the storm water drainage system at Tenant's required location shown on the Utility and Drainage Plan, including any such system or portions thereof relating to roof drainage, truck well drainage and drainage for parking areas adjacent to the Building; (iv) the construction and installation of paving (including heavy-duty paving), and curbing for parking areas (including sidewalk curb in front of the Building), vehicular access and service roads, and driveways, in accordance with the "Paving Specifications" attached hereto as <u>Attachment "9"</u>; (v) the completion of landscaping at the Shopping Center in accordance with Landlord's governmentally approved landscaping plan; (vi) the construction and installation of lighting in the Shopping Center to standards no less than those set forth in the "Shopping Center Lighting Specifications" attached hereto as <u>Attachment "10"</u>; and (vii) Landlord's installation of any pylon and/or monument sign(s) identifying the Shopping Center required to be constructed under paragraph 8 of the Lease, all no later than the dates established therefor in <u>Attachment "5"</u>.

(d)    <u>Landlord Work</u>. All of the work described to be performed by Landlord in this paragraph 1 is collectively referred to as the "Landlord Work". All Landlord Work shall be performed in accordance with all applicable laws and this Lease, in a good and workmanlike manner, as appropriate by engineers, surveyors, architects and consultants, who are bondable, licensed in the State and of good reputation. Landlord may make changes to those portions of the Grading Plans and the Utility and Drainage Plans relating to areas of the Shopping Center lying outside of Tenant's Preferred Area, so long as such changes do not adversely affect Tenant's use of the Premises. Landlord may not make any changes to those portions of such plans within Tenant's Preferred Area without Tenant's written consent, which shall not be unreasonably withheld with respect to such changes that do not adversely affect Tenant's use of the Premises. Landlord's general contractor shall be experienced in shopping center development and in phasing and coordinating construction schedules with major anchors and national retailers. In the event that Landlord defaults at any time in completion of any component of the Landlord Work within the Tenant's Preferred Area (or any other area required to be completed in order for Tenant to obtain its Certificate of Occupancy), and fails to cure the same within fifteen (15) days of written notice by Tenant, Tenant shall have the right, but not the obligation, to perform at Landlord's sole cost and expense, all or any part of Landlord Work. Thereafter, Tenant shall exercise this right by providing Landlord with written notice thereof, which notice shall reasonably detail those portions of the Landlord Work which Tenant elects to complete. Tenant may exercise the rights set forth in this paragraph 1(d) from time to time so long as Tenant provides Landlord notice specified herein (i) within a reasonable amount of time prior to the date upon which Landlord would otherwise commence that portion of the Landlord Work, or (ii) at such other time where it is feasible for Tenant to take over that portion of the

MWBB 12/5/95
7716U:\1097\Circuit\midatl\rockv\lease.012

Landlord Work from Landlord. In the event and to the extent that Tenant exercises its right hereunder, Landlord agrees to cooperate in good faith and provide Tenant with reasonable assistance so that Tenant can complete said portions of the Landlord Work. Landlord agrees to reimburse Tenant for any and all reasonable and justifiable costs incurred by Tenant in connection with any portion of the Landlord Work which Tenant is in the process of completing within five (5) business days after receipt of written request from Tenant, which request shall be reasonably supported by invoices and/or written description of the Landlord Work performed. In the event that the Landlord does not timely reimburse Tenant as hereinabove contemplated, Tenant shall be entitled to deduct the costs of such Landlord Work from rentals and other payments due under the Lease, in the manner provided for in paragraph 4(d) below.

2.    Tenant Improvements.

(a)    Building Construction. Upon completion of all requirements therefor, Landlord shall give Tenant written notice (which shall include any required certifications, including but not limited to those required by Attachment "3") of delivery of the Land in the form of Attachment "6". Tenant shall promptly notify Landlord if any such requirement has not been met to Tenant's reasonable satisfaction, provided the Tenant does not elect its self-help remedies set forth in this Lease. Upon completion of any such previously unmet requirements, Tenant shall promptly commence and pursue to completion with due diligence the construction of the Improvements. Tenant shall, at its own expense (including tap fees), tap into the utilities (temporary or permanent, as the case may be) installed by Landlord as required hereunder. ~~Tenant shall be solely responsible~~ ✗ The construction work on the Improvements shall be performed by a duly licensed contractor chosen by Tenant, shall be done in a good and workmanlike manner, in compliance with all applicable laws and in substantial accordance with the "Plans and Specifications" (defined below). Tenant covenants and agrees to use reasonable efforts and due diligence to achieve "Substantial Completion" (as defined below) on or before the date which is seven (7) months after the date the Land is delivered (or deemed delivered, if later) by Landlord hereunder.

(b)    Plans and Specifications. Tenant shall prepare and furnish to Landlord for its approval, not to be unreasonably withheld, conditioned or delayed, complete architectural drawings and specifications and building elevations (the "Plans and Specifications") for the construction of the Building and Other Improvements, incorporating therein the items specified and shown in the "Schematic Floor Plan and Elevation" (which are hereby approved by Landlord) attached hereto as Attachment "11". The Plans and Specifications shall clearly reflect the area, if any, to be constructed as Shop Space. Landlord agrees that it will approve the Plans and Specifications, so long as they are materially consistent with the Schematic Floor Plan and Elevation, within ten (10) business days after receipt thereof. If the Plans and

MWBB 12/5/95
7716U:\1097\Circuit\midatl\rocky\lease.012

Specifications are not disapproved by Landlord within fifteen (15) days of delivery thereof to Landlord, they will be deemed approved. The Plans and Specifications shall not be substantially changed by Tenant without the prior written consent of the Landlord, which consent shall not be unreasonably withheld, conditioned or delayed; provided, however, that Tenant shall make any changes to its plans reasonably required by governmental authorities, except with respect to Tenant's entry feature.

(c)    Permits. Tenant, at its sole cost and expense, shall obtain or cause to be obtained those certain building permits, licenses, other governmental approvals and temporary and permanent certificates of occupancy which may be required for the lawful construction and occupancy of the Premises as a retail shopping facility in accordance with the Plans and Specifications. Landlord agrees to assist and cooperate fully with Tenant in obtaining such permits, licenses, approvals and certificates, but all at no material cost to Landlord. Landlord shall be responsible for any other permits necessary for the development of the Shopping Center.

(d)    Landlord Inspections. During the course of construction of the Improvements, Landlord may, at its own risk and in cooperation with Tenant's contractor, enter upon the Land for purposes of inspecting the work, provided that such inspections shall not interfere with Tenant's construction.

(e)    Substantial Completion. Substantial completion of the Improvements ("Substantial Completion") shall be deemed to occur when a certificate of occupancy, whether temporary and subject to minor items to be completed, or permanent, as the case may be, has been issued by the applicable governmental authority. The foregoing shall not be deemed to relieve Tenant of its responsibility to complete the Improvements in accordance with the Plans and Specifications.

(f)    Warranties. Tenant shall assign all warranties to Landlord for Tenant Improvements made by Tenant (or shall enforce the same on Landlord's behalf if the same are not assignable) relating to Landlord's repair obligations under the Lease and which shall include but not be limited to, a one year warranty on all items of Tenant's Improvements, except for structural which shall be at least a five (5) year warranty and roof which shall be at least a fifteen (15) year warranty.

3. Costs. No later that thirty (30) days after Substantial Completion and Tenant's furnishing to Landlord (i) the certificates of insurance required under paragraph 14 of the Lease, (ii) an indemnity in the form of Exhibit "J" attached hereto against any exception in Landlord's or its Mortgagee's policy of title insurance with respect to mechanics' liens arising out of Tenant's construction, and (iii) if requested by Landlord, confirmation from Tenant that Landlord holds title to the Improvements (in form reasonably acceptable to Landlord and Tenant), Landlord shall pay to Tenant a "Tenant Improvement Allowance" in an amount equal to Two Million, One Hundred Twenty Nine Thousand, Eight Hundred Seventy-Seven

and 50/100 Dollars ($2,129,877.50) payable by wire transfer of funds by Landlord to Tenant's account. If Landlord fails to pay the Tenant Improvement Allowance in full within thirty (30) days after Substantial Completion and receipt of items (i), (ii) and (iii) above, the Landlord shall be in default hereunder and Base Rent shall be reduced to $280,000.00 per year until the same is paid to Tenant. If Landlord has not tendered payment of the Tenant Improvement Allowance by that date which is one (1) year from Substantial Completion (the "Substantial Completion Anniversary"), then (i) such date shall become the Commencement Date; (ii) Base Rent shall be permanently reduced to ground rent equal to Two Hundred Eighty Thousand and No/100 Dollars ($280,000.00) per annum thereafter during the Term of the Lease; (iii) this Lease shall be converted to a ground lease, with ownership of the Improvements remaining with Tenant, and Landlord's and any Mortgagees' names being removed as additional insureds or mortgagees on any casualty insurance described in paragraph 14(a) of the Lease; and (iv) Landlord shall be permanently relieved of its obligation to pay the Tenant Improvement Allowance. Landlord and Tenant covenant and agree that upon the reasonable written request of either the Tenant or Landlord, the Landlord and Tenant shall execute such documentation as necessary to formalize the conversion of this Lease to a ground lease upon the Substantial Completion Anniversary.

Notwithstanding the foregoing, at any time following the Substantial Completion Anniversary and upon thirty (30) days prior written notice, Tenant shall have the right at Tenant's sole election, but not the obligation, to mortgage, sell, convey, assign, lease or otherwise encumber (collectively, a "Transfer") Tenant's interest in the Building, the Improvements and the Lease. Such right shall be in addition to the rights of Tenant set forth in paragraph 21 of the Lease.

Landlord covenants to (i) execute all documents necessary to permit Tenant to effect the Transfer described herein, and (ii) cause any Mortgagee to specifically acknowledge the rights of Tenant's lender and third parties arising as a result of such Transfer. Notwithstanding such Transfer, Tenant shall continue to pay the ground rentals described herein during the remainder of the Term.

4.  Construction Delays.

(a)    Delays by Landlord. In the event, subject to force majeure, Landlord shall fail to complete the Site Work and accomplish delivery of the Land in the condition specified by the date set forth on Attachment "5" hereto Landlord agrees that it shall reimburse Tenant for its fixed and ascertainable costs incurred as a result thereof in the exercise of all reasonable efforts to open for business by February 28, 1997. Such costs shall not exceed $120,000, and shall be limited to Tenant's out-of-pocket expenses of construction overtime, acceleration charges and bonuses paid to Tenant's contractors or subcontractors, charges for the scheduling of construction crews on days on which work cannot be performed due to the delays by Landlord and construction period interest charges actually incurred to the

MWBB 12/5/95

7716U:\1097\Circuit\midas\rockv\lease.012

extent that such charges exceed those which would have accrued without such delay, and shall be due only if Tenant diligently prosecutes accelerated construction after delivery.

In the event, subject to force majeure, Landlord shall fail to accomplish delivery of the Land by the date which is fifteen (15) days following the date Landlord should have delivered the Land, or to complete any element of the Landlord Work by the completion date established therefor in Attachment "5", Tenant, at its option and upon five (5) days' prior written notice to Landlord, which notice may be given prior to or at any time after the applicable date for performance, may in addition to any other rights and remedies set forth herein, enter the Shopping Center and perform any task required for delivery of the Land or, as applicable, any element of the Landlord Work which has not been timely completed, and Landlord shall reimburse Tenant for its reasonable and actual costs thereof, including interest on such costs at the Default Rate. In such case, Landlord hereby grants Tenant the right, as its agent, to directly contact and contract with Landlord's contractors, on behalf of Landlord, to complete such work, all at Landlord's cost and expense. In such case, Landlord covenants, upon Tenant's request, to provide Tenant with duplicate sets of all plans, specifications and contracts prepared in connection with the construction of the Shopping Center, as well as schedules of all contractors, subcontractors and suppliers. If such costs are not reimbursed to Tenant prior to the Commencement Date, Tenant may offset such amounts against Base Rent and CAM Charges otherwise due until such costs and accrued interest are reimbursed in full.

In the event, for any reason whatsoever and regardless of force majeure, Landlord shall fail to complete delivery of the Land to Tenant by the date which is sixty (60) days from the date set forth on Attachment "5", Tenant shall be entitled to terminate this Lease at any time prior to such delivery and receive from Landlord promptly thereafter a sum equal to the actual out-of-pocket and substantiated third-party legal, architectural and engineering costs incurred by Tenant to the date of termination, not to exceed One Hundred Thousand and No/100 Dollars ($100,000.00); provided, however, that if Landlord's failure to deliver the Land in a timely fashion results solely from the existence at the Land of hazardous substances or subsurface obstacles at the time Landlord tenders delivery of the Land to Tenant and all such conditions are not known to Landlord, Tenant shall have no right to terminate this Lease solely as a result of such conditions unless Tenant has advised Landlord in writing of such conditions and Landlord has failed to remedy the same within thirty (30) days of Tenant's delivery of such notice (provided that such right of notice and cure shall have no effect upon any right of Tenant hereunder other than the right of termination described above). Landlord agrees that it shall not deliver the Land to Tenant between the dates of November 1 of any year and February 28 of the following year. In addition to any other rights and remedies set forth herein, if the Landlord fails to timely deliver the Land or any element of

the Site Work before July 31, 1996 regardless of force majeure, and such delay results in a delivery of the Land during the period March 1 until June 30 (the "Unacceptable Window Period"), then Tenant shall be entitled to a full abatement of one day's rent (including additional rent) hereunder for each day elapsing after such delivery and before June 30, such abatement to be taken with respect to the first rent otherwise to have been due hereunder.  For purposes of calculating time periods hereunder based upon the date of delivery of the Land, such date shall be deemed to be June 30 if Landlord delivers the Land within the Unacceptable Window Period.

(b)     <u>Delays by Tenant.</u>     If, subject to force majeure, Tenant shall fail to achieve Substantial Completion by that date which is two hundred ten (210) days following delivery of the Land, Landlord, at its option, upon prior written notice to Tenant, may require Tenant to proceed with its construction and reimburse Landlord for its fixed and ascertainable costs incurred as a result thereof. Such costs shall be limited to Landlord's out-of-pocket expenses of construction overtime, acceleration charges and bonuses paid to Landlord's contractors or subcontractors, charges for the scheduling of construction crews on days on which work cannot be performed on account of the aforesaid delays by Tenant, the cost of erecting barricades around Tenant's unfinished work and construction period interest charges to the extent that such charges exceed those which would have accrued without such delay.  In the event, for any reason whatsoever and regardless of force majeure, Tenant shall fail to achieve Substantial Completion by that date which is one (1) year following delivery of the Land, Landlord shall be entitled to terminate this Lease upon sixty (60) days prior written notice to Tenant, during which sixty (60) day period Tenant may cure any such default hereunder.

(c)     <u>Miscellaneous.</u> Notwithstanding the foregoing, a delay by any party in exercising its cure rights or other remedies hereunder shall not be deemed an event of force majeure for purposes of extending the date(s) established for performance by the party whose actions or omissions gave rise to such cure rights or remedies.  All sums owing to Landlord under subparagraph (b) above shall, to the extent applicable and except for Base Rent, Real Estate Taxes and CAM Charges, be deducted from the Tenant Improvement Allowance.

(d)     <u>Tenant's Deduction Rights.</u> All sums owing to Tenant under paragraph 1 hereof and/or subparagraph (a) above shall, to the extent applicable, be added to the Tenant Improvement Allowance and paid simultaneously therewith; and, if not so paid, Tenant shall be entitled to offset all such costs, plus interest at the Default Rate, against Base Rent and CAM charges and Real Estate Taxes otherwise due hereunder.

Notwithstanding anything contained herein to the contrary, Landlord covenants that it shall complete its construction and delivery obligations in accordance with the "Completion Dates" set forth

in the Construction Schedule.   In the event that the Landlord fails to complete its construction and delivery obligations in accordance with such Completion Dates, Tenant may, at its sole election, exercise such remedies as are set forth in this Exhibit "C" and the Lease.

MWBB 12/5/95

7716U:\1097\Circuit\midatl\rockv\lease.012

5.      <u>Attachments</u>.

"1"  Environmental Certification

"2"  Scope of Geotechnical Evaluation

"3"  Standards for Grading Work

"4"  Grading Plans

"5"  Construction Schedule

"6"  Site Work Certification

"7"  Utilities Specifications

"8"  Utility and Drainage Plan

"9"  Paving Specifications

"10" Shopping Center Lighting Specifications

"11" Schematic Floor Plan and Elevation

<u>Attachment "1"</u>

Circuit City Stores, Inc.
9950 Mayland Drive
Richmond, VA  23233

ATTN:

This letter is written with respect to paragraph 1(a) of Exhibit "C", which are the Construction Provisions to your lease with Congressional North Associates Limited Partnership, dated _____, 1995 (the "Lease").  We have been retained by _____ to provide an environmental site assessment report concerning any potential environmental hazards present on or about the shopping center property which is the subject of the Lease.  We understand that the provision of a report in form and substance satisfactory to Circuit City is a condition of the Lease.  Please be advised that Circuit City can rely on our environmental site assessment report entitled _____, dated _____, subject to the limitations and qualifications contained therein (the "Report").  The Report meets the requirements of the Phase I (and/or Phase II) Environmental Assessment as described in the Lease, a copy of the relevant portions of which have been delivered to us.  Attached to this letter as Enclosure 1 is a description of our professional liability insurance coverages, including the name of the carriers and the amount of the coverages.

Sincerely,


_____  (Name of consultant)

Attachment "2"

Scope of Geotechnical Evaluation

I.   **GENERAL**

    A.   All borings shall comply with all applicable codes and regulations.

    B.   Circuit City shall be informed, by phone, of the job progress and of any unexpected or special conditions.

    C.   Soil samples shall be retained by the soil testing firm for at least: Six (6) months on projects where shallow foundations are recommended; twelve (12) months on projects where deep foundations are recommended.  (Differing periods may be acceptable.  If deviations from the specified periods are proposed, state proposed periods, and state any additional cost to comply with the specified periods).

    D.   The time required to complete the soil boring, testing, and investigation report following authorization to proceed shall be twenty-one (21) calendar days or less.

    E.   At the end of the agreed upon time period, submit to Circuit City six copies of the report including black line prints of all logs, charts, diagrams, drawings, etc. on 8-1/2" x 11" sheets.

    F.   All reports are to be sealed by an Engineer licensed in the State in which the work is performed.

    G.   Evidence of suitable levels of Professional Liability, General Liability and Workmen's Compensation Insurance Coverage is required before commencing work.

II.    Within 21 days after notification by Circuit City Stores, the developer or A/E firm shall furnish a Report of Subsurface Investigation, which shall be performed by an independent soils engineer approved by Circuit City, and shall include the following:

A.    <u>Visual Description and Report</u>:    Describe the Shopping Center site as to existing conditions noting in particular any unique or unusual features which might affect any proposed construction.

B.    Soil borings shall be as follows:

1.    In granular soils, borings shall be standard penetration tests employing a 140 lb. hammer having a free fall of 30" and using a 2" outside diameter (1-3/8" ID) split spoon, ASTM Method D-1586.

2.    In cohesive soils, standard penetration test ASTM-D-1586 or thin wall tube sampling of soils ASTM D-1587 may be employed.

C.    Soil samples shall be taken at 2'-6" intervals up to 10' depth and at 5' or at each change of strata thereafter.

D.    Indicate as accurately as possible the water line in all holes, at the time of boring and twenty-four (24) hours later.

E.    Where fill is encountered trenching or other explanatory procedures should be employed. Fill shall be described in great detail, including such information as approximate amount of organic material, topsoil, wood, or other decaying matter, loose or well compacted, amount of moisture, amount and type of debris, where compactible or to be removed, etc.

F.    Where rock is encountered, rock core samples of a minimum 1-1/4" diameter and minimum 5'-0" length shall be obtained, recovery ratios shall be given as well as a clear description of the type of rock, in particular, the means required to excavate same.

G.   At least five (5) borings should be taken within the Building Area limit lines on the Circuit City Parcel (with one at each extreme corner).  The specific information required includes:

  1.   Allowable bearing pressure under footings for dead load, dead plus live load and dead plus lateral loads.

  2.   Friction value for lateral load-soil to footing.

  3.   Friction value for drilled caissons for uplift.

  4.   Equivalent fluid pressure to be used for retaining wall design.

  5.   Allowable passive resistance of soil-for lateral loads on drilled caissons and footings.

  6.   Evaluation of the suitability of on-site material for engineered fill.

MWBB 12/5/95

7716U:\1097\Circuit\mxlsd\rockv\lease.012

7.   The typical loads for a Circuit City building vary from location to location; however, the following general criteria is provided:

| SNOW LOAD (PSF) | MAX. INT. COL. LOAD (KIPS) | MAX. EXT. COL. LOAD (KIPS) | MAX. EXT. NON-LOAD BEARING WALL (KIPS/FT) |
|---|---|---|---|
| 0 | 46 | 26 | |
| 20 | 58 | 33 | |
| 25 | 65 | 37 | |
| 30 | 71 | 41 | 3.0 |
| 35 | 78 | 45 | |
| 40 | 85 | 48 | |

1.   Assumes tributary area of 1326 ft.

2.   Assumes tributary area of 750 ft.

3.   Assumes 12" normal weight block reinforced at 24" o.c.

8.   Comment on effect of expansive soil and recommended footing depth to minimize effect of expansive soil. When material has a plastic index greater than twenty, swell tests shall be performed.

9.   Recommendation for slab construction; including thickness, reinforcing, moisture barrier, and capillary break.

10.   Recommendations on the need for geological and/or seismic investigations of the site or surrounding area.

11.   Recommendations on the need for additional boring samples based on the consistency of the boring data previously obtained.

12.   The report shall include a statement describing the field investigation technique and laboratory procedures.  Include a commentary on the site in general as well as on the subsurface conditions.

13.   Test data shall be illustrated on table, charts, graphs, etc., as required to summarize the results.

14.   Final boring logs shall give a detailed description of the various soil strata and they shall include the group symbol based on the Uniform Soil Classification System.

15.   Recommended specification for materials and placement of any required off site fill including granular and cohesive materials.  Estimated cost per cubic yard installed for these materials.

16.   Provide an indication of how susceptible the on-site materials are to moisture damage during the construction season at the proposed subgrade elevations and what recommended procedures should be taken to alleviate possible problems.

C.   <u>Pavement Design</u>:  Perform soils borings and any other field investigations necessary to provide a recommendation for the design of pavement sections for a 20 year life span and various traffic indices.

If poor subgrade material is encountered, recommend an alternate paving design using a reinforcing fabric (such as Mirafi 500X) and a thickened paving base, including thickness and material specifications for topping, asphaltic base, primer (if required) and reinforcing fabric and an estimated in-place cost per square yard for both the paving and fabric system.

Recommend both a heavy and light duty paving system, including thickness and material specification for topping, asphaltic base primer (if required) and granular sub-base. Light duty paving should be based on an estimated 500 automobiles per day and general parking. Heavy duty paving should be based on 500 automobiles per day, plus 3 tractor trailers per day with 9000 lb. wheel loads. Provide an estimated cost per square yard for both the paving and base in-place.

D.   Foundation Investigation Recommendations and Evaluations:

    1.   Grading and Earthwork. Described recommended procedures relating to:

        (a)   Stripping.

        (b)   Excavations.

        (c)   Fills (import and on-site material).

        (d)   Suitability of on-site top soil material for landscaping.

        (e)   Grading operations.

        (f)   Compaction.

        (g)   Stockpiling on-site materials.

    2.   Footings/Foundations:

        (a)   Described suitable foundation systems and attendant requirements.

        (b)   Describe advantages and disadvantages of any logical and/or feasible alternative systems.

        (c)   Bearing values.

        (d)   Setting depths.

        (e)   Soil preparation.

        (f)   Anticipated settlement or movement (in inches). The maximum differential movement shall be 1/2 inch.

        (g)   Foundation drainage system, if required.

    3.   Non-structural Slab on Grade. Describe recommended procedures relating to:

        (a)   Soil preparation.

        (b)   Slab reinforcement.

        (c)   Slab underlayment with particular attention to capillary breaks or moisture problems.

        (d)   Anticipated settlement or movement (in inches). The maximum differential movement shall be 1/2 inch.

        (e)   Underslab drainage system, if required.

MWBB 12/5/95
7716U:\1097\Circuit\midatl\rockv\lease.012

4.     Retaining Walls.  Design requirements/parameters for:

    (a)     Equivalent fluid pressure.

    (b)     Backfills.

    (c)     Drainage.

    (d)     Provide design requirements/parameters for capabilities of soil to support these structures.

5.     Light pole bases or similar pole structures:  Provide design requirement/parameters for capabilities of soil to support these structures.

<u>Attachment "3"</u>

Standards for Grading Work

1.     The Land and the Tenant's Preferred Area Shopping Center shall be graded in accordance with the following:

(a)     The Grading Plan shall show contours in accordance with standard engineering practice and these contours shall be shown with the existing (shown as a dashed line)  and final (shown as a solid line) elevations.   Whether existing or proposed, all buildings, improvements, roads   and highways, including those adjacent to the Shopping Center, shall be shown in their true locations.

(b)     Except as shown on the Grading Plans, the Building will be accessible by grade level parking only.  Steps and stairs are not permitted.

(c)     Except as shown on the Grading Plans, sidewalk at the Building will slope away from the Building with grade of no less than 1.5% and no more than 3.0%.  All water shall be sheet drained away from the Tenant's doors.

(d)     Except as shown on the Grading Plans, asphalt paving areas will be graded to avoid ponding water with slopes no less than 1.5% and no more than 4.0%.  Entrances and access drives shall have a maximum slope of 6.0%.

(e)     Except as shown on the Grading Plans, surface drainage swales will not be allowed without prior approval of Tenant.  Such swales must have a grade of not less than 0.5% and no more than 3.5% and shall be constructed of concrete.

(f)     The cut and fill on the Shopping Center site should be balanced, if practical.  All fill material must be of a select grade and sources for acquisition of fill material, as well as locations for cut material, must be identified.

(g)     No retaining walls or embankments causing breaks in grade shall be permitted unless specifically approved by Tenant.

2.     "Tenant's Pad Area" shall be defined as the area extending five (5) feet beyond the Building walls and truck dock and ramp area, or to the back of curbing around the Building, whichever is further.  The Site Work shall comply with the following additional requirements:

(a)     Landlord shall be responsible for preparing the Tenant's Pad Area subgrades to within plus or minus one-tenth of a foot as set by Tenant's architect.  Tenant's subgrades are typically 8"-10" below finished floor elevation. Landlord will complete compaction in accordance with the appropriate engineering standards and building code requirements, but in no event less than ninety-five percent (95%) of the modified proctor soil test for water content and compaction levels ("Modified

Proctor") on the Land, so as to enable Landlord to perform construction work necessary to provide completed Improvements in accordance with the "Plans and Specifications" (defined in the Construction Provisions), with standard footings for soil with a minimum bearing capacity of 3,500 pounds per square inch and without the necessity of pilings or spread footings or other extraordinary foundation work. Tenant's minimum slab thickness and under slab fill will be established in accordance with the report of an independent professional soils engineer. Such report will be obtained by Landlord at its sole expense. All compacted areas of the Tenant's Preferred Area shall be verified by an independent professional soils engineering test laboratory and a certificate from such independent laboratory indicating compliance with the soils report shall be furnished to Tenant upon completion of the Site Work.

(b)    Tenant's Pad Area soil shall have a minimum bearing capacity of 2,500 pounds per square foot. Earth stabilization and/or replacement shall be performed by Landlord as necessary to meet this minimum requirement.

(c)    During the preparation of Tenant's Pad Area, Landlord shall at its expense have an independent professional soils engineering test laboratory monitor and certify the preparation of Tenant's Pad Area in accordance with the independent soils engineer's report referenced in Attachment "2" (II) above. The greater of three in-place compaction tests per work day or one in-place compaction test per 5,000 square feet of pad area must be completed.

(d)    On or before July 31, 1996, Landlord shall provide Tenant with:

(i)    An independent soils engineer's written certification that all pad work was completed in accordance with the Grading Plans and the Plans and Specifications. This report shall include the results of all compaction and other tests performed during the pad preparation phase and any tests performed prior to the date of such certification.

(ii)    A surveyor's written elevation certification stating that Tenant's Pad Area is at the prescribed elevation within the stated tolerance of plus or minus one-tenth of a foot. This certification shall be based upon an "as-prepared" survey which shall accompany such certification and shall show thereon elevation shots taken on a 50-foot-grid minimum including pad perimeter and building corners. Promptly upon completion of the Site Work, Landlord shall cause its surveyor or engineer to designate the corners of the Land by means of standard surveying monuments.

(e)    Landscaping slopes and berms shall be set by Landlord to preserve the integrity of the slopes as determined by an independent soils engineer. However, in no case may the slope of a landscaping berm within the Tenant's Preferred Area exceed 3 to 1 in turf areas, or 2 to 1 in ground cover and shrub areas.

(f)    Top soil excavated during grading of the Shopping Center shall be stockpiled by Landlord and made available for use during final landscaping operations including landscaping inside perimeter sidewalks around the Building, if found agronomically suitable by an independent soils analysis lab.  Other excavated soil material shall be stockpiled and made available for use as backfill if required, but only if a soil report indicates it is suitable.

(g)    All material, including native and fill, within 3 feet of any surface of the building including foundation concrete, shall be nonexpansive with a plasticity index of 12 or less.  The material shall also have sufficient cohesion to stand vertically for 3 feet.  No oversize material or lumps greater than 6" in diameter will be allowed and not more than 15% of the material shall be greater than 2-1/2" diameter.

(h)    The Grading Plans shall not be materially changed by Landlord without the prior consent of Tenant, which consent shall not be unreasonably withheld or delayed.

(i)    All outlots or future building areas shall be rough graded and planted with grass seed.

MWBB 12/5/95

7716U:\1097\Circuit\midatl\rockv\lease.012

<u>Attachment "4"</u>

Grading Plans


[To be attached by parties after execution of Lease]

Attachment "5"

Construction Schedule

| Landlord's Task | Completion Date |
|---|---|
| 1. Construction of all-weather construction access to the Premises, staging area and curbcuts in Tenant's Preferred Area. | July 30, 1996 |
| 2. Completion of Site Work including approval for all curbcuts. | July 30, 1996 |
| 3. Installation of temporary utilities. | July 30, 1996 |
| 4. Landlord's delivery of the Land to Tenant | July 31, 1996 |
| 5. Construction and installation of permanent utilities including permanent telephone service. | October 1, 1996 |
| 6. Construction and installation of storm water drainage. | January 15, 1996 |
| 7. Construction and installation of paving (including heavy-duty paving) and curbing. | January 15, 1997 |
| 8. Completion of landscaping at Shopping Center. | February 1, 1997 |
| 9. Construction and installation of exterior lighting in the Shopping Center. | January 15, 1997 |
| 10. Construction and installation of any pylon and/or monument sign(s) identifying the Shopping Center. | February 1, 1997 |

MWBB 12/5/95

7716U:\1097\Circuit\midatl\rockv\lease.012

Attachment "6"

Site Work Certification


To:    Circuit City Stores
       9950 Mayland Drive
       Richmond, Virginia  23233
       Attention:  Vice President-Real Estate

       Re: Circuit City Store/Rockville, Maryland-Lease Agreement dated _____


Ladies and Gentlemen:

The undersigned, as Landlord under the Lease has caused "delivery of the Land" to occur, and accordingly, completion of the Site Work, all in accordance with the terms of the Lease.  Specifically the undersigned hereby certifies that:   (i) the grading of the Land has occurred in accordance with the Standards for Grading Work, attached as Attachment "3" to the Lease, and Tenant's building pad has been prepared strictly in accordance with your geotechnical report; (ii) the Staging Area has been completed and (iii) an all-weather construction access road to the Land no less than 24 feet width has been prepared and is ready for your use.


All conditions precedent to issuance of your building permit have been satisfied by the Landlord, and we certify that all elements of the Site Work and delivery of the Land have been satisfied in accordance with the Lease.


       [LANDLORD]

2

Attachment "7"

Utilities Specifications

Landlord will provide the following temporary utilities to within fifty (50) feet (five (5) feet in the case of water) of the Premises no later than the date for completion of such temporary utilities set forth in the Construction Schedule:

> water (from the hydrant) and electric power (200 amps, 1-phase, 4-wire, 120 volts, with weatherproof and rainproof fused disconnect switch) for use by Tenant in its construction of the Improvements.

Landlord will provide the following permanent utilities to within five (5) feet of the Premises at Tenant's identified entry points no later than the date for completion of such permanent utilities set forth in the Construction Schedule:

> gas (if available), telephone, permanent electricity (adequate for 800-amp panel, 3-phase, 277/480 volt), sanitary sewer (6" line), domestic water (2" line), fire protection water (8" line, 50 pounds per square inch residual pressure, 2000 gallons per minute or at least sufficient capacity to service Tenant's sprinkler system without the need for any fire pump, as approved by Tenant's fire protection consultant).

<u>Attachment "8"</u>

**Utility and Drainage Plan**

[To be attached by parties after execution of Lease]

<u>Attachment "9"</u>

Paving Specifications

1.    With respect to parking area and roadway surfacing:

    (a)    Pavement design shall be based on a "Design Period" of twenty (20) years for the traffic indices specified by an independent civil engineer approved by Tenant and compensated by Landlord.

    (b)    All pavement design shall be subject to review and approval by Tenant, and shall conform to the recommendations of an independent soils engineer selected and compensated by Landlord.

    (c)    Consideration must be given to heavier use in main drives and service area.

2.    With respect to sidewalks and curbs:

    (a)    Landlord shall provide and install all curbs and sidewalks including perimeter curbs and sidewalks.

    (b)    All sidewalks and curbs shall be constructed of concrete and shall have a minimum slope of 1.5% and a maximum slope of 3.0% away from the Building. All sidewalks and curbs shall be a minimum of four (4) inches thick, with a rough non-skid texture (as approved by the Landlord's architect with respect to the Common Area), over a suitable granular base. Salt finish is not acceptable.

    (c)    Entrance and access roads and other areas as required for suitable drainage, shall have six (6) inch curbs with 18-inch gutters; however, next to sidewalks and buildings when drainage is not a factor a straight curb six (6) inches (without gutters) above the finished paving shall be permitted. Parking lot islands and landscape enclosures shall be vertical barrier-type curbs and all integral-type curbs and gutters and vertical barrier-type curbs shall be concrete. Extruded asphalt or concrete curbing may not be used.

    (d)    Curbs at all non-parking areas shall be painted an appropriate color with an exterior flat appropriate color latex paint, receive a trowel finish and be designated "No Parking" by a contrasting paint color.

Attachment "10"

Shopping Center Lighting Specifications

Minimum design standards for lighting of the Shopping Center are as follows:

1.   The Developer shall prepare and submit plans showing the location and height of all light poles, fixtures, type of fixture shielding (if any), circuiting and details of the complete lighting arrangement and equipment.

2.   Illumination as measured at pavement shall be:

   a.   5.0 foot candles minimum maintained within 50' of Tenant's entry.

   b.   One and one-half (1 1/2) foot candles average maintained, measured at grade.

   c.   2.0 foot candles minimum maintained on entry drives.

3.   Twenty-five percent (25%) of the overall lighting shall be designated as security lighting (i.e., remains on from dusk to dawn).  The security lighting layout and pattern shall be subject to Tenant's approval.

4.   Selection of fixture types shall be subject to Tenant's review and approval prior to design and circuiting.

5.   Landlord shall install a seven-day time switch to control all parking area lighting wired to a common house panel.  All security lighting shall be placed on photo-cell switching.

6.   The control of parking area lights shall be accessible to Tenant's local store management due to late-night and holiday sales.

<u>Attachment "11"</u>

**Schematic Floor Plan and Elevation**

[to be added]





## EXHIBIT "D"

STORE FIXTURES

ALL STORAGE RACKING

ALL SECURITY SYSTEM ITEMS

TELEPHONES AND PAGING SYSTEMS

COMPUTER SYSTEM

OFFICE FURNITURE AND TRASH RECEPTACLES

BATTERY CHARGER

TRASH COMPACTOR

SIGNS (INTERIOR/EXTERIOR)

ANTENNA SYSTEM

ELECTRONIC SWITCHING

AIR COMPRESSOR (ROADSHOP)

SAFE

CONVEYOR

MEDECO CYLINDER LOCKS (5)

REFRIGERATOR AND MICROWAVE USED BY EMPLOYEES

TACK BOARDS

WATER COOLER

FIRE EXTINGUISHERS

AUDIO ROOM FIXTURES AND SWITCHGEAR

PICTURES

WAREHOUSE AND MATERIAL HANDLING EQUIPMENT (MOVABLE LADDERS,   DOLLIES, ETC.)

TRACK LIGHTS (CANS ONLY, NOT TRACKS)



CONGRESSIONAL NORTH SHOPPING CENTER -- FREESTANDING IDENTIFICATION SIGN
BIGNELL WATKINS HASSER ARCHITECTS
OCTOBER 27, 1995

Red Lobster.  BED BATH & BEYOND
CIRCUIT CITY BOOKS AND STUFF
CRAFTS & MORE    FASHION BASEMENT

✳ All Tenant Lettering to
Be "cast" black letters

CIRCUIT CITY
STORES INC.
9950 MAYLAND DRIVE
RICHMOND VA. 23233



TYPICAL FRONT ELEVATION

CIRCUIT CITY
STORES INC.
9950 MAYLAND DRIVE
RICHMOND VA. 23233



# AUDIO VIDEO COMPUTERS

SIGN (1)

SIGN (2)

SIGN (3)

# APPLIANCES

SIGN (4) LAYOUT

SECTION SIGN (1)

LETTER DETAIL
SIGN (1)

53'-0"

9'-1"   3'-0"   9'-8"   3'-0"   19'-11"

19'-4"

**SIGN D**
MANUFACTURE ONE (1) SET OF 24" CHANNEL LETTERS WITH PLASTIC FACES AND INTERNAL
LIGHTING AS PER OUR DRAWING

MESSAGE: AUDIO VIDEO APPLIANCES (20 LINE)

MATERIALS:
CHANNEL LETTERS CONSTRUCTED OF .040 ALUMINUM 1" DEEP AND SPRAYED BRUSHED
ALUMINUM ON ALL EXTERIOR SURFACES AND WHITE ON INTERIOR OF LETTER.

LIGHTING FROM AN OUTLINE OF 15MM CLEAR RED NEON TUBING POWERED BY 30MA
PYREX TRANSFORMERS LOCATED IN EACH LETTER. ALL WIRING AND MATERIALS WILL BE
U.L. APPROVED.

FACES OF 1/8" RED #2283 BANDED WITH 1" SILVER SILVATRIM MOLDING.

MOUNT LETTERS FLAT AGAINST ALUCOBOND FASCIA WITH FIF STAINLESS STEEL SCREWS.

MOUNT LETTERS FLAT AGAINST ALUCOBOND FASCIA WITH FIF STAINLESS STEEL SCREWS.

ELECTRICAL TO SIGN LOCATION BY OTHERS. THREE (3) 20 AND 120 VOLT CIRCUITS
REQUIRED. PRIMARY LINES PIGTAILED OUT BACKS OF LETTERS IN 20 SECTIONS OF
LIQUID TYPE GREENFIELD INTO JUNCTION BOXES ON INSIDE OF WALL. NOTE: LOCAL
INSTALLER TO INTERCONNECT ALL LETTERS AND MAKE FINAL HOOK UP TO CIRCUITS
PROVIDED BY OTHERS. NOTE: ALL ELECTRICAL AND MOUNTING PENETRATIONS SEALED
WITH SILICONE ADHESIVE.

ALL WIRING AND MATERIALS
USED WILL BE U.L. APPROVED
AND IN ACCORDANCE WITH N.E.C.

**CIRCUIT CITY
STORES INC.**
9950 MAYLAND DRIVE
RICHMOND VA. 23233

NOTE: ACCESS MUST BE
PROVIDED TO THIS
AREA BY OTHERS

JUNCTION BOX

.040 ALUMINUM CHANNEL
SPRAYED MATTHEWS BRUSHED
ALUMINUM AL-5942

.040 ALUMINUM CHANNEL
SPRAYED MATTHEWS BRUSHED
ALUMINUM AL-5942

15MM CLEAR RED
NEON POWERED BY
30MA. PYREX TRANS.

1/8" #2783 RED
RFX FACES

1" SILVER
SILVATRIM MOLDING



**Customer Pick-Up**

NON-ELECTRIC

SIGN E LAYOUT

*CIRCUIT CITY*
Car Stereo Installation

SIGN F LAYOUT        NON-ELECTRIC

SIGNS E & F:
MANUFACTURE TWO (2) SINGLE FACED NON ELECTRIC LOZENGE SHAPED BUILDING
MOUNTED SIGNS AS PER OUR DRAWING

MESSAGES:   SIGN E - (1) 15' X 8'-0'   - CUSTOMER PICK-UP
            SIGN F - (1) 30' X 8'-0'   - CIRCUIT CAR STEREO INSTALLATION

MATERIALS:
SIGNS FABRICATED OF ALUMINUM OVER ALUMINUM ANGLE SPRAYED MEXICALI RED
#42-214 ON ALL SURFACES.

COPY AND INSET BORDER OF BRUSHED ALUMINUM VINYL.

MOUNT SIGNS ON RESPECTIVE BACKGROUNDS WITH CONCEALED FASTENERS.

SECTION SIGNS E & F

*CIRCUIT CITY*
*STORES INC.*
8950 MAYLAND DRIVE
RICHMOND VA. 23233

CIRCUIT CITY
SQUARE FOOTAGE CALCULATIONS

I.    36" CIRCUIT CITY

OPTION A - CALCULATIONS ON EACH QWRD

3' X 19        57 )
                    )   90 SQ. FT. PER SET
3' X 11'       33 )


OPTION B - CALCULATIONS ON FOUR LINES

7' X 19'       133 SQ. FT.


OPTION C - CALCULATIONS ON EIGHT LINES

3' X 19'       57 )
                    )   101 SQ. FT.
4' X 11'       44 )


OPTION D - CALCULATIONS BASED ON SIZE OF EACH LETTER

C - 32-1/2 - 8.13 SQ. FT.      C - 32-1/2 - 8.13
I - 11-1/4 - 2.81             I - 11-1/4 - 2.81
R - 32      - 7.98            T - 31      - 7.74
C - 32-1/2 - 8.13            Y - 37-1/2 - 9.38
U - 32      - 7.98                       -----
I - 11-1/4 - 2.81                        28.06
T - 31        7.74
              -----
              45.58
              28.06
              -----
              73.64 SQ. FT. X 2 =

## CIRCUIT CITY
## SQUARE FOOT CALCULATIONS

II.    31' CIRCUIT CITY

OPTION A - 31' X 16'     41.28 )
                                ) 69.66 SQ. FT.
          31' X 11'     28.38 )


OPTION B -  6' X 16'              96 SQ. FT.


OPTION C - 31' X 16     41.28 )
                                ) 72.06 SQ. FT.
          41' X 9     30.78 )

CIRCUIT CITY
SQUARE FOOT CALCULATIONS

III.   24" AUDIO VIDEO APPLIANCES

OPTION A - CALCULATIONS ON EACH WORD

| AUDIO | - 2' X 9'-7" | - | 19.16 SQ. FT. | |
|---|---|---|---|---|
| VIDEO | - 2' X 9'-8" | - | 19.32 SQ. FT. | |
| APPLIANCES | - 2' X 19'-4" | - | 38.66 SQ. FT. | _____ 77.14 SQ. FT. |
| COMPUTERS | 2' X 20' | - | 40. SQ. FT. | |

--------------
117.14 SQ. FT.

OPTION B - CALCULATIONS ON 4 LINES
W/OUT "COMPUTERS"      2' X 53'      106   SQ. FT.

WITH "COMPUTERS"      2' X 80'-8"   161.32 SQ. FT.

OPTION C - CALLCULATIONS BASED ON SIZE OF EACH LETTER

| A - 22-1/2" | - 3.75 SQ. FT. | A - 22-1/2" | - 3.75 SQ. FT. | C - 22" | - 3.6 SQ. FT. |
|---|---|---|---|---|---|
| U - 19 | - 3.16 | P - 19 | - 3.16 | O - 23 | - 3.84 |
| D - 21 | - 3.5 | P - 19 | - 3.16 | M - 24-1/2 | - 4.08 |
| I - 5 | - .84 | L - 17 | - 2.84 | P - 19 | - 3.16 |
| O - 23 | - 3.84 | I - 5 | - .84 | U - 19 | - 3.17 |
| | | A - 22-1/2 | - 3.75 | T - 20 | - 3.32 |
| V - 22 | - 3.66 | N - 20-1/2 | - 3.4 | E - 18 | - 3. |
| I - 5 | - .84 | C - 22 | - 3.6 | R - 20 | - 3.32 |
| D - 21 | - 3.5 | E - 18 | - 3. | S - 20 | - 3.32 |
| E - 18 | - 3. | S - 20 | - 3.32 | | |
| O - 23 | - 3.84 | | | | |
| | ----- | | ----- | | ----- |
| | 29.93 | | 30.82 | | 30.8 |

-------------------------------------------------------------------
91.55 SQUARE FEET



## CIRCUIT CITY
## SQUARE FOOT CALCULATIONS

IV.   CUSTOMER PICK-UP

OPTION A -  9" X 4'-0"      3 SQ. FT.

OPTION B - 16" X 8'-0"    10.64 SQ. FT.

## CIRCUIT CITY
## SQUARE FOOT CALCULATIONS

V.   CIRCUIT CITY CAR STEREO INSTALLATION

OPTION A - 16" X 8'-0"     10.64 SQ. FT. (NO CIRCUIT CITY)

OPTION B - 30" X 8'-0"      20 SQ. FT.

## CIRCUIT CITY
## SQUARE FOOT CALCULATIONS

VI.   READER BOARD

5'0" X 12'-0"     60 SQ. FT.

# EXHIBIT "F"

## PART I - PERMITTED ENCUMBRANCES

1.      The restrictive lease provisions, and proposed restrictive lease provisions set forth in Parts II and III, respectively, of this Exhibit "F."

2.      Deeds of trust and other security instruments pursuant to which Tenant has been granted nondisturbance in accordance with the terms of this Lease.

3.      The non-exclusive rights of third parties in and to the Common Areas, but only to the extent such rights do not conflict with the rights purported to be granted to Tenant hereunder.

# EXHIBIT "F"

## Part II - "EXCLUSIVES" CURRENTLY IN EXISTENCE

1.      **The following provision contained in the Bed Bath and Beyond** Lease, which contains the following provision:

    <u>Section 2</u>.  Landlord and Tenant specifically agree with each other as follows:

       A.    In recognition of the fact that the following types of operations would unduly burden the parking areas serving the Premises and the Shopping Center and would hamper the use of said parking areas by customers of Tenant, Landlord will not lease, sell, or otherwise permit any structure within the Shopping Center to be used in whole or in part as a supermarket, (provided however this restriction shall not preclude Landlord from leasing one food store of 12,000 square feet or less, no part of which is located within 180 linear feet of any portion of the Premises), bar (excepting from this prohibition full service restaurants having a bar as an incidental part of its food service operation, which restaurants may only be located in the spaces presently occupied by Red Lobster in 10,000 square feet of space and the Hooter's building of 8,000 square feet, which includes the space presently occupied by Citizen's Bank), theater of any kind, bowling alley, skating rink, amusement park, carnival, meeting hall, "disco" or other dance hall, sporting event or other sports facility, auditorium or any other like place of public assembly unless such structure is presently shown on the Site Plan, or health spa.  Except for the restaurants referred to above and any replacements thereof, Landlord will not permit any other restaurants

in the Shopping Center. Landlord shall also not permit the operation of any non-retail businesses in the Buildings designated Anchor "A", "B" and "C" on the Site Plan.

        B.     Landlord further agrees during the term of this Lease it will not lease, sell or otherwise permit any structure within the Shopping Center to be used in whole or in part for any manufacturing operation; as a factory; for any industrial usage; as a warehouse, processing or rendering plant; for any establishment selling cars (new or used), trailers, mobile homes; for the operation of a billiard parlor, amusement center, flea market, massage parlor or carnival; for a so-called "off-track betting" operation; or for the operation of a pornography store or adult book store.

Landlord agrees that it will not lease (including granting consent for an assignment or subletting) or sell any premises within the Shopping Center to a business which uses in the aggregate more than three percent (3%) of its floor area for the sale or rental of:   linens and domestics, bathroom items, housewares, window treatments and/or closet, shelving and storage items.

MWBB 12/5/95

7716U:\1097\Circuit\midatl\rockv\lease.012

## EXHIBIT "G"
## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT
### (Mortgage)

THIS AGREEMENT, dated the _____ day of _____, 199____, between _____, a _____ ("Mortgagee"), and CIRCUIT CITY STORES, INC., a Virginia corporation ("Tenant").

## W I T N E S S E T H :

(a) Tenant has entered into a certain lease (the "Lease") dated _____, _____ with Congressional North Associates Limited Partnership ("Landlord"), covering premises located within that certain property known as Congressional North Shopping Center, located in the City of Rockville, _____ County, Maryland, and more particularly described in Schedule A hereto; and

(b) Mortgagee has made a loan to Landlord as evidenced and secured by a [Deed of Trust] recorded _____, 199____ in the land records of _____ County, _____, in Book _____ at page _____ (the "Mortgage"), encumbering the property described in Schedule A; and the parties hereto desire to set forth their agreement with regard to the priority of the Mortgage and the effect thereof on Tenant and its leasehold interest in the aforesaid premises, as set forth below.

NOW, THEREFORE, in consideration of the premises and of the sum of One Dollar ($1.00) by each party in hand paid to the other, the receipt of which is hereby acknowledged, the parties hereby agree as follows:

1.  The Lease is and shall be subject and subordinate to the lien of the Mortgage insofar as it affects the real property of which the premises form a part, and to all renewals, modifications, consolidations, replacements and extensions thereof, to the full extent of the principal sum secured thereby and interest thereon.

2.  Tenant agrees that it will attorn to and recognize any purchaser at a foreclosure sale under the Mortgage, any transferee who acquires the premises by deed in lieu of foreclosure, the successors and assigns of such purchasers, as its Landlord for the unexpired balance (and any extensions, if exercised) of the term of the Lease upon the same terms and conditions set forth in the Lease.

3.  In the event that it should become necessary to foreclose the Mortgage, Mortgagee thereunder will not terminate the Lease nor join Tenant in summary or foreclosure proceedings so long as Tenant is not in default under any of the material terms,

covenants, or conditions of the Lease, beyond any applicable cure period provided in the Lease.

4.  Mortgagee consents to the application of casualty and condemnation proceeds in accordance with paragraphs 15 and 16 of the Lease between Landlord and Tenant, whether or not the Mortgage is then foreclosed.

5.  In the event that Mortgagee shall succeed to the interest of Landlord under the Lease, Mortgagee shall not be:

(a) liable for any act or omission of any prior lessor (including Landlord); or

(b) liable for the return of any security deposits unless delivered to Mortgagee; or

(c) bound by any rent or other periodic payments which Tenant might have paid for more than the current month to any prior lessor (including Landlord); or

(d) bound by any amendment or modification of the Lease made without its consent, which consent shall not be unreasonably withheld or delayed.

6.  Notwithstanding anything contained herein to the contrary, it is expressly understood and agreed that in the event that Landlord defaults in the payment of the Tenant Improvement Allowance, as defined in the Lease, and Mortgagee acquires title to the Shopping Center by foreclosure or otherwise, Mortgagee shall become liable for payment of the Tenant Improvement Allowance to Tenant, and Tenant shall otherwise be entitled to effect a Transfer all in accordance with the terms of the Lease.

7.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, and their successors and assigns.

MWBB 12/5/95
7716U:\1097\Circuit\midatl\rockv\lease.012

IN WITNESS WHEREOF, the parties hereto have executed these presents the day and year first above written.

ATTEST:                                    CIRCUIT CITY STORES, INC.,
                                           a Virginia corporation

_____        By:_____
_____            _____


ATTEST:                                    COMPANY NAME

_____        By:_____
_____            _____


Note: Attach appropriate notary blocks for the State.

## EXHIBIT "G"

## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

(Ground Lease)

THIS AGREEMENT, dated the _____ day of _____, 199___, between
_____, a _____ ("Ground Lessor"), and
CIRCUIT CITY STORES, INC., a Virginia corporation ("Tenant").

### W I T N E S S E T H :

(a) Tenant has entered into a certain lease (the "Lease") dated _____, _____ with Congressional North Associates Limited Partnership ("Landlord"), covering premises located within that certain property known as Congressional North Shopping Center, located in the City of Rockville, _____ County, Maryland, and more particularly described in Schedule A hereto; and

(b) Ground Lessor has entered into a Lease with Landlord as evidenced and recorded _____, 199_____ in the land records of _____ County, _____, in Book _____ at page _____ (the "Ground Lease"), covering the property described in Schedule A; and the parties hereto desire to set forth their agreement with regard to the priority of the Ground Lease and the effect thereof on Tenant and its leasehold interest in the aforesaid premises, as set forth below.

NOW, THEREFORE, in consideration of the premises and of the sum of One Dollar ($1.00) by each party in hand paid to the other, the receipt of which is hereby acknowledged, the parties hereby agree as follows:

1.  The Lease is a sublease and shall be subordinate to the Ground Lease insofar as it affects the real property of which the premises form a part thereof.

2.  Tenant agrees that it will attorn to Ground Lessor and any successor to the Ground Lessor by deed or otherwise as its Landlord for the unexpired balance (and any extensions, if exercised) of the term of the Lease upon the same terms and conditions set forth in the Lease, in the event of a termination of the Ground Lease.

3.  In the event that it should become necessary to terminate the Ground Lease, Ground Lessor thereunder will not terminate the Lease nor join Tenant in summary proceedings so long as Tenant is not in default under any of the material terms, covenants, or conditions of the Lease, beyond any applicable cure period provided in the Lease.

4.    Ground Lessor consents to the application of casualty and condemnation proceeds in accordance with paragraphs 15 and 16 of the Lease between Landlord and Tenant, whether or not the Ground Lease has been terminated.

5.    In the event that Ground Lessor shall succeed to the interest of Landlord under the Lease, Ground Lessor shall not be:

(a) liable for any act or omission of any prior lessor (including Landlord); or

(b) liable for the return of any security deposits unless delivered to Ground Lessor; or

(c) bound by any rent or other periodic payments which Tenant might have paid for more than the current month to any prior lessor (including Landlord); or

(d) bound by any amendment or modification of the Lease made without its consent, which consent shall not be unreasonably withheld or delayed.

6.    Notwithstanding anything contained herein to the contrary, it is expressly understood and agreed that in the event that Landlord defaults in the payment of the Tenant Improvement Allowance, as defined in the Lease, and Ground Lessor terminates the Lease, Ground Lessor shall become liable for payment of the Tenant Improvement Allowance to Tenant, and Tenant shall otherwise be entitled to effect a Transfer all in accordance with the terms of the Lease.

7.    This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, and their successors and assigns.

MWBB 12/5/95

7716U:\1097\Circuit\midatl\rockv\lease.012

IN WITNESS WHEREOF, the parties hereto have executed these presents the day and year first above written.


ATTEST:                                    CIRCUIT CITY STORES, INC.,
                                           a Virginia corporation


_____      By:    _____
_____             _____


ATTEST:                                    COMPANY NAME


_____      By:    _____
_____             _____


Note: Attach appropriate notary blocks for the State.

MWBB 12/5/95
7716U:\1097\Circuit\midatl\rockv\lease.012

<u>EXHIBIT "H"</u>

MEMORANDUM OF LEASE

This Memorandum of Lease is made this _____ day of _____, 1995, between **CONGRESSIONAL NORTH ASSOCIATES LIMITED PARTNERSHIP**, a _____ _____ (hereinafter referred to as "Landlord"), and **CIRCUIT CITY STORES, INC.**, a Virginia corporation (hereinafter referred to as "Tenant").

W I T N E S S E T H:

Landlord and Tenant have entered into a Lease (the "Lease") dated _____, 1995, whereby Landlord has leased to Tenant a portion of the real property (the "Property"), located in the City of Rockville, Montgomery County, Maryland, the legal description of which Property is set forth on <u>Exhibit "A-1"</u> attached hereto. The Lease contains provisions and rights appurtenant to the Property, some of which are as follows:

I.  <u>Term</u>. The term of the Lease is for a period of fifteen (15) years, commencing on the Commencement Date (as established in the Lease based upon the substantial completion of the improvements upon the Property). Thereafter, Tenant has the right under the Lease to renew and extend the term of the Lease for five (5) successive periods of five (5) years each.

II.  <u>Exclusive Use Rights</u>. The Lease provides that Tenant shall enjoy the sole and exclusive privilege in the Shopping Center located on the Property to sell or rent consumer, office and automotive electronics products (which include, but shall not be limited to, televisions, stereos, speakers and video recorders and players), computer hardware and software, entertainment software and entertainment media (which include, but shall not be limited to, records, game cartridges, video tapes, cassettes and compact discs), cellular telephones, household appliances (which include, but shall not be limited to, refrigerators, freezers, stoves, microwave ovens, vacuum cleaners and dishwashers) and related goods, and the sale and installation of motor vehicle audio, stereo and telephone systems.

III.  <u>Successors</u>. The covenants, conditions and agreements made and entered into by the parties hereto shall be binding upon and inure to the benefits of their respective heirs, administrators, executors, representatives, successors and assigns.

IV.    <u>Incorporation of Lease</u>.  All terms and conditions of the Lease are hereby incorporated
herein by reference as if fully set forth herein.

V.    <u>Conflicts with Lease</u>.  This Memorandum of Lease is solely for notice and recording
purposes and shall not be construed to alter modify, expand, diminish or supplement the
provisions of the Lease.  In the event of any inconsistency between the provisions of this
Memorandum of Lease and the provisions of the Lease, the provisions of the Lease shall
govern.


IN WITNESS WHEREOF, this Memorandum of Lease has been duly executed by the parties
hereto as of the day and year first above written.

CONGRESSIONAL NORTH ASSOCIATES LIMITED
PARTNERSHIP,    a    _____    limited
partnership


By:    _____
Name: _____
Title: _____


CIRCUIT CITY STORES, INC.,
Attest:                                     a Virginia corporation


By:_____          By:    _____
        Secretary                            Name: _____
                                             Title: _____


Note:  Attach appropriate notary blocks for the state.

## EXHIBIT "I"

## COMMENCEMENT DATE AGREEMENT

THIS AGREEMENT, made as of this ____ day of _____, 19__, between CONGRESSIONAL NORTH ASSOCIATES LIMITED PARTNERSHIP (herein called "Landlord"), and CIRCUIT CITY STORES, INC. (herein called "Tenant").

## W I T N E S S E T H:

WHEREAS, Landlord is the owner of certain premises situated in the City of Rockville, _____ County, Maryland (herein called the "Premises"); and

WHEREAS, by that certain lease dated _____ __, 19__ (herein called the "Lease"), Landlord leased the Premises to Tenant; and

[WHEREAS, a memorandum or short form lease in respect of the Lease was recorded in the office of the Clerk of _____ County, _____, on the ____ day of _____, 19__, in Book _____ at Page ____; and]

WHEREAS, Tenant is in possession of the Premises and the term of the Lease has commenced; and

WHEREAS, under Paragraph 25 of the Lease, Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease;

NOW, THEREFORE, Landlord and Tenant agree as follows:

1. The term of the Lease commenced on, and the Commencement Date (as such term is defined in the Lease) was, _____, 19__. The term of the Lease shall expire on January 31, ____ unless Tenant exercises any option to extend the term of the Lease or unless the Lease terminates earlier as provided in the Lease.

2. The date of commencement of the first "Option Period" (as such term is defined in the Lease) shall be February 1, ____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, ____ unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

3. The date of commencement of the second Option Period shall be February 1, ____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, ____ unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

MWBB 12/5/95
7716U:\1097\Circuit\midat\.rockv\lease.012

4. The date of commencement of the third Option Period shall be February 1, _____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, _____ unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

5. The date of commencement of the fourth Option Period shall be February 1, _____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, _____ unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

6. The date of commencement of the fifth Option Period shall be February 1, _____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, _____ unless the Lease terminates earlier as provided in the Lease.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed the day and year first above written.

Attest or Witness:                          Congressional North Associates Limited Partnership

_____        By    _____


Attest:                                     CIRCUIT CITY STORES, INC.


_____        By    _____
Assistant Secretary                           Vice President

MWBB 12/5/95

7716U:\1097\Circuit\midatl\rockv\lease.012

## EXHIBIT "J"

### INDEMNIFICATION AGREEMENT

This Indemnification Agreement is made this _____ day of _____, 199__, between CONGRESSIONAL NORTH ASSOCIATES LIMITED PARTNERSHIP a _____ corporation (hereinafter referred to as "Landlord") and CIRCUIT CITY STORES, INC., a Virginia corporation (hereinafter referred to as "Tenant").

### WITNESSETH

Landlord and Tenant have entered into a Lease (the "Lease") dated _____ whereby Landlord has leased to Tenant a portion of the real property located in the City of Rockville, _____ County, Maryland (the "Shopping Center") and Tenant has constructed on such real property a store premises (the "Premises").

NOW, THEREFORE, in consideration of the payment of the Tenant Improvement Allowance as defined in the Lease and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.     The Tenant hereby indemnifies and agrees to hold the Landlord harmless from any loss, payment, claim or expense as the result of mechanics and materialmen filing liens or otherwise making claims against Landlord's interest in the Premises and the Shopping Center. In the event that any mechanic, materialman or other claimant makes claim against the Premises or Shopping Center based upon materials or services provided under contract with the Tenant, the Tenant shall hold harmless and protect the Landlord from any loss, payment, claim or expense related thereto.

2.     The Tenant reserves the right to contest in good faith the amount of any claim or lien assessed against the Premises or the Shopping Center by any of such claimants; provided, however, should the holder or holders of such claim or lien attempt to enforce their lien by foreclosure by any other means, the Tenant shall bond around, pay or remove such lien by any manner reasonably necessary to protect Landlord's interest in the Premises and the Shopping Center. This indemnity and hold harmless shall not apply to any liens or claims caused by the Landlord or Landlord's agents.

EXECUTED this _____ day of _____, 199__.

**LANDLORD**

Congressional   North   Associates   Limited
Partnership

By: _____
Name: _____
Title: _____

**TENANT**

CIRCUIT CITY STORES, INC.,
a Virginia corporation

By: _____
Name: _____
Title: _____

MWBB 12/5/95
7716U:\I097\Circuit\midatl\rockv\lease.012

## EXHIBIT "F"

## Part III - "EXCLUSIVES" WHICH MAY BE GRANTED BY LANDLORD IN THE FUTURE

1.    Office Use Exclusive:

Section 5.2.1. Exclusive Use. Except for the sale of the Products, no part of the Center shall be used for the sale of office equipment, office furniture or office supplies, or the provision of any office services; and

Section 5.2.2. Prohibited Uses. No part of the Center shall be used for any of the following: (i) tanning, health, exercise or racquet club or spa, gymnasium, bowling alley, skating rink or other sports or recreational facility; (ii) school, library, reading room, or house of worship; (iii) movie theater, gallery, auditorium, meeting hall, hotel or motor inn; (iv) massage parlor, adult bookstore, a so-called "head" shop or off-track betting; (v) car wash, automobile repair work or automotive service, automobile body shop, automobile, boat, trailer or truck leasing or sales, or laundromat; (vi) amusement park, carnival, banquet facility, dance hall, disco, nightclub, or other entertainment facility including video game room, pool hall, arcade or other amusement center; (vii) any manufacturing, warehouse or office use (except incidental to a retail operation); (viii) funeral parlor, animal raising or storage, pawn shop, flea market or swap meet, junk yard; (ix) drilling for and/or removal of subsurface substances, dumping, disposal, incineration or reduction or garbage or refuse, other than in enclosed receptacles intended for such purposes; or (x) any use which constitutes a public or private nuisance or produces objectionable noise or vibration; and

2.    Nursery Exclusive:

Lessor covenants that Lessee shall have the exclusive right, during the term of the Lease and any renewal thereof, to operate a retail nursery and crafts store in the Shopping Center, and leases entered into subsequent to the date hereof with tenants in the Shopping Center will prohibit such tenants from selling at retail nursery and craft items, including but not limited to, nursery stock, indoor live goods, annuals, Easter plants, garden supplies and equipment, crafts, Christmas trees, decorations and trimmings ("Protected Merchandise"). This covenant shall not apply to existing and new tenants of the Shopping Center, with leases of a duration of one year or more, where the tenants' sale of Protected Merchandise is incidental to their business and the sale of Protected Merchandise occupies less than 1,500 square feet of gross leasable space.