UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA

IN RE:                          .   Case No. 08-35653(KRH)
                                .
                                .
                                .
CIRCUIT CITY STORES             .   701 East Broad Street
INC.,                           .   Richmond, VA 23219
                                .
                                .
          Debtor.               .   January 29, 2009
. . . . . . . . . . . . . . .        10:06 a.m.


TRANSCRIPT OF HEARING and BENCH RULING
BEFORE HONORABLE KEVIN R. HUENNEKENS
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:            McGuireWoods LLP
                           By:  DOUGLAS FOLEY, ESQ.
                           9000 World Trade Center
                           101 W. Main St.
                           Norfolk, VA  23510

                           Skadden Arps Slate Meagher & Flom LLP
                           By:  GREGG M. GALARDI, ESQ.
                                KELLAN GRANT, ESQ.
                           One Rodney Sq.
                           Wilmington, DE 19899

For the Creditors          Pachulski Stang Ziehl & Jones
Committee:                 By:  JEFF N. POMERANTZ, ESQ.
                           10100 Santa Monica Boulevard
                           11th Floor
                           Los Angeles, CA  90067


Proceedings recorded by electronic sound recording, transcript
produced by transcription service
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311    Fax No. (609) 587-3599**

2

**APPEARANCES (CONT'D):**

| | |
|---|---|
| For Greystone Data Systems: | Nixon Peabody, LLP<br>By:  CHRISTOPHER M. DESIDERIO, ESQ.<br>437 Madison Avenue<br>New York, NY  10022 |
| For TomTom: | Nixon Peabody, LLP<br>By:  DENNIS J. DREBSKY, ESQ.<br>     CHRISTOPHER M. DESIDERIO, ESQ.<br>437 Madison Avenue<br>New York, NY  10022 |
| For Pratt Center, LLC, Valley Corners, LLC, Mansfield SEQ287, WLTD, No. Plainfield VF, LLC, Marlton VF, LLC: | Sands Anderson Marks & Miller<br>By:  LISA TAYLOR HUDSON, ESQ.<br>801 East Main Street<br>Suite 1800<br>Richmond, VA  23219 |
| For Reverend Dwayne Funches, individually and as independent executor of the estates of Travis Funches, Dione Funches, Dwayne Funches, Jr., Emily Funches, Lovera Funches, Shatira Funches: | Sands Anderson Marks & Miller<br>By:  LISA TAYLOR HUDSON, ESQ.<br>801 East Main Street<br>Suite 1800<br>Richmond, VA  23219<br><br>Propes & Kaveny, LLC<br>By:  LORNA PROPES, ESQ.<br>833 West Jackson, Suite 200<br>Chicago, IL  60607 |
| For Cynthia Olloway, individually and as a Special Administrator of the estate of Cedric Coy Langston, Jr. a deceased minor: | Sands Anderson Marks & Miller<br>By:  LISA TAYLOR HUDSON, ESQ.<br>801 East Main Street<br>Suite 1800<br>Richmond, VA  23219<br><br>Propes & Kaveny, LLC<br>By:  LORNA PROPES, ESQ.<br>833 West Jackson, Suite 200<br>Chicago, IL  60607 |
| For Schimenti Construction: | LeClairRyan<br>By:  TARA ELGIE, ESQ.<br>225 Reinekers Lane<br>Suite 700<br>Alexandria, VA 22314 |

**APPEARANCES (CONT'D):**

| | |
|---|---|
| For Schimenti<br>Construction: | Thelen, LLP<br>By:  PATRICK M. BIRNEY, ESQ.<br>     PETER E. STRNISTE, ESQ.<br>185 Asylum Street<br>Cityplace II, 10th Floor<br>Hartford, CT   06103 |
| For Verizon Wireless: | Blank Rome, LLP<br>By:  REGINA STANGO KELBON, ESQ.<br>One Logan Square<br>130 North 18th Street<br>Philadelphia, PA   19103 |
| For Madison Waldorf,<br>LLC: | Bean, Kinney & Korman, P.C.<br>By:  MITCHELL B. WEITZMAN, ESQ.<br>2300 Wilson Boulevard<br>Suite 700<br>Arlington, VA   22201 |
| For James Stacia: | CowanGates<br>By:  FRANK F. RENNIE, IV, ESQ.<br>1930 Huguenot Road<br>P.O. Box 35655<br>Richmond, VA   23235 |
| For Savitri Cohen: | Christian & Barton, LLP<br>By:  MICHAEL MUELLER, ESQ.<br>909 East Main Street<br>Suite 1200<br>Richmond, VA   23219 |
| For ESI: | Seyfarth Shaw<br>By:  RHETT E. PETCHER, ESQ.<br>975 F Street, N.W.<br>Washington, D.C.   20004 |
| For Alliance<br>Entertainment, LLC.: | Linowes and Blocher, LLP<br>By:  BRADFORD F. ENGLANDER, ESQ.<br>7200 Wisconsin Avenue<br>Suite 800<br>Bethesda, MD 20814-4842 |
| For the Official<br>Committee of Unsecured<br>Creditors: | Tavenner & Beran, PLC<br>By:  PAULA STEINHILBER BERAN, ESQ.<br>20 North Eighth Street, Second Floor<br>Richmond, VA 23219 |

4

**APPEARANCES (CONT'D):**


For the Official          Pachulski Stang Ziehl & Jones
Committee of Unsecured    By:  ROBERT FEINSTEIN, ESQ.
Creditors:                780 Third Avenue, 36th Floor
(via telephone)           New York, NY 10017-2024

For the Federal           Hunton & Williams
Warranty Service          By:  JOHN RONALD SMITH, ESQ.
Corporation and           Riverfront Plaza, East Tower
related Assurant          951 East Byrd Street
Companies:                Richmond, VA 23219-4074

For Chase Bank, USA:      Kutak Rock LLP
                          By:  MICHAEL A. CONDYLES, ESQ.
                          Bank of America Center
                          1111 East Main Street, Suite 800
                          Richmond, VA 23219-3500

For Golf Galaxy, Inc.:    Williams Mullen
                          By:  WILLIAM H. SCHWARZSCHILD, III,
                               ESQ.
                          James Center Two
                          1021 East Cary Street
                          Richmond, VA 23219

**J&J COURT TRANSCRIBERS, INC.**

# I N D E X

                                                          **PAGE**

**WITNESSES FOR THE MOVANTS**

LORNA PROPES
  Direct Examination by Ms. Hudson          35
  Cross Examination by Mr. Foley            52


**SUMMATION**

  By Ms. Hudson                             55
  By Mr. Foley                              69
  By Ms. Hudson                             73
  By Mr. Foley                              81




| **EXHIBITS** | | **ID.** | **EVD.** |
|---|---|---|---|
| A | Graph | 27 | 28 |
| B | Endorsement | 28 | 28 |
| C | Complaint | 28 | 28 |

**J&J COURT TRANSCRIBERS, INC.**

6

1          THE CLERK:  All rise.  The United States Bankruptcy

2    Court for the Eastern District of Virginia is now in session.

3    The Honorable Kevin R. Huennekens presiding.  Please be seated

4    and come to order.

5          The matter of Circuit City Stores, Incorporated, case

6    number 0835653.  Hearing on items one through nineteen as set

7    out on debtor's amended agenda.

8          MR. FOLEY:  Good morning, Your Honor, Doug Foley with

9    McGuireWoods on behalf of Circuit City.  With me at counsel

10   table is Gregg Galardi from Skadden Arps as well as Kellan

11   Grant from Skadden Arps.

12         Your Honor, one thing that we would like to address

13   with the Court first that's actually not on the agenda.  Mr.

14   Englander is here on behalf of Alliance Entertainment, LLC.

15         Alliance is a -- holds -- claims to hold a

16   warehouseman's possessory lien over certain inventory that we

17   own, DVDs, video games, and the like in their warehouses.

18   Under the final DIP order they got preservation of their rights

19   with respect to whatever that lien may turn out to be.

20   Everybody reserved rights to challenge it later.

21         The problem is we have a lot of goods that are in

22   their possession.  We would like to have those released to get

23   to the store so that it could be sold as part of the sale

24   process.

25         And Alliance obviously wants adequate protection with

1  respect to whatever their lien rights are.  The amount that

2  they are owed that they claim to have a possessory lien against

3  our goods is $1,028,153.34.

4        And what we've agreed is we're working on language of

5  a consensual stipulation establishing adequate protection for

6  this warehouseman's lien that would provide that that amount of

7  money from the sale proceeds of the sale that's ongoing would

8  be segregated by the debtors in a bank account later with

9  everybody reserving their rights with us with respect to

10  whether or not the value of the goods that were sold didn't

11  meet that amount, with respect to the bank saying they defeat

12  their lien in a priority dispute.

13        But the money is set aside and that -- once it's set

14  aside and once you know we announce that some --

15        THE COURT:  The lien would attach to the proceeds.

16        MR. FOLEY:  Whatever it is, it would attach to the

17  proceeds.  And he can go make a phone call so that those goods

18  can start to ship right away because time is really of the

19  essence to get these goods into the stores.

20        And the bank's counsel is here.  They're not going to

21  be a party to the stipulation but they have acknowledged it and

22  they don't have an objection to the protocol that we have

23  established and same is true with the committee counsel I

24  believe, Your Honor.

25        THE COURT:  All right.  Mr. Englander.

**J&J COURT TRANSCRIBERS, INC.**

8

1           MR. ENGLANDER:  Yes, Your Honor.  Because of the time

2   sensitivity the stipulation is going to be coming over the next

3   several days we hope.  But assuming the Court will excuse me as

4   we're finished with this portion of the hearing, I will make a

5   phone call and let my client know that they should take the

6   goods that are now on the docks and ship them as quickly as

7   possible.

8           But one of the things I do want to make clear is that

9   the lien is going to be preserved despite the fact that we're

10  shipping before the stipulation is finalized and entered.  This

11  is the replacement lien and proceeds.

12          THE COURT:  I understand exactly what you're saying

13  and that's a sensible resolution it seems to me.

14          MR. ENGLANDER:  All right.

15          THE COURT:  Let me hear from Ms. Beran.

16          MS. BERAN:  Good morning, Your Honor.  For the record

17  Paula Beran on behalf of the Official Committee of Unsecured

18  Creditors.  In addition, Your Honor, Mr. Robert Feinstein is on

19  the line this morning representing the committee as well.

20          This matter was brought to the committee's attention

21  late yesterday.  While the professionals of the committee do

22  believe that this is a wonderful idea in concept, we have not

23  had the opportunity to review any of the documents.

24          We do appreciate the party's efforts in coming up

25  with this resolution.  But nonetheless given the short time

9

1 period we have not been able to digest and obtain committee

2 support so we're not able to stand before Your Honor this

3 morning to either support it or object to it.

4          THE COURT:  Okay.  Very good.  Well obviously the

5 Court hasn't looked at the documents either because I

6 understand there are no documents.  But I understand the

7 concept.  The concept makes good sense to me and so I will

8 approve that provisionally and look forward to receiving the

9 stipulation.

10          MR. FOLEY:  We'll submit that later today, Your

11 Honor.  There's one other item that wasn't on the agenda.

12          MR. ENGLANDER:  Your Honor, may I be excused?

13          THE COURT:  You may be excused.  Thank you, sir.

14          MR. ENGLANDER:  Thank you very much, Your Honor.

15          MR. FOLEY:  One other item that's not on the agenda,

16 Your Honor, is we did submit a proposed order extending the bar

17 date for the Canadian Monitor in the Canadian proceeding with

18 respect to our case.

19          MR. GALARDI:  It's the Canadian debtor not the

20 monitor but he was here before.

21          MR. FOLEY:  Okay.

22          MR. GALARDI:  Your Honor, if I may?

23          THE COURT:  Yes.

24          MR. GALARDI:  As you are aware there is a Canadian

25 proceeding going on and one of the affiliated companies of the

**J&J COURT TRANSCRIBERS, INC.**

1   debtors is in bankruptcy.

2           At the request of the monitor who is not in control

3   of that entity but is charged with protecting the creditors of

4   the Canadian entity, they had asked for an extension of the bar

5   date.

6           We had submitted a stipulation that extended that bar

7   date.  I don't know if Your Honor will get a chance to sign and

8   approve it, but tomorrow is the bar date so I wanted to make it

9   clear that even if the order is not entered by tomorrow, Your

10  Honor, we've agreed to extend the bar date as set forth in that

11  stipulation.

12          We -- Mr. Hedgebeth (phonetic) who is in the

13  courtroom is on behalf of a U.S. debtor acting as the

14  shareholder for Canadian entity, authorized that Canadian

15  entity to have a longer bar date.

16          And again it's just in case of inter company claims

17  between the States and Canada.  That stipulation was worked out

18  with monitor's counsel.  Our Canadian counsel approved it.  And

19  so I just wanted to make sure on the record that we've agreed

20  to extend that bar date regardless of whether that order

21  happens to get entered by tomorrow or not.

22          And counsel for the monitor is in the courtroom today

23  and it's not on the agenda.

24          THE COURT:  Okay.  Has that order been tendered to me

25  at this point?

**J&J COURT TRANSCRIBERS, INC.**

1            MR. GALARDI:  I think it was tendered yesterday, Your

2   Honor.

3            THE COURT:  Okay.  So I should be able to get that

4   entered today without any problem.  But I understand the point

5   that you're making.

6            MR. GALARDI:  Thank you, Your Honor.

7            THE COURT:  Thank you.

8            MR. SMITH:  Good morning, Your Honor, J.R. Smith on

9   behalf of the Canadian monitor.  Mr. Galardi is correct and we

10  would ask the Court to consider the order that's been submitted

11  consensually and to expedite its consideration and approval as

12  soon as possible.

13           THE COURT:  I should be able to get that entered as

14  soon as we're done with our proceedings today.

15           MR. SMITH:  Thank you, Your Honor.

16           MR. FOLEY:  Thank you, Your Honor.  Sorry for the

17  distraction there off of the agenda.  We can now go to the

18  items that are listed on the agenda.

19           Your Honor, item number one is a motion by CCD, St.

20  Mary, and Popolio (phonetic) with respect to compulsion of

21  payment of certain post-petition rent.  We've settled up with

22  them on their post-petition obligations and we've paid them.

23           That matter is resolved and can be removed from the

24  docket.

25           THE COURT:  All right.

**J&J COURT TRANSCRIBERS, INC.**

1              MR. FOLEY:  Your Honor, the same is true with the

2   next motion, item number two, which is the motion of Cole CC

3   Town MALC for compelling payments under 365(d)(3).  I believe

4   Mr. Condyles is here.  That has also been settled up and paid.

5              THE COURT:  All right.  Mr. Condyles.

6              MR. CONDYLES:  That's correct, Your Honor.  We've

7   reached an agreement on that.

8              THE COURT:  All right.  So that will be resolved as

9   well.

10             MR. FOLEY:  Your Honor, item number three, this is

11  also a similar motion by Cottonwood Corners Phase V, LLC for an

12  order compelling payment under 365(d)(3) and 503(b).  We have

13  resolved the payment issue there on post-petition rent and that

14  has -- that can be removed from the docket.

15             THE COURT:  All right.

16             MR. FOLEY:  Your Honor, item number four is again our

17  motion to establish sale down procedures for trading and equity

18  securities.  This may ultimately become moot but it's not yet

19  so we would ask the Court to adjourn that until the next

20  hearing on February 13th, Your Honor, at 10:00.

21             THE COURT:  Okay.

22             MR. FOLEY:  Your Honor, item number five.  Mr.

23  Schwarzschild is here.  There is a couple remaining objections

24  to a lease rejection motion that we had our first hearing on by

25  Golf Galaxy, Dick's Sporting Goods and Dollar Tree stores.

**J&J COURT TRANSCRIBERS, INC.**

13

1          I believe they were trying to work out new

2     arrangements with the over landlord.  These were subleases that

3     were rejected.  And they ask that we continue this matter,

4     their objections until the February 13th omnibus hearing date

5     and possibly farther.

6          In fact I believe we have a hearing on March 3rd,

7     Your Honor, and if -- I did not know what date that was when we

8     were discussing it yesterday, but if Mr. Schwarzschild wants

9     the March 3rd date, we're fine with that as well.

10          MR. SCHWARZSCHILD:  That's fine with us, Your Honor.

11     Thank you.

12          THE COURT:  March?

13          MR. FOLEY:  March 3rd is the next hearing date.

14          THE COURT:  March 3rd will be the date then.  Okay.

15          MR. FOLEY:  Your Honor, item number six is a motion

16     that was continued from the last hearing by Engineered

17     Structures.  I believe we have one issue left that we have to

18     deal with?  Okay.

19          MR. PETCHER:  Your Honor, we've actually agreed to a

20     pair of consent orders that we've submitted to Your Honor, one

21     of which would lift the stay to allow a foreclosure action to

22     proceed as to the two closed stores.

23          The other is a temporary solution which allows for

24     ESI to file, service, and post a lis pendens in California with

25     respect to the two stores that are still operating.

**J&J COURT TRANSCRIBERS, INC.**

1        We've agreed, the parties have agreed to allow that

2   to happen with the condition that nothing further will happen

3   until we either resolve the issues relating to the scope of the

4   stay and whether ESI can proceed further or it becomes moot by

5   some other reason.

6        The only reason -- one thing I would ask, Your Honor.

7   The deadline for the first of those lien foreclosures is Monday

8   so we would just simply ask that if possible if you would be

9   able to at least take a look at those orders to ensure that we

10  have something on the record so we can proceed with those by

11  Monday.  Is that -- do you think that would be possible?

12           THE COURT:  Have those orders been submitted to me?

13           MR. PETCHER:  Yes, Your Honor, one of them was

14  submitted on Wednesday and -- I'm sorry -- Tuesday and the

15  other one was submitted yesterday, Your Honor.

16           THE COURT:  I'll certainly take a look at those.

17           MR. PETCHER:  Okay.  Thank you.

18           THE CLERK:  Could I get your name for the record

19  please?

20           MR. PETCHER:  Oh, I'm sorry.  It's Rhett Petcher for

21  Engineer Structures, Inc.  One other thing on the orders, Your

22  Honor.  The parties agreed to continue the remaining of the

23  issues until the next hearing which is February 13th so the

24  other issues raised we'd ask to continue those until the next

25  hearing.

**J&J COURT TRANSCRIBERS, INC.**

15

1          THE COURT:  That was my understanding.

2          MR. PETCHER:  Okay.

3          THE COURT:  Thank you.

4          MR. FOLEY:  Thank you, Your Honor.  Item number seven

5    is the next item on the agenda.  This is also a motion by

6    Motorola for allowance and payment of an administrative claim

7    under 503(b)(9).  They have agreed to adjourn this matter until

8    the February 13th docket date.

9          Your Honor, similarly item number eight which is the

10   motion of General Instrument Incorporation doing business as

11   Home Networks Mobility business of Motorola, Inc. for allowance

12   and payment of an administrative claim under 503(b)(9).

13         They have similarly agreed to adjourn this matter

14   until the February 13th omnibus hearing date.

15         Your Honor, item number nine is our motion to approve

16   a settlement with IBM Corporation.  The committee has asked for

17   additional time to review the terms of that settlement and so

18   we've agreed to adjourn that matter until the February 13th

19   omnibus hearing date.

20         THE COURT:  All right.

21         MR. FOLEY:  Your Honor, item number ten is a motion

22   for relief from stay by Plum Choice.  They originally asked for

23   an expedited hearing.  But in talking to them we're going to

24   try to see if we can work through their issues and reach a

25   resolution before the February 13th omnibus hearing date.

**J&J COURT TRANSCRIBERS, INC.**

 1          And based upon that representation to try to resolve

 2   the matter they've agreed to adjourn the matter until the

 3   February 13th hearing date as well.

 4          THE COURT:  All right.

 5          MR. FOLEY:  Your Honor, item number 11, this is the

 6   motion of Federal Warranty Services Corp. to compel assumption

 7   rejection of the Assurant agreement.

 8          This one has some relationship to the Greystone

 9   adversary proceeding that's also on for the 13th.  They've

10   agreed to adjourn this matter until the February 13th omnibus

11   hearing date.

12          THE COURT:  All right.

13          MR. FOLEY:  Your Honor, I'm going to skip 12 for a

14   moment because Mr. Grant is going to address the Court on

15   number 12 and number 14.  Number 13, Your Honor, is our motion

16   to approve a settlement with Verizon.

17          We have agreed to continue that matter until the

18   February 13th hearing date.  I'll just --

19          MR. GALARDI:  Yes, let me just --

20          MR. FOLEY:  Okay.

21          MR. GALARDI:  Your Honor, it's a little more tricky

22   than that.  Your Honor, we passed over -- again for the record

23   Gregg Galardi.  Your Honor, with respect to -- this is somewhat

24   related if you've read the papers, and I'm sure you have, to

25   the Plum Choice matters and we've skipped over Plum Choice and

**J&J COURT TRANSCRIBERS, INC.**

1  I believe Plum Choice yesterday filed a large administrative

2  claim.

3         So what we had requested Verizon to do was in light

4  of that to move this over to February 13th.  Unfortunately

5  Verizon's counsel could not get to their client since the

6  events.  So it's not an agreement.

7         We're going to seek to move it over to the 13th.

8  They do not contest that, but they can't say that they've

9  consented to it.  So I didn't want it to be an agreement.  They

10 were specific about that because they haven't reached the

11 counsel.

12        There is no deadline by which we had to have that

13 settlement approved so we don't think it puts the settlement.

14 We just wanted to evaluate it in light of the Plum Choice

15 motion, the Plum Choice claim because they are rather related.

16        So we've asked to move that over to the 13th.

17 They've not agreed, but they don't object.

18        THE COURT:  All right.  Very good.  It will be set

19 for the 13th then.

20        MR. GALARDI:  Thank you, Your Honor.

21        MR. GRANT:  Good morning, Your Honor, Kellan Grant

22 for the debtors.  I'm just going to address items 12 and 14.

23        Twelve involves a lease that we originally were going

24 to reject.  It had a sublease under it.  The over landlord

25 requested that instead we let them purchase the lease so we

18

1  filed a motion to assume the assign.

2         The subtenant subsequently objected and wanted to put

3  in a counteroffer.  Since that time those two parties have

4  worked together and the objection is withdrawn.

5         THE COURT:  All right.

6         MR. GRANT:  Item 14 is the motion on Mansfield for

7  relief from stay.  This involves a tenant allowance under a

8  lease where we built a building.

9         Pre-petition the building was finished and the tenant

10 allowance came due.  There is some dispute about whether it

11 really was payable in light of events, the upcoming rejection,

12 the fact that there were liens against the property.

13        So we've reached a resolution and we'll submit an

14 order that basically nets out the allowance with claims of the

15 landlord and liens and we will convey the property.

16        There's some question of the ownership of the

17 building.  The order will provide that we convey that building

18 to Mansfield as well.

19        THE COURT:  All right.  Very good.

20        MR. GRANT:  Thank you, Your Honor.

21        MR. FOLEY:  Your Honor, if we could drop down for a

22 moment over the number 15, Mr. Galardi will address the items

23 on the remainder of the docket and then we could come back to

24 number 15, Your Honor.

25        THE COURT:  All right.  That will be fine, Mr. Foley.

1            MR. GALARDI:  Your Honor, moving to 16 and 17.  As

2   Your Honor may recall the approval of the Protivity (phonetic)

3   and the Jeffries (phonetic).  Your Honor, in light of the

4   company's store closing procedures I had expressed a concern

5   about continuing professionals.

6            I'm pleased to say that we're continuing to work with

7   the committee regarding budgets, financials, and do that.  What

8   I would ask for is on that same issue, although I think I have

9   a proposal I don't think we have formalized it and there may be

10  some other lingering issues that we're going to meet and talk

11  to the committee with I think as early as tomorrow.

12           What I'd ask to do is to simply put this over to

13  February 13th.  I haven't said this to Mr. Feinstein who's on

14  the call.  What we'd do is put it over to February 13th.  We

15  did have a February 5th date in our sort of agreement that we

16  may have Jeffries only extend to February 5th, but I did want

17  to talk to him about that in light of the Canadian sale

18  process, the IP sale process, and Jeffries continuing role in

19  how we come up with a wind down budget for this company.

20           So I think -- I'll spring it on Mr. Feinstein on the

21  phone -- but if that's acceptable I'd assume we could put this

22  over to February 13th to continue to work cooperative on that

23  issue.

24           THE COURT:  All right.  Very good.  Mr. Feinstein, do

25  you have any objection to carrying this over to the 13th of

1  February?

2          MR. FEINSTEIN:  No, Your Honor, that's fine with us.

3          THE COURT:  All right.  Very good.  Thank you, sir.

4  All right.  That will be carried over to -- that's number 16?

5          MR. FOLEY:  And 17.

6          MR. GALARDI:  And number 17 yes, Your Honor.

7          THE COURT:  Okay.  Both of those will be carried over

8  to the 13th of February.

9          MR. GALARDI:  Thank you, Your Honor.  Your Honor,

10  number 18 is as Your Honor received we had had a motion by

11  Chase which is our private label credit card company to

12  expedite a hearing to have us reject or terminate the

13  agreement.

14          We filed an opposition to that and frankly we hadn't

15  gotten our after the one week of which has had a lot of flurry

16  of activity, hadn't understood exactly what the implications

17  were.

18          We have agreed with Chase to put that over to the

19  February 13th hearing so that we can assess it and see if we

20  can reach a consensual resolution.  If we're unable to do so

21  then we'll be before Your Honor on that motion on February

22  13th.

23          THE COURT:  Mr. Condyles, do you wish to be heard on

24  that?

25          MR. CONDYLES:  Yes, sir, if I may.  Michael Condyles

1  on behalf of Chase Bank, USA.

2         Your Honor, just to give a little color to this, we

3  did ask for an emergency hearing on this.  And to put some

4  flavor into what we're addressing from Chase's side that

5  resulted in the request.

6         Chase has issued the private label and cobranded

7  credit cards for Circuit City and that constitutes

8  approximately a $3 billion credit card portfolio that they have

9  outstanding so it's no insignificant sum to Chase.

10        Now the cobranded cards and the private label, what

11 are they?  Well when you go into Circuit City and you get your

12 ten percent off if you get a Circuit City card that has their

13 label on it and you can use it only there, that's the private

14 label.

15        Cobranded is your Visa card that has a Circuit City

16 label on it but you can use it anywhere including Circuit City.

17        So there are substantial amounts that are in this

18 portfolio and there are substantial obligations that Chase has

19 under the existing credit card program agreement.

20        In light of the liquidation there's no conceivable

21 way that that program agreement can be assumed by the debtor

22 under its terms or otherwise, but there are significant

23 obligations that Chase has including the maintaining of a call

24 center with 600 employees down in Kennesaw, Georgia,

25 maintaining a management staff here, and so forth.

22

1          So we were to us it's very important that we get

2     before the Court immediately.  We did give deference to the

3     request of the debtor to give it more opportunity to review

4     this document.

5          But we want to emphasize the necessity to go forward

6     on the 13th one way or another.  So I just wanted to put some

7     color to this for the Court's benefit and --

8          THE COURT:  So that's a long way of saying you're in

9     agreement?

10                         (Laughter)

11          MR. CONDYLES:  We are in agreement.

12          THE COURT:  Okay.

13          MR. CONDYLES:  Thank you, Your Honor.

14          THE COURT:  All right.

15          MR. GALARDI:  And, Your Honor --

16          THE COURT:  And we'll hear it by the 13th.

17          MR. GALARDI:  And, Your Honor, again I was trying to

18     be short.  We obviously have a disagreement about a lot of

19     those things that are said so that's why we thought it would be

20     important to put it on the 13th.

21          Your Honor, number -- so we would -- a short way to

22     say number 18 is adjourned to February 13th.

23          Your Honor, number 19 is a motion of the Assurant

24     Companies.  Again there's been an agreement of asking for an

25     extension of that time to February 13th as well and the parties

**J&J COURT TRANSCRIBERS, INC.**

23

 1  have agreed to adjourn that.

 2          THE COURT:  All right.  Mr. Smith, do you wish to be

 3  heard on that?

 4          MR. SMITH:  For the record, Your Honor, J.R. Smith on

 5  behalf of Federal Warranty Service Corporation and related

 6  Assurant Companies.  What Mr. Galardi said is correct.  Thank

 7  you, Your Honor.

 8          THE COURT:  Okay.  Very good.  So we'll carry number

 9  19 over to February 13 as well.

10          MR. GALARDI:  Thank you, Your Honor.

11          THE COURT:  Thank you, Mr. Galardi.

12          MR. FOLEY:  Your Honor, before we get to the Funches

13  lift stay matter which we're going to go forward on, as Your

14  Honor is aware we contacted chambers about another hearing date

15  that we may need between February 13th and March 3rd.

16          And obviously everybody doesn't need to stick around

17  for the Funches relief from stay matter, but everybody may want

18  to know, who's in the courtroom, may want to know if Your Honor

19  has some time available the week of February 23rd if we could

20  get on the calendar for that.

21          MR. GALARDI:  And, Your Honor, to give some color,

22  one, you notice that we've had a number of adjourned matters;

23  two, we anticipate as the liquidation of the stores go for

24  example we're going to have lease matters so Your Honor is very

25  familiar with the number of landlords that have come.

**J&J COURT TRANSCRIBERS, INC.**

1          The 13th may be a little tight.  We hope to file

2   motions probably by February 2nd, 3rd, and 4th on various

3   matters.  So we sort of picked that 23rd, 24th to try to get 20

4   or more -- close to 20 days notice.

5          So anywhere in that time frame would be very helpful

6   for us to schedule some matters and they probably couldn't wait

7   until March 2nd because lease rejections and the accrual method

8   and other matters it makes sense to have in that time period.

9          I hate to burden you with another hearing there, but

10  that's sort of where we're thinking.  Not only what we just

11  adjourned, I know there will be some contested matters and

12  landlord matters which I think takes up a significant time on

13  the docket.

14          THE COURT:  All right.  Well the Court's calendar is

15  tight that week but we'll make it happen.  I can do the

16  afternoon on Wednesday the 25th beginning at 2:00.  Would that

17  work?

18          MR. FOLEY:  Yes, Your Honor.

19          THE COURT:  Okay.

20          MR. FOLEY:  Other than the Funches relief from stay

21  matter I think that concludes everything that we wanted to

22  address the Court today.

23          THE COURT:  All right.

24          MR. FOLEY:  Your Honor, Ms. Hudson and I have talked

25  about some stipulations and stipulated exhibits which I think

1   will cut down on the hearing quite a bit.

2           Your Honor, Ms. Hudson has asked that I read the

3   stipulation into the record and then there's three related

4   exhibits that are uncontested that we can hand up to the Court

5   as well.

6           THE COURT:  All right.

7           MR. FOLEY:  As Your Honor is aware this motion for

8   relief from stay has to do with a request to seek to be able to

9   go after insurance proceeds.  Part of the issue that reasonably

10  ask -- are going to ask the Court to deny the motion is because

11  of the way the deductible and self insured retention works

12  under our insurance program.

13          But, Your Honor, the stipulated facts that we wanted

14  to bring to the Court's attention is that our general liability

15  policy for the year in question is with Old Republic Insurance

16  Company, the policy number is MWZY55973, the coverage for each

17  occurrence is $1.5 million, the deductible including allocated

18  loss adjustment and expenses is $1.5 million, and the self

19  insured retention exists including allocated loss adjustment

20  expenses is $500,000.

21          The second issue that we stipulated on factually,

22  Your Honor, is that Circuit City has expended approximately

23  $326,000 in costs of defense with respect to this litigation to

24  date that would go against the self insured retention of

25  $500,000.

1          Your Honor, we have also stipulated to the fact that

2    there are several lawyers of excess insurance.  And the

3    schematic that I'll be showing the Court lays it out, but I'll

4    read into the record the different layers.

5          Your Honor, after the first $2 million, again which

6    is Circuit City's expenditure, we have National Union Fire

7    Insurance Company which is the primary excess carrier for the

8    next $25 million, we have Liberty Mutual Insurance Company

9    which is the first layer after the primary of excess for $50

10   million, we have Fireman's Fund Insurance Company which is the

11   next excess layer for $25 million, we have American Guarantee

12   and Liability Company for the next $50 million, and Ohio

13   Casualty Insurance Company for the next $25 million.

14         Your Honor, we have also stipulated to the fact that

15   as part of this litigation Circuit City made a demand against

16   one of the other defendants insurance carriers Thompson, who's

17   the manufacturer of the television in question, to defend us

18   under indemnity obligation.

19         They declined, their carrier declined to take up the

20   defense of the matter so we had to file a DEC action in same

21   court that's pending as a separate proceeding to recover our

22   cost of defense that has been expended against Thompson's

23   insurance carrier.  And we have a copy of that particular

24   complaint that we will submit as a stipulated exhibit.

25         Your Honor, we have also agreed as part of narrowing

1  the presentation of evidence here today that we will provide

2  copies of the excess liability policies that I just mentioned

3  to counsel for the Funches by February 6th provided that it's

4  done so under a suitable confidentiality agreement.

5          Did I read it right?

6          MS. HUDSON:  Good morning, Your Honor, Lisa Hudson

7  here on behalf of the Funches and the Olloways.

8          The only addition I have is under the fifth

9  stipulation, the dec action with Thompson over the

10 indemnification and defense between the two codefendants.

11         Thompson actually did handle defense for two years

12 from 2006 to 2008 in the case and then stopped and that

13 precipitated the dec action filed.

14         But with that exception the complaint and all of its

15 exhibits and the schematic that Mr. Foley mentioned and I

16 believe a self insured retention excerpt are the exhibits or

17 documents that we stipulate on the admissibility of today.

18         THE Court:  All right.  Thank you, Ms. Hudson.

19         MR. FOLEY:  Your Honor, I'll hand the exhibits up at

20 this point.

21         THE Court:  This is three copies of the same thing,

22 Exhibit A.

23         MR. FOLEY:  Yes, I have one for the law clerk and one

24 for the Court and then -- Your Honor, what that is is a

25 schematic obviously that shows, it graphically depicts what I

1  just read to you as part of the stipulation.

2       The column that you should look at for purposes of

3  this is general liability which is the second column and then

4  go up.  You'll see the 500 shaded in orange, that's the 500

5  self insured retention.

6       And then you see a green box that says Old Republic

7  Insurance Company 1.5 million.  That's the essentially the GL

8  fronting that Old Republic is doing but that's our deductible

9  too.

10      And then when you get to the yellow that's when the

11 actual real insurance kicks in.

12      The next exhibit, Your Honor, is Exhibit B.  This is

13 an endorsement to the Old Republic policy that sets forth the

14 $500,000 self insured retention.

15      Your Honor, the second page of that document shows

16 the dollar amount for the self insured retention.

17      The last exhibit, Your Honor, is the complaint that

18 Ms. Hudson referenced with respect to the declaratory judgment

19 action.

20      MS. HUDSON:  And, Your Honor, this complaint has just

21 a portion of the exhibits, but the complaint is complete.

22      THE COURT:  Thank you, Ms. Hudson.

23      MR. FOLEY:  Your Honor, we would ask that all those

24 exhibits be admitted into evidence.

25      THE COURT:  They will be admitted as Exhibits A, B,

**J&J COURT TRANSCRIBERS, INC.**

29

1   and C that were handed up.

2          MR. FOLEY:  Okay.  With that I don't know that we

3   have any -- the debtors don't have any additional evidence,

4   Your Honor, at this point.

5          THE COURT:  All right.  Thank you, Mr. Foley.

6          MS. HUDSON:  Thank you, Your Honor.  Again Lisa

7   Hudson here on behalf of I'll just short circuit and say the

8   Funches and the Olloways, the movants today.  And I'm here with

9   Lorna Propes from Illinois who is lead counsel for the Olloway

10  family.  She flew in for this hearing today.

11         I think Your Honor knows from the preliminary hearing

12  that this is a state court case of wrongful death and something

13  called survival claims unique to Illinois regarding products

14  liability and strict liability and negligence involving a

15  September 24th house fire at the Funches's home.

16         And a suit was filed in 2005 first by the Funches

17  family and then later joined by Olloway just as we have done in

18  this motion for relief from stay proceeding that killed four

19  children.  Three children in the Funches family, one child in

20  the Olloway family.

21         And that case was filed in March 2005 so it's four

22  years and going.  The TV was manufactured by one of the

23  defendants Thompson.  It was sold by Circuit City and serviced

24  by Circuit City.  And those defendants are Thompson, Circuit

25  City, and RCA.

**J&J COURT TRANSCRIBERS, INC.**

1        And the City of Chicago is also a defendant because

2   of a 911 call that was made and hung up on thinking that it was

3   a prank.  And so as a result we have the four deaths and it is

4   a joint and several liability case amongst those defendants and

5   Ms. Propes will be able to explain that far better than I can.

6        But Illinois has a unique creature in their joint and

7   several liability that as long as you have 25 percent liability

8   against any -- against all of the defendants you can choose

9   which of the defendants you recover against.  So it is a

10  different creature than what we have here.

11       And it is a jury trial and there has been extensive

12  discovery.  And again she will testify to that today.

13       But movants come forward today to say that this is

14  not a core proceeding because under 28 U.S.C. 157 this is the

15  wrongful death carve out that Congress has for tort action or

16  wrongful death and it's not appropriate for those type matters

17  to be tried in bankruptcy court.

18       Those matters should be liquidated and brought to

19  judgment in a tribunal like the state court or in a district

20  court here or a district court there.  But this Court has

21  discretion to abstain and allow it to stay in the state court

22  where it's been proceeding for four years and then it would

23  come back to this Court in terms of the scheme for collection

24  on that claim.

25       But to try to put this into the context of a 502

**J&J COURT TRANSCRIBERS, INC.**

1 proceeding or some sort of claims objection process is not

2 appropriate because Congress has mandated that this Court

3 doesn't liquidate that claim.

4        So that's what is at issue today and of course the

5 insurance would come into play at the collection standpoint,

6 not at the standpoint of liquidating this actually to a sum

7 certain or a judgment.

8        And there will be probably argument about the cost to

9 the debtor here in liquidation to defend this, but case law is

10 very clear that unless you have something of the mega realm of

11 10,000 cases or 25,000 cases or 50,000 cases, and you've got an

12 arsenal of attorneys, and you have management involved, and you

13 have extensive review and a huge litigation team, that those

14 defense costs aren't at that nature of prejudice in the

15 balancing test.  And I will speak to that in a moment.

16       But we do have a stipulation that $326,000 has been

17 exhausted and if you divide that by the years we're at I think

18 about 62 grand a year.

19       And I guess significantly yesterday morning I got the

20 ABI blog on my computer that says debtor's counsel's earning

21 $18.50 a minute in this case.  So putting it all in perspective

22 $60,000 a year, I'm not making light of that figure, but that

23 is not the kind of prejudice that Congress spoke of in 157 and

24 it's not the kind of prejudice in case law for merely having to

25 defend a matter.

**J&J COURT TRANSCRIBERS, INC.**

1        So I want to be clear that we are backing away from

2   our original relief sought in the motion for relief.  We're not

3   seeking to collect, we are just seeking to reduce the claim to

4   a judgment amount and have this Court abstain in its discretion

5   and allow this to continue before Judge Egan.

6        This Court has entered a comfort order previously to

7   educate Judge Egan that the stay did not apply to non debtors

8   and unfortunately that's still a confusion in that court.

9        The City of Chicago doesn't want to learn that and

10  doesn't want to accept that and wants to ride the bandwagon of

11  the stay.  And I believe there's even another hearing tomorrow

12  in that regard.  And again I'm going to need to defer to Ms.

13  Propes to give the Court a status update there.

14       But we are not seeking to collect, we are just

15  seeking to reduce the judgment.  And we had tried and

16  represented to Your Honor at the preliminary hearing that we

17  were going to have this judicial recusal hearing and we were

18  going to have some major things in the litigation that didn't

19  really affect everyone and have cost carved out and possibly

20  try to resolve things and maybe have some destructive testing

21  and inspection of the artifacts from the fire.

22       Those negotiations unfortunately broke down in light

23  of the liquidation and because debtor's argument is that the

24  costs are significant there.  But today Ms. Propes will be able

25  to testify that those costs aren't significant, it will be

1   videotaped, they don't need to have an expert or an attorney

2   there.

3        But once you undo the beast and pop the back off and

4   blow fuses or cut into things it can't be undone and we can't

5   even go against non debtor parties in a way that would

6   prejudice or spoil -- or have a spoliation claim.

7        So at a minimum we have to be allowed to the extent

8   that the stay still applies to do that destructive testing.

9   And all parties have agreed that April 1st, 2nd, and 3rd could

10  be carved out for that and the cost associated for that we

11  would even be willing to pay at the facility and all the

12  evidence would be digital so it could be later ordered by

13  Circuit City if there would be a need in their defense in the

14  litigation.

15       So with that in mind we have filed this motion for

16  relief.  It was on an expedited basis.  We did have those carve

17  outs.  And today we come to the Court seeking those two things,

18  the ability to proceed with that inspection of artifacts which

19  is the TV and various other appliances in the Funches's home

20  which is now destroyed, and to proceed in the litigation in

21  Cook County circuit court which has been going on since 2005

22  before Judge Egan who has now been restored through that

23  judicial recusal hearing that this Court allowed to go forward.

24       If I might call -- have Ms. Propes sworn in and call

25  her.

1          THE COURT:  I think Mr. Foley would like to make an

2  opening statement too.

3          MS. HUDSON:  Sure.

4          MR. FOLEY:  Your Honor, just first a correction of a

5  couple factual statements.  This suit was filed originally in

6  2005 but we weren't a party to it initially.

7          This lawsuit was originally commenced against the

8  City of Chicago for failing to respond to a 911 call at this

9  residence that burnt to the ground and resulted in the deaths

10  of these children.  We weren't brought into the case until two

11  years later.

12          And another factual correction I think, I don't want

13  the Court to be misled with respect to the stipulation about

14  the cost that we've expended.

15          We had never been reimbursed by Thompson, the

16  manufacturer of this television, for any costs we've expended.

17  They have never taken up the defense.  We tendered the defense

18  to them.  They've always denied the claim which is why we had

19  to file the dec action which is Exhibit C.  So I just wanted to

20  make that clear, Your Honor.

21          And the other issue that I'm concerned about is I

22  don't know that it's appropriate for counsel to testify to the

23  Court about what's going on in the Chicago litigation.  If she

24  wants to make an argument or advise the Court as to what the

25  proceedings are, I guess that's appropriate.  But to take

Propes - Direct                                    35

1   testimony --

2          THE COURT:  Well I'm going to allow Ms. Hudson to

3   call her witness.

4          MR. FOLEY:  Okay.

5          THE COURT:  And if you have specific objection to any

6   of the questions that are asked --

7          MR. FOLEY:  Okay.

8          THE COURT:  -- if they're outside and don't qualify

9   under the rules of evidence, you can make your evidentiary

10  objection.

11         MR. FOLEY:  Thank you, Your Honor.

12         THE COURT:  Ms. Hudson, you may proceed.

13         MS. HUDSON:  Thank you, Your Honor.  Ms. Propes.

14         MS. PROPES:  Good morning, Your Honor.  Where would

15  you like me?  Oh, okay.

16         THE COURT:  Ma'am, would you stand right there next

17  to the marshal?

18         MS. PROPES:  Oh, stand right here.  Okay.  Now I see

19  why my witnesses get this confused.

20         THE COURT:  Yes.

21              LORNA PROPES, MOVANT'S WITNESS, SWORN

22                      DIRECT EXAMINATION

23  BY MS. HUDSON:

24  Q    Ma'am, please state your name for the record and spell

25  your last name.

**J&J COURT TRANSCRIBERS, INC.**

Propes - Direct                           36

1  A    My name is Lorna Propes, P as in Paul, r-o-p-e-s.

2  Q    Ms. Propes, what is your role in the Funches and Olloway

3  litigation in Cook County?

4  A    My firm represents Cynthia Olloway who is the mother of

5  one of the children who died in the fire.

6  Q    And when did you become involved in that litigation?

7  A    Well it would have been some time within several months

8  after the fire that was in 2004.

9  Q    And you ultimately drafted the complaint and amended

10  complaints and brought suit against the parties that have been

11  represented today?

12  A    That's correct.  The Funches family is represented by

13  attorney Dan Bederman.  He and I are co-counsel on the case.

14  There are no claims between the Funches and the Olloways, but

15  we are co-plaintiffs going forward against the three

16  defendants.

17  Q    And what counts relate to Circuit City specifically in the

18  Funches and Olloway matters?

19  A    Well there are three defendants.  The City of Chicago is

20  one defendant and on willful and wanton conduct claims

21  essentially.  Thompson which is the manufacturer of the RCA TV

22  and Circuit City from whom the Funches family purchased the TV

23  are defendants in the product liability claims.

24         The particular claim against Circuit City at this

25  time is (1) that they sold the television to the Funches family

**J&J COURT TRANSCRIBERS, INC.**

Propes - Direct                                    37

1  and (2) that they repaired the television in such a way as to

2  exacerbate the defect or fail to fix the defect in the TV.

3  Q    And how do those two claims relate to the wrongful death

4  and survival action?

5  A    In Illinois in the case of a death of an individual claim

6  can be brought pursuant to our wrongful death statute where the

7  people who have the right to recover are the heirs of the

8  deceased.

9        The survival claim is recovery of the deceased

10 person's estate for the person's conscious pain and suffering

11 during their lifetime.

12       So in some ways the same people recover but it's a

13 different avenue of recovery.  One is for wrongful death, one

14 is a recovery through the estate for the survival claims of the

15 deceased person.

16       And those claims in this instance and the claims

17 against Thompson and Circuit City, both the wrongful death and

18 the survival claims are based on product liability theories.

19       The case against the City is also for wrongful death

20 and survival, but it's based on willful and wanton conduct.  In

21 other words a higher form of negligence which has to be because

22 of the law in Illinois which indemnifies the City for

23 negligence.

24 Q    And how I mean you've heard me, Ms. Propes, try to explain

25 to the Court inartfully how joint and several liability works.

**J&J COURT TRANSCRIBERS, INC.**

Propes - Direct                                        38

1  But amongst multiple tortfeasors what is the process in

2  Illinois?

3          MR. FOLEY:  Your Honor, at this point I'm going to

4  object based upon relevancy.  This is really just explaining to

5  the Court the state of the law in Illinois.  I'm not sure it's

6  appropriate to have a lawyer --

7          THE COURT:  I'm not sure how it's relevant either but

8  I'm going to allow Ms. Hudson a little bit of leeway to tie it

9  up.

10          MS. HUDSON:  Thank you, Your Honor.

11 Q    Please explain how a joint and several liability --

12 A    I'll explain it specifically, Your Honor, with respect --

13 not to the City but to Thompson and Circuit City which is what

14 I think Ms. Hudson's trying to get me to address here.

15          And that is that under our joint and several

16 liability rules, if any one of a number of defendants is found

17 more than 25 percent liable by the jury, then they are jointly

18 and severally liable for the plaintiff's injuries.

19          That means that the plaintiff then has the option to

20 execute on the judgment against any of those found jointly and

21 severally liable.

22          If an entity, let's say Circuit City here, were found

23 to be jointly and severally liable, if they had no money, if

24 they were judgment proof, which in this instance of course they

25 never would be because they have $170 million in liability

**J&J COURT TRANSCRIBERS, INC.**

Propes - Direct                                   39

1  coverage out there, we could choose to execute against Thompson

2  or against the City and not execute against Circuit City at

3  all.  So that's one thing.

4          If Circuit City were found just simply severally

5  liable, that is under 25 percent but some liability under 25

6  percent, then that portion of that judgment could only be

7  executed, we could only execute against Circuit City for their

8  let's say 15 percent.

9          If they were judgment proof, if they didn't have $170

10  million in insurance coverage, then we probably just wouldn't

11  execute on that portion of the recovery if it could not be paid

12  by them.

13          But when you tip into the joint and several liability

14  category, then again we would have the option of executing

15  against anyone.

16          The problem that we face here and that we bring to

17  this Court today is not a matter of executing on a judgment

18  which we do not yet have, it's a matter of moving the

19  litigation forward.

20          So what's happening with the stay is that it's

21  keeping us from moving this complex litigation forward against

22  the other two defendants.

23          Now it shouldn't keep us from moving forward against

24  the City, but the City is fighting us tooth and nail on that

25  every inch of the way and as Ms. Hudson remarked we will have

Propes - Direct                                      40

1  another hearing on that tomorrow.

2          But it does keep us from moving forward against

3  Thompson because there's a commonality of issues between

4  Thompson and Circuit City, that is the defect in the TV.

5  Q    Ms. Propes, with respect to the posture of the case on

6  November 10th when the stay went into effect, where are you in

7  the litigation chain or chronology?

8  A    Well we have -- the litigation has been complex

9  particularly against the City.  And most, I will say that most

10  of the discovery work has revolved around the City up until

11  now, Your Honor, and indeed we've taken between 50 and 60

12  depositions in the case, countless discovery motions, motions

13  to compel, even motions for sanctions have been brought against

14  the City.

15          And so it has been a very hard fought litigation.

16  Nevertheless a great deal of work has been done.

17          The very next step in this process is for us to do a

18  inspection by an electrical engineer of the television, of the

19  remains of the television set and the other electronics that

20  were there.

21          The initial fire department inspections and

22  inspections done by our experts revealed that the origin of the

23  fire was at the television set.

24          So now the question is what is it about the

25  television set if anything that actually caused the fire.  So

**J&J COURT TRANSCRIBERS, INC.**

Propes - Direct                                    41

1  that's where we are.

2           We had this inspection set I want to say it was

3  January, February.  The stay came along and we weren't able to

4  do that.  We now have it set for April 1st, 2nd, and 3rd I

5  think we have those dates set aside.  Not that it will

6  necessarily take three days.

7           But that inspection is critical to us moving forward

8  in the case even, Your Honor, for our own analysis of the case

9  and our own development of our experts and our theories.  We

10 can't move forward until our expert can examine this artifact.

11          And I heard Mr. Foley makes some -- may I proceed

12 with this, Ms. Hudson, about the testing?

13          THE COURT:  I think it would be appropriate if you

14 answer questions --

15          THE WITNESS:  Okay, I'm sorry.

16          THE COURT:  -- that your counsel asks.

17          THE WITNESS:  Yeah.

18 Q    So you're at the point of a rescheduled testing and you

19 have conducted discovery, is that correct?

20 A    Yes, we have, a great deal of discovery.

21 Q    And does Circuit City have counsel in Cook County?

22 A    They do.

23 Q    What is their counsel team composed of?

24 A    Well they have a firm that represents them, a lawyer who

25 comes to court and an associate that comes to court sometimes.

Propes - Direct                                    42

1  Q     Is it one lawyer?

2  A     Usually there's one lawyer in court for Circuit City.

3  Q     And what is his or her name?

4  A     Mr. Vocolla (phonetic).

5  Q     And up to the point of the stay in November did Mr.

6  Vocolla participate in the litigation and defense of Circuit

7  City?

8  A     Sure, he did.

9  Q     Is there a dec action now between Circuit City and

10 Thompson for this indemnification and defense?

11 A     Actually I should say that Thompson filed a third party

12 complaint for contribution against Circuit City.  Circuit City

13 in turn has filed a third party complaint for contribution

14 against Thompson and this only controls how they between

15 themselves have to pay any judgment.

16       But Circuit City has also alleged in their

17 counterclaim against Thompson that Thompson has an insurance

18 policy which by the terms of their vendor agreement Thompson

19 was required to provide for Circuit City.

20       Circuit City has tendered their defense to this

21 insurance company that Thompson provided.  They've denied it.

22 So Circuit City not only has made in their counterclaim for

23 contribution the claim that Thompson breached the agreement to

24 provide insurance which obviously impacts this, but they've

25 also filed a declaratory judgment action seeking to force

**J&J COURT TRANSCRIBERS, INC.**

Propes - Direct                                    43

1  Thompson's insurance company to indemnify and defend them as

2  they most likely should be doing.

3          And that, and of course that is outside of any issue

4  that I guess would be involved.

5  Q    Ma'am, are both the dec actions and the third party

6  complaint between Thompson and Circuit City stayed at this

7  point?

8  A    Everything -- well yes.  I mean the litigation -- I guess

9  so.

10 Q    Are there any issues in the Cook County complaint that do

11 not involve exclusively Illinois state law?

12 A    No, ma'am.

13 Q    Is there any expertise needed of a bankruptcy court on any

14 matters in the Cook County complaint other than on education of

15 the scope of the automatic stay?

16 A    Only to convince our trial judge that it doesn't apply to

17 the City or to Thompson for that matter.

18 Q    Are there any federal counts in any --

19 A    No.

20 Q    -- of the complaints?

21 A    No.

22 Q    Or as amended?

23 A    No.

24 Q    Where are the witnesses located for this litigation?

25 A    Well all of the witnesses are located in Chicago.

**J&J COURT TRANSCRIBERS, INC.**

Propes - Direct                                              44

1  Q    Where are the parties existing and the Funches and Olloway

2  families located?

3  A    The Funches and Olloway families all live in Chicago.  All

4  of the firemen, all of the call takers for the City, all of the

5  City employees, everyone, lives in Illinois, the Chicagoland

6  area.

7  Q    And where is the Circuit City repairmen or servicemen or

8  service call person located?

9  A    Illinois.

10  Q    Is there any counsel involved in the litigation in Cook

11  County from outside of Illinois?

12  A    Not that I've ever met, seen or heard of.

13  Q    And where are the files at the court located and this

14  evidence from the -- that's been removed from the house?  Where

15  is that located?

16  A    Well we have the artifacts that were removed from the

17  house are being kept at a company that's an expert type of

18  analysis company and they have a warehouse.  And we pay them

19  $1,000 a month to store the artifacts.

20        And the, you asked about the files, well every law

21  firm has their own files.  The City has voluminous documents

22  and files.  I mean all of that's in Chicago.

23  Q    And the court files, ma'am, where are the court files?

24  A    Oh, the court files are in the Circuit Court of Cook

25  County.

**J&J COURT TRANSCRIBERS, INC.**

Propes - Direct                                    45

1  Q    Is there any concern amongst the Funches and Olloway legal

2  teams about the ability to have witnesses who have not yet been

3  deposed remain in the area and to be able to locate them

4  specific to Circuit City?

5  A    Well there's the general trial lawyer's concern that the

6  longer a case goes on the less available witnesses and evidence

7  are to you.

8  Q    Would it be practical in your estimation to transfer that

9  litigation to Virginia to a district court in the Eastern

10 District of Virginia?

11 A    Well I think it would not be practical for the cost alone

12 and the wear and tear on the lawyers and the witnesses and

13 everyone that's located in Illinois.  It would cost hundreds of

14 thousands of dollars of litigation costs alone to -- for the

15 lawyers to maintain the litigation in Richmond.

16        And that ultimately gets passed along to the clients

17 of course.

18 Q    Do you seek, meaning on behalf of the Funches and Olloways

19 today, ma'am, any collection of sums now that Circuit City may

20 ultimately be found liable for?

21 A    No.  We want to move ahead with the inspection and move

22 ahead with the litigation.

23 Q    Do you understand that a further motion or order would

24 have to be filed with the court in order to do that sort of

25 collection?

**J&J COURT TRANSCRIBERS, INC.**

Propes - Direct                          46

1  A    Yes, I do.

2  Q    Is there a jury trial request in this litigation?

3  A    Yes.

4  Q    And has it been opposed or challenged --

5  A    Oh, no.

6  Q    -- in any way?

7  A    No.

8  Q    Are any Circuit City management or high level employees or

9  is anyone from Circuit City corporate involved in the

10 litigation that you are aware of in Cook County?

11        MR. FOLEY:  Your Honor, I'm going to object to the

12 question, lack of foundation.  I don't know how she would know

13 who at Circuit City is involved in managing this litigation or

14 has been.

15        THE COURT:  Objection sustained.  Please set a

16 foundation.

17        MS. HUDSON:  Withdraw the question, Your Honor.

18 Q    Ma'am, you've heard me speak about the what we're calling

19 the inspection or the examination.  Can you explain to the

20 Court why it is considered destructive or what about it is

21 irreparable once conducted?

22 A    The inspection is planned to be conducted by our expert

23 electrical engineer.  The TV is all melted down.  There's an

24 interest in seeing -- determining certain things that might be

25 inside of it.  I know one of the things is fuses.

**J&J COURT TRANSCRIBERS, INC.**

Propes - Direct                                47

1    And the plan is to examine this as carefully as

2 possible.  But it's going to have to be taken apart in some

3 ways, this blob of plastic, in order to see what's inside of

4 it.

5    The way this works with these experts is that they

6 will be there and they will all agree to what they do next.  So

7 there will be an expert for Thompson there for sure and his

8 expert and our expert will agree well move that piece, move

9 this piece.

10    It will all be videotaped, it will all -- there will

11 be, every second of it will be photographed.  And then the plan

12 is to x-ray these components as they're able to tease them out.

13    Now nothing will be destroyed in the sense of

14 destroyed although it will be rearranged somewhat because it's

15 a matter of trying to take off the cover, something's melted

16 you know, and get behind it.

17    These things are done very scientifically.  These

18 experts work together all the time.  And that is the reason

19 they're doing it, largely to see the inside of the TV and see

20 these components.

21    That's the plan.  Should I go on about the cost?

22 Q    No, ma'am.  With respect to the inspection.  When we were

23 trying to negotiate with Circuit City prior to today's hearing

24 did you or members of your firm develop a protocol or a project

25 sheet of the scope and nature of what's proposed in that

**J&J COURT TRANSCRIBERS, INC.**

Propes - Direct                                    48

1  testing?

2  A    We did that at your request.  We created a protocol that

3  would describe for the Court and everyone involved here the

4  testing that was to be done.

5  Q    And did that protocol set forth the approximate out of

6  pocket cost to all of the parties?

7  A    Yes.  Each party would pay their own expert --

8        MR. FOLEY:  Objection, Your Honor, I don't know how

9  they would know what the cost would be to all of the parties if

10 they decided to participate.  It depends on what the party, the

11 level of participation each party decides to do.

12       So we would object to the question as somehow

13 establishing what the appropriate cost would be to do this

14 testing.

15       THE COURT:  Again I think you need to provide a

16 foundation for how it would know.

17 Q    Ma'am, are there any costs involved in the protocol that

18 are generic or common to all parties?

19 A    Yes.  As I said each party would pay their own expert and

20 I would have no way of knowing what the other defendant's

21 experts would cost.  However Alloyweld, A-l-l-o-y-w-e-l-d, is

22 the facility where this will take place and they charge $75 per

23 hour for use of their facility.  Additionally they charge $25

24 for every digital x-ray that is taken.

25       We proposed that this be shared proportionately, that

**J&J COURT TRANSCRIBERS, INC.**

Propes - Direct                                          49

1  the daily cost be shared proportionately by all the

2  participants.  However we, the plaintiffs, will bear Circuit

3  City's proportionate share of this if we are allowed to go

4  forward with it.

5        Secondly the digital x-rays, any party who wants

6  them, they can order them and pay their proportionate share of

7  it.  If there's a cost just for doing the digital x-rays just

8  for taking them, we will bear Circuit City's proportionate

9  share.

10       If Circuit City wants the pictures from the digital

11 x-rays some point in time later on down the line, they can say

12 we want three, we want 300, and have them themselves.  But they

13 don't need that, you know that's not needed at this time.

14       Anything that this facility charges will be split

15 between the plaintiff, Thompson, and Circuit City and we'll pay

16 their part in order to be able to go forward with it, Your

17 Honor.

18 Q    So --

19 A    And can I say one other thing about this?

20 Q    -- with the exception of those facility costs and perhaps

21 making of x-ray costs, is it your understanding that the only

22 other costs applicable to the parties are the costs of their

23 experts and/or counsel if they choose to have them participate?

24 A    Right.  An expert can be there, but they don't need to be

25 there because as I said it is all recorded in the reports, the

Propes - Direct                                      50

1  x-rays, the videotape.  And counsel doesn't need to be there at

2  all.  I mean I've been at a lot of these and I know that

3  counsel sits on the side and sends messages on their

4  Blackberries.  So counsel doesn't need to be there --

5  Q    What is --

6  A    -- but they could be.

7  Q    -- what is the cost estimated to the Funches and Olloways

8  of the testing for one to three days?

9  A    What is our expert charging us?

10 Q    What is the comprehensive cost of expert facility and

11 should there be a charge for the creation, not ordering of

12 x-rays, an approximation?

13 A    Well I'm not, at this moment I don't exactly remember what

14 our expert is charging us.  But I can tell you from my

15 experience this is going to cost between five and ten thousand

16 dollars for us to do this.  I would imagine our cost.

17         Because our expert is taking the lead on it, he's the

18 one that's doing it, it will cost us money.  It would be

19 certainly substantially less for the onlookers I should think.

20 Q    With respect to the Funches and we've spoken about the

21 impacts of the litigation on counsel and on the other

22 defendants, but with respect to the Funches and Olloway

23 families, what is the impact of the stay from November 10th,

24 2008 to the present and if it were to continue for the life

25 span of this bankruptcy case?

**J&J COURT TRANSCRIBERS, INC.**

Propes - Direct                          51

1          MR. FOLEY:  Objection.  I'm not sure I understand the

2  question.  What is the effect of the automatic stay?

3          THE COURT:  Please rephrase --

4          MS. HUDSON:  I'll rephrase.

5          THE COURT:  -- the question.

6  Q    Ms. Propes, how is the automatic stay and the inability to

7  proceed with a wrongful death litigation in Cook County

8  impacting the Funches and Olloway families?

9  A    It impacts the litigation and to the extent that anything

10 that impacts the litigation impacts them.  You know it means

11 that we can't move the case forward, it means that witness's

12 memories get stale, it means that it costs us more to maintain

13 the artifacts.

14         It just means we can't move forward.  And I think

15 that not moving forward is to deny them justice.  And I -- and

16 for those reasons it's been a long time.  We've lost time

17 because of the stay, we've lost time because of the motion for

18 substitution of the trial judge.

19         And we are now on a track and an aggressive one to

20 move the case forward.  We are looking to try to have a trial

21 by the end of this year.  And that's our plan and we're hoping

22 that we can do it and we need to be able to move forward with

23 this inspection and move forward with the case.

24 Q    And with respect to the Funches and Olloway members or

25 surviving members of the family personally, what are the

                    **J&J COURT TRANSCRIBERS, INC.**

Propes - Direct                              52

1  impacts of the stay if you can speak to that?

2  A    Well I think they like any litigation they want, you know

3  it's an overused word, but closure and they want it to be done.

4  They want compensation.  They want their day in court.  And to

5  deny that is it's excruciating for them actually.

6         MS. HUDSON:  Nothing further of this witness, Your

7  Honor.

8         THE COURT:  All right.  Thank you, Ms. Hudson.  Cross

9  examine.

10                   CROSS EXAMINATION

11 BY MR. FOLEY:

12 Q    Good morning, Ms. Propes, how are you?

13 A    Good morning, Mr. Foley.

14 Q    You mentioned in your testimony that there were some 50

15 depositions taken in this case?

16 A    Yes, sir.

17 Q    Isn't it correct that those relate to the action against

18 the City?

19 A    Oh, yes.  I thought I made that clear.

20 Q    Okay.

21 A    Many of them do.  Now there are some which related to

22 firemen and things that could be said to relate to cause and

23 origin of the fire.

24 Q    Okay.

25 A    But none directed to the product liability case --

                  **J&J COURT TRANSCRIBERS, INC.**

Propes - Direct                                53

1  Q    Okay.

2  A    -- that's correct.

3  Q    I just wanted to make that --

4  A    Yes.  That's right.

5  Q    -- clear that there hasn't been a whole lot of discovery

6  on the products liability case at all.

7  A    No, there has not.

8  Q    Okay.  And in fact this litigation proceeded solely

9  against the City for the first two years, isn't that correct?

10  A    I don't know that it was quite two years, but if you can

11  tell me the exact date that the amended complaint was filed,

12  then that's how long it would be.

13  Q    But it was more than a year.

14  A    I know that the original case was filed in March of 2007.

15  I don't know when the first amended complaint was filed.

16  Q    And it is correct is it not that you could proceed against

17  the City obviously on your claims without any relief from this

18  Court any time that you would like?

19  A    Well it is correct that if we dismissed Thompson we would

20  have to voluntarily dismiss Thompson to do that.

21  Q    No, no.  The question was whether you can proceed against

22  the City.

23  A    We have a case that is both defendants and all three.

24       THE COURT:  Ma'am, please, just answer the question.

25  A    We could not do that without voluntarily dismissing

Propes - Direct                                    54

1  Thompson and Circuit City which would impact our case going

2  forward because we would only have a certain amount of time to

3  bring it back.  That's all I can --

4  Q    Okay.  Have you filed -- have your clients filed a proof

5  of claim in the bankruptcy case?

6  A    I understand I think Ms. Hudson would --

7  Q    Is handling that?

8  A    Is handling that.

9  Q    Okay.  Is it also correct that the fire department for the

10 City of Chicago has determined that they cannot determine the

11 cause of the fire at this point in time?

12 A    They have -- no.  They haven't said that the TV has caused

13 the fire if that's what you're getting at.

14 Q    They have not said -- they have not determined what the

15 cause of the fire is?

16 A    The cause of the fire is undetermined.

17 Q    Undetermined.

18 A    They have not done that kind of analysis.

19 Q    Okay.

20 A    They haven't examined any of the artifacts.  They know the

21 origin of the fire.

22 Q    Well actually isn't -- they have not determined -- well

23 explain what you mean by the origin.

24 A    The origin of the fire is in an area of the room like the

25 northeast corner where the TV and these other electronics were

**J&J COURT TRANSCRIBERS, INC.**

Propes - Direct                                    55

1  located.

2  Q    So by origin you mean the room in which --

3  A    Yes.

4  Q    -- the fire started, not that it started in a particular

5  appliance or anything like that?

6  A    That's true.

7  Q    Okay.

8           MR. FOLEY:  I have no further questions, Your Honor.

9           THE COURT:  All right.  Thank you.  Any redirect?

10          MS. HUDSON:  No, Your Honor.

11          THE COURT:  All right.  You may step down, Ms.

12  Propes.

13          THE WITNESS:  Thank you, Your Honor.

14          THE COURT:  Do you have any other witnesses?

15          MS. HUDSON:  No, just closing argument, Your Honor.

16          THE COURT:  Okay.  I'll hear your closing argument.

17          MS. HUDSON:  As Your Honor is aware, the test for

18  lifting the stay under a motion for relief to proceed in

19  existing pre-petition state court litigation as for cause under

20  362(d) and cause unfortunately is not defined in the code so

21  it's a discretional test on a case by case basis and we look to

22  case law for those factors.

23          And fortunately we do have a balancing test in the

24  fourth circuit that looks to the prejudice of the debtor in

25  lifting the stay versus the prejudice to the litigants or the

**J&J COURT TRANSCRIBERS, INC.**

1  movants in not lifting the stay for that determination of the

2  amorphous term cause.

3         And the fourth circuit factors are set forth in the

4  Robbins case of 1992, the lead case on this matter.  And those

5  factors are whether issues in the pending litigation involve

6  only state law so that the expertise of a bankruptcy court is

7  unnecessary, whether modifying the stay will promote judicial

8  economy, whether there would be a greater interference with the

9  bankruptcy case if the stay were not lifted because matters

10  would have to be litigated in bankruptcy court, and whether the

11  estate can be properly protected by requirement that the

12  creditors seek enforcement of any judgment through the

13  bankruptcy court context.

14         Returning to that first factor of whether or not the

15  pending litigation involves only state law, you've heard my

16  proffers and Ms. Propes's testimony today that has been

17  undisputed that these issues are vanilla state law, wrongful

18  death, and survivorship under the sounding and the causes of

19  strict liability and negligence in Cook County.

20         With respect to the second factor or promoting

21  judicial economy and what exactly is meant by judicial economy,

22  admittedly we have to drill down into the case law and you've

23  heard Ms. Propes testify this Court about the nature and impact

24  on the witnesses, on the parties, on the counsel, on the Court,

25  on the judge that's now been permitted and has survived if

1 that's the right term a recusal motion, Judge Egan, and is

2 presiding over the case again.

3       And where the files and the evidence are located,

4 where these artifacts are being stored, the familiarity of the

5 Court, the aspect of the defense of Circuit City there through

6 attorney Vocolla, and the nature of the expenses to the party

7 and the convenience to the party in where all of the nexus of

8 the litigation has been proceeding since that time of the fire

9 in September of 2004 as well as the very real probability with

10 Circuit City employees scattering and the nature of those very

11 employees that they may not be available later down the line

12 and certainly that memories will fade.

13       With respect to the third factor about whether or not

14 there's a greater interference because the matter would be

15 tried in bankruptcy courts, 28 U.S.C. 157 handles that for us

16 because we can't have this trial in bankruptcy court nor under

17 502 can we reduce this to some sort of claims adjudication

18 process.

19       Filing a proof of claim for $200 million and having

20 this estimated here because Congress has clearly said it's not

21 appropriate to do any kind of estimation, it's not appropriate

22 to reduce to judgment anything in the wrongful death and in the

23 tort carve out under that bankruptcy legislation.

24       It needs to go to the district court here or it needs

25 to go to the district court in that forum, foreign forum or the

1   Court has discretion to keep it in the state court and abstain

2   discretionarily as we are requesting this Court to do.

3        And in <u>Robbins</u> that Court did indeed find that the

4   stay should be lifted because it was an equitable distribution

5   case that involved interpretation of Florida law.  Florida

6   courts were familiar.  There were no bankruptcy court issues.

7   The bankruptcy court should grant deference to the state court

8   and it could be more conveniently and quickly done there and

9   the state could be -- the bankruptcy estate could be protected

10  because you could come back for collection to the bankruptcy

11  court.

12       The other factors that have been gleaned from other

13  cases in the fourth circuit or whether or not a state court

14  action has actually proceeded instead of having a demand and we

15  have that here.  It commenced in 2005, arguably later against

16  Circuit City, but there's no argument that it's pre-petition

17  several years.

18       We also have counter and cross motions involving

19  Circuit City and some filed as recently as July of this year.

20  But those are entwining Thompson and Circuit City in a way that

21  it's not practical, and Ms. Propes has testified, to proceed

22  against non-debtor parties.

23       And you've heard her testify about the vociferous

24  defense at every step of the way and my proffer that even

25  tomorrow there's another hearing on the applicability of the

59

1   stay to the City of Chicago.  And this Court in --

2           THE COURT:  Haven't I already entered an order that

3   said that they can go forward?

4           MS. HUDSON:  You did, Your Honor, a comfort order and

5   even offered to educate chambers and provide a telephone number

6   and there is still confusion about the parties.  I understand

7   from Mr. Foley that they're contacting him as well.

8           Try as we might parties here in Virginia are trying

9   to educate those in Cook County and it's falling apart.

10          The other factors are whether or not there's a jury

11  trial.  It's indisputable that there's a jury trial and that we

12  can't have one here and the discovery is in progress.  Maybe

13  we're arguing about how far discovery is along, who discovery

14  involves, whether or not it's been very much in depth against

15  Circuit City at this point.

16          But discovery is underway.  It's not like this suit

17  has just been filed on the eve of or bankruptcy was filed right

18  after the suit was commenced.  And that the claims are based

19  entirely on state law and can be appropriately and

20  expeditiously determined there.

21          You've heard Ms. Propes testify that they are going

22  to seek a trial date and she believes that this can happen by

23  the end of this year 2009.

24          Also the nature of the automatic stay and Congress

25  returning to the broad application of the automatic stay, under

**J&J COURT TRANSCRIBERS, INC.**

1  362 we have congressional and legislative history that says

2  even despite that broad application that there are instances

3  when it is appropriate to lift it and one of those instances is

4  when it's more appropriate to permit a proceeding to continue

5  in its place of origin when there's no great prejudice to the

6  bankruptcy estate that would result and in order to leave the

7  parties to their chosen forum and relieve the bankruptcy court

8  from the duties involved in the case so that it may be handled

9  elsewhere.

10         And the <u>Robbins</u> Court found in the exact same

11  instance of litigation of four or five years proceeding in

12  Florida, yes it wasn't a wrongful death it was a divorce case,

13  but that was sufficient to leave it there and keep it outside

14  of the bankruptcy court.

15         And they also addressed this 502 concern of having it

16  somehow allowing the debtors to pick the forum and have a mini

17  trial in terms of a claim objection and said that the Court,

18  for the Court to determine the allowability and amount it would

19  have to study and interpret state law, it would have to review

20  the files of the last four and five years, it would have to

21  replay evidence and all of that would be unnecessary because

22  there is a state court judge who had done all of that and it

23  would be less money to have the proceeding conclude there.

24         So that Court determined that the amount of the

25  claims of the parties to the insurance and the money damages

1  could be determined by that jurisdiction and then in terms of

2  the collection of it and the liquidating of the claim and the

3  bankruptcy that it could be done there.

4         And as Your Honor is very familiar in the <u>AMF</u> case of

5  Stephen Gould Paper, the 2003 case, the Court granted relief

6  from stay there.  It didn't allow global relief from stay this

7  Court, it just said to do everything short of collection, but

8  it was the same kind of matter, pre-petition litigation.

9         And the debtors, Your Honor, argued that there could

10 be a proof of claim filed just as Mr. Foley is arguing and that

11 could establish the claim in the case and that it would impose

12 all these time demands on the employees, it would be a drain on

13 their resources, it would divert attention and responsibility.

14        The same kind of arguments that were addressed here

15 and the Court said nothing would be collected without further

16 order of the Court.  It would just, the claim would just be

17 liquidated to judgment.

18        And this Court found that any significant prejudice

19 to the debtor caused by its employees being required to oversee

20 counsel's handling of the litigation was minimal at best and

21 any prejudice to the debtor is more than offset by the judicial

22 economy of letting that PI suit in the Gould case continue in

23 Nevada and by the prejudice of the movants in denial of the

24 motion and the probability of the movants succeeding on the

25 merits.

**J&J COURT TRANSCRIBERS, INC.**

1           And the Court held that because they had not filed

2    that proof of claim at that point that they weren't entitled to

3    -- the movants to blanket relief from stay but that they should

4    have relief from stay to proceed in the litigation outside of

5    the bankruptcy court for determination of liability which is

6    exactly the reduced relief that we seek here today.

7           And the Court did not grant relief to seek and

8    collect against insurance just to reduce -- to liability which

9    again is the exact -- excuse me -- relief that we seek today.

10          And we also have Judge Doumar's case <u>Elliott v.</u>

11   <u>Hardison</u> from Norfolk in the eastern district educating us on

12   another factor of cause and that is when liquidation of the

13   claim may be more conveniently and speedily determined in

14   another forum.

15          To transfer this to the clogged docket in the fourth

16   circuit in the eastern district would certainly set this back

17   to stage one and all counsel would have to transfer and

18   relocate here and not only would it be more expensive on

19   Circuit City, but on the Olloways, on RCA, on Thompson, on the

20   Funches as well.

21          And Judge Doumar wrote that the Court can find no

22   policy in the bankruptcy code that would be fostered by

23   preventing that litigant Elliott from liquidating his claim

24   against Hardison and neither has the Court been shown that to

25   allow Elliott to liquidate his claim would jeopardize

63

1   Hardison's estate or that reorganization of the estate and so

2   lifting of the stay was appropriate.

3         And lastly, Your Honor, I had argued before about

4   this whole nature of defense costs.  The debtor's have said

5   it's going to be very expensive for us to participate in this

6   inspection or even if we have this insurance we have a

7   retention and we have the sophisticated tiering system set

8   forth on this graph and the costs are just too onerous for us

9   to defend this case, let us choose the forum, let us pick the

10  time, let the stay, you know stop everything.

11        Well In Re Todd Shipyards in the district of New

12  Jersey in 1988, PI plaintiffs moved for relief from stay to

13  proceed with multiple PI defendants with state court actions

14  and the bankruptcy court held that the automatic stay would be

15  lifted to allow them to proceed.

16        And the Court actually determined the sufficient

17  cause in terms of the lifting of the stay by conducting the

18  same kind of balancing test.  Yes, it's New Jersey not the

19  fourth circuit, but they said the interests of the estate

20  versus the hardship incurred by the movants was that test which

21  is exactly akin to our test in the fourth circuit.

22        And the quote of significance in that case is that

23  absent extraordinary circumstances, litigation expenses do not

24  constitute an injury sufficient enough to justify enjoining

25  litigation of the debtors.

**J&J COURT TRANSCRIBERS, INC.**

64

1          That was a wrongful death and personal injury claim

2   as well and said that it had to be tried in forums outside the

3   bankruptcy court and that was 65 different tort actions, 65.

4   Not you know one matter with one attorney Vocolla, but

5   something of a massive extent relatively and the Court in Todd

6   Shipyards allowed that to happen and said that the movants

7   alleged you know the stay would be a hardship on them, they

8   said it would cause them to remain uncompensated for their loss

9   and impact their quality of life and it would impede memory of

10  witnesses and prejudice their chances in ultimately prevailing

11  just as we have here.

12         And the debtors made the same argument there.  They

13  made the argument that the damages could be significant, they

14  wouldn't have anything to pay, there would be substantive time

15  and resources that would be drained in defense of the suit, and

16  that they would have to divert their attention away from

17  management and proceeding in the bankruptcy.

18         Granted we're in a liquidation here and not a

19  reorganization, but they said asserting those kinds of costs

20  and those kind of resources in defending the suit would be

21  substantial, expense, and investment and that's true.

22         That's one consideration in the balancing test,

23  conserving those very resources.  We admit that.  We can't get

24  away from that.  We respect the automatic stay.  That's why

25  we've had three hearings before Your Honor and we've been

**J&J COURT TRANSCRIBERS, INC.**

1  negotiating since -- I filed this right before Thanksgiving.

2           But Judge DeVito of the district of New Jersey

3  bankruptcy court said litigation expenses do not constitute an

4  injury sufficient to justify the enjoining of litigation

5  against a debtor.

6           There are cases when potential litigation expenses

7  rise to that level of enjoining it, but those are suits like

8  5,000 suits that are going to endanger the very existence of a

9  debtor, 17,000 claims that would drain the debtor irreparably

10 in <u>AH Robbins</u>, 5,000 suits plus an equal number of pending

11 suits that would consume all assets of the debtor.

12          This is not a case like that.  We have 175 million in

13 excess insurance, we're not trying to collect anything, we've

14 stipulated and they've stipulated that they have 326,000 in

15 expenses.  If they proceed at that average it's still 60 some

16 thousand a year.

17          We are not at the level of 20,000, 50,000 claims with

18 an arsenal of attorneys and it's just not at the level to

19 exceed that threshold.

20          So courts have regarded also that deference to state

21 court and the opportunity to litigate the issues of liability

22 as something significant and sacrosanct that's protected under

23 28 Section 157 and shouldn't be set aside and that the

24 automatic stay was never intended to preclude that

25 determination of tort liability.

**J&J COURT TRANSCRIBERS, INC.**

1       True you can prevent the collection and you can make

2   us come back for an orderly distribution in the claims process,

3   but we have to be able to liquidate that to a sum certain and

4   we're prepared to come back to the Court for a motion and an

5   order.

6       And even Congress has you know recognized that with

7   that specific statutory mandate and, Your Honor, there are also

8   cases in Texas such as <u>In Re Fowler</u> where it was an auto

9   accident tort which was -- is not anywhere near the level of

10  what we're going with here, but that case involved insurance

11  and the nature of bills actually exceeding insurance.

12      Well here we have something different.  We have

13  deductibles and SIRs before we would reach insurance.  But the

14  same kind of issue where it's not dollar for dollar, first

15  dollar insurance and no impact on the debtors because cost of

16  defense and insurance would provide.

17      And that Court said there's no reason to believe that

18  the burden on the debtor would be any more onerous to liquidate

19  the case in state court than to have the reference withdrawn

20  and litigate under federal district court.

21      So you know to say that there should be a claims

22  proceeding that then should be withdrawn to the Eastern

23  District of Virginia is going to make it more expensive even

24  for the debtors themselves.

25      And in the <u>Revco</u> case <u>Murray v. On-Line Business</u>

**J&J COURT TRANSCRIBERS, INC.**

1  Systems, the adversary proceeding in the Northern District of

2  Ohio of 1989, the debtor there argued that plaintiffs should

3  proceed in district court in a removed action and that some 100

4  claims that existed against them that first the relief from

5  stay should not be granted because it would just be a first

6  step in opening the flood gates anticipating that there would

7  be an unmanageable and unworkable situation and that sort of

8  argument.

9      And the Court said that the administration of that

10  bankruptcy case in Revco would not be prejudiced if the case

11  would be allowed to proceed in state court for final judgment

12  regarding the claims against the debtor if any because the

13  Court could modify the stay to allow the trial to proceed, but

14  prohibit actions to recover.

15      And we're coming to the Court conceding that we won't

16  do that.  We just want to reduce to a judgment, to a sum

17  certain.

18      So with -- and also, Your Honor, Judge Shelley's case

19  from 1989 Picklick v. Hudgins (phonetic) and In Re Hudgins

20  (phonetic), he spoke to the congressional mandate in 28 U.S.C.

21  157 and said it was made clear that the issues surrounding

22  personal injury and wrongful death claims are excluded from the

23  jurisdiction of this court and explains succinctly and very

24  clearly that Section 502 provides for an estimation for the

25  purposes of allowance of a claim, whether it's contingent,

1   whether it's unliquidated.

2          But that Section 152(b)(2)(b) prohibits the

3   bankruptcy court from estimating contingent and unliquidated

4   personal injury and wrongful death claims against the estate

5   for distribution purposes.

6          And that 157 says that personal injury and wrongful

7   death cases are to be withdrawn as categories from other types

8   of proceedings affecting the liquidation of the estate and they

9   are not something that the bankruptcy court can entertain.

10          And further that the district court has this very

11   discretion I spoke of to abstain in favor of state courts from

12   hearing those very proceedings.  And the power to abstain is

13   something that is discretionary and will only be reviewed as an

14   abuse of that discretion.

15          And finally, Your Honor, in the bankruptcy case of

16   Ice Cream liquidation from the district of Connecticut in 2002,

17   the creditors there had sexual harassment claims against a

18   Chapter 11 debtor and they moved for relief from stay and this

19   very same beast that we're seeking today, discretionary

20   abstention to allow their claims to be liquidated in state

21   court.

22          And the stay was lifted to liquidate those claims to

23   a judgment and a sum certain and they were ordered to come back

24   to the Court under further motion on collection possibly

25   depending on what happens.  And they sought that Court to

69

1 abstain from exercising its jurisdiction in its discretion and

2 to allow deference to the state court who had already been

3 proceeding with those unique state court claims that involve no

4 bankruptcy issues whatsoever.

5 　　　　And that Court found it prudent to do the very thing

6 that we're asking this Court to do which is lift the stay for

7 us to continue with the litigation as to all parties, including

8 the debtor, and reduce it to a judgment and come back to this

9 Court for the claims proceeding.

10 　　　　And barring that at a very minimum to allow this

11 testing, destructive testing to occur on April 1st through 3rd

12 to the extent that the stay applies just because the very

13 nature of the testing and all of the parties and the

14 interweavings of counts against and defenses and cross claims

15 against one other and the nature of the spoliation and

16 prejudice arguments that could be later mounted by defendants

17 because of the nature of what's done in that testing.

18 　　　　THE COURT:  All right.  Thank you, Ms. Hudson.  Mr.

19 Foley.

20 　　　　MR. FOLEY:  As Your Honor mentioned, this motion has

21 been pending since the beginning of this case which although a

22 lot has happened obviously in this case, it's still only a

23 couple months old.

24 　　　　We did consent to Your Honor entering a comfort order

25 to help hopefully convince the judge in Chicago that this

**J&J COURT TRANSCRIBERS, INC.**

1 matter can proceed against the non-debtor defendants and it can

2 still proceed against the non-debtor defendants, Thompson as

3 well as the City.  In fact it proceeded against the City for

4 the first two years of the litigation before we were even

5 brought into it.

6        But the point is here, Your Honor, the motion should

7 be denied because it was filed on a false premise.  The false

8 premise is that there is first dollar insurance coverage here

9 and there will be no cost or expense to the estate.

10        It's an undisputed fact now Exhibit A, which is in

11 front of you, that we have a self insured retention of $500,000

12 and a deductible of $1.5 million which includes cost of defense

13 that we have to pay out of pocket before any real insurance

14 kicks in.

15        So what we have here is a situation that's really no

16 -- although it's a very tragic event that occurred, it's a

17 tragic claim, cause doesn't exist because the fact that the

18 automatic stay is inconvenient or it's impractical doesn't

19 establish cause.

20        There's no difference between this claimant and any

21 other claimant with a pre-petition claim that would like to

22 have their choice of forum honored and just basically go

23 forward as though the bankruptcy doesn't exist.

24        I mean we're in the middle of the largest retail

25 liquidation in history that Your Honor approved less than a

1  week and a half ago.  The staff at the headquarters as you can

2  imagine is a lot smaller than it was a week and a half ago.

3        We have administrative expenses that are accruing in

4  this case.  We don't need to spend another $2 million defending

5  this claim until the insurance, real insurance takes over.

6        Your Honor entered a comfort order again to help the

7  -- convince the judge that the matter can go forward against

8  the non-debtor defendants.

9        I have urged counsel for the movants here to simply

10  dismiss us without prejudice in that suit and at that point

11  there would be no issue that the judge over there could be

12  concerned about going forward.

13        They don't need relief from stay to go do this

14  testing.  What they want relief from stay for is to bind us to

15  some result that's occurring over there.  That's why they don't

16  want to dismiss us without prejudice.  They want to bind us to

17  whatever result will happen in Cook County.

18        They're going to file a proof of claim.  You heard

19  the testimony with respect to that.  It's deemed allowed until

20  it's objected to.  It may never need to be liquidated.  If they

21  go forward against the City and they get a judgment, they go

22  forward against Thompson and they get a judgment, they collect

23  everything that they think they're owed.

24        It may never be necessary to try this claim against

25  Circuit City.  So why impose upon us, take away the benefit of

1 | bankruptcy which is the automatic stay, to make us spend up to

2 | $2 million in defense costs.

3 | As Your Honor heard, this case has been pending for a

4 | long time and they haven't even gotten started on the products

5 | liability aspect of this case yet.  They just want to begin

6 | that.  There's been no determination of the cause of this fire.

7 | The first two years of this litigation had to do with the City

8 | of Chicago which I understand from counsel for the movant has a

9 | history of botched 911 calls for lack of a better word.

10 | And you know we do have a lot of claims in this case.

11 | You know the claims bar date is not until tomorrow, but as of

12 | three days ago we have 6,000 claims already filed in this case.

13 | And so we're going to have a lot of work to do in the claims

14 | process.

15 | One issue that I would like to distinguish is the <u>AMF</u>

16 | decision that was referenced.  We were counsel for the debtor

17 | in that case, Your Honor.  That did involve first dollar

18 | insurance coverage so although there was inconvenience to

19 | witnesses and whatnot, there was no out of pocket expenditure

20 | involved in that case.

21 | Again, Your Honor, we're in the middle of the largest

22 | retail liquidation in the history of the United States and we

23 | don't think there's any cause here that's been established.  Is

24 | the automatic stay inconvenient to these claimants?  Yes.  Is

25 | it impractical to proceed against the other defendants?  Maybe.

**J&J COURT TRANSCRIBERS, INC.**

1  But is it impossible?  No.

2          You heard the testimony.  They could dismiss us

3  without prejudice.  They could go forward against the other

4  parties, file their proof of claim.  And if we ever have to

5  liquidate the claim against Circuit City we can do so at a

6  later date.

7          But the only thing that's before the Court is whether

8  cause exists to grant relief from the automatic stay and it

9  doesn't.  We would ask the Court to deny the motion.

10          THE COURT:  All right.  Thank you, Mr. Foley.

11  Anything further, Ms. Hudson?

12          MS. HUDSON:  Just briefly, Your Honor.  Mr. Foley

13  argues that the motion was filed on a false premise of first

14  dollar insurance and I will concede that at that point it was

15  filed in an expedited manner to preserve a hearing the very

16  next day and some depositions and some discovery sanctions and

17  it was filed hastily on the Wednesday night before

18  Thanksgiving.

19          But it does address as I believe he's now come around

20  to in paragraph eight that this is not a core proceeding

21  appropriate to be litigated and especially of the light that

22  it's been active in another court for some four years.

23          Lifting the stay will promote judicial economy,

24  permit the parties to proceed efficiently.  It will not disrupt

25  the bankruptcy process.  The state could still be protected if

1  the stay is lifted there may be insurance to fund some or all

2  of the claims and any prejudice would be more than offset by

3  the prejudice incurred by the movants because the litigation

4  would be significantly delayed.

5         So all of these factors and those tests were in the

6  motion and to suggest that it was just filed hey this is a

7  simple insurance piece, let us go forward, the memorandum

8  certainly stretched broadly than that.

9         And to suggest that the only factors that we've been

10 here for hours now today on are inconvenience and

11 impracticability, I don't even think I articulated them in that

12 fashion.  But we certainly have ad nauseam gone through far

13 more factors than that.

14        And then finally I'm perplexed, I'm a little bit

15 confused.  There's no evidence whatsoever of $2 million being

16 needed to defend this.  He's just suggesting and pulling a

17 number outside of his head.

18        The stipulation is 326,000 since the case has begun

19 several years before and continuing on that pace does not get

20 us from here into the stratosphere of $2 million.  So I don't

21 know --

22        THE COURT:  But the discovery is just going to begin

23 now with regard to the product liability portion of the case

24 and what he was referring to was the first $2 million of

25 defense cost comes out of Circuit City's pocket.

**J&J COURT TRANSCRIBERS, INC.**

1          MS. HUDSON:  And 326,000 of that has already been

2    expended, Your Honor --

3          THE COURT:  Well that was pre-petition.

4          MS. HUDSON:  -- so that deducts from it.

5          THE COURT:  Right now the company's faced with all

6    kinds of administrative expenses in winding down this company

7    and this would be an additional administrative expense.  That

8    was the  point Mr. Foley was making.

9          MS. HUDSON:  And I do understand that, Your Honor.

10   Unfortunately we have a balancing test and it is not practical

11   for us to be able to dismiss Circuit City for the reasons Ms.

12   --

13         THE COURT:  I would like you to address that because

14   Mr. Foley made that point about why can't you just dismiss them

15   as a party without prejudice.  You could file your proof of

16   claim as he suggests in this court and then if it -- if the

17   claim does need to be liquidated at a later time, you know it

18   could be, but why can't you do that?

19         MS. HUDSON:  Well we can't for the reasons that Ms.

20   Propes testified about what's going on between Thompson and

21   Circuit City, the third party action and the counter claim.

22         Us trying to do something just with respect to our

23   rights in them does not affect those two beasts.  And Ms.

24   Propes testified as to the intertwined nature in a products

25   liability between all of those people and we have Circuit City

1 probably repairing and servicing the television.

2          They're going to be an indispensable party to the

3 defense of the other defendants and to have a jury trial where

4 the jury's seeing an empty chair for one of those parties --

5          THE COURT:  It wouldn't be empty, it would just be

6 gone.

7          MS. HUDSON:  Well also this issue of the joint and

8 several liability in Illinois.  We need to have a finding of 25

9 percent liability with respect to all of the defendants to be

10 able to collect against any of them and we don't want to be in

11 a situation where this is a case -- I mean we've chosen who we

12 brought into this case and we've survived that scrutiny under

13 state law, it's not to be requestioned here, and a bankruptcy

14 would never trump that, enforce a dismissal.

15          THE COURT:  I wasn't suggesting that it would force a

16 dismissal.  I was just asking why it was imperative to go

17 forward right now.

18          MS. HUDSON:  The intertwined nature of the defenses

19 amongst the defendants, the insurance between two of the

20 defendants, the counter claims filed between them for

21 contribution and indemnification.

22          That affects it as well as our theories of the case

23 under products liability.

24          THE COURT:  How does contribution claim though

25 between two defendants affect the plaintiff in the case?

**J&J COURT TRANSCRIBERS, INC.**

1          MS. HUDSON:  Well the insurance at issue with

2     Thompson, if that were to fund the defense and any kind of

3     award that Circuit City would be responsible for, we would

4     benefit from that recovery.

5          That's another asset from which we can recover.

6     Those excess insurance policies, anything that we would get on

7     a claim here in this court, and that Thompson policy, and maybe

8     very practically, Your Honor, that Thompson policy and their

9     ability to succeed there if that's strongly grounded in that

10    contract is perhaps the strongest ability for us to recover.

11         And you've heard about how obstreperous the City of

12    Chicago has been and that the majority of the hearings and

13    contested nature have been with them.

14         So our very real probability of recovery could be

15    that Thompson policy.

16         THE COURT:  The other thing I would like you to

17    address is why can't you go forward with the examination of the

18    television set on April 1?  I thought that the relief that I

19    had granted was also so that you could proceed with that

20    testing.

21         MS. HUDSON:  At one point we had proffered that to

22    the Court.  But when it came time to actually frame the order

23    that was not part of that relief that was granted in my

24    recollection.

25         But the problem, Your Honor, is we have that test and

**J&J COURT TRANSCRIBERS, INC.**

78

1    Circuit City is absent and doesn't participate and their

2    interests aren't aligned with ours or with the others and those

3    experts do what they're going to do, they photograph, they

4    test, they pry, they melt, they saw and Circuit City doesn't

5    participate.

6          Then it comes times to liquidate the claim.  They

7    object to it in this court.  We can't do some sort of 502

8    proceeding, it's not appropriate to liquidate it here, it's

9    statutorily carved out.

10         We have to go back to that court.  How do we with

11   digital x-rays allow an expert to participate coldly from that

12   and recreate everything for them to have -- I'm stepping into

13   the shoes of Circuit City here -- for them to have any

14   meaningful defense?

15         They're going to argue they were prejudiced in not

16   being able to participate, the evidence has been tampered with

17   and has been permanently destroyed or partially destroyed, and

18   there's a spoliation of it.

19         So they're going to argue on it from an evidentiary

20   concern and under state law defenses that they weren't able to

21   participate in this.  And the whole thing comes down to cause

22   and origin.  Where in the room, which apparatus or appliance,

23   was Circuit City there to repair it, did they have a coolant

24   problem, did the repairman make a mistake, was he the last

25   person in the chain.

**J&J COURT TRANSCRIBERS, INC.**

1          I'm not trying to step into the shoes of state court

2     attorney here, but all of that is at issue and Circuit City is

3     a major player in that.  We can't just say the RCA or the

4     Thompson television set that was sold and then have a major

5     disconnect in the jury's mind to the death of four children in

6     a fire.

7          I mean there is an issue with a defect in this TV or

8     something after the fact in this TV and Circuit City is a major

9     player in that.

10          And that testing is going to show -- we admit, Your

11    Honor, that we may come forward to Circuit City or to Cook

12    County -- excuse me -- and dismiss Circuit City after that

13    testing.  The testing is needed on so many grounds, for us to

14    advance against the non-debtor parties and against Circuit

15    City, and for the experts to get whatever they need moving

16    forward in the case.

17          And the expense is nominal of a couple thousand

18    dollars if even.  It's not necessary to have every expert there

19    or every attorney there because of the videotaping, but

20    certainly one would have a more meaningful defense being able

21    to participate in that and instruct how that's conducted and

22    glean whatever needs to be safeguarded and preserved for later

23    defense.

24          But it's just not practical to be able to snapshot

25    this and say dismiss this right now almost akin to a non-suit

**J&J COURT TRANSCRIBERS, INC.**

1  and in six months when we don't exist, our deliveryman doesn't

2  exist, nobody exists in corporate, our counsel's not being

3  paid, let's take this to Cook County and whatever is left in

4  the fallout you guys can liquidate against us.

5         But they can't pick the -- they say we can't pick the

6  forum, they can't pick the forum.  This is something that

7  Congress said has to go to state court and be liquidated.  And

8  we're not trying to collect and those defense costs --

9         THE COURT:  It didn't say it had to go to state

10 court, it said it had to go to district court.

11        MS. HUDSON:  Correct, Your Honor, I'm sorry.  But

12 discretionarily to abstain it could be appropriate to go to a

13 state court, particularly one of long tenure like Cook County

14 here.

15        And then Your Honor is correct and Mr. Foley is

16 correct that that comfort order was entered but that it did

17 address only going forward with those hearings that have

18 occurred.

19        And tomorrow there is even another hearing on the

20 applicability of the stay to the City of Chicago.  So it is

21 obvious that there would be a continued nature to educate this

22 Court and possibly a further comfort order that would need to

23 be entered because they're just not getting it.

24        THE COURT:  Well the stay just doesn't apply to the

25 City of Chicago and it doesn't apply to Thompson or --

1          MS. HUDSON:  And short of a telephone call, Your

2   Honor, or a conference call, I don't know how other -- I mean

3   they've been contacting myself, they've been contacting Mr.

4   Foley, and they've been contacting my client, and they've gone

5   to multiple hearings about the judge, about discovery, and

6   continue to still say that it does apply.

7          How that's happening in a state court proceeding I

8   don't know.  But we are not trying to say that this inspection

9   is some sort of complicated process but because of that need to

10  very clearly articulate the ramifications of the stay and the

11  scope of it, that's why we seek it.  And also with respect to

12  the relationship and the significance and the effect on the

13  parties and the codefendants that I've previously argued about

14  is why we seek that from the relief from stay as well.

15          THE COURT:  Thank you.

16          MS. HUDSON:  Thank you, Your Honor.

17          THE COURT:  Anything further, Mr. Foley?

18          MR. FOLEY:  Your Honor, just to clarify.  The order

19  that we did talk about before, the comfort order, did to the

20  extent it was necessary allowed the parties to go forward on a

21  motion to substitute the judge that's hearing this matter.

22          The City of Chicago wanted a new judge.  They thought

23  the judge in place there didn't like them and was prejudiced

24  against them.

25          Another judge obviously heard the substitution of

1  judge motion, denied it, so the City of Chicago is stuck with

2  the same judge that they tried to get rid of.

3         We pre-petition filed joinder papers with the

4  plaintiff opposing the substitution of judge motion because we

5  thought the judge was fine.  So that's what went forward.  To

6  the extent relief from stay was necessary we were on the same

7  side of that.

8         This testing issue, Your Honor is absolutely right,

9  they can go do the testing any time they want.  They don't need

10 relief from stay to do that.  They just can't bind us or

11 proceed against us.  They want relief from stay to setup I

12 guess some kind of an estoppel argument is what I heard.  I

13 don't know.

14        And in the argument that I heard seemed to be

15 inconsistent with the testimony which was this testing is very

16 meticulous and scientific and recorded and pristine and

17 videotaped.

18        So why do we have to participate unless they want to

19 use it as some kind of an estoppel against the estate or

20 something?

21        But again, Your Honor, the answer to this and I think

22 maybe the judge would benefit from some clarity whenever Your

23 Honor rules on this motion.  If Your Honor denies it that may

24 provide some clarity.  If they dismiss us without prejudice

25 that may provide some clarity.

**J&J COURT TRANSCRIBERS, INC.**

1          I think the fact that this motion has been pending

2     for two months may have something to do with some of the

3     confusion that's going on in Chicago rather than the Court

4     simply not understanding that the automatic stay only applies

5     to us and doesn't apply to anybody else.

6          But again, Your Honor, for all the reasons we've

7     stated earlier we think the motion is not well founded and

8     should be denied.

9          THE COURT:  All right, thank you.

10         All right, the Court has before it the motion for

11    relief from the automatic stay to proceed with the state court

12    litigation.  The Court is going to deny that motion.

13         I'm terribly concerned in the balancing about the

14    administrative expenses that this company is going to be

15    incurring as it goes through, as Mr. Foley described it, the

16    largest liquidation in history and those expenses are going to

17    be considerable and all of the efforts having to be put forward

18    by management and all of the current employees of Circuit City,

19    at this time need to be focused on that process and I don't

20    think the Court should burden that process with this additional

21    layer.

22         There are -- this is one of many, many, many claims

23    that have been filed and will be filed against Circuit City and

24    there will be a time in this case when all the claims are going

25    to have to be analyzed and resolved, and to allow this matter

84

1  to go forward at this point in time would burden the company

2  with potentially $2 million of additional administrative

3  expenses at a time it can't afford to turn its focus away from

4  what needs to be done.

5         Now, that said, there is nothing about the automatic

6  stay that affects the City of Chicago, or Thomson or any other

7  third party, to litigation.  And the litigation can proceed in

8  the state court, just not as to Circuit City.  Same thing with

9  testing.  A testing can go forward, just not with regard to

10  Circuit City.  And, certainly, you know, Circuit City can be

11  dismissed without prejudice if counsel desires.  It's not

12  required to do that by the bankruptcy code or the order of this

13  Court.  I'm just not allowing the stay to be lifted so that

14  litigation can proceed against it.

15         Any questions with regard to the Court's ruling?

16         MS. HUDSON:  No, Your Honor, but if we might request,

17  in light of the confusion in Cook County, a subsequent comfort

18  order that I'd be prepared to address and circulate to Mr.

19  Foley with respect to the inspection.  That we could have that

20  entered before that April 1st date, we would appreciate that.

21         THE COURT:  I would entertain that.  I would like it

22  to be a consensual order.  I don't think it would be a problem.

23  I think that, you know, Mr. Foley would be amenable to that as

24  well.

25         MR. FOLEY:  No problem, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1            THE COURT:  Okay.  So, I would entertain that.

2            MS. HUDSON:  And, I guess secondly, Your Honor, with

3    regard to the expediency of the hearing tomorrow on City of

4    Chicago's continued motion to have the stay apply as to the

5    litigation, if we would have a consensual reiteration of that

6    comfort order drafted today and presented to chambers in an

7    expedited fashion, would the Court be willing to entertain

8    that?

9            THE COURT:  I would take every effort I possibly can,

10   you know.  The earlier you can get it to me the better, I'll

11   have a chance to review it and such.  But I will try to do

12   that, yes.

13           MS. HUDSON:  Thank you, Your Honor.

14           THE COURT:  All right.  Mr. Foley, is there anything

15   else that we need to take up this morning?

16           MR. FOLEY:  No, Your Honor, I think we're finished.

17   Thank you, Your Honor.

18           THE COURT:  Okay, thank you.

19           COURT CLERK:  All rise.  The court is now adjourned.

20

21                      *  *  *  *  *

22

23

24

25


**J&J COURT TRANSCRIBERS, INC.**

1        **C E R T I F I C A T I O N**

2              WE, JANET D. PERSONS and ELAINE HOWELL, court

3   approved transcribers, certify that the foregoing is a correct

4   transcript from the official electronic sound recording of the

5   proceedings in the above-entitled matter and to the best of our

6   ability.

7

8   /s/ Janet D. Persons            Date:  February 2, 2009

9   JANET D. PERSONS

10  J&J COURT TRANSCRIBERS, INC.

11

12  /s/ Elaine Howell              Date:  February 2, 2009

13  ELAINE HOWELL

14  J&J COURT TRANSCRIBERS, INC.

15

16

17

18

19

20

21

22

23

24

25