# EXHIBIT "A"

# LEASE

LOCATION:        Holyoke, Massachusetts
DRAFT DATED:     November 20, 1995

**LEASE**

between

**CIRCUIT CITY STORES, INC.,**

as Tenant

and

**O'CONNELL PROPERTIES, INC.,
or its designee**

as Landlord

dated *December 12*, 1995

**HOLYOKE CROSSING**

TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | Leased Property; Condominium | 1 |
| 2. | Construction of Building and Improvements | 5 |
| 3. | Lease Term | 6 |
| 4. | Base Rent; Ground Rent. | 7 |
| 5. | Development of Shopping Center by Landlord | 10 |
| 6. | Easements | 12 |
| 7. | Common Areas and Common Area Maintenance | 16 |
| 8. | Signs and Communications Equipment | 24 |
| 9. | Taxes | 27 |
| 10. | Maintenance, Repairs and Replacements | 30 |
| 11. | Payment of Utility Bills | 33 |
| 12. | Alterations | 34 |
| 13. | Mechanics' Liens | 36 |
| 14. | Insurance | 36 |
| 15. | Damages by Fire or Other Casualty | 44 |
| 16. | Condemnation | 49 |
| 17. | Assignment and Subletting | 53 |
| 18. | Use | 57 |
| 19. | Warranties and Representations | 60 |
| 20. | Estoppel Certificates. | 72 |
| 21. | Subordination, Non-Disturbance and Attornment | 73 |
| 22. | Change of Landlord | 75 |
| 23. | Tenant's Financing | 76 |
| 24. | Tenant's Property and Waiver of Landlord's Lien | 77 |
| 25. | Memorandum of Lease; Commencement Date Agreement | 77 |
| 26. | Expiration of Term and Holding Over | 78 |
| 27. | "For Rent" Signs and Showing Premises | 79 |
| 28. | Force Majeure | 79 |
| 29. | Events of Tenant's Default | 80 |
| 30. | Landlord's Remedies | 81 |
| 31. | Events of Landlord's Default; Tenant's Remedies | 86 |
| 32. | Waiver | 88 |

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

33. <u>Compliance with Applicable Laws</u> . . . . . . . . . . . .   89

34. <u>Notices</u> . . . . . . . . . . . . . . . . . . . . . . .   90

35. <u>Brokers</u> . . . . . . . . . . . . . . . . . . . . . . .   90

36. <u>Miscellaneous</u> . . . . . . . . . . . . . . . . . . . .   91

37. <u>Effectiveness of Lease; Tenant's Right to Terminate</u> . .   94

38. <u>Confidentiality</u> . . . . . . . . . . . . . . . . . . . .   96

<u>EXHIBITS</u>

| | |
|---|---|
| "A" | Site Plan |
| "A-1" | Shopping Center Legal Description |
| "B" | Index of Definitions |
| "C" | Construction Provisions |
| "D" | Removable Trade Fixtures |
| "E" | Sign and Antenna Plans |
| "F" | Permitted Encumbrances |
| "G" | Subordination, Non-Disturbance and Attornment Agreement |
| "H" | Memorandum of Lease |
| "I" | Commencement Date Agreement |
| "J" | Indemnification Agreement |
| "K" | Condominium Master Deed and By-Laws |
| "L" | Recognition Agreement |

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

HOLYOKE CROSSING
HOLYOKE, MASSACHUSETTS

## LEASE

This LEASE is made as of the 12th day of ~~November~~ *December*, 1995, by
and between O'CONNELL PROPERTIES, INC., a Massachusetts
corporation, or its designee, having an address at 480 Hampden
Street, P. O. Box 267, Holyoke, Massachusetts 01041 ("Landlord"),
and CIRCUIT CITY STORES, INC., a Virginia corporation having an
address at 9950 Mayland Drive, Richmond, Virginia 23233 ("Tenant").

### W I T N E S S E T H :

That for and in consideration of the mutual covenants herein
contained and other good and valuable consideration, the receipt
and sufficiency of which are hereby acknowledged, the parties
hereto agree as follows:

1.     Leased Property; Condominium    (a)   Landlord demises and
leases to Tenant and Tenant leases and takes from Landlord,
commencing on Landlord's delivery of the "Land" (as defined below)
to Tenant, all those certain "Premises" consisting of the
"Building" and "Other Improvements" (both as defined in paragraph
2), as and when same are constructed or renovated and that
approximately 31,625 square foot parcel (the "Land"), on which the
Building and Other Improvements are or will be located, as more
particularly shown (approximately) outlined in red on Exhibit "A"
hereto (the "Site Plan"), together with exclusive rights in the
four (4) parking spaces labelled "Customer Pick-Up" in front of the

Building as shown on the Site Plan and with the easements described
in paragraph 6 below, all located in the "Shopping Center" (herein
so called), which consists of that certain real property with
buildings and improvements constructed or to be constructed
thereon, located at the intersection of Lower Westfield Road and
Holyoke Street, lying and being in the City of Holyoke (the
"City"), County of Hampden, Commonwealth of Massachusetts (the
"State"), and more particularly shown on the Site Plan and
described by metes and bounds or platted lot legal description on
Exhibit "A-1" attached hereto and made a part hereof for all
purposes. All of the Shopping Center exclusive of the Premises is
hereinafter called "Landlord's Premises", whether or not owned by
Landlord. The description of the Premises may be adjusted slightly
in accordance with Tenant's final bid set of Plans and
Specifications as described in Exhibit "C" attached hereto.

(b) (i) Tenant acknowledges and agrees that, following
the execution of this Lease, the Premises shall be converted to a
condominium unit in the Holyoke Crossing Condominium (the
"Condominium") comprising the entirety of the Shopping Center,
which shall be created by Landlord pursuant to Massachusetts
General Laws, Chapter 183A by the Master Deed recorded or to be
recorded in substantially the form attached hereto as Exhibit "K"
(the "Master Deed"), and which shall be subject to the Condominium
By-Laws (including the Rules and Regulations incorporated therein)
in substantially the form attached hereto as Exhibit "K" (the "By-
Laws"). The Master Deed and the By-Laws are hereinafter referred

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

to as the "Condominium Documents".  Tenant reserves the right to require minor changes to the Condominium Documents to clarify certain provisions thereof affecting this Lease.  Subject to the provisions of subparagraph (iii) below, Tenant hereby agrees to subordinate this Lease to the Condominium Documents.  The Condominium Documents may not be modified during the Term of this Lease in any respect which diminishes Tenant's rights or increases Tenant's obligations under this Lease without Tenant's prior written consent.  Further, Landlord shall not exercise its voting rights under the Condominium Documents regarding any matter as to which this Lease requires Tenant's consent, without first obtaining Tenant's prior written consent, which, if required under this Lease not to be unreasonably withheld or delayed, shall not be unreasonably withheld or delayed.  Wherever Landlord's consent is required by this Lease to be reasonable, it shall be reasonable for Landlord to disapprove of the matter in question if the Condominium Association (as hereinafter defined) disapproves of such matter, provided that, in such case, the Condominium Association shall also be required to act reasonably in granting or withholding its consent to such matter.

(ii) As between Landlord and Tenant, the terms and provisions of this Lease shall control, notwithstanding any provisions in the Condominium Documents to the contrary.  Tenant and persons acting under Tenant shall have the right to exercise such rights as are granted to Landlord as the owner of the Premises under the Condominium Documents to use the Common Areas of the

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

Shopping Center.  Tenant shall comply in all material respects with all provisions of the Condominium Documents which pertain to the use of the Premises and the Common Areas.  Tenant shall also comply in all material respects with the rules and regulations of the Condominium, as initially attached to the Bylaws and as the same may hereafter be modified, subject to Tenant's prior written consent if Tenant's consent is required pursuant to subparagraph (i) above.  Tenant hereby agrees to indemnify, defend and hold Landlord harmless from all claims, costs, liability, damage or expense, including reasonable attorneys' fees, resulting from any breach of the Condominium Documents by Tenant, any entity related to Tenant or their respective agents, contractors or employees.

(iii)     Notwithstanding anything to the contrary contained above, prior to the subordination of this Lease to the Condominium Documents and as a condition to Tenant's obligation to execute any such instruments as may be required to effect such subordination, Landlord shall deliver to Tenant an agreement, in recordable form, substantially in the form attached hereto as Exhibit "L", pursuant to which the governing board of the Condominium ("Condominium Association") agrees to provide simultaneous notice to Tenant of any default by Landlord under the Condominium Documents, recognizes Tenant's rights under this Lease (including Tenant's right to consent to any exercise by Landlord of voting rights under the Condominium Documents as to which this Lease requires Tenant's consent) and agrees to accept performance by Tenant as satisfaction of any defaults by Landlord under the

4

Condominium Documents, as well as such other matters as shall be set forth in Exhibit "L".

2.   Construction of Building and Improvements.   Following "delivery of the Land" (as defined in the Construction Provisions (herein so called) attached hereto as Exhibit "C" and incorporated herein by reference for all purposes), Tenant shall construct within the Shopping Center a one-story retail building, containing approximately 31,625 square feet of ground-floor gross leasable area, with provisions for customer pickup, delivery and car stereo installation facilities, initially for use as a Circuit City Superstore (the "Building"), together with loading ramps, sidewalks (which, once constructed by Tenant, shall become part of the Common Areas defined in paragraph 7), trash compactor, transformer pad and other such appurtenances and improvements (collectively, the "Other Improvements"), as more particularly set forth in the Construction Provisions.   The Building and Other Improvements are sometimes collectively referred to herein as the "Improvements".   The Improvements shall be constructed in accordance with the "Plans and Specifications" to be prepared by Tenant as specified in the Construction Provisions.   Except as otherwise provided herein, title to the Improvements shall be deemed transferred to Landlord upon full payment of the "Tenant Improvement Allowance", as defined in the Construction Provisions.   The deadlines and requirements pertaining to Landlord's delivery of the Land and Tenant's construction of the Improvements are set forth in the Construction Provisions attached hereto as Exhibit "C".

[J:\013363\161\4bkao82x.W51]
[12/01/95 10:10am; WEITZEL_M]

3.  **Lease Term.**  Subject to the conditions to the effective-
ness of this Lease set forth in paragraph 37, the construction term
(the "Construction Term") of this Lease shall commence on the date
of Landlord's delivery of the Land to Tenant in accordance with,
and in the condition specified in, the Construction Provisions, and
shall end on the "Commencement Date" (as defined in paragraph 4
below).  The main term (the "Main Term") of the Lease shall com-
mence on the Commencement Date and shall end on the last day of
January following the twenty-fifth (25th) anniversary of the
Commencement Date.

In addition to the Main Term, Tenant shall have the option
(each such right referred to herein as a "Renewal Option") to renew
and extend the Lease for five (5) consecutive five (5) year periods
(each such period referred to as an "Option Period" and
collectively as the "Option Periods") immediately following the
Main Term, at the rent specified below. Tenant shall give Landlord
written notice of its election to exercise any Renewal Option at
least one hundred eighty (180) days prior to the expiration of the
Main Term or any then-current Option Period, as applicable;
provided, however, that in order to avoid any forfeiture or
inadvertent lapse of such Renewal Option, if Tenant shall fail to
give any such notice within the one hundred eighty (180) day time
limit and shall not have given Landlord prior written notice of its
intent not to exercise its Renewal Option, then and as often as the
same shall occur, Tenant's right to exercise such Renewal Option
shall nevertheless continue, as shall its tenancy hereunder (under

6

the same terms and conditions as theretofore in effect and notwithstanding that the Main Term or then-current Option Period shall have expired), until ten (10) business days after Landlord shall have given Tenant a written notice of Landlord's election to terminate the Renewal Option, during which period Tenant may exercise its Renewal Option at any time prior to the expiration of such ten (10) business day period. Upon the giving of notice of renewal and extension in accordance with the foregoing provisions, the "Term" (defined below) of this Lease shall thereupon be renewed and extended in accordance with such notice without further act by Landlord or Tenant, the same as if such notice had been timely given hereunder. If Tenant does not exercise its Renewal Option during such ten (10) business day period, Tenant shall have no further option to renew or extend the Lease beyond the expiration of the Main Term or then-current Option Period, as applicable.

The Construction Term, Main Term and Option Periods are, col-lectively, the "Term". The term "Lease Year" shall mean each successive period of twelve (12) consecutive calendar months, commencing on the first day of each February during the Term, except that the first Lease Year shall commence on the Commencement Date and shall end on the last day of January following the first anniversary of the Commencement Date.

4. Base Rent; Ground Rent. (a) During the Construction Term, Tenant shall have no rental obligations (except as specified in subparagraph (b) below) nor shall Tenant be responsible for any "Real Estate Taxes" (as defined in paragraph 9) or "CAM Charges"

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

(as defined in paragraph 7) or any similar costs, fees, rentals or expenses. Tenant agrees to pay base rent ("Base Rent") for the Premises in the amounts and in the manner specified hereunder, commencing (subject to the provisions of paragraph 4 of the Construction Provisions) on the date on which Landlord makes payment of the Tenant Improvement Allowance as set forth in the Construction Provisions (the "Commencement Date"). For purposes of computing Base Rent, the Premises shall be deemed to contain 31,625 square feet of leasable area.

Tenant shall pay Base Rent in equal monthly installments, in advance on the first day of each succeeding calendar month throughout the Term, with appropriate proration for any partial calendar month or Lease Year, to the address given for Landlord in paragraph 34 hereof, unless Landlord shall give Tenant written notice of a change of address or of the party to whom such rents shall be payable. Unless adjusted as provided in paragraph 3 of the Construction Provisions, Base Rent shall be paid pursuant to the following schedule:

(i) First Five Years. During the first five (5) Lease Years, Tenant shall pay annual Base Rent in the amount of Four Hundred Seventy-Four Thousand Three Hundred Seventy-Five Dollars ($474,375.00), payable in equal monthly installments of Thirty-Nine Thousand Five Hundred Thirty-One and 25/100 Dollars ($39,531.25).

(ii) Increases in Base Rent. Annual Base Rent shall increase on the first day of the sixth (6th) and every succeeding

[J:\013363\161\4bkao82x.W51]
[12/01/95 10:10am; WEITZEL_M]

fifth (5th) Lease Year, over the Base Rent charged hereunder during
the immediately preceding five (5) Lease Year period by the lesser
of fifteen percent (15%) or twice the percentage increase in the
"CPI-U" (as defined below) during the five (5) year period ending
on October 31 of the fifth (or, as applicable, any succeeding
fifth) Lease Year. As used herein, the CPI-U shall be the United
States Department of Labor, Bureau of Labor Statistics Consumer
Price Index for All Urban Consumers, Boston Metropolitan Area. If
at any time during the Term the CPI-U shall be discontinued,
Landlord and Tenant shall mutually and reasonably agree to
substitute an existing official index published by the Bureau of
Labor Statistics or its successor or another similar index most
nearly equivalent to the CPI-U.

(b)   If the Land is delivered between on or before **June
1, 1996,** and the Tenant Improvement Allowance has not been paid to
Tenant by the date which is the later to occur of **December 15, 1996**
or the date which is seven (7) months after the actual date of
delivery of the Land due to the failure of Tenant to have achieved
"Substantial Completion" (as defined in Exhibit "C") by such date,
then commencing on such date Tenant shall pay ground rent ("Ground
Rent") for the Premises in an amount equal to 25% of the amount
which would otherwise be payable as Base Rent, until such time as
the full Base Rent becomes due and payable pursuant to subparagraph
(a) above.   If the Land is delivered after **June 1, 1996,** then,
provided the Land is delivered by not later than **September 1, 1996,**
Ground Rent in the amount aforesaid shall become payable on **April**

9

**1, 1997**, <u>provided</u> <u>that</u> the Tenant Improvement Allowance has not been paid to Tenant by such date due to the failure of Tenant to have achieved Substantial Completion by such date. If Substantial Completion of the Improvements has still not occurred on or before the date which is five (5) months after the date Tenant's obligation to pay Ground Rent has commenced as aforesaid, the Ground Rent shall be increased to 50% of the amount which would otherwise be payable as Base Rent until such time as the full Base Rent becomes due and payable pursuant to subparagraph (a) above. Tenant's obligation to pay Ground Rent pursuant to this subparagraph (b) shall not be affected by delays in Tenant's construction of the Improvements which are caused by Force Majeure and shall end when Base Rent becomes payable.

5.    <u>Development of Shopping Center by Landlord</u>.    Landlord covenants to construct and develop a first-class shopping center. The location of buildings and other tenant space therein will only be within the "Permissible Building Areas" designated on the Site Plan, and the parking ratio for the Shopping Center shall be at least as shown thereon, but in no event shall said ratio be less than the greater of (i) 4.5 spaces (for full-sized or compact automobiles) per 1,000 square feet of gross leasable area or (ii) that required by applicable zoning requirements. All such parking shall be at ground level. Landlord shall construct or cause such improvements to be constructed in a good and workmanlike manner, lien-free in accordance with paragraph 13 below, and Landlord hereby agrees to indemnify, defend and hold Tenant harmless from

10

any loss or damage suffered by Tenant as a result of Landlord's construction.  After delivery of the Land has occurred, Landlord shall not permit construction traffic over the Premises, shall stage and store its construction materials and equipment only in the location(s) reasonably satisfactory to Tenant (which shall be located outside Tenant's Preferred Area) and shall refrain from interfering with the conduct of Tenant's business.  So long as Tenant is open for business in the Premises, no exterior construction shall be permitted in the Shopping Center during the months of November and December (except for emergency repairs and minor construction activities such as completion of punchlist items) and, if Landlord has not yet completed the construction of other buildings in the Shopping Center by the time Tenant opens for business in the Premises, all staging and storage for such construction must be relocated to areas behind the buildings in the Shopping Center or to the interior of such buildings, and, except as set forth above, only interior work may be performed during such months.  Any breach by Landlord of the foregoing requirement shall entitle Tenant to withhold all rent and other charges for the period during which exterior construction and/or staging or storage is continuing during the months of November and December.  Landlord shall keep and maintain or cause the improvements and the "Common Areas" (as defined in paragraph 7(a)) in the Shopping Center to be kept and maintained in good condition and repair and shall not operate, or permit to be operated, in the Shopping Center any activity which constitutes a nuisance, overburdens the available

11

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

utilities, or violates any of the "Site Covenants" contained in
subparagraph 19(a)(ix) or the prohibited activities set forth in
subparagraph 19(a)(viii).

6.    Easements.    In addition to and simultaneously with the
lease of the Premises, Landlord grants to Tenant certain
nonexclusive leasehold easements over or upon certain areas of
Landlord's Premises, as set forth below, which easements shall run
as covenants with Landlord's Premises and the Premises during the
Term and shall expire or terminate simultaneously with this Lease,
except as provided below.  Upon the subordination of this Lease to
the Condominium Documents, Tenant's easement rights as set forth
below shall be deemed granted with respect to the Common Areas of
the Condominium and shall be subsumed in (but not extinguished by)
the rights granted in the Condominium Documents to the owners and
occupants of the Condominium, and Tenant shall continue to have the
right to exercise the easement rights set forth below, as well as
such additional rights as are accorded to Landlord or others as
owners or occupants of a unit in the Condominium which pertain to
the subject matter of such easement rights.

(a)    Construction Easements.    During the Construction
Term, Landlord grants to Tenant a nonexclusive easement across a
mutually agreeable designated route, providing access to and from
the public roadways nearest to the Land, over the "Common Areas"
(as defined in paragraph 7(a) below) for the purpose of
construction access to the Premises.  In addition, Landlord grants
to Tenant during the Construction Term an exclusive easement for a

12

construction staging area (the "Staging Area") of approximately **20,000** square feet, in a portion of the Common Areas mutually acceptable to Tenant and Landlord, as provided in the Construction Provisions. Tenant agrees to move the Staging Area not more than once during its construction of the Improvements to a mutually agreeable location to accommodate Landlord's completion of the parking lot and other portions of the Common Areas.

(b)  <u>Footing and Foundation Easements</u>.  Landlord grants to Tenant, and Tenant grants to Landlord, easements and rights in the Premises and the portions of the Shopping Center adjoining the Premises, as appropriate (i) for the construction and maintenance of foundations, footings, supports and demising walls; (ii) to allow their respective buildings to abut and connect (but not to bear structurally upon each other unless and except as otherwise provided herein); (iii) for roof projections, allowing the grantee to tie its building into the adjoining building by flashing and reglets; and (iv) for encroachments which reasonably occur in the construction of the building components set forth in subparagraphs (i) through (iii) above.  No such attachment or connection shall be made, however, unless detailed plans therefor shall have been timely submitted to and approved by the party to whose building the attachment is to be made, which approval shall not be unreasonably withheld.

(c)  <u>Utility Easements</u>.  During the Term, upon prior reasonable request of Tenant (following the initial "Landlord Work" as set forth in the Construction Provisions), Landlord agrees to

13

use reasonable efforts to obtain such underground, public or private utility service as Tenant deems necessary, without unreasonably interfering with the use by Landlord or other owners or occupants of portions of the Shopping Center of the Common Areas, for the benefit of the Premises. The cost of obtaining same during the Construction Term shall be the responsibility of Landlord to the extent same are required as part of or incidental to the Landlord Work required under the Construction Provisions; thereafter, the cost of obtaining same shall be the responsibility of Tenant. For the purpose of exercising the rights granted in this subparagraph 6(c), Tenant and/or the utility provider shall have the right to enter upon and use the Common Areas to install the utility systems, to such extent and so long as reasonably necessary to accomplish such purpose, subject to restoration of the Common Areas following such installation, procurement of appropriate insurance and indemnity agreements and any other reasonable conditions and requirements imposed by Landlord or, if this Lease is then subject to the Condominium Documents, the Condominium Association.

(d) <u>Common Area Easement</u>. During the Term, Landlord grants to Tenant, for the benefit of the Premises, the nonexclusive right, privilege and easement (the "Common Area Easement") to use the Common Areas for their intended purposes and to permit Tenant and its employees, agents, subtenants, assignees, licensees, suppliers, customers and invitees to use the same, in common with Landlord, its successors, assigns, employees, agents, lessees,

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

licensees, suppliers, customers and invitees and all other persons claiming by or through them, and all other occupants of the Shopping Center, for the purposes (without limitation) of parking and pedestrian, service and vehicular access, ingress and egress to, from and between the Premises and the Common Areas and the streets and highways abutting and adjacent to the Shopping Center, in accordance with the Site Covenants, without payment of any fee or other charge therefor.   It is specifically agreed that with respect to the parking spaces designated on the Site Plan as Tenant's "Customer Pick-Up", (i) Tenant shall, upon prior notice to Landlord and the Condominium Association, have the right, from time to time, to relocate the same to other areas immediately in front of the Improvements so long as such relocation does not have any materially adverse impact on the use of the Common Areas, and (ii) notwithstanding the fact the same are in, and constitute a part of, the "Common Areas", such parking spaces shall be used exclusively by Tenant's customers, invitees and patrons.

(e)   Non-Dedication.   None of the easements granted by the parties to this Lease is intended, nor shall any of them be construed, as a dedication of any portion of the Shopping Center for public use, and the parties will refrain from taking any action which would cause such a dedication and will take whatever steps may be necessary to avoid any such dedication, except as may be agreed upon in writing by the parties hereto or their respective successors or assigns.

15

(f)    Effect of Condominium on Easements.    Landlord and Tenant hereby acknowledge and agree that, upon Tenant's subordination of this Lease to the Condominium Documents, the foregoing easements shall be deemed subsumed by and incorporated in (but not superseded by) the rights and benefits granted to Landlord as a unit owner in the Condominium, all of which easements, rights and benefits accorded to Landlord shall be deemed granted to and exercisable by Tenant so long as this Lease is in effect.

7.    Common Areas and Common Area Maintenance.

(a)    Definition of Common Areas.    The term "Common Areas" shall be defined to include the parking areas, lanes, drives, entrances, truck passageways, sidewalks, elevators, escalators, ramps, stairways, landscaped and other unpaved areas, parking lot lighting facilities and equipment, pylon sign(s), directional, traffic and monument sign structure(s) and shared utility facilities (including storm drainage) located in the Shopping Center (including any such areas and facilities contained within outparcels and adjacent tracts but reserved to the benefit of the Shopping Center occupants) and intended and available for the common use of all of the tenants and other occupants within the Shopping Center (including any outparcel and other adjacent occupants which contribute toward "CAM Charges" (as defined below) and which are not responsible for separate maintenance of such outparcels or tracts), their subtenants, licensees, and business invitees.  Landlord shall be responsible for operating, maintaining and repairing the Common Areas in a first-class manner, including

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

cleaning, maintenance of pylon and other sign structure(s), snow removal and ice treatment, removal of Common Area trash and garbage, lighting, repairing, repaving and restriping the parking area, security measures (if and to the extent Landlord or the Condominium Association elects to provide the same), ordinary maintenance and periodic cleaning and painting of the exterior walls of buildings in the Shopping Center (but structural repairs or replacements of such walls shall not be included in Common Area Maintenance), operation, maintenance and repair of shared utility rooms, and maintaining, replanting and replacing landscaping in the Common Areas, all such work to be referred to collectively as "Common Area Maintenance". Common Area Maintenance shall not include repairs or replacements necessitated by the negligence or wrongful action of Tenant (including any failure by Tenant to construct any portion of the Improvements in accordance with the approved Plans and Specifications therefor) or any other tenant or occupant of the Shopping Center, and Tenant (or such other tenant or occupant) shall be responsible for either performing any such repairs or replacements at its sole cost and expense, or, at the option of Landlord, for reimbursing Landlord (or the Condominium Association) for the reasonable cost of such repairs or replacements. Landlord may, in Landlord's reasonable discretion, provide security measures as to the Common Areas, but under no circumstances shall Landlord be responsible for providing any security within the Premises and Tenant shall be solely responsible for any security measures taken or required to be taken within the

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

Premises.    At such time as this Lease is subordinated to the
Condominium Documents, the Condominium Association may undertake
all or part of the responsibility of Landlord hereunder for Common
Area Maintenance, and Tenant shall pay for the same as if the
Common Area Maintenance were provided by Landlord, but under no
circumstances shall Landlord be released from its responsibility
under this Lease to perform or cause to be performed the Common
Area Maintenance required hereunder.

(b)  CAM Charges.  For the purpose of this paragraph 7,
the cost of Common Area Maintenance (the "CAM Charges") shall
include (i) the reasonable and proper direct costs and expenses of
operating and maintaining the Common Areas and (ii) all overhead
expenses for administering same (or in lieu thereof a management
fee) in an amount not to exceed five percent (5%) of the total of
such costs (specifically excluding from such total the amounts paid
for insurance, capital expenditures, Real Estate Taxes and
utilities serving the Common Areas).    Notwithstanding the
foregoing, the following shall not be included in the CAM Charges:

(1)  real estate taxes paid, and maintenance
performed, on separately assessed and/or maintained
outparcels or other adjacent tracts not reserved to the
benefit of the Shopping Center occupants;

(2)  any dues or charges for a merchants' or other
association of the tenants in the Shopping Center;

(3)  maintenance, repairs or replacements to the
Common Areas (but no other portions of the Shopping

18

Center), necessitated by the negligent or wrongful act of
the Landlord or made to correct any construction defect
or condition, or to any buildings (including exterior
walls thereof (except as set forth above)) or utility
systems not part of the Common Areas;

(4) repairs or replacements necessitated by any
governmental entity or by the negligence or the wrongful
action of Landlord (including failure to construct any
portion of the Shopping Center in accordance with plans
or specifications therefor) or any other tenant or
occupant of the Shopping Center or made to correct any
initial construction defect or condition in existence
prior to the Commencement Date of this Lease or to
correct damage caused by subsidence or adverse or
substandard soil conditions;

(5) amounts paid to entities related to Landlord in
excess of the commercially reasonable cost of such
services;

(6) amounts reimbursable from insurance proceeds,
under warranty or by Tenant, any other tenant or occupant
in the Shopping Center or any other third party other
than pursuant to a Common Area expense provision similar
to this paragraph 7;

(7) premiums for Common Area liability insurance for
coverage in excess of the limits established in paragraph
14(e) below;

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

(8) repairs or replacements of a capital nature (whether or not capitalized), unless the costs of same are amortized, together with interest at the actual borrowing cost (or at the prime rate, if no actual borrowing occurs) incurred by Landlord (or the Condominium Association), over the entire useful life of such repairs or replacements and provided that repairs or replacements are not the direct result of initial defects in materials or workmanship;

(9) improvements, repairs or replacements (other than patching and similar minor periodic maintenance) to the parking lot or other paved areas during the first ten (10) "CAM Years" (as defined below);

(10) reserves for anticipated future expenses;

(11) interest, late charges or penalties incurred as a result of the failure to pay bills in a timely manner;

(12) management, personnel, overhead, home office or administrative expenses except as set forth in subparagraph (b)(ii) above, and except for reasonable and competitive charges for personnel actually providing Common Area Maintenance services at the Shopping Center, which charges shall be prorated as among all properties serviced by such personnel;

(13) amounts incurred to remediate any Hazardous Substances (as defined in the Construction Provisions); or

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

(14) other maintenance expenses not considered
normal and customary under generally accepted accounting
principles or shopping center industry standards. CAM
Charges shall be in an amount consistent with the costs
incurred by other landlords of similar shopping centers
in the City (but not greater than as described in this
paragraph 7(b)), and in all events such charges shall be
obtained at competitive rates pursuant to a proposed
Common Area maintenance budget delivered to Tenant on or
before the end of each CAM Year.

The foregoing exclusions from CAM Charges shall be applicable
notwithstanding the subordination of this Lease to the Condominium
Documents and/or the performance of Common Area Maintenance by the
Condominium Association (or its agent) rather than by Landlord and,
in the event of any discrepancy between the CAM Charges
reimbursable to Landlord pursuant to this Lease, as set forth
above, and the amounts payable by Landlord to the Condominium
Association for Common Area Maintenance, as set forth in the
Condominium Documents, Landlord shall be solely responsible for
paying the shortfall to the Condominium Association.

(c) <u>Tenant Payments</u>. Commencing on the Commencement
Date and continuing until December 31 of the calendar year during
which the Commencement Date occurs (which shall be the first "CAM
Year"), Tenant shall pay to Landlord a fee (which Landlord esti-
mates on a non-binding basis to be $1.85 per square foot of ground-
floor gross leasable area in the Building per annum), payable in

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

equal monthly installments, as its share of CAM Charges. Thereafter, the annual charge shall be computed on the basis of periods of twelve (12) consecutive calendar months, as designated by Landlord (each such period is a "CAM Year"), and shall be paid by Tenant in equal monthly installments, in advance, on the first day of each month during such CAM Year. In no event shall the CAM Charges (excluding the costs of snow removal) in any CAM Year after the second CAM Year containing 12 full calendar months exceed by more than ten percent (10%) the CAM Charges in effect (excluding the costs of snow removal) during the CAM Year two years earlier. For any CAM Year within the Term which is less than a full twelve (12) months, the annual charge shall be appropriately prorated. Within ninety (90) days after the end of the first CAM Year and each CAM Year thereafter, Landlord will furnish to Tenant a statement showing in detail (with such substantiating documentation as Tenant may reasonably request) the amount of the CAM Charges for the preceding CAM Year and the then-current number of square feet of gross leasable area in the Shopping Center. Any necessary adjustment with respect to amounts owed by either party for such preceding CAM Year shall thereupon be made; and the monthly payments to be made by Tenant for the ensuing year shall be estimated according to the Common Area maintenance budget prepared by Landlord and delivered to Tenant. Subject to adjustments as herein contemplated, Tenant's share (such fraction being referred to herein as "Tenant's Pro Rata Share") of CAM Charges after the first CAM Year shall always be the product of the CAM Charges

22

multiplied by a fraction, the numerator of which is the number of square feet of the ground-floor gross leasable area in the Building and the denominator of which is the number of square feet of the gross leasable area (including the area of any basement or second story space if used for sales purposes) in the Shopping Center.   In determining the gross leasable area of any building in the Shopping Center (including the Building), measurement shall be made from the centerline of any common walls and from the outside of any exterior walls.     Changes  in  applicable  floor  areas  shall  result  in corresponding adjustments of Tenant's Pro Rata Share, but in no event shall the denominator of the fraction by which Tenant's Pro Rata Share is determined be less than the gross leasable area of the Shopping Center as shown on the Site Plan.   The remainder of CAM Charges shall be borne by Landlord and/or other tenants or occupants of the Shopping Center.

(d)   <u>Examination of Landlord's Records</u>.   Tenant shall have the right, from time to time, but not more often than once as to any CAM Year and no later than twelve (12) months after the end of such CAM Year, to examine and make copies of the records pertaining to CAM Charges for such CAM Year.   Tenant's right of examination shall be exercised during reasonable business hours at the principal records office of Landlord or the Condominium Association on reasonable prior notice to Landlord.     If such examination shall disclose any overcharge, Landlord shall promptly reimburse Tenant for any overpayment of Tenant's Pro Rata Share of CAM Charges; and if such overpayment by Tenant is in excess of

23

three percent (3%) of the actual Tenant's Pro Rata Share of CAM Charges, Landlord shall reimburse Tenant for the reasonable cost of such examination or audit.    Tenant shall promptly reimburse Landlord for any underpayment disclosed by such examination.

8.    Signs and Communications Equipment.

(a)    Signs.  Landlord, at its sole cost and expense, no later than the date set forth on Attachment "5" to the Construction Provisions (but subject to Force Majeure), shall construct and install upon the Common Areas at the location so shown on the Site Plan, a pylon sign structure (with electrical wired box installed) having sufficient space thereon in the position provided for the Premises in the Condominium Documents (which shall initially be the second from the top panel) for inclusion of doublesided "face panels" identifying Tenant's store, which face panels shall be constructed in accordance with the requirements of the Condominium Documents and installed at Tenant's sole cost and expense.    The sizes of the pylon sign and sign panels shall be determined based on the maximum pylon signage allowable by the governmental authorities having jurisdiction, but no tenant or occupant of the Shopping Center shall have a sign panel on the pylon sign structure which is bigger than the sign panel installed by Tenant.    The Condominium Documents shall govern, based on square footage occupied, the relative sizes and location of pylon sign panels. Landlord shall submit to Tenant plans and specifications for such pylon sign (including colors, design, dimensions, type of lighting and position of tenant panels) prior to construction and

24

installation thereof for Tenant's written approval, which shall not
be unreasonably withheld or delayed.    Attached as a portion of
Exhibit "E" are plans and specifications for Tenant's current
prototypical face panels and for Tenant's building signage, which
Landlord hereby approves upon its execution of this Lease.   Tenant
shall be permitted to install the foregoing approved building
signage on the front, rear and sides of the Building, at Tenant's
sole option, but subject to governmental requirements.   The pylon
face panels and building signage referred to above are the only
signs which Tenant has the right to initially install at the
Shopping Center; any replacement signage requested by Tenant to be
installed at the Shopping Center shall be subject to Landlord's
prior written consent, which shall not be unreasonably withheld,
delayed or conditioned.   Notwithstanding the foregoing, Tenant
shall be entitled, subject to governmental requirements, as
aforesaid, to replace any and all of its signs with signage
consistent with Tenant's then-current prototypical sign plans,
provided Tenant first obtains Landlord's prior written consent,
which shall not be unreasonably withheld, delayed or conditioned
and which shall be granted so long as such signage complies with
the sign criteria adopted by the Condominium Association, which
criteria must be reasonable and enforced in a non-discriminatory
manner as to all tenants and occupants of the Shopping Center.   In
the event of an assignment or subletting as a result of which
Tenant is no longer occupying any portion of the Premises, Tenant's
signs may be replaced by signs identifying the appropriate assignee

25

or subtenant, provided that the specific design of such signage
shall be subject to Landlord's consent, which consent shall not be
unreasonably withheld, conditioned or delayed, and which shall be
granted in the case of prototypical sign plans of a national or
regional retailer so long as such signage complies with the sign
criteria adopted by the Condominium Association, which criteria
must be reasonable and enforced in a non-discriminatory manner as
to all tenants and occupants of the Shopping Center.

(b)   Communications Equipment.   Tenant may, from time to
time, install, maintain and/or replace any satellite dishes or
antennas on the roof and/or exterior walls or parapet of the
Building as Tenant deems necessary or desirable, provided same
shall not adversely and materially affect the roof or the
structural elements thereof. If necessary because of governmental
requirements, the satellite dishes or antennas shall be located on
the ground as shown on the Site Plan.   The initial design and
location of such equipment shall be as shown on the Plans and
Specifications for the Improvements attached hereto as Exhibit "E",
which have been approved by Landlord.  Tenant shall have the right
to replace such equipment from time to time without the consent of
Landlord, but any future relocation of existing equipment or
replacement with new equipment shall be subject to Landlord's prior
written approval, which shall not be unreasonably withheld, delayed
or conditioned, and the location and manner of installation of such
equipment shall comply with all governmental requirements affecting
the Shopping Center.   Upon removal by Tenant of any satellite

26

dishes or antennas, Tenant shall repair any damage done in
connection with such removal.

9.    Taxes.

(a)    Taxes Contemplated Hereunder.  The term "Real Estate
Taxes" shall mean all general real estate taxes and assessments and
other ad valorem taxes, rates and levies paid upon or with respect
to the Shopping Center, including the Premises, for a calendar year
or a portion thereof to any governmental agency or authority and
all charges specifically imposed in lieu of any such taxes.
Nothing contained in this Lease shall require Tenant to pay any
local, county, municipal, state or federal income, franchise,
corporate, estate, inheritance, succession, capital levy, business
or transfer tax of Landlord, or any local, county, municipal, state
or federal income, profits, gross receipts, sales or renewal tax or
charge upon the rent or other charges payable by Tenant under this
Lease.

(b)    Payment of Real Estate Taxes.  At such intervals as
Landlord is required to pay the Real Estate Taxes, Tenant shall pay
Tenant's Pro Rata Share of Real Estate Taxes (calculated in the
same manner as Tenant's Pro Rata Share of CAM Charges in paragraph
7(c)) levied against the tax parcel or parcels comprising the
Shopping Center (the "Tax Parcel").  If the Premises are separately
assessed for Real Estate Taxes as a condominium unit by the taxing
authority, Tenant shall pay the entire amount of Real Estate Taxes
so assessed against the condominium unit comprising the Premises.
Tenant's Pro Rata Share of Real Estate Taxes shall be net of any

27

early-payment discounts available at the time Tenant's payment is
due. Tenant shall pay Tenant's Pro Rata Share of Real Estate Taxes
within thirty (30) days after Tenant's receipt of Landlord's
statement therefor, accompanied by the tax bill on the basis of
which such statement is rendered. Provided Tenant shall timely pay
its Pro Rata Share of Real Estate Taxes as aforesaid, Landlord
shall pay, or cause the payment of, all Real Estate Taxes before
any fine, penalty, interest or cost may be added thereto, become
due or be imposed by operation of law for the nonpayment or late
payment thereof. If any such fine, penalty, interest or cost is
added to Real Estate Taxes by virtue of Tenant's late payment of
its Pro Rata Share thereof, Tenant shall be solely responsible for
the payment of such fine, penalty, interest or cost. In no event
shall Tenant be liable for any discount forfeited or penalty
incurred as a result of late payment by another tenant or by
Landlord.    Real Estate Taxes shall be prorated as of the
Commencement Date and the expiration or earlier termination of this
Lease, and Landlord shall promptly return to Tenant any overpayment
made by Tenant not attributable to the period of Tenant's
possession of the Premises.    Landlord shall remain primarily
responsible for such payment notwithstanding the fact that such
payment may be made by a tenant or other occupant of the Shopping
Center or other third party pursuant to an agreement to which
Tenant is not a party. In addition, should Landlord fail to pay
such Real Estate Taxes before same become delinquent, Tenant shall
have the right, at its election, to cure such failure by payment of

28

delinquent Real Estate Taxes and any interest and penalties due thereon and in such event Tenant may deduct the cost thereof, plus interest at the lesser of fifteen percent (15%) per annum or the highest rate permitted by State law (the "Default Rate"), from the next installment(s) of Base Rent and other charges due hereunder.

(c) <u>Contest of Real Estate Taxes and/or Assessed Valuation of Property</u>. Tenant shall have the right, at Tenant's sole expense, to contest the amount or validity, or otherwise seek an exemption or abatement, of any Real Estate Taxes or to seek a reduction in the valuation of the Premises assessed for Real Estate Tax purposes, by appropriate proceedings diligently conducted in good faith, provided that Tenant shall first have notified Landlord of its intent to do so and Landlord shall have failed to notify Tenant in writing, within ten (10) business days of receipt of Tenant's notice, that Landlord intends to contest such Real Estate Taxes or seek such a reduction. In any instance where any such action or proceeding is being undertaken by Tenant, Landlord shall cooperate with Tenant, execute any and all documents required in connection therewith and, if required by any law, rule or regulation of the taxing authority, shall join with Tenant in the prosecution thereof, provided Tenant shall reimburse Landlord for the reasonable costs of Landlord's cooperation with Tenant in that regard.

(d) <u>Payment Following Appeal</u>. Upon the termination of the proceedings set forth in subparagraph (c) above (unless the taxing authority requires that Real Estate Taxes be paid under

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

protest prior to commencement of such proceedings), Tenant shall pay Tenant's Pro Rata Share of such Real Estate Taxes as finally determined in such proceedings, the payment or partial payment of which may have been lawfully deferred during the prosecution of such proceedings.   Tenant shall be entitled to a refund of any overpayment of Real Estate Taxes relating or allocable to the Premises.   All costs, fees and expenses incurred in such protest or reassessment shall be reimbursed to Tenant only from any refund of Real Estate Taxes secured by Tenant.

10.   Maintenance, Repairs and Replacements.   Except (i) for costs covered by the Landlord's insurance required to be maintained hereunder, (ii) for condemnation proceeds to be received by Tenant, (iii) for obligations arising from the negligent acts or omissions or willful misconduct of Landlord or an entity related to Landlord (or their respective agents, employees or other tenants), or (iv) as otherwise set forth in this Lease, Tenant shall be solely responsible for correcting any defects (whether structural or nonstructural) in the initial construction of the Improvements (provided such defects are discovered during the first three (3) Lease Years) and for maintenance of the exterior and interior non-structural elements of the Building, including, but not limited to, repairs and/or replacements to plumbing, heating, electrical and air conditioning systems which serve only the Premises.   Tenant shall also be responsible for performing any maintenance, repairs and replacements necessitated by any applicable legal requirements as a result of the particular manner of Tenant's store layout, use

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

or operations of the Premises by Tenant so long as same is not
required of retail tenants generally. During the last five (5)
years of the Term of the Lease (without consideration to the
exercise of any additional Renewal Options), Tenant shall be
obligated to so install or construct alterations or incur
expenditures pursuant to this paragraph notwithstanding that, under
generally accepted accounting principles, same constitute a
"capital item"; provided, however, that if Tenant is required to
expend any sum in connection with capital items in satisfaction of
its obligations hereunder, and if the resulting capital item cannot
be fully amortized in accordance with generally accepted accounting
principles, or the Internal Revenue Code and Regulations, over the
remainder of the Term (giving consideration to the exercise of any
additional Renewal Options), then Tenant shall be reimbursed by
Landlord upon the expiration of the Term by that amount of the cost
of repair, construction or alteration associated with such capital
item for the period beyond the remainder of the Term. Except (i)
for obligations arising from the negligent acts or omissions or
willful misconduct of Tenant or an entity related to Tenant (or
their respective agents, employees or subtenants), (ii) for initial
construction defects in the Improvements, which are required to be
corrected by Tenant during the first three (3) Lease Years, or
(iii) as otherwise set forth in this Lease, Landlord shall maintain
all structural elements of the Premises (whether or not same serve
only the Premises), including, without limitation, the roof, roof
structure, flooring system, floor slab, foundation, load bearing

31

walls and exterior structural walls, but shall have no other
responsibility for maintenance, repair or replacements to the
Premises or any part thereof; provided, however, this provision is
in no way intended to limit Landlord's obligation to perform (or
cause to be performed) the maintenance, repair and replacement of
any and all elements, both structural and non-structural, of the
Common Areas pursuant to the terms of this Lease.  In addition to
the Landlord's maintenance and repair obligations set forth herein
and otherwise set forth in this Lease, Landlord agrees to maintain
(or cause to be maintained) the Other Improvements immediately
surrounding the Building, including sidewalks and landscaping,
except for maintenance and repairs necessitated by the negligence
or wrongful action of Tenant or any other tenant or occupant of the
Shopping Center, in which latter event Tenant (or such other tenant
or occupant) shall be responsible for either performing any such
maintenance or repairs at its sole cost and expense or, at the
option of Landlord, for reimbursing Landlord (or the Condominium
Association) for the reasonable cost of such maintenance and
repair.  Should either party fail to perform its obligations under
this paragraph 10, the other party may, at its option, effect such
maintenance, replacements or repairs, provided that such curing
party shall have given the non-performing party thirty (30) days'
prior written notice, except in the case of emergencies (in which
event only such notice as may be reasonable under the circumstances
shall be required); but further provided that such thirty (30) day
period (or reasonable period in event of emergencies) shall be

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

extended in respect of any cure that cannot with reasonable diligence be accomplished within such period so long as the party required to effect such cure has commenced such cure within such thirty (30) day period (or reasonable period in event of emergencies) and thereafter diligently prosecutes such cure to completion. The non-performing party shall reimburse the other party on demand for the reasonable and actual amount so expended (as evidenced by detailed invoice), plus interest at the Default Rate. However, in the event of emergency repairs, no interest shall accrue if reimbursed within thirty (30) days of request (including detailed invoice) for reimbursement. All maintenance, repairs or replacements shall be done by Tenant or Landlord lien-free and in a good and workmanlike manner consistent with the quality of labor and materials used in originally constructing the Improvements and in accordance with all applicable law. In order for Landlord and Tenant to effectively perform their maintenance, repair and replacement obligations hereunder, Tenant and Landlord, as applicable, shall assign to the other party (or, at Landlord's request, the Condominium Association) any and all manufacturers' and contractors' warranties relating to such work performed on behalf of the other party to the party who is required to maintain same under the Lease.

11. <u>Payment of Utility Bills</u>. Tenant will pay directly to the appropriate utility company or governmental agency, when due, all bills for gas, electricity, telephone and other public or private utilities used by Tenant with regard to the Improvements.

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

Water and sewer service shall be provided by Landlord (or the Condominium Association) and Tenant shall reimburse Landlord (or the Condominium Association) within thirty (30) days after billing for the cost of the water and sewer services provided to the Premises, which shall be determined by submeters installed by Landlord at its cost and to which cost no mark-up, overhead or profit shall be permitted to be added.   Landlord shall pay (or cause to be paid) when due all utility charges incurred in the operation of the Common Areas and the Shopping Center.

12.   Alterations.   During the Term, Tenant shall have the right, at its discretion and its sole cost, without Landlord's (or the Condominium Association's) consent, to make any interior nonstructural alterations or modifications it may desire, so long as the same do not materially adversely affect the building systems in or serving the Premises. With Landlord's (and the Condominium Association's) consent, which shall not be unreasonably withheld, conditioned or delayed, Tenant shall have the right, at its sole cost, to make any other alterations or modifications necessary or desirable in order to bring the Premises into conformity with Tenant's then-current stores and otherwise to alter, modify or reconstruct the exterior and/or structure of the Building or Other Improvements.   Landlord's (or the Condominium Association's) withholding of consent as to any alteration or modification shall be deemed reasonable only if same is materially inconsistent with the then-existing architecture of the Shopping Center, if the quality of construction of same is inferior to that which it is

34

replacing or if the alteration or modification materially impairs the value of the Premises or adversely affects any other part of the Shopping Center in any material respect. Tenant shall cause all such alterations to be lien-free (in accordance with paragraph 13) and made and completed at Tenant's cost in a workmanlike manner and in compliance with all applicable law. Tenant hereby agrees to indemnify, defend and hold Landlord and the Condominium Association harmless from any loss or damage suffered by Landlord or the Condominium Association as a result of Tenant's construction of alterations or modifications to the initial Improvements and shall refrain from interfering with the conduct of business by any other tenant or occupant of the Shopping Center. Should consent be required, conceptual plans and specifications for such work shall be provided to Landlord prior to commencement of any such work. Landlord and the Condominium Association shall be deemed to have consented to such work if written notice of disapproval, with reasons specified, is not received by Tenant within fifteen (15) days following Tenant's delivery of such plans and specifications to Landlord. Without cost or expense to Landlord, Landlord shall cooperate with Tenant in the obtaining of any and all licenses, building permits, certificates of occupancy or other governmental approvals which may be required in connection with any such modifications or alterations, and Landlord shall execute, acknowledge and deliver any documents reasonably required in furtherance of such purposes.

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

13. <u>Mechanics' Liens</u>. Landlord and Tenant covenant to each other that they will not permit any lien to be filed against the Premises or the Shopping Center as a result of nonpayment for, or disputes with respect to, labor or materials furnished to the Premises or the Shopping Center for or on behalf of Tenant, Landlord or any party claiming by, through, or under Tenant or Landlord or any entity related to Landlord, nor shall either party permit any judgment, lien or attachment to lie, as applicable, against the Premises or the Shopping Center. Should any lien of any nature, including but not limited to the foregoing, be filed against the Premises or Shopping Center, the party on account of whose actions such lien has been filed shall, within ten (10) days after receipt of written notice of such lien, cause said lien to be removed, or otherwise protected against execution during good faith contest, by substitution of collateral, posting a bond therefor, escrowing of adequate funds to cover the claim and related transaction costs or such other method as may be permissible under applicable title insurance regulations and reasonably acceptable to the other party hereto.

14. <u>Insurance</u>.

(a) <u>Property Damage</u>. During the Construction Term, Tenant shall keep or require its general contractor to keep, in full force and effect, a policy of builder's risk insurance covering loss or damage to the Improvements for the full replacement value of all such construction. During the Main Term and all Option Periods, Tenant shall keep in full force and effect

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

a policy of fire and extended coverage insurance covering loss or
damage to the Premises in the amount of the replacement value of
the Building, exclusive of excavation, footings and foundations
(which initial amount shall be not less than the Tenant Improvement
Allowance), with a commercially reasonable deductible, for which
Tenant shall be fully responsible; provided that, so long as Tenant
has a reported net worth, as of the end of Tenant's most recent
quarterly reporting period, of not less than Seventy-Five Million
Dollars ($75,000,000) as computed in accordance with generally
accepted accounting principles consistently applied, the amount of
the insurance coverage shall not be required to exceed 80% of the
replacement value of the Building and Tenant shall be permitted to
self-insure the 20% balance of the replacement value of the
Building. After the Premises are converted to a condominium unit,
the Improvements to be insured by Tenant shall include the
condominium unit comprising the Premises and the "limited common
areas" appurtenant thereto, as defined in the Condominium
Documents. Pursuant to Paragraph 15(b) below, if and only to the
extent that Landlord has a claim to receive the insurance proceeds
payable on account of damage or destruction to the Premises, Tenant
shall not settle any insurance claim for damage to the Premises
without the prior written consent of Landlord, Landlord's first
"Mortgagee" and the Condominium Association, which consent shall
not be unreasonably withheld or delayed. Landlord, Landlord's
first "Mortgagee" (as defined in paragraph 21 below) and/or the
Condominium Association shall be named in such policy or policies

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

as additional insureds as their respective interests may appear. Landlord shall not construct, or permit to be constructed, any improvement in the Shopping Center, nor conduct any activity, or permit the conduct of any activity, in the Shopping Center which will prevent Tenant from being able to obtain insurance coverage at commercially reasonable rates, including, without limitation, a fully-sprinklered fire insurance rate. Should Landlord cause or permit any insurance rate increase to occur, Landlord will reimburse Tenant for the additional premium required, subject to Tenant's right to self-insure (in which event Landlord will contribute to Tenant's self insurance fund to cover increased actuarial risks).

(b) <u>Liability Insurance</u>. During the Term, Tenant shall keep in full force a policy or policies of commercial general and automobile liability insurance with bodily injury and property damage coverage with respect to the Premises and business operated by Tenant, which shall name Landlord, Landlord's first Mortgagee and the Condominium Association as additional insureds as their respective interests may appear. The limits of such commercial general liability policy shall initially be not less than $3,000,000.00 combined single limit for bodily injury and property damage, with a commercially reasonable deductible. Thereafter, the limits of such policy shall be increased from time to time to such reasonable and customary limits as are customarily carried by tenants of like shopping centers in the vicinity of the Shopping Center.

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

(c) <u>Workers' Compensation Insurance.</u>  To the extent required by law, Landlord and Tenant shall maintain workers' compensation insurance covering their respective employees in statutory limits, or maintain such alternate coverages or arrangements as legally permissible.

(d) <u>Self-Insurance.</u>  Notwithstanding anything to the contrary contained herein, Tenant shall have the right to self-insure against any of the risks or portions thereof set forth in subparagraphs (a) and (b) (and to the extent then permitted by law, (c)) above, provided Tenant is then occupying the Premises and has a reported net worth, as of the end of Tenant's most recent quarterly reporting period, of not less than Seventy-Five Million Dollars ($75,000,000), as computed in accordance with generally accepted accounting principles, consistently applied, as determinable from Tenant's public disclosures and/or regularly maintained corporate balance sheets which are generally available to shareholders (no right of Landlord to audit or conduct independent investigations being implied by this provision).

(e) <u>Common Area, Additional Area and Third Party Tenant Insurance and Insurance During Landlord's Construction.</u>  During the Term, Landlord shall keep (or cause to be kept) in full force and effect, in form reasonably acceptable to Tenant, policies of (1) commercial general liability insurance, and (2) fire and extended coverage insurance, with respect to the Common Areas and with respect to all other areas of the Shopping Center over which Landlord or any entity related to Landlord from time to time has

present possessory rights (or, under the Condominium Documents or any lease, provides insurance coverage because of another occupant's or tenant's failure to maintain such required coverage) but which do not constitute a portion of the Common Areas (such areas here sometimes collectively referred to as the "Additional Areas"). The Additional Areas shall include, without limitation: (i) as yet unconstructed portions of the Shopping Center intended for occupancy by tenants or other occupants, (ii) constructed but unoccupied portions of the Shopping Center, (iii) uninsured tenant space, whether by reason of lease expiration, default or otherwise, and (iv) constructed and occupied portions of the Shopping Center. Said policies shall name Tenant and Tenant's lender designated by Tenant from time to time, as an additional insured only if and only to the extent Tenant and such lender have insurable interests. The limits of such policies shall be the same as those set forth in subparagraphs (a) and (b) above, as applicable, except that Landlord and the Condominium Association shall be permitted to carry liability insurance with a $5,000,000 limit notwithstanding the $3,000,000 limit specified in subparagraph (b). The cost of the premiums for coverages relating to Common Areas shall be an element of CAM Charges, provided that Tenant shall not be liable for its pro rata share of any premium for coverage in excess of that coverage which is customary among owners of like shopping centers in the City. Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center, including the Additional Areas and areas leased to third party

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

tenants or sold to third party occupants, are insured with substantially similar coverages to those required for the Premises and the Common Areas, such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever Tenant may be assured that the Shopping Center will be reconstructed in equal or superior condition within the time frame set forth in paragraph 15. During any period in which Landlord or a related entity is conducting construction activities at the Shopping Center, Landlord shall keep, or cause its general contractor to keep, in full force and effect, with regard to the Shopping Center at least the minimum insurance coverages set forth below:

1) Workers' Compensation – Statutory Limits;
   Employers Liability - $500,000;

2) Automotive Liability for all vehicles with limits of
   $2,000,000; and

3) Commercial General Liability to include premises
   operations and products/completed operations coverage
   with limits of $2,000,000.

Additionally, Landlord shall keep or require its general contractor to keep in full force and effect a policy of builder's risk insurance covering loss or damage to the Shopping Center for the full replacement value of all such construction. To the fullest extent Tenant has an insurable interest, such liability policy shall name Tenant an additional insured and such builder's risk policy shall name Tenant a loss payee.

(f) Policy Provisions. All policies of insurance (other than self-insurance) enumerated above shall be on commercially reasonable forms and shall be provided by insurance carriers

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

licensed in Massachusetts and with a Best rating of not less than
B+VI. Any insurance coverage enumerated above may be effected by
a blanket policy or policies of insurance or under so-called "all
risk" or "multi-peril" insurance policies, provided that the total
amount of insurance available with respect to the Premises and
Tenant's or Landlord's liability hereunder shall be at least the
equivalent of separate policies in the amounts herein required, and
provided further that in other respects any such policy or policies
shall comply with the provisions of this paragraph 14. Neither
Landlord nor any entity related to Landlord which is required to
maintain insurance pursuant to this Paragraph 14 shall be entitled
to self-insure against any of the risks recited herein, except the
amount of any commercially reasonable deductible shall be deemed to
be self-insurance. An increased coverage or "umbrella" policy may
be provided and utilized by either party to increase the coverage
provided by individual or blanket policies in lower amounts, and
the aggregate coverage provided by all such policies with respect
to the Premises and Tenant's or Landlord's liability hereunder
shall be satisfactory provided that such policies otherwise comply
with the provisions of this paragraph 14.

      (g) <u>Waiver of Right of Recovery and Subrogation</u>. To the
extent that insurance proceeds are recoverable in satisfaction of
a loss which is required to be covered by insurance or in the event
of a loss which is self-insured hereunder (with the deductible
under any policy being deemed to be self-insured), Landlord (for
itself and any related entity) and Tenant hereby waive any and all

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

rights of recovery against each other (and, if a waiver similar to that contained herein in this subparagraph (g) is made by the Condominium Association for the benefit of Landlord and Tenant, against the Condominium Association) for any loss or damage to the Premises or the contents contained therein, for loss of income on account of fire or other casualty, or for injury sustained on the Premises or the Common Areas; and each party's aforesaid policies of insurance shall contain appropriate provisions recognizing this mutual release and waiving all rights of subrogation by the respective insurance carriers.

(h) <u>Evidence of Insurance</u>. Subject to Tenant's right to self-insure hereunder (which, if exercised by Tenant, shall require Tenant to submit to Landlord within a reasonable time after Landlord's written request therefor, proof of Tenant's right to self-insure pursuant to paragraph 14(d)), upon (i) commencement of the Construction Term (as to builder's risk insurance required by subparagraph 14(a)), (ii) commencement of the Main Term (as to property insurance), (iii) delivery of the Land (as to liability insurance) and (iv) no less than annually thereafter as to the insurance referred to in clauses (ii) and (iii) above, Tenant and Landlord shall cause to be issued to each other in lieu of the original policy, a duplicate of such policy or appropriate certificates of insurance reasonably acceptable to the other party and evidencing compliance with the applicable covenants of this paragraph 14. Each such certificate shall provide that no expiration, cancellation or material change in the insurance evidenced

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

thereby shall be effective unless thirty (30) days' unconditional notice of such expiration, cancellation or material change shall have been given to the certificate-holder (and any Mortgagee, if applicable).

(i) Indemnities. Except if arising from the negligent or willful acts of Landlord or its agents or employees (to the extent that paragraph 14(g) is inapplicable thereto), Tenant hereby agrees to indemnify, defend and hold Landlord harmless from all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring on the Premises or resulting from the use thereof by Tenant, any entity related to Tenant or their respective agents or employees.

Except if arising from the negligent or willful acts of Tenant or its agents or employees (to the extent that paragraph 14(g) is inapplicable thereto), Landlord agrees to indemnify, defend and hold Tenant harmless from any and all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring in, on or around the Shopping Center, exclusive of the Premises, or other buildings within Landlord's Premises or resulting from the use thereof by Landlord, any entity related to Landlord or their respective agents or employees.

15. Damages by Fire or Other Casualty.

(a) In the event of any insured (or self-insured) fire, earthquake or other casualty, causing destruction or damage to the

44

Improvements, Common Areas and/or Additional Areas, this Lease shall not terminate except as expressly set forth herein, and Base Rent and other charges shall continue to be paid by Tenant pursuant to the terms of paragraph 4 hereof. Within a reasonable time after such casualty, subject to Force Majeure, applicable building codes, the procurement of building permits and the receipt of insurance proceeds (unless self-insured in whole or in part, which shall be deemed to include the amount of any deductible) to the extent of the damage to the Premises, or the Common Areas or Additional Areas, as applicable, Tenant shall complete reconstruction of the Building and Other Improvements (which shall be deemed to include the limited common areas appurtenant to the Premises once the Condominium is formed), and Landlord shall complete (or cause the Condominium Association to complete) reconstruction of the Common Areas and Additional Areas (including, for both Tenant's and Landlord's reconstruction, substantially equivalent value in equipment, furniture and fixtures), to that condition existing immediately prior to such casualty, in the reconstructing party's reasonable discretion, with, in event of any Tenant reconstruction, such alterations as may be permitted under paragraph 12 hereof. In the event the insurance proceeds are not sufficient to complete the reconstruction required by either party, whether as a result of self-insurance or the amount of the deductible or otherwise, the reconstructing party shall be required to make available not less than the amount necessary for such reconstruction in addition to the amount of insurance proceeds received by it. In the event,

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

subject to Force Majeure, the Premises, Common Areas and/or
Additional Areas, as applicable, are not substantially repaired and
reconstructed, and equipment, furniture and fixtures restored or
replaced, by the party with repair and restoration obligations
within two hundred forty (240) days after receipt of any required
governmental permits, for which permits the party with repair
obligations shall make prompt application following such
destruction or damage, then the other party, at its option, by
giving written notice to the party with repair obligations, within
thirty (30) days after the expiration of said period, may undertake
completion of such reconstruction, in which event the party with
repair obligations shall make available to the notifying party all
applicable insurance proceeds for such reconstruction (including
any applicable deductible or, in the case of self-insurance, the
amount of any shortfall) but not less than the amount necessary for
such reconstruction. Notwithstanding the foregoing, in the event
of a casualty which is not required to be insured (or self-insured)
hereunder causing damage to the Premises which has a repair and
reconstruction cost of more than twenty percent (20%) of the then
total replacement cost of the Premises, Tenant shall have the
option of terminating this Lease. Tenant shall notify Landlord of
its exercise of such option within sixty (60) days following the
occurrence of such casualty.

(i)  Application of Funds.   All insurance (or self-
insurance or deductible) proceeds received on account of such
damage or destruction, less the cost, if any, of such recovery,

46

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

shall be applied pursuant to the terms of this Lease to the payment
of the cost of such restoration, repair, replacement, rebuilding,
or alteration (the "Work"), including expenditures made for tempo-
rary repairs or for the protection of property pending the com-
pletion of permanent restoration, repair, replacement, rebuilding,
or alteration, and, if required by any Mortgagee or the Condominium
Association, shall be held by such Mortgagee or a mutually
agreeable third-party escrow agent (which is, for these purposes,
the "Escrow Agent"), in an interest-bearing account in a federally
insured financial institution or institutions such that all funds
are deposit insured (or otherwise assured in a manner acceptable to
the parties), to be paid out, as provided below, from time to time
(but no more often than once monthly), as the Work progresses, upon
Tenant's written request in event of work by Tenant, or Landlord's
or the Condominium Association's written request in event of work
by Landlord or the Condominium Association, accompanied by a
certificate of the architect or engineer in charge of the Work (the
"Certificate"), dated not more than seven (7) days prior to such
request, stating that the sum then requested either has been paid
by Tenant or Landlord (or the Condominium Association), as
applicable, or is justly due to the named contractors,
subcontractors, materialmen, engineers, architects, or other
persons (whose addresses shall also be stated) who have rendered
services or furnished materials for certain portions of the Work.
The Certificate shall give a brief description of such services and
materials, shall list the several amounts so paid or owing to each

47

of such persons, shall state the cost of the Work at the date of the requisition, and shall state that no part of such expenditures has been or is being made the basis for any other request for payment. The Certificate shall state also that, except for the amounts listed therein, there is no outstanding indebtedness known to such architect or engineer, after due inquiry, for labor, wages, materials, supplies, or services in connection with the Work which, if unpaid, might become the basis of a vendor's, mechanic's, laborer's, materialman's, or similar lien upon the Work or upon the Premises or any part thereof.

(ii) Disbursement. Upon compliance with the foregoing provisions of paragraph 15(a)(i), the Escrow Agent shall pay, out of the escrowed funds, to the persons named in the Certificate the respective amounts stated to be due to them or shall pay to Tenant, in the event of Tenant work, or Landlord or the Condominium Association, in the event of Landlord or Condominium Association work, the amount stated to have been paid by Tenant or Landlord (or the Condominium Association), as applicable; provided, however, that such payments shall not exceed in amount the cost of the relevant Work as stated in the Certificate. If the insurance proceeds or reconstruction funds paid by Tenant, Landlord or the Condominium Association, as applicable, to the Escrow Agent exceed the amount required to pay the total cost of the Work, the party paying such amount to the Escrow Agent, as applicable, after payment of all costs of the Work, shall be entitled to receive or retain, as applicable, such excess.

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

(b) <u>Last Five (5) Years of Main Term or Option Period</u>. Notwithstanding the foregoing, if any damage or destruction to the Improvements by fire, earthquake or other casualty occurs within the last five (5) years of the Main Term or of any Option Period and has a material impact on Tenant's ability to conduct business, as reasonably determined by Tenant, Tenant shall be under no obligation to restore the Improvements, in which case this Lease shall terminate at Tenant's option, such option to be exercised by Tenant not later than sixty (60) days after the casualty by giving not less than thirty (30) days' prior written notice to Landlord, and Landlord shall receive the proceeds of any insurance (together with any applicable deductible) which may be payable with regard to such destruction or damage or, in the event Tenant self-insures, the amount necessary for reconstruction of the Improvements.

16. <u>Condemnation</u>.

(a) <u>Definition of Taking and Substantial Taking</u>. For the purpose of this Lease, a "Taking" shall mean any condemnation or exercise of the power of eminent domain by any authority vested with such power or any other taking for public use, including a private purchase in lieu of condemnation by an authority vested with the power of eminent domain; the "Date of Taking" shall mean the earlier of the date upon which title to the Premises, the Shopping Center or any portion thereof so taken is vested in the condemning authority or the date upon which possession of the Premises, the Shopping Center, or any portion thereof is taken by the condemning authority; and "Substantially All of the Premises"

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

shall mean (i) so much of the Improvements and/or Shopping Center and Common Areas as, when taken, leaves the untaken portion unsuitable, in Tenant's reasonable opinion, for the continued feasible and economic operation of the Premises by Tenant for the same purposes as immediately prior to such Taking or as contemplated herein, (ii) so many of the parking spaces within the Shopping Center as reduces the parking ratio below the greater of 4.5 spaces (for full-sized automobiles) per 1000 square feet of ground-floor gross leasable area or that ratio which is required by the zoning ordinance applicable to the Shopping Center, and Landlord's failure to provide substantially equivalent alternative parking reasonably acceptable to Tenant within sixty (60) days after such Taking, or (iii) so much of the Common Area Easement described in paragraph 6(d) above that access to the Premises is impeded.

(b)   Tenant's Rights Upon Taking or Substantial Taking. In the event of a Taking of Substantially All of the Premises, Tenant, at its option upon thirty (30) days' written notice to Landlord, which shall be given no later than sixty (60) days following the Taking, shall have the right to terminate this Lease. All Base Rent and other sums payable by Tenant hereunder shall be apportioned and paid through and including the Date of Taking, and neither Landlord nor Tenant shall have any rights in any compensation or damages payable to the other in connection with such Taking.

50

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

(c)  Tenant's Rights Upon Less Than Substantial Taking.
In the event of a Taking of less than Substantially All of the
Premises, Base Rent and other charges shall be reduced fairly and
equitably in accordance with the portion condemned or taken,
effective as of the Date of Taking, and Tenant shall make all
necessary restorations to the Improvements so that the portions of
the Improvements not taken constitute a complete architectural
unit, provided that the cost thereof to Tenant shall not exceed the
proceeds of Tenant's condemnation award (to the extent that such
relates to the Improvements and not to Tenant's personal property,
intangibles or out-of-pocket expenses unrelated thereto) and the
portion of Landlord's or the Condominium Association's award
allocable to the Premises, which Landlord and/or the Condominium
Association shall make available to Tenant for such restoration.
If required by a Mortgagee or the Condominium Association, such
awards shall be escrowed and disbursed in accordance with the
procedure set forth in paragraph 15(a) above.  If the Taking occurs
within the last two (2) years of the Main Term or of any Option
Period and has a material impact on Tenant's ability to conduct
business as reasonably determined by Tenant, this Lease shall
terminate at Tenant's option, such option to be exercised by Tenant
giving not less than thirty (30) days' prior written notice to
Landlord.

(d)  Landlord's Obligations Upon Any Taking.  In the
event of any Taking following which the Lease continues in effect,
Landlord  shall  make  (or  cause  to  be  made)  all  necessary

51

restorations to all portions of the Common Areas and Additional
Areas such that they each constitute a complete architectural unit
and serve the function originally intended. Additionally, Landlord
shall assure (through parallel lease provisions or otherwise) that
all areas of the Shopping Center leased to third party tenants or
sold to third party occupants are subject to substantially similar
reconstruction obligations to those of the Premises, Common Areas
and Additional Areas, such that in the event of any condemnation of
any portion of the Shopping Center whatsoever, and in the event
Tenant elects to maintain this Lease in force, Tenant shall be
assured that the Shopping Center will be reconstructed to its
former condition within reasonable time.

(e)  Rights Upon Temporary Taking.  In the event of a
Taking of the Premises, the Common Areas and/or any other area
within the Shopping Center, or any portion thereof, for temporary
use (specifically one not exceeding 60 days in duration), without
the taking of the fee simple title thereto, this Lease shall remain
in full force and effect.  All awards, damages, compensation and
proceeds payable by the condemnor by reason of such Taking relating
to the Premises, or relating to the Common Areas but reasonably
attributable to the Premises, for periods prior to the expiration
of the Lease shall be payable to Tenant.  All such awards, damages,
compensation and proceeds for periods after the expiration of the
Lease shall be payable to Landlord.  Anything contained herein to
the contrary notwithstanding, a temporary Taking for any period in
excess of sixty (60) days may, at Tenant's option, be deemed a

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

permanent Taking and shall be governed by subparagraph (b) or (c) above, as applicable.

(f) <u>Taking of the Pylon Sign(s)</u>.   In the event of a taking, whether permanent or temporary, of any pylon or monument sign (as contemplated by paragraph 8) on which Tenant has installed identification panels, Landlord shall provide (or cause to be provided) a substitute site (reasonably acceptable to Tenant) therefor, with adequate electrical power, located so as to be visible to vehicular traffic or roadways adjacent to the Shopping Center and/or at entrances to the Shopping Center, and Landlord (or the Condominium Association) shall replace and/or rebuild any of such signage so taken at its sole cost.

(g) <u>Tenant's Right Upon Condemnation</u>.   In the event of a Taking described in subparagraph (b) or (c) above, Tenant shall be entitled to claim compensation from the condemning authority for its unamortized leasehold improvements paid for by Tenant, relocation expenses and any other items to which Tenant is entitled under applicable law as a result of a Taking of the Premises or a portion thereof, or, once the Condominium is formed, the limited common areas appurtenant thereto, but Landlord shall reserve the right to obtain compensation for the net present value of Tenant's leasehold interest in the Premises.

17.   <u>Assignment and Subletting</u>.   (a)   Tenant shall have the right to sublet, assign, transfer and reassign (a "Transfer") all or any part of the Premises and any of Tenant's rights and obligations under this Lease during the Term, provided that Tenant

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

first obtains Landlord's prior written consent, which shall not be unreasonably withheld, delayed or conditioned.  Tenant may also grant licenses and/or concessions (or subleases in the nature of same which are integrated in Tenant's store operations) without the consent of Landlord.  In the event of a Transfer or the granting of any such concessions or licenses, Tenant shall remain liable for all of Tenant's obligations to Landlord arising hereunder; provided that if this Lease is changed, modified or amended in any respect by Landlord and any transferee following any Transfer, Tenant shall not be responsible for any additional obligations undertaken by the transferee thereunder.  Transfers to subsidiaries, affiliates, or related parties, following which the Premises continues to be operated as a "Circuit City" store or a store under such trade name as at least five (5) or more of the transferee's stores in the State of Massachusetts are then being operated, Transfers involving beneficial ownership interests in Tenant, and Transfers to a purchaser of five (5) or more of Tenant's stores in the State of Massachusetts in connection with a sale of all or substantially all of Tenant's operating assets in that State, shall not be deemed a Transfer hereunder and same may be effected without Landlord's knowledge or consent (but Tenant shall notify Landlord of such Transfer within a reasonable time thereafter) and without any right on the part of Landlord to terminate or recapture this Lease as provided below.

(b)   Landlord acknowledges and agrees that it shall be unreasonable for Landlord to withhold its consent to any Transfer

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

hereunder for the purpose of obtaining a material amendment or modification to the terms of this Lease. Landlord further agrees that it shall be unreasonable for Landlord to withhold its consent to any Transfer hereunder if the transferee meets the following criteria:

(i) the transferee is a national or regional operator of a chain of at least ten (10) stores; and

(ii) the transferee has a minimum net worth of Ten Million Dollars ($10,000,000.00).

(c) In the event of a proposed Transfer, Tenant shall give written notice to Landlord setting forth the terms and conditions of the proposed Transfer. Landlord shall have thirty (30) days after receipt of Tenant's notice within which to advise Tenant, in writing, of Landlord's approval. Failure by Landlord to respond within said 30-day period shall be deemed an approval.

(d) In the event of a proposed Transfer which is either an assignment of this Lease or a subletting of more than 10,000 square feet of space in the Premises which, in either case, is not exempted from Landlord's consent pursuant to subparagraph (a) above, Landlord shall have the option, within thirty (30) days after receipt of Tenant's notice of such proposed Transfer, to advise Tenant, in writing, of Landlord's election to terminate this Lease, in the case of an assignment, or to recapture the portion of the Premises proposed to be subleased, in the case of a subletting of more than 10,000 square feet of space in the Premises. For the purposes hereof, "recapture" shall be defined as Landlord's right

55

to terminate this Lease in respect to the portion (or the entirety, as the case may be) of the Premises for the remainder of the term of this Lease or to suspend the Lease for the period involved in the proposed subletting (i.e., the term of the Lease in respect of the sublet area shall be terminated during such time period and Tenant's rental obligations shall be reduced in proportion to the area in respect of which the term of the Lease is suspended). In that case, this Lease shall terminate as to the applicable portion of the Premises upon the date of the proposed assignment or subletting and upon such termination, Tenant shall be reimbursed by Landlord for the unamortized costs of all then-existing Tenant leasehold improvements, the costs of which were not reimbursed to Tenant through payment of the Tenant Improvement Allowance, in the portion of the Premises terminated, in the case of a subletting, or as to the entirety of the Premises, in the case of an assignment, as reflected on Tenant's financial records, provided such financial records are maintained in accordance with generally accepted accounting principles. Failure by Landlord to exercise its right to terminate this Lease (in the case of an assignment only) or to recapture the portion of the Premises proposed to be sublet, as aforesaid, within the 30-day period shall be conclusively deemed to be a waiver of such right to terminate or recapture with respect to the proposed Transfer (but this paragraph 17(d) shall apply to any other proposed Transfer which is not exempt from recapture as provided in subparagraph (a) above).

56

(e)   Any assignment or subletting of this Lease by Tenant shall be executed by Tenant and the assignee or sublessee. Each assignee or sublessee shall agree directly with Landlord to assume, be bound by, and perform all terms, covenants, and conditions of this Lease to be kept and performed by Tenant. After execution of the assignment or sublease, Tenant will forward a completed copy thereof to Landlord.   No consent by Landlord to any proposed Transfer shall be deemed a consent to any future Transfer.

(f)   Notwithstanding the foregoing, Tenant shall have the right to sublet up to 10,000 square feet of space in the Premises without Landlord having any right to recapture the Premises, as provided in subparagraph (d) above, but such proposed subletting (unless exempted from Landlord's consent as provided in subparagraph (a) above) shall require Landlord's prior written consent, which shall not be unreasonably withheld, delayed or conditioned, as provided above.

18.  Use.

(a)   Subject to force majeure, and provided Landlord delivers the Land to Tenant not later than June 1, 1996, within twelve (12) months after delivery of the Land, Tenant shall open the Premises as a fully stocked and fully staffed Circuit City retail store and for a period of not less than six (6) months thereafter shall maintain, use and operate the Premises for (i) the sale of consumer, office and automotive electronics products (which include, but shall not be limited to, televisions, stereos, speakers and video recorders and players), computer hardware and

57

software, entertainment software and entertainment media (which
include, but shall not be limited to, records, game cartridges,
video tapes, cassettes and compact discs), cellular telephones,
household appliances (which include, but shall not be limited to,
refrigerators, freezers, stoves, microwave ovens, vacuum cleaners
and dishwashers) and related goods and the sale and installation of
motor vehicle audio, stereo and telephone systems (all of such
items being herein collectively referred to as the "Products"), and
(ii) renting, servicing, repairing and warehousing of the Products.
In the event delivery of the Land occurs after **June 1, 1996**, Tenant
shall not be required to open the Premises as aforesaid until the
later to occur of **September 1, 1997** or twelve (12) months after the
actual date of delivery of the Land.

(b)  Following the expiration of the six (6) month
operating period referred to in subparagraph (a) above, Tenant
shall have the right to use the Premises for any other lawful
retail use which is not inconsistent with the operation of a first
class shopping center; provided, however, that the Premises shall
not be used (i) for any nuisance or illegal purpose or otherwise in
violation of Paragraph 33, (ii) for any use prohibited under
paragraph 19(a)(viii) or (ix)(C)(3) below or violative of any other
restrictions set forth in this Lease or in the Condominium
Documents, (iii) in violation of only those exclusive use
restrictions heretofore granted or now proposed to be granted to
tenants or other occupants of the Shopping Center by Landlord or
the Condominium Association which are described in detail on

58

Exhibit "F", and for only so long as the occupant of the Shopping
Center who is benefitted by any such restriction is operating a
store for the protected use, or (iv) in violation of any other
applicable provision of the "Permitted Encumbrances" contained in
Exhibit "F". In addition to the forgoing restrictions on the
future use of the Premises, with respect to any portion of the
Premises not operated by Circuit City or the operator of another
national or regional chain of consumer electronics stores, Tenant
shall also be prohibited from changing the use of such portion of
the Premises to a use which violates any exclusive use restriction
hereafter granted to protect the primary use (only) of a tenant or
other occupant of the Shopping Center owning or leasing 10,000
square feet or more of space in the Shopping Center.

     (c)  Except as may be expressly set forth in this
paragraph 18, nothing contained in this Lease shall be construed to
require Tenant to operate the Premises continuously either for the
use first stated or for any other use.

     (d)  In the event that the Premises shall, at any time
after the expiration of the six (6) month operating period required
under subparagraph (a) above, be closed for business for a period
of 180 consecutive days or more, other than as a result of force
majeure or a casualty or condemnation, then at any time after such
180 day period, but prior to any day on which Tenant shall reopen
for business or shall give notice to Landlord that Tenant intends
to reopen the Premises for business ("Tenant's Reopening Notice"),
Landlord may terminate this Lease by giving Tenant written notice

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

thereof and this Lease shall terminate on the 30th day after the giving of such written notice by Landlord, whereupon neither Landlord nor Tenant shall have any further liability hereunder, except that upon such termination, Tenant shall be reimbursed by Landlord for the unamortized cost of all then-existing Tenant leasehold improvements which were not reimbursed by payment of the Tenant Improvement Allowance, as reflected on Tenant's financial records provided such records are maintained in accordance with generally accepted accounting principles. If the Premises shall be closed for business as aforesaid for a period exceeding 180 consecutive days or more as a result of a pending Transfer, then, provided an assignment or sublease agreement is fully executed within such 180-day period which requires the transferee to open for business in the Premises, Landlord may not terminate this Lease unless the Premises is not reopened for business within an additional 90-day period following such initial 180-day period.

19.   <u>Warranties and Representations</u>.

(a)   Landlord represents, warrants and covenants to Tenant that:

(i)   <u>Quiet and Peaceful Enjoyment</u>.   Landlord and those persons executing this Lease on its behalf have the right and lawful authority to enter into this Lease and perform Landlord's obligations hereunder, and Landlord warrants, represents and covenants that, so long as Tenant is not in default hereunder beyond any applicable cure period, Tenant shall have quiet and peaceful use, enjoyment and

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

occupancy of the Premises, without hindrance by Landlord or persons claiming by, through or under Landlord, but subject to the rights of record of any lenders or other entities to which this Lease is subordinated.

(ii) <u>Title</u>.  Landlord's fee simple interest in the Shopping Center shall be free and clear of any mortgages, deeds, encumbrances, declarations, easements, agreements, leases, tenancies or restrictions, or any other encumbrances which would restrict Tenant's use of the Premises for the sale of Products or would restrict in any respect the right of Tenant, its employees, customers and invitees to use the Common Areas in accordance with the terms of this Lease, except as set forth in the Condominium Documents and except for those matters referred to in Paragraph 18(b) or set forth on <u>Exhibit "F"</u> attached hereto and entitled "Permitted Encumbrances." Nothing contained in this Lease, including the Permitted Encumbrances and other matters disclosed on <u>Exhibit "F"</u>, shall restrict Tenant's right to operate a consumer electronics business in the Premises, initially as described in Paragraph 18(a).  Landlord specifically covenants and warrants that, except as set forth in Paragraph 18(b), no third party, including but not limited to any other occupant of the Shopping Center, has the right to object to Tenant's tenancy hereunder, prohibit the selling, renting, servicing, repairing or warehousing of the Products, or (except for governmental authorities and, with respect to future

61

modifications, the Condominium Association) the right to consent to any feature of the Improvements or Tenant's signage. This representation and warranty is a material inducement to the Tenant's execution of this Lease.

(iii)    <u>Certificate of Authority</u>.    Landlord covenants that it is a duly constituted corporation under the laws of the Commonwealth of Massachusetts, and that its President who is acting as its signatory in this Lease is duly authorized and empowered to act for and on behalf of the corporation.

(iv) <u>No Litigation</u>. There are no judicial, quasi-judicial, administrative or other orders, injunctions, moratoria or pending proceedings against Landlord or any entity related to Landlord or the Shopping Center which preclude or interfere with, or would preclude or interfere with, the construction contemplated in paragraph 2 hereof or the occupancy and use of the Premises for the purposes herein contemplated.

(v)    <u>Hazardous or Toxic Materials</u>. Landlord has not used, discharged, dumped, spilled or stored any Hazardous Substances (as defined in the Construction Provisions) on or about the Shopping Center, whether accidentally or intentionally, legally or illegally, and has received no notice and has no knowledge that any such condition exists at the Shopping Center, except as set forth in a report dated _____ prepared by _____, a copy of which has been delivered
/November 1994    /Dr. Clarence Weltl, PE, PC

[J:\013363\161\4bkao82x.W51]
[11/28/95 11:23am; WEITZEL_M]

to Tenant.  If any claim is ever made against Tenant relating
to Hazardous Substances present at or around the Shopping
Center, whether or not such substances are present as of the
date hereof, or any Hazardous Substances are hereafter
discovered at the Shopping Center (unless introduced by
Tenant, its agents, contractors or employees), all costs of
removal incurred by, all liability imposed upon, or damages
suffered by, Tenant because of the same shall be borne by
Landlord, and Landlord hereby indemnifies and agrees to defend
and hold Tenant harmless from and against all such costs,
losses, liabilities and damages, including, without
limitation, all third-party claims (including sums paid in
settlement thereof, with or without legal proceedings) for
personal injury or property damage and other claims, actions,
administrative proceedings, judgments, compensatory and
punitive damages, lost profits, penalties, fines, costs,
losses, attorneys' fees and expenses (through all levels of
proceedings), consultants or experts fees and all costs
incurred in enforcing this indemnity.  The representation,
warranty and indemnity of Landlord described in this paragraph
19(a)(v) shall survive the termination or expiration of this
Lease.

          (vi) <u>Tenant's Exclusive Use</u>.    So  long  as  the
Premises are used for the initial uses set forth in paragraph
18(a) (including, without limitation, any period of not more
than six (6) months when restoration or remodelling work is

being conducted), no tenant or occupant of the Shopping Center shall be entitled to sell or rent (or rent to own) any of the Products, other than computer software, entertainment software and entertainment media, which shall not be subject to the foregoing restrictions.  The foregoing restrictions shall not be applicable to Tweeter so long as it operates a store under that trade name in the Shopping Center; nor shall they be applicable to any store operated by Tweeter under a different trade name or by any assignees or subtenants who are subsidiaries or affiliates of Tweeter, so long as the store is operated as a multiple-product consumer electronics store selling principally audio and video equipment not exceeding 10,000 square feet of space in the Shopping Center; any other assignees or subtenants of Tweeter shall be bound by the foregoing restrictions. Further, Tenant, at its option, shall have the right to enter into such agreements with Tandy Corporation and Office Max as Tenant desires to protect its exclusive use and, whether or not Tenant obtains any such agreement, Tenant hereby releases Landlord from any responsibility for enforcing the provisions of this subparagraph (vi) as against Tandy Corporation, Office Max or their respective assignees or subtenants, and Tenant shall look solely to Tandy Corporation, Office Max and/or such assignees and subtenants for the enforcement of any such separate agreements.  Under no circumstances shall any other so-called "big box" discount price consumer electronics store

64

(such as those currently operated by The Wiz, Best Buy and
Lechmere) be permitted in the Shopping Center.

[J:\013363\161\4bkao82x.W51]
[11/28/95 11:23am; WEITZEL_M]

(vii)    <u>Zoning and Subdivision</u>. The Premises and the Shopping Center are presently properly subdivided, in conformity with all applicable laws and zoned so as to permit (A) the development and operation of the Premises and the Shopping Center in accordance with the provisions of this Lease; and (B) the initial use of the Premises described in paragraph 18 of this Lease.

(viii)    <u>Prohibited Activities</u>. Landlord shall not operate or lease (or permit to be operated or leased) any building or tenant space in the Shopping Center for any use as:

(A)    a bar, pub, nightclub, music hall or disco in which less than fifty percent (50%) of its space or revenue is devoted to and derived from food service;

(B)    a bowling alley;

(C)    a billiard or bingo parlor;

(D)    a flea market;

(E)    a massage parlor;

(F)    a funeral home;

(G)    a facility for the sale of paraphernalia for use with illicit drugs;

(H)    a facility for the sale or display of pornographic material (as determined by community standards for the area in which the Shopping Center is located);

(I)    an off-track betting parlor;

(J)    a carnival, amusement park or circus;

(K)    a gas station, car wash or auto repair or body shop (the parties specifically acknowledging that Tenant's car stereo installation facility is not included in this prohibition (K));

(L)    a facility for the sale of new or used motor vehicles, trailers or mobile homes;

(M)    a facility for any use which is illegal or dangerous, constitutes a nuisance or is inconsistent with an integrated, community-oriented retail and commercial shopping center;

(N)    a skating rink;

65

(O) an arcade, pinball or computer gameroom (provided that retail facilities in the Shopping Center may operate no more than four (4) such electronic games incidentally to their primary operations);

(P) service-oriented offices (such as, by way of example, medical or employment offices, travel agencies, real estate agencies or dry cleaning establishments) or other non-retail uses except for offices and storage facilities incidental to a primary retail operation;

(Q) a banquet hall, auditorium or other place of public assembly;

(R) a training or educational facility (including, without limitation, a beauty school, barber college, reading room, school or other facility catering primarily to students or trainees rather than customers);

(S) a theater of any kind; or

(T) a gymnasium, sport or health club or spa.

In addition to the foregoing, Landlord shall not operate, lease or permit to be operated or leased any restaurant in the Shopping Center. In addition, no auction, fire or going-out-of-business sale shall be conducted in the Shopping Center.

Once this Lease has been subordinated to the Condominium Documents, the foregoing prohibited activities shall be deemed subsumed in the list of forbidden uses set forth in the Condominium Documents.

(ix) Site Covenants. With regard to the development of the Shopping Center and the uses and operations of the Common Areas, Landlord makes the following representations and warranties (the "Site Covenants"):

(A) Building Height and Location. No building adjacent to the Premises shall exceed the height of the Premises, it being understood that all buildings in line

66

with the Premises shall have a common parapet height, nor shall any other building adjacent to the Premises be positioned so as to project beyond the portion of the front wall of the Building immediately adjacent thereto to a greater extent than that currently shown on the Site Plan attached to this Lease as <u>Exhibit "A"</u>.  No outparcels, barriers, buildings, kiosks or other structures, either temporary or permanent, shall be located within Tenant's Preferred Area.  No development shall occur within the Shopping Center except as shown on the Site Plan or as otherwise permitted in this Lease.

(B)   <u>Construction and Alterations</u>.  Following the end of the first Lease Year, no construction shall be permitted in the Shopping Center during the months of November and December, except for interior alterations not affecting the operations of any other occupant of the Shopping Center and except for emergency repairs.  In the event of any construction within the Shopping Center, Landlord shall designate a construction access route, staging and parking areas located so as to minimize interference with customers or the operations of other occupants of the Shopping Center and shall require erection of safety barriers as necessary and an opaque wall around the site of such construction of a size necessary to screen such construction from ground level view.  With regard to any construction on Landlord's

67

Premises, Landlord or other entities shall be solely responsible for any governmentally imposed impact fees, hook-up, connection, installation or tap-in fees and other, similar construction-related charges. Landlord shall make no material changes (nor permit any material changes to be made) in the Common Areas (including, without limitation, changes in the location of curbcuts, drive aisles, roadways, sidewalks or parking spaces or reduction of the parking ratio specified in paragraph 5) without Tenant's express written consent, which Tenant may, in its sole discretion, withhold as to proposed changes in Tenant's Preferred Area and, as to proposed changes in the Common Areas outside Tenant's Preferred Area, which Tenant shall not unreasonably withhold, delay or condition; provided that none of such changes, in Tenant's reasonable opinion, adversely impact access to the Premises by Tenant's, vendors or customers or the visibility of the Premises or its signage.

(C) Prohibited Uses in Common Areas. Landlord covenants that it shall not, without Tenant's express written consent, permit the following uses or activities to occur in the Common Areas: (1) advertisements or signs except for the pylon and/or monument signs described in paragraph 8, the "for rent" signs described in paragraph 27 and traffic control signs; (2) display or sale of merchandise; (3) operation of loudspeakers or

68

other sound electronically amplified so as to be heard in the Common Areas; or (4) imposition of a charge for parking. Landlord further covenants that it will not seek, nor permit any other owner or occupant of the Shopping Center to seek, a variance or waiver from the minimum parking requirements applicable to the Shopping Center under the zoning code or other applicable ordinance establishing the ratio of parking spaces to building area or otherwise mandating the number of parking spaces required for the Shopping Center and the uses contained therein. Parking by employees of Tenant, Landlord and other occupants of the Shopping Center shall be in designated "employee parking" areas, the location of which shall be designated in the Condominium Documents, but Landlord shall not exercise its right to designate such employee parking areas without Tenant's prior written consent.

(D) <u>Easements</u>. Landlord shall not subdivide, parcel or otherwise divide the Shopping Center or create any easements in the Common Areas which permit the Common Areas to be used by persons other than occupants of the Shopping Center and providers of utilities or other services to the Shopping Center or otherwise interfere with the use of the Common Areas for their intended purposes, without Tenant's prior written consent nor

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

shall Landlord permit any of the foregoing to be done by any other owner or occupant of the Shopping Center.

(x) Interference with Tenant's Reception/ Transmission. Landlord shall not install or permit to be installed by Landlord, any other tenant or other person anywhere in the Shopping Center, any radio or other transmitting equipment which would cause any interference with satellite, radio or television reception or transmission in or from the Building.

(xi) Notices Affecting the Premises. Landlord shall promptly forward to Tenant any notice or other communication affecting the Premises or the Shopping Center received by Landlord (or any entity related to Landlord) from any owner of property adjoining, adjacent or nearby to the Premises or the Shopping Center or from any municipal or governmental authority, in connection with any hearing or other administrative procedure relating to the use or occupancy of the Premises, Shopping Center or any such neighboring property.

(xii) Constructive Trust. Landlord covenants that all sums paid by Tenant to Landlord (or any entity related to Landlord) and intended for payment to a third party (such as, by way of example, taxes and certain elements of CAM Charges) are given to Landlord (or such other entity) in trust and shall be applied only for such third-party payments, as and when due.

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

(b) Tenant represents, warrants and covenants to Landlord that:

(i) <u>Tenant's Authority</u>.    Tenant is a duly constituted corporation organized under the laws of the Commonwealth of Virginia; it has the power to enter into this Lease and perform Tenant's obligations hereunder; and the Vice President executing this Lease on Tenant's behalf has the right and lawful authority to do so.

(ii) <u>Tenant's Warranty as to Hazardous or Toxic Materials</u>.  As to Tenant's use and occupancy of the Premises and use of the Common Areas, Tenant will not introduce, discharge, dump, spill or store within the Premises or the Shopping Center any Hazardous Substances nor permit its agents, employees or contractors to do the same; and Tenant indemnifies and agrees to hold Landlord harmless from and against all costs, liability and damages as a result thereof, to the same extent that Landlord indemnifies and holds Tenant harmless in subparagraph (a)(v) above.    The warranty and indemnity of Tenant described in this paragraph 19(b)(ii) shall survive the termination of this Lease.

(c) In the event there is a condition at variance with the foregoing representations and warranties of Landlord with respect to the Premises or the Shopping Center which prevents or in any material way inhibits the use of the Premises or any part thereof or the Common Areas for their intended purposes by Tenant or Tenant's employees, licensees, agents, suppliers, customers or

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

invitees, or if Landlord shall default in the observance or per-
formance of any of the foregoing representations and warranties,
then, Tenant may, in addition to its other remedies under this
Lease, after thirty (30) days' notice to Landlord, obtain an
injunction or writ of specific performance to enforce such term or
covenant, the parties hereby acknowledging the inadequacy of
Tenant's legal remedy and the irreparable harm which would be
caused to Tenant by any such variance or default. In addition, in
the event that any of the representations, warranties and covenants
set forth in this paragraph 19 are untrue or incorrect, or in the
event that Tenant suffers any loss, cost, liability or damage as a
result of the breach of any of such covenants, representations and
warranties, Landlord shall defend, indemnify and hold Tenant
harmless from any of such loss, costs, liability or damage incurred
as a result of Landlord's breach hereunder.

20. <u>Estoppel Certificates.</u> Without charge, at any time and
from time to time hereafter, within ten (10) days after receipt of
written request by either party, the other party shall certify, by
written and duly executed instrument, to any other entity
("Person") specified in such request: (a) as to whether this Lease
has been supplemented or amended, and, if so, the substance and
manner of such supplement or amendment; (b) as to the validity,
force and effect of this Lease, to the certifying party's best
knowledge; (c) as to the existence of any default hereunder by the
other party, to the certifying party's best knowledge; (d) as to
the existence of any offsets, counterclaims, or defenses hereto on

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

the part of the certifying party, to the certifying party's best
knowledge; (e) as to the commencement and expiration dates of the
Term; and (f) as to any other matters which may reasonably be so
requested.  Any such certificate may be relied upon by the party
requesting it and any Person to whom the same may be exhibited or
delivered, and the contents of such certificate shall be binding on
the party executing same.

    21.   Subordination, Non-Disturbance and Attornment.

    (a)  Simultaneously with the execution hereof, Landlord
shall deliver to Tenant with regard to all "Ground Leases" (as
defined below) and any and all "Mortgages" (as defined below)
encumbering the Premises and placed thereon by Landlord, if any
exist as of the date hereof, a non-disturbance and attornment
agreement in the form of Exhibit "G" hereto attached, executed by
the Landlord under any such Ground Lease ("Ground Lessor") or the
holder of such Mortgage ("Mortgagee"), as applicable. In addition,
throughout the term, Landlord shall deliver to Tenant a non-
disturbance and attornment agreement in the form of Exhibit "G", in
each case containing such commercially reasonable modifications and
additions as the Ground Lessor or Mortgagee shall require (except
that no such modification or addition shall prevent insurance
proceeds or condemnation awards from being utilized for restoration
of the Premises as required herein) executed by Ground Lessor or
Mortgagee (as applicable) with regard to all future Ground Leases
and Mortgages and with regard to all renewals, modifications,
replacements and extensions of such Ground Leases or Mortgages.

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

Upon Tenant's receipt of the non-disturbance and attornment agreement, this Lease shall be subordinate to the corresponding Ground Lease or Mortgage.

In the event of a foreclosure of any Mortgage or any conveyance of the Premises in lieu thereof, Tenant shall attorn to a Mortgagee or any purchaser at a foreclosure sale on deed in lieu thereof (any such foreclosure, or under a deed in lieu thereof, shall be referred to as a "Foreclosure") of a Mortgage only if such Mortgagee or purchaser executes a writing in favor of Tenant which states the following (provided Tenant is not in uncured material default beyond the expiration of any applicable grace periods): (i) this Lease shall not terminate by reason of such Foreclosure, (ii) Tenant's possession of the Premises shall not be disturbed, (iii) the Mortgagee or purchaser upon such Foreclosure shall recognize Tenant and all its rights hereunder and shall be obligated to fully and completely perform Landlord's duties and obligations under the Lease arising from and after the date of such Foreclosure, including but not limited to an obligation to make all payments to Tenant and satisfy all construction obligations set forth in this Lease, (iv) Tenant shall not be named as a party in any action for foreclosure, and (v) the Mortgagee, whether or not the Mortgage is foreclosed, shall make all proceeds arising from a casualty or condemnation loss to the Premises available to Tenant for restoration of the Improvements in accordance with the terms hereof. In the event of termination of the Ground Lease, Tenant

74

shall attorn to any Ground Lessor from whom Tenant has received a non-disturbance agreement in accordance with this paragraph 21.

Landlord shall cause any present or future Mortgagee to deliver a non-disturbance and attornment agreement in accordance with this paragraph 21 at or prior to the time which the lien of the Mortgage is filed against record title to the Premises, as set forth in paragraph 37(b) below. As used in this paragraph 21, the term "Mortgage" shall mean any mortgage, deed to secure debt, deed of trust, trust deed or other collateral conveyance of, or lien or encumbrance against, the Premises, and the term "Ground Lease" shall mean any ground lease or master lease affecting the Premises.

(b) If requested by any Mortgagee, from time to time during the Term, Tenant agrees to execute a subordination, non-disturbance and attornment agreement, either in the form of Exhibit "G" or in such other form as may be acceptable to Tenant, which shall include Tenant's agreement to provide to such Mortgagee (simultaneously with notice to Landlord) notice of Landlord's defaults and the same periods for such Mortgagee to cure such defaults as those provided Landlord herein, and such other agreements as may be satisfactory to Tenant and as are typically found in subordination, non-disturbance and attornment agreements with institutional lenders.

22. Change of Landlord. Subject to paragraph 21 above, in the event Landlord's interest in the Premises passes to a successor (the "Successor") by sale, lease, Foreclosure or in any other manner, Tenant shall be bound to the Successor under all of the

75

terms of this Lease for the balance of the Term with the same force and effect as if the Successor were the landlord under the Lease, and Tenant hereby agrees to attorn to the Successor as its Landlord, such attornment to be effective upon written notice thereof given by Landlord to Tenant. In the event that Landlord's interest in the Premises passes to a Successor and such Successor is bound unto Tenant as set forth above, Landlord shall be released from all obligations to Tenant hereunder arising after the date Landlord's interest so passes, except that Landlord agrees to indemnify, defend and hold Tenant harmless from and against all costs, claims, loss, liability or damage suffered by Tenant as a result of Landlord's transfer of its interests hereunder and/or Landlord's failure to provide Tenant with notice of such Successor.

23.  Tenant's Financing.  Notwithstanding any other provisions of this Lease, Tenant may, without Landlord's consent, from time to time, secure financing or general credit lines and grant the lenders thereof, as security therefor, (i) a security interest in Tenant's fixtures, personalty, inventory and equipment (collectively, "Personalty"), (ii) the right to enter the Premises to realize upon any Personalty so pledged, and/or (iii) a collateral assignment of Tenant's leasehold interest in the Premises, with rights of reassignment; provided, however, such collateral assignment shall be made solely for the purpose of securing Tenant's indebtedness and any reassignment shall be subject to the provisions of paragraph 17, including, without limitation, the provisions permitting Landlord to terminate this

76

Lease, if applicable. Upon Tenant providing notice of such financing to Landlord, Landlord agrees to evidence its consent in writing to such security interest and agreement and to give such lenders the same notice and opportunity to cure any default of Tenant as is provided Tenant hereunder (including time to foreclose or otherwise take possession of the Premises, if necessary to effect such cure). In addition, Landlord agrees to cause any Mortgagee specifically to acknowledge the rights of Tenant's lenders described herein and in paragraph 24 below. Nothing in this Paragraph 23 shall be interpreted so as to diminish Landlord's rights under Paragraph 18(d) of this Lease.

24. <u>Tenant's Property and Waiver of Landlord's Lien</u>. All of the Personalty shall be and remain the personal property of Tenant. Landlord expressly waives its statutory or common law landlord's liens (as same may be enacted or may exist from time to time) and any and all rights granted under any present or future laws to levy or distrain for rent (whether in arrears or in advance) against the aforesaid property of Tenant on the Premises and further agrees to execute any reasonable instruments evidencing such waiver, at any time or times hereafter upon Tenant's request.

25. <u>Memorandum of Lease; Commencement Date Agreement</u>. Landlord and Tenant agree, at the other's request and at the sole expense of the requesting party, to execute a Memorandum of Lease in recordable form, substantially similar to that attached hereto as <u>Exhibit "H"</u>, setting forth such provisions hereof as may be required by State law. In addition, Landlord and Tenant shall

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

execute a Commencement Date Agreement in the form attached hereto as Exhibit "I", once the Commencement Date has been established. Recording costs for either or both documents shall be borne by the party requesting recordation of the same. The provisions of this Lease shall control, however, with regard to any omissions from, or provisions hereof which may be in conflict with, the Memorandum of Lease or Commencement Date Agreement.

26. Expiration of Term and Holding Over. All of the Personalty shall be removable by Tenant any time prior to, or within thirty (30) days after, the expiration or earlier termination of this Lease and shall be so removed by Tenant at the request of Landlord within thirty (30) days after the expiration or termination of this Lease. In the event Tenant fails to remove any or all of its Personalty within the said thirty (30) day period, Landlord may remove such Personalty, or the balance thereof, cause such Personalty to be placed into storage and thereafter charge Tenant the cost of such removal and storage, together with interest thereon at the Default Rate. Those improvements that are integrated into the physical structure of the Building, except any of Tenant's trade fixtures, shall not be removed and shall become the property of Landlord. (A nonexclusive list of Tenant's removable trade fixtures is attached hereto as Exhibit "D".) Tenant agrees promptly to repair any damage to the Premises occasioned by the removal of Tenant's trade fixtures, furnishings and equipment (except for small holes caused by nails, fasteners and the like) and to surrender the Premises broom clean, in as good

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

condition as on the date of Tenant's opening for business therein, ordinary wear and tear, casualty and condemnation excepted. Tenant agrees that at the expiration of this Lease, it will deliver to Landlord peaceable possession of the Premises. No holding over by Tenant nor acceptance of Base Rent or other charges by Landlord shall operate as a renewal or extension of the Lease without the written consent of Landlord and Tenant. Should Tenant hold over without the consent of Landlord, this Lease shall continue in force from month to month, subject to all of the provisions hereof and at the monthly Base Rent Tenant had been paying during the preceding Lease Year.

27. "For Rent" Signs and Showing Premises. Tenant hereby permits Landlord during the last ninety (90) days of the Main Term or of any Option Period, as the case may be (provided that no applicable Renewal Option has been exercised or deemed exercised), to place one (1) "For Rent" or "For Sale" sign, not exceeding four (4) feet by four (4) feet in size, on the parking lot of the Shopping Center. Tenant will also allow Landlord or its agents, upon prior written notice and accompanied by a representative of Tenant designated by Tenant, to show the Premises, exterior and interior, to prospective tenants, purchasers, or mortgagees during reasonable business hours by prior appointment, provided same does not interfere with the conduct of Tenant's business.

28. Force Majeure. Except as otherwise specifically contemplated in this Lease or in paragraph 4 of the Construction Provisions, in the event that Landlord or Tenant shall be delayed

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, delay by the other party, failure of power or unavailability of utilities, riots, insurrection, war or other reason of a like nature not the fault of such party or not within its control, then performance of such act shall be excused for the period of delay, and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay; provided, however, that in connection with the construction of the Improvements, the consequences of delays by the other party shall be governed by paragraph 4 of the Construction Provisions.

29. <u>Events of Tenant's Default</u>. Any of the following occurrences, conditions or acts by Tenant shall constitute an "Event of Default" under this Lease:

(a) <u>Failure to Pay Rent; Breach.</u> (i) Tenant's failure to make any payment of money required by this Lease (including without limitation Base Rent, Ground Rent, CAM Charges or Real Estate Taxes) (subject to Tenant's right of good faith contest), within ten (10) days after the receipt of written notice from Landlord to Tenant that same is overdue; or (ii) Tenant's failure to observe or perform any other material provision of this Lease within thirty (30) days after receipt of written notice from Landlord to Tenant specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period,

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

Tenant shall have such longer period as is reasonably necessary to cure the default, so long as Tenant proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion and provided further that in the case of an emergency, Landlord shall be required to give only such notice as is reasonable under the circumstances.

(b)  Bankruptcy.    (i)  The filing by Tenant of any petition for reorganization, arrangement or otherwise under any bankruptcy law, any taking of Tenant's leasehold interest under this Lease by execution or other process of law, or any assignment by Tenant of Tenant's property for the benefit of Tenant's creditors, or (ii) Tenant's adjudication as bankrupt or insolvent, or the appointment of a receiver, trustee in involuntary bankruptcy or other, similar officer to take charge of any substantial part of Tenant's property, or the filing of any petition against Tenant under any bankruptcy law, which proceeding under any subpart of this item (ii) is not dismissed within one hundred twenty (120) days after it is begun.

30.  Landlord's Remedies.  After the occurrence of an Event of Default by Tenant, Landlord shall have the right to exercise the following remedies:

(a)  Continue Lease.    Landlord may, at its option, continue this Lease in full force and effect, without terminating Tenant's right to possession of the Premises, in which event Landlord shall have the right to collect Ground Rent, Base Rent and other charges when due, including any sums due for any Option

81

Period for which a Renewal Option has been exercised, and to cure

the occurrences, conditions or acts by Tenant which constitute the

Event of Default, following which cure, Tenant shall reimburse

Landlord on demand for the reasonable and actual amounts, including

any and all transaction costs and reasonable attorneys' fees, so

expended (as evidenced by detailed invoice) plus interest at the

Default Rate.  In the alternative, Landlord shall have the right to

terminate Tenant's right to possession and peaceably re-enter the

Premises on the terms set forth in this Lease, or to so re-enter,

without such re-entry being deemed a termination of the Lease or an

acceptance by Landlord of a surrender thereof.  Landlord shall also

have the right, at its option, from time to time, either with or

without terminating this Lease, to relet the Premises, or any part

thereof, with or without legal process, as the agent and for the

account of Tenant, upon such terms and conditions as Landlord may

deem advisable, in which event the rents received on such reletting

shall be applied (i) first to the reasonable and actual expenses of

such reletting and collection, including without limitation

necessary renovation and alterations of the Premises, reasonable

and actual attorneys' fees and any reasonable and actual real

estate commissions paid, and (ii) thereafter toward payment of all

sums due or to become due Landlord hereunder.  If a sufficient

amount to pay such expenses and sums shall not be realized or

secured, in Landlord's exercise of reasonable efforts to mitigate

its damages (which Landlord hereby agrees to make provided that

Landlord shall not be required to lease the Premises or portions

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

thereof to tenants which are either not compatible with the uses in the balance of the Shopping Center or are not reasonably creditworthy or while Landlord (or a related entity) has unleased space available in the Shopping Center, then Tenant shall pay Landlord any such deficiency monthly, and Landlord may bring an action therefor as such monthly deficiency shall arise; provided that if Tenant shall fail to pay Landlord for any such deficiency for a period of more than three (3) consecutive months, Landlord shall be entitled, in Landlord's sole discretion, to elect to recover from Tenant, in addition to the monthly deficiency amounts previously accrued and owing to Landlord, an amount equal to the difference between the rents and other sums due or to become due to Landlord hereunder for the balance of the Term of this Lease but not, however, to exceed a period of sixty (60) months from the date on which the last monthly deficiency payment shall have been paid in full, and the fair market rental value of the Premises for the same period, such difference to be discounted to its net present value using a discount rate of one and one-quarter percent (1¼%) over the prime rate. Upon payment of such lump sum amount and any other amounts due to Landlord under Paragraph 30(c) below, Tenant shall be under no further liability with respect to this Lease.

Landlord shall not, in any event, be required to pay Tenant any sums received by Landlord on a reletting of the Premises in excess of the rent provided in this Lease, but such excess shall reduce any accrued present or future obligations of Tenant hereunder.   Landlord's re-entry and reletting of the Premises

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

without termination of this Lease shall not preclude Landlord from subsequently terminating this Lease as set forth below.

(b) <u>Terminate Lease</u>. Landlord may terminate this Lease by written notice to Tenant specifying a date therefor, which shall be no sooner than thirty (30) days following receipt of such notice by Tenant, and this Lease shall then terminate on the date so specified as if such date had been originally fixed as the expiration date of the Term. In the event of such termination, Landlord shall be entitled to recover from Tenant the monthly deficiency payments described in subparagraph (a) above and, at Landlord's election, in its sole discretion, if Tenant fails to make such monthly deficiency payments for a period of more than three (3) consecutive months, the lump sum amount described in subparagraph (a) above and any amounts due to Landlord under Paragraph 30(c) below.

In the event this Lease shall be terminated as provided above, by summary proceedings or otherwise, Landlord, its agents, servants or representatives may immediately or at any time thereafter peaceably re-enter and resume possession of the Premises and remove all persons and property therefrom, by summary dispossession proceedings. Landlord shall never be entitled to dispossess the Tenant of the Premises pursuant to any "lock-out" or other nonjudicial remedy.

(c) <u>Reimbursement of Landlord's Costs in Exercising Remedies</u>. Landlord may recover from Tenant, and Tenant shall pay to Landlord upon demand, such reasonable and actual expenses as

84

Landlord may incur in recovering possession of the Premises under any subparagraph of this Paragraph 30, placing the same in good order and condition and repairing the same for reletting, and all other reasonable and actual expenses, commissions and charges incurred by Landlord in exercising any remedy provided herein or in attempting to relet the Premises or otherwise, as a result of any Event of Default by Tenant hereunder (including without limitation attorneys' fees), provided that in no event shall Tenant be obligated to compensate Landlord for any speculative or consequential damages caused by Tenant's failure to perform its obligations under this Lease.

(d)    Remedies Are Cumulative.    The various rights and remedies reserved to Landlord herein (which shall be deemed to include Landlord's remedies as set forth in Paragraph 10), are cumulative, and Landlord may pursue any and all such rights and remedies (but no others), whether at the same time or otherwise (to the extent not inconsistent with specific provisions of this Lease). Notwithstanding anything herein to the contrary, Landlord expressly waives its right to forcibly dispossess Tenant from the Premises, whether peaceably or otherwise, without judicial process, such that Landlord shall not be entitled to any "commercial lockout" or any other provisions of applicable law which permit landlords to dispossess tenants from commercial properties without the benefit of judicial review.

(e)    Interest on Late Payments.    If Tenant fails to make any payment of money required by this Lease (including without

85

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

limitation Ground Rent, Base Rent, CAM Charges or Real Estate Taxes) within ten (10) days after the date when such payment is due, interest shall accrue at the Default Rate on such amount from the due date of such payment to the date of actual payment; provided, however, that such interest shall never exceed the maximum legal rate from time to time permitted by applicable law.

31.  Events of Landlord's Default; Tenant's Remedies.  (a) Any of the following occurrences, conditions or acts by Landlord shall constitute an "Event of Default": (a) Landlord's failure to make any payments of money due Tenant hereunder or due to the Condominium Association under the Condominium Documents, within ten (10) days after the receipt of written notice from Tenant that same is overdue (in which event the delinquent amount shall accrue interest at the Default Rate from the due date until the date actually paid); or (b) Landlord's failure to perform any nonmonetary obligation of Landlord hereunder or under the Condominium Documents within thirty (30) days after receipt of written notice from Tenant to Landlord specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Landlord shall have such longer period as may be reasonably necessary to cure the default, so long as Landlord proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion and provided further that in the case of an emergency, Tenant shall

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

be required to give only such notice as is reasonable under the circumstances.

(b) Upon the occurrence of an Event of Default by Landlord, at Tenant's option, in addition to any and all other remedies which it may have at law and/or in equity, and without its actions being deemed an election of remedies or a cure of Landlord's default, Tenant may do all or any of the following: (i) pay or perform such obligations and offset Tenant's reasonable and actual cost of performance, including any and all transaction costs and attorneys' fees, plus interest at the Default Rate, against the Base Rent (but not against more than 60% of any installment thereof), Ground Rent, CAM Charges and any and all other amounts and charges due Landlord hereunder or (ii) withhold Base Rent (but not more then 60% of any installment thereof), Ground Rent, CAM Charges and any other payments due to Landlord under this Lease until such Event of Default, including payment of interest and transaction costs specified in subsection (i) above, is cured by Landlord, or (iii) if such Event of Default has continued uncured for six (6) months or longer, terminate this Lease and sue for damages, including interest, transaction costs and attorneys' fees as specified in subsection (i) above; provided that in no event shall Landlord be obligated to compensate Tenant for any speculative or consequential damages caused by Landlord's failure to perform its obligations under this Lease. If Landlord fails to pay Tenant the Tenant Improvement Allowance in a timely manner, Tenant shall be entitled to the rights and remedies set forth in

87

the Construction Provisions in addition to those provided herein; and, as to a breach of the warranties and representations contained in paragraph 19, Tenant shall be entitled to the remedies provided therein, in addition to those remedies provided herein.

(c)    In the event of any default or breach by Landlord with respect to any of the terms, covenants and conditions of this Lease, Tenant shall look solely to the interest, estate and property of Landlord in the Shopping Center, and the rents, issues, profits and proceeds therefrom, for the collection of any sum of money, except that, Landlord shall remain personally liable for payment of the Tenant Improvement Allowance to Tenant. Except with respect to the payment of the Tenant Improvement Allowance, no other property or assets of Landlord or Landlord's officers, directors, shareholders or principals, or its affiliates, shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies.

32.    <u>Waiver</u>.    If either Landlord or Tenant fails to insist on the strict observance by the other of any provisions of this Lease, neither shall thereby be precluded from enforcing nor be held to have waived any of the obligations, past, present or future, of this Lease. Either party may accept late payment or performance by the other without waiving any Event of Default which may then have accrued.

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

33. <u>Compliance with Applicable Laws</u>.   During the Term,
Landlord and Tenant shall comply with all lawful requirements of
the local, county and state health boards, police and fire
departments, municipal and state authorities and any other
governmental authorities with jurisdiction over the Improvements,
and of the board of fire underwriters, respecting Tenant's use and
occupancy of the Improvements.   In the event that Tenant, within
thirty (30) prior days' written notice (except in the case of an
emergency, in which event only such notice as is reasonable under
the circumstances shall be required) from Landlord or any such
authority ordering performance of any such work which Tenant is
required to perform in order to remain in, or come into, compliance
with any such requirement, fails to perform or diligently commence
performance of same with reasonable promptness, Landlord may
perform said work and collect the reasonable cost thereof plus
interest at the Default Rate from Tenant with the next installment
or installments of Base Rent.   In the event that Landlord, within
thirty (30) prior days' written notice (except in the case of an
emergency, in which event only such notice as is reasonable under
the circumstances shall be required) from Tenant or any such
authority ordering performance of any such work which Landlord is
required to perform in order to remain in, or come into, compliance
with any such requirement, fails to perform or diligently commence
performance of same with reasonable promptness, Tenant may perform
said work and deduct the reasonable cost thereof plus interest at

89

the Default Rate from Landlord with the next installment or installments of Base Rent.

34. <u>Notices</u>. Any notice permitted or required to be given pursuant to this Lease shall be deemed to have been given three (3) business days after mailing a written notice by certified mail, postage prepaid, return receipt requested, or one (1) business day after sending by Federal Express or other comparable overnight express courier service (with proof of receipt available), addressed to the parties as follows:

```
If to Tenant:        CIRCUIT CITY STORES, INC.
                     9950 Mayland Drive
                     Richmond, Virginia  23233
                     Attention:  Corporate Secretary

with a copy to:      CIRCUIT CITY STORES, INC.
                     9950 Mayland Drive
                     Richmond, Virginia  23233
                     Attention:  Vice President of Real Estate


If to Landlord:      O'CONNELL PROPERTIES, INC.
                     480 Hampden Street
                     Holyoke, Massachusetts  01041
                     Attention:  President
```

or to such other addressees as any party hereto shall from time to time give notice to the other party in accordance with this paragraph.

35. <u>Brokers</u>. Landlord and Tenant each covenant that they have not dealt with any real estate broker or finder with respect to this Lease, except for The Dartmouth Company and The Triad Group, which shall be paid a commission by Landlord pursuant to their separate written agreement. Except for the foregoing, each

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

party shall hold the other party harmless from all damages, claims,
liabilities or expenses, including reasonable and actual attorneys'
fees (through all levels of proceedings), resulting from any claims
that may be asserted against the other party by any real estate
broker or finder with whom the indemnifying party either has or is
purported to have dealt.

36.   Miscellaneous.

(a)   Headings and Gender.  All paragraph headings, titles
or captions contained in this Lease are for convenience only and
shall not be deemed a part of this Lease and shall not in any way
limit or amplify the terms and provisions of this Lease.   The
masculine, feminine or neuter gender and the singular or plural
number shall be deemed to include the others whenever the context
so requires or indicates.

(b)   Construction.  The parties hereto agree that all the
provisions hereof are to be construed as covenants and agreements
as though the words importing such covenants and agreements were
used in each separate paragraph hereof.

(c)   Waiver of Jury Trial.  In the event of any court
action arising out of this Lease, each party hereby expressly
waives its right to trial by jury.

(d)   Relationship of Landlord-Tenant; No Third Party
Deficiencies.  Nothing contained in this Lease shall be deemed or
construed by the parties hereto or by any third person to create
the relationship of principal and agent, partnership, joint
venture, or any other association between Landlord and Tenant other

91

than the landlord-tenant relationship described herein, nor to benefit any third party.

(e) <u>Entire Agreement; Merger</u>. This Lease, including all exhibits hereto (which are hereby incorporated herein by reference for all purposes), contains the full and final agreement of every kind and nature whatsoever between the parties hereto concerning the subject matter of this Lease, and all preliminary negotiations and agreements of whatsoever kind or nature between Landlord and Tenant (including without limitation the letter of intent dated September 6, 1995) are merged herein.  This Lease cannot be changed or modified in any manner other than by a written amendment or modification executed by Landlord and Tenant.

(f) <u>Attorneys' Fees</u>. In the event either party shall be required to commence or defend any action or proceeding against any other party by reason of any breach or claimed breach of any provision of this Lease, to commence or defend any action or proceeding in any way connected with this Lease or to seek a judicial declaration of rights under this Lease, the party prevailing in such action or proceeding shall be entitled to recover from or to be reimbursed by the other party for the prevailing party's reasonable and actual attorneys' fees and costs through all levels of proceedings.

(g) <u>Partial Invalidity</u>. If any provision of this Lease or the application thereof to any person or circumstance shall be deemed invalid or unenforceable, the remainder of this Lease and its application to other persons or circumstances shall not be

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

affected by such partial invalidity but shall be enforced to the fullest extent permitted by law as though such invalid or unenforceable provision was never a part hereof.

(h)  Consents. Any consent or approval granted by either party hereunder shall be deemed a consent only as to the matter on which such consent was requested and shall not waive the consenting party's right to give or withhold consent to any subsequent matter.

(i)  Holidays.  If the day on which rent or any other payment due hereunder is payable falls on a Sunday or on a legal holiday, it shall be payable on the following business day.

(j)  Applicable Law.  This Lease shall be construed in accordance with the laws of the State, and the parties agree that jurisdiction for all actions hereunder shall lie therein.

(k)  Successors and Assigns. All rights, obligations and liabilities herein given to or imposed upon any party hereto shall extend to the permitted successors and assigns of such party.

(l)  Counterparts.  This Lease may be executed in one or more identical counterparts, and as so executed by all parties hereto shall constitute a single instrument for purposes of the effectiveness of this Lease.

(m)  Trademarks and Trade Names.  All trademarks, trade names, service marks, signs and all other marks of identification used by Tenant in its business shall at all times remain the exclusive property of Tenant, and Landlord shall have no right, interest in, or title to any of Tenant's trademarks, trade names, service marks, signs or other marks of identification.

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

37.   <u>Effectiveness of Lease; Tenant's Right to Terminate</u>.
Notwithstanding the execution of this Lease or any provision hereof
to the contrary, the parties hereto agree that the effectiveness of
this Lease is expressly conditioned upon the complete satisfaction
(or waiver) of each and all of the following conditions:

(a)   Landlord's   representations,   warranties   and
covenants, including but not limited to those set forth in
paragraph 19 herein, being true and accurate as of the date of
delivery of the Land (as defined in the Construction Provisions).

(b)   Prior to delivery of the Land to Tenant, Tenant's
obtaining satisfactory written assurances that Landlord has
obtained financing adequate to fund the Tenant Improvement
Allowance and development of the remainder of the Shopping Center.

The existence of the foregoing conditions is solely for the
benefit of Tenant, and Tenant may waive any such condition at its
sole discretion by delivering to Landlord a written notice signed
by Tenant which specifically states the condition(s) being waived
by Tenant.

The parties hereto expressly agree that, notwithstanding any
other provision in this Lease to the contrary, in the event any of
the foregoing conditions shall not be met, satisfied or waived by
the applicable deadline specified above, Tenant shall have the
right at any time thereafter, upon ten (10) days' prior written
notice to Landlord (unless such condition(s) is fully met,
satisfied or waived within that ten (10) day period) to terminate
this Lease in its sole and absolute discretion at any time prior to

94

the satisfaction or waiver of any such condition by delivering to
Landlord a written notice signed by Tenant which states that Tenant
is terminating this Lease on account of the failure of one or more
of the foregoing conditions.  In the event of any such termination,
the rights and obligations of the parties shall be of no further
force and effect and the parties shall have no further liability
one to the other (except that the indemnifications set forth in
paragraphs 14(i), 19(a)(v) and 19(b)(ii) hereof shall survive such
termination) upon Tenant's delivery of said notice to Landlord.

The delivery of this executed Lease by Tenant to Landlord
constitutes the offer of the Tenant to the Landlord to bind
Landlord and Tenant to the provisions of this Lease, subject to the
conditions set forth in this paragraph 37.   It is a further
condition to the effectiveness of this Lease that upon receipt of
the executed Lease from Tenant, the Landlord, without delay,
execute and return same to the Tenant in accordance with any
instructions delivered by Tenant or its legal counsel.   In the
event the Landlord fails to immediately execute and return the
Lease, the Tenant may at any time after delivery of the Lease (but
prior to Landlord's execution and delivery of the Lease to Tenant)
provide written notice to the Landlord that Tenant revokes its
delivery of the executed Lease and thereupon the Landlord shall be
immediately obligated to return to the Tenant all executed original
counterparts as well as any copies of this Lease in the possession
of the Landlord, and this Lease shall thereafter be null and void.

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

38. _Confidentiality_. The parties hereto, including, but not limited to, their heirs, successors, assigns and legal representatives, agree that this Lease may not be recorded and that all such parties hereby agree to use their best reasonable efforts to preserve the confidentiality of the specific terms of this transaction. This confidentiality agreement extends to any developers, bankers, lawyers, accountants, employees, agents or any other persons acting on behalf of the parties hereto. The parties hereto agree to use their best reasonable efforts to avoid discussing with, or disclosing to, any third parties (except those parties listed above) any of the terms, conditions or particulars in connection with this transaction. It is specifically agreed by way of illustration, but not by limitation, that the covenant of confidentiality set forth herein shall not be breached if such information is disclosed in connection with or due to any governmental law or ordinance, but this covenant of confidentiality shall be breached if Landlord, or any of Landlord's developers, bankers, accountants, agents, lenders, lawyers or other similar parties, discloses the content of, or delivers a copy of this Lease to, any third party without the express written consent of all parties to this Lease. Any breach of this confidentiality

96

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

agreement shall constitute an Event of Default under the terms and provisions of this Lease.

Notwithstanding the foregoing, Landlord and Tenant agree to jointly announce to the public the fact that they have entered into this Lease pursuant to a press release which shall be subject to the mutual approval of Landlord and Tenant.

WITNESS the following signatures and seals:

LANDLORD

O'CONNELL PROPERTIES, INC.
a Massachusetts corporation

ATTEST:

By: _____
Name: Michael T. Downey
Title: President

TENANT

CIRCUIT CITY STORES, INC.,
a Virginia corporation

ATTEST:

Its: Assistant Secretary

By: _____
Name: Benjamin B. Cummings, Jr.
Title: Vice President

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]