# EXHIBIT "A"

## SITE PLAN

Components:     Premises (outlined in red)

Tenant's Preferred Area

Permissible Building Areas

Customer Pick-Up

Pylon/Monument Signage

Truck Well(s)/Trash Compactor

1





EXHIBIT M (PAGE 2)

PERMISSIBLE BUILDING AREA

## EXHIBIT "A-1"

### LEGAL DESCRIPTION

A certain parcel of land with the buildings and other improvements thereon in Holyoke, Hampden County, Massachusetts shown as containing 14.740 acres on "Preliminary Plan of Easements in Holyoke, Massachusetts Prepared for Mead Realty Group" dated November 8, 1995, by Heritage Surveys, Inc., and bounded and described according to the plan as follows:

| | |
|---|---|
| NORTHERLY: | by Lower Westfield Road by two courses measuring 75.66 feet and 273.66 feet; |
| NORTHEASTERLY: | by the intersection of Lower Westfield Road and Holyoke Street (formerly Whiting Farms Road Extension), 112.17 feet; |
| EASTERLY: | by Holyoke Street (formerly Whiting Farms Road Extension) by two courses measuring 313 feet and 239.62; |
| SOUTHEASTERLY: | by Holyoke Street (formerly Whiting Farms Road Extension) 27 feet; |
| EASTERLY: | by Holyoke Street (formerly Whiting Farms Road Extension) 313.45 feet; |
| SOUTHERLY: | by land of City of Holyoke 132 feet; |
| EASTERLY: | by land of City of Holyoke 100 feet; |
| SOUTHERLY: | by land of Pioneer Valley Railroad Company, 657.57 feet; and |
| NORTHWESTERLY: | by Interstate Route 91 by three courses measuring 287.58 feet, 368 feet and 405.39 feet. |

The above-referenced plan is stamped "preliminary project print" as certain proposed easements shown thereon are not final, and is being used for purposes of describing the boundaries of the Shopping Center.

[J:\013363\161\4bkao82x.W51]
[12/01/95 10:10am; WEITZEL_M]

## EXHIBIT "B"

### INDEX OF DEFINITIONS

| **Term** | **Paragraph where defined** |
|---|---|
| Additional Areas | 14(e) |
| Assessment(s) | Ex. "C", para. 1(a) |
| Base Rent | 4(a) |
| Building | 2 |
| CAM Charges | 7(b) |
| CAM Year | 7(c) |
| Certificate | 15(a)(i) |
| City | 1 |
| Commencement Date | 4 |
| Common Area Easement | 6(d) |
| Condominium Documents | 1 |
| Common Area Maintenance | 7(a) |
| Common Areas | 7(a) |
| Construction Term | 3 |
| CPI-U | 4(a)(iii) |
| Date of Taking | 16(a) |
| Default Rate | 9(b) |
| Delivery of the Land | Ex. "C", para. 1(b) |
| Escrow Agent | 15(a)(i) |
| Event of Default (Landlord) | 31 |
| Event of Default (Tenant) | 29 |
| Force Majeure | 28 |

1

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

| | |
|---|---|
| Foreclosure | 21(a) |
| Grading Plans | Ex. "C", para. 1(b) |
| Ground Lessor | 21(a) |
| Ground Rent | 4(b) |
| Hazardous Substances | Ex. "C", para. 1(a) |
| Improvements | 2 |
| Land | 1 |
| Landlord | Introduction |
| Landlord's Premises | 1 |
| Landlord Work | Ex. "C", para. 1(d) |
| Lease Year | 3 |
| Main Term | 3 |
| Modified Proctor | Ex. "C", para. 2(a) |
| Mortgage | 21(a) |
| Mortgagee | 21(a) |
| Option Periods | 3 |
| Other Improvements | 2 |
| Permissible Building Areas | Ex. "A" |
| Permitted Encumbrances | Ex. "F" |
| Person | 20 |
| Personalty | 23 |
| Plans and Specifications | Ex. "C", para. 2(b) |
| Premises | 1 |
| Real Estate Taxes | 9(a) |
| Renewal Option | 3 |

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

| **Term** | **Paragraph where defined** |
|---|---|
| Schematic Floor Plan and Elevation | Ex. "C", para. 2(b) |
| Shopping Center | 1 |
| Site Covenants | 19(a)(ix) |
| Site Work | Ex. "C", para. 1(b) |
| Site Plan | 1 |
| Soils Report | Ex. "C", para 1(b) |
| Staging Area | 6(a) |
| State | 1 |
| Substantial Completion | Ex. "C", para. 2(e) |
| Successor | 22 |
| Taking | 16(a) |
| Tax Parcel | 9(b) |
| Tenant | Introduction |
| Tenant Improvement Allowance | Ex. "C", para. 3 |
| Tenant's Preferred Area | Ex. "A" |
| Tenant's Pro Rata Share | 7(c) |
| Term | 3 |
| Transfer | Ex. "C", para. 3 |
| Utility and Drainage Plan | Ex. "C", para. 1(c) |
| Work | 15(a)(i) |

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

HOLYOKE CROSSING

## EXHIBIT "C"

CONSTRUCTION PROVISIONS

THESE CONSTRUCTION PROVISIONS (herein so called) are hereby made a part of the Lease between Landlord and Tenant to which these Construction Provisions are attached as Exhibit "C". All defined terms shall have the meanings attributed to them in the Lease unless otherwise specifically defined in these Construction Provisions.

1.    Landlord's Delivery of the Land; Other Landlord Work. All of the work set forth in subparagraphs (a), (b) and (c) below is, collectively, the "Landlord Work":

(a)    Hazardous Substances. Landlord shall deliver the Land to Tenant free of any pollution or contamination from toxic or hazardous substances, asbestos or any other chemicals or substances in amounts which exceed standards for public health or welfare as established and regulated by any local governmental authority, the State or the United States Government (herein collectively referred to as "Hazardous Substances"). Landlord hereby grants Tenant and its agent access to the Premises and Shopping Center to enable Tenant to conduct such soil and environmental tests as its deems necessary.

(b)    Site Work. Landlord, at its sole cost and expense, shall: (i) verify its proposed development of the Shopping Center and compliance of its civil engineering plans with the "Scope of

1

Geotechnical Evaluation" shown on Attachment "2" attached hereto;
(ii) cause the Land to be free and clear of any known or unknown
(which, but for Landlord's failure to discover same, should be
removed prior to delivery of the Land to Tenant) obstructions,
foundations, footings, utilities, easements, improvements and
tenancies, except for the Permitted Encumbrances; (iii) complete
grading of the Land and, to the extent necessary for Tenant to
construct the Improvements, the Common Areas in accordance with the
"Soils Report" (as defined below), the "Standards for Grading Work"
attached hereto as Attachment "3", and with the final plans
prepared by the civil engineer approved by Tenant (the "Grading
Plans"), which Grading Plans are described on Attachment "4"
hereto, and which are subject to Tenant's written approval, which
approval shall not be unreasonably withheld or delayed; (iv)
complete Tenant's building pad strictly in accordance with the
Soils Report and the Standards for Grading Work and the Grading
Plans; (v) obtain approvals for all curbcuts indicated on the
Grading Plans and all on and off-site permits required for any work
to be performed by Landlord necessary to develop the Shopping
Center which permits may be a prerequisite for issuance of Tenant's
building permit; (vi) complete (A) all curbcuts for Tenant's
Preferred Area, (B) 20,000 square feet of Staging Area in a
location mutually agreeable to Landlord and Tenant, to either be
paved or stone to provide for all weather use, and (C) an all-
weather construction access road to the Land, the Staging Area and
around the Building no less than twenty-four (24) feet in width,

2

connecting the existing dedicated roadway adjacent to the Shopping
Center with the Land, all in accordance with the Grading Plans; and
(vii) obtain site plan approval and conditional use approval, if
any, from governmental authorities having jurisdiction over the
Shopping Center, permitting Tenant's construction of the Premises
(subject to issuance of Tenant's building permit). All of the work
described in (i) through (vii) above is, collectively, the "Site
Work". To the extent that any of the final plans and
specifications for the Site Work which have been approved by Tenant
are inconsistent with the Scope of Geotechnical Evaluation shown on
Attachment "2" and/or the "Standards for Grading Work" attached
hereto as  Attachment  "3",  the  approved  final  plans  and
specifications shall control. Further, Tenant has elected to rely
upon Landlord's geotechnical evaluation of the Land prepared by
Landlord's consultants (the "Soils Report") and in the event the
Soils Report is inconsistent with Attachments 2 and/or 3, the Soils
Report shall control. No changes shall be made to any of the Site
Work, including but not limited to any plans and specifications
therefor, without Tenant's prior written consent, which shall not
be unreasonably withheld or delayed. Tenant's consent to any
proposed changes in the Site Work or any plans or specifications
therefor shall not be deemed to be unreasonably withheld or delayed
if such changes are materially inconsistent with any of the
Attachments to these Construction Provisions. The Site Work shall
be performed in accordance with the construction schedule attached
hereto as Attachment "5" (sometimes referred to herein as the

[J:\013363\161\4bkao82x.W51]
[11/28/95 11:23am; WEITZEL_M]

"Construction Schedule"). As contemplated by Paragraph 28 of the Lease, all deadlines set forth in the Construction Schedule or otherwise in the Lease or in these Construction Provisions shall be subject to Force Majeure except where otherwise specifically contemplated in the Lease or in these Construction Provisions. Landlord specifically covenants and agrees that any problems or delays it encounters in grading the Premises in satisfaction of the Site Work requirements set forth above in connection with the condition of the soils (including environmental or hazardous waste issues, subsidence sinking, surface waters, subsurface waters, site conditions or the like) shall be its sole responsibility and shall not constitute Force Majeure unless, based on the soils and other reports available to Landlord such conditions, and the problems and/or delays resulting therefrom were not reasonably foreseeable by Landlord; in no event shall the cost associated with such problems or conditions be passed on to Tenant in any manner.

Landlord will maintain the construction access road in good condition throughout the construction of the Common Areas. If the items of Site Work to be performed on the Land are completed earlier than forty-five (45) days prior to Tenant's scheduled commencement of construction of the Improvements (as provided below), the Land shall be overbuilt and sloped to drain and, within such forty-five (45) day period, shall be regraded and recompacted.

Subject to Force Majeure, Landlord covenants and agrees to complete, at its sole cost and expense, each item of the Site Work and to provide temporary utilities to within five (5) feet of the

[J:\013363\161\4bkao82x.W51]
[11/28/95 11:23am; WEITZEL_M]

building pad at Tenant's designated points of entry as set forth in the Plans and Specifications, as contemplated in paragraph 1(c) below, in accordance with the dates established therefor in Attachment "5", to the end that promptly upon completion of such requirements (collectively "delivery of the Land"), Tenant shall be able, subject to issuance of its building permit and matters within Tenant's control, to commence construction of the Improvements.

Landlord acknowledges that Tenant's ability to obtain a building permit for its construction may be delayed due to the failure by Landlord to obtain necessary approvals or permits or to pay necessary fees for its construction and development of the Shopping Center. Landlord agrees that delivery of the Land shall not be deemed to have occurred until all such aforesaid approvals and permits shall have been obtained and all such fees, including but not limited to impact fees and assessments, shall have been paid, if and to the extent that such approvals, permits and fees for Landlord's construction shall be prerequisites to the issuance of Tenant's building permit. Landlord agrees to keep Tenant advised in writing on a monthly basis as to Landlord's progress in completing the Site Work. Upon the delivery of the Land, Landlord shall certify to Tenant that all elements of the Site Work have been completed in the form of the Site Work Certificate attached hereto as Attachment "6".

Should the Site Work require minor adjustments in order to be in accordance with Attachments "3" and/or "4", Tenant may direct its contractor to make such adjustments, the total cost of which

{J:\013363\161\4bkao82x.W51]
[11/28/95 11:23am; WEITZEL_M]

shall be reimbursed by Landlord to Tenant upon demand in a sum not
to exceed Five Thousand Dollars ($5,000.00).

    (c) <u>Paving, Lighting, Utilities, Landscaping and
Drainage</u>. Landlord, at its sole cost and expense, and in
accordance with <u>Attachment "5"</u>, shall cause a contractor licensed
in the State to complete, subject only to minor punchlist items
which do not delay or interfere with Tenant's commencement of its
work: (i) installation of temporary utilities, as described in the
"Utilities Specifications" attached hereto as <u>Attachment "7"</u>; (ii)
the construction and installation within five (5) feet of the
Building, of permanent telephone service and permanent utilities,
including but not limited to gas, electric, domestic water and fire
water (in size sufficient to satisfy local fire codes), as
described in the Utilities Specifications, each at Tenant's
required entry points shown in the "Utility and Drainage Plan"
described on <u>Attachment "8"</u> hereto (the "Utility and Drainage
Plan"), and at depths adequate for Tenant's tie-in without
additional cost above that contemplated by the "Plans and
Specifications" (as defined in paragraph 2(b) below); (iii) the
construction and installation of the storm water drainage system at
the location shown on the Utility and Drainage Plan; (iv) the
construction and installation of paving (including heavy-duty
paving), and curbing for parking areas (including sidewalk curb in
front of the Building), vehicular access and service roads, and
driveways, in accordance with the "Paving Specifications" attached
hereto as <u>Attachment "9"</u>; (v) subject to customary delays in

[J:\013363\161\4bkao82x.W51]
[11/28/95 11:23am; WEITZEL_M]

installation to accommodate seasonal weather conditions, the completion of landscaping at the Shopping Center in accordance with Landlord's landscaping plan; (vi) the construction and installation of lighting in the Shopping Center to standards no less than those set forth in the "Shopping Center Lighting Specifications" attached hereto as <u>Attachment "10"</u>; and (vii) Landlord's installation of the pylon sign identifying the Shopping Center as described in paragraph 8 of the Lease, all no later than the dates established therefor in <u>Attachment "5"</u>.

(d)   <u>Landlord Work</u>.   All of the work described to be performed by Landlord in this paragraph 1 is collectively referred to as the "Landlord Work". All Landlord Work shall be performed in accordance with all applicable laws and this Lease, in a good and workmanlike manner, as appropriate by engineers, surveyors, architects and consultants, who are bondable, licensed in the State and of good reputation.   Landlord's general contractor shall be experienced in shopping center development and in phasing and coordinating construction schedules with major anchors and national retailers.   In the event that Landlord defaults at any time in completion of any component of the Landlord Work which delays or interferes with Tenant's performance of its work, Tenant shall have the right, but not the obligation, to perform at Landlord's sole cost and expense, such part of Landlord Work.   Tenant shall exercise this right by providing Landlord with written notice thereof, which notice shall reasonably detail those portions of the Landlord Work which Tenant elects to complete. Tenant may exercise

7

the rights set forth in this paragraph 1(d) from time to time so long as Tenant provides Landlord notice specified herein (i) within a reasonable amount of time prior to the date upon which Landlord would otherwise commence that portion of the Landlord Work, or (ii) at such other time where it is feasible for Tenant to take over that portion of the Landlord Work from Landlord.  In the event and to the extent that Tenant exercises its right hereunder, Landlord agrees to cooperate in good faith and provide Tenant with reasonable assistance so that Tenant can complete said portions of the Landlord Work.  Landlord agrees to reimburse Tenant for any and all costs incurred by Tenant in connection with any portion of the Landlord Work which Tenant is in the process of completing within thirty (30) days after receipt of written request from Tenant, which request shall be reasonably supported by invoices and/or written description of the Landlord Work performed.  In the event that the Landlord does not timely reimburse Tenant as hereinabove contemplated, Tenant shall be entitled to deduct the costs of such Landlord Work from rentals and other payments due under the Lease, together with interest at the Default Rate from the date of expenditure by Tenant until paid in full.

[J:\013363\161\4bkao82x.W51]
[11/28/95 11:23am; WEITZEL_M]

2.   Tenant Improvements.

     (a)   Building Construction.   Upon completion of all
requirements therefor, Landlord shall give Tenant written notice
(which shall include any required certifications, including but not
limited to those required by Attachment "3") of delivery of the
Land in the form of Attachment "6".   Tenant shall use reasonable
efforts to notify Landlord within ten (10) days after Landlord's
notice of delivery, if any such requirement has not been met to
Tenant's reasonable satisfaction, whether or not Tenant elects to
exercise its self-help remedies set forth in this Lease.   Upon
completion of any such previously unmet requirements, Tenant shall
promptly commence and pursue to completion with due diligence the
construction of the Improvements.   The construction work on the
Improvements shall be performed by a duly licensed contractor
chosen by Tenant, shall be done in a good and workmanlike manner,
in compliance with all applicable laws and in material accordance
with the "Plans and Specifications" (defined below).   Provided
delivery of the Land occurs by not later than **May 15, 1996**, Tenant
agrees, subject to Force Majeure, to substantially complete the
construction of the "building shell" of the Building (i.e., the
four walls, subflooring and roof, but not the floor or other
interior improvements) by not later than **September 15, 1996**.   If
delivery of the Land occurs after **May 15, 1996** but prior to **July 1,
1996**, Tenant agrees, subject to Force Majeure, to substantially
complete the construction of the building shell of the Building by
not later than one hundred twenty (120) days after the date of

9

delivery of the Land. If Tenant fails to substantially complete
the building shell as required under this Paragraph 2, Landlord
may, at its option, substantially complete the building shell
provided that Landlord shall have given Tenant thirty (30) days'
prior written notice of its intention to do so and that during such
30-day period Tenant shall not have substantially completed the
building shell. Tenant shall reimburse Landlord on demand for the
reasonable and actual amounts so expended by Landlord (as evidenced
by detailed invoice) in the substantial completion of the building
shell, plus interest at the Default Rate. If delivery of the Land
occurs after **July 1, 1996**, Tenant shall not be required to
construct the building shell by any earlier deadline than that
applicable to "Substantial Completion" as required below. Provided
that the Land is delivered on or before **June 1, 1996**, Tenant
covenants and agrees to use reasonable efforts and due diligence to
achieve "Substantial Completion" (as defined below) on or before
the date which is the later to occur of **December 15, 1996**, or seven
(7) months after the actual date of delivery of the Land. If
delivery of the Land occurs after **June 1, 1996**, the deadline for
Tenant to achieve Substantial Completion shall be the later to
occur of **April 1, 1997** or seven (7) months after the actual date of
delivery of the Land and the deadline for Tenant to open the
Premises for business to the general public shall be the later to
occur of **September 1, 1997** or twelve (12) months after the actual
date of delivery of the Land.

10

(b)   <u>Plans and Specifications</u>.   Tenant shall prepare and furnish to Landlord for its approval, not to be unreasonably withheld, conditioned or delayed, complete architectural drawings and specifications and building elevations (the "Plans and Specifications") for the construction of the Building and Other Improvements, incorporating therein the items specified and shown in the "Schematic Floor Plan and Elevation" (which are hereby approved by Landlord) attached hereto as <u>Attachment "11"</u>.   Landlord agrees that it will approve the Plans and Specifications, so long as they are materially consistent with the Schematic Floor Plan and Elevation and provide for good quality standards for design and construction, within ten (10) business days after receipt thereof. In no event shall Landlord require Tenant to alter its building elevations or customer pickup area.     If the Plans and Specifications are not disapproved by Landlord within ten (10) business days of delivery thereof to Landlord, they will be deemed approved.     The Plans and Specifications shall not be materially changed by Tenant without the prior written consent of the Landlord, which consent shall not be unreasonably withheld, conditioned or delayed.

(c)   <u>Permits</u>.     Tenant, at its sole cost and expense, shall obtain or cause to be obtained those certain building permits, licenses, other governmental approvals and temporary and permanent certificates of occupancy which may be required for the lawful construction and occupancy of the Premises as a retail shopping facility in accordance with the Plans and Specifications.

11

[J:\013363\161\4bkao82x.W51]
[11/28/95 11:23am; WEITZEL_M]

Landlord agrees to assist and cooperate fully with Tenant in obtaining such permits, licenses, approvals and certificates. Landlord shall be responsible for any other permits necessary for the development of the Shopping Center.

(d) <u>Landlord Inspections</u>.   During the course of construction of the Improvements, Landlord may, at its own risk and in cooperation with Tenant's contractor, enter upon the Land for purposes of inspecting the work, provided that such inspections shall not interfere with Tenant's construction.

(e) <u>Substantial Completion</u>. Substantial completion of the Improvements ("Substantial Completion") shall be deemed to occur when a certificate of occupancy, whether temporary and subject to minor items to be completed, or permanent, as the case may be, has been issued by the applicable governmental authority. The foregoing shall not be deemed to relieve Tenant of its responsibility to complete the Improvements in accordance with the Plans and Specifications. Within sixty (60) days after Substantial Completion, Tenant shall furnish to Landlord marked up final construction drawings for the Improvements.   Tenant shall not be obligated to deliver "as built" drawings, but Tenant shall permit Landlord to make the same, at Landlord's sole cost and expense, if Landlord so elects.

3. <u>Costs</u>. Upon Substantial Completion and Tenant's furnish-ing to Landlord (i) the certificates of insurance required under paragraph 14 of the Lease, (ii) an indemnity in the form of <u>Exhibit</u> <u>"J"</u> attached hereto (which Tenant agrees to issue to Landlord's

[J:\013363\161\4bkao82x.W51]
[11/28/95 11:23am; WEITZEL_M]

lender and/or title insurance company) against any exception in Landlord's or its Mortgagee's policy of title insurance with respect to mechanics' liens arising out of Tenant's construction (except that, if any mechanics' liens are in fact filed against the Shopping Center as a result of Tenant's work, Tenant shall be required to either bond over or discharge such liens if Landlord's title company or Mortgagee refuses to accept Tenant's indemnity as to such liens), (iii) if requested by Landlord, confirmation from Tenant that Landlord holds title to the Improvements (in form reasonably acceptable to Landlord and Tenant), (iv) a certificate from Tenant's general contractor certifying that the Improvements have been substantially completed in accordance with the Plans and specifications, subject only to punchlist items, and (v) a general assignment by Tenant of all warranties (whether issued or to be issued and only to the extent assignable) for portions of the Improvements which are required to be repaired by Landlord under this Lease, Landlord shall pay to Tenant a "Tenant Improvement Allowance" in an amount equal to One Million Eight Hundred Thousand and No/100 Dollars ($1,800,000.00), payable by wire transfer of funds by Landlord to Tenant's account no later than thirty (30) days after Substantial Completion and submission of the items listed above. If Landlord fails to pay the Tenant Improvement Allowance in full within thirty (30) days after Substantial Completion and receipt of the items listed above, interest shall accrue on the unpaid Tenant Improvement Allowance at the Default Rate commencing on the thirty-first (31st) day following

[J:\013363\161\4bkao82x.W51]
[12/01/95 10:10am; WEITZEL_M]

Substantial Completion and submission of the items listed above until the date of payment of the Tenant Improvement Allowance and, in lieu of Tenant's obligation to pay any Ground Rent, Base Rent, CAM Charges or other payments to Landlord under this Lease, for every month (or portion of a month) from and after the date Tenant opens for business in the Premises until the date the Tenant Improvement Allowance has been paid in full, Tenant's liability for Base Rent shall be deemed reduced to fifty percent (50%) of the amount otherwise payable pursuant to Paragraph 4 (i.e., initially $19,765.63 per month) and all of such reduced Base Rent and all other amounts payable to Landlord under the Lease shall be offset against the unpaid Tenant Improvement Allowance (and all accrued interest thereon) until such time as the entire balance of said Allowance and accrued interest is either funded in full by Landlord or offset in full by Tenant as aforesaid.   If the Tenant Improvement Allowance (and all accrued interest thereon) has not been fully funded to Tenant within one (1) year after Tenant opens the Premises for business, the then balance of the Tenant Improvement Allowance shall be deemed increased by $180,000.00 and shall be required to be funded or offset, as aforesaid, before any Base Rent shall become payable under this Lease.

4.   Construction Delays.

(a)   Delays by Landlord.   In the event, notwithstanding delays caused by Force Majeure, Landlord shall fail to complete the Site Work and accomplish delivery of the Land in the condition

14

specified by **May 15, 1996**, Landlord agrees that it shall reimburse
Tenant for its fixed and ascertainable costs incurred as a result
thereof in the event Tenant elects, in its sole and absolute
discretion, to exercise all reasonable efforts to open for business
by **December 31, 1996.** Such costs shall be limited to Tenant's out-
of-pocket expenses of construction overtime, acceleration charges
and bonuses paid to Tenant's contractors or subcontractors, charges
for the scheduling of construction crews on days on which work
cannot be performed due to the delays by Landlord and construction
period interest charges actually incurred to the extent that such
charges exceed those which would have accrued without such delay.
The foregoing remedy shall only be available to Tenant if Landlord
has commenced but not completed the Site Work and if Tenant in fact
opens for business by **December 31, 1996.** Tenant shall provide
Landlord with copies of Tenant's original and revised construction
schedules and consult with Landlord concerning the proposed means
and costs of accelerating Tenant's Work pursuant to this
subparagraph (a).

In the event, subject to Force Majeure, Landlord shall fail to
accomplish delivery of the Land by **July 1, 1996** or to complete any
element of the Landlord Work which delays or interferes with
Tenant's work or the opening of the Premises for business by the
completion date established therefor in Attachment "5", Tenant, at
its option and upon five (5) days' prior written notice to
Landlord, which notice may be given prior to or at any time after
the applicable date for performance, may in addition to any other

[J:\013363\161\4bkao82x.W51]
[11/28/95 11:23am; WEITZEL_M]

rights and remedies set forth herein, enter the Shopping Center and perform any task required for delivery of the Land or, as applicable, any such element of the Landlord Work which has not been timely completed, and Landlord shall reimburse Tenant for its reasonable and actual costs thereof, including interest on such costs at the Default Rate.  Landlord hereby grants Tenant the right, as its agent, to directly contact and contract with Landlord's contractors, on behalf of Landlord, to complete such work, all at Landlord's cost and expense. Landlord covenants, upon Tenant's request, to provide Tenant with duplicate sets of all plans, specifications and contracts prepared in connection with the construction of the Shopping Center, as well as schedules of all contractors, subcontractors and suppliers.  If such costs are not reimbursed to Tenant prior to the Commencement Date, Tenant may offset such amounts against Base Rent and CAM Charges otherwise due until such costs and accrued interest are reimbursed in full.

In the event, for any reason whatsoever but subject to Force Majeure, Landlord shall fail to complete delivery of the Land to Tenant by **July 1, 1996**, Tenant shall be entitled to terminate this Lease at any time prior to such delivery and receive from Landlord promptly thereafter a sum equal to the actual out-of-pocket and substantiated third-party legal, architectural and engineering costs incurred by Tenant to the date of termination, not to exceed One Hundred Thousand and No/100 Dollars ($100,000.00).  In addition to any other rights and remedies set forth herein, if the Landlord fails to timely deliver the Land, or complete any element of the

16

Site Work which delays or interferes with Tenant's Work, by **June 1, 1996,** and regardless of Force Majeure, Tenant may elect to delay the opening of its store facility as provided in Paragraph 18(a) of the Lease, during which time Tenant shall pay no Base Rent, Real Estate Taxes or CAM Charges and shall only be liable for Ground Rent if and to the extent required to be paid pursuant to Paragraph 4(b). In such event, Landlord shall deliver the Land and complete the Site Work on or before **September 1, 1996,** and Landlord shall pay to Tenant on demand an amount equal to all additional costs reasonably incurred by Tenant in the delayed development of its store facility (whether or not Tenant shall have completed the building shell in the Fall of 1996 notwithstanding the delay in delivery of the Land), including, but not limited to, increases in costs of materials and all additional engineering, architectural and legal fees, as compensation to Tenant for Landlord's delays hereunder. Tenant shall provide Landlord with information, upon request, as to the actual and anticipated costs of the delayed development of Tenant's store facility.

(b) Delays by Tenant. In the event Tenant shall fail to achieve Substantial Completion by the applicable deadline for Substantial Completion required in Paragraph 2(a) of these Construction Provisions for reasons other than Force Majeure, whether or not Tenant is paying and Landlord is accepting Ground Rent pursuant to paragraph 4 of this Lease, Landlord shall be entitled to terminate this Lease upon sixty (60) days prior written

17

notice to Tenant, during which sixty (60) day period Tenant may cure any such default hereunder.

(c)  <u>Miscellaneous</u>.   Notwithstanding the foregoing, a delay by any party in exercising its cure rights or other remedies hereunder shall not be deemed an event of force majeure for purposes of extending the date(s) established for performance by the party whose actions or omissions gave rise to such cure rights or remedies.   All sums owing to Tenant under paragraph 1 hereof and/or subparagraph (a) above shall, to the extent applicable, be added to the Tenant Improvement Allowance and paid simultaneously therewith; and, if not so paid, Tenant shall be entitled to offset all such costs, plus interest at the Default Rate, against Base Rent and CAM Charges otherwise due hereunder.

5.    <u>Attachments</u>.

"1"   Intentionally Deleted

"2"   Scope of Geotechnical Evaluation

"3"   Standards for Grading Work

"4"   Grading Plans

"5"   Construction Schedule

"6"   Site Work Certification

"7"   Utilities Specifications

"8"   Utility and Drainage Plan

"9"   Paving Specifications

"10"  Shopping Center Lighting Specifications

"11"  Schematic Floor Plan and Elevation

[J:\013363\161\4bkao82x.W51]
[11/28/95 11:23am; WEITZEL_M]

Attachment "1"

INTENTIONALLY DELETED

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

Attachment "2"

Scope of Geotechnical Evaluation

I. **GENERAL**

A. All borings shall comply with all applicable codes and regulations.

B. Circuit City shall be informed, by phone, of the job progress and of any unexpected or special conditions.

C. Soil samples shall be retained by the soil testing firm for at least: six (6) months on projects where shallow foundations are recommended; twelve (12) months on projects where deep foundations are recommended. (Differing periods may be acceptable. If deviations from the specified periods are proposed, state proposed periods, and state any additional cost to comply with the specified periods).

D. The time required to complete the soil boring, testing, and investigation report following authorization to proceed shall be twenty-one (21) calendar days or less.

E. At the end of the agreed upon time period, submit to Circuit City six copies of the report including black line prints of all logs, charts, diagrams, drawings, etc. on 8-1/2" x 11" sheets.

F. All reports are to be sealed by an Engineer licensed in the State in which the work is performed.

G. Evidence of suitable levels of Professional Liability, General Liability and Workmen's Compensation Insurance Coverage is required before commencing work.

II. Within 21 days after notification by Circuit City Stores, the developer or A/E firm shall furnish a Report of Subsurface Investigation, which shall be performed by an independent soils engineer approved by Circuit City, and shall include the following:

A. Visual Description and Report: Describe the Shopping Center site as to existing conditions noting in particular any unique or unusual features which might affect any proposed construction.

1

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

B.  Soil borings shall be as follows:

    1.  In granular soils, borings shall be standard penetration tests employing a 140 lb. hammer having a free fall of 30" and using a 2" outside diameter (1-3/8" ID) split spoon, ASTM Method D-1586.

    2.  In cohesive soils, standard penetration test ASTM-D-1586 or thin wall tube sampling of soils ASTM D-1587 may be employed.

C.  Soil samples shall be taken at 2'-6" intervals up to 10' depth and at 5' or at each change of strata thereafter.

D.  Indicate as accurately as possible the water line in all holes, at the time of boring and twenty-four (24) hours later.

E.  Where fill is encountered trenching or other explanatory procedures should be employed. Fill shall be described in great detail, including such information as approximate amount of organic material, topsoil, wood, or other decaying matter, loose or well compacted, amount of moisture, amount and type of debris, where compatible or to be removed, etc.

F.  Where rock is encountered, rock core samples of a minimum 1-1/4" diameter and minimum 5'-0" length shall be obtained, recovery ratios shall be given as well as a clear description of the type of rock, in particular, the means required to excavate same.

G.  At least five (5) borings should be taken within the Building Area limit lines on the Circuit City Parcel (with one at each extreme corner). The specific information required includes:

    1.  Allowable bearing pressure under footings for dead load, dead plus live load and dead plus lateral loads.

    2.  Friction value for lateral load-soil to footing.

    3.  Friction value for drilled caissons for uplift.

    4.  Equivalent fluid pressure to be used for retaining wall design.

    5.  Allowable passive resistance of soil-for lateral loads on drilled caissons and footings.

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

6.   Evaluation of the suitability of on-site material for engineered fill.

7.   The typical loads for a Circuit City building vary from location to location; however, the following general criteria is provided:

| SNOW LOAD (PSF) | MAX. INT. COL. LOAD (KIPS) | MAX. EXT. COL. LOAD (KIPS) | MAX. EXT. NON-LOAD BEARING WALL (KIPS/FT) |
|---|---|---|---|
| 0 | 46 | 26 | |
| 20 | 58 | 33 | |
| 25 | 65 | 37 | |
| 30 | 71 | 41 | 3.0 |
| 35 | 78 | 45 | |
| 40 | 85 | 48 | |

1.   Assumes tributary area of 1326 ft.
2.   Assumes tributary area of 750 ft.
3.   Assumes 12" normal weight block reinforced at 24" o.c.

8.   Comment on effect of expansive soil and recommended footing depth to minimize effect of expansive soil. When material has a plastic index greater than twenty, swell tests shall be performed.

9.   Recommendation for slab construction; including thickness, reinforcing, moisture barrier, and capillary break.

10.  Recommendations on the need for geological and/or seismic investigations of the site or surrounding area.

11.  Recommendations on the need for additional boring samples based on the consistency of the boring data previously obtained.

12.  The report shall include a statement describing the field investigation technique and laboratory procedures.  Include a commentary on the site in general as well as on the subsurface conditions.

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

13.  Test data shall be illustrated on table, charts, graphs, etc., as required to summarize the results.

14.  Final boring logs shall give a detailed description of the various soil strata and they shall include the group symbol based on the Uniform Soil Classification System.

15.  Recommended specification for materials and placement of any required off site fill including granular and cohesive materials. Estimated cost per cubic yard installed for these materials.

16.  Provide an indication of how susceptible the on-site materials are to moisture damage during the construction season at the proposed subgrade elevations and what recommended procedures should be taken to alleviate possible problems.

C.  Pavement Design:  Perform soils borings and any other field investigations necessary to provide a recommendation for the design of pavement sections for a 20 year life span and various traffic indices.

If poor subgrade material is encountered, recommend an alternate paving design using a reinforcing fabric (such as Mirafi 500X) and a thickened paving base, including thickness and material specifications for topping, asphaltic base, primer (if required) and reinforcing fabric and an estimated in-place cost per square yard for both the paving and fabric system.

Recommend both a heavy and light duty paving system, including thickness and material specification for topping, asphaltic base primer (if required) and granular sub-base. Light duty paving should be based on an estimated 500 automobiles per day and general parking. Heavy duty paving should be based on 500 automobiles per day, plus 3 tractor trailers per day with 9000 lb. wheel loads.  Provide an estimated cost per square yard for both the paving and base in-place.

D.  Foundation Investigation Recommendations and Evaluations:

1.  Grading and Earthwork. Described recommended procedures relating to:

(a)  Stripping.
(b)  Excavations.
(c)  Fills (import and on-site material).
(d)  Suitability of on-site top soil material for landscaping.

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

      (e)   Grading operations.
      (f)   Compaction.
      (g)   Stockpiling on-site materials.

2.     Footings/Foundations:

      (a)   Described suitable foundation systems and attendant requirements.
      (b)   Describe advantages and disadvantages of any logical and/or feasible alternative systems.
      (c)   Bearing values.
      (d)   Setting depths.
      (e)   Soil preparation.
      (f)   Anticipated settlement or movement (in inches). The maximum differential movement shall be 1/2 inch.
      (g)   Foundation drainage system, if required.

3.     Non-structural Slab on Grade.   Describe recommended procedures relating to:

      (a)   Soil preparation.
      (b)   Slab reinforcement.
      (c)   Slab underpayment with particular attention to capillary breaks or moisture problems.
      (d)   Anticipated settlement or movement (in inches). The maximum differential movement shall be 1/2 inch.
      (e)   Underslab drainage system, if required.

4.     Retaining Walls.   Design requirements/parameters for:

      (a)   Equivalent fluid pressure.
      (b)   Backfills.
      (c)   Drainage.
      (d)   Provide design requirements/parameters for capabilities of soil to support these structures.

5.     Light pole bases or similar pole structures:   Provide design requirement/parameters for capabilities of soil to support these structures.

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

Attachment "3"

Standards for Grading Work

1.    The Land and the Shopping Center shall be graded in accordance with the following:

(a)    The Grading Plan shall show contours in accordance with standard engineering practice and these contours shall be shown with the existing (shown as a dashed line) and final (shown as a solid line) elevations.  Whether existing or proposed, all buildings, improvements, roads  and highways, including those adjacent to the Shopping Center, shall be shown in their true locations.

(b)    The Building will be accessible by grade level parking only.  Steps and stairs are not permitted.

(c)    Sidewalk at the Building will slope away from the Building with grade of no less than 1.5% and no more than 3.0%. All water shall be sheet drained away from the Tenant's doors.

(d)    Asphalt paving areas will be graded to avoid ponding water with slopes no less than 1.5% and no more than 4.0%. Entrances and access drives shall have a maximum slope of 6.0%.

(e)    Surface drainage swales will not be allowed without prior approval of Tenant.  Such swales must have a grade of not less than 0.5% and no more than 3.5% and shall be constructed of concrete.

(f)    The cut and fill on the Shopping Center site should be balanced, if practical.  All fill material must be of a select grade and sources for acquisition of fill material, as well as locations for cut material, must be identified.

(g)    No retaining walls or embankments causing breaks in grade shall be permitted unless specifically approved by Tenant.

2.    "Tenant's Pad Area" shall be defined as the area extending five (5) feet beyond the Building walls and truck dock and ramp area, or to the back of curbing around the Building,

1

whichever is further.   The Site Work shall comply with the
following additional requirements:

(a)   Landlord shall be responsible for preparing the
Tenant's Pad Area subgrades to within plus or minus one-tenth of a
foot as set by Tenant's architect.   Tenant's subgrades are
typically 8"-10" below finished floor elevation. Landlord will
complete compaction in accordance with the appropriate engineering
standards and building code requirements, but in no event less than
ninety-eight percent (98%) of the modified proctor soil test for
water content and compaction levels ("Modified Proctor") on the
Land, so as to enable Landlord to perform construction work
necessary to provide completed Improvements in accordance with the
"Plans   and   Specifications"   (defined   in   the   Construction
Provisions), with standard footings and without the necessity of
pilings or spread footings or other extraordinary foundation work.
Tenant's minimum slab thickness and under slab fill will be
established in accordance with the report of an independent
professional soils engineer.   Such report will be obtained by
Landlord at its sole expense.   All compacted areas of the site
shall be verified by an independent professional soils engineering
test laboratory and a certificate from such independent laboratory
indicating compliance with the soils report shall be furnished to
Tenant upon completion of the Site Work.

(b)   Tenant's Pad Area soil shall have a minimum bearing
capacity of 2,500 pounds per square foot.   Earth stabilization
and/or replacement shall be performed by Landlord as necessary to
meet this minimum requirement.

(c)   During the preparation of Tenant's Pad Area,
Landlord shall at its expense have an independent professional
soils engineering test laboratory monitor and certify the
preparation of Tenant's Pad Area in accordance with the independent
soils engineer's report referenced in Attachment "2" (II) above.
The greater of three in-place compaction tests per work day or one

2

in-place compaction test per 5,000 square feet of pad area must be completed.

(d)   On or before **May 15, 1996**, Landlord shall provide Tenant with:

(i)   An independent soils engineer's written certification that all pad work was completed in accordance with the Grading Plans and the Plans and Specifications. This report shall include the results of all compaction and other tests performed during the pad preparation phase and any tests performed prior to the date of such certification.

(ii) A surveyor's written elevation certification stating that Tenant's Pad Area is at the prescribed elevation within the stated tolerance of plus or minus one-tenth of a foot. This certification shall be based upon an "as-prepared" survey which shall accompany such certification and shall show thereon elevation shots taken on a 50-foot-grid minimum including pad perimeter and building corners. Promptly upon completion of the Site Work, Landlord shall cause its surveyor or engineer to designate the corners of the Land by means of standard surveying monuments.

(e)   Landscaping slopes and berms shall be set by Landlord to preserve the integrity of the slopes as determined by an independent soils engineer. However, in no case may the slope of a landscaping berm exceed 3 to 1 in turf areas, or 2 to 1 in ground cover and shrub areas.

(f)   Top soil excavated during grading of the Shopping Center shall be stockpiled by Landlord and made available for use during final landscaping operations including landscaping inside perimeter sidewalks around the Building, if found agronomically suitable by an independent soils analysis lab. Other excavated soil material shall be stockpiled and made available for use as backfill if required, but only if a soil report indicates it is suitable.

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

(g)   All material, including native and fill, within 3 feet of any surface of the building including foundation concrete, shall be nonexpansive with a plasticity index of 12 or less.   The material shall also have sufficient cohesion to stand vertically for 3 feet.   No oversize material or lumps greater than 6" in diameter will be allowed and not more than 15% of the material shall be greater than 2-1/2" diameter.

(h)   The Grading Plans shall not be materially changed by Landlord without the prior consent of Tenant, which consent shall not be unreasonably withheld or delayed.

(i)   All outlots or future building areas shall be rough graded and planted with grass seed.

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

0188422.01
12/13/95

## ATTACHMENT "4"

Grading Plans

Drawing No. C-3 entitled "Grading Plan" dated January 20, 1995
prepared by Sumner Schein Architects and Engineers, Inc.

Attachment "5"

Construction Schedule

| Landlord's Task | Completion Date |
|---|---|

1.  Construction of all-weather construction access to the Premises, staging area and curbcuts in Tenant's Preferred Area.    May 15, 1996

2.  Completion of Site Work including approval for all curbcuts.    May 15, 1996

3.  Installation of temporary electricity and other utilities.    May 15, 1996

4.  Landlord's delivery of the Land to Tenant.    May 15, 1996

5.  Construction and installation of permanent utilities including permanent telephone service.    August 15, 1996

6.  Construction and installation of storm water drainage.    September 15, 1996

7.  Construction and installation of paving (including heavy-duty paving) and curbing.    September 15, 1996

8.  Completion of landscaping at Shopping Center.    September 15, 1996

9.  Construction and installation of exterior lighting in the Shopping Center.    September 15, 1996

10. Construction and installation of pylon sign(s) identifying the Shopping Center.    September 15, 1996

11. Balance of Common Area grading.    September 15, 1996

1

[J:\013363\161\4bkao82x.W51]
[11/28/95 11:23am; WEITZEL_M]

Attachment "6"

Site Work Certification


To:  Circuit City Stores
     9950 Mayland Drive
     Richmond, Virginia  23233
     Attention:  Vice President-Real Estate


     Re: Circuit City Store/Holyoke Crossing
         Lease Agreement dated November, 1995

Ladies and Gentlemen:

     The undersigned, as Landlord under the Lease has caused
"delivery of the Land" to occur, and accordingly, completion of the
requisite Site Work, all in accordance with the terms of the Lease.
Specifically the undersigned hereby certifies that:   (i) the
grading of the Land and Common Areas necessary for Tenant to
construct its Improvements has occurred in accordance with the
Standards for Grading Work, attached as Attachment "3" to the
Lease, and Tenant's building pad has been prepared strictly in
accordance with the requirements of the Lease; (ii) the Staging
Area has been completed and (iii) an all-weather construction
access road to the Land no less than 24 feet width has been
prepared and is ready for your use.

     All conditions to be performed by Landlord precedent to
issuance of your building permit have been satisfied by the
Landlord, and we certify that all elements of the Site Work
required to be completed upon delivery of the Land and, therefore,
delivery of the Land have been satisfied in accordance with the
Lease.

                         O'CONNELL PROPERTIES, INC.



                         By: _____



                              2

Attachment "7"

Utilities Specifications

Landlord will provide the following temporary utilities to within five (5) feet of the Premises no later than the date for completion of such temporary utilities set forth in the Construction Schedule:

> water (2" line, with sufficient pressure that pumping is not necessary) and electric power (200 amps, 1-phase, 4-wire, 120 volts, with weatherproof and rainproof fused disconnect switch) for use by Tenant in its construction of the Improvements.

Landlord will provide the following permanent utilities to within five (5) feet of the Premises at Tenant's identified entry points no later than the date for completion of such permanent utilities set forth in the Construction Schedule:

> gas (if available), telephone, permanent electricity (adequate for 600-amp panel, 3-phase, 277/480 volt), sanitary sewer (6" line), domestic water (2" line), fire protection water (8" line, 50 pounds per square inch residual pressure, 2000 gallons per minute or at least sufficient capacity to service Tenant's sprinkler system without the need for any fire pump, as approved by Tenant's fire protection consultant).

1

ATTACHMENT "8"

Utility and Drainage Plans

Drawing No. C-4 entitled "Drawing Plan" dated January 20, 1995 and
Drawing No. C-5 entitled "Utility Plan" dated February 3, 1995
prepared by Sumner Schein Architects and Engineers, Inc.

Attachment "9"

Paving Specifications

1.   With respect to parking area and roadway surfacing:

(a)   Pavement design shall be based on a "Design Period" of twenty (20) years for the traffic indices specified by an independent civil engineer approved by Tenant and compensated by Landlord.

(b)   All pavement design shall be subject to review and approval by Tenant, and shall conform to the recommendations of an independent soils engineer selected and compensated by Landlord.

(c)   Consideration must be given to heavier use in main drives and service area.

2.   With respect to sidewalks and curbs:

(a)   Landlord shall provide and install all curbs and sidewalks including perimeter curbs and sidewalks.

(b)   All sidewalks and curbs shall be constructed of concrete and shall have a minimum slope of 1.5% and a maximum slope of 3.0% away from the Building.   All sidewalks and curbs shall be a minimum of four (4) inches thick, with a rough non-skid texture (as approved by the Landlord's architect with respect to the Common Area), over a suitable granular base.   Salt finish is not acceptable.

(c)   Entrance and access roads and other areas as required for suitable drainage, shall have six (6) inch curbs with 18-inch gutters; however, next to sidewalks and buildings when drainage is not a factor a straight curb six (6) inches (without gutters) above the finished paving shall be permitted. Parking lot islands and landscape enclosures shall be vertical barrier-type curbs and all integral-type curbs and gutters and vertical barrier-type curbs shall be concrete.   Extruded asphalt or concrete curbing may not be used.

1

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

       (d)   Curbs at all non-parking areas shall be painted red with an exterior flat red latex paint, receive a trowel finish and be designated "No Parking" by a contrasting paint color.

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

Attachment "10"

Shopping Center Lighting Specifications

Minimum design standards for lighting of the Shopping Center are as follows:

1.   The Developer shall prepare and submit plans showing the location and height of all light poles, fixtures, type of fixture shielding (if any), circuiting and details of the complete lighting arrangement and equipment.

2.   Illumination as measured at pavement shall be:

    a.   4.0 foot candles minimum maintained within 50' of Tenant's entry.

    b.   One and one-half (1 1/2) foot candles average maintained, measured at grade.

    c.   2.0 foot candles minimum maintained on entry drives.

3.   Twenty-five percent (25%) of the overall lighting shall be designated as security lighting (i.e., remains on from dusk to dawn). The security lighting layout and pattern shall be subject to Tenant's approval.

4.   Selection of fixture types shall be subject to Tenant's review and approval prior to design and circuiting.

5.   Landlord shall install a seven-day time switch to control all parking area lighting wired to a common house panel. All security lighting shall be placed on photo-cell switching.

6.   The control of parking area lights shall be accessible to Tenant's local store management due to late-night and holiday sales.

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

## ATTACHMENT "11"

Schematic Floor Plan and Elevation

Sheet No. VO1 (Drawing Description:  Elevations) and Sheet No. PO1 (Drawing Description:  Fixture Plan), both dated November 16, 1995 for Store No. /CCSI Project No. 3159 prepared by Schnee Architects, Incorporated.

0120080.01
11/20/95

# HOLYOKE CROSSING CONDOMINIUM

## MASTER DEED

_____, a _____ with its principal and usual places of business in Holyoke, Hampden County, Massachusetts (hereinafter referred to as the "Grantor"), being the sole owner of certain property in Holyoke, Hampden County, Massachusetts, described in Exhibit A attached hereto (the "Property"), by duly executing and filing this Master Deed, hereby submits the Property to the provisions of Chapter 183A of the General Laws of Massachusetts and proposes to create and hereby creates a condominium (the "Condominium"), to be governed by and subject to the provisions of Chapter 183A of the General Laws, as amended. The Grantor hereby declares as follows:

1.    Terms Defined.

The following words and phrases will have the following meanings in this Master Deed:

Association. The Holyoke Crossing Condominium Association, the organization of the Unit Owners of the Condominium.

Beneficial Interest. The percentage undivided interest in the Common Areas which is appurtenant to each Unit, as set forth on Schedule C hereto.

Board. The Board of Managers of the Association.

Buildings. The buildings described in Section 4 hereof which contain all the Units of the Condominium.

By-Laws. The By-Laws of the Association, as recorded in the Registry and as amended and/or restated of record from time to time.

Chapter 183A. Chapter 183A of the General Laws of The Commonwealth of Massachusetts, as amended from time to time.

Common Areas. The common areas and facilities of the Condominium as more specifically described in Section 6.

## EXHIBIT "D"

STORE FIXTURES

ALL STORAGE RACKING

ALL SECURITY SYSTEM ITEMS

TELEPHONES AND PAGING SYSTEMS

COMPUTER SYSTEM

OFFICE FURNITURE AND TRASH RECEPTACLES

BATTERY CHARGER

TRASH COMPACTOR

SIGNS (INTERIOR/EXTERIOR)

ANTENNA SYSTEM

ELECTRONIC SWITCHING

AIR COMPRESSOR (ROADSHOP)

SAFE

CONVEYOR

MEDECO CYLINDER LOCKS (5)

REFRIGERATOR AND MICROWAVE USED BY EMPLOYEES

TACK BOARDS

WATER COOLER

FIRE EXTINGUISHERS

AUDIO ROOM FIXTURES AND SWITCHGEAR

PICTURES

WAREHOUSE AND MATERIAL HANDLING EQUIPMENT (MOVABLE LADDERS, DOLLIES, ETC.)

TRACK LIGHTS (CANS ONLY, NOT TRACKS)

# EXHIBIT "E"

## SIGN PLANS AND CRITERIA





## EXHIBIT "F"

### PERMITTED ENCUMBRANCES

A.    Exclusive uses:  So long as Unit 1 is operated as a bookstore, the Premises shall not be used for the primary purpose of selling books, magazines, newspapers, other periodicals or books-on-tape, nor shall more than 2,000 square feet of sales area in the Premises be used for the sale of such items, unless otherwise agreed to by Tenant and the bookstore occupant of Unit 1.

B.    Permitted Title Exceptions;

1.    Rights of upper and lower riparian owners in and to the waters of the Tannery Brook and the natural flow thereof. Such riparian rights relate only to moving streams of water and do not give such riparian owners the "right of entry" onto the Shopping Center.

2.    Drainage Easement as set forth in an Order of Taking by Commonwealth of Massachusetts, dated April 17, 1965, and recorded in the Hampden County Registry of Deeds in Book 3103, Page 216 and Plan Book 98, Page 109.

3.    Easement as set forth in an Order of Taking by the City of Holyoke, dated January 30, 1975, and recorded in the Hampden County Registry of Deeds in Book 4096, Page 127. (See Book of Plans 157, Page 128).

4.    Permanent Slope Easement to the City of Holyoke as set forth in an instrument dated April 7, 1981 and recorded in the Hampden County Registry of Deeds in Book 5101, Page 119.

5.    Relocated utility easement referenced in Settlement Agreement Regarding Release of Deed Restriction and Relocation of Electric Line Easement between Holyoke Water Power Company, Mead Realty Group, Inc. and O'Connell Properties, Inc. as set forth in an instrument dated July 26, 1994 and recorded in Hampden County Registry of Deeds in Book 8959, Page 412; provided that Landlord covenants and agrees that, prior to delivery of the Land, all lines in the original easement area shall be removed from the Land and the easement shall be relocated, both in fact and of record, to locations in the Western and Southern perimeters of the Shopping Center which do not lie within Tenant's building pad or otherwise interfere with Tenant's construction and use of the Premises.

[J:\013363\161\4bkao82x.W51]
[12/01/95 10:10am; WEITZEL_M]

6. The Condominium Documents (in substantially the forms attached as Exhibit "K" to the Lease).

7. Any mortgage for which Tenant has received a non-disturbance agreement as provided in paragraph 21 of the Lease.

8. Real estate taxes and assessments not yet due and payable.

Notwithstanding anything contained in this Exhibit "F" to the contrary, nothing contained herein shall be construed to prohibit the exercise of the rights and privileges granted to the Tenant under the Lease including, but not limited to, Tenant's exclusive use rights set forth in paragraph 18 of the Lease.

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

## EXHIBIT "G"
## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT
### (Mortgage)

THIS AGREEMENT, dated the _____ day of _____,

199_____, between _____, a

_____ ("Mortgagee"), and CIRCUIT CITY

STORES, INC., a Virginia corporation ("Tenant").

### W I T N E S S E T H :

(a) Tenant has entered into a certain lease (the "Lease")

dated _____, _____ with

_____

("Landlord"), covering premises located within that certain

property known as _____ Shopping Center, located in

the City of _____, _____ County, _____,

and more particularly described in Schedule A hereto; and

(b) Mortgagee has made a loan to Landlord as evidenced and

secured by a Deed of Trust recorded _____, 199_____ in the

land records of _____ County, _____, in Book

_____ at page _____ (the "Mortgage"), encumbering the property

described in Schedule A; and the parties hereto desire to set forth

their agreement with regard to the priority of the Mortgage and the

effect thereof on Tenant and its leasehold interest in the

aforesaid premises, as set forth below.

NOW, THEREFORE, in consideration of the premises and of the

sum of One Dollar ($1.00) by each party in hand paid to the other,

the receipt of which is hereby acknowledged, the parties hereby

agree as follows:

1

1.   The Lease is and shall be subject and subordinate to the lien of the Mortgage insofar as it affects the real property of which the premises form a part, and to all renewals, modifications, consolidations, replacements and extensions thereof, to the full extent of the principal sum secured thereby and interest thereon.

2.   Tenant agrees that it will attorn to and recognize any purchaser at a foreclosure sale under the Mortgage, any transferee who acquires the premises by deed in lieu of foreclosure, the successors and assigns of such purchasers, as its Landlord for the unexpired balance (and any extensions, if exercised) of the term of the Lease upon the same terms and conditions set forth in the Lease.   Tenant agrees to send simultaneous notice to Mortgagee (or such purchaser or transferee) of any default by Landlord under the Lease.

3.   In the event that it should become necessary to foreclose the Mortgage, Mortgagee thereunder will not terminate the Lease nor join Tenant in summary or foreclosure proceedings so long as Tenant is not in default under any of the material terms, covenants, or conditions of the Lease, beyond any applicable cure period provided in the Lease.

4.   Mortgagee consents to the application of casualty and condemnation proceeds in accordance with paragraphs 15

2

and 16 of the Lease between Landlord and Tenant, whether or not the Mortgage is then foreclosed.

5.   In the event that Mortgagee (or a purchaser at foreclosure or a transferee under a deed in lieu of foreclosure) shall succeed to the interest of Landlord under the Lease, Mortgagee shall not be:

(a) liable for any act or omission of any prior lessor (including Landlord) or subject to any defense or offset against amounts coming due under the Lease except where offset is specifically permited by the Lease and such Mortgagee (or purchaser or transferee) has received written notice of same; or

(b) liable for the return of any security deposits unless delivered to Mortgagee; or

(c) bound by any rent or other periodic payments which Tenant might have paid for more than the current month to any prior lessor (including Landlord); or

(d) bound by any amendment or modification or voluntary termination of the Lease made without its consent, which consent shall not be unreasonably withheld or delayed.

6.   Notwithstanding anything contained herein to the contrary, it is expressly understood and agreed that in the event that Landlord defaults in the payment of the Tenant Improvement Allowance, as defined in the Lease, and Mortgagee acquires title to the Shopping Center by foreclosure or otherwise, Mortgagee shall become liable

3

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

for payment of the Tenant Improvement Allowance to Tenant, and Tenant shall otherwise be entitled to exercise its remedies for such default by Landlord, all in accordance with the terms of the Lease.

7.    This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, and their successors and assigns.

IN WITNESS WHEREOF, the parties hereto have executed these presents the day and year first above written.

ATTEST:                              CIRCUIT CITY STORES, INC.,
                                     a Virginia corporation

_____              By:_____
_____                 _____


ATTEST:                              COMPANY NAME

_____              By:_____
_____                 _____


Note: Attach appropriate notary blocks for the State.

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

## EXHIBIT "G"

## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

(Ground Lease)

THIS AGREEMENT, dated the _____ day of _____,
199____, between _____, a
_____ ("Ground Lessor"), and CIRCUIT CITY
STORES, INC., a Virginia corporation ("Tenant").

### W I T N E S S E T H :

(a) Tenant has entered into a certain lease (the "Lease")
dated _____, _____ with
_____
("Landlord"), covering premises located within that certain
property known as _____ Shopping Center, located in
the City of _____, _____ County, _____,
and more particularly described in Schedule A hereto; and

(b) Ground Lessor has entered into a Lease with Landlord as
evidenced and recorded _____, 199_____ in the land records
of _____ County, _____, in Book _____ at page
_____ (the "Ground Lease"), covering the property described in
Schedule A; and the parties hereto desire to set forth their
agreement with regard to the priority of the Ground Lease and the
effect thereof on Tenant and its leasehold interest in the
aforesaid premises, as set forth below.

1

NOW, THEREFORE, in consideration of the premises and of the sum of One Dollar ($1.00) by each party in hand paid to the other, the receipt of which is hereby acknowledged, the parties hereby agree as follows:

1.    The Lease is a sublease and shall be subordinate to the Ground Lease insofar as it affects the real property of which the premises form a part thereof.

2.    Tenant agrees that it will attorn to Ground Lessor and any successor to the Ground Lessor by deed or otherwise as its Landlord for the unexpired balance (and any extensions, if exercised) of the term of the Lease upon the same terms and conditions set forth in the Lease, in the event of a termination of the Ground Lease.

3.    In the event that it should become necessary to terminate the Ground Lease, Ground Lessor thereunder will not terminate the Lease nor join Tenant in summary proceedings so long as Tenant is not in default under any of the material terms, covenants, or conditions of the Lease, beyond any applicable cure period provided in the Lease.

4.    Ground Lessor consents to the application of casualty and condemnation proceeds in accordance with paragraphs 15 and 16 of the Lease between Landlord and Tenant, whether or not the Ground Lease has been terminated.

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

5.    In the event that Ground Lessor shall succeed to the interest of Landlord under the Lease, Ground Lessor shall not be:

(a) liable for any act or omission of any prior lessor (including Landlord); or

(b) liable for the return of any security deposits unless delivered to Ground Lessor; or

(c) bound by any rent or other periodic payments which Tenant might have paid for more than the current month to any prior lessor (including Landlord); or

(d) bound by any amendment or modification of the Lease made without its consent, which consent shall not be unreasonably withheld or delayed.

6.    Notwithstanding anything contained herein to the contrary, it is expressly understood and agreed that in the event that Landlord defaults in the payment of the Tenant Improvement Allowance, as defined in the Lease, and Ground Lessor terminates the Lease, Ground Lessor shall become liable for payment of the Tenant Improvement Allowance to Tenant, and Tenant shall otherwise be entitled to effect a Transfer all in accordance with the terms of the Lease.

7.    This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, and their successors and assigns.

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

IN WITNESS WHEREOF, the parties hereto have executed these presents the day and year first above written.


ATTEST:                          CIRCUIT CITY STORES, INC.,
                                 a Virginia corporation


_____   By:_____
_____      _____


ATTEST:                          COMPANY NAME


_____   By:_____
_____      _____



Note: Attach appropriate notary blocks for the State.


[J:\013363\161\4bkao82x.W51]
                                         [11/20/95 3:27pm; WEITZEL_M]

## EXHIBIT "H"

### MEMORANDUM OF LEASE

This Memorandum of Lease is made this _____ day of
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ , 199 _ _ _ , b e t w e e n
_____ , a
_____ (hereinafter referred to as "Landlord"),
and CIRCUIT CITY STORES, INC., a Virginia corporation (hereinafter
referred to as "Tenant").

### W I T N E S S E T H:

Landlord and Tenant have entered into a Lease (the "Lease")
dated _____ , 199___ , whereby Landlord has leased to
Tenant a portion of the real property (the "Property"),
_____ , _____ County, _____ ,
the legal description of which Property is set forth on Exhibit "A-
1" attached hereto.   The Lease contains provisions and rights
appurtenant to the Property, some of which are as follows:

I.    <u>Term</u>.   The term of the Lease is for a period of twenty-
      five (25) years, commencing on the Commencement Date (as
      established in the Lease based upon the substantial
      completion of the improvements upon the Property).
      Thereafter, Tenant has the right under the Lease to renew
      and extend the term of the Lease for five (5) successive
      periods of five (5) years each.

II.   <u>Exclusive Use Rights</u>.   The Lease provides that, so long
      as the leased premises are used for the sale of such
      products, subject to certain limited exceptions set forth
      in the Lease, Tenant shall enjoy the sole and exclusive
      privilege in the Shopping Center located on the Property
      to sell or rent consumer, office and automotive elec-
      tronics products (which include, but shall not be limited
      to, televisions, stereos, speakers and video recorders
      and players), computer hardware, cellular telephones,
      household appliances (which include, but shall not be
      limited to, refrigerators, freezers, stoves, microwave
      ovens, vacuum cleaners and dishwashers) and related
      goods, and the sale and installation of motor vehicle
      audio, stereo and telephone systems.

III.  <u>Successors</u>.   The covenants, conditions and agreements
      made and entered into by the parties hereto shall be
      binding upon and inure to the benefits of their
      respective heirs, administrators, executors,
      representatives, successors and assigns.

1

[J:\013363\161\4bkao82x.W51]
[11/20/95 4:07pm; WEITZEL_M]

IV.   Incorporation of Lease.  All terms and conditions of the
      Lease are hereby incorporated herein by reference as if
      fully set forth herein.

V.    Conflicts with Lease.  This Memorandum of Lease is solely
      for notice and recording purposes and shall not be
      construed to alter modify, expand, diminish or supplement
      the provisions of the Lease.  In the event of any
      inconsistency between the provisions of this Memorandum
      of Lease and the provisions of the Lease, the provisions
      of the Lease shall govern.


      IN WITNESS WHEREOF, this Memorandum of Lease has been duly
executed by the parties hereto as of the day and year first above
written.

Attest:                          a _____
                                   _____


By:_____         By:_____
      Secretary                  Name:_____
                                 Title:_____


                                 CIRCUIT CITY STORES, INC.,
Attest:                          a Virginia corporation


By:_____         By:_____
      Secretary                  Name:_____
                                 Title:_____



      Note: Attach appropriate notary blocks for the State.

                                        [J:\013363\161\4bkao82x.W51]
                                        [11/20/95 4:07pm; WEITZEL_M]

## EXHIBIT "I"

### COMMENCEMENT DATE AGREEMENT

THIS AGREEMENT, made as of this _____ day of _____, 19___, between _____ (herein called "Landlord"), and CIRCUIT CITY STORES, INC. (herein called "Tenant").

### W I T N E S S E T H:

WHEREAS, Landlord is the owner of certain premises situated in _____, _____ County, _____ (herein called the "Premises"); and

WHEREAS, by that certain lease dated _____ __, 19__ (herein called the "Lease"), Landlord leased the Premises to Tenant; and

WHEREAS, a memorandum or short form lease in respect of the Lease was recorded in the office of the Clerk of _____ County, _____, on the _____ day of _____, 19__, in Book _____ at Page _____; and

WHEREAS, Tenant is in possession of the Premises and the term of the Lease has commenced; and

WHEREAS, under Paragraph 25 of the Lease, Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease;

NOW, THEREFORE, Landlord and Tenant agree as follows:

1. The term of the Lease commenced on, and the Commencement Date (as such term is defined in the Lease) was, _____, 19__.  The term of the Lease shall expire on January 31, _____, unless Tenant exercises any option to extend the term of the Lease or unless the Lease terminates earlier as provided in the Lease.

2. The date of commencement of the first "Option Period" (as such term is defined in the Lease) shall be February 1, _____, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, _____, unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

3. The date of commencement of the second Option Period shall be February 1, _____, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

expire on January 31, _____ unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

4. The date of commencement of the third Option Period shall be February 1, _____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, _____ unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

5. The date of commencement of the fourth Option Period shall be February 1, _____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, _____ unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

6. The date of commencement of the fifth Option Period shall be February 1, _____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, _____ unless the Lease terminates earlier as provided in the Lease.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed the day and year first above written.

Attest or Witness:

_____

_____        By_____

Attest:                                 CIRCUIT CITY STORES, INC.

_____        By_____
Assistant Secretary                        Vice President

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

## EXHIBIT "J"

### INDEMNIFICATION AGREEMENT

This Indemnification Agreement is made this _____ day of
_____, 199__, between _____,
a _____ (hereinafter referred to as "Indemnitee")
and CIRCUIT CITY STORES, INC., a Virginia corporation (hereinafter
referred to as "Tenant").

### WITNESSETH

Landlord and Tenant have entered into a Lease (the "Lease")
dated _____ whereby Landlord has leased to Tenant a
portion of the real property located in _____,
_____ County, _____ (the "Shopping Center")
and Tenant has constructed on such real property a store premises
(the "Premises").

NOW, THEREFORE, in consideration of the payment of the Tenant
Improvement Allowance as defined in the Lease and other good and
valuable consideration, the receipt of which is hereby
acknowledged, the parties hereto agree as follows:

1.    The Tenant hereby indemnifies and agrees to hold the
Indemnitee harmless from any loss, payment, claim or expense as the
result of mechanics and materialmen filing liens or otherwise
making claims against Landlord's (or Indemnitee's) interest in the
Premises and the Shopping Center. In the event that any mechanic,
materialman or other claimant makes claim against the Premises or
Shopping Center based upon materials or services provided under
contract with the Tenant, the Tenant shall hold harmless and
protect the Indemnitee from any loss, payment, claim or expense
related thereto.

2.    The Tenant reserves the right to contest in good faith
the amount of any claim or lien assessed against the Premises or
the Shopping Center by any of such claimants; provided, however,
should the holder or holders of such claim or lien attempt to

[J:\013363\161\4bkao82x.W51]
[11/20/95 4:07pm; WEITZEL_M]

enforce their lien by foreclosure by any other means, the Tenant shall bond around, pay or remove such lien by any manner reasonably necessary to protect Landlord's (or Indemnitee's) interest in the Premises and the Shopping Center. This indemnity and hold harmless shall not apply to any liens or claims caused by the Landlord or Landlord's agents.

EXECUTED this _____ day of _____, 199__.

**LANDLORD**

_____

By: _____
Name: _____
Title: _____

**TENANT**

CIRCUIT CITY STORES, INC.,
a Virginia corporation

By: _____
Name: _____
Title: _____

[J:\013363\161\4bkao82x.W51]
[11/20/95 4:07pm; WEITZEL_M]