## EXHIBIT "K"

Condominium Master Deed and By-Laws

[J:\013363\161\4bkao82x.W51]
[11/20/95 3:27pm; WEITZEL_M]

11/01/1996  10:43    4135360134    DUCHARME,MORIARTY    PAGE  02

96 71/501

0249809.01

HAMPDEN COUNTY
REGISTRY OF DEEDS
RECEIVED & RECORDED
OCT 31 1996
4 D'C 00 A M
DONALD E. ASHE, REGISTER

## HOLYOKE CROSSING CONDOMINIUM

### MASTER DEED

Holyoke Crossing Limited Partnership, a Massachusetts limited partnership with its principal and usual places of business in Holyoke, Hampden County, Massachusetts (hereinafter referred to as the "Grantor"), being the sole owner of certain property in Holyoke, Hampden County, Massachusetts, described in Exhibit A attached hereto (the "Property"), by duly executing and filing this Master Deed, hereby submits the Property to the provisions of Chapter 183A of the General Laws of Massachusetts and proposes to create and hereby creates a condominium (the "Condominium"), to be governed by and subject to the provisions of Chapter 183A of the General Laws, as amended. The Grantor hereby declares as follows:

1.    Terms Defined.

The following words and phrases will have the following meanings in this Master Deed:

Association. The Holyoke Crossing Condominium Association, the organization of the Unit Owners of the Condominium.

Beneficial Interest. The percentage undivided interest in the Common Areas which is appurtenant to each Unit, as set forth on Exhibit B hereto.

Board. The Board of Managers of the Association.

Buildings. The buildings described in Section 4 hereof which contain all the Units of the Condominium.

By-Laws. The By-Laws of the Association, as recorded in the Registry and as amended and/or restated of record from time to time.

Chapter 183A. Chapter 183A of the General Laws of The Commonwealth of Massachusetts, as amended from time to time.

Common Areas. The common areas and facilities of the Condominium as more specifically described in Section 6.

0249809.01
9/27/96

# HOLYOKE CROSSING CONDOMINIUM

## MASTER DEED

Holyoke Crossing Limited Partnership, a Massachusetts limited partnership with its principal and usual places of business in Holyoke, Hampden County, Massachusetts (hereinafter referred to as the "Grantor"), being the sole owner of certain property in Holyoke, Hampden County, Massachusetts, described in Exhibit A attached hereto (the "Property"), by duly executing and filing this Master Deed, hereby submits the Property to the provisions of Chapter 183A of the General Laws of Massachusetts and proposes to create and hereby creates a condominium (the "Condominium"), to be governed by and subject to the provisions of Chapter 183A of the General Laws, as amended.  The Grantor hereby declares as follows:

1.   Terms Defined.

The following words and phrases will have the following meanings in this Master Deed:

Association.  The Holyoke Crossing Condominium Association, the organization of the Unit Owners of the Condominium.

Beneficial Interest.  The percentage undivided interest in the Common Areas which is appurtenant to each Unit, as set forth on Exhibit B hereto.

Board.  The Board of Managers of the Association.

Buildings.  The buildings described in Section 4 hereof which contain all the Units of the Condominium.

By-Laws.  The By-Laws of the Association, as recorded in the Registry and as amended and/or restated of record from time to time.

Chapter 183A.  Chapter 183A of the General Laws of The Commonwealth of Massachusetts, as amended from time to time.

Common Areas.  The common areas and facilities of the Condominium as more specifically described in Section 6.

Common Expenses. The expenses of operation, administration, maintenance, repair and replacement of the Common Areas (other than the Limited Common Areas) and the other expenses of operating and administering the Condominium and the Association, as described in and subject to the limitations set forth in Article V of the By-Laws and by Chapter 183A.

Condominium. The premises comprising the Property, the Buildings and all other improvements on the Property, including the Units and the Common Areas described herein, and all rights and easements appurtenant thereto.

Condominium Documents. This Master Deed, the Recorded Plans, the By-Laws, and the Rules and Regulations.

Development Rights. All rights reserved by the Grantor in Section 9 hereof.

Exclusive Use Restrictions. Restrictions on use of the Units reserving specific uses for Owners of one or more but not all Units, as further described in Section 10.3 hereof.

Floor Plans. The plans recorded herewith which show the layout, location, Unit designations and dimensions of the Units, and bear the certification required by Section 8 of Chapter 183A, as such plans are amended or added of record from time to time.

Grantor. Holyoke Crossing Limited Partnership and its successors and assigns.

Limited Common Areas. Areas and facilities exterior to the Units reserved for the exclusive use of Owners of one or more but not all Units, as further described in Section 7 hereof.

Majority of Unit Owners. Unit Owners holding more than 50 percent of the aggregate Beneficial Interests of the Condominium.

Manager. A member of the Board of Managers of the Association.

Master Deed. This Master Deed, as amended and/or restated of record from time to time.

Percent (%) of Unit Owners. With reference to any given percentage (%), the Owners of that percent of aggregate Beneficial Interests.

Property. The land described in Section 3 of the Master Deed.

Recorded Plans. The Site Plan and the Floor Plans.

-2-

Registry.  The Hampden County Registry of Deeds.

Rules and Regulations.  The Rules and Regulations adopted from time to time by the Board.

Site Plan.  The site plan recorded herewith which shows the location of the Building and other improvements, access ways, and easements on the Property, as amended of record from time to time.

Unit.  A unit (as defined in Chapter 183A) in the Condominium, more specifically described in Section 5 hereof.

Unit Deed.  A deed to a particular Unit complying with Section 9 of Chapter 183A.

Unit Owner.  An owner of record of a Unit.

2.    Name.

The name of the Condominium shall be:  HOLYOKE CROSSING CONDOMINIUM.  The shopping center operated at the Condominium shall be known as Holyoke Crossing for all purposes, including signage, and the name shall not be changed without the approval of all Unit Owners.

3.    Description of Property.

The Property is that parcel of land situated on Lower Westfield Road and Holyoke Street, Holyoke, Hampden County, Massachusetts, and described in Exhibit A, provided however that Grantor reserves its rights with respect to the Kiosk Area as set forth in Section 9.3 below.

4.    Description of Buildings.

The Condominium contains two buildings of steel frame construction containing seven (7) Units.  The Buildings are located as shown on the Site Plan.  Building One consists of four (4) Units, one (1) two-story Unit (designated Unit 1) and three (3) one story Units (designated Units 2 through 4).  Building Two is a one-story building containing three (3) Units (designated Units 5 through 7).

5.    Description of Units.

The location and designation of each Unit, a statement of its approximate interior area, appurtenant Limited Common Areas, other appurtenant rights, and the immediate Common Area to which it has access are set forth on Exhibit B hereto.

The boundaries of the Units with respect to the floors, ceiling, walls, doors and windows thereof are as follows:

(a)    Floors: The upper surface the subflooring; or if there is no subflooring, the plane of the upper surface of the floor joists.

(b)    Ceilings: The plane of the lower surface of the ceiling joists.

(c)    Interior Building Walls between Units: The plane of the interior surface of the furring strips; absent furring strips, the plane of the interior surface of the wall studs.

(d)    Exterior Building Walls, Doors and Windows: As to exterior building walls, the plane of the interior surface of the furring strips or of the exterior surface of the drywall or plaster; as to doors, the exterior surface thereof; as to windows, the exterior surface of the glass, the window sashes and frames.

Each Unit shall have appurtenant thereto, subject to this Master Deed, the By-Laws and the Rules and Regulations, the rights and easement to use, in common with the other Units, all Common Areas, except for the Limited Common Areas appurtenant only to other Units and except for the pylon sign described in Section 6(f) below. Each Unit Owner shall install and maintain, at its sole expense, a sign panel on the pylon sign as set forth on Exhibit C attached hereto.

Each Unit shall have appurtenant thereto, subject to this Master Deed, the By-Laws and the Rules and Regulations, the exclusive right and easement to use certain portions of the Common Areas designated as "Limited Common Areas" as set forth in Section 7 hereof.

6.    Description of Common Areas.

The Common Areas of the Condominium shall consist of the entire Condominium, including all parts of the Buildings and improvements, other than the Units, and shall include, without limitation, the following, subject, however, to the rights of Grantor with respect to the Kiosk Area as set forth in Section 9.3 below:

(a)    The Property;

(b)    All foundations, structural columns, girders, beams, supports, exterior walls, common walls, stairways, and roofs;

(c)    All land, walkways, driveways, parking areas, storm water detention ponds, lawn, gardens, exterior benches, and other improved and unimproved areas not within the Units;

(d)     The central service installations, storm water drainage system, trash collection equipment, utility rooms, and all other apparatus and installations in or about the Buildings for common use or necessary or convenient to the existence, maintenance or safety of the Buildings (but not including equipment appurtenant to and servicing a single Unit);

(e)     The pylon sign located as shown on the Site Plan;

(f)     The portions of the loading dock(s) located outside of the Units and the loading areas adjacent to such loading docks as shown on the Site Plan;

(g)     All sewer and drainage pipes, and all conduits, pipes, wires, ducts, flues, plumbing, cables, utility lines and installations and other utility systems and facilities wherever located on the Property which serve more than one Unit;

(h)     All sewer and drainage pipes, and all conduits, pipes, wires, ducts, flues, plumbing, cables, utility lines and installations and other utility systems and facilities located outside of a Unit which serve only one Unit; and

(i)     All other items listed as Common Areas in Chapter 183A and located in the Condominium.

7.     Limited Common Areas.

The portions of the Common Areas set forth in Sections 6(b), 6(f) and 6(h) above are hereby designated Limited Common Areas, and each such Limited Common Area shall be appurtenant to the Unit(s) served by the same as described on Exhibit B. Except as set forth in Section 24, the Association shall maintain, repair, replace, and insure all Limited Common Areas provided that the entire cost of such maintenance, repair, replacement and insurance, including without limitation a management fee equal to 8% of such costs (other than insurance), shall be paid by the Unit Owner of the Unit to which the Limited Common Area in question is appurtenant (such cost to be reasonably allocated by the Board among the appropriate Unit Owners if the cost is for Limited Common Areas appurtenant to more than one Unit). All payments by Unit Owners on account of Limited Common Areas shall be paid within thirty (30) days after billing by the Board to the Unit Owner. Any such maintenance, repair or replacement, the cost of which shall exceed $5,000, shall be subject to a competitive bidding process except in cases of emergency. The Board shall, to the extent reasonable, award the contracts for such work to the low bidder in such process.

Each Unit Owner shall have the right, with the consent of the Board (which shall not be unreasonably withheld) to install, operate, maintain and repair (i) HVAC equipment on the roof of its Unit, (ii) an electric transformer and trash compactor at locations within the

Common Areas reasonably designated by the Board, and (iii) telecommunications antennas on the roof of its Unit or another location within the Common Areas reasonably designated by the Board. All such HVAC equipment, transformers and antennas shall be installed, maintained, repaired and operated by the Unit Owner in accordance with standards for a first-class shopping center, including reasonable requirements established by the Board concerning such matters as aesthetic appearance and non-interference with other Unit Owners and their tenants.

8.    Site and Floor Plans.

The Recorded Plans showing the layout, location, Unit numbers and dimensions of the Units, stating the name of the Buildings and bearing the verified statement of a registered architect or engineer certifying that the Recorded Plans fully and accurately depict the layout, location, Unit number and dimensions of the Units as built, have been recorded with the Registry simultaneously with the recording hereof.

9.    Reservation of Rights by Grantor.

9.1    General Reservation of Right. The Grantor hereby reserves the Development Rights and the rights with respect to the Kiosk Area set forth in this Section and any other general development rights set forth in this Master Deed. All Unit Owners, and all persons now or hereafter claiming an interest in a Unit through a Unit Owner, including, without limitation, all tenants and all holders of mortgages on Units, shall be subject to and bound by the provisions of this Section. The Grantor may exercise each of the Development Rights and the rights with respect to the Kiosk Area at any time, and from time to time, without the consent of any Unit Owner or of any holder of a mortgage on a Unit, subject to and in accordance with the terms and conditions of this Section 9.

9.2    Reservation of Specific Development Rights. Until the date 120 days after all Units have been conveyed by the Grantor to Unit purchasers not affiliated with the Grantor, the Grantor hereby reserves the following specific Development Rights:

(a)    The right to grant or reserve in the future other rights, easements or restrictions over the Common Areas of the Property (other than the Limited Common Areas) which the Grantor deems appropriate or advisable, and to which the interests of all Unit Owners shall be subject, including without limitation easements over the Common Areas (other than the Limited Common Areas) for access and utility services to any premises adjacent to the Property, provided only that, unless the affected Unit Owner consents thereto, such grants or reservations do not materially adversely affect access to a Unit, or the visibility of a Unit from the parking areas or adjacent public ways, materially alter the layout of the parking areas or otherwise materially adversely interfere

with the use of the Units or Common Areas for their intended purposes by the Unit Owners or any tenant;

(b)     The right to enter any Unit upon reasonable notice and at reasonable times, to perform such development work, including, without limitation, utility and mechanical system installation and repairs, and take such actions as the Grantor deems necessary or appropriate for the exercise of the Development Rights or for the benefit of other Unit Owners, provided, however, that any such action shall not materially adversely interfere with the use and occupancy of the Unit by the Unit Owner or any tenant and further provided that Grantor provides the Unit Owner or any tenant with an indemnification against liability arising out of such action and evidence of insurance coverage, both on terms reasonably acceptable to such Unit Owner or tenant, as the case may be;

(c)     The right to amend and/or restate any of the Condominium Documents from time to time by recording with the Registry an amendment thereto and/or a restatement thereof, with such changes as are necessary or desirable for any of the following reasons, but subject to the limitations set forth below:

   (i)     to satisfy the provisions of the Condominium Documents:

   (ii)    to induce any entities to make, purchase, sell, insure or guarantee first mortgage loans on the Units;

   (iii)   to bring the Condominium Documents into compliance with Chapter 183A;

   (iv)    to correct typographical or clerical errors in the Condominium Documents; and

   (v)     to make such technical and other non-material changes to the Condominium Documents as the Grantor deems appropriate to develop the Condominium.

In furtherance of the foregoing, the Grantor hereby reserves, and each Unit Owner hereby grants to the Grantor, a power coupled with an interest to execute, deliver, and record such amendments and/or restatements on behalf of such Unit Owner as proxy or attorney-in-fact, as the case may be. Each deed, mortgage, or other instrument affecting a Unit and the acceptance thereof, shall be deemed to be an acknowledgment of and consent to the reservation of the power of the Grantor to execute, deliver, and record such amendments and/or restatements. The right of the Grantor to amend the Condominium Documents for reasons (i) through (v) above shall be deemed to have been

assigned to the Board as of the date 120 days after all Units have been conveyed by Grantor to Unit purchasers not affiliated with the Grantor. Notwithstanding the foregoing, any amendment which alters any boundary of a Unit or materially alters the boundary of the Condominium, access to a Unit, visibility of a Unit from the parking areas or adjacent public ways, the Limited Common Area appurtenant to a Unit, the Beneficial Interest of any Unit, the purposes for which a Unit may be used, the financial obligations of any Unit Owner under the Condominium Documents or the value of any Unit, shall also require the consent of the Owner(s) of the affected Unit or Units. Notwithstanding the foregoing, unanimous consent of the Unit Owners is required for any amendment to this Master Deed that would reduce the parking ratio set forth in Section 13 hereof, that would permit the construction of any additional buildings at the Condominium or that would reserve any additional privilege or right to Grantor not previously reserved to Grantor.

(d)     Any affected Unit Owner shall be deemed to have consented to any proposed action by Grantor under this Section 9 if such Unit Owner does not provide written objection to such action to Grantor, stating the grounds for objection in reasonable detail, within 10 business days of receipt of notice of the proposed action.

9.3     Kiosk Area.   Notwithstanding anything in this Master Deed to the contrary, Grantor does hereby also expressly reserve to itself all rights in the portion of the Property shown as the Kiosk Area on the Site Plan, including but not limited to the exclusive right to improve, and use, lease, license, or sell the Kiosk Area, provided however the Kiosk Area shall at all times be used either for public parking or as a one-story kiosk structure used for banking purposes or other retail uses which are not Forbidden Uses or Exclusive Uses, and any such structure shall be kept in good condition and repair. Grantor's reserved rights shall include easements to use the Common Areas for access and parking in connection with the Kiosk Area and from time to time to install, maintain, repair and use pipes, wires, ducts, flues, cables, conduits and public utility lines in locations reasonably approved by the Board within the Common Areas, subject to compliance with Section 11 below. All utilities provided to the Kiosk Area shall be separately metered and not included in Common Expenses, and all associated signage shall be within the Kiosk Area.

Grantor shall have the right, but not the obligation, at any time and from time to time, to grant and convey, by appropriate instrument or instruments, the entire interest of Grantor in and to the Kiosk Area, subject to any lease or license, to anyone whomsoever, including but not limited to the Association, provided, however, that if such conveyance is made to the Association, the consideration thereof shall not exceed one ($1.00) dollar, and the Association shall be obligated to accept such conveyance and Grantor's interest in any such lease or license.

-8-

10.   Use of the Units.

10.1   In General.   The Units are intended only for retail and reasonably appurtenant purposes, subject to applicable zoning and other governmental regulation and to the requirements of this Section 10.

10.2   Forbidden Uses.   A Unit shall not be used in whole or in part for any of the following:

1.   Medical or employment offices, travel agencies, real estate agencies or other office uses (other than the office uses incidental to a store selling goods and/or services as permitted hereunder and office areas as may be reasonably needed in connection with the operation of the Condominium); or any use not involving the sale of goods, wares, merchandise, food or beverages to the public at retail;

2.   Any business furnishing care for children without the supervision or involvement of a parent or guardian;

3.   Any unlawful use;

4.   Any business principally selling or displaying goods or merchandise not in stock at its premises;

5.   Repair or service center, or service use offering services to the general public or any similar use consisting of more than 3,000 square feet of leaseable floor area (it being understood that the foregoing shall not prohibit the sale, installation or servicing of car stereos and telephones nor a facility for repair of products sold at the premises incidental to an otherwise permitted retail use);

6.   Auditorium, meeting hall, church or other place of public assembly (it being understood that the foregoing shall not prohibit any public lectures, celebrity appearances or similar events customary for stores in first class shopping centers);

7.   Bingo, or betting parlor;

8.   Repair, sale, lease or display of cars, trucks, boats, recreational vehicles, trailers or mobile homes (new or used) (it being understood that the foregoing shall not prohibit the sale, installation or servicing of car stereos and telephones);

9.   Animal clinic;

10.    Medical clinic;

11.    Health club, spa, gymnasium or sporting event or other exercise or sports
       facility;

12.    Gas station or car wash;

13.    So-called "head shops"; or tattoo parlor;

14.    Hotel, motel, sleeping apartments/lodging rooms or living quarters;

15.    Any business or use that emits offensive odors, fumes, dust or vapors; or any
       business or use which emits loud noise or sounds which are reasonably
       objectionable (including without limitation any speaker or public address
       system aimed at or reasonably audible from the Common Areas); or any use
       which creates a hazard to the health or safety of Unit Owners, tenants, or their
       agents, employees, tenants, licensees, or invitees;

16.    Indecent, immoral, illegal or pornographic purposes or uses or any activity of a
       type not generally considered appropriate for a first class suburban retail
       shopping center conducted in accordance with the highest standards of
       operation such as a massage parlor; adult bookstore or store selling or
       exhibiting pornographic materials (it being understood that the foregoing shall
       not prohibit the sale of books, publications, recordings, software or other
       materials customarily sold in first class shopping centers);

17.    Bar, pub, tavern, or manufacture or sale of any intoxicating or alcoholic
       beverages;

18.    Any restaurant, delicatessen or the like (it being understood that the foregoing
       shall not prohibit a coffee shop or cafe incidental to uses otherwise permitted
       hereunder);

19.    Bowling alley; arcade, amusement center, pinball or computer gameroom or
       other entertainment facility (it being understood that the foregoing shall not
       prohibit the operation or display of electronic games sold at the premises);
       carnival, amusement park or circus; skating rink; or billiard room;

20.    Nightclub, ballroom, music or dance hall or discotheque;

21.   Warehouse for storage of goods not intended to be sold on or from the premises (other than storage areas as may be reasonably needed in connection with the operation of the Condominium);

22.   Bailbondsman;

23.   Central laundry, dry cleaning plant, or laundromat; or dry-cleaning business;

24.   Lumberyard;

25.   Blood bank; mortuary; or funeral parlor;

26.   Theater (live or movie);

27.   Beauty school, barber college or reading room; or any training school or educational facility (except where incidental to uses permitted hereunder);

28.   Auction, liquidation, going out of business, fire, bankruptcy sales or the like (unless directed by a court order);

29.   Flea market; "second-hand" store or army, navy or governmental "surplus" store or the like;

30.   Any business or use operated on any basis other than a full-time basis, during normal business hours, on at least a Monday through Saturday basis (and no such business or use shall be operated on a part-time basis [i.e., for only a portion of the week or month]);

31.   Any use that would cause the Condominium's insurance to be canceled, suspended or non-renewed or, until the Tenant has agreed to pay the increase, which would increase the Condominium's insurance premiums; and

32.   Manufacturing purposes

10.3   Exclusive Uses.  No Unit shall be used in violation of the Exclusive Use Restrictions.  The initial Exclusive Use Restrictions are set forth in Exhibit D attached hereto and shall be considered a part of the Rules and Regulations.  The Board in its discretion may, from time to time upon the request of any Unit Owner and after at least thirty (30) days' prior notice to each Unit Owner, impose additional Exclusive Use Restrictions to the extent that such restrictions limit the primary use of a Unit (i.e., do not restrict incidental uses) and do not conflict with (i) the Condominium Documents, (ii) any then current actual use of a Unit (provided such use is a permitted use under the Condominium Documents and any other restrictions applicable to the Unit), or (iii) any other Exclusive Use Restriction then in force

-11-

and (iv) the last sentence of this Section 10.3. The Board shall also delete Exclusive Use
Restrictions from time to time at the request of any Unit Owner but only with the consent of
the Unit Owner benefited by the Exclusive Use Restriction being deleted. Any changes in
Exclusive Use Restrictions pursuant to the provisions of this Section 10 shall be promptly
promulgated by the Board as an amendment to the Rules and Regulations and shall be for the
benefit of the Owners of all Units and the Association and shall be enforceable by the Board
and by any Unit Owner benefited by the applicable restriction. The Board and any Unit
Owner benefited by the applicable restrictions shall be entitled to all remedies available
under applicable law, including but not limited to a decree compelling specific performance
to comply with any restrictions pursuant to this Section 10. All costs of enforcement shall be
assessed to the Unit Owner of any Unit(s) determined by the Board to be in violation of the
Exclusive Use Restrictions. Notwithstanding the foregoing, a Unit which is subject to a lease
executed prior to the date of this Master Deed or which is subject to any other lease approved
by the Board shall only be subject to additional Exclusive Use Restrictions imposed after the
date of this Master Deed to the extent provided in such lease.

     10.4   Restrictions on Use.

     (a)    A Unit shall be used only in conformity with this Master Deed, the By-Laws
and the Rules and Regulations. Any use of a Unit in violation of the Master Deed, By-Laws,
or Rules and Regulations shall be cured promptly by and at the expense of the Unit Owner of
the Unit in violation.

     (b)    Any use of a Unit in violation of any applicable laws, regulations and
government orders shall be cured promptly by and at the expense of the Unit Owner of the
Unit in violation. Unit Owners shall have the sole responsibility for obtaining any applicable
consents, permits, licenses or the like necessitated by the specific use of their Units.

     (c)    A Unit Owner may lease a Unit or any portion thereof. Any lease or other
occupancy agreement for all or any portion of a Unit shall be in writing and shall provide that
the lease is subject to the Condominium Documents. The provisions of the Condominium
Documents shall be enforceable directly against any tenant by the Board or with respect to
Exclusive Use Restrictions, the Unit Owner benefited by the restriction. Each Unit Owner
shall, immediately upon execution of such lease or other occupancy agreement, provide
written notice to the Board of the name or names of any tenants or occupants of its Unit.

     (d)    All signs, logos, and exterior windows shall be illuminated from dusk until at
least 12:00 a.m. unless the Association permits signs and signage to be illuminated for
shorter hours.

     10.5   Application. The restrictions in this Section 10 shall be for the benefit of the
Owners of all Units and the Association and shall be enforceable by the Board and by any
Unit Owner benefited by the applicable restriction and except as expressly provided above

are intended to "run with the Unit" and to be enforceable and valid until August 28, 2094, as such term may be extended at such time or times and in such manner as permitted or required by law for the continued enforceability thereof. All costs of enforcement shall be assessed to the Unit Owner of any Unit(s) determined by the Board to be in violation of the restrictions set forth in this Section 10. No Unit Owner shall be liable for any breach of the provisions of this Section except those which occur during its ownership of the Unit.

11.   Construction Work and Modification of Buildings.

Interior modifications may be made to any Unit or Limited Common Area by the Unit Owner unless the modifications will materially adversely affect the systems or structure of a Building, in which case the modifications may be made only with the unanimous consent of the affected Unit Owners within such Building (such consent not to be unreasonably withheld or delayed). Exterior modifications, including exterior signage, may be made only with the consent of the Board, such consent not to be unreasonably withheld or delayed. The Board's withholding of consent shall be deemed reasonable only if the modification is materially inconsistent with the then existing architecture of the Condominium, if the quality of construction is inferior to that which it is replacing, or if the modification adversely affects any other part of the Condominium in any material respect. The Board (and any Unit Owner having an approval right) shall be deemed to have approved proposed modifications if the same are not disapproved, with reasons specified, within ten (10) days after receipt of conceptual plans and specifications for the proposed work. No Unit Owner shall have the right to enlarge any Building or to erect additional buildings on the Property. Notwithstanding the foregoing, installation or modifications of exterior signage shall be subject to the terms and provisions of Exhibit C attached hereto.

The Unit Owner performing any interior or exterior modifications shall be responsible for obtaining all government approvals and permits necessary to construct such modifications, shall maintain liability insurance in amount satisfactory to the Board and shall indemnify, defend and hold harmless the Association and all other Unit Owners for any loss, damage, cost, injury or claim (including, without limitation, reasonable attorneys fees and costs) of or to any person or to the property of any person resulting from or arising out of any such modification. Any Unit Owner performing any interior or exterior construction performed after completion of initial construction of the Units shall, at its sole cost: (i) erect or cause to be erected, adequate, painted construction barricades to be maintained until such construction is substantially completed; (ii) require that all construction equipment or machinery use only Common Areas reasonably designated by the Board; (iii) daily remove all construction material and debris from the Common Areas (other than those portions of the Common Area located within the construction barricade); (iv) conduct such construction in a manner which will not materially interfere with the use of the Units for their intended purposes and (v) install temporary direction signage in the immediate area of the construction.

-13-

No exterior construction shall be permitted at the Condominium during the months of November and December except for emergency repairs and minor construction activities such as completion of punchlist items, and during such months any staging or storage areas must be relocated to the interior of the Buildings or to portions of the Common Areas reasonably designated by the Board behind the Buildings, and except as set forth above only interior construction shall be performed during such time period.

12.    Subdivision or Consolidation of Units.

Subject to Section 11 and to the terms of this Section 12, a Unit Owner may at any time divide its Unit into two or more Units, or combine two or more adjacent Units which are in common ownership, without further consent or approval of the Board or any other Unit Owner under the Condominium Documents, provided that there shall be no change in the outer boundaries, aggregate Beneficial Interest, Limited Common Areas, or signage of the Units being subdivided or combined.

No such division or consolidation shall become effective until notice is delivered to the Board and to all Unit Owners that such division or consolidation is to take place, and until the Unit Owner proposing such division or consolidation has caused to be recorded an amended Master Deed and amended Floor Plans, showing the Units created thereby, at the Registry. Such amendment shall indicate the Unit(s) created and identify their Beneficial Interest and appurtenant Limited Common Areas and signage rights. Such amendment shall comply in all respects with the requirements of Chapter 183A. The Unit Owner dividing its Unit, or combining Units, shall bear all costs and expenses of recording and any other expenses connected with such division or consolidation. The Board shall join in any such amended Master Deed.

The acceptance and recording of a Unit Deed by a Unit Owner and the recording of a mortgage at any time on any Unit shall constitute the assent of such Unit Owner and mortgagee to any such amended Master Deed. Each Unit Owner and mortgagee shall take title to a Unit subject to the right of each and every other Unit Owner to divide its Unit, or combine adjacent Units, by recording, on behalf of all Unit Owners and mortgagees, an amended Master Deed and amended Floor Plans. Each Unit Owner, and mortgagee, by accepting and recording its Unit Deed or mortgage, acknowledges and accepts the provisions of this Section 12 and consents to any such future amendment to the Master Deed. The recording of an amended Master Deed pursuant to this Section 12 shall not require compliance with the consent requirements of Section 14. Notwithstanding the foregoing, each Unit Owner and each mortgagee, by the recording of its Unit Deed or mortgage, respectively, agrees to execute any and all documentation reasonably requested in connection with any division or combination of Units hereunder.

Any Unit Owner dividing its Unit or combining Units agrees that all construction work in connection therewith shall be subject to the provisions of Section 11.

-14-

13.    Parking.

There shall be no fewer than 623 parking spaces at the Condominium. Parking spaces shown on the Site Plan as employee parking shall be designated for the exclusive use of employees of the Unit Owners or their lessees. All employees of Unit Owners or their tenants shall park only in such designated spaces, and all leases and occupancy agreements for all or any portion of a Unit shall so provide.

14.    Amendment of the Master Deed.

This Master Deed may be amended by vote of at least 75% in number and in interest of all Unit Owners, cast in person or by proxy at a meeting duly held in accordance with the provisions of the By-Laws. In lieu of a meeting, any amendment may be approved in writing, after notice to all Unit Owners, by 75% in number and in interest of all Unit Owners. This Master Deed may also be amended by the Grantor pursuant to rights reserved in Section 9. No amendment shall be effective until recorded in the Registry. Any amendment which alters any boundary of a Unit or materially alters the boundary of the Condominium, access to a Unit, visibility of a Unit from the parking areas or adjacent public ways, the Limited Common Area appurtenant to a Unit, the Beneficial Interest of any Unit, the purposes for which a Unit or the Common Areas may be used, the financial obligations of any Unit Owner under the Condominium Documents or the value of any Unit, or which would alter the rights or obligations of a tenant of a Unit under a lease executed prior to notice of the amendment, shall also require the consent of the Owner(s) of the affected Unit or Units (including, in the case of any additions to the Limited Common Area appurtenant to any Unit, the consent of all Unit Owners of abutting Units). Notwithstanding the foregoing, unanimous consent of the Unit Owners is required for any amendment to this Master Deed that would change the name of the Condominium, require illumination of signage, logos or exterior windows after 12:00 a.m. or impose more restrictive signage requirements than set forth on Exhibit C, that would reduce the parking ratio set forth in Section 13 hereof; that would permit the construction of any additional buildings at the Condominium; that would change the voting or approval rights of any Unit Owner, or that would reserve any additional privilege or right to Grantor not previously reserved to Grantor. Any Unit Owner shall be deemed to have consented to any proposed amendment if such Unit Owner does not provide written objection to such amendment to the Unit Owner(s) proposing the amendment within 10 business days of receipt of notice of such proposed amendment. No amendment which would render this Master Deed inconsistent or contrary to any provision of Chapter 183A shall be of any force unless the same has been assented to in writing by all the then Unit Owners. No action to challenge the validity of an amendment adopted pursuant to this Section 14 or to Section 9 may be brought more than one month after the recording of the amendment.

-15-

Until the date on which the Grantor ceases to own any Unit (or interest in the Kiosk Area), no amendment which impairs any Development Rights of the Grantor (or Grantor's rights with respect to the Kiosk Area) shall be of any effect unless consented to of record by the Grantor.

15.    Condominium Unit Owner's Association.

The Association has been formed as an unincorporated association through which the Unit Owners will manage the Condominium, and has enacted By-Laws for this purpose pursuant to Chapter 183A. The Association shall have such powers and duties as are set forth in the By-Laws. The mailing address of the Association is 480 Hampden Street, P. O. Box 867 Holyoke, Massachusetts 01041-0867. The names and addresses of the initial Managers of the Association are:

>           Michael Downey
>           O'Connell Engineering and Financial, Inc.
>           480 Hampden Street
>           P. O. Box 267
>           Holyoke, Massachusetts 01041

>           Andrew Crystal
>           O'Connell Engineering and Financial, Inc.
>           480 Hampden Street
>           P. O. Box 267
>           Holyoke, Massachusetts 01041

16.    Determination of Beneficial Interests

The Beneficial Interest of each Unit has been determined on the basis of the approximate relation which the fair value of the Unit bears to the aggregate fair value of all the Units. The Beneficial Interests of each Unit are set forth in Exhibit B hereto. In the event that the size of the Buildings is reduced due to the casualty or condemnation, such interests shall be promptly adjusted by the Board.

17.    Encroachments.

If any portion of the Common Areas now encroaches upon any Unit, or if any Unit now encroaches upon any other Unit or upon any portion of the Common Areas, or if any such encroachment shall occur hereafter as a result of (a) settling of a Building, (b) alteration or repair of any Common Area made in accordance with the Master Deed, By-Laws, and Rules and Regulations of the Condominium, (c) repair or restoration of a Building or Unit after damage by fire or other casualty, or (d) condemnation or eminent domain proceedings, an easement shall exist for such encroachment so long as the Building in question stands.

18.    Pipes, Wires, Flues, Ducts, Cables, Conduits, Public Utility Lines, and Other
Common Areas located Inside of Units.

Each Unit Owner shall have an easement (in common with the Owners of the other
Units) to use all pipes, wires, ducts, flues, cables, conduits, public utility lines and other
Common Areas located in other Units or elsewhere on the Condominium and serving its
Unit. Each Unit Owner shall also have an easement from time to time to install, maintain,
repair, and use additional pipes, wires, ducts, flues, cables, conduits, and public utility lines
in locations reasonably approved by the Board within the Common Areas, subject to
compliance with Section 11 above. Each Unit shall be subject to an easement in favor of the
Owners of the other Units to use the pipes, wires, ducts, flues, cables, conduits, public utility
lines and other Common Areas serving such other Units and located in such Unit. The Board
shall have a right of access to each Unit to inspect and to maintain, repair or replace Common
Areas located therein as more fully set forth in Section 5.10 of the By-Laws.

19.    Payment of Common Expenses.

All Unit Owners shall pay the Common Expenses assessed by the Board in
accordance with the provisions of Section 5 of the By-Laws and shall be personally liable for
all sums assessed for its share of the Common Expenses accruing during its period of
ownership of the Unit including late charges, fines, penalties, and interest and all costs of
collection. This covenant shall run with the land and shall bind any person having any
interest in the Units from time to time as though it were recited in each deed or other
conveyance or lease of the units.

20.    Indemnification.

Each Unit Owner shall indemnify and hold harmless the Board, all other Unit
Owners, and their tenants, from and against all claims, and all costs, expenses, and liabilities
(including without limitation reasonable attorneys' fees and costs) incurred in connection
with such claims, including any action or proceeding brought thereon, arising from or as a
result of (a) any accident, injury, loss, or damage whatsoever caused to any natural person, or
to the property of any person, alleged to have occurred in its Unit during the term of its
ownership, (b) any alleged or proven negligence or willful misconduct of such Unit Owner,
any tenant of its Unit, or their agents, contractors, servants or employees alleged or proved to
have occurred in or about the Condominium, and (c) any breach by such Unit Owner or any
tenant of its Unit of its duties and obligations under the Condominium Documents.

Each Unit Owner shall further indemnify and hold harmless the Board and all other
Unit Owners from and against all claims, and all costs, expenses, and liabilities (including
without limitation reasonable attorneys' fees and costs) incurred in connection with such
claims, including any action or proceeding brought thereon, arising from or as a result of any

Hazardous Materials released or threatened to be released onto the Property by such Unit Owner, any tenant of its Unit, or their agents, contractors, servants or employees. Such indemnity shall include, without limitation, all costs incurred by the Board or any Unit Owner or tenant in connection with any investigation or monitoring of site conditions, any clean-up, containment, remedial or restoration work because of the presence, suspected presence, release or suspected release of any hazardous materials on, about, under or within the Property as a result of the actions of such Unit Owner, its tenant, or their agents, contractors, servants or employees. "Hazardous Materials" shall mean any hazardous or toxic substances, materials, and wastes in excess of amounts permitted under applicable laws and otherwise listed as hazardous substances by the Environmental Protection Agency or the Massachusetts Department of Environmental Protection or regulated under applicable local, state or federal law.

21. <u>Units Subject to Master Deed, Unit Deed, By-Laws and Rules and Regulations.</u>

All Unit Owners, tenants, visitors, and occupants of Units shall comply with the provisions of the Condominium Documents and the applicable Unit Deed, all of which shall be covenants running with the land and shall bind any person having any interest in such Unit, as though such provisions were recited in each deed or other conveyance or lease thereof. Each Unit Owner may assign any of its rights under the Condominium Documents to a tenant of its Unit, and the obligations of a Unit Owner under the Condominium Documents may be performed by such tenant.

22. <u>Invalidity and Conflicts.</u>

The invalidity of any provision of this Master Deed shall not affect the validity and enforceability of the remainder of this Master Deed. This Master Deed is set forth to comply with the requirements of Chapter 183A in effect upon the date of execution of this Master Deed and any future amendments thereto which are specifically made retroactive in application. In case any of the provisions of this Master Deed conflict with the provisions of Chapter 183A, the provisions of Chapter 183A shall control.

23. <u>Waiver.</u>

No provision contained in this Master Deed shall be deemed to have been waived by reason of any failure to enforce the same, irrespective of the number of violations or breaches which my occur.

24. <u>Special Provisions.</u>

The following special provisions shall apply notwithstanding any contrary provision of this Master Deed, the By-Laws, or the Rules and Regulations:

(a)     There shall be appurtenant to Unit 5 the exclusive right to use up to four (4) parking spaces located in front of Unit 5, as designated from time to time by the Unit Owner of Unit 5 for customer pick-up purposes.

(b)     Unless the Unit Owner of Unit 5 otherwise requests in writing, the Limited Common Areas described in Section 6(b) which are appurtenant to Unit 5 shall be maintained, repaired, replaced and insured by the Unit Owner of Unit 5, at its expense. The Unit Owner of Unit 5 agrees to maintain, repair, replace and insure such Limited Common Areas to the same extent that the Association would be required so to do under the Master Deed, By-Laws, and Rules and Regulations. However, the Unit Owner shall not be required to provide casualty insurance for such Limited Common Areas in excess of 80% of the replacement cost so long as the Unit Owner (or its tenant) self-insures the balance and is obligated to rebuild the Limited Common Areas after an insured casualty regardless of the sufficiency of the insurance proceeds.

(c)     No change shall be permitted in the Common Areas which requires the approval of a tenant under a lease executed prior to the date of this Master Deed or under any other lease approved by the Board without the prior approval of the Unit Owner who is the landlord under such lease.

Executed under seal dated October 31, 1996.

HOLYOKE CROSSING LIMITED
PARTNERSHIP

By:     O'Connell-Crossing Corp.,
        its sole general partner

By:     _Michael T. Downey_  Pres
        Michael T. Downey, President

-19-

COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.

October 2ₗ, 1996

Then personally appeared before me Michael T. Downey, President of O'Connell-Crossing Corp., sole general partner of Holyoke Crossing Limited Partnership and acknowledged the foregoing to be his/her free act and deed and that of said corporation on behalf of said partnership.

Notary Public Constantine T. Moriarty Jr.
My commission expires: February 19, 1999

-20-

Exhibit A

Property Description

## Exhibit B

### Unit Descriptions

| Unit Number | Location | Interior Unit Area | Beneficial Interest | Limited Common Area | Immediate Common Area |
|---|---|---|---|---|---|
| 1 | Building One | 33,221 | 23.66% | See Below | Exterior Walkway |
| 2 | Building One | 12,116 | 8.63% | See Below | " |
| 3 | Building One | 4,393 | 3.13% | See Below | " |
| 4 | Building One | 8,746 | 6.23% | See Below | " |
| 5 | Building Two | 30,710 | 21.87% | See Below | " |
| 6 | Building Two | 35,984 | 25.63% | See Below | " |
| 7 | Building Two | 15,232 | 10.85% | See Below | " |
| | | 140,402 | 100.00% | | |

Limited Common Areas:  For each Unit, the foundation, structural columns, girders, beams, supports, exterior walls, common walls, stairways, and roofs under, in, immediately adjacent to, or over the Unit; the loading area immediately adjacent to the Unit as shown on the Site Plan; all sewer and drainage pipes, and all conduits, pipes, wires, ducts, flues, plumbing, cables, utility lines and installations and other utility systems and facilities serving the Unit exclusively.

Exhibit C

SIGNAGE RIGHTS

Pylon Sign

Each Unit Owner shall install and maintain a sign panel on the Pylon Sign displaying the trade name of each store operating in its Unit using lettering of the same graphic style as the exterior building signage for such store(s). Colors shall be subject to the approval of the Board in its good-faith discretion. The sign panels shall be located on the sign pylon by descending store size (largest store at top), and shall be relocated from time to time if store areas change. The total sign panel area for each Unit having a floor area of at least 25,000 square feet shall be 33 square feet in size (a "Full Panel"), the total sign panel area for each Unit having a floor area of 15,000 to 24,999 square feet shall be three-quarters of a Full Panel, and the total sign panel area for each smaller Unit shall be one-half of a Full Panel.

Exterior Building Signage

Each Unit Owner shall install and maintain exterior signage above each store entrance in its Unit, and with the approval of the Board in its good-faith discretion may install (and shall thereafter maintain) additional signage on the exterior of its Unit. Except for signage on the exterior of a Unit and on the Pylon Sign, no store or advertising signage shall be permitted at the Condominium. The design and manner of installation of all signs shall be subject to the approval of the Board, acting in its good-faith discretion to insure tasteful, quality signage throughout the Condominium which is consistent with standards for a first-class retail shopping center. Without limiting the generality of the foregoing, all exterior building signage shall comply with the following requirements. The Board shall not withhold its consent to prototypical signage for a national or regional retailer which complies with the following requirements.

1.      Unit Owner Sign Responsibility:

All signs, including fastening devices and final electrical connections, shall be furnished and installed by or for the Unit Owner. Shop drawings, location plans, and at the Board's request perspective views of the sign and complete storefront, shall be submitted to the Board in connection with approval of the sign. Shop drawings must show sign materials, illumination, fastenings, colors, details and full artwork. The location plan must show the sign complete delineated. Storefront elevations must show exact placement and limits of all signage. Sign construction shall be in accordance with applicable legal requirements, including zoning and other code requirements and other requirements of governmental authorities. Components shall

bear the "UL" inspection labels (transformer, wire, etc.). Each Unit Owner must obtain its own sign permits.

2.    General Limitations:

    a.    Except as approved by the Board in its discretion, and except as permitted under a lease executed prior to the date of this Master Deed or any other lease approved by the Board, sign text shall be limited to the trade name(s) of the store(s) operating in the Unit.

    b.    Flashing, occulting and moving signs are not permitted.

    c.    Individual channel letters are required. Formed plastic or injection molded signs are not permitted.

    d.    Exposed transformers, etc., are not permitted.

    e.    Visible sign company names are not permitted.

    f.    "Box Signs" are not permitted unless used by a national or regional retailer as part of its prototypical signage.

    g.    The Board may limit the use of "logos" other than logos used by a national or regional retailer as part of its prototypical signage.

    h.    Letter type shall be selected from the standard catalogues of commercially available letter type designs.

3.    Specific Limitations:

    a.    Colors: The color of the sides of the letters shall match the color of the Building facade. All color of sign faces, sources of illumination, etc. shall be subject to the Board's approval, in its good-faith discretion.

    b.    Title: All exterior signs shall be limited to the retailer's trade name and/or logo, and additional words advertising or describing products, services or target customers are not permitted, without the approval of the Board in its discretion.

    c.    Illuminations: All exterior signs must be illuminated through the letter face.

d.    Letter Height: 6'-0" maximum, except that the maximum height for stores of less than 10,000 square feet in sales area shall be 2'-0" maximum unless otherwise approved by the Board.

e.    Storefront signs must be evenly centered over the storefront entrance.

f.    No signage shall be installed on the roof of any Building or which will project above the top of any parapet wall or roof line.

g.    No sign or logo, except a sign or logo for the tenant or subtenant of Unit 6 shall include the words bed, bedroom, bath, bathroom, sheets, towels, or housewares provided that (i) this restriction shall not apply to any tenant or subtenant under a lease executed prior to the date of this Master Deed and (ii) this restriction shall terminate on the expiration or earlier termination of that certain lease dated July 12, 1996 between Bed Bath & Beyond, Inc. and Holyoke Crossing Limited Partnership.

### General

The requirements of this Exhibit C shall be enforced in a non-discriminatory manner as to all Unit Owners, tenants, and occupants of the Condominium. Subject to compliance with all of the other requirements of this Exhibit C, no approval of the Board shall be required for signage which may be installed pursuant to a lease executed prior to the date of this Master Deed or pursuant to any other lease approved by the Board by a national or regional retailer, as tenant, without the requirement of obtaining any approval from the Unit Owner, as landlord.

<u>Exhibit D</u>

Exclusive Use Restrictions

1.     So long as Unit 1 is operated as a bookstore, no other Unit shall be used for the primary purpose of selling books, magazines, newspapers, other periodicals, or books-on-tape, nor shall more than 2,000 square feet of sales area in each other Unit be used for sale of such items.

2.     So long as Unit 2 is operated for the sale, lease, service and supply of computers, computer software, computer tools, computer peripherals, and components thereof ("Computer Equipment"), no other Unit shall be used for the sale, lease, service or supply of Computer Equipment except that this Exclusive Use Restriction shall not prohibit the sale of Computer Equipment in other Units so long as the sale of Computer Equipment is not the primary use of the Unit and the portion of the Unit used for the sale of Computer Equipment does not exceed the lesser of (i) 10% of the Unit's gross sales area for computer hardware and 10% of the Unit's gross sales area for computer software or (ii) 2,500 square feet. Also, this Exclusive Use Restriction shall not be binding on certain portions of the Condominium as originally set forth in that certain Lease dated December 12, 1995 between Tandy Corporation and O'Connell Properties, Inc. (the "Tandy Lease"). The exceptions to this Exclusive Use Restriction originally set forth in the Tandy Lease shall continue to apply notwithstanding any amendment or termination of the Tandy Lease, and any Unit Owner, tenant, or other third party may rely on the written representation of the Unit Owner of Unit 2 as to the provisions of the Tandy Lease.

3.     So long as Unit 5 is operated for the sale of consumer, office and automotive electronics products (which include, but shall not be limited to, televisions, stereos, speakers and video recorders and players), computer hardware, cellular telephones, household appliances (which include, but shall not be limited to, refrigerators, freezers, stoves, microwave ovens, vacuum cleaners and dishwashers) and related goods and the sale and installation of motor vehicle audio, stereo and telephone systems (all of such items being herein collectively referred to as the "Electronics and White Good Products"), no other Unit shall be used for the sale, rental (or rental to own) of any of the Electronics and White Good Products, except that this Exclusive Use Restriction shall not be binding on certain portions of the Condominium as originally set forth in that certain Lease dated December 12, 1995 between Circuit City Stores, Inc. and O'Connell Properties, Inc. The exceptions to this Exclusive Use Restriction originally set forth in the Circuit City Lease shall continue to apply notwithstanding any amendment or termination of the Circuit City Lease, and any Unit Owner, tenant, or other third party may rely on the written representation of the Unit Owner of Unit 5 as to the provisions of the Circuit City Lease. This Exclusive Use Restriction shall also be subject to the additional exceptions set forth in that certain Letter Agreement dated June 21, 1996 between Circuit City Stores, Inc. and Bed Bath & Beyond, Inc., which

exceptions are for the benefit of Bed Bath & Beyond, Inc. and its affiliates and successors as set forth therein.

4.     No Unit which contains 8,000 square feet, or less, of ground floor area, other than Unit 4, shall be used as a store whose principal and primary purpose is the sale of consumer entertainment and communications electronics products and other consumer electronics products (not including computer equipment, components, accessories, and computer software but including microprocessors that control video, audio, or other consumer electronic entertainment equipment).  The Exclusive Use Restrictions shall not prohibit tenants of leased premises containing more than 8,000 square feet of ground floor area from subleasing or licensing portions of their leased premises for a use which would otherwise violate this Exclusive Use Restriction even if the area so subleased or licensed contains less than 8,000 square feet of ground floor area.

5.     So long as Unit 7 is operated as a pet store, meaning a store for the sale of pet food and supplies, live fish, birds, reptiles considered non-poisonous in Massachusetts and small animals, grooming, veterinary services (unless not allowed by law) and related goods and services, no other store shall be used as a pet store.

6.     So long as at least one-half of the retail floor area (including an allocable portion of adjacent aisle space) of Unit 6 is used for the sale, rental or distribution of linens and domestics, bathroom items, housewares, frames and wall art, window treatments and/or closet, shelving and storage items (the "Household Products"), no other Unit shall be used for the sale, rental or distribution of any of the Household Products except that a portion of each other Unit may be used for the sale, rental or distribution of Household Products up to an aggregate floor area for each Unit which is the lesser of (x) 7.5% of the selling space in such other Unit (including an allocable portion of the aisle space adjacent to such selling space) or (y) 1,500 square feet.  For purposes of this Exclusive Use Restriction, the use of Unit 6 for the sale, rental or distribution of Household Products shall not be considered to be discontinued during Excused Periods as defined in that certain lease dated July 12, 1996 between Bed Bath & Beyond, Inc. and Holyoke Crossing Limited Partnership or any periods of time not exceeding six (6) consecutive months when Unit 6 is not so used.  This Exclusive Use Restriction shall also be subject to the additional exceptions set forth in that certain Letter Agreement dated June 21, 1996 between Circuit City Stores, Inc. and Bed Bath & Beyond, Inc., which exceptions are for the benefit of Circuit City Stores, Inc. and its affiliates and successors as set forth therein.

9671/529

0249812.01
9/23/96

# HOLYOKE CROSSING CONDOMINIUM

## BY-LAWS

HAMPDEN COUNTY
REGISTRY OF DEEDS
RECEIVED & RECORDED
OCT 31 1996
9 of 00 p M
DONALD L. A.. REGISTER

## ARTICLE I

### General

1.1   **The Condominium.** The property in Holyoke, Massachusetts, described in the Master Deed dated October 31, 1996 and recorded in the Hampden County Registry of Deeds immediately prior hereto has been submitted to the provisions of Chapter 183A of the Massachusetts General Laws by Holyoke Crossing Limited Partnership, a Massachusetts limited partnership. The Condominium thereby created shall be known as Holyoke Crossing Condominium. The undersigned first Board of Managers hereby executes these By-Laws to establish the Holyoke Crossing Condominium Association in accordance with Chapter 183A.

1.2   **Definitions.** The following words and phrases will have the following meanings in these By-Laws:

**Association.** Holyoke Crossing Condominium Association, the organization of the Unit Owners of the Condominium.

**Beneficial Interest.** The percentage undivided interest in the Common Areas which is appurtenant to each Unit, as set forth on Schedule C of the Master Deed.

**Board.** The Board of Managers of the Association.

**Buildings.** The two buildings which comprise the Condominium.

**By-Laws.** The By-Laws of the Association, as recorded in the Registry and as amended and/or restated of record from time to time.

**Chapter 183A.** Chapter 183A of the General Laws of The Commonwealth of Massachusetts, as amended from time to time.

**Common Areas.** The common areas and facilities of the Condominium as set forth in Section 6 of the Master Deed.

0251170.01
9/23/96

## HOLYOKE CROSSING CONDOMINIUM

## BY-LAWS

## ARTICLE I

### General

1.1    The Condominium. The property in Holyoke, Massachusetts, described in the Master Deed dated _____ and recorded in the Hampden County Registry of Deeds immediately prior hereto has been submitted to the provisions of Chapter 183A of the Massachusetts General Laws by Holyoke Crossing Limited Partnership, a Massachusetts limited partnership. The Condominium thereby created shall be known as Holyoke Crossing Condominium. The undersigned first Board of Managers hereby executes these By-Laws to establish the Holyoke Crossing Condominium Association in accordance with Chapter 183A.

1.2    Definitions. The following words and phrases will have the following meanings in these By-Laws:

Association. Holyoke Crossing Condominium Association, the organization of the Unit Owners of the Condominium.

Beneficial Interest. The percentage undivided interest in the Common Areas which is appurtenant to each Unit, as set forth on Schedule C of the Master Deed.

Board. The Board of Managers of the Association.

Buildings. The two buildings which comprise the Condominium.

By-Laws. The By-Laws of the Association, as recorded in the Registry and as amended and/or restated of record from time to time.

Chapter 183A. Chapter 183A of the General Laws of The Commonwealth of Massachusetts, as amended from time to time.

Common Areas. The common areas and facilities of the Condominium as set forth in Section 6 of the Master Deed.

Common Expenses. The expenses of operation, administration, maintenance, repair and replacement of the Common Areas (other than the Limited Common Areas) and all the other expenses of operating and administering the Condominium and the Association, as described in and subject to the limitations set forth in Article V of these By-Laws and by Chapter 183A.

Condominium. The premises constituting Holyoke Crossing Condominium as created by the Master Deed, comprising the Property, the Buildings and all other improvements on the Property, including the Units and the Common Areas described in the Master Deed, and all rights and easements appurtenant thereto.

Condominium Documents. The Master Deed, the Recorded Plans, the By-Laws, and the Rules and Regulations.

Development and Kiosk Rights. All rights reserved by the Grantor in Section 9 of the Master Deed.

Floor Plans. The plans recorded with the Master Deed which show the layout, location, Unit designations and dimensions of the Units and bear the certification required by Section 6 of Chapter 183A, as such plans are amended or added of record from time to time.

Grantor. Holyoke Crossing Limited Partnership, and its successors and assigns.

Limited Common Areas. Areas exterior to the Units reserved for the exclusive use of Owners of one or more but not all Units, as further described in Section 7 of the Master Deed.

Majority of Unit Owners. Unit Owners holding more than 50 percent of the aggregate Beneficial Interests of the Condominium.

Manager. A member of the Board of Managers of the Association.

Managing Agent. The person or entity appointed by the Board to administer the operation of the Condominium.

Master Deed. The Master Deed of the Condominium as recorded in the Registry and as amended and/or restated of record from time to time.

Percent (%) of Unit Owners. With reference to any given percentage (%), the Owners of that percent of aggregate Beneficial Interests.

Property. The land described in Section 3 of the Master Deed.

Recorded Plans. The Site Plan and the Floor Plans.

Registry. The Hampden County Registry of Deeds.

Rules and Regulations. The Rules and Regulations adopted from time to time by the Board.

Site Plan. The Site Plan recorded with the Master Deed which shows the location of the Building and other improvements, access ways, and easements on the Property, as amended of record from time to time.

Unit. A unit (as defined in Chapter 183A) in the Condominium, more specifically described in Section 5 of the Master Deed.

Unit Deed. A deed to a particular Unit complying with Section 6 of Chapter 183A.

Unit Owner. An owner of record of a Unit.

1.3    Purpose. The purpose of the Association is to serve as the governing entity of the Condominium pursuant to Section 10 of Chapter 183A.

1.4    Application. A Unit Owner shall automatically become a member of the Association upon taking record title to a Unit. The membership of a Unit Owner shall terminate when such Unit Owner ceases to be a Unit Owner, with such membership automatically transferred to his or her successor in interest. All present and future Owners, mortgagees, lessees and occupants of Units and their employees, and any other persons who may use the facilities of the Condominium in any manner, are subject to the By-Laws, the Master Deed, and the Rules and Regulations.

1.5    Office. The office of the Condominium and of the Board of Managers of the Association shall be located at 480 Hampden Street, P.O. Box 867, Holyoke, Massachusetts 01041-0867, or such other location in Holyoke as the Board shall designate from time to time.

## ARTICLE II

### Board of Managers

2.1    Number and Term. Except as provided in Section 2.3, the Board of Managers shall be composed of as many individuals as there are Units in the Condominium. One Manager shall be appointed by each of the Unit Owners (which term includes the Grantor as owner of any Unit or Units that have not been conveyed to a Unit purchaser). Notwithstanding the foregoing, if more than one Unit is owned by a single Owner, such Owner may designate a single individual to serve as Manager for all such Units and such Manager shall have the number of votes equal to the number of Units owned by the Owner. Except as otherwise provided herein, a Manager shall serve until his or her successor is appointed and all conditions to the successor's assuming office are satisfied.

2.2    Vacancies, Appointment, Appointment and Acceptance of Managers. If a vacancy occurs on the Board of Managers due to death, disability, removal or resignation, the Unit Owner that originally appointed the Manager whose position has become vacant shall have the right, exercisable by notice to all other Unit Owners, to appoint a successor Manager.

Despite any vacancy in the office of Manager, the remaining Managers shall continue to exercise and discharge all of the powers and duties of the Managers hereunder; provided, however, that if there remain Managers with fewer than three votes, said Managers shall not exercise said powers and discretion and duties except as to matters which by their nature and/or effect require immediate attention.

The election or appointment of a Manager shall become effective upon the recording of an instrument with the Registry, executed and acknowledged before a notary public by the then Managers, (a) referencing the Master Deed and these By-Laws, (b) reciting the appointment of the successor Manager, and (c) containing an acceptance of such appointment by the successor Manager.

2.3    Original Board of Managers. Notwithstanding Section 2.1, the first Board of Managers shall be designated by the Grantor and shall consist of two Managers designated in the Master Deed. Within 30 days after the first conveyance of a Unit, the Board shall convene a meeting of the Unit Owners, at which time the Unit Owners shall appoint the Managers to replace the Grantor's designees. For purposes of the appointment of such Managers, and in all subsequent appointments of Managers, the Grantor shall be deemed the Unit Owner of any Unit or Units then unsold and may vote in accordance with the Beneficial Interest of such unsold Unit or Units.

-4-

2.4    Removal. Any Unit Owner may, at any time, remove the Manager designated for such Unit. Such removal may be without cause. The term of any Manager shall automatically come to an end if, during his or her term of office, the Unit Owner by whom he or she was appointed shall cease to own such Unit.

2.5    Powers and Duties. The Board shall have the powers and duties necessary for the administration of the affairs of the Condominium, and may do all things related thereto subject to the Master Deed and these By-Laws and except those specifically restricted by law. Such powers and duties of the Board shall include, but shall not be limited to, the following:

(a)    Operation of the Condominium, including repair, replacement, improvement, maintenance, and security (if and to the extent that the Board elects to provide security or the same is requested by Unit Owners or tenants of more than one-half of the floor area of the Condominium) of the Common Areas;

(b)    Exercising a right of entry upon any Unit to make emergency repairs and upon reasonable notice to do other work reasonably necessary for the proper maintenance or operation of the Condominium;

(c)    Collection of assessments from the Unit Owners and enforcement of all obligations of Unit Owners;

(d)    Employment and dismissal of personnel and firms appropriate to the operation and affairs of the Condominium;

(e)    Obtaining insurance for the Condominium as provided in Section 5;

(f)    Making replacements, additions, improvements, or alterations to the Condominium as provided herein;

(g)    Reviewing and approving construction work or other matters over which the Association may specifically have review or approval authority under the provisions of the Master Deed and these By-Laws;

(h)    Granting permits, licenses, easements or other real property interests over or in the Common Areas for utilities, roads and other purposes which the Board deems reasonably necessary or useful for the proper maintenance or operation of the Condominium or otherwise reasonable or appropriate, and acquiring and relocating easements or other real property interests as necessary for such purposes, provided that

-5-

such grants do not interfere with the use of the Units or Common Areas for their intended purposes;

(i)     Determination of the Common Expenses appropriate to the affairs of the Condominium and allocating items of income and expense;

(j)     Adoption, amendment, and administration (including waiver) of reasonable non-discriminatory Rules and Regulations covering the operation and use of the Condominium, and, at the Board's discretion, levying or abating fines against Unit Owners for violation thereof, which fines shall be additional assessments constituting a lien on the Units as provided in Section 5;

(k)     Opening bank accounts on behalf of the Condominium and designating the signatories required therefor;

(l)     Managing and otherwise dealing with the Common Areas, including allocating expenses involving Limited Common Areas to appropriate Unit Owners;

(m)     Incurring indebtedness to meet expenses in the following circumstances: (i) in the event of a default by a Unit Owner in the payment of any assessment, the Board may, but shall not be obligated to, borrow funds from a Unit Owner (or an affiliate thereof), or a third party lender, in the amount of the default provided that the applicable rate of interest shall be no greater than the late charge set forth in Section 5.3 and all other costs of the borrowing shall be paid by the defaulting Unit Owner, and (ii) otherwise, with the consent of all Unit Owners;

(n)     For any period prior to separate assessment of all Units for real estate taxes, computing each Unit Owner's proportionate share of real estate taxes relating to the Condominium based on the Beneficial Interests of the Unit Owners whose Units are included in such tax bill, collecting payments on account of such taxes, and paying the same to appropriate governmental authorities if and as the Board deems it appropriate to do so;

(o)     Bringing or settling claims or conducting litigation as to any matter involving the Condominium or Units owned by the Condominium, or the Common Areas, or arising out of the enforcement of the By-Laws, Rules and Regulations or the Master Deed;

(p)     Cure, at the Board's election, of any breach by any Unit Owner of any provision of the Condominium Documents, (i) at any time in the event of any emergency and (ii) otherwise, if such breach is not cured within 30 days of notice of

-6-

such breach from the Board to such Unit Owner, such 30-day period to be extended as
reasonably necessary in the case of breaches not curable within 30 days, provided that
such Unit Owner commences a cure within such 30-day period and diligently pursues
such cure to completion. All costs incurred by the Board pursuant to this Section 2.5(p)
shall be paid by the defaulting Unit Owner;

(q)    At the request of a Unit Owner, enter into an agreement on behalf of the
Association with a tenant of such Unit Owner agreeing to provide the tenant with
copies of default notices sent to the Unit Owner under the Condominium Documents,
to obtain the tenant's consent to any amendment of the Condominium Documents
requiring the Unit Owner's consent, and otherwise agreeing to recognize the Tenant's
rights under its lease; and

(r)    Exercising the same powers and duties with respect to the Kiosk Area.

2.6    Managing Agent. The Board shall employ for the Condominium a
Managing Agent to perform the duties required by Chapter 183A §10(f) and such other
duties and services as the Board shall authorize. The Board may delegate to the
Managing Agent those powers granted to it by these By-Laws. The Managing Agent
may be an affiliate of Grantor or any Unit Owner. If the Managing Agent is an affiliate
of Grantor or any Unit Owner, the fee for such services shall not exceed 8% of
Common Expenses, other than utilities and insurance premiums. In addition to such
fee, the Managing Agent shall be reimbursed for the costs of all work performed at the
Property, including an allocable share of the salary or wages and benefits of all
personnel of the Managing Agent to the extent employed on-site, and for all other out-
of-pocket costs of providing management services to the Condominium other than
home-office overhead and administration, and to the extent collected under Section 7 of
the Master Deed shall be paid a fee for work to maintain, repair and replace the Limited
Common Areas equal to 8% of the cost thereof.

2.7    Meeting. Regular meetings of the Board may be held in the
Condominium at such time and location as shall be determined from time to time by a
majority of the Managers, but at least one such meeting shall be held during each fiscal
year. Notice of regular meetings of the Board shall be given to each member of the
Board by the Clerk, by mail or telephone, at least three days prior to the day named for
such meeting. Special meetings of the Board may be called by the President on
24 hours' notice to each member of the Board, given by mail or telephone, which notice
shall state the time, location, and purpose of the meeting. Special meetings of the
Board shall be called by the President or Clerk in like manner, and on like notice, on
the written request of at least two members of the Board. Any member of the Board
may at any time waive notice of any meeting of the Board in writing. Attendance by a

-7-

member of the Board at any meeting of the Board shall constitute a waiver of notice thereof. Members of the Board may participate in a meeting of the Board by means of a conference telephone or similar communications equipment which enables all persons participating in the meeting to hear each other at the same time, and participation by such means shall constitute presence in person at such meeting. If all the members of the Board are present at any meeting of the Board, no notice shall be required and any business may be transacted.

    2.8   Quorum and Voting.

    (a)   At all meetings of the Board, members representing at least fifty-one Percent of Unit Owners shall constitute a quorum for the transaction of business. The votes of members of the Board representing at least fifty-one Percent of Unit Owners shall constitute the decision of the Board, provided that any Board members representing Unit Owners required to consent to such action pursuant to the Condominium Documents shall have consented to such action. Any action which might be taken at a meeting of the Board may be taken without a meeting if, after proper notice is given to all members of the Board, a written consent to the action is signed by all of the members of the Board whose vote would be required to adopt the action at a meeting. Such a consent shall be treated for all purposes as a vote of the Board. If at any meeting there is less than a quorum present, Managers representing a majority of the votes of the Board of Managers present may adjourn the meeting from time to time; and at any adjourned meeting at which a quorum is present, any business which might have been transacted at the meeting originally called may be transacted without further notice.

    (b)   Notwithstanding the foregoing, no action shall be taken by the Board without the consent of any affected Unit Owner if such action would materially adversely affect access to or visibility of a Unit from the parking areas or adjacent public ways, materially alter the layout of parking areas adjacent to a Unit, or materially adversely affect the floor plan of any Unit or otherwise materially interfere with the use of a Unit for its intended purpose by the Unit Owner or any tenant.

    (c)   Further notwithstanding the foregoing, if any proposed action materially increases the financial obligations of any Unit Owner under the Condominium Documents and is inconsistent with standards for managing, operating, maintaining or repairing a first class retail shopping center, a Unit Owner may object to the proposed action (within the 10 business day period provided in (d) below) by notice to the Board specifically stating the grounds for objection. Notwithstanding any dispute concerning the Board's action, payments shall be made by the Unit Owners in accordance with any action taken by the Board over the objection of any Unit Owner

-8-

and if necessary there shall be a further adjustment between the parties as set forth below. If a Unit Owner provides the Board with timely notice as described above specifically stating objections to a Board action and if such dispute shall not have been settled by agreement of the parties within 10 days after such notice, the parties shall resolve the dispute by arbitration in the manner set forth in Section 5.1 hereof. The arbitrator shall be charged to determine whether the Board's action was inconsistent with standards for managing, operating, maintaining and repairing a first-class retail shopping center. The arbitrator shall have no jurisdiction or authority to make any other determination. If the arbitrator determines that the Board's action was not consistent with standards for managing, operating, maintaining and repairing a first-class retail shopping center, any Unit Owners whose representatives voted in favor of such action shall be liable for the objecting Unit Owner's share of the cost of such action, such cost to be allocated among the Unit Owners voting in favor of such action according to their Beneficial Interests.

(d)    For purposes of this Section 2.8, any Unit Owner shall be deemed to have consented to any proposed Board action if such Unit Owner does not provide a written objection to such proposed action, in reasonable detail, within 10 business days of receipt of notice of the proposed action.

2.9    Compensation. No member of the Board shall receive compensation from the Condominium for acting as such. The term "compensation" shall not be deemed to include reimbursement for reasonable expenses incurred by a Manager in connection with his or her duties.

2.10    Indemnity. The Board and each Manager shall be indemnified by the Unit Owners against any loss, cost, damage, expense or liability (including reasonable attorneys' fees and costs) incurred by the Board or any Manager in carrying out in good faith the Board's duties hereunder, including, without limitation, liabilities in contract and in tort, and liabilities for damages, penalties and fines. Every agreement made by the Board or by the Managing Agent or by a Manager on behalf of the Association shall provide that the executing parties are acting only as agents for the Association and shall have no personal liability thereunder (except as Unit Owners), and that each Unit Owner's liability thereunder shall be limited to a percentage of the total liability which is equal to the Unit Owner's Beneficial Interest.

2.11    No Personal Liability. No Manager shall be held liable or accountable out of personal assets for any good faith action or omission while serving as Manager, or for allowing another Manager to have possession of the Association's books or property, or for honest (i) errors of judgment or (ii) mistakes of fact or law. Managers shall be liable only for willful acts in bad faith.

2.12    Managers and Unit Owners Dealing With the Condominium. No Manager nor Unit Owner, nor any affiliate thereof, shall be disqualified from contracting or dealing, directly or indirectly, with the Board or with one or more Unit Owners as vendor, purchaser or otherwise because of the Manager's or the Unit Owner's interest in any organization connected with such contracting or dealing. No Manager or Unit Owner, nor any affiliate thereof, so dealing or contracting shall be liable to account for any profit realized by any such arrangement by reason of the Manager's office or of the fiduciary relation hereby established, or by reason of the Unit Owner's status, provided that the Manager or Unit Owner shall act in good faith and shall disclose such interest in advance.

## ARTICLE III

### Unit Owners

3.1    Annual Meetings. Annual meetings of Unit Owners shall be held on the second Thursday of March or such other date as may be set at the next preceding Annual Meeting (no annual meeting need be held if all of the Units are in common ownership). At such meetings, Unit Owners shall elect members of the Board of Managers in accordance with the requirements of Article II and transact such other business of the Association as may properly come before them.

3.2    Place of Meetings. Meetings of the Unit Owners shall be held at the principal office of the Association, or at such other suitable place convenient to the Unit Owners and from time to time designated by the Board.

3.3    Special Meetings. The President shall call a special meeting of the Unit Owners when so directed by the Board, or upon presentation to the Board of a petition signed by Unit Owners representing at least one-third of the Beneficial Interests.

3.4    Notice of Meetings. The Clerk shall give notice by mail or telephone of each annual or special meeting, stating the purpose thereof as well as the time and place where it is to be held, to each Unit Owner of record, at least five but not more than ten days prior to such meeting. A notice mailed in the manner provided in these By-Laws shall be considered given upon mailing.

3.5    Quorum. The presence in person or by proxy of Unit Owners representing a majority of the Beneficial Interests shall constitute a quorum at all meetings of the Unit Owners.

3.6    _Adjournment of Meetings_. If any meeting of Unit Owners cannot be held because a quorum has not attended, a majority of the Unit Owners who are present at such meeting, either in person or by proxy, shall adjourn the meeting to a time not less than 48 hours from the time the original meeting was called; and at any adjourned meeting at which a quorum is present, any business which might have been transacted at the meeting originally called may be then transacted without further notice.

3.7    _Consent in Lieu of Meeting_. Any action to be taken by the Unit Owners may be taken without a meeting if, after proper notice is given to all Unit Owners, the requisite percentage of Unit Owners entitled to vote on the matter consents to the action by a writing filed with the records of meetings of Unit Owners, provided that any Unit Owner required to consent to such action pursuant to the Condominium Documents shall have consented to such action. Such consent shall be treated for all purposes as a vote at a meeting.

3.8    _Voting_. Each Unit Owner, or some person (who need not be a Unit Owner) designated by such owner to act as proxy, shall be entitled to cast the votes appurtenant to such Unit at all meetings of Unit Owners. The designation of any such proxy shall be made in writing to the Clerk, and shall be revocable at any time prior to the vote by written notice to the Clerk by the Owner so designating. The vote of a Unit owned by more than one person or entity may not be split and shall be counted only if a proxy is executed or if the vote is cast by all Owners of record unanimously. Each Unit Owner (including the Grantor, if the Grantor shall then own one or more Units) shall be entitled to vote the Beneficial Interest appurtenant to his or her Unit at all meetings of the Unit Owners. Any Unit or Units owned by the Board or its designee shall not be entitled to vote and shall be excluded from the total of Beneficial Interests when computing the Beneficial Interests of all other Unit Owners for voting purposes.

The vote of Unit Owners representing at least fifty-one percent of the Beneficial Interests shall be binding upon all Unit Owners for all purposes except where in the Master Deed or these By-Laws or by statute a higher percentage vote, or the consent of a particular Unit Owner, is required.

ARTICLE IV

Officers

4.1    _Designation_. The principal officers of the Condominium shall be the President, the Clerk, and the Treasurer, all of whom shall be elected by the Board from among its members. The Board may also appoint an Assistant Treasurer, an Assistant

Clerk, and such other officers as in its judgment may be necessary, none of whom need be members of the Board. Any individual may hold more than one office.

4.2     Election of Officers. The officers of the Condominium shall be elected annually by the Board and shall hold office at the pleasure of the Board and until their successors are elected.

4.3     Removal of Officers. Upon the affirmative vote of a majority of the members of the Board, any officer may be removed, either with or without cause, and his or her successor may be elected at any regular meeting of the Board, or at any special meeting called for such purpose.

4.4     President. The President shall be the chief executive officer of the Association. He or she shall preside at all meetings of the Unit Owners and of the Board. He or she shall have all of the general powers and duties which are incident to the office of president of a stock corporation organized under the Business Corporation Law of The Commonwealth of Massachusetts, including, but not limited to, the power to appoint committees from among the Unit Owners from time to time to assist in the conduct of the affairs of the Condominium.

4.5     Treasurer. The Treasurer shall have the responsibility for Condominium funds and securities and shall be responsible for keeping full and accurate financial records and books of account showing all receipts and disbursements and for the preparation of all appropriate financial data. He or she shall be responsible for the deposit of all moneys and other valuable effects in the name of the Association, or the Managing Agent, in such depositories as may from time to time be designated by the Board, and he or she shall, in general, perform all the duties incident to the office of treasurer of a stock corporation organized under the Business Corporation Law of The Commonwealth of Massachusetts. The Treasurer shall take the place of the President and perform the President's duties whenever the President is absent or unable to act.

4.6     Agreements, Contracts, Deeds, Checks, etc. All agreements, contracts, deeds, leases, and other instruments of the Association, and all checks for amounts in excess of $5,000 (which amount may be increased from time to time by the Board in its sole discretion) shall be executed by any two officers of the Association, or by any one officer and such other person or persons as may be designated by the Board. Payment vouchers shall be approved by the Treasurer unless the Board otherwise authorizes.

4.7     Compensation of Officers. No officer shall receive any compensation from the Condominium for acting as such. The term compensation shall not be

deemed to include reimbursement for reasonable expenses incurred by an officer in connection with his or her duties.

 4.8 <u>Certification</u>. It shall be the duty of the Board or any officer or Manager, as the case may be, when so requested by any Unit Owner or mortgagee of a Unit, to certify to matters relating to the Condominium or the Association. Any instrument signed by a majority of the Board as they appear of record, duly attested as the act of the Association, and indicating the book and page (and document number, if appropriate) within the Registry of the documents from which the signers of such instrument obtained their authority to sign on behalf of the Association, shall bind the Association, including without limitation a certification as to the then members of the Board. No person dealing with the Board shall be bound to inquire further as to any matter set forth in any such certificate.

## ARTICLE V

### Operation of the Condominium

 5.1 <u>Determination of Common Expenses and Fixing of Common Expenses</u>. The fiscal year of the Condominium shall be the calendar year unless otherwise decided by the Board.

 Each Unit Owner shall pay each year an amount equal to the product of (a) its Beneficial Interest and (b) the Common Expenses (as defined below). The Board shall from time to time, and at least 30 days before the commencement of each fiscal year of the Association, prepare and deliver to the Unit Owners a budget for the Condominium. Such budget shall contain an estimate of the Common Expenses expected to be incurred during such fiscal year. Each Unit Owner's share of the Common Expenses shall be paid in equal monthly installments on the first day of each calendar month in amounts reasonably estimated by the Board for the then current calendar year. The Board may from time to time during the fiscal year revise such estimates based on available information relating to the Common Expenses or otherwise affecting the calculation hereunder. After the end of each calendar year, the Board will provide the Unit Owners with a statement, prepared by a representative of the Board or the Board's Managing Agent, of the total amount of Common Expenses for such calendar year prepared in accordance herewith and otherwise in accordance with generally accepted accounting principles. Upon issuance of the Board's statement, there shall be an adjustment between the Board and the Unit Owners for the calendar year covered by such statement to the end that the Association shall have received the exact amount of Common Expenses shown on the statement. Any overpayments by the Unit Owners

hereunder shall be credited against the Common Expenses payments next due. Any underpayments by the Unit Owners shall be due and payable within ten (10) days of delivery of the Board's statement.

The Board's statement with respect to Common Expenses shall be binding upon, and may not be disputed by, each Unit Owner unless the statement is incorrect and is disputed by such Unit Owner (within 25 months of the Unit Owner's receipt of the Board's statement) by a notice to the Board specifically stating the grounds for dispute. Any Unit Owner's failure so to dispute the Board's statement shall constitute a waiver of the Unit Owner's right to dispute the statement. Notwithstanding any dispute concerning the Board's statement, payments shall be made by the Unit Owners in accordance with the Board's statement at the time and in the manner set forth above, and if necessary there shall be a further adjustment between the parties at the time the dispute is resolved. If a Unit Owner so requests within such 25 month period, the Board will make available in the Board's offices (or in such other reasonable location as the Board may from time to time designate), for review, audit and reasonable copying by the Unit Owner, any of its tenants, or their representatives, all expense and accounting records and documents used in preparing the Board's annual accounting for the years in dispute; provided that prior to such inspection the Unit Owner or tenant (and their representatives) shall enter into a confidentiality agreement (in form reasonably supplied by the Board) restricting the use of such information solely to the determination of the Unit Owner's share of Common Expenses hereunder.

If a Unit Owner provides the Board with a timely notice under the preceding paragraph disputing the correctness of such statement, and if such dispute shall not have been settled by agreement of the parties within sixty (60) days after the Unit Owner's notice of dispute is given to the Board, then the parties shall seek to identify one mutually acceptable impartial third party to serve as sole arbitrator. Any such arbitrator shall be a certified public accountant, having current and at least fifteen (15) years' prior experience with respect to first-class shopping center type retail properties of more than 100,000 square feet in Massachusetts and having no prior relationship with either party. If the parties are unable or fail to agree upon the arbitrator within ten (10) days, the arbitrator shall be selected by JAMS/ENDISPUTE, Inc., or any successor entity. If neither JAMS/ENDISPUTE, Inc. nor any successor entity exists at the time of the dispute, the arbitrator shall be selected by the American Arbitration Association ("AAA") or any successor entity. If neither AAA nor any successor entity exist at the time of the dispute, the arbitrator shall be selected by the largest private provider of dispute resolution services then doing business in the greater Springfield area. The arbitrator shall agree, in writing, to adhere to the time periods specified herein for conducting the arbitration proceedings and issuing a decision. If more than one Unit Owner has provided the Board with a notice of dispute under the preceding

paragraph, all such disputes not settled by agreement of the parties may, at the Board's option, be consolidated into a single proceeding to be resolved in accordance with this paragraph. The arbitration of such matters shall take place in Holyoke, Massachusetts and shall be governed by and be conducted in accordance with the Federal Arbitration Act, 9 U.S.C. §§1, et. seq., and the now current JAMS/ENDISPUTE, Inc. Comprehensive Arbitration Rules and Procedures, a copy of which is attached as Exhibit C hereto, insofar as such rules are not inconsistent with the applicable provisions of this Section (in which case the provisions of this Section shall govern) and shall be binding on the parties. At the commencement of such arbitration, each party shall declare its final position as to the amount of the Common Expenses for the year just ended. The Board and the Unit Owner shall each have a reasonable opportunity to present evidence to the arbitrator. The arbitrator shall be charged to reach promptly (if feasible, within 45 days of his or her appointment), and shall reach, a decision in accordance with the applicable standards set forth herein by selecting either the amount proposed by the Board or that proposed by the Unit Owner under the second preceding sentence. The arbitrator's decision shall be final and binding upon the parties and the arbitrator shall have no jurisdiction or authority to make any other determination. Upon issuance of the arbitrator's decision, the parties shall promptly adjust for any over-payment or under-payment of Common Expenses. If the arbitration determines that, after adjustment for the correct amounts, the aggregate Common Expenses for any year are at least 5% less than the corresponding amount in the Board's final statement, then the Board shall reimburse the Unit Owner for the reasonable, out-of-pocket cost of the audit (the amount of such reimbursement to be a Common Expense attributable for the year in which such reimbursement is made). (If such arbitration determines that the Unit Owner has underpaid Common Expenses, then the Unit Owner shall promptly pay the amount of such underpayment.) The party whose final position as to the amount of Common Expenses under the fourth sentence of this paragraph is furthest from the amount established by the arbitrator shall bear the cost of the arbitrator's services.

"Common Expenses" means all reasonable and competitive costs of the Association in servicing, operating, managing, maintaining, repairing, replacing, and to the extent permitted under these By-Laws improving the Common Areas (other than the Limited Common Areas) of the Condominium and other costs incurred by the Association for the benefit of all Unit Owners pursuant to the Condominium Documents, including, without limitation, the costs of the following: (i) supplies, materials and equipment purchased or rented, personnel to the extent employed on-site (including total wage, salary, tax and benefits costs), and contractors employed, in the operation, maintenance, security, cleaning, repair, replacement or permitted improvement of the Common Areas; (ii) work for or on behalf of all Unit Owners by the Board's employees or by other persons under contract with the Board or the Board's

-15-

Managing Agent including work necessary to comply with governmental permits or approvals or other legal requirements but only if applicable to the Common Areas or Condominium as a whole; (iii) utilities consumed and expenses incurred in the operation, maintenance and repair of the Common Areas (other than the Limited Common Areas) of the Condominium including, without limitation, oil, gas, electricity, water and, sewer; (iv) casualty, liability and other insurance in such amounts and insuring such risks as herein provided and unreimbursed costs incurred by the Association which are subject to an insurance deductible; (v) the amount of any taxes, special assessments and agreed or governmentally imposed "in lieu of tax" or similar charges attributable to the Condominium (including personal property located in the Common Areas) and not assessed to Unit Owners, including so-called "linkage payments"; and (vi) other costs in the nature of common area maintenance costs of the Condominium including, without limitation, maintenance of an adequate replacement reserve fund pursuant to Chapter 183A, management fees and related costs (as set forth in and limited by Section 2.6 with respect to fees paid to Grantor, a Unit Owner, or an affiliate thereof), snow plowing and removal, repair, maintenance, replacement and permitted improvement of the parking areas, lighting, and storm drainage system, trash collection, grounds maintenance and the like. If the Board, with the consent of all Unit Owners, incurs indebtedness to install a new or replacement capital item for the purpose of reducing or conserving the use of energy, complying with any building code or other law, regulation, or legal requirement, effecting a major repaving of the parking areas, or otherwise relating to the operation of the Condominium, the cost of such borrowing shall be included in Common Expenses. Common Expenses shall not include the cost of any work in the nature of tenant improvement work.

    5.2    Payment of Assessments. Unit Owners shall pay the assessed Common Expenses in equal installments, on the first day of each month in advance or at such other times as the Board shall determine, without any right of set off, recoupment, or counterclaim. Unit Owners shall pay all other assessments under the Condominium Documents within thirty days after billing, without any right of set-off, recoupment, or counterclaim. If any Unit Owner fails to pay any such assessment when due, the amount thereof, with interest, costs, and reasonable attorney's fees, shall constitute a lien on the Unit as provided in Section 6 of Chapter 183A, provided that such lien shall be subordinate to any bona fide institutional first mortgage on such Unit. Except as provided in the foregoing sentence, such lien shall have priority over any lien or encumbrance on the Unit recorded after the date of recordation of the Master Deed. No Unit Owner shall be liable for the payment of any part of the Common Expenses assessed against its Unit subsequent to a conveyance of the Unit (irrespective of whether an assessment is made as part of the annual budgeting process or is made on account of a supplemental budget reflecting a determination by the Board that the Common Expenses previously assessed for the year are insufficient). Such Unit Owner

shall, however, be personally liable for Common Expenses assessed and due prior to such conveyance. A conveyance for this purpose shall be deemed to occur when the Unit Deed is recorded. A purchaser of a Unit shall be liable for the payment of Common Expenses assessed and unpaid against the Unit prior to its acquisition by it. The foregoing limitation shall not prevent the subsequent assessment among the appropriate Unit Owners, including a new Unit Owner who takes pursuant to a foreclosure of a first mortgage, of amounts unassessed at the time of the conveyance.

5.3     Collection of Assessments. The Board shall take prompt action to collect any assessments due from any Unit Owner which remain unpaid for more than 30 days from the due date. If a Unit Owner is delinquent in paying his or her assessment, he or she shall pay (i) a late charge equal to (x) 18% of the amount due divided by (y) 365, multiplied by (z) the number of days from the original due date until the date the amount in question is paid (or such lesser charge as constitutes the maximum amount permitted be to charged by law) and (ii) all expenses, including reasonable attorneys' fees, incurred by the Board in any collection proceeding and for any borrowing made by the Association on account of the delinquency. The Board may recover such assessment, together with interest thereon, and the expenses of the proceedings and any such borrowing, including reasonable attorneys' fees, in an action at law or in equity or by foreclosure of the lien on such Unit as provided in Section 6 of Chapter 183A. A suit to recover a money judgment for unpaid assessments may be maintained without foreclosing or waiving the lien securing the same. At least thirty (30) days prior to the filing of an action by the Board to enforce any such lien, the Board shall give notice of its intention to file such action to any Listed Mortgagee of the affected Unit by certified and first-class mail.

5.4     Insurance. The Board shall maintain, to the extent reasonably commercially obtainable, the following master policies of insurance covering the interests of the Association, the Board, all Unit Owners and all Listed Mortgagees, and all tenants, as their interests may appear:

(a)     Property damage insurance covering: (i) all the Common Areas, including the Limited Common Areas, except land, foundation, excavation, and other items normally excluded from coverage and except for any Limited Common Areas insured by a Unit Owner pursuant to Section 24 of the Master Deed; (ii) fixtures and building service equipment (including pylon signs) which are part of the Common Areas; (iii) personal property belonging to the Association; and (iv) such finish materials, fixtures, equipment, and/or other property as are customarily considered to be part of a Unit for the purposes of sale, purchase, or mortgage of such Unit (for example, dry wall, surface flooring, windows

-17-

and doors, as well as mechanical and electrical equipment).  Except as herein provided, furniture, furnishings, or other personal property installed by Unit Owners shall not be covered by such policy.

Such property damage insurance shall cover 100% of the current replacement cost of the Condominium, including all items listed herein, and shall insure against loss or damage by all perils normally covered by the standard "all risk" endorsement.

(b)    Worker's compensation and employer's liability insurance with respect to employees of the Association.

(c)    Commercial general liability insurance covering all Common Areas and public ways on the Condominium.  Such policy shall provide for a minimum coverage of $5,000,000 for bodily injury, death, or property damage, or such higher limits as the Board deems prudent from time to time.  Such policy shall contain no Employee Exclusion as to claims for personal injury and shall include Contractual Liability Insurance and Non-Owned Automobile Liability Insurance.

(d)    Flood insurance for the Buildings, the Common Areas, and any other common property of the Condominium in a special flood hazard area, as determined by the latest F.E.M.A. approved flood map.  Such insurance shall be at least equal to the lesser of 100% of the "current replacement cost" of the property insured or the maximum coverage available lender the appropriate National Flood Insurance Program.  The maximum deductible amount for the policy two percent of the face amount of the policy.

(e)    Directors and officers insurance insuring the Managers and Officers against personal liability, blanket fidelity insurance in accordance with Chapter 183A, §10(h), and such other insurance as the Board may reasonably determine, consistent with prudent shopping center management in the Holyoke vicinity.

All insurance policies shall be issued by insurers rated B+ by Best's rating service (or such higher rating as may be reasonably requested by any Unit Owner) and shall provide that adjustment of loss shall be made by the Board as Insurance Trustee, and that the net proceeds thereof shall be payable to the Board on behalf of the Association and the Unit Owners, as the case may be.  The Board shall receive, hold, and dispose of any proceeds of insurance in trust for Unit Owners and their mortgagees,

as their interests may appear. All such proceeds collected by the Board shall be deposited in an interest bearing account, segregated from the general funds of the Condominium. If proceeds are to be distributed, pursuant to the provisions of applicable law, the Master Deed, or these By-Laws, the Board shall distribute such proceeds to the Unit Owners or their mortgagees, as their interests may appear, in accordance with their respective Beneficial Interests. The Board shall cause the value of the Condominium, including the Common Areas and each of the Units, to be appraised as frequently as the Board deems appropriate, and, if necessary, shall increase the amount of coverage in the master policies accordingly.

All policies of insurance obtained by the Board shall provide that such policies may not be canceled or substantially modified without at least 10 days' written notice to all of the insureds, including all Listed Mortgagees and tenants of Units of which the Board is given notice. Certificates of such insurance and all renewals thereof, together with proof of payment of premiums, shall be delivered to Unit Owners and their mortgagees upon request. Such policies shall also provide:

(a)     that any right of the insurer to elect to restore damage in lieu of making a cash settlement may not be exercised without the approval of the Board or if in conflict with Chapter 183A, the Master Deed, or these By-Laws;

(b)     for waivers of any defense based upon the conduct of any insured;

(c)     that the insurer shall not be entitled to contribution as against any casualty insurance which may be purchased separately by Unit Owners; and

(d)     for an agreed amount  endorsement and an inflation guard endorsement or their equivalents, to the extent available. The Board may include a commercially reasonable deductible provision.

In obtaining and maintaining the insurance coverage referred to in this Section, the Board shall be entitled to rely on the advice and/or judgment of any independent insurance broker or agent.

Unit Owners may carry insurance for their own benefit insuring their furniture, trade fixtures, decorations, furnishings, inventory, and other personal property, provided that the liability of the carriers issuing insurance obtained by the Board shall not be affected or diminished by reason of any such additional insurance carried by any Unit Owner.

Each Unit Owner shall promptly notify the Board of improvements to be made to its Unit, the value of which exceeds 5% of the value of the Unit prior to such improvements (or such other amount which the Board deems will affect the amount of coverage required on the master policies). Such notice shall state in reasonable detail the nature of the improvements and the value thereof. Upon notification of such improvements, the Board shall promptly notify the insurer of the Condominium, and, if appropriate, increase the amount of coverage on the master policies correspondingly. Any increase in insurance premiums resulting from such improvements shall be assessed to the Unit Owner making such improvements as an addition to his or her share of the Common Expenses. No Unit Owner shall take any action which will increase the cost of or cause the cancellation of any Condominium insurance.

Any insurance obtained by the Association shall deny to the insurer rights of subrogation against the Unit Owners and their tenants or subtenants to the extent rights have been waived by the Association hereunder prior to the occurrence of injury and loss. Any insurance obtained by any Unit Owner shall deny to the insurer rights of subrogation against the Association and other Unit Owners to the extent rights have been similarly waived hereunder. Notwithstanding any provisions of the Master Deed or these By-Laws to the contrary, (i) the Association and each of the Unit Owners hereby waive any rights of recovery that each may have against any other for injury or loss due to hazards covered by such insurance to the extent of the indemnification received thereunder and (ii) the Association hereby waives any rights of recovery that it may have against a tenant or subtenant for injury or loss to the same extent as a Unit Owner, as landlord, has under a lease generally waived its rights of recovery against the tenant or subtenant in question, but only if the tenant or subtenant has waived its rights of recovery against the Association to the same extent under the lease.

5.5    Repair or Reconstruction After Fire or Other Casualty. In the event of damage to or destruction of the Condominium or any part thereof as a result of fire or other insured casualty, the Board shall promptly adjust the loss and arrange for the repair and restoration of the Units and Common Areas (including Limited Common Areas subject to the provisions set forth in Sections 7 and 24 of the Master Deed) damaged or destroyed (but not fixtures, furnishings, inventory or other personal property placed in Units by Unit Owners). The Board shall disburse the proceeds of all insurance policies to contractors engaged in such repair and restoration in appropriate progress payments. If the insurance proceeds are not sufficient to cover the cost of repairs, the balance of the cost of repairs to any Unit(s) (including any appurtenant Limited Common Areas) shall be assessed against the affected Unit Owner(s) and the cost of repairs to Common Areas shall be assessed against all Unit Owners as a Common Expense.

If the amount of any such insurance proceeds exceeds the cost of repair or restoration, then the excess shall be added to the Condominium's reserve funds or, at the option of the Board, be divided among the affected Unit Owners and their mortgagees, as their interests may appear, in proportion to their Beneficial Interests after first paying out of the share due each Unit Owner such amounts as may be required to reduce unpaid liens on such Unit in the order of priority of such liens. Such distribution to a Unit Owner shall be paid directly to a Unit Owner's mortgagee if the mortgagee so requires by prior notice to the Board.

    5.6    Maintenance and Repairs.

a)  Each Unit Owner shall maintain its Unit in good repair and in clean, orderly and sanitary condition, free of insects, rodents and other pests and shall keep any garbage, trash, rubbish and other refuse in vermin-proof containers within the Premises and out of sight of the public and other occupants of the Condominium until removed. Except as provided herein and in Section 5.5, all maintenance and repairs to any Unit (other than to the Common Areas contained therein) shall be performed by the Unit Owner at the Unit Owner's expense.

b)  All maintenance, repairs and replacements to the Common Areas (including Limited Common Areas), including emergency works, shall be performed by the Board and shall be charged to all the Unit Owners as a Common Expense (except that maintenance, repair and replacement of Limited Common Areas shall be subject to the provisions of Sections 7 and 24 of the Master Deed). If, however, the same are necessitated by the negligence, misuse or neglect of a Unit Owner (or a tenant or occupant of a Unit), such expense shall be charged to such Unit Owner.

    5.7    Restrictions on Use of Common Areas.

(a)  No Common Area shall be used for the sale or display of any merchandise or for any other business, occupation or undertaking, and no charge may be levied for the use of any parking areas of the Condominium.

(b)  The Common Areas shall be used only for furnishing the services and facilities for which they are reasonably suited and which are incidental to the use of the Units.

(c)  No nuisance or noisy, immoral, improper, offensive, or unlawful use shall be made of the Condominium or any Unit (it being understood that the

foregoing shall not restrict the sale of books, other publications, recordings, software or similar materials customarily sold in a first-class shopping center). The Common Areas shall be used only in accordance with all applicable laws, regulations and governmental orders. Violations of such laws, orders, or regulations shall be cured promptly by and at the expense of the Unit Owner or the Board, whichever shall have the obligation to maintain the portion of the Condominium in violation.

(d) No signs of any kind may be placed in the Common Areas (including Limited Common Areas) except as permitted by the Master Deed. A Unit Owner shall in no event have the right to place signage of any kind on the roof of any Building.

(e) No Unit Owner (or tenant) shall permit the parking of vehicles so as to interfere with the use of any driveway, corridor, footwalk, parking area or other Common Area.

5.8     Improvements to Common Areas. If and whenever the Board shall propose to make any capital expense to construct additional improvements (including addition of signage) to the Common Areas, or to upgrade existing improvements beyond a level of quality consistent with other first-class shopping centers, or shall be requested by any Unit Owner to make any such improvement, the Board shall submit to all Unit Owners a form of agreement specifying the proposed improvement and the estimated cost thereof. The proposed improvement shall be performed by the Board only if all of the Unit Owners agree to make such improvement and the cost of such improvement shall be assessed to the Unit Owners as a Common Expense, except that in the case of proposed improvements to any Limited Common Area the cost shall be assessed in accordance with Section 7 of the Master Deed. In no event shall any additional buildings or structures (including kiosks, booths or similar structures) be constructed at the Condominium, nor shall the number of parking spaces, or the entrances and exits to the Property, or the curb cuts, roadways and sidewalks at the Property, be altered, except as may be agreed by all of the Unit Owners or, with respect to the Kiosk Area, permitted under Section 9.3 of the Master Deed.

Nothing in this Section 5.8 shall limit the right of the Board to make any and all repairs, capital replacements and upgrades to existing improvements to the Common Areas reasonably required to maintain a level of quality consistent with other first class shopping centers without further consent of the Unit Owners and to assess the costs of such repairs and replacements as a Common Expense, except that in the case of proposed repairs, replacements and upgrades to any Limited Common Area the cost shall be assessed in accordance with Section 7 of the Master Deed.

-22-

5.9    Additions, Alterations, or Improvements by Unit Owners. No Unit Owner shall make or permit any addition, alteration, or improvement in its Unit which will materially adversely affect the systems or structure of a Building without the prior consent of the affected Unit Owners in the affected Building, in accordance with and subject to the provisions of the Master Deed. The affected Unit Owners shall answer any written request by a Unit Owner for consent under this Section within 30 days after such request is received, and failure to do so shall constitute a consent. Any request for consent shall include a description of the proposed work in reasonable detail and any Unit Owner who declines to give its consent shall specify in reasonable detail the grounds therefor. Any application to any department of the City of Holyoke or to any other governmental authority for a permit to make an addition, alteration, or improvement in or to any Common Area, shall be executed by the Board alone (unless otherwise required by law). The Board or any Manager or the Association shall not incur any liability on account of such execution to any contractor, subcontractor, or material man on account of such addition, alteration, or improvement, or to any person having any claim for injury to person or damage to property arising therefrom. This Section shall not apply to unsold Units owned by the Grantor, provided that no alteration to such Units shall materially adversely affect the Building systems or structure serving any sold Units.

All additions, alterations or improvements to any Unit shall be performed in compliance with all applicable laws, regulations and codes, by licensed contractors when required by law, and in such a manner as not materially to inconvenience or disturb the use of the other Units.

5.10    Right of Access. Each Unit Owner hereby grants a right of access to his or her Unit to any person authorized by the Board for inspections or for correcting any conditions originating in his or her Unit and threatening another Unit or any Common Areas, or for performing work on the mechanical or electrical services or other Common Areas. Requests for entry shall be made in advance, and any such entry shall be at a time reasonably convenient to the Unit Owner. In case of emergency such right of entry shall be immediate, whether a representative of the Unit Owner is present or not.

5.11    Rules and Regulations. The Board has adopted the Rules and Regulations set forth in Schedule A attached. Copies of any amendment shall be furnished to each Unit Owner before the amendment becomes effective. No amendment to the Rules and Regulations may discriminate against any Unit Owner or Unit occupant, alter the rights or obligations of a Unit Owner set forth in the Master

Deed or By-Laws, or alter the rights or obligations of a tenant of a Unit under a lease executed prior to notice of the amendment.

5,12   Utilities. Each Unit Owner shall arrange and pay for separately metered electric, gas, and other utility services to its Unit. Water and sewer service shall be provided by the Association, and each Unit Owner shall reimburse the Association, as an assessment of the Condominium, within thirty (30) days after billing for its Unit's share of the water and sewer charges for the Condominium. Each Unit's share of the charges shall be equal to its share of the Condominium's total water use as determined by water meters installed for each Unit and the Common Areas by the Association. Electric services to the Common Areas shall be separately metered, and shall be a Common Expense.

## ARTICLE VI

### Transfer

6.1   No Severance of Ownership. There shall be no severance of a Unit and the Beneficial Interest or Limited Common Areas appurtenant to it. No Unit Owner shall execute any deed, mortgage, or other instrument conveying or mortgaging title to his or her Unit without including therein the Beneficial Interest and Limited Common Areas of such Unit. Any deed, mortgage, or other instrument purporting to affect one or more of such interests without including all such interests shall be deemed to include the interest or interests so omitted.

6.2   Payment of Assessments. No Unit Owner shall sell, mortgage, lease or otherwise convey his or her Unit until he or she shall have paid in full to the Board all unpaid assessments against the Unit.

6.3   Notice of Acquisition. Each Unit Owner shall, at the time of acquisition of record ownership of a Unit, provide to the Board and to each mortgagee holding a recorded mortgage on such Unit notice of such Unit Owner's name and mailing address.

ARTICLE VII

Mortgages

7.1     Notice to Board.  Any Unit Owner who mortgages its Unit shall notify the Board of the name and address of the mortgagee and shall file a copy of the mortgage with the Board.  The Board shall maintain this information in its records.  A "Listed Mortgagee" shall mean the holder of a mortgage of record on a Unit, of which mortgage the Board has written notice from the Unit Owner or the mortgagee, specifying the address to which notices are to be sent whenever written notice is required by these By-Laws to be sent to a Listed Mortgagee by the Board.  Such mortgagee shall remain a Listed Mortgagee until the Board receives written notice from the mortgagee of withdrawal of the listing or the mortgage is discharged on record.

7.2     Notice of Association Address.  The Board shall, within sixty (60) days of acquisition by a Unit Owner of record ownership of a Unit, provide to any Listed Mortgagee written notice of the Association's name and mailing address.  The Board shall provide written notice to each Listed Mortgagee of any changes in the name or mailing address of the Association.

7.3     Notice of Unpaid Assessments.  The Board, whenever so requested in writing by a mortgagee of a Unit, shall promptly report to such mortgagee any then delinquent assessments from the owner of the mortgaged Unit or any other violation of the provisions of the Condominium Documents by such Unit Owner.

7.4     Notice of Default.  When a Unit Owner is given notice of a default in paying any assessments of Common Expenses or other violation of the provisions of the Condominium Documents, the Board shall send a copy of such notice to the Listed Mortgagees of such Unit by certified and first-class mail.

7.5     Assignment by Unit Owner of Rights and Options.  The right of any Unit Owner to vote, to grant any consent, and any other rights herein granted to a Unit Owner, may be assigned or transferred to any Listed Mortgagee, and the Board shall be bound by any such assignment or transfer upon notice in writing to the Board from a Listed Mortgagee setting forth the terms of such assignment.

## ARTICLE VIII

### Condemnation

8.1     Condemnation.  If all or a portion of the Condominium is taken under the power of eminent domain (a "taking"), the taking shall be treated as a casualty and repair and reconstruction shall be governed by Section 5.6 hereof.  Where as a result of a partial taking any Unit is decreased in size, or where the number of Units is decreased by a partial taking, then the Board may make such provision for realignment of the Beneficial Interests as shall be appropriate.

In the event of a total or partial taking, the Unit Owners shall be represented by the Board.  Any resulting award (or proceeds of settlement) shall be payable to the Board.  In the event of a partial taking, the net award (after deduction of the reasonable expenses of the Board related thereto, including reasonable attorneys' fees and the expenses of restoration) shall be allocated to the Unit Owners (or their mortgagees, as their interests may appear) according to their Beneficial Interests, except as to such portion or portions of the net award which are attributable to direct or consequential damages suffered by particular Units, which shall be payable (in proportion to damages suffered) to the Owners of such Units or their mortgagees, as their interests may appear.  In the case of a total taking of all Units and the Common Areas, the entire award shall be payable to the Board to be distributed (after deduction of the reasonable expenses of the Board related thereto, including reasonable attorneys' fees) to the Unit Owners or their mortgagees, as their interests may appear, in accordance with their Beneficial Interests.

## ARTICLE IX

### Records

9.1     Records.  The Board shall keep or cause to be kept (i) a copy of the Master Deed, as amended from time to time; (ii) a copy of these By-Laws, as amended from time to time; (iii) minutes of the meetings of the Board and of the Unit Owners; (iv) financial records and books of account of the Association, including (a) records of all receipts and expenditures, invoices and vouchers authorizing payments, receivables, and any related bank statements, (b) records regarding the replacement reserve fund or any other funds of the Association and any related bank statements, (c) audits, reviews, accounting statements, and financial reports relating to the Association, (d) contracts for work to be performed for or services to be provided to the Association, and (e) all current insurance policies of the Association; and (v) a separate account for each Unit,

which, among other things, shall contain the amount of each assessment of Common Expenses against such Unit, the date when due, the amounts paid thereon, and the balance remaining unpaid. An annual report of the receipts and expenditures of the Association shall be prepared by the Board or the Managing Agent within 120 days after the end of each fiscal year and shall be rendered to all Unit Owners within thirty (30) days after its completion. Such report shall include, without limitation, a balance sheet, income and expense statement, and a statement of funds available in the various funds of the Association. A copy of such report shall be made available upon request to any mortgagee of record or any tenant entitled to the same under the terms of its lease with a Unit Owner. The foregoing records or any tenant entitled to the same under the terms of its lease with a Unit Owner shall be maintained at the office of the Board or the Managing Agent for a period of at least seven years and shall be available for inspection by Unit Owners and their authorized agents during business hours upon reasonable notice.

## ARTICLE X

### Miscellaneous

10.1    Invalidity. The invalidity of any part of these By-Laws shall not affect the validity or enforceability of the balance of these By-Laws.

10.2    Notices. Whenever under the Condominium Documents notice or consent or the like is required to be given to the Board, any Manager, or any Unit Owner, such notice shall be given in writing, by hand delivery or by mail, addressed to the Board at the office referred to in Section 1.1, to a Manager or other Unit Owner at his or her Unit (or such other address as such person shall have notified the Board to use). Notice shall be deemed given as of the date of hand delivery or mailing.

10.3    Waiver; Enforcement. No requirement in these By-Laws or Rules and Regulations adopted hereunder shall be deemed to have been waived by reason of any failure or failures to enforce the same. The Board shall have the right, at its election, to cure a breach of any provision of the Condominium Documents by a Unit Owner as set forth in Section 2.5(p), and all costs incurred thereby shall be assessed to and paid by the defaulting Unit Owner. The Board and any aggrieved Unit Owner shall have the right, in addition to any other rights set forth in these By-Laws, to enjoin, by legal proceedings against individual Unit Owners or the Association as appropriate, any breach of the Condominium Documents, and/or to seek to recover damages therefor (except that all disputes subject to arbitration under the Condominium Documents shall be resolved by arbitration as so provided).

## ARTICLE XI

### Amendments to By-Laws, Conflicts

11.1      Amendments to By-Laws. These By-Laws may be amended by vote of at least 75% in number and in interest of all Unit Owners, cast in person or by proxy at a meeting duly held in accordance with the provisions of these By-Laws. In lieu of a meeting, any amendment may be approved in writing, after notice to all Unit Owners, by 75% in number and in interest of all Unit Owners. These By-Laws may also be amended by the Grantor pursuant to rights reserved in Section 9 of the Master Deed. Any amendment which alters any boundary of a Unit or materially alters the boundary of the Condominium, access to a Unit, visibility of a Unit from the parking areas or adjacent public ways, the Limited Common Areas appurtenant to a Unit, the Beneficial Interest of any Unit, the purposes for which a Unit or Common Area may be used, the financial obligations of any Unit Owner under the Condominium Documents or the value of any Unit, or which would alter the rights of a tenant under a lease executed prior to notice of the amendment, shall also require the consent of the Owner(s) of the affected Unit or Units (including, in the case of any additions to the Limited Common Area appurtenant to any Unit, the consent of all Unit Owners of abutting Units). Notwithstanding the foregoing, unanimous consent of the Unit Owners is required for any amendment to these By-Laws that would change the name of the Condominium, require illumination of signage, logos, or exterior windows after 12:00 a.m. or impose more restrictive signage requirements than set forth in the Master Deed, reduce the parking ratio set forth in Section 12 of the Master Deed, that would permit construction of an additional building at the Condominium, that would affect the voting or approval rights of any Unit Owner or that would reserve any additional privilege or right to Grantor not previously reserved to Grantor. Any Unit Owner shall be deemed to have consented to any proposed amendment if such Unit Owner does not provide written objection to such amendment to the Unit Owner proposing the same, specifying in reasonable detail the grounds for objection, within 10 business days of receipt of notice of such proposed amendment. No amendment which would render these By-Laws inconsistent or contrary to any provision of Chapter 183A shall be of any force unless the same has been assented to in writing by all the then Unit Owners. No action to challenge the validity of an amendment adopted pursuant to this Section 11 or to Section 9 may be brought more than one month after the recording of the amendment.

Until the date on which the Grantor ceases to own any Unit, no amendment which impairs any Development and Kiosk Rights of the Grantor shall be of any effect unless consented to of record by the Grantor.

11.2   Conflicts.   These By-Laws are adopted to comply with the requirements of Chapter 183A. In case any of these By-Laws conflicts with the provisions of Chapter 183A, the provisions of Chapter 183A shall control; in case any of these By-Laws conflicts with the provisions of the Master Deed, the Master Deed shall control.

The undersigned, being the Grantor in said Master Deed and all of the members of the initial Board of Managers, hereby certify that this is a true copy of the By-Laws adopted pursuant to the Master Deed.

Dated as of   Oct. 31, 1996.

> HOLYOKE CROSSING LIMITED PARTNERSHIP
>
> By:   O'Connell-Crossing Corp.,
>        its sole general partner
>
> By: _____
>        Michael T. Downey, President

MANAGERS:

_____
Michael T. Downey

_____
Andrew J. Crystal

COMMONWEALTH OF MASSACHUSETTS

Hampden, ss.

October 31, 1996

Then personally appeared the above named Michael T. Downey, President, and acknowledged the foregoing instrument to be his free act and deed and that of Holyoke Crossing Limited Partnership before me,

_____
Cornelius J. Moriarty, II.,
Notary Public
My Commission Expires: Dec. 19, 1997

-29-

EXHIBIT A

RULES AND REGULATIONS.

Each Unit Owner agrees to observe the rights reserved to the Association and the other Unit Owners in the Condominium Documents and agrees, for itself, its lessees, employees, agents, clients, customers, invitees and guests, to comply with the following rules and regulations and with such reasonable modifications thereof and additions thereto as the Board may make, from time to time, for the Condominium.

(a)     No Unit shall be used for any purpose which violates the Exclusive Use Restrictions under the Master Deed, as currently in effect, which are listed on Schedule 1 attached hereto.

(b)     No Unit Owner shall permit the parking of vehicles so as to interfere with the use of any driveway, corridor, footwalk, parking area, or other Common Area.

(c)     No auction, fire or bankruptcy sales may be conducted without the previous written consent of the Board (unless directed by a court order).

(d)     No Unit Owner shall use the sidewalks or any other Common Area or Limited Common Area of the Condominium for business purposes (including, without limitation, the display of merchandise, distribution of handbills or advertising of any type) without the previous written consent of the Board.

(e)     Unit Owners shall keep the windows of their Unit clean and shall keep the same electrically lighted as required by the Master Deed.

(f)     Unit Owners shall receive and deliver goods and merchandise only in the manner, at such times, and in such areas, as may be reasonably designated by the Board; and all trash, refuse, and the like, shall be either (1) kept in covered cans, which cans shall be kept within the Unit at all times, and in no event stored outside of the same or, if a compactor is available, (2) deposited in a trash compactor from time to time designated by the Board for such purposes. Any wet refuse shall be kept in cold storage within the Units. If provision is made by the Board for trash removal by a contractor, the Unit Owners shall use said contractor for trash removal and pay when due all charges at the rate established therefor from time to time, provided such rate is competitive within the area for similar services. If any Unit Owner fails so to pay for trash removal, the Board shall have the same remedies (even if such payment is due to

such contractor and not to the Board) as the Board has for non-payment of Common Expenses under the Condominium Documents.

(g)     Except to the extent otherwise expressly permitted in the Condominium Documents, no Unit Owner shall place on the exterior of its Unit (including, but without limitation, windows, doors, and entrance lobbies) any signs whatsoever.

(h)     No Unit Owner shall perform any act or carry on any practice which may injure its Unit or any other part of the Condominium, or cause any offensive odors or loud noise (including, but without limitation, the use of loudspeakers), or constitute a nuisance or menace to any other occupant or other persons in the Condominium, and in no event shall any noises or offensive odors be emitted from its Unit.

(i)     Each Unit Owner shall at all times fully and adequately heat and/or air-condition (as the circumstances require) its Unit.

(j)     Each Unit Owner agrees that it and its tenants, employees and others connected with retail operations at its Unit will abide by all reasonable rules and regulations from time to time established by the Board with respect to the Condominium.

(k)     Each Unit Owner shall at all times provide handicapped access to and through their Units in accordance with all applicable laws of The Commonwealth of Massachusetts and ordinances of the City of Holyoke, and in accordance with all directions, rules and regulations of the Building Inspector and other proper officers of the governmental agencies having jurisdiction thereover.

(l)     Each Unit Owner, and its tenants, employees, and agents shall conduct business in its Units in such a manner that customers and invitees shall not collect, line-up or linger outside of its Unit.

(m)     No Unit Owner shall use, handle or store hazardous materials or hazardous wastes in its Unit, except as necessary for a first-class retail operation and in accordance with applicable legal requirements.

(n)     Each Unit Owner shall be solely responsible for all costs and expenses of security systems and/or personnel used in connection with the conduct of business in its Unit.

(o)     Each Unit Owner, and its tenants, shall use reasonable efforts to require all employees to park exclusively in the employee parking areas designated from time to time by the Board.

(p)     Each Unit Owner shall insure that its contractors performing construction work at the Condominium are insured as reasonably required by the Board, and at the Board's request shall require its contractors to name the Association and all Unit Owners as additional insureds on the contractor's general liability policy and to provide certificates of insurance prior to commencing work.

SCHEDULE 1

Exclusive Use Restrictions

1.      So long as Unit 1 is operated as a bookstore, no other Unit shall be used for the primary purpose of selling books, magazines, newspapers, other periodicals, or books-on-tape, nor shall more than 2,000 square feet of sales area in each other Unit be used for sale of such items.

2.      So long as Unit 2 is operated for the sale, lease, service and supply of computers, computer software, computer tools, computer peripherals, and components thereof ("Computer Equipment"), no other Unit shall be used for the sale, lease, service or supply of Computer Equipment except that this Exclusive Use Restriction shall not prohibit the sale of Computer Equipment in other Units so long as the sale of Computer Equipment is not the primary use of the Unit and the portion of the Unit used for the sale of Computer Equipment does not exceed the lesser of (i) 10% of the Unit's gross sales area for computer hardware and 10% of the Unit's gross sales area for computer software or (ii) 2,500 square feet. Also, this Exclusive Use Restriction shall not be binding on certain portions of the Condominium as originally set forth in that certain Lease dated December 12, 1995 between Tandy Corporation and O'Connell Properties, Inc. (the "Tandy Lease"). The exceptions to this Exclusive Use Restriction originally set forth in the Tandy Lease shall continue to apply notwithstanding any amendment or termination of the Tandy Lease, and any Unit Owner, tenant, or other third party may rely on the written representation of the Unit Owner of Unit 2 as to the provisions of the Tandy Lease.

3.      So long as Unit 5 is operated for the sale of consumer, office and automotive electronics products (which include, but shall not be limited to, televisions, stereos, speakers and video recorders and players), computer hardware, cellular telephones, household appliances (which include, but shall not be limited to, refrigerators, freezers, stoves, microwave ovens, vacuum cleaners and dishwashers) and related goods and the sale and installation of motor vehicle audio, stereo and telephone systems (all of such items being herein collectively referred to as the "Electronics and White Good Products"), no other Unit shall be used for the sale, rental (or rental to own) of any of the Electronics and White Good Products, except that this Exclusive Use Restriction shall not be binding on certain portions of the Condominium as originally set forth in that certain Lease dated December 12, 1995 between Circuit City Stores, Inc. and O'Connell Properties, Inc. The exceptions to this Exclusive Use Restriction originally set forth in the Circuit City Lease shall continue to apply notwithstanding any amendment or termination of the Circuit City Lease, and any Unit Owner, tenant, or other third party may rely on the written representation of the Unit Owner of Unit 5 as

to the provisions of the Circuit City Lease. This Exclusive Use Restriction shall also be subject to the additional exceptions set forth in that certain Letter Agreement dated June 21, 1996 between Circuit City Stores, Inc. and Bed Bath & Beyond, Inc., which exceptions are for the benefit of Bed Bath & Beyond, Inc. and its affiliates and successors as set forth therein.

4.    No Unit which contains 8,000 square feet, or less, of ground floor area, other than Unit 4, shall be used as a store whose principal and primary purpose is the sale of consumer entertainment and communications electronics products and other consumer electronics products (not including computer equipment, components, accessories, and computer software but including microprocessors that control video, audio, or other consumer electronic entertainment equipment). The Exclusive Use Restrictions shall not prohibit tenants of leased premises containing more than 8,000 square feet of ground floor area from subleasing or licensing portions of their leased premises for a use which would otherwise violate this Exclusive Use Restriction even if the area so subleased or licensed contains less than 8,000 square feet of ground floor area.

5.    So long as Unit 7 is operated as a pet store, meaning a store for the sale of pet food and supplies, live fish, birds, reptiles considered non-poisonous in Massachusetts and small animals, grooming, veterinary services (unless not allowed by law) and related goods and services, no other store shall be used as a pet store.

6.    So long as at least one-half of the retail floor area (including an allocable portion of adjacent aisle space) of Unit 6 is used for the sale, rental or distribution of linens and domestics, bathroom items, housewares, frames and wall art, window treatments and/or closet, shelving and storage items (the "Household Products"), no other Unit shall be used for the sale, rental or distribution of any of the Household Products except that a portion of each other Unit may be used for the sale, rental or distribution of Household Products up to an aggregate floor area for each Unit which is the lesser of (x) 7.5% of the selling space in such other Unit (including an allocable portion of the aisle space adjacent to such selling space) or (y) 1,500 square feet. For purposes of this Exclusive Use Restriction, the use of Unit 6 for the sale, rental or distribution of Household Products shall not be considered to be discontinued during Excused Periods as defined in that certain lease dated July 12, 1996 between Bed Bath & Beyond, Inc. and Holyoke Crossing Limited Partnership or any periods of time not exceeding six (6) consecutive months when Unit 6 is not so used. This Exclusive Use Restriction shall also be subject to the additional exceptions set forth in that certain Letter Agreement dated June 21, 1996 between Circuit City Stores, Inc. and Bed Bath & Beyond, Inc., which exceptions are for the benefit of Circuit City Stores, Inc. and its affiliates and successors as set forth therein.

-34-

HAMPDEN COUNTY
REGISTRY OF DEEDS
RECEIVED & RECORDED
INST. #: 11237
BK: 17165   PG 72
TIME: 12:37PM
DATE: 2/26/08
DONALD E. ASHE, REGISTER

### FIRST AMENDMENT
### TO THE MASTER DEED
### AND BY-LAWS
### OF
### HOLYOKE CROSSING CONDOMINIUM

KNOW ALL MEN BY THESE PRESENTS that the Master Deed of **Holyoke Crossing Condominium** (hereinafter the "**Condominium**") duly executed on October 31, 1996, and recorded in the Hampden County Registry of Deeds, Book 9671, Page 501 on October 31, 1996, is hereby amended pursuant to the terms and provisions of Massachusetts General Laws, Chapter 183A; and pursuant to the terms and provisions of the Master Deed, Section 9.2 (Reservation of Space Development Rights) and Section 14 (Amendment of Master Deed). The **Condominium** By-Laws duly executed on October 31, 1996 and recorded in the Hampden County Registry of Deeds, Book 9671, Page 529, on October 31, 1996, are also amended, pursuant to Article XI (Amendments to By-Laws, Conflicts,).

Holyoke-Crossing Limited Partnership, a Massachusetts Limited Partnership with its principal and usual place of business at 480 Hampden Street, Holyoke, Massachusetts 01040 as the Unit Owner in the **Condominium** of Unit 1, located at 7 Holyoke Street, Holyoke, Massachusetts, and Holyoke Crossing Limited Partnership II, a Massachusetts Limited Partnership with its principal and usual place of business at 480 Hampden Street, Holyoke, Massachusetts 01040 as the Unit Owner in the **Condominium** of Unit 2 (15 Holyoke Street), Unit 3 (21 Holyoke Street), Unit 4 (27 Holyoke Street), Unit 5 (33 Holyoke Street), Unit 6 (39 Holyoke Street), and Unit 7 (44 Holyoke Street), and the Kiosk Area as shown and more specifically described on the Site Plan, in Holyoke, Massachusetts, collectively representing all of the Unit Owners in the **Condominium**, and representing all of the voting rights and beneficial interests in and to the said Holyoke Crossing Condominium Association, hereby amend the aforesaid Master Deed and By-Laws as follows:

## AMENDMENTS TO MASTER DEED

Section 10.2, subsection (17) & (18) are hereby stricken and deleted and the following inserted in place thereof:

(17)    bar, pub, tavern or manufacture or sale of any intoxicating or alcoholic beverages; provided, however, a full service, casual dining, family restaurant (such as, by way of illustration, an "Applebees", "Red Robin", "Bennigans", "Fuddruckers", "Charlie's", "Restaurant 99", "TGI Fridays", "Chili's", "Ruby Tuesdays", "Houstons") with the right in connection with said operation to serve beer, wine and alcohol for on-premises consumption, subject to all applicable governmental laws and regulations, shall be allowed.

(18)    any restaurant (except for those described above in §10.2 (17)), delicatessen or the like (it being understood that the foregoing shall not prohibit a coffee shop or cafe incidental to uses otherwise permitted hereunder).

Exhibit D Exclusive Use Restrictions:

The following new Subparagraph 7 is inserted immediately after Subparagraph 6:

7.    Except for Unit 4, no other Unit in the Condominium, or any portion thereof, shall be used for, or be permitted to operate as, a full service, casual dining, family restaurant (such as, by way of illustration, an "Applebees", "Red Robin", "Bennigans", "Fuddruckers", "Charlie's", "Restaurant 99", "TGI Fridays", "Chili's", "Ruby Tuesdays", "Houstons).

## AMENDMENT TO BY-LAWS

SCHEDULE I of the By-Laws entitled "Exclusive Use Restrictions" is amended as follows:

The following new Subparagraph 7 is inserted immediately after Subparagraph 6:

Except for Unit 4, no other Unit in the Condominium, or any portion thereof, shall be used for, or be permitted to operate as, a full service, casual dining, family restaurant (such as, by way of illustration, an "Applebees", "Red Robin", "Bennigans", "Fuddruckers", "Charlie's", "Restaurant 99", "TGI Fridays", "Chili's", "Ruby Tuesdays", "Houstons").

2

IN WITNESS WHEREOF, the parties have caused this instrument to be executed under seal as of this 25th day of January , 2008.

HOLYOKE-CROSSING LIMITED PARTNERSHIP,
a Massachusetts Limited Partnership

By:  O'Connell-Crossing Corp.,
     a Massachusetts corporation,
     Its General Partner

*James D. Klingensmith*
witness

By: _James N. Sullivan, Treasurer_
Name: James N. Sullivan
Title:  Treasurer


HOLYOKE CROSSING LIMITED PARTNERSHIP II,
a Massachusetts Limited Partnership

By:     O'Connell-Crossing Corp. II,
        a Massachusetts corporation,
        Its General Partner

*James D. Klingensmith*
witness

By: _James N. Sullivan, Treasurer_
Name: James N. Sullivan
Title:  Treasurer

## CONSENT OF MORTGAGE HOLDER

The below holders of mortgages hereby consent to the Amendment to Master Deed and By-Laws.

Holder of Mortgage on Unit 1
**TD BANKNORTH, N.A.**

Dated : 1/25/08

By _Thomas J. McColgan_
Name: _Thomas J. McColgan_
Its: _VICE PRESIDENT_

4

## CONSENT OF MORTGAGE HOLDER

The below holders of mortgages hereby consent to the Amendment to Master Deed and By-Laws.

Holder of Mortgage on Units 2,3,4,5,6 and 7 and Kiosk Area
**HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY**

By:  HARTFORD INVESTMENT MANGAEMENT COMPANY
Its Agent and Attorney-In-Fact

Dated: 2/12/08

By _____
Name: STEVEN KALMIN
Its    VICE PRESIDENT

5

COMMONWEALTH OF MASSACHUSETTS

County of Hampden
City of Holyoke

On this 25th day of January, 2008, before me appeared James N. Sullivan
to me personally known who being by me duly sworn did say that he is the Treasurer of
O'Connell-Crossing Corp., the general partner of **Holyoke-Crossing Limited
Partnership**, a Massachusetts limited partnership, and that the seal affixed to said
instrument is the corporate seal of said corporation and that said instrument was signed
and sealed in behalf of said corporation by authority of its Board of Directors and said
James N. Sullivan acknowledged said instrument to be his free act and deed and to be the
free act and deed of **O'Connell-Crossing Corp., the general partner of Holyoke-
Crossing Limited Partnership.**

Notary Public
My Commission expires:

COMMONWEALTH OF MASSACHUSETTS

County of Hampden
City of Holyoke

On this 25th day of January, 2008, before me appeared James N. Sullivan to me
personally known who being by me duly sworn did say that he is the Treasurer of
O'Connell-Crossing Corp. II, the general partner of **Holyoke Crossing Limited
Partnership II**, a Massachusetts limited partnership, and that the seal affixed to said
instrument is the corporate seal of said corporation and that said instrument was signed
and sealed in behalf of said corporation by authority of its Board of Directors and said
James N. Sullivan acknowledged said instrument to be his free act and deed and to be the
free act and deed of **O'Connell-Crossing Corp. II, the general partner of Holyoke
Crossing Limited Partnership II.**

Notary Public
My Commission expires:

6

COMMONWEALTH OF MASSACHUSETTS

County of Hampden
City of Springfield

On this 29th day of January, 2008, before me, the undersigned notary public, personally appeared, Thomas J. McClean , the Vice President of **TD Banknorth, N.A.**, a national banking association, proved to me through satisfactory evidence of identification as he is personally known to me to be the person whose name is signed on the preceding or attached document, and acknowledged to me that he signed it voluntarily for its stated purpose as Vice President for **TD Banknorth, N.A.**

Notary Public
My Commission expires:

Diane L. Battelle
Notary Public
My Commission Expires March 19, 2010
Commonwealth of Massachusetts

STATE OF CONNECTICUT        *Hartford Investment
                            Management Company,
County of _Hartford_            Agent and Attorney-In-Fact
City of Hartford

On this 12th day of _February_, 2008, before me, the undersigned officer,
personally appeared, _Steven Kalmin_, proved to me through satisfactory
evidence of identification as he is personally known to me to be the person whose name
is signed on the preceding or attached document, and acknowledged to me that he signed
it voluntarily for its stated purpose as _Vice President of_ for **Hartford Life and
Accident Insurance Company.**

_Nancy Villen_

Commissioner of the Superior Court
Notary Public
My Commission Expires:

Nancy Villeneuve
Notary Public-Connecticut
My Commission Expires
June 30, 2011

8

Jul. 10. 2008  1:44PM                                                        No. 7032   P. 2

COPY

HAMPDEN COUNTY
REGISTRY OF DEEDS
RECEIVED & RECORDED
INST. #: 45199
BK: 17381 PG 98
TIME: 3:03PM
DATE: 7/7/08
DONALD E. ASHE, REGISTER

*(left margin, rotated text)* Unit 1, Unit 2, Unit 3, Unit 4, Unit 5, Unit 6, Unit 7 & Kiosk Area, Holyoke Street, Holyoke, MA

## SECOND AMENDMENT
## TO THE MASTER DEED
## OF
## HOLYOKE CROSSING CONDOMINIUM

KNOW ALL MEN BY THESE PRESENTS that the Master Deed of Holyoke Crossing Condominium (hereinafter the "Condominium") duly executed on October 31, 1996, and recorded in the Hampden County Registry of Deeds, Book 9671, Page 501 on October 31, 1996, as amended by First Amendment To The Master Deed and By-Laws (hereinafter the First Amendment) recorded on February 26, 2008 in the aforesaid Registry of Deeds, Book 17165, Page 72, is hereby further amended pursuant to the terms and provisions of Massachusetts General Laws, Chapter 183A; and pursuant to the terms and provisions of the Master Deed as amended , Section 14 (Amendment of Master Deed).

Holyoke-Crossing Limited Partnership, a Massachusetts Limited Partnership with its principal and usual place of business at 480 Hampden Street, Holyoke, Massachusetts 01040 as the Unit Owner in the Condominium of Unit 1, located at 7 Holyoke Street, Holyoke, Massachusetts and Holyoke Crossing Limited Partnership II, a Massachusetts Limited Partnership with its principal and usual place of business at 480 Hampden Street, Holyoke, Massachusetts 01040 as the Unit Owner in the Condominium of Unit 2 (15 Holyoke Street), Unit 3 (21 Holyoke Street), Unit 4 (27 Holyoke Street), Unit 5 (33 Holyoke Street), Unit 6 (39 Holyoke Street), and Unit 7 (45 Holyoke Street), and the Kiosk Area, in Holyoke, Massachusetts, all as shown and more specifically described in the Site Plan dated October 10, 1996, recorded in the Hampden County Registry of Deeds Book 300, Pages 99-101, as amended by the Revised Condominium Site Plan of Land and Revised Floor Plans of Building One, Revision Date May 5, 2008, recorded simultaneously herewith, collectively representing all of the Unit Owners in the Condominium, and representing all of the voting rights and beneficial interests in and to the said Holyoke Crossing Condominium Association, hereby further amend the aforesaid Master Deed as follows:

Case 08-35653-KRH   Doc 1943-3   Filed 02/03/09   Entered 02/03/09 17:08:27   Desc
Exhibit(s) A-2 - Lease Exhibits Kff   Page 74 of 88

Jul. 10. 2008  1:44PM                                                No. 7032   P. 2

AMENDMENT TO MASTER DEED

Exhibit B entitled Unit Descriptions is hereby stricken and deleted and the attached Exhibit B inserted in place thereof.

IN WITNESS WHEREOF, the parties have caused this instrument to be executed under seal as of this _24th_ day of June, 2008.

HOLYOKE-CROSSING LIMITED
PARTNERSHIP,
a Massachusetts Limited Partnership

By:  O'Connell-Crossing Corp.,
     Its General Partner

By:  _James N. Sullivan  Treas._
Name:  James N. Sullivan
Title:   Treasurer

HOLYOKE CROSSING LIMITED
PARTNERSHIP II,
a Massachusetts Limited Partnership

By:  O'Connell-Crossing Corp. II,
     Its General Partner

By:  _James N. Sullivan  Treas._
Name:  James N. Sullivan
Title:   Treasurer

COMMONWEALTH OF MASSACHUSETTS

County of Hampden
City of Holyoke

On this __11th__ day of June, 2008, before me appeared James N. Sullivan
to me personally known who being by me duly sworn did say that he is the Treasurer of
O'Connell-Crossing Corp., the general partner of Holyoke-Crossing Limited
Partnership, a Massachusetts limited partnership, and that the seal affixed to said
instrument is the corporate seal of said corporation and that said instrument was signed
and sealed in behalf of said corporation by authority of its Board of Directors and said
James N. Sullivan acknowledged said instrument to be his free act and deed and to be the
free act and deed of O'Connell-Crossing Corp., the general partner of Holyoke-
Crossing Limited Partnership.

_Laura C. Tereso_

Notary Public
My Commission Expires:

LAURA C. TERESO
Notary Public
Commonwealth of Massachusetts
My Commission Expires
October 5, 2012

COMMONWEALTH OF MASSACHUSETTS

County of Hampden
City of Holyoke

On this __11th__ day of June, 2008, before me appeared James N. Sullivan to me
personally known who being by me duly sworn did say that he is the Treasurer of
O'Connell-Crossing Corp. II, the general partner of Holyoke Crossing Limited
Partnership II, a Massachusetts limited partnership, and that the seal affixed to said
instrument is the corporate seal of said corporation and that said instrument was signed
and sealed in behalf of said corporation by authority of its Board of Directors and said
James N. Sullivan acknowledged said instrument to be his free act and deed and to be the
free act and deed of O'Connell-Crossing Corp. II, the general partner of Holyoke
Crossing Limited Partnership II.

_Laura C. Tereso_

Notary Public
My Commission Expires:

LAURA C. TERESO
Notary Public
Commonwealth of Massachusetts
Commission Expires
October 5, 2012

## CONSENT OF MORTGAGE HOLDER

The below holder of a mortgage hereby consent to the Second Amendment to Master Deed.

Dated: June 17, 2008

Holder of Mortgage on Unit 1
TD BANK, N.A.

By: _____
Name:  Thomas J. McColgan
Its:    Vice President

## COMMONWEALTH OF MASSACHUSETTS

County of Hampden
City of Springfield

On this 17th day of June, 2008, before me, the undersigned notary public, personally appeared, Thomas J. McColgan, proved to me through satisfactory evidence of identification as he is personally known to me to be the person whose name is signed on the preceding or attached document, and acknowledged to me that he signed it voluntarily for its stated purpose as Vice President for TD Bank, N.A., a national banking association.

_____
Notary Public
My Commission Expires:

Diane L. Rahalle
Notary Public
My Commission Expires March 19, 2010
Commonwealth of Massachusetts

## CONSENT OF MORTGAGE HOLDER

The below holder of a mortgage hereby consent to the Second Amendment to Master Deed.

Holder of Mortgage on Units 2,3,4,5,6 and 7 and Kiosk Area
HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY

By:  HARTFORD INVESTMENT
MANAGEMENT COMPANY
Its Agent and Attorney-In-Fact

Dated: _6-24-08_

By _____
Name:  STEVEN KALMIN
Its:  VICE PRESIDENT

## STATE OF CONNECTICUT

County of Hartford
City of Hartford

On this 24th day of June, 2008, before me, the undersigned notary public, personally appeared, _Steven Kalmin_, proved to me through satisfactory evidence of identification as he is personally known to me to be the person whose name is signed on the preceding or attached document, and acknowledged to me that he signed it voluntarily for its stated purpose as _Vice President_ of Hartford Investment Management Company, Agent and Attorney-In-Fact for Hartford Life and Accident Insurance Company.

Nancy Villeneuve
Notary Public-Connecticut
My Commission Expires
June 30, 2011

Notary Public
My Commission Expires:

Exhibit B

Unit Descriptions

| Unit Number | Location | Interior Unit Area | Beneficial Interest | Limited Common Area | Immediate Common Area |
|---|---|---|---|---|---|
| 1 | Building One | 33,221 | 23.52% | See Below | Exterior Walkway |
| 2 | Building One | 12,116 | 8.58% | See Below | " |
| 3 | Building One | 6,159 | 4.36% | See Below | " |
| 4 | Building One | 7,949 | 5.63% | See Below | " |
| 5 | Building Two | 30,710 | 21.74% | See Below | " |
| 6 | Building Two | 35,868 | 25.39% | See Below | " |
| 7 | Building Two | 15,232 | 10.78% | See Below | " |
| | | 141,255 | 100.00% | | |

Limited Common Areas: For each Unit, the foundation, structural columns, girders, beams, supports, exterior walls, common walls, stairways, and roofs under, in, immediately adjacent to, or over the Unit; the loading area immediately adjacent to the Unit as shown on the Site Plan; all sewer and drainage pipes, and all conduits, pipes, wires, ducts, flues, plumbing, cables, utility lines and installations and other utility systems and facilities serving the Unit exclusively.

### EXHIBIT "L"

### SUBORDINATION AND RECOGNITION AGREEMENT

THIS AGREEMENT, made as the _____ day of _____, 199_,
between THE HOLYOKE CROSSING CONDOMINIUM ASSOCIATION, a
condominium association organized in accordance with Chapter 183A
of the Massachusetts General Laws, having an address at 480
Hampden Street, Holyoke, Massachusetts 01041 ("Association"), and
CIRCUIT CITY STORES, INC., a Virginia corporation having an
address at 9950 Mayland Drive, Richmond, Virginia 23233
("Tenant").

### R E C I T A L S

(a)  The Association is the organization of the Unit Owners
of the condominium known as "Holyoke Crossing Condominium" (the
"Condominium") created pursuant to Massachusetts General Laws,
Chapter 183A by that certain Master Deed ("Master Deed") and
those certain By-Laws ("By-Laws") (including the Rules and
Regulations incorporated therein) dated _____ and
recorded with the Hampden County Registry of Deeds at Book ___,
Page ___ (the Master Deed and By-Laws, and all amendments thereof
permitted under this Agreement, being hereinafter referred to as
the "Condominium Documents") with respect to that certain
property known as Holyoke Crossing Shopping Center, located in
Holyoke, Massachusetts, and more particularly described in the
Master Deed ("Property"); and

(b)  Tenant has entered into a certain Lease, dated November
__, 1995, (the "Lease") with O'Connell Properties, Inc. or its
designee, which Lease has been assigned to _____
("Landlord"), a Unit Owner in the Condominium, for that portion
of the Property consisting of Unit No. 5 in the Condominium
("Demised Premises");

(c)  A Notice of Lease with respect to the Lease dated
_____ has been recorded with the Hampden County
Registry of Deeds at Book ___, Page ___;

(d)  Landlord has requested Tenant to subordinate the Lease
to the Condominium Documents and, pursuant to the provisions of
the Lease, Tenant is willing to do so so long as its rights under
the Lease are recognized by the Association as provided herein;
and

(e)  Association and Tenant desire to assure Tenant's
possession of the Demised Premises and the continuation of its
rights under the Lease, upon the terms and conditions set forth
in the Lease, pursuant to the terms and conditions set forth
below.

NOW, THEREFORE, it is agreed as follows:

1.    Tenant hereby agrees that, subject to the terms and
provisions of this Agreement, Tenant's rights and interests under
the Lease shall be subject and subordinate to the Condominium
Documents, as if the Lease had been executed and delivered, and
the Notice of Lease recorded, after the execution, delivery and
recording of the Condominium Documents.   Tenant agrees to be
bound by and comply with the terms and provisions of the
Condominium Documents.   Any right which Tenant may have under the
Lease to require changes in the Condominium Documents has been
waived by Tenant.

2.    Association hereby acknowledges and recognizes the
Lease and all of the terms, covenants and provisions thereof, and
the rights of Tenant thereunder, and agrees that the exercise by
Tenant of any of the rights, remedies and options contained
therein shall not constitute a default under or violation of the
Condominium Documents so long as such rights, remedies and
options are not inconsistent with the Condominium Documents.

3.    Association agrees that whenever it has an obligation
with respect to the Demised Premises, or its consent or approval
is required not to be unreasonably withheld as to any proposed
action of Tenant under the Lease, then, it will perform such
obligation and will not unreasonably withhold or unduly delay
such consent or approval.

4.    Association shall not, in the exercise of any of the
rights arising or which may arise out of the Condominium
Documents or of any instrument modifying or amending the same or
entered into in substitution or replacement thereof, disturb or
deprive Tenant in, or of, its possession or its rights to
possession of the Demised Premises or of any right or privilege
granted to or inuring to the benefit of Tenant under the Lease
which is not inconsistent with the Condominium Documents.

5.    Association hereby waives and relinquishes all rights
or remedies (if any) against Tenant, pursuant to any lien,
statutory or otherwise, that it may have against the property,
good or chattels of Tenant in or on the Demised Premises, whether
as a result of any default by Landlord under the Condominium
Documents or otherwise.

6.    Association acknowledges that, as between Landlord and
Tenant, the terms and provisions of the Lease shall control,
notwithstanding any provisions in the Condominium Documents to
the contrary.

[J:\013363\161\4c79$e2x.W51]
                                                 [12/11/95 3:44pm; WEITZEL_M]

7.      Association acknowledges and agrees that the
Condominium Documents may not be modified during the term of the
Lease in any respect which diminishes Tenant's rights or
increases Tenant's obligations under the Lease without Tenant's
prior written consent.  The Association further acknowledges that
Landlord shall not be entitled to exercise its voting rights
under the Condominium Documents regarding any matter as to which
the Lease requires Tenant's consent, without first obtaining
Tenant's prior written consent, which, if required under the
Lease not to be unreasonably withheld or delayed, shall not be
unreasonably withheld or delayed.

8.      Association agrees to provide simultaneous notice to
Tenant of any default by Landlord under the Condominium Documents
and agrees to accept performance by Tenant as satisfaction of any
defaults by Landlord under the Condominium Documents.

9.      Association specifically acknowledges and agrees that
no consent or approval granted by Landlord as Unit Owner of Unit
No. 5 in the Condominium to any amendment of the Condominium
Documents which would alter the rights or obligations of Tenant
under the Lease shall be valid unless the consent of Tenant is
also obtained.

10.     Any notices, consents, approval, submissions, demands
or other communications (hereinafter collectively referred to as
"Notice") given under this Agreement shall be in writing.  Unless
otherwise required by law or governmental regulation, Notices
shall be deemed given if sent by registered or certified mail,
return receipt requested, postage prepaid or by an overnight
courier service providing for delivery upon receipt (i) to
Association at the address of Association as hereinabove set
forth or such other address as Association may designate by
Notice to the other parties hereto, (ii) to Tenant, at the
address of Tenant as hereinabove set forth or such other address
or persons as Tenant may designate by Notice for the other
parties hereto.  All Notices shall become effective only on the
receipt or rejection of same by the proper parties.

11.     Association shall permit insurance, eminent domain,
condemnation and similar proceeds and/or awards relating to the
Demised Premises to be used as required or permitted by the
provisions of the Lease.

12.     No amendment or modification of this Agreement shall be
valid or binding unless in writing, signed by the party or
parties to be bound thereby.

13.     This Agreement shall be binding upon and inure to the
benefit of the parties hereto and their respective successors,
assigns and subtenants (including, without limitation, any person

-3-

[J:\013363\161\4c79$e2x.W51]
[12/11/95 3:44pm; WEITZEL_M]

or entity acquiring title to the Property or portions thereof by foreclosure or otherwise).

14.   This Agreement may be executed in one or more counterparts, each of which when exchanged shall be considered an original document.

15.   This Agreement is intended to be recorded and to run with the land and any portion thereof.

IN WITNESS WHEREOF, the parties have caused this instrument to be executed under seal the date first above written.

ATTEST:                        **TENANT:**

                               CIRCUIT CITY STORES, INC.

By: _____    By: _____


ATTEST:                        **ASSOCIATION:**

                               THE HOLYOKE CROSSING
                               CONDOMINIUM ASSOCIATION

By: _____    By: _____

                               By: _____


**Note:**   Attach appropriate notary blocks for the state in which the Demised Premises are located.

[J:\013363\161\4c79$e2x.W51]
[12/11/95 3:44pm; WEITZEL_M]

FIRST AMENDMENT TO LEASE

THIS FIRST AMENDMENT TO LEASE (the "Amendment") is dated as of November _9_, 2007 by and between **Holyoke Crossing Limited Partnership II**, a Massachusetts limited partnership with its principal office located at 480 Hampden St., Holyoke, Massachusetts 01040 ("Landlord"), and **Circuit City Stores, Inc.**, a Virginia corporation, having an address of 9950 Mayland Drive, Richmond, Virginia 23233 ("Tenant").

RECITALS

WHEREAS, Landlord is the owner of Unit No. 5 in the condominium known as "Holyoke Crossing Condominium" (the "Condominium") which was created pursuant to Massachusetts General Laws, Chapter 183A by that certain Master Deed (the "Master Deed") and those certain By-Laws dated October 31, 1996, and recorded in the Hampden County Registry of Deeds (the "By-Laws"; and together with the Master Deed, the "Condominium Documents") with respect to the property known generally as Holyoke Crossing Shopping Center, located in Holyoke, Massachusetts, and more particularly described in the Master Deed (the "Property");

WHEREAS, Landlord, as successor in interest to O'Connell Properties, Inc., and Tenant are parties to that certain Lease dated December 12, 1995 (the "Lease"), whereby Landlord demised to Tenant that portion of the Property consisting of Unit No. 5 in the Condominium (the "Premises"); and

WHEREAS, of even date herewith, Landlord, Tenant and The Holyoke Crossing Condominium Association are entering into a certain Consent Agreement simultaneous herewith (the "Consent") pursuant to which Tenant will consent to certain amendments to the Condominium Documents relating to, among other things, the use of Unit 4 in the Condominium (the "Restaurant Unit") for restaurant purposes; and

WHEREAS, as a material inducement to Tenant to provide the Consent, and as a condition thereto, Landlord and Tenant have agreed to modify and amend the Lease as more particularly set forth herein.

AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

1.    **Definitions.**  Initially capitalized terms used in this Amendment and not otherwise defined herein shall have the meanings given to those terms in the Lease.

2.    **Restaurant Use.**  Notwithstanding anything to the contrary contained in Paragraph 19(a)(viii) of the Lease, but subject at all times to the provisions that follow, the uses

First Amendment To Lease
Page 2 of 2

set forth in the proposed Amendments to Master Deed as set forth in *Exhibit A* to the Consent, and the proposed Amendment to Schedule I of the By-Laws as set forth in *Exhibit B* to the Consent, shall not be a Prohibited Activity under the Lease; provided however, that notwithstanding the foregoing and the Consent, Landlord hereby agrees that without Tenant's prior written consent, which consent shall not be unreasonably withheld, Landlord shall not enter any lease, license or other agreement relating to the Restaurant Unit (or consent to any sublease or other agreement relating to the Restaurant Unit) which allows use of such unit for restaurant purposes unless such lease, license or other agreement incorporates (a) the terms and conditions set forth on Exhibit 1 attached to this Amendment (the "Restaurant Restrictions"), modified only as provided in the last sentence of this Paragraph 2 or (b) terms and conditions with regard to assignment, subletting and consent to assignment and subletting which are more restrictive for the tenant, licensee or other user than the Restaurant Restrictions. Landlord further agrees that Landlord will not modify, amend or delete such provisions from any lease, license or other agreement relating to the Restaurant Unit (including any renewal or extension of such lease, license or other agreement) without the prior written consent of Tenant, which consent shall not be unreasonably withheld. Without limiting the foregoing, Landlord agrees that it will incorporate the Restaurant Restrictions into the lease currently being negotiated by Landlord with RR Realty of Holyoke, LLC ("Red Robin") and will not modify, amend or delete such provisions without the prior consent of Tenant, which consent shall not be unreasonably withheld. Notwithstanding the foregoing provisions of this Paragraph 2, Landlord and Tenant agree that without the prior consent of Tenant, the Restaurant Restrictions can be modified to replace any references to "Red Robin" to the direct or indirect parent company of any restaurant operator.

3.    **Ratification.** Except as amended and modified hereby, the Lease is ratified, confirmed and approved and shall remain in full force and effect in accordance with its terms.

4.    **Counterparts.** This Amendment may be executed in any number of counterparts with the same force and effect as if all signatures were appended to one document, each of which shall be deemed an original. In order to expedite the transaction contemplated herein, telecopied signatures or signatures transmitted electronically may be used in place of original signatures on this Amendment. Landlord and Tenant intend to be bound by the signatures on the telecopied or electronically transmitted document, are aware that the other party will rely on the telecopied or electronically transmitted signatures and hereby waive any defenses to the enforcement of the terms of this Amendment based on the form of signature.

[Signatures follow on next page]
[The remainder of this page is intentionally left blank]

First Amendment To Lease
Page 3 of 3

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment to Lease under seal as of the date first written above.

ATTEST:                              LANDLORD:
                                     **HOLYOKE CROSSING LIMITED PARTNERSHIP II,**
                                     a Massachusetts Limited Partnership

                                     By:    O'Connell-Crossing Corp. II, Its General Partner

*James P. Klingent*                         By: *James N. Sullivan, Treas.*
                                            Name: James N. Sullivan
                                            Title:  Treasurer


ATTEST:                              TENANT:
                                     **CIRCUIT CITY STORES, INC., a Virginia corporation**

                                     By: _____
                                     Name:  John Mulleady
                                     Title:  Vice President Real Estate & Construction

First Amendment To Lease
Page 4 of 4

## EXHIBIT "1"

Provisions to be incorporated into, and made a part of, any lease executed between Landlord and Red Robin:

> "5.9.1 General. Tenant shall not assign this Lease, or sublet or license the Premises or any portion thereof, or permit the occupancy of all or any portion of the Premises by anyone other than Tenant (all or any of the foregoing actions are referred to as "Subleases" and all or any of assignees, subtenants, licensees, and other such parties are referred to as "Subtenants") without obtaining, on each occasion, the prior written consent of the Landlord, which consent shall not be unreasonably withheld, delayed or conditioned by Landlord, as more fully described in Section 5.9.2. The term Sublease shall not include and Landlord's consent shall not be required for any transfer of Tenant's interest in this Lease by operation of law or by merger or consolidation of Tenant into any other firm or corporation, nor the transfer or sale of an interest in Tenant (whether by sale of its capital stock or otherwise) or the assets or operations of Tenant within the metropolitan area in which the Premises are located, nor the transfer of Tenant's interest herein to any entity controlling, controlled by or under common control with Tenant, so long as Tenant gives prompt notice thereof to Landlord, the transferee (other than a purchaser of stock or membership interest in Tenant) promptly delivers to Landlord an instrument in which such transferee assumes all the obligations of the original named Tenant and the original Tenant and any Guarantor named herein shall remain directly and primarily obligated under this Lease (any transfer described in this sentence shall be referred to as a "Permitted Transfer"). In addition, the term Sublease shall not include and Landlord's consent shall not be required for an assignment or sublease to Red Robin International, Inc. ("Red Robin"), Tenant's franchisor, or to a parent, subsidiary or affiliate of Red Robin, so long as Tenant gives prompt notice thereof to Landlord, the transferee promptly delivers to Landlord an instrument in which such transferee assumes all the obligations of the original named Tenant and the original Tenant and any Guarantor named herein shall remain directly and primarily obligated under this Lease.
>
> Tenant shall not enter into any Sublease with respect to less than the entire Premises (except as otherwise expressly set forth herein) nor shall Tenant enter into any Sublease for uses other than the Permitted Uses and except as Landlord may consent in writing (such

First Amendment To Lease
Page 5 of 5

consent shall not be unreasonably withheld, delayed or conditioned by Landlord), provided such use complies with the other provisions of this Lease, including without limitation the provision of Section 5.1.4., and the original named Tenant and any Guarantor named herein shall remain directly and primarily obligated under this Lease.

Tenant, in requesting Landlord's written consent to a Sublease hereunder, shall provide the proposed Subtenant's name, trade-name, proposed uses, reasonable business and financial information about the Subtenant and such other information as is required under Section 5.9.2.

5.9.2   Sublease Consents. Subleases shall be subject to the prior written consent of Landlord as required in Section 5.9.1. Such consent shall not be unreasonably withheld, conditioned or delayed, but may be withheld if Landlord has reasonable concern about the quality, reputation, financial strength or anticipated sales volume of the proposed Subtenant, and whether the proposed use is in keeping with the development of the Shopping Center as a first-class retail shopping center and appropriate given the other stores located within the Shopping Center.   Tenants request for consent to a Sublease shall include a copy of the proposed Sublease instrument, if available, or else a statement of the proposed Sublease in detail satisfactory to Landlord, together with reasonably detailed financial, business and other information about the proposed Subtenant. The consent by Landlord to a particular Sublease under Section 5.9.1 shall not relieve Tenant from the requirement of obtaining the consent of Landlord to any further Sublease."

## AFFIDAVIT OF LANDLORD AND TENANT CORRECTING LEASE

Reference is made to that certain lease by and between Holyoke Crossing Limited Partnership II ("Landlord") as successor- in- interest to O'Connell Properties, Inc., and Circuit City Stores, Inc. ("Tenant") dated December 12, 1995, as amended by that certain First Amendment To Lease dated January 31, 2008 (the "First Amendment") (collectively, said lease and First Amendment are referred to as the "Lease"), whereby Landlord demised to Tenant that portion of the Property consisting of Unit No. 5 in the condominium known as "Holyoke Crossing Condominium" which was created pursuant to Massachusetts General Laws, Chapter 183A by that certain Master Deed and those certain By-Laws, dated October 31, 1996 and recorded in the Hampden County Registry of Deeds at Book 9671, Page 501 and Book 9671, Page 529, respectively.

The undersigned hereby avers, acknowledges and agrees that:

Any and all references within said First Amendment to "RR Realty of Holyoke, LLC" are intended to mean "Round Robin Realty of Holyoke, LLC".

IN WITNESS WHEREOF, the parties hereto have executed this Affidavit of Landlord and Tenant under penalties and pain of perjury and seal as of this _6th_ day of March, 2008.

ATTEST:                           LANDLORD:
                                  **HOLYOKE CROSSING LIMITED PARTNERSHIP II,**
                                  a Massachusetts Limited Partnership

                                  By:    O'Connell-Crossing Corp. II, Its General Partner

_James D. Klimpmik_               By: _James N. Sullivan, Treasurer_
                                  Name: James N. Sullivan
                                  Title:   Treasurer


ATTEST:                           TENANT:
                                  **CIRCUIT CITY STORES, INC.,**
                                  a Virginia corporation

                                  By: _____
                                  Name: John Mulleady
                                  Title:   Vice President Real Estate & Construction

Reginald D. Hedgebeth
Senior VP, General Counsel & Secretary