H. Slayton Dabney Jr., Esq.,
(VSB No. 14145)
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222
sdabney@kslaw.com


Counsel for Applied
Predictive Technologies, Inc.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

------------------------------------------------x

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **CIRCUIT CITY STORES, INC., et al.,** | ) | **Case No. 08-35653-KRH** |
| | ) | |
| **Debtors.** | ) | **Jointly Administered** |
| | ) | **Judge Kevin R. Huennekens** |

------------------------------------------------x

## MOTION OF APPLIED PREDICTIVE TECHNOLGIES, INC. FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM

NOW COMES Applied Predictive Technologies, Inc. ("APT"), by and through its

undersigned counsel, pursuant to Bankruptcy Code section 503(b)(1)(A), and moves the Court

for allowance and payment of a Chapter 11 administrative expense claim ("Administrative

Expense Motion").

### JURISDICTION

1. The Court has jurisdiction over this Administrative Expense Motion pursuant to 28

U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of

this Motion is proper under 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

2.  On or about September 1, 2002, APT and one or more of the above captioned debtors ("Circuit City" or "Debtors") entered into the Applied Predictive Technologies Order Agreement, providing that the Debtors licensed the use of certain software provided by APT for a 3-year term. *See* Attachment A. On or about September 1, 2005, APT and the Debtors entered into the Applied Predictive Technologies Renewal Order Agreement, whereby the Debtors extended the licensed use of APT's software for an additional 3-year term. *See* Attachment B. On or about September 1, 2008, APT and the Debtors entered into the Applied Predictive Technologies License Extension ("Extension"), whereby the Debtors extended the licensed use of APT's software for an additional 6-month term. *See* Attachment C. Pursuant to the Extension, the Debtors agreed to pay APT $75,000 for the licensed use of the software from September 1, 2008 through March 1, 2009.

3.  Since the Debtors filed for chapter 11 on November 10, 2008 ("Petition Date"), APT has performed under the Extension. Specifically, from the Petition Date through February 2, 2009, APT provided post-petition goods and services to the Debtors totaling at least $35,000, thereby providing a benefit to the Debtors' estate. The value of the post-petition goods and services is derived by multiplying the per diem license fee of $416.67 by the 84 days from the petition date through February 2, 2009.

4.  The Debtor has failed to pay for the post-petition goods and services due under the contracts. The Debtors owe $35,000 for charges incurred post-petition.

5.  The amounts owed by the Debtors were actual, necessary costs and expenses of preserving the Debtors' estates and are unsecured debts incurred by the Debtor in the ordinary course of its business.

2

## RELIEF REQUESTED

6.       Section 503 of the Bankruptcy Code provides that the "actual, necessary costs and expenses of preserving the estate, including . . . [costs] for services rendered after the commencement of the case" shall be allowed as an administrative expense. 11 U.S.C. § 503(b)(1)(A).

7.       In the present case, APT is entitled to a Chapter 11 allowed administrative expense claim against the Debtors' bankruptcy estate pursuant to Section 503(b)(1)(A) of the Bankruptcy Code for the post-petition charges, because APT delivered beneficial services post-petition. *See Devan v. Simon DeBartolo Group, L.P. (In re Merry-Go-Round Enters., Inc.)*, 180 F.3d 149, 157 (4th Cir. 1998).

8.       The amount owed to APT by the Debtors under the contracts for the post-petition period to date is $35,000.[1]  *See* Attachments D, E, & F (Invoices for the Extension).

## WAIVER OF MEMORANDUM OF LAW

9.       APT respectfully requests that the Court treat this Motion as a written memorandum of points and authorities and waive any requirement that this Motion be accompanied by a written memorandum of points and authorities as required by Local Bankruptcy Rule 9013-1(G).

## CONCLUSION

BASED UPON THE FOREGOING, APT respectfully requests that this Court enter an order: (i) granting the Motion; (ii) allowing APT a Chapter 11 administrative claim pursuant to Section 503(b)(1)(A) of the Bankruptcy Code in the amount of $35,000; and (iii) granting such other and further relief as is just and proper.

---

[1] APT reserves the right to supplement this Administrative Expense Motion with additional amounts that become due after this motion is filed.

DATED: February 3, 2009

Respectfully submitted,

/s/ H. Slayton Dabney Jr., Esq.,
(VSB No. 14145)
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222

**COUNSEL FOR APPLIED
PREDICITIVE TECHNOLOGIES**

## CERTIFICATE OF SERVICE

I hereby certify that on February 3, 2009, a true and complete copy of the foregoing was filed and served using the Court's ECF System and was sent by first class mail, postage prepaid to the parties set forth below:

Greg M. Galardi
Skadden, Arps, Slate, Meagher & Flom
One Rodney Square
P.O. Box 636
Wilmington, DE 19899-0636
gregg.galardi@skadden.com

*Counsel for the Debtors*

Dion W. Hayes
McGuire Woods, LLP
One James Center
901 East Cary Street
Richmond, VA 23219
dhayes@mcguirewoods.com

*Counsel for the Debtors*

Lynn L. Tavenner
Tavenner & Beran, PLC
20 North Eighth Street
Second Floor
Richmond, VA 23219
ltavenner@tb-lawfirm.com

*Counsel for the Creditors Committee*

Robert J. Feinstein
Pachulski Stang Ziehl & Jones LLP
780 Third Avenue
36th Floor
New York, NY 10017
rfeinstein@pszjlaw.com

*Counsel for the Creditors Committee*

Robert B. Van Arsdale
Office of the United States Trustee
701 East Broad Street, Suite 4304

5

Richmond, VA 23219
Robert.b.van.arsdale@usdog.gov
*Assistant United States Trustee*

/s/ H. Slayton Dabney Jr., Esq.,
(VSB No. 14145)
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222

6

**ATTACHMENT A**

# APPLIED PREDICTIVE TECHNOLOGIES ORDER AGREEMENT

This Order Agreement ("Order Agreement"), effective as of the 1st day of September 2002 ("Effective Date"), is between Applied Predictive Technologies, Inc., a Delaware corporation located at 901 North Stuart Street, Suite 1100, Arlington, VA 22203 ("APT") and the business entity identified below ("Licensee") and shall be governed pursuant to the APT General Software License, Support and Service Terms attached hereto as Exhibit A ("Terms") between the parties dated September 1, 2002. Capitalized terms in this Order Agreement not otherwise defined shall have the same meanings as set forth in the Terms. In the event of any conflict between the provisions of the Terms and the provisions of this Order Agreement, the provisions of this Order Agreement shall govern. APT grants to Licensee a non-exclusive, non-transferable license to use the following Software for Licensee's internal use in North America:

1.    Licensee:            Circuit City Stores, Inc.

2.    Software/License Terms:

*License*

| Item No. | Software Product | License Type | Units |
|---|---|---|---|
| 1 | AptRetailer | End-User License for Three (3) Years commencing on the Effective Date (the "License Period") | Fifty (50) user license |

*Support, Hosting Services and Consulting Services*

| Item No | Software Name | Support Level | Start Date | Renewal Date |
|---|---|---|---|---|
| 1 | aptRetailer | Full | Effective Date | See Below |

*Definitions and Restrictions*

Full Support includes, for the period Full Support is purchased: (1) user access to APT designated call support line M-F 8:00am – 6:00 pm EST , (2) APT hosting of the Software, (3) all updates or upgrades or new releases of the Software released by APT during the period support is purchased, (4) error correction (items 1, 3 and 4 being collectively referred to herein as "Support" and item 2 as "Hosting Services"), and (5) Consulting Services, all as more particularly described in the Terms.

1



Delivery:  Delivery of the Software occurs when the Site Planner portion of the Software is available to predict the performance of a site anywhere in the United States.

3.      **Fees/Payment Terms:**

License Fee:                          $585,000, 50% due upon execution of the Terms and this Order Agreement, 50% due upon Delivery.  The parties acknowledge that APT has represented to Licensee that it intends to provide an upgrade, update or new release of the Network Planning module of the Software no later than one hundred twenty (120) days following the Effective Date.  In the event APT fails to provide such upgrade, update or new release by such date, or in the event such update, upgrade or new release is not satisfactory to Licensee, in its sole discretion, then Licensee may, at its option, either (1) terminate this Agreement and receive a full refund of the License Fee and fees paid for Full Support, or (2) provide APT with another ninety (90) days to enhance the Network Planning module of the Software, and if after the additional ninety (90) days Licensee is still not satisfied, Licensee may terminate this Agreement and receive a pro-rata refund of the License and Support Fees.  Furthermore, and notwithstanding anything to the contrary set forth in the Terms, if at any time during the License Period Licensee determines that apt*Retailer* fails to meet the specifications defined in Schedule 1 or in the Related Documentation, then Licensee may, at its option, demand correction of the error, defect or deficiency or terminate this Agreement and receive refund of the pro rata portion of the License Fee and fees for Full Support, Support, Hosting Services and/or Consulting Services (such fees being referred to here collectively as "Support Fees") remaining.   This amount will be calculated as the remaining number of months remaining in the License Period divided by 36 times the original License Fee and the remaining number of months remaining in the year for which Support Fees have been paid divided by 12 times the Support Fee year.  Such refund shall also be due and owing in the event Licensee otherwise terminates this Order Agreement or the Terms due to a breach of any material obligation hereof or thereof.  In the event Licensee demands correction as described above, and such correction is not provided within a reasonable time, or within the time otherwise set

2

forth in the Terms, Licensee may then exercise the termination rights and receive the refunds set forth above.

Support Fee:  Full Support shall be provided at $117,000 per year for the first year of the License Period set forth in this Order Agreement, unless earlier terminated in accordance with the Terms. For the second and third years of the License Period set forth in this Order Agreement, Licensee may elect to purchase (i) Support and Hosting Services alone for the amount of $70,200, or (ii) Full Support for the amount of $117,000. Full Support for the first year is payable upon Delivery, and Support Fees, as elected by Licensee, for the second and third year of the License Period on the anniversary of Delivery thereafter. In the event Licensee does not elect to purchase Consulting Services either separately or as part of Full Support, APT agrees to provide Consulting Services to Licensee on an as requested basis at APT's standard rates then in effect.

Normal Expenses:  Normal expenses to support ongoing work will be billed monthly. Such expense items as travel, food and lodging will be billed by APT in accordance with Licensee's Travel Policy and data acquisition will be billed as incurred by APT with no mark-up.

Exclusivity:  During the Initial License Period, Licensee shall be the exclusive consumer electronics retailer with an average store size greater than 12,000 square feet, to which APT licenses or provides software or services relating to real estate or network planning issues. In addition, during the Initial License period, Licensee shall be the only consumer electronics retailer with an average store size greater than 12,000 square feet, to which Jim Manzi or Patrick O'Reilly provides consulting services on behalf of APT.

Professional Services:  No additional fees for the initial year – see above for options for Consulting Services for years two and three.

Renewal:  If Licensee, at its sole option, elects to renew its software license with APT at the conclusion of the first three year license period, APT will make available to Licensee a three year license renewal for an amount equal to the previous term's software license fee ($585,000) multiplied by a factor equal to the combined three-year increase in the US Consumer Price Index (the CPI-U, US City Average, All Items (NSA), or if no longer available its closest CPI equivalent), plus 2 percentage points per

3

year. For example, if the CPI has increased 3 percent per year, the factor would equal an annual increase of 5 percent, compounded over the life of the three year term, per year, or 1.1576. Therefore, the second three year license would cost $677,196. Likewise, Licensee may elect to renew APT support and the annual Full Support Fees would equal 20% of the software license fee, or in this case $135,439 per year for the second three year term. In addition to the first renewal terms described above, Licensee shall have the right and option to continue renewing in perpetuity the terms of the software license agreement and the hosting, maintenance, support and upgrade agreement using the above formula to determine the amount of fees to be paid APT for each renewal term. APT shall furnish Licensee with invoices for renewal fees, which invoices shall require payment no sooner than thirty (30) days after commencement of a renewal term. If the number of stores Licensee wishes to load into the Software at the beginning of a renewal period is more than three times as many as the number of stores at the beginning of the prior license term, then this paragraph will be void. Also, this paragraph assumes that the Exclusivity agreement will be cancelled as part of the renewal. If Licensee does not cancel the exclusivity provisions, then the price guarantees in this paragraph are void.

4.    **Reporting Center(s):**

All support calls from Licensee should be directed to the APT Support Center (703-875-7700).

This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia without regard to principles of conflicts of law.

This Agreement shall be binding upon Licensee and APT and their respective permitted successors and assigns.

Circuit City Stores, Inc.

By: _____

Date: _____

John Froman
EVP and Chief Operating Officer

Applied Predictive Technologies, Inc.

By: _____

Date: _____

Patrick O'Reilly
Vice President, Business Development

4

## APT GENERAL SOFTWARE LICENSE, SUPPORT & SERVICES TERMS ("Terms")

### 1.0 GENERAL TERMS

1.1 These Terms, effective the 1st date of September, 2002 ("Effective Date") govern the license by Licensee of APT software programs in object code form ("Software"), and related user manuals and documentation ("Related Documentation"), as well as the provision of support for the Software ("Support") and other services relating to the Software, including but not limited to Hosting Services, training Services and Consulting Services ("Services"). In these Terms, unless otherwise stated, the word "Software" includes Related Documentation.

1.2 Software, Services and Support will be provided to Licensee pursuant to the Order Agreement appearing on the face of this document or in a separate or any subsequent document referencing these Terms executed by both parties ("Order Agreement"). Each Order Agreement will be subject to these Terms. Any conflict between these Terms and the Order Agreement will be resolved in favor of the latter and any conflict between Order Agreements will be resolved in favor of the most recent.

### 2.0 SOFTWARE LICENSE.

2.1 APT grants to Licensee a non-exclusive, non-transferable license to use the Software described in the Order Agreement. Each copy of the Software and any update, upgrade or new release of the Software provided to Licensee is subject to the provisions of these Terms. The term "Software" shall be deemed to include any such update, upgrade or new release provided hereunder.

2.2 Licensee's use of Software is limited to the hardware (computers, CPU's, or servers) the number of copies or users, the number of stores, call centers and Web Sites, and such other restrictions, as set out in the Order Agreement. In addition, in the event Licensee is providing hosting for the Software, Licensee may make and use copies of the Software for backup and disaster recovery purposes. Licensee is entitled to use a number of copies of the Related Documentation equivalent to such number of copies, users, stores, call centers and Web Sites set forth in the Order Agreement. Licensee may purchase additional copies of Related Documentation at prevailing APT prices.

2.3 Licensee will use the Software only for its own internal purposes and those of its Affiliates, and will not sublicense, distribute, rent, lease, or otherwise make the Software available to any unrelated third party other than an Affiliate except as set forth herein. Licensee will not make available the Software or use the Software or its outputs either directly or as a service bureau to any third party institution other than an Affiliate that does not own a license to the Software. For purposes of these Terms, an Affiliate is an individual or entity controlling, controlled by or under common control with Licensee. The parties agree that Carmax is not an affiliate.

### 3.0 SUPPORT & SERVICES

3.1 Requests for Support will be directed through the Licensee's representatives to the APT Support Center identified in the Order Agreement. Such Support shall include telephone support as set forth in the Order Agreement, all updates, upgrades and new releases of the Software, and correction of all material errors, deficiencies and defects in the Software Material errors, deficiencies and defects shall be addressed in accordance with the escalation procedures attached hereto as Exhibit B

3.2 If provided on the Order Agreement, APT agrees to provide hosting services for the Software ("Hosting Services"). Such Hosting Services will be provided in accordance with the service levels and availability requirements set forth in Exhibit B attached hereto and shall be subject to the escalation procedures attached hereto as Exhibit B. Failure to meet such service levels, availability requirements or escalation procedures shall be subject to the remedies set forth in Exhibit B. Such Hosting Services shall be provided in accordance with commercially reasonable security standards, including standards relating to physical and data security. Upon reasonable prior request from Licensee, APT agrees to provide access to its hosting facility (regardless of whether such hosting facility is in house at APT or is a third party hosting facility) to Licensee's personnel (or Licensee's representative) for purposes of conducting such security review or audit as Licensee may deem reasonably necessary, at Licensee's expense. In the event Licensee determines that there are material deficiencies to such security procedures, APT shall cure such deficiencies within the time frame set forth by Licensee, and, in the event APT fails to cure such deficiencies to the satisfaction of Licensee, Licensee may either (i) terminate the Hosting Services with regard to a particular Order Agreement; (ii) terminate the applicable Order Agreement; or (iii) terminate these Terms. In addition, in the event that APT hosts the Software at a third party facility, APT will, upon request by Licensee, provide proof of payment of such third party facility's fees.

3.3 At all times that APT is providing Hosting Services hereunder, it will maintain a commercially reasonable disaster recovery plan and will provide a copy of the same to Licensee upon request

3.4 During the term of this agreement, APT shall maintain : (a) Statutory Workers' Compensation insurance as required by applicable law and (b) a policy of commercial general liability insurance, including products - completed operations coverage, with an insurance carrier authorized to do business in the United States and having a rating of "A," "A-" or better by A.M. Best Company and a financial rating of at least Class VIII, with limits of no less than $2,000,000 per occurrence and $3,000,000 aggregate. Complete coverage will be maintained for the time period covered by this agreement and for at least five (5) years after the goods to be delivered under this agreement have been delivered to Circuit City Stores, Inc. In addition APT will maintain Errors and Omissions coverage with limits of no less than $3,000,000 with an insurance carrier meeting the standards set forth above. Such policies shall name Circuit City Stores, Inc. as an additional insured A certificate of insurance shall be provided to Circuit City Stores, Inc. upon reasonable request, evidencing the coverage required and naming Circuit City Stores, Inc. as an additional insured

3.5 Notwithstanding anything to the contrary contained in the Order Agreement, Licensee may, at any time, upon at least thirty (30) days notice to APT, terminate Hosting Services, and may elect to host the Software itself. In such event, APT will promptly deliver the Software and any of the Licensee's data related to the Software to Licensee, together with any and all documentation necessary to set up and support the system in electronic form. APT will, upon the request of Licensee, provide services to the Licensee in connection with the installation, configuration and hosting of the Software by

5



Licensee at fees to be mutually agreed upon by the parties, but not greater than APT's then current rates.

3.6 For no additional cost, APT will provide Licensee with the training Services set forth on Schedule 1

3.7 During the period for which Licensee has purchased Full Support or Consulting Services, as set forth on the applicable Order Agreement, for no additional cost, APT will provide Licensee with a reasonable amount of Services consisting of on-site analytical support

3.8 Neither the Software, Support nor the Services will contain or introduce into Licensee's computers, networks or systems any virus, time bomb, worm, trojan horse or other similar damaging device

3.9 Licensee shall own and retain ownership of all data, information, materials, or other items including Confidential Data provided by Licensee to APT hereunder, and shall own and retain ownership of any output created by the Software, and all such output shall be deemed to be Confidential Data hereunder. Except as set forth above or as otherwise agreed by the parties, APT retains all right, title and interest in any software, documentation or other works provided to Licensee or developed as a result of performing Services ("Works") APT grants Licensee a perpetual, non-exclusive, non-transferrable license to use and modify the Works solely for Licensee's internal purposes and not for distribution. Except as otherwise expressly agreed and subject to any provisions relating to exclusivity set forth herein or in the Order Agreement, either party may (a) independently develop works competitive with or similar to the Works, and (b) make use of the know-how acquired, principles learned or experience gained during the performance of the Services.

3.10 For a period ending six (6) months after the completion of any Services neither party will knowingly directly or indirectly, solicit, induce away from the other any employee or sub-contractor of the other who has provided those services.

3.11 APT agrees to indemnify and hold Licensee harmless from and against any and all claims, loss, cost, liability, damage or expense arising out of or in connection with any breach of Section 3.3 or 3.8, and violation of the security provisions of Section 3.2

## 4.0   FEES & CHARGES

4.1 Licensee will pay APT the fees, charges or other amounts specified in the Order Agreement. All invoices are due forty-five (45) days from receipt of the invoice. Licensee shall pay to APT interest equal to the lesser of 1.5% or the maximum legal interest rate of the undisputed portion of an unpaid invoice for each thirty (30) day period, or portion thereof, in which any invoice remains unpaid

4.2 All sales, value-added and other taxes relating to Software, Related Documentation, Support or Services, excluding taxes on the income of APT, will be paid by Licensee

## 5.0   CONFIDENTIAL DATA

The Confidentiality Agreement between the parties dated as of November 6, 2001 is attached as Exhibit D and is incorporated into this Agreement by reference. The parties acknowledge and agree that such Confidentiality Agreement shall govern the disclosure and use of all Confidential Data (as defined therein) disclosed pursuant to or in the course of the performance hereunder or in the course of receipt of Support or Services hereunder

## 6.0   WARRANTY

6.1 In addition to and not in limitation of any warranties provided in the Order Agreement, APT warrants that: (a) it has the right to grant the license to use the Software as set out in these Terms; and (b) for a period of thirty (30) days following the initial delivery of the Software, or of any new release of the Software, to Licensee the media, if any provided by APT will be free of defects in materials and workmanship; (c) the Software will function in accordance with Schedule 1, Exhibit B and its Related Documentation in each of the currencies, including the Euro, constituting the European Monetary Union ("EMU"), and enable a user to process its data in accordance with the legal framework implementing the EMU, excluding malfunction caused, present or inherent in the data, database or native file system that the Software accesses; (e) the Software and the medium, if any, on which it was originally provided to Licensee is free from any virus at the time of delivery; (f) Support and Services will be provided in a competent, efficient and workmanlike manner and in accordance with generally accepted software industry standards; and (g) neither the Software, Support nor Services will infringe, misappropriate, or otherwise violate any patent, copyright, trademark, trade secret or other proprietary right of any third party. In the event the Order Agreement does not provide a warranty with regard to the performance of the Software, APT represents and warrants that for a period of ninety (90) days following (i) the initial delivery of the Software or any update, upgrade or new release to the Software to Licensee where Hosting Services are provided, or (ii) the installation of the Software or any update, upgrade or new release of the Software where Hosting Services are not provided, the Software will perform in conformity with Schedule 1 and its Related Documentation

6.2 There is no warranty that the APT's information, efforts, or system will fulfill any of Licensee's particular needs or purposes.

6.3 THESE WARRANTIES ARE IN LIEU OF ALL OTHER WARRANTIES EXPRESS, IMPLIED, OR STATUTORY, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY, QUALITY, OR FITNESS FOR A PARTICULAR PURPOSE.

6.4 In addition to and not in limitation of any remedies provided in the Order Agreement, if the above warranties are breached APT will, at its option and at no cost to Licensee (a) provide remedial services necessary to enable the Software, Support or Services to conform to the warranty or  (b) replace any defective Software or media, or (c) refund amounts paid in respect of the defective Software, Support or Services. With regard to the Software, APT's warranty obligations will only extend to material errors that can be demonstrated to exist in an unmodified version of the Software except where the modifications were carried out by APT or with its approval Licensee will notify APT promptly of any breach of warranty and provide APT with a reasonable opportunity to remedy any breach, and reasonable assistance in remedying any defects

6.5   In certain jurisdictions some or all of the provisions in this Section may not be effective or the applicable law mandates a more extensive warranty in which case the applicable law will prevail over these Terms.

## 7.0 LIMITATION OF LIABILITY

6



7.1  Neither party will be liable to the other for loss of profits, or special, indirect, incidental, consequential or exemplary damages in connection with the supply, use of performance of the Software or the performance of its other obligations pursuant to these Terms, even if it is aware of the possibility of the occurrence of such damages. The foregoing limit does not apply to the indemnity given in Sections 3.3, 3.8 and 9, to a violation of the security provisions of Section 3.2, to gross negligence or willful misconduct of either party, a breach by either party of its obligations set forth in Section 5 above, or to death or personal injury arising from negligence of APT or in respect of accidental loss of, or damage to Licensee's property, to the extent caused by APT, its employees or subcontractors. In certain jurisdictions the foregoing limitations may not be effective, in which case the applicable law will prevail over these Terms.

7.2  In any event and independent of Section 7.1, the total liability of APT (including the licensors of products forming part of the Software) to Licensee and the total liability of Licensee to APT for any claim under these Terms or any Order Agreement whether it arises by statute, contract or otherwise, will not exceed the amounts paid to APT by Licensee under these Terms or any Order Agreement for the Software, Support or Services which form the subject of the claim. The foregoing limit does not apply to the indemnity given 9, to Sections 3.3, 3.8, or to violations of the security provisions in Section 3.2, to gross negligence or willful misconduct of either party, a breach by either party of its obligations set forth in Section 5 above, or to death or personal injury arising from negligence of APT or in respect of accidental loss of, or damage to Licensee's property, to the extent caused by APT, its employees or subcontractors.

## 8.0  PROPRIETARY RIGHTS

Licensee acknowledges APT's representations that the Software contains confidential and proprietary information and trade secrets belonging to APT and its licensors, and that title in and rights to the Software remain exclusively with APT. Licensee's rights to the Software are strictly limited to those granted in these Terms. Licensee will not decompile, disassemble or otherwise reverse engineer the Software. If the foregoing provision is prohibited by applicable law, Licensee will (a) notify APT of its intention to decompile, disassemble or otherwise reverse engineer the Software and (b) the nature of the work involved. APT will be given the right of first refusal to perform such work at its prevailing rates and prices.

## 9.0  INTELLECTUAL PROPERTY INDEMNIFICATION

APT will indemnify, defend and hold Licensee harmless against any claims, legal actions, losses, damages, liability costs and expenses (including but not limited to reasonable attorneys' fees and court costs) arising out of or in connection with any claim that the Software, Support or Services infringe, misappropriate or otherwise violate any patent, copyright, trademark, trade secret or other proprietary right of any third party ("Claim"), on the condition that Licensee notifies APT promptly of the Claim and gives APT sole control of the defense and negotiations for its settlement or compromise (provided, however, that Licensee may elect to participate in such defense with counsel of its choice at its own expense) If Licensee is, or may become, prohibited from continued use of any Software by reason of an actual or anticipated Claim, APT will use its reasonable efforts to (a) obtain for Licensee the right to use the Software, or (b)

replace or modify such Software so that it is no longer subject to a Claim, but performs the same functions in an equivalent manner. If it cannot do so, APT will refund to Licensee the unused portion of the license fees paid in respect of the Software (determined by depreciating the license fees paid on a straight-line basis over three years) and any corresponding unused Support Fees. APT will have no liability for any Claim based on (i) use of other than a prevailing release of the Software (if the Claim could have been avoided by that release and Licensee has been so notified), or (ii) any use or modification of Software not approved by APT. THIS SECTION STATES THE ENTIRE RESPONSIBILITY OF APT CONCERNING CLAIMS AND WILL SURVIVE THE TERMINATION OF THESE TERMS.

## 10.0  TERM & TERMINATION

These Terms shall become effective upon the Effective Date of the first Order Agreement to which these Terms are attached, and shall remain in effect until the termination or expiration of all Order Agreements subject to these terms. A party ("Terminating Party") may, on giving notice to the other party, terminate either these Terms or an individual Order Agreement on written notice to the other if the other party fails to remedy a breach of any material obligation under these Terms or any Order Agreement within 30 (thirty) days after receiving notice thereof from the Terminating Party. If either these Terms or an individual Order Agreement are terminated, the parties will continue to be liable for any obligations arising, liabilities accrued or amounts payable prior to the date of termination under all Order Agreements executed prior to termination. In addition to any other remedies, APT may seek injunctive relief in respect of any breach of these Terms or any Order Agreement by Licensee (or any Affiliate). Notwithstanding the foregoing, Sections 2, 5, 7, 8, 9 and 12 of these Terms shall survive the termination of this Agreement

## 11.0  AUDIT RIGHTS

In the event Licensee hosts Software at any of its locations, Licensee will keep accurate records of the number of copies of Software made and distributed, if any, the number of end users and their location. APT may enter Licensee's premises during business hours on at least 5 (five) business days notice for the purpose of examining, or having examined (at APT' own expense), Licensee's relevant books, records and computers to verify Licensee's fulfillment of its obligations under these Terms and/or any applicable Order Agreement. In the event a third party examines such books, records, and computers on behalf of APT, such third party shall be required to enter into such agreements with Licensee as Licensee may deem necessary to protect the security and confidentiality of its Confidential Data.

## 12.0  GENERAL

12.1  All notices pursuant to these Terms will be in writing and given by: delivery, registered or certified mail (postage prepaid), or by facsimile transmission (with answerback), to the other party at the address appearing in these Terms. Each party will promptly give written notice of any change in its address or addressee. Notices will be deemed to be received on delivery, on the fifth (5th) business day after mailing, or upon facsimile transmission (with answerback), as the case may be.

7

12.2   No delay or failure in exercising any right under these Terms, or any partial or single exercise of any right, will constitute a waiver of that right or any other rights under these Terms No consent to a breach of any express or implied term set out in these Terms constitutes a consent to any subsequent breach  Except as otherwise expressly set forth herein, the parties shall have all remedies available at law or in equity, and the remedies set forth herein are not exclusive.

12.3   If any provision of these Terms is, or becomes, unenforceable, it will be severed from these Terms and the remainder of these Terms will remain in full force and effect.

12.4   These Terms are binding upon and will inure to the benefit of both parties, and their respective successors and assigns Either party may assign or otherwise transfer its rights under these Terms to a third party ("assignment") on the condition that (a) the third party delivers to the non-assigning party a duly executed document agreeing to be bound by these Terms and (b) the assignment is part of a bona fide internal corporate reorganization or a merger or acquisition of all or substantially all of the assets of such party (provided that if APT is the assigning party, acquiror is not a competitor of Licensee)  Despite the foregoing, if all or part of the Licensee's business is acquired by a third party (by way of asset or share purchase, merger or amalgamation) or if it becomes an Affiliate of a third party, the scope and effect of these Terms and any Order Agreement(s) will be limited (a) to the business carried on by the Licensee and its Affiliates and (b) to the total number of copies or users of Software authorized in those Order Agreements, immediately prior to either of the foregoing events.

12.5   This agreement, consisting of the Terms and all Order Agreements referencing the same, and any matters relating to it, will be governed, construed and interpreted in accordance with the laws applicable in the Commonwealth of Virginia, excluding its law relating to conflicts of laws and the United Nations *Convention on Contracts for the International Sale of Goods* (and any legislation implementing such Convention)

12.6   Licensee will ensure that, to the extent permitted hereunder, the Software (and any direct products thereof) is exported or re-exported in compliance with applicable statutes or regulations (including U.S. export laws) relating to the country of destination, or to the users or uses of the Software

12.7   This agreement, consisting of the Terms and all Order Agreements referencing the same, is the entire understanding and agreement between Licensee and APT with respect to the Software and it supersedes all prior negotiations, commitments and understandings, verbal or written, any purchase order issued by Licensee and any terms (in any form or medium) provided with or in the Software  These Terms or an Order Agreement may only be amended or otherwise modified by written agreement signed by the authorized signatories of both parties

12.8   At such time as these Terms and any Order Agreement become effective, the Licensee authorizes APT to use Licensee's name in a press release or similar communication referring to the license of the Software by the Licensee, provided, however, that any such press release or similar communication shall be approved in writing by Licensee prior to its release. Any additional information relating to the license of the Software or any other Service provided

hereunder shall be reviewed and approved by Licensee prior to publication.

12.9   At all times during the term of these Terms, APT warrants that it will maintain in force an arrangement for the escrow of the source code version of the Software, together with an image of the server(s) upon which the source code is deployed to assist Licensee with re-deployment in Licensee's environment and such system documentation, database and data module information as may be required to enable Licensee to install, host, operate and maintain the Software (the "Escrowed Materials") in accordance with the Source Code Escrow Agreement attached hereto as Exhibit C which shall set forth the terms and conditions under which Licensee may be entitled to obtain a copy of the Escrowed Materials as more particularly described in the Source Code Escrow Agreement  The fees of the Escrow Agent under such Source Code Escrow Agreement, as they relate to Licensee, shall be paid by Licensee.  The parties agree that, within a reasonable time following the execution of this Agreement, they will enter into a supplemental agreement with the Escrow Agent to (i) reflect the deposit of items described in this paragraph 12.9 but not set forth in the Escrow Agreement, (ii) to clarify that the termination referred to in paragraph 4(a) of the Escrow Agreement is a termination of the Order Agreement and Terms and Conditions as a whole, or of the Support services, and that the failure or refusal set forth in paragraph 4(e)(3) is a failure or refusal to provide Support or Hosting Services, or a failure of APT to comply with Section 3.5 hereof, (iii) to provide that the parties desire the Escrow Agreement to be supplementary to the License Agreement pursuant to 11 United States [Bankruptcy] Code, Section 365(n), and that the parties agree that the Escrow Agreement is not an executory agreement as to Depositor within the scope of Section 365 of the U.S. Bankruptcy Code, 11 U.S.C. Section 101 et seq. (the "Bankruptcy Code") and is not subject to rejection under that statute, (iv) the release of the source code from escrow upon the occurrence of certain other events in the event of the bankruptcy of APT, including but not limited to the failure of APT as debtor in possession in a chapter 11 bankruptcy case to assume this Agreement by order of the Bankruptcy Court entered on or before the thirtieth (30th) calendar day after the petition date of such bankruptcy case, a default by APT under any debtor in possession credit facility obtained by it in connection with a chapter 11 bankruptcy case, which default is not cured within any applicable cure period; the appointment of a chapter 11 trustee or the conversion of any chapter 11 case of APT to a case under chapter 7 of the Bankruptcy Code the denial by the Bankruptcy Court which presides over any chapter 11 case of APT of confirmation of a plan of reorganization proposed by Depositor; the confirmation by the Bankruptcy Court presiding over any chapter 11 case of Depositor of a plan of liquidation, or a plan of reorganization that does not expressly provide for APT's assumption of the License Agreement under Section 365 of the Bankruptcy Code; (v) to provide that any affidavit provided to the Escrow Agent under Section 4(a) is not subject to any discretionary review by the Escrow Agent, and that all copies and notices required to be provided by the Escrow Agent under the Escrow Agreement must be provided promptly, (vi) to delete the requirement for a nondisclosure covenant set forth in Section 4(d), (vii) to specify that the place of the arbitration shall be in Richmond, Virginia, (viii) that any termination of the

8



Escrow Agreement or resignation of the Escrow Agent shall require notice to Licensee, and shall provide that, upon a payment default by APT, Escrow Agent shall provide Licensee with the right to cure such payment default. If the parties are unable to enter into such a supplemental Escrow Agreement by November 30, 2002, then Licensee may elect to terminate this Agreement, and shall be entitled to a refund of a prorata portion of the License and Support Fees previously paid.

12.10    APT and Licensee are independent contractors. Nothing herein shall be deemed or construed by the parties hereto or by any third party as creating any other relationship (including, but not limited to, principal and agent, master and servant, employer and employee, franchisor and franchisee or joint venturer) whatsover, and neither party has any express or implied authority to create or assume any obligation on behalf of the other.

9

# SCHEDULE 1:  SOFTWARE FUNCTIONAL CAPABILITIES

apt*Retailer* will have the following functional capabilities:

*Integrated Reporting*.  This module provides integrated, efficient access to the comprehensive set of tabular and multimedia data collected for each site in the analyzed Circuit City network.

The user will be provided with access to all the data that has been captured about each store through a convenient user interface.  This will include any residential and business demographics, traffic counts, competitive store locations and descriptions, and Circuit City store design and operational, merchandising and other data.  This data set will include all the data elements used by the predictive models, but will also include the much larger set of data that is not directly used by the optimization algorithms.  These data elements provide valuable contextual information about each site that will assist the user in developing improvement plans by store based on the outputs of the predictive models.  Satellite / aerial photos are available to the user for any location in the US.  In addition, any available multimedia data elements, including store photographs, plan-o-grams, engineering designs and trade area maps can be captured in this database and reported through the integrated interface.  Customized structured reports will be created for Circuit City that will allow immediate views of logically grouped information.  In addition, a powerful query engine designed for use by general business users will allow any user to create fully customized reports covering a specific site, a group of sites or the entire analyzed Circuit City network on the fly.  This reporting module will support convenient printing and exporting.

*Benchmarking, Target-Setting and Analysis*.  This module provides the capability to identify and prioritize improvement opportunities by category by store.

apt*Retailer* will assist business users in setting potential-based, rather than history-based, targets for each store.  The tool will automatically apply multiple algorithms to help set these targets, including Linear Regression, Neural Network and Case-Based Reasoning methods.  The Case-Based Reasoning algorithm searches the entire network to find those few stores that are the closest "analog" locations for each store based on demographic, traffic, facilities, operational and local area competitive factors.  These algorithms will automatically weigh each of these factors and generate predictions.

The user will have the capability to drill-down within the network to isolate the specific facility and/or operational drivers of performance.  These factors will be automatically prioritized, and the user will have the capability to automatically generate powerful statistical analyses of the impact of each of these factors across the entire network.  This reporting module will support convenient printing and exporting.

*New Site Prediction*.  This module provides the capability to predict the economic performance of a new proposed location.

apt*Retailer* allows the user to specify a new proposed site location via GIS interface, and will automatically predict sales, gross profit and projected returns to investment for the new site.  The tool will be used to calibrate three types of prediction algorithms: Linear Regressions, Neural Networks and Case-Base Reasoning (CBR) methods.  Proprietary APT algorithms will be employed to select an optimized

10



variable list from all available site attributes. Each algorithm will be optimized through repeated application of a train / test approach in which algorithms are built on one data set and then tested on another data set to prevent over-fitting and to maximize model performance in the field. Each of these three optimized algorithms will combined via an optimized weighted voting scheme to further improve performance. This process will be repeated for each major category, and independent predictions will be created for sales / volume for each major category.

apt*Retailer* will automatically search a market or sub-market to identify the best potential intersections for site locations.

*Scenario Evaluation.* This module provides the capability to predict the competitive and economic impact of a proposed market-level network planning scenario.

apt*Retailer* allows the user to identify a set of actions for a market through explicit business rules, and applies these user rules to determine a set of actions for the network. The impact of these actions is evaluated for all sites in the network using site prediction models as well as proprietary APT spatial interaction models. The logic and parameter settings for these models are available to the user, and can be modified by authorized users.

The user can structure reports that project detailed financial impact including profit and capital returns impacts for Circuit City sites. Scenario results can also be displayed graphically or directly on the market map. This module will support convenient printing and exporting.

*Store Clustering / Segmentation.* This module will provide the capability to create stable segmentations of the network to support de-averaged store planning and management.

apt*Retailer* will apply proprietary APT algorithms, based on extend K-Means Clustering, to automatically identify stable clusters of stores with similar characteristics or behaviors. The user may specify whether clustering is to be executed based on similar sales patterns or based on similar store demographics, configuration competition and other sales drivers.

The user will have substantial control over the automated clustering algorithms. The user can determine the number of clusters to be created, the maximum and minimum number of stores in each cluster, and the data time period to be used when clustering based on sales patterns. This is useful, for example, when identifying what stores have similar seasonal sales behavior. The user can move stores between automatically derived clusters, and can manually create clusters without the assistance of the automatic clustering algorithms. The user can name each cluster.

apt*Retailer* will automatically analyze the performance and performance drivers of each cluster. The relative impact of each store characteristic in the creation of each cluster will be measured and reported. The user will have access to a user-friendly query engine that will allow the creation of customized reports by cluster on the fly. This module will support convenient printing and exporting.

*Operational Optimization.* This module will provide the capability to test individual marketing promotions, sales programs, store upgrades, resets, labor practice changes and other marketing programs and then optimize the roll-out of the programs across the entire network.

Users will be able to employ a convenient GUI to identify any activities that have taken place or will take place at some subset of sites in the network. These actions can either be programs (such as a POS promotion, local advertising campaign or price discount) that are executed for a defined period or events that take place at a point in time (such as the addition of an ATM, execution of a new training program, a major store reset or the opening of a new nearby competitive location). These actions can either be planned programs or represent retrospective identifications of prior actions that have taken place without conscious planning.

The stores at which these identified actions take place are defined as a Test Group. apt*Retailer* will automatically employ the CBR algorithm to construct a Control Group of stores that are similar to the Test Group. Alternatively, the user can manually specify a different Control Group. The tool will then measure the exact change in sales and profit performance created by the tested activity. apt*Retailer* will automatically (at the user's option) identify and suppress outlier results at individual stores for the test period. The tool will report the results for each group in total and by store, and will automatically measure and report the statistical validity of the test results using a battery of statistical significance tests. Our experience has been that the careful selection of Control Groups, outlier suppression and statistical significance testing are crucial to accurate evaluation of program results.

Typically, any program will create widely varying results across tested stores. Most of the useful information in any test is not simply how the Test Group performed on average vs. a Control Group, but why the tested activity worked so much better in some tested stores than in others. This module will automatically identify the drivers of relative test success within the Test Group and model the impact of roll-out of the activity across each segment of the network in order to identify the expected financial impact at each store.

*Elasticity Modeling.* This module will provide the capability to predict changes in sales and profit outcomes as a function of any intermediate metric.

This is the functional module that was used to analyze the impact of changes in BizRate scores on changes in sales and profit. This functionality can also be used, for example, to evaluate the price-sensitivity of specific stores or product classes. This module will allow the user to specify an intermediate metric and time frame, and will thereupon evaluate the network-wide sensitivity of any outcome metric to changes in the intermediate metric. The user can display this outcome in numerical form or as an elasticity graph. Elasticity can be then be segmented by the user to evaluate elasticity by store segments or other groupings down to the individual store level.

APT will thoroughly train Circuit City staff in the use of the apt*Retailer* tool. Up to fifty (50) Circuit City users will be identified as the User Group. APT will conduct up to three classroom training sessions with these Users at a central location to be determined by Circuit City. These training sessions will include application training and an in-depth discussion of modeling methodologies.

12

## EXHIBIT B

## Service Levels and Other APT Obligations

1. **Serviceability**.

   a)    •    **Response Time**: ± 15% of following response times:

   Projecting sales for a new site in Network Planner: 120 seconds

   Analyzing an event in Activity Analyzer with a 50-store test group, using all other stores as a control group: 120 seconds

   b)    **Availability**: The Software will be available 24x7x365 (except during scheduled downtime). Any unscheduled downtime condition must be subject to immediate corrective action. Downtime shall mean that the Software cannot be accessed by Licensee through no fault of Licensee. Downtime shall not include an error in a part of the Software nor the inability of Licensee to access the Software where such error or inability to access is caused by Licensee's Internet access problems.

   c)    **Unscheduled Downtime**: The Software will incur no more than 3 hours *unscheduled* downtime in a given month during the hours of 7am to midnight, EDT, Monday-Friday. APT will waive 1% of prorated monthly license and maintenance fees for each additional hour of downtime accumulated during the month.

   d)    **Scheduled Downtime**: The Software will incur no more than six hours *scheduled* downtime in a given month, without Licensee's prior consent. Scheduled downtime will occur only on weekends or between 6 pm and 6 am, EDT. APT will waive 1% of the prorated monthly license for each additional hour of downtime scheduled *or* any hour of downtime scheduled outside the prescribed window, unless either has been consented to Licensee in writing.

   e)    **Termination**: If, pursuant to paragraphs (c) and (d) above, Licensee is entitled to a refund for product downtime of at 20% for three consecutive months, then Licensee shall be entitled to terminate this Agreement upon notice to APT within thirty (30) days of the end of the third month and receive a pro-rata refund of all License and Support Fees paid.

2. **Support**.

   a)    APT will provide support as described below:

13

b)    A Severity Level 1 issue will be defined as an instance wherein the Software is not accessible as the result of an error on the APT side, regardless of whether the error is related to the Software or the Hosting Services.  In the case of a Severity Level 1 issue, Licensee should follow the following procedures (the "Emergency Contact Procedures"):  first call the APT Support Line (703-875-7700).  If Licensee fails to reach a person at this number, they should contact Patrick O'Reilly's cell phone (703-980-3577), and if that fails, Anthony Bruce's cell phone (703-395-4913).

c)    Provided Licensee follows the Emergency Contact Procedures, APT will respond to Severity Level 1 issues raised from Monday-Friday within 30 minutes from the time of contact and will commence diagnosis and corrective action by qualified staff within 60 minutes.  APT will respond to Severity Level 1 issues raised on Saturday or Sunday within 60 minutes from the time of contact and will commence diagnosis and corrective action by qualified staff within 180 minutes.

d)    For all issues not designated Severity Level 1, APT and Licensee will define an agreeable protocol, including response times and hours for support.  For such issues, APT will provide resolution or resolution status within one (1) business day of notification.

# EXHIBIT C:  ESCROW AGREEMENT

**Agreement No.  7215**

## SOFTWARE ESCROW AGREEMENT
*Multi User Plan*

Between:

| | | |
|---|---|---|
| Lincoln-Parry  SoftEscrow, Inc. | | Applied Predictive Technologies, Inc. |
| 400 Inverness Drive, | - and - | 901 North Stuart Street |
| Suite 200 | | Suite 1100 |
| Englewood, Colorado 80112 | | Arlington, VA 22203 |
| Telephone: 888-771-2042 | | 703.875.7722 |
| Fax:  613-839-1362 | | 703.243.8742 |
| (called the Escrow Agent) | | (called the Licensor) |

WHEREAS the Licensor carries on the business of licensing computer software and is desirous of making available severally to certain of its customers, each herein called the Licensee the benefits contemplated by this agreement, and;

WHEREAS the Licensor has granted or shall grant to the Licensee the right to use certain computer programs in object form and has agreed or shall agree to support the programs but wishes to maintain their confidentiality as trade secrets, and;

WHEREAS the Licensee is desirous of being assured that the source code, documentation and related materials for such programs will be made available to it for the purposes of self support if certain events named herein occur:

THEREFORE the parties agree as follows:

15

# 1. ESCROW MATERIALS

The computer programs to which this agreement applies are those named in the List of Escrow Programs. A program shall consist of the source code magnetically or optically stored, and such supporting documentation and related materials that are necessary to allow a reasonably competent programmer to maintain and modify such programs. The programs shall be collectively referred to herein as the Software.

# 2. BENEFICIARIES

All Licensees of the Software shall separately become a beneficiary hereunder upon the filing by the Licensor with the Trustee of a notification in the form described in Schedule C and shall have full standing under this agreement as though signed by each of the Licensees.

# 3. DELIVERY AND CERTIFICATION

The following procedure shall be adopted for the presentation and certification of the Software into escrow.

(a) Within 10 days after the signing of this agreement by both parties, the Trustee shall supply to the Licensor a standard sized container which is capable of being sealed and in which the Software shall be stored.

(b) The Licensor shall thereupon deposit the Software into the said container, identifying it by name and release number, and shall certify as to the authenticity of the contents in the sealed container on the form supplied by the Trustee.

(c) The Licensor shall seal the container and shall deliver it to the Trustee to hold in accordance with the terms of this agreement.

(d) The Licensor will deposit new releases into escrow, and the Trustee shall retain the latest such deposits and shall return earlier deposits to the Licensor upon being so directed in writing.

(e) The Trustee shall hold the container in its sealed state and shall not open, cause or permit it to be opened under any circumstances whatsoever except as may be permitted under this agreement or amendments thereto.

# 4. EVENTS CAUSING RELEASE

The Software shall be held in escrow by the Trustee until the earliest of the following events:

(a) A cessation of the use of the Software by the Licensee and the termination or expiry of its program license agreement with the Licensor, or the termination or expiry caused or permitted by the Licensee of the Software maintenance and support services portion of the said program license agreement.

(b) A termination of this agreement by consent of the Licensor and Licensee, or the Licensee alone.

(c) The occurrence of any of the following events, and provided in all events that the Licensor has not made suitable alternate arrangements for the continued supplying of maintenance of the Software:

(1) A petition in bankruptcy, or an assignment for the benefit of creditors of the Licensor is filed by the Licensor, or a third party against the Licensor and is not dismissed within 30 days of its filing;

(2) A cessation of normal business operations by the Licensor during the term of this agreement;

(3) A failure or refusal by the Licensor to provide the Software maintenance and support services required of it under its program license agreement with the Licensee, which failure has been preceded by a notice in writing to the Licensor that its continued default would cause the Licensee to invoke its rights under this agreement fifteen (15) days after the date of the said notice

:

# 5. RETURN TO LICENSOR

The Trustee shall deliver the Software back to the Licensor if any of the events named in paragraph 4(a) or 4(b) occurs before any of the events named in paragraph 4(c), provided that a Termination Notice in the form set out in Schedule A and signed by the Licensor and the Licensee has been delivered to the Trustee along with the balance of any fees and charges that are due, and further provided that no other Licensee is a beneficiary under this agreement at the time.

# 6. RETURN TO LICENSEE

The Trustee shall deliver a copy of the Software to the Licensee if any of the events named in paragraph 4(c) occur before any of the events named in paragraphs 4(a) or 4(b), provided that the procedure set out below has been followed and the conditions met.

(a) The Licensee has delivered to the Trustee a written request for the release of the Software, accompanied by a sworn affidavit in a form satisfactory to the Trustee from a senior officer of the Licensee stating the particulars of the reasons for its request.

16

(b) A copy of the request and affidavit have been delivered by the Trustee to the Licensor, and the Licensor has received at least the notice period named in paragraph 4(c)(3).

(c) No dispute in writing has been received from the Licensor by the Trustee within ten (10) days of the Licensor's receipt of the Licensee's request and affidavit.

(d) The Licensee has signed a non disclosure covenant in the form set out in Schedule B and delivered it to the Trustee.

(e) All outstanding charges under this agreement have been paid to the Trustee, and the Licensee has paid copying and delivering costs incurred by the Trustee.

## 7. DISPUTES AND ARBITRATION

If the Licensor enters a dispute as contemplated by paragraph 6(c) then the procedure set out below shall be followed before the Software is delivered to the Licensee.

(a) The Licensor and Licensee shall within ten (10) days after the entering of a dispute name an arbitrator to decide whether the Licensee is entitled to receive the Software. If they are unable to agree upon the selection of an arbitrator then the Trustee shall make the said selection.

(b) The arbitration shall otherwise be conducted in . . . . . . . . . in accordance with the Rules of the American Arbitration Association and the Trustee shall immediately upon the expiry of any appeal period carry out the decision of the arbitration.

## 8. VERIFICATION PROCEDURE

In order to verify the authenticity of the contents of any container deposited by the Licensor and being held in escrow the Licensee may at any time call for its inspection in the manner and subject to the conditions below.

(a) The Licensee shall notify the Licensor and the Trustee in writing of its demand to inspect the contents of a container, and such notification shall be made at least 30 days in advance of the date appointed for such inspection.

(b) The Trustee shall appoint the location for such inspection.

(c) The Trustee shall attend at the appointed time and place and shall thereat produce the sealed container in question.

(d) The contents of the container shall be removed and inspected by the Licensee and a determination made as to whether they are as purported by the Licensor on its certificate.

(e) If the contents are determined to be as purported, they will be resealed and returned to the Trustee to continue

to hold in escrow. The Licensee shall pay all costs associated with the inspection, including machine time, operating personnel, travel, food, lodging and a reasonable per diem fee for the attendance of all the parties attending at the inspection.

(f) If the contents of the container are determined not to be as purported, then Licensor shall pay all of the costs named in sub paragraph (e) and shall also forthwith deliver to the Trustee a copy of the authentic software as purported on the Licensor's certification, and the Licensee may first verify that the same are authentic.

## 9. DUTIES OF TRUSTEE

(a) The Trustee shall store the sealed containers in a safe and secure location of its own choosing.

(b) The Licensor may direct the Trustee to store the sealed containers in a location selected by the Licensor, in which event the Trustee shall comply with such direction provided that access to the location is under the Trustee's control and that any additional costs incurred by the Trustee in using the site are paid by the Licensor.

(c) The Licensor represents that Software does not require any storage conditions other than office environment conditions.

(d) The Trustee shall exercise reasonable judgment in the handling of the Software in the event of a dispute and shall not be liable to either party except for grossly or deliberately negligent conduct.

## 10. FEES, CHARGES AND TERM

The Licensor shall pay to the Trustee the following fees and charges:

(a) An annual fee of $540.00 payable upon execution by the Licensor of this Agreement and on each anniversary date thereafter unless earlier terminated by either party.

(b) This agreement shall continue thereafter on a yearly basis unless terminated by either party by giving the other at least ninety (90) days written notice prior to any anniversary date, and provided that all named beneficiaries have either ceased to hold a use license for the Software or have consented to the termination of this agreement.

(c) A fee of $54.75 US per container per year or part year for each container in excess of one being held by the Trustee at any given time payable on the anniversary date of this agreement.

17

(d) A fee of $27.25 US per written notice delivered by the Trustee.

(e) A charge respecting all expenses incurred by the Trustee for media, copying, shipping, delivery, and special storage requested by the Licensor payable on receipt of account.

(f) The term of this agreement shall continue so long as any beneficiary has rights under it.

(g) The Trustee may stand down at the end of any year provided that it has delivered at least thirty days prior written notice to the Licensor to find a replacement.

## 11. DEFAULT IN PAYMENT

If the Licensor fails to pay any fee or charge on its due date, then the Trustee may, after giving the Licensor ninety (90) days prior written notice to make such payment, terminate this agreement and either destroy or return the escrow materials in its possession at the Trustee's option. The remedies above do not exclude any other remedies that are otherwise available to the Trustee.

## 12. INSPECTION

For the purpose of insuring that any sealed container delivered to and held by the Trustee under this agreement remains in a sealed state, either the Licensor or the Licensee may at any time demand to inspect such container at the offices of the Trustee, and the Trustee shall produce such container on a timely basis for inspection.

## 13. NOTICES

Any notice required to be given in writing under this agreement shall be given by prepaid certified or registered post, return receipt requested, to the respective addresses above first mentioned or to such other addresses as the parties may from time to time direct.

## 14. TITLE

Title to the Software shall remain in the Licensor either in its own right or as agent for the owner. The Trustee shall have title to the physical storage medium but not to the Software residing on it.

## 15. GOVERNING LAW

This agreement shall be governed in accordance with the laws of the State of Virginia without giving effect to its conflict of laws provisions.

## 16. ENUREMENT

This agreement shall be binding upon and enure to the benefit of parties and the beneficiaries named by the Licensor and the assignees of each of them. This agreement may not be assigned by the Trustee without the prior written consent of the Licensor.

WITNESS WHEREOF the parties have by their representatives so authorized executed this agreement to go into force on the date below first mentioned.

Lincoln-Parry SoftEscrow, Inc.          Applied Predictive Technologies, inc.

By _____        By _____

_____

Title _____     Title _____

_____

Date _____      Date _____

_____

**LIST OF ESCROW PROGRAMS**

18

| Program Name | Description | Release No. |
|---|---|---|
| | | 3.0 |
| | | |

* The Licensor shall deposit updates if any to the Software above listed not less frequently than annually, and such updates shall be considered as included in the Software.

**SCHEDULE A - TERMINATION NOTICE**

TO:    Lincoln-Parry SoftEscrow, Inc.
       Software Trustees
       400 Inverness Drive South
       Suite 200
       Englewood, Colorado    80112


TAKE NOTICE THAT the Licensor and the Licensee being parties to a Software Escrow Agreement bearing No. 7215 and date 2/21/02          do hereby terminate the said agreement as of the date of this notice and direct you to deliver the Software thereunder held by you to the Licensor forthwith.

Licensor: Applied Predictive Technologies, Inc.          Licensee:  Circuit City Stores, Inc.

_____          _____
Authorized representative               Authorized representative

_____          _____
Name:                                   Name:

_____          _____
Title:                                  Title:

_____          _____
Date                                    Date:

## SCHEDULE B - NON DISCLOSURE COVENANT

TO:

    Lincoln-Parry SoftEscrow, Inc.
    Software Trustees
    400 Inverness Drive South
    Suite 200
    Englewood, Colorado    80112

Applied Predictive Technologies, Inc., 901 North Stuart Street, Suite 1100, Arlington, VA 22203

                    (Licensor)

      WHEREAS the Licensor and the Licensee are parties to a Software Escrow Agreement bearing No.
and dated                 pursuant to which the Software therein shall be released to the Licensee by the
Trustee, and;

      WHEREAS a prior condition of such release is set out in paragraph 6(d) of the said agreement, namely
that the Licensee must first execute this form of non disclosure covenant and deliver it to the Trustee;

      THEREFORE the Licensee covenants as follows for the benefit of the Licensor:

1. To hold the Software in the strictest of confidence, recognizing that it is a valuable trade secret of the
Licensor and that its improper disclosure will cause substantial and irreparable injury to the Licensor.

2. To restrict the use of the Software solely and exclusively for the purpose of supporting the Licensee's own
installation or the installations of sublicensees if the Licensee is an authorized VAR or OEM of the Software, and
for no other purpose whatsoever.  Licensee acknowledges that title to the Software shall at all times remain with
the Licensor.

3. To restrict disclosure of the Software or any part thereof to only those of the Licensee's employees or agents
who have a bona fide need to know, and who have received written notice of the confidential nature of the
Software and have agreed to abide by these restrictions.

4. Other than for back up, not to make any copy, derivation, translation or imitation of the Software, or to use
any of its algorithms, designs or architecture in producing another program.

5. To fully observe and perform all other obligations which may bind the Licensee under any other agreement
which exist between it and the Licensor.

                                    Licensee:

                                    _____
                                    Authorized representative

                                    _____
                                    Name:

                                    _____
                                    **Title:**

                                    _____
                                    Date:

## SCHEDULE C - NOTIFICATION

Date:

9/9/02

TO:   Lincoln-Parry SoftEscrow, Inc.
      Software Trustees
      400 Inverness Drive South
      Suite 200
      Englewood, Colorado   80112

BE INFORMED THAT

Name   Circuit City Stores, Inc. _____   (Licensee)

Address  9950 Mayland Drive _____

         Richmond, VA  23233-1464   _____

Contact   Tom Nolan   _____

Telephone: _(804) 527-4000_____   Fax: _  (804) 418-8344_____

has become a licensed user of those programs included in the Software described or otherwise included in
Software Escrow Agreement No. 7215          and bearing date  2/21/02          between you and  Applied
Predictive Technologies, Inc. (Licensor) which are listed below and as such becomes entitled to the rights of a
beneficiary thereunder upon filing of this Notification with the Trustee.  The Licensee's rights under this
Agreement shall relate to the Software in those container(s) held by the Trustee for which the Licensee has a valid
license agreement  that is not in arrears or otherwise in default , at such time as those rights are exercised.

Programs of the software licensed by the Licensee:

1. apt Retailer
2.
3
4

Licensor: Applied Predictive Technologies, Inc.

_____
Authorized representative

_____
Name:

_____
Title:

_____
Date:

# EXHIBIT D:

## MUTUAL CONFIDENTIALITY AGREEMENT

This Mutual Confidentiality Agreement ("Confidentiality Agreement") is entered into this _____ day of _____, 2001, by and between **CIRCUIT CITY STORES, INC.** ("Circuit City"), a Virginia corporation, with its main office at 9950 Mayland Drive, Richmond, VA 23233-1464, and **APPLIED PREDICTIVE TECHNOLOGIES, INC.** ("Company"), a Delaware corporation, with offices at 901 N. Stuart St., Suite 1100, Arlington, VA 22203.

Whereas, Company and Circuit City are considering a business relationship which may lead to an agreement of understanding or other contractual arrangement ("Agreement") between them; and

Whereas, discussions between Circuit City and Company regarding a potential business relationship may require the use by one party of certain information and materials of the other party which such other party considers to be proprietary to itself and/or its affiliates, respectively.

Now, therefore, for valuable consideration, Circuit City and Company agree as follows:

1.        The parties have made, or expect to make, available to each other certain information and materials which are technical and/or business in nature which may include, among other things, marketing materials; processes; know-how; financial data; analyses; forecasts; past, present or prospective customers or employees; documents; source code; apt*Retailer* software screen shots; business practices; business plans; product plans; and proposals (hereafter individually and collectively referred to as "Confidential Data"). Confidential Data may be written, oral, recorded on tapes or in any other media or format. The term Confidential Data includes, but is not limited to (a) all copies and reproductions thereof, whether in whole or in part, and (b) the actual existence of the association between Company and Circuit City relating to the purpose of this Confidentiality Agreement.

2.        Each party acknowledges (a) that all Confidential Data is and shall be considered to be proprietary to and/or trade secrets of the furnishing party or its affiliate(s), as applicable, and (b) that the unauthorized use or disclosure of any Confidential Data could be detrimental to the furnishing party and/or its affiliate(s). Nothing herein shall be construed to grant either party a license from the other party under any patent, copyright, trademark or trade secret rights. Each party receiving Confidential Data shall give all further assurances, as the furnishing party deems reasonably necessary, to evidence title and ownership in such furnishing party.

3.        In consideration of the above, and except as permitted herein or as necessary to perform under the Agreement, each party agrees that neither it nor its employees, officers, directors or agents will duplicate, distribute, disclose, convey or in any other manner make available any Confidential Data to third parties including, but not limited to, other retail organizations. Each party also specifically agrees that it shall not use Confidential Data for any purpose other than for evaluation of a relationship with the other and, if applicable, provision of the requested services under the referenced Agreement. In protecting such Confidential Data from disclosure, each party shall use at least the same level of care that such party uses to protect its own proprietary information of a similar nature, but in no event shall said party use less than reasonable care in protecting the Confidential Data.

4.        Each party agrees that only its respective employees, officers and directors with a defined need to know shall be granted access to Confidential Data. Confidential Data of a party shall not be distributed, disclosed, conveyed or in any other manner made available to any consultant, subcontractor or any third party ("Retained Party") retained by or associated with the other party to this Confidentiality Agreement (the "Retaining Party") unless such Retained Party also agrees to be bound by

the terms of this Confidentiality Agreement and the Retaining Party agrees to be liable to the other party to this Confidentiality Agreement for any breach of this Confidentiality Agreement by any such Retained Party to the same extent as if such breach was committed by the Retaining Party. No copies or reproductions shall be made by one party of any Confidential Data of the other party for any reason or benefit except as set forth herein or for the purpose of fulfilling the terms of the Agreement between Circuit City and Company.

5.       Because of the unique nature of the Confidential Data, each party would suffer irreparable harm in the event the other party fails to comply with any of the terms of this Confidentiality Agreement, and money damages and other remedies at law available in the event of a breach or a threatened breach of this Confidentiality Agreement are not, and will not be, adequate to compensate for the harm caused by the breach or the threatened breach. Accordingly, the non-breaching party may be entitled to such injunctive relief as a court of competent jurisdiction may deem appropriate. Such injunctive relief will be in addition to, and not in lieu of, any other remedy available at law or in equity.

6.       If a third party should request one party hereto (or a respective Retained Party as referred to in Section 4 above) to submit Confidential Data of the other party hereto to such third party pursuant to subpoena, summons, search warrant, court or governmental order or otherwise (collectively a "Lawful Order"), the party receiving the request will provide the other party hereto a reasonable opportunity to oppose release of the Confidential Data prior to releasing any such Confidential Data pursuant to such Lawful Order, as appropriate. If any disclosure is finally directed by Lawful Order, the party receiving the Lawful Order shall disclose only so much of the Confidential Information as is necessary to meet the requirements thereof. The party seeking to restrict disclosure of the Confidential Data will pay the other party's reasonable attorneys' fees incurred in connection with resisting the release of the Confidential Data on such party's behalf.

7.       (a) As this Confidentiality Agreement affects restricted disclosures by Company, the obligations set forth in Paragraphs 1 through 6 above shall not apply to any information, including but not limited to Confidential Data, (i) which has become part of the public domain through no act or omission of Company, (ii) which was lawfully disclosed to Company without restriction, (iii) is or has been independently developed by Company, or (iv) is or was rightfully in Company's possession prior to disclosure by Circuit City hereunder or pursuant to the Agreement.

(b) As this Confidentiality Agreement affects restricted disclosures by Circuit City, the obligations set forth in Paragraphs 1 through 6 above shall not apply to any information, including but not limited to Confidential Data, (i) which has become part of the public domain through no act or omission of Circuit City, (ii) which was lawfully disclosed to Circuit City without restriction, (iii) is or has been independently developed by Circuit City, or (iv) is or was rightfully in Circuit City's possession prior to disclosure by Company hereunder or pursuant to the Agreement.

8.       Confidential Data of each party, respectively, shall at all times remain the sole and exclusive property of such party and shall be returned to such party (a) immediately upon request, (b) upon termination of discussions between the parties hereto without both parties executing the Agreement, or (c) upon termination of the fully execute Agreement, if any and as applicable, unless the Agreement terms provide otherwise. If Confidential Data is contained in any computer data processing tape(s), the other party shall be responsible for returning the same tape(s) originally supplied and deleting all related files upon request or within seven (7) days of the termination of the Agreement, if any, as applicable.

9.       Any notice or other communication required or permitted hereunder shall be given in writing, sent by U.S. postage prepaid mail, and addressed to the receiving party at the address set forth below.

10.      (a) Company agrees to be liable to Circuit City, its directors, officers, agents, employees and shareholders, for any and all loss, damage, liability, costs, expenses (including reasonable attorney's

fees) claims or causes of action resulting from the acts or omissions of Company, its directors, officers, agents and employees, in connection with a breach of this Confidentiality Agreement. In addition, if Company breaches this Confidentiality Agreement, it agrees to pay Circuit City all amounts received by Company from (i) Company's unauthorized use of Confidential Data, or (ii) Company's unauthorized provision of Confidential Data to, or for the benefit of, a third party.

(b) Circuit City agrees to be liable to Company, its directors, officers, agents, employees and shareholders, for any and all loss, damage, liability, costs, expenses (including reasonable attorney's fees) claims or causes of action resulting from the acts or omissions of Circuit City, its directors, officers, agents and employees, in connection with a breach of this Confidentiality Agreement. In addition, if Circuit City breaches this Confidentiality Agreement it agrees to pay Company all amounts received by Circuit City from (i) Circuit City's unauthorized use of Confidential Data, or (ii) Circuit City's unauthorized provision of Confidential Data to, or for the benefit of, a third party.

11.    This Confidentiality Agreement is binding on the parties hereto and their respective successors and assigns, and its provisions may be waived only by written agreement of both parties. Any such waiver must make specific reference to this Confidentiality Agreement. This is the entire agreement between the parties concerning the confidentiality of Confidential Data, unless and except provisions governing confidentiality, if any, that may exist in any subsequently executed Agreement. The terms and conditions of this Confidentiality Agreement shall be governed by the laws of the Commonwealth of Virginia and it shall be deemed to have been executed and entered into within Richmond, Virginia. Any provision found to be illegal or unenforceable shall be stricken to the extent necessary and the remainder of this Confidentiality Agreement shall be of full force and effect.

12.    Both parties agree that all the terms, rights, duties and conditions contained in this Confidentiality Agreement shall survive for a period of two (2) years from the latter of (a) the termination of discussions without entering into an Agreement or (b) the termination of the Agreement, if any.

13.    If either party shall (a) file a petition in bankruptcy; (b) fail to have vacated and discharged within 60 days such bankruptcy proceeding once commenced against such party; (c) make an assignment for the benefit of creditors; or (d) cause a receiver to be appointed for its business and assets, then in any such event, such party shall immediately return the other party's Confidential Data to said other party, together with all copies thereof.

14.    Any claim, controversy or dispute between the parties, their agents, employees, officers, directors or affiliated agents may be resolved by arbitration. A single arbitrator in the practice of law shall conduct the arbitration under the then current rules of the American Arbitration Association. The Federal Arbitration Act, not state law, shall govern the arbitrability of all claims. The arbitrator shall have authority to award compensatory damages only. The arbitration shall be conducted in a AAA office in the city of Arlington, Virginia if the claim for arbitration is brought by Circuit City, and in the AAA office in the city of Richmond, Virginia, if the claim for arbitration hereunder is brought by Company. The arbitrator's award shall be final and binding and may be entered in a court having jurisdiction thereof. Each party shall bear its own costs and attorneys' fees in any such arbitration.

IN WITNESS WHEREOF, the parties have executed this Confidentiality Agreement in duplicate, each to have the full force and effect of the original for all purposes, by and through their respective duly authorized representatives as of the date first written above.

P.5

NAME: _____
TITLE: C 8 0
DATE: 11 / 8 / 2001
MAILING ADDRESS:
901 N. STUART ST., SUITE 1100
ARLINGTON, VA  22203

NAME: JOE CIPOLLA
TITLE: VP  MIS
DATE: 11/7/01
MAILING ADDRESS:
9950 MAYLAND DRIVE
RICHMOND, VIRGINIA  23233-1464

**ATTACHMENT B**

# APPLIED PREDICTIVE TECHNOLOGIES RENEWAL ORDER AGREEMENT

This Renewal Order Agreement ("Renewal Order Agreement") is effective as of the 1st day of September 2005 ("Renewal Order Effective Date"), between Applied Predictive Technologies, Inc., a Delaware corporation located at 901 North Stuart Street, Suite 1100, Arlington, VA 22203 ("APT") and the business entity identified below ("Licensee"). This Order Agreement shall be governed pursuant to the APT General Software License, Support and Service Terms agreed to by the parties on September 1, 2002 ("Terms"). Capitalized terms in this Order Agreement not otherwise defined shall have the same meanings as set forth in the Terms. In the event of any conflict between the provisions of the Terms and the provisions of this Renewal Order Agreement, the provisions of this Renewal Order Agreement shall govern. APT grants to Licensee a non-exclusive, non-transferable license to use the following Software for Licensee's internal use in North America:

1.      **Licensee:**            Circuit City Stores, Inc.

2.      **Software/License Terms:**

*License*

| Item No. | Software Product | License Type | Units |
|---|---|---|---|
| 1 | APT v5.1, Test & Learn for Sites, Network Planner, and Performance Manager Modules | End-User License for Three (3) Years commencing on the Renewal Order Effective Date (the "License Period") | Fifty (50) named user license |
| | | | |

*Support, Hosting Services and Consulting Services*

| Item No. | Software Name | Support Level | Start Date | Renewal Date |
|---|---|---|---|---|
| 1 | APT v5.1, Test & Learn for Sites, Network Planner, and Performance Manager Modules | As described below | Renewal Order Effective Date | See Below |
| | | | | |

*Definitions and Restrictions*

Full Support includes, for the period Full Support is purchased: (1) user access to APT designated call support line Monday - Friday 8:00am – 6:00 pm EST , (2) APT hosting of the Software, (3) all updates, upgrades or new releases of the Software released by APT during the period support is purchased, (4) error correction (items 1, 3 and 4 being collectively referred to herein as "Support" and item 2 as "Hosting Services"), all as more particularly described in Exhibit A, which is incorporated into this Agreement by reference.

3.    **Fees/Payment Terms:**

License Fee:         $663,000, billable upon execution and due within forty five (45) from receipt of invoice.

Support Fee:         Full Support shall be provided at $132,600 per year for the License Period set forth in this Renewal Order Agreement, unless earlier terminated in accordance with the Terms and billable on the Renewal Effective Date and annually thereafter and due within forty five (45) from receipt of invoice.  Full Support for the first year is payable upon execution of this Renewal Order Agreement, and Support Fees, as elected by Licensee, for the second and third year of the License Period on the anniversary of the Effective Date thereafter. Licensee may terminate the Support at any time for convenience upon thirty (30) days written notice to APT. In the event of such termination, APT shall refund to Licensee a pro-rata portion of the Support Fees from the effective date of termination through the next anniversary of the Renewal Effective Date.

Renewal:         If Licensee, at its sole option, elects to renew its software license with APT at the conclusion of this three (3) year license period, APT will make available to Licensee a three (3) year license renewal for an amount equal to the current term's software license fee ($663,000) multiplied by a factor equal to the combined three-year increase in the US Consumer Price Index (the CPI-U, US City Average, All Items (NSA), or if no longer available its closest CPI equivalent), plus 2 percentage points per year. For example, if the CPI has increased three (3) percent per year, the factor would equal an annual increase of five (5) percent, compounded over the life of the three year term, per year, or 1.1576. Likewise, Licensee may elect to renew APT support and the annual Full Support Fees would equal 20% of the software license fee. APT shall furnish Licensee with invoices for renewal fees, which invoices shall require payment no sooner than forty five (45) days after commencement of a renewal term.  If the number of stores Licensee wishes to load into the Software at the beginning of a renewal period is more than three times as many as the number of stores at the beginning of the prior license term, then this paragraph will be void.

4.    **Other:**

This Renewal Order Agreement shall be binding upon Licensee and APT and their respective permitted successors and assigns.

Accepted and agreed to as of the date last signed below:

APPLIED PREDICTIVE                    CIRCUIT CITY STORES, INC.
TECHNOLOGIES, INC.

By:                                    By:

_____              _____

Date:                                  Date:

James J. Manzi                         Name: MIKE JONES

CEO                                    Title: SVP & CIO

## EXHIBIT A –Service Levels and Other APT Obligations

1.  **Serviceability**.

   a)    **Time**: ± 15% of following response times:
   1.    Projecting sales for a new site in Network Planner: 120 seconds
   2.    Analyzing an event in Activity Analyzer with a 50-store test group, using all other stores as a control group, on a single metric/category: 120 seconds

   b)    **Availability**: The Software will be available 24x7x365 (except during scheduled downtime). Any unscheduled downtime condition must be subject to immediate corrective action. Downtime shall mean that the Software cannot be accessed by Licensee through no fault of Licensee. Downtime shall not include an error in a part of the Software nor the inability of Licensee to access the Software where such error or inability to access is caused by Licensee's Internet access problems.

   c)    **Unscheduled Downtime**: The Software will incur no more than three (3) hours "Unscheduled Downtime" in a given thirty (30) day period during the hours of 7am to midnight, EDT, Monday-Friday. APT will waive one percent (1%) of prorated monthly license and maintenance fees for each additional hour of downtime accumulated during such thirty (30) day period.

   d)    **Scheduled Downtime**: The Software will incur no more than six (6) hours *scheduled* downtime in a given month, without Licensee's prior consent. Scheduled downtime will occur only on weekends or between 6:00 pm and 6:00 am, EDT. APT will waive one percent (1%) of the prorated monthly license for each additional hour of downtime scheduled *or* any hour of downtime scheduled outside the prescribed window, unless either has been consented to Licensee in writing.

   e)    **Termination**: If, pursuant to paragraphs (c) and (d) above, Licensee is entitled to a refund for product downtime of twenty percent (20%) for three (3) consecutive months, then Licensee shall be entitled to terminate this Renewal Order Agreement upon notice to APT within thirty (30) days of the end of the third month and receive a pro-rata refund of all License and Support Fees paid.

2.  **Support**.

   APT will provide support and corrective action as described below:

   a)    **Severity 1 Issues**:
   i.    A Severity Level 1 issue will be defined as an instance wherein the Software is not accessible as the result of an error on the APT side.
   ii.   In the case of a Severity Level 1 issue, Licensee should follow the following procedures (the "Emergency Contact Procedures"): Call the APT Support Line (703-875-7700). Licensee should provide a summary of the problem and contact information for APT to follow-up. If there is no response at the APT Support Line, Licensee will contact the on duty Emergency support line as indicated on the voicemail message on the APT Support line.
   iii.  Provided Licensee follows the Emergency Contact Procedures for a Severity Level 1 Issue, APT will commence diagnosis and corrective action by qualified staff within sixty (60) minutes. APT will commence diagnosis and corrective action in response to Severity Level 1 issues raised on Saturday or Sunday within 180 minutes. APT

will provide a resolution or resolution status within 180 minutes of the beginning of corrective action.

iv.   Unscheduled Downtime shall accumulate upon APT's receipt of a Severity Level 1 issue using the Emergency Contact Procedures and shall be subject to the terms of Section 1(c) hereof.

b)   **Severity 2 Issues:**

i.    A Severity Level 2 issue will be defined as an instance wherein a material component of the Software is not accessible as the result of an error on the APT side.

ii.   In the case of a Severity Level 2 issue, Licensee should follow the following procedures: call the APT Support Line (703-875-7700). Licensee should provide a summary of the problem and contact information for APT to follow-up. If there is no response at the APT Support Line, Licensee will contact the on duty Emergency support line as indicated on the voicemail message on the APT Support line.

iii.  APT will commence diagnosis and corrective action by qualified staff within 180 minutes of receiving notice of a Severity Level 2 issue during the hours of 8:00 am to 7:00 pm EST, Monday to Friday (the "Support Hours"). APT will commence diagnosis and corrective action in response to Severity Level 2 issues raised outside of the Support Hours within 180 minutes of the following beginning of the Support Hours. APT will provide a resolution or resolution status within 180 minutes of the beginning of corrective action.

c)   **Severity 3 Issues:**

i.    A Severity Level 3 issue will be defined as an instance wherein a non-material component of the Software is not accessible as the result of an error on the APT side, regardless of whether the error is related to the Software or the Hosting Services.

ii.   In the case of a Severity Level 3 issue, Licensee should follow the following procedures: call the APT Support Line (703-875-7700), or send an email to APT to Licensee@predictivetechnologies.com. Licensee should provide a summary of the problem and contact information for APT to follow-up.

iii.  APT will commence diagnosis and corrective action by qualified staff within 24 hours of receiving notice of a Severity Level 3 issue from Monday to Friday. For Severity Level 3 issues raised by Licensee on Saturday or Sunday, APT will commence diagnosis and corrective action by qualified staff by 7:00 pm, EST the following Monday. APT will provide a resolution or resolution status within 24 hours of the beginning of corrective action.

ATTACHMENT C

# APPLIED PREDICTIVE TECHNOLOGIES LICENSE EXTENSION

This License Extension Agreement (the "Extension Agreement") is between Circuit City Stores, Inc. ("Licensee") and Applied Predictive Technologies, Inc. ("APT") and is effective as of the date first signed below. For due consideration, the parties agree as follows:

1. Extension of License Period: Licensee's licensed use of APT's Test & Learn for Sites, Network Planner, and Performance Manager Software Modules under the terms of the Renewal Order Agreement signed by Licensee and APT effective, September 1, 2005, will continue until March 1, 2009 under the same terms and conditions.

2. Fees: Licensee will pay $75,000, invoiced as follows: $25,000 on October 1, 2008; $25,000 on November 1, 2008; and $25,000 on December 1, 2008.

3. Other: This Extension Agreement shall be binding upon Licensee and APT and their respective permitted successors and assigns.

Accepted and agreed to as of the date first signed below:

APPLIED PREDICTIVE                        CIRCUIT CITY STORES, INC.
TECHNOLOGIES, INC.

By: _____              By: _____

Date: 9/26/08                            Date: 9/26/08
Patrick O'Reilly                         Name: DAVID STRASS
SVP                                      Title: V.C.

**ATTACHMENT D**

## Invoice 5122

October 1, 2008

Michael Healy
Circuit City Stores, Inc.
9950 Mayland Drive
Richmond, VA  23233-1464

**apt**
APPLIED PREDICTIVE
TECHNOLOGIES

*SOFTWARE/SERVICES*      *APT Test & Learn for Sites, Network*
*CONTRACT:*      *Planner, and Performance Manager*

| Description | Amount |
| --- | --- |
| License Fee | $ 25,000.00 |

| **Total Due This Invoice** | **$ 25,000.00** |
| --- | --- |

Due Date: **November 15, 2008**

Please Remit To:

**By Wire Transfer:**
Acct Name: Applied Predictive Technologies
Bank: Wachovia Bank
     1300 I St., NW, 12th Floor
     Washington, DC 20005
ABA/Routing #: 054001220
Account #: 2030000118902

**By Mail:**
Applied Predictive Technologies, Inc.
Attn: Accounts Receivable
901 North Stuart Street
Suite 1100
Arlington, VA 22203
(703) 875-7700

Tax Identification Number:      13-4094079

**ATTACHMENT E**

## Invoice 5154

November 1, 2008

**apt**
APPLIED PREDICTIVE
TECHNOLOGIES

Michael Healy
Circuit City Stores, Inc.
9950 Mayland Drive
Richmond, VA 23233-1464

*SOFTWARE/SERVICES*          *APT Test & Learn for Sites, Network*
*CONTRACT:*          *Planner, and Performance Manager*

| Description | Amount |
|---|---|
| License Fee | $ 25,000.00 |

| | |
|---|---|
| **Total Due This Invoice** | **$ 25,000.00** |

Due Date: **December 16, 2008**

Please Remit To:

By Wire Transfer:
Acct Name: Applied Predictive Technologies
Bank: Wachovia Bank
       1300 I St., NW, 12th Floor
       Washington, DC 20005
ABA/Routing #: 054001220
Account #: 2030000118902

By Mail:
Applied Predictive Technologies, Inc.
Attn: Accounts Receivable
901 North Stuart Street
Suite 1100
Arlington, VA 22203
(703) 875-7700

Tax Identification Number:                    13-4094079

**ATTACHMENT F**

## Invoice 5190

December 1, 2008

Michael Healy
Circuit City Stores, Inc.
9950 Mayland Drive
Richmond, VA  23233-1464

**apt**
APPLIED PREDICTIVE
TECHNOLOGIES

*SOFTWARE/SERVICES*
*CONTRACT:*

*APT Test & Learn for Sites, Network*
*Planner, and Performance Manager*

| Description | Amount |
|-------------|--------|
| License Fee | $ 25,000.00 |

| **Total Due This Invoice** | **$ 25,000.00** |
|---|---|

Due Date: **January 15, 2009**

Please Remit To:

**By Wire Transfer:**
Acct Name: Applied Predictive Technologies
Bank: Wachovia Bank
        1300 I St., NW, 12th Floor
        Washington, DC 20005
ABA/Routing #: 054001220
Account #: 2030000118902

**By Mail:**
Applied Predictive Technologies, Inc.
Attn: Accounts Receivable
901 North Stuart Street
Suite 1100
Arlington, VA 22203
(703) 875-7700

Tax Identification Number:                    13-4094079