Gregg M. Galardi, Esq.
Ian S. Fredericks, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
One Rodney Square
PO Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

Dion W. Hayes (VSB No. 34304)
Douglas M. Foley (VSB No. 34364)
MCGUIREWOODS LLP
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

              - and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
333 West Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

Counsel to the Debtors and
Debtors in Possession

              IN THE UNITED STATES BANKRUPTCY COURT
                FOR THE EASTERN DISTRICT OF VIRGINIA
                         RICHMOND DIVISION

- - - - - - - - - - - - - - x
                           :
In re:                     :    Chapter 11
                           :
CIRCUIT CITY STORES, INC., :    Case No. 08-35653 (KRH)
et al.,                    :
                           :
           Debtors.        :    Jointly Administered
- - - - - - - - - - - - - - x

**DEBTORS' MOTION FOR ORDER UNDER BANKRUPTCY CODE SECTIONS
105, 363(b) AND 503(c)(3) APPROVING A WIND DOWN
INCENTIVE AND RETENTION PLAN AND AUTHORIZING PAYMENT OF
WIND DOWN INCENTIVE AND RETENTION PAY**

          The debtors and debtors in possession in the

above-captioned cases (collectively, the "Debtors")[1]

_____

[1]   The Debtors and the last four digits of their respective taxpayer
      identification numbers are as follows: Circuit City Stores, Inc.
                                                        *(cont'd)*

1

hereby move for entry of an order, under sections 105, 363(b) and, to the extent applicable, 503(c) of title 11 of the United States Code (the "Bankruptcy Code"), approving the Wind Down Incentive and Retention Plan (as defined herein) and authorizing, but not directing, payment of wind down incentive and retention pay to Plan Participants (as defined herein).  In support of the Motion, the Debtors respectfully represent as follows:

### JURISDICTION AND VENUE

1.    This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicate for the relief requested herein are Bankruptcy

---

*(cont'd from previous page)*
   (3875), Circuit City Stores West Coast, Inc. (0785), InterTAN, Inc. (0875), Ventoux International, Inc. (1838), Circuit City Purchasing Company, LLC (5170), CC Aviation, LLC (0841), CC Distribution Company of Virginia, Inc. (2821), Circuit City Properties, LLC (3353), Kinzer Technology, LLC (2157), Abbott Advertising Agency, Inc. (4659), Patapsco Designs, Inc.(6796), Sky Venture Corp. (0311), PRAHS, INC. (n/a), XSStuff, LLC (9263), Mayland MN, LLC (6116), Courchevel, LLC (n/a), Orbyx Electronics, LLC (3360), and Circuit City Stores PR, LLC (5512).  The address for Circuit City Stores West Coast, Inc. is 9250 Sheridan Boulevard, Westminster, Colorado 80031.  For all other Debtors, the address is 9950 Mayland Drive, Richmond, Virginia 23233.

Code sections 105, 363(b) and, to the extent applicable,
503(c)(3).

## BACKGROUND

2.    On November 10, 2008 (the "Petition
Date"), the Debtors filed voluntary petitions in this
Court for relief under chapter 11 of the Bankruptcy Code.

3.    The Debtors continue to manage and operate
their businesses as debtors in possession pursuant to
Bankruptcy Code sections 1107 and 1108.

4.    On November 12, 2008, the Office of the
United States Trustee for the Eastern District of
Virginia appointed a statutory committee of unsecured
creditors (the "Creditors' Committee").  To date, no
trustee or examiner has been appointed in these chapter
11 cases.

5.    On January 16, 2009, the Court authorized
the Debtors, among other things, to conduct going out of
business sales at the Debtors' remaining 567 stores
pursuant to an agency agreement (the "Agency Agreement")
between the Debtors and a joint venture, as agent (the
"Agent").  On January 17, 2009, the Agent commenced going
out of business sales pursuant to the Agency Agreement at
the Debtors remaining stores.

## RELIEF REQUESTED

6.    By this Motion, the Debtors seek entry of
an order under Bankruptcy Code sections 105, 363(b) and,
to the extent applicable, 503(c) (i) approving the Wind
Down Incentive and Retention Plan, (ii) authorizing the
Debtors to implement the Wind Down Incentive and
Retention Plan for the Plan Participants, and (iii)
allowing all payments thereunder as administrative
expenses of these estates.  As set forth herein, the
Debtors do not believe that the Wind Down Incentive and
Retention Plan implicates Bankruptcy Code section 503(c);
however, to the extent that section 503(c) is applicable,
the Debtors believe that such payments are justified by
the facts and circumstances of their fast-moving and
complex bankruptcy cases.[2]

## BASIS FOR RELIEF

7.    As this Court is aware, on January 16,
2009, the Debtors commenced liquidating their assets by

---

[2]   Prior to filing this Motion, the Debtors provided counsel to Bank
of America, N.A., as agent (the "DIP Agent") to the Debtors'
post-petition secured lenders (the "DIP Lenders"), and counsel to
the Creditors' Committee with copies of the Wind Down Incentive
and Retention Plan.  As of the filing of this Motion, the Debtors
were involved in discussions with such parties and such parties
were still evaluating the Wind Down Incentive and Retention Plan.
However, the amounts and payments contemplated by the Wind Down
Incentive and Retention Plan are included in the wind down budget
currently the subject of negotiations with the DIP Agent and the
DIP Lenders.

obtaining approval to sell their inventory through going
out of business sales at their remaining stores.  Against
this backdrop, the Debtors, with the assistance of their
advisers, formulated and have begun implementing a
thorough wind down plan.  The plan contemplates, among
other things, liquidating the Debtors remaining assets,
winding up their remaining businesses, minimizing
administrative expenses, investigating causes of action
for the benefit of their estates, and reconciling claims.

8.    Because the Debtors will no longer operate
as a going concern, however, the Debtors have experienced
a noticeable increase in employee turnover.  This
turnover threatens the Debtors ability to implement the
wind down plan and maximize value for their estates and
stakeholders.  Thus, to successfully complete the wind
down of the Debtors' remaining operations effectively and
efficiently, the Debtors determined that formulating an
incentive and retention plan was in the best interest of
their estates and creditors.  Such a plan would help
ensure that employees (the "Plan Participants") who are
essential to the wind down process and critical to
managing the effective and timely wind down of the
Debtors' estates are retained and appropriately motivated
to maximize value.

9.    In that regard, the Plan Participants have been and will continue to be called upon to expend significantly more hours during the wind down process than contemplated by the normal terms of their employment.  The efforts of these employees have been, and continue to be, critical to the Debtors' efforts to facilitate a liquidation and wind down process that will allow the Debtors and their estates to realize the highest value possible.

10.   In order to motivate Plan Participants to continue to expend the additional effort required of them to efficiently wind down the Debtors' estates, as well as to continue to manage an efficient and coordinated chapter 11 process, the Debtors have worked with their restructuring professionals to develop an appropriate but limited wind down incentive and retention plan (the "Wind Down Incentive and Retention Plan").

11.   The Debtors formulated the Wind Down Incentive and Retention Plan with the goal of rewarding the substantial contribution and performance of the Plan Participants going forward.  Because the Debtors waited until their liquidation was underway before proposing the Wind Down Incentive and Retention Plan, it is imperative that the Plan Participants be motivated to continue their substantial contributions.  The efforts of the Plan

6

Participants have been and will continue to be instrumental to the Debtors efforts to effectively wind down their estates, including ongoing efforts to maintain value in order to provide the maximum return to the Debtors' estates and creditors.  In light of the foregoing, on February 3, 2009, the Compensation Committee -- the committee delegated the responsibility to approve such plans by the Board of Directors -- approved the Debtors pursuing this Court's approval of the Wind Down Incentive and Retention Plan.

12.  As set forth herein, the Debtors believe that one hundred fifty four (154) employees,[3] including certain members of the Debtors' management should receive additional compensation in connection with their much needed and continued exceptional efforts.  Specifically, the Debtors request that the Court approve the general structure described below.

### THE WIND DOWN INCENTIVE AND RETENTION PLAN

13.  The proposed Wind Down Incentive and Retention Plan is relatively straightforward and designed to motivate Plan Participants to continue their increased efforts to wind down the estate and help maximize value.

_____

[3]  A list of all 154 employees and their proposed compensation under the Wind Down Incentive and Retention Plan is attached as Exhibit C.

The Wind Down Incentive and Retention Plan consists of two types of compensation, retention payments and incentive bonus payments.  The maximum aggregate amount of the payments to be made under the Plan could be $4.63 million, but that maximum amount would be paid only if all participants in the incentive portion of the Plan earn 100% of their incentive bonuses, which in turn would realize the Debtors' estates approximately $250 million of additional value.

14.   The Wind Down Incentive and Retention Plan divides Plan Participants and payments into two tiers. The first tier, designated as "Tier I", consists of a management level employees that may be considered "insiders", as that term is defined Bankruptcy Code section 101(31), who would be entitled to earn incentive bonuses based upon their performance with respect to various identified tasks and as described more fully below.  The second tier, designated as Tier II, consists of non-insider key employees that would earn retention payments based upon their continued service to the Debtors for a specified period of time as described more fully below.[4]

---

[4]    The Debtors will provide the Court, the United States Trustee, counsel to the DIP Agent, and counsel to the Committee with the identity of the Plan Participants and the Debtors'

*(cont'd)*

15.   **Tier I**.   Tier I consists of 16 Plan
Participants and contemplates payments of not more than
$2.3 million.   Tier I Plan Participants are comprised of
members of the Debtors' management and are paid based on
successfully completing certain tasks associated with
their employment.   Payments to Tier I Plan Participants
are staggered depending on benchmarks -- "Tasks" --
designed to denote the level of success and are derived
from each such Plan Participants salary earned during the
wind down period.[5]   Furthermore, based upon the level of
success that a Tier I Plan Participate achieves, the Plan
Participant may receive 0, 50%, 75% or 100% of the
incentive bonus.   Thus, if a Tier I Plan Participant does
not successfully complete any Tasks, there will be no
payment to the Tier I Plan Participant.   If all of the
Tier I Plan Participants achieve all of their Task at the
minimum level necessary to earn the 50% incentive bonus,
the Debtors estimate that the aggregate payout to the
Tier I Plan Participants would be approximately $1.14
million.

_____

*(cont'd from previous page)*
proposal regarding the relative share of each of the Plan
Participants.   Additionally, the names of those persons
required to file statements pursuant to section 16(b) of the
Securities Exchange Act of 1934 are set forth on a list
attached as Exhibit A.

[5]      A list of the Tasks are attached as Exhibit B.

16.   To illustrate, consider the circumstances under which a Tier I Plan Participant associated with Task V would be paid.   Task V requires that distribution centers be closed by one of three dates, which could save the Debtors' estates occupancy expenses of approximately $2 million per month.   Certain, but not all, Tier I Plan Participants are eligible to receive payments allocated to Task V if Task V is successfully completed, success being measured by the date on which the distribution centers are closed.

17.   If the distribution centers are closed by no later than February 14, 2009, all Plan Participants associated with Task V would receive 100% of their bonus that is allocated to Task V.   If the distribution centers are not closed under February 28, 2009, such Plan Participant would only receive 75% of the allocable portion of their bonuses.   Likewise, if the distributions centers are not closed until March 14, 2009, such Plan Participants will receive 50% of the allocable share of their bonuses.   Finally, if the distributions centers are not closed until sometime thereafter, no bonus for Task V will be paid to any Plan Participant.

18.   The Debtors estimate that if the Tasks are completed at the 100% bonus level, the Debtors' estates will receive incremental proceeds of approximately $250

million.  By contrast, such Plan Participants will only
be entitled to additional compensation of approximately
$2.3 million or less than 1% of the total estate value
realized.

19.  **Tier II**.  Tier II consists of 137 non-
insider Plan Participants and contemplates payments of
not more than $1.62 million in retention bonuses.  None
of the Tier II Plan Participants are members of the
Debtors' management.  Indeed, only one Tier II employee
holds the title of Vice President.  Other titles include
department Manager, General Manager, Assistant Manager,
Project Manager, department Director, Regional Director,
Supervisor, Assistant Treasurer, Senior Processor,
Assistant General Counsel, Senior Buyer, Senior Engineer,
Senior Analyst, Processor, and Mechanic.  Notwithstanding
any of the foregoing titles, the Debtors submit that none
of the Tier II Plan Participants are persons "in control"
of the Debtors such that they set overall corporate
policy or perform other executive duties.

20.  The Debtors propose payments to Tier II
Plan Participants based in part on the length of service
the Debtors are requiring and in part on the services the
Tier II Participants perform.  Critically, for those Plan
Participants that are being asked to remain with the
Debtors for longer than 13 weeks, the retention payments

11

are structured so that they are back end loaded, _i.e._, a greater percentage of the retention bonus is being paid upon the day that the Plan Participants' employment is no longer needed.  In that regard, the Tier II performance period is broken into three periods, weeks 13, 26, and 52, (the "Performance Periods"), and the Tier II Plan Participants payments are either made at the conclusion of the Performance Period or the week following last day on which the Tier II Plan Participant was employed. Importantly, if a Tier II Plan Participant voluntary terminates his or her employment or is terminated for cause during a Performance Period, the Plan Participant will not receive any portion of any retention bonus that the Tier II Plan Participant would have received upon the conclusion of the Performance Period.

21.   Additionally, Tier II Plan Participants are treated differently and payments to a particular Tier II Plan Participant depend on three factors:  (1) the Tier II Plan Participant's weekly salary, (2) the length of time for which the Plan Participant services are needed, and (3) whether the Plan Participant has been designated to receive 25%, 50%, or 75% of their weekly salary earned during the Performance Periods.  Notably, Tier II Plan Participants are not required to accomplish

specific performance metrics to be eligible for a payment.

22. **Discretionary Bonus Pool**.  In addition, the Wind Down Incentive and Retention Plan includes a $750,000 discretionary bonus pool (the "Discretionary Bonus Pool").  No Tier I Plan Participant will be eligible receive any payment from the discretionary Bonus Pool.  Tier II Plan Participants and other employees who are neither Tier I nor Tier II Plan Participants will, however, be eligible to receive payments from the Discretionary Bonus Pool.

23. The Discretionary Bonus Pool is designed to ensure the retention of critical employees through the conclusion of the wind down process.  In that regard, the Discretionary Bonus Pool would not only be used to incentive people needed to stay longer or fill additional positions, but also to enable the Debtors to quickly address unpredictable employment loses, transfers and the possible need to hire people with particular skill sets. Payments from the Discretionary Payment Pool must be approved by the present Chief Executive Officer, the Chief Accounting Officer and the Executive Vice President, General Counsel and Secretary (as may be reconstituted from time to time, the "Wind Down Board"),

13

and only after advance consultation with the Creditors'
Committee.

### APPLICABLE AUTHORITY

**I.   THE WIND DOWN INCENTIVE AND RETENTION PLAN IS A
VALID EXERCISE OF THE DEBTORS' BUSINESS JUDGMENT AND
WARRANTED UNDER BANKRUPTCY CODE SECTION 363(B).**

24.  Bankruptcy Code section 363(b) provides,
in relevant part, that "[t]he trustee, after notice and a
hearing, may use, sell or lease, other than in the
ordinary course of business, property of the estate."  11
U.S.C. § 363(b)(1).

25.  Under Bankruptcy Code section 363, this
Court may approve a debtor's request for relief when the
debtor demonstrates a sound business justification for
seeking such relief.  In re WBQ P'ship, 189 B.R. 97, 102
(Bankr. E.D. Va. 1995)(citing Stephens Indus., Inc. v.
McClung, 789 F.2d 386, 390 (6th Cir. 1986)); see also In
re W.A. Mallory Co., Inc., 214 B.R. 834, 836 (Bankr. E.D.
Va. 1997).

26.  As set forth above, the Debtors have
articulated valid business reasons for implementing the
Wind Down Incentive and Retention Plan.  Among other
things, the Wind Down Incentive and Retention Plan will
reward Plan Participants for their significant efforts
since the liquidation commenced and their increased
responsibilities and burdens as a result of the

liquidation and winding down process.  Moreover, as
outlined above, the Wind Down Incentive and Retention
Plan is structured to maximize value for the Debtors'
estates and creditors and approval of the Debtors efforts
to obtain approval of the Wind Down Incentive and
Retention Plan was approved by the Debtors' Compensation
Committee.  Accordingly, the Debtors believe that valid
business reasons exist for the implementation of the Wind
Down Incentive and Retention Plan and, thus, that it
should be approved.

     27.  Once a debtor articulates a valid business
justification for a particular form of relief, the Court
reviews the debtor's request under the "business judgment
rule."  The business judgment rule has vitality in
chapter 11 cases and shields a debtor's management from
judicial second-guessing.  In re Integrated Res., Inc.,
147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van
Gorkom, 488 A.2d 858, 872 (Del. 1985)).  The business
judgment rule 'is a presumption that in making a business
decision the directors of a corporation acted on an
informed basis, in good faith and in the honest belief
that the action was in the best interests of the
company.'"  See id.

     28.  In that regard, courts have found that a
debtor's use of reasonable performance bonuses and other

15

incentives for employees is a valid exercise of a
debtor's business judgment. <u>See</u>, <u>e.g.</u>, <u>In re America
West Airlines, Inc.</u>, 171 B.R. 674, 678 (Bankr. D. Ariz.
1994) (noting that it is the proper use of a debtor's
business judgment to propose bonuses for employees who
helped propel the debtor successfully through the
bankruptcy process); <u>In re Interco Inc.</u>, 128 B.R. 229,
234 (Bankr. E.D. Mo. 1991) (stating that a debtor's
business judgment was controlling in the approval of a
"performance/retention program").

29.  More importantly, perhaps, even after the
recent amendments to the Bankruptcy Code, courts have
approved employee bonus programs as valid exercises of
business judgment. <u>See</u>, <u>e.g., In re Blue Water
Automotive Systems, Inc.</u>, Case No. 08-43196 (McIvor, J.)
(Bankr. E.D. Mich. May 12, 2008) (approving incentive
payments to employees in connection with a potential sale
of assets); <u>In re Nellson Nutraceutical, Inc.</u>, 368 B.R.
787, 801 (Bankr. D. Del. 2007) (Bankruptcy Code section
503(c)(1) does not restrict incentive payments to non-
insider employees); <u>In re Dana Corp.</u>, 358 B.R. 567
(Lifland, J.) (Bankr. S.D.N.Y. Nov. 30, 2006) (approving
management incentive plan under the business judgment
standard), <u>appeal docketed</u> Case No. 07-CV-01888 (PKC)
(S.D.N.Y. Mar. 5, 2007) (appeal dismissed by consent of

16

parties); In re Global Home Prods. LLC, 369 B.R. 778
(Bankr. D. Del. 2007) (approving management incentive
program for benefit of nine employees of the debtors
provided that such employees fulfilled their obligations
to the debtors through the closing of a sale of
substantially all of the Debtors' assets).

30.   Recently, courts have also approved
similar two-tier incentive plans that contemplate "task"
based incentive payments to management and retention
payments to non-insiders.   See In re KB Toys, Inc., Case
No. 08-13269 (Carey, J.) (Bankr. D. Del. Jan. 6, 2009)
(approving a retention plan for non-insider employees);
In re KB Toys, Inc., Case No. 08-13269 (Carey, J.)
(Bankr. D. Del. Jan. 14, 2009) (approving an incentive
plan based on successfully completing of identifiable
"tasks" consistent with targets, which plan applied to
certain members of the debtor's management); In re
Mervyn's Holdings, LLC, Case No. 08-11586 (Gross, J.)
(Bankr. D. Del. Oct. 30, 2009) (approving a retention
plan for non-insiders and a task and target based
incentive plan for certain members of the debtor's
management); see also In re Movie Gallery, Inc., 07-33849
(Tice, J.) (Bankr. E.D. Va. Feb. 29, 2008) (approving a
key employee incentive plan under which management
received payments based on performance and non-insiders

17

received payments based on completion of certain tasks associated with their respective positions); In re Linens Holding Co., Case No. 08-10832 (Sontchi, J.) (Bankr. D. Del. Oct. 21, 2008) (approving a retention plan for non-insiders and wind down incentive plan to certain members of the debtor's management); In re Plastech Engineered Products, Inc., Case No. 08-42417 (Shefferly, J.) (Bankr. E.D. Mich. June 27, 2008 (approving a management incentive plan tied to the performance of requisite tasks).

31.   In the present case, authorizing the Debtors to provide the Wind Down Incentive and Retention Plan to the Plan Participants will accomplish a similarly sound business purpose.  The Debtors have determined that the costs associated with such additional post-petition compensation are more than justified by the benefits that the Debtors will realize by creating appropriate incentives for the Plan Participants, whose experience, skills and diligent efforts are critical for the Debtors to maximize the value of their business as they wind down.

II.   **THE WIND DOWN INCENTIVE AND RETENTION PLAN DOES NOT CONFLICT WITH BANKRUPTCY CODE SECTION 503(c)(1) or (c)(2).**

32.   Bankruptcy Code Section 503(c) governs retention, severance and other payments to insiders.  The

Wind Down Incentive and Retention Plan does not conflict with Bankruptcy Code section 503(c) for two primary reasons.

33.   First and foremost, the Tier II Plan Participants are not "insiders" within the meaning of Bankruptcy Code section 101(31) because they do not exercise control over the Debtors, influence general corporate policy, or perform other important executive functions.  See 455 CPW Assocs. v. Greater N.Y. Sav. Bank (In re 455 CPW Assocs.), 2000 U.S. App. LEXIS 23470 (2d Cir. Sept. 14, 2000) (affirming a bankruptcy court's holding that a vice president of a limited partnership that was a limited partner of the debtor was not an insider because he was not "in control"); NMI Sys. v. Pillard (In re NMI Sys.), 179 B.R. 357, 368 (Bankr. D.D.C. 1995) (concluding that a "vice president" was not an "officer" or a "person in control" within the meaning of insider in the Bankruptcy Code because the employee was not in a position to influence corporate policy); C.f., Gold v. Sloan, 486 F.2d 340, 350 (4th Cir. Va. 1973) (concluding, in the context of a section 16(b) Securities Exchange Act of 1934 lawsuit, that an officer's title was "merely titular" because such officer was a member of lower level management and did not have access to or could avail himself of inside information);

19

C.R.A. Realty Corp. v. Crotty, 878 F.2d 562, 566 (2d Cir.
1989) (concluding that a vice president was not an
"officer" within the meaning of section 16(b) of the
Securities Exchange Act of 1934 because, among other
things, the officer did not have access to inside
information).  As such, Bankruptcy Code section 503(c)
not only does not conflict with the Wind Down Incentive
and Retention Plan as it applies to Tier II Plan
Participants, the Code section is not applicable.

34.   Turning to Tier I Plan Participants, the
Wind Down Incentive and Retention Plan does not conflict
with either subsection (1) or (2) of Bankruptcy Code
section 503(c).  Although Tier I Plan Participants are
"insiders", Bankruptcy Code section 503(c)(1) applies
only to payments that are meant to induce insiders to
"remain with the [debtors'] business."  11 U.S.C. §
503(c)(1).  The Wind Down Incentive and Retention Plan is
not intended to "induce" any Tier I Plan Participant to
"remain with the [debtors'] business."

35.   Furthermore, although in some instances a
Tier I Plan Participant must be employed by the Debtors
on the day that a payment is earned, the requirement is
not to induce such Plan Participants to stay.  Rather,
the requirement is designed to ensure that Tier I Plan
Participants achieve the Task by a date certain and

20

continue their efforts to do everything in their power to
maximize value for these estates.  In addition, the
requirement is designed to ensure that Tier I Plan
Participants do not receive payments they were eligible
to receive if they were no longer employed by the Debtors
before the bonus was earned.  Consequently, for Tier I
Plan Participants, the Wind Down Incentive and Retention
Plan is properly characterized as a performance based,
short term incentive plan, not a retention plan for
insiders subject to the requirements of Bankruptcy Code
section 503(c)(1).  See, e.g., In re Global Home
Products, LLC, 369 B.R. at 786.

        36.  Nor is the Wind Down Incentive and
Retention Plan a severance program for insiders subject
to the provisions of Bankruptcy Code Section 503(c)(2).
See 11 U.S.C. § 503(c)(2).  Specifically, the Wind Down
Incentive and Retention Plan does not provide benefits to
Tier I Plan Participants upon termination of their
employment with the Debtors.  Under the terms of the Wind
Down Incentive and Retention Plan, Tier I Plan
Participants will receive compensation upon the
accomplishment of certain performance metrics, regardless
of whether the Tier I Plan Participant thereafter remains
employed by the Debtors.  Therefore, the Wind Down
Incentive and Retention Plan is a short term incentive

plan, not a severance plan subject to the requirements of

Bankruptcy Code section 503(c)(2).

**III. THE WIND DOWN INCENTIVE AND RETENTION PLAN IS JUSTIFIED UNDER THE FACTS AND CIRCUMSTANCES UNDER BANKRUPTCY CODE SECTION 503(c)(3).**

37.   Bankruptcy Code section 503(c)(3)

provides:

> [There shall neither be allowed, nor paid--]
> (3) other transfers or obligations that are
> outside the ordinary courts of business and
> not justified by the facts and circumstances
> of the case, including transfers made to, or
> obligations incurred for the benefit of,
> officers, managers, or consultants hired
> after the date of the filing of the
> petition.

11 U.S.C. § 503(c)(3).

38.   Courts have held that the requirement that

transfers or obligations be "justified by the facts and

circumstances of the case" is a reiteration of the

business judgment test (or sound business judgment test)

incorporated into Bankruptcy Code section 363(b) (and as

set forth above) and under which courts traditionally

evaluated executive compensation programs prior to recent

amendments to the Bankruptcy Code.  See In re Dana Corp.,

567 B.R. at 576; In re Nobex Corp., Case No. 05-20050

(Walrath, J.) (Bankr. D. Del. Jan. 12, 2006) ("So I do

read (c)(3) to be the catch-all and the standard under

(c)(3) for any transfers or obligations made outside the

ordinary course of business are those that are justified
by the facts and circumstances of the case.  Nothing more
- no further guidance being provided to the Court by
Congress, I find it quite frankly nothing more than a
reiteration of the standard under 363 . . . under which
courts had previously authorized transfers outside the
ordinary course of business and that is, based on the
business judgment [sic] of the debtor, the court always
considered the facts and circumstances of the case to
determine whether it was justified."); In re Calpine
Corp., Case No. 05-60200 (Lifland, J.) (approving
incentive plan under Bankruptcy Code section 503(c)(3)
pursuant to the business judgment test); 4 Collier on
Bankruptcy ¶ 503.17[3] (15th rev. ed. 2006) (indicating
that the standard for approval under Bankruptcy Code
section 503(c)(3) is "unlikely to be much different than
the standard for approval that would otherwise be applied
by the court").  Cf., In re Refco Inc., Case No. 05-60006
(Drain, J.) (Bankr. S.D.N.Y. Jan. 10, 2006 (approving
non-insider retention plan pursuant to business judgment
test).

        39.  As demonstrated above, the Debtors have
established a sound business justification for the
proposed Wind Down Incentive and Retention Plan.  The
Wind Down Incentive and Retention Plan will motivate and

23

reward Plan Participants for their significant efforts
and the increased demands placed upon them in connection
with the liquidation and winding down of these estates.
Additionally, the Wind Down Incentive and Retention Plan
is designed to maximize value for the Debtors' estates
and creditors, and payments will only be made if an
incentive or retention target is actually achieved.

40.   Finally, the Wind Down Incentive and
Retention Plan is fair and reasonable and does not
discriminate among members of the Debtors' management, as
it provides a pool from which a Plan Participant may
participate and designs a "tiered" system commensurate
with the additional demands placed on and efforts taken
by such Plan Participants.  Moreover, the total potential
payout the Debtors seek to pay pursuant to the Wind Down
Incentive and Retention Plan is reasonable in the context
of the Debtors' assets and liabilities, as well as the
value the Debtors anticipate preserving and obtaining as
a result of the critical employees' efforts.

**IV.   THE WIND DOWN INCENTIVE AND RETENTION PLAN IS ALSO
        APPROPRIATE UNDER BANKRUPTCY CODE SECTION 105(A).**

41.   Bankruptcy Code section 105 provides that
"[t]he court may issue any order, process, or judgment
that is necessary or appropriate to carry out the
provisions of this title."  11 U.S.C. § 105.

24

42.   As set forth in detail above, the Wind Down Incentive and Retention Plan is critical to the Debtors' efforts to maximize the value of their estates throughout the liquidation and winding down process.   The efforts of the Plan Participants in pursuing the maximum return for the Debtors' creditors and other parties in interest are essential to the Debtors.   Therefore, the costs associated with the incentive plan are reasonable and necessary and are justified by the benefits that the Debtors will realize as a result of the services of the Plan Participants.

43.   For all the foregoing reasons, the Debtors submit that the Wind Down Incentive and Retention Plan should be approved.

**V.     WAIVER OF THE TEN-DAY STAYS PROVIDED BY BANKRUPTCY RULE 6004 SHOULD BE WAIVED.**

44.   Bankruptcy Rule 6004(h) provides that: "[a]n order authorizing the use, sale, or lease of property is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).

45.   The Debtors request that the Court waive the ten-day stay of Bankruptcy Rules 6004 with respect to Wind Down Incentive and Retention Plan following entry of the Order approving such plan.   By waiving such

25

requirements, the Debtors will be able to immediately

provide certainty to Plan Participants that they will be

compensated for their efforts to maximize value for these

estates.

## NOTICE

46.   Notice of this Motion has been provided to those parties entitled to notice under this Court's Order Pursuant to Bankruptcy Code Sections 102 and 105, Bankruptcy Rules 2002 and 9007, and Local Bankruptcy Rules 2002-1 and 9013-1 Establishing Certain Notice, Case Management, and Administrative Procedures (Docket No. 130).  The Debtors submit that, under the circumstances, no other or further notice need be given.

## WAIVER OF MEMORANDUM OF LAW

47.   Pursuant to Local Bankruptcy Rule 9013-1(G), and because there are no novel issues of law presented in the Motion and all applicable authority is set forth in the Motion, the Debtors request that the requirement that all motions be accompanied by a separate written memorandum of law be waived.

## NO PRIOR REQUEST

48.   No previous request for the relief sought in this Motion has been made to this Court or any other Court.

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form annexed hereto, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated: February 6, 2009
       Richmond, Virginia    SKADDEN, ARPS, SLATE, MEAGHER &
                                FLOM, LLP
                                Gregg M. Galardi, Esq.
                                Ian S. Fredericks, Esq.
                                P.O. Box 636
                                Wilmington, Delaware 19899-0636
                                (302) 651-3000

                                      - and -

                                SKADDEN, ARPS, SLATE, MEAGHER &
                                FLOM, LLP
                                Chris L. Dickerson, Esq.
                                333 West Wacker Drive
                                Chicago, Illinois 60606
                                (312) 407-0700

                                      - and -

                                MCGUIREWOODS LLP

                                _/s/ Douglas M. Foley_____
                                Dion W. Hayes (VSB No. 34304)
                                Douglas Foley (VSB No. 34364)
                                One James Center
                                901 E. Cary Street
                                Richmond, Virginia 23219
                                (804) 775-1000

                                Counsel for Debtors and Debtors
                                in Possession