## LEASE AGREEMENT

**THIS LEASE AGREEMENT** (this "Lease"), dated as of the 18th day of January 200_7_ ("Effective Date"), by and between MDS REALTY II, LLC, a Delaware limited liability company ("Landlord") with an office at c/o Klaff Realty, 122 South Michigan Avenue, Suite 1000, Chicago, Illinois 60603, and CIRCUIT CITY STORES, INC. ("Tenant") with an office at, 9950 Mayland Drive, Richmond, Virginia 23233.

## W I T N E S S E T H:

In consideration of the rents and covenants set forth in this Lease, Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises (as defined in Section 1.01(P)) upon the following terms and conditions:

## ARTICLE I

## FUNDAMENTAL LEASE PROVISIONS

SECTION 1.01 Definitions:

A.    **Additional Charges**:

1.    Initial CAM Costs:  Estimated at One and 41/100 Dollars ($1.41) per square foot of Floor Area (as defined below), which includes the initial insurance cost of ten Cents ($0.10) per square foot of Floor Area (the "Initial Insurance Cost").

2.    Initial Taxes: Estimated at One and 86/100 Dollars ($1.86) per square foot of Floor Area.

B.    **Alternative Rent**:  An amount equal to sixty-five percent (65%) of the Annual Minimum Rent (as defined below) that would have otherwise been due during the period of time that Tenant is entitled to pay Alternative Rent.

C.    **Annual Minimum Rent** (subject to adjustment pursuant to Section 2.09):

| Period | Rent p.s.f. | Annual Rent | Monthly Installments |
|---|---|---|---|
| Initial Lease Term: | | | |
| Commencement Date through end of tenth Lease Year (as defined in Section 1.01(J)) | $17.50 | $545,615.00 | $45,467.92 |
| 1st Extension Period (as defined in Section 1.01(F)): | $19.25 | $600,176.50 | $50,014.71 |

| | | | |
|---|---|---|---|
| 2nd Extension Period: | $21.18 | $660,350.04 | $55,029.17 |
| 3rd Extension Period: | $23.30 | $726,447.40 | $60,537.28 |

D.    **Brokers**: Landmark Commercial Real Estate, Inc., Metro Commercial Real Estate, Inc. and NAI Farbman

E.    **Delivery Dates**:    1.    Anticipated Possession Date: July 15, 2007

                            2.    Outside Possession Date: February 15, 2008.

F.    **Extension Periods**: Three (3) periods of five (5) years each.

G.    **Floor Area**:   The actual number of square feet of space contained on all floors within any building area in a particular leased premises (including the Premises) within the Landlord's Parcel (as defined below), and, with respect to exterior areas, including all permanent exterior sales areas leased to or exclusively used by one (1) or more tenants (other than loading dock areas, trash compactor areas, and trash container areas).  All measurements shall be from the exterior of outside walls or store front and/or to the centerline of any common walls, but in no event shall Floor Area include any non-selling or storage space areas within any mezzanine, lower floor, second floor or, except as set forth above, any exterior areas.

H.    **Initial Lease Term**: Ten (10) Lease Years, plus the partial Lease Year commencing on the Commencement Date and ending on the January 31 immediately thereafter.

I.    **Key Tenants**: Michaels, OfficeMax, Target, and Sports Authority, or their "Acceptable Replacement Tenants", as herein defined.

J.    **Lease Year**: Each period within the Term (as defined below) commencing on February 1 and ending the next succeeding January 31, except that Lease Year 1 shall include the partial Lease Year commencing on the Commencement Date and ending on the January 31 immediately thereafter.

K.    **Minimum Ongoing Cotenancy Percentage**: At least three of the Key Tenants are open for business other than allowable periods for remodeling or reconstruction, or retail tenants, open for business other than allowable period for remodeling or reconstruction, during normal business hours, occupying at least forty percent (40%) of the Floor Area of the Shopping Center, exclusive of the premises occupied by the Key Tenants and the Premises, as such Floor Area is noted on Exhibit A-1,.

L.    **Minimum Initial Cotenancy Percentage**: Retail tenants, open for business during normal business hours, occupying at least forty percent (40%) of the Floor Area of the Shopping Center, exclusive of the premises occupied by the Key Tenants and the Premises, as such Floor Area is noted on Exhibit A-1,.

2

M.    **Minimum Parking Ratios**:  Any parking ratio references shall be as ascribed in the OEA (as defined in Section 20.04).

N.    **Opening Requirement:**  Three of the Key Tenants are open for business and the Minimum Initial Cotenancy Percentage is met.

O.    **Permitted Use**:  The sale, rental, installation, servicing and repairing of consumer, office and automotive electronics products (collectively, the "<u>Products</u>"); and/or for any other lawful retail use not specifically prohibited by the provisions of Section 8.01 including subject to Prohibited Uses and Existing Exclusives (hereinafter defined).  The term "<u>Products</u>" shall include, without limitation, televisions, stereos, speakers, video and audio recorders and players and cameras; computer hardware and software and related software services (which include internet access services, entertainment software and entertainment media [such as, by way of example only, game cartridges, video tapes, cassettes, compact discs, DVD's and DVD equipment]); cellular and wireless telephones and telecommunication devices and related accessories; motor vehicle audio, stereo and telephone systems; and technological evolutions of the foregoing.

P.    **Premises**:  Approximately thirty one thousand one hundred seventy eight (31,178) square feet of Floor Area, including 170 feet of frontage and a depth of 174 feet, located in that retail building containing approximately 77,187 square feet of Floor Area (the "<u>Building</u>") having a street address of 32399 John R. Road, Madison Heights, Michigan (the "<u>State</u>").  The Premises is crosshatched on the site plan attached hereto as <u>Exhibit A</u> (the "<u>Site Plan</u>").  The Building constitutes a portion of certain property owned by Landlord, which property is depicted on the Site Plan and legally described on <u>Exhibit B</u> hereto (herein, "<u>Landlord's Parcel</u>").  Landlord's Parcel constitutes a portion of a shopping center known as "Madison Place" (the "<u>Shopping Center</u>").  The Shopping Center is depicted on <u>Exhibit A-1</u> hereof.

Q.    **Slack Delivery Period**:  Periods of time beginning November 15 and ending on the following February 1.

R.    **Slack Season**:  The period of time beginning on November 15th and ending on the following January 1.

S.    **Tenant' s Share**:  A fraction, the numerator of which shall be the Floor Area of the Premises and the denominator of which shall be the Floor Area of the building improvements on the Landlord's Parcel.

T.    **Term**:  The Initial Lease Term plus the Extension Periods, if the option for any such Extension Period is exercised.

## ARTICLE II

## LEASE OF PREMISES - TERM OF LEASE

SECTION 2.01 Demise.

(a)    Landlord does hereby lease and demise to Tenant, and Tenant does hereby hire from Landlord, the Premises, together with the licenses, rights, privileges and easements appurtenant to the Premises.

(b)    Tenant and its employees, invitees, agents, customers, concessionaires and licensees shall have the nonexclusive right, in common with Landlord and other tenants of the Landlord Parcel, to use all sidewalks, paved parking areas, paved service areas, signs, traffic controls, lighting and all means of ingress, egress, acceleration, deceleration and stacking lanes and circulation for the aforesaid parking and service areas of the Landlord Parcel to and from public streets and roads bordering the Landlord Parcel (collectively, the "Landlord Parcel Common Areas") now or hereafter made available or maintained by Landlord on the Landlord Parcel. Tenant's right to use the Common Areas may be subject to such regulations as may from time to time be imposed upon, and equally applicable to, all tenants of Landlord's Parcel by Landlord or its agents and in any event in accordance with the OEA (as defined in Section 20.04). Landlord shall cause and permit Tenant and its employees, invitees, agents, customers, concessionaries and licensees to have the nonexclusive right to use all sidewalks, paved parking areas, paved service areas, and other common areas of the Shopping Center (the "Shopping Center Common Areas") pursuant to the terms and conditions set forth in the OEA. The Landlord Parcel Common Areas and the Shopping Center Common Areas are sometimes collectively referred to herein as the "Common Areas".

(c)    Subject to all Laws and the receipt of any approvals and consents that may be required under the OEA (the "OEA Consents"), if any, Tenant shall have the right to use, on a "24 hour a day", "365 days a year" basis and without any additional charge, the loading facilities serving the Premises, the customer pick-up area, car stereo parking areas, four (4) web order customer pick-up parking spaces, trash compactor area and transformer pad area (collectively, the "Other Improvements"), all as shown on the Site Plan. Subject to all Laws and the OEA Consents, if any, Tenant shall have the right to: (i) erect a sign identifying Tenant's customer pick-up area and/or Tenant's car stereo parking areas; (ii) erect signage, stripe, and print on the four (4) web order customer pick-up parking spaces in order to so identify such parking spaces and (iii) have a truck or other vehicle parked in "Tenant's Preferred Area" as shown on the Site Plan ("Tenant's Preferred Area"), for up to five (5) consecutive days in duration for each occurrence, for the purpose of promoting and displaying merchandise (each occurrence up to five [5] days in duration is referred to as a "Tenant Promotion"). Landlord shall have no obligation to enforce or police Tenant's web order customer pick up parking spaces or the car stereo parking areas. Subject to all Laws and the OEA Consents, Tenant may have up to six (6) Tenant Promotions during Lease Year 1, and up to five (5) Tenant Promotions for each subsequent Lease Year. Until such time as an OEA Consent, if any, needed for Tenant's permanent use of the car stereo parking areas and web order customer pick-up parking spaces fails to be obtained, Tenant may designate and use such areas for such purposes. Tenant may endeavor to obtain the OEA Consents at its sole cost and expenses; however, at Tenant's request, Landlord agrees to

4

use its commercially reasonable efforts to assist Tenant in obtaining the OEA Consents, provided that Landlord shall not be required to incur any out of pocket costs or expenses in connection therewith.

SECTION 2.02  Extension Periods.  Provided Tenant is not then in monetary default or in default of any material terms or provisions this Lease, after the lapse of all applicable grace periods, at the time of exercising any option herein or at the time of the commencement of any Extension Period, Tenant shall have the option to extend the Term for the number of Extension Periods shown in Section 1.01(F), upon all the terms and conditions contained in this Lease. Each such option is exercisable by Tenant giving irrevocable notice to Landlord (a) at least two hundred seventy (270) days prior to the expiration of the Initial Lease Term, or of the preceding Extension Period, as the case may be, or (b) if Tenant fails to give Landlord such notice, then within twenty (20) days after receipt of notice from Landlord that Tenant has failed to exercise its option to extend within the time period provided in (a) above.

SECTION 2.03  Commencement Date and Landlord Reimbursement.  "Commencement Date" shall mean the date which is the earlier to occur of (a) Tenant's opening for business, or (b) 90 days following the Possession Date.  "Landlord Reimbursement" shall mean the product obtained by multiplying Thirty Dollars ($30.00) by the Floor Area of the Premises as determined by the Floor Area Certification (as defined in Section 2.09).  Tenant shall be responsible for all costs of Tenant's Work in excess of the Landlord's Reimbursement.  Tenant shall remove any mechanic's liens filed against the Premises or the Landlord's Parcel as a result of Tenant's Work in accordance with the procedures and time guidelines as provided in this Lease.  Upon the Possession Date and Tenant's furnishing to Landlord (i) the certificates of insurance required under Section 11.02, (ii) an Indemnification Agreement in the form of Exhibit M attached to this Lease with respect to mechanics' liens arising out of Tenant's construction, (iii) the Floor Area Certification as provided for in Section 2.09 and (iv) Tenant's demand for payment of the Landlord Reimbursement, Landlord shall pay to Tenant the Landlord Reimbursement.  The Landlord Reimbursement shall be payable by wire transfer of funds by Landlord to Tenant's account no later than forty five (45) days after the Possession Date and receipt of items (i), (ii), (iii) and (iv) above (the "Reimbursement Due Date").  However, if the Commencement Date shall occur during the Slack Season or prior to the date on which the Opening Requirement is met, and Tenant elects to delay the opening of its store, then, notwithstanding that the Commencement Date shall have occurred, Rent (as defined in Section 4.03) shall fully abate until the later to occur of (A) the first (1st) day following the end of the Slack Season, or (B) the date on which the Opening Requirement is met.  However, if Tenant elects, at its discretion, to open for business during the Slack Season or prior to the date that the Opening Requirement is met, then Tenant shall pay, in lieu of Annual Minimum Rent, Alternative Rent until the later to occur of (1) the first (1st) day following the end of the Slack Season, or (2) the date on which the Opening Requirement is met.  In no event shall Tenant's election to delay opening its store in any way delay or modify the date on which the Landlord Reimbursement is required to be paid by Landlord to Tenant.  The parties acknowledge and agree that Landlord shall continue to be the owner of the Building, but not including any of Tenant's Property (as defined in Section 16.01) and Landlord shall be entitled to depreciate the Building for tax purposes.

SECTION 2.04  Possession Date.  "Possession Date" shall mean the date on which the last of the following conditions shall have been satisfied:

(a)    Landlord shall have caused delivery of the Premises (as defined in the "Site Design Requirements", which are attached hereto and made a part hereof as Exhibit C) to occur;

(b)    Intentionally omitted;

(c)    Intentionally omitted;

(d)    Intentionally omitted;

(e)    The representations and warranties of Landlord set forth in Sections 9.03 and 20.02 below shall then be true and in effect in all material respects, and Landlord shall not then be in violation of any of the Site Covenants (as defined in Section 20.03);

(f)    Landlord shall have delivered to Tenant a fully-executed original counterpart of a non-disturbance and/or recognition agreement, as applicable, from each Mortgagee and Ground Lessor (as such terms are defined in Section 19.01) as more fully set forth in Section 19.02;

(g)    Intentionally omitted; and

(h)    Landlord shall have delivered to Tenant the W-9 form attached hereto as Exhibit D.

Landlord currently anticipates that the Possession Date will occur on or about the Anticipated Possession Date (provided for in Section 1.01(E)), subject to the provisions of Section 2.05 below.  In no event shall the Possession Date occur prior to the Expected Possession Date (as defined in Section 2.05).

SECTION 2.05    Expected Possession Date.

(a)    Landlord shall give Tenant no less than ninety (90) days notice of the date on which the Possession Date shall occur, using the form of Possession Date Notice attached hereto as Exhibit C-1 (the "Possession Date Notice").  The date specified in such notice shall be defined as the "Expected Possession Date".

(b)    If Landlord fails to accomplish the Possession Date within five (5) days of the Expected Possession Date (subject to Force Majeure, as defined in Section 23.12, but in no event shall the aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed a period of thirty (30) days), then Landlord shall pay to Tenant on demand, as a liquidated reimbursement (and not as a penalty) for all of the damages that Tenant will suffer as a result of any such delay, an amount equal to the sum of an amount equal to two (2) days of Annual Minimum Rent for each day that the Possession Date is delayed beyond the Expected Possession Date.  The foregoing liquidated reimbursements represent the parties' good faith agreement as to an agreed upon amount which shall have been incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment.

SECTION 2.06  Possession Date During Slack Period Delivery.  Anything contained in this Lease to the contrary notwithstanding, if the Possession Date occurs during the Slack Delivery Period, then Tenant may refuse to accept the Premises.  In that event, the Possession Date shall be delayed and shall not be deemed to occur until the first (1st) day following the end of the applicable Slack Delivery Period, subject to the other provisions of this Lease (including, without limitation, Sections 2.04 and 2.05).

SECTION 2.07  Delayed Possession.  If the Possession Date does not occur before the Outside Possession Date (subject to Force Majeure, but in no event shall the aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed a period of thirty (30) days), then Tenant shall have the right to (a) terminate this Lease by written notice to Landlord (the "Termination Notice"), or (b) delay opening its store facility for a period of not to exceed six (6) months, which right shall be exercised by Tenant upon notice to Landlord at any time prior to the Possession Date.  If Tenant terminates this Lease, then there shall be no further liability on the part of Landlord or Tenant, except: (i) for those obligations that expressly survive the expiration or other termination of this Lease, and (ii) Landlord shall (which obligation shall survive the termination of this Lease), within ten (10) business days following Tenant's Termination Notice, reimburse Tenant for all its reasonable third-party costs and expenses incurred in connection with this Lease (including, without limitation, costs associated with the preparation and review of plans and specifications, and attorneys' fees), not to exceed Seventy-Five Thousand Dollars ($75,000).  If Tenant elects to delay opening its store facility, then Landlord shall cause the Possession Date to occur on the date subsequently required by Tenant, as required above, and Landlord shall pay to Tenant on demand an amount equal to all additional costs, not to exceed Seventy-Five Thousand Dollars ($75,000) incurred by Tenant in the development of its store facility including, but not limited to, costs of materials and all engineering, architectural, legal fees, and costs of delay resulting from Landlord's failure to timely deliver.  Tenant shall provide Landlord reasonable documentation of all such costs to be paid by Landlord.  However, Landlord may nullify such termination by sending Tenant notice within ten (10) days after Landlord's receipt of the Termination Notice confirming that landlord will deliver possession within thirty (30) days after its receipt of the Termination Notice.

SECTION 2.08  Early Entry.  Any time prior to the Possession Date, Tenant shall have the right to enter the Premises to (a) inspect the physical condition of the Premises and (b) inspect Landlord's Work (as defined in Section 3.01); provided, however, that such entry may not unreasonably interfere with Landlord's Work.  Such entry shall not be construed as an acceptance of the Premises by Tenant under the provisions of this Lease or as a waiver of any of the provisions hereof.

SECTION 2.09  Measurement.  Tenant shall within thirty (30) days after the Possession Date have the Premises remeasured and surveyed by a registered architect, which survey shall provide the square footage building perimeter and shall be certified to Tenant and Landlord (the "Floor Area Certification").  Tenant shall deliver a copy to Landlord.  If the parties disagree as to the size of the Premises, the parties shall mutually select an independent, registered architect to make a final determination of the square footage and both parties shall be bound by such determination.  Landlord and Tenant shall share equally the cost of such architect.  If the Floor Area Certification shall disclose that the Premises contains more or less than the Floor Area

7

shown in Section 1.01(P), then Landlord and Tenant agree to amend this Lease to adjust all Rent to account for the actual Floor Area of the Premises.

SECTION 2.10 <u>Commencement Date Agreement</u>. When the Commencement Date has been determined, Landlord and Tenant shall execute a memorandum, in the form of <u>Exhibit E</u>, which shall expressly confirm the Commencement Date and the expiration date of the Initial Lease Term, and which shall also ratify and affirm all of the terms and provisions of this Lease.

SECTION 2.11 <u>Intentionally omitted</u>.

## ARTICLE III

## INITIAL CONSTRUCTION

SECTION 3.01 <u>Landlord's and Tenant's Work</u>. Landlord shall perform Landlord's work in accordance with the Site Design Requirements and as otherwise required by this Lease ("<u>Landlord's Work</u>"). Tenant shall construct all improvements to the Premises in accordance with Tenant's Plans (as defined in Section 23.24) and with the Site Design Requirements ("<u>Tenant's Work</u>") for which Landlord shall pay to Tenant the Landlord Reimbursement (in accordance with and subject to the provisions of Section 2.03). Landlord and Tenant acknowledge receipt of the Site Design Requirements and each agrees to comply with the provisions thereof relating to their respective work. In connection with Tenant's performance of Tenant's Work and during any other periods of construction during the Term, Tenant shall have the right to use as a construction staging area a portion of the Landlord Parcel Common Areas in the location identified on the Site Plan as "<u>Staging Area</u>."

## ARTICLE IV

## RENT

SECTION 4.01 <u>Annual Minimum Rent</u>. Commencing on the Commencement Date, Tenant shall pay to Landlord monthly installments of Annual Minimum Rent without setoff or deductions, except as otherwise provided for in this Lease, on the first (1st) day of each calendar month during the Term. However, if the Commencement Date occurs on a day other than the first (1st) day of a calendar month, then the monthly installment of Annual Minimum Rent and other charges shall be prorated for the remaining days of that calendar month. Anything contained in this Lease to the contrary notwithstanding, if Tenant shall be paying Alternative Rent in lieu of Annual Minimum Rent as permitted under this Lease during such time as Tenant shall be entitled to an abatement of, deduction from or setoff against Annual Minimum Rent, then Tenant shall be entitled to the same abatement of, deduction from or setoff against Alternative Rent.

SECTION 4.02 <u>Additional Rent</u>. The term "<u>Additional Rent</u>" shall mean all amounts required to be paid by Tenant under this Lease other than Annual Minimum Rent. Wherever an item of Additional Rent is payable "on demand" or no time period for payment of an item of Additional Rent is specifically provided for in this Lease, such item of Additional Rent shall be

8

paid by Tenant within thirty (30) days after Tenant's receipt of Landlord's invoice therefor, accompanied by appropriate, reasonable back-up documentation.

SECTION 4.03 Rent; Method of Payment. The term "Rent" shall mean, collectively, Annual Minimum Rent and Additional Rent. All payments of Rent shall be made by check payable to Landlord, mailed or delivered to the address listed in Section 22.01 or to such other person or place as Landlord shall designate by notice to Tenant, or by such other reasonable method of payment (such as by wire transfer).

## ARTICLE V

### COMMON AREA MAINTENANCE AND COST

SECTION 5.01 Maintenance. Landlord shall operate, maintain, insure, repair and replace the Landlord Parcel Common Areas or cause the same to be done in a manner so as to maintain the Building, and any portion of the Shopping Center that may subsequently be acquired by Landlord or required to be maintained by Landlord, in good, first-class order, repair and condition and in accordance with the requirements of the OEA. Without limiting the generality of the foregoing, Landlord shall be solely responsible, and Tenant shall have no obligation (except if caused by Tenant or its agent, employee or contractor and except to reimburse Landlord for Tenant's Share of the cost thereof, as provided below), for the maintenance, repair or replacement of the following on the Landlord Parcel: parking areas (including, without limitation, any necessary repaving and restriping), parking lot lighting, utility systems and connections, access ways and other Landlord Parcel Common Areas and for the clearing of snow and ice from the Landlord Parcel Common Areas. Landlord may at any time, except between October 25 and January 1, close temporarily any Landlord Parcel Common Areas to make repairs, to prevent the acquisition of public rights therein or discourage non-customer parking. Between October 25 and January 1, Landlord may temporarily close parts of the Landlord Parcel Common Areas on weekdays between Monday and Thursday as necessary to perform tenant fit-up work or necessary exterior repairs, provided, however, that on weekends between Friday and Sunday, Landlord shall not close any part of Tenant's Preferred Area, except to make repairs of an emergency nature. However, in any instance of such emergency repairs Landlord shall use all reasonable efforts to perform the necessary repairs in the most expeditious manner possible and in such a way and at such times as to cause the least interference possible with ingress and egress to and from the Premises. In order to reduce interference with Tenant's business operation during such period, Landlord shall effect temporary repairs, where feasible, and complete the permanent repairs after January 1. Notwithstanding anything in the foregoing to the contrary, any of the obligations set forth in this Section 5.01 which are imposed upon Landlord may be performed by the Shopping Center's "Developer" (as defined in the OEA), pursuant to the OEA, provided, in the event the Developer performs such obligations, Landlord shall use its commercially reasonable efforts to ensure that Developer's performance is consistent with the requirements of the Lease.

SECTION 5.02 Construction Clean-up and Post-Possession Work. Following the Possession Date, any construction by Landlord or other tenants or occupants of the Building affecting any portion of the Building or the Landlord Parcel Common Areas shall be subject to

9

the following terms and conditions (in addition if any other applicable provisions of this Lease, such as, by way of example only, Section 20.03(g)):

(a)    staging and storage of materials and parking of construction vehicles shall not occur in Tenant's Preferred Area;

(b)    Intentionally Omitted;

(c)    Landlord shall maintain the Building, Landlord's Parcel, and any portion of the Shopping Center that may be subsequently acquired by Landlord, in a clean, safe, and sightly condition, and shall use reasonable efforts to ensure that such construction shall not materially adversely interfere with the normal conduct of any business operations in the Premises; and

(d)    Landlord shall clear all rubble and debris from the Premises and Tenant's Preferred Area resulting from any construction by Landlord.

SECTION 5.03 <u>CAM Costs</u>. "CAM Costs" shall mean the actual amount (without profit or "mark up" by Landlord or any Affiliate, as defined in Section 11.07, of Landlord) of all necessary, competitive and reasonable costs and expenses actually incurred by or charged to Landlord: (i) in operating, insuring, maintaining, repairing or replacing portions of the Common Areas in an appropriate manner commensurate with good business practice and first-class shopping centers and in accordance with the OEA; and (ii) amounts actually payable by Landlord to the Shopping Center's "Developer" (as defined in the OEA) as "Common Area Maintenance Costs", in addition thereto, in lieu of any cost(s) or expense(s) relating to the administration and management of the Common Areas, an administrative fee (the "<u>Administrative Fee</u>") equal to seven percent (7%) of the CAM Costs for the operating year in question, the cost of electricity and other utilities, and the cost of insurance premiums. Except as otherwise provided for in the OEA, in no event will CAM Costs include: (a) real estate taxes, (b) any costs associated with maintenance performed by another tenant or occupant of the Landlord's Parcel on portions of the Landlord Parcel Common Areas separately maintained by such tenant or occupant; (c) any dues or charges for a merchants' or other association of occupants of the Building; (d) maintenance, repairs or replacements to the Landlord Parcel Common Areas (i) necessitated by the negligent or wrongful act of Landlord or any tenant or occupant, (ii) made to correct any construction defect, or (iii) relating to any improvements or utility systems not serving the Common Areas (e.g. roofs and exterior walls) except for fire protection systems and cleaning and painting of exterior walls; (e) repairs or replacements made to correct any condition in existence prior to the Commencement Date; (f) amounts reimbursable from insurance proceeds, under warranty, or by any tenant or occupant of the Landlord's Parcel or any other third party other than pursuant to a Common Area expense provision similar to this Section 5.03; (g) premiums for insurance for coverage maintained by Landlord with respect to the Shopping Center (except that premiums for Common Areas liability insurance may be included as part of CAM Costs provided the coverage provided by such liability insurance policy is not in excess of the limits established in Section 11.01, or, if such liability insurance policy is an umbrella policy, the reasonably allocated portion of the premiums for such umbrella policy), any costs resulting from insurance deductibles under any insurance policy maintained by Landlord, any costs which would have been reimbursed or paid for by insurance proceeds had

10

Landlord maintained the insurance required under Section 11.01, and the amount of any judgment or other charge entered, or costs assessed against, Landlord in excess of the policy limits of the insurance maintained by Landlord under Section 11.01; (h) the cost of any replacements or capital improvements to the Common Areas, except any expense which would be classified as a capital expenditure in accordance with generally accepted accounting principles shall be amortized over its useful life and such annual amount included in CAM Costs and, except that the cost of repaving the parking areas of the Shopping Center may be included within CAM Costs so long as such cost is otherwise permitted to be included within CAM Costs and is amortized on a straight-line basis over the useful life thereof under generally accepted accounting principles consistently applied, and is not incurred (i) prior to the expiration of the fifth (5th) full operating year of the Term, or (ii) more than once during each ten (10) full operating years of the Term; (i) reserves for anticipated future expenses; (j) interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner; (k) Landlord's personnel, overhead, home office or administrative expenses, except for the Administrative Fee; (l) amounts incurred to remediate any Hazardous Materials (as defined in Section 9.03(a)); (m) the cost to construct any new buildings in the Landlord's Parcel or Common Areas including, but not limited to, renovations to the facade of the Building; (n) holiday or other decorations or other promotional expenses relating to the Shopping Center; or (o) any fees, costs or expenses not related to the operation, maintenance, insurance, repair or replacement of the Common Areas. Notwithstanding the foregoing, CAM Costs shall include painting and/or cleaning (including powerwashing) of the exterior of the Building, as well as fire life safety systems that service the Building.

SECTION 5.04 <u>Tenant's Share of CAM Costs</u>. Tenant shall pay to Landlord Tenant's Share of CAM Costs in each operating year during the Term. Tenant's Share of CAM Costs shall be appropriately prorated for partial operating years at the beginning and at the end of the Term. Operating year shall be the 12-month period selected by Landlord for billing of CAM Costs, currently the operating year is January 1 – December 31.

SECTION 5.05 <u>Payment of CAM Costs</u>. Tenant's Share of CAM Costs shall be payable in equal monthly installments on the first (1st) day of each month. Such monthly installments shall be at the rate of one-twelfth (1/12th) of Tenant's Share of CAM Costs for the preceding operating year, subject to adjustment when the actual amount of CAM Costs or a change in Tenant's Share thereof is determined. Within ninety (90) days after the end of each operating year, Landlord shall furnish Tenant with a detailed statement certified by an authorized representative of Landlord of the actual amount of CAM Costs and of Tenant's Share thereof for the preceding operating year (including the basis of allocation to Tenant). Within thirty (30) days after receipt of such statement by Tenant, Tenant shall pay to Landlord any deficiency due. Any surplus paid by Tenant shall be credited against the next installment(s) of Rent, however, if the Term has been terminated or has expired then refunded to Tenant forthwith. Landlord's records of CAM Costs for each year shall be available for inspection by Tenant for a period of three (3) years after Landlord notifies Tenant of Tenant's Share of CAM Costs for the year in question. Tenant may, during such three (3) year period, upon ten (10) days' prior notice to Landlord, have an audit made of CAM Costs and the allocations thereof to Tenant including, without limitation, reviewing copies of paid bills and other reasonable records substantiating its expenditures ("CAM Records"). In addition, Landlord agrees to forward copies of CAM Records to Tenant or its representative within ten (10) days of a request therefor. Any

overcharges shown by any such audit shall, at Tenant's option, be credited against the next installment(s) of Rent, however, if the Term has been terminated or has expired then refunded to Tenant forthwith.  If any such audit shows that Tenant's Share of CAM Costs have been overstated by more than three percent (3%), then Landlord shall pay to Tenant the reasonable out of pocket costs of such audit within ten (10) days of request thereof.

Tenant shall have the right to examine Landlord's CAM Records as provided above provided all of the following conditions are satisfied:  (a) the examination is conducted at Landlord's home office during Landlord's normal business hours; (b) the examination occurs no more than one (1) time each year; and (c) each year of CAM Costs can only be examined one (1) time during the entire term of the Lease.  Promptly upon completion of such examination, Tenant must provide Landlord with a copy of the examination report.  Tenant agrees that all the information, data and documents pertaining to any examination and the examination process (including, but not limited to, any discussions, negotiations, interpretations of this Lease or proposals or positions taken by Landlord) are confidential information and will be used solely by Tenant and its authorized representatives for the purpose of conducting the examination and Tenant and its representatives shall not disclose or disseminate any such information pertaining to the examination or the examination process.

SECTION 5.06 CAM Costs Increases.  Notwithstanding anything contained in this Lease to the contrary, for all operating years subsequent to the first (1st) full operating year of the Term, in no event shall Tenant's Share of CAM Costs increase, from any operating year to the immediately succeeding operating year, by more than seven percent (7%) on a cumulative basis, excluding from such calculation, the costs of snow and ice removal, sanding, insurance costs and utility costs for the operating years in question for which Tenant shall pay its full Tenant's Share.  As way of illustration of the 7% cap on CAM Costs on a cumulative basis, if Tenant's Share of CAM Costs for the 1st full operating year is $1.00 per square foot, then Tenant's Share of CAM Costs shall not exceed $1.07/sf in the 2nd operating year, $1.145 in the 3rd operating year and $1.23 in the 4th operating year, and the compounding of the 7% shall continue for the remainder of the Term.

Notwithstanding anything contained herein to the contrary, in the event Tenant exercises its option to extend the Term as provided in Section 2.02, Tenant's Share of the CAM Costs for the first full operating year of each Extension Period shall be its full Tenant's Share, without any cap, based on CAM Costs for that year, and in no event shall Tenant's Share of CAM Costs increase in any operating year thereafter by more than seven percent (7%) on a cumulative basis as provided in the paragraph above.

## ARTICLE VI

## TAXES

SECTION 6.01 Taxes.  Landlord shall pay when due all real estate taxes and assessments levied and assessed against the land, improvements and buildings comprising the Landlord's Parcel.  Except as hereinafter provided to the contrary, for each fiscal tax year or part thereof during the Term, Tenant shall pay Tenant's Share of the net amount (after reflecting all discounts for early payment, if any, refunds and credits that are applicable to a fiscal tax year during the Term and after excluding all penalties, interest, late charges and real estate taxes and

assessments levied against free-standing buildings which are separately assessed but only to the extent that the occupant(s) of such buildings is responsible to pay for such taxes directly to the taxing authority) of all real estate taxes and assessments (collectively, "Taxes") levied and assessed against the land, improvements and buildings comprising the Landlord's Parcel, as applicable. The Initial Taxes are an estimate of Tenant's Share of Taxes for the first (1st) full calendar year (including the prior partial year, if any).

SECTION 6.02 <u>Payment of Taxes</u>. Tenant shall be liable for and shall pay Tenant's Share of Taxes only with respect to Taxes accruing during the Term, regardless of when such Taxes are billed or become due and payable. Tenant's Share of Taxes shall be appropriately prorated for partial fiscal tax years at the beginning and at the end of the Term. Tenant shall pay Tenant's Share of Taxes (a) within thirty (30) days after Landlord submits to Tenant a tax bill for such Taxes and a statement setting forth the manner in which Tenant's Share of Taxes is calculated, or (b) ten (10) days before the same are due and payable, whichever is later.

SECTION 6.03 <u>Exclusions from Taxes</u>. Notwithstanding anything contained in this Lease to the contrary with respect to betterments or other extraordinary or special assessments, Tenant's obligations shall apply only to the extent such assessments (and interest thereon) are payable in respect of the Term, and Tenant's Share of any such assessments shall be determined as if such assessments are payable in installments over the longest payment period permitted by law for the particular assessment, in which case Tenant shall pay only those installments payable in respect of the Term. Landlord represents to Tenant that, as of the Effective Date and, to the best of Landlord's knowledge, no portion of the Landlord's Parcel is or will be (a) subject to or the beneficiary of an abatement and/or exemption of Taxes, (b) subject to any special assessments or similar charges, or (c) included in any special improvement district(s) which would result in higher sales taxes or other similar impositions than would exist in the absence of such district(s). Further, Taxes shall not include any: (i) income, excise, profits, estate, inheritance, succession, gift, transfer, franchise, capital, or other tax or assessment upon Landlord or upon the rentals payable under this Lease; (ii) taxes on rents (other than to the extent that such taxes are customarily paid by retail tenants in the State), gross receipts or revenues of Landlord from the Premises; (iii) fine, penalty, cost or interest for any tax or assessment, or part thereof, which Landlord or its lender failed to timely pay, unless such late payment was solely attributable to late payment by Tenant of Tenant's Share of Taxes; (iv) assessment for a public improvement arising from the initial construction or expansion of the Landlord's Parcel or the Premises; (v) Taxes resulting directly from an increase in the assessment caused by a sale or ground lease of all or any portion of the Landlord's Parcel to an Affiliate of Landlord; or (vi) fees imposed upon Landlord in connection with Landlord's development of the Landlord's Parcel (including, without limitation, trip generation fees). All Taxes payable by Tenant pursuant to this Article VI shall be determined as if the Landlord's Parcel was the only property owned by Landlord.

SECTION 6.04 <u>Right to Contest</u>. At Tenant's request, Landlord shall contest the amount or validity of any assessed valuation of Taxes provided Landlord has not done so within the last 12-month period, failing which Tenant may contest the assessed valuation or Taxes by appropriate proceedings conducted in good faith. If Tenant initiates such contest, then Landlord shall cooperate with Tenant including, without limitation, executing any and all documents required in connection therewith and, if required by any governmental authority having

13

jurisdiction, joining with Tenant in the prosecution thereof.  If any rebate or refund of Taxes is received as a result of any contest or otherwise, then Tenant shall be entitled to Tenant's Share thereof, but only to the extent applicable to Taxes that accrued during the Term (after reasonable and customary expenses incurred by Landlord and/or Tenant in connection with such contest are paid to the party which incurred such expense).

## ARTICLE VII

## UTILITIES

SECTION 7.01 Utilities.  Tenant acknowledges and agrees that upon its execution of this Lease, Tenant is satisfied that the Premises are properly serviced with gas, electric, telephone, water, sewer and other utilities sufficient to meet Tenant's requirements in accordance with the Site Design Requirements.  Tenant, as part of Tenant's Work, shall cause all such utilities to the Premises to be separately metered at Tenant's sole cost and expense.  Tenant shall pay, as same become due and payable, all charges for utility services furnished to the Premises during the Term.  If at any time during the Term, for any reason, Landlord shall provide utility service to the Premises, Tenant's cost for such utility service shall not exceed the lesser of (a) Landlord's actual cost for such utility service, or (b) the cost of the same service if Tenant had obtained such service directly from such utility provider.  In addition, Tenant shall have the right to install a test meter to verify its utility usage.  Notwithstanding anything contained in this Lease to the contrary, Tenant shall be entitled to select the utility service providers to the Premises including the telecommunication provider.  Landlord shall permit full and free access to all available conduits in the Building for the applicable utility service subject to such reasonable requirements as Landlord may impose and at Tenant's sole cost and expense.

SECTION 7.02 Interruption.  If utilities serving the Premises are disrupted due to the acts or omissions of Landlord, its agents, contractors, servants or employees, then Landlord shall promptly restore the affected utilities at Landlord's sole cost and expense.  If such disrupted utilities are not restored within twenty-four (24) hours after the Landlord has knowledge of such disruption and Tenant is unable to conduct its normal business in the Premises as a result of such disruption, then Rent shall be equitably abated during the period of disruption.

## ARTICLE VIII

## USE OF PREMISES

SECTION 8.01 Permitted Use.  The Premises may be used and occupied for any Permitted Use.  However, Tenant shall not use the Premises for any of the Prohibited Uses (as defined in Exhibit F), the Existing Exclusives (as defined in Section 8.05(a)), and/or any prohibited use as the same is set forth in the OEA, to the extent then applicable.

SECTION 8.02 Conduct of Operations.  Subject to the other provisions of this Lease (including, without limitation, Article II), Tenant shall initially open its store for business to the public in the Premises for at least one (1) day, not later than the two hundred fortieth (240th) day after the Possession Date.  Other than as expressly set forth in the preceding sentence, Tenant shall have no obligation to operate any business in the Premises, and shall have the right, at any

14

time, to cease to conduct any business operations in the Premises, and Tenant shall incur no liability to Landlord by reason thereof. If Tenant does not operate or cause to be operated any retail business in the Premises (other than prior to the Commencement Date or during Excused Periods, as defined below) for more than two hundred seventy (270) consecutive days, then Landlord shall have the option to terminate this Lease, which option shall be exercisable by giving notice thereof to Tenant by not later than the thirtieth (30th) day after the date on which such 270-day period expires (the "Recapture Notice"), and paying to Tenant, within thirty (30) days after such notice is given, the Unamortized Costs (as defined in Section 8.04(f)). If Landlord gives the Recapture Notice, then this Lease shall terminate upon the sixtieth (60th) day (the "Recapture Date") after the date on which Tenant receives Landlord's termination notice. Upon termination of this Lease under this Section 8.02, there shall be no further liability on the part of Landlord or Tenant, except for obligations that expressly survive the expiration or sooner termination of this Lease. If Landlord fails to pay to Tenant the Unamortized Costs within the thirty (30) day period provided for above, Tenant shall notify Landlord of such failure and Landlord shall have ten (10) days in which to pay Tenant the Unamortized Costs. If such failure to pay continues through the Recapture Date, then Tenant shall have the option of (a) treating this Lease as being terminated, in which case Landlord's obligation to pay to Tenant the Unamortized Costs shall expressly survive the termination of this Lease, or (b) treating Landlord's Recapture Notice as being null and void, in which event Landlord shall be deemed to have waived Landlord's right to terminate under this Section 8.02. "Excused Period(s)" shall mean such periods during which the Premises were not open for business (i) because of alterations or renovations, damage or destruction, eminent domain proceedings or actions, Force Majeure, or any act or omission of Landlord, or its employees, agents, or contractors, such period(s) not to exceed six (6) months or such longer period(s) provided Tenant is diligently pursuing such work to completion, or (ii) following the execution of a letter of intent for an assignment of this Lease or sublease of all or any portion of the Premises provided that the parties thereto are proceeding in good faith to enter into an assignment of this Lease or sublease and, thereafter, the assignee or sublessee proceeds with due diligence to open the Premises, or portion thereof, for business, such period(s) not to exceed six (6) months.

Tenant's cessation of business in the Premises shall not relieve Tenant of its obligations under the Lease, including, but not limited to Tenant's obligation (a) to pay Rent, (b) to insure the Premises, and (c) to maintain utility services, specifically including adequate heat to keep the pipes from freezing and adequate electric and security measures so as to prevent vandalism and keep the Landlord's Parcel well lit and attractive in appearance.

SECTION 8.03 Leasing Restrictions. Landlord shall construct, lease, operate, maintain and manage the Landlord's Parcel as a first-class shopping center comparable to other first-class shopping centers in the State. In that regard, subject to the rights of tenants with leases in effect as of the Effective Date and any assignees, subtenants or successors by merger thereof (provided Landlord agrees not to approve a change in use (where Landlord's approval is required) so as to violate the prohibited uses in this Section, Landlord shall not lease, rent or occupy, or permit to be leased, rented or occupied, any portion of the Landlord's Parcel for any of the Prohibited Uses. In addition, subject to the rights of tenants with leases in effect as of the Effective Date and any assignees, subtenants or successors by merger thereof, Landlord shall not lease, rent or occupy, or permit to be leased, rented or occupied on the Landlord Parcel, any building within

15

one hundred forty (140) feet of the front entrance of the Premises for use as a restaurant. Notwithstanding the foregoing to the contrary, one (1) counter service only, quick serve food use consisting of no more than 2,400 square feet of Floor Area shall be expressly permitted on the Landlord Parcel.  Additionally, to the extent that Landlord's consent is required in order for a third party in the Shopping Center to lease, rent or occupy any building within one hundred forty (140) feet of the front entrance of the Premises for use as a restaurant, Landlord agrees that it shall not to consent to the same without first obtaining the prior written consent of Tenant.  Upon any breach of the restrictions set forth in this Section 8.03, Tenant shall provide Landlord with notice of such default.  If the default is not cured within sixty (60) days after Landlord's receipt of such notice, then Tenant may elect to pay Alternative Rent in lieu of Annual Minimum Rent for so long as such violation shall continue.  If a tenant shall occupy or use its premises in the Landlord's Parcel as a restaurant in violation of its lease with Landlord and such breach shall continue for more than one hundred eighty (180) days, then Tenant shall have the right to terminate this Lease at any time thereafter prior to the time such violation is cured. Notwithstanding the foregoing, Tenant's right to pay Alternative Rent pursuant to this Section shall be tolled provided that Landlord shall have promptly commenced appropriate legal proceedings against such tenant or occupant, and shall thereafter diligently prosecute such proceedings to completion so as to enjoin and prohibit any such violation.  If Landlord shall have failed to promptly commence such proceedings, or shall fail thereafter to diligently prosecute the same, then Tenant's right to pay Alternative Rent shall be as set forth above.

SECTION 8.04  Tenant's Exclusive.

(a)     Landlord shall not hereafter lease, rent or occupy, or permit to be leased, rented, occupied, any other premises in the Landlord's Parcel, or on any land owned or controlled by Landlord or any of its Affiliates within a one (1) mile radius of the Landlord's Parcel during the Term ("Affiliated Land"), for the sale, rental, installation, servicing and/or repairing, either singly or in any combination, of the Products.  The Incidental Sale (as defined below) of the Products in connection with the overall business of another tenant shall not be deemed a violation this Section 8.04(a).  "Incidental Sale" shall mean sales in the lesser of (i) five hundred (500) square feet, or (ii) ten percent (10%) of such tenant's or occupant's, or Landlord's or any of its Affiliate's display area.  Tenant's exclusive shall be enforceable unless and until Tenant is in default beyond any applicable cure periods or no longer occupies the Premises for the principal use of the sale of the Products.  The exclusive use rights granted to Tenant in this Section 8.04(a) (the "Exclusive Use Protection") shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of all or more than 18,750 square feet of the Premises, provided the principal use is for the sale of the Products.

(b)     The Exclusive Use Protection shall not apply to existing tenants of the Landlord's Parcel or the then existing tenants of the Affiliated Land (and current or future successors by merger, assignees or sublessees of such tenants) occupying their respective premises pursuant to the terms and provisions of leases which have been executed prior to the Effective Date (which leases are referenced on Exhibit G).  However, such existing tenants shall nevertheless be subject to the Exclusive Use Protection if: (i) any existing tenant's lease requires the consent of Landlord to any assignment or subletting or to a change in the use of the applicable premises to permit the sale, rental, installation, servicing and/or repairing of the

16

Products; or (ii) Landlord permits or agrees to an expansion of the applicable premises for the sale, rental, installation, servicing and/or repairing of the Products.

(c)     The Exclusive Use Protection shall also not apply to a full-line: supermarket (for example, Safeway, Winn-Dixie, or Stop & Shop), department store or discount department store (for example, Wal-Mart, Kmart, J.C. Penney, Macy's, Kohl's or Target), full line sporting goods store (for example, Dicks Sporting Goods), or discount club (for example, Costco, BJ's Wholesale Club, or Sam's Club); provided, however, that, as to each of the foregoing, such stores (i) are National Tenants or Regional Tenants (as such terms are defined in Section 8.06), (ii) are operated in substantially the same manner as same are operated as of the Effective Date, and (iii) the supermarket contains at least 40,000 square feet of Floor Area and the department, discount department store, and discount club contains at least 60,000 square feet of Floor Area.

(d)     Upon any violation of the Exclusive Use Protection, Tenant must provide Landlord with notice of the proposed violation.  If the violation is not cured within sixty (60) days after Landlord's receipt of such notice, then Tenant may elect to pay Alternative Rent in lieu of Annual Minimum Rent for so long as such violation shall continue.  If such breach shall continue for more than one hundred eighty (180) days, then Tenant shall have the right to terminate this Lease at any time thereafter, but prior to the time such violation is cured, in which event the applicable provisions of Section 8.04(f) shall control.

(e)     Notwithstanding anything contained in subparagraph (d) above, if any tenant or other occupant of the Landlord's Parcel violates the Exclusive Use Protection and such violation also constitutes a default under its lease with Landlord, then Tenant's right to pay Alternative Rent pursuant to Section 8.04 (d) shall be tolled provided that Landlord shall have promptly commenced appropriate legal proceedings against such tenant or occupant, and shall thereafter diligently prosecute such proceedings to completion so as to enjoin and prohibit any such violation.  If Landlord shall have failed to promptly commence such proceedings, or shall fail thereafter to diligently prosecute the same, then Tenant's right to pay Alternative Rent shall apply for as long as such violation exists, and, in such event, Tenant shall have the right (i) to conduct and prosecute such legal proceedings (including an action for injunctive relief) in its own name, at Landlord's expense (such obligation limited to Tenant's reasonable actual out of pocket expenses only), or (ii) in the event the right set forth in clause (i) above is not permitted to be exercised under Laws, to conduct and prosecute such legal proceedings in the name of Landlord, at Landlord's expense (such indemnification limited to Tenant's reasonable actual out of pocket expenses only), and Landlord shall cooperate with Tenant with respect to such prosecution (including executing any documentation or authorization reasonably required by Tenant in connection with such prosecution and by appearing at any hearing or trial with respect to such prosecution).  If Tenant shall have paid Alternative Rent pursuant to this Section 8.04(e) for twenty-four (24) consecutive months, then Tenant shall have the rights to terminate this Lease subject to and in accordance with the provisions of Section 8.04(f).

(f)     If Tenant shall have paid Alternative Rent pursuant to Sections 8.04(d) or (e) for twenty-four (24) full consecutive months, then Tenant must elect either to (i) terminate this Lease, or (ii) resume paying Annual Minimum Rent from and after the expiration of the thirty (30) day period following the end of such twenty-four (24) month period.  Tenant shall

17

make such election by notice to Landlord within thirty (30) days after the expiration of such twenty-four (24) month period. If Tenant fails to make such an election, then Tenant shall be deemed to have elected to proceed under clause (ii) above. If Tenant elects to terminate this Lease pursuant to Sections 8.04(d) or (e), then this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of Landlord or Tenant, except: (x) for those obligations which expressly survive the expiration or other termination of this Lease, (y) Landlord shall (which obligation shall survive the termination of this Lease), within ten (10) business days after receiving a statement from Tenant showing the Unamortized Costs, reimburse Tenant for the then unamortized costs (amortized on a straight-line basis over the Term) of any alterations or improvements made by Tenant to the Premises in excess of the Landlord's Reimbursement (the "Unamortized Costs"), and (z) Tenant reserves all claims against Landlord for damages resulting from the violation of the Exclusive Use Protection.

SECTION 8.05 Exclusives Applicable To Tenant.

(a)    Tenant shall not use (or permit to used) the Premises in violation of those certain use restrictions and exclusives granted by Landlord to certain other tenants in the Landlord's Parcel pursuant to the terms and provisions of leases which have been executed prior to the Effective Date (the "Existing Exclusives"). Landlord represents and warrants that a true and complete listing and description of such Existing Exclusives is attached as Exhibit H. Notwithstanding the foregoing, Tenant shall be entitled to enter into a separate agreement with any tenant or other occupant for whose benefit the Existing Exclusive is granted which nullifies or modifies the corresponding Existing Exclusive with regard to the Premises, provided Landlord receives a fully executed copy of such agreement.

(b)    Intentionally omitted.

(c)    Landlord represents and warrants that, other than the Existing Exclusives and Permitted Exceptions, there are (and will be) no exclusives or use restrictions in effect which would apply to Tenant or any other occupant of the Premises, and Landlord covenants to indemnify, defend and hold Tenant harmless from and against all loss, cost, liability or expense (including, without limitation, reasonable legal fees) incurred by Tenant by reason of the enforcement by any person or entity of such exclusive or other use restriction.

SECTION 8.06    Key Tenants. Landlord represents and warrants that (a) it has entered into a lease or leases with the Key Tenants and/or (b) to the best of Landlord's knowledge, at least three (3) of the Key Tenants are in occupancy at the Shopping Center. If, from and after the satisfaction of the Opening Requirement, the Minimum Ongoing Cotenancy Percentage is not met, then Tenant shall have the option to pay Alternative Rent in lieu of Annual Minimum Rent until such time as the Minimum Ongoing Cotenancy Percentage is met. If the Minimum Ongoing Cotenancy Percentage is not met for a period of eighteen (18) consecutive months or more, then Tenant shall have the right to terminate this Lease upon ninety (90) days notice to Landlord, such notice to be given at any time prior to the date the condition giving rise to such termination right has been satisfied. If Tenant shall elect to terminate this Lease, then this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of Landlord or Tenant, except: (i) for those obligations which expressly survive the expiration or other termination of this Lease, and (ii) Landlord shall (which obligation shall

18

survive the termination of this Lease), within ten (10) business days after receiving a statement from Tenant showing the Unamortized Costs, reimburse Tenant for the Unamortized Costs. If Tenant does not terminate this Lease within ninety (90) days after the expiration of such eighteen (18) month period, then commencing on the day following the end of such ninety (90) day period, Tenant shall resume paying full Annual Minimum Rent. However, Tenant shall again be entitled to exercise its rights under this Section 8.06 each time another Key Tenant ceases operations or the number of retail tenants occupying less than the Minimum Ongoing Cotenancy Percentage worsens by more than five percent (5%). It is hereby understood and acknowledged by Landlord that a Key Tenant may only be replaced, for the purposes of this Section 8.06 only, by a National Tenant or Regional Tenant (or combination of no more than two of such National or Regional Tenants) of comparable size (meaning at least 80% of the size of the Key Tenant's premises) and having similar quality of merchandise, "Acceptable Replacement Tenants". "National Tenant(s)" shall mean a tenant(s) operating, as of the applicable date, at least sixty-five (65) retail stores in the continental United States under a single trade name in first-class shopping centers, and "Regional Tenant(s)" shall mean a tenant(s) operating, as of the applicable date, at least twenty (20) retail stores in first-class shopping centers in any of the following states under a single trade name: Michigan, Wisconsin, Illinois, and Ohio.

## ARTICLE IX

## REPAIRS

SECTION 9.01 Landlord Obligations. Landlord shall, at Landlord's sole expense (and not included in CAM Costs), keep and maintain in good order, condition and repair (including replacements, if necessary) and in a safe condition (a) the roof of the Premises (to be maintained in a watertight condition at all times), all utility systems and lines (including, without limitation, electrical, plumbing and mechanical) serving the Premises (but only to the point of exclusively serving the Premises), the exterior of the Premises including, without limitation, the walls and Other Improvements, but excluding storefront, Tenant's signs, exterior and interior of all windows, plate glass, doors, frames and bucks, the loading dock and truck well serving the Premises, and the interior of all walls and the structural portions of the Premises including, without limitation, footings and foundation, floor slab, and structural walls, columns and beams, and (b) any damage to the Premises or the Landlord's Parcel which is caused by (i) defects in Landlord's Work, or (ii) the act or omission of Landlord, its employees, agents or contractors. Landlord's obligations under this Section 9.01 shall be subject to the provisions of Articles XII and XIII. Landlord shall use reasonable efforts to perform any and all repairs and replacements to be performed under this Lease without material interference with or disruption to the normal conduct of any business operations in the Premises. Landlord shall give Tenant at least five (5) days prior notice of any repairs or replacements to the Premises (except in the case of an emergency posing imminent risk of material harm to persons or property, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances). If, in Tenant's reasonable judgment, Landlord's repairs would materially interfere with or disrupt the normal conduct of any business operations in the Premises, then Landlord shall perform such repairs only after the regular hours of operation of the Premises.

19

SECTION 9.02  Tenant's Obligations.

(a)     Subject to Landlord's obligations under Section 9.01, Tenant shall at all times during the Term, at Tenant's sole expense, keep and maintain in good order, condition and repair and in a safe condition (i) the non-structural, interior elements of the Premises including painting, plate glass, doors, frames and bucks, storefront, Tenant's signs, exterior and interior of all windows, plate glass, doors, frames and bucks, the loading dock and truck well serving the Premises and the heating, ventilation and air conditioning ["HVAC"] units, and the electrical, plumbing, mechanical, and/or alarm systems from the point exclusively the Premises, (ii) any damage to the Premises or the Landlord's Parcel which is caused by the act or omission of Tenant, its employees, agents or contractors, and (iii) Tenant's Property (as hereafter defined). Tenant's obligations under this Section 9.02 shall also be subject to the provisions of Articles XII and XIII and to Landlord's obligation to clear the Premises of all dirt and debris following completion of Landlord's Work pursuant to Section 5.02.  At all times during the term, Tenant shall have a maintenance and service contract in effect for the HVAC system with a reputable and licensed HVAC contractor.

(b)     Provided Tenant has maintained the HVAC system in accordance with Section 9.02(a), if any HVAC units must be repaired or replaced during the last three (3) years of the Term, then in light of the fact that the same will require a substantial expenditure by Tenant and will result in a benefit to Landlord following the expiration of the Term, upon the expiration or earlier termination of this Lease (unless such termination results from Tenant's default of its obligations under this Lease), Landlord shall reimburse Tenant within thirty (30) days after receipt of invoice and documentation from Tenant for the unamortized portion of the reasonable expenses incurred by Tenant in connection with the replacement of such equipment during the last three (3) years of the Term, based on (i) the date of the installation of such new equipment, and (ii) the useful life of said equipment.  The provisions of this Section 9.02(b) shall survive the expiration or earlier termination of this Lease.

(c)     Tenant shall be responsible, at its sole cost and expense, to obtain its own trash containers and/or compactor.  In addition, Tenant hereby covenants and agrees, at its sole cost and expense, to cause its garbage and refuse to be removed from the Landlord's Parcel by a reputable contractor.  Tenant's trash containers/compactors shall be located in the area shown on the Site Plan.  Landlord may, but shall not be required to, furnish garbage and refuse removal services to Tenant.  In the event Landlord elects to provide or contract for garbage and refuse removal services at the Building, Tenant shall comply with all such reasonable rules and regulations regarding such service and such charges shall be included in CAM Costs.

SECTION 9.03  Hazardous Materials.

(a)     Landlord represents and warrants that, as of the Effective Date (and as of the Possession Date), the Landlord's Parcel shall comply with all Environmental Regulations, and Landlord agrees that the removal or neutralization of any Hazardous Materials that become present at the Landlord's Parcel during the Term shall be at the sole cost and expense of Landlord (and not included in CAM Costs) and shall be remediated as required by Environmental Regulations, other than Hazardous Materials introduced by Tenant or its employees, agents or contractors.  "Hazardous Materials" shall mean (i) any waste, material or

20

substance (whether in the form of a liquid, a solid, or a gas and whether or not air-borne) which is deemed to be a pollutant or a contaminant, or to be hazardous, toxic, ignitable, reactive, infectious, explosive, corrosive, dangerous, harmful or injurious to public health or to the environment, and which is now or becomes regulated in the future by or under the authority of any applicable local, state or federal laws, judgments, ordinances, orders, rules, regulations, codes or other governmental restrictions or requirements, any amendments or successor(s) thereto, replacements thereof or publications promulgated pursuant thereto (collectively, "Environmental Regulations", and individually, "Environmental Regulation"); (ii) petroleum; (iii) asbestos and asbestos containing materials; (iv) any polychlorinated biphenyl; and (v) any radioactive material. In addition to the foregoing, the term "Environmental Regulations" shall be deemed to include, without limitation, local, state and federal laws, judgments, ordinances, orders, rules, regulations, codes and other governmental restrictions and requirements, any amendments and successors thereto, replacements thereof, which deal with or otherwise in any manner relate to, environmental matters of any kind.

(b)     Landlord and Tenant each agree that neither Landlord nor Tenant or their respective agents, employees or contractors shall cause or permit any Hazardous Materials to exist on, or to escape, seep, leak, spill or be discharged, emitted or released from the Landlord's Parcel during the Term in violation of any applicable Environmental Regulation.

(c)     Landlord hereby indemnifies Tenant and its successors and assigns, and agrees to hold Tenant and its successors and assigns harmless from and against any and all losses, liabilities, damages, injuries, penalties, fines, costs, expenses and claims of any and every kind whatsoever, including reasonable attorneys' fees and costs (collectively, "Environmental Liabilities") paid, incurred or suffered by, or asserted against, Tenant or its successors and assigns with respect to, or as a result of (i) the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission or release from the Landlord's Parcel of any Hazardous Materials which were brought into the Landlord's Parcel by Landlord, its agents, employees or their respective predecessors-in-interest, or (ii) a breach by Landlord, its agents, employees or their respective predecessors-in-interest of any Environmental Regulation to which Landlord is subject.

(d)     Tenant hereby indemnifies Landlord and its successors and assigns, and agrees to hold Landlord and its successors and assigns harmless from and against any and all Environmental Liabilities paid, incurred or suffered by, or asserted against, Landlord or its successors and assigns with respect to, or as a direct or indirect result of (i) the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission or release from the Premises or the Landlord's Parcel of any Hazardous Materials which was brought into the Premises or Landlord's Parcel by Tenant, its agents or employees, or (ii) a breach by Tenant, its agents or employees of any Environmental Regulation to which Tenant is subject.

(e)     With respect to Hazardous Materials which are or become present at the Landlord's Parcel as the result of any cause whatsoever (other than Hazardous Materials which were brought into the Premises by Tenant, its agents or employees), Landlord shall, at Landlord's sole cost (and not included in CAM Costs), in a good, workmanlike and expeditious manner, and in compliance with Environmental Regulations, perform all work necessary to clean-up, remove and otherwise remediate such Hazardous Materials in compliance with

21

Environmental Regulations.    Should the presence of such Hazardous Materials render the Premises Unusable (as defined below) or should Tenant be required to close during the removal or neutralization of such Hazardous Materials by Landlord, Tenant shall notify Landlord and all Rent shall be immediately abated until such time as Tenant can safely resume normal business operations.    If such work is not commenced within thirty (30) days after the date (the "Notification Date") that Tenant notifies Landlord of Hazardous Materials rendering the Premises Unusable (or such additional period as may be reasonably required to engage environmental consultants and/or engineers and obtain permits and licenses) or if such work is not completed within ninety (90) days after the Notification Date (or such additional period as may reasonably be required given the nature of the work, provided that Landlord diligently pursues same to completion), then Tenant shall have the right, at any time thereafter, to terminate this Lease.    However, Tenant's option to terminate this Lease pursuant to this Section 9.03(e) shall cease (if not exercised prior thereto) at any time the Premises are no longer Unusable.    If Tenant shall elect to terminate this Lease, then the Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of Landlord or Tenant, except: (i) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, (ii) Landlord shall (which obligation shall survive the termination of this Lease), within ten (10) business days after receiving a statement from Tenant showing the Unamortized Costs, reimburse Tenant for the Unamortized Cost, and (iii) Tenant reserves all claims against Landlord for damages resulting from a default by Landlord under this Section 9.03.    For the purpose of this Section 9.03(e), "Unusable" means that the Tenant does not have access to at least ninety percent (90%) of the Premises because of the enforcement of any Environmental Regulation or the remediation of any Hazardous Materials, or because use of the Premises would represent a material adverse risk to the health or safety of Tenant, Tenant's employees, agents or invitees.

SECTION 9.04    Surrender of the Premises.    At the expiration or earlier termination of this Lease, Tenant shall surrender the Premises to Landlord broom clean with all of Tenant's personal moveable property removed and repair any damage caused by such removal, and otherwise deliver to the Premises to Landlord in the same condition as it is required to be maintained by Tenant pursuant to Section 9.02 above; excepting, however, reasonable wear and tear, damage by fire or other casualty, and the effects of a Taking (as defined in Section 13.01).

## ARTICLE X

## REQUIREMENTS OF LAW

SECTION 10.01    Landlord's Obligations.    As part of Landlord's Work and throughout the Term, Landlord shall be responsible, at Landlord's sole cost and expense (and not included in CAM Costs, except as otherwise permitted by the Lease), for complying with all applicable laws, statutes, ordinances and regulations of federal, state, county and municipal authorities (collectively, "Laws") affecting the Landlord's Parcel including, without limitation, the Premises, except as specifically provided in Section 10.02.

SECTION 10.02    Tenant's Obligations.    Throughout the Term, Tenant shall be responsible, at Tenant's sole cost and expense, for complying with all Laws affecting the Premises if such compliance is required solely as a result of: (a) Tenant's specific manner of use

22

of the Premises (as opposed to retailers in general), (b) Tenant's Work or any other alterations or repairs performed by Tenant, (c) Tenant's Property, and (d) Tenant's operation of its business in the Premises, such as, any special licenses and recycling requirements.

SECTION 10.03 <u>Right to Contest</u>.  The party responsible for compliance pursuant to Section 10.01 or 10.02 shall have the right to contest the validity of any Law at the expense of the party responsible for compliance, unless such contest would result in any criminal liability imposed upon the other party or subject such other party to any fine or penalty.

**ARTICLE XI**

**INSURANCE**

SECTION 11.01  <u>Landlord's Insurance</u>.

(a)    Landlord shall maintain in full force and effect from and after the Effective Date and throughout the Term:

(i)    Commercial general liability insurance with regard to the Common Areas protecting and insuring Landlord, naming Tenant as "additional insured-lessee" for claims arising out of the use or occupancy of the Common Areas and the obligations assumed by Landlord under this Lease, and having a combined single limit of liability of not less than Five Million Dollars ($5,000,000) for bodily injury, death and property damage liability; and

(ii)    Special Form (formerly known as "<u>All-Risk</u>") property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of the buildings (other than the Premises) and other insurable improvements in the Landlord's Parcel, (exclusive of excavation, footings and foundations) including, without limitation, the Common Areas.

(b)    Landlord may carry any of its insurance under "umbrella policies" and/or "blanket policies" covering the Landlord's Parcel and other properties it or any Affiliate of Landlord owns, provided that: (i) the total amount of the insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article XI.  All policies required to be maintained by Landlord pursuant to this Section 11.01 shall provide that any proceeds thereof shall be deposited with the Mortgagee, or if none, to Landlord, in either event to be held in trust by such party and disbursed only in accordance with the provisions of, and for the purposes set forth in, Article XII.

(c)    Landlord shall be permitted to maintain a deductible as a part of any insurance policy carried by it in compliance with this Section 11.01.  However, in no event shall any deductible with regard to the insurance described in Sections 11.01(a)(i) or 11.01(a)(ii) exceed Two Hundred Thousand Dollars ($200,000), with higher deductibles for catastrophic incidents, without Tenant's consent.

23

(d)    To the extent the OEA requires insurance coverage in amounts greater than provided for by this Section 11.01, Landlord shall maintain insurance in compliance with the OEA.

SECTION 11.02  Tenant's Insurance.

(a)    Tenant shall maintain in full force and effect throughout the Term:

(i)    Commercial general liability insurance protecting and insuring Tenant, naming Landlord, its mortgagee and/or ground lessor, as their respective interests may appear, as "additional insured-lessor" for claims arising out of the use or occupancy of the Premises by Tenant and having a combined single limit of liability of not less than Four Million Dollars ($4,000,000) for bodily injury, death and property damage liability;

(ii)    Special Form (commonly known as "All-Risk") property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of the Premises, exclusive of excavation, footings and foundations, naming Landlord as "Loss Payee";

(iii)    Broad Form Boiler and Machinery Insurance on all air-conditioning equipment, miscellaneous electrical apparatus, boilers and other pressure vessels or systems, whether fired or unfired, installed in, adjoining, above or beneath the Demised Premises; and if said equipment, vessels or systems and the damage that may be caused by or result from them are not covered by Tenant's extended coverage insurance mentioned in subparagraph (b)(ii) of this Section.

Upon Landlord's request, Tenant shall also name the Mortgagee as an additional insured or Loss Payee, as its interest may appear, on the insurance policies described in Section 11.02(a).

(b)    Tenant may carry any of its insurance under "umbrella policies" and/or "blanket policies" covering the Premises and other locations it or any Affiliate of Tenant owns or leases, provided that: (i) the total amount of the insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article XI.

(c)    All insurance required to be maintained under this Section 11.02 may be provided under a plan of self-insurance provided that Tenant maintains, during the period of such self-insurance, a tangible net worth of at least One Hundred Million Dollars ($100,000,000). To the extent any deductible is maintained as a part of any insurance policy carried by Tenant in compliance with this Section 11.02, Tenant shall be deemed to be covering the amount of that deductible under an informal plan of self-insurance.

SECTION 11.03  Insurance Requirements Generally.

(a)    All insurance required to be maintained by Landlord and Tenant under this Lease shall be maintained with insurance companies qualified to do business in the State, and rated at least A-/VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published). Each party shall have its insurers provide thirty (30) days (ten

24

(10) days in the event of non-payment of premium) prior notice to the other party of cancellation or non-renewal of any policy required hereunder. Each party shall provide to the other duly executed certificates evidencing the insurance coverage described in Sections 11.01 and 11.02 above, respectively.

(b)     The liability insurance requirements under Sections 11.01(a)(i) and 11.02(a)(i) shall be reviewed by Landlord and Tenant every five (5) years for the purpose of mutually increasing (in consultation with their respective insurance advisors) the minimum limits of such insurance to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards. The replacement value of the buildings and other insurable improvements constituting the Landlord's Parcel shall be re-evaluated from time to time at the request of either Landlord or Tenant.

(c)     In the event (i) Tenant does not meet the self-insurance requirements set forth in Section 11.02(c) and (ii) Tenant fails to take out or to keep in force any insurance required to be taken out and kept in force by Tenant, Landlord shall have the right, without assuming any obligation in connection therewith, to effect such insurance at the sole cost and expense of Tenant and shall be paid by Tenant to Landlord on demand as additional rent.

SECTION 11.04  Landlord's Insurance Cost.

(a)     The reasonable insurance premiums attributable to the policies required to be maintained by Landlord pursuant to Section 11.01(a)(i) shall be included as part of CAM Costs. If Landlord carries blanket insurance covering the Landlord's Parcel together with other property owned by Landlord, then Landlord shall obtain evidence reasonably satisfactory to Tenant of the cost of such insurance allocable to the Landlord's Parcel and the amount so allocable shall be included in CAM Costs for the purposes of determining Tenant's Share of any insurance premium included in CAM Costs.

(b)     If the rates for any insurance Landlord is required to carry are increased as a result of the use or other activity of any other occupant of the Landlord's Parcel which is not a typical shopping center use, then the amount of such increase shall be excluded from CAM Costs. To the extent that Landlord receives a dividend, credit, rebate or other return of a premium which had previously been included in CAM Costs, Landlord shall promptly refund to Tenant Tenant's Share of such dividend, credit, rebate, or return.

(c)     The provisions of this Section 11.04 shall survive the expiration or earlier termination of this Lease.

SECTION 11.05  Indemnity.

(a)     Except as otherwise provided in Section 11.06, Tenant covenants to defend and indemnify Landlord and hold Landlord harmless from and against any and all claims, actions, damages, liabilities and expenses, including reasonable attorneys' fees, (i) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises, or any part thereof, (ii) occasioned wholly or in part by any act or

omission of Tenant, its agents, contractors, employees, servants, or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Landlord, its agents, contractors, licensees, employees, or other tenants and occupants, or (iii) as a result of Tenant's Work failing to be in compliance with the terms of this Lease, any Laws and/or the OEA.

(b)    Except as otherwise provided in Section 11.06, Landlord covenants to defend and indemnify Tenant and hold Tenant harmless from and against any and all claims, actions, damages, liabilities and expenses, including reasonable attorneys' fees, (i) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon any portion(s) of the Landlord's Parcel (excluding the Premises), or (ii) occasioned wholly or in part by any act or omission of Landlord, its agents, contractors, employees, servants, tenants (other than Tenant), occupants or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Tenant, its agents, contractors, licensees or employees.

SECTION 11.06  Mutual Waiver of Subrogation.

(a)    Landlord and Tenant, on their own behalf and on behalf of anyone claiming under or through either one by way of subrogation, hereby release and waive all rights of recovery and causes of action against each other and their respective Affiliates arising from any and all liability for any loss or damage to property or resulting from damage to such property (and, in either case, any resulting loss of business or rental income), whether caused by the negligence or fault of the other party, which is normally insured under Special Form property insurance (formerly known as "All-Risk") and time element insurance required to be maintained hereunder or under any other property or time element insurance maintained by either party.  If either Landlord or Tenant is a self-insurer or maintains a deductible (as either may be permitted under this Lease), then the self-insuring party or the party maintaining the deductible hereby releases the other party from any liability arising from any event which would have been covered had the required insurance been obtained and/or the deductible not been maintained.

(b)    Landlord and Tenant shall cause each property insurance policy carried by either of them insuring the Premises, the contents thereof, or the Landlord's Parcel, to provide that the insurer waives all rights of recovery by way of subrogation or otherwise against the other party hereto (and all of such other party's Affiliates) in connection with any loss or damage which is covered by such policy or that such policy shall otherwise permit, and shall not be voided by the releases provided above.

SECTION 11.07  Affiliate.  "Affiliate" shall mean a corporation, partnership, person or other entity which is controlling, controlled by, or under common control with, Landlord or Tenant, as the case may be.  As used in the definition of Affiliate, "control" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise.

## ARTICLE XII

## DAMAGE OR DESTRUCTION

SECTION 12.01  Landlord's Obligation to Rebuild.  If all or any part of the Landlord's Parcel (including, without limitation, the Premises) is damaged or destroyed by fire, the elements or other casualty, then Landlord shall promptly repair all damage and restore the Landlord's Parcel, including the Building, to its condition immediately prior to such damage or destruction. Without limiting Landlord's obligations under this Article XII, the proceeds of the policies required to be obtained and maintained by Landlord pursuant to Section 11.01 shall, to the extent necessary, be used for the performance of such rebuilding and restoration work.  The provisions of this Section 12.01 shall not apply if Landlord or Tenant terminates this Lease pursuant to provision this Article XII.  Landlord shall have the right to terminate the Lease if more than fifty percent (50%) of the Floor Area of the Landlord's Parcel is damaged or destroyed by fire, the elements, or other casualty during the last five (5) years of the Term, and the restoration period is reasonably estimated by Landlord to be in excess of two hundred forty (240) days.  Landlord shall notify Tenant of its exercise of such option to terminate within forty-five (45) days following the occurrence of such casualty.  If Tenant has not exercised its option to extend the Term of the Lease and any such extension periods remain, Tenant may exercise such option within thirty (30) days after receipt of Landlord's termination notice and Landlord's termination notice shall be nullified and Landlord shall be obligated to rebuild in accordance with the terms of the Lease.

SECTION 12.02  Tenant's Obligation to Rebuild.  If all or any part of the Premises is damaged or destroyed by fire, the elements or other casualty, then Tenant shall promptly repair all damage and restore the Premises to its condition immediately prior to such damage or destruction (subject to any changes to the Premises that Tenant shall desire to make to the extent same shall otherwise be permitted under Section 14.01).  Without limiting Tenant's obligations under this Article XII, the proceeds of the policies required to be obtained and maintained by Tenant pursuant to Section 11.02 shall, to the extent necessary, be used for the performance of such rebuilding and restoration work.  The provisions of this Section 12.02 shall not apply if Landlord or Tenant terminates this Lease pursuant to provision this Article XII.

SECTION 12.03  Termination.

(a)     Tenant shall have the right to terminate this Lease:

(i)     if all or any part of the Premises is damaged or destroyed by fire, the elements or other casualty during the last three (3) years of the Term, and the restoration period is reasonably estimated by Tenant to be in excess of one hundred eighty (180) days,

(ii)     if all or more than fifteen percent (15%) of the Premises is damaged or destroyed by fire, the elements or other casualty during the last two (2) years of the Term, or

(iii)      if all or more than ten percent (10%) of the Premises is damaged or destroyed by fire, the elements or other casualty at any time during the Term and such damage or destructions is not covered under the insurance policy(ies) required to be maintained by Tenant under Sections 11.02(a)(ii) or 11.02(b)

Tenant shall notify Landlord of its exercise of such option to terminate within forty-five (45) days following the occurrence of such casualty.

(b)      If (i) Landlord fails to commence in good faith Landlord's repair and restoration obligations in Tenant's Preferred Area within one hundred twenty (120) days after any damage or destruction, or (ii) Landlord fails to timely complete such repair and restoration within two hundred forty (240) days after such damage or destruction, then Tenant shall have the option, upon notice to Landlord, to elect (y) to complete the repair and restoration to the Tenant's Preferred Area and (1) to receive reimbursement therefor in full from Landlord of the reasonable costs incurred by Tenant within thirty (30) days after Landlord's receipt of an invoice together with reasonable documentation of such expenses or (2) if Landlord has not reimbursed Tenant within such thirty (30) day period, to offset the cost and expense thereof against the payment of Rent and, if necessary to recoup such cost and expense through offset, at Tenant's option, to extend the Term until such time as Tenant, through such offsets, has recouped the entire cost and expense to Tenant of such repair and restoration (provided, however, that Landlord may, upon receipt of notice of Tenant's intent to offset, reimburse Tenant as provided in (1) above), or (z) to terminate this Lease effective as of the date of such damage or destruction.  The time periods referenced in this Section 12.03(b) shall be subject to Force Majeure, but in no event shall the aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed a period of ninety (90) days.

(c)      If (i) Tenant fails to commence in good faith Tenant's repair and restoration obligations within ninety (90) days after any damage or destruction, or (ii) Tenant fails to timely complete such repair and restoration within two hundred forty (240) days after such damage or destruction, then Landlord shall have the option, upon notice to Tenant, to elect to complete the repair and restoration to the Premises and to receive reimbursement therefor in full from Tenant on demand.  The time periods referenced in this Section 12.03(c) shall be subject to Force Majeure, but in no event shall the aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed a period of ninety (90) days.

If this Lease is terminated, then this Lease shall terminate on the date set forth in Tenant's or Landlord's notice of termination without further liability on the part of either Landlord or Tenant, except: (i) for those obligations which expressly survive the expiration or other termination of this Lease, and (ii) Tenant shall thereupon make available to Landlord (1) all insurance proceeds paid by Tenant's insurance carrier and pay Landlord any deductible or self insured retention amount, or (2) if self-insured, an amount equal to the full replacement cost of the Premises, to the extent such amounts would have been payable under the insurance outlined in Section 11.02(a)(ii), or (3) assign its interest in the insurance claim to Landlord, pay Landlord the insurance deductible or self insured retention amount associated with such claim, and assist Landlord in collecting on such claim to the extent assistance is reasonably required.

## ARTICLE XIII

## CONDEMNATION

SECTION 13.01  Taking.

(a)    In the event of condemnation by eminent domain or similar law, including a sale in lieu thereof to an authority or other entity having the power of eminent domain (a "Taking"), of all or any portion of the Landlord's Parcel, which (i) results in a Taking of (x) any part of the Premises, (y) more than ten percent (10%) of the Landlord Parcel Common Areas, or (z) more than five percent (5%) of the parking spaces in either Tenant's Preferred Area or more than ten percent (10%) of the parking spaces in the Landlord's Parcel, unless Landlord provides replacement parking spaces elsewhere which are, in Tenant's reasonable judgment, as accessible to the Premises and as usable as the spaces lost, (ii) materially and adversely affects ingress or egress to the Premises or the Landlord's Parcel, or (iii) materially prohibits or inhibits Tenant's use of the Premises for a period in excess of one hundred twenty (120) days, then Tenant may terminate this Lease by giving notice to Landlord not more than ninety (90) days after the later of the date on which title vests in the condemning authority or the date Tenant receives notice of said vesting.

(b)    In the event of a Taking of all of the Premises, this Lease shall terminate as of the date of vesting of title or transfer of the Premises, whichever is earlier, without further liability on the part of either Landlord or Tenant, except for those obligations which expressly survive the expiration or other termination of this Lease.

(c)    In the event of a Taking of the Premises, the Landlord Parcel Common Areas and/or any other area within the Landlord's Parcel, or any portion thereof, for temporary use (specifically one not exceeding one hundred twenty (120) days in duration), without the taking of the fee simple title thereto, this Lease shall remain in full force and effect. All awards, damages, compensation and proceeds payable by the condemnor by reason of such Taking relating to Tenant's loss of its trade fixtures, removal and relocation expenses, or to Tenant's use of the Premises, or located in Tenant's Preferred Area, for periods prior to the expiration of the Lease shall be payable to Tenant. All other awards, damages, compensation and proceeds shall be payable to Landlord. Anything contained to the contrary notwithstanding, a temporary Taking for any period in excess of one hundred twenty (120) days may, at Tenant's option, be deemed a permanent Taking and shall be governed by Section 13.01 (a) or (b), as applicable.

SECTION 13.02  Restoration and Rent Adjustment.  In the event of a Taking, if this Lease is not terminated by Tenant pursuant to Section 13.01, then (a) Landlord shall promptly restore the Landlord's Parcel as nearly as practicable to a complete unit of like quality and character as existed prior to the Taking, which restoration shall, as applicable, include all of Tenant's Work and all other leasehold improvements performed by Tenant, but shall not include Tenant's Property, and (b) if a portion of the Premises is Taken, then from and after the date on which title vests in the condemning authority, the Rent shall be equitably reduced in proportion to the area of the Premises subject to the Taking.

SECTION 13.03 Award. In the event of any Taking, if Landlord fails to restore any portion of the Premises as required under the terms of this Lease, Tenant shall be entitled to an amount of the award or compensation paid for such Taking equal to the Unamortized Costs of any portion of the Premises not restored by Landlord, if any, and the balance shall belong to Landlord. Tenant shall also have the right to claim and recover from the condemning authority such compensation as may be separately awarded or recoverable by Tenant on account of any and all damage to Tenant's business by reason of the condemnation and for or on account of any cost or loss to which Tenant might be put in moving Tenant's Property, or for any other damages compensable separately to Tenant; provided, however, that no such award shall reduce the award payable to Landlord for its fee interest in the Premises. The provisions of this Section 13.03 shall be subject to the provisions of Section 13.01(c) with respect to a temporary Taking.

## ARTICLE XIV

## ALTERATIONS AND MECHANICS' LIENS

SECTION 14.01 Tenant's Alteration Rights.

(a) Tenant shall not perform any structural or exterior alterations or improvements to the Premises (except to the extent same pertain to Tenant's Work) without the prior approval of Landlord; provided, however, that Tenant's alteration of the exterior of the Premises to conform to Tenant's (or any subtenant's) then-current prototypical elevation shall not require Landlord's consent, provided, however, that if such subtenant or assignee is not a National Tenant or Regional Tenant, Landlord's consent shall be required, not to be unreasonably withheld, conditioned, or delayed. The provisions of this Section 14.01(a) shall not apply to Tenant's building signage, which shall be governed by the applicable provisions of Article XV.

(b) Tenant may, from time to time, without the prior approval of Landlord, make non-structural interior alterations and improvements to the Premises as Tenant deems necessary or desirable including, but not limited to, the electrical systems, the HVAC and other mechanical systems, installation of fixtures and equipment, painting, and wall and floor coverings.

(c) Tenant shall have the right to erect and maintain an antenna, a satellite dish and/or related equipment on the roof of the Premises, provided that Tenant: (i) uses a contractor approved by Landlord for all roof penetrations so as not to violate or invalidate any roof warranties maintained by Landlord, (ii) repairs any damage to the roof caused by the making of the roof penetrations, (iii) erects and maintains such equipment in accordance with Laws, (iv) Landlord, in its reasonable discretion, approves the location and method of installation, and (v) at the expiration or sooner termination of this Lease, Tenant shall remove the antenna from the building at Tenant's sole cost and expense. Tenant shall restore the area and leave it in good order and repair. If Tenant does not remove the antenna as and when required, Landlord may remove and dispose of the antenna and charge Tenant for all reasonable costs and expenses incurred in connection therewith.

30

(d)     Landlord shall, at no cost to Landlord, execute and return to Tenant all appropriately completed building department or equivalent applications within ten (10) days after Tenant's request therefor, and will reasonably cooperate with Tenant in the permitting process.  If any violation of Laws which is noted against the Landlord's Parcel or the Premises (other than a violation caused by Tenant) prevents Tenant from obtaining a building permit for any alterations or a certificate of occupancy, then, upon request by Tenant, Landlord shall promptly and diligently cause such violation to be removed of record to the extent required to permit Tenant to obtain its building permit or certificate of occupancy, as the case may be. However, if the violation was not caused by Landlord (or any of Landlord's agents, contractors, employees or invitees), then Landlord's obligations under this Section 14.01(d) shall be satisfied by Landlord using diligent, good faith and commercially reasonable efforts to have the responsible party remove such violation of record.

(e)     Landlord shall not make any alterations to the Premises (including, without limitation, changing the design, color or materials of the exterior of the Premises) nor shall Landlord construct an additional floor or floors above or below the Premises.  Landlord shall neither make nor permit to be made any alterations to the exterior architectural theme of the remainder of the Landlord's Parcel or, to the extent Landlord has approval rights under the OEA, the Shopping Center which would be inconsistent with a first-class shopping center in the State (exclusive of other National Tenants' or Regional Tenants' façade, storefront and entrance features), without the prior consent of Tenant.

SECTION 14.02 Mechanics' Liens.   Tenant covenants that Tenant shall promptly discharge of record (by payment, bond, order of a court of competent jurisdiction or otherwise) within twenty (20) days after receipt of notice of same or request by Landlord, any mechanic's lien filed against the Premises or all or any part of the Landlord's Parcel for any work, labor, services or materials claimed to have been performed at, or furnished to, the Premises or the Landlord's Parcel, for or on behalf of Tenant, or at the insistence of Tenant, or anyone acting for, through or under Tenant.  Similarly, Landlord covenants that Landlord shall within twenty (0) days after receipt of notice of same or request by Tenant, promptly discharge of record (by payment, bond, order of a court of competent jurisdiction or otherwise) any mechanic's lien filed any lien against the Premises or all or any part of the Landlord's Parcel for any work, labor, services, materials claimed to have been performed at, or furnished to, the Premises or the Landlord's Parcel, for or on behalf of Landlord, or at the insistence of Landlord, or anyone acting for, through or under Landlord.  If either party shall fail to cause any such lien to be discharged within thirty (30) days after the other party shall demand that the former party remove same, then, the demanding party may discharge the same by paying the amount claimed to be due, by bonding or by any other proceeding deemed appropriate by such demanding party, and the amount so paid by such demanding party and/or all costs and expenses including reasonable attorneys' fees incurred by such demanding party in procuring the discharge of such lien shall be reimbursed by the other party upon demand.  Nothing contained in this Lease shall be construed as a consent on the part of the Landlord to subject Landlord's estate in the Premises to any lien or liability under any law relating to liens.