# EXHIBIT A

LOCATION: Polaris Shopping Center
Columbus, Ohio

# LEASE

Between

## CIRCUIT CITY STORES, INC.,

as Tenant

and

## POLARIS CIRCUIT CITY, LLC

as Landlord

dated ___June 15___, 2004

## POLARIS SHOPPING CENTER

~CHGO2:20156016.v9 |6/7/04

## TABLE OF CONTENTS

**PARAGRAPH**                                                                    **PAGE**

Leased Property

Constru tion   B  di      Impro      ts. T  an Impro      Al    ice.      .2

Lease T

Base R      Ground R

Development of hopping Center **by** Landlord

   asements

C mmon Areas and Commo  Area M  ten

   gns and Communicat      Equipment

T  es

.0.   **M** tenance R      and Replacements

            Pro der; aym   of U

Alterati

Mechanics Li

Insuranc

D     ges by ire    Other Casualty

Condemnation.

Assignment and ubletting

Use                                                                              .24

Warran      Rep      tat:      and Co      ts.

Estoppel Certificates

   ubordination, Non Disturbance and Attornment                                 .34

T      nancing

23        T          Property and W·         Landlord   Lic                                          .3:

          Memorandum of L(  e; Commencemen  Date Agreemen                                            .3·

          Expirati    of T(   and Holdin  Over

26        Force Maj

          Events f Tenan   Defaul

          Landl rd   Remedi

29          ts    Landlord   Defaul   Tenant   Remedi

i0.       W    ·er.                                                                                  40

          Compliance with Applicab   Law                                                             40

          Notices                                                                                    .4

          Brokers                                                                                    4

          Miscellaneous.

          Effecti eness f Lease: Tenant   Right to Terminate                                         44

i6.       Inten   nally Omitted                                                                       46

          Inten  onally Omitted                                                                       46

3⟨        Inten    ial  Omitted.

          Importanc   Each C  enant

40        "For R       gns

## EXHIBITS

"A"      Site Plan
"A-1"   Shopping Center Legal Description
"B"      Index of Definitions
"C"      Construction Provisions
          Attachment "1" Utilities Survey
          Attachment "2" Schematic Floor Plan and Elevations
          Attachment "3" Phase 1 Summary
"C-1"   Design and Construction Specifications
"D"      Intentionally Deleted
"E"      Sign Plans
"F"      Permitted Encumbrances
"G"      Subordination, Non-Disturbance and Attornment Agreement
"H"      Memorandum of Lease
"I"      Commencement Date Agreement
"J"      Indemnification Agreement

iii

Polaris Shopping Center
Columbus, Ohio

### LEASE

THIS LEASE ("**Lease**") is made as of the _15_ th day of _June_ , 2004, by and between **POLARIS CIRCUIT CITY, LLC**, an Ohio limited liability company having an address at 8800 Lyra Drive, Suite 550, Columbus, Ohio 43250 ("**Landlord**"), and **CIRCUIT CITY STORES, INC.**, a Virginia corporation, having an address at Deep Run I, 9950 Mayland Drive, Richmond, Virginia 23233 ("**Tenant**").

### W I T N E S S E T H:

The parties hereto agree as follows:

1.    **Leased Property**.  Landlord leases to Tenant the "Premises" (as defined in paragraph 2), which when constructed or renovated as provided in this Lease will contain a building thereon containing approximately 34,772 square feet of "ground-floor gross leasable area" (as defined in paragraph 7(c) below) on that certain land (the "**Land**") outlined in red on **Exhibit "A"** (the "**Site Plan**"), together with exclusive rights to the six (6) parking spaces labeled "Car Stereo Parking" at the rear of the Building as shown on the Site Plan, with the "Other Improvements" (defined below) and with the easements described in paragraph 6 below; all located in an in-line store center totaling 5.09 acres adjacent to Polaris Fashion Place (such in-line center herein referred to as the "**Shopping Center**"), located at Polaris Parkway and Lyra Drive, in the City of Columbus (the "**City**"), County of Delaware, State of Ohio (the "**State**"), shown on the Site Plan and described by metes and bounds or platted lot legal description on **Exhibit "A-1"** attached hereto.   All of the Shopping Center exclusive of the Premises is "Landlord's Premises". Landlord grants to Tenant all of those certain rights, in common with others, granted Landlord under (a) that certain Declaration of Protective Covenants for Polaris Centers of Commerce dated August 20, 1992, recorded in Volume 0548, Pages 720 – 752 of the Deed Records of Delaware County, Ohio, as amended by Amendment to Declaration of Protective Covenants dated February 1, 1994, recorded in Book 0026, Pages 751 – 753 of the Deed Records of Delaware County, Ohio, and as further amended by Amendment to Declaration of Protective Covenants dated July 16, 1999, recorded in Volume 0034, Pages 539 – 540 of the Deed Records of Delaware County, Ohio and as further amended by Ninth Amendment to Declaration of Protective Covenants recorded on November 16, 2001 in Volume 0144, Pages 1941-1943 of the Deed of Records of Delaware County, Ohio; (b) that certain Declaration of Restrictions dated June 28, 2001, recorded in Volume 0108, Pages 0261 – 0300 of the Deed Records of Delaware County, Ohio; and (c) that certain Curb Cut and Access Maintenance Agreement dated August 31, 2000, as amended by First Amendment to the Curb Cut and Access Maintenance Agreement dated February 25, 2002, all as recorded against record title of the Shopping Center (collectively, the "**Protective Covenants**"). Landlord agrees (i) that it will not consent to, approve, or otherwise agree to any modification of the Protective Covenants at any time during the term of this Lease, to the extent the Protective Covenants being modified relate to Tenant's Preferred Area or primary access to the Shopping Center or parking ratio or the

visibility of Tenant's Premises or which would diminish Tenant's rights under this Lease or would increase Tenant's obligations under this Lease, without Tenant's prior written approval (which may be withheld in Tenant's reasonable discretion); (ii) will enforce the terms of the Protective Covenants for Tenant's benefit, consistent with Landlord's obligations under this Lease; and (iii) will exercise all approval rights granted Landlord under the Protective Covenants in favor of enforcement of the terms of this Lease. Landlord further agrees that it will not consent to, approve or establish any rules and regulations applicable to the Shopping Center, as permitted under the Protective Covenants, without Tenant's prior consent, which will not be unreasonably withheld.

2. **Construction of Building and Improvements; Tenant Improvement Allowance**.

(a) Landlord shall complete the "Delivery of the Land" (as defined in the Construction Provisions (herein so called) attached hereto as **Exhibit "C"** and incorporated herein by reference for all purposes) on the date of this Lease, which date shall be the "**Delivery Date**" for purposes of this Lease. Tenant shall have the right to construct within the Shopping Center a one-story retail building, containing approximately 34,772 square feet of "ground-floor gross leasable area" plus mezzanine, with provisions for car stereo installation facilities, initially for use as a Circuit City Superstore (the "**Building**"), together with loading ramps, truck wells, sidewalks, trash compactor, transformer pad and other improvements (collectively, the "**Other Improvements**"), set forth in the Construction Provisions. The Building and Other Improvements are sometimes collectively referred to herein as the "**Improvements**". The Improvements shall be constructed to completion with due diligence in accordance with the "Plans and Specifications" to be prepared by Tenant as specified in the Construction Provisions. Except as otherwise provided herein, title to the Improvements shall be deemed transferred to Landlord upon full payment of the "Tenant Improvement Allowance", as defined below. The Improvements and the Land are referred to herein as the "**Premises**".

(b) Upon the date that (x) Substantial Completion (as defined in the Construction Provisions) has occurred; and (y) Tenant has furnished to Landlord (i) the certificates of insurance required under paragraph 14 of the Lease, (ii) an indemnity in the form of **Exhibit "J"** attached hereto against any exception in Landlord's or its Mortgagee's policy of title insurance with respect to mechanics' liens arising out of Tenant's construction, and (iii) a square footage building perimeter survey certified to Tenant and Landlord, Landlord shall pay to Tenant a "Tenant Improvement Allowance" in an amount equal to Seventy Four Dollars ($74) per square foot of ground-floor gross leasable area of the Building (which shall be determined by the amount of ground-floor gross leasable area shown in Tenant's square footage building perimeter survey mentioned above), payable by wire transfer of funds by Landlord to Tenant's account no later than thirty (30) days after the date that all of the matters described in (x) and (y) above have occurred. If the Base Rent is increased or decreased pursuant to paragraph 4(b) of this Lease, the Tenant Improvement Allowance shall likewise be proportionately increased or decreased. The amount of ground floor gross leasable area

2

of Tenant's Building, as set forth on said survey, shall be deemed conclusive unless Landlord objects to same in writing within fifteen (15) days of receipt of such survey. If Landlord objects, the Tenant and Landlord shall jointly select, at their shared expense, an independent architect or engineer to measure such ground floor gross leasable area, which measurement shall be final and binding upon Landlord and Tenant.

3.    **Lease Term**.  Subject to paragraph 35, the construction term (the "**Construction Term**") of this Lease shall commence on the date of Landlord's Delivery of the Land to Tenant in the condition specified in the Construction Provisions and shall end on the "Commencement Date" (as defined in paragraph 4 below). The main term (the "**Main Term**") of the Lease shall commence on the Commencement Date and shall end on the last day of January following the fifteenth (15th) anniversary of the Commencement Date.

In addition to the Main Term, Tenant shall have the option (a "**Renewal Option**") to renew and extend the Lease for three (3) consecutive five (5) year periods (each period referred to as an "**Option Period**") immediately following the Main Term, at the rent specified below. Tenant shall give Landlord written notice of its election to exercise any Renewal Option at least one hundred eighty (180) days prior to the expiration of the Main Term or any then-current Option Period. If, during such one hundred eighty (180) day period, Tenant does not give Landlord written notice of its intent not to exercise its Renewal Option, Tenant's right to exercise such Renewal Option shall continue, as shall its tenancy hereunder, until ten (10) business days after Landlord has given Tenant written notice of Landlord's election to terminate the Renewal Option, during which ten (10) business day period Tenant may exercise its Renewal Option whereupon the Term (defined below) of this Lease shall be renewed and extended as if such notice had been given prior to such expiration of the one hundred eighty (180) day period described above.

The Construction Term, Main Term and Option Periods are, collectively, the "**Term**". The term "**Lease Year**" shall mean each successive period of twelve (12) consecutive calendar months, commencing on the first day of each February during the Term, except that the first Lease Year shall commence on the Commencement Date and shall end on the last day of January following the first anniversary of the Commencement Date.

4.    **Base Rent; Ground Rent**.  During the Construction Term, Tenant shall pay no rent or Real Estate Tax (as defined in paragraph 9 below) or CAM Charges (as defined in paragraph 7 below) or any similar costs, fees, rentals or expenses. Tenant agrees to pay base rent ("**Base Rent**") for the Premises in the amounts and manner specified hereunder, commencing on the date (the "**Commencement Date**") which is the later to occur of (i) the date on which Landlord makes payment of the Tenant Improvement Allowance, and (ii) the date of Substantial Completion of the Improvements. "**Ground Rent**," in lieu of Base Rent, shall be due under certain circumstances, as described in subparagraph 4(i) below, and when due, shall be payable in the same manner as Base Rent. Notwithstanding the foregoing, until Landlord has completed, executed and delivered to Tenant a W-9 form (the form of which will be delivered to Landlord by Tenant together with this Lease for execution), no Base Rent, Ground Rent or other sums shall be due Landlord by Tenant hereunder.

3

Landlord shall give Tenant written notice of a change of address or change of the party to whom such rents shall be payable along with written documentation reasonably satisfactory to Tenant of such party's right to receive payment hereunder. Unless adjusted as provided below or in paragraph 2 above relating to the Tenant Improvement Allowance (it being intended by Landlord and Tenant that the same square footage be used for purposes of determining the Base Rent and Tenant Improvement Allowance), Base Rent shall be paid in equal monthly installments in advance on the first day of each calendar month throughout the Term, to the address given for Landlord in paragraph 32, pursuant to the following schedule:

(a)    **First Five Lease Years**. During the first five (5) Lease Years, Tenant shall pay annual Base Rent in the amount of Six Hundred Twenty Five Thousand Eight Hundred Ninety Six and 00/100 Dollars ($625,896.00), payable in equal monthly installments of Fifty Two Thousand One Hundred Fifty Eight and 00/100 Dollars ($52,158.00).

(b)    **Lease Years 6-10**. During Lease Years six through ten, Tenant shall pay annual Base Rent in the amount of Six Hundred Forty Three Thousand Two Hundred Eighty Two and 00/100 Dollars ($643,282.00), payable in equal monthly installments of Fifty Three Thousand Six Hundred Six and 83/100 Dollars ($53,606.83).

(c)    **Lease Years 11-15**. During Lease Years eleven through fifteen, Tenant shall pay annual Base Rent in the amount of Six Hundred Sixty Thousand Six Hundred Sixty Eight and 00/100 Dollars ($660,668.00), payable in equal monthly installments of Fifty Five Thousand Fifty Five and 66/100 Dollars ($55,055.66).

(d)    **Adjustment in Base Rent**. Notwithstanding the Base Rent provisions, in the event that the ground-floor gross leasable area of the Building when constructed does not equal 34,772 square feet of ground-floor gross leasable area, annual Base Rent during the first fifteen (15) Lease Years shall be adjusted based upon the product obtained by multiplying the actual ground-floor gross leasable area of the Building (as evidenced by the square footage building perimeter survey described in paragraph 2 above) by $18 (for the first 5 Lease Years), $18.50 (for Lease Years 6-10) and $19 (for Lease Years 11-15) (i.e., being the annual Base Rent rate per square foot of ground-floor gross leasable area of the Building for each such Lease Year, as described in subsections (a) – (c) above). In determining the ground-floor gross leasable area, measurements shall be made in accordance with paragraph 7(c) below. If any Lease Year is other than twelve (12) months in length, annual Base Rent during such Lease Year shall be the product of the applicable monthly Base Rent times the number of months in such Lease Year, with appropriate proration for any partial calendar month therein.

(e)    **Lease Years 16-20**. During Lease Years 16 through 20, Tenant shall pay annual Base Rent in an amount equal to the lesser of (i) the product obtained by multiplying the actual ground-floor gross leasable area of the Building (as evidenced by the square footage building perimeter survey described in paragraph 2 above), by $20, and (ii) the product obtained by multiplying the annual Base Rent payable during the fifteenth (15th) Lease Year times the sum of one plus ten (10) times the percentage

~CHGO2:20156016.v9  |6/3/04

increase (expressed as a decimal) in the "CPI" (as defined below in paragraph 4(h)) during said fifteenth (15th) Lease Year.

(f)     **Lease Years 21-25**.  During Lease Years 21 through 25, Tenant shall pay annual Base Rent in an amount equal to the lesser of (i) the product obtained by multiplying the actual ground-floor gross leasable area of the Building (as evidenced by the square footage building perimeter survey described in paragraph 2 above), by $21, and (ii) the product obtained by multiplying the annual Base Rent payable during the twentieth (20th) Lease Year times the sum of one plus ten (10) times the percentage increase (expressed as a decimal) in the "CPI" during said twentieth (20th) Lease Year.

(g)     **Lease Years 26-30**.  During Lease Years 26 through 30, Tenant shall pay annual Base Rent in an amount equal to the lesser of (i) the product obtained by multiplying the actual ground-floor gross leasable area of the Building (as evidenced by the square footage building perimeter survey described in paragraph 2 above), by $22, and (ii) the product obtained by multiplying the annual Base Rent payable during the twenty fifth (25th) Lease Year times the sum of one plus ten (10) times the percentage increase (expressed as a decimal) in the "CPI" during said twenty fifth (25th) Lease Year.

(h)     **CPI**.  For purposes of this Lease, the term "CPI" shall mean the Consumer Price Index -- All Urban Consumers (U.S. City Average, All Items: Base 1982-84-100) as published by the United States Department of Labor, Bureau of Labor Statistics.  Should the CPI publication be discontinued or the CPI published less frequently or in some manner altered, Tenant shall select a substitute index or procedure which reasonably reflects consumer prices and has been generally accepted as a substitute index for CPI.

(i)     **Ground Rent**.  Subject to Tenant having received all permits, approvals and other clearances necessary to permit the completion of Tenant's Site Work and the Tenant Improvements and subject to *force majeure*, if the Commencement Date has not then occurred, then during the period commencing on the date which is one hundred eighty (180) days following the Delivery of the Land and ending on the day before the Commencement Date, Tenant shall pay to Landlord Ground Rent.  For purposes hereof, annual "Ground Rent" shall equal Three Hundred Sixty Nine Thousand and 00/100 Dollars ($369,000.00), payable in equal installments of $30,750.00 and Tenant's prorata share of CAM Charges and Real Estate Taxes (to the extent separately assessed for the Land) as set forth herein; provided, however, that said annual Ground Rent amount shall be adjusted, as applicable, based upon the actual ground-floor gross leasable area of the Building being less than or greater than 34,772 square feet (as evidenced by the square footage building perimeter survey described above).

5.     **Development of Shopping Center by Landlord**.  Landlord covenants to operate a first-class shopping center.  The location of buildings and other tenant space will only be within the **"Permissible Building Areas"** designated on the Site Plan, **Exhibit "C"** (Construction Provisions) and **Exhibit "C-1"** (Standard Design and Construction Specifications).  The parking ratio for the Shopping Center shall be at least as shown thereon, but

5



in no event shall said ratio be less than the greater of (i) 201 total parking spaces, or (ii) that required by applicable zoning requirements, without variance. All parking shall be at ground level. Landlord hereby acknowledges, agrees and covenants that there are no outparcels and shall be no outparcels within the Shopping Center. Landlord shall construct all improvements in a good and workmanlike manner, lien-free and Landlord agrees to indemnify, defend (with legal counsel reasonably acceptable to Tenant) and hold Tenant harmless from any loss or damage suffered by Tenant as a result of Landlord's construction activities. Landlord's construction activities shall not unreasonably interfere with the conduct of Tenant's business. If Landlord fails to maintain the above required parking ratio (except as a result of a condemnation event), Tenant shall, in addition to any other legal or equitable remedy, including specific performance, have the right to pay, in lieu of any scheduled Base Rent and other charges that would be otherwise payable under this Lease, one-half (1/2) of the scheduled Base Rent hereunder from time to time together with one-half (1/2) of all other scheduled charges payable hereunder from time to time, until such time as the above-specified parking ratio is again maintained.

6.      **Easements**.   Landlord also grants to Tenant those nonexclusive leasehold easements over Landlord's Premises, which shall run as covenants with Landlord's Premises and the Premises during the Term, as are useful and appropriate for the construction, operation and maintenance of the Premises, including but not limited to:

(a)      **Construction Easements**. During the Construction Term, any period of renovation or reconstruction thereafter, and during any period which Tenant desires to install additional utility services including television cable, fiber optic line or other systems serving the Premises, Landlord grants to Tenant (i) a nonexclusive easement across a mutually agreeable designated route, providing access to and from the public roadways nearest to the Land, over the Common Areas (as defined in paragraph 7(a) below) for construction access to the Premises, as well as an exclusive easement for a construction staging area (the "**Staging Area**") of approximately 20,000 square feet, in a portion of the Common Areas at a mutually agreeable location within a reasonable distance of the Land for Tenant's use in constructing the Improvements, (ii) an easement to permit the Building to abut adjacent buildings, and the foundations, footings, common walls and roof projections to bear structurally upon Landlord's Premises, (iii) an easement for such additional underground, public or private utility or cable, fiber optic or other easements as Tenant deems necessary, without unreasonably interfering with the use by Landlord of the Common Areas by Landlord and other tenants of the Shopping Center and their respective employees, customers and invitees, for the benefit of the Premises. For the purpose of exercising the rights granted in this paragraph 6, Tenant and/or the utility or other service provider shall have the right to enter upon and use the Common Areas to install the utility systems, to such extent and so long as reasonably necessary to accomplish such purpose, subject to prompt restoration of the Common Areas following such installation. Notwithstanding anything to the contrary contained herein, except for initial alterations by Tenant in no event may any work be performed in easement areas described in (iii) above during the months of October, November, December or January (except for emergency repairs).

6

(b)    **Common Area Easements**.  Landlord grants to Tenant an easement (the "**Common Area Easement**") to use the Common Areas for their intended purposes and to permit Tenant and its employees, agents, subtenants, assignees, licensees, suppliers, customers and invitees to use the Common Areas for the purposes of parking and pedestrian, service and vehicular access, ingress and egress to, from and between the Premises and Landlord's Premises and the streets and highways abutting and adjacent to the Shopping Center, without payment of any fee or other charge.  Tenant shall have the right to install up to four (4) cart corrals within the parking area located in the Tenant's Preferred Area as shown on the Site Plan (or other mutually agreeable location), and Tenant shall be permitted to store its shopping carts outside of the Premises in such cart corrals.  Said cart corrals shall be appropriately screened as approved by the Polaris Design Review Committee.  Tenant agrees to use reasonable efforts to periodically remove its shopping carts from the Common Areas.  Tenant shall also have the right to use such Common Areas immediately adjacent to Tenant's Improvements and within Tenant's Preferred Area for "sidewalk sales", seasonal and promotional sales and demonstrations and other sales customary to Tenant's business operations exclusively for Tenant's customers, invitees and patrons.  Such sales shall not exceed seven (7) days per sale period, and shall not occur in excess of four (4) times per year.

7.    **Common Areas and Common Area Maintenance**.

(a)    **Definition of Common Areas**.  The term "**Common Areas**" shall be defined to include the parking areas, lanes, drives, entrances, truck passageways, sidewalks, ramps, stairways, landscaped and other unpaved areas, parking lot lighting facilities and equipment, Landlord's pylon sign(s), if any, directional, traffic and monument sign structure(s) and shared utility facilities located in all elements of the Shopping Center (including any such areas and facilities contained within adjacent tracts (including without limitation, Polaris Fashion Place) but reserved for the benefit of the Shopping Center occupants) and which are intended and available for the common use of all of the tenants within the Shopping Center (including any other adjacent occupants which contribute toward "CAM Charges" (as defined below) and which are not responsible for separate maintenance of such outparcels or tracts), their subtenants, licensees, and business invitees.  Landlord shall operate, maintain, repair and replace the Common Areas in good condition, including, without limitation, sweeping and cleaning, maintenance of Landlord's pylon and other sign structure(s), including traffic directional signs, markers and lines and informational signs, snow removal and ice treatment, removal of Common Area trash, debris and garbage, lighting (including lighting of signage and Common Areas), repairing, repaving and restriping the parking area, and maintaining, replanting and replacing landscaping and sprinkler systems, storm drains, sewers and other utility lines and facilities not dedicated to the public or owned by a private utility company, which are necessary for the operation of the Shopping Center, customary and reasonable security services, and maintaining all insurance required under this Lease to be maintained by Landlord, all such work to be referred to collectively as "**Common Area Maintenance**".

7

If Tenant reasonably determines that the Common Areas are being maintained at a level that impairs the sale of Products at Tenant's Premises, Tenant may elect to provide the Common Area Maintenance for the Shopping Center upon 90 days' prior notice to Landlord, in which event Landlord shall reimburse Tenant for its Landlord's Share (as defined below) of Tenant's actual costs within 15 days after demand therefor. Tenant's administrative fee for these services shall be subject to the same limitation provided in Section 7 (b) (ii) below on the administrative fee which Landlord may charge. For purposes of this Lease, **"Landlord's Share"** shall mean a percentage, calculated by dividing the ground floor gross leasable area in the Shopping Center (other than the Building) by the aggregate ground floor gross leasable area in the Shopping Center (including the Building). As of the date of this Lease, the Landlord's share is projected to be 14.32% (using 5,810 ground floor gross leasable area in the Shopping Center, excluding the Building, divided by 40,582 ground floor gross leasable area in the Shopping Center, including the Building). Tenant may, upon at least 90 days' prior written notice, cause Landlord to resume its obligation to perform the Common Area Maintenance.

(b)     **CAM Charges.** For the purpose of this paragraph 7, the cost of Common Area Maintenance (the "CAM Charges") shall include (i) Landlord's reasonable direct costs and expenses of operating and maintaining the Common Areas, and (ii) Landlord's overhead expenses for administering same, or in lieu thereof a management fee, neither of which shall exceed five percent (5%) of the total of such costs (specifically excluding from such total the amounts paid by Landlord and Tenant for insurance, capital expenditures, "Real Estate Taxes" [as defined in paragraph 9 below] and utilities serving the Common Areas). CAM Charges shall not include any Common Area Maintenance to the extent Tenant elects to provide same pursuant to Section 7(a) above. Notwithstanding the foregoing, the following shall not be included in the CAM Charges:

(1)     real estate taxes paid, and maintenance performed, on separately assessed and/or maintained outparcels or other adjacent tracts not reserved to the benefit of the Shopping Center occupants;

(2)     any dues or charges for a merchants' or other association of the tenants in the Shopping Center;

(3)     maintenance, repairs or replacements to the Common Areas (but no other portions of the Shopping Center), necessitated by the negligent or wrongful act of Landlord or made to correct any construction defect or condition with respect to any buildings (including the roof and exterior walls) or to any utility systems not part of the Common Areas;

(4)     repairs or replacements necessitated by any governmental entity or by the negligence or the wrongful action of Landlord (including failure to construct any portion of the Shopping Center in accordance with plans or specifications) or any other tenant or made to correct any initial construction

8

defect or condition in existence prior to the Commencement Date of this Lease or to correct damage caused by subsidence or adverse or substandard soil conditions;

(5)    amounts paid to entities related to Landlord in excess of the cost of such services from any competitive source;

(6)    amounts reimbursable from insurance proceeds, under warranty or by Tenant, any other tenant in the Shopping Center or any other third party other than pursuant to a Common Area expense provision similar to this paragraph 7;

(7)    premiums for Common Area liability insurance for coverage in excess of the limits established in paragraph 14(e) below;

(8)    repairs or replacements of a capital nature, unless made after the expiration of the first two (2) CAM Years (as defined below) and only to the extent each such item is amortized over its useful life in accordance with generally accepted accounting principles consistently applied;

(9)    improvements, repairs or replacements (other than patching and similar minor periodic maintenance) to the parking lot or other paved areas during the first six (6) full "CAM Years" (as defined below), except that after the sixth (6th) full CAM Year of the Term and only at six (6) year intervals thereafter, the amortized cost of resurfacing may be included in CAM Charges, provided the included cost shall be limited to the amount amortized over the useful life of such expenditure in accordance with generally accepted accounting principles consistently applied;

(10)    reserves for anticipated future expenses;

(11)    interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner;

(12)    Landlord's personnel, overhead, home office or administrative expenses, except as set forth in subparagraph (b)(ii) above;

(13)    amounts incurred to remediate any Hazardous Substances (as defined in paragraph (19)(a)(v) below);

(14)    any new improvements to the Shopping Center or Common Areas, including, but not limited to, renovations to the facade of the Shopping Center and improvements to landscaped areas of the Shopping Center;

(15)    amounts incurred to monitor or maintain fire protection systems in the Shopping Center if Tenant separately monitors and maintains the Premises;

(16)    holiday or other decorations;

~CHGO2:20156016.v9 |6/3/04

(17)   other maintenance expenses not considered normal and customary under generally accepted accounting principles or shopping center industry standards. CAM Charges shall be in an amount consistent with the costs incurred by other landlords of similar shopping centers in the City (but not greater than as described in this paragraph 7(b)), and in all events such charges shall be obtained at competitive rates pursuant to a proposed Common Area maintenance budget delivered to Tenant on or before the beginning of each CAM Year; or

(18)   premiums for any "rent loss" insurance carried by Landlord or its affiliates; provided, Tenant agrees not to abate its Rent upon the occurrence of a casualty event.

(c)   **Tenant's Estimated and Actual Payments**. During each calendar year ("**CAM Year**") commencing on the Commencement Date, Tenant shall make estimated payments of its Pro Rata Share (as hereinafter defined) of the CAM Charges incurred by Landlord. Tenant's estimated payments of its Pro Rata Share of CAM Charges shall be paid by Tenant in equal monthly installments on the first day of each month during a CAM Year. Tenant's estimated payments of its Pro Rata Share (and its actual Pro Rata Share) of CAM Charges payable for the first 4 CAM Years shall not exceed by more than four percent (4%) those in effect during the preceding applicable CAM Year and during the remaining 11 CAM Years of the Term, shall not exceed by more than five percent (5%) those in effect during the preceding applicable CAM Year (in either case, excluding from the aforementioned caps, snow removal expenses, insurance expenses, utilities serving the Common Areas, real estate taxes and the annual Ring Road maintenance assessment). For any period within the Term which is less than a full CAM Year, Tenant's Pro Rata Share of CAM Charges shall be appropriately pro rated. Within ninety (90) days after the end of the first CAM Year and each CAM Year thereafter, Landlord will furnish to Tenant a statement showing in detail (with such substantiating documentation as Tenant may reasonably request) the amount of the CAM Charges for the preceding CAM Year and the then-current number of square feet of ground-floor gross leasable area in the Shopping Center. Any necessary adjustment with respect to amounts owed by either party based upon the actual amount of CAM Charges paid by Landlord for such preceding CAM Year shall be made; and the monthly payments to be made by Tenant for the next year shall be estimated according to the Common Area maintenance budget prepared by Landlord and delivered to Tenant.

Tenant's pro rata share of CAM Charges (herein referred to as "**Pro Rata Share**") shall always be the product of the CAM Charges multiplied by a fraction, the numerator of which is the number of square feet of the ground-floor gross leasable area in the Building and the denominator of which is the number of square feet of the ground-floor gross leasable area (including the area of any outside sales area exclusive to a single occupant) in the Shopping Center. In determining the "**ground-floor gross leasable area**" of any building in the Shopping Center (including the Building), measurement shall be made from the centerline of any common walls and from the outside of any exterior walls. The gross leasable area of any outside sales area shall be measured from the outside of the exterior wall of any adjacent building to the actual exterior perimeters

10

of such outside sales area, including any aisles, fences or walls included therein. Changes in applicable floor areas shall result in corresponding adjustments of Tenant's Pro Rata Share, but in no event shall the denominator of the fraction by which Tenant's Pro Rata Share is determined be less than 40,582 square feet of ground-floor gross leasable area. The remainder of CAM Charges shall be borne by Landlord and/or other tenants.

(d)    **Examination of Landlord's Records**. Tenant shall have the right, once as to any CAM Year and no later than three (3) years after the end of such CAM Year, to examine and make copies of the records pertaining to CAM Charges for such CAM Year. If the examination discloses any overcharge by Landlord, Landlord shall reimburse Tenant within ten (10) days for any overpayment of Tenant's Pro Rata Share of CAM Charges; and if such overpayment by Tenant is in excess of three percent (3%) of the actual Tenant's Pro Rata Share of CAM Charges, Landlord shall reimburse Tenant for the actual cost of such examination or audit, including, but not limited to, reasonable travel expenses, together with interest thereon at the Default Rate ( as defined in paragraph 9(b) below) from the date paid by Tenant until reimbursement.

(e)    Tenant shall also pay its Pro Rata Share of charges incurred by the Shopping Center for annual maintenance to the Ring Road identified on the Site Plan, and the Polaris Mall Owners Association assessment, provided such Pro Rata Share of the Ring Road maintenance charge and association assessment shall not initially exceed Tenant's Pro Rata Share of $3,600 and shall not increase by more than 10% upon each 3-year anniversary of this Lease.

8.    **Signs and Communications Equipment**.

(a)    **Signs**. Tenant, at its sole cost and expense, may construct and install upon the Common Areas at the location shown on the Site Plan, a monument sign structure (with electrical wired box installed) with doublesided "face panels" identifying Tenant's store, which sign structure shall comply with all applicable laws, covenants and restrictions as long as approved by the Polaris Design Review Committee (as required). If other face panels are available on Tenant's pylon sign, Tenant shall permit other tenants of the Shopping Center to install a sign panel on such pylon sign, provided such tenant provides such sign panel and installation at its sole cost and reimburses Tenant for proportionate share of the costs incurred by Tenant in constructing the pylon sign, which proportionate share shall be based on such tenant's signage area against the total panel-signage area on said pylon sign. If at any time during the Term there becomes available a face panel on any of the Shopping Center pylon or monument signs which would permit Tenant's presence in the Shopping Center to be designated in a higher pylon or monument panel position, then Tenant shall have the right to relocate its pylon or monument sign panel to such higher sign position. Landlord shall submit to Tenant plans and specifications for such pylon sign (including colors, design, dimensions, type of lighting and position of tenant panels) prior to construction and installation thereof for Tenant's written approval, which shall not be unreasonably withheld or delayed. Attached as a portion of **Exhibit "E"** are plans and specifications for the monument sign

1

structure, Tenant's current prototypical face panels and for Tenant's building signage, as presented to the Polaris Design Review Committee, which Landlord hereby approves. Tenant, its successors, subtenants and assigns shall be entitled with Landlord's and Polaris Design Review Committee's consent, and subject to governmental requirements, to replace all of its signs with signage consistent with Tenant's  (or its successors' subtenants' or assigns') then-current prototypical sign plans.

(b)   **Communications Equipment**.   Tenant may install, maintain and/or replace any satellite dishes, antennas, cellular and PCS towers and poles on the roof and/or exterior walls or parapet of the Building as Tenant deems necessary or desirable, provided (i) same shall not adversely and materially affect the roof or its structural elements, (ii) any such rooftop equipment shall be screened with materials consistent with the Tenant's Building design, and (iii) Tenant, not Landlord, shall be responsible for any roof maintenance, repair or replacement necessitated by the installation, penetration, operation and/or removal of such equipment.  Tenant shall use the same roof contractor as used on the base Building when making any roof penetrations to maintain any roof warranty.

9.   **Taxes**.

(a)   **Taxes Contemplated Hereunder**.   The term "**Real Estate Taxes**" shall mean all general real estate taxes and assessments and other ad valorem taxes, rates and levies paid upon or with respect to the Shopping Center, including the Premises, for a calendar year or a portion thereof to any governmental agency or authority and all charges specifically imposed in lieu of any such taxes.  Nothing contained in this Lease shall require Tenant to pay any local, county, municipal, state or federal income, franchise, corporate, estate, inheritance, succession, capital levy, business or transfer tax of Landlord, or any local, county, municipal, state or federal income, profits, gross receipts, sales or renewal tax or charge upon the rent or other charges payable by Tenant under this Lease.

(b)   **Payment of Real Estate Taxes**.   After the Commencement Date has occurred, at such intervals as Landlord is required to pay the Real Estate Taxes, Tenant shall pay Tenant's Pro Rata Share (calculated in the same manner as Tenant's Pro Rata Share of CAM Charges in paragraph 7(c)) of Real Estate Taxes levied against the tax parcel or parcels comprising the Shopping Center (the "**Tax Parcel**").  For purposes of determining Tenant's Pro Rata Share of Real Estate Taxes, Real Estate Taxes shall be reduced by any early-payment discounts available at the time Tenant's payment is due and any real estate tax and assessment amounts which are paid directly by other tenants or occupants of the Shopping Center to the applicable taxing authority.  Tenant's Pro Rata Share of Real Estate Taxes for the first Lease Year of the Term are unlikely to exceed Two and 00/100 Dollars ($2.00) per square foot of ground-floor gross leasable area of the Building.  Tenant shall pay to Landlord Tenant's Pro Rata Share of Real Estate Taxes within twenty (20) days after Tenant's receipt of Landlord's statement (or within the same time period granted to the Landlord to pay such tax bill – e.g., if Landlord is delivered a copy of the bill 30 days in advance of its due date by the

12



applicable governmental entity, then Tenant shall have 30 days after receipt of a copy of the tax bill from Landlord), accompanied by the tax bill on the basis of which such statement is rendered. Landlord shall pay, or cause the payment of, all Real Estate Taxes before any fine, penalty, interest or cost are added, become due, or are imposed by operation of law for nonpayment or late payment. In no event shall Tenant be liable for any discount forfeited or penalty incurred as a result of late payment by another tenant or by Landlord. Real Estate Taxes shall be prorated as of the Commencement Date and the expiration or earlier termination of this Lease (i.e., such that Tenant shall not be required to pay for any Real Estate Taxes which are levied or assessed for periods prior to the Commencement Date or after the expiration or earlier termination of this Lease), and Landlord shall promptly return to Tenant any overpayment made by Tenant not attributable to the period of Tenant's possession of the Premises. Landlord shall remain primarily responsible for such payment notwithstanding the fact that such payment may be made by a tenant of Landlord's Premises or other third party pursuant to an agreement to which Tenant is not a party. In addition, should Landlord fail to pay such Real Estate Taxes before same become delinquent, Tenant shall have the right, at its election, to cure such failure by payment of delinquent Real Estate Taxes and any interest and penalties due and in such event Tenant may deduct the cost, plus interest at the lesser of ten percent (10%) per annum or the highest rate permitted by State law (the "**Default Rate**"), from the next installment(s) of Base Rent and other charges due.

(c)     **Contest of Real Estate Taxes and/or Assessed Valuation of Property**. Tenant shall have the right, at Tenant's sole expense, to contest the amount or validity, or otherwise seek an exemption or abatement, of any Real Estate Taxes or to seek a reduction in the valuation of the Premises assessed for Real Estate Tax purposes, by appropriate proceedings diligently conducted in good faith, provided that Tenant shall first have notified Landlord of its intent to do so and Landlord shall have failed to notify Tenant in writing, within ten (10) days of receipt of Tenant's notice, that Landlord intends to contest such Real Estate Taxes or seek such a reduction. In any instance where any such action or proceeding is being undertaken by Tenant, Landlord shall reasonably cooperate with Tenant, execute all documents reasonably required and, if required by any law, rule or regulation of the taxing authority, shall join with Tenant in the prosecution.

(d)     **Payment Following Appeal**. Upon the termination of the proceedings set forth in subparagraph (c) above (unless the taxing authority requires that Real Estate Taxes be paid under protest prior to commencement of such proceedings), Tenant shall pay Tenant's Pro Rata Share of such Real Estate Taxes as finally determined in such proceedings, the payment of which may have been deferred during the prosecution of such proceedings. Tenant shall be entitled to a refund of any overpayment of Real Estate Taxes relating or allocable to the Premises, as well as a reimbursement from the appropriate taxing authority of all costs, fees and expenses it incurs in such protest or reassessment.

10.     **Maintenance, Repairs and Replacements**. Except (i) for costs covered by Landlord's insurance required to be maintained, (ii) for condemnation proceeds to be received by Tenant, (iii) for obligations arising from the negligent acts or omissions or willful misconduct of

~CHGO2:20156016.v9 |6/3/04

Landlord (or its agents, employees or other tenants), or (iv) as otherwise set forth in this Lease, Tenant shall be solely responsible for maintenance of the exterior and interior non-structural elements of the Building, including painting of the exterior of the Building. Notwithstanding the foregoing, Tenant shall have no obligation to install or construct alterations or incur expenditures pursuant to this paragraph during the last five (5) years of the Lease Term; provided, however, that if Tenant is required to expend any sum in satisfaction of its obligations relating to the HVAC system serving the Premises, and if the resulting improvement to the Improvements cannot be fully amortized in accordance with generally accepted accounting principles, or the Internal Revenue Code and Regulations, over the remainder of the Term, then Tenant shall be reimbursed by Landlord by that amount of the cost associated with such repairs, construction or alteration for the period beyond the remainder of the Term. Landlord shall maintain all structural elements of the Premises (whether or not same serve only the Premises) including the roof, roof structure, flooring system, floor slab, foundation, load bearing walls and exterior structural walls. Upon request, Tenant agrees to assign to Landlord the benefit of all warranties issued by contractors constructing improvements in the Common Areas. In addition, Landlord agrees to maintain the Other Improvements immediately surrounding the Building, as well as sidewalks and landscaping. Should either party fail to perform its obligations under this paragraph 10, the other party may, at its option, effect such maintenance, replacements or repairs, provided that with respect to the exterior of the Building, the deterioration thereof has escalated beyond that of the surrounding buildings in the Polaris Fashion Place outparcels and the curing party shall give the non-performing party thirty (30) days' prior written notice, except in the case of emergencies (in which event only such notice as may be reasonable under the circumstances shall be required); but further provided that the thirty (30) day period (or reasonable period in event of emergencies) shall be extended in respect of any cure that cannot with reasonable diligence be accomplished within such period so long as the party required to effect such cure has commenced such cure within the thirty (30) day period (or reasonable period in event of emergencies) and thereafter diligently prosecutes such cure to completion. The non-performing party shall reimburse the curing party on demand for the reasonable and actual amount expended (as evidenced by detailed invoice), plus interest at the Default Rate. However, in the event of emergency repairs, no interest shall accrue if reimbursed within thirty (30) days of request (including detailed invoice) for reimbursement. All maintenance, repairs or replacements shall be done by Tenant or Landlord lien-free and in a good and workmanlike manner consistent with the quality of labor and materials used in originally constructing the Improvements and in accordance with all applicable law. In order for Landlord and Tenant to effectively perform their maintenance, repair and replacement obligations, Tenant and Landlord, as applicable, shall provide to the other party all manufacturers' and contractors' warranties relating to such work performed on behalf of the other party to the party who is required to maintain same under the Lease; however, Tenant shall not be required to perform the foregoing obligation so long as the Tenant Improvement Allowance remains unpaid.

11.   **Utility Service Provider; Payment of Utility Bills.**   Tenant shall be entitled, subject to State law, to select the utility service provider which shall provide water, electric, gas, cable, and telecommunication services to the Premises. Tenant will pay directly to the appropriate utility company or governmental agency, when due, all bills for gas, water, sanitary sewer, electricity, telephone and other public or private utilities used by Tenant with regard to the Improvements. Landlord shall pay when due all utility charges incurred in the operation of

14

the Common Areas and the Shopping Center. Tenant shall cause, as part of Tenant's Site Work, all utilities serving the Premises to be separately metered.

12. **Alterations**. During the Term, Tenant shall have the right, at its discretion and its sole cost, without Landlord's consent but subject to approval of the Polaris Design Review Committee (if required) to make (i) any alterations or modifications necessary or desirable in order to bring the Premises into conformity with Tenant's then-current prototype for similarly sized stores and (ii) any interior nonstructural alterations or modifications it may desire, provided such exterior design is not inconsistent with the existing design and architecture of the other buildings in Polaris Fashion Place Outparcels. With Landlord's consent, which shall not be unreasonably withheld, conditioned or delayed and the approval of the Polaris Design Review Committee, Tenant shall have the right, at its sole cost, to otherwise alter, modify or reconstruct the exterior and/or structure of the Building or Other Improvements. Landlord's withholding of consent as to any exterior or structural alteration or modification shall be deemed reasonable only if same is materially inconsistent with the then-existing architecture of the Shopping Center. Should Landlord's consent be required, conceptual plans and specifications for such work shall be provided to Landlord prior to commencement of any such work. Landlord shall be deemed to have consented to such work if written notice of disapproval, with reasons specified, is not received by Tenant within fifteen (15) days following Tenant's delivery of such plans and specifications to Landlord. Without cost or expense to Landlord, Landlord shall cooperate with Tenant in the obtaining of any and all licenses, building permits, certificates of occupancy or other governmental approvals which may be required in connection with any such modifications or alterations, and Landlord shall execute, acknowledge and deliver any documents reasonably required by Tenant.

13. **Mechanics' Liens**. Landlord and Tenant covenant to each other that they will not permit any lien to be filed against the Premises or the Shopping Center as a result of nonpayment for, or disputes with respect to, labor or materials furnished to the Premises or the Shopping Center for or on behalf of Tenant, Landlord or any party claiming by, through, or under Tenant or Landlord, nor shall either party permit any judgment, lien or attachment to lie, as applicable, against the Premises or the Shopping Center. Should any lien of any nature, including but not limited to the foregoing, be filed against the Premises or Shopping Center, the party on account of whose actions such lien has been filed shall, within thirty (30) days after receipt of written notice of such lien, cause said lien to be removed, or otherwise protected against execution during good faith contest, by substitution of collateral, posting a bond, escrowing of adequate funds to cover the claim and related transaction costs or such other method as may be permissible under applicable title insurance regulations and reasonably acceptable to the other party (collectively, "**Adequate Lien Removal**"). Failure to provide Adequate Lien Removal within five (5) days after written notice from Landlord (which states in all caps and bold letters on the front "FAILURE TO REMOVE THE LIEN DESCRIBED IN THIS NOTICE WITHIN 5 DAYS SHALL BE DEEMED AN AUTOMATIC DEFAULT UNDER THE LEASE"), which notice shall be delivered after expiration of the 30-day time period specified herein, shall be an automatic Event of Default under the Lease.

15

14.   **Insurance**

(a)   **Property Damage**.  During the Construction Term, Tenant shall keep or require its general contractor to keep, in full force and effect, a policy of builder's risk insurance covering loss or damage to the Improvements for the full replacement value of all construction.  During the Term, Tenant shall keep the Premises insured against loss or damage by fire and the perils covered under standard "all risk" or "special form" coverage in the amount of full replacement value of the Building, exclusive of excavation, footings and foundations (which initial amount shall be not less than Tenant Improvement Allowance), with a commercially reasonable deductible, for which Tenant shall be fully responsible.  Landlord and Landlord's first "Mortgagee" (as defined in paragraph 21 below), shall be named in such policy as additional insureds and certificate holders as their respective interests may appear.  Landlord shall not construct, or permit to be constructed, any improvement in the Shopping Center, nor conduct or permit the conduct of any activity, in the Shopping Center which will prevent Tenant from being able to obtain insurance coverage at commercially reasonable rates.  Should Landlord cause or permit any insurance rate increase to occur, Landlord will reimburse Tenant for the additional premium required, subject to Tenant's right to self-insure (in which event Landlord will contribute to Tenant's self insurance fund to cover increased actuarial risks).

(b)   **Liability and Builder's Risk Insurance**.  During the Term, Tenant shall keep in full force a policy of commercial general liability insurance with bodily injury and property damage coverage with respect to the Premises and business operated by Tenant, which shall name Landlord and Landlord's first Mortgagee as additional insureds and certificate holders as their respective interests may appear.  The limits of such commercial general liability policy (maintained under a primary policy or by a combination of primary plus umbrella insurance) shall be not less than $3,000,000.00 combined single limit for bodily injury and property damage, with a commercially reasonable deductible. Additionally, Tenant shall keep or require its general contractor to keep in full force and effect a policy of builder's risk insurance covering loss or damage to the Building, for the full replacement value of all such construction.

(c)   **Workers' Compensation Insurance**.  To the extent required by law, Landlord and Tenant shall maintain workers' compensation insurance covering their respective employees in statutory limits, or maintain such alternate coverages or arrangements as legally permissible.

(d)   **Self-Insurance**.  Notwithstanding anything to the contrary contained herein, upon notice to Landlord, Tenant shall have the right to self-insure against any of the risks or portions thereof set forth in subparagraphs (a) and (b) (and to the extent then permitted by law, (c)) above, provided Tenant has a reported net worth, as of the end of Tenant's most recent quarterly reporting period, of not less than Seventy-Five Million Dollars ($75,000,000).  For purposes of this subparagraph, "self-insure" shall mean the complete absence of a required commercial general liability policy or the complete absence of a Special Form/All-Risk policy insuring against property damage.

16

(e)    **Common Area, Additional Area and Third Party Tenant Insurance and Insurance During Landlord's Construction.**  During the Term, Landlord shall keep in full force and effect policies of (1) commercial general liability insurance, and (2) property insurance insuring against loss or damage by fire and the perils covered under standard "all risk" or "special form" coverage, with respect to the Common Areas and with respect to all other areas of the Shopping Center over which Landlord from time to time has present possessory rights (or has the right under any lease to provide insurance coverage because of a tenant's failure to maintain such required coverage) but which do not constitute a portion of the Common Areas (the "**Additional Areas**").  The Additional Areas shall include, without limitation: (i) as yet unconstructed portions of the Shopping Center intended for tenant occupancy, (ii) constructed but unoccupied portions of the Shopping Center, (iii) vacated or otherwise uninsured tenant space, whether by reason of lease expiration, default or otherwise, and (iv) constructed and occupied portions of the Shopping Center.  Said policies shall name Tenant, and any lender, investor or other stakeholder which is designated by Tenant from time to time, as an additional insured to the fullest extent Tenant and such stakeholder have insurable interests.   The limits of such policies shall be the same as those set forth in subparagraphs (a) and (b) above, as applicable.  The premiums for coverages relating to Common Areas shall be an element of CAM Charges, provided that Tenant shall not be liable for its pro rata share of any premium for coverage in excess of that coverage which is customary among owners of like shopping centers in the City.  Any deductible amount for Common Area insurance coverage shall be reasonable in amount given the nature of the risk insured and probable frequency of claims made under such coverage, but in no event shall such deductible amount exceed $5,000 for Common Area liability coverage.  Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center, including the Additional Areas and areas leased to third party tenants or sold to third party occupants, are insured with substantially similar coverages to those required for the Premises and the Common Areas, such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever Tenant may be assured that the Shopping Center will be reconstructed in equal or superior condition within the time frame set forth in paragraph 15.  In the event and during any period in which Landlord is conducting construction activities at the Shopping Center, Landlord shall keep, or cause its general contractor to keep, in full force and effect, with regard to the Shopping Center, in form reasonably acceptable to Tenant, at least the minimum insurance coverages set forth below:

(1)    Workers' Compensation - Statutory Limits; Employer's Liability - $500,000;

(2)    Automobile Liability for all vehicles with limits of $3,000,000; and

(3)    Commercial General Liability to include premises operations and products/completed operations coverage with limits of $3,000,000.

.7

Additionally, Landlord shall keep or require its general contractor to keep in full force and effect a policy of builder's risk insurance covering loss or damage to the Shopping Center for the full replacement value of all such construction. To the fullest extent Tenant has an insurable interest, such liability policy shall name Tenant an additional insured and such builder's risk policy shall name Tenant a loss payee.

(f)   **Policy Provisions**. All policies of insurance (other than self-insurance) shall be provided by insurance carriers with a Best's rating of not less than A-VIII. Any insurance coverage may be effected by a blanket policy of insurance or under so-called "all risk" or "multi-peril" insurance policies, provided that the total amount of insurance available with respect to the Premises and Tenant's or Landlord's liability hereunder shall be at least the equivalent of separate policies in the amounts herein required, and provided further that in other respects any such policy shall comply with the provisions of this paragraph 14. Landlord shall not be entitled to self-insure against any of the risks recited herein, except the amount of any commercially reasonable deductible shall not be deemed to be self-insurance. An increased coverage or "umbrella" policy may be provided by either party to increase the coverage provided by individual or blanket policies in lower amounts, and the aggregate coverage provided by all such policies with respect to the limits required herein shall be satisfactory provided that such policies otherwise comply with the provisions of this paragraph 14.

(g)   **Waiver of Right of Recovery and Subrogation**. To the extent that insurance proceeds are actually received in satisfaction of a loss which is required to be covered by insurance or is self-insured hereunder (with the deductible under any policy being deemed to be self-insured), Landlord and Tenant waive any and all rights of recovery against each other for any loss or damage to the Premises or the contents contained therein, for loss of income on account of fire or other casualty, or for injury sustained on the Premises or the Common Areas that is covered by (or would be covered by) the insurance required of the waiving party hereunder; and each party's policies of insurance shall contain provisions recognizing this mutual release and waiving all rights of subrogation by the respective insurance carriers.

(h)   **Evidence of Insurance**. Subject to Tenant's right to self-insure, (i) upon commencement of the Main Term (as to property insurance), (ii) upon Delivery of the Land (as to liability insurance) and (iii) prior to policy expiration, Tenant and Landlord shall cause to be issued to each other in lieu of the original policy, a duplicate of such policy or certificates of insurance reasonably acceptable to the other party and evidencing compliance with the applicable covenants of this paragraph 14. Each such certificate shall provide that coverage shall not be cancelled without thirty (30) days notice to the certificate-holder (and any Mortgagee, if applicable).

(i)   **Indemnities**. Except if arising from the negligent or willful acts of Landlord or its agents or employees (to the extent that paragraph 14(g) is inapplicable), Tenant agrees to indemnify, defend and hold Landlord harmless from all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring on the Premises or resulting from Tenant's use.

18

Except if arising from the negligent or willful acts of the other party or its agents or employees (to the extent that paragraph 14(g) is inapplicable), each party agrees to indemnify, defend and hold the other party harmless from any and all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring in, on or around the Shopping Center, or resulting from the use by the indemnifying party, its agents or employees.

15.    **Damages by Fire or Other Casualty**.

(a)    **First Thirteen Lease Years**.  In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Improvements, Common Areas and/or Additional Areas during the first thirteen (13) Lease Years, this Lease shall not terminate except as expressly set forth herein, and Base Rent and other charges shall continue to be paid by Tenant pursuant to the terms of paragraph 4.  Within a reasonable time after such casualty, subject to force majeure, applicable building codes, the procurement of building permits and the receipt of insurance proceeds (unless self-insured), Tenant shall complete reconstruction of the Building and Other Improvements, and Landlord shall complete reconstruction of the Common Areas and Additional Areas (including substantially equivalent value in equipment, furniture and fixtures), to that condition existing immediately prior to such casualty, in the reconstructing party's reasonable discretion, with, in event of any Tenant reconstruction, such alterations as may be permitted under paragraph 12.  In the event, subject to force majeure, the Premises, Common Areas and/or Additional Areas, as applicable, are not substantially repaired and reconstructed, and equipment, furniture and fixtures restored or replaced, by the party with repair and restoration obligations within two hundred forty (240) days after receipt of any required governmental permits, for which permits the party with repair obligations shall make prompt application following such destruction or damage, and insurance proceeds (if not self-insured), then the other party, at its option, by giving written notice to the party with repair obligations, within thirty (30) days after the expiration of said period, may undertake completion of such reconstruction, in which event the party with repair obligations shall make available to the notifying party all insurance proceeds received by the non-performing party for such reconstruction (including any applicable deductible) or, if self-insured, the amount necessary for such reconstruction.

(b)    **Last Two Lease Years**.  In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Improvements, Common Areas and/or Additional Areas, during (i) the last two (2) years of the Main Term or any Option Period which would require a restoration period in excess of two hundred ten (210) days, or (ii) the last two (2) years of the Term, regardless of the duration of restoration activities, or in the event of any uninsured casualty, Tenant shall have the option of terminating this Lease.  Tenant shall notify Landlord of its exercise of such option within sixty (60) days following the occurrence of such casualty and shall thereupon make available to Landlord (i) all insurance proceeds paid by Tenant's insurance carrier, or (ii) if self-insured, an amount equal to the reconstruction costs of the Improvements or, if the Improvements are not being reconstructed, an amount equal to the actual value of the

19

Improvements (not to exceed, however, an amount equal to the reconstruction costs of the Improvements), to the extent such amounts would have been payable under the insurance outlined in paragraph 14(a) above. In the event Tenant does not elect to terminate this Lease, then, subject to force majeure, within two hundred forty (240) days after receipt by Tenant of the required governmental permits for restoration, for which permits Tenant shall make prompt application following such destruction or damage, and insurance proceeds (if not self-insured) with regard to such damage or destruction, Tenant shall complete reconstruction of the Improvements to their condition existing immediately prior to such damage, in Tenant's reasonable discretion, with such alterations as may be permitted under paragraph 12, and shall restore the Premises (including equipment, furniture and fixtures). Should Tenant elect to maintain this Lease in full force and effect, Landlord shall reconstruct all Common Areas and Additional Areas in the manner specified by subparagraph (a) above regardless of the amount of damage to same.

16.   **Condemnation**.

(a)   **Definition of Taking and Substantial Taking**. For the purpose of this Lease, a "**Taking**" shall mean any condemnation or exercise of the power of eminent domain by any authority vested with such power or any other taking for public use, including a private purchase in lieu of condemnation by an authority vested with the power of eminent domain; the "**Date of Taking**" shall mean the earlier of the date upon which title to the Premises, the Shopping Center or any portion so taken is vested in the condemning authority or the date upon which possession of the Premises, the Shopping Center, or any portion is taken by the condemning authority; and "**Substantially All of the Premises**" shall mean (i) so much of the Improvements and/or Shopping Center and Common Areas as, when taken, leaves the untaken portion unsuitable, in Tenant's reasonable opinion, for the continued feasible and economic operation of the Premises by Tenant for the same purposes as immediately prior to such Taking or as contemplated herein, (ii) so many of the parking spaces within the Shopping Center (excepting therefrom the outparcels shown on the Site Plan) as reduces the parking ratio by ten percent (10%) or more below the 201 parking spaces shown on the Site Plan or that ratio which is required by the zoning ordinance applicable to the Shopping Center (excepting therefrom the outparcels shown on the Site Plan), and Landlord's failure to provide substantially equivalent alternative parking reasonably acceptable to Tenant within sixty (60) days after such Taking, or (iii) so much of the Common Area Easement described in paragraph 6 above that access to the Premises is unreasonably impeded and a reasonably similar substitute means of access is not promptly provided.

(b)   **Tenant's Rights Upon Taking or Substantial Taking**. In the event of a Taking of Substantially All of the Premises, Tenant, at its option upon thirty (30) days' written notice to Landlord, which shall be given no later than sixty (60) days following the Taking, shall have the right to terminate this Lease. All Base Rent and other sums payable by Tenant shall be apportioned and paid through and including the Date of Taking, and neither Landlord nor Tenant shall have any rights in any compensation or damages payable to the other in connection with such Taking.

20

(c)    **Tenant's Rights Upon Less Than Substantial Taking**. In the event of a Taking of less than Substantially All of the Premises, Base Rent and other charges shall be reduced fairly and equitably in accordance with the portion condemned or taken, effective as of the Date of Taking, and Tenant shall make all necessary restorations to the Improvements so that the portions of the Improvements not taken constitute a complete architectural unit, provided that the cost to Tenant shall not exceed the proceeds of Tenant's condemnation award (to the extent that such relates to the Improvements and not to Tenant's personal property, intangibles or out-of-pocket expenses unrelated) and the portion of Landlord's Improvements award, excluding land, allocable to the Premises, which Landlord shall make available to Tenant for such restoration. If the Taking occurs within the last two (2) years of the Term and has a material impact on Tenant's ability to conduct business as reasonably determined by Tenant, this Lease shall terminate at Tenant's option, such option to be exercised by Tenant giving not less than thirty (30) days' prior written notice to Landlord.

(d)    **Landlord's Obligations Upon Any Taking**. In the event of any Taking following which the Lease continues in effect, Landlord shall make all necessary restorations to all portions of the Common Areas and Additional Areas such that they each constitute a complete architectural unit and serve the function originally intended. Additionally, Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center leased to third party tenants or sold to third party occupants are subject to substantially similar reconstruction obligations to those of the Premises, Common Areas and Additional Areas, such that in the event of any condemnation of any portion of the Shopping Center whatsoever, and in the event Tenant elects to maintain this Lease in force, Tenant shall be assured that the Shopping Center will be reconstructed to its former condition within reasonable time.

(e)    **Rights Upon Temporary Taking**. In the event of a Taking of the Premises, the Common Areas and/or any other area within the Shopping Center, or any portion thereof, for temporary use (specifically one not exceeding ninety (90) days in duration), without the taking of the fee simple title thereto, this Lease shall remain in full force and effect. All awards, damages, compensation and proceeds payable by the condemnor by reason of such Taking relating to the Premises, or relating to the Common Areas but reasonably attributable to the Premises, for periods prior to the expiration of the Lease shall be payable to Tenant and Landlord in accordance with their respective interests. All such awards, damages, compensation and proceeds for periods after the expiration of the Lease shall be payable to Landlord. Anything contained to the contrary notwithstanding, a temporary Taking for any period in excess of ninety (90) days may, at Tenant's option, be deemed a permanent Taking and shall be governed by subparagraph (b) or (c) above, as applicable.

(f)    **Taking of the Pylon Sign(s)**. In the event of a taking, whether permanent or temporary, of any pylon or monument sign on which Tenant has installed identification panels, Tenant shall be permitted to construct a substitute pylon or monument sign, with adequate electrical power, located so as to be visible to vehicular

21

traffic or roadways adjacent to the Shopping Center and/or at entrances to the Shopping Center.

     (g)    **Tenant's Right Upon Condemnation**. In the event of a Taking described in subparagraph (b) or (c) above, Tenant shall be entitled to claim compensation from the condemning authority for the value of its leasehold interest in the Premises, its unamortized leasehold improvements paid for by Tenant, relocation expenses and any other items to which Tenant is entitled under applicable law; provided, however, that any reward for the value of fee interest or reversion interest shall belong to Landlord.

     (h)    **Interest Applicable Solely to Landlord**. Landlord shall also be entitled to claim compensation from the condemning authority for the value of its unamortized improvements paid for by Landlord and any other items to which Landlord is entitled under applicable law, subject to subsection (g) above.

    17.    **Assignment and Subletting**. Tenant shall have the right to sublet, assign, transfer reassign and grant concessions or licenses (a "**Transfer**") in all or any part of the Premises and any of Tenant's rights and obligations under this Lease during the Term, without Landlord's prior consent. In the event of a Transfer, Tenant shall remain liable for all of Tenant's obligations to Landlord so long as this Lease is not changed, modified or amended without Tenant's consent. Should Tenant wish to be relieved of its obligations upon a Transfer, Landlord's and Mortgagee's prior consent to a Transfer shall be required, which consent shall not be unreasonably withheld, conditioned or delayed. Notwithstanding the immediately preceding sentence, in the event any transferee subsequent to a Transfer has a net worth calculated in accordance with generally accepted accounting principles equal to or greater than Two Hundred Fifty Million and No/Dollars ($250,000,000.00), neither the consent of Landlord nor Mortgagee shall be necessary to such Transfer, and Tenant shall thereafter be relieved of any further obligation under this Lease. Tenant shall not be relieved of unfulfilled or past obligations unless assumed by the new Tenant. Landlord acknowledges and agrees that it shall be unreasonable for Landlord to withhold its consent to any Transfer for the purpose of obtaining a material amendment or modification to the terms of this Lease. Transfers to subsidiaries, affiliates, or related parties, and Transfers involving beneficial ownership interests in Tenant, shall not be deemed a Transfer and may be effected without Landlord's knowledge or consent.

     (a)    Except in connection with an "Intracorporate Transfer/Bulk Sale", if Tenant shall desire to assign or sublease all or any portion of the Premises, Tenant shall deliver written notice thereof ("**Assignment/Sublet Notice**") to Landlord, which Assignment/Sublet Notice shall, among other things, conspicuously state thereon that if Landlord does not deliver the Recapture Notice (defined below) within the 30 day period described below, Landlord shall be deemed to have elected not to exercise its recapture and termination right under this subparagraph (b). If available, Tenant shall include a copy of a letter of intent, the name of the proposed assignee or subtenant, any financial information delivered by said assignee or subtenant (but only to the extent Tenant is not required by law to keep such financial information confidential) and the rent and other material terms of the proposed assignment or sublease transaction. Landlord shall have the right to recapture and terminate this Lease with respect to the portion of the Premises

~CHGO2:20156016.v9 |6/3/04

