www.circuitcity.com or www.firedog.com ("Websites") to a DIRECTV fulfillment website for the lease and activation of DIRECTV Programming Packages in the amount of One Hundred Forty and No/100 Dollars ($140.00). Subject to the terms of this Interim Agreement, DIRECTV shall pay Circuit City the Programming Commissions for activations by Qualifying Subscribers procured through its Websites within twenty (20) business days after the end of each calendar month during the Term hereof in which the activation occurs. DIRECTV shall pay Programming Commission pursuant to this Section 9 for activations of DIRECTV Programming Packages made by a Subscriber after the Effective Date of this Interim Agreement and prior to termination of this Interim Agreement. Programming Commissions under this Section 9 shall not be subject to a pro-rated chargeback by DIRECTV, but may be subject to a chargeback if the Programming Commission was not earned by or payable to Circuit City (e.g., not a Qualifying Subscriber, a payment made in error, etc.).

10. **PROGRAMMING COMMISSIONS (FOR ORDERS THROUGH REFERRAL CUSTOMERS).** During the term of this Interim Agreement (i.e. prior to the New Fulfillment Model Implementation Date), DIRECTV shall also pay Circuit City a Programming Commission in connection with Qualifying Subscribers who were Circuit City Referral Customers as described herein in the amount of One Hundred and No/100 Dollars ($100.00). Subject to the terms of this Interim Agreement, DIRECTV shall pay Circuit City the Programming Commissions for activations by Circuit City Referral Customers within twenty (20) business days after the end of each calendar month during the Term hereof in which the activation occurs. DIRECTV shall pay Programming Commission pursuant to this Section 10 for activations of DIRECTV Programming Packages made by a Referral Customer after the Effective Date of this Interim Agreement and prior to termination of this Interim Agreement. Programming Commissions under this Section 10 shall not be subject to a pro-rated chargeback by DIRECTV but may be subject to a chargeback if the Programming Commission was not earned by or payable to Circuit City (e.g., not a Qualifying Subscriber, a payment made in error, etc.).

11. **MARKETING DEVELOPMENT FUNDS.** During the term of this Interim Agreement (i.e. prior to the New Fulfillment Model Implementation Date), DIRECTV agrees to assist Circuit City in the marketing and promotion of the Consumer Offers and the DIRECTV Programming Packages by providing funds be used to pay for promotional activities as mutually agreed to by the parties (the "MDF Payments"). DIRECTV shall pay Circuit City an amount equal to One Hundred Nineteen and No/100 Dollars ($119.00) per Qualifying Subscriber procured through Circuit City Retail Locations, and Forty and No/100 Dollars ($40.00) per Qualifying Subscriber procured through Circuit City Websites. As of the Execution Date (as defined in Section 28) of this Interim Agreement, Circuit City represents and warrants that Circuit City has expended all MDF Payments in connection with promotional activities as mutually agreed by the parties. Circuit City shall invoice DIRECTV for the entire amount of MDF Payments payable during the term hereof immediately after the Execution Date.

12. **INTERIM PROGRAM MDF.** In addition to the MDF Payments as more particularly provided in Section 11 hereof, for each Approved Activation occurring during the period from August 1, 2007 until termination of this Interim Agreement (i.e. prior to the New Fulfillment Model Implementation Date), DIRECTV agrees to provide incremental marketing funds in connection with the interim program described herein (the "Incremental MDF Payments"). DIRECTV shall pay Circuit City an amount equal to Twenty-Eight and No/100 Dollars ($28.00) per Qualifying Subscriber procured through Circuit City Retail Locations as Incremental MDF Payments. Incremental MDF Payments under this Section 12 are earned and shall not be subject to chargeback by DIRECTV. Circuit City shall invoice DIRECTV for the entire amount of Incremental MDF Payments payable during the term hereof immediately after the Execution Date.

16

13. **ADVANCED HARDWARE SUPPORT.** During the term of this Interim Agreement (i.e. prior to the New Fulfillment Model Implementation Date), DIRECTV agrees to provide Circuit City additional funding to support high definition (HD) and digital video recorder (DVR) subscription and related DIRECTV Receiver promotions through Circuit City Retail Locations ("Advanced Hardware Support") in accordance with this Section 13.

13.1 **ADVANCED HARDWARE SUPPORT SCHEDULE.** DIRECTV agrees to provide Circuit City with Advance Hardware Support funds in accordance with the following schedule:

(a) For each Approved Activation of HD DIRECTV Service (a/k/a HD Access) occurring during the period from the Effective Date of this Interim Agreement until August 1, 2007, DIRECTV shall pay Circuit City Advanced Hardware Support in an amount equal to Twenty-Three and No/100 Dollars ($23.00); provided, that Circuit City has properly installed the 5LNB satellite dish. Advanced Hardware Support under this Section 13.1(a) shall not be subject to a pro-rated chargeback by DIRECTV, but may be subject to a chargeback if the Advance Hardware Support was not earned by or payable to Circuit City (e.g., a 5LNB satellite dish was not installed).

(b) For each Approved Activation of DVR DIRECTV Service (a/k/a DVR Access without HD) occurring during the period from August 1, 2007 until termination of this Interim Agreement (i.e. prior to the New Fulfillment Model Implementation Date), DIRECTV shall pay Circuit City Advanced Hardware Support in an amount equal to Sixty and No/100 Dollars ($60.00).

(c) For each Approved Activation of HD DIRECTV Service (a/k/a HD Access) or HD DVR DIRECTV Service (a/k/a DVR Access with HD) occurring during the period from August 1, 2007 until termination of this Interim Agreement (i.e. prior to the New Fulfillment Model Implementation Date), DIRECTV shall pay Circuit City Advanced Hardware Support in an amount equal to Eighty-Three and No/100 Dollars ($83.00).

13.2 **DIRECTV CHARGEBACKS.** Notwithstanding Section 13.1(b) and Section 13.1(c) above, during the period July 12, 2007 to July 31, 2007, DIRECTV shall chargeback Circuit City in the amount of Forty and No/100 Dollars ($40.00) per Approved Activation of HD DIRECTV Service (a/k/a HD Access) or DVR DIRECTV Service (a/k/a DVR Access). Circuit City agrees that such chargeback relates to the advanced hardware included in Consumer Offers for HD DIRECTV Service (a/k/a HD Access) and DVR DIRECTV Service (a/k/a DVR Access) provided to Qualifying Subscribers during the relevant time period. Such amount may be offset against Programming Commissions otherwise payable to Circuit City hereunder.

14. **VOLUME INCENTIVE REBATE.** DIRECTV shall pay Circuit City a volume incentive rebate (the "Volume Incentive Rebate") for the gross number of Approved Activations of DIRECTV Programming Packages to Qualifying Subscribers procured through Circuit City Retail Locations during the period from the Effective Date of this Interim Agreement until May 31, 2008 (the "VIR Period"). The calculation of the Volume Incentive Rebate, and amounts payable by DIRECTV to Circuit City in furtherance of the Volume Incentive Rebate, shall specifically survive expiration or earlier termination of this Interim Agreement for so long as the VIR Period continues.

14.1 **VOLUME INCENTIVE REBATE TARGETS.** DIRECTV will pay Circuit City a Volume Incentive Rebate for each Approved Activation as determined based on the number of gross VIR Activations during the VIR Period, as set forth in this Section 14.1. For purposes of this Section 14, a "VIR Activation" shall mean (i) Approved Activations of DIRECTV Programming Packages to Qualifying Subscribers procured through Circuit City Retail Locations; (ii) activations of

17

DIRECTV Programming Packages to Qualifying Subscribers procured by Circuit City through transfer from Circuit City Websites to a DIRECTV fulfillment website, and (iii) activations by Customer Referral activities hereunder. For purposes of clarity, the Volume Incentive Rebate shall only be paid on Approved Activations, notwithstanding that other sources of activations are included as a "VIR Activation" for purposes of calculating the per transaction rate applicable for the Volume Incentive Rebate.

(a) In the event Circuit City procures in excess of 15,000 but less than 25,000 VIR Activations, DIRECTV shall pay Circuit City a Volume Incentive Rebate equal to a rate ("VIR Rate") of One Hundred and No/100 Dollars ($100.00) for all Approved Activations during the VIR Period.

(b) In the event Circuit City procures in excess of 25,000 VIR Activations during the VIR Period but less than 35,000 VIR Activations, DIRECTV shall pay Circuit City a Volume Incentive Rebate equal to a VIR Rate of One Hundred Twenty-Five and No/100 Dollars ($125.00) for all Approved Activations during the VIR Period.

(c) In the event Circuit City procures in excess of 35,000 VIR Activations during the VIR Period but less than 45,000 VIR Activations, DIRECTV shall pay Circuit City a Volume Incentive Rebate equal to a VIR Rate of One Hundred Fifty and No/100 Dollars ($150.00) for all Approved Activations during the VIR Period.

(d) In the event Circuit City procures in excess of 45,000 VIR Activations during the VIR Period, DIRECTV shall pay Circuit City a Volume Incentive Rebate equal to a VIR Rate of One Hundred Seventy-Five and No/100 Dollars ($175.00) for all Approved Activations during the VIR Period.

By way of example, if as of May 31, 2008 Circuit City has procured 40,000 VIR Activations, 30,000 of which are Approved Activations through Circuit City's Retail Locations DIRECTV shall be responsible to pay Circuit City a Volume Incentive Rebate of $4,500,000 calculated pursuant to Section 14.1(c) above (i.e., a total of 30,000 Approved Activations x $150 VIR Rate), less any amounts previously paid.

14.2 **PAYMENT.** The Volume Incentive Rebate shall become payable by DIRECTV to Circuit City at such time as the threshold amount of 15,000 VIR Activations is satisfied. The Volume Incentive Rebate shall be payable at the same time as Programming Commissions (i.e. within 20 business days after the end of each calendar month in which the Approved Activation occurs). At such time as the VIR Rate is increased as a result of exceeding a new VIR Activation threshold, DIRECTV's immediately succeeding Volume Incentive Rebate payment shall include all amounts required to adjust for the increased VIR Rate applicable retroactively to the first Approved Activation hereunder. By way of example, if as of November 1 DIRECTV has paid Volume Incentive Rebate to Circuit City a VIR Rate of $100 (25,000>35,000 VIR Activations), but during November the VIR Rate increases to $125 (VIR Activations have increased above 35,000 but less than 45,000), DIRECTV shall be responsible to pay Circuit City the following within 20 business days after the end of November: (i) $125 x the number of Approved Activations during the month of November, plus (ii) $25 x the number of Approved Activations prior to November during the VIR Period (representing incremental, retroactive VIR Rate adjustment).

18

15. **COMPENSATION GENERALLY.**

   15.1 **SHARING COMPENSATION PROHIBITED.** Circuit City shall not rebate or share any commissions or other compensation hereunder with another authorized retailer of DIRECTV, or any other third party (whether or not an authorized retailer of DIRECTV) who is not an Affiliated Entity. Circuit City may not combine sales of DIRECTV Programming Packages with another retailer. Circuit City acknowledges that any orders submitted under another authorized retailer's account number or through such other agent's electronic interface with DIRECTV shall not be credited to Circuit City for purposes of calculating commissions or other compensation hereunder.

   15.2 **SET-OFFS.** A party may set-off or recoup any amounts owed to it by the other party, or by its subsidiaries and affiliates, pursuant to this or any other agreement with such party, and any damages suffered by a party due to the other party's breach hereof or other misconduct, against any amounts which it owes to the other party. The foregoing does not limit a party's right to recover any unrecouped balance.

16. **CONFIDENTIAL INFORMATION.**

   16.1 **CONFIDENTIAL INFORMATION.** Each party recognizes and acknowledges that it may have access to certain trade secrets or other confidential information of the other party including, but not limited to, store lists, financial data, subscriber lists and data, drawings and other technical and commercial information, service and sales methods, advertising, promotion and marketing strategies, programming strategies and prices relating to the development and marketing of their respective products and services and that such information constitutes valuable, special and unique property of the other party. The confidential information of each party including the terms and provisions of this Interim Agreement is hereinafter collectively referred to as the "Confidential Information." The obligations of this Section 16 shall not apply to any information, including but not limited to Confidential Information, (i) which has become part of the public domain through no act or omission of the receiving party, (ii) which was lawfully disclosed to the receiving party without restriction, (iii) is or has been independently developed by the receiving party, or (iv) is or was rightfully in the receiving party's possession prior to disclosure by the disclosing party hereunder.

   16.2 **MAINTAINING CONFIDENTIALITY.** Each party agrees to maintain the confidentiality of the Confidential Information and not to sell, give, assign, transfer or otherwise disclose the Confidential Information to any third party other than its employees, attorneys, independent certified public accountants or other advisors who need to know the Confidential Information for purposes related to this Interim Agreement and who are bound by materially similar confidentiality obligations. Each party agrees that any person to whom the Confidential Information is rightfully disclosed hereunder will use the Confidential Information only for purposes related to the performance of this Interim Agreement.

17. **INTELLECTUAL PROPERTY.** DIRECTV shall provide Circuit City with a logo and trademark usage manual ("Usage Manual") (which may be amended by DIRECTV from time to time in its discretion, any such amended manual to be provided promptly to Circuit City) that specifies the permitted uses of DIRECTV's service marks, trademarks, and other commercial symbols ("Marks"). Circuit City may use the Marks only in accordance with the provisions of this Interim Agreement and the Usage Manual. Circuit City shall not use any logo, trademark, service mark or trade name of any supplier of DIRECTV (including, without limitation, entities providing programming to DIRECTV) for any purpose except as expressly permitted by such supplier. Circuit City shall not acquire any right to any goodwill, Mark, copyright, or other form of intellectual or commercial property of DIRECTV, except for the limited use rights expressly granted herein. DIRECTV may use Circuit City's logo and tagline for

19

the limited purposes of representing Circuit City as an authorized retailer of DIRECTV's services and to otherwise promote the business of Circuit City, and such use shall be in accordance with that certain License Agreement between the parties dated September 1, 2001.

18. **ASSIGNMENT.** This Interim Agreement shall be binding upon and inure to the benefit of the successors (in whole or in part), including by change in ownership of the controlling shares of stock, spin-off, merger, consolidation, acquisition or sale/transfer of all (or substantially all) of the business or assets of the parties hereto, and the permitted assigns of the parties hereto. Neither this Interim Agreement nor any of the parties rights hereunder shall be assigned by either party hereto without the prior written consent of the other party which shall not be unreasonably withheld, except in conjunction with a change in ownership of the controlling shares of stock of that party in a transaction or a series of transactions to a non-competitor of the other party, or a spin-off, merger with a non-competitor of the other party, consolidation, acquisition, or the sale or transfer of all (or substantially all) of that party's business or assets, whether voluntarily or by operation of law, to a non-competitor of the other party. Any other such purported assignment or transfer without prior written consent shall be deemed a breach of the Interim Agreement and shall be null and void.

19. **BOOKS AND RECORDS.**

19.1 Throughout the term of this Interim Agreement and for a period of two (2) years following its termination, DIRECTV and its designated agents will, upon at least fourteen (14) days' prior written request and no more than four (4) times per calendar year, have reasonable access to the books and records of Circuit City relating to this Interim Agreement. In addition, DIRECTV will have the right pursuant to this Interim Agreement to extract from such books and records in order to determine compliance by Circuit City with all of the terms and provisions of this Interim Agreement. Notwithstanding the foregoing, if any of the four (4) audits reveals that Circuit City is in non-compliance with the terms and conditions of this Interim Agreement, DIRECTV may have reasonable access to such books and records at all reasonable times as reasonably requested by DIRECTV during the remainder of the calendar year in question.

19.2 Throughout the term of this Interim Agreement and for a period of two (2) years following its termination, Circuit City and its designated agents will, upon at least fourteen (14) days' prior written request and no more than four (4) times per calendar year, have reasonable access to the books and records of DIRECTV relating to this Interim Agreement. In addition, Circuit City will have the right pursuant to this Interim Agreement to extract from such books and records in order to determine compliance by DIRECTV with all of the terms and provisions of this Interim Agreement. Notwithstanding the foregoing, if any of the four (4) audits reveals that DIRECTV is in non-compliance with the terms and conditions of this Interim Agreement, Circuit City may have reasonable access to such books and records at all reasonable times as reasonably requested by Circuit City during the remainder of the calendar year in question.

20. **TERM.** The term of this Interim Agreement shall commence on the Effective Date hereof and shall continue, unless terminated in accordance herewith, until October 23, 2007, or if later, as soon as possible after implementation of an online order platform as mutually agreed by the parties.

21. **TERMINATION.** In addition to and without limiting any other rights the parties may have under this Interim Agreement, this Interim Agreement shall be terminable upon the following conditions:

21.1 **REGULATORY CHANGES.** Either party may terminate this Interim Agreement immediately upon written notice to the other party if the Federal Communications Commission or any other regulatory agency promulgates any rule or order which in effect or application substantially impedes DIRECTV or Circuit City from fulfilling its obligations hereunder. DIRECTV may terminate this Interim Agreement immediately upon written notice to Circuit City if the Federal Communications Commission or any other regulatory agency promulgates any rule or order which in effect or application (a) substantially impedes DIRECTV from providing DIRECTV Service, or (b) materially and adversely affects DIRECTV's ability to conduct a DIRECTV Service business upon terms and conditions acceptable to DIRECTV, in its reasonable discretion.

21.2 **IMMEDIATE TERMINATION.**

(a) DIRECTV may terminate this Interim Agreement immediately upon written notice to Circuit City, without opportunity to cure, if Circuit City (i) knowingly misrepresents the Consumer Offers, the DIRECTV Service or Programming Packages to customers or otherwise materially misleads customers as to their content, rates or terms, excluding any situation directly caused by express written directive from DIRECTV; (ii) violates any law applicable to its obligations hereunder, excluding any situation directly caused by express written directive from DIRECTV; (iii) knowingly breaches the standards of conduct set forth in Section 3.6; (iv) knowingly uses or discloses DIRECTV's Confidential Information in violation of Section 16; (v) commits a material breach hereof which by its terms or nature is not curable, excluding any situation directly caused by express written directive from DIRECTV; or (vi) fails to submit, within any three (3) month period during the term of this Interim Agreement, at least three (3) Orders that are accepted as Approved Activations by DIRECTV.

(b) Circuit City may terminate this Interim Agreement immediately upon written notice to DIRECTV, without opportunity to cure, if DIRECTV (i) knowingly uses or discloses Circuit City's Confidential Information in violation of Section 16, (ii) commits a material breach hereof which by its terms or nature is not curable, or (iii) violates any law applicable to its obligations hereunder. In addition, Circuit City may terminate this Interim Agreement for any materially adverse changes made by DIRECTV to its Policies as described in Section 3.5.

21.3 **BREACH BY CIRCUIT CITY.** Except as otherwise provided herein, DIRECTV may terminate this Interim Agreement immediately upon written notice if Circuit City fails to cure a breach of any material obligation hereunder which is curable, within thirty (30) days after written notice specifying such breach.

21.4 **BREACH BY DIRECTV.** Except as otherwise provided herein, Circuit City may terminate this Interim Agreement immediately upon written notice if DIRECTV fails to cure a breach of any material obligation hereunder which is curable, within thirty (30) days after written notice specifying such breach.

21.5 **BANKRUPTCY OR CESSATION OF BUSINESS.** Subject to applicable law, this Interim Agreement shall terminate automatically upon either party's cessation of business, election to dissolve, dissolution, insolvency, failure in business, commission of an act of bankruptcy, general assignment for the benefit of creditors, any levy, attachment or foreclosure, or the enforcement of any of the rights of a secured creditor of Circuit City or DIRECTV or the filing of any petition in bankruptcy or for relief under the provisions of the bankruptcy laws.

## 22. RIGHTS AND OBLIGATIONS UPON TERMINATION OR CANCELLATION.

22.1 **COMPENSATION.** After the expiration or termination hereof for any reason, subject to the terms and conditions of this Interim Agreement, DIRECTV shall pay to Circuit City the amounts set forth in this Section 22.1. NOTWITHSTANDING THE ABOVE, CIRCUIT CITY SHALL NOT ENTITLED TO ANY COMPENSATION WHATSOEVER FOR ORDERS WHICH ARE NOT DELIVERED TO DIRECTV IN COMPLIANCE WITH THE TERMS OF THIS INTERIM AGREEMENT, WHETHER RECEIVED BY DIRECTV PRIOR TO OR AS OF THE EFFECTIVE DATE OF TERMINATION, EVEN IF SUCH ORDERS RESULT IN ACTIVE SUBSCRIPTIONS TO THE DIRECTV SERVICE.

(a) For Approved Activations, DIRECTV shall pay Circuit City any unpaid Programming Commission, Installation Incentive, Multiswitch Reimbursement, Mounting Pole Reimbursement, and Advanced Hardware Support which was earned by Circuit City prior to such expiration or termination, including without limitation any such amounts attributable to Orders which Circuit City properly delivered to DIRECTV prior to expiration or termination (provided such Orders are accepted as Approved Activations by DIRECTV within thirty (30) days (or such other reasonable time period thereafter in order to accommodate the installation scheduling request of a Subscriber) of the termination or the expiration date and as applicable Circuit City performs standard professional installation services related thereto within a reasonable time thereafter).

(b) For activations through the Websites, DIRECTV shall pay Circuit City any unpaid Programming Commission which was earned by Circuit City prior to such expiration or termination, including without limitation any such amounts attributable to Qualifying Subscribers which Circuit City properly transferred to DIRECTV prior to expiration or termination, for whom orders were established prior to the expiration or termination and such orders were accepted and approved by DIRECTV within thirty (30) days (or such other reasonable time period thereafter in order to accommodate the installation request of a Subscriber) of the expiration or termination date.

(c) For Customer Referrals, DIRECTV shall pay Circuit City any unpaid Programming Commission which was earned by Circuit City prior to such expiration or termination, including without limitation any such amounts attributable to Customer Referrals which Circuit City referred to DIRECTV prior to expiration or termination, for whom orders were established prior to the expiration or termination and such orders were accepted and approved by DIRECTV within thirty (30) days (or such other reasonable time period thereafter in order to accommodate the installation request of a Subscriber) of the expiration or termination date.

(d) DIRECTV shall pay Circuit City any unpaid MDF Payments or Incremental MDF Payments which were earned by Circuit City prior to such expiration or termination, including without limitation any such amounts attributable to (i) Qualifying Subscribers procured by Circuit City and delivered to DIRECTV prior to expiration or termination for whom Orders were established prior to expiration or termination and such Orders were accepted as Approved Activations by DIRECTV within thirty (30) days (or such other reasonable time period thereafter in order to accommodate the installation scheduling request of a Subscriber) of the termination or the expiration date; and (ii) for activations through the Websites and for Customer Referrals, any such amounts attributable to Qualifying Subscribers which Circuit City properly transferred or referred to DIRECTV prior to expiration or termination, for whom orders were accepted and approved by DIRECTV within thirty (30) days (or such other reasonable time period thereafter in order to accommodate the installation request of a Subscriber) of the expiration or termination date.

(e) DIRECTV shall pay Circuit City any unpaid Volume Incentive Rebates which were earned by Circuit City prior to such expiration or termination, including without limitation any such amounts attributable to Qualifying Subscribers procured by Circuit City and delivered to DIRECTV prior to expiration or termination for whom Orders were established prior to expiration or termination and such Orders were accepted as Approved Activations by DIRECTV within thirty (30) days (or such other reasonable time period thereafter in order to accommodate the installation scheduling request of a Subscriber) of the termination or the expiration date.

22.2 **OBLIGATIONS OF CIRCUIT CITY.**

(a) Upon termination of this Interim Agreement for any reason, Circuit City shall immediately cease using and shall, upon request of DIRECTV and at DIRECTV's expense, deliver to DIRECTV or destroy and certify such destruction promptly upon request: (i) any unused DIRECTV sales/lease literature; (ii) all originals and copies of completed and uncompleted Order forms and applications; and (iii) all forms, directives, policy manuals and other written information and materials supplied to it by DIRECTV pursuant to this Interim Agreement or which contain DIRECTV's Marks, except for advertising materials created by Circuit City which incorporate the Marks and are retained for record purposes only.

(b) On termination, Circuit City shall immediately discontinue all sales of DIRECTV Programming Packages and all use of DIRECTV's Confidential Information, unless the parties otherwise agree to a reasonable transition period in light of marketing element commitments which cannot be cancelled.

(c) Further, on termination Circuit City and DIRECTV shall cooperate to develop a reasonable strategy for Circuit City to cease to identify itself as an authorized retailer/referral contractor for DIRECTV or otherwise affiliated in any manner with DIRECTV (taking into account any advertising which cannot reasonably be stopped prior to the effective date of termination), and for DIRECTV to cease to identify Circuit City as an authorized independent retailer/referral contractor of DIRECTV or otherwise affiliated with DIRECTV in any manner.

(d) Because of the difficulty in establishing the improper use of customer lists and other Confidential Information, Circuit City agrees that for a period of two (2) years after termination Circuit City shall not, on behalf of any other provider of audio/video entertainment programming packages or equipment or on its own behalf solicit any DIRECTV Subscriber by means which exclusively target such DIRECTV Subscribers. By way of example, Circuit City may not disseminate a marketing piece specifically targeted to a DIRECTV Subscriber group which includes an offer to switch or terminate DIRECTV service and replace with another multi-channel video programming provider (e.g., "bounty activities"). In the alternative, the foregoing shall not prohibit Circuit City from including DIRECTV Subscribers in its general direct mail or other marketing offers which do not include bounty, switch-out or similar offers.

22.3 INTENTIONALLY OMITTED

22.4 **WAIVER OF CLAIMS.** EACH PARTY WAIVES ANY RIGHT TO COMPENSATION AND DAMAGES IN CONNECTION WITH THE PROPER TERMINATION OF THIS INTERIM AGREEMENT IN ACCORDANCE HEREWITH, TO WHICH IT MIGHT OTHERWISE BE ENTITLED UNDER ANY APPLICABLE LAW. BY WAY OF EXAMPLE, BOTH PARTIES SHALL HAVE NO RIGHT, BASED ON SUCH TERMINATION, TO ANY PAYMENT FROM THE OTHER FOR LOST BUSINESS, FUTURE PROFITS, LOSS OF GOODWILL,

REIMBURSEMENT OF EXPENDITURES OR INVESTMENTS MADE OR COMMITMENTS ENTERED INTO, ADVERTISING COSTS, OVERHEAD OR OTHER COSTS INCURRED OR ACQUIRED BASED UPON THE BUSINESS DERIVED OR ANTICIPATED UNDER THIS INTERIM AGREEMENT.

22.5  **SURVIVAL.**  In addition to DIRECTV's payment obligations set forth in Section 22.1, Circuit City's obligations as set forth in Section 22.2, and Circuit City's inventory buy back right set forth in Section 6.5, the terms, conditions, obligations, covenants and conditions herein which, by their terms or nature, extend beyond the termination or expiration of this Interim Agreement, shall survive such termination or expiration until fully performed including, but not limited to, indemnification, confidentiality obligations and exclusivity obligations, as otherwise provided herein.

23.  **FORCE MAJEURE.**  Neither party shall be liable for any loss, damage, cost, delay, or failure to perform in whole or in part resulting from causes beyond such party's control, including but not limited to, fires, strikes, insurrections, riots, or requirements of any governmental authority.

24.  **INDEPENDENT CONTRACTOR RELATIONSHIP.**  Each party is an independent contractor under this Interim Agreement and neither party is authorized during the term hereof to refer orders for DIRECTV Programming Packages as a commissioned independent retailer/referral contractor. Circuit City is not a partner, franchisee, or employee of DIRECTV for any purpose whatsoever. The provisions of this Interim Agreement are for the benefit only of the parties hereto, and no third party may seek to enforce, or benefit from, these provisions.

25.  **INDEMNIFICATION.**  Except as provided below, each party shall defend and indemnify the other, its subsidiaries and affiliates and their respective employees, officers, and directors from and against any and all third party claims and resulting damages, costs, and other liabilities arising out of the indemnifying party's breach or alleged breach of its representations, warranties, covenants or obligations under this Interim Agreement, negligence, or other wrongful conduct. DIRECTV shall defend and indemnify Circuit City against any and all claims of third parties (i) that the Marks infringe upon such third party's trademark, service mark, trade secret or other intellectual property right, provided Circuit City's use of the Mark is in accordance with this Interim Agreement and the Usage Manual, and (ii) arising from marketing claims/representations made by DIRECTV to Circuit City which Circuit City uses and incorporates without any modifications whatsoever to content into its advertising or upon which Circuit City relies when soliciting subscriptions for DIRECTV Programming Packages hereunder. DIRECTV shall not be required to indemnify Circuit City with respect to the content of any programming (including without limitation claims relating to trademark, copyright, music, music performance and other proprietary interests) unless and solely to the extent of any applicable pass-through indemnification provided to DIRECTV by the providers of such programming. CIRCUIT CITY WAIVES ANY RIGHT TO INDEMNIFICATION ARISING OUT OF THE CONSTRUCTION, USE AND/OR OPERATION OF DIRECTV'S SATELLITE(S) AND RELATED SYSTEMS.

26.  **LIMITATION OF LIABILITY.**  NEITHER PARTY SHALL BE LIABLE FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES OF THE OTHER PARTY, WHETHER FORESEEABLE OR NOT AND WHETHER BASED ON NEGLIGENCE OR OTHERWISE EXCEPT WITH RESPECT TO CLAIMS BY OR DAMAGES AWARDED TO A THIRD PARTY AGAINST WHICH A PARTY TO THIS INTERIM AGREEMENT HAS AN OBLIGATION TO DEFEND AND INDEMNIFY. PROJECTIONS OR FORECASTS BY EITHER PARTY SHALL NOT CONSTITUTE BINDING COMMITMENTS.  NOTHING HEREIN SHALL LIMIT THE PARTY'S INDEMNIFICATION OBLIGATIONS UNDER SECTION 25 ABOVE.

27. **MISCELLANEOUS.**

27.1 **LAWS.** All issues with respect to the construction of this Interim Agreement and the rights and liabilities of the parties shall be governed by the laws of the State of New York, without regard to its conflicts of law rules.

27.2 **INTEGRATION.** This Interim Agreement replaces any prior agreement, understanding and commitment between the parties regarding Circuit City's appointment and performance as a commissioned retailer/referral contractor for DIRECTV. Neither party is relying on any oral or written statements or representations made by any employee or representative of the other party regarding such matters other than those expressly set forth herein.

27.3 **EXPENSES.** Except as otherwise provided herein, each party shall pay all of its costs and expenses under this Interim Agreement and shall be solely responsible for the acts and expenses of its own agents and employees.

27.4 **AMENDMENTS.** Any modification of this Interim Agreement must be in writing and signed by both parties, except as otherwise expressly provided herein. Circuit City acknowledges that modifications to the Policies promulgated by DIRECTV in accordance with Section 3.5 do not constitute modifications requiring Circuit City's written consent.

27.5 **AUTHORIZATION; CAPACITY.** Each party represents that the execution, delivery and performance of this Interim Agreement have been duly authorized, that it has the full right, power, and authority to execute, deliver and perform this Interim Agreement, and that such execution, delivery and performance do not and will not conflict with any agreement, instrument, order, judgment or decree to which either party is a party or by which it is bound.

27.6 **NO IMPLIED WAIVERS.** The failure of either party to require the performance by the other of any provision of this Interim Agreement shall not affect in any way the right to require such performance at any later time nor shall the waiver by either party of a breach of any provision hereof be deemed a waiver of such provision.

27.7 **NOTICES.** Any notice or other written communication required or permitted to be given by this Interim Agreement shall be deemed given when personally delivered or delivered by Federal Express or telecopied, or three (3) business days after it has been sent by United States first-class, certified or registered mail, postage prepaid, properly addressed to the addresses set forth below the signatures herein. Each party shall provide a minimum of ten (10) days advance written notice to the other in the event of any address or telephone change, or any change in ownership. Any notice of breach or default shall also be sent to:

| If to DIRECTV: | DIRECTV, Inc.<br>2230 E. Imperial Highway<br>El Segundo, CA 90245<br>Attention: Senior Vice President, Sales & Distribution |
| --- | --- |
| With a copy to: | Same address as above<br>Attention: Business & Legal Affairs |

25

|  |  |
|---|---|
| If to Circuit City: | Circuit City Stores, Inc.<br>9950 Mayland Drive<br>Richmond, VA 23233<br>Attention: Buyer, Digital Video Services |
| With a copy to: | Same address as above<br>Attention: Legal Department<br>Assistant General Counsel - Commercial |

27.8  **INVALID OR UNENFORCEABLE PROVISIONS.** If any provision of this Interim Agreement is determined to be invalid or unenforceable, the provision shall be deemed severed from the remainder, which shall remain enforceable. If any provision of this Interim Agreement does not comply with any law, ordinance or regulation of any governmental or quasi-governmental authority, now existing or hereinafter enacted, such provision shall to the extent possible be interpreted in such a manner so as to comply with such law, ordinance or regulation, or if such interpretation is not possible, it shall be deemed amended, to satisfy the minimum requirements thereof.

27.9  **GOVERNMENTAL APPROVALS.** This Interim Agreement shall be subject to all necessary approvals of local, state and federal regulatory agencies.

27.10  **TAXES.** Subject to Section 5.6 hereof, any taxes asserted against Circuit City or DIRECTV by any governmental authority as a result of this Interim Agreement shall be the responsibility of the parties as follows: (a) Circuit City shall be responsible for any taxes or levies arising out of its performance hereunder; and (b) each party shall be responsible for any taxes related to its income derived hereunder.

27.11  **ATTORNEYS' FEES.** In the event of any litigation or arbitration between the parties with respect to this Interim Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and costs of litigation, as the court or tribunal may determine.

28.  **EXECUTION DATE.** Circuit City and DIRECTV acknowledge and agree that, upon execution of this Interim Agreement by the last signing party, this Interim Agreement shall be deemed executed effective as of the Effective Date through October 22, 2007, in order to document the transactions described herein.

**IN WITNESS WHEREOF**, Circuit City and DIRECTV have caused this Interim Agreement to be executed effective as of the Effective Date.

| Circuit City: | DIRECTV: |
|---|---|
| **CIRCUIT CITY STORES, INC.:** | **DIRECTV, INC.:** |
| By: _[signature]_ | By: _[signature]_ |
| Name: Julu Rowp | Name: DAVID OLSEN |
| Title: VP 6mm | Title: SVP SALES |
| Date: 1-Y-08 | Date: 1/28/08 |

26

## EXHIBIT A

### DIRECTV PROGRAMMING PACKAGES
(Effective until replaced by DIRECTV)

Family® Programming Package and above*† (containing those video, audio and data programming services selected by DIRECTV)

    $29.99 per month per Qualifying Subscriber

Basico™ Programming Package and above*† (containing those video, audio and data programming services selected by DIRECTV – a portion of programming available from a satellite located at 119° West Longitude – requires a multi-satellite capable DIRECTV® Receiver with a DIRECTV Multi-Satellite Dish Antenna)

    $29.99 per month per Qualifying Subscriber

Jadeworld† (Chinese programming) (containing those video, audio and data programming services selected by DIRECTV – available from a satellite located at 119° West Longitude – requires a multi-satellite capable DIRECTV® Receiver with a DIRECTV Multi-Satellite Dish Antenna)

    $36.99 per month per Qualifying Subscriber

DIRECTV® BASIC plus any WorldDirect™ International Language Service† (containing those video, audio and data programming services selected by DIRECTV – available from a satellite located at 95° West Longitude – requires a multi-satellite capable DIRECTV® Receiver with a 36" DIRECTV Multi-Satellite Dish Antenna)

    $9.99 per month per Qualifying Subscriber + the cost of the selected WorldDirect™ service

DIRECTV® PREFERRED CHOICE™ plus any WorldDirect™ International Language Service† (containing those video, audio and data programming services selected by DIRECTV – available from a satellite located at 95° West Longitude – requires a multi-satellite capable DIRECTV® Receiver with a 36" DIRECTV Multi-Satellite Dish Antenna)

    $29.99 per month per Qualifying Subscriber + the cost of the selected WorldDirect™ services

*Excludes any sports subscriptions and a la carte packages. Programming Package prices will be $3.00 less in those designated market areas where DIRECTV does not offer local channels or for customers who are unable to receive local channels due to technical issues (e.g., line of site issues, 72.5° local channel markets). † For customers who lease DIRECTV Advanced Products, there is a 2 year commitment in place of the eighteen (18) months commitment for DIRECTV System.

## EXHIBIT B

## ORDER PROCEDURES

DIRECTV and Circuit City will work together to identify necessary electronic communications interfaces between Circuit City and DIRECTV to allow Circuit City to perform automated account set-up and processing from a specified location of Circuit City, in a manner which complies with the technical parameters and/or standards specified by DIRECTV. Each of Circuit City and DIRECTV shall be responsible for implementing and bearing the costs associated with their respective interfaces. Each party shall bear their respective telephone line costs associated with the electronic communications interface link between the party and the Electronic Data Interchange ("EDI") address (or other applicable computer interface connection point) in connection with this Agreement.

Circuit City hereby covenants that Circuit City will maintain and only use, an electronic communications interface which complies with the technical parameters and/or standards specified by DIRECTV; provided, however, other methods for transmitting and confirming orders (such as facsimile) may be used only when the electronic communications interface is unavailable.

After receiving an authorization request message from Circuit City's automated account set-up system, DIRECTV shall, upon acceptance of such request, establish a pending account for the subscriber.

### SCHEDULE 1.3

### CONSUMER OFFERS

### ALL LEASE TRANSACTION

| Receiver | Offer | Limit* |
|---|---|---|
| Standard | 4 Standard Receivers For $0 (No-Fee Customers) 2 Standard Receivers For $0 (Fee Customers) Upgrade With Additional For $69 Each | 6 |
| DVR | Upgrade For $99 Each** | 2 |
| HD | Upgrade For $99 Each** | 2 |
| HD-DVR | Upgrade For $299 Each** | 1 |

*6 Receiver maximum per order
**New customers are eligible for one Advanced Receiver instant or mail-in rebate ($100) per household
18 months programming commitment required for lease of standard receivers only
2 year programming commitment required for lease of any advanced-type products
Upon disconnection, cancellation or termination of the customer's DIRECTV account, the customer is required to return all DIRECTV Systems to DIRECTV in accordance with the terms of the Equipment Lease Addendum.

*Formatted: No underline, Font color: Auto*

VER.10.01.07 (NEW)     3

## SCHEDULE 3.4

## APPROVAL PROCESS

**INITIAL DIRECTV REVIEW OF CIRCUIT CITY ADVERTISING**

**PRE APPROVED ADVERTISEMENTS**

1. DIRECTV shall provide Circuit City with a menu of pre-approved templates and disclosures. Such templates and disclosures shall reasonably conform to the ad-space limitations outlined by Circuit City. Such templates and disclosures shall outline legal compliance guidelines (including contractual requirements and any third party requirements, such as programming providers) as opposed to creative content restrictions. DIRECTV hereby represents and warrants that such legal compliance guidelines are required for all of its authorized independent retailers and that DIRECTV will enforce and require its authorized independent retailers to comply with such legal compliance guidelines.

   - Circuit City retains full creative control over look, feel and style of all advertisements so long as Circuit City is in compliance with the terms and conditions of the Consumer Offers, the applicable DIRECTV national consumer offer, the applicable laws and DIRECTV's marketing and usage guidelines.
   - Circuit City may combine any one pre-approved template with any one pre-approved disclosure for such approved template.
   - Circuit City will submit the resulting advertising material to DIRECTV for approval. The advertising material shall be submitted to individuals as identified by DIRECTV to Circuit City via electronic transmission.
   - To the extent that Circuit City submits an advertisement utilizing a pre-approved template, DIRECTV will provide approval, approval with changes required or disapproval for any such advertisement within two (2) business days of receipt of such submission. If no response is received from DIRECTV the advertisement shall be deemed approved.
   - The Pre Approved timeline shall only apply to advertising materials utilizing the pre-approved template and the pre-approved disclosure.
   - From time to time, the parties hereto may create additional pre-approved templates and disclosures for use by Circuit City.

**SPECIAL ADVERTISEMENTS**

1. Circuit City shall supply DIRECTV Account Executive(s) with advertising materials on a timely basis that enables and provides for DIRECTV to have:

   - seven (7) working days to provide its approval or disapproval on non-weekly insert print materials, radio scripts, TV scripts, and/or storyboards.
   - five (5) working days to provide its approval or disapproval on Video Rough Cuts, and;
   - fifteen (15) working days, to provide for its approval or disapproval for ad review where NFL/NFL Sunday Ticket is concerned. The parties hereto agree to work with the NFL to obtain approval of templates which may be used in subsequent advertising materials.

   Notwithstanding the foregoing, DIRECTV will use its commercially reasonable efforts to provide its approval or disapproval of the materials as promptly as possible.

2. All advertisements shall be supplied via electronic transmission (e.g. PDF file, JPEG file, etc.) and will have passed internal review through all appropriate departments, including marketing, advertising,

VER.10.01.07 (NEW)                                4