## AUTHORIZED RETAILER AGREEMENT

       **THIS AUTHORIZED RETAILER AGREEMENT** ("Agreement") shall be deemed to be effective as of October 23, 2007 (the "Effective Date"), between **DIRECTV, Inc.**, a California corporation ("DIRECTV") and **Circuit City Stores, Inc.**, a Virginia corporation ("Circuit City"), with reference to the following:

       A.    DIRECTV operates a multi-channel video and entertainment service ("DIRECTV Service") through which consumers may receive video, audio, interactive, broadband and other related services using specialized digital satellite receiving equipment.

       B.    Circuit City wishes to act as one of DIRECTV's authorized retailers in the United States (i) for the marketing, advertising, promotion and leasing of DIRECTV receivers, (ii) for the marketing, advertising and promotion of DIRECTV Service, and (iii) to solicit consumers to order certain DIRECTV programming packages and services which are identified in **Exhibit A** attached hereto, as the same may be amended from time to time ("DIRECTV Programming Packages").

       C.    Circuit City also wishes to act as one of DIRECTV's commissioned customer referral contractors for the general marketing, advertising, and promotion of DIRECTV Service through brochures or other direct marketing materials made available by Circuit City under the terms hereof.

       **NOW, THEREFORE**, and in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

       1.    **DEFINITIONS.**  In addition to such other terms as are specifically defined herein, the following terms shall have the meanings ascribed to them below for purposes of this Agreement:

       1.1    "Affiliated Entity" shall mean a party's parents, subsidiaries, affiliates, related companies, dealers and franchisees.

       1.2    "Approved Activation" shall mean an activation of a DIRECTV Programming Package by an Eligible Residential Household Customer, as a result of (a) DIRECTV's receipt of an Order for a DIRECTV Programming Package which is initially procured directly by Circuit City through its Retail Locations, Websites and Call Centers, and delivered to DIRECTV in accordance with DIRECTV's Order procedures as set forth in **Exhibit B**; and (b) DIRECTV's acceptance of such Order as an Approved Activation, in accordance with its credit policies and other standard terms and conditions required by DIRECTV for new customer activations, as evidenced by the attachment of Circuit City's unique retailer number to the corresponding customer account.

       1.3    "Call Center" shall mean a Circuit City call center or a call center operated by a Circuit City third party contractor (as authorized pursuant to Section 3.3 of this Agreement) through which Circuit City may (a) market the Consumer Offers and DIRECTV Programming Packages and procure Orders and Approved Activations; or (b) refer Prospective Referral Customers (as set forth in Section 2.2 of this Agreement) to DIRECTV.

       1.4    "Consumer Offer" shall mean consumer offers as established by DIRECTV from time to time as set forth in **Schedule 1.4** attached hereto and made a part hereof, which Consumer Offer will generally include promotional offers for new and existing DIRECTV customers whereby customers

will be able to lease DIRECTV Receivers from DIRECTV, bundled with standard professional installation therefor.

1.5    "<u>DIRECTV Receiver</u>" shall mean that certain specialized satellite receiving equipment (i.e., an integrated receiver/decoder, set-top box) necessary to receive DIRECTV Programming Packages and/or DIRECTV Service.  For purposes of this Agreement and by way of examples, a DIRECTV Receiver shall include a stand-alone DIRECTV Receiver, DIRECTV DVR, DIRECTV HD Receiver, DIRECTV HD/DVR Receiver and other types of DIRECTV Receivers as identified by DIRECTV from time to time.

1.6    "<u>DIRECTV System</u>" shall mean the DIRECTV Receiver(s), a receiver dish, if any, and a remote control therefor, necessary to receive DIRECTV Programming Packages and/or DIRECTV Service.

1.7    "<u>Eligible Residential Household Customer</u>" shall mean a single-family residential customer within the Territory who (a) is not currently a DIRECTV subscriber; (b) has not been a DIRECTV subscriber during the past two (2) years or such other duration as established by DIRECTV from time to time in its usual course of business; (c) if previously a DIRECTV subscriber, his/her account was closed in good standing as determined by DIRECTV in its sole discretion in the usual course of its business (i.e., no balance remained on the account, etc.); and (d) if previously a DIRECTV subscriber, such former customer has been identified by DIRECTV to be eligible for new Customer Offers in accordance with DIRECTV's usual course of business.

1.8    "<u>Equipment Lease Addendum</u>" shall mean a written agreement which evidence the terms and conditions of a lease of one or more DIRECTV Receivers as set forth on **Schedule 1.8** attached hereto and made a part hereof.  The parties agree and acknowledge that the Equipment Lease Addendum may be amended by DIRECTV from time to time in its sole discretion.

1.9    "<u>Order</u>" shall have the meaning ascribed to it in Section 5.3(a) of this Agreement.

1.10    "<u>Programming Commissions</u>" shall mean commissions payable to Circuit City in consideration of Circuit City's services in marketing the Consumer Offers and DIRECTV Programming Packages and procuring Orders and/or referring Prospective Referral Customers as more particularly described in Sections 7 and 8 of this Agreement.

1.11    "<u>Prospective Referral Customer</u>" shall have the meaning ascribed to it in Section 2.2 of this Agreement.

1.12    "<u>Qualifying Subscriber</u>" shall mean a residential household located within the United States from whom Circuit City procures or refers an activation for a Subscription (as hereinafter defined).

1.13    "<u>Retail Locations</u>" shall mean Circuit City's retail store locations within the Territory from which Circuit City may market the Consumer Offers and DIRECTV Programming Packages, and procure and establish Orders and Approved Activations.

1.14    "<u>Subscription</u>" shall mean the receipt of DIRECTV Service by a residential customer with at least one DIRECTV Programming Package and activation of a DIRECTV Receiver.

1.15    "<u>Territory</u>" shall mean the United States.

1.16    "<u>Websites</u>" shall mean circuitcity.com or such other website domain name owned by Circuit City through which Circuit City may (i) market the Consumer Offers and DIRECTV Programming Packages and procure Orders and Approved Activations; or (ii) refer Prospective Referral Customers to DIRECTV.

2.    **APPOINTMENT OF CIRCUIT CITY.**

2.1    **AUTHORIZED RETAILER.**

(a)    DIRECTV hereby engages Circuit City as an authorized independent retailer contractor to (i) market, promote and advertise the leasing of DIRECTV Receivers; (ii) market, promote and advertise the sale of DIRECTV Programming Packages ("<u>Subscriptions</u>") by extending Consumer Offers to Eligible Residential Household Customers on behalf of DIRECTV through marketing tactics, channels and methods as agreed to by the parties on the terms and conditions contained herein; and (iii) directly procure Orders for Approved Activations under the terms of this Agreement. For Orders procured by Circuit City hereunder, DIRECTV shall be responsible for fulfilling such Orders with the appropriate DIRECTV Receivers ordered by each Eligible Residential Household Customer and installing such DIRECTV Receivers in accordance with the terms and conditions of the Consumer Offers.

(b)    Circuit City may (i) market, promote and advertise the leasing of DIRECTV Receivers; (ii) market, promote and advertise the sale of Subscriptions to Eligible Residential Household Customers on behalf of DIRECTV; and (iii) directly procure Orders for Approved Activations under the terms of this Agreement.

(c)    Circuit City may market, promote and solicit Subscriptions only for the DIRECTV Programming Packages identified in **<u>Exhibit A</u>** attached hereto, and not any other programming packages or services DIRECTV may offer.

(d)    DIRECTV may amend the list of DIRECTV Programming Packages from time to time on written notice to Circuit City.  As provided in Section 5.2 hereof, DIRECTV shall use commercially reasonable efforts to provide Circuit City with written notice at least forty-five (45) days' prior to the effective date of the change, but not less than thirty (30) days' prior written notice, unless such change is beyond the control of DIRECTV.

(e)    Circuit City hereby accepts such engagement and shall use its best commercial efforts (i) to market, promote and advertise the leasing of DIRECTV Receivers; (ii) to market, promote, advertise and solicit sales of Subscriptions; and (iii) to promote and enhance DIRECTV's business, reputation and goodwill in accordance with the terms of this Agreement.

2.2    **PROSPECTIVE CUSTOMER REFERRAL CONTRACTOR.**  In addition to DIRECTV's appointment of Circuit City as an authorized independent retailer contractor for directly procuring Orders under the terms of this Agreement, DIRECTV also hereby engages Circuit City as a prospective customer referral contractor for the general marketing, advertising, and promotion of DIRECTV Service from Circuit City marketing channels, pursuant to which Circuit City shall promote, market and advertise DIRECTV Service and refer those customers interested in becoming a DIRECTV customer to DIRECTV, and thereafter, DIRECTV shall transact orders directly with such referred

prospective customer (collectively, the "Prospective Referral Customers").  The content and distribution channels for such Prospective Referral Customers shall be as agreed upon on a case-by-case basis by DIRECTV and Circuit City.  The parties hereto shall cooperate and determine the method by which DIRECTV will be able to identify those prospective customers as Prospective Referral Customers referred by or through Circuit City for purposes of associating them with Circuit City for paying commissions hereunder.

2.3  **NO EXCLUSIVITY REQUIRED OF DIRECTV.**  DIRECTV may itself extend the Consumer Offers and solicit Subscriptions from consumers, either directly, indirectly, or in conjunction with any third party, and may authorize parties other than Circuit City to act as its authorized retailers or dealers to extend the Consumer Offers and to solicit Subscriptions, for any compensation and upon any other terms as DIRECTV may determine in its discretion.  Such compensation and terms may differ from those provided to Circuit City in this Agreement.  Circuit City acknowledges that DIRECTV and such other parties may compete with Circuit City in the solicitation of the Consumer Offers and Subscriptions.

2.4  **LIMITED EXCLUSIVITY REQUIRED OF CIRCUIT CITY.**

(a)  The parties agree and acknowledge that DIRECTV will, throughout the Term of this Agreement, provide substantial support to Circuit City for its efforts (i) in marketing, advertising, promoting and soliciting the Consumer Offers, (ii) in the leasing of DIRECTV Receivers and (iii) in the solicitation of the sale of DIRECTV Service; and Circuit City will have access to certain of DIRECTV's confidential information regarding DIRECTV's business.  Accordingly, Circuit City agrees that it will not directly or indirectly, promote, advertise, market, offer, sell, lease or solicit sales during the Term of this Agreement of any satellite television programming packages or equipment which compete with the DIRECTV Service in the Territory (the "Exclusive Obligation").  The Exclusive Obligation described herein shall not affect Circuit City's activities outside of the Territory.  The parties agree and acknowledge that the Exclusive Obligation described herein is a material term of this Agreement.  Accordingly, in addition to any other rights DIRECTV may have, DIRECTV shall have the right to terminate this Agreement immediately for Circuit City's material breach of this subsection (which shall be deemed incurable), as provided in Section 18.2(a) hereof.

(b)  Circuit City shall not, directly or indirectly, produce, place, display or use any advertising or marketing material, conduct any sales associate training or engage in any activities designed to switch or "flip" any DIRECTV subscribers to another audio/video multi-channel entertainment service; provided, however, that the foregoing shall not prohibit Circuit City from general product and service offerings permitted under subsection (a) hereinabove so long as such offerings do not include switch-out or similar offers.

3.  **CIRCUIT CITY'S GENERAL OBLIGATIONS.**

3.1  **RETAIL DISPLAYS.**  In the video area/department at each of its Retail Locations, Circuit City shall (i) display point of sale materials provided or as mutually approved by DIRECTV and Circuit City, and (ii) provide demonstrations of the DIRECTV System which provides a live feed of DIRECTV programming on a monitor of not less than seventeen inches (17"), unless otherwise mutually agreed in writing by DIRECTV and Circuit City.  Circuit City shall keep such DIRECTV System turned on and tuned to such channels as the parties mutually agree best represent DIRECTV programming content during normal business hours; provided, however, Circuit City shall not be required to provide a live feed of DIRECTV programming where such a live feed is not available or where the cost of such live feed makes it economically unfeasible to provide such live feed.  Upon

4

termination or expiration of this Agreement or in the event that Circuit City decides to remove any DIRECTV-funded displays from the floor, Circuit City shall either return or destroy, at DIRECTV's written request delivered within thirty (30) days of such termination or expiration and at DIRECTV's expense, any DIRECTV-related displays, display units or display materials.

3.2     **TRAINING**.  DIRECTV shall make training and training materials available for Circuit City's internal training personnel, as DIRECTV reasonably deems necessary.  Circuit City shall train its own employees to the reasonable satisfaction of DIRECTV.  DIRECTV may request that Circuit City's employees attend supplementary training classes from time to time provided that such classes be arranged to minimally interfere with the work schedule of Circuit City's employees.  DIRECTV shall coordinate any such training through Circuit City.  The cost and related expenses of any training requested by DIRECTV and agreed to by Circuit City in its sole discretion under this subsection shall be as mutually agreed by the parties at the time the training is scheduled.

3.3     **SALES PERSONNEL**.

(a)     As an authorized independent retailer contractor for DIRECTV, Circuit City may allow its employees (a) to market, promote, advertise and solicit leasing of the DIRECTV Receivers or (b) to market, promote and advertise the Consumer Offers and to solicit, take or deliver to DIRECTV any Orders for DIRECTV Programming Packages through Retail Locations, Websites or Call Centers.

(b)     Circuit City may not allow any third party independent contractors, sub-agents or other parties to market, promote and advertise the Consumer Offers or to solicit, take or deliver any Orders for DIRECTV Programming Packages under this Agreement, including without limitation third party Call Center contractors, except with DIRECTV's prior written consent which may not be unreasonably withheld or delayed.  In the event DIRECTV provides consent of use of any third party sales personnel in accordance with this Section 3.3(b) ("Consented Sales Personnel"), in addition to any other additional terms and conditions required by DIRECTV, Circuit City understands that (i) Circuit City shall ensure that such Consented Sales Personnel comply with any and all applicable provisions of this Agreement; (ii) Circuit City shall properly train any such Consented Sales Personnel or ensure that the Consented Sales Personnel are properly trained; (iii) Circuit City shall be solely responsible for any action or omissions on the part of Consented Sales Personnel; (iv) Circuit City shall indemnify and hold DIRECTV harmless from any acts or omissions of such Consented Sales Personnel; (v) DIRECTV shall have the reasonable right to revoke or rescind its consent of one or more of Consented Sales Personnel at any time and Circuit City shall be required to remove the terminated Consented Sales Personnel from services relating to DIRECTV hereunder within ten (10) calendar days of receipt of notice by DIRECTV; and (vi) DIRECTV reserves the right to terminate this Agreement for a breach of any applicable provision of this Agreement by any Consented Sales Personnel and such Consented Sales Personnel has not been removed or terminated in accordance herewith.

3.4     **ADVERTISING AND MARKETING**.  Circuit City shall promote and advertise the Consumer Offers, DIRECTV and the DIRECTV Service.  Circuit City shall not affix, attach, impose or otherwise place any additional conditions or restrictions for the Consumer Offers to Circuit City's customers, except as agreed to by DIRECTV in writing.  All advertising materials using DIRECTV's Marks (as hereinafter defined) shall be subject to DIRECTV's prior approval, in accordance with the "Approval Process" described in **Schedule 3.4** attached hereto and made a part hereof.  No approval shall limit Circuit City's obligation to comply with applicable law or be deemed an endorsement by DIRECTV of any advertising content except to the extent that such advertising content replicates terms and conditions for Consumer Offers as dictated and reviewed for accuracy by

DIRECTV. DIRECTV shall have the right to terminate this Agreement immediately upon written notice to Circuit City for a material breach of this subsection by Circuit City (which shall be deemed incurable), as provided in Section 18.2(a) hereof except to the extent Circuit City's breach was caused by DIRECTV's failure to provide timely notice in accordance with Section 5.2.

3.5 **STANDARD POLICIES**. Circuit City shall comply with the standard policies and procedures DIRECTV may promulgate for its authorized independent retailers in written notices, guidelines, and bulletins, including, without limitation, the credit approval/checking policy as outlined in **Schedule 3.5(i)** attached hereto and made a part hereof (the "Credit Policy") and the telemarketing policy as outlined in **Schedule 3.5(ii)** attached hereto and made a part hereof (the "Telemarketing Policy"), as they may be amended from time to time (collectively "Policies"). The Policies shall be an integral part of this Agreement but may not impair any of Circuit City's rights granted herein and shall not contravene or violate any applicable laws. Circuit City may terminate this Agreement immediately upon written notice to DIRECTV if any changes to DIRECTV's Policies materially and adversely affects Circuit City's ability to market the Consumer Offers (including the DIRECTV Service and DIRECTV Programming Packages) in Circuit City's reasonable discretion, as provided in Section 18.2(b) hereof.

3.6 **STANDARD OF CONDUCT.** In all of its activities hereunder as a contractor for DIRECTV, Circuit City shall conduct itself in a commercially reputable and ethical manner, shall comply with all applicable federal, state and local laws, rules, regulations and ordinances, and shall engage in no deceptive sales practice or other practice which impugns DIRECTV's commercial reputation and goodwill.

3.7 **NO TYING.** In no event may Circuit City condition the sale of a DIRECTV Programming Package or the transaction involving the Consumer Offers upon the customer's acquisition of any other product or service, except as approved by DIRECTV in writing. Notwithstanding the foregoing, DIRECTV acknowledges and agrees that Circuit City may market DIRECTV Programming Packages and Consumer Offers in a bundle with televisions or other products offered by Circuit City; provided that (a) Circuit City also offers the sale of a DIRECTV Programming Package or Consumer Offer separate from a product bundle, and (b) Circuit City shall obtain DIRECTV's prior approval to all marketing of bundles, which shall not be unreasonably withheld or delayed.

3.8 **CUSTOMER SOLICITATION**. Circuit City shall not solicit, induce or otherwise cause an active DIRECTV subscriber to disconnect his/her service and/or reconnect/reactivate his/her service through a DIRECTV Receiver leased through the Consumer Offers extended by Circuit City for the purpose of improperly earning the Programming Commission, provided however that no general solicitation containing a general offer to acquire the multi-channel audio/video entertainment programming services of DIRECTV shall be deemed a solicitation, inducement or other cause for a DIRECTV Service disconnection.

3.9 **MISREPRESENTATIONS.** Circuit City shall not mislead, deceive or otherwise make misrepresentations to customers in connection with the terms and conditions of the Consumer Offers, the DIRECTV Service, or the DIRECTV Programming Packages. If Circuit City misrepresents or fails to fully disclose any material terms of the Consumer Offers or the DIRECTV Programming Packages to any customer, it shall reimburse DIRECTV any amount which DIRECTV is compelled, or in its reasonable judgment according to its standard business practices decides, to pay or credit the customer in compensation for such misrepresentation. Notwithstanding the foregoing, DIRECTV shall have no right of reimbursement hereunder if the claim for any such misrepresentation originates in any advertisement that is provided or approved by DIRECTV or results from changes made

by DIRECTV of which Circuit City does not receive notice sufficient to implement the changes pursuant to Section 5.2 of this Agreement.

4.     **DIRECTV'S GENERAL OBLIGATIONS.**   In all of its activities hereunder, DIRECTV shall conduct itself in a commercially reputable and ethical manner and shall not engage in any practice which impugns Circuit City's commercial reputation and goodwill.  In addition, DIRECTV hereby represents and warrants that the terms of the Consumer Offers, the DIRECTV Service, the DIRECTV Programming Packages, and all advertising and marketing materials, disclaimers, and customer contracts or agreements relating thereto comply with all applicable federal, state and local laws, rules, regulations and ordinances.

5.     **CONSUMER OFFERS.**

5.1     **TERMS.**   Under the terms of this Agreement, Circuit City may only market, advertise, promote and offer such Consumer Offers as are designated by DIRECTV from time to time.  The Consumer Offers will generally include promotional offers for new and existing DIRECTV customers whereby customers will be able to lease DIRECTV Receivers from DIRECTV under the terms and conditions of the Consumer Offers and the Equipment Lease Addendum.  The Consumer Offers for new DIRECTV customers will require the prospective customer (a) to satisfy and meet the Credit Policy or such other terms and conditions reasonably promulgated by DIRECTV from time to time and (b) to make a programming commitment to a qualifying DIRECTV Programming Package.  The Consumer Offers for new DIRECTV customers will also contain bundled offers for standard professional installation at no charge to the customer.  Circuit City shall provide or disclose any information, terms and conditions regarding the Consumer Offers (including the Equipment Lease Addendum and the Credit Policy requirements) as reasonably directed and/or required by DIRECTV.  DIRECTV may determine the content, pricing, terms, and conditions of the Consumer Offers and the DIRECTV Programming Packages in its discretion.  Circuit City shall not represent that the Consumer Offers or DIRECTV Programming Packages may be obtained on any different terms or rates, shall not impose additional or different terms and shall not offer customers any discount, rebate, or other material benefits in consideration for subscribing to them, except as expressly authorized by DIRECTV in writing.

5.2     **CHANGES.**   DIRECTV may change, amend or discontinue the content, pricing, terms, conditions, and availability of the Consumer Offers or the DIRECTV Programming Packages from time to time in its discretion.  DIRECTV shall use commercially reasonable efforts to provide Circuit City with written notice at least forty-five (45) days' prior to the effective date of such changes, but not less than thirty (30) days' prior written notice, unless such change is beyond the control of DIRECTV.  Upon receipt of such notice, Circuit City shall use best efforts to make changes to pending advertisements, replace point of sale materials, and/or make system changes as necessary to reflect the DIRECTV changes to the Consumer Offers or DIRECTV Programming Packages.  In the event that Circuit City does not receive such advance notice, or if Circuit City is unable to reasonably implement such changes within the time period required by DIRECTV after receiving such advance notice, Circuit City's failure to make the changes shall not constitute an event of default or other breach hereunder provided that Circuit City is making reasonable progress toward implementation of such necessary changes.  Circuit City may terminate this Agreement immediately with written notice if any changes to the Consumer Offers and/or DIRECTV Programming Packages materially and adversely affect Circuit City's ability to market the Consumer Offers (including the DIRECTV Service and DIRECTV Programming Packages) or to offer DIRECTV Receivers for lease to its customers, in Circuit City's reasonable discretion.

5.3     **ORDER PROCEDURES; DIRECTV PROGRAMMING PACKAGES**.

(a)     For Eligible Residential Household Customers only, Circuit City shall comply with the procedures set forth in **Exhibit B** attached hereto, as the same may be amended by DIRECTV from time to time upon at least thirty (30) days' prior written notice, regarding the receipt and delivery of orders for Consumer Offers and DIRECTV Programming Packages through Circuit City's Retail Locations, Websites and Call Centers (each, an "Order").

(b)     The Consumer Offers for new DIRECTV customers through Circuit City's Retail Locations, Websites and Call Centers will require the prospective DIRECTV customer (i) to satisfy and meet the Credit Policy or such other terms and conditions reasonably promulgated by DIRECTV from time to time and (ii) to make a programming commitment to a qualifying DIRECTV Programming Package. For those prospective DIRECTV customers who do not meet the requirements under the Credit Policy, DIRECTV may permit Circuit City to make available the DIRECTV Programming Package under terms and conditions which may differ from those meeting the requirements, or in the alternative the DIRECTV Programming Package may not be made available.  In any event, all Orders for new DIRECTV customers shall be subject to acceptance or rejection by DIRECTV in its reasonable discretion.  Circuit City may terminate this Agreement upon thirty (30) days prior written notice if any changes to DIRECTV's Order procedures materially and adversely affect Circuit City's ability to market the Consumer Offers (including the DIRECTV Service and DIRECTV Programming Packages), in Circuit City's reasonable discretion.

5.4     **ORDER PROCEDURES; EQUIPMENT LEASE ADDENDUM**.    In furtherance of the Consumer Offers through Circuit City's Retail Locations, Websites and Call Centers, Circuit City shall perform the following Order procedures (i) for each prospective new DIRECTV customer (i.e., a potential Qualifying Subscriber) in addition to the Order Procedures set forth in Section 5.3 above; and (ii) for existing DIRECTV customers who desire to lease additional DIRECTV Receivers as part of a current Subscription:

(a)     Explain the general terms and conditions of the Equipment Lease Addendum required by DIRECTV as a condition to the lease of one or more DIRECTV Receivers, as described in **Schedule 5.4** attached hereto and in other materials provided by DIRECTV from time to time;

(b)     Provide a reference to the Equipment Lease Addendum on the customer's point-of-sale receipt;

(c)     Cause the customer to acknowledge the Equipment Lease Addendum;

(d)     Verify and validate to the extent reasonably possible the accuracy of the information provided by the customer for the Order;

(e)     Follow the mutually agreed procedure (through an electronic interface or such other method as reasonably agreed by DIRECTV, using a third party processor as approved by DIRECTV) with respect to the acknowledgement of the Equipment Lease Addendum;

(f)     Make acknowledgements of the Equipment Lease Addendum available to DIRECTV as needed; and

(g)      With respect to existing DIRECTV subscribers, contact them promptly following the placement of an Order, to re-confirm such subscriber's understanding of and agreement to the terms and conditions of the Equipment Lease Addendum.

Circuit City shall not (i) mislead, deceive or otherwise make misrepresentations to customers in connection with the terms and conditions of the Equipment Lease Addendum; (ii) force or coerce customers into executing the Equipment Lease Addendum; (iii) falsify any information contained in the Equipment Lease Addendum; or (iv) falsely claim that a customer has executed or agreed to the Equipment Lease Addendum.

5.5     **NO FINANCING OR COLLECTION OF SUBSCRIPTION FEES.**  Circuit City shall not provide financing for the Consumer Offers, the DIRECTV Service, the DIRECTV Programming Package Subscriptions or collect Subscription fees from DIRECTV subscribers, subject to provision for collection and remittance of any fees as required under the Credit Policy or as otherwise approved by DIRECTV in writing from time to time or other amounts as provided under the Consumer Offers.  Except as provided above or as otherwise approved in writing by DIRECTV, all Subscription fees shall be billed directly by DIRECTV.  Notwithstanding the foregoing, DIRECTV acknowledges and agrees that Circuit City may provide financing, as reasonably approved in advance by DIRECTV, for televisions or other consumer electronics products marketed and sold as a bundle with the Consumer Offers, the DIRECTV Service, and the DIRECTV Programming Package Subscriptions.  DIRECTV shall be responsible for collecting any sales, use or other taxes imposed on the DIRECTV subscriber in connection with the Subscription fees billed directly by DIRECTV.  Circuit City's failure to comply with the provisions of this Section 5.5 shall be deemed a material breach by Circuit City that is incurable, and shall entitle DIRECTV to immediately terminate this Agreement as set forth in Section 18.2(a).

5.6     **COLLECTION OF AMOUNTS RELATING TO THE CONSUMER OFFERS**.  Upon a customer's approval and acceptance of the Consumer Offer, and subsequent acknowledgement of an Equipment Lease Addendum for one or more DIRECTV Receivers under an Order through Circuit City's Retail Locations, Websites or Call Centers, Circuit City shall (a) collect the amount required, if any, under the applicable Consumer Offer from a customer at point of sale (whether a Qualifying Subscriber or an existing DIRECTV subscriber); or (b) enable DIRECTV to collect such amounts through process and procedures as agreed to by the parties.  DIRECTV specifically acknowledges that (x) Circuit City shall not collect sales/use tax on lease payments made by a Qualifying Subscriber monthly under the term of the Equipment Lease Addendum; and (y) Circuit City shall not collect sales/use tax on an accelerated basis at the time the customer agrees to the terms of the Equipment Lease Addendum (as may be required by certain states) for lease payments due by a DIRECTV Subscriber.  DIRECTV acknowledges that such sales/use tax amounts are the responsibility of DIRECTV, and DIRECTV shall hold Circuit City harmless from all taxes, penalties and interest that may subsequently be assessed or claimed against Circuit City in connection with such sales/use tax amounts under this Agreement.  DIRECTV acknowledges and agrees that Circuit City makes no representation, warranty or covenant as to the accuracy of its method of calculating this sales/use tax liability.  Notwithstanding the above, Circuit City shall assess and collect tax due on "Lease Upgrade Fees" (as referenced in Section 6.1 hereof) at the point-of-sale in the same manner collected on tangible personal property, per direction hereunder from DIRECTV to Circuit City.  Circuit City acknowledges that collection and remittance of such tax amounts to the appropriate governmental agencies are the responsibility of Circuit City.  Circuit City shall hold DIRECTV harmless from all taxes, penalties and interest that may subsequently be assessed or claimed against DIRECTV under this Agreement relating to Circuit City's failure to collect and remit tax for lease upgrade fees.

5.7    **SUBSCRIPTION REPORTING REQUIREMENTS.**  For each Qualifying Subscriber referred or procured hereunder for Orders submitted as set forth in Section 5.3, Circuit City shall provide DIRECTV with the reports reasonably requested by DIRECTV from time to time.  The parties understand that Circuit City must rely upon its customers to provide accurate and complete information.  The parties agree that Circuit City shall not be responsible for inaccuracies resulting from incorrect, incomplete or erroneous information provided by its customers.  Notwithstanding the forgoing, Circuit City shall take commercially reasonable actions to prevent fraud and inaccurate reporting by personnel.  In exercising rights or performing duties under this Section 5.7, the parties shall operate in good faith and deal fairly with each other.

5.8    **NO PROSPECTIVE SUBSCRIBER SWITCHING**.  DIRECTV agrees that it shall not solicit any prospective new DIRECTV customer who was acquired through Circuit City under this Agreement by means which exclusively target and induce such prospective customer to cancel his/her DIRECTV Receiver/Service order with Circuit City and contemporaneously place an order with another person or entity in an effort to deny Circuit City from potentially earning Programming Commission under this Agreement.  Circuit City shall have the right to terminate this Agreement immediately upon material breach of this Section 5.8 by DIRECTV.

6.    **DIRECTV RECEIVER UPGRADE LEASE TO EXISTING CUSTOMERS**.

6.1    **DIRECTV RECEIVERS**.  DIRECTV has designated the DIRECTV Receiver products identified in **Schedule 6.1** hereto which may be leased to existing DIRECTV subscribers and available for "carry-out" from Retail Locations by such existing DIRECTV subscribers.  The list of eligible DIRECTV Receivers may be amended from time to time by DIRECTV without the necessity of amending **Schedule 6.1**, provided that DIRECTV gives Circuit City at least ninety (90) days' prior written notice.  Subject to this Section 6.1 and **Schedule 6.1**, DIRECTV will sell the DIRECTV Receiver products to Circuit City under the terms and conditions of a Master Dealer Agreement and Product Addendum between the parties dated as of May 20, 2005 (the "Hardware Purchase Agreement").  Circuit City shall purchase the DIRECTV Receiver products from DIRECTV at the prices set forth in **Schedule 6.1** (the "Receiver Cost").  Circuit City is authorized to use such purchased DIRECTV Receivers as units available for lease and "carry-out" from Retail Locations by existing DIRECTV Subscribers.  Upon lease of such DIRECTV Receiver, Circuit City will collect a "Lease Upgrade Fee" from the existing DIRECTV subscriber per direction from DIRECTV in the amount set forth in **Schedule 6.1**, and DIRECTV shall permit Circuit City to retain such "Lease Upgrade Fee" as compensation for the lease of the DIRECTV Receiver (the "Upgrade Compensation").  DIRECTV will provide Circuit City with at least thirty (30) days' prior written notice of any changes to the Receiver Cost and/or the Lease Upgrade Fee and the Upgrade Compensation related thereto.  Circuit City may terminate this Agreement upon thirty (30) days prior written notice if any changes to the Receiver Costs or Upgrade Compensation materially and adversely affect Circuit City's ability to market the Consumer Offers (including the DIRECTV Service and DIRECTV Programming Packages) in Circuit City's reasonable discretion.  For any DIRECTV Receiver models deleted from the eligible list on **Schedule 6.1**, DIRECTV agrees to work with Circuit City to develop a plan to sell-through any of such models remaining in Circuit City inventory.  The foregoing shall not, however, affect the provisions of Section 6.4 herein and the Hardware Purchase Agreement upon termination or expiration of this Agreement.

6.2    **UPGRADE LEASE**.  For upgrade DIRECTV Receivers available for lease and "carry-out" from Retail Locations as described in Section 6.1 above, Circuit City shall make such DIRECTV Receivers available for lease to existing DIRECTV subscribers pursuant to DIRECTV's lease transaction described in the Equipment Lease Addendum executed or agreed to by the DIRECTV subscriber at the Retail Location.  In furtherance of such lease transaction, contemporaneously with lease of the

DIRECTV Receiver by an existing DIRECTV subscriber at a Retail Location Circuit City shall transfer the title to the leased DIRECTV Receivers provided by it to DIRECTV.  Circuit City shall not be provided any further consideration above the Upgrade Compensation collected by Circuit City from the customer, if any.  The risk of loss of the Leased Equipment shall pass to DIRECTV upon transfer of the title thereto as described herein.  Circuit City shall pass on and deliver to DIRECTV all applicable manufacturers' warranties and user and title documents, and shall attach such proprietary notices to and otherwise prepare the DIRECTV Receivers for lease, as DIRECTV may reasonably prescribe.  DIRECTV shall bear the cost of any materials required for such preparation.  In the event a Circuit City customer returns one or more DIRECTV Receivers prior to activation with DIRECTV, Circuit City shall refund the customer in accordance with Section 6.3 below.

6.3     **RETURNS OF DIRECTV RECEIVERS**.  In the event of a customer's return of an upgrade "lease and carry out" DIRECTV Receiver from a Retail Location prior to activation of the DIRECTV Receiver, (a) Circuit City shall refund to customer any amounts collected by Circuit City from the customer for the upgrade "lease and carry out" DIRECTV Receiver; and (b) DIRECTV shall transfer the title to the upgrade leased DIRECTV Receiver returned by a customer to Circuit City.  Customers may only return an upgrade "lease and carry out" DIRECTV Receiver which has been activated to DIRECTV; provided, however, that in the case that Circuit City deems it necessary to accept such return as a customer accommodation, DIRECTV shall use commercially reasonable efforts to work with Circuit City to accept such return.

6.4     **INVENTORY BUYBACK ON TERMINATION OR END OF LIFE**.  Upon termination or expiration of this Agreement for any reason whatsoever, Circuit City shall have the right to return all unused DIRECTV Receivers purchased by Circuit City from DIRECTV under the terms of the Hardware Purchase Agreement in its inventory as of the date of such termination or expiration, and DIRECTV shall purchase all such inventory at the same price Circuit City paid for such products as set forth under the terms of the Hardware Purchase Agreement.  Circuit City shall use commercially reasonable efforts to return all such products for repurchase by DIRECTV within one hundred twenty (120) days after termination or expiration of this Agreement.  DIRECTV shall pay all shipping costs to return such inventory and pay Circuit City by check within forty-five (45) days of receipt of goods, regardless of any offset rights hereunder relating to Programming Commissions.

7.     **CIRCUIT CITY PROGRAMMING COMMISSIONS**.  During the Term of this Agreement, subject to the terms and conditions set forth herein, in consideration of Circuit City's services in marketing the Consumer Offers and DIRECTV Programming Packages and procuring Orders which result in Approved Activations as described herein, Circuit City shall receive a Programming Commission in the amount of Two Hundred Seventy-Five and No/100 Dollars ($275.00) for each Approved Activation acquired through its Retail Locations.  Additionally, during the Term of this Agreement and subject to the terms and conditions set forth herein, in consideration of Circuit City's services in marketing the Consumer Offers and DIRECTV Programming Packages and Approved Activations as described herein, Circuit City shall receive a Programming Commission in the amount of One Hundred Forty and No/100 Dollars ($140.00) for each Approved Activation acquired through its Websites and/or Call Centers.

7.1     **CONDITIONS TO PROGRAMMING COMMISSIONS**.

(a)     Programming Commissions shall only be payable to Circuit City in connection with (i) those Approved Activations for which the Equipment Lease Addendum from the customer has been obtained through an acknowledgement and agreement to the terms thereof, (ii) those customers who have activated a DIRECTV Programming Package listed in **Exhibit A** and (iii) those

Orders for which Circuit City has materially followed DIRECTV's Order procedures as set forth on **Exhibit B**.

(b)    Subject to the terms and conditions set forth herein, the parties hereby agree and acknowledge that no Programming Commissions or other amounts shall be payable to Circuit City in connection with an existing DIRECTV subscriber referred by Circuit City who activates a DIRECTV Programming Package.

(c)    Circuit City acknowledges that Circuit City's material failure to properly follow DIRECTV's Order procedures (as set forth on **Exhibit B**) can prevent any such Orders from being deemed an Approved Activation for purposes of earning Programming Commissions or any other amounts herein, if any.  DIRECTV's reasonable determination of whether Circuit City has materially failed to follow DIRECTV's Order procedures shall be determinative.  Notwithstanding anything to the contrary herein, DIRECTV shall not be required to pay any Programming Commission pursuant to this Section 7 relating to (i) any Subscription canceled prior to the commencement of service; (ii) Orders made by a Qualifying Subscriber to Circuit City prior to the Effective Date of this Agreement (such Orders being subject to prior agreements between Circuit City and DIRECTV); (iii) Orders for DIRECTV Programming Packages delivered to DIRECTV after termination of this Agreement; or (iv) any Orders for which Circuit City failed to comply with the terms of this Agreement.  DIRECTV shall not be required to pay any Programming Commissions or other amounts on account of payments received by DIRECTV from Qualifying Subscribers after the termination of this Agreement, except as otherwise expressly provided in Section 19 of this Agreement.

7.2    **PAYMENT TERMS.**  Subject to the terms of this Agreement, DIRECTV shall pay Circuit City the Programming Commission for Approved Activations by Qualifying Subscribers procured through its Retail Locations within twenty (20) business days after the end of each calendar month in which the Approved Activation occurs.

8.    **PROGRAMMING COMMISSIONS (FOR ORDERS THROUGH PROSPECTIVE REFERRAL CUSTOMERS)**.  During the Term of this Agreement, DIRECTV shall also pay Circuit City a Programming Commission in connection with Qualifying Subscribers who were referred by Circuit City as  Prospective Referral Customers as described herein in the amount of Seventy-Five and No/100 Dollars ($75.00).  Subject to the terms of this Agreement, DIRECTV shall pay Circuit City the Programming Commissions for Qualifying Subscriber activations of Circuit City Prospective Referral Customers within twenty (20) business days after the end of each calendar month in which the activation occurs.  DIRECTV shall pay Programming Commission pursuant to this Section 8 for activations of DIRECTV Programming Packages made by a Prospective Referral Customer after the Effective Date of this Agreement and prior to termination of this Agreement.  Programming Commissions under this Section 8 shall not be subject to a pro-rated chargeback by DIRECTV but may be subject to a chargeback if the Programming Commission was not earned by or payable to Circuit City (e.g., not a Qualifying Subscriber, a payment made in error, etc.).

9.    **ADDITIONAL COMPENSATION (FOR ORDERS THROUGH PROSPECVTIVE REFERRAL CUSTOMERS).**  During the Term of this Agreement, DIRECTV agrees to assist Circuit City in the marketing and promotion of the Consumer Offers and the DIRECTV Programming Packages by providing funds be used to pay for promotional activities as mutually agreed to by the parties relating to Qualifying Subscribers who were referred by Circuit City as Prospective Referral Customers through one or more of its- Websites to a fulfillment website operated by DIRECTV(the "Additional Compensation").  DIRECTV shall pay Circuit City an amount equal to Eighty and No/100 Dollars ($80.00) per Qualifying Subscriber who is referred to a DIRECTV fulfillment website through a Circuit

City Website as a Prospective Referral Customer (e.g., Circuit City shall be paid $75 in Programming Commission per Section 8 above plus $80 Additional Compensation, for a total compensation of $155 relating to each such Qualifying Subscriber).   DIRECTV shall pay Circuit City the Additional Compensation within twenty (20) business days after the end of each calendar month in which the Approved Activation relating thereto occurs.

10.    INTENTIONALLY OMITTED

11.    **VOLUME INCENTIVE REBATE.**  Under the terms of this Agreement and that certain Authorized Retailer Agreement [Interim] dated as of June 1, 2007 (the "Interim Agreement"), DIRECTV agreed to pay Circuit City a volume incentive rebate (the "Volume Incentive Rebate") for the gross number of Approved Activations of DIRECTV Programming Packages to Qualifying Subscribers procured through Circuit City Retail Locations during the period from June 1, 2007 until May 31, 2008 (the "VIR Period").

11.1    **VOLUME INCENTIVE REBATE TARGETS**.  DIRECTV will pay Circuit City a Volume Incentive Rebate for each Approved Activation as determined based on the number of gross VIR Activations during the VIR Period, as set forth in this Section 11.1.  Notwithstanding the terms of the Interim Agreement, for purposes of the Volume Incentive Rebate, a "VIR Activation" shall mean (i) Approved Activations of DIRECTV Programming Packages to Qualifying Subscribers procured through Circuit City Retail Locations, Websites and Call Centers; and (ii) activations by Prospective Referral Customer activities hereunder.  For purposes of clarity, the Volume Incentive Rebate shall only be paid on Approved Activations, notwithstanding that other sources of activations (i.e. Prospective Referral Customers) are included as a "VIR Activation" for purposes of calculating the per transaction rate applicable for the Volume Incentive Rebate.

(a)    In the event Circuit City procures in excess of 15,000 but less than 25,000 VIR Activations, DIRECTV shall pay Circuit City a Volume Incentive Rebate equal to a rate ("VIR Rate") of One Hundred and No/100 Dollars ($100.00) for all Approved Activations during the VIR Period.

(b)    In the event Circuit City procures in excess of 25,000 VIR Activations during the VIR Period but less than 35,000 VIR Activations, DIRECTV shall pay Circuit City a Volume Incentive Rebate equal to a VIR Rate of One Hundred Twenty-Five and No/100 Dollars ($125.00) for all Approved Activations during the VIR Period.

(c)    In the event Circuit City procures in excess of 35,000 VIR Activations during the VIR Period but less than 45,000 VIR Activations, DIRECTV shall pay Circuit City a Volume Incentive Rebate equal to a VIR Rate of One Hundred Fifty and No/100 Dollars ($150.00) for all Approved Activations during the VIR Period.

(d)    In the event Circuit City procures in excess of 45,000 VIR Activations during the VIR Period, DIRECTV shall pay Circuit City a Volume Incentive Rebate equal to a VIR Rate of One Hundred Seventy-Five and No/100 Dollars ($175.00) for all Approved Activations during the VIR Period.

By way of example, if as of May 31, 2008 Circuit City has procured 40,000 VIR Activations, 30,000 of which are Approved Activations through Circuit City's Retail Locations, Websites and Call Centers, DIRECTV shall be responsible to pay Circuit City a Volume Incentive Rebate of $4,500,000 calculated pursuant to Section 11.1(c) above (i.e., a total of 30,000 Approved Activations x $150 VIR Rate), less any amounts previously paid.

11.2    **PAYMENT**.  The Volume Incentive Rebate shall become payable by DIRECTV to Circuit City at such time as the threshold amount of 15,000 VIR Activations is satisfied.  The Volume Incentive Rebate shall be payable at the same time as Programming Commissions (i.e. within 20 business days after the end of each calendar month in which the Approved Activation occurs).  At such time as the VIR Rate is increased as a result of exceeding a new VIR Activation threshold, DIRECTV's immediately succeeding Volume Incentive Rebate payment shall include all amounts required to adjust for the increased VIR Rate applicable retroactively to the first Approved Activation hereunder.  By way of example, if as of January 1, DIRECTV has paid Volume Incentive Rebate to Circuit City a VIR Rate of $100 (25,000>35,000 VIR Activations), but during January the VIR Rate increases to $125 (VIR Activations have increased above 35,000 but less than 45,000), DIRECTV shall be responsible to pay Circuit City the following within 20 business days after the end of January: (i) $125 x the number of Approved Activations during the month of November, plus (ii) $25 x the number of Approved Activations prior to January during the VIR Period (representing incremental, retroactive VIR Rate adjustment).

12.    **COMPENSATION GENERALLY**.

12.1    **SHARING COMPENSATION PROHIBITED**.  Unless otherwise agreed by DIRECTV, Circuit City shall not rebate or share any commissions or other compensation hereunder with another authorized retailer of DIRECTV, or any other third party (whether or not an authorized retailer of DIRECTV) who is not an Affiliated Entity.  Circuit City may not combine sales of DIRECTV Programming Packages with another retailer.  Circuit City acknowledges that any orders submitted under another authorized retailer's account number or through such other agent's electronic interface with DIRECTV shall not be credited to Circuit City for purposes of calculating commissions or other compensation hereunder.

12.2    **SET-OFFS.**  Unless specifically provided to the contrary hereunder, a party may set-off or recoup any amounts owed to it by the other party, or by its subsidiaries and affiliates, pursuant to this or any other agreement with such party, and any damages suffered by a party due to the other party's breach hereof or other misconduct, against any amounts which it owes to the other party.  The foregoing does not limit a party's right to recover any unrecouped balance.

13.    **CONFIDENTIAL INFORMATION.**

13.1    **CONFIDENTIAL INFORMATION**.  Each party recognizes and acknowledges that it may have access to certain trade secrets or other confidential information of the other party including, but not limited to, store lists, financial data, DIRECTV subscriber lists and data, drawings and other technical and commercial information, service and sales methods, advertising, promotion and marketing strategies, programming strategies and prices relating to the development and marketing of their respective products and services and that such information constitutes valuable, special and unique property of the other party.  The confidential information of each party including the terms and provisions of this Agreement is hereinafter collectively referred to as the "Confidential Information."  The obligations of this Section 13 shall not apply to any information, including but not limited to Confidential Information, (i) which has become part of the public domain through no act or omission of the receiving party, (ii) which was lawfully disclosed to the receiving party without restriction, (iii) is or has been independently developed by the receiving party, or (iv) is or was rightfully in the receiving party's possession prior to disclosure by the disclosing party hereunder.

13.2    **MAINTAINING CONFIDENTIALITY**.  Each party agrees to maintain the confidentiality of the Confidential Information and not to sell, give, assign, transfer or otherwise disclose the Confidential Information to any third party other than its employees, attorneys, independent certified public accountants or other advisors who need to know the Confidential Information for purposes related to this Agreement and who are bound by materially similar confidentiality obligations.  Each party agrees that any person to whom the Confidential Information is rightfully disclosed hereunder will use the Confidential Information only for purposes related to the performance of this Agreement.

14.    **INTELLECTUAL PROPERTY.**  DIRECTV shall provide Circuit City with a logo and trademark usage manual ("Usage Manual") (which may be amended by DIRECTV from time to time in its discretion, any such amended manual to be provided promptly to Circuit City) that specifies the permitted uses of DIRECTV's service marks, trademarks, and other commercial symbols (collectively, "Marks").  Circuit City may use the Marks only in accordance with the provisions of this Agreement and the Usage Manual.  Circuit City shall not use any logo, trademark, service mark or trade name of any supplier of DIRECTV (including, without limitation, entities providing programming to DIRECTV) for any purpose except as expressly permitted by such supplier.  Circuit City shall not acquire any right to any goodwill, Mark, copyright, or other form of intellectual or commercial property of DIRECTV, except for the limited use rights expressly granted herein.  DIRECTV may use Circuit City's logo and tagline for the limited purposes of representing Circuit City as an authorized retailer of DIRECTV's services and to otherwise promote the business of Circuit City, and such use shall be in accordance with that certain License Agreement between the parties dated September 1, 2001.

15.    **ASSIGNMENT.**  This Agreement shall be binding upon and inure to the benefit of the successors (in whole or in part), including by change in ownership of the controlling shares of stock, spin-off, merger, consolidation, acquisition or sale/transfer of all (or substantially all) of the business or assets of the parties hereto, and the permitted assigns of the parties hereto.  Neither this Agreement nor any of the parties rights hereunder shall be assigned by either party hereto without the prior written consent of the other party which shall not be unreasonably withheld, except in conjunction with a change in ownership of the controlling shares of stock of that party in a transaction or a series of transactions to a non-competitor of the other party, or a spin-off, merger with a non-competitor of the other party, consolidation, acquisition, or the sale or transfer of all (or substantially all) of that party's business or assets, whether voluntarily or by operation of law, to a non-competitor of the other party.  Any other such purported assignment or transfer without prior written consent shall be deemed a breach of the Agreement and shall be null and void.

16.    **BOOKS AND RECORDS.**

16.1    Throughout the Term of this Agreement and for a period of two (2) years following its termination, DIRECTV and its designated agents will, upon at least fourteen (14) days' prior written request and no more than two (2) times per calendar year, have reasonable access to the books and records of Circuit City relating to this Agreement.  In addition, DIRECTV will have the right pursuant to this Agreement to extract from such books and records in order to determine compliance by Circuit City with all of the terms and provisions of this Agreement.  Notwithstanding the foregoing, if any of the two (2) audits reveals that Circuit City is in non-compliance with the terms and conditions of this Agreement, DIRECTV may have reasonable access to such books and records at all reasonable times as reasonably requested by DIRECTV during the remainder of the calendar year in question.

16.2    Throughout the Term of this Agreement and for a period of two (2) years following its termination, Circuit City and its designated agents will, upon at least fourteen (14) days' prior written request and no more than two (2) times per calendar year, have reasonable access to the

books and records of DIRECTV relating to this Agreement.  In addition, Circuit City will have the right pursuant to this Agreement to extract from such books and records in order to determine compliance by DIRECTV with all of the terms and provisions of this Agreement.  Notwithstanding the foregoing, if any of the two (2) audits reveals that DIRECTV is in non-compliance with the terms and conditions of this Agreement, Circuit City may have reasonable access to such books and records at all reasonable times as reasonably requested by Circuit City during the remainder of the calendar year in question.

     17.    **TERM.**  The term of this Agreement shall commence on the Effective Date hereof and shall continue, unless terminated in accordance herewith, until May 31, 2008 (the "Term").

     18.    **TERMINATION.**  In addition to and without limiting any other rights the parties may have under this Agreement, this Agreement shall be terminable upon the following conditions:

     18.1    **REGULATORY CHANGES.**  Either party may terminate this Agreement immediately upon written notice to the other party if the Federal Communications Commission or any other regulatory agency promulgates any rule or order which in effect or application substantially impedes DIRECTV or Circuit City from fulfilling its obligations hereunder.  DIRECTV may terminate this Agreement immediately upon written notice to Circuit City if the Federal Communications Commission or any other regulatory agency promulgates any rule or order which in effect or application (a) substantially impedes DIRECTV from providing DIRECTV Service, or (b) materially and adversely affects DIRECTV's ability to conduct a DIRECTV Service business upon terms and conditions acceptable to DIRECTV, in its reasonable discretion.

     18.2    **IMMEDIATE TERMINATION.**

     (a)    DIRECTV may terminate this Agreement immediately upon written notice to Circuit City, without opportunity to cure, if Circuit City (i) knowingly misrepresents the Consumer Offers, the DIRECTV Service or Programming Packages to customers or otherwise materially misleads customers as to their content, rates or terms, excluding any situation directly caused by express written directive from DIRECTV; (ii) violates any law applicable to its obligations hereunder, excluding any situation directly caused by express written directive from DIRECTV; (iii) knowingly breaches the standards of conduct set forth in Section 3.6; (iv) knowingly uses or discloses DIRECTV's Confidential Information in violation of Section 13; (v) commits a material breach hereof which by its terms or nature is not curable, excluding any situation directly caused by express written directive from DIRECTV; or (vi) fails to submit, within any three (3) month period during the Term of this Agreement, at least three (3) Orders that are accepted as Approved Activations by DIRECTV.

     (b)    Circuit City may terminate this Agreement immediately upon written notice to DIRECTV, without opportunity to cure, if DIRECTV (i) knowingly uses or discloses Circuit City's Confidential Information in violation of Section 13, (ii) commits a material breach hereof which by its terms or nature is not curable, or (iii) violates any law applicable to its obligations hereunder.  In addition, Circuit City may terminate this Agreement for any materially adverse changes made by DIRECTV to its Policies as described in Section 3.5.

     18.3    **BREACH BY CIRCUIT CITY.**  Except as otherwise provided herein, DIRECTV may terminate this Agreement immediately upon written notice if Circuit City fails to cure a breach of any material obligation hereunder which is curable, within thirty (30) days after written notice specifying such breach.

18.4 **BREACH BY DIRECTV.** Except as otherwise provided herein, Circuit City may terminate this Agreement immediately upon written notice if DIRECTV fails to cure a breach of any material obligation hereunder which is curable, within thirty (30) days after written notice specifying such breach.

18.5 **BANKRUPTCY OR CESSATION OF BUSINESS.** Subject to applicable law, this Agreement shall terminate automatically upon either party's cessation of business, election to dissolve, dissolution, insolvency, failure in business, commission of an act of bankruptcy, general assignment for the benefit of creditors, any levy, attachment or foreclosure, or the enforcement of any of the rights of a secured creditor of Circuit City or DIRECTV or the filing of any petition in bankruptcy or for relief under the provisions of the bankruptcy laws.

19. **RIGHTS AND OBLIGATIONS UPON TERMINATION OR CANCELLATION.**

19.1 **COMPENSATION.** After the expiration or termination hereof for any reason, subject to the terms and conditions of this Agreement, DIRECTV shall pay to Circuit City the amounts set forth in this Section 19.1 without set-off except for actual amounts owed to it or actual damages as provided in Section 12.2 hereof. NOTWITHSTANDING THE ABOVE, CIRCUIT CITY SHALL NOT BE ENTITLED TO ANY COMPENSATION WHATSOEVER FOR ORDERS WHICH ARE NOT DELIVERED TO DIRECTV IN COMPLIANCE WITH THE TERMS OF THIS AGREEMENT, WHETHER RECEIVED BY DIRECTV PRIOR TO OR AS OF THE EFFECTIVE DATE OF TERMINATION, EVEN IF SUCH ORDERS RESULT IN ACTIVE SUBSCRIPTIONS TO THE DIRECTV SERVICE.

(a) For Approved Activations, DIRECTV shall pay Circuit City any unpaid Programming Commission, which was earned by Circuit City prior to such expiration or termination, including without limitation any such amounts attributable to Orders which Circuit City properly delivered to DIRECTV prior to expiration or termination and for whom such Orders are accepted as Approved Activations by DIRECTV within thirty (30) days (or such other reasonable time period thereafter in order to accommodate the installation scheduling request of a Qualifying Subscriber) of the termination or the expiration date.

(b) For Prospective Referral Customers, DIRECTV shall pay Circuit City any unpaid Programming Commission and any unpaid Additional Compensation which were earned by Circuit City prior to such expiration or termination, including without limitation any such amounts attributable to Prospective Referral Customers which Circuit City referred to DIRECTV prior to expiration or termination, for whom Orders were established prior to the expiration or termination and such orders were accepted and approved by DIRECTV within thirty (30) days (or such other reasonable time period thereafter in order to accommodate the installation request of a Qualifying Subscriber) of the expiration or termination date.

(d) DIRECTV shall pay Circuit City any unpaid Volume Incentive Rebates which were earned by Circuit City prior to such expiration or termination, including without limitation any such amounts attributable to Qualifying Subscribers procured by Circuit City and delivered to DIRECTV during the Interim Agreement and through the VIR Period or prior to expiration or termination of this Agreement, whichever is earlier, for whom Orders were established through the VIR Period or prior to expiration or termination, as applicable, and such Orders were accepted as Approved Activations by DIRECTV within thirty (30) days (or such other reasonable time period thereafter in order to accommodate the installation scheduling request of a Qualifying Subscriber) of the termination or the expiration date.

19.2    **OBLIGATIONS OF CIRCUIT CITY.**

(a)    Upon termination of this Agreement for any reason, Circuit City shall immediately cease using and shall, upon request of DIRECTV and at DIRECTV's expense, deliver to DIRECTV or destroy and certify such destruction promptly upon request:  (i) any unused DIRECTV sales/lease literature; (ii) all originals and copies of completed and uncompleted Order forms and applications; and (iii) all forms, directives, policy manuals and other written information and materials supplied to it by DIRECTV pursuant to this Agreement or which contain DIRECTV's Marks, except for advertising materials created by Circuit City which incorporate the Marks and are retained for record purposes only.

(b)    On termination, Circuit City shall immediately discontinue (i) all sales of DIRECTV Programming Packages; and (ii) all use of DIRECTV's Confidential Information, unless the parties otherwise agree to a reasonable transition period in light of marketing element commitments which cannot be cancelled.

(c)    Further, on termination Circuit City and DIRECTV shall cooperate to develop a reasonable strategy for Circuit City to cease to identify itself as an authorized retailer/referral contractor for DIRECTV or otherwise affiliated in any manner with DIRECTV (taking into account any advertising which cannot reasonably be stopped prior to the effective date of termination), and for DIRECTV to cease to identify Circuit City as an authorized independent retailer/referral contractor of DIRECTV or otherwise affiliated with DIRECTV in any manner.

(d)    Because of the difficulty in establishing the improper use of customer lists and other Confidential Information, Circuit City agrees that for a period of two (2) years after termination Circuit City shall not, on behalf, of any other provider of audio/video entertainment programming packages or equipment or on its own behalf solicit any DIRECTV subscriber by means which exclusively target such DIRECTV subscribers.  By way of example, Circuit City may not disseminate a marketing piece specifically targeted to a DIRECTV subscriber group which includes an offer to switch or terminate DIRECTV Service and replace with another multi-channel video programming provider (e.g., "bounty activities").  In the alternative, the foregoing shall not prohibit Circuit City from including DIRECTV subscribers in its general direct mail or other marketing offers which do not include bounty, switch-out or similar offers.

19.3    **WAIVER OF CLAIMS.**    EACH PARTY WAIVES ANY RIGHT TO COMPENSATION AND DAMAGES IN CONNECTION WITH THE PROPER TERMINATION OF THIS AGREEMENT IN ACCORDANCE HEREWITH, TO WHICH IT MIGHT OTHERWISE BE ENTITLED UNDER ANY APPLICABLE LAW.  BY WAY OF EXAMPLE, BOTH PARTIES SHALL HAVE NO RIGHT, BASED ON SUCH TERMINATION, TO ANY PAYMENT FROM THE OTHER FOR LOST BUSINESS, FUTURE PROFITS, LOSS OF GOODWILL, REIMBURSEMENT OF EXPENDITURES OR INVESTMENTS MADE OR COMMITMENTS ENTERED INTO, ADVERTISING COSTS, OVERHEAD OR OTHER COSTS INCURRED OR ACQUIRED BASED UPON THE BUSINESS DERIVED OR ANTICIPATED UNDER THIS AGREEMENT.

19.4    **SURVIVAL.**    In addition to DIRECTV's payment obligations set forth in Section 19.1, Circuit City's obligations as set forth in Section 19.2, and Circuit City's inventory buy back right set forth in Section 6.4, the terms, conditions, obligations, covenants and conditions herein which, by their terms or nature, extend beyond the termination or expiration of this Agreement, shall survive

such termination or expiration until fully performed including, but not limited to, indemnification, confidentiality obligations and exclusivity obligations, as otherwise provided herein.

20.    **FORCE MAJEURE.**  Neither party shall be liable for any loss, damage, cost, delay, or failure to perform in whole or in part resulting from causes beyond such party's control, including but not limited to, fires, strikes, insurrections, riots, or requirements of any governmental authority.

21.    **INDEPENDENT CONTRACTOR RELATIONSHIP.**  Each party is an independent contractor under this Agreement and neither party is authorized during the Term hereof to refer orders for DIRECTV Programming Packages as a commissioned independent retailer/referral contractor.  Circuit City is not a partner, franchisee, or employee of DIRECTV for any purpose whatsoever. The provisions of this Agreement are for the benefit only of the parties hereto, and no third party may seek to enforce, or benefit from, these provisions.

22.    **INDEMNIFICATION**.    Except as provided below, each party shall defend and indemnify the other, its subsidiaries and affiliates and their respective employees, officers, and directors from and against any and all third party claims and resulting damages, costs, and other liabilities arising out of the indemnifying party's breach or alleged breach of its representations, warranties, covenants or obligations under this Agreement, negligence, or other wrongful conduct.  DIRECTV shall defend and indemnify Circuit City against any and all claims of third parties (i) that the Marks infringe upon such third party's trademark, service mark, trade secret or other intellectual property right, provided Circuit City's use of the Mark is in accordance with this Agreement and the Usage Manual, and (ii)  arising from marketing claims/representations made by DIRECTV to Circuit City which Circuit City uses and incorporates without any modifications whatsoever to content into its advertising or upon which Circuit City relies when soliciting subscriptions for DIRECTV Programming Packages hereunder.  DIRECTV shall not be required to indemnify Circuit City with respect to the content of any programming (including without limitation claims relating to trademark, copyright, music, music performance and other proprietary interests) unless and solely to the extent of any applicable pass-through indemnification provided to DIRECTV by the providers of such programming.  CIRCUIT CITY WAIVES ANY RIGHT TO INDEMNIFICATION ARISING OUT OF THE CONSTRUCTION, USE AND/OR OPERATION OF DIRECTV'S SATELLITE(S) AND RELATED SYSTEMS.

23.    **LIMITATION OF LIABILITY**.  NEITHER PARTY SHALL BE LIABLE FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES OF THE OTHER PARTY, WHETHER FORESEEABLE OR NOT AND WHETHER BASED ON NEGLIGENCE OR OTHERWISE EXCEPT WITH RESPECT TO CLAIMS BY OR DAMAGES AWARDED TO A THIRD PARTY AGAINST WHICH A PARTY TO THIS AGREEMENT HAS AN OBLIGATION TO DEFEND AND INDEMNIFY.  PROJECTIONS OR FORECASTS BY EITHER PARTY SHALL NOT CONSTITUTE BINDING  COMMITMENTS.    NOTHING  HEREIN  SHALL  LIMIT  THE  PARTY'S INDEMNIFICATION OBLIGATIONS UNDER SECTION 22 ABOVE.

24.    **MISCELLANEOUS.**

24.1    **LAWS.**  All issues with respect to the construction of this Agreement and the rights and liabilities of the parties shall be governed by the laws of the State of New York, without regard to its conflicts of law rules.

24.2    **ENTIRE  AGREEMENT.**  This Agreement shall be the entire agreement between Circuit City and DIRECTV with regard to the subject matter hereof.  Neither party is relying on

any oral or written statements or representations made by any employee or representative of the other party regarding such matters other than those expressly set forth herein.

24.3    **EXPENSES.**  Except as otherwise provided herein, each party shall pay all of its costs and expenses under this Agreement and shall be solely responsible for the acts and expenses of its own agents and employees.

24.4    **AMENDMENTS.**  Any modification of this Agreement must be in writing and signed by both parties, except as otherwise expressly provided herein.  Circuit City acknowledges that modifications to the Policies promulgated by DIRECTV in accordance with Section 3.5 do not constitute modifications requiring Circuit City's written consent.

24.5    **AUTHORIZATION; CAPACITY.**  Each party represents that the execution, delivery and performance of this Agreement have been duly authorized, that it has the full right, power, and authority to execute, deliver and perform this Agreement, and that such execution, delivery and performance do not and will not conflict with any agreement, instrument, order, judgment or decree to which either party is a party or by which it is bound.

24.6    **NO IMPLIED WAIVERS.**   The failure of either party to require the performance by the other of any provision of this Agreement shall not affect in any way the right to require such performance at any later time nor shall the waiver by either party of a breach of any provision hereof be deemed a waiver of such provision.

24.7    **NOTICES.**  Any notice or other written communication required or permitted to be given by this Agreement shall be deemed given when personally delivered or delivered by Federal Express or telecopied, or three (3) business days after it has been sent by United States first-class, certified or registered mail, postage prepaid, properly addressed to the addresses set forth below the signatures herein.  Each party shall provide a minimum of ten (10) days advance written notice to the other in the event of any address or telephone change, or any change in ownership.  Any notice of breach or default shall also be sent to:

|  |  |
|---|---|
| If to DIRECTV: | DIRECTV, Inc. |
|  | 2230 E. Imperial Highway |
|  | El Segundo, CA 90245 |
|  | Attention:  Senior Vice President, Sales & Distribution |
|  |  |
| With a copy to: | Same address as above |
|  | Attention:  Business & Legal Affairs |
|  |  |
| If to Circuit City: | Circuit City Stores, Inc. |
|  | 9950 Mayland Drive |
|  | Richmond, VA 23233 |
|  | Attention:  Buyer, Digital Video Services |
|  |  |
| With a copy to: | Same address as above |
|  | Attention:  Legal Department |
|  | Assistant General Counsel - Commercial |

24.8    **INVALID OR UNENFORCEABLE PROVISIONS.**  If any provision of this Agreement is determined to be invalid or unenforceable, the provision shall be deemed severed from the

remainder, which shall remain enforceable.  If any provision of this Agreement does not comply with any law, ordinance or regulation of any governmental or quasi-governmental authority, now existing or hereinafter enacted, such provision shall to the extent possible be interpreted in such a manner so as to comply with such law, ordinance or regulation, or if such interpretation is not possible, it shall be deemed amended, to satisfy the minimum requirements thereof.

24.9    **GOVERNMENTAL APPROVALS.**  This Agreement shall be subject to all necessary approvals of local, state and federal regulatory agencies.

24.10    **TAXES.**  Subject to Section 5.6 hereof, any taxes asserted against Circuit City or DIRECTV by any governmental authority as a result of this Agreement shall be the responsibility of the parties as follows: (a) Circuit City shall be responsible for any taxes or levies arising out of its performance hereunder; and (b) each party shall be responsible for any taxes related to its income derived hereunder.

24.11    **ATTORNEYS' FEES.**  In the event of any litigation or arbitration between the parties with respect to this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and costs of litigation, as the court or tribunal may determine.

25.    **EXECUTION DATE**.  Circuit City and DIRECTV acknowledge and agree that, upon execution of this Agreement by the last signing party, this Agreement shall be deemed executed effective as of the Effective Date, in order to document the transactions described herein.

**IN WITNESS WHEREOF**, Circuit City and DIRECTV have caused this Agreement to be executed effective as of the Effective Date.

**Circuit City**:                                    **DIRECTV**:

**CIRCUIT CITY STORES, INC.:**            **DIRECTV, INC.:**

By: _____        By: _____

Name: _____        Name: _____

Title: _____        Title: _____

Date: _____        Date: _____