| Vendor Name: | DIRECTV, Inc. | Vendor #: | |
| Payables: | Mario Martinez | E-mail: | mmartinez@direct.com |
| Address: | 2230 E. Imperial Hwy Attn: AR Dept. RE/R08/N367 | | |
| City, State, Zip | El Segundo, Ca. 90245 | | |
| Business Phone: | (310) 964-4499 | Fax Phone: | 310-535-5428 |

| Debit Memos & RTVs: | Jane Pascoe | E-mail: | jepascoe@direct.com |
| Business Phone: | 310-964-5186 | Fax Phone: | 310-535-5428 |

| Advertising Sample: | Stephen Blackburn | E-mail: | smblackburn@directv.com |
| Business Phone: | 770-437-4163 | Fax Phone: | (770) 437-4199 |

| Orders/Customer Service | John Bibeau | E-mail: | jjbibeau@directv.com |
| Business Phone: | 303-712-4735 | Fax Phone: | 303-754-0076 |

| Product/Technical Support: | Support line | E-mail: | Directv.com |
| Business Phone: | 800-347-3288 | Fax Phone: | NA |

| Service: | Support Line | E-mail: | Directv.com |
| Business Phone: | 800-347-3288 | Fax Phone: | NA |

| EDI: | Tom Julin | E-mail: | tajulin@directv.com |
| Business Phone: | 303-712-4793 | Fax Phone: | 303-754-0076 |
| Projected Volume: | | | |

| Logistics: | John Bibeau | E-mail: | jjbibeau@directv.com |
| Business Phone: | 303-712-4735 | Fax Phone: | 303-754-0076 |

| Transportation: | John Bibeau | E-mail: | jjbibeau@directv.com |
| Business Phone: | 303-712-4735 | Fax Phone: | 303-754-0076 |

| Return Authorization:: | Jabil | E-mail: | directvreturns@jabil.com |
| Address: | 3696 Knight Road | | |
| City, State, Zip | Memphis, TN. 38118 | | |
| Business Phone: | 877-508-7456 | Fax Phone: | 901-795-5305 |

| Ship Returned Product to: | Jabil Global Services / Directv | Attention: DirecTV receiving | |
| Address: | 3696 knight Road | | |
| City, State, Zip | Memphis, TN. 38118 | | |
| Business Phone: | 877-508-7456 | Fax Phone: | 901-795-5305 |

**Returns are shipped freight collect.**  CCS prefers Overnite & Watkins.  (Watkins will not ship intrastate.)

Preferred Carrier:          NA

For smaller shipments, choose UPS, Airborne or FedEx, etc          Carrier:          FedEx          Billing #:          NA

## ELECTRONIC DATA INTERCHANGE
## TRADING PARTNER AGREEMENT

THIS ELECTRONIC DATA INTERCHANGE TRADING PARTNER AGREEMENT (the "Agreement") by and between **Circuit City Stores, Inc. (CCS)** and _DirecTV_ ("Vendor") is entered into this _16_ day of _May_____, 2005.

The parties hereto desire to engage in transactions involving the electronic transmission of commercial data in agreed formats to facilitate EDI Transactions.

**1.   Documents.**  Each party may electronically transmit to or receive from the other party any mutually agreed upon documents.

**2.   Cost of EDI.**  Each party, at its own expense, shall provide and maintain its own equipment, software, services and testing necessary to effectively and reliably transmit and receive documents. The cost of a third party service provider, if any, shall be borne by each individual party unless otherwise agreed to in writing.

**3.   Security Procedures.**  Each party shall properly use those security procedures which are reasonably sufficient to ensure that all transmissions of documents are authorized and to protect its business records and data from improper access.  Parties will not be liable for the consequences of an incomplete or incorrect transmission if the error is or should be reasonably obvious to the recipient.

**4.   Timing and Acceptance.**  Each party will retrieve the contents of their electronic mailbox during reasonably regular times that allow for timely processing of data received.  Upon proper receipt of any Document, the receiving party shall promptly and properly transmit a functional acknowledgment.  Any such document, which has been properly received, shall not give rise to any obligation unless and until the party initially transmitting such document has properly received acknowledgment of receipt.

_____   **Initial**

**5.    Garbled Transmission.**  If any properly transmitted document is received in an unintelligible or garbled form, the receiving party shall promptly notify the originating party, if identifiable from the received document.

**6.    Terms and Conditions.**  The terms and conditions of the EDI Transactions made pursuant to this Agreement are those contained in the Vendor Buying Agreement.

**7.    Confidentiality.**  Each party shall use their reasonable efforts to ensure that the content, frequency or terms of any EDI Transactions governed hereby shall not be disclosed to any person or entity not a party to this Agreement except by mutual written consent of the parties.

**8.    Validity/Enforceability.**  This Agreement has been executed by the parties to evidence their mutual intent to create binding purchase and sale obligations.  Any document properly transmitted pursuant to this Agreement shall be considered to be a "writing" or "in writing" and a fully "executed" document which constitutes an "original" document.  The parties hereby agree that neither will raise any defense of lack of writing or signature or any other similar defense based upon a "Statute of Frauds" or similar rule in any dispute that may arise between them for any transaction entered into through EDI.

**9.    Termination.**  This Agreement shall remain in effect until terminated by either party with not less than 30 days prior written notice, which notice shall specify the effective termination date.  Any termination shall not affect the respective obligations or rights of the parties arising under any document or under this Agreement even if the performance is to take place after the effective date of termination.

**10.    Agreement Applicability.**  No obligation to enter into any EDI Transaction or for any continuing business is to be implied from the execution or delivery of this Agreement.

_____    **Initial**

11.    **Exclusion of Damages.**  Neither party shall be liable to the other for any special, incidental, exemplary or consequential damages arising from or as a result of any delay, omission or error in the EDI Transaction or receipt of any documents pursuant to this Agreement unless the delay, omission or EDI error is caused by the willful misconduct on the part of either party.

12.    If electronically trading invoice information, the acknowledgment with reject flag provides sufficient notification that Circuit City has rejected an invoice as "unworkable".  The vendor must re-send the invoice once it has been corrected.  Failure of the original invoice to be processed, due to its contents, will not alter the discount(s) and terms made available to Circuit City.

13.    Electronically traded documents need to accommodate a four-digit year date format as approved by ANSI in version 4010.  Both parties will ensure there is no interruption of business processes due to year 2000.

Each party has caused this Agreement to be properly executed on its behalf as of the date written.

**CIRCUIT CITY STORES, INC.**                    **VENDOR**

By _____          By _____

Name: ____Margaret Browne_____          Name: __John Suranyi_____

Title: **EDI Specialist, Supply Chain**          Title: President, Sales and Service



Circuit City Stores, Inc.
9950 Mayland Drive
Richmond, VA 23233-1464
804.527.4000

Email: rich_hart@circuitcity.com

May 6, 2005

Stephen Blackburn
DIRECTV
2230 East Imperial Hwy.
El Segundo, CA 90245

This letter is to confirm that the following is the current program for Class 111 offered to Circuit City Stores, Inc. (Circuit City) by DIRECTV Corporation (DIRECTV) for all Set Top Boxes.

EFFECTIVE DATES:        4/1/05 – 6/30/06

PRICING:                See Schedule 7.3 of Independent Retailer Agreement (hard copy Attached to this letter)

TERMS:                  Standard terms are Net 30 ROG (Receipt of Goods).  Notwithstanding the foregoing, Circuit City acknowledges that each DIRECTV invoice shall state Net 35 SOG (Shipment of Goods).  In the event that the actual date of receipt provides for less than 30 days from the due date of the applicable invoice, a Net 30 ROG due date based on Circuit City's actual receipt date will apply.

FREIGHT:                FOB Destination, freight prepaid by DIRECTV

PRICE PROTECTION:       Price Protection will be provided on all existing inventories in the event that DIRECTV lowers its costs.  This price protection will be taken as a reduction of Circuit City's accounts balance with DIRECTV.  Any price decrease in DIRECTV's standard rates effectuated during the contract period shall be passed on to Circuit City, effective the date the price decrease is announced to the general public or is provided to any competing retailer.  Circuit City shall not purchase product at a rate higher than the lowest rate during the term hereof.

RETURNS:                See Return Goods Agreement Dated 12/29/04 (hard copy attached to this letter)

INDEMNIFICATION:        See Independent Retailer Agreement Section 16.

Sincerely,

Rich Hart
Senior Buyer Corporate Merchandising
804-527-4000 x6050

By Signing Below you commit that you agree to the terms and conditions of doing business at Circuit City Stores, Inc. as outlined in this document.

DIRECTV by:       (John Suranyi)                                5/13/05
                                                                Date

cc:

All other terms and conditions of Independent retailer agreement remain the same.

## MASTER DEALER AGREEMENT

**THIS MASTER DEALER AGREEMENT** ("Agreement") is made as of the ___ day of April, 2005 (the "Effective Date") by and between Circuit City Stores, Inc., a Virginia corporation with its principal office at 9950 Mayland Drive, Richmond, Virginia 23233-1464 ("Circuit City") and DIRECTV, Inc., a California corporation with its principal office at 2230 East Imperial Highway, El Segundo, California 90245 ("Vendor").

### Recitals

WHEREAS, Circuit City and Vendor have entered into that certain Independent Retailer Agreement dated as of July 1, 2004 ("Independent Retailer Agreement"), pursuant to which DIRECTV authorized Circuit City as an independent retailer of DIRECTV direct broadcast satellite service ("DBS Service"); and

WHEREAS, Circuit City and Vendor desire to enter into this Agreement to set forth certain terms and conditions under which Circuit City will purchase equipment from Vendor which is capable of receiving DIRECTV DBS Service (the "Products") for resale to the public in Circuit City's retail distribution outlets.

### Agreement

In consideration of these premises, and the mutual agreements set forth below, the parties agree as follows:

1.      **APPOINTMENT**.  Vendor appoints Circuit City, and Circuit City agrees to serve as a retail dealer of the Products that are listed in the Product Addendum that is attached to this Agreement as Product Addendum No.1, and in any other product or program addenda referencing this Agreement that may be entered into from time to time by the parties (each a "Product Addendum").   The parties acknowledge that Circuit·City intends to purchase the Products from Vendor and resell the Products to consumers in connection with the sale of DIRECTV DBS Service, as set forth in the Independent Retailer Agreement (as amended), which is attached to this Agreement as **Exhibit A** and incorporated herein by this reference.  Further, returns of Products by consumers to Circuit City shall be governed by the terms of that certain Return Goods Agreement, dated as of December 29, 2004 between the parties, which is attached to this Agreement as **Exhibit B** and incorporated herein by this reference.

2.      **PRICE AND TERMS OF SALE**.  Vendor will sell and Circuit City will purchase Products upon the terms and at the prices specified in the applicable Product Addendum.  Circuit City will unilaterally establish its own prices and terms for the resale of the Products to the public, and Vendor will not advise, instruct or in any way interfere with Circuit City's independent establishment of its retail prices.  Unless stated otherwise in a Product Addendum, Circuit City will have the right to set off only those amounts owed to it by Vendor related to any Product purchases as contemplated hereunder against any amount owing by it to Vendor for such Product purchases.  In addition, in the event Vendor is ever in a debit balance with Circuit City, Vendor will remit payment of any such amounts to Circuit City by certified check or wire transfer within thirty (30) days of demand by Circuit City.

3.      **ORDERS AND OPERATING PROCEDURES**.

        **(a)**      Vendor agrees to comply with the requirements contained in Circuit City's Vendor Operating Guidelines, as amended (the "Vendor Operating Guidelines"), which are attached to this Agreement as **Exhibit C** and incorporated herein by this reference.

        **(b)**      Without limiting the generality of the foregoing, Circuit City will order Products by submitting its purchase order ("Purchase Order") to Vendor via Electronic Data Interchange

("EDI"). A copy of the Purchase Order is contained in the Vendor Operating Guidelines. In the event of a conflict between the Purchase Order and this Agreement, this Agreement will control. Circuit City may amend the form of Purchase Order in its sole discretion from time to time. Vendor will be provided at least thirty (30) days notice of any amendments, and will be deemed to have accepted the amendments unless it objects to the same in writing prior to their effective date. In the event Vendor objects in writing to any amendment, the parties agree to negotiate in good faith with regard to the objection. During the pendency of such negotiations, unless the parties otherwise agree in writing, the terms of such amendment shall be in force. Any agreement reached by the parties resolving the objection will be set forth in a writing signed by the parties, which will be deemed to be an amendment to this Agreement. In the event the parties are unable to reach agreement with regard to the objection, Vendor's sole recourse will be to terminate this Agreement in accordance with Section 7(b) below.

(c)     All terms and conditions contained in the Purchase Order (including, but not limited to, any terms accompanying the Purchase Order or appearing on the reverse side of the Purchase Order form) are specifically included in and made a part of this Agreement, notwithstanding the fact that such terms and conditions may not be transmitted or included with a Purchase Order. Any terms proposed or submitted by Vendor at any time, including but not limited to, any provisions or terms contained in Vendor's franchise agreement(s), invoices, billing statements, documents used in the ordinary course of filling, accepting or acknowledging orders, or other similar documents, will be of no force or effect. Vendor will fill each order in accordance with the Purchase Order. In addition to any other remedies Circuit City may have, Circuit City may, at its option, cancel any Purchase Order without further obligation or liability, and may refuse and/or return the Products to Vendor at Vendor's expense if the terms and conditions set forth in any Purchase Order or in this Agreement are not met by Vendor.

(d)     In the event that Vendor's inventories are insufficient to fill orders received from all of its customers at the time of receipt of Circuit City's Purchase Order, Vendor will notify Circuit City immediately and will ratably allocate Products among its customers. In the event Circuit City elects not to cancel its Purchase Order or any portion of its Purchase Order following such notice (but prior to shipment of the Products as described in this Section), Circuit City will be entitled to direct the placement of available quantities to such distribution centers or other locations as Circuit City may elect. As soon as practicable and upon prior notice to Circuit City, Vendor will ship on-order or back-order (without the requirement of placement or maintenance of multiple Purchase Orders with first in priority) Products to Circuit City at the lower of the prices in effect as of the date of the Purchase Order relative to such Products or the price on the date of receipt of such Products. Cancellation or consolidation of older Purchase Orders as requested or allowed by Circuit City will not result in the loss of priority for shipment and receipt of the Product.

4.     **SUPPLY CHAIN STANDARDS**. Vendor agrees to comply with requirements set forth in the Circuit City Vendor Supply Chain Standards (the "Supply Chain Standards") which are attached to this Agreement as **Exhibit D** and incorporated herein by this reference.

5.     **WARRANTIES; INSURANCE; INDEMNIFICATION; LIMITATION OF LIABILITY**.

(a)     VENDOR WARRANTS GOOD AND MARKETABLE TITLE TO THE PRODUCTS FREE OF ANY LIEN OR ENCUMBRANCE. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, VENDOR REPRESENTS AND WARRANTS THAT (I) IT IS THE OWNER OR VALID LICENSEE OF ANY AND ALL INTELLECTUAL PROPERTY OR OTHER PROPRIETARY RIGHTS PERTAINING TO THE PRODUCTS, PRODUCT IMAGES AND VENDOR'S AND PRODUCT TRADEMARKS AND/OR TRADE NAMES AND (II) IT HAS THE FULL AND SUFFICIENT RIGHT, POWER AND AUTHORITY TO SELL THE PRODUCTS TO CIRCUIT CITY AND GRANT THE RIGHTS AND LICENSES GRANTED UNDER THIS AGREEMENT. VENDOR FURTHER REPRESENTS AND WARRANTS THAT THE PRODUCTS, PRODUCT IMAGES AND VENDOR'S TRADEMARKS AND/OR TRADE NAMES DO NOT AND WILL NOT (I) INFRINGE, MISAPPROPRIATE OR OTHERWISE VIOLATE ANY

PATENT, COPYRIGHT, TRADEMARK, TRADE SECRET OR OTHER PROPRIETARY RIGHT OF ANY THIRD PARTY, (II) COMPETE UNFAIRLY (INCLUDING BUT NOT LIMITED TO PASSING OFF, MISAPPROPRIATION OR VIOLATION OF ANY FEDERAL OR STATE STATUTE) OR (III) VIOLATE ANY OTHER RIGHTS OF THIRD PARTIES.  VENDOR WILL COMPLY WITH ALL APPLICABLE FEDERAL, STATE AND LOCAL LAWS AND REGULATIONS IN PERFORMING ITS OBLIGATIONS UNDER THIS AGREEMENT.

**(b)**     Vendor agrees to ensure that the Products comply in all respects with the Magnuson-Moss Warranty Act [15 U.S.C. Sections 2301, et seq.] and the regulations issued thereunder, as the same may be amended from time to time.  Prior to the initial delivery of each Product purchased under this Agreement, Vendor agrees to deliver to Circuit City at least one copy of all written warranty documents covering each Product.  In the event a Product is not covered by a written warranty, Vendor agrees to deliver to Circuit City a written statement that no such warranty is offered for that specified Product.  In the event any existing Product warranty is amended, updated or modified, Vendor agrees to deliver to Circuit City at least one copy of any amended, updated or modified warranty document within a reasonable time prior to the effective date of the change.

**(c)**     During the term of this Agreement, Vendor will maintain a policy of commercial general liability insurance, including products – completed operations coverage, with an insurance carrier authorized to do business in the United States and having a rating of "A", "A-", or better by A.M. Best Company and a Financial Size Category rating of at least Class VIII, with limits of no less than $2,000,0000 per occurrence and $10,000,000 aggregate.  Products – completed operations coverage will be maintained for the time period covered by this Agreement and for at least five (5) years after the Products to be delivered under this Agreement have been delivered to Circuit City.  Such policies will name "Circuit City Stores, Inc." as an additional insured.  All certificates will provide for at least thirty (30) days written notice prior to cancellation of any insurance referred to under this agreement.  A certificate of insurance meeting this above requirements will be delivered to Circuit City (i) prior to the initial delivery of the Products, (ii) upon renewal of the insurance policy and annually thereafter, and (iii) upon reasonable request.

**(d)**     Vendor agrees to defend (through counsel reasonably satisfactory to Circuit City), indemnify and hold harmless Circuit City and its affiliates, and their respective directors, officers, employees, agents, successors and assigns from and against any and all actions, judgments, claims, losses, damages, expenses or costs (including attorneys' fees and costs and expenses of defense) and liabilities which arise out of, relate to or are in any way connected with (i) the sale, resale and/or use or failure of the Products, including, without limitation, liability based upon death or injury to any person (including Circuit City employees) or damage to property resulting or arising from or alleged to result or arise from or out of the sale, resale, use and/or failure of the Products, (ii) Vendor's actual or alleged breach of this Agreement, including, but not limited to breach of any warranty set forth in Section 5(a) above, (iii) Vendor's actual or alleged violation of any of the laws of any governmental entity with respect to the Products, (iv) any representations made by Vendor to Circuit City which Circuit City uses or incorporates into its advertising or upon which Circuit City relies when selling the Products under this Agreement, or (v) any actual or alleged infringement, misappropriation or other violation by Vendor of any patent, copyright, trademark, trade secret or other proprietary or intellectual property rights of any third party.

**(e)**     IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY LOSS OF PROFITS OR REVENUE OR FOR ANY INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES RESULTING FROM ANY PERFORMANCE, NON-PERFORMANCE, BREACH OR TERMINATION OF THIS AGREEMENT.

6.     **INTELLECTUAL PROPERTY**.

**(a)**    Circuit City acknowledges that it has no ownership right in or to Vendor's trademarks and/or trade names. Circuit City is hereby licensed to use Vendor's Product images, trademarks and/or trade names as it may deem necessary or advisable in conjunction with the marketing and sale of the Products, and in accordance with the terms and conditions of paragraph 9 ("intellectual Property") of the Independent Retailer Agreement.

**(b)**    Vendor acknowledges that it has no right in or to Circuit City's trademarks and/or trade names. Vendor will not use Circuit City's trademarks and/or trade names either in connection with the Products or for any other reason whatsoever without obtaining Circuit City's prior written consent, and in the event such consent is obtained, such use will be subject to such restrictions or limitations as Circuit City may impose and in accordance with such instructions as Circuit City may provide.

7.    **TERM AND TERMINATION**.

**(a)**    The term of this Agreement will commence on the Effective Date and will continue until June 30, 2006 ("Initial Term"), unless earlier terminated hereunder. The term will automatically renew for additional one-year terms (each, a "Renewal Term") unless either party terminates this Agreement by giving the other party at least forty-five (45) days' written notice prior to the end of the Initial Term or any Renewal Term. The Initial Term and any Renewal Term(s) hereunder shall be sometimes collectively referred to in this Agreement as the "Term."

**(b)**    Notwithstanding the foregoing, this Agreement shall automatically terminate upon expiration or earlier termination of the Independent Retailer Agreement.

**(c)** Either party may terminate this Agreement immediately, without liability or further obligation, upon notice to the other party if the other party (i) breaches any term of this Agreement and fails to cure the breach within ten (10) business days following receipt of notice of such breach, (ii) becomes insolvent, files (or has filed against it) a petition in bankruptcy, makes an assignment for the benefit of creditors or ceases normal business operations, or (iii) assigns or attempts to assign this Agreement or any of the rights and obligations under this Agreement without first obtaining consent as required under this Agreement.

**(d)**    Upon termination of this Agreement or any Product Addendum under this Agreement for any reason, at Circuit City's election, Vendor will purchase from Circuit City and Circuit City will sell and deliver to Vendor at Vendor's expense all Products purchased pursuant to the terminated Product Addendum or this Agreement as a whole (as the case may be) then in Circuit City's inventory at the same price as Circuit City paid for such Products.

8.    **CONFIDENTIALITY**. The parties are subject to confidentiality provisions contained in the Independent Retailer Agreement, and acknowledge and agree that the Independent Retailer Agreement will apply to all Confidential Information (as defined in the Independent Retailer Agreement) disclosed under this Agreement. The terms of this Section 8 will survive the termination of this Agreement.

9.    **RELATIONSHIP OF THE PARTIES**. The relationship between Circuit City and Vendor is that of independent contractors and neither has any express or implied authority to create or assume any obligation on behalf of the other. Nothing in this Agreement will be construed as creating any other relationship (including, but not limited to, principal and agent, master and servant, employer and employee, franchisor and franchisee or joint venturer) whatsoever between the parties.

10.    **NOTICES**. Any notice required or permitted under this Agreement and not otherwise addressed pursuant to specific instructions relating to contact information will be in writing and will be sent to the address of the party to be notified provided in the Independent Retailer Agreement, unless such party has previously notified the other of a change of address, in which case notice

4

will be sent to such changed address. Any notice will be sent by prepaid registered or certified United States mail, return receipt requested, or via any national overnight mail service, and will be deemed to have been duly given or rendered five (5) days after mailing, or upon receipt, whichever is earlier.

11.     **FORCE MAJEURE**.  Neither party will be liable to the other party for failure or delay in performance under this Agreement due in whole or in part to an act of God, strike, lockout or other labor dispute, civil commotion, sabotage, fire, flood, explosion, acts of any government, unforeseen shortages or unavailability of fuel, power, transportation, or supplies, inability to obtain or delay in obtaining governmental approvals, permits, licenses, or allocations, and any other causes which are not within such party's reasonable control, whether or not of the kind specifically enumerated above.

12.     **MISCELLANEOUS**.  Neither party may assign this Agreement, or any of its rights or duties under this Agreement, without the prior written consent of the other party.  This Agreement will be governed by the laws of the State of New York (other than its conflicts of laws provisions). Neither party will be deemed to have waived any right, power, privilege or remedy unless the waiver is in writing and duly executed by it.  If any provision of this Agreement is determined by a court of competent jurisdiction to be unenforceable, the provision will be deemed to be severed, and the remaining provisions of this Agreement will remain in full force and effect.  The headings in this Agreement are for convenience of reference only and will not affect its interpretation or construction.  The terms of Sections 5 through 13 shall survive the termination of this Agreement. This Agreement, including any exhibits, schedules, attachments or documents incorporated under this Agreement, constitutes the entire agreement between the parties with respect to the subject matter of this Agreement and supersedes any prior agreements between the parties with respect to such subject matter.

IN WITNESS WHEREOF, the parties have caused this Master Dealer Agreement to be executed as of the date and year first above written.

**CIRCUIT CITY STORES, INC.**

By: _John Rowe_

Name: _John Rowe_

Title: _Merchandise Mgr._

Date: _5-20-05_

**DIRECTV, INC.**

By: _____

Name: _John Suranyi_

Title: _President, Sales & Service_

Date: _5/18/05_

## PRODUCT ADDENDUM

This Product Addendum is entered into as of the _____ day of April (the "Effective Date") pursuant to the Master Dealer Agreement between Circuit City Stores, Inc. ("Circuit City") and DIRECTV, Inc. ("Vendor") dated April __, 2005 (the "Agreement") to set forth certain terms of sale to Circuit City by Vendor of the Products referenced in the attached pricing grid schedule(s) (the "Pricing Grid"). Capitalized terms not otherwise defined in this Addendum will have the meaning set forth in the Agreement.

1.    **PAYMENT TERMS**.

       **(a)**      The price for each Product sold under this Product Addendum is set forth on the attached Pricing Grid. The Parties may add additional Products to this Addendum or amend the Pricing Grid for existing Products under this Addendum via an additional Pricing Grid referencing this Addendum. Except as otherwise stated herein, the price for all Products purchased hereunder shall be the price in effect at the time of the receipt of the Products at a Circuit City location. Any listing of suggested retail prices is for point of reference only. This is not an agreement to sell the Products at a certain price, and Circuit City reserves the right, in its sole discretion, to establish the price at which it will sell the Products.

       **(b)**      Payment terms are Net 30. Payment will be made in U.S. dollars.

2.    **FREIGHT**. Unless otherwise set forth by Circuit City in a Purchase Order, freight will be FOB Destination as indicated in the Circuit City Purchase Order, Freight Prepaid by Vendor.

3.    **PRICE INCREASE TIMING**. In the event of an increase in Vendor's price to Circuit City, Circuit City will pay the lower price for all Products ordered under open Purchase Orders.

4.    **PRICE PROTECTION**. In the event that Vendor lowers its price for the Products, price protection will be provided to Circuit City for all Products in inventory or in transit to Circuit City at the time of the price reduction. This price protection will be taken as a reduction of Circuit City's account balance with Vendor. In the event price protection creates a debit balance, such amounts will be payable in accordance with the terms of the Agreement.

5.    **PRODUCT RETURNS**. In addition to any other rights it may have at law or in equity, Circuit City may refuse and/or return, at Vendor's expense, any Products which are (i) goods that are nonconforming with the applicable Purchase Order or that are shipped contrary to or not in accordance with the terms of the Purchase Order or any other instruction provided by Circuit City, (ii) shipped in excess of or not covered by the Purchase Order, or (iii) not shipped in standard packaging or containers. Any Products subject to a Product recall, or Products returned by a Circuit City customer in accordance with Circuit City's return policies as they may exist from time to time, shall be returned to Vendor under the terms of the Return Goods Agreement attached as **Exhibit B** to the Agreement.

6.    THIS SECTION HAS BEEN INTENTIONALLY DELETED.

7.    **TERM AND TERMINATION**. This Product Addendum will commence on the Effective Date and will continue until the earlier of (i) termination by either party with or without cause upon not less than forty-five (45) days prior written notice to the other party; or (ii) the termination of the Agreement.

       IN WITNESS WHEREOF, the parties have caused this Product Addendum to be executed as of the date and year first above written.

**CIRCUIT CITY STORES, INC.**                    **DIRECTV, INC.:**

By: _John Rowe_____

Name: _John Rowe_____

Title: _Merchandise Mgr._____

Date: _5-20-05_____

By: _____

Name: _John Suranyi_____

Title: _President, Sales & Service_

Date: _5/16/2005_____

Pricing Grid to Product Addendum

| DIRECTV Receiver System Type | Manufacturer/Brand Name | Model Number | Price |
|---|---|---|---|
| Standard | Thomson | D10 | $25.00 |
| DVR | Thomson | DVR40 | $60.00 |
| DVR | Thomson | R10 | $60.00 |
| HD | Samsung | SIR-TS360 | $190.00 |
| HD | Samsung | H10 | $190.00 |
| HD DVR | DIRECTV | HR-250 | $681.00 |



# Vendor
# Supply Chain
# Standards
## Version 3

# Vendor Supply Chain Standards

## <u>Table of Contents</u>

1. Vendor Supply Chain Standards Overview ........................................9

2. Performance Requirements Detail .....................................................14

    2.1. On Time Delivery Metric for Freight Prepaid Vendors........14

    2.2. On Time Shipment Metric for Freight Collect Vendors.......19

    2.3. Shipment Accuracy...................................................25

    2.4. Order Cycle Frequency..............................................26

3. Vendor Transaction Guidelines .......................................................28

    3.1. Order Corporate Freeze Days....................................28

    3.2. Purchase Order Lead Time.......................................29

    3.3. Electronic Data Interchange (EDI)............................29

4. Performance Reporting ...................................................................31

5. Vendor Acknowledgement of Circuit City's Vendor Supply Chain Standards program.......................................................................32

6. Terms and Amendments ...................................................................33

# 1. Vendor Supply Chain Standards Overview

Circuit City's Vendor Supply Chain Standards (the "Supply Chain Standards Program" or the "Supply Chain Standards") were initially implemented several years ago as part of a broader vendor performance and supply chain improvement effort. We recognize that improving our supply chain requires collaborative effort between our vendors and ourselves. Based upon our experience and that collaborative effort, we have improved and refined our Supply Chain Standards.

Supply Chain Standards is one component of Circuit City's overall supply chain improvement initiative. We also plan to initiate programs to increase the level of data and information sharing, improve order forecasting procedures and pilot alternate methods of product distribution. We are evaluating every aspect of the way we do business to identify opportunities to improve the overall financial and operating performance of our supply chain. We expect significant benefits for Circuit City and our community of vendors.

This Supply Chain Standards document outlines the critical metrics being monitored and establishes our requirements for your supply chain performance. The Supply Chain Standards Program consists of a number of different performance requirements, as well as required transaction terms. The overarching purpose for both the performance requirements and transaction terms is to facilitate and drive superior supply chain performance. Certain financial assessments will be imposed against you if you fail to meet these requirements. The financial assessments and performance measurements are based upon the product invoice cost (either by class or by model, as set forth below), before discounts or other reductions in price and before any other credits to Circuit City.

Please note that the days referred to in this document are calendar days and that purchase orders written under the Circuit City Direct Import program are excluded from this program.



The Vendor Supply Chain Standards basic performance requirements are:

| Measurement | Target | Financial Assessment |
|---|---|---|
| On Time Delivery (1) | 90% | 1% to 5% of the invoice cost of the units not delivered on time |
| On Time Shipment (2) | 90% | 1% to 5% of the invoice cost of the units not shipped on time |
| Shipment Accuracy | 100% | Per model on Shipment- 2% of the model invoice cost on the shipment or $100 per model, which ever is lowest.<br><br>The assessment is capped at $500 per shipment. |
| Weekly Order and Delivery | 100% | Carrying costs of additional inventory held by Circuit City due to non-weekly schedule:<br>    -1% of the total invoice cost for the period for bi-monthly classes<br>    -2% of the total invoice cost for the period for monthly classes |

Notes:
1. Applicable for freight prepaid vendors only.
2. Applicable for freight collect vendors only.

On a monthly basis you will receive from Circuit City a report indicating your performance across these and other measures. The report contains details of assessments against you as a result of performance below target. You will have 30 days from the date of the report to challenge any assessments. In addition, the monthly report serves as the starting point for root cause analysis and collaborative problem solving discussions between us. They will also serve as an ongoing tool to track supply chain improvement. Additional detail concerning how each performance requirement is defined and measured is included in this document.

# 2. Performance Requirements Detail

## 2.1. On Time Delivery Metric for Freight Prepaid Vendors

Consistent on time delivery performance is critical to removing variability and reducing lead times from the supply chain. These improvements in turn facilitate large reductions in inventory levels throughout the supply chain and freeing up capital for use in more productive ways. Consequently, if you work with Circuit City on a freight prepaid basis, you will be subject to on time delivery requirements.

Every purchase order issued to you by Circuit City includes a "Do Not Deliver Before" and a "Do Not Deliver After" date (the "On Time Delivery Window"). A product delivery will be considered on time if the product is delivered by you to the facility specified in the purchase order on or after the "Do Not Deliver Before" date and on or before the "Do Not Deliver After" date.

Freight prepaid shipments will be measured to a three-day On Time Delivery Window during the period from March 2004 through February 2005. The latest date in the On Time Delivery Window is the expected receipt date ("ERD") listed on the purchase order and the earliest date in the On Time Delivery Window is the ERD minus two days. In order for a shipment to be considered on time, the shipment must enter the facility specified on the purchase order no earlier than the "Do Not Deliver Before" date and no later than the "Do Not Deliver After" date.

> **Example for FY05 (March 2004-February 2005):**
> Expected Receipt Date (ERD) = 1/9/2004
> Do Not Deliver Before Date = 1/7/2004
> Do Not Deliver After Date = 1/9/2004
>
> If a shipment arrives on 1/6/2004, the shipment is early and there will be a financial assessment.
> If a shipment arrives on 1/10/2004, the shipment is late and there will be a financial assessment.

Freight prepaid shipments will be measured to a two-day On Time Delivery Window during the period from March 2005 through Feb 2006. The latest date in the On Time Delivery Window is the ERD listed on the purchase order and the earliest date in the On Time Delivery Window is ERD minus one day.

> **Example for FY06 (March 2005-February 2006):**
> Expected Receipt Date (ERD) = 1/9/2004
> Do Not Deliver Before Date = 1/8/2004
> Do Not Deliver After Date = 1/9/2004
>
> If a shipment arrives on 1/7/2004, the shipment is early and there will be a financial assessment.
> If a shipment arrives on 1/10/2004, the shipment is late and there will be a financial assessment.

Starting March 2006 all freight prepaid shipments will be measured to a one-day On Time Delivery Window. The shipment must be received on the ERD. If you are able to drop the trailer at the facility, you may do so one day before the ERD and the shipment will be considered on time.

> **Example after March 2006:**
> Expected Receipt Date (ERD) = 1/9/2004
> Do Not Deliver Before Date = 1/9/2004
> Do Not Deliver After Date = 1/9/2004
>
> If a shipment arrives on 1/8/2004 and was dropped, the shipment is on time and there is no financial penalty.
> If a shipment arrives on 1/8/2004 and was not dropped, the shipment is early and there will be a financial assessment.
> If a shipment arrives on 1/10/2004, the shipment is late and there will be a financial assessment.

At the end of every month, you will be evaluated to determine if you achieved the target performance for the month. If you supply Circuit City with multiple classes of merchandise (based on Circuit City's classification

system), you will be evaluated separately for each class of merchandise. For any month in which you have a class of merchandise that fails to achieve the target of at least 90% on time delivery performance, assessments for all early or late product deliveries within the class will be calculated. The assessments will be deducted from any balance due to you. On time delivery rates for each class of merchandise will be calculated as follows:

| On time Delivery Rate | |
| --- | --- |
| On time Delivery %  = | Total invoice cost of units received on time |
| | Total invoice cost of all units received |

The following chart outlines the assessment penalty for each day of early or late delivery:

| Receiving Window | Financial Assessment |
| --- | --- |
| • 10 days or greater early | • 5.0% of the total invoice cost of the units delivered early |
| • 9 days early | • 4.5% of the total invoice cost of the units delivered early |
| • 8 days early | • 4.0% of the total invoice cost of the units delivered early |
| • 7 days early | • 3.5% of the total invoice cost of the units delivered early |
| • 6 days early | • 3.0% of the total invoice cost of the units delivered early |
| • 5 days early | • 2.5% of the total invoice cost of the units delivered early |
| • 4 days early | • 2.0% of the total invoice cost of the units delivered early |
| • 3 days early | • 1.5% of the total invoice cost of the units delivered early |
| • 2 days early | • 1.0% of the total invoice cost of the units delivered early |
| • 1 day early | • 1.0% of the total invoice cost of the units delivered early |
| • On time | • No financial assessment |
| • 1 day late | • 1.0% of the total invoice cost of the units delivered late |
| • 2 days late | • 1.0% of the total invoice cost of the units delivered late |
| • 3 days late | • 1.5% of the total invoice cost of the units delivered late |
| • 4 days late | • 2.0% of the total invoice cost of the units delivered late |
| • 5 days late | • 2.5% of the total invoice cost of the units delivered late |
| • 6 days late | • 3.0% of the total invoice cost of the units delivered late |
| • 7 days late | • 3.5% of the total invoice cost of the units delivered late |
| • 8 days late | • 4.0% of the total invoice cost of the units delivered late |
| • 9 days late | • 4.5% of the total invoice cost of the units delivered late |
| • 10 days or greater late | • 5.0% of the total invoice cost of the units delivered late |

If a vendor cancels a purchase order and Circuit City decides to hold the vendor accountable for the cancelled purchase order quantity, the vendor will be charged 5% of the total invoice cost of the units on the purchase order that was cancelled.

New vendors who sign the Supply Chain Standards agreement will have two (2) full months of "shadow" (interim) reporting, in which no assessments will be made. Assessments, if any, will be made beginning with the third full month of your participation in the Supply Chain Standards Program.

## 2.2. On Time Shipment Metric for Freight Collect Vendors

If you work with Circuit City on a freight collect basis, you will be subject to the on time shipment requirements. These requirements mirror the on time delivery requirements, except they recognize for freight collect vendors, Circuit City is responsible for arranging and paying for shipment (subject to any agreements relating to freight allowances paid by the vendor) of product from the vendor's facility to a Circuit City facility.

Every purchase order issued by Circuit City includes a "Do Not Ship Before" and a "Do Not Ship After" date (the "Ship Window"). A product shipment will be considered on time if the product is tendered and picked up by a Circuit City designated carrier on or after the "Do Not Ship Before" date and on or before the "Do Not Ship After" date. In addition, at any time after a purchase order has been issued but prior to the "Do Not Ship After" date, the Circuit City designated logistics provider may contact you to request that the freight be tendered on a specific date

during the Ship Window. If you fail to tender the freight on that specific date and the shipment ships outside the shipping window, the shipment will be considered late. You also must follow all guidelines and procedures in the freight conversion routing guide and associated ship matrix documentation, which have been provided to you by Circuit City.

Freight collect shipments will be measured to a three-day ship window from March 2004 through February 2005. Beginning in March 2005, freight collect shipments will be measured to a two-day ship window. The start and end of the shipping window will be based on the shipping lane and mode. The objective is to ship the product by a certain day so that it arrives on time at the Circuit City destination. The specifics of how these windows are calculated using lane transit times are defined in the ship matrix documentation.

#### Example for FY05 (March 2004 – February 2005): (transit time = 2 days)
Expected Receipt Date (ERD) = 1/9/2004
Do Not Ship Before Date = 1/5/2004
Do Not Ship After Date = 1/7/2004

If a shipment is tendered and shipped before 1/5/2004 by you, the shipment is early and there will be a financial assessment.
If a shipment is tendered and shipped after 1/7/2004 by you, the shipment is late and there will be a financial assessment.

#### Example after March 2005, : (transit time = 2 days)
Expected Receipt Date (ERD) = 1/9/2004
Do Not Ship Before Date = 1/6/2004
Do Not Ship After Date = 1/7/2004

If a shipment is tendered and shipped before 1/6/2004 by you, the shipment is early and there will be a financial assessment.
If a shipment is tendered and shipped after 1/7/2004 by you, the shipment is late and there will be a financial assessment.

When the shipment is released by you within the Ship Window and, in the opinion of Circuit City or its Third Party Logistics provider, Circuit City or the Third Party Logistics group caused the shipment to ship outside the Ship Window the vendor will not be held accountable. The shipment will be identified in your Supply Chain Standards report in the column "3PL Fault Flag" with a "C" when Circuit City is at fault or a "T" when the Third Party Logistics group is at fault. If a record is identified with a "C" or "T", the record will be shown as on time and you will not be assessed for early and late shipments.

If, in the opinion of Circuit City or its Third Party Logistics provider, you are at fault for shipping outside the Ship Window, the record will be identified with a "V." The record will be measured to the Ship Window and a financial assessment will be levied against you.

At the end of every month, you will be evaluated to determine if you achieved the target performance for the month. If you supply Circuit City with multiple classes of merchandise (based on Circuit City's classification system), you will be evaluated separately for each class of merchandise. For any month in which you have a class of merchandise that fails to achieve the target of at least 90% on time shipping performance, assessments for all early and late product shipped within the class will be calculated. The assessments will be deducted from any balance due to you. On time shipping rates for each class of merchandise will be calculated as follows:

| On time Shipment Rate | | |
| --- | --- | --- |
| On time Shipment % = | Total invoice cost of units shipped on time | |
| | Total invoice cost of all units shipped | |

The following chart outlines the assessment penalty for each day of early or late shipping:

| Shipping Window | Financial Assessment |
|---|---|
| • 10 days or greater early | • 5.0% of the total invoice cost of the units shipped early |
| • 9 days early | • 4.5% of the total invoice cost of the units shipped early |
| • 8 days early | • 4.0% of the total invoice cost of the units shipped early |
| • 7 days early | • 3.5% of the total invoice cost of the units shipped early |
| • 6 days early | • 3.0% of the total invoice cost of the units shipped early |
| • 5 days early | • 2.5% of the total invoice cost of the units shipped early |
| • 4 days early | • 2.0% of the total invoice cost of the units shipped early |
| • 3 days early | • 1.5% of the total invoice cost of the units shipped early |
| • 2 days early | • 1.0% of the total invoice cost of the units shipped early |
| • 1 day early | • 1.0% of the total invoice cost of the units shipped early |
| • On time | • No financial assessment |
| • 1 day late | • 1.0% of the total invoice cost of the units shipped late |
| • 2 days late | • 1.0% of the total invoice cost of the units shipped late |
| • 3 days late | • 1.5% of the total invoice cost of the units shipped late |
| • 4 days late | • 2.0% of the total invoice cost of the units shipped late |
| • 5 days late | • 2.5% of the total invoice cost of the units shipped late |
| • 6 days late | • 3.0% of the total invoice cost of the units shipped late |
| • 7 days late | • 3.5% of the total invoice cost of the units shipped late |
| • 8 days late | • 4.0% of the total invoice cost of the units shipped late |
| • 9 days late | • 4.5% of the total invoice cost of the units shipped late |
| • 10 days or greater late | • 5.0% of the total invoice cost of the units shipped late |

If a vendor cancels a purchase order and Circuit City decides to hold the vendor accountable for the cancelled purchase order quantity, the vendor will be charged 5% of the total invoice cost of the units on the purchase order that was cancelled.

You will have two (2) full months of "shadow" (interim) reporting, in which no assessments will be made. Assessments, if any, will be made beginning with the third full month of your participation in the Supply Chain Standards Program.

## 2.3.  Shipment Accuracy

Accurate and complete shipping documentation is a critical component in streamlining receiving procedures. When a vendor sends an accurate Advance Ship Notice ("ASN") along with their load, Circuit City is able to process the load 75% faster than a load sent with an inaccurate or incomplete document.

As a result, you (concurrent with the requirement to use EDI) will be required to submit ASN information for each shipment and to ensure that all information included on each ASN matches the corresponding information on each shipment's Bill of Lading ("BOL") or freight bill documentation. This information must also match the physical contents of the associated shipment. This requirement specifically includes all quantity and product description information, destination or location codes, tracking information and any other data used to expedite and process the receipt. All shipments received at any Circuit City location will be subject to audit. For each model on a shipment without an EDI ASN and/or BOL or with inaccurate information on the ASN or BOL, you will be assessed 2% of the total invoice cost of all units of the model included in the shipment, or $100, whichever is smaller. In effect, the financial assessment is capped at $100 per model. The total amount of assessments levied for shipment inaccuracy will be capped at $500 per shipment. For these purposes, a shipment will be identified based on the Circuit City Distribution Center Keyrec identification number, which should correspond to the load identified on the freight bill sent with the shipment.

## 2.4. Order Cycle Frequency

An order cycle is that period of time during which a vendor accepts a set of orders from Circuit City to make deliveries or shipments to a set of Circuit City locations. Typically these cycles are monthly, semi-monthly or weekly. Increasing the order cycle frequency reduces both the cycle stock and safety stock inventory required throughout the supply chain and improves the accuracy of the forecasting process. Increasing the order cycle frequency also provides greater overall flexibility to the supply chain. Accordingly, you will be required to accept orders from and make shipments or deliveries to Circuit City on a weekly basis. In the event you do not accept orders from Circuit City on a weekly basis, the following assessments will be levied:

| Order Cycle | Financial Assessment |
|---|---|
| • Bi-Monthly | • 1% of total invoice cost for the period for all classes not weekly |
| • Monthly | • 2% of total invoice cost for the period for all classes not weekly |

# 3. Vendor Transaction Guidelines

The consumer electronics industry continues to evolve at an increasing speed. New products introduced today are often obsolete within six months. In today's environment it is no longer possible to conduct business using outdated and inefficient transaction terms. To ensure that Circuit City remains capable of responding to a rapidly changing business environment and to encourage our vendors and business partners to improve their supply chains, we have developed the following transaction guidelines.

## 3.1. Order Corporate Freeze Days

Order corporate freeze days represent the time prior to the expected receipt date within which we provide you with a final forecast of our anticipated purchases of a particular quantity of a particular product. (Note that these are forecasts only, and not commitments to purchase any particular quantity of product). The shorter the period of time during which forecasts must be frozen, the more accurate our order forecasts will be. This in turn reduces the amount of safety stock inventory that must be carried throughout the supply chain. Consistent with our belief that the current business environment demands increased flexibility and improved supply chain performance, your corporate freeze should be between 30 to 36 days from the ERD.



| Maximum Corporate Freeze Days |
|---|
| • 30-36 |

## 3.2. Purchase Order Lead Time

The Purchase Order Lead Time represents how many days in advance of the receipt of goods Circuit City must send a purchase order to a vendor. The shorter this lead time, the better inventory deployment decision Circuit City will make with the inventory being purchased, thus enabling us to carry less safety stock. Your Purchase Order Lead Time should be less than 14 days from the ERD.



| Maximum Purchase Order Lead Time |
|---|
| • 14 days |

## 3.3. Electronic Data Interchange (EDI)

The technology underlying many supply chain improvement opportunities is EDI. Accordingly, you will be required to use and accept the following EDI documents for all transactions completed with Circuit City:

| EDI Document |
|---|
| 810 Invoice |
| 830 Forecast |
| 830I Incoming Forecast |
| 850 Purchase Order |
| 855 Purchase Order Acknowledgement |
| 856 Advance Shipment Notice |
| 860 P.O. Change |
| 997 Functional Acknowledgement |

## 4. Performance Reporting

On a monthly basis, you will receive from Circuit City a report listing your performance across a variety of statistics, including those outlined herein. Together, we will use these monthly trend reports as a guide to indicate where problems need to be resolved. The reports also include trend data to track performance over time.

In addition, you will also receive a detailed account of any financial assessments and the supporting calculations for those assessments. You will then have a period of 30 days from the date of the report to file a Chargeback Claim to challenge any amounts assessed. Any claims filed to challenge the assessments must be submitted in written form to Circuit City along with detailed support as to why the assessments are incorrect. Circuit City will endeavor to respond to any such challenges within 30 days, but all challenges are resolved in accordance with Circuit City's sole discretion. If at the end of the resolution period, there are still assessments, you will see a deduction on your check remittance. All Supply Chain Standards debits have an invoice number similar to "VP_MONTH_YEAR". In the event you are ever in a debit balance with Circuit City, you agree to remit payment of any such amounts to Circuit City by certified check or wire transfer within thirty (30) days of demand by Circuit City.

## 5. Vendor Acknowledgement of Circuit City's Vendor Supply Chain Standards program

By signing below, you agree to abide by the terms of Circuit City's Supply Chain Standards Program as set forth herein. In addition, you agree that the terms in this Vendor Supply Chain Standards document shall be applicable to any agreement between you and Circuit City whereby Circuit City purchases products from you, and, unless otherwise stated in the other agreement. Any conflict or discrepancy between the terms of any such agreement(s) and this Vendor Supply Chain Standards document shall be resolved in favor of this Vendor Supply Chain Standards document. Notwithstanding the foregoing, Circuit City's rights and remedies set forth in this Supply Chain Standards document are not exclusive. The rights and remedies set forth herein (including, but not limited to any right to financial assessments) shall be in addition to and not in limitation of any right or remedy Circuit City may have under any other agreement with you or under applicable law.

## 6. Terms and Amendments

This Supply Chain Standards Program will remain in effect until terminated by Circuit City. In the event Circuit City wishes to amend its Supply Chain Standards Program in its sole discretion, you will be provided with at least thirty (30) days notice of any amendments. You will be deemed to have accepted such amendments unless you object to the same in writing prior to their effective date. In the event you object in writing to any amendment, we agree to negotiate in good faith with regard to the amendment. During the period of the negotiations, unless we otherwise agree in writing, the terms of the amendment shall be in force. Any agreement reached by us resolving the objection will be set forth in a writing signed by the parties, which will be deemed to be an amendment to these Supply Chain Standards. In the event the parties are unable to reach agreement with regard to the objection, your sole recourse will be to terminate the applicable agreement between the parties for the sale of goods.

| | |
|---|---|
| Vendor Name: | DIRECTV, Inc. |
| Signature: | |
| Name: | John Suranyi |
| Title: | President, Sales and Service |
| Date: | 5/18/05 |