Court File No. 08-CL-7841

## ONTARIO

### SUPERIOR COURT OF JUSTICE

### COMMERCIAL LIST

*IN THE MATTER OF THE COMPANIES' CREDITORS
ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED*

*AND IN THE MATTER OF A PLAN OF COMPROMISE OR
ARRANGEMENT OF INTERTAN CANADA LTD. AND
TOURMALET CORPORATION*

APPLICANTS

### FIFTH REPORT OF THE MONITOR

### ALVAREZ & MARSAL CANADA ULC

### FEBRUARY 19, 2009

## INTRODUCTION

1.    By order of this Honourable Court dated November 10, 2008, InterTAN Canada Ltd. ("InterTAN") and Tourmalet Corporation ("Tourmalet" and together with InterTAN the "Applicants") obtained protection from their creditors under the *Companies' Creditors Arrangement Act* ("CCAA"). These proceedings are referred to herein as the "CCAA Proceedings".

2.    Pursuant to the Initial Order in the CCAA Proceedings, Alvarez & Marsal Canada ULC ("A&M") was appointed monitor of the Applicants during these CCAA proceedings (the "Monitor").

3.    Concurrently with the commencement of the CCAA Proceedings, the Applicants' ultimate parent company, Circuit City Stores, Inc. ("Circuit City") and certain of its U.S. affiliates (collectively the "U.S. Debtors") commenced proceedings under Chapter 11, Title 11 of the *United States Code* (the "U.S. Bankruptcy Code"). These proceedings are referred to herein as the "Chapter 11 Proceedings".

- 2 -

4.    In connection with the Applicants' application for protection under the CCAA, A&M provided this Honourable Court with an initial report in its capacity as proposed monitor (the "Initial Report") dated November 10, 2008.

5.    The Monitor delivered its first report dated November 24, 2008 (the "First Report") in connection with the "come back" hearing that was returnable on November 26, 2008 under paragraph 52 of the Initial Order.  On November 26, 2008, the Court adjourned the "come back" hearing to December 5, 2008.

6.    The Monitor delivered its second report dated December 3, 2008 (the "Second Report") in connection with the hearing on December 5, 2008.  At that hearing, this Honourable Court granted an extension of the stay of proceedings under the CCAA and approval of a sale process for the business and assets of InterTAN.  The Order issued on November 10, 2008 was also amended and restated on December 5, 2008.  A copy of the Amended and Restated Initial Order is attached hereto as Appendix "A" (the "Initial Order").

7.    In light of certain developments concerning the Second Amendment to the Senior Secured Super-Priority Debtor-in Possession Credit Agreement (the "Second Amendment"), which developments are discussed in detail in the Monitor's third report dated January 10, 2009 (the "Third Report"), the Court issued an interim Order on December 24, 2008 prohibiting the distribution of proceeds of the Applicants' property and any intercompany advances from the Applicants to any of its U.S. affiliates pending a return date before the Court on January 14, 2009 (the "Status Quo Order").

8.    The Monitor delivered the Third Report in connection with the motion returnable January 14, 2009, in which the Monitor sought directions from the Court regarding the fair and appropriate way to address the impact of the Second Amendment on the Applicants and their stakeholders.  On January 23, 2009, the Court issued an Order extending the Status Quo Order until further Order of the Court and ordering an accounting of the claims of the DIP Lenders (as defined in paragraph 35 of the Initial Order) in the CCAA Proceedings.

9.    The Monitor delivered its fourth report dated February 6, 2009 (the "Fourth Report") in connection with the Applicants' motion returnable February 10, 2009 to approve a process for the submission of pre-filing claims against the Applicants (the "Pre-Filing Claims Process"). On February 10, 2009, the Court granted an Order approving the Claims Process proposed by the Applicants (the "Pre-Filing Claims Process Order").

10.   The purpose of this report (the "Fifth Report") is to provide the Court and the Applicants' stakeholders with a status report on the proceedings and to address certain matters in connection with the Applicants' motion returnable February 23, 2009. In particular, the Fifth Report provides this Honourable Court with an update in respect of the following:

- cash flow results relative to forecast;

- the Pre-Filing Claims Process; and

- DIP financing matters, including a proposed amendment to the Senior Secured Super-Priority Debtor-in Possession Credit Agreement (the "DIP Facility").

**TERMS OF REFERENCE**

11.   In preparing this report, the Monitor has relied upon unaudited financial information, InterTAN's books and records, financial information prepared by InterTAN and its advisors, and discussions with management of InterTAN and its advisors. The Monitor has not audited, reviewed, or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, the Monitor expresses no opinion or other form of assurance on the information contained in this report.

12.   Certain of the information referred to in this report consists of forecasts and/or projections. An examination or review of financial forecasts and projections, as outlined in the Canadian Institute of Chartered Accountants Handbook, has not been performed. Future-oriented financial information referred to in this report was prepared based on management's estimates and assumptions. Readers are cautioned that since projections are based upon assumptions about future events and conditions that are not ascertainable,

- 4 -

actual results will vary from the projections, even if the assumptions materialize, and the variations could be significant.

13.     The Monitor has requested that management bring to its attention any significant matters that were not addressed in the course of its specific inquiries. Accordingly, this report is based solely on the information (financial or otherwise) made available to the Monitor.

14.     All references to dollars in this report are in Canadian currency unless otherwise noted.

## BACKGROUND

15.     InterTAN is a leading specialty retailer of consumer electronics in Canada and is the operating Canadian subsidiary of the major U.S.-based electronics retailer Circuit City. Tourmalet is a Nova Scotia unlimited liability company that is an indirect, wholly-owned subsidiary of Circuit City. Tourmalet is a non-operating holding company whose sole asset is the preferred stock of InterTAN Inc., which is the sole shareholder of InterTAN. Circuit City is the Applicants' ultimate parent company.   Further background to InterTAN, Tourmalet and Circuit City is contained in the materials filed relating to the Initial Order, including the Affidavit of Mark Wong sworn November 10, 2008.  These documents, together with other information regarding the CCAA Proceedings, including the Initial Order and supporting affidavit, have been posted by the Monitor on its website at www.alvarezandmarsal.com/intertan.

16.     On November 10, 2008, the U.S. Debtors commenced the Chapter 11 Proceedings in the United States Bankruptcy Court for the Eastern District of Virginia (the "U.S. Bankruptcy Court").  The U.S. Debtors have subsequently commenced a liquidation of their assets and property in the Chapter 11 Proceedings.  A hyperlink to information concerning the U.S. Debtors' restructuring and liquidation can be found at www.kccllc.net.

17.     Additional background information can be found in the Initial Report, the First Report, the Second Report, the Third Report and the Fourth Report.

- 5 -

## CASH FLOW RESULTS RELATIVE TO FORECAST

18.   InterTAN's cash receipts and disbursements for the 13-week period ended February 8,
2009 are summarized below and are compared to the cash flow forecast previously filed
with this Honourable Court (the "CCAA Cash Flow Forecast"):

| *(Unaudited, in $CDN 000's)* | | | |
|---|---|---|---|
| | **For the Weeks Ended February 8, 2009** | | |
| | **Actual** | **Forecast** | **Variance** |
| *Receipts* | **236,091** | **235,185** | **906** |
| | | | |
| *Disbursements* | | | |
| Merchandise | (128,690) | (120,463) | (8,227) |
| Payroll and payroll taxes | (27,978) | (29,351) | 1,373 |
| Operating disbursements | (38,258) | (38,491) | 233 |
| Restructuring costs | (7,438) | (8,021) | 583 |
| Other | (4,197) | (4,124) | (73) |
| *Total Disbursements* | **(206,561)** | **(200,450)** | **(6,111)** |
| **Net Cash Flow** | **29,530** | **34,735** | **(5,205)** |

19.   Receipts for the 13-week period were consistent with the CCAA Cash Flow Forecast
with only a small cumulative positive variance of approximately $906,000 during the
period.

20.   Disbursements for the 13-week period were approximately $6.1 million greater than the
CCAA Cash Flow Forecast.  Management attributes this variance primarily to efforts to
properly manage the timing of inventory receipts (where requirements for accelerated
payment terms and associated delivery lead times have meant that InterTAN has had to
pay for certain inventory faster than forecast), partially offset by lower store-level payroll
expenses as costs have been reduced as a result of small sales declines relative to the
prior year.

- 6 -

21.    InterTAN's ending cash balance as at February 8, 2009 was approximately $2.6 million.
This ending cash balance takes into account the cumulative net repayment by InterTAN
of $32.5 million in respect of amounts borrowed under the DIP Facility.

22.    Overall, during the 13-week period ended February 8, 2009, InterTAN experienced a net
negative cash flow variance of approximately $5.2 million relative to the CCAA Cash
Flow Forecast.    However, as described in the First Report, InterTAN's opening
combined net cash and loan position, before letters of credit ("LC's"), at the
commencement of these proceedings was approximately $6.5 million better than forecast
($5.6 million of cash in bank, plus $832,000 lower opening loan position than forecast),
primarily because management had anticipated that there would  be no funds in the
Company's bank accounts as at the date of the CCAA filings.

23.    As described in the First Report, at the time the CCAA Cash Flow Forecast was prepared,
management anticipated that InterTAN's LC requirements would be met through the LC
facility available to Circuit City as part of the DIP Facility and that InterTAN's LC's
would not be included in its availability calculations under the DIP Facility.  However, as
management and InterTAN's advisors worked with the DIP Lenders and Circuit City to
calculate the opening loan position as at the date of the CCAA filings, it was determined
that InterTAN's LC's would be included in its overall loan position for purposes of
calculating borrowing availability under the DIP Facility.  InterTAN's outstanding LC's
as at the filing date were approximately $7.7 million.

24.    InterTAN's opening and closing combined net cash, loan and LC positions for the 13-
week period ended February 8, 2009 are summarized below and are compared to the
comparable period of the CCAA Cash Flow Forecast:

- 7 -

| *(Unaudited, in $CDN 000's)* | For the Weeks Ended February 8, 2009 | | |
| --- | --- | --- | --- |
| | **Actual** | **Forecast** | **Variance** |
| **Opening position** | | | |
| Cash in bank (a) | 5,613 | - | 5,613 |
| Loans (b) | (42,500) | (43,332) | 832 |
| Letters of credit (c) | (7,650) | - | (7,650) |
| Combined net opening position | (44,537) | (43,332) | (1,205) |
| **Activity during the period** | | | |
| Net cash flow (see above) (d) | 29,530 | 34,735 | (5,205) |
| Net change in LC's (e) | (3,863) | - | |
| Net DIP repayments (f) | (32,500) | (34,736) | |
| **Closing position** | | | |
| Cash in bank (a+d-f) | 2,643 | - | 2,643 |
| Loans and LC's (b+c-e-f) | (13,787) | (8,596) | (5,191) |
| **Combined net closing position** | **(11,144)** | **(8,596)** | **(2,548)** |

25.   In summary, through the end of the 13 weeks following the date of the Initial Order (February 8, 2009), the CCAA Cash Flow Forecast had projected a net loan position of $8,596,000, the LC's being included in the U.S. borrowings and no cash in InterTAN's bank accounts. In fact, as at February 8, 2009, InterTAN had approximately $2.6 million in its bank accounts and had a balance of $13.8 million outstanding under the DIP Facility after including $3.8 million of LC's. On a comparable basis, InterTAN's cash/loan position (after netting out its cash on hand and excluding the $3.8 million of LC's that were not contemplated by the CCAA Cash Flow Forecast) would have been a loan/negative position of approximately $7.4 million, as compared to a forecast loan position of $8.6 million.

26.   With combined closing loan and LC balances of approximately $13.8 million (U.S.$11.2 million), InterTAN had substantial availability on its current allocation from the DIP

- 8 -

Facility of U.S.$50 million as at February 8, 2009.  Further, it also had cash on hand of approximately $2.6 million.

## PRE-FILING CLAIMS PROCESS

27.    In accordance with the Pre-Filing Claims Process Order:

     (a)    On February 10, 2009, the Monitor posted the Notice to Creditors and the Proof of Claim, Instruction Letter, and a copy of the Pre-Filing Claims Process Order (the "Claims Package") to its website at www.alvarezandmarsal.com/intertan;

     (b)    on February 12, 2009, the Applicants placed a Notice to Creditors in the Globe and Mail (National Edition) and a French language translation of the notice in La Presse; and

     (c)    on February 13, 2009, the Applicants, with the assistance of the Monitor, mailed a Claims Package to each known creditor of the Applicants at the last recorded address as set out in the books and records of the Applicants.

28.    Pursuant to the Pre-Filing Claims Process Order, any person and/or entity asserting a Pre-Filing Claim against one or both of the Applicants must set out its aggregate Pre-Filing Claim in a Proof of Claim and deliver the Proof of Claim to the Applicants so that it is received no later than 5:00 p.m. (Toronto time) on March 16, 2009 (the "Claims Bar Date").

29.    Pursuant to the Pre-Filing Claims Process Order, certain parties are not required to file a Proof of Claim under the Pre-Filing Claims Process, including:

     (a)    The DIP Lenders (as defined in the Amended and Restated Initial Order);

     (b)    the Applicants' U.S. debtor affiliates;

     (c)    customers with gift cards, store credits or with ongoing warranty programs;

(d)   employees who continued to be employed by the Applicants after November 10, 2008; and

(e)   Joint Venture Managers in respect of deposits provided to InterTAN pursuant to joint venture agreements.

30.   Any person and/or entity who does not deliver a Proof of Claim in respect of a Pre-Filing Claim by the Claims Bar Date, or such later date as the Applicants, the Monitor and such person and/or entity may agree, is forever barred from asserting such Pre-Filing Claim against either of the Applicants and the Pre-Filing Claim shall be forever extinguished.

**DIP FINANCING**

**(i)   Background**

31.   The Initial Order authorized InterTAN to enter into the DIP Facility as a co-borrower with certain of the U.S. Debtors.  As previously reported to the Court, the DIP Facility was subsequently amended on two occasions.

32.   In its present form, the DIP Facility contemplates that the Chapter 11 Proceedings would result in a going concern sale of the U.S. Debtors' business concurrently with a going concern sale of the Applicants' business.  However, the U.S. Debtors have been unable to complete a going concern sale transaction for the sale of their business.

33.   On January 16, 2009, the United States Bankruptcy Court entered an "Order Approving Agency Agreement, Store Closing Sales and Related Relief" (the "U.S. Liquidation Order") that authorized the U.S. Debtors to commence liquidation sales at the U.S. Debtors' remaining stores.  The liquidating agents under the approved agency agreement commenced the liquidation sales on January 17, 2009.

**(ii)   Effect of the U.S. Debtors' Liquidation on DIP Facility**

34.   Under the DIP Facility, for the period from November 10, 2008 through January 16, 2009, InterTAN's credit availability was a function of a borrowing base calculation based on InterTAN's accounts receivable and inventory.  However, from and after January 17,

2009, InterTAN's credit availability is based upon excess availability in the U.S. Debtors' borrowing base, and there is no independent margining of the assets of InterTAN.

35.  The U.S. Debtors' borrowing base is a function of eligible credit card receivables, inventory and letters of credit. The DIP Lenders take the position that, as a result of the U.S. Debtors' liquidation, there are currently no eligible receivables or letters of credit and that the eligible inventory is encumbered by the liquidation agents under the liquidation agency agreement approved by the U.S. Bankruptcy Court. As a result, the DIP Lenders have communicated their view that, since there is no borrowing base to support loans to InterTAN, they are under no obligation to provide additional funds to InterTAN pursuant to the DIP Facility.

36.  As a result of their liquidation, the U.S. Debtors do not need access to further credit under the DIP Facility. However, InterTAN continues to require credit to fund its working capital and for general corporate purposes as it advances towards a sale of its business in the CCAA Proceedings.

37.  In the absence of an amendment to the DIP Facility, the U.S. Debtors' liquidation could be a default under the DIP Facility. An amendment to the DIP Facility is therefore necessary to address this default and allow the U.S. Debtors to pay down their obligations under the DIP Facility in an orderly manner. Moreover, the DIP Lenders require the U.S. Debtors and InterTAN to enter into a proposed amendment to the DIP Facility in order for InterTAN to continue to access credit under the DIP Facility. A copy of the proposed amendment to the DIP Facility agreed to by the parties (the "Third Amendment") is attached as Appendix "B".

**(iii)    The Third Amendment**

38.  The Monitor understands that changes to the DIP Facility are required in order to ensure that InterTAN is able to continue to draw funds under the DIP Facility. In particular, InterTAN requires a direct lending commitment that is not dependent on a borrowing base consisting of property of the U.S. Debtors.

- 11 -

39.  For approximately three weeks, the Applicants, the U.S. Debtors and the DIP Lenders have been in discussions with a view to settling the terms of the proposed amendment to the DIP Facility to accommodate these changes. The Monitor was kept apprised of these discussions and had the opportunity to comment on drafts of the Third Amendment.

40.  The Third Amendment is the end product of these discussions. It has been agreed to by InterTAN, the U.S. Debtors and the DIP Lenders.

41.  The key provisions of the Third Amendment that relate to the Applicants are as follows:

   (i)  the Third Amendment is effective as of January 17, 2009;

   (ii)  the "Maturity Date" of the DIP Facility with respect to InterTAN is amended from November 10, 2009 to the earlier of:

       (a)  the consummation of a sale of InterTAN's business; or

       (b)  June 30, 2009,

       unless InterTAN's obligations are otherwise accelerated in accordance with the terms of the DIP Facility;

   (iii)  the DIP Facility is amended such that the April 30, 2009 maturity date of the loans to the U.S. Debtors will not result in a termination of the DIP Facility with respect to InterTAN;

   (iv)  InterTAN's availability under the DIP Facility is no longer dependent upon a borrowing base calculation involving the assets and property of the U.S. Debtors; instead, InterTAN has an independent commitment from the DIP Lenders based upon a margining of its own assets;

   (v)  the maximum credit available to InterTAN under the DIP Facility is reduced from U.S.$50 million to U.S.$40 million, and aggregate outstanding LC's may not exceed U.S.$20 million (within the U.S.$40 million limit);

(vi)    the amount of the credit extensions to InterTAN shall not be required to be repaid by the U.S. Debtors or from the proceeds of the sale of their assets until such time as all of the U.S. Debtors' obligations under the DIP Facility have been repaid or cash collateralized;

(vii)    certain of the performance covenants set out in the DIP Facility are amended such that the Applicants' total cash expenditures may not be greater than 110% of the projected total amount set forth in the Applicants' rolling 13-week cash flow forecasts; this covenant is to be confirmed weekly pursuant to a variance report to be prepared on a four-week trailing basis;

(viii)    certain of the performance covenants with respect to the U.S. Debtors have been amended such that the U.S. Debtors are permitted to use funds only in accordance with a "Wind Down Budget" (to February 28, 2009) produced in accordance with the U.S. liquidation sale.  The U.S. Debtors' cumulative total cash expenditures may not exceed 100% of the projected cumulative total amount set forth in the Wind Down Budget.  The U.S. Debtors' failure to comply with this provision would constitute a default under the DIP Facility, which could impair the availability of loans to InterTAN; and

(ix)    the Third Amendment expressly states that the effectiveness of the Third Amendment shall not be deemed to be an approval by this Honourable Court of the Second Amendment.

42.    As part of the negotiations concerning the Third Amendment, the Applicants requested relief from the cross-default provisions in the DIP Facility.  In particular, InterTAN requested that the cross-default provisions of the DIP Facility not apply to any default that results from the inability of the U.S. Debtors and the DIP Lenders to agree on a Wind Down Budget beyond February 28, 2009; however, the DIP Lenders did not agree to grant this accommodation.

- 13 -

**(iv)    Approval of the Third Amendment**

43.    The Third Amendment provides that a condition precedent to the effectiveness of the amendment is the approval of both the U.S. Bankruptcy Court and this Honourable Court.

44.    On February 12, 2009, the U.S. Debtors filed a motion for the approval of the Third Amendment by the U.S. Bankruptcy Court (the "U.S. Amendment Motion").    On February 17, 2009, the Third Amendment was approved in the Chapter 11 Proceedings. A copy of the Order of the U.S. Bankruptcy Court approving the Third Amendment is attached as Appendix "C".

45.    The Applicants have brought the present motion to seek this Court's approval of the Third Amendment.

**THE MONITOR'S COMMENTS ON THE THIRD AMENDMENT**

46.    The Monitor is mindful that, if the Third Amendment is approved, the ability of InterTAN to borrow further funds under the DIP Facility will be conditional on the U.S. Debtors' compliance with the requirement that their cumulative total cash expenditures not exceed the projected cumulative total amount set forth in the Wind Down Budget. This is a condition that is not within the control of InterTAN and therefore presents a risk to InterTAN's ability to access the DIP Facility.    However, the Monitor has been provided with Circuit City's variance reporting for the first three weeks of its going-out-of-business sale ("GOB Sale") (through the week ended February 7, 2009) which shows a positive variance of approximately 21% relative to cumulative disbursements, therefore, the experience to-date has been that Circuit City has complied with the covenant.    Also, the net cash flow through February 7, 2009 generated from Circuit City's GOB sale has substantially exceeded forecast.

47.    In addition, the existing Wind Down Budget is a projection to and including February 28, 2009.    Any further availability under the DIP Facility is contingent upon a subsequent Wind Down Budget being approved by the DIP Lenders.    To the extent that there is no agreement on further cash flows in the U.S. subsequent to February 28, 2009 or a court order mandating approval of a further Wind Down Budget, the DIP Facility would be in

- 14 -

default and InterTAN could be at risk of not being able to draw further funds under the DIP Facility. However, the Monitor understands that Circuit City advised the U.S. Court at the February 17, 2009 hearing to approve the Third Amendment that it anticipates that it will have generated sufficient net proceeds to fully pay its direct borrowings under the DIP Facility and will have cash in excess of 103% of the face amount of its outstanding LC obligations on or before the week ending February 28, 2009. As such, the Monitor understands that Circuit City expects that it will be able to agree on a further Wind Down Budget with the DIP Lenders beyond February 28, 2009. If these targets are met, it appears that the likelihood of any cross default resulting from a default by the U.S. Debtors is relatively low.

48.     Further, the Monitor notes the following additional considerations in connection with the Third Amendment:

(i)     a direct credit commitment to InterTAN that is independent of the U.S. Debtors' borrowing base is necessary to enable InterTAN to have continued availability under the DIP Facility;

(ii)    InterTAN is satisfied that the June 30, 2009 Maturity Date should be sufficient to allow it to continue its efforts to complete a going concern sale of its business. If a sale has not been completed by that date, InterTAN would be required to negotiate a further amendment to the DIP Facility or obtain alternate financing;

(iii)   as set out in the cash flow forecast through the week ending June 28, 2009 (the "Extended Forecast"), which was submitted by the Applicants in connection with the present motion, InterTAN's maximum projected borrowings are $32.3 million during the week of June 7, 2009; this suggests that the maximum availability of U.S.$40 million is sufficient to enable InterTAN to fund its operations and the costs of the CCAA Proceedings through to the end of June 2009; and

(iv)    InterTAN has indicated that it expects to be able to maintain cash expenditures within 110% of the Extended Forecast.

- 15 -

49.     For the foregoing reasons, the Monitor recommends that the Third Amendment be
        approved by this Honourable Court with the specific clarification that the approval
        thereof is not an approval of the Second Amendment, all as sought in the Applicants'
        draft order for their motion returnable February 23, 2009.

All of which is respectfully submitted at Toronto, Ontario this 19th day of February, 2009.


**ALVAREZ & MARSAL CANADA ULC**
in its capacity as Court appointed Monitor of
InterTAN Canada Ltd. and Tourmalet Corporation

Per:    _____
        Name:  Douglas R. McIntosh
        Title:   Managing Director
        I/We have the authority to bind the corporation

# APPENDIX "A"



Court File No. 08-CL-7841

***ONTARIO***

**SUPERIOR COURT OF JUSTICE**

**COMMERCIAL LIST**

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | MONDAY, THE 10th DAY |
| | ) | |
| JUSTICE MORAWETZ | ) | OF NOVEMBER, 2008 |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF INTERTAN CANADA LTD. AND TOURMALET CORPORATION

APPLICANTS

**AMENDED AND RESTATED INITIAL ORDER**

THIS APPLICATION, made by the Applicants, pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA") was heard this day at 330 University Avenue, Toronto, Ontario.

ON READING the affidavit of Mark J. Wong sworn November 10, 2008 and the Exhibits thereto (the "Wong Affidavit") and on hearing the submissions of counsel for the Applicant, Alvarez & Marsal Canada ULC, Bank of America, N.A. (Canadian Branch) in its capacity as a lender and Canadian agent (the "Canadian Agent"), and on reading the consent of Alvarez & Marsal Canada ULC to act as the Monitor.

- 2 -

**SERVICE**

1.      THIS COURT ORDERS that the time for service of the Notice of Application and the
Application Record is hereby abridged so that this Application is properly returnable today
and hereby dispenses with further service thereof.

**APPLICATION**

2.      THIS COURT ORDERS AND DECLARES that the Applicants are companies to
which the CCAA applies.

**PLAN OF ARRANGEMENT**

3.      THIS COURT ORDERS that the Applicants shall have the authority to file and may,
subject to further order of this Court, file with this Court a plan of compromise or arrangement
(hereinafter referred to as the "Plan") between, *inter alia*, the Applicants and one or more
classes of its secured and/or unsecured creditors as it deems appropriate.

**POSSESSION OF PROPERTY AND OPERATIONS**

4.      THIS COURT ORDERS that the Applicants shall remain in possession and control of
their current and future assets, undertakings and properties of every nature and kind
whatsoever, and wherever situate including all proceeds thereof (the "Property"). Subject to
this and any further Order of this Court, the Applicants shall continue to carry on business in a
manner consistent with the preservation of its business (the "Business") and Property. The
Applicants shall be authorized and empowered to continue to retain and employ the
employees, consultants, agents, experts, accountants, counsel and such other persons
(collectively "Assistants") currently retained or employed by it, with liberty to retain such
further Assistants as it deems reasonably necessary or desirable in the ordinary course of
business or for the carrying out of the terms of this Order.

5.      THIS COURT ORDERS that the Applicants shall be directed to continue to utilize the
central cash management system currently in place as described in the Wong Affidavit or
replace it with another substantially similar central cash management system as necessary to
facilitate the DIP Facility approved herein (the "Cash Management System") and that any
present or future bank providing the Cash Management System shall not be under any

- 3 -

obligation whatsoever to inquire into the propriety, validity or legality of any transfer, payment, collection or other action taken under the Cash Management System, or as to the use or application by the Applicants of funds transferred, paid, collected or otherwise dealt with in the Cash Management System, shall be entitled to provide the Cash Management System without any liability in respect thereof to any Person (as hereinafter defined) other than the Applicants, pursuant to the terms of the documentation applicable to the Cash Management System, and shall be, in its capacity as provider of the Cash Management System, an unaffected creditor under the Plan with regard to any claims or expenses it may suffer or incur in connection with the provision of the Cash Management System.

6.      THIS COURT ORDERS that, subject to availability under the DIP Facility (as hereinafter defined), the Applicants shall be entitled but not required to pay the following expenses whether incurred prior to or after this Order:

     (a)      the fees and disbursements of any Assistants retained or employed by the Applicants in respect of these proceedings, at their standard rates and charges;

     (b)      payments in respect of the key employee retention program (the "KERP") as described in the Wong Affidavit;

     (c)      amounts owing for goods or services actually supplied to the Applicants prior to the date of this order:

         (i)      by Purolator Courier and other logistics or supply chain providers;

         (ii)      by custom brokers; and

         (iii)      with the consent of the Monitor, up to $2 million, by other North American suppliers, including payments in respect of outstanding documentary credits or deposits, if, in the opinion of the Applicants, the supplier is critical to the Business and ongoing operations of the Applicants;

- 4 -

(d)    goods and services actually supplied to the Applicants prior to the date of this order, including payments in respect of outstanding documentary credits or deposits, by trade vendors and suppliers outside of North America;

(e)    the JV Manager Share to the JV Managers (both as defined in the Wong Affidavit);

(f)    all amounts related to servicing warranties and honouring gift cards and reward and loyalty programs issued before or after the date of this Order; and

(g)    any other costs and expenses that are deemed necessary for the preservation of the Property and/or the Business by the Applicants with the consent of the Monitor.

7.    THIS COURT ORDERS that, except as otherwise provided to the contrary herein, the Applicants shall be entitled but not required to pay all reasonable expenses incurred by the Applicants in carrying on the Business in the ordinary course after this Order, and in carrying out the provisions of this Order, which expenses shall include, without limitation:

(a)    all expenses and capital expenditures reasonably necessary for the preservation of the Property or the Business including, without limitation, payments on account of insurance (including directors and officers insurance), maintenance and security services; and

(b)    payment for goods or services actually supplied to the Applicants following the date of this Order.

8.    THIS COURT ORDERS that the Applicants shall remit, in accordance with legal requirements, or pay:

(a)    subject to availability under the DIP Facility, all outstanding and future wages, salaries, employee and pension benefits, vacation pay, bonuses and reasonable expenses payable to employees payable on or after the date of this Order, in each case incurred in the ordinary course of business and consistent with existing compensation policies and arrangements;

- 5 -

(b)    any statutory deemed trust amounts in favour of the Crown in right of Canada or
of any Province thereof or any other taxation authority which are required to be
deducted from employees' wages, including, without limitation, amounts in
respect of (i) employment insurance, (ii) Canada Pension Plan, (iii) Quebec
Pension Plan, and (iv) income taxes;

(c)    all goods and services or other applicable sales taxes (collectively, "Sales Taxes")
required to be remitted by the Applicants in connection with the sale of goods and
services by the Applicants, but only where such Sales Taxes are accrued or
collected after the date of this Order, or where such Sales Taxes were accrued or
collected prior to the date of this Order but not required to be remitted until on or
after the date of this Order, and

(d)    any amount payable to the Crown in right of Canada or of any Province thereof or
any political subdivision thereof or any other taxation authority in respect of
municipal realty, municipal business or other taxes, assessments or levies of any
nature or kind which are entitled at law to be paid in priority to claims of secured
creditors and which are attributable to or in respect of the carrying on of the
Business by the Applicants.

9.      THIS COURT ORDERS that until such time as an Applicant delivers a notice in
writing to repudiate a real property lease in accordance with paragraph 11(c) of this Order (a
"Notice of Repudiation"), such Applicant shall pay all amounts constituting rent or payable as
rent under real property leases (including, for greater certainty, common area maintenance
charges, utilities and realty taxes and any other amounts payable to the landlord under the
lease) or as otherwise may be negotiated between such Applicant and the relevant landlord
from time to time ("Rent"), for the period commencing from and including the date of this
Order, twice-monthly in equal payments on the first and fifteenth day of each month, in
advance (but not in arrears). On the date of the first of such payments, any arrears relating to
the period commencing from and including the date of this Order shall also be paid. Upon
delivery of a Notice of Repudiation, such Applicant shall pay all Rent due for the notice

- 6 -

period stipulated in paragraph 11(c) of this Order, to the extent that Rent for such period has not already been paid.

10.     THIS COURT ORDERS that, except as specifically permitted herein, the Applicants are hereby directed, until further Order of this Court: (a) to make no payments of principal, interest thereon or otherwise on account of amounts owing by the Applicants to any of their creditors as of this date; (b) to grant no security interests, trusts, liens, charges or encumbrances upon or in respect of any of its Property; and (c) to not grant credit or incur liabilities except in the ordinary course of the Business.

## RESTRUCTURING

11.     THIS COURT ORDERS that the Applicants shall, subject to such covenants as may be contained in the DIP Facility (as hereinafter defined), (other than sub-section 11(c) which shall apply regardless of the covenants contained in the DIP Facility), have the right to:

(a)     permanently or temporarily cease, downsize or shut down any of their businesses or operations and to dispose of redundant or non-material assets not exceeding $500,000 in any one transaction or $1,000,000 in the aggregate, subject to paragraph 11(c), if applicable;

(b)     terminate the employment of such of their employees or temporarily lay off such of their employees as they deems appropriate on such terms as may be agreed upon between the Applicants and such employee, or failing such agreement, to deal with the consequences thereof in the Plan;

(c)     subject to paragraph 11A herein, in accordance with paragraphs 12 and 13, vacate, abandon or quit the whole but not any part of any leased premises and/or repudiate any real property lease and any ancillary agreements relating to any leased premises, on not less than fourteen (14) days' notice in writing to the relevant landlord on such terms as may be agreed upon between the Applicants and such landlord, or failing such agreement, to deal with the consequences thereof in the Plan;

- 7 -

(d)    subject to paragraph 11A herein, repudiate such of their arrangements or
       agreements of any nature whatsoever, whether oral or written, as the Applicants
       deem appropriate on such terms as may be agreed upon between the Applicants
       and such counter-parties, or failing such agreement, to deal with the consequences
       thereof in the Plan;

(e)    pursue all avenues of refinancing and offers for material parts of their Business or
       Property, in whole or part, subject to prior approval of this Court being obtained
       before any material refinancing or any sale (except as permitted by subparagraph
       (a), above); and

(f)    apply to this Court for such approval, vesting or other Orders as may be necessary
       to consummate sale transactions.

all of the foregoing to permit the Applicants to proceed with an orderly restructuring of the
Business (the "Restructuring").

11A    THIS COURT ORDERS that the Applicants shall obtain the approval of the Monitor
prior to the Applicants repudiating or disclaiming any material agreements, which shall
include real property leases, in accordance with paragraphs 11(c) or 11(d) herein. If the
Monitor does not provide such approval, the Applicants shall be entitled to apply to the Court
on no less than seven (7) days' notice to the Monitor and the co-contracting party for an order
that the agreement be repudiated or disclaimed.

12.    THIS COURT ORDERS that the Applicants shall provide each of the relevant
landlords with notice of an Applicant's intention to remove any fixtures from any leased
premises at least seven (7) days prior to the date of the intended removal. The relevant
landlord shall be entitled to have a representative present in the leased premises to observe
such removal and, if the landlord disputes the Applicant's entitlement to remove any such
fixture under the provisions of the lease, such fixture shall remain on the premises and shall be
dealt with as agreed between any applicable secured creditors, such landlord and the
Applicant, or by further Order of this Court upon application by the Applicants on at least two
(2) days' notice to such landlord and any such secured creditors. If an Applicant repudiates the
lease governing such leased premises in accordance with paragraph 11(c) of this Order, it shall

- 8 -

not be required to pay Rent under such lease pending resolution of any such dispute (other
than Rent payable for the notice period provided for in paragraph 11(c) of this Order), and the
repudiation of the lease shall be without prejudice to the Applicant's claim to the fixtures in
dispute.

13.     THIS COURT ORDERS that if a Notice of Repudiation is delivered, then: (a) during
the notice period prior to the effective time of the repudiation, the landlord may show the
affected leased premises to prospective tenants during normal business hours, on giving the
Applicant and the Monitor 24 hours' prior written notice, and (b) at the effective time of the
repudiation, the relevant landlord shall be entitled to take possession of any such leased
premises without waiver of or prejudice to any claims or rights such landlord may have
against the Applicant in respect of such lease or leased premises and such landlord shall be
entitled to notify the Applicant of the basis on which it is taking possession and to gain
possession of and re-lease such leased premises to any third party or parties on such terms as
such landlord considers advisable, provided that nothing herein shall relieve such landlord of
its obligation to mitigate any damages claimed in connection therewith.

14.     THIS COURT ORDERS that any Charge (as defined below) created by this Order
over leases of real property in Canada shall only be a Charge in the Applicants' interest in
such real property leases.

15.     THIS COURT ORDERS that notwithstanding anything to the contrary in any
agreement providing for the liquidation of assets from any leased premises, but subject to: (a)
any written agreement between an Applicant, a liquidator and any landlord; or (b) a further
Order of this Court:

     (i)     the Applicants shall at all times abide by and be subject to the terms of all real
             property leases (collectively, the "Leases") and shall cause any liquidator to abide
             by the terms of the Leases, and the Applicant and the liquidator shall obtain the
             applicable landlord's approval for all signage and promotional advertising for
             sales to be conducted by the liquidator pursuant to the agreement with the
             Applicant in any of the leased premises to the extent otherwise not permitted by
             the applicable Lease; and

(ii)    neither the Applicants nor any liquidator shall augment the merchandise in any leased premises unless otherwise permitted by the applicable Lease or approved by the applicable landlord.

## NO PROCEEDINGS AGAINST THE APPLICANTS OR THE PROPERTY

16.    THIS COURT ORDERS that, with the exception of the remedies (other than any steps to seize, possess or foreclose, or such other like remedy, on its own behalf or through any agent on the Property) pursuant to the DIP Facility and the terms of this or any other Order of this Court, until and including December 9, 2008, or such later date as this Court may order (the "Stay Period"), no proceeding or enforcement process in any court or tribunal (each, a "Proceeding") shall be commenced or continued against or in respect of the Applicants or the Monitor, or affecting the Business or the Property, except with the written consent of the Applicants and the Monitor, or with leave of this Court, and any and all Proceedings currently under way against or in respect of the Applicants or affecting the Business or the Property are hereby stayed and suspended pending further Order of this Court.

## NO EXERCISE OF RIGHTS OR REMEDIES

17.    THIS COURT ORDERS that during the Stay Period, all rights and remedies of any individual, firm, corporation, governmental body or agency, or any other entities (all of the foregoing, collectively being "Persons" and each being a "Person") against or in respect of the Applicants or the Monitor, or affecting the Business or the Property, are hereby stayed and suspended except with the written consent of the Applicants and the Monitor, or leave of this Court, provided that nothing in this Order shall (i) empower the Applicants to carry on any business which the Applicants are not lawfully entitled to carry on, (ii) exempt the Applicants from compliance with statutory or regulatory provisions relating to health, safety or the environment, (iii) prevent the filing of any registration to preserve or perfect a security interest, or (iv) prevent the registration of a claim for lien.

## NO INTERFERENCE WITH RIGHTS

18.    THIS COURT ORDERS that during the Stay Period, no Person shall discontinue, fail to honour, alter, interfere with, repudiate, terminate or cease to perform any right, renewal

- 10 -

right, contract, agreement, licence or permit in favour of or held by the Applicants, except with the written consent of the Applicants and the Monitor, or leave of this Court.

19.     THIS COURT ORDERS that during the Stay Period, no Person (other than the Applicants) having any agreement, arrangement, licence or lease with any dealer of the Applicants in connection with the supply of goods or services or the lease of premises at the retail locations at which products of the Applicants are sold, may take any Proceeding or exercise any right (including but not limited to a right to terminate, accelerate, suspend, modify or cancel) under such agreement, arrangement, licence or lease solely as a result of the filing of this Application or the making of this Order.

## CONTINUATION OF SERVICES

20.     THIS COURT ORDERS that during the Stay Period, all Persons having oral or written agreements with the Applicants or statutory or regulatory mandates for the supply of goods and/or services, including without limitation all computer software, communication and other data services, centralized banking services, payroll services, insurance, transportation, services, utility or other services to the Business or the Applicants, are hereby restrained until further Order of this Court from discontinuing, altering, interfering with or terminating the supply of such goods or services as may be required by the Applicants, and that the Applicants shall be entitled to the continued use of its current premises, telephone numbers, facsimile numbers, internet addresses and domain names, provided in each case that the normal prices or charges for all such goods or services received after the date of this Order are paid by the Applicants in accordance with normal payment practices of the Applicants or such other practices as may be agreed upon by the supplier or service provider and each of the Applicants and the Monitor, or as may be ordered by this Court.

## NON-DEROGATION OF RIGHTS

21.     THIS COURT ORDERS that, notwithstanding anything else contained herein, no creditor of the Applicants shall be under any obligation after the making of this Order to advance or re-advance any monies or otherwise extend any credit to the Applicants. Nothing in this Order shall derogate from the rights conferred and obligations imposed by the CCAA.

- 11 -

**PROCEEDINGS AGAINST DIRECTORS AND OFFICERS**

22.     THIS COURT ORDERS that during the Stay Period, and except as permitted by subsection 11.5(2) of the CCAA, no Proceeding may be commenced or continued against any of the former, current or future directors or officers of the Applicants with respect to any claim against the directors or officers that arose before the date hereof and that relates to any obligations of the Applicants whereby the directors or officers are alleged under any law to be liable in their capacity as directors or officers for the payment or performance of such obligations, until a compromise or arrangement in respect of the Applicants, if one is filed, is sanctioned by this Court or is refused by the creditors of the Applicants or this Court.

**DIRECTORS' AND OFFICERS' INDEMNIFICATION AND CHARGE**

23.     THIS COURT ORDERS that InterTAN hereby indemnifies its directors and officers from all claims, costs, charges and expenses relating to the failure of InterTAN, after the date hereof, to make payments of the nature referred to in subparagraphs 8(a), 8(b), 8(c) and 8(d) of this Order which they sustain or incur by reason of or in relation to their respective capacities as directors and/or officers of InterTAN except to the extent that, with respect to any officer or director, such officer or director has actively participated in the breach of any related fiduciary duties or has been grossly negligent or guilty of wilful misconduct.

24.     THIS COURT ORDERS that the directors and officers of InterTAN shall be entitled to the benefit of and are hereby granted a charge (the "Directors' Charge") on the Property, which charge shall not exceed an aggregate amount of $19.3 million, as security for the indemnity provided in paragraph 23 of this Order. The Directors' Charge shall have the priority set out in paragraphs 44 and 46 herein.

25.     THIS COURT ORDERS that, notwithstanding any language in any applicable insurance policy to the contrary, (a) no insurer shall be entitled to be subrogated to or claim the benefit of the Directors' Charge, and (b) InterTAN's directors and officers shall only be entitled to the benefit of the Directors' Charge to the extent that they do not have coverage under any directors' and officers' insurance policy, or to the extent that such coverage is insufficient to pay amounts indemnified in accordance with paragraph 23 of this Order.

- 12 -

**APPOINTMENT OF MONITOR**

26.    THIS COURT ORDERS that Alvarez & Marsal Canada ULC is hereby appointed
pursuant to the CCAA as the Monitor, an officer of this Court, to monitor the Property and the
Applicants' conduct of the Business with the powers and obligations set out in the CCAA or
set forth herein and that the Applicants and their shareholders, officers, directors, and
Assistants shall advise the Monitor of all material steps taken by the Applicants pursuant to
this Order, and shall co-operate fully with the Monitor in the exercise of its powers and
discharge of its obligations.

27.    THIS COURT ORDERS that the Monitor, in addition to its prescribed rights and
obligations under the CCAA, is hereby directed and empowered to:

   (a)    monitor the Applicants' receipts and disbursements;

   (b)    liaise with the Applicants' financial advisor and investment bankers with respect
          to all matters relating the Property, the Business and such other matters as may be
          relevant to the proceedings herein;

   (c)    report to this Court at such times and intervals as the Monitor may deem
          appropriate with respect to matters relating to the Property, the Business, and such
          other matters as may be relevant to the proceedings herein;

   (d)    assist the Applicants, in their dissemination, to the Canadian Agent and its
          counsel on a regular basis of financial and other information as agreed to between
          the Applicants and the Canadian Agent;

   (e)    advise the Applicants and their financial advisor in the preparation of the
          Applicants' cash flow statements and reporting required by the Canadian Agent,
          which information shall be reviewed with the Monitor and delivered to the
          Canadian Agent and its counsel;

   (f)    advise the Applicants in their development of the Plan and any amendments to the
          Plan;

- 13 -

(g)     assist the Applicants, to the extent required by the Applicants, with the establishment of a claims process and the holding and administering of creditors' meetings for voting on the Plan;

(h)     have full and complete access to the books, records and management, employees, advisors and investment bankers of the Applicants and to the Business and the Property to the extent required to perform its duties arising under this Order;

(i)     be at liberty to engage independent legal counsel or such other persons as the Monitor deems necessary or advisable respecting the exercise of its powers and performance of its obligations under this Order;

(j)     consider, and if deemed advisable by the Monitor, prepare a report and assessment on the Plan; and

(k)     perform such other duties as are required by this Order or by this Court from time to time.

28.     THIS COURT ORDERS that the Monitor shall not take possession of the Property and shall take no part whatsoever in the management or supervision of the management of the Business and shall not, by fulfilling its obligations hereunder, be deemed to have taken or maintained possession or control of the Business or Property, or any part thereof.

29.     THIS COURT ORDERS that nothing herein contained shall require the Monitor to occupy or to take control, care, charge, possession or management (separately and/or collectively, "Possession") of any of the Property that might be environmentally contaminated, might be a pollutant or a contaminant, or might cause or contribute to a spill, discharge, release or deposit of a substance contrary to any federal, provincial or other law respecting the protection, conservation, enhancement, remediation or rehabilitation of the environment or relating to the disposal of waste or other contamination including, without limitation, the *Canadian Environmental Protection Act*, the Ontario *Environmental Protection Act*, the *Ontario Water Resources Act*, or the Ontario *Occupational Health and Safety Act* and regulations thereunder and any other similar legislation and regulations of other provinces or territories in which the Applicants carry on business operations (the "Environmental

- 14 -

Legislation"), provided however that nothing herein shall exempt the Monitor from any duty to report or make disclosure imposed by applicable Environmental Legislation. The Monitor shall not, as a result of this Order or anything done in pursuance of the Monitor's duties and powers under this Order, be deemed to be in Possession of any of the Property within the meaning of any Environmental Legislation, unless it is actually in possession.

30.    THIS COURT ORDERS that that the Monitor shall provide any creditor of the Applicants and the Canadian Agent with information provided by the Applicants in response to reasonable requests for information made in writing by such creditor addressed to the Monitor. The Monitor shall not have any responsibility or liability with respect to the information disseminated by it pursuant to this paragraph. In the case of information that the Monitor has been advised by the Applicants is confidential, the Monitor shall not provide such information to creditors unless otherwise directed by this Court or on such terms as the Monitor and the Applicants may agree.

31.    THIS COURT ORDERS that, in addition to the rights and protections afforded the Monitor under the CCAA or as an officer of this Court, the Monitor shall incur no liability or obligation as a result of its appointment or the carrying out of the provisions of this Order, save and except for any gross negligence or wilful misconduct on its part. Nothing in this Order shall derogate from the protections afforded the Monitor by the CCAA or any applicable legislation.

32.    THIS COURT ORDERS that the Monitor, counsel to the Monitor and counsel to the Applicants shall be paid their reasonable fees and disbursements, in each case at their standard rates and charges, by the Applicants as part of the costs of these proceedings. The Applicants are hereby authorized and directed to pay the accounts of the Monitor, counsel for the Monitor and counsel for the Applicants on a regular basis and, in addition, the Applicants are hereby authorized to pay to the Monitor and counsel to the Applicants, retainers in the amounts of $100,000 and $200,000 respectively to be held by them as security for payment of their respective fees and disbursements outstanding from time to time

33.    THIS COURT ORDERS that the Monitor and its legal counsel shall pass their accounts from time to time, and for this purpose the accounts of the Monitor and its legal

- 15 -

counsel are hereby referred to a judge of the Commercial List of the Ontario Superior Court of Justice.

34.    THIS COURT ORDERS that the Monitor, counsel to the Monitor, the financial advisors to InterTAN and the Applicants' counsel shall be entitled to the benefit of and are hereby granted a charge (the "Administration Charge") on the Property, which charge shall not exceed an aggregate amount of $2 million, as security for their professional fees and disbursements incurred at the standard rates and charges of the Monitor and such counsel, both before and after the making of this Order in respect of these proceedings. The Administration Charge shall have the priority set out in paragraphs 44 and 46 hereof.

## DIP FINANCING

35.    THIS COURT ORDERS that the Applicant InterTAN Canada Ltd. ("InterTAN") is hereby authorized and empowered to obtain funding and borrow and become a joint and several obligor with other borrower affiliates which have filed petitions for reorganization under Chapter 11 of the U.S. Bankruptcy Code (the "U.S. Chapter 11 Debtors") under a credit facility between InterTAN and the U.S. Chapter 11 Debtors, as joint and several borrowers, and the Canadian Agent and other lenders (collectively, the "DIP Lenders") on the terms and subject to the conditions set forth in the Senior Secured, Super Priority, Debtor-in-Possession Credit Agreement among, InterTAN (as Canadian Borrower), the U.S. Chapter 11 Debtors and the DIP Lenders dated as of November 7, 2008 (the "DIP Facility"), attached as Exhibit "K" to the Wong Affidavit, in order to finance InterTAN's and the other loan parties' working capital requirements and other general corporate purposes and capital expenditures, provided that borrowings under such credit facility by InterTAN shall not exceed US$60 million unless permitted by further Order of this Court or otherwise permitted under the DIP Facility.

36.    THIS COURT ORDERS that the Applicants are hereby authorized and empowered to execute and deliver such credit agreements, mortgages, charges, hypothecs and Definitive Documents, guarantees and other documents, including confirmations of existing liens and charges in favour of the DIP Lenders, as are contemplated by the DIP Facility or as may be reasonably required by the DIP Lenders pursuant to the terms thereof (collectively, with the DIP Facility the "Definitive Documents"), and the Applicants are hereby authorized and

directed to pay and perform all of their indebtedness, interest, fees, liabilities and obligations to the DIP Lenders under and pursuant to the Definitive Documents as and when the same become due and are to be performed, notwithstanding any other provision of this Order.

37.    THIS COURT ORDERS that the Canadian Agent on behalf of the DIP Lenders shall be entitled to the benefit of and is hereby granted a charge (the "DIP Lenders' Charge") on the Property, which charge shall not exceed the aggregate amount owed to the DIP Lenders under the DIP Facility. The DIP Lenders' Charge shall have the priority set out in paragraphs 44 and 46 hereof.

38.    THIS COURT ORDERS that subject to the provisions of this Order:

    (a)    the Canadian Agent may take such steps from time to time as it may deem necessary or appropriate to file, register, record or perfect the DIP Lenders' Charge or any of the Definitive Documents;

    (b)    upon the occurrence of an event of default under the Definitive Documents, the Canadian Agent, upon five days notice to the Applicants and the Monitor (or such shorter period as may be ordered by the Court), may exercise any and all of its rights and remedies on behalf of the DIP Lenders against the Applicants or the Property under or pursuant to the Definitive Documents and the DIP Lenders' Charge, including without limitation, to cease making advances to the Applicants and set off and/or consolidate any amounts owing by the DIP Lenders to the Applicants against the obligations of the Applicants to the DIP Lenders under the Definitive Documents, to make demand, accelerate payment and give other notices, or to apply to this Court for the appointment of a receiver, receiver and manager or interim receiver, or for a bankruptcy order against the Applicants and for the appointment of a trustee in bankruptcy of the Applicants, and upon the occurrence of an event of default under the terms of the DIP Facility, the Canadian Agent shall be entitled to seize and retain proceeds from the sale of the Property and the cash flow of the Applicants to repay amounts owing to the DIP Lenders in accordance with the DIP Facility and the Definitive Documents and

the DIP Lenders' Charge, but subject to the priorities as set out in paragraphs 44 and 46 of this Order; and

(c)   the foregoing rights and remedies of the DIP Lenders shall be enforceable against any trustee in bankruptcy, interim receiver, receiver or receiver and manager of the Applicants or the Property.

39.   THIS COURT ORDERS that, notwithstanding anything contained in the Definitive Documents to the contrary, other than with respect to credit extensions made directly to the Applicants, the Canadian Agent and the DIP Lenders shall not, without first providing five days' notice to the Applicants and the Monitor (or such shorter period as may be ordered by the Court), apply any amounts received in the Blocked Accounts of InterTAN or any collateral of InterTAN to payment of any of the obligations of the U.S. debtor affiliates of the Applicants under the DIP Facility.

40.   THIS COURT ORDERS that, notwithstanding anything contained in the Definitive Documents to the contrary, the Canadian Agent and the DIP Lenders shall not, without first providing five days' notice to the Applicants and the Monitor (or such shorter period as may be ordered by the Court), cease making extensions of credit to InterTAN pursuant to the terms of the DIP Facility unless (a) InterTAN has failed to make any payments to the DIP Lenders under the DIP Facility; (b) InterTAN does not have borrowing availability for such extensions of credit as required by the DIP Facility; (c) there is any variation or change to this Order which is materially adverse to the DIP Lenders without the Canadian Agent's consent; or (d) InterTAN is declared bankrupt.

41.   THIS COURT ORDERS AND DECLARES that the DIP Lenders shall be treated as unaffected in any plan of arrangement or compromise filed by the Applicants under the CCAA, or any proposal filed by the Applicants under the *Bankruptcy and Insolvency Act* of Canada (the "BIA"), with respect to any advances made under the DIP Facility.

42.   THIS COURT ORDERS that the Applicants are hereby authorized and empowered to obtain and make inter-company loans from and to its U.S. Chapter 11 debtor affiliates as described in paragraph 99 of the Wong Affidavit.

43.     THIS COURT ORDERS that, notwithstanding anything contained in the Definitive Documents to the contrary:

    (a)    unsecured creditors of the Applicants (including, without limitation, all landlord creditors and creditors with restructuring claims under paragraph 11 of this Order, but not including claims by corporate entities related to the Applicants) shall be entitled to the benefit of and are hereby granted a charge (the "Canadian Creditor Charge") on the Property in the amount of $25 million to secure claims owing by the Applicants to such creditors. To the extent that the Directors' Charge is not realized upon or utilized by the beneficiaries of the Directors' Charge after the passage of a claims bar date in respect of claims against the beneficiaries of the Directors' Charge, then, subject to a reserve for claims (including a reserve for reasonable expenses and defence costs in respect of such claims) (the "Reserve") against the beneficiaries of the Directors' Charge that remain outstanding pending the final determination of such claims, the Canadian Creditor Charge shall increase dollar for dollar by the amount of the Directors' Charge, less the Reserve, until there are no claims against the beneficiaries of the Directors' Charge that have been advanced and remain outstanding, at which time any unutilized portion of the Reserve shall also be used to increase the Canadian Creditor Charge dollar for dollar, meaning that the maximum amount of the Canadian Creditor Charge shall be $44.3 million; and

    (b)    the key employees referred to in the KERP shall be entitled to the benefit and are hereby granted a charge (the "KERP Charge") on the Property in the amount of $838,000 to secure amounts owing to such key employees under the KERP.

## VALIDITY AND PRIORITY OF CHARGES CREATED BY THIS ORDER

44.     THIS COURT ORDERS that the priorities of the Directors' Charge, the Administration Charge, the KERP Charge, the Canadian Creditor Charge and the DIP Lenders' Charge, as among them, shall be as follows:

    First – Administration Charge;

- 19 -

Second – Directors' Charge;

Third – KERP Charge;

Fourth – DIP Lenders' Charge in an amount equal to the obligations of InterTAN under the Definitive Documents with respect to direct advances made to InterTAN thereunder, which amount shall not exceed US$60 million plus accrued and unpaid interest, allowable costs and expenses payable by InterTAN, provided that, an amount equal to the sum of the Administration Charge, the Directors' Charge, the KERP Charge and the Canadian Creditor Charge shall be reserved and remain in the possession of or be transferred to the Applicants before and when the Canadian Agent or the DIP Lenders apply any amounts received in the Blocked Accounts of InterTAN to obligations of the U.S. debtor affiliates of the Applicants under the DIP Facility.  Pursuant to the terms of and in accordance with the DIP Facility and this Order, nothing herein shall prevent the Canadian Agent or the DIP Lenders from applying amounts received in the Blocked Accounts of InterTAN or that they otherwise receive, to repay direct advances made by the DIP Lenders to InterTAN;

Fifth – Canadian Creditor Charge; and

Six – DIP Lenders' Charge.

45.    THIS COURT ORDERS that the filing, registration or perfection of the Directors' Charge, the Administration Charge, the KERP Charge, the Canadian Creditor Charge, or the DIP Lenders' Charge (collectively, the "Charges") shall not be required, and that the Charges shall be valid and enforceable for all purposes, including as against any right, title or interest filed, registered, recorded or perfected subsequent to the Charges coming into existence, notwithstanding any such failure to file, register, record or perfect.

46.    THIS COURT ORDERS that each of the Directors' Charge, the Administration Charge, the KERP Charge, the Canadian Creditor Charge and the DIP Lenders' Charge shall constitute a charge on the Property and such Charges shall rank in priority to all other security interests, trusts, liens, charges and encumbrances, statutory or otherwise (collectively,

"Encumbrances") in favour of any Person, other than claims which may be asserted under Sections 81.3, 81.4, 81.5 and 81.6 of the BIA or other statutory liens and deemed trusts which cannot by law be subordinated to the Charges.

47.     THIS COURT ORDERS that except as otherwise expressly provided for herein, or as may be approved by this Court, the Applicants shall not grant any Encumbrances over any Property that rank in priority to, or *pari passu* with, any of the Charges, unless the Applicants also obtain the prior written consent of the Monitor, the Canadian Agent and the beneficiaries of the Directors' Charge, the Administration Charge and the KERP Charge, or further Order of this Court.

48.     THIS COURT ORDERS that the Directors' Charge, the Administration Charge, the KERP Charge, the Canadian Creditor Charge, the Definitive Documents and the DIP Lenders' Charge shall not be rendered invalid or unenforceable and the rights and remedies of the chargees entitled to the benefit of the Charges (collectively, the "Chargees") and/or the DIP Lenders thereunder shall not otherwise be limited or impaired in any way by (a) the pendency of these proceedings and the declarations of insolvency made herein; (b) any application(s) for bankruptcy order(s) issued pursuant to the BIA, or any bankruptcy order made pursuant to such applications; (c) the filing of any assignments for the general benefit of creditors made pursuant to the BIA; (d) the provisions of any federal or provincial statutes; or (e) any negative covenants, prohibitions or other similar provisions with respect to borrowings, incurring debt or the creation of Encumbrances, contained in any existing loan documents, lease, sublease, offer to lease or other agreement (collectively, an "Agreement") which binds the Applicants, and notwithstanding any provision to the contrary in any Agreement:

> (a)     neither the creation of the Charges nor the execution, delivery, perfection, registration or performance of the Definitive Documents shall create or be deemed to constitute a breach by an Applicant of any Agreement to which it is a party;

> (b)     none of the Chargees shall have any liability to any Person whatsoever as a result of any breach of any Agreement caused by or resulting from InterTAN entering

into the DIP Facility, the creation of the Charges, or the execution, delivery or performance of the Definitive Documents; and

(c)  the payments made by the Applicants pursuant to this Order or the Definitive Documents, the granting of the Charges and the entering into by the Applicants of the Definitive Documents, do not and will not constitute fraudulent preferences, fraudulent conveyances, oppressive conduct, settlements, transactions under value or other challengeable, voidable or reviewable transactions under any applicable law.

**SERVICE AND NOTICE**

49.    THIS COURT ORDERS that the Applicants shall, within ten (10) business days of the date of entry of this Order, send a copy of this Order to the Applicants' landlords or property managers and known creditors, other than employees and creditors to which the Applicants owe less than $10,000, at their addresses as they appear on the Applicants' records, and shall promptly send a copy of this Order (a) to all parties filing a Notice of Appearance in respect of this Application, and (b) to any other interested Person requesting a copy of this Order, and the Monitor is relieved of its obligation under Section 11(5) of the CCAA to provide similar notice, other than to supervise this process.

50.    THIS COURT ORDERS that the Applicants and the Monitor be at liberty to serve this Order, any other materials and orders in these proceedings, any notices or other correspondence, by forwarding true copies thereof by prepaid ordinary mail, courier, personal delivery or electronic transmission to the Applicants' creditors or other interested parties at their respective addresses as last shown on the records of the Applicants and that any such service or notice by courier, personal delivery or electronic transmission shall be deemed to be received on the next business day following the date of forwarding thereof, or if sent by ordinary mail, on the third business day after mailing.

51.    THIS COURT ORDERS that the Applicants, the Monitor, and any party who has filed a Notice of Appearance may serve any court materials in these proceedings by e-mailing a PDF or other electronic copy of such materials to counsels' email addresses as recorded on the Service List from time to time, in accordance with the E-filing protocol of the Commercial

List to the extent practicable, and the Monitor may post a copy of any or all such materials on its website at www.alvarezandmarsal.com/intertan.

**GENERAL**

52.    THIS COURT ORDERS that a further hearing in this Application shall be held at 9:00 a.m. on November 26, 2008 or such alternate date as this Court may fix, at which time this Order may be supplemented or otherwise varied. The Applicants and the Monitor shall serve their materials for this further hearing on all parties who serve a Notice of Appearance on the Applicants and the Monitor, such materials to be served no later than 3 days prior to the date scheduled for the further hearing.

53.    THIS COURT ORDERS that the Applicants or the Monitor may from time to time apply to this Court for advice and directions in the discharge of their powers and duties hereunder.

54.    THIS COURT ORDERS that nothing in this Order shall prevent the Monitor from acting as an interim receiver, a receiver, a receiver and manager, or a trustee in bankruptcy of the Applicants, the Business or the Property.

55.    THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada or in the United States of America, including the United States Bankruptcy Court for the Eastern District of Virginia, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

56.    THIS COURT ORDERS that the Applicants and the Monitor all be at liberty and are hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative

- 23 -

body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

57.    THIS COURT ORDERS that any interested party (including the Applicants and the Monitor) may apply to this Court to vary or amend this Order on not less than seven (7) days' notice to any other party or parties likely to be affected by the order sought or upon such other notice, if any, as this Court may order.

58.    THIS COURT ORDERS that this Order and all of its provisions are effective as of 12:01 a.m. Eastern Standard Time on the date of this Order.


ENTERED AT / INSCRIT À TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

DEC 0 5 2008

PER / PAR: TV


TOR_A2G:3424177.3

Court File No: 08-CL-7851

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF INTERTAN CANADA LTD. AND TOURMALET CORPORATION

APPLICANTS

*Ontario*
**SUPERIOR COURT OF JUSTICE
COMMERCIAL LIST**

Proceeding commenced at Toronto

**ORDER**
**(December 5, 2008)**

**OSLER, HOSKIN & HARCOURT LLP**
P.O. Box 50
1 First Canadian Place
Toronto, ON   M5X 1B8

Edward Sellers (LSUC #30110F)
Tel: (416) 862-5959

Jeremy Dacks (LSUC #41851R )
Tel: (416) 862-4923

Marc Wasserman (LSUC #44066M )
Tel: (416) 862-4908

F# 1113457

T0R_P223375984.1