(b)    <u>Terminate Tenancy</u>.  Landlord may terminate this tenancy and Tenant's right to possession by written notice to Tenant given as provided in paragraph 28(a) above.  In the event of such termination, Landlord shall be entitled to recover from Tenant all of the following:

(i)    The "worth at the time of the award" (defined below) of any obligation which has accrued prior to the date of termination; and

(ii)    The "worth at the time of the award" of the amount by which the unpaid Construction Rent or Base Rent and all other charges which would have accrued after termination until the time of award exceeds the amount of any sums which Landlord has (or Tenant proves that Landlord could have) received in mitigation.

As used in this paragraph 29(b), the term, "worth at the time of the award", shall be computed by allowing simple interest at an accrual rate of the Default Rate for past due obligations, and a discount rate to net present value of twelve percent (12%) on anticipated future obligations, on the amount of the obligations payable on the date of such calculation.  In the event Tenant's tenancy shall be terminated as provided above, by summary proceedings or otherwise, Landlord, its agents, servants or representatives may immediately or at any time thereafter peaceably re-enter and resume possession of the Premises and remove all persons and property therefrom, by summary dispossession proceedings.  Landlord shall never be entitled to dispossess the Tenant of the Premises pursuant to any "lock-out" or other nonjudicial remedy.

(c)    <u>Reimbursement of Landlord's Costs in Exercising Remedies</u>.  Landlord may recover from Tenant, and Tenant shall pay to Landlord upon demand, such reasonable and actual expenses as Landlord may incur in recovering possession of the Premises, placing the same in good order and condition and repairing the same for reletting, and all other reasonable and actual expenses, commissions and charges incurred by Landlord in exercising any remedy provided herein or as a result of any Event of Default by Tenant hereunder (including without limitation attorneys' fees), provided that in no event shall Tenant be obligated to compensate Landlord for any speculative or consequential damages caused by Tenant's failure to perform its obligations under this Lease.

(d)    <u>Remedies Are Cumulative</u>.  The various rights and remedies reserved to Landlord herein, are cumulative, and Landlord may pursue any and all such rights and remedies (but no others), whether at the same time or otherwise (to the extent not inconsistent with

C:\CIRCUIT.CTY\GREENFIE\LEASE.RV8

specific provisions of this Lease).  Notwithstanding anything herein to the contrary, Landlord expressly waives its right to forcibly dispossess Tenant from the Premises, whether peaceably or otherwise, without judicial process, such that Landlord shall not be entitled to any "commercial lockout" or any other provisions of applicable law which permit landlords to dispossess tenants from commercial properties without the benefit of judicial review.

30.    Events of Landlord's Default; Tenant's Remedies.    Any of the following occurrences, conditions or acts by Landlord shall constitute an "Event of Default": (a) Landlord's failure to make any payments of money due Tenant hereunder within ten (10) days after the receipt of written notice from Tenant that same is overdue (in which event the delinquent amount shall accrue interest at the Default Rate); or (b) Landlord's failure to perform any nonmonetary obligation of Landlord hereunder within thirty (30) days after receipt of written notice from Tenant to Landlord specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Landlord shall have such longer period as may be reasonably necessary to cure the default, so long as Landlord proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion and provided further that in the case of an emergency, Tenant shall be required to give only such notice as is reasonable under the circumstances.

Upon the occurrence of an Event of Default by Landlord, at Tenant's option, in addition to any and all other remedies which it may have at law and/or in equity, and without its actions being deemed an election of remedies or a cure of Landlord's default, Tenant may do all or any of the following: (i) pay or perform such obligations and offset Tenant's reasonable and actual cost of performance, including any and all transaction costs and attorneys' fees, plus interest at the Default Rate, against the Construction Rent, Base Rent, and any and all other amounts and charges due Landlord hereunder or (ii) terminate this Lease and sue for damages (exclusive of speculative or consequential damages, but including actual damages), including interest, transaction costs and attorneys' fees as specified in subsection (i) above. If Landlord fails to pay Tenant the Tenant Improvement Allowance in a timely manner, Tenant shall be entitled to the rights and remedies set forth in the Construction Provisions in addition to those provided herein; and, as to a breach of the warranties and representations contained in paragraph 18, Tenant shall be entitled to the remedies provided therein, in addition to those remedies provided herein.  The

C:\CIRCUIT.CTY\GREENFIE\LEASE.RV8

various rights and remedies reserved to Tenant herein are cumulative, and Tenant may pursue any and all rights and remedies, whether at the same time or otherwise.

31.    Waiver. If either Landlord or Tenant fails to insist on the strict observance by the other of any provisions of this Lease, neither shall thereby be precluded from enforcing nor be held to have waived any of the obligations, past, present or future, of this Lease.  Either party may accept late payment or performance by the other without waiving any Event of Default which may then have accrued.

32.    Compliance with Applicable Laws. During the Term, Landlord and Tenant shall comply with all lawful requirements of the local, county and state health boards, police and fire departments, municipal and state authorities and any other governmental authorities with jurisdiction over the Improvements, and of the board of fire underwriters, respecting Tenant's use and occupancy of the Improvements, such respective obligations being concurrent with the parties' respective construction and maintenance obligations set forth in this Lease.  In the event that Tenant, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Landlord or any such authority ordering performance of any such work which Tenant is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Landlord may perform said work and collect the reasonable cost thereof plus interest at the Default Rate from Tenant with the next installment or installments of Construction Rent or Base Rent.  In the event that Landlord, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Tenant or any such authority ordering performance of any such work which Landlord is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Tenant may perform said work and deduct the reasonable cost thereof plus interest at the Default Rate from Landlord with the next installment or installments of Construction Rent or Base Rent.

33.    Notices. Any notice permitted or required to be given pursuant to this Lease shall be deemed to have been given three (3) business days after mailing a written notice by certified mail, postage prepaid, return receipt requested, or one (1) business day after sending by Federal

C:\CIRCUIT.CTY\GREENFIE\LEASE.RV8

29

Express or other comparable overnight express courier service (with proof of receipt available), addressed to the parties as follows:

| | |
|---|---|
| If to Tenant: | CIRCUIT CITY STORES, INC.<br>9950 Mayland Drive<br>Richmond, Virginia 23233<br>Attention: Corporate Secretary |
| with a copy to: | CIRCUIT CITY STORES, INC.<br>9950 Mayland Drive<br>Richmond, Virginia 23233<br>Attention: Vice President of Real Estate |
| If to Landlord: | Dentici Family Limited Partnership<br>c/o James P. Dentici<br>3405 S. Waterville Road<br>Oconomowoc, Wisconsin 53066 |
| with a copy to: | Peregrine Law Offices, S.C.<br>633 W. Wisconsin Ave., Suite 1300<br>Milwaukee, Wisconsin 53203-1960 |

or to such other addressees as any party hereto shall from time to time give notice to the other party in accordance with this paragraph.

34.   Brokers.  Landlord and Tenant each covenant that they have not dealt with any real estate broker or finder with respect to this Lease, except for Commercial Property Associates, and Prime Retail, which shall be paid a commission by Landlord pursuant to their separate written agreement. Except for the foregoing, each party shall hold the other party harmless from all damages, claims, liabilities or expenses, including reasonable and actual attorneys' fees (through all levels of proceedings), resulting from any claims that may be asserted against the other party by any real estate broker or finder with whom the indemnifying party either has or is purported to have dealt.  Landlord shall provide Tenant with a copy of all brokerage agreements executed in connection with this Lease.

35.   Miscellaneous.

(a)   Headings and Gender.  All paragraph headings, titles or captions contained in this Lease are for convenience only and shall not be deemed a part of this Lease and shall not in any way limit or amplify the terms and provisions of this Lease.  The masculine, feminine

C:\CIRCUIT.CTY\GREENFIE\LEASE.RV8

or neuter gender and the singular or plural number shall be deemed to include the others whenever the context so requires or indicates.

(b)    <u>Construction</u>.  The parties hereto agree that all the provisions hereof are to be construed as covenants and agreements as though the words importing such covenants and agreements were used in each separate paragraph hereof.

(c)    <u>Relationship of Landlord-Tenant</u>.  Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent, partnership, joint venture, or any other association between Landlord and Tenant other than the landlord-tenant relationship described herein.

(d)    <u>Entire Agreement; Merger</u>.  This Lease, including all exhibits hereto (which are hereby incorporated herein by reference for all purposes), contains the full and final agreement of every kind and nature whatsoever between the parties hereto concerning the subject matter of this Lease, and all preliminary negotiations and agreements of whatsoever kind or nature between Landlord and Tenant are merged herein.  This Lease cannot be changed or modified in any manner other than by a written amendment or modification executed by Landlord and Tenant.

(e)    <u>Attorneys' Fees</u>.  In the event either party shall be required to commence or defend any action or proceeding against any other party by reason of any breach or claimed breach of any provision of this Lease, to commence or defend any action or proceeding in any way connected with this Lease (in which Landlord and Tenant are adverse parties) or to seek a judicial declaration of rights under this Lease, the party prevailing in such action or proceeding shall be entitled to recover from or to be reimbursed by the other party for the prevailing party's reasonable and actual attorneys' fees and costs through all levels of proceedings.

(f)    <u>Partial Invalidity</u>.  If any provision of this Lease or the application thereof to any person or circumstance shall be deemed invalid or unenforceable, the remainder of this Lease and its application to other persons or circumstances shall not be affected by such partial invalidity but shall be enforced to the fullest extent permitted by law as though such invalid or unenforceable provision was never a part hereof.

(g)    <u>Consents</u>.  Any consent or approval granted by either party hereunder shall be deemed a consent only as to the matter on which such consent was requested and shall not waive the consenting party's right to give or withhold consent to any subsequent matter.

C:\CIRCUIT.CTY\GREENFIE\LEASE.RV8

31

(h)    Holidays.  If the day on which rent or any other payment due hereunder is payable falls on a Sunday or on a legal holiday, it shall be payable on the following business day.

(i)    Applicable Law.  This Lease shall be construed in accordance with the laws of the State of Wisconsin, and the parties agree that exclusive jurisdiction for all actions hereunder shall lie in the courts of the State of Wisconsin.

(j)    Successors and Assigns.  All rights, obligations and liabilities herein given to or imposed upon any party hereto shall extend to the permitted successors and assigns of such party.

(k)    Counterparts.  This Lease may be executed in one or more identical counterparts, and as so executed by all parties hereto shall constitute a single instrument for purposes of the effectiveness of this Lease.

(l)    Trademarks and Trade Names.  All trademarks, trade names, service marks, signs and all other marks of identification used by Tenant in its business shall at all times remain the exclusive property of Tenant, and Landlord shall have no right, interest in, or title to any of Tenant's trademarks, trade names, service marks, signs or other marks of identification.

36.    Effectiveness of Lease; Tenant's Right to Terminate.  Notwithstanding the execution of this Lease or any provision hereof to the contrary, the parties hereto agree that the effectiveness of this Lease is expressly conditioned upon the complete satisfaction (or waiver) of each and all of the following conditions by the dates set forth below, as applicable, but if no date is set forth, then on or before July 1, 1995:

(a)    Tenant's receipt, at Tenant's expense, simultaneously with or prior to the execution hereof, of: (i) a commitment for leasehold policy of title insurance for the Premises; (ii) copies of all underlying documents referred to in said commitment for title insurance; and (iii) Landlord's most current survey of the Premises and Tenant's approval of the foregoing in writing within thirty (30) days after receiving all of said documents, but not later than April 28, 1995.

(b)    Landlord's delivery of the Land by the date and in the condition specified in the Construction Provisions.

(c)     Tenant's obtaining the required City, County and State permits and approvals to construct said Improvements on the Premises no later than May 1, 1995. Tenant agrees to apply for such permits promptly as provided herein, to use due diligence and to expend any necessary application or other fees to secure such permits and approvals; provided, however, that the foregoing shall not be deemed to require Tenant to initiate litigation or to agree to any conditions imposed upon issuance of any such permit or approval.

(d)     Landlord's and Tenant's representations, warranties and covenants, including but not limited to those set forth in paragraph 18 herein, being true and accurate as of the date of delivery of the Land (as defined in the Construction Provisions).

(e)     Tenant's obtaining satisfactory assurances, within thirty (30) days of execution hereof, that adequate utility services (including gas, electricity, telephone, domestic water, fire protection water, storm sewer and sanitary sewer) are available for connection at the Premises or in close proximity thereto in amounts sufficient to support Tenant's operations.

(f)     Not later than May 1, 1995, Tenant's obtaining satisfactory assurances that all necessary approvals and consents, and the storm drainage easement agreement have been obtained.

(g)     Not later than May 15, 1995, Tenant's completion of acceptable feasibility studies showing that the Land is feasible for Tenant's use and development.

(h)     Not later than May 5, 1995, Landlord and Tenant having agreed in writing as to the manner of funding that portion, if any, of the cost of remediation in excess of $25,000 of underground storage tank #1 ("UST #1") shown as Tank #1 on Figure 4 of the Draft Phase I Environmental Assessment dated December 9, 1994 prepared by STS Consultants, Ltd., a copy of such Figure 4 being attached as Attachment "1" to the Construction Provisions.

The existence of the foregoing conditions is solely for the benefit of Tenant, and Tenant may waive any such condition at its sole discretion by delivering to Landlord a written notice signed by Tenant which specifically states the condition(s) being waived by Tenant.

Notwithstanding any other provision in this Lease to the contrary, in the event any of the foregoing conditions shall not be met, satisfied or waived, the parties hereto expressly agree that Tenant shall have the right to terminate this Lease in its sole and absolute discretion at anytime prior to the satisfaction or waiver of any such condition by delivering to Landlord a written notice signed by Tenant which states that Tenant is terminating this Lease on account of the

C:\CIRCUIT.CTY\GREENFIE\LEASE.RV8

failure of one or more of the foregoing conditions.  In the event of any such termination, the rights and obligations of the parties shall be of no further force and effect and the parties shall have no further liability one to the other (except that the indemnifications set forth in paragraphs 13(i), 18(a)(v) and 18(b)(ii) hereof shall survive such termination) upon Tenant's delivery of said notice to Landlord.

37.    Confidentiality.  The parties hereto, including, but not limited to, their heirs, successors, assigns and legal representatives, agree that this Lease may not be recorded and that all such parties hereby agree to use their best reasonable efforts to preserve the confidentiality of this transaction.  This confidentiality agreement extends to any developers, bankers, lawyers, accountants, employees, agents or any other persons acting on behalf of the parties hereto.  The parties hereto agree to use their best reasonable efforts to avoid discussing with, or disclosing to, any third parties (except those parties listed above) any of the terms, conditions or particulars in connection with this transaction.  It is specifically agreed by way of illustration, but not by limitation, that the covenant of confidentiality set forth herein shall not be breached if such information is disclosed in connection with or due to any governmental law or ordinance, but this covenant of confidentiality shall be breached if Landlord, or any of Landlord's developers, bankers, accountants, agents, lenders, lawyers or other similar parties, discloses the content of, or delivers a copy of this Lease to, any third party without the express written consent of all parties to this Lease.   Disclosure is also permissible for the following purposes: legal proceedings, either actual or contemplated, in connection with a sale, insuring, financing or in connection with enforcing rights under related agreements, such as Mortgages.

38.    Demolition.  All conditions to Landlord's commencement of demolition as set forth in paragraph 1(b) of the Construction Provisions shall have been satisfied or waived in writing not later than July 1, 1995.  The existence of the foregoing condition is solely for the benefit of Landlord, and Landlord may waive any such condition at its sole discretion by delivering to Tenant a written notice signed by Landlord which specifically states the condition(s) being waived by Landlord.  Notwithstanding any other provision in this Lease to the contrary, in the event any of the foregoing condition shall not be met, satisfied or waived, the parties hereto expressly agree that Landlord shall have the right to terminate this Lease in its sole and absolute discretion at anytime prior to the satisfaction or waiver of any such condition by delivering to Tenant a written notice signed by Landlord which states that Landlord is

C:\CIRCUIT.CTY\GREENFIE\LEASE.RV8

terminating this Lease on account of the failure of the foregoing condition.  In the event of any such termination, the rights and obligations of the parties shall be of no further force and effect and the parties shall have no further liability one to the other (except that the indemnifications of Landlord by Tenant set forth in paragraphs 13(i), 18(b)(ii) and Exhibit "C" paragraph 1(a) hereof shall survive such termination) upon Landlord's delivery of said notice to Tenant.

WITNESS the following signatures and seals:

LANDLORD

DENTICI FAMILY LIMITED PARTNERSHIP,
a Wisconsin limited partnership

WITNESS:

By: _____
      James P. Dentici,
      its General Partner

WITNESS:

By: _____
      John P. Dentici,
      its General Partner

C:\CIRCUIT.CTY\GREENFIELEASE.RV8

35

<u>TENANT</u>

CIRCUIT CITY STORES, INC.,
a Virginia corporation

ATTEST:

Its: Assistant Secretary

By:
Name:  Benjamin B. Cummings, Jr.
Title:   Vice President

36

PARCEL 1:
A part of the Southeast One-quarter (1/4) of Section Twenty-one (21), Township
Six (6) North, Range Twenty-one (21) East, in the City of Greenfield, Milwaukee
County, Wisconsin, bounded and described as follows:  Commencing at a point
660.00 feet North of the South line and 60.00 feet West of the East line of
said 1/4 Section; thence North and parallel to the East line of said 1/4
Section, 117.59 feet to a point in the South line of the Milwaukee County
expressway; thence South 81°52'10" West along said expressway, 252.23 feet to
a point; thence South and parallel to the East line of said 1/4 Section, 86.70
feet to a point that is 660.00 feet North of the South line of said 1/4
Section; thence North 88°53'50" East, and parallel to the South line of said
1/4 Section, 250.00 feet to the place of beginning.

PARCEL 2:
Outlot "A" of Certified Survey Map No. 4893, being a redivision of Parcel A of
Certified Survey Map No. 3080, being a part of the Southeast One-quarter (1/4)
of the Southeast One-quarter (1/4) of Section Twenty-one (21), in Township Six
(6) North, Range Twenty-one (21) East, in the City of Greenfield, Milwaukee
County, Wisconsin, recorded in the Office of the Register of Deeds for
Milwaukee County, on February 26, 1987 in Reel 2048, Image 1813 as Document No.
6026347.

PARCEL 3:
Parcel E of Certified Survey Map No. 2220, a Redivision of Parcel 2 of
Certified Survey Map No. 1218 and Parcel "B" in Certified Survey Map No. 2052,
being a part of the Southeast One-quarter (1/4) of the Southeast One-quarter
(1/4) of Section Twenty-one (21), Township Six (6) North, Range Twenty-one (21)
East, in the City of Greenfield, Milwaukee County, Wisconsin, recorded on
November 9, 1973, in Reel 755, Image 303 as Document No. 4804802.

PARCEL 4:
Parcel "B" of Certified Survey Map No. 3080, being a division of Parcel "B" of
Certified Survey Map No. 2480, which is a division of Parcel "C" of
Certified Survey Map No. 2220, being a redivision of Parcel 2 of Certified
Survey Map No. 1218 and Parcel "B" in Certified Survey Map No. 2052, being a
part of the Southeast One-quarter (1/4) of the Southeast One-quarter (1/4) of
Section Twenty-one (21), Township Six (6) North, Range Twenty-one (21) East,
and a division of Parcel "B" of Certified Survey Map No. 2470, being a
redivision of Parcel "D" of Certified Survey Map No. 2220, being a part of the
Southeast One-quarter (1/4) of the Southeast One-quarter (1/4) of Section
Twenty-one (21), Township Six (6) North, Range Twenty-one (21) East, in the
City of Greenfield, Milwaukee County, Wisconsin, recorded on June 10, 1977 in
Reel 1022, Image 1361 as Document No. 5109042.

# EXHIBIT "B"

## INDEX OF DEFINITIONS

| Term | Paragraph where defined |
|------|------------------------|
| Assessment(s) | Ex. "C", para. 1(a) |
| Base Rent | 4 |
| Building | 2 |
| City | 7 |
| Commencement Date | 4 |
| Concept Plans | Ex. "C", para. 2(b) |
| Construction Term | 3 |
| CPI-U | 4(d) |
| Date of Taking | 15(a) |
| Default Rate | 9 |
| Delivery of the Land | Ex. "C", para. 1(b) |
| Demolition Plans and Specifications | Ex. "C", para. 1(b) |
| Event of Default (Landlord) | 30 |
| Event of Default (Tenant) | 28 |
| Foreclosure | 20(a) |
| Hazardous Substances | Ex. "C", para. 1(a) |
| Improvements | 2 |
| Land | 1 |
| Landlord | Introduction |
| Landlord Work | Ex. "C", para. 1(c) |
| Lease Year | 3 |
| Main Term | 3 |
| Mortgage | 20(a) |
| Mortgagee | 20(a) |
| Option Periods | 3 |
| Other Improvements | 2 |

C:\CIRCUIT.CTY\GREENFIE\LEASE.RV8

| Term | Paragraph where defined |
| --- | --- |
| Permitted Encumbrances | Ex. "F" |
| Person | 19 |
| Personalty | 22 |
| Plans and Specifications | 2 |
| Premises | 1 |
| Real Estate Taxes | 8(a) |
| Renewal Option | 3 |
| Site Work | Ex. "C", para. 1(b) |
| Site Plan | 1 |
| State | 8 |
| Substantial Completion | Ex. "C", para. 2(e) |
| Substantially All of the Premises | 15(a) |
| Successor | 21 |
| Taking | 15(a) |
| Tax Parcel | 8(b) |
| Tenant | Introduction |
| Tenant Improvement Allowance | Ex. "C", para. 3 |
| Term | 3 |
| Transfer | Ex. "C", para. 3 |
| UST #1 | 36(h) |
| Worth at the time of the award | 29(b) |

C:\CIRCUIT.CTY\GREENFIE\LEASE.RV8

GREENFIELD, WI

EXHIBIT "C"

CONSTRUCTION PROVISIONS

THESE CONSTRUCTION PROVISIONS (herein so called) are hereby made a part of the Lease between Landlord and Tenant to which these Construction Provisions are attached as Exhibit "C". All defined terms shall have the meanings attributed to them in the Lease unless otherwise specifically defined in these Construction Provisions.

1.   Landlord's Delivery of the Land; Other Landlord Work.

All of the work set forth in subparagraphs (a), (b) and (c) below is, collectively, the "Landlord Work":

(a)   Hazardous Substances.   Subject to the terms of these Construction Provisions, Landlord shall deliver the Land to Tenant free of any pollution or contamination from toxic or hazardous substances, asbestos or any other chemicals or substances in amounts which exceed standards for public health or welfare as established and regulated by any local governmental authority, the State or the United States Government (herein collectively referred to as "Hazardous Substances"). Landlord hereby grants Tenant and its agent access to the Premises to enable Tenant to conduct such soil and environmental tests as Tenant deems necessary. Tenant shall indemnify and hold Landlord harmless from costs or damages due to personal injury or property damage and/or to the filing of liens arising out of Tenant's or Tenant's agents' investigations and other activities on the Land. Notwithstanding anything to the contrary herein contained, this obligation of indemnity shall survive the termination of the Lease.

Each party shall have the right to contract for such environmental assessments as each shall deem appropriate under the circumstances. Landlord and Tenant shall each deliver to the other, within five (5) days after receipt, copies of all environmental site assessments, reports, and analyses, including, without limitation, all geotechnical and soil analyses, procured with respect to the Premises.

(i) Tenant has contracted for a Phase II assessment. Landlord shall pay 50% of the cost of the Phase II assessment, Landlord's cost not to exceed $5,000, in addition to the Tenant Improvement Allowance.

(ii) If either the Phase I or Phase II assessment reveals contamination (including contamination in or about the lifts located in the presently existing structures on the site), then Tenant shall remediate the same on Landlord's behalf (which remediation may include methane venting of the Premises) in accordance with standards approved by the Wisconsin Department of Natural Resources. Landlord shall pay to Tenant within thirty (30) days of Tenant's written request therefor, the cost of remediation (and if not so paid Tenant may offset such cost against Base Rent due under the Lease), provided, however, that the cost to Landlord of remediation (exclusive of that related to underground storage tanks) will not exceed $40,000, and any additional cost of such remediation will be borne by Tenant. Subsequent to installation, the maintenance of the methane venting system shall be performed by Tenant at its cost, provided, however, any improvements to the methane venting system required by the Wisconsin Department of Natural Resources during the Term will be performed by Tenant on Landlord's behalf, at Landlord's cost, which cost Landlord shall pay to Tenant within thirty (30) days of Tenant's written request therefor, and if not so paid Tenant may offset such cost against Base Rent due under the Lease.

(iii)    If test results from STS Consultants, Ltd., regarding UST #1 (shown on Attachment "1") described in paragraph 36(h) reveal contamination, Tenant shall remediate contamination associated with UST #1, on Landlord's behalf in accordance with standards approved by the Wisconsin Department of Natural Resources. Landlord shall pay to Tenant within thirty (30) days of Tenant's written request therefor (and if not so paid, Tenant may offset such cost against Base Rent due under the Lease) the cost of testing and remediation, provided, however, that if the cost to Landlord of testing and remediation related to UST #1 will exceed $25,000 (in addition to the $40,000 set forth in paragraph 1(a)(ii) above) and neither party commits in writing to fund such excess within the time period permitted therefor in paragraph 36(h) of the Lease then, unless the parties agree otherwise, this Lease shall be terminable by either party.

Nothing herein shall imply that Tenant is responsible to third parties for Landlord's environmental obligations pertaining to the Premises, and nothing herein shall impair Landlord's indemnity of Tenant with regard thereto set forth in paragraph 18(a)(v) of the Lease, provided, however, that Landlord's obligation to indemnify Tenant shall not include any amounts required to be paid by Tenant as provided in this paragraph 1(a).

(b) <u>Landlord Work</u>. Landlord's obligation to commence demolition of existing site improvements is conditioned upon the satisfaction or waiver in writing of each of the following:

(i) receipt from the Wisconsin Department of Natural Resources of the foundry sand exemption;

(ii) completion of all environmental assessments and analyses to Tenant's satisfaction, including completion of the Phase II assessment;

(iii) conditions 36(a), 36(f), 36(g) and 36(h) of the Lease having been satisfied or waived by Tenant in writing; and

(iv) receipt of Tenant's demolition plans being prepared by National Surveying and engineering and specifications dated March 31, 1995, prepared by STS Consultants, Ltd., a copy of such specifications being attached as <u>Attachment "4"</u> to this <u>Exhibit "C"</u> (collectively the "Demolition Plans and Specifications") and Tenant's environmental analysis of stockpiled soil.

Landlord shall, at its sole cost and expense, within twenty-eight (28) days after the aforesaid conditions have been satisfied or waived in writing, subject to force majeure, with extensions equal to the period of each such force majeure delay, demolish all existing site improvements, including footings and foundations that will affect Tenant's Building pad. "Delivery of the Land" shall be deemed to occur when Landlord shall have completed such demolition.

Upon completion of such demolition, Landlord shall give Tenant written notice of Delivery of the Land in the form of <u>Attachment "6"</u>. Landlord shall, at its sole cost and expense, within forty-five (45) days after the aforesaid conditions have been satisfied or waived in writing, subject to force majeure, with extensions as aforesaid, (i) remove such of the remaining site improvements, including such footings and foundations as are required to be removed pursuant to Tenant's Demolition Plans and Specifications so that Tenant may thereafter commence site grading, installation of utilities and other work necessary to commence construction of the Building and (ii) utilize existing stockpiled soil located on the Premises, subject to Tenant's environmental analysis thereof, in the leveling of the portion of the site which will require future fill materials. All of the Landlord Work shall be completed in accordance with the Demolition Plans and Specifications. As used herein, force majeure shall

C:\CIRCUIT.CTY\GREENFIE\LEASE.RV8

3

mean weather-related delays only as of the later of May 1, 1995 or the date which is ninety (90) days after commencement of demolition.

(c)    Performance of Landlord Work.    All Landlord Work shall be performed in accordance with all applicable laws and this Lease, in a good and workmanlike manner, as appropriate by contractors, engineers, surveyors, architects and consultants, who are bondable, licensed in the State and of good reputation.    In the event that Landlord defaults at any time in completion of any component of the Landlord Work, Tenant shall have the right, but not the obligation, to perform at Landlord's sole cost and expense, all or any part of Landlord's Work. Tenant shall exercise this right by providing Landlord with written notice thereof, which notice shall reasonably detail those portions of the Landlord Work which Tenant elects to complete. Tenant may exercise the rights set forth in this paragraph 1(c) from time to time so long as Tenant provides Landlord notice specified herein (i) within a reasonable amount of time prior to the date upon which Landlord would otherwise commence that portion of the Landlord Work, or (ii) at such other time where it is feasible for Tenant to take over that portion of the Landlord Work from Landlord.    In the event and to the extent that Tenant exercises its right hereunder, Landlord agrees to cooperate in good faith and provide Tenant with reasonable assistance so that Tenant can complete said portions of the Landlord Work.    Landlord agrees to reimburse Tenant for any and all costs incurred by Tenant in connection with any portion of the Landlord Work which Tenant is in the process of completing within five (5) days after receipt of written request from Tenant, which request shall be reasonably supported by invoices and written description of the Landlord Work performed.    In the event Landlord does not timely reimburse Tenant as hereinabove contemplated, Tenant shall be entitled to deduct the costs of such Landlord Work from rentals and other payments due under the Lease, together with interest at the Default Rate from the date of expenditure by Tenant until paid in full.

2.    Tenant Improvements.

(a)    Building Construction.    Upon completion of the Landlord Work, Landlord shall give Tenant written notice in the form of Attachment "2".    Tenant shall promptly notify Landlord if any such requirement has not been met to Tenant's reasonable satisfaction, provided Tenant does not elect its self-help remedies set forth in this Lease.    Upon Delivery of the Land, Tenant shall promptly commence and pursue to completion with due diligence the construction of the Site Work and the Improvements.    The construction of the Site Work and the

C:\CIRCUIT.CTY\GREENFIE\LEASE.RV8

4

Improvements shall be performed by a duly licensed contractor chosen by Tenant, shall be done in a good and workmanlike manner, in compliance with all applicable laws and in substantial accordance with the "Plans and Specifications" (defined below). Provided that the Land is delivered within the period of time set forth in paragraph 1(b) above, Tenant covenants and agrees to use reasonable efforts and due diligence to achieve "Substantial Completion" (as defined below) on or before the date which is seven (7) months thereafter.

(b)     Site Work. As used herein, the term "Site Work" shall mean construction and installation of: (i) an all-weather construction access road with all curbcuts for the Premises; (ii) a building pad constructed to within 0.1' of foundation level and graded, level and compacted to no less than 95% of the modified proctor soil test for water content and compaction levels, with bearing material of no less than 2500 per sq. ft. allowable design bearing pressure, with foundation strata in accordance with local building codes, in accordance with Tenant's soils report dated February 21, 1995, and prepared by STS Consultants, Ltd.; (iii) temporary water and electricity to within 5 feet of the building pad in accordance with Attachment "7" hereto; (iv) all grading work in accordance with the standards set forth on Attachment "3" hereto, and paving (including heavy-duty paving), curbing for parking areas and vehicular access; (v) landscaping in accordance with Tenant's landscaping plans and any governmental requirements; (vi) site lighting; (vii) a storm water drainage system (which must include gravity flow drainage over adjacent property or as otherwise agreed by the parties); and (viii) the following utilities to within 5 feet of the building pad at Tenant's required points of entry: gas (if available), telephone, permanent electricity (adequate for 800-amp panel, 3-phase, 277/480 volt), sanitary sewer (6" line), domestic water (2" line), and fire protection water (8" line, 50 psi residual pressure, 2000 gallons per minute, with no pumping required) at depths adequate for Tenant's tie-in; all in a good and workmanlike manner, in accordance with Tenant's prototypical specifications.

(c)     Plans and Specifications. Tenant shall prepare and furnish to Landlord for its approval, not to be unreasonably withheld, conditioned or delayed, complete architectural drawings and specifications and building elevations (the "Plans and Specifications") for the construction of the Site Work and the Improvements, incorporating therein the items specified and shown in the "Concept Plans" attached hereto as Attachment "11". Landlord agrees that it will approve the Plans and Specifications, so long as they are materially consistent with the

Concept Plans, within ten (10) business days after receipt thereof (provided that in no event shall Landlord require Tenant to alter its building elevations, standard entrance tower, customer pick-up area or use of Alucobond and red trim on the front exterior of the Building).    If the Plans and Specifications are not disapproved by Landlord within fifteen (15) days of delivery thereof to Landlord, they will be deemed approved.    The Plans and Specifications shall not be substantially changed by Tenant without the prior written consent of the Landlord, which consent shall not be unreasonably withheld, conditioned or delayed.

(d)    Permits.    Tenant, at its sole cost and expense, shall obtain or cause to be obtained those certain building permits, licenses, other governmental approvals and temporary and permanent certificates of occupancy which may be required for the lawful construction of the Site Work and the lawful construction and occupancy of the Premises as a retail shopping facility in accordance with the Plans and Specifications and for erection of any signage on the Premises.    Landlord agrees to assist and cooperate fully with Tenant in obtaining such permits, licenses, approvals and certificates.    Landlord shall be responsible for any other permits necessary for the development of the Premises.

(e)    Landlord Inspections.    During the course of construction of the Site Work and the Improvements, Landlord and its agents may, at its own risk and in cooperation with Tenant's contractor, enter upon the Land for purposes of inspecting the work, provided that such inspections shall not interfere with Tenant's construction.

(f)    Substantial Completion.    Substantial completion of the Improvements and the Site Work ("Substantial Completion") shall be deemed to occur when a certificate of occu-pancy, whether temporary and subject to minor items to be completed, or permanent, as the case may be, has been issued by the applicable governmental authority.    The foregoing shall not be deemed to relieve Tenant of its responsibility to complete the Improvements and the Site Work in accordance with the Plans and Specifications.

(g)    Contractors.    Landlord shall submit to Tenant a contractor list to be provided to Tenant's general contractor for purposes of inclusion of such contractors in the bidding process for the work to complete the Improvements and the Site Work.    Tenant shall provide written notice to Landlord of the winning bidders and amounts for the Site Work upon determination by Tenant of the identity of such winning bidders.

C:\CIRCUIT.CTY\GREENFIE\LEASE.RV8

6

3. <u>Costs</u>.  Upon Substantial Completion and Tenant's furnishing to Landlord (a) the certificates of insurance required under paragraph 13 of the Lease, (b) an indemnity in the form of <u>Exhibit "J"</u> attached hereto against any exception in Landlord's or its Mortgagee's policy of title insurance with respect to mechanics' liens arising out of Tenant's construction, and (c) confirmation from Tenant that Landlord holds title to the Improvements (in form reasonably acceptable to Landlord and Tenant), Landlord shall pay to Tenant: (i) a "Tenant Improvement Allowance" in an amount equal to Thirty-Four and No/100 Dollars ($34.00) per square foot of ground floor gross leasable square feet of the Building not to exceed a total of 42,460 square feet; and (ii) the lesser of: (A) the actual Site Work costs incurred by Tenant to complete the Site Work, or (B) Four Hundred Thousand and No/100 Dollars ($400,000.00) (the "Site Work Allowance"), to reimburse Tenant for Site Work costs incurred by Tenant to complete the Site Work.  The Tenant Improvement Allowance and the Site Work Allowance are payable by wire transfer of funds by Landlord to Tenant's account no later than thirty (30) days after the later of (x) Substantial Completion, or (y) delivery to Landlord of the items specified in (a), (b) and (c) above.

If Landlord fails to pay the Tenant Improvement Allowance and the Site Work Allowance in full within the period specified herein, Landlord shall be in default hereunder, no Building Rent shall be due or owing to Landlord until the same is paid to Tenant, and interest shall accrue on the unpaid Tenant Improvement Allowance and Site Work Allowance at the Default Rate commencing on the thirty-first (31st) day following the due date thereof until the date of payment of the Tenant Improvement Allowance and the Site Work Allowance; provided, however, that if Landlord has not tendered payment of the Tenant Improvement Allowance and Site Work Allowance by that date which is one (1) year from the due date thereof (the "Substantial Completion Anniversary"), but on the express condition that Tenant's net worth has not materially adversely changed, then (a) such date shall become the Commencement Date; (b) Base Rent shall be reduced to ground rent equal to Seventy-Five Thousand and No/100 Dollars ($75,000.00) per annum during the first year following the Substantial Completion Anniversary, Fifty Thousand and No/100 Dollars ($50,000.00) per annum during the second year following the Substantial Completion Anniversary, and Twenty-Five Thousand and No/100 Dollars ($25,000.00) per annum thereafter during the Term of the Lease; and (c) this Lease shall be converted to a ground lease, with ownership of the Improvements remaining with Tenant, and

C:\CIRCUIT.CTY\GREENFIE\LEASE.RV8

Landlord's and any Mortgagees' names being removed as additional insureds or mortgagees on any casualty insurance described in paragraph 13(a) of the Lease. Landlord and Tenant covenant and agree that upon the reasonable written request of either Tenant or Landlord, Landlord and Tenant shall execute such documentation as necessary to formalize the conversion of this Lease to a ground lease upon the Substantial Completion Anniversary.

Notwithstanding the foregoing, at any time following the Substantial Completion Anniversary and upon thirty (30) days prior written notice, Tenant shall have the right at Tenant's sole election, but not the obligation, in lieu of the requirement that Landlord pay to Tenant the Tenant Improvement Allowance and the Site Work Allowance, to mortgage, sell, convey, assign, lease or otherwise encumber (collectively, a "Transfer") Tenant's interest in the Building, the Improvements and the Lease. Such right shall be in addition to the rights of Tenant set forth in paragraph 30 of the Lease.

Landlord covenants to (a) execute all documents necessary to permit Tenant to effect the Transfer described herein, and (b) cause any Mortgagee to specifically acknowledge the rights of Tenant's lender and third parties arising as a result of such Transfer. Notwithstanding such Transfer, Tenant shall continue to pay the ground rentals described herein during the remainder of the Term.

4. Construction Delays.

(a) Delays by Landlord. In the event, subject to force majeure, Landlord shall fail to complete the Landlord Work or accomplish Delivery of the Land in the condition specified within the periods of time in paragraph 1(b) above, Landlord agrees that it shall reimburse Tenant for its fixed and ascertainable costs incurred as a result thereof in the exercise of all reasonable efforts to open for business by the date which is seven (7) months following the date of Delivery of the Land. Such costs shall be limited to Tenant's out-of-pocket expenses of construction overtime, acceleration charges and bonuses paid to Tenant's contractors or subcontractors, charges for the scheduling of construction crews on days on which work cannot be performed due to the delays by Landlord and construction period interest charges actually incurred to the extent that such charges exceed those which would have accrued without such delay.

In the event, subject to force majeure, Landlord shall fail to accomplish Delivery of the Land or to complete any element of the Landlord Work by the date which is fifteen (15) days

C:\CIRCUIT.CTY\GREENFIE\LEASE.RV8

8

after the periods set forth in paragraph 1(b) above, Tenant, at its option and upon five (5) days' prior written notice to Landlord, which notice may be given prior to or at any time after the applicable date for performance, may in addition to any other rights and remedies set forth herein, enter the Premises and perform any task required for delivery of the Land or, as applicable, any element of the Landlord Work which has not been timely completed, and Landlord shall reimburse Tenant for its reasonable and actual costs thereof, including interest on such costs at the Default Rate.  Landlord hereby grants Tenant the right, as its agent, to directly contact and contract with Landlord's contractors, on behalf of Landlord, to complete such work, all at Landlord's cost and expense.  If such costs are not reimbursed to Tenant prior to the Commencement Date, Tenant may offset such amounts against Base Rent otherwise due until such costs and accrued interest are reimbursed in full.

(b)    Delays by Tenant.  If, subject to force majeure, Tenant shall fail to achieve Substantial Completion by that date which is two hundred ten (210) days following Delivery of the Land, Landlord, at its option, upon five (5) days prior written notice to Tenant, may require Tenant to proceed with its construction, commence the payment of Ground Rent, and reimburse Landlord for its fixed and ascertainable costs incurred as a result thereof.  Such costs shall be limited to Landlord's out of pocket expenses of construction overtime, acceleration charges and bonuses paid to Landlord's contractors or subcontractors, charges for the scheduling of construction crews on days on which work cannot be performed on account of the aforesaid delays by Tenant, the cost of erecting barricades around Tenant's unfinished work and construction period interest charges to the extent that such charges exceed those which would have accrued without such delay.

In the event, for any reason whatsoever and regardless of force majeure, Tenant shall fail to achieve Substantial Completion by that date which is one (1) year following Delivery of the Land, Landlord shall be entitled to terminate this Lease upon sixty (60) days prior written notice to Tenant, during which sixty (60) day period Tenant may cure any such default hereunder.  Any sums owing to Landlord under this subparagraph (b) shall be deducted from the Tenant Improvement Allowance.

(c)    Miscellaneous.  Notwithstanding the foregoing, a delay by any party in exercising its cure rights or other remedies hereunder shall not be deemed an event of force

C:\CIRCUIT.CTY\GREENFIE\LEASE.RV8

majeure for purposes of extending the date(s) established for performance by the party whose actions or omissions gave rise to such cure rights or remedies.

     5.    <u>Attachments</u>.

"1"  Figure 4 to Environmental Assessment

"2"  Landlord Work Certification

"3"  Standards for Grading Work

"4"  Demolition Specifications

"5"  [Intentionally Deleted]

"6"  Certification of Delivery of the Land

"7"  Utilities Specifications

"8"  [Intentionally Deleted]

"9"  [Intentionally Deleted]

"10" [Intentionally Deleted]

"11" Concept Plans

C:\CIRCUIT.CTY\GREENFIE\LEASE.RV8



SITE DIAGRAM
CIRCUIT CITY STORES, INC.
SOUTHRIDGE LOCATION
GREENFIELD, WISCONSIN

## ATTACHMENT "2"

### Landlord work certification

To: Circuit City Stores
    9950 Mayland Drive
    Richmond, Virginia. 23233

    Attention: VICE PRESIDENT-REAL ESTATE

RE: Circuit City Store,Greenfield,Wisconsin-Lease Agreement dated
    May 2,1995.


Via UPS Overnight service


June 27,1995

Ladies and Gentlemen:

    The undersigned, as Landlord under the Lease has caused all
Landlords Work to be completed in accordance with the terms of the
Lease. Specifically the undersigned hereby certifies that: (i)all
existing site improvements, including footings and foundations to
the extent provided in the Demolition Plans and Specifications,
have been removed and (ii) the Land has been rough graded.

    We certify that all elements of the Landlord Work have been
satisfied in accordance with the Lease.


Dentici Family Ltd. Partnership


James Dentici
General Partner

Attachment "2"

Landlord Work Certification


To:    Circuit City Stores
       9950 Mayland Drive
       Richmond, Virginia  23233
       Attention:  Vice President-Real Estate


       Re: Circuit City Store/[Location]-Lease Agreement dated _____

Ladies and Gentlemen:

       The undersigned, as Landlord under the Lease has caused all Landlord's Work to be completed in accordance with the terms of the Lease.  Specifically the undersigned hereby certifies that: (i) all existing site improvements, including footings and foundations to the extent provided in the Demolition Plans and Specifications, have been removed and (ii) the Land has been rough graded.

       We certify that all elements of the Landlord Work have been satisfied in accordance with the Lease.

                              [LANDLORD]

1

Attachment "3"

Standards for Grading Work

1.    The Premises shall be graded in accordance with the following:

(a)    The Grading Plan shall show contours in accordance with standard engineering practice and these contours shall be shown with the existing (shown as a dashed line) and final (shown as a solid line) elevations.   Whether existing or proposed, all buildings, improvements, roads  and highways, including those adjacent to the Shopping Center, shall be shown in their true locations.

(b)    The Building will be accessible by grade level parking only.  Steps and stairs are not permitted.

(c)    Sidewalk at the Building will slope away from the Building with grade of no less than 1.5% and no more than 3.0%.  All water shall be sheet drained away from the Tenant's doors.

(d)    Asphalt paving areas will be graded to avoid ponding water with slopes no less than 1.5% and no more than 4.0%.  Entrances and access drives shall have a maximum slope of 6.0%.

(e)    Surface drainage swales will not be allowed without prior approval of Tenant.  Such swales must have a grade of not less than 0.5% and no more than 3.5% and shall be constructed of concrete.

(f)    The cut and fill on the Shopping Center site should be balanced, if practical.  All fill material must be of a select grade and sources for acquisition of fill material, as well as locations for cut material, must be identified.

(g)    No retaining walls or embankments causing breaks in grade shall be permitted unless specifically approved by Tenant.

2.    "Tenant's Pad Area" shall be defined as the area extending five (5) feet beyond the Building walls and truck dock and ramp area, or to the back of curbing around the Building, whichever is further.  The Site Work shall comply with the following additional requirements:

(a)    Tenant shall be responsible for preparing the Tenant's Pad Area subgrades to within plus or minus one-tenth of a foot as set by Tenant's architect.  Tenant's subgrades are

typically 8"-10" below finished floor elevation.  Tenant will complete compaction in accordance with the appropriate engineering standards and building code requirements, but in no event less than ninety-five percent (95%) of the modified proctor soil test for water content and compaction levels ("Modified Proctor") on the Land, so as to enable Tenant to perform construction work necessary to provide completed Improvements in accordance with the "Plans and Specifications" (defined in the Construction Provisions), with standard footings and without the necessity of pilings or spread footings or other extraordinary foundation work.  Tenant's minimum slab thickness and under slab fill will be established in accordance with the report of an independent professional soils engineer.  All compacted areas of the site shall be verified by an independent professional soils engineering test laboratory and a certificate from such independent laboratory indicating compliance with the soils report shall be furnished to Tenant upon completion of the Site Work.

     (b)    Tenant's Pad Area soil shall have a minimum bearing capacity of 2,500 pounds per square foot.  Earth stabilization and/or replacement shall be performed by Landlord as necessary to meet this minimum requirement.

     (c)    All material, including native and fill, within 3 feet of any surface of the building including foundation concrete, shall be nonexpansive with a plasticity index of 12 or less. The material shall also have sufficient cohesion to stand vertically for 3 feet.  No oversize material or lumps greater than 6" in diameter will be allowed and not more than 15% of the material shall be greater than 2-1/2" diameter.

Circuit City Stores, Inc.
Southridge Site
STS Project No. 84612A
Draft Copy

Attachment "4"
Demolition Specifications

## SECTION 02050

## SITE DEMOLITION

## PART 1 - GENERAL

1.01   Summary

A. Work Includes:  Provide materials, labor, and equipment necessary and incidental to complete demolition and removal of existing structures, pavements, and utilities as shown on demolition drawing prepared by National Survey & Engineering and as specified herein, including:

  1. Demolition and removal of building structures.

  2. Demolition and removal of obstructions, foundation walls, and footings to a minimum depth of 2 feet below proposed site grades.

  3. Demolition and removal of concrete slabs-on-grade.

  4. Demolition and removal of asphaltic pavements.

  5. Removal and disposal of hazardous or contaminated materials and other regulated waste which may be encountered during the demolition process.

  6. Disconnection, capping, removal, abandonment, and identification of utilities encountered in demolition areas including gas, electric, water, storm sewer, and telephone lines.

  7. Repair of damage done to adjacent property due to performance of required work.

B. Demolition material becomes property of the Contractor.  As such, the material may be salvaged, recycled, or legally disposed of as determined by the Contractor.  The Wisconsin Department of Natural Resources recommended in their March 29, 1995 letter to Mr. Jim Dentici that much of the unregulated solid wastes ( i.e., concrete, concrete blocks, brick, and asphalt) from the demolition be recycled and used for site preparation and general fill purposes.

C. Work Not Included: Abandonment of existing methane monitoring wells (CC-1, -1A, -1B, -1C, -1D, -3A).

D. A Testing Agency will be retained by Circuit City Stores, Inc. to monitor, perform testing and document observations made during demolition work.

1.02   Regulatory Requirements

A. Obtain required permits from authorities having jurisdiction.

Circuit City Stores. Inc.
Southridge Site
STS Project No. 84612A
Draft Copy

B. Comply with applicable local. state and federal building codes and regulations for demolition and abandonment of structures and utilities.

C. Notify affected utility companies before starting work and comply with their requirements.

D. Dispose of all regulated waste material at licensed landfills or facilities as required by applicable local. state and federal agencies.

E. A Site Health & Safety Plan shall be prepared to document plans for compliance with local, state and federal regulations.

1.03   Record Documents

A. The Testing Agency will monitor demolition activities and document pertinent observations. including materials encountered, testing results, demolition methods used. locations of excavated and abandoned utilities, and backfilling operations.

B. Contractor shall cooperate with testing agency by providing access for monitoring, sampling and testing.

C. Contractor shall furnish to the Testing Agency written records documenting how all demolition materials were disposed of.

1.04   Project Schedule

A. Work shall be performed between the hours of 7 a.m. and 10 p.m. and shall be completed ~~by May 5, 1995.~~ within the time parameters set forth in Exhibit "C" of the Lease The Contractor shall notify the Testing Agency of its schedule at least 3 days prior to commencing work.

**PART 2 - PRODUCTS**

- Not Used -

**PART 3 - EXECUTION**

3.01   Preparation

A. Provide. erect. and maintain temporary barriers and security devices for protection of employees and public, and adjacent buildings, pavements. utilities, appurtenances, landscaping, and adjoining property not scheduled to be demolished.

B. Identify known underground, above ground, and aerial utilities. Stake and flag locations.   Contact Digger's Hotline and local utilities prior to beginning demolition operations.

C. Check that erosion controls have been installed and meet the requirements of the Wisconsin Construction Site Best Management Practice Handbook prior to the start of demolition or excavation work.