UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA

IN RE:                          .    Case No. 08-35653(KRH)
                                .
                                .
                                .
CIRCUIT CITY STORES             .    701 East Broad Street
INC.,                           .    Richmond, VA 23219
                                .
                                .
           Debtor.              .    February 25, 2009
. . . . . . . . . . . . . .      .    2:02 p.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE KEVIN R. HUENNEKENS
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:          McGuireWoods LLP
                         By:  DOUGLAS FOLEY, ESQ.
                         9000 World Trade Center
                         101 W. Main St.
                         Norfolk, VA  23510

                         Skadden Arps Slate Meagher & Flom LLP
                         By:  IAN FREDERICKS, ESQ.
                              GREGG M. GALARDI, ESQ.
                         One Rodney Sq.
                         Wilmington, DE 19899

For the Creditors        Pachulski Stang Ziehl & Jones
Committee:               By:  JEFF N. POMERANTZ, ESQ.
                         10100 Santa Monica Boulevard
                         11th Floor
                         Los Angeles, CA  90067

                         Tavenner & Beran PLC
                         By: PAULA S. BERAN, ESQ.
                         20 North Eighth Street, Second Floor
                         Richmond, VA  23219

Proceedings recorded by electronic sound recording, transcript
produced by transcription service

_____

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@optonline.net

(609) 586-2311    Fax No. (609) 587-3599

**APPEARANCES (CONT'D):**

| | |
|---|---|
| For Greystone Data<br>Systems: | Nixon Peabody, LLP<br>By:  CHRISTOPHER M. DESIDERIO, ESQ.<br>437 Madison Avenue<br>New York, NY  10022 |
| For TomTom: | Nixon Peabody, LLD<br>By:  DENNIS J. DREBSKY, ESQ.<br>      CHRISTOPHER M. DESIDERIO, ESQ.<br>437 Madison Avenue<br>New York, NY  10022 |
| For Pratt Center, LLC,<br>Valley Corners, LLC,<br>Mansfield SEQ287, WLTD,<br>No. Plainfield VF, LLC,<br>Marlton VF, LLC: | Sands Anderson<br>By:  LISA TAYLOR HUDSON, ESQ.<br>801 East Main Street<br>Suite 1800<br>Richmond, VA  23219 |
| For Schimenti<br>Construction: | LeClairRyan<br>By:  CHRIS PERKINS, ESQ.<br>225 Reinekers Lane<br>Suite 700<br>Alexandria, VA 22314 |
| | Thelen, LLP<br>By:  PATRICK M. BIRNEY, ESQ.<br>      PETER E. STRNISTE, ESQ.<br>185 Asylum Street<br>Cityplace II, 10th Floor<br>Hartford, CT  06103 |
| For Verizon Wireless: | Blank Rome, LLP<br>By:  REGINA STANGO KELBON, ESQ.<br>One Logan Square<br>130 North 18th Street<br>Philadelphia, PA  19103 |
| For Madison Waldorf,<br>LLC: | Bean, Kinney & Korman, P.C.<br>By:  MITCHELL B. WEITZMAN, ESQ.<br>2300 Wilson Boulevard<br>Suite 700<br>Arlington, VA  22201 |

**J&J COURT TRANSCRIBERS, INC.**

**APPEARANCES (CONT'D):**

For James Stacia:           CowanGates
                            By:  FRANK F. RENNIE, IV, ESQ.
                            1930 Huguenot Road
                            P.O. Box 35655
                            Richmond, VA  23235

For Savitri Cohen:          Christian & Barton, LLP
                            By:  A.C. EPPS, ESQ.
                            909 East Main Street
                            Suite 1200
                            Richmond, VA  23219

For ESI:                    Seyfarth Shaw
                            By:  RHETT E. PETCHER, ESQ.
                            975 F Street, N.W.
                            Washington, D.C.  20004

For U.S. Trustee:           Office of the U.S. Trustee
                            By:  ROBERT B. VAN ARSDALE
                            701 East Broad Street, Suite 4304
                            Richmond, VA  23119

**J&J COURT TRANSCRIBERS, INC.**

1          UNIDENTIFIED FEMALE SPEAKER:  All rise, court is now

2    in session.  Please be seated and come to order.

3          COURT CLERK:  In the matter of Circuit City Stores,

4    Incorporated, Case Number 08-35653, hearing on items on amended

5    agenda as filed this morning.

6          MR. FOLEY:  Good morning, Your Honor, Doug Foley with

7    McGuireWoods on behalf of Circuit City.  With me at counsel

8    table is Gregg Galardi, from Skadden Arps.  Also today in

9    court, Your Honor, are three officers of the company.  Mr. Jim

10   Marcum, who you've seen before, who is the CEO, Michelle Moser,

11   who is the CFO and Reggie Hedgepath who is the general counsel.

12         Your Honor, the items on the agenda, there's 13 items

13   on the agenda today, many of them we're close to resolving

14   and/or have agreed with the counterparties to adjourn them to

15   the March 3rd hearing.

16         Just going through the order of the items on the

17   agenda, Your Honor, the first matter is Principal Life

18   Insurance, motion for relief from the automatic stay.  I

19   believe we have submitted to chambers an agreed order granting

20   very limited relief from the automatic stay for the purposes

21   that they were seeking with respect to instituting some

22   foreclosure actions on a landlord. So, I believe that matter

23   can be removed from the docket, Your Honor, as resolved.

24         THE COURT:  All right.

25         MR. FOLEY:  Your Honor, items number 2 and 3 are

 1  related.  They are AOL's motion and Platform A's motion for

 2  payment of administrative claim.  We are continuing to work

 3  with them and they have agreed to adjourn both those matters to

 4  the March 3rd hearing date at 10 a.m.

 5          THE COURT:  That's fine.

 6          MR. FOLEY:  Your Honor, item number 4 is the motion

 7  by Federal Warranty and Assurant.  We are actually having a

 8  meeting with them tomorrow, in person, here in Richmond to

 9  discuss that matters.  We're hopefully going to reach a

10  resolution of that and they have agreed to continue the matter

11  until the March 3rd hearing date, Your Honor.

12          THE COURT:  March 3rd, that will be fine.

13          MR. FOLEY:  Yes, Your Honor.  Your Honor, item number

14  5 is the motion by D.L. Peterson Trust, as assignee for PHH

15  Vehicle Management Services, to compel assumption or rejection

16  of agreements and for relief from the automatic stay.

17  Similarly, with the previous matter, Your Honor, we're working

18  to try to resolve that matter consensually.  They've agreed to

19  adjourn the hearing until the March 3rd hearing at ten.

20          THE COURT:  That will be fine.

21          MR. FOLEY:  Your Honor, items number 6 and 7 are

22  related.  These are motions by Plumb Choice, one for relief

23  from the automatic stay, one for payment of administrative

24  claims.  We have, this morning, been reconciling the amounts

25  that we think they might be owed and they are agreeing to make

**J&J COURT TRANSCRIBERS, INC.**

6

1  some concessions.  We're very close.  We think we're going to

2  be able to submit an order before the March 3rd hearing date,

3  but they've agreed and asked that we -- so they could avoid the

4  trip down here today, to carry these matters over to the March

5  3rd date.

6           THE COURT:  That will be fine.

7           MR. FOLEY:  Your Honor, I'm going to -- if it's okay

8  with the Court, we'd like to pass over for the time being item

9  number 8 which was a matter relating to the sale of certain

10 defective inventory that was excluded from the otherwise

11 inventory sale.

12          THE COURT:  All right.

13          MR. FOLEY:  The next two items, Your Honor, relate to

14 the wind down incentive plan motion which is matter number 11

15 on the agenda.  Items number 9 and number 10, one is a motion

16 to shorten time with respect to the underlying motion and

17 number 10 is the motion to seal the names of the individuals

18 and the proposed incentive compensation.  There's been no

19 objections to either of those two procedural motions, we'd ask

20 that Court grant those, Your Honor.

21          THE COURT:  Anybody wish to be heard in connection

22 with matters number 9 and 10 on the Court's docket?

23                    (No audible response)

24          THE COURT:  All right.  Both motions are granted.

25          MR. FOLEY:  Your Honor, we'll pass over number 11,

**J&J COURT TRANSCRIBERS, INC.**

1  just for a moment.  We've resolved the issues with respect to

2  number 12.  This is the third omnibus motion to reject certain

3  leases.  There were two objections filed, one by Inland and one

4  by Macy's and we've resolved both objections.  The order, we're

5  going to make some clarifying language that provides the

6  rejection date is the later of the date that's set forth in the

7  motion or the date the possession and keys are turned over to

8  the landlord and both of the objectors are agreeable to that.

9       With respect to the Macy's objection, Mr. Epps is

10 here.  There was an issue regarding payment of the full amount

11 of February's rent with respect to that location and we've

12 agreed with Mr. Epps to the extent that February rent has not

13 been paid in full, it will be paid in full.  And I believe that

14 resolves his objection.

15       THE COURT:  All right.  Do you wish to be heard, Mr.

16 Epps?

17       MR. EPPS:  Your Honor, only to confirm what Mr. Foley

18 said.

19       THE COURT:  All right, very good.  Thank you, sir.

20       MR. FOLEY:  Your Honor, that leaves items numbers 8,

21 which Mr. Fredericks will address, who is here in court now,

22 and items number 11, which Mr. Galardi will address.

23       MR. FREDERICKS:  Good afternoon, Your Honor, Ian

24 Fredericks of Skadden, Arps, Slate, Meagher, & Flom.

25       THE COURT:  Good afternoon.

1      MR. FREDERICKS:  By way of background, Your Honor, we

2  originally, came before you on this motion on February 13th,

3  and this was originally a motion to set up procedures to sell

4  certain defective inventory.  And as you might recall, we'd

5  reached an agreement with the committee whereby we might

6  explore an alternate proposal with the committee's consent, or

7  if the committee didn't consent, by another further order of

8  the Court.

9      We did receive two alternate proposals.  We received

10  the actual final proposals this morning.  This morning we held

11  an auction among those two bidders to purchase all of the

12  defective inventory, free and clear of all liens.  The initial

13  proposal that was deemed to be the highest or otherwise best

14  which we started the auction, was a proposal presented by

15  Channel Velocity.  It was for a purchase price of $9 million,

16  subject to a maximum purchase price adjustment of approximately

17  $350,000 and then a right to terminate the agreement if the

18  variance, which will be determined through an audit conducted

19  over the next couple of days, if that variance exceeded 15

20  percent, the buyer had the right to terminate the agreement or

21  the parties could negotiate a further purchase price reduction.

22      The other bidder, who had submitted a bit was Hyper

23  Microsystems.  During the auction, there was very competitive

24  bidding and ultimately Hyper Microsystems presented the highest

25  or otherwise best bid on the Channel Form APA and a purchase

**J&J COURT TRANSCRIBERS, INC.**

1  price of $12.2 million.  So, there was an increase from the

2  initial bid of approximately $3.2 million.

3        At the conclusion of the auction and after

4  consultation with the creditor's committee's professionals, the

5  debtors determined that the highest or otherwise best bid was

6  that presented by Hyper Microsystems.

7        It is my understanding, based on discussion with the

8  committee's professionals that they have a meeting tomorrow,

9  that the committee's professionals will be recommending that

10 the committee accept this proposal.  And so, we anticipate

11 we'll have committee consent tomorrow and, thus, there will be

12 no further need of a court order.  In lieu of a court order,

13 we'll file the sale notice in accordance with the current

14 order.

15       To the extent that the committee for some reason does

16 not consent, we would ask the Court that we be permitted to

17 come back on March 3rd, to have a hearing to consider this

18 proposal.  The closing is scheduled for March 4th, and the

19 audit is anticipated to be completed on March 2nd.

20       With that presentation, Your Honor, unless there are

21 any questions from the Court, or any statements that counsel

22 and the committee would like to make, I'd move the transcript

23 of the auction into evidence.  I'd request that.

24       THE COURT:  All right.  This sale is also subject to

25 an audit, then, I take?

**J&J COURT TRANSCRIBERS, INC.**

1        MR. FREDERICKS:  Yes.  There will be an audit

2  conducted.  It's -- the audit is basically -- there will be two

3  -- what we're selling is basically defective inventory that's

4  currently packaged on pallets and basically will be loaded onto

5  trucks.  The buyer and the seller will each select two trucks

6  at each location, I believe there's seven locations, by which

7  to conduct an audit to make sure that what's listed on the

8  pallet or what's included in the pallet actually is reflected

9  properly on a manifest.  And there are certain variances that

10  there will be purchase price adjustments and then there are

11  variances after you've kind of averaged them, there will be a

12  determination about whether or not there needs to be a purchase

13  price adjustment.

14        But, yeah, there will be an audit conducted over, I

15  think it's scheduled to be completed by Monday.

16        THE COURT:  All right, very good.  And you wish to

17  offer the transcript of the auction into evidence, you said?

18        MR. FREDERICKS:  Yes, Your Honor.

19        THE COURT:  Does any party object to the introduction

20  of the exhibit?

21                (No audible response)

22        THE COURT:  It will be received.

23        MR. FREDERICKS:  Thank you.  May I approach, Your

24  Honor?

25        THE COURT:  Yes.  Thank you.

1          MR. FREDERICKS:  With that, Your Honor, that

2   concludes my presentation on that matter.

3          THE COURT:  All right, thank you.  And then we'll

4   carry this over just so we have it on the -- to the March 3

5   docket, just in case there's an objection from the committee,

6   otherwise, you'll be removing it from the docket.

7          MR. FREDERICKS:  Yes.

8          THE COURT:  All right, thank you.

9          MR. FREDERICKS:  Thank you, Your Honor.

10          THE COURT:  This will be marked as Exhibit 1,

11   Debtor's Exhibit 1.

12          MR. FREDERICKS:  Thank you.  And with that, Your

13   Honor, I'd like to turn the podium over to Mr. Galardi, from

14   Skadden Arps.

15          THE COURT:  Thank you.

16          MR. FREDERICKS:  Thank you, Your Honor.

17          MR. GALARDI:  Good afternoon, Your Honor.

18          THE COURT:  Good afternoon.

19          MR. GALARDI:  Gregg Galardi on behalf of Circuit

20   City.  Your Honor, the last matter -- well not the last matter,

21   the last debtor matter on the agenda is matter number 11, which

22   was the debtor's motion under 105, 363 and 503(c) for approval

23   of an incentive and retention plan.

24          Your Honor, to give some background and then we have

25   two witnesses in the courtroom today.  The first is Mr. Mark

1  Weinsten, who is of FTI Consulting, who is a financial adviser

2  to the company, he's a senior manager there and also we have

3  Mr. Marcum, who is the Vice Chairman and Acting CEO of Circuit

4  City.

5          Your Honor, I'm pleased to say that we have resolved

6  what we listed on the agenda as the informal objection of the

7  creditors' committee.  My understanding is, again, and it may

8  be institutional, but not factual, the U.S. Trustee's Office

9  may still pursue or have some comments about that, that's not

10  unusual.

11          To give Your Honor just some background with respect

12  to the plan, and then what we have done to change the plan and

13  to go through the negotiations at least that started the last

14  week that I was here.  Your Honor, the plan, as you are aware,

15  really splits up into what I'll call three groups, or three

16  sums of money.

17          The first is what we call Tier 1 Group, which is a --

18  we call the executives or arguably, officers of the company

19  that could be otherwise deemed to be insiders under a strict

20  reading of the bankruptcy code, whether or not everyone of

21  those individuals concerts control of the company, we're not

22  going to fight over.  They are officers and some 16 officers

23  under the securities law, so we broke those into what we call

24  the Tier 1 persons.

25          With respect to the motion, Your Honor, what we are

1  seeking authority for, with respect to the 16, and I'll give

2  some modifications, is that that be approved under 503(c)(3),

3  using the facts and circumstances of the case and that since

4  they are insiders and since (c)(1) and (c)(2) are not

5  applicable as we will argue, it's a (c)(3) and the facts and

6  circumstances which is why I've put proffers in for today and

7  why we think that's important.

8         Your Honor, Tier 2 is director people and below, so

9  we don't believe they are officers, they don't carry an officer

10 title.  As we note in our motion, there is one individual and

11 the irony is, that person was two days or three days before the

12 bankruptcy was, in fact, given a promotion to the VP title.

13 Whether that's actually an officer, or not, he is a VP of Asset

14 Protection which is, essentially, the head of security at this.

15 We don't believe this person is an insider, an officer or a

16 person in control, and I think that's important, Your Honor,

17 because what -- as Your Honor knows from the bankruptcy code

18 and the BAPCA provisions, is that we believe this is -- whether

19 it's ordinary course or not, justifiable under 363, that it is

20 a retention program.  We're not trying to give an incentive

21 program, although we think there is value for these people and

22 they do create value.

23        The Tier 2 people, which consisted of 137 people, are

24 getting a retention program, and if you read 503(c), (c)(1)

25 really, at least we read and I believe the courts in Dana and

1   other jurisdictions that I've appeared before and made the

2   argument before, believe that if it's not an insider, it really

3   doesn't get caught up in 503(c) in the BACRA amendments, but

4   the BACRA amendments were really directed at the advisers and

5   if you -- I've done this with a number of courts, if you look

6   at the statements by, you know, Kennedy, it was directed at

7   what he believed were abuses with respect to cases such as

8   <u>Polaroid</u>, which was my case, which was not an abuse, I will

9   say.  I always put in that commercial announcement when I do

10  this.

11          Your Honor, so with respect to retention Tier 2,

12  these are 137 people that are below the director level, not

13  have an officer title, with the one exception that someone

14  could say a VP is an officer, but he was a director two days

15  before the bankruptcy case.

16          Finally, Your Honor, we had asked for authority with

17  respect to a discretionary fund of $750,000.  Important,

18  because we don't I think spell this out as much, Your Honor,

19  since commencing the going out of business sales on January

20  16th, there are still a large number of people working at the

21  company.  People that are not included in this program, with

22  the 16 and the 137, are approximately 250 people.

23          Again, not knowing what circumstances would occur,

24  essentially the company requested $750,000 of authority, or

25  roughly 3,000 per person, to be able to retain or incentivize

1 those people but really for retention.  And as we described in

2 the motion, that $750,000 that we originally asked for was not

3 slotted to go to any of the Tier 1 or any of the officer

4 people, but it was really to fill in holes and also to retain

5 people to the extent we needed to retain, at that director and

6 lower level and there are 250 people.  So, I wanted Your Honor

7 to understand the scope of what we were asking for discretion

8 because this is a large company and we all read that it's

9 putting 34,000 or 40,000 people out of work and we are talking

10 here as to a much smaller group, but still a very large group.

11 It takes a lot of people to wind down this operation.

12        Your Honor, once we had filed this motion and the

13 U.S. Trustee had reviewed it, we, myself and Mr. Foley met with

14 the U.S. Trustee.  I guess it was right after the last hearing,

15 regarding the concerns and the U.S. Trustee essentially

16 expressed two or three concerns, in addition to the

17 institutional concern that the U.S. Trustee's Office Generally

18 have with these programs.

19        One, I guess I've been called the king of carve out

20 now, because I tend to carve people out of programs.  And would

21 I consider carving Mr. Marcum out of this program, which is

22 always a hot button with respect to any retention plan, the CEO

23 and, again, Mr. Marcum is slightly different than other people

24 because he's only been the CEO since April, but that's always

25 one of the programs, so that the U.S. Trustee expressed that

**J&J COURT TRANSCRIBERS, INC.**

1  concern.

2         The U.S. Trustee expressed a second concern with

3  respect to the 16 and the Tier 1, the concern was, is this

4  really an incentive.  The metaphysical question, again, going

5  back to some other background that I have, the metaphysical

6  question is, is something really a retention or is it really an

7  incentive, you know, and I think we've done this before in

8  certain cases, someone could argue a paycheck is both retentive

9  and incentive.

10        So, he was concerned with respect to those 16 people,

11  are these people, and do I need to take depositions with

12  respect to all 16 people to see whether in their own mental

13  state this is really to incentivize them or is it to retain

14  them and how do we deal with that metaphysical quandary.

15        What we end up doing with the U.S. Trustee's Office,

16  Your Honor, and, again Mr. Weinsten and Mr. Marcum are in the

17  courtroom if called to testify, they have reviewed this

18  document and we prepared it for the U.S. Trustee's Office,

19  which detailed what the responsibilities of the individuals on

20  that list were and how those responsibilities have either

21  increased, or the time devoted to those, or how this will

22  motivate them.  Because, again, it may seem simple that, you

23  know, when they were operating a going concern business, they

24  were doing one thing, and clearly their tasks have changed, but

25  we wanted to give the U.S. Trustee the information and we

1  provided them, the U.S. Trustee's Office, with information

2  regarding those 16 and if called as a witness, both Mr.

3  Weinsten and Mr. Marcum would testify that their individual

4  roles with respect to each of the 16, including Mr. Marcum, but

5  also including the other 15, have all changed in some way,

6  shape or form and in addition, if we called them in, many of

7  those hours have changed significantly over this period of

8  time, just simply because of the kinds of tasks and the demands

9  of a restructuring or in this instance, this liquidation.  We

10 provided that information to the U.S. Trustee.

11        And, the third concern simply was to make sure, and

12 he may have other concerns, to make sure that the people in

13 Tier 2 and that the additional discretionary amounts, were only

14 going to non-officer, and below director positions.  And we

15 have affirmed that subject to a modification with respect to

16 negotiations.

17        After meeting those requirements and providing the

18 U.S. Trustee, we also entered into negotiations with the

19 committee and the committee refrained from filing an objection,

20 actually, until yesterday when, in fact, we finally resolved

21 their issues.

22        Not surprisingly, the committee raised concerns,

23 again, this is a liquidation, they are concerned, they have

24 expressed their concerns on multiple occasions about the

25 expenses, the value, and getting something to unsecured

1  creditors.

2       Your Honor, as a result of those discussions with

3  Protiviti, their financial advisors and FTI going through, they

4  focused and I'm going to -- Mr. Weinsten can testify to this,

5  Mr. Marcum can testify to this, as to the good faith back and

6  forth between the parties.  Again, the committee raised in our

7  first call what I would call, I believe, anticipated

8  objections.  One, can Mr. Marcum be carved out.  That's a hot

9  button, let's talk about that.  Two, the committee raised the

10 objection that all of these percentages are way too high, let's

11 cut them in half or some rough number by that.

12      Those were the two major objections and then, Your

13 Honor, with respect to tasks 1 through 20, which were put forth

14 in the objection, could we please tighten those up in certain

15 ways, make them more specific.

16      Your Honor, in that regard, the company considered

17 the committee's request and to a large extent, I think we've

18 met them and to a large extent the committee has agreed to

19 compromise significantly in favor of the form of the plan.

20      In particular, Your Honor, first of all, Mr. Marcum

21 readily wants both parties agreed, and in light of the

22 circumstances, to carve himself out of this package for the

23 time being.  That's an ongoing negotiation with us and the

24 committee but it was better to have -- because of the

25 importance of this program, Mr. Marcum willingly carved himself

19

1  out of the plan so he is no longer included in the Tier 1.

2  We've put that out for another period of time to negotiate.  We

3  may be back for the same amount, we may be back for a lesser

4  amount, I've agreed with them that I won't ask for a higher

5  amount.  But we have carved that out for the period of time and

6  to set sort of thresholds for Mr. Marcum and to treat him

7  separately.  That also made Mr. Marcum very comfortable,

8  testifying as to each and every one of the other 15.

9          Your Honor, as an unfortunate circumstance, one of

10  the 15 has left us and given us notice so one of the other

11  things that has happened is, I think it's Mr. Young who was in

12  the program, has left us now, so we're down to 14 in that

13  program.

14          Your Honor, then we went to --

15          THE COURT:  Does that decrease the amount then?

16          MR. GALARDI:  That does decrease the amount

17  available, Your Honor.  Your Honor, again, depending upon high

18  and low, if you take Mr. Marcum's number out, $375,000 and you

19  take out the other individual's amount, which I think could

20  range from 50 to 100,000, we're close to 435 to 475,000 less as

21  a plan.

22          In addition, Your Honor, and when I go through the

23  thresholds and the amounts, there are other ways in which,

24  though the numbers could be the same they may, in fact, be

25  less.

**J&J COURT TRANSCRIBERS, INC.**

1          Your Honor, the other thing we agreed with, and so we

2     took care of -- I mean, it wasn't an easy thing, but expectable

3     thing that Mr. Marcum said, I will step aside on that aspect,

4     we'll deal with me separately, it's more important for the plan

5     and the company.

6          Your Honor, the second aspect was, we agreed not to

7     really fight about the discretionary amounts in the following

8     way and we reached a resolution with the committee regarding

9     this and we've advised the U.S. Trustee of all of these

10    resolutions.

11         With respect to the $750,000, what we've agreed is

12    the first $250,000 we can use without committee consent.  With

13    respect to the next $500,000 or up to the $750,000, we will not

14    use that money without the committee's consent or a court

15    order.  So if we have a disagreement with the committee, then

16    we'll come back to court, if we don't have a disagreement with

17    the committee we will have that extra $500,000 amount to be

18    able to use.  So, that was another way to trim $500,000,

19    potentially, off and we think we'll be able to work in good

20    faith with the committee on that.

21         The other task that's really became the financial

22    advisor and the legal advisor task, Your Honor, was to go

23    through the tasks, the 20 top tasks that we had identified with

24    persons.  I will tell you that the committee had asked for

25    reductions in both the percentages at Tier 1 and as Tier 2 and

1  the company set in stone one principle which then led to the

2  next discussions.  If we were going to carve out Mr. Marcum,

3  and we were going to agree to the discretionary amount, the one

4  thing, and I think this is important for the company to make

5  public, is Tier 2 was non-negotiable from our perspective.

6         It was an important point that the directors and

7  below, not the individuals that are the more highly compensated

8  individuals, that they had earned and will earn and are

9  entitled to retention bonuses for the period of time.  So,

10  notwithstanding the committee's request, we set in stone one

11  bedrock principle which was, we'll give up the other two things

12  but we want Tier 2 to be compensated on the terms, and they

13  agreed to that.  So, we really got down to the Tier 1

14  negotiations in addition to Mr. Marcum.

15         Your Honor, then going through and I think it's

16  important for Your Honor to see how we have actually changed

17  this because I think that as any compromise, there's both

18  happiness and not happiness by both sides that people have

19  achieved things.

20         With respect to and I have a sheet of paper, if I may

21  hand it up to Your Honor.

22         THE COURT:  You may.

23         MR. GALARDI:  And, Your Honor, I will go through

24  this.  I will say that I think the committee has reviewed this,

25  but since everything went until late last night, this may get

22

1  tweaked a little bit more but I think we've got it down to

2  where I think we were.

3          Your Honor, the first task and it was very important

4  to the company, was to achieve a guaranteed recovery of a

5  certain amount as a result of the store liquidation sales.  As

6  Your Honor may recall from the first sheet, we had set it at

7  percentages, 70.5, 72.5 and 74.5 and, really, that corresponded

8  to the way at the time we filed this motion, the company was

9  thinking of the net recovery off of the cost value of

10 inventory.  That's how the bidding had went, that's what we

11 did.

12         Without going into detail, really, what came back is

13 then the committee wanted percentages and we wanted percentages

14 and then we basically figured, we need a minimum amount to meet

15 plan and then everything else is upside.

16         Well, we had a back and a forth and this was actually

17 the last point.  We have now changed the plan that you can

18 receive only one and only one bonus and it's a 50 percent bonus

19 if the company hits the minimum of $810 million, on task one.

20         Now, by modifying that task, every thread you pull

21 will lead to something else, we've modified that task and that

22 task essentially affected five individuals because as you may

23 recall, task one goes to five individuals.  That really meant

24 75 and the 100 percent bonus was no longer available to those

25 people which came to be roughly $80,000.

**J&J COURT TRANSCRIBERS, INC.**

 1           So, my one exception to the rule I already said was

 2    Tier 1 would never get anything from the discretionary, if we

 3    should be so fortunate to get up to the 833 or the 856 number

 4    that used to be here or would have corresponded to the

 5    percentages, we will have the discretion to either use the 250

 6    that they can't consent to, to give to those individuals, or we

 7    can go to the next 500, which would use their consent.  Those

 8    are the only Tier 1 people that can possibly use anything from

 9    what we've called the set aside discretionary bonus and --

10           THE COURT:  And these are five individuals.

11           MR. GALARDI:  -- and it's five individuals that are

12    listed in the exhibits, the committee is aware of it, and it

13    would only be to compensate them if we have proceeds in the

14    amount of 833 and, I think, 856.

15           So, that was the last sort of point going back to the

16    committee about that, but Task 1 is simply now, achieve $810

17    million of cash.

18           Your Honor, Task 2, we are now --

19           THE COURT:  And, there's no date deadline as far as

20    achieving that number?

21           MR. GALARDI:  No, there's no date, it's really net

22    proceeds, and the way this works, Your Honor, is the sales as

23    I've mentioned and we'll sort of get to this as we go through

24    some of these, the sales are going faster than expected,

25    fortunately, they are going better than expected.  We do not

                      **J&J COURT TRANSCRIBERS, INC.**

1 think and Mr. Marcum would testify, as would Mr. Weinsten, but

2 Mr. Marcum is dealing with this on a daily basis, that the 810

3 is far from a certainty, after reconciliation and other

4 elements that have gone, it is not a certainty by any stretch

5 of the imagination.

6        The committee did think it was a lower number, we

7 think it's a higher number and we just decided to give the up

8 side up and deal with it as the discretionary and that was the

9 back and forth there as Mr. Marcum would testify.

10        Your Honor, the next thing and because the sales are

11 going faster than we expected, your exhibit had Task 2 broken

12 into an A, B and C long periods of time.  We believe that we

13 will be in the very fortunate circumstance of not needing a

14 budget for the lenders as of April 4th, the reason being is,

15 the budget is a requirement under our DIP and as we went in on

16 January 16th thinking about this matter, the idea was, we'd

17 like to generate enough cash.  As I mentioned at the last DIP

18 hearing, there was an issue of whether we would cash

19 collateralize the LCs and if we couldn't cash collateralize the

20 LCs then we would have to extend another budget beyond that

21 April 4th period.

22        We are -- I won't say we think it's a sure thing, but

23 we think it's at this point, very reasonable and the one

24 objection from the bank is that we don't pay any of this money

25 until we do this, is that we will be able to cash collateralize

1 the LCs by March 31st, as the budget would have required.

2        If that's the case, then we don't need budgets for

3 the bank purposes, or measures against budgets for the periods

4 after 11 weeks, 22 weeks, 26 weeks, 52 weeks.  So, we just took

5 out those tasks and the committee agreed because we all think

6 we're going to be able to cash collateralize the LCs.

7        So, we just eliminated two tasks and, Your Honor, we

8 raise the thresholds from the original one and, again, this is

9 where actually timing of the motion has hurt the company but

10 compromised.  If you go to the original 2A, Your Honor, if we

11 simply met budget, you've got a 50 percent bonus.  If you did 5

12 percent better than budget, you got 75 percent bonus, and if

13 you did 100 percent -- 10 percent better than budget, you would

14 have gotten 100 percent bonus.

15        Again, we suffered from our success in this aspect

16 with respect to the committee because as of today, we're 10

17 percent ahead of budget.  So, they use that to say, well, you

18 gave yourself a leg up.  Now, we don't th ink we did, but we

19 agreed to compromise that and in Task 2 what we've said is,

20 that if we achieve for the 11 week period a 5 percent better

21 than budget, it's 50 percent, if it's 8 percent it's 75

22 percent, and the we raised the hurdle above 10 percent to still

23 give people an incentive, to 12 percent for the 100 percent

24 bonus.  We're hopeful that we'll make that 12 percent, but with

25 that, the committee was comfortable with the numbers that we

1  had provided at that point.

2        Again, going into January 16th and I do want to

3 emphasize this, we didn't know where the proceeds were when we

4 put it together or the budget, but we took some away to say

5 they can use a little bit of hindsight, although there were

6 many discussions about whether that was fair or not.

7        THE COURT:  And just to put that percentages in

8 perspective, when you go from 5 percent to 8 percent and 8

9 percent to 12 percent, what are the savings to the company that

10 we're realizing or getting in exchange for that?

11        MR. GALARDI:  Can I take a break one second to answer

12 your question?

13                    (Pause)

14        MR. GALARDI:  Your Honor, I should have anticipated

15 your question.  Just rough numbers, it's over -- it would be 50

16 million would be the budget, so it would be over a $5 million

17 savings to budget.

18        THE COURT:  All right.  Thank you.

19        MR. GALARDI:  And we feel comfortable, it's probably

20 a larger number than that, I don't know is Protiviti knows.

21 Okay, so, it's about that.  So, a 10 percent savings would be

22 $5 million, so it would be a savings to the company that way.

23        Your Honor, the next one that changed was the Task 4

24 and, again, we suffered to some extent, but the committee gave

25 back on this one, where it hadn't given before, we suffered

1  again by being into the sale period.  Task 4 used to provide

2  that we would have sufficient cash to cash collateralize the

3  LCs over a period of time.  We said that we would have to have

4  that by the dates, it used to be that Task 4 said, pay down

5  senior lenders, excluding cash collateral of LCs now, what we

6  have revised it to say is pay down senior lenders, including

7  maintaining sufficient cash to collateralize the LCs by the

8  following dates.  We're not sure we may have made it by the

9  14th, we think we'll make it by the 28th, we'll definitely make

10 it by the 14th.  We're hopeful and that's why we're in a

11 position to have eliminated 2A and 2.  Again, that's critical

12 for two reasons.

13        One, that will bet the loan paid off, or resolved;

14 two, it's a great incentive because the banks, the only concern

15 or objection to this entire plan is that until their cash

16 collateralized, none of the money would be paid under this

17 plan.  Our timing for payments only begins in 13 weeks, so it

18 was very important that we get to this point.  We think we're

19 comfortable with that point. And so, we think they will achieve

20 the bonuses there, but we no longer needed the excluding, which

21 as $100 million of proceeds.  So it was very important that we

22 got there and I think we are going to get there from the sales.

23 So, that was a modification, again.

24        The committee knew we were getting there, so they

25 didn't use hindsight against us in this one and conceded as

**J&J COURT TRANSCRIBERS, INC.**

1  long as we got to that cash.

2          Your Honor, the next task that I believe changed

3  significantly was Task 9.  And I think this helps with one of

4  the objections, Your Honor, and I do want to point this out.

5          Task 9 says prepare and document exit strategy for

6  wind down of benefit plans, including health plans, 401k's

7  pension plan, that enables the company to be able to recapture

8  any over funded positions.  We said now, we've put a minimum of

9  at least $10 million.  So, one, there will have to be some

10  return to the company and we've had meetings today with respect

11  to the pension plans, we're hoping to get some money back.

12          The reason I say that partially goes to one of the

13  objections today, Your Honor, and I think even the papers pick

14  up on this, and I think it's an unfortunate pickup because it

15  seems to misunderstand COBRA and what the law is all about.

16          The fact of the matter is, Your Honor, you have to,

17  when you don't have a benefit plan any more in a liquidation

18  like this, you don't have a place to place a COBRA and that's

19  an unfortunate circumstance.  COBRA, as I'm sure Your Honor

20  knows, requires people to pay 103 percent of the benefits

21  anyway, so it's generally self-funded.

22          What this task does and the person working on this,

23  Your Honor, is actually trying to find placements for those

24  people that would have termination of insurance when the WARN

25  Act ends and we've given people WARN Act and 60 days notice and

1 they're in contact with people such as Blue Cross/Blue Shield,

2 to see if there is a placement.  It's just an unfortunate fact,

3 you can't offer COBRA.  The aspect of this is there is a person

4 who is dedicated to make sure that we do this, and do this

5 right and my own personal experience is, many times when you

6 liquidate and if you let people go, this doesn't get done right

7 and that is something, and if you look at the dates, they're

8 tagged to dates where it will be by the end of the WARN Act

9 period, which is 3/31.  The WARN Act really, our time frame

10 runs 3/20 and followup periods, but this with respect to the

11 health benefits, they're going to be done during the WARN Act

12 period.  With respect to the pension, we have an over funded

13 pension, that's going to take a lot longer to see if we can

14 realize value.  But they are very much focused on the health

15 plans and it is just an unfortunate fact that COBRA cannot be

16 offered, really, under these circumstances.

17        So that was one task that changed, but now it put in

18 a threshold of $10 million to earn the bonus so, again, that

19 more than pays for itself.

20        The next change, I think, Your Honor, was of

21 significance, is we did, in fact, change the wording in Task 11

22 to say that the completion of the physical 2009 tax returns,

23 that will result in collections of income tax funds of $16

24 million, so there was more of a causal relationship, a little

25 tightening up there than the previous one.

1          Task 13 was just a word change.  Task 14, 15, 16 and

2     17 all were changed to put various provisions in there, again,

3     to make it obvious that it is incentivized to maximize the

4     values of the estates.

5          Your Honor, with respect to Task 14, the original

6     task had numbers 2.5, 5 and 10 million to get a reduction of

7     administrative expenses charge backs, those numbers have now

8     been raised to $5, $10 and $15 million dollars so, again, a

9     straight value, a higher hurdle to achieve to be able to

10    receive the incentives, review and research listings of letters

11    of credit as of the sale date which results in cancellation.

12    Well, the sale date was January 16th, Your Honor, and as I

13    presented to Your Honor at that point, I think the LCs were

14    roughly $93 million to cash collateralize them.  We had a

15    threshold, much lower thresholds in, you know, I think it was

16    2.5, 5 and 10 million, with the committee, we've agreed to go

17    up to 10, 15 and 20, which would be a benefit, has to benefits.

18    To the extent we get the cancellation or the runoff, then we're

19    being able to cash collateralize the LCs of the bank; two, to

20    the extent we can get funds back which we are hopeful to do and

21    we're working on it now with respect to a captive insurance

22    company not in the bankruptcy, we will be able to cancel LCs,

23    good for the banks and to bring cash back into the estate.  So,

24    again, large value, again with the committee we got through

25    that.

**J&J COURT TRANSCRIBERS, INC.**

1          The other next one was Task Number 16, Your Honor.

2    Task 16 said, you had to simply obtain court approval of sale

3    of Canadian assets by 2/28, 3/31 or 4/20, it was date, but not

4    value driven.  We were on -- and we are getting very close to

5    that sale, but what we did, instead of just having dates, Your

6    Honor, is, we wanted to make sure that the U.S. received value,

7    so now we have successfully obtained Court approval of sale of

8    Canadian assets that realizes to the United States a minimum of

9    15 million and greater than 50 million.  So, again, tagged

10   directly to dollars.  We think the time frame, though somewhat

11   relevant, is less relevant than the net proceeds.  I am pleased

12   to say that we're moving very quickly on that and I think we

13   will be doing well with that sale and coordinating with Canada

14   has gone well over the last period of time.

15          For Your Honor's information, the court in Canada, I

16   think yesterday, approved the third amendment that Your Honor

17   had approved previously, or on Monday, they had done so without

18   objections and with the support of the monitor this time.  So,

19   Your Honor didn't get any calls, I hope, from Canada this time.

20          Your Honor, with respect to the next matter, we are

21   at Task Number 17, successfully obtain approval of the sale of

22   internet assets.  Again, that used to be tagged to a date,

23   2/28, 3/31 and 4/30, we have now changed that to amounts, in

24   excess of 4 million, 6 million and 8 million.

25          Your Honor, so with that, instead of just simply

32

1  getting things by dates, it was to get them for value.

2        Your Honor, so those were the changes that we

3  negotiated with the committee after much back and forth and

4  much investigation by the advisors.  We have come to an

5  agreement on those tasks.  I don't know, I may have left one or

6  two out that were changed, but those were the significant

7  tasks.  Again, believing that one, the thresholds were now set

8  high enough to increase the incentives, and two, to justify the

9  pay outs.

10        Turning, now, Your Honor, just to brief proffer of

11  Mr. Weinsten, to give Your Honor comfortable about the process

12  other than the back and forth, and then to turn the podium, I

13  think to the U.S. Trustee.  Your Honor, Mr. Weinsten is in the

14  courtroom today, he's next to Mr. Marcum.  If called as a

15  witness, he is a senior managing director of FTI Consulting and

16  that FTI Consulting, as you know, has been employed as the

17  financial consultants to the company.

18        As part of the engagement, Mr. Weinsten was brought

19  in to help formulate right around the time and right before the

20  time of the store closings, an incentive and retention program.

21  If called as a witness, Mr. Weinsten would testify that the

22  company had been working on an incentive and retention program

23  with respect to a going concern but, unfortunately, we had no

24  going concern and the timing for filing such a motion just

25  never really materialized.

**J&J COURT TRANSCRIBERS, INC.**

1          Mr. Weinsten would further testify that he has

2    extensive experience in Chapter 11 retail and other matters

3    and, in particular, that he has extensive experience in

4    developing incentive and retention plans, both prior to and

5    after the BAPCPA amendments to the bankruptcy code.  In that

6    regard, Mr. Weinsten would testify that he reviewed the Circuit

7    City plan and helped formulate the plan with members of

8    management and other advisors such as my firm, with respect to

9    trying to come up with a plan that both had the retention

10   elements that the company required, with respect to directors

11   and below, and incentivize those persons who would, under

12   BAPCPA not be entitled to or not be able to get a retention or

13   severance payment.

14          With respect to that, Mr. Marcum, the other members

15   of the company and Mr. Weinsten met on numerous occasions and

16   they developed the 20 or so tasks that we have just gone

17   through and revised those tasks.  Mr. Weinsten, again, with Mr.

18   Marcum and the company then developed the percentage bonuses,

19   both for the retention amounts as well as the incentive bonuses

20   and then Mr. Weinsten looked at those with respect to two plans

21   in particular that he was most familiar with and court

22   approved, those in KB Toys, and those in -- what's the other

23   one, I'm losing it, it's the W one, but I will come --

24   Mervyn's, rather, it's not a W, it's an upside down M.

25   Mervyn's case, in which they had similar plans upon

**J&J COURT TRANSCRIBERS, INC.**

1   liquidations where they would get recoveries.

2            Mr. Weinsten then looked at the overall amounts of

3   those plans and that's as filed and determined that those

4   amounts in his view and based on his experience with respect to

5   these matters, was reasonable and within the range of those

6   plans, at some points in the low end, at some points on the

7   higher ends, but within the range of reasonable, that, again,

8   for a company of this size and with this kind of wind down.

9            Mr. Weinsten would also testify that in choosing

10  those tasks, what was a fundamental concern of the company for

11  both Mr. Marcum, Mr. Weinsten and the company itself, was to

12  execute on the wind down budget that it was negotiating and to

13  maximize the recovery and minimize expenses that those tasks

14  were tailored to do that.

15           Mr. Weinsten would then testify that with respect to

16  this matter, he brought this matter to -- that thy divided the

17  people, as I already mentioned into Tier 1 and Tier 2, those

18  who were officers and those who were not officers and that he

19  believes that they could accomplish the requirements of

20  incentivizing those people to maximize the value of the company

21  and the value of the assets for distribution and to minimize

22  costs with respect to the top 16 and with respect to those 137

23  in Tier 2 to retain those people to do such tasks as exiting

24  leases, making sure security is in places.

25           Mr. Weinsten then would testify that he made his

1  presentation both to the Compensation Committee and to the

2  board, both of whom have approved this plan and that in his

3  view under the facts and circumstances of this case and given

4  the challenges facing the company, that with respect to Tier 1

5  that this is warranted use of cash or use of its assets to pay

6  the Tier 1.  With respect to Tier 2, that it is within any

7  range of reasonable a retention plan and with respect to the

8  discretionary amounts, that the discretionary amounts are both

9  necessary and will be critical for the company to maximize

10  value by way of either maximizing value assets or minimizing

11  costs over the period of time that the company is facing.

12         Mr. Weinsten would, if called as a witness, opine

13  that this is fair, reasonable and in the best interest of the

14  company.  Mr. Weinsten would also testify, having participated,

15  that it is the result of back and forth, arms length

16  negotiations with the committee over the last few weeks with

17  respect -- over the last week, with respect to at least the

18  Tier 1, Mr. Marcum, the discretionary bonus, and Tier 2 and

19  that he would recommend that the Court approve this plan and

20  that this plan is within the range of reasonable with plans

21  that have been approved by other courts and that it complies

22  with what he understands, not being a lawyer, the requirements

23  of 363 and also 5039(c).

24         I don't know if anyone would like to cross examine Mr.

25  Weinstein.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  At this point would anybody in the

2    courtroom wish to examine Mr. Weinsten?

3                    (No audible response)

4          THE COURT:  All right.  Mr. Galardi, the Court will

5    accept the proffer of his testimony.

6          MR. GALARDI:  Thank you, Your Honor. I'll try to be

7    briefer with Mr. Marcum.

8          With respect to Mr. Marcum, if he's called as a

9    witness, he would testify that he is the Vice Chairman and

10   Acting CEO.  That prior to the announcement of the full store

11   chain liquidation, he was -- that the company was already

12   experiencing some significant employee turnover and retention

13   issues as well as incentives.

14         Your Honor, with respect to the people in the Tier 1,

15   Mr. Marcum would testify that all of them have employment

16   contracts, that provide for severance, annual bonuses, and that

17   all of them, or most of them would have received had we not

18   filed bankruptcy, significant annual bonuses on January 10th of

19   2009, as well as significant incentive plan bonuses in May.

20         Mr. Marcum would also testify that as a result of

21   their learning that bankruptcy and what that has on the effects

22   of employment contracts, faced significant issues through the

23   months of December and January, retaining those people that are

24   necessary, such as the 16 or 15 of the other people on that

25   list.  That immediately upon the determination that the company

**J&J COURT TRANSCRIBERS, INC.**

1    would do a chain wide liquidation, Mr. Marcum and actually a

2    little bit before, began commencing the process and

3    commissioned, essentially FTI and myself, and others at the

4    company to come up with the incentive plan through the Human

5    Relations Department, the outside advisors that would comply

6    with BAPCPA and also serve the purposes of the company.

7          That that plan, and Mr. Marcum would testify that it

8    was directed to make sure that the company met the wind down

9    budget presently being negotiated at that time and also to

10   maximize value by way of two essential principles, realize the

11   assets, on the assets and to minimize costs.

12         In addition, Mr. Marcum would testify that the other

13   concern was that within 60 days or shorter, the company would

14   lose most of the people available and that they would

15   immediately start working jobs and with a company this size, it

16   was of critical importance to formulate the records and keep

17   the materials available so that the professionals and those

18   people remaining behind, could maximize assets such as vendor

19   recoveries, charge backs, and that he charged and met with

20   people from the heads of each of the companies legal, Mr.

21   Hedgepath, Ms. Moser from financial, and other departments to

22   pick among those people who would be best to realize value for

23   the estate.

24         That Mr. Marcum would testify that he has had daily,

25   since the day of liquidation, and the sale, GOB's process and

1   even before that, has had retention problems and incentive

2   problems with the company's keeping the critical employees at

3   the company and that this plan is absolutely necessary at this

4   point to create an incentive and retention plan that the people

5   most critical, to be able to maximize value and minimize costs,

6   remain with the company through the various wind down periods.

7   That in consultation with FTI and company management, that this

8   plan has been calculated to keep those people necessary for 13

9   weeks, 26 weeks, 52 weeks, so that you can have an orderly wind

10  down.   That, in fact, in Mr. Marcum's opinion, this plan has

11  already had a positive effect with respect to the sales.

12          For example, Mr. Marcum would testify that the sales

13  have proceeded after the announcement of this and even in the

14  formulation of this, to be able to increase sales at the GOB

15  process by, for example, having security, a minimize shrink.

16  By having people realize that we need to get out of facilities.

17  Mr. Marcum would also use as an example the distribution

18  centers which now have been eliminated, all of the property,

19  and as Mr. Fredericks has now told us, selling a lot of the

20  defective inventory to enable us to reduce expense, such as

21  lease expense, distribution expense.   That, in fact, the

22  company has become single focused, to make sure that all

23  expenses.

24          With respect to any concerns, whether this is simply

25  people doing their jobs, or what their paid to do, Mr. Marcum

1  would testify that these people are not only doing their jobs,

2  they're doing more than what they had done before and different

3  tasks than what they had done before.  It is not common for

4  these people, for example, the head of merchandising to call up

5  the vendors and say, pay us all of these monies, now that

6  you've owed us for years or whatever, to reconcile those

7  amounts, to put them in the records.  These are outside the

8  ordinary course of their employment and that these people have

9  responded very favorably and beneficially for the estate.

10         So, Mr. Marcum would further testify that, again,

11  with respect to legal advice and Mr. Weinsten's advice that the

12  company determined to split people into Tier 1, Tier 2 and to

13  have a discretionary bonus.  Mr. Marcum would testify that he

14  is not satisfied with the 250,000 and the discretion to consent

15  but, nonetheless, as a compromise is willing to live with that

16  and we anticipate coming back to the Court or to the committee

17  with respect to an amount above the $250,000.

18         That Mr. Marcum would further testify that this is

19  absolutely critical, necessary and warranted by the facts and

20  circumstances of this case, to be able to one, incentivize the

21  14 remaining people in the Tier 1 pool, to achieve the goals on

22  those 20 tasks, and that the tasks are, in fact, not lay ups,

23  not simple and, in fact, will result in, if you made the 100

24  percent, as much as $250 million greater value to the estate.

25         Mr. Marcum would also testify with respect to Tier 2,

1 that these are people that could otherwise simply find jobs in

2 this economy and that the retention bonuses are, in fact,

3 necessary to retain these people and, indeed, may even

4 sometimes be inadequate as we've learned because people will

5 still find other jobs.  This may not keep them here, but it is

6 the best we can do with the funds that we have.

7 　　　　　With respect to what I'll call the Tier 3, those

8 people, the 250, Mr. Marcum fully intends to make sure that we

9 can respond to the needs of the company and with respect to

10 those people that are not on the list, that it would be an

11 intention to use this money to, in fact, retain those people

12 for such thing as the sale of the IP and the other assets for

13 which we don't have people on this plan and that it was a very

14 difficult decision to exclude certain people.  But that it was

15 better to have a pool to respond to circumstances on a daily

16 basis.

17 　　　　　Again, Your Honor, Mr. Marcum would testify that he

18 believes it's in the best interest of the creditors and the

19 estates and we think that the creditors have recognized that by

20 cooperating and reaching a reasonable resolution of this plan

21 and supporting this plan and we would ask Your Honor, and he

22 would ask Your Honor to approve the plan.

23 　　　　　Your Honor, again, just for my two cents worth, I

24 haven't been at a liquidating company that has cared as much

25 about the employees and I would just note two facts about that.

1  One, as Your Honor knows and, again, over the committee's

2  objection and I understood it well, we came to this court the

3  first day paying WARN to people that we terminated prepetition

4  and as you read every day, every filing, it is now the action

5  du jour to terminate employees and not pay WARN.  This company

6  has been concerned about its employees and continues to be

7  concerned about the employees in this community.

8        Two, Your Honor, we have said, and I said to Your

9  Honor, on the sale, we are paying WARN to the employees today

10  that we had to let go on January 16th.  That is actually, as Mr

11  Marcum would testify, a blessing because there has been

12  circumstances, for example, when we had an issue at the stores,

13  to be able to call those people back in.  They are still ready,

14  willing and able to serve, they have, in fact, implemented a

15  plan to make sure that these people haven't obtained and got

16  WARN and gotten it, so it has been a benefit to the company.

17        And, again, with respect to the benefits, we've

18  continued the insurance, we continue to pay benefits, and we're

19  doing everything to make the smoothest transition. So, Your

20  Honor, we think that both the incentive, the plan and the

21  retention plan should be approved.  Again, I know there's been

22  much and I don't like to read the paper here, but leaving that

23  aside, the plan is now drafted, Your Honor, it is not a top

24  heavy plan with respect to directors.  With these

25  modifications, I think the maximum amount of the plan is maybe

1  $4 million of which 1.6, I think, goes to the Tier 2 and the

2  discretion in addition, goes to Tier 2 or below.

3         So, I think it's important that, and, again, Mr.

4  Marcum did want to make -- by taking himself out, taking

5  another executive out, and making the hurdles, again, often

6  these things get a lot of press but it is the fact that this is

7  not a top heavy plan and it was, and I think it's important,

8  and Mr. Marcum would testify, as Mr. Weinsten said, Tier 2 was

9  a non-negotiable, the discretionary essentially was

10 non-negotiable, as the amount and that really all benefits to

11 the director and below level.  As to the other level, those

12 people are people that will realize significant value as much

13 as $250 million.

14        Your Honor, with that, we would ask for your

15 approval, but I know the U.S. Trustee may have a comment as

16 well as the committee.

17        THE COURT:  Well, before -- I did have a question on

18 that very last point.

19        MR. GALARDI:  Sure.

20        THE COURT:  It was in your papers, you did talk about

21 the incentive plan resulting in incremental proceeds of $250

22 million, but I didn't hear that number in your proffers and I

23 just wondered, is that still the target number, if we hit all

24 of these incentives in your plan?

25        MR. GALARDI:  Your Honor, actually I think the number

**J&J COURT TRANSCRIBERS, INC.**

1   is probably increased because of the thresholds that the

2   committee has, in fact, asked us, and we have consulted with,

3   it's actually now a higher number than probably the 250.  The

4   only thing I can say backwards is because on that Task 1 where

5   we took out the extra numbers, that's not in there, so I

6   haven't done the back of the calculation but 200 is still in,

7   and I think Mr. Weinstein and Mr. Marcum would testify that that

8   200 million, 250, plus or minus $10 to $20 million is still, if

9   you were to achieve the 100 percent bonuses here, the company

10  would achieve that, around that number of additional, either

11  cost savings or asset value for the company to be able to

12  distribute to the general unsecured creditors or administrative

13  creditors of this case.

14          THE COURT:  All right.  And I am also impressed that

15  your incentive plan includes incentivizing the company, to

16  develop the exit strategy for the wind down benefit plans,

17  including the health plans.

18          I would like to hear from other parties at this

19  point.

20          MR. GALARDI:  I didn't pass Mr. Marcum, I don't know

21  if anyone wants to cross examine Mr. Marcum.  I forgot that,

22  I'm sorry.

23          THE COURT:  Oh, I'm sorry.  Does anybody in the

24  courtroom wish to cross examine Mr. Marcum with regard to the

25  proffer of his testimony?

**J&J COURT TRANSCRIBERS, INC.**

1                      (No audible response)

2              THE COURT:  All right, that proffer will be received

3    as well.  Thank you.

4              MR. GALARDI:  Thank you, Your Honor.

5              MS. BERAN:  Good afternoon, Your Honor, for the

6    record, Paula Beran, may it please the Court.  I'm standing

7    before Your Honor, as you know, as counsel to the Official

8    Committee of Unsecured Creditors.  With me as well on the line

9    is Mr. Rob Feinstein.

10             Your Honor, the committee does stand before you,

11   today, supporting the plan as modified and as indicated in the

12   --

13             THE COURT:  This is your money.

14             MS. BERAN:  Yes, Your Honor, it is and Mr. Galardi's

15   representations to the Court are accurate.  In essence, Your

16   Honor, that the committee did have some initial concerns and

17   had some serious initial concerns.  Thereafter, the committee

18   and its professionals spent a substantial amount of time

19   negotiating with the debtors, and their professionals.  The

20   committee truly believes that those negotiations were done in

21   good faith, that the committee truly appreciates all of the

22   debtor's and its professionals and its managements effort and

23   the information exchange that was received during this process.

24             In addition, as Mr. Galardi represented to the Court,

25   the debtor, after that exchange did agree to certain

1  modifications, albeit not all of the requested modifications of

2  th committee, nonetheless, the committee believes that that

3  exchange was healthy and productive and that the resolution

4  that's put before Your Honor today is truly in the best

5  interest of the estate.

6       Given the same, as well as the current liquidation

7  situation of this company and the fact that the committee

8  really desires that administrative expenses be limited, i.e.,

9  that we not stand before Your Honor having a huge battle over

10  this, similarly, that the debtor and its professionals focus on

11  liquidation in a cost effective manner as well as maximizing

12  the value of its remaining assets for the benefit of the

13  estate.  The committee does stand before Your Honor in support

14  of the plan as modified.

15       With me today, Your Honor, also at counsel table, is

16  Mr. Guy Davis of Proviviti who is the financial advisors to the

17  committee.  To the extent necessary, Your Honor, Mr. Davis is

18  prepared to testify on the specifics as to why the committee is

19  in support of the modified or revised plan and specifically why

20  the committee does believe it is now in the best interest of

21  the estate.  Thank you, Your Honor.

22       THE COURT:  Would Mr. Davis be able to testify that

23  he's in agreement that the incremental proceeds that would be

24  realized from the incentive plan be in the neighborhood of $250

25  million?

**J&J COURT TRANSCRIBERS, INC.**

 1          MS. BERAN:  Your Honor, if I may beg the Court's

 2   indulgence and confer with Mr. Davis as it relates to that.

 3   Thank you.

 4                        (Pause)

 5          MS. BERAN:  Your Honor, as it relates to what Mr.

 6   Davis could testify, he has not done the math specifically as

 7   the debtor and its professionals have done but, nonetheless,

 8   given the calculations and the analysis that Protiviti has

 9   completed, Mr. Davis would testify that give or take $20

10   million, that the net benefit to the estate would be

11   approximately the 250 million.

12          THE COURT:  So, it's a significant benefit.

13          MS. BERAN;  Yes, Your Honor.

14          THE COURT:  All right.  Thank you.  Does any other

15   party wish to be heard in connection with the incentive plan?

16          MR. VAN ARSDALE:  Robert Van Arsdale for the U.S.

17   Trustee.  Your Honor, we come before the Court to object to the

18   plan, and, albeit the plan that we did object to has been

19   altered in many significant ways, including ways that change

20   points that we made in our objection.

21          THE COURT:  I thought largely in response to some of

22   your objections, such as timing dates as opposed to actual

23   dollar figures, coming into the estate.

24          MR. VAN ARSDALE:  Exactly, Your Honor.  And while I'm

25   not in a position to say that that cures all the problems, I

1  would simply like to address the Court, probably on a more

2  overarching kind of view of this.

3         And it really stems from what are we to make of 503.

4  At this point, with the number of decisions that we've had,

5  many of which have come down on the side of an interpretation

6  that if there is some portion of the plan that is incentivizing

7  and I think Mr. Galardi was correct when he talked about the

8  metaphysics of incentive versus retention, those two things are

9  more like DNA, I mean they're all wound up in each other,

10  depending on what particular point you are in the development

11  of the plan and where we are in terms of whether people are

12  going to start jumping ship.  It's not clear.  And it's so

13  unclear that some courts, like in Nelson Nutraceutical, what

14  the judge there decided to do was add a word.  We'll add a word

15  to the statute so it says that it's primarily for retention.

16  Unless it's primarily for retention, then it's not really

17  covered by 503(c)(1).

18         And, the reason that it's really important for the

19  debtor not to be covered by 503(c)(1) in this instance is when

20  you get down to the other portions of 503(c)(1), you have such

21  things as that they would have to prove that they have bona

22  fide job offers.  My experience has been, from private practice

23  as well as government service, that when you have a bona fide

24  job offer in this circumstance, you're gone.

25         THE COURT:  That's why we're down to number 14

1  instead of 15.

2        MR. VAN ARSDALE:  I mean, that's what happens.  The

3  second part of this, when you're talking about a liquidation

4  plan, when you get to part B, the services provided by the

5  person are essential to the survival of the business.

6        Well, it's not going to survive, I mean we already

7  know that.

8        THE COURT:  But doesn't that beg the whole question

9  about whether 503(c) is applicable to a liquidating debtor at

10  all?  I mean, because you could also read it to say that it

11  talks about, you know, to remain with the debtor's business, we

12  don't have a business that's going to be here.

13        MR. VAN ARSDALE:  No, we don't and the problem that

14  that presents is, what do you -- what if you say, okay, it

15  doesn't apply, but the words are there, it seems to mean

16  something and it does stem from Senator Kennedy thinking that

17  people on the top drawer here, Tier 1, were getting too much

18  and need to calm down and had this legislation passed, so that

19  would happen.  And, it continues to happen.

20        Now, it's written in a way that's very difficult to

21  know what it's supposed to apply to, but where in Nutraceutical

22  they say -- they take and put in primarily, I guess we could

23  take and put in 10 percent, if it's 10 percent retention,

24  that's enough.

25        The situation that we have here isn't completely

**J&J COURT TRANSCRIBERS, INC.**

49

1 outside of the statute.  This is the situation where you have

2 different tiers of people and now we have 14 left at the top

3 tier, who have benefitted greatly as this company was doing

4 well and who, by the intention if not the wording, the

5 intention of the statute should not be allowed to get more than

6 what they would normally get in this circumstance.  And that

7 really is the key point that I'm trying to make.  And some of

8 the examples of some of the problems in the plan were pointed

9 out in our objection because those problems made it less

10 incentivizing and made it more retentive.

11        Having said that, I know that debtor's counsel and

12 counsel for the committee and the two professionals who have

13 analyzed and crunched the numbers have worked very hard to get

14 to this point, and I know that many of the changes that were

15 made in here strip away some of the points that the Office of

16 the U.S. Trustee was making in its objection.  But on the main

17 point, whether this type of plan should go forward in these

18 cases for officers, for the people who ran the company, on that

19 main point it would still be our contention that the intention

20 of 503(c) is the answer to that question, is no.

21        THE COURT:  But don't you think if the unsecured

22 creditors are standing up saying, wait a second, we know we're

23 going to spend this $4 million or so on this incentive plan and

24 you know, our expert tells us if we do spend this $4 million

25 we're going to realize for this estate, you know, somewhere in

50

1  the neighborhood of $250 million, that that's a pretty good

2  investment, isn't that their call?  I mean, it seems like we're

3  spending their money to do this.

4       MR. VAN ARSDALE:  Your Honor, I understand that and

5  that is their call, and what the debtor is trying to do is

6  their call.  And, this is my call.  And this is our call and

7  this is what sometimes I have to do in order to fully represent

8  my client.

9       THE COURT:  So, what your point is, is if it has any

10  retention aspect to it at all, then it has to fall into 503(c).

11       MR. VAN ARSDALE:  Your Honor, I wouldn't even go that

12  far, because as has been pointed out in the other cases, that

13  would keep you from paying salaries because the salary itself

14  has a retentive value.

15       THE COURT:  Exactly.

16       MR. VAN ARSDALE:  I mean -- so, I don't think that

17  that's right.  I'm not sure that primarily is right, either,

18  because what we have to enter into is sort of this fill in the

19  blank analysis of the law as it is written and all the law says

20  is, retention.

21       THE COURT:  In some of the cases they talk about,

22  well, as long as the incentive is not a lay up, we'll use a

23  basketball analogy, I guess, and maybe it's a free throw, or

24  it's got to be a three pointer, I'm not sure, but as long as

25  it's something, you know, more difficult than just routine.

**J&J COURT TRANSCRIBERS, INC.**

51

1         MR. VAN ARSDALE:  Well, and some of those things are

2    easier to discern as not being incentivizing.  If you get to

3    the point where all of the marks that you're using to

4    incentivize somebody, it happened in the pass, to continue the

5    basketball analogy, one of my cohorts said, it's not that these

6    people didn't score enough baskets, they didn't even know they

7    were playing basketball because it had already happened.  So

8    that's -- and that's not here.  That's not here.

9         THE COURT:  But here we're saying, you've got to win

10   the game.  And isn't that the better analogy?

11        MR. VAN ARSDALE:  What I wonder, with that analysis,

12   is what does it do to 503(c)?  It's like it is gone.  And that

13   can't -- that's not something we're supposed to just allow to

14   happen.

15        THE COURT:  Well, we're not paying somebody under

16   this plan, as I read it, just to keep them around.  We're

17   giving the specific goals, saying, bring this amount of dollars

18   into this bankruptcy estate and then you will be rewarded for

19   making that happen and that's -- you know, I would assume the

20   committee would sit here and say if Joe Smith out on the street

21   can bring $250 million into this estate from some place else,

22   we don't know about, we'd probably pay the $4 million, too.

23        MR. VAN ARSDALE:  Your Honor, I agree that that would

24   be a great thing, I think some of that, and correct me if I'm

25   wrong, but I think some of that $250 million also involves a

52

1  lot of work by other people.  I think one of the tasks involved

2  is to gather up all the information that's needed to look at

3  chargebacks and everything.  That money won't come until Mr.

4  Galardi and his group get together and figure out what to do

5  with it and how to turn it into cash.  It's not instant money,

6  I don't believe.

7          THE COURT:  I realize some of it is instant, some of

8  it's delayed.  But you're not going to be able to realize it

9  unless you lay the groundwork.

10          MR. VAN ARSDALE:  Yes, yes.  Your Honor, that's all I

11  have for the Court.  I mean, we have listened with great

12  interest and have been kept well informed by both the debtor

13  and the Creditors' Committee about what they were up to.  I

14  think it does do some good to see that a lot of the tasks that

15  we were objecting to have been changed to make them more

16  directly incentivizing.

17          THE COURT:  I think the motion or the objection filed

18  has had a very positive impact on what the final result was.

19          MR. VAN ARSDALE:  Thank you, Your Honor.

20          THE COURT:  Mr. Galardi, do you wish to respond?

21          MR. GALARDI:  Yes, Your Honor, just because, again,

22  just so that we have the sort of statutory framework because I

23  think we've got to think, what's the rule, what's the

24  exception, what's the exception to the exception because if you

25  go through this, I think you start with, and why we do it this

53

1  way.   363 says that we can use money outside the ordinary

2  course.   So, let's presume it's outside the ordinary course.

3  So, one, I can do that in business judgment, I think we've

4  satisfied that standard.

5          Then it goes, can I pay an allowed administrative

6  expense because this is post petition, that's 503(b), it says,

7  yes.  So now we get to 503(c), which says, yes, but you can't

8  pay it, right, 503(c) says, you can't, notwithstanding it may

9  be an actual expense, notwithstanding it may be 363(b), it says

10  you can't pay it, and neither shall be paid or allowed and it

11  gives three exceptions and I don't want it to sound like every

12  one of these is a retention because it says, one, we can't pay

13  if it's retention, except in the circumstances the U.S. Trustee

14  commented.

15          But if you went there, but then it goes to (c) and it

16  says, but if it's ordinary course and it's not justified by the

17  facts, then you can't pay it, but if it's justified by the

18  facts, it's not ordinary course and it's not retention, so it

19  doesn't do any of those nots, it can be paid.

20          So, I think the U.S. Trustee's position, and having

21  done this a number of times, it's actually reading retention to

22  swallow up and essentially eviscerate (c)(3).  (3) says, if the

23  circumstances justify it and it's not the retention that's not

24  allowed in (1) and it's not the severance that's not allowed in

25  (2), you can pay it.  So, their burden is to come forward and

54

1  say, this is retentive.

2          Now, I know retention and it says, okay, you state X,

3  regardless of what results you make, that's retention.  But if

4  you have to get results in a certain time frame or to a certain

5  amount that may -- people may see it, it's that carrot that you

6  talked about that's dangling in front of them.  I can make a

7  lot money here if I can do it.  That certainly has the

8  retention because you've got to do it to get to the carrot, but

9  the purpose and I think this is where the courts and Judge

10  Sontchi in Nutraceutical, and I may not agree about

11  predominant, but the fact of the matter is, it's -- you've got

12  to show, they've got to show that there's a reason to bar the

13  payment under (c)(1), they've got to show that it is retentive

14  and it's solely retentive or, you know, not primarily not

15  retentive.

16          And I think what we've shown here is that it's not to

17  stay though a date, it's not to stay and just earn your money,

18  it's to stay and meet goals.  And I think that's why you can't

19  read (c)(3) out of the exceptions because it says if it's not

20  one of those two things, you can pay it outside the ordinary

21  course, to insiders, as long as the facts and circumstances

22  justify it.

23          I think the committee's review, our review, Mr.

24  Marcum's testimony, Mr. Weinsten's testimony, and the fact and

25  circumstance here overwhelmingly say the business judgment has

1 been properly applied, it's not retentive, it's not severance,

2 in fact, they've lost their retention bonuses, they've not got

3 the severance payment and this is to compensate them for

4 certain goals.  So, we think statutorily it's permissible and

5 (c)(1) can't swallow up (c)(3).  Thank you.

6          THE COURT:  Thank you.  Anything further, Mr. Van

7 Arsdale?

8          MR. VAN ARSDALE:  No, Your Honor.

9          THE COURT:  All right.  Does any other party wish to

10 be heard in connection with this matter?

11                    (No audible response)

12          THE COURT:  All right.  The Court is going to approve

13 the incentive plan as has been modified and put on the record

14 today.  I think it does properly incentivize the people that

15 are in Tier 1 to produce value for this estate and is,

16 therefore, appropriate under Section 503(c)(3) and the Court

17 will approve the incentive plan, as well as the plan for Tier 2

18 and Tier 3.  And Mr. Galardi, I'd ask that you prepare the

19 order to that effect.

20          MR. GALARDI:  Yes, Your Honor, and we will circulate

21 it to the committee so that we can get the revised tasks as

22 part of that order.

23          THE COURT:  All right, thank you.

24          MR. GALARDI:  Thank you.

25          THE COURT:  All right.  We've got one matter

**J&J COURT TRANSCRIBERS, INC.**

1  remaining on the docket, I believe, which is not the debtor's.

2            UNIDENTIFIED MALE SPEAKER:  Yes, Your Honor, we also

3  may have a status report to give to the Court with respect to

4  the auction, lease auction dates that we're confirming right

5  now with DJMS, but we can take that up if we need to make that

6  report to the Court.

7            THE COURT:  And the Court also had a question on a

8  matter not on the docket, too, regarding the appeal that has

9  been taken, the direct appeal.  Do I need to certify that as

10 far as being interlocutory?  Because there was a request that

11 had been made to the Court and I don't know if it's ever been

12 brought on, is that something I still have to do or has that

13 been rendered moot by the joint filing?

14            MR. EPPS:  Your Honor, A.C. Epps Jr., for the

15 appellants in that direct certification.

16            My first comment is, I'm not sure.  But my -- but I

17 believe that you do not have to do anything else.

18            THE COURT:  Okay.

19            MR. EPPS:  I believe that what the next step is,

20 that we have to petition to the Fourth Circuit to accept the

21 interlocutory appeal, and that's where the interlocutory issue

22 is raised.  That's my understanding, but my first comment is my

23 last, which is that I am not sure.  I'm going to do my --

24            THE COURT:  When I read the rule that's what it

25 looked like to me, too, but I wasn't sure, I wanted to make

1 sure that you weren't waiting on me to do something.  If you

2 change your mind on that and need to come back, let me know.

3          MR. EPPS:  Yes, sir.

4          MR. FOLEY:  Your Honor, we will be -- we're actually

5 going to be talking to Mr. Epps after the court hearing today

6 about some other aspects of the direct appeal that we're

7 talking about.

8          THE COURT:  I guess the other question I had, there

9 were other parties that noted appeals as well.  Are those

10 appeals going to be consolidated with this appeal or are those

11 going to go to the district court when this one goes to the

12 Fourth Circuit, or what are we doing there?

13          MR. FOLEY:  Go ahead.

14          MR. EPPS:  Your Honor, that's under discussion.  I'm

15 sure that if nothing else happens, that the Fourth Circuit will

16 consolidate them.  We've discussed it with several of the other

17 appellants at this stage and what we're trying to avoid is to

18 have a mass meeting of some kind, we're trying to put some

19 order into the process, I don't know the answer but I feel

20 confident to the last ounce that the Fourth Circuit will

21 consolidate them if it takes the case.

22          THE COURT:  Well, you might ask the Court to do that,

23 because right now the clerk is struggling to know where he's

24 supposed to send these files.

25          MR. EPPS:  Yes, sir.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  All right, thank you.

2          MR. FOLEY:  Thank you, Your Honor.  If the debtors

3   can be excused, at least for this last matter that's going on

4   with Ms. Hudson, we may be back, Your Honor, before the end of

5   that matter to give you a status report on the auction.

6          THE COURT:  You may be excused.

7          MR. FOLEY:  Thank you, Your Honor.

8          UNIDENTIFIED FEMALE SPEAKER:  Item 13 on debtor's

9   amended agenda, motion by Schimenti Construction Company for

10  2004 examination of and production of document by North

11  Plainfield VF, LLC.

12         MR. PERKINS:  Good afternoon, Your Honor, Chris

13  Perkins of LeClair Ryan, on behalf of Schimenti Construction

14  Company, LLC.  I'm joined on the telephone by my co-counsel,

15  Patrick Birney of the law firm Robinson & Cole, in Hartford,

16  Connecticut.  Mr. Birney has been previously admitted pro hac

17  vice in this matter and he's here to argue the motion today.

18         THE COURT:  And I entered an order, if I recall,

19  earlier in this, granting him permission to appear by telephone

20  and argue the motion today.

21         MR. PERKINS:  That's correct.

22         MR. BIRNEY:  Good afternoon, Your Honor, Patrick

23  Birney, Robinson & Cole on behalf of Schimenti Construction

24  Company, LLC.

25         THE COURT:  All right, thank you.

1          MR. BIRNEY:  Thank you, Your Honor, for allowing me

2     to appear telephonically for today's hearing.

3          THE COURT:  Okay.  And now, from Ms. Hudson, would

4     you please state your appearance, as well?

5          MS. HUDSON:  Yes, Your Honor, Lisa Hudson, I'm here

6     on behalf of North Plainfield VF LLC, on my motion to quash an

7     objection to that motion for 2004 examination.

8          THE COURT:  Okay.  So -- just from my standpoint, are

9     we here today on your objection or are we here on the motion

10    for the 2004 exam, or I guess who is going first in all of this

11    and what am I being asked to decide?

12         MS. HUDSON:  Who's on first, what's on second.  I

13    agreed with local counsel Tara Elgie to notice all three, the

14    motion, my motion to quash an objection and their reply for

15    today, so it's an omnibus on that, and I'm happy to concede to

16    counsel on the telephone, since he's the moving party.

17         THE COURT:  Okay.  Mr. Birney, then you may proceed.

18         MR. BIRNEY:  May it please the Court, Your Honor,

19    thank you very much.  Schimenti Construction Company, not like

20    many other construction entities that are involved in this

21    Circuit City case, provided construction and fit out work for

22    several of the debtor's property, including construction and

23    fit out work for a store in North Plainfield, New Jersey.

24         The store was leased to the debtor by North

25    Plainfield VF LLC, which I'll refer today as the landlord,

**J&J COURT TRANSCRIBERS, INC.**

which itself, Your Honor, is subject to a lease with a ground

landlord.  Schimenti has moved to conduct the Rule 2004

examination of the landlord, and if Your Honor grants the Rule

2004 motion that Schimenti has filed with the Court, we would

subsequently issue a subpoena with a document request in

accordance with Rule 9016 of the Federal Rules of Bankruptcy

Procedure.

Your Honor, I need not consume the Court's time

recounting Rule 2004 this afternoon, and what courts including

courts in this district say about the purpose and reach of

2004, but because of the arguments raised by the landlord in

this case, I wanted to cite to Bankruptcy Judge Shelley in the

Nucletron Manufacturing case where he said that the, Judge

Shelly said that the scope of the examination under Rule 2004,

is extremely wide, some going as far as saying that Rule 2004

allows for a fishing expedition.

I raise that point, Your Honor, not because this is a

fishing expedition, but just to underscore the fact that our

inquiry with regards to the landlord and the document request

that we ultimately will be serving pursuant to the subpoena, is

tightly focused on the relationship between the debtor and its

landlords arising out of the lease agreements for the store in

question.

Specifically, and this is laid out in our papers,

Your Honor, our goal here is to ascertain whether the store

1   lease or the ground lease, or any other agreement, for that

2   matter, provides for the allowances of the work that has been

3   performed by Schimenti.  In turn, this information may directly

4   affect the debtor's liability to Schimenti, it may directly

5   impact the landlord's prepetition or rejection claim against

6   the debtor, and it may raise additional issues with regards to

7   the administration of the debtor's bankruptcy estate.

8           And, to that point, Your Honor, I note that the

9   landlord has submitted a Chang affidavit and submitted the

10  Chang affidavit in support of its motion to quash and although

11  artfully and carefully crafted, we sensed that there was a

12  credibility gap between some of the arguments that Ms. Chang

13  stated in her affidavit and some of the -- or some of the facts

14  that were stated in the Chang affidavit, and some of the

15  arguments that were put forth by the landlord, in opposition of

16  our legitimate efforts to conduct a Rule 2004 examination.

17          For example, Your Honor, in the motion to quash at

18  paragraph 39, the landlord states that there is no information

19  to divulge.  But Ms. Chang, in her affidavit avers to five

20  statements, five statements with regards to information that go

21  to the heart of the inquiry and go to the heart, Your Honor, of

22  the documents that Schimenti seeks.  We believe that this is

23  prima facie evidence that the inquiry is appropriate.

24          Additionally, Your Honor, the affidavit states that

25  all the documents have been filed in this proceeding.  Well,

62

1  Your Honor, the landlord's motion to quash states that the 130

2  page lease was too voluminous to attach and, in fact, the only

3  portion of the lease that was attached, was attached in the

4  landlord's motion to compel, filed back in early January, and

5  that only -- actually, Your Honor, it was filed in late

6  December, and only contained seven pages of the lease.

7        So, Your Honor, there's a disconnect between the

8  arguments raised in the motion to quash and the Chang affidavit

9  and based on the case law that we cited in our brief, we

10 believe that this disconnect, both in the area of inquiry and

11 in our request for documents, supports the ability for us to

12 have the Rule 2004 motion granted, and allow and enable us to

13 ultimately issue a subpoena pursuant to Rule 9016.

14       And, with that in mind, Your Honor, one additional

15 point.  There were issues raised, subtly, in both the motion to

16 quash and the Chang affidavit regarding a protective order.  To

17 the extent that Your Honor treats the landlord's motion as, in

18 fact, a motion to quash, our position is, they have not met

19 their burden to quash our subpoena on any of the issues, based

20 on the area of inquiry, or the documents that Schimenti

21 Construction seeks in accordance with its motion.  Thank you,

22 Your Honor.

23       THE COURT:  Thank you.  Ms. Hudson.

24       MS. HUDSON:  Your Honor, if I might just cut to the

25 chase here, the motion for a 2004 examination, we believe

1  should be dismissed because procedurally it's flawed.  It was

2  filed as a discovery motion without any consultation and

3  doesn't include the statement that the local rules require.  We

4  have a disagreement about whether this is a contested matter,

5  not that 2004 is a discovery tool, but amongst counsel whether

6  or not that requirement applies.

7          Even if it doesn't, we believe it should be denied

8  because it is, indeed, a fishing expedition.  Their Exhibit A

9  asks for anything regarding debtor's liabilities.  Well, we

10  have filed that post petition motion, which they joined in

11  because it compelled the debtors to pay off liens which is a

12  violation of the lease, to allow liens to apply to the

13  property, in paragraph 13, and it is my understanding and

14  representation to counsel's colleague this morning that we did,

15  indeed, attach, we said in our footnote, that excerpts were

16  attached, but it was a 130 page document, and it is voluminous

17  but to the extent that that's not complete, we had offered

18  prior to today, to supply that under a protective order.  It

19  has terms of art, it has negotiated terms, it's not something

20  we want passed around, general public knowledge.  If it was

21  previously filed in toto, that was inadvertent and we don't

22  think it's unreasonable to ask for a protective order to

23  protect the terms of that lease.

24          So, our post petition motion did set forth those

25  liabilities that relate to the debtors.  We also directly, the

1  landlord filed a proof of claim, that was a prepetition

2  damages, post petition damages, rejection damages, in the

3  claims register.  Those are the only two things that relate and

4  this lease, I have represented, Ms. Chang represented in what

5  they now say is artfully crafted, in an affidavit that was done

6  as a settlement tool and then became attached to the ultimate

7  objection we had to file, but she's represented that the lease

8  is all there is and there's no tenant allowance paragraph, and

9  if they'll sign a protective order, we'll give them that so

10  they can go down the table of contents and the paragraphs and

11  know that this is a new Circuit City lease, boilerplate lease,

12  no tenant allowance.  You can't produce what you can't produce.

13        THE COURT:  If it's a boilerplate lease, then why is

14  it subject to this need for a protective order?

15        MS. HUDSON:  Well, on the terms of tenant work and

16  tenant allowance, negotiated terms for money and terms of trade

17  that were specific in the exhibits is really what I'm referring

18  to, not the missing paragraph on tenants allowance.  I mean, I

19  represent to the Court, knowing all of my obligations, that

20  there is no such thing, the paralegal that does all leases in

21  bankruptcy has 16 years experience, has been at Vernado, which

22  is the parent company, for five years, represents to me she has

23  reviewed the file.  She then reviewed the file again with me,

24  there is no tenant allowance.  And all there is is the lease

25  and we're happy to provide the lease, but to compel her to come

1   to Virginia to LeClair Ryan's offices for a half a day or a day

2   from Paramus, New Jersey, to say, no, no, no, and no, to me is

3   an abuse of 2004, because it is restricted by its very own

4   terms saying it may relate only to acts, conduct, liability,

5   aspects of administration of the estate of the debtor and the

6   only thing we can speak to is liabilities, and on the public

7   record in the claim registry and in this docket, and what we're

8   willing to supply, again, to the extent it's not fulsome under

9   a protective order, is all that we can do.  Our lease has been

10   rejected, it's not property of the estate any more, it was

11   surrendered.  You asked me, would we accept it, at a hearing on

12   1/16 and it was surrendered, actually, the day prior.  So, this

13   is no longer part of the estate.  They say that's a red

14   herring, we say no, buy their dispute is with the debtor.

15           I mean, this is under tenants work, we had no

16   involvement with Schimenti.  We had a lease, yes, 8/23/06, with

17   the debtor and sometime thereafter the debtor entered into fit

18   out work and construction work with Schimenti.  And we believe

19   that work was completed and we know they claimed 620 some

20   thousand dollars, partially secured, secured.  All we say is,

21   debtor you violate the lease by allowing those liens to be on

22   the property, not that we consented, not that we were a party,

23   not that we signed any agreements and I just question the

24   futility of bringing her down here and counsel has since

25   conceded, since they didn't consult prior to setting the date

1  for documents to be produced, and setting the deposition date,

2  she's on vacation, but they said, well, we'll have it our New

3  York office, but we won't accept your representations, Ms.

4  Hudson, we won't accept the affidavit and I said, well, can I

5  make her available for a phone call, I mean, let's not take a

6  discovery dispute to the court.  You guys should have done your

7  homework before filing this.   You don't just file something

8  with a five business day notice reply on ECF and snail mail it.

9  By the time I got it, I had to react immediately, and we're a

10 landlord for ten different landlords and Circuit City, let

11 alone the other four mega cases this Court is facing right now.

12          So, I appreciate the extension they gave me to reply

13 and we have worked after the fact, but the duty to confer and

14 to narrow these disputes was before, and I'm very troubled that

15 Exhibit A of their motion for a 2004 exam, goes far beyond the

16 lease.  It is not tightly constructed.  It goes far beyond our

17 relationship even with the debtor.  All documents, all

18 accounting and reports, all communications with us and any

19 other person, all written communications with us and the debtor

20 not even germane to the lease, I don't even know how I would

21 compel those, if those are even complied, if they are even

22 retained.  All I can say is that there is no tenant allowance,

23 we hold no monies, it would have been in our post petition

24 motion to the Court, they would have mentioned it at the

25 hearing when Ms. Elgie participated, it is unfortunate that we

**J&J COURT TRANSCRIBERS, INC.**

1 have no such money, they must be aware of that in the ordinary

2 course in other cases, but it does not exist here.

3        And to compel Ms. Chang to come to Virginia, to come

4 to their New York offices, or wherever, even if they go to New

5 Jersey, is going to be a day of no, no, no and no, the lease

6 didn't obligate us to do any of that, and we don't have it.

7        THE COURT:  Is the New York office with 100 miles of

8 her place of business or residence?

9        MS. HUDSON:  I have to defer to counsel on that, and

10 they have told me when I raised those objections to the mileage

11 fee and the witness fee, that they would be willing to work on

12 that, but I do not know the distance from Paramus to their

13 office, or even to North Plainfield's New York counsel, Fried

14 Frank.  There would be several options for doing this, if it

15 has to be scheduled, but the other problem I have is that their

16 reply brings in this ground lease and the ground lease was done

17 some decade before today, and had nothing to do with Circuit

18 City.  That was done back in 1999 or 2000 and isn't even in

19 their motion.  They mention it for the first time in the reply.

20 So, they're trying to bootstrap any other related matters and a

21 ground lease and all of these other parties, all employees and

22 communications that's just way overly broad here, when this

23 comes down to a lease and a proof of claim both of which Ms.

24 Chang, in her duties, knows that lease and collection of that

25 lease in bankruptcy, she prepared the proof of claim with

1  management at Vernado, and she said all that she can say in the

2  affidavit.  There is nothing further that can be compelled

3  here.  I'm trying to prevent an exercise in futility and my

4  credibility is not accepted.

5          The affidavit, by the way, I represented to counsel

6  before coming here today, why would it be any different with a

7  court reporter and with this -- in a setting of a deposition

8  because she has signed her notary clause on February 12th

9  saying that she swears the information contained herein is

10  truthful and accurate.  That the only governing document is the

11  lease, there is no tenant allowance provision therein, they

12  hold no escrow or any other monies, the only way the lease can

13  be amended is by written agreement, there is no written

14  agreement, she's reviewed everything in the file with me,

15  regarding brokerage agreements, things long before Circuit City

16  ever became involved, and these guys have no right and

17  entitlement to review.  And this is burdensome to us, this

18  costs a lot of money, obviously, we got our post petition

19  motion denied, we haven't been paid.  Yes, the property was

20  surrendered to us, but our claim is out there for everybody to

21  see and our lease we will supply under an appropriate

22  protective order, but they shot everything down, despite the

23  settlement overtures, which I don't know what those are, other

24  than moving the venue of the deposition and the date of it, but

25  to me that's hardly a settlement overture when I'm trying to

1  produce the information and cut to the chase.

2          THE COURT:  Well, aren't they entitled to examine the

3  witness, though?

4          MS. HUDSON:  Well, we say no, Your Honor, only -- the

5  rule specifically says it may relate only to the acts of the

6  debtor, we know nothing about that.  The conduct of the debtor,

7  we know nothing of that.  The property of the debtor, it's not.

8          THE COURT:  Well, you say you don't know any of that,

9  but, I mean, aren't they entitled to ask those questions?  I

10 mean, you know, counsel cites the Nucletron case, I'm familiar

11 with that case, and that's exactly what Judge Shelley said in

12 that case.

13         MS. HUDSON:  Well, Your Honor, I guess if the lease

14 weren't open and closed and it were ambiguous as to whether or

15 not it contained a tenant allowance provision and we didn't

16 already have matters filed on the record that conclusively

17 state the nature of the debtor's liability to us and why we

18 filed to remove those liens, because it's a violation of the

19 mechanics lien section of the lease, and if we didn't have this

20 affidavit of Ms. Chang and we didn't have the proof of claim

21 out there with all of our damages, and a schedule, that may be

22 necessary to ascertain the scope of our knowledge, but when

23 what's going to come to bear is exactly what's being

24 represented today, it's an exercise in futility and it's an

25 exercise in futility for them and for us and their dispute here

1  is with the debtor.  That's who they have an agreement with,

2  their own motion says that's who they have a contract with, we

3  did not consent to it, we don't know anything about it, we

4  weren't a party to it and to come in with our ground lease,

5  that's not even mentioned in their motion, but they put it in

6  their reply, has nothing to do with Circuit City, that's

7  something back in 1999.  How should that be part of this scope?

8          THE COURT:  I don't know but maybe they want to find

9  out why it doesn't have anything to do with Circuit City.

10         MS. HUDSON:  Well, at a minimum, I would say that

11  Exhibit A needs to be carved back and that all correspondence

12  between us and the debtor is not appropriate here, this is

13  about tenants allowance and construction work, not all

14  communication and employment --

15         THE COURT:  Well, you say that, but how do they know

16  that?  Maybe their claim is broader than that?

17         MS. HUDSON:  Their claim is, they've specified it, is

18  for fit out work and construction associated with the North

19  Plainfield store.  I'm not aware of anything broader than that.

20         THE COURT:  All right.  Well, the Court, as you say,

21  is going to cut to the chase, too.  I think that the 2004

22  examination is in order, I think you need to produce a witness

23  on behalf of your client, whether it's Ms. Chang or somebody

24  else, and testify to these matters.  I don't think that the

25  exhibit is over broad, that is attached to it.

**J&J COURT TRANSCRIBERS, INC.**

1          I do think that you are entitled to a protective

2    order for any proprietary information that you may be asked to

3    reveal and if you cannot negotiate a protective order, then

4    both counsel can submit proposed orders and the Court will

5    enter one of them, one or the other of them.

6          Also, I don't think that Ms. Chang, or your

7    representative, need to come to Richmond, Virginia. I think

8    that you can do that in New Jersey or in New York if that's

9    within a 100 mile radius of where she either lives or works,

10   and she's entitled to the witness fee, as well as the mileage.

11   Any questions on the Court's ruling?

12          MS. HUDSON:  Your Honor, and it's up to us in the

13   order today to just reschedule the date in light of Ms. Chang's

14   vacation?

15          THE COURT:  Yes, I'd like you to reschedule that with

16   counsel, to a time that's mutually convenient.  Again, if the

17   two of you can't agree on a date, submit that to me as well,

18   proposed dates and I'll pick one.

19          MS. HUDSON:  Thank you, Your Honor, I --

20          MR. BIRNEY:  Your Honor --

21          THE COURT:  Yes, sir?

22          MR. BIRNEY:  Your Honor, just -- you had asked a

23   question, I didn't want to interrupt counsel, North Plainfield

24   and Paramus are approximately 39 miles from Midtown Manhattan.

25   And, Your Honor, we had intended to serve a subpoena pursuant

72

1    to 9016 which would have -- that's when we would have tendered

2    the witness fees and, obviously, we could not have issued the

3    subpoena until such time as Your Honor granted the Rule 2004

4    motion.

5            THE COURT:  Right.  I'm aware of that.  So, if it's

6    within 39 miles, then you could do it in New York.

7            MR. BIRNEY:  Yes, Your Honor.

8            THE COURT:  And so that will be fine. And I would

9    expect counsel to be able to agree on the terms of a protective

10   order as well as the terms or the agreement on a date and not

11   have to bother me about it, but if you can't, you can, like I

12   said, submit that to me and I'll pick it.

13           MS. HUDSON:  Thank you, Your Honor.

14           MR. BIRNEY  Thank you, Your Honor.

15           THE COURT:  Thank you both.  Mr. Fredericks?

16           MR. FREDERICKS:  Yes, Your Honor, Ian Fredericks,

17   again, for the record.  I apologize to come back before you.

18   There is one matter that's not on the agenda that we wanted to

19   bring to the Court's attention.

20           As you may recall at the last hearing you approved an

21   order establishing lease procedures, including auction dates

22   and related dates and procedures.  In an ongoing effort to

23   evaluate the lease sales/rejection termination process, the

24   debtors believe that they may think moving the March auction

25   date up from March 5th to an earlier date may be in the best

1  interest of these estates, given the lease market.  They are

2  still consulting with their real estate advisor, DJM and they

3  will consult with the committee before making a final

4  determination, but in the event the debtors determine that they

5  should be moved up, they may submit a supplemental order

6  establishing an earlier auction date.  I just wanted to advise

7  the Court that that may be coming at some point in the future.

8       THE COURT:  All right.  And I assume that you'll be

9  able to give the appropriate notices to everybody that's

10 involved then in the process and such, so that by moving the

11 date we don't do anything to deter bidding or anything of that

12 sort.

13      MR. FREDERICKS:  Yes.  That's one of the matters

14 that's being discussed with DJM.  DJM is in regular contact

15 with both the landlords and interested bidders, there's a

16 finite group of interested bidders in addition to the landlords

17 that they've been in discussions with.  And that's one of the

18 considerations that we're discussing with DJM.

19      THE COURT:  All right, thank you.

20      MR. FREDERICKS:  Thank you, Your Honor.  With that, I

21 don't believe there's -- I'll turn it back over to Mr. Foley.

22 Thank you, Your Honor.

23      THE COURT:  All right, thank you.

24      MR. EPPS:  Your Honor, A.C. Epps, Jr., again for the

25 appellants in the potential direct appeal.  Your Honor, after

**J&J COURT TRANSCRIBERS, INC.**

1 you questioned us before, when we were discussing this in the

2 hall, we'd point out that we did at the Court's suggestion,

3 submit an agreed order on this issue.

4        The clerk was of the opinion that you didn't, and

5 perhaps, even shouldn't sign it, but we think you should.  And

6 we think that it does help because ordinarily the rule seems to

7 say that upon the Court's certification, it doesn't say

8 anything about what happens when you have the joint

9 certification of the parties, but we do think it does two

10 things.  One is to make sure that the Appellate Court knows

11 that this Court does know what we're up to and doing and the

12 second is, I think it does fill in the gap in the procedure. If

13 it's the wrong thing to do it's nothing worse than duplicative.

14        THE COURT:  All right.  So, has that been submitted

15 to me in a form that I would be able to sign?

16        MR. EPPS:  It was submitted on BOPS several days ago,

17 Your Honor.

18        THE COURT:  Okay.  Because I don't know that I've

19 seen that.

20        MR. EPPS:  I think the clerk had it.

21        THE COURT:  Okay.  I'll make appropriate inquiry and

22 find out about that.  I know that in the one that Judge Adams

23 certified to the Fourth Circuit, he made the certification as

24 well.  And that's really where I was coming from, both from the

25 interlocutory as well as that.  I mean, I'm perfectly happy to

**J&J COURT TRANSCRIBERS, INC.**

1   certify it and so I think we need to get an answer on that.

2          MR. EPPS:  Well, the sketch order that was submitted,

3   we think is fairly complete.  If it's more complete than the

4   Court desires, it is in Word format, I think, or in an

5   appropriate Word format for BOPS and you can take the red

6   pencil to it, as the Court prefers.

7          THE COURT:  Okay.

8          MR. EPPS:  Your Honor, with regard to your question

9   about what do we do about these other appeals, Mr. Foley and I

10  need a day or two, no more than two days, but we need to figure

11  that out, at what we think our best suggestion is and get back

12  to you as soon as we can.

13         THE COURT:  All right, very good.

14         MR. FOLEY:  Your Honor, Doug Foley for the debtors,

15  Your Honor.  The point of the certification, obviously,

16  everybody is in agreement with doing this, and, obviously, I

17  think the Court understands the importance of having this issue

18  heard, we want to make sure that we follow the most expedient

19  path to get to the Fourth Circuit and I think Your Honor's

20  entry of an order and participation in the certification in an

21  informal way will certainly help that process and with respect

22  to the other landlord counsel, and landlords that may want to

23  either join the appeal, or consolidate, again, our concern is,

24  cost and expediency of having this matter heard. If it can be

25  consolidated in a way that makes sense, where there's not

1  duplicative brief writing, then maybe that makes sense, but

2  another way to go is to have the other ones stayed pending this

3  one being ruled on, since it will affect everyone in the case.

4  Again, we're just concerned about cost and speed because those

5  are the things that we're concerned about.

6          THE COURT:  And, the Court, obviously, concerned

7  about the cost, too, to keep the administrative expenses down

8  in the case and we don't need to have duplicative appeals going

9  in difference directions.  So, either consolidation or staying

10 the other ones makes perfectly good sense to the Court.  So,

11 let me know which way you want to proceed and we'll handle it

12 accordingly.

13         MR. EPPS:  We will.  Your Honor, if for some reason

14 that order is misplaced, it's our computer at Christian &

15 Barton and we'll send it again.

16         THE COURT:  Yes.  I'll get back to you if I need to

17 have you resubmit it.

18         MR. EPPS:  Thank you.

19         THE COURT:  Is there any other business we need to

20 take up this afternoon?

21         MR. FOLEY:  No, Your Honor, thank you.

22         THE COURT:  Thank you.

23         COURT CLERK:  All rise.  Court is now adjourned.

24                     *  *  *  *  *

25

**J&J COURT TRANSCRIBERS, INC.**

# **C E R T I F I C A T I O N**

I, ELAINE HOWELL, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter and to the best of my ability.


/s/ Elaine Howell_____        Date:  March 5, 2009

ELAINE HOWELL

J&J COURT TRANSCRIBERS, INC.


**J&J COURT TRANSCRIBERS, INC.**