Court File No. 08-CL-7841

**ONTARIO**

**SUPERIOR COURT OF JUSTICE**

**COMMERCIAL LIST**

*IN THE MATTER OF THE COMPANIES' CREDITORS
ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED*

*AND IN THE MATTER OF A PLAN OF COMPROMISE OR
ARRANGEMENT OF INTERTAN CANADA LTD. AND
TOURMALET CORPORATION*

APPLICANTS

# SIXTH REPORT OF THE MONITOR
# ALVAREZ & MARSAL CANADA ULC
### (dated March 2, 2009)

**Goodmans LLP**
250 Yonge Street
Suite 2400
Toronto, ON   M5B 2M6

Jay A. Carfagnini  LSUC#: 222936
Fred Myers  LSUC#: 26301A
L. Joseph Latham  LSUC#: 32326A

Tel:  416.979.2211
Fax:  416.979.1234

Solicitors for the Monitor

# **I N D E X**

<u>TAB</u>

1.    Sixth Report of the Monitor Alvarez & Marsal Canada ULC dated March 2, 2009

    Appendix "A"    -    December 5, 2008 Sale Process Order

    Appendix "B"    -    Amended and Restated Initial Order dated November 10, 2008

    Appendix "C"    -    Weekly Cash Flow Report of Circuit City Stores, Inc. for the Week
                         Ended February 21 and 22, 2009

# TAB 1

Court File No. 08-CL-7841

ONTARIO

SUPERIOR COURT OF JUSTICE

COMMERCIAL LIST

*IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED*

*AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF INTERTAN CANADA LTD. AND TOURMALET CORPORATION*

APPLICANTS

SIXTH REPORT OF THE MONITOR

ALVAREZ & MARSAL CANADA ULC

MARCH 2, 2009

INTRODUCTION

1.      By Order of this Honourable Court dated November 10, 2008, InterTAN Canada Ltd. ("InterTAN") and Tourmalet Corporation ("Tourmalet" and together with InterTAN, the "Applicants") obtained protection from their creditors under the *Companies' Creditors Arrangement Act* ("CCAA") and Alvarez & Marsal Canada ULC ("A&M") was appointed monitor of the Applicants (the "Monitor"). These proceedings are referred to herein as the "CCAA Proceedings".

2.      Concurrent with the commencement of the CCAA Proceedings, the Applicants' ultimate parent company, Circuit City Stores, Inc. ("Circuit City") and certain of its U.S. affiliates (collectively, the "U.S. Debtors") commenced proceedings under Chapter 11, Title 11 of the *United States Code* (the "U.S. Bankruptcy Code"). These proceedings are referred to herein as the "Chapter 11 Proceedings".

3.      In connection with the Applicants' application for protection under the CCAA, A&M provided this Honourable Court with an initial report in its capacity as proposed monitor (the "Initial Report") dated November 10, 2008.

4.     The Monitor delivered its first report dated November 24, 2008 (the "First Report") in connection with the "come back" hearing that was returnable on November 26, 2008 under paragraph 52 of the Initial Order.  On November 26, 2008, the Court adjourned the "come back" hearing to December 5, 2008.

5.     The Monitor delivered its second report dated December 3, 2008 (the "Second Report") in connection with the hearing on December 5, 2008.  At that hearing, this Honourable Court granted an Order extending the stay of proceedings under the CCAA and approving a sale process for the business and assets of InterTAN (the "Sale Process Order"), a copy of which is attached as Appendix "A".  The Order issued on November 10, 2008 was also amended and restated on December 5, 2008.  A copy of the Amended and Restated Initial Order is attached as Appendix "B" (the "Initial Order").

6.     In light of certain developments concerning the Second Amendment to the Senior Secured Super-Priority Debtor-in Possession Credit Agreement (the "Second Amendment"), which developments are discussed in detail in the Monitor's third report dated January 10, 2009 (the "Third Report"), the Court issued an interim Order on December 24, 2008 prohibiting the distribution of proceeds of the Applicants' property and any intercompany advances from the Applicants to any of its U.S. affiliates pending a return date before the Court on January 14, 2009 (the "Status Quo Order").

7.     The Monitor delivered the Third Report in connection with the motion returnable January 14, 2009, in which the Monitor sought directions from the Court regarding the fair and appropriate way to address the impact of the Second Amendment on the Applicants and their stakeholders.  On January 23, 2009, the Court issued an Order extending the Status Quo Order until further Order of the Court and ordering an accounting of the claims of the DIP Lenders (as defined in paragraph 35 of the Initial Order) in the CCAA Proceedings.

8.     The Monitor delivered its fourth report dated February 6, 2009 (the "Fourth Report") in connection with the Applicants' motion returnable February 10, 2009 to approve a process for the submission of pre-filing claims against the Applicants (the "Pre-Filing

Claims Process"). On February 10, 2009, the Court granted an Order approving the Claims Process proposed by the Applicants (the "Pre-Filing Claims Process Order").

9.    The Monitor delivered its fifth report dated February 19, 2009 (the "Fifth Report") to provide the Court and the Applicants' stakeholders with a status report on the proceedings and to address certain matters in connection with the Applicants' motion returnable February 23, 2009. On February 23, 2009, the Court granted an Order approving certain amendments to the DIP Facility as defined and approved in the Initial Order as sought by the Applicants.

10.   The Applicants have brought a motion returnable March 9, 2009 seeking the following relief:

1.    An Order (the "Approval and Vesting Order") substantially in the form attached as Exhibit "A" to the Affidavit of Mark Wong sworn March 2, 2009 (the "Wong Sale Affidavit"):

(a)    approving the sale transaction contemplated by the asset purchase agreement (the "APA") by and among InterTAN, Circuit City Stores West Coast Inc. ("West Coast") and Ventoux International, Inc. ("Ventoux") (collectively, the "Seller Parties"), 4458729 Canada Inc. (the "Purchaser") and Bell Canada (the "Sale Transaction"), a copy of which is attached as an appendix to the Confidential Supplement (as herein defined), as filed; and

(b)    vesting in the Purchaser all of InterTAN's right, title and interest in and to the Seller Assets (as defined in the APA) free and clear of all encumbrances;

AND,

2.    An Order substantially in the form attached as Exhibit "B" to the Wong Sale Affidavit (the "Additional Approvals Order"):

(a)    if necessary, abridging the time for service of the Notice of Motion and the Motion Record, and directing that any further service of the Notice of Motion and the Motion Record be dispensed with;

- 4 -

(b)    extending the Stay Period, as defined in the Initial Order and as subsequently extended, from March 31, 2009 until July 3, 2009;

(c)    approving the Settlement and Coexistence Agreement between Foto Source Canada Inc., InterTAN and West Coast, made as of February 20, 2009 (the "Foto Source Settlement Agreement");

(d)    approving the agreement dated February 23, 2009 between InterTAN, Circuit City Stores, Inc. ("Circuit City"), West Coast and Ventoux (the "Intercompany Agreement");

(e)    providing that the contents of the Confidential Supplement be sealed, kept confidential and not form part of the public record until further Order of the Court; and

(f)    such further and other relief as counsel may request and this Honourable Court may deem just;

AND,

3.    AN ORDER, following a hearing on a date yet to be scheduled with the Court, recognizing an order of the U.S. Bankruptcy Court which, *inter alia*, authorizes InterTAN, Inc.'s authorization of InterTAN's sale of its assets pursuant to the APA, and approves the APA as it relates to Ventoux and West Coast (the "U.S. Sale Order").

11.    The purpose of this sixth report of the Monitor is to provide the Court and interested stakeholders with information concerning the Applicants' motion, and in particular the Applicants' request that this Court approve InterTAN entering into the APA to provide for a going concern sale of InterTAN's business to the Purchaser. The Sale Transaction proposed includes the sale of InterTAN's business, including the possibility of the assumption of all employees and leases. For the reasons discussed below, the Monitor respectfully recommends that the Court approve the APA, the Sale Transaction and the other agreements as requested by the Applicants.

12.     In the event that the proposed sale does not close, it would be harmful to the Applicants'
sale process and to the Applicants' business were the full details of the bids to become
public. In the interim, in order to protect the Purchaser and InterTAN's business (and
hence the stakeholders), the Monitor believes that it is necessary for the APA itself and
certain of its terms to remain confidential. Among other things, the Monitor believes that
the sale process could be prejudiced if the details of certain aspects of the APA were to
be known to other potential bidders and stakeholders. These issues are dealt with by the
Monitor in its Confidential Supplement which the Monitor proposes be sealed, kept
confidential and not form part of the public record until further Order of the Court.

## TERMS OF REFERENCE

13.     In preparing this report, the Monitor has relied upon unaudited financial information,
InterTAN's books and records, financial information prepared by InterTAN and its
advisors, and discussions with management of InterTAN and its advisors. The Monitor
has not audited, reviewed, or otherwise attempted to verify the accuracy or completeness
of the information and, accordingly, the Monitor expresses no opinion or other form of
assurance on the information contained in this report.

14.     Certain of the information referred to in this report consists of forecasts and/or
projections. An examination or review of financial forecasts and projections, as outlined
in the Canadian Institute of Chartered Accountants Handbook, has not been performed.
Future-oriented financial information referred to in this report was prepared based on
management's estimates and assumptions. Readers are cautioned that since projections
are based upon assumptions about future events and conditions that are not ascertainable,
actual results will vary from the projections, even if the assumptions materialize, and the
variations could be significant.

15.     The Monitor has requested that management bring to its attention any significant matters
that were not addressed in the course of its specific inquiries. Accordingly, this report is
based solely on the information (financial or otherwise) made available to the Monitor.

16.     All references to dollars in this report are in Canadian currency unless otherwise noted.

## BACKGROUND

17. InterTAN is a leading specialty retailer of consumer electronics in Canada and is the operating Canadian subsidiary of the U.S.-based electronics retailer Circuit City. Tourmalet is a Nova Scotia unlimited liability company that is an indirect, wholly-owned subsidiary of Circuit City. Tourmalet is a non-operating holding company whose sole asset is the preferred stock of InterTAN, Inc., which is the sole shareholder of InterTAN. Circuit City is the Applicants' ultimate parent company. Further background to InterTAN, Tourmalet and Circuit City is contained in the materials filed relating to the Initial Order, including the Affidavit of Mark Wong sworn November 10, 2008. These documents, together with other information regarding the CCAA Proceedings, including the Initial Order and supporting affidavit, have been posted by the Monitor on its website at www.alvarezandmarsal.com/intertan.

18. On November 10, 2008, the U.S. Debtors commenced the Chapter 11 Proceedings in the United States Bankruptcy Court for the Eastern District of Virginia (the "U.S. Bankruptcy Court"). The U.S. Debtors have subsequently commenced a liquidation of their assets and property in the Chapter 11 Proceedings. A hyperlink to information concerning the U.S. Debtors' restructuring and liquidation can be found at www.kccllc.net.

19. Additional background information can be found in the prior report submitted by the Monitor to this Honourable Court.

## SALES PROCESS

20. Pursuant to the Sale Process Order, N M Rothschild & Sons Canada Securities Limited ("Rothschild") was engaged to assist the Applicants in conducting a going concern sale process. As previously reported by the Monitor, Rothschild commenced its efforts with the Applicants very early in these proceedings. On January 14, 2009, this Honourable Court approved Rothschild's engagement. The Monitor notes that it has been in frequent contact with Rothschild and has been included in significant discussions and negotiations throughout.

- 7 -

21.  Rothschild has advised the Monitor that it contacted 87 prospective purchasers, both strategic and financial, located in Canada and the U.S., and sent 45 teaser documents to prospects. 31 prospects executed and returned confidentiality agreements to Rothschild, and, of those, 28 prospects accessed the Applicants' confidential data rooms pursuant to confidentiality agreements.  As indicated at paragraph 14 of the Wong Sale Affidavit, management presentations were made to 8 potential purchasers.

22.  A total of 11 parties submitted Indicative Bids.  A summary of the Indicative Bids is contained in the Confidential Supplement.

23.  Consistent with the Sale Process Order, Rothschild and the Applicants reviewed the Indicative Bids in consultation with the Monitor and determined which of the potential purchasers to invite to participate in the next phase of the Sale Process.

24.  On January 9, 2009, the Applicants and Rothschild provided a *pro forma* purchase and sale agreement to each of the prospective purchasers invited to participate in the second phase of the Sale Process.

25.  Pursuant to the Sale Process Order, potential purchasers who had been invited to participate in the second phase of the Sale Process were required to provide firm proposals and a mark-up of the draft asset purchase agreement to Rothschild by no later than 5:00 p.m. (Toronto time) on January 15, 2009.  By Order dated January 14, 2009, the Court extended the bid deadline to 5:00 p.m. (Toronto time) on January 23, 2009 (the "Bid Deadline").

26.  At the Bid Deadline, Rothschild received four (4) proposals from bidders.  A spreadsheet showing the bidders and the most salient terms of each bid is attached to the Confidential Supplement.  After discussions among the Applicants, the Monitor and Rothschild, Rothschild held various discussions with each of those bidders to seek clarifications or improvements to the terms of the various bids.  The Monitor was involved in many of these discussions.

27.  For reasons outlined in greater detail in the Confidential Supplement, it was apparent that the offer of the Purchaser was superior to the other bids in price and other criteria.

28.   The Monitor has reviewed the efforts of Rothschild and the Applicants to market InterTAN's business.  The Monitor is of the view that the assets had significant exposure to a substantial number of prospective purchasers.   Rothschild and the Applicants engaged in detailed discussions with prospective bidders and allowed bidders access to sufficient information (under appropriate confidentiality terms) to allow the bidders to formulate informed views on the value of the business and the terms of their proposals. The Monitor therefore believes that there has been sufficient marketing to conclude that the APA represents the best value that can reasonably be realized for InterTAN's business in the circumstances.

**THE PROPOSED APA**

29.   The Monitor has reviewed the description of the APA contained in the Wong Sale Affidavit and is satisfied that it fairly summarizes the key terms of the APA other than those contained in the Confidential Supplement.

30.   The parties to the APA include InterTAN, West Coast, Ventoux, the Purchaser and Bell Canada.

31.   West Coast is a wholly-owned subsidiary of Circuit City and is the owner of certain trademarks which the Purchaser wishes to purchase (such as the name "The Source") and other trademarks which the Purchaser wishes to license (such as the right to use the name "Circuit City").

32.   Ventoux is a wholly-owned subsidiary of Circuit City and is the owner of the shares of Circuit City Global Sourcing, Limited ("CCGS"), which sources private label products for InterTAN from offices in Asia, and which the Purchaser wishes to acquire.

33.   The APA provides for the Purchaser to make offers of employment to all of InterTAN's non-executive employees, to assume all of the contracts of InterTAN's executive employees, and to assume InterTAN's collective bargaining agreement.

34.    Pursuant to the APA, the Purchaser has paid a deposit of $15,000,000 to the Monitor in escrow. The balance of the purchase price will be paid in cash on closing, and is discussed in detail in the Confidential Supplement.

35.    The closing date is the later of June 30, 2009 and the date that is two business days after satisfaction of the closing conditions outlined in the APA (or such other date as the parties may agree). The conditions to closing are listed in paragraph 34 of the Wong Sale Affidavit. The APA provides that the Outside Date of the Sale Transaction is July 31, 2009, subject to extension in certain circumstances to September 30, 2009.

36.    InterTAN currently sells products and services under an agreement with Rogers Wireless Inc. and Rogers Wireless Communications Inc. (collectively, "Rogers") made as of June 21, 2001 (the "Rogers Contract"). The Rogers Contract will expire in accordance with its terms on December 31, 2009 if it is not terminated prior to that time by parties who may be entitled to do so. The consent of Rogers is required to assign the Rogers Contract to the Purchaser. Pursuant to the APA, InterTAN and the Purchaser are to use commercially reasonable efforts to obtain such consents as may be required to assign the Rogers Contract to the Purchaser. The APA contains a mechanism to deal with obtaining the required consents to assign the Rogers Contract, including the consent of Rogers, failing which the Rogers Contract will become an Excluded Asset and any liabilities related thereto will become Excluded Liabilities. Specifically, the APA provides that:

(a)    [InterTAN] agrees that it shall not extend, renew or otherwise modify or amend the Rogers Contract in any manner whatsoever.

(b)    The Purchaser and [InterTAN] agree that they shall use commercially reasonable efforts to obtain, prior to April 30, 2009, all such consents as may be required to the assignment of the Rogers Contract to the Purchaser on Closing, including the consent of all counterparties thereto. Notwithstanding any other provision of this Agreement, any such consents must be on terms and conditions as are acceptable to the Purchaser in its reasonable discretion, which terms and conditions shall include such confirmations from Rogers and/or such amendments to the Rogers Contract as may be determined by the Purchaser to be necessary or desirable in its reasonable discretion, except that the Purchaser shall not be entitled to stipulate, as a term and condition of assignment of the Rogers Contract, that the term of the Rogers Contract expire prior to December 31, 2009, that the distribution relationship contemplated by the Rogers Contract be non-exclusive or that Rogers agree to material changes to the material financial terms of the Rogers Contract. The Purchaser agrees that it will, in connection with any assignment of the

Rogers Contract, agree to such commercially reasonable operating and information sharing procedures as may be reasonably requested by Rogers that limit the nature and scope of the information relating to the Rogers Contract, and the distribution relationship contemplated thereby, that may be provided by the Purchaser to its Affiliates and/or officers, directors or employees of its Affiliates.

(c)    If the required consents to the assignment of the Rogers Contract to the Purchaser are not obtained by the Purchaser on or prior to April 30, 2009, including the consent of all counterparties thereto, on terms and conditions as are acceptable to the Purchaser in its reasonable discretion, including with such confirmations from Rogers and/or such amendments to the Rogers Contract as may be determined by the Purchaser to be necessary or desirable in its reasonable discretion, then, notwithstanding any other provision of this Agreement or any document or instrument delivered in connection herewith, the Rogers Contract and all related Contracts, as well as all rights thereunder, all Accounts Receivable due to [InterTAN] in respect thereof and the inventory of products purchased in connection with the Rogers Contract and all related Contracts, will become Excluded Assets for all purposes of this Agreement, and the Purchaser shall assume no Liabilities with respect thereto (including, for greater certainty, any Liability in respect of any determination by [InterTAN] to repudiate, disclaim, terminate or breach the Rogers Contract).

\*\*\*

(e)    The Purchaser acknowledges and agrees that if the Rogers Contract is not assigned to the Purchaser, then all Confidential Information (as such term is defined in the Rogers Contract) of Rogers is and shall remain confidential and shall not be disclosed, transferred or assigned to the Purchaser in any manner whatsoever.

37.    The Monitor expects that the Applicants and the Purchaser will be approaching Rogers shortly to commence discussions concerning the assignment of the Rogers Contract.

## INTERCOMPANY AGREEMENT WITH THE U.S. DEBTORS

38.    Many of the bids and offers submitted during the Sale Process required the sale of certain intellectual property owned by West Coast and of the shares of CCGS owned by Ventoux. It was necessary therefore to find a mechanism to convey those assets to a purchaser who wished to acquire them and to determine the price to be paid to West Coast and/or Ventoux for those assets.

39.    The Monitor was also engaged in discussions with the Applicants and the U.S. Debtors concerning proposed amendments to the DIP Facility. As reported in the Monitor's Fifth Report, the U.S. Debtors have advised the U.S. Bankruptcy Court that they expect that they will generate sufficient net proceeds to fully pay their direct borrowings under the

DIP Facility and to have cash in excess of 103% of the face amount of their outstanding LC obligations on or before the week ending February 28, 2009. A copy of the most recent Weekly Cash Flow Report for Circuit City, for the week ended February 21, 2009, as delivered to the Monitor by FTI Consulting Inc., is attached as Appendix "C". This report indicates that, as at February 21, 2009, the full amount of the DIP Lenders' direct advances to the U.S. Debtors has been repaid and the U.S. Debtors hold cash of approximately U.S.$215 million that is available to cash collateralize outstanding letters of credit totalling approximately U.S.$83.7 million. Accordingly, it appears that the DIP Lenders will be paid in full in the Chapter 11 Proceedings (including cash collateralizing the LC's). Therefore, it appears that the DIP Lenders will not need to access the sixth charge listed in paragraph 44 of the Initial Order (the "Sixth Charge").

40.    However, despite the expected success of the U.S. Debtors in repaying their DIP Facility, the U.S. Debtors also indicated that they have concerns that they may experience periods in which they need liquidity funding given that their access to future draws under the DIP Facility has been terminated. The U.S. Debtors' need for liquidity funding and InterTAN's need for certainty regarding the availability and pricing of assets owned by West Coast and Ventoux resulted in the U.S. Debtors and InterTAN entering into the Intercompany Agreement as discussed in the Wong Sale Affidavit at paragraphs 48 to 52.

41.    The Intercompany Agreement is subject to the approval of both the U.S. and Canadian Courts.

42.    The Monitor has reviewed the discussion of the Intercompany Agreement in the Wong Sale Affidavit and supports InterTAN's request for approval of that agreement for the reasons set out by Mr. Wong. The Monitor notes that it is not aware of any independent appraisal having been conducted for the intellectual property and shares that are being sold and/or licensed by the U.S. Debtors under the APA. However, the Monitor has been advised generally of certain costs associated with InterTAN's re-branding efforts in 2004 when it adopted "The Source by Circuit City" brand. The hard costs of further re-branding now, such as purchasing and installing signs for hundreds of stores, would make up a substantial portion of the value being attributed to the purchased intellectual property under the APA (before considering the value of the CCGS shares). In the

- 12 -

context of a transaction of the magnitude of the sale under the APA, the Monitor is satisfied that the price for those assets under the Intercompany Agreement is reasonable.

43.    In connection with the borrowing contemplated by the Intercompany Agreement, the Monitor is satisfied that sufficient conditions are in place in that agreement, including the requirement that any loan be approved by this Court, to ensure that the interests of the Applicants and their creditors will be adequately protected.

## THE FOTO SOURCE SETTLEMENT AGREEMENT

44.    The terms of the Foto Source Settlement Agreement are set out in paragraphs 44 to 47 of the Wong Sale Affidavit. The effectiveness of the settlement of the litigation between InterTAN and Foto Source is a condition precedent of the APA. In the context of the APA, the Monitor is prepared to recommend the approval of the Foto Source Settlement Agreement.

## THE MONITOR'S COMMENTS

### Recovery to Creditors

45.    In paragraph 39 of the First Report, the Monitor reported that management had estimated that the quantum of unsecured trade creditor claims that would be subject to the stay of proceedings contained in the Initial Order (net of potential set-offs and excluding litigation claims and claims that InterTAN expected to pay while subject to these proceedings or to have assumed by a purchaser) totalled approximately $29.3 million. Currently InterTAN management's estimate is closer to approximately $31 million and this will be refined further as the Pre-Filing Claims Process unfolds.

46.    The Applicants' most recent cash flow projection that is filed with the Court estimated that the Applicants' liability under the DIP Facility will peak at approximately $32 million between this date and June 30, 2009. At this time, there are no known liabilities under the Directors' Charge contained in the Initial Order. As noted above, with the U.S. Debtors having repaid the DIP Lenders in the Chapter 11 Proceedings, there will likely be no claims under the Sixth Charge. This means that after satisfying the first four charges contained in the Initial Order (including repayment of direct advances to

- 13 -

InterTAN under the DIP Facility) and after payment of the U.S.$15 million payable to West Coast and Ventoux under the APA, it is expected that there will be significant remaining proceeds available to pay Canadian creditors on their claims. The Monitor notes that, in addition to the expected pre-filing claims outlined above, additional claims may arise under the Pre-Filing Claims Process. Although the Purchaser is assuming a number of liabilities under the APA (i.e. offers to all employees and no requirement to repudiate leases), which should significantly reduce the number of potential restructuring claims, there are a number of Excluded Liabilities (a summary of which is set out in paragraph 33 of the Wong Sale Affidavit) which may result in additional claims in these CCAA Proceedings. The Monitor believes that, subject to the outcome of the Pre-Filing Claims Process and any process related to the adjudication of any restructuring claims which may arise in connection with the Sale Transaction, it appears likely at this time that the Applicants' unsecured creditors will be paid in full, following closing of the Sale Transaction. To the extent that Canadian creditors are paid in full on their claims, any remaining proceeds will be distributed to InterTAN's shareholder on account of its equity.

**"Soundair" Principles**

47.   The APA reflects the Applicants' efforts to obtain the best price for their assets and is not improvident. Rothschild and the Applicants involved the Monitor in the Sale Process. It appears to the Monitor that the Sale Process was carried out fairly and appropriately at all stages, with efficacy and integrity. In analyzing the APA, the Monitor considered the interests of all stakeholders, including the Applicants' shareholder, and concluded that the APA represents the best option available. In light of the foregoing, the Intercompany Agreement and the Foto Source Settlement Agreement are necessary and reasonable adjuncts to the APA.

- 14 -

**MONITOR'S RECOMMENDATION**

48.     For the foregoing reasons, the Monitor recommends that the APA be approved and that all of the relief sought by the Applicants should therefore be granted.

All of which is respectfully submitted at Toronto, Ontario this 2nd day of March, 2009.

**ALVAREZ & MARSAL CANADA ULC**
in its capacity as Court appointed Monitor of
InterTAN Canada Ltd. and Tourmalet Corporation

Per: _____
          Name: Douglas R. McIntosh
          Title:   Managing Director
          I/We have the authority to bind the corporation

Court File No.: 08-CL-7841

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF INTERTAN

CANADA LTD. AND TOURMALET CORPORATION

**ONTARIO**

**SUPERIOR COURT OF JUSTICE**

**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**SIXTH REPORT OF THE MONITOR**

**Goodmans LLP**
Barristers & Solicitors
250 Yonge Street, Suite 2400
Toronto, Canada M5B 2M6

Jay A. Carfagnini (LSUC#222936)
Fred Myers (LSUC#26301A)
L. Joseph Latham (LSCU# 32326A)

Tel: 416.979.2211
Fax: 416.979.1234

Solicitors for the Monitor

\5688942.7

# EXHIBIT "A"



Court File No. 08-CL-7841

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

| THE HONOURABLE MR. | ) | FRIDAY, THE 5th DAY |
| | ) | |
| JUSTICE MORAWETZ | ) | OF DECEMBER, 2008 |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF INTERTAN CANADA LTD. AND TOURMALET CORPORATION

APPLICANTS

## ORDER
### (Sale Process and Stay Extension)

THIS MOTION, made by the Applicants for an order approving the sale process as described in the affidavit of Mark J. Wong, sworn December 3, 2008 (the "Wong Affidavit"), and extending the Stay Period (as defined in the Amended and Restated Initial Order dated November 10, 2008) from December 9, 2008 until January 30, 2009, was heard this day at 330 University Avenue, Toronto, Ontario.

ON READING the Notice of Motion, the Wong Affidavit and the Exhibits thereto, the Second Report of the Monitor dated December 3, 2008 (the "Second Report") and on hearing the submissions of counsel for the Applicants, the Monitor, Bank of America, N.A. (Canadian

TOR_P2Z:3412052.2

- 2 -

Branch) in its capacity as a lender and Canadian agent (the "Canadian Agent"), the Cadillac
Fairview Corporation Limited, and other various landlords and other counsel, no one else
appearing although duly served as set out in the Affidavit of Service of Gillian S.G. Scott
dated December 3, 2008:

**SERVICE**

1.          THIS COURT ORDERS that the time for service of the Notice of Motion and
the Motion Record is hereby abridged so that this Motion is hereby abridged and any further
service of the Notice of Motion and the Motion Record is hereby dispensed with.

**SALE PROCESS**

2.          THIS COURT ORDERS that the sale process described in the Wong Affidavit
(the "CCAA Sale Process") is approved and the Applicants, N M Rothschild & Sons Canada
Securities Limited ("Rothschild Canada") and the Monitor are hereby authorized and directed
to take such actions as are required to complete the CCAA Sale Process.

3.          THIS COURT ORDERS that pursuant to and in accordance with the terms of
the CCAA Sale Process:

      (a)          preliminary non-binding indications of interest (the "Indicative Bids") shall be
            provided by potential purchasers by no later than 5:00 pm Toronto time on
            December 17, 2008;

      (b)          potential purchasers who are invited to participate in the next phase of the sale
            process, and wish to proceed, shall provide firm proposals, together with a
            mark-up of the draft purchase and sale agreement, by no later than 5:00 pm
            Toronto time January 15, 2009; and

      (c)          the Applicants will then seek any further relief necessary from this Court to
            implement any sale transaction.

4.          THIS COURT ORDERS that, in addition to the duties of the Monitor set out in
the Amended and Restated Initial Order, the Monitor is directed and empowered to:

- 3 -

(a)   participate fully in the CCAA Sale Process;

(b)   discuss the implementation of the CCAA Sale Process with the Applicants and Rothschild Canada, including attending regular meetings with, and receiving updates from, Rothschild Canada regarding its activities with respect to the CCAA Sale Process;

(c)   receive and review copies of all offers, including the Indicative Bids, received by the Applicants and Rothschild Canada under the CCAA Sale Process;

(d)   assist the Applicants, its advisors and Rothschild Canada with respect to the evaluation of all offers, including the Indicative Bids, received under the CCAA Sale Process and the process leading to the selection by the Applicants of potential purchasers to participate further in the CCAA Sale Process, prior to the Applicants engaging in negotiations with potential purchasers in respect of a definitive purchase and sale agreement; and

(e)   assist in negotiations and discussions between the Applicants (or its U.S. debtor affiliates) and potential purchasers regarding the negotiation and execution of a definitive purchase and sale agreement in respect of the Applicants' assets or the shares of the Applicants;

and the Applicants and Rothschild Canada shall fully co-operate with the Monitor in the exercise of its duties with respect to the CCAA Sale Process.

## APPROVAL OF MONITOR'S ACTIVITIES

5.      THIS COURT ORDERS that the Report of the Proposed Monitor dated November 10, 2008, the First Report of the Monitor dated November 24, 2008 and the Second Report and the activities of the Monitor as detailed in such reports are hereby approved.

- 4 -

**STAY EXTENSION**

6.          THIS COURT ORDERS that the Stay Period is hereby extended until January 30, 2009.

ENTERED AT / INSCRIT À TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

DEC 0 5 2008

PER / PAR: TV

Court File No: 08-CL-7851

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF INTERTAN CANADA LTD. AND TOURMALET CORPORATION

APPLICANTS

*Ontario*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

Proceeding commenced at Toronto

**ORDER**
(December 5, 2008)

**OSLER, HOSKIN & HARCOURT LLP**
P.O. Box 50
1 First Canadian Place
Toronto, ON  M5X 1B8

Edward Sellers (LSUC #30110F)
Tel: (416) 862-5959

Jeremy Dacks (LSUC #41851R )
Tel: (416) 862-4923

Marc Wasserman (LSUC #44066M )
Tel: (416) 862-4908

F# 1113457

TOR_P223575584.1

# EXHIBIT "B"