

Court File No. 08-CL-7841

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### COMMERCIAL LIST

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | MONDAY, THE 10th DAY |
| | ) | |
| JUSTICE MORAWETZ | ) | OF NOVEMBER, 2008 |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,* R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF INTERTAN CANADA LTD. AND TOURMALET CORPORATION

APPLICANTS

### AMENDED AND RESTATED INITIAL ORDER

THIS APPLICATION, made by the Applicants, pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA") was heard this day at 330 University Avenue, Toronto, Ontario.

ON READING the affidavit of Mark J. Wong sworn November 10, 2008 and the Exhibits thereto (the "Wong Affidavit") and on hearing the submissions of counsel for the Applicant, Alvarez & Marsal Canada ULC, Bank of America, N.A. (Canadian Branch) in its capacity as a lender and Canadian agent (the "Canadian Agent"), and on reading the consent of Alvarez & Marsal Canada ULC to act as the Monitor.

**SERVICE**

1.      THIS COURT ORDERS that the time for service of the Notice of Application and the Application Record is hereby abridged so that this Application is properly returnable today and hereby dispenses with further service thereof.

**APPLICATION**

2.      THIS COURT ORDERS AND DECLARES that the Applicants are companies to which the CCAA applies.

**PLAN OF ARRANGEMENT**

3.      THIS COURT ORDERS that the Applicants shall have the authority to file and may, subject to further order of this Court, file with this Court a plan of compromise or arrangement (hereinafter referred to as the "Plan") between, *inter alia*, the Applicants and one or more classes of its secured and/or unsecured creditors as it deems appropriate.

**POSSESSION OF PROPERTY AND OPERATIONS**

4.      THIS COURT ORDERS that the Applicants shall remain in possession and control of their current and future assets, undertakings and properties of every nature and kind whatsoever, and wherever situate including all proceeds thereof (the "Property").  Subject to this and any further Order of this Court, the Applicants shall continue to carry on business in a manner consistent with the preservation of its business (the "Business") and Property.  The Applicants shall be authorized and empowered to continue to retain and employ the employees, consultants, agents, experts, accountants, counsel and such other persons (collectively "Assistants") currently retained or employed by it, with liberty to retain such further Assistants as it deems reasonably necessary or desirable in the ordinary course of business or for the carrying out of the terms of this Order.

5.      THIS COURT ORDERS that the Applicants shall be directed to continue to utilize the central cash management system currently in place as described in the Wong Affidavit or replace it with another substantially similar central cash management system as necessary to facilitate the DIP Facility approved herein (the "Cash Management System") and that any present or future bank providing the Cash Management System shall not be under any

obligation whatsoever to inquire into the propriety, validity or legality of any transfer, payment, collection or other action taken under the Cash Management System, or as to the use or application by the Applicants of funds transferred, paid, collected or otherwise dealt with in the Cash Management System, shall be entitled to provide the Cash Management System without any liability in respect thereof to any Person (as hereinafter defined) other than the Applicants, pursuant to the terms of the documentation applicable to the Cash Management System, and shall be, in its capacity as provider of the Cash Management System, an unaffected creditor under the Plan with regard to any claims or expenses it may suffer or incur in connection with the provision of the Cash Management System.

6.      THIS COURT ORDERS that, subject to availability under the DIP Facility (as hereinafter defined), the Applicants shall be entitled but not required to pay the following expenses whether incurred prior to or after this Order:

(a)    the fees and disbursements of any Assistants retained or employed by the Applicants in respect of these proceedings, at their standard rates and charges;

(b)    payments in respect of the key employee retention program (the "KERP") as described in the Wong Affidavit;

(c)    amounts owing for goods or services actually supplied to the Applicants prior to the date of this order:

(i)    by Purolator Courier and other logistics or supply chain providers;

(ii)    by custom brokers; and

(iii)    with the consent of the Monitor, up to $2 million, by other North American suppliers, including payments in respect of outstanding documentary credits or deposits, if, in the opinion of the Applicants, the supplier is critical to the Business and ongoing operations of the Applicants;

TOR_A2G:3424177.3

(d)     goods and services actually supplied to the Applicants prior to the date of this order, including payments in respect of outstanding documentary credits or deposits, by trade vendors and suppliers outside of North America;

(e)     the JV Manager Share to the JV Managers (both as defined in the Wong Affidavit);

(f)     all amounts related to servicing warranties and honouring gift cards and reward and loyalty programs issued before or after the date of this Order; and

(g)     any other costs and expenses that are deemed necessary for the preservation of the Property and/or the Business by the Applicants with the consent of the Monitor.

7.     THIS COURT ORDERS that, except as otherwise provided to the contrary herein, the Applicants shall be entitled but not required to pay all reasonable expenses incurred by the Applicants in carrying on the Business in the ordinary course after this Order, and in carrying out the provisions of this Order, which expenses shall include, without limitation:

(a)     all expenses and capital expenditures reasonably necessary for the preservation of the Property or the Business including, without limitation, payments on account of insurance (including directors and officers insurance), maintenance and security services; and

(b)     payment for goods or services actually supplied to the Applicants following the date of this Order.

8.     THIS COURT ORDERS that the Applicants shall remit, in accordance with legal requirements, or pay:

(a)     subject to availability under the DIP Facility, all outstanding and future wages, salaries, employee and pension benefits, vacation pay, bonuses and reasonable expenses payable to employees payable on or after the date of this Order, in each case incurred in the ordinary course of business and consistent with existing compensation policies and arrangements;

(b)     any statutory deemed trust amounts in favour of the Crown in right of Canada or of any Province thereof or any other taxation authority which are required to be deducted from employees' wages, including, without limitation, amounts in respect of (i) employment insurance, (ii) Canada Pension Plan, (iii) Quebec Pension Plan, and (iv) income taxes;

(c)     all goods and services or other applicable sales taxes (collectively, "Sales Taxes") required to be remitted by the Applicants in connection with the sale of goods and services by the Applicants, but only where such Sales Taxes are accrued or collected after the date of this Order, or where such Sales Taxes were accrued or collected prior to the date of this Order but not required to be remitted until on or after the date of this Order, and

(d)     any amount payable to the Crown in right of Canada or of any Province thereof or any political subdivision thereof or any other taxation authority in respect of municipal realty, municipal business or other taxes, assessments or levies of any nature or kind which are entitled at law to be paid in priority to claims of secured creditors and which are attributable to or in respect of the carrying on of the Business by the Applicants.

9.      THIS COURT ORDERS that until such time as an Applicant delivers a notice in writing to repudiate a real property lease in accordance with paragraph 11(c) of this Order (a "Notice of Repudiation"), such Applicant shall pay all amounts constituting rent or payable as rent under real property leases (including, for greater certainty, common area maintenance charges, utilities and realty taxes and any other amounts payable to the landlord under the lease) or as otherwise may be negotiated between such Applicant and the relevant landlord from time to time ("Rent"), for the period commencing from and including the date of this Order, twice-monthly in equal payments on the first and fifteenth day of each month, in advance (but not in arrears). On the date of the first of such payments, any arrears relating to the period commencing from and including the date of this Order shall also be paid. Upon delivery of a Notice of Repudiation, such Applicant shall pay all Rent due for the notice

period stipulated in paragraph 11(c) of this Order, to the extent that Rent for such period has not already been paid.

10.     THIS COURT ORDERS that, except as specifically permitted herein, the Applicants are hereby directed, until further Order of this Court: (a) to make no payments of principal, interest thereon or otherwise on account of amounts owing by the Applicants to any of their creditors as of this date; (b) to grant no security interests, trusts, liens, charges or encumbrances upon or in respect of any of its Property; and (c) to not grant credit or incur liabilities except in the ordinary course of the Business.

## RESTRUCTURING

11.     THIS COURT ORDERS that the Applicants shall, subject to such covenants as may be contained in the DIP Facility (as hereinafter defined), (other than sub-section 11(c) which shall apply regardless of the covenants contained in the DIP Facility), have the right to:

(a)     permanently or temporarily cease, downsize or shut down any of their businesses or operations and to dispose of redundant or non-material assets not exceeding $500,000 in any one transaction or $1,000,000 in the aggregate, subject to paragraph 11(c), if applicable;

(b)     terminate the employment of such of their employees or temporarily lay off such of their employees as they deems appropriate on such terms as may be agreed upon between the Applicants and such employee, or failing such agreement, to deal with the consequences thereof in the Plan;

(c)     subject to paragraph 11A herein, in accordance with paragraphs 12 and 13, vacate, abandon or quit the whole but not any part of any leased premises and/or repudiate any real property lease and any ancillary agreements relating to any leased premises, on not less than fourteen (14) days' notice in writing to the relevant landlord on such terms as may be agreed upon between the Applicants and such landlord, or failing such agreement, to deal with the consequences thereof in the Plan;

(d)     subject to paragraph 11A herein, repudiate such of their arrangements or agreements of any nature whatsoever, whether oral or written, as the Applicants deem appropriate on such terms as may be agreed upon between the Applicants and such counter-parties, or failing such agreement, to deal with the consequences thereof in the Plan;

(e)     pursue all avenues of refinancing and offers for material parts of their Business or Property, in whole or part, subject to prior approval of this Court being obtained before any material refinancing or any sale (except as permitted by subparagraph (a), above); and

(f)     apply to this Court for such approval, vesting or other Orders as may be necessary to consummate sale transactions.

all of the foregoing to permit the Applicants to proceed with an orderly restructuring of the Business (the "Restructuring").

11A     THIS COURT ORDERS that the Applicants shall obtain the approval of the Monitor prior to the Applicants repudiating or disclaiming any material agreements, which shall include real property leases, in accordance with paragraphs 11(c) or 11(d) herein. If the Monitor does not provide such approval, the Applicants shall be entitled to apply to the Court on no less than seven (7) days' notice to the Monitor and the co-contracting party for an order that the agreement be repudiated or disclaimed.

12.     THIS COURT ORDERS that the Applicants shall provide each of the relevant landlords with notice of an Applicant's intention to remove any fixtures from any leased premises at least seven (7) days prior to the date of the intended removal. The relevant landlord shall be entitled to have a representative present in the leased premises to observe such removal and, if the landlord disputes the Applicant's entitlement to remove any such fixture under the provisions of the lease, such fixture shall remain on the premises and shall be dealt with as agreed between any applicable secured creditors, such landlord and the Applicant, or by further Order of this Court upon application by the Applicants on at least two (2) days' notice to such landlord and any such secured creditors. If an Applicant repudiates the lease governing such leased premises in accordance with paragraph 11(c) of this Order, it shall

- 8 -

not be required to pay Rent under such lease pending resolution of any such dispute (other than Rent payable for the notice period provided for in paragraph 11(c) of this Order), and the repudiation of the lease shall be without prejudice to the Applicant's claim to the fixtures in dispute.

13.    THIS COURT ORDERS that if a Notice of Repudiation is delivered, then: (a) during the notice period prior to the effective time of the repudiation, the landlord may show the affected leased premises to prospective tenants during normal business hours, on giving the Applicant and the Monitor 24 hours' prior written notice, and (b) at the effective time of the repudiation, the relevant landlord shall be entitled to take possession of any such leased premises without waiver of or prejudice to any claims or rights such landlord may have against the Applicant in respect of such lease or leased premises and such landlord shall be entitled to notify the Applicant of the basis on which it is taking possession and to gain possession of and re-lease such leased premises to any third party or parties on such terms as such landlord considers advisable, provided that nothing herein shall relieve such landlord of its obligation to mitigate any damages claimed in connection therewith.

14.    THIS COURT ORDERS that any Charge (as defined below) created by this Order over leases of real property in Canada shall only be a Charge in the Applicants' interest in such real property leases.

15.    THIS COURT ORDERS that notwithstanding anything to the contrary in any agreement providing for the liquidation of assets from any leased premises, but subject to: (a) any written agreement between an Applicant, a liquidator and any landlord; or (b) a further Order of this Court:

     (i)     the Applicants shall at all times abide by and be subject to the terms of all real property leases (collectively, the "Leases") and shall cause any liquidator to abide by the terms of the Leases, and the Applicant and the liquidator shall obtain the applicable landlord's approval for all signage and promotional advertising for sales to be conducted by the liquidator pursuant to the agreement with the Applicant in any of the leased premises to the extent otherwise not permitted by the applicable Lease; and

    (ii)    neither the Applicants nor any liquidator shall augment the merchandise in any leased premises unless otherwise permitted by the applicable Lease or approved by the applicable landlord.

## NO PROCEEDINGS AGAINST THE APPLICANTS OR THE PROPERTY

16.    THIS COURT ORDERS that, with the exception of the remedies (other than any steps to seize, possess or foreclose, or such other like remedy, on its own behalf or through any agent on the Property) pursuant to the DIP Facility and the terms of this or any other Order of this Court, until and including December 9, 2008, or such later date as this Court may order (the "Stay Period"), no proceeding or enforcement process in any court or tribunal (each, a "Proceeding") shall be commenced or continued against or in respect of the Applicants or the Monitor, or affecting the Business or the Property, except with the written consent of the Applicants and the Monitor, or with leave of this Court, and any and all Proceedings currently under way against or in respect of the Applicants or affecting the Business or the Property are hereby stayed and suspended pending further Order of this Court.

## NO EXERCISE OF RIGHTS OR REMEDIES

17.    THIS COURT ORDERS that during the Stay Period, all rights and remedies of any individual, firm, corporation, governmental body or agency, or any other entities (all of the foregoing, collectively being "Persons" and each being a "Person") against or in respect of the Applicants or the Monitor, or affecting the Business or the Property, are hereby stayed and suspended except with the written consent of the Applicants and the Monitor, or leave of this Court, provided that nothing in this Order shall (i) empower the Applicants to carry on any business which the Applicants are not lawfully entitled to carry on, (ii) exempt the Applicants from compliance with statutory or regulatory provisions relating to health, safety or the environment, (iii) prevent the filing of any registration to preserve or perfect a security interest, or (iv) prevent the registration of a claim for lien.

## NO INTERFERENCE WITH RIGHTS

18.    THIS COURT ORDERS that during the Stay Period, no Person shall discontinue, fail to honour, alter, interfere with, repudiate, terminate or cease to perform any right, renewal

- 10 -

right, contract, agreement, licence or permit in favour of or held by the Applicants, except with the written consent of the Applicants and the Monitor, or leave of this Court.

19.      THIS COURT ORDERS that during the Stay Period, no Person (other than the Applicants) having any agreement, arrangement, licence or lease with any dealer of the Applicants in connection with the supply of goods or services or the lease of premises at the retail locations at which products of the Applicants are sold, may take any Proceeding or exercise any right (including but not limited to a right to terminate, accelerate, suspend, modify or cancel) under such agreement, arrangement, licence or lease solely as a result of the filing of this Application or the making of this Order.

**CONTINUATION OF SERVICES**

20.      THIS COURT ORDERS that during the Stay Period, all Persons having oral or written agreements with the Applicants or statutory or regulatory mandates for the supply of goods and/or services, including without limitation all computer software, communication and other data services, centralized banking services, payroll services, insurance, transportation, services, utility or other services to the Business or the Applicants, are hereby restrained until further Order of this Court from discontinuing, altering, interfering with or terminating the supply of such goods or services as may be required by the Applicants, and that the Applicants shall be entitled to the continued use of its current premises, telephone numbers, facsimile numbers, internet addresses and domain names, provided in each case that the normal prices or charges for all such goods or services received after the date of this Order are paid by the Applicants in accordance with normal payment practices of the Applicants or such other practices as may be agreed upon by the supplier or service provider and each of the Applicants and the Monitor, or as may be ordered by this Court.

**NON-DEROGATION OF RIGHTS**

21.      THIS COURT ORDERS that, notwithstanding anything else contained herein, no creditor of the Applicants shall be under any obligation after the making of this Order to advance or re-advance any monies or otherwise extend any credit to the Applicants. Nothing in this Order shall derogate from the rights conferred and obligations imposed by the CCAA.

**PROCEEDINGS AGAINST DIRECTORS AND OFFICERS**

22.    THIS COURT ORDERS that during the Stay Period, and except as permitted by
subsection 11.5(2) of the CCAA, no Proceeding may be commenced or continued against any
of the former, current or future directors or officers of the Applicants with respect to any claim
against the directors or officers that arose before the date hereof and that relates to any
obligations of the Applicants whereby the directors or officers are alleged under any law to be
liable in their capacity as directors or officers for the payment or performance of such
obligations, until a compromise or arrangement in respect of the Applicants, if one is filed, is
sanctioned by this Court or is refused by the creditors of the Applicants or this Court.

**DIRECTORS' AND OFFICERS' INDEMNIFICATION AND CHARGE**

23.    THIS COURT ORDERS that InterTAN hereby indemnifies its directors and officers
from all claims, costs, charges and expenses relating to the failure of InterTAN, after the date
hereof, to make payments of the nature referred to in subparagraphs 8(a), 8(b), 8(c) and 8(d) of
this Order which they sustain or incur by reason of or in relation to their respective capacities
as directors and/or officers of InterTAN except to the extent that, with respect to any officer or
director, such officer or director has actively participated in the breach of any related fiduciary
duties or has been grossly negligent or guilty of wilful misconduct.

24.    THIS COURT ORDERS that the directors and officers of InterTAN shall be entitled to
the benefit of and are hereby granted a charge (the "Directors' Charge") on the Property,
which charge shall not exceed an aggregate amount of $19.3 million, as security for the
indemnity provided in paragraph 23 of this Order.  The Directors' Charge shall have the
priority set out in paragraphs 44 and 46 herein.

25.    THIS COURT ORDERS that, notwithstanding any language in any applicable
insurance policy to the contrary, (a) no insurer shall be entitled to be subrogated to or claim
the benefit of the Directors' Charge, and (b) InterTAN's directors and officers shall only be
entitled to the benefit of the Directors' Charge to the extent that they do not have coverage
under any directors' and officers' insurance policy, or to the extent that such coverage is
insufficient to pay amounts indemnified in accordance with paragraph 23 of this Order.

- 12 -

## APPOINTMENT OF MONITOR

26.     THIS COURT ORDERS that Alvarez & Marsal Canada ULC is hereby appointed pursuant to the CCAA as the Monitor, an officer of this Court, to monitor the Property and the Applicants' conduct of the Business with the powers and obligations set out in the CCAA or set forth herein and that the Applicants and their shareholders, officers, directors, and Assistants shall advise the Monitor of all material steps taken by the Applicants pursuant to this Order, and shall co-operate fully with the Monitor in the exercise of its powers and discharge of its obligations.

27.     THIS COURT ORDERS that the Monitor, in addition to its prescribed rights and obligations under the CCAA, is hereby directed and empowered to:

(a)     monitor the Applicants' receipts and disbursements;

(b)     liaise with the Applicants' financial advisor and investment bankers with respect to all matters relating the Property, the Business and such other matters as may be relevant to the proceedings herein;

(c)     report to this Court at such times and intervals as the Monitor may deem appropriate with respect to matters relating to the Property, the Business, and such other matters as may be relevant to the proceedings herein;

(d)     assist the Applicants, in their dissemination, to the Canadian Agent and its counsel on a regular basis of financial and other information as agreed to between the Applicants and the Canadian Agent;

(e)     advise the Applicants and their financial advisor in the preparation of the Applicants' cash flow statements and reporting required by the Canadian Agent, which information shall be reviewed with the Monitor and delivered to the Canadian Agent and its counsel;

(f)     advise the Applicants in their development of the Plan and any amendments to the Plan;

TOR_A2G:3424177.3

(g)     assist the Applicants, to the extent required by the Applicants, with the establishment of a claims process and the holding and administering of creditors' meetings for voting on the Plan;

(h)     have full and complete access to the books, records and management, employees, advisors and investment bankers of the Applicants and to the Business and the Property to the extent required to perform its duties arising under this Order;

(i)     be at liberty to engage independent legal counsel or such other persons as the Monitor deems necessary or advisable respecting the exercise of its powers and performance of its obligations under this Order;

(j)     consider, and if deemed advisable by the Monitor, prepare a report and assessment on the Plan; and

(k)     perform such other duties as are required by this Order or by this Court from time to time.

28.     THIS COURT ORDERS that the Monitor shall not take possession of the Property and shall take no part whatsoever in the management or supervision of the management of the Business and shall not, by fulfilling its obligations hereunder, be deemed to have taken or maintained possession or control of the Business or Property, or any part thereof.

29.     THIS COURT ORDERS that nothing herein contained shall require the Monitor to occupy or to take control, care, charge, possession or management (separately and/or collectively, "Possession") of any of the Property that might be environmentally contaminated, might be a pollutant or a contaminant, or might cause or contribute to a spill, discharge, release or deposit of a substance contrary to any federal, provincial or other law respecting the protection, conservation, enhancement, remediation or rehabilitation of the environment or relating to the disposal of waste or other contamination including, without limitation, the *Canadian Environmental Protection Act*, the Ontario *Environmental Protection Act*, the *Ontario Water Resources Act*, or the Ontario *Occupational Health and Safety Act* and regulations thereunder and any other similar legislation and regulations of other provinces or territories in which the Applicants carry on business operations (the "Environmental

Legislation"), provided however that nothing herein shall exempt the Monitor from any duty to report or make disclosure imposed by applicable Environmental Legislation. The Monitor shall not, as a result of this Order or anything done in pursuance of the Monitor's duties and powers under this Order, be deemed to be in Possession of any of the Property within the meaning of any Environmental Legislation, unless it is actually in possession.

30.    THIS COURT ORDERS that that the Monitor shall provide any creditor of the Applicants and the Canadian Agent with information provided by the Applicants in response to reasonable requests for information made in writing by such creditor addressed to the Monitor. The Monitor shall not have any responsibility or liability with respect to the information disseminated by it pursuant to this paragraph. In the case of information that the Monitor has been advised by the Applicants is confidential, the Monitor shall not provide such information to creditors unless otherwise directed by this Court or on such terms as the Monitor and the Applicants may agree.

31.    THIS COURT ORDERS that, in addition to the rights and protections afforded the Monitor under the CCAA or as an officer of this Court, the Monitor shall incur no liability or obligation as a result of its appointment or the carrying out of the provisions of this Order, save and except for any gross negligence or wilful misconduct on its part. Nothing in this Order shall derogate from the protections afforded the Monitor by the CCAA or any applicable legislation.

32.    THIS COURT ORDERS that the Monitor, counsel to the Monitor and counsel to the Applicants shall be paid their reasonable fees and disbursements, in each case at their standard rates and charges, by the Applicants as part of the costs of these proceedings. The Applicants are hereby authorized and directed to pay the accounts of the Monitor, counsel for the Monitor and counsel for the Applicants on a regular basis and, in addition, the Applicants are hereby authorized to pay to the Monitor and counsel to the Applicants, retainers in the amounts of $100,000 and $200,000 respectively to be held by them as security for payment of their respective fees and disbursements outstanding from time to time

33.    THIS COURT ORDERS that the Monitor and its legal counsel shall pass their accounts from time to time, and for this purpose the accounts of the Monitor and its legal

- 15 -

counsel are hereby referred to a judge of the Commercial List of the Ontario Superior Court of Justice.

34.     THIS COURT ORDERS that the Monitor, counsel to the Monitor, the financial advisors to InterTAN and the Applicants' counsel shall be entitled to the benefit of and are hereby granted a charge (the "Administration Charge") on the Property, which charge shall not exceed an aggregate amount of $2 million, as security for their professional fees and disbursements incurred at the standard rates and charges of the Monitor and such counsel, both before and after the making of this Order in respect of these proceedings. The Administration Charge shall have the priority set out in paragraphs 44 and 46 hereof.

## DIP FINANCING

35.     THIS COURT ORDERS that the Applicant InterTAN Canada Ltd. ("InterTAN") is hereby authorized and empowered to obtain funding and borrow and become a joint and several obligor with other borrower affiliates which have filed petitions for reorganization under Chapter 11 of the U.S. Bankruptcy Code (the "U.S. Chapter 11 Debtors") under a credit facility between InterTAN and the U.S. Chapter 11 Debtors, as joint and several borrowers, and the Canadian Agent and other lenders (collectively, the "DIP Lenders") on the terms and subject to the conditions set forth in the Senior Secured, Super Priority, Debtor-in-Possession Credit Agreement among, InterTAN (as Canadian Borrower), the U.S. Chapter 11 Debtors and the DIP Lenders dated as of November 7, 2008 (the "DIP Facility"), attached as Exhibit "K" to the Wong Affidavit, in order to finance InterTAN's and the other loan parties' working capital requirements and other general corporate purposes and capital expenditures, provided that borrowings under such credit facility by InterTAN shall not exceed US$60 million unless permitted by further Order of this Court or otherwise permitted under the DIP Facility.

36.     THIS COURT ORDERS that the Applicants are hereby authorized and empowered to execute and deliver such credit agreements, mortgages, charges, hypothecs and Definitive Documents, guarantees and other documents, including confirmations of existing liens and charges in favour of the DIP Lenders, as are contemplated by the DIP Facility or as may be reasonably required by the DIP Lenders pursuant to the terms thereof (collectively, with the DIP Facility the "Definitive Documents"), and the Applicants are hereby authorized and

directed to pay and perform all of their indebtedness, interest, fees, liabilities and obligations to the DIP Lenders under and pursuant to the Definitive Documents as and when the same become due and are to be performed, notwithstanding any other provision of this Order.

37.    THIS COURT ORDERS that the Canadian Agent on behalf of the DIP Lenders shall be entitled to the benefit of and is hereby granted a charge (the "DIP Lenders' Charge") on the Property, which charge shall not exceed the aggregate amount owed to the DIP Lenders under the DIP Facility.  The DIP Lenders' Charge shall have the priority set out in paragraphs 44 and 46 hereof.

38.    THIS COURT ORDERS that subject to the provisions of this Order:

(a)    the Canadian Agent may take such steps from time to time as it may deem necessary or appropriate to file, register, record or perfect the DIP Lenders' Charge or any of the Definitive Documents;

(b)    upon the occurrence of an event of default under the Definitive Documents, the Canadian Agent, upon five days notice to the Applicants and the Monitor (or such shorter period as may be ordered by the Court), may exercise any and all of its rights and remedies on behalf of the DIP Lenders against the Applicants or the Property under or pursuant to the Definitive Documents and the DIP Lenders' Charge, including without limitation, to cease making advances to the Applicants and set off and/or consolidate any amounts owing by the DIP Lenders to the Applicants against the obligations of the Applicants to the DIP Lenders under the Definitive Documents, to make demand, accelerate payment and give other notices, or to apply to this Court for the appointment of a receiver, receiver and manager or interim receiver, or for a bankruptcy order against the Applicants and for the appointment of a trustee in bankruptcy of the Applicants, and upon the occurrence of an event of default under the terms of the DIP Facility, the Canadian Agent shall be entitled to seize and retain proceeds from the sale of the Property and the cash flow of the Applicants to repay amounts owing to the DIP Lenders in accordance with the DIP Facility and the Definitive Documents and

- 17 -

the DIP Lenders' Charge, but subject to the priorities as set out in paragraphs 44
and 46 of this Order; and

(c)    the foregoing rights and remedies of the DIP Lenders shall be enforceable against
any trustee in bankruptcy, interim receiver, receiver or receiver and manager of
the Applicants or the Property.

39.    THIS COURT ORDERS that, notwithstanding anything contained in the Definitive
Documents to the contrary, other than with respect to credit extensions made directly to the
Applicants, the Canadian Agent and the DIP Lenders shall not, without first providing five
days' notice to the Applicants and the Monitor (or such shorter period as may be ordered by
the Court), apply any amounts received in the Blocked Accounts of InterTAN or any collateral
of InterTAN to payment of any of the obligations of the U.S. debtor affiliates of the
Applicants under the DIP Facility.

40.    THIS COURT ORDERS that, notwithstanding anything contained in the Definitive
Documents to the contrary, the Canadian Agent and the DIP Lenders shall not, without first
providing five days' notice to the Applicants and the Monitor (or such shorter period as may
be ordered by the Court), cease making extensions of credit to InterTAN pursuant to the terms
of the DIP Facility unless (a) InterTAN has failed to make any payments to the DIP Lenders
under the DIP Facility; (b) InterTAN does not have borrowing availability for such extensions
of credit as required by the DIP Facility; (c) there is any variation or change to this Order
which is materially adverse to the DIP Lenders without the Canadian Agent's consent; or (d)
InterTAN is declared bankrupt.

41.    THIS COURT ORDERS AND DECLARES that the DIP Lenders shall be treated as
unaffected in any plan of arrangement or compromise filed by the Applicants under the
CCAA, or any proposal filed by the Applicants under the *Bankruptcy and Insolvency Act* of
Canada (the "BIA"), with respect to any advances made under the DIP Facility.

42.    THIS COURT ORDERS that the Applicants are hereby authorized and empowered to
obtain and make inter-company loans from and to its U.S. Chapter 11 debtor affiliates as
described in paragraph 99 of the Wong Affidavit.

TOR_A2G:3424177.3

43.    THIS COURT ORDERS that, notwithstanding anything contained in the Definitive
Documents to the contrary:

   (a)    unsecured creditors of the Applicants (including, without limitation, all landlord
          creditors and creditors with restructuring claims under paragraph 11 of this Order,
          but not including claims by corporate entities related to the Applicants) shall be
          entitled to the benefit of and are hereby granted a charge (the "Canadian Creditor
          Charge") on the Property in the amount of $25 million to secure claims owing by
          the Applicants to such creditors.  To the extent that the Directors' Charge is not
          realized upon or utilized by the beneficiaries of the Directors' Charge after the
          passage of a claims bar date in respect of claims against the beneficiaries of the
          Directors' Charge, then, subject to a reserve for claims (including a reserve for
          reasonable expenses and defence costs in respect of such claims) (the "Reserve")
          against the beneficiaries of the Directors' Charge that remain outstanding pending
          the final determination of such claims, the Canadian Creditor Charge shall
          increase dollar for dollar by the amount of the Directors' Charge, less the
          Reserve, until there are no claims against the beneficiaries of the Directors'
          Charge that have been advanced and remain outstanding, at which time any
          unutilized portion of the Reserve shall also be used to increase the Canadian
          Creditor Charge dollar for dollar, meaning that the maximum amount of the
          Canadian Creditor Charge shall be $44.3 million; and

   (b)    the key employees referred to in the KERP shall be entitled to the benefit and are
          hereby granted a charge (the "KERP Charge") on the Property in the amount of
          $838,000 to secure amounts owing to such key employees under the KERP.

## VALIDITY AND PRIORITY OF CHARGES CREATED BY THIS ORDER

44.    THIS COURT ORDERS that the priorities of the Directors' Charge, the
Administration Charge, the KERP Charge, the Canadian Creditor Charge and the DIP
Lenders' Charge, as among them, shall be as follows:

          First – Administration Charge;

Second – Directors' Charge;

Third – KERP Charge;

Fourth – DIP Lenders' Charge in an amount equal to the obligations of InterTAN under the Definitive Documents with respect to direct advances made to InterTAN thereunder, which amount shall not exceed US$60 million plus accrued and unpaid interest, allowable costs and expenses payable by InterTAN, provided that, an amount equal to the sum of the Administration Charge, the Directors' Charge, the KERP Charge and the Canadian Creditor Charge shall be reserved and remain in the possession of or be transferred to the Applicants before and when the Canadian Agent or the DIP Lenders apply any amounts received in the Blocked Accounts of InterTAN to obligations of the U.S. debtor affiliates of the Applicants under the DIP Facility.  Pursuant to the terms of and in accordance with the DIP Facility and this Order, nothing herein shall prevent the Canadian Agent or the DIP Lenders from applying amounts received in the Blocked Accounts of InterTAN or that they otherwise receive, to repay direct advances made by the DIP Lenders to InterTAN;

Fifth – Canadian Creditor Charge; and

Six – DIP Lenders' Charge.

45.     THIS COURT ORDERS that the filing, registration or perfection of the Directors' Charge, the Administration Charge, the KERP Charge, the Canadian Creditor Charge, or the DIP Lenders' Charge (collectively, the "Charges") shall not be required, and that the Charges shall be valid and enforceable for all purposes, including as against any right, title or interest filed, registered, recorded or perfected subsequent to the Charges coming into existence, notwithstanding any such failure to file, register, record or perfect.

46.     THIS COURT ORDERS that each of the Directors' Charge, the Administration Charge, the KERP Charge, the Canadian Creditor Charge and the DIP Lenders' Charge shall constitute a charge on the Property and such Charges shall rank in priority to all other security interests, trusts, liens, charges and encumbrances, statutory or otherwise (collectively,

"Encumbrances") in favour of any Person, other than claims which may be asserted under Sections 81.3, 81.4, 81.5 and 81.6 of the BIA or other statutory liens and deemed trusts which cannot by law be subordinated to the Charges.

47.   THIS COURT ORDERS that except as otherwise expressly provided for herein, or as may be approved by this Court, the Applicants shall not grant any Encumbrances over any Property that rank in priority to, or *pari passu* with, any of the Charges, unless the Applicants also obtain the prior written consent of the Monitor, the Canadian Agent and the beneficiaries of the Directors' Charge, the Administration Charge and the KERP Charge, or further Order of this Court.

48.   THIS COURT ORDERS that the Directors' Charge, the Administration Charge, the KERP Charge, the Canadian Creditor Charge, the Definitive Documents and the DIP Lenders' Charge shall not be rendered invalid or unenforceable and the rights and remedies of the chargees entitled to the benefit of the Charges (collectively, the "Chargees") and/or the DIP Lenders thereunder shall not otherwise be limited or impaired in any way by (a) the pendency of these proceedings and the declarations of insolvency made herein; (b) any application(s) for bankruptcy order(s) issued pursuant to the BIA, or any bankruptcy order made pursuant to such applications; (c) the filing of any assignments for the general benefit of creditors made pursuant to the BIA; (d) the provisions of any federal or provincial statutes; or (e) any negative covenants, prohibitions or other similar provisions with respect to borrowings, incurring debt or the creation of Encumbrances, contained in any existing loan documents, lease, sublease, offer to lease or other agreement (collectively, an "Agreement") which binds the Applicants, and notwithstanding any provision to the contrary in any Agreement:

(a)   neither the creation of the Charges nor the execution, delivery, perfection, registration or performance of the Definitive Documents shall create or be deemed to constitute a breach by an Applicant of any Agreement to which it is a party;

(b)   none of the Chargees shall have any liability to any Person whatsoever as a result of any breach of any Agreement caused by or resulting from InterTAN entering

into the DIP Facility, the creation of the Charges, or the execution, delivery or performance of the Definitive Documents; and

(c)     the payments made by the Applicants pursuant to this Order or the Definitive Documents, the granting of the Charges and the entering into by the Applicants of the Definitive Documents, do not and will not constitute fraudulent preferences, fraudulent conveyances, oppressive conduct, settlements, transactions under value or other challengeable, voidable or reviewable transactions under any applicable law.

## SERVICE AND NOTICE

49.    THIS COURT ORDERS that the Applicants shall, within ten (10) business days of the date of entry of this Order, send a copy of this Order to the Applicants' landlords or property managers and known creditors, other than employees and creditors to which the Applicants owe less than $10,000, at their addresses as they appear on the Applicants' records, and shall promptly send a copy of this Order (a) to all parties filing a Notice of Appearance in respect of this Application, and (b) to any other interested Person requesting a copy of this Order, and the Monitor is relieved of its obligation under Section 11(5) of the CCAA to provide similar notice, other than to supervise this process.

50.    THIS COURT ORDERS that the Applicants and the Monitor be at liberty to serve this Order, any other materials and orders in these proceedings, any notices or other correspondence, by forwarding true copies thereof by prepaid ordinary mail, courier, personal delivery or electronic transmission to the Applicants' creditors or other interested parties at their respective addresses as last shown on the records of the Applicants and that any such service or notice by courier, personal delivery or electronic transmission shall be deemed to be received on the next business day following the date of forwarding thereof, or if sent by ordinary mail, on the third business day after mailing.

51.    THIS COURT ORDERS that the Applicants, the Monitor, and any party who has filed a Notice of Appearance may serve any court materials in these proceedings by e-mailing a PDF or other electronic copy of such materials to counsels' email addresses as recorded on the Service List from time to time, in accordance with the E-filing protocol of the Commercial

List to the extent practicable, and the Monitor may post a copy of any or all such materials on its website at www.alvarezandmarsal.com/intertan.

**GENERAL**

52.   THIS COURT ORDERS that a further hearing in this Application shall be held at 9:00 a.m. on November 26, 2008 or such alternate date as this Court may fix, at which time this Order may be supplemented or otherwise varied.  The Applicants and the Monitor shall serve their materials for this further hearing on all parties who serve a Notice of Appearance on the Applicants and the Monitor, such materials to be served no later than 3 days prior to the date scheduled for the further hearing.

53.   THIS COURT ORDERS that the Applicants or the Monitor may from time to time apply to this Court for advice and directions in the discharge of their powers and duties hereunder.

54.   THIS COURT ORDERS that nothing in this Order shall prevent the Monitor from acting as an interim receiver, a receiver, a receiver and manager, or a trustee in bankruptcy of the Applicants, the Business or the Property.

55.   THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada or in the United States of America, including the United States Bankruptcy Court for the Eastern District of Virginia, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order.  All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

56.   THIS COURT ORDERS that the Applicants and the Monitor all be at liberty and are hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative

- 23 -

body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

57.     THIS COURT ORDERS that any interested party (including the Applicants and the Monitor) may apply to this Court to vary or amend this Order on not less than seven (7) days' notice to any other party or parties likely to be affected by the order sought or upon such other notice, if any, as this Court may order.

58.     THIS COURT ORDERS that this Order and all of its provisions are effective as of 12:01 a.m. Eastern Standard Time on the date of this Order.

ENTERED AT / INSCRIT À TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

DEC 0 5 2008

PER / PAR: TV

TOR_A2G:3424177.3

Court File No: 08-CL-7851

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF INTERTAN CANADA LTD. AND TOURMALET CORPORATION

APPLICANTS

*Ontario*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

Proceeding commenced at Toronto

**ORDER**
**(December 5, 2008)**

**OSLER, HOSKIN & HARCOURT LLP**
P.O. Box 50
1 First Canadian Place
Toronto, ON   M5X 1B8

Edward Sellers (LSUC #30110F)
Tel: (416) 862-5959

Jeremy Dacks (LSUC #41851R )
Tel: (416) 862-4923

Marc Wasserman (LSUC #44066M )
Tel: (416) 862-4908

F# 1113457

TOR_P223375584.1

# EXHIBIT "C"

**Circuit City Stores, Inc**
**Weekly Cash Flow Report**
**($ in 000's)**

| | | Current Week Variance | | Current Week Forecast Variance | | Film To Date Forecast Variance | | Film To Date Forecast Variance | |
|---|---|---|---|---|---|---|---|---|---|
| | | 1 Week Ending | | | | 5 Weeks Ending | | | |
| | | 21-Feb | 21-Feb | Variance $ | Variance % | 21-Feb | 21-Feb | Variance $ | Variance % |
| | | Actual | Forecast | Fav / (Unfav) | Fav / (Unfav) | Actual | Forecast | Fav / (Unfav) | Fav / (Unfav) |
| **A. PROCEEDS FROM SALE OF ASSETS** | | | | | | | | | |
| GOB Gross Sales | [1] | 176,018 | 144,787 | 33,231 | 23.0% | 864,264 | 831,032 | 33,231 | 4.0% |
| Less: GOB Sales Fees | | (19,902) | (30,009) | 1,098 | 36.6% | (21,766) | (22,864) | 1,098 | 4.8% |
| Subtotal GOB Sales Receipts | | 176,116 | 141,787 | 34,329 | 24.2% | 842,498 | 808,168 | 34,329 | 4.2% |
| Sales Tax | | 10,850 | 10,634 | 216 | 2.0% | 58,943 | 58,727 | 216 | 0.4% |
| Total GOB Sales Receipts | | 186,966 | 152,421 | 34,545 | 22.7% | 901,441 | 866,895 | 34,545 | 4.0% |
| Corporate Jet - Hawker | | - | - | - | 0.0% | - | - | (0) | 0.0% |
| Corporate Jet - Lear | | 4,113 | 4,113 | - | 0.0% | 4,113 | 4,113 | (0) | 0.0% |
| Vendor Receivables | | 72 | - | 72 | 0.0% | 4,670 | 4,599 | 72 | 1.6% |
| Misc FF&E | | - | - | - | 0.0% | - | - | - | 0.0% |
| Salvage Inventory | | - | - | - | 0.0% | - | - | - | 0.0% |
| A/R Float | | - | - | - | 0.0% | 3,779 | 3,779 | (0) | 0.0% |
| Cash in Stores | | - | - | - | 0.0% | 2,455 | 2,455 | - | 0.0% |
| Other | [2] | 5,009 | - | 5,009 | 0.0% | 5,009 | - | 5,009 | 0.0% |
| **Total Cash Proceeds** | | 196,160 | 156,534 | 39,626 | 25.3% | 921,466 | 881,841 | 39,626 | 4.5% |
| **B. REDUCTIONS TO INITIAL PROCEEDS** | | | | | | | | | |
| Payroll & Taxes | [3] | 27,435 | 27,429 | (6) | 0.0% | 103,805 | 103,799 | (6) | 0.0% |
| Rent & Utilities | [4] | 2,102 | 1,092 | (1,010) | -92.5% | 35,685 | 34,675 | (1,010) | -2.9% |
| Other / General Operating | [5] | 25,347 | 32,498 | 7,151 | 22.0% | 82,142 | 89,293 | 7,151 | 8.0% |
| Subtotal | | 54,885 | 61,019 | 6,134 | 10.1% | 221,632 | 227,767 | 6,134 | 2.7% |
| **Other Admin Claims During GOB** | | | | | | | | | |
| Post Petition Trade Credit / AP Accruals | | 1,250 | 7,500 | 6,250 | 83.3% | 13,148 | 19,399 | 6,250 | 32.2% |
| Management Incentive Plan | | - | - | - | 0.0% | 1,462 | 4,906 | 3,444 | 70.2% |
| Customer Rebates | | 63 | 3,506 | 3,443 | 98.2% | | | | 0.0% |
| Customer Deposits | | - | - | - | 0.0% | 5,000 | 5,000 | - | 0.0% |
| Fund Utilities Reserve | | 5,000 | 5,000 | - | 0.0% | 5,000 | 5,000 | - | 0.0% |
| Sales Tax for Sales Prior to GOB | | 8,183 | 9,608 | 1,425 | 14.8% | 25,851 | 27,276 | 1,425 | 5.2% |
| Debtor Professional Fees per DIP | [6] | 1,004 | 2,000 | 996 | 49.8% | 3,707 | 4,703 | 996 | 21.2% |
| Consumer's Professional Fees per DIP | [7] | 1,507 | 1,580 | 73 | 4.6% | 1,507 | 1,580 | 73 | 4.6% |
| Subtotal | | 17,008 | 29,194 | 12,186 | 41.7% | 50,676 | 62,863 | 12,186 | 19.4% |
| **Expenses** | | 71,893 | 90,213 | 18,321 | 20.3% | 272,308 | 290,630 | 18,321 | 6.3% |
| **C. SECURED DEBT & CASH ROLL FWD** | | | | | | | | | |
| Bank Fees and Expenses | | 852 | - | (852) | 0.0% | 2,633 | 2,633 | - | 0.0% |
| Drawn L/C's | | - | - | - | 0.0% | 6,429 | 5,577 | (852) | -15.3% |
| Taxing Authorities / Other | | - | - | - | 100.0% | 20 | - | (852) | 9.0% |
| Bank Professionals | | - | 980 | 980 | 0.0% | 9,082 | 1,000 | 980 | 98.0% |
| Secured Claims (excl bank debt) | | - | 980 | 980 | 13.0% | 9,082 | 9,210 | 128 | 1.4% |
| **Total Disbursements** | | 72,745 | 91,193 | 18,448 | 20.2% | 281,390 | 299,841 | 18,448 | 6.2% |
| **Net Cash Flow** | | 123,415 | 65,341 | 58,074 | 88.9% | 640,076 | 582,001 | 58,073 | 10.0% |
| Beginning US Loan Balance | | - | - | - | 0.0% | 425,040 | 425,040 | - | 0.0% |
| Net Cash Flow Applied to Loan | | - | - | - | 0.0% | (425,040) | (425,040) | - | 0.0% |
| Ending US Loan Balance before Check Float | | - | - | - | 0.0% | - | - | - | 0.0% |
| Beginning Cash Balance | | 91,621 | 91,621 | 0 | 0.0% | | | - | 0.0% |
| Net Cash Flow | | 123,415 | 65,341 | 58,074 | 88.9% | 215,036 | 156,961 | 58,074 | 37.0% |
| Ending Cash Balance before Check Float | | 215,036 | 156,961 | 58,075 | 37.0% | 215,036 | 156,961 | 58,075 | 37.0% |
| Memo: Check Float Adjustment | | 27,641 | N/A | N/A | N/A | 27,641 | N/A | N/A | N/A |
| Memo: Ending Cash Balance after Check Floa | [8] | 242,677 | - | - | - | 242,677 | - | - | - |
| **Net Cash Flow** | [9] | 83,747 | 84,913 | 1,166 | 1.4% | 83,747 | 84,913 | 1,166 | 1.4% |
| **D. COVENANTS TEST** | | | | | | | | | |
| Cumulative Ending Commitments Test | [10] | 83,747 | 225,000 | 141,253 | 62.8% | 83,747 | 225,000 | 141,253 | 62.8% |
| Cumulative Disbursements Test | [11] | 72,682 | 87,687 | 15,005 | 17.1% | 279,928 | 294,935 | 15,006 | 5.1% |
| Loan to Value Test | [12] | 5.06 | N/A | N/A | N/A | 5.06 | N/A | N/A | N/A |

**Notes:**
[1] Positive performance to budget
[2] Other proceeds mainly due to $4.2M interest tax refund from FY01
[3] Amounts for payroll, rent and other are aggregated into one line item for reporting purposes. See page two with
      notes [3], [4] & [5] for detail.
[4] Variance mainly due to timing of utility payments
[5] Variance mainly due to timing of occupancy expenses ($4.4M). Balance includes $6.4M for liquidator expenses.
[6] Timing of payments
[7] Timing of payments
[8] Ending cash balance per the bank forecast budget does not include check float
[9] Actual $81.3M LC balance multiplied by 103% reflects cash collateralized equivalent reported in DIP budget
[10] Calculated as total of loan balance and L/C's versus threshold for the 3rd Amendment
[11] Calculated as total disbursements less customer rebates, deposits and DIP payments
[12] Calculation: [$243M cash balance + (inventory 257M * 70.5%)] / $94M LC balance

DRAFT - Subject to Change
Privileged and Confidential

Court File No.: 08-CL-7841

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF INTERTAN
CANADA LTD. AND TOURMALET CORPORATION

*ONTARIO*

**SUPERIOR COURT OF JUSTICE**

**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**SIXTH REPORT OF THE MONITOR**
**ALVAREZ & MARSAL CANADA ULC**
(dated March 2, 2009)

**Goodmans LLP**
Barristers & Solicitors
250 Yonge Street, Suite 2400
Toronto, Canada  M5B 2M6

Jay A. Carfagnini (LSUC#222936)
Fred Myers (LSUC#26301A)
L. Joseph Latham (LSCU# 32326A)

Tel: 416.979.2211
Fax: 416.979.1234

Solicitors for the Monitor

\5690297