UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA

```
IN RE:                      .     Case No. 08-35653(KRH)
                            .
                            .
CIRCUIT CITY STORES         .     701 East Broad Street
INC.,                       .     Richmond, VA  23219
                            .
          Debtor.           .
                            .     January 9, 2009
. . . . . . . . . . . ..           1:05 a.m.
```

TRANSCRIPT OF HEARING
BEFORE HONORABLE KEVIN R. HUENNEKENS
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

```
For the Debtor:          McGuireWoods, LLP
                         By: DOUGLAS FOLEY, ESQ.
                         900 World Trade Center
                         101 W. Main St.
                         Norfolk, VA  23510

                         Skadden Arps Slate Meagher & Flom, LLP
                         By:  GREGG M. GALARDI
                         One Rodney Sq.
                         Wilmington, DE   19899

For the Creditors        Pachulski Stang Ziehl & Jones
Committee:               By: ROBERT FEINSTEIN, ESQ.
                         10100 Santa Monica Boulevard
                         11th Floor
                         Los Angeles, CA  90067
```

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail: jjcourt@optonline.net**

**(609)586-2311      Fax No. (609)587-3599**

**APPEARANCES (CONT'D):**

| | |
|---|---|
| For Central<br>Properties Group;<br>Various Landlords: | Ballard Spahr Andrews & Ingersoll<br>By:  DAVID POLLACK, ESQ.<br>51st Floor<br>1735 Market Street<br>Philadelphia, PA 19103-7599 |
| For Developers<br>Diversified;<br>Various Landlords | Kelley Drye & Warren<br>By:  ROBERT LeHANE, ESQ.<br>101 Park Avenue<br>New York, NY 10178-0002 |
| For Bear Valley<br>Partners;<br>Various West Coast<br>Landlords | Allen Matkins Leck Gamble Mallory &<br>Natsis LLP<br>By:  IVAN GOLD, ESQ.<br>Three Embarcadero Center 12th Floor<br>San Francisco, CA 94111 |
| For the Secured<br>Lenders: | KATHERINE MILLER, ESQ. |
| For Savitri Cohen: | Christian & Barton, LLP<br>By:  MICHAEL MUELLER, ESQ.<br>909 East Main Street<br>Suite 1200<br>Richmond, VA  21219 |
| For 50212 86th Street;<br>Various Landlords: | Troutman Sanders<br>By:  SHEILA deLa CRUZ, ESQ.<br>1660 International Drive Suite 600<br>Mclean, VA   22102 |
| For Cosmo Eastgate<br>Limited: | Troutman Sander<br>By:  VIVIEON KELLEY, ESQ.<br>    JENNIFER HOOVER, ESQ.<br>600 Peachtree Street, NE Suite 5200<br>Atlanta, GA 30308-2216<br>(Telephonic Appearances) |
| For Interstate<br>Augusta Properties;<br>Various Landlords: | PETER BILLOUGHS, ESQ.<br>(Telephonic Appearance) |

**APPEARANCES (CONT'D):**

For Verizon Wireless:          Blank Rome, LLP
                               By:  REGINA STANGO KELBON, ESQ.
                               One Logan Square
                               130 North 18th Street
                               Philadelphia, PA   19103
                               (Telephonic Appearance)

For Douglas County,            Douglas County Attorney's Office
Colorado:                      By:  ROBERT CLARK, ESQ.
                               100 Third Street
                               Castle Rock, CO 80104
                               (Telephonic Appearance)

For Brookline                  Hancock & Estabrook
Development:                   By:  JOHN CLARK, ESQ.
                               1500 AXA Tower I
                               100 Madison Street
                               Syracuse, New York 13202
                               (Telephonic Appearance)

For Faber Brothers,            DAVID DEAN, ESQ.
Inc.:                          (Telephonic Appearance)

For E.L. McGee, LLC:           Howard Rice
                               By:  GARY KAPLAN, ESQ.
                               3 Embarcadero Center, 7th Floor
                               San Francisco CA 94111
                               (Telephonic Appearance)

4

1          THE CLERK:  All rise.  The United States Bankruptcy

2   Court for the Eastern District of Virginia is now in session.

3   The Honorable Kevin R. Huennekens presiding.  Please be seated

4   and come to order.

5          THE COURT CLERK:  In the matter of Circuit City

6   Stores, Incorporated.

7          MR. FOLEY:  Good afternoon, Doug Foley from

8   McGuireWood, on behalf of debtors.  We want to extend our

9   appreciation to the Court for scheduling this hearing on short

10  notice.  We have noticed it to several thousand parties since

11  it was filed this morning by fax and, as you will hear from the

12  telephone participation, there's a lot of appearances to be

13  read into the record.  But, at this point, Mr. Galardi will be

14  presenting the motion to the Court.

15         MR. GALARDI:  Thank you. Mr. Foley.  Good afternoon,

16  Your Honor.  For the record, Gregg Galardi on behalf of Circuit

17  City.  Your Honor, I think what would be helpful for the Court

18  and for people in the courtroom to understand what we've done

19  to come to this point, including the procedural steps that we

20  have taken, as Your Honor is aware, we filed under seal the

21  motion to conduct a sale process with Your Honor, on, I think

22  it was Monday, January 5th, and it was filed under seal with

23  the consent of the bank group who was on the call and, I think,

24  maybe present in the courtroom as well as the committee.  That

25  wasn't the first time that either the bank group or the

1  committee had seen that motion nor landlords, Your Honor, at

2  least certain landlord counsels.  To get to that point, I think

3  we had forwarded to Your Honor even a draft prior to that date,

4  maybe Friday.  We have also circulated it to the U.S. Trustee

5  at the time we filed it.  We had also met with, as Your Honor

6  knows, the landlords, have been a very active contingency.  I

7  happen to know five or six of their counsel fairly well.

8         Before we ever filed the motion, we circulated a

9  draft of that motion to their counsel to get an input from them

10  as to how best to proceed with the procedures for what we

11  thought would be an expedited sale process, and I say expedited

12  only in the public sense.  I'll give some detail about why it

13  wasn't expedited coming up to this point.  It's more expedited

14  from this point on.

15         We sent it to the landlords.  We sent it to the

16  committee and we sent it to the bank group.  And I'd say, with

17  respect to the bank group and the committee, there are no

18  issues as to the procedures that are currently existing after

19  back and forth negotiations and language.  It is a fully

20  consensual procedure and dates and, simply stated, it is driven

21  off of the January 16th date for a sale hearing.  As Your Honor

22  will recall, the last time I was before Your Honor, I believe

23  it was December 22nd, we had filed under seal a second

24  amendment to the DIP credit agreement.  Pursuant to that DIP

25  credit agreement in that amendment, we had agreed with the bank

1   group and the committee that we would file a sale motion or

2   sale procedures motion by the January 5th date and also seek a

3   sale hearing or a financing by the January 16th date.  That was

4   an agreement that helped resolve the issues between the

5   committee and the bank group and so we were working towards

6   those dates by having filed that and that was part of the

7   resolution.  The parties had also met over the holidays to

8   decide when to make that public and when to pursue it.  So this

9   was a date that we had been looking to for January 16th with

10  the committee since their formation.

11           In addition, Your Honor, just to remind everybody in

12  the courtroom, because I think the January 16th date has had a

13  prominence since the day that we first came in, as Your Honor

14  may recall, the January 16th hearing was also the date by which

15  we said, in the original DIP before it was amended, that we

16  would have to have a subordinated financing of about $75

17  million.  And why we scheduled the hearing for the January 16th

18  was that was a critical date in these cases that I think I

19  described.  We needed a bridge to somewhere, whether it be a

20  sale, a plan of reorganization.  So we have been focusing on

21  that January 16th date and I think it's the one immovable date

22  that we've always talked about in this court and I think, as

23  the events have transpired in this case, the 16th is the date

24  by which we would like to get this case set on a course for,

25  hopefully, and what we think is encouraging, is to some sort of

1  going concern transaction.

2         Your Honor, with that, what we had also done is

3  obviously negotiated with the landlords and I notice that

4  there's a lot of landlord counsel on the phone.  We have been

5  in contact with the landlords and obviously we are very

6  sympathetic and understand what the landlords' concerns are in

7  having discussed this at length with landlord counsel,

8  including even yesterday when we were going through these

9  procedures.

10         The original procedures contemplated, for example, an

11  assumption and assignment of contracts and leases.  With our

12  filing it on the 5th, keeping it under seal until this morning

13  at 8:15, we understand that it is going to be next to

14  impossible to assume and assign and fix cure amounts by the

15  16th.  And the good news for Your Honor and the good news for

16  the landlords who have not been sort of with what I'll call the

17  landlord cabal that I've been dealing with and as they

18  professionally call themselves, we have agreed that we are not

19  going to file any sort of cure notice tomorrow to make

20  landlords on 500 leases compute their cures, take the risk of

21  getting that, and having an assumption and assignment.

22         In addition, Your Honor, we actually think we're not

23  going to affect landlords' rights at all in the next seven

24  days, although I can't say absolutely not.  Here is where we

25  stand on the sale process, Your Honor, and I have a

1  representative of FTI and a representative of Rothschild in to

2  the extent Your Honor would want testimony or a proffer.  But

3  since the commencement of this case, Rothschild was involved as

4  an investment banker and has been seeking solutions for the

5  company as a going concern transaction in the form of either a

6  financing to a vendor or third party supported plan or in the

7  form of a sale under Section 363.

8       I'm pleased to say, Your Honor, that there are still,

9  as we speak, and one of the reasons we kept this motion under

10  seal was to try to proceed as far along as possible with two

11  interested parties.  We still have, as we stand here today, two

12  parties that are still interested in a going concern

13  transaction for the company which we are very hopeful could, in

14  fact, be consummated.  Realistically speaking, Your Honor, and

15  even hearing from those bidders, it is extremely unlikely that

16  we could consummate, file a motion to sell a company

17  (indiscernible) billion dollars in revenue on January 16th and

18  assume and assign all of the leases and assume and assign all

19  of the contracts.  That's just not realistic, Your Honor.

20       What is realistic, Your Honor, is to continue to

21  pursue those alternatives and, to that extent, the management

22  has made trips to outside of the country, inside of the

23  country, to Las Vegas to meet at the Consumer Electronics

24  meetings with the bidders and a few other electronics people,

25  and we were still encouraged that there could still be these

1    two parties that may want a going concern transaction.

2          Though I can't say absolutely, if those transactions

3    actually come closer and are fully negotiated or negotiated

4    further, what I would suspect the January 16th date to be is

5    really an interim financing hearing to get us to a bridge to a

6    sale of a 363 or perhaps to a supported plan.  So the idea is,

7    we've set out a procedure to get going concern bids.  We are

8    hopeful that we will have two such bids but not in the form of,

9    we might think, fully vetted asset purchase agreement, all of

10   those terms, leases to be assumed, contracts to be assumed,

11   everything to be dealt with.

12         Given that that's the reality, and I say this for the

13   landlords' benefit, it is extremely unlikely that I'll move to

14   a full and final lease in that context.  What's more likely is

15   we'd come in with some financing to bridge one, two, three,

16   four weeks, to be able to consummate it and deal with all the

17   lease issues, the cure issues, the adequate assurance issues,

18   at a future hearing.  That's one scenario that we've been going

19   over and we're very hopeful of that scenario.

20         The other scenario, Your Honor, as FTI would testify

21   to, is, look, if there is no alternative, then there's the

22   inventory and, again, landlords are concerned about that.  What

23   normally concerns them is what concerns them with the 155

24   stores.  What are going to be the procedures?  What are the

25   guidelines?  What are the store closing guidelines?  Again,

10

1   they have been circulated.  We would continue to circulate

2   those to the landlords.  But that becomes a hearing, at best,

3   on the 16th about sale guidelines.  It's not assumption

4   assignment.  It's not cure, unfortunately.  It's one of those

5   solutions.

6           So we think, again, focusing on that 16th date, that

7   is a very doable deadline and we have been soliciting and

8   giving bid packages out to third parties to make us a proposal

9   for that.  There would be an auction that we propose the 13th

10  and 14th, whether it's going concern or miscellaneous assets.

11  We think that is a realistic time line but I don't think that

12  affects landlords other than sale guidelines which we have made

13  and can make available with agency agreements and they've

14  actually been standard.  Your Honor has approved and the only

15  real key is, in this instance, if you're really going out of

16  business, you might add that phrase.  But, for the most part,

17  those are fairly standard procedures and we think we could

18  resolve all of those issues by the 16th.

19          So the only way that I think that landlords and

20  contract parties may be affected is -- and there is interest in

21  this and it's also encouraging -- it is quite possible that

22  some buyers could want to buy a market or two markets or three

23  markets.  And if that were the case, it could present us with

24  an assumption and assignment issue on the 16th.  The good news

25  is that the company did decide that, in this context, knowing

1   full well where we were, we've paid January rent, so that takes

2   the pressure off of the 16th on those issues.  If a bidder

3   comes in and it's not identified yet, we can let landlords

4   know.

5          I won't comment on the environment other than to say

6   that I believe the landlords would love nothing more than an

7   adequate assurance fight on this and have their leases taken in

8   such circumstances and that leaves the cure issue.  And what

9   we've decided to do is, if we do get such a bid on the 13th or

10  14th and we give the landlords notice of that bid, and we would

11  pick off the landlords, then we'd say, go ahead and file your

12  cure amount.  We'll determine -- we'll take the burden to say

13  it's right or not right.  Let the buyers know.  And if we have

14  a fight, we can put it off for another day.  If we had an

15  adequate assurance fight and you really want to fight that,

16  that can be put off for another day very rapidly within the

17  next two weeks.  But if you're convinced that you want this

18  person and it's really just a dispute over the cure where we'll

19  pay the undisputed amount and we'll go forward on a fight if we

20  want to, unless the buyer doesn't want to do that.  But that's

21  something I think we're going to have to manage between the

22  13th and the 16th and I think, at least our track record in

23  this case, is that we'll be able to manage that even though we

24  may have 500 objections.  We probably can resolve that.

25          And the idea was, with respect to the bid procedures,

1   is for us to delete and the landlords who are in the courtroom

2   have helped us with this, is delete the provision saying we're

3   going to file a cure notice because no matter what notice we

4   file, we know we're going to be inaccurate.  In some sense,

5   they're going to have estimates from year ends.  It's just not

6   worth the paper damage that it will do to this court in seven

7   days so we've said, let's not do that.  Let's first see if

8   somebody is bidding on a lease, then we'll take the burden to

9   notify those people with the leases.  They can choose to file a

10  cure amount.  They can choose not to file a cure amount.  We

11  could choose to have an adequate assurance, we could choose not

12  to.  And when we get here on the 16th, I will bet that we will

13  be able to resolve any issues and punt most of the issues that

14  we need to punt.

15          So I think when you boil down what the relief is that

16  we're asking for today, is really simply three days or three

17  dates that go into four.  One, Your Honor, and it's going to

18  seem odd, but we would like to set an initial bid deadline of

19  tomorrow at five o'clock for bids on assets.  The reason that

20  we think that that is an appropriate date, Your Honor, is

21  first, as I've mentioned, Rothschild has notified bidders in

22  the world who are interested in going concern or other

23  piecemeal transactions that tomorrow is a date.  It's done so

24  for the last month or so, at least.  Two, we've notified, what

25  I'll call the liquidation community, of that date and, three,

1  we've actually talked to, what I'll call the one-off pocket

2  bidders, of that date.  So we think that to set that date at

3  least gets us a grounding in what these bids are, to see if

4  we're having bids, and how to put hopefully multiple

5  permutations together for the greatest value for this estate.

6           Obviously, if we don't get those bids, and it's set

7  forth in the motion, in consultation with the committee and

8  with our fiduciary obligation to maximize value, we can let

9  those dates slip.  We can talk to parties and encourage them to

10  bid and indeed, Your Honor, up until such time at the end of

11  the auction or before your Court approves it, we'll always

12  consider higher and better bids.  I'm not asking anybody to do

13  that because it is important to have a process to go through

14  this process.  So we'd like to set that initial bid deadline.

15           To the extent -- and I know our going concern bidders

16  are not going to have that deadline tomorrow.  We'll entertain

17  and continue with proposals with them through the weekend,

18  through Monday, through Tuesday.  So the first deadline is the

19  initial deadline.  The second deadline is a date to commence an

20  auction in New York at our offices which would be the 13th of

21  this month and we schedule two days.  Hopefully, we'll have an

22  auction.  A lot of that time, if Your Honor has been to

23  auctions, you spend the first day negotiating.  You have one

24  page on the docket and you're out seven hours and we always pay

25  the court reporter by the hour because, if you pay them by the

 1   page like they normally make, they'd never make any money.

 2           So we figure we'll have that on the 13th and 14th.

 3   We've given ourselves a day breathing spell in case it actually

 4   spilled into the 15th and we'd like to come back to Your Honor

 5   on the 16th.  At bottom, that's really all this motion is

 6   asking for, is a time table.  We think the time table is fair.

 7   We don't think it prejudices or deprives anybody of any

 8   property rights and clearly, Your Honor, we gave only notice to

 9   a select group of people.  We gave two thousand by fax or

10   e-mail today.

11           If anyone has an objection to the due process nature

12   of this or to the sale of the assets or the impairment of their

13   property rights, all rights are reserved for the 16th.  No one

14   is trying to prejudice them or to say they can't have those

15   rights or to argue otherwise.  This was really to set a process

16   that's actually been in motion in a public forum now to get to

17   the 16th.

18           Again, if I were a betting man, it would seem to be

19   we will hopefully have some sort of financing transaction with

20   one of those bidders to further this process for a going

21   concern.  That is the company's hope, that we are encouraged by

22   the discussions.  That is our hope.  Otherwise, it'll be the

23   inventory or pocket bids and then we'll have a little bit more

24   work to do on the 16th.  But I'm encouraged by the two going

25   concern bidders.

15

 1          Now, landlords often ask, and I'll put it on the

 2  record and hopefully -- I know there's lots of them in here --

 3  do I have -- can I bid on my lease, do I have to show up at the

 4  auction.  Okay.  So let's take those issues first.  If you want

 5  to bid on your lease, please feel free to do so.  All we would

 6  ask for is a letter by January 12th and that's simply to

 7  coordinate our knowledge of whether or not they want to bid.  It

 8  is possible, for example, that we get somebody to bid for 70

 9  stores and a few leases and, if you put all this together, you

10  might get maximum value.  We'd like to know if a landlord wants

11  to bid.  Most likely, if we get ten, 15 of those, 20 of those,

12  it's not going to be enough to carry the value of this company

13  and we'd like to be then able to give them notice that there

14  will be no sale of your lease at this period of time; you need

15  not be involved in more.  The sooner you get us a letter of

16  your interest, the sooner we can tell you whether you need to

17  come to an auction or not.

18          The second thing is, do you have to attend.  Every

19  landlord is entitled to attend the auction.  My conference room

20  in New York cannot handle that so we're going to open up a

21  telephone line that -- we'll give a conference call.  We'll

22  post it.  There will be a call-in line so that they can

23  participate in the auction, so they can stay in their office

24  and not have to stay in our conference room for the eight hours

25  or whatever time it is to negotiate.  Landlords are entitled to

1  vote.  So, I think, fundamentally, one, no adequate assurance

2  fights do we believe will go forward on the 16th; two, no cure

3  motion has to be filed, a cure statement has to be, unless they

4  want to; three, if we get a bid for a lease, we'll give that

5  landlord specific notice of the bid and how we're going to go

6  through with that process.  We would encourage any buyer of

7  leases to work through that process; four, we think that we can

8  get landlords to the end of the month because we've already

9  paid them January rent so it will be really an issue between us

10 and the buyer as to when you would assume that, whether you

11 want the inventory in that store and all those things so I

12 think we're not going to prejudice the landlords; five, they

13 can show up and bid on their leases.  All we'd ask is prior

14 notice; we're not going to hold onto that but it helps us to

15 assess whether they should come or not.  Give us a letter by

16 the 12th at 5 p.m., an e-mail to myself or Mr. Fredericks; and,

17 six, they're all invited to the auction.  We'd ask them to take

18 telephone appearances unless they want to really sit in the

19 conference room in New York which we hope not to pay for under

20 their leases so we'd ask them to stay on the telephone.

21        With that, Your Honor, I think -- I'm not asking for

22 much other than that, from Your Honor, other than an approval

23 of that sort of time line and procedure to give Your Honor the

24 idea that we are, in fact, very hopeful that we can pull off a

25 going concern transaction and looking forward to trying to get

1    the financing necessary to carry us to be able to consummate

2    such a transaction.

3            I don't know if Your Honor had any questions about

4    the procedures.  There's a lot of words but, again, there's a

5    termination fee, Your Honor, that we often talk about.  My

6    general position is that, since I'm asking for it in advance as

7    opposed to when I have a stalking horse, it's open game for the

8    Court to approve it or ratify our decision.  It would only be a

9    decision to ratify should we get it and I think it's going to

10    be very unlikely here.  But if the committee and we, and the

11    banks agree that it really is good to start this auction with

12    one bidder as opposed to another, in this sort of inventory

13    process, this could very well be the case.  Then let's start

14    with a floor contract and then we'd come back and show why we

15    thought it was wise in hindsight.  We just would like to have

16    the discretion.  It sometimes fleshes out better fundamental

17    bids but we would put on the evidence on the 16th.  Should we

18    decide to do that, the committee will have all rights to

19    object.  The banks would have all rights to object.  Any party

20    would have a right to object.  But we thought it would be good

21    to have the authority so that when we are negotiating these

22    contracts over the next few days, we can say, yes, we think

23    it's worthwhile to have this form of contract.

24            Other than that, I can't anticipate granting a

25    break-up fee at this point in time.  That's the only other

1  standard but non-standard provision that we're asking for, Your

2  Honor.  I would turn the podium over, Your Honor.

3          THE COURT:  Thank you.

4          MR. FEINSTEIN:  Good afternoon, Your Honor.  Robert

5  Feinstein, Pachulski Stang Ziehl & Jones, lead counsel for the

6  committee.  Briefly, Your Honor, I can confirm Mr. Galardi's

7  presentation, that what you see today in terms of process is

8  really the tip of the iceberg in that we have been at this 24/7

9  for the last several weeks.  The committee has been intimately

10  involved in the development of the procedures.  I believe the

11  banks have as well.  And there has been some pursuit of a sale

12  process and the committee endorsed the filing of the motion

13  under seal and, where we are today, we are hopeful as well.

14  We'll take matters as they come and certainly we support the

15  relief that's been requested today and we'll see what happens

16  in the coming week or ten days.

17          THE COURT:  All right.  Thank you, Mr. Feinstein.

18          MR. POLLACK:  Good afternoon, Your Honor.  David

19  Pollack, Ballard Spahr, on behalf of Central Properties Group

20  and various other landlords noted of record.  Your Honor, I

21  guess we now have a name, that we are now the landlord cabal.

22  I think I like that better than what one of your colleagues

23  once referred to us as, the whining landlords.  I think cabal

24  is a little bit better.

25          THE COURT:  We would never say that in this court.

1          MR. POLLACK:  No, no.  What Mr. Galardi has described

2     is very accurate.  He has -- and I said this to him earlier

3     today.  He previously bared himself pretty completely to Judge

4     Sanchie this morning in a matter, so I didn't know there was

5     anything left but, you know, I won't turn around and check.  He

6     has been very forthright with the landlords.  He did invite our

7     comments starting on January the 2nd.  We were able to see the

8     pleadings that they had intended.  We had input into those

9     pleadings, input into this order.  He and Mr. Fredericks have

10    kept us advised of the various dates because they have been, as

11    Your Honor knows, a moving target.  My colleague and fellow

12    cabal member, Mr. Gold, unfortunately flew in from San

13    Francisco for yesterday's hearing but now one extra day in

14    Richmond is fine.  Mr. LeHane, Mr. Branch, Mr. Epps and his

15    colleagues, all participated in these things and I think Your

16    Honor knows from the prior hearings that, among those

17    landlords, there is a very large number of the debtor's stores.

18    I don't know whether it's a third or a half or whatever among

19    all of us.  So we have been involved in the process.  We did

20    have input in it, a number of the things that Mr. Galardi

21    addressed such as the cure issues, and we spent some time

22    talking about, you know, what nonsense it would be to file all

23    these pleadings and everything, and we did very easily work to

24    an end to get here today and for these procedures.

25          As he indicated, and I can't speak for the other

1  landlords, but I know I've talked to my clients and I think the

2  phrase we were using was the unfortunate homeless person on

3  Union Square in San Francisco who agreed to pay twenty-five

4  cents for the lease might be sufficient to prove adequate

5  assurance.  But we'll leave that evidentiary burden for another

6  day, depending upon who the actual proposed assignees are.

7          Everybody has reserved all rights.  We know that if

8  we get here on the 16th and things have changed, we have

9  reserved our rights to say we need more time and Mr. Galardi

10  obviously has his rights to go forward but getting to the 16th,

11  I think, we are all okay.  There are some things that need to

12  be changed in the order because the order having been filed on

13  the 5th contemplated some things.  We had been discussing, you

14  know, cure issues based on our earlier discussions and some

15  things that are in the order that was filed on the 5th are not

16  things that Mr. Galardi has represented to the Court today.  We

17  can work through that with Mr. Galardi and Mr. Fredericks for

18  submission of the final order.  And I think that his

19  representations on the record today are really the things that

20  take precedence over anything that's in an order -- in the

21  order, as sort of a final determination because he has

22  represented accurately where we stand on cure, where we stand

23  on bidding, and all of those other things.

24          So nobody wants to be in the position of potentially

25  losing all of these stores for any reason.  We're hopeful that

1   there will be a going concern bidder and, if we have fights,

2   we'll worry about those another day.  But from a process

3   standpoint and from the procedures orders standpoint, we think

4   that the debtor is in the right place today.  We are reserving

5   our rights.  I don't think we'll get to those fights based upon

6   the cooperation to date but we're prepared to have the Court

7   enter the order.  Thank you.

8           THE COURT:  All right.  Very good.  Thank you, Mr.

9   Pollack.  Any other party wish to be heard?

10          MR. LeHANE:  Good morning, Your Honor.  Robert

11  Lehane, Kelley Drye and Warren, on behalf of Developers

12  Diversified, a member of the committee, landlord of 50

13  locations and a number of other landlords.  I don't want to

14  take too much time, I think.  I absolutely agree with

15  everything Mr. Pollack said.  I commend Mr. Galardi for making

16  every effort to bring us into the loop and put together a set

17  of procedures with our cooperation that, to the extent

18  possible, alleviated our concerns.  It's not a perfect world.

19  We understand there's a possibility we'll have some issues on

20  the 16th and everybody has reserved their rights.  Some of our

21  clients may want to move forward with some issues and Gregg may

22  have some people that he wants to move forward with a sale

23  process that may require assumption and assignment.  As Mr.

24  Pollack indicated, if that's the case, our clients will

25  probably be very happy in most instances to have a tenant

22

1   that's going to take over a location that would otherwise be

2   closed.

3        And being a member of the committee, we were also

4   very involved in the process and are aware of the

5   confidentiality issues and we understand that there are many

6   landlords out there that weren't involved in the process or

7   landlord counsel that weren't involved in the process and

8   they're getting this on very short notice.  And we are

9   sensitive to that issue and understand the difficulty that

10   representing landlords and these landlords themselves or the

11   business people have decisions to make and have to report back

12   to other people and that makes life very difficult and it's

13   difficult sometimes turn around on a dime and disseminate this

14   information.  But, at the same time, very mindful of the need

15   to keep this information confidential until today in order to

16   maximize revenues for all members of the estate and we think

17   that this really is the best possible set of procedures we

18   could have.

19        THE COURT:  All right.  Thank you.  Any other party

20   wish to be heard?

21        MR. GOLD:  Good afternoon, Your Honor.  Ivan Gold

22   from Allen Matkins.  I represent Bear Valley Road Partners and

23   a number of other of the West Coast landlords.  I want to first

24   thank Mr. Galardi and Mr. Fredericks and also Mr. Foley for the

25   work over the last week and managing a difficult situation and

23

1   then being able to put this together this morning.  One of the

2   things we have asked for and I thank the Court for was the

3   opportunity for those who didn't have a little bit of heads up

4   to, given the circumstances, be able to listen in and

5   participate by telephone if necessary.  And I thank Mr. Foley

6   for helping us put that together.

7           I join in the comments of my fellow cabal members,

8   Mr. LeHane and Mr. Pollack.  I really think it boils down to we

9   have three scenarios and I think two of them are real

10  straightforward.  As Mr. Galardi described, we're either going

11  to have what, in essence, would be a bridge financing motion on

12  the 16th that would be -- that would take us to either a

13  Section 363 sale or a plan under a schedule that we would

14  discuss on the 16th.  And we think that's quite manageable.  We

15  might be in a situation where we have to deal with the approval

16  of GOB sales if, unfortunately, a going concern bidder does not

17  emerge.  Since we're not writing on a blank slate, since you

18  did previously approve some GOB guidelines, you know, they may

19  need some modifications.  They may need discussions.  But under

20  the circumstances, you know, we'll do our best to roll up our

21  sleeves and get that squared away and luckily the liquidators

22  are people we've dealt with in the past and we're confident.

23          It's that third transaction or third set of

24  transactions, third scenario, that would be greater cause for

25  concern.  To use Mr. Galardi's terminology, if we had one-off

1    or pocket bidders at one end, a more piecemeal approach to the

2    sale of assets or, as he said, you know, some maybe market

3    based buyers of geographical pods of leases where assumption

4    assignment is potentially an issue that presents more of a

5    challenge.  And, obviously, the debtor's payment of the January

6    rent has taken a lot of the pressure off.

7             I would just emphasize and ask the Court, if we do

8    get to that on the 16th, that certainly all parties' rights are

9    reserved, I would just urge Your Honor to be procedurally

10   flexible, understanding, sympathetic.  Maybe our evidentiary

11   standards are going to be a little light that day in terms of,

12   you know -- you know, I say this coming from the West Coast and

13   obviously, you know, Circuit City has stores all throughout the

14   country.  You know, it's not easy to get people to Richmond.

15   You know, it's fine once you get here but getting here

16   sometimes can be a challenge, particularly from the West Coast.

17   And, you know, in terms of being able to get access to the

18   decision makers, you know, on what could be important

19   decisions, and I agree with the prior counsel that there's no

20   question in many, most, and perhaps virtually all

21   circumstances, people that might emerge may be perfectly

22   acceptable but somebody has still got to know who they are in

23   the limited amount of time.

24             So, you know, I'd be optimistic.  We may even do some

25   things consensually on the 16th if we do get to that third

1  scenario.  But if we don't, you know, we're going to have to

2  figure out a path that works, you know, in the remaining days

3  of January.  And, you know, I just wanted to emphasize and I

4  guess an early plea to Your Honor if we get to that scenario

5  but I hope we don't and I thank you.

6          THE COURT:  Thank you very much, Mr. Gold.

7          MS. MILLER:  Good afternoon, Your Honor.  Katherine

8  Miller on behalf of the Secured Lenders.  The lenders support

9  the debtor's motion, and while I'd like to confirm that the

10  lender's preference is for the discussed deadlines and the

11  credit agreement does have the requirements set forth in the

12  motion, the lenders have been engaged in discussions with the

13  debtor to possibly extend the time periods if there is a sale

14  transaction reasonably possible.  But the debtors (sic) are

15  acting in good faith with the debtor -- excuse me, the lenders

16  are acting in good faith with the debtors.  Thank you, Your

17  Honor.

18          THE COURT:  Thank you very much.

19          MR. MUELLER:  Good afternoon, Your Honor.  Michael

20  Mueller with the law firm of Christian & Barton, on behalf of

21  several landlords.  We also were part of the cabal landlord

22  group and were involved in the discussions with debtor's

23  counsel, creditors committee, and lenders with respect to the

24  procedures and, as my colleagues have indicated, all thanks to

25  everyone for working hard throughout the weekend and so forth.

1          I do have one thing that I need to clarify with

2   respect to landlord bids.  Mr. Galardi has commented that -- I

3   believe he said that he would like landlords to indicate by

4   letter on the 12th that they're interested in bidding, and if

5   that is the case, some of my clients have no problem with that.

6   However, we do not want to be have to be required to submit our

7   actual bid until the auction.  The landlords that are

8   interested in bidding, the procedures originally called for

9   them to indicate so by tomorrow at five o'clock with their bid

10  broken down into what was going to be the cash portion and what

11  was going to be the credit bid portion.  And I think we can

12  live with indicating our interest in bidding on the 12th, by

13  letter by the 12th, but do not want to have to actually

14  disclose what our bid is going to be until the actual auction

15  like all other parties.  And I just would like to clarify that.

16          Other than that, I don't believe we have any problems

17  with the procedures.

18          MR. GALARDI:  Your Honor, we have no objection as

19  long as they identify the property.  I mean, I'd love to know

20  what the value is but if they're not prepared to do that,

21  that's fine, as long as I know the property so I know what's

22  covered.  I'd appreciate that.

23          THE COURT:  All right.  Thank you.

24          MR. MUELLER:  We can do that, Your Honor.  Thank you

25  very much.

1          THE COURT:  All right.  Thank you, Mr. Mueller.

2          MS. deLa CRUZ:  Good afternoon.  Sheila deLa Cruz for

3    50212 86th Street, LLC and other landlords that are of record.

4    I understand Mr. Galardi's comments and appreciate that all

5    rights are reserved, especially for landlords who feel that

6    their rights may be impaired by this motion and auction

7    procedures.  I do still want to raise a limited objection at

8    this time, and will probably have to raise it in the future,

9    with regard to the proposed process of paying disputed portions

10   of the cure amounts.  Just merely saying that the disputed cure

11   amounts will hopefully at some point be resolved and paid later

12   if they turn out to be legitimate cure amounts does not provide

13   my clients adequate assurance that their legitimate cure claims

14   will be paid.

15          My clients have requested that if there is a

16   possibility of a disputed cure amount that the Court require

17   that that amount of funds which are disputed, be escrowed and

18   then, if it is later found to be a legitimate cure amount, then

19   the escrowed funds would subsequently be paid to my clients.

20          THE COURT:  I don't need to decide that today.  You

21   reserve your right to --

22          MS. deLa CRUZ:  And it's really just noting it for

23   the record and reserving that specific right.

24          THE COURT:  Okay.  That right certainly is reserved.

25          MS. deLA CRUZ:  Right.  But I do appreciate Mr.

28

1  Galardi's efforts to try and protect the landlord's right at

2  this time.

3         THE COURT:  All right.  Thank you.  Does any other

4  party in the courtroom wish to be heard?

5                      (Pause)

6         THE COURT:  All right.  Does any party that is

7  participating by telephone wish to be heard?

8         MS. KELLEY:  Yes, Your Honor.  This is Vivieon Kelley

9  of Troutman Sanders appearing on behalf of Cosmo Eastgate

10  Limited, Northcliff Residual Parcel 4, LLC.  Also on the phone

11  with me is Jennifer Hoover representing those entities.  We

12  also -- my firm also represents a number of other landlords and

13  we would be some of the landlords on the outer fringes of the

14  cabal, it appears.

15         We've not been participating in the process up to

16  this point and, while we certainly recognize all the work that

17  has gone into this and we certainly respect the desire as

18  stated earlier of counsel to prevent the needless filing of

19  documents with this Court, we'd just like to receive some sort

20  of confirmation of those leases that are intended to be

21  included in the process.  We do represent some lessors whose

22  leases should have been rejected at the end of last year and

23  other to maintain ongoing leases.  And so we just would like to

24  insure exactly where we stand as we go into this process so

25  that we know whether or not we do, in fact, need to submit a

29

1  letter expressing an intent to bid on the 12th.

2        THE COURT:  All right, Ms. Kelley.  Thank you.  Mr.

3  Galardi, I would assume that all leases that have not been

4  heretofore rejected are included.

5        MR. GALARDI:  Correct, Your Honor, and I think

6  there's an order that said they were -- the ones that were sort

7  of liquidated were rejected effective December 31st.  So if

8  you're not subject to an order and it hasn't otherwise

9  terminated, you're subject to open to the going concern

10  purchaser.

11        THE COURT:  All right.  Thank you.  Ms. Kelley, does

12  that address your concern?

13        MS. KELLEY:  We certainly understand that.  We'd just

14  like to see a schedule so that we know that we're all on the

15  same page.

16        THE COURT:  Well, it's already gone out.  If your

17  lease has been rejected, then you're on that schedule.  If your

18  lease has not been rejected, then you can assume that you are

19  part of this process.  Does that --

20        MS. HOOVER:  Your Honor, this is Jennifer Hoover.  I

21  am co-counsel with Vivieon Kelley.  I do believe there was some

22  miscommunication and there are two pleadings, I think, slightly

23  ambiguous with regard to specifically which closing store

24  location leases are, in fact, rejected which is why we're

25  urging a complete designation of what leases are part of this

1    process.

2            THE COURT:  The closing store leases?

3            MR. GALARDI:  Your Honor, I guess it's whether the

4    glass is half empty or half full.  If you are subject to a

5    motion that says you were rejected, you are not included.  I

6    don't have a list of all those that are not subject.  I haven't

7    published a list.  Obviously, if I get to an auction or I get

8    to a sale, we're going to have to give specific notice to those

9    parties.  So I think a simple way that we're trying to do it is

10   if you received a notice either that you were rejected already

11   -- I think there may even be some pending construction leases

12   that are being rejected -- anybody who has received a notice

13   that the lease has been rejected, those leases are not covered.

14   Everything else, every contract that's not been rejected, every

15   lease that's not been rejected, is subject to a bid if people

16   want to bid on it.  We've not listed every contract.  I guess

17   you could go to the schedules and sort of do it yourself and

18   see it but we didn't think it was necessary for this purpose.

19           THE COURT:  Nor do I.  I think it's perfectly clear.

20   If your lease has not been rejected, then it's part of this

21   process and I don't think that that's necessary.  Is there

22   anybody else on the phone that wishes to be heard?

23           MR. BILLOUGHS:  Good afternoon, Your Honor.  Peter

24   Billoughs on behalf of Ray Mucci, Interstate Augusta

25   Properties, and other landlords.  I, too, and my clients have

31

1    not been part of the discussions with the debtors and the

2    committee so this is the first time I'm hearing about it.   I

3    think what's necessary is that, and I would think that debtor's

4    counsel is going to do this, but circulating a revised order.

5    Obviously, there are significant changes to what was proposed

6    in the motion that was filed this morning and I'm still a

7    little bit unclear about when debtor's counsel says that all

8    rights are reserved when -- when rights are reserved until.

9    Are those issues going to be, other than, say, cure, are issues

10   of adequate assurance and the suitability of prospective

11   tenants, is that going to be the subject of the hearing next

12   Friday or is that going to be something that we are going to

13   agree to deal with that at a later date?

14          The other thing is I'm not sure it's clear on the

15   record today when the notice date would be for prospective

16   purchasers because I understand that the auction may go as long

17   as the day before the hearing and, although there may be some

18   landlord counsel and other folks that are privy to the -- more

19   privy to discussions with what's going on, we haven't been up

20   to this date, so if we can get that cleared up, that there will

21   be some formal process for getting notice to all landlords

22   about prospective purchasers and when.   Thank you, Your Honor.

23          THE COURT:  All right.   Thank you, Mr. Billoughs.

24          MR. GALARDI:  Your Honor, I think -- let's be as

25   blunt as possible.  All rights are reserved on all issues until

1   the 16th.  I think what we have laid out in spades is, if I

2   have a going concern bidder, it's most likely going to be a

3   financing transaction so no rights will even be decided on the

4   16th.  If I go forward on an inventory bid, then the only

5   rights that will be really decided on the 16th are what the

6   procedures say with respect to store closings.  And the only

7   thing I can't absolutely say at this point is that if I get

8   some bidder that wants eight or ten leases as a going concern,

9   your rights are reserved to, one, challenge that I haven't

10  given you due process and sufficient time to give you notice to

11  bring your witness here to argue adequate assurance.  Your

12  rights are preserved to argue cure.  Your rights are argued to

13  ask for an adjournment of that hearing.  All those rights are

14  reserved until I try to do something affirmative and I haven't

15  tried to do anything affirmative yet other than schedule a

16  hearing today.

17          With respect to the prospective purchaser notice,

18  again, Your Honor, since the 10th would have been the deadline,

19  I would have hoped to give notice as soon as the 11th but I'm

20  going to be realistic.  What I think is it's most likely going

21  to happen that these could dribble and drab in.  I'm hoping

22  that I get a 10th -- as soon as I get a notice, within six

23  hours we'll get to the landlords or post something.  I would

24  say that any notice by the morning of, let's say, 11 o'clock on

25  the 13th before I commence an auction will be the last notice I

1  give because I should have all bids unless somebody shows up at

2  an auction.   I would say we'll post any notice of any bids with

3  respect to any leases no later than 11 a.m. on the morning of

4  the 13th.   I'll try to do it by 5 p.m. on the 12th if at all

5  possible, if I have all that information.   And maybe that's --

6  you know what?   I think it's probably better now that I've

7  convinced myself.   Let's say we'll post it by 7 p.m. on the

8  evening of the 12th.   That way, if somebody really is upset and

9  they want to come to New York for an auction or appear at the

10 hearing, they'll know.   They can look at the docket at 7 p.m.

11 on the 12th and, anything we know at that point with respect to

12 any leases, we will post a notice of those leases that people

13 have shown an interest that they want to purchase. I think

14 that's a simple way to try to deal with the notice of purchaser

15 deadline.

16         THE COURT:  All right.  Very good.  Does any other

17 party on the phone wish to be heard?

18         MS. KELBON:  Yes, Your Honor.  Your Honor, good

19 afternoon.  This is Regina Stango Kelbon from Blank Rome on

20 behalf of Celco Partnership doing business as Verizon Wireless.

21         THE COURT:  I'm sorry.  I didn't get your name.  If

22 you could repeat that, please?

23         MS. KELBON:  I said good afternoon, Your Honor.  This

24 is Regina Stango Kelbon from Blank Rome on behalf of Celco

25 Partnership doing business as Verizon Wireless.

1          THE COURT:  Thank you.

2          MS. KELBON:  Your Honor, Verizon Wireless appreciates

3   the debtor's financial predicament and issues in this case.  As

4   Your Honor may recall, Verizon Wireless operates a Verizon

5   Wireless store within a store.  In that regard, Verizon does

6   have important concerns in this case.  Verizon Wireless has

7   approximately 2,000 of its own employees operating the stores

8   within a store in over 545 locations.  So, to insure an orderly

9   process, Verizon needs to be informed as to the plan for each

10  store as Verizon has to effectuate plans for its 2,000

11  employees.  So, to aid in this smooth liquidation, Verizon

12  needs advance notice and opportunity to plan not only, first

13  and foremost, for its employees but there are other issues.  It

14  has to remove its highly proprietary trademarks and signage.

15          At the initial 154 store closings, Verizon was able

16  to work out in an orderly fashion to remove its kiosks and

17  signage at each of the stores that closed in the initial wave

18  and we just want to make sure that Circuit City has someone

19  available to work with Verizon Wireless to address this issue

20  as well.  You know, thirdly, Verizon has to remove its

21  inventory which is locked up and apart from Circuit City in an

22  orderly fashion.

23          Therefore, Your Honor, we request that the debtors

24  inform Verizon of their intended course of action so that the

25  parties can coordinate an orderly exit from each of these

1   locations if that becomes necessary and be permitted to observe

2   the auction and that any purchasers may be aware of Verizon's

3   rights in its inventory.  Since we didn't have advance notice

4   of this, Your Honor, we're just concerned about making sure

5   that we are kept in the loop and informed because we are

6   particularly concerned of our employees.

7           THE COURT:  All right.  Thank you.

8           MR. GALARDI:  Your Honor, first, Ms. Kelbon can send

9   me an e-mail and we'll try to get her a point person, as she

10  said we coordinated on the one fifty-five.  Your Honor, two,

11  she keeps using the liquidation word.  I think they hope and we

12  hope we have a going concern which will alleviate this and, as

13  I said, we have two active parties so I really want to

14  emphasize that.  We are hopeful about that.

15          With respect to her attending the auction, again, she

16  can attend the auction in person, on the phone, however she

17  wants to.  And the bidders have all been aware, as she's made

18  clear from the very first day, Verizon has kiosks.  We all know

19  it.  We understand that their equipment is locked.  We heard

20  about that the first day.  And we'll keep them posted and

21  hopefully Verizon will help us succeed with a going concern

22  bid.

23          THE COURT:  All right.  Thank you, Mr. Galardi.

24          MS. KELBON:  Thank you, Your Honor.

25          THE COURT:  Thank you.  Anybody else on the phone

36

1  wish to be heard?

2        MR. CLARK:  Yes, Your Honor.  This is Robert Clark,

3  Assistant Douglas County Attorney.  This is Douglas County,

4  Colorado.  We have a secured property tax claim and our

5  objection is a very limited one.

6        When the order approving the sale is issued, we'd

7  like a clause in there saying that valid pre-petition liens

8  attach to the proceeds as required under Section 363(e).

9        THE COURT:  All right.  Mr. Clark, I think that's

10 appropriate for a sales order but this is just a procedure at

11 this point to get us to that kind of an order.

12       MR. CLARK:  Well, I was a little bit uncertain as to

13 the correct time to express that concern so I figured I'd jump

14 on the wagon as soon as I could.

15       THE COURT:  And I think that that's good.  Express it

16 often and we'll make sure that all rights of lien creditors are

17 observed.

18       MR. GALARDI:  And, Your Honor, no fault of the

19 gentleman, I mean, we do have proposed sale orders in there.

20 So when and if we're submitting a sale order, we're well aware.

21 I'm sure we'll have Texas and I'm sure we'll have all the

22 states come in and jump on that bandwagon so we'll keep it in

23 mind when we submit a sale order.

24       MR. CLARK:  We appreciate that.  Thank you.

25       THE COURT:  Anyone else on the phone wish to be

1  heard?

2          MR. CLARK:  Your Honor, my name is John Clark.  I'm

3  with Hancock & Estabrook.  I represent Brookline Development.

4  I have a question regarding the landlord's bid procedure with

5  respect to its own lease.  Whether or not a landlord wishes to

6  bid on its lease may be influenced by whether or not any third

7  parties express any interest.  And if the landlords have to

8  indicate their interest by 5 o'clock and third parties by later

9  than that, it may put the landlords at a disadvantage.

10          MR. GALARDI:  Your Honor, again, if I'm giving notice

11  of prospective purchasers and landlords want to hold it until

12  after that, I don't really have a problem.  I'm just trying to

13  coordinate a process.

14          MR. CLARK:  I understand.  So a landlord wouldn't

15  necessarily be precluded from bidding if he doesn't submit his

16  letter of interest by five o'clock on the 12th?

17          MR. GALARDI:  If you want to make a defensive bid

18  because you don't like a third party purchaser, be my guest

19  after the deadline, after the notice.  That's the only thing I

20  can see why that would be affected for this particular party.

21  I understood why they didn't want to put an amount in.  They

22  didn't want to get locked into a bid if nobody's bidding.  Now,

23  they just don't want to get locked up with a third party.

24  After the 7 o'clock notice, if a landlord wants to tell us now

25  that, I see somebody, I'm now interested, that's fine, Your

1  Honor.  I think we can be very flexible in this process.  I've

2  not had a problem before.

3              THE COURT:  All right.  Very good.

4              MR. CLARK:  Thank you.  That's fine.

5              THE COURT:  Any other party on the phone wish to be

6  heard?

7              MR. DEAN:  Yes, Your Honor.  This is David Dean on

8  behalf of Faber Brothers, Inc., and I just have a brief

9  question about the 7 p.m. notice.  Is that going to be posted

10 on the docket or are parties going to have to go somewhere else

11 to find this notice?

12             MR. GALARDI:  Your Honor, what I will do --

13             MR. DEAN:  Or is it going to be served by e-mail?

14             MR. GALARDI:  Your Honor, I think that e-mail is

15 going to be very difficult because I don't have everybody's

16 e-mail.  What we will do is file a notice and list it on our

17 case CCLLC website where we post our pleadings.  That will be

18 posted by 7 p.m. so people usually can have access to that and

19 see it on those two -- those spots and that's pretty

20 instantaneous.

21             THE COURT:  All right.  And that's satisfactory to

22 the Court.  Any other party on the phone wish to be heard?

23             MR. KAPLAN:  Yes, Your Honor.  This is Gary Kaplan

24 from the Howard Rice Law Firm in San Francisco.  I represent

25 E.L. McKee, LLC, one of the landlords here in California.  Now,

1  I have a procedural question regarding the hearings tentatively

2  scheduled for next week, January 16th.  Will the Court again

3  permit out of town counsel to participate without local counsel

4  also associating with them?

5            THE COURT:  I think that, given the nature of these

6  proceedings and how quickly they're going, the Court is going

7  to accommodate out of state counsel by allowing them to

8  participate by telephone.

9            MR. KAPLAN:  Thank you, Your Honor.  I have nothing

10  further.

11            THE COURT:  And there won't be any necessity for you

12  to file a separate motion asking for that.  You can assume

13  right now that you can participate by phone.

14            MR. KAPLAN:  Thank you very much, Your Honor.  I

15  assume there will be a conference call-in number that's

16  circulated by debtor's counsel, like was done today?

17            THE COURT:  Yes.  Mr. Foley will circulate a

18  telephone number for people to call in.

19            MR. KAPLAN:  Thank you, Your Honor.

20            MR. GALARDI:  And we'll post a notice and put it on

21  the case CCL website for parties to find.

22            THE COURT:  All right.  When you post a notice, Mr.

23  Galardi, if you could include that they can participate by

24  telephone?

25            MR. GALARDI:  Yes, Your Honor.  Those will be

1  speaking lines.

2         THE COURT:  Very good.  Thank you.  Does anybody else

3  on the phone wish to be heard?

4                    (No audible response)

5         THE COURT:  All right.  Mr. Galardi, I think that

6  everybody has had their say.  The Court has reviewed the motion

7  and, with the clarifications you provided today, you've

8  addressed my concerns.  My most immediate one was how we were

9  going to have a bid deadline by tomorrow.  But I'm satisfied

10  with the process that you've laid out and I hope that this is

11  going to work.  I guess, at this point, it appears to me that

12  you want to get this order entered today.

13         MR. GALARDI:  Your Honor, I'm -- well, I'm going to

14  do two things that get me concerned.  One, I'm okay because I

15  think the dates are the critical thing, if Your Honor approves

16  that.  What I'd like to do, unfortunately to the 2000 people on

17  the phone that we gave notice to, I'd like to -- if the

18  landlords don't object, I'd like to circulate it to the

19  landlords' counsel that are in the courtroom today to sign off

20  on the language.  I unfortunately don't want to spend the next

21  week negotiating this order for the rest of the language.  I

22  think the record is pretty clear as to what I said and

23  reservation of rights and everything can be construed against

24  me on the 16th if there's an ambiguity in what I've said.  I

25  have no problem with that because I really think it's just the

1  dates and the reservation of rights is what we've agreed to

2  here.  But I'd like the landlords to sign off on it and, if it

3  gets entered tomorrow, that would be fine.  If we could do it

4  today, that's great.  But I just want to make sure our dates

5  are fixed and we can start proceeding along those lines.

6         THE COURT:  All right.  Mr. Galardi, the Court will

7  fix those dates and I will look for that order.  If you don't

8  get it in today, then, you know, obviously I can enter it

9  tomorrow.  Whether it actually gets docketed by the Clerk's

10 Office tomorrow would be a different issue.

11        MR. GALARDI:  Oh, I'm sorry, Judge.  It's Friday.

12        THE COURT:  I know.  We lose track of time.  But

13 we've all been kind of busy.  The Court will enter it certainly

14 tomorrow if you do but it may be docketed Monday morning.  But

15 that won't interfere with any of the deadlines or anything and

16 I will -- it will show it was entered as of the time that I

17 signed it.

18        MR. GALARDI:  Thank you, Your Honor.

19        THE COURT:  All right.  Do we have any other business

20 we need to take up this afternoon?

21           (No audible response)

22        THE COURT:  All right.  I wish you luck with your

23 sale.

24        MR. GALARDI:  Thank you, Your Honor.

25        MR. FOLEY:  Thank you again for accommodating with

1   all that flexibility over this week.

2                THE COURT:  Very good.

3                THE CLERK:  All rise.  The court is now adjourned.

4                       * * * * *

5

                   **C E R T I F I C A T I O N**

            I, CECILIA ASHBOCK, court approved transcribers,

certify that the foregoing is a correct transcript from the

official electronic sound recording of the proceedings in the

above-entitled matter, and to the best of my ability.


/s/ Cecilia Ashbock              DATE:  March 5, 2009
CECILIA ASHBOCK
J&J COURT TRANSCRIBERS, INC.