Gregg M. Galardi, Esq.
Ian S. Fredericks, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
One Rodney Square
PO Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

Dion W. Hayes (VSB No. 34304)
Douglas M. Foley (VSB No. 34364)
MCGUIREWOODS LLP
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

- and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
333 West Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

Counsel to the Debtors and
Debtors in Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

- - - - - - - - - - - - - - x
In re:                        :   Chapter 11
                              :
CIRCUIT CITY STORES, INC.,    :   Case No. 08-35653 (KRH)
et al.,                       :
                              :
                              :   Jointly Administered
            Debtors.          x
- - - - - - - - - - - - - -

**MOTION FOR ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 363 AND BANKRUPTCY RULE 9019 (I) APPROVING THE SALE BY CIRCUIT CITY STORES WEST COAST, INC. AND VENTOUX INTERNATIONAL, INC. OF CERTAIN ASSETS FREE AND CLEAR OF ALL INTERESTS; (II) APPROVING INTERTAN, INC.'S AUTHORIZATION OF INTERTAN CANADA LTD.'S SALE OF SUBSTANTIALLY ALL OF ITS ASSETS; (III) APPROVING THE INTERCOMPANY AGREEMENT; (IV) APPROVING THE FOTO SOURCE SETTLEMENT AGREEMENT; AND (V) GRANTING RELATED RELIEF**

Circuit City Stores, Inc. ("Circuit City"),

InterTAN, Inc. ("InterTAN"), Circuit City Stores West

Coast, Inc. ("West Coast"), and Ventoux International,

Inc. ("Ventoux" and together with Circuit City, InterTAN

and West Coast, the "Movants" and, collectively with the

debtors and debtors in possession in the above-captioned

jointly administered cases, the "Debtors")[1] hereby move

(the "Motion"), pursuant to sections 105 and 363 of ti-

tle 11 of the United States Code (the "Bankruptcy Code")

and Rules 2002, 4001, 6004 and 9019 of the Federal Rules

of Bankruptcy Procedure (the "Bankruptcy Rules"), for

entry of an order (I) approving the sale or licensing,

as applicable, (the "Sale") of (A) certain trade-marks

and licensed trade-marks by West Coast (the "Trade-

marks" and the "Licensed Trademarks," respectively) and

(B) the shares in Circuit City Global Sourcing Limited

("CCGS" and such shares in CCGS, the "CCGS Shares") by

---

[1]    The Debtors and the last four digits of their respective taxpayer
identification numbers are as follows: Circuit City Stores, Inc.
(3875), Circuit City Stores West Coast, Inc. (0785), InterTAN,
Inc. (0875), Ventoux International, Inc. (1838), Circuit City
Purchasing Company, LLC (5170), CC Aviation, LLC (0841), CC Dis-
tribution Company of Virginia, Inc. (2821), Circuit City Proper-
ties, LLC (3353), Kinzer Technology, LLC (2157), Abbott Advertis-
ing Agency, Inc. (4659), Patapsco Designs, Inc.(6796), Sky Ven-
ture Corp. (0311), Prahs, Inc.(n/a), XSStuff, LLC (9263), Mayland
MN, LLC (6116), Courchevel, LLC (n/a), Orbyx Electronics, LLC
(3360), and Circuit City Stores PR, LLC (5512).  The address for
Circuit City Stores West Coast, Inc. is 9250 Sheridan Boulevard,
Westminster, Colorado 80031.  For all other Seller, the address
is 9950 Mayland Drive, Richmond, Virginia 23233.

Ventoux to 4458729 Canada Inc. or its designee or desig-
nees (the "Purchaser") free and clear of all Interests
(as defined herein), (II) approving InterTAN's authori-
zation (the "Authorization") for InterTAN Canada Ltd.
("InterTAN Canada") to sell substantially all of its as-
sets (the "InterTAN Canada Assets") to the Purchaser,
(III) approving the Intercompany Agreement (as defined
herein), (IV) approving the Foto Source Settlement
Agreement (as defined herein) and (V) granting related
relief.  In support of the Motion, the Movants respect-
fully represent as follows:

**JURISDICTION AND VENUE**

1.      This Court has jurisdiction to consider
this Motion under 28 U.S.C. §§ 157 and 1334.  This is a
core proceeding under 28 U.S.C. § 157(b).  Venue of
these cases and this Motion in this District is proper
under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief
requested herein are Bankruptcy Code sections 105 and
363 and Bankruptcy Rules 2002, 4001, 6004 and 9019.

**BACKGROUND**

**A.   The Chapter 11 Cases**

3.    On November 10, 2008 (the "Petition Date"), the Debtors filed voluntary petitions in this Court for relief under chapter 11 of the Bankruptcy Code.

4.    On January 12, 2009, the Court entered an order authorizing the Debtors to conduct auctions for a sale or sales of the Debtors' businesses as a going concern or for liquidation (D.I. 1460).

5.    At the conclusion of the auction, the Debtors determined that the highest and otherwise best bid was that of Great American Group WF, LLC, Hudson Capital Partners, LLC, SB Capital Group, LLC, and Tiger Capital Group, LLC (collectively, the "Agent").  On January 16, 2009, the Court approved the Agent's bid and authorized the Debtors to conduct going out of business sales at the Debtors' remaining stores (D.I. 1634).  The Agent commenced going out of business sales at the Debt-ors' remaining stores on January 17, 2009.

**B.   The Canadian Case**

6.    Also on the Petition Date, InterTAN Can-ada and Tourmalet Corporation commenced proceedings (the

4

"Canadian Case") in the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (the "CCAA") in Canada.

7.    InterTAN Canada is a wholly owned subsidiary of InterTAN.[2]  Headquartered in Barrie, Ontario, InterTAN is engaged in the business of selling consumer electronics in Canada under the trade name The Source By Circuit City[SM].  InterTAN Canada's operations consist of approximately 750 retail stores and dealer outlets in Alberta, British Columbia, Manitoba, Newfoundland, Northwest Territories, Nova Scotia, Nunavut, Ontario, Prince Edward Island, Quebec, Saskatchewan, and the Yukon.  Additionally, InterTAN Canada maintains a website -- www.thesource.ca -- to sell consumer electronics and related products.

**RELIEF REQUESTED**

8.    By this Motion, the Movants seek entry of an order, substantially in the form attached hereto as <u>Exhibit A</u> (the "Sale Order") (I) authorizing, but not

---

[2]  Although InterTAN Canada is a wholly owned subsidiary of InterTAN, InterTAN Canada operates with separate officers, directors and employees in Canada.  However, InterTAN, as sole shareholder must approve the transactions contemplated by the Agreement.

requiring, West Coast and Ventoux to enter into the As-
set Purchase Agreement (the "Agreement"), dated February
23, 2009, by and among InterTAN Canada, West Coast, Ven-
toux, the Purchaser and Bell Canada, and to comply with
each of their obligations thereunder, (II) authorizing,
but not requiring, InterTAN to authorize InterTAN Can-
ada's sale of the InterTAN Canada Assets to the Pur-
chaser pursuant to the Agreement, (III) authorizing, but
not requiring, Circuit City, West Coast and Ventoux to
enter into the Intercompany Agreement (the "Intercompany
Agreement"), dated February 23, 2009, by and among In-
terTAN Canada, Circuit City, West Coast and Ventoux, (IV)
authorizing, but not requiring, West Coast to enter into
the Settlement and Coexistence Agreement (the "Foto
Source Settlement Agreement"), dated February 20, 2009,
by and among Foto Source Canada, Inc. ("Foto Source"),
InterTAN Canada and West Coast and (V) granting related
relief.

## BASIS FOR RELIEF

9.    InterTAN's equity interest in InterTAN
Canada, the Trade-marks and the CCGS Shares represent
valuable assets of the Movants' estates.  Accordingly,

6

the Debtors, together with InterTAN Canada, have been
extensively marketing these assets to interested parties,
as set forth more fully below.  As a result of that mar-
keting effort, the Movants believe that the Sale by West
Coast and Ventoux (together, the "Sellers") of the
Trade-marks and the CCGS Shares (collectively, the "US
Assets") and InterTAN's authorization of InterTAN Can-
ada's sale of the InterTAN Canada Assets (together with
the US Assets, the "Purchased Assets") pursuant to the
Agreement could bring significant recovery for the
Movants' estates and creditors.  The Movants believe
that the Agreement represents the highest and best offer
for the Purchased Assets.  The Movants further believe
that the allocation of the purchase price under the
Agreement represents a fair and reasonable allocation
and is in the best interests of the Movants and their
estates and creditors.  Finally, the Movants believe
that the Foto Source Settlement Agreement represents a
fair and reasonable compromise of the dispute with Foto
Source and is in the best interest of the Movants, their
estates and creditors.

**A.    Marketing Efforts**

10.    Prior to the Petition Date, Circuit City and InterTAN Canada had explored the option of selling all or a portion of InterTAN Canada's business.  In early 2008, Circuit City considered its strategic alternatives with respect to InterTAN Canada, and engaged Goldman, Sachs & Co. ("Goldman") as its financial advisor to canvass the market with a view to pursuing a potential divestiture transaction.  Goldman prepared disclosure and marketing materials concerning the business that were distributed to potential strategic and financial purchasers that entered into a confidentiality agreement with Circuit City (the "Initial Process"). Although Goldman received significant expressions of interest from potential purchasers interested in an acquisition transaction concerning the business of InterTAN Canada as a stand-alone entity, no transaction was completed.

11.    Following the Petition Date, during the chapter 11 cases and the Canadian Case, NM Rothschild & Sons Canada Securities Limited and its U.S. affiliate, Rothschild, Inc. (collectively, "Rothschild"), pursued a

8

"two-track" sale process as a restructuring alternative, whereby potential purchasers would be able to: a) pursue a transaction involving the acquisition of InterTAN Canada as part of an acquisition of Circuit City's global operations; or b) pursue a transaction involving the acquisition solely of InterTAN Canada.  As Circuit City's U.S. operations are being liquidated, as set forth above, there is no longer an opportunity for InterTAN Canada to be sold as part of a sale of Circuit City's global operations.

12.   Pursuant to the sale process approved by the Canadian Court on December 5, 2008 (the "CCAA Sale Process"), Rothschild worked closely with InterTAN Canada's management team and financial advisor, FTI Consulting, Inc. ("FTI"), to market InterTAN Canada's business.  The CCAA Sale Process built on the Initial Process.  Rothschild developed a comprehensive list of potential purchasers located in the U.S., Canada and elsewhere, including certain potential purchasers that had expressed an interest in the business of InterTAN Canada during the Initial Process, as well as other potential strategic and financial purchasers who, in the opinion

9

of Rothschild, may have been interested in a possible

transaction involving the business of InterTAN Canada.

In total, Rothschild contacted 87 potential purchasers,

including 21 potential strategic purchasers and 66 po-

tential financial purchasers.

13.   Rothschild also worked closely with In-

terTAN Canada's management team to create marketing

documents for the business of InterTAN Canada including

a "Teaser" and a comprehensive management presentation.

The Teaser provided a high-level overview of the busi-

ness of InterTAN Canada and was designed to assist po-

tential purchasers in determining whether or not to pro-

ceed with an in-depth investigation of the acquisition

opportunity.  Of the 87 potential purchasers contacted

by Rothschild, 46 potential purchasers expressed further

interest in an acquisition opportunity involving the In-

terTAN Canada business. Teasers were distributed to

these 46 potential purchasers.

14.   A confidential online data room was set

up containing information that would be pertinent to a

potential purchaser including: financial, operational,

leasehold and other relevant information (the "Data

Room").   Potential purchasers that expressed interest
and executed a nondisclosure agreement in connection
with the CCAA Sale Process were granted access to the
Data Room.   InterTAN Canada or Circuit City entered into
nondisclosure agreements with 30 potential purchasers
interested in a transaction involving InterTAN Canada or
its business, and these potential purchasers were
granted access to the Data Room.   Throughout the CCAA
Sale Process, Rothschild and InterTAN Canada worked with
FTI and InterTAN Canada's legal advisors to update the
Data Room.

        15.   InterTAN Canada's management team, to-
gether with Rothschild Canada, met with and delivered
management presentations to eight potential purchasers.
These management presentations provided the opportunity
for potential purchasers to ask Rothschild Canada and
InterTAN Canada's management specific questions about
the business.

        16.   InterTAN Canada received a total of ten
indicative bids from prospective purchasers.   Rothschild
reviewed all of the indicative bids and discussed them
with InterTAN, as sole shareholder.   Subsequently,

Rothschild chose to continue negotiations with five po-
tential purchasers (the "Potential Purchasers") in the
CCAA Sale Process.  On January 9, 2009, Rothschild sent
a letter via email to all of the Potential Purchasers
attaching a copy of a proposed version of an Asset Pur-
chase Agreement (the "Proposed Sale Agreement"), devel-
oped by the InterTAN Canada, Rothschild and the monitor
in the Canadian Case (the "Monitor").

17.   As a result of the CCAA Sale Process,
InterTAN Canada received four formal bids (the "Formal
Bids" and the parties making such bids, the "Formal Bid-
ders") which included mark-ups of the Proposed Sale
Agreement.  InterTAN Canada and Rothschild, in consulta-
tion with the Monitor, proceeded to discuss each Formal
Bid with each of the Formal Bidders in an attempt to
reach an agreement to sell the business as a going con-
cern and to secure the best possible transaction for the
sale of InterTAN Canada's business in the circumstances.

C.    **The Agreement.**[3]

18.    The Purchaser, a direct, wholly-owned subsidiary of Bell Canada, made a Formal Bid for the InterTAN Canada business through the CCAA Sale Process (the "Bell Canada Bid").

19.    It is the view of InterTAN Canada, the Movants and their advisors that the Bell Canada Bid was the best overall bid received, both in terms of the proposed purchase price for the InterTAN Canada business and with respect to certainty of the Purchaser's ability to close the transaction.

20.    On February 23, 2009, as a result of extensive, around-the-clock, arm's length negotiations, the Agreement was finalized.   InterTAN Canada and the Sellers have executed the Agreement which is subject to the approval of this Court and the Canadian Court.

21.    Pursuant to the Agreement, InterTAN Canada would sell the InterTAN Canada Assets to the Pur-

---

[3]   The Agreement contains confidential information.  Copies of the Agreement have been provided to the Court, the US Trustee and the official committee of unsecured creditors (the "Creditors' Committee").  Any additional parties may receive copies of the Agreement upon a showing of need and execution of a confidentiality agreement reasonably acceptable to the Debtors, InterTAN Canada and the Purchaser.

chaser, West Coast would sell and/or license the Trade-
marks to the Purchaser, and Ventoux would sell the CCGS
Shares to the Purchaser.

22.   The InterTAN Canada assets are comprised
of substantially all of InterTAN Canada's undertaking,
property, assets, interests and rights of any kind other
than certain excluded assets.  The Trade-marks are com-
prised of certain trade-marks and other intellectual
property used in the day-to-day operations of InterTAN
Canada, including "The Source" and "The Source by Cir-
cuit City", which is the name under which InterTAN Can-
ada trades.  The CCGS Shares comprise all of the issued
and outstanding shares in CCGS.  Through CCGS, InterTAN
Canada sources private label products from factories in
Asia and utilizes CCGS's offices in Hong Kong, Shenzhen,
China and Taipei, Taiwan for sourcing, merchandising and
quality control.

23.   The significant terms of the Agreement
are as follows:[4]

---

[4]   In the event of any discrepancy between the Agreement and this
summary of the Agreement, the provisions of the Agreement are
controlling.

(a)   <u>General Terms</u>.  The Purchaser would ac-
quire (i) the InterTAN Canada Assets, (ii) the Trade-
marks and the Licensed Trade-marks set forth in the
Agreement and (iii) the CCGS Shares, consisting of 1000
ordinary shares with a value of HK$1.00 each, comprising
all of the issued and outstanding shares of CCGS,
through an asset sale.

(b)   <u>Deposit</u>.  The Purchaser has provided a
deposit in the amount of CDN$15 million (the "Deposit"),
deposited with the Monitor as escrow agent.  The Monitor
has received the Deposit in trust to be held pending the
closing of the transaction pursuant to an escrow agree-
ment, executed by InterTAN Canada, the Purchaser and the
Monitor.

(c)   <u>Guarantee</u>.  Bell Canada is a signatory
to the Agreement and has guaranteed the performance by
the Purchaser of its obligations thereunder.  InterTAN
Canada and the Sellers would not be bound to seek re-
course against the Purchaser before enforcing the guar-
antee obligations of Bell Canada.

(d)   <u>Closing</u>.  The closing of the sale trans-
action (the "Closing") would occur on the date (the
"Closing Date") that is: (a) the later of: i) June 30,
2009; and ii) the date that is two business days after
the day on which all of the closing conditions set forth
in the Agreement have been satisfied or have been waived
by the appropriate party, other than certain conditions
that are to be satisfied at the Closing, or b) such
other date as may be agreed to in writing by the parties.
The outside date for the Closing is July 31, 2009, sub-
ject to extension to September 30, 2009 in accordance
with the terms of the Agreement.

(e)   <u>Actions Prior to Closing</u>.  The Agreement
includes restrictions on InterTAN Canada incurring in-
debtedness and engaging in other operational changes
during the interim period prior to Closing.  InterTAN
Canada has also agreed to provide the Purchaser with in-
formation concerning its business during the period
prior to the Closing.  InterTAN Canada has agreed to

consult in good faith on not less than a weekly basis
with a designated representative of the Purchaser to re-
port material operational developments and the general
status of ongoing operations of InterTAN Canada's busi-
ness, and to provide a reasonable opportunity for such
designated representative to attend (as an observer)
regular and other meetings of InterTAN Canada's manage-
ment team.

(f)  <u>No Shop</u>.  InterTAN Canada and the Sell-
ers have agreed that they will immediately cease any ex-
isting discussions with persons other than the Purchaser
with respect to a purchase, sale, license or transfer of
the Purchased Assets, other than the sale of inventory
in the ordinary course of business.  Further, InterTAN
Canada and the Sellers have agreed that, until the ear-
lier of the termination of the Agreement or the Closing
Date, they will not, directly or indirectly, solicit of-
fers for InterTAN Canada's business or the Purchased As-
sets.  This obligation does not restrict any of the par-
ties from complying with their respective disclosure ob-
ligations to the Monitor, the unsecured creditors com-
mittee in the Chapter 11 Proceeding, this Court or the
Canadian Court.

(g)  <u>Employees</u>.  The Purchaser would assume
all of the employees of InterTAN Canada on Closing as
follows: (i) the Purchaser would assume the written em-
ployment agreements for each of InterTAN Canada's "Ex-
ecutive Employees"; (ii) the Purchaser would offer em-
ployment to all of InterTAN Canada's "Non-Executive Em-
ployees" on substantially similar, and no less favour-
able in the aggregate, terms as those in effect immedi-
ately prior to Closing.  InterTAN Canada and the Pur-
chaser have agreed to exercise reasonable efforts to
persuade the Non-Executive Employees to accept such of-
fers of employment; and (iii) the Purchaser would assume
the Collective Agreement applicable to InterTAN Canada's
unionized workers at its Barrie warehouse.

(h)  <u>Real Property Leases</u>.  The Purchaser
would assume the "Assumed Liabilities" (discussed below),
which include all post-Closing liabilities of InterTAN

16

Canada under the "Contracts" that are assigned to the Purchaser and that are not "Excluded Assets". None of the real property leases are "Excluded Assets", and thus the Agreement does not require the repudiation of any real property leases and represents an offer for the entire footprint of "The Source" locations. A condition to Closing is that InterTAN Canada shall have obtained landlord consents for the assignment to the Purchaser of a specified number of InterTAN Canada's real property leases, including certain leases which are specified in the Agreement.

(i)    Excluded Assets.  The Agreement provides, *inter alia*, that certain of the property and assets of InterTAN Canada will not be acquired by the Purchaser (the "Excluded Assets").  A summary of the Excluded Assets is as follows:

    (i)    certain cash;

    (ii)    insurance policies;

    (iii)    refundable taxes;

    (iv)    minute books and tax records;

    (v)    accounts receivable from Circuit City or any affiliate of Circuit City;

    (vi)    credit card receivables in respect of sales during any period ending on or prior to the time of Closing;

    (vii)    any and all contracts between InterTAN Canada and its affiliates;

    (viii)    any shares or securities owned by InterTAN Canada;

    (ix)    the purchase agreement dated November 28, 2002 between InterTAN Canada and StarChoice Communications and all ac-

17

counts receivable and inventory pur-
chased in respect thereof; and

(x)     all accounts receivable that may be
offset against any liability related to
a contract in respect of goods and/or
services supplied to InterTAN Canada's
business prior to November 10, 2008
that remain outstanding as of the Clos-
ing Date.

(j)     Assumed Liabilities. At Closing, the
Purchaser would assume the "Assumed Liabilities".   A
summary of these liabilities (which specifically do not
include the "Excluded Liabilities" discussed below) is
as follows:

(i)     operating expenses relating to InterTAN
Canada's business incurred by InterTAN
Canada in the ordinary course of busi-
ness at a given date which are not yet
due and payable at such date (to the
extent recorded on InterTAN Canada's
books), including:

(1)     expenses for the receipt of goods
and services;

(2)     accruals for vacation pay and em-
ployee bonuses for the "Assumed Em-
ployees";

(3)     amounts paid to InterTAN Canada as
deposits in respect of inventory
shrinkage and other potential losses
by InterTAN Canada's Joint Venture
Managers, together with all amounts
held back by InterTAN from the Joint
Venture Managers and added to such
amounts;

18

      (4)  customer rebates and allowances for product returns and product warranty claims;

      (5)  gift cards or similar customer vouchers of certificates;

(ii)  specified accounts payable as at the Closing Date;

(iii) liabilities for "Assumed Employees" which have been recorded on InterTAN Canada's books to the extent not payable on or prior to the Closing Date and all liabilities to the "Assumed Employees" following the Closing Date;

(iv)  InterTAN Canada's "Benefit Plans" and all of InterTAN Canada's rights, obligations and liabilities under and in relation to the "Benefit Plans";

(v)   liabilities for product warranty service claims made in connection with InterTAN Canada's extended warranty program;

(vi)  post-Closing liabilities under contracts, agreements and leases (that are not Excluded Assets) that are assigned to the Purchaser; and

(vii) post-Closing liabilities under all licenses, permits, authorizations and approvals issued to InterTAN Canada by government authorities which are necessary to conduct InterTAN Canada's business, or to use, operate and enjoy the InterTAN Canada Assets and that are assigned to the Purchaser.

(k)   <u>Excluded Liabilities</u>.  Other than the Assumed Liabilities set out in the immediately preceding paragraph, no other liabilities of InterTAN Canada or with respect to its business or assets would be assumed

19

by the Purchaser.  A summary of the "Excluded Liabilities" is as follows:

(i)     income, capital or capital gains taxes or taxes on InterTAN Canada's profits;

(ii)    taxes in respect of InterTAN Canada's business or the InterTAN Canada Assets for any period ending on or prior to the time of Closing;

(iii)   taxes collected or collectible by InterTAN Canada for any period ending on or prior to the time of Closing, whether or not remitted by InterTAN Canada prior to the time of Closing;

(iv)    liabilities related to the Excluded Assets;

(v)     intercompany payables owing to Circuit City or its affiliates;

(vi)    professional fees and expenses incurred by InterTAN Canada in connection with the Canadian Case or the sale of InterTAN Canada's business;

(vii)   liabilities of InterTAN Canada under the Agreement;

(viii)  indebtedness or guarantees of indebtedness for borrowed money, including those relating to, arising under or incurred in connection with the DIP Facility;

(ix)    liabilities arising from any violation or alleged violation of the law or breach or alleged breach of any contract, order or decree;

(x)     liabilities relating to claims for breach of any express or implied warranty, personal injury, damage to property or other loss based upon or arising out of the sale and distribution of products or the provision of services by InterTAN Canada prior to the time of Closing;

(xi)     liabilities with respect to any employees owing and payable up to and including the Closing Date, and to any employee who does not accept the Purchaser's offer of employment, including, pay in lieu of notice, termination pay and severance pay;

(xii)     any liabilities of InterTAN Canada or amounts owing by InterTAN Canada under any contract in respect of any goods and/or services supplied to the InterTAN Canada business prior to November 10, 2008 that remain outstanding as of the Closing Date;

(xiii)  liabilities arising as a result of any legal action initiated at any time on or prior to the Closing, to the extent related to InterTAN Canada, the InterTAN Canada Assets or InterTAN Canada's business;

(xiv)    any amounts of basic rent and/or additional rent payable under the real property leases for InterTAN Canada's stores accruing in or related to periods prior to or ending on Closing Date; and

(xv)    liabilities in respect of the charges created by the Amended and Restated Initial CCAA Order.

21

(l)   <u>Conditions of Closing</u>.  The principal conditions of Closing (in addition to the condition concerning the assignment of real property leases referred to above) include:

(i)    each of the representations and warranties of the parties shall be true and correct in all material respects;

(ii)   the parties shall have performed and complied in all material respects with all obligations required by the Agreement, and shall have delivered or caused to be delivered the various closing documents required to be delivered under the Agreement;

(iii)  clearance under the *Competition Act* R.S., 1985, c. C-34 shall have occurred;

(iv)   the Settlement and Coexistence Agreement between Foto Source Canada Inc. ("Foto Source"), InterTAN Canada and West Coast, made as of February 20, 2009 (the "Foto Source Settlement Agreement"), shall have received all necessary approvals of this Court and the Canadian Court, and the settlement amount under the Settlement Agreement shall have been paid to Foto Source;

(v)    the pending Canadian trademark applications for "The Source by Circuit City" (application number 1,252,450) and The Source by Circuit City & Design (application number 1,253,279) shall have been withdrawn;

(vi)   no legal action shall be pending in any jurisdiction to enjoin or prohibit any of the transactions contemplated by the Agreement;

22

(vii)  the Sale Order, in a form reasonably acceptable to the Purchaser which, *inter alia,* (i) authorizes InterTAN's authorization of InterTAN Canada's sale of the InterTAN Canada Assets pursuant to the Agreement; and (ii) approves the Agreement as it relates to Ventoux and West Coast shall be effective and not stayed, and any appeal of the Sale Order shall have been resolved or the time for appeal of the Sale Order shall have expired and no stay pending appeal of the Sale Order nor a motion for rehearing or certiorari shall have been requested or issued; and

(viii) an order by the Canadian Court (the "Approval and Vesting Order"), in a form reasonably acceptable to the Purchaser, approving the Agreement and the transactions contemplated thereby shall have been issued and entered and remain unamended, and shall not have been varied or set aside or be subject to any stay or rights of appeal, and the appeal period shall have expired.

(m)   Trade-marks and West Coast Transaction. On the Closing Date, West Coast would deliver or cause to be delivered to the Purchaser the following documents, executed by West Coast or any other designated transferor: (i) a sale and transfer agreement in respect of the Trade-marks to be assigned to the Purchaser; and (ii) a license agreement in respect of the Trade-marks to be licensed to the Purchaser.  West Coast has also agreed that if, prior to the Closing Date, it assigns or transfers all or any part of its interest in the Trade-marks to be licensed to the Purchaser, it would only do so with a condition that for a one-time payment of $100, the transferee will grant West Coast an exclusive, royalty-free license (in accordance with the terms set forth in the license agreement attached to the Agreement) to use such Trade-marks in Canada, which license shall

23

be assigned to the Purchaser at Closing or if West Coast otherwise makes arrangements satisfactory to the Purchaser, acting reasonably, to ensure that the Purchaser obtains on Closing an exclusive, royalty free license to the Trade-marks on the same terms and conditions of the license agreement attached to the Agreement.

(n)   <u>Alternative Purchaser of CCGS Shares</u>. The Purchaser has the right, exercisable at any time up to two business days prior to the Closing, to designate in writing an alternative purchaser (the "Alternative Purchaser") of the CCGS Shares. In the event of any such designation, on the Closing Date, Ventoux would sell to the Alternative Purchaser, and the Alternative Purchaser would purchase, the CCGS Shares on the terms and conditions set out in the Agreement as though such Alternative Purchaser was the Purchaser.

(o)   <u>Name</u>.  Immediately following the Closing Date, InterTAN would discontinue the use of the name "The Source by Circuit City".

(p)   <u>Release</u>.  On the Closing Date, the Purchaser, on behalf of itself and its affiliates, would release and discharge InterTAN Canada, the Sellers and their respective affiliates and their present direct and indirect equityholders, officers, directors and advisors (collectively, the "Released Parties") from any and all claims based in whole or in part on any act or omission, transaction, dealing or other occurrence existing or taking place on or prior to the Closing relating to, arising out of or in connection with the Purchased Assets, InterTAN Canada's business, the Agreement and the Real Property Leases, except for claims arising out of fraud, bad faith or illegal acts by the Released Parties or claims arising out of any post-Closing covenant.

## D.   **The Authorization.**

24.   On February 23, 2009, the Board of Directors of InterTAN, as sole shareholder of InterTAN

24

Canada, authorized InterTAN Canada to sell the InterTAN

Canada Assets to the Purchaser pursuant to the Agreement

(the "InterTAN Resolution," attached hereto as <u>Exhibit</u>

<u>B</u>).

25.   As set forth above, the Agreement is the

result of extensive and thorough marketing efforts.

Moreover, InterTAN submits that the Agreement reflects

an intensely negotiated, arm's length transaction.

Throughout the negotiations, the Purchaser has at all

times acted in good faith.  The Purchaser's bid is not

the product of fraud or collusion between the Purchaser

and other interested parties or the trustee, or an at-

tempt to take grossly unfair advantage of other inter-

ested parties and the Purchaser (i) is not an "insider"

or "affiliate" of the Sellers, (ii) is not a successor

to the Sellers and (iii) has no continuity of enterprise

with the Sellers.

26.   Accordingly, InterTAN has determined in

its business judgment that the sale of the InterTAN Can-

ada Assets pursuant to the Agreement is in the best in-

terests of InterTAN Canada and of InterTAN.

**E.    The Intercompany Agreement.**

27.    On February 23, 2009, Circuit City, the
Sellers and InterTAN Canada entered into an Intercompany
Agreement (the "Intercompany Agreement").  A copy of the
Intercompany Agreement is attached as Exhibit C.

28.    Under the Intercompany Agreement, Inter-
TAN Canada agrees that, upon Closing, it shall make a
payment of no more than the Canadian Dollar equivalent
of US$15 million in the aggregate (less any applicable
withholding taxes in respect of the Licensed Trade-marks)
(the "US Assets Purchase Price") to West Coast and/or
Ventoux, or as they may otherwise direct in writing, as
consideration for the Purchaser's acquisition and/or li-
cence of the US Assets.  As noted above, pursuant to the
Agreement, the Sellers would receive the Canadian dollar
equivalent of US$15 million of the purchase price under
the Agreement.

29.    The payment of the US Assets Purchase
Price was the result of negotiations between Circuit
City, the Sellers and InterTAN Canada.  Prior to entry
into the Agreement or the Intercompany Agreement, the
Debtors and their advisors analyzed and evaluated the

value of the US Assets.  Based on this valuation, the
CCAA Sale Process, and their negotiations, the Sellers
and Circuit City believe that the US Assets Purchase
Price is fair and reasonable under the circumstances.

30.  Furthermore, pursuant to the Intercom-
pany Agreement, InterTAN Canada has agreed to make a
loan (the "Loan") out of the proceeds of the sale re-
ceived from the Purchaser to Circuit City in an amount
of up to CAD$35 million, on terms that are satisfactory
to Circuit City, InterTAN Canada and the Monitor.  The
Loan would be subject to certain conditions precedent,
including that such Loan be made pursuant to a loan
agreement or promissory note, which agreement or promis-
sory note must be approved by this Court.

31.  The Loan constitutes additional compen-
sation for the Sale of the US Assets.  The funds pro-
vided by the Loan will assist in the Debtors' wind down
efforts.

32.  The Intercompany Agreement will provide
the Debtors with US$15 million in immediate funds upon
the Closing of the Agreement as the US Assets Purchase
Price, as well as certain additional funds pursuant to

27

the Loan.  Moreover, the terms of the Loan will be sub-

ject to approval by this Court.  Accordingly, the

Movants believe the terms of the Intercompany Agreement

are fair and reasonable in the circumstances.  The

Movants thus seek approval of the entry by Circuit City

and the Sellers into the Intercompany Agreement.

**F.    The Foto Source Settlement Agreement.**

33.    The Foto Source Settlement Agreement

settles a trademark infringement action (the "Trademark

Action") brought in a Canadian court by Foto Source

against InterTAN Canada and West Coast, arising out of

InterTAN Canada's use in Canada of West Coast's family

of "SOURCE" trade-marks, as well as various trademark

opposition proceedings and proceedings under section 45

of the Canadian Trade-marks Act (collectively, the

"Trademark Proceedings").  A copy of the Foto Source

Settlement Agreement is attached as Exhibit D.

34.    The principal provisions of the Foto

Source Settlement Agreement are as follows:[5]

---

[5]    In the event of any discrepancy between the Foto Source Settle-
ment Agreement and this summary of the Settlement Agreement, the
provisions of the Foto Source Settlement Agreement are control-
ling.

28

(a)   the total settlement amount to be paid by InterTAN Canada to Foto Source is $500,000.  Of this amount, $50,000 is effectively a non-refundable deposit, which has been paid.  If InterTAN Canada pays the balance, namely $450,000, on or before September 30, 2009, the provisions of the agreement relating to coexistence and settlement of the Trademark Action and Trademark Proceedings immediately become effective.  Alternatively, if InterTAN Canada does not pay the $450,000, by the specified deadlines, these provisions never become effective;

(b)   with respect to coexistence, for trade-marks that include "SOURCE", the agreement sets out what trade-marks Foto Source on the one hand, and InterTAN Canada and West Coast on the other, can and cannot use.  In general terms:

(i)    Foto Source can use the trade-marks "FOTO SOURCE", "YOUR DIGITAL SOURCE" and any other trade-marks that that include these words together;

(ii)    subject to certain exceptions, Foto Source will not use any trademark that includes "SOURCE" unless it is preceded by "FOTO";

(iii)   InterTAN Canada can use all other trade-marks that incorporate "SOURCE", subject to certain limited exceptions (which relate primarily to trade-marks that include "SOURCE" along with "FOTO", "PHOTO" or "DIGITAL"); and

(iv)    Foto Source, InterTAN Canada and West Coast will not use "GET IT RIGHT, FROM THE SOURCE" or "GET IT RIGHT FROM THE SOURCE".

29

(c)   an order will be sought, on consent, dis-
missing the Trademark Action without
costs;

(d)   the Trademark Proceedings will be with-
drawn; and

(e)   the agreement may be assigned without
consent, including by InterTAN Canada to
a purchaser of some or all of its assets
and by West Coast to an assignee of cer-
tain of its trade-marks.

35.   It is a condition precedent to Closing
under the Agreement that the Movants obtain authoriza-
tion from this Court of the Foto Source Settlement
Agreement (and that the settlement be effective).  The
total settlement amount will be paid by InterTAN Canada
and West Coast will not be responsible for payment of
any of the settlement amount.  It is the Movant's belief
that the Settlement Agreement is fair and reasonable in
the circumstances.

**APPLICABLE AUTHORITY**

**I.   APPROVAL OF THE SALE, THE AUTHORIZATION AND THE
INTERCOMPANY AGREEMENT IS WARRANTED UNDER
BANKRUPTCY CODE SECTIONS 105(A) AND 363(B)(1).**

36.   Bankruptcy Code section 363(b)(1) pro-
vides that "[t]he trustee, after notice and a hearing,
may use, sell, or lease, other than in the ordinary

30

course of business, property of the estate."   11 U.S.C.

§ 363(b)(1).   Moreover, Bankruptcy Code section 105(a)

provides that "[t]he Court may issue any order, process,

or judgment that is necessary or appropriate to carry

out the provisions of this title."   11 U.S.C. § 105(a).

37.   Assets of the Movants may be sold out-

side of the ordinary course of business, pursuant to

Bankruptcy Code section 363(b)(1), if a sound business

purpose exists for doing so.   In re WBQ P'ship, 189 B.R.

97, 102 (Bankr. E.D. Va. 1995)(citing Stephens Indus.,

Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986)); see

also In re W.A. Mallory Co., Inc., 214 B.R. 834, 836

(Bankr. E.D. Va. 1997).

38.   To satisfy the "sound business purpose

test," the debtor must demonstrate that (1) a sound

business reason or emergency justifies a pre-

confirmation sale; (2) the sale was proposed in good

faith; (3) the purchase price is fair and reasonable;

and, (4) adequate and reasonable notice of the sale has

been provided.   In re WBQ P'ship, 189 B.R. at 102.

39.   Based upon the results of their analysis,

the Sellers' management and advisors have concluded that

the Sale of the US Assets to the Purchaser pursuant to
the Agreement, and payment to the Sellers pursuant to
the Intercompany Agreement, will maximize recoveries to
the Sellers' estates and avoid deterioration of the
value of the US Assets.  Maximizing asset value and
avoiding asset deterioration are sound business purposes
that warrant authorizing the proposed Sale and entry
into the Intercompany Agreement.

> 40.   In addition, InterTAN's Board of Direc-
tors, management and advisors have concluded that the
sale of the InterTAN Canada Assets by InterTAN Canada to
the Purchaser will maximize recoveries to InterTAN's es-
tate and avoid deterioration of the value of the Inter-
TAN Canada Assets and hence of InterTAN's interest in
InterTAN Canada.  In particular, the proposed sale to
the Purchaser, as guaranteed by Bell Canada, has the
benefit of preserving the InterTAN Canada business as a
going concern, which includes the consequential benefits
of:

> > (a)  preserving the jobs of InterTAN Canada's
> > employees who accept an offer of employ-
> > ment from the Purchaser;

(b)   providing for an ongoing distribution
channel in the Canadian consumer elec-
tronics market;

(c)   preserving customer programs such as war-
ranties and gift cards;

(d)   including an offer for all of InterTAN
Canada's real property leases that are
assigned to the Purchaser in accordance
with the terms of the Asset Purchase
Agreement; and

(e)   generally minimizing restructuring claims
that may result from a transaction for
InterTAN Canada's business.

41.   Thus, InterTAN believes that the Agree-
ment represents the best possible transaction in the
circumstances for the benefit of InterTAN Canada and In-
terTAN, as shareholder.

42.   The Sale of the Purchased Assets pursu-
ant to the Agreement is the product of extensive market-
ing by the Debtors and InterTAN Canada, as set forth
above, and has been subject to competitive bids through-
out the process prior to signing of the Agreement.  Con-
sequently, the fairness and reasonableness of the con-
sideration to be received by the Movants has been demon-
strated by a "market check," which is the best means for
establishing whether a fair and reasonable price is be-

33

ing paid.  Accordingly, the Sale, the Authorization and the Intercompany Agreement are supported by sound business judgment.

43.    Moreover, the Movants will provide notice as set forth below, whereby the Movants' major creditor constituencies, those parties most interested in these cases and others whose interests are potentially implicated by the proposed Sale, the Authorization and the Intercompany Agreement will receive adequate notice under the circumstances of the hearing to be held thereon (the "Sale Hearing").  In light of the circumstances, and in accordance with the Case Management Motion (as defined herein), such notice is reasonably calculated to provide timely and adequate notice to the Movants' major creditor constituencies, those parties most interested in these cases and others whose interests are potentially implicated by the relief sought in the Motion.

44.    Accordingly, the Movants believe that the Sale, the Authorization and the Intercompany Agreement are in the best interests of the Movants, their estates and creditors.

34

II.   **THE PURCHASER IS A GOOD FAITH PURCHASER PURSUANT TO SECTION 363(m) OF THE BANKRUPTCY CODE AND THE TRANSACTION CONTEMPLATED BY THE AGREEMENT SHOULD CARRY THE PROTECTIONS OF SECTION 363(n) OF THE BANKRUPTCY CODE.**

45.   Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  While the Bankruptcy Code does not define "good faith," the Fourth Circuit Court of Appeals has "adopt[ed] the traditional equitable definition that has been adopted by various courts of appeal: 'one who purchases the assets for value, in good faith, and without notice of adverse claims.'"  Willemain v. Kivitz, 764 F.2d 1019, 1023 (4th Cir. 1985)(citations omitted).

46.   Section 363(n) of the Bankruptcy Code further provides, in relevant part, that:

> The trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders

35

> at such sale, or may recover from a party
> to such agreement any amount by which the
> value of the property sold exceeds the
> price at which such sale was consummated,
> and may recover any costs, attorneys'
> fees, or expenses incurred in avoiding
> such sale or recovering such amount.

11 U.S.C. § 363(n).

47.    The Movants submit, and will present evidence at the Sale Hearing, that the Agreement reflects an intensely negotiated, arm's length transaction. Throughout the negotiations, the Purchaser has at all times acted in good faith.  Moreover, the Purchaser's bid is not the product of fraud or collusion between the Purchaser and other interested parties or the trustee, or an attempt to take grossly unfair advantage of other interested parties.

48.    As a result of the foregoing, the Movants request that the Court make a finding that the transactions under the Agreement include reasonably equivalent value and fair consideration under any applicable law.  The Movants further request that this Court make a finding that the Purchaser has purchased the Purchased Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code.  Additionally, the

Movants request that this Court make a finding that that
the transactions contemplated by the Agreement are not
avoidable under section 363(n) of the Bankruptcy Code.

**III. THE SALE OF THE US ASSETS SHOULD BE FREE AND CLEAR
OF LIENS, CLAIMS AND ENCUMBRANCES UNDER BANKRUPTCY
CODE SECTION 363(f).**

49.   To facilitate the Sale, the Movants re-
quest authorization for (i) the Sale of the US Assets
free and clear of any and all liens (statutory or other),
mortgages, charges, hypothecs, pledges, security inter-
ests, easements, prior assignments, options, warrants,
leases, subleases, rights to possession, restrictive
covenants, claims, prior claims, or rights or restric-
tions, interest or any other encumbrance ("Interests")
and (ii) the Authorization of the sale of the InterTAN
Canada Assets free and clear of any and all Interests
except the Permitted Liens.

50.   Under section 363(f) of the Bankruptcy
Code, a debtor in possession may sell property free and
clear of any interest in such property if, among other
things:

> (1) applicable nonbankruptcy law permits
> sale of such property free and clear of
> such interest;

37

(2) such entity consents;

(3) such interest is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide  dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

51.   Section 363(f) permits the sale of estate property free and clear of interests if any one of the five conditions above is met.  See, e.g., In re Laines, 352 B.R. 410, 414-15 (Bankr. E.D. Va. 2005).

52.   Courts have held that the authority of a debtor to sell assets free and clear of interests is broad and should be read expansively.  See In re TWA, Inc., 322 F.3d 283, 289 (3d Cir. 2003); see also United Mine Workers of Am. 1992 Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.), 99 F.3d 573, 582 (4th Cir. W. Va. 1996) (holding that the phrase "any interest in property" includes more than just in rem interests); In re P.K.R. Convalescent Centers, Inc.,

189 B.R. 90, 94 (Bankr. E.D. Va. 1995)("As the plain meaning of the statute demonstrates, § 363 covers more situations than just sales involving liens."). Moreover, courts have noted that the purpose of the "free and clear" language is to allow the debtor to obtain a maximum recovery on its assets in the marketplace. See In re TWA, Inc., 2001 Bankr. LEXIS 723, at *8-*10 (Bankr. D. Del. Mar. 27, 2001).

53.    Accordingly, this Court should authorize the Sellers to sell the US Assets free and clear of all Interests and InterTAN to authorize the sale of the InterTAN Canada Assets free and clear of all Interests except the Permitted Liens, with any such Interests attaching to the net proceeds of the Sale of the Purchased Assets in the same order and priority as they exist against the Purchased Assets and in accordance with the terms and provisions of the Debtors' post-petition financing facility.

**IV.    THE FOTO SOURCE SETTLEMENT AGREEMENT IS WARRANTED UNDER BANKRUPTCY RULE 9019 AND BANKRUPTCY CODE SECTION 363(b)(1).**

54.    Bankruptcy Rule 9019 provides that the Court "may approve a compromise or settlement." Compro-

mises are tools for expediting the administration of the
case and reducing administrative costs and are favored
in bankruptcy.  See In re Bond, 1994 U.S. App. Lexis
1282, *9–*14 (4th Cir. 1994)("To minimize litigation and
expedite the administration of a bankruptcy estate,
'compromises are favored in bankruptcy'."); Fogel v.
Zell, 221 F.3d 955, 960 (7th Cir. 2000); In re Martin,
91 F.3d 389, 393 (3d Cir. 1996).  Various courts have
endorsed the use of Bankruptcy Rule 9019.  See, e.g.,
Bartel v. Bar Harbour Airways, Inc., 196 B.R. 268
(S.D.N.Y. 1996); In re Foundation for New Era Philan-
thropy, Case No. 95–13729B, 1996 Bankr. LEXIS 1892
(Bankr. E.D. Pa. Aug. 21, 1996); In re Miller, 148 B.R.
510, 516 (Bankr. N.D. Ill. 1992); In re Check Reporting
Service, Inc., 137 B.R. 653 (Bankr. W.D. Mich. 1992); In
re Patel, 43 B.R. 500, 504 (N.D. Ill. 1982).

     55.  The standards by which a Court should
evaluate a settlement are well established.  In addition
to considering the proposed terms of the settlement, the
Court should consider the following factors:

     (a)  the probability of success in litigation;

40

(b)   the difficulty in collecting any judgment
that may be obtained;

(c)   the complexity of the litigation involved,
and the expense inconvenience and delay
necessarily attendant to it; and

(d)   the interest of creditors and stockhold-
ers and a proper deference to their rea-
sonable views of the settlement.

See Protective Comm. for Indep. Stockholders of TMT

Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424-245

(1968); United States ex. Rel. Rahman v. Oncology Assoc.,

P.C., 269 B.R. 139, 152 (D. Md. 2001); In re Frye, 216

B.R. 166, 174 (E.D. Va. 1997).

56.   The decision to approve a settlement or

compromise is within the discretion of the Court and is

warranted where the settlement is found to be reasonable

and fair in light of the particular circumstances of the

case.  See TMT Trailer Ferry, 390 U.S. at 424-25.  The

settlement need not be the best that the debtor could

have achieved, but need only fall "within the reasonable

range of litigation possibilities."  In re Telesphere

Communications, Inc., 179 B.R. 544, 553 (Bankr. N.D. Ill.

1994).  In making its determination, a court should not

substitute its own judgment for that of the debtor.  In

41

re Neshaminy Office Bldg. Assoc., 62 B.R. 798, 803 (E.D.
Pa. 1986).

57.    The proposed Settlement Agreement be-
tween Foto Source, InterTAN Canada and West Coast meets
the standards for approval under applicable law.    The
Foto Source Settlement Agreement represents a fair and
reasonable compromise of Foto Source's Trademark Pro-
ceedings.    The Settlement Agreement avoids the cost, de-
lay and uncertainty of litigation and ensures that West
Coast and, after the Sale, the Purchaser, will be able
to continue to use the Trade-marks.

58.    Accordingly, for the reasons detailed
herein, the Debtors have determined that the Foto Source
Settlement Agreement is in their best interests and the
best interests of their estates, creditors and parties
in interest and seek approval of the Foto Source Settle-
ment Agreement under Bankruptcy Rule 9019.

59.    Additionally, under Bankruptcy Code sec-
tion 363, a bankruptcy court is empowered to authorize a
chapter 11 debtor to expend funds in the bankruptcy
court's discretion outside the ordinary course of busi-
ness.    See 11 U.S.C. § 363.    In order to obtain approval

42

for the use of estate assets outside the ordinary course

of business, the debtor must articulate a valid business

justification for the requested use.  See In re Iono-

sphere Clubs, Inc., 98 B.R. 174, 176 (Bankr. S.D.N.Y.

1985).  It is a condition precedent to the Sale that the

Debtors obtain approval of the Foto Source Settlement

Agreement and that the settlement be effective.  Thus,

there is a more than sufficient business justification

for entry into the Settlement Agreement and payment of

the settlement amount thereunder.

**V.    WAIVER OF THE TEN-DAY STAYS PROVIDED BY BANKRUPTCY
RULE 6004 SHOULD BE WAIVED FOR ANY ORDER APPROVING
THE SALE OF THE PURCHASED ASSETS.**

60.   Bankruptcy Rule 6004(h) provides that:

"[a]n order authorizing the use, sale, or lease of prop-

erty is stayed until the expiration of 10 days after en-

try of the order, unless the court orders otherwise."

Fed. R. Bankr. P. 6004(h).

61.   The Movants request that the Court waive

the ten-day stay of Bankruptcy Rule 6004 with respect to

the Sale of the Purchased Assets following entry of this

any and all orders approving such transactions.  By

waiving such requirements, the Movants and any purchaser

43

will be able to immediately close the transactions ap-

proved by such orders, which will in turn save the

Movants continued accrual of administrative expenses and

thereby benefit the Movants' estates.

**NOTICE**

62.    Notice of this Motion has been provided

to those parties entitled to notice under the Order Pur-

suant to Bankruptcy Code Sections 102 and 105, Bank-

ruptcy Rules 2002 and 9007, and Local Bankruptcy Rules

2002-1 and 9013-1 Establishing Certain Notice, Case Man-

agement, and Administrative Procedures (D.I. 130; the

"Case Management Order"), as well as (a) all entities

known to have expressed an interest in a transaction re-

garding the Purchased Assets during the past three

(3) months; (b) all entities known to have an interest

in any of the Purchased Assets; and (c) all federal,

state, and local regulatory or taxing authorities or re-

cording offices that have a reasonably known interest in

the relief requested through the Motion.  Notice of the

entry of the Sale Order will be provided to the same

parties.  The Debtors submit that, under the circum-

stances, no other or further notice need be given.

## WAIVER OF MEMORANDUM OF LAW

63.   Pursuant to Local Bankruptcy Rule 9013-1(G), and because there are no novel issues of law presented in the Motion and all applicable authority is set forth in the Motion, the Movants request that the requirement that all motions be accompanied by a separate memorandum of law be waived.

## NO PRIOR REQUEST

64.   No previous request for the relief sought herein has been made to this Court or any other court.

## CONCLUSION

WHEREFORE, the Seller respectfully requests that the Court enter an Order, substantially in the form annexed hereto, granting the relief requested herein and such other and further relief as may be just and proper.

Dated: March 6, 2009       SKADDEN, ARPS, SLATE, MEAGHER &
       Richmond, Virginia  FLOM, LLP
                    Gregg M. Galardi, Esq.
                    Ian S. Fredericks, Esq.
                    P.O. Box 636
                    Wilmington, Delaware 19899-0636
                    (302) 651-3000

                            - and -

                    SKADDEN, ARPS, SLATE, MEAGHER &
                    FLOM, LLP
                    Chris L. Dickerson, Esq.
                    333 West Wacker Drive
                    Chicago, Illinois 60606
                    (312) 407-0700

                            - and -

                    MCGUIREWOODS LLP

                    /s/ Douglas M. Foley         .
                    Dion W. Hayes (VSB No. 34304)
                    Douglas M. Foley (VSB No. 34364)
                    One James Center
                    901 E. Cary Street
                    Richmond, Virginia 23219
                    (804) 775-1000

                    Counsel for Debtors and Debtors
                    in Possession

## EXHIBIT A

**(Sale Order)**

Gregg M. Galardi, Esq.           Dion W. Hayes (VSB No. 34304)
Ian S. Fredericks, Esq.          Douglas M. Foley (VSB No. 34364)
SKADDEN, ARPS, SLATE, MEAGHER &  MCGUIREWOODS LLP
FLOM, LLP                        One James Center
One Rodney Square                901 E. Cary Street
PO Box 636                       Richmond, Virginia 23219
Wilmington, Delaware 19899-0636  (804) 775-1000
(302) 651-3000

              - and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
333 West Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

Counsel to the Debtors and
Debtors in Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

- - - - - - - - - - - - - - x
In re:                        :   Chapter 11
                              :
CIRCUIT CITY STORES, INC.,    :   Case No. 08-35653 (KRH)
et al.,                       :
                              :
              Debtors.        :   Jointly Administered
- - - - - - - - - - - - - - x

**ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 363
(I) APPROVING THE SALE BY CIRCUIT CITY STORES WEST
COAST, INC. AND VENTOUX INTERNATIONAL, INC. OF CERTAIN
ASSETS FREE AND CLEAR OF ALL INTERESTS; (II) APPROVING
INTERTAN, INC.'S AUTHORIZATION OF INTERTAN CANADA,
LTD.'S SALE OF SUBSTANTIALLY ALL OF ITS ASSETS; (III)
APPROVING THE INTERCOMPANY AGREEMENT; (IV) APPROVING THE
FOTO SOURCE SETTLEMENT AGREEMENT; AND (V) GRANTING
RELATED RELIEF**

Upon the motion (the "Motion")[1] of InterTAN, Inc. ("InterTAN"), Circuit City Stores West Coast, Inc. ("West Coast"), and Ventoux International, Inc. ("Ventoux" and together with InterTAN and West Coast, the "Movants" and, collectively with the debtors and debtors in possession in the above-captioned jointly administered cases, the "Debtors"), for entry of an order pursuant to sections 105 and 363 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 4001, 6004 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order (I) approving the sale or licensing, as applicable, (the "Sale") of (A) certain trade-marks and licensed trade-marks by West Coast, listed on Exhibit 1 hereto (the "Trade-marks" and the "Licensed Trademarks," respectively) and (B) the shares in Circuit City Global Sourcing Limited ("CCGS" and such shares in CCGS, the "CCGS Shares") by Ventoux to 4458729 Canada Inc. or its designee or designees (the "Purchaser") free and clear of all Interests (as defined herein), (II) approving In-

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

terTAN's authorization (the "Authorization") for Inter-
TAN Canada Ltd. ("InterTAN Canada") to sell substan-
tially all of its assets (the "InterTAN Canada Assets")
to the Purchaser, (III) approving the Intercompany
Agreement (as defined herein), (IV) approving the Foto
Source Settlement Agreement (as defined herein) and
(V) granting related relief; and the Court having con-
ducted a hearing on the Motion on March 20, 2009 (the
"Sale Hearing"); and all parties in interest having been
heard, or having had the opportunity to be heard, re-
garding the asset purchase agreement between InterTAN
Canada, West Coast, Ventoux, the Purchaser and Bell Can-
ada (the "Agreement"), and the transactions contemplated
thereby (the "Transactions"); and the Court having re-
viewed and considered the Motion, and the arguments of
counsel made, and the evidence adduced, at the Sale
Hearing; and upon the record of the Sale Hearing and
these chapter 11 cases, and after due deliberation
thereon, and good cause appearing therefore it is hereby

**FOUND AND DETERMINED THAT:**[2]

---

[2]  Findings of fact shall be construed as conclusions of law and
conclusions of law shall be construed as findings of fact when
appropriate.  See Fed. R. Bankr. P. 7052.

A.   The Court has jurisdiction to hear and determine the Motion and to grant the relief requested in the Motion pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(b).

B.   Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

C.   The statutory predicates for the relief requested in the Motion are Bankruptcy Code sections 105 and 363 and Bankruptcy Rules 2002, 4001, 6004 and 9019.

D.   Notice of the Motion and entry of the Sale Order has been provided to (i) all entities known to have asserted any Interest in the Purchased Assets, (ii) all federal, state, and local regulatory or taxing authorities or recording offices, which have a reasonably known interest in the relief requested by the Motion and (iii) all parties entitled to notice under the Order Pursuant to Bankruptcy Code Sections 102 and 105, Bankruptcy Rules 2002 and 9007, and Local Bankruptcy Rules 2002-1 and 9013-1 Establishing Certain Notice, Case Man-

4

agement, and Administrative Procedures (D.I. 130; the "Case Management Order").

E.    Based upon the affidavits of service filed with the Court, notice of the Motion and the Sale Hearing was adequate and sufficient under the circumstances of these chapter 11 cases and these proceedings and complied with the various applicable requirements of the Bankruptcy Code, the Bankruptcy Rules and the Case Management Order.

F.    A reasonable opportunity to object and be heard with respect to the Motion and the relief requested therein was afforded to all interested persons and entities.

G.    The Agreement was approved in the Canadian Case by virtue of that Approval and Vesting Order issued March __, 2009.

H.    The Trade-marks are property of West Coast's estate and title thereto is vested in West Coast's estate.

I.    The CCGS Shares are property of Ventoux's estate and title thereto is vested in Ventoux's estate.

5

J.    InterTAN is the sole shareholder of In-
terTAN Canada.

K.    The Movants, InterTAN Canada and their
professionals marketed the Purchased Assets as set forth
in the Motion.  Any and all other parties interested in
bidding on or acquiring the Purchased Assets were pro-
vided, upon request, sufficient information by InterTAN
Canada, the Debtors and the Monitor to permit them to
bid on the Purchased Assets.  The process employed by
InterTAN Canada, the Debtors and the Monitor in connec-
tion with the CCAA Sale Process was adequate and reason-
able to obtain the highest and best bid for the Pur-
chased Assets.

L.    The Movants have determined, after a full
and reasonable marketing process, that the highest and
best offer for the Purchased Assets was that of Pur-
chaser.  The Debtors and their creditors will receive a
significant benefit from the Transactions.

M.    Subject to the entry of this Order, the
Debtors, in general, and each of West Coast and Ventoux
(together, the "Sellers"), in particular, (i) has full
power and authority to execute the Agreement and all

other documents contemplated thereby, and the Sale of

the Trade-marks and the CCGS Shares (together, the "US

Assets") has been duly and validly authorized by all

necessary company action of each of the Sellers, (ii)

has all of the power and authority necessary to consum-

mate the Transactions contemplated by the Agreement and

(iii) has taken all company action necessary to author-

ize and approve the Agreement and the consummation by

each of the Transactions.  No consents or approvals,

other than those expressly provided for in the Agreement

or this Order, are required for the Sellers to close the

Sale and consummate the Transactions.

N.   Subject to entry of this Order, the Debt-

ors, in general, and InterTAN, in particular, (i) has

full power and authority to provide the Authorization of

the sale of the InterTAN Canada Assets by InterTAN Can-

ada, (ii) has all of the power and authority to author-

ize InterTAN Canada's consummation of the Transactions

contemplated by the Agreement and (iii) has taken all

company action necessary to provide the Authorization.

No consents or approvals, other than those expressly

provided for in the Agreement or this Order, are re-

quired for InterTAN to authorize InterTAN Canada to close the sale and consummate the Transactions.

O.    The Agreement and the Transactions were negotiated and have been and are undertaken by the Sellers, InterTAN Canada and the Purchaser at arms' length without collusion or fraud, and in good faith within the meaning of Sections 363(m) of the Bankruptcy Code.  As a result of the foregoing, each of the Sellers, InterTAN Canada, the Purchaser and its affiliates are entitled to the protections of Section 363(m) of the Bankruptcy Code.

P.    Neither the Movants nor Purchaser engaged in any conduct that would cause or permit the Agreement or the consummation of the Transactions to be avoided, or costs or damages to be imposed, under Section 363(n) of the Bankruptcy Code.

Q.    The bid by the Purchaser for the Purchased Assets is the highest and best offer received by the Debtors, and the Agreement provides (a) reasonably equivalent value under the Bankruptcy Code and Uniform Fraudulent Transfer Act, (b) fair consideration under the Uniform Fraudulent Conveyance Act, and (c) reasona-

bly equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession, or the District of Columbia ((a), (b) and (c) collectively, "Value"), for the Purchased Assets.

R.   Purchaser would not have entered into the Agreement and would not consummate the Transactions, thus adversely affecting the Debtors, their estates, and their creditors, if the sale of the Purchased Assets to Purchaser was not free and clear of all Interests (as defined herein), or if Purchaser would, or in the future could, be liable for any of such Interests.  A sale of the Purchased Assets other than one free and clear of all Interests would adversely impact the Debtors' estates, and would yield substantially less value for the Debtors' estates, with less certainty than the Sale.

S.   The sale of the CCGS Shares and the Trade-marks and the license of the Licensed Trade-marks is an integral part of the Agreement and cannot be severed from the sale of the remainder of the assets being sold by InterTAN Canada.  Without a sale of the CCGS Shares and the Trade-marks and the license of the Li-

censed Trade-marks, Purchaser would not purchase any of the Purchased Assets.

T.    There are no licenses or rights to use the Trade-marks that conflict with any of the licenses or rights to use the Trade-marks in the manner contemplated by the Agreement.

U.    Purchaser is only purchasing or licensing, as applicable, the Purchased Assets and is not acquiring any of the Excluded Assets.  Purchaser is not assuming any of the debts, liabilities or obligations of the Debtors, and Purchaser shall not in any way be liable or responsible for any liabilities, commitments or obligations in any way related to the Debtors, InterTAN Canada or the Purchased Assets arising before the date and time of the closing under the Agreement (the "Closing Date"), except as expressly set forth in the Agreement.  No executory contracts or unexpired leases are being assumed or assigned to Purchaser pursuant to Bankruptcy Code section 365 in connection with the Agreement.

V.    The Purchaser (i) is not an "insider" or "affiliate" of the Sellers, (ii) is not a successor to

the Sellers and (iii) has no continuity of enterprise with the Sellers.  The Transactions do not amount to, or otherwise constitute, a consolidation, merger or de fac-tor merger of Purchaser with the Sellers.  The Debtors and Purchaser do not have any common controlling share-holders or senior management.

W.   West Coast may sell and/or license the Trade-marks, Ventoux may sell the CCGS Shares, and In-terTAN may authorize the sale of the InterTAN Canada As-sets free and clear of all Interests, because, with re-spect to each creditor asserting an Interest in the Pur-chased Assets, one or more of the standards set forth in Bankruptcy Code § 363(f)(1)-(5) has been satisfied. Those holders of Interests who did not object or who withdrew their objections to the Sale or the Motion are deemed to have consented to the Motion and Sale pursuant to Bankruptcy Code § 363(f)(2). Those holders of Inter-ests who did object fall within one or more of the other subsections of Bankruptcy Code Section 363(f).

X.   The payment of the US Assets Purchase Price was the result of negotiations between Circuit City, the Sellers and InterTAN Canada.  The US Assets

Purchase Price is fair and reasonable under the circumstances.

Y.   Subject to the entry of this Order, the Debtors, in general, and each of Circuit City and the Sellers, in particular, (i) has full power and authority to execute the Intercompany Agreement and all other documents contemplated thereby, and entry into the Intercompany Agreement has been duly and validly authorized by all necessary company action of each of the Sellers and (ii) has taken all company action necessary to authorize and approve the Intercompany Agreement.  No consents or approvals, other than those expressly provided for in the Intercompany Agreement or this Order, are required for Circuit City and the Sellers to enter into the Intercompany Agreement.

Z.   The Intercompany Agreement will provide the Debtors with US$15 million in immediate funds upon the Closing of the Agreement as the US Assets Purchase Price, as well as certain additional funds pursuant to the Loan.  The terms of the Intercompany Agreement are fair and reasonable in the circumstances.  Accordingly,

12

entry into the Intercompany Agreement is in the best in-
terests of Circuit City and the Sellers.

AA.   The Foto Source Settlement Agreement is
fair and reasonable under the circumstances and West
Coast will not be responsible for payment of the settle-
ment amount.   Moreover, entry into the Foto Source Set-
tlement Agreement is a condition precedent to Closing of
the Agreement and cannot be severed from the Agreement.
Without approval and consummation of the Foto Source
Settlement Agreement, Purchaser would not purchase any
of the Purchased Assets.   Accordingly, entry into the
Foto Source Settlement Agreement is in the best interest
of West Coast.

BB.   Subject to the entry of this Order, the
Debtors, in general, and West Coast, in particular, (i)
has full power and authority to execute the Foto Source
Settlement Agreement and all other documents contem-
plated thereby, and entry into the Foto Source Settle-
ment Agreement has been duly and validly authorized by
all necessary company action of West Coast and (ii) has
taken all company action necessary to authorize and ap-
prove the Foto Source Settlement Agreement.   No consents

or approvals, other than those expressly provided for in
the Agreement or this Order, are required for the Sell-
ers to close the Sale and consummate the Transactions.

CC.  The Court finds that the Movants have ar-
ticulated good and sufficient business reasons justify-
ing the sale of the Purchased Assets to Purchaser.  Such
business reasons include, but are not limited to, the
following: (i) the Agreement constitutes the highest and
best offer for the Purchased Assets; (ii) the Agreement
and the Closing thereon will present the best opportu-
nity to realize the value of the Purchased Assets and
avoid decline and devaluation of the Purchased Assets;
(iii) there is a risk of deterioration of the value of
the Purchased Assets if the Sale is not consummated
promptly; and (iv) the Agreement and the Closing thereon
will provide a greater recovery for the Debtors' credi-
tors than would be provided by any other presently
available alternative.

DD.  Time is of the essence in consummating
the Sale.  In order to maximize the value of the Debt-
ors' assets, it is essential that the sale of the Pur-
chased Assets occur within the time constraints set

forth in the Agreement.  Accordingly, there is cause to
lift the stay contemplated by Bankruptcy Rule 6004.

        EE.  The Sale, the Authorization, the Inter-
company Agreement and the Foto Source Settlement Agree-
ment are in the best interests of the Debtors and their
estates, creditors, and Interest holders and all other
parties in interest herein; and it is therefore

                **ORDERED, ADJUDGED AND DECREED THAT:**

        1.    The relief requested in the Motion is
GRANTED.

        2.    Pursuant to Bankruptcy Code sections 105
and 363, the Agreement and the Sale of the US Assets to
Purchaser free and clear of all Interests (including the
license of the Licensed Trade-marks) are hereby approved
and authorized in all respects.

        3.    Pursuant to Bankruptcy Code sections 105
and 363, the Authorization and the InterTAN Resolution,
attached hereto as <u>Exhibit 2</u>, are hereby approved and
authorized in all respects.

        4.    Pursuant to Bankruptcy Code sections 105
and 363, the Intercompany Agreement, attached hereto as

                                15

Exhibit 3, is hereby approved and authorized in all re-
spects.

5.    Pursuant to Bankruptcy Rule 9019, the
Foto Source Settlement Agreement, attached hereto as Ex-
hibit 4, is hereby approved and authorized in all re-
spects.

6.    Pursuant to Bankruptcy Code sections
363(b) and 363(f), upon the consummation of the Transac-
tions, Sellers' right, title, license to and interest in
the US Assets shall be transferred to the Purchaser free
and clear of all interests, including (without limita-
tion) any lien (statutory or other), mortgage, charge,
hypothec, pledge, security interest, easement, prior as-
signment, option, warrant, lease, sublease, right to
possession, restrictive covenant, claim, prior claim, or
right or restriction, interest or any other encumbrance
(collectively, "Interests"), with all such Interests to
attach to the cash proceeds of the Sale in the order of
their priority, with the same validity, force, and ef-
fect that they had as against the US Assets immediately
before such transfer, subject to any claims and defenses
the Sellers may possess with respect thereto.

16

7.    Purchaser is not assuming nor shall it or any affiliate of Purchaser be in any way liable or responsible, as a successor or otherwise, for any liabilities, debts, or obligations of the Sellers in any way whatsoever relating to or arising from the ownership or use of the US Assets by the Sellers prior to the consummation of the Transactions contemplated by the Agreement, or any liabilities calculable by reference to the Sellers or the US Assets, or relating to continuing or other conditions existing on or prior to the Closing.

8.    All persons are enjoined from in any way pursuing the Purchaser or the US Assets by suit or otherwise to recover on any Interests which such person had, has or may have against the Sellers or the US Assets.

9.    The Transactions were undertaken by the Purchaser in good faith and the Purchaser is a good faith purchaser of the Purchased Assets as that term is used in Bankruptcy Code section 363(m).  The Purchaser and its affiliates are entitled to all of the protections afforded by Section 363(m) of the Bankruptcy Code.

17

10.   Pursuant to sections 105 and 363 of the
Bankruptcy Code, the Movants and the Purchaser are each
hereby authorized to take any and all actions necessary
or appropriate to: (i) consummate the Sale of the US As-
sets to Purchaser and the Closing of the Sale in accor-
dance with the Motion, the Agreement and this Order; and
(ii) perform, consummate, implement and close fully the
Agreement together with all additional instruments and
documents that may be reasonably necessary or desirable
to implement the Agreement, including, but not limited
to, the Intercompany Agreement and the Foto Source Set-
tlement Agreement.

11.   Notwithstanding anything to the contrary
in the Senior Secured Super-Priority Debtor-in-
Possession Credit Agreement dated as of November 12,
2008 by, among others, InterTAN Canada, Circuit City and
other borrowers party thereto, and Bank of America,
N.A., as amended from time to time, the proceeds from
the Transactions contemplated by the Agreement shall be
distributed as set forth in this Order.

12.   This Order is and shall be binding upon
and govern the acts of all entities, including, all fil-

18

ing agents, filing officers, title agents, title compa-
nies, recorders of mortgages, recorders of deeds, regis-
trars of deeds, administrative agencies or units, gov-
ernmental departments or units, secretaries of state,
federal, state and local officials and all other persons
and entities who may be required by operation of law,
the duties of their office, or contract, to accept,
file, register or otherwise record or release any docu-
ments or instruments, or who may be required to report
or insure any title or state of title in or to the US
Assets conveyed to Purchaser.  All such entities de-
scribed above in this paragraph are authorized and spe-
cifically directed to strike all recorded Liens against
the US Assets from their records, official and other-
wise.

13.  Each and every federal, state and govern-
mental agency or department, and any other person or en-
tity, is hereby directed to accept any and all documents
and instruments necessary and appropriate to consummate
the Transactions contemplated by the Agreement.

14.  This Court requests the aid and recogni-
tion of any court, tribunal, regulatory or administra-

tive body having jurisdiction in Canada or in the United States to give effect to this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance as may be necessary or desirable to give effect to this Order.

15. Any portion of the Agreement, the Intercompany Agreement and the Foto Source Settlement Agreement, and any related agreements may be waived, modified, amended, or supplemented by written agreement of the parties thereto without further action of the Court; provided, however, that any such waiver, modification, amendment, or supplement is not material and substantially conforms to and effectuates the respective Agreement.

16. The failure specifically to include any particular provisions of the Agreement, the Intercompany Agreement, the Foto Source Settlement Agreement or any related agreements in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court, the Debtors and Purchaser that the Agreement, the Intercompany Agreement, the Foto Source

20

Settlement Agreement and any related agreements are au-

thorized and approved in their entirety with such amend-

ments thereto as may be made by the parties in accor-

dance with this Order before the Closing Date.

17.   This Order shall be effective immediately

upon entry, and any stay of orders provided for in Bank-

ruptcy Rules 6004(h) and any other provision of the

Bankruptcy Code or Bankruptcy Rules is expressly lifted.

18.   To the extent permitted by section 525 of

the Bankruptcy Code, no governmental unit may revoke or

suspend any right, license, trademark or other permis-

sion relating to the use of the Purchased Assets sold,

transferred or conveyed to Purchaser on account of the

filing or pendency of these chapter 11 cases or the con-

summation of the Sale.

19.   The Court retains jurisdiction, even af-

ter the Closing, of these chapter 11 cases, to:

(1) interpret, implement and enforce the terms and pro-

visions of this Order (including the injunctive relief

provided in this Order) and the terms of the Agreement,

the Intercompany Agreement, the Foto Source Settlement

Agreement, all amendments thereto and any waivers and

21

consents thereunder; (2) protect Purchaser, or the US

Assets, from and against any of the Interests; (3) com-

pel delivery of the US Assets to Purchaser; and

(4) resolve any disputes arising under or related to the

Agreement, the Sale, the Authorization, the Transactions

or Purchaser's peaceful use and enjoyment of the US As-

sets.


Dated:  Richmond, Virginia
        March ____, 2009


        _____
        UNITED STATES BANKRUPTCY JUDGE

WE ASK FOR THIS:

Gregg M. Galardi, Esq.
Ian S. Fredericks, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
One Rodney Square
PO Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

        - and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
333 West Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

        - and -

/s/ Douglas M. Foley
Dion W. Hayes (VSB No. 34304)
Douglas M. Foley (VSB No. 34364)
MCGUIREWOODS LLP
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

Counsel to the Debtors and Debtors in Possession


### CERTIFICATION OF ENDORSEMENT UNDER LOCAL RULE 9022-1(C)

        Pursuant to Local Bankruptcy Rule 9022-1(C), I
hereby certify that the foregoing proposed order has
been endorsed by or served upon all necessary parties.

                        /s/ Douglas M. Foley

## **EXHIBIT 1**

**(Trade-marks and Licensed Trade-marks)**

## SCHEDULE 8

**TRADEMARKS AND LICENSED TRADE-MARKS**

## Trade-marks

| Trademark | App./Reg. No. | Comments |
|---|---|---|
| THE SOURCE | 1372924 | |
| THE SOURCE & DESIGN  | 1372925 | |
| SOURCE REWARDS | 1385275 | |

## Licensed Trade-marks

| Trade-mark | Application Number | Registration Number |
|---|---|---|
| CIRCUIT CITY | 0680646 | TMA407148 |
| CIRCUIT CITY | 0608678 | TMA427363 |
| CIRCUIT METRO | 0608679 | TMA481169 |
| CIRCUIT CITY EXPRESS | 0743999 | TMA508369 |
| CIRCUIT CITY & DESIGN | 0792254 | TMA508806 |
| CIRCUIT CITY DIRECT | 0795658 | TMA523186 |
| THE SOURCE BY CIRCUIT CITY | Withdrawn | |
| THE SOURCE BY CIRCUIT CITY & DESIGN | Withdrawn | |
| thesourcecc.ca | Domain name | |
| thesourcecc.com | Domain name | |
| lasourcecc.ca | Domain name | |
| lasourcecc.com | Domain name | |

**<u>EXHIBIT 2</u>**

**(InterTAN Resolution)**

**InterTAN Canada Ltd.**
**(the "Corporation")**

## RESOLUTION OF THE SHAREHOLDER

**RECITALS:**

A.   It is desirable and in the best interests of InterTAN, Inc., the sole shareholder of the Corporation (the "**Shareholder**"), to cause the Corporation to agree to sell certain assets and assign certain liabilities to 4458729 Canada Inc. (the "**Purchaser**") and the Purchaser has agreed to purchase certain assets and assume certain liabilities for cash consideration (the "**Transaction**") on the terms and conditions set forth in an asset purchase agreement and certain ancillary agreements.

B.   It is desirable and in the best interests the Shareholder to cause the Corporation to agree to lend certain funds to Circuit City Stores, Inc. (the "**Parent**") from the proceeds of the Transaction to the Parent on the terms and conditions set forth in a intercompany agreement.

C.   It is desirable and in the best interests of the Shareholder to cause the Corporation to agree to settle certain intellectual property disputes between the Corporation, Circuit City Stores West Coast, Inc. ("**West Coast**") and Foto Source Canada Inc. ("**Foto Source**") on the terms and conditions set forth in a settlement and coexistence agreement.

**RESOLVED THAT:**

1.   The entering into by the Corporation of an asset purchase agreement between the Corporation, West Coast, Ventoux International, Inc. ("**Ventoux**") and the Purchaser (the "**Asset Purchase Agreement**"), in the form presented to the Shareholder and the performance by the Corporation of its obligations thereunder, are hereby authorized and approved.

2.   The entering into by the Corporation of an escrow agreement between the Corporation, the Purchaser and Alvarez & Marsal Canada ULC (the "**Escrow Agreement**"), in the form presented to the Shareholder and the performance by the Corporation of its obligations thereunder, are hereby authorized and approved.

3.   The entering into by the Corporation of a conveyance and assumption of obligations agreement between the Corporation and the Purchaser (the "**Conveyance and Assumption of Obligations Agreement**"), in the form presented to the Shareholder and the performance by the Corporation of its obligations thereunder, are hereby authorized and approved.

4.   The entering into by the Corporation of a confirmatory assignment of trade-marks (the "**Confirmatory Assignment of Trade-marks**") in the form presented to the Shareholder and the performance by the Corporation of its obligations thereunder, are hereby authorized and approved.

5.    The entering into by the Corporation of an assignment and assumption of real property leases agreement between the Corporation and the Purchaser (the "**Assignment and Assumption of Real Property Leases Agreement**"), in the form presented to the Shareholder and the performance by the Corporation of its obligations thereunder, are hereby authorized and approved.

6.    The entering into by the Corporation of a license termination agreement between the Corporation and West Coast (the "**License Termination Agreement**"), in the form presented to the Shareholder and the performance by the Corporation of its obligations thereunder, are hereby authorized and approved.

7.    The entering into by the Corporation of an intercompany agreement between the Corporation, West Coast, Ventoux and the Parent (the "**Intercompany Agreement**"), in the form presented to the Shareholder and the performance by the Corporation of its obligations thereunder, are hereby authorized and approved.

8.    The entering into by the Corporation of a settlement and coexistence agreement between the Corporation, West Coast and Foto Source (the "**Settlement and Coexistence Agreement**"), in the form presented to the Shareholder and the performance by the Corporation of its obligations thereunder, are hereby authorized and approved.

9.    Any officer or director of the Corporation, acting alone (each an "**Authorized Signatory**") is authorized and directed to negotiate, finalize, execute and deliver any and all such further documents, agreements, authorizations, certificates, elections or other instruments, including, the Asset Purchase Agreement, the Escrow Agreement, the Conveyance and Assumption of Obligations Agreement, the Confirmatory Assignment of Trade-marks, the Assignment and Assumption of Real Property Leases Agreement, the License Termination Agreement, the Intercompany Agreement and the Settlement and Coexistence Agreement (the "**Agreements**"), with or without the corporate seal affixed, and to take any and all such further action as the Authorized Signatory, in its sole discretion may deem necessary or desirable in order to complete the transactions contemplated in this resolution, the execution and delivery of any such documents, agreements, authorizations, elections or other instruments, including the Agreements, or the doing of any such other act or thing by such Authorized Signatory to be conclusive evidence of such determination.

10.    All actions previously taken by an officer or director of the Corporation relating to or in connection with any of the transactions described above are approved, ratified and confirmed.

*[The remainder of this page has intentionally been left blank]*

The foregoing resolutions are passed as evidenced by the signature of the Shareholder of the Corporation pursuant to the provisions of the *Business Corporations Act* (Ontario) and in accordance with the power vested in the Shareholder by virtue of a Declaration of the Shareholder made as of October 7, 2008.

**DATED** February 23, 2009.

INTERTAN, INC.

By: _Michelle Mosier_____

Michelle Mosier

Chief Financial Officer and Treasurer

TOR_A2G:3606844.3

## EXHIBIT 3

**(Intercompany Agreement)**

## INTERCOMPANY AGREEMENT

**THIS AGREEMENT** is made as of February 23, 2009

**B E T W E E N :**

> **InterTAN Canada Ltd.**, a corporation governed by the laws of Ontario
>
> ("**InterTAN**")
>
> > - and -
>
> **Circuit City Stores, Inc.**, a corporation governed by the laws of Virginia
>
> ("**Circuit City**")
>
> > - and -
>
> **Circuit City Stores West Coast, Inc.**, a corporation governed by the laws of California
>
> ("**West Coast**")
>
> > - and -
>
> **Ventoux International, Inc.**, a corporation governed by the laws of Delaware
>
> ("**Ventoux**")

**RECITALS:**

A.    InterTAN is an indirect, wholly-owned subsidiary of Circuit City.

B.    West Coast and Ventoux are each wholly-owned subsidiaries of Circuit City.

C.    On November 10, 2008, Circuit City and certain of its U.S. subsidiaries voluntarily commenced bankruptcy proceedings under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court, Eastern District of Virginia (the "**Chapter 11 Proceedings**") and InterTAN and Tourmalet Corporation, an unlimited liability corporation governed by the laws of Nova Scotia, commenced a voluntary proceeding under the *Companies' Creditors Arrangement Act* (Canada) in the Province of Ontario (the "**CCAA Proceeding**").

D.    InterTAN, West Coast, Ventoux, 4458729 Canada Inc. and Bell Canada have entered into an Asset Purchase Agreement dated February 23, 2009 ("APA"), whereby InterTAN has agreed to sell substantially all of its assets to the Purchaser (as defined in the APA), and

the Purchaser has agreed to purchase such assets and to assume certain of InterTAN's liabilities.

E.    West Coast is the owner of certain Trademarks (as defined in the APA) related to InterTAN's Business (as defined in the APA).

F.    Ventoux is the owner of all of the issued and outstanding shares of Circuit City Global Sourcing, Limited ("**CCGS**"), a company incorporated under the laws of Hong Kong.

G.    Pursuant to the APA, the Purchaser intends to acquire ownership of and obtain a license of the Trademarks currently owned by West Coast and to acquire the Shares of CCGS.

H.    Subject to approval of the U.S. Bankruptcy Court and the CCAA Court (both as defined in the APA) and subject to the terms set forth herein, Circuit City may wish to borrow funds from InterTAN from the proceeds of sale of the transaction contemplated by the APA to assist Circuit City to pay certain expenses in connection with the wind down of its operations.

**NOW, THEREFORE**, in consideration of the mutual promises herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties intending to be lawfully bound agree as follows:

1.    **Payment to West Coast and Ventoux.**  InterTAN agrees that, in connection with the closing of the transaction contemplated by the APA (the "**Closing**"), the amount to be paid to West Coast to acquire and/or licence the Trademarks and to Ventoux to acquire the shares of CCGS shall be no more than the Canadian Dollar equivalent of U.S.$15,000,000 in the aggregate (less any applicable withholding taxes in respect of the Licensed Trademarks), such payment to be made to West Coast, to Ventoux, or as they may otherwise direct in writing, from the proceeds of sale under the APA, and provided that such amount may be allocated between West Coast and Ventoux as they deem appropriate.  For greater certainty, nothing herein shall prevent Circuit City and its affiliates from agreeing to any other allocation of proceeds received from InterTan or the Closing (excluding any loan made in furtherance of paragraph 2 hereof, if any) among West Coast, Ventoux or other entities.

2.    **Loan to Circuit City.**  InterTAN agrees to make available a loan to Circuit City from the Sale Proceeds in an amount up to CAD$35,000,000 (the "**Loan**"), on terms that are satisfactory to Circuit City, InterTAN and the Monitor (as defined in the APA), each acting reasonably, and subject to the following conditions precedent being met to the reasonable satisfaction of both InterTAN and the Monitor:

(a)    This Agreement shall be approved by both the U.S. Bankruptcy Court and the CCAA Court.

(b)    Circuit City shall furnish to both InterTAN and the Monitor cash flows demonstrating that the amount of any Loan is necessary to assist Circuit City to conclude the wind down of its operations.

- 3 -

(c)     Both InterTAN and the Monitor shall be satisfied with the mechanics and timing for repayment of any Loan and the ability of Circuit City to make full repayment thereof.

(d)     InterTAN and Circuit City shall enter into a loan agreement or Circuit City shall provide InterTAN with a promissory note to evidence the Loan, and Circuit City shall cause any of its subsidiaries and affiliates to provide any guarantee that may be reasonably requested by InterTAN and the Monitor with respect to the Loan, each of which shall be in form and substance satisfactory to InterTAN and the Monitor acting reasonably, which loan agreement or promissory note and any Loan provided thereunder, and which guarantees, shall be approved by both the U.S. Bankruptcy Court and the CCAA Court on terms satisfactory to InterTan and the Monitor, acting reasonably, before the making of any such Loan.

(e)     The obligation to repay the Loan by Circuit City and the guarantee of such repayment of the Loan by the subsidiaries and affiliates of Circuit City, shall be secured by all the property, assets, and undertaking of Circuit City and its subsidiaries or affiliates, as applicable (the "**Security**").

(f)     The Security (and the priority of such Security) shall be satisfactory to InterTAN and the Monitor, acting reasonably and be approved by the U.S. Bankruptcy Court and the CCAA Court on notice to all affected creditors or as InterTAN and/or the Monitor may direct.

(g)     Circuit City shall furnish to both InterTAN and the Monitor evidence showing that the property, assets and undertaking of Circuit City and its subsidiaries and affiliates pledged as Security to InterTAN to secure the obligation for repayment of the Loan are adequate and sufficient to secure full payment of the Loan, which evidence shall be satisfactory to InterTan and the Monitor, acting reasonably.

3.     **Assignment.**  Except as expressly provided herein, the parties hereto may not assign or transfer, whether absolutely, by way of security or otherwise, all or any part of their respective rights or obligations under this Agreement without the prior written consent of the other parties.

4.     **Governing Law.**  This Agreement shall be governed by and construed in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein.

5.     **Successors and Assigns.**  This Agreement shall enure to the benefit of, and be binding upon, the Parties and their respective successors and permitted assigns.

6.     **Counterparts.**  This Agreement may be delivered by facsimile transmission and be executed in any number of counterparts, each of which shall be deemed to be an original and all of which shall constitute one and the same instrument.

*[The remainder of this page has been intentionally left blank]*

**IN WITNESS WHEREOF** the parties hereto have executed this Agreement as of the date first written above.

INTERTAN CANADA LTD.

By: _____

Name: _MARK WONG_

Title: _VICE PRESIDENT, GENERAL
COUNSEL AND SECRETARY_

CIRCUIT CITY STORES, INC.

By: _____

Reginald D. Hedgebeth
Senior Vice President, General Counsel and
Secretary

CIRCUIT CITY STORES WEST COAST, INC.

By: _____

Reginald D. Hedgebeth
Chairman/CEO

*Intercompany Agreement*

**IN WITNESS WHEREOF** the parties hereto have executed this Agreement as of the date first written above.

INTERTAN CANADA LTD.

By:    InterTAN, Inc.

    By: _____

       Name:

       Title:

CIRCUIT CITY STORES, INC.

By: _____

    Reginald D. Hedgebeth

    Senior Vice President, General Counsel and Secretary

CIRCUIT CITY STORES WEST COAST, INC.

By: _____

    Reginald D. Hedgebeth

    Chairman/CEO

*Intercompany Agreement*

**IN WITNESS WHEREOF** the parties hereto have executed this Agreement as of the date first written above.

**INTERTAN CANADA LTD.**

By:   InterTAN, Inc.

     By: _____

       Name:

       Title:

**CIRCUIT CITY STORES, INC.**

By:   _____

     Reginald D. Hedgebeth

     Senior Vice President, General Counsel and Secretary

**CIRCUIT CITY STORES WEST COAST, INC.**

By:   _____

     Reginald D. Hedgebeth

     Chairman/CEO

*Intercompany Agreement*

- 2 -

VENTOUX INTERNATIONAL, INC.

By: _____
Reginald D. Hedgebeth
Vice President and Secretary

*Intercompany Agreement*

## <u>EXHIBIT 4</u>

**(Foto Source Settlement Agreement)**

## SETTLEMENT AND COEXISTENCE AGREEMENT

**THIS AGREEMENT** is made as of February 20, 2009

**BETWEEN:**

> **FOTO SOURCE CANADA INC.**, a company incorporated pursuant to the laws of the Province of Ontario, having its principal office at 2333 Wyecroft Road, Oakville, Ontario, Canada
>
> - and –
>
> **INTERTAN CANADA LTD.**, a corporation incorporated pursuant to the laws of the Province of Ontario, having its principal office at 279 Bayview Drive, Barrie, Ontario, Canada
>
> - and –
>
> **CIRCUIT CITY STORES WEST COAST, INC.**, a corporation incorporated pursuant to the laws of the State of California, having its principal office at 9520 Sheridan Boulevard, Westminster, Colorado, U.S.A.

**RECITALS**:

A.    Unless otherwise indicated, all capitalized terms have the meanings ascribed to them in paragraph 1 below.

B.    By entering into this Agreement, Foto Source, InterTAN and CCSWC intend to fully and finally settle all issues arising from, or in any way related to the Action.

**THEREFORE**, the parties agree as follows:

1.    Whenever used in this Agreement, the following words and terms shall have the meanings set out below:

> (a)    **"Action"** means the action commenced in the Federal Court of Canada by Foto Source against InterTAN and Circuit City under Court File No. T-2243-06.
>
> (b)    **"CCSWC"** means Circuit City Stores West Coast, Inc.

(c)     **"CCSWC Marks"** means the trade-mark THE SOURCE and any other word or design trade-mark which includes the word SOURCE (other than the Foto Source Marks and the trade-marks prohibited in paragraph 8 below), and includes the following trade-marks:

   (i)     THE SOURCE BY CIRCUIT CITY which is the subject matter of Canadian trade-mark application number 1252450;

   (ii)    THE SOURCE BY CIRCUIT CITY & DESIGN which is the subject matter of Canadian trade-mark application number 1253279;

   (iii)   SOURCE REWARDS which is the subject matter of Canadian trade-mark application number 1385275;

   (iv)    THE SOURCE which is the subject matter of Canadian trade-mark application number 1372924; and

   (v)     THE SOURCE & DESIGN which is the subject matter of Canadian trade-mark application number 1372925.

(d)     **"CCSWC Releasees"** means CCSWC, and any related and affiliated corporations and entities, and all successors and assigns (including, for greater certainty, any assignee of the CCSWC Marks), as the case may be, and all of the officers, directors, employees and agents, as the case may be, of any of the foregoing.

(e)     **"CIPO"** means the Canadian Intellectual Property Office and includes the Trade-marks Office.

(f)     **"Claims"** means any claims, actions, causes of action, damages, losses, debts, demands and liabilities of absolutely any kind whatsoever, whether known or not, contingent or otherwise, that a party ever had, now has or may hereinafter have in respect of any matter existing as of the present in any way relating to the CCSWC Marks, the Foto Source Marks or the issues raised in the Action and including oppositions or Section 45 Proceedings that have been or could have been commenced before CIPO in relation to the CCSWC Marks or the Foto Source Marks.

(g)     **"Deposit Deadline"** means 5:00 p.m. Eastern Standard Time on the fifth business day following the execution of this Agreement by all parties.

(h)     **"Foto Source"** means Foto Source Canada Inc.

(i)     **"Foto Source Releasees"** means Foto Source, and any related and affiliated corporations and entities, and all successors and assigns (including, for greater certainty, any assignee of the Foto Source Marks), as the case may be, and all of the officers, directors, employees and agents, as the case may be, of any of the foregoing.

(j)     **"Foto Source Marks"** means the trade-marks FOTO SOURCE and YOUR DIGITAL SOURCE, and any word or design trade-mark which includes FOTO

SOURCE or YOUR DIGITAL SOURCE, and includes the following trade-marks:

(i)     FOTO SOURCE DESIGN, which is the subject matter of Canadian trade-mark registration number TMA462312 and application number 0752606-01 amending TMA462312;

(ii)    FOTO SOURCE, which is the subject matter of Canadian trade-mark registration number TMA467248 and application number 0752605-01 amending TMA467248;

(iii)   FOTO SOURCE & LOGO DESIGN which is the subject matter of Canadian trade-mark registration number TMA725112;

(iv)    DESIGN ICON which is the subject matter of Canadian trade-mark registration number TMA467035;

(v)     YOUR DIGITAL SOURCE & DESIGN which is the subject matter of Canadian trade-mark registration number TMA622437 and application number 1174850-01 amending TMA622437;

(vi)    YOUR DIGITAL SOURCE which is the subject matter of Canadian trade-mark application number 1319511; and

(vii)   LE SPÉCIALISTE DU NUMÉRIQUE & DESIGN which is the subject matter of Canadian trade-mark registration number TMA622328.

(k)    "**GET IT RIGHT Marks**" means the trade-mark GET IT RIGHT, FROM THE FOTO SOURCE and the trade-mark GET IT RIGHT, FROM FOTO SOURCE.

(l)    "**InterTAN**" means InterTAN Canada Ltd.

(m)    "**InterTAN Releasees**" means InterTAN, and any related and affiliated corporations and entities, as the case may be, and all of the officers, directors, employees and agents, as the case may be, of any of the foregoing.

(n)    "**Phase Out Deadline**" means 1 year from the date on which InterTAN pays the Settlement Amount, should InterTAN pay the Settlement Amount.

(o)    "**Section 45 Proceedings**" means proceedings pursuant to section 45 of the *Trade-marks Act*.

(p)    "**Settlement Amount**" means the sum of $450,000 CDN.

(q)    "**Settlement Payment Deadline**" means 5:00 p.m. Eastern Standard Time on September 30, 2009.

(r)    "**Withdrawal Deadline**" means 20 days from the date on which InterTAN pays the Settlement Amount, should InterTAN pay the Settlement Amount.

- 4 -

**Settlement Amount**

2.

    (a)    InterTAN shall pay to Foto Source prior to the Deposit Deadline the sum of $50,000 CDN.

    (b)    At any time prior to the Settlement Payment Deadline, InterTAN may, if it chooses to do so, pay the Settlement Amount to Foto Source. InterTAN is under no obligation to pay the Settlement Amount to Foto Source. If InterTAN pays the Settlement Amount to Foto Source prior to the Settlement Payment Deadline, paragraphs 3 to 21 immediately become effective. If InterTAN does not pay the sum of $50,000 to Foto Source by the Deposit Deadline, or InterTAN does not pay the Settlement Amount to Foto Source prior to the Settlement Payment Deadline:

        (i)    paragraphs 3 to 21 never become effective and are of no force and effect; and

        (ii)    the parties agree that the Agreement and all negotiations leading up to its execution are without prejudice communications (with the exception of the possible use by Foto Source of this Agreement in the proceedings relating to InterTAN under the *Companies' Creditors Arrangement Act*).

    (c)    Notwithstanding the foregoing, prior to the Settlement Payment Deadline, InterTAN will not sell, transfer, lease, convey, assign or otherwise dispose of all or substantially all of its assets, or otherwise dispose of its assets as a part of a going concern transaction, unless:

        (i)    the Settlement Payment has already been paid to Foto Source or will be paid to Foto Source at or immediately following such sale; and

        (ii)    InterTAN assigns this Agreement to the purchaser of all or substantially all of its assets, or the acquiror of its assets as part of a going concern sale, as the case may be, and such purchaser or acquiror agrees to be bound by this Agreement.

**Foto Source Marks and Activities**

3.    InterTAN and CCSWC have no objection to:

    (a)    Foto Source or its successors or assigns using, licensing others to use, or assigning to others the right to use, the Foto Source Marks, and the GET IT RIGHT Marks, in association with any of the wares or services specified in the registrations and applications listed in subparagraph 1(j) above, or any other wares or services; and

    (b)    Foto Source or its successors or assigns filing applications in Canada to register any of the Foto Source Marks, including the GET IT RIGHT Marks.

4.      Foto Source will withdraw its Canadian trade-mark application number 1275762 for the trade-mark GET IT RIGHT, FROM THE SOURCE and will do so by filing with CIPO the appropriate documentation prior to the Withdrawal Deadline. Foto Source hereby authorizes and directs its trade-mark agents to execute and file such documentation prior to the Withdrawal Deadline. Foto Source or its trade-mark agents will provide a copy of such documentation to InterTAN and CCSWC, date stamped by CIPO to confirm its filing date.

5.      Foto Source and its licensees will cease all use of the trade-mark GET IT RIGHT, FROM THE SOURCE by no later than the Phase Out Deadline.  After the Phase Out Deadline, Foto Source and its licensees will not directly or indirectly use, or licence others to use, the trade-mark GET IT RIGHT, FROM THE SOURCE.

6.      With the exception of the Foto Source Marks and the GET IT RIGHT Marks, Foto Source will not directly or indirectly use, or apply to register, any trade-mark that includes SOURCE, unless SOURCE is immediately preceded by FOTO.

### CCSWC Marks and Activities

7.      Except as set out in paragraph 8 below, Foto Source has no objection to:

(a)      CCSWC or InterTAN or their respective successors or assigns using, licensing others to use, or assigning to others the right to use, the CCSWC Marks in association with any of the wares or services specified in the applications listed in subparagraph 1(c) above, or any other wares or services;

(b)      CCSWC or InterTAN or their respective successors or assigns filing applications in Canada to register any of the CCSWC Marks; and

(c)      Without limiting the generality of the foregoing, and for greater certainty, Foto Source has no objection to CCSWC, InterTAN or their successors and assigns, including any assignee of the CCSWC Marks, using or registering any SOURCE-formative mark, except as specifically prohibited in paragraph 8 below.

8.      Neither CCSWC nor InterTAN nor their respective successors or assigns will directly or indirectly:

(a)      use, or licence others to use, or apply to register, any trade-mark that includes FOTO;

- 6 -

(b)   use, or licence others to use, or apply to register, any trade-mark that includes both PHOTO (or any word that includes PHOTO such as PHOTOGRAPHER) and SOURCE separated by five or fewer words;

(c)   use, or licence others to use, or apply to register, any trade-mark that includes DIGITAL (or any word that includes DIGITAL such as DIGITALLY) and SOURCE separated by five or fewer words;

(d)   use, or licence others to use, or apply to register, any trade-mark that includes both GET IT and SOURCE;

9.   CCSWC will withdraw its Canadian trade-mark application number 1261117 for the trade-mark GET IT RIGHT FROM THE SOURCE and will do so by filing with CIPO the appropriate documentation prior to the Withdrawal Deadline.  CCSWC hereby authorizes and directs its trade-mark agents to execute and file such documentation prior to the Withdrawal Deadline. CCSWC or its trade-mark agents will provide a copy of such documentation to Foto Source, date stamped by CIPO to confirm its filing date.

### *Withdrawal of Oppositions*

10.   To the extent that InterTAN or CCSWC have opposed any applications by Foto Source for the Foto Source Marks or initiated any Section 45 Proceedings as against any registrations for Foto Source Marks, InterTAN or CCSWC as the case may be, will withdraw such oppositions or Section 45 Proceedings prior to the Withdrawal Deadline. InterTAN and CCSWC hereby authorize and direct their respective trade-mark agents, to execute and file such documentation prior to the Withdrawal Deadline. InterTAN, CCSWC or their respective trade-mark agents will provide a copy of such documentation to Foto Source, date stamped by CIPO to confirm its filing date.

11.   To the extent that Foto Source has opposed any applications to register any of the CCSWC Marks or initiated any Section 45 Proceedings as against any registrations for CCSWC Marks, Foto Source will withdraw such oppositions or Section 45 Proceedings prior to the Withdrawal Deadline.  Foto Source hereby authorizes and directs its trade-mark agents to execute and file such documentation prior to the Withdrawal Deadline. Foto Source or its trade-mark agents will provide a copy of such documentation to CCSWC, date stamped by CIPO to confirm its filing date.

***Not To Oppose Any Future Applications or Use***

12.     To the extent that CCSWC or its successors or assigns apply to register any CCSWC Marks, Foto Source will not oppose such applications and if required, will consent to such applications.  Foto Source will not take any steps to stop, or seek relief to stop the use of any CCSWC Marks by InterTAN, CCSWC and any successors and assigns, including any assignee of the CCSWC Marks.

13.     To the extent that Foto Source or its successors or assigns apply to register any Foto Source Marks or the GET IT RIGHT Marks, neither InterTAN nor CCSWC will oppose such applications and if required, will consent to such applications.  Neither InterTAN nor CCSWC will take any steps to stop, or seek relief to stop the use of any Foto Source Marks or the GET IT RIGHT Marks by Foto Source and any successors and assigns.

***Business Names, etc.***

14.     To the extent that a party has agreed herein not to apply to register a particular trade-mark, or not to use a particular trade-mark, that prohibition shall extend to business names, trade names, domain names and corporate names.

15.     To the extent that a party has agreed herein not to oppose any application for a particular trade-mark, that prohibition shall extend to opposing or challenging the corresponding business names, trade names, domain names and corporate names.

16.     For greater certainty, the parties acknowledge and agree that:

(a)     the use of the domain names THESOURCE.CA, THESOURCECC.CA, THESOURCECC.COM, LASOURCECC.CA, LASOURCECC.COM, and any other domain name using the word SOURCE (except those prohibited by paragraph 8) by CCSWC, InterTAN or their successors or assigns, including any assignee of the CCSWC Marks, is acceptable, and Foto Source will not challenge or oppose such use; and

(b)     the use of the domain names FOTOSOURCE.CA and FOTOSOURCE.COM and any other domain name using the word SOURCE immediately preceded by the word FOTO by Foto Source or its successors or assigns is acceptable, and neither CCSWC nor InterTAN will challenge or oppose such use.

- 8 -

### *The Action*

17.    The parties consent to an order dismissing the Action, on consent, without costs.  The motion for such an order will be brought by Foto Source and will be brought prior to the Withdrawal Deadline.

### *Release by Foto Source*

18.    Without any admission of liability, Foto Source:

(a)    releases and discharges the InterTAN Releasees and the CCSWC Releasees from all Claims;

(b)    acknowledges and agrees that such release shall be effective and enure to the benefit of all successors and assigns of the InterTAN Releasees and the CCSWC Releasees (and, for greater certainty, any assignee of the CCSWC Marks);

(c)    agrees not to assist any person, corporation or entity to assert any Claims against any of the InterTAN Releasees or the CCSWC Releasees with respect to the Claims that are released and discharged pursuant to this paragraph;

(d)    agrees not to assert, or to assist any person, corporation or entity to assert, any Claims, including taking any proceedings, against any other person, corporation or entity who might claim contribution or indemnity or other similar relief from any of the InterTAN Releasees and the CCSWC Releasees with respect to the Claims that are released and discharged pursuant to this paragraph; and

(e)    agrees to execute a separate confirmatory release (effective as of the date of the payment by InterTAN to Foto Source of the Settlement Amount) in favour of any assignee of the CCSWC Marks, the wording of which will be in all material respects the same as in this paragraph.   At any time after the payment by InterTAN of the Settlement Amount, InterTAN or CCSWC may provide written notice to Foto Source (or its solicitors) of an intention on the part of CCSWC to assign the CCSWC Marks and the name of the assignee, in which case the confirmatory release shall be executed by Foto Source and delivered to CCSWC (or its solicitors) as soon as possible.  Contemporaneously with the assignment by CCSWC of the CCSWC Marks, or at any time afterwards, CCSWC (or its solicitors) may deliver the confirmatory release to the assignee.

### *Release by InterTAN and CCSWC*

19.    Without any admission of liability, InterTAN and CCSWC each:

(a)    releases and discharges the Foto Source Releasees from all Claims;

(b)    acknowledges and agrees that such release shall be effective and enure to the benefit of all successors and assigns of the Foto Source Releasees;

- 9 -

    (c)        agrees not to assist any person, corporation or entity to assert any Claims against any of the Foto Source Releasees with respect to the Claims that are released and discharged pursuant to this paragraph; and

    (d)        agrees not to assert, or to assist any person, corporation or entity to assert, any Claims, including taking any proceedings, against any other person, corporation or entity who might claim contribution or indemnity or other similar relief from any of the Foto Source Releasees with respect to the Claims that are released and discharged pursuant to this paragraph.

### Geographic Scope

20.    Paragraphs 3 to 16 apply to activities in Canada, including display on the Internet.

### Mediation

21.    In the event one party believes that another party is in breach of this Agreement, prior to commencing legal proceedings, the following steps must be taken:  Written notice shall be given to the party alleged to be in breach of the Agreement.  If within 15 days of such notice being given, the matter has not been satisfactorily resolved, senior business people from each of the parties involved in the particular matter will meet within 30 days of the original notice being given to discuss the matter and ascertain whether it can be resolved.  If at the end of that 30 day period the matter has not been satisfactorily resolved, any party may commence legal proceedings.

The foregoing does not apply in the event a party commences legal proceedings and immediately seeks an interim and/or interlocutory injunction.  Following the procedure set out above shall not in any way prevent a party from seeking an interim and/or interlocutory injunction.

### Assignment

22.    This Agreement shall enure to the benefit of and be binding upon the parties and their respective successors (including any successor by reason of amalgamation of any party) and assigns.  Any of the parties may assign the Agreement without consent.  Without limiting the generality of the forgoing:

    (a)        InterTAN may assign the Agreement to a purchaser of some or all of its assets; and

    (b)        CCSWC may assign the Agreement to an assignee of the CCSWC Marks.

23.     Neither Foto Source nor any of its successors or assigns will assign the Foto Source Marks unless it also assigns this Agreement to the assignee of the Foto Source Marks and such assignee agrees to be bound by this Agreement.

24.     Neither CCSWC nor any of its successors or assigns will assign any of the CCSWC Marks unless it also assigns this Agreement to the assignee of the CCSWC Marks and such assignee agrees to be bound by this Agreement.

25.     CCSWC hereby represents and warrants that at this time: CCSWC is the owner of the CCSWC Marks; InterTAN is the sole licensee of the CCSWC Marks (InterTAN having sublicensed the CCSWC Marks); and, CCSWC has not otherwise licensed the CCSWC Marks and has not assigned any of its rights in the CCSWC Marks.

26.     InterTAN will not assign any of its rights (such as licence rights) in respect of the CCSWC Marks unless it also assigns this Agreement to the assignee of such rights, and such assignee agrees to be bound by this Agreement.

27.     In the event that InterTAN has not paid the Settlement Payment to Foto Source by the Settlement Payment Deadline, then paragraphs 23, 24 and 26 cease to be effective and are no longer of any force or effect.

### *Deferral of Opposition Proceedings and Section 45 Proceedings*

28.     To the extent that there are currently any opposition proceedings or Section 45 Proceedings pending in respect of any Foto Source Marks or CCSWC Marks and there are any deadlines in such opposition proceedings or Section 45 Proceedings prior to the Withdrawal Deadline, the parties hereby consent to a request or requests to CIPO that it extend such deadlines, ultimately until November 30, 2009.  Unless required to do so by CIPO, neither party shall file materials, or take steps to advance or respond to such opposition proceedings or Section 45 Proceedings unless and until:

(a)     InterTAN fails to pay $50,000 to Foto Source by the Deposit Deadline; or

(b)     InterTAN fails to pay the Settlement Amount by the Settlement Payment Deadline; or

(c)     InterTAN advises Foto Source in writing that it does not intend to pay the Settlement Amount by the Settlement Deadline (the foregoing does not affect the

obligations of InterTAN prior to the Settlement Payment Deadline as set out in subparagraph 2(c) above).

### *Certain Rules of Interpretation*

29.  In this Agreement:

(a)  **Currency** - Unless otherwise specified, all references to money amounts are to the lawful currency of Canada.

(b)  **Governing Law** - This Agreement is a contract made under and shall be governed by and construed in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable in the Province of Ontario**.**

(c)  **Headings** - Headings have been inserted for convenience of reference only and shall not affect the construction or interpretation of this Agreement**.**

(d)  **Including** - Where the word "including" or "includes" is used in this Agreement, it means "including (or includes) without limitation".

(e)  **No Strict Construction** – The language used in this Agreement is the language chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any party.

(f)  **Number and Gender** – Unless the context otherwise requires, words importing the singular include the plural and vice versa and words importing gender include all genders.

(g)  **Severability** – If, in any jurisdiction, any provision of this Agreement or its application to any party or circumstance is restricted, prohibited or unenforceable, such provision shall, as to such jurisdiction, be ineffective only to the extent of such restriction, prohibition or unenforceability without invalidating the remaining provisions of this Agreement and without affecting the validity or enforceability of such provision in any other jurisdiction and without affecting its application to other parties or circumstances.

### *Entire Agreement*

30.  This Agreement and the Schedules hereto (if any) constitute the entire agreement between the parties and set out all the covenants, promises, warranties, representations, conditions, understandings and agreements between the parties pertaining to the subject matter of this Agreement and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written.  There are no covenants, promises, warranties, representations, conditions, understandings or other agreements, oral or written, express, implied or collateral between the parties in connection with the subject

- 12 -

matter of this Agreement except as specifically set forth in this Agreement and any document required to be delivered pursuant to this Agreement.

*Amendment*

31.    No amendment, supplement, modification or waiver or termination of this Agreement and, unless otherwise specified, no consent or approval by any party, shall be binding unless executed in writing by the party to be bound thereby.

*Further Assurances*

32.    The parties shall with reasonable diligence do all such things and provide all such reasonable assurances as may be required to consummate the transactions contemplated by this Agreement, and each party shall provide such further documents or instruments required by any other party as may be reasonably necessary or desirable to effect the purpose of this Agreement and carry out its provisions.

*Execution and Delivery*

33.    This Agreement may be executed by the parties in counterparts and may be executed and delivered by fax or e-mail and all such counterparts shall together constitute one and the same agreement.

**[the rest of this page has been left intentionally blank]**

**IN WITNESS OF WHICH** the parties have duly executed this Agreement.

**FOTO SOURCE CANADA INC.**

By: _~Crewson~_____

"I have authority to bind the Corporation"

Name (print): _JOHN CREWSON_____

Title: _PRESIDENT_____

Date: _FEB 20 2009_____

**INTERTAN CANADA LTD.**

By: _____

"I have authority to bind the Corporation"

Name (print): _____

Title: _____

Date: _____

**CIRCUIT CITY STORES WEST COAST, INC.**

By: _____

"I have authority to bind the Corporation"

Name (print): _____

Title: _____

Date: _____

- 13 -

**IN WITNESS OF WHICH** the parties have duly executed this Agreement.

**FOTO SOURCE CANADA INC.**

By: _____

"I have authority to bind the Corporation"

Name (print): _____

Title: _____

Date: _____


**INTERTAN CANADA LTD.**

By: _____

"I have authority to bind the Corporation"

Name (print): *MARK WONG*

Title: *VICE PRESIDENT GENERAL COUNSEL AND SECRETARY*

Date: *February 23, 2009*


**CIRCUIT CITY STORES WEST COAST, INC.**

By: _____

"I have authority to bind the Corporation"

Name (print): _____

Title: _____

Date: _____

- 13 -

**IN WITNESS OF WHICH** the parties have duly executed this Agreement.

**FOTO SOURCE CANADA INC.**

By: _____

"I have authority to bind the Corporation"

Name (print): _____

Title: _____

Date: _____


**INTERTAN CANADA LTD.**

By: _____

"I have authority to bind the Corporation"

Name (print): _____

Title: _____

Date: _____


**CIRCUIT CITY STORES WEST COAST, INC.**

By: _____

"I have authority to bind the Corporation"

Name (print): _Reginald D. Hedgebeth_

Title: _Chairman & Chief Executive Officer_

Date: _____

TOR_A2G:3607002.4

## EXHIBIT B

**(InterTAN Resolution)**

**InterTAN Canada Ltd.**
**(the "Corporation")**

## RESOLUTION OF THE SHAREHOLDER

**RECITALS:**

A.  It is desirable and in the best interests of InterTAN, Inc., the sole shareholder of the Corporation (the "**Shareholder**"), to cause the Corporation to agree to sell certain assets and assign certain liabilities to 4458729 Canada Inc. (the "**Purchaser**") and the Purchaser has agreed to purchase certain assets and assume certain liabilities for cash consideration (the "**Transaction**") on the terms and conditions set forth in an asset purchase agreement and certain ancillary agreements.

B.  It is desirable and in the best interests the Shareholder to cause the Corporation to agree to lend certain funds to Circuit City Stores, Inc. (the "**Parent**") from the proceeds of the Transaction to the Parent on the terms and conditions set forth in a intercompany agreement.

C.  It is desirable and in the best interests of the Shareholder to cause the Corporation to agree to settle certain intellectual property disputes between the Corporation, Circuit City Stores West Coast, Inc. ("**West Coast**") and Foto Source Canada Inc. ("**Foto Source**") on the terms and conditions set forth in a settlement and coexistence agreement.

**RESOLVED THAT:**

1.  The entering into by the Corporation of an asset purchase agreement between the Corporation, West Coast, Ventoux International, Inc. ("**Ventoux**") and the Purchaser (the "**Asset Purchase Agreement**"), in the form presented to the Shareholder and the performance by the Corporation of its obligations thereunder, are hereby authorized and approved.

2.  The entering into by the Corporation of an escrow agreement between the Corporation, the Purchaser and Alvarez & Marsal Canada ULC (the "**Escrow Agreement**"), in the form presented to the Shareholder and the performance by the Corporation of its obligations thereunder, are hereby authorized and approved.

3.  The entering into by the Corporation of a conveyance and assumption of obligations agreement between the Corporation and the Purchaser (the "**Conveyance and Assumption of Obligations Agreement**"), in the form presented to the Shareholder and the performance by the Corporation of its obligations thereunder, are hereby authorized and approved.

4.  The entering into by the Corporation of a confirmatory assignment of trade-marks (the "**Confirmatory Assignment of Trade-marks**") in the form presented to the Shareholder and the performance by the Corporation of its obligations thereunder, are hereby authorized and approved.

5.  The entering into by the Corporation of an assignment and assumption of real property leases agreement between the Corporation and the Purchaser (the "**Assignment and Assumption of Real Property Leases Agreement**"), in the form presented to the Shareholder and the performance by the Corporation of its obligations thereunder, are hereby authorized and approved.

6.  The entering into by the Corporation of a license termination agreement between the Corporation and West Coast (the "**License Termination Agreement**"), in the form presented to the Shareholder and the performance by the Corporation of its obligations thereunder, are hereby authorized and approved.

7.  The entering into by the Corporation of an intercompany agreement between the Corporation, West Coast, Ventoux and the Parent (the "**Intercompany Agreement**"), in the form presented to the Shareholder and the performance by the Corporation of its obligations thereunder, are hereby authorized and approved.

8.  The entering into by the Corporation of a settlement and coexistence agreement between the Corporation, West Coast and Foto Source (the "**Settlement and Coexistence Agreement**"), in the form presented to the Shareholder and the performance by the Corporation of its obligations thereunder, are hereby authorized and approved.

9.  Any officer or director of the Corporation, acting alone (each an "**Authorized Signatory**") is authorized and directed to negotiate, finalize, execute and deliver any and all such further documents, agreements, authorizations, certificates, elections or other instruments, including, the Asset Purchase Agreement, the Escrow Agreement, the Conveyance and Assumption of Obligations Agreement, the Confirmatory Assignment of Trade-marks, the Assignment and Assumption of Real Property Leases Agreement, the License Termination Agreement, the Intercompany Agreement and the Settlement and Coexistence Agreement (the "**Agreements**"), with or without the corporate seal affixed, and to take any and all such further action as the Authorized Signatory, in its sole discretion may deem necessary or desirable in order to complete the transactions contemplated in this resolution, the execution and delivery of any such documents, agreements, authorizations, elections or other instruments, including the Agreements, or the doing of any such other act or thing by such Authorized Signatory to be conclusive evidence of such determination.

10. All actions previously taken by an officer or director of the Corporation relating to or in connection with any of the transactions described above are approved, ratified and confirmed.

*[The remainder of this page has intentionally been left blank]*

The foregoing resolutions are passed as evidenced by the signature of the Shareholder of the Corporation pursuant to the provisions of the *Business Corporations Act* (Ontario) and in accordance with the power vested in the Shareholder by virtue of a Declaration of the Shareholder made as of October 7, 2008.

**DATED** February 23, 2009.

INTERTAN, INC.

By: _Michelle Mosier_ _____

Michelle Mosier

Chief Financial Officer and Treasurer

## EXHIBIT C

**(Intercompany Agreement)**

## INTERCOMPANY AGREEMENT

**THIS AGREEMENT** is made as of February 23, 2009

**B E T W E E N :**

> **InterTAN Canada Ltd.**, a corporation governed by the laws of Ontario
>
> ("**InterTAN**")
>
> - and -
>
> **Circuit City Stores, Inc.**, a corporation governed by the laws of Virginia
>
> ("**Circuit City**")
>
> - and -
>
> **Circuit City Stores West Coast, Inc.**, a corporation governed by the laws of California
>
> ("**West Coast**")
>
> - and -
>
> **Ventoux International, Inc.**, a corporation governed by the laws of Delaware
>
> ("**Ventoux**")

**RECITALS:**

A.     InterTAN is an indirect, wholly-owned subsidiary of Circuit City.

B.     West Coast and Ventoux are each wholly-owned subsidiaries of Circuit City.

C.     On November 10, 2008, Circuit City and certain of its U.S. subsidiaries voluntarily commenced bankruptcy proceedings under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court, Eastern District of Virginia (the "**Chapter 11 Proceedings**") and InterTAN and Tourmalet Corporation, an unlimited liability corporation governed by the laws of Nova Scotia, commenced a voluntary proceeding under the *Companies' Creditors Arrangement Act* (Canada) in the Province of Ontario (the "**CCAA Proceeding**").

D.     InterTAN, West Coast, Ventoux, 4458729 Canada Inc. and Bell Canada have entered into an Asset Purchase Agreement dated February 23, 2009 ("APA"), whereby InterTAN has agreed to sell substantially all of its assets to the Purchaser (as defined in the APA), and

- 2 -

the Purchaser has agreed to purchase such assets and to assume certain of InterTAN's liabilities.

E.    West Coast is the owner of certain Trademarks (as defined in the APA) related to InterTAN's Business (as defined in the APA).

F.    Ventoux is the owner of all of the issued and outstanding shares of Circuit City Global Sourcing, Limited ("**CCGS**"), a company incorporated under the laws of Hong Kong.

G.    Pursuant to the APA, the Purchaser intends to acquire ownership of and obtain a license of the Trademarks currently owned by West Coast and to acquire the Shares of CCGS.

H.    Subject to approval of the U.S. Bankruptcy Court and the CCAA Court (both as defined in the APA) and subject to the terms set forth herein, Circuit City may wish to borrow funds from InterTAN from the proceeds of sale of the transaction contemplated by the APA to assist Circuit City to pay certain expenses in connection with the wind down of its operations.

**NOW, THEREFORE**, in consideration of the mutual promises herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties intending to be lawfully bound agree as follows:

1.    **Payment to West Coast and Ventoux.**  InterTAN agrees that, in connection with the closing of the transaction contemplated by the APA (the "**Closing**"), the amount to be paid to West Coast to acquire and/or licence the Trademarks and to Ventoux to acquire the shares of CCGS shall be no more than the Canadian Dollar equivalent of U.S.$15,000,000 in the aggregate (less any applicable withholding taxes in respect of the Licensed Trademarks), such payment to be made to West Coast, to Ventoux, or as they may otherwise direct in writing, from the proceeds of sale under the APA, and provided that such amount may be allocated between West Coast and Ventoux as they deem appropriate.  For greater certainty, nothing herein shall prevent Circuit City and its affiliates from agreeing to any other allocation of proceeds received from InterTan or the Closing (excluding any loan made in furtherance of paragraph 2 hereof, if any) among West Coast, Ventoux or other entities.

2.    **Loan to Circuit City.**  InterTAN agrees to make available a loan to Circuit City from the Sale Proceeds in an amount up to CAD$35,000,000 (the "**Loan**"), on terms that are satisfactory to Circuit City, InterTAN and the Monitor (as defined in the APA), each acting reasonably, and subject to the following conditions precedent being met to the reasonable satisfaction of both InterTAN and the Monitor:

(a)    This Agreement shall be approved by both the U.S. Bankruptcy Court and the CCAA Court.

(b)    Circuit City shall furnish to both InterTAN and the Monitor cash flows demonstrating that the amount of any Loan is necessary to assist Circuit City to conclude the wind down of its operations.

(c)     Both InterTAN and the Monitor shall be satisfied with the mechanics and timing for repayment of any Loan and the ability of Circuit City to make full repayment thereof.

(d)     InterTAN and Circuit City shall enter into a loan agreement or Circuit City shall provide InterTAN with a promissory note to evidence the Loan, and Circuit City shall cause any of its subsidiaries and affiliates to provide any guarantee that may be reasonably requested by InterTAN and the Monitor with respect to the Loan, each of which shall be in form and substance satisfactory to InterTAN and the Monitor acting reasonably, which loan agreement or promissory note and any Loan provided thereunder, and which guarantees, shall be approved by both the U.S. Bankruptcy Court and the CCAA Court on terms satisfactory to InterTan and the Monitor, acting reasonably, before the making of any such Loan.

(e)     The obligation to repay the Loan by Circuit City and the guarantee of such repayment of the Loan by the subsidiaries and affiliates of Circuit City, shall be secured by all the property, assets, and undertaking of Circuit City and its subsidiaries or affiliates, as applicable (the "**Security**").

(f)     The Security (and the priority of such Security) shall be satisfactory to InterTAN and the Monitor, acting reasonably and be approved by the U.S. Bankruptcy Court and the CCAA Court on notice to all affected creditors or as InterTAN and/or the Monitor may direct.

(g)     Circuit City shall furnish to both InterTAN and the Monitor evidence showing that the property, assets and undertaking of Circuit City and its subsidiaries and affiliates pledged as Security to InterTAN to secure the obligation for repayment of the Loan are adequate and sufficient to secure full payment of the Loan, which evidence shall be satisfactory to InterTan and the Monitor, acting reasonably.

3.     **Assignment.**   Except as expressly provided herein, the parties hereto may not assign or transfer, whether absolutely, by way of security or otherwise, all or any part of their respective rights or obligations under this Agreement without the prior written consent of the other parties.

4.     **Governing Law.**   This Agreement shall be governed by and construed in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein.

5.     **Successors and Assigns.**   This Agreement shall enure to the benefit of, and be binding upon, the Parties and their respective successors and permitted assigns.

6.     **Counterparts.**   This Agreement may be delivered by facsimile transmission and be executed in any number of counterparts, each of which shall be deemed to be an original and all of which shall constitute one and the same instrument.

*[The remainder of this page has been intentionally left blank]*

**IN WITNESS WHEREOF** the parties hereto have executed this Agreement as of the date first written above.

INTERTAN CANADA LTD.

By: _____
Name: *MARK WONG*
Title: *VICE PRESIDENT, GENERAL COUNSEL AND SECRETARY*

CIRCUIT CITY STORES, INC.

By: _____
Reginald D. Hedgebeth
Senior Vice President, General Counsel and Secretary

CIRCUIT CITY STORES WEST COAST, INC.

By: _____
Reginald D. Hedgebeth
Chairman/CEO

*Intercompany Agreement*

**IN WITNESS WHEREOF** the parties hereto have executed this Agreement as of the date first written above.

**INTERTAN CANADA LTD.**

By:   InterTAN, Inc.
        By: _____
           Name:
           Title:

**CIRCUIT CITY STORES, INC.**

By: _____
    Reginald D. Hedgebeth
    Senior Vice President, General Counsel and Secretary

**CIRCUIT CITY STORES WEST COAST, INC.**

By: _____
    Reginald D. Hedgebeth
    Chairman/CEO

*Intercompany Agreement*

**IN WITNESS WHEREOF** the parties hereto have executed this Agreement as of the date first written above.

**INTERTAN CANADA LTD.**

By:   InterTAN, Inc.

    By: _____

       Name:

       Title:

**CIRCUIT CITY STORES, INC.**

By: _____

    Reginald D. Hedgebeth

    Senior Vice President, General Counsel and Secretary

**CIRCUIT CITY STORES WEST COAST, INC.**

By: _____

    Reginald D. Hedgebeth

    Chairman/CEO

*Intercompany Agreement*

- 2 -

**VENTOUX INTERNATIONAL, INC.**

By: _____

Reginald D. Hedgebeth
*Vice President and Secretary*

*Intercompany Agreement*

## EXHIBIT D

**(Foto Source Settlement Agreement)**

## SETTLEMENT AND COEXISTENCE AGREEMENT

**THIS AGREEMENT** is made as of February 20, 2009

**BETWEEN:**

> **FOTO SOURCE CANADA INC.**, a company incorporated pursuant to the laws of the Province of Ontario, having its principal office at 2333 Wyecroft Road, Oakville, Ontario, Canada
>
> - and –
>
> **INTERTAN CANADA LTD.**, a corporation incorporated pursuant to the laws of the Province of Ontario, having its principal office at 279 Bayview Drive, Barrie, Ontario, Canada
>
> - and –
>
> **CIRCUIT CITY STORES WEST COAST, INC.**, a corporation incorporated pursuant to the laws of the State of California, having its principal office at 9520 Sheridan Boulevard, Westminster, Colorado, U.S.A.

**RECITALS**:

A.     Unless otherwise indicated, all capitalized terms have the meanings ascribed to them in paragraph 1 below.

B.     By entering into this Agreement, Foto Source, InterTAN and CCSWC intend to fully and finally settle all issues arising from, or in any way related to the Action.

**THEREFORE**, the parties agree as follows:

1.     Whenever used in this Agreement, the following words and terms shall have the meanings set out below:

> (a)     **"Action"** means the action commenced in the Federal Court of Canada by Foto Source against InterTAN and Circuit City under Court File No. T-2243-06.
>
> (b)     **"CCSWC"** means Circuit City Stores West Coast, Inc.

(c)    "**CCSWC Marks**" means the trade-mark THE SOURCE and any other word or design trade-mark which includes the word SOURCE (other than the Foto Source Marks and the trade-marks prohibited in paragraph 8 below), and includes the following trade-marks:

    (i)    THE SOURCE BY CIRCUIT CITY which is the subject matter of Canadian trade-mark application number 1252450;

    (ii)    THE SOURCE BY CIRCUIT CITY & DESIGN which is the subject matter of Canadian trade-mark application number 1253279;

    (iii)    SOURCE REWARDS which is the subject matter of Canadian trade-mark application number 1385275;

    (iv)    THE SOURCE which is the subject matter of Canadian trade-mark application number 1372924; and

    (v)    THE SOURCE & DESIGN which is the subject matter of Canadian trade-mark application number 1372925.

(d)    "**CCSWC Releasees**" means CCSWC, and any related and affiliated corporations and entities, and all successors and assigns (including, for greater certainty, any assignee of the CCSWC Marks), as the case may be, and all of the officers, directors, employees and agents, as the case may be, of any of the foregoing.

(e)    "**CIPO**" means the Canadian Intellectual Property Office and includes the Trade-marks Office.

(f)    "**Claims**" means any claims, actions, causes of action, damages, losses, debts, demands and liabilities of absolutely any kind whatsoever, whether known or not, contingent or otherwise, that a party ever had, now has or may hereinafter have in respect of any matter existing as of the present in any way relating to the CCSWC Marks, the Foto Source Marks or the issues raised in the Action and including oppositions or Section 45 Proceedings that have been or could have been commenced before CIPO in relation to the CCSWC Marks or the Foto Source Marks.

(g)    "**Deposit Deadline**" means 5:00 p.m. Eastern Standard Time on the fifth business day following the execution of this Agreement by all parties.

(h)    "**Foto Source**" means Foto Source Canada Inc.

(i)    "**Foto Source Releasees**" means Foto Source, and any related and affiliated corporations and entities, and all successors and assigns (including, for greater certainty, any assignee of the Foto Source Marks), as the case may be, and all of the officers, directors, employees and agents, as the case may be, of any of the foregoing.

(j)    "**Foto Source Marks**" means the trade-marks FOTO SOURCE and YOUR DIGITAL SOURCE, and any word or design trade-mark which includes FOTO

SOURCE or YOUR DIGITAL SOURCE, and includes the following trade-marks:

(i)    FOTO SOURCE DESIGN, which is the subject matter of Canadian trade-mark registration number TMA462312 and application number 0752606-01 amending TMA462312;

(ii)    FOTO SOURCE, which is the subject matter of Canadian trade-mark registration number TMA467248 and application number 0752605-01 amending TMA467248;

(iii)    FOTO SOURCE & LOGO DESIGN which is the subject matter of Canadian trade-mark registration number TMA725112;

(iv)    DESIGN ICON which is the subject matter of Canadian trade-mark registration number TMA467035;

(v)    YOUR DIGITAL SOURCE & DESIGN which is the subject matter of Canadian trade-mark registration number TMA622437 and application number 1174850-01 amending TMA622437;

(vi)    YOUR DIGITAL SOURCE which is the subject matter of Canadian trade-mark application number 1319511; and

(vii)    LE SPÉCIALISTE DU NUMÉRIQUE & DESIGN which is the subject matter of Canadian trade-mark registration number TMA622328.

(k)    "**GET IT RIGHT Marks**" means the trade-mark GET IT RIGHT, FROM THE FOTO SOURCE and the trade-mark GET IT RIGHT, FROM FOTO SOURCE.

(l)    "**InterTAN**" means InterTAN Canada Ltd.

(m)    "**InterTAN Releasees**" means InterTAN, and any related and affiliated corporations and entities, as the case may be, and all of the officers, directors, employees and agents, as the case may be, of any of the foregoing.

(n)    "**Phase Out Deadline**" means 1 year from the date on which InterTAN pays the Settlement Amount, should InterTAN pay the Settlement Amount.

(o)    "**Section 45 Proceedings**" means proceedings pursuant to section 45 of the *Trade-marks Act*.

(p)    "**Settlement Amount**" means the sum of $450,000 CDN.

(q)    "**Settlement Payment Deadline**" means 5:00 p.m. Eastern Standard Time on September 30, 2009.

(r)    "**Withdrawal Deadline**" means 20 days from the date on which InterTAN pays the Settlement Amount, should InterTAN pay the Settlement Amount.

- 4 -

### Settlement Amount

2.

    (a)    InterTAN shall pay to Foto Source prior to the Deposit Deadline the sum of $50,000 CDN.

    (b)    At any time prior to the Settlement Payment Deadline, InterTAN may, if it chooses to do so, pay the Settlement Amount to Foto Source.  InterTAN is under no obligation to pay the Settlement Amount to Foto Source.  If InterTAN pays the Settlement Amount to Foto Source prior to the Settlement Payment Deadline, paragraphs 3 to 21 immediately become effective.  If InterTAN does not pay the sum of $50,000 to Foto Source by the Deposit Deadline, or InterTAN does not pay the Settlement Amount to Foto Source prior to the Settlement Payment Deadline:

        (i)    paragraphs 3 to 21 never become effective and are of no force and effect; and

        (ii)    the parties agree that the Agreement and all negotiations leading up to its execution are without prejudice communications (with the exception of the possible use by Foto Source of this Agreement in the proceedings relating to InterTAN under the *Companies' Creditors Arrangement Act*).

    (c)    Notwithstanding the foregoing, prior to the Settlement Payment Deadline, InterTAN will not sell, transfer, lease, convey, assign or otherwise dispose of all or substantially all of its assets, or otherwise dispose of its assets as a part of a going concern transaction, unless:

        (i)    the Settlement Payment has already been paid to Foto Source or will be paid to Foto Source at or immediately following such sale; and

        (ii)    InterTAN assigns this Agreement to the purchaser of all or substantially all of its assets, or the acquiror of its assets as part of a going concern sale, as the case may be, and such purchaser or acquiror agrees to be bound by this Agreement.

### Foto Source Marks and Activities

3.    InterTAN and CCSWC have no objection to:

    (a)    Foto Source or its successors or assigns using, licensing others to use, or assigning to others the right to use, the Foto Source Marks, and the GET IT RIGHT Marks, in association with any of the wares or services specified in the registrations and applications listed in subparagraph 1(j) above, or any other wares or services; and

    (b)    Foto Source or its successors or assigns filing applications in Canada to register any of the Foto Source Marks, including the GET IT RIGHT Marks.

- 5 -

4.      Foto Source will withdraw its Canadian trade-mark application number 1275762 for the trade-mark GET IT RIGHT, FROM THE SOURCE and will do so by filing with CIPO the appropriate documentation prior to the Withdrawal Deadline.  Foto Source hereby authorizes and directs its trade-mark agents to execute and file such documentation prior to the Withdrawal Deadline. Foto Source or its trade-mark agents will provide a copy of such documentation to InterTAN and CCSWC, date stamped by CIPO to confirm its filing date.

5.      Foto Source and its licensees will cease all use of the trade-mark GET IT RIGHT, FROM THE SOURCE by no later than the Phase Out Deadline.  After the Phase Out Deadline, Foto Source and its licensees will not directly or indirectly use, or licence others to use, the trade-mark GET IT RIGHT, FROM THE SOURCE.

6.      With the exception of the Foto Source Marks and the GET IT RIGHT Marks, Foto Source will not directly or indirectly use, or apply to register, any trade-mark that includes SOURCE, unless SOURCE is immediately preceded by FOTO.

### CCSWC Marks and Activities

7.      Except as set out in paragraph 8 below, Foto Source has no objection to:

(a)     CCSWC or InterTAN or their respective successors or assigns using, licensing others to use, or assigning to others the right to use, the CCSWC Marks in association with any of the wares or services specified in the applications listed in subparagraph 1(c) above, or any other wares or services;

(b)     CCSWC or InterTAN or their respective successors or assigns filing applications in Canada to register any of the CCSWC Marks; and

(c)     Without limiting the generality of the foregoing, and for greater certainty, Foto Source has no objection to CCSWC, InterTAN or their successors and assigns, including any assignee of the CCSWC Marks, using or registering any SOURCE-formative mark, except as specifically prohibited in paragraph 8 below.

8.      Neither CCSWC nor InterTAN nor their respective successors or assigns will directly or indirectly:

(a)     use, or licence others to use, or apply to register, any trade-mark that includes FOTO;

- 6 -

(b)     use, or licence others to use, or apply to register, any trade-mark that includes both PHOTO (or any word that includes PHOTO such as PHOTOGRAPHER) and SOURCE separated by five or fewer words;

(c)     use, or licence others to use, or apply to register, any trade-mark that includes DIGITAL (or any word that includes DIGITAL such as DIGITALLY) and SOURCE separated by five or fewer words;

(d)     use, or licence others to use, or apply to register, any trade-mark that includes both GET IT and SOURCE;

9.      CCSWC will withdraw its Canadian trade-mark application number 1261117 for the trade-mark GET IT RIGHT FROM THE SOURCE and will do so by filing with CIPO the appropriate documentation prior to the Withdrawal Deadline.  CCSWC hereby authorizes and directs its trade-mark agents to execute and file such documentation prior to the Withdrawal Deadline. CCSWC or its trade-mark agents will provide a copy of such documentation to Foto Source, date stamped by CIPO to confirm its filing date.

***Withdrawal of Oppositions***

10.     To the extent that InterTAN or CCSWC have opposed any applications by Foto Source for the Foto Source Marks or initiated any Section 45 Proceedings as against any registrations for Foto Source Marks, InterTAN or CCSWC as the case may be, will withdraw such oppositions or Section 45 Proceedings prior to the Withdrawal Deadline. InterTAN and CCSWC hereby authorize and direct their respective trade-mark agents, to execute and file such documentation prior to the Withdrawal Deadline. InterTAN, CCSWC or their respective trade-mark agents will provide a copy of such documentation to Foto Source, date stamped by CIPO to confirm its filing date.

11.     To the extent that Foto Source has opposed any applications to register any of the CCSWC Marks or initiated any Section 45 Proceedings as against any registrations for CCSWC Marks, Foto Source will withdraw such oppositions or Section 45 Proceedings prior to the Withdrawal Deadline.  Foto Source hereby authorizes and directs its trade-mark agents to execute and file such documentation prior to the Withdrawal Deadline. Foto Source or its trade-mark agents will provide a copy of such documentation to CCSWC, date stamped by CIPO to confirm its filing date.

***Not To Oppose Any Future Applications or Use***

12.     To the extent that CCSWC or its successors or assigns apply to register any CCSWC Marks, Foto Source will not oppose such applications and if required, will consent to such applications.  Foto Source will not take any steps to stop, or seek relief to stop the use of any CCSWC Marks by InterTAN, CCSWC and any successors and assigns, including any assignee of the CCSWC Marks.

13.     To the extent that Foto Source or its successors or assigns apply to register any Foto Source Marks or the GET IT RIGHT Marks, neither InterTAN nor CCSWC will oppose such applications and if required, will consent to such applications.  Neither InterTAN nor CCSWC will take any steps to stop, or seek relief to stop the use of any Foto Source Marks or the GET IT RIGHT Marks by Foto Source and any successors and assigns.

***Business Names, etc.***

14.     To the extent that a party has agreed herein not to apply to register a particular trade-mark, or not to use a particular trade-mark, that prohibition shall extend to business names, trade names, domain names and corporate names.

15.     To the extent that a party has agreed herein not to oppose any application for a particular trade-mark, that prohibition shall extend to opposing or challenging the corresponding business names, trade names, domain names and corporate names.

16.     For greater certainty, the parties acknowledge and agree that:

   (a)      the use of the domain names THESOURCE.CA, THESOURCECC.CA, THESOURCECC.COM, LASOURCECC.CA, LASOURCECC.COM, and any other domain name using the word SOURCE (except those prohibited by paragraph 8) by CCSWC, InterTAN or their successors or assigns, including any assignee of the CCSWC Marks, is acceptable, and Foto Source will not challenge or oppose such use; and

   (b)      the use of the domain names FOTOSOURCE.CA and FOTOSOURCE.COM and any other domain name using the word SOURCE immediately preceded by the word FOTO by Foto Source or its successors or assigns is acceptable, and neither CCSWC nor InterTAN will challenge or oppose such use.

- 8 -

### *The Action*

17.     The parties consent to an order dismissing the Action, on consent, without costs.  The motion for such an order will be brought by Foto Source and will be brought prior to the Withdrawal Deadline.

### *Release by Foto Source*

18.     Without any admission of liability, Foto Source:

(a)     releases and discharges the InterTAN Releasees and the CCSWC Releasees from all Claims;

(b)     acknowledges and agrees that such release shall be effective and enure to the benefit of all successors and assigns of the InterTAN Releasees and the CCSWC Releasees (and, for greater certainty, any assignee of the CCSWC Marks);

(c)     agrees not to assist any person, corporation or entity to assert any Claims against any of the InterTAN Releasees or the CCSWC Releasees with respect to the Claims that are released and discharged pursuant to this paragraph;

(d)     agrees not to assert, or to assist any person, corporation or entity to assert, any Claims, including taking any proceedings, against any other person, corporation or entity who might claim contribution or indemnity or other similar relief from any of the InterTAN Releasees and the CCSWC Releasees with respect to the Claims that are released and discharged pursuant to this paragraph; and

(e)     agrees to execute a separate confirmatory release (effective as of the date of the payment by InterTAN to Foto Source of the Settlement Amount) in favour of any assignee of the CCSWC Marks, the wording of which will be in all material respects the same as in this paragraph.   At any time after the payment by InterTAN of the Settlement Amount, InterTAN or CCSWC may provide written notice to Foto Source (or its solicitors) of an intention on the part of CCSWC to assign the CCSWC Marks and the name of the assignee, in which case the confirmatory release shall be executed by Foto Source and delivered to CCSWC (or its solicitors) as soon as possible.  Contemporaneously with the assignment by CCSWC of the CCSWC Marks, or at any time afterwards, CCSWC (or its solicitors) may deliver the confirmatory release to the assignee.

### *Release by InterTAN and CCSWC*

19.     Without any admission of liability, InterTAN and CCSWC each:

(a)     releases and discharges the Foto Source Releasees from all Claims;

(b)     acknowledges and agrees that such release shall be effective and enure to the benefit of all successors and assigns of the Foto Source Releasees;

(c)     agrees not to assist any person, corporation or entity to assert any Claims against any of the Foto Source Releasees with respect to the Claims that are released and discharged pursuant to this paragraph; and

(d)     agrees not to assert, or to assist any person, corporation or entity to assert, any Claims, including taking any proceedings, against any other person, corporation or entity who might claim contribution or indemnity or other similar relief from any of the Foto Source Releasees with respect to the Claims that are released and discharged pursuant to this paragraph.

### *Geographic Scope*

20.     Paragraphs 3 to 16 apply to activities in Canada, including display on the Internet.

### *Mediation*

21.     In the event one party believes that another party is in breach of this Agreement, prior to commencing legal proceedings, the following steps must be taken:  Written notice shall be given to the party alleged to be in breach of the Agreement.  If within 15 days of such notice being given, the matter has not been satisfactorily resolved, senior business people from each of the parties involved in the particular matter will meet within 30 days of the original notice being given to discuss the matter and ascertain whether it can be resolved.  If at the end of that 30 day period the matter has not been satisfactorily resolved, any party may commence legal proceedings.

The foregoing does not apply in the event a party commences legal proceedings and immediately seeks an interim and/or interlocutory injunction.  Following the procedure set out above shall not in any way prevent a party from seeking an interim and/or interlocutory injunction.

### *Assignment*

22.     This Agreement shall enure to the benefit of and be binding upon the parties and their respective successors (including any successor by reason of amalgamation of any party) and assigns.  Any of the parties may assign the Agreement without consent.  Without limiting the generality of the forgoing:

(a)     InterTAN may assign the Agreement to a purchaser of some or all of its assets; and

(b)     CCSWC may assign the Agreement to an assignee of the CCSWC Marks.

23.     Neither Foto Source nor any of its successors or assigns will assign the Foto Source
        Marks unless it also assigns this Agreement to the assignee of the Foto Source Marks and
        such assignee agrees to be bound by this Agreement.

24.     Neither CCSWC nor any of its successors or assigns will assign any of the CCSWC
        Marks unless it also assigns this Agreement to the assignee of the CCSWC Marks and
        such assignee agrees to be bound by this Agreement.

25.     CCSWC hereby represents and warrants that at this time: CCSWC is the owner of the
        CCSWC Marks; InterTAN is the sole licensee of the CCSWC Marks (InterTAN having
        sublicensed the CCSWC Marks); and, CCSWC has not otherwise licensed the CCSWC
        Marks and has not assigned any of its rights in the CCSWC Marks.

26.     InterTAN will not assign any of its rights (such as licence rights) in respect of the
        CCSWC Marks unless it also assigns this Agreement to the assignee of such rights, and
        such assignee agrees to be bound by this Agreement.

27.     In the event that InterTAN has not paid the Settlement Payment to Foto Source by the
        Settlement Payment Deadline, then paragraphs 23, 24 and 26 cease to be effective and are
        no longer of any force or effect.

### *Deferral of Opposition Proceedings and Section 45 Proceedings*

28.     To the extent that there are currently any opposition proceedings or Section 45
        Proceedings pending in respect of any Foto Source Marks or CCSWC Marks and there
        are any deadlines in such opposition proceedings or Section 45 Proceedings prior to the
        Withdrawal Deadline, the parties hereby consent to a request or requests to CIPO that it
        extend such deadlines, ultimately until November 30, 2009.  Unless required to do so by
        CIPO, neither party shall file materials, or take steps to advance or respond to such
        opposition proceedings or Section 45 Proceedings unless and until:

        (a)     InterTAN fails to pay $50,000 to Foto Source by the Deposit Deadline; or

        (b)     InterTAN fails to pay the Settlement Amount by the Settlement Payment
                Deadline; or

        (c)     InterTAN advises Foto Source in writing that it does not intend to pay the
                Settlement Amount by the Settlement Deadline (the foregoing does not affect the

obligations of InterTAN prior to the Settlement Payment Deadline as set out in subparagraph 2(c) above).

### *Certain Rules of Interpretation*

29.  In this Agreement:

(a)  **Currency** - Unless otherwise specified, all references to money amounts are to the lawful currency of Canada.

(b)  **Governing Law** - This Agreement is a contract made under and shall be governed by and construed in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable in the Province of Ontario**.**

(c)  **Headings** - Headings have been inserted for convenience of reference only and shall not affect the construction or interpretation of this Agreement**.**

(d)  **Including** - Where the word "including" or "includes" is used in this Agreement, it means "including (or includes) without limitation".

(e)  **No Strict Construction** – The language used in this Agreement is the language chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any party.

(f)  **Number and Gender** – Unless the context otherwise requires, words importing the singular include the plural and vice versa and words importing gender include all genders.

(g)  **Severability** – If, in any jurisdiction, any provision of this Agreement or its application to any party or circumstance is restricted, prohibited or unenforceable, such provision shall, as to such jurisdiction, be ineffective only to the extent of such restriction, prohibition or unenforceability without invalidating the remaining provisions of this Agreement and without affecting the validity or enforceability of such provision in any other jurisdiction and without affecting its application to other parties or circumstances.

### *Entire Agreement*

30.  This Agreement and the Schedules hereto (if any) constitute the entire agreement between the parties and set out all the covenants, promises, warranties, representations, conditions, understandings and agreements between the parties pertaining to the subject matter of this Agreement and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written.  There are no covenants, promises, warranties, representations, conditions, understandings or other agreements, oral or written, express, implied or collateral between the parties in connection with the subject

- 12 -

matter of this Agreement except as specifically set forth in this Agreement and any document required to be delivered pursuant to this Agreement.

### *Amendment*

31.    No amendment, supplement, modification or waiver or termination of this Agreement and, unless otherwise specified, no consent or approval by any party, shall be binding unless executed in writing by the party to be bound thereby.

### *Further Assurances*

32.    The parties shall with reasonable diligence do all such things and provide all such reasonable assurances as may be required to consummate the transactions contemplated by this Agreement, and each party shall provide such further documents or instruments required by any other party as may be reasonably necessary or desirable to effect the purpose of this Agreement and carry out its provisions.

### *Execution and Delivery*

33.    This Agreement may be executed by the parties in counterparts and may be executed and delivered by fax or e-mail and all such counterparts shall together constitute one and the same agreement.

**[the rest of this page has been left intentionally blank]**

**IN WITNESS OF WHICH** the parties have duly executed this Agreement.

**FOTO SOURCE CANADA INC.**

By: _~Crewson~_____

"I have authority to bind the Corporation"

Name (print): _JOHN CREWSON_____

Title: _PRESIDENT_____

Date: _FEB 20 2009_____


**INTERTAN CANADA LTD.**

By: _____

"I have authority to bind the Corporation"

Name (print): _____

Title: _____

Date: _____


**CIRCUIT CITY STORES WEST COAST, INC.**

By: _____

"I have authority to bind the Corporation"

Name (print): _____

Title: _____

Date: _____

- 13 -

**IN WITNESS OF WHICH** the parties have duly executed this Agreement.

**FOTO SOURCE CANADA INC.**

By: _____

"I have authority to bind the Corporation"

Name (print): _____

Title: _____

Date: _____


**INTERTAN CANADA LTD.**

By: *[signature]*

"I have authority to bind the Corporation"

Name (print): *MARK WONG*

Title: *VICE PRESIDENT GENERAL COUNSEL AND SECRETARY*

Date: *February 23, 2009*


**CIRCUIT CITY STORES WEST COAST, INC.**

By: _____

"I have authority to bind the Corporation"

Name (print): _____

Title: _____

Date: _____

- 13 -

**IN WITNESS OF WHICH** the parties have duly executed this Agreement.

**FOTO SOURCE CANADA INC.**

By: _____

"I have authority to bind the Corporation"

Name (print): _____

Title: _____

Date: _____


**INTERTAN CANADA LTD.**

By: _____

"I have authority to bind the Corporation"

Name (print): _____

Title: _____

Date: _____


**CIRCUIT CITY STORES WEST COAST, INC.**

By: _____

"I have authority to bind the Corporation"

Name (print): Reginald D. Hedgebeth

Title: Chairman & Chief Executive Officer

Date: _____