UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA

IN RE:                              .    Case No. 08-35653(KRH)
                                    .
                                    .
                                    .
CIRCUIT CITY STORES,                .    701 East Broad Street
INC.,                               .    Richmond, VA 23219
                                    .
                                    .
        Debtor.                     .    February 13, 2009
. . . . . . . . . . . . . . .            11:26 a.m.


TRANSCRIPT OF EXCERPTED PORTION OF MOTION HEARING
AGENDA ITEM 28 ONLY
BEFORE HONORABLE KEVIN R. HUENNEKENS
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:         McGuire Woods, LLP
                        By:  DOUGLAS FOLEY, ESQ.
                        9000 World Trade Center
                        101 W. Main Street
                        Norfolk, VA 23510

For Lexar Media,        Wiley Rein, LLP
Inc.:                   By:  VALERIE P. MORRISON, ESQ.
                        7925 Jones Branch Drive, Suite 6200
                        McLean, VA 22102

For the Creditors'      Tavenner & Beran, PLC
Committee:              By:  PAULA BERAN, ESQ.
                        20 North Eighth Street, Second Floor
                        Richmond, VA 23219


Audio Operator:         Gail Fathergill


Proceedings recorded by electronic sound recording, transcript
produced by transcription service
_____

**J&J COURT TRANSCRIBERS, INC.**
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@optonline.net

(609) 586-2311    Fax No. (609) 587-3599

1        MR. FOLEY:  Good morning, Your Honor, the next item
2   on the agenda is the motion by Lexar Media and Ms. Morrison is
3   here on behalf of Lexar.
4        THE COURT:  All right.  Very good.
5        MS. MORRISON:  Good morning, Your Honor.
6        THE COURT:  Good morning.
7        MS. MORRISON:  I'm Valerie Morrison representing
8   Lexar Media.  Your Honor, I have just a couple of exhibits I'd
9   like to hand up to the Court.  This is our motion for relief
10  from the automatic stay and to compel the debtor to reject an
11  executory contract.  Your Honor, I've handed the motion, an
12  original plus two and now I'll hand them to debtor's counsel.
13       MR. FOLEY:  Your Honor, we haven't been provided
14  these exhibits until just now.
15       THE COURT:  All right.
16       MR. FOLEY:  So --
17       MS. MORRISON:  That's correct, Your Honor, I'm just
18  providing them.  They are the contract that was attached to our
19  motion and let me inform the Court that it is a --
20       THE COURT:  Have you provided a copy of this now to
21  Mr. Foley?
22       MS. MORRISON:  I'm doing that right now, Your Honor.
23  They are simply a copy of the contract that was attached to our
24  motion and I should advise the Court that it is a redacted

1  version.  What has been redacted is the pricing, the sensitive
2  pricing information.  If Your Honor prefers that we submit an
3  un-redacted version, we would ask the Court for leave to file
4  it under seal and will do so after the hearing.
5          THE COURT:  So your Exhibit Number 1, the consignment
6  agreement, is the same agreement that is attached to your
7  motion?
8          MS. MORRISON:  That's correct, Your Honor.
9          THE COURT:  Okay.  And Exhibit Number 2 is --
10         MS. MORRISON:  That's a summary statement of our
11 estimate of -- excuse me, Your Honor -- of what we are owed
12 post-petition as an administrative amount for goods shipped and
13 ordered post-petition.
14         THE COURT:  All right.  Mr. Foley, do you have
15 objection to the Court receiving proposed Exhibit Number 1, the
16 redacted form of the consignment agreement?
17         MR. FOLEY:  If Ms. Morrison is representing that's
18 what was attached to the motion, we have no objection to that.
19 Exhibit Number 2 looks like a summary and accounting.  We can't
20 stipulate to that.  We don't know the accuracy of that.  We
21 haven't had a chance to --
22         THE COURT:  Right.  Well, I assume Ms. Morrison will
23 have somebody testify to that and --
24         MR. FOLEY:  Your Honor, just to clarify, this is on
25 for a preliminary hearing on a motion for relief from the

1 automatic stay and a motion to compel to order compelling
2 assumption or rejection of the contract.  So I'm not exactly
3 sure what the evidence regarding what the claim situation is is
4 about today because we talked before the hearing.  We both
5 agreed this wasn't about resolving their claim, although I
6 think that's really what -- that's our opposition to the
7 motion.  This is a claims reconciliation matter which doesn't
8 need to be determined today or in the procedure in the format
9 in which it's being raised.
10            MR. MORRISON:  Your Honor, this is not a claim
11 adjudication proceeding.  However, I thought it would be
12 helpful for the Court to understand just approximately how much
13 was shipped post-petition and is owed to my client for
14 post-petition goods on an administrative basis.  Although we're
15 not seeking to determine the claim today, what we're asking the
16 Court to do is allow us to terminate this contract to cut off
17 liability heading back to the estate which could affect the
18 amount of the claim.
19            So it's not the essential issue of the case, but it
20 is something I wanted the Court to be aware of, roughly our
21 estimate of what we believe we're owed.  It's still subject to
22 further reconciliation and we have not filed a request from
23 haven of administrative expense claim yet.  But we will -- we
24 anticipate doing so in the future.  So -- but we are not asking
25 for adjudication of our claim today.  This is really more by

1  way of information to the Court and our estimate of what's
2  owed.
3           THE COURT:  All right.  And the -- you're asking for
4  relief from stay to be able to terminate this contract.  Why
5  isn't this a 365 matter as opposed to a 362 matter?
6           MS. MORRISON:  Your Honor, we did ask the Court to
7  grant us relief from the stay to terminate the contract and
8  also compel the debtor to reject because the debtor has
9  breached post-petition and is no longer ordering goods and, in
10 our opinion and I hope to convince the Court of this, is not
11 able to assume this contract.  And when -- I think it's fairly
12 well-settled in this jurisdiction that when a contract is not
13 capable of assumption, there is plenty of authority for the
14 proposition that it's appropriate to grant relief from the
15 automatic stay.  And why this is key to us, Your Honor, is that
16 there is a unique provision of this contract.  In fact, it
17 might be helpful to actually take a look at it.  Again, it's
18 Exhibit 1, Your Honor.
19          And by way of background, let me start with at what
20 this contract was.  Your Honor, Lexar is a manufacturer of
21 flash cards and junk drives.  The parties entered into a
22 consignment agreement on November 5th of last year, just a
23 couple of days before the bankruptcy was filed.  And, in
24 essence, what the contract provided was for Lexar to supply
25 goods on consignment for resale by Circuit City in its retail

1  operations.

2  Under the contract, the debtor submitted purchase
3  orders for consigned goods that it wants to purchase and Lexar
4  has the ability to accept or the discretion to reject any
5  purchase order.  Once a purchase order was accepted, Lexar
6  would ship the goods at an agreed price pursuant to the terms
7  of the contracts.  Payments for these goods were made upon sale
8  to the ultimate consumer because this was a consignment
9  agreement.  So title was retained in Lexar until sale
10 ultimately through to the consumer.  And payments were remitted
11 daily.

12 In addition, Your Honor, the contract requires the
13 debtor to provide several reports including inventory reports,
14 sales reports and monthly sales tax reports to enable Lexar to
15 monitor the sales as they are sold through to the customer and
16 determine how much is owed and, also, because Lexar retained
17 title to the property, to the goods, to determine what personal
18 property tax liabilities it may have.

19 Now, Your Honor, pursuant to this agreement, the
20 debtor did, in fact, submit several post-petition purchase
21 orders which Lexar accepted and delivered the goods to Circuit
22 City on credit post-petition.  And what the statement which is
23 Exhibit 2 is purporting to show is that my client is --
24       THE COURT:  Well, now, I've admitted Exhibit 1, but
25 there's been an objection to Exhibit 2 so you'll need to --

1   MS. MORRISON: That's right. We will put on our
2 evidence of that, Your Honor. I do have a witness present in
3 the courtroom, Mr. Brad Gray (phonetic) who will testify to
4 that if we're permitted to proceed. But, in any event, Lexar
5 has advanced on credit in terms of goods and amounts owed,
6 approximately $2,013,000 at this point, Your Honor.
7   Now, the unique provision of this contract is the
8 requirement or provision for the payment by Lexar of marketing
9 and slotting fees. And it's not exactly a payment, but it is a
10 credit against Circuit City's payments to Lexar for the amount
11 of these marketing and slotting fees. This is set forth in
12 Exhibit C to this contract, Your Honor. And the amount of the
13 fees is broken down in monthly payments of $625,000 each. But
14 the payments are for an entire year and front loaded to the
15 first four months. So, in other words, $625,000 a month for
16 four months applicable for advertising and marketing and
17 slotting fees for the entire year.
18   Now, marketing fees are advertisements. The parties
19 had an agreement pursuant to which Circuit City would advertise
20 in their weekly circular that was distributed as part of a
21 Sunday newspaper ad to 38 million households in the area. And
22 there were other advertisements, as well. The slotting fees
23 are for real estate in the store. The -- Lexar's goods, the
24 memory cards and the junk drives are hung on pegs that are
25 located in the store. So the slotting fees are in payment of

1  that.  And, again, they're front loaded to the first four
2  months, but applicable to the entire year of the contract, the
3  entire year term.
4           Now why is this important or why is termination
5  important?  Your Honor, there is a provision a provision at the
6  end of each segment of Exhibit C to this contract which talks
7  about what happens on termination of the contract and it's an
8  identical provision.  It's the last sentence of both the MDF or
9  Marketing Development Fund section and the slotting fee section
10 and I'll read it.  The slotting fees will not be repaid upon
11 the return of consigned product hereunder provided.  However,
12 as the slottings fees represent payment for slotting usage
13 throughout the initial term of the agreement, in the event the
14 agreement is terminated prior to the expiration of the initial
15 term, and the initial term is the 12-month period that
16 commenced November 5th, 2008, Circuit City shall refund to
17 Lexar a pro rata portion of the slotting fees previously paid
18 by Lexar and Circuit City.  Identical provision appears for the
19 marketing and development funds.
20          So, Your Honor, as I interpret this, for example, if
21 we were 45 days into the contract, roughly 13 percent of the
22 annual fees would be credited against the amounts owed to Lexar
23 on Circuit City's invoices and the balance would no longer be
24 an obligation to be paid because 13 percent is the product of
25 45 over 365 days.  As it is -- as of the date we filed our

1  motion on January 28th, and we have asked that relief be
2  granted retroactively, we were 84 days into the contract.  That
3  turns out to be 24 percent of the contract and would result in
4  a credit against the amounts owed to Lexar of $600,000.  This
5  has a value to Lexar of $6,761 a day.  So every day that goes
6  by that this contract is not terminated, my client loses close
7  to $7,000 or potentially loses close to $7,000 determining --
8  depending on exactly how this provision is ultimately
9  interpreted by the Court.

10         Now, the debtor's position here is what the -- what
11 is the rush.  You know, we have until plan confirmation to
12 assume or reject.  We need time to decide.  And I just
13 explained what the rush is, Your Honor.  If we are not
14 permitted to terminate the contract, Lexar is exposed to a
15 depletion, if you will, of its administrative claim for goods
16 sold on post-petition credit as the rate of just under $7,000 a
17 day.

18         But, you know, critically, Your Honor, the argument
19 that the debtor needs more time to evaluate this contract is in
20 my view a red herring because the debtor has no ability and no
21 intention to assume this contract.  And that's without even
22 addressing the question of whether the debtor has the ability
23 to cure the substantial default of $2 million, perhaps with a
24 credit of 600,000.  The debtor is out of business.  The debtor
25 is winding down its affairs.  The debtor is not -- this is not

1  a situation where the debtor is going to order more inventory.
2  I can't imagine that the debtor is authorized to order more
3  inventory.  The point is the debtor doesn't need this contract
4  for the purpose for which it was intended which is to be a
5  source of supply of memory and flash cards for the debtor in
6  the ordinary course of its operations.  The debtor is
7  liquidating its inventory, liquidating its furniture, fixtures,
8  equipment and leases.  The contract is of no value and this
9  fact is not disputed by Circuit City.
10             The only other possibility is that the debtor might
11 find some value in this contract and want to assume it and
12 assign it to a third party and create some value for the
13 benefit of the estate.  But that, too, Your Honor, is a hollow
14 and illusory argument if the debtor intended to make it.  Why
15 is that?  Well, first, under the terms of the contract -- and I
16 point the Court to section -- excuse me -- Paragraph 3B.  If
17 Your Honor takes a look at Paragraph 3B, you will see that
18 under the express terms of the contract Lexar has no obligation
19 to accept purchase orders from Circuit City and has complete
20 discretion to reject any purchase order.  "All purchase orders
21 are subject to acceptance by Lexar via ED1855" -- which is a
22 computer program pursuant to which purchase orders were
23 transmitted -- "and Lexar shall have no liability to Circuit
24 City with respect to purchase orders that are not accepted."
25             Secondly, Paragraph 22 of this contract, 22A.  And

1  this is a key point, Your Honor.  This contract is terminable
2  by either party without cause, liability or obligation on 60
3  days notice.  So what have we got?  We've got a contract under
4  which my client is under no obligation to accept any orders of
5  any kind and we've got a contract that's terminable at will
6  without cause, liability or obligation on 60-day notice -- 60
7  days notice.  We have a contract that has no potential value to
8  anyone.  There is nothing here for this estate to assume or
9  assign.
10            So where are we?  We're back at the fact that Lexar
11 faces the possibility of losing $7,000 a day while the debtor
12 determines whether it wants to assume or reject a contract that
13 it has no ability or intention of assuming or assigning.
14 There's just absolutely no business purpose to be accomplished
15 by delay, by holding this contract out.  My client extended
16 credit to Circuit City in good faith post-petition.  You know,
17 unfortunately, like so many vendors it gets caught up.
18 However, it should not have its claim depleted by an artifice,
19 by an artificial need to evaluate a contract that has no
20 commercial value to anyone anywhere.
21            Your Honor, I'd cite for the Court the _TechDyn_ case
22 which is a case from Judge Mitchell at 235 BR 857 which stands
23 for the proposition that relief from the automatic stay is
24 absolutely appropriate when a contract is not capable of being
25 assumed, as we have here.  The facts were different there.

1  That was a case where a contract as a matter of law was not
2  capable of being assumed because it was -- I believe it was a
3  patent license and, therefore, was not assignable under
4  applicable federal law.  But the same principle applies here,
5  although we're dealing with a commercial reality as opposed to
6  a legally non-assignable contract.

7       We have another breach by the debtor which I believe
8  is uncontested.  There's a specific provision of this contract,
9  Paragraph 22B, which requires the debtor to continue operating
10 its retail business in the ordinary course.  And this is a
11 material term of the contract which is in breach and I don't
12 believe that the debtor in any meaningful way or realistic way
13 would attempt to refute or contest the fact that it is out of
14 business, that it's not operating currently in the ordinary
15 course of business.

16      Now, the debtor has argued in its papers that this is
17 an ipso facto clause.  But, in fact, it's not an ipso facto
18 clause.  There may be other ipso facto clauses in this
19 contract, but an operations clause, the requirement that the
20 company remain operating as a retail enterprise as a going
21 concern, that has nothing to do with the financial condition of
22 the debtor.  And it has nothing to do with the fact that the
23 debtor has filed for bankruptcy.  In fact, as I mentioned, my
24 client entered into this contract a few short days before the
25 bankruptcy.  After the bankruptcy, it continued to sell on

1  credit to Circuit City and it continued to do this without ever
2  threatening to terminate in the hopes that Circuit City would
3  survive.  And you'll hear testimony to that effect if we're
4  allowed to put our witness on.
5      What caused my client to want to terminate this
6  contract was when the debtor decided it was going out of
7  business.  That and the fact that the debtor stopped paying.  I
8  do have a witness present in court.  There are several other
9  defaults which, you know, obviously, we would need testimony to
10 establish, but the debtor's not advertising the way it said
11 that it would and it's not reporting the way that it said that
12 it would.  For these reasons, we'd like to be able to proceed,
13 although I do believe that if this Court deems this a
14 preliminary hearing, there is enough based on the four corners
15 of the contract and without evidence for the Court to rule that
16 there is nothing here to assume or assign and, therefore, the
17 stay should be lifted as a matter of law.
18      THE COURT:  All right.  Thank you.  Mr. Foley?
19      MR. FOLEY:  Your Honor, I think Ms. Morrison got into
20 the real heart of what she wants toward the end of her argument
21 where she said what she's concerned about is claim depletion.
22 That's what she's -- that's what this motion is really all
23 about.  It's an accelerated effort to determine the amount of
24 Lexar's administrative claim in this case.  What she didn't
25 tell you is that Lexar is not a perfected consignment vendor in

1  this case.  There is no perfection documents.  They don't want
2  the goods back.  They don't want us to escrow the sale proceeds
3  from their goods and have it determined at the end of the sale
4  process.  We've offered that.  That's not what they want.
5           What they want is for you to order today that they
6  effectively terminated the contract on January 26 so they can
7  summarily eliminate a credit that the estate would otherwise
8  have been entitled to that arose on January 31 in the amount of
9  $625,000.  Yes, the MDF credits and the slotting fee credits
10 which go back and forth between the parties and the amounts
11 that we owe them for goods and its all netted out and paid in
12 the ordinary course when we're -- you know, if we weren't in
13 bankruptcy.  Yes, those are front loaded.  Are there operation
14 provisions in the contract as to how much of those we're
15 entitled to at the end of the day?  Yes.
16          But what this is is a claim reconciliation issue.
17 There is absolutely no reason to have that determined today.
18 They're not selling us anymore goods.  They're not paying us
19 anything for these credits.  She's saying they're suffering a
20 penalty of $7,000 a day.  Well, this is claim resolution
21 process.  We will resolve this as part of the claim process.
22 We are selling the goods under the agency agreement.  We're
23 getting -- the estate's getting a benefit for selling the
24 goods.  The e-mail that they receive about the lack of
25 reporting, as Your Honor is aware, the headquarters personnel

1 was drastically reduced after January 16th.  The e-mail that
2 they received was somebody who was laid off.  We can and we
3 have confirmed this morning that we can give them accurate
4 reporting at the conclusion of the sale process which will
5 occur by the end of March.
6          And we would ask the Court to simply carry this
7 matter over for a final hearing and we will try to resolve it
8 beforehand and/or develop the factual record before the March
9 30th hearing date because as a factual matter she wants you to
10 determine today that we are entitled to no more credits after
11 January 26 because we started going out of business sales.
12 Well, the facts may be that we sold every one of their products
13 exactly where it was supposed to be in the store pursuant to
14 the -- our entitlement to the slotting agreement, the slotting
15 fees, and that the advertising may have actually occurred in
16 the way it was supposed to occur.  And then, you know, we've
17 actually -- the estate actually may have some entitlement to
18 some credits post January 26.  And so we can't determine those
19 factual issues today.
20          We're going to try to negotiate with them and resolve
21 it and see if we can do that.  But we would ask the Court to
22 carry both these matters over to March 30th for a final
23 evidentiary hearing.  We'll take depositions beforehand if we
24 have to, but we're going to try to resolve this.  We will
25 voluntarily give them sales reporting information real time if

1  they want it.  But the sale, we think it makes sense to do it
2  at the end of the sale process which should end some time in
3  the middle of March.  And that way we'll know exactly what
4  we're dealing with and hopefully we can resolve it by then.
5            THE COURT:  All right.  Thank you.
6            MS. BERAN:  Your Honor, although the Committee did
7  not file a formal objection to this pleading, the Committee has
8  been in consultation with the debtor and the debtor's handling
9  on this and it is in support of the debtor's position.  In this
10 instance, the Committee is concerned that the Court, in
11 essence, would be resolving an administrative expense claim
12 today with -- on a very short time table without any type of
13 discovery and without even time to review.
14           Based on that and based on the debtor's suggestion of
15 potentially putting proceeds in an escrow and having all
16 parties' rights reserved, we believe it's most appropriate for
17 this Court to deny without prejudice for refiling this pleading
18 today and the next alternative, as suggested by Mr. Foley,
19 would be to set this matter down for final hearing.  We believe
20 all parties' rights could be preserved and that would allow the
21 debtor and its management to focus on really the critical
22 aspect of what it needs to focus on right now and that's in
23 maximizing the value of its assets for the benefit of all
24 parties in interest in this case.
25           THE COURT:  Thank you, Ms. Beran.  Ms. Morrison, it

1 is -- it's not the Court's procedure to hear evidence in a
2 preliminary hearing.  The Court -- if there's going to be
3 evidence on a motion for relief from stay, sets the matter down
4 for a final hearing so that everyone can be prepared to put
5 forth their evidence.  And I'm not going to dismiss your motion
6 for relief from stay as was suggested by Ms. Beran, but I am
7 going to set it down for a final hearing so that we can have
8 some facts if there is cause, as I understand your argument to
9 be, to terminate the automatic stay, if 362 is applicable to
10 executory contract under Section 365 which I'm not saying it
11 is.  Just -- but those are the issues as I understand would
12 need to be resolved at the final hearing.
13          MS. MORRISON:  Your Honor, I would simply ask that
14 the Court set this as quickly as possible because we do
15 perceive the danger of, again, a draining of the administrative
16 claim of $7,000 a day which adds up very quickly.  So we would
17 just simply ask that if Your Honor is inclined to set this for
18 final hearing that it be set as quickly as possible.
19          THE COURT:  The -- let me drill down on that a little
20 bit.  If the debtor is not doing what -- and you're able to
21 show that the debtor is not doing what they're supposed to be
22 doing under the terms of the contract, why would be they
23 entitled to the credit?
24          MS. MORRISON:  I would agree with that
25 wholeheartedly, Your Honor.

1        THE COURT: And if they are doing what they're
2   supposed to be doing, then they should be entitled to the
3   credit. So I don't understand why the timing makes any
4   difference as far as that's concerned. It's --
5        MS. MORRISON: There --
6        THE COURT: That's a factual issue which seems to me
7   more important thing is to find out what the facts are. Are
8   they doing it or are they not doing it? And rather than
9   putting it on a fast track, we ought to do it on a regular
10  track so that the, you know, the evidence can be developed.
11       MS. MORRISON: All I would say in response to that,
12  Your Honor, is this is an unusual contract. It's an unusual
13  provision. The pro rata application may be susceptible to an
14  interpretation that requires termination in order for the pro
15  rata to kick in, the pro rata reduction to kick in. And if
16  that's the case, with that hanging out there, there is still an
17  exposure or a risk that this contract could be interpreted that
18  way and my client could be facing a loss of $7,000 a day. If,
19  on the other hand, the contract is not susceptible to such an
20  interpretation and I know Your Honor is probably not going to
21  rule on this right now to give us some comfort.
22       THE COURT: I'm not. You're safe.
23       MS. MORRISON: Given that probability or given that
24  possibility that it's susceptible to that interpretation,
25  there's still the risk out there. And that's why we're asking.

1  That's why we moved on an emergency basis.  That's why we're
2  asking the Court to consider this on an expedited scheduling if
3  at all possible.
4           THE COURT:  All right.  Mr. Foley, can we agree on a
5  date for a final hearing?
6           MR. FOLEY:  Your Honor, as Your Honor is aware, we
7  have several hearings coming up that are pretty full.  That's
8  why I suggested the March 30th date.  And, again, I think Your
9  Honor was correct about the timing issue.  If Your Honor
10 determines that at some point in time, you know, we were not in
11 compliance and not entitled to credits, you can effectuate the
12 relief that she's seeking by saying that, you know, she's not
13 prejudiced by the fact that the matter is heard at a later
14 date.  Again, this is a claim reconciliation matter.  She's
15 talking about $7,000 a day, but Your Honor gets to decide that.
16 Your Honor gets to decide whether we are entitled to credits
17 after a certain period of time.
18          THE COURT:  And I agree with that.  I think I can
19 resolve that so that there wouldn't be any prejudice no matter
20 when we heard it.  But -- so I'm going to set it down then for
21 the March 30 omnibus hearing date.  And that will be then an
22 evidentiary hearing so you'll need -- both parties need to be
23 prepared.
24          MR. FOLEY:  Yes, Your Honor.
25          UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

Document    Page 20 of 20

20

1                     \* \* \* \* \*

## **C E R T I F I C A T I O N**

      I, KELLI R. PHILBURN, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.

<u>/s/ Kelli R. Philburn</u>        DATE:  MARCH 9, 2009
KELLI R. PHILBURN
J&J COURT TRANSCRIBERS, INC.

**J&J COURT TRANSCRIBERS, INC.**