# EXHIBIT A

1/26/93
florie\reals\sport.11new

## SUBLEASE AGREEMENT

THIS SUBLEASE is made as of the 29 day of January, 1993, by and between Sportmart, Inc., a Delaware corporation, ("Landlord") and Circuit City Stores, Inc., a Virginia corporation, ("Tenant").

WITNESSETH THAT, in consideration of the rents, covenants and agreements hereinafter set forth, the Landlord and Tenant enter into the following agreements:

1. **BASIC SUBLEASE DATA:**
The descriptions and amounts set forth below are qualified by their usage elsewhere in this Sublease, including those lease sections referred to in parentheses:

   1.1.1   **Premises** (Section 2.1): A portion of the Building located at 1750 Highway 36, West Roseville, Minnesota (the Property). The Premises are marked on Exhibit C by diagonal lines.

   1.1.2   **Area of Premises** (Section 2.1): The Premises consist of the existing space which contains approximately 22,600 square feet along with the Expansion Area (to be constructed by Tenant at the north end of the Building pursuant to the provisions of Article III hereof) consisting of approximately 9,381 square feet. In no event, however, shall the size of the Expansion Area exceed 12,000 square feet. The total square feet of the Premises shall therefore not exceed 34,600 square feet.

   1.1.3   **Sublease Term** (Section 2.3): The Term of this Sublease shall commence on the Commencement Date and, shall, subject to the Tenant's options to renew the Term of this Sublease, end on January 30, 2008, ("Sublease Expiration Date") unless sooner terminated in accordance with the provisions of this Sublease.

   Provided Tenant is not in default of any of the terms and conditions of this Sublease, beyond any applicable grace or cure period, and further provided the Landlord has either (i) exercised the then current option or options granted to it under the Master Lease; or (ii) it has acquired legal title to the Property and in the event of the applicability of either of such events described at (i) or (ii) above, Tenant shall have the option to renew the Term of this Sublease for four (4) consecutive five year periods.

   In the event Tenant intends to exercise the option granted herein, Tenant shall notify Landlord, in writing, at least 270 days prior to the expiration of the then remaining Term. No later than 120 days after Tenant has exercised an option, Landlord shall advise Tenant if it has either: (i) exercised or intends to exercise the current option granted to it under the Master Lease; or (ii) acquired or intends to acquire legal title to the Property, pursuant to the option granted to it under the Master Lease; or (iii) elected not to exercise either such option. If Landlord fails to provide Tenant with such notice, Tenant shall, within 10 business days following the expiration of the 120 day period, provide Landlord with an Additional Notice advising Landlord of such failure. If Landlord fails to respond to the Additional Notice, it shall be presumed that Landlord has elected not to (and will not thereafter elect to) exercise such option. In the event of Landlord's failure to respond to the Additional Notice, Landlord shall be presumed to have waived its rights to exercise both such options under the Master Lease. Tenant may rely upon such presumption and waiver in determining whether or not to exercise Tenant's rights under its recognition or similar agreement with the Master Landlord. If Landlord notifies Tenant that Landlord intends to proceed pursuant to (i) or (ii) above, and thereafter fails to proceed, then Landlord shall be deemed to be in default of this Sublease if such failure to proceed was caused by Landlord.

   The same terms and conditions as set forth herein shall apply, during the options, except however, the Minimum Annual Rent, Minimum Monthly Rent and Gross Sales Volumes set forth herein shall be increased in the manner set forth in Sections 1.1.7 and 1.1.13.

   1.1.4   **Commencement Date** (Section 2.3): January 16, 1993.

   1.1.5   **Possession Date**: The date on which Landlord will make the Premises available for commencement of Tenant's Work. The Possession Date shall occur on the date on which this Sublease is executed and delivered by Landlord and Tenant.

   1.1.6   **Effective Date of Sublease**: If either: (i) this Lease is executed subsequent to January 1, 1993; or (ii) if the conditions precedent described at Section 3.5 hereof are satisfied or waived subsequent to January 1, 1993, the Tenant's obligations to pay Rent shall be deemed nevertheless to have commenced as of January 1, 1993.

**EXHIBIT A**

1

ARTICLE IV
RENT

Section 4.1. Minimum and Percentage Rent.
Tenant covenants and agrees to pay to Landlord, without notice or demand, and without deduction or set-off of any kind unless otherwise set forth herein, at Landlord's Notice Address, as rent for the Premises:

(i) The Minimum Annual Rent and Special Minimum Rent, designated at Section 1.1.7, in advance upon the first day of each and every month, commencing effective as of January 1, 1993, (notwithstanding that such date is prior to the Commencement Date (such monthly installment being hereinafter called "Minimum Monthly Rent").

(ii) In addition to the Minimum Annual Rent, Tenant agrees to pay the Landlord a Percentage Rent, (in the percentage designated at Section 1.1.13) on all Gross Sales Volume made during any Sublease Year, that are in excess of the Gross Sales Volume designated at Section 1.1.13. Tenant's obligation to pay Percentage Rent during any Sublease Year shall commence when Tenant's Gross Sales for such Sublease Year exceeds the applicable Gross Sales Volume. Thereafter, Percentage Rent shall be payable on or before the thirtieth (30th) day of each month on any portion of Tenant's Gross Sales Volume made during the preceding month which is in excess of the Gross Sales Volume for such Sublease Year. The Sales Volume shall be prorated (on the basis of a 365 day year) for any partial Sublease Year. All Gross Sales Volume made from the Premises (whether generated by Tenant or any other party claiming any right of occupancy or use of the Premises by, through or under Tenant) shall be included in the computation of Gross Sales Volume.

Section 4.2 Miscellaneous Rent Provisions.
Any rent (which is hereby defined as the sum of all Minimum Rent, Special Minimum Rent, Percentage Rent and Additional Rent) or other amounts to be paid by Tenant which are not paid when due shall bear interest from the date due until the date paid at the rate equal to the then published prime rate of American National Bank and Trust Company of Chicago plus five percent (5%), and such interest shall be deemed Additional Rent. In addition, if Tenant shall fail to pay any rent, more than twice during any Sublease Year within seven (7) days after the same is due, Tenant shall be obligated to pay a late payment charge equal to Five Hundred Dollars ($500) to reimburse Landlord for its additional administrative costs.

Any payment by Tenant or acceptance by Landlord of a lesser amount than shall be due from Tenant shall be treated as a payment on account. The acceptance by Landlord of a check for a lesser amount with an endorsement or statement thereon, or upon any letter accompanying such check, that such lesser amount is payment in full shall be given no effect, and Landlord may accept such check without prejudice to any other rights or remedies which Landlord may have against Tenant. Unless otherwise stated, all amounts required or provided to be paid by Tenant under this Sublease which are in addition to the Minimum Monthly Rent shall be deemed Additional Rent, and the failure to pay the same shall be treated in all events as the failure to pay Rent.

Section 4.3. Gross Sales Records.
Tenant shall keep and maintain at Tenant's corporate headquarters books and records covering all Gross Sales made or rendered by it in or from the Premises. Tenant agrees that it shall keep such books and records in the same manner that Tenant does for its other Circuit City superstores, all in accordance with generally acceptable accounting principles. Tenant's books and records shall be available for inspection by Landlord for three (3) years after Tenant notifies Landlord of its Gross Sales for such period. Errors, if any, in any statement submitted by Tenant shall be corrected and Percentage Rent payments adjusted accordingly. If any error shall amount to an underreporting of Gross Sales Volume of more than four percent (4%) in the Gross Sales Volume, the reasonable costs of an examination, including the full amount of bills rendered to Landlord by its then regularly employed accountant for such examination of Tenant's books, shall be paid by Tenant concurrently with the next payment of Minimum Monthly Rent. The furnishing by Tenant of any wilfully, fraudulent and intentionally inaccurate statement or a statement inaccurate to the extent of four percent (4%) or more of Gross Sales Volume shall entitle the Landlord, at Landlord's option, to terminate this Sublease upon thirty (30) days prior written notice. Landlord agrees to keep any information obtained from Tenant confidential, except that Landlord may give such information to any mortgagee or party secured by a deed of trust, or to a prospective purchaser of the Center, and in connection with any litigation or arbitration proceedings between the parties, or as may be required by any competent judicial or other legally constituted authority.

Section 4.4. Percentage Rent Reports.
On the 30th day of each month, Tenant shall deliver to Landlord a statement of Gross Sales, for the preceding month, such statement shall be signed by an authorized representative of Tenant. Within sixty (60) days after the end of each Sublease Year, Tenant shall deliver to Landlord an annual statement of Gross Sales and any Percentage Rent due and owing for the preceding Sublease Year. The statement shall be signed by an officer of Tenant. The Percentage Rent shall be computed on the basis of such statement.

In the event Tenant shall be delinquent in providing any monthly or annual sales statements required hereunder, then Landlord shall have the right, with ten (10) days prior notice, and Tenant's failure to provide such statement within such ten day period, to conduct an audit as provided by Section 4.3 and all charges occasioned by reason thereof shall be satisfied by Tenant. Furthermore, if the Tenant shall be delinquent in furnishing such report or reports, after the aforesaid notice and cure period, more than twice in any Sublease

9

Year, the Tenant shall be obligated to pay a Late Report Charge of Five Hundred Dollars ($500.00) for each month that the report is delinquent.

Section 4.5. "Gross Sales" Defined.

As used herein, "Gross Sales" means the sale prices of all goods, wares and merchandise sold, and the charges for all services performed by Tenant (or any other party claiming any right of occupancy or use of the Premises by, through or under Tenant). Gross Sales shall also include sales and services: (i) where the orders originate in, at or from the Premises, without regard to where delivery or performance is made; (ii) made pursuant to mail, telephone or telegraph or otherwise received or filled at the Premises; and (iii) deposits not refunded to customers.

Anything contained in this Sublease to the contrary notwithstanding, Gross Sales shall not include (A) service charges to customers or other charges for extending credit to customers, and amounts in excess of Tenant's cash sales price charged to customers on sales made on credit or under a time payment plan, not to exceed, however, two percent (2%) of Tenant's Gross Sales, (B) sales to employees of Tenant at cost, not to exceed however, 2% of Tenant's Gross Sales, (C) returns to and refunds made by Tenant, (D) exchanges of merchandise between stores or warehouses of Tenant where such exchange is made solely for the convenient operation of the business of Tenant and such exchange of merchandise was not made for the purpose of consummating a sale which has been made, in, at, on or from the Premises, (E) the amount of any city, county, state or federal sales, luxury or excise tax on such sales which is both added to the selling price (or absorbed therein) and paid to the taxing authority by Tenant (but not by Tenant's vendor), (F) sums and credits received in the settlement of claims for loss of or damage to merchandise, (G) receipts for incidental items, such as cigarettes and candy, from snack bars, cafeterias and vending machines operated primarily for the use of Tenant's employees and receipts from public pay telephones. The number of vending machines shall not exceed the average number of vending machines in a majority of Tenant's similar sized stores, (H) charges for repair and/or servicing of merchandise, including sales of service contracts, not to exceed, however, two percent (2%) of Tenant's Gross Sales, (I) delivery and installation charges relating to work performed outside the Premises, (J) exchanges of merchandise to the extent of the value of the merchandise returned for exchange, (K) sales of store fixtures and equipment used at the Premises and not sold in the ordinary course of business, and (L) sales which are uncollectible and written off Tenant's books as uncollectible, provided, however, that this deduction or exclusion (L) from Gross Sales shall not exceed one percent (1%) of Tenant's Gross Sales in any Sublease Year, calculated on a noncumulative basis, and such deduction or exclusion shall relate only to the sales price and not to any interest, carrying or service charges in connection therewith; if such sales are subsequently collected, then they shall be deemed a part of Gross Sales in the Sublease Year in which collected.

Section 4.6. Real Estate Taxes.

On the earlier to occur of the day in which the Tenant opens for business with the public or the day Tenant is obligated to open for business pursuant to Section 3.4 hereof, Tenant shall pay Tenant's Pro Rata Share of all real estate taxes, assessments and other governmental levies and charges, general and special, ordinary and extraordinary, unforeseen as well as foreseen, of any kind and nature which may be imposed, levied, assessed or confirmed by any lawful taxing authorities or which may become due and payable out of or for, or which may become a lien or charge upon or against, the whole, or any part, of the Property, or any taxes in lieu thereof (collectively "Taxes"), and also all expenses and attorneys' fees incurred by Landlord in contesting Taxes.

Any fiscal tax year or years commencing during any Sublease Year hereof shall be deemed to correspond to such Sublease Year, except that with respect to the first and last Sublease Years of the Term, the Taxes for the then current fiscal tax year or years, and the Taxes payable by Tenant shall be prorated from the commencement of the Sublease Year and to the end of the Sublease Year, as to which Tenant's obligation shall survive the expiration of the Term.

Landlord shall have the sole, absolute and unrestricted right to settle any contest, proceeding or action upon whatever terms Landlord may, in its sole discretion, determine. In the event Landlord fails to contest taxes following receipt of notice from Tenant, Tenant shall have the right to contest the amount or validity of any Taxes by appropriate proceedings diligently conducted in good faith, provided that Tenant shall first have notified Landlord of its intention to do so and Landlord shall have failed to notify Tenant, within fifteen (15) days of receipt of such notice, that Landlord intends to contest the same.

In the event Landlord receives any refund of such Taxes Landlord shall credit such proportion of such refund as shall be allocated to payments of Taxes actually made by Tenant (less Tenant's pro rata share of expenses and attorneys' fees) against the next succeeding payment of Taxes due from Tenant.

During such times that either (i) Tenant's reported net worth is less than $100,000,000 computed in accordance with Generally Accepted Accounting Principles consistently applied, by the public accounting firm used by Tenant for all of its Circuit City stores; or (ii) Tenant has failed on more than two occasions during any sixty (60) month period of the Term to pay its pro rata share of Taxes within the time provided herein, then, and in either of such events, and without thereby waiving Tenant's liability for its entire proportionate share of such Taxes, until Landlord receives the next notice of assessment or tax bill, Tenant shall pay to Landlord monthly, in advance, on the first day of each month, as Additional Rent, an amount equal to one-twelfth (1/12th) of the estimated Taxes subject to adjustment when the amount of such Taxes are computed. At all other times Tenant shall pay to Landlord its pro rata share of Taxes within twenty (20) days after Tenant's receipt of Landlord's statement therefore accompanied by the tax bill on the basis of which statement is

rendered, but, in no event shall Landlord request Tenant's payment of its pro rata share of Taxes earlier than thirty (30) days before any installment of Taxes is due. Tenant agrees to supply Landlord with financial information certifying its net worth no later than ninety (90) days after the end of each Lease Year or 14 business days after receipt of Landlord's notice that it has not received such information, whichever is later.

Nothing contained in this Sublease shall require Tenant to pay any franchise, corporate, estate, inheritance, succession, capital levy, business or transfer tax of Landlord, or any income, profits, gross receipts or renewal tax or charge upon the rent payable by Tenant under this Sublease, unless any of such taxes or charges are in lieu of Real Estate Taxes. In the event there are any special assessments, same shall be paid over as many installments as are permitted by law and Tenant shall only be responsible for those installments falling due during the term of this Sublease. Landlord shall pay, or cause the payment of, all Taxes before any fine, penalty, interest or cost may be added thereto, become due or be imposed by operation of law for the nonpayment or late payment thereof. In addition, should Landlord fail to pay such Taxes before same become delinquent, Tenant shall have the right, (after providing Landlord with written notice of its intention to do so) at its election, to cure such failure by payment of Taxes and any interest and penalties due thereon and may deduct the cost thereof, plus interest at the interest rate described at Section 4.2 above, from the next installment(s) of Minimum Annual Rent, Percentage Rent, Additional Rent and other charges due hereunder.

### ARTICLE V
### COMMON AREAS

Section 5.1. Common Areas.
All sanitary sewer, storm sewer, sewer lines, water mains, sprinkler systems for the Building, mechanical equipment, pipes, ducts, conduit wires and all other facilities furnished, made available or maintained by Landlord and others in or near the Property for the common and joint use and benefit of Landlord, the Property, the Tenant and other lessees their respective customers and invitees, including, but not limited to, pedestrian sidewalks, parking areas, driveways and roads, ramps, landscaped areas, retaining walls, retention and detention areas, perimeter walls, roofs (subject to the provisions of Section 6.2(9)), and fences, bus stops, lighting facilities and other areas and improvements (collectively the "Common Areas") shall at all times be subject to the exclusive control and management of Landlord. Landlord represents that throughout the Term of this Sublease that the Common Areas shall contain no less than the number of parking spaces required by lawful governmental laws, rules and ordinances specifically including any special use variances caused or created by or at the request of Tenant and specifically excluding any special use variances caused or created by or at the request of Landlord. Except as may be specifically provided in this Sublease to the contrary, nothing in the preceding sentence shall be deemed to grant to Tenant permission to seek any such special use or variance. Landlord shall have the right, from time to time, to establish, modify and enforce reasonable rules and regulations with respect to the Common Areas. Tenant also agrees to comply with all rules and regulations set forth in Exhibit "G" attached hereto and all reasonable amendments thereto, provided the foregoing apply to all other occupants at the Building (including Landlord, so long as Landlord is an occupant at the Building). Said Rules and Regulations shall be uniform, non-discriminating and shall not restrict the rights granted to Tenant pursuant to this Sublease, and Tenant further agrees to cause its concessionaires, officers, employees, agents, customers and invitees to abide thereby.

Section 5.2. Use of Common Areas.
Tenant, its permitted subtenants, and its invitees, employees and customers shall have the nonexclusive right, in common with Landlord and all others to whom Landlord has granted or may hereafter grant rights, to use the Common Areas subject to the rights of Landlord set forth in this Sublease and to "tie into" utilities located thereon with such "tie-in" to be at Tenant's expense and subject to Landlord's consent which consent shall not be unreasonably withheld or delayed. Landlord may after having provided Tenant with prior notice, (except no notice shall be required in the event of perceived of emergency situations) at any time close temporarily any portion of the Common Area to make repairs or changes, prevent the acquisition of public rights therein or for other reasonable purposes. Landlord will exercise its good faith efforts to avoid any such closures during the months of October, November, and December of each year. Landlord and Tenant shall each agree that except in cases of emergencies or as may be required by law, that they will not perform any work at the Property which would have any affect whatsoever upon the conduct of another tenant's business at the Property during the months of October, November and December. In no event, however, shall Landlord perform any repairs, changes or construction of the Common Areas during the months of November or December of any year except, in the event of an emergency or as required by law. Further, neither Landlord nor Tenant shall perform any repairs, changes or construction to the exterior of either of their premises during November or December unless exterior walls are erected by October 1st and the affected construction area is screened with an opaque barrier which shall be reasonably acceptable to the party who is not performing such construction. Tenant shall not interfere with Landlord's or other tenants' rights to use any part of the Common Areas.

Landlord reserves the right to erect both temporary and permanent kiosks within the Common Areas, to change or modify and add to or subtract from the size and dimensions of the Building, and to design and decorate any portion of the Property as it desires, provided, however, access to and visibility of the Premises shall not be permanently, materially or adversely affected and further provided that Landlord may not make any changes to that portion of the Property, identified on Exhibit C hereof as "Tenant Preferred Areas" without Tenant's consent, which consent will not be unreasonably withheld or delayed. The right of Landlord hereunder shall be subject to other provisions of this Lease (such as Section 5.2 respecting the timing of such work). Notwithstanding anything contained herein to the contrary, Landlord shall not be entitled to construct

11

as each such inspection discloses to be required and, in addition, all repairs, testing and servicing as shall be necessary or reasonably required by Landlord or Landlord's insurance underwriter. A suitable contractor shall be one who is reliable and capable of performing Tenant's obligations hereunder and reasonably approved by Landlord.

If replacement of any portion of the Premises, which Tenant is required to maintain is required, Tenant shall make such replacements with equipment, fixtures, systems and appurtenances of the same quality. If the Tenant fails to perform its maintenance, repair and replacement obligations under this section, the Landlord may, but shall not be obligated to, perform such work (after notice to Tenant and Tenant's failure to perform same in accordance with the provisions of Section 18.1 below) and add the cost of the same (on the basis of the actual cost plus ten percent (10%) for overhead and supervision) to the next installment of Minimum Monthly Rent due hereunder.

Section 9.3. Surrender of Premises.
Upon the termination of this Sublease, Tenant shall surrender the Premises in a broom-clean condition, free of debris and in the same condition (subject to the alterations, changes, additions and improvements made by Tenant pursuant to this Sublease) as the Premises were on the date the Tenant opened the Premises for business to the public, reasonable wear and tear and fire casualty and condemnation excepted, and shall surrender all keys for the Premises to Landlord at the place then fixed for the payment of rent and shall inform Landlord of all combinations on locks and safes in the Premises. During the last thirty (30) days of such Term, Tenant shall remove all of its trade fixtures described at Exhibit I hereof, and Tenant shall repair any damage to the Premises caused by such removal.

Any alterations, changes, additions and improvements made by Tenant pursuant to this Sublease shall be deemed to be abandoned by Tenant at the expiration or sooner termination of this Sublease and such abandoned property shall, become Landlord's property, and may be sold, destroyed or otherwise disposed of by Landlord without notice or obligation to compensate Tenant. Tenant shall not remove any lighting fixtures, (except as set forth on Exhibit I hereof), or the heating and air conditioning system or the pylon sign (other than Tenant's sign identification panel) unless requested, in writing, to do so by Landlord. Tenant's obligation to observe or perform the obligations of this Section 9.3 shall survive the termination of the Term.

Section 9.4. Access to Building.
Anything contained in this Sublease to the contrary notwithstanding, Tenant shall have right to enter those portions of the Building not being leased to Tenant in order for Tenant to exercise its rights and/or to perform its obligations under this Sublease (including, without limitation, in connection with the performance of Tenant's Work pursuant to Article III and the performance of Tenant's maintenance obligations pursuant to Section 9.2) provided that: (a) Tenant provides Landlord with at least three (3) days' advance notice of each such entry (except in the event of emergencies); (b) Tenant does not unreasonably interfere with the business operations being conducted at such portions of the Building; and (c) Tenant performs such work as quickly as possible under the circumstances; and (d) Tenant indemnifies and saves Landlord harmless from and against any and all liabilities, liens, claims, demands, damages, expenses, reasonable attorneys' fees, costs, fines, penalties, suits, proceedings, actions and causes of action of any kind and every nature arising out of or growing out of, or in any way connection with, such entry.

ARTICLE X
LIENS, SIGNS, AWNINGS, CANOPIES

Section 10.1. Tenant Shall Discharge All Liens.
Tenant will not create, permit to be created or to remain, and will discharge, any lien (including, but not limited to, the liens of mechanics, laborers or materialmen for work or materials alleged to be done or furnished in connection with the Premises), encumbrance or other charge upon the Premises or any part thereof, upon Tenant's leasehold interest therein.

Tenant shall have the right to contest, in good faith, and by appropriate legal proceedings, the validity or amount of any mechanics', laborers' or materialmen's lien or claimed lien. In the event of such contest, Tenant shall within fifteen (15) days give to Landlord a bond or other security in form and substance as may be required by Landlord to insure payment thereof and to prevent any sale, foreclosure or forfeiture of the Premises or any part thereof by reason of such nonpayment. On final determination of such lien or such claim for lien, and upon such payment and release or satisfaction, Landlord will promptly return to Tenant such security as Landlord shall have received in connection with such contest. Landlord reserves the right to enter the Premises to post and keep posted notices of non-responsibility for any such lien. Tenant will pay, protect and indemnify Landlord within ten (10) days after demand therefor from and against all liabilities (actual or contingent), losses, claims, damages, costs and expenses, including reasonable attorneys' fees, reasonably incurred by Landlord by reason of the filing of any lien and/or the removal of the same.

Section 10.2. Signs.
Tenant shall have the right to construct and thereafter repair, replace and maintain, at its own expenses, signs in the size and with the colors and the materials and at the approximate location designated on Exhibits C and F-1 hereof. Landlord agrees that Tenant shall be entitled to install its pylon sign at the approximate location wherein the former occupant's pylon sign was located. The Tenant has been advised by the Landlord that governmental ordinances with respect to pylon signs at the Property allow a maximum of 75 square feet of signage and allow a maximum height of 20 feet. Landlord hereby consents to Tenant's proposed pylon sign

17