# EXHIBIT B

Lawrenceville, NJ
TSA #804

## LEASE

### PARTIES

THIS LEASE made and entered into as of this 22nd day of July, 1992, between CIRCUIT CITY STORES, INC., a Virginia corporation having its principal offices at 9950 Mayland Drive, Richmond, Virginia, 23233, (herein referred to as "Landlord"), and THE SPORTS AUTHORITY, INC., a Delaware corporation having its principal office at 3383 North State Road 7, Ft. Lauderdale, Florida 33319 (herein referred to as "Tenant").

WITNESSETH: That in consideration of the rents, covenants and conditions herein set forth, Landlord and Tenant do hereby covenant, promise and agree as follows:

### DEMISED PREMISES

1. Upon delivery of the completed building pad by Landlord as provided in Article 6 hereof, Landlord does demise unto Tenant and Tenant does take from Landlord for the lease term herein provided (i) Tenant's completed building which shall include a complete building unit containing approximately forty-one thousand two hundred seventy three (41,273) square feet of floor space, which shall be herein referred to as the "completed building," the loading dock area, the trash compactor and dumpster pad (collectively designated THE SPORTS AUTHORITY on Exhibit "B"), (ii) the land underneath the completed building, (iii) site improvements to be constructed as hereinafter specified by Landlord, at its expense, and (iv) a non-exclusive easement and right to use all public and common facilities erected or serving a shopping center to be constructed by Landlord upon the property described in Exhibit "A" also attached hereto and made a part hereof, and intended for common use; including, but not limited to, all entrances, exits, driveways, parking areas, walks, service drives and all utilities servicing said property. Tenant's said building to be in the location and of the dimensions as depicted on Exhibit "B," attached hereto and incorporated herein by reference.

Said land, Tenant's completed building and the site improvements, together with all licenses, rights, privileges and easements appurtenant thereto, shall be herein collectively referred to as the "demised premises" and shall be a part of the shopping center to be constructed by Landlord and Tenant on the property described in Exhibit "A". In addition, Landlord and Tenant have simultaneously executed a Development Agreement for the orderly development of the property described in Exhibit "A" and a Maintenance Agreement for the maintenance, repair and replacement

1



term," as used in this lease, shall be the term of this lease and any extension thereof pursuant to said Article 10.

## ANNUAL MINIMUM RENTAL

3. Tenant shall, during the lease term, pay to Landlord at such place as Landlord shall designate in writing, from time to time, and without set-off or demand except as provided hereafter, the annual minimum rentals as hereinafter provided unless abated or diminished, as set forth in the Rent Schedule attached hereto as Exhibit "F" and incorporated herein by reference. Said rentals shall be paid in equal monthly installments on the first day of each month, in advance, commencing upon the first day of the lease term; provided, however, in the event the first day of the lease term shall not be the first day of a calendar month, then the rental for such month shall be prorated upon a daily basis.

## REAL ESTATE TAXES

4. Unless the demised premises is separately assessed as hereinafter provided, Tenant shall pay and discharge Tenant's proportionate share (as that term is hereafter defined) of all ad valorem real estate taxes and assessments which shall be levied against the demised premises during the lease term. Tenant shall also pay and discharge Tenant's proportionate share (as that term is hereafter defined) of all ad valorem real estate taxes and assessments which shall be levied against the common areas and all improvements located within said common area (excluding the actual buildings constructed thereon whether leased or occupied) located upon the land described in Exhibit "A". In addition, Tenant shall pay and discharge Tenant's proportionate share of all taxes which are levied as a substitute in whole or in part for the ad valorem real estate taxes identified herein (excluding therefrom payment of any income, franchise, transfer, inheritance, capital stock, estate, profit or succession tax levied against Landlord).
In either event, Tenant shall be responsible to pay the annual ad valorem real estate taxes and annual assessments or the taxes levied as a substitute thereof which are assessed on an annual basis (subject to the restrictions contained herein) at the highest discountable amount.

To the extent permitted by law and provided Landlord elects to pay any such assessment in annual installments, Tenant shall pay its' proportionate share of such assessment in annual installments. If Landlord shall elect to pay such assessment on the installment basis, then Tenant shall pay only its' proportionate share of those installments which shall become due and payable during the lease term. Any such installments due and payable in the years in which this lease commences and terminates shall be prorated proportionately. In either event, Tenant shall be responsible to pay its' proportionate share of such assessments based at the highest discountable amount available during the

3

fiscal or calendar year (depending on the taxing authorities tax year) such assessment or installment was paid.

Tenant shall not be chargeable with nor be obligated to pay any tax of any kind whatsoever which may be imposed on the Landlord except for its' proportionate share of the ad valorem real estate taxes and assessments mentioned in the first paragraph of this Article 4 and its' proportionate share of any taxes or assessments which are imposed on the rents payable hereunder which are hereinafter imposed in substitution, in whole or in part, or in addition to the ad valorem real estate taxes and assessments.

Tenant may, at its expense, have the demised premises separately assessed from the land and improvements comprising the remainder of the shopping center as shown on Exhibit "B". If a separate assessment is unobtainable, Tenant shall obtain a certificate of assessment upon the demised premises. Tenant shall pay such taxes and assessments as shall be attributable to the demised premises directly to the taxing authority (if a separate assessment is obtained as hereinbefore provided). If the demised premises are not separately assessed but a certificate of assessment is available, Tenant shall pay to Landlord the amount of ad valorem real estate taxes and assessments, based on the highest discountable amount available for paying such taxes and assessments on an annual basis, attributable to the demised premises in accordance with the certificate of assessment.

Where Tenant is required to pay a proportionate share of taxes to Landlord, the same shall be paid to Landlord within thirty (30) days following receipt of Landlord's written notification that such taxes and assessments are due. Landlord's written notification shall be forwarded to Tenant not later than forty (40) days prior to the date such taxes and assessments shall be due (unless governmental delays cause such shorter notice; provided however that Tenant shall still be required to pay a proportionate share of taxes to Landlord within thirty (30) days of receipt of written notification) and shall be accompanied by a copy of the tax bill or certificate and such additional information as Tenant may reasonably require to show how Tenant's proportionate share of such taxes and assessments was calculated. "Tenant's proportionate share" of the taxes and assessments levied against the demised premises shall be in the ratio that the square foot floor area of Tenant's building bears to the square foot floor area of all the buildings located on the land described in Exhibit "A" and "Tenant's proportionate share" of the taxes and assessments levied against the common areas (excluding the actual buildings located thereon whether leased or occupied) located upon the land described in Exhibit "A" shall be in the ratio that the square foot floor area of Tenant's building bears to the square foot floor area of all the buildings located on the land described in Exhibit "A", provided however that Tenant's proportionate share of the taxes and assessments levied against the common areas shall not exceed sixty

4

percent ( 60 %).

Tenant shall have the right to participate in all negotiations of tax assessments against the demised premises or the land described in Exhibit "A". Tenant shall have the right (provided Landlord does not contest the validity or amount of any tax or assessment in which instance Tenant may join in such contest) to contest the validity or the amount of any tax or assessment levied against the demised premises or the land described in Exhibit "A" by such appellate or other proceedings as may be appropriate in the jurisdiction in which such properties lie and may defer payment of such obligations, pay same under protest or take such other steps as Tenant may deem appropriate; provided, however, Tenant shall take no action which will cause or allow the taxes to become delinquent, or allow the institution of any foreclosure proceedings or similar action against the demised premises or the land described in Exhibit "A". Tenant shall post any bond or security required by governmental authorities to insure payment of the tax assessment after a final determination of the tax contest. Tenant agrees to indemnify Landlord in connection with any claims, losses, costs or expenses or other liabilities or obligations affecting Landlord by reason of Tenant's action to contest the tax assessment. Landlord shall cooperate, at Tenant's expense, in the institution and prosecution of any such proceedings initiated by Tenant and will execute any documents required therefor.

Should Landlord institute proceedings to contest the validity or the amount of any tax or assessment levied against the demised premises and/or the land described in Exhibit "A" Tenant, at Landlord's expense, will cooperate in such proceedings.

Should any of the proceedings referred to in the preceding two paragraphs of this Article 4 result in reducing the total annual real estate tax and assessment liability against the demised premises and/or the land described in Exhibit "A" the instituting party shall, after deducting any expenses incurred, be entitled to receive such refunds attributable to the demised premises (or the adjacent premises as it relates to the Landlord) and its proportionate share of the common areas located on the lands described in Exhibit "A". Any balance of such refund remaining after a proportionate distribution of the proceeds of the proceeding, shall belong to Landlord. If no refund shall be secured in any given proceeding, the party instituting the proceeding shall bear the entire cost.

<u>DRAWINGS AND SPECIFICATIONS</u>

5.    Landlord acknowledges receipt of Tenant's working drawings and specifications on March 25, 1992 which drawings and specifications are identified as Circuit City Superstore Block Superstore and The Sports Authority; which drawings were issued on

5

## EXHIBIT F

## RENT SCHEDULE

Tenant shall, during the lease term, pay to Landlord pursuant to and in accordance with Article 3 of the lease annual minimum rental in the following amounts:

From and after the date of occupancy (as that term is defined in Article 7) and until reimbursement by Landlord pursuant to Article 8 of the Development Agreement, Tenant shall pay to Landlord monthly installments of the annual minimum rental of Thirty Five Thousand One Hundred Seventy Five Dollars ($35,175.00).

From and after reimbursement by Landlord of the amount stated in Article 8 of the Development Agreement, Tenant shall pay to Landlord monthly installments of the annual minimum rental as follows:

| Year of Term | Annual Minimum Rental | Monthly Installment of Annual Minimum Rental |
|---|---|---|
| 1 - 10 | $550,994.55 | $45,916.21 |
| 11 - 20 | $606,094.01 | $50,507.83 |
| 21 - 30 | $666,703.41 | $55,558.62 |
| 31 - 40 | $773,373.75 | $64,447.81 |

NOTE: THIS EXHIBIT HAS BEEN PREPARED AND CIRCULATED FOR DISCUSSION PURPOSES AND PRIOR TO A FINAL DETERMINATION OF THE SQUARE FOOTAGE OF THE SPORTS AUTHORITY SPACE. THE RENTAL HEREIN IS BASED UPON 41,273 SQUARE FEET OF SPACE. THE RENT WILL NEED TO BE MODIFIED SHOULD THE FINAL SQUARE FOOTAGE BE DIFFERENT THAN THAT NOTED HEREIN. THE FINAL DETERMINATION OF THE SQUARE FOOTAGE WILL BE CALCULATED BY BURT HILL KOSAR RITTELMANN ASSOCIATES AND THE CERTIFICATION OF THE SQUARE FOOTAGE OF THE DEMISED PREMISES (EXCLUDING THE LOADING DOCKS AND UNENCLOSED AREAS) SHALL BE CONCLUSIVELY BINDING ON THE PARTIES HERETO.

Lawrenceville, NJ<br>TSA #804

## MAINTENANCE AGREEMENT

THIS AGREEMENT, entered into as of this 22nd day of JULY, 1992, between CIRCUIT CITY STORES, INC., a Virginia corporation, having an office at 9950 Mayland Drive, Richmond, Virginia 23233, (hereafter "Circuit City") and THE SPORTS AUTHORITY, INC., a Delaware corporation, having an office at 3383 N. State Road 7, Fort Lauderdale, Florida 33319 (hereafter "Sports Authority").

### Preliminary Statement

Circuit City and Sports Authority each have certain rights to construct a building in the location designated on Exhibit B annexed hereto upon the property located in Lawrenceville, New Jersey, which property consists of 8.528 acres of land and is more particularly described on Exhibit A annexed hereto. Sports Authority and Circuit City intend to develop their buildings separately but in an integrated fashion for shopping center purposes (sometimes collectively called the "Center") and have contemporaneously herewith entered into a Development Agreement and a Lease to govern the development, use and operation of the Center. Except as otherwise indicated, the capitalized terms herein shall have the same meaning as defined in the Development Agreement and the Lease. Sports Authority desires to retain Circuit City to perform certain of the obligations under the Lease with respect to the maintenance and operation of the common areas located on its Parcel.

NOW, THEREFORE, Sports Authority and Circuit City for good and valuable consideration the receipt and sufficiency of which are hereby acknowledge agree as follows:

1. **Maintenance Obligation.**

Sports Authority hereby designates and hires Circuit City and Circuit City hereby accepts and agrees to perform the obligations and services set forth in Article 3 hereof with respect to the common areas ("common areas" are defined as the land described in Exhibit A that does not contain either the Circuit City building or Sports Authority building).

2. **Term.**

(a) The term of this Agreement shall commence on the date of occupancy as that term is defined in the Lease. The term of this Agreement shall continue for the term of the Lease

1

4. <u>Reimbursement of Cost.</u>

(a) Sports Authority shall pay monthly installments in advance on the first day of each calendar month of one-twelfth (1/12th) of Sports Authority's "Share" of the amount estimated by Circuit City for the cost of common area maintenance. As used herein the term "Share" shall mean a fraction, the numerator of which shall be the number of square feet of floor area in the Sports Authority building as measured from the exterior face of any exterior wall and to the center line of any party wall and the denominator of which shall be equal to the aggregate of the floor area in all buildings in the Center as designated on the as-built plans. In addition, Sports Authority shall reimburse Circuit City for general administrative expenses of Circuit City five percent (5%) of the actual costs incurred by Circuit City in performing the responsibilities set forth in this Article except for the costs incurred by Circuit City for the work designated in subsections (h) and (i) of Article 3.

Such costs shall include, without limitation, all costs incurred by Circuit City in performing the common area maintenance, repair and replacement, set forth in Article 3 including fees for permits, licenses and approvals required with respect to the common area; the cost of renting moveable equipment used solely in providing the common area maintenance; salaries, wages and other compensation for personnel providing common area maintenance (other than bookkeeping and other administrative services), provided that such personnel are located and employed at the Center; payments to outside contractors and personnel in connection with providing the common area maintenance and costs incurred by Circuit City in maintaining and repairing the common area facilities, provided that Circuit City shall obtain the consent of Sports Authority, which consent shall not be unreasonably withheld or delayed before making a capital expenditure or series of related capital expenditures costing in excess of Fifteen Thousand Dollars ($15,000.00). Real estate taxes assessed on the land and building shall not be treated as costs of common area maintenance.

(b) Circuit City shall use its good faith efforts to minimize the costs of common area maintenance consistent with the intentions of this Agreement and with the maintenance of the Center in accordance with the standard set forth in Article 3. All rebates and discounts received by Circuit City shall be deducted from the costs of common area maintenance before calculating Sports Authority's Share. Any contracts for common area maintenance entered into with entities related to or affiliated with Circuit City shall provide for the rendering of such services at their commercially competitive rates.

(c) For the first year of the term of this Maintenance Agreement, Circuit City estimates that Sports Authority's Share of the common area maintenance costs to be Three Thousand Dollars

3