**IBM CREDIT LLC**                           North Castle Drive
                                             Armonk, NY 10504-1785
                                             914/765-1900

## AGREEMENT OF ASSIGNMENT AND ASSUMPTION

This Agreement of Assignment and Assumption (the "Agreement") dated as of this 27 day of ___April___, 2007 (hereinafter defined as "Effective Date", provided that all the parties have executed this Agreement and all the other conditions set forth in paragraph 3 have been satisfied), is entered into by and among  Circuit City Stores, Inc. ("Assignor"), Circuit City Stores West Coast, Inc. (Assignee") and IBM  Credit LLC  ("Lessor").

## WHEREAS

A.  Assignor and Lessor have entered into a Term Lease  Master  Agreement No. TLMA/PSF032007  and all amendments  and addenda  thereto, a copy of which is attached hereto as Exhibit A  ("2007 TLMA") and those specific Term  Lease  Supplements referencing the 2007 TLMA and all amendments and addenda thereto that are funded during the Funding Period (as such term is defined in the 2007 TLMA) (the "2007 Supplements") pursuant to which Assignor leases from Lessor various equipment types set forth on Exhibit B hereto which are either located or to be located (as designated by the Installed State for such equipment set forth on the applicable 2007 Supplement) in the States set forth on Exhibit C hereto but not including those locations listed on Exhibit D hereto (the "Leased Equipment"):

B.  Assignor desires to assign to Assignee all of Assignor's rights, duties and obligations under the  2007 TLMA and 2007 Supplements with  respect to the Leased Equipment (specifically but without limitation all obligations set forth in the corresponding line item for the Leased Equipment set forth on the various 2007 Supplements), and Assignee wishes to assume such rights, duties and obligations, all in accordance with the terms hereof.

C.   Assignee desires to have Assignor act as Assignee's agent and discharge various duties with respect to the 2007 TLMA and 2007 Supplements as more fully set forth herein.

NOW THEREFORE, for valuable consideration, the receipt and adequacy thereof which is hereby acknowledged, the parties agree  as follows:

1.a. As of the  Effective  Date (as  hereinafter  defined), the  Assignor hereby sells and assigns  to the Assignee, and the Assignee hereby purchases and assumes from Assignor, all of Assignor's rights, duties and obligations under the 2007 TLMA and 2007 Supplement with respect to the Leased Equipment and all Assignor's right, title and interest in Assignor's leasehold interest in such Leased Equipment, all in accordance with the terms of this Agreement.  By its signature hereto, Assignee acknowledges that it has read the 2007 Supplements and agrees to be bound by the terms thereof.  By signing this Agreement, Assignee represents and warrants that Assignee's  name as set forth in the signature block below is Assignee's exact legal name and the information identifying Assignee's state of organization is true and accurate and complete in all respects.

   b.  The parties hereto acknowledge and agree that all rights, duties and obligations under the 2007  TLMA and 2007 Supplement with respect to the Leased Equipment will continue.

   c.  Assignor's original obligations under the 2007 TLMA and the 2007 Supplements as lessee shall not be affected by any extension, renewal or other change in the terms of payment of any assigned lease, supplement, equipment or any other agreement between Lessor and Assignee, or any change in the manner,

NO CHANGES TO THIS AGREEMENT ARE AUTHORIZED
                                             Agreement No.  PSF032007

place or terms of payment or performance thereof, or the release, settlement or compromise with any party liable for the payment or performance thereof, or the waiver of any default or event of default under any agreement between Lessor and Assignee, or the release or non-perfection of any security thereunder, any change in Assignee's financial condition, or the interruption of business relations between Lessor and Assignee. Lessor need not exhaust its rights or recourse against Assignee or any other person it may have at any time before being entitled to payment from Assignor. If Assignee is acquired, dissolved, or otherwise undergoes any change in its management, ownership, identity or organization structure, Assignor's obligations shall continue to extend to any liabilities of the Assignee or such resulting entity, dissolved corporation or new or changed legal entity or identity. Assignor waives notice of nonpayment, nonperformance, notices of the release of any collateral, notices of any legal proceedings or other efforts to collect against Assignee; notice of any recoupment or setoff, notice and any opportunity for a hearing as to any prejudgment remedies; and any other demands and notices required by law. Assignor further waives all rights to assert against Lessor any right of recoupment, set-off, and all defenses to the payment and performance of Assignor's original obligations under the 2007 TLMA and the 2007 Supplements (other than the defense of payment or performance of the obligations). Assignor's obligations and liabilities relating to the Leased Equipment shall survive any and all bankruptcy or insolvency proceedings, actions and/or claims brought by or against Assignee, whether such proceedings, actions and/or claims are federal and/or state.

2.  Assignee agrees that as of the Effective Date, it will assume and perform all the duties, obligations, covenants and representations of "Lessee" under the 2007 TLMA and 2007 Supplement, including without limitation, with respect to the Leased Equipment (regardless of when such duties, obligations, covenants and representations arose).

3.  Assignor shall act, and Assignee shall by acceptance of the assignment herein be deemed to have appointed Assignor to act, as agent for Assignee with such powers and discretion as are given to by the terms hereof and of any 2007 Supplement, together with such other powers as are reasonably incidental thereto, including, without limitation, the power (a) to execute and deliver on behalf of Assignee all notices required or permitted by the terms of hereof to be delivered by Assignee, (b) to receive notices and invoices on behalf of Assignee, (c) to disburse funds credited to Assignee to Assignee, (d) to give consents and approvals and make elections on behalf of Assignee and (e) to make payments on behalf of Assignee. Any action taken by the Assignor on behalf of Assignee shall be deemed to bind Assignee and shall be deemed approved by Assignee. The Lessor (i) may rely on any notice delivered by the Assignor on behalf of Assignee and (ii) shall not have any responsibility for any actions as are delegated by Assignee to the Assignor hereunder. Any notice given by the Lessor to the Assignor shall be deemed given to Assignee.

4.  Lessor consents to the assignment and assumption contemplated by this Agreement and the appointment of Assignor as agent for Assignee pursuant to paragraph 3 above subject to the terms herein and subject to the following conditions being fulfilled to Lessor's satisfaction (Lessor's execution hereof being evidence of the satisfaction of such conditions): (a) this Agreement is fully executed by the parties hereto; (b) all amounts due under the 2007 TLMA and 2007 Supplement and related line items of Financing Transactions (as defined in the 2007 TLMA and 2007 Supplement) having been paid by Assignor up to the Effective Date; and (c) the Assignor and Assignee agreeing (as indicated by their signature hereto) that the assignment is made subject to any security interest or ownership interest Lessor may have in the Leased Equipment and Assignee reaffirming (as indicated by its signature hereto) Lessor's security interest or ownership interest in the Leased Equipment.

5.  The consent of Lessor to the assignment contemplated by this Agreement shall not be deemed a waiver of any of Lessor's rights under the 2007 TLMA and 2007 Supplement whatsoever, including, without limitation, its rights with respect to any future assignments or transfers thereof.

---

NO CHANGES TO THIS AGREEMENT ARE AUTHORIZED

Agreement No.  PSF032007

6.  Assignee shall not sell, lease, assign, transfer or otherwise dispose of the Leased Equipment or any interest therein, or sublease the same, unless expressly consented to in writing by Lessor.

7.  This Agreement does not convey or constitute any right or transfer of software licensed by Assignor's Supplier.

8.  This Agreement does not constitute a release of any commitments Assignor has under any other Supplier contracts.

11. Assignor and Assignee authorize and consent to Lessor taking all steps necessary to reflect this assignment on Lessor's systems and books and records, including but not limited to changing relevant entries in Lessor's records and applying all credits in accordance with this Agreement. Assignor and Assignee also authorize Lessor to give notice to third parties of the assignment as may be necessary. Notwithstanding the foregoing, Lessor has no responsibility to give any such notice and if any such notice to third parties is necessary to effect the assignment contemplated herein under any applicable law, Assignor and Assignee retain all such responsibility to give such notice and agree to give such notice.

12. This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

13. This Agreement may be executed in any number of separate counterparts (including by telecopy), and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

14. Assignor acknowledges that nothing herein shall be deemed to be an assignment or transfer of any of Assignor's remaining obligation to Lessor for any soft costs or other equipment items that are not Leased Equipment.

**CIRCUIT CITY STORES, INC.**

by _____
   (Authorized Signature)

Title _Chairman, President, and CEO_

Date _____4|27|07_____

**CIRCUIT CITY STORES WEST COAST, INC.**

by _____
   (Authorized Signature)

Title ___VP and Treasurer___

Date _____4|27|07_____

**IBM CREDIT LLC**

by _____
   (Authorized Signature)

Title _A. Cust. Gen Mgn_

Date ___5-1-07___

---

NO CHANGES TO THIS AGREEMENT ARE AUTHORIZED
Agreement No. PSF032007

## EXHIBIT A

## TLMA

[See attached.]

## IBM CREDIT LLC

### EXHIBIT B

## LEASE FINANCING - AVERAGE STORE DETAIL

| Supplier | Part No. | Description | Per Site Needs | 2005/2006 Cost | Unit Cost c. 12/10/06 | Extended Amount Financed |
|---|---|---|---|---|---|---|
| IBM- Agilysis | 4610-TG4 | SUREPOS REGISTER PRINTER | 14.0 | Unknown | $635.00 | $8,890 |
| IBM- Agilysis | 4610-TG4 | SUREPOS WAREHOUSE PRINTER | 1.0 | Unknown | $635.00 | $635 |
| IBM- Agilysis | 4810-32H | SUREPOS PLUG, W/O DISPLAY REG | 10.4 | Unknown | $1,100.00 | $11,440 |
| IBM- Agilysis | 4810-32H | SUREPOS LOCK, W/O DISPLAY REG | 3.0 | Unknown | $1,100.00 | $3,300 |
| IBM- Agilysis | 4810-32H | SUREPOS, PLUG WITH DISPLAY | 0.4 | Unknown | $1,266.00 | $506 |
| IBM- Agilysis | 4810-32H | SUREPOS LOCK WITH DISPLAY | 0.2 | Unknown | $1,266.00 | $253 |
| IBM- Agilysis | 6636-AC1 | 15" LCD FLAT PANEL DISPLAY | 7.0 | Unknown | $230.00 | $1,610 |
| IBM- Agilysis | 9165 AB6 | LENOVO 15" FLAT PANEL DISPLAY | 7.0 | Unknown | $175.00 | $1,225 |
| **IBM - TOTAL = CATEGORY 1.1** | | | | | | **$27,860** |
| Symbol- IBM ITS | LS2208-SR20007R | SYMBOL LS2208 BAR CODE SCANNER | 16 | $120.90 | $102.66 | $1,643 |
| Symbol- IBM ITS | 25-57917-20 | SYMBOL 15 PIN CABLE FOR LS2208 SCANNER | 14 | $43.62 | $56.26 | $788 |
| Symbol- IBM ITS | CBA-K01-S07PA | PS-2 POWER PORT 7 FEET STRAIGHT | 2 | $15.30 | $15.30 | $31 |
| Symbol- IBM ITS | 50-14000-008R | POWER SUPPLY | 2 | $26.65 | $26.65 | $53 |
| Symbol- IBM ITS | PD8500-CA0DDPUC220 | SYMBOL PD8500 (COLOR) SIGCAP W/ KEY INJE | 16 | $444.59 | $444.59 | $7,113 |
| Symbol- IBM ITS | 23844-00-00R | US AC LINE CORD | 16 | $8.18 | $8.00 | $128 |
| Symbol- IBM ITS | 50-24000-006 | POWER SUPPLY FOR PD8500 | 16 | $39.51 | $38.28 | $612 |
| Symbol- IBM ITS | PF14007-12 | DB-9 CABLE FOR PD8500 ( ASSUMES RS-232 CO | 16 | $9.82 | $9.63 | $154 |
| **SYMBOL - TOTAL = CATEGORY 2.1** | | | | | | **$10,522** |
| **STORE TOTAL** | | | | | | **$38,382** |

## LEASE FINANCING - AVERAGE STORE SUMMARY

| | | | | | | |
|---|---|---|---|---|---|---|
| IBM- Agilysis | 4610-TG4 | Printers | 15.0 | | $635.00 | $9,525 |
| IBM- Agilysis | 4810-32H | Registers | 14.0 | | $1,107.11 | $15,500 |
| IBM- Agilysis | 6636-AC1 | Displays | 7.0 | | $230.00 | $1,610 |
| IBM- Agilysis | 9165 AB6 | Displays | 7.0 | | $175.00 | $1,225 |
| **IBM - TOTAL = CATEGORY 1.1** | | | | | | **$27,860** |
| **SYMBOL - TOTAL = CATEGORY 2.1** | | | | | | **$10,522** |
| **STORE TOTAL** | | | | | | **$38,382** |

IBM CREDIT LLC

## EXHIBIT C

## STORE LOCATIONS

Circuit City Stores West Coast, Inc. consists of retail (store) locations in the following states:

Arizona
California
Colorado
Hawaii
Idaho
New Mexico
Nevada
Oregon
Utah
Wyoming

NO CHANGES TO THIS AGREEMENT ARE AUTHORIZED

Agreement No. PSF092005

IBM CREDIT LLC

## EXHIBIT D

### SERVICE CENTERS AND DISTRIBUTION CENTERS

| Division | Location # | Address | | | |
|---|---|---|---|---|---|
| SERVICE | 582 | 505 SOUTH CHERYL LANE | WALNUT | CA | 91789 |
| SERVICE | 1120 | 98 - 145 KAONOHI ST. | AIEA | HI | 96701 |
| DISTRIBUTION | 344 | 400 LONGFELLOW COURT, SUITES A & B | LIVERMORE | CA | 94550 |
| DISTRIBUTION | 353 | 680 S. LEMON AVE | WALNUT | CA | 91789 |
| DISTRIBUTION | 717 | 501 SOUTH CHERYL LANE | WALNUT | CA | 91789 |

NO CHANGES TO THIS AGREEMENT ARE AUTHORIZED

Agreement No.  PSF092005

# Amendment to
# Term Lease Master Agreement

Name and Address of Lessee:

Agreement No.: TLMA/PSF092005

Circuit City Stores, Inc.
9950 Mayland Drive
Richmond, Virginia 23233

Branch Office No.:

Branch Office Address:

Customer No.: 9485000

This Amendment ("Amendment") to the Term Lease Master Agreement dated December 23, 2005 ("Agreement") is by and between IBM Credit LLC (the "Lessor") and Circuit City Stores, Inc. ("Lessee").

The Agreement is hereby amended by deleting the definition of "Funding Period" and replacing it with the following new definition:

""Funding Period" means the period beginning on the Closing Date and ending on December 31, 2007 after which Lessor will not make any further Loans or enter into any additional Leases."

All definitions not otherwise defined herein shall have the respective meanings set forth in the Agreement.

**Ratification of Agreement.**    Except as specifically amended hereby, all of the provisions of the Agreement shall remain unamended and in full force and effect. Lessee hereby, ratifies, confirms and agrees that the Agreement, as amended hereby, represents a valid and enforceable obligation of Lessee, and is not subject to any claims, offsets or defenses.

**Governing Law.** This Amendment shall be governed by and interpreted in accordance with the laws which govern the Agreement.

**Counterparts.** This Amendment may be executed in any number of counterparts, each of which shall be an original and all of which shall constitute one agreement.

**IN WITNESS WHEREOF**, this Amendment has been executed by duly authorized officers of the undersigned as of the day and year first above written

**IBM Credit LLC**

By: _Eileen M Earley_

Print Name: _Eileen M Earley_

Title: _Sr. Cust. Ops Mgr._

Date: _May 1 2007_

**Circuit City Stores, Inc.**

By: _[signature]_

Print Name: _Philip J. Schoonover_

Title: _Chairman, President, and CEO_

Date: _4/27/07_

# Term Lease Master Agreement

Name and Address of Lessee:
Circuit City Stores, Inc.
9954 Maryland Drive
Richmond, VA 23233
Branch Office Address:

Agreement No.: TLMA/PSF032007

Branch Office No.:

Customer No.: 9485001

The Lessor pursuant to this Term Lease Master Agreement (Agreement) will be (a) IBM Credit LLC, or a subsidiary or affiliate thereof, (b) a partnership in which IBM Credit LLC is a partner, or (c) a related business enterprise for whom IBM Credit LLC is the agent (Lessor). The subject matter of the lease shall be machines, field installable upgrades, feature additions or accessories and shall be referred to as equipment (Equipment). A lease or financing transaction requested by Lessee and accepted by Lessor shall be specified in a Term Lease Supplement (Supplement). A Supplement shall refer to and incorporate by reference this Agreement and, when signed by the parties, shall constitute the lease (Lease) for the Equipment or a loan for the Products specified therein. Additional details pertaining to a Lease or Loan shall be specified in a Supplement. A Supplement may also specify additional terms and conditions as well as other amounts to be financed (Financing). Financing may include licensed program material charges for licensed programs marketed by Lessee's Supplier under the referenced Lessee's Supplier license agreement (License Agreement).

**1.     OPTIONS.** The Supplement shall designate various lease and financing options. Option B is a Lease with a fair market purchase option at the end of the Lease and Lessor is the owner for tax purposes. Option B+ is a Lease with a fair market purchase option at the end of the Lease and Lessee is the owner for tax purposes. For Equipment under Option B Prime (B'), Lessor assumes for tax purposes that Lessee is the owner. Option L is a Lease for used Equipment supplied by Lessor. For financing software charges, Option S or T will apply.

**2.     DEFINITIONS.**
**"Closing Date"** means April 27, 2007.
**"Contractual Obligations"** means as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.
**"Credit Limit"** is an amount equal to $30,000,000.00 which represents the maximum amount to be financed by Lessor under this Agreement.
**"Default"** means an Event of Default or any event or condition that would constitute an Event of Default with the requirement that notice be given or time elapse or both.
**"Event of Default"** shall mean any Event of Default under Paragraph 37 – Default; No Waiver.
**"Financed Amount"** for each Category is the aggregate amount of principal and interest of all Loans and the aggregate amount of Rent, accrued interest and late charges for all Leases for such Category funded under this Agreement.
**"Funding Period"** means the period beginning on the Closing Date and ending on December 31, 2007 after which Lessor will not make any further Loans or enter into any additional Leases.
**"GAAP"** means generally accepted accounting principles in effect in the United States of America as revised from time to time.
**"Governmental Authority"** means any nation or government, any state or other political subdivision thereof, and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, and any corporation or other entity owned or controlled (through stock or capital ownership or otherwise) by any of the foregoing.
**"IBM"** shall mean International Business Machines Corporation.
**"IBM Services"** shall mean services performed by IBM pertaining to the installation, preparation and set-up of Equipment leased or financed hereunder.
**"Lessee's Supplier"** shall mean, with respect to each Product, the vendor set forth therefore on Exhibit A hereto.

**"Loan"** means a loan made by Lessor to Lessee that is subject to the terms and conditions of this Agreement and listed as a Financing Transaction specified on the Supplement and identified with an option code of S or T the proceeds of which will be paid directly to Lessee's Supplier in the amount specified in the Supplier's invoice in accordance with the terms hereof.
**"Material Adverse Effect"** means any change or event or events which, individually or together with other changes or events could reasonably be expected to have a material adverse effect on (a) Lessee's business, operations, results of operations, assets or financial condition or ability to perform under the Agreement, (b) the validity or enforceability of this Agreement or any document related to the Agreement, or (c) the rights and remedies of Lessor under this Agreement.
**"Material Obligations"** means all debts, obligations or liabilities for money borrowed or raised which in accordance with GAAP, would be included in determining total liabilities as shown on the liability side of the balance sheet of Lessee.
**"Other Documents"** means all agreements, leases, instruments, documents, guarantees, schedules of assignment, contracts and similar agreements executed by Lessee and delivered to Lessor, pursuant to this Agreement and all Supplements and other modifications to the foregoing from time to time.
**"Permitted Encumbrance"** means any lien or encumbrance (i) in favor of Lessor and (ii) for taxes not yet payable or being contested in good faith by appropriate proceedings.
**"Person"** means any individual, association, firm, corporation, limited liability company, partnership, business or other trust, unincorporated organization, joint venture, joint stock company, Governmental Authority or other entity whatsoever.
**"Products"** means information technology services, software, Programming and Equipment listed on Exhibit A attached hereto to be acquired by Lessee and financed by Lessor or to be acquired by Lessor and leased to Lessee.
**"Requirement of Law"** means as to any Person, the articles of incorporation and by-laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject."
**"Symbol"** shall mean Symbol Technologies, Inc.
**"Total Financing"** the aggregate Financed Amount for all Leases and Loans made by Lessor under any Supplement entered into pursuant to this Agreement."

**THE ADDITIONAL TERMS AND CONDITIONS ON PAGES 2 THROUGH 8, EXHIBITS A, B, C-1, C-2 AND RIDER I ARE PART OF THIS AGREEMENT.**

**EACH OF LESSEE AND LESSOR ACKNOWLEDGES THAT IT HAS READ THIS AGREEMENT AND ITS SUPPLEMENT, UNDERSTANDS THEM, AND AGREES TO BE BOUND BY THEIR TERMS AND CONDITIONS. FURTHER, LESSEE AND LESSOR AGREE THAT THIS AGREEMENT AND ITS SUPPLEMENT ARE THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN THE PARTIES, SUPERSEDING ALL PROPOSALS OR PRIOR AGREEMENTS, ORAL OR WRITTEN, AND ALL OTHER COMMUNICATIONS BETWEEN THE PARTIES RELATING TO THE SUBJECT MATTER HEREOF.**

INITIAL IF AGREEMENT COVERPAGE IS ATTACHED.

Accepted by:
**IBM Credit LLC**

By _Eileen M. Earley_
     Authorized Signature

_Eileen M. Earley_        5-1-07
Name (Type or Print)        Date

Circuit City Stores, Inc.
                                                    Lessee
By _____
     Authorized Signature

Philip J. Schoonover        4/27/07
Name (Type or Print)        Date

\\FIN\263010.4

**3. AGREEMENT TERM.** This Agreement shall be effective when signed by both parties.

**4. PRODUCTS FINANCED, FINANCING CATEGORIES, FEES.** Lessor agrees to finance Lessee's acquisition of Products and to acquire and lease to Lessee Products during the Funding Period and pursuant to the terms specified herein; provided however, that (i) the Conditions Precedent specified herein have been satisfied and (ii) after giving effect to any Lease, the Total Financing made by Lessor hereunder, as of the date of such Lease or Loan, shall not exceed the Credit Limit. Unless agreed to by the Lessor in writing, the Lessee may only Lease or Finance the Products listed on Exhibit A.

Additional Lease or Financing terms applicable to each Product is determined by reference to the Category assigned to such Product in Exhibit A under the column heading "Category." The Financing rate, Lease rate, Term and Lease/Financing option shall be determined by Category as specified on Exhibit B attached hereto.

If the aggregate Amount Financed for all Products does not exceed at the end of the Funding Period, $15,000,000.00 Lessee shall pay a fee (the "Unused Line Fee") in an amount that is determined by subtracting from $15,000,000.00 the aggregate Total Amount Financed (as specified on all Supplements) for all Products leased hereunder and multiplying such amount by 2.0%. The Unused Line Fee will become due and payable thirty (30) days after the end of the Funding Period.

**5. PAYMENT TO SUPPLIERS.** Upon the delivery to Lessor of a Certificate of Acceptance and Supplement each executed by Lessee covering Products to be leased or financed hereunder, Lessor agrees to pay Lessee's Supplier for such Products, and Lessor shall not make any such payment to any Lessee's Supplier or otherwise with respect to any such Products until such Certificate of Acceptance and Supplement are executed and delivered to Lessor by Lessee. Lessee agrees to repay the Loan (and the interest accrued thereon) and to make payments under the Lease, as applicable, by making the Rent (as defined in Paragraph 16 below) and Interest payments for the number of months specified as "Term" in the Supplement. Lessor will pay the proceeds of the Loan to Lessee's Suppliers for the Financed Items. Lessor will pay the purchase price for the Equipment leased hereunder directly to Lessee's Supplier, provided the purchase price for such Equipment (as specified on the Supplement as the Amount Financed for such Equipment) shall not vary more than thirty percent (30%) of the Unit Cost specified for such Product under the column heading "Unit Cost" on Exhibit A attached hereto.

**6. SELECTION AND USE OF EQUIPMENT, PROGRAMMING AND LICENSED PROGRAM MATERIALS.** Lessee agrees that it shall be responsible for the selection, use of, and results obtained from, the Equipment, any programming supplied by Lessee's Supplier without additional charge for use on the Equipment (Programming), licensed program materials, and any other associated equipment, programs or services; provided that nothing herein shall affect any warranties of Lessee's Supplier.

**7. ASSIGNMENT TO LESSOR.** Lessee hereby assigns, exclusively to Lessor, Lessee's right to purchase the Equipment from Lessee's Supplier. This assignment is effective when Lessor accepts the applicable Supplement and Lessor shall then be obligated to purchase and pay for the Equipment. Other than the obligation to pay the purchase price, all responsibilities and limitations applicable to Customer as defined in the referenced Lessee's Supplier's purchase agreement in effect at the time the Supplement is accepted by Lessor (Purchase Agreement) shall apply to Lessee.

If the Equipment is subject to a volume procurement amendment to the Purchase Agreement or to another discount offering, (a) Lessor will pay the same amount for the Equipment that would have been payable by Lessee, and (b) Lessee will remain responsible to Lessee's Supplier for any late order change charges, settlement charges, adjustment charges or any other charges incurred under the volume procurement Agreement or other discount offering, other than charges arising as a result of the sole negligence or willful misconduct of Lessor.

**8. LEASE NOT CANCELLABLE; LESSEE'S OBLIGATIONS ABSOLUTE.** Lessee's obligation to pay Rent, Interest and all other amounts due hereunder shall be absolute and unconditional and shall not be subject to any delay, reduction, set-off, defense, counterclaim or recoupment for any reason whatsoever, including any failure of the Equipment, Programming or licensed program materials or any representations by Lessee's Supplier. If the Equipment, Programming or licensed program materials are unsatisfactory for any reason, Lessee shall make any claim solely against Lessee's Supplier, and shall, nevertheless, pay Lessor all amounts payable under the Lease.

**9. WARRANTIES.** Lessor grants to Lessee the benefit of any and all warranties made available by Lessee's Supplier in the Purchase Agreement or otherwise made available with respect to the Products. Lessor warrants that neither Lessor nor anyone acting or claiming through Lessor, by assignment or otherwise, will interfere with Lessee's quiet enjoyment of the use of the Products so long as no Event of Default shall have occurred and be continuing. EXCEPT FOR LESSOR'S WARRANTY OF QUIET ENJOYMENT AND WARRANTY OF TITLE EXPRESSLY SET FORTH HEREIN OR IN ANY OTHER DOCUMENT OR AGREEMENT EXECUTED BY LESSOR IN CONNECTION HEREWITH, LESSOR MAKES NO WARRANTY, EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. AS TO LESSOR, LESSEE LEASES THE EQUIPMENT AND TAKES ANY PROGRAMMING "AS IS". EXCEPT FOR ANY THEFT, CONVERSION OR OTHER DISPOSITION OF THE EQUIPMENT (OR PART THEREOF) ARISING OUT OF LESSEE'S ACTION OR INACTION, IN NO EVENT SHALL LESSOR OR LESSEE HAVE ANY LIABILITY FOR, NOR SHALL LESSOR OR LESSEE HAVE ANY REMEDY AGAINST THE OTHER FOR, CONSEQUENTIAL DAMAGES, ANY LOSS OF PROFITS OR SAVINGS, LOSS OF USE, OR ANY OTHER COMMERCIAL LOSS.

**10. LESSEE AUTHORIZATION.** So long as no Event of Default has occurred and is continuing under the Lease (a) Lessee is authorized to act on Lessor's behalf concerning delivery and installation of the Equipment and other Products, any Lessee's Supplier warranty service for the Equipment and other Products, and any programming services for the Programming, and (b) Lessee shall have, solely for these purposes, all rights Lessor may have against Lessee's Supplier under the Purchase Agreement or otherwise. The foregoing authorization shall not constitute any surrender of Lessor's interest in the Equipment.

**11. DELIVERY AND INSTALLATION.** Lessee shall arrange with Lessee's Supplier for the delivery of the Equipment and other Products and Programming and for installation of the Equipment at the Equipment Location listed on the applicable Supplement. Unless Financed hereunder, Lessee shall pay any delivery and installation charges. Lessor shall not be liable to Lessee for any delay in, or failure of, delivery of the Equipment and other Products. Lessee shall examine the Equipment and other Products immediately upon delivery. If the Equipment is not in good condition or the Equipment or any of the other Products does not correspond to Lessee's Supplier's specifications, Lessee shall promptly give Lessee's Supplier written notice and shall provide Lessee's Supplier reasonable assistance to cure the defect or discrepancy. If the Equipment and such other Products are acceptable to Lessee, Lessee shall execute and deliver to Lessor a Certificate of Acceptance and Supplement for such Equipment and other Products.

**12. CONDITIONS PRECEDENT.** Lessor's obligation to make Loans or enter into Leases pursuant to this Agreement is subject to the satisfaction of the conditions set forth below ("Conditions Precedent") and Loans and Leases shall not be made regardless of any communication theretofore given to Lessee or Lessee's Supplier unless, on and as of the date of such Lease or Loan, all of such Conditions Precedent have been fully satisfied as determined by Lessor:

(a) The representations and warranties contained in this Agreement or in any document, instrument or agreement executed in connection herewith are true and correct in all material respects on and as of the date of such Lease or Loan as though made on and as of such date;

(b) No event has occurred and is continuing on or after giving effect to such Lease or Loan or the application of the proceeds thereof, would result in or would constitute a Default under this Agreement;

(c) No event has occurred and is continuing which could reasonably be expected to have a Material Adverse Effect;

(d) The Rent Commencement Date for the Lease and/or the Loan has occurred;

(e) For each Product that is the subject of such Lease or Loan the Lessor shall have received a complete and fully executed Certificate of Acceptance and Supplement; and

(f) For each Product that is the subject of a Lease, the purchase price (identified on the Supplement as the Amount Financed for such Product) shall not vary by more than thirty percent (30%) of the Unit Cost specified for such Product on Exhibit A.

**13. RENT COMMENCEMENT DATE**. The Rent Commencement Date shall be the date shown on the Certificate of Acceptance as determined by Lessee. Lessee shall be notified of the Rent Commencement Date and the serial numbers of the Equipment.

**14. LEASE TERM**. The Lease shall be effective when signed by both parties. The initial Term of each Lease or Financing Transaction shall begin on the Rent Commencement Date therefor and shall expire at the end of the number of months under "Term" in the Supplement. However, obligations under the Lease shall continue until they have been performed in full.

**15. RATE INDEXING**. The Rent shall be based on the Lease Rate specified in the Supplement. For the purposes of this Agreement, the parties agree to incept Leases and Loans using the rates, Term and lease/financing options as specified in Exhibit B attached hereto.

**16. RENT**. During the initial Term, Lessee shall pay Lessor all amounts owed for each Payment Period set forth in the applicable Supplement as "Rent." Lessee's obligation to pay Rent shall begin on the Rent Commencement Date. Rent will be invoiced in advance as of the first day of each Payment Period and will be due thirty (30) days after the invoice date. When the Rent Commencement Date is not on the first day of a calendar month and/or when the initial Term does not expire on the last day of a calendar month, the applicable Rent will be prorated on the basis of 30-day months. Advance Rent, if any, will be applied to the initial invoice(s).

**17. RENEWAL**. Provided that Lessee is not in Default under subparagraphs (a), (c), (d), (e), or (f) of Paragraph 37 herein, Lessee may renew the Lease one or more times but not beyond six years from the expiration of the initial Term. Lessor shall offer renewal Terms of one year and may offer longer Terms if then generally available. All such renewal terms shall be set forth in the applicable Supplement. For a renewal Term, upon request by Lessee, at least five months prior to Lease expiration, Lessor shall notify Lessee, at least four months prior to expiration, of the Rent, any changes to the Payment Period and due dates, and of any required Purchase Option or Renewal Option Percents not specified in the Supplement. The Rent shall be objectively determined by Lessor by using the projected fair market rental value of the Equipment as of the commencement of such renewal Term. However, for Option B', the Rent shall be as specified in the Supplement. Lessee may renew for any renewal Term only by so notifying Lessor in writing at least one month before expiration. For purposes of this Paragraph, fair market rental value shall be the value which would be obtained in an arm's length transaction between an informed and willing Lessee and an informed and willing Lessor under no compulsion by either party to perform the transaction. If Lessee disagrees with the projected fair market rental value of the Equipment determined by Lessor, Lessee will promptly so indicate in its notice of election to renew and will provide documentary support for a proposed alternative price. This documentation will include a firm offer to sell from an independent third party an equivalent item of Equipment, having the same machine type, model and configuration as the item of Equipment in dispute, from a supplier able and willing to provide such equipment from its inventory free and clear of any encumbrances. Upon receipt, the parties agree to utilize the dispute resolution process provided for in Paragraph 45.

During the period of these discussions, rental payments will continue pursuant to the terms of this Agreement. Lessee may terminate these discussions on written notice to Lessor, subject to optional extension provisions. All discussions between the parties will be confidential.

**18. PURCHASE OF EQUIPMENT**. Provided that Lessee is not in Default under subparagraphs (a), (c), (d), (e), or (f) of Paragraph 37 herein, Lessee may, upon one month prior written notice to Lessor, purchase Equipment upon expiration of the Lease thereof. Under Option B or B+, the purchase price shall be objectively determined by Lessor by using the fair market sales value of the Equipment as of such expiration date. Under Option B Prime (B') the purchase price shall be an amount determined by multiplying the Unit Purchase Price listed on the applicable Supplement by the Purchase Option Percent listed on the applicable Supplement for such Equipment.

If Lessee purchases any Equipment, Lessee shall, on or before the date of purchase, pay to Lessor the purchase price, any applicable sales taxes, all Rent due through the day preceding the date of purchase, any other amounts due hereunder, and the prepayment of Financing with respect to Products (that are not Equipment) related to such purchased Equipment (Paragraph 35). Lessor shall, on the date of purchase, transfer to Lessee by bill of sale, without recourse or warranty of any kind, express or implied, all of Lessor's right, title and interest in and to such Equipment on an "As Is, Where Is" basis except that Lessor shall warrant title free and clear of all encumbrances.

For purposes of this Paragraph, fair market sales value shall be the value which would be obtained in an arm's length transaction between an informed and willing buyer and an informed and willing seller under no compulsion by either party to perform the transaction. If Lessee disagrees with the projected fair market sales value of the Equipment determined by Lessor, Lessee will promptly so indicate in its notice of election to purchase and will provide documentary support for a proposed alternative purchase price. This documentation will include a firm offer to sell from an independent third party an equivalent item of Equipment, having the same machine type, model and configuration as the item of Equipment in dispute, from a supplier able and willing to provide such equipment from its inventory free and clear of any encumbrances. Upon receipt, the parties agree to utilize the dispute resolution process provided for in Paragraph 45.

During the period of these discussions, rental payments will continue pursuant to the terms of this Agreement. Lessee may terminate these discussions on written notice to Lessor, subject to optional extension provisions. All discussions between the parties will be confidential.

**19. OPTIONAL EXTENSION**. If Lessee has not elected to renew or purchase, and as long as Lessee is not in Default under the Lease, the Lease will be extended unless Lessee notifies Lessor in writing prior to Lease expiration. The extension will be under the same terms and conditions then in effect, including Rent (but, for Options or B, not less than fair market rental value) and will continue on a day-to-day basis until the earlier of termination by either party upon one month prior written notice or six years after expiration of the initial Term. For purposes of this paragraph, the Rent shall be calculated as the sum of the Lease payments over the initial Term divided by the initial Term of the Lease, but for Options B, B+ or L not less than fair market rental value.

**20. INSPECTION; MARKING; FINANCING STATEMENT**. Upon reasonable prior written request, Lessee shall make the Equipment and its maintenance records available for inspection by Lessor during Lessee's normal business hours. Lessee shall affix to the Equipment any labels indicating ownership supplied by Lessor. Lessee shall execute and deliver to Lessor for filing any Uniform Commercial Code financing statements or similar documents Lessor may reasonably request to evidence Lessor's interest in the Products.

**21. EQUIPMENT USE**. Lessee agrees that Equipment will be operated by competent, qualified personnel, in accordance with applicable operating instructions, laws and government regulations and that Equipment will be used only for business purposes.

**22. MAINTENANCE**. Lessee, at its expense, shall keep the Equipment in a suitable environment as specified by Lessee's Supplier with respect to any Lessee's Supplier warranties and in good condition and working order, ordinary wear and tear excepted.

**23. ALTERATIONS; MODIFICATIONS; PARTS**. Lessee may alter or modify the Equipment. Any non-manufacturer alteration is to be removed and the Equipment restored to its normal, unaltered condition at Lessee's expense prior to its return to Lessor, except that, at Lessee's option, any Lessee's Supplier field installable upgrade, feature addition or accessory added to any item of Equipment (Modification) may be but is not required to be removed. If removed, the Equipment is to be restored at Lessee's expense to its normal, unmodified condition. If not removed, such Modification shall, upon return of the Equipment, become, without charge, the property of Lessor free of all encumbrances. Restoration will include replacement of any parts removed in connection with the installation of an alteration or Modification. Any part installed in connection with warranty or maintenance service shall be the property of Lessor.

**24. LESSEE COVENANTS**. Lessee will cause the following information to be delivered promptly to Lessor:

(A) notice from Lessee in reasonable detail of any development or event that has had or could reasonably be expected to have a Material Adverse Effect.

(B) Lessee agrees that until it has satisfied all of its obligations under this Agreement, it will, in the event the Lessee's Financial Statements are not publicly available, provide to Lessor: (i) audited Financial Statements , as soon as available and in any event within 90 days after the end of each fiscal year, audited by an independent public accountant accompanied by an opinion of such accountant (which shall not be qualified as to scope of audit or in any manner calling into question the status of its business as a going concern) to the effect that such consolidated financial statements fairly present its financial condition and results of operations and that of its consolidated

subsidiaries, taken as a whole, in accordance with GAAP; (ii) quarterly statements, within 45 days after the end of each of the Lessee's fiscal quarters of each fiscal year (other than the last quarterly fiscal period of each such fiscal year), copies of: (a) a consolidated balance sheet of the Lessee and its Subsidiaries as at the end of such quarter, and (b) consolidated statements of income, changes in shareholders' equity and cash flows of the Lessee and its subsidiaries, for such quarter and (in the case of the second and third quarters) for the portion of the fiscal year ending with such quarter, setting forth in each case in comparative form the figures for the corresponding periods in the previous fiscal year, all in reasonable detail, prepared in accordance with GAAP applicable to quarterly financial statements generally, and certified by a senior financial officer as fairly presenting, in all material respects, the financial position of the companies being reported on and their results of operations and cash flows, subject to changes resulting from year-end adjustments and (iii) any such additional financial and other information from Lessee as Lessor may from time to time reasonably request.

**25. RETURN OF EQUIPMENT.** Upon expiration or termination of the Lease for any item of Equipment other than in connection with the purchase of such Equipment by Lessee or in connection with a Casualty Loss, or upon demand by Lessor pursuant to Paragraph 38, Lessee shall promptly return the Equipment, freight prepaid, to a location in the continental United States specified by Lessor. In connection with such return, Lessee shall pay any costs and expenses incurred by Lessor to inspect and qualify the Equipment for manufacturer's maintenance agreement service or, if not available, the cost to return the Equipment to good condition and working order, ordinary wear and tear excepted. Any parts removed in connection therewith shall become Lessor's property.

**26. CASUALTY INSURANCE; LOSS OR DAMAGE.** Lessor will maintain, at its own expense, insurance covering loss of or damage to the Equipment (but excluding any Modifications not subject to a Lease and any non-manufacturer alterations) with a $5,000 deductible per incident. If any item of Equipment shall be lost, stolen, or irreparably damaged by any cause whatsoever (Casualty Loss) before the Date of Installation as defined in the Purchase Agreement, such item shall not become subject to the Lease. If any item of Equipment suffers Casualty Loss, or shall be otherwise damaged, on or after the Date of Installation, Lessee shall promptly inform Lessor. If the item is damaged but is not subject to a Casualty Loss and can be economically repaired, Lessee shall place the item in good condition and working order and Lessor will reimburse Lessee the reasonable cost of such repair, less the deductible. If not so economically repairable, Lessee shall pay Lessor the lesser of $5,000 or the fair market value of the Equipment immediately prior to the Casualty Loss. Upon Lessor's receipt of such payment the Lease for that item shall terminate.

**27. TAXES.** Lessee shall promptly reimburse Lessor for, as additional Rent, all taxes, charges, and fees imposed or levied by any governmental body or agency upon or in connection with the purchase, ownership, leasing, possession, use or relocation of the Equipment or otherwise in connection with the transactions contemplated by the Lease. Upon request, Lessee will provide proof of payment of such taxes. Lessor shall be responsible for reporting to all applicable jurisdictions with respect to all taxes, charges, and fees imposed or levied hereunder.

Lessee may contest any determination regarding any tax or portion thereof, with respect to which Lessee may be required to make any payment, reimbursement or indemnification under this Paragraph 27, provided such action is conducted solely in Lessee's own name and at its own expense. Lessor shall be notified, in writing, prior to any such contest.

Where a contest of any tax, or portion thereof, with respect to which Lessee may be required to make payment, reimbursement or indemnification under this Paragraph 27 is not permitted to be brought solely in the name of Lessee, Lessor shall conduct a tax contest upon Lessee's written request provided Lessee shall have furnished Lessor with an opinion of independent tax counsel chosen by Lessee and reasonably acceptable to Lessor, to the effect that Lessor has a reasonable basis for contesting the tax. Counsel selected by Lessor shall conduct all contests and control of all contests, including choice of forum, shall be in the sole discretion of Lessor. All costs and expenses of any contest, including attorney's fees, shall be borne by Lessee. In addition, solely with respect to personal property tax

contests involving valuation of the leased equipment, in the event the contest is fully or partially successful, Lessor shall be entitled to receive ten percent (10%) of the successfully contested amount, not to exceed $25,000, to reimburse Lessor for the internal and administrative costs associated with conducting such contest.

Lessee shall hold Lessor harmless from all costs, expenses, liens and property seizures which may result from the conduct of any contest, whether conducted by Lessee or Lessor. Notwithstanding anything to the contrary: (a) where Lessor has already paid a tax which Lessee desires to contest or where the tax must be paid prior to the conduct of any contest, Lessor shall not be obligated to conduct such contest unless Lessee shall have provided Lessor (as an interest-free loan) funds in the amount of such tax; if Lessor subsequently receives a refund of tax in connection with a final determination of such contest (or would have received a refund had any payment made from funds provided by Lessee not been applied in payment of a tax liability determined to be owing by Lessor for which Lessee is not required to indemnify Lessor hereunder), such refund (or an amount equal to such amount so applied), together with any interest (net of taxes paid thereon by Lessor) also received (or which would have been received) by Lessor and fairly attributable to such refund of tax or amount so applied, will be paid over to Lessee, to the extent of Lessee's payment to Lessor, and (b) Lessor may decline Lessee's request to contest all or any portion of any claim upon written notice to Lessee and Lessee shall thereupon be relieved of its obligation to reimburse Lessor with respect to the portion of the claim described in the notice, provided, however, that Lessor will not unreasonably decline Lessee's request to contest any amount relating to personal property taxes or sales/use taxes.

**28. LESSOR'S PAYMENT.** If Lessee fails to perform its obligations under Paragraph 27 or 31 or to discharge any encumbrances on the Equipment created by Lessee, other than Permitted Encumbrances, Lessor shall have the right upon five (5) days notice to Lessee to substitute performance in which case, Lessee shall pay Lessor the reasonable cost thereof.

**29. TAX INDEMNIFICATION (APPLIES ONLY FOR EQUIPMENT UNDER OPTION B).** The Lease is entered into on the basis that under the Internal Revenue Code of 1986, as amended (Code), Lessor shall be entitled to (1) maximum Modified Accelerated Cost Recovery System (MACRS) deductions for 5-year property (MACRS Deductions), and (2) deductions for interest expense incurred to finance the purchase of the Equipment (Interest Deductions).

Lessee represents, warrants and covenants that at all times during the Lease:

(a)   the Equipment will not constitute "tax-exempt use property" as defined in the Code;

(b)   the Equipment will not constitute "public utility property" as defined in the Code;

(c)   the Equipment will not be used "predominantly outside the United States" as defined in the Code;

(d)   Except to the extent required by applicable law or regulation or final Internal Revenue Service or judicial determination, Lessee will take no position inconsistent with the assumption that Lessor is the owner of the Equipment for federal income tax purposes; and

(e)   Lessee will keep and make available to Lessor the records required to establish the matters referred to in this paragraph.

If, as a result of any act, failure to act, misrepresentation, inaccuracy, or breach of any warranty or covenant, or Default under the Lease, by Lessee, an affiliate of Lessee, or any person who shall obtain the use or possession of any item of Equipment through Lessee, other than the exercise of any right or option granted Lessee herein or under any Supplement, Lessor shall lose the right to claim or shall suffer any disallowance or recapture of all or any portion of any MACRS Deductions or Interest Deductions (Tax Loss) with respect to any item of Equipment, then, promptly upon written notice to Lessee that a Tax Loss has occurred, Lessee shall reimburse Lessor the amount determined below.

Lessor shall, upon written request and at Lessee's expense, provide to Lessee a letter from Lessor's regularly engaged firm of independent certified public accountants certifying that such firm has reviewed

Lessor's records and that the amount to be reimbursed under this paragraph 29 is accurate and proper.

The reimbursement shall be an amount that, in the reasonable opinion of Lessor, shall make Lessor's after-tax rate of return and cash flows (Financial Returns), over the term of the Lease for such item of Equipment, equal to the expected Financial Returns that would have been otherwise available. The reimbursement shall take into account the effects of any interest, penalties and additions to tax required to be paid by Lessor as a result of such Tax Loss and all taxes required to be paid by Lessor as a result of any payments pursuant to this paragraph. Financial Returns shall be based on economic and tax assumptions used by Lessor in entering into the Lease.

All the rights and privileges of Lessor arising from this Paragraph 29 shall survive the expiration or termination of the Lease.

For purposes of determining tax effects under Paragraphs 18, 27, 29 and 30, the term "Lessor" shall include, to the extent of interests, any partner in Lessor and any affiliated group of corporations, and each member thereof, of which Lessor or any such partner is or shall become a member and with which Lessor or any such partner joins in the filing of consolidated or combined returns.  Lessee shall have no obligation to reimburse Lessor for a Tax Loss resulting from the failure of the Lease to constitute a true lease for federal income tax purposes, provided such failure is not the result of an act, failure to act, misrepresentation, breach of any warranty or covenant, or default by Lessee, in which case Lessee's obligation shall be solely as set forth above.

Lessor shall notify Lessee in writing of any actual or proposed federal income tax claim, adjustment or other action received by Lessor in writing with respect to which Lessee may be required to make payment, reimbursement or indemnification under this Paragraph 29 hereof (a "Proposed Adjustment") (but the failure of Lessor to so notify Lessee shall not relieve Lessee of its obligations hereunder except to the extent that such failure shall have materially prejudiced the ability to contest the Proposed Adjustment or increased any penalties or interest in respect thereof).  If Lessee shall request in writing within thirty (30) days after the notice described above that the Proposed Adjustment be contested, Lessor shall contest the Proposed Adjustment provided, however, that Lessor shall not be required to contest any Proposed Adjustment unless (i) Lessee shall have furnished Lessor with an opinion of independent tax counsel chosen by Lessee and reasonably acceptable to Lessor, to the effect that "substantial authority", within the meaning of Section 6662 of the Code, exists for contesting the Proposed Adjustment; (ii) Lessee shall have to the extent the basis for the claim or adjustment has become clear, acknowledged its obligation to indemnify Lessor hereunder in the event Lessor does not prevail in such contest (provided that Lessee shall not be bound by any such acknowledgment to the extent the contest is resolved on a basis for which Lessee is not liable and provided, further, that the foregoing limitations on Lessee's obligations to provide an acknowledgment of liability shall not limit or diminish Lessee's obligation to indemnify Lessor pursuant to the terms of the Lease), (iii) Lessee shall have agreed to reimburse Lessor, promptly on demand, all reasonable costs and expenses that Lessor may incur in connection with contesting such Proposed Adjustment, including without limitation reasonable attorneys' and accountants' fees and expenses, (iv) the amount of the potential indemnity (taking into account all similar or logically related claims that may have been or could be raised in any audit involving Lessor) exceeds $50,000; and (v) the action to be taken will not result in (1) a material risk of the sale, forfeiture or loss of the Equipment, or any material part thereof unless in such event Lessee shall have posted a bond or other security reasonably satisfactory to Lessor in respect of such risk, or (2) the risk of criminal sanctions against, or criminal liability of, Lessor.

Counsel selected by Lessor shall conduct all contests and control of all contests, including choice of forum, shall be in the sole discretion of Lessor. Lessor shall consult in good faith with Lessee and keep Lessee informed. In no event, however, shall Lessee have any right to inspect the books and records of Lessor.

Notwithstanding anything to the contrary: (a) where Lessor has already paid a tax which Lessee desires to contest or where the tax must be paid prior to the conduct of any contest, Lessor shall not be obligated to conduct such contest unless Lessee shall have provided Lessor (as an interest-free loan) funds in the amount of such tax; if Lessor

subsequently receives a refund of tax in connection with a final determination of such contest (or would have received a refund had any payment made from funds provided by Lessee not been applied in payment of a tax liability determined to be owing by Lessor for which Lessee is not required to indemnify Lessor hereunder), such refund (or an amount equal to such amount so applied), together with any interest (net of taxes paid thereon by Lessor) also received (or which would have been received) by Lessor and fairly attributable to such refund of tax or amount so applied, will be paid over to Lessee, to the extent of Lessee's payment to Lessor, and (b) Lessor may decline Lessee's request to contest all or any portion of any claim upon written notice to Lessee and Lessee shall thereupon be relieved of its obligation to reimburse Lessor with respect to the portion of the claim described in the notice.

In no event shall Lessor be required to appeal an adverse judicial determination to the United States Supreme Court.

**30.  GENERAL INDEMNITY.** This Lease is a net lease. Therefore, Lessee shall indemnify Lessor against, and hold Lessor harmless from, any and all claims, actions, damages, obligations, liabilities and liens, and all reasonable costs and expenses, including reasonable legal fees, incurred by Lessor in connection therewith, arising out of the Lease including, without limitation, the purchase by Lessor, ownership, lease, licensing, possession, maintenance, condition, use or return of the Equipment, Programming or licensed program materials, or arising by operation of law ("Expenses"), excluding, however: (i) any of the foregoing which result from the sole negligence or willful misconduct of Lessor, (ii) any of the foregoing arising after the return by Lessee of the Equipment pursuant to the terms hereof and (iii) any of the foregoing arising out of or relating to (1) the incorrectness of any representation or warranty by Lessor in this Agreement or in any other document delivered in connection herewith to the extent that such incorrectness results in the creation, or an increase in the amount, of such Expense (in which case this indemnity shall not cover such Expense or such increased amount, as the case may be) or (2) the failure by Lessor to perform or observe its obligation to (i) pay Lessee's Suppliers as set forth in Paragraph 5 hereof and (ii) provide quiet enjoyment of the use of the Products pursuant to Paragraph 9 hereof or (3) any taxes, assessments or impositions or any other charges or fees imposed by any governmental body or agency, or any interest or penalties related hereto as such indemnity shall be governed by the terms of Paragraph 29 hereof, or (4) any other Expense which Lessor has expressly agreed to bear pursuant to this Agreement or any other document delivered in connection herewith.  In the event that Lessee shall have paid an amount to Lessor pursuant to this Section 30, and Lessor subsequently shall be reimbursed in respect of such indemnified amount from any other person or entity, Lessor shall promptly pay an amount equal to the amount of such reimbursement (but in no event more than such payment) to the Lessee. Nothing in this paragraph shall obligate Lessor to seek such reimbursement.  Lessee agrees that upon written notice by Lessor of the assertion of any claim, action, damage, obligation, liability or lien, Lessee shall assume full responsibility for the defense thereof. Any payment pursuant to this paragraph shall be of such amount as shall be necessary so that, after payment of any taxes required to be paid thereon by Lessor, including taxes on or measured by the net income of Lessor, the balance will equal the amount due hereunder. Lessee's obligations under this paragraph shall not constitute a guarantee of the residual value or useful life of any item of Equipment or a guarantee of any debt of Lessor. The provisions of this paragraph with regard to matters arising during the Lease shall survive the expiration or termination of the Lease.

**31.  LIABILITY INSURANCE.**  Lessee shall obtain and maintain comprehensive general liability insurance, in an amount of $1,000,000 or more for each occurrence, with an insurer having a "Best's Policyholders" rating of B+ or better. The policy shall name Lessor as an additional insured as Lessor's interests may appear and shall contain a clause requiring the insurer to give Lessor at least one month's (10 days for non-payment of premium) prior written notice of the cancellation, or any alteration in the terms, of the policy. Lessee shall furnish to Lessor, upon request, evidence that such insurance coverage is in effect.

**32.  SUBLEASE OF EQUIPMENT; ASSIGNMENT BY LESSEE**
Upon Lessor's prior written consent, which will not be unreasonably withheld, Lessee may sublet the Equipment. No sublease shall relieve Lessee of its obligations under the Lease. In no event shall Lessee

remove the Equipment from the United States and Puerto Rico. Lessee shall not assign, transfer or otherwise dispose of the Lease or Equipment, or any interest therein, or create or suffer any levy, lien or encumbrance thereof except those created by Lessor and Permitted Encumbrances. Notwithstanding the foregoing, Lessee pursuant and subject to an Assignment and Assumption Agreement between Lessor and Lessee reasonably acceptable to the parties (the "Assignment Agreement") may assign the Lessee's interest in all or any portion of the Equipment and any Lease or Loan related thereto described in the Assignment Agreement to any wholly owned subsidiary without Lessor's prior consent provided that:

(A) no Event of Default under the Lease shall have occurred and be continuing,

(B) such assignee is not itself in default under any Lease with Lessor,

(C) assignee will be the end user of the Equipment at its own business location at the U.S. street address provided to Lessor,

(D) assignee expressly acknowledges Lessor's interest in the Equipment,

(E) assignee shall not assign, transfer or otherwise dispose of the Lease or Equipment, or any interest therein, or create or suffer any levy, lien or encumbrance thereon except Permitted Encumbrances,

(F) all financing statements required to continue the Lessor's security interest are filed,

(G) for any assignment contemplated by this paragraph occurring after the Rent Commencement Date of the related Supplement, Lessee shall provide to Lessor, within 14 days of assignment inception, the location of all Equipment subject to such assignment by serial number. Upon reasonable request of Lessor, Lessee shall provide Lessor, within 14 days of such request, the location of all Equipment by serial number. Failure to provide a complete accounting for all Equipment to Lessor within thirty (30) days of assignment inception or Lessor's written request will constitute an Event of Default,

(H) in the event of a assignee bankruptcy, Lessee shall not object to or otherwise oppose any motion or other action by Lessor to, among other things, enforce its rights under this Agreement, to seek relief from the stay imposed by section 362 of the United States Bankruptcy Code (the "Code"), or to seek adequate protection as such term is used in the Code, and

(I) Lessee's obligation to maintain and insure the Equipment is not altered.

The terms of this paragraph apply solely to the Lessee. No further assignment of Equipment by any assignee without Lessor's consent is authorized.

Lessor will prepare for Lessee's execution, such assignment language or assignment documents as Lessor reasonably determines may be necessary to give effect to the provisions of this Agreement, which Lessee covenants and agrees to execute and return to Lessor by April 11, 2007. The terms of this paragraph apply solely to the Lessee. No further assignment of Equipment by any assignee without Lessor's consent is authorized.

**33.    ASSIGNMENT BY LESSOR.**    Lessee acknowledges and understands that the terms and conditions of the Lease have been fixed to enable Lessor to sell and assign its interest or grant a security interest or interests in the Lease and the Equipment individually or together, in whole or in part, for the purpose of securing loans to Lessor or otherwise; provided that no such sale, assignment or grant shall increase the obligations of Lessee hereunder. If Lessee is given written notice of any assignment, it shall promptly acknowledge receipt thereof in writing. Each such assignee shall have all of the rights of Lessor under the Lease. Lessee shall not assert against any such assignee any set-off, defense or counterclaim that Lessee may have against Lessor or any other person. Lessor shall not be relieved of its obligations hereunder as a result of any such assignment unless Lessee expressly consents thereto.

**34.    FINANCING.**    Software, program licenses, maintenance services and other one-time charges Financed under the Supplement constitute "Financed Items" and the terms (i) of the Supplement, (ii) any applicable attachments, and (iii) the Agreement, each as may be amended by addenda, constitute the "Financing Transaction" for such Financed Items.

**35.    FINANCING PREPAYMENT (Does Not Apply for Items of Equipment).**    Lessee may terminate an item of Financing (but not an item of Equipment) by prepaying an amount equal to the present value of the remaining Rent using a discount rate which is the lesser of (i) the two (2) year LIBOR weekly average swap rate (as defined in Exhibit B) at the inception of the Financing for Categories 4 and 5 plus 75 basis points; or (ii) the two (2) year LIBOR weekly average swap rate at effective date of prepayment plus 75 basis points. Lessee shall provide Lessor with notice of the intended prepayment date which shall be at least ten (10) days after the date of the notice. If, prior to Lease expiration, Lessee purchases the Equipment or if the Lease is terminated, Lessee shall at the same time prepay any related Financing including that for programs licensed to the Equipment.

**36. DELINQUENT PAYMENTS.** If any amount to be paid to Lessor is not paid on or before its due date, including any applicable grace periods, Lessee shall pay Lessor on demand 1.0% of such late payment for each month or part thereof from the due date until the date paid or, if less, the maximum allowed by law.

**37. DEFAULT; NO WAIVER.** An Event of Default shall have occurred under the Lease and/or Financing Transaction upon the occurrence of any of the following events: (a) Lessee fails to pay when due any amount required to be paid by Lessee under the Lease and/or Financing Transaction and such failure shall continue for a period of seven days after written notice thereof from Lessor; (b) Lessee fails to perform any other provisions under the Lease and/or Financing Transaction or violates any of the covenants or representations made by Lessee in the Lease and/or Financing Transaction, or Lessee fails to perform any of its obligations under any other Lease and/or Financing Transaction entered into pursuant to this Agreement, and such failure or breach shall continue unremedied for a period of 30 days after written notice is received by Lessee from Lessor; (c) Lessee makes an assignment for the benefit of creditors, whether voluntary or involuntary, or consents to the appointment of a trustee or receiver, or if either shall be appointed for Lessee or for a substantial part of its property without its consent and, with respect any involuntary assignment or appointment, the same continues unstayed and in effect for a period of 60 consecutive days; (d) any petition or proceeding is filed by or against Lessee or assignee, as described in Paragraph 32, under any Federal or State bankruptcy or insolvency code or similar law and with respect to any petition or proceeding filed against Lessee, the same continues unstayed and in effect for a period of 60 consecutive days; (e) Lessee terminates its organizational existence, consolidates with or merges into any entity, and Lessee is not the surviving entity of such organizational change, consolidation or merger and such surviving entity has not expressly assumed Lessee's obligations under this Agreement; or (f) any condition or event shall have occurred that permits the holder of any of Lessee's Material Obligations in excess of $50,000,000.00 to accelerate the maturity therefore, and such acceleration is not cured within fifteen (15) days.

Any failure of Lessor to require strict performance by Lessee or any waiver by Lessor of any provision in the Lease shall not be construed as a consent or waiver of any other breach of the same or of any other provision.

**38. REMEDIES.** If an Event of Default set forth in Paragraph 37 (b) hereof has occurred and is continuing, Lessor shall, prior to the exercise of any remedies hereunder, notify Lessee of such Event of Default and provide Lessee the opportunity to purchase all Equipment leased hereunder within three (3) business days for an amount that is determined by Lessor in its sole discretion and agreed to by Lessee together with Rent to become due, discounted at a rate which is the Eurodollar deposits (London) 1-month Weekly Friday rate and all other amounts due and payable hereunder. Upon receipt of such payment, Lessor shall transfer such Equipment to Lessee free and clear of all encumbrances. If any other Event of Default has occurred and is continuing, or if Lessee fails to exercise the buyout described above, then Lessor shall have the right, in its sole discretion, to exercise any one or more of the following remedies. Lessor may (a) declare any Lease and/or Financing transaction entered into pursuant to this Agreement to be in default; (b) terminate in whole or in part any Lease; (c) recover from Lessee any and all amounts then due and all Rent to become due, discounted at a rate which is the lesser of the Eurodollar deposits (London) 1-month Weekly Friday rate (as published in Statistical Release H.15 and can be found at: http://www.federalreserve.gov/Releases/H15/data.htm) at either the

inception of the Lease and/or Financing Transaction or the date of Default; (d) take possession of any or all items of Equipment, wherever located, without demand or notice, without any court order or other process of law; and (e) demand that Lessee return any or all such items of Equipment to Lessor in accordance with Paragraph 25 and, for each day that Lessee shall fail to return any item of Equipment, Lessor may demand an amount equal to the Rent, prorated on the basis of a 30-day month, in effect immediately prior to such Event of Default. Upon repossession or return of such item or items of Equipment, Lessor shall sell, lease or otherwise dispose of such item or items in a commercially reasonable manner, with or without notice and on public or private bid, and apply the net proceeds thereof towards the amounts due under the Lease but only after deducting (i) in the case of sale, the estimated fair market value of such item or items as of the scheduled expiration of the Lease; or (ii) in the case of any replacement lease, the rent due for any period beyond the scheduled expiration of the Lease, for such item or items (iii) in either case, all expenses, including reasonable legal fees, incurred in connection therewith; and (iv) where appropriate, any amount in accordance with Paragraph 29.  Any excess net proceeds are to be retained by Lessor.  Lessor may pursue any other remedy available at law or in equity, including, but not limited to, seeking damages, specific performance and an injunction.

No right or remedy is exclusive of any other provided herein or permitted by law or equity.  All such rights and remedies shall be cumulative and may be enforced concurrently or individually from time to time.

**39. LESSOR'S EXPENSE.**  Lessee shall pay Lessor on demand all reasonable costs and expense, including reasonable legal and collection fees, incurred by Lessor in enforcing the terms, conditions or provisions of the Lease or in protecting Lessor's rights and interests in the Lease and the Equipment.  Lessor shall pay its own costs and expenses related to the negotiation, execution and administration of this Agreement and each Supplement, including all fees and expenses of Lessor's counsel.

**40. OWNERSHIP; PERSONAL PROPERTY; LICENSED PROGRAM MATERIALS.**  The Equipment under Lease is and shall be the property of Lessor. Lessee shall have no right, title or interest therein except as set forth in the Lease. The Equipment is, and shall at all times be and remain, personal property and shall not become a fixture or realty. Licensed program materials are licensed and provided by Lessee's Supplier directly to Lessee under the terms and conditions of the License Agreement.

**41. NOTICES; ADMINISTRATION.**  Service of all notices under the Lease shall be sufficient if delivered personally or mailed to Lessee at its address specified in the Supplement or to IBM Credit LLC as Lessor in care of the IBM Office specified in the Supplement. Notice by mail shall be effective when deposited in the United States mail, duly addressed and with postage prepaid. Notices, consents and approvals from or by Lessor shall be given by Lessor or on its behalf by IBM and all payments shall be made to IBM at the address set forth in the applicable Supplement until Lessor shall notify Lessee otherwise.

**42. LESSEE REPRESENTATION.**  Lessee represents and warrants the following:

**(A) Organization and Qualifications.**  Lessee (i) is duly organized, validly existing and in good standing, in the exact name set forth in this Agreement under the laws of the jurisdiction of its organization, and (ii) has the corporate or other power and authority, and the legal right, to own its properties and assets, to lease the property it operates as a lessee and to transact the businesses in which it presently is engaged.

**(B) Financial Condition.**  In the event the Lessee's Financial Statements are not publicly available and Lessee subsequently provides same to Lessor, (i) the audited consolidated balance sheets of Lessee and its consolidated subsidiaries as of February 28, 2005, (ii) the related consolidated statements of income and of cash flows for the fiscal year ended on such date, and (iii) the unaudited interim consolidated balance sheets of Lessee and its consolidated subsidiaries for each quarterly period ended subsequent to such date and the related consolidated statement of income and cash flow for the quarters ended on such dates present fairly the consolidated financial condition of Lessee and its consolidated subsidiaries as such dates. All such financial statements, including the related schedules and notes thereto, have been prepared in accordance with GAAP applied consistently throughout the periods involved (except as approved by Lessee's auditors).  Lessee and its subsidiaries do not have any

material obligations, contingent liabilities and liabilities for taxes, or any long-term leases or unusual forward or long-term commitments, including any interest rate or foreign currency swap or exchange transaction or other obligation in respect of derivatives, that are not reflected in the most recent financial statements referred to in this paragraph. During the period from February 28, 2005 to and including the date hereof there has been, with respect to any property of Lessee, no sale, lease, sale and leaseback, assignment, conveyance, transfer or other disposition thereof, by Lessee of any material part of its business or property.

**(C) No Material Adverse Effect.**  Since February 28, 2005, there has been no development or event that has had or could reasonably be expected to have a Material Adverse Effect.

**(D) No Conflicts.**  The execution, delivery and performance by Lessee of this Agreement and any Other Documents to which it is a party and the obtaining of each Lease and Loan and other extensions of credit hereunder and thereunder (a)  are within its power and authority and legal right; (b) are duly  authorized by all necessary organizational actions; (c) are not in contravention in any respect of any  Requirement of Law or any indenture, contract, lease, agreement, instrument or other commitment to   which it is a party or by which it or any of its properties are bound; (d) do not require the consent, registration or approval of any Governmental Authority or any other Person (except such as have been duly obtained, made or given, and are in full force and effect); and (e) will not, except as contemplated herein, result in the imposition of any liens upon any of  its properties. This Agreement has been duly executed and delivered on behalf of Lessee.    No Requirement of Law or Contractual Obligations applicable to Lessee could reasonably be expected to have a Material Adverse Effect.

**(E) Enforceability.**  This Agreement and any Other Documents executed and delivered by Lessee in connection herewith are the legal, valid and binding obligations of Lessee, and are enforceable in accordance with their terms, except as such enforceability may be limited by the effect of any applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or similar laws affecting creditors rights generally or the general equitable principles relating thereto; provided, however, that such laws shall not materially interfere with the practical realization of the benefit of this Agreement or the Other Documents, except for: (i) possible delay; (ii) situations that may arise under Chapter 11 of the Bankruptcy Code; and (iii) equitable orders of Bankruptcy court.

**43.    WAIVER OF JURY TRIAL.**  Each party hereby irrevocably waives the right to trial by jury in any  action or proceeding  (including any counterclaim) of any type in which Lessor and Lessee are parties as to all matters arising  directly or indirectly out of the Agreement or any document, instrument or agreement executed in  connection herewith.

**44. APPLICABLE LAW; SEVERABILITY.**   The Lease shall be governed by the laws of the State of New York. If any provision shall be held to be invalid or unenforceable, the validity and enforceability of the remaining provisions shall not in any way be affected or impaired.

**45. DISPUTE RESOLUTION.**  For all matters under this Agreement, should a dispute arise between the parties, the parties agree that a representative will be designated by both Lessee and Lessor and within ten (10) days following receipt of written notice from the party initiating the dispute, the representatives will act in good faith to resolve the dispute.  In the event these two individuals cannot resolve the matter, each party will designate one of its senior executives to meet within ten (10) business days to resolve the dispute.   In the event these two individuals cannot resolve the matter, Lessor's General Manager and Lessee's President or Chief Executive Officer will meet within ten (10) business days to  resolve the dispute. Notwithstanding the foregoing, the provision of this Paragraph 45, do not apply if there is a dispute with respect to any Event of Default.

**46. CUSTOMER CENTER APPLICATIONS.**  Lessor agrees, subject to Lessee's signing Lessor's Online User Agreement, to make available via its web applications information regarding all Equipment leased under this Agreement, the location of such Equipment according to the records of Lessor and the status of all Financing Transactions.

**47. UCC FINANCING STATEMENTS.**  Lessor agrees that the UCC financing statements filed in connection with this Agreement shall contain the following collateral description, properly completed to describe the Supplement number and the Equipment types covered thereby and shall be in the form substantially described below:

"All of the following equipment together with all related software, whether now owned or hereafter acquired and wherever located (all as more fully described on IBM Credit Supplement number: *(List equipment type)* all additions, attachments, accessories, accessions and upgrades thereto and any and all substitutions, replacements or exchanges for any such item of equipment or software and any and all proceeds of any of the foregoing, including, without limitations, payments under insurance or any indemnity or warranty relating to loss or damage to such equipment and software."

**48. CUSTOMER-OWNED EQUIPMENT.** Lessee for itself and on behalf of its wholly-owned subsidiary, Circuit City Purchasing Company LLC ("Purchasing"), represents to Lessor that it possesses and holds title to various Category 1.1 and Category 2.1 equipment (the "Customer-Owned Equipment"). Lessee for itself and on behalf of Purchasing requests and Lessor agrees, subject to the terms herein, to acquire during the Funding Period up to an aggregate amount of $3,500,000.00 (the "Aggregate Cap") of Customer-Owned Equipment from Lessee and/or Purchasing for the purpose of leasing any such Customer-Owned Equipment to Lessee. The parties agree that the Aggregate Cap shall be the sum of the Bills of Sale, substantially in the form of Exhibit C-1, and/or the invoices, substantially in the form of Exhibit C-2, ("Purchasing Invoice(s)"), each attached hereto, which may be executed from time to time throughout the Funding Period and that all associated Leases are to commence thereafter.

The parties agree that all acquisitions of Customer-Owned Equipment by Lessor shall first be subject to Lessor's fair market valuation of all Customer-Owned Equipment.

Any Customer-Owned Equipment owned by Lessee shall be handled in accordance with the terms set forth in sub-paragraph "A" below; and any Customer-Owned Equipment owned by Purchasing shall be handled in accordance with the terms set forth in sub-paragraph "B" below.

A. Sale-Leaseback Equipment.
Any Customer-Owned Equipment owned by Lessee ("SLB Equipment"), shall be acquired by Lessor by a Bill of Sale acceptable to Lessor and prepared by Lessee. Following Lessor's acceptance of such Bill of Sale for any SLB Equipment, Lessor will pay Lessee the purchase price listed in the Bill of Sale which is equal to the lesser of (i) the actual unit cost of the SLB Equipment at the time of its purchase or (ii) the Unit Cost of the SLB Equipment as indicated in Exhibit A.

Lessee agrees that the terms and conditions set forth in this Paragraph 48(A) shall apply and modify, to the extent necessary, any Leases from Lessor to Lessee of SLB Equipment. For the sake of administration, any Leases for SLB Equipment shall include on the applicable Term Lease Supplement the term "SLB EQUIP" inputted by Lessor into the Amendment field of such Term Lease Supplement which incorporates by reference the terms and conditions of this Paragraph 48(A).

Notwithstanding the terms of Paragraph 13 of the Agreement, the Rent Commencement Date for SLB Equipment shall be the day following the date Lessor signs the applicable Bill of Sale. Title to SLB Equipment passes to Lessor free and clear of any liens, encumbrances, security interests or charges of any kind on the Rent Commencement Date. Lessee represents and warrants that on the Rent Commencement Date, SLB Equipment:

1) is in good operating condition and qualifies for maintenance by the manufacturer without additional expense;
2) including all features, subassemblies and parts therein are genuine as manufactured and assembled; and
3) is owned by Lessee free and clear of all liens, encumbrances, security interests or charges of any kind.

Lessee hereby assigns to Lessor any and all remaining rights with respect to SLB Equipment under the "Warranties" and "Patents and

Copyrights" provisions of the agreement under which Lessee purchased such SLB Equipment.

Applicable sales tax due under the terms of any Leases for SLB Equipment will be billed by Lessor to Lessee and will be the sole obligation of Lessee.

**B.** Purchasing Equipment.
Any Customer-Owned Equipment owned by Purchasing ("Purchasing Equipment") shall be acquired by Lessor by a Purchasing Invoice acceptable to Lessor and prepared by Lessee on behalf of Purchasing. Following Lessor's acceptance of such Purchasing Invoice for any Purchasing Equipment, Lessor will pay Lessee the purchase price listed in the Purchasing Invoice which is equal to the lesser of (i) the actual unit cost of the Purchasing Equipment at the time of its purchase or (ii) the Unit Cost of the Purchasing Equipment as indicated in Exhibit A.

A Lease requested by Lessee for Purchasing Equipment shall be handled in accordance with the terms and conditions of this Agreement including, but not limited to, Paragraph 13. Lessee shall cause title to Purchasing Equipment to pass to Lessor free and clear of any liens, encumbrances, security interests or charges of any kind in accordance with the Purchasing Invoice. In the Purchasing Invoice, Lessee shall cause Purchasing to represent and warrant that on the Purchasing Invoice Date, Purchasing Equipment:

1) is in good operating condition and qualifies for maintenance by the manufacturer without additional expense;
2) including all features, subassemblies and parts therein are genuine as manufactured and assembled; and
3) is owned by Purchasing free and clear of all liens, encumbrances, security interests or charges of any kind.

In the Purchasing Invoice, Lessee shall cause Purchasing to assign to Lessor any and all remaining rights with respect to Purchasing Equipment under the "Warranties" and "Patents and Copyrights" provisions of the agreement under which Purchasing purchased such Purchasing Equipment.
Applicable sales tax due under the terms of any Leases for Purchasing Equipment will be billed by Lessor to Lessee and will be the sole obligation of Lessee.

**49. CONDITIONAL** ACCEPTANCE This Agreement is conditioned upon: (i) the acceptance and execution by both parties of Amendment 1 to TLMA/PSF092005, dated on or about April 27, 2007 to adjust the Funding Period; and (ii) IBM and Lessee's mutually agreeable execution of PCR 14 to Statement of Work for Store of Tomorrow Deployment Services, dated on or about April 12, 2007, in a manner acceptable to Lessor that includes, but is not limited to, confirmation of the terms of PCR 12 and PCR 13.

Exhibit A

## LEASE FINANCING - AVERAGE STORE DETAIL

| Supplier | Part No. | Description | Per Site Needs | 2005/2006 Cost | Unit Cost c. 12/10/06 | Extended Amount Financed |
|---|---|---|---|---|---|---|
| IBM- Agilysis | 4610-TG4 | SUREPOS REGISTER PRINTER | 14.0 | Unknown | $635.00 | $8,890 |
| IBM- Agilysis | 4610-TG4 | SUREPOS WAREHOUSE PRINTER | 1.0 | Unknown | $635.00 | $635 |
| IBM- Agilysis | 4810-32H | SUREPOS PLUG, W/O DISPLAY REG | 10.4 | Unknown | $1,100.00 | $11,440 |
| IBM- Agilysis | 4810-32H | SUREPOS LOCK, W/O DISPLAY REG | 3.0 | Unknown | $1,100.00 | $3,300 |
| IBM- Agilysis | 4810-32H | SUREPOS, PLUG WITH DISPLAY | 0.4 | Unknown | $1,266.00 | $506 |
| IBM- Agilysis | 4810-32H | SUREPOS LOCK WITH DISPLAY | 0.2 | Unknown | $1,266.00 | $253 |
| IBM- Agilysis | 6636-AC1 | 15" LCD FLAT PANEL DISPLAY | 7.0 | Unknown | $230.00 | $1,610 |
| IBM- Agilysis | 9165 AB6 | LENOVO 15" FLAT PANEL DISPLAY | 7.0 | Unknown | $175.00 | $1,225 |
| **IBM - TOTAL = CATEGORY 1.1** | | | | | | **$27,860** |
| Symbol- IBM ITS | LS2208-SR20007R | SYMBOL LS2208 BAR CODE SCANNER | 16 | $120.90 | $102.66 | $1,643 |
| Symbol- IBM ITS | 25-57917-20 | SYMBOL 15 PIN CABLE FOR LS2208 SCANNER | 14 | $43.62 | $56.26 | $788 |
| Symbol- IBM ITS | CBA-K01-S07PA | PS-2 POWER PORT 7 FEET STRAIGHT | 2 | $15.30 | $15.30 | $31 |
| Symbol- IBM ITS | 50-14000-008R | POWER SUPPLY | 2 | $26.65 | $26.65 | $53 |
| Symbol- IBM ITS | PD8500-CA0DDPUC220 | SYMBOL PD8500 (COLOR) SIGCAP W/ KEY INJE | 16 | $444.59 | $444.59 | $7,113 |
| Symbol- IBM ITS | 23844-00-00R | US AC LINE CORD | 16 | $8.18 | $8.00 | $128 |
| Symbol- IBM ITS | 50-24000-006 | POWER SUPPLY FOR PD8500 | 16 | $39.51 | $38.28 | $612 |
| Symbol- IBM ITS | PF14007-12 | DB-9 CABLE FOR PD8500 ( ASSUMES RS-232 C | 16 | $9.82 | $9.63 | $154 |
| **SYMBOL - TOTAL = CATEGORY 2.1** | | | | | | **$10,522** |
| **STORE TOTAL** | | | | | | **$38,382** |

## LEASE FINANCING - AVERAGE STORE SUMMARY

| | | | | | | |
|---|---|---|---|---|---|---|
| IBM- Agilysis | 4610-TG4 | Printers | 15.0 | | $635.00 | $9,525 |
| IBM- Agilysis | 4810-32H | Registers | 14.0 | | $1,107.11 | $15,500 |
| IBM- Agilysis | 6636-AC1 | Displays | 7.0 | | $230.00 | $1,610 |
| IBM- Agilysis | 9165 AB6 | Displays | 7.0 | | $175.00 | $1,225 |
| **IBM - TOTAL = CATEGORY 1.1** | | | | | | **$27,860** |
| **SYMBOL - TOTAL = CATEGORY 2.1** | | | | | | **$10,522** |
| **STORE TOTAL** | | | | | | **$38,382** |

## Exhibit B

Upon the receipt of an invoice(s), Lessor will provide Lessee with a Certificate of Acceptance matching the invoice(s) and a Supplement which will contain a rate, a Term and a lease/finance option that is determined by the Category assigned to such Product in Exhibit A.   For each Product, the Supplement shall specify, as applicable, a Category 1.1 Rate, Category 2.1 Rate ("Category Rates").

These Category Rates shall be for the "Category Terms" as follows: the Category 1.1 Term is 60 months, the Category 2.1 Term is 36 months.

The Lease/Financing options will be listed on the Supplement as follows: the Category 1.1 Type is a Lease with an end of Lease purchase option that is determined by the Lessor based on the Equipment's Fair Market Value ("FMV Lease"); the Category 2.1 Type is FMV Lease.

The "Category 1.1 Rate" shall be the rate per annum based on the LIBOR Swap (as hereinafter defined) plus 10 basis points, the "Category 2.1 Rate" shall be the rate per annum based on the LIBOR Swap minus 367 basis points.  The Category Rates for Category 1.1 shall be based on the weekly average of the three (3) year London Inter Bank Offer Rate ("LIBOR") Swap Rates published by the Federal Reserve Board for the weekly period ending on the Friday immediately preceding the issuance date of each Supplement ("Three Year LIBOR Swap").  The Three Year LIBOR Swap is published in Statistical Release H.15 and can be found at: http://www.federalreserve.gov/Releases/H15/data.htm in the Interest Rate Swaps' section thereof.

The Category Rates for Category 2.1 shall be based on the weekly average of the two (2) year LIBOR Swap Rates published by the Federal Reserve Board for the weekly period ending on the Friday immediately preceding the issuance date of each Lease Rate Supplement ("Two Year LIBOR Swap"). The Two Year LIBOR Swap is published in Statistical Release H.15 and can be found at: http://www.federalreserve.gov/Releases/H15/data.htm in the Interest Rate Swaps' section thereof.

The following calculation will be used to determine the actual monthly Rent Rate payable each month in advance ("Rent Rate") per thousand dollars ($1,000) for an item of Equipment or Financing as it appears on the Supplement ("Rate Calculation"). For the purposes of Rate Calculation the following will apply:

# Example of Rate Calculation

### DEFINITION OF TERMS

| | | | |
|---|---|---|---|
| $1,000 | = Amount Financed | SWAP | = LIBOR Swap Rate |
| R/K | = Rent Rate per $1,000 | SPREAD | = Spread to LIBOR Swap Rate |
| N | = Term of Lease or Loan | | |

### GENERAL FORMULA

$$R/K = \cfrac{\$1,000}{\left[\dfrac{1+(SWAP+SPREAD)/12}{(SWAP+SPREAD)/12}\right]\left[1-\left(\dfrac{1}{1+(SWAP+SPREAD)/12}\right)^N\right]}$$

### EXAMPLE ASSUMPTIONS & RESULTS

| | | | |
|---|---|---|---|
| $1,000 | = Amount Financed | SWAP | = 4.25% |
| R/K | = $18.79 | SPREAD | = 0.75% |
| N | = 60 Months | | |

$$\$18.79 = \cfrac{\$1,000}{\left[\dfrac{1+(.0425+.0075)/12}{(0.0425+0.0075)/12}\right]\left[1-\left(\dfrac{1}{1+(0.0425+0.0075)/12}\right)^{60}\right]}$$

Exhibit C-1

## CIRCUIT CITY STORES, INC. BILL OF SALE

Purchaser Name: IBM Credit LLC
Address: North Castle Drive
Armonk, New York 10504

Circuit City Stores, Inc. (for or as Seller), a corporation duly organized in the state of _____ with its principal office at _____, for valuable consideration, the receipt of which is acknowledged, hereby sells and transfers to the Purchaser named above to have and hold forever the following equipment:

| Type/Serial | Type/Serial | Type/Serial | Type/Serial | $ Dollar Amount |
|---|---|---|---|---|
| | | | | |

Seller hereby warrants to Purchaser that immediately prior to the delivery of this Bill of Sale, Seller was the lawful owner of the equipment listed above, and that Seller had a good and lawful right to sell such equipment and that the title to such equipment was free from any charge of encumbrance due, including any tax obligations, to claims placed against Seller.

**EXCEPT AS PROVIDED ABOVE, THE EQUIPMENT IS SOLD "AS IS, WHERE IS" AND SELLER MAKES NO OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THOSE OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR USE.**

**IN WITNESS WHEREOF,** Seller caused this instrument to be executed in its name duly authorized representative on the _____ day of _____.

**Circuit City Stores, Inc.**

By: _____     _____
    Authorized Signature                             Date

**Acknowledged and agreed to:**

**IBM Credit LLC**

By _____     _____
    Authorized Signature                             Date

## Exhibit C-2

**CIRCUIT CITY PURCHASING COMPANY, LLC**

| | | |
|---|---|---|
| Please direct inquiries and correspondence to | Invoice Number | Invoice Date |
| Circuit City Purchasing Company LLC | | |

Contact Information:
Phone:                    Fax:                    E-Mail Address:

Installed at
[CIRCUIT CITY LESSEE NAME AND ADDRESS]

Please remit payments to                                 Terms
Circuit City Purchasing Company LLC                       PAYMENTS ARE DUE BY THE FIRST
ADDRESS                                                   DAY OF THE MONTH FOLLOWING
                          THE INVOICE DATE

Circuit City Purchasing Company LLC represents and warrants that as of the Invoice Date above, the Equipment listed below:

1) is in good operating condition and qualifies for maintenance by the manufacturer without additional expense;
2) including all features, subassemblies and parts therein are genuine as manufactured and assembled; and
3) is owned by Circuit City Purchasing Company LLC free and clear of all liens, encumbrances, security interests or charges of any kind.  Further, Circuit City Purchasing Company LLC  hereby assigns to IBM Credit LLC any and all remaining rights with respect to such  Equipment under the "Warranties" and "Patents and Copyrights" provisions of the agreement under which Circuit City Purchasing Company LLC  purchased such Equipment.

Title shall pass to IBM Credit LLC upon IBM Credit LLC's payment of the amount specified below.

**INVOICE SUBJECT TO THE TERMS OF THE TERM LEASE MASTER AGREEMENT NO. PSF032007 BETWEEN IBM CREDIT LLC & CIRCUIT CITY STORES, INC.  UPON PAYMENT, CIRCUIT CITY PURCHASING COMPANY, LLC TRANSFERS ALL OF ITS RIGHT, TITLE AND INTEREST WHICH IT MAY HAVE IN AND TO THE EQUIPMENT DETAILED BELOW AND CIRCUIT CITY PURCHASING COMPANY, LLC TRANSFERS TITLE TO IBM CREDIT LLC FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES.**

| TYPE/DESCRIPTION | LEASE | FROM | THRU | PERIODIC |
|---|---|---|---|---|
| MOD/SERIAL | OPTION | DATE | DATE | CHARGE |

TOTALS

STATE TAX

LOCAL TAX

| **PLEASE PAY THIS AMOUNT** | $ |
|---|---|

# RIDER I

A.  Anything herein to the contrary notwithstanding, Lessee shall not be required under Paragraph 27 to reimburse Lessor for, or otherwise make payment for any of the following: (i) U.S. federal income taxes; (ii) state and local taxes based upon or measured by gross or net income or receipts, other than receipts taxes in the nature of a sales tax including, but not limited to, the Arkansas Gross Receipts Tax, the Alabama Leasing Privilege Tax, and the Arizona Transaction Privilege Tax (unless, in the case of taxes based upon or measured by gross income or receipts, imposed by withholding), or that are or are in the nature of franchise, capital, capital stock, net worth, privilege or doing business taxes; (iii) taxes to the extent attributable to any period after termination of the applicable Lease provided, however, that Lessee shall be required to reimburse Lessor for the total amount of personal property tax which relates to an assessment date during the Lease Term even though a portion of the tax period associated with such assessment may fall, in whole or in part, without the Lease Term and provided, further, that Lessee shall not be required to reimburse Lessor for any personal property tax which relates to an assessment date following the end of the Lease Term even though a portion of the tax period associated with such assessment may fall, in whole or in part, within the Lease Term; (iv) taxes resulting from the gross negligence or willful misconduct of Lessor; (v) taxes to the extent resulting from any act of Lessor that is expressly prohibited by (or the failure to perform an act expressly required by) the applicable Lease or by a breach by Lessor, or the inaccuracy, of any of Lessor's representations, warranties or covenants under the Lease; (vi) taxes to the extent resulting from any voluntary disposition or any involuntary disposition resulting from a bankruptcy or similar proceeding for relief of debtors in which Lessor is a debtor, by (for foreclosure by a creditor of ) Lessor; (vii) taxes to the extent resulting from the failure of Lessor to comply on a timely basis with certification, information, documentation, reporting or similar requirements, provided that the exclusion in this clause (vii) shall apply only if Lessor is eligible to comply with such requirement; (viii) taxes for which Lessee is obligated to indemnify Lessor under Paragraph 29 hereof (or which are expressly excluded from the application thereof); (ix) taxes to the extent resulting from Lessor being organized in a jurisdiction other than the United States or any state therein; (x) taxes imposed under Sections 1441 through 1446 of the Code, or under Section 4975 of the Code or under subtitle B of title I of ERISA; and (xi) taxes that are being contested in good faith pursuant to the contest provisions hereof (but only for so long as they are being so contested).

B.  Anything herein to the contrary notwithstanding, Lessee shall not be required under Paragraph 29 to indemnify Lessor for or with respect to any Tax Loss to the extent that such Tax Loss results from one or more of the following:  (i) Lessor's failure to have sufficient taxable income to benefit from the relevant MACRS Deductions or Interest Deductions; (ii) any Lessee act or failure to act occurring after the earlier of the termination of the applicable lease or return of the relevant Equipment to Lessor; (iii) taxes resulting from the gross negligence or willful misconduct of Lessor, or the breach or inaccuracy of any representation, warranty or covenant by Lessor under the Lease; (iv) the failure of Lessor timely or properly to claim any tax benefits resulting from the MACRS Deductions or the Interest Deductions; the application of Sections 168(d)(3), 168(d)(4)(C) or, unless caused by Lessee failing to make any payment when due, Section 467 of the Code; (v) any amendment, supplement, modification or waiver to the Lease to which Lessee has not agreed in writing; (vi) a determination that Lessor is not holding its interest in the Equipment in the ordinary course of a trade or business or that Lessor did not enter into the transactions contemplated by the Lease for profit for purposes of the Code; (vii) any election by Lessor that is inconsistent with the entitlements contemplated by the first sentence of Paragraph 29; (viii) any voluntary disposition or any involuntary disposition resulting from a bankruptcy or similar proceeding for relief of debtors in which Lessor is a debtor, by (for foreclosure by a creditor of ) Lessor; and (ix) the failure of Lessor to contest a Proposed Adjustment in accordance with, and to the extent required by, the contest provisions hereof.  Further, Lessee shall not be required to make any payment to Lessor pursuant to Paragraph 29 for any Tax Loss relating to which a Proposed Adjustment is being contested in good faith pursuant to the contest provisions hereof (but only for so long as they are being so contested).

C.  Lessee shall have no liability to indemnify Lessor under Paragraph 30 for or in respect of any taxes, as the parties acknowledge that Lessee's responsibilities to Lessor with respect to taxes are governed solely by Paragraphs 27 and 29 hereof.

D.  Anything herein to the contrary notwithstanding, Lessee shall not be obligated to make any payment, reimbursement or indemnification under any of Paragraphs 27 or 29 in excess of that which Lessee would have been required to make had no assignment or transfer by Lessor or any assignee of Lessor taken place.  Without limiting the generality of the preceding sentence, all exclusions, exceptions and limitations to Lessee's obligations under Paragraphs 27 and 29 contained herein shall apply *mutatis mutandis* with respect to any assignee or transferee of Lessor.