## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| In Re: | ) | Chapter 11 |
| | ) | |
| CIRCUIT CITY STORES, INC., et al., | ) | Case Nos. 08-35653 (KRH) |
| | ) | |
| | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | |
| | ) | |

### FIRST INTERIM APPLICATION OF FTI CONSULTING, INC.
### AS FINANCIAL ADVISORS TO THE DEBTORS
### FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES
### INCURRED FOR THE PERIOD NOVEMBER 10, 2008 THROUGH JANUARY 31, 2009

Name of Applicant:  FTI Consulting, Inc.

Authorized to Provide
Professional Services to:  DEBTORS

Date of Retention:  December 23, 2008 *nunc pro tunc to* November 10, 2008

Period for which compensation
and reimbursement is sought:  November 10, 2008 through January 31, 2009

Amount of Compensation
requested:  $2,475,866.00

Amount of Expense Reimbursement
requested:  $138,574.39

This is an: _____ Monthly __X__ Interim _____ Final Application

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In Re: | ) Chapter 11 |
| | ) |
| CIRCUIT CITY STORES, INC., et al., | ) Case Nos. 08-35653 (KRH) |
| | ) |
| | ) Jointly Administered |
| | ) |
| Debtors. | ) |
| | ) |

## FIRST INTERIM APPLICATION OF FTI CONSULTING, INC.
## AS FINANCIAL ADVISORS TO THE DEBTORS
## FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES
## INCURRED FOR THE PERIOD NOVEMBER 10, 2008 THROUGH JANUARY 31, 2009

**Summary of Professionals and Fees**
**November 10, 2008 through January 31, 2009**

**FTI Professionals**

| FTI Professionals | Description of Function | Hours | Hourly Rate | Fee |
|---|---|---|---|---|
| Duffy, Robert J (JAN 2009) | Senior Managing Director | 206.0 | $ 825.00 | $ 169,950.00 |
| Duffy, Robert J (NOV, DEC 2008) | Senior Managing Director | 201.0 | 715.00 | 143,715.00 |
| Coulombe, Stephen L (JAN 2009) | Senior Managing Director | 83.0 | 825.00 | 68,475.00 |
| Coulombe, Stephen L (NOV, DEC 2008) | Senior Managing Director | 261.0 | 665.00 | 173,565.00 |
| Regan, Kevin (JAN 2009) | Senior Managing Director | 33.0 | 825.00 | 27,225.00 |
| Regan, Kevin (NOV, DEC 2008) | Senior Managing Director | 60.8 | 715.00 | 43,472.00 |
| Weinsten, Mark (JAN 2009) | Senior Managing Director | 46.5 | 825.00 | 38,362.50 |
| Weinsten, Mark (NOV, DEC 2008) | Senior Managing Director | 0.5 | 665.00 | 332.50 |
| Behnke, Thomas A (JAN 2009) | Managing Director | 126.9 | 675.00 | 85,657.50 |
| Behnke, Thomas A (NOV, DEC 2008) | Managing Director | 385.2 | 620.00 | 238,824.00 |
| Cashman, Brian (JAN 2009) | Director | 231.5 | 550.00 | 127,325.00 |
| Cashman, Brian (NOV, DEC 2008) | Director | 290.0 | 480.00 | 139,200.00 |
| Greanias, Jennifer (JAN 2009) | Director | 71.2 | 550.00 | 39,160.00 |
| Greanias, Jennifer (NOV, DEC 2008) | Director | 280.9 | 475.00 | 133,427.50 |
| Waiting, Mark (JAN 2009) | Director | 240.0 | 550.00 | 132,000.00 |
| Waiting, Mark (NOV, DEC 2008) | Director | 332.0 | 475.00 | 157,700.00 |
| Ehrenhofer, Jodi (NOV, DEC 2008) | Director | 37.0 | 535.00 | 19,795.00 |
| Robinson, Joshua M. (NOV, DEC 2008) | Director | 3.4 | 535.00 | 1,819.00 |
| Lewandowski, Douglas (JAN 2009) | Director | 2.2 | 520.00 | 1,144.00 |
| Summers, Joseph E (NOV, DEC 2008) | Director | 14.3 | 505.00 | 7,221.50 |
| Ryba, Lauren (JAN 2009) | Senior Consultant | 193.0 | 455.00 | 87,815.00 |
| Ryba, Lauren (NOV, DEC 2008) | Senior Consultant | 239.0 | 385.00 | 92,015.00 |
| Chew, Katherine (JAN 2009) | Senior Consultant | 67.0 | 420.00 | 28,140.00 |
| Chew, Katherine (NOV, DEC 2008) | Senior Consultant | 268.0 | 350.00 | 93,800.00 |
| Stegenga, Scott (JAN 2009) | Senior Consultant | 152.1 | 420.00 | 63,882.00 |
| Stegenga, Scott (NOV, DEC 2008) | Senior Consultant | 106.8 | 350.00 | 37,380.00 |
| McKeighan, Erin (JAN 2009) | Consultant | 42.4 | 380.00 | 16,112.00 |
| McKeighan, Erin (NOV, DEC 2008) | Consultant | 247.5 | 305.00 | 75,487.50 |
| Fowler, Douglas (NOV, DEC 2008) | Systems Engineer | 0.5 | 315.00 | 157.50 |
| Cartwright, Emily (NOV, DEC 2008) | Consultant | 7.7 | 305.00 | 2,348.50 |
| O'Loughlin, Morgan (JAN 2009) | Consultant | 212.0 | 290.00 | 61,480.00 |
| O'Loughlin, Morgan (NOV, DEC 2008) | Consultant | 301.8 | 235.00 | 70,923.00 |
| Torres, Diego (JAN 2009) | Consultant | 9.6 | 290.00 | 2,784.00 |
| Torres, Diego (NOV, DEC 2008) | Consultant | 291.8 | 235.00 | 68,573.00 |
| Gilleland, Jeffrey (NOV, DEC 2008) | Consultant | 98.2 | 265.00 | 26,023.00 |
| Goldberg, Kristina (JAN 2009) | Consultant | 2.0 | 225.00 | 450.00 |
| Carolla, Alyssa (NOV, DEC 2008) | Intern | 1.0 | 125.00 | 125.00 |
| **Subtotal:** | | **5,146.8** | | **$ 2,475,866.00** |

| | | |
|---|---|---|
| Out of Pocket Expenses @ 100% | | 138,574.39 |
| **Total Fees & Expenses:** | | **2,614,440.39** |
| Less: Payment to Date | | - |
| **Total Payment Requested** | | **$ 2,614,440.39** |

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| In Re: | Chapter 11 |
| CIRCUIT CITY STORES, INC., et al., | Case Nos. 08-35653 (KRH) |
| | Jointly Administered |
| Debtors. | |

**FIRST INTERIM APPLICATION OF FTI CONSULTING, INC.**
**AS FINANCIAL ADVISORS TO THE DEBTORS**
**FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES**
**INCURRED FOR THE PERIOD NOVEMBER 10, 2008 THROUGH JANUARY 31, 2009**

**Summary of Expenses**
**November 10, 2008 through January 1, 2009**

| Expense Category | Total Amount for Period |
|---|---|
| Business Meals | $        8,682.00 |
| Lodging | 57,017.27 |
| Transportation | 65,607.44 |
| Other | 7,267.68 |
| **Total Disbursements** | **$      138,574.39** |

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| In Re: | ) | Chapter 11 |
| | ) | |
| CIRCUIT CITY STORES, INC., et al., | ) | Case Nos. 08-35653 (KRH) |
| | ) | |
| | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | |
| | ) | |

**FIRST INTERIM APPLICATION OF FTI CONSULTING, INC.**
**AS FINANCIAL ADVISORS TO THE DEBTORS**
**FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES**
**INCURRED FOR THE PERIOD NOVEMBER 10, 2008 THROUGH JANUARY 31, 2009**

INDEX

| EXHIBIT A | Copy of the Retention Order authorizing employment of the Applicant |
|---|---|
| EXHIBIT B | Summary of professional fees by professional |
| EXHIBIT C | Summary of professional fees by task code |
| EXHIBIT D | Complete accounting of time expended by day by professional |
| EXHIBIT E | Summary of actual and necessary expenses incurred by expense category |

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| In Re: | ) Chapter 11 |
| | ) |
| CIRCUIT CITY STORES, INC., et al., | ) Case Nos. 08-35653 (KRH) |
| | ) |
| | ) Jointly Administered |
| | ) |
| Debtors. | ) |

**FIRST INTERIM APPLICATION OF FTI CONSULTING, INC.**
**AS FINANCIAL ADVISORS TO THE DEBTORS,**
**FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES**
**INCURRED FOR THE PERIOD NOVEMBER 10, 2008 THROUGH JANUARY 31, 2009**

FTI Consulting, Inc., (hereinafter referred to as "FTI Consulting", "FTI" or the "Applicant") as Financial Advisors to Circuit City Stores, Inc. (collectively, "Circuit City", the "Company", or the "Debtors" or the "Estate") files this First Interim Application for Compensation and Reimbursement of Expenses (the "First Interim Application") for the period of November 10, 2008 through January 31, 2009 (the "First Interim Application Period").

In support of this application, the Applicant respectfully represents as follows:

**A. BACKGROUND**

1.     On November 10, 2008 (the "Petition Date"), the Debtors filed a voluntary petition for relief pursuant to Chapter 11 of the United States Bankruptcy Code (the "Code"). Since that date, the Debtors have continued in possession of their business and property as Debtors-in-Possession in accordance with sections 1107(a) and 1108 of the Code.

2.     The Applicant is a financial advisory services firm with numerous offices throughout the country and was retained by the Debtors as Financial Advisors.

3.     The Applicant's retention as Financial Advisors to assist the Debtors in the performance of their duties as Debtors-in-Possession was approved on December 23, 2008 by

this Court *nunc pro tunc* to November 10, 2008 (the "Retention Order").  A copy of said order, dated December 23, 2008, is attached hereto as Exhibit A and incorporated herein by reference.

4.    All services for which the Applicant requests compensation were performed for, or on behalf of, the Debtors.

5.    The Applicant has received from the Debtors and holds as of the Petition Date, "on account" cash in the amount of $695,574.52 (the "On Account Cash").

6.    On December 9, 2008, this Court entered an Administrative Order under Bankruptcy Code Section 105(a) and 331 establishing procedures for interim compensation (Court Docket No. 830) (the "Administrative Order").

7.    Pursuant to the terms of the Administrative Order, if no objection is filed to a Monthly Fee Request within twenty (20) days of the date of the filing of that request , then the respective professionals may be paid eighty-five percent (85%) of the fees and one hundred percent (100%) of expenses set forth in the applicable Monthly Fee Request.

8.    Every three (3) months beginning with the three-month period ending January 31, 2009, this Court will then make a determination, after hearing, if the remaining fifteen (15) percent of fees sought in the proceeding three (3) months will be paid. Per the Administrative Order, the First Interim Application Period should cover from the Petition Date through and including January 31, 2009.

9.    Pursuant to the Administrative Order, FTI Consulting is filing this Application for compensation for professional services rendered and reimbursements made in these cases for the period of November 10, 2008 through January 31, 2009 totaling 5,146.8 hours, and in connection therewith, requests approval of the full amount of fees and expenses, in the amount of one hundred percent (100%) of the $2,475,866.00 in fees and reimbursement of one hundred percent (100%) of actual expenses in the amount of $138,574.39.

10.    FTI Consulting maintains contemporaneous records of the time expended for the professional services and expenses related hereto performed in connection with these Chapter 11 cases and such records are maintained in the ordinary course of its business.  These records

provide a detailed description of the services rendered and expenses incurred during the period for which this First Interim Application is being made.

## B. DESCRIPTION OF SERVICES AND EXPENSES AND RELIEF REQUESTED

11.    The Applicant's services on behalf of the Debtors are summarized in Exhibit B and Exhibit C and described in detail in Exhibit D.  The Retention Order authorized the retention of the Applicant to render to the Debtors the following essential services, which include, but are not limited to:

**Store Footprint Analysis**

- Analyze liquidity and earnings impact of potential store closures.
- Provide assistance with contract terms for disposition of leases.
- Develop informational materials to support store closing processes.
- Review procedure for projecting revenue, occupancy costs and inventory levels for potential closing stores.
- Advise on "best practices" for drafting an agency agreement for inventory disposition and on negotiating structure for real estate disposition.
- Prepare information package for landlord conference calls and participate in lease termination discussions.
- Coordinate with such third party real estate advisors as may be retained by the Company in conjunction with real estate analyses and related negotiations.

**Liquidity Forecasting**

- Evaluate current liquidity position and expected future cash flows.
- Assist with management and control of cash disbursements.
- Advise management on cash conservation measures and assist with implementation of cash forecasting and reporting tools as requested.

**Restructuring/Other Advisory Services**

- Assist with development of an out-of-court restructuring plan and related financial projections.
- Assess potential EBITDA based on store closing strategy and other restructuring initiatives.
- Analyze long term capital need to effectuate potential out-of court restructuring and capital structure alternatives.

- Assist with working capital management and liquidity forecasting.

- Participate in development of strategy to negotiate with key stakeholders in order to effectuate a potential out-of-court restructuring.

- Assist management with development of employee retention and communications programs.

- Assist management in developing strategy relating to merchandise and other vendors.

- Assist management and, if necessary, other advisors in developing a strategy relating to landlords in conjunction with a potential out-of-court restructuring.

- Assist management and, if necessary, other advisors in developing strategy relating to existing and prospective capital providers in conjunction with a potential out-of-court restructuring.

- Provide weekly status and fee updates to management personnel designated by the Company.

- Provide other services as requested by management.

**Asset Sales**

- Assist management with the development and implementation of a store closing process including marketing certain stores identified by the Company for closure (including, but not limited to, inventory, real estate, furniture, fixtures and equipment other tangible assets) to inventory disposition firms including conducting a 363 sale process, contacting potential buyers, facilitating due diligence requests, negotiating asset purchase agreement(s) and conducting a final auction.

  - Prepare "bid packages" for Liquidators and manage selection process.

  - Solicit potential inventory Liquidators for going-out-of-business sale process.

  - Assist the Company in the negotiation of an Agency agreement.

  - Manage the process to liquidate stores and conduct going-out-business sales in the ordinary course of business.

  - Solicit bids from real estate consulting firms to evaluate lease mitigation strategies.

- Assist with data collection and information gathering related to third party due diligence.

- Advise and assist the Company and other professionals retained by the Company in developing, negotiating and executing plan of reorganization scenarios, 363 sales or other potential sales of assets or business units.

**Contingency Planning**

- Assist management and the Board of Directors in contingency planning including the evaluation, planning and execution of a potential Chapter 11 filing.

- Assist Company personnel with the communications and negotiations, at your request and under your guidance, with lenders, creditors, and other parties-in-interest including the preparation of financial information for distribution to such parties-in-interest.

- Advise and assist the Company in the compilation and preparation of financial information necessary due to requirements of the Bankruptcy Court and/or Office of the US Trustee.

- Assist the Company in the preparation of a liquidation valuation for a reorganization plan and/or negotiation purposes.

- Assist the Company in managing and executing the reconciliation process involving claims filed by all creditors.

- Advise and assist the Company in identifying and/or reviewing preference payments, fraudulent conveyances and other causes of action.

- Assist the Debtors in the preparation of financial related disclosures required by this Court including the Schedules of Assets and Liabilities, the Statement of Financial Affairs, and Monthly Operating Reports.

- Assist the Debtors in claims processing, analysis, and reporting, including plan classification modeling and claim estimation.

- Assist the Debtors in responding to and tracking reclamation, 503(b)(9) and consignment claims.

**Financing**

- Lead efforts to arrange second lien financing and refinancing of the existing senior debt or debtor-in-possession ("DIP") financing in a Chapter 11 filing.

- Advise the Company in the process of identifying and reviewing DIP financing and assist the Company in preparing a collateral package in support of such financing.

**Other**

- Assist with such other accounting and financial advisory services as requested by the Company and/or the Board of Directors consistent with the role of a financial advisor and not duplicative of services provided by other professionals.

12.    This First Interim Application is made by the Applicant in accordance with Local Rule 9013-1(G), the Guidelines adopted by the Executive Office for the United States Trustee

and the Administrative Order, Pursuant to Section 105(a) and 331 of the Bankruptcy Code, Establishing Procedures for Interim Compensation approved by this Court on December 9, 2008.

13.     This is the Applicant's First Interim Application for compensation and expense reimbursement filed in this case.

14.     Pursuant to this application, the Applicant has attached the following exhibits:

a)   Exhibit A – Copy of the Retention Order authorizing employment of the Applicant;

b)   Exhibit B – Summary schedule showing the professionals who performed services, the number of hours spent, the respective professional's billing rate, and the total fees for such services for the period November 10, 2008 through January 31, 2009;

c)   Exhibit C – Summary schedule showing professional fees by task code for the period November 10, 2008 through January 31, 2009;

d)   Exhibit D – Complete accounting of professional fees including itemized time records by task code in chronological order for which an award of compensation is sought.  The itemized records include:  (i) the date each service was rendered; (ii) the professional(s) who performed the service; (iii) a description of the services rendered; and (iv) the time spent performing the service in increments of tenths of an hour for the period November 10, 2008 through January 31, 2009;

e)   Exhibit E – Summary of actual and necessary expenses by expense category and by individual for which reimbursement is sought (all airfare was for coach class travel).  The Applicant has eliminated the reimbursement request for certain out-of-pocket expenses when it would not be possible to assemble the billing details for reimbursement under the Guidelines.  These out-of-pocket expenses represent real costs that benefited the estate and typically include telephone charges for calls placed in the Applicant's offices, postage costs including Federal Express charges and copying and facsimile charges incurred

at the Applicant's offices in connection with this case.  In addition, the
Applicant has voluntarily chosen not to bill certain other out of pocket
expenses that have been incurred by the Applicant and have benefited the
Estate.

15.    Applicant respectfully requests that the Court enter an Order allowing interim
compensation in the sum of one hundred percent (100%) of the amount incurred by the
Applicant of $2,475,866.00 for professional services and reimbursement of one hundred percent
(100%) of the $138,574.39 of actual expenses incurred on behalf of the Estate during the period
from November 10, 2008 through January 31, 2009 and directing prompt payment to FTI
Consulting of the holdback amount of $371,379.91.

16.    This First Interim Application is divided into fifteen narrative sections based on
the activity descriptions listed below.  Each narrative section describes the more significant
services rendered by the Applicant for each of the activity categories and its benefit to the Estate.
The Applicant is charging only on an hourly basis for these services.  The fees applied for herein
are based on the hourly rates that reflect the usual and customary fees charged to all clients of the
Applicant and are commensurate with the usual and customary rates charged for services
performed by accountants and financial advisors in bankruptcy cases of this nature.  To assist the
Court in its review of the fees sought by the Applicant, a narrative follows the table for the
activity categories set forth in the table below.  Each narrative section describes the fees incurred
associated with the task.

**Summary of Fees by Task**
**November 10, 2008 through January 31, 2009**

| Task | Total Hours | Total Fees |
|------|------------:|-----------:|
| Attendance at Bankruptcy Court Hearings | 28.5 | $      18,478.00 |
| Bankruptcy Reporting and Postpetition Accounting | 115.9 | 51,493.00 |
| Canadian Matters | 41.5 | 23,968.50 |
| Claims Management | 247.8 | 136,256.50 |
| Committee Matters | 200.5 | 114,933.75 |
| DIP Financing & Reporting | 407.4 | 192,322.00 |
| Financial Projections | 331.9 | 149,460.00 |
| General Duties and Case Administration | 146.8 | 87,996.50 |
| Liquidation Analysis/Wind down | 404.9 | 233,403.50 |
| Management Incentive Plan | 81.7 | 62,067.50 |
| Plan of Reorganization Alternatives | 399.2 | 231,815.75 |
| Short Term Cash Management | 216.1 | 107,690.00 |
| Statements and Schedules | 1,472.0 | 584,060.00 |
| Store Closing Activities | 669.2 | 298,863.50 |
| Travel | 383.5 | 183,057.50 |
| **Total** | **5,146.8** | **$    2,475,866.00** |

### *Attendance at Bankruptcy Court Hearings*

During the First Interim Application Period, the Applicant prepared for and attended various Bankruptcy Court hearings.  The Applicant was instrumental in providing informational support to the Debtors and Debtors' counsel as needed on DIP financing and preparing a revised budget. The Applicant was prepared to provide expert testimony related to DIP financing. The Debtors were able to successfully receive interim and final approval on the DIP loan financing which was critical to the Debtors' post-petition reorganization efforts..  In addition, at the request of the Debtors' counsel and the Debtors' management, the Applicant was present at numerous other court hearings and was prepared to testify on matters relating to DIP financing, store closings, bid procedures, the management incentive plan, among others.

During the First Interim Application Period, the Applicant's professionals spent 28.5 hours on matters related to attendance at bankruptcy court hearings for which compensation is sought with the time value of $18,478.00.  The detailed time entries for this task are attached hereto as Exhibit D.

***Bankruptcy Reporting and Postpetition Accounting***

During the First Interim Application Period, the Applicant assisted the Debtors with first day reporting, bankruptcy reporting and post petition accounting activities.

First, the Applicant assisted the Debtors and Debtors' counsel with the process for approving, tracking, and reporting payments made in accordance with first day orders. In addition, the Applicant assisted the Debtors with completing US Trustee reporting requirements including the monthly operating report.  In order to prepare monthly operating reports, the Applicant was required to participate in numerous meetings and teleconferences with the Debtors' financial staff in order to coordinate the collection of the data.  The Applicant subsequently reviewed the monthly operating reports with the Debtors' management team to ensure the data reported in the report was as complete and accurate as possible given the Debtors' limited timeframe to close the books.

Second, the Applicant participated in discussions and meetings that were conducted after the Chapter 11 filing in order to provide the Debtors' accounting and finance staff with knowledge of the process and reporting requirements necessary in a postpetition environment.  The Applicant assisted the Debtors in implementing controls and procedures to ensure proper classification of all pre and post petition vendor invoices and held discussions with management to ensure that the Debtors did not make unauthorized prepetition payments.  The Applicant assisted the Debtors' accounting staff with the resolution of various accounting related issues as a result of the Chapter 11 filing, provided support for various day-to-day financial and operational activities as well as provided guidance and advice with respect to closing the books and records as of the filing date.  The Applicant also provided the real estate and account payable teams' with guidance and analysis relating to payments to landlords.

During the First Interim Application Period, the Applicant's professionals spent 115.9 hours on matters related to postpetition accounting and business operations which compensation is sought with the time value of $51,493.00.  The detailed time entries for this task are attached hereto as Exhibit D.

***Canadian Matters***

During the First Interim Application Period, the Applicant participated in meetings and teleconferences between the Debtors and Canadian professionals to discuss and coordinate critical case issues including DIP financing, financial projections and sale activities.

First, the Applicant ensured accuracy in the Canadian Monitor's reports to the Canadian court relating to U.S. matters.  The Applicant's work in this area was critical to coordinating financing and sale issues with lenders and ensuring that communications to the Canadian court relative to the U.S. and cross boarder issues were conveyed accurately.

Second, the Applicant reviewed and monitored the Canadian entity's cash flow reports on a weekly basis to ensure compliance to the Canadian weekly cash flow budget.  The Canadian entity's borrowing base and loan balance were included in the U.S. borrowing base formula and consequently impacted U.S. liquidity.  The Applicant worked closely with the Canadian professionals to ensure that the Canadian entity maintained strict compliance to budget and accurately forecast the Canadian entity's seasonal working capital needs.  The Applicant's efforts ensured the Debtors maintained the highest liquidity possible from the Canadian entity which was critical to the Debtors' efforts to explore and execute a potential going concern transaction.

Third, the Applicant worked closely with Canadian professionals to analyze the potential value of the Canadian assets.  The value of the Canadian assets directly impacts the recovery to the Debtors' creditor constituencies as a residual portion of the proceeds will be distributed to the U.S. estate.  The Applicant worked in concert with the Canadian professionals to review going concern bids for the Canadian chain in order to maximize the recovery to the Debtors' estate. Additionally, the Applicant reviewed bids on the Canadian intellectual property and other miscellaneous assets to ensure that those assets realized the maximum possible value for the Debtors' estate.

During the First Interim Application Period, the Applicant's professionals spent 41.5 hours on matters related to Canadian matters for which compensation is sought with the time value of $23,968.50.  The detailed time entries for this task are attached hereto as Exhibit D.

### *Claims Management*

During this Application Period, the Applicant assisted the Debtors in the area of claims management.  The Applicant's assistance focused on: (i) advising the Debtors in relation to the bar date notice, including advise on notice documents, preparation of frequently asked questions, performing detailed analysis on the notice population and preparing mail files to be used by the claims agent to create customized proof of claim notices; (ii) assisting in the preparation of claims resolution procedures and training materials describing in detail the claims resolution process, tasks to be completed and training materials on the use of the Applicant's Claims Management System ("CMS") used to track claims; (iii) assisting the Debtors in establishing claim reconciliation priorities; (iv) establishing a baseline claim system including all docketed proofs of claim; and (v) assisting the Debtors complete and generate claim objection exhibits for the first omnibus objection to duplicate or amended claims.

The Applicant assisted the Debtors' claims resolution team in their efforts to reconcile, object to, settle and resolve proofs of claims filed against the Debtors in this Chapter 11 proceeding.  The Debtors' claims resolution team was comprised of Debtors' personnel, supported by professionals from the Debtors' counsel and the Applicant.  Due to the complexity of these cases, the large number of creditors who filed proofs of claim against the Debtors and a high number of complex claims including over 1,300 claims filed under section 503(b)(9),  the Applicant assembled a team of professionals with significant experience in complex bankruptcy claims reconciliation to assist the Debtors in this area.  To date, creditors have filed over 10,200 proofs of claim in these cases that require reconciliation.

The Applicant's assistance in the statements and schedules process allowed the Debtors to comply with court mandated bar dates. This assistance included consulting on the types of documents to be included in the notice, reviewing and commenting on drafted notice documents, and consulting on the types of responses that the Debtors could provide employees and creditors in relation to the bar date notice. The Applicant also assisted in the bar date notice by collecting and providing the claims agent with creditor address information for notice and customized notice for parties included on the Debtors' schedules of liabilities and executory contracts. In total, over 370,000 parties, excluding equity holders, were included in mailings of the Debtors' bar date notice that the Applicant was responsible for collecting, organizing and providing to the claims agent for notice.

The Applicant's assistance in the claims management area included all aspects of claims management and claims resolution. Utilizing proprietary bankruptcy software called the Claims Management System ("CMS"), the Applicant established a multi-user, computer information system environment designed to manage the Debtors' scheduled liabilities and proofs of claim. The Debtors use and rely on CMS to track the progress and status of each proof of claim, perform analysis of claims, object to claims and generate various management reports. The CMS database server and software is available via a secure internet protected environment that provides the Debtors and their advisors access to claims related information and enables the Debtors to increase personnel resources as necessary to meet the requirements and deadlines of the cases. During this Application Period, the Applicant loaded proof of claim data into CMS received from the claims agent to establish a baseline system for the Debtors to begin the reconciliation process.

In addition to maintaining CMS for the Debtors, the Applicant also assisted the Debtors establish and manage the claims resolution process. This included: (i) assisting in the preparation of and modification to claims resolution protocols and training materials describing in detail the claims resolution process and resolution tasks to be completed; (ii) training the claims resolution team members on the process and the tasks associated with claims reconciliation, including tracking

claim resolutions, identifying claims for objection and reporting on claims; and, (iii) participation in working sessions with the Debtors and counsel to resolve issues and develop strategies regarding case specific complexities and to advise the Debtors with respect to timing and resource needs.  In addition, the Applicant assisted the Debtors establish procedures for identifying and reviewing duplicate or amended claims which resulted in the filing of the Debtors' first omnibus objection to claims which seeks to disallow claims totaling approximately $136 million.  The Applicant also assisted the Debtors by generating reports of 503(b)(9) claims and establishing procedures for reviewing the claims in order to classify and identify claims that can later be objected to as non-product 503(b)(9) claims.


During the First Interim Application Period, the Applicant's professionals spent 247.8 hours on matters related to claims management for which compensation is sought with the time value of $136,256.50.  The detailed time entries for this task are attached hereto as Exhibit D.


***Committee Matters***

During the First Interim Application Period, the Applicant participated in numerous meetings and teleconferences with the Unsecured Creditors' Committee (the "Committee") and its financial and legal advisors.  The Applicant, at the direction of the Debtors' management, coordinated all responses and diligence requests with the Committee and their advisors.  The Applicant attended meetings in Washington, D.C. on November 19, 2008 and December 12, 2008 that included both the Debtors and its advisors and the Committee and is advisors to discuss critical case issues such as DIP financing, short term liquidity projections, long term business plan projections and sale transaction opportunities.  The Applicant's efforts assisted the Debtors in keeping the Committee and its advisors well informed of developments in the case. The Applicant helped to maintain an effective working relationship with the Committee and the Committee's constituents, many of whom were crucial to the Debtors' efforts to effectuate a possible going concern transaction.

First, the Applicant participated in teleconferences with the Debtors and its advisors and the Committee and its advisors to discuss vendor proposals with various credit term scenarios under which the Company could potentially reorganize under a vendor financed plan.  The Applicant, together with the Debtors and its advisors, worked with the Committee to appropriately inform the Debtors' key vendors of the Debtors' financial condition and explore creative vendor financing solutions to assist prospective going concern acquirers.  The Applicant attended several meetings that included both the Debtors and its advisors and the Committee and its advisors to update the Committee on critical case issues including DIP financing, short term liquidity projections, long term business plan projections and sale transaction opportunities.

Second, the Applicant prepared several detailed presentations and financial analyses outlining the liquidity profile of the business, the projected profitability of a down-sized business model, and enumerated key challenges and milestones the Debtors' needed to achieve a going concern transaction for the Committee and its advisors.  The Applicant, in conjunction with the Debtors' management and Debtors' counsel, worked diligently to ensure the Committee and its advisors were well informed of the Debtors' critical and time-sensitive need for trade credit from the merchandise vendor community, one of the Committee's largest groups of constituents.  The Applicant prepared liquidity sensitivity models at the request of the Committee's advisors and participated in numerous meetings and teleconferences to ensure the Committee was well apprised of the Debtors' capital needs in the early weeks of the bankruptcy filing.  The Applicant worked tirelessly with the Committee, beginning shortly after the bankruptcy filing in mid November, to explore a going concern transaction alternative through the final hours of the auction on January 15, 2009.

Third, the Applicant participated in several meetings and teleconferences with the Committee's Advisors to discuss case matters, fulfill data requests and respond to various due diligence questions.  The Applicant was responsible for receiving and responding to all due diligence requests received from the Committee's advisors.  These requests included, but were not limited to, the following topics: (i) historical financial results; (ii) short-term cash flows and DIP budgets; (iii) monthly financial projections, assets and liabilities of the Debtors; (iv) closing store

performance metrics; (v) information related to potential claims, inventory data, liquidity issues, overhead costs; (vi) and, overhead cost reduction initiatives and estimated recovery rates to the unsecured creditors.

The Applicant's participation in these meetings and teleconferences was at the request of the Debtors and helped to ensure that the Committee and its advisors were fully informed on all key issues as quickly as possible.

During the First Interim Application Period, the Applicant's professionals spent 200.5 hours on matters related to committee matters which compensation is sought with the time value of $114,933.75.  The detailed time entries for this task are attached hereto as Exhibit D.

### *DIP Financing and Reporting*

During the First Interim Application Period, the Applicant performed a variety of analyses in order to assist the Debtors with various matters related to DIP financing and budget variance reporting.

First, the Applicant assisted the Debtors with financial projections demonstrating current and future projected DIP financing needs.  The Applicant created a detailed weekly cash flow model at the request of the Debtors' management.  As part of its duties, the Applicant communicated frequently with representatives of the DIP lenders as well as the Debtors' senior management and the Committee's financial advisors to discuss the assumptions that were used to create the Debtors' weekly cash flow forecasts.  The Applicant was present at first day hearings and was prepared to testify concerning the adequacy of the DIP financing.  The Applicant also analyzed the liquidity provided by the DIP financing for a potential contested DIP hearing and was prepared to testify.

Second, the Applicant routinely communicated with Debtors' management and Debtors' counsel to address questions raised by the DIP lenders and its counsel.  The Applicant assisted the Debtors in finalizing the debtor-in-possession financing including the development of covenants

that were achievable based on the Debtors' financial projections.  The Applicant worked closely to ensure that the DIP documents and budgets presented to the court were accurate and consistent.  The Applicant reviewed the interim and final DIP orders to ensure proper execution and accuracy.  In addition, the Applicant responded to questions from various participants in the DIP lending facility regarding projections, assumptions and historical results.

Third, the Applicant tracked actual results against the DIP forecast and measured other performance metrics on a weekly basis to ensure compliance with covenants in the DIP loan agreement.  The Applicant created a comprehensive financial reporting package for the DIP lenders' containing several reports detailing the Debtors' financial performance.  These reports were designed by the Applicant in order to summarize the Debtors' financial information in a manner which the Debtors' senior secured lending agent, Bank of America, could easily interpret and disseminate to other constituents in the lending syndicate.  In addition to distributing the weekly cash call to the lending group, the Applicant was responsible for coordinating the aggregation of data required to populate the financial reporting package that were sourced from various areas of the Debtors' functional areas.  Finally, the Applicant went through an exhaustive review process every week with the Debtors' treasury team to confirm the accuracy of the numbers and subsequently reviewed the reports with Debtors' management.

Fourth, the Applicant participated in weekly conference calls with the Debtors' secured lenders to discuss performance against the budget and other business activity.  The reports developed for the DIP lenders were also provided to the Committee on a weekly basis and provided a framework to ensure that the Debtors complied with all relief provided in first day orders.  The financial reporting package and weekly communication with the Debtors' senior secured collateral agent ensured that the bank lending syndicate remained comfortable with the Debtors' ability to manage liquidity.  The Applicant's efforts were critical in this vein of the case as the reporting package and weekly communication were instrumental in compelling the senior secured lending syndicate to provide the Debtors' with a two month liquidity runway to attempt to execute a sale transaction.

During the First Interim Application Period, the Applicant's professionals spent 407.4 hours on matters related to DIP financing and reporting which compensation is sought with the time value of $192,322.00. The detailed time entries for this task are attached hereto as Exhibit D.

### *Financial Projections*

During the First Interim Application Period, the Applicant performed a variety of analyses to support the Debtors' reorganization efforts including the construction of an integrated monthly financial model containing detailed assumptions for forecast profit and loss, balance sheet, working capital, and liquidity outlook through 2011.

First, at the direction of the Debtors' management, the Applicant created an integrated financial model built from the bottom up at the store-level, with functionality to modify key assumptions. This model ultimately proved to be an invaluable tool to the potential going concern reorganization efforts as prospective acquirers did not have ample time to construct detailed projections of their own and therefore relied upon the models developed by the Applicant to run scenarios. The financial model developed by the Applicant allowed the Debtors' management, investment bankers, and prospective buyers to expeditiously modify assumptions and test restructuring scenarios. The model was used extensively to create alternative store footprint scenarios for the Salinas Group and Golden Gate Capital, the Debtors' most active prospective going concern acquirers. The Applicant spent a significant amount of time, from the early days of the case in mid November through the final hours of the auction on January 15, 2009, creating alternative restructuring scenarios for the Debtors' management, investment bankers and prospective going concern acquirers.

Second, the Applicant created a highly detailed corporate overhead cost savings model constructed at the cost center and department level detail to assist the Debtors' in identifying and rationalizing central overhead expenses. The corporate overhead model was instrumental in identifying the departments and cost centers within the Company that had experienced expense increases on a year-over-year basis as well as the areas within the Company that were burning significant amounts of cash. In addition, the Applicant assisted the Debtors' with their analysis

of corporate overhead headcount and worked with the Debtors' to maximize the efficiency of the Debtors' resources.

Third, the Applicant spent considerable time with the Debtors' financial planning and analysis team and management testing and validating the model's assumptions and ensuring that the Debtors' forecast was both reasonable and adequately documented.  The Applicant provided the Debtors' management with a menu of financial restructuring options and explained the pros and cons of each.  In addition, the Applicant worked with management to ensure that key assumptions were thoroughly challenged to ensure that prospective buyers could rely upon the Debtors' forecast.

Fourth, the Applicant also assisted the Debtors with various other analyses that were critical to management of liquidity and case strategy development.  The Applicant developed a framework for analyzing potential creditor recoveries.  This analysis necessitated the evaluation and potential value of all tangible and intangible assets.  In addition, the Applicant worked closely with the Debtors to analyze and assess administrative, priority and unsecured claims including wind down costs, 503(b)(9) claims, reclamation claims and preference actions.  The Applicant also worked closely with the Debtors to ensure that post-petition landlord payments were accurate including elimination of payments for rejected leases and monitoring of postpetition stub rent requests to confirm Court approval.

During the First Interim Application Period, the Applicant's professionals spent 331.9 hours on matters related to financial projections which compensation is sought with the time value of $149,460.00.  The detailed time entries for this task are attached hereto as Exhibit D.

### *General Duties and Case Administration*

In any complex bankruptcy case, it is necessary for professionals to perform certain administrative tasks that support the overall advisory effort. During the First Interim Application Period, these tasks included but were not limited to: (i) development and revision of work plans and subsequent meetings to assign tasks to complete the work plan; (ii) teleconferences and

meetings with Debtors' management, legal and financial advisors to discuss case status, open items, creation of work plans, distribution of responsibilities, and strategies to be implemented to ensure efficiencies in executing defined objectives; (iii) performance of administrative tasks such as distribution of information to management, and Debtors' counsel and other parties-in-interest; and, (iv) preparation of retention documents and monthly fee statements in accordance with the Administrative Order in this case, as well as with the requirement established by the United States Bankruptcy Code, the Bankruptcy Court, the U.S. Trustee and the Local Rules.

During the First Interim Application Period, the Applicant's professionals spent 146.8 hours on matters related to general duties and case administration which compensation is sought with the time value of $87,996.50.  The detailed time entries for this task are attached hereto as Exhibit D.

### *Liquidation Analysis/Wind Down*

During the First Interim Application Period, the Applicant developed a detailed liquidation analysis, employee wind down budget and detailed wind down cash flow extending through 2010 at the direction of the Debtors' management.

First, the Applicant developed a detailed waterfall liquidation analysis to provide the Debtors' board of directors, Debtors' management, lenders and Committee with estimated recoveries to the various classes of creditors.  The Applicant worked with the Debtors' management and Debtors' counsel to identify all possible receivables, payables, revenues and expenses to assess whether the senior secured lenders could be paid out in full before the end of the final store closing sale.  The Applicant prepared a line-by-line waterfall analysis comprised of over one hundred inflow and outflow categories.  Each line item of the waterfall analysis was researched in extensive detail with Debtors' personnel to ensure the accuracy of the estimates.  Examples of the inflow categories included, but were not limited to, the following estimates: (i) net recovery on store closing inventory; (ii) corporate aircraft; (iii) furniture and fixtures; (iv) owned real estate, (v) leases; (vi) income tax receivables; (vii) intellectual property; (viii) credit card holdback; (ix) salvage inventory; (x) vendor receivables, among others.  Examples of the outflow categories included, but were not limited to, the following estimates: (i) store closing expenses;

(ii) distribution wind down expenses; (iii) corporate office wind down expenses; (iv) accruals, (v) employee vacation; (vi) gift cards; (vii) November stub rent; (viii) customer deposits; (ix) merchandise accounts payable; (x) expense accounts payable, among others.

Second, the Applicant obtained an employee census as of December 22, 2008 comprising 1,428 remaining employees from the Debtors' management and used the information to create a wind down budget by employee for the remainder of the liquidation period.  The Applicant attended several meetings with the Debtors' management to ensure that the appropriate staff were retained to wind down the Company.  The Applicant interviewed department heads and worked in conjunction with the Debtors' management to indentify the personnel that would be required to wind down the estate.  The Applicant also assisted management with a phasing plan that was used to determine the length of service required for each of the 1,428 remaining employees.

Third, the Applicant rolled the waterfall liquidation analysis into both a weekly and monthly wind down cash flow extending through 2010.  The Applicant spent considerable time estimating the timing of both inflows and outflows in the liquidation analysis, including timing of store closing proceeds, to determine whether the Debtors would have sufficient liquidity to pay down the secured lenders following the outcome of the auction on January 15, 2009.  The Applicant also provided the Committee with routine updates and participated in numerous teleconferences and meetings to discuss the assumptions in the wind down budget.  The wind down cash flow was essential to the Debtors and the Committee as it demonstrated that the Debtors had sufficient liquidity to perform an orderly wind down of the estate's assets during the course of the final store closing sale, including meeting payroll obligations to post petition wind down employees, while operating within the parameters of a Chapter 11 bankruptcy.  The wind down cash flow and liquidation analysis, prepared by the Applicant with assistance from the Debtors' management and Debtors' counsel, were instrumental in convincing the senior secured lending syndicate to cooperate with the Debtors during the wind down period.  The senior secured lending syndicate's cooperation during the full chain store closing sale allowed the Debtors' to execute a successful sale of over one billion dollars in inventory by maintaining an open secured

revolving credit line for key expense items such as payroll, occupancy, advertising, and general operating expenses.

During the First Interim Application Period, the Applicant's professionals spent 404.9 hours on matters related to the liquidation analysis/wind down for which compensation is sought with the time value of $233,403.50.  The detailed time entries for this task are attached hereto as Exhibit D.

### Management Incentive Plan

During the First Interim Application Period, the Applicant assisted the Debtors' with the framework of a management incentive plan to compensate and retain key employees who were critical to the wind down effort.  The plan was designed to reward and motivate key employees within the wind down team to efficiently wind down the Debtors' estate through a well planned process with the objective of maximizing the estate's financial return.

First, the Applicant assisted the Debtors' with the creation of approximately twenty key tasks and metrics that were critical to maximizing liquidation proceeds.  The Applicant assisted the Debtors' with selecting approximately one hundred and fifty employees who were deemed critical to the wind down.  In order to establish metrics and tasks required for a management incentive plan bonus payout, the Applicant participated in numerous meetings and teleconferences with the Debtors' management and Debtors' counsel to set appropriate performance hurdles and benchmarks for the plan participants.  The Applicant also participated in several teleconferences with the Committee's advisors and counsel to ensure the plan was mutually agreeable.

Second, the Applicant created a comprehensive data file including, but not limited to, the following information: (i) tasks of the incentive plan; (ii) a listing of approximately one hundred and fifty employees eligible for the plan; (iii) tiered payout structures for each of the approximately twenty tasks; (iv) timing of payout for each employee included within the plan; and, (v) a summary of recent case history and relevant management incentive plan metrics.  The

Applicant researched recent bankruptcy case history, many of which were cases in which the Applicant had assisted former debtors with management incentive plan programs, and created a comprehensive presentation to support the validity of the program for the Debtors' board of directors and the Committee.  In addition, the Applicant was prepared to testify as to the reasonableness of the management incentive plan for the Debtors' and had testified on cases for numerous former debtors.

During the First Interim Application Period, the Applicant's professionals spent 81.7 hours on matters related to the management incentive plan for which compensation is sought with the time value of $62,067.50.  The detailed time entries for this task are attached hereto as Exhibit D.

### Plan of Reorganization Alternatives

During the First Interim Application Period, the Applicant assisted the Debtors' management and investment bankers with specific due diligence requests from investors interested in purchasing the business as a going concern.

First, the Applicant routinely worked in concert with the Debtors' investment bankers to prepare presentation materials for prospective acquirers and revise materials for dissemination.  The Applicant prepared ad hoc models to assess the feasibility of a vendor backed plan and other sale scenarios.   The Applicant also prepared a bid comparison worksheet to assist the Debtors' investment bankers evaluate going concern and liquidation bids at auction.

Second, the Applicant participated in numerous teleconferences with prospective going concern acquirers and was instrumental in the preparation and dissemination of weekly and monthly projections that were crucial to prospective acquirers' due diligence efforts.  At the request of Debtors' senior management, the Applicant spent a significant amount of time preparing monthly financial projections with integrated profit and loss, balance sheet, working capital, and liquidity statements.  The Debtors' investment bankers utilized the Applicant's monthly and weekly financial models to assist prospective going concern acquirers with diligence and therefore routinely requested and required the support of the Applicant to explain assumptions

and the mechanics of the models.  At the direction of the Debtors, the Applicant also routinely performed scenario analysis for prospective acquirers and participated in conference calls to discuss business plan assumptions.

Third, the Applicant solicited bids from various lease disposition firms and negotiated the economic terms of a lease disposition and rent reduction engagement.  The Applicant successfully negotiated favorable terms that maximized the Debtors' liquidity profile with the winning bidder, DJM Realty, LLC ("DJM").  In summary, the contract stipulated that DJM would only receive payment to the extent a minimum rent reduction savings hurdle of $30 million dollars was achieved.

Fourth, the Applicant reviewed letters of intent and stalking horse bids, together with the Debtors' management, counsel and investment bankers, and provided valuable insight as to the plausibility of a successful transaction with a going concern acquirer.  The Applicant was required to participate in numerous teleconferences and meetings with the Debtors' management, board of directors, investment bankers, counsel, as well as the Committee's advisors to provide advice and discuss financial projections.

Fifth, at the direction of Debtors' management, the Applicant spent a significant amount of time with the Salinas Group from early December 2008 through January 15, 2009.  The Applicant assisted the prospective going concern acquirer with numerous analyses including, but not limited to, the following: (i) monthly financial modeling; (ii) weekly cash flow modeling; (iii) store footprint scenarios; (iv) asset based lending requirements; (v) financing requirements; (vi) vendor trade credit sensitivity analysis; and, (vii) business plan sensitivity analysis.  In addition, the Applicant met together with the Salinas Group and with the Debtors' senior lending agent, Bank of America, to discuss the feasibility of an asset based revolving credit facility required for a going concern transaction.  The Applicant met with the Salinas Group's financial advisors on several occasions to discuss financial projections and coordinated numerous diligence responses.

During the First Interim Application Period, the Applicant's professionals spent 399.2 hours on matters related to the plan of reorganization alternatives for which compensation is sought with the time value of $231,815.75.  The detailed time entries for this task are attached hereto as Exhibit D.

### *Short Term Cash Management*

During the First Interim Application Period, the Applicant performed a variety of analyses in order to assist the Debtors with cash management and provided guidance on maximizing short term liquidity.

First, at the request of Debtors' counsel and management, the Applicant revisited its weekly cash collateral analysis which it had prepared pre-filing to assess the Debtors' ability to operate without a secured DIP revolving credit facility.  The Applicant revisited the cash collateral analysis as a result of the Committee's advisors' questions regarding the necessity of the DIP financing.  The Applicant, together with the Debtors' management and the Debtors' counsel, confirmed that a DIP loan was necessary to finance the seasonal working capital needs of the business and resolved the issue with the Committee.  In addition, the Applicant reviewed the use of cash collateral in historical retail bankruptcy cases to assess the likelihood of a successful outcome of a going concern transaction without a DIP loan.

Second, at the request of Debtors' management, the Applicant created several reporting and forecasting tools to monitor and manage short term cash flow.  The Applicant created a daily cash flow report which highlighted important financial performance metrics compared to forecast and helped the Debtors improve the process for tracking daily receipts and disbursements.  The accuracy of the daily projection model allowed the Debtors' management to discuss payment schedules with vendors on a fluid day-by-day basis and maximize inventory receipt flow, which was crucial to the Debtors' ability to successfully effectuate a financial turnaround.

Third, the Applicant coordinated daily cash review meetings with Debtors' management to ensure the Debtors' liquidity was maximized and managed as effectively as possible. The Applicant interacted daily with management to assist with disbursement decisions based on the amount of liquidity available to the Debtors under the revolving credit facility. The Applicant routinely performed sensitivity analysis for scenarios posed by management during the daily meetings to assess the near term impact to the Debtors' liquidity profile. The Applicant's input and participation in daily cash flow meetings was critical to ensuring that the Debtors did not run afoul of any of the DIP covenants which would have reduced the amount of runway the Debtors' were allotted to complete a sale transaction.

Fourth, the Applicant performed several ad hoc analyses and tasks related to short term cash management, including, but not limited to, the following activities: (i) reviewing wire payments; (ii) reconciling cash receipts with the ledger; (iii) reconciling inventory receipts; (iv) calculating outstanding check float; (v) analyzing prepaid inventory balances by vendor; (vi) analyzing advertising vendor prepayments; (vii) estimating variances in receipt flow based on varying levels of sales, among other activities.

The Applicant's work in this area was critical to the Debtors' ability to manage its inventory, disbursements and cash flow to stay in compliance with its DIP financing covenants while preserving all reorganization options.

During the First Interim Application Period, the Applicant's professionals spent 216.1 hours on matters related to short term cash management which compensation is sought with the time value of $107,690.00. The detailed time entries for this task are attached hereto as Exhibit D.

### *Statements and Schedules*

During the First Interim Application Period, the Applicant also worked closely with the Debtors and Debtors' counsel on the preparation of the Statement of Financial Affairs (SoFA) and Schedules of Assets and Liabilities (SoAL).

The Applicant led the coordination of the preparation of the Debtors' SoFA(s) and SoAL(s) which required significant effort due to the magnitude of the data involved and the timeframe to complete as a result of the timing of the bar date notice mailing.  The combined SoFA and SoAL submission totaled approximately 15,000 pages with a combined liability and executory contract creditor count of over 115,000 parties.  In addition, the Applicant assisted the Debtors in the identification of additional potential creditor data sources to be gathered, analyzed and consolidated into the Applicant's Claims Management System ("CMS") for notice of the bar date.  In total, over 350,000 parties from over 200 creditor sources were assembled and utilized in the preparation of the SoFA and SoAL and bar date notice.

The Applicant's assistance in the SoFA and SoAL process included the creation of a detailed work plan to manage and coordinate the collection of information for all eighteen (18) Debtors and provide status updates to all parties involved.  During the course of the SoFA and SoAL process in the First Interim Application Period, the Applicant:  (i) directed organizational and training meetings with Debtors' management to highlight the process and timeline for filing the documents; (ii) developed a process to gather and reconcile information to the Debtors' trial balances and financial records to ensure completeness of information gathered; (iii) developed a protocol for reporting asset, liability and other information on a debtor by debtor basis in the SoFA and SoAL documents; (iv) gathered data from various functions within the Debtors, including accounting, finance, human resources, legal, procurement, tax, treasury;  (v) analyzed voluminous data submissions to verify accuracy and consistent format for consolidation into CMS; and, (vi) conducted numerous meetings and corresponded with Debtors' counsel and the Debtors' noticing agent to raise and resolve issues related to the data for inclusion in the SoFA(s) and SoAL(s).

The Applicant has significant experience in assisting complex debtors in this area.  Such projects require a significant amount of coordination, investigation, issues resolution, and training to identify the hundreds of data sources required to be collected and assemble such a large and complex notice and filing.  The Applicant's experience in these types of large, complex cases helped ensure an accurate, complete and timely noticing to creditor and equity holders.

During the First Interim Application Period, the Applicant's professionals spent 1,472.0 hours on matters related to bankruptcy reporting and related activities which compensation is sought with the time value of $584,060.00. The detailed time entries for this task are attached hereto as Exhibit D.

### Store Closing Activities

During the First Quarterly Application Period, the Applicant coordinated numerous key work streams related to store closings.

First, beginning on November 10, 2008 and extending through late December, the Applicant was involved in managing numerous work streams related to the first 154 store closings including, but not limited to, the following activities: (i) reconciling weekly expenses and cash receipts; (ii) participating in weekly operational meetings with Debtors' management to discuss store closing issues; (iii) negotiating a commission structure for consignment inventory; furniture and fixtures; (iv) discussing credit card carrier issues; (v) establishing a product return policy; (vii) discuss acceptable advertising programs; (viii) updating daily and weekly flash reporting for key constituencies; (ix) resolving disputes between the liquidation group and the Debtors' personnel; (x) coordinating site visits and physical inventories, among others. The Applicant assisted the Debtors in addressing loss prevention issues related to the first 154 store closing sale including the allocation of resources to minimize shrink without substantially increasing payroll costs. The Applicant also assisted the Debtors in coordinating the disposition of furniture, fixtures and equipment. The Applicant facilitated negotiations with third party fixture disposition firms and created a bid comparison scheduled to assist Debtors' management with the selection of a winning bidder. The Applicant's aforementioned efforts to facilitate the initial 154 store closings resulted in a successful sale that exceeded forecast expectations and allowed the Debtors' the runway to market the business for a potential sale transaction through January 15, 2009.

Second, the Applicant provided weekly updates throughout the First Interim Application Period to the secured DIP lenders that involved combining information from the Debtors' records and the liquidators to determine sales, gross margin, expenses and remaining inventory levels. Further diligence was done each week to ensure that the liquidators were in compliance with all provisions of the Agency Agreement.

Third, beginning on or about December 19, 2008, the Applicant provided guidance on the content and compilation of bid packages relating to inventory and fixtures for the potential liquidation of the entire chain. A significant portion of the Applicant's time was spent preparing for a potential going out of business sales ("GOB") scenario. Specifically, the Applicant organized and coordinated the dissemination of a due diligence package for the liquidators including, but not limited to, the following: (i) detailed inventory data; (ii) store-level profitability statements; (iii) operating expense data; (iv) payroll data; (v) store lease data; and, (vi) historical sales and margin data. In addition, the Applicant prepared a standard Agency Agreement for potential bidders in order to easily assess the basis of bids received. The Applicant worked with the Debtors' accounting staff to ensure the Company was adequately prepared to provide accurate data to the liquidators when the Debtors' deemed it appropriate to distribute liquidation bid packages. Additionally, the Applicant participated in discussions regarding the auction process, liquidation alternatives and the content of a full chain liquidation agency agreement. The Applicant held numerous discussions and teleconferences to review draft agency agreement language as well as to discuss other factors related to the orderly liquidation of the Debtors' inventory.

Fourth, the Applicant attended the Debtors' auction in New York City on January 14th and January 15th of 2009. At the auction, the Applicant worked closely with the Debtors' management and counsel, in conjunction with the Committee's financial advisors and counsel, to evaluate full chain store closing bids and negotiate the terms of an agency agreement for the final store closing sale.

Fifth, beginning on January 16, 2009, store liquidation sales commenced at the remaining 567 store locations.  The Applicant was involved in managing numerous work streams similar to the first round of store closings including, but not limited to, the following activities: (i) reconciling weekly expenses and cash receipts, (ii) participating in weekly operational meetings with Debtors' management to discuss store closing issues, (iii) negotiating a commission structure for consignment inventory, furniture and fixtures, (iv) discussing credit card carrier issues, (v) establishing a product return policy, (vi) discuss acceptable advertising programs, (v) updating daily and weekly flash reporting for key constituencies, (vi) resolving disputes between the liquidation group and the Debtors' personnel, (vii) coordinating site visits and physical inventories, among others.  The Applicant assisted the Debtors in addressing loss prevention issues related to the second store closing sale and coordinated negotiations and hiring of a third party loss mitigation firm.  The Applicant facilitated negotiations with third party fixture disposition firms and created a bid comparison scheduled to assist Debtors' management with the selection of a winning bidder.  The Applicant's aforementioned efforts to facilitate the final round of store closings resulted in a successful sale of over one billion dollars of inventory that exceeded forecast expectations and resulted in the cash collateralization of the secured creditors' debt balance prior to the end of the store closing sale.

During the First Interim Application Period, the Applicant's professionals spent 669.2 hours on matters related to store closing activities for which compensation is sought with the time value of $298,863.50.  The detailed time entries for this task are attached hereto as Exhibit D.

*Travel*

During the First Interim Application Period, the Applicant traveled from their home offices to various locations as required by the demands of the case.  Travel time is charged at one half of the actual time incurred for traveling to and from the client site for travel in which services were performed in transit in order to meet the deadlines and requirements of the case.

During the First Interim Application Period, the Applicant's professionals spent 383.5 hours on matters related to travel which compensation is sought with the time value of $183,057.50. The detailed time entries for this task are attached hereto as Exhibit D.

17.     FTI Consulting respectfully submits that the amounts applied for herein for professional services rendered on behalf of the Debtors in this proceeding to date are fair and reasonable given: (i) the time expended; (ii) the nature and extent of the services performed at the time at which such services were rendered; (iii) the value of such services; and (iv) the costs of comparable services other than in a Chapter 11 case.

18.     The time and labor expended by FTI Consulting has been commensurate with the size and complexity of the case. In rendering these services, FTI Consulting made every effort to maximize the benefit to the Estate, to work efficiently with the other professionals employed in the case, and to leverage staff appropriately in order to minimize duplication of effort. The complex issues of the case required staff professionals to confer and collaborate at certain times to ensure the efficient allocation of resources and to plan strategies effectively. While essential to the effective administration of the engagement, to the extent possible these conferences were kept to a minimum. Compensation is sought for participation by more than one professional only in instances where joint participation was necessary because of the significant impact of a particular meeting, the complexity of the problem involved, and the specialization required or the need to preserve continuity of representation. At times, it may have been necessary for more than one professional to attend a meeting to facilitate communication of information rather than to relay the information from individual to individual.

19.     During the First Interim Application Period, FTI Consulting provided a focused range of professional services as requested by the Debtors. The Applicant respectfully submits that these services: (i) were necessary and beneficial to the successful and prompt administration of this case; and (ii) have been provided in a cost efficient manner.

20.     The Applicant has exercised reasonable billing judgment and has either reduced its fees or not sought reimbursement in relation to a number of tasks performed and expenses incurred for the benefit of the Debtors. The Applicant has carefully reviewed all of its time

records and has elected to make certain voluntary reductions to the fees it is requesting which results primarily from the application of FTI Consulting's firm-wide policy which requires professional personnel to exercise reasonable billing judgment on a daily basis. Chargeable hours are recorded on a daily basis, at which time professional staff members make informed judgments as to the quality and productivity of time spent on the engagement. The exercise of reasonable billing judgment, at the professional staff level, effectively considers the quality of time charged to the Debtors. In this regard, non-productive time has not been billed to the Debtors' Estate.

21.    The services that have been provided by FTI Consulting during these proceedings have been wholly consistent with the Debtors' intentions and have been undertaken with specific direction and guidance from the Debtors' senior management. These cases have necessitated the use of experienced advisors with specialized expertise in bankruptcy issues and financial analysis to timely and thoroughly address the needs of the Debtors in performing their duties as Debtors-in-Possession. The persons who have worked on this case have demonstrated the skill in their respective areas of expertise required to provide the services necessary to assist the Debtors.

22.    Other than as provided in Section 504(b) of the Bankruptcy Code, FTI Consulting has not shared, or agreed to share, any compensation received as a result of this case with any person, firm or entity. No promises concerning compensation have been made to FTI Consulting by any firm, person or entity. The sole and exclusive source of compensation shall be funds of the Estate.

23.    This Application has been prepared in accordance with the United States Trustee Guidelines for Compensation and Reimbursement of Expenses Filed under U.S.C.§330 and the Guidelines for Compensation and Expense Reimbursement of Professionals set forth by the United States Bankruptcy Court, Eastern District of Virginia, Richmond Division. The Applicant has exercised reasonable billing judgment and has either reduced its fees or not sought reimbursement in relation to a number of tasks performed and expenses incurred for the benefit of the Debtors.

24.    The Applicant reserves the right to supplement this Application prior to a hearing. Further, FTI Consulting specifically reserves the right to file subsequent applications for, and to seek final approval of, the fees and expenses requested herein.

25.    I have read this application and to the best of my knowledge, information and belief formed after reasonable inquiry, certify that the fees and disbursements sought are billed at rates in accordance with practices customarily employed by FTI Consulting and generally accepted by our clients.

26.    In accordance with the Administrative Order, Pursuant to Sections 105(a) and 331 of the Bankruptcy Code, Establishing Procedures for Interim Compensation (the "Administrative Order"), FTI Consulting has submitted to the Court its First Interim Application requesting compensation for the period November 10, 2008 through January 31, 2009.

27.    Taking into consideration the skill and experience of FTI Consulting, the benefits to the Debtors, the nature of the assignment, and the time expended, FTI Consulting believes that fair and reasonable compensation for the services rendered and expenses incurred during the Application period is $2,614,440.39.

THEREFORE, FTI Consulting respectfully requests that the Court enter an Order allowing interim compensation for the period from November 10, 2008 through January 31, 2009 in the sum of one hundred percent (100%) of the amount incurred by the Applicant of $2,475,866.00 in fees and reimbursement of one hundred percent (100%) of actual expenses in the amount of $138,574.39 and directing prompt payment to FTI Consulting of the holdback amount of $371,379.91 and granting such other and further relief as may be just.

Respectfully submitted,


FTI Consulting, Inc.


  /s/ Robert J. Duffy                                              March 17, 2009

Robert J. Duffy
FTI Consulting, Inc.
200 State Street
2nd Floor
Boston, MA 02109
(617) 897-1501

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
Gregg M. Galardi, Esq.
Ian S. Fredericks, Esq.
P.O. Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
Chris L. Dickerson, Esq.
333 West Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

- and -

MCGUIREWOODS LLP


/s/ Douglas M. Foley        .
Dion W. Hayes (VSB No. 34304)
Douglas M. Foley (VSB No. 34364)
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

Counsel for Debtors
and Debtors in Possession