Premises and further agrees to execute any reasonable instruments evidencing such waiver, at any time or times hereafter upon Tenant's request.

25.    <u>Memorandum of Lease; Commencement Date Agreement</u>.  Landlord agrees, at Tenant's request and Tenant's sole expense, to execute a Memorandum of Lease in recordable form, substantially similar to that attached hereto as <u>Exhibit "H"</u>, setting forth such provisions hereof as may be required by Texas law.  In addition, Landlord and Tenant shall execute a Commencement Date Agreement in the form attached hereto as <u>Exhibit "I"</u>, once the Rent Commencement Date has been established.  Recording costs for either or both documents shall be borne by the party requesting recordation of the same.  Tenant agrees to execute a release of such Memorandum of Lease on the expiration or earlier termination of this Lease.

26.    <u>Holding Over</u>.  Tenant agrees that at the expiration of this Lease, it will deliver to Landlord peaceable possession of the Premises.  No holding over by Tenant nor acceptance of Base Rent or other charges by Landlord shall operate as a renewal or extension of this Lease without the written consent of Landlord and Tenant.  Should Tenant hold over without the consent of Landlord, this Lease shall continue in force from month to month, subject to all of the provisions hereof and at one hundred fifty percent (150%) of the monthly Base Rent Tenant had been paying during the preceding Lease Year.

27.    <u>"For Rent" Signs</u>.  Tenant hereby permits Landlord during the last one hundred eighty (180) days of the Main Term or of any Option Period, as the case may be (provided that no applicable Renewal Option has been exercised or deemed exercised), to place one (1) "For Rent" or "For Sale" sign, not exceeding six (6) feet by eight (8) feet in size, on the parking lot of the Shopping Center.  Tenant will also allow Landlord or its agents, accompanied by a representative of Tenant designated by Tenant, to show the Premises, exterior and interior, to prospective tenants, purchasers, or mortgagees during reasonable business hours by prior appointment, provided same does not interfere with the conduct of Tenant's business.

28.    <u>Force Majeure</u>.  Except as otherwise specifically contemplated in paragraph 4 of <u>Exhibit "C"</u>, in the event that Landlord or Tenant shall be delayed or hindered in, or prevented from, the performance of any act required hereunder (other than the payment of

47

money) by reason of strikes, lockouts, labor troubles, inability to procure materials, delay by the other party, failure of power, riots, insurrection, war or other reason of a like nature not the fault of such party or not within its control, then performance of such act shall be excused for the period of delay; and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay; provided, however, that in connection with the construction of the Improvements, the consequences of delays by the other party shall be governed by paragraph 4 of Exhibit "C".

29.    Events of Tenant's Default.  Any of the following occurrences, conditions or acts by Tenant shall constitute an "Event of Default" under this Lease:

(a)    Failure to Pay Rent; Breach.  (i) Tenant's failure to make any payment of money required by this Lease (including without limitation Base Rent, CAM Charges or Real Estate Taxes) within ten (10) days after the receipt of written notice from Landlord to Tenant that same is overdue; or (ii) Tenant's failure to observe or perform any other provision of this Lease within thirty (30) days after receipt of written notice from Landlord to Tenant specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) days, Tenant shall have such longer period as is reasonably necessary to cure the default, so long as Tenant proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion, and provided further that in the case of an emergency, Landlord shall be required to give only such notice as is reasonable under the circumstances.

(b)    Bankruptcy.  (i) Tenant's adjudication as bankrupt or insolvent, or the appointment of a receiver, trustee in involuntary bankruptcy or other, similar officer to take charge of any substantial part of Tenant's property, which proceeding is not dismissed within one hundred twenty (120) days after it is begun; or (ii) Tenant's voluntarily filing a petition in bankruptcy or for reorganization under any existing or future provisions of the Bankruptcy Code, providing a plan for a debtor to settle, satisfy or extend the time for the payment of debts; or (iii) Tenant's voluntary assignment for the benefit of its creditors; if, as a result of any of the foregoing occurrences, the covenants to be performed by Tenant under this Lease

u(4313):\circuit\plano\lease.006

(including the covenant to pay rent) are not being performed by Tenant or a party claiming through Tenant.

30.    <u>Landlord's Remedies</u>.  After the occurrence of an Event of Default, Landlord shall have the right to exercise the following remedies:

(a)    <u>Continue Lease</u>.  Landlord may, at its option, continue this Lease in full force and effect, without terminating Tenant's right to possession of the Premises, in which event Landlord shall have the right to collect Base Rent and other charges when due, including any Base Rent or other charges due for any Option Period for which a Renewal Option has been exercised.  In the alternative, Landlord shall have the right to peaceably re-enter and repossess the Premises on the terms set forth in subparagraph (b) below, without such re-entry being deemed a termination of this Lease or an acceptance by Landlord of a surrender thereof.  Landlord shall also have the right, at its option, from time to time, without terminating this Lease, to relet the Premises, or any part thereof, with or without legal process, as the agent, and for the account, of Tenant upon such terms and conditions as Landlord may deem advisable, in which event the rents received on such reletting shall be applied (i) first to the reasonable and actual expenses of such reletting and collection, including without limitation necessary renovation and alterations of the Premises, reasonable and actual attorneys' fees, any reasonable and actual real estate commissions paid, and (ii) thereafter toward payment of all sums due or to become due Landlord hereunder.  If a sufficient sum to pay such expenses and sums shall not be realized or secured, in Landlord's exercise of reasonable efforts to mitigate its damages (which Landlord hereby agrees to make), then Tenant shall pay Landlord any such deficiency monthly, and Landlord may bring an action therefor as such monthly deficiency shall arise.  Nothing herein, however, shall be construed to require Landlord to re-enter and relet in any event, except as provided by Texas law.  Landlord shall not, in any event, be required to pay Tenant any sums received by Landlord on a reletting of the Premises in excess of the rent provided in this Lease, but such excess shall reduce any accrued present or future obligations of Tenant hereunder. Landlord's re-entry and reletting of the Premises without termination of this Lease shall not preclude Landlord from subsequently terminating this Lease as set forth below.

u(4313):\circuit\plano\lease.006

(b)     Terminate Lease.  In the event of an Event of Default by Tenant, Landlord may terminate this Lease by written notice to Tenant specifying a date therefor, which shall be no sooner than thirty (30) days following receipt of such notice by Tenant, and this Lease shall then terminate on the date so specified as if such date had been originally fixed as the expiration date of the Term.  Subject to Tenant's offset rights and remedies provided by this Lease, any failure to pay Base Rent or other sums of money hereunder shall be deemed to be an Event of Default as used herein and the time period for curing same shall not exceed the ten (10) day cure period set forth in Section 29(a) of this Lease.  In the event of such termination, Landlord shall be entitled to recover from Tenant all of the following:

(i)  The "worth at the time of the award" (defined below) of any obligation which has accrued prior to the date of termination; and

(ii)  The worth at the time of the award of the amount by which the unpaid Base Rent and all other charges which would have accrued after termination until the time of award exceeds the amount of any sums which Landlord has (or Tenant proves that Landlord could have) received in mitigation.

As used in this subparagraph 30(b), the term, "worth at the time of the award", shall be computed by allowing interest at the Default Rate on the amount of the obligations set forth therein.  In the event this Lease shall be terminated as provided above, by summary proceedings or otherwise, Landlord, its agents, servants or representatives, may immediately or at any time thereafter peaceably re-enter and resume possession of the Premises and remove all personal property therefrom, either by summary dispossess proceedings or by other suitable action or proceeding at law without liability for damages therefor.  Landlord shall never be entitled to dispossess Tenant of the Premises pursuant to any "lock-out" or other nonjudicial remedy.

(c)     Reimbursement of Landlord's Costs in Exercising Remedies.  Landlord may recover from Tenant, and Tenant shall pay to Landlord upon demand, such reasonable and actual expenses as Landlord may incur in recovering possession of the Premises, including reasonable attorney's fees, placing the same in good order and condition and repairing the same for reletting, all other reasonable and actual expenses, commissions and

charges incurred by Landlord in exercising any remedy provided herein or as a result of any Event of Default by Tenant hereunder (including without limitation attorneys' fees), and any other amount necessary to compensate Landlord for any detriment proximately caused by Tenant's failure to perform its obligations under this Lease.

(d)     <u>Remedies Are Cumulative</u>.  The various rights and remedies reserved to Landlord herein, including those not specifically described by law in force and effect at the time of the execution hereof, are cumulative, and Landlord may pursue any and all such rights and remedies, whether at the same time or otherwise.

31.     <u>Events of Landlord's Default; Tenant's Remedies</u>.  (a) Any of the following occurrences, conditions or acts by Landlord shall constitute an "Event of Default": (i) Landlord's failure to make any payments of money due Tenant hereunder within ten (10) days after the receipt of written notice from Tenant that same is overdue; or (ii) Landlord's failure to perform any nonmonetary obligation of Landlord hereunder within thirty (30) days after receipt of written notice from Tenant to Landlord specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) days, Landlord shall have such longer period as may be reasonably necessary to cure the default, so long as Landlord proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion, and provided further that in the case of an emergency, Tenant shall be required to give only such notice as is reasonable under the circumstances.

(b)     Notwithstanding the foregoing, from and after payment of the Tenant Improvement Allowance, the liability of Landlord, its partners, principals or joint venturers, under this Lease shall be limited to Landlord's interest in the Shopping Center, including any rents and profits, insurance proceeds and condemnation awards derived therefrom and further including any consideration received by Landlord, its partners, principals or joint venturers, from the sale or other disposition of all or any part of the Shopping Center.  From and after the payment of the Tenant Improvement Allowance, Tenant agrees to look solely to the Shopping Center for satisfaction of any and all claims it may have against Landlord, provided that nothing contained herein shall prevent Tenant from bringing a suit for specific performance or seeking injunctive relief against Landlord in an appropriate case, from

51                                    u(4313):\circuit\plano\lease.006

attaching rents and profits, sale proceeds, insurance or condemnation awards derived from the Shopping Center, nor limit Tenant's right to any other action or remedy (not involving the personal liability of Landlord, its partners, principals or joint venturers) which may be accorded Tenant by law.

Upon the occurrence of an Event of Default, at Tenant's option, in addition to any other remedies which it may have, and without its actions being deemed a cure of Landlord's default, Tenant may do all or any of the following: (i) pay or perform such obligations and offset Tenant's reasonable and actual cost of performance, plus interest at the Default Rate, against the Base Rent, and all CAM Charges and other charges due Landlord hereunder, or (ii) withhold Base Rent, CAM Charges and any other payments due to Landlord under this Lease until such Event of Default is cured by Landlord, (iii) sue for damages, or (iv) in the event such default of Landlord is material, terminate this Lease. Notwithstanding the foregoing, if Landlord fails to pay Tenant the Tenant Improvement Allowance in a timely manner, Tenant shall be entitled to the rights and remedies set forth in Exhibit "C" in addition to those provided herein; and, as to a breach of the warranties and representations contained in paragraph 19, Tenant shall be entitled to the remedies provided therein.

32.    Waiver. If Landlord or Tenant fails to insist on the strict observance by the other of any provisions of this Lease, neither shall thereby be precluded from enforcing nor be held to have waived any of the obligations, past, present and future, of this Lease. Either party may accept late payment or performance by the other without waiving any Event of Default which may then have accrued.

33.    Compliance with Applicable Laws. During the Term, to the extent that the Premises are affected thereby, Tenant shall comply with all lawful requirements of the local, county and state health boards, police and fire departments, municipal and state authorities and any other governmental authorities with jurisdiction over the Improvements, and of the board of fire underwriters, respecting Tenant's use and occupancy of the Improvements. If Tenant, after notice from Landlord or any such authority ordering performance of any such work which Tenant is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform same with reasonable promptness, Landlord may perform said work and collect the reasonable cost thereof plus interest at the Default Rate

from Tenant with the next installment or installments of Base Rent, after thirty (30) days'
prior written notice to Tenant (except in the case of an emergency, in which event only such
notice as is reasonable under the circumstances shall be required) and Tenant's failure to cure
or commence to cure during such thirty (30) days and diligently prosecute the cure to
completion.  In the event that Landlord, within thirty (30) prior days' written notice (except
in the case of an emergency, in which event only such notice as is reasonable under the
circumstances shall be required) from Tenant or any such authority ordering performance of
any such work which Landlord is required to perform in order to remain in, or come into,
compliance with any such requirement, fails to perform or diligently commence performance
of same with reasonable promptness, Tenant may perform said work and deduct the
reasonable cost thereof plus interest at the Default Rate from Landlord with the next
installment or installments of Base Rent.

    34.   <u>Notices</u>.  Any notice permitted or required to be given pursuant to this Lease
shall be deemed to have been given and received three (3) business days after mailing a
written notice by certified mail, postage prepaid, return receipt requested, or one (1) business
day after sending by Federal Express or other comparable overnight express courier service
(with proof of receipt available), addressed to the parties as follows:

|  |  |
|---|---|
| If to Tenant: | CIRCUIT CITY STORES, INC.<br>9950 Mayland Drive<br>Richmond, Virginia 23233<br>Attention: Corporate Secretary |
| with a copy to: | CIRCUIT CITY STORES, INC.<br>9950 Mayland Drive<br>Richmond, Virginia 23233<br>Attention: Vice President of Real Estate |
| If to Landlord: | Parker Central Plaza, Ltd.<br>5068 W. Plano Parkway, Suite 215<br>Plano, Texas 75093 |
| with a copy to: | William A. Thau<br>Jenkens & Gilchrist, P.C.<br>1445 Ross Avenue, Suite 3200<br>Dallas, TX 75202 |

u(4313):\circuit\plano\lease.006

or to such other addressees as any party hereto shall from time to time give notice thereof to any other party.

35.    <u>Brokers</u>.  Landlord and Tenant each covenant that they have not dealt with any real estate broker or finder with respect to this Lease except for United Commercial Realty, Inc., which shall be paid a commission by Landlord pursuant to their separate written agreement.  Except for the foregoing, each party shall indemnify, defend and hold the other party harmless from all damages, claims, liabilities or expenses, including reasonable and actual attorneys' fees (through all levels of proceedings), resulting from any claims that may be asserted against the other party by any real estate broker or finder with whom the indemnifying party has or purportedly has dealt.

36.    <u>Miscellaneous</u>.

(a)    <u>Headings and Gender</u>.  Any paragraph headings, titles or captions contained in this Lease are for convenience only and shall not be deemed a part of this Lease and shall not in any way limit or amplify the terms and provisions of this Lease.  The masculine, feminine or neuter gender and the singular or plural number shall be deemed to include the others whenever the context so requires or indicates.

(b)    <u>Construction</u>.  The parties hereto agree that all the provisions hereof are to be construed as covenants and agreements as though the words importing such covenants and agreements were used in each separate paragraph hereof.

(c)    <u>Waiver of Jury Trial</u>.  In the event of any court action arising out of this Lease, each party hereby expressly waives its right to trial by jury.

(d)    <u>Relationship of Landlord-Tenant</u>.  Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent or of partnership or of joint venture or of any association between Landlord and Tenant other than the landlord-tenant relationship.

(e)    <u>Entire Agreement Merger</u>.  This Lease, including all exhibits hereto (which are hereby incorporated herein by reference), covers, in full, each and every final agreement of every kind and nature whatsoever between the parties hereto concerning the subject matter of this Lease, and all preliminary negotiations and agreements of whatsoever

u(4313):\circuit\plano\lease.006

kind or nature are merged herein. This Lease cannot be changed or modified in any manner other than a written amendment or modification executed by Landlord and Tenant.

(f)     Attorneys' Fees. In the event either party shall be required to commence or defend any action or proceeding against any other party by reason of any breach or claimed breach of any provision of this Lease, to commence or defend any action or proceeding in any way connected with this Lease or to seek a judicial declaration of rights under this Lease, the party prevailing in such action or proceeding shall be entitled to recover from or to be reimbursed by the other party for the prevailing party's reasonable and actual attorneys' fees and costs through all levels of proceedings.

(g)     Partial Invalidity. If any provision of this Lease or the application thereof to any person or circumstance shall be deemed invalid or unenforceable, the remainder of this Lease and its application to other persons or circumstances shall not be affected by such partial invalidity but shall be enforced to the fullest extent permitted by law.

(h)     Consents. Any consent or approval granted by either party hereunder shall be deemed a consent only as to the matter on which such consent was requested and shall not waive the consenting party's right to give or withhold consent to any subsequent matter.

(i)     Holidays. If the day on which rent is payable falls on a Sunday or on a legal holiday, it shall be payable on the following business day.

(j)     Applicable Law. This Lease shall be construed in accordance with the laws of the State of Texas, and the parties agree that jurisdiction shall lie therein.

(k)     Successors and Assigns. All rights, obligations and liabilities herein given to or imposed upon any party hereto shall extend to the permitted successors and assigns of such party.

(l)     Trademarks and Trade Names. All trademarks, trade names, service marks, signs and all other marks of identification used by Tenant in its business shall at all times remain the exclusive property of Tenant, and Landlord shall have no right, interest in, or title to any of Tenant's trademarks, trade names, service marks, signs or other marks of identification. Likewise, all trademarks, trade names, service marks, signs and all other marks of identification used by Landlord in its business shall at all times remain the

u(4313):\circuit\plano\lease.006

exclusive property of Landlord, and Tenant shall have no right, interest in, or title to any of Landlord's trademarks, trade names, service marks, signs or other marks of identification.

37.   <u>Effectiveness of Lease; Tenant's Right to Terminate</u>.  Notwithstanding the execution of this Lease or any provision hereof to the contrary, the parties hereto agree that the effectiveness of this Lease is expressly conditioned upon the complete satisfaction (or waiver) of each and all of the following conditions:

(a)   Landlord's delivery of subordination, nondisturbance and attornment agreements executed by any and all existing Mortgagees and Ground Lessors in the form attached hereto as <u>Exhibit "G"</u> simultaneously with the execution of this Lease or as otherwise set forth in Paragraph 21(a) hereof.

(b)   Landlord's representations, warranties and covenants, including but not limited to those set forth in paragraph 19 herein, being true and accurate as of the date of delivery of the Land.

The existence of the foregoing conditions is solely for the benefit of Tenant, which may waive any such condition at its sole discretion by delivering to Landlord a written notice signed by Tenant which states the condition(s) being waived by Tenant.

Notwithstanding any other provision in this Lease to the contrary, in the event any of the foregoing conditions shall not be met, satisfied or waived, the parties hereto expressly agree that Tenant shall have the right to terminate this Lease in its sole and absolute discretion at anytime prior to the satisfaction or waiver of any such condition by delivering to Landlord a written notice signed by Tenant which states that Tenant is terminating this Lease on account of the failure of one or more of the foregoing conditions.  In the event of any such termination, the rights and obligations of the parties shall be of no further force and effect (and the parties shall have no further liability except that the indemnification set forth in paragraph 14(i) hereof shall survive such termination) upon Tenant's delivery of said notice to Landlord. Notwithstanding the foregoing, however, in the event Tenant has not elected to terminate this Lease within thirty (30) days after the date hereof as a result of the nonsatisfaction of one or more of the above conditions, then this paragraph 37 shall automatically be of no further force or effect and this Lease shall be deemed to be effective,

u(4313):\circuit\plano\lease.006

provided that the elimination of such conditions shall not excuse Landlord from the performance of its obligations under this Lease.

38.    <u>Right to Terminate</u>.  If Landlord has not closed on the purchase of the Land and the remainder of the Shopping Center by March 15, 1996, then Tenant shall have the right to terminate this Lease by delivering written notice to Landlord within thirty (30) days. In the event that Tenant exercises its right to terminate hereunder, then neither party hereto shall have any further liability to the other hereunder.

39.    <u>Tenant's Opening</u>.  Tenant agrees to open its business in the Premises initially as a Circuit City Store ("Tenant's Opening").  Tenant's Opening shall occur, subject to force majeure, within one hundred twenty (120) days after the Rent Commencement Date. Thereafter, Tenant shall not be obligated to operate its business in the Premises (as a Circuit City store or otherwise), and nothing contained in this Lease shall be construed as a covenant or other agreement of Tenant to continuously operate, or stay open, in the Premises. Notwithstanding the foregoing, in the event that Tenant intends to cease operations of its business in the Premises, Tenant shall provide Landlord with written notice of such intent. Landlord shall have the option to terminate this Lease within thirty (30) days (time is of the essence) from the delivery of Tenant's notice to Landlord by providing Tenant with written notice of Landlord's termination of this Lease and paying to Tenant the amount of Tenant's unamortized tenant improvement costs (being costs for fixtures, furnishings and improvements to the Premises) incurred by Tenant with respect to the Premises during the Term, which amounts shall not include any amounts previously reimbursed to Tenant by payment of the Tenant Improvement Allowance to Tenant, as carried on the books of Tenant in accordance with generally accepted accounting principles consistently applied.  In addition to and notwithstanding the foregoing, in the event that Tenant shall fail to operate its business in the Premises for a consecutive period of one hundred eighty (180) days during any Lease Year, and such failure is not due to force majeure, any damage or casualty, condemnation or remodeling, then Landlord may terminate this Lease upon written notice to Tenant.  In the event of a termination of this Lease by Landlord pursuant to the terms of the preceding sentence of this paragraph 39, neither party hereunder shall have further liability to the other and in such event Landlord shall have no obligation to pay Tenant's unamortized

u(4313):\circuit\plano\lease.006

costs as described herein; provided, that such termination shall not affect Tenant's indemnification obligation hereunder and Tenant's obligation to pay to Landlord on demand all amounts which have accrued prior to the date thereof or to promptly surrender the Premises to Landlord peaceably in accordance with requirements of this Lease.

u(4313):\circuit\plano\lease.006

WITNESS the following signatures and seals:

LANDLORD:

PARKER CENTRAL PLAZA, LTD.,
a Texas limited partnership

ATTEST:

By: Parker Central Partners, LLC,
    a Texas limited liability company

By:_____
Its:_____

By:_____
Name:  Wayne L. Nash
Title:  Manager

TENANT:
CIRCUIT CITY STORES, INC.,
a Virginia corporation

ATTEST:

By:_____
Its: Assistant Secretary

(SEAL)

By:_____
Name: Benjamin B. Cummings, Jr.
Title:  V.P.

u(4313):\circuit\plano\lease.006



EXHIBIT "A"

## EXHIBIT "A-1"

Whereas Clifton R. Haggard Trust is the owner of land situated in the City of Plano, Texas, out of the Daniel Rowlett Survey, Abstract No. 738, said tract includes Tract A and Part of Tract B of Las Tiendas Subdivision, an addition to the City of Plano and as recorded in Volume 9, Page 59 of the Map Records of Collin County, Texas and being more particularly described as follows:

Beginning at a 1 inch iron rod found for point in the Southeast line of U.S. Highway No. 75, said point being the most Westerly corner of Fairview Farm Marketplace Addition, according to the recorded map thereof, in Drawer G, Page 630 in the Map Records, Collin County, Texas;

Thence South 89 degrees 40 minutes 25 seconds East along the South line of said Fairview Farm Marketplace Addition, a distance of 815.12 feet to a 1 inch iron rod found for corner in the Westerly line of a 100 foot Dart Railroad right-of-way;

Thence South 18 degrees 57 minutes 48 seconds West along said right-of-way line, a distance of 58.51 feet to the beginning of a curve to the left having a central angle of 13 degrees 40 minutes 07 seconds, a radius of 2,914.93 feet and a tangent length of 349.36 feet to a 1/2 inch iron rod set for corner;

Thence along said curve to the left, an arc length of 695.40 feet to a point in the North line of Parker Road (100 foot R.O.W.), to a concrete monument set for corner;

Thence North 87 degrees 37 minutes 25 seconds West, along said North line of Parker Road, a distance of 597.72 feet to a 1/2 inch iron rod set for corner;

Thence North 17 degrees 10 minutes 47 seconds West, a distance of 119.14 feet to a 1 inch iron rod found for corner;

Thence North 57 degrees 14 minutes 48 seconds West, a distance of 113.32 feet to a 1/2 inch iron rod set for corner;

Thence North 66 degrees 42 minutes 15 seconds West, a distance of 100.71 feet to a 1 inch iron rod found for corner;

Thence North 21 degrees 13 minutes 20 seconds West, a distance of 70.06 feet to a point in the Southeast line of U.S. Highway No. 75, a 1 inch iron rod found for corner;

Thence North 24 degrees 15 minutes 35 seconds East along said line of said Highway, a distance of 475.15 feet to the Point of Beginning and containing 575,596 square feet or 13.2139 acres of land, more or less.

## EXHIBIT "B"

### INDEX OF DEFINITIONS

| Term | Paragraph where defined |
|------|-------------------------|
| Access Easement | 19(a) |
| Adjacent Property | 19(a) |
| Alternative Access Easement | 19(a) |
| Base Rent | 4(a) |
| Building | 2 |
| CAM Charges | 7(b) |
| CAM Year | 7(c) |
| Capital Costs | 7(b) |
| Certificate | 15(a)(i) |
| Common Area Easement | 6(e) |
| Common Area Maintenance | 7(a) |
| Common Areas | 7(a) |
| Construction Term | 3 |
| CPI-U | 4(c) |
| Date of Taking | 16(a) |
| Default Rate | 9(b) |
| Delivery of Land | Exh. "C", para. 1(b) |
| Escrow Agent | 15(a)(i) |

B-1

| Term | Paragraph where defined |
|---|---|
| Event of Default (Landlord) | 30 |
| Event of Default (Tenant) | 29 |
| Foreclosure | 21(a) |
| Grading Plans | Exh. "C", para. 1(b) |
| Hazardous Substances | Exh. "C", para. 1(a) |
| Improvements | 1 |
| Land | 1 |
| Landlord | Introduction |
| Landlord's Premises | 1 |
| Landlord Work | Exh. "C", para. 1 |
| Lease Year | 3 |
| Main Term | 3 |
| Modified Proctor | Exh. "C", para. 1(b) |
| Mortgage | 21(a) |
| Mortgagee | 21(a) |
| Option Periods | 3 |
| Permissible Building Areas | Exhibit "A" |
| Permitted Encumbrances | Exhibit "F" |
| Person | 20 |
| Personalty | 23 |

B-2

| Term | Paragraph where defined |
|------|------------------------|
| Plans and Specifications | Exh. "C", para. 2(b) |
| Premises | 1 |
| Real Estate Taxes | 9(a) |
| Renewal Option | 3 |
| Rent Commencement Date | 4(a) |
| Schematic Floor Plans and Elevations | Exh. "C", para. 2(b) |
| Shopping Center | 1 |
| Site Covenants | 19(a)(ix) |
| Site Plan | 1 |
| Site Work | Exh. "C", para. 1(b) |
| Soils Report | Exh. "C", para. 1(b) |
| Staging Area | 6(a) |
| Substantial Completion | Exh. "C", para. 2(e) |
| Substantially All of the Premises | 16(a) |
| Successor | 22 |
| Taking | 16(a) |
| Tax Parcel | 9(b) |
| Tenant | Introduction |
| Tenant's Cost of Funds | 4 |
| Tenant Improvement Allowance | Exh. "C", para. 3 |

B-3

| Term | Paragraph where defined |
|------|------------------------|
| Tenant's Opening | 39 |
| Tenant's Preferred Area | Exhibit "A" |
| Term | 3 |
| Work | 1 5(a)(i) |
| Worth at the Time of Award | 30(b)(i) |

B-4

EXHIBIT "C"

CONSTRUCTION PROVISIONS

THESE CONSTRUCTION PROVISIONS (herein so called) are hereby made a part of the Lease between Landlord and Tenant to which these Construction Provisions are attached as Exhibit "C". All defined terms shall have the meanings attributed to them in the Lease unless otherwise specifically defined in these Construction Provisions.

1.      Landlord's Delivery of the Land.

(a)      Hazardous Substances. Landlord shall deliver the Land to Tenant free of any pollution or contamination from toxic or hazardous substances, asbestos or any other chemicals or substances in amounts which exceed standards for public health or welfare as regulated by any local governmental authority, the State of Texas or the United States Government (herein collectively referred to as "Hazardous Substances").  During the Construction Term, Landlord hereby grants Tenant and its agent access to the Premises and Shopping Center to enable Tenant to conduct such soil and environmental tests as it deems necessary at reasonable times and upon reasonable notice.  Tenant covenants that Tenant will conduct such soil and environmental tests in a manner that will not materially interfere with Landlord's construction and development and operations at the Shopping Center. Furthermore, except to the extent of any claims, costs, liability, damage, or expense arising from the neglect or willful acts of Landlord or its agents or employees, Tenant agrees to indemnify and hold Landlord harmless from any and all claims, costs, liability, damage or expense resulting from the negligent acts of Tenant or its agents or employees in connection with such soil and environmental tests.

u(4313):\circuit\plano\lease.006

(b)    Common Wall.  The north wall of Tenant's building may be a common wall between Tenant and future retail areas.  The aforementioned common wall provides benefits to both Tenant and Landlord's future adjacent tenants.  Landlord and Tenant agree that all costs associated with common walls, including excavation, footings and tilt wall shall be shared on an equal basis.  If such common walls are built, then the costs shall be identified as those costs noted under a bid item in Tenant's bid package.

2.    Tenant Improvements.

(a)    Plans and Specifications.  Tenant has prepared and furnished to Landlord, and Landlord has approved, complete architectural drawings and specifications (the "Plans and Specifications") for the construction of the Building and Improvements, incorporating therein the items specified and shown in the "Schematic Floor Plan and Elevation" (which are hereby approved by Landlord) attached as Attachment "1".  The Plans and Specifications shall not be substantially changed by Tenant without the prior written consent of Landlord, which consent shall not be unreasonably withheld or delayed.

(b)    Permits.  Tenant, at its sole cost and expense, shall obtain or cause to be obtained all building permits, licenses, other governmental approvals and temporary and permanent certificates of occupancy which may be required for the lawful construction and occupancy of the Premises as a retail shopping facility in accordance with the Plans and Specifications.  Landlord agrees to assist and cooperate fully with Tenant, at Tenant's sole cost and expense, in obtaining such permits, licenses, approvals and certificates.  Landlord shall be responsible for any other permits necessary for the development of the Shopping Center.

u(4313):\circuit\plano\lease.006

(c)    <u>Landlord Inspections</u>.  During the course of construction of the Improvements, Landlord and Landlord's lender (or its designated agent) may, at their own risk and in cooperation with Tenant's contractor, enter upon the Land for purposes of inspecting the work, provided that such inspections shall not interfere with Tenant's construction.

(d)    <u>Substantial Completion</u>.  Substantial completion of the Improvements ("Substantial Completion") shall be deemed to occur when a certificate of occupancy, whether temporary and subject to minor items to be completed, or permanent, as the case may be, has been issued by the applicable governmental authority.  The foregoing shall not be deemed to relieve Tenant of its responsibility to complete the Improvements in accordance with the Plans and Specifications.

3.    <u>Costs</u>.  Within thirty (30) days after Substantial Completion and Tenant's Opening and upon Tenant's furnishing to Landlord (i) the certificates of insurance required under paragraph 14 of the Lease, (ii) an indemnity substantially in the form attached hereto as <u>Exhibit "J"</u> and documentation reasonably necessary (other than final lien waivers) for a title insurance underwriter to delete exceptions for mechanic's and materialman's liens, (iii) a bill of sale conveying title to the Improvements to Landlord, (iv) the certificate of occupancy, and (v) an architect's certificate from Tenant's architect or Vice President of Construction, stating that Tenant has achieved Substantial Completion in accordance with the Plans and Specifications (hereinafter those items described in (i) through and including (v) above are referred to as, the "Construction Documents"), Landlord shall pay to Tenant a "Tenant Improvement Allowance" in an amount equal to Two Million One Hundred Fifty-

Five Thousand Six Hundred Ninety-Three and 50/100 Dollars ($2,155,693.50), payable by

wire transfer of funds by Landlord to Tenant's account.  Tenant covenants to obtain, within

one hundred eighty (180) days following the date of Substantial Completion, assignment of

all warranties from the general contractor or subcontractors (including but not limited to a

general contractor's warranty covering a period of one (1) year from Substantial Completion,

in form reasonably acceptable to Landlord), unless such warranty relates to any obligation of

Tenant to maintain the Premises, and a roofing manufacturer's limited service warranty

agreement, including flashing endorsement, signed by an authorized representative of the

contractor and covering a period of ten (10) years from Substantial Completion, but such

covenant shall not relieve Landlord of its obligation to timely pay the Tenant Improvement

Allowance in accordance with the foregoing.  If the Base Rent is increased or decreased

pursuant to paragraph 4(b) of the Lease, the Tenant Improvement Allowance shall likewise

be increased or decreased.  If Landlord fails to tender payment of the Tenant Improvement

Allowance in full within thirty (30) days following the date of Substantial Completion and

Tenant's Opening and Tenant's delivery of the Construction Documents, then any obligation

to pay any Base Rent shall, for the next thirty (30) day period, be reduced, in addition to any

other reduction in Base Rent already applicable, by an amount equal to Eleven Thousand Six

Hundred and No/100 Dollars ($11,600,00), and thereafter Base Rent shall abate until the

payment of the Tenant Improvement Allowance (it being understood that any abated

payments of Base Rent shall be forfeited by Landlord).  If Landlord fails to tender payment

of the Tenant Improvement Allowance within one (1) year after the date it becomes due and

payable, Base Rent shall convert to ground rent equal to Seventy Five Thousand and No/100

u(4313):\\circuit\plano\lease.006

Dollars ($75,000) per annum during the second year following the date of Substantial Completion and Tenant's Opening, Fifty Thousand and No/100 Dollars ($50,000) per annum during the third year following the date of Substantial Completion and Tenant's Opening and Twenty-Five Thousand and No/100 Dollars ($25,000.00) per annum thereafter during the Term of the Lease, and (iii) this Lease shall be converted to a ground lease, with ownership of the Improvements remaining with Tenant and Landlord's and any Mortgagees' names being removed as additional insureds or mortgagees on any casualty insurance described in Paragraph 14(a) of the Lease. Notwithstanding the foregoing, at any time following ninety (90) days following the date of the Substantial Completion and Tenant's Opening and upon thirty (30) days prior written notice, provided that Landlord has not then paid the Tenant Improvement Allowance and Tenant has delivered the Construction Documents to Landlord, Tenant shall have the right, but not the obligation, in lieu of the requirement that Landlord pay to Tenant the Tenant Improvement Allowance, to mortgage, sell, convey, assign, lease or otherwise encumber (collectively, a "Transfer") Tenant's interest in the Building, the Improvements and the Lease.  Such right shall be in addition to the rights of Tenant set forth in paragraph 21 of the Lease.  Landlord covenants to (i) execute all documents necessary to permit Tenant to effect the Transfer described herein, and (ii) cause any Mortgagee to specifically acknowledge the rights of Tenant's lenders and third parties arising as a result of such Transfer.  Notwithstanding such Transfer, Tenant shall continue to pay the ground rentals described herein during the remainder of the Term.

    4.   <u>Construction Delays</u>.

u(4313):\circuit\plano\lease.006

(a)    <u>Delays by Tenant</u>.  If, subject to force majeure and delays caused by Landlord, Tenant shall fail to achieve Substantial Completion and deliver the Construction Documents by June 1, 1996, Landlord, at its option, upon prior written notice to Tenant, may either (i) complete Tenant's construction, prepare the Construction Documents and deduct the cost of such construction and preparation of the Construction Documents from the Tenant Improvement Allowance and require Tenant to commence payment of Base Rent, CAM Charges and all other sums due hereunder by Tenant on August 1, 1996, or (ii) (subject to payment of the Tenant Improvement Allowance) require Tenant to proceed with its construction and thereafter deliver the Construction Documents to Landlord, commence payment of Base Rent and CAM Charges on August 1, 1996, and reimburse Landlord for its fixed and ascertainable costs incurred as a result thereof.  Such costs shall be limited to Landlord's out-of-pocket expenses of construction overtime, acceleration charges and bonuses paid to Landlord's contractors or subcontractors, charges for the scheduling of construction crews on days on which work cannot be performed on account of the aforesaid delays by Tenant, the cost of erecting barricades around Tenant's unfinished work and construction period interest charges to the extent that such charges exceed those which would have accrued without such delay.  In the event, for any reason whatsoever and regardless of force majeure, Tenant shall fail to achieve Substantial Completion, open for business and deliver the Construction Documents by that date which is one (1) year following Landlord's delivery of the Land, Landlord shall, in addition to any other remedies available at law or in equity, be entitled to terminate this Lease.

(b)    <u>Miscellaneous</u>.  For purposes hereof, any delays occasioned by the other party (and to the extent so occasioned), other than as specified above, shall be deemed events of force majeure for the purpose of determining dates for the performance of the delayed party's obligations.  Notwithstanding the foregoing, a delay by any party in exercising its cure rights or other remedies hereunder shall not be deemed an event of force majeure for purposes of extending the date(s) established for performance by the party whose actions or omissions gave rise to such cure rights or remedies.  All sums owing to Landlord under subparagraph (a) above shall, to the extent applicable and except for Base Rent and CAM Charges, be deducted from the Tenant Improvement Allowance.  In the event that Landlord is prevented from obtaining construction draws from its construction lender due to the existence of a lien filed against the Shopping Center by Tenant's general contractor, or other parties supplying services or materials in connection with Tenant's construction contract, Tenant agrees that it shall within thirty (30) days cause such lien to be bonded, removed or otherwise satisfied so that Landlord may receive a down date endorsement from its title company permitting it to receive construction funds from its construction lender.

5.    <u>Attachments</u>.

"1"    Schematic Floor Plan and Elevation

u(4313):\circuit\plano\lease.006

## EXHIBIT "D"

## REMOVABLE TRADE FIXTURES

STORE FIXTURES
ALL STORAGE RACKING
ALL SECURITY SYSTEM ITEMS
TELEPHONES AND PAGING SYSTEMS
COMPUTER SYSTEM
OFFICE FURNITURE AND TRASH RECEPTACLES
BATTERY CHARGER
TRASH COMPACTOR
SIGNS (INTERIOR/EXTERIOR)
ANTENNA SYSTEM
ELECTRONIC SWITCHING
AIR COMPRESSOR (ROADSHOP)
SAFE
CONVEYOR
MEDECO CYLINDER LOCKS (5)
REFRIGERATOR AND MICROWAVE USED BY EMPLOYEES
TACK BOARDS
WATER COOLER
FIRE EXTINGUISHERS
AUDIO ROOM FIXTURES AND SWITCHGEAR
PICTURES
WAREHOUSE AND MATERIAL HANDLING EQUIPMENT (MOVABLE LADDERS,
DOLLIES, ETC.)
TRACK LIGHTS (CANS ONLY, NOT TRACKS)

u(4313):\circuit\plano\lease.006



CIRCUIT CITY
STORES INC.
9950 MAYLAND DRIVE
RICHMOND VA. 23233



# CIRCUIT CITY STORES INC.

9950 MAYLAND DRIVE
RICHMOND VA. 23233

ALL WIRING AND MATERIALS
USED WILL BE U.L. APPROVED
AND IN ACCORDANCE WITH N.E.C.

SECTION SIGN Ⓖ

SIGN Ⓖ LAYOUT

NOTE:
Not shown on
Elevation drawings

SIGN Ⓖ - RETURN NOTE(S)
MANUFACTURE ONE (1) 5'-0" X 12'-0" SINGLE FACED INTERNALLY ILLUMINATED
PLASTIC FACED READER BOARD SIGN TO ACCOMODATE FOUR (4) LINES OF 10" COPY
AS PER OUR DRAWING

MATERIALS:
SIGN CABINET CONSTRUCTED OF INNER ANGLE IRON FRAMING COVERED WITH .063
ALUMINUM AND SPRAYED BRUSHED ALUMINUM 141-312 ON ALL EXTERIOR SURFACES AND
WHITE ENAMEL ON INTERIORS.

LIGHTING FROM AN INTERNAL SOURCE OF T-12 DAYLIGHT HIGH OUTPUT FLUORESCENT
LAMPS POWERED BY AWG HX BALLASTS.  ALL WIRING AND MATERIALS WILL BE U.L.
APPROVED.

FACE OF 3/16" WHITE #7328 PLEXIGLAS SUSPENDED FROM 10" TRACK.  FACE WILL
HAVE CLEAR PLASTIC TRACK FOR 18" COPY. (4 ROWS)
MOUNT SIGN FLAT AGAINST ALUCABOND FACIA WITH HARDWARE THROUGH EXPOSED
CLIPS.

ELECTRIC TO SIGN LOCATION BY OTHERS. ONE (1) 20 AMP 120 VOLT CIRCUIT
REQUIRED.

ACCESSORIES: ONE (1) SET FONT OF 10" E-Z CHANGE STANDARD BLOCK STYLE
SOLID STROKE BLOCK LETTERS. TWO (2) STORAGE CABINETS 1308 CAP. I, AND
ONE (1) 6' TO 18' MECHANICAL HAND.



TYPICAL FRONT ELEVATION

CIRCUIT CITY STORES INC.
9950 MAYLAND DRIVE
RICHMOND VA. 23233







SIGN (E) LAYOUT

CIRCUIT CITY
Car Stereo Installation

NON-ELECTRIC

SIGN (F) LAYOUT

Customer Pick-Up

NON-ELECTRIC

SECTION SIGNS (E) & (F)

SIGNS E & F
MANUFACTURE TWO (2) SINGLE FACED NON-ELECTRIC LOZENGE SHAPED BUILDING
MOUNTED SIGNS AS PER OUR DRAWING.

MESSAGES:
SIGN E - ... ... ... - CUSTOMER PICK-UP
SIGN F - ... ... ... - CIRCUIT CITY CAR STEREO INSTALLATION

MATERIALS:
SIGNS FABRICATED OF ALUMINUM OVER ALUMINUM ANGLE SPRAYED MEDICALL RED
ALL OR ALL SURFACES.

COPY AND INSERT BORDER OF BRUSHED ALUMINUM VINYL.

MOUNT SIGNS ON RESPECTIVE BACKGROUNDS WITH CONCEALED FASTENERS.

CIRCUIT CITY
STORES INC.
9950 MAYLAND DRIVE
RICHMOND VA. 23233

CIRCUIT CITY
SQUARE FOOTAGE CALCULATIONS

I.   36" CIRCUIT CITY

OPTION A - CALCULATIONS ON EACH GWRD

3' X 19      57 )
                    ) 90 SQ. FT. PER SET
3' X 11'     33 )


OPTION B - CALCULATIONS ON FOUR LINES

7' X 19'     133 SQ. FT.


OPTION C - CALCULATIONS ON EIGHT LINES

3' X 19'     57 )
                    ) 101 SQ. FT.
4' X 11'     44 )


OPTION D - CALCULATIONS BASED ON SIZE OF EACH LETTER

C - 32-1/2 - 8.13 SQ. FT.        C - 32-1/2 - 8.13
I - 11-1/4 - 2.81                I - 11-1/4 - 2.81
R - 32     - 7.98               T - 31     - 7.74
C - 32-1/2 - 8.13               Y - 37-1/2 - 9.38
U - 32     - 7.98                          -----
I - 11-1/4 - 2.81                          28.06
T - 31       7.74
          -----
          45.58
          28.06
          -----
          73.64 SQ. FT. X 2 =

CIRCUIT CITY
SQUARE FOOT CALCULATIONS

II.    31' CIRCUIT CITY

OPTION A - 31' X 16'      41.28 )
                                  )  69.66 SQ. FT.
            31' X 11'      28.38 )


OPTION B -  6' X 16'              96 SQ. FT.


OPTION C - 31' X 16       41.28 )
                                  )  72.06 SQ. FT.
            41' X 9       30.78 )

CIRCUIT CITY
SQUARE FOOT CALCULATIONS

III.    24" AUDIO VIDEO APPLIANCES

OPTION A - CALCULATIONS ON EACH WORD

AUDIO        - 2' X 9'-7"    -    19.16 SQ. FT.

VIDEO        - 2' X 9'-8"    -  - 19.32 SQ. FT.

APPLIANCES  - 2' X 19'-4"   -    38.66 SQ. FT.  _____  77.14 SQ. FT.

COMPUTERS    2' X 20'        -    40. " SQ. FT.    · ·
                                 --------------
                                 117.14 SQ. FT.

OPTION B - CALCULATIONS ON 4 LINES
              W/OUT "COMPUTERS"        2' X 53'      106   SQ. FT.

              WITH "COMPUTERS"         2' X 80'-8"   161.32 SQ. FT.

OPTION C - CALLCULATIONS BASED ON SIZE OF EACH LETTER

| A - 22-1/2" - 3.75 SQ. FT. | A - 22-1/2" - 3.75 SQ. FT. | C - 22"     - 3.6 SQ. FT. |
|---|---|---|
| U - 19      - 3.16         | P - 19      - 3.16         | O - 23      - 3.84        |
| D - 21      - 3.5          | P - 19      - 3.16         | M - 24-1/2 - 4.08         |
| I - 5       - .84          | L - 17      - 2.84         | P - 19      - 3.16        |
| O - 23      - 3.84         | I - 5       - .84          | U - 19      - 3.17        |
|                            | A - 22-1/2  - 3.75         | T - 20      - 3.32        |
| V - 22      - 3.66         | N - 20-1/2  - 3.4          | E - 18      - 3.          |
| I - 5       - .84          | C - 22      - 3.6          | R - 20      - 3.32        |
| D - 21      - 3.5          | E - 18      - 3.           | S - 20      - 3.32        |
| E - 18      - 3.           | S - 20      - 3.32         |                          |
| O - 23      - 3.84         |                            |                          |
|   -----                    |   -----                    |   -----                   |
| 29.93                      | 30.82                      | 30.8                      |

------------------------------------------------------------------
                        91.55 SQUARE FEET

CIRCUIT CITY
SQUARE FOOT CALCULATIONS

IV.   CUSTOMER PICK-UP

OPTION A -  9" X 4'-0"        3 SQ. FT.

OPTION B - 16" X 8'-0"    10.64 SQ. FT.


CIRCUIT CITY
SQUARE FOOT CALCULATIONS

V.   CIRCUIT CITY CAR STEREO INSTALLATION

OPTION A - 16" X 8'-0"      10.64 SQ. FT. (NO CIRCUIT CITY)

OPTION B - 30" X 8'-0"       20 SQ. FT.


CIRCUIT CITY
SQUARE FOOT CALCULATIONS

VI.   READER BOARD

5'0" X 12'-0"      60 SQ. FT.

EXHIBIT "F"

I.    **PERMITTED ENCUMBRANCES**

1.    Easement to The Texas Pipe Line Company, filed 04/24/18, recorded in Volume 217, Page 167, Deed Records of Collin County, Texas, and as shown on survey of Needham Wright Laskey Engineers, Inc., certified by Robert M. Needham, R.P.L.S., dated January 20, 1996.

2.    Limited or lack of access to road or highway abutting subject property as set forth in instrument filed 01/28/77, recorded in Volume 1035, Page 863, Deed Records of Collin County, Texas, and as shown on survey of Needham Wright Laskey Engineers, Inc., certified by Robert M. Needham, R.P.L.S., dated January 20, 1996.

3.    Terms and conditions contained in Drainage Easement dated August 28, 1995 by and between Circuit City Stores, Inc. and Fairview Farm Development Company, Ltd., filed on August 30, 1995, in Collin County Clerk's File No. 95-0063684, Collin County, Texas, and as shown on survey of Needham Wright Laskey Engineers, Inc., certified by Robert M. Needham, R.P.L.S., dated January 20, 1996.

4.    Access Easement to Fairview Farm Development Company, Ltd., filed August 30, 1995, in Collin County Clerk's File No. 95-0063684, Land Records of Collin County, Texas, and as shown on survey of Needham Wright Laskey Engineers, Inc., certified by Robert M. Needham, R.P.L.S., dated January 20, 1996.

5.    Ten foot (10') water line easement shown by the plat recorded in Volume 9, Page 59, Map Records of Collin County, Texas, and as shown on survey of Needham Wright Laskey Engineers, Inc., certified by Robert M. Needham, R.P.L.S., dated January 20, 1996.

6.    Fifty foot (50') building setback line as shown on survey of Needham Wright Laskey Engineers, Inc., certified by Robert M. Needham, R.P.L.S., dated January 20, 1996.

7.    20' fire lane and 25' fire lane shown by the plat recorded in Volume 9, Page 59, Map Records of Collin County, Texas, and as shown on survey of Needham Wright Laskey Engineers, Inc., certified by Robert M. Needham, R.P.L.S., dated January 20, 1996. (To be abandoned upon replat of the Property.)

8.    Easement to Texas Power & Light Company, filed 08/22/69, recorded in Volume 739, Page 398, Deed Records of Collin County, Texas, and as shown on survey of Needham Wright Laskey Engineers, Inc., certified by Robert M. Needham, R.P.L.S., dated January 20, 1996. (To be abandoned upon replat of the Property.)

9.   Easement to Texas Power & Light Company, filed 08/31/87, recorded in Volume 2698, Page 257, Land Records of Collin County, Texas, and as shown on survey of Needham Wright Laskey Engineers, Inc., certified by Robert M. Needham, R.P.L.S., dated January 20, 1996. (To be abandoned upon replat of the Property.)

10.  Easement to Texas Power & Light Company, filed 04/21/89, recorded in Volume 3040, Page 474, Land Records of Collin County, Texas, and as shown on survey of Needham Wright Laskey Engineers, Inc., certified by Robert M. Needham, R.P.L.S., dated January 20, 1996. (To be abandoned upon replat of the Property.)

11.  Easement to Texas Power & Light Company and General Telephone Company, filed 07/08/75, recorded in Volume 960, Page 814, Deed Records of Collin County, Texas, and as shown on survey of Needham Wright Laskey Engineers, Inc., certified by Robert M. Needham, R.P.L.S., dated January 20, 1996. (To be abandoned upon replat of the Property.)

12.  Reciprocal Easements with Covenants and Restrictions Affecting Land ("REA") dated August 28, 1995 by and between Clifton R. Haggard, Trustee under the wills of W. O. Haggard, deceased, and Rosa Haggard, deceased, and Circuit City Stores, Inc., filed on August 30, 1995 in County Clerk's File No. 95-0063682, Deed Records of Collin County, Texas. (To be released at Closing.)

13.  Subject to any easements, building lines and setback lines to be created by Preliminary Plat of Lot 1, Block A, Phase 2 and Phase 2 of Parker Central Plaza Addition to be filed in Collin County Plat Records, Collin County, Texas.

## II.   OTHER TENANT LEASES - EXCLUSIVE USES

### ROSS STORES, INC.

Landlord has agreed not to permit any other tenant to use its premises for the sale of off-price family oriented wearing apparel, Landlord shall not permit any other tenant or occupant of Landlord's parcel to sell as its primary use off-price family oriented wearing apparel.

### PETSMART, INC.

Landlord has agreed not to permit any other tenant to use its premises primarily as a pet store.

2

## TANDY CORPORATION d/b/a Computer City

Landlord has agreed that, except only for Circuit City Stores, Inc. (and only so long as Circuit City Stores, Inc. is open and operating for business in the Shopping Center), no other tenant or occupant in the Shopping Center shall be entitled to use its premises for the sale, lease, service and supply of computers, computer software, computer tools, computer peripherals, and components thereof; provided that such exclusive use does not prohibit Landlord from leasing within the Shopping Center space to other tenants who use not more than 2,000 square feet of their floor area for the sale of computer hardware and not more than 400 square feet of floor area for the sale of computer software.

## READING CHINA & GLASS, INC. d/b/a Reading China & More!

Landlord has agreed that no other tenant shall have the right to use more than 2,500 square feet of its premises for the retail sale of china, dinnerware, stoneware, glassware, cookware, housewares, kitchenware, kitchen electrical appliances, crystal, flatware, household accessories and furnishings, giftware, wicker furniture, kitchen and dining linen, gourmet food, coffee and espresso bar service and other kitchen or dining tabletop merchandise.

## JUST FOR FEET, INC.

Landlord has agreed not to lease any space in the Shopping Center to any tenant who uses its premises primarily for the retail sale of athletic footwear.

4313U:\CIRCUIT\PARKPLAZ\EXH-F.001

3

## SUBORDINATION, NONDISTURBANCE AND ATTORNMENT AGREEMENT

THIS AGREEMENT made this _____ day of February, 1996, between GUARANTY FEDERAL BANK, F.S.B., a federal savings bank (hereinafter called "Mortgagee"), CIRCUIT CITY STORES, INC. (hereinafter called "Tenant") and PARKER CENTRAL PARTNERS, LTD., a Texas limited partnership ("Landlord").

## W I T N E S S E T H   T H A T:

WHEREAS, Mortgagee is now or will be the owner and holder of a Deed of Trust and Security Agreement (hereinafter called the "Deed of Trust") dated February _____, 1996, covering the real property described in Exhibit A, the buildings and improvements thereon and other property described therein (hereinafter collectively called the "Mortgaged Premises"), securing the payment of a promissory note in the stated principal amount of $11,578,727.00 payable to the order of Mortgagee;

WHEREAS, Tenant is the tenant under the lease (hereinafter called the "Lease") dated February _____, 1996, made by Parker Central Partners, Ltd., a Texas limited partnership, as landlord (said landlord and its successors and assigns occupying the position of landlord under the Lease hereinafter called "Landlord"), covering certain property (hereinafter called the "Demised Premises") consisting of all or a part of the Mortgaged Premises; and

WHEREAS, Tenant and Mortgagee desire to confirm their understanding with respect to the Lease and the Deed of Trust;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, Mortgagee and Tenant hereby agree and covenant as follows:

1.    Subordination.  The Lease now is, and shall at all times and for all purposes continue to be, subject and subordinate, in each and every respect, to the lien of the Deed of Trust, it being understood and agreed that the foregoing subordination shall apply to any and all increases, renewals, modifications, extensions, substitutions, replacements and/or consolidations of the Deed of Trust, provided that any and all such increases, renewals, modifications, extensions, substitutions, replacements and/or consolidations shall nevertheless be subject to the terms of this Agreement.

2.    Non-Disturbance.  So long as (i) Tenant is not in default (beyond any period given Tenant to cure such default) in the payment of rent or additional rent or in the performance of any of the other material terms, covenants or conditions of the Lease on Tenant's part to be performed, (ii) the Lease is in full force and effect according to its

original terms, or with such amendments or modifications as Lender shall have approved, and (iii) Tenant attorns to Mortgagee or a purchaser of the Mortgaged Premises as provided in Paragraph 3, then (a) Tenant's possession, occupancy, use and quiet enjoyment of the Demised Premises under the Lease, or any extensions or renewals thereof or acquisition of additional space which may be effected in accordance with any option therefor in the Lease, shall not be terminated, disturbed, diminished or interfered with by Mortgagee in the exercise of any of its rights under the Deed of Trust, and (b) Mortgagee will not join Tenant as a party defendant in any action or proceeding for the purpose of terminating Tenant's interest and estate under the Lease because of any default under the Deed of Trust. The Mortgagee shall be bound and abide by the terms of the Lease upon succeeding to the interest of the Landlord under the Lease, including but not limited to those provisions controlling the treatment of casualty and condemnation proceeds.

3.      Attornment. If Mortgagee shall become the owner of the Mortgaged Premises or the Mortgaged Premises shall be sold by reason of foreclosure or other proceedings brought to enforce the Deed of Trust or the Mortgaged Premises shall be conveyed by deed in lieu of foreclosure, the Lease shall continue in full force and effect as a direct Lease between the then owner of the Mortgaged Premises, who shall succeed to the rights and duties of Landlord, and Tenant, and Tenant shall attorn to Mortgagee or such purchaser, as the case may be, upon any such occurrence and shall recognize Mortgagee or such purchaser, as the case may be, as the Landlord under the Lease. Such attornment shall be effective and self-operative without the execution of any further instrument on the part of any of the parties hereto. Tenant agrees, however, to execute and deliver at any time and from time to time, upon the reasonable request of Landlord or of any holder(s) of any of the indebtedness or other obligations secured by the Deed of Trust or any such purchaser, any instrument or certificate which is necessary or appropriate in any such foreclosure proceeding or otherwise to evidence such attornment. Tenant hereby waives the provisions of any statute or rule of law, now or hereafter in effect, which may give or purport to give Tenant any right or election to terminate or otherwise adversely affect the Lease and the obligations of Tenant thereunder as a result of any such foreclosure or deed in lieu of foreclosure.

4.      Obligations and Remedies. If Mortgagee shall become the owner of the Mortgaged Premises or the Mortgaged Premises shall be sold by reason of foreclosure or other proceedings brought to enforce the Deed of Trust or the Mortgaged Premises shall be conveyed by deed in lieu of foreclosure, Mortgagee or such purchaser, as the case may be, shall have the same remedies in the event of any default by Tenant (beyond any period given Tenant to cure such default) that Landlord had or would have had if Mortgagee or such purchaser had not succeeded to the interest of Landlord. Upon attornment by Tenant as provided herein, Mortgagee or such purchaser shall be bound to Tenant under all the terms, covenants and conditions of the Lease and Tenant shall have the same remedies against Mortgagee or such purchaser for the breach of an agreement contained in the Lease that Tenant might have had under the Lease against

Landlord if Mortgagee or such purchaser had not succeeded to the interest of Landlord; provided, however, that Mortgagee or such purchaser shall not be liable or bound to Tenant:

> (a)  for any act or omission of any prior landlord (including Landlord); or

> (b)  for any offsets or defenses which Tenant might have against any prior landlord (including Landlord) unless Mortgagee was provided notice of the default creating the right of offset or such defense and was given the same opportunity to cure such default as provided Landlord under the Lease; or

> (c)  for or by any rent or additional rent which Tenant might have paid for more than the current month to any prior landlord (including Landlord); or

> (d)  for any security deposit, rental deposit or similar deposit given by Tenant to a prior landlord (including Landlord) unless such deposit is actually paid over to Mortgagee or such purchaser by the prior landlord; or

> (e)  for any moving, relocation or refurbishment allowance; or

> (f)  by any notice given by Tenant to a prior landlord (including Landlord) unless a copy thereof was also then given to Mortgagee; or

> (g)  for payment of the Tenant Improvement Allowance (as defined in Exhibit C to the Lease); provided, however, the foregoing shall not affect Tenant's rights to (i) reduce or abate any rent payments due to Landlord under the Lease; (ii) offset any unpaid portion of the Tenant Improvement Allowance against any rental payments due to Landlord under the Lease; or (iii) convert the Lease to a ground lease as provided therein.

Except as set out above, the person or entity to whom Tenant attorns shall be liable to Tenant under the Lease only for matters arising during such person's or entity's period of ownership.

5.    No Abridgment.  Nothing herein contained is intended, nor shall it be construed, to abridge or adversely affect any right or remedy of Landlord or Tenant under the Lease in the event of any default by either Landlord or Tenant (beyond any period given Landlord or Tenant to cure such default) in the performance of any of the terms, covenants or conditions of the Lease.

6.    Notices of Default to Mortgagee.  Tenant agrees to give Mortgagee a copy of any default notice sent by Landlord under the Lease to Tenant or by Tenant to Landlord.

7.    Representations by Tenant.  Tenant represents and warrants to Mortgagee that Tenant has validly executed the Lease; the Lease is valid, binding and enforceable and is in full force and effect in accordance with its terms; the Lease has not been amended except as stated herein; no rent under the Lease has been paid more than thirty (30) days in advance of its due date; Tenant is unaware of any defaults existing under the Lease; and Tenant, as of this date, has no existing charge, lien, counterclaim or claim of offset under the Lease, or otherwise, against the rents or other charges due or to become due under the Lease.

8.    Rent Payment.  If Mortgagee shall become the owner of the Mortgaged Premises or the Mortgaged Premises shall be sold by reason of foreclosure or other proceedings brought to enforce the Deed of Trust or the Mortgaged Premises shall be conveyed by deed in lieu of foreclosure, Tenant agrees to pay all rents directly to Mortgagee or such purchaser, as the case may be, in accordance with the Lease immediately upon notice of Mortgagee or such purchaser, as the case may be, succeeding to Landlord's interest under the Lease.  Tenant further agrees to pay all rents directly to Mortgagee immediately upon notice that Mortgagee is exercising its rights to such rents under the Deed of Trust or any other loan documents (including but not limited to any Assignment of Leases and Rents) following a default by Landlord or other applicable party.  Landlord consents to such payment directly to Mortgagee upon receipt by Tenant of such notice.

9.    Notice of Deed of Trust.  To the extent that the Lease shall entitle Tenant to notice of any mortgage or security agreement, this Agreement shall constitute such notice to the Tenant with respect to the Deed of Trust and to any and all other mortgages and security agreements which may hereafter be subject to the terms of this Agreement.

10.    Landlord Defaults.  Tenant agrees with Mortgagee that effective as of the date of this Agreement, Tenant shall not take any steps to terminate the Lease for any default by Landlord or any succeeding owner of the Mortgaged Premises until after giving Mortgagee a copy of any notice of default required to be provided to Landlord under the Lease and allowing Mortgagee the opportunity to cure such default within the time period allowed Landlord to cure under the Lease.

11.    Notice.  Any notice or communication required or permitted hereunder shall be given in writing, sent by (a) personal delivery, or (b) expedited delivery service with proof of delivery, or (c) United States mail, postage prepaid, registered or certified mail, or (d) confirmed telegram, telex or telecopy, addressed as follows:

|                  |                                                                                                                              |
|------------------|------------------------------------------------------------------------------------------------------------------------------|
| To Mortgagee:    | Guaranty Federal Bank, F.S.B.<br>8333 Douglas Avenue<br>Dallas, Texas  75225<br>Attention:  Commercial Real Estate Lending Division |
| To Tenant:       | Circuit City Stores, Inc.<br>9950 Mayland Drive<br>Richmond, Virginia  23233<br>Attention:  Vice President of Real Estate     |

or to such other address or to the attention of such other person as hereafter shall be designated in writing by the applicable party sent in accordance herewith.  Any such notice or communication shall be deemed to have been given and received either at the time of personal delivery or, in the case of delivery service or mail, as of the date of first attempted delivery at the address and in the manner provided herein, or in the case of confirmed telegram, telex or telecopy, upon receipt.

12.    Modification.  This Agreement may not be modified orally or in any manner other than by an agreement in writing signed by the parties hereto or their respective successors in interest.

13.    Successor Mortgagee.  The term "Mortgagee" as used throughout this Agreement includes any successor or assign of Mortgagee and any holder(s) of any interest in the indebtedness secured by the Deed of Trust.

14.    Successors and Assigns.  This Agreement shall inure to the benefit of and be binding upon the parties hereto, their successors and assigns, and any purchaser or purchasers at foreclosure of the Mortgaged Premises, and their respective heirs, personal representatives, successors and assigns.

15.    Paragraph Headings.  The paragraph headings contained in this Agreement are for convenience only and shall in no way enlarge or limit the scope or meaning of the various and several paragraphs hereof.

16.    Gender and Number.  Within this Agreement, words of any gender shall be held and construed to include any other gender, and words in the singular number shall be held and construed to include the plural and words in the plural number shall be held and construed to include the singular, unless the context otherwise requires.

17.    Applicable Law.  This Agreement and the rights and duties of the parties hereunder shall be governed by all purposes by the law of the State of Illinois and the law of the United States applicable to transactions within such state.

33544 00056 REALEST 75239

18.  _Counterparts._  This Agreement may be executed in multiple counterparts and by the different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be one and the same instrument with the same effect as if all parties to this agreement had signed the same signature page.

IN WITNESS WHEREOF, the parties hereto have hereunto caused this Agreement to be duly executed as of the day and year first above written.

**Tenant:**

CIRCUIT CITY STORES, INC.
a Virginia corporation


By: _____
            Name: _____
            Title: _____

**Lender:**

GUARANTY FEDERAL BANK, F.S.B., a
federal savings bank


By: _____
            Jim J. Johnson, Vice President


**Landlord:**

PARKER CENTRAL PLAZA, LTD., a Texas
limited partnership

By:  Parker Central Partners, LLC, a Texas
limited liability company, its Managing General
Partner


By: _____
            Wayne L. Nash, Manager

THE STATE OF VIRGINIA            )
                                 )
COUNTY OF _____        )

    This instrument was acknowledged before me on February _____, 1996 by
_____, _____ of Circuit City Stores, Inc., a
Virginia corporation on behalf of said corporation.

                         _____
                         Notary Public, State of Virginia

                         _____
My commission expires:
                             (printed name)

_____.


THE STATE OF TEXAS               )
                                 )
COUNTY OF DALLAS                 )

    This instrument was acknowledged before me on February _____, 1996 by Jim J.
Johnson, Vice President of Guaranty Federal Bank, F.S.B., a federal savings bank, on
behalf of said federal savings bank.

                         _____
                         Notary Public, State of Texas

                         _____
My commission expires:
                           (printed name)

_____.

33544 00056 REALEST 75239

7

THE STATE OF TEXAS )
)
COUNTY OF DALLAS )

    This instrument was acknowledged before me on February _____, 1996 by Wayne L. Nash, Manager of Parker Central Partners, LLC, a Texas limited liability company, on behalf of said limited liability company in its capacity as General Partner of Parker Central Partners, Ltd., a Texas limited partnership.

_____
Notary Public, State of Texas

_____
(printed name)

My commission expires:

_____.

After recording, return to:

Juliet N. Carter
Thompson & Knight, P.C.
1700 Pacific Avenue, Suite 3300
Dallas, Texas  75201

## EXHIBIT "H"

## MEMORANDUM OF LEASE AGREEMENT

This Memorandum of Lease is made this _____ day of February, 1996, between PARKER CENTRAL PLAZA, LTD., a Texas limited partnership (hereinafter referred to as "Landlord"), and CIRCUIT CITY STORES, INC., a Virginia corporation (hereinafter referred to as "Tenant").

### W I T N E S S E T H:

Landlord and Tenant have entered into a Lease (the "Lease") dated February __, 1996, whereby Landlord has leased to Tenant a portion of the real property (the "Property"), located in the City of Plano, Collin County, Texas, the legal description of which Property is set forth on Exhibit "A-1" attached hereto. The Lease contains provisions and rights appurtenant to the Property, some of which are as follows:

1.    Term.  The term of the Lease is for a period of twenty (20) years, commencing on the Commencement Date (as established in the Lease based upon the substantial completion of the improvements upon the Property).  Thereafter, Tenant has the right under the Lease to renew and extend the term of the Lease for four (4) successive periods of five (5) years each.

2.    Exclusive Use Rights.  The Lease provides that no tenant or occupant of the Property other than Tenant shall be entitled to use more than five hundred (500) square feet of its premises for (i) the sale of consumer, office and automotive electronics products (which include, but shall not be limited to, televisions, stereos, speakers and video recorders and players), computer hardware and software, entertainment software and entertainment media (which include, but shall not be limited to, records, game cartridges, video tapes, cassettes and compact discs), cellular telephones, household appliances (which include, but shall not be limited to, refrigerators, freezers, stoves, microwave ovens, vacuum cleaners and dishwashers) and related goods and the sale and installation of motor vehicle audio, stereo and telephone systems (all of such items being herein collectively referred to as the "Products"), or (ii) rental of consumer, office and automotive electronics equipment, computer hardware and appliances, or repair of the Products, subject only to the rights of

Computer City to use its premises for the following uses: (i) the sale, lease, service or supply of computers, computer software, computer tools, computer peripherals, and components thereof, and (ii) the sale, lease, service and supply of any other product or device that has an office, home-office or personal productivity use or application (including, by way of example and without limitation, paper goods, ribbons, calculators, personal organizers, hand-held electronic devices, hand-held computers, copiers, facsimile machines, cellular phones and office furniture).  The foregoing exception to Tenant's exclusive use shall be in effect only if any exclusive use provisions of Computer City shall not be applicable to Tenant, and only so long as Computer City is open and operating for business in the shopping center in which the Property is located.

     3.   <u>Successors</u>.  The covenants, conditions and agreements made and entered into by the parties hereto shall be binding upon and inure to the benefits of their respective heirs, administrators, executors, representatives, successors and assigns.

     4.   <u>Incorporation of Lease</u>.  All terms and conditions of the Lease are hereby incorporated herein by reference as if fully set forth herein.

     5.   <u>Conflicts with Lease</u>.  This Memorandum of Lease is solely for notice and recording purposes and shall not be construed to alter modify, expand, diminish or supplement the provisions of the Lease.  In the event of any inconsistency between the provisions of this Memorandum of Lease and the provisions of the Lease, the provisions of the Lease shall govern.

     IN WITNESS WHEREOF, this Memorandum of Lease has been duly executed by the parties hereto as of the day and year first above written.

                      LANDLORD: PARKER CENTRAL PLAZA, LTD.,
                      a Texas limited partnership

ATTEST:            By:    Parker Central Partners, LLC, a Texas limited
                       liability company

By:_____
Its:_____

                      By:_____
                      Name:  Wayne L. Nash
                      Title: Manager

Attest:                          TENANT: CIRCUIT CITY STORES, INC., a Virginia
                                 corporation


_____          By: _____
Its: Assistant Secretary              Vice President

(SEAL)

STATE OF VIRGINIA  )

          )ss.

COUNTY OF HENRICO  )

   The foregoing instrument was acknowledged before me this day of _____ 1996, by _____, _____ of Circuit City Stores, Inc., a Virginia corporation, on behalf of the corporation.


     _____

     Notary Public in and for said County and State


My commission expires: _____


(SEAL)




STATE OF TEXAS   )

         )ss.

COUNTY OF COLLIN  )


   The foregoing instrument was acknowledged before me this \_\_\_ day of _____ 1996, by Wayne L. Nash, manager of Parker Central Partners, LLC, a Texas limited liability company, on behalf of the limited liability company.


     _____

     Notary Public in and for said County and State


My commission expires: _____  (SEAL)

[4313]:\circuit\plano\lease.mem