**EXHIBIT A**



**LEASE AGREEMENT**

by and between

**PORT ARTHUR HOLDINGS III, LTD.**

as Landlord

and

**CIRCUIT CITY STORES, INC.**

as Tenant

SHOPPES AT PORT ARTHUR

Table of Contents

Page

ARTICLE I       FUNDAMENTAL LEASE PROVISIONS ..................................................... 1
    Section 1.01    Definitions: ........................................................................... 1
ARTICLE II      LEASE OF PREMISES - TERM OF LEASE ................................................ 3
    Section 2.01    Demise ................................................................................. 3
    Section 2.02    Extension Periods................................................................... 4
    Section 2.03    Commencement Date and Landlord Reimbursement ......................... 4
    Section 2.04    Possession Date...................................................................... 5
    Section 2.05    Expected Possession Date ........................................................ 6
    Section 2.06    Possession Date During Slack Period Delivery ................................ 6
    Section 2.07    Delayed Possession ................................................................ 6
    Section 2.08    Early Entry ............................................................................ 7
    Section 2.09    Measurement.......................................................................... 7
    Section 2.10    Commencement Date Agreement ................................................ 7
ARTICLE III     INITIAL CONSTRUCTION ................................................................... 7
    Section 3.01    Landlord's and Tenant's Work ................................................... 7
ARTICLE IV      RENT ................................................................................................. 8
    Section 4.01    Annual Minimum Rent ............................................................. 8
    Section 4.02    Additional Rent...................................................................... 8
    Section 4.03    Rent; Method of Payment ......................................................... 8
ARTICLE V       COMMON AREA MAINTENANCE AND COST ....................................... 8
    Section 5.01    Maintenance .......................................................................... 8
    Section 5.02    Construction Clean-up and Post-Possession Work............................ 9
    Section 5.03    CAM Costs............................................................................. 9
    Section 5.04    Tenant's Share of CAM Costs .................................................. 10
    Section 5.05    Payment of CAM Costs .......................................................... 10
    Section 5.06    CAM Costs Increases.............................................................. 11
ARTICLE VI      TAXES.............................................................................................. 11
    Section 6.01    Taxes .................................................................................. 11
    Section 6.02    Payment of Taxes.................................................................. 11
    Section 6.03    Exclusions from Taxes............................................................ 12
    Section 6.04    Right to Contest ................................................................... 12

Table of Contents
(continued)

Page

ARTICLE VII    UTILITIES ................................................................. 12

Section 7.01    Utilities ................................................................. 12

Section 7.02    Interruption ................................................................. 13

ARTICLE VIII    USE OF PREMISES ................................................................. 13

Section 8.01    Permitted Use ................................................................. 13

Section 8.02    Conduct of Operations ................................................................. 13

Section 8.03    Leasing Restrictions ................................................................. 13

Section 8.04    Tenant's Exclusive ................................................................. 14

Section 8.05    Exclusives Applicable To Tenant ................................................................. 15

Section 8.06    Key Tenants ................................................................. 15

ARTICLE IX    REPAIRS ................................................................. 16

Section 9.01    Landlord Obligations ................................................................. 16

Section 9.02    Tenant's Obligations ................................................................. 16

Section 9.03    Hazardous Materials ................................................................. 17

Section 9.04    Surrender of the Premises ................................................................. 18

ARTICLE X    REQUIREMENTS OF LAW ................................................................. 19

Section 10.01    Landlord's Obligations ................................................................. 19

Section 10.02    Tenant's Obligations ................................................................. 19

Section 10.03    Right to Contest ................................................................. 19

ARTICLE XI    INSURANCE ................................................................. 19

Section 11.01    Landlord's Insurance ................................................................. 19

Section 11.02    Tenant's Insurance ................................................................. 20

Section 11.03    Insurance Requirements Generally ................................................................. 21

Section 11.04    Landlord's Insurance Cost ................................................................. 21

Section 11.05    Indemnity ................................................................. 21

Section 11.06    Mutual Waiver of Subrogation ................................................................. 22

Section 11.07    Affiliate ................................................................. 22

ARTICLE XII    DAMAGE OR DESTRUCTION ................................................................. 23

Section 12.01    Landlord's Obligation to Rebuild ................................................................. 23

Section 12.02    Tenant's Obligation to Rebuild ................................................................. 23

Table of Contents
(continued)

Page

Section 12.03    Termination.................................................................. 23

ARTICLE XIII    CONDEMNATION .................................................... 24

Section 13.01    Taking ........................................................................ 24

Section 13.02    Restoration and Rent Adjustment ....................................... 25

Section 13.03    Award......................................................................... 25

ARTICLE XIV    ALTERATIONS AND MECHANICS' LIENS ................. 25

Section 14.01    Tenant's Alteration Rights................................................. 25

Section 14.02    Mechanics' Liens .......................................................... 26

ARTICLE XV    SIGNS....................................................................... 27

Section 15.01    Tenant's Signs.............................................................. 27

Section 15.02    Pylon Signs ................................................................. 27

Section 15.03    Replacement................................................................ 27

ARTICLE XVI    TENANT'S PROPERTY ............................................. 28

Section 16.01    Tenant's Property .......................................................... 28

ARTICLE XVII    ASSIGNMENT AND SUBLETTING ........................... 28

Section 17.01    Assignment and Subletting Rights...................................... 28

Section 17.02    Collateral Assignment..................................................... 28

Section 17.03    Cure Rights of Original Tenant.......................................... 28

Section 17.04    Recognition Agreement .................................................. 29

ARTICLE XVIII    DEFAULT ............................................................. 29

Section 18.01    Tenant's Default............................................................ 29

Section 18.02    Additional Landlord Remedies Due to Construction Delays by
                 Tenant ....................................................................... 30

Section 18.03    Landlord's Default ......................................................... 31

Section 18.04    Additional Tenant Self-help, Equitable and Legal Remedies
                 Due to Construction Delays by Landlord ........................... 32

Section 18.05    Additional Tenant Remedies Due to Landlord's Failure to Pay
                 the Landlord Reimbursement........................................... 32

Section 18.06    Waiver; Non-Exclusive Remedies ..................................... 33

ARTICLE XIX    SUBORDINATION, TRANSFER OF INTEREST ............ 33

Section 19.01    Subordination............................................................... 33

Table of Contents
(continued)

Page

Section 19.02    Existing Mortgages and Ground Leases ........................................... 34

Section 19.03    Transfer of Interest................................................................ 34

Section 19.04    Tenant Estoppel Certificates ..................................................... 35

Section 19.05    Landlord Estoppel Certificates .......................................... 35

Section 19.06    Payments ................................................................ 35

ARTICLE XX    LANDLORD'S REPRESENTATIONS, WARRANTIES AND COVENANTS ........................................................ 35

Section 20.01    Quiet Enjoyment .................................................... 35

Section 20.02    Representations, Warranties and Covenants..................................... 35

Section 20.03    Site Covenants ....................................................... 36

Section 20.04    Intentionally Deleted................................................... 37

ARTICLE XXI    HOLDING OVER ............................................... 37

Section 21.01    Holding Over ........................................................ 37

ARTICLE XXII    NOTICE................................................................ 38

Section 22.01    Where and How Given..................................................... 38

Section 22.02    When Given .......................................................... 38

ARTICLE XXIII    MISCELLANEOUS ............................................... 39

Section 23.01    Rent Proration ...................................................... 39

Section 23.02    Construction............................................................... 39

Section 23.03    Section Headings.................................................... 39

Section 23.04    Partial Invalidity................................................... 39

Section 23.05    Waiver ....................................................................... 39

Section 23.06    Governing Law ..................................................... 39

Section 23.07    Successors and Assigns..................................................... 39

Section 23.08    No Broker.............................................................. 39

Section 23.09    Memorandum of Lease ...................................................... 40

Section 23.10    Entire Agreement .................................................... 40

Section 23.11    Relationship of Parties ....................................................... 40

Section 23.12    Force Majeure ...................................................... 40

Section 23.13    Limitation of Landlord's Liability ...................................... 40

Table of Contents
(continued)

Page

Section 23.14    Limitation of Tenant's Liability.........................................................41

Section 23.15    Consents..........................................................................................41

Section 23.16    Costs...............................................................................................41

Section 23.17    Attorneys' Fees ..............................................................................41

Section 23.18    Survival of Obligations ..................................................................41

Section 23.19    Joint and Several Liability ..............................................................41

Section 23.20    Definition of Hereunder, Herein, etc. .............................................41

Section 23.21    Tenant's Trade Name.......................................................................41

Section 23.22    Counterparts ..................................................................................42

## EXHIBITS

EXHIBIT A          Site Plan
EXHIBIT B          Legal Description of the Shopping Center
EXHIBIT C          Site Design Requirements
EXHIBIT C-1        Possession Date Notice
EXHIBIT D          W-9 Form
EXHIBIT E          Commencement Date and Expiration Date Agreement
EXHIBIT F          Prohibited Uses
EXHIBIT G          Existing Leases
EXHIBIT H          Existing Exclusives
EXHIBIT I          Recognition Agreement
EXHIBIT J          Subordination, Non-Disturbance and Attornment Agreement
EXHIBIT K          Permitted Exceptions
EXHIBIT L          Memorandum of Lease
EXHIBIT M          Indemnity Agreement
EXHIBIT N          Pylon Sign Rendering
EXHIBIT O          Ross Dress For Less Construction Access and Staging Area

## LEASE AGREEMENT

**THIS LEASE AGREEMENT** (this "Lease"), dated as of the 22nd day of December, 2006 ("Effective Date"), by and between **PORT ARTHUR HOLDINGS III, LTD.,** a Texas limited partnership ("Landlord") with an office at 712 Main Street, Houston, TX 77002, and **CIRCUIT CITY STORES, INC.,** a Virginia corporation ("Tenant") with an office at 9950 Mayland Drive, Richmond, Virginia 23233.

## W I T N E S S E T H:

In consideration of the rents and covenants set forth in this Lease, Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises (as defined in Section 1.01(P)) upon the following terms and conditions:

### ARTICLE I

### FUNDAMENTAL LEASE PROVISIONS

SECTION 1.01 Definitions:

A. **Additional Charges**:

1. Initial CAM Costs: Two and 00/100 Dollars ($2.00) per square foot of Floor Area (as defined below), which includes the initial insurance cost of Fifty Cents ($0.50) per square foot of Floor Area (the "Initial Insurance Cost").

2. Initial Taxes: One and 50/100 Dollars ($ 1.50) per square foot of Floor Area.

B. **Alternative Rent**: An amount equal to fifty percent (50%) of the Annual Minimum Rent (as defined below) that would have otherwise been due during the period of time that Tenant is entitled to pay Alternative Rent.

C. **Annual Minimum Rent** (subject to adjustment pursuant to Section 2.09):

| Period | Rent p.s.f. | Annual Rent | Monthly Installments |
|---|---|---|---|
| Initial Lease Term: | | | |
| Commencement Date through end of tenth (10th) Lease Year (as defined in Section 1.01(J)) | $14.00 | $284,256.00 | $23,688.00 |
| 1st Extension Period (as defined in Section 1.01(F)): | $15.00 | $304,560.00 | $25,380.00 |
| 2nd Extension Period: | $16.00 | $324,864.00 | $27,072.00 |

|                       |         |              |             |
|-----------------------|---------|--------------|-------------|
| 3rd Extension Period: | $17.00  | $345,168.00  | $28,764.00  |
| 4th Extension Period: | $18.00  | $365,472.00  | $30,456.00  |

D.   **Broker**:  Western Retail Advisors, LLC.

E.   **Delivery Dates**:   1.   Anticipated Possession Date:  February 1, 2007.

                            2.   Outside Possession Date:  March 1, 2007.

F.   **Extension Periods**:  Four (4) periods of five (5) years each.

G.   **Floor Area**:   The actual number of square feet of space contained on all floors within any building area in a particular leased premises (including the Premises) within the Shopping Center (as defined below), or in the Shopping Center, as applicable, and, with respect to exterior areas, including all exterior areas leased to or exclusively used by one (1) or more tenants (other than loading dock areas, trash compactor areas, and trash container areas).  All measurements shall be from the exterior of outside walls or store front and/or to the centerline of any common walls, but in no event shall Floor Area include any non-selling or storage space areas within any mezzanine, lower floor, second floor or, except as set forth above, any exterior areas.

H.   **Initial Lease Term**:  Ten (10) Lease Years, plus the partial Lease Year commencing on the Commencement Date and ending on the January 31 immediately thereafter.

I.   **Key Tenants**:  Ross Dress for Less ("Ross") and one (1) additional 15,000 square foot (or larger) national tenant.

J.   **Lease Year**:  Each period within the Term (as defined below) commencing on February 1 and ending the next succeeding January 31, except that Lease Year 1 shall include the partial Lease Year commencing on the Commencement Date and ending on the January 31 immediately thereafter.

K.   **Minimum Ongoing Cotenancy Requirement**:  Key tenants, open for business during normal business hours, exclusive of the Premises.

L.   **Minimum Initial Cotenancy Requirement**:  Key tenants, open for business during normal business hours, exclusive of the Premises.

M.   **Minimum Parking Ratios**:  Four and one half (4.5) full-size parking spaces for each one thousand (1,000) square feet of Floor Area in the Shopping Center, with each parking space being at least nine (9) feet in width and eighteen (18) feet in length and for full-sized automobiles.

N.   **Opening Requirement:**  All of the Key Tenants are open for business.

O.   **Permitted Use**:  The sale, rental, installation, servicing and repairing of consumer, office and automotive electronics products (collectively, the "Products"); and/or for any other

lawful retail use not specifically prohibited by the provisions of Section 8.01.  The term "Products" shall include, without limitation, televisions, stereos, speakers, video and audio recorders and players and cameras; computer hardware and software and related software services (which include internet access services, entertainment software and entertainment media [such as, by way of example only, game cartridges, video tapes, cassettes, compact discs, DVD's and DVD equipment]); cellular and wireless telephones and telecommunication devices and related accessories; motor vehicle audio, stereo and telephone systems; and technological evolutions of the foregoing.

P.     **Premises:**  The store building to be constructed by Tenant as part of Tenant's Work (as defined in Section 3.01), containing approximately 20,304 square feet of Floor Area, including 138 feet of frontage, as crosshatched on the site plan attached hereto as Exhibit A (the "Site Plan"), in the shopping center known as Shoppes at Port Arthur, containing approximately 75,000 square feet of Floor Area and located at the northwest corner of Hwy 69 and FM 365 in Port Arthur, Texas (the "State"), as more particularly described in Exhibit B (the "Shopping Center").  The outparcels (as shown on the Site Plan) shall not be included as a part of the Shopping Center for purposes of (i) CAM Costs, (ii) Taxes, (iii) determining Minimum Parking Ratios, (iv) Article XII (casualty), or (v) Article XIII (condemnation).  The outparcels shall each be separate tax parcels, maintained in first-class condition by the owner or occupant thereof and contain sufficient parking spaces within its boundaries to meet applicable parking code requirements.

Q.     **Slack Delivery Period**:  Periods of time beginning on May 5 and ending on the following July 5, and November 1 and ending on the following March 1.

R.     **Slack Season**:  The period of time beginning on November 1st and ending on the following January 1.

S.     **Tenant' s Share**:  A fraction, the numerator of which shall be the Floor Area of the Premises and the denominator of which shall be the Floor Area of all buildings in the Shopping Center.  In no event shall the denominator of the fraction by which Tenant's Share is determined be less than ninety percent (90%) of the Floor Area of the building areas shown on the Site Plan.

T.     **Term**:  The Initial Lease Term plus the Extension Periods, if the option for any such Extension Period is exercised.

## ARTICLE II

## LEASE OF PREMISES - TERM OF LEASE

SECTION 2.01 Demise.

(a)     Landlord does hereby lease and demise to Tenant, and Tenant does hereby hire from Landlord, the Premises, together with the licenses, rights, privileges and easements appurtenant to the Premises.

(b)    Tenant and its employees, invitees, agents, customers, concessionaires and licensees shall have the nonexclusive right, in common with Landlord and other tenants of the Shopping Center, to use all Shopping Center sidewalks, paved parking areas, paved service areas, signs, traffic controls, lighting and all means of ingress, egress, acceleration, deceleration and stacking lanes and circulation for the aforesaid parking and service areas of the Shopping Center to and from public streets and roads bordering the Shopping Center (collectively, the "Common Areas") now or hereafter made available or maintained by Landlord in the Shopping Center.  Tenant's right to use the Common Areas may be subject to such reasonable regulations (consistent with Tenant's rights under this Lease) as may from time to time be imposed upon, and equally applicable to, all tenants of the Shopping Center by Landlord or its agents.  Landlord shall provide Tenant with at least sixty (60) days prior notice of any such rules and regulations, which notice shall contain a copy of such rules and regulations.

(c)    Tenant shall have the exclusive right to use, on a "24 hour a day", "365 days a year" basis and without any additional charge, the loading facilities serving the Premises, the customer pick-up area, car stereo parking areas, four (4) web order customer pick-up parking spaces, trash compactor area and transformer pad area (collectively, the "Other Improvements"), all as shown on the Site Plan.  Tenant shall have the right to erect a sign identifying Tenant's customer pick-up area and/or Tenant's car stereo parking areas.  Tenant shall also have the right to erect signage, stripe, and print on the four (4) web order customer pick-up parking spaces in order to so identify such parking spaces.  In addition, Tenant shall have the right to have a truck or other vehicle parked in "Tenant's Preferred Area" as shown on the Site Plan ("Tenant's Preferred Area"), for up to seven (7) consecutive days in duration for each occurrence, for the purpose of promoting and displaying merchandise (each occurrence up to seven (7) days in duration is referred to as a "Tenant Promotion").  Tenant may have up to six (6) Tenant Promotions during Lease Year 1, and up to five (5) Tenant Promotions for each subsequent Lease Year.

SECTION 2.02  Extension Periods.  Provided Tenant is not then in default of any material terms or provisions this Lease, after the lapse of all applicable grace periods, Tenant shall have the option to extend the Term for the number of Extension Periods shown in Section 1.01(F), upon all the terms and conditions contained in this Lease.  Each such option is exercisable by Tenant giving notice to Landlord (a) at least one hundred eighty (180) days prior to the expiration of the Initial Lease Term, or of the preceding Extension Period, as the case may be, or (b) if Tenant fails to give Landlord such notice, then within twenty (20) days after receipt of notice from Landlord that Tenant has failed to exercise its option to extend within the time period provided in (a) above.

SECTION 2.03  Commencement Date and Landlord Reimbursement.  "Commencement Date" shall mean the date on which Landlord makes payment of the Landlord Reimbursement in accordance with this Lease.  "Landlord Reimbursement" shall mean the product obtained by multiplying Seventy Dollars ($70.00) by the Floor Area of the Premises as determined by the Floor Area Certification (as defined below).  Upon Substantial Completion (as defined in the site design requirements attached hereto as Exhibit C ["Site Design Requirements"]) and Tenant's furnishing to Landlord (a) the certificates of insurance required under Section 11.02, (b) an indemnity in the form of Exhibit M attached to this Lease with respect to mechanics' liens arising out of Tenant's construction, and (c) a square footage building perimeter survey certified to

Tenant and Landlord (the "Floor Area Certification"), Landlord shall pay to Tenant the Landlord Reimbursement.  The Landlord Reimbursement shall be payable by wire transfer of funds by Landlord to Tenant's account no later than thirty (30) days after Substantial Completion and receipt of items (a), (b) and (c) above.  However, if the Commencement Date shall occur during the Slack Season or prior to the date on which the Opening Requirement is met, and Tenant elects to delay the opening of its store, then, notwithstanding that the Commencement Date shall have occurred, Rent (as defined in Section 4.03) shall fully abate until the later to occur of (i) the first (1st) day following the end of the Slack Season, or (ii) the date on which the Opening Requirement is met.  However, if Tenant elects, at its discretion, to open for business during the Slack Season or prior to the date that the Opening Requirement is met, then Tenant shall pay, in lieu of Annual Minimum Rent, Alternative Rent until the later to occur of (i) the first (1st) day following the end of the Slack Season, or (ii) the date on which the Opening Requirement is met.  In no event shall Tenant's election to delay opening its store in any way delay or modify the date on which the Landlord Reimbursement is required to be paid by Landlord to Tenant.   Upon Substantial Completion and payment of the Landlord Reimbursement from Landlord to Tenant, Landlord shall be the owner of the Building (as defined in the Site Design Requirements, but not including any of Tenant's Property, as defined in Section 16.01) and Landlord shall be entitled to depreciate the Building for tax purposes.  Tenant shall have the right to deliver to Landlord, a bill of sale evidencing the conveyance of the Building from Tenant to Landlord.  Landlord shall also have the right to require Tenant to deliver to Landlord such a bill of sale.  However, the conveyance of the Building shall be deemed to have occurred notwithstanding that a bill of sale was not so delivered.

SECTION 2.04  Possession Date.  "Possession Date" shall mean the date on which the last of the following conditions shall have been satisfied:

(a)     Landlord shall have caused the Delivery of the Land (as defined in the Site Design Requirements) to occur;

(b)     Landlord shall have delivered the soils engineer's and surveyor's certifications as required by Circuit City's Specifications (as defined in the Site Design Requirements);

(c)     Intentionally Omitted;

(d)     Intentionally Omitted;

(e)     The representations and warranties of Landlord set forth in Sections 9.03 and 20.02 below shall then be true and in effect in all material respects, and Landlord shall not then be in violation of any of the Site Covenants (as defined in Section 20.03);

(f)     Landlord shall have delivered to Tenant a fully-executed original counterpart of a non-disturbance and/or recognition agreement, as applicable, from each Mortgagee and Ground Lessor (as such terms are defined in Section 19.01), as more fully set forth in Section 19.02;

(g)     Landlord shall have entered into contracts of sale or leases with each of the Key Tenants for terms of at least ten (10) years each; and

(h)      Landlord shall have delivered to Tenant the W-9 form attached hereto as Exhibit D.

Landlord currently anticipates that the Possession Date will occur on the Anticipated Possession Date, subject to the provisions of Section 2.05 below.  In no event shall the Possession Date occur prior to the Expected Possession Date (as defined in Section 2.05).

SECTION 2.05  Expected Possession Date.

(a)      Landlord shall give Tenant no less than One Hundred Eighty (180) days notice of the date on which the Possession Date (including, without limitation, the Delivery of the Land) shall occur, using the form of Possession Date Notice attached hereto as Exhibit C-1 (the "Possession Date Notice").  The date specified in such notice shall be defined as the "Expected Possession Date".

(b)      If Landlord fails to accomplish the Possession Date by the Expected Possession Date (subject to Force Majeure, as defined in Section 23.12, but in no event shall the aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed a period of thirty (30) days), then Landlord shall pay to Tenant on demand, as a liquidated reimbursement (and not as a penalty) for all of the damages that Tenant will suffer as a result of any such delay, an amount equal to the sum of: (i) Fifty Thousand Dollars ($50,000), plus (ii) an amount equal to two (2) days of Annual Minimum Rent for each day that the Possession Date is delayed.  If Landlord fails to complete any other element of Landlord's Work (as defined in Section 3.01) on or before the date required therefor in the Construction Schedule (as defined in the Site Design Requirements), subject to Force Majeure (but in no event shall the aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed a period of thirty (30) days), then Landlord shall pay to Tenant on demand, as a liquidated reimbursement (and not as a penalty) for all of the damages that Tenant will suffer as a result of any such delay, an amount equal to four (4) days of Annual Minimum Rent for each day that such component of Landlord's Work is delayed.  The foregoing liquidated reimbursements represent the parties' good faith agreement as to an agreed upon amount which shall have been incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment.

SECTION 2.06  Possession Date During Slack Delivery Period.  Anything contained in this Lease to the contrary notwithstanding, if the Possession Date occurs during the Slack Delivery Period, then Tenant may refuse to accept the Premises.  In that event, the Possession Date shall be delayed and shall not be deemed to occur until the first (1st) day following the end of the applicable Slack Delivery Period, subject to the other provisions of this Lease (including, without limitation, Sections 2.04 and 2.05).

SECTION 2.07  Delayed Possession.  If the Possession Date does not occur before the Outside Possession Date (subject to Force Majeure, but in no event shall the aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed a period of thirty (30) days), then Tenant shall have the right to (a) terminate this Lease, or (b) delay opening its store facility for a period of not to exceed nine (9) months, which right shall be exercised by Tenant upon notice to Landlord at any time prior to the Possession Date.  If Tenant terminates this Lease, then there shall be no further liability on the part of Landlord or Tenant, except: (i) for those

obligations that expressly survive the expiration or other termination of this Lease, and (ii) Landlord shall (which obligation shall survive the termination of this Lease), within three (3) business days following Tenant's termination notice, reimburse Tenant for all its reasonable third-party costs and expenses incurred in connection with this Lease (including, without limitation, costs associated with the preparation and review of plans and specifications, and attorneys' fees), not to exceed Fifty Thousand Dollars ($50,000).  If Tenant elects to delay opening its store facility, then Landlord shall cause the Possession Date (including, without limitation,  the Delivery of the Land) to occur on the date subsequently required by Tenant, and Landlord shall pay to Tenant on demand an amount equal to all additional costs incurred by Tenant in the development of its store facility including, but not limited to, costs of materials and all engineering, architectural, legal fees, and costs of delay resulting from Landlord's failure to timely deliver.

SECTION 2.08  Early Entry.  Any time prior to the Delivery of the Land, Tenant shall have the right to enter the Premises to (a) inspect the physical condition of the Land (as defined in the Site Design Requirements) and conduct its due diligence investigation of the Land to determine the suitability of the Land for Tenant's intended development, construction, use and operation and (b) inspect Landlord's Work; provided, however, that such entry may not unreasonably interfere with Landlord's Work.  Such entry shall not be construed as an acceptance of the Premises by Tenant under the provisions of this Lease or as a waiver of any of the provisions hereof.

SECTION 2.09  Measurement.  If the Floor Area Certification shall disclose that the Premises contains more or less than the Floor Area shown in Section 1.01(P), then Landlord and Tenant agree to amend this Lease to adjust all Rent to account for the actual Floor Area of the Premises.

SECTION 2.10  Commencement Date Agreement.  When the Commencement Date has been determined, Landlord and Tenant shall execute a memorandum, in the form of Exhibit E, which shall expressly confirm the Commencement Date and the expiration date of the Initial Lease Term, and which shall also ratify and affirm all of the terms and provisions of this Lease.

## ARTICLE III

## INITIAL CONSTRUCTION

SECTION 3.01  Landlord's and Tenant's Work.  Landlord shall perform Landlord's work in accordance with the Site Design Requirements and as otherwise required by this Lease ("Landlord's Work").  Tenant shall construct the Building and storefront sidewalk in accordance with the Site Design Requirements ("Tenant's Work") for which Landlord shall pay to Tenant the Landlord Reimbursement.  Landlord and Tenant acknowledge receipt of the Site Design Requirements and each agrees to comply with the provisions thereof relating to their respective work.  In connection with Tenant's performance of Tenant's Work and during any other periods of construction during the Term, Tenant shall have the right to use as a construction staging area approximately 20,000 square feet of the Common Areas in the location identified on the Site Plan as "Staging Area."  Landlord hereby agrees to permit construction access and staging in

connection with construction of the Ross Dress For Less store only in the locations therefor shown on the site plan attached as Exhibit O.

## ARTICLE IV

## RENT

SECTION 4.01  Annual Minimum Rent.  Commencing on the Commencement Date, Tenant shall pay to Landlord monthly installments of Annual Minimum Rent without setoff or deductions, except as otherwise provided for in this Lease, on the first (1st) day of each calendar month during the Term.  However, if the Commencement Date occurs on a day other than the first (1st) day of a calendar month, then the monthly installment of Annual Minimum Rent and other charges shall be prorated for the remaining days of that calendar month.  Anything contained in this Lease to the contrary notwithstanding, if Tenant shall be paying Alternative Rent, Ground Rent (as defined in Section 18.02(a)) or any other ground rent in lieu of Annual Minimum Rent as permitted under this Lease during such time as Tenant shall be entitled to an abatement of, deduction from or setoff against Annual Minimum Rent, then Tenant shall be entitled to the same abatement of, deduction from or setoff against Alternative Rent, Ground Rent or the other ground rent.

SECTION 4.02  Additional Rent.  The term "Additional Rent" shall mean all amounts required to be paid by Tenant under this Lease other than Annual Minimum Rent.  Wherever an item of Additional Rent is payable "on demand" or no time period for payment of an item of Additional Rent is specifically provided for in this Lease, such item of Additional Rent shall be paid by Tenant within thirty (30) days after Tenant's receipt of Landlord's invoice therefor, accompanied by the appropriate back-up documentation.

SECTION 4.03  Rent; Method of Payment.  The term "Rent" shall mean, collectively, Annual Minimum Rent and Additional Rent.  All payments of Rent shall be made by check payable to Landlord, mailed or delivered to the address listed in Section 22.01 or to such other person or place as Landlord shall designate by notice to Tenant, or by such other reasonable method of payment (such as by wire transfer).

## ARTICLE V

## COMMON AREA MAINTENANCE AND COST

SECTION 5.01  Maintenance.  Landlord shall operate, maintain, insure, repair and replace the Common Areas or cause the same to be done in a manner so as to maintain the Shopping Center in good, first-class order, repair and condition.  Without limiting the generality of the foregoing, Landlord shall be solely responsible, and Tenant shall have no obligation (except to reimburse Landlord for Tenant's Share of the cost thereof, as provided below), for the maintenance, repair or replacement of the parking areas (including, without limitation, any necessary repaving and restriping), parking lot lighting, utility systems and connections, access ways and other Common Areas and for the clearing of snow and ice from the Common Areas. Landlord may at any time, except between October 1 and January 1, close temporarily any Common Areas to make repairs, to prevent the acquisition of public rights therein or discourage

non-customer parking.  Between October 1 and January 1, Landlord may temporarily close parts of the Common Areas, but only to make repairs of an emergency nature.  However, in any instance of such emergency repairs Landlord shall use all reasonable efforts to perform the necessary repairs in the most expeditious manner possible and in such a way and at such times as to cause the least interference possible with ingress and egress to and from the Premises.  In order to reduce interference with Tenant's business operation during such period, Landlord shall effect temporary repairs, where feasible, and complete the permanent repairs after January 1.

SECTION 5.02  <u>Construction Clean-up and Post-Possession Work</u>.  Following the Possession Date, any construction by Landlord or other tenants or occupants of the Shopping Center affecting any portion of the Shopping Center shall be subject to the following terms and conditions (in addition if any other applicable provisions of this Lease, such as, by way of example only, Section 20.03(g)):

(a)  staging and storage of materials and parking of construction vehicles shall not occur in Tenant's Preferred Area;

(b)  Landlord shall diligently ensure that, from and after Tenant's opening for business to the public, no ingress, egress or passage of any construction, delivery and related vehicles engaged in the performance of such work or other construction activities shall take place except through the entrance/exit drive designated as the "<u>Construction Drive</u>" on  the Site Plan;

(c)  Landlord shall maintain the Shopping Center in a clean, safe, and sightly condition, and shall use reasonable efforts to ensure that such construction shall not materially adversely interfere with the normal conduct of any business operations in the Premises; and

(d)  Landlord shall clear all rubble and debris from the Premises and Common Areas resulting from any construction by Landlord or any other tenant or occupant of the Shopping Center.

SECTION 5.03  <u>CAM Costs</u>.  "<u>CAM Costs</u>" shall mean the actual amount (without profit or "mark up" by Landlord or any Affiliate, as defined in Section 11.07, of Landlord) of all necessary, competitive and reasonable costs and expenses actually incurred by Landlord in operating, insuring and maintaining the Common Areas in an appropriate manner commensurate with good business practice and first-class shopping centers, and, in addition thereto, in lieu of any cost(s) or expense(s) relating to the administration and management of the Common Areas, an administrative fee (the "<u>Administrative Fee</u>") equal to five percent (5%) of the CAM Costs for the calendar year in question, but excluding from the computation of such Administrative Fee the cost of any replacement or improvement of a capital nature (to the extent otherwise permitted to be included in CAM Costs), the cost of electricity and other utilities, and the cost of insurance premiums.  In no event will CAM Costs include: (a) real estate taxes, (b) any costs associated with maintenance performed by another tenant or occupant of the Shopping Center on portions of the Common Areas separately maintained by such tenant or occupant; (c) any dues or charges for a merchants' or other association of occupants of the Shopping Center; (d) maintenance, repairs or replacements to the Common Areas (i) necessitated by the negligent or wrongful act of Landlord or any tenant or occupant, (ii) made to correct any construction defect, or (iii) relating to any improvements or utility systems not within the Common Areas (e.g. roofs, exterior walls,

fire protection systems); (e) repairs or replacements necessitated by any governmental entity or made to correct any condition in existence prior to the Commencement Date, or to correct damage caused by subsidence or adverse or substandard soil conditions; (f) amounts reimbursable from insurance proceeds, under warranty, or by any tenant or occupant of the Shopping Center or any other third party other than pursuant to a Common Area expense provision similar to this Section 5.03; (g) premiums for insurance for coverage maintained by Landlord with respect to the Shopping Center (except that premiums for Common Areas liability insurance may be included as part of CAM Costs provided the coverage provided by such liability insurance policy is not in excess of the limits established in Section 11.01), any costs resulting from insurance deductibles under any insurance policy maintained by Landlord, any costs which would have been reimbursed or paid for by insurance proceeds had Landlord maintained the insurance required under Section 11.01, and the amount of any judgment or other charge entered, or costs assessed against, Landlord in excess of the policy limits of the insurance maintained by Landlord with respect to the Shopping Center or required to be maintained by Landlord under Section 11.01; (h) the cost of any replacements or capital improvements to the Common Areas, except that the cost of repaving the parking areas of the Shopping Center may be included within CAM Costs so long as such cost is otherwise permitted to be included within CAM Costs and is amortized on a straight-line basis over the useful life thereof under generally accepted accounting principles consistently applied, and is not incurred (i) prior to the expiration of the tenth (10th) full calendar year of the Term, or (ii) more than once during each ten (10) full calendar years of the Term; (i) reserves for anticipated future expenses; (j) interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner; (k) Landlord's personnel, overhead, home office or administrative expenses, except for the Administrative Fee; (l) amounts incurred to remediate any Hazardous Materials (as defined in Section 9.03(a)); (m) any new improvements to the Shopping Center or Common Areas including, but not limited to, renovations to the facade of the Shopping Center and improvements to landscaped areas of the Shopping Center; (n) holiday or other decorations or other promotional expenses relating to the Shopping Center; or (o) any fees, costs or expenses not related to the operation, maintenance, insurance or repair of the Common Areas.  Further, Landlord shall exclude from CAM Costs all costs or expenses in connection with any repairs or replacements to the Common Areas from the Commencement Date through the first (1st) anniversary of the Commencement Date, and Landlord shall also make an appropriate adjustment for the increase in CAM Costs attributable to tenants or occupants of the Shopping Center operating between the hours of 10 p.m. and 9 a.m.

SECTION 5.04  Tenant's Share of CAM Costs.  Tenant shall pay to Landlord Tenant's Share of CAM Costs in each calendar year during the Term.  Tenant's Share of CAM Costs shall be appropriately prorated for partial calendar years at the beginning and at the end of the Term. Notwithstanding anything contained in this Lease to the contrary, in no event shall Tenant's Share of CAM Costs in the first (1st) full calendar year of the Term (including the prior partial year, if any) exceed the Initial CAM Costs, and in no event shall the component(s) thereof for Landlord's insurance obligations exceed the Initial Insurance Cost.

SECTION 5.05  Payment of CAM Costs.  Tenant's Share of CAM Costs shall be payable in equal monthly installments on the first (1st) day of each month.  Such monthly installments shall be at the rate of one-twelfth (1/12th) of Tenant's Share of CAM Costs for the preceding calendar year, subject to immediate adjustment when the actual amount of CAM Costs or a

change in Tenant's Share thereof is determined.  Within ninety (90) days after the end of each calendar year, Landlord shall furnish Tenant with a detailed statement certified by an authorized representative of Landlord of the actual amount of CAM Costs and of Tenant's Share thereof for the preceding calendar year (including the basis of allocation to Tenant).  Within thirty (30) days after receipt of such statement by Tenant, Tenant shall pay to Landlord any deficiency due.  Any surplus paid by Tenant shall, at Tenant's option, be credited against the next installment(s) of Rent or be refunded to Tenant forthwith.  Landlord's records of CAM Costs for each year shall be available for inspection by Tenant for a period of three (3) years after Landlord notifies Tenant of Tenant's Share of CAM Costs for the year in question.  Tenant may, during such three (3) year period, upon ten (10) days' prior notice to Landlord, have an audit made of CAM Costs and the allocations thereof to Tenant including, without limitation, reviewing copies of paid bills and other records substantiating its expenditures ("CAM Records").  In addition, Landlord agrees to forward copies of CAM Records to Tenant or its representative within ten (10) days of a request therefor.  Any overcharges shown by any such audit shall, at Tenant's option, be credited against the next installment(s) of Rent or be refunded to Tenant forthwith.  If any such audit shows that Tenant's Share of CAM Costs have been overstated by more than three percent (3%), then Landlord shall immediately pay to Tenant the reasonable cost of such audit.

SECTION 5.06  CAM Costs Increases.  Notwithstanding anything contained in this Lease to the contrary, for all calendar years subsequent to the first (1st) full calendar year of the Term, in no event shall Tenant's Share of CAM Costs increase, from any calendar year to the immediately succeeding calendar year, by more than five percent (5%), excluding insurance.

## ARTICLE VI

## TAXES

SECTION 6.01  Taxes.  Landlord shall pay when due all real estate taxes and assessments levied and assessed against the land, improvements and buildings comprising the Shopping Center.  Except as hereinafter provided to the contrary, for each calendar year or part thereof during the Term, Tenant shall pay Tenant's Share of the net amount (after reflecting all discounts for early payment, refunds and credits and after excluding all penalties, interest, late charges and real estate taxes and assessments levied against free-standing buildings which are separately assessed) of all real estate taxes and assessments (collectively, "Taxes") levied and assessed against the land, improvements and buildings comprising the Shopping Center. Tenant's Share of Taxes shall be equitably adjusted if the use or value of any portion (other than the Premises) of any buildings in the Shopping Center included in computing Tenant's allocation cause Taxes attributable to such buildings to be assessed at a disproportionately higher rate. Notwithstanding anything contained in this Lease to the contrary, in no event shall Tenant's Share of Taxes for the first (1st) full calendar year of the Term (including the prior partial year, if any) exceed the Initial Taxes.

SECTION 6.02  Payment of Taxes.  Tenant shall be liable for and shall pay Tenant's Share of Taxes only with respect to Taxes accruing during the Term, regardless of when such Taxes are billed or become due and payable. Tenant's Share of Taxes shall be appropriately prorated for partial fiscal tax years at the beginning and at the end of the Term.  Tenant shall pay Tenant's Share of Taxes within thirty (30) days after Landlord submits to Tenant a tax bill for

such Taxes and a statement setting forth the manner in which Tenant's Share of Taxes is calculated, or (b) thirty (30) days before the same are due and payable, whichever is later.

SECTION 6.03  <u>Exclusions from Taxes</u>.  Notwithstanding anything contained in this Lease to the contrary with respect to betterments or other extraordinary or special assessments, Tenant's obligations shall apply only to the extent such assessments (and interest thereon) are payable in respect of the Term, and Tenant's Share of any such assessments shall be determined as if such assessments are payable in installments over the longest payment period permitted by law for the particular assessment, in which case Tenant shall pay only those installments payable in respect of the Term.  Landlord represents to Tenant that, as of the Effective Date and, to the best of Landlord's knowledge, as of the Possession Date, no portion of the Shopping Center is or will be (a) subject to or the beneficiary of an abatement, exemption and/or phase-in of Taxes, (b) subject to any special assessments or similar charges, or (c) included in any special improvement district(s) which would result in higher sales taxes or other similar impositions than would exist in the absence of such district(s).  Further, Taxes shall not include any: (i) income, excise, profits, estate, inheritance, succession, gift, transfer, franchise, capital, or other tax or assessment upon Landlord or upon the rentals payable under this Lease; (ii) taxes on rents (other than to the extent that such taxes are customarily paid by retail tenants in the State), gross receipts or revenues of Landlord from the Premises; (iii) fine, penalty, cost or interest for any tax or assessment, or part thereof, which Landlord or its lender failed to timely pay, unless such late payment was solely attributable to late payment by Tenant of Tenant's Share of Taxes; (iv) assessment for a public improvement arising from the initial construction or expansion of the Shopping Center or the Premises; or (v) fees imposed upon Landlord in connection with Landlord's development of the Shopping Center (including, without limitation, trip generation fees).  All Taxes payable by Tenant pursuant to this Article VI shall be determined as if the Shopping Center was the only property owned by Landlord.

SECTION 6.04  <u>Right to Contest</u>.  At Tenant's request, Landlord shall contest the amount or validity of any assessed valuation or Taxes, failing which Tenant may contest the assessed valuation or Taxes by appropriate proceedings conducted in good faith.  If Tenant initiates such contest, then Landlord shall cooperate with Tenant including, without limitation, executing any and all documents required in connection therewith and, if required by any governmental authority having jurisdiction, joining with Tenant in the prosecution thereof.  If any rebate or refund of Taxes is received as a result of any contest or otherwise, then Tenant shall be entitled to Tenant's Share thereof (after reasonable and customary expenses incurred by Landlord and/or Tenant in connection with such contest are paid to the party which incurred such expense).  Tenant shall have the right to defer payment of Tenant's Share of Taxes during any such Tax contest if permitted under Laws (as defined in Section 10.01).

## ARTICLE VII

## UTILITIES

SECTION 7.01  <u>Utilities</u>.  Landlord covenants and agrees that the Premises shall be properly serviced with gas, electric, telephone, water, sewer and other utilities sufficient to meet Tenant's requirements in accordance with the Site Design Requirements.  Landlord, as part of Landlord's Work, shall cause all such utilities to the Premises to be separately metered at

Landlord's sole cost and expense.  Tenant shall pay, as same become due and payable, all charges for utility services furnished to the Premises during the Term.  If at any time during the Term, for any reason, Landlord shall provide utility service to the Premises, Tenant's cost for such utility service shall not exceed the lesser of (a) Landlord's actual cost for such utility service, or (b) the cost of the same service if Tenant had obtained such service directly from such utility provider.  In addition, Tenant shall have the right to install a test meter to verify its utility usage.  Notwithstanding anything contained in this Lease to the contrary, Tenant shall be entitled to select the utility service providers to the Premises including the telecommunication provider.  Landlord shall permit full and free access to all available conduits in the Shopping Center for the applicable utility service subject to such reasonable requirements as Landlord may impose.

SECTION 7.02  Interruption.  If utilities serving the Premises are disrupted due to the acts or omissions of Landlord, its agents, contractors, servants or employees, then Landlord shall promptly restore the affected utilities at Landlord's sole cost and expense.  If such disrupted utilities are not restored within three (3) business hours after the Landlord has knowledge of such disruption and Tenant is unable to conduct its normal business in the Premises as a result of such disruption, then Rent shall be equitably abated during the period of disruption.

## ARTICLE VIII

## USE OF PREMISES

SECTION 8.01  Permitted Use.  The Premises may be used and occupied for any Permitted Use.  However, Tenant shall not use the Premises for any of the Prohibited Uses (as defined in Exhibit F).

SECTION 8.02  Conduct of Operations.  Subject to the other provisions of this Lease (including, without limitation, Article II), Tenant shall initially open its store for business to the public in the Premises for at least one (1) day, not later than the two hundred seventieth  (270th) day after the Commencement Date.  Other than as expressly set forth in the preceding sentence, Tenant shall have no obligation to open or operate any business in the Premises, and shall have the right, at any time, to cease to conduct any business operations in the Premises, and Tenant shall incur no liability to Landlord by reason thereof.

SECTION 8.03  Leasing Restrictions.  Landlord shall construct, lease, operate, maintain and manage the Shopping Center as a first-class shopping center comparable to other first-class shopping centers in the State.  In that regard, Landlord shall not lease, rent or occupy, or permit to be leased, rented or occupied, any portion of the Shopping Center for any of the Prohibited Uses.  In addition, Landlord shall not lease, rent or occupy, or permit to be leased, rented or occupied, any building within three hundred (300) feet of the front entrance of the Premises for use as a restaurant except as shown as outparcels on the Site Plan.  Upon any breach of the foregoing Section 8.03(a), Tenant may elect to pay Alternative Rent in lieu of Annual Minimum Rent for so long as such violation shall continue.

SECTION 8.04  <u>Tenant's Exclusive</u>.

(a)    Landlord shall not lease, rent or occupy, or permit to be leased, rented, occupied, any other premises in the Shopping Center for the sale, rental, installation, servicing and/or repairing, either singly or in any combination, of the Products.  The Incidental Sale (as defined below) of the Products in connection with the overall business of another tenant shall not be deemed a violation this Section 8.04(a).  "<u>Incidental Sale</u>" shall mean sales in the lesser of (i) two hundred (200) square feet, or (ii) ten percent (10%) of such tenant's or occupant's, or Landlord's or any of its Affiliate's display area.  The exclusive use rights granted to Tenant in this Section 8.04(a) (the "<u>Exclusive Use Protection</u>") shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of all or part of the Premises.

(b)    The Exclusive Use Protection shall also not apply to Ross, or a full-line: supermarket (for example, Safeway, Winn-Dixie, or Stop & Shop), department store or discount department store (for example, Wal-Mart, K-Mart, J.C. Penney, Macy's, Kohl's or Target), or discount club (for example, Costco, BJ's Wholesale Club, or Sam's Club); <u>provided</u>, <u>however</u>, that, as to each of the foregoing, such stores (i) are National Tenants or Regional Tenants (as such terms are defined in Section 8.06), (ii) are operated in substantially the same manner as same are operated as of the Effective Date, and (iii) contain at least 80,000 square feet of Floor Area.

(c)    Upon any violation of the Exclusive Use Protection, Tenant may elect to pay Alternative Rent in lieu of Annual Minimum Rent for so long as such violation shall continue.  If such breach shall continue for more than sixty (60) days, then Tenant shall have the right to terminate this Lease at any time thereafter, in which event the applicable provisions of Section 8.04(f) shall control.

(d)    However, if any tenant or other occupant of the Shopping Center violates the Exclusive Use Protection and such violation also constitutes a default under its lease with Landlord, then Tenant's right to pay Alternative Rent pursuant to Section 8.04 (d) shall be tolled provided that Landlord shall have promptly commenced appropriate legal proceedings against such tenant or occupant, and shall thereafter diligently prosecute such proceedings to completion so as to enjoin and prohibit any such violation.  If Landlord shall have failed to promptly commence such proceedings, or shall fail thereafter to diligently prosecute the same, or if the violation does not cease within one hundred eighty (180) days after Landlord shall have been made aware of such violation, then Tenant's right to pay Alternative Rent shall apply for as long as such violation exists.  In addition, Tenant shall have the right (i) to conduct and prosecute such legal proceedings (including an action for injunctive relief) in its own name, at Landlord's expense, or (ii) in the event the right set forth in clause (i) above is not permitted to be exercised under Laws, to conduct and prosecute such legal proceedings in the name of Landlord, at Landlord's expense, and Landlord shall cooperate with Tenant with respect to such prosecution (including executing any documentation or authorization reasonably required by Tenant in connection with such prosecution and by appearing at any hearing or trial with respect to such prosecution).  If Tenant shall have paid Alternative Rent pursuant to this Section 8.04(e) for twenty-four (24) consecutive months, then Tenant shall have the rights to terminate this Lease subject to and in accordance with the provisions of Section 8.04(f).

(e)     If Tenant shall have paid Alternative Rent pursuant to Sections 8.04(d) or (e) for eighteen (18) full consecutive months, then Tenant must elect either to (i) terminate this Lease, or (ii) resume paying Annual Minimum Rent from and after the expiration of the thirty (30) day period following the end of such eighteen (18) month period.  Tenant shall make such election by notice to Landlord within thirty (30) days after the expiration of such eighteen (18) month period.  If Tenant fails to make such an election, then Tenant shall be deemed to have elected to proceed under clause (ii) above.  If Tenant elects to terminate this Lease pursuant to Sections 8.04(d) or (e), then this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of Landlord or Tenant, except: (x) for those obligations which expressly survive the expiration or other termination of this Lease, (y) Landlord shall (which obligation shall survive the termination of this Lease), within thirty (30) days after receiving a statement from Tenant showing the Unamortized Costs, reimburse Tenant for the then unamortized costs (amortized on a straight-line basis over the Term) of any alterations or improvements made by Tenant to the Premises (the "Unamortized Costs"), and (z) Tenant reserves all claims against Landlord for damages resulting from the violation of the Exclusive Use Protection.

SECTION 8.05  No Exclusives Applicable To Tenant.  Landlord represents and warrants that there are (and will be) no exclusives or use restrictions in effect which would apply to Tenant or any other occupant of the Premises, and Landlord covenants to indemnify, defend and hold Tenant harmless from and against all loss, cost, liability or expense (including, without limitation, reasonable legal fees) incurred by Tenant by reason of the enforcement by any person or entity of such exclusive or other use restriction.

SECTION 8.06  Key Tenants.  Landlord represents and warrants that it has entered or will enter into leases and/or operating agreements with the Key Tenants for initial terms expiring no sooner than the expiration of the Initial Lease Term.  If, from and after the satisfaction of the Opening Requirement, fewer than all of the Key Tenants are open for regular business or the Minimum Ongoing Cotenancy Percentage is not met, then Tenant shall have the option to pay Alternative Rent in lieu of Annual Minimum Rent until such time as all of the Key Tenants are open for regular business and the Minimum Ongoing Cotenancy Percentage is met.  If such Key Tenant(s) ceases operations for a period of twelve (12) consecutive months or more, or if the Minimum Ongoing Cotenancy Percentage is not met for a period of twelve (12) consecutive months or more, then Tenant shall have the right to terminate this Lease upon thirty (30) days notice to Landlord, such notice to be given at any time prior to the date the condition giving rise to such termination right has been satisfied.  If Tenant shall elect to terminate this Lease, then this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of Landlord or Tenant, except: (a) for those obligations which expressly survive the expiration or other termination of this Lease, and (b) Landlord shall (which obligation shall survive the termination of this Lease), within three (3) business days after receiving a statement from Tenant showing the Unamortized Costs, reimburse Tenant for the Unamortized Costs.  If Tenant does not terminate this Lease within thirty (30) days after the expiration of such twelve (12) month period, then commencing on the day following the end of such thirty (30) day period, Tenant shall resume paying full Annual Minimum Rent.  However, Tenant shall again be entitled to exercise its rights under this Section 8.06 each time another Key Tenant ceases operations or the number of retail tenants occupying less than the Minimum Ongoing Cotenancy Percentage worsens by more than five percent (5%).  It is hereby understood

and acknowledged by Landlord that a Key Tenant may only be replaced, for the purposes of this Section 8.06 only, by a National Tenant or Regional Tenant of comparable use, size and quality of merchandise.  "National Tenant(s)" shall mean a tenant(s) operating, as of the applicable date, at least seventy-five (75) retail stores in the continental United States under a single trade name in first-class shopping centers, and "Regional Tenant(s)" shall mean a tenant(s) operating, as of the applicable date, at least thirty-five (35) retail stores in first-class shopping centers in any of the following states under a single trade name:  Louisiana, Oklahoma, New Mexico and Arkansas.

## ARTICLE IX

### REPAIRS

SECTION 9.01  Landlord Obligations.  Landlord shall, at Landlord's sole expense (and not included in CAM Costs), keep and maintain in good order, condition and repair (including replacements, if necessary) and in a safe condition (a) the roof of the Premises (to be maintained in a watertight condition at all times), all utility systems and lines (including, without limitation, electrical, plumbing, mechanical and/or alarm systems) serving the Premises (from the point of connection at the Premises to the public utility mains), the exterior of the Premises (including, without limitation, the walls and Other Improvements, but excluding window glass, doors and frames) and the structural portions of the Premises including, without limitation, footings and foundation, floor slab, and structural walls, columns and beams, and (b) any damage to the Premises or the Shopping Center which is caused by (i) defects in Landlord's Work, or (ii) the act or omission of Landlord, its employees, agents or contractors.  Landlord's obligations under this Section 9.01 shall be subject to the provisions of Articles XII and XIII.  Landlord shall perform any and all repairs and replacements to be performed under this Lease without material interference with or disruption to the normal conduct of any business operations in the Premises. Landlord shall give Tenant at least five (5) days prior notice of any repairs or replacements to the Premises (except in the case of an emergency posing imminent risk of material harm to persons or property, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances).  If, in Tenant's reasonable judgment, Landlord's repairs would materially interfere with or disrupt the normal conduct of any business operations in the Premises, then Landlord shall perform such repairs only after the regular hours of operation of the Premises.

SECTION 9.02  Tenant's Obligations.

(a)  Subject to Landlord's obligations under Section 9.01, Tenant shall at all times during the Term, at Tenant's sole expense, keep and maintain in good order, condition and repair and in a safe condition (i) the non-structural, interior elements of the Premises (including painting, window glass, doors and frames, and the heating, ventilation and air conditioning ["HVAC"] units, and the electrical, plumbing, mechanical, and/or alarm systems located in and serving exclusively the Premises), and (ii) any damage to the Premises or the Shopping Center which is caused by the act or omission of Tenant, its employees, agents or contractors.  Tenant's obligations under this Section 9.02 shall also be subject to the provisions of Articles XII and XIII and to Landlord's obligation to clear the Premises of all dirt and debris following completion of Landlord's Work pursuant to Section 5.02.

(b)      If any HVAC units must be repaired or replaced during the last five (5) years of the Term, then in light of the fact that the same will require a substantial expenditure by Tenant and will result in a benefit to Landlord following the expiration of the Term, upon the expiration or earlier termination of this Lease (unless such termination results from Tenant's default of its obligations under this Lease), Landlord shall reimburse Tenant for the unamortized portion of the reasonable expenses incurred by Tenant in connection with the replacement of such equipment during the last five (5) years of the Term, based on (i) the date of the installation of such new equipment, and (ii) the applicable depreciation period for such new equipment determined in accordance with the Internal Revenue Code and Regulations.  The provisions of this Section 9.02(b) shall survive the expiration or earlier termination of this Lease.

SECTION 9.03  Hazardous Materials.

(a)      Landlord represents and warrants that, as of the Effective Date (and as of the Possession Date), there are (and will be) no Hazardous Materials present in the Shopping Center, and Landlord agrees that the removal or neutralization of any Hazardous Materials that become present or become known to be present at the Shopping Center during the Term shall be at the sole cost and expense of Landlord (and not included in CAM Costs), other than Hazardous Materials introduced by Tenant.  "Hazardous Materials" shall mean (i) any waste, material or substance (whether in the form of a liquid, a solid, or a gas and whether or not air-borne) which is deemed to be a pollutant or a contaminant, or to be hazardous, toxic, ignitable, reactive, infectious, explosive, corrosive, dangerous, harmful or injurious to public health or to the environment, and which is now or becomes regulated in the future by or under the authority of any applicable local, state or federal laws, judgments, ordinances, orders, rules, regulations, codes or other governmental restrictions or requirements, any amendments or successor(s) thereto, replacements thereof or publications promulgated pursuant thereto (collectively, "Environmental Regulations", and individually, "Environmental Regulation"); (ii) petroleum; (iii) asbestos and asbestos containing materials; (iv) any polychlorinated biphenyl; and (v) any radioactive material.  In addition to the foregoing, the term "Environmental Regulations" shall be deemed to include, without limitation, local, state and federal laws, judgments, ordinances, orders, rules, regulations, codes and other governmental restrictions and requirements, any amendments and successors thereto, replacements thereof and publications promulgated pursuant thereto, which deal with or otherwise in any manner relate to, environmental matters of any kind.

(b)      Landlord and Tenant each agree that neither Landlord nor Tenant shall cause or permit any Hazardous Materials to exist on, or to escape, seep, leak, spill or be discharged, emitted or released from the Shopping Center during the Term in violation of any applicable Environmental Regulation.

(c)      Landlord hereby indemnifies Tenant and its successors and assigns, and agrees to hold Tenant and its successors and assigns harmless from and against any and all losses, liabilities, damages, injuries, penalties, fines, costs, expenses and claims of any and every kind whatsoever, including attorneys' fees and costs (collectively, "Environmental Liabilities") paid, incurred or suffered by, or asserted against, Tenant or its successors and assigns with respect to, or as a direct or indirect result of (i) the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission or release from the Shopping Center of any Hazardous Materials which were brought into the Shopping Center by Landlord, its agents, employees or

their respective predecessors-in-interest, or (ii) a breach by Landlord, its agents, employees or their respective predecessors-in-interest of any Environmental Regulation to which Landlord is subject.

(d)    Tenant hereby indemnifies Landlord and its successors and assigns, and agrees to hold Landlord and its successors and assigns harmless from and against any and all Environmental Liabilities paid, incurred or suffered by, or asserted against, Landlord or its successors and assigns with respect to, or as a direct or indirect result of (i) the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission or release from the Premises of any Hazardous Materials which was brought into the Premises by Tenant, its agents or employees, or (ii) a breach by Tenant, its agents or employees of any Environmental Regulation to which Tenant is subject.

(e)    With respect to Hazardous Materials which are or become present at the Shopping Center as the result of any cause whatsoever (other than Hazardous Materials which were brought into the Premises by Tenant, its agents or employees), Landlord shall, at Landlord's sole cost (and not included in CAM Costs), in a good, workmanlike and expeditious manner, and in compliance with Environmental Regulations, perform all work necessary to clean-up, remove and otherwise remediate such Hazardous Materials in compliance with Environmental Regulations.  Should the presence of such Hazardous Materials render the Premises Unusable (as defined below) or should Tenant be required to close during the removal or neutralization of such Hazardous Materials by Landlord, Tenant shall notify Landlord and all Rent shall be immediately abated until such time as Tenant can safely resume normal business operations.  If such work is not commenced within thirty (30) days after the date (the "Notification Date") that Tenant notifies Landlord of Hazardous Materials rendering the Premises Unusable (or such additional period as may be reasonably required to engage environmental consultants and/or engineers and obtain permits and licenses) or if such work is not completed within ninety (90) days after the Notification Date (or such additional period as may reasonably be required given the nature of the work, provided that Landlord diligently pursues same to completion), then Tenant shall have the right, at any time thereafter, to terminate this Lease.  However, Tenant's option to terminate this Lease pursuant to this Section 9.03(e) shall cease (if not exercised prior thereto) at any time the Premises are no longer Unusable.  If Tenant shall elect to terminate this Lease, then the Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of Landlord or Tenant, except: (i) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, (ii) Landlord shall (which obligation shall survive the termination of this Lease), within three (3) business days after receiving a statement from Tenant showing the Unamortized Costs, reimburse Tenant for the Unamortized Cost, and (iii) Tenant reserves all claims against Landlord for damages resulting from a default by Landlord under this Section 9.03.  For the purpose of this Section 9.03(e), "Unusable" means that the Tenant does not have access to at least ninety percent (90%) of the Premises because of the enforcement of any Environmental Regulation or the remediation of any Hazardous Materials, or because use of the Premises would represent a risk to the health or safety of Tenant, Tenant's employees, agents or invitees.

SECTION 9.04  Surrender of the Premises.  At the expiration or earlier termination of this Lease, Tenant shall surrender the Premises to Landlord in the same condition as it is required

to be maintained by Tenant pursuant to Section 9.02 above; excepting, however, reasonable wear and tear, damage by fire or other casualty, and the effects of a Taking (as defined in Section 13.01).

**ARTICLE X**

**REQUIREMENTS OF LAW**

SECTION 10.01    Landlord's Obligations.  As part of Landlord's Work and throughout the Term, Landlord shall be responsible, at Landlord's sole cost and expense (and not included in CAM Costs), for complying with all applicable laws, statutes, ordinances and regulations of federal, state, county and municipal authorities (collectively, "Laws") affecting the Shopping Center including, without limitation, the Premises, except as specifically provided in Section 10.02.

SECTION 10.02    Tenant's Obligations.  Throughout the Term, Tenant shall be responsible, at Tenant's sole cost and expense, for complying with all Laws affecting the Premises if such compliance is required solely as a result of Tenant's specific manner of use of the Premises (as opposed to retailers in general) and relates to the interior elements of the Premises which are neither structural nor comprise the major building systems serving the Premises.

SECTION 10.03    Right to Contest.  The party responsible for compliance pursuant to Section 10.01 or 10.02 shall have the right to contest the validity of any Law at the expense of the party responsible for compliance, unless such contest would result in any criminal liability imposed upon the other party or subject such other party to any fine or penalty.

**ARTICLE XI**

**INSURANCE**

SECTION 11.01    Landlord's Insurance.

(a)    Landlord shall maintain in full force and effect from and after the Effective Date and throughout the Term:

(i)    Commercial general liability insurance with regard to the Common Areas protecting and insuring Landlord, naming Tenant as "additional insured-lessee" for claims arising out of the use or occupancy of the Common Areas and the obligations assumed by Landlord under this Lease, and having a combined single limit of liability of not less than Three Million Dollars ($3,000,000) for bodily injury, death and property damage liability; and

(ii)    Special Form (formerly known as "All-Risk") property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of the buildings (other than the Premises) and other insurable improvements in the Shopping Center, (exclusive of excavation, footings and foundations) including, without limitation, the Common Areas.

(b)    Landlord may carry any of its insurance under "blanket policies" covering the Shopping Center and other properties it or any Affiliate of Landlord owns, provided that: (i) the total amount of the insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article XI.  All policies required to be maintained by Landlord pursuant to this Section 11.01 shall provide that any proceeds thereof shall be deposited with the Mortgagee, or if none, to Landlord, in either event to be held in trust by such party and disbursed only in accordance with the provisions of, and for the purposes set forth in, Article XII.

(c)    Landlord shall be permitted to maintain a deductible as a part of any insurance policy carried by it in compliance with this Section 11.01.  However, in no event shall any deductible with regard to the insurance described in Sections 11.01(a)(i) or 11.01(a)(ii) exceed Twenty-Five Thousand Dollars ($25,000), without Tenant's consent.

SECTION 11.02  <u>Tenant's Insurance</u>.

(a)    Tenant shall maintain in full force and effect throughout the Term:

(i)    Commercial general liability insurance protecting and insuring Tenant, naming Landlord as "additional insured-lessor" for claims arising out of the use or occupancy of the Premises by Tenant and having a combined single limit of liability of not less than Three Million Dollars ($3,000,000) for bodily injury, death and property damage liability; and

(ii)    Special Form (formerly known as "All-Risk") property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of the Premises, exclusive of excavation, footings and foundations, naming Landlord as "additional insured-lessor".

Upon Landlord's request, Tenant shall also name the Mortgagee as an additional insured, as its interest may appear, on the insurance policies described in Section 11.02(a).

(b)    Tenant may carry any of its insurance under "umbrella policies" and/or "blanket policies" covering the Premises and other locations it or any Affiliate of Tenant owns or leases, provided that: (i) the total amount of the insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article XI.

(c)    All insurance required to be maintained under this Section 11.02 may be provided under a plan of self-insurance provided that Tenant maintains, during the period of such self-insurance, a tangible net worth of at least One Hundred Million Dollars ($100,000,000).  To the extent any deductible is maintained as a part of any insurance policy carried by Tenant in compliance with this Section 11.02, Tenant shall be deemed to be covering the amount of that deductible under an informal plan of self-insurance.

SECTION 11.03  Insurance Requirements Generally.

(a)      All insurance required to be maintained by Landlord and Tenant under this Lease shall be maintained with insurance companies qualified to do business in the State, and rated at least A-/VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published).  Each party shall use its diligent efforts to have its insurers provide thirty (30) days (ten (10) days in the event of non-payment of premium) prior notice to the other party of cancellation or non-renewal of any policy required hereunder.  Each party shall provide to the other duly executed certificates evidencing the insurance coverage described in Sections 11.01 and 11.02 above, respectively.

(b)      The liability insurance requirements under Sections 11.01(a)(i) and 11.02(a)(i) shall be reviewed by Landlord and Tenant every five (5) years for the purpose of mutually increasing (in consultation with their respective insurance advisors) the minimum limits of such insurance to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards.  The replacement value of the buildings and other insurable improvements constituting the Shopping Center shall be re-evaluated from time to time at the request of either Landlord or Tenant.

SECTION 11.04  Landlord's Insurance Cost.

(a)      The reasonable insurance premiums attributable to the policies required to be maintained by Landlord pursuant to Section 11.01(a)(i) shall be included as part of CAM Costs.  If Landlord carries blanket insurance covering the Shopping Center together with other property owned by Landlord, then Landlord shall obtain evidence reasonably satisfactory to Tenant of the cost of such insurance allocable to the Shopping Center and the amount so allocable shall be included in CAM Costs for the purposes of determining Tenant's Share of any insurance premium included in CAM Costs.

(b)      If the rates for any insurance Landlord is required to carry are increased as a result of the use or other activity of any other occupant of the Shopping Center, then the amount of such increase shall be excluded from CAM Costs.  To the extent that Landlord receives a dividend, credit, rebate or other return of a premium which had previously been included in CAM Costs, Landlord shall promptly refund to Tenant Tenant's Share of such dividend, credit, rebate, or return.

(c)      The provisions of this Section 11.04 shall survive the expiration or earlier termination of this Lease.

SECTION 11.05  Indemnity.

(a)      Except as otherwise provided in Section 11.06, Tenant covenants to defend and indemnify Landlord and hold Landlord harmless from and against any and all claims, actions, damages, liabilities and expenses, including reasonable attorneys' fees, (i) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises, or any part thereof, or (ii) occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of

Landlord, its agents, contractors, licensees, employees, or other tenants and occupants, or for which any of said parties may be statutorily liable.

(b)    Except as otherwise provided in Section 11.06, Landlord covenants to defend and indemnify Tenant and hold Tenant harmless from and against any and all claims, actions, damages, liabilities and expenses, including reasonable attorneys' fees, (i) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon any portion(s) of the Shopping Center (excluding the Premises), or (ii) occasioned wholly or in part by any act or omission of Landlord, its agents, contractors, employees, servants, tenants (other than Tenant), occupants or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Tenant, its agents, contractors, licensees or employees, or for which any of said parties may be statutorily liable.

SECTION 11.06  Mutual Waiver of Subrogation.

(a)    Landlord and Tenant, on their own behalf and on behalf of anyone claiming under or through either one by way of subrogation, hereby release and waive all rights of recovery and causes of action against each other and their respective Affiliates arising from any and all liability for any loss or damage to property or resulting from damage to such property (and, in either case, any resulting loss of business or rental income), whether caused by the negligence or fault of the other party, which is normally insured under Special Form property insurance (formerly known as "All-Risk") and time element insurance required to be maintained hereunder or under any other property or time element insurance maintained by either party.  If either Landlord or Tenant is a self-insurer or maintains a deductible (as either may be permitted under this Lease), then the self-insuring party or the party maintaining the deductible hereby releases the other party from any liability arising from any event which would have been covered had the required insurance been obtained and/or the deductible not been maintained.

(b)    Landlord and Tenant shall cause each property insurance policy carried by either of them insuring the Premises, the contents thereof, or the Shopping Center, to provide that the insurer waives all rights of recovery by way of subrogation or otherwise against the other party hereto (and all of such other party's Affiliates) in connection with any loss or damage which is covered by such policy or that such policy shall otherwise permit, and shall not be voided by the releases provided above.

SECTION 11.07  Affiliate.  "Affiliate" shall mean a corporation, partnership, person or other entity which is controlling, controlled by, or under common control with, Landlord or Tenant, as the case may be.  As used in the definition of Affiliate, "control" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise.

# ARTICLE XII

# DAMAGE OR DESTRUCTION

SECTION 12.01  <u>Landlord's Obligation to Rebuild</u>.  If all or any part of the Shopping Center (including, without limitation, the Premises) is damaged or destroyed by fire, the elements or other casualty, then Landlord shall promptly repair all damage and restore the Shopping Center, other than the Premises, to its condition immediately prior to such damage or destruction.  Without limiting Landlord's obligations under this Article XII, the proceeds of the policies required to be obtained and maintained by Landlord pursuant to Section 11.01 shall, to the extent necessary, be used for the performance of such rebuilding and restoration work.  The provisions of this Section 12.01 shall not apply if Landlord or Tenant terminates this Lease pursuant to provision this Article XII.

SECTION 12.02  <u>Tenant's Obligation to Rebuild</u>.  If all or any part of the Premises is damaged or destroyed by fire, the elements or other casualty, then Tenant shall promptly repair all damage and restore the Premises to its condition immediately prior to such damage or destruction (subject to any changes to the Premises that Tenant shall desire to make to the extent same shall otherwise be permitted under Section 14.01).  Without limiting Tenant's obligations under this Article XII, the proceeds of the policies required to be obtained and maintained by Tenant pursuant to Section 11.02 shall, to the extent necessary, be used for the performance of such rebuilding and restoration work.  The provisions of this Section 12.02 shall not apply if Landlord or Tenant terminates this Lease pursuant to provision this Article XII.

SECTION 12.03  <u>Termination</u>.

      (a)  Tenant shall have the right to terminate this Lease:

      (i)  if all or any part of the Premises is damaged or destroyed by fire, the elements or other casualty during the last five (5) years of the Term, and the restoration period is reasonably estimated by Tenant to be in excess of two hundred ten (210) days,

      (ii)  if all or any part of the Premises is damaged or destroyed by fire, the elements or other casualty during the last two (2) years of the Term, or

      (iii)  if all or any part of the Premises is damaged or destroyed by fire, the elements or other casualty at any time during the Term and such damage or destructions is not covered under the insurance policy(ies) required to be maintained by Tenant under Sections 11.02(a)(ii) or 11.02(b)

Tenant shall notify Landlord of its exercise of such option within forty-five (45) days following the occurrence of such casualty.

      (b)  If (i) Landlord fails to commence in good faith Landlord's repair and restoration obligations within ninety (90) days after any damage or destruction, or (ii) Landlord fails to timely complete such repair and restoration within two hundred forty (240) days after such damage or destruction, then Tenant shall have the option, upon notice to Landlord, to elect

(y) to complete the repair and restoration to the Common Area and (1) to receive reimbursement therefor in full from Landlord on demand and/or (2) to offset the cost and expense thereof against the payment of Rent and, at Tenant's option, to extend the Term until such time as Tenant, through such offsets, has recouped the entire cost and expense to Tenant of such repair and restoration, or (z) to terminate this Lease effective as of the date of such damage or destruction.  The time periods referenced in this Section 12.03(b) shall be subject to Force Majeure, but in no event shall the aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed a period of ninety (90) days.

(c)    If (i) Tenant fails to commence in good faith Tenant's repair and restoration obligations within ninety (90) days after any damage or destruction, or (ii) Tenant fails to timely complete such repair and restoration within two hundred forty (240) days after such damage or destruction, then Landlord shall have the option, upon notice to Tenant, to elect to complete the repair and restoration to the Premises and to receive reimbursement therefor in full from Tenant on demand.  The time periods referenced in this Section 12.03(c) shall be subject to Force Majeure, but in no event shall the aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed a period of ninety (90) days.

(d)    If this Lease is terminated, then this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of either Landlord or Tenant, except: (i) for those obligations which expressly survive the expiration or other termination of this Lease, and (ii) only in the case where Tenant terminates this Lease, Tenant shall thereupon make available to Landlord (1) all insurance proceeds paid by Tenant's insurance carrier, or (2) if self-insured, an amount equal to the reconstruction costs of the Premises or, if the Premises are not being reconstructed, an amount equal to the actual value of the Premises (not to exceed, however, an amount equal to the reconstruction costs of the Premises), to the extent such amounts would have been payable under the insurance outlined in Section 11.02(a)(ii).

## ARTICLE XIII

## CONDEMNATION

SECTION 13.01  Taking.

(a)    In the event of condemnation by eminent domain or similar law, including a sale in lieu thereof to an authority or other entity having the power of eminent domain (a "Taking"), of all or any portion of the Shopping Center, which (i) results in a Taking of (x) any part of the Premises, (y) more than ten percent (10%) of the Common Areas, or (z) any parking spaces in the Shopping Center which results in the Shopping Center containing less than the Minimum Parking Ratio, (ii) materially and adversely affects ingress or egress to the Premises or the Shopping Center, or (iii) materially prohibits or inhibits Tenant's use of the Premises for a period in excess of sixty (60) days, then Tenant may terminate this Lease by giving notice to Landlord not more than ninety (90) days after the later of the date on which title vests in the condemning authority or the date Tenant receives notice of said vesting.

(b)     In the event of a Taking of all of the Premises, this Lease shall terminate as of the date of vesting of title or transfer of the Premises, whichever is earlier, without further liability on the part of either Landlord or Tenant, <u>except</u> for those obligations which expressly survive the expiration or other termination of this Lease.

(c)     In the event of a Taking of the Premises, the Common Areas and/or any other area within the Shopping Center, or any portion thereof, for temporary use (specifically one not exceeding sixty (60) days in duration), without the taking of the fee simple title thereto, this Lease shall remain in full force and effect.  All awards, damages, compensation and proceeds payable by the condemnor by reason of such Taking relating to the Premises, or relating to the Common Areas but reasonably attributable to the Premises, for periods prior to the expiration of the Lease shall be payable to Tenant.  All such awards, damages, compensation and proceeds for periods after the expiration of the Lease shall be payable to Landlord.  Anything contained to the contrary notwithstanding, a temporary Taking for any period in excess of sixty (60) days may, at Tenant's option, be deemed a permanent Taking and shall be governed by Section 13.01 (a) or (b), as applicable.

SECTION 13.02  <u>Restoration and Rent Adjustment</u>.  In the event of a Taking, if this Lease is not terminated by Tenant pursuant to Section 13.01, then (a) Landlord shall promptly restore the Shopping Center as nearly as practicable to a complete unit of like quality and character as existed prior to the Taking, which restoration shall, as applicable, include all of Tenant's Work and all other leasehold improvements performed by Tenant, but shall not include Tenant's Property, and (b) if a portion of the Premises is Taken, then from and after the date on which title vests in the condemning authority, the Rent shall be equitably reduced in proportion to the area of the Premises subject to the Taking.

SECTION 13.03  <u>Award</u>.  In the event of any Taking of all or part of the Premises, Tenant shall be entitled to an amount of the award or compensation paid for such Taking equal to the Unamortized Costs, if any, and the balance shall belong to Landlord.  Tenant shall also have the right to claim and recover from the condemning authority such compensation as may be separately awarded or recoverable by Tenant on account of any and all damage to Tenant's business by reason of the condemnation and for or on account of any cost or loss to which Tenant might be put in moving Tenant's Property, or for any other damages compensable separately to Tenant; <u>provided</u>, <u>however</u>, that no such award shall reduce the award payable to Landlord for its fee interest in the Premises.  The provisions of this Section 13.03 shall be subject to the provisions of Section 13.01(c) with respect to a temporary Taking.

## ARTICLE XIV

## ALTERATIONS AND MECHANICS' LIENS

SECTION 14.01  <u>Tenant's Alteration Rights</u>.

(a)     Tenant shall not perform any structural or exterior alterations or improvements to the Premises (except to the extent same pertain to Tenant's Work) without the prior approval of Landlord; <u>provided</u>, <u>however</u>, that Tenant's alteration of the exterior of the Premises to conform to Tenant's (or any subtenant's) then-current prototypical elevation shall

not require Landlord's consent.  Notwithstanding any provision contained in this Lease to the contrary, Landlord shall not be required to maintain any structural items modified without its consent under this Section 14.01(a).  The provisions of this Section 14.01(a) shall not apply to Tenant's building signage, which shall be governed by the applicable provisions of Article XV.

(b)    Tenant may, from time to time, without the prior approval of Landlord, make non-structural interior alterations and improvements to the Premises as Tenant deems necessary or desirable including, but not limited to, the electrical systems, the HVAC and other mechanical systems, installation of fixtures and equipment, painting, and wall and floor coverings.

(c)    Tenant shall have the right to erect and maintain an antenna, a satellite dish and/or related equipment on the roof of the Premises, provided that Tenant: (i) uses a contractor approved by Landlord for all roof penetrations so as not to violate or invalidate any roof warranties maintained by Landlord, (ii) repairs any damage to the roof caused by the making of the roof penetrations, and (iii) erects and maintains such equipment in accordance with Laws.

(d)    Landlord shall execute and return to Tenant all appropriately completed building department or equivalent applications within ten (10) days after Tenant's request therefor, and will reasonably cooperate with Tenant in the permitting process.  If any violation of Laws which is noted against the Shopping Center or the Premises (other than a violation caused by Tenant) prevents Tenant from obtaining a building permit for any alterations or a certificate of occupancy, then, upon request by Tenant, Landlord shall promptly and diligently cause such violation to be removed of record to the extent required to permit Tenant to obtain its building permit or certificate of occupancy, as the case may be.  However, if the violation was not caused by Landlord (or any of Landlord's agents, contractors, employees or invitees), then Landlord's obligations under this Section 14.01(d) shall be satisfied by Landlord using diligent, good faith and commercially reasonable efforts to have the responsible party remove such violation of record.

(e)    Landlord shall not make any alterations to the Premises (including, without limitation, changing the design, color or materials of the exterior of the Premises) nor shall Landlord construct an additional floor or floors above or below the Premises.  Landlord shall neither make nor permit to be made any alterations to the exterior architectural theme of the remainder of the Shopping Center which would be inconsistent with a first-class shopping center in the State (exclusive of other National Tenants' or Regional Tenants' entrance features), without the prior consent of Tenant.

SECTION 14.02  Mechanics' Liens.  Tenant covenants that Tenant shall promptly discharge of record (by payment, bond, order of a court of competent jurisdiction or otherwise) any mechanic's lien filed against the Premises or all or any part of the Shopping Center for any work, labor, services or materials claimed to have been performed at, or furnished to, the Premises or the Shopping Center, for or on behalf of Tenant, or at the insistence of Tenant, or anyone acting for, through or under Tenant.  Similarly, Landlord covenants that Landlord shall promptly discharge of record (by payment, bond, order of a court of competent jurisdiction or otherwise) any mechanic's lien filed any lien against the Premises or all or any part of the

Shopping Center for any work, labor, services, materials claimed to have been performed at, or furnished to, the Premises or the Shopping Center, for or on behalf of Landlord, or at the insistence of Landlord, or anyone acting for, through or under Landlord.  If either party shall fail to cause any such lien to be discharged within sixty (60) days after the other party shall demand that the former party remove same, then, the demanding party may discharge the same by paying the amount claimed to be due, by bonding or by any other proceeding deemed appropriate by such demanding party, and the amount so paid by such demanding party and/or all costs and expenses including reasonable attorneys' fees incurred by such demanding party in procuring the discharge of such lien shall be reimbursed by the other party upon demand.  Nothing contained in this Lease shall be construed as a consent on the part of the Landlord to subject Landlord's estate in the Premises to any lien or liability under any law relating to liens.

## ARTICLE XV

### SIGNS

SECTION 15.01  <u>Tenant's Signs</u>.  Tenant shall have the exclusive right during the Term to erect, maintain, and replace on the storefront and exterior walls of the Premises, and on the side walls of any entrance design element, if any, signs (including, without limitation, under-canopy or blade signs), banners (including temporary banners placed on the storefront of the Premises and such other walls of the Premises as selected by Tenant), awnings, and flags of such size, design and color as Tenant, from time to time, may desire, subject to compliance with Laws.  Tenant may erect and maintain in the interior of the Premises any signs it may desire.

SECTION 15.02  <u>Pylon Signs</u>.  Landlord shall provide pylons and monuments at the locations shown on the Site Plan.  Landlord, as part of Landlord's Work, shall obtain all governmental approvals and permits for such pylons and monuments (including Tenant's sign panels on all sides of such pylons and monuments).  Tenant's sign panels shall be procured and installed at Tenant's cost, and shall be in the second highest position on such sign(s).  A rendering of such pylon(s)/monument(s) showing the dimensions of the pylon/monument(s) and the size and position of all panels to be installed thereon, including Tenant's panel, is attached to this Lease as Exhibit N.  Landlord shall not change or alter the pylons or monuments bearing Tenant's sign panel(s) without obtaining Tenant's prior consent.  The cost of maintaining all pylons and monuments bearing Tenant's sign panel(s) (but not the cost of individual tenants' signs thereon or the cost of the construction of the pylons and monuments) and the cost of any electricity used to illuminate them, shall be includable in CAM Costs.

SECTION 15.03  <u>Replacement</u>.  Tenant and its subtenants shall be entitled, without Landlord's consent but subject to complying with Laws, to replace all of its signs with signage consistent with Tenant's and/or its subtenant's then-current prototypical sign plans.  Any signage which is not consistent with such prototypical sign plans shall be subject to Landlord's approval.

# ARTICLE XVI

## TENANT'S PROPERTY

SECTION 16.01  <u>Tenant's Property</u>.  All of Tenant's movable trade fixtures, ornate light fixtures, equipment, furniture, inventory and other property owned by Tenant and located at, on or in the Premises including, without limitation, computer display and storage area showcases, partitions, mezzanine, shelving, wall cases and signs (collectively, "<u>Tenant's Property</u>") shall remain the property of Tenant, exempt from the claims of Landlord or any Mortgagee or Ground Lessor, without regard to the means by which or the persons by whom Tenant's Property is installed or attached.  Tenant shall have the right at any time and from time to time to remove Tenant's Property, provided that if removal of any of Tenant's Property permanently damages any part of the Premises, Tenant shall repair such damage.

# ARTICLE XVII

## ASSIGNMENT AND SUBLETTING

SECTION 17.01  <u>Assignment and Subletting Rights</u>.   Tenant shall have the right from time to time, without the consent of Landlord but with notice to Landlord, to assign Tenant's interest in this Lease and/or to sublet, concession or license all or any portion of the Premises, subject to all of the terms and conditions of this Lease.  Unless otherwise agreed to in writing by Landlord, no assignment, subletting, licensing or concessioning by Tenant shall reduce the liability of Tenant under this Lease to the extent that such liability is not increased as a result of any amendment or modification to this Lease between Landlord and any assignee.  However, in the event of an assignment by Tenant to an assignee having an Adequate Net Worth (as defined below), or to an assignee whose obligations under this Lease are guaranteed by a guarantor having an Adequate Net Worth, all liability of the assigning Tenant under this Lease accruing from and after the effective date of such assignment shall terminate.  "<u>Adequate Net Worth</u>" shall mean a tangible net worth, as of the effective date of such assignment, of at least One Hundred Fifty Million Dollars ($150,000,000).

SECTION 17.02  <u>Collateral Assignment</u>.  In addition to Tenant's other rights set forth in this Article XVII, a collateral assignment of Tenant's interest in this Lease by Tenant to one (1) or more Lenders (hereinafter defined), as collateral security for an indebtedness or other obligation of Tenant or its Affiliates shall be permitted and Landlord shall execute all documentation reasonably requested by Tenant or any such Lender in connection therewith.  In addition, Tenant shall have the right, without Landlord's consent, to grant to an Affiliate of Tenant a license to operate all of Tenant's business operations at the Premises, without such Affiliate having assumed any liability for the performance of Tenant's obligations under this Lease.  "<u>Lender</u>" shall mean a state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender.

SECTION 17.03  <u>Cure Rights of Original Tenant</u>.  If Tenant assigns Tenant's interest in this Lease and the assignor remains liable under this Lease following such assignment, then Landlord, when giving notice to said assignee or any future assignee in respect of any default,

shall also give a copy of such notice to the Tenant originally named in this Lease or its Affiliate (collectively, the "Original Tenant"), and no notice of default shall be effective until a copy thereof is so given to Original Tenant.  Original Tenant shall have the right (but not the obligation) to cure such default, which cure period shall be thirty (30) days longer than the cure period applicable to Tenant.

SECTION 17.04  Recognition Agreement.  If Tenant subleases all or any portion of the Premises for a term of at least five (5) years, then, notwithstanding any other provisions of this Lease, Landlord shall, upon Tenant's request, execute and deliver an agreement among Landlord, Tenant and each such subtenant in the form of Exhibit I, in recordable form (the "Recognition Agreement").

## ARTICLE XVIII

## DEFAULT

SECTION 18.01  Tenant's Default.

(a)     If Tenant defaults in the payment of any installment of Rent and such default is not cured within fifteen (15) days after receipt of notice from Landlord thereof or if Tenant defaults in the observance of any other material covenant or agreement herein contained and Tenant shall not, within thirty (30) days after receipt of notice thereof from Landlord, cure or commence to cure such default (it being intended in connection with a default not susceptible of being cured with due diligence within said thirty (30) day period that the time allowed Tenant within which to cure same shall be extended for such period as may be necessary to complete same with all due diligence), then Landlord may, by giving notice to Tenant at any time thereafter during the continuance of such default:

(i)     terminate this Lease, without any right by Tenant to reinstate its rights by payment of Rent or other performance of the terms and conditions hereof and upon such termination Tenant shall immediately surrender possession of the Premises to Landlord, and Landlord shall immediately become entitled to receive from Tenant, as liquidated, agreed final damages, an amount equal to the difference between the aggregate of all rentals reserved under this Lease for the balance of the Term, and the fair rental value of the Premises for that period (both discounted to present value at an annual interest rate equal to eight percent (8%)), determined as of the date of such termination; or

(ii)     with or without terminating this Lease, as Landlord may elect, re-enter and repossess the Premises, or any part thereof, and lease them to any third-party upon commercially reasonable terms and conditions, for a term within or beyond the Term; provided, however, that any such reletting prior to termination shall be for the account of Tenant, and Tenant shall remain liable for (y) Annual Minimum Rent, Tenant's Share of CAM Costs, Tenant's Share of Taxes, and other sums which would be payable hereunder by Tenant in the absence of such expiration, termination or repossession, less (z) the net proceeds, if any, of any reletting effected for the account of Tenant after deducting from such proceeds all of Landlord's reasonable expenses (which

expenses shall be amortized over the term of the new tenant's lease and only the portion thereof allocable to the balance of the Term shall be so deducted by Landlord hereunder) in connection with such reletting (including, without limitation, all repossession costs, reasonable brokerage commissions, reasonable attorneys' fees and expenses, reasonable alteration costs and expenses of preparation for such reletting).

(b)    If the Premises is at the time of default sublet or leased by Tenant to others, Landlord may, as Tenant's agent, collect rents due from any subtenant or other tenant and apply such rents to Rent due hereunder.  Any monthly deficiencies payable by Tenant shall be paid monthly on the date herein provided for the payment of Annual Minimum Rent.  If, after the lapse of all applicable grace periods, Landlord reasonably expends any money to cure a default by Tenant, then Tenant shall, on demand, pay Landlord the amount so paid by Landlord together with interest thereon at the rate of two percent (2%) per annum in excess of the rate charged to Tenant for short-term borrowings by any bank with which Tenant regularly transacts business (the "Default Rate").

(c)    Landlord shall also be entitled to all other rights and remedies available to Landlord at law, in equity or otherwise, except as otherwise expressly set forth in this Lease. Landlord expressly waives (i) any right to accelerate any element of Rent except as expressly set forth in Section 18.01(a)(i) above, (ii) any right to recover consequential or punitive damages as a result of a Tenant default or any other act or omission of Tenant, and (iii) all rights to any so-called "landlord's lien" or any similar statutory lien, granting Landlord a lien on any of Tenant's Property for the performance of any obligations of Tenant.  At the request of Tenant, Landlord shall promptly confirm such waiver(s) by a writing in form satisfactory to Tenant.  Anything contained in this Lease to the contrary notwithstanding, Landlord shall use all reasonable efforts to relet the Premises or any portion thereof to mitigate Landlord's damages to which Landlord would otherwise be entitled to as a result of a Tenant default.

SECTION 18.02  Additional Landlord Remedies Due to Construction Delays by Tenant.

(a)    If Tenant shall fail to achieve Substantial Completion by that date which is two hundred forty (240) days following Delivery of the Land, then Landlord, at its option, upon prior notice to Tenant, may require Tenant to commence payment of Ground Rent (as defined below) on the date which is two hundred forty (240) days following Delivery of the Land. "Ground Rent" shall mean $113,702.40 annually, shall be payable in lieu of Annual Minimum Rent, and shall be payable in equal monthly installments of 1/12 each and in the same manner as Annual Minimum Rent.

(b)    If Tenant shall fail to achieve Substantial Completion by that date which is one (1) year following Delivery of the Land, then Landlord shall be entitled, as its sole remedy, to terminate this Lease upon sixty (60) days prior notice to Tenant unless Tenant, within such sixty (60) day period, achieves Substantial Completion.  If Landlord terminates this Lease, then there shall be no further liability on the part of Landlord or Tenant, except for those obligations that expressly survive the expiration or other termination of this Lease.

SECTION 18.03  Landlord's Default.

(a)    If Landlord shall (i) default in the observance of any material covenant or agreement herein contained, breach any material representation or warranty under this Lease, or shall fail to pay any charges or other amounts required to be paid by Landlord under this Lease (including, without limitation, any insurance premiums or any reimbursements due to Tenant) and Landlord does not cure such default within fifteen (15) days (as to a monetary default) or thirty (30) days (as to a non-monetary default), as applicable, after notice thereof by Tenant (it being intended in connection with a non-monetary default not susceptible of being cured with due diligence within said thirty (30) day period that the time allowed Landlord within which to cure same shall be extended for such period as may be necessary to complete same with all due diligence), or (ii) fail to pay when due any Taxes, ground rent or any other charge or assessment, the lien of which is prior to the lien of this Lease, then Tenant shall have the right (but shall not be obligated) to:

(w)    perform such obligation(s) of Landlord in accordance with the applicable provisions of this Lease on behalf of, and at the expense of Landlord;

(x)    bring suit for the collection of any amounts for which Landlord is in default, seek injunctive relief, or seek specific performance for any other covenant or agreement of Landlord;

(y)    offset against the Rent all amounts owed by Landlord to Tenant and/or the amounts reasonably expended by Tenant performing Landlord's obligations under this Lease, including costs and reasonable attorneys' fees, together with interest thereon at the Default Rate from the date of the outlay until paid, and, at Tenant's option, extend the Term if necessary for Tenant to fully recoup all amounts owed by Landlord to Tenant; and/or

(z)    terminate this Lease, without waiving its rights to damages for Landlord's Default, provided that:  (1) Landlord's default materially interferes with the normal conduct of any business operations in the Premises, (2) Landlord's default is not reasonably capable of being cured by Tenant, and  (3) subject to Section 18.02(b), Tenant gives notice of Landlord's default to any Mortgagee of whom Landlord shall have previously given Tenant notice (including its address), and such Mortgagee shall not have cured Landlord's default within the time period provided in Section 18.02(b).

Notwithstanding the foregoing, Tenant's right of offset under clause (y) above shall be limited to fifty percent (50%) of each installment of Rent next becoming due unless insufficient Term remains to fully recoup the amounts owed by Landlord to Tenant on the amounts expended by Tenant, together with interest as provided above, in which event the amount of Tenant's offset shall be increased so that Tenant is able to fully recoup all such amounts expended by Tenant, together with interest as aforesaid, prior to the expiration of the Term.

(b)    If a Mortgagee shall have notified Tenant in writing that it is the holder of such lien on the Shopping Center and shall so request, then Tenant shall give a similar notice to such Mortgagee and such Mortgagee shall have the same time period allowed to Landlord under this Lease to correct or remedy such default.

(c)     Tenant shall also be entitled to all other rights and remedies available to Tenant at law, in equity or otherwise, except as otherwise expressly set forth in this Lease. Tenant expressly waives any right to recover consequential or punitive damages as a result of a Landlord default or any other act or omission of Landlord, except with respect to a Landlord default relating to Tenant's Exclusive Use Protection or Hazardous Materials.

(d)     Notwithstanding the foregoing, if, in Tenant's reasonable judgment, a condition posing imminent risk of liability or material harm to persons or property or material disruption to the normal conduct of any business operations in the Premises shall exist, then Tenant may exercise, at its election and without prior notice to Landlord, any or all of the remedies set forth in clauses (w), (x) and (y) above.

SECTION 18.04  Additional Tenant Self-help, Equitable and Legal Remedies Due to Construction Delays by Landlord.  If Landlord defaults at any time in the timely completion of any component of Landlord's Work (including, without limitation, Delivery of the Land) and Landlord does not cure such default within five (5) business days after notice thereof by Tenant, then Tenant shall have the right, but not the obligation, to:

(a)     perform, at Landlord's sole cost and expense, all or any part of Landlord's Work.  If and to the extent that Tenant exercises its right under this Section 18.04(a), Landlord agrees to cooperate in good faith and provide Tenant with reasonable assistance so that Tenant can complete such portions of Landlord's Work.  Landlord hereby grants Tenant the right, as its agent, to directly contact and contract with Landlord's contractors, on behalf of Landlord, to complete such work, all at Landlord's cost and expense.  Landlord covenants, upon Tenant's request, to provide Tenant with duplicate sets of all plans, specifications and contracts prepared in connection with the construction of the Shopping Center, as well as schedules of all contractors, subcontractors and suppliers.  Landlord agrees to reimburse Tenant for any and all costs incurred by Tenant in connection with any portion of Landlord's Work which Tenant completes within ten (10) days after receipt of request therefor from Tenant, which request shall be reasonably supported by invoices and/or written description of Landlord's Work performed. If Landlord does not timely reimburse Tenant as contemplated above, then Tenant shall be entitled to deduct the costs of such work from Rent, together with interest at the Default Rate from the date of expenditure by Tenant, until paid in full;

(b)     seek injunctive relief, specific performance or other equitable remedies against Landlord to require Landlord to perform its obligations under this Lease (including, without limitation, the Site Design Requirements), the costs of which litigation shall be borne by Landlord including, without limitation, attorneys' fees and court's costs; and/or

(c)     seek legal remedies available to Tenant, the costs of which shall be borne by Landlord, including, without limitation, attorneys' fees and court costs.

SECTION 18.05  Additional Tenant Remedies Due to Landlord's Failure to Pay the Landlord Reimbursement.

(a)     If Landlord fails to pay the Landlord Reimbursement in full on or before its due date, then Landlord shall be in default under this Lease, and no Rent shall be due or owing to Landlord until the Landlord Reimbursement is paid to Tenant, together with interest

which shall accrue on the unpaid Landlord Reimbursement at the Default Rate commencing on the thirty-first (31st) day following Substantial Completion until the date of payment of the Landlord Reimbursement.  However, if Landlord has not tendered payment of the Landlord Reimbursement and interest by that date which is one (1) year from Substantial Completion (the "Substantial Completion Anniversary"), then (i) such date shall become the Commencement Date; (ii) Annual Minimum Rent shall be reduced to ground rent equal to Fifty Thousand and No/100 Dollars ($50,000.00) per annum during the Term; and (iii) this Lease shall be converted to a ground lease, with ownership of the Building remaining with Tenant, and Landlord's and any Mortgagees' names being removed as additional insureds or mortgagees on any casualty insurance described in Section 11.02.  Landlord and Tenant covenant and agree that upon the reasonable written request of either Tenant or Landlord, Landlord and Tenant shall execute such documentation as necessary to formalize the conversion of this Lease to a ground lease upon the Substantial Completion Anniversary.

(b)      At any time following the Substantial Completion Anniversary and upon thirty (30) days prior notice, Tenant shall have the right at Tenant's sole election, but not the obligation, in lieu of the requirement that Landlord pay to Tenant the Landlord Reimbursement, to mortgage, sell, convey, assign, lease or otherwise encumber (collectively, a "Financing Transfer") Tenant's interest in the Building and this Lease.  Landlord covenants to (i) execute all documents necessary to permit Tenant to effect the Financing Transfer described herein, and (ii) cause any Mortgagee to specifically acknowledge the rights of Tenant's lender and third parties arising as a result of such Financing Transfer.  Notwithstanding such Financing Transfer, Tenant shall continue to pay the ground rentals described in Section 18.05(a) during the remainder of the Term.

SECTION 18.06  Waiver; Non-Exclusive Remedies.  The parties hereby waive trial by jury in any action, proceeding or counterclaim brought by either of them against the other on any matters arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Premises, and/or any claim of injury or damage. Tenant hereby expressly waives any and all rights of redemption granted by or under any present of future law if this Lease is terminated or Tenant is evicted or dispossessed by reason of violation by Tenant of any of the provisions of this Lease.  Except as otherwise expressly set forth in this Lease, no right or remedy herein conferred upon or reserved to Landlord or Tenant is intended to be exclusive of any other right or remedy in this Lease or by law or in equity provided, but each shall be cumulative and in addition to every other right or remedy given in this Lease or now or hereafter existing at law or in equity or otherwise.

## ARTICLE XIX

## SUBORDINATION, TRANSFER OF INTEREST

SECTION 19.01  Subordination.  Landlord reserves the right to subject and subordinate this Lease at all times to the lien of any first mortgage or deed of trust for the benefit of any Mortgagee hereafter encumbering or affecting all or any portion of the Shopping Center, as well as to any future ground or underlying leases encumbering or affecting all or any part of the Shopping Center; provided, however, that (a) each Mortgagee shall first execute and deliver to Tenant a subordination, non-disturbance and attornment agreement in substantially the form

attached as <u>Exhibit J</u> hereto, in recordable form, and (b) any Ground Lessor shall execute (and shall obtain the written consent of any Mortgagee) and deliver to Tenant a fee owner recognition agreement in a form reasonably satisfactory to Tenant, which shall include the following provisions: (i) the Ground Lessor will not, in the exercise of any of the rights arising or which may arise out of such lease, disturb or deprive Tenant in or of its possession or its rights to possession of the Premises or of any right or privilege granted to Tenant or inuring to the benefit of Tenant under this Lease; (ii) in the event of the termination of the Ground Lease (as defined below), Tenant shall not be made a party in any removal or eviction action or proceeding, nor shall Tenant be evicted or removed of its possession or its right of possession of the Premises, and this Lease shall continue in full force and effect as a direct lease between the Ground Lessor and Tenant for the remainder of the Term and on the same terms and conditions as contained herein, without the necessity of executing a new lease; and (iii) Landlord and Tenant shall have the right to execute any amendment to this Lease which is specifically required hereunder and the Ground Lessor shall recognize and be bound thereto.  "<u>Ground Lessor</u>" shall mean the landlord under any existing or future ground or underlying lease(s) affecting all or any part of the Shopping Center (such ground or underlying lease(s) is referred to as the "<u>Ground Lease(s)</u>"). "<u>Mortgagee</u>" shall mean any state or federally regulated bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender, which is not an Affiliate of Landlord, and which holds a mortgage on the Shopping Center or is the beneficiary under a deed of trust encumbering the Shopping Center (such mortgage or deed of trust is referred to as the "<u>Mortgage</u>").

SECTION 19.02  <u>Existing Mortgages and Ground Leases</u>.  If a Mortgage or any Ground Lease encumbers the Shopping Center or any part thereof on the Effective Date, then, simultaneously with the execution of this Lease, Landlord shall deliver to Tenant, in recordable form: (a) a subordination, non-disturbance and attornment agreement substantially in the form attached as <u>Exhibit J</u>, in recordable form, executed by each and every Mortgagee, and (b) a fee owner recognition agreement in the form and content described in Section 19.01(b), in recordable form, executed by any Ground Lessor (and, as may be required, consented to by the Mortgagee).  Should Landlord fail to so deliver such instrument(s) as provided above, Tenant shall have the right, by notice given to Landlord at any time prior to the date on which such instrument(s) are delivered, to terminate this Lease without further liability on the part of Landlord or Tenant, <u>except</u>: (i) for those obligations which expressly survive the expiration or other termination of this Lease, and (ii) Landlord shall (which obligation shall survive the termination of this Lease), within three (3) business days following Tenant's termination notice, reimburse Tenant for all its reasonable, third-party costs and expenses incurred in connection with this Lease (including, without limitation, costs associated with the preparation and review of plans and specifications, the performance of Tenant's Work, and attorneys' fees), not to exceed Seventy-Five Thousand Dollars ($75,000).

SECTION 19.03  <u>Transfer of Interest</u>.  Landlord shall provide Tenant with notice upon or immediately after any sale or transfer of Landlord's interest in the Shopping Center.  Landlord shall require the buyer or transferee to assume in writing all of the obligations of Landlord under this Lease.  Notwithstanding Section 23.13, Landlord shall continue to remain liable for all accrued liability, if any, up to the date of such sale or transfer.  Notwithstanding anything contained herein to the contrary, Landlord shall continue to remain liable hereunder after such

sale or transfer unless the buyer or transferee has expressly assumed in writing all of the obligations of Landlord under this Lease.

SECTION 19.04  <u>Tenant Estoppel Certificates</u>.  Tenant agrees, within thirty (30) days of Landlord's request, to execute and deliver to Landlord or any Mortgagee, on a form prepared by or on behalf of the party so requesting, an estoppel certificate (a) ratifying this Lease and confirming that there are no modifications or amendments to this Lease, except as may be stated in the certificate, (b) confirming the commencement and expiration dates of this Lease, (c) certifying to Tenant's actual knowledge and belief that the Landlord is not in default under this Lease, and that there are no offsets or defenses to enforcement of this Lease, except as may be stated in the certificate, and (d) stating the date through which Annual Minimum Rent and other charges payable by Tenant have been paid.

SECTION 19.05  <u>Landlord Estoppel Certificates</u>.  Landlord agrees, within thirty (30) days of Tenant's request, to execute and deliver to Tenant or any assignee, transferee, subtenant or Lender, on a form prepared by or on behalf of the party so requesting, an estoppel certificate (a) ratifying this Lease and confirming that there are no modifications or amendments to this Lease, except as may be stated in the certificate, (b) confirming the commencement and expiration dates of this Lease, (c) certifying to Landlord's actual knowledge and belief that Tenant is not in default under this Lease, and that there are no offsets or defenses to enforcement of this Lease, except as may be stated in the certificate, and (d) stating the date through which Annual Minimum Rent and other charges payable by Tenant have been paid.

SECTION 19.06 Payments.  If Landlord shall request Tenant to execute more than one (1) subordination, attornment and recognition agreement in any twelve (12) month period, then, as a condition to Tenant's obligations under Sections 19.01 or 19.04, as the case may be, Landlord shall pay to Tenant One Thousand Dollars ($1,000) for each subsequent request for a subordination, attornment and recognition agreement within such twelve (12) month period.

## ARTICLE XX

## LANDLORD'S REPRESENTATIONS, WARRANTIES AND COVENANTS

SECTION 20.01  <u>Quiet Enjoyment</u>.  Landlord covenants and agrees that Tenant, during the Term, shall freely, peacefully, and quietly occupy and enjoy the use and possession of the Premises without disturbance, molestation, hindrance or ejectment of any kind whatsoever.

SECTION 20.02  <u>Representations, Warranties and Covenants</u>.  In order to induce Tenant to execute this Lease and in consideration thereof, Landlord covenants, warrants and represents to Tenant as follows:

(a)    As of the Effective Date and as of the Possession Date, Landlord owns the fee simple title to the Shopping Center free and clear of all easements, restrictions, liens, encumbrances, leases and the like, except as described on <u>Exhibit K</u>; that the Shopping Center, as of the Effective Date (and as of the Possession Date), is not (and will not be) subject to the lien of any Mortgage (except such instruments where the lienor has entered into an agreement in favor of Tenant, as described in Sections 19.01 and 19.02); that Landlord has the full power,

right and authority to make this Lease for the Term without the consent, joinder, or approval of any other party; and that Landlord will put Tenant into complete and exclusive possession of the Premises free from all orders, restrictions, covenants, agreements, leases, easements, laws, codes, ordinances, regulations or decrees (including, without limitation, those matters described on Exhibit K) which would, in any way, prevent or inhibit the use of the Premises for the uses thereof by Tenant as contemplated by this Lease, or prevent or restrict the use of the Common Areas or limit ingress and egress to and from Hwy 69 and FM 365, the public thoroughfares shown on the Site Plan, by Tenant, its agents, employees or invitees.

(b)    Landlord shall, on or before the Possession Date, have caused the Delivery of the Land to occur in accordance with this Lease.

(c)    The Shopping Center shall, at the time of commencement of construction by Landlord, be properly zoned for the operation and maintenance of a store similar to other stores operated by Tenant and for its contemplated use, and that all necessary governmental consents, permits and approvals allowing for the Premises to be occupied for such use shall have been obtained by Landlord.

SECTION 20.03  Site Covenants.  In order to induce Tenant to enter into this Lease, Landlord covenants to Tenant as follows (the "Site Covenants"):

(a)    Landlord shall not construct (or permit to be constructed) any buildings or other improvements in the area identified on the Site Plan as the "No-Build Area" (the "No-Build Area").

(b)    Landlord shall not construct (or permit to be constructed) any projections either vertical or horizontal (other than Tenant's signs or identifications) which will project along the front or rear of the building in which the Premises are situated in such a manner as to obstruct the view of Tenant's signs or its store front in any manner.

(c)    The number of paved, full-size parking spaces in the Shopping Center shall be the greater of (i) the ratio listed in Section 1.01(M) or (ii) the amount of spaces required by Laws (without variance), and, without limiting the generality of the foregoing, the number of spaces contained in Tenant's Preferred Area shall be the same number of spaces as shown on the Site Plan.

(d)    Landlord shall not erect (or permit to be erected) any building or other structures (including, without limitation, kiosks) in any outparcel except as and where shown on the Site Plan, and all outparcel buildings constructed shall (i) not be exceed a height of twenty-four (24) feet above the finished floor of the Premises (inclusive of all roof top mechanicals, all projections and all architectural treatments and embellishments), (ii) not exceed the Floor Area shown on the Site Plan, (iii) satisfy all parking requirements (without variance) using the parking spaces located within each such outparcel, and (iv) be used solely for retail purposes and other uses typically situated in shopping centers.

(e)    Landlord shall not use (or permit the use of) all or any portion of the Common Areas for retail sales or for promotional purposes, subject to Tenant's rights under Section 2.01(c).

(f)     Landlord shall not make (and shall not permit there to be made) any changes to those Common Areas identified as "No-Change Area" on the Site Plan (the "No-Change Area") including, without limitation, changes in the location of curbcuts, drive aisles, entrances, access points, roadways, sidewalks or parking spaces or reduction of the parking ratio specified in Section 20.03(c), without Tenant's consent, which may be withheld in Tenant's sole discretion. Landlord shall not make (and shall not permit to be made) any other changes to the Common Areas which adversely affects Tenant's access to the Premises or the Shopping Center or the visibility of the Premises or of any of Tenant's signage, without Tenant's consent, which may be withheld in Tenant's sole discretion.  Any other changes to the Common Areas may be made without Tenant's consent.

(g)     Following Tenant's opening for business at the Premises, (a) Landlord shall use reasonably efforts to control any noise and dust at the Shopping Center (including, without limitation, during any periods of permitted construction within the Shopping Center) such that neither interferes with the normal operation of Tenant's business, and (b) Landlord shall not perform (and shall not permit there to be performed) any exterior construction in the Shopping Center during the months of October, November, December and January, except to the extent permitted under Section 5.01.

(h)     Landlord shall not permit any solicitation, distribution of handbills, picketing, or other public demonstration in the Common Areas, except as otherwise may be mandated by Laws.

(i)     No transmission and/or reception towers for wireless telephone or internet communications shall be permitted within the Shopping Center.

(j)     Landlord shall not knowingly install or permit to be installed by any other tenant or other person anywhere in the Shopping Center any structure or equipment which would cause any interference with satellite, radio, telecommunications or television reception or transmission in or from the Building.

SECTION 20.04  Intentionally Deleted.

## ARTICLE XXI

## HOLDING OVER

SECTION 21.01  Holding Over.  If Tenant remains in possession of the Premises after the expiration of the Term without having duly exercised its right, if any, to extend or further extend the Term, such continuing possession shall create a month-to-month tenancy on the terms herein specified and such tenancy may be terminated at the end of any month thereafter by either party by giving at least thirty (30) days notice thereof to the other party.  During such holdover and provided that Landlord and Tenant are not in good faith negotiations with regard to the renewal or extension of this Lease or the entering into a new lease for premises within the Shopping Center, Tenant shall be liable for Annual Minimum Rent on a monthly basis (or, if applicable, on a prorated daily basis) in an amount equal to one hundred twenty-five percent

(125%) of the amount thereof payable by Tenant for the month immediately preceding the last day of the Term, as well as for all Additional Rent payable by Tenant under this Lease.

## ARTICLE XXII

### NOTICE

SECTION 22.01  <u>Where and How Given</u>.  All notices or demands which either party hereto either is required to or may desire to serve upon the other shall be in writing and shall be sufficiently served upon such other party, by (a) mailing a copy thereof by certified or registered mail, postage prepaid, return receipt requested, addressed to the party to whom the notice is directed at the "Notice Address" of such party, or (b) by a reliable overnight courier (such as Federal Express), all charges prepaid, furnishing a receipt upon delivery, and addressed to the party to whom the notice is addressed at the Notice Address of the part.  The Notice Address of each party is:

|   |   |   |
|---|---|---|
| a) | Landlord: | PORT ARTHUR HOLDINGS III, LTD.<br>c/o SDI Realty, Ltd.<br>712 Main Street<br>Houston, Texas 77002 |
| b) | Tenant: | CIRCUIT CITY STORES, INC.<br>9954 Mayland Drive<br>Richmond, Virginia 23233<br>Attention: Vice President of Real Estate |
|  | with a copy to: | CIRCUIT CITY STORES, INC.<br>9950 Mayland Drive<br>Richmond, Virginia 23233<br>Attention:  General Counsel |
|  | with a copy to: | Kostas & Birne, LLP<br>530 One Turtle Creek Village<br>3878 Oak Lawn Avenue<br>Dallas, Texas  75219<br>Attention:  Pamela G. Kostas |

The addresses to which notices and demands shall be delivered or sent may be changed from time to time by notice served, as hereinbefore provided, by either party upon the other party.

SECTION 22.02  <u>When Given</u>.  Unless otherwise provided for herein, notice shall be deemed to have been served at the earlier of the date received, refused or returned as undeliverable.  However, if such notice pertains to the change of address of either of the parties hereto, then such notice shall be deemed to have been served upon receipt thereof by the party to whom such notice is given.

## ARTICLE XXIII

## MISCELLANEOUS

SECTION 23.01  <u>Rent Proration</u>.  If this Lease is terminated prior to its natural expiration date for any reason other than a Tenant default, then Landlord shall promptly reimburse Tenant for any Rent prepaid by Tenant for periods subsequent to such termination date.  This Section 23.01 shall survive the termination of this Lease.

SECTION 23.02  <u>Construction</u>.  In construing this Lease, feminine or neuter pronouns shall be substituted for those masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place in which the context so requires.  This Lease shall be construed without regard to: (a) the identity of the party who drafted the various provisions hereof, and (b) the addition or deletion of text made during the negotiation of this Lease.  Moreover, each and every provision of this Lease shall be construed as though all parties hereto participated equally in the drafting thereof.  As a result of the foregoing, any rule or construction that a document is to be construed against the drafting party shall not be applicable hereto.

SECTION 23.03  <u>Section Headings</u>.  The section headings in this Lease are for convenience only and do not in any way limit or simplify the terms and provisions of this Lease, nor should they be used to determine the intent of the parties.

SECTION 23.04  <u>Partial Invalidity</u>.  If any term, covenant, condition or provision of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, then the remainder of this Lease or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby and each term, covenant, condition and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

SECTION 23.05  <u>Waiver</u>.  The failure of either party to seek redress for violation of, or to insist upon strict performance of, any term, covenant or condition contained in this Lease shall not prevent a similar subsequent act from constituting a default under this Lease.

SECTION 23.06  <u>Governing Law</u>.  This Lease shall be governed and construed in accordance with the laws of the State.

SECTION 23.07  <u>Successors and Assigns</u>.  This Lease shall inure to the benefit of and be binding upon the heirs, executors, administrators, successors and assigns of Landlord and the successors and assigns of Tenant.

SECTION 23.08  <u>No Broker</u>.  Landlord and Tenant represent to each other that no broker or person is entitled to any commission by reason of the negotiation and execution of this Lease, other than the Broker identified in Section 1.01(D), and Landlord agrees that Landlord shall be solely responsible for the fees and commissions of the Broker.  Landlord and Tenant agree to indemnify, defend and hold each other harmless against any and all claims by any other person for brokerage commissions or fees arising out of any conversation, negotiations or other dealings held by the other party with any other broker regarding this Lease.

SECTION 23.09  <u>Memorandum of Lease</u>.  Landlord and Tenant agree to execute a Memorandum of Lease in recordable form, substantially similar to that attached as <u>Exhibit L</u>, setting forth such provisions hereof as may be required by State law.  If so requested by Tenant, Landlord shall execute such Memorandum of Lease simultaneously with the execution of this Lease. Recording costs shall be borne by the party requesting recordation of same; however, any transfer taxes or other fees charged by any local or state governmental authorities in connection with such recordation shall be paid by Landlord.  The provisions of this Lease shall control with regard to any omissions from, or provisions which may be in conflict with, the Memorandum of Lease.

SECTION 23.10  <u>Entire Agreement</u>.  This instrument contains the entire and only agreement between the parties and no oral statements or representations or written matter not contained in this instrument shall have any force or effect.  This Lease shall not be amended or modified in any way except by a writing executed by both parties.  All of the exhibits attached to this Lease are incorporated into this Lease by reference and for all purposes are a part of this Lease.

SECTION 23.11  <u>Relationship of Parties</u>.  The relationship between the parties hereto is solely that of landlord and tenant and nothing in this Lease shall be construed as creating a partnership or joint venture between the parties hereto, it being the express intent of Landlord and Tenant that the business of Tenant on the Premises and elsewhere, and the good will thereof, shall be and remain the sole property of Tenant.

SECTION 23.12  <u>Force Majeure</u>.  If either party hereto shall be delayed or hindered in, or prevented from, the performance of any act required under this Lease by reason of strikes, lockouts, labor troubles, failure of power, riots, insurrection, war or other reasons of a like nature beyond the reasonable control of the party delayed in performing works or doing acts required under the terms of this Lease (any such delay, hindrance or prevention is referred to as "<u>Force Majeure</u>"), then performance of such act shall be excused for the period of the delay, and the period of the performance of any such act shall be extended for a period equivalent to the period of such delay, except as otherwise specifically provided herein to the contrary.  The provisions of this Section 23.12 shall not be applicable to delays resulting from the inability of a party to obtain financing or to proceed with its obligations under this Lease because of a lack of funds.

SECTION 23.13  <u>Limitation of Landlord's Liability</u>.  Except with respect to (a) insurance proceeds or condemnation awards received by Landlord which are required by the terms of this Lease to be applied to the repair or restoration of the Premises or the Shopping Center, (b) Landlord's failure to pay the Landlord Reimbursement in accordance with this Lease, and (c) any monies owed by Landlord to Tenant in connection with Landlord's default in performing Landlord's Work, Tenant shall, on and after the Commencement Date, look only to Landlord's estate and property in the Shopping Center (or the proceeds from the sale, financing or refinancing of all or any portion thereof) and net income derived from the Shopping Center for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord hereunder, and no other property or assets of Landlord, its officers, directors, stockholders, members or partners shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease.  Except with respect to the limitation on personal liability hereinabove set

forth, the provisions of this Section 23.13 shall not be deemed or construed to limit Tenant's rights and remedies pursuant to this Lease or which may be available at law, in equity or otherwise.

SECTION 23.14  Limitation of Tenant's Liability.  Landlord, its successors and assigns, shall look solely to the assets, if any, of Tenant and its successors and assigns, for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director, member or employee of Tenant or any of its Affiliates.

SECTION 23.15  Consents.  Except as may be otherwise expressly set forth in this Lease, whenever under this Lease provision is made for either party's securing the consent or approval of the other party, (a) such consent or approval shall be in writing and shall not be unreasonably withheld, delayed or conditioned, and (b) in all matters contained herein, both parties shall have an implied obligation of reasonableness.

SECTION 23.16  Costs.  Whenever this Lease requires the performance of an act by a party, such party shall perform the act at its own cost and expense, unless otherwise expressly provided to the contrary in this Lease.

SECTION 23.17  Attorneys' Fees.  In any action or proceeding hereunder (whether to enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall be entitled to recover from the other party the prevailing party's reasonable costs and expenses in such action or proceeding, including reasonable attorneys' fees, costs and expenses.  Except as otherwise set forth herein, if either party is sued by a third party as a result of a violation of a covenant, representation or warranty herein contained by the other party hereto, then the party who has violated the covenant, representation or warranty shall be responsible for the reasonable costs and expenses in such action or proceeding against the non-violating party, including reasonable attorneys' fees, costs and expenses.

SECTION 23.18  Survival of Obligations.  The obligation to pay any sums due to either party from the other that by the terms herein would not be payable, or are incapable of calculation, until after the expiration or sooner termination of this Lease shall survive and remain a continuing obligation until paid.  All indemnity obligations under this Lease shall survive the expiration or earlier termination of this Lease.

SECTION 23.19  Joint and Several Liability.  If either party consists of more than one person, then the persons constituting such party shall be jointly and severally liable hereunder.

SECTION 23.20  Definition of Hereunder, Herein, etc..  Unless the context clearly indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar import refer to this Lease and all of the Exhibits attached hereto as a whole and not to any particular section, subsection, or paragraph hereof.

SECTION 23.21  Tenant's Trade Name.  Landlord shall not make use of Tenant's trade name (i.e., "Circuit City"®) in any advertising or marketing material including, without limitation, on any internet website, without obtaining Tenant's prior written approval, which may be withheld in Tenant's sole and absolute discretion.  Notwithstanding the foregoing, Landlord

may use Tenant's trade name on Landlord's website and in informational brochures, but only for the purposes of identifying Tenant as a tenant of the Shopping Center.

SECTION 23.22  Counterparts.  This instrument may be executed in several counterparts, each of which shall be deemed an original.  The signatures to this instrument may be executed and notarized on separate pages, and when attached to this instrument, shall constitute one complete document.

[Signature page follows]

IN WITNESS WHEREOF, Landlord and Tenant have caused this Lease to be duly executed and delivered in their respective names as of the date first above written.

LANDLORD:

**PORT ARTHUR HOLDINGS III, LTD.**,
a Texas limited partnership

By:    Port Arthur Holdings Management, LLC,
       its general partner

Date: _12-22-06_

By:_____
Name: Charles W. Shears
Title: Manager

TENANT:

**CIRCUIT CITY STORES, INC.**, a Virginia
corporation

Date: _12/6/06_

By: _____
    John B. Mulleady
    Vice President, Real Estate and Construction

Approved for Signature:

_PMK_ Responsible Atty.
_____ RE Manager

Tenant's counsel:

Pamela G. Kostas
Kostas & Birne, LLP
530 One Turtle Creek Village
3878 Oak Lawn Avenue
Dallas, Texas 75219

# EXHIBIT A

## Site Plan

Premises – crosshatched, with Floor Area and frontage thereof (Section 1.01P)
All buildings within the Shopping Center and Floor Area thereof (Section 1.01S)
Customer Pick-Up Areas (Section 2.01(c))
Car Stereo Parking Areas (Section 2.01(c))
Trash Compactor Area (Section 2.01(c))
Web Order Pick-Up Parking Spaces (Section 2.01(c))
Transformer Pad Area (Section 2.01(c))
Tenant's Preferred Area (Section 2.01(c))
Staging Area (Section 3.01)
Construction Drive (Section 5.02(b))
Primary Restoration Area (Section 12.01(a))
Pylon Sign(s) (Section 15.02)
Public Thoroughfares (Section 20.02(a))
No Build Area (Section 20.03(a))
Parking Spaces In Tenant's Preferred Area (Section 20.03(c))
Landlord's permitted outparcel build-out area (Section 22.03(d))
No-Change Area (Section 20.03(f))
Tenant's Trailer (Section E of Exhibit C)

## EXHIBIT B

Legal Description of the Shopping Center

Legal Description: 10.2154 Acre Tract or Parcel of Land
Out of and Part of Lots 63, 64, 65, 66, 67, 68,
69, 70, 71, 72 and 73, Block 6
All of Lots 8, 9, 10, 11, 12 and 13
and Out of and Part of Lot 14, Block 8
Hillcrest Second Revised Addition
Volume 7, Page 6, Map Records
Out of and Part of Lot 22, Block 6
Hillcrest Second Addition "Acres"
A Portion of El Paso Street
Volume 4, Page 106, Map Records
Wm. McFaddin Survey, Abstract No. 417
T. & N.O.R.R. Survey, Section No. 11, Abstract No. 243
Jefferson County, Texas

**BEING** a 10.2154 acre tract or parcel of land situated in the Wm. McFaddin Survey, Section No. 11, Abstract No. 243 and the T. & N.O.R.R. Survey, Section No. 11, Abstract No. 243, Jefferson County, Texas and being out of and part of Lots 63, 64, 65, 66, 67, 68, 69, 70, 71, 72 and 73, Block 6, All of Lots 8, 9, 10, 11, 12 and 13, and Out of and Part of Lot 14, Block 8 of the Hillcrest Second Revised Addition, a subdivision of the City of Port Arthur, Jefferson County, Texas, according to the plat thereof recorded in Volume 7, Page 6, Map Records, Jefferson County, Texas and also being out of and Part of Lot 22, Block 6 of the Hillcrest Second Addition "Acres", a subdivision of the City of Port Arthur, Jefferson County, Texas, according to the plat thereof recorded in Volume 4, Page 106, Map Records, Jefferson County, Texas, and being a portion of El Paso Street (previously dedicated)(based on a width of 50') and also being all of that certain tract of land of land, identified as TRACT II, being called all of Lots 63,64 and 65, Block 6 of the said Hillcrest Second Revised Addition, save and except that certain tract conveyed to the State of Texas recorded in Volume 1210, Page 434, Deed Records, Jefferson County, Texas, as described in a "Warranty Deed" from McPhillips Tire and Auto, Inc. to Larry McPhillips as recorded in Clerk's File No. 9607726, Official Public Records of Real Property, Jefferson County, Texas and also being all of that certain tract of land being called all of Lots 66-70, Block 6 of the said Hillcrest Second Revised Addition as described in a "Warranty Deed with Vendor's Lien" from James E. Rainey, Sr. to Larry McPhillips and wife, Ileana McPhillips as recorded in Clerk's File No. 2003001893, Official Public Records of Real Property, Jefferson County, Texas, save and except that certain tract of land as conveyed to the State of Texas as recorded in Volume 1254, Page 145, Deed Records, Jefferson County, Texas and being all of that certain called 0.9243 acre tract of land as described in a "Special Warranty Deed with Vendor's Lien" from Robert Q. Keith and Port Arthur Land Company, Ltd. to Larry McPhillips and wife, Ileana McPhillips as recorded in Clerk's File No. 2003048087, Official Public Records of Real Property, Jefferson County, Texas, and also being all of that certain tract of land being called the North 154 feet of Lot 22, Block 6 of the Hillcrest Second Addition "Acres" as described in a deed from Luke Greene and wife, Laura Belle Greene to John Earl Greene as

recorded in Volume 1703, Page 236, Deed Records, Jefferson County, Texas  and all of that certain tract of land as described in a "Warranty Deed" from Luke Greene and wife, Laura Belle Greene to John Earl Greene as recorded in Volume 1816, Page 499, Deed Records, Jefferson County, Texas, and all of that certain tract of land identified as TRACT I, TRACT II, and TRACT III as described in a "Warranty Deed" from John Earl Greene and David L. Greene, Co-Independent Executors of the Estate of Luke Greene, Deceased, to the Greene Family Trust as recorded in Clerk's File No. 2001010571, Official Public Records of Real Property, Jefferson County, Texas, and also being out of and part of that certain tract of land as described in a "Warranty Deed" from Steven Kemp and Debra Allison Kemp to John Earl Greene, Sr. as recorded in Clerk's File No. 9720993, Official Public Records of Real Property, Jefferson County, Texas and also all of that certain tract of land as described in a "Warranty Deed" from Harold W. Gardenhire, Sr., et al. to John Earl Greene as recorded in Clerk's File No. 2003018965, Official Public Records of Real Property, Jefferson County, Texas said 10.2154 acre tract being more particularly described as follows:

> *NOTE:  All bearings are based on the Southwesterly right-of-way line of El Paso Street as SOUTH 48°47'00" EAST.*

**BEGINNING** at a 1/2" iron rod found for most Westerly corner of the said Lot 22 and the most Westerly corner of the said John Earl Greene tract as recorded in Volume 1703, Page 236, Deed Records, Jefferson County, Texas and also being the most Southerly corner of Lot 80, Block 6 of the Hillcrest Second Revised Addition, a subdivision of the City of Port Arthur, Jefferson County, Texas, according to the plat thereof recorded in Volume 7, Page 6, Map Records, Jefferson County, Texas and also being the most Southerly corner of that certain tract of land as described in a "Substitute Trustee's Deed" to Excavators and Constructors, Inc. as recorded in Clerk's File No. 9439142, Official Public Records of Real Property, Jefferson County, Texas and said corner being in the Northeasterly right-of-way line of El Paso Street (based on a width of 50 feet);

**THENCE** NORTH 41°22'29" EAST, for the boundary between the tract herein described and the said Excavators and Constructors, Inc. tract and that certain called 0.5936 acre tract of land as described in a "Warranty Deed with Vendor's Lien" from Excavators and Constructors, Inc. to Ernest Parker as recorded in Clerk's File No. 2000024148, Official Public Records of Real Property, Jefferson County, Texas, for a distance of 275.00 feet to a 5/8" iron rod set for corner, said corner being the most Northerly corner of the said Lot 22 and the common corner of Lots 59, 60 and 80, Block 6 of the above referenced Hillcrest Second Revised Addition, said corner also being the most Westerly corner of that certain tract of land being part of Lots 60, 61 and 62, Block 6 of the above referenced Hillcrest Second Revised Addition identified by Jefferson County Tax Appraisal District Account No. 029001-000-004300-00000-5 owned by Mini Serve Inc. (unable to locate deed reference) and from said corner a 3/4" iron pipe found for the most Easterly corner of the said 0.5936 acre Parker tract bears NORTH 41°22'29" EAST a distance of 70.42 feet;

**THENCE** SOUTH 48°37'55" EAST, for the boundary between the tract herein described and the Southwesterly line of the said Mini Serve Inc. tract, the same being the common line between the said Lot 22 and Lots 60, 61 and 62, for a distance of 154.03 feet to a punch mark in concrete found for corner, said corner being the most Northerly corner of that certain called 0.9243 acre

tract of land as described in a "Special Warranty Deed with Vendor's Lien" from Robert Q. Keith and Port Arthur Land Company, Ltd. to Larry McPhillips and wife, Ileana McPhillips as recorded in Clerk's File No. 2003048087, Official Public Records of Real Property, Jefferson County, Texas and also being the most Easterly corner of the said John Earl Greene tract;

**THENCE** SOUTH 49°32'09" EAST, for the boundary between the tract herein described and the said Mini Serve Inc. tract, the same being the common line between the said Lot 62 and Lot 22, for a distance of 12.45 feet to a 2" iron pipe in concrete found for corner, said corner being the most Southerly corner of the said Mini Serve Inc. tract, the same being the most Southerly corner of the said Lot 22 and the most Westerly corner of the said Lot 63, the same being the most Westerly corner of the said McPhillips tract recorded in Clerk's File No. 9607726, Official Public Records of Real Property, Jefferson County, Texas;

**THENCE** NORTH 41°16'43" EAST, for the boundary between the tract herein described and the said Mini Serve Inc. tract, the same being the common line between the said Lots 62 and 63 and also being the Northwesterly line of the said McPhillips tract recorded in Clerk's File No. 9607726, for a distance of 51.06 feet to a scribed "X" in concrete set for corner, said corner being in the Southwesterly right-of-way line of U.S. Highway 69, 96 and 287 (width varies);

**THENCE** SOUTH 44°38'53" EAST, along and with the Southwesterly right-of-way line of U.S. Highway 69, 96 and 287, for a distance of 149.62 feet to a 1/2" iron rod found for corner, said corner being in the common line between the said Lots 65 and 66 and also being the most Easterly corner of the said McPhillips tract recorded in Clerk's File No. 9607726 and the most Northerly corner of the said McPhillips tract recorded in Clerk's File No. 2003001893, Official Public Records of Real Property, Jefferson County, Texas;

**THENCE** SOUTH 48°41'16" EAST, continuing along and with the Southwesterly right-of-way line of U.S. Highway 69, 96 and 287, for a distance of 250.94 feet to a 5/8" iron rod set for corner, said corner being in the common line between the said Lots 70 and 71 and being the most Easterly corner of the said McPhillips tract recorded in Clerk's File No. 2003001893 and an exterior ell corner of the said 0.9243 acre McPhillips tract;

**THENCE** SOUTH 37°58'58" EAST, continuing along and with the Southwesterly right-of-way line of U.S. Highway 69, 96 and 287, for a distance of 101.86 feet to a Texas Department of Transportation concrete monument found for corner, said corner being the intersection of the Southwesterly right-of-way line of U.S. Highway 69, 96 and 287 and the Northwesterly right-of-way line of State Highway No. 365 (based on a width of 200') and also being the most Easterly corner of the said 0.9243 acre McPhillips tract;

**THENCE** SOUTH 21°41'22" WEST, along and with the Northwesterly right-of-way line of State Highway No. 365, passing at a distance of 96.23 feet a Texas Department of Transportation concrete monument found the most Southerly corner of the said 0.9243 acre McPhillips tract and the most Easterly corner of that certain tract of land identified as TRACT I as described in a "Warranty Deed" from John Earl Greene and David L. Greene, Co-Independent Executors of the Estate of Luke Greene, Deceased, to the Greene Family Trust as recorded in Clerk's File No. 2001010571, Official Public Records of Real Property, Jefferson County, Texas, and continuing with the Northwesterly right-of-way line of State Highway No. 365 for a total distance of 139.83

feet to a 5/8" iron rod found for corner, said corner being an angle point in the Northwesterly right-of-way line of State Highway No. 365;

**THENCE** SOUTH 41°54'39" WEST, along and with the Northwesterly right-of-way line of State Highway No. 365, passing at a distance of 163.76 feet a cotton picker spindle found for corner at the intersection of the Northwesterly right-of-way line of State Highway No. 365 and the Northeasterly right-of-way line of El Paso Street, and continuing over and across El Paso Street passing at a distance of 213.87 feet a 5/8" iron rod set for the intersection of the Northwesterly right-of-way line of State Highway No. 365 and the Southwesterly right-of-way line of El Paso Street, and continuing along and with the Northwesterly right-of-way line of State Highway No. 365, for a total distance of 489.31 feet to a 5/8" iron rod set for corner, said corner being the intersection of the Southwesterly line of the said Lot 14, the same being the Northeasterly line of Lot 17, Block 8 of Hillcrest Second Addition "Acres", a subdivision of the City of Port Arthur, Jefferson County, Texas, according to the plat thereof recorded in Volume 4, Page 106, Map Records, Jefferson County, Texas and the Northwesterly right-of-way line of State Highway No. 365;

**THENCE** NORTH 48°46'38" WEST, for the boundary between the tract herein described and the said Lot 17, Block 8 of Hillcrest Second Addition "Acres", the same being the Southwesterly line of the said Lots 8 -14, Block 8 of Hillcrest Second Revised Addition, for a distance of 708.46 feet a 40d nail in a cut off fence post found for the common corner of the Lots 2 and 17, Block 8 of the said Hillcrest Second Addition "Acres" and the Lots 7 and 8, Block 8 of the said Hillcrest Second Revised Addition;

**THENCE** NORTH 41°15'19" EAST, for the boundary between the said Lots 7 and 8, Block 8 of the Hillcrest Second Revised Addition, for a distance of 275.34 feet to a 1" iron pipe found for corner, said corner being the most Easterly corner of the said Lot 7 and the most Northerly corner of the said Lot 8, Block 8 of the Hillcrest Second Revised Addition and said corner being in the Southwesterly right-of-way line of El Paso Street;

**THENCE** NORTH 41°09'11" EAST, over and across the El Paso Street right-of-way, for a distance of  50.11 feet to the **POINT OF BEGINNING** and containing 10.2154 ACRES, more or less.

# EXHIBIT C

<u>Site Design Requirements</u>

**PORT ARTHUR, TX**



# <u>SITE DESIGN REQUIREMENTS</u>

Dated _____, 2006

Shopping Center:  SHOPPES AT PORT ARTHUR

# <u>TABLE OF CONTENTS</u>

1.   Content .................................................................................................................... 1

2.   Definitions .............................................................................................................. 1

3.   Landlord Responsibilities ...................................................................................... 3

4.   Circuit City Improvements. .................................................................................... 6

5.   Sign Plans ............................................................................................................... 7

6.   Survey .................................................................................................................... 7

<u>Attachments:</u>

"1"  Circuit City Specifications

"2"  Construction Schedule

"3"  Site Delivery Work Certification

"4"  Floor Plan and Elevation

"5"  Sign Plans

"6"  Survey Criteria

"7-A"  Geotechnical Reliance Letter

"7-B"  Environmental Reliance Letter

1.    Content.    The information included is subject to revision from time to time by Circuit City Stores, Inc. ("Circuit City").    Nothing in this document shall be construed as a representation or warranty of any sort by Circuit City or any agent of Circuit City that the specifications and details set forth herein or in the prototypical drawings and specifications attached hereto or provided by Circuit City satisfy and/or comply with applicable laws, statutes, ordinances, codes or regulations, and it shall be the responsibility of each respective party to confirm that the final construction documents for any improvements to the Shopping Center comply with all such applicable laws, statutes, ordinances, codes and regulations.

All items in this document are critical to Circuit City and cannot be omitted, limited or altered in any way without prior review and written approval by Circuit City.    All approvals, governmental or otherwise (including, but not limited to, permits, variances, and certificates of occupancy) shall be obtained after and based upon full clear disclosure to the approving agency of all applicable use, operational, or physical characteristics of the Circuit City store.    Any landlord or other person or entity who obtains these approvals shall be responsible for such disclosure.

2.    Definitions.    In addition to other terms that may be defined herein, the following terms shall have the meanings set forth below for purposes of this document:

(a)    Building.    The term "Building" shall mean the one-story retail building with provisions for car stereo installation facilities to be constructed for operation as a Circuit City store, to be located generally within the cross-hatched area shown on the Site Plan.

(b)    Building Pad.    The term "Building Pad" shall mean (a) that portion of the land upon which the Building is to be constructed including, without limitation, the footprint of the store and a minimum of fifteen (15) feet beyond such footprint, and (b) the area to be occupied by loading docks, truck loading wells, sidewalks and trash compactor pads.

(c)    Circuit City Project Manager.    The term "Project Manager" shall mean Circuit City's Architectural Project Manager designated as having primary responsibility within the Circuit City organization for supervision, monitoring and/or oversight of construction of the Building.

(d)    Circuit City Specifications.    The term "Circuit City's Specifications" shall mean those specifications set forth on Attachment "1" attached hereto.

(e)    Civil Engineer.    The term "Civil Engineer" shall be defined as the entity from which construction drawings are provided to develop the Shopping Center.

(f)    Civil Plans.    The term "Civil Plans" shall mean the final plans prepared by Landlord's Civil Engineer, which are subject to Circuit City's written approval.

(g)    Construction Schedule.    The term "Construction Schedule" shall mean a schedule for development, planning and construction of the Shopping Center and the Building Pad (including, without limitation, scheduling of information gathering and permitting and of deadlines for performance by all parties, including, Landlord, of their various responsibilities related to the Shopping Center) attached hereto as Attachment "2".

(h)    Contractor.    The term "Contractor" shall mean the person or entity providing construction services to perform all necessary site/building aspects of the Shopping Center and shall include suppliers, sub-contractors and vendors.

(i)    Delivery of the Land.    The term "Delivery of the Land" shall mean the completion of all Site Delivery Work, and, as more particularly set forth in Paragraph 3(b) below, the obtaining of all approvals and permits and the payment of all fees such that Circuit City shall be able to commence its construction.

(j)    Floor Plans and Elevations.    The term "Floor Plans and Elevations" shall mean the floor plans and elevations for the Building attached hereto as Attachment "4".

(k)    Environmental Report.    The term "Environmental Report" shall mean the environmental report(s), including, without limitation, the Phase I Environmental Site Assessment, and, if necessary, Phase II Environmental Site Assessment and asbestos survey, generated for Landlord or Circuit City, at Landlord's cost, with respect to environmental characteristics of the Land upon which the Shopping Center is to be developed. The Environmental Report shall be a product of the environmental consultant's efforts, investigation, testing and evaluation, and shall be prepared in accordance with the requirements of American Society for Testing and Materials (ASTM) E 1527-05.  The Environmental Report shall set forth and establish the requirements and criteria associated with and relating to the performance of further environmental testing and proposed environmental clean-up and remediation work by Circuit City or Landlord.  The date of the Environmental Report shall be no older than thirteen (13) months prior to the date of the Lease.  Circuit City shall have no liability in favor of said environmental consultant in connection with the issuance of the Environmental Report.

(l)    Geotechnical Report.    The term "Geotechnical Report" shall mean the report generated by Carney Engineering Company dated May 12, 2006, and boring logs dated July 17, 2006for Landlord, at Landlord's cost, with respect to geotechnical characteristics of the Land upon which the Shopping Center is to be developed and may also be referred to as the "Soils Report." The Geotechnical Report shall be a product of the geotechnical engineer's efforts, investigation, testing and evaluation.  The Geotechnical Report shall set forth and establish the requirements and criteria associated with and relating to the performance of earthwork and geotechnical-related work by Circuit City or Landlord.  The date of the Geotechnical Report shall be no older than eight (8) months prior to the date of the Lease.  Circuit City shall have no liability in favor of said geotechnical engineer in connection with the issuance of the Geotechnical Report.

(m)    Land.  The term "Land" shall mean the parcel or parcels of land on which the Building Pad is located and upon which the Building is to be constructed.

(n)    Land Plan.    The term "Land Plan" shall mean the Land Plan for the Shopping Center and the surround shopping center Land, if applicable, prepared and/or approved by Circuit City.

(o)    <u>Landlord's Work</u>.  The term "Landlord's Work " shall mean all of the work required to be completed by Landlord pursuant to Paragraph 3 of these Site Design Requirements and as otherwise required by the Lease.

(p)    <u>Lease</u>.  The term "Lease" shall mean the lease agreement entered into between Landlord and Circuit City relating to the Land and the Building.

(q)    <u>Plans and Specifications</u>.  The term "Plans and Specifications" shall mean the complete architectural drawings and specifications of the Building, including elevations.

(r)    <u>Staging Area</u>.  The term "Staging Area" shall mean the 20,000 square foot area immediately in front of and adjacent to the Land as shown on the Site Plan.  Landlord to provide concrete paving for staging area.  Tenant's contractor responsible for maintenance and protection of this concrete surface throughout Tenant's construction

Except as otherwise defined herein, all capitalized terms shall have the same meaning ascribed to them in the Lease.

3.    <u>Landlord Responsibilities</u>.    In connection with planning, permitting and development of the Shopping Center, Landlord shall be responsible for the following work, absent express written agreement to the contrary by Circuit City:

(a)    <u>Site Delivery Work</u>.  Landlord acknowledges receipt of, and covenants to comply with the Circuit City Specifications attached hereto as Attachment "1" in the completion of Landlord's Work.  Landlord, at its sole cost and expense, shall:

(i)    In the event the Geotechnical Report is not made for and certified to Circuit City, Landlord shall cause Landlord's geotechnical engineer preparing the Geotechnical Report to provide Circuit City a "Geotechnical Reliance Letter" in the same form attached hereto as <u>Attachment "7-A"</u>, but in no event shall the issuance of any such letter result in liability on the part of Circuit City in favor of said geotechnical engineer.

(ii)    In the event the Environmental Report is not made for and certified to Circuit City, Developer shall cause Developer's environmental consultant preparing the Environmental Report to provide Circuit City an "Environmental Reliance Letter" in the same form attached hereto as <u>Attachment "7-B"</u>, but in no event shall the issuance of any such letter result in liability on the part of Circuit City in favor of said environmental consultant.

(iii)    Verify that its proposed development of the Shopping Center and its Civil Plans comply with the Soils Report and with the Circuit City Specifications;

(iv)    Cause the Land to be free and clear of any known or unknown (which, but for Landlord's failure to discover same, should be removed prior to Delivery of the Land to Circuit City) obstructions, foundations, footings, rock, utilities, easements, improvements and tenancies;

(v)    Cause the Land to be delivered free of any Hazardous Materials;

(vi)   Complete grading of the Land and the Common Areas in accordance with the Soils Report, and the Circuit City Specifications and the Civil Plans;

(vii)   Complete the Building Pad strictly in accordance with the Soils Report and the Circuit City Specifications (including, without limitation, providing Circuit City with the certifications required by the Circuit City Specifications);

(viii)   Obtain approvals for all curbcuts indicated on the Civil Plans and all on and off-site permits required for any work to be performed by Landlord necessary to develop the Shopping Center which permits may be a prerequisite for issuance of Circuit City's building permit;

(ix)   Complete (A) all curbcuts for Tenant's Preferred Area, (B) 20,000 square feet of Staging Area outside of but adjacent to the Building Pad to be concrete pavement to provide for all weather use, and (C) an all-weather construction access road to the Land and around the Building Pad no less than twenty-four (24) feet in width, connecting the existing dedicated roadway adjacent to the Shopping Center with the Land, to be maintained by Landlord in good condition throughout the construction of the Common Areas; and

(x)   Obtain Land Plan approval and conditional use approval, if any, from governmental authorities having jurisdiction over the Shopping Center, permitting Circuit City's construction of the Building (subject to issuance of Circuit City's building permit).

All of the work described in (i) through (x) above is herein collectively referred to as the "Site Delivery Work".  No changes shall be made to any of the Site Delivery Work without Circuit City's prior written consent.  The Site Delivery Work shall be performed in accordance with the Construction Schedule.  Landlord specifically covenants and agrees that any problems or delays it encounters in grading the Building Pad in satisfaction of the Site Delivery Work requirements set forth above in connection with the condition of the soils, including environmental or hazardous waste issues, subsidence sinking, surface waters, subsurface waters, unforeseen site conditions or the like shall be its sole responsibility, shall not cause a force majeure delay, and in no event shall the cost associated with such problems or conditions be passed on to Circuit City in any manner.

If the items of Site Delivery Work are completed earlier than forty-five (45) days prior to Circuit City's scheduled commencement of construction of the Building, the Land shall be overbuilt and sloped to drain and, within such forty-five (45) day period, shall be regraded and recompacted.

Subject to force majeure, Landlord covenants and agrees to complete, at its sole cost and expense, each item of the Site Delivery Work and to provide temporary utilities to within five (5) feet of the Building Pad at Circuit City's designated points of entry as set forth in the Plans and Specifications, and temporary telephone service to the Building and the Staging Area, in accordance with the dates established therefor in the Construction Schedule, to the end that promptly upon completion of such requirements, Circuit City shall be able, subject to issuance of its building permit and matters within Circuit City's control, to commence construction of the Building.

WO 460674.5

Should the Site Delivery Work require minor adjustments in order to be in accordance with the Circuit City Specifications or the Civil Plans, Circuit City may direct its contractor to make such adjustments, the total cost of which shall be reimbursed by Landlord to Circuit City upon demand in a sum not to exceed Five Thousand and No/100 Dollars ($5,000.00), provided that Circuit City provides supporting documentation of the costs incurred.

(b)    <u>Payment of Fees and Permits</u>.  Landlord agrees that Delivery of the Land shall not be deemed to have occurred until all approvals and permits shall have been obtained and all fees, including but not limited to impact fees and assessments, shall have been paid, if and to the extent that such approvals, permits and fees for Landlord's construction shall be prerequisites to the issuance of Circuit City's building permit.  In addition, Landlord shall pay all impact fees assessed with respect to Circuit City's construction of the Building.  Upon Delivery of the Land, Landlord shall certify to Circuit City that all elements of the Site Delivery Work have been completed in the form of the Site Delivery Work Certificate attached hereto as Attachment "3".

(c)    <u>Civil Plans</u>.  Landlord shall promptly deliver to Circuit City full and complete Civil Plans, which Civil Plans shall be subject to Circuit City's approval.  Circuit City's approval of the Civil Plans shall be for compliance with the Circuit City Specifications only and shall not be deemed to be an approval of the content of the Civil Plans.  Landlord expressly agrees that it will retain the risk if its Civil Plans do not conform to applicable laws, rules and regulations and/or contain errors, defects or omissions.  To the extent there is a conflict between the Circuit City Specifications and the Civil Plans, the Circuit City Specifications shall prevail.

(d)    <u>Paving, Lighting, Utilities, Landscaping and Drainage</u>.  Landlord, at its sole cost and expense, and in accordance with and on the date set forth in the Construction Schedule, shall cause its Contractor to complete:

(i)    Installation of temporary utilities, as described in the Circuit City Specifications;

(ii)    The construction and installation within five (5) feet of the Building Pad, of permanent telephone service and permanent utilities, including but not limited to gas, electric, cable tv, domestic water and fire protection water (in size sufficient to satisfy Circuit City's fire consultant, without need for a fire pump) and sanitary sewer as described in the Circuit City Specifications, each at Circuit City's required entry points, at depths adequate for Circuit City's tie-in without additional cost above that contemplated by the Plans and Specifications;

(iii)    The construction and installation of the storm water drainage system at Circuit City's required locations;

(iv)    The construction and installation of paving (including heavy-duty paving), and curbing for parking areas (including sidewalk curb in front of the Building), vehicular access and service roads, and driveways, in accordance with the Circuit City Specifications;

(v)    The completion of landscaping at the Shopping Center in accordance with Landlord's governmentally approved landscaping plan;

(vi)    The construction and installation of lighting in the Shopping Center to standards no less than those set forth in the "Shopping Center Lighting Specifications" as described in the Circuit City Specifications; and

(vii)    Landlord's installation of the pylon sign(s) identifying the Shopping Center, all no later than the dates established therefor in the Construction Schedule.

(e)    <u>Landlord's Work</u>.  All of the work described to be performed by Landlord in this paragraph 4 is collectively referred to as the "Landlord's Work".  All Landlord's Work shall be performed in accordance with all applicable laws, these Site Design Requirements, the Construction Schedule, and the Civil Plans in a good and workmanlike manner, as appropriate by engineers, surveyors, architects and consultants and contractors, who are bondable, all licensed in the state where the Shopping Center is situated and of good reputation.  Landlord's Contractor shall be experienced in shopping center development and in phasing and coordinating construction schedules with major anchors and national retailers.

4.    <u>Circuit City Improvements.</u>

(a)    <u>Building Construction</u>.  Upon completion of all of the Site Delivery Work, Landlord shall give Circuit City written notice (which shall include any required certifications, including but not limited to those required by the Circuit City Specifications) of Delivery of the Land.  Circuit City shall promptly notify Landlord if any such requirement has not been met to Circuit City's reasonable satisfaction, provided Circuit City does not elect to exercise its self-help remedies set forth in the Lease.  Upon the later to occur of (a) the completion of any such previously unmet requirements, or (b) the Possession Date, Circuit City shall within a reasonable time commence and pursue to completion with due diligence the construction of the Building and storefront sidewalk.  The construction work on the Improvements and storefront sidewalk shall be performed by a duly licensed contractor chosen by Circuit City, shall be done in a good and workmanlike manner, in compliance with all applicable laws and in substantial accordance with the Plans and Specifications.

(b)    <u>Plans and Specifications</u>.  Circuit City shall prepare and furnish to Landlord for its approval, not to be unreasonably withheld, conditioned or delayed, the Plans and Specifications for the construction of the Building incorporating therein the items shown on the Floor Plans and Elevations.  Landlord agrees that it will approve the Plans and Specifications, so long as they are materially consistent with Circuit City's then-current prototype, within ten (10) business days after receipt thereof.  If the Plans and Specifications are not disapproved by Landlord within such 10-day period, they will be deemed approved.  The Plans and Specifications shall not be substantially changed by Circuit City without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed; provided, any changes made by Circuit City to its prototypical store prior to commencement of construction by Circuit City shall be deemed approved by Landlord.  Any changes which Landlord desires to make to the Plans and Specifications which are different than a Building based on Circuit City's prototypical elevations and building materials or different from the initial

Plans and Specifications submitted by Circuit City to Landlord shall be subject to Circuit City's approval, which may be withheld in Circuit City's sole discretion, and made at Landlord's sole cost and expense.

(c)    <u>Permits</u>.    Circuit City shall obtain or cause to be obtained those certain building permits, licenses, other governmental approvals and temporary and permanent certificates of occupancy which may be required for the lawful construction and occupancy of the Building in accordance with the Plans and Specifications including water meter and associated meter fees.    Landlord agrees to assist and cooperate fully with Circuit City in obtaining such permits, licenses, approvals and certificates.    Landlord shall be responsible for any other permits necessary for the development of the Shopping Center.

(d)    <u>Substantial Completion</u>.    Substantial completion of the Building ("Substantial Completion") shall be deemed to occur when a certificate of occupancy, whether temporary or permanent, as the case may be, has been issued by the applicable governmental authority.

5.    <u>Sign Plans</u>.    Landlord shall submit to Circuit City plans and specifications for the pylon sign(s) contained or to be constructed within the Shopping Center (including colors, design, dimensions, type of lighting and position of Circuit City's panels) prior to construction and installation thereof for Circuit City's written approval, which shall not be unreasonably withheld or delayed.    Landlord shall submit to Circuit City any sign criteria that may impact Circuit City's building or pylon signs.    Attached hereto as Attachment "5" are plans and specifications for Circuit City's current prototypical face panels for pylon signs and for Circuit City's building signage, which Landlord hereby approves.

6.    <u>Survey</u>.    Landlord shall provide Circuit City with a current ALTA survey of the Shopping Center, at Landlord's expense, in form and substance acceptable to Tenant, meeting the survey criteria attached hereto as Attachment "6".

These Site Design Requirements shall only become binding upon Circuit City and Landlord upon the execution of the Lease and the attachment of these Site Design Requirements as an exhibit to the Lease.

Approved By:

LANDLORD:

By:    _____

Name:    _____

Dated:    _____

Attachment "1"

CIRCUIT CITY SPECIFICATIONS

I.    STANDARDS FOR GRADING WORK

A.    Grading Requirements:  The Land and the Shopping Center shall be graded in accordance with the following:

1.    The Civil Plans shall show contours in accordance with standard engineering practice and these contours shall be shown with the existing (shown as a dashed line) and final (shown as a solid line) elevations. Whether existing or proposed, all buildings, improvements, roads and highways, including those adjacent to the Shopping Center, shall be shown in their true locations.

2.    The Building will be accessible by grade level parking only.  Steps and stairs are not permitted.

3.    Sidewalk at the Building will slope away from the Building with grade of no less than 1.5% and no more than 3.0%.  All water shall be sheet drained away from Circuit City's doors.

4.    Asphalt paving areas will be graded to avoid ponding water with slopes no less than 1.5% and no more than 4.0%.  Entrances and access drives shall have a maximum slope of 6.0%.

5.    Surface drainage swales will not be allowed without prior approval of Circuit City.  Such swales must have a grade of not less than 0.5% and no more than 3.5% and shall be constructed of concrete.

6.    The cut and fill on the Shopping Center land should be balanced, if practical.  All fill material must be of a select grade and sources for acquisition of fill material, as well as locations for cut material, must be identified.

7.    No retaining walls or embankments causing breaks in grade shall be permitted unless specifically approved by Circuit City.

B.    Building Pad:  Landlord's Work shall comply with the following additional requirements:

1.    Landlord shall be responsible for preparing the Building Pad subgrades to within plus or minus one-tenth of a foot as set by Circuit City's architect. Circuit City's subgrades are 8" below finished floor elevation. Landlord will complete compaction in accordance with the appropriate engineering standards and building code requirements, but in no event less than ninety-five percent (95%) of the standard proctor soil test for water content and

compaction levels ("Standard Proctor") on the Land, so as to enable Circuit City to perform construction work necessary to provide completed Improvements in accordance with the Plans and Specifications, with drilled piers footings and without the necessity of pilings or other extraordinary foundation work. Circuit City's minimum slab thickness and under slab fill will be established in accordance with the Soils Report. All compacted areas of the Land shall be verified by an independent professional soils engineering test laboratory and a certificate from such independent laboratory indicating compliance with the Soils Report and shall be furnished to Circuit City upon completion of the Site Delivery Work.

2.      The Building Pad soil shall have a minimum bearing capacity of 2,500 pounds per square foot.  Earth stabilization and/or replacement shall be performed by Landlord as necessary to meet this minimum requirement.

3.      During the preparation of the Building Pad, Landlord shall at its expense have an independent professional soils engineering test laboratory monitor and certify the preparation of the Building Pad in accordance with the Soils Report.  Landlord shall perform one in-place compaction test per 5,000 square feet of pad area per lift.

4.      On or before the date of Delivery of the Land, Landlord shall provide Circuit City with:

(a)      An independent soils engineer's written certification that all pad work was completed in accordance with the Soils Report, the Civil Plans and the Plans and Specifications.  This report shall include the results of all compaction and other tests performed during the pad preparation phase and any tests performed prior to the date of such certification.  A copy of such certification shall be delivered to Circuit City's Vice President-Construction at Circuit City's address.

(b)      A surveyor's written elevation certification stating that the Building Pad is at the prescribed elevation within the stated tolerance of plus or minus one-tenth of a foot.  This certification shall be based upon an "as-prepared" survey that shall accompany such certification and shall show thereon elevation shots taken on a 50-foot-grid minimum including pad perimeter and building corners.  Promptly upon completion of the Site Delivery Work, Landlord shall cause its surveyor or engineer to designate the corners of the Building Pad by means of standard surveying markers.

5.      Landscaping slopes and berms shall be set by Landlord to preserve the integrity of the slopes as determined by an independent soils engineer.

However, in no case may the slope of a landscaping berm exceed 3 to 1 in turf areas, or 2 to 1 in ground cover and shrub areas.

6.   Top soil excavated during grading of the Shopping Center shall be stockpiled by Landlord and made available for use during final landscaping operations including landscaping inside perimeter sidewalks around the Building, if found agronomically suitable by an independent soils analysis lab.  Other excavated soil material shall be stockpiled and made available for use as backfill if required, but only if a soil report indicates it is suitable.

7.   All material, including native and fill, within 5 feet of any surface of the Building including foundation concrete, shall be non-expansive with a plasticity index of 12 or less.  The material shall also have sufficient cohesion to stand vertically for 3 feet.  No oversize material or lumps greater than 6" in diameter will be allowed and not more than 15% of the material shall be greater than 2-1/2" diameter.  Any existing rock within 5 feet of Circuit City's proposed foundations must be removed by Landlord prior to pad delivery, so that construction of the Building can be completed without any rock excavation by Circuit City.

8.   The Civil Plans shall not be materially changed by Landlord without the prior consent of Circuit City, which consent shall not be unreasonably withheld or delayed.

9.   All outlots or future building areas shall be rough graded and planted with grass seed.

## II.   UTILITIES SPECIFICATIONS

A.   <u>Temporary Utilities</u>:  Landlord will provide the following temporary utilities to the Staging Area in a location selected by Circuit City no later than the date for completion of such temporary utilities set forth in the Construction Schedule:

water (2" line, with sufficient pressure that pumping is not necessary), electric power (200 amps, 1-phase, 4-wire, 120 volts, with weatherproof and rainproof fused disconnect switch) and temporary telephone for use by Circuit City in its construction of the Building.

B.   <u>Permanent Utilities</u>:  Landlord will provide the following permanent utilities to within five (5) feet of the Building (unless otherwise noted) or the sidewalk at Circuit City's identified entry points (but in any event the stub point of such utilities shall not be covered by paving) no later than the date for completion of such permanent utilities set forth in the Construction Schedule:

gas (if available), telephone, cable tv, secondary electrical service to Circuit City's designated point of termination within the Building (adequate for an 600-amp panel, 3-phase, 277/480 volt), storm sewer

system (in accordance with Civil Plans), sanitary sewer (6" line), domestic water (2" line), fire protection water (8" line, 50 pounds per square inch residual pressure, 2000 gallons per minute or at least sufficient capacity to service Circuit City's sprinkler system without the need for any fire pump, as approved by Circuit City's fire protection consultant).

III.    PAVING SPECIFICATIONS

    A.    <u>Parking Area and Roadway Surfacing</u>:

        1.    Pavement design shall be based on a "Design Period" of twenty (20) years for the traffic indices specified by an independent civil engineer approved by Circuit City and compensated by Landlord.

        2.    All pavement design shall be subject to review and approval by Circuit City, and shall conform to the recommendations of the Soils Report.

        3.    Heavy duty paving must be used in main drives and service areas as required by the Soils Report.

    B.    <u>Sidewalks and Curbs</u>:

        1.    Landlord shall provide and install all curbs and sidewalks including perimeter curbs and sidewalks, except for sidewalks in front of the Building.

        2.    All sidewalks and curbs shall be constructed of concrete and shall have a minimum slope of 1.5% and a maximum slope of 3.0% away from the Building.  All sidewalks and curbs shall be a minimum of four (4) inches thick, with a rough non-skid texture (as approved by Landlord's architect with respect to the Common Areas), over a suitable granular base. Salt finish is not acceptable.

        3.    Entrance and access roads and other areas as required for suitable drainage, shall have six (6) inch curbs with 18-inch gutters; however, next to sidewalks and buildings when drainage is not a factor a straight curb six (6) inches (without gutters) above the finished paving shall be permitted. Parking lot islands and landscape enclosures shall be vertical barrier-type curbs and all integral-type curbs and gutters and vertical barrier-type curbs shall be concrete.  Extruded asphalt or concrete curbing may not be used.

        4.    Curbs at all non-parking areas shall be painted red with an exterior flat red latex paint, receive a trowel finish and be designated "No Parking" by a contrasting paint color.

IV.    SHOPPING CENTER LIGHTING SPECIFICATIONS

    A.    <u>Design Standards for Lighting of the Shopping Center</u>:

WO 460674.5

1.    Landlord shall prepare and submit plans showing the location and height of all light poles, fixtures, type of fixture shielding (if any), circuiting and details of the complete lighting arrangement and equipment.

2.    Illumination as measured at pavement shall be:

    (a)    6.0 foot candles minimum maintained within 50' of the Building's entry.

    (b)    6.0 foot candles minimum maintained throughout, measured at grade.

    (c)    Entry canopy soffit: 40.0 foot candles.  Circuit City will illuminate the entry tower with 2 – 1000 watt metal halide light fixtures mounted on a 25' high metal pole on a 3' high 24" diameter concrete pedestal located on the center line of Circuit City's entry approximately 100' away.

3.    Twenty-five percent (25%) of the overall lighting shall be designated as security lighting (i.e., remains on from dusk to dawn).  The security lighting layout and pattern shall be subject to Circuit City's approval.

4.    Selection of fixture types shall be subject to Circuit City's review and approval prior to design and circuiting.

5.    Landlord shall install a seven-day time switch to control all parking area lighting wired to a common house panel.  All security lighting shall be placed on photo-cell switching.

6.    The control of parking area lights shall be accessible to Circuit City's local store management due to late-night and holiday sales.

<u>Attachment "2"</u>

Construction Schedule

| **<u>Landlord's Task</u>** | **<u>Completion Date</u>** |
|---|---|
| I. Landlord's delivery of the final Civil Plans for the Shopping Center and architectural scale building elevations for the remainder of the Shopping Center. | 11/30/06 |
| Landlord's delivery of the Geotechnical Report and the Environmental Report. | 11/20/06 |
| Landlord's delivery of the Geotechnical Reliance Letter and the Environmental Reliance Letter. | 11/20/06 |
| II SITE DELIVERY WORK | 2/10/07 |
| Landlord's Delivery of the Land to Circuit City with pad certification; construction of all-weather construction access road to the Land, staging area and curbcuts in Circuit City's Preferred Area; installation of temporary utilities; and completion of Site Delivery Work, including approval for all curbcuts. | |
| III REMAINDER OF LANDLORD'S WORK | |
| Construction and installation of: permanent utilities including permanent telephone service and storm water drainage. | 4/10/07 |
| Construction and installation of: paving (including heavy-duty paving), curbing, and exterior lighting. | 5/21/07 |
| Construction and installation of: landscaping, and pylon sign(s) identifying the Shopping Center. | 5/21/07 |

WO 460674.5

<u>Attachment "3"</u>

Site Delivery Work Certificate

To:    Circuit City Stores, Inc.
       Deep Run I
       9950 Mayland Drive
       Richmond, Virginia  23233
       Attention:  Vice President-Real Estate

       Re:    Circuit City Store/[Location]

Ladies and Gentlemen:

The undersigned, as Landlord has caused "Delivery of the Land" to occur on _____, _____, and accordingly, completion of the Site Delivery Work, all in accordance with the terms of the Site Design Requirements dated _____, _____ (the "Site Design Requirements").  Specifically the undersigned hereby certifies that:  (i) the grading of the Land and Common Areas has occurred in accordance with the Site Design Requirements, and the Building Pad has been prepared strictly in accordance with the Soils Report; (ii) the Staging Area has been completed and (iii) an all-weather construction access road to the Land no less than 24 feet width has been prepared and is ready for your use.

All conditions precedent to issuance of your building permit have been satisfied by Landlord, and we certify that all elements of the Site Delivery Work and Delivery of the Land have been satisfied in accordance with the Site Design Requirements.

LANDLORD:

_____,
a _____

By:    _____
       Name: _____
       Title: _____

Attachment "4"

Floor Plan and Elevations

(attached)

410129 v6 (00050.00001.000)

<u>Attachment "5"</u>

Sign Plans

(attached)

Attachment "6"

Survey Criteria

## ALTA SURVEY REQUIREMENTS

I.  The Survey must be an ALTA/ACSM Land Title Survey made in accordance with (i) the most current "Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys," jointly established and adopted by ALTA and ACSM, and (ii) the requirements listed below.

II.  The Survey must contain a single perimeter metes and bounds description (with no "save and excepts") of all the land that comprises the Shopping Center. Such metes and bounds description must be based upon permanent monuments or markers either set or found which must be identified as set or found on the Survey and in the metes and bounds description. All calls to a "point" must be replaced by a set or found marker or permanent monument. If the legal descriptions for the Property contained in the Commitment for Title Insurance (the "Commitment") used by the surveyor in preparing the Survey differs from the legal description contained on the Survey, the title company will be required to revise the Commitment to match the Survey. If a lot/block description must be used pursuant to State requirements, such description must be followed by the metes and bounds description described herein.

III.  The distances, bearings and angles must be taken from a recent instrument Survey, or recently re-certified instrument Survey by a registered professional engineer or registered public surveyor.

IV.  Each and every symbol and abbreviation depicted on the Survey must be listed and identified in a Legend. Unidentified symbols and abbreviations are not acceptable. Further, each matter to be noted by symbol requires a singular symbol; use of the same symbol to denote different matters is not acceptable.

V.  The words "Point of Beginning", and, if different, "Point of Commencement", must appear on the Survey at the location of same.

VI.  All building setback lines and height restrictions, if any, including those established by restrictive covenant, recorded plat or zoning ordinance (identifying the source of each) must be shown, along with curb cuts, driveways, sidewalks, stoops and landscaping. If there are no building setback lines or height restrictions to be shown, the surveyor must state such facts in the Survey Notes. The Survey must show the height of all existing buildings and the location of all applicable setback lines.

VII.  The number of existing parking spaces must be listed in a Survey Note on the Survey, along with the number of parking spaces required by local ordinance.

VIII.  The Survey must be based upon a current Commitment for Title Insurance and refer to the Commitment, in a Survey Note, by its number and effective date and state the name of the title company issuing same. All easements and other matters of record must be

listed in the Survey Notes by book and page numbers (do not list by paragraph number in the Commitment) followed by the appropriate comment as follows: "encumbers the Property", "does not encumber the Property", or "benefits, but does not encumber the Property", whichever, is applicable. All matters contained in recorded documents that can be shown on the Survey must be located thereon and identified by the recording information for such documents.  If a recorded document involves matters that cannot be shown on the drawing, the reason why such document cannot be shown must be contained in the Survey Notes, i.e., "blanket easement, unable to plot", "easement was released by document recorded in Volume _____ at Page _____", "Not a survey matter, unable to plot", etc.  With respect to non-survey matters, the Survey Notes must state whether or not the document containing same encumbers or does not encumber the Property as determined by the legal description attached thereto.

IX.     The Survey must contain a Survey Note stating which Flood Zone is applicable to the Property and a description of same according the FEMA Map, i.e. "Flood C, an area of minimal flooding".

X.      All recorded easements and the recording information for same must be shown on the Survey.

The Survey must contain the following certification:

### <u>[SURVEYOR'S CERTIFICATE]</u>

Certified to Circuit City Stores, Inc., a Virginia corporation ("Landlord"), _____, a _____ ("Title Company"), and _____ _____, a _____ corporation ("Title Agent"). The undersigned _____ (the "Surveyor") hereby certifies that (a) the Survey Plat dated _____, 20_____, prepared by the undersigned, of that certain tract of land consisting of _____ sq. ft., or _____ acres, in the _____ _____, in the City of _____, County of _____, State of _____, and the metes and bounds description set forth thereon are true and correct and prepared from an actual on-the-ground survey of the real property (the "Property") shown thereon and has been made in accordance with "Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys", jointly established and adopted by ALTA and ACSM in 2005, and includes items 1 through 14 and 16 through 18 of Table A thereof, and pursuant to the Accuracy Standards (as adopted by ALTA and ACSM and in effect on the date of this certification) of an Urban Survey; (b) such survey was conducted by the Surveyor or under his supervision; (c) all monuments shown thereon actually exist, and the location and type of material thereof are correctly shown; (d) the location of all streets, roads, highways and easements are as shown thereon; (e) except as shown thereon, there are no encroachments onto the Property or protrusions therefrom, there are no improvements on the Property, there are no visible easements or rights-of-way on the Property, there are no visible discrepancies, conflicts, shortages in area or boundary line conflicts; (f) the distance from the nearest intersection street or road is as shown; (g) all recorded easements have been correctly platted thereon; (h) the boundaries, dimensions and other details shown thereon are true and correct; and (i) the Property is not located in a 100-year flood plain as presently designated by the U.S. Corps of Engineers, or in an identified "flood prone area" as defined by the U.S. Department of Housing and Urban Development, pursuant to the Flood Disaster Protection Act of 1973, as amended, except as shown.  **[Note: If no portion of the Property is in a flood plain, delete "except as shown" and put a period after "amended".]**

EXECUTED this _____ day of _____, 20____.

_____
Signature
Printed Name:_____
R.P.L.S. No._____

Attachment "7-A"

**GEOTECHNICAL RELIANCE LETTER**


_____, 200__


Circuit City Stores, Inc.
Deep Run I
9950 Mayland Drive
Richmond, Virginia 23233
Attention:  Vice President – Real Estate

      Re:      _____(the "Report")
                 Project Name: Circuit City Store/[Store Location]
                 Job Number:  _____

Dear _____:

      This will serve to confirm that _____ ("Consultant") will allow Circuit City Stores, Inc. ("Circuit City") to rely on the Report in connection with the assessment and evaluation of the subject property as fully and completely as if the Report had been prepared for and was addressed to Circuit City.  Consultant acknowledges that Consultant shall not look to Circuit City for any liability of Consultant's primary client under the _____, the underlying agreement between Consultant and its primary client.

      This reliance letter is given in consideration of the sum of Ten Dollars ($10.00) and other valuable consideration, receipt of which is hereby acknowledged. Please indicate your acceptance of these terms by signing in the space provided below and returning a copy to me.


               Very truly yours,


               _____


               By:_____
               Its:_____


Agreed this _____ day of
_____, 200__.

Circuit City Stores, Inc.


_____
By:_____
Its:_____

410129 v6 (00050.00001.000)

Attachment "7-B"

**ENVIRONMENTAL RELIANCE LETTER**

_____, 200\_\_

Circuit City Stores, Inc.
Deep Run I
9950 Mayland Drive
Richmond, Virginia 23233
Attention:  Vice President – Real Estate

   Re: _____(the "Report")
     Project Name: Circuit City Store/[Store Location]
     Job Number:  _____

Dear _____:

   This will serve to confirm that _____ ("Consultant") will allow Circuit City Stores, Inc. ("Circuit City") to rely on the Report in connection with the assessment and evaluation of the subject property as fully and completely as if the Report had been prepared for and was addressed to Circuit City.  Consultant acknowledges that Consultant shall not look to Circuit City for any liability of Consultant's primary client under the _____, the underlying agreement between Consultant and its primary client.

   This reliance letter is given in consideration of the sum of Ten Dollars ($10.00) and other valuable consideration, receipt of which is hereby acknowledged. Please indicate your acceptance of these terms by signing in the space provided below and returning a copy to me.

     Very truly yours,

     _____

     By:_____
     Its:_____

Agreed this \_\_\_\_ day of
_____, 200\_\_.

Circuit City Stores, Inc.

_____

By:_____
Its:_____

**EXHIBIT C-1**

<u>Possession Date Notice</u>

[Letterhead of Landlord]

_____, 200__

[via overnight courier
service per Article XXII of the Lease]

Circuit City Stores, Inc.
9954 Mayland Drive
Richmond, Virginia 23233
Attention:  Vice President of Real Estate

> Re:    Lease Agreement dated as of _____, 200__ (the "**<u>Lease</u>**"), between **PORT ARTHUR HOLDINGS III, LTD.**, as landlord ("**<u>Landlord</u>**"), and **CIRCUIT CITY STORES, INC.**, as tenant ("**<u>Tenant</u>**"), with respect to certain retail premises (the "**<u>Premises</u>**") <u>located in The Shoppes at Port Arthur Shopping Center, Port Arthur, Texas</u> .

Gentlemen:

In accordance with the provisions of Section 2.05(a) of the Lease, Landlord hereby informs the Tenant that the Possession Date (including, without limitation, the Delivery of the Land) shall take place at 8:00 A.M. on _____, 200__.  This notice shall constitute the Possession Date Notice referred to in Section 2.05 of the Lease.   All capitalized terms as used in this Possession Date Notice shall have the same meaning as set forth in the Lease, unless otherwise defined in this Possession Date Notice.

**PORT ARTHUR HOLDINGS III, LTD.**, a Texas limited partnership

By:    Port Arthur Holdings Management, LLC,
         its general partner

         By:_____
                 Name: Charles W. Shears
                 Title: Manager

cc:    Circuit City Stores, Inc.
         9950 Mayland Drive
         Richmond, Virginia 23233
         Attention:  General Counsel
         [_____, Esq.]

## EXHIBIT D

W-9 Form

| **Circuit City Stores, Inc.** | **Substitute W-9 Form** |
|---|---|

According to federal tax law, we are required to obtain taxpayer identification numbers for all individuals & businesses to whom reportable payments are made. If you do not provide us with this information, your payments may be subject to federal income tax backup withholding. You may also be subject to a $50 penalty imposed by the Internal Revenue Service under section 6723. Federal law on backup withholding preempts any state or local law remedies such as any right to a mechanic's lien. If you do not furnish a valid TIN or if you are subject to backup withholding, the payor is required to withhold taxes from its payment to you. Backup withholding is not a failure to pay you. It is an advance tax payment. You should report all backup withholding as a credit for taxes paid on your federal income tax return.

Use this form only if you are a U.S. person (including U.S. resident alien).

If you are a foreign person, use the appropriate form W-8.

If you were a nonresident alien and have now become a resident alien, read the note below and attach a statement if necessary.

**Note to U.S. Resident Aliens who formerly were Nonresident Aliens:**

If there is a tax treaty between the U.S. and your country and it contains a "saving clause" to exempt certain types of income from U.S. tax even after you have become a resident Alien, and you want to claim that exemption, fill out all of this form AND attach a page showing:

1. The treaty country
2. The treaty article about the income
3. The article number fro the "saving clause"
4. The type and amount of the income that qualifies for the saving clause
5. Facts that provide a sufficient explanation of why the saving clause applies

**Instructions:**

1. Complete Part 1 by printing your tax information in the boxes that correspond to your tax status.
2. Complete Part 2 if you are exempt from Form 1099 Reporting
3. Complete Part 3 by filling in all lines
4. Fax this form to [ENTER YOUR FAX NUMBER HERE] or mail to Circuit City Stores, Inc. 9954 Mayland Drive, Richmond, VA  23233. Attn: [ENTER YOUR NAME HERE]

| **Part 1 - Tax Status:**   (complete only one row of boxes) |
|---|

**Individuals:**
*(Fill out this row)*

Individual Name (first name, middle initial, last name)

Individual's Social Security Number

**Sole Proprietor (or an LLC with one owner):**
*(Fill out this row)*

A sole proprietorship may have a "doing business as" trade name, but the legal name is the name of the business owner.

Business Owners Name (REQUIRED)

Business Owner's Social Security Number

Business or Trade Name
(Required if checks should be issued to this name)

**OR** Employer Identification Number

**Partnership
(or an LLC with
multiple owners):**
*(Fill out this row)*

Partnership's Name on IRS records (see IRS Mailing Label)

Partnership's Employer Identification Number

Business or Trade Name  (Required if checks should be issued to this name)

**Corporation or Tax-Exempt Entity:**
*(Fill out this row)*

A Corporation may use an abbreviated name or its initials, but its legal name is the name on the articles of incorporation.

Name of Corporation or Entity

Employer Identification Number

Business or Trade Name  (Required if payment should be made to this name)

| **Part 2 - Exemption:** If exempt from Form 1099 reporting, check your qualifying exemption reason below: |
|---|

☐ Corporation - Note that there is no corporate exemption for medical & healthcare payments or payments for legal services
☐ Tax Exempt Entity under 501(a) (includes 501(c)(3) or IRA
☐ The United States or any of its agencies or instrumentality's
☐ A State, the District of Columbia, a possession of the United States, or any of their political subdivisions or agencies

## EXHIBIT E

<u>Commencement Date and Expiration Date Agreement</u>

THIS COMMENCEMENT DATE AND EXPIRATION DATE AGREEMENT, made as of the ____ day of _____, 200___, by and between **PORT ARTHUR HOLDINGS III, LTD.,** a Texas limited partnership (**"Landlord"**) and **CIRCUIT CITY STORES, INC.**, a Virginia corporation (**"Tenant"**).

## W I T N E S S E T H :

WHEREAS, Landlord is the owner of a certain shopping center known as The Shoppes at Port Arthur  (the "**Shopping Center**"), situated in Port Arthur, Texas;

WHEREAS, by that certain Lease Agreement dated as of _____ __, 200__ (the **"Lease"**), Landlord leased a portion (the **"Premises"**) of the Shopping Center to Tenant;

WHEREAS, Tenant is in possession of the Premises and the Term of the Lease has commenced; and

WHEREAS, under Section 2.10 of the Lease, Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease.

NOW, THEREFORE, Landlord and Tenant agree as follows:

1.        The Commencement Date occurred on _____, 200___.

2.        The **Initial Lease Term** shall expire on January 31, 20___, unless Tenant exercises any option to extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

3.        The date of commencement of the **first Extension Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

4.        The date of commencement of the **second Extension Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

5.        The date of commencement of the **third Extension Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the

Term of the Lease shall expire on January 31, 20___, unless the Lease terminates earlier as provided in the Lease.

6.      The date of commencement of the **fourth Extension Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless the Lease terminates earlier as provided in the Lease.

7.      Capitalized terms used, but not defined, herein shall have the meanings ascribed to them in the Lease.

IN WITNESS WHEREOF, the parties hereto have caused this Commencement Date and Expiration Date Agreement to be executed the date and year first above written.

**LANDLORD**:

**PORT ARTHUR HOLDINGS III, LTD.**, a Texas limited partnership

By:  Port Arthur Holdings Management, LLC, its general partner

Date: _____

By:_____
      Name: Charles W. Shears
      Title: Manager

**TENANT**:

**CIRCUIT CITY STORES, INC.**, a Virginia corporation

Date: _____

By:_____
      John B. Mulleady
      Vice President, Real Estate and Construction

**EXHIBIT F**

<u>Prohibited Uses</u>

"<u>Prohibited Uses</u>" shall mean any one or more of the following uses:

(a)     a bar, pub, nightclub, music hall or disco in which less than fifty percent (50%) of its space or revenue is devoted to and derived from food service;

(b)     a bowling alley;

(c)     a billiard or bingo parlor;

(d)     a flea market;

(e)     a massage parlor;

(f)     a funeral home;

(g)     a facility for the sale of paraphernalia for use with illicit drugs;

(h)     a facility for the sale or display of pornographic material (as determined by community standards for the area in which the Shopping Center is located);

(i)     an off-track betting parlor;

(j)     a carnival, amusement park or circus;

(k)     a gas station, car wash or auto repair or body shop (the parties specifically acknowledging that Tenant's car stereo installation facility is not included in this prohibition (k));

(l)     a facility for the sale of new or used motor vehicles, trailers or mobile homes;

(m)     a facility for any use which is illegal or dangerous, constitutes a nuisance or is inconsistent with an integrated, community-oriented retail and commercial shopping center;

(n)     a skating rink;

(o)     an arcade, pinball or computer game room (provided that retail facilities in the Shopping Center may operate no more than four (4) such electronic games incidentally to their primary operations);

(p)     service-oriented offices (such as, by way of example, medical or employment offices, travel agencies, real estate agencies or dry cleaning establishments) or other non-retail uses except for offices and storage facilities incidental to a primary retail operation;

(q)     a banquet hall, auditorium or other place of public assembly;

(r)      a training or educational facility (including, without limitation, a beauty school, barber college, reading room, school or other facility catering primarily to students or trainees rather than customers);

(s)      a theater of any kind;

(t)      a facility for the sale or rental of used goods (including thrift shops, secondhand or consignment stores) or any facility selling new or used merchandise as a wholesale operation, a liquidation operation, odd lots, lot sales, factory close-outs or imperfect goods;

(u)      a gymnasium, sport or health club or spa; or

(v)      hotel or residential facility.

# EXHIBIT G

<u>Existing Leases</u>

Landlord's lease with Ross's Dress for Less (Ross Stores, Inc.) executed on or about the date of this Lease.

**EXHIBIT H**

<u>Existing Exclusives</u>

None.

## EXHIBIT I

<u>Recognition Agreement</u>

THIS RECOGNITION AGREEMENT, made as of the _____ day of _____, 200__, by and between **PORT ARTHUR HOLDINGS III, LTD.,** a Texas limited partnership, having an address at 712 Main Street, Houston, TX 77002 ("<u>Landlord</u>"); **CIRCUIT CITY STORES, INC.,** a Virginia corporation, having an office at, 9950 Mayland Drive, Richmond, Virginia 23233 ("<u>Tenant</u>"); and _____, a [_____] **[corporation] [limited] [general] [partnership]**, having an address at _____ ("<u>Subtenant</u>").

R E C I T A L S:

A.      Landlord and Tenant have entered into a certain Lease Agreement (the "<u>Lease</u>") dated as of _____ __, 200__, a short form of which has been recorded in _____, which demises certain premises (the "<u>Premises</u>") located in the Shoppes of Port Arthur, Port Arthur, Texas, which Shopping Center is more particularly described on Exhibit A annexed hereto and made a part hereof.

B.      Section 17.04 of the Lease provides that in the event Tenant subleases all or a portion of the Premises for a term of at least five (5) years, Landlord shall, upon Tenant's request, execute and deliver a Recognition Agreement among Landlord, Tenant and each such subtenant in the form attached to the Lease, in recordable form.

C.      Pursuant to a Sublease dated as of _____ (the "<u>Sublease</u>"), Tenant has subleased **[a portion of]** the Premises to Subtenant (the "<u>Subleased Premises</u>").

D.      The parties hereto desire to effectuate the provisions of Section 17.04 of the Lease with respect to the Sublease and the Subleased Premises.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto, intending to be legally bound hereby, agree as follows:

1.      Landlord warrants and represents as follows:

(a)      that it is the fee owner of the Premises,

(b)      that the Lease is unmodified (except as may be otherwise set forth in Exhibit B annexed hereto, if any) and is in full force and effect,

(c)      that the term of the Lease expires on _____, but is subject to _____ [__] renewal periods of **[five (5)]** years each, and

(d)      that Tenant is not in default under the Lease nor has any event occurred which would after notice to Tenant and the passage of time become a default of Tenant under the Lease.

2.      Landlord hereby acknowledges receipt of a copy of, and consents to and approves, the Sublease and all of the terms, covenants and provisions thereof, and agrees that the exercise by Subtenant of any of its rights, remedies and options contained therein shall not constitute a default under the Lease.

3.      Landlord agrees that whenever it has an obligation with respect to the Premises, or its consent or approval is required for any action of Tenant under the Lease, then, to the extent such obligation, consent or approval relates to the Subleased Premises or Subtenant's use and occupation thereof, it will perform such obligation in accordance with the terms and conditions of the Lease, and, subject to the applicable terms of the Lease, will not unreasonably withhold or unduly delay such consent or approval.

4.      Landlord hereby waives and relinquishes any and all rights or remedies against Subtenant, pursuant to any lien, statutory or otherwise, that it may have against the property, goods or chattels of Subtenant in or on the Subleased Premises.

5.      Any notices, consents, approvals, submissions, demands or other communications (hereinafter collectively referred to as "Notice") given under this Agreement shall be in writing. Unless otherwise required by law or governmental regulation, Notices shall be deemed given if sent by registered or certified mail, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, postage prepaid (a) to Landlord, at the address of Landlord as hereinabove set forth or such other address or persons as Landlord may designate by Notice to the other parties hereto, (b) to Tenant, to Circuit City Stores, Inc., 9954 Mayland Drive, Richmond, Virginia 23233, Attention: Vice President of Real Estate, with duplicate copies to Circuit City Stores, Inc., 9950 Mayland Drive, Richmond, Virginia 23233, Attention: General Counsel, and _____, or such other address or persons as Tenant may designate by Notice to the other parties hereto, and (c) to Subtenant, at the address of Subtenant as hereinabove set forth or such other address or persons as Subtenant may designate by Notice to the other parties hereto.  During the period of any postal strike or other interference with the mails, personal delivery shall be substituted for registered or certified mail.  All Notices shall become effective only on the receipt or rejection of same by the proper parties.

6.      No modification, amendment, waiver or release of any provision of this Agreement or of any right, obligation, claim or cause of action arising hereunder shall be valid or binding for any purpose whatsoever unless in writing and duly executed by the party against whom the same is sought to be asserted.

7.      This Agreement shall be binding on and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors, assigns and sublessees.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties have caused this Recognition Agreement to be executed under seal the date first above written.

**LANDLORD:**

**PORT ARTHUR HOLDINGS III, LTD.**, a Texas limited partnership

By:  Port Arthur Holdings Management, LLC, its general partner

      By:_____
         Name: Charles W. Shears
         Title: Manager

**TENANT:**

**CIRCUIT CITY STORES, INC.** , a Virginia corporation

By:_____
   John B. Mulleady
   Vice President, Real Estate and Construction

**SUBTENANT:**

_____

By:_____
Name:_____
Title:_____

STATE OF _____)
                                  ) : ss.
COUNTY OF _____)

On this ___ day of _____, 200__, before me personally came John B. Mulleady to me known, who being by me duly sworn, did depose and say that he is the Vice President, Real Estate and Construction of **CIRCUIT CITY STORES, INC.,** the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

_____
Notary Public

My Commission Expires:

_____

STATE OF _____)
                                  ) : ss.
COUNTY OF _____)

On this ___ day of _____, 200__, before me personally came _____ to me known, who being by me duly sworn, did depose and say that he is the _____ of _____, the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

_____
Notary Public

My Commission Expires:

_____

STATE OF _____)

　　　　　　　　　　　　　　　　　) : ss.

COUNTY OF _____)

     On this ____ day of _____, 200__, before me personally came _____ to me known, who being by me duly sworn, did depose and say that he is the _____ of _____, the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

_____
Notary Public

My Commission Expires:

_____

# EXHIBIT J

After recording, return to:
Pamela G. Kostas
Kostas & Birne, LLP
530 One Turtle Creek Village
3878 Oak Lawn Avenue
Dallas, Texas  75219

<u>Subordination, Non-Disturbance and Attornment Agreement</u>

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT, made as of the _____ day of _____, 200__, by and between _____, a _____ **[corporation] [limited] [general] [partnership] [national banking association]**, having an office at _____ _____ (the "<u>Mortgagee</u>") and **CIRCUIT CITY STORES, INC.**, a Virginia corporation, having an office at, 9950 Mayland Drive, Richmond, Virginia 23233 (the "<u>Tenant</u>").

<u>W I T N E S S E T H</u>:

WHEREAS, Mortgagee is the holder of a mortgage (the "<u>Mortgage</u>") covering a parcel of land owned by _____, a _____ **[corporation], [limited] [general] [partnership]** (the "<u>Landlord</u>") together with the improvements [to be] erected thereon (said parcel of land and improvements thereon being hereinafter referred to as the "<u>Shopping Center</u>" and being more particularly described on <u>Exhibit A</u> attached hereto and made a part hereof); and

WHEREAS, by a certain Lease Agreement heretofore entered into between Landlord and Tenant dated as of _____ (the "<u>Lease</u>"), Landlord leased to Tenant a portion of the Shopping Center, as more particularly described in the Lease (the "<u>Premises</u>"); and

WHEREAS, a copy of the Lease has been delivered to Mortgagee, the receipt of which is hereby acknowledged; and

**[For mortgages existing as of the date Lease is executed:** WHEREAS, as an inducement to Tenant to enter into the Lease, **[Section 2.04(f)/Section 19.02]** thereof provides that the Lease is conditioned upon Landlord obtaining this Agreement from Mortgagee; and

WHEREAS, the parties desire to satisfy the foregoing condition and to provide for the non-disturbance of Tenant by the holder of the Mortgage; and**]**

**[For mortgages occurring after the Lease is executed:** WHEREAS, Section 19.01 of the Lease provides that the Lease shall become subject and subordinate to a mortgage encumbering the fee interest of Landlord in and to the Shopping Center if and when a non-disturbance agreement is entered into with respect to such mortgage; and

WHEREAS, the parties hereto desire to effect the subordination of the Lease to the Mortgage and to provide for the non-disturbance of Tenant by Mortgagee.**]**

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements herein contained, the parties hereto, intending to be legally bound hereby, agree as follows:

1.      Mortgagee hereby consents to and approves the Lease and the term thereof, including the options to extend the term as set forth in the Lease, and covenants and agrees that the exercise by Tenant of any of the rights, remedies and options therein contained shall not constitute a default under the Mortgage.

2.      Tenant covenants and agrees with Mortgagee that the Lease is made and shall continue hereafter to be subject and subordinate to the lien of the Mortgage, and to all modifications and extensions thereof (and such subordination shall not lessen or diminish Tenant's rights under the Lease), subject, however, to the provisions of this Agreement.

3.      Mortgagee agrees that so long as the Lease shall be in full force and effect, and so long as Tenant shall not be in default under the Lease beyond any applicable notice and grace period:

(a)      Tenant shall not be named or joined as a party or otherwise in any suit, action or proceeding for the foreclosure of the Mortgage or to enforce any rights under the Mortgage or the bond or note or other obligation secured thereby;

(b)      The possession by Tenant of the Premises and Tenant's rights thereto shall not be disturbed, affected or impaired by, nor will the Lease or the term thereof be terminated or otherwise affected by (i) any suit, action or proceeding brought upon the Mortgage or the bond or note or other obligation secured thereby, or for the foreclosure of the Mortgage or the enforcement of any rights under the Mortgage, or by any judicial sale or execution or other sale of the Premises or the Shopping Center, or any deed given in lieu of foreclosure, or by the exercise of any other rights given to any holder of the Mortgage or other documents as a matter of law, or (ii) any default under the Mortgage or the bond or note or other obligation secured thereby; and

(c)      All condemnation awards and insurance proceeds paid or payable with respect to the Premises or any other part of the Shopping Center shall be applied and paid in the manner set forth in the Lease.

4.      If Mortgagee or any future holder of the Mortgage shall become the owner of the Shopping Center by reason of foreclosure of the Mortgage or otherwise, or if the Shopping Center shall be sold as a result of any action or proceeding to foreclose the Mortgage, or transfer of ownership by deed given in lieu of foreclosure, the Lease shall continue in full force and effect, without necessity for executing any new lease, as a direct lease between Tenant and the then owner of the Shopping Center, as "landlord", upon all of the same terms, covenants and provisions contained in the Lease, and in such event:

(a)      Tenant shall be bound to such new owner under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Extension Periods, if Tenant elects or has elected to exercise its options to extend the term) and Tenant

hereby agrees to attorn to such new owner and to recognize such new owner as "<u>Landlord</u>" under the Lease; and

(b)     Such new owner shall be bound to Tenant under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Extension Periods, if Tenant elects or has elected to exercise its options to extend the term) which such new owner hereby agrees to assume and perform and Tenant shall, from and after the date such new owner succeeds to the interest of "landlord" under the Lease, have the same remedies against such new owner for the breach of any covenant contained in the Lease that Tenant might have had under the Lease against Landlord if such new owner had not succeeded to the interest of "landlord"; <u>provided</u>, <u>however</u>, that such new owner shall not be:

(i)     liable for any act or omission of any prior landlord (including Landlord) unless such act or omission continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(ii)     subject to any defenses which Tenant may have against any prior landlord (including Landlord) unless resulting from any default or breach by such prior landlord which continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(iii)     subject to any offsets which Tenant may have against any prior landlord, except to the extent such offsets are expressly provided under the Lease and Mortgagee has received notice thereof and the opportunity to cure within the applicable time periods set forth in the Lease (it being further agreed that offsets under the Lease that were deducted by Tenant prior to the date upon which the new owner succeeds to the interest of such prior landlord shall not be subject to challenge);

(iv)     bound by any annual minimum rent or additional rent which Tenant might have paid for more than one month in advance of its due date under the Lease to any prior landlord (including Landlord), unless such additional rent is paid in accordance with the applicable provisions of the Lease; or

(v)     bound by any amendment or modification of the Lease made without its consent; notwithstanding the foregoing, Mortgagee acknowledges that the Lease specifically provides for amendments thereof upon the occurrence of certain events described in the Lease (such as, for example, an amendment to the Lease confirming the measurement of the Premises), and, by its execution below, Mortgagee agrees to recognize such amendments as part of the Lease, and Mortgagee further agrees that such new owner shall also be bound by such amendment(s) to the Lease, without any consent on the part of Mortgagee or such new owner.

(c)     Tenant's obligations hereunder shall be effective only so long as Mortgagee is bound to Mortgagee's obligations hereunder.

5.     Tenant will notify Mortgagee of any default by Landlord under the Lease which would entitle Tenant to terminate the Lease or abate the rent payable thereunder and agrees that notwithstanding any provision of the Lease, no notice of termination thereof nor any abatement shall be effective unless Mortgagee has received the aforesaid notice and has failed to cure the

H:\44050055-Port Arthur, TX\Lease Ver 4.doc

subject default within the same time period allowed Landlord under the Lease.  It is understood that the abatement provisions of this Section relate to abatements by reason of Landlord's default and do not apply to provisions of the Lease whereby Tenant has the automatic right to abate rentals such as, for example, abatement upon casualty or condemnation.

6.      Neither the Mortgage nor any other security instrument executed in connection therewith shall encumber or be construed as subjecting in any manner to the lien thereof, any trade fixtures, signs or other personal property at any time furnished or installed by or for Tenant or its subtenants or licensees on the aforementioned property regardless of the manner or mode of attachment thereof.

7.      Any notices of communications given under this Agreement shall be in writing and shall be given by registered or certified mail, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, postage prepaid, (a) if to Mortgagee, at the address of Mortgagee as hereinabove set forth or at such other address or persons as Mortgagee may designate by notice in the manner herein set forth, or (b) if to Tenant, to Circuit City Stores, Inc., 9954 Mayland Drive, Richmond, Virginia 23233, Attention: Vice President of Real Estate, with duplicate copies to Circuit City Stores, Inc., 9950 Mayland Drive, Richmond, Virginia 23233, Attention: General Counsel, or such other address or persons as Tenant may designate by notice in the manner herein set forth.  All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee.

8.      This Agreement shall bind and inure to the benefit of and be binding upon and enforceable by the parties hereto and their respective successors, assigns, and sublessees.

9.      This Agreement contains the entire agreement between the parties and cannot be changed, modified, waived or canceled except by an agreement in writing executed by the party against whom enforcement of such modification, change, waiver or cancellation is sought.

10.     This Agreement and the covenants herein contained are intended to run with and bind all lands affected thereby.

**[to add if Tenant's memorandum of lease has been recorded prior to the subject mortgage]** NOTE: THIS AGREEMENT BY TENANT SHALL NOT BE EFFECTIVE UNLESS AND UNTIL ANY PRIOR MORTGAGES ON THIS PROPERTY HAVE BEEN SATISFIED SO THAT TENANT'S PRIOR AGREEMENTS TO ATTORN TO SAID MORTGAGES AND/OR TO SUBORDINATE ITS LEASE TO SAID MORTGAGES SHALL HAVE BEEN EXTINGUISHED.

IN WITNESS WHEREOF, the parties hereto have duly executed this Subordination, Non-Disturbance and Attornment Agreement as of the day and year first above written.

-Signature Page Follows-

**MORTGAGEE:**

_____

By:_____
Name:_____
Title:_____


**TENANT:**

**CIRCUIT CITY STORES, INC.** , a Virginia
corporation


By:_____
    John B. Mulleady
    Vice President, Real Estate and Construction

STATE OF _____)
                                                  ) : ss.
COUNTY OF _____)

On this ___ day of _____, 200__, before me personally came John B. Mulleady to me known, who being by me duly sworn, did depose and say that he is the Vice President, Real Estate and Construction of **CIRCUIT CITY STORES, INC.,** the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

_____
Notary Public

My Commission Expires:

_____

STATE OF _____)
                                                  ) : ss.
COUNTY OF _____)

On this ___ day of _____, 200__, before me personally came _____ to me known, who being by me duly sworn, did depose and say that he is the _____ of _____, the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

_____
Notary Public

My Commission Expires:

_____

## EXHIBIT K

Permitted Exceptions

1.      Airport Zoning Regulations of the Jefferson County Airport recorded in Vol. 787 page 488 Deed Records of Jefferson County, Texas.

2.      Deed of Trust Lien, dated 6-9-2006 filed 6-14-2006 under County Clerk's File No. 2006023322 Official Public Records of Real Property of Jefferson County, Texas; executed by Port Arthur Holdings III, Ltd. to Jimmy R. Locke, Trustee for the benefit of the Frost National Bank; provided Landlord delivers to Tenant a Subordination, Non-Disturbance and Attornment Agreement relating thereto, as required by this Lease.

**NOTE:   ITEMS 3 THROUGH 11 BELOW ARE PERMITTED EXCEPTIONS ONLY TO THE EXTENT THERE ARE NO SURFACE RIGHTS WITH RESPECT TO THE MINERAL INTERESTS CONTAINED THEREIN OR THE CITY OF PORT ARTHUR, TEXAS HAS AN EXISTING ORDINANCE WHICH PROHIBITS ANY USE OF THE SURFACE OF LAND WITHIN THE CITY'S LIMITS FOR DRILLING AND EXTRACTING MINERALS; OTHERWISE, ITEMS 3 THROUGH 11 ARE NOT PERMITTED EXCEPTIONS TO THE LEASE AND LANDORD HEREBY INDEMNIFIES AND HOLDS TENANT HARMLESS WITH RESPECT TO ANY LOSS, DAMAGE OR COSTS INCURRED BY TENANT IN CONNECTION WITH SUCH MINERAL INTERESTS.**

3.      A $7/64^{th}$ royalty interest reserved, being 7/8ths of a $1/8^{th}$ royalty in all oil, gas or other minerals, in Deed executed by Tyrrell-Combest Realty Company recorded in Vol. 551 page 515 Deed Records, Jefferson County, Texas; (Tract I)

4.      A $7/64^{th}$ royalty interest reserved, being a $7/8^{th}$ of a $1/8^{th}$ royalty in all oil, gas or other minerals, in Deeds recorded in Vol. 537 page 250 and Vol. 479 page 30, both in the Deed Records of Jefferson County, Texas; (Tract I)

5.      A $7/64^{th}$ royalty interest reserved, being a $7/8^{th}$ of a $1/8^{th}$ royalty in all oil, gas or other minerals, in Deeds recorded in Vol. 442 page 17 and Vol. 680 page 373, both in the Deed Records of Jefferson County, Texas; (Tract I) and

6.      All minerals reserved, with no right of entry, by Port Arthur Resources, Inc. in Deed recorded under County Clerk's File No. 9603287 Official Public Records of Real Property Records of Jefferson County, Texas; (Tract I)

7.      Oil and Gas Lease dated 4-4-1958 recorded in Vol. 1108 page 362 Deed Records of Jefferson County, Texas, executed by Luke Greene, et ux in favor of Dana T. Richardson, Jr. for a three (3) year period; (Tracts II and III)

8.      A $7/64^{th}$ royalty interest reserved by Tyrrell-Combest Realty Company recorded in Vol. 850 page 269 Deed Records of Jefferson County, Texas; (Tracts II and III)

9.      A 7/64[th] royalty interest reserved in Deed dated 4-6-1951 recorded in Vol. 828 page 392
        Deed Records of Jefferson County, Texas executed by Tyrrell-Combest Realty Company
        in favor of W.M. Monroe; (Tracts II and III)

10.     A 4/64[th] royalty interests reserved in Deed dated 2-27-45 recorded in Vol. 572 page 213
        Deed Records of Jefferson County, Texas, executed by Tyrrell Combest Realty Company
        in favor of Domenick Leone; (Tracts II and III) and

11.     All minerals reserved in Deed dated 10-28-57 recorded in Vol. 1087 page 505 Deed
        Records of Jefferson County, Texas, executed by Domenick Leone in favor of H.P.
        Youmans; (Tracts II and III)

12.     A ten (10) foot utility easement across front of Lot 8, Block 8, as reserved in Deed dated
        2-27-45 recorded in Vol. 572 page 213 Deed Records of Jefferson County, Texas,
        executed by Tyrrell-Combest Realty Company in favor of Domenick Leone, and as
        shown on survey by Thomas S. Rowe, Registered Professional Surveyor No. 5728, dated
        12-8-2005.  (Tract III)

13.     A ten (10) foot utility easement across the front (or any key site) of Lots 9, 10 and 11,
        Block 8, as recorded in Vol. 828 page 392 Deed Records of Jefferson County, Texas, as
        shown on survey by Thomas S. Rowe, Registered Professional Surveyor No. 5728, dated
        12-8-2005. (Tract III)

14.     A ten (10) foot easement across the front of Lots 12, 13 and 14, Block 8, as set forth in
        deed recorded in Vol. 850 page 269 Deed Records of Jefferson County, Texas, and as
        shown on survey by Thomas S. Rowe, Registered Professional Surveyor No. 5728, dated
        12-8-2005.  (Tract III)

15.     This property is included in Jefferson County Drainage District No. 7, wherein the
        amount of bonded indebtedness in the aggregate is stated as $0.00 (tax rate $0.179063 per
        $100.00).  (All Tracts)

16.     Overhead electric lines on all three tracts as shown on survey by Thomas S. Rowe,
        Registered Professional Surveyor No. 5728, dated 12-8-2005.

17.     Protrusion of structures on Tract I into U.S. Highway 69, 96, 287 right of way; structures
        lying between Tracts II and III into El Paso Street; and structures from Tract II into State
        Highway No. 365 right of way; all as shown on survey by Thomas S. Rowe, Registered
        Professional Surveyor No. 5728, dated 12-8-2005.

## EXHIBIT L

<u>Memorandum of Lease</u>

After recording, return to:
Pamela G. Kostas
Kostas & Birne, LLP
530 One Turtle Creek Village
3878 Oak Lawn Avenue
Dallas, Texas  75219

---

(The Above Space for Recorder's Use Only)

     THIS MEMORANDUM OF LEASE, made as of _____, 200__ by and between **PORT ARTHUR HOLDINGS III, LTD.**, a Texas limited partnership, having an office at 712 Main Street, Houston, Texas ("**Landlord**"), and **CIRCUIT CITY STORES, INC.**, a Virginia corporation, having an office at 9950 Mayland Drive, Richmond, Virginia 23233 ("**Tenant**").

<u>Preliminary Statement</u>

     Landlord is the fee owner of certain real property located in the County of Jefferson, State of Texas, as more particularly described on <u>Exhibit A</u> hereto annexed, together with improvements constructed or to be constructed thereon (the "**Shopping Center**").  Landlord and Tenant, as of the date hereof, have entered into a lease (the "**Lease**") demising a portion of the Shopping Center as more particularly described therein (the "**Premises**") to Tenant.   In connection therewith, Landlord and Tenant have entered into this Memorandum to confirm the demise of the Premises and to provide notice to any interested party of such demise and of the terms and provisions of the Lease.

     NOW, THEREFORE, the parties state as follows:

     1.    All capitalized terms used, but not otherwise defined, herein shall have the meanings ascribed to them in the Lease.

     2.    The terms and conditions of the Lease are incorporated herein as though set forth in full, whereby Tenant may have and hold the Premises together with any and all rights, benefits, privileges and easements, now or hereafter appurtenant thereto, at the rental and upon the terms and conditions therein stated, for an initial term of approximately Ten (10) years commencing on the Commencement Date (the "**Initial Lease Term**").  Under the terms of the Lease, Tenant has the right to extend the Initial Lease Term for four (4) separate and additional periods of five (5) years each after the expiration of the Initial Lease Term.

     3.    This Memorandum of Lease is executed for the purpose of recordation in order to give notice of all of the terms, provisions and conditions of the Lease, including, without limitation:

(i)     that, subject to certain exceptions more particularly set forth in the Lease, Landlord shall not lease, rent or occupy or permit any other premises in the Shopping Center to be occupied, for the sale, rental, installation, servicing and/or repairing, either singly or in any combination, of consumer, office and/or automotive electronics products, including, without limitation, televisions, stereos, speakers, video and audio recorders and players and cameras; computer hardware and software and related software services (which include internet access services, entertainment software and entertainment media [such as, by way of example only, game cartridges, video tapes, cassettes, compact discs, DVD's and DVD equipment]); cellular and wireless telephones and telecommunication devices and related accessories; motor vehicle audio, stereo and telephone systems; and technological evolutions of the foregoing;

(ii)     the restrictions set forth therein on Landlord's ability to lease certain portions of the Shopping Center for certain uses which are otherwise prohibited by the terms of the Lease;

(iii)     provisions set forth therein regarding Tenant's right to install and maintain signage upon the exterior of the Premises and upon a pylon and/or monument sign located at the Shopping Center;

(iv)     provisions set forth therein regarding Tenant's right to use (and to permit Tenant's customers, employees, agents and contractors to use) certain common areas of the Shopping Center (such as, without limitation, the parking facilities of the Shopping Center); and

(v)     provisions set forth therein regarding certain areas in the Shopping Center in which no improvements are to be constructed, or changes made without the consent of the Tenant.

4.     In addition to those terms hereinabove set forth, the Lease contains numerous other terms, covenants and conditions which likewise affect not only the Premises but also the Shopping Center, and notice is hereby given that reference should be had to the Lease directly with respect to the details of such terms, covenants and conditions.  The Lease and exhibits thereto are hereby incorporated by reference in this Memorandum of Lease and the parties hereby ratify and confirm the Lease as if said Lease were being re-executed by them and recorded.  In the event of any conflict between the provisions of this instrument and the Lease, the provisions of the Lease shall control.

**IN WITNESS WHEREOF**, the parties hereto have executed this Memorandum of Lease as of the day and year first above written.

<u>**LANDLORD:**</u>

**PORT ARTHUR HOLDINGS III, LTD.,**
a Texas limited partnership

By:    Port Arthur Holdings Management, LLC,
      its general partner

Date: _____   By: _____
                                         Name: Charles W. Shears
                                         Title:   Manager

<u>**TENANT:**</u>

**CIRCUIT CITY STORES, INC.,**
a Virginia corporation

Date: _____   By:_____
                                         John B. Mulleady
                                       Vice President, Real Estate and Construction

STATE OF TEXAS             )
                                   ) : ss.
COUNTY OF HARRIS      )

On this ___ day of _____, 200__, before me personally came Charles W. Shears to me known, who being by me duly sworn, did depose and say that he is the Manager of Port Arthur Holdings Management, LLC, a Texas limited liability company, General Partner of Port Arthur Holdings III, Ltd., a Texas limited partnership, the partnership described in and which executed the above instrument and that he signed his name thereto by order of the partners of said partnership.

_____
Notary Public

My Commission Expires:

_____

STATE OF _____)
                                  ) : ss.
COUNTY OF _____)

On this ___ day of _____, 200__, before me personally came John B. Mulleady to me known, who being by me duly sworn, did depose and say that he is the Vice President, Real Estate and Construction of **CIRCUIT CITY STORES, INC.**, the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

_____
Notary Public

My Commission Expires:

_____

<u>EXHIBIT A</u>


<u>Legal Description of the Shopping Center</u>

**EXHIBIT M**

Indemnification Agreement

     This INDEMNIFICATION AGREEMENT is made this _____ day of _____, _____, between **PORT ARTHUR HOLDINGS III, LTD.,** a Texas limited partnership (hereinafter referred to as "Landlord") and **CIRCUIT CITY STORES, INC.,** a Virginia corporation (hereinafter referred to as "Tenant").

W I T N E S S E T H:

     Landlord and Tenant have entered into a Lease (the "Lease"), dated _____ whereby Landlord has leased to Tenant a portion of the real property located in Port Arthur, Jefferson County, Texas (the "Shopping Center") and Tenant has constructed on such real property a store premises (the "Premises").

     NOW, THEREFORE, in consideration of the payment of the Landlord Reimbursement as defined in the Lease and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

     1.     Tenant hereby indemnifies and agrees to hold Landlord harmless from any loss, payment, claim or expense as the result of mechanics and materialmen filing liens or otherwise making claims against Landlord's interest in the Premises and the Shopping Center as a result of Tenant's construction activities at the Shopping Center.  In the event that any mechanic, materialman or other claimant makes claim against the Premises or Shopping Center based upon materials or services provided under contract with Tenant, Tenant shall hold harmless and protect Landlord from any loss, payment, claim or expense related thereto.

     2.     Tenant reserves the right to contest in good faith the amount of any claim or lien assessed against the Premises or the Shopping Center by any of such claimants; provided, however, should the holder or holders of such claim or lien attempt to enforce their lien by foreclosure or by any other means, Tenant shall bond around, pay or remove such lien by any manner reasonably necessary to protect Landlord's interest in the Premises and the Shopping Center.  This indemnity and hold harmless shall not apply to any liens or claims caused by Landlord or Landlord's agents.

     EXECUTED this _____ day of _____, _____.

     LANDLORD:

     _____,
a _____

     By: _____
Name: _____
Title: _____

<u>TENANT</u>:

**CIRCUIT CITY STORES, INC.**,
a Virginia corporation

By: _____
       John B. Mulleady
       Vice President, Real Estate and Construction

EXHIBIT N

Pylon Sign Rendering

# EXHIBIT O

Ross Dress For Less Construction Access and Staging Area