**EXHIBIT B**

LOCATION:  San Felipe at Loop 610
Houston, Texas

# LEASE

between

## CIRCUIT CITY STORES, INC.,

as Tenant

and

## 610 & SAN FELIPE, INC.,

as Landlord

dated March 1, 1996

## 610 & SAN FELIPE SHOPPING CENTER

RECEIVED MAR - 8 1996

# TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | Leased Property | 1 |
| 2. | Construction of Building and Improvements | 1 |
| 3. | Lease Term | 2 |
| 4. | Base Rent | 3 |
| 5. | Development of Shopping Center by Landlord | 5 |
| 6. | Easements | 5 |
| 7. | Common Areas and Common Area Maintenance | 7 |
| 8. | Signs and Communications Equipment | 11 |
| 9. | Taxes | 12 |
| 10. | Maintenance, Repairs and Replacements | 14 |
| 11. | Payment of Utility Bills | 16 |
| 12. | Alterations | 16 |
| 13. | Mechanics' Liens | 17 |
| 14. | Insurance | 18 |
| 15. | Damages by Fire or Other Casualty | 22 |
| 16. | Condemnation | 24 |
| 17. | Assignment and Subletting | 26 |
| 18. | Use | 27 |
| 19. | Warranties and Representations | 28 |
| 20. | Estoppel Certificates. | 35 |
| 21. | Subordination, Non-Disturbance and Attornment | 36 |
| 22. | Change of Landlord | 37 |
| 23. | Tenant's Financing | 37 |

H:\2080-7\LEASE.RV9 [52\74] (TS#3199)

24.    Tenant's Property and Waiver of Landlord's Lien . . . . . . . . . . . . . . . . . . . .    38

25.    Memorandum of Lease; Commencement Date Agreement . . . . . . . . . . . . . .    38

26.    Expiration of Term and Holding Over . . . . . . . . . . . . . . . . . . . . . . . . . .    38

27.    "For Rent" Signs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    39

28.    Force Majeure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    39

29.    Events of Tenant's Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    40

30.    Landlord's Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    40

31.    Events of Landlord's Default; Tenant's Remedies . . . . . . . . . . . . . . . . . . .    43

32.    Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    44

33.    Compliance with Applicable Laws . . . . . . . . . . . . . . . . . . . . . . . . . . . .    44

34.    Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    45

35.    Brokers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    45

36.    Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    46

37.    Effectiveness of Lease; Tenant's Right to Terminate . . . . . . . . . . . . . . . . . .    48

38.    Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    50

    H:\2080-7\LEASE.RV9 [52\74] (TS#3199)

## EXHIBITS

"A"             Site Plan

"A-1"           Shopping Center Legal Description

"B"             Index of Definitions

"C"             Construction Provisions

"D"             Removable Trade Fixtures

"E"             Sign Plans

"F"             Permitted Encumbrances

"G"             Subordination, Non-Disturbance and Attornment Agreement

"H"             Memorandum of Lease

"I"             Commencement Date Agreement

"J"             Indemnification Agreement

H:\2080-7\LEASE.RV9 [52\74] (TS#3199)

San Felipe at Loop 610
Galleria Area/Houston, TX

## LEASE

This LEASE is made as of the 1st day of March, 1996, by and between 610 & SAN FELIPE, INC., a Texas corporation, having an address at 11219-100 Avenue, Edmonton, Alberta, Canada  T5K0J1 ("Landlord"), and CIRCUIT CITY STORES, INC., a Virginia corporation having an address at 9950 Mayland Drive, Richmond, Virginia 23233 ("Tenant").

W I T N E S S E T H :

That for and in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Leased Property.  Landlord demises and leases to Tenant and Tenant leases and takes from Landlord, commencing on Landlord's delivery of the "Land" (as defined below) to Tenant, all those certain "Premises" consisting of the "Building" and "Other Improvements" (both as defined in paragraph 2), as and when same are constructed, and that approximately 42,684 square foot parcel (the "Land") on which the Building and Other Improvements are or will be located, as more particularly shown (approximately) outlined in red on Exhibit "A" hereto (the "Site Plan"), together with exclusive rights in the four (4) parking spaces labelled "Customer Pick-Up" adjacent to the Building as shown on the Site Plan and with the easements described in paragraph 6 below, all located in the "Shopping Center" (herein so called), which consists of that certain real property with buildings and improvements constructed or to be constructed thereon, located at San Felipe and Loop 610, lying and being in the City of Houston (the "City"), County of Harris, State of Texas  (the "State"), and more particularly shown on the Site Plan and described by metes and bounds or platted lot legal description on Exhibit "A-1" attached hereto and made a part hereof for all purposes.  All of the Shopping Center exclusive of the Premises is "Landlord's Premises".  The description of the Premises may be adjusted in accordance with Tenant's final bid set of Plans and Specifications as described in Exhibit "C" attached hereto.

2.    Construction of Building and Improvements.  Commencing immediately upon "delivery of the Land" (as defined in the Construction Provisions (herein so called) attached hereto as Exhibit "C" and incorporated herein by reference for all purposes), Tenant shall have

H:\2080-7\LEASE.RV9 [52\74] (TS/#3199)

the right to construct within the Shopping Center a one-story retail building, containing approximately 42,684 square feet of ground-floor gross leasable area plus mezzanine, with provisions for customer pickup, delivery and car stereo installation facilities, initially for use as a Circuit City Superstore (the "Building"), together with loading ramps, sidewalks, trash compactor, transformer pad and other such appurtenances and improvements (collectively, the "Other Improvements"), as more particularly set forth in the Construction Provisions. The Building and Other Improvements are sometimes collectively referred to herein as the "Improvements". The Improvements shall be constructed in accordance with the "Plans and Specifications" to be prepared by Tenant as specified in the Construction Provisions. Except as otherwise provided herein, title to the Improvements shall be deemed transferred to Landlord upon full payment of the "Tenant Improvement Allowance", as defined in the Construction Provisions.

3.   Lease Term. Subject to the conditions to the effectiveness of this Lease set forth in paragraph 37, the construction term (the "Construction Term") of this Lease shall commence on the date of Landlord's delivery of the Land to Tenant in accordance with, and in the condition specified in, the Construction Provisions, and shall end on the "Commencement Date" (as defined in paragraph 4 below). The main term (the "Main Term") of the Lease shall commence on the Commencement Date and shall end on the last day of January following the twentieth (20th) anniversary of the Commencement Date.

In addition to the Main Term, Tenant shall have the option (each such right referred to herein as a "Renewal Option") to renew and extend the Lease for four (4) consecutive five (5) year periods (each such period referred to as an "Option Period" and collectively as the "Option Periods") immediately following the Main Term, at the rent specified below. Tenant shall give Landlord written notice of its election to exercise any Renewal Option at least one hundred eighty (180) days prior to the expiration of the Main Term or any then-current Option Period, as applicable; provided, however, that in order to avoid any forfeiture or inadvertent lapse of such Renewal Option, if Tenant shall fail to give any such notice within the one hundred eighty (180) day time limit and shall not have given Landlord prior written notice of its intent not to exercise its Renewal Option, then and as often as the same shall occur, Tenant's right to exercise such Renewal Option shall nevertheless continue, as shall its tenancy hereunder (under the same terms and conditions as theretofore in effect and notwithstanding that the Main Term or then-

current Option Period shall have expired), until ten (10) business days after Landlord shall have given Tenant a written notice of Landlord's election to terminate the Renewal Option, during which period Tenant may exercise its Renewal Option at any time prior to the expiration of such ten (10) business day period. Upon the giving of notice of renewal and extension in accordance with the foregoing provisions, the Term (defined below) of this Lease shall thereupon be renewed and extended in accordance with such notice without further act by Landlord or Tenant, the same as if such notice had been timely given hereunder.

The Construction Term, Main Term and Option Periods are, collectively, the "Term". The term "Lease Year" shall mean each successive period of twelve (12) consecutive calendar months, commencing on the first day of each February during the Term, except that the first Lease Year shall commence on the Commencement Date and shall end on the last day of January following the first anniversary of the Commencement Date.

4.    Base Rent. During the Construction Term, Tenant shall have no rental obligations nor shall Tenant be responsible for any Real Estate Taxes (as defined in paragraph 9) or CAM Charges (as defined in paragraph 7) or any similar costs, fees, rentals or expenses. Tenant shall, however, pay for utility charges incurred by Tenant during the Construction Term. Tenant agrees to pay base rent ("Base Rent") for the Premises in the amounts and in the manner specified hereunder, commencing (subject to the provisions of paragraph 4 of the Construction Provisions) on the earlier to occur of (i) Tenant opening for business at the Premises, or (ii) two hundred ten (210) days following delivery to Tenant of the Land in accordance with the Construction Provisions, PROVIDED THAT Landlord has then made payment of the Tenant Improvement Allowance as set forth in the Construction Provisions (the "Commencement Date"). Landlord shall deliver the Land to Tenant no later than April 1, 1996.

Tenant shall pay Base Rent in equal monthly installments, in advance on the first day of each succeeding calendar month throughout the Term, with appropriate proration for any partial calendar month or Lease Year, to the address given for Landlord in paragraph 34 hereof, unless Landlord shall give Tenant written notice of a change of address or of the party to whom such rents shall be payable along with written documentation reasonably satisfactory to Tenant of such party's right to receive payment hereunder. Unless adjusted as provided in paragraph 3 of the Construction Provisions, Base Rent shall be paid pursuant to the following schedule:

3

    (i) <u>First Ten Years</u>.  During the first five (5) Lease Years (years 1 through 5), Tenant shall pay annual Base Rent in the amount of Eight Hundred Ten Thousand Nine Hundred Ninety-Six and 00/100 Dollars ($810,996.00), payable in equal monthly installments of Sixty-Seven Thousand Five Hundred Eighty-Three and 00/100 Dollars ($67,583.00).  During the second five (5) Lease Years (years 6 through 10), Tenant shall pay annual Base Rent in the amount of Eight Hundred Forty-Three Thousand and Nine and No/100 Dollars ($843,009.00), payable in equal monthly installments of Seventy Thousand Two Hundred Fifty and 75/100 Dollars ($70,250.75).

    (ii) <u>Reduction in Base Rent</u>.  Notwithstanding the Base Rent provisions, in the event that the ground-floor gross leasable area of the Building when constructed does not equal 42,684 square feet, annual Base Rent during the first five (5) Lease Years shall be the product of the actual ground-floor gross leasable area of the Building (as shown in the Plans and Specifications), multiplied by $19.00, and during the second five (5) Lease Years (years 5 through 10), annual Base Rent shall be the product of the actual ground-floor gross leasable area of the Building (as shown in the Plans and Specifications), multiplied by $19.75.  In determining the aforesaid ground-floor gross leasable area, measurements shall be made in accordance with the specifications set forth in paragraph 7(c) below.  If any Lease Year is other than twelve (12) months in length, annual Base Rent during such Lease Year shall be the product of the applicable monthly Base Rent times the number of months in such Lease Year, with appropriate proration for any partial calendar month therein.  In no event shall the Base Rent be based on a building having less than 42,000 square feet of ground-floor gross leasable area.

    (iii) <u>Increases in Base Rent</u>.  Annual Base Rent shall increase on the first day of the eleventh and every succeeding fifth Lease Year, over the initial Base Rent charged hereunder by the lesser of One and 70/100 Dollars ($1.70) per square foot of gross leasable area of the Premises or the percentage increase in the "CPI-U" (as defined below) during the preceding five (5) year period ending on October 31 of the tenth (or, as applicable, any succeeding fifth) Lease Year.  As used herein, the CPI-U shall be the United States Department of Labor, Bureau of Labor Statistics Consumer Price Index for All Urban Consumers, Houston area.  If at any time during the Term the CPI-U shall be discontinued, Landlord and Tenant shall mutually and reasonably agree to substitute an existing official index published by the Bureau of Labor Statistics or its successor or another similar index most nearly equivalent to the CPI-U.

4

5.   <u>Development of Shopping Center by Landlord</u>.  Landlord covenants to construct and develop a first-class shopping center.  The location of buildings and other tenant space therein will only be within the "Permissible Building Areas" designated on the Site Plan as building footprints, and the parking ratio for the Shopping Center shall be at least as shown thereon, but in no event shall said ratio be less than the greater of (i) 4.25 spaces (for full-sized automobiles, subject to the terms of paragraph 19(ix)E below) per 1,000 square feet of gross leasable area or (ii) that required by applicable zoning requirements.  All such parking shall be at ground level.  Landlord shall construct or cause such improvements to be constructed in a good and workmanlike manner, lien-free in accordance with paragraph 13 below, and Landlord hereby agrees to indemnify, defend and hold Tenant harmless from any loss or damage suffered by Tenant as a result of Landlord's construction.  Landlord shall not permit construction traffic over the Premises, and Landlord shall refrain from interfering with the conduct of Tenant's business.  Landlord shall keep and maintain or cause the improvements and the "Common Areas" (as defined in paragraph 7(a)) in the Shopping Center to be kept and maintained in good condition and repair and shall not operate, or permit to be operated, in the Shopping Center any activity which constitutes a nuisance, overburdens the available utilities, or violates any of the "Site Covenants" contained in subparagraph 19(a)(ix) or the prohibited activities set forth in subparagraph 19(a)(viii).

6.   <u>Easements</u>.  In addition to and simultaneously with the lease of the Premises, Landlord grants to Tenant certain nonexclusive leasehold easements over or upon certain areas of Landlord's Premises, as set forth below, which easements shall run as covenants with Landlord's Premises and the Premises during the Term and shall expire or terminate simultaneously with this Lease, except as provided below.

(a)   <u>Construction Easements</u>.  During the Construction Term, and any period of renovation or reconstruction thereafter, Landlord grants to Tenant a nonexclusive easement across a mutually agreeable designated route, providing access to and from the public roadways nearest to the Land, over the Common Areas (as defined in paragraph 7(a) below) for the purpose of construction access to the Premises.  In addition, Landlord grants to Tenant an exclusive easement for a construction staging area (the "Staging Area") of approximately 20,000 square feet, in a portion of the Common Areas at a mutually agreeable location within a

reasonable distance of the Land for Tenant's use in constructing the Improvements, in accordance with paragraph 1(b) of <u>Exhibit "C"</u> attached hereto.

(b)    <u>Footing and Foundation Easements</u>.    Landlord grants to Tenant, and Tenant grants to Landlord, easements and rights in Landlord's Premises and the Premises, as appropriate (i) for the construction and maintenance of foundations, footings, supports and demising walls; (ii) to allow their respective buildings to abut and connect (but not to bear structurally upon each other unless and except as otherwise provided herein); (iii) for roof projections, allowing the grantee to tie its building into the adjoining building by flashing and reglets; and (iv) for encroachments which reasonably occur in the construction of the building components set forth in subparagraphs (i) through (iii) above.   No such attachment or connection shall be made, however, unless detailed plans therefor shall have been timely submitted to and approved by the party to whose building the attachment is to be made, which approval shall not be unreasonably withheld.

(c)    <u>Utility Easements</u>.   During the Term, upon prior reasonable request of Tenant (following the initial "Landlord Work" as set forth in the Construction Provisions), Landlord agrees to obtain such underground, public or private utility easements as Tenant deems necessary, without unreasonably interfering with the use by Landlord of the Common Areas, for the benefit of the Premises.   For the purpose of exercising the rights granted in this subparagraph 6(c), Tenant and/or the utility provider shall have the right to enter upon and use the Common Areas to install the utility systems, to such extent and so long as reasonably necessary to accomplish such purpose, subject to restoration of the Common Areas following such installation and any other reasonable conditions and requirements imposed by Landlord.

(d)    <u>Common Area Easement</u>.   During the Term, Landlord grants to Tenant, for the benefit of the Premises, the nonexclusive right, privilege and easement (the "Common Area Easement") to use the Common Areas for their intended purposes and to permit Tenant and its employees, agents, subtenants, assignees, licensees, suppliers, customers and invitees to use the same, in common with Landlord, its successors, assigns, employees, agents, lessees, licensees, suppliers, customers and invitees and all other persons claiming by or through them, for the purposes (without limitation) of parking and pedestrian, service and vehicular access, ingress and egress to, from and between the Premises and the Landlord's Premises and the streets and highways abutting and adjacent to the Shopping Center, in accordance with the Site

Covenants, without payment of any fee or other charge therefor. It is specifically agreed that with respect to the parking spaces designated on the Site Plan as Tenant's "Customer Pick-Up", (i) Tenant shall have the right, from time to time, to relocate the same to other areas adjacent to the Improvements and (ii) notwithstanding the fact the same are in, and constitute a part of, the "Common Areas", such parking spaces shall be used exclusively by Tenant's customers, invitees and patrons. In addition, Tenant shall have the right to use such Common Areas as are immediately adjacent to Tenant's Improvements and within the Tenant's Preferred Area as shown on the Site Plan for "sidewalk sales", seasonal and promotional sales and other sales customary to Tenant's business operations, as permitted by applicable laws, ordinances and restrictive covenants.

(e)    Non-Dedication. None of the easements granted by the parties to this Lease is intended, nor shall any of them be construed, as a dedication of any portion of the Shopping Center for public use, and the parties will refrain from taking any action which would cause such a dedication and will take whatever steps may be necessary to avoid any such dedication, except as may be agreed upon in writing by the parties hereto or their respective successors or assigns.

7.    Common Areas and Common Area Maintenance.

(a)    Definition of Common Areas. The term "Common Areas" shall be defined to include the parking areas, lanes, drives, entrances, truck passageways, sidewalks, ramps, stairways, landscaped and other unpaved areas, parking lot lighting facilities and equipment, Landlord's two (2) pylon signs, directional, traffic and monument sign structure(s) and shared utility facilities located in the Shopping Center (including any such areas and facilities contained within outparcels and adjacent tracts but reserved to the benefit of the Shopping Center occupants) and intended and available for the common use of all of the tenants within the Shopping Center (including any outparcel and other adjacent occupants which contribute toward "CAM Charges" (as defined below) and which are not responsible for separate maintenance of such outparcels or tracts), their subtenants, licensees, and business invitees. Landlord shall be responsible for operating, maintaining and repairing the Common Areas in a first-class manner, including cleaning, maintenance of Landlord's pylon and other sign structure(s), snow removal and ice treatment, removal of Common Area trash and garbage, lighting, repairing, repaving and

restriping the parking area, and maintaining, replanting and replacing landscaping, all such work to be referred to collectively as "Common Area Maintenance".

(b)    CAM Charges.  For the purpose of this paragraph 7, the cost of Common Area Maintenance (the "CAM Charges") shall include (i) Landlord's reasonable and proper direct costs and expenses of operating and maintaining the Common Areas (including utility charges and maintenance fees payable to the Post Oak Park Landowner's Association (the "Property Owner's Association"), which Landlord estimates to be $14,052.00 per year), (ii) subject to the terms of paragraph 8 below and subparagraph 7(b)(xiv) below, Landlord's reasonable costs in construction of the two (2) pylon signs shown on the Site Plan and meeting the sign criteria described in paragraph 8(a) below (except that Tenant shall pay no portion of CAM Charges associated with signs on which Tenant's identification is not located), (iii) Landlord's overhead expenses for administering same (or in lieu thereof a management fee) in an amount not to exceed seven percent (7%) of the total of such costs (specifically excluding from such total the amounts paid by Landlord and Tenant for insurance, capital expenditures, and Real Estate Taxes, and (iv) the amount of any insurance deductible paid by Landlord to reconstruct any portion of the Shopping Center required by the terms of this Lease to be reconstructed by Landlord, up to $2,000 per claim.  Notwithstanding the foregoing, the following shall not be included in the CAM Charges:

(1)    real estate taxes paid, and maintenance performed, on separately assessed and/or maintained outparcels or other adjacent tracts not reserved to the benefit of the Shopping Center occupants;

(2)    any dues or charges for a merchants' or other association of the tenants in the Shopping Center;

(3)    maintenance, repairs or replacements to the Common Areas (but no other portions of the Shopping Center), necessitated by the negligent or wrongful act of the Landlord or made to correct any construction, defect or condition, to any interior mall space or to any buildings (including exterior walls thereof) or utility systems not part of the Common Areas;

(4)    repairs or replacements necessitated by any governmental entity or by the negligence or the wrongful action of Landlord (including failure to construct any portion of the Shopping Center in accordance with plans or specifications therefor) or any

H:\2080-7\LEASE.RV9 [52\74] (TS#3199)

other tenant or made to correct any initial construction defect or condition in existence prior to the Commencement Date of this Lease or to correct damage caused by subsidence or adverse or substandard soil conditions;

(5)     amounts paid to entities related to Landlord in excess of the cost of such services from any competitive source;

(6)     amounts reimbursable from insurance proceeds, under warranty or by Tenant, any other tenant in the Shopping Center or any other third party other than pursuant to a Common Area expense provision similar to this paragraph 7;

(7)     premiums for Common Area liability insurance for coverage in excess of the limits established in paragraph 14(e) below;

(8)     repairs or replacements of a capital nature (whether or not capitalized) unless the costs of same are amortized over the entire useful life of such repairs or replacements and provided that such repairs or replacements are not the result of initial defects in materials or workmanship;

(9)     improvements, repairs or replacements (other than patching and similar minor periodic maintenance) to the parking lot or other paved areas during the first ten (10) "CAM Years" (as defined below);

(10)    reserves for anticipated future-expenses;

(11)    interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner (any such charges payable due to Tenant's or any other tenants' failure to pay such bills on a timely basis shall be paid by the tenant causing the delay);

(12)    Landlord's personnel, overhead, home office or administrative expenses except as set forth in subparagraph (b)(ii) above;

(13)    amounts incurred to remediate any Hazardous Substances (as defined in the Construction Provisions); or

(14)    other maintenance expenses not considered normal and customary under generally accepted accounting principles or shopping center industry standards, or pertaining to any feature or element of the Common Areas not utilized by Tenant (i.e. pylon signs not containing Tenant's identification). CAM Charges shall be in an amount consistent with the costs incurred by other landlords of similar shopping centers in the

9

Galleria area of the City (but not greater than as described in this paragraph 7(b)), and in all events such charges shall be obtained at competitive rates pursuant to a proposed Common Area maintenance budget delivered to Tenant on or before the end of each CAM Year; or

        (15)    Charges, costs or expenses of constructing or maintaining any "Walkways" required under the Protective Covenants or Development Control Manual, or otherwise, relating to the Shopping Center and the Subdivision of which the Shopping Center is a part, as more particularly described in paragraph 37(e) hereinbelow.

        (c)    <u>Tenant Payments</u>.    Commencing on the Commencement Date and continuing until the expiration of the first Lease Year, Tenant shall pay to Landlord a fee (which Landlord estimates to be $4.70 per square foot of ground-floor gross leasable area in the Building per annum), payable in equal monthly installments, as its share of CAM Charges. Thereafter, the annual charge shall be computed on the basis of periods of twelve (12) consecutive calendar months, as designated by Landlord (each such period is a "CAM Year"), and shall be paid by Tenant in equal monthly installments, in advance, on the first day of each month during such CAM Year. All charges which are a component of CAM charges shall be based on arms-length agreements and contracts entered into by Landlord with parties not affiliated with Landlord. For any period within the Term which is less than a full CAM Year, the annual charge shall be appropriately prorated. Within sixty (60) days after the end of the first CAM Year and each CAM Year thereafter, Landlord will furnish to Tenant a statement showing in detail (with such substantiating documentation as Tenant may reasonably request) the amount of the CAM Charges for the preceding CAM Year and the then-current number of square feet of ground-floor gross leasable area in the Shopping Center. Any necessary adjustment with respect to amounts owed by either party for such preceding CAM Year shall thereupon be made; and the monthly payments to be made by Tenant for the ensuing year shall be estimated according to the Common Area maintenance budget prepared by Landlord and delivered to Tenant. Subject to adjustments as herein contemplated, Tenant's share (such fraction being referred to herein as "Tenant's Pro Rata Share") of CAM Charges after the first CAM Year shall always be the product of the CAM Charges multiplied by a fraction, the numerator of which is the number of square feet of the ground-floor gross leasable area in the Building and the denominator of which is the number of square feet of the ground-floor gross

10

leasable area (including the area of any non-temporary outside sales area exclusive to a single occupant) in the Shopping Center.  In determining the ground-floor gross leasable area of any building in the Shopping Center (including the Building), measurement shall be made from the centerline of any common walls and from the outside of any exterior walls.  The gross leasable area of any outside sales area shall be measured from the outside of the exterior wall of any adjacent building to the actual exterior perimeters of such outside sales area, including any aisles, fences or walls included therein.  Changes in applicable floor areas shall result in corresponding adjustments of Tenant's Pro Rata Share, but in no event shall the denominator of the fraction by which Tenant's Pro Rata Share of Real Estate Taxes and dues or fees payable to the Property Owner's Association is determined be less than seventeen thousand (17,000) square feet plus the number of square feet in the Building.  The remainder of CAM Charges shall be borne by Landlord and/or other tenants.

(d)    Examination of Landlord's Records.  Tenant shall have the right, from time to time, but not more often than once as to any CAM Year and no later than two (2) years after the end of such CAM Year, to examine and make copies of the records pertaining to CAM Charges for such CAM Year.  Tenant's right of examination shall be exercised during reasonable business hours at Landlord's principal records office on reasonable prior notice to Landlord.  If such examination shall disclose any overcharge by Landlord, Landlord shall promptly reimburse Tenant for any overpayment of Tenant's Pro Rata Share of CAM Charges; and if such overpayment by Tenant is in excess of three percent (3%) of the actual Tenant's Pro Rata Share of CAM Charges, Landlord shall reimburse Tenant for the reasonable cost of such examination or audit.  Tenant shall promptly reimburse Landlord for any underpayment disclosed by such examination.

8.    Signs and Communications Equipment.

(a)    Signs.  Landlord, at its sole cost and expense but subject to reimbursement as part of CAM Charges as set forth in paragraph 7(b) above, no later than the date set forth on Attachment "5" to the Construction Provisions, shall construct and install upon the Common Areas at each of the two (2) locations so shown on the Site Plan, a pylon sign structure (with electrical wired box installed) having sufficient space thereon in the top tenant position for inclusion of doublesided "face panels" and a "readerboard" identifying Tenant's store, which face panels and readerboard shall be constructed and installed at Tenant's sole cost and expense.

11

Tenant shall reimburse to Landlord the full cost incurred by Landlord in constructing any pylon sign on which Tenant is the only tenant identified, and its proportionate share of any pylon sign on which Tenant and any other tenant(s) is/are identified (based on the number of square feet of signage each tenant identified on the sign utilizes). All maintenance and repair costs associated with the pylon signs on which Tenant is identified shall be likewise borne, notwithstanding anything contained herein to the contrary. Landlord shall submit to Tenant plans and specifications for each such pylon sign (including colors, design, dimensions, type of lighting and position of tenant panels) prior to construction and installation thereof for Tenant's written approval, which shall not be unreasonably withheld or delayed. Attached as a portion of Exhibit "E" are plans and specifications for Tenant's current prototypical face panels and for Tenant's building signage, which Landlord hereby approves upon its execution of this Lease. Notwithstanding the foregoing, Tenant shall be entitled without Landlord's consent, but subject to governmental requirements, as aforesaid, to replace any and all of its signs with signage consistent with Tenant's then-current prototypical sign plans. In the event of an assignment or subletting as a result of which Tenant is no longer occupying any portion of the Premises, Tenant's signs may be replaced by signs identifying the appropriate assignee or subtenant, provided that the specific design of such signage shall be subject to Landlord's consent, which consent shall not be unreasonably withheld, conditioned or delayed, and to the extent required by instruments binding on Landlord, the consent of the Property Owner's Association.

      (b)    Communications Equipment. Tenant may, from time to time, install, maintain and/or replace any satellite dishes or antennas on the roof and/or exterior walls or parapet of the Building as Tenant deems necessary or desirable, provided same shall not adversely and materially affect the roof or the structural elements thereof, and provided same complies with all applicable laws, ordinances and regulations. Upon removal by Tenant of any satellite dishes or antennas, Tenant shall repair any damage done in connection with such removal. To the extent reasonably possible, Tenant shall screen all communications equipment from public view.

     9.    Taxes.

      (a)    Taxes Contemplated Hereunder. The term "Real Estate Taxes" shall mean all general real estate taxes and assessments and other ad valorem taxes, rates and levies paid upon or with respect to the Shopping Center, including the Premises, for a calendar year or a

H:\2080-7\LEASE.RV9 [52\74] (TS#3199)

portion thereof to any governmental agency or authority and all charges specifically imposed in lieu of any such taxes. Nothing contained in this Lease shall require Tenant to pay any local, county, municipal, state or federal income, franchise, corporate, estate, inheritance, succession, capital levy, business or transfer tax of Landlord, or any local, county, municipal, state or federal income, profits, gross receipts, sales or renewal tax or charge upon the rent or other charges payable by Tenant under this Lease (except, in the case of a tax upon the rent due hereunder, that tax or charge required by legislation to be paid by Tenant).

(b)    Payment of Real Estate Taxes. At such intervals as Landlord is required to pay the Real Estate Taxes, Tenant shall pay Tenant's Pro Rata Share of Real Estate Taxes (calculated in the same manner as Tenant's Pro Rata Share of CAM Charges in paragraph 7(c)) levied against the tax parcel or parcels comprising the Shopping Center (the "Tax Parcel"). Tenant's Pro Rata Share of Real Estate Taxes shall be net of any early-payment discounts available at the time Tenant's payment is due. Tenant shall receive the benefit of the early-payment discount so long as Tenant pays Landlord Tenant's Pro Rata Share of Real Estate Taxes when due. Tenant shall pay Tenant's Pro Rata Share of Real Estate Taxes within thirty (30) days after Tenant's receipt of Landlord's statement therefor, accompanied by the tax bill on the basis of which such statement is rendered. Landlord shall pay, or cause the payment of, all Real Estate Taxes before any fine, penalty, interest or cost may be added thereto, become due or be imposed by operation of law for the nonpayment or late payment thereof. In no event shall Tenant be liable for any discount forfeited or penalty incurred as a result of late payment by another tenant or by Landlord. Tenant shall pay to Landlord the amount of any late penalty assessed against Landlord with respect to Real Estate Taxes caused by Tenant's failure to pay its Pro Rata Share thereof to Landlord when due in accordance with the terms of this Lease. Real Estate Taxes shall be prorated as of the Commencement Date and the expiration or earlier termination of this Lease, and Landlord shall promptly return to Tenant any overpayment made by Tenant not attributable to the period of Tenant's possession of the Premises. Landlord shall remain primarily responsible for such payment notwithstanding the fact that such payment may be made by a tenant of Landlord's Premises or other third party pursuant to an agreement to which Tenant is not a party. In addition, should Landlord fail to pay such Real Estate Taxes before same become delinquent, Tenant shall have the right, at its election, to cure such failure by payment of delinquent Real Estate Taxes and any interest and penalties due thereon and in

H:\2080-7\LEASE.RV9 [52\74] (TS#3199)

such event Tenant may deduct the cost thereof, plus interest at the rate of twelve percent (12%) per annum but not in excess of the highest rate permitted by State law (the "Default Rate"), from the next installment(s) of Base Rent and other charges due hereunder.

      (c)    Contest of Real Estate Taxes and/or Assessed Valuation of Property. Tenant shall have the right, at Tenant's sole expense, to contest the amount or validity, or otherwise seek an exemption or abatement, of any Real Estate Taxes or to seek a reduction in the valuation of the Premises assessed for Real Estate Tax purposes, by appropriate proceedings diligently conducted in good faith, provided that Tenant shall first have notified Landlord of its intent to do so and Landlord shall have failed to notify Tenant in writing, within five (5) days of receipt of Tenant's notice, that Landlord intends to contest such Real Estate Taxes or seek such a reduction. In any instance where any such action or proceeding is being undertaken by Tenant, Landlord shall cooperate with Tenant, execute any and all documents required in connection therewith and, if required by any law, rule or regulation of the taxing authority, shall join with Tenant in the prosecution thereof. Tenant shall reimburse Landlord for Landlord's reasonable costs incurred, if any, in connection with Landlord's cooperative efforts required hereunder.

      (d)    Payment Following Appeal. Upon the termination of the proceedings set forth in subparagraph (c) above (unless the taxing authority requires that Real Estate Taxes be paid under protest prior to commencement of such proceedings), Tenant shall pay Tenant's Pro Rata Share of such Real Estate Taxes as finally determined in such proceedings, the payment or partial payment of which may have been deferred during the prosecution of such proceedings. Tenant shall be entitled to a refund of any overpayment of Real Estate Taxes relating or allocable to the Premises, as well as a reimbursement of all costs, fees and expenses it incurs in any successful protest or reassessment, to the extent such costs, fees and expenses are reimbursed by the taxing authority.

      10.    Maintenance, Repairs and Replacements. Except (i) for costs covered by the Landlord's insurance required to be maintained hereunder, (ii) for condemnation proceeds to be received by Tenant, (iii) for obligations arising from the negligent acts or omissions or willful misconduct of Landlord (or its agents, employees or other tenants), or (iv) as otherwise set forth in this Lease, Tenant shall be solely responsible for maintenance of the roof membrane once the initial warranty thereon expires, any pylon sign on which Tenant is the only tenant of the

Shopping Center identified, and the exterior and interior non-structural elements of the Building, including, but not limited to, repairs and/or replacements to plumbing, heating, electrical and air conditioning systems which serve only the Premises. During the last five (5) years of the Term of the Lease (without consideration to the exercise of any additional Renewal Options) Tenant shall be obligated to so install or construct alterations or incur expenditures pursuant to this paragraph; provided, however, that if Tenant is required to expend any sum in satisfaction of its replacement obligations hereunder, and if the resulting improvement to the Improvements cannot be fully amortized in accordance with generally accepted accounting principles, or the Internal Revenue Code and Regulations, over the remainder of the Term (without consideration to the exercise of any additional Renewal Options), Tenant shall so notify Landlord and Landlord shall either (a) direct Tenant that Landlord elects not to cause Tenant to make such capital expenditure, and Tenant shall thereby be relieved of any liability for such replacement obligation (unless such capital expenditure involves a Building system critical to the operation of Tenant's business, in which event Landlord shall be deemed to have elected (b) immediately following) or (b) direct Tenant to make such capital expenditure in which event Tenant shall be reimbursed by Landlord at the end of the Term by that amount of the cost associated with such replacement, construction or alteration (but not repair costs) for the period beyond the remainder of the Term (with consideration to the exercise of any additional Renewal Options). Landlord shall maintain all structural elements of the Premises (whether or not same serve only the Premises), including, without limitation, the roof, roof trusses, roof structure (and the roof membrane until the initial warranty thereon expires), flooring system, floor slab, foundation, load bearing walls and exterior structural walls, but shall have no other responsibility for maintaining the cosmetic or aesthetic aspects of any structural element or for repair of a non-structural nature to any structural element, or for maintenance, repair or replacements to the Premises or any part thereof; provided, however, this provision is in no way intended to limit Landlord's obligation to maintain, repair and replace any and all elements, both structural and non-structural, of the Common Areas pursuant to the terms of this Lease. In addition to the Landlord's maintenance and repair obligations set forth herein and otherwise set forth in this Lease, Landlord agrees to maintain the Other Improvements immediately surrounding the Building, including sidewalks and landscaping. Should either party fail to perform its obligations under this paragraph 10, the other party may, at its option, effect such maintenance, replacements or repairs, provided that

such curing party shall have given the nonperforming party thirty (30) days' prior written notice, except in the case of emergencies (in which event only such notice as may be reasonable under the circumstances shall be required); but further provided that such thirty (30) day period (or reasonable period in event of emergencies) shall be extended in respect of any cure that cannot with reasonable diligence be accomplished within such period so long as the party required to effect such cure has commenced such cure within such thirty (30) day period (or reasonable period in event of emergencies) and thereafter diligently prosecutes such cure to completion. The nonperforming party shall reimburse the other party on demand for the reasonable and actual amount so expended (as evidenced by detailed invoice), plus interest at the Default Rate. However, in the event of emergency repairs, no interest shall accrue if reimbursed within thirty (30) days of request (including detailed invoice) for reimbursement. All maintenance, repairs or replacements shall be done by Tenant or Landlord lien-free and in a good and workmanlike manner consistent with the quality of labor and materials used in originally constructing the Improvements and in accordance with all applicable law. In order for Landlord and Tenant to effectively perform their maintenance, repair and replacement obligations hereunder, Tenant and Landlord, as applicable, shall assign to the other party any and all manufacturers' and contractors' warranties relating to such work performed on behalf of the other party to the party who is required to maintain same under the Lease.

11.    Payment of Utility Bills.   Tenant will pay directly to the appropriate utility company or governmental agency, when due, all bills for gas, water, sanitary sewer, electricity, telephone and other public or private utilities used by Tenant with regard to the Improvements. Landlord shall pay when due all utility charges incurred in the operation of the Common Areas and the Shopping Center. Landlord shall cause the utilities used by Tenant to be separately metered.

12.    Alterations.   During the Term, Tenant shall have the right, at its discretion and its sole cost, without Landlord's consent, to make (i) any alterations or modifications necessary or desirable in order to bring the Premises into conformity with Tenant's then-current prototype for similarly sized stores and (ii) any interior nonstructural alterations or modifications it may desire.   Any such alterations and modifications which require the approval of the Property Owner's Association pursuant to the terms of the documents described on Exhibit "F" attached hereto shall first be approved by the Property Owner's Association.   With Landlord's consent,

16                    H:\2080-7\LEASE.RV9 [52\74] (TS\3199)

which shall not be unreasonably withheld, conditioned or delayed, Tenant shall have the right, at its sole cost, to alter, modify or reconstruct the exterior and/or structure of the Building or Other Improvements. Landlord's withholding of consent as to any structural alteration or modification shall be deemed reasonable only if same is materially inconsistent with the then-existing architecture of the Shopping Center. Tenant shall cause all such alterations to be lien-free (in accordance with paragraph 13) and made and completed at Tenant's cost in a workmanlike manner and in compliance with all applicable law. Should Landlord's consent be required, conceptual plans and specifications for such work shall be provided to Landlord prior to commencement of any such work. Landlord shall be deemed to have consented to such work if written notice of disapproval, with reasons specified, is not received by Tenant within fifteen (15) business days following Tenant's delivery of such plans and specifications to Landlord. Without cost or expense to Landlord, Landlord shall cooperate with Tenant in the obtaining of any and all licenses, building permits, certificates of occupancy or other governmental approvals which may be required in connection with any such modifications or alterations, and Landlord shall execute, acknowledge and deliver any documents reasonably required in furtherance of such purposes. Expansion of the Building by Tenant shall require Landlord's prior approval, which shall not be unreasonably withheld, conditioned or delayed and shall be deemed approved if written notice of disapproval (with reasons specified) is not received by Tenant within fifteen (15) days following Tenant's request for Landlord's approval. The terms set forth above relating to Tenant's obligation to complete all alterations lien-free and in compliance with applicable laws, and relating to Landlord's obligation to cooperate regarding licenses, permits, etc., shall likewise be applicable to any approved expansion.

13.    <u>Mechanics' Liens</u>. Landlord and Tenant covenant to each other that they will not permit any lien to be filed against the Premises or the Shopping Center as a result of nonpayment for, or disputes with respect to, labor or materials furnished to the Premises or the Shopping Center for or on behalf of Tenant, Landlord or any party claiming by, through, or under Tenant or Landlord, nor shall either party permit any judgment, lien or attachment to lie, as applicable, against the Premises or the Shopping Center. Should any lien of any nature, including but not limited to the foregoing, be filed against the Premises or Shopping Center, the party on account of whose actions such lien has been filed shall, within thirty (30) days after receipt of written notice of such lien, cause said lien to be removed, or otherwise protected

against execution during good faith contest, by substitution of collateral, posting a bond therefor, escrowing of adequate funds to cover the claim and related transaction costs or such other method as may be permissible under applicable title insurance regulations and reasonably acceptable to the other party hereto.

    14.   <u>Insurance</u>.

    (a)   <u>Property Damage</u>.  During the Construction Term, Tenant shall keep or require its general contractor to keep, in full force and effect, a policy of builder's risk insurance covering loss or damage to the Improvements for the full replacement value of all such construction.  During the Main Term and all Option Periods, Landlord shall keep in full force and effect a policy of all-risk fire and extended coverage insurance (excluding flood and earthquake property damage insurance) covering loss or damage to the Premises in the amount of full replacement value of the Building, exclusive of excavation, footings and foundations (which initial amount shall be not less than the Tenant Improvement Allowance), with a commercially reasonable deductible, for which Landlord shall be fully responsible.  Tenant and Landlord's first lien "Mortgagee" (as defined in paragraph 21 below), shall be named in such policy or policies as additional insureds as their respective interests may appear.  Tenant shall carry fire insurance on its inventory and fixtures.  Neither Tenant or Landlord shall construct, or permit to be constructed, any improvement in the Shopping Center, nor conduct any activity, or permit the conduct of any activity, in the Shopping Center which will prevent Landlord or Tenant from being able to obtain insurance coverage at commercially reasonable rates, including, without limitation, a fully-sprinklered fire insurance rate.  Should Landlord or Tenant cause or permit any insurance rate increase to occur, Landlord or Tenant (as applicable) will reimburse the other for the additional premium required, subject to Tenant's right to self-insure (in which event Landlord will contribute to Tenant's self insurance fund to cover increased actuarial risks).

    (b)   <u>Liability Insurance</u>.  During the Term, Tenant shall keep in full force a policy of commercial general liability insurance with bodily injury and property damage coverage with respect to the Premises and business operated by Tenant, which shall name Landlord and Landlord's first lien Mortgagee as additional insureds as their respective interests may appear.  The limits of such commercial general liability policy shall be not less than $3,000,000.00 combined single limit for bodily injury and property damage, with a commercially reasonable deductible.  Landlord and Tenant shall have the right to increase or

decrease the amount of insurance required hereunder no more frequently than every three (3) Lease Years, to that required by similar first class shopping centers in the general area of the Shopping Center.

      (c)    <u>Workers' Compensation Insurance.</u>  To the extent required by law, Landlord and Tenant shall maintain workers' compensation insurance covering their respective employees in statutory limits, or maintain such alternate coverages or arrangements as legally permissible.

      (d)    <u>Self-Insurance</u>. Notwithstanding anything to the contrary contained herein, Tenant shall have the right to self-insure against any of the risks or portions thereof set forth in subparagraphs (a) and (b) (and to the extent then permitted by law, (c)) above, provided Tenant is then occupying the Premises and has a reported net worth, as of the end of Tenant's most recent quarterly reporting period, of not less than Seventy-Five Million Dollars ($75,000,000), as computed in accordance with generally accepted accounting principles, consistently applied, as determinable from Tenant's public disclosures and/or regularly maintained corporate balance sheets which are generally available to shareholders (no right of Landlord to audit or conduct independent investigations being implied by this provision).

      (e)    <u>Common Area and Third Party Tenant Insurance and Insurance During Landlord's Construction.</u>  During the Term, Landlord shall keep in full force and effect, in form reasonably acceptable to Tenant, policies of (1) commercial general liability insurance having at least a $3,000,000 combined single limit for bodily injury and property damage, with a commercially reasonable deductible, and (2) fire and extended coverage insurance with respect to the Common Areas.  References in this Lease to Building Area A, Building Area B and Building Area C shall mean those areas designated as such on the Site Plan.  Landlord may elect to not insure Building Area A, Building Area B or Building Area C, so long as Landlord commences rebuilding, repairing, and reconstructing each such Building Area within sixty (60) days of casualty damage thereto and completes same within two hundred forty (240) days of such casualty damage. If Landlord does not commence and complete the restoration within such time period, Landlord shall promptly and at its sole cost (not reimbursable as CAM Charges) convert any such unrestored area to Common Area (specifically parking), which such area shall remain as Common Area parking until Landlord elects to rebuild such area in accordance with the terms of this Lease applicable to development of the Center.  Said policies shall name Tenant, and any

19

lender, investor or other stakeholder which is designated by Tenant from time to time, as an additional insured to the fullest extent Tenant and such stakeholder have insurable interests. The limits of such policies shall be the same as those set forth in subparagraphs (a) and (b) above, as applicable. The cost of the premiums for coverages relating to Common Areas shall be an element of CAM Charges, provided that Tenant shall not be liable for its pro rata share of any premium for coverage in excess of that coverage which is customary among owners of like shopping centers in the City. During any period in which Landlord is conducting construction activities at the Shopping Center, Landlord shall keep, or cause its general contractor to keep, in full force and effect, with regard to the Shopping Center, in form reasonably acceptable to Tenant, at least the minimum insurance coverages set forth below:

> (i)  Workers' Compensation - Statutory Limits;
> Employers Liability - $500,000;
>
> (ii)  Automotive Liability for all vehicles with limits of $2,000,000; and
>
> (iii)  Commercial General Liability to include premises operations and products/completed operations coverage with limits of $2,000,000.

Additionally, Landlord shall keep or require its general contractor to keep in full force and effect a policy of builder's risk insurance covering loss or damage to the Shopping Center for the full replacement value of all such construction. To the fullest extent Tenant has an insurable interest, such liability policy shall name Tenant an additional insured and such builder's risk policy shall name Tenant a loss payee. Landlord and Tenant shall have the right to increase or decrease the amount of insurance required hereunder no more frequently than every three (3) Lease Years, to that required by similar first class shopping centers in the general area of the Shopping Center.

(f)     Policy Provisions. All policies of insurance (other than self-insurance) enumerated above shall be provided by insurance carriers with a Best rating of not less than B+VI (or its closest equivalent, if B+VI is not available). Any insurance coverage enumerated above may be effected by a blanket policy or policies of insurance or under so-called "all risk" or "multi-peril" insurance policies, provided that the total amount of insurance available with respect to the Premises and Tenant's or Landlord's liability hereunder shall be at least the equivalent of separate policies in the amounts herein required, and provided further that in other respects any such policy or policies shall comply with the provisions of this paragraph 14.

H:\2080-7\LEASE.RV9 [52\74] (TS#3199)

Landlord shall not be entitled to self-insure against any of the risks recited herein, except the amount of any commercially reasonable deductible shall be deemed to be self-insurance. An increased coverage or "umbrella" policy may be provided and utilized by either party to increase the coverage provided by individual or blanket policies in lower amounts, and the aggregate coverage provided by all such policies with respect to the Premises and Tenant's or Landlord's liability hereunder shall be satisfactory provided that such policies otherwise comply with the provisions of this paragraph 14.

(g)     Waiver of Right of Recovery and Subrogation.    To the extent that insurance proceeds are actually received in satisfaction of a loss which is required to be covered by insurance or is self-insured hereunder (with the deductible under any policy being deemed to be self-insured), Landlord and Tenant hereby waive any and all rights of recovery against each other for any loss or damage to the Premises or the contents contained therein, for loss of income on account of fire or other casualty, or for injury sustained on the Premises or the Common Areas; and each party's aforesaid policies of insurance shall contain appropriate provisions recognizing this mutual release and waiving all rights of subrogation by the respective insurance carriers.

(h)     Evidence of Insurance.    Subject to Tenant's right to self-insure hereunder, upon (i) commencement of the Main Term (as to property insurance), (ii) upon delivery of the Land (as to liability insurance) and (iii) no less than annually thereafter, Tenant and Landlord shall cause to be issued to each other in lieu of the original policy, a duplicate of such policy or appropriate certificates of insurance reasonably acceptable to the other party and evidencing compliance with the applicable covenants of this paragraph 14.    Each such certificate shall provide that no expiration, cancellation or material change in the insurance evidenced thereby shall be effective unless thirty (30) days' unconditional notice of such expiration, cancellation or material change shall have been given to the certificate-holder (and any Mortgagee, if applicable).

(i)     Indemnities.    Except if arising from the negligent or willful acts of Landlord or its agents or employees (to the extent that paragraph 14(g) is inapplicable thereto), Tenant hereby agrees to indemnify, defend and hold Landlord harmless from all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to

persons or property occurring on the Premises or resulting from the use by Tenant, or Tenant's invitees, agents or employees, thereof.

Except if arising from the negligent or willful acts of Tenant or its agents or employees (to the extent that paragraph 14(g) is inapplicable thereto), Landlord agrees to indemnify, defend and hold Tenant harmless from any and all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring in, on or around the Shopping Center, exclusive of the Premises, or other buildings within Landlord's Premises or resulting from the use thereof by Landlord, its invitees, agents or employees.

15.    Damages by Fire or Other Casualty.    The provisions of paragraph 14(e) shall govern the rights and obligations of Landlord with respect to casualty damage to Building Areas A, B and C.

(a)    Less Than 240 Days to Reconstruct.    In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Improvements or the Common Areas, requiring less than two-hundred forty (240) days to repair and reconstruct the Improvements and/or Common Areas as estimated by an architect licensed in the State acceptable to Landlord and Tenant (without regard to any time periods during which construction is prohibited under the terms of this Lease), this Lease shall not terminate except as expressly set forth herein, and Base Rent and other charges shall continue to be paid by Tenant pursuant to the terms of paragraph 4 hereof. Within a reasonable time after such casualty, subject to force majeure, applicable building codes, the procurement of building permits and the receipt of insurance proceeds to the extent of the damage to the Premises or the Common Areas, as applicable, Landlord (or, at Tenant's option, Tenant) shall complete reconstruction of the Building and Other Improvements, and Landlord shall complete reconstruction of the Common Areas, to that condition existing immediately prior to such casualty, with such alterations as may have been permitted under paragraph 12 hereof. In the event, subject to force majeure and subject to any periods of prohibited construction imposed under this Lease (to the extent not waived by Tenant), the Premises and/or Common Areas, as applicable, are not substantially repaired and reconstructed, and equipment, furniture and fixtures restored or replaced, by the party with repair and restoration obligations within two hundred forty (240) days after receipt of any required governmental permits, for which permits the party with repair obligations shall make

prompt application following such destruction or damage, and insurance proceeds (if not self-insured), then the other party at its option, by giving written notice to the party with repair obligations within thirty (30) days after the expiration of said period, may undertake completion of such reconstruction, in which event the party with repair obligations shall make available to the notifying party all applicable insurance proceeds for such reconstruction (including any applicable deductible).   In the event Tenant elects to reconstruct the Building and/or Other Improvements, Landlord shall make all insurance proceeds payable with respect thereto available to Tenant for Tenant's use in performing the reconstruction.

   (b) <u>240 Days or More to Reconstruct</u>.   In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Improvements and/or Common Areas requiring more than two-hundred forty (240) days to repair and reconstruct said areas as estimated by an architect licensed in the State acceptable to Landlord and Tenant (without regard to any time periods during which construction is prohibited under the terms of this Lease), or in the event of any uninsured casualty, Tenant shall have the option of terminating this Lease.   Tenant shall notify Landlord of its exercise of such option within sixty (60) days following the occurrence of such casualty.   In the event Tenant does not elect to terminate this Lease as set forth above, then, subject to force majeure and subject to any periods of prohibited construction imposed under this Lease (to the extent not waived by Tenant), within two hundred forty (240) days after receipt by Landlord of the required governmental permits for restoration, for which permits Landlord shall make prompt application following such destruction or damage, and insurance proceeds with regard to such damage or destruction, Landlord (or at Tenant's option, Tenant) shall complete reconstruction of the Improvements to their condition existing immediately prior to such damage, in Tenant's reasonable discretion, with such alterations as may be permitted under paragraph 12, and shall restore the Premises.   Should Tenant elect to maintain this Lease in full force and effect, Landlord shall reconstruct all Common Areas in the manner specified by subparagraph (a) above regardless of the amount of damage to same and Base Rent and other charges shall continue to be paid by Tenant pursuant to the terms of paragraph 4 hereof.   Additionally, Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center leased to third party tenants or sold to third party occupants are subject to substantially similar reconstruction obligations to those of the Premises and/or Common Areas, such that in the event of any destruction or

damage to any portion of the Shopping Center whatsoever, in the event Tenant elects to maintain this Lease in force, Tenant shall be assured that the Shopping Center as a whole will be reconstructed in accordance with this paragraph 15 (and paragraph 14 as relates to Building Areas A, B and C).  In the event Tenant elects to reconstruct the Building and/or Other Improvements, Landlord shall make all insurance proceeds payable with respect thereto available to Tenant for Tenant's use in performing the reconstruction.

(c)     Last Two (2) Years of Main Term or Option Period.  Notwithstanding the foregoing, if any such damage or destruction occurs within the last two (2) years of the Main Term or of any Option Period and has a material impact on Tenant's ability to conduct business, as reasonably determined by Tenant, this Lease may terminate at Tenant's option, such option to be exercised by Tenant giving not less than thirty (30) days' prior written notice to Landlord, and Landlord shall receive the proceeds of any insurance (together with any applicable deductible) which may be payable with regard to such destruction or damage.

16.     Condemnation.

(a)     Definition of Taking and Substantial Taking.   For the purpose of this Lease, a "Taking" shall mean any condemnation or exercise of the power of eminent domain by any authority vested with such power or any other taking for public use, including a private purchase in lieu of condemnation by an authority vested with the power of eminent domain; the "Date of Taking" shall mean the earlier of the date upon which title to the Premises, the Shopping Center or any portion thereof so taken is vested in the condemning authority or the date upon which possession of the Premises, the Shopping Center, or any portion thereof is taken by the condemning authority; and "Substantially All of the Premises" shall mean (i) so much of the Improvements and/or Shopping Center and Common Areas as, when taken, leaves the untaken portion unsuitable, in Tenant's reasonable opinion, for the continued feasible and economic operation of the Premises by Tenant for the same purposes as immediately prior to such Taking or as contemplated herein, (ii) so many of the parking spaces within the Shopping Center as reduces the remaining spaces to less than two hundred eleven (211) spaces (for full sized automobiles) or the parking ratio to below that ratio which is required by the zoning ordinance applicable to the Shopping Center, and Landlord's failure to provide substantially equivalent alternative parking reasonably acceptable to Tenant within sixty (60) days after such

H:\2080-7\LEASE.RV9 [52\74] (TS#3199)

Taking, or (iii) so much of the Common Area Easement described in paragraph 6(d) above that access to the Premises is impeded.

(b)    Tenant's Rights Upon Taking or Substantial Taking.   In the event of a Taking of Substantially All of the Premises, Tenant, at its option upon thirty (30) days' written notice to Landlord, which shall be given no later than sixty (60) days following the Taking, shall have the right to terminate this Lease.   All Base Rent and other sums payable by Tenant hereunder shall be apportioned and paid through and including the Date of Taking, and neither Landlord nor Tenant shall have any rights in any compensation or damages payable to the other in connection with such Taking.

(c)    Tenant's Rights Upon Less Than Substantial Taking.   In the event of a Taking of less than Substantially All of the Premises, Base Rent and other charges shall be reduced fairly and equitably in accordance with the portion condemned or taken, effective as of the Date of Taking, and Tenant shall make all necessary restorations to the Improvements so that the portions of the Improvements not taken constitute a complete architectural unit, provided that the cost thereof to Tenant shall not exceed the proceeds of Tenant's condemnation award (to the extent that such relates to the Improvements and not to Tenant's personal property, intangibles or out-of-pocket expenses unrelated thereto) and the portion of Landlord's award allocable to the Premises, which Landlord shall make available to Tenant for such restoration.   If the Taking occurs within the last two (2) years of the Main Term or of any Option Period and has a material impact on Tenant's ability to conduct business as reasonably determined by Tenant, this Lease shall terminate at Tenant's option, such option to be exercised by Tenant giving not less than thirty (30) days' prior written notice to Landlord.

(d)    Landlord's Obligations Upon Any Taking.   In the event of any Taking following which the Lease continues in effect, Landlord shall make all necessary restorations to all portions of the Common Areas such that they each constitute a complete architectural unit and serve the function originally intended.   Additionally, Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center leased to third party tenants or sold to third party occupants are subject to substantially similar reconstruction obligations to those of the Premises and Common Areas, such that in the event of any condemnation of any portion of the Shopping Center whatsoever, and in the event Tenant elects to maintain this Lease

in force, Tenant shall be assured that the Shopping Center will be reconstructed to its former condition within reasonable time.

(e)    Rights Upon Temporary Taking. In the event of a Taking of the Premises, the Common Areas and/or any other area within the Shopping Center, or any portion thereof, for temporary use (specifically one not exceeding 60 days in duration), without the taking of the fee simple title thereto, this Lease shall remain in full force and effect and Base Rent and other charges shall continue to be paid by Tenant pursuant to the terms of paragraph 4 hereof. All awards, damages, compensation and proceeds payable by the condemnor by reason of such Taking relating to the Premises, or relating to the Common Areas but reasonably attributable to the Premises, for periods prior to the expiration of the Lease shall be payable to Tenant. All such awards, damages, compensation and proceeds for periods after the expiration of the Lease shall be payable to Landlord. Anything contained herein to the contrary notwithstanding, a temporary Taking for any period in excess of sixty (60) days may, at Tenant's option, be deemed a permanent Taking and shall be governed by subparagraph (b) or (c) above, as applicable.

(f)    Taking of the Pylon Sign(s). In the event of a taking, whether permanent or temporary, of any pylon or monument sign (as contemplated by paragraph 8) on which Tenant has installed identification panels, Landlord shall provide a substitute site (reasonably acceptable to Tenant) therefor, with adequate electrical power, located so as to be visible to vehicular traffic or roadways adjacent to the Shopping Center and/or at entrances to the Shopping Center, and Landlord shall replace and/or rebuild any of such signage so taken at its cost, but shall thereafter apply against such cost any proceeds from a condemnation award received by Landlord therefor, and shall thereafter be reimbursed by Tenant its proportionate share of such remaining cost, determined in the manner set forth in paragraph 8 hereof.

(g)    Tenant's Right Upon Condemnation. In the event of a Taking described in subparagraph (b) or (c) above, Tenant shall be entitled to claim compensation from the condemning authority for the value of its leasehold interest in the Premises, its unamortized leasehold improvements paid for by Tenant, relocation expenses and any other items to which Tenant is entitled under applicable law.

17.    Assignment and Subletting. Tenant shall have the right to sublet, assign, transfer reassign and grant concessions or licenses (a "Transfer") in all or any part of the Premises and

any of Tenant's rights and obligations under this Lease during the Term, without Landlord's prior consent.  In the event of such a Transfer, Tenant shall remain liable for all of Tenant's obligations to Landlord arising hereunder so long as this Lease is not changed, modified or amended in any respect by Landlord and any transferee without Tenant's approval, which shall not be unreasonably withheld, delayed or conditioned.  Should Tenant wish to be relieved of its obligations hereunder upon a Transfer, Landlord's and Mortgagee's prior consent to a Transfer shall be required, which consent shall not be unreasonably withheld, conditioned or delayed. Landlord acknowledges and agrees that it shall be unreasonable for Landlord to withhold its consent to any Transfer hereunder for the purpose of obtaining a material amendment or modification to the terms of this Lease.  Transfers to subsidiaries, affiliates, or related parties, and Transfers involving beneficial ownership interests in the Tenant, shall not be deemed a Transfer hereunder and same may be effected without Landlord's knowledge or consent.

Any assignment or subletting of this Lease by Tenant shall be executed by Tenant and the assignee or sublessee.  Each assignee or sublessee, for the benefit of Landlord, shall agree to assume, be bound by, and perform all terms, covenants, and conditions of this Lease to be kept and performed by Tenant.  After execution of the assignment or sublease, Tenant will forward a completed copy thereof to Landlord.

18.    Use.

(a)    Tenant shall initially maintain, use and operate the Premises as a retail store for (i) the sale of consumer, office and automotive electronics products (which includes, but shall not be limited to, televisions, stereos, speakers and video recorders and players), computer hardware and software, entertainment software and entertainment media (which includes, but shall not be limited to, records, game cartridges, video tapes, cassettes and compact discs, but does not include reading materials such as magazines and books), cellular telephones, household appliances (which includes, but shall not be limited to, refrigerators, freezers, stoves, microwave ovens, vacuum cleaners and dishwashers) and similar goods, and the sale and installation of motor vehicle audio, stereo and telephone systems (all of such items being herein collectively referred to as the "Products"), and (ii) renting, servicing, repairing, installing and warehousing of the Products.  Tenant may also sell household alarm systems.

(b)    Thereafter, Tenant shall have the right to use the Premises for any lawful retail use; provided, however, that the Premises shall not be used (i) for any illegal purpose, (ii)

27

for any use prohibited under paragraph 19(a)(viii) below, (iii) in violation of any exclusive use restriction granted a tenant or other occupant of the Shopping Center pursuant to a lease or restrictive covenants executed prior to this Lease and shown on <u>Exhibit "F"</u>, or (iv) in violation of any other applicable provision of the "Permitted Encumbrances" contained in <u>Exhibit "F"</u>.

      (c)    Except as may be expressly set forth in this paragraph 18, nothing contained in this Lease shall be construed to require Tenant to operate the Premises continuously either for the use first stated or for any other use.

19.   <u>Warranties and Representations</u>.

      (a)    Landlord represents, warrants and covenants to Tenant that:

      (i)    <u>Quiet and Peaceful Enjoyment</u>.   Landlord and those persons executing this Lease on its behalf have the right and lawful authority to enter into this Lease and perform Landlord's obligations hereunder, and Landlord warrants, represents and covenants that, so long as Tenant is not in default hereunder beyond any applicable cure period, Tenant shall have quiet and peaceful use, enjoyment and occupancy of the Premises.

      (ii)    <u>Title</u>.  As of the date of this Lease, Landlord's fee simple interest in the Shopping Center is free and clear of any mortgages, deeds, encumbrances, declarations, easements, agreements, leases, tenancies or restrictions, except those matters set forth on <u>Exhibit "F"</u> attached hereto and entitled "Permitted Encumbrances", or any other encumbrances which would prohibit Tenant's use of the Premises for the sale of Products or would restrict in any respect the right of Tenant, its employees, customers and invitees to use the Common Areas in accordance with the terms of this Lease. Nothing contained in this Lease, including the Permitted Encumbrances and other matters disclosed on <u>Exhibit "F"</u>, shall restrict Tenant's right to operate its business in the Premises. Landlord specifically covenants and warrants that no third party, including but not limited to any other occupant of the Shopping Center, has the right to object to Tenant's tenancy hereunder, prohibit the selling, renting, servicing, repairing or warehousing of the Products, or the right to consent to any feature of the Improvements or Tenant's signage except the Property Owner's Association or the City of Houston as set forth herein. This representation and warranty is a material inducement to the Tenant's execution of this Lease.

(iii)   <u>Certificate of Authority</u>.   Landlord covenants that it is a duly constituted corporation under the laws of the State of Texas, and that its Secretary who is acting as its signatory in this Lease is duly authorized and empowered to act for and on behalf of the corporation.   Landlord has furnished Tenant prior hereto with evidence of (a) the existence of the corporation, and (b) the authority of the Secretary to bind the corporation as contemplated herein.

(iv)   <u>No Litigation</u>.   There are no judicial, quasi-judicial, administrative or other orders, injunctions, moratoria or pending proceedings against Landlord or the Shopping Center which preclude or interfere with, or would preclude or interfere with, the construction contemplated in paragraph 2 hereof or the occupancy and use of the Premises for the purposes herein contemplated.

(v)   <u>Hazardous or Toxic Materials</u>.   Landlord has not used, discharged, dumped, spilled or stored any Hazardous Substances (as defined in the Construction Provisions) on or about the Shopping Center, whether accidentally or intentionally, legally or illegally, and has received no notice and has no knowledge that any such condition exists at the Shopping Center.   If any claim is ever made against Tenant relating to Hazardous Substances present at or around the Shopping Center, whether or not such substances are present as of the date hereof, or any Hazardous Substances are hereafter discovered at the Shopping Center (unless introduced by Tenant, its agents or employees), all costs of removal incurred by, all liability imposed upon, or damages suffered by, Tenant because of the same shall be borne by Landlord, and Landlord hereby indemnifies and agrees to defend and hold Tenant harmless from and against all such costs, losses, liabilities and damages, including, without limitation, all third-party claims (including sums paid in settlement thereof, with or without legal proceedings) for personal injury or property damage and other claims, actions, administrative proceedings, judgments, compensatory and punitive damages, lost profits, penalties, fines, costs, losses, attorneys' fees and expenses (through all levels of proceedings), consultants or experts fees and all costs incurred in enforcing this indemnity.   The representation, warranty and indemnity of Landlord described in this paragraph 19(a)(v) shall survive the termination or expiration of this Lease.   Notwithstanding the above, Landlord shall not be liable to Tenant for any personal injury or personal property damage or lost

profits suffered by Tenant or Tenant's agents, employees and contractors as the result of any Hazardous Substances being present at the Shopping Center unless Landlord has caused such Hazardous Substances to be present at the Shopping Center or Landlord has failed to remove and remediate such contamination and/or Hazardous Substances when Landlord otherwise would be required to do so.

(vi) <u>Tenant's Exclusive Use</u>. So long as the Premises are used for the initial uses set forth in paragraph 18, no other tenant or occupant of the Shopping Center shall be entitled to use more than 200 square feet of their space to sell, rent (or rent to own), service, warehouse or install in motor vehicles any of the Products, subject only to rights granted any such tenants under leases in existence as of the date of this Lease and described on <u>Exhibit "F"</u>.

(vii) <u>Zoning and Subdivision</u>. The Premises and the Shopping Center are presently properly subdivided, in conformity with all applicable laws and zoned so as to permit (A) the development and operation of the Premises and the Shopping Center in accordance with the provisions of this Lease; and (B) the initial use of the Premises described in paragraph 18 of this Lease.

(viii) <u>Prohibited Activities</u>. Landlord shall not operate or lease (or permit to be operated or leased) any building or tenant space in the Shopping Center for use as:

(A) a bar, pub, nightclub, music hall or disco in which less than fifty percent (50%) of its space or revenue is devoted to and derived from food service;

(B) a bowling alley;

(C) a billiard or bingo parlor;

(D) a flea market;

(E) a massage parlor;

(F) a funeral home;

(G) a facility for the sale of paraphernalia for use with illicit drugs;

(H) a facility for the sale or display of pornographic material (as determined by community standards for the area in which the Shopping Center is located);

(I) an off-track betting parlor;

(J) a carnival, amusement park or circus;

(K) a gas station (unless it is a national chain), car wash or auto repair or body shop (the parties specifically acknowledging that Tenant's car stereo installation facility is not included in this prohibition);

(L) a facility for the sale of new or used motor vehicles, trailers or mobile homes;

H:\2080-7\LEASE.RV9 [52\74] (TS#3199)

(M)  a facility for any use which is illegal or dangerous, constitutes a nuisance or is inconsistent with an integrated, community-oriented retail and commercial shopping center;

(N)  a skating rink;

(O)  an arcade, pinball or computer gameroom (provided that retail facilities in the Shopping Center may operate no more than four (4) such electronic games incidentally to their primary operations);

(P)  service-oriented offices (such as, by way of example, medical or employment offices, travel agencies, real estate agencies or dry cleaning establishments other than a dry-cleaning pick-up station) or other nonretail uses except for offices and storage facilities incidental to a primary retail operation or; provided that, service-oriented offices shall be allowed if (i) of the following type: bank/financial institution, optician/optical/ optometrist, travel agent, dry-cleaner (pick-up only), hairdresser, barber, jewelry appraisal/ engravers, costume/formal wear rental, photographer, wedding consultant, chiropractor, acupuncturist, or massage therapist; and (ii) the aggregate square footage of all such permitted service-oriented uses, when added to the aggregate square footage of food-related uses allowed in Building Area A as set forth below, never exceeds a total square footage of food and service-oriented uses in excess of 3,500 square feet in Building Area A;

(Q)  a banquet hall, auditorium or other place of public assembly;

(R)  a training or educational facility (including, without limitation, a beauty school, barber college, reading room, school or other facility catering primarily to students or trainees rather than customers);

(S)  a theater of any kind; or

(T)  a gymnasium, sport or health club or spa.

Subject to specific exceptions set forth in this Lease, Landlord shall not permit the operation of a restaurant within the Shopping Center. Landlord shall not permit the operation of a full service sit-down restaurant within Building Area A (although other types of food sales may be permitted within Building Area A, i.e., ice cream, donuts, coffee, deli, etc.), SO LONG AS AND PROVIDED THAT the aggregate food service and food sales area within Building Area A shall never exceed 3,500 square feet (the deli portion of which shall never exceed 1,800 square feet, and with the maximum portion utilized by any other single food use occupant therein being 1,500 square feet) and all such food areas shall have limited seating (if any seating is provided). A fast food restaurant meeting the requirements set forth in subparagraph (ix)(A) below shall be permitted in Building Area B. In addition, no auction, fire or going-out-of-business sale shall be conducted in the Shopping Center. Tenant and Crown Book Store (owned by Super Crown Books Corporation, a Delaware corporation) have entered into a consent agreement dated November 16, 1995, a copy of which has been provided Landlord,

allowing one another's exclusive uses within the Shopping Center, subject to certain conditions set forth in said agreement.

(ix)    <u>Site Covenants.</u>  With regard to the development of the Shopping Center and the uses and operations of the Common Areas, Landlord makes the following representations and warranties (the "Site Covenants"):

(A)    <u>Building Height, Square Footage and Location.</u>  Subject to the exception immediately following, no building adjacent to the Premises shall exceed twenty-eight (28) feet in height above finished grade, nor shall it be positioned so as to project beyond the portion of the front wall of the building immediately adjacent thereto; however, Building Area A shall not exceed twenty-four (24) feet in height above finished grade (or thirty (30) feet above finished grade including architectural features), and Building Area B shall not exceed eighteen (18) feet in height above finished grade including any parapet (or twenty-four (24) feet above finished grade including architectural features).    No outparcels, barriers, buildings, kiosks or other structures, either temporary or permanent, shall be located within Tenant's Preferred Area, and no building located on an outparcel elsewhere in the Shopping Center shall exceed one story, eighteen (18) feet in height, nor shall it exceed the size necessary for such outparcel to maintain, within its boundaries, the parking ratio required for its use under the applicable zoning code without use of parking spaces located in the Common Areas.  No development shall occur within the Shopping Center except as shown or contemplated on the Site Plan.  The total gross leasable area within Building Area A shall not exceed the number of square feet of building area necessary to maintain the parking ratio required by this Lease, and the gross leasable area of Building Area B shall not exceed 4,000 square feet of building area.  No entrance to Building Area B shall ever be located in the eastern half of Building Area B (except that Tenant has specifically approved the location of the main entrance facing north for the proposed Jack-in-the-Box facility in Building Area B as shown on the site plan thereof dated January 8, 1995, prepared by Mayse & Associates Architects, Inc., such approval having been granted by

Tenant for Jack-in-the-Box and any future fast food restaurant occupying the building shown on said site plan intended to be occupied by Jack-in-the-Box).

(B)    Construction and Alterations.  Following the end of the first Lease Year, no construction shall be permitted in the Shopping Center during the months of October, November and December, except for interior alterations not affecting the operations of any other occupant of the Shopping Center and except for emergency repairs.  In the event of any construction within the Shopping Center, Landlord shall designate a construction access route, staging and parking areas located so as to minimize interference with customers or the operations of other occupants of the Shopping Center and· shall require erection of safety barriers as necessary and an opaque wall around the site of such construction of a size necessary to screen such construction from ground level view.  With regard to any construction on Landlord's Premises, Landlord shall be solely responsible for any governmentally imposed impact fees, hook-up, connection, installation or tap-in fees and other, similar construction-related charges.  Landlord shall make no changes in the Common Areas (including, without limitation, changes in the location of curbcuts, drive aisles, roadways, sidewalks or parking spaces or reduction of the parking ratio specified in paragraph 5) without Tenant's express written consent, which Tenant may, in its sole discretion, withhold.

(C)    Prohibited Uses in Common Areas.  Landlord covenants that it shall not, without Tenant's express written consent, permit the following uses or activities to occur in the Common Areas:  (1) advertisements or signs except for the pylon and/or monument signs described in paragraph 8, the "for rent" signs described in paragraph 27 and traffic control signs; (2) display or sale of merchandise; (3) operation of loudspeakers or other sound electronically amplified so as to be heard in the Common Areas; or (4) imposition of a charge for parking.  Landlord further covenants that it will not seek, nor permit any other occupant of the Shopping Center to seek, a variance or waiver from the minimum parking requirements applicable to the Shopping Center under the zoning code or other applicable ordinance establishing the ratio of parking spaces to building area or otherwise mandating the number of parking spaces required

33

for the Shopping Center and the uses contained therein. Parking by employees of Tenant, Landlord and other occupants of the Shopping Center shall be in designated "employee parking" areas, the location of which shall be agreed upon by Landlord and Tenant.

(D)   Easements.   Landlord shall not subdivide, parcel or otherwise divide the Shopping Center or create any easements in the Common Areas without Tenant's prior written consent.

(E)   Parking Spaces.   All parking spaces within the Common Areas shall be of standard width for full-sized automobiles, but some of such spaces may be shorter than standard in length, as shown on the Site Plan, only as permitted by applicable codes and ordinances.

(x)   Interference with Tenant's Reception/Transmission.   Landlord shall not install or permit to be installed by Landlord, any other tenant or other person anywhere in the Shopping Center, any radio or other transmitting equipment which would cause any interference with satellite, radio or television reception or transmission in or from the Building.

(xi)   Notices Affecting the Premises.   Landlord shall promptly forward to Tenant any notice or other communication affecting the Premises or the Shopping Center received by Landlord from any owner of property adjoining, adjacent or nearby to the Premises or the Shopping Center or from any municipal or governmental authority, in connection with any hearing or other administrative procedure relating to the use or occupancy of the Premises, Shopping Center or any such neighboring property.

(xii)   Constructive Trust.   Landlord covenants that all sums paid by Tenant to Landlord and intended for payment by Landlord to a third party (such as, by way of example, taxes and certain elements of CAM Charges) are given to Landlord in trust and shall be applied only for such third-party payments, as and when due.

(b)   Tenant represents, warrants and covenants to Landlord that:

(i)   Tenant's Authority.   Tenant is a duly constituted corporation organized under the laws of the Commonwealth of Virginia; it has the power to enter into this Lease and perform Tenant's obligations hereunder; and the Vice President executing this Lease on Tenant's behalf has the right and lawful authority to do so.

H:\2080-7\LEASE.RV9 [52\74] (TS#3199)

(ii)    <u>Tenant's Warranty as to Hazardous or Toxic Materials</u>.    As to Tenant's use and occupancy of the Premises and use of the Common Areas, Tenant will not introduce, discharge, dump, spill or store within the Premises or the Shopping Center any Hazardous Substances; and Tenant indemnifies and agrees to hold Landlord, Landlord's agents, employees and invitees harmless from and against all costs, liability and damages as a result thereof, to the same extent that Landlord indemnifies and holds Tenant harmless in subparagraph (a)(v) above.    The warranty and indemnity of Tenant described in this paragraph 19(b)(ii) shall survive the termination of this Lease.

(c)    In the event there is a condition at variance with the foregoing representations and warranties of Landlord with respect to the Premises or the Shopping Center which prevents or in any material way inhibits the use of the Premises or any part thereof or the Common Areas for their intended purposes by Tenant or Tenant's employees, licensees, agents, suppliers, customers or invitees, or if Landlord shall default in the observance or performance of any of the foregoing representations and warranties, then, in addition to such other remedies as may be accorded Tenant at law, in equity or under the terms of this Lease, Tenant may, in addition to its other remedies under this Lease, after thirty (30) days' notice to Landlord, obtain an injunction or writ of specific performance to enforce such term or covenant, the parties hereby acknowledging the inadequacy of Tenant's legal remedy and the irreparable harm which would be caused to Tenant by any such variance or default.    In addition, in the event that any of the representations, warranties and covenants set forth in this paragraph 19 are untrue or incorrect, or in the event that Tenant suffers any loss, cost, liability or damage as a result of the breach of any of such covenants, representations and warranties, Landlord shall defend, indemnify and hold Tenant, Tenant's employees, agents and invitees harmless from any of such loss, costs, liability or damage incurred as a result of Landlord's breach hereunder.

20.    <u>Estoppel Certificates</u>.    Without charge, at any time and from time to time hereafter, within ten (10) days after receipt of written request by either party, the other party shall certify, by written and duly executed instrument, to any other entity ("Person") specified in such request:  (a) as to whether this Lease has been supplemented or amended, and, if so, the substance and manner of such supplement or amendment; (b) as to the validity, force and effect of this Lease, to the certifying party's best knowledge; (c) as to the existence of any default hereunder, to the certifying party's best knowledge; (d) as to the existence of any offsets,

counterclaims, or defenses hereto on the part of such other party, to the certifying party's best knowledge; (e) as to the commencement and expiration dates of the Term; and (f) as to any other matters which may reasonably be so requested.  Any such certificate may be relied upon by the party requesting it and any Person to whom the same may be exhibited or delivered, and the contents of such certificate shall be binding on the party executing same.

     21.   <u>Subordination, Non-Disturbance and Attornment</u>.

     (a)   No later than upon execution by Landlord of this Lease, Landlord shall deliver to Tenant with regard to any and all Mortgages (as defined below) encumbering the Premises and placed thereon by Landlord, a non-disturbance and attornment agreement substantially in the form of <u>Exhibit "G"</u> hereto attached, executed by the holder of such Mortgage ("Mortgagee"), as applicable.  In addition, throughout the term, Landlord shall deliver to Tenant a non-disturbance and attornment agreement substantially in the form of <u>Exhibit "G"</u> executed by Mortgagee with regard to all future Mortgages and with regard to all renewals, modifications, replacements and extensions of such Mortgages.  Upon Tenant's receipt of the non-disturbance and attornment agreement, this Lease shall be subordinate to the corresponding Mortgage.

     In the event of a foreclosure of any Mortgage, Tenant shall attorn to a Mortgagee or any purchaser at a foreclosure sale (any such foreclosure, or deed in lieu thereof, shall be referred to as a "Foreclosure") of a Mortgage only if such Mortgagee or purchaser executes a writing in favor of Tenant which states the following (provided Tenant is not in uncured material default beyond the expiration of any applicable grace periods): (i) this Lease shall not terminate by reason of such Foreclosure, (ii) Tenant's possession of the Premises shall not be disturbed, (iii) the Mortgagee or purchaser upon such Foreclosure shall recognize Tenant and all its rights hereunder and shall be obligated to fully and completely perform Landlord's duties and obligations under the Lease arising from and after the date of such Foreclosure, including but not limited to an obligation to make all payments to Tenant and satisfy all construction obligations set forth in this Lease, (iv) Tenant shall not be named as a party in any action for foreclosure, and (v) the Mortgagee, whether or not the Mortgage is foreclosed, shall make all proceeds arising from a casualty or condemnation loss to the Premises available to Tenant for restoration of the Improvements in accordance with the terms hereof.

     

Landlord shall cause any present or future Mortgagee to deliver a non-disturbance and attornment agreement in accordance with this paragraph 21 at or prior to the time which the lien of the Mortgage is filed against record title to the Premises, as set forth in paragraph 37(b) below. As used in this paragraph 21, the term "Mortgage" shall mean any mortgage, deed to secure debt, deed of trust, trust deed or other collateral conveyance of, or lien against, the Premises.

(b)     If requested by any Mortgagee, from time to time during the Term, Tenant agrees to execute such subordination, non-disturbance and attornment agreement, which shall include Tenant's agreement to provide to such Mortgagee (simultaneously with notice to Landlord) notice of Landlord's defaults and the same periods for such Mortgagee to cure such defaults as those provided Landlord herein, and such other agreements as may be satisfactory to Tenant and as are typically found in subordination, non-disturbance and attornment agreements with institutional lenders.

22.   Change of Landlord.   Subject to paragraph 21 above, in the event Landlord's interest in the Premises passes to a successor (the "Successor") by sale, lease, Foreclosure or in any other manner, Tenant shall be bound to the Successor under all of the terms of this Lease for the balance of the Term with the same force and effect as if the Successor were the landlord under the Lease, and Tenant hereby agrees to attorn to the Successor as its Landlord, such attornment to be effective upon written notice thereof given by Landlord to Tenant. In the event that Landlord's interest in the Premises passes to a Successor and such Successor is bound unto Tenant as set forth above, Landlord shall be released from all obligations to Tenant hereunder arising after the date Landlord's interest so passes, except that Landlord agrees to indemnify, defend and hold Tenant harmless from and against all costs, claims, loss, liability or damage suffered by Tenant as a result of Landlord's transfer of its interests hereunder and/or Landlord's failure to provide Tenant with notice of such Successor.

23.   Tenant's Financing.   Notwithstanding any other provisions of this Lease, Tenant may, without Landlord's consent, from time to time, secure financing or general credit lines and grant the lenders thereof, as security therefor, (i) a security interest in Tenant's fixtures, personalty, inventory and equipment (collectively, "Personalty"), (ii) the right to enter the Premises to realize upon any Personalty so pledged, and/or (iii) a collateral assignment of Tenant's leasehold interest in the Premises, with rights of reassignment; provided, however, such

collateral assignment may be made solely for the purpose of securing Tenant's indebtedness. Upon Tenant providing notice of such financing to Landlord, Landlord agrees to evidence its consent in writing to such security interest and agreement and to give such lenders the same notice and opportunity to cure any default of Tenant as is provided Tenant hereunder (including time to foreclose or otherwise take possession of the Premises, if necessary to effect such cure). In addition, Landlord agrees to cause any Mortgagee specifically to acknowledge the rights of Tenant's lenders described herein and in paragraph 24 below.

24.    Tenant's Property and Waiver of Landlord's Lien.  All of the Personalty shall be and remain the personal property of Tenant.  Landlord expressly waives its statutory or common law landlord's liens (as same may be enacted or may exist from time to time) and any and all rights granted under any present or future laws to levy or distrain for rent (whether in arrears or in advance) against the aforesaid property of Tenant on the Premises and further agrees to execute any reasonable instruments evidencing such waiver, at any time or times hereafter upon Tenant's request.

25.    Memorandum of Lease; Commencement Date Agreement.  Landlord and Tenant agree, at the other's request and at the sole expense of the requesting party, to execute a Memorandum of Lease in recordable form, substantially similar to that attached hereto as Exhibit "H", setting forth such provisions hereof as may be required by State law.  In addition, Landlord and Tenant shall execute a Commencement Date Agreement in the form attached hereto as Exhibit "I", once the Commencement Date has been established.  Recording costs for either or both documents shall be borne by the party requesting recordation of the same.  The provisions of this Lease shall control, however, with regard to any omissions from, or provisions hereof which may be in conflict with, the Memorandum of Lease or Commencement Date Agreement.

26.    Expiration of Term and Holding Over.  All of the Personalty shall be removable by Tenant any time prior to, or within thirty (30) days after, the expiration or earlier termination of this Lease and shall be so removed by Tenant at the request of Landlord within thirty (30) days after the expiration or termination of this Lease.  In the event Tenant fails to remove any or all of its Personalty within the said thirty (30) day period, Landlord may remove such Personalty, or the balance thereof, cause such Personalty to be placed into storage and thereafter charge Tenant the cost of such removal and storage, together with interest thereon at the Default

Rate. Those improvements that are integrated into the physical structure of the Building, except any of Tenant's trade fixtures, shall not be removed and shall become the property of Landlord. (A nonexclusive list of Tenant's removable trade fixtures is attached hereto as Exhibit "D".) Tenant agrees promptly to repair any damage to the Premises occasioned by the removal of Tenant's trade fixtures, furnishings and equipment (except for small holes caused by nails, fasteners and the like) and to surrender the Premises broom clean, in as good condition as on the date of Tenant's opening for business therein, ordinary wear and tear, casualty and condemnation excepted, subject to the terms of paragraph 10 hereof. Tenant agrees that at the expiration of this Lease, it will deliver to Landlord peaceable possession of the Premises. No holding over by Tenant nor acceptance of Base Rent or other charges by Landlord shall operate as a renewal or extension of the Lease without the written consent of Landlord and Tenant. Should Tenant hold over without the consent of Landlord, this Lease shall continue in force from month to month, subject to all of the provisions hereof and at the monthly Base Rent Tenant had been paying during the preceding Lease Year.

27.    "For Rent" Signs. Tenant hereby permits Landlord during the last ninety (90) days of the Main Term or of any Option Period, as the case may be (provided that no applicable Renewal Option has been exercised or deemed exercised), to place one (1) "For Rent" or "For Sale" sign, not exceeding four (4) feet by four (4) feet in size, on the parking lot of the Shopping Center, so long as Tenant has approved the location of such sign in advance. Tenant will also allow Landlord or its agents, upon prior written notice and accompanied by a representative of Tenant designated by Tenant, to show the Premises, exterior and interior, to prospective tenants, purchasers, or mortgagees during reasonable business hours by prior appointment, provided same does not interfere with the conduct of Tenant's business.

28.    Force Majeure. Except as otherwise specifically contemplated in this Lease or in paragraph 4 of the Construction Provisions, in the event that Landlord or Tenant shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, delay by the other party, failure of power or unavailability of utilities, riots, insurrection, war or other reason of a like nature not the fault of such party or not within its control, then performance of such act shall be excused for the period of delay, and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay; provided, however, that in

connection with the construction of the Improvements, the consequences of delays by the other party shall be governed by paragraph 4 of the Construction Provisions.

29.   Events of Tenant's Default.  Any of the following occurrences, conditions or acts by Tenant shall constitute an "Event of Default" under this Lease:

(a)   Failure to Pay Rent; Breach.  (i) Tenant's failure to make any payment of money required by this Lease (including without limitation Base Rent, CAM Charges or Real Estate Taxes) (subject to Tenant's right of good faith contest), within ten (10) days after the receipt of written notice from Landlord to Tenant that same is overdue (however, Landlord shall not be obligated to give Tenant more than two (2) past due notices regarding Base Rent in any twelve (12) month period); or (ii) Tenant's failure to observe or perform any other material provision of this Lease within thirty (30) days after receipt of written notice from Landlord to Tenant specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Tenant shall have such longer period as is reasonably necessary to cure the default, so long as Tenant proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion and provided further that in the case of an emergency, Landlord shall be required to give only such notice as is reasonable under the circumstances.

(b)   Bankruptcy; Assignment; Execution.  Tenant's adjudication as bankrupt or insolvent, or the appointment of a receiver, trustee in involuntary bankruptcy or other, similar officer to take charge of any substantial part of Tenant's property, which proceeding is not dismissed within one hundred twenty (120) days after it is begun; the making by Tenant of a general assignment for the benefit of its creditors; and the sale under execution or similar legal process of the interest of Tenant in the Products.

30.   Landlord's Remedies.  After the occurrence of an Event of Default by Tenant, Landlord shall have the right to exercise the following remedies:

(a)   Continue Lease.  Landlord may, at its option, continue this Lease in full force and effect, without terminating Tenant's right to possession of the Premises, in which event Landlord shall have the right to collect Base Rent and other charges when due, including any sums due for any Option Period for which a Renewal Option has been exercised.  In the alternative, Landlord shall have the right to peaceably re-enter the Premises on the terms set

40

forth in subparagraph (b) below, without such re-entry being deemed a termination of the Lease or an acceptance by Landlord of a surrender thereof. Landlord shall also have the right, at its option, from time to time, without terminating this Lease, to relet the Premises, or any part thereof, with or without legal process, as the agent, and for the account, of Tenant upon such terms and conditions as Landlord may deem advisable, in which event the rents received on such reletting shall be applied (i) first to the reasonable and actual expenses of such reletting and collection, including without limitation necessary renovation and alterations of the Premises, reasonable and actual attorneys' fees and any reasonable and actual real estate commissions paid, and (ii) thereafter toward payment of all sums due or to become due Landlord hereunder. If a sufficient amount to pay such expenses and sums shall not be realized or secured, in Landlord's exercise of reasonable efforts to mitigate its damages (which Landlord hereby agrees to make), then Tenant shall pay Landlord any such deficiency monthly, and Landlord may bring an action therefor as such monthly deficiency shall arise. Landlord shall not, in any event, be required to pay Tenant any sums received by Landlord on a reletting of the Premises in excess of the rent provided in this Lease, but such excess shall reduce any accrued present or future obligations of Tenant hereunder. Landlord's re-entry and reletting of the Premises without termination of this Lease shall not preclude Landlord from subsequently terminating this Lease as set forth below.

(b)    Terminate Lease. Landlord may terminate this Lease by written notice to Tenant specifying a date therefor, which shall be no sooner than thirty (30) days following receipt of such notice by Tenant, and this Lease shall then terminate on the date so specified as if such date had been originally fixed as the expiration date of the Term. In the event of such termination, Landlord shall be entitled to recover from Tenant all of the following:

(i)    The "worth at the time of the award" (defined below) of any obligation which has accrued prior to the date of termination; and

(ii)    The "worth at the time of the award" of the amount by which the unpaid Base Rent and all other charges which would have accrued after termination until the time of award exceeds the amount of any sums which Landlord has (or Tenant proves that Landlord could have) received in mitigation.

As used in this paragraph 30(b), the term, "worth at the time of the award", shall be computed by allowing simple interest at an accrual rate of six percent (6%) for past due

obligations, and a discount rate to net present value of twelve percent (12%) on anticipated future obligations, on the amount of the obligations payable on the date of such calculation. In the event this Lease shall be terminated as provided above, by summary proceedings or otherwise, Landlord, its agents, servants or representatives may immediately or at any time thereafter peaceably re-enter and resume possession of the Premises and remove all persons and property therefrom, by summary dispossession proceedings. Landlord shall never be entitled to dispossess the Tenant of the Premises pursuant to any "lock-out" or other nonjudicial remedy.

(c)     Reimbursement of Landlord's Costs in Exercising Remedies. Landlord may recover from Tenant, and Tenant shall pay to Landlord upon demand, such reasonable and actual expenses as Landlord may incur in recovering possession of the Premises, placing the same in good order and condition and repairing the same for reletting, and all other reasonable and actual expenses, commissions and charges incurred by Landlord in exercising any remedy provided herein or as a result of any Event of Default by Tenant hereunder (including without limitation attorneys' fees), provided that in no event shall Tenant be obligated to compensate Landlord for any speculative or consequential damages caused by Tenant's failure to perform its obligations under this Lease.

(d)     Remedies Are Cumulative. The various rights and remedies reserved to Landlord herein, are cumulative, and Landlord may pursue any and all such rights and remedies, and additionally the equitable remedies of injunction and specific performance, but no others, whether at the same time or otherwise (to the extent not inconsistent with specific provisions of this Lease). Notwithstanding anything herein to the contrary, Landlord expressly waives its right to forcibly dispossess Tenant from the Premises, whether peaceably or otherwise, without judicial process, such that Landlord shall not be entitled to any "commercial lockout" or any other provisions of applicable law which permit landlords to dispossess tenants from commercial properties without the benefit of judicial review.

31.     Events of Landlord's Default; Tenant's Remedies. Any of the following occurrences, conditions or acts by Landlord shall constitute an "Event of Default": (a) Landlord's failure to make any payments of money due Tenant hereunder within ten (10) days after the receipt of written notice from Tenant that same is overdue (in which event the delinquent amount shall accrue interest at the Default Rate); or (b) Landlord's failure to perform any nonmonetary obligation of Landlord hereunder within thirty (30) days after receipt of written

notice from Tenant to Landlord specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Landlord shall have such longer period as may be reasonably necessary to cure the default, so long as Landlord proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion and provided further that in the case of an emergency, Tenant shall be required to give only such notice as is reasonable under the circumstances.  Provided Landlord has given Tenant written notification of the name and address of its Mortgagee(s), Tenant shall provide to such Mortgagee(s) a copy of the same notice of default delivered by Tenant to Landlord in accordance with the terms hereof.

Upon the occurrence of an Event of Default by Landlord, at Tenant's option, in addition to any and all other remedies which it may have at law and/or in equity, and without its actions being deemed an election of remedies or a cure of Landlord's default, Tenant may do all or any of the following: (i) pay or perform such obligations and offset Tenant's reasonable and actual cost of performance, including any and all transaction costs and attorneys' fees, plus interest at the Default Rate, against the Base Rent, CAM Charges and any and all other amounts and charges due Landlord hereunder or (ii) withhold Base Rent, CAM Charges and any other payments due to Landlord under this Lease until such Event of Default, including payment of interest and transaction costs specified in subsection (i) above, is cured by Landlord, or (iii) in the event of a material Event of Default, terminate this Lease and sue for damages, including interest, transaction costs and attorneys' fees as specified in subsection (i) above.  If Landlord fails to pay Tenant the Tenant Improvement Allowance in a timely manner, Tenant shall be entitled to the rights and remedies set forth in the Construction Provisions in addition to those provided herein; and, as to a breach of the warranties and representations contained in paragraph 19, Tenant shall be entitled to the remedies provided therein, in addition to those remedies provided herein.  All amounts, including interest, transaction costs and attorneys' fees, arising out of uncured defaults of Landlord shall constitute liens against Landlord's interest in the Shopping Center, which may be enforced by non-judicial means available under State law, or any other applicable proceedings.  The various rights and remedies reserved to Tenant herein are cumulative, and Tenant may pursue any and all rights and remedies, whether at the same time or otherwise.  With respect to any right of offset granted Tenant in this Lease, Tenant agrees that in any one calendar month, Tenant shall not offset more than thirty percent (30%)

of all payments due Landlord from Tenant during said month (including without limitation Base Rent and CAM Charges), but the amount of such payments not offset in any such calendar month shall bear interest at the Default Rate as of the date of the default giving rise to said accrual of interest, and shall be similarly offset against future rental payments. The immediately preceding sentence limiting Tenant's right of offset shall not apply to any sum due Tenant from Landlord pursuant to a judgment entered in a court of competent jurisdiction. With respect to exercise by Tenant of its right to terminate this Lease as set forth in this paragraph, prior to exercising such termination right, Tenant shall deliver a second notice of default to Landlord whenever a prior notice of default was required under the terms of this Lease, granting Landlord ten (10) additional days to cure the subject default. The preceding sentence shall not apply to any circumstance under this Lease in which Tenant is granted a specific right to terminate the Lease upon the occurrence of a specified event (i.e. casualty, condemnation, construction delays by Landlord, etc.).

32.    Waiver. If either Landlord or Tenant fails to insist on the strict observance by the other of any provisions of this Lease, neither shall thereby be precluded from enforcing nor be held to have waived any of the obligations, past, present or future, of this Lease. Either party may accept late payment or performance by the other without waiving any Event of Default which may then have accrued.

33.    Compliance with Applicable Laws. During the Term, Landlord and Tenant shall comply with all lawful requirements of the local, county and state health boards, police and fire departments, municipal and state authorities and any other governmental authorities with jurisdiction over the Improvements, and of the board of fire underwriters, respecting Tenant's use and occupancy of the Improvements. In the event that Tenant, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Landlord or any such authority ordering performance of any such work which Tenant is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Landlord may perform said work and collect the reasonable cost thereof plus interest at the Default Rate from Tenant with the next installment or installments of Base Rent. In the event that Landlord, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is

reasonable under the circumstances shall be required) from Tenant or any such authority ordering performance of any such work which Landlord is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Tenant may perform said work and deduct the reasonable cost thereof plus interest at the Default Rate from Landlord with the next installment or installments of Base Rent.

34.   Notices.  Any notice permitted or required to be given pursuant to this Lease shall be deemed to have been given three (3) business days after mailing a written notice by certified mail, postage prepaid, return receipt requested, or one (1) business day after sending by Federal Express or other comparable overnight express courier service (with proof of receipt available), addressed to the parties as follows:

If to Tenant:   CIRCUIT CITY STORES, INC.
9950 Mayland Drive
Richmond, Virginia 23233
Attention:  Corporate Secretary

with a copy to:   CIRCUIT CITY STORES, INC.
9950 Mayland Drive
Richmond, Virginia 23233
Attention:  Vice President of Real Estate

If to Landlord:   610 & San Felipe, Inc.
11219-100 Avenue
Edmonton, Alberta
Canada  T5K0J1
Attention:  Cameron Allard

or to such other addressees as any party hereto shall from time to time give notice to the other party in accordance with this paragraph.

35.   Brokers.  Landlord and Tenant each covenant that they have not dealt with any real estate broker or finder with respect to this Lease, except for CB Commercial and The Equity Group, both of which shall be paid a commission by Landlord pursuant to their separate written agreement. Landlord acknowledges that The Equity Group has acted on behalf of Tenant in connection with this Lease.  Except for the foregoing, each party shall hold the other party harmless from all damages, claims, liabilities or expenses, including reasonable and actual attorneys' fees (through all levels of proceedings), resulting from any claims that may be asserted against the other party by any real estate broker or finder with whom the indemnifying

H:\2080-7\LEASE.RV9 [52\74] (TS#3199)

party either has or is purported to have dealt.  Upon execution of this Lease, Landlord shall deliver to Tenant true, complete and accurate copies of its brokerage agreements with the above-named brokers.

36.  <u>Miscellaneous</u>.

(a)  <u>Headings and Gender</u>.  All paragraph headings, titles or captions contained in this Lease are for convenience only and shall not be deemed a part of this Lease and shall not in any way limit or amplify the terms and provisions of this Lease.  The masculine, feminine or neuter gender and the singular or plural number shall be deemed to include the others whenever the context so requires or indicates.

(b)  <u>Construction</u>.  The parties hereto agree that all the provisions hereof are to be construed as covenants and agreements as though the words importing such covenants and agreements were used in each separate paragraph hereof.

(c)  <u>Waiver of Jury Trial</u>.  In the event of any court action arising out of this Lease, each party hereby expressly waives its right to trial by jury.

(d)  <u>Relationship of Landlord-Tenant</u>.  Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent, partnership, joint venture, or any other association between Landlord and Tenant other than the landlord-tenant relationship described herein.

(e)  <u>Entire Agreement; Merger</u>.  This Lease, including all exhibits hereto (which are hereby incorporated herein by reference for all purposes), contains the full and final agreement of every kind and nature whatsoever between the parties hereto concerning the subject matter of this Lease, and all preliminary negotiations and agreements of whatsoever kind or nature between Landlord and Tenant are merged herein.  This Lease cannot be changed or modified in any manner other than by a written amendment or modification executed by Landlord and Tenant.

(f)  <u>Attorneys' Fees</u>.  In the event either party shall be required to commence or defend any action or proceeding against any other party by reason of any breach or claimed breach of any provision of this Lease, to commence or defend any action or proceeding in any way connected with this Lease or to seek a judicial declaration of rights under this Lease, the party prevailing in such action or proceeding shall be entitled to recover from or to be

H:\2080-7\LEASE.RV9 [52\74] (TS#3199)

reimbursed by the other party for the prevailing party's reasonable and actual attorneys' fees and costs through all levels of proceedings.

(g)    Partial Invalidity.  If any provision of this Lease or the application thereof to any person or circumstance shall be deemed invalid or unenforceable, the remainder of this Lease and its application to other persons or circumstances shall not be affected by such partial invalidity but shall be enforced to the fullest extent permitted by law as though such invalid or unenforceable provision was never a part hereof.

(h)    Consents.  Any consent or approval granted by either party hereunder shall be deemed a consent only as to the matter on which such consent was requested and shall not waive the consenting party's right to give or withhold consent to any subsequent matter.  Any consent or approval of the Property Owner's Association required under this Lease or in connection therewith shall be diligently pursued by Landlord and Landlord shall permit Tenant to participate in the approval process, including any correspondence, meetings, phone conversations, etc., upon Tenant's request.  Landlord shall use its best efforts to obtain such consents and approvals, and agrees not to enter into any agreements with the Property Owner's Association or other landowners subject to the regulation or jurisdiction of the Property Owner's Association which expands or increases, or modifies adversely, the Property Owner's Association's rights or abilities to effect Tenant's use, occupancy, and operation of the Building and Tenant's store in the Shopping Center.

(i)    Holidays.  If the day on which rent or any other payment due hereunder is payable falls on a Sunday or on a legal holiday, it shall be payable on the following business day.

(j)    Applicable Law.  This Lease shall be construed in accordance with the laws of the State, and the parties agree that jurisdiction for all actions hereunder shall lie therein.

(k)    Successors and Assigns.  All rights, obligations and liabilities herein given to or imposed upon any party hereto shall extend to the permitted successors and assigns of such party.

(l)    Counterparts.  This Lease may be executed in one or more identical counterparts, and as so executed by all parties hereto shall constitute a single instrument for purposes of the effectiveness of this Lease.

(m)    Trademarks and Trade Names.    All trademarks, trade names, service marks, signs and all other marks of identification used by Tenant in its business shall at all times remain the exclusive property of Tenant, and Landlord shall have no right, interest in, or title to any of Tenant's trademarks, trade names, service marks, signs or other marks of identification.

37.    Effectiveness of Lease; Tenant's Right to Terminate.    Notwithstanding the execution of this Lease or any provision hereof to the contrary, the parties hereto agree that the effectiveness of this Lease is expressly conditioned upon the complete satisfaction (or waiver) of each and all of the following conditions, all of which must occur within thirty (30) days of the effective date of this Lease, unless otherwise indicated below:

(a)    Landlord's delivery of subordination, non-disturbance and attornment agreements executed by any and all existing Mortgagees and Ground Lessors in a form satisfactory to Tenant simultaneously with the execution hereof.

(b)    Landlord's delivery of the Land in the condition specified in the Construction Provisions no later than April 7, 1996.

(c)    Tenant's obtaining the required City, County and State permits and approvals to construct said Improvements on the Premises no later than April 1, 1996.  Tenant agrees to apply for such permits promptly as provided herein, to use due diligence and to expend any necessary application or other fees to secure such permits and approvals; provided, however, that the foregoing shall not be deemed to require Tenant to initiate litigation or to agree to any conditions imposed upon issuance of any such permit or approval.

(d)    Landlord's representations, warranties and covenants, including but not limited to those set forth in paragraph 19 herein, being true and accurate as of the date of delivery of the Land (as defined in the Construction Provisions).

(e)    Landlord's causing the execution and recording in the Harris County Deed Records of an amendment to the Protective Covenants and Development Control Manual removing the obligation of Landlord with respect to all "Walkways" described in, referred to or required under the terms of said Protective Covenants and Development Control Manual.  As used herein, the term Protective Covenants means the instrument entitled "Protective Covenants" recorded in Volume 313, Page 112 of the Map Records of Harris County, Texas and under Clerk's File No. G-618013, dated July 29, 1980, as subsequently amended.  As used herein, the

term "Development Control Manual" means that certain instrument entitled "Development Control Manual" dated January 1, 1986 not recorded in the Public Records but referred to in the Protective Covenants and amended by certain amendments to said Covenants. The amendment required hereunder must be satisfactory to Tenant. In lieu of the amendment required in this subparagraph, Landlord may deliver to Tenant on or before April 1, 1966 a writing executed by the Property Owner's Association acknowledging that no "Walkways" other than those shown on the Site Plan are required to be constructed. If neither such written acknowledgment nor amendment is delivered to Tenant by April 1, 1966, Landlord must deliver to Tenant on or before April 1, 1966 an indemnity agreement in form and substance acceptable to Tenant indemnifying Tenant and agreeing to hold Tenant harmless from and against all cost, damage, claims, liability, charges and expenses incurred, directly or indirectly, by Tenant as the result of any Walkways ever being required or constructed within the Shopping Center; however, Landlord shall thereafter still continue to use all reasonable efforts to obtain the acknowledgment or amendment described above.

(f)    Landlord's obtaining and recording an agreement either terminating the utility easement recorded under Clerk's File No. D521819 of the Harris County Deed Records (the "HL&P Easement") or amending it to not cover any portion of the Shopping Center intended for the constructing of improvements other than Common Areas. The termination or relocation agreement required hereunder must be satisfactory to Tenant, and if not delivered to Tenant prior to April 1, 1996, Landlord must deliver to Tenant an indemnity agreement in form and substance acceptable to Tenant indemnifying Tenant and agreeing to hold Tenant harmless from and against all cost, damage, claims, liability, charges and expenses incurred, directly or indirectly, by Tenant as the result of the continued existence of the HL&P Easement; however, Landlord shall thereafter still continue to use all reasonable efforts to obtain and record the aforementioned amendment or modification agreement.

(g)    Landlord's delivery to Tenant of assurances satisfactory to Tenant that all necessary approvals and consents, including approvals or consents from other tenants in the Shopping Center, the City of Houston and the Property Owner's Association and all necessary reciprocal use and easement agreements, have been obtained within thirty (30) days following the date of execution hereof. Landlord agrees to use its best reasonable efforts to obtain the approval of the Property Owner's Association for the Site Plan and the Building and signs (pylon

and building signage), and the issuance of Landlord's development and/or building permit by the City of Houston (or other appropriate authority).

      (h)   Tenant's obtaining satisfactory written assurances that Landlord has obtained financing adequate to fund the Tenant Improvement Allowance and development of the remainder of the Shopping Center.

The existence of the foregoing conditions is solely for the benefit of Tenant, and Tenant may waive any such condition at its sole discretion by delivering to Landlord a written notice signed by Tenant which specifically states the condition(s) being waived by Tenant.

Notwithstanding any other provision in this Lease to the contrary, in the event any of the foregoing conditions shall not be met, satisfied or waived within the applicable time periods set forth in this Lease with respect to each such condition, the parties hereto expressly agree that Tenant shall have the right to terminate this Lease in its sole and absolute discretion at anytime prior to the satisfaction or waiver of any such condition by delivering to Landlord a written notice signed by Tenant which states that Tenant is terminating this Lease on account of the failure of one or more of the foregoing conditions. In the event of any such termination, the rights and obligations of the parties shall be of no further force and effect and the parties shall have no further liability one to the other (except that the indemnifications set forth in paragraphs 14(i), 19(a)(v) and 19(b)(ii) hereof shall survive such termination) upon Tenant's delivery of said notice to Landlord.

The delivery of this executed lease by Tenant to Landlord constitutes the offer of the Tenant to the Landlord to bind Landlord and Tenant to the provisions of this Lease, subject to the conditions set forth in this paragraph 37. It is a further condition to the effectiveness of this Lease that upon receipt of the executed Lease from Tenant, the Landlord, without delay, execute and return same to the Tenant in accordance with any instructions delivered by Tenant or its legal counsel within five (5) business days of receipt. In the event the Landlord fails to so execute and return the Lease, the Tenant may at any time after delivery of the Lease provide written notice to the Landlord that Tenant revokes its delivery of the executed Lease and thereupon the Landlord shall be immediately obligated to return to the Tenant all executed original counterparts as well as any copies of this Lease in the possession of the Landlord, and this Lease shall thereafter be null and void.

H:\2080-7\LEASE.RV9 [52\74] (TS#3199)

38.    Confidentiality.  The parties hereto, including, but not limited to, their heirs, successors, assigns and legal representatives, agree that this Lease may not be recorded and that all such parties hereby agree to use their best reasonable efforts to preserve the confidentiality of this transaction.  This confidentiality agreement extends to any developers, bankers, lawyers, accountants, employees, agents or any other persons acting on behalf of the parties hereto.  The parties hereto agree to use their best reasonable efforts to avoid discussing with, or disclosing to, any third parties (except those parties listed above) any of the terms, conditions or particulars in connection with this transaction.  It is specifically agreed by way of illustration, but not by limitation, that the covenant of confidentiality set forth herein shall not be breached if such information is disclosed in connection with or due to any governmental law or ordinance, but this covenant of confidentiality shall be breached if Landlord, or any of Landlord's developers, bankers, accountants, agents, lenders, lawyers or other similar parties, discloses the content of, or delivers a copy of this Lease to, any third party without the express written consent of all parties to this Lease.  Any breach of this confidentiality agreement shall constitute an Event of Default under the terms and provisions of this Lease, but neither Landlord or Tenant may terminate this Lease as a result of such breach.

WITNESS the following signatures and seals:

**LANDLORD**

610 & SAN FELIPE, INC.,
a Texas corporation

ATTEST (WITNESS):

_Mike Mark_
MIKE MARTIN

By:  _Brad Clough_
Name:  BRAD CLOUGH
Title:  Secretary

51                                            H:\2080-7\LEASE.RV9 [52\74] (TS#3199)

**TENANT**

**CIRCUIT CITY STORES, INC.,**
a Virginia corporation

**ATTEST:**

_____
Its Assistant Secretary

By: _____
Benjamin B. Cummings, Jr.
Vice President

# EXHIBIT "A"

## SITE PLAN

Components:      Premises (outlined in red)

Tenant's Preferred Area

Permissible Building Areas

Customer Pick-Up

Pylon/Monument Signage

Truck Well(s)/Trash Compactor

Building Area A, Building Area B and Building Area C

Maximum square footage of leasable area for
Building Areas A, B, and C

## EXHIBIT "A-1"

### LEGAL DESCRIPTION

A tract or parcel of land containing 4.3381 acres situated in the William White Survey, Abstract No. 836, Harris County, Texas. Said 4.3381 acre is cut of Block 5, Unrestricted Reserve "E" of the corrected subdivision plat of Post Oak Park, Section 2 Subdivision, as recorded in Volume 313, Page 112, and the original plat of Post Oak Park, Section 2, as recorded in Volume 296, Page 137 of the Harris County Map Records. Said 4.3381 acre tract is more particularly described by metes and bounds as follows:

COMMENCING at the point of intersection of the extended Westerly right-of-way line of Post Oak Park Drive (variable width right-of-way) with the extended Southerly right-of-way line of Post Oak Parkway (80-foot wide right-of-way);

THENCE, South 87° 05' 16" West, along the extended Southerly right-of-way line of Post Oak Parkway, for a distance of 7.96 feet to a 5/8-inch iron rod found at the POINT OF BEGINNING of the herein describe 4.3381 acre tract;

THENCE, South 47° 54' 44" East, for a distance of 11.05 feet to a 5/8-inch iron rod found in the Westerly right-of-way line of said Post Oak Park Drive, said 5/8-inch iron rod being in a curve to the right;

THENCE, continuing along the Westerly right-of-way line of said Post Oak Park Drive and along said curve to the right, having a central angle of 07° 42' 01", a radius of 490.00 feet, an arc length of 65.85 feet (a chord bears South 02° 32' 54" West, 65.80 feet) to a 5/8-inch iron rod found at the point of reverse curvature to the left;

THENCE, continuing along the Westerly right-of-way line of said Post Oak Park Drive and along said curve to the left, having a central angle of 09° 14' 55", a radius of 510.00 feet, an arc length of 82.32 feet (a chord bears South 01° 46' 27" West, 84.24 feet) to a 5/8-inch iron rod found at the point of tangency of said curve to the left;

THENCE, South 02° 51' 01" East, continuing along the Westerly right-of-way line of Post Oak Park Drive, for a distance of 90.00 feet to a 5/8-inch iron rod found at the point of curvature of a curve to the right;

THENCE, along said curve to the right, having a central angle of 96° 03' 19", a radius of 50.00 feet, an arc length of 83.82 feet (a chord bears South 45° 10' 39" West, 74.35 feet) to a 5/8-inch iron rod found at the point of compound curvature of a curve to the right, said point being in the Northerly right-of-way line of San Felipe Road (variable width right-of-way);

THENCE, continuing along the Northerly right-of-way line of San Felipe Road and along said curve to the right, having a central angle of 18° 01' 57", a radius of 1,298.14 feet, an arc length of 408.56 feet (a chord bears North 77° 46' 43" West, 406.88 feet) to a 5/8-inch iron rod found at the point of compound curvature of a curve to the right;

H:\2080-7\LEASE.RV9 [52\74] (TS#3199)

THENCE, continuing along the Northerly right-of-way line of San Felipe Road and along said curve to the right, having a central angle of 09° 17' 00", a radius of 490.00 feet, an arc length of 79.39 feet (a chord bears North 64° 07' 14" West, 79.31 feet) to a 5/8-inch iron rod found at the point of reverse curvature of a curve to the left;

THENCE, continuing along the Northerly right-of-way line of said San Felipe Road and along said curve to the left, having a central angle of 01° 38' 14", a radius of 1,156.00 feet, an arc length of 33.03 feet (a chord bears North 60° 17' 51" West, 33.03 feet) to a 5/8-inch iron rod at the point of tangency of said curve to the left;

THENCE, North 61° 06' 58" West, continuing along the Northerly right-of-way line of San Felipe Road, for a distance of 121.00 feet to a 5/8-inch iron rod found in the Easterly right-of-way line of Loop 610 (variable width right-of-way);

THENCE, North 03° 23' 53" West, leaving the Northerly right-of-way line of said San Felipe Road and along the Easterly right-of-way line of Loop 610, for a distance of 26.52 feet to a 5/8-inch iron rod found for corner;

THENCE, North 42° 05' 16" East, leaving the Easterly right-of-way line of Loop 610, for a distance of 363.77 feet to a 5/8-inch iron rod found in the aforementioned Southerly right-of-way line of Post Oak Parkway (80-foot wide right-of-way), said point being in a curve to the right;

THENCE along the Southerly right-of-way line of Post Oak Parkway and along said curve to the right, having a central angle of 03° 35' 16", a radius of 260.00 feet, an arc length of 16.28 feet (a chord bears South 47° 42' 28" East, 16.28 feet) to a 5/8-inch iron rod found at the point of tangency of said curve to the right;

THENCE, South 45° 54' 49" East, continuing along the Southerly right-of-way line of said Post Oak Parkway, for a distance of 130.06 feet to a 5/8-inch iron rod found at the point of curvature of a curve to the left;

THENCE, continuing along the Southerly right-of-way line of said curve to the left, having a central angle of 46° 59' 54", a radius of 340.00 feet, an arc length of 278.89 feet (a chord bears South 69° 24' 47" East, 271.14 feet) to a 5/8-inch iron rod found at the point of tangency of said curve to the left;

THENCE, North 87° 05' 16" East, continuing along the Southerly right-of-way line of said Post Oak Parkway, for a distance of 47.71 feet to the POINT OF BEGINNING; CONTAINING within these metes and bounds 4.3381 acres or 188,968 square feet of land area, more or less.

H:\2080-7\LEASE.RV9 [52\74] (TS#3199)

# EXHIBIT "B"

## INDEX OF DEFINITIONS

| Term | Paragraph where defined |
|------|-------------------------|
| Assessment(s) | Ex. "C", para. 1(a) |
| Base Rent | 4(a) |
| Building | 2 |
| Building Area A | 14(e), Ex. "A" |
| Building Area B | 14(e), Ex. "A" |
| Building Area C | 14(e), Ex. "A" |
| CAM Charges | 7(b) |
| CAM Year | 7(c) |
| Certificate | 15(a)(i) |
| City | 1 |
| Commencement Date | 4 |
| Common Area Easement | 6(d) |
| Common Area Maintenance | 7(a) |
| Common Areas | 7(a) |
| Construction Term | 3 |
| CPI-U | 4(a)(iii) |
| Date of Taking | 16(a) |
| Default Rate | 9(b) |
| Delivery of the Land | Ex. "C", para. 1(b) |
| Development Control Manual | 37(e) |
| Escrow Agent | 15(a)(i) |
| Event of Default (Landlord) | 31 |
| Event of Default (Tenant) | 29 |
| Foreclosure | 21(a) |
| Grading Plans | Ex. "C", para. 1(b) |
| Hazardous Substances | Ex. "C", para. 1(a) |
| HL&P Easement | 37(f) |

H:\2080-7\LEASE.RV9 [52\74] (TS#3199)