**EXHIBIT B
(cont'd)**

| **Term** | **Paragraph where defined** |
|---|---|
| Improvements | 2 |
| Land | 1 |
| Landlord | Introduction |
| Landlord's Premises | 1 |
| Landlord Work | Ex. "C", para. 1(d) |
| Lease Year | 3 |
| Main Term | 3 |
| Modified Proctor | Ex. "C", para. 2(a) |
| Mortgage | 21(a) |
| Mortgagee | 21(a) |
| Option Periods | 3 |
| Other Improvements | 2 |
| Permissible Building Areas | Ex. "A" |
| Permitted Encumbrances | Ex. "F" |
| Person | 20 |
| Personalty | 23 |
| Plans and Specifications | Ex. "C", para. 2(b) |
| Premises | 1 |
| Property Owner's Association | 7(b) |
| Protective Covenants | 37(e) |
| Real Estate Taxes | 9(a) |
| Renewal Option | 3 |
| Schematic Floor Plan and Elevation | Ex. "C", para. 2(b) |
| Shopping Center | 1 |
| Site Covenants | 19(a)(ix) |
| Site Work | Ex. "C", para. 1(b) |
| Site Plan | 1 |
| Soils Report | Ex. "C", para 1(b) |
| Staging Area | 6(a) |
| State | 1 |

H:\2080-7\LEASE.RV9 [52\74] (TS#3199)

| **Term** | **Paragraph where defined** |
|---|---|
| Substantial Completion | Ex. "C", para. 2(e) |
| Substantially All of the Premises | 16(a) |
| Successor | 22 |
| Taking | 16(a) |
| Tax Parcel | 9(b) |
| Tenant | Introduction |
| Tenant Improvement Allowance | Ex. "C", para. 3 |
| Tenant's Preferred Area | Ex. "A" |
| Tenant's Pro Rata Share | 7(c) |
| Term | 3 |
| Transfer | Ex. "C", para. 3 |
| Utility and Drainage Plan | Ex. "C", para. 1(c) |
| Work | 15(a)(i) |
| Worth at the time of the award | 30(b) |

H:\2080-7\LEASE.RV9 [52\74] (TS#3199)

HOUSTON/San Felipe

### EXHIBIT "C"

## CONSTRUCTION PROVISIONS

THESE CONSTRUCTION PROVISIONS (herein so called) are hereby made a part of the Lease between Landlord and Tenant to which these Construction Provisions are attached as Exhibit "C". All defined terms shall have the meanings attributed to them in the Lease unless otherwise specifically defined in these Construction Provisions.

1.    Landlord's Delivery of the Land; Other Landlord Work.

All of the work set forth in subparagraphs (a), (b) and (c) below is, collectively, the "Landlord Work":

(a)    Hazardous Substances. Landlord shall deliver the Land to Tenant free of any pollution or contamination from toxic or hazardous substances, asbestos or any other chemicals or substances in amounts which exceed standards for public health or welfare as established and regulated by any local governmental authority, the State or the United States Government (herein collectively referred to as "Hazardous Substances"). Landlord hereby grants Tenant and its agent access to the Premises and Shopping Center to enable Tenant to conduct sueh soil and environmental tests as its deems necessary.

(b)    Site Work. Landlord, at its sole cost and expense, shall: (i) verify its proposed development of the Shopping Center and compliance of its civil engineering plans with Tenant's geotechnical evaluation of the Land dated March 28, 1995 prepared by Kevin Coleman of Reed Engineering Group, Inc., Job No. 2308 (the "Soils Report"); (ii) cause the Land to be free and clear of any known or unknown (which, but for Landlord's failure to discover same, should be removed prior to delivery of the Land to Tenant) obstructions, foundations, footings, utilities, easements, improvements and tenancies; (iii) complete grading of the Land in accordance with the Soils Report and the "Standards for Grading Work" attached hereto as Attachment "3", and with the final plans prepared by the civil engineer approved by Tenant (the "Grading Plans"), which Grading Plans are described on Attachment "4" hereto, and which are subject to Tenant's written approval, which approval shall not be unreasonably withheld or delayed; (iv) completion of Tenant's building pad strictly in accordance with Tenant's Soils Report; (v) obtain approvals for all curbcuts indicated on the Grading Plans and all on and off-

H:\2080-7\LEASE.RV9 [52\74] (TS#3199)

site permits required for any work to be performed by Landlord necessary to develop the Shopping Center which permits may be a prerequisite for issuance of Tenant's building permit; (vi) complete (A) all curbcuts for Tenant's Preferred Area, (B) 20,000 square feet of Staging Area outside of but adjacent to the building pad area, which Staging Area may be reduced to no less than 10,000 square feet per agreement between Tenant and Landlord, with Tenant and Landlord to coordinate their construction activities to minimize interference with one another's activities, so long as, if Landlord requires Tenant to relocate its Staging Area once it is in place, Landlord shall pay Tenant's costs of relocation and give Tenant at least one (1) week's prior notification of the need to relocate, and (C) an all-weather construction access road to the Land and around the building no less than twenty-four (24) feet in width, connecting the existing dedicated roadway adjacent to the Shopping Center with the Land, all in accordance with the Grading Plans; and (vii) obtain site plan approval and conditional use approval, if any, from governmental authorities having jurisdiction over the Shopping Center, permitting Tenant's construction of the Premises (subject to issuance of Tenant's building permit). All of the work described in (i) through (vii) above is, collectively, the "Site Work". No changes shall be made to any of the Site Work, including but not limited to any plans and specifications therefor, without Tenant's prior written consent. The Site Work shall be performed in accordance with the construction schedule attached hereto as <u>Attachment "5"</u> (sometimes referred to herein as the "Construction Schedule"). Landlord specifically covenants and agrees that any problems or delays it encounters in grading the Premises in satisfaction of the Site Work requirements set forth above in connection with the condition of the soils, including environmental or hazardous waste issues, subsidence sinking, surface waters, subsurface waters, unforeseen site conditions or the like shall be its sole responsibility, shall not cause a force majeure delay, and in no event shall the cost associated with such problems or conditions be passed on to Tenant in any manner.

Landlord will maintain the construction access road in good condition throughout the construction of the Common Areas. If the items of Site Work to be performed on the Land are completed earlier than forty-five (45) days prior to Tenant's scheduled commencement of construction of the Improvements (as provided below), the Land shall be overbuilt and sloped to drain and, within such forty-five (45) day period, shall be regraded and recompacted.

Subject to force majeure, Landlord covenants and agrees to complete, at its sole cost and expense, each item of the Site Work and to provide temporary utilities to within fifty (50) feet

H:\2080-7\LEASE.RV9 [52\74] (TS#3199)

of the building pad at Tenant's designated points of entry as set forth in the Plans and Specifications, as contemplated in paragraph 1(c) below, in accordance with the dates established therefor in Attachment "5", to the end that promptly upon completion of such requirements (collectively "delivery of the Land"), Tenant shall be able, subject to issuance of its building permit and matters within Tenant's control, to commence construction of the Improvements.

Landlord acknowledges that Tenant's ability to obtain a building permit for its construction may be delayed due to the failure by Landlord to obtain necessary approvals or permits or to pay necessary fees for its construction and development of the Shopping Center. Landlord agrees that delivery of the Land shall not be deemed to have occurred until all such aforesaid approvals and permits shall have been obtained and all such fees, including but not limited to impact fees and assessments, shall have been paid, if and to the extent that such approvals, permits and fees for Landlord's construction shall be prerequisites to the issuance of Tenant's building permit. Landlord agrees to keep Tenant advised in writing on a monthly basis as to Landlord's progress in completing the Site Work. Upon the delivery of the Land, Landlord shall certify to Tenant that all elements of the Site Work have been completed in the form of the Site Work Certificate attached hereto as Attachment "6".

Should the Site Work require minor adjustments in order to be in accordance with Attachments "3" and/or "4", and Landlord fails to make those adjustments promptly after receipt of notification of the adjustment needed from Tenant and in a time period which would permit Tenant to meet its construction schedule, Tenant may direct its contractor to make such adjustments, the total cost of which shall be reimbursed by Landlord to Tenant upon demand in a sum not to exceed Five Thousand Dollars ($5,000.00).

(c)    Paving, Lighting, Utilities, Landscaping and Drainage. Landlord, at its sole cost and expense, and in accordance with Attachment "5", shall cause a contractor licensed in the State to complete (i) installation of temporary utilities, as described in the "Utilities Specifications" attached hereto as Attachment "7"; (ii) the construction and installation within five (5) feet of the Building, of permanent telephone service and permanent utilities (as per Attachment "7"), including but not limited to gas, electric, domestic water and fire water (in size sufficient to satisfy local fire codes), each at Tenant's required entry points shown in the "Utility and Drainage Plan" described on Attachment "8" hereto (the "Utility and Drainage Plan"), at depths adequate for Tenant's tie-in without additional cost above that contemplated by the "Plans

and Specifications" (as defined in paragraph 2(b) below); (iii) the construction and installation of the storm water drainage system at Tenant's required location shown on the Utility and Drainage Plan; (iv) the construction and installation of paving (including heavy-duty paving), and curbing for parking areas (including sidewalk curb in front of the Building), vehicular access and service roads, and driveways, in accordance with the "Paving Specifications" attached hereto as Attachment "9"; (v) the completion of landscaping at the Shopping Center in accordance with Landlord's governmentally approved landscaping plan; (vi) the construction and installation of lighting in the Shopping Center to standards no less than those set forth in the "Shopping Center Lighting Specifications" attached hereto as Attachment "10"; and (vii) Landlord's installation of the pylon sign(s) identifying the Shopping Center as described in paragraph 8 of the Lease, all no later than the dates established therefor in Attachment "5"; and (viii) installation of the control panel for the parking lot lights where designated by Tenant inside Tenant's Building, or at Landlord's option, its installation elsewhere near the Building in a location approved by Tenant (in its reasonable discretion) so long as Tenant is granted access to the control panel (through Landlord providing Tenant with a key or other method of access), so that Tenant may control the hours of operation of the exterior lighting for the Common Areas.

(d)    Landlord Work. All of the work described to be performed by Landlord in this paragraph 1 is collectively referred to as the "Landlord Work". All Landlord Work shall be performed in accordance with all applicable laws and this Lease, in a good and workmanlike manner, as appropriate by engineers, surveyors, architects and consultants, who are bondable, licensed in the State and of good reputation. Landlord's general contractor shall be experienced in shopping center development and in phasing and coordinating construction schedules with major anchors and national retailers. In the event that Landlord defaults at any time in completion of any component of the Landlord Work, Tenant shall have the right, but not the obligation, to perform at Landlord's sole cost and expense, all or any part of Landlord Work. Tenant shall exercise this right by providing Landlord with at least three (3) days written notice thereof, which notice shall reasonably detail those portions of the Landlord Work which Tenant elects to complete. Tenant may exercise the rights set forth in this paragraph 1(d) from time to time so long as Tenant provides Landlord notice specified herein (i) within a reasonable amount of time prior to the date upon which Landlord would otherwise commence that portion of the Landlord Work, or (ii) at such other time where it is feasible for Tenant to take over that

portion of the Landlord Work from Landlord.  In the event and to the extent that Tenant exercises its right hereunder, Landlord agrees to cooperate in good faith and provide Tenant with reasonable assistance so that Tenant can complete said portions of the Landlord Work.  Landlord agrees to reimburse Tenant for any and all costs incurred by Tenant in connection with any portion of the Landlord Work which Tenant is in the process of completing within five (5) days after receipt of written request from Tenant, which request shall be reasonably supported by invoices and/or written description of the Landlord Work performed.  In the event that the Landlord does not timely reimburse Tenant as hereinabove contemplated, Tenant shall be entitled to deduct the costs of such Landlord Work from rentals and other payments due under the Lease, together with interest at the Default Rate from the date of expenditure by Tenant until paid in full.

2. <u>Tenant Improvements</u>.

(a) <u>Building Construction</u>.  Upon completion of all requirements therefor, Landlord shall give Tenant written notice (which shall include any required certifications, including but not limited to those required by <u>Attachment "3"</u>) of delivery of the Land in the form of <u>Attachment "6"</u>.  Tenant shall promptly notify Landlord if any such requirement has not been met to Tenant's reasonable satisfaction (based on all the specifications and requirements set forth in or referred to in this Lease), provided the Tenant does not elect its self-help remedies set forth in this Lease.  Upon completion of any such previously unmet requirements, Tenant shall promptly commence and pursue to completion with due diligence the construction of the Improvements.  The construction work on the Improvements shall be performed by a duly licensed contractor chosen by Tenant, shall be done in a good and workmanlike manner, in compliance with all applicable laws and in substantial accordance with the "Plans and Specifications" (defined below).  Provided that the Land is delivered on or before the date set forth on <u>Attachment "5"</u>, Tenant covenants and agrees to use reasonable efforts and due diligence to achieve "Substantial Completion" (as defined below) on or before the date which is seven (7) months thereafter.

(b) <u>Plans and Specifications</u>.  Tenant shall prepare and furnish to Landlord for its approval, not to be unreasonably withheld, conditioned or delayed, complete architectural drawings and specifications and building elevations (the "Plans and Specifications") for the construction of the Building and Other Improvements, incorporating therein the items specified

and shown in the "Schematic Floor Plan and Elevation" (which are hereby approved by Landlord) attached hereto as <u>Attachment "11"</u>.  Landlord agrees that it will approve the Plans and Specifications, so long as they are materially consistent with the Schematic Floor Plan and Elevation, within ten (10) business days after receipt thereof.  If the Plans and Specifications are not disapproved by Landlord within fifteen (15) days of delivery thereof to Landlord, they will be deemed approved.  The Plans and Specifications shall not be substantially changed by Tenant without the prior written consent of the Landlord, which consent shall not be unreasonably withheld, conditioned or delayed.  Any costs incurred by Tenant to construct the Building and Other Improvements due to Landlord's specific requests and elevation requirements or the Property Owner's Association shall be paid by Landlord unless such change is required by the City of Houston.  Payments of such costs to Tenant shall be made at the same time payment of the Tenant Improvement Allowance is paid, as described below.

(c)      <u>Permits</u>.  Tenant, at its sole cost and expense, shall obtain or cause to be obtained those certain building permits, licenses, other governmental approvals and temporary and permanent certificates of occupancy which may be required for the lawful construction and occupancy of the Premises as a retail shopping facility in accordance with the Plans and Specifications.  Landlord agrees to assist and cooperate fully with Tenant in obtaining such permits, licenses, approvals and certificates.  Landlord shall be responsible for any other permits necessary for the development of the Shopping Center.

(d)      <u>Landlord Inspections</u>.  During the course of construction of the Improvements, Landlord may, at its own risk and in cooperation with Tenant's contractor, enter upon the Land for purposes of inspecting the work, provided that such inspections shall not interfere with Tenant's construction.

(e)      <u>Substantial Completion</u>.  Substantial completion of the Improvements ("Substantial Completion") shall be deemed to occur when a certificate of occupancy, whether temporary and subject to minor items to be completed, or permanent, as the case may be, has been issued by the applicable governmental authority.  The foregoing shall not be deemed to relieve Tenant of its responsibility to complete the Improvements in accordance with the Plans and Specifications.

3.      <u>Costs</u>.  Upon Substantial Completion and Tenant's furnishing to Landlord (i) the certificates of insurance required under paragraph 14 of the Lease, (ii) an indemnity in the form

of Exhibit "J" attached hereto against any exception in Landlord's or its Mortgagee's policy of title insurance with respect to mechanics' liens arising out of Tenant's construction, and (iii) if requested by Landlord, confirmation from Tenant that Landlord holds title to the Improvements (in form reasonably acceptable to Landlord and Tenant), Landlord shall pay to Tenant a "Tenant Improvement Allowance" in an amount equal to One Million Nine Hundred Seventy-Four Thousand One Hundred Thirty-Five and No/100 Dollars ($1,974,135.00), being $46.25 per square foot of gross leasable area of the Premises, payable by wire transfer of funds by Landlord to Tenant's account no later than thirty (30) days after Substantial Completion. If the Base Rent is increased or decreased pursuant to paragraph 4(ii) of the Lease, the Tenant Improvement Allowance shall likewise be proportionately increased or decreased by the sum of $46.25 per square foot of gross leasable area. If Landlord fails to pay the Tenant Improvement Allowance in full within thirty (30) days after Substantial Completion and receipt of items (i), (ii) and (iii) above, the Landlord shall be in default hereunder, no Base Rent or CAM Charges shall be due or owing to Landlord until the same is paid to Tenant, and interest shall accrue on the unpaid Tenant Improvement Allowance at the Default Rate commencing on the thirty-first (31st) day following Substantial Completion until the date of payment of the Tenant Improvement Allowance; provided, however, that if Landlord has not tendered payment of the Tenant Improvement Allowance by that date which is one (1) year from Substantial Completion (the "Substantial Completion Anniversary"), then (i) such date shall become the Commencement Date; (ii) Base Rent shall be reduced to ground rent equal to Seventy-Five Thousand and No/100 Dollars ($75,000.00) per annum during the first year following the Substantial Completion Anniversary, Fifty Thousand and No/100 Dollars ($50,000.00) per annum during the second year following the Substantial Completion Anniversary, and Twenty-Five Thousand and No/100 Dollars ($25,000.00) per annum thereafter during the Term of the Lease; and (iii) this Lease shall be converted to a ground lease, with ownership of the Improvements remaining with Tenant, and Landlord's and any Mortgagees' names being removed as additional insureds or mortgagees on any casualty insurance described in paragraph 14(a) of the Lease. Landlord and Tenant covenant and agree that upon the reasonable written request of either the Tenant or Landlord, the Landlord and Tenant shall execute such documentation as necessary to formalize the conversion of this Lease to a ground lease upon the Substantial Completion Anniversary.

Notwithstanding the foregoing, at any time following the Substantial Completion Anniversary and upon thirty (30) days prior written notice, Tenant shall have the right at Tenant's sole election, but not the obligation, in lieu of the requirement that Landlord pay to Tenant the Tenant Improvement Allowance, to mortgage, sell, convey, assign, lease or otherwise encumber (collectively, a "Transfer") Tenant's interest in the Building, the Improvements and the Lease. Such right shall be in addition to the rights of Tenant set forth in paragraph 21 of the Lease.

Landlord covenants to (i) execute all documents necessary to permit Tenant to effect the Transfer described herein, and (ii) cause any Mortgagee to specifically acknowledge the rights of Tenant's lender and third parties arising as a result of such Transfer. Notwithstanding such Transfer, Tenant shall continue to pay the ground rentals described herein during the remainder of the Term.

4.    Construction Delays.

(a)    Delays by Landlord. In the event, subject to force majeure, Landlord shall fail to complete the Site Work and accomplish delivery of the Land in the condition specified by the date set forth on Attachment "5" hereto Landlord agrees that it shall reimburse Tenant for its fixed and ascertainable costs incurred as a result thereof in the exercise of all reasonable efforts to open for business by the date which is seven (7) months following the date Landlord should have delivered the Land and completed the Site Work. Such costs shall be limited to Tenant's out-of-pocket expenses of construction overtime, acceleration charges and bonuses paid to Tenant's contractors or subcontractors, charges for the scheduling of construction crews on days on which work cannot be performed due to the delays by Landlord and construction period interest charges actually incurred to the extent that such charges exceed those which would have accrued without such delay.

In the event, subject to force majeure, Landlord shall fail to accomplish delivery of the Land by the date which is fifteen (15) days following the date Landlord should have delivered the Land, or to complete any element of the Landlord Work by the completion date established therefor in Attachment "5", Tenant, at its option and upon five (5) days' prior written notice to Landlord, which notice may be given prior to or at any time after the applicable date for performance, may in addition to any other rights and remedies set forth herein, enter the Shopping Center and perform any task required for delivery of the Land or, as applicable, any

H:\2080-7\LEASE.RV9 [52\74] (TS#3199)

element of the Landlord Work which has not been timely completed, and Landlord shall reimburse Tenant for its reasonable and actual costs thereof, including interest on such costs at the Default Rate.  Landlord hereby grants Tenant the right, as its agent, to directly contact and contract with Landlord's contractors, on behalf of Landlord, to complete such work, all at Landlord's cost and expense.  Landlord covenants, upon Tenant's request, to provide Tenant with duplicate sets of all plans, specifications and contracts prepared in connection with the construction of the Shopping Center, as well as schedules of all contractors, subcontractors and suppliers.  If such costs are not reimbursed to Tenant prior to the Commencement Date, Tenant may offset such amounts against Base Rent and CAM Charges otherwise due until such costs and accrued interest are reimbursed in full.

In the event, for any reason whatsoever and regardless of force majeure, Landlord shall fail to complete delivery of the Land to Tenant by the date which is sixty (60) days from the date set forth on <u>Attachment "5"</u>, Tenant shall be entitled to terminate this Lease at any time prior to such delivery and receive from Landlord promptly thereafter a sum equal to the actual out-of-pocket and substantiated third-party legal, architectural and engineering costs incurred by Tenant to the date of termination, not to exceed One Hundred Thousand and No/100 Dollars ($100,000.00).  In addition to any other rights and remedies set forth herein, if the Landlord fails to timely deliver the Land or any element of the Site Work as of the thirtieth (30th) day after the intended date of delivery, and regardless of force majeure, Tenant may elect to delay opening of its store facility for a period not to exceed nine (9) months, during which time Tenant shall pay no Base Rent, Real Estate Taxes or CAM Charges.  In such event, Landlord shall deliver the Land and complete the Site Work on the date required by Tenant, and Landlord shall pay to Tenant on demand an amount equal to all costs incurred by Tenant in the development of its store facility, including, but not limited to, costs of materials and all engineering, architectural and legal fees, as compensation to Tenant for the loss of store revenues due to Landlord's delays hereunder.

(b)    <u>Delays by Tenant</u>.    If, subject to force majeure, Tenant shall fail to commence its construction by that date which is ninety (90) days following delivery of the Land, Landlord at its option, upon prior written notice to Tenant, may require Tenant to proceed with its construction and commence payment of Ground Rent (as hereinafter defined) on the date which is two hundred forty (240) days following delivery of the Land.

H:\2080-7\LEASE.RV9 [52\74] (TS#3199)

If, subject to force majeure, Tenant shall fail to achieve Substantial Completion by that date which is two hundred forty (240) days following delivery of the Land, Landlord, at its option, upon prior written notice to Tenant, may require Tenant to proceed with its construction, commence payment of Ground Rent on the date which is two hundred forty (240) days following Delivery of the Land, and reimburse Landlord for its fixed and ascertainable costs incurred as a result thereof.  Such costs shall be limited to Landlord's out-of-pocket expenses of construction overtime, acceleration charges and bonuses paid to Landlord's contractors or subcontractors, charges for the scheduling of construction crews on days on which work cannot be performed on account of the aforesaid delays by Tenant, the cost of erecting barricades around Tenant's unfinished work and construction period interest charges to the extent that such charges exceed those which would have accrued without such delay.

In the event, for any reason whatsoever and regardless of force majeure, Tenant shall fail to achieve Substantial Completion by that date which is one (1) year following delivery of the Land, Landlord shall be entitled to terminate this Lease upon sixty (60) days prior written notice to Tenant, during which sixty (60) day period Tenant may cure any such default hereunder.

For purposes hereof, Ground Rent shall equal Base Rent less the yearly payment required to amortize the amount of the Tenant Improvement Allowance over twenty (20) years at twelve percent (12%) per annum, payable in monthly installments.

(c)    Miscellaneous.  Notwithstanding the foregoing, a delay by any party in exercising its cure rights or other remedies hereunder shall not be deemed an event of force majeure for purposes of extending the date(s) established for performance by the party whose actions or omissions gave rise to such cure rights or remedies.  All sums owing to Tenant under paragraph 1 hereof and/or subparagraph (a) above shall, to the extent applicable, be added to the Tenant Improvement Allowance and paid simultaneously therewith; and, if not so paid, Tenant shall be entitled to offset all such costs, plus interest at the Default Rate, against Base Rent and CAM Charges otherwise due hereunder.  All sums owing to Landlord under subparagraph (b) above shall, to the extent applicable and except for Base Rent and CAM Charges, be deducted from the Tenant Improvement Allowance.

Notwithstanding anything contained herein to the contrary, Landlord covenants that it shall complete its construction and delivery obligations in accordance with the "Completion Dates" set forth in the Construction Schedule.  In the event that the Landlord fails to complete

H:\2080-7\LEASE.RV9 [52\74] (TS#3199)

its construction and delivery obligations in accordance with such Completion Dates, Tenant may, at its sole election, exercise such remedies as are set forth in this <u>Exhibit "C"</u> and the Lease.

5.    <u>Attachments</u>.

"1"   Environmental Certification

"2"   (intentionally deleted)

"3"   Standards for Grading Work

"4"   Grading Plans

"5"   Construction Schedule

"6"   Site Work Certification

"7"   Utilities Specifications

"8"   Utility and Drainage Plan

"9"   Paving Specifications

"10"  Shopping Center Lighting Specifications

"11"  Schematic Floor Plan and Elevation

H:\2080-7\LEASE.RV9 [52\74] (TS#3199)

Attachment "1"

**[INTENTIONALLY DELETED]**

12 - Ex. "C"

Attachment "2"

## Scope of Geotechnical Evaluation

[INTENTIONALLY DELETED]

Attachment "3"

## Standards for Grading Work

1.     The Land and the Shopping Center shall be graded in accordance with the following:

(a)     The Grading Plan shall show contours in accordance with standard engineering practice and these contours shall be shown with the existing (shown as a dashed line) and final (shown as a solid line) elevations.   Whether existing or proposed, all buildings, improvements, roads  and highways, including those adjacent to the Shopping Center, shall be shown in their true locations.

(b)     The Building will be accessible by grade level parking only.  Steps and stairs are not permitted.

(c)     Sidewalk at the Building will slope away from the Building with grade of no less than 1.5% and no more than 3.0%.  All water shall be sheet drained away from the Tenant's doors.

(d)     Asphalt paving areas will be graded to avoid ponding water with slopes no less than 1.5% and no more than 4.0%.  Entrances and access drives shall have a maximum slope of 6.0%.

(e)     Surface drainage swales will not be allowed without prior approval of Tenant.  Such swales must have a grade of not less than 0.5% and no more than 3.5% and shall be constructed of concrete.

(f)     No retaining walls or embankments causing breaks in grade shall be permitted unless specifically approved by Tenant.

2.     "Tenant's Pad Area" shall be defined as the area extending five (5) feet beyond the Building walls and truck dock and ramp area, or to the back of curbing around the Building, whichever is further.  The Site Work shall comply with the following additional requirements:

(a)     Landlord shall be responsible for preparing the Tenant's Pad Area subgrades to within plus or minus two (2) inches as set by Tenant's architect.   Tenant's subgrades are typically 8"-10" below finished floor elevation. Landlord will complete compaction in accordance with the appropriate engineering standards and building code

requirements, but in no event less than ninety-eight percent (98%) of the modified proctor soil test for water content and compaction levels ("Modified Proctor") on the Land, so as to enable Landlord to perform construction work necessary to provide completed Improvements in accordance with the "Plans and Specifications" (defined in the Construction Provisions), with standard footings and without the necessity of pilings or spread footings or other extraordinary foundation work. Tenant's minimum slab thickness and under slab fill will be established in accordance with the report of an independent professional soils engineer. Such report will be obtained by Landlord at its sole expense. All compacted areas of the site shall be verified by an independent professional soils engineering test laboratory and a certificate from such independent laboratory indicating compliance with the soils report shall be furnished to Tenant upon completion of the Site Work.

(b)    Tenant's Pad Area soil shall have a minimum bearing capacity of 2,500 pounds per square foot. Earth stabilization and/or replacement shall be performed by Landlord as necessary to meet this minimum requirement.

(c)    During the preparation of Tenant's Pad Area, Landlord shall at its expense have an independent professional soils engineering test laboratory monitor and certify the preparation of Tenant's Pad Area in accordance with the independent soils engineer's report referenced in Attachment "2" (II) above. The greater of three in-place compaction tests per work day or one in-place compaction test per 5,000 square feet of pad area must be completed.

(d)    On or before April 1, 1996, Landlord shall provide Tenant with:

(i)    An independent soils engineer's written certification that all pad work was completed in accordance with the Grading Plans and the Plans and Specifications. This report shall include the results of all compaction and other tests performed during the pad preparation phase and any tests performed prior to the date of such certification.

(ii)    A surveyor's written elevation certification stating that Tenant's Pad Area is at the prescribed elevation within the stated tolerance of plus or minus one-tenth of a foot. This certification shall be based upon an "as-prepared" survey which shall accompany such certification and shall show thereon elevation shots taken on a 50-foot-grid minimum including pad perimeter and building corners. Promptly upon completion of the Site Work, Landlord shall cause its surveyor or engineer to designate the corners of the Land by means of standard surveying monuments.

(e)     Landscaping slopes and berms shall be set by Landlord to preserve the integrity of the slopes as determined by an independent soils engineer and as required by local ordinances.

(f)     The Grading Plans shall not be materially changed by Landlord without the prior consent of Tenant, which consent shall not be unreasonably withheld or delayed.

(g)     All outlots or future building areas shall be rough graded and planted with grass seed.

Attachment "4"

**Grading Plans**

See attached plans.

17 - Ex. "C"

Attachment "5"

## Construction Schedule

| Landlord's Task | Completion Date |
|---|---|

1.  Construction of all-weather construction access
    to the Premises, staging area and curbcuts in
    Tenant's Preferred Area.                                   4/1/96

2.  Completion of Site Work including approval for
    all curbcuts.                                              4/1/96

3.  Installation of temporary utilities.                      4/1/96

4.  Landlord's delivery of the Land to Tenant.                4/1/96

5.  Construction and installation of permanent
    utilities including permanent telephone service.          7/1/96

6.  Construction and installation of storm water
    drainage.                                                 7/1/96

7.  Construction and installation of paving (including
    heavy-duty paving) and curbing.                           7/1/96

8.  Completion of landscaping at Shopping Center.             8/1/96

9.  Construction and installation of exterior lighting
    in the Shopping Center.                                   8/1/96

10. Construction and installation of pylon sign(s)
    identifying the Shopping Center.                          8/1/96

18 - Ex. "C"

Attachment "6"

## Site Work Certification

To:    Circuit City Stores
       9950 Mayland Drive
       Richmond, Virginia  23233
       Attention:  Vice President-Real Estate

       Re:    Circuit City Store/Houston, Texas (610 & San Felipe) - Lease Agreement dated
              _____

Ladies and Gentlemen:

The undersigned, as Landlord under the Lease has caused "delivery of the Land" to occur, and accordingly, completion of the Site Work, all in accordance with the terms of the Lease.  Specifically the undersigned hereby certifies that:  (i) the grading of the Land [and Common Areas] has occurred in accordance with the Standards for Grading Work, attached as Attachment "3" to the Lease, and Tenant's building pad has been prepared strictly in accordance with your geotechnical report; (ii) the Staging Area has been completed and (iii) an all-weather construction access road to the Land no less than 24 feet width has been prepared and is ready for your use.

All conditions precedent to issuance of your building permit have been satisfied by the Landlord, and we certify that all elements of the Site Work and delivery of the Land have been satisfied in accordance with the Lease.

[LANDLORD]

Note:  Landlord may elect to not complete the required grading of the Common Areas and other land comprising the Shopping Center (other than the Land) at the same time Landlord completes delivery of the Land, and if Landlord so elects, the grading of the then ungraded land must be completed no later than 6/1/96 and a second Site Work Certification in the form set forth above delivered to Tenant addressing the completed grading of the Shopping Center.

<u>Attachment "7"</u>

**Utilities Specifications**

Landlord will provide the following temporary utilities to within fifty (50) feet of the Premises no later than the date for completion of such temporary utilities set forth in the Construction Schedule:

> water (2" line, with sufficient pressure that pumping is not necessary) and electric power (200 amps, 1-phase, 4-wire, 120 volts, with weatherproof and rainproof fused disconnect switch) for use by Tenant in its construction of the Improvements.

Landlord will provide the following permanent utilities to within five (5) feet of the Premises at Tenant's identified entry points no later than the date for completion of such permanent utilities set forth in the Construction Schedule:

> gas (if available), empty conduit for telephone, permanent electricity (empty conduit adequate for 800-amp panel, 3-phase, 277/480 volt connected to a transformer), sanitary sewer (6" line), domestic water (2" line), fire protection water (8" line, 50 pounds per square inch residual pressure, 2000 gallons per minute or at least sufficient capacity to service Tenant's sprinkler system without the need for any fire pump, as approved by Tenant's fire protection consultant and at depths adequate for Tenant's tie-in without extra cost).

During the Construction Term, Tenant shall pay all utility charges related to Tenant's consumption of water and electricity.

## Attachment "8"

**Utility and Drainage**

See attached plans.

21 - Ex. "C"

Attachment "9"
**Paving Specifications**

1.    With respect to parking area and roadway surfacing:

(a)    Pavement design shall be based on a "Design Period" of twenty (20) years for the traffic indices specified by an independent civil engineer approved by Tenant and compensated by Landlord.

(b)    All pavement design shall be subject to review and approval by Tenant, and shall conform to the recommendations of an independent soils engineer selected and compensated by Landlord.

(c)    Consideration must be given to heavier use in main drives and service area.

2.    With respect to sidewalks and curbs:

(a)    Landlord shall provide and install all curbs and sidewalks including perimeter curbs and sidewalks.

(b)    All sidewalks and curbs shall be constructed of concrete and shall have a minimum slope of 1.5% and a maximum slope of 3.0% away from the Building. All sidewalks and curbs shall be a minimum of four (4) inches thick, with a rough non-skid texture (as approved by the Landlord's architect with respect to the Common Area), over a suitable granular base. Salt finish is not acceptable.

(c)    Entrance and access roads and other areas as required for suitable drainage, shall have six (6) inch curbs with 18-inch gutters; however, next to sidewalks and buildings when drainage is not a factor a straight curb six (6) inches (without gutters) above the finished paving shall be permitted. Parking lot islands and landscape enclosures shall be vertical barrier-type curbs and all integral-type curbs and gutters and vertical barrier-type curbs shall be concrete. Extruded asphalt or concrete curbing may not be used.

(d)    Curbs at all non-parking areas shall be painted red with an exterior flat red latex paint, receive a trowel finish and be designated "No Parking" by a contrasting paint color.

<u>Attachment "10"</u>

**Shopping Center Lighting Specifications**

Minimum design standards for lighting of the Shopping Center are as follows:

1.    The Developer shall prepare and submit plans showing the location and height of all light poles, fixtures, type of fixture shielding (if any), circuiting and details of the complete lighting arrangement and equipment.

2.    Illumination as measured at pavement shall be:

     a.    5.0 foot candles minimum maintained within 50' of Tenant's entry.

     b.    One and one-half (1 1/2) foot candles average maintained, measured at grade.

     c.    2.0 foot candles minimum maintained on entry drives.

3.    Twenty-five percent (25%) of the overall lighting shall be designated as security lighting (i.e., remains on from dusk to dawn).  The security lighting layout and pattern shall be subject to Tenant's approval.

4.    Selection of fixture types shall be subject to Tenant's review and approval prior to design and circuiting.

5.    Landlord shall install a seven-day time switch to control all parking area lighting wired to a common house panel.  All security lighting shall be placed on photo-cell switching.

6.    The control of parking area lights shall be accessible to Tenant's local store management due to late-night and holiday sales.

23 - Ex. "C"

Attachment "11"

## Schematic Floor Plan and Elevation

[to be added]





*CIRCUIT CITY STORES INC.*
9050 MAYLAND DRIVE
RICHMOND VA. 23233



CIRCUIT CITY
STORES INC.
9950 MAYLAND DRIVE
RICHMOND VA. 23233







SECTION SIGNS (E) & (F)

SIGN (B) LAYOUT

Customer Pick-Up

NON-ELECTRIC

SIGN (B) LAYOUT

CIRCUIT CITY

Car Stereo Installation

NON-ELECTRIC

CIRCUIT CITY
STORES INC.
9950 MAYLAND DRIVE
RICHMOND VA. 23233

SIGNS E & F

MANUFACTURE AND (2) SINGLE FACED NON ELECTRIC LUGGAGE SHAPED BUILDING
MOUNTED SIGNS AS PER DWG DESIGN :

MESSAGES:   SIGN E : · CUSTOMER PICK-UP
            SIGN F : · CIRCUIT CITY CAR STEREO INSTALLATION

MATERIALS:
SIGNS FABRICATED OF ALUMINUM WITH ALUMINUM ANGLE SPRAYED VERTICAL RED
443-314 ON ALL SURFACES.

COPY AND INSET BORDER OF BRUSHED ALUMINUM VINYL.

MOUNT SIGNS ON RESPECTIVE BACKGROUNDS WITH CONCEALED FASTENERS.

CIRCUIT CITY
SQUARE FOOTAGE CALCULATIONS

I.    36' CIRCUIT CITY

OPTION A - CALCULATIONS ON EACH OWRD

            3' X 19        57 )
                              )  90 SQ. FT. PER SET
            3' X 11'        33 )


OPTION B - CALCULATIONS ON FOUR LINES

            7' X 19'        133 SQ. FT.


OPTION C - CALCULATIONS ON EIGHT LINES

            3' X 19'        57 )
                              )  101 SQ. FT.
            4' X 11'        44 )


OPTION D - CALCULATIONS BASED ON SIZE OF EACH LETTER

        C - 32-1/2 - 8.13 SQ. FT.      C - 32-1/2 - 8.13
        I - 11-1/4 - 2.81              I - 11-1/4 - 2.81
        R - 32     - 7.96              T - 31     - 7.74
        C - 32-1/2 - 8.13              Y - 37-1/2 - 9.38
        U - 32     - 7.98                            -----
        I - 11-1/4 - 2.81                            28.06
        T - 31       7.74
                   -----
                   45.58
                   28.06
                   -----
                   73.64 SQ. FT. X 2 =

CIRCUIT CITY
SQUARE FOOT CALCULATIONS

II.    31' CIRCUIT CITY

OPTION A - 31' X 16'    41.28 ).
                                    )  69.66 SQ. FT.
             31' X 11'    28.38 )


OPTION B -  6' X 16'                96 SQ. FT.


OPTION C - 31' X 16    41.28 )
                                    )  72.06 SQ. FT.
             41' X 9     30.78 )

CIRCUIT CITY
SQUARE FOOT CALCULATIONS

III.   24" AUDIO VIDEO APPLIANCES

OPTION A - CALCULATIONS ON EACH WORD

AUDIO          - 2' X  9'-7"     -     19.16 SQ. FT.

VIDEO          - 2' X  9'-8"     -     19.32 SQ. FT.

APPLIANCES  - 2' X 19'-4"     -     38.66 SQ. FT. _____ 77.14 SQ. FT.

COMPUTERS    2' X 20'        -     40. SQ. FT.
                                     ---------------
                                     117.14 SQ. FT.


OPTION B - CALCULATIONS ON 4 LINES
                W/OUT 'COMPUTERS'        2' X 53'        106    SQ. FT.

                WITH 'COMPUTERS'         2' X 80'-8'   161.33 SQ. FT.


OPTION C - CALCULATIONS BASED ON SIZE OF EACH LETTER

| A - 22-1/2" - 3.75 SQ. FT. | A - 22-1/2" - 3.75 SQ. FT. | C - 22" - 3.6 SQ. FT. |
|---|---|---|
| U - 19 - 3.16 | P - 19 - 3.16 | O - 22 - 3.84 |
| D - 21 - 3.5 | P - 19 - 3.16 | M - 24-1/2 - 4.08 |
| I - 5 - .84 | L - 17 - 2.84 | P - 19 - 3.16 |
| O - 22 - 3.64 | I - 5 - .84 | U - 19 - 3.17 |
|  | A - 22-1/2 - 3.75 | T - 20 - 3.32 |
| V - 22 - 3.66 | N - 20-1/2 - 2.4 | E - 18 - 3. |
| I - 5 - .84 | C - 22 - 3.6 | R - 20 - 3.32 |
| D - 21 - 3.5 | E - 18 - 3. | S - 20 - 3.32 |
| E - 18 - 3. | S - 20 - 3.32 |  |
| O - 22 - 3.64 |  |  |
| ----- | ----- | ----- |
| 29.93 | 30.82 | 30.8 |

---------------------------------------------------------------
                              91.55 SQUARE FEET

CIRCUIT CITY
SQUARE FOOT CALCULATIONS

IV.   CUSTOMER PICK-UP

OPTION A - 9" X 4'-0"        3 SQ. FT.

OPTION B - 16" X 8'-0"    10.64 SQ. FT.


CIRCUIT CITY
SQUARE FOOT CALCULATIONS

V.   CIRCUIT CITY CAR STEREO INSTALLATION

OPTION A - 16" X 8'-0"     10.64 SQ. FT. (NO CIRCUIT CITY)

OPTION B - 30" X 8'-0"       20 SQ. FT.


CIRCUIT CITY
SQUARE FOOT CALCULATIONS

VI.   READER BOARD

5'0" X 12'-0"     60 SQ. FT.



SECTION SIGN Ⓖ

ALL WIRING AND MATERIAL
USED WILL BE U.L. APPROVED
AND IN ACCORDANCE WITH N.E.C.

**CIRCUIT CITY
STORES INC.**
9950 MAYLAND DRIVE
RICHMOND VA. 23233

SIGN Ⓖ LAYOUT

(8 AMPS)

Note:
Not shown on
elevation drawings

## EXHIBIT "D"

STORE FIXTURES

ALL STORAGE RACKING

ALL SECURITY SYSTEM ITEMS

TELEPHONES AND PAGING SYSTEMS

COMPUTER SYSTEM

OFFICE FURNITURE AND TRASH RECEPTACLES

BATTERY CHARGER

TRASH COMPACTOR

SIGNS (INTERIOR/EXTERIOR)

ANTENNA SYSTEM

ELECTRONIC SWITCHING

AIR COMPRESSOR (ROADSHOP)

SAFE

CONVEYOR

MEDECO CYLINDER LOCKS (5)

REFRIGERATOR AND MICROWAVE USED BY EMPLOYEES

TACK BOARDS

WATER COOLER

FIRE EXTINGUISHERS

AUDIO ROOM FIXTURES AND SWITCHGEAR

PICTURES

WAREHOUSE AND MATERIAL HANDLING EQUIPMENT (MOVABLE LADDERS, DOLLIES, ETC.)

TRACK LIGHTS (CANS ONLY, NOT TRACKS)

## EXHIBIT "E"

### SIGN PLANS AND CRITERIA

[to be added]

H:\2080-7\LEASE.RV9 [52\74] (TS#3199)

EXHIBIT "E"



**CIRCUIT CITY STORES INC.**
9950 MAYLAND DRIVE
RICHMOND VA. 23233



CIRCUIT CITY
STORES INC.
9950 MAYLAND DRIVE
RICHMOND VA. 23233

SECTION SIGNS (B) & (C)

SIGNS (B) & (C) LAYOUT

ALL WIRING AND MATERIALS
USED WILL BE U.L. APPROVED
AND IN ACCORDANCE WITH N.E.C.





CIRCUIT CITY
STORES INC.
9950 MAYLAND DRIVE
RICHMOND VA. 23233



24½"

SECTION SIGNS E & F

Customer Pick-Up
NON-ELECTRIC

SIGN E LAYOUT

CIRCUIT CITY
Car Stereo Installation
NON-ELECTRIC

SIGN F LAYOUT

SIGNS E & F

MANUFACTURE TWO (2) SINGLE FACED NON ELECTRIC SURFACE SHAPED BUILDING
MOUNTED SIGNS AS PER OUR DRAWING

MESSAGES:   SIGN E - ... 15" × 8'-0"   - CUSTOMER PICK-UP
            SIGN F - ... 30" × 8'-0"   - CIRCUIT CITY CAR STEREO INSTALLATION

MATERIALS:
SIGNS FABRICATED OF ALUMINUM WITH ALUMINUM ANGLE SPRAYED MEDICAL RED
#12-365 ON ALL SURFACES.

COPY AND INSET BORDER OF BRUSHED ALUMINUM FINISH.

MOUNT SIGNS ON RESPECTIVE BACKGROUNDS WITH CONCEALED FASTENERS.

CIRCUIT CITY
SQUARE FOOTAGE CALCULATIONS

36' CIRCUIT CITY

OPTION A - CALCULATIONS ON EACH OWRD

```
3' X 19      57 )
                 )  90 SQ. FT. PER SET
3' X 11'     33 )
```

OPTION B - CALCULATIONS ON FOUR LINES

```
7' X 19'     133 SQ. FT.
```

OPTION C - CALCULATIONS ON EIGHT LINES

```
3' X 19'     57 )
                 )  101 SQ. FT.
4' X 11'     44 )
```

OPTION D - CALCULATIONS BASED ON SIZE OF EACH LETTER

```
C - 32-1/2 - 8.13 SQ. FT.     C - 32-1/2 - 8.13
I - 11-1/4 - 2.81             I - 11-1/4 - 2.81
R - 32     - 7.96             T - 31     - 7.74
C - 32-1/2 - 8.13             Y - 37-1/2 - 9.38
U - 32     - 7.98                         -----
I - 11-1/4 - 2.81                         28.06
T - 31       7.74
             -----
             45.58
             28.06
             -----
             73.64 SQ. FT. X 2 =
```

CIRCUIT CITY
SQUARE FOOT CALCULATIONS

II.    31' CIRCUIT CITY

OPTION A - 31' X 16'    41.28 )
                                    ) 69.66 SQ. FT.
              31' X 11'    28.38 )


OPTION B -  6' X 16'                96 SQ. FT.


OPTION C - 31' X 16    41.28 )
                                    ) 72.06 SQ. FT.
              41' X 9    30.78 )

CIRCUIT CITY
SQUARE FOOT CALCULATIONS

III.    24' AUDIO VIDEO APPLIANCES

OPTION A - CALCULATIONS ON EACH WORD

| AUDIO | - 2' X 9'-7" | - | 19.16 SQ. FT. |
| VIDEO | - 2' X 9'-8" | - | 19.32 SQ. FT. |
| APPLIANCES | - 2' X 19'-4" | - | 38.66 SQ. FT. | 77.14 SQ. FT. |
| COMPUTERS | 2' X 20' | - | 40. SQ. FT. |

---------------
117.14 SQ. FT.

OPTION B - CALCULATIONS ON 4 LINES

| W/OUT 'COMPUTERS' | 2' X 53' | 106 | SQ. FT. |
| WITH 'COMPUTERS' | 2' X 80'-8" | 161.33 SQ. FT. |

OPTION C - CALCULATIONS BASED ON SIZE OF EACH LETTER

| A - 22-1/2" | - 3.75 SQ. FT. | A - 22-1/2" | - 3.75 SQ. FT. | C - 22" | - 3.6 SQ. FT. |
| U - 19 | - 3.15 | P - 19 | - 3.16 | O - 23 | - 3.84 |
| D - 21 | - 3.5 | P - 19 | - 3.16 | M - 24-1/2 | - 4.08 |
| I - 5 | - .84 | L - 17 | - 2.84 | P - 19 | - 3.15 |
| O - 23 | - 3.84 | I - 5 | - .84 | U - 19 | - 3.17 |
| | | A - 22-1/2 | - 3.75 | T - 20 | - 3.32 |
| V - 22 | - 3.66 | N - 20-1/2 | - 3.4 | E - 18 | - 3. |
| I - 5 | - 84 | C - 22 | - 3.6 | R - 20 | - 3.32 |
| D - 21 | - 3.5 | E - 18 | - 3. | S - 20 | - 3.32 |
| E - 18 | - 3. | S - 20 | - 3.32 | | |
| O - 23 | - 3.84 | | | | |

-----        -----        -----
29.93        30.82        30.8

-----------------------------------------------------------------
91.55 SQUARE FEET

CIRCUIT CITY
SQUARE FOOT CALCULATIONS

IV.   CUSTOMER PICK-UP

OPTION A -  9" X 4'-0"        3 SQ. FT.

OPTION B - 16" X 8'-0"      10.64 SQ. FT.

CIRCUIT CITY
SQUARE FOOT CALCULATIONS

V.    CIRCUIT CITY CAR STEREO INSTALLATION

OPTION A - 16" X 8'-0"     10.64 SQ. FT. (NO CIRCUIT CITY)

OPTION B - 30" X 8'-0"        20 SQ. FT.

CIRCUIT CITY
SQUARE FOOT CALCULATIONS

VI.   READER BOARD

5'0" X 12'-0"      60 SQ. FT.



SECTION SIGN Ⓖ

*CIRCUIT CITY*
*STORES INC.*
9950 MAYLAND DRIVE
RICHMOND VA. 23233

ALL WIRING AND MATERIALS
USED WILL BE U.L. APPROVED
AND IN ACCORDANCE WITH N.E.C.



SIGN Ⓖ LAYOUT

(8 AMPS)

Note:
Not shown on
Elevation Drawings

## EXHIBIT "F"

## PERMITTED ENCUMBRANCES

A.  Tenant Exclusive Uses [see paragraph 19(a)(viii)].

B.  Permitted Title Exceptions.

1.  Protective Covenants for Post Oak Park Subdivision, Section 2 as set out in Volume 313, Page 112 of the Map Records, Harris County, Texas, and those recorded under Clerk's File No. G-618013 on July 29, 1980, Real Property Records, Harris County, Texas.

2.  Supplement to Protective Covenants, Clerk's File No. G618014, dated July 7, 1980, recorded July 29, 1980 Real Property Records, Harris County, Texas, as shown on a plat recorded in Volume 296, Page 137, Map Records Harris County, Texas.

3.  Amendment to Protective Covenants, Clerk's File No. G769529, dated November 5, 1980, recorded November 21, 1980, as shown on a plat recorded in Volume 296, Page 137, Map Records Harris County, Texas.

4.  Amendment to Protective Covenants, Clerk's File No. G973701, dated February 4, 1981, recorded May 14, 1981, Real Property Records, Harris County, Texas,  as shown on a plat recorded in Volume 296, Page 137, Map Records Harris County, Texas.

5.  Amendment to Protective Covenants, Clerk's File No. H140881, dated September 10, 1981, recorded September 14, 1981, Real Property records, Harris County, Texas, as shown on a plat recorded in Volume 296, Page 137, Map Records Harris County, Texas.

6.  Amendment to Protective Covenants, Clerk's File No. H799502, dated January 31, 1983, recorded February 1, 1983, Real Property Records, Harris County, Texas, as shown on a plat recorded in Volume 296, Page 137, Map Records Harris County, Texas, as corrected by Correction Plat recorded in Volume 313, Page 112 of Map Records, Harris County, Texas.

7.  Amendment to Protective Covenants Post Oak Park, Section 2, Waiver of Mandatory Overhead pedestrian Walkways Between Parcels 1, 2, 3, 4, and 5, recorded under Clerk's File No. N070889, dated March 26, 1991, recorded March 28, 1991, Real Property Records, Harris County, Texas.

8.  Amendment to Protective Covenants Post Oak Park, Section 2, Use Requirements on Parcel 3, recorded under Clerk's File No. N861063 dated September 3, 1992,

H:\2080-7\LEASE.RV9 [52\74] (TS#3199)

filed of record September 15, 1992, Real Property Records, Harris County, Texas.

9.    Amendment to Protective Covenants Post Oak Park, Section 2, Use Requirements on Parcel 3, dated February 9, 1993, filed under Clerk's File No. P087336, February 11, 1993, Real Property Records, Harris County, Texas.

10.    Amendment to Protective Covenants Post Oak Park, Section 2, Use Requirements on Parcel 3, dated March 25, 1993, filed under Clerk's File No. P154254, March 29, 1993, Real Property Records, Harris County, Texas.

11.    Amendment to Protective Covenants Post Oak Park, Section 2, Set-back Requirements on Parcel 3, dated January 27 1994, filed under Clerk's File No. P693751, February 7, 1994, Real Property Records, Harris County, Texas.

12.    Amendment to Protective Covenants, Clerk's File No. P844519, dated May 5, 1994, recorded May 5, 1994, Real Property Records, Harris County, Texas.

13.    Amendment to Protective Covenants, Post Oak Park Subdivision, Section 2, dated March 15, 1994, recorded May 5, 1994 under Clerk's File No. P844521, Real Property Records, Harris County, Texas, also amending the Post Oaks Control Manual dated 1984 and revised January 1, 1986.

14.    Amendment to Protective Covenants Post Oak Park Subdivision, Section 2, Parcel 4A and Parcel 4B, dated April 28, 1994, recorded under Clerk's File No. P844522 May 5, 1994, Real Property Records, Harris County, Texas, shown on plats of record in Volume 296, Page 137, and Volume 313, Pages, respectively, Map Records Harris County, Texas.

15.    Amendment to Protective Covenants Post Oak Park, Section 2, Parcel 8 and Parcel 9, dated March 21, 1994, recorded under Clerk's File No. P844523, May 5, 1994, Real Property Records, Harris County, Texas.

16.    Amendment to Protective Covenants Post Oak Park, Section 2 Reduced Parcel 2, and Developer's Control Manual, Clerk's File No. R026645, dated August 25, 1994, recorded August 25, 1994, Real Property Records, Harris County, Texas.

17.    Sanitary sewer easement and building set back line 10 feet in width located along the Westerly property line (Loop 610), as reflected by the recorded plat in Volume 134, Page 25 and Volume 313, Page 112 of the Map Records of Harris County, Texas.

18.    Easement ten (10) feet in width located along the North to Northeasterly property line (Post Oak Parkway) and along the Easterly property line (Post Oak Drive), together with an unobstructed aerial easement five (5) feet in width from a plane twenty (20) feet above ground level upward as shown on the plat recorded in Volume 313, Page 112 of the Map Records of Harris County, Texas

H:\2080-7\LEASE.RV9 [52\74] (TS#3199)

19. Building Set Back Line ten (10) feet in width along the North to Northeasterly property line (Post Oak Parkway) and along the northerly portion of the Easterly property line (Post Oak Drive) as shown on the recorded plat in Volume 313, Page 112 of the Map Records, Harris County, Texas.

20. Building Set Back Line fifteen (15) feet in width located along the Southerly property line (San Felipe Road) and twenty (20) feet in width located along the Easterly (Post Oak Park Drive) and Northwesterly property lines as reflected by instrument recorded under Clerk's File No. G-618013 and amended under Clerk's File No. P-693751 of the Real Property Records, Harris County, Texas.

21. Building Set Back Line fifteen (15) feet in width located along the North to Northeasterly property line (Post Oak Parkway) as shown by instrument recorded under Clerk's File No. G-618013 and amended under Clerk's File Nos. H-140881 and P-693751 of the Real Property Records of Harris County, Texas.

22. Waste water capacity reservation and associated water rights from the City of Houston appurtenant to the Property, as shown by Warranty Deed with Vendor's Lien, recorded under Clerk's File No. R-249346 of the Real Property Records, Harris County, Texas.

23. Assignment of All Rights as Developer to Property Owner's Association of Post Oak Park, Inc., dated May 25, 1995, filed of record May 26, 1995, under Clerk's File No. R412767, Harris County, Texas.

24. Vendor's Lien retained in Deed dated January 30, 1995, recorded under Clerk's File No. R-249346, executed by TRI Realty, Inc., a Texas corporation to 601 & San Felipe, a Texas corporation, securing the payment of one note of even date therewith in the principal sum of $3,325,000.00 payable to the order of TRI Realty, Inc., additionally secured by Deed of Trust of even date therewith to Keith Chunn, Jr., Trustee, for the benefit of TRI Realty, Inc., filed for record in the office of the County Clerk of Harris County, Texas on January 30, 1995, under Clerk's File No. R-249347 of the Real Property Records, Harris County, Texas.

**Notwithstanding anything contained in this Exhibit "F" to the contrary, nothing contained herein shall be construed to prohibit the exercise of the rights and privileges granted to the Tenant under the Lease, including but not limited to the Tenant's exclusive use rights set forth in paragraph 18 of the Lease.**

## EXHIBIT "G"
## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT
### (Mortgage)

THIS AGREEMENT, dated the _____ day of _____, 199____, between
_____, a _____ ("Mortgagee"), and
CIRCUIT CITY STORES, INC., a Virginia corporation ("Tenant").

### W I T N E S S E T H :

(a) Tenant has entered into a certain lease (the "Lease") dated _____, _____
with _____
("Landlord"), covering premises located within that certain property known as
_____ Shopping Center, located in the City of _____,
_____ County, _____, and more particularly described in Schedule A hereto;
and

(b) Mortgagee has made a loan to Landlord as evidenced and secured by a Deed of Trust
recorded _____, 199_____ in the land records of _____ County,
_____, in Book _____ at page _____ (the "Mortgage"), encumbering the property
described in Schedule A; and the parties hereto desire to set forth their agreement with regard
to the priority of the Mortgage and the effect thereof on Tenant and its leasehold interest in the
aforesaid premises, as set forth below.

NOW, THEREFORE, in consideration of the premises and of the sum of One Dollar
($1.00) by each party in hand paid to the other, the receipt of which is hereby acknowledged,
the parties hereby agree as follows:

1.    The Lease is and shall be subject and subordinate to the lien of the Mortgage
insofar as it affects the real property of which the premises form a part, and to
all renewals, modifications, consolidations, replacements and extensions thereof,
to the full extent of the principal sum secured thereby and interest thereon.

2.    Tenant agrees that it will attorn to and recognize any purchaser at a foreclosure
sale under the Mortgage, any transferee who acquires the premises by deed in
lieu of foreclosure, the successors and assigns of such purchasers, as its Landlord
for the unexpired balance (and any extensions, if exercised) of the term of the
Lease upon the same terms and conditions set forth in the Lease.

3.    In the event that it should become necessary to foreclose the Mortgage,
Mortgagee thereunder will not terminate the Lease nor join Tenant in summary
or foreclosure proceedings so long as Tenant is not in default under any of the
material terms, covenants, or conditions of the Lease, beyond any applicable cure
period provided in the Lease.

4.    Mortgagee consents to the application of casualty and condemnation proceeds in
accordance with paragraphs 15 and 16 of the Lease between Landlord and
Tenant, whether or not the Mortgage is then foreclosed.

1 - Ex. "G"
(Mortgage)                                        H:\2080-7\LEASE.RV9 [52\74] (TS#3199)

5.   In the event that Mortgagee shall succeed to the interest of Landlord under the Lease, Mortgagee shall not be:
(a) liable for any act or omission of any prior lessor (including Landlord); or
(b) liable for the return of any security deposits unless delivered to Mortgagee; or
(c) bound by any rent or other periodic payments which Tenant might have paid for more than the current month to any prior lessor (including Landlord); or
(d) bound by any amendment or modification of the Lease made without its consent, which consent shall not be unreasonably withheld or delayed.

6.   Notwithstanding anything contained herein to the contrary, it is expressly understood and agreed that in the event that Landlord defaults in the payment of the Tenant Improvement Allowance, as defined in the Lease, and Mortgagee acquires title to the Shopping Center by foreclosure or otherwise, Mortgagee shall become liable for payment of the Tenant Improvement Allowance to Tenant, and Tenant shall otherwise be entitled to effect a Transfer all in accordance with the terms of the Lease. [once the TIA is paid, this paragraph shall be deleted]

7.   This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, and their successors and assigns.

IN WITNESS WHEREOF, the parties hereto have executed these presents the day and year first above written.


ATTEST:                                CIRCUIT CITY STORES, INC.,
                                       a Virginia corporation


_____                By: _____
_____                    _____



ATTEST:                                COMPANY NAME


_____                By: _____
_____                    _____



Note: Attach appropriate notary blocks for the State.

2 - Ex. "G"

## EXHIBIT "H"

### MEMORANDUM OF LEASE

This Memorandum of Lease is made this _____ day of _____, 199___, between _____, a _____ (hereinafter referred to as "Landlord"), and CIRCUIT CITY STORES, INC., a Virginia corporation (hereinafter referred to as "Tenant").

### W I T N E S S E T H :

Landlord and Tenant have entered into a Lease (the "Lease") dated _____, 199___, whereby Landlord has leased to Tenant a portion of the real property (the "Property"), _____, _____ County, _____, the legal description of which Property is set forth on Exhibit "A-1" attached hereto, together with certain non-exclusive easements in, over, under, upon, across and through certain areas of Landlord's Premises. The Lease contains provisions and rights appurtenant to the Property, some of which are as follows:

I.   Term.  The term of the Lease is for a period of _____ (____) years, commencing on the Commencement Date (as established in the Lease based upon the substantial completion of the improvements upon the Property).  Thereafter, Tenant has the right under the Lease to renew and extend the term of the Lease for four (4) successive periods of five (5) years each.

II.  Exclusive Use Rights.  The Lease provides that Tenant shall enjoy the sole and exclusive privilege in the Shopping Center located on the Property to sell or rent consumer, office and automotive electronics products (which include, but shall not be limited to, televisions, stereos, speakers and video recorders and players), computer hardware and software, entertainment software and entertainment media (which include, but shall not be limited to, records, game cartridges, video tapes, cassettes and compact discs), cellular telephones, household appliances (which include, but shall not be limited to, refrigerators, freezers, stoves, microwave ovens, vacuum cleaners and dishwashers) and related goods, and the sale and installation of motor vehicle audio, stereo and telephone systems.

III. Successors.  The covenants, conditions and agreements made and entered into by the parties hereto shall be binding upon and inure to the benefits of their respective heirs, administrators, executors, representatives, successors and assigns.

IV.  Incorporation of Lease.   All terms and conditions of the Lease are hereby incorporated herein by reference as if fully set forth herein.

V.   Conflicts with Lease.  This Memorandum of Lease is solely for notice and recording purposes and shall not be construed to alter modify, expand, diminish

or supplement the provisions of the Lease.  In the event of any inconsistency between the provisions of this Memorandum of Lease and the provisions of the Lease, the provisions of the Lease shall govern.

IN WITNESS WHEREOF, this Memorandum of Lease has been duly executed by the parties hereto as of the day and year first above written.

Attest:                                         a _____

By:_____          By: _____
      Secretary                              Name: _____
                                             Title: _____



                                        CIRCUIT CITY STORES, INC.,
Attest:                                 a Virginia corporation


By:_____          By: _____
      Secretary                              Name: _____
                                             Title: _____



Note: Attach appropriate notary blocks for the State.

## EXHIBIT "I"

## COMMENCEMENT DATE AGREEMENT

THIS AGREEMENT, made as of this ____ day of _____, 19__, between _____ (herein called "Landlord"), and CIRCUIT CITY STORES, INC. (herein called "Tenant").

## W I T N E S S E T H:

WHEREAS, Landlord is the owner of certain premises situated in _____, _____ County, _____ (herein called the "Premises"); and

WHEREAS, by that certain lease dated _____, 19__ (herein called the "Lease"), Landlord leased the Premises to Tenant; and

WHEREAS, a memorandum or short form lease in respect of the Lease was recorded in the office of the Clerk of _____ County, _____, on the ____ day of _____, 19__, in Book _____ at Page ____; and

WHEREAS, Tenant is in possession of the Premises and the term of the Lease has commenced; and

WHEREAS, under Paragraph 25 of the Lease, Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease;

NOW, THEREFORE, Landlord and Tenant agree as follows:

1. The term of the Lease commenced on, and the Commencement Date (as such term is defined in the Lease) was, _____, 19__. The term of the Lease shall expire on January 31, ____ unless Tenant exercises any option to extend the term of the Lease or unless the Lease terminates earlier as provided in the Lease.

2. The date of commencement of the first "Option Period" (as such term is defined in the Lease) shall be February 1, ____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, ____ unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

3. The date of commencement of the second Option Period shall be February 1, ____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, ____ unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

H:\2080-7\LEASE.RV9 [52\74] (TS#3199)

4. The date of commencement of the third Option Period shall be February 1, _____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, _____ unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

5. The date of commencement of the fourth Option Period shall be February 1, _____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, _____ unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

6. The date of commencement of the fifth Option Period shall be February 1, _____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, _____ unless the Lease terminates earlier as provided in the Lease.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed the day and year first above written.

Attest or Witness:

_____     By: _____

Attest:                        CIRCUIT CITY STORES, INC.

_____     By: _____
Assistant Secretary                Vice President

H:\2080-7\LEASE.RV9 [52\74] (TS#3199)

## EXHIBIT "J"

## INDEMNIFICATION AGREEMENT

This Indemnification Agreement is made this _____ day of _____, 199__, between _____, a _____ (hereinafter referred to as "Landlord") and CIRCUIT CITY STORES, INC., a Virginia corporation (hereinafter referred to as "Tenant").

## WITNESSETH

Landlord and Tenant have entered into a Lease (the "Lease") dated _____ whereby Landlord has leased to Tenant a portion of the real property located in _____, _____ County, _____ (the "Shopping Center") and Tenant has constructed on such real property a store premises (the "Premises").

NOW, THEREFORE, in consideration of the payment of the Tenant Improvement Allowance as defined in the Lease and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.    The Tenant hereby indemnifies and agrees to hold the Landlord harmless from any loss, payment, claim or expense as the result of mechanics and materialmen filing liens or otherwise making claims against Landlord's interest in the Premises and the Shopping Center. In the event that any mechanic, materialman or other claimant makes claim against the Premises or Shopping Center based upon materials or services provided under contract with the Tenant, the Tenant shall hold harmless and protect the Landlord from any loss, payment, claim or expense related thereto, and shall take measures needed to prevent such a lien from adversely affecting Landlord's ability to obtain financing for the Shopping Center.

2.    The Tenant reserves the right to contest in good faith the amount of any claim or lien assessed against the Premises or the Shopping Center by any of such claimants; provided, however, should the holder or holders of such claim or lien attempt to enforce their lien by foreclosure by any other means, the Tenant shall bond around, pay or remove such lien by any manner reasonably necessary to protect Landlord's interest in the Premises and the Shopping Center. This indemnity and hold harmless shall not apply to any liens or claims caused by the Landlord or Landlord's agents.

H:\2080-7\LEASE.RV9 [52\74] (TS#3199)

EXECUTED this _____ day of _____, 199__.

**LANDLORD**

_____

By:     _____
Name:   _____
Title:  _____

**TENANT**

CIRCUIT CITY STORES, INC.,
a Virginia corporation


By: _____
Name: _____
Title: _____