Gregg M. Galardi, Esq.                  Dion W. Hayes (VSB No. 34304)
Ian S. Fredericks, Esq.                 Douglas M. Foley (VSB No. 34364)
SKADDEN, ARPS, SLATE, MEAGHER &         MCGUIREWOODS LLP
FLOM, LLP                               One James Center
One Rodney Square                       901 E. Cary Street
PO Box 636                              Richmond, Virginia 23219
Wilmington, Delaware 19899-0636         (804) 775-1000
(302) 651-3000

                - and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
333 West Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

Counsel to the Debtors and
Debtors in Possession

                IN THE UNITED STATES BANKRUPTCY COURT
                 FOR THE EASTERN DISTRICT OF VIRGINIA
                          RICHMOND DIVISION

- - - - - - - - - - - - - - x
In re:                      :   Chapter 11
                            :
CIRCUIT CITY STORES, INC.,  :   Case No. 08-35653 (KRH)
et al.,                     :
                            :
                            :   Jointly Administered
            Debtors.        x
- - - - - - - - - - - - - -

**MOTION FOR ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105
AND 363 AND BANKRUPTCY RULE 9019 (I) APPROVING COMMUTATION
AND RELEASE AGREEMENT BETWEEN CIRCUIT CITY STORES, INC. AND
NORTHERN NATIONAL INSURANCE LTD., (II) AUTHORIZING CIRCUIT
CITY STORES, INC. TO ENGAGE IN AFFILIATE TRANSACTIONS WITH
NORTHERN NATIONAL INSURANCE LTD., AND
(III) APPROVING CIRCUIT CITY STORES, INC.'S AUTHORIZATION
OF NORTHERN NATIONAL INSURANCE LTD.'S COMMENCEMENT OF
LIQUIDATION PROCEEDINGS**

        Circuit City Stores, Inc. ("Circuit City") and

its affiliated debtors and debtors in possession in the

above-captioned jointly administered cases (the "Debt-

ors")[1] hereby move (the "Motion"), pursuant to sections

105 and 363 of title 11 of the United States Code (the

"Bankruptcy Code") and Rule 9019 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), for entry

of an order (I) approving a Commutation and Release

Agreement between Circuit City and Northern National In-

surance Ltd. ("Northern National"), (II) authorizing

Circuit City to engage in affiliate transactions with

Northern National, and (III) approving Circuit City's

authorization of Northern National's commencement of

liquidation proceedings.  In support of the Motion, the

Debtors respectfully represent as follows:

---

[1]  The Debtors and the last four digits of their respective taxpayer
identification numbers are as follows: Circuit City Stores, Inc.
(3875), Circuit City Stores West Coast, Inc. (0785), InterTAN,
Inc. (0875), Ventoux International, Inc. (1838), Circuit City
Purchasing Company, LLC (5170), CC Aviation, LLC (0841), CC Dis-
tribution Company of Virginia, Inc. (2821), Circuit City Proper-
ties, LLC (3353), Kinzer Technology, LLC (2157), Abbott Advertis-
ing Agency, Inc. (4659), Patapsco Designs, Inc.(6796), Sky Ven-
ture Corp. (0311), Prahs, Inc.(n/a), XSStuff, LLC (9263), Mayland
MN, LLC (6116), Courchevel, LLC (n/a), Orbyx Electronics, LLC
(3360), and Circuit City Stores PR, LLC (5512).  The address for
Circuit City Stores West Coast, Inc. is 9250 Sheridan Boulevard,
Westminster, Colorado 80031.  For all other Debtors, the address
is 9954 Mayland Drive, Richmond, Virginia 23233.

**JURISDICTION AND VENUE**

1.    This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.    The statutory predicates for the relief requested herein are Bankruptcy Code sections 105 and 363 and Bankruptcy Rule 9019.

**BACKGROUND**

3.    On November 10, 2008 (the "Petition Date"), the Debtors filed voluntary petitions in this Court for relief under chapter 11 of the Bankruptcy Code.

4.    On January 12, 2009, the Court entered an order authorizing the Debtors to conduct auctions for a sale or sales of the Debtors' businesses as a going con-cern or for liquidation (D.I. 1460).

5.    At the conclusion of the auction, the Debtors determined that the highest and otherwise best bid was that of Great American Group WF, LLC, Hudson Capital Partners, LLC, SB Capital Group, LLC, and Tiger Capital Group, LLC (collectively, the "Agent").  On

January 16, 2009, the Court approved the Agent's bid and
authorized the Debtors to conduct going out of business
sales at the Debtors' remaining stores (D.I. 1634).  The
Agent commenced going out of business sales at the Debt-
ors' remaining stores on January 17, 2009.

### RELIEF REQUESTED

6.   By this Motion, the Movants seek entry of
an order, substantially in the form attached (the "Or-
der") (I) authorizing, but not requiring, Circuit City
to enter into the Commutation and Release Agreement with
Northern National and to comply with its obligations
thereunder, (II) authorizing, but not requiring, Circuit
City to engage in affiliate transactions with Northern
National, and, (III) approving Circuit City 's authori-
zation of Northern National's commencement of liquida-
tion proceedings.

4

## BASIS FOR RELIEF

**A.    Northern National and the Green Island Pools.**

7.    Northern National is a direct, wholly owned subsidiary of Circuit City.[2]  Northern National was organized under the laws of Bermuda, and is engaged in the business of insurance and reinsurance.  Primarily, Northern National was formed for the purpose of providing insurance to the Debtors in an amount sufficient to cover the Debtors' deductibles under their third party insurance agreements.

8.    In order to reallocate and diversify risk under its various insurance contracts, Northern National participated in the 2007 and 2008 Green Island Reinsurance Pools, as well as the 2007 and 2008 Green Island Loss Stabilization Reinsurance Pools (collectively, the "Green Island Pools" or the "Pools").  As a participant of the Pools, Northern National ceded certain of its insurance risks to the other participants of the Pools,

---

[2]    Although Northern National is a direct, wholly owned subsidiary of Circuit, Northern National operates with separate officers, directors and employees.  That said, certain of these representatives are also officers and employees of Circuit City.

while at the same time assuming for itself risks from all other participants of the Green Island Pools.

**B.    The Pre-Petition Relationship And Wind-Down Efforts.**

9.    The Debtors and Northern National were (and in certain instances are) parties to various contracts of insurance (collectively, the "Insurance Contracts").  At different times during the course of their relationship, the Debtors contracted with Northern National to provide workers' compensation, general liability, and automobile liability insurance sufficient to cover the deductibles under the Debtors' third party insurance contracts.

10.    However, beginning in 2008, Circuit City determined that utilizing Northern National for purposes of insuring the Debtors' insurance deductibles was no longer optimal.  As a result, Circuit City began to wind-down Northern National's affairs.

11.    To that end, Northern National entered into a series of commutation and release agreements.

12.    In particular, Circuit City and Northern National entered into a Commutation and Release Agreement with an effective date of September 1, 2008 (the

6

"September Commutation and Release Agreement"), whereby
Circuit City assumed all obligations associated with
general liability and automobile policies, as well as
certain workers' compensation policies.  Also, pursuant
to the September Commutation and Release Agreement, Cir-
cuit City and Northern National released all claims
against each other.

13.  As a result of the September Commutation
and Release Agreement, Northern National has no further
liability to Circuit City for the Insurance Contracts
Circuit City assumed thereunder.

14.  Similarly, Northern National terminated
its relationship with the Pools.  Northern National and
other participants of the Green Island Pools executed
the Limited Commutation, Termination and Release Agree-
ment (the "Green Island Commutation Agreement"), with an
effective date of September 30, 2008.

15.  Pursuant to the terms of the Green Island
Commutation Agreement, Northern National and the Pools'
participants fully and finally settled and commuted all
ceded and assumed liabilities resulting from Northern
National's participation in the Pools.  The Pools' par-

ticipants agreed to pay Northern National the aggregate sum of $2,723,580 (the "Ceded Liability Commutation Amount") as the total amount due in full and final settlement of the liabilities ceded to Northern National during its participation in the Pools for the 2007 calendar year. Likewise, Northern National agreed to pay the Pools' participants the aggregate sum of $3,933,190 (the "Assumed Liability Commutation Amount") as the total amount due in full and final settlement of the liabilities assumed by the Pools' participants during Northern National's participation in the Pools for the 2007 calendar year. The result was a net payment by Northern National to the Pools' participants in the amount of $1,209,610, which amount was paid on March 13, 2009. Moreover, the Green Island Commutation Agreement effectively terminated Northern National's agreement to participate in the Green Island Pools during the 2008 calendar year from its inception.

16. Accordingly, Northern National was released from any further liability for losses stemming from its participation in the Pools upon the effective date of the Green Island Commutation Agreement.

8

**C.    The Remaining Relationship Between Circuit City And Northern National.**

17.    At present, Circuit City and Northern National are only parties to two Insurance Contracts.  Under these contracts, Northern National insures Circuit City's workers' compensation insurance deductibles.

18.    Given that Northern National has terminated its participation in the Pools and only acts as an insurer under two Insurance Contracts with Circuit City, Circuit City and Northern National have determined that Northern National should liquidate its assets for the benefit of its stakeholders.

19.    As part of these liquidation efforts, it is necessary for Northern National and Circuit City to terminate the remaining two Insurance Contracts and related obligations.  Because Circuit City is obligated to pay the deductibles regardless of whether Northern National would ultimately provide coverage under the Insurance Contracts, the consequences of terminating the Insurance Contracts are minimal, if any.  Indeed, as discussed below, there are significant benefits that will inure to the Debtors and their estates.  Conse-

9

quently, Circuit City has agreed to release Northern National from its duties and obligations under the Insurance Contracts.

**D.    The Commutation and Release Agreement.**

20.   To memorialize the parties' agreement, Circuit City and Northern National negotiated and entered into the Commutation and Release Agreement (the "Commutation and Release Agreement"), in substantially the form attached as <u>Exhibit A</u>.  The significant terms of the Commutation and Release Agreement are as follows:[3]

(a) Northern National shall be deemed to have ceased to be a party to the Insurance Contracts as of March 1, 2009;

(b) Northern National shall pay Circuit City US$6,392,755.00 (the "Commutation Amount"), within sixty (60) business days of the execution of the Commutation and Release Agreement by Northern National and Circuit City;

(c) Upon receipt by Circuit City of the Commutation Amount, the Insurance Contracts will be irrevocably commuted and terminated, and Circuit City agrees to discharge Northern National from any and all liability of whatever kind or character arising out of, or in connection with, the Insurance Contracts;

---

[3]   In the event of any discrepancy between the Commutation and Release Agreement and this summary of the Commutation and Release Agreement, the provisions of the Commutation and Release Agreement are controlling.

(d) Circuit City agrees to undertake all former liabilities of Northern National howsoever arising under the Insurance Contracts.  Circuit City also agrees to assume all liabilities arising from all claims, proceedings, costs, demands, expenses, charges, losses, or liabilities of whatever kind or character in connection therewith;

(e) Payment of the Commutation Amount shall constitute full and final settlement of all liabilities, costs and expenses whether known or unknown as at the assumption date in relation to the Insurance Contracts;

(f) In the event Northern National fails to pay the Commutation Amount, Circuit City may, at its option, rescind the Commutation and Release Agreement; and,

(g) Payment of the full Commutation Amount shall constitute between the parties, their predecessors, successors, affiliates, subsidiaries, agents, officers, directors, shareholders, and assigns an irrevocable mutual release and discharge from any and all rights, liabilities, duties and obligations, present and future payment obligations, adjustments, executions, offsets, actions, causes of action, suits, debts, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, claims, demands, and/or losses, whatsoever and howsoever arising under or in connection with the Insurance Contracts.

21.  As will be discussed below, the Commutation Amount will be offset against Circuit City's outstanding obligation due under a promissory note in favor of Northern National.

11

22.   The Debtors believe that the Commutation and Release Agreement is in the best interests of the Debtors and their estates and creditors.

**E.    The Affiliate Transactions.**

23.   Currently, in addition to the outstanding promissory note with the Debtors, Northern National's assets total approximately $9 million.  These assets consist mostly of loss reserve accounts (the "Loss Reserve Accounts"), which were set aside to satisfy valid claims under Northern National's insurance contracts.

24.   In order to further wind down Northern National for the benefit of its creditors and Circuit City as the sole shareholder of Northern National, Circuit City and Northern National have agreed to enter into a series of affiliate transactions (the "Affiliate Transactions").

25.   The Affiliate Transactions include: (1) repayment of a $10 million promissory note by Circuit City in favor of Northern National and, (2) the issuance of four dividends (collectively, the "Dividends") by Northern National for the benefit of Circuit City.

12

26.   Unless expressly stated to the contrary, the Affiliate Transactions will take the form of book entries.  In any event, no funds will be transferred from the Debtors' bankruptcy estates to Northern National on account of any Affiliate Transaction described herein.

**(1) Repayment of the Note and the First Two Dividends.**

27.   In February of 2001, Circuit City and Northern National executed a revolving note (the "Note"), under the terms of which, Circuit City was permitted to borrow sums up to $35 million from Northern National.  A copy of the Note is attached hereto as <u>Exhibit B</u>.

28.   Circuit City has outstanding indebtedness under the Note in the amount of $10 million.

29.   Northern National and Circuit City have agreed that Circuit City will repay the $10 million obligation.  In order to effectuate repayment of the Note, Northern National will declare a dividend of $3,607,245.00 (the "First Dividend") in favor of Circuit City as sole the shareholder of Northern National.  The First Dividend, combined with the Commutation Amount of

13

$6,392,755.00, will offset Circuit City's liability un-
der the Note.

30.    Northern National will then declare a
second dividend (the "Second Dividend") in the approxi-
mate amount of $4,800,000.00 in favor of Circuit City,
which funds will actually be transferred from Northern
National to Circuit City.

**(2) The Third Dividend.**

31.    As a consequence of these transactions,
Circuit City will incur certain tax liabilities, includ-
ing income tax, deferred tax, and interest.  In order to
satisfy these liabilities, Northern National will de-
clare a third dividend (the "Third Dividend") in favor
of Circuit City in the approximate amount of
$5,347,668.00.  Because this dividend is intended to
satisfy tax obligations, it will solely take the form of
a book entry; no cash will be transferred from Northern
National for the benefit of Circuit City on account of
this dividend.

**(3) Surrender of Insurance License and Issuance of
Final Dividend.**

14

32.  After repayment of the Note and issuance of the First, Second, and Third Dividends, Northern National will have approximately $4,200,000.00 cash and capital remaining in its Loss Reserve Accounts.

33.  In order to effectively wind down its operations, Northern National must surrender its Certificate of Registration (insurance license) to the Bermuda Monetary Authority (the "BMA").  Northern National estimates that surrender of the Certificate of Registration will occur between four and five weeks after execution of the Commutation and Release Agreement.

34.  Upon acceptance of Northern National's Certificate of Registration by the BMA, Northern National will then declare a fourth and final dividend (the "Final Dividend") of approximately $4,100,000.00 in favor of Circuit City.

35.  After the Final Dividend is distributed to Circuit City, Northern National will have approximately $271,182 in cash and capital remaining in its Loss Reserve Accounts as it commences liquidation.

36.  By structuring the Affiliate Transactions in this way, the Affiliate Transactions will maximize

15

the value of the Debtors' bankruptcy estates and result
in certain tax benefits that are beneficial to the Debt-
ors and their estates.

**F.    The Authorization.**

37.    Northern National has engaged KPMG Advi-
sory Limited ("KPMG") to act as liquidator and conduct a
liquidation of all of Northern National's assets.

38.    Once the assumption of the Insurance Con-
tracts and releases under the Commutation and Release
Agreement become effective and the Affiliate Transac-
tions are finalized, Northern National will have very
few creditors and outstanding obligations.  Indeed,
other than amounts due to KPMG, legal fees, and miscel-
laneous obligations owed to, among others, Marsh Manage-
ment Services (Bermuda) Ltd., Northern National's cap-
tive manager, for services rendered through the effec-
tive date of Northern National's liquidation, Northern
National will have no significant creditors or out-
standing obligations.

39.    Indeed, after the Affiliate Transactions
are consummated, Northern National will have $271,182
remaining in the Loss Reserve Accounts to satisfy the

16

foregoing creditor claims.  Northern National estimates
that its outstanding obligations upon the effective date
of its liquidation will be approximately $125,000.  Any
sums remaining in the Loss Reserve Accounts after satis-
faction of creditor claims will be paid to Circuit City
in its capacity as the sole shareholder of Northern Na-
tional.

40.  As the sole shareholder of Northern Na-
tional, Circuit City must approve the proposed liquida-
tion of Northern National before any formal liquidation
proceedings can commence.  In light of the foregoing,
Circuit City has determined, in its business judgment,
that the liquidation of Northern National is in the best
interests of Northern National and the Debtors and their
estates.

## APPLICABLE AUTHORITY

**I.    APPROVAL OF THE COMMUTATION AND RELEASE AGREEMENT
       IS WARRANTED UNDER BANKRUPTCY RULE 9019 AND
       BANKRUPTCY CODE SECTION 105(a).**

41.  Bankruptcy Rule 9019 provides that the
Court "may approve a compromise or settlement."  Compro-
mises are tools for expediting the administration of the
case and reducing administrative costs and are favored

in bankruptcy.   See In re Bond, 1994 U.S. App. Lexis

1282, *9-*14 (4th Cir. 1994)("To minimize litigation and

expedite the administration of a bankruptcy estate,

'compromises are favored in bankruptcy'."); Fogel v.

Zell, 221 F.3d 955, 960 (7th Cir. 2000); In re Martin,

91 F.3d 389, 393 (3d Cir. 1996).   Various courts have

endorsed the use of Bankruptcy Rule 9019.   See, e.g.,

Bartel v. Bar Harbour Airways, Inc., 196 B.R. 268

(S.D.N.Y. 1996); In re Foundation for New Era Philan-

thropy, Case No. 95-13729B, 1996 Bankr. LEXIS 1892

(Bankr. E.D. Pa. Aug. 21, 1996); In re Miller, 148 B.R.

510, 516 (Bankr. N.D. Ill. 1992); In re Check Reporting

Service, Inc., 137 B.R. 653 (Bankr. W.D. Mich. 1992); In

re Patel, 43 B.R. 500, 504 (N.D. Ill. 1982).

    42.   The standards by which a Court should

evaluate a settlement are well established.   In addition

to considering the proposed terms of the settlement, the

Court should consider the following factors:

    (a)   the probability of success in litigation;

    (b)   the difficulty in collecting any judgment
          that may be obtained;

    (c)   the complexity of the litigation involved,
          and the expense inconvenience and delay

necessarily attendant to it; and

(d)  the interest of creditors and stockhold-
     ers and a proper deference to their rea-
     sonable views of the settlement.

See Protective Comm. for Indep. Stockholders of TMT

Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424-245

(1968); United States ex. Rel. Rahman v. Oncology Assoc.,

P.C., 269 B.R. 139, 152 (D. Md. 2001); In re Frye, 216

B.R. 166, 174 (E.D. Va. 1997).

43.  The decision to approve a settlement or

compromise is within the discretion of the Court and is

warranted where the settlement is found to be reasonable

and fair in light of the particular circumstances of the

case.  See TMT Trailer Ferry, 390 U.S. at 424-25.  The

settlement need not be the best that the debtor could

have achieved, but need only fall "within the reasonable

range of litigation possibilities."  In re Telesphere

Communications, Inc., 179 B.R. 544, 553 (Bankr. N.D. Ill.

1994).  In making its determination, a court should not

substitute its own judgment for that of the debtor.  In

re Neshaminy Office Bldg. Assoc., 62 B.R. 798, 803 (E.D.

Pa. 1986).

19

44.    The proposed Commutation and Release Agreement between Circuit City and Northern National meets the standards for approval under applicable law. As set forth above, Circuit City is assuming obligations under the Insurance Contracts for which it is already obligated to pay.  In other words, if Northern National was unable to meet its obligations to Circuit City under the Insurance Contracts, Circuit City would still be liable to third parties for the deductible portions of its third party insurance contracts.  Additionally, the Commutation Amount will be offset against Circuit City's outstanding obligation under the Note.  After Circuit City repays the Note, it will immediately receive a significant portion of the Loss Reserves in the form of dividends, as opposed to sometime in the future after all claims under the Insurance Contracts have been resolved.  And, entry into the Commutation and Release Agreement enables Northern National to expedite its liquidation, which should result in an additional distribution to Circuit City, as the sole shareholder of Northern National.  Thus, the Commutation and Release Agreement represents a fair and reasonable compromise of the

20

parties' claims.  Moreover, the Commutation and Release Agreement ensures a maximum recovery for the Debtors' estates.

45.  Accordingly, for the reasons detailed herein, the Debtors have determined that entry into the Commutation and Release Agreement is in their best interests and the best interests of their estates, creditors and parties in interest.  Therefore, the Debtors seek approval of the Commutation and Release Agreement under Bankruptcy Rule 9019.

46.  Additionally, Bankruptcy Code section 105 provides in pertinent part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  As noted above, approval of the Commutation and Release Agreement furthers the Debtors' efforts to resolve claims in a manner that benefits the Debtors and is fair and equitable to other parties in interest.

47.  Accordingly, granting the relief requested herein is justified under Bankruptcy Code section 105.

21

II.   **APPROVAL OF THE AFFILIATE TRANSACTIONS AND THE
      AUTHORIZATION IS WARRANTED UNDER BANKRUPTCY CODE
      SECTIONS 105(a) AND 363(b)(1).**

48.   Under Bankruptcy Code section 363, a
bankruptcy court is empowered to authorize a chapter 11
debtor to expend funds in the bankruptcy court's discre-
tion outside of the ordinary course of business.  See 11
U.S.C. § 363.  In order to obtain approval for the use
of estate assets outside the ordinary course of business,
the debtor must articulate a valid business justifica-
tion for the requested use.  See In re Ionosphere Clubs,
Inc., 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1985).  Moreover,
Bankruptcy Code section 105(a) provides that "[t]he
Court may issue any order, process, or judgment that is
necessary or appropriate to carry out the provisions of
this title."  11 U.S.C. § 105(a).

49.   Based upon the results of their analysis,
the Debtors' management and advisors have concluded that
repayment of the $10 million Note and the issuance of
the Dividends to Circuit City, as the sole shareholder
of Northern National, will maximize the value of the
Debtors' estates.  The Affiliate Transactions will also
result in certain tax benefits that will ultimately in-

22

ure to the benefit of the Debtors' estates and their
creditors.  Maximizing the value of the Debtors' bank-
ruptcy estates is a sound business purpose that warrants
authorizing repayment of the Note.  Moreover, the Af-
filiate Transactions will predominantly take the form of
book entries; the Debtors will not actually expend funds
from their bankruptcy estates in order to satisfy the
obligation due under the Note.  Thus, there is more than
sufficient business justification for entry into the Af-
filiate Transactions and repayment of the Note there-
under.

        50.  Thus, Circuit City believes that the Af-
filiate Transactions represent the best possible trans-
actions under the circumstances for the benefit of
Northern National and Circuit City, as its sole share-
holder.

        51.  In addition, Circuit City's Board of Di-
rectors, management and advisors have concluded that
liquidation of Northern National will maximize recover-
ies for the Debtors' estates.  Northern National has few
creditors and *de minimus* liabilities and any funds re-
maining in the Loss Reserve Accounts after satisfying

its creditors will inure to the benefit of Circuit City
as the sole shareholder of Northern National.

52.   Accordingly, the Debtors believe that the
Commutation and Release Agreement, the Affiliate Trans-
actions, and the Authorization are in the best interests
of the Movants, their estates and creditors.

53.   For all of the foregoing reasons, the re-
lief requested herein should be granted.

## NOTICE

54.   Notice of this Motion has been provided
to those parties entitled to notice under the Order Pur-
suant to Bankruptcy Code Sections 102 and 105, Bank-
ruptcy Rules 2002 and 9007, and Local Bankruptcy Rules
2002-1 and 9013-1 Establishing Certain Notice, Case Man-
agement, and Administrative Procedures (D.I. 130; the
"Case Management Order").   The Debtors submit that, un-
der the circumstances, no other or further notice need
be given.

## WAIVER OF MEMORANDUM OF LAW

55.   Pursuant to Local Bankruptcy Rule 9013-
1(G), and because there are no novel issues of law pre-
sented in the Motion and all applicable authority is set

24

forth in the Motion, the Movants request that the re-

quirement that all motions be accompanied by a separate

memorandum of law be waived.

### NO PRIOR REQUEST

56.  No previous request for the relief sought

herein has been made to this Court or any other court.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an Order, substantially in the form annexed hereto, granting the relief requested herein and such other and further relief as may be just and proper.

Dated: March 26, 2009      SKADDEN, ARPS, SLATE, MEAGHER &
      Richmond, Virginia  FLOM, LLP
      Gregg M. Galardi, Esq.
      Ian S. Fredericks, Esq.
      P.O. Box 636
      Wilmington, Delaware 19899-0636
      (302) 651-3000

              - and -

      SKADDEN, ARPS, SLATE, MEAGHER &
      FLOM, LLP
      Chris L. Dickerson, Esq.
      333 West Wacker Drive
      Chicago, Illinois 60606
      (312) 407-0700

              - and -

      MCGUIREWOODS LLP

      /s/ Douglas M. Foley            .
      Dion W. Hayes (VSB No. 34304)
      Douglas M. Foley (VSB No. 34364)
      One James Center
      901 E. Cary Street
      Richmond, Virginia 23219
      (804) 775-1000

      Counsel for Debtors and Debtors
      in Possession

## EXHIBIT A

**(Commutation and Release Agreement)**

# COMMUTATION AND RELEASE AGREEMENT

THIS COMMUTATION AND RELEASE AGREEMENT (the "Agreement") is made as of the 1st. day of March, 2009 between Northern National Insurance Ltd., a company incorporated under the laws of Bermuda and whose registered office is at Canon's Court, 22 Victoria Street, Hamilton HM 12, Bermuda (hereinafter called "the Insurer") of the first part and Circuit City Stores Inc., a company incorporated under the laws of the State of Virginia in the United States of America and whose registered office is at 9954 Mayland Drive, Richmond, Virginia 23233, U.S.A. (hereinafter called "the Insured") of the second part.

WHEREAS:-

(A)     The Insurer is a party to various contracts of insurance with the Insured (the "Contracts") as more particularly set forth in the schedule annexed hereto ("Schedule A").

(B)     The Insurer wishes to be discharged from all liabilities and obligations owed to the Insured under the Contracts.

(C)     The Insured, in consideration of acquiring the Insurer's rights under the Contracts, has agreed to assume all liabilities thereunder.

(D)     The Insured has consented and agreed to release the Insurer from any and all liabilities and obligations under the Contracts.

NOW THIS AGREEMENT WITNESSETH AS FOLLOWS:-

1.     The Insurer shall be deemed to have ceased to be a party to the Contracts as of 12:01 a.m. Eastern Standard Time on the 1st. day March, 2009.

2.     Upon receipt by the Insured of the Commutation Amount (as defined below) and with no further action required, the Contracts will be irrevocably commuted and terminated, and the Insured hereby releases and discharges the Insurer from any and all liability of whatever kind or character arising out of, or in connection with, the Contracts.

3.     The Insured covenants with, and undertakes that, it will meet all the former liabilities of the Insurer howsoever arising under the Contracts and hereby undertakes to assume all liabilities arising from all claims, proceedings, costs, demands, expenses, charges, losses or liabilities of whatever kind or character in connection therewith.

4.     Pursuant to the assumption by the Insured of any and all outstanding liabilities under the Contracts, the Insurer, in consideration of the Insured assuming such liabilities, hereby agrees to transfer, to the account of the Insured, at Wachovia Bank, account number: 2055275431509 (ABA# 05140049) the sum of US$6,392,755 (US Dollars six million, three hundred and ninety-two thousand, seven hundred and fifty-five) (the "Commutation Amount"), within 60 business days of the execution of this Agreement by both the Insurer and the Insured, in full and final settlement of all liabilities, costs and expenses whether known or unknown as at the assumption date in relation to the Contracts.

5.     Notwithstanding any other provisions of this Agreement, in the event the Insurer fails to transfer the foregoing funds in the amount and manner specified in Clause 4, the Insured may, at its

discretion, rescind this Agreement by written notice to the Insurer at its address set forth above, and this Agreement shall then be null and void.

6.      Payment of the full Commutation Amount by the Insurer in accordance with clause 4 above shall constitute between the Parties, their predecessors, successors, affiliates, subsidiaries, agents, officers, directors, shareholders, and assigns an irrevocable mutual release and discharge from any and all rights, liabilities, duties and obligations, present and future payment obligations, adjustments, executions, offsets, actions, causes of action, suits, debts, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, judgements, claims, demands, and/or losses, whatsoever and howsoever arising under or in connection with the Contracts, whether in contract, tort, equity or otherwise, and whether presently known or unknown, certain or contingent, reported  or unreported, present, past or future, and whether or not the amount thereof is fixed or unliquidated, or the Contracts are void or voidable.

7.      The rights, duties and obligations set forth herein shall inure to the benefit of and be binding upon any and all the predecessors, parents, successors, affiliates, officers, directors, employees, subsidiaries, stockholders, liquidators, receivers and assigns of the parities hereto.

Warranties

Each of the Parties expressly represents and warrants that

(i)      it has not assigned or purported to assign any of its rights or obligations under any of the Contracts; and

(ii)      it is duly incorporated with power to enter into this Agreement and to exercise rights and perform obligations under it; all necessary authorisations and approvals, required to enable it to enter into and perform and comply with its obligations under this Agreement have been obtained and are in full force and effect; the persons executing this Agreement have the necessary and appropriate authority to do so; and the making and performance of this Agreement will not violate any provisions of applicable law or its articles of incorporation or bylaws (or similar organizational documents).

Avoidance

None of the Parties shall seek to re-open or set aside this Agreement or any of the Contracts on any grounds whatsoever, including, without limitation, that this Agreement or any of the Contracts are void or voidable or on the basis that any of the parties in the future has become aware of any mistake of law (including any such mistake arising as a result of a subsequent change in the law, which shall include a settled understanding of the law which is subsequently departed from by judicial decision) or any mistake of fact in any way whatsoever connected with or related to this Agreement or the Contracts.

Entire Agreement

This Agreement constitutes the entire Agreement between the parties with regard to its subject matter and supercedes all and any previous such Agreements. In entering into this Agreement and consenting to its terms, no Party has relied on any statement, warranty or representation made by or on behalf of another Party other than as contained in this Agreement.

Parties

This Agreement and all of its terms are binding on, and inure only to the benefit of, the Parties, their predecessors. successors and permitted assigns. This Agreement is not intended to benefit any other person or entity.

Variation

No variation of this Agreement shall be valid unless it is in writing and signed by or on behalf of each of the Parties.

Assignment

No Party may assign any rights, obligations or benefits arising under or in connection with this Agreement without the prior written consent of the other Parties.

Governing Law and Jurisdiction

This Agreement shall be interpreted under and governed by the laws of Bermuda. The Parties agree to submit to the exclusive jurisdiction of the Bermuda Courts in respect of any dispute arising out of or in connection with this Agreement.

Execution

This Agreement may be executed in counterpart originals with the same force and effect as if signed in an original document.  All counterparts shall constitute one document, notwithstanding the parties are not signatories of the same counterpart.  Signatures on each counterpart may be sent via facsimile transmission, and any facsimile transmission of such signature shall be deemed to have the same force and effect as an original signature.

**IN WITNESS WHEREOF** this Agreement has been executed by or on behalf of the Insurer and the Insured:

|  |  |
|---|---|
| **THE INSURER** | **THE INSURED** |
| _____ | _____ |
| Authorised Representative | Authorised Representative |
| _____ | _____ |
| Title | Title |
| _____ | _____ |
| Date | Date |

## NORTHERN NATIONAL INSURANCE LTD.

### Open Policies

### SCHEDULE A

| Policy Number | Policy Year |
|---|---|
| NNILWCALGL - 015* | 01 Oct 2006 - 01 Oct 2007 |
| NNIL 1-10001-00* | 01 Oct 2007 - 31 Dec 2008 |

* Applies to liabilities or obligations relating to workers' compensation losses under (i) Contract NNILWCALGL – 015, with respect to policy year 1st. October, 2006 – 1st. October, 2007 (but only with respect to losses occurring on/after 1st. January, 2007), and (ii) Contract NNIL 1-10001-00, with respect to policy year 1st. October, 2007 – 31st. December, 2008 (as to losses occurring during the entire policy year), in each case up to a limit of US$100,000 any one loss and/or occurrence, as may be more fully defined in the overlying workers' compensation policy(ies) under such Contracts.

**<u>EXHIBIT B</u>**

**(Promissory Note)**

February  2001

# REVOLVING NOTE

In consideration of the establishment of a loan to a maximum of US$35,000,000 against which the undersigned CIRCUIT CITY STORES, INC., a company incorporated under the laws of the Commonwealth of Virginia, shall be entitled to borrow such amounts from time to time not exceeding collectively the aforesaid $35,000,000 and shall, on demand pay to NORTHERN NATIONAL INSURANCE LTD., a company incorporated under the laws of Bermuda such sum as is owing from time to time together with interest thereon, with such interest being the variable Prime Rate as established from time to time by First Union National Bank for its best corporate clients.

This note shall be governed by the laws of Bermuda.

This note may be prepaid in whole or in part at any time by CIRCUIT CITY STORES, INC., without any penalty arising or payable whatsoever.

IN WITNESS WHEREOF the undersigned officers of CIRCUIT CITY STORES, INC., and NORTHERN NATIONAL INSURANCE LTD. have duly executed this Note as the date first above indicated.

_____

By and For:
CIRCUIT CITY STORES, INC.

_____

By and For:
NORTHERN NATIONAL INSURANCE LTD.

REVNOTE.DOC