Gregg M. Galardi, Esq.               Dion W. Hayes (VSB No. 34304)
Ian S. Fredericks, Esq.              Douglas M. Foley (VSB No. 34364)
SKADDEN, ARPS, SLATE, MEAGHER &      MCGUIREWOODS LLP
FLOM, LLP                            One James Center
One Rodney Square                    901 E. Cary Street
PO Box 636                           Richmond, Virginia 23219
Wilmington, Delaware 19899-0636      (804) 775-1000
(302) 651-3000

          - and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
333 West Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

Counsel to the Debtors and
Debtors in Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

- - - - - - - - - - - - - - x
In re:                        :    Chapter 11
                              :
CIRCUIT CITY STORES, INC.,    :    Case No. 08-35653 (KRH)
et al.,                       :
                              :
            Debtors.          :    Jointly Administered
- - - - - - - - - - - - - - x

**MOTION FOR ORDERS PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 332 AND 363 (I)(A) APPROVING PROCEDURES IN CONNECTION WITH SALE OF INTELLECTUAL PROPERTY, INTERNET-RELATED PROPERTY AND CUSTOMER INFORMATION, (B) AUTHORIZING SELLERS TO ENTER INTO A STALKING HORSE AGREEMENT IN CONNECTION THEREWITH, (C) APPROVING CERTAIN BID PROTECTIONS IN CONNECTION THEREWITH, (D) APPROVING FORM AND MANNER OF SALE NOTICE AND (E) SETTING AUCTION AND SALE HEARING DATES; (II) AUTHORIZING U.S. TRUSTEE TO APPOINT CONSUMER PRIVACY OMBUDSMAN; (III) APPROVING SALE OF INTELLECTUAL PROPERTY, INTERNET-RELATED PROPERTY AND CUSTOMER INFORMATION FREE AND CLEAR OF ALL INTERESTS; AND (IV) GRANTING RELATED RELIEF**

Circuit City Stores West Coast, Inc. and Circuit

City Stores, Inc. (the "Sellers" and, collectively with the

debtors and debtors in possession in the above-captioned
jointly administered cases, the "Debtors")[1] hereby move (the
"Motion"), pursuant to sections 105, 332 and 363 of title 11
of the United States Code (the "Bankruptcy Code") and Rules
2002 and 6004 of the Federal Rules of Bankruptcy Procedure
(the "Bankruptcy Rules"), for entry of orders (I)(A) approv-
ing procedures in connection with soliciting bids for a sale
(the "Sale") of certain of the Sellers' intellectual prop-
erty, internet-related property and customer information
(all as more particularly set forth in the Agreement (as de-
fined herein), the "Intellectual Property and Internet As-
sets"), (B) authorizing the Sellers to enter into a stalking
horse agreement  in connection with the Sale of the Intel-
lectual Property and Internet Assets, (C) approving certain
Bid Protections (as defined below) in connection therewith,
(D) approving the form and manner of sale notice (the "No-

---

[1]   The Debtors and the last four digits of their respective taxpayer
identification numbers are as follows: Circuit City Stores, Inc.
(3875), Circuit City Stores West Coast, Inc. (0785), InterTAN, Inc.
(0875), Ventoux International, Inc. (1838), Circuit City Purchasing
Company, LLC (5170), CC Aviation, LLC (0841), CC Distribution Company
of Virginia, Inc. (2821), Circuit City Properties, LLC (3353), Kinzer
Technology, LLC (2157), Abbott Advertising Agency, Inc. (4659), Patap-
sco Designs, Inc.(6796), Sky Venture Corp. (0311), Prahs, Inc.(n/a),
XSStuff, LLC (9263), Mayland MN, LLC (6116), Courchevel, LLC (n/a),
Orbyx Electronics, LLC (3360), and Circuit City Stores PR, LLC (5512).
The address for Circuit City Stores West Coast, Inc. is 9250 Sheridan
Boulevard, Westminster, Colorado 80031.  For all other Seller, the ad-
dress is 9950 Mayland Drive, Richmond, Virginia 23233.

tice Procedures"), and (E) scheduling Auction and Sale Hearing dates (each as defined below); (II) authorizing the U.S. Trustee to appoint a consumer privacy ombudsman; (III) approving the Sale of the Intellectual Property and Internet Assets free and clear of all Interests (as defined below) and (IV) granting related relief.  In support of the Motion, the Sellers respectfully represent as follows:

## JURISDICTION AND VENUE

1.    This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.    The statutory predicates for the relief requested herein are Bankruptcy Code sections 105, 332 and 363 and Bankruptcy Rules 2002 and 6004.

## BACKGROUND

3.    On November 10, 2008 (the "Petition Date"), the Debtors filed voluntary petitions in this Court for relief under chapter 11 of the Bankruptcy Code.

4.     The Debtors continue to manage and operate
their businesses as debtors in possession pursuant to Bank-
ruptcy Code sections 1107 and 1108.

5.     On November 12, 2008, the Office of the
United States Trustee for the Eastern District of Virginia
appointed a statutory committee of unsecured creditors (the
"Creditors' Committee").  To date, no trustee or examiner
has been appointed in these chapter 11 cases.

6.     On January 16, 2009, the Court authorized the
Debtors, among other things, to conduct going-out-of-
business sales at the Debtors' remaining 567 stores pursuant
to an agency agreement (the "Agency Agreement") between the
Debtors and a joint venture, as agent (the "Agent").  On
January 17, 2009, the Agent commenced going-out-of-business
sales pursuant to the Agency Agreement at the Debtors' re-
maining stores.

## RELIEF REQUESTED

7.     By this Motion, the Sellers seek (I) entry
of an order, substantially in the form attached hereto as
Exhibit A (the "Bidding Procedures Order") (A) approving the
bidding procedures attached to the Bidding Procedures Order
as Exhibit 1 (the "Bidding Procedures"), (B) authorizing the

4

Sellers to enter into the Asset Purchase Agreement (the

"Agreement"),[2] attached to the Bidding Procedures Order as

Exhibit 2, by and among the Sellers and Systemax Inc. (the

"Purchaser" or the "Stalking Horse Bidder") as a "stalking

horse" agreement, (C) authorizing the Sellers to provide the

Stalking Horse Bidder with certain Bid Protections (as de-

fined below), (D) approving the Notice Procedures and

(E) scheduling the Auction for May 11, 2009 and the hearing

with respect to any Bid or proposal accepted by the Sellers

(the "Sale Hearing") for May 13, 2009; (II) entry of an or-

der substantially in the form attached hereto as Exhibit B

(the "CPO Order") ordering the U.S. Trustee to appoint a

consumer privacy ombudsman and (III) entry of an order, sub-

stantially in the form attached hereto as Exhibit C (the

"Sale Approval Order") approving the Sale of the Intellec-

tual Property and Internet Assets free and clear of all In-

terests and granting related relief.

### BASIS FOR RELIEF

8.    In the course of their continued liquidation,

the Sellers have identified various assets --  including the

---

[2]  Capitalized terms used but not otherwise defined herein have the mean-
ings ascribed to them in the Agreement.

Intellectual Property and Internet Assets —- that are valu-
able but for which the Sellers have no use going forward.
The Sellers have thus determined that the sale of the Intel-
lectual Property and Internet Assets would bring significant
recovery for the Sellers' estates and creditors.

9.    To help ensure that the Sellers receive the
highest or otherwise best proposal for the Intellectual
Property and Internet Assets, the Sellers seek authorization
to enter into the Agreement with the Stalking Horse Bidder,
and to solicit competing bids in accordance with the Bidding
Procedures.

10.    The Sellers believe that conducting the Auc-
tion with respect to the Intellectual Property and Internet
Assets among the Purchaser and any bidders submitting com-
peting offers will enable them to maximize value and mini-
mize expenses incurred.

## BIDDING PROCEDURES[3]

11.    **The Bid Deadline.**  The Sellers propose that
bids to purchase all or substantially all of the Intellec-
tual Property and Internet Assets (the "Bids") be required

---

[3]    This section of the Motion constitutes a summary of the Bidding Proce-
dures.  In the event there is a conflict between the Motion and the
Bidding Procedures, the Bidding Procedures shall control.

to be submitted on or before May 6, 2009 at 5:00 p.m. (East-ern) (the "Bid Deadline").  Up until the Bid Deadline, the Sellers will accept competing Bids to purchase the Intellec-tual Property and Internet Assets from those bidders who submit qualified proposals in accordance with the Bidding Procedures (collectively, the "Qualified Bidders" and such Bids by Qualified Bidders, the "Qualified Bids").  Such com-peting Bids must exceed the Stalking Horse Bid by a minimum of $350,000 (the "Initial Minimum Overbid").

12.    **The Auction.**  The Sellers propose that, if they receive any Qualified Bids besides the Stalking Horse Bid, on May 11, 2009 they will hold an auction (the "Auc-tion") among such Qualified Bidders.  The Auction will take place at the offices of Skadden, Arps, Slate, Meagher & Flom, LLP, 4 Times Square, New York, New York 10036, beginning at 10:00 a.m. (Eastern) or such later time or other place as the Sellers notify all Qualified Bidders who have submitted Qualified Bids.  The Qualified Bidders who wish to partici-pate in an Auction, or their authorized representative, must be present in person or by phone for the Auction.

13.    The Sellers will commence the Auction with the highest or otherwise best Qualified Bid submitted prior

7

to the Bid Deadline.  During the Auction, any Qualified Bid-
der may submit subsequent Bids (the "Auction Bids").  Each
Auction Bid will exceed the previous Bid by a minimum of
$25,000 (the "Subsequent Minimum Overbid").  Bidding in the
Auction will remain open until all Qualified Bidders, in-
cluding the Stalking Horse Bidder, have submitted their
highest or otherwise best proposal for the Intellectual
Property and Internet Assets.

14.  **The Successful Bidder.**  Upon the conclusion
of bidding in the Auction, the Sellers, after consultation
with counsel to the Creditors' Committee, will determine
which proposal provides the Sellers, their estates and
creditors with the highest or otherwise best offer, taking
into account the net value of the offer to the Sellers' es-
tates.  Finally, the Sellers will announce the bidder or
bidders submitting the proposal that they have determined
constitutes the highest or otherwise best proposal (the
"Successful Bid," and the party submitting the Successful
Bid, the "Successful Bidder") and close the Auction.

15.  In qualifying bidders and conducting the Auc-
tion, the Sellers intend to implement the Bidding Procedures
summarized above substantially in the form attached hereto

8

as <u>Exhibit A</u>.  The Sellers reserve their right to modify

such procedures as necessary or as they deem appropriate, in

consultation with counsel to the Creditors' Committee, to

maximize value for their estates and creditors.  The Sellers

believe that such procedures are appropriate and will maxi-

mize the recovery for the Sellers and their estates in con-

nection with the Auction.

## THE AGREEMENT

### A.    Marketing Efforts

16.  Since the Petition Date, the Debtors have

pursued various restructuring alternatives, including a

stand-alone plan, transactions with strategic partners and

sales of all or certain aspects of their businesses.  As

noted above, these efforts ultimately culminated in the

Court's approval of the Agency Agreement and the Debtors'

liquidation.

17.  In the period leading up to the Court's au-

thorization of the liquidation, the Debtors' financial advi-

sor, Rothschild, Inc. ("Rothschild") actively contacted po-

tential purchasers concerning sales of some or all of the

assets of the Debtors.  In connection therewith, Rothschild

received several indications of interest in certain of the

9

Debtors' intellectual property and internet-related assets,
including two offers to purchase certain of such assets.

    18.  Given the Debtors' focus on pursuing a sale
of the Debtors' businesses as a going concern, the Debtors
did not go forward with these offers at that time.  However,
following the Court's approval of the Agency Agreement and
liquidation of the Debtors' inventory, the Debtors and their
advisors recommenced efforts to market the Intellectual
Property and Internet Assets.

    19.  To that end, Rothschild developed a compre-
hensive list of potential purchasers, including (i) certain
potential purchasers that had expressed an interest in some
or all of the Debtors' intellectual property and internet-
related assets during the earlier sale process, (ii) parties
that expressed an interest in some or all of the Debtors'
intellectual property and internet-related assets in the pe-
riod following approval of the liquidation and (iii) other
potential purchasers who, in the opinion of Rothschild, may
have been interested in a possible transaction involving
such assets.  In total, Rothschild contacted approximately
90 potential purchasers of the Debtors' intellectual prop-
erty and internet-related assets.

20.  A confidential online data room was set up
containing information pertinent to the intellectual prop-
erty and internet-related assets (the "Data Room").  Poten-
tial purchasers that expressed interest and executed a non-
disclosure agreement were granted access to the Data Room.
In addition, upon request, the Debtors' management conducted
due diligence calls with potential purchasers.  In all, ap-
proximately 40 interested parties executed nondisclosure
agreements (including parties who executed such agreements
in connection with the earlier sale process) and conducted
due diligence through the Data Room and/or though discus-
sions with management.

21.  During the period from late January to mid-
February, the Debtors received eight bids from prospective
purchasers for various portions of the Debtors' intellectual
property and internet-related assets.  Rothschild reviewed
each of these bids with the Debtors and their other advisors.
Subsequently, Rothschild and the Debtors chose to continue
negotiations with two potential purchasers, including the
Purchaser, who each presented potential stalking horse of-
fers for substantial packages of the Debtors' intellectual
property and internet-related assets at values that were, in

11

the judgment of Rothschild and the Debtors, superior to the other offers.  Each of the two potential purchasers presented transaction structures that included both upfront cash and potential future contingent payments.  Negotiations with these two parties continued for several weeks through the end of March. The negotiations revolved around transaction structure, price, assets to be sold, and contractual arrangements.

22.  These negotiations culminated in the signing of the Agreement with the Purchaser on April 5, 2009 for the purchase of the Intellectual Property and Internet Assets.

23.  From and after the date hereof, the Debtors intend to market their intellectual property and internet-related assets, including soliciting bids for the Intellectual Property and Internet Assets upon approval of the Bidding Procedures Order.  To that end, the Debtors intend to seek authorization to retain Streambank, LLC as their intellectual property disposition consultant in these chapter 11 cases.

**B.   The Agreement.**

24.  Pursuant to the Agreement, the Sellers have agreed to sell the Intellectual Property and Internet Assets to the Purchaser for $6.5 million plus the Earn-Out Payment

12

(as defined herein)(collectively, the "Purchase Price"),

subject to higher or otherwise better proposals and this

Court's approval.

25.  The other significant terms of the Agreement

are as follows:[4]

(a)  General Terms.  The Purchaser would acquire
the Intellectual Property and Internet Assets, consisting of
certain of the Sellers' (i) trademarks and the associated
goodwill, (ii) domain names, (iii) toll-free numbers, (iv)
patents and registrations and applications therefor, (v)
website content and (vi) customer information, including the
Circuit City Data and the Alpine Data, each as more fully
described in the Agreement or Schedule 1.02(a) to the Agree-
ment, through an asset sale.

(b)  Excluded Assets.  Notwithstanding anything to
the contrary in the Agreement, and for the avoidance of
doubt, the Sellers are not selling, conveying, assigning,
transferring or delivering to the Purchaser any assets or
rights other than those conveyed to the Purchaser pursuant
to section 1.02(a) of the Agreement.

(c)  Sale.  The Intellectual Property and Internet
Assets would be sold free and clear of all liens, mortgages,
security interests, charges, easements, leases, subleases,
covenants, rights of way, options, claims, restrictions or
encumbrances of any kind (collectively, the "Liens"), except
for (i) mechanics', carriers', workmen's, landlord's, re-
pairmen's or other like Liens arising or incurred in the or-
dinary course of business, (ii) other imperfections of title
or encumbrances, if any, that, individually and in the ag-
gregate, do not materially impair the use of the Intellec-
tual Property and Internet Assets in the conduct of the
Seller's business as conducted as of December 31, 2008, or
(iii) Liens listed in Section 3.03 of the Sellers' disclo-
sure schedules attached to the Agreement (collectively, the

---

[4]   In the event of any discrepancy between the Agreement and this summary
of the Agreement, the provisions of the Agreement are controlling.

"Assumed Liens"), and free and clear of all debts, adverse claims, liabilities, commitments, responsibilities and obligations of any kind or nature whatsoever, direct, indirect, absolute or contingent, matured or unmatured, whether accrued, vested or otherwise, whether known or unknown, foreseen or unforeseen, and whether or not actually reflected, or required to be reflected, in a party's balance sheets or other books and records (collectively, the "Liabilities" and together with the Liens, other than the Assumed Liens, the "Interests").

(d)  Earn-Out Payment.  The Purchaser would pay to the Sellers (the "Earn-Out Payment") a certain percentage of the gross revenues of the Purchaser or its affiliates resulting from the sale of (i) goods originated through any of the domain names or URLs acquired under the Agreement or (ii) any other proprietary product that is sold by Purchaser or its affiliates utilizing the Circuit City brand, during (i) the period commencing on the thirtieth (30th) day following the date of Closing (as defined herein) and ending on the one year anniversary of the thirtieth (30th) day following the date of Closing (the "First Earn-Out Period"); (ii) the period commencing on the day immediately following the end of the First Earn-Out Period and ending on the one year anniversary of the end of the First Earn-Out Period (the "Second Earn-Out Period"); and (iii) the period commencing on the day immediately following the end of the Second Earn-Out Period and ending on the date six (6) months after the end of the Second Earn-Out Period (the "Third Earn-Out Period"). The percentage would vary depending on the magnitude of the revenues generated during each Earn-Out Period.

(e)  Transfer Taxes.  All transfer, documentary, sales, use, stamp, registration and other such taxes, any conveyance fees, any recording charges and any other similar fees and charges (including penalties and interest in respect thereof) (collectively, the "Transfer Taxes") attributable to Sellers' Sale of the Intellectual Property and Internet Assets would be borne and paid equally by the Sellers, on the one hand, and the Purchaser, on the other hand.

(f)  Bankruptcy Court Approval.  The Sale of the Intellectual Property and Internet Assets would be subject to approval by this Court and competitive bidding pursuant to the Bidding Procedures.

14

(g)  Documentation.  The Sale would be effected
pursuant to the Agreement and related documentation.

(h)  Representations And Warranties.  Pursuant to
the Agreement, the Sellers would provide certain standard
representations and warranties relating to the Sale, includ-
ing representations and warranties with respect to the In-
tellectual Property and Internet Assets.  The Purchaser
would provide representations and warranties generally stan-
dard in a transaction of this type.  The representations and
warranties would not survive the Closing.

(i)  Covenants.  Pursuant to the Agreement, the
Sellers and the Purchaser would make certain covenants in-
cluding, among others: (i) that Sellers shall not sell or
otherwise dispose of the Intellectual Property and Internet
Assets, (ii) that Sellers and/or Purchaser, as the case may
be, shall use reasonable best efforts to ensure that condi-
tions precedent to the agreement are satisfied, to obtain
necessary approvals of the Sale, including Court approval,
and to facilitate the transfer the Intellectual Property and
Internet Assets, (iii) that Purchaser shall use its best ef-
forts to satisfy or otherwise address matters related to the
conveyance of the Circuit City Data, including the transfer
of personally identifiable information ("PII"), identified
by any consumer privacy ombudsman, as defined by the Bank-
ruptcy Code, or otherwise, (iv) that the Purchaser shall
agree to certain restrictions with respect to the use of the
Circuit City Data, as described more fully in the following
subsection, (v) that Sellers will file this Motion within
five (5) business days of execution of the Agreement, (vi)
that Purchaser shall execute and deliver to the parties to
that certain Asset Purchase Agreement, dated February 23,
2009, among Bell Canada, 4458729 Canada, Inc., InterTAN Can-
ada, Ltd., Circuit City Stores West Coast, Inc. and Ventoux
International, LLC (the "Canada APA") a trademark licensing
agreement in the form attached to the Canada APA with re-
spect to certain licensed trademarks (the "Canada License
Agreement," attached to the Bid Procedures as Exhibit 1),
(vii) that Purchaser may request a list of employees from
the Sellers and may solicit such employees for possible re-
tention after the Closing, (viii) that Sellers shall afford
Purchaser reasonable access to information about the Sell-
ers' businesses prior to the Closing and (ix) that Sellers
shall use commercially reasonable efforts to protect and

15

preserve the trademarks and patents included in the Intel-
lectual Property and Internet Assets and shall not license,
transfer or assign such trademarks or patents except as pro-
vided by the Canada License Agreement.

(j)  <u>Privacy Policy and Non-Exclusive Right to Use
Circuit City Data In Connection with Extended Warranties</u>.
With respect to the transfer Circuit City Data from the
Sellers to the Purchaser, the Purchaser (at a minimum)
agrees (a) to adopt and comply with the Sellers' privacy
policy with respect to the Circuit City Data, attached to
the Agreement as Schedule G (the "Privacy Policy"); (b) to
use PII for the same purpose(s) as are specified in the Pri-
vacy Policy; (c) that, prior to making any material change
to the Privacy Policy with respect to Circuit City Data or
the use or disclosure of PII different from that specified
in the Privacy Policy, the Purchaser will notify the persons
whose PII is included in the Circuit City Data by mail or
email and afford such persons the opportunity to opt-out of
the changes to the Privacy Policy or the new uses of their
Data; (d) to employ appropriate information security con-
trols and procedures (technical, operational, and managerial)
to protect the Circuit City Data; (e) to abide by all appli-
cable U.S. laws and regulations; (f) to take such additional
reasonable actions as may be agreed between the Sellers and
the Purchaser or recommended or requested by the CPO, and (g)
to grant the Sellers a non-exclusive, perpetual, royalty
free, worldwide right to use the Circuit City Data in con-
nection with the offer for sale and sale of renewals of ex-
tended warranties sold by Circuit City to its customers.

(k)  <u>Conditions Precedent</u>.  Each party's obliga-
tions under the Agreement would be subject to the satisfac-
tion or waiver of certain conditions at or prior to the
Closing, including that (i) all necessary governmental ap-
provals shall have been obtained, (ii) the representations
and warranties of each party shall be or shall have been
true at the relevant time and (iii) the Sale Approval Order
(and any other necessary orders), containing the findings
and conclusions set forth in the Agreement, shall have been
entered by the Court.

(l)  <u>Termination</u>.  The Agreement could be termi-
nated prior to Closing in the following circumstances: (i)
by Purchaser and Sellers, upon mutual written consent, (ii)

16

by Purchaser or Sellers, upon written notice, if the Closing
shall not have occurred on or before the earlier of (A) the
consummation of an alternate transaction, (B) thirty (30)
days after the Sale Hearing or (C) July 15, 2009, (iii) by
Sellers or Purchaser, if the other party shall have breached
or failed to perform in any material respect any of its re-
spective representations, warranties, covenants or other
agreements contained in the Agreement, under the conditions
as provided in the Agreement, (iv) by Purchaser, upon writ-
ten notice, if the Bid Procedures Order is not entered on or
before twenty-five (25) days from the date of the filing of
this Motion or if such Order is stayed, reversed, amended or
vacated, (v) by Purchaser, upon written notice, if the Sale
Approval Order is not entered on or before forty-five (45)
days from the date of entry of the Bid Procedures Order or
if the Sale Approval has not become final within eleven (11)
days after its entry, (vi) by Purchaser or Sellers, if ap-
plicable law or an injunction prevents the consummation of
the transactions under the Agreement or (vii) by Sellers, if
the Sellers terminate the bidding process or the Auction for
the Intellectual Property and Internet Assets.  In the event
of termination, Purchaser shall, upon request, return to the
Sellers or destroy all materials received from the Sellers
relating to the proposed transactions and continue to abide
by the terms of the confidentiality agreement between the
parties.

        (m)    Break-Up Fee and Expense Reimbursement.    The
Sellers would pay Purchaser a break-up fee of $250,000 (the
"Break-Up Fee") and would reimburse the actual, reasonable
and documented attorney's fees and expenses incurred by Pur-
chaser on or after January 23, 2009 and related to the
Agreement, in an amount not to exceed $75,000 (the "Expense
Reimbursement") if, and only if (i)(A) the Purchaser is not
in breach of or default under the Agreement, (B) the Agree-
ment is not conditioned on conducting any further, or com-
pleting, due diligence and (C) the Sellers consummate the
Sale for all or substantially all of the Intellectual Prop-
erty and Internet Assets with a higher or otherwise better
bidder at the Auction or (ii) the Sellers terminate the bid-
ding and auction process.

        (n)    Closing.    The closing of the transactions un-
der the Agreement (the "Closing") shall take place at the
Delaware offices of Skadden, Arps, Slate, Meagher & Flom,

17

LLP on the second (2nd) business day following the satisfac-
tion or waiver of the conditions precedent to Closing (ex-
cept those conditions precedent which can be fulfilled or
waived only at Closing), or at such other time and place as
shall be agreed upon by the Purchaser and the Sellers.

**C.    Bid Protections.**

26.    The Purchaser has expended, and likely will

continue to expend, considerable time, money, and energy

pursuing the Sale and has engaged in extended arm's length

and good faith negotiations regarding a possible purchase of

the Intellectual Property and Internet Assets.  The Agree-

ment is the culmination of these efforts.

27.    In recognition of this expenditure of time,

energy, and resources, the Sellers have agreed to provide

certain bid protections to the Purchaser, including the

Break-Up Fee and the Expense Reimbursement (together, the

"Bid Protections").  Specifically, the Agreement provides

for, and the Sellers respectfully request that the Bidding

Procedures Order approve, the Break-Up Fee payable by the

Sellers to the Purchaser in the amount of $250,000 if (i)

the Sellers terminate the Agreement to close an alternative

transaction, so long as the Purchaser is not in breach of

the Agreement and the Agreement is not conditioned on con-

ducting or completing any further due diligence or obtaining

18

financing or (ii) the Sellers terminate the bidding and auc-
tion process.

28.  In addition, the Sellers respectfully request
this Court's approval of the Expense Reimbursement.  As set
forth in the Agreement, the Expense Reimbursement provides
for reimbursement of the Purchaser's actual, reasonable and
documented attorney's fees and expenses incurred by Pur-
chaser on or after January 23, 2009 and related to the
Agreement, in an amount not to exceed $75,000, if (i) the
Sellers terminate the Agreement to close an alternative
transaction, so long as the Purchaser is not in breach of
the Agreement and the Agreement is not conditioned on con-
ducting or completing any further due diligence or obtaining
financing or (ii) the Sellers terminate the bidding and auc-
tion process.

29.  The Sellers believe that the proposed Bid
Protections are fair and reasonable in view of (a) the
analysis, due diligence investigation, and negotiation un-
dertaken by the Purchaser in connection with the Sale and (b)
the fact that the Purchaser's efforts would maximize the
value of the Intellectual Property and Internet Assets for
the benefit of all stakeholders, whether as a result of con-

19

summating the Sale pursuant to the Agreement or by generat-

ing a higher or otherwise better offer pursuant to the Bid-

ding Procedures.

30.   The Purchaser is unwilling to keep open its

offer to purchase the Intellectual Property and Internet As-

sets under the terms of the Agreement unless this Court au-

thorizes payment of the Bid Protections.   Thus, absent entry

of the Bidding Procedures Order and approval of the Bid Pro-

tections, the Sellers may lose the opportunity to obtain

what they believe to be the highest and best offer for the

Intellectual Property and Internet Assets.   The Auction,

moreover, is a competitive mechanism designed to test

whether any alternative use for the Intellectual Property

and Internet Assets would yield a higher or better return

for the Sellers.   Approving the Bid Protections will thus

commit the Purchaser to serve as the Stalking Horse Bidder

under the Agreement, and the Purchaser's bid would serve to

start any additional bidding for the Intellectual Property

and Internet Assets at a fair and reasonable purchase price.

31.   Moreover, payment of the Break-Up Fee will

not diminish the Sellers' estates.   The Sellers would not be

obligated to pay the Break-Up Fee or the Expense Reimburse-

ment unless either (i) they do so to accept an alternative
Successful Bid, which would result in even greater value to
the Sellers' estates and their stakeholders or (ii) they opt
to terminate the bidding and auction process.  This is par-
ticularly true given the Initial Minimum Overbid requirement,
which ensures that Auction Bids represent higher or other-
wise better offers for the Intellectual Property and Inter-
net Assets, taking into account payment of the Bid Protec-
tions.  The Sellers thus request that this Court authorize
payment of the Bid Protections pursuant to the terms and
conditions of the Agreement.

### APPOINTMENT OF A CONSUMER PRIVACY OMBUDSMAN

32.  Pursuant to the Agreement, the Sellers and
the Purchaser agree to use their reasonable best efforts to
satisfy and otherwise address matters relating to the con-
veyance of Circuit City Data as identified by a consumer
privacy ombudsman (the "CPO").  Accordingly, the Sellers re-
quest that the Court order the U.S. Trustee to appoint a CPO
pursuant to, and as defined by, Bankruptcy Code sections 332
and 363(b)(1)(B).  The Sellers believe that the appointment
of a CPO will ensure the protection of the PII included in
the Circuit City Data.

21

### THE SALE OF THE CIRCUIT CITY DATA

33.   Pursuant to the Agreement, and subject to Court approval, the Sellers have agreed to sell and the Purchaser has agreed to purchase the Circuit City Data, including any PII included therein.  With respect to the transfer of the Circuit City Data from the Sellers to the Purchaser, the Purchaser has expressly agreed to the restrictions set forth in section 5.06 of the Agreement, which are designed to safeguard PII.

34.   Accordingly, the Sellers request that the Court approve the sale of the Circuit City Data as set forth above.  As discussed further below, the Sellers believe a sale of the Circuit City Data, with the above protections, will adequately protect PII, complies with the Bankruptcy Code and is in the best interests of the Sellers and their estates and creditors.

### NOTICE PROCEDURES

35.   Within five (5) days after entry of the Bidding Procedures Order (the "Mailing Date"), the Sellers (or their agent) propose to serve the Motion, the Agreement, the Bidding Procedures, the Bidding Procedures Order and the proposed Sale Approval Order by electronic mail, if possible,

22

or first-class mail, postage prepaid, upon (i) all entities
known to have expressed an interest in a transaction with
respect to the Intellectual Property and Internet Assets
during the past three (3) months, (ii) all entities known to
have asserted any Lien upon the Intellectual Property and
Internet Assets, (iii) all federal, state, and local regula-
tory or taxing authorities or recording offices, which have
a reasonably known interest in the relief requested by the
Motion and (iv) all parties entitled to notice under the Or-
der Pursuant to Bankruptcy Code Sections 102 and 105, Bank-
ruptcy Rules 2002 and 9007, and Local Bankruptcy Rules 2002-
1 and 9013-1 Establishing Certain Notice, Case Management,
and Administrative Procedures (D.I. 130; the "Case Manage-
ment Order").

        36.   The Sellers also propose, pursuant to Bank-
ruptcy Rule 2002(l) and 2002(d), to publish a notice of the
Sale, substantially in the form attached hereto as Exhibit D,
in the Wall Street Journal (International Edition), the New
York Times and the Richmond Times Dispatch within five (5)
days of entry of the Bidding Procedures Order or as soon as
practicable thereafter.  The Sellers request that such pub-

lication notice be deemed proper notice to any other inter-
ested parties whose identities are unknown to the Sellers.

## APPLICABLE AUTHORITY

## I.    THE BIDDING PROCEDURES ARE REASONABLE AND APPROPRIATE.

37.   Bankruptcy Code section 363(b)(1) provides
that "[t]he trustee, after notice and a hearing, may use,
sell, or lease, other than in the ordinary course of busi-
ness, property of the estate."  11 U.S.C. § 363(b)(1).
Moreover, Bankruptcy Code section 105(a) provides that
"[t]he Court may issue any order, process, or judgment that
is necessary or appropriate to carry out the provisions of
this title."  11 U.S.C. § 105(a).

38.   The Sellers believe that the Bidding Proce-
dures are appropriate under Bankruptcy Code sections 105 and
363 to ensure that the bidding and auction process is fair
and reasonable and will yield the maximum value for their
estates and creditors.  The Bidding Procedures permit the
Sellers to maximize the value of the Intellectual Property
and Internet Assets.  In addition, the Bidding Procedures
set deadlines for conducting the Auction and holding the
Sale Hearing with respect to the transactions proposed
herein.

39.  Accordingly, the Sellers believe the Court should approve the Bidding Procedures, including the dates established thereby for, _inter alia_, the Bid Deadline, the Auction and the Sale Hearing.  Similar procedures have been previously approved by this Court in other cases.  _See_, _e.g._, _In re The Rowe Companies_, Case No. 06-11142 (SSM) (Bankr. E.D. Va. Dec. 20, 2006); _In re Ceyoniq, Inc._, Case No. 02-85887 (RGM) (Bankr. E.D. Va. Jan. 30, 2003).

## II.  THE BID PROTECTIONS REQUESTED HEREIN ARE REASONABLE AND SHOULD BE APPROVED.

40.  In connection with Sale of the Intellectual Property and Internet Assets, the Court should authorize the Sellers to pay the Break-Up Fee and the Expense Reimbursement identified herein.

41.  Agreements to provide break-up fees and other bidding incentives are designed to compensate a potential acquirer who serves as a catalyst that may attract higher and better offers, and have been approved in bankruptcy to encourage bidding. _See In re Ryan_, 261 B.R. 867, 870 (Bankr. E.D. Va. 2001).  Break-up fees can be advantageous to both buyers and sellers because they encourage bidding to ensure that sellers receive the highest or otherwise best offer

while compensating the buyer for the risk of being outbid.
See id.

42.   Break-up fees are allowed as an administra-
tive expense claim against the estate if they satisfy the
standard of section 503(b)(1).  In re Tropea, 352 B.R. 766,
768 (Bankr. N.D.W.Va. 2006).  Thus, the fee must reflect the
actual and necessary cost of preserving the estate.  See 11
U.S.C. § 503(b)(1).  See also In re Tropea, 352 B.R. at 768.
In Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re
O'Brien Envtl. Energy, Inc.), 181 F.3d 527 (3d Cir. 1999),
the United States Court of Appeals for the Third Circuit ex-
plained how the section 503(b)(1) standard applied to break-
up fees.  The Third Circuit Court of Appeals held that even
though bidding incentives are measured against a business
judgment standard in non-bankruptcy transactions, the admin-
istrative expense provisions of Bankruptcy Code section
503(b) govern in the bankruptcy context.  Accordingly, to be
approved, bidding incentives must provide some postpetition
benefit to the debtor's estate.  See id. at 533; see also In
re Lamb, 2002 WL 31508913 (Bankr. D. Md. 2002) (implicitly
adopting the administrative expense standard set forth in
O'Brien).

43.    The O'Brien Court identified at least two in-
stances in which bidding incentives may provide benefit to
the estate.  First, benefit may be found if "assurance of a
break-up fee promoted more competitive bidding, such as by
inducing a bid that otherwise would not have been made and
without which bidding would have been limited."  Id. at 537.
Second, when the availability of bidding incentives induce a
bidder to research the value of the debtor and submit a bid
that serves as a minimum or floor bid on which other bidders
can rely, "the bidder may have provided a benefit to the es-
tate by increasing the likelihood that the price at which
the debtor is sold will reflect its true worth."  Id.

44.    Here, the Sellers seek authority to utilize
the Bid Protections in the event that the Purchaser is not
ultimately the Successful Bidder.  The proposed Bid Protec-
tions, including the Break-Up Fee, are appropriate under
Bankruptcy Code section 503.  The Bid Protections are fair
and reasonable in amount, particularly in view of the ef-
forts that will have to be expended by the Purchaser.  More-
over, the Agreement, including the Bid Protections provided
for therein, will enable the Sellers to secure an adequate
floor for the Auction and, thus, insist that competing bids

27

be materially higher or otherwise better than the Stalking

Horse Bid (as incorporated in the Initial Minimum Overbid

requirement), a clear benefit to the Sellers' estates.

     45.  In sum, the Sellers' ability to offer the Bid

Protections enables them to ensure the Sale of the Intellec-

tual Property and Internet Assets to a contractually-

committed bidder at a price that they believe to be fair

while, at the same time, providing them with the potential

of even greater benefit to the estates.  Thus, the Bid Pro-

tections should be approved.

## III. APPROVAL OF THE SALE OF THE INTELLECTUAL PROPERTY AND INTERNET ASSETS IS WARRANTED UNDER BANKRUPTCY CODE SECTIONS 105(A) AND 363(B)(1).

     46.  As set forth above, Bankruptcy Code section

363(b)(1) authorizes a trustee to "use, sell, or lease"

property of the estate with the Court's approval.  11 U.S.C.

§ 363(b)(1).  Assets of the Sellers may be sold outside of

the ordinary course of business, pursuant to Bankruptcy Code

section 363(b)(1), if a sound business purpose exists for

doing so.  In re WBQ P'ship, 189 B.R. 97, 102 (Bankr. E.D.

Va. 1995)(citing Stephens Indus., Inc. v. McClung, 789 F.2d

386, 390 (6th Cir. 1986)); see also In re W.A. Mallory Co.,

Inc., 214 B.R. 834, 836 (Bankr. E.D. Va. 1997).

47.   To satisfy the "sound business purpose test,"
the debtor must demonstrate that (1) a sound business reason
or emergency justifies a pre-confirmation sale; (2) the sale
was proposed in good faith; (3) the purchase price is fair
and reasonable; and, (4) adequate and reasonable notice of
the sale has been provided.  In re WBQ P'ship, 189 B.R. at
102.

48.   Based upon the results of their exhaustive
analysis, the Sellers' management and advisors have con-
cluded that the sale of the Intellectual Property and Inter-
net Assets to the Purchaser or the Successful Bidder in ac-
cordance with the procedures set forth in the Bidding Proce-
dures will maximize recoveries to the estates and stop dete-
rioration (if any) of the value of the Intellectual Property
and Internet Assets.  Maximizing asset value and preventing
deterioration are sound business purposes that warrant au-
thorizing the proposed Sale.

49.   The Sale of the Intellectual Property and
Internet Assets will be subject to competing bids, thereby
enhancing the Sellers' ability to receive the highest or
otherwise best value for the Intellectual Property and
Internet Assets.  Consequently, the fairness and reasonable-

ness of the consideration to be received by the Sellers will
ultimately be demonstrated by a "market check" through the
auction process, which is the best means for establishing
whether a fair and reasonable price is being paid.

50.    Moreover, pursuant to the Notice Procedures,
all creditors and parties in interest will receive adequate
notice under the circumstances of the Bidding Procedures and
the Sale Hearing.  In light of the circumstances, such no-
tice is reasonably calculated to provide timely and adequate
notice to the Sellers' major creditor constituencies, those
parties most interested in these cases, those parties poten-
tially interested in bidding on the Intellectual Property
and Internet Assets, and others whose interests are poten-
tially implicated by the proposed Sale.

## IV.    THE APPOINTMENT OF A CPO IS WARRANTED UNDER BANKRUPTCY CODE SECTION 332

51.    Bankruptcy Code section 332 provides, in part,
that:

> If a hearing is required under section
> 363(b)(1)(B), the court shall order the
> United States trustee to appoint, not later
> than 5 days before the commencement of the
> hearing, 1 disinterested person... to serve
> as the consumer privacy ombudsman in the
> case . . ..

30

11 U.S.C. § 332(a).  Bankruptcy Code section 332(b) further

provides that the CPO may appear and be heard at the hearing

and "shall provide to the court information to assist the

court in its consideration of the facts, circumstances and

conditions of the proposed sale" of PII.  11 U.S.C. § 332(b).

52.  Here, the Sellers are proposing to sell Cir-

cuit City Data pursuant to Bankruptcy Code section

363(b)(1)(B).  Thus, the Court should order the U.S. Trustee

to appoint a CPO to assist the Court in its consideration of

the sale of the Circuit City Data and Alpine Data as set

forth in the Agreement.

53.  CPOs have been appointed by Courts in this

district and elsewhere in connection with sales of PII.  See,

e.g., In re Storehouse, Inc., Case No. 06-11144 (SSM) (Bankr.

E.D. Va. 2006); In re Foxtons, Inc., Case No. 07-24496

(MBK)(Bankr. D.N.J. 2007); In re Three A's Holdings, LLC,

Case No. 06-10886 (BLS)(Bankr. D. Del. 2006); In re Refco,

Inc., Case No. 06-60006 (DD)(Bankr. S.D.N.Y. 2005).

54.  Accordingly, the Debtors request that the

Court order the U.S. Trustee to appoint a CPO in these chap-

ter 11 cases in connection with the sale of the Circuit City

Data.

V.   **THE SALE OF THE CIRCUIT CITY DATA AND ALPINE DATA ARE
     APPROPRIATE UNDER BANKRUPTCY CODE SECTION 363(b)(1).**

55.   Section 363(b)(1) provides that a debtor may
sell property outside of the ordinary course of business
with court approval.  11 U.S.C. § 363(b)(1).  Where such a
sale contemplates the transfer of "personally identifiable
information" (or PII) and the debtor has a privacy policy
pertaining to such information as of the commencement of the
case, the debtor must satisfy subsections (b)(1)(A) or
(b)(1)(B).

56.   Bankruptcy Code section 363(b)(1)(A) author-
izes a sale if the applicable privacy policy permits the
sale or transfer of PII.  11 U.S.C. § 363(b)(1)(A).  By con-
trast, if the privacy policy does not permit the sale or
transfer of personally identifiable information, the Court
may approve the sale or transfer if two conditions are sat-
isfied.

57.   First, the Court must consider the facts,
circumstances and conditions of such sale or transfer.  11
U.S.C. § 363(b)(1)(B)(i).  Second, the Court must determine
that such sale or transfer does not violate applicable non-
bankruptcy law.  11 U.S.C. § 363(b)(1)(B)(ii).

32

58.    More particularly, Bankruptcy Code section 363(b)(1)(B) provides, in relevant part, that:

> "[I]f the debtor in connection with offering a product or a service discloses to an individual a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtor and if such policy is in effect on the date of commencement of the case, then the trustee may not sell or lease personally identifiable information to any person unless –
>
> ...
>
> (B)    after appointment of a consumer privacy ombudsman in accordance with section 332, and after notice and a hearing, the court approves such sale or such lease – (i) giving due consideration to the facts, circumstances and conditions of such sale or such lease; and (ii) finding that no showing was made that such sale or such lease would violate applicable nonbankruptcy law.

11 U.S.C. § 363(b)(1).

59.    Here, the Debtors are proposing to sell two categories of PII:  (1) the Alpine Data; and (2) the Circuit City Data.  The Alpine Data is comprised of, among other information, PII obtained by the Sellers during operation of their retail business, but does not include PII obtained through circuitcity.com.  The Circuit City Data is comprised of, among other information, PII obtained by the Sellers through circuitcity.com.

33

60.  Although the Sellers collected PII and other data through multiple sales and marketing channels, the Sellers only maintained one privacy policy -- the Privacy Policy.  The Privacy Policy was only disclosed on circuit-city.com and only applied to Circuit City Data (not Alpine Data).

**A.    The Sale of the Alpine Data.**

61.  As set forth above, Bankruptcy Code section 363(b)(1) authorizes a debtor to sell or transfer PII that is not subject to a privacy policy without satisfying either standard under Bankruptcy Code section 363(b)(1)(A) or (B). Here, the Alpine Data is not (and was not as of the commencement of the Debtors' cases) subject to the Privacy Policy (or any other privacy policy).  Thus, the sale of the Alpine Data is subject to the traditional test under Bankruptcy Code section 363(b)(1).  <u>See</u>, <u>generally</u>, 11 U.S.C. § 363(b)(1); <u>In re WBQ P'ship</u>, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995).

62.  As set forth above in section III hereof, the Sellers submit that sound business purposes exist for the Sale of the Alpine Data.

63.  To the extent the Court determines that a sale or transfer of the Alpine Data is subject to Bankruptcy

34

Code section 363(b)(1)(A) or (B), the Sellers submit that
relief under either subsection is warranted for the reasons
discussed below pertaining to Circuit City Data.

**B.    The Sale of the Circuit City Data.**

64.    As noted above, the Circuit City Data was
subject to the Privacy Policy.    Thus, the sale or transfer
of such data must satisfy Bankruptcy Code section
363(b)(1)(A) or (B).    Guided by this section, the Bankruptcy
Court for the Eastern District of Virginia has previously
approved the sale of PII in <u>In re Storehouse, Inc.</u>, Case No.
06-11144 (SSM)(Bankr. E.D. Va. Sep. 11, 2007).    In <u>Store-
house</u>, the Court approved the licensing of PII to a licensee
of the purchaser with the following conditions:

(a)    The purchaser must be in materially the same line
of business as seller;

(b)    The purchaser must use the PII consumer records
for the same purpose(s) as are specified in the
applicable privacy policy;

(c)    The purchaser must agree to comply with the appli-
cable privacy policy and its specified policies
and practices;

(d)    The purchaser must agree that prior to making any
"material change" to the applicable privacy policy,
or the use or disclosure of personal information
different from that specified in such privacy pol-
icy, the purchaser will notify all consumers and
offer them an opportunity to "opt out" of the
changes to those policies or the new uses of their
personal information;

35

(e)  The purchaser must agree to employ appropriate in-
formation controls and procedures (technical, op-
erational and managerial) to protect the person-
ally identifiable consumer information; and

(f)  The purchaser must agree to abide my any applica-
ble state privacy and data breach law.

Id. (such conditions, the "Storehouse Conditions").

65.  With these conditions in place, this Court
approved the sale and license of the PII under Bankruptcy
Code section 363(b)(1)(B)(i) and (ii) based on the "facts,
circumstances and conditions" of such sale.

66.  Here, the Purchaser has agreed, and any Suc-
cessful Bidder would agree, to comply with substantially all
of the Storehouse Conditions with respect to the Circuit
City Data.  Specifically, with respect to the transfer of
the Circuit City Data, the Purchaser has agreed (at a mini-
mum) (a) to adopt and comply with the Privacy Policy with
respect to the Circuit City Data; (b) to use PII for the
same purpose(s) as are specified in the Privacy Policy; (c)
that, prior to making any material change to the Privacy
Policy with respect to Circuit City Data or the use or dis-
closure of PII different from that specified in the Privacy
Policy, Purchaser will notify the persons whose PII is in-
cluded in the Circuit City Data by mail or email and afford
such persons the opportunity to opt-out of the changes to

36

the Privacy Policy or the new uses of their Data; (d) to em-
ploy appropriate information security controls and proce-
dures (technical, operational, and managerial) to protect
the Circuit City Data; (e) to abide by all applicable US
laws and regulations; and (f) to take such additional rea-
sonable actions as may be agreed between the Sellers and the
Purchaser or recommended or requested by the CPO.

67.   Thus, a sale of the Circuit City Data to the
Purchaser or the Successful Bidder would comply with sub-
stantially all of the Storehouse Conditions.  Accordingly,
the Debtors believe that, pursuant to Bankruptcy Code sec-
tion 363(b)(1)(B), the facts, circumstances and conditions
of the sale of the Circuit City Data are such that the sale
should be approved.

**VI.   THE PURCHASER IS OR SUCCESSFUL BIDDER WOULD BE A GOOD
FAITH PURCHASER PURSUANT TO BANKRUPTCY CODE SECTION
363(M) AND THE TRANSACTION CONTEMPLATED BY THE
AGREEMENT SHOULD CARRY THE PROTECTIONS OF BANKRUPTCY
CODE SECTION 363(N).**

68.   Bankruptcy Code section 363(m) provides:

The reversal or modification on appeal of an
authorization under subsection (b) or (c) of
this section of a sale or lease of property
does not affect the validity of a sale or
lease under such authorization to an entity
that purchased or leased such property in
good faith, whether or not such entity knew
of the pendency of the appeal, unless such

37

authorization and such sale or lease were
stayed pending appeal.

11 U.S.C. § 363(m).  While the Bankruptcy Code does not de-

fine "good faith," the Fourth Circuit Court of Appeals has

"adopt[ed] the traditional equitable definition that has

been adopted by various courts of appeal: 'one who purchases

the assets for value, in good faith, and without notice of

adverse claims.'"  Willemain v. Kivitz, 764 F.2d 1019, 1023

(4th Cir. 1985)(citations omitted).

69.  Bankruptcy Code section 363(n) further pro-

vides, in relevant part, that:

> The trustee may avoid a sale under this sec-
> tion if the sale price was controlled by an
> agreement among potential bidders at such
> sale, or may recover from a party to such
> agreement any amount by which the value of
> the property sold exceeds the price at which
> such sale was consummated, and may recover
> any costs, attorneys' fees, or expenses in-
> curred in avoiding such sale or recovering
> such amount.

11 U.S.C. § 363(n).

70.  The Sellers submit, and will present evidence

at the Sale Hearing, that the Agreement reflects an in-

tensely negotiated, arm's length transaction.  Throughout

the negotiations, the Purchaser has at all times acted in

good faith.  Moreover, to the extent that the assets are

sold to a Successful Bidder, it will be because of a well-

38

planned competitive process and arm's length negotiations.
Additionally, the Bidding Procedures ensure that a prospec-
tive purchaser will not be able to exert any undue influence
over the Sellers.  Moreover, the Purchaser's is or Success-
ful Bidder's bid will not be the product of fraud or collu-
sion between the Purchaser or Successful Bidder and other
bidders or the trustee, or an attempt to take grossly unfair
advantage of other bidders.

71.  As a result of the foregoing, the Sellers re-
quest that the Court make a finding that the purchase price
to be paid by the Purchaser or the Successful Bidder consti-
tutes reasonably equivalent value and fair consideration un-
der any applicable law.  The Sellers further request that
this Court make a finding that the Purchaser or the Success-
ful Bidder, as the case may be, has purchased the Intellec-
tual Property and Internet Assets in good faith within the
meaning of Bankruptcy Code section 363(m).  Additionally,
the Sellers request that this Court make a finding that a
purchase agreement reached as a result of the Bidding Proce-
dures necessarily will comprise an arm's length, intensely-
negotiated transaction entitled to the protections of Bank-
ruptcy Code section 363(m) and that the transactions contem-

39

plated by the Agreement are not avoidable under Bankruptcy
Code section 363(n).

**VII. THE SALE OF THE INTELLECTUAL PROPERTY AND INTERNET
ASSETS SHOULD BE FREE AND CLEAR OF LIENS, CLAIMS AND
ENCUMBRANCES UNDER BANKRUPTCY CODE SECTION 363(f).**

72.   To facilitate a sale of the Intellectual
Property and Internet Assets, the Sellers request authoriza-
tion to sell the Intellectual Property and Internet Assets
free and clear of any and all Interests.

73.   Under Bankruptcy Code section 363(f), a
debtor in possession may sell property free and clear of any
interest in such property if, among other things:

> (1)   applicable nonbankruptcy law permits sale of
> such property free and clear of such interest;
>
> (2)   such entity consents;
>
> (3)   such interest is a lien and the price at
> which such property is sold is greater than
> the aggregate value of all liens on such
> property;
>
> (4)   such interest is in bona fide   dispute; or
>
> (5)   such entity could be compelled, in a legal or
> equitable proceeding, to accept a money sat-
> isfaction of such interest.

11 U.S.C. § 363(f).

74.   Section 363(f) permits the sale of estate
property free and clear of interests if any one of the five

40

conditions above is met.  See, e.g., In re Laines, 352 B.R.
410, 414-15 (Bankr. E.D. Va. 2005).

75.  Courts have held that the authority of a
debtor to sell assets free and clear of interests is broad
and should be read expansively.  See In re TWA, Inc., 322
F.3d 283, 289 (3d Cir. 2003); see also United Mine Workers
of Am. 1992 Benefit Plan v. Leckie Smokeless Coal Co. (In re
Leckie Smokeless Coal Co.), 99 F.3d 573, 582 (4th Cir. W. Va.
1996) (holding that the phrase "any interest in property"
includes more than just in rem interests); In re P.K.R. Con-
valescent Centers, Inc., 189 B.R. 90, 94 (Bankr. E.D. Va.
1995)("As the plain meaning of the statute demonstrates, §
363 covers more situations than just sales involving
liens.").  Moreover, courts have noted that the purpose of
the "free and clear" language is to allow the debtor to ob-
tain a maximum recovery on its assets in the marketplace.
See In re TWA, Inc., 2001 Bankr. LEXIS 723, at *8-*10 (Bankr.
D. Del. Mar. 27, 2001).

76.  Accordingly, this Court should authorize the
Sellers to sell the Intellectual Property and Internet As-
sets free and clear of all Interests, with any such Inter-
ests attaching to the net proceeds of the sale of the Intel-

41

lectual Property and Internet Assets in the same order and
priority as they exist against the Intellectual Property and
Internet Assets and in accordance with the terms and provi-
sions of the DIP Facility.

**VIII. THE TEN-DAY STAY PROVIDED BY BANKRUPTCY RULE 6004**
**SHOULD BE WAIVED FOR ANY ORDER APPROVING THE SALE OF**
**THE INTELLECTUAL PROPERTY AND INTERNET ASSETS.**

77.  Bankruptcy Rule 6004(h) provides that: "[a]n
order authorizing the use, sale, or lease of property is
stayed until the expiration of 10 days after entry of the
order, unless the court orders otherwise."  Fed. R. Bankr. P.
6004(h).

78.  The Sellers request that the Court waive the
ten-day stays of Bankruptcy Rule 6004 with respect to the
Sale of the Intellectual Property and Internet Assets fol-
lowing entry of any and all orders approving such transac-
tions.  By waiving such requirement, the Sellers and any
purchaser will be able to immediately close the transactions
approved by such orders, which will in turn save the Sellers
continued accrual of administrative expenses and thereby
benefit the Sellers' estates.

### NOTICE

79.  Notice of this Motion has been provided to
those parties entitled to notice under this Court's Order

Pursuant to Bankruptcy Code Sections 102 and 105, Bankruptcy Rules 2002 and 9007, and Local Bankruptcy Rules 2002-1 and 9013-1 Establishing Certain Notice, Case Management, and Administrative Procedures (Docket No. 130). Following entry of the Bidding Procedures Order, the Debtors will provide notice as directed therein.

### WAIVER OF MEMORANDUM OF LAW

80. Pursuant to Local Bankruptcy Rule 9013-1(G), and because there are no novel issues of law presented in the Motion and all applicable authority is set forth in the Motion, the Sellers request that the requirement that all motions be accompanied by a separate memorandum of law be waived.

### NO PRIOR REQUEST

81. No previous request for the relief sought herein has been made to this Court or any other court.

43

## CONCLUSION

WHEREFORE, the Sellers respectfully request that the Court (i) enter the Bidding Procedures Order, substantially in the form annexed hereto, (ii) enter the CPO Order, substantially in the form annexed hereto, (iii) following completion of the Auction, enter the Sale Approval Order, substantially in the form annexed hereto and (iv) grant such other and further relief as may be just and proper.

Dated: April 9, 2009
      Richmond, Virginia

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
Gregg M. Galardi, Esq.
Ian S. Fredericks, Esq.
P.O. Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

              - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
Chris L. Dickerson, Esq.
333 West Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

              - and -

MCGUIREWOODS LLP

/s/ Douglas M. Foley                    .
Dion W. Hayes (VSB No. 34304)
Douglas M. Foley (VSB No. 34364)
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

Counsel for Debtors and Debtors in Possession