**EXECUTION COPY**

ASSET PURCHASE AGREEMENT

Dated as of April 5, 2009

among

SYSTEMAX INC.,

as Buyer,

and

CIRCUIT CITY STORES WEST COAST, INC.

and

CIRCUIT CITY STORES, INC.,

as Sellers

# TABLE OF CONTENTS

Page

ARTICLE I PURCHASE AND SALE OF ACQUIRED ASSETS; PURCHASE PRICE ... 1

SECTION 1.01. Purchase and Sale of Acquired Assets. ...1
SECTION 1.02. Assets and Liabilities ...1
SECTION 1.03. Purchase Price. ...2
SECTION 1.04. Earn-Out Payment. ...3
SECTION 1.05. Transfer Taxes. ...5

ARTICLE II CLOSING; CERTAIN DELIVERIES ... 5

SECTION 2.01. Closing. ...5
SECTION 2.02. Certain Deliveries of the Sellers. ...5
SECTION 2.03. Certain Deliveries of Buyer. ...6

ARTICLE III REPRESENTATIONS AND WARRANTIES RELATING TO THE COMPANY AND THE SELLERS ... 6

SECTION 3.01. Organization; Authority; Execution and Delivery; Enforceability ...7
SECTION 3.02. No Conflicts; Consents. ...7
SECTION 3.03. Title to Assets. ...8
SECTION 3.04. Financial Advisors. ...8
SECTION 3.05. AS IS. ...8
SECTION 3.06. Intellectual Property. ...8

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF BUYER ... 9

SECTION 4.01. Organization, Standing and Power. ...9
SECTION 4.02. Authority; Execution and Delivery; Enforceability ...9
SECTION 4.03. No Conflicts; Consents ...10
SECTION 4.04. Financing. ...10
SECTION 4.05. No Brokers. ...10
SECTION 4.06. Litigation. ...10

ARTICLE V COVENANTS ... 10

SECTION 5.01. Covenants Relating to Conduct of Business ...10
SECTION 5.02. Reasonable Best Efforts. ...11
SECTION 5.03. Supplemental Disclosure. ...12
SECTION 5.04. Further Assurances. ...12
SECTION 5.05. Service. ...13
SECTION 5.06. Circuit City Data. ...13
SECTION 5.07. Bid Procedures and Sale Motion ...13
SECTION 5.08. Publicity. ...14

| | | |
|---|---|---:|
| SECTION 5.09. | Canadian Trademarks. | 14 |
| SECTION 5.10. | Employees. | 14 |
| SECTION 5.11. | Access to Information. | 14 |
| SECTION 5.12. | Cessation of Use, Removal of Marks. | 15 |
| SECTION 5.13. | Trademark and Patent Prosecution and Maintenance. | 15 |

ARTICLE VI CONDITIONS PRECEDENT ........................................................... 15

| | | |
|---|---|---:|
| SECTION 6.01. | Conditions to Each Party's Obligation. | 15 |
| SECTION 6.02. | Conditions to Obligations of Buyer. | 15 |
| SECTION 6.03. | Conditions to Obligation of the Sellers. | 16 |

ARTICLE VII TERMINATION, AMENDMENT AND WAIVER ............................ 17

| | | |
|---|---|---:|
| SECTION 7.01. | Termination. | 17 |
| SECTION 7.02. | Effect of Termination. | 19 |
| SECTION 7.03. | Amendments and Waivers. | 19 |

ARTICLE VIII GENERAL PROVISIONS ............................................................. 19

| | | |
|---|---|---:|
| SECTION 8.01. | Expenses. | 19 |
| SECTION 8.02. | No Survival of Representations and Warranties. | 19 |
| SECTION 8.03. | Assignment. | 19 |
| SECTION 8.04. | No Third Party Beneficiaries. | 19 |
| SECTION 8.05. | Remedies. | 20 |
| SECTION 8.06. | Notices. | 20 |
| SECTION 8.07. | Interpretation; Exhibits and Schedules; Certain Definitions | 21 |
| SECTION 8.08. | Counterparts. | 24 |
| SECTION 8.09. | Entire Agreement. | 24 |
| SECTION 8.10. | Severability. | 24 |
| SECTION 8.11. | Exclusive Jurisdiction. | 24 |
| SECTION 8.12. | Governing Law. | 24 |
| SECTION 8.13. | Waiver of Jury Trial. | 24 |
| SECTION 8.14. | Bankruptcy Court Approval. | 25 |

## ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT**, dated as of April 5, 2009 (this "Agreement"), is by and among Systemax Inc., a Delaware corporation ("Buyer"), Circuit City Stores West Coast, Inc., a California corporation ("CCWC"), and Circuit City Stores, Inc., a Virginia corporation (the "Company", and together with CCWC, the "Sellers").

**WHEREAS**, each of CCWC and the Company are debtors which have commenced cases under chapter 11 of the Bankruptcy Code by filing voluntary petitions with the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court") (collectively, the "Cases");

**WHEREAS**, Sellers currently operate the Business;

**WHEREAS**, each of the Sellers wishes to sell, or cause to be sold, to Buyer, and Buyer wishes to purchase from the Sellers, all of the Acquired Assets pursuant to, inter alia, Sections 363 and 365 of the Bankruptcy Code, the applicable Federal Rules of Bankruptcy Procedure, and all other Applicable Laws; and

**WHEREAS**, the sale of the Acquired Assets is subject to the approval of the Bankruptcy Court.

**NOW, THEREFORE**, in consideration of the mutual representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to the terms and conditions hereof, the parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I

## PURCHASE AND SALE OF ACQUIRED ASSETS; PURCHASE PRICE

**SECTION 1.01.** Purchase and Sale of Acquired Assets. Subject to the terms and conditions of this Agreement, at and as of the Closing, (a) the Sellers shall (and the Company shall cause the Sellers and the Sellers' subsidiaries to) sell, assign, convey, transfer and deliver to Buyer all of seller's rights and interests in and to the Acquired Assets, free and clear of all Liens other than Assumed Liens, and free and clear of all Liabilities; and (b) in exchange therefor, Buyer shall pay an amount equal to the Purchase Price in accordance with Section 1.03, and shall accept, assume and agree to pay, perform or otherwise discharge, in accordance with the respective terms and subject to the respective conditions thereof, the Assumed Liens.

**SECTION 1.02.** Assets and Liabilities.

(a) Acquired Assets. For purposes of this Agreement, "Acquired Assets" means all rights and interests of the Sellers described in clauses (i) through (vii) below, and a non-exclusive, perpetual, royalty free, worldwide right to use the Alpine Data. For the avoidance of doubt, if any Acquired Asset is not sold, assigned, conveyed, transferred or delivered to Buyer or its designees on the Closing Date, such Acquired Asset shall be sold, assigned, conveyed,

1

transferred or delivered as promptly as possible in accordance with the procedures for assumption and assignment set forth in the Sale Order.

(i)    The "Circuit City" and related trademarks and domain names set forth on Schedule 1.02(a)(i) and all goodwill associated with such trademarks (the "Circuit City Marks");

(ii)    "The City" and related trademarks and domain names set forth on Schedule 1.02(a)(ii) and all goodwill associated with such trademarks (the "City Marks"), it being understood that notwithstanding anything in this Agreement to the contrary, the City Marks are being sold, assigned, conveyed, transferred or delivered to Buyer on an "as is" basis, and all warranties, express or implied, including warranties of merchantability and fitness for use, are excluded from the sale and transfer of the City Marks. In addition, Sellers make no representations or warranties of any nature with respect to the City Marks;

(iii)    The other miscellaneous domain names set forth on Schedule 1.02(a)(iii);

(iv)    The toll-free numbers set forth on Schedule 1.02(a)(iv);

(v)    The patents, and registrations and applications therefor, set forth on Schedule 1.02(a)(v) (the "Patents");

(vi)    The website content described in Schedule 1.02(a)(vi); and

(vii)    Subject to the terms of Section 5.02(g), Section 5.06, and Bankruptcy Court approval, the Circuit City Data.

(b)    Excluded Assets.    Notwithstanding anything to the contrary in this Agreement and for the avoidance of doubt, Seller is not selling, conveying, assigning, transferring or delivering to Buyer any assets or rights other than those conveyed to Buyer pursuant to the terms of Section 1.02(a) (all other assets and rights, the "Excluded Assets").

(c)    Excluded Liabilities.    Notwithstanding anything contained in this Agreement to the contrary, Buyer is not assuming any Liabilities related to the Acquired Assets. All Liabilities related to the Acquired Assets shall be Excluded Liabilities and shall be retained by and remain the Liabilities of the Sellers.

**SECTION 1.03.**    Purchase Price.    The purchase price for the Acquired Assets (the "Purchase Price") shall be (a) an amount in cash equal to Six Million Five Hundred Thousand Dollars ($6,500,000) (the "Initial Consideration") which for the purposes of this Agreement shall include the good faith deposit previously delivered by Buyer to the Sellers in connection with Buyer's bid proposals for the Acquired Assets, and (b) the Earn-Out Payment (as defined below).

2

SECTION 1.04.    Earn-Out Payment.

(a)    Buyer shall pay or cause to be paid to Sellers an additional payment (each, an "Earn-Out Payment"), as and to the extent provided in this Section 1.04, in respect of CC Net Revenues (as defined below) of Buyer or its Affiliates during each Earn-Out Period (as defined below).  As used herein each "Earn-Out Payment" shall be computed as follows (provided, however, that each dollar amount referenced below shall be reduced by fifty percent (50%) in the case of the Third Earn-Out Period (as defined below)):

| | In respect of CC Net Revenues during the then-applicable Earn Out Period: | The Earn-Out Payment on each such tranche of CC Net Revenues shall be equal to: |
|---|---|---|
| (a) | greater than $0 but less than Five Hundred Million Dollars ($500,000,000) | ½ of 1% of such CC Net Revenues |
| (b) | in respect of incremental CC Net Revenues above those in paragraph (a) and greater than Five Hundred Million Dollars ($500,000,000) but less than One Billion Dollars ($1,000,000,000) | 1% of such CC Net Revenues |
| (c) | in respect of incremental CC Net Revenues above those in paragraphs (a) and (b) and greater than One Billion Dollars ($1,000,000,000) but less than One Billion Five Hundred Million Dollars ($1,500,000,000) | 1½% of such CC Net Revenues |
| (d) | in respect of incremental CC Net Revenues above those in paragraphs (a), (b) and (c) and greater than One Billion Five Hundred Million Dollars ($1,500,000,000) | 1¾% of such CC Net Revenues |

For purposes hereof, "CC Net Revenues" shall mean the amount of gross revenues of Buyer or Affiliates of Buyer during the Earn-Out Period from the sale of (i) goods originated through any of the domain names or URLs acquired hereunder, less returns, credits, allowances and freight charges or (ii) any other proprietary product of Buyer or Affiliates of Buyer that is sold utilizing the Circuit City brand through any other Buyer sales channel.  "Earn-Out Period" shall mean each of the following periods: (i) the period commencing on the thirtieth (30th) day following the Closing Date and ending on the one year anniversary of the thirtieth (30th) day following the Closing Date (the "First Earn-Out Period"); (ii) the period commencing on the day immediately following the end of the First Earn-Out Period and ending on the one year anniversary of the end

3

of the First Earn-Out Period (the "Second Earn-Out Period"); and (iii) the period commencing on the day immediately following the end of the Second Earn-Out Period and ending on the date six (6) months after the end of the Second Earn-Out Period (the "Third Earn-Out Period").

(b) As soon as practicable following the end of each Earn-Out Period but in no event more than ninety (90) days thereafter, Buyer shall prepare and deliver to the Sellers, a certificate setting forth in reasonable detail the calculation of the Earn-Out Payment associated with such Earn-Out Period (the "Earn-Out Certificate").

(c) Sellers shall have a period of thirty (30) days after receipt of each Earn-Out Certificate to audit at Sellers' sole cost and expense the CC Net Revenues and Buyer's calculation of the Earn-Out Payment reflected in such Earn-Out Certificate (the "Audit Period"), and in this regard Sellers shall be given access, upon reasonable advance written request during regular business hours, to Buyer's books and records reasonably necessary to determine the CC Net Revenues. Sellers shall have a period of ten (10) Business Days after the expiration of the each Audit Period to present, in writing, to Buyer any objection Sellers may have to any of the matters set forth in the related Earn-Out Certificate, which objections shall be set forth in reasonable detail and shall state the basis for such objection in reasonable detail. If no objections are raised within such 10-Business Day period, the Earn-Out Certificate shall be deemed accepted and approved by Buyer and by Sellers and the payment required by Section 1.04(a) shall be made no later than the third (3rd) Business Day following the expiration of such 10-Business Day period.

(d) If Sellers shall raise any objections within the aforesaid 10-Business Day period, representatives of Buyer and Sellers shall attempt to resolve the matter or matters in dispute and, if resolved, shall accept on behalf of Buyer and Sellers a revised Earn-Out Certificate prepared in accordance with such resolution, whereupon the confirmed or revised Earn-Out Certificate shall be final, binding and conclusive on Buyer and Sellers. In such event, the payment required by Section 1.04(a) shall be made no later than three (3) Business Days following the receipt of such confirmed or revised Earn-Out Certificate by Buyer and Sellers.

(e) If such dispute cannot be resolved by representatives of Buyer and Sellers within ten (10) Business Days after the delivery of the Earn-Out Certificate, then the specific matters in dispute shall be submitted to a recognizable, reputable and impartial certified public accounting firm that is mutually acceptable to the Buyer and the Seller (the "Neutral Firm"). If the Buyer and the Sellers cannot agree upon a Neutral Firm within ten (10) days, a mediator selected by JAMS at the request of the parties shall choose a recognized, reputable, and impartial certified public accounting firm to act as the Neutral Firm. The Neutral Firm shall promptly resolve the amounts remaining in dispute between the parties and shall, within thirty (30) days of its engagement, deliver a revised Earn-Out Certificate in accordance with its determination of the amounts remaining in dispute. Such determination shall be final, binding and conclusive on Buyer and Sellers. In such event, the payment required pursuant to Section 1.04(a) shall be made no later than three (3) Business Days following the receipt of the documents confirming such determination of the Neutral Firm by Buyer and Sellers.

(f) The fees and expenses of the Neutral Firm shall be borne by the Buyer if the Neutral Firm determines that an Earn-Out Payment that has not been evidenced on the Earn-

4

Out Certificate delivered pursuant to Sections 1.04(b)-(d) is payable to the Sellers for the applicable Earn-Out Period and the fees and expenses of the Neutral Firm shall be borne by the Sellers if the Neutral Firm determines that no Earn-Out Payments are payable to Sellers for the applicable Earn-Out Period other than those Earn-Out Payments evidenced on the Earn-Out Certificate delivered pursuant to Sections 1.04(b)-(d).

(g) The parties agree to cooperate with each other and each other's authorized representatives and with the Neutral Firm in order that any and all matters in dispute be resolved as soon as practicable and that a final determination of the Earn-Out Payments be made.

SECTION 1.05.    Transfer Taxes. Notwithstanding any other provision herein, all Transfer Taxes attributable to the Sellers' sale of the Acquired Assets, as well as the cost of the filing of all necessary tax returns and other documentation with respect to all such Transfer Taxes, shall be borne and paid equally by the Sellers, on the one hand, and Buyer, on the other, when due, and the Sellers and Buyer shall file all necessary tax returns and other documentation required to be filed by them with respect to all such Transfer Taxes, and, if required by applicable law, Buyer and the Sellers will, and will cause their affiliates to, file or join in the execution of any such tax returns and other documentation; provided that the parties shall reasonably cooperate in availing themselves of any available exemptions from any collection of (or otherwise reduce) any such Transfer Taxes.

## ARTICLE II

## CLOSING; CERTAIN DELIVERIES

SECTION 2.01.    Closing. Unless this Agreement shall have been terminated and the Transactions shall have been abandoned pursuant to Article VII hereof, the closing of the Transactions (the "Closing") shall take place at the Delaware offices of Skadden, Arps, Slate, Meagher & Flom LLP, One Rodney Square, Wilmington, Delaware, at 10:00 a.m. on the second Business Day following the satisfaction (or, to the extent permitted, the waiver) of each of the conditions set forth in Article VI (other than those conditions which, by their nature, can be fulfilled only at the Closing, but subject to the fulfillment or waiver of such conditions) or at such other place or at such other time as shall be agreed upon by Buyer and the Company. The date on which the Closing occurs is referred to in this Agreement as the "Closing Date."

SECTION 2.02.    Certain Deliveries of the Sellers. At the Closing, the Sellers shall, at Sellers' expense, deliver the following to Buyer:

(a) An executed Bill of Sale, Assignment and Assumption Agreement in form and substance set forth in Exhibit A hereto;

(b) A certified copy of the Sale Order;

(c) The officer's certificates required to be delivered pursuant to Section 6.02(c) hereof;

(d) A certified copy of all required directors' resolutions;

(e) Duly executed and acknowledged (as appropriate) assignments of the U.S. trademark registrations and applications and U.S. patents and patent applications included in the Acquired Assets contemplated to be acquired pursuant to the terms hereof, in a form reasonably acceptable to Buyer and suitable for recording in the U.S. Patent and Trademark Office, as well as assignment documents for trademark and/or patent rights in other jurisdictions as reasonably requested by Purchaser;

(f) Such other documents of assumption and adequate assurances as may be required by the Sale Order that the Buyer shall have identified not later than five (5) business days prior to the Closing Date; and

(g) Such other documents as Buyer may reasonably require, including, without limitation, as needed to convey to Buyer the Data, website content, toll-free numbers, and domain names included in the Acquired Assets.

SECTION 2.03.    Certain Deliveries of Buyer.    At the Closing, Buyer shall, at Buyer's expense, deliver to the Sellers:

(a) By wire transfer of immediately available funds to the account(s) designated by the Company, the Initial Consideration;

(b) An executed Bill of Sale, Assignment and Assumption Agreement in form and substance set forth in Exhibit A hereto;

(c) The officer's certificate required to be delivered pursuant to Section 6.03(c) hereof;

(d) An executed copy of the Canada License (as hereinafter defined);

(e) Such other documents of assumption and adequate assurance as may be required by the Sale Order; and

(f) Such other documents as Sellers may reasonably require.

### ARTICLE III

### REPRESENTATIONS AND WARRANTIES
### RELATING TO THE COMPANY AND THE SELLERS

Sellers have delivered to Buyer and attached hereto certain Disclosure Schedules prepared by Sellers with numbered sections corresponding to the relevant sections in this Article III (the "Seller Disclosure Schedules"), and any exception or qualification set forth in the Seller Disclosure Schedules with respect to a particular representation or warranty contained in this Article III shall be deemed to be an exception or qualification with respect to such section of this Article III and all other representations or warranties contained in this Article III only to the extent any description of fact regarding the event, item or matter is disclosed in such a way as to make it reasonably apparent from the face of such disclosure without further inquiry that such exception or qualification is applicable to such other Section of this Article III.

6

The Sellers hereby represent and warrant to Buyer, jointly and severally, as of the date of this Agreement and (unless the representation and warranty specifies that it is made as of the date of this Agreement) as of the Closing Date as follows:

SECTION 3.01.     Organization; Authority; Execution and Delivery; Enforceability.

(a)     Each Seller is duly organized, validly existing and in good standing under the laws of its jurisdiction of formation.

(b)     The Sellers have full power and authority to execute and deliver (or cause to execute and deliver) this Agreement and each other document, instrument and certificate contemplated by this Agreement (the "Seller Documents") and, subject to the entry of the Sale Order, to consummate (or cause to consummate) the Transactions and transactions contemplated by the Seller Documents. The execution and delivery by the Sellers of this Agreement and Seller Documents and the consummation by the Sellers of the Transactions and transactions contemplated by the Seller Documents have been duly authorized by all necessary corporate action. The Sellers have duly executed and delivered this Agreement and, assuming this Agreement constitutes a valid and binding obligation of the other parties hereto, this Agreement and the Seller Documents will, subject to the entry of the Sale Order, constitute a valid and binding obligation of each of the Sellers enforceable against it in accordance with its terms.

(c)     Any consent, authorization or approval required for the commencement of the Cases, the execution and delivery of this Agreement and the Seller Documents and the consummation of the Transactions and the transactions contemplated by the Seller Documents has been obtained.

SECTION 3.02.     No Conflicts; Consents. Subject to obtaining Bankruptcy Court approval pursuant to the Sale Order, and assuming that Buyer acquires the Acquired Assets upon the consummation of the Transactions, the execution and delivery by the Sellers of this Agreement does not, and the consummation of the Transactions and compliance by the Sellers with the terms hereof will not, conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to loss of a benefit under, or to increased, additional, accelerated or guaranteed rights or entitlements of any Person under, or result in the creation of any Lien upon any of the properties or assets of the Sellers or any of their subsidiaries under, any provision of (i) the certificate of incorporation or by-laws of the Company or the comparable governing instruments of any of the Sellers, (ii) subject to obtaining the third party consents set forth on Section 3.02 of the Seller Disclosure Schedules to the extent required, any Contract to which the Company or any of the Sellers is a party or by which any of their respective properties or assets is bound or (iii) any judgment, order or decree ("Judgment") or statute, law, ordinance, rule or regulation ("Applicable Law") applicable to the Sellers or their respective properties or assets, other than, in the case of clause (iii) above, any such items that, individually or in the aggregate, would not reasonably be expected to have a Seller Material Adverse Effect. No consent of, or registration, declaration or filing with, any Federal, state, local or foreign government or any court of competent jurisdiction, administrative agency or commission or other governmental authority or instrumentality, domestic or foreign (a "Governmental Entity") is required to be obtained or made by or with respect to Sellers or any of their subsidiaries in

connection with the execution, delivery and performance of this Agreement or the consummation of the Transactions, other than (i) the Sale Order, (ii) such filings as may be required by the Bankruptcy Court in connection with the Cases, and (iii) such other items as are required solely by reason of the participation of Buyer (as opposed to any third party) in the Transactions.

**SECTION 3.03.**    Title to Assets.  The Company or one of the Sellers has good and valid title to or leasehold interest in the Acquired Assets in each case free and clear of Liens, except (i) mechanics', carriers', workmen's, landlord's, repairmen's or other like Liens arising or incurred in the ordinary course of business, (ii) other imperfections of title or encumbrances, if any, that, individually and in the aggregate, do not materially impair, and would not reasonably be expected to materially impair, the use of the Acquired Assets in the conduct of the Business as conducted by the Company and its subsidiaries as of December 31, 2008, or (iii) Liens listed in Section 3.03 of the Seller Disclosure Schedules (the Liens described in clauses (i), (ii) and (iii) above are referred to collectively as "Assumed Liens").  Assuming receipt of the Sale Order and obtaining the consents listed in Section 3.02 of the Seller Disclosure Schedules, upon Closing, Buyer will be vested with good and valid title to or leasehold interest in the Acquired Assets free and clear of all Liens, except for the Assumed Liens, to the fullest extent permissible under Sections 363 and 365 of the Bankruptcy Code.

**SECTION 3.04.**    Financial Advisors.  Except as set forth on in Section 3.04 of the Seller Disclosure Schedules, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Sellers in connection with the Transactions and no Person is entitled to any fee or commission or like payment in respect thereof.

**SECTION 3.05.**    AS IS.  EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED HEREIN, ALL OF THE ACQUIRED ASSETS ARE BEING SOLD AND TRANSFERRED TO BUYER ON AN "AS IS" AND "WHERE IS" BASIS AND ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR USE, ARE EXCLUDED FROM THE SALE AND TRANSFER OF THE ACQUIRED ASSETS.  SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES OF ANY NATURE WITH RESPECT TO THE ACQUIRED ASSETS OTHER THAN AS EXPRESSLY PROVIDED FOR HEREIN.

**SECTION 3.06.**    Intellectual Property.  Except as set forth on Section 3.06 of the Seller Disclosure Schedules:

(a)    To the Sellers' knowledge, no third party is infringing upon, misappropriating, or otherwise violating the Circuit City Marks or the Patents.

(b)    To the Seller's knowledge, the use of the Circuit City Marks in the Business as conducted as of December 31, 2008 does not conflict with, infringe upon or violate any trademark right of any Person.

(c)    The execution, delivery and performance of this Agreement and the Seller Documents, and the consummation of the transaction contemplated hereby and thereby, will not, to the Sellers' knowledge, constitute a material breach of any Contract involving any Acquired

8

Assets, nor cause the forfeiture or termination of any Acquired Assets, except as would not reasonably be expected to result in a Seller Material Adverse Effect.

(d)  Section 3.06 of the Seller Disclosure Schedules sets forth a complete and accurate list of (i) any Contract pursuant to which any third party is authorized to use any of the Acquired Assets (the "Seller Licenses"). Each of the Seller Licenses are valid and enforceable against the Sellers, and, to the knowledge of the Sellers, the other party or parties thereto, in accordance with its terms.

(e)  Sellers have implemented industry "best practices" to ensure the physical and electronic protection of the Circuit City Data and the Alpine Data from unauthorized disclosure, use or modification. Other than as set forth in Section 3.06 of the Sellers Disclosures Schedules, there has been no breach of security involving any of the Circuit City Data or the Alpine Data. Sellers have neither sold nor licensed to use any Circuit City Data. The Circuit City Data and the Alpine Data has been collected, stored, maintained and used in accordance with all applicable terms and policies of the Sellers, and all applicable U.S. laws and regulations.

(f)  As of the date of this Agreement, the Circuit City Data and the Alpine Data includes all historical transaction data within the possession of Sellers with respect to each individual listed therein.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to the Sellers that, except as set forth in the Buyer Disclosure Schedules, as of the date of this Agreement and as of the Closing Date as follows:

**SECTION 4.01.**  *Organization, Standing and Power.*  Buyer is duly organized, validly existing and in good standing under the laws of its jurisdiction of formation.

**SECTION 4.02.**  *Authority; Execution and Delivery; Enforceability.*

(a)  Buyer has full power and authority to execute this Agreement and, subject to the entry of the Sale Order, to consummate the Transactions. The execution and delivery by Buyer of this Agreement and the consummation by Buyer of the Transactions have been duly authorized by all necessary corporate action. Buyer has duly executed and delivered this Agreement, and assuming this Agreement constitutes valid and binding obligations of the other parties hereto this Agreement will, subject to the entry of the Sale Order, constitute a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms, except as limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally and (ii) general equitable principles.

(b)  To Buyer's knowledge, no state takeover statute or similar statute or regulation applies or purports to apply to Buyer with respect to this Agreement or any the Transactions.

SECTION 4.03.    No Conflicts; Consents.

(a) The execution and delivery by Buyer of this Agreement do not, and the consummation of the Transactions and compliance by Buyer with the terms hereof will not conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to loss of a material benefit under, or to increased, additional, accelerated or guaranteed rights or entitlements of any Person under, or result in the creation of any Lien upon any of the properties or assets of Buyer or any of its subsidiaries under, any provision of (i) organizational documents of Buyer or any of its subsidiaries, (ii) any Contract to which Buyer or any of its subsidiaries is a party or by which any of their respective properties or assets is bound or (iii) subject to the filings and other matters referred to in Section 4.03(b), any Judgment or Applicable Law applicable to Buyer or any of its subsidiaries or their respective properties or assets, other than, in the case of clauses (ii) and (iii) above, any such items that, individually or in the aggregate, have not had and would not reasonably be expected to have a Buyer Material Adverse Effect.

(b) No consent of, or registration, declaration or filing with any Governmental Entity is required to be obtained or made by or with respect to Buyer or any of its subsidiaries in connection with the execution, delivery and performance of this Agreement or the consummation of the Transactions, other than (i) such filings as may be required by the Bankruptcy Court in connection with the Cases, and (ii) such other items those that may be required solely by reason of the participation of the Company (as opposed to any other third party) in the Transactions.

SECTION 4.04.    Financing.  Buyer will have funds on hand as of the Closing Date which will be sufficient to pay the Purchase Price.

SECTION 4.05.    No Brokers.  No broker, investment banker or other Person is entitled to any broker's, finder's or other similar fee or commission in connection with the Transactions based upon arrangements made by or on behalf of Buyer.

SECTION 4.06.    Litigation.  There are not any (a) outstanding Judgments against or affecting Buyer, (b) Proceedings pending or threatened against or affecting Buyer, or (c) investigations by any Governmental Entity that are pending or threatened against or affecting Buyer that, in each case, individually or in the aggregate, would reasonably be expected to have a Buyer Material Adverse Effect.

## ARTICLE V

## COVENANTS

SECTION 5.01.    Covenants Relating to Conduct of Business.

(a) Except for matters set forth in Section 5.01 of the Seller Disclosure Schedules or otherwise expressly permitted by the terms of this Agreement, from the date of this Agreement to the Closing, taking into account that the Sellers are involved in a bankruptcy proceeding, the Sellers shall not, and shall cause their subsidiaries not to, without the prior

10

written consent of Buyer, which consent shall not be unreasonably withheld, delayed or conditioned:

 (i) directly or indirectly (through any merger, consolidation, reorganization, issuance of securities or rights, license, lease, encumbrance or otherwise), sell, assign, convey, transfer, license, lease or otherwise dispose of any Acquired Assets other than (a) the Alpine Data or (b) the Circuit City Data as permitted in Section 5.06(g);

 (ii) directly or indirectly solicit and/or negotiate an alternate transaction with any other Person for the sale and purchase of any Acquired Assets prior to the filing with the Bankruptcy Court of the Bid Procedures and Sale Motion (as defined herein); or

 (iii) authorize any of, or commit or agree to take, whether in writing or otherwise, to do any of, the foregoing actions, or request the Bankruptcy Court to approve or authorize the Sellers to take or omit to take any action which would breach the Sellers' covenants under or any other provisions of this Agreement, or consent to any such approval or authorization.

 (b) <u>Advise of Changes</u>.  The Sellers shall use all reasonable efforts to promptly advise the Buyer orally (to be followed promptly by written confirmation) of the occurrence of any matter or event that is material to the Acquired Assets.

 **SECTION 5.02.** <u>Reasonable Best Efforts</u>.  Upon the terms and subject to the conditions herein provided, Buyer, on the one hand, and each of the Sellers, on the other hand, shall (and each Seller shall cause its subsidiaries to) use its respective reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other parties hereto in doing, all things necessary, proper or advisable under Applicable Laws and regulations to ensure that the conditions set forth in this Agreement are satisfied and to consummate and make effective, in the most expeditious manner practicable, the Transactions, including, without limitation, the following:

 (a) Buyer, on the one hand, and each of the Sellers, on the other hand, shall (and each Seller shall cause its subsidiaries to) use its reasonable best efforts (including, in the case of the Sellers, petitioning the Bankruptcy Court pursuant to Sections 363 and 365 of the Bankruptcy Code) to obtain, at its own expense, any and all approvals, authorizations, consents and other actions by Governmental Entities, administrative agencies, courts and other Persons necessary or appropriate (above and beyond the entry of the Sale Order) for such party to consummate the Transactions. Without limiting the generality of the foregoing, each Seller shall (and shall cause its Subsidiaries to) use its reasonable best efforts, considering the operation, force and effect of the Sale Order in authorizing such transfers, to obtain, at its own expense, any approvals, authorizations, consents and other actions by all parties necessary for the Sellers to transfer to Buyer, as applicable, and Buyer to receive, all assets associated with the Business which are Acquired Assets.

 (b) Each of the Sellers shall take all actions, including appropriate service and notice of pleadings, in form and substance reasonably satisfactory to Buyer, needed to obtain a

11

Sale Order that authorizes, orders and effects a sale of all of the Acquired Assets free and clear of all Excluded Liabilities and Liens other than Assumed Liens and the other orders contemplated herein.

(c) Each Seller shall cooperate fully, following entry of the Sale Order approving the sale of the Acquired Assets to Buyer or its designee, in the arrangements for the transfer of the Acquired Assets from the Sellers to Buyer in an orderly fashion, free and clear of and from any and all Excluded Liabilities and Liens other than Assumed Liens and otherwise in accordance with the terms, provisions and conditions of this Agreement and all other agreements, documents and instruments executed and/or delivered in connection herewith, including to the extent reasonably practical, entering into any ancillary insolvency, restructuring or similar proceedings in any relevant non-U.S. jurisdiction.

(d) Without limiting the generality of the foregoing, the parties hereto shall furnish to each other such necessary information and reasonable assistance, as each may request in connection with each Seller's preparation and filing of applications, motion papers and filings, including the Bid Procedures and Sale Motion needed to obtain Bankruptcy Court approval of the Transactions, and shall execute any additional instruments necessary to consummate the Transactions, whether before or after the Closing.

(e) Subject to Applicable Law and the instructions of any Governmental Entity, the Sellers and Buyer each shall keep the other apprised of the status of matters relating to completion of the Transactions, including promptly furnishing the other with copies of notices or other communications received by Buyer or the Sellers, from any third party and/or any Governmental Entity with respect to such Transactions.

(f) Not fewer than five (5) days prior to Closing or such earlier date as prescribed by Applicable Law, Sellers shall obtain all approvals and certificates (including tax clearance certificates and all applicable bulk sale filings) required by any Governmental Entity and shall deliver all notices required by any Governmental Entity in connection with the sale of the Acquired Assets except to the extent that any such approval certificate is not required by entry of the Sale Order.

(g) Sellers and Buyer shall use their reasonable best efforts to satisfy and otherwise address matters related to the conveyance of Circuit City Data identified by the CPO in the CPO Report or otherwise.

SECTION 5.03.    Supplemental Disclosure.    Each party shall promptly notify the other parties of, and furnish such other parties with any information such other parties may reasonably request with respect to, the occurrence to such party's actual knowledge of any event or condition or the existence to such party's actual knowledge of any fact that would reasonably be expected to cause any of the conditions set forth in Article VI to not be satisfied.

SECTION 5.04.    Further Assurances.    From time to time, as and when requested by any party, each party shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as such other party may reasonably deem necessary or desirable to consummate the Transactions,

12