# EXHIBIT 1(b)

period described above. Upon such termination, Tenant and Landlord shall be relieved of and from any and all further liability or obligation to the other under and pursuant to this Lease, and further, Landlord shall pay to Tenant the value of its unamortized improvements made to the Premises, which amount shall include the unamortized amount of Tenant Improvement Allowance only if Landlord has not paid such amount pursuant to the Construction Provisions. Notwithstanding anything contained herein to the contrary, Landlord's obligation to reimburse Tenant for its unamortized improvements shall survive the expiration or termination of Lease in the event Landlord exercises its recapture option as provided above. For purposes of this paragraph, "cessation" of operation at the Premises shall not mean or include any period during which Tenant is not operating within the Premises due to a casualty event, condemnation, reconstruction, alterations, modifications, maintenance or repair, or preparing the Premises for occupation by an assignee or subtenant.

19.   Warranties, Representations and Covenants.

(a)   Landlord represents, warrants and covenants to Tenant that:

(i)   Quiet and Peaceful Enjoyment. Tenant shall have quiet and peaceful use, enjoyment and occupancy of the Premises, by, through or under Landlord.

(ii)   Title. Landlord's fee simple interest in the Shopping Center is free and clear of any mortgages, deeds, encumbrances, declarations, easements, agreements, leases, tenancies or restrictions, except those matters set forth on Exhibit "F" attached hereto and entitled "Permitted Encumbrances", or any other encumbrances which would restrict Tenant's use of the Premises for the sale of Products or would restrict in any respect the right of Tenant, its employees, customers and invitees to use the Common Areas in accordance with the terms of this Lease. Nothing contained in this Lease, including the Permitted Encumbrances and other matters disclosed on Exhibit "F", shall restrict Tenant's right to sell the Products in the Premises. Landlord specifically covenants and warrants that no third party, including but not limited to any other occupant of the Shopping Center, has the right to object to Tenant's tenancy hereunder, prohibit the selling, renting, servicing, repairing or warehousing (i.e. inventory storage) of the Products, or, except for governmental authorities and parties permitted to enforce the terms of the REA, the right to consent to any feature of the Improvements or Tenant's signage. This representation, warranty and covenant is a material inducement to Tenant's execution of this Lease.

(iii)   Certificate of Authority. Landlord covenants that it is a duly constituted limited liability company under the laws of the State of Illinois, and that its managing

27

member who is acting as its signatory in this Lease is duly authorized and empowered to act for and on behalf of the limited liability company. Landlord has furnished Tenant prior hereto with evidence of (a) the existence of the limited liability company, and (b) the authority of the managing member to bind the limited liability company as contemplated herein.

(iv)     No Litigation. There are no judicial, quasi-judicial, administrative or other orders, injunctions, moratoria or pending proceedings against Landlord or the Shopping Center which preclude or interfere with, or would preclude or interfere with, the construction contemplated herein or the occupancy and use of the Premises for the purposes herein contemplated.

(v)     Hazardous or Toxic Materials. To the best of Landlord's knowledge, Landlord has not used, discharged, dumped, spilled or stored any Hazardous Substances (as defined in the Construction Provisions) on or about the Shopping Center, whether accidentally or intentionally, legally or illegally, and has received no notice and has no knowledge that any such condition exists at the Shopping Center. If any claim is ever made against Tenant relating to Hazardous Substances present at or around the Shopping Center, whether or not such substances are present as of the date hereof, or any Hazardous Substances are hereafter discovered at the Shopping Center (unless introduced by Tenant, its agents or employees), all costs of removal incurred by, all liability imposed upon, or damages suffered by, Tenant because of the same shall be borne by Landlord, and Landlord hereby indemnifies and agrees to defend and hold Tenant harmless from and against all such costs, losses, liabilities and damages, including, without limitation, all third-party claims (including sums paid in settlement thereof, with or without legal proceedings) for personal injury or property damage and other claims, actions, administrative proceedings, judgments, compensatory and punitive damages, lost profits, penalties, fines, costs, losses, attorneys' fees and expenses (through all levels of proceedings), consultants or experts fees and all costs incurred in enforcing this indemnity. The representation, warranty and indemnity of Landlord described in this paragraph 19(a)(v) shall survive the termination or expiration of this Lease. Notwithstanding the foregoing, in the event any Hazardous Substances are introduced to the Shopping Center by unrelated third parties, Landlord shall be responsible for the expeditious removal thereof, to the extent required by law or affecting Tenant's operation, Tenant's business or Tenant's Preferred Area, but Landlord shall not be required to indemnify, defend or hold Tenant harmless against any claims asserted by third parties against Tenant arising out of such Hazardous Substances or be liable for any claims by Tenant for compensatory and punitive damages, lost profits or other consequential

damages resulting therefrom, so long as Landlord promptly and diligently pursues the clean-up and remediation of the Hazardous Substances as required above. Nothing contained in the foregoing sentence shall be construed to limit Tenant's rights against third parties.

(vi)   Tenant's Exclusive Use. So long as the Premises are used for the initial uses set forth in paragraph 18(a), no other tenant or occupant of the Shopping Center shall be entitled to sell or rent (or rent to own) any of the Products, subject only to rights granted any such tenants under leases in existence as of the date of this Lease and described on Exhibit "F", and subject to Landlord's right to permit the operation of one (1) videotape rental store in the Shopping Center, such as Blockbuster, Hollywood Video or similar store, so long as it is operating as it is as of the Effective Date. Incidental Sale (as hereinafter defined) of the Products in connection with the overall business of another occupant or tenant shall not be deemed a violation of the preceding sentence. As used herein, "Incidental Sale" shall mean the lesser of (i) two hundred (200) square feet, or (ii) ten percent (10%) of such operator or tenant's display area. Notwithstanding anything contained herein to the contrary, (i) in the event any existing tenant leases provide that the tenant thereunder may change its use, Landlord, to the extent it has a right to do so under such lease, will exercise any approval rights in favor of protecting Tenant's exclusive use provided above, and (ii) Office Max, so long as Office Max is operating substantially as it is operating as of the Effective Date, shall be permitted to operate in the Shopping Center. Landlord agrees to deliver to Tenant for recording, on or before Landlord's execution of this Lease, the two (2) agreements relating to exclusives and other matters set forth in Exhibit "K", fully executed and complying with the terms of paragraph 35(f) below.

(vii)   Zoning and Subdivision. The Premises and the Shopping Center are presently properly subdivided, in conformity with all applicable laws and zoned so as to permit (A) the development and operation of the Premises and the Shopping Center in accordance with the provisions of this Lease; and (B) the initial use of the Premises described in paragraph 18 of this Lease.

(viii)   Prohibited Activities. Neither Landlord or Tenant shall operate or lease (nor shall Landlord permit to be operated or leased) any building or tenant space in Tenant Preferred Area or elsewhere in the Shopping Center for use as:

(A)   a bar, pub, nightclub, music hall or disco in which less than fifty percent (50%) of its space or revenue is devoted to and derived from food service; provided, the

foregoing restriction shall not preclude the operation of restaurants such as Applebees, Chili's, Cheddars, Ruby Tuesday and TGI Fridays, as same are operating as of the Effective Date;

(B)    a bowling alley;

(C)    a billiard or bingo parlor;

(D)    a flea market;

(E)    a massage parlor;

(F)    a funeral home;

(G)    a facility for the sale of paraphernalia for use with illicit drugs;

(H)    a facility for the sale or display of pornographic material (as determined by community standards for the area in which the Shopping Center is located);

(I)    an off-track betting parlor;

(J)    a carnival, amusement park or circus;

(K)    a gas station, car wash or auto repair or body shop (the parties specifically acknowledging that Tenant's car stereo installation facility is not included in this prohibition (K));

(L)    a facility for the sale of new or used motor vehicles, trailers or mobile homes;

(M)    a facility for any use which is illegal or dangerous, constitutes a nuisance or is inconsistent with an integrated, community-oriented retail and commercial shopping center;

(N)    a skating rink;

(O)    an arcade, pinball or computer gameroom (provided that retail facilities in the Shopping Center may operate no more than four (4) such electronic games incidentally to their primary operations);

(P)    service-oriented offices (such as, by way of example, medical or employment offices, travel agencies, real estate agencies or dry cleaning establishments) or other nonretail uses, except for offices and storage facilities incidental to a primary retail operation, in more than 10% of the gross leasable area of the Shopping Center, no one such occupant or tenant to occupy more than 12,000 square feet of floor area;

(Q)    a banquet hall, auditorium or other place of public assembly;

(R)    a training or educational facility (including, without limitation, a beauty school, barber college, reading room, school or other facility catering primarily to students or trainees rather than customers);

(S)    a theater of any kind;

(T)    a facility for the sale or rental of used goods (including thrift shops, secondhand or consignment stores) or any facility selling new or used merchandise as a wholesale operation, a liquidation operation, odd lots, lot sales, factory close-outs or imperfect goods unless same is a regional or national retailer such as Marshall's, TJ Maxx, Goody's, Burlington Coat Factory, or similar store;

(U)    a gymnasium, sport or health club or spa;

(V)    any use which emits an obnoxious odor, noise, or sound which can be heard or smelled outside of any building in the Shopping Center (except that this provision shall not prohibit normal cooking odors which are associated with a first-class restaurant operation nor to Tenant's car stereo installation areas);

(W)    any operation primarily used as a storage warehouse operation and any assembling, manufacturing, distilling, refining, smelting, agricultural or mining operation;

258343_8 [51-36 (11919)]

(X)    any "second hand" store or "surplus" store, thrift shop or other business principally engaged in the sale of used merchandise;

(Y)    any mobile home park, trailer court, labor camp, junkyard or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction or maintenance);

(Z)    any dumping, disposing, incineration, or reduction of garbage (exclusive of garbage compactors located near the rear of any building);

(AA)    any fire sale, going-out-of-business sale, bankruptcy sale (unless pursuant to a court order) or auction house operation;

(BB)    any central laundry, central dry cleaning plant or laundromat (except that this provision shall not prohibit nominal supportive facilities for on-site service oriented to pickup and delivery by the ultimate consumer as the same may be found in first-class shopping centers);

(CC)    any automobile, truck, trailer or recreational vehicles sales, leasing, display, body shop or repair operation;

(DD)    any movie theater, night club or live performance theater;

(EE)    any living quarters, sleeping apartments or lodging rooms;

(FF)    any veterinary hospital or animal raising facility (except that this prohibition shall not prohibit pet shops or pet supply superstores and veterinary services which are incidental thereto);

(GG)    any mortuary, funeral home or crematory;

(HH)    any adult book store, adult video store, adult movie theater or other establishment selling, renting or exhibiting pornographic materials or drug-related paraphernalia (except that this provision shall not prohibit the operation of a bookstore or video store which carries a broad inventory of books or videos and other materials directed towards the interest of the general public [as opposed to specific segment thereof]);

(II)    any flea market, amusement or video arcade, pool or billiard hall, car wash, tattoo parlor or dance hall (except that this provision shall not prohibit a restaurant from including video games as an incidental use to its operations);

(JJ)    any training or educational facility, including, but not limited to, beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers (except that this provision shall not prohibit on-site employee training [whether for employment at the Shopping Center or at another business location of such occupant] by an occupant incidental to the conduct of its business at the Shopping Center);

(KK)    any church, school, day care center or related religious or educational facility or religious reading room;

(LL)    any massage parlor (except that this provision shall not prohibit massages in connection with a beauty salon, health club or athletic facility);

(MM)    any casino or other gambling facility or operation, including, but not limited to, off-track or sports betting parlors, table games such as black-jack or poker, slot machines, video gambling machines and similar devices, and bingo halls; or

(NN)    no portion of the Shopping Center shall be used, purchased or leased by a direct competitor of Border's, Inc. with types of tenants such as Barnes & Noble, Media Play, Books a Million, Crown Books and/or B. Dalton.

258343_11 [51-36 (11919)]

In addition to the foregoing, Landlord shall not operate, lease or permit to be operated or leased any restaurant in the Shopping Center within three hundred (300) feet of the front entrance to the Building or bookstore with an eating facility, unless there is no separate entrance for the eating establishment or its door, if separate, is located at the furthest end of the building in which it is located, from the Building.

(ix)   Site Covenants.  With regard to the development of the Shopping Center and the uses and operations of the Common Areas, Landlord makes the following representations, warranties and covenants (the "Site Covenants"):

(A)   Building Height and Location.  No buildings shall exceed the building heights set forth in the REA.  Development shall only occur within the area shown on the Site Plan as Permissible Building Area, except that the rear wall of any of the in-line buildings may be extended east as far as possible while still maintaining the rear service drive as shown on the Site Plan.

(B)   Construction and Alterations.  Following the end of the first Lease Year, no exterior construction and no construction staging shall be permitted in the Shopping Center during the months of October, November and December except for emergency repairs.  In the event of any construction within the Shopping Center, Landlord shall designate a construction access route, staging and parking areas located so as to minimize interference with customers or the operations of other occupants of the Shopping Center and shall require erection of safety barriers as necessary and an opaque wall around the site of such construction of a size necessary to screen such construction from ground level view.  With regard to any construction on Landlord's Premises, Landlord shall be solely responsible for any governmentally imposed impact fees, hookup, connection, installation or tap in fees and other similar construction-related charges.  Landlord shall make no changes in Tenant's Preferred Area as shown on the Site Plan (including, without limitation, changes in the location of curbcuts, drive aisles, roadways, sidewalks or parking spaces or reduction of the parking ratio specified in paragraph 5) without Tenant's express written consent, which Tenant may, in its sole discretion, withhold.  Landlord shall not make any

258343_11 [51-36 (11919)]

other changes to the Common Areas which affect Tenant's parking, visibility or access without Tenant's consent.

(C)    Prohibited Uses in Common Area.    Landlord covenants that it shall not, without Tenant's express written consent, permit the following uses or activities to occur in the Common Areas, nor will Tenant do the following: (1) advertisements or signs except for the pylon and/or monument signs described in paragraph 8, the "for rent" signs described in paragraph 41 and traffic control signs; (2) display or sale of merchandise; (3) operation of loudspeakers or other sound electronically amplified so as to be heard in the Common Areas; (4) imposition of a charge for parking; or (5) operation of cellular telephone or other telecommunication tower for use by any other party not an occupant of the Shopping Center. Landlord further covenants that it will not seek, nor permit any other occupant of the Shopping Center to seek, a variance or waiver from the minimum parking requirements applicable to the Shopping Center under the zoning code or other applicable ordinance establishing the ratio of parking spaces to building area or otherwise mandating the number of parking spaces required for the Shopping Center and the uses contained therein. Parking by employees of Tenant, Landlord and other occupants of the Shopping Center may be designated "employee parking" areas, the location of which shall be agreed upon by Landlord and Tenant.

(D)    Easements.    Landlord shall not subdivide, parcel or otherwise divide the Shopping Center or create any easements in the Common Areas without Tenant's prior written consent.

(x)    Interference with Tenant's Reception/Transmission.    Landlord shall not install and use its best efforts to not permit to be installed by any other tenant or other person anywhere in the Shopping Center, any structure or equipment which would cause any interference with satellite, radio or television reception or transmission in or from the Building.

(xi)    Notices Affecting the Premises.    Landlord shall promptly forward to Tenant any notice or other communication affecting the Premises or the Shopping Center received by Landlord from any owner of property adjoining, adjacent or nearby to the Premises or the Shopping Center or from any municipal or governmental authority, in connection with any hearing

or other administrative procedure relating to the use or occupancy of the Premises, Shopping Center or any such neighboring property.

(xii)   Constructive Trust. Landlord covenants that all sums paid by Tenant to Landlord and intended for payment by Landlord to a third party (such as, by way of example, taxes and certain elements of CAM Charges) are given to Landlord in trust and shall be applied only for such third-party payments, as and when due.

(b)   Tenant represents, warrants and covenants to Landlord that:

(i)   Tenant's Authority. Tenant is a duly constituted corporation organized under the laws of the Commonwealth of Virginia; it has the power to enter into this Lease and perform Tenant's obligations hereunder; and the Assistant Vice President executing this Lease on Tenant's behalf has the right and lawful authority to do so.

(ii)   Tenant's Warranty as to Hazardous or Toxic Materials. As to Tenant's use and occupancy of the Premises and use of the Common Areas, Tenant will not introduce, discharge, dump, spill or store within the Premises or the Shopping Center any Hazardous Substances; and Tenant indemnifies and agrees to hold Landlord harmless from and against all costs, liability and damages as a result thereof, to the same extent that Landlord indemnifies and holds Tenant harmless in subparagraph (a)(v) above. The warranty and indemnity of Tenant described in this paragraph 19(b)(ii) shall survive the termination of this Lease.

(c)   In addition to such other remedies as may be accorded Tenant at law, in equity (including but not limited to an injunction or writ of specific performance) or under the terms of this Lease, (i) in the event that any of the representations, warranties and covenants of Landlord set forth in this paragraph 19 are untrue or incorrect, or (ii) in the event that Tenant suffers any loss, cost, liability or damage as a result of the breach of any of such covenants, representations and warranties, Landlord shall defend, indemnify and hold Tenant harmless from any of such loss, costs, liability or damage incurred as a result of Landlord's breach hereunder.

In addition to such other remedies as may be accorded Landlord at law, in equity (including but not limited to an injunction or writ of specific performance) or under the terms of this Lease, (i) in the event that any of Tenant's representations, warranties and covenants set forth in this paragraph 19 are untrue or incorrect, or (ii) in the event that Landlord suffers any loss, cost, liability or damage as a result of the breach of any of such covenants, representations and warranties,

Tenant shall defend, indemnify and hold Landlord harmless from any of such loss, costs, liability or damage incurred as a result of Tenant's breach hereunder.

20.     Estoppel Certificates. Without charge, at any time and from time to time hereafter, within thirty (30) days after receipt of written request by either party, the other party shall certify, by written and duly executed instrument, to any other entity ("Person") specified in such request: (a) as to whether this Lease has been supplemented or amended, and, if so, the substance and manner of such supplement or amendment; (b) as to the validity, force and effect of this Lease, to the certifying party's best knowledge; (c) as to the existence of any default hereunder, to the certifying party's best knowledge; (d) as to the existence of any offsets, counterclaims, or defenses hereto on the part of such other party, to the certifying party's best knowledge; (e) as to the commencement and expiration dates of the Term; and (f) as to any other matters which may reasonably be so requested. In addition, without charge, at any time any from time to time hereafter, within thirty (30) days after receipt of written request of Tenant, Landlord shall deliver an estoppel certificate to Tenant's assignee or subtenant that states in the event Tenant defaults under any of its obligations under this Lease following the date of any assignment or subletting hereunder, Landlord will permit such assignee or subtenant to satisfy obligations of Tenant hereunder, including but not limited to the direct payment of rentals to Landlord; provided, such acceptance by Landlord shall not constitute a waiver of Tenant's obligations under the Lease not cured by the assignee or sublessee and such assignee or sublessee shall have the same cure period as Tenant. Any such certificate may be relied upon by the party requesting it and any Person to whom the same may be exhibited or delivered, and the contents of such certificate shall be binding on the party executing same.

21.     Subordination, Non-Disturbance and Attornment.

(a)     Simultaneously with the execution hereof, Landlord shall deliver to Tenant with regard to any and all Ground Leases (as defined below) and any and all Mortgages (as defined below) encumbering the Shopping Center and placed thereon by Landlord, a subordination, non-disturbance and attornment agreement in the form of Exhibit "G" hereto attached, executed by Landlord under any such Ground Lease ("Ground Lessor") or the holder of such Mortgage ("Mortgagee"), as applicable. In addition, throughout the term, Landlord shall deliver to Tenant a subordination, non-disturbance and attornment agreement in the form of Exhibit "G" executed by Ground Lessor or Mortgagee (as applicable) with regard to all future Ground Leases and Mortgages, which have priority over this Lease, if any, and with regard to all renewals, modifications,

258343_8 [51-36 (11919)]

replacements and extensions of such Ground Leases or Mortgages, to the extent any would have priority over this Lease. Such Agreement shall contain, at a minimum, the following: (i) the Lease shall not terminate by reason of a foreclosure or deed in lieu thereof ("Foreclosure"), (ii) Tenant's possession of the Premises shall not be disturbed so long as Tenant is not in default beyond any applicable cure period, (iii) the Mortgagee or purchaser upon such Foreclosure shall recognize Tenant and all its rights hereunder and shall be obligated to fully and completely perform Landlord's duties and obligations under the Lease arising from and after the date of such Foreclosure, including but not limited to an obligation to make all payments to Tenant and satisfy all construction obligations set forth in this Lease, (iv) Tenant shall not be named as a party in any action for foreclosure, and (v) the Mortgagee, whether or not the Mortgage is foreclosed, shall make all proceeds arising from a casualty or condemnation loss to the Shopping Center available for restoration of the Improvements in accordance with the terms hereof. Upon Tenant's receipt and execution of said subordination, non-disturbance and attornment agreement, this Lease shall be subordinate to the corresponding Ground Lease or Mortgage. Landlord shall use reasonable efforts to cause any future Mortgagee or Ground Lessor to deliver a subordination, non-disturbance and attornment agreement in accordance with this paragraph 21 and the form attached as Exhibit "G"; provided Tenant shall not be required to subordinate its rights under this Lease to the lien of such future Mortgage or Ground Lease until such subordination, nondisturbance and attornment agreement is delivered to Tenant. Tenant agrees to execute and deliver such agreement to Landlord and Landlord's lender within thirty (30) days of receipt, so long as it is in the form required hereunder. As used in this paragraph 21, the term "Mortgage" shall mean any mortgage, deed to secure debt, deed of trust, trust deed or other collateral conveyance of, or lien or encumbrance against, the Shopping Center or any part thereof, and the term "Ground Lease" shall mean any ground lease or master lease affecting the Shopping Center or any part thereof. After the delivery by Landlord of the non-disturbance and attornment agreement issued by the Mortgagee providing the Tenant Improvement Allowance, Landlord agrees to pay Tenant's reasonable attorney's fees incurred in negotiating any additional non-disturbance and attornment agreements not conforming to the terms of Exhibit "G" attached hereto, reciprocal easement agreements or other documents required in the event Landlord sells, finances or refinances the Premises or Shopping Center, or enters into any other transaction requiring the execution of same (including the reasonable equivalent of such fees in the event Tenant elects to utilize in-house legal counsel for the provision of such

services), the payment of which fees shall be a condition precedent to the effectiveness of Tenant's execution of such non-disturbance and attornment agreement, reciprocal easement agreement or other document.

(b)       So long as Tenant's sublease requires the sublessee to abide and be bound by, and perform all of the terms of this Lease and Tenant remains primarily liable under this Lease, Landlord shall, from time to time, upon the request of Tenant, enter into agreements with Tenant and its subtenants providing that if Tenant defaults under this Lease, Landlord shall (a) give such sublessee notice of the default or other occurrence in the manner provided in this Lease; and (b) give such sublessee the same time as is given Tenant under this Lease to cure the default or rectify the other occurrence; provided in no event shall the curing of any default or the rectifying of any other occurrence by any sublessee act as a release or waiver of any of Tenant's primary obligations under this Lease, and Landlord agrees to exercise no remedies with respect to any default unless the sublessee has been given such notice and opportunity to cure, and fails to cure said default within the applicable cure period.

22.       Tenant's Financing. Notwithstanding any other provisions of this Lease, Tenant may, without Landlord's consent, from time to time, secure financing or general credit lines and grant the lenders thereof, as security therefor, (i) a security interest in Tenant's removable trade fixtures, personalty, inventory and equipment (collectively, "Personalty"), (ii) the right to enter the Premises to realize upon any Personalty so pledged, and/or (iii) a collateral assignment of Tenant's leasehold interest in the Premises, with rights of reassignment; provided, however, such collateral assignment may be made solely for the purpose of securing Tenant's indebtedness. Upon Tenant providing notice of such financing to Landlord, Landlord agrees to evidence its consent in writing to such security interest and agreement and to give such lenders the same notice and opportunity to cure any default of Tenant as is provided Tenant hereunder. In addition, Landlord agrees to cause any Mortgagee specifically to acknowledge the rights of Tenant's lenders described herein and in paragraph 23 below.

23.       Tenant's Property and Waiver of Landlord's Lien. All of the Personalty shall be and remain the personal property of Tenant and shall be removable by Tenant any time prior to, or within thirty (30) days after, the expiration or earlier termination of this Lease. (A nonexclusive list of Tenant's removable trade fixtures is attached hereto as Exhibit "D".) Landlord expressly waives its statutory or common law landlord's liens (as same may be enacted or may exist from time to time)

and any and all rights granted under any present or future laws to levy or distrain for rent (whether in arrears or in advance) against the aforesaid property of Tenant on the Premises and further agrees to execute any reasonable instruments evidencing such waiver, at any time or times hereafter upon Tenant's request. The foregoing is not intended to apply to judgment liens.

24.    Memorandum of Lease; Commencement Date Agreement. Landlord and Tenant agree, at the other's request and at the sole expense of the requesting party, to execute a Memorandum of Lease in recordable form, substantially similar to that attached hereto as Exhibit "H", setting forth such provisions hereof as may be required by State law. In addition, Landlord and Tenant shall execute a Commencement Date Agreement in the form attached hereto as Exhibit "I", once the Commencement Date has been established. Recording costs for either or both documents shall be borne by the party requesting recordation of the same. The provisions of this Lease shall control, however, with regard to any omissions from, or provisions hereof which may be in conflict with, the Memorandum of Lease or Commencement Date Agreement.

25.    Expiration of Term and Holding Over. At the expiration or earlier termination of the Lease, Tenant shall surrender the Premises and Improvements in the same condition as existed on the Commencement Date, less reasonable wear and tear and in broom clean condition. Should Tenant hold over without the written consent of Landlord, Tenant shall pay Landlord an amount equal to one hundred twenty-five percent (125%) of the monthly Base Rent Tenant had been paying during the preceding Lease Year for each month (prorated for any portion thereof) that Tenant holds over. CAM Charges and Tenant's Pro Rata Share of Real Estate Taxes shall additionally be due by Tenant, prorated for any partial month, during such holdover period.

26.    Force Majeure. Except as otherwise specifically contemplated in this Lease or in the Construction Provisions, in the event that Landlord or Tenant shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, delay by the other party, failure of power or unavailability of utilities, riots, insurrection, war or other reason of a like nature not the fault of such party or not within its control, then performance of such act shall be excused for the period of delay, and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay; provided, however, that in connection with the construction of the Improvements, the consequences of delays by the other party shall be governed by paragraphs 28(d) and 29(c) of this Lease.

38

27.  Events of Tenant's Default. Any of the following occurrences, conditions or acts by Tenant shall constitute an "Event of Default" under this Lease:

(a)  Failure to Pay Rent; Breach. (i) Tenant's failure to make any payment of money required by this Lease (including without limitation Base Rent, CAM Charges or Real Estate Taxes) (subject to Tenant's right of good faith contest of Real Estate Taxes), within ten (10) days after the receipt of written notice from Landlord to Tenant that same is overdue; or (ii) Tenant's failure to observe or perform any other provision of this Lease within thirty (30) days after receipt of written notice from Landlord to Tenant specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Tenant shall have such longer period as is reasonably necessary to cure the default, so long as Tenant proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion. In the case of an emergency, Landlord shall be required to give only such notice as is reasonable under the circumstances.

(b)  Bankruptcy.  Tenant's adjudication as bankrupt or insolvent, or the appointment of a receiver, trustee in involuntary bankruptcy or other, similar officer to take charge of any substantial part of Tenant's property, which proceeding is not dismissed within one hundred twenty (120) days after it is begun.

28.  Landlord's Remedies. After the occurrence of an Event of Default by Tenant, and without its actions being deemed an election of remedies or a cure of Tenant's default, Landlord shall have the right to exercise the following remedies:

(a)  Continue Lease. Landlord may, at its option, continue this Lease in full force and effect, without terminating Tenant's right to possession of the Premises, in which event Landlord shall have the right to collect Base Rent and other charges when due. Landlord shall also have the right, in Landlord's exercise of reasonable efforts to mitigate its damages (which Landlord hereby agrees to make), at its option, from time to time, without terminating this Lease but terminating Tenant's possession, to relet the Premises, or any part thereof, with or without legal process, as the agent, and for the account, of Tenant upon such terms and conditions as Landlord may deem advisable, in which event the rents received on such reletting shall be applied (i) first to the reasonable and actual expenses of such reletting and collection, including without limitation necessary renovation and alterations of the Premises, reasonable and actual attorneys' fees and any

reasonable and actual real estate commissions paid, and (ii) thereafter toward payment of all sums due or to become due Landlord hereunder.

(b)    Terminate Lease.    Landlord may terminate this Lease by written notice to Tenant specifying a date therefor, which shall be no sooner than thirty (30) days following receipt of such notice by Tenant, and this Lease shall then terminate on the date so specified as if such date had been originally fixed as the expiration date of the Term.    In the event of such termination, Landlord shall be entitled to recover from Tenant all of the following:

(i)    The "worth at the time of the award" (defined below) of any obligation which has accrued prior to the date of termination; and

(ii)    The "worth at the time of the award" of the amount by which the unpaid Base Rent and all other charges which would have accrued after termination until the time of award exceeds the amount of any sums which Landlord has (or Tenant proves that Landlord could have) received in mitigation.

As used in this paragraph 28(b), the term, "worth at the time of the award", shall be computed by allowing simple interest at an accrual rate of the Default Rate for past due obligations, and a discount rate to net present value of ten percent (10%) on anticipated future obligations, on the amount of the obligations payable on the date of such calculation.    In the event this Lease shall be terminated as provided above, by summary proceedings or otherwise, Landlord, its agents, servants or representatives may immediately or at any time thereafter peaceably re-enter and resume possession of the Premises and remove all persons and property therefrom, by summary dispossession proceedings.    Landlord shall never be entitled to dispossess Tenant of the Premises pursuant to any "lock-out" or other nonjudicial remedy.

(c)    Remedies Are Cumulative.    Landlord may enforce the provisions of this Lease and may enforce and protect the rights of Landlord hereunder by a suit or suits in equity or at law for the specific performance of any covenant or agreement contained herein, or for the enforcement of any other appropriate legal or equitable remedy, including, without limitation, injunctive relief, to the extent not inconsistent with specific provisions of this Lease. The various rights and remedies reserved to Landlord herein are cumulative, and Landlord may pursue any and all such rights and remedies (but no others), whether at the same time or otherwise (to the extent not inconsistent with specific provisions of this Lease).    Notwithstanding anything herein to the contrary, Landlord expressly waives its right to forcibly dispossess Tenant from the Premises, whether peaceably or

40

otherwise, without judicial process, such that Landlord shall not be entitled to any "commercial lockout" or any other provisions of applicable law which permit landlords to dispossess tenants from commercial properties without the benefit of judicial review.

(d)    Additional Landlord Remedies Due to Construction Delays by Tenant. If, subject to force majeure, Tenant shall fail to commence its construction by that date which is ninety (90) days following Delivery of the Land, Landlord at its option, upon prior written notice to Tenant, may require Tenant to proceed with its construction and commence payment of Ground Rent (as hereinafter defined) on the date which is two hundred ten (210) days following Delivery of the Land.

If, subject to force majeure, Tenant shall fail to achieve Substantial Completion by that date which is two hundred forty (240) days following Delivery of the Land, Landlord, at its option, upon prior written notice to Tenant, may require Tenant to proceed with its construction, commence payment of Ground Rent on the date which is two hundred forty (240) days following Delivery of the Land, and reimburse Landlord for its fixed and ascertainable costs incurred as a result thereof. Such costs shall be limited to Landlord's out-of-pocket expenses of construction overtime and acceleration charges paid to Landlord's contractors or subcontractors, charges for the scheduling of construction crews on days on which work cannot be performed on account of the aforesaid delays by Tenant, the cost of erecting barricades around Tenant's unfinished work and construction period interest charges to the extent that such charges exceed those which would have accrued without such delay.

In the event, for any reason whatsoever and regardless of force majeure, Tenant shall fail to achieve Substantial Completion by that date which is one (1) year following Delivery of the Land, Landlord shall be entitled to terminate this Lease upon sixty (60) days prior written notice to Tenant, during which sixty (60) day period Tenant may cure any such default hereunder.

For purposes hereof, annual Ground Rent shall equal $220,242.00, payable monthly in equal installments of 1/12 each of the amount of the annual Ground Rent, in lieu of Base Rent, for so long as Tenant's failure continues.

29.    Events of Landlord's Default; Tenant's Remedies.

(a)    Default by Landlord. Any of the following occurrences, conditions or acts by Landlord shall constitute an "Event of Default": (i) Landlord's failure to make any payments of money due Tenant or any third party, including but not limited to the payment of the brokerage commissions pursuant to paragraph 33 hereof, within ten (10) days after the receipt of written notice

41                                    258343_8 [51-36 (11919)]

from Tenant that same is overdue (in which event the delinquent amount shall accrue interest from the due date at the Default Rate); or (ii) Landlord's failure to perform any nonmonetary obligation of Landlord hereunder within thirty (30) days after receipt of written notice from Tenant to Landlord specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Landlord shall have such longer period as may be reasonably necessary to cure the default, so long as Landlord proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion and provided further that in the case of an emergency, Tenant shall be required to give only such notice as is reasonable under the circumstances. Notwithstanding the foregoing, with respect to any event of default described in subparagraph (c) below, Tenant shall not be obligated to deliver any notice of default nor any opportunity to cure such default, except as may be specifically set forth in Exhibit "C", it being agreed that with respect to the dates set forth therein time is of the essence.

(b)     Remedies Upon Landlord's Default.  Upon the occurrence of an Event of Default by Landlord, at Tenant's option, in addition to any and all other remedies which it may have at law and/or in equity, and without its actions being deemed an election of remedies or a cure of Landlord's default, Tenant may do all or any of the following: (i) pay or perform such obligations and offset Tenant's actual cost of performance, including any and all transaction costs and attorneys' fees, plus interest at the Default Rate, against the Base Rent, CAM Charges and any and all other amounts and charges due Landlord hereunder or (ii) if the Event of Default is curable by Landlord, withhold, to the extent commensurate with Landlord's default, Base Rent, CAM Charges and any other payments due to Landlord under this Lease until such Event of Default, including payment of interest, transaction costs and attorney's fees specified in subsection (i) above, is cured by Landlord whereupon all such amounts so withheld by Tenant shall be paid to Landlord, (iii) following a second written notice given by Tenant to Landlord, terminate this Lease and sue for damages, including interest, transaction costs and attorneys' fees as specified in subsection (i) above.  If Landlord fails to pay Tenant the Tenant Improvement Allowance in a timely manner, Tenant shall be entitled to the rights and remedies set forth in this paragraph and the Construction Provisions; and, as to a breach of the warranties and representations contained in paragraph 19, Tenant shall be entitled to the remedies provided therein, in addition to those remedies provided herein. The various

rights and remedies reserved to Tenant herein are cumulative, and Tenant may pursue any and all
rights and remedies, whether at the same time or otherwise.

(c)     Additional Tenant Remedies Due to Construction Delays by Landlord. In the
event, subject to force majeure, Landlord shall fail to complete the Site Work and accomplish
Delivery of the Land in the condition specified herein the Effective Date or earlier date if an early
entry agreement is entered into by Landlord and Tenant separate from this Lease (the "Delivery
Date"), Landlord agrees that it shall reimburse Tenant for its fixed and ascertainable costs incurred
as a result thereof in the exercise of all reasonable efforts to open for business by October 1, 2001.
Such costs shall be limited to Tenant's out-of-pocket expenses of construction overtime, acceleration
charges and bonuses paid to Tenant's contractors or subcontractors, charges for the scheduling of
construction crews on days on which work cannot be performed due to the delays by Landlord and
construction period interest charges actually incurred to the extent that such charges exceed those
which would have accrued without such delay.

In the event, subject to force majeure, Landlord shall fail to accomplish Delivery of the Land
by the date which is fifteen (15) days following the Delivery Date, or to complete any subsequent
element of the Landlord Work by the completion date established therefor in Attachment "1" of
Exhibit "C" attached hereto (the Construction Schedule), Tenant, at its option and upon five (5) days'
prior written notice to Landlord, which notice may be given prior to or at any time after the
applicable date for performance, may in addition to any other rights and remedies set forth herein,
enter the Shopping Center and perform any task required for Delivery of the Land or, as applicable,
any element of the Landlord Work which has not been timely completed, and Landlord shall
reimburse Tenant for its actual costs thereof, including interest on such costs at the Default Rate.
Landlord hereby grants Tenant the right, as its agent, to directly contact and contract with Landlord's
contractors, on behalf of Landlord, to complete such work, all at Landlord's cost and expense.
Landlord covenants, upon Tenant's request, to provide Tenant with duplicate sets of all plans,
specifications and contracts prepared in connection with the construction of the Shopping Center,
as well as schedules of all contractors, subcontractors and suppliers. If such costs are not reimbursed
to Tenant prior to the Commencement Date, Tenant may offset such amounts against Base Rent and
CAM Charges otherwise due until such costs and accrued interest are reimbursed in full.

In the event, for any reason whatsoever and regardless of force majeure, Landlord shall fail
to complete Delivery of the Land to Tenant by the date which is thirty (30) days from the Delivery

Date, Tenant shall be entitled to terminate this Lease at any time prior to such delivery and receive from Landlord promptly thereafter a sum equal to the actual out-of-pocket expenses and substantiated third-party legal, architectural and engineering costs incurred by Tenant to the date of termination, not to exceed One Hundred Thousand and No/100 Dollars ($100,000.00) or Tenant may elect to delay opening of its store facility for a period not to exceed nine (9) months, during which time Tenant shall pay no Ground Rent, Base Rent, Real Estate Taxes or CAM Charges. In such event, Landlord shall deliver the Land and complete the Site Work on the date subsequently required by Tenant, and Landlord shall pay to Tenant on demand an amount equal to all costs incurred by Tenant in the development of its store facility, including, but not limited to, costs of materials and all engineering, architectural, legal fees, and costs of delay resulting from Landlord's failure to timely deliver.

(d) _Exercise of Remedies_. Notwithstanding the foregoing, a delay by Tenant in exercising its cure rights or other remedies hereunder shall not be deemed an event of force majeure for purposes of extending the date(s) established for performance by Landlord. All sums owing to Tenant under paragraph 29(c) hereof shall, to the extent applicable, be added to the Tenant Improvement Allowance and paid simultaneously therewith; and, if not so paid, Tenant shall be entitled to offset all such costs, plus interest at the Default Rate, against Base Rent and CAM Charges otherwise due hereunder.

(e) _Time is of the Essence_. Notwithstanding anything contained herein to the contrary, Landlord covenants that it shall complete its construction and delivery obligations in accordance with the "Completion Dates" set forth in the Construction Schedule. In the event that Landlord fails to complete its construction and delivery obligations in accordance with such Completion Dates, Tenant may, at its sole election, exercise such remedies as are set forth herein.

30. _Waiver_. If either Landlord or Tenant fails to insist on the strict observance by the other of any provisions of this Lease, neither shall thereby be precluded from enforcing nor be held to have waived any of the obligations, past, present or future, of this Lease. Either party may accept late payment or performance by the other without waiving any Event of Default which may then have accrued.

31. _Compliance with Applicable Laws_. During the Term, Tenant shall comply with all lawful requirements of the local, county and state health boards, police and fire departments, municipal and state authorities and any other governmental authorities with jurisdiction over the

258343_8 [51-36 (11919)]

Improvements, and of the board of fire underwriters (collectively, the "Lawful Requirements") respecting Tenant's use and occupancy of the Improvements and the interior of the Building, and Landlord shall comply with all Lawful Requirements otherwise relating to the Improvements. In the event that Tenant, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Landlord or any such authority ordering performance of any such work which Tenant is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Landlord may perform said work and collect the reasonable cost thereof plus interest at the Default Rate from Tenant with the next installment or installments of Base Rent. In the event that Landlord, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Tenant or any such authority ordering performance of any such work which Landlord is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Tenant may perform said work and deduct the reasonable cost thereof plus interest at the Default Rate from Landlord with the next installment or installments of Base Rent.

      32.   <u>Notices</u>. Any notice permitted or required to be given pursuant to this Lease shall be deemed to have been given three (3) business days after mailing a written notice by certified mail, postage prepaid, return receipt requested, or one (1) business day after sending by Federal Express or other comparable overnight express courier service (with proof of receipt available), addressed to the parties as follows:

If to Tenant:          CIRCUIT CITY STORES, INC.
                        Deep Run I
                        9950 Mayland Drive
                        Richmond, Virginia 23233
                        Attention: Corporate Secretary

with a copy to:      CIRCUIT CITY STORES, INC.
                        Deep Run I
                        9950 Mayland Drive
                        Richmond, Virginia 23233
                        Attention: Vice President of Real Estate

If to Landlord:      RUBLOFF MCHENRY EAST, L.L.C.
                      6277 East Riverside Boulevard
                      Rockford, Illinois 61114
                      Attention: Robert Brownson

with a copy to:     RUBLOFF MCHENRY EAST, L.L.C.
                      6277 East Riverside Boulevard
                      Rockford, Illinois 61114
                      Attention: General Counsel

or to such other addressees as any party hereto shall from time to time give notice to the other party in accordance with this paragraph.

33.    <u>Brokers</u>. Landlord and Tenant each covenant that they have not dealt with any real estate broker or finder with respect to this Lease, except for Interstate Commercial, and The Equity Group (together, "Brokers"), each of which shall be paid a commission by Landlord pursuant to their separate written agreement. Landlord agrees that, if Landlord fails to pay either of such Brokers its commission when due, Tenant may pay same and offset such amount against the amounts then next becoming due from Tenant to Landlord hereunder. Landlord agrees that Brokers are representing Tenant with respect to this leasing transaction, and, although Landlord is responsible for payment to Brokers of the Broker's commission, the Brokers owe no fiduciary's, agent's or other duty whatsoever to Landlord. Except for the foregoing, each party shall hold the other party harmless from all damages, claims, liabilities or expenses, including reasonable and actual attorneys' fees (through all levels of proceedings), resulting from any claims that may be asserted against the other party by any real estate broker or finder with whom the indemnifying party either has or is purported to have dealt.

34.    <u>Miscellaneous</u>.

(a)    <u>Headings and Gender</u>. All paragraph headings, titles or captions contained in this Lease are for convenience only and shall not be deemed a part of this Lease and shall not in any way limit or amplify the terms and provisions of this Lease. The masculine, feminine or neuter gender and the singular or plural number shall be deemed to include the others whenever the context so requires or indicates.

(b)    <u>Construction</u>. The parties hereto agree that all the provisions hereof are to be construed as covenants and agreements as though the words importing such covenants and agreements were used in each separate paragraph hereof.

258343_8 [51-36 (11919)]

(c)     <u>Waiver of Jury Trial</u>. In the event of any court action arising out of this Lease, each party hereby expressly waives its right to trial by jury.

(d)     <u>Relationship of Landlord-Tenant</u>. Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent, partnership, joint venture, or any other association between Landlord and Tenant other than the landlord-tenant relationship described herein.

(e)     <u>Entire Agreement: Merger</u>. This Lease, including all exhibits hereto (which are hereby incorporated herein by reference for all purposes), contains the full and final agreement of every kind and nature whatsoever between the parties hereto concerning the subject matter of this Lease, and all preliminary negotiations and agreements of whatsoever kind or nature between Landlord and Tenant are merged herein. This Lease cannot be changed or modified in any manner other than by a written amendment or modification executed by Landlord and Tenant. The provisions of any letter of intent related to this Lease or the Premises are hereby declared null and void.

(f)     <u>Attorneys' Fees</u>. In the event either party shall be required to commence or defend any action or proceeding against or by the other party by reason of any breach or claimed breach of any provision of this Lease, to commence or defend any action or proceeding against or by the other party in any way connected with this Lease or to seek a judicial declaration of rights under this Lease, the party prevailing in such action or proceeding shall be entitled to recover from or to be reimbursed by the other party for the prevailing party's reasonable and actual attorneys' fees and costs through all levels of proceedings.

(g)     <u>Partial Invalidity</u>. If any provision of this Lease or the application thereof to any person or circumstance shall be deemed invalid or unenforceable, the remainder of this Lease and its application to other persons or circumstances shall not be affected by such partial invalidity but shall be enforced to the fullest extent permitted by law as though such invalid or unenforceable provision was never a part hereof.

(h)     <u>Consents</u>. Any consent or approval granted by either party hereunder shall be deemed a consent only as to the matter on which such consent was requested and shall not waive the consenting party's right to give or withhold consent to any subsequent matter.

(i)     <u>Holidays</u>. If the day on which rent or any other payment due hereunder is payable falls on a Saturday, Sunday or on a legal holiday, it shall be payable on the following business day.

258343_8 [51-36 (11919)]

(j)    Applicable Law. This Lease shall be construed in accordance with the laws of the State, and the parties agree that jurisdiction for all actions hereunder shall lie therein.

(k)    Successors and Assigns. All rights, obligations and liabilities herein given to or imposed upon any party hereto shall extend to the permitted successors and assigns of such party.

(l)    Counterparts. This Lease may be executed in one or more identical counterparts, and as so executed by all parties hereto shall constitute a single instrument for purposes of the effectiveness of this Lease.

(m)    Trademarks and Trade Names. All trademarks, trade names, service marks, signs and all other marks of identification used by Tenant in its business shall at all times remain the exclusive property of Tenant, and Landlord shall have no right, interest in, or title to any of Tenant's trademarks, trade names, service marks, signs or other marks of identification.

(n)    Exhibits. All of the exhibits to this Lease are hereby incorporated herein by reference for all purposes and are part of this Lease.

(o)    No Construction Against Either Party. This Agreement shall be interpreted to give it fair meaning and shall not be construed against either party.

(p)    Effective Date. This Lease shall be deemed executed on the date (the "Effective Date") on which it is fully executed by all parties.

35.    Effectiveness of Lease: Tenant's Right to Terminate. Notwithstanding the execution of this Lease or any provision hereof to the contrary, the parties agree that the effectiveness of this Lease is expressly conditioned upon the complete satisfaction (or waiver) of each and all of the following conditions:

(a)    Tenant's receipt, simultaneously with or prior to the execution hereof (except for the survey), of (i) a commitment for leasehold policy of title insurance for the Shopping Center; (ii) copies of all underlying documents referred to in said commitment for title insurance; and (iii) within thirty (30) days of execution hereof, an ALTA survey of the Shopping Center, at Landlord's expense, in form and substance acceptable to Tenant, at a minimum identifying by metes and bounds or platted lot all of the real property within the Shopping Center, each of the parcels owned under every ground lease pertinent to the Shopping Center, and the Land, (iv) all instruments reasonably required by the title company issuing the commitment for leasehold policy of title insurance to issue a policy meeting Tenant's requirements, including, without limitation, an Owner's Affidavit and

48                                            258343_8 [51-36 (11919)]

Indemnity in form acceptable to the title company; and (v) Tenant's approval of all of the foregoing in writing within thirty (30) days after receiving all of said documents.

(b)     Landlord's delivery of subordination, non-disturbance and attornment agreements and estoppel letters executed by any and all existing Mortgagees and Ground Lessors in a form satisfactory to Tenant simultaneously with the execution hereof.

(c)     Landlord's Delivery of the Land by the date and in the condition specified in the Construction Provisions.

(d)     Landlord's representations, warranties and covenants, including but not limited to those set forth in paragraph 19 herein, being true and accurate as of the date of Delivery of the Land (as defined in the Construction Provisions).

(e)     Prior to execution of this Lease by Landlord, Landlord has caused (i) the outparcels to be burdened with, and the current lessee, if any, and owner of such parcel to be bound by, certain terms relative to this Lease, and (ii) the Encumbered Lots owned by Landlord to be burdened with a prohibition on use as an electronics superstore, and delivered to Tenant fully executed agreements evidencing same for recording in the real property records of the County, said agreements to be in form and substance identical to that attached hereto as Exhibit "K".

The existence of the foregoing conditions is solely for the benefit of Tenant, and Tenant may waive any such condition at its sole discretion by delivering to Landlord a written notice signed by Tenant which specifically states the condition(s) being waived by Tenant.

Notwithstanding any other provision in this Lease to the contrary, in the event any of the foregoing conditions shall not be met, satisfied or waived, the parties hereto expressly agree that Tenant shall have the right to terminate this Lease in its sole and absolute discretion at anytime prior to the satisfaction or waiver of any such condition by delivering to Landlord a written notice signed by Tenant which states that Tenant is terminating this Lease on account of the failure of one or more of the foregoing conditions. In the event of any such termination, the rights and obligations of the parties shall be of no further force and effect and the parties shall have no further liability one to the other (except that the indemnifications set forth in paragraphs 14(i), 19(a)(v) and 19(b)(ii) hereof shall survive such termination) upon Tenant's delivery of said notice to Landlord. All conditions contained in this paragraph except subparagraphs (a) and (g) unless previously waived or satisfied shall expire as of the date of Tenant's store opening.

The delivery of this executed Lease by Tenant to Landlord constitutes the offer of Tenant to Landlord to bind Landlord and Tenant to the provisions of this Lease, subject to the conditions set forth in this paragraph 35. It is a further condition to the effectiveness of this Lease that upon receipt of the executed Lease from Tenant, Landlord execute and return same to Tenant within ten (10) days following receipt thereof by Landlord. In the event Landlord fails to execute and return the Lease within such ten (10) day period, Tenant may at any time after delivery of the Lease provide written notice to Landlord that Tenant revokes its delivery of the executed Lease and thereupon Landlord shall be immediately obligated to return to Tenant all executed original counterparts as well as any copies of this Lease in the possession of Landlord, and this Lease shall thereafter be null and void.

36.     Confidentiality [Intentionally Deleted].

37.     Rules and Regulations. Tenant agrees to observe the following rules and reasonable regulations, which rules shall apply uniformly to Tenant and each of the other tenants in the Building:

(a)     No loudspeakers, television sets, radios, or other devices shall be used in a manner as to be heard outside the Premises.

(b)     No person shall use the Premises as sleeping quarters, sleeping apartments or lodging rooms.

(c)     Tenant shall obtain and keep in force and effect all permits or licenses necessary or required to conduct its business.

(d)     No live animals other than fish in an aquarium shall be kept or displayed upon the Premises.

38.     Conveyance by Landlord.   If Landlord or any successor owner of the Shopping Center shall convey or otherwise transfer the Shopping Center, or any portion thereof, or Landlord's interest in this Lease to another person, including any mortgagee, which party assumes all of Landlord's obligations under this Lease arising after the date of such transfer, such transferee shall, upon written notice by Landlord given to Tenant, be and become Landlord hereunder and shall be liable upon all liabilities and obligations of this Lease to be performed by Landlord that first arise after the date of such conveyance and such transferor shall be released from any responsibility, liability, and claims under this Lease arising after the date of such conveyance and assumption.

258343_8 [51-36 (11919)]

39.     Consequential/Punitive Damages.  Notwithstanding any provision in this Lease to the contrary, neither party to this Lease shall be liable to the other for any consequential or punitive damages, except in the event of a breach by Landlord of the exclusive use granted Tenant in paragraph 19(a)(vi) above.

40.     Limitation of Right of Recovery.  It is specifically understood and agreed that there shall be no personal liability of Landlord with respect to any of the covenants, conditions or provisions of this Lease, except Landlord's obligation to pay the Tenant Improvement Allowance (defined in Exhibit "C").  In the event of a breach or default by Landlord of any of its obligations under this Lease, Tenant shall look solely to Landlord's interest in the Shopping Center and Landlord's equity, including all rents, profits and proceeds (including, without limitation, those from insurance, condemnation, sales and financing or refinancing) in the Shopping Center for the satisfaction of Tenant's remedies.  Notwithstanding anything contained in this paragraph, however, the limitation of personal liability set forth herein shall not be applicable to events occurring due to Landlord's willful misconduct, fraud or intentional acts.

41.     "For Rent" Signs.  Tenant hereby permits Landlord during the last ninety (90) days of the Main Term or of any Option Period, as the case may be (provided that no applicable Renewal Option has been exercised or deemed exercised), to place one (1) "For Rent" or "For Sale" sign, not exceeding four (4) feet by four (4) feet in size, in the parking lot portion of Tenant's Preferred Area.  During said ninety (90) day period, Tenant will also allow Landlord or its agents, upon prior written notice and accompanied by a representative of Tenant designated by Tenant, to show the Premises, exterior and interior, to prospective tenants, purchasers, or mortgagees during reasonable business hours by prior appointment, provided same does not interfere with the conduct of Tenant's business.  WITNESS the following signatures and seals:

51                          258343_8 [51-36 (11919)]

LANDLORD

**RUBLOFF MCHENRY EAST, L.L.C.,**
an Illinois limited liability company

By:    Rubloff Development Group, Inc.,
       its Managing Member

By: _____
Name: _____
Title: _____

52

<u>TENANT</u>

**CIRCUIT CITY STORES, INC.,**
a Virginia corporation

By: _____

(Stanley L. Heller, Assistant Vice President