<u>LEASE</u>

THIS LEASE is made as of the _____ day of _____, 1993, by and between ST. CLOUD ASSOCIATES, a Pennsylvania limited partnership, having an address at 1609 Walnut Street, Philadelphia, Pennsylvania 19102 (the "Landlord"), and CIRCUIT CITY STORES, INC., a Virginia corporation having an address at 9950 Mayland Drive, Richmond, Virginia 23233 (the "Tenant").

W I T N E S S E T H :

That for and in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    <u>Leased Property</u>.  Landlord demises and leases to Tenant and Tenant leases and takes from Landlord, commencing on Landlord's delivery of the "Premises" (defined below) to Tenant, all those certain premises ("Premises") consisting of an approximate 95,555-square foot existing building together with loading ramps, sidewalks, trash compactors and other appurtenances (collectively, the "Building") and any additional improvements constructed by Tenant on or appurtenant to the Building and/or the "Land" (defined below) pursuant to this Lease, together with that approximately 95,555-square foot parcel

(the "Land"), on which the Building and aforesaid improvements
are or will be located, as more particularly shown (approxi-
mately) on Exhibit "A-1" hereto, together with the easements
described in paragraph 6 below, all located in the "Shopping
Center" (as defined below). The "Shopping Center" consists of
that certain real property with buildings and improvements
constructed or to be constructed thereon, located at the
intersection of West Division Street and E. 33rd Avenue, lying
and being in the Township of St. Cloud, County of Stearns, State
of Minnesota, and more particularly shown on Exhibit "A-1." The
Shopping Center is comprised of "Tract I," "Tract II," "Tract
III," and "Tract IV," all as shown on Exhibit "A-2" attached
hereto and made a part hereof for the sole purpose of showing the
approximate location of the aforementioned Tracts. The legal
metes and bounds description of each Tract is attached hereto and
made a part hereof as Exhibit "A-3". Tract I is owned in fee by
ROLAND M. JERMYN, JR., TRUSTEE OF ALPHA PETROLEUM EXPLORATION
CORPORATION EMPLOYEE BENEFIT PLAN TRUST ("Master Landlord") and
leased to Landlord pursuant to that certain ground lease entered
into between Master Landlord and Landlord and dated July 30, 1981
("Master Lease"). Tract II, Tract III and Tract IV are not owned
by or leased to either Master Landlord or Landlord. The entire
Shopping Center is subject to that certain Deed of Declaration by
Delco Development Company of St. Cloud, dated October 1, 1969,
and filed October 13, 1971 in Book 112 of Miscellaneous, page
299, Document Number 419418, as amended and supplemented by that

-2-

certain Reciprocal Easements Agreement entered into between Delco
Development of St. Cloud and Equity Properties dated, March 5,
1973 and filed March 9, 1973 in Book 57 of A & A, page 317,
Document Number 432868 (collectively, "REA"). (That portion of
Tract I exclusive of the Premises is hereafter referred to as
"Landlord's Premises.") The description of the Premises may be
adjusted in accordance with Tenant's as-built survey to be
attached hereto as Exhibit "A-4" upon completion of the Building
(as described in paragraph 2 below).

    2.    Construction of Building.  Commencing immediately upon
"delivery of the Premises" (as defined in Exhibit "C" hereto),
Tenant shall have the right to construct thereon certain
improvements and/or renovate all or any portion of the Building
for the initial use as a Circuit City superstore containing
approximately 33,000 square feet of ground floor space plus
mezzanine, with provisions for customer pickup, delivery and car
stereo installation facilities, together with loading ramps,
sidewalks, trash compactor and other such appurtenances, as more
particularly set forth in the construction provisions attached
hereto as Exhibit "C." (The portion of the Building and the
aforesaid improvements to be initially used as and for a Circuit
City superstore as hereafter referred to as the "Circuit City
Superstore".) The portion of the Building to be used for the
Circuit City Superstore shall be constructed and/or renovated in
accordance with the plans and specifications to be prepared by
Tenant and approved by Landlord as specified in Exhibit "C";

(J:\013363\048\29ndof3e.W51)
(10/11/93 6:04pm; MOORE_M)

provided, however, that in no event shall Landlord require Tenant
to alter its standard entrance tower, customer pick-up area or
use of Alucobond and red trim on the front exterior of the
Building.

3.    Lease Term.    Subject to the conditions to the
effectiveness of this Lease set forth in paragraph 37, the
construction term (the "Construction Term") of this Lease shall
commence on the date of Landlord's delivery of the Premises to
Tenant in accordance with, and in the condition specified in,
Exhibit "C", which shall occur no later than November 1, 1993,
and shall end on the "Rent Commencement Date" (as defined below).
The main term (the "Main Term") of the Lease shall commence on
the earlier to occur of (a) Tenant's advertised "grand opening"
of the Premises for business to the public (as opposed to a
shake-down opening, which shall in no event exceed seven (7)
days), or (b) March 1, 1994 (the earlier to occur of "(a)" and
"(b)" is hereinafter referred to as the "Rent Commencement
Date"), and shall end on the last day of January following the
twentieth (20th) anniversary of the Rent Commencement Date.

In addition to the Main Term, Tenant shall have the option
(a "Renewal Option") to renew and extend the Lease for four (4)
consecutive five (5) year periods (the "Option Periods")
immediately following the Main Term, at the rent specified below.
Tenant shall give Landlord written notice of its election to
exercise any Renewal Option at least one hundred eighty (180)
days prior to the expiration of the Main Term or any then-current

{J:\013363\048\29ndo#3e.W51}
(10/11/93 6:04pm; MOORE_M)

Option Period, as applicable; provided, however, that in order to
avoid any forfeiture or inadvertent lapse of any right to renew
or extend as aforesaid, if Tenant shall fail to give any such
notice within the aforesaid time limit and shall not have given
Landlord prior written notice of its intention not to renew or
extend as aforesaid, then and as often as the same shall occur,
Tenant's right to exercise such Renewal Option shall nevertheless
continue, as shall its tenancy hereunder (under the same terms
and conditions as theretofore in effect and notwithstanding that
the Main Term or then-current Option Period shall have expired)
until ten (10) business days after Landlord shall have given
Tenant notice of Landlord's election to terminate the Renewal
Option, and Tenant may exercise its Renewal Option at any time
prior to expiration of said ten (10) business day period.  Upon
the giving of notice of renewal and extension in accordance with
the foregoing provisions, the term of this Lease shall thereupon
be renewed and extended in accordance with such notice without
further act by Landlord or Tenant, the same as if such notice had
been timely given hereunder.

     The Construction Term, Main Term and Option Periods are,
collectively, the "Term."  The term "Lease Year" shall mean each
successive period of twelve (12) consecutive calendar months,
commencing on the first day of each February during the Term,
except that the First Lease Year shall commence on the Rent
Commencement Date and shall end on the last day of January
following the first anniversary of the Rent Commencement Date.

(J:\013363\048\29ndof3e.u51)
(10/11/93 6:04pm; MOORE_M)

4.   Rent.  Tenant agrees to pay base rent ("Base Rent") for
the Premises, commencing (subject to the provisions of paragraph
4 of Exhibit "C") on the later to occur of (i) date on which
Landlord makes payment of the "Repair Allowance" (as defined in
Exhibit "C"), or (ii) the Rent Commencement Date.

Tenant shall pay Base Rent in equal monthly installments, in
advance on the first day of each succeeding calendar month
throughout the Term, with appropriate proration for any partial
month or Lease Year, to the address given for Landlord at
paragraph 34 hereof, unless Landlord shall give Tenant written
notice of a change of address or of the party to whom such rents
shall be payable.  Unless abated pursuant to any express
provision of this Lease, Base Rent shall be paid pursuant to the
following schedule:

(a)  First Twenty Years.  During the first twenty (20)
Lease Years, Tenant shall pay annual Base Rent in the amount of
Two Hundred Seventy-Seven Thousand One Hundred Nine and No/100
Dollars ($277,109), payable in monthly installments of Twenty-
Three Thousand Ninety-Two and 42/100 Dollars ($23,092.42).

(b)  Increases in Base Rent for Option Periods.  Annual
Base Rent shall increase on the first day of, if any, the Twenty-
First Lease Year (i.e., the first day of the first Option Period)
and every succeeding fifth Lease Year (i.e., the first day of
each succeeding Option Period), over that just previously in
effect, by the lesser of eight percent (8%) or the increase in
the "CPI-U" (as defined below) during the five (5) year period

-6-

ending on October 31 of the Twentieth (or, as applicable, any
succeeding fifth) Lease Year.  As used herein, the CPI-U shall be
the United States Department of Labor, Bureau of Labor Statistics
Consumer Price Index for All Urban Consumers for the
Minneapolis/St. Paul Standard Metropolitan Statistical Area.  If
at any time during the Term the CPI-U shall be discontinued,
Landlord and Tenant shall mutually and reasonably agree to
substitute an existing official index published by the aforesaid
Bureau of Labor Statistics or a successor other, similar
governmental agency, which index is most nearly equivalent to the
CPI-U.

5.  Development of Shopping Center by Landlord.  The
location of buildings and other tenant space in the Shopping
Center is and shall always be for the Term of the Lease within
the "Permissible Building Areas" as shown on Exhibit "A-5," and
the parking ratio for the Shopping Center shall be at least as
shown thereon, but in no event shall said ratio be less than five
(5) spaces (for full-sized automobiles) per 1,000 square feet of
gross leasable area (unless the parking ratio as of the date of
this Lease is less than five (5) parking spaces per 1,000 square
feet of gross leasable area) nor less than the applicable zoning
requirements.  All such parking shall be at ground level.
Landlord has constructed or caused the improvements located on
the "Common Areas" (as defined in paragraph 7) existing on the
Shopping Center (including, without limitation, the paving,
lighting and landscaping) to be constructed in a first-class,

- 7 -

(J:\013363\048\29ndof3e.w51)
(10/11/93 6:04pm; MOORE_M)

good and workmanlike manner, lien-free, in accordance with
paragraph 13 below, and shall indemnify and hold Tenant harmless
for any loss or damage suffered by Tenant as a result of
Landlord's construction.  If Tenant shall discover that the
aforesaid has not been constructed in a first-class, good and
workmanlike manner and lien-free, then Tenant, in addition to
other rights and remedies available to Tenant under this Lease,
in law, at equity or otherwise, may exercise its rights and
remedies under subparagraphs 31(b) and 31(i), except that the
thirty-day cure period referred to in subparagraph 31(b) shall be
reduced to ten (10) days for the purpose of this paragraph 5 if
Tenant notifies Landlord of such defect on or before January 1,
1994.  If Landlord or any "Affiliate" (as hereafter defined in
paragraph 36(l)) of Landlord becomes the owner or ground lessee
of or in any manner controls the balance of the Shopping Center
(or any portion thereof), then the foregoing obligations and
restrictions shall also apply thereto.

6.  Easements.  In addition to and simultaneously with the
lease of the Premises, Landlord grants to Tenant (i) certain
nonexclusive leasehold easements over or upon certain areas of
Landlord's Premises, as set forth below, which easements shall
run with Landlord's Premises and the Premises, and (ii) the
benefit of all easements, licenses, rights and privileges granted
to Landlord as an "owner" under the REA and as "tenant" under the
Master Lease, during the Term and same shall expire or terminate
simultaneously with this Lease, except as provided below.

{J:\013363\048\29ndof3e.w51}
{10/11/93 6:04pm; MOORE_M}

(a)  Construction Easements.  For the period of
Tenant's construction of the Circuit City Superstore, Landlord
grants to Tenant a nonexclusive easement across a designated
route in the Common Areas for the purpose of construction access
to the Premises.  In addition, Landlord grants to Tenant an
exclusive easement for a construction staging area (the "Staging
Area") of approximately 5000 square feet, in a portion of the
Common Areas at a mutually agreeable location within a reasonable
distance of the Premises for Tenant's use in storing its
construction equipment, construction vehicles, construction
workers' vehicles, trailers, materials, sheds and other items to
be used by Tenant in the course of its construction, for which
items Tenant shall be solely responsible.  The use of such .
easements by Tenant shall not result in damage or injury to the
buildings or other improvements of Landlord, and shall not
unreasonably interfere with the business or construction
operations conducted by Landlord, and said easements shall be
subject to such other reasonable conditions as Landlord shall
require from time to time.  Tenant will indemnify and hold
Landlord harmless from such damage or injury to the buildings,
roads, utilities, landscaping or other improvements of Landlord,
from unreasonable interference with the business or construction
operations conducted by Landlord on Landlord's Premises, and from
any and all claims, liabilities, costs or expenses in connection
with death or personal injury resulting from Tenant's use of this
easement.  After the initial construction of the Circuit City

(J:\013363\048\29ndof3e.w511
[10/11/93 6:04pm; MOORE_M]

Superstore, these easements shall automatically terminate; provided, however, Landlord agrees to grant Tenant equivalent construction easements in connection with any required, approved or permitted reconstruction, alteration or repairs as provided herein.

(b)  <u>Utility Easements</u>.  During the Term, upon prior reasonable request of Tenant, and (following the initial "Landlord Work" as set forth in Exhibit "C") at Tenant's sole expense, Landlord agrees to obtain such underground, public or private utility easements as Tenant deems necessary, without unreasonably interfering with the use by Landlord of the Common Areas, for the benefit of the Premises.  For the purpose of exercising the rights granted in this subparagraph 6(b), Tenant and/or the utility provider shall have the right to enter upon and use the Common Areas to install the utility systems, to such extent and so long as reasonably necessary to accomplish such purpose, subject to restoration of the Common Areas upon such installation and any other reasonable conditions and requirements which Landlord may make.

To the extent possible, no such work shall be performed on weekends or during holiday seasons.

(c)  <u>Common Area Easement</u>.  During the Term, Landlord grants to Tenant, for the benefit of the Premises, the nonexclusive right, privilege and easement (the "Common Area Easement") to use the Common Areas for their intended purposes and to permit its employees, agents, subtenants, assignees,

-10-

licensees, suppliers, customers and invitees to use the same, in
common with Landlord, its heirs, successors, assigns, employees,
agents, lessees, licensees, suppliers, customers and invitees and
all other persons claiming by or through them, for the purposes
(without limitation) of parking and pedestrian, service and
vehicular access, ingress and egress to, from and between the
Premises and the Landlord's Premises and the streets and highways
abutting and adjacent to the Shopping Center, in accordance with
the Site Covenants, without payment of any fee or other charge
therefor.  The aforesaid "grant" shall also include the benefit
of all easements, licenses, rights and privileges granted to
Landlord as an "owner" under the REA.  Landlord shall have no
right to take any action regarding the Common Areas which would
violate the Site Covenants, but shall have the right to
temporarily block off access to the Common Areas, but no more
often than Landlord and its attorneys reasonably deem to be
legally necessary in order to avoid the implication of dedicating
the same for public use or of creating prescriptive rights
therein as a matter of law, such barriers to be temporarily
erected for such purpose, if possible, at a time or upon a day
when the Shopping Center is not open for business, and then for
only the minimum time required to accomplish such purpose.

     (d)  <u>Miscellaneous</u>.  During the Term, Landlord grants
to Tenant any other easements which are necessary to construct
and/or renovate the Building for the Circuit City Superstore, as

{J:\013363\048\29ndof3e.W51}
{10/11/93 6:04pm; MOORE_M}

shown on Exhibit "A-1" and to operate and use the Premises as and
                        and other permitted uses
for the initial use /set forth in paragraph 18.

        (e)  Non-Dedication.  None of the easements granted by
the parties to this Lease is intended, nor shall any of them be
construed, as a dedication of any portion of the Shopping Center
for public use, and the parties will refrain from taking any
action which would cause such a dedication and will take whatever
steps may be necessary to avoid any such dedication, except as
may be agreed upon in writing by the parties hereto or their
respective successors or assigns.

        7.  Common Areas and Common Area Maintenance.

        (a)  Definition of Common Areas.  The term "Common
Areas" shall be defined to include the parking areas, lanes,
drives, entrances, truck passageways, sidewalks, elevators,
escalators, ramps, stairways, landscaped and other unpaved areas,
parking lot lighting facilities and equipment, Landlord's pylon
sign structure(s) and shared utility facilities located in the
Shopping Center (including any such areas and facilities
contained within outparcels but reserved to the benefit of the
Shopping Center occupants) and intended and available for the
common use of all of the tenants within the Shopping Center
(including any outparcel occupants which contribute toward "CAM
Charges" (as defined below) and are not responsible for separate
maintenance of such outparcels), their subtenants, licensees, and
business invitees.  Landlord shall be responsible for operating,
maintaining and repairing the Common Areas (or causing same to be

-12-

operated, maintained and repaired), as reasonably necessary, in a first-class manner, including cleaning, maintenance of Landlord's pylon sign structure(s), snow removal and ice treatment, removal of Common Area trash and garbage, lighting, repairing, repaving and restriping the parking area, and replanting and replacing landscaping, all such work to be collectively "Common Area Maintenance."

(b)   CAM Charges.   For the purpose of this paragraph 7, the cost of Common Area Maintenance (the "CAM Charges") shall include (i) all of Landlord's reasonable and proper direct costs and expenses of operating and maintaining the Common Areas and (ii) for as long as Landlord is maintaining the Common Areas either by itself or pursuant to an arrangement between Landlord and a management company, a management fee equal to five percent (5%) of the total of such costs (specifically excluding from such total for the purposes of paying the management fee any amounts payable for insurance, capital expenditures other than the amortized portion of any such capital expenditures permitted to be included in the CAM Charge for the applicable "CAM Year" (as defined below), real estate taxes and separately metered utilities servicing the Common Areas). Notwithstanding the foregoing, the following shall not be included in the CAM Charges:   (1) real estate taxes payable or assessed on any of the Tracts other than Tract I, and maintenance performed on separately maintained outparcels; (2) any dues or charges for a merchants' or other association of the tenants in the Shopping

-13-

{J:\013363\048\29ndot3e.U51}
(10/11/93 6:04pm; MOORE_M)

Center; (3) maintenance, repairs or replacements to any buildings (including exterior walls thereof) or utility systems not part of the Common Areas; (4) repairs or replacements necessitated by the negligence or the wrongful action of Landlord (including failure to construct any portion thereof in accordance with plans or specifications therefor) or any other tenant or made to correct any initial construction defect or condition in existence prior to the Rent Commencement Date of this Lease or to correct damage caused by subsidence or adverse or substandard soil conditions; (5) amounts paid to entities related to Landlord in excess of the cost of such services from any competitive source; (6) amounts reimbursable from insurance proceeds, under warranty or by Tenant, any other tenant in the Shopping Center or any other third party other than pursuant to a Common Area expense provision similar to this paragraph 7; (7) premiums for Common Area liability insurance for coverage in excess of the limits established in paragraph 14(e) below; (8) repairs or replacements of a capital nature (whether or not capitalized), unless the costs of same are amortized over the entire useful life of such repairs or replacements and provided that repairs or replacements are not the direct result of initial defects in materials or workmanship; (9) improvements, repairs or replacements (other than patching and similar minor periodic maintenance) to the parking lot or other paved areas during the first ten (10) CAM Years; (10) reserves for anticipated future expenses; (11) any management, overhead and/or administration fees or charges in

(J:\013363\048\29ndcf3e.451;
[10/11/93 6:04pm; MOORE_41

connection with the management or administration of the Common Areas (except for the 5% management fee to the extent provided for in Section 7(b)(ii)); or (12) interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner.  CAM Charges shall be in an amount consistent with the costs incurred by other landlords of similar shopping centers in the St. Cloud, Minnesota metropolitan area.

(c)   Tenant Payments.  Commencing on the Rent Commencement Date, Tenant shall pay to Landlord a fee (which Landlord estimates to be $.377 per square foot of ground floor area in the Building per annum), payable in equal monthly installments, as its share of CAM Charges.  Thereafter, the annual charge shall be computed on the basis of periods of twelve (12) consecutive calendar months, as designated by Landlord (each such period is a "CAM Year"), and shall be paid by Tenant in equal monthly installments, in advance, on the first day of each month during such CAM Year.  For any period within the Term which is less than a full CAM Year, the annual charge shall be appropriately prorated.  Within sixty (60) days after the end of the first CAM Year and each CAM Year thereafter, Landlord will furnish to Tenant a statement showing in detail (with such substantiating documentation as Tenant may reasonably request) the amount of the CAM Charges for the preceding CAM Year and the then-current number of square feet of ground floor gross leasable space in the Shopping Center. Any necessary adjustment with respect to amounts owed by either party for such preceding CAM

-15-

Year shall thereupon be made; and the monthly payments to be made
by Tenant for the ensuing year shall be estimated accordingly.
Tenant's share of CAM Charges shall be calculated in accordance
with the applicable provisions of the REA or pursuant to any
other arrangement agreed to by the owners of the Shopping Center
and consented to by Tenant, it being understood and agreed that
Tenant shall have no obligation to consent to any such
arrangement.  Pursuant to the REA, Tenant's share of CAM Charges
shall be calculated by first deducting any amount payable by the
owner of Tract III and then prorating the remaining CAM Charges
between Tenant and the owner of Tract II in proportion to the
ground floor area of the buildings erected within Tract I and
Tract II.  The owner of Tract IV is not required to contribute
toward CAM Charges.  For the purpose of the foregoing proration,
the ground floor area of the Building shall be deemed to be
90,000 square feet.  The remainder of CAM Charges shall be borne
by Landlord and/or other owners/tenants of the Shopping Center;
however, Landlord shall not be required to subsidize any
deficiency between Tenant's share of CAM Charges as determined
pursuant to the REA and Tenant's share of CAM Charges as
determined on a "full" pro rata basis based upon the gross
leasable area of all buildings within the Shopping Center, which
deficiency is created because the owner of Tract III is not
required to pay its "full" pro rata share of CAM Charges and the
owner of Tract IV is not required to make any payments towards
CAM Charges.

-16-

[J:\013363\048\29ndof3e.W51]
(10/11/93 6:04pm; MOORE_M)

(d)  <u>Examination of Landlord's Records</u>.  Tenant shall have the right, from time to time, but not more often than once as to any CAM Year and no later than two (2) years after the end of such CAM Year, to examine and make copies of the records pertaining to CAM Charges for such CAM Year.  Tenant's right of examination shall be exercised during reasonable business hours at Landlord's principal records office on at least ten (10) business days' prior notice to Landlord.  If such examination shall disclose any overcharge by Landlord, Landlord shall promptly reimburse Tenant for any overpayment of Tenant's share of CAM Charges; and if such overpayment by Tenant is in excess of the greater of (i) three percent (3%) of Tenant's actual share of CAM Charges or (ii) Five Hundred Dollars ($500), Landlord shall reimburse Tenant for the reasonable cost of such examination or audit. Tenant shall promptly reimburse Landlord for any underpayment disclosed by such examination.

8.  <u>Signs</u>.  (a)  Landlord, at its sole cost and expense, no later than November 5, 1993, shall cause the "Best Buy" sign panel(s) to be removed from the former K-Mart position (<u>i.e.</u>, the top tenant position with no less square footage of signage than that of the previously existing K-Mart sign panel) on the existing pylon sign structure at the location so shown on Exhibit "A-1" ("Pylon").  Tenant, without Landlord's consent but subject to governmental requirements, shall be permitted to install Tenant's identification panels (and readerboard, if applicable) in the former K-Mart portion on the Pylon ("Tenant's

-17-

[J:\013363\048\2adf$63e.W51]
[10/13/93 3:43pm; KRAUSE_P]

Allocation"), at Tenant's sole cost and expense. Tenant shall further be entitled, without Landlord's consent but subject to governmental requirements, to replace any and all of its sign panels. Tenant, at Tenant's option and from time to time, may divide Tenant's Allocation into one or more sign panels, and shall be permitted to allow any of its subtenants to install their respective sign panels thereon, without Landlord's consent but subject to governmental requirements.

(b)   Tenant shall also have the right, at Tenant's expense, without Landlord's consent but subject to governmental requirements and the REA, to erect another pylon sign on the Common Areas.

(c)   Tenant shall have the right to erect its signs on the facade of the Building, subject to governmental requirements. Tenant's initial facade signs shall be substantially similar to those set forth as part of the "Concept Plans" attached as Attachment 11 to Exhibit "C." Tenant shall be entitled, without Landlord's consent but subject to governmental requirements, to replace from time to time any or all of its signs or signage. Tenant's subtenants, if any, shall also be permitted to erect its signs on the facade of the Building, without Landlord's consent but subject to governmental requirements.

9.   <u>Taxes</u>.

(a)   <u>Taxes Contemplated Hereunder</u>.   The term "Real Estate Taxes" shall mean all general and special real estate taxes, special assessments and other ad valorem taxes, rates,

-18-

levies and assessments paid upon or with respect to Tract I,
including the Premises, for a calendar year or a portion thereof
to any governmental agency or authority and all taxes
specifically imposed in lieu of any such taxes.  Nothing
contained in this Lease shall require Tenant to pay any
franchise, corporate, estate, inheritance, succession, capital
levy, business or transfer tax of Landlord or Master Landlord, or
any income, profits, gross receipts or renewal tax or charge upon
the rent payable by Tenant under this Lease or Landlord under the
Master Lease, or for any betterment assessment report on Chicago
Title Insurance Company Policy No. 24-005-04-00462.

   (b)  <u>Payment of Real Estate Taxes</u>.  Landlord represents
that (i) Tract I is separately assessed, (ii) the Building, the
pylon sign, lighting fixtures and any other improvements existing
as of the date hereof are and will be the only assessed
improvements located thereon, and (iii) Landlord does not receive
any reimbursement from other owners of the balance of the
Shopping Center in respect of the Real Estate Taxes.  Tenant
shall pay to Landlord the Real Estate Taxes levied against the
tax parcel or parcels comprising Tract I within fifteen (15) days
after Tenant's receipt of Landlord's statement therefor (but in
no event more than fifteen (15) days before Landlord shall either
lose the benefit of any discount given by the taxing authority
for early payment or incur any penalty for late payment),
accompanied by the tax bill on the basis of which such statement
is rendered.  Landlord shall pay, or cause the payment of, all

[J:\013363\048\29ndof3e.w511
(10/11/93 6:04pm; MOORE_M]

Real Estate Taxes before any fine, penalty, interest or cost may
be added thereto, become due or be imposed by operation of law
for the nonpayment or late payment thereof. In the event that
Tenant's payment of Real Estate Taxes is not timely tendered to
Landlord, Tenant shall be liable to Landlord for any discount
which would have been available to Tenant as aforesaid had Tenant
made timely payment or, as applicable, for its pro rata share of
any penalty which would have been avoided by such timely payment,
notwithstanding the fact that Landlord may actually have made
timely payment and received the discount or avoided the penalty.
In no event shall Tenant be liable for any discount forfeited or
penalty incurred as a result of late payment by Landlord, Master
Landlord or any other third party. Taxes shall be prorated as of
the Rent Commencement Date and the expiration or earlier
termination of this Lease, and Landlord shall promptly return to
Tenant any overpayment made by Tenant not attributable to the
period of Tenant's possession of the Premises. Landlord shall
remain primarily responsible for such payment notwithstanding the
fact that such payment may be made by a tenant of Landlord's
Premises or other third party pursuant to an agreement to which
Tenant is not a party. In addition, should Landlord fail to pay
such Real Estate Taxes before same become delinquent, Tenant
shall have the right, at its election, to cure such failure by
payment of Real Estate Taxes and any interest and penalties due
thereon and may deduct the cost thereof, plus interest at the
lesser of eleven percent (11%) per annum or the highest rate

[J:\013363\048\29ndof3e.w51]
(10/11/93 6:04pm; MOORE_M]

permitted by Minnesota law (the "Default Rate"), from the next installment(s) of Base Rent and other charges due hereunder.

(c)   Contest of Real Estate Taxes.   Tenant shall have the right, at Tenant's sole expense, to contest the amount or validity, or otherwise seek an exemption or abatement, of any Real Estate Taxes, by appropriate proceedings diligently conducted in good faith, provided that Tenant shall first have notified Landlord of its intent to do so and Landlord shall have failed to notify Tenant, within five (5) days of receipt of such notice that Landlord intends to contest same.

(d)   Reduction in Assessed Valuation of Property. Tenant, at its sole cost and expense, shall have the right to seek a reduction in the valuation of the Premises assessed for Real Estate Tax purposes.   In any instance where any such action or proceeding is being undertaken by Tenant, Landlord shall (and shall use reasonable efforts to cause Master Landlord to) cooperate with Tenant, execute any and all documents required in connection therewith and, if required by any law, rule or regulation of the taxing authority, join with Tenant in the prosecution thereof.

(e)   Expenses.   Upon the termination of the proceedings set forth in (c) or (d) (unless the taxing authority requires that Real Estate Taxes be paid under protest prior to commencement of such proceedings), Tenant shall pay its share of such Real Estate Taxes as finally determined in such proceedings, the payment or partial payment of which may have been deferred

[J:\013363\048\29ndof3e.W51]
[10/11/93 6:04pm; MOORE_M]

during the prosecution of such proceedings.  In addition, Tenant shall be solely responsible for any costs, fees, interest, penalties or other liabilities incurred in connection with such proceedings.  Tenant shall be entitled to a refund of any overpayment of Real Estate Taxes relating or allocable to the Premises, after deducting therefrom all costs, fees, penalties or interest thereon, which shall be reimbursed to the contesting party.

10.   Maintenance, Repairs and Replacements.  Except as set forth below or arising from the negligent acts or omissions or willful misconduct of Landlord (or its agents, employees or other tenants), Tenant shall be solely responsible for maintenance of the exterior and interior of the Building including, but not limited to, repairs and/or replacements to plumbing, heating, electrical and air conditioning systems.  Landlord shall maintain (including, without limitation, repairs and/or replacements of) the roof, roof structure, floor slab and exterior structural walls (including, without limitation, the maintenance of that portion of the Repair Work (as defined in paragraph 3 of Exhibit C) which affects the roof, roof structure, floor slab or exterior structural walls notwithstanding that Tenant initially performed the Repair Work) but shall have no other responsibility for maintenance, repair or replacements to the Premises or any part thereof; but should either party fail to perform its obligations under this paragraph 10, the other may, at its option, effect such maintenance or repairs, provided that such curing party

- 22 -

shall have given the nonperforming party thirty (30) days' prior
written notice, except in the case of emergencies (in which event
only such notice as may be reasonable under the circumstances
shall be required). The nonperforming party shall reimburse the
other on demand for the reasonable and actual amount so expended,
plus interest at the Default Rate. All maintenance, repairs or
replacements shall be done by Tenant or Landlord in a manner
consistent with the then-existing Shopping Center of which the
Building is a part. In order for Landlord effectively to perform
its maintenance obligations hereunder, Tenant shall assign to
Landlord any and all manufacturers' and contractors' warranties
relating to those elements which Landlord is required to maintain
(including, without limitation, warranties relating to those
portions of the Repair Work that Landlord is required to
maintain).

  11. <u>Payment of Utility Bills</u>. Tenant will pay directly to
the appropriate utility company or governmental agency, when due,
all bills for gas, water, sanitary sewer, electricity, telephone
and other public or private utilities used by Tenant with regard
to the Building.

  12. <u>Alterations</u>. During the Term, Tenant shall have the
right, at its discretion and its sole cost, without obtaining the
prior consent from Landlord, to make (i) any alterations or
modifications necessary in order to bring the Premises into
conformity with Tenant's then-current prototype for similarly
sized stores and (ii) any interior or exterior nonstructural

[J:\013363\048\29ndof3e..51]
[10/11/93 6:04pm; MOORE_M]

alterations or modifications it may desire. With Landlord's
consent, which shall not be unreasonably withheld or delayed,
Tenant shall have the right, at its sole cost, to alter, modify
or reconstruct the structure of the Building. To the extent
Tenant makes any such structural alteration (other than those
portions of the Repair Work which Landlord shall be required to
maintain pursuant to paragraph 10), Landlord shall not be
required to maintain same, provided, however, Landlord shall not
be relieved of its maintenance obligations with respect to any
portion of the roof, roof structure, floor slab or exterior
structural walls which did not undergo any structural alteration
by Tenant. Landlord's withholding of consent as to any
structural alteration or modification shall be deemed reasonable
only if same would impair the structural integrity of the
Building. Tenant shall cause all such alterations to be
lien-free (in accordance with paragraph 13) and made and
completed at the cost of Tenant in a workmanlike manner and in
compliance with all applicable law. Should Landlord's consent be
required, conceptual plans and specifications for such work shall
be provided to Landlord prior to commencement of any such work.
Without cost or expense to Landlord, Landlord shall cooperate
with Tenant and shall use reasonable efforts to cause Master
Landlord to cooperate with Tenant, in the obtaining of any and
all licenses, building permits, certificates of occupancy or
other governmental approvals which may be required in connection
with any such alterations, and Landlord shall (and shall use

[J:\013363\048\29ndof3e.451]
(10/11/93 6:04pm; MOORE_M]

reasonable efforts to cause Master Landlord to) execute, acknowledge and deliver any documents reasonably required in furtherance of such purposes.

In addition, Tenant may, from time to time, install, maintain and/or replace any satellite dish or antennas on the roof and/or exterior walls or parapet of the Building as Tenant deems necessary or desirable, provided same shall not adversely and materially affect the roof or the structural elements thereof.    Upon removal by Tenant of any satellite dish or antennas, Tenant shall repair any damage done in connection with such removal.

13.    Mechanics' Liens.    Landlord and Tenant covenant to each other that they will not permit any lien to be filed against the Premises or the Shopping Center on account of nonpayment for, or disputes with respect to, labor or materials furnished to the Premises or the Shopping Center for or on behalf of Tenant, Landlord or any party claiming by, through, or under Tenant or Landlord, nor shall either party permit any judgment, lien or attachment to lie, as applicable, against the Premises or the Shopping Center.    Should any lien of any nature, including but not limited to the foregoing, be filed against the Premises or Shopping Center, the party on account of whose actions such lien has been filed shall, within thirty (30) days after receipt of written notice of such lien, cause said lien to be removed by substitution of collateral, posting a bond therefor or such other method as may be reasonably acceptable to the other party hereto.

(J:\013363\048\29ncolo3e.w511
[10/11/93 6:04pm; MOORE_M]

14. Insurance.

(a) Property Damage. During any period when either
party is performing construction or maintenance within the
Shopping Center, such party shall keep or require its general
contractor to keep, in full force and effect, a policy of
builder's risk insurance covering loss or damage to the Building
(or portion thereof on which construction is being performed) for
the full replacement value of all such construction. During the
Main Term and all Option Periods, Tenant shall keep in full force
and effect, in a form reasonably acceptable to Landlord, a policy
of fire and extended coverage insurance covering loss or damage
to the Premises in the amount of full replacement value of the
Building thereon, exclusive of excavation, footings and
foundations (which initial amount shall be not less than Tenant's
cost to construct its improvements) with a commercially
reasonable deductible, for which Tenant shall be fully
responsible. Landlord and any "Mortgagee" (as defined in
paragraph 21 below), shall be named in such policy or policies as
additional insureds as their respective interests may appear and
such policy shall contain the standard mortgagee endorsement.
Tenant shall furnish to Landlord a duplicate certificate of
insurance showing insurance existing in such amount.

(b) Liability Insurance. During the Term, Tenant
shall keep in full force, in a form reasonably acceptable to
Landlord, a policy of commercial general liability insurance with
bodily injury and property damage insurance with respect to the

-26-