Gregg M. Galardi, Esq.            Dion W. Hayes (VSB No. 34304)
Ian S. Fredericks, Esq.           Douglas M. Foley (VSB No. 34364)
SKADDEN, ARPS, SLATE, MEAGHER &   MCGUIREWOODS LLP
FLOM, LLP                         One James Center
One Rodney Square                 901 E. Cary Street
PO Box 636                        Richmond, Virginia 23219
Wilmington, Delaware 19899-0636   (804) 775-1000
(302) 651-3000

            - and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
333 West Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

Counsel to the Debtors and
Debtors in Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

- - - - - - - - - - - - - - x
In re:                       :   Chapter 11
                             :
CIRCUIT CITY STORES, INC.,   :   Case No. 08-35653 (KRH)
et al.,                      :
                             :
            Debtors.         :   Jointly Administered
- - - - - - - - - - - - - - x

**DEBTORS' MOTION FOR ORDER PURSUANT TO BANKRUPTCY CODE
SECTIONS 105, 363 AND 503 AND BANKRUPTCY RULES 2002 AND
6004 (A) AUTHORIZING SELLER TO ENTER INTO AGREEMENT IN
CONNECTION WITH SALE OF CERTAIN REAL PROPERTY LOCATED IN
ARDMORE, OKLAHOMA, SUBJECT TO HIGHER OR OTHERWISE BETTER
BIDS, (B) APPROVING TERMINATION FEE IN CONNECTION
THEREWITH, (C) APPROVING SALE OF REAL PROPERTY FREE AND
CLEAR OF ALL INTERESTS, AND (D) GRANTING RELATED RELIEF**

Circuit City Stores, Inc. (the "Seller," and

collectively with the debtors and debtors in possession

1

in the above-captioned jointly administered cases, the

"Debtors")[1] hereby move (the "Motion"), pursuant to

sections 105, 363, and 503 of title 11 of the United

States Code (the "Bankruptcy Code") and Rules 2002 and

6004 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), for entry of an order

(A) authorizing the Sellers to enter into an agreement

with the Purchaser (as defined herein) for the sale (the

"Sale") of certain of the Seller's real property located

at 1901 Cooper Drive, Ardmore, Oklahoma, (the

"Property"), a copy of which is attached as Exhibit A to

the Sale Order (the "Agreement")[2], subject to higher or

otherwise better proposals, (B) approving the

Termination Fee (as defined below) in connection

---

[1]   The Debtors and the last four digits of their respective taxpayer
      identification numbers are as follows: Circuit City Stores, Inc.
      (3875), Circuit City Stores West Coast, Inc. (0785), InterTAN,
      Inc. (0875), Ventoux International, Inc. (1838), Circuit City
      Purchasing Company, LLC (5170), CC Aviation, LLC (0841), CC
      Distribution Company of Virginia, Inc. (2821), Circuit City
      Properties, LLC (3353), Kinzer Technology, LLC (2157), Abbott
      Advertising Agency, Inc. (4659), Patapsco Designs, Inc.(6796),
      Sky Venture Corp. (0311), PRAHS, INC. (n/a), XSStuff, LLC (9263),
      Mayland MN, LLC (6116), Courchevel, LLC (n/a), Orbyx Electronics,
      LLC (3360), and Circuit City Stores PR, LLC (5512).  The address
      for Circuit City Stores West Coast, Inc. is 9250 Sheridan
      Boulevard, Westminster, Colorado 80031.  For all other Debtors,
      the address is 9954 Mayland Drive, Richmond, Virginia 23233.

[2]   Capitalized terms used but not otherwise defined herein have the
      meanings ascribed to them in the Agreement.

2

therewith, (C) approving the Sale free and clear of all Liens (as defined below) and (D) granting related relief. In support of the Motion, the Seller respectfully represents as follows:

### JURISDICTION AND VENUE

1.     This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.     The statutory predicates for the relief requested herein are Bankruptcy Code sections 105 and 363 and Bankruptcy Rules 2002 and 6004.

### BACKGROUND

**A.    The Bankruptcy Cases.**

3.     On November 10, 2008 (the "Petition Date"), the Debtors filed voluntary petitions in this Court for relief under chapter 11 of the Bankruptcy Code.

4.     The Debtors continue to manage and operate their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.

5.    On November 12, 2008, the Office of the
United States Trustee for the Eastern District of
Virginia appointed a statutory committee of unsecured
creditors (the "Creditors' Committee").  To date, no
trustee or examiner has been appointed in these chapter
11 cases.

6.    On January 16, 2009, the Court
authorized the Debtors, among other things, to conduct
going out of business sales at the Debtors' remaining
567 stores pursuant to an agency agreement (the "Agency
Agreement") between the Debtors and a joint venture, as
agent (the "Agent").  On January 17, 2009, the Agent
commenced going out of business sales pursuant to the
Agency Agreement at the Debtors remaining stores.  As of
on or about March 8, 2009, the going out of business
sales concluded.

### RELIEF REQUESTED

7.    By this Motion, the Seller seeks an
order (A) authorizing the Seller to enter into the
Agreement in connection the Sale of the Property,
subject to higher or otherwise better proposals,
(B) approving the Termination Fee in connection

therewith, (C) approving the of the Sale of the Property free and clear of all interests, and (D) granting related relief (the "Sale Order").

8.    As more fully set forth below, after a comprehensive review, the Seller believes that the Sale represents its best opportunity under the circumstances to maximize the value of the Property.  Therefore, the Sale is in the best interests of the its estate and stakeholders.

**BASIS FOR RELIEF**

**A.    Events Leading To The Sale.**

9.    In light of the failure to obtain any feasible going concern bids and the decision to liquidate the Debtors' inventory through going-out-of-business sales, as described above, the Seller has been left with various assets -- including the Property -- for which it has no remaining use.  In contrast, the sale of such assets, including the Sale of the Property, would result in significant proceeds for the Seller's estate and creditors.

10.    Since at or about the time the going-out-of-business sales were commenced, the Seller, along with

its real estate advisor, DJM Realty, LLC ("DJM"), has

been marketing the Property.  As a result of these

marketing efforts, the Seller received various proposals

to purchase the Property.  Upon reviewing these

proposals, the Seller determined that the proposal

submitted by the Purchaser was considerably higher or

otherwise better than the alternate proposals received.

Thus, the Seller elected to proceed with the Sale of the

Property to the Purchaser.

**B.    The Agreement.**

11.    Pursuant to the Agreement, the Seller

would sell the Property to Shores Oilfield Equipment

Company, Inc. (the "Purchaser") for $6 million (the

"Purchase Price").

12.    The significant terms of the Agreement

are as follows:[3]

(a)   <u>General Terms</u>.   The Purchaser would
acquire the Property, consisting solely of the Seller's
right, title and interest in and to the property located
at 1901 Cooper Drive in Ardmore, Oklahoma, comprising
approximately 38 acres, together with (i) all rights and
appurtenances pertaining to such land, (ii) all

---

[3]   In the event of any discrepancy between the Agreement and this
summary of the Agreement, the provisions of the Agreement are
controlling.

buildings (including a warehouse building containing approximately 750,000 square feet), structures and other improvements on said land and (iii) electrical, mechanical, air conditioning and other fixtures attached thereto, as more fully described in Exhibit A to the Agreement, through an asset sale.  The Property will not included any movable personal property and equipmentount.

(b)  Sale.  The Property would be sold free and clear of all liens, charges, pledges, security interests, conditional sale agreements or other title retention agreements, leases, mortgages, security interests, options, or other encumbrances (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction) and any monetary amounts which are secured by any lien (collectively, the "Liens"), except for (i) liens for real property taxes that are not yet due and payable, (ii) zoning ordinances, building codes and other land use laws and applicable governmental regulations, (iii) all covenants, agreements, conditions, easements, restrictions and rights, whether of record or otherwise and (iv) any and all matters that would be shown by a physical inspection of the Property (collectively, the "Permitted Encumbrances").

(c)  Bankruptcy Court Approval.  The Sale of the Property would be subject to approval by this Court and competitive bidding pursuant to the Bidding Procedures (as defined below).

(d)  Documentation.  The Sale would be effected pursuant to the Agreement and related documentation.

(e)  Purchase Price.  The Purchase Price to be paid by the Purchaser for the Property would be $6 million.

(f)  Deposit Escrow.  In accordance with the Agreement, the Purchaser has previously placed $600,000 into an escrow account. Upon closing of the Sale (the "Closing"), or if the Agreement is terminated prior to Closing because of the Purchaser's breach of the

Agreement (on the terms as provided in the Agreement), the Seller would be entitled to the funds in the escrow account (the "Deposit").  Retention of the Deposit would constitute the Seller's sole recourse in such event.

(g)  <u>Representations And Warranties</u>.  Pursuant to the Agreement, the Seller would provide certain standard representations and warranties relating to the Sale of the Property and the Purchaser would provide representations and warranties generally standard in a transaction of this type.  The representations and warranties of the Purchaser survive indefinitely following the Closing or the termination of the Agreement.  The representations and warranties of the Seller shall expire and be extinguished at the Closing.

(h)  <u>Termination</u>.  The Agreement could be terminated prior to Closing in the following circumstances:  (i) by Purchaser, if an action is initiated to take any material portion of the Property by eminent domain proceedings, (ii) by Purchaser, in the event of damage to the Property exceeding $600,000 occurring during the period after the date of the Agreement and prior to Closing, if Seller does not repair such damage, (iii) by Purchaser, in the event that Seller shall fail to consummate the transactions contemplated by the Agreement, (iv) by Seller, in the event that Purchaser shall fail to comply with the Agreement and (v) by Seller, in order to permit Seller to accept a higher or better offer for the Property pursuant to the Bidding Procedures.

**C.    Termination Fee.**

13.   The Seller has agreed to pay the

Purchaser a break-up fee of $50,000.00 (the "Termination

Fee") if, and only if (i) Purchaser is not in breach of

or default under the Agreement and (ii) the Seller

consummates the Sale of the Property with a higher or

otherwise better bidder following the Auction (as defined herein) and approval by the Bankruptcy Court.

14.   The Purchaser has expended, and likely will continue to expend, considerable time, money, and energy pursuing the Sale and has engaged in arm's length and good faith negotiations regarding a possible sale of the Property.  The Agreement is the culmination of these efforts.

15.   In recognition of this expenditure of time, energy, and resources, the Seller has agreed to the Termination Fee.  Specifically, the Agreement provides for, and the Seller respectfully requests that the Sale Order approve, the Termination Fee payable by the Seller to the Purchaser in the amount of $50,000.00 if the Seller terminates the Agreement to close an alternative transaction, so long as the Purchaser is not in breach of the Agreement.

16.   The Seller believes that the proposed Termination Fee is fair and reasonable in view of (a) the analysis, due diligence investigation, and negotiation undertaken by the Purchaser in connection with the Sale and (b) the fact that the Purchaser's

efforts would maximize the value of the Property for the
benefit of all stakeholders, whether as a result of
consummating the Sale pursuant to the Agreement or by
generating a higher or otherwise better offer.

17.  The Purchaser is unwilling to keep open
its offer to purchase the Property under the terms of
the Agreement unless this Court authorizes payment of
the Termination Fee.  Thus, absent entry of the Sale
Order with approval of the Termination Fee, the Seller
may lose the opportunity to obtain what it believes to
be the highest or otherwise best offer for the Property.
And, as described below, the Agreement is subject to
higher or otherwise better proposals.  Approving the
Termination Fee will thus commit the Purchaser to
purchase the Property under the Agreement, and the
Agreement would serve to start any additional bidding
for the Property at a fair and reasonable purchase price.

18.  Payment of the Termination Fee will not
diminish the Seller's estate.  The Seller would not
expect to pay the Termination Fee unless it does so to
accept an alternative proposal, which would result in
even greater value to the Seller's estate and its

stakeholders.  This is particularly true given the

Initial Minimum Overbid requirement (as defined below),

which ensures that other proposals represent higher or

otherwise better offers for the Property taking into

account payment of the Termination Fee.  The Seller thus

requests that this Court authorize payment of the

Termination Fee pursuant to the terms and conditions of

the Agreement.

**D.    The Bidding Procedures.**

19.    To ensure the Seller receives the

highest or otherwise best proposal for the Property, the

Seller will entertain alternate proposals for the Sale

of the Property.  The Seller accordingly requests that

this Court order that any parties, including those

parties that previously submitted proposals, who wish to

submit an alternate proposal for consideration by the

Debtors be required to do so by May 6, 2009 at 4:00 p.m.

(ET) (the "Bid Deadline").

20.    If the Seller receives any Qualified

Bids (as defined herein), the Seller would hold an

auction (the "Auction") on May 11, 2009, either

telephonically or at the offices of Skadden, Arps, Slate,

Meagher & Flom LLP, 4 Times Square, New York, NY.  The
Seller will advise the Purchaser and all other parties
that submitted a Qualified Bid of the Auction.

21.   At the conclusion of any Auction, the
Seller, in consultation with its advisors (and
representatives of the Creditors' Committee), would
determine the highest or otherwise best bid (the
"Successful Bid").

22.   Following the Auction, if any, the
Seller intends to proceed with a hearing to approve the
Sale of the Property on May 13, 2009 at 2:00 p.m. (ET)
(the "Sale Hearing").

23.   If no Qualified Bids other than the bid
of the Purchaser are received, the Seller would proceed
with the Sale to the Purchaser following entry of the
Sale Order.  If the Seller receives additional Qualified
Bids, then at the Sale Hearing, the Seller would seek
approval of the Successful Bid, as well as the second
highest or best Qualified Bid (the "Alternate Bid," and
such bidder, the "Alternate Bidder").  A bid would not
be deemed accepted by the Seller unless and until
approved by the Court.

24.    Following approval of the Sale to the
Successful Bidder, if the Successful Bidder fails to
consummate the sale for specified reasons, then the
Alternate Bid would be deemed to be the Successful Bid
and the Seller would be permitted to effectuate a sale
to the Alternate Bidder without further order of the
Court.

25.    To ensure that only bidders with a
serious interest in the purchase of the Property
participate in the bidding process, the Seller would
only consider the "Qualified Bids" of "Qualified
Bidders."  To be considered a "Qualified Bid" and a
"Qualified Bidder" for purposes of the Auction, the
person or entity submitting the bid would be required to
submit an offer by the Bid Deadline that includes:

(a)    an executed copy of the Agreement marked
to show those amendments and
modifications to the Agreement that the
Qualified Bidder proposes (such modified
Agreement, a "Marked Agreement"),
including modifications to the Purchase
Price, which price must be at least
$6,250,000.00 (the "Initial Minimum
Overbid");

(b)    the potential bidder and the officer(s)
or authorized agent(s) who will appear on
behalf of such bidder;

13

      (c)   a statement that the bid shall not be conditioned on the outcome of unperformed due diligence by the bidder or any financing contingency;

      (d)   a good faith deposit (the "Good Faith Deposit") equal to $625,000.00;

      (e)   an acknowledgement that the bidder's offer is irrevocable until two (2) business days after the closing of the Sale of the Property; and

      (f)   an acknowledgement that, in the event the bidder is the Alternate Bidder, the bidder will proceed with the purchase of the Property pursuant to the terms the Marked Agreement.

26.   The Seller reserves the right to (i) determine in its reasonable discretion (after consultation with representatives of the Creditors' Committee) which offer is the highest or otherwise best offer; (ii) reject at any time prior to the closing of a Sale, without liability, any offer that the Seller in its reasonable discretion (after consultation with representatives of the Creditors' Committee) deems to be (x) inadequate or insufficient, (y) not in conformity with the requirements of the bidding procedures or applicable law or (z) contrary to the best interests of the Seller and its estate; (iii) re-open the Auction, (iv) withdraw the Property from the Auction, and

(v) waive the requirements of any of the bidding
procedures with respect to a potential or Qualified
Bidder if the Seller determines in its business judgment
(after consultation with representatives of the
Creditors' Committee) it is in the best interests of its
estate and creditors.

27.   Objections to the Sale, if any, shall be
filed and served no later than 4:00 p.m. (ET) on May 6,
2009.

**APPLICABLE AUTHORITY**

**I.    APPROVAL OF THE SALE OF THE PROPERTY IS WARRANTED
        UNDER BANKRUPTCY CODE SECTION 363(b)(1).**

28.   As set forth above, Bankruptcy Code
section 363(b)(1) authorizes a  trustee to "use, sell,
or lease" property of the estate with the Court's
approval.  11 U.S.C. § 363(b)(1).  Assets of the Debtors
may be sold outside of the ordinary course of business,
pursuant to Bankruptcy Code section 363(b)(1), if a
sound business purpose exists for doing so.  In re WBQ
P'ship, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995)(citing
Stephens Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th

Cir. 1986)); see also In re W.A. Mallory Co., Inc., 214

B.R. 834, 836 (Bankr. E.D. Va. 1997).

29.   To satisfy the "sound business purpose

test," the debtor must demonstrate that (1) a sound

business reason or emergency justifies a pre-

confirmation sale; (2) the sale was proposed in good

faith; (3) the purchase price is fair and reasonable;

and (4) adequate and reasonable notice of the sale has

been provided.   In re WBQ P'ship, 189 B.R. at 102.

30.   Based upon the results of their analysis,

the Seller's management and advisors have concluded that

the Sale of the Property pursuant to the Agreement or a

higher or otherwise better offer would maximize the

value of the Property for the Seller's estate.

Maximizing asset value is a sound business purpose that

warrants authorizing the proposed Sale.

31.   The Sale of the Property will be subject

to competing bids, thereby enhancing the Seller's

ability to receive the highest or otherwise best value

for the Property.   Consequently, the fairness and

reasonableness of the consideration to be received by

the Seller will ultimately be demonstrated by a "market

check" through the auction process, which is the best means for establishing whether a fair and reasonable price is being paid.

32. Moreover, the Seller proposes to provide adequate notice of the Auction and the Sale Hearing as set forth below.  In light of the circumstances, such notice is reasonably calculated to provide timely and adequate notice to the Seller's major creditor constituencies, those parties most interested in these cases, those parties potentially interested in bidding on the Property and others whose interests are potentially implicated by the proposed Sale.

## II.   THE SALE PROCESS IS REASONABLE AND APPROPRIATE.

33. Bankruptcy Code section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Moreover, Bankruptcy Code section 105(a) provides that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

34.   The disposition of the Sale pursuant to the terms reflected in the Agreement resulted from the bids submitted for the Property, pursuant to a marketing process led by DJM.  Conducting a marketing process through a third party broker represents an accepted method of selling Property.  Similar marketing processes have been approved in other chapter 11 cases.  See, e.g., Ready v. Rice, 2006 WL 4550188 at *3 (D. Md. 2006); see also In re Reading Broadcasting, Inc., 386 B.R. 562, 571-72 (Bankr. E.D. Pa. 2008); In re King-Wilson, 1998 WK 737887 at *4-5 (N.D. Cal. 1998).

35.   In addition, bid procedures similar those Bid Procedures outlined above have been approved by this Court in this case.  See Order Approving (I) Approving Bidding Procedures and (II) Setting Auction and Sale Hearing Dates in Connection With the Sale of Certain Real Property Located in Phoenix, Arizona, (D.I. 2401).

36.   Finally, the other interested parties are provided with an opportunity to submit a higher or otherwise better proposal and, if necessary, the Seller will conduct an auction.

37.   In light of the foregoing, the Seller submits that the Sale process is reasonable and appropriate.

### III. THE TERMINATION FEE REQUESTED HEREIN IS REASONABLE AND SHOULD BE APPROVED.

38.   In connection with Sale of the Property, the Court should authorize the Seller to pay the Termination Fee.

39.   Agreements to provide termination fees and other bidding incentives are designed to compensate a potential acquirer who serves as a catalyst that may attract higher and better offers, and have been approved in bankruptcy to encourage bidding.  See In re Ryan, 261 B.R. 867, 870 (Bankr. E.D. Va. 2001).  Termination fees can be advantageous to both buyers and sellers because they encourage bidding to ensure that sellers receive the highest or otherwise best offer while compensating the buyer for the risk of being outbid.  See id.

40.   Termination fee fees are allowed as an administrative expense claim against the estate if they satisfy the standard of section 503(b)(1).  In re Tropea, 352 B.R. 766, 768 (Bankr. N.D.W.Va. 2006).  Thus, the

19

fee must reflect the actual and necessary cost of preserving the estate.  See 11 U.S.C. § 503(b)(1).  See also In re Tropea, 352 B.R. at 768.  In Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527 (3d Cir. 1999), the United States Court of Appeals for the Third Circuit explained how the section 503(b)(1) standard applied to termination fees. The Third Circuit Court of Appeals held that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context. Accordingly, to be approved, bidding incentives must provide some postpetition benefit to the debtor's estate. See id. at 533; see also In re Lamb, 2002 WL 31508913 (Bankr. D. Md. 2002) (implicitly adopting the administrative expense standard set forth in O'Brien).

41.  The O'Brien Court identified at least two instances in which bidding incentives may provide benefit to the estate.  First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would

not have been made and without which bidding would have been limited." Id. at 537. Second, when the availability of bidding incentives induce a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id.

42. Here, the Seller seeks authority to pay the Termination Fee in the event that the Purchaser is not ultimately the Successful Bidder. The proposed Termination Fee is appropriate under Bankruptcy Code section 503 as it is fair and reasonable in amount, particularly in view of the efforts that will have to be expended by the Purchaser. Moreover, the Agreement, including the Termination Fee provided for therein, will enable the Seller to secure an adequate floor for an auction and, thus, insist that competing bids be materially higher or otherwise better than the purchase price pursuant to the Agreement (as incorporated in the

Initial Minimum Overbid requirement), a clear benefit to the Seller's estate.

43.   In sum, the Seller's ability to offer the Termination Fee enables it to ensure the Sale of the Property to a contractually-committed bidder at a price that they believe to be fair while, at the same time, providing them with the potential of even greater benefit to the estates.

44.   Thus, the Termination should be approved.

**IV.   THE PURCHASER OR SUCCESSFUL BIDDER SHOULD BE AFFORDED THE PROTECTIONS OF SECTION 363(m) OF THE BANKRUPTCY CODE AND THE TRANSACTION CONTEMPLATED BY THE AGREEMENT SHOULD CARRY THE PROTECTIONS OF SECTION 363(n) OF THE BANKRUPTCY CODE.**

45.   Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of Leases does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  While the Bankruptcy Code does not define "good faith," the Fourth Circuit Court of Appeals

has "adopt[ed] the traditional equitable definition that has been adopted by various courts of appeal: 'one who purchases the assets for value, in good faith, and without notice of adverse claims.'" Willemain v. Kivitz, 764 F.2d 1019, 1023 (4th Cir. 1985)(citations omitted).

46.   Section 363(n) of the Bankruptcy Code further provides, in relevant part, that:

> The trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders at such sale, or may recover from a party to such agreement any amount by which the value of the property sold exceeds the price at which such sale was consummated, and may recover any costs, attorneys' fees, or expenses incurred in avoiding such sale or recovering such amount.

47.   The Seller submits, and will present evidence at the Sale Hearing, that the Agreement reflects an negotiated, arm's length transaction. Throughout the negotiations, the Purchaser has at all times acted in good faith.  Moreover, to the extent that the assets are sold to a Successful Bidder, it will be because of a well-planned competitive process and negotiations at arm's length to be conducted at an auction.  As a result of the foregoing, the Seller

requests that the Court make a finding that the Purchase
Price to be paid by the Purchaser or the Successful
Bidder constitutes reasonably equivalent value and fair
consideration under any applicable law.

48.   The Seller, therefore, requests that this
Court make a finding that the Purchaser or the
Successful Bidder, as the case may be, has purchased the
Property in good faith within the meaning of section
363(m) of the Bankruptcy Code.  Further, the Seller
requests that this Court make a finding that the
Agreement or any purchase agreement reached as a result
of the bidding procedures necessarily will comprise an
arm's length, negotiated transaction entitled to the
protections of section 363(m) of the Bankruptcy Code.
Because the Seller has shown that the Purchaser's or
Successful Bidder's bid is not the product of fraud or
collusion between the Purchaser or Successful Bidder and
other bidders or the trustee, or an attempt to take
grossly unfair advantage of other bidders, the Seller
furthers request that this Court make a finding that the
transactions contemplated by the Agreement are not
avoidable under section 363(n) of the Bankruptcy Code.

V.   **THE SALE OF THE PROPERTY FREE AND CLEAR OF ALL INTERESTS SHOULD BE AUTHORIZED UNDER BANKRUPTCY CODE SECTION 363(f).**

49.   To facilitate a sale of the Property, the Seller requests authorization to sell the Property free and clear of any and all Liens that may be asserted against such property.

50.   Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell property free and clear of any interest in such property if, among other things:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide   dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

51.   Section 363(f) permits the sale of estate property free and clear of interests if any one of the

25

five conditions above is met.  See, e.g., In re Laines,
352 B.R. 410, 414-15 (Bankr. E.D. Va. 2005).

52.   Courts have held that the authority of a
debtor to sell assets free and clear of interests is
broad and should be read expansively.  See In re TWA,
Inc., 322 F.3d 283, 289 (3d Cir. 2003); see also United
Mine Workers of Am. 1992 Benefit Plan v. Leckie
Smokeless Coal Co. (In re Leckie Smokeless Coal Co.), 99
F.3d 573, 582 (4th Cir. 1996) (holding that the phrase
"any interest in property" includes more than just in
rem interests); In re P.K.R. Convalescent Centers, Inc.,
189 B.R. 90, 94 (Bankr. E.D. Va. 1995)("As the plain
meaning of the statute demonstrates, § 363 covers more
situations than just sales involving liens.").  Moreover,
courts have noted that the purpose of the "free and
clear" language is to allow the debtor to obtain a
maximum recovery on its assets in the marketplace.  See
In re TWA, Inc., 2001 Bankr. LEXIS 723, at *8-*10 (Bankr.
D. Del. Mar. 27, 2001).

53.   Accordingly, this Court should authorize
the Seller to sell the Property free and clear of any
and all Liens that may be asserted by any parties, with

any such Liens attaching to the net proceeds of the sale
of the Property in the same order and priority and
subject to the same defenses as they exist against the
Property.

**VII. WAIVER OF THE TEN-DAY STAY PROVIDED BY BANKRUPTCY
RULE 6004 SHOULD BE WAIVED FOR ANY ORDER APPROVING
THE SALE OF THE PROPERTY.**

54.   Bankruptcy Rule 6004(h) provides that:
"[a]n order authorizing the use, sale, or lease of
property of the estate is stayed until the expiration of
10 days after entry of the order, unless the court
orders otherwise."  Fed. R. Bankr. P. 6004(h).

55.   The Seller requests that the Court waive
the ten-day stay of Bankruptcy Rule 6004 with respect to
the Sale of the Property following the entry of the Sale
Order.  By waiving such requirements, the Seller and the
Purchaser or the Successful Bidder, as applicable, will
be able to immediately close the Sale, which will result
in a more immediate benefit to the Seller's estate,
which will in turn save the Seller continued accrual of
administrative expenses and thereby benefit the Seller's
estate.

56.   Moreover, the Purchaser is purchasing the property as part of a Internal Revenue Code section 1031 "like kind exchange".  Under the relevant tax laws, if the Seller does not close a transaction by immediately following entry of the Sale Order, the Purchaser risks losing the ability to effectuate a section 1031 exchange.

57.   Accordingly, the stay under Bankruptcy Rule 6004(h) should be waived.

**NOTICE**

58.   Notice of this Motion has been provided to those parties entitled to notice under the Order Pursuant to Bankruptcy Code Sections 102 and 105, Bankruptcy Rules 2002 and 9007, and Local Bankruptcy Rules 2002-1 and 9013-1 Establishing Certain Notice, Case Management, and Administrative Procedures (D.I. 130; the "Case Management Order"), as well as (a) all entities known to have expressed an interest in a transaction regarding the Property during the past three (3) months; and (b) all entities reasonably known to have a Lien on the Property; and (c) all federal, state, and local regulatory or taxing authorities or recording offices that have a reasonably known interest in the

relief requested by the Motion.  The Seller submits that,
under the circumstances, no other or further notice need
be given.

### WAIVER OF MEMORANDUM OF LAW

59.  Pursuant to Local Bankruptcy Rule 9013-
1(G), and because there are no novel issues of law
presented in the Motion and all applicable authority is
set forth in the Motion, the Seller requests that the
requirement that all motions be accompanied by a
separate memorandum of law be waived.

### NO PRIOR REQUEST

60.  No previous request for the relief sought
herein has been made to this Court or any other court.

## CONCLUSION

WHEREFORE, the Seller respectfully request that the Court (i) enter an Order, substantially in the form annexed hereto, granting the relief requested herein, and (ii) such other and further relief as may be just and proper.

Dated: April 24, 2009
     Richmond, Virginia

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
Gregg M. Galardi, Esq.
Ian S. Fredericks, Esq.
P.O. Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

– and –

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
Chris L. Dickerson, Esq.
333 West Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

– and –

MCGUIREWOODS LLP

_/s/ Douglas M. Foley_____
Dion W. Hayes (VSB No. 34304)
Douglas M. Foley (VSB No. 34364)
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

Counsel for Debtors and Debtors
in Possession

Gregg M. Galardi, Esq.              Dion W. Hayes (VSB No. 34304)
Ian S. Fredericks, Esq.             Douglas M. Foley (VSB No. 34364)
SKADDEN, ARPS, SLATE, MEAGHER &     MCGUIREWOODS LLP
FLOM, LLP                           One James Center
One Rodney Square                   901 E. Cary Street
PO Box 636                          Richmond, Virginia 23219
Wilmington, Delaware 19899-0636     (804) 775-1000
(302) 651-3000

                    - and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
333 West Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

Counsel to the Debtors and
Debtors in Possession

            IN THE UNITED STATES BANKRUPTCY COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA
                     RICHMOND DIVISION

- - - - - - - - - - - - - - x
In re:                     :    Chapter 11
                           :
CIRCUIT CITY STORES, INC., :    Case No. 08-35653 (KRH)
et al.,                    :
                           :
            Debtors.       :    Jointly Administered
- - - - - - - - - - - - - - x

**ORDER UNDER BANKRUPTCY CODE SECTIONS 105, 363 AND 503
AND BANKRUPTCY RULES 2002 AND 6004 APPROVING SALE BY
SELLER OF CERTAIN REAL PROPERTY LOCATED IN ARDMORE,
OKLAHOMA FREE AND CLEAR OF LIENS**

        Upon the motion (the "Motion")[1] of Circuit City

Stores, Inc. (the "Seller," and collectively with the

debtors and debtors in possession in the above-captioned

_____

[1]  Capitalized terms not otherwise defined herein shall have the
     meanings ascribed to such terms in the Motion.

jointly administered cases, the "Debtors") for orders

pursuant to Bankruptcy Code sections 105 and 363 and

Bankruptcy Rules 2002 and 6004 (A) authorizing the

Seller to enter into an agreement with the Purchaser for

Sale of the Property, subject to higher or otherwise

better proposals, (B) approving the Termination Fee in

connection therewith, (C) approving the Sale and of the

Property free and clear of all interests and

(D) granting related relief; and the Sale Hearing having

been held on May 13, 2009, at which time all interested

parties were offered an opportunity to be heard with

respect to the Motion, and at which counsel for the

Debtors advised the Court that the Debtors, after

consultation with representatives of the Creditors'

Committee, have determined in the exercise of their

business judgment that [    ] (the "Successful Bidder")

submitted the highest and best offer for the Property in

the amount of $[    ] (the "Successful Bid") and that

[    ] (the "Alternate Bidder") submitted the second

highest and best bid for the Property in the amount of

$[    ] (the "Alternate Bid"); and the Court having

reviewed the Motion; and the Court having determined

that the relief requested in the Motion is in the best
interests of the Seller, its estate, its creditors and
other parties in interest; and it appearing that proper
and adequate notice of the Motion has been given and
that no other or further notice is necessary; and upon
the record herein; and after due deliberation thereon;
and good and sufficient cause appearing therefor, it is
hereby

**FOUND AND DETERMINED THAT:**[2]

A.    The Court has jurisdiction over the
Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this
matter is a core proceeding pursuant to 28 U.S.C.
§ 157(b)(2)(A).

B.    Venue of these cases and the Motion in
this district is proper under 28 U.S.C. §§ 1408 and 1409.

C.    The notice of the Motion, the Bid
Deadline, the Auction and the Sale Hearing given by the
Seller constitutes due and sufficient notice thereof.

---

2 Findings of fact shall be construed as conclusions of law and
  conclusions of law shall be construed as findings of fact when
  appropriate. See Fed. R. Bankr. P. 7052.

D.    The Bidding Procedures are reasonable and appropriate and represent the best method for maximizing the realizable value of the Property.

E.    The Seller and its professionals marketed the Property and conducted a sale process as set forth in and in accordance with the Motion.  Based upon the record of these proceedings, all creditors and other parties in interest and all prospective purchasers have been afforded a reasonable and fair opportunity to bid for the Property.

F.    The Seller has demonstrated good, sufficient, and sound business purpose and justification for the Sale because, among other things, the Seller and its advisors diligently and in good faith analyzed all other available options in connection with the disposition of the Property and determined that (a) the terms and conditions set forth in the Successful Bidder's Agreement, (b) the transfer to the Successful Bidder of the Property pursuant thereto and (c) the purchase price agreed to by the Successful Bidder, $[   ] are all fair and reasonable and together constitute the

highest or otherwise best value obtainable for the
Property.

G.   A reasonable opportunity to object or be
heard with respect to the Motion and the relief
requested therein has been afforded to all interested
persons and entities, including without limitation: (a)
those parties entitled to notice under the Order
Pursuant to Bankruptcy Code Sections 102 and 105,
Bankruptcy Rules 2002 and 9007, and Local Bankruptcy
Rules 2002-1 and 9013-1 Establishing Certain Notice,
Case Management, and Administrative Procedures (D.I. 130;
the "Case Management Order"), (b) all entities known to
have expressed an interest in a transaction regarding
the Property during the past three (3) months; (c) all
entities known to have an interest in any of the
Property; and (d) all federal, state, and local
regulatory or taxing authorities or recording offices
that have a reasonably known interest in the relief
requested through the Motion.

H.   The Seller has full power and authority
to execute the agreement submitted by the Successful
Bidder, a copy of which is annexed hereto as Exhibit A

(the "Successful Bidder's Agreement") and all other
applicable documents contemplated thereby.  The transfer
and conveyance of the Property by the Seller have been
duly and validly authorized by all necessary action of
the Seller.  The Seller has all of the power and
authority necessary to consummate the transactions
contemplated by the Successful Bidder's Agreement and
has taken all action necessary to authorize and approve
the Successful Bidder's Agreement and to consummate the
transactions contemplated thereby.  No consents or
approvals, other than those expressly provided for in
the Successful Bidder's Agreement, are required for the
Seller to consummate such transactions.

        I.   The Successful Bidder is not an "insider"
of any of the Debtors as that term is defined in 11
U.S.C. § 101(31).

        J.   This Sale Order and the consummation of
the contemplated transactions are supported by good
business reasons, and will serve the best interests of
the Seller, its estate and creditors by maximizing the
value to be obtained from the Property.

K.   The Successful Bidder's Agreement was
negotiated, proposed, and entered into by the Seller and
the Successful Bidder without collusion, in good faith,
and from arm's-length bargaining positions.  Neither the
Seller nor the Successful Bidder has engaged in any
conduct that would cause or permit the Sale to be
avoidable under Bankruptcy Code section 363(n).

L.   The Successful Bidder is a good faith
purchaser under Bankruptcy Code section 363(m) and, as
such, is entitled to all of the protections afforded
thereby.  The Successful Bidder will be acting in good
faith within the meaning of Bankruptcy Code section
363(m) in closing the transactions contemplated by the
Successful Bidder's Agreement at all times after the
entry of this Sale Order.

M.   The consideration provided by the
Successful Bidder for the Property pursuant to the
Successful Bidder's Agreement and the Successful Bid
(i) is fair and reasonable, (ii) is the highest or
otherwise best offer for the Property, (iii) will
provide a greater recovery for the Seller's stakeholders
than would be provided by any other practical available

alternative and (iv) constitutes reasonably equivalent

value and fair consideration under the Bankruptcy Code

and under the laws of the United States, any state,

territory, or possession thereof, or the District of

Columbia.

N.   The Sale must be approved and consummated

promptly to obtain the value provided under the terms of

the Successful Bidder's Agreement and the Successful Bid.

O.   The transfer of the Property to the

Successful Bidder is a legal, valid, and effective

transfer of the Property, and shall vest the Successful

Bidder with all right, title, and interest of the Seller

to the Property free and clear of any lien (including

tax liens and any statutory or common law liens,

possessory or otherwise), charge, pledge, security

interest, conditional sale agreement or other title

retention agreement, lease, mortgage, security interest,

option or other encumbrance (including the filing of, or

agreement to give, any financing statement under the

Uniform Commercial Code of any jurisdiction) and any

monetary amounts which are secured by any lien

(collectively, the "Liens"), except for those items

defined in the Successful Bidder's Agreement(and which are referred to hereinafter) as the "Permitted Encumbrances".

P.   If the Sale of the Property by the Seller were not free and clear of any Liens, except for the Permitted Encumbrances, as set forth in the Successful Bidder's Agreement and this Sale Order, or if the Successful Bidder would, or in the future could, be liable for any of the Liens, the Successful Bidder would not have entered into the Successful Bidder's Agreement or submitted a bid for the Property and would not consummate the Sale contemplated by the Successful Bidder's Agreement, thus adversely affecting the Seller, its estate, and its stakeholders.

Q.   The Seller may sell its interest in the Property free and clear of all Liens (except the Permitted Encumbrances) because, in each case, one or more of the standards set forth in Bankruptcy Code sections 363(f)(1)-(5) has been satisfied.  All holders of Liens who did not object or withdrew their objections to the Sale are deemed to have consented to the Sale pursuant to 11 U.S.C. § 363(f)(2) and all holders of

Liens are adequately protected by having their Liens, if any, attach to the cash proceeds of the Sale ultimately attributable to the property against or in which they claim an interest with the same priority, validity, force, and effect as they attached to such property immediately before the closing of the Sale.

R.   Approval of the Successful Bidder's Agreement and consummation of the Sale of the Property at this time are in the best interests of the Seller, its estate, its stakeholders and other parties in interest; and it is therefore

**ORDERED, ADJUDGED AND DECREED THAT:**

1.   The Motion is GRANTED as set forth herein.

2.   Any and all objections to the Motion not waived, withdrawn, settled, adjourned or otherwise resolved herein are hereby overruled on the merits and denied with prejudice.

**A.   Approval Of The Successful Bidder's Agreement.**

3.   Pursuant to Bankruptcy Code section 363(b), the Successful Bidder's Agreement and all of the terms and conditions thereof are hereby approved.

4.    Pursuant to Bankruptcy Code section
363(b), the Seller is authorized and directed, to
perform its obligations under the Successful Bidder's
Agreement and comply with the terms thereof and
consummate the Sale in accordance with and subject to
the terms and conditions of the Successful Bidder's
Agreement.

5.    The Seller is authorized, but not
directed, to execute and deliver, and empowered to
perform under, consummate, and implement, the Successful
Bidder's Agreement, together with all additional
instruments and documents as may be reasonably necessary
or desirable to implement the Successful Bidder's
Agreement, and to take all further actions as may be
requested by the Successful Bidder for the purpose of
assigning, transferring, granting, conveying, and
conferring to the Successful Bidder or reducing to
possession the Property as contemplated by the
Successful Bidder's Agreement.

6.    This Sale Order and the Successful
Bidder's Agreement and the Successful Bid shall be
binding in all respects upon the Seller, all

stakeholders (whether known or unknown) of the Seller,
all affiliates and subsidiaries of the Seller, and any
subsequent trustees appointed in the Seller's chapter 11
case or upon a conversion to chapter 7 under the
Bankruptcy Code.  To the extent that any provision of
this Sale Order is inconsistent with the terms of the
Successful Bidder's Agreement, this Sale Order shall
govern.

7.   The Successful Bidder's Agreement and any
related agreements, documents, or other instruments may
be modified, amended, or supplemented by the parties
thereto, in a writing signed by such parties, and in
accordance with the terms thereof, without further order
of the Court; _provided_ that any such modification,
amendment, or supplement is disclosed to the Creditors'
Committee and does not have a material adverse effect on
the Seller's estate, in the good faith business judgment
of the Seller.

**B.   Sale And Transfer Of The Property.**

8.   Pursuant to Bankruptcy Code sections
363(b) and 363(f), upon the consummation of the
Successful Bidder's Agreement, the Seller's right, title,

and interest in the Property shall be transferred to the
Successful Bidder free and clear of all Liens except the
Permitted Encumbrances, with all such Liens to attach to
the cash proceeds of the Sale in the order of their
priority, with the same validity, force, and effect
which they had as against the Property immediately
before such transfer, subject to any claims and defenses
the Seller may possess with respect thereto.

9.   If any person or entity which has filed
financing statements, mortgages, mechanic's liens, <u>lis
pendens</u>, or other documents or agreements evidencing
Liens on or against the Property shall not have
delivered to the Seller prior to the Closing of the Sale,
in proper form for filing and executed by the
appropriate parties, termination statements, instruments
of satisfaction, releases of all Liens that the person
or entity has with respect to the Property, or otherwise,
then (a) the Seller is hereby authorized to execute and
file such statements, instruments, releases, and other
documents on behalf of the person or entity with respect
to the Property and (b) the Successful Bidder is hereby
authorized to file, register, or otherwise record a

certified copy of this Sale Order, which, once filed,

registered, or otherwise recorded, shall constitute

conclusive evidence of the release of all Liens on or

against the Property of any kind or nature whatsoever

except for the Permitted Encumbrances.

10.  This Sale Order (a) shall be effective as

a determination that, upon the Closing of the Sale, all

Liens of any kind or nature whatsoever existing as to

the Seller or the Property prior to the Closing of the

Sale, except for the Permitted Encumbrances, have been

unconditionally released, discharged, and terminated

(other than any surviving obligations), and that the

conveyances described herein have been effected and (b)

shall be binding upon and shall govern the acts of all

entities including, without limitation, all filing

agents, filing officers, title agents, title companies,

recorders of mortgages, recorders of deeds, registrars

of deeds, administrative agencies, governmental

departments, secretaries of state, federal, state, and

local officials, and all other persons and entities who

may be required by operation of law, the duties of their

office, or contract, to accept, file, register, or

otherwise record or release any documents or instruments,
or who may be required to report or insure any title or
state of title in or to any of the Property.

11. All persons and entities, including, but
not limited to, all debt security holders, equity
security holders, governmental, tax, and regulatory
authorities, lenders, trade stakeholders, and other
stakeholders, holding Liens of any kind or nature
whatsoever against or in the Seller or the Property,
except the Permitted Encumbrances (whether legal or
equitable, secured or unsecured, matured or unmatured,
contingent or non-contingent, senior or subordinated)
arising under or out of, in connection with, or in any
way relating to the Property prior to the Closing of the
Sale, or the transfer of the Property to the Successful
Bidder, hereby are forever barred, estopped, and
permanently enjoined from asserting against the
Successful Bidder, its successors or assigns, its
property, or the Property, such persons' or entities'
Liens.  Nothing in this Sale Order or the Successful
Bidder's Agreement releases or nullifies any liability
to a governmental agency under any environmental laws

and regulations that any entity would be subject to as
owner or operator of any Property after the date of
entry of this Sale Order.   Nothing in this Sale Order or
the Successful Bidder's Agreement bars, estops, or
enjoins any governmental agency from asserting or
enforcing, outside the Court, any liability described in
the preceding sentence.   Notwithstanding the above,
nothing herein shall be construed to permit a
governmental agency to obtain penalties from the
Successful Bidder for days of violation of environmental
laws and regulations prior to Closing.

## C.   Additional Provisions

12.   The consideration provided by the
Successful Bidder's for the Property under the
Successful Bidder's Agreement and the Successful Bid is
hereby deemed to constitute reasonably equivalent value
and fair consideration under the Bankruptcy Code, the
Uniform Fraudulent Conveyance Act, the Uniform
Fraudulent Transfer Act, and under the laws of the
United States, and any state, territory, or possession
thereof, or the District of Columbia.

13.   Upon the Closing of the Sale, this Sale
Order shall be construed as and shall constitute for any
and all purposes a full and complete general assignment,
conveyance, and transfer of all the Property or a bill
of sale transferring good and marketable title in the
Property to the Successful Bidder pursuant to the terms
of the Successful Bidder's Agreement.

14.   The transactions contemplated by the
Successful Bidder's Agreement are undertaken by the
Seller and the Successful Bidder at arm's-length,
without collusion and in good faith, as that term is
used in section 363(m) of the Bankruptcy Code, and
accordingly, the reversal or modification on appeal of
the authorization provided herein to consummate the sale
of the Property shall not affect the validity of the
Sale to the Successful Bidder, unless such authorization
is duly stayed pending such appeal.  The Successful
Bidder is a purchaser in good faith, within the meaning
of section 363(m) of the Bankruptcy Code, of the
Property, and is, and shall be, entitled to all of the
protections afforded by such section and in accordance
therewith.

15.   The consideration provided by the
Successful Bidder for the Property under the Successful
Bidder's Agreement and the Successful Bid is fair and
reasonable and the Sale may not be avoided under section
363(n) of the Bankruptcy Code.

16.   The failure specifically to include or to
reference any particular provision of the Successful
Bidder's Agreement in this Sale Order shall not diminish
or impair the effectiveness of such provision, it being
the intent of the Court that the Successful Bidder's
Agreement and the Successful Bid be authorized and
approved in their entirety.

17.   If the Successful Bidder fails to close
on the purchase of the Property in accordance with the
terms of the Successful Bidder's Agreement due to no
fault of and Seller is not in default of its obligations
under such Agreement, then Seller's counsel shall file
with the Court and serve upon the Successful Bidder,
the Alternate Bidder and their counsel, a notice of such
default, which shall include a copy of the Alternate
Bidder's agreement upon which the Seller will then close,
in which case (i) Seller shall be deemed authorized to

close on the sale of the Property with the Alternate

Bidder on ten (10) days' advance written notice to the

Alternate Bidder, and (ii) the Alternate Bidder shall be

afforded all of the protections originally afforded to

the Successful Bidder under this Sale Order and the

findings herein as to adequacy and fairness of

consideration paid and good faith shall be deemed to

apply to the Alternate Bidder, its Alternate Bid, and

its purchase and sale agreement with the Seller, without

the necessity of further order of this Court.

18.   All deposits submitted to the Seller for

the Property shall be returned to the bidder that

submitted it no later than (i) two business days after

the closing of the sale with the Successful Bidder (or

the Alternate Bidder, as the case may be) except in the

case of a bidder who closed on the sale of the Property

or who was required to close in accordance with the

terms of this Sale Order but failed to do so in breach

of its contractual obligations through no fault of the

Seller.

19.   The requirement under Local Bankruptcy
Rule 9013-1(G) to file a memorandum of law in connection
with the Motion is hereby waived.

20.   This Court retains exclusive jurisdiction
to interpret, construe, enforce, and implement the terms
and provisions of this Sale Order, the Successful
Bidder's Agreement, all amendments thereto, any waivers
and consents thereunder, and of each of the agreements
executed in connection therewith in all respects,
including, but not limited to, retaining jurisdiction to
(a) compel delivery of the Property to the Successful
Bidder, (b) compel delivery of the purchase price or
performance of other obligations owed to the Seller
pursuant to the Successful Bidder's Agreement,
(c) resolve any disputes arising under or related to the
Successful Bidder's Agreement, the Alternate Bid, and
any deposit delivered to Seller by a bidder for the
Property, (d) interpret, implement, and enforce the
provisions of this Sale Order, and (e) protect the
Successful Bidder against any Lien against the Seller or
the Property of any kind or nature whatsoever, except
for Permitted Encumbrances, which Liens, valid and

timely perfected, shall attach to the proceeds of the

Sale.

Dated:  Richmond, Virginia
        May 13, 2009

        _____
        UNITED STATES BANKRUPTCY JUDGE

WE ASK FOR THIS:

Gregg M. Galardi, Esq.
Ian S. Fredericks, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
One Rodney Square
PO Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

        - and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
333 West Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

        - and -

/s/ Douglas M. Foley
_____
Dion W. Hayes (VSB No. 34304)
Douglas M. Foley (VSB No. 34364)
MCGUIREWOODS LLP
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

Counsel to the Debtors and Debtors in Possession

**CERTIFICATION OF ENDORSEMENT UNDER LOCAL RULE 9022-1(C)**

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

/s/ Douglas M. Foley

**Exhibit 1**

**(Successful Bidder's Agreement)**

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "Agreement"), dated as of April 23, 2009, is made by and between CIRCUIT CITY STORES, INC., a Virginia corporation ("Seller"), and SHORES OILFIELD EQUIPMENT CO., INC., an Oklahoma corporation ("Purchaser").

## RECITALS

Seller is a debtor in possession in a Chapter 11 bankruptcy case (the "**Bankruptcy Case**") that is pending in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "**Bankruptcy Court**"). Upon the terms and conditions of this Agreement, Seller desires to sell and convey, and Purchaser desires to purchase and acquire, the Property (as defined below). This Agreement and the purchase and sale of the Property are subject to the approval of the Bankruptcy Court. As contemplated by Section 9.2 of this Agreement, Seller will prepare and file the Sale Motion seeking approval of this Agreement.

In consideration of the mutual covenants and representations herein contained, intending to be legally bound, Seller and Purchaser agree as follows:

1. **PURCHASE AND SALE**

    1.1   Purchase and Sale.   Subject to the terms and conditions of this Agreement, Seller hereby agrees to sell and convey to Purchaser, and Purchaser hereby agrees to purchase from Seller, all of the Seller's right, title and interest in and to the property located at 1901 Cooper Drive, Ardmore, Oklahoma, comprising approximately 38 acres of land and improvements thereon, and being more particularly described on Exhibit A attached hereto and made a part hereof, together with (i) all the rights and appurtenances pertaining to such land, (ii) all buildings (including a warehouse building containing approximately 750,000 square feet), structures, and other improvements on said land, and (iii) all electrical, mechanical, air conditioning, plumbing and other fixtures attached thereto (herein collectively called the "**Property**"); provided, however, the Property shall not include any moveable personal property and equipment which shall be excluded from the sale (the "**Excluded Personal Property**"). Purchaser reserves the right to assign its interest in this Agreement to any other entity in which Purchaser or its shareholders own at least a fifty percent (50%) beneficial interest in order to close in such entity should Purchaser deem it desirable to do so for tax or business reasons, provided, in such event that any such assignee would be obligated in all respects hereunder as Purchaser, including all representations and warranties made by Purchaser herein. Purchaser shall provide prompt notice to Seller of any such assignment. Notwithstanding the foregoing permitted assignment, Purchaser shall remain liable for its obligations under this Agreement following an assignment unless Seller consents to such release.

2. **PURCHASE PRICE**

1

\8870829.4

**2.1**    Purchase Price.      The purchase price (the **"Purchase Price"**) for the Property shall be SIX MILLION AND NO/100 DOLLARS ($6,000,000.00). The Purchase Price, less the Deposit (as defined below) and as adjusted by prorations and payment of expenses as herein provided, shall be paid by Purchaser into the Escrow Agent's (as defined below) escrow account in cash by wire transfer in accordance with wire transfer instructions to be provided by the Escrow Agent.

**3.    DEPOSIT**

**3.1**    Deposit.      Concurrently with execution of this Agreement, Purchaser shall deliver to Stewart Title Guaranty Company (the **"Escrow Agent"**), c/o Stewart Title North Texas, 1717 Main Street, Suite 3500, Dallas, Texas 75201, Attention: Joe Grant, Phone: 214-220-2060, Email: jgrant@stewart.com, by wire transfer or cashier's check payable to Escrow Agent, an amount equal to SIX HUNDRED THOUSAND and 00/100 DOLLARS ($600,000.00) (which amount, and all interest accrued thereon, is herein called the **"Deposit"**) to be held by the Escrow Agent in a federally insured, interest bearing money market account (the **"Escrow Account"**) as the parties hereto shall direct.

**3.2**    Application of Deposit.      If the sale of the Property is consummated under this Agreement, the Deposit shall be paid to Seller and applied to the payment of the Purchase Price. If Purchaser terminates this Agreement in accordance with Section 7.1, Section 7.2, or Section 8.1 hereof, or if Purchaser or Seller terminates this Agreement in accordance with Section 9.4, the Deposit shall be returned promptly to Purchaser, and no party hereto shall have any further obligations under this Agreement except for such obligations that survive termination of this Agreement as expressly set forth in this Agreement (the **"Survival Obligations"**). If Seller terminates this Agreement in accordance with Section 8.2 or Section 10.11, the Deposit shall be retained by Seller and no party hereto shall have any further obligations under this Agreement except for the Survival Obligations. All interest earned on the Deposit shall be reported to the Internal Revenue Service as income of Purchaser and Purchaser shall promptly execute all forms reasonably requested by the Escrow Agent regarding such interest.

**4.    ITEMS DELIVERED; REPRESENTATIONS AND WARRANTIES**

**4.1**    Items Delivered.

(a)    Seller has, or within two (2) business days following the full execution of this Agreement by both parties shall cause to be, delivered to Purchaser's counsel a copy of the Commitment of Title Insurance (Order No. 9040204) dated April 3, 2009 and issued by Stewart Title Guaranty Company (the **"Title Commitment"**) with respect to the Property together with all instruments referenced therein.  Purchaser shall have one (1) week following its receipt of the Title Commitment to apprize Seller, in writing, of any objections to title.  Notwithstanding any other provision in this Agreement to the contrary, Seller shall have no obligation to satisfy any of the requirements or cure any exceptions identified in the Title Commitment or objected to by Purchaser other than to

2

\8870829.4

obtain the release of the Indenture of Mortgage and Deed of Trust in favor of Manufacturers and Traders Trust Company and Stuart A. Mitchell, as Trustees, dated June 1, 1996 and recorded June 19, 1996 at Book 3020, Page 247 (the "**Indenture**") and the Assignment of Lease and Agreement dated June 1, 1996 and recorded June 19, 1996 at Book 3021, Page 1 and the termination of the Memorandum of Lease dated June 13, 1996 and recorded June 19, 1996 at Book 3020, Page 243, as amended at Book 3685, Page 152 (collectively, the "Basic Encumbrances"). Purchaser's right to review and object to matters contained in the Title Commitment shall not create or be deemed to create in Purchaser's favor a right to terminate this Agreement (regardless of Seller's response or failure to respond to the title objections) or otherwise obligate Seller to cure any such objections other than the Basic Encumbrances.

(b)   If Purchaser timely communicates to Seller, in writing, one or more objections, requirements or exceptions to title other than the Basic Encumbrances which Purchaser is unwilling to accept and Seller elects, in writing, to cure or satisfy any such requirements or exceptions identified by Purchaser, Seller shall have until the Closing Date to remedy the same. Seller also has, or within two business day following the full execution hereof shall, deliver to Purchaser's counsel any pin survey(s) or environmental audits or reports of any kind which Seller has in its possession.

4.2   Purchaser's Representations and Warranties.   Purchaser represents and warrants to Seller that (a) Purchaser is a corporation, duly organized and in good standing under the State of Oklahoma, is authorized to do business in the State of Oklahoma, and has the power to enter into this Agreement and to execute and deliver this Agreement and to perform all of its duties and obligations hereunder, and Purchaser has obtained all necessary authorizations required in connection with the execution, delivery and performance contemplated by this Agreement and has obtained the consent of all entities and parties necessary to bind Purchaser to this Agreement; (b) neither the execution nor the delivery of this Agreement, nor the consummation of the purchase and sale contemplated hereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement conflict with or will result in the breach of any of the terms, conditions, or provisions of any agreement or instrument to which Purchaser, or any partner or related entity or affiliate of Purchaser, is a party or by which Purchaser, any partner or related entity or affiliate of Purchaser, or any of Purchaser's assets is bound; and (c) this Agreement is the legal, valid and binding obligation of Purchaser and is enforceable against Purchaser in accordance with its terms. Purchaser's representations and warranties contained herein must be true and correct through the Closing Date, and Purchaser's failure to notify Seller prior to the Closing Date of any inaccuracies shall be a default by Purchaser under this Agreement. The Purchaser's representations and warranties set forth in this Section 4.2 shall survive the Closing or termination of this Agreement.

4.3   Seller's Representations and Warranties.   Seller represents and warrants to Purchaser that (a) Seller is a corporation duly organized and validly existing under the laws of the Commonwealth of Virginia; (b) Seller has the corporate power and authority to enter into,

3

\8870829.4

execute and deliver this Agreement and to perform all of its duties and obligations under this Agreement; (c) upon entry of the Sale Order (as defined hereinafter) in the Bankruptcy Case, this Agreement will be the legal, valid and binding obligation of Seller and will be enforceable against Seller in accordance with its terms; and (d) at the Closing, Seller shall convey to Purchaser fee simple title to the Property, free and clear of liens (including the liens of Seller's post-petition lenders and liens for past-due real property taxes), claims and encumbrances other than Permitted Encumbrances (as defined below). The representations and warranties contained in this Section 4.3 shall expire and be extinguished at the Closing.

4.4   Further Assurances.   Seller and Purchaser agree to execute and deliver at or prior to Closing any documents or instruments reasonably necessary to carry out the terms of this Agreement.

5.   **DISCLAIMER OF REPRESENTATIONS OR WARRANTIES BY SELLER; ACCEPTANCE OF PROPERTY**

5.1   Disclaimer.   PURCHASER ACKNOWLEDGES AND AGREES THAT SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES (OTHER THAN THE SPECIAL OR LIMITED WARRANTY OF TITLE AS SET OUT IN THE DEED, AS DEFINED BELOW), PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, STATUTORY, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO (A) THE VALUE, NATURE, QUALITY OR CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY, (B) THE INCOME TO BE DERIVED FROM THE PROPERTY, (C) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH PURCHASER OR ANY TENANT MAY CONDUCT THEREON, (D) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY, (E) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY, (F) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY, (G) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY, (H) COMPLIANCE WITH ANY ENVIRONMENTAL REQUIREMENTS (AS HEREINAFTER DEFINED), INCLUDING THE EXISTENCE IN OR ON THE PROPERTY OF HAZARDOUS MATERIALS (AS DEFINED BELOW), (I) THE STATUS, ACCURACY OR PROPRIETY OF ANY REAL ESTATE OR PERSONAL PROPERTY ASSESSMENT OR TAX LEVIED OR COLLECTED AGAINST ALL OR ANY PORTION OF THE PROPERTY OR (J) ANY OTHER MATTER WITH RESPECT TO THE PROPERTY. ADDITIONALLY, NO PERSON ACTING ON BEHALF OF SELLER IS AUTHORIZED TO MAKE, AND BY EXECUTION HEREOF PURCHASER ACKNOWLEDGES THAT NO PERSON HAS MADE, ANY

4

\8870829.4

REPRESENTATION, AGREEMENT, STATEMENT, WARRANTY, GUARANTY OR PROMISE REGARDING THE PROPERTY OR THE TRANSACTION CONTEMPLATED HEREIN; AND NO SUCH REPRESENTATION, WARRANTY, AGREEMENT, GUARANTY, STATEMENT OR PROMISE, IF ANY, MADE BY ANY PERSON ACTING ON BEHALF OF SELLER SHALL BE VALID OR BINDING UPON SELLER UNLESS EXPRESSLY SET FORTH HEREIN. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE PROPERTY, PURCHASER IS RELYING SOLELY ON ITS OWN INVESTIGATION OF THE PROPERTY AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY SELLER AND AGREES TO ACCEPT THE PROPERTY AT THE CLOSING AND WAIVE ALL OBJECTIONS OR CLAIMS AGAINST SELLER (INCLUDING, BUT NOT LIMITED TO, ANY RIGHT OR CLAIM OF CONTRIBUTION) ARISING FROM OR RELATED TO THE PROPERTY OR TO ANY HAZARDOUS MATERIALS ON THE PROPERTY. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT ANY INFORMATION PROVIDED OR TO BE PROVIDED WITH RESPECT TO THE PROPERTY WAS OBTAINED FROM A VARIETY OF SOURCES AND THAT SELLER HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND MAKES NO REPRESENTATIONS AS TO THE ACCURACY, TRUTHFULNESS OR COMPLETENESS OF SUCH INFORMATION. SELLER IS NOT LIABLE OR BOUND IN ANY MANNER BY ANY VERBAL OR WRITTEN STATEMENT, REPRESENTATION OR INFORMATION PERTAINING TO THE PROPERTY, OR THE OPERATION THEREOF, FURNISHED BY ANY REAL ESTATE BROKER, CONTRACTOR, AGENT, EMPLOYEE, SERVANT OR OTHER PERSON. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT, TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE SALE OF THE PROPERTY AS PROVIDED FOR HEREIN IS MADE ON AN "AS IS" "WHERE IS" CONDITION AND BASIS WITH ALL FAULTS. IT IS UNDERSTOOD AND AGREED THAT THE PURCHASE PRICE REFLECTS THAT THE PROPERTY IS BEING SOLD BY SELLER AND PURCHASED BY PURCHASER SUBJECT TO THE FOREGOING. PURCHASER HEREBY AGREES TO INDEMNIFY, PROTECT, DEFEND, SAVE AND HOLD HARMLESS SELLER FROM AND AGAINST ANY AND ALL DEBTS, DUTIES, OBLIGATIONS, LIABILITIES, SUITS, CLAIMS, DEMANDS, CAUSES OF ACTION, DAMAGES, LOSSES, FEES AND EXPENSES (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES AND EXPENSES AND COURT COSTS) IN ANY WAY RELATING TO, OR IN CONNECTION WITH OR ARISING OUT OF PURCHASER'S ACQUISITION, OWNERSHIP, LEASING, USE, OPERATION, MAINTENANCE AND MANAGEMENT OF THE PROPERTY; PROVIDED, HOWEVER, PURCHASER SHALL NOT BE REQUIRED TO INDEMNIFY SELLER WITH RESPECT TO MATTERS ARISING PRIOR TO THE CLOSING AND ATTRIBUTABLE SOLELY TO SELLER'S CONDUCT. THE PROVISIONS OF THIS SECTION 5.1 SHALL SURVIVE THE CLOSING OR ANY TERMINATION HEREOF.

    5.2    Hazardous Materials. **"Hazardous Materials"** shall mean any substance which is or contains (i) any "hazardous substance" as now or hereafter defined in §101 (14) of the

5

\8870829.4

Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. §9601 et seq.) ("CERCLA"), or any regulations promulgated under CERCLA; (ii) any "hazardous waste" as now or hereafter defined in the Resource Conservation and Recovery Act, as amended (42 U.S.C. §6901 et seq.) ("RCRA"), or regulations promulgated under RCRA; (iii) any substance regulated by the Toxic Substances Control Act (15 U.S.C. §2601 et seq.); (iv) gasoline, diesel fuel, or other petroleum hydrocarbons; (v) asbestos and asbestos containing materials, in any form, whether friable or non-friable; (vi) polychlorinated biphenyls; (vii) radon gas; and (viii) any additional substances or materials which are now or hereafter classified or considered to be hazardous or toxic under Environmental Requirements (as hereinafter defined) or the common law, or any other applicable laws relating to the Property. Hazardous Materials shall include, without limitation, any substance, the presence of which on the Property, (A) requires reporting, investigation or remediation under Environmental Requirements; (B) causes or threatens to cause a nuisance on the Property or adjacent property or poses or threatens to pose a hazard to the health or safety of persons on the Property or adjacent property; or (C) which, if it emanated or migrated from the Property, could constitute a trespass.

**5.3**    Environmental Requirements.    **"Environmental Requirements"** shall mean all laws, ordinances, statutes, codes, rules, regulations, agreements, judgments, orders, and decrees, now or hereafter enacted, promulgated, or amended, of the United States, the states, the counties, the cities, or any other political subdivisions in which the Property is located, and any other political subdivision, agency or instrumentality exercising jurisdiction over the owner of the Property, the Property, or the use of the Property, relating to pollution, the protection or regulation of human health, natural resources, or the environment, or the emission, discharge, release or threatened release of pollutants, contaminants, chemicals, or industrial, toxic or hazardous substances or waste or Hazardous Materials into the environment (including, without limitation, ambient air, surface water, ground water or land or soil).

**5.4**    Purchaser's Independent Investigations.    Purchaser is a sophisticated investor in, or purchaser of, properties similar in type or condition to the Property.    Purchaser acknowledges that Seller has provided Purchaser with a copy of an environmental site assessment and update letter prepared by ERM-Southeast, Inc. in satisfaction of the requirement in Section 4.1(b). Seller agrees to provide Purchaser with full access to the Property to conduct its own inspections, tests, investigations, environmental audits and other reviews of the Property as Purchaser deems necessary or appropriate, and Purchaser is relying on its own such inspections, tests, investigations, environmental audits and other reviews in determining the advisability of acquiring the Property. Purchaser agrees to notify Seller in advance before accessing the Property pursuant to this Section 5.4 and to provide Seller with evidence of insurance coverage as reasonably requested by Seller. Notwithstanding the foregoing, Purchaser shall not be permitted to conduct any invasive tests or inspections, including but not limited to any Phase II environmental site assessments, without Seller's prior written consent (which Seller may withhold in its sole discretion).

**6.    CLOSING**

6

\8870829.4

**6.1**    _Closing_.      Unless otherwise agreed by the parties in writing or necessitated by operation of any terms herein, the closing of the purchase and sale of the Property (the "**Closing**") shall be conducted by mail or, if necessary, held at the offices of Escrow Agent not later than ten (10) days following entry by the Bankruptcy Court of the Sale Order (as defined below) (the date on which the Closing occurs is referred to as the "**Closing Date**").

**6.2**    _Possession_.    Possession of the Property shall be delivered to Purchaser at the Closing, subject to (i) liens for real property taxes, other governmental charges and assessments that are not yet due and payable, (ii) zoning ordinances, building codes and other land use laws and applicable governmental regulations, (iii) all covenants, agreements, conditions, easements, restrictions and rights, whether of record or otherwise including, without limitation, those matters identified in Schedule B-Section II of the Title Commitment attached to this Agreement as _Schedule 6.2_, except for those matters which Seller has agreed to release of record as provided in Section 4.1 above, and (iv) any and all matters that would be shown by a physical inspection or an accurate survey of the Property or were otherwise caused by or resulted from the acts of Purchaser (collectively, the "**Permitted Encumbrances**").  Any Excluded Personal Property present at the Property on the Closing Date shall be considered part of the Property.

**6.3**    _Proration_.    All utilities with respect to the Property for the month in which the Closing occurs, and real estate taxes and other assessments with respect to the Property for the year in which the Closing occurs, shall be prorated as of the Closing Date as follows:

(a)    All real estate taxes and assessments, both general and special, water charges and sewer rents, whether or not then due or payable, and all other normally proratable items shall be prorated to the Closing Date, based upon the latest assessments or actual invoices available.  Should any such proration be inaccurate based upon the actual tax bill or assessment when received, either party hereto may demand and shall be entitled to receive on demand, a payment from the other correcting such malapportionment. Seller shall pay all costs associated with any fees, taxes, impact fees, assessments, delinquent or otherwise, and any other land use charges attributable to a period prior to Closing.

(b)    Purchaser shall cause all utility meters to be read as of the Closing Date, shall cause the transfer of all utility services for the Property to Purchaser's name as of the Closing Date, and where necessary, shall post deposits with the utility companies; provided, however, Seller shall cooperate reasonably with Purchaser in connection with switching utility services over to Purchaser's name. Seller shall be entitled to a credit of whatever deposits Seller may have with any utility companies if Purchaser receives the benefit of such deposits.  If the Closing shall occur before the actual amount of utilities and all other operating expenses with respect to the Property for the month in which the Closing occurs are determined, the apportionment of such utilities and other operating expenses shall be upon the basis of an estimate by Seller of such utilities and other operating expenses for such month. Subsequent to the Closing, when the actual amount

7

\8870829.4

of such utilities and other operating expenses with respect to the Property for the month in which the Closing occurs are determined, the parties agree to adjust the proration of such utilities and other operating expenses and, if necessary, to refund or repay such sums as shall be necessary to effect such adjustment.

The agreements of Seller and Purchaser set forth in this Section 6.3 shall survive the Closing.

**6.4** <u>Closing Costs</u>.   Purchaser shall pay, on the Closing Date, any and all closing expenses and costs, including, without limitation, title insurance fees and premiums (including the fees of Stewart Title Guaranty Company, or its agent, in connection with the Title Commitment regardless of whether Purchaser elects to obtain a title policy from such company), survey costs, environmental and engineering costs, recordation fees, stamp tax and mortgage taxes and any and all other due diligence costs. Except as otherwise provided herein, each party shall pay its own attorneys' fees. The parties shall share equally in any escrow fee; and, with regard to other costs of Closing, the parties shall bear the costs of recording and settlement as is the custom in Oklahoma.

**6.5** <u>Seller's Obligations at the Closing</u>.   At the Closing, Seller shall deliver to Escrow Agent the following:

(a) <u>Deed</u>. A special warranty deed, duly executed by Seller in a form mutually acceptable to the Parties and the Escrow Agent, conveying the Property in fee simple as contemplated by the Sale Order, subject to the Permitted Encumbrances.

(b) <u>Foreign Person</u>.   An affidavit or certificate duly executed by Seller certifying that Seller is not a "foreign person," as defined in the federal Foreign Investment in Real Property Tax Act of 1980, and the 1984 Tax Reform Act, as amended.

**6.6** <u>Purchaser's Obligations at the Closing</u>.   At the Closing, Purchaser shall deliver to Escrow Agent the following:

(a) <u>Purchase Price</u>.   The Purchase Price (less the amount of the Deposit, which shall be released separately by the Escrow Agent to Seller) by wire transfer of immediately available funds.

(b) <u>Evidence of Authority</u>.   Such organizational and authorizing documents of Purchaser as shall be reasonably required by Seller authorizing Purchaser's acquisition of the Property pursuant to this Agreement and the execution of this Agreement and any documents to be executed by Purchaser at the Closing.

(c) <u>Taxpayer I.D. Certificate</u>.   A certificate duly executed by Purchaser certifying Purchaser's address and Taxpayer I.D. Number and consenting to Seller's release of this information to any governmental authority.

8

\8870829.4

6.7   Commission.   Seller and Purchaser represent that there are no real estate brokers or agents of record in this transaction, other than DJM Realty Services, LLC ("Broker"), and upon Closing, Seller shall pay Broker a commission pursuant to a separate written agreement. Neither Seller nor Purchaser shall be responsible for any other real estate commissions or fees of any kind or nature whatsoever.   Seller and Purchaser each agrees to hold the other harmless against any claim made for brokerage commissions or finders' fees resulting from such parties' actions in this transaction.  The provisions of the preceding sentence shall survive the Closing.

## 7.   RISK OF LOSS; EXISTING INSURANCE PROCEEDS

7.1   Condemnation.      If, prior to the Closing, action is initiated to take any material portion of the Property by eminent domain proceedings or by deed in lieu thereof, Purchaser may either at or prior to Closing (a) terminate this Agreement and receive a return of the Deposit and neither party will have any further right or obligation hereunder except for the Survival Obligations, or (b) consummate the Closing, in which latter event the award of the condemning authority shall be assigned to Purchaser at the Closing, and there shall be no reduction in the Purchase Price.

7.2   Casualty.      Seller assumes all risks and liability for damage to or injury occurring to the Property by fire, storm, accident, or any other casualty or cause until the Closing has been consummated.  If the Property, or any part thereof, suffers any damage in excess of Six Hundred Thousand and No/100 Dollars ($600,000.00) after the date of this Agreement and prior to the Closing from fire or other casualty, which Seller, at its sole option, does not repair, Purchaser may either at or prior to Closing (a) terminate this Agreement and receive a refund of the Deposit and neither party will have any further right or obligation hereunder except for the Survival Obligations, or (b) consummate the Closing, in which latter event all of Seller's right, title and interest in and to the proceeds of any insurance covering such damage (less an amount equal to any expenses and costs incurred by Seller to repair or restore the Property or to be paid on account of the loss of rents or other income from the Property for the period prior to and including the Closing Date, all of which shall be payable to Seller), to the extent the amount of such insurance does not exceed the Purchase Price, plus Seller's deductible under its insurance policy, shall be assigned to Purchaser at the Closing. If the Property, or any part thereof, suffers any damage less than Six Hundred Thousand and No/100 Dollars ($600,000.00) after the date of this Agreement and prior to the Closing, Purchaser agrees that it will consummate the Closing and accept the assignment of the proceeds of any insurance covering such damage, plus Seller's deductible under its insurance policy, and there shall be no reduction in the Purchase Price. Seller shall maintain casualty insurance for the Property through the Closing Date and, if Purchaser is entitled to insurance proceeds pursuant to this Section 7.2, Seller shall cooperate with Purchaser in good faith in connection with the prosecution of any such insurance claim.

## 8.   DEFAULT

8.1   Breach by Seller.      In the event that Seller shall fail to consummate the transactions contemplated by this Agreement for any reason, except Purchaser's default or a

9

\8870829.4

termination of this Agreement by Purchaser or Seller pursuant to a right to do so under the provisions hereof, Purchaser, as its sole and exclusive remedy may terminate this Agreement and receive a refund of the Deposit. In no event shall Purchaser be entitled to any remedy other than the return of the Deposit and Seller shall not be liable to Purchaser for any actual, punitive, speculative or consequential damages. In no event shall Purchaser be entitled to the remedy of specific performance.

8.2    Breach by Purchaser. If Purchaser fails to comply with this Agreement for any reason, except Seller's default, Seller may terminate this Agreement and thereupon shall be entitled to the Deposit as Seller's full liquidated damages pursuant to applicable state statute (and not as a penalty) as Seller's sole remedy and relief hereunder and shall not be entitled to the remedy of specific performance. Seller and Purchaser have made this provision for liquidated damages because it would be impossible to estimate more precisely, on the date hereof, the amount of actual damages for such breach, and that these sums represent a reasonable pre-estimate of Seller's probable loss in the event of Purchaser's breach. PURCHASER WAIVES ANY CLAIM, RIGHT OR DEFENSE UNDER OKLAHOMA STATUTES, TITLE 15, SECTION 215 THAT THE DEPOSIT DOES NOT REPRESENT A REASONABLE AMOUNT FOR SELLER'S DAMAGES FOLLOWING A DEFAULT BY PURCHASER UNDER THIS AGREEMENT. SELLER AND PURCHASER HAVE NEGOTIATED THIS AGREEMENT AS AN ARMS-LENGTH TRANSACTION, HAVE BEEN REPRESENTED BY COUNSEL OF THEIR CHOOSING AND ACKNOWLEDGE THAT THE DEPOSIT IS A REASONABLE ESTIMATE OF SELLER'S DAMAGES TO FOREGO OTHER OFFERS IN ORDER TO BESTOW ONTO PURCHASER THE STATUS OF THE STALKING HORSE PARTY IN THE BANKRUPTCY AUCTION. Purchaser acknowledges that there is no other information with respect to the waiver contained in this Section 8.2 which if made available to Purchaser would have induced Purchaser to not have entered into this Agreement. Notwithstanding the foregoing, the provisions of this Section 8.2 shall not limit or affect any of Purchaser's indemnities as provided in any other Section of this Agreement. The provisions of this Section 8.2 shall survive the expiration or earlier termination of this Agreement.

Purchaser's Initials: _____

9.    **BANKRUPTCY ISSUES**

9.1    Generally. Notwithstanding any other provision of this Agreement, the provisions of this Article 9 shall apply to the sale of the Property.

9.2    Filing a Sale Motion. The obligation of Seller to sell and convey the Property to Purchaser, and the obligation of Purchaser to purchase the Property from Seller, are subject to the condition precedent that the Bankruptcy Court shall have entered an order in the Bankruptcy Case (the **"Sale Order"**) (i) approving the sale of the Property to Purchaser subject to the terms of this Agreement, free and clear of liens, claims and encumbrances other than Permitted Encumbrances, and (ii) authorizing Seller to consummate the transactions contemplated by this Agreement. Within two (2) business days after the date of this Agreement, Seller will file with the Bankruptcy Court a motion pursuant to section 363 of the Bankruptcy Code seeking approval of this Agreement, the consummation of the transactions contemplated hereby, the bidding

10

\8870829.4

procedures in connection with the qualification of bidders and the auction of the Property and entry of an order approving the foregoing (the "**Sale Motion**"). The Sale Motion shall be in form and substance consistent with this Agreement, and Seller shall be responsible for serving and providing notice of the Sale Motion.

9.3    Entry of Sale Order.   The closing of the sale of the Property to Purchaser shall take place as provided in Section 6.1 above. Purchaser shall cooperate with the Seller in good faith to obtain entry by the Bankruptcy Court of the Sale Order as soon as reasonably practicable.

9.4    Termination.   Purchaser acknowledges that the Seller intends to solicit "higher or better" offers for the Property, including entertaining other offers from competing bidders, and to conduct an auction on or around May 11, 2009. To facilitate this process, Seller agrees to the following procedures for responding to other offers that the Seller may receive for the Property: (a) an initial minimum overbid for the Property of at least $6,250,000.00; (b) each initial overbid must be accompanied by a deposit of at least $625,000.00; (c) each competing offer must have terms and conditions that are substantially identical to those set forth in this Agreement; and (d) if an acceptable competing offer is received by Seller, Seller shall conduct an auction among Purchaser and all qualified bidders (as determined by Seller pursuant to the bidding procedures) to determine the highest or best offer for the Property. The last day for submission of higher or better offers will be fixed by the Seller or established by order of the Bankruptcy Court; Seller shall request that the Bankruptcy Court accept May 6, 2009 as the due date for submission of competing bids. Notwithstanding any other provision of this Agreement, (i) Seller shall have the right to terminate this Agreement in order to permit Seller to accept a "higher or better" offer for the Property, and (ii) each of Seller and Purchaser shall have the right to terminate this Agreement if the Bankruptcy Court has not entered the Sale Order on or prior to the later of May 15, 2009 or twenty days after the date of the auction. In the event that Seller terminates this agreement pursuant to clause (i) in the preceding sentence, Seller agrees to pay Purchaser a breakup fee of $50,000.00 from the cash proceeds of a sale to the New Bidder approved by the Sale Order. If this Agreement is terminated by Seller as provided in this Section 9.4, or because the Bankruptcy Court will not enter the Sale Order prior to May 15, 2009, Escrow Agent shall disburse the Deposit to Purchaser.

## 10.    MISCELLANEOUS

10.1    Notices.     All notices, demands and requests which may be given or which are required to be given by either party to the other, and any exercise of a right of termination provided by this Agreement, shall be in writing and shall be deemed effective either: (a) on the date personally delivered to the address below, as evidenced by written receipt therefore, whether or not actually received by the person to whom addressed; (b) on the third (3rd) business day after being sent, by certified or registered mail, return receipt requested, addressed to the intended recipient at the address specified below; or (c) on the first (1st) business day after being deposited into the custody of a nationally recognized overnight delivery service such as Federal

11

\8870829.4

Express, addressed to such party at the address specified below.  For purposes of this Section 10.1, the addresses of the parties for all notices are as follows:

If to Purchaser:

_____

_____

_____

Attention: _____

with a copy to:    Richard C. Labarthe
1621 N. Classen Boulevard
Oklahoma City, Oklahoma 73106

If to Seller (prior to April 29, 2009):

CIRCUIT CITY STORES, INC.
9950 Mayland Drive
Richmond, Virginia 23233
Attention: Deborah Miller

If to Seller (after April 29, 2009):

CIRCUIT CITY STORES, INC.
4951 Lake Brook Drive, 5th Floor
Glen Allen, Virginia 23060-9279
Attention: Deborah Miller

and a copy to:    McGuireWoods LLP
901 East Cary Street
Richmond, Virginia 23219
Attention:  T. Craig Harmon

The addresses to which notices and demands shall be delivered or sent may be changed from time to time by notice served, as hereinbefore provided, by either party upon the other party.

10.2    Entire Agreement.    This Agreement embodies the entire agreement between the parties relative to the subject matter hereof, and there are no oral or written agreements between the parties, nor any representations, promises or inducements made by either party relative to the subject matter hereof, which are not expressly set forth herein.

12

\8870829.4

**10.3** _Amendment._ This Agreement may be amended only by a written instrument executed by the party or parties to be bound thereby.

**10.4** _Heading._ The captions and headings used in this Agreement are for convenience of reference only and do not in any way limit, amplify, or otherwise modify the provisions of this Agreement.

**10.5** _Time of Essence._ Time is of the essence of this Agreement; however, if the final date of any period which is set out in any provision of this Agreement falls on a Saturday, Sunday or legal holiday under the laws of the United States, or the State where the Property is located, then, in such event, the time of such period shall be extended to the next day which is not a Saturday, Sunday or legal holiday.

**10.6** _Governing Law._ This Agreement shall be governed by the laws of the State of Oklahoma and the laws of the United States pertaining to transactions in such State.

**10.7** _Successors and Assigns: Assignment._ This Agreement shall bind and inure to the benefit of Seller and Purchaser and their respective heirs, executors, administrators, personal and legal representatives, successors and permitted assigns. Purchaser shall be permitted to assign Purchaser's rights under this Agreement as provided in Section 1.1 above; provided, however, any subsequent assignment may be made only with the prior written consent of Seller. No assignment of Purchaser's rights hereunder shall relieve Purchaser of its liabilities under this Agreement. This Agreement is solely for the benefit of Seller and Purchaser; there are no third party beneficiaries hereof. Any assignment of this Agreement in violation of the foregoing provisions shall be null and void.

**10.8** _Invalid Provision._ If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws, such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Agreement; and, the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by such illegal, invalid, or unenforceable provision or by its severance from this Agreement.

**10.9** _Attorneys' Fees._ In the event it becomes necessary for either party hereto to file suit to enforce this Agreement or any provision contained herein, the party prevailing in such suit shall be entitled to recover, in addition to all other remedies or damages, as provided herein, reasonable attorneys' fees incurred in such suit.

**10.10** _Multiple Counterparts._ This Agreement may be executed in a number of identical counterparts which, taken together, shall constitute collectively one (1) agreement; in making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart with each party's signature.

13

\8870829.4

**10.11** <u>No Recordation.</u>      Seller and Purchaser hereby acknowledge that neither this Agreement nor any memorandum or affidavit thereof shall be recorded of public record in any real property or other public records. Should Purchaser ever record or attempt to record this Agreement, or a memorandum or affidavit thereof, or any other similar document, then, notwithstanding anything herein to the contrary, said recordation or attempt at recordation shall constitute a default by Purchaser hereunder, and, in addition to the other remedies provided for herein, Seller shall have the express right to terminate this Agreement by filing a notice of said termination in the county in which the Property is located or otherwise as may be necessary to give public notice of such termination.

**10.12** <u>Merger Provision.</u>      Except as otherwise expressly provided herein, any and all rights of action of Purchaser for any breach by Seller of any representation, warranty or covenant contained in this Agreement shall merge with the Deed and other instruments executed at Closing, shall terminate at Closing and shall not survive Closing.

**10.13** <u>Brokers.</u>      Except as contemplated by Section 6.7, no commissions, brokerage fees, finders' fees, or other similar fees shall be due in connection with this Agreement.

**10.14** <u>Consent to Jurisdiction of Bankruptcy Court.</u>      THE      BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ALL MATTERS, INCLUDING ANY LEGAL ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY RELATED AGREEMENTS OR THE CONTEMPLATED TRANSACTIONS AND THE INTERPRETATION, IMPLEMENTATION AND ENFORCEMENT OF THIS AGREEMENT AND THE PARTIES HERETO IRREVOCABLY SUBMIT AND CONSENT TO SUCH JURISDICTION.

Buyer and Purchaser further agree that service of any process, summons, notice or document by U.S. registered mail to any such party's respective address set forth in Section 10.1 of this Agreement will be effective service of process for any action, suit or proceeding with respect to any matters to which it has submitted to jurisdiction as set forth above. Each of Buyer and Purchaser irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in the Bankruptcy Court.

*Signature Pages to Follow.*

14

\8870829.4

IN WITNESS WHEREOF, the parties hereto have executed this Purchase and Sale Agreement as of the date first written above.

SELLER

CIRCUIT CITY STORES, INC.,
a Virginia corporation

By: _Michelle Mosier_____
Name: _Michelle Mosier_____
Title: _VP & Controller_____

PURCHASER

SHORES OILFIELD EQUIPMENT CO., INC.,
an Oklahoma corporation

By: _____
Name: _____
Title: _____

16

\8870829.4

IN WITNESS WHEREOF, the parties hereto have executed this Purchase and Sale Agreement as of the date first written above.

SELLER

CIRCUIT CITY STORES, INC.,
a Virginia corporation

By: _____
Name: _____
Title: _____


PURCHASER

SHORES OILFIELD EQUIPMENT CO., INC.,
an Oklahoma corporation

By: _Mark K Houser_____
Name: _MARK R. Houser_____
Title: _Secretary_____

15

\8870829.4

The escrow terms and conditions of this Agreement are agreed to and accepted this 23 day of _April_, 2009.

ESCROW AGENT:

STEWART TITLE GUARANTY COMPANY

By: _____

Name: _Joseph M. Grant_

Title: _Escrow Officer_

Mailing Address:

c/o Stewart Title North Texas
1717 Main Street, Suite 3500
Dallas, Texas 75201
Attention: Joe Grant

16

\8870820.4

EXHIBIT A

LEGAL DESCRIPTION OF PROPERTY

(See attached)

\8870829.4

LEGAL DESCRIPTION OF PROPERTY

Parcel 1

A tract of land lying in the East Half (E/2) Southwest Quarter (SW/4) of Section Twenty-Three (23), Township Four (4) South, Range One (1) East, Carter County, Oklahoma, described by metes and bounds as follows:

Part of Lot 3, Block 1 WESTPORT INDUSTRIAL PARK to Ardmore, Carter County, Oklahoma, described as beginning at a point on the west line of said E/2 SW/4, 455.00 feet north of southwest corner thereof, said point also being the southwest corner of said Lot 3, thence N 00°33'30' W along west line of said E/2 SW/4, 1182.00 feet to a point 126.00 feet south of northwest corner of said Lot 3; thence N 89°27'09" E, 961.71 feet to a point on the east line of Lot 3, 125.23 feet south of northeast corner thereof; thence S 00°33'30" E along said east line, 1182.77 feet to a point on the south line of said Lot 3, thence S 89°29'54" W, 961.71 feet to point of beginning.

Being a portion of the land vested in Grantor pursuant to Warranty Deed dated August 2, 1994 and recorded August 3, 1994 at Book 1905, Page 251 and Warranty Deed dated July 27, 1994 and recorded August 3, 1994 at Book 1905, Page 253.

Parcel 2

A tract of land lying in the Northeast Quarter (NE/4) Southwest Quarter (SW/4) of Section Twenty three (23), Township Four (4) South, Range One (1) East, Carter County, Oklahoma, described by metes and bounds as follows:

Part of Lot 3, Block 1 WESTPORT INDUSTRIAL PARK to Ardmore, Carter County, Oklahoma, described as beginning at the northwest corner of said Lot 3, thence N 89°29'54" E, 961.71 feet to the northeast corner

\8870829.4

thereof; thence S 00°33'30" E along east line thereof, 125.23 feet; thence S 89°27'09" W, 961.71 feet to a point of the west line of said Lot 3; thence N 00°33'30" W along said west line, 126.00 feet to point of beginning containing 2.773 acres.

Being the same property conveyed by Grantor to Grantee by General Warranty Deed dated August 1, 2001 and recorded at Book 3685, Page 150 with the County Clerk of Carter County, Oklahoma.

Parcel 3

A portion of the Northeast Quarter (NE/4) of the Southwest Quarter (SW/4) of Section Twenty-Three (23), Township Four (4) South, Range One (1) East, situated in the City of Ardmore, Carter County, Oklahoma, and being more particularly described as follows:

Commencing at the Southwest Corner of said Section 23; thence North 89°29'54" East along the South line of said Section 23, a distance of 1318.13 feet to the Southwest Corner of the SE/4 of the SW/4 of said Section 23; thence North 00°33'30" West along the West line of said SE/4 of the SW/4 of Section 23, a distance of 1763.00 feet to a ½" iron pin set for the point and place of BEGINNING of the herein described tract; thence North 00°33'30" West continuing along the West line of said NE/4 of the SW/4 of Section 23, a distance of 453.00 feet to a ½" iron pin set; thence North 89°29'54" East, a distance of 961.71 feet to a ½" iron pin set; thence South 00°33'30" East, a distance of 453.00 feet to a ½" iron pin set; thence South 89°29'54" West, a distance of 961.71 feet to the point of BEGINNING.

Also known as Lot 4 of Block 1 of Westport Industrial Park.

Being the same property conveyed by Grantor to Grantee by General Warranty Deed dated October 16, 2000 and recorded at Book 3582, Page 263 with the County Clerk of Carter County, Oklahoma.

\8870829.4

SCHEDULE 6.2

THE TITLE COMMITMENT

(see attached)

\8870829.4

American Land Title Association Commitment (6/17/06)

# ALTA COMMITMENT FORM

## COMMITMENT FOR TITLE INSURANCE

Issued by



→title guaranty company

Stewart Title Guaranty Company, A Texas Corporation, "Company", for a valuable consideration, commits to issue its policy or policies of title insurance, as identified in Schedule A, in favor of the Proposed Insured named in Schedule A, as owner or mortgagee of the estate or interest covered hereby in the land described or referred to in Schedule A, upon payment of the premiums and charges and compliance with the Requirements; all subject to the provisions of Schedules A and B and to the Conditions of this Commitment.

This Commitment shall be effective only when the identity of the Proposed Insured and the amount of the policy or policies committed for have been inserted in Schedule A hereof by the Company.

All liability and obligation under this Commitment shall cease and terminate six months after the Effective Date or when the policy or policies committed for shall issue, whichever first occurs, provided that the failure to issue the policy or policies is not the fault of the Company.

The Company will provide a sample of the policy form upon request.

Signed under seal for the Company, but this Commitment shall not be valid or binding until it bears an authorized Countersignature.

   IN WITNESS WHEREOF, Stewart Title Guaranty Company has caused its corporate name and seal to be hereunto affixed by its duly authorized officers on the date shown in Schedule A.

Countersigned by:

**stewart**
title guaranty company

Senior Chairman of the Board

Authorized Countersignature

Chairman of the Board

Stewart Abstract & Title of Oklahoma
Oklahoma City, Oklahoma
(405) 232-6764

President

**Order No. 9040204**

American Land Title Association Commitment (6/17/06)

## CONDITIONS

1. The term mortgage, when used herein, shall include deed of trust, trust deed or other security instrument.

2. If the proposed Insured has or acquires actual knowledge of any defect, lien, encumbrance, adverse claim or other matter affecting the estate or interest or mortgage thereon covered by this Commitment other than those shown in Schedule B hereof, and shall fail to disclose such knowledge to the Company in writing, the Company shall be relieved from liability for any loss or damage resulting from any act or reliance hereon to the extent the Company is prejudiced by failure to so disclose such knowledge. If the proposed Insured shall disclose such knowledge to the Company, or if the Company otherwise acquires actual knowledge of any such defect, lien, encumbrance, adverse claim or other matter, the Company at its option may amend Schedule B of this Commitment accordingly, but such amendment shall not relieve the Company from liability previously incurred pursuant to paragraph 3 of these Conditions and Stipulations.

3. Liability of the Company under this Commitment shall be only to the named proposed Insured and such parties included under the definition of Insured in the form of policy or policies committed for and only for actual loss incurred in reliance hereon in undertaking in good faith (a) to comply with the requirements hereof, or (b) to eliminate exceptions shown in Schedule B, or (c) to acquire or create the estate or interest or mortgage thereon covered by this Commitment. In no event shall such liability exceed the amount stated in Schedule A for the policy or policies committed for and such liability is subject to the insuring provisions, the Conditions and Stipulations, and the Exclusions from Coverage of the form of policy or policies committed for in favor of the proposed Insured which are hereby incorporated by reference and are made a part of this Commitment except as expressly modified herein.

4. This Commitment is a contract to issue one or more title insurance policies and is not an abstract of title or a report of the condition of title. Any action or actions or rights of action that the proposed Insured may have or may bring against the Company arising out of the status of the title to the estate or interest or the status of the mortgage thereon covered by this Commitment must be based on and are subject to the provisions of this Commitment.

5. *The policy to be issued contains an arbitration clause. All arbitrable matters when the Amount of Insurance is $2,000,000 or less shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties. You may review a copy of the arbitration rules at www.alta.org.*

stewart
→ title guaranty company

All notices required to be given the Company and any statement in writing required to be furnished the Company shall be addressed to it at P.O. Box 2029, Houston, Texas 77252.

# STEWART TITLE GUARANTY COMPANY

## COMMITMENT FOR TITLE INSURANCE

### SCHEDULE A

Order No. 9040204

Effective Date: April 3, 2009 at 7:59:00 AM

Closer: MARGARET HARKEY

Prepared For:
Stewart Abstract & Title of Oklahoma
701 N. Broadway
Suite 300
Oklahoma City, Oklahoma 73102

Inquiries should be directed to:
Stewart Abstract & Title Company of Oklahoma, Inc.

1. Policy or Policies to be issued:

   (a) ☒    ALTA Owner's Policy          Amount   TO BE DETERMINED

       Proposed Insured: TBD

   (b) ☒    ALTA Loan Policy             Amount   TO BE DETERMINED

       Proposed Insured:

2. The estate or interest in the land described or referred to in this Commitment and covered herein is a Fee Simple

3. Title to said estate or interest in said land is at the effective date hereof vested in:
   ARDMORE DEVELOPMENT AUTHORITY, pursuant to Warranty Deed dated August 2, 1994 and recorded August 3, 1994 at Book 1905, Page 251 (entry 712-A) and Warranty Deed dated July 27, 1994 and recorded August 3, 1994 at Book 1905, Page 253 (entry 714-A), as to the following legal description:

   A tract of land lying in the East Half (E/2) Southwest Quarter (SW/4) of Section Twenty-three (23), Township Four (4) South, Range One (1) East, Carter County, Oklahoma, described by metes and bounds as follows:
   Part of Lot 3, Block 1 WESTPORT INDUSTRIAL PARK to Ardmore, Carter County, Oklahoma, described as beginning at a point on the west line of said E/2 SW/4, 455.00 feet north of southwest corner thereof, said point also being the southwest corner of said Lot 3, thence N 00°33'30" W along west line of said E/2 SW/4, 1182.00 feet to a point 126.00 feet south of northwest corner of said Lot 3; thence N 89°27'09" E, 961.71 feet to a point on the east line of

April 15, 2009    Jennifer Moradi

ALTA Commitment (6/17/06)

This commitment is invalid unless the Insuring Provisions and Schedules B1 and B2 are attached.

Schedule A consists of 3 page(s)

# STEWART TITLE GUARANTY COMPANY

## COMMITMENT FOR TITLE INSURANCE

### SCHEDULE A

Order No. 9040204

Lot 3, 125.23 feet south of northeast corner thereof; thence S 00°33'30" E along said east line, 1182.77 feet to a point on the south line of said Lot 3; thence S 88°29'54" W, 961.71 feet to point of beginning.

**AND**

CIRCUIT CITY STORES, INC., pursuant to Warranty Deed dated October 16, 2000 and recorded October 24, 2000 at Book 3582, Page 263 (entry 288-B) and Warranty Deed dated August 1, 2001 and recorded August 7, 2001 at
Book 3685, Page 150 (entry 315-B), as to the following legal description:

Lot Four (4), Block One (1), WESTPORT INDUSTRIAL PARK to Ardmore, Carter County, Oklahoma, according to the recorded plat thereof.
AND
A tract of land lying in the Northeast Quarter (NE/4) Southwest Quarter (SW/4) of Section Twenty-three (23), Township Four (4) South, Range One (1) East, Carter County, Oklahoma, described by metes and bounds as follows:
Part of Lot 3, Block 1 WESTPORT INDUSTRIAL PARK to Ardmore, Carter County, Oklahoma, described as beginning at the northwest corner of Lot 3, thence N 89°29'54" E, 961.71 feet to the northeast corner thereof; thence S 00°33'30" E along east line thereof, 125.23 feet; thence S 89°27'09" W, 961.71 feet to a point on the west line of said Lot 3; thence N 00°33'30" W along said west line, 126.00 feet to the point of beginning.

4. The land referred to in the Commitment is located in the County of Carter State of Oklahoma and described as follows:

Lots Three (3) and Four (4), Block One (1), WESTPORT INDUSTRIAL PARK to Ardmore, Carter County, Oklahoma, according to the recorded plat thereof.

TAX ID #:

April 15, 2009    Jennifer Moradi

ALTA Commitment (6/17/06)
This commitment is invalid unless the Insuring Provisions and Schedules B1 and B2 are attached.

Schedule A consists of 3 page(s)

# STEWART TITLE GUARANTY COMPANY

## COMMITMENT FOR TITLE INSURANCE

### SCHEDULE A

Order No.  9040204

### CONTINUATION SHEET

Be advised that this title commitment is issued in pursuant to an examination of the following described materials, to-wit:

A)  Abstract Number: 9406144A (Volumes 1 & 2)
Compiled by:        Carter County Abstract Company, Inc.
Last Certified to:  August 3, 1994 at 10:19 a.m.
Consisting of       719 Entries

B)  Abstract Number: 9040204
Compiled by:        Stewart Abstract and Title of Oklahoma
Last Certified to:  April 3, 2009 at 7:59 a.m.
Consisting of:      394 Entries

April 15, 2009    Jennifer Moradi

ALTA Commitment (6/17/06)
This commitment is invalid unless the Insuring Provisions and Schedules B1 and B2 are attached.

Schedule A consists of 3 page(s)

# STEWART TITLE GUARANTY COMPANY
## COMMITMENT FOR TITLE INSURANCE

### SCHEDULE B - SECTION I

### REQUIREMENTS

The following are the requirements to be complied with:

1. Stewart Title requires **Certified Funds** at closing in the form of a Certified Check, Cashiers Check, U.S. Treasury Check or Wire Transfer into our escrow account.

2. Stewart Title requires all parties to present a valid Drivers License or other acceptable Photo I.D. at closing.

3. Payment to or for the account of the grantors or mortgagors of the full consideration for the estate or interest, mortgage or lien to be issued.

4. Furnish proof of payment of all bills for labor and material furnished or to be furnished in connection with improvements erected or to be erected.

5. Determine by gap check that no adverse documents, transactions, or other matters, affecting title, or as against insured owner(s) have been filed subsequent to the effective date of this commitment to actual date of closing.

6. Obtain affidavit of Seller (Borrower) that said Borrower or Seller is not a foreign person as that term is defined in Section 1445 of the Internal Revenue Code of 1954 as amended (the Code), and the applicable regulations. If a foreign person, then compliance is required with the Code, its rules and regulations pertaining thereto.

7. Obtain affidavit and indemnity agreement from Seller (Borrower) as to debts, liens and possession.

8. Have a certified survey performed by a registered land surveyor or civil engineer certifying that said survey was made on the ground of the subject property, that the same is correct and that there are no discrepancies, conflicts, shortages in area, boundary line conflicts, encroachments, overlapping or improvements, easements, or rights of way as shown herein, and that said property has access to and from a dedicated roadway, all conforming to ALTA/ACSM survey standards for an urban survey.

9. Ascertain the amount of, pay and satisfy 2008 ad valorem taxes, plus penalty and interest.

10. Obtain and file for record a properly executed Release of the Indenture of Mortgage and Deed of Trust, as to the subject premises, in favor of Manufacturers and Traders Trust Company and Stuart A. Mitchell, as Trustees, dated as of June 1, 1996 and recorded June 19, 1996 at Book 3020, Page 247 (entry 181-B) in the principal amount of $13,000,000.00, as partially released by Release of Part of Mortgaged Property recorded at Book 3685, Page 145 (entry 310-B).

ALTA Commitment (6/17/06)                                        File No.: 9040204

This commitment is invalid unless the Insuring Provisions and Schedules A and B-Section II are attached.

Schedule B-Section I consists of 2 page(s)

# STEWART TITLE GUARANTY COMPANY

## COMMITMENT FOR TITLE INSURANCE

### SCHEDULE B - SECTION I

### REQUIREMENTS

11. Obtain and file for record a properly executed Release of the Assignment of Lease and Agreement, as to the subject premises, in favor of Manufacturers and Traders Trust Company and Stuart A. Mitchell, as Trustees, dated as of June 1, 1996 and recorded June 19, 1996 at Book 3021, Page 1 (entry 240-B).

12. Obtain and file for record a properly executed Quit Claim Deed by Ardmore Development Authority in favor of Circuit City Stores, Inc., covering the portion of the subject premises owned by Circuit City Stores, Inc., required by virtue of the defective legal description contained in Warranty Deed recorded at Book 4433, Page 91 (entry 380-B).

13. Obtain and file for record a properly executed Warranty Deed by ARDMORE DEVELOPMENT AUTHORITY in favor of Circuit City Stores, Inc. covering the portion of the subject premises owned by Ardmore Development Authority.

14. The Company requires for its review satisfactory evidence of the approval of the Ardmore Development Authority to the transaction as well as satisfactory evidence of the authority of the individual executing the deed on behalf of the Development Authority.  At the time the Company is furnished these items, the Company may make additional requirements or exceptions.

15. A portion of the property is subject to bankruptcy proceedings of Circuit City Stores, Inc., Debtor in United States Bankruptcy Court for the Eastern District of Virginia Richmond Division Case No. 08-35653 (KRH). The Company requires copies of the docket sheet, petition with schedules, and other satisfactory final nonappealable orders, plans, or documents in the bankruptcy proceedings authorizing the contemplated transaction. At the time the Company is furnished these items, the Company may make additional requirements or exceptions.

16. Obtain and file for record a properly executed Warranty Deed by CIRCUIT CITY STORES, INC. in favor of proposed purchaser, covering the subject premises.

17. The Company requires for its review a copy of the Articles of Incorporation, a satisfactory Board of Directors resolution authorizing the proposed transaction, Shareholders' Resolution where applicable, and verification of Good Standing Certificate evidencing that CIRCUIT CITY STORES, INC. is a company in good standing in the state of its incorporation.  At the time the Company is furnished these items, the Company may make additional requirements or exceptions.

18. Be advised that this Commitment will remain effective for a period of 180 days commencing April 3, 2009 at 7:59 a.m.

19. The Company reserves the right to make additional requirements based upon additional information derived from our review of the transaction.

ALTA Commitment (6/17/06)

File No.: 9040204

This commitment is invalid unless the insuring Provisions and Schedules A and B-Section II are attached.

Schedule B-Section I consists of 2 page(s)

# STEWART TITLE GUARANTY COMPANY
## COMMITMENT FOR TITLE INSURANCE

### SCHEDULE B – SECTION II

### EXCEPTIONS

The policy or policies to be issued will contain exceptions to the following unless the same are disposed of to the satisfaction of the Company.

1.  Defects, liens, encumbrances, adverse claims or other matters, if any, created, first appearing in the public records or attaching subsequent to the effective date hereof but prior to the date the proposed insured acquires for value of record the estate or interest or mortgage thereon covered by this commitment.

2.  Rights or claims of parties in possession.

3.  Easements, or claims of easements, visible on the property or not shown by the public records.

4.  Encroachments, overlaps, boundary line disputes, or other matters which would be disclosed by an accurate survey and inspection of the premises.

5.  Any lien, or right to a lien, for services, labor, or material hereto or hereafter furnished, imposed by law and not shown by the public records.

6.  Taxes or special assessments which are not shown as existing liens by the public records.

7.  Taxes for the year 2009 the amount of which is not ascertainable or payable.

8.  Title to the minerals within and underlying the subject premises; oil and gas leases and mineral grants affecting the subject premises; all rights, interest and privileges appurtenant thereto.

9.  Statutory Section Line Road Easements in favor of the State of Oklahoma, where applicable.

10. Easement contained in Indenture Conveying Property, in favor of Oklahoma Natural Gas Company, recorded at Book Deed 79, Page 492 (entry 373-A).

11. Easement in favor of Southwester Bell Telephone Company recorded at Book 1934, Page 283 (entry 12-B).

12. Westport Industrial Park Protective Covenants recorded at Book 1939, Page 226 (entry 13-B).

ALTA Commitment (6/17/06)                                              File No.. 9040204

This commitment is invalid unless the Insuring Provisions and Schedules A and B-Section I are attached.

Schedule B- Section II consists of 2 page(s)

# STEWART TITLE GUARANTY COMPANY

## COMMITMENT FOR TITLE INSURANCE

### SCHEDULE B – SECTION II

### EXCEPTIONS

13. Westport Industrial Park Protective Covenants recorded at Book 1943, Page 244 (entry 19-B); Amended Protective Covenants recorded at Book 3239, Page 77 (entry 258-B).

14. Easement in favor of Circuit City Stores, Inc. recorded at Book 1943, Page 262 (entry 37-B).

15. Owner's Certificate, Dedication, Restrictions and Plat of Lot 3, Block 1 Westport Industrial Park recorded at Plat Book P165-A, Document No. 354 (entry 56-B).

16. Owner's Certificate, Dedication, Restrictions and Plat of Lot 4, Block 1 Westport Industrial Park recorded at Plat Book P190-B, Document No. 5469 (entry 297-B).

17. All easements, building set back lines, limitations on access, notes and other matters shown on or set forth in the recorded Plats (entries 56-B and 297-B).

18. Right of Way in favor of Oklahoma Natural Gas Company recorded at Book 1959, Page 136 (entry 73-B).

19. Easement in favor of Oklahoma Gas & Electric Company recorded at Book 2044, Page 199 (entry 154-B).

20. Terms, conditions and provisions contained in Lease by and between Ardmore Development Authority and Circuit City Stores, Inc., evidenced of record by Memorandum of Lease dated June 13, 1996 and recorded June 19, 1996 at Book 3020, Page 243 (entry 177-B), as amended by First Amendment to Memorandum of Lease recorded at Book 3685, Page 152 (entry 317-B).

21. Reciprocal Easement Agreement by and between The Ardmore Development Authority and Circuit City Stores, Inc., dated August 1, 2001 and recorded August 7, 2001 at Book 3685, Page 156 (entry 321-B).

22. Easement Agreement in favor of Chickasaw Telephone Company recorded at Book 4102, Page 277 (entry 356-B).

23. Rights of parties in possession as tenants under unrecorded leases and of parties claiming by, through or under them.

---

ALTA Commitment (6/17/06)                                    File No.: 9040204

This commitment is invalid unless the Insuring Provisions and Schedules A and B-Section I are attached.

Schedule B- Section II consists of 2 page(s)