UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA

IN RE:                     .      Case No. 08-35653(KRH)
                           .
                           .
                           .
CIRCUIT CITY STORES        .      701 East Broad Street
INC.,                      .      Richmond, VA 23219
                           .
                           .
          Debtor.          .      April 14, 2009
. . . . . . . . . . . . ..         10:07 a.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE KEVIN R. HUENNEKENS
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:            McGuireWoods LLP
                           By:  DOUGLAS FOLEY, ESQ.
                           9000 World Trade Center
                           101 W. Main St.
                           Norfolk, VA  23510

                           McGuireWoods LLP
                           By:  SARAH B. BOEHM, ESQ.
                           One James Center
                           901 East Cary Street
                           Richmond, VA  23219

                           Skadden Arps Slate Meagher & Flom LLP
                           By:  GREGG M. GALARDI, ESQ.
                           One Rodney Sq.
                           Wilmington, DE 19899

Proceedings recorded by electronic sound recording, transcript
produced by transcription service

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@optonline.net

(609) 586-2311   Fax No. (609) 587-3599

2

**APPEARANCES (CONT'D):**

For the U.S. Trustee:        U.S. Department of Justice
                             By:  ROBERT B. VAN ARSDALE, AUST
                             U.S. Courthouse
                             701 East Broad Street
                             Suite 4304
                             Richmond, VA  23219

For the Official            Tavenner & Beran, PLC
Committee of Unsecured      By:  LYNN TAVENNER, ESQ.
Creditors:                  20 North Eighth Street
                            Second Floor
                            Richmond, VA  23219

For TomTom:                 Nixon Peabody, LLD
                            By:  CHRISTOPHER M. DESIDERIO, ESQ.
                            437 Madison Avenue
                            New York, NY  10022

For IBM:                    ThompsonMcMullan, PC
                            By:  ROBERT DYBING, ESQ.
                            100 Shockoe Slip
                            Richmond, VA  23219

1          THE CLERK:  In the matter of Circuit City Stores,

2    Incorporated.  Hearing on Items one through 46 as set out on

3    debtors' agenda.

4          MR. FOLEY:  Good morning, Your Honor.  Doug Foley

5    with McGuireWoods on behalf of the debtors.  With me today at

6    counsel table is Sarah Boehm with our firm and Gregg Galardi

7    from Skadden Arps.  Also here today, Your Honor, from the

8    company is Jim Marcum who's the chief executive officer.

9          Your Honor, we have 47, six items on the agenda, but

10   we hope it won't take that long.  As Your Honor's aware, most

11   of the matters are not contested.  We'll go through those

12   briefly.

13         If Your Honor please, the first ten items are matters

14   that we have resolved in various ways.  The first matter is a

15   carryover from our first lease rejection motion that we filed

16   back in November.  Your Honor, the objections of Dick's

17   Sporting Goods, Galleria and the joinders by the over-landlords

18   have now all be resolved on the same basis that we reported to

19   the Court at the last hearing, the rejection date will be

20   November 30th and all the claims issues will be reserved for

21   another time.  So that can be removed from the docket.

22         THE COURT:  All right.

23         MR. FOLEY:  Your Honor, Item Number 2, the Navarre

24   motion, 363 motion has finally be withdrawn.  That can be

25   removed from the docket.  Your Honor, Item Number 3, which is

**J&J COURT TRANSCRIBERS, INC.**

1  the motion by Evening Post Publishing for payment of an

2  administrative claim, we were able to reconcile and settle up

3  on that amount with them, so that matter has also been

4  withdrawn.

5          Your Honor, Item Number 4 is our fifth omnibus lease

6  rejection motion.  As Your Honor recalls, at the last hearing,

7  the Sports Authority had a concern, a limited objection that we

8  have resolved to their satisfaction so that matter is now final

9  and can be removed from the docket.

10          THE COURT:  All right.

11          MR. FOLEY:  Your Honor, Items Number 5, 6, 7 and 8,

12  Cleveland Construction, John Rohrer, Hillson Electronics and

13  other constructions, Lang Construction, counsel, Mr. Gray is

14  here today for most of those matters.  And I believe orders

15  either have been or will be submitted today.

16          THE COURT:  All right, very good.  Mr. Gray?

17          MR. GRAY:  Good morning, Your Honor.  I am counsel

18  for Items 6, 7 and 8 on the agenda, not Number 5, just for

19  clarification.  But we have entered into a consent order and I

20  will be submitting it to Your Honor today.

21          THE COURT:  All right, I'll look for that order.

22          MR. GRAY:  Thank you.

23          MR. FOLEY:  Thank you, Your Honor.  I have Number 9,

24  Your Honor --

25          THE COURT:  So do I understand, Mr. Foley, that

1  Number 5 though is also, there's going to be a consent order

2  submitted on that one, just different counsel?

3          MR. FOLEY:  Yes, Your Honor.

4          THE COURT:  Thank you.

5          MR. FOLEY:  Your Honor, Item Number 9, Tremor Media,

6  that's their motion for payment of administrative claim.  We

7  were able to reconcile and resolve the amounts that they said

8  were outstanding, so they have withdrawn that motion, Your

9  Honor.

10          THE COURT:  Okay.

11          MR. FOLEY:  With respect to Item Number 10, this is

12  the Prosite Business Solutions matter.  We were able to resolve

13  that last evening and we will be submitting an order resolving

14  that matter today, Your Honor.

15          THE COURT:  All right.

16          MR. FOLEY:  Items Number 11 through 22 are matters

17  that we've agreed with the counter-parties to adjourn to a

18  future hearing date.  Your Honor, Item Number the Motorola

19  503(b)(9) motion.  They've agreed to again, adjourn that matter

20  to the April 28th omnibus hearing date.  Item Number 12, which

21  is the General Instruments Corporation's Home Networks'

22  Mobility Business motion, also an affiliate of Motorola, a

23  similar motion, they've also agreed to adjourn that to April

24  28th.

25          Your Honor, Item Number 13, this is our motion with

**J&J COURT TRANSCRIBERS, INC.**

1  respect to a resolution of amounts and lease obligations with

2  IBM and we're still working through whether that, because we're

3  dealing with some of their computer issues now, we hope that

4  those will be resolved by that 28th hearing.  But we've agreed

5  to adjourn it until the April 28th omnibus hearing date.

6          Your Honor, Item Number 14, this is the Federal

7  Warranty Assurant matter.  We're working through a global

8  resolution with them.  We had some progress yesterday.  We hope

9  that we'll be exchanging additional offers and counter offers.

10  We hope to reach a resolution by the 28th.  So we'd ask the

11  Court that that one also be adjourned to April 28th.

12          Item Number 15, Your Honor.  This is our lease

13  disposition procedures motion.  If Your Honor recalls, there

14  were some cure disputes that we had to reconcile.  All of those

15  parties were still working through the reconciliation of the

16  various amounts alleged.  These are again, the disputed cure

17  amounts.  Items Number A, B, D, E and F, they've all agreed to

18  adjourn their issues until the April 28th hearing date.  Item

19  Number C, which is SEA Properties, Your Honor, has requested

20  that theirs be adjourned until the May 28th hearing date.

21          THE COURT:  All right.

22          MR. FOLEY:  Your Honor, Item Number 16 is a motion by

23  DIRECTV for setoff and recoupment.  We're still working through

24  reconciling those amounts.  We hope to have those resolved by

25  the April 28th hearing date, but we've asked that one also to

**J&J COURT TRANSCRIBERS, INC.**

1 be carried over.

2          Item Number 17 is the Sony Pictures Home

3 Entertainment motion under 503(b)(9).  They have agreed to

4 adjourn that matter to the April 28th hearing date.  Item

5 Number 18, Your Honor, this is the motion by AT&T.  We've

6 actually believe we have that one resolved.  We're waiting for

7 confirmation of one final factual issue.  We hope to actually

8 have that resolved this week and if we can submit an order

9 early, it's a rejection order, we will do so and have that one

10 taken off the docket entirely.

11          THE COURT:  All right, very good.

12          MR. FOLEY:   Your Honor, Item Number 19 is the TKG

13 Coffee Tree LP motion under 365(d)(3).  That's a recently filed

14 motion.  We're trying to reconcile the amounts they allege are

15 owed, and they've agreed to adjourn their motion to the April

16 28th hearing date.

17          Your Honor, Item Number 20 is the Sennheiser Electric

18 Corporation motion to file a late claim, a late 503(b)(9) claim

19 after the bar date.  They also have agreed, we're looking at

20 their facts and circumstances, they've also agreed to adjourn

21 their matter until the April 28th hearing date.

22          Your Honor, Item Number 21, South Peak Interactive,

23 LLC, request for payment of administrative claim.  That one was

24 recently filed.  Again, we're trying to reconcile the amounts

25 allegedly owed.  They've agreed to adjourn their motion to the

1  April 28th hearing date.

2          Your Honor, Item Number 22, this is a recently filed

3  motion by Google to compel assumption or rejection of various

4  executory contracts and/or relief from the automatic stay to

5  terminate their agreements with us.  We're working through

6  their issues as well and Mr. Campsen, who's their counsel has

7  agreed to continue this motion until the April 28th hearing

8  date.

9          Those are the adjourned items, Your Honor.  Items 23

10 through 34 are the other motions that are going forward today,

11 Your Honor.  Mr. Galardi will be addressing the Court with

12 respect to Items 24, 27 and 30.  But before we get to those, I

13 would like to just be able to go through the other items before

14 we get to that.

15          THE COURT:  You may.

16          MR. FOLEY:  Your Honor, Item Number 23 is our fourth

17 motion to reject certain executory contracts.  As Your Honor is

18 aware from the exhibits attached to the motion, there are two

19 service agreements and one licensing agreement.  These are with

20 Thompson Financial and High Jump Software and there's been no

21 response to the motion.  We'd ask the Court to grant that

22 requested relief.

23          THE COURT:  Any party wish to be heard in connection

24 with Docket Number 23?  All right, that motion will be granted.

25          MR. FOLEY:  Your Honor, Items Number 25 and 26 are

**J&J COURT TRANSCRIBERS, INC.**

1  procedural motions relating to the request for additional

2  compensation for certain eligible employees.  One is our

3  request to expedite the hearing for today, which we would ask

4  the Court to grant as well as our motion to shorten the notice

5  period.  We've not received any response from any party with

6  respect to those requested reliefs.

7       THE COURT:  Any party wish to be heard in connection

8  with the motion for expedited hearing and for the motion to

9  shorten notice period?  All right, both of those motions are

10 granted.

11      MR. FOLEY:  Thank you, Your Honor.  Items Number 28

12 and 29 are similarly our procedural request for an expedited

13 hearing and our motion to shorten the notice period with

14 respect to the procedures motion that we have on this morning

15 to approve the sale of certain intellectual property assets.

16 We've not received any response to either of those procedural

17 requests for relief and ask the Court to grant those.

18      THE COURT:  Any party wish to be heard in connection

19 with the motion for expedited hearing?

20      MR. DYBING:  Good morning, Your Honor.  Robert Dybing

21 representing IBM.  IBM submitted an objection to the merits

22 based motion.

23      THE COURT:  I'm familiar with that.

24      MR. DYBING:  And one of our concerns deals with the

25 lack of clarity as to whether the merits based motion deals

**J&J COURT TRANSCRIBERS, INC.**

1  with software that is defined as disputed software under an

2  earlier settlement approval motion filed with this Court.  And

3  we believe that if Circuit City can explain, identify whether

4  the IBM software is the subject of Docket Number 30, then we

5  don't object to the expedited hearing.  If Circuit City is not

6  able to address that, we would submit respectfully that it

7  would be premature to consider the merits of Docket Number 30

8  until we were able to clarify whether the IBM disputed software

9  is the subject of that motion.

10       THE COURT:  As I understand it, basically what we're

11  going be asking for if I grant this motion is to have a hearing

12  on setting bidding procedures and other procedures for the sale

13  of certain software.  Wouldn't you have sufficient time between

14  now, because I understand the auction's not until May, to

15  ferret out the issues that you're raising here?

16       MR. DYBING:  Well, we certainly hope that that could

17  be done within that time -- excuse me -- we've not heard from

18  Circuit City with regard to our questions, and that gives rise

19  to our concern.

20       THE COURT:  Okay, very good.  Thank you.

21       MR. DYBING:  Thank you.

22       THE COURT:  All right, thank you.

23       THE COURT:  Any other party wish to be heard?  All

24  right, Mr. Dybing, I'm going to overrule your objection to the

25  motion for expedited hearing.  I will hear your concerns when

1  we get to the substance of the motion itself.  But since this

2  is just a procedural -- motion in connection with a procedural

3  motion, I'm going to grant both the motion to expedite hearing

4  and shorten time.

5          MR. FOLEY:  Thank, Your Honor.  And you can be

6  assured and counsel can be assured that we will obviously work

7  with them to iron out any issues with respect to the particular

8  software question when we get to the merits of the --

9          THE COURT:  I'm confident.  That has been your track

10  record so far in this case.

11         MR. FOLEY:  Thank you, Your Honor.  Your Honor, Item

12  Number 31 is a matter that we have resolved with TomTom.  Your

13  Honor, if you recall, this matter's been pending for some time

14  and we've put a lot of time and effort into reconciling the

15  various amounts of credits that the estate is entitled to with

16  respect to the amounts owed to TomTom for goods delivered

17  either within the 20 days of the bankruptcy filing or the

18  petition date.  We'll finally be able to reconcile those

19  numbers, but we still have some legal issues that we want to

20  address at a later point in time.  So counsel's here today, we

21  have a stipulation that we'll be submitting to the Court later

22  today.  But in sum and substance, we've been able to reconcile

23  that the amount of TomTom's 503(b)(9) administrative expense

24  claim is $7,339,636.44.  And the amount of TomTom's 503(b)(1)

25  administrative claim for goods that were actually delivered on

12

1  the petition date is $1,072,893.12.  And we've also agreed that

2  the amount of the credits that Circuit City is entitled to to

3  potentially offset against those amounts is $3,350,000.

4        Your Honor, what we have agreed in this stipulation,

5  as you will see, is there are certain legal issues that the

6  estate tends to raise with respect to the 503(b)(9) claims

7  including whether or not setoff and/or recoupment can occur or

8  payment in light of the fact that there may be a preferential

9  transfer still out there under 502(d) and an objection that we

10 intend to raise with respect to those issues.  So the

11 stipulation provides for a briefing schedule with respect to

12 that issue and we will submit our memorandum in support of our

13 position with respect to that issue on April 24th.  TomTom will

14 be able to respond by May the 1st.  And if the Court so grants

15 the stipulation, we'll have a hearing on the matter on May

16 13th.

17        Also, Your Honor, to the extent that there is

18 ultimately an authorization, either because of a resolution of

19 the preference exposure question or Your Honor's ruling on a

20 502(d) objection, there's an agreement that any setoff of the

21 credits will first occur against the 503(b)(1) claim, which is

22 the administrative claim, and then until that's reduced to

23 zero, and then against the 503(b)(9) claim until the credits

24 are exhausted.  Other than that, Your Honor, everybody

25 preserves their rights with respect to any prepetition claims

**J&J COURT TRANSCRIBERS, INC.**

1  or offsets or credits.  This only deals with the post-petition

2  issues.  And if I, I believe I stated it right, but counsel is

3  here and he can correct me if I'm wrong.

4         THE COURT:  All right.

5         MR. DESIDERIO:  Your Honor, Chris Desiderio from

6  Nixon Peabody on behalf of TomTom.  What counsel has

7  articulated is true and correct and I think we're basically

8  there and we'll submit it later today.

9         THE COURT:  All right, very good.

10         MR. DESIDERIO:  Thank you.

11         THE COURT:  Thank you.  All right, the Court will

12  look for that stipulation then.

13         MR. FOLEY:  Thank, Your Honor.  Item Number 32, Your

14  Honor, is the motion for relief from stay filed by Decarla

15  Taylor-Conyers.  We were advised by counsel last evening that

16  they desire to withdraw that motion for relief from stay, so I

17  represent to the Court that that one can be removed from the

18  docket.

19         THE COURT:  All right.

20         MR. FOLEY:  Your Honor, Items Number 33 and 34 are

21  motions for relief from stay filed by Kina Thompson and William

22  Gower.  These relate to certain workers' compensation claims.

23  We have similar issues with respect to insurance coverage.

24  We're working through some factual issues that may exist with

25  respect to both of these motions.  Counsel, we've spoke to

14

1  counsel last night and he's agreed to set these, both these

2  motions for a final evidentiary hearing on the May 28th omnibus

3  hearing date and we'll work to try to resolve all issues,

4  factual issues, prior to that time.

5         THE COURT:  So we're setting those for final hearing

6  so those will be evidentiary hearings set on that date.

7         MR. FOLEY:  Yes, Your Honor.

8         THE COURT:  And counsel for the movant understands

9  that they'll have to have their witnesses here.

10        MR. FOLEY:  Absolutely, Your Honor.

11        THE COURT:  All right.

12        MR. FOLEY:  Your Honor, Mr. Galardi, again, will

13 address Items 24, 27 and 30 and then Ms. Boehm will address

14 Items 35 through 42.

15        THE COURT:  All right, very good.

16        MR. FOLEY:  Thank you.

17        MR. GALARDI:  Good morning, Your Honor.

18        THE COURT:  Good morning.

19        MR. GALARDI:  For the record, Gregg Galardi on behalf

20 of Circuit City.  Your Honor, first, with respect to Matter 24,

21 there were no objections to that motion, Your Honor.  Just

22 briefly so that everyone is aware, Circuit City has a wholly

23 owned subsidiary called Northern National Insurance Limited.

24 It is a Bermuda insurance company.  As these intercompany

25 transactions are fairly complex, let me see if I can try to

1 explain what's going on.  But bottom line, Your Honor, is if

2 Your Honor approves these transactions, we think that Circuit

3 City is taking on no greater liabilities as it is already

4 liable on the insurance policies, and as a result, there will

5 essentially be a net dividend in actual cash up to the estates

6 of $9 million.  And what is not set forth in the motion, but

7 what happened as part of, in anticipation of the motion, was

8 that there used to be an LC backstopping that deductible and

9 other obligations of Circuit City for $10 million, and that LC

10 was cancelled, which means we didn't have to cash collateralize

11 at 103 percent that, so that therefore that became cash

12 available for the estate.

13          At the end of the day, that's what all the

14 transactions are.  But to give a little bit more detail,

15 currently there is a note, a promissory note from Circuit City

16 to the insurance, captive insurance company of approximately

17 $10 million, and the captive insurance company is holding

18 essentially $9 million of cash obligations.  What would happen

19 is that there would be a termination of the participation in

20 the programs and that Circuit City would essentially receive

21 the following payments.  First, there would be a payment, not

22 -- a book entry, of $6.4 million to Circuit City which is a

23 simple book entry.  Then there would be a second dividend which

24 is actually cash, of $4.8 million paid to Circuit City.  Then

25 there would be another book entry to pick up a tax obligation

1   of essentially $5.3 million, and approximately two months now,

2   if Your Honor approves this, there would be a final dividend of

3   approximately $4.2 million leading to Circuit City receiving

4   $9 million of cash from its captive insurance company.  That

5   captive insurance company, and again, Circuit City, it's a

6   wholly owned subsidiary, is seeking authority to have the

7   liquidation of its subsidiary, the captive insurance company,

8   and to allow them to appoint KPMG as the liquidator in Bermuda.

9   There will be funds left behind of roughly $271,000 to allow

10  them, which is more than the estimated cost of 125 to liquidate

11  the Bermuda insurance company.  They will liquidate it, and if

12  there are funds left over from that 271, then I guess there

13  would be a final dividend of a much less significant amount,

14  roughly $100,000 back to Circuit City.

15          Obviously this is a motion that's seeking Court

16  approval to liquidate one of the subsidiaries.  It's an asset

17  to take certain corporate actions and also to allow the

18  dividends to come up.  We have discussed this motion with the

19  Committee, they had no objection, no other party has had an

20  objection, and again, we think that the series of transactions

21  does not incur, does not give Circuit City any greater

22  liabilities.  We are releasing a subsidiary in a Bermuda

23  company of liabilities, but we think, if anything, we would owe

24  them an obligation under the note.  They are essentially paying

25  off the notes by way of that plus the dividends, and Circuit

1  City nets $9 million plus a little bit, and also as I said, in

2  part of this process that started back in March, we've also

3  been relieved of the LC obligation so we didn't have to cash

4  collateralize that.

5         So Mr. Marcum is in the courtroom today and could

6  testify that he believes this transaction and the approval of

7  the transaction is in the best interest of the company.  As I

8  mentioned and as the docket shows, this was not on shorten

9  notice.  There are no objections to this motion.  The Committee

10  had no objection, we'd ask Your Honor to approve the

11  transactions that I've just described.

12         THE COURT:  All right, thank you.  Any party wish to

13  be heard in connection with the debtor's motion?  All right,

14  Mr. Galardi, the Court will grant the motion.

15         MR. GALARDI:  Thank you, Your Honor.  That was Number

16  24, Your Honor.  Now moving to 27.  Your Honor, the motion on

17  Number 27 is an attempt by the debtors to one, save cash, but

18  at the same time to provide those people that are continuing

19  with the company an equivalent cash amount of the benefits.  To

20  step back, Your Honor, as Your Honor is aware, the store

21  closing sales were concluded sometime in the middle of March or

22  in the beginning of March, and the warn period that we had

23  given many of those employees notice for was done around March

24  23rd.  So as of March 30th, the company had a significant

25  downsizing of employees that they could therefore decided to

1  terminate all of their benefit and other insurance programs at

2  a significant cost savings.

3        In particular, benefits and COBRA and those sorts of

4  insurance benefits roughly saves the estate a million dollars,

5  approximately a million dollars a month by terminating the

6  insurance coverage.  Obviously however, the estate still has

7  approximately at this date about 129 employees who therefore

8  would not have health, dental and other insurance costs.  What

9  the company determined is instead of holding onto those

10  insurance plans, it would be more cost effective to essentially

11  terminate those policies, saving the gigantic cost, the million

12  dollars a month cost with respect to the health, the dental and

13  the vision plans, but at the same time, provide a cash stipend

14  to those employees that are continuing so that they would at

15  their option be able to purchase comparable coverage.

16        And therefore price the program of roughly $200 a

17  week or $400 biweekly pay periods as compensation for the

18  employees so that they can go out and buy the appropriate

19  insurance.  And we priced it at what it would cost to buy the

20  insurance that Circuit City had for these people in place.

21  When you buy it individually and you buy it for the 129 people,

22  the company determined that it was roughly $320,000 a year for

23  an employee versus 400 if we had bought if for them directly,

24  so there was a small savings of $80,000.  Plus as I had

25  mentioned, there was a large savings of just terminating all

1   insurance coverage with the carrying costs and the other costs

2   that the company would have had to incur.

3        So we believe that this was one, a very significant

4   cost savings benefit.  Two, it left our employees that were

5   continuing with us in a position that they could get comparable

6   coverage.  It is important for those employees to just simply

7   not have their benefits terminated.  We thought that was unfair

8   when we were taking the cost savings measure.

9        We think that this program is justified under 363

10  outside the ordinary course.  Since some of the people are

11  "insiders" Your Honor, certain senior management people will in

12  fact be receiving the stipend.  We also think that it's not a

13  severance, it's not a retention, it is simply the payment, and

14  that the facts and circumstances to continue to have those

15  people to be able to receive the stipends, the management level

16  people, we put in, really under 503(c) saying that it was under

17  (c)(3) which was the facts and circumstances justified it.

18       Your Honor, again, though it was on short notice, we

19  had been in contact with the Committee regarding this, we have

20  talked to the Committee about why we did what we did.  They

21  had no objections with respect to the change in the way the

22  benefits' plan and given the savings, they were supportive of

23  it.  We've received no objections, Your Honor, and again, we

24  would ask that Your Honor approve the employee stipend motion.

25       THE COURT:  All right.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. GALARDI:  Again, Mr. Marcum is in the courtroom

2    today.  He can testify to the morale of the employees, the need

3    for such a program.  Mr. Cashman is also in the courtroom today

4    and as a financial matter, could testify to the savings that

5    the company had gone through in the analysis to make the

6    savings for this program and its decision to try to save the

7    money, but also compensate the employees.

8          THE COURT:  All right, thank you, Mr. Galardi.  Does

9    any party wish to be heard in connection with the debtor's

10   motion approving additional compensation for eligible

11   employees?  Mr. Van Arsdale?

12         MR. VAN ARSDALE:  Robert Van Arsdale for the U.S.

13   Trustee, Your Honor.  On behalf of the U.S. Trustee I would say

14   that not only don't we object to this, we think this is a very

15   responsible and cost saving motion that has been made.  I agree

16   with Mr. Galardi that it does not fall within the prohibited

17   sphere of either a severance payment or an incentive, a KERP as

18   it were, so we have no objection.

19         THE COURT:  All right, thank you.  Any other party

20   wish to be heard?  All right, Mr. Galardi, the Court will grant

21   your motion.

22         MR. GALARDI:  Thank you, Your Honor.  Your Honor,

23   then to the third motion that's already been mentioned today

24   that I'll be handling.  It's the IP sale motion.  Your Honor,

25   essentially we filed one motion seeking three forms of relief.

**J&J COURT TRANSCRIBERS, INC.**

1   First, which is relief that we think is now required under the

2   bankruptcy code, the appointment of a consumer privacy

3   ombudsman.  Your Honor, we informed the U.S. Trustee back in

4   February that this was likely to happen.  Just by way of

5   background, and again, with respect to this matter, I have Mr.

6   Nicholas Barns of Rothschild in the courtroom today as well as

7   Mr. Marcum, who if called as a witness would verify the facts

8   in the motion and I'd offer the proffer of their testimony with

9   respect to this.

10          When we were conducting the company sale process back

11  in January and even late December, we were contacted by parties

12  with respect to whether we would be interested in selling the

13  IP or the intellectual property of the company, including

14  Circuitcity.com and those sorts of names.  When we determined

15  that we had to do the store closing sales, we then started the

16  process of marketing that IP and noted that in fact the IP

17  would have certain privacy concerns which are addressed by the

18  amendments to the Bankruptcy Code, and therefore notified the

19  U.S. Trustee's office that we would need a consumer privacy

20  ombudsman or CPO.   We provided the U.S. Trustee with updates

21  as we went through the process selecting a stalking horse

22  bidder, and then on April 10th, I think the order entered

23  authorizing the UST to appoint a CPO, and U.S. Trustee has

24  already appointed one, Lucy Thompson has been appointed CPO, so

25  we've sought authority to proceed with that CPO.  That was one

1  part of the relief that we had requested.

2         The second part of the procedures that we had asked

3  that is essentially today, Your Honor, to seek approval of a

4  stalking horse agreement with Systemax and with, to go forward

5  on the time table set forth in the motion where there will be a

6  bid deadline of May 6th, an auction of May 11th and an ultimate

7  sale hearing on May 13th.

8         Your Honor, with respect to this matter -- and again,

9  we'll take the objection up, I saw the IBM objection, I've been

10 trying to talk to the counsel that I'm most familiar with, Mr.

11 Belmonte -- we had been searching and Mr. Barnes, if called as

12 a witness would testify, that after the January 16th hearing,

13 Rothschild took on the responsibility to find a stalking horse

14 bidder or bidder with respect to various intellectual property

15 rights which range from FireDog to the Circuitcity.com name.

16 These assets of the company were to be marketed, and we

17 received what I would say is a wide-ranging series of bids for

18 all sorts of permutations of the bids and all sorts of

19 potential sales.  At the same time, Mr. Barnes would testify

20 that we were conducting the sale process that Your Honor is

21 familiar with in Canada with respect to Circuit City, the

22 Circuit Citys or the stores up in Canada and there was an

23 interest in maintaining that as a going concern and also

24 maintaining the IP there.  So a lot of this process was

25 complicated by the fact that whoever was going to buy the

23

1   Circuit City, the source by Circuit City up in Canada would

2   also need to have intellectual property rights, and whether

3   this would expand into Canada.  So over the last two months,

4   led by Rothschild and the company, the company has been

5   soliciting bids.  They narrowed the bids down to two potential

6   bids for -- to serve as a stalking horse arrangement.  After

7   back and forth on the agreements, the company determined to

8   select Systemax as the stalking horse bid on the terms set

9   forth on the agreement.

10          The stalking horse bid buys certain of the assets

11  that are intellectual property that are in fact defined in that

12  agreement.  The agreement provides for a breakup fee of

13  $250,000 with an expense reimbursement capped at $75,000.  The

14  purchase price, cash purchase price under the stalking horse

15  deal is $6.5 million cash, but there is also an earn-out

16  provision for $2.5 million.  Roughly, Your Honor, you can value

17  this deal whether it's the low end of 6.5 or somewhere around

18  ten to a little bit more than $10 million.  We could dispute

19  what the earn-out's value it, but professionals can decide

20  that.  I make that point because if you look at the breakup fee

21  in the context of the purchase price, that would say it's

22  anywhere from -- if you add the breakup fee and the expense

23  reimbursement, anywhere as high as four percent or a little

24  higher to a three percent breakup fee.  Again, the sort of

25  standard, at least in Delaware and other places is the three

1  percent.  But as the deals get smaller in value, sometimes the

2  percentages go up because of the kinds of costs and expenses

3  incurred.  There was much negotiation back and forth with the

4  stalking horse bidder over exactly what the intellectual

5  property assets were to be purchased and what rights they would

6  have with respect to those intellectual property, including

7  with respect to giving a license to the Canadian facility,

8  which that is a very significant deal and we want to make sure

9  that they preserve their rights.

10       Ultimately the company determined to enter into a

11  stalking horse agreement with Systemax because of a few things.

12  First, it gave the greatest up-front cash number of 6.5.

13  Second, it gave the Creditors' Committee, which they were also

14  interested in and which we were interested in, a definitive

15  earn-out of a specific value that could, within the life span

16  of a plan of reorganization, be paid off or monetized.  We

17  thought that was important.

18       In connection with that, we also thought that they

19  worked very flexible with what we call two types of data.

20  There is the Circuit City data, Your Honor.  That is personal,

21  private information that Circuit City obtains by way of its

22  website.  Circuit City has a privacy policy.  This goes to the

23  ombudsman issue, which has certain limitations.  The company

24  has taken the position that to the extent that the information

25  was obtained in the website, that that privacy policy would be

1  enforced and be honored by any bidder, and Systemax has agreed

2  to honor that privacy policy, which will help facilitate a

3  closing of this transaction subject to any concerns the

4  ombudsman might have.

5          There's also the Alpine data, which is customer

6  information that Circuit City has acquired by way of in the

7  store or questionnaires that the company, Circuit City takes

8  the position that it is not subject to its privacy policy.

9  That still raises ombudsman concerns that they will look into,

10 but they've agreed that they are going to acquire that

11 information, again, on a nonexclusive basis, but will work with

12 the ombudsman on that issue.

13         So after all is said and done, Your Honor, with

14 respect to Systemax, the company determined that it was a clean

15 contract, it had a specific cash amount, it had a specific

16 earn-out which would facilitate bidding and set a floor for the

17 bidding at the 6.5 plus an earn-out that can be easily

18 compared.  That as a result of the back and forth which has

19 taken probably a month or so on getting this agreement done,

20 that a breakup fee of $250,000 would be fair in expense

21 reimbursement after the legal time of negotiating the

22 contracts, doing due diligence, looking into the websites and

23 in fact narrowly defining those intellectual property rights

24 they can take and those that they're not taking was a fair

25 expense reimbursement, all things considered, in the event that

1 they are not the highest and best bidder.  They have agreed to

2 the bid deadline, as I said, of May 6th, an auction on May 11th

3 and a minimum overbid of $350,000, which would cover the

4 breakup fee and any expense reimbursement and a sale hearing on

5 May 13th.

6 　　　　Your Honor, we've also sought approval of the various

7 notice procedures which are standard to notice people with

8 parties in interest, also a publication notice.  Your Honor, we

9 think though the time frame may seem, 30 days may see short,

10 Rothschild, if Mr. Barnes were called to testify would testify

11 that he's already notified 90 parties that have been involved,

12 and essentially there was a pre-auction already for the

13 stalking horse bid so that the parties are on notice and many

14 of the parties have said let's just get to an actual auction.

15 So we think one, the breakup fee would not deter or chill

16 bidding in any shape.  We are encouraged that we think people

17 will in fact bid at this auction for the IP.  We think that the

18 Systemax deal does set a valuable floor, and we would ask for

19 approval of that deal and of the time frames.

20 　　　　With respect to IBM, Your Honor, it is correct that

21 we had thought we had filed, I guess it's schedule 1.02 that

22 they had complained about.  It seems to have been inadvertently

23 not filed.  It was served on IBM yesterday.  As I said, myself

24 and Mr. Fredericks have tried to reach out to Mr. Belmonte to

25 discuss, but my understanding is he is in court this morning.

27

1  It is our understanding and Mr. Barnes would state, and I think

2  Mr. Marcum would state, we do not believe that any of the

3  disputed license rights with IBM are in fact being transferred.

4  That said, can't make a representation, let IBM look at it,

5  but, Your Honor, we think that essentially their objection to

6  any such transfer is a sale objection, not an objection to the

7  bid procedures or the stalking horse, and all rights are

8  preserved to object to the sale, and if there is a transfer or

9  disputed license or IBM's rights at all, we think that would be

10 in the context and properly raised in the context of an

11 objection to the sale process on the grounds that that property

12 could not in fact be sold or transferred.  Again, it's our

13 belief that it's not.  We don't think that the schedule in any

14 way prejudices IBM and we would ask Your Honor to approve the

15 selection of Systemax as the stalking horse, the approval of

16 the breakup fee process, the expense reimbursement and the time

17 table set forth in the motion.

18        THE COURT:  All right, very good.  Does any party

19 wish to examine either of the proffered witnesses?  Okay, I'll

20 accept the two proffers of their testimony.  Can you enlighten

21 me on the difference qualitatively as far as the information

22 that the company has with regard to the Circuit City data and

23 the Alpine data.  Is there anything qualitatively different

24 about it or is it just how it was acquired?

25        MR. GALARDI:  Well, I think it's mostly how it's

1  acquired, but that may mean that you have more specific

2  information on the Circuit City data, because there's, it's

3  more likely you've got some of the personal information.  I

4  think the nonexclusive data -- and let me go talk to my client

5  -- but I think I know --

6                            (Pause)

7            MR. GALARDI:  Your Honor, I conferred with Mr. Barnes

8  and Mr. Marcum.  There's some overlap in the information, but

9  one of the significant differences in the dot com information,

10 they actually had e-mail addresses, which makes sense because

11 it comes through that.   That's not in the Alpine data.  That's

12 one qualitative difference.  The Alpine data is also years and

13 years of buying warranty information or point of purchase

14 information, so you might not have all of the same information,

15 but you have more historical information, and that's what

16 they're acquiring on nonexclusive basis.  Obviously with the e-

17 mail information, that is the exclusive information and that's

18 what is subject to the privacy policy.   You can't just give

19 that out.  And our policy directs that, and that's one of the

20 concerns that the ombudsman would look at.  So those are the

21 sort of the qualitative differences, but the e-mail addresses

22 on the Circuit City information are one of the major

23 differences qualitatively speaking.

24            THE COURT:  All right.  Thank you for that

25 clarification.  Does any party wish to be heard in connection

**J&J COURT TRANSCRIBERS, INC.**

1  with the debtor's motion?  Ms. Tavenner?

2          MS. TAVENNER:  Good morning, Your Honor.  Lynn

3  Tavenner of the law firm of Tavenner and Beran appearing on

4  behalf of the Official Committee of Unsecured Creditors.  Did

5  want to advise the Court that the Committee and its

6  professionals have been actively involved in the process

7  described today by Mr. Galardi and we support the relief

8  requested.

9          THE COURT:  Okay, thank you, Ms. Tavenner.  Mr.

10 Dybing, you wish to be heard?

11         MR. DYBING:  Yes, Your Honor.  Again, very briefly,

12 IBM's concern was that it did not know from the terms of the

13 motion whether its software was the subject of the motion and

14 the IP agreement.  And accordingly, to the extent that the

15 procedures bespoke an understanding as to what the software

16 would be, and IBM didn't know what that was, we had to object.

17         THE COURT:  Of course.

18         MR. DYBING:  And therefore, we made our objection

19 known.  We're confident that if we can, Mr. Galardi and Mr.

20 Belmonte, my co-counsel in New York can resolve the question of

21 whether IBM software is implicated, that should address IBM's

22 concerns.  But that was the rationale for filing the objection,

23 but Section 102(a) was not part of the document.

24         THE COURT:  I'm aware of that.  Now that the schedule

25 has been filed as of yesterday, the Court could approve these

1  bid procedures and IBM could look at the schedule, satisfy

2  itself that its license rights are not being transferred, and

3  if you are so satisfied then that would resolve your objection,

4  if you're not, then you can certainly raise your objection in

5  connection with the actual motion to approve the sale.

6              MR. DYBING:  The sale.  Understood, Judge.

7              THE COURT:  Okay.  So by overruling your objection

8  today, that does not, is not with prejudice in any way.   You'd

9  be able to raise your sale motion.

10             MR. DYBING:  Understood, that will be fine.

11             THE COURT:  All right.  Thank you, Mr. Dybing.

12             MR. DYBING:  Thank you, Judge.

13             THE COURT:  Any other party wish to be heard?  Mr.

14 Galardi, the Court has reviewed your motion and the proposed

15 procedures and the Court will grant the motion that you are

16 asking for today.  The relative amount of the breakup fee and

17 the expense reimbursement was not bothersome as far as the

18 Court was concerned.

19             MR. GALARDI:  Thank you, Your Honor.  And I neglected

20 to say, and again with the Committee's support, we are also,

21 just so Your Honor knows a little bit about the sale process

22 and to give Your Honor -- we will also be filing a motion of a

23 firm called Streambank who will also be supplementing the sale

24 process.  That's one of the things that we had agreed with the

25 Committee to help supplement and further beat the bushes with

1 the intellectual property.  And they've been involved in this

2 process a little bit with Rothschild as well.  So I did want to

3 let Your Honor know that there's also more marketing going on

4 between Rothschild and a specialty firm in this area that has

5 had bankruptcy experience as well.  So we think that the

6 process will not chill bidding and we're hopeful that we'll

7 have a lively auction.  But thank you, Your Honor.

8          THE COURT:  I certainly hope so.  Ms. Boehm, you've

9 got all the important work to do today.

10          MS. BOEHME:  Absolutely, Your Honor.  That's the only

11 reason why I showed up for work today.  Sarah Boehm from

12 McGuireWoods on behalf of the debtors.  I'm going to address

13 Items 35 through 42 on the agenda which relate to the debtors'

14 applications, first interim fee applications.

15          Pursuant to the interim compensation procedures order

16 that was entered earlier in the case, all of the professionals

17 have been submitting monthly fee statements to the debtors, and

18 provided there were no objections received, the debtors have

19 been paying 85 percent of fees and 100 percent of expenses.

20          On March 17th, all of the first interim fee

21 applications were filed for the period of November 10th through

22 January 31.  While no formal objections were filed, the U.S.

23 Trustee did contact several parties and raised some informal

24 objections, and as a result, four of the debtors' professionals

25 took voluntary reductions to resolve those objections.  And I

1  have a chart here for the Court that reflects the new fee

2  requests.  The total voluntary reductions between the four

3  professionals were approximately $56,000, and the proposed

4  orders that we will be submitting today will reflect the

5  numbers that are in that chart which reflect these voluntary

6  reductions.

7          In order to save costs for the estate, we did ask --

8  several of the professional who are just listening by phone, if

9  the Court has any specific questions, we can take a brief

10 recess or we can adjourn those.  Otherwise we would ask the

11 Court to enter the orders with the proposed figures in the

12 chart.

13         THE COURT:  What was the basis for the voluntary

14 reductions that were taken?

15         MS. BOEHM:  The issues that the U.S. Trustee raised?

16         THE COURT:  Yes.

17         MS. BOEHM:  Most of it related to travel time,

18 non-working travel time.  Some of the people had not discounted

19 that and the U.S. Trustee's office asked that that be

20 discounted 50 percent.  There were other ones where there were

21 multiple attendees at certain meetings or hearing and only

22 certain time keepers were permitted to bill for that.  That was

23 the vast majority of it, it was my understanding.

24         THE COURT:  All right, very good.  Let me hear from

25 the Office of the U.S. Trustee.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. VAN ARSDALE:  Robert Van Arsdale for the U.S.

2    Trustee.  Your Honor, upon the inspection of the fee

3    applications for McGuireWoods, for example, there were, there

4    did seem to be some meetings and attendances where there were a

5    few more people there then we thought were necessary.  They

6    agreed to a reduction of $10,000 in their fees.  And for Ernst

7    and Young, that was mostly based on, they had billed all their

8    travel at 100 percent rather than 50 percent.  We did get that

9    reduced.  On, let's see, FTI Consulting, there was an agreed

10   reduction of $20,000.  A lot of what we had there, again, was

11   the travel expense, but there were also a lot of internal

12   meetings that seemed to involve an awful lot of people, and

13   after going through that and making the points that we made

14   over the phone, we did come to an agreement of a $20,000

15   reduction for them.

16         THE COURT:  All right.  Thank you very much.  Does

17   any party wish to be heard in connection with the applications

18   for compensation of Skadden Arps, McGuireWoods, Kirkland and

19   Ellis, FTI Consulting, Rothschild, KPMG, Ernst and Young or DJM

20   Realty Services?  All right, Ms. Boehm, the Court has reviewed

21   the applications with the voluntary reductions, to the Court

22   will approve those applications.  So if you would submit orders

23   to that effect.

24         MS. BOEHME:  We'll submit those this afternoon.

25   Thank you, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1                THE COURT:  Thank you.

2                MS. TAVENNER:  Good morning again, Your Honor.  Lynn

3       Tavenner appearing on behalf of the Official Committee.  And

4       the remaining items on the docket are matters 43 through 46,

5       which are the first interim applications for the approved

6       professionals for the Committee in this case.  Specifically

7       being my law firm, Tavenner and Beran, the law firm of

8       Pachulski, Stang, Ziehl and Jones, the application of Jeffries

9       and Company, and the application of Protiviti Inc.  Your Honor,

10      no objections, official objections were received to any of the

11      applications, though we did receive an informal objection by

12      the Office of the U.S. Trustee to the application of Pachulski

13      Stang.

14               Mr. Feinstein is on the phone if you have additional

15      questions, but I can tell you generally that the questions

16      raised by the Committee -- by the U.S. Trustee, excuse me --

17      have resulted in a voluntary reduction by Mr. Feinstein's firm

18      in the amount of $52,601.78.  The large majority of those

19      reductions go to write off for reduction in travel time to half

20      time.  In addition there is a small amount that goes to a

21      deletion of a secretarial overtime charge and a business meal.

22               With that, Your Honor, the U.S. Trustee was satisfied

23      with not only the application of Mr. Feinstein's firm, but the

24      three additional applications.  Unless Your Honor has specific

25      questions with respect to any of those applications, we would

1  respectfully request that you enter orders approving the same.

2          THE COURT:  All right.  Thank you, Ms. Tavenner.  Let

3  me hear from the Office of the U.S. Trustee.

4          MR. VAN ARSDALE:  Robert Van Arsdale for the U.S.

5  Trustee.  Your Honor, also in this case the major part of the

6  writedown had to do with billing 100 percent of travel time

7  rather than 50 percent as had been discussed earlier in the

8  case.  We have no other problems with the bill that was

9  presented.  Once that is done and there was some rather large

10 meal that somebody had that we thought was a little out of the

11 norm, as we would say, we have had absolutely no problem in

12 working with any of the professionals and working through what

13 our objections were.  And in that regard this has been a fairly

14 easy case for us.

15         THE COURT:  All right, thank you.  Does any party

16 wish to be heard in connection with the applications for

17 approving compensation for Pachulski, Stang, Protiviti,

18 Jeffries and Company or Tavenner and Beran?  All right, Ms.

19 Tavenner, there being no objections to those applications, the

20 Court will approve the applications with the adjustments as

21 been represented to the Court today and ask you to submit

22 orders to that effect.

23         MS. TAVENNER:  Thank you, Your Honor.  We will do the

24 same.

25         THE COURT:  All right, thank you.

1          MR. FOLEY:  Your Honor, one clarification on Item

2   Number 5 on the agenda.  I misspoke earlier.  This is the

3   Cleveland Construction matter.  Your Honor has already entered

4   an order with respect that motion for relief from stay, and so

5   I didn't want Your Honor to be looking for an additional order

6   on that one.  Thank you, Your Honor.

7          THE COURT:  All right, very good.  Thank you.  Is

8   there any other business we need to take up this morning?

9          MR. FOLEY:  There is not, Your Honor.  Thank you.

10          THE COURT:  Thank you all.

11                        *  *  *  *  *

12                 **C E R T I F I C A T I O N**

13          I, RITA BERGEN, court approved transcriber, certify

14   that the foregoing is a correct transcript from the official

15   electronic sound recording of the proceedings in the above-

16   entitled matter, and to the best of my ability.

17

18   /s/ Rita Bergen                    DATE:  April 30, 2009

19   RITA BERGEN

20   J&J COURT TRANSCRIBERS, INC.

21

22

23

24

25

**J&J COURT TRANSCRIBERS, INC.**