450050001
4550

| Marlene Brisk/Corp/SSC/US | To | michelle.stewart@spgroup.com |
| 07/30/2008 10:33 AM | cc | |
| | bcc | |
| | Subject | Fw: Circuit City Loc 3196-Beavercreek OH |

please put this info. in MRI and in the file.

Marlene

_____

Marlene B. Brisk, Corporate Counsel
Schottenstein Property Group
1798 Frebis Ave.
Columbus, OH 43206
(614) 449-6875

Caution; This correspondence may contain certain confidential information that is protected by attorney-client or work-p
Should you receive this correspondence in error please notify the sender immediately.

----- Forwarded by Marlene Brisk/Corp/SSC/US on 07/30/2008 10:33 AM -----

| Chuck Seall/Corp/SSC/US | | |
| 07/30/2008 10:12 AM | To | Marlene Brisk/Corp/SSC/US@SSC |
| | cc | |
| | Subject | Fw: Circuit City Loc 3196-Beavercreek OH |

Just FYI

Charles M. Seall Jr.
Vice President, Property Management
Schottenstein Property Group
1798 Frebis Ave., Columbus, OH 43206
Phone: (614) 449-6853

PLEASE NOTE:

Our corporate name has changed to Schottenstein Property Group.
My email address will change to chuck.seall@spgroup.com effective September 5, 2007.
----- Forwarded by Chuck Seall/Corp/SSC/US on 07/30/2008 10:11 AM -----

| Monique_Scott@circuitcity.com | To | chuck.seall@spgroup.com |
| 07/29/2008 10:21 AM | cc | |
| | Subject | Circuit City Loc 3196-Beavercreek OH |

Hello Chuck,

I am contacting you to let you know that I am the current Property Administrator for the above property. Kori Overby has been gone from our company several years and Lynda Capehart has just recently left. Below is my contact information for your reference. Yesterday,  I received the tax bill that Marlene Brisk sent and this is being sent to our Tax Department now for processing.  Thank you.

Monique C. Scott, Property Administrator
Circuit City Stores, Inc.
9950 Mayland Drive-Attn: Property Management Dept.
DR I-4th Floor
Richmond, VA  23233
phone (804) 486-2019
FAX (804) 486-8162
email:  monique_scott@circuitcity.com
============================

The information contained in this message may be privileged, confidential and protected from disclosure. This message is intended only for the designated recipient(s). It is subject to access, review and disclosure by the sender's Email System Administrator. If you have received this message in error, please advise by return e-mail so that our address records can be corrected and please delete immediately without reading, copying or forwarding to others. Any unauthorized review, use, disclosure or distribution is prohibited.
Thank you.

MAR-26-2003  16:37                                                    614 449 0403    P.02

*Beavercreek*

## SUBORDINATION, NON-DISTURBANCE
## AND ATTORNMENT AGREEMENT

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT (this "**Agreement**") made as of the___day of_____, 1998, by and among Nomura Asset Capital **Corporation ("Lender")**, Circuit City Stores, Inc. **("Tenant")** and Shoppes of Beavercreek Ltd. ("**Landlord**").

### WITNESSETH:

WHEREAS, Lender has agreed to make a loan (the "Loan") of approximately $13,400,000.00 to Landlord;

WHEREAS, the Loan will be evidenced by a mortgage **and/or** deed of trust note (the "Note") of even date herewith made by Landlord to order of Lender and will be secured by, among other things, a mortgage **and/or** deed of **trust**, assignment of leases and rents and security agreement (the "**Mortgage/Deed of Trust**") of even date herewith made by Landlord to Lender covering the land (the "Land") described on Exhibit A attached hereto and **all** improvements (the "Improvements") now or hereafter located on the land (the Land and the Improvements hereinafter collectively referred to as the "**Property**"); and

WHEREAS, by a lease dated as of November 4, 1996 (which lease, as the same may have been amended and supplemented, is hereinafter called the "**Lease**"), Landlord leased to Tenant approximately 32,530 square feet of space located in the Improvements (the "**Premises**"); and

WHEREAS, the parties hereto desire to make the Lease subject and subordinate to the Mortgage/Deed of Trust.

[lien of the]

NOW, THEREFORE, the parties hereto, in consideration of the covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby agree as follows:

1.    The Lease, as the same may hereafter be modified, amended or extended, and all of Tenant's right, title and interest in and to the Premises and all rights, remedies and options of Tenant under the Lease, are and shall be unconditionally subject and subordinate to the [the lien of] Mortgage/Deed of Trust ~~and the lien thereof, to all the terms, conditions and provisions of the Mortgage/Deed of Trust~~, to each and every advance made or hereafter made under the Mortgage/Deed of Trust, and to all renewals, modifications, consolidations, replacements, substitutions and extensions of the Mortgage/Deed of Trust, so that at all times the Mortgage/Deed of Trust shall be and remain a lien on the Property prior and superior to the Lease for all purposes, provided, however, and Lender agrees, that so long as (A) no event has occurred and no condition exists [beyond any applicable cure period] which would entitle Landlord to terminate the Lease or would cause, without further action of Landlord, the termination of the Lease or would entitle Landlord to

which consent shall not be unreasonably conditioned, withheld or delayed,

dispossess Tenant from the Premises, (B) the term of the Lease has commenced and Tenant is in possession of the Premises, (C) the Lease shall be in full force and effect and shall not have been otherwise modified or supplemented in any way without Lender's prior written consent, (D) Tenant shall duly confirm its attornment to Lender or its successor or assign by written instrument as set forth in Paragraph 3 hereof, ~~(E) neither Lender nor its successors or assigns shall be liable under any warranty of construction contained in the Lease or any implied warranty of construction, and~~ (F) all representations and warranties made herein by Tenant shall be true and correct as of the date of such attornment; then, and in such event Tenant's leasehold estate under the Lease shall not be terminated, Tenant's possession of the Premises shall not be disturbed by Lender and Lender will accept the attornment of Tenant.

the same cure period provided Landlord under the Lease

2.    Notwithstanding anything to the contrary contained in the Lease, Tenant hereby agrees that in the event of any act, omission or default by Landlord or Landlord's agents, employees, contractors, licensees or invitees which would give Tenant the right, either immediately or after the lapse of a period of time, to terminate the Lease, or to claim a partial or total eviction, or to reduce the rent payable thereunder or credit or offset any amounts against future rents payable thereunder, Tenant will not exercise any such right (i) until it has given written notice of such act, omission or default to Lender by delivering notice of such act, omission or default, in accordance with Paragraph 8 hereof, and (ii) ~~until a period of not less than sixty (60) days~~ for remedying such act, omission or default shall have elapsed following the giving of such notice. ~~Notwithstanding the foregoing, in the case of any default of Landlord which cannot be cured within such sixty (60) day period,~~ If Lender shall within such period proceed promptly to cure the same ~~(including such time as may be necessary to acquire possession of the Premises if possession is necessary to effect such cure)~~ and thereafter shall prosecute the curing of such default with diligence, then the time within which such default may be cured by Lender shall be extended for such period as may be necessary to complete the curing of the same with diligence. Lender's cure of Landlord's default shall not be considered an assumption by Lender of Landlord's other obligations under the Lease. Unless Lender otherwise agrees in writing, Landlord shall remain solely liable to perform Landlord's obligations under the Lease (but only to the extent required by and subject to the limitation included with the Lease), both before and after Lender's exercise of any right or remedy under this Agreement. If Lender or any successor or assign becomes obligated to perform as Landlord under the Lease, such person or entity will be released from those obligations when such person or entity assigns, sells or otherwise transfers its interest in the Premises or the Property.

3.    Without limitation of any of the provisions of the Lease, in the event that Lender succeeds to the interest of Landlord or any successor to Landlord, then subject to the provisions of this Agreement including, without limitation, Paragraph 1 above, the Lease shall nevertheless continue in full force and effect and Tenant shall and does hereby agree to attorn to and accept Lender and to recognize Lender as its Landlord under the Lease for the then remaining balance of the term thereof, and upon request of Lender, Tenant shall execute and deliver to Lender an agreement of attornment reasonably satisfactory to Lender.

4.    If Lender succeeds to the interest of Landlord or any successor to Landlord, in no event shall Lender have any liability for any act or omission of any prior landlord

-2-

under the Lease which occurs prior to the date Lender succeeds to the rights of Landlord under the Lease, nor any liability for claims, offsets or defenses which Tenant might have had against Landlord. In no event shall Lender have any personal liability as successor to Landlord and Tenant shall look only to the estate and property of Lender in the Land and the Improvements for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money in the event of any default by Lender as Landlord under the Lease, and no other property or assets of Lender shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to the Lease.

5.      Tenant agrees that no prepayment of rent or additional rent due under the Lease of more than one month in advance, and no amendment, modification, surrender or cancellation of the Lease, and no waiver or consent by Landlord under the terms of the Lease, shall be binding upon or as against Lender, as holder of the Mortgage/Deed of Trust, and as Landlord under the Lease if it succeeds to that position, unless consented to in writing by Lender **which consent shall not be unreasonably conditioned, withheld or delayed**. In addition, and notwithstanding anything to the contrary set forth in this Agreement, Tenant agrees that Lender, as holder of the Mortgage/Deed of Trust, and as Landlord under the Lease if it succeeds to that position, shall in no event have any liability for the performance or completion of any initial work or installations or for any loan or contribution or rent concession towards initial work, which are required to be made by Landlord (A) under the Lease or under any related Lease documents or (B) for any space which may hereafter become part of said Premises, and any such requirement shall be inoperative in the event Lender succeeds to the position of Landlord prior to the completion or performance thereof. ~~Tenant further agrees with Lender that Tenant will not voluntarily subordinate the Lease to any lien or encumbrance without Lender's prior written consent.~~

6.      This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute and be construed as one and the same instrument.

7.      All remedies which Lender may have against Landlord provided herein, if any, are cumulative and shall be in addition to any and all other rights and remedies provided by law and by other agreements between Lender and Landlord or others. If any party consists of multiple individuals or entities, each of same shall be jointly and severally liable for the obligations of such party hereunder.

8.      All notices to be given under this Agreement shall be in writing and shall be deemed served upon receipt by the addressee if served personally or, if mailed, upon the first to occur of receipt or the refusal of delivery as shown on a return receipt, after deposit in the United States Postal Service certified mail, postage prepaid, addressed to the address of Landlord, Tenant or Lender appearing below, **or overnight express courier service** or, if sent by telegram, when delivered by or refused upon attempted delivery by the telegraph office. Such addresses may be changed by notice given in the same manner. If any party consists of multiple individuals or entities, then notice to any one of same shall be deemed notice to such party.

-3-

Lender's Address:

Nomura Asset Capital Corporation
Two World Financial Center, Building B
New York, New York 10281-1198

Attention: Ms. Sheryl McAfee

Tenant's Address:

Circuit City Stores, Inc.
9950 Mayland Drive
Richmond, Virginia 2____

Attention: ~~Bert Cunningham~~ Vice President-Real Estate
Attention: ~~Attorney-Bert Property Administrator~~ Corporate Secretary

Landlord's Address:

Shoppes of Beavercreek Ltd.
1800 Moler Road
Columbus, Ohio 43207

Attention:  Director of Real Estate

9.      This Agreement shall be interpreted and construed in accordance with and governed by the laws of the State of Ohio.

10.     This Agreement shall apply to, bind and inure to the benefit of the parties hereto and their respective successors and assigns. As used herein **"Lender"** shall include any subsequent holder of the Mortgage/Deed of Trust.

11.     Tenant acknowledges that Landlord has assigned to Lender its right, title and interest in the Lease and to the rents, issues and profits of the Property and the Property pursuant to the Mortgage/Deed of Trust, and that Landlord has been granted the license to collect such rents provided no Event of Default has occurred under, and as defined in, the Mortgage/Deed of Trust. Tenant agrees to pay all rents and other amounts due under the Lease directly to Lender upon receipt of written demand by Lender, and Landlord hereby consents thereto. The assignment of the Lease to Lender, or the collection of rents by Lender pursuant to such assignment, shall not obligate Lender to perform Landlord's obligations under the Lease.

12.     Lender hereby consents to the application of casualty and condemnation proceeds in accordance with Paragraphs 15 and 16 of the Lease whether or not the Mortgage/Deed of Trust is then foreclosed.

-4-

MAR-26-2003  16:39                                           614 449 0403    P.06

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

Signed and acknowledged in the presence of:   **LANDLORD:**

_See attached page_

Witness Name:_____

**SHOPPES OF BEAVERCREEK LTD.,**
an Ohio limited liability company

By:_____
Name:_____

Witness Name:_____

Its:_____

Address:  1800 Moler Road
         Columbus, Ohio  43207

**TENANT:**

Witness Name: _Maureen Bero_

**CIRCUIT CITY STORES, INC.,**
a Virginia corporation

Witness Name: _Karen Field_

By:_____
Name: Benjamin B. Cummings, Jr.
Its:    Vice President

Address: 9950 Mayland Drive
        Richmond, Virginia  23233

**LENDER:**

Witness Name:_____

**NOMURA ASSET CAPITAL
CORPORATION,** a Delaware corporation

Witness Name:_____

By:_____
Name:_____
Its:_____

Address: Real Estate Division
        311 South Wacker Drive, Suite 6100
        Chicago, Illinois 60606

-5-

MAR-26-2003  16:38                                    614 449 0403    P.07

See attached page

STATE OF _____ )
                              ) SS:
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this_____day of _____, 1998, by _____, the _____ of **Shoppes** of Beavercreek Ltd., an Ohio limited liability **company, on** behalf of said company.

_____
Notary Public


STATE OF Virginia      )
                       ) ss.
        Henrico        )
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this 10 day of ___March___, 1998, by  Benjamin B. Cummings, Jr. the Vice PResident of Circuit City Stores, Inc., a Virginia corporation, on behalf of said corporation.

_____
Notary Public  My Commission Expires February 28, 2001


STATE OF _____ )
                             ) ss.
COUNTY OF _____ J

The foregoing instrument was acknowledged before me this ___ day of _____, 1998, by                    the _____ of Nomura Asset Capital **Corporation,** a Delaware **corporation,** on behalf of said corporation.

_____
Notary Public


-6-

MAR-26-2003  16:38                                                614 445 2403    P.08

SHOPPES OF BEAVERCREEK LTD., an
Ohio limited liability company

By:  Shoppes of Beavercreek-II Ltd., an Ohio
     limited liability company, Its Manager

     By: Beavercreek Corporation, an Ohio
         corporation, Its Manager

         By: _____
             Benton E. Kraner, Vice President

Witness Name: _Terri Robinson_

Witness Name: _Pamula A. Lillie_

Address:  1800 Moler Road
          Columbus, Ohio 43207

STATE OF __Ohio__ )
                  ) ss.
COUNTY OF _Franklin_ )

     The foregoing instrument was acknowledged before me this 1st day of ~~March~~ April, 1998,
by Benton E. Kraner, Vice President of Beavercreek Corporation, an Ohio corporation and the
manager of Shoppes of Beavercreek-II Ltd., an Ohio limited liability company and the manager of
Shoppes of Beavercreek Ltd., an Ohio limited liability company, on behalf of such corporation, on
behalf of such company, on behalf of such company.

                                        _____
                                        Notary Public

PAMULA A. LILLIE
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES MARCH 16, 2002

05/18/98 - 8069046/01

MAR-26-2003  16:38                                              614 449 0403    P. 09

EXHIBIT "A-1"

SHOPPING CENTER

LEGAL DESCRIPTION

PARCEL I:

Situate in the City of Beavercreek, County of Greene, State of
Ohio, and in Section 35, Town 3, Range 7 and being more fully
described as follows;

Beginning at an iron pin being the southeast corner of Harold W.
Kooglers 8.99 acres and bearing North 5° 24' 44" East, 1334.49 feet
from a stone at the southeast corner of said Kooglers 149.401
acres;

thence North 82° 46' 06" West, 981.17 feet to a point in the west
line of North Fairfield Road;

thence North 5° 54' 12" East, .167.39 feet;

thence North 19° 01' 50" East, 103.08 feet;

thence North 10° 11' 19" East, 111.64 feet;

thence North 73° 22' 26" East, 180.98 feet to an iron pin;

thence South 72° 11' 34" East, 793.50 feet to an iron pin;

thence South 5° 24' 44" West, 307.50 feet to the place of beginning
and containing eight and fifty seven hundredths (8.57) acres of
real estate be it the same more or less.

VOL 1053 PG 869

1

(J:\013363\170\LEASE7.W51]
(September 25, 1996, Divita)

*PARCEL II:*

Situate in the City of Beavercreek, County of Greene, and State of Ohio and in Section 35, Town 3, Range 7 and being more fully described as follows:

Starting at the intersection of the centerline of New Germany-Trebein Road and North Fairfield Road; thence South 84° 21' 22" East, 902.40 feet along New Germany-Trebein Road to a point a corner to K.A. VanHoose .692 acre tract; thence South 5° 38' 38" West, 25.00 feet to an iron pin in the line of said .692 acres and a corner to JARD Enterprises 148.709 acres and in the south line of New Germany-Trebein Road and the true place of beginning for the following described tract;

thence South 5° 24' 44" West, 225.00 feet to an iron pin a corner to said .692 and 148.709 acre tracts;

thence South 84° 21' 22" East, 120.60 feet to an iron pin a corner to said .692 and 148.709 acre tracts;

thence South 5° 24' 44" West, 824.20 feet to an iron pin a corner to said 148.709 acres and Doris M. Koegler's 8.57 acres;

thence North 72° 11' 34" West, 793.50 feet to an iron pin a corner to said 143.709 and 8.57 acre tracts;

thence North 37° 06' 33" East, 767.94 feet to an iron pin;

thence North 5° 38' 33" East, 201.03 feet to an iron pin in the south line of said New Germany-Trebein Road;

thence South 85° 04' 20" East, 134.40 feet along said right of way line to a point;

thence North 53° 26' 29" East, 118.23 feet to the place of beginning and containing eleven and three hundred and eleven thousandths (11.311) acres of land be it the same more or less.

(J:\013363\170\LEASE7.WS1)
(September 26, 1996; DIvica)

MAR-26-2023  16:39                                                614 449 0403    P. 11

## ACKNOWLEDGMENT OF
## LANDLORD'S ASSIGNMENT OF LEASE

Subsequent to **Lender's** agreement to make the Loan and as a condition of the making of the Loan by Lender, Shoppes of Beavercreek Ltd. (**"Shoppes"**) assigned all of its right, title and interest as lessor under the **Lease** to Shoppes at Beavercreek **Ltd.**, an Ohio limited liability company in which Shoppes is a member. Therefore, all references in this **Subordination, Non-Disturbance and Attornment** Agreement to Landlord shall mean Shoppes at Beavercreek Ltd. as Landlord by virtue of such assignment of the Lease, as the maker of the Note and as mortgagor under the **Mortgage/Deed** of Trust. By executing this Acknowledgment, Shoppes confirms its assignment of the Lease to Shoppes at Beavercreek Ltd. and Shoppes at Beavercreek Ltd. agrees to be bound by all obligations of **"Landlord"** under the **Subordination,** Non-Disturbance and Attornment Agreement.

SHOPPES AT BEAVERCREEK LTD.,
an Ohio limited liability company

By:    Beavercreek **Corporation,**
Witness Name:_____    an Ohio **corporation,**
                                        Its Managing Member


**By:**_____
Witness Name:_____    **Benton** E. **Kraner,**
                                        Vice President


SHOPPES OF BEAVERCREEK LTD.,
an Ohio limited liability company

By its manager:
Witness Name:_____    **Jubilee-Beavercreek** SC, L.L.P.,
                                        a Delaware limited liability company

By:    Jubilee Limited Partnership,
Witness Name:_____    an Ohio limited partnership,
                                        Its Managing Member


04/10/98 - 8279572.01

MAR-26-2003  16:39                                                614 449 0403    P.12

## TENANT ESTOPPEL CERTIFICATE

**TO:**    CDC Mortgage Capital Inc. and its successors and assigns (collectively, the **Lender**)

**RE:**    Premises known as and located at   #3196, 2720 Towne Drive, Beavercreek, Ohio   (the **Building**)

The undersigned,   Circuit City Stores, Inc.   (Tenant), does hereby certify to the Lender as follows:

1.    Tenant is the tenant under that certain lease dated   November 4, 1996, between Tenant and Shoppes of Beavercreek, Ltd., as landlord (**Landlord**), as amended, modified or supplemented by ___, leasing a portion of the Building (the **Premises**) as more particularly described in the said lease. Said lease, as so amended, modified or supplemented, is hereinafter referred to as the **Lease**.

items listed on Exhibit "A" attached hereto

2.    The Lease is in full force and effect and, except as set forth above, has not been amended, modified or supplemented.

3.    The Lease represents the entire agreement between Tenant and Landlord with respect to the leasing and occupancy of the Premises, and there are no other agreements or representations of any kind between Landlord and Tenant with respect thereto. Without limiting the foregoing, Tenant does not have any rights of first refusal for additional space, options to increase or relocate its space or options to purchase the Premises or any interest therein. to the best of Tenant's knowledge,

4.    All obligations of Landlord to be performed or complied with by Landlord through the date hereof have been fully performed and complied with including, without limitation, any obligations of Landlord to prepare the Premises for Tenant's occupancy, and there exists no default or condition, state of facts or event that, with the passing of time or the giving of notice, or both, would constitute a default by Landlord in the performance of its obligations under the Lease.

5.    All obligations of Tenant to be performed or complied with by Tenant through the date hereof have been fully performed and complied with and there exists no default or condition, state of facts or event that, with the passing of time or the giving of notice, or both, would constitute a default by Tenant in the performance of its obligations under the Lease.

6.    The term of the Lease commenced on   July 29, 1997   , and shall expire on   January 31, 2018   , unless sooner terminated in accordance with the terms of the Lease. Tenant has no rights to extend the term of the Lease except as set forth below:
        4 ~ 5 years renewal terms:
                                                34,861.32
7.    The current rent under the Lease is $34,355.53 per month and has been paid for the period through   March 2000  . [The aggregate amount of percentage rent in the amount of $   N/A   has been paid for the twelve month period ending ___.] All additional [and/or percentage rent] and other charges have been paid for the current periods.

8.    There are no existing offsets or defenses by Tenant to the payment of rent and other charges payable by Tenant or otherwise to the enforcement by Landlord of the Lease.

Shoppes of Beavercreek
General Real Estate/VGF Duanno

MAR-26-2003  16:39                                                    614 449 0403      P.13

9. No security deposit or other security has been given to Landlord under the Lease except as follows: none _____

10. There is no remaining free rent period or any unexpired concession in or abatement of rent.

11. Tenant is in sole possession of the Premises and has not assigned, sublet, pledged, mortgaged, transferred or otherwise conveyed all or any portion of its interest in the Premises or the Lease.

12. There are no actions, whether voluntary or otherwise, pending against Tenant under the bankruptcy or insolvency laws of the United States or of any state or territory of the United States.

13. Tenant understands and acknowledges that this certificate is delivered to, and shall be relied on by, the Lender in connection with an extension of a loan financing the Landlord's interest in the Building and the land on which it stands (the **Mortgaged Property**).

14. Tenant agrees to promptly provide the Lender at its offices at 9 West 57th Street, New York, New York 10019, Attention: Barry Funt, with copies of any notices of default given by or received by Tenant with respect to the Lease and/or the Premises.

CIRCUIT CITY STORES, INC.

By: _____
Name:   BENJAMIN B. CUMMINGS, JR.
Title:        VICE PRESIDENT                    HS

Dated: ___March 9___, 2000

15. Tenant has not received the 1999 reconciliation or exercised its rights to request an audit for 1999 or any prior years as permitted under the Lease. Tenant reserves the right to request any audit(s), and receive any overpayments pursuant to the terms of the Lease.

Sawmill of Beavercreek
General Real Estate/VCF estoppel

EXHIBIT "A"

1. Letter from Schottenstein Management Company to Tenant dated
   April 2, 1998;

2. Letter from Tenant to The Shoppes of Beavercreek, LLC. dated
   November 25, 1997;

3. Letter from Tenant to Mr. Doug Randahl dated November 25. 1997;
   and

4. Letter from Schottenstein Management Company to Tenant dated
   September 23. 1997.

*Direct Line (804) 527-4000 X6965*
*Facsimile (804) 527-4186*

**VIA FEDERAL EXPRESS**                              June 16, 1997

Shoppes of Beavercreek, Ltd.
c/o Schottenstein Management Company
1800 Moler Road
Columbus, OH  43207

Reference:     Circuit City Store #3196
               Beavercreek, OH

Gentlemen:

Enclosed are items required by our mutual lease for collection of our tenant improvement
allowance on the above location.

Item (i) Certificate of Insurance

Item (ii) An executed Indemnification Agreement in the form of "Attachment 10."

Item (iii) An executed Bill of Sale

Item (iv) A Certificate of Occupancy

Item (v) As-Built Survey

Based on the actual square footage of 32,530, Circuit City Stores shall expect payment of the
tenant improvement allowance in full in the amount of $2,068,257.40 no later than July 16,
1997.  For your convenience I have enclosed wiring instructions.

Please feel free to contact me at (804) 527-4000 X6965 if you have any questions.

                                        Sincerely,

                                        *Maureen E. Bero*

                                        Maureen E. Bero
                                        Property Administrator

Enclosures

cc: Ron Russ

DRAFT DATED: 10/29/96

**LEASE**

between

CIRCUIT CITY STORES, INC.,

as Tenant

and

SHOPPES OF **BEAVERCREEK** LTD.,

as Landlord

dated November 4, 1996

THE SHOPPES *OF* **BEAVERCREEK** SHOPPING **CENTER**

[J:\013363\170\LEASE9.doc]
[November 22, 19%: DiVita]

TABLE OF CONTENTS

1.   Leased Property . . . . . . . . . . . . . . . . . . . . . . 1

2.   Construction of Building and Improvements . . . . . . 2

3.   Lease Term . . . . . . . . . . . . . . . . . . . . . . 3

4.   Rent . . . . . . . . . . . . . . . . . . . . . . . . . 4

5.   Development of Shopping Center by Landlord . . . . 6

6.   Easements . . . . . . . . . . . . . . . . . . . . . . 6

7.   Common Areas and Common A    y    e    . . . . . . . . 13

8.   Signs and Communications Equipment . . . . . . . . 18

9.   Taxes . . . . . . . . . . . . . . . . . . . . . . . . 20

10.  Maintenance, Repairs and Replacements . . . . . . 22

11.  Payment of Utility Bills . . . . . . . . . . . . . 24

12.  Alterations . . . . . . . . . . . . . . . . . . . . 24

13.  Mechanics' Liens . . . . . . . . . . . . . . . . . 25

14.  Insurance . . . . . . . . . . . . . . . . . . . . . 26

15.  Damages by Fire or Other Casualty . . . . . . . . 31

16.  Condemnation . . . . . . . . . . . . . . . . . . . 36

17.  Assignment and Subletting . . . . . . . . . . . . 39

18.  Use . . . . . . . . . . . . . . . . . . . . . . . . 39

19.  Warranties and Representations . . . . . . . . . . 41

20.  Estoppel Certificates. . . . . . . . . . . . . . . 50

21.  Subordination, Non-Disturbance and Attornment . . 51

22.  Change of Landlord . . . . . . . . . . . . . . . . 52

23.  Tenant's Financing . . . . . . . . . . . . . . . . 53

24.  Tenant's Property and Waiver of Landlord's Lien . 53

25.  Memorandum of Lease; Commencement Date Agreement . 54

[J:\013363\170\LEASE8.W51]
[October 1, 1996; DiVita]

26.  Expirati  of Term and Holding Over . . . . . . . . .  54

27.  "For Rent" Signs . . . . . . . . . . . . . . . .  55

28.  Force Majeure . . . . . . . . . . . . . . . .  56

29.  Events of Tenant's Default . . . . . . . . . . .  56

30.  L a n d l o r d ' s . . . . . . . . . . . . . .  57

31.  Events of Landlord's Default: Tt ' s Remedies . . . .  60

32.  Waiver . . . . . . . . . . . . . . . . . . . .  61

33.  Compliance with Applicable Laws . . . . . . . . . .  62

34.  Not ices . . . . . . . . . . . . . . . . . . .  62

35.  Brokers . . . . . . . . . . . . . . . . . . . .  63

36.  Miscellaneous . . . . . . . . . . . . . . . . .  64

37.  Effectiveness of Lease . . . . . . . . . . . . .  66

38.  Confidentiality . . . . . . . . . . . . . . . .  69

39.  Feasibility Review; Tenant's Right to Terminate . . . .  70

40.  Exculpation . . . . . . . . . . . . . . . . . .  70

[J:\013363\170\LEASE8.V51]
[October 1. 1996: DiVita]

## EXHIBITS

"A"          Site Plan
"A-1"        Shopping Center Legal Description
"B"          Index of Definitions
"C"          Construction Provisions
"D"          Removable Trade Fixtures
"E"          Sign Plans
"F"          Permitted Encumbrances
"G"          Subordination,   Non-Disturbance   and   Attornment
             Agreement
"H"          Memorandum of Lease
"I"          Commencement Date Agreement

[J:\013363\170\LEASE8.W51]
(October 1, 1996; DiVita)

Beavercreek, Ohio

## LEASE

This LEASE is made as of the 4TH day of November, 1996, by and between SHOPPES **OF** BEAVERCREEK LTD., an Ohio limited liability company, having an address at c/o Schottenstein Management Company, **1800** Moler Road, Columbus, Ohio 43207 **("Landlord"),** and CIRCUIT CITY **STORES,** INC., a Virginia corporation having an address at **9950 Mayland** Drive, Richmond, Virginia 23233 **("Tenant").**

W I T N E S S E T H :

That for and in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt, and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    **Leased Property.** Landlord demises and leases to Tenant and Tenant leases and takes from Landlord, commencing on Landlord's delivery of the **"Land"** (as defined below) to Tenant, all those certain **"Premises"** consisting of the **"Building"** and **"Other Improvements"** (both as defined in paragraph **2),** as and when same are constructed or renovated and that approximately 32,226 square foot parcel (the **"Land"),** on which the Building and Other Improvements are or will be located, as more particularly shown (approximately) outlined in red on **Exhibit "A"** hereto (the **"Site Plan"),** together with exclusive rights in the four (4) parking spaces labeled "Customer Pick-Up" adjacent to the south side of the Building as shown on the Site Plan, the exclusive rights in the six (6) parking spaces labeled **"Car** Stereo Parking" at the rear of the Building as shown on the Site Plan and with the **easements described** in paragraph 6 below, all located in the **"Shopping** Center" (herein so called), which **consists** of that certain real property with buildings and improvements constructed or to be constructed thereon, located at the intersection of North Fairfield Road and New Germany-Trebein Road, lying and being in the City of

Beavercreek (the **"City"**), County of Greene, State of Ohio (the
**"State"),** and more particularly shown on the Site Plan and
described by metes and bounds or platted lot legal description on
**Exhibit "A-1"** attached hereto and made a part hereof for all
purposes. All of the Shopping Center exclusive of the Premises is
"Landlord's Premises". The description of the Premises may be
adjusted in accordance with Tenant's final bid set of Plans and
Specifications as described in **Exhibit "C"** attached hereto,
provided however, the location and dimensions of the Building shall
not be substantially increased or changed and Tenant shall obtain
all necessary approval and permits for any such change to the
location and/or dimensions of the Building.

    2. **Construction of Building and Improvements.** Commencing
immediately upon **"delivery** of the Land" (as defined in the
Construction Provisions (herein so called) attached hereto as
**Exhibit "C"** and incorporated herein by reference for all purposes),
Tenant shall have the right and obligation to construct within the
Shopping Center a one-story retail building, containing
approximately 32,226 square feet of ground-floor gross leasable
area plus mezzanine, with provisions for customer pickup, delivery
and car stereo installation facilities, initially for use as a
Circuit City Superstore (the **"Building"),** together with loading
ramps, sidewalks, trash compactor, transformer pad and other such
appurtenances and improvements (collectively, the **"Other
Improvements"),** as more particularly set forth in the Construction
Provisions. The Building and Other Improvements are sometimes
collectively referred to herein as the **"Improvements".** The
Improvements shall be constructed substantially in accordance with
the "Plans and Specifications" enumerated on Attachment 9 to the
Construction Provisions, which Plans and Specifications have been
approved by Landlord. Except as otherwise provided herein, title
to the Improvements shall be deemed transferred to Landlord upon

[J:\013363\170\LEASE8.W51]
[October 1, 1996; DiVita]

full payment of the "Tenant Improvement **Allowance"** (as defined in the Construction Provisions).

3.  Lease **Term.**  The construction term (the "Construction **Term")** of this Lease shall commence on the date of Landlord's delivery of the Land to Tenant in accordance with, and in the condition specified in, the Construction Provisions, and shall end on the "Commencement **Date"** (as defined in paragraph 4 below).  The main term (the **"Main Term")** of the Lease shall commence on the Commencement Date and shall end on the last day of January following the twentieth (20th) anniversary of the Commencement Date.

In addition to the Main Term, so long as Tenant is not in default of any of the monetary obligations on Tenant's part to be performed under this Lease beyond any applicable grace or cure periods, Tenant shall have the option (each such right referred to herein as a "Renewal Option") to renew and extend the Lease for four (4) consecutive five (5) year periods (each such period referred to as an **"Option** Period" and collectively as the "Option Periods")  immediately following the Main Term,  at the rent specified below.  Tenant shall give Landlord written notice of its election to exercise any Renewal Option at least one hundred eighty (180) days prior to the expiration of the Main Term or any then: current Option Period, as applicable.  Upon the giving of notice of renewal and extension in accordance with the foregoing provisions, the **"Term"** (defined below) of this Lease shall thereupon be renewed and extended in accordance with such notice without further act by Landlord or Tenant.

The Construction Term, Main Term and Option Periods are, collectively, the **"Term".**  The term **"Lease Year"** shall mean each successive period of twelve (12) consecutive calendar months, commencing on the first day of each February during the Term, except that the first Lease Year shall commence on the Commencement

3

**Date** and shall end on the last day of January following the first anniversary of the Commencement Date.

4 . **Base Rent**. During the Construction Term, Tenant shall have no rental obligations nor shall Tenant be responsible for any "Real Estate Taxes" (as defined in paragraph 9) or "CAM Charges" (as defined in paragraph 7) or any similar costs, fees, rentals or expenses. Tenant agrees to pay base-rent ("Base Rent") for the Premises in the amounts and in the manner specified hereunder, commencing (subject to the provisions of paragraph 4 of the Construction Provisions) on the date which is the first to occur of (i) one hundred eighty (180) days after Landlord's delivery of the Land to Tenant in accordance with, and in the condition specified in the Construction Provisions (i.e. the commencement date of the Construction Term) and Tenant's receipt of all required City, County and State permits and approvals to construct the Improvements on the Premises, or (ii) the date Tenant first opens the Premises for business to the public; provided, however, in no event shall Tenant be obligated to pay Base Rent, Real Estate Taxes or CAM Charges until Landlord has paid to Tenant the Tenant Improvement Allowance (but Landlord may require Tenant to pay "Ground Rent" [as defined in paragraph 4(b) of the Construction Provisions]) and the "Opening Co-Tenancy" (as defined in paragraph 37(h)) has been satisfied (the "Commencement Date"). Tenant may, in its sole and absolute discretion, open its store prior to satisfaction of the opening Co-Tenancy, provided however, notwithstanding the fact Tenant has opened its store for business, the Commencement Date shall not occur and Tenant shall not be required to pay Base Rent, Real Estate Charges or CAR Charges until such time as the Opening Co-Tenancy is satisfied.

Tenant shall pay Base Rent to Landlord without deduction or setoff (except as specifically provided herein) in equal monthly installments, in advance on the first day of each succeeding calendar month throughout the Term, with appropriate proration for

4

any partial calendar month or Lease Year, to the address given for Landlord in paragraph 34 hereof, unless Landlord shall give Tenant written notice of a change of address or of the party to whom such rents shall be payable along with written documentation reasonably satisfactory to Tenant of such party's right to receive payment hereunder.   Unless adjusted as provided in paragraph 3 of the Construction Provisions, Base Rent shall be paid pursuant to the following schedule:

(i) <u>First Five Years</u>. During the first five (5) Lease Years, Tenant shall pay annual Base Rent in the amount of Four Hundred Fourteen Thousand Four Hundred Twenty Six and **36/100** Dollars **($414,426.36)**, payable in equal monthly installments of Thirty Four Thousand Five Hundred Thirty Five and **53/100** Dollars **($34,535.53)**.

(ii) **Reduction in Base Rent.**  Notwithstanding **the** Base Rent provisions, in the event that the ground-floor gross leasable area of the Building when constructed does not equal 32,226 square feet, annual Base Rent during the first five (5) Lease Years shall be the product of the actual ground-floor gross leasable area of the Building (as shown in the Plans and Specifications), multiplied **by $12.86.**   In determining the aforesaid ground-floor gross leasable area, measurements shall be made in accordance with the specifications set forth in paragraph 7(c) below.   If any Lease Year is other than twelve (12) months in length, annual Base Rent during such Lease Year shall be the product of the applicable monthly Base Rent times the number of months in such Lease Year, with appropriate proration for any partial calendar month therein.

(iii) **Increases in Base Rent.** Annual Base Rent shall increase on the first day of the sixth and every succeeding fifth Lease Year, over the initial Base Rent charged hereunder by the lesser of ten percent (10%) or two (2) times the percentage increase in the **"CPI-U"** (as defined below) during the five (5) year period ending on October 31 of the fifth (or, as applicable, any succeeding fifth) Lease Year.   As used herein, the **"CPI-U"** shall be

5

the United States Department of Labor, Bureau of Labor Statistics Consumer Price Index for All Urban Consumers, U.S. City Average. If at any time during the Term the CPI-U shall be discontinued, Landlord and Tenant shall mutually and reasonably agree to substitute an existing official index published by the Bureau of Labor Statistics or its successor or another similar index most nearly equivalent to the CPI-U.

5. <u>Development of Shopping Center by Landlord</u>. Landlord covenants to construct and develop a first-class shopping center. The location of buildings and other tenant space therein will only be within the "Permissible Building Areas" designated on the Site Plan as building footprints, and the parking ratio for the Shopping Center shall be at least as shown thereon, but in no event shall said ratio be less than the greater of: (i) the number of parking spaces (for full-sized automobiles) shown on the Site Plan, or (ii) that required by applicable zoning requirements. All such parking shall be at ground level. Landlord shall construct or cause such improvements to be constructed in a good and workmanlike manner, lien-free in accordance with paragraph 13 below, and Landlord hereby agrees to indemnify, defend and hold Tenant harmless from any loss or damage suffered by Tenant as a result of Landlord's construction. Landlord shall not permit construction traffic over the Premises, and Landlord's construction shall not interfere with the conduct of Tenant's business. Landlord shall keep and maintain or cause the improvements and the "Common Areas" (as defined in paragraph 7(a) below) in the Shopping Center to be kept and maintained in good condition and repair and shall not operate, or permit to be operated, in the Shopping Center any activity which constitutes a nuisance, overburdens the available utilities, or violates any of the "Site Covenants" contained in subparagraph 19(a)(ix) or the prohibited activities set forth in subparagraph 19(a)(viii).

[J:\013363\170\LEASE8.V51]
[October 1, 1996; DiVita]

6 . **Easements.** In addition to and simultaneously with the lease **of** the Premises, Landlord grants to Tenant **certain** nonexclusive leasehold easements over or upon certain areas of Landlord's Premises, as set forth below, which easements shall run as covenants with Landlord's **Premises** and the Premises during the Term and shall expire or terminate simultaneously with this Lease, except as provided below.

(a) C o n s t r u c t i o n · During the period commencing on delivery of the Land by Landlord to Tenant and ending on the date which the earlier of **(x)** one year after delivery of the Land by landlord to Tenant, or (y) expiration of the Construction Term, Landlord grants to Tenant a nonexclusive easement across a mutually agreeable designated route, providing access to and from the public roadways nearest to the Land, over the Common Areas for the purpose of construction access to the Premises. In addition, Landlord grants to Tenant an exclusive easement for a construction staging area (the **"Staging Area"**) in a that portion of the Common Areas shown and designated **therefor** on the Site Plan. During any period of renovation or reconstruction of the Premises, Landlord grants to Tenant, for a period not exceeding one hundred twenty (120) days, an exclusive easement for use of a construction Staging Area not exceeding 20,000 square feet in the Common Areas at a mutually and reasonably agreeable location within a reasonable distance of the Premises. Tenant shall use reasonable efforts to prevent its use of the Staging Area(s) from interfering with the business operations of other tenants in the Shopping Center. Tenant shall indemnify and hold Landlord harmless from and against any claims, liabilities, costs or injuries arising out of Tenant's use of the Staging Area (unless due to the negligence of Landlord or another tenant).

(b) **Footing and Foundation Easements.** Landlord grants to Tenant, and Tenant grants to Landlord, easements and rights in Landlord's Premises and the Premises, as appropriate (i) for the construction and maintenance of foundations, footings, supports and

7

demising walls; (ii) to allow their respective buildings to abut and connect and with respect to the **"Party Wall"** and "Shared Footings" (as such terms are defined below) to bear structurally upon each other; (iii) for roof projections, allowing the grantee to tie its building into the adjoining building by flashing and reglets; and (iv) for encroachments which reasonably occur in the construction of the building components set forth in subparagraphs (i) through (iii) above. No such attachment or connection shall be made, however, unless detailed plans **therefor** shall have been timely submitted to and approved by the party to whose building the attachment is to be made, which approval shall not be unreasonably withheld. The grantee shall indemnify and hold the grantor harmless from and against all damages, liabilities, costs or injuries arising from grantee's construction of such attachment or connection.

Landlord and Tenant acknowledge and agree that the northern wall of the Building and the southern-most wall of the adjacent premises (the "Adjacent Premises") shall be a party wall ("the Party **Wall")** and the Adjacent Premises and the Building shall share a common foundation and footings (collectively, "Shared Footings"). Tenant shall construct the Party Wall and the Shared Footings simultaneously with the construction of the Building. Tenant shall construct the Party Wall and Shared Footings as shown on the Plans and Specifications and in accordance with the following:

(A) Tenant hereby grants Landlord an easement for the Term in and across the Party Wall and the Shared Footings for the construction of the Adjacent Premises.

(B) Landlord shall, at its sole cost and expense, be allowed to make such additions and improvements to the Party Wall and/or Shared Footings as are 'necessary to **construct** the Adjacent Premises, including, without limitation, installing column footings, columns, joists, crossbeams, studs and other structural components, pipes, conduit and the like; provided, however, that (i) **such** additions and improvements shall not damage **or** impair the

8

structural integrity of the Party Wall, the Shared Footings or the Building; (ii) no joists, crossbeams, studs or other structural components used in the construction of the Adjacent Premises **will** penetrate farther than the lesser of six inches **(6")** or halfway through the Party Wall; and (iii) Tenant shall have approved detailed plans and specifications therefor, such approval not to be unreasonably withheld. Landlord shall be responsible for constructing any attachments, flashings and the like **in** order to give the Building and the Adjacent Premises the appearance of one building structure, which attachments and the like shall be made pursuant to detailed plans and specifications approved by Tenant.

**(C)** Neither Tenant nor Landlord shall make or provide any openings in the Party Wall or alterations to the Shared Footings of any nature (except in accordance with **"(B)"** above) whatsoever without the prior written consent of the other party, which consent **may** be withheld in such party's sole and absolute discretion.

(D) Tenant grants to Landlord from time to time prior to substantial completion of construction of the Building, an easement during normal business hours (except in the event of an emergency), subject to the requirements of clause **"(H)"** below, to enter upon the Premises to the extent necessary to exercise Landlord's rights with respect to the Adjacent Premises (including, without limitation, to construct the Adjacent Premises). Landlord shall provide at least ten (10) days advance notice to Tenant prior to exercising such right, except in the event of an emergency.

**(E)** All costs, expenses and fees relating to the construction of the Party Wall and Shared Footings shall be borne equally by Landlord and Tenant. Tenant, at any time after substantial completion of construction of the Party Wall and Shared Footings, shall submit to Landlord a statement, in reasonable detail, of the costs and expenses paid for design and construction of the Party Wall and Shared Footings, together with copies of invoices or receipts therefor. Landlord shall, within thirty (30)

[J:\013363\170\LEASE8.W51]
[October 1, 1996: DiVita]

days after receipt of said statement, reimburse Tenant fifty percent (50%) of the costs and expenses incurred by Tenant in connection with design and construction of the Party Wall and Shared Footings. Failing such reimbursement, Tenant may deduct said sums from any Fixed Rent and/or Additional Rent due or thereafter becoming due to Landlord under this Lease.

(F) All additions and improvements to the interior portion of the Party Wall shall be the property of the party, owner or occupant making such additions or improvements.

(G) The Party Wall (including any utility or electrical lines located therein but excluding any studs and wall board attached to studs within the Adjacent Premises) and the Shared Footings, when constructed, shall constitute part of the Premises, and Tenant, at Tenant's sole cost and expense, shall insure the Party Wall in the manner and the amounts set forth in paragraph 14 below, subject to Tenant's right to self-insure as provided in paragraph 14(d) below. Anything contained in this Lease to the contrary notwithstanding, Tenant shall have no obligation to insure the Shared Footings or any non-structural additions, improvements or attachments made to the Party Wall by Landlord or the occupant of the Adjacent Premises (including, without limitation, any wall paper, painting, paneling or other wall covering, or any fixture, equipment or personal property attached to the portion of the Party Wall facing into the Adjacent Premises) or any structural changes made to the Party Wall by Landlord or the occupant of the Adjacent Premises (including without limitation, the addition or alteration of joists, crossbeams, studs and other structural components, pipes, conduits or the like) (the foregoing items which Tenant is not obligated to insure are collectively referred to as the "Adjacent Premises Items").

(H) After the opening of either Tenant's store or the Adjacent Premises for business to the public, the party performing any and all construction, maintenance or repair on or to the Adjacent Premises, the Building, the Party Wall and/or the Shared

[J:\013363\170\LEASE8.W51]
[October 1, 1996; DiVita]

Footings, shall take all reasonable steps necessary to minimize any interference with and disruption to the operations of the other's business.

(I)   In the event all or a portion of the Building or the Adjacent Premises is damaged or destroyed by fire or other casualty, and if the repair, restoration or rebuilding of the Building or Adjacent Premises requires alteration of or modification to the Party Wall or the Shared Footings, or any other property owned by the other party, the constructing party shall submit to the other party plans and specifications for such alteration or modification and such plans and specification shall be subject to the other party's prior written approval, as the case may be, which approval is not to be unreasonably withheld or delayed.   In the event the Party Wall and/or the Shared Footings are destroyed in whole or in part by fire or other casualty and Tenant is required, or elects, to reconstruct the Building pursuant to paragraph 15 **below**, the Party Wall shall be restored by Tenant and the Shared Footings shall be restored by Landlord, and the restored wall and footings and foundation shall be deemed to be the Party Wall and the Shared Footings, as applicable, and all terms and conditions set forth in this paragraph 6(b), including all easements granted herein, shall remain in full force and effect and shall be applicable to such restored Party Wall and/or Shared Footings.   Anything contained in this Lease to the contrary notwithstanding, Tenant shall not be obligated to reconstruct any of the Adjacent Premises Items, and if any portion of the restoration cost of the Party Wall is not covered by the insurance that Tenant is obligated to maintain under this Lease, then Landlord shall reimburse Tenant for one-half of the costs and expenses incurred by Tenant in restoring the Party Wall.   In the event of a conflict between the provisions of this clause **"(I)"** and paragraph 15 below regarding the parties' respective rights and obligations respecting the restoration of the Party Wall and the

11

Shared Footings in the event **of** a fire or other casualty, the provisions of this clause **"(I)"** shall control.

**(c)** **Utility Easements.**   During the Term, upon prior reasonable request of Tenant (following the initial "Landlord **Work"** as set forth in the Construction Provisions), Landlord agrees to use its best efforts to obtain such underground, public or private utility easements as Tenant deems necessary, without unreasonably interfering with the use by Landlord of the Common Areas, for the benefit of the Premises.  For the purpose of exercising the rights granted in this subparagraph 6(c), Tenant and/or the utility provider shall have **the right** to enter upon and use the Common Areas to install the utility systems, to such extent and so long as reasonably necessary to accomplish such purpose, subject to restoration of the Common Areas following such installation and any other reasonable conditions and requirements imposed by Landlord. Tenant shall take reasonable steps to prevent its use of the utility easements from interfering with or reducing access to and/or visibility of the other tenants' stores in the Shopping Center.  Tenant shall indemnify and hold Landlord harmless from and against any claims, liabilities, costs or injuries arising out of Tenant's use of the utility easements (unless due to the negligence of Landlord).

**(d)** C o m m o n - During the Term, Landlord grants to Tenant, for the benefit of the Premises, the nonexclusive right, privilege and easement (the "Common Area Easement") to use the Common Areas for their intended purposes and to permit Tenant and its employees, agents, subtenants, assignees, licensees, suppliers, customers and invitees to use the same, in common with Landlord, its successors, assigns, employees, agents, lessees, licensees, suppliers, customers and invitees and all other persons claiming by or through them, for the purposes (without limitation) of **parking and** pedestrian, service and vehicular access, ingress and egress to, from and between the Premises and the Landlord's Premises and the streets and highways abutting and adjacent to the

[J:\013363\170\LEASEB.v51]
[October 1, 1996: DiVita]

Shopping Center, in accordance with the Site **Covenants**, without payment of any fee or other charge therefor.  It is specifically agreed, that with respect to the parking spaces designated on the Site Plan as Tenant's "Customer Pick-Up", Tenant shall have the right, subject to governmental approval, notwithstanding the fact the same are in, and constitute a part of, the **"Common Areas"**, **to** restrict the use of such parking spaces for the exclusive use of Tenant's customers, invitees and patrons.

(e)  Non-Dedication.  None of the easements granted by the parties to this Lease is intended, nor shall any of them be construed, as a dedication of any portion of the Shopping Center for public use, and the parties **will refrain** from taking any action which would cause such a dedication and will take whatever steps may be necessary to avoid any such dedication, except as may be agreed upon in writing by the parties hereto or their respective successors or assigns.  However, if **"Towne Drive"** (defined in paragraph 7(a) below) is required to be dedicated to the City of Beavercreek for public use, then the Landlord shall cause Towne Drive to be dedicated for public use and accepted by the appropriate governmental body **on** or before thirty (30) days prior to the opening of Tenant's store (if such dedication is necessary for Tenant to obtain a certificate of occupancy and/or open the Premises for business to the public), or at such other time as the governmental body shall require provided that Tenant's use and operation of the Premises is not affected in any way by such dedication.

7.  **Common Areas and Common** Area **Maintenance**.

(a) Definition of **Common Areas**.  The term "Common **Areas"** shall be defined to include the parking areas, lanes, drives, entrances, truck passageways, sidewalks, ramps, stairways, landscaped and other unpaved areas, parking lot lighting facilities and equipment, Landlord's pylon sign(s), directional, traffic and monument sign structure(s) and shared utility facilities located in

13

the Shopping Center (including any such areas and facilities contained within outparcels and adjacent tracts but reserved to the benefit of the Shopping Center occupants) and intended and available for the common *use* of all of the tenants within **the** Shopping Center (including any outparcel and other adjacent occupants which contribute toward **"CAM** Charges" (as defined below) and which are not responsible for separate maintenance of such outparcels or tracts), their subtenants, licensees, and business invitees. Anything contained herein to the contrary notwithstanding, until such time as the road identified as Towne Drive on the Site Plan **("Towne** Drive") is dedicated for public use and accepted by the City of Beavercreek, Towne Drive shall be deemed, for all purposes, to be part of the Common Areas. Landlord shall be responsible for operating, maintaining and repairing the Common Areas in a first-class manner, including, but not limited **to,** cleaning, maintenance of Landlord's pylon and other sign structure(s), snow removal and ice treatment, removal of Common Area trash and garbage, lighting, repairing, repaving and restriping the parking area, and maintaining, replanting and replacing landscaping, all such work to be referred to collectively as **"Common** Area Maintenance".

**(b)** **CAM Charges.** For the purpose of this paragraph 7, the cost of common Area Maintenance (the "CAM Charges") shall include (i) Landlord's reasonable and proper direct costs 'and expenses of operating and maintaining the Common Areas in a first class manner consistent with other similar shopping centers *in* the Dayton, Ohio metropolitan area, and (ii) Landlord's overhead expenses for administering same (or in lieu thereof a management fee) in an amount not to exceed five percent (5%) of the total of such costs (specifically excluding from such total the amounts paid by Landlord and Tenant for insurance, capital expenditures, Real Estate Taxes and utilities serving the Common Areas). Notwithstanding the foregoing, the following shall not be included in the CAM Charges:

14

(1) real estate taxes paid, and maintenance performed, on separately assessed and/or maintained outparcels or other adjacent tracts not reserved to the benefit of the Shopping Center occupants;

(2) any dues or charges for a merchants' or other association of the tenants in the Shopping Center;

(3) maintenance, repairs or replacements to the Common Areas (but no other portions of the Shopping Center), necessitated by the negligent or wrongful act of the Landlord or made to correct any construction, defect or condition, to any interior mall space or to any buildings (including exterior walls thereof) or utility systems not part of the Common Areas;

(4) repairs or replacements necessitated by any governmental entity or by the negligence or the wrongful action of Landlord (including failure to construct any portion of the Shopping Center in accordance with plans or specifications therefor) or any other tenant or made to correct any initial construction defect or condition in existence prior to the Commencement Date of this Lease or to correct damage caused by subsidence or adverse or substandard soil conditions;

(5) amounts paid to entities related to Landlord in excess of the cost of such services from any competitive source;

(6) amounts reimbursable from insurance proceeds, under warranty or by Tenant, any other tenant in the Shopping Center or any other third party other than pursuant to a Common Area expense provision similar to this paragraph 7;

(7) premiums for Common Area liability insurance for coverage in excess of the limits established in paragraph 14(e) below;

[J:\013363\170\LEASE8.W51]
[October 1, 1996: DiVita]

(8) repairs or replacements of a capital nature (whether or not capitalized);

(9) improvements, repairs or replacements (other than patching and similar minor periodic maintenance) to the parking lot or other paved areas during the first ten (10) "CAM Years" (as defined below);

(10) reserves for anticipated future expenses;

(11) interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner;

(12) Landlord's personnel, overhead, home office or administrative expenses except as set forth in subparagraph (b)(ii) above;

(13) amounts incurred to remediate any Hazardous Substances (as defined in the Construction Provisions, so long as same are not introduced by Tenant); or

(14) other maintenance expenses not considered normal and customary under generally accepted accounting principles or shopping center industry standards. CAM Charges shall be obtained at competitive rates pursuant to a proposed common Area maintenance budget delivered to Tenant on or before the end of each CAM Year.

(c) **Tenant Payments.** Commencing on the Commencement Date and continuing until the expiration of the first Lease Year, Tenant shall pay to Landlord a fee (which shall not exceed $1.00 per square foot of ground-floor gross leasable area in the Building per annum), payable in equal monthly installments, as its share of CAM Charges. Thereafter, the annual charge shall be computed on the basis of periods of twelve (12) consecutive calendar months, as designated by Landlord (each such period is a "CAM Year"), and shall be paid by Tenant in equal monthly installments, in advance, on the first day of each month during such CAM Year. In no event shall such CAM Charges exceed by more than three percent (3%) those in effect during the preceding CAM Year. For any period within the

[J:\013363\170\LEASE8.v51]
[October 1, 1996: DiVita]

Term which is less than a full CAR Year, the annual charge shall be appropriately prorated. Within ninety (90) days after the end of the first CAR Year and each CAM Year thereafter, Landlord **will** furnish to Tenant a statement showing in detail (with such substantiating documentation as Tenant may reasonably request) the amount of the **CAM** Charges for the preceding CAR Year and the **then-** current number of square feet of ground-floor gross leasable area in the Shopping Center. Any necessary adjustment with respect to amounts owed by either party for such preceding CAM Year shall thereupon be made; and the monthly payments to be made by Tenant for the ensuing year shall be estimated according to the Common Area maintenance budget prepared by Landlord and delivered to Tenant. Subject to adjustments as herein contemplated, Tenant's share (such fraction being referred to herein as "Tenant's Pro Rata Share") of CAM Charges after the first CAM Year shall always be the product of the CAM Charges multiplied by a fraction, the numerator of which is the number of square feet of the ground-floor gross leasable area in the Building and the denominator of which is the number of square feet of the ground-floor gross leasable area (including the area of any outside sales area exclusive to a single occupant) in the Shopping Center. In determining the ground-floor gross leasable area of any building in the Shopping Center (including the Building), measurement shall be made from the centerline of any common walls and from the outside of any exterior walls. The gross leasable area of any outside sales area of a long term or permanent nature shall be measured from the outside of the exterior wall of any adjacent building to the actual exterior perimeters of such outside sales area, including any aisles, fences or walls included therein. Changes in applicable floor areas shall result in corresponding adjustments of Tenant's Pro Rata Share, but in no event shall the denominator of the fraction by which Tenant's Pro Rata Share is determined be less than the total gross leasable area of the Shopping Center. The remainder of CAM Charges shall be borne by Landlord and/or other tenants.

17

(d) **Examination of Landlord's Records**.  Tenant shall have the right, from time to time, but not more often than once as to any CAM Year and no later than two (2) years after the end of such CAM Year, to examine and make copies of the records pertaining to **CAM** Charges for such CAM Year.  Tenant's right of examination shall be exercised, on at least five (5) days prior notice, during reasonable business hours at Landlord's principal records office on reasonable prior notice to Landlord... If such examination shall disclose any overcharge by Landlord, Landlord shall promptly reimburse Tenant for any overpayment Of Tenant's Pro Rata Share of CAM Charges; and if such overpayment by Tenant is in excess of five percent (5%) of the actual Tenant's **Pro** Rata Share of CAM Charges, Landlord shall reimburse Tenant for the reasonable cost of such examination or audit.  Tenant shall promptly reimburse Landlord **for** any underpayment disclosed by such examination.

8.  **Signs and Communications Equipment**.

(a) **Signs**.  Landlord, at its sole cost and expense, no later than the date set forth on Attachment"5" to the Construction Provisions, shall construct and install upon the Common Areas at the location so shown on the Site Plan, at least one (1) pylon sign structure (with electrical wired boxes installed) having sufficient space thereon in the position(s) shown and depicted on **Exhibit "E"**. for inclusion of double-sided "face panels" identifying Tenant's store, which face panels shall be constructed and installed at Tenant's sole cost and expense.  In addition, subject to receipt of governmental permits and approvals therefor, Landlord, at its sole cost and expense, no later than the date set forth on Attachment **"5"** to the Construction Provisions, shall **construct** and install upon the Common Areas at the location so shown on the Site Plan, a monument sign structure (with electrical wired boxes installed) having sufficient space thereon in the position(s) shown and depicted on **Exhibit "E"**. for inclusion of double-sided **"face** panels" identifying Tenant's store, which face panels shall be constructed

[J:\013363\170\LEASEB.V51]
[October 1, 1996; DiVita]

and installed at Tenant's sole cost and expense. Landlord shall submit to Tenant plans and specifications for such pylon and monument signs (including colors, design, dimensions, type of lighting and position of tenant panels) prior to construction and installation thereof for Tenant's written approval, which shall not be unreasonably withheld or delayed.   Attached as a portion of Exhibit "E" are plans and specifications for Tenant's current prototypical building signage, which Landlord hereby approves upon its execution of this Lease.. Notwithstanding the foregoing, Tenant shall be entitled without Landlord's consent, but subject to governmental requirements, as aforesaid, to install upon the pylon and monument signs Tenant's prototypical face panels, and to replace any and all of its building, pylon and monument signs with signage consistent with Tenant's then-current prototypical sign plans, provided same is consistent with the architectural theme of the Shopping Center.   In the event of an assignment or subletting as a result of which Tenant is no longer occupying any portion of the Premises, Tenant's signs may be replaced by signs identifying the appropriate assignee or subtenant, provided that the specific design of such signage shall be subject to Landlord's consent, which consent shall not be unreasonably withheld, conditioned or delayed.

(b)  Communications Equipment.  Subject to governmental regulations, Tenant may, from time to time, install, maintain and/or replace any satellite dishes or antennas on the roof (within the parapet)  of the Building as Tenant deems necessary or desirable, provided same shall (i) not adversely and materially affect the roof or the structural elements thereof, (ii) be screened from view from the parking lot and (iii) not exceed six (6) feet in height.  Notwithstanding the foregoing, Landlord shall have the right to approve the method of installation of Tenant's communication equipment, which approval shall not be unreasonably withheld, delayed or conditioned.  Upon removal by Tenant of any satellite dishes or antennas, Tenant shall repair any damage done

[J:\013363\170\LEASE8.W51]
(October 1, 1996; DiVita)

in connection with such removal. Tenant shall indemnify and hold Landlord harmless from and against any damage, claim, loss or liability resulting from Tenant's installation of such communication equipment (unless due to Landlord's negligence).

9 .   **Taxes.**

(a) T   a   x   e   s. The term **"Real** Estate Taxes" shall **mean** all general real **estate** taxes and assessments and other ad **valorem** taxes, rates and **levies** paid upon or with respect to the Shopping Center, including the Premises, for a calendar year or a portion thereof to any governmental agency or authority and all charges specifically imposed in lieu of any such taxes. Nothing contained in this Lease shall require Tenant to pay any local, county, municipal, state or federal income, franchise, corporate, estate, inheritance, succession, capital levy, business or transfer tax of Landlord, or any local, county, municipal, state or federal income, profits, gross receipts, sales or renewal tax or charge upon the rent or other charges payable **by** Tenant under this Lease.

(b) **Payment** of **Real Estate Taxes.** At such intervals as Landlord is required to pay the Real Estate Taxes, Tenant shall pay Tenant's Pro Rata Share of Real Estate Taxes (calculated in the same manner as Tenant's Pro Rata Share of CAM Charges in paragraph 7(c)) levied against the tax parcel or parcels comprising the Shopping Center (the **"Tax** Parcel"). Tenant's Pro Rata Share of Real Estate Taxes shall be net of any early-payment discounts available at the time Tenant's payment is due. Tenant shall **pay** Tenant's Pro Rata Share of Real Estate Taxes within thirty (30) days after Tenant's receipt of Landlord's statement therefor, accompanied by the tax bill on the basis of which such statement is rendered. Landlord shall pay, or cause the payment of, all Real Estate Taxes before any fine, penalty, interest or cost may be added thereto, become due or be imposed by operation of law for the nonpayment or late payment thereof. In no event shall Tenant be liable for any

20

discount forfeited or penalty incurred as a result of late **payment** by another tenant or by Landlord.  Real Estate Taxes shall be prorated as of the Commencement Date and the expiration or earlier termination of this Lease, and Landlord shall promptly return to Tenant any overpayment made by Tenant not attributable to the period of Tenant's possession of the Premises.  Landlord shall remain primarily responsible for such payment notwithstanding the fact that such payment may be **made by** a tenant of Landlord's Premises or other third party pursuant to an agreement to which Tenant is not a party.  In addition, should Landlord fail to pay such Real Estate Taxes before same become delinquent, Tenant shall have the right, at its election, to cure such failure by payment of delinquent Real Estate Taxes and any interest and penalties due thereon and in such event Tenant may deduct the cost thereof, plus interest at the lesser of (i) the per annum rate of two percent (2%) in excess of the then-current rate announced by Citibank, **N.A.** as its "prime **rate"** or (ii) the highest rate permitted by State **law** (the "Default Rate"), from the next installment(s) of Base Rent and other charges due hereunder.

(c) <u>**Contest of Real Estate Taxes and/or Assessed Valuat**ion of **Property**</u>.  Tenant shall have the right, at Tenant's sole expense, to contest the amount or validity, or otherwise seek an exemption or abatement, of any Real Estate Taxes or to seek a reduction in the valuation of the Premises assessed for Real Estate Tax purposes, by appropriate proceedings diligently conducted in good faith, provided that Tenant shall first have notified Landlord of its intent to do so and Landlord shall have'failed to notify Tenant in writing, within fifteen (15) days of receipt of Tenant's notice, that Landlord intends to contest such Real Estate Taxes or **seek such** a reduction.  In any instance where any such action or proceeding is being undertaken by Tenant, Landlord shall cooperate **with** Tenant, execute any and all documents reasonably required in connection therewith and,  if required by any law,  rule or

[J:\013363\170\LEASE8.v51]
(October 1, 1996; DiVita)

regulation of the taxing authority, shall join with Tenant in the prosecution thereof.

(d) **Payment Following Appeal**. In the event Tenant or Landlord is successful in obtaining a **tax** reduction, *Tenant* shall be entitled to a refund *of* any **overpayment** of Real Estate Taxes relating or allocable to the Premises, **as** well as a reimbursement from the appropriate taxing authority of all costs, fees and expenses it incurs in such protest **or reassessment.**

10. **Maintenance, Repairs and Replacements.** Except **(i)** for costs covered by the Landlord's *insurance* required to be maintained hereunder, (ii) for condemnation proceeds to be received by Tenant, (iii) for obligations arising from the negligent acts or omissions or willful misconduct of Landlord (or its agents, employees); or (iv) as otherwise set forth in this Lease, Tenant shall be solely responsible for maintenance of the exterior and interior non-structural elements of the Building, including, but not limited to, repairs and/or replacements to plumbing, heating, electrical and air conditioning systems which serve only the Premises. During the last two (2) years of the Term of the Lease (as such Term may be extended by Tenant's exercise of any Renewal Options) Tenant shall be obligated to so install or construct alterations or incur expenditures pursuant to this paragraph; provided, however, that if Tenant is required to expend any sum in satisfaction of its obligations hereunder, and if the resulting improvement to the Improvements cannot be fully amortized in accordance with generally accepted accounting principles, or the Internal Revenue Code and Regulations, over the remainder of the Term (without consideration to the exercise of any additional Renewal Options), then Tenant shall be reimbursed by Landlord by that amount of the cost associated with such repairs, construction or alteration for the period beyond the remainder of the Term (without consideration to the exercise of any additional Renewal Options). Landlord shall maintain all structural elements of the Premises (whether or not

[J:\013363\170\LEASE8.V51]
[October 1, 1996; DiVita]

same serve only the Premises), including, without limitation, the roof, **roof** structure, flooring system, floor slab, foundation, load bearing walls and exterior structural walls, but shall have no other responsibility for maintenance, repair or replacements to the Premises or any part thereof; provided, however, this provision is in no way intended to limit Landlord's obligation to maintain, repair and replace any and all elements, both structural and non-structural, of the Common Areas pursuant to the terms of this Lease.   In addition to the Landlord's maintenance and repair obligations set forth herein and otherwise set forth in this Lease, Landlord agrees to maintain the Other Improvements immediately surrounding the Building, including sidewalks and landscaping. Should either party fail to perform its obligations under this paragraph 10, the other party may, at its option, effect such maintenance, replacements or repairs, provided that such curing party shall have given the nonperforming party thirty (30) days' prior written notice, except in the case of emergencies (in which event only such notice as may be reasonable under the circumstances shall be required); but further provided that such thirty (30) day period (or reasonable period in event of emergencies) shall be extended in respect of any cure that cannot with reasonable diligence **be** accomplished within such period so long as the party required to effect such cure has commenced such cure within such thirty (30) day period [or reasonable period in event of emergencies)  and thereafter diligently prosecutes such cure to completion.   The nonperforming party shall reimburse the other party on demand for the reasonable and actual amount so expended (as evidenced by detailed invoice), plus interest at the Default Rate.   However, in the event of emergency repairs, no interest shall accrue if reimbursed within thirty (30) days of request (including detailed invoice) for reimbursement. All maintenance, repairs or replacements shall be done by Tenant or Landlord **lien-**free and in a good and workmanlike manner consistent with the quality of labor and materials used in originally constructing the

[J:\013363\170\LEASE8.W51]
[October 1, 1996; DiVita]

Improvements and in accordance with all applicable law.  In order
for Landlord and Tenant to effectively perform their maintenance,
repair and replacement obligations hereunder, Tenant and Landlord,
as applicable,  shall assign to the other party any and all
manufacturers' and contractors' Warranties relating to such work
performed on behalf of the other party to the party who is required
to maintain same under the Lease.

11. **Payment of Utility Bills**. **Tenant** will pay directly to
the appropriate utility company or governmental agency, when due,
all bills for gas, water, sanitary sewer, electricity, telephone
and other public or private utilities used by Tenant with regard to
the Improvements.  In the event Landlord elects to provide utility
services to Tenant, Tenant agrees to reimburse Landlord for the
utility services used by Tenant as Additional Rent, provided that
Landlord's utilities charges are competitive with market rates and
do not exceed the rates customarily charged to Tenant by such
utility company(ies).  Landlord shall pay when due all utility
charges incurred in the operation of the Common Areas and the
Shopping Center.

12. **Alterations**.  During the Term, Tenant shall have the
right, at its discretion and its sole cost, without Landlord's
consent, to make (i) any structural interior and nonstructural
exterior alterations or modifications necessary or desirable in
order to bring the Premises into conformity with Tenant's **then**-
current stores and (ii) any interior nonstructural alterations'or
modifications it may desire; **provided**, however, that any non-
structural exterior alterations shall be consistent with the
architectural theme of the Shopping Center and based upon changes
made to Tenant's prototype throughout the Dayton, Ohio trade area.
All structural exterior changes shall be subject to Landlord's
prior consent, which consent shall not be unreasonably withheld,
conditioned or delayed.  With Landlord's consent, which shall not

[J:\013363\170\LEASE8.W51]
(October 1, 1996; DiVita]

be unreasonably withheld, conditioned or delayed, Tenant shall have
the right, at its sole cost, to alter, modify or reconstruct the
exterior and/or structure of the Building or Other Improvements.
Landlord's withholding of consent as to any structural alteration
or modification shall be deemed reasonable only if same is
materially inconsistent with the then-existing architecture of the
Shopping Center. Tenant shall cause all such alterations to be
lien-free (in accordance with **paragraph 13**) and made and completed
at Tenant's cost in a workmanlike manner and in compliance with **all**
applicable law. Regardless of whether Landlord's consent is
required, conceptual plans and specifications for such work shall
be provided to Landlord prior to commencement of any such work;
**provided, however,** if Landlord's consent is not required, such
plans shall be provided to Landlord for informational purposes
only. Landlord shall be deemed to have consented to such work if
written notice of disapproval, with reasons specified, is not
received by Tenant within thirty **(30)** days following Tenant's
delivery of such plans and specifications to Landlord. Without
cost or expense to Landlord, Landlord shall cooperate with Tenant
in the obtaining of any and all licenses, building permits,
certificates of occupancy or other governmental approvals which may
be required in connection with **any** such modifications or
alterations, and Landlord shall execute, acknowledge and deliver
any documents reasonably required in furtherance of such purposes.

    1 3 . **Mechanics Liens.** Landlord and Tenant covenant to each
other that they will not permit any lien to be filed against the
Premises or the Shopping Center as a result of nonpayment for, or
disputes with respect to, labor or materials furnished to the
Premises or the Shopping Center for or on behalf of Tenant, Land-
lord or any party claiming by, through, or under Tenant or Land-
lord, nor shall either party permit any judgment, lien or attach-
ment to lie, as applicable, against the Premises or the Shopping
Center. Should any lien of any nature, including but not limited

[J:\013363\170\LEASE8.W51]
[October 1, 1996; DiVita]

to the foregoing, be filed against the Premises or Shopping Center, the party on account of whose actions such lien has been filed shall, within thirty (30) days after receipt of written notice of such lien, cause said lien to be removed, or otherwise protected against execution during good faith contest, by substitution of collateral, posting a bond therefor, escrowing of adequate funds to cover the claim and related transaction costs or such other method as may be permissible under applicable-title insurance regulations and reasonably acceptable to the other party hereto.

14.   Insurance.

(a)  **Property Damage**.  During the Construction Term, and during any subsequent construction, Tenant shall keep or require its general contractor to keep, in full force and effect, a policy of builder's risk insurance covering loss or damage to the Improvements for the **full** replacement value of all such construction.  During the Main Term and all Option Periods, Tenant shall keep in full force and effect a policy of fire and extended coverage insurance covering loss or damage to the Premises in the amount of eighty percent (80%) of the replacement value (or one hundred percent (100%) of the replacement value if Tenant does not meet the net worth test described in paragraph 14(d) below, or if such insurance coverage is required by Landlord's first mortgagee) of the Building, exclusive of excavation, footings and foundations (which initial amount shall be not less than the Tenant Improvement Allowance), with a commercially reasonable deductible, for which Tenant shall be fully responsible.  Landlord and Landlord's first **"Mortgagee"** (as defined in paragraph 21 below), shall be named in such policy or policies as additional insureds as their respective interests may appear.  Neither Landlord nor Tenant shall construct, or permit to be constructed, any improvement in the Shopping Center, or conduct any **activity(ies),** or permit the conduct of any activity(ies), in the shopping Center which will prevent Landlord or Tenant, as the case may be, from being able to obtain insurance

[J:\013363\170\LEASE8.W51]
[October 1, 1996: DiVita]

coverage at commercially reasonable rates, including, without limitation, a fully-sprinklered fire insurance rate. Should Landlord cause or permit any insurance rate increase to occur, Landlord will reimburse Tenant for the additional premium required, subject to Tenant's right to self-insure (in which event Landlord will contribute to Tenant's self insurance fund to cover increased actuarial risks). All insurance policies obtained shall be issued by reputable insurance companies licensed to do business in the State of Ohio.

(b) **Liability Insurance**. During **the** Term, Tenant shall keep in full force a policy of commercial general liability insurance with bodily injury and property damage coverage with respect to the Premises and business operated by Tenant, which shall name Landlord and Landlord's first Mortgagee as additional insureds as their respective interests may appear. The limits of such commercial general liability policy shall be not less than **$3,000,000.00** combined single limit for bodily injury and property damage, with a commercially reasonable deductible.

(c) **Workers' Compensation Insurance.** To the extent required by law, Landlord and Tenant shall maintain workers' compensation insurance covering their respective employees in statutory limits, or maintain such alternate coverages or arrangements as legally permissible.

(d) -            - Notwithstanding anything to the contrary contained herein, Tenant shall have the right to **self-**insure against any of the risks or portions thereof set forth in subparagraphs (a) and (b) (and to the extent then permitted by law, (c)) above, provided Tenant is then occupying the Premises and has a reported tangible net worth, as of the end of Tenant's most recent quarterly reporting period, of not less than Seventy-Five Million Dollars **($75,000,000),** as computed in accordance with generally accepted accounting principles, consistently applied, as determinable from Tenant's public disclosures and/or regularly maintained corporate balance sheets which are generally available

27

to shareholders **(no** right of Landlord to audit or conduct independent investigations being implied by this provision). Upon Landlord's request, Tenant shall provided Landlord with a copy of Tenant's most recent annual report.

(e) <u>**Common Area, Additional Area and** T h i r d **Insurance and Insurance During Landlord's Construction.**</u> During the Term, Landlord shall keep in full force and effect, in form reasonably acceptable to Tenant, **policies** of (1) commercial general liability insurance, and (2) fire and extended coverage insurance, with respect to the Common Areas and with respect to all other areas of the Shopping Center over which Landlord from time to time has present possessory rights (or has the right under any lease to provide insurance coverage because of a tenant's failure to maintain such required coverage) but which do not constitute a portion of the Common Areas (such areas here sometimes collectively referred to as the "Additional Areas"). The Additional Areas shall include, without limitation: **(i)** as yet unconstructed portions of the Shopping Center intended for tenant occupancy, (ii) constructed but unoccupied portions of the Shopping Center, (iii) vacated or otherwise uninsured tenant space, whether by reason of lease expiration, default or otherwise, and (iv) constructed and occupied portions of the shopping Center. Said policies shall name Tenant, and any lender, investor or other stakeholder which is designated by Tenant from time to time, as an additional insured to the fullest extent Tenant and such stakeholder have insurable interests. The limits of such policies shall be the same as those set forth in subparagraphs (a) and (b) above, as applicable. The cost of the premiums for coverages relating to Common Areas shall be an element of CAM Charges. Any deductible amount for Common Area insurance coverage shall be reasonable in amount given the nature of the risk insured and probable frequency of claims made under such coverage, but in no event shall **such deductible** amount exceed $5,000 for Common Area liability coverage. Landlord shall assure (by maintaining or causing to be maintained similar

(J:\013363\170\LEASE8.W51]
[October 1, 1996; DiVita]

insurance coverage) that all areas of the Shopping Center, including the Additional Areas and areas leased to third party tenants or sold to third party occupants, are insured with substantially similar coverages to those required for the Premises and the common Areas, such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever Tenant may be assured that the Shopping Center Will be reconstructed in equal or superior condition within the time-frame Set forth in paragraph 15. During any period in which Landlord is conducting construction activities at the shopping Center, Landlord shall keep, or cause its general contractor to keep, in full force and effect, with regard to the shopping Center, in form reasonably acceptable to Tenant, at least the minimum insurance coverages set forth below:

1)   Workers' Compensation - Statutory Limits;
     Employers Liability - $500,000;

2)   Automotive Liability for all vehicles with limits of **$3,000,000;** and

3)   Commercial General Liability to include premises operations and products/completed operations coverage with limits of **$3,000,000.**

Additionally, Landlord shall keep or require its general contractor to keep in full force and effect a policy of builder's risk insurance covering loss or damage to the Shopping Center for the full replacement value of all such construction. To the fullest extent Tenant has an insurable interest, such liability policy shall name Tenant an additional insured and such builder's risk policy shall name Tenant a loss payee.

(f) **Policy** Provisions. All policies of insurance (other than self-insurance) enumerated above shall be provided by insurance carriers with a Best rating of not less than **B+VI.   Any** insurance coverage enumerated above may be effected by a blanket policy or policies of insurance or under so-called **"all risk"** or "multi-peril" insurance policies, provided that the total amount of

[J:\013363\170\LEASE8.V51]
(October 1, 1996; DiVita)

**insurance** available with respect to the Premises and Tenant's or Landlord's liability hereunder shall **be at** least the equivalent of separate policies in the amounts herein required, and provided further that in other respects any such policy or policies shall comply with the provisions of this paragraph 14.  Landlord shall have the right to self-insure against any of the risks recited herein, provided Landlord has a reported tangible net worth, as of the end of Landlord's **most recent quarterly** reporting period, of not less than Seventy-Five Million Dollars (**$75,000,000**), as computed in accordance with generally accepted accounting principles, consistently applied, as determinable from Landlord's public disclosures and/or regularly maintained corporate balance sheets.  An increased coverage or **"umbrella"** policy **may** be provided and utilized by either party to increase the coverage provided by individual or blanket policies in lower amounts, and the aggregate coverage provided by all such policies with respect to the Premises and Tenant's or Landlord's liability hereunder shall be satisfactory provided that such policies otherwise comply with the provisions of this paragraph 14.  All commercial general liability insurance policies herein shall include contractual liability coverage.

(g)  **Waiver** of **Right** of Recover- **Subrogation**.  To the extent that insurance proceeds are actually received in satisfaction of a loss which is required to be covered by insurance or is self-insured hereunder (with the deductible under any policy being deemed to be self-insured), Landlord and Tenant hereby waive any and all rights of recovery against each other for any loss or damage to the Premises or the contents contained therein, for loss of income on account of fire or other casualty, or for injury sustained on the Premises or the Common Areas; and each party's aforesaid policies of **insurance** shall **contain** appropriate provisions recognizing this mutual release and waiving all rights of subrogation by the respective insurance carriers.

[J:\013363\170\LEASE8.V51]
[October 1, 1996; DiVita]

(h) **Evidence of Insurance**. Subject to Tenant's right to self-insure hereunder, upon (i) **Commencement** of the Main **Term** (as to property insurance), (ii) upon delivery of the Land (as to liability insurance) and (iii) no less than annually thereafter, Tenant and Landlord shall cause to be issued to each other in lieu of the original policy, a duplicate of such policy or appropriate certificates of insurance reasonably acceptable to the other party and evidencing compliance with the applicable covenants of this paragraph 14. Each such certificate shall provide that no expiration, cancellation or material change in the *insurance* evidenced thereby shall be effective unless thirty (30) days' notice of such expiration, cancellation or material change shall have been given to the certificate-holder (and *any Mortgagee*, if applicable).

(i) **Indemnities**. Except if arising from the negligent or willful acts of Landlord or its agents or employees (to the extent that paragraph 14(g) is inapplicable thereto), Tenant hereby agrees to indemnify, defend and hold Landlord harmless from all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring on the Premises or resulting from Tenant's use thereof.

Except if arising from the negligent or willful acts of Tenant or its agents or employees (to the extent that paragraph 14(g) is inapplicable **thereto**), Landlord agrees to indemnify, defend and hold Tenant harmless from any and all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring in, on or around the Shopping Center, exclusive of the Premises, or other buildings within Landlord's Premises or resulting from the use thereof by Landlord, its agents or employees.

15. **Damages** by Fire or **Other Casualty**.

(a) **Less Than Thirty** Percent **(30%)**. In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Improvements, Common Areas and/or Additional Areas,

31

which has a repair and reconstruction cost of less than thirty percent (30%) of the then-total replacement cost of any of **the** Improvements, Common Areas and/or Additional Areas, this **Lease** shall not terminate except as expressly set forth herein, and Base Rent and other charges shall continue to be paid by Tenant pursuant to the terms of paragraph 4 hereof. Within a reasonable time after such casualty, subject to force majeure, applicable building codes, the procurement of building permits 'and the receipt of insurance proceeds (unless self-insured) to the extent of the damage to the Premises, or the Common Areas or Additional Areas, as applicable, Tenant shall complete reconstruction of the Building and Other Improvements, and Landlord shall complete reconstruction of the Common Areas and Additional Areas (including substantially equivalent value in equipment, furniture and fixtures), to that condition existing immediately prior to such casualty, in the reconstructing party's reasonable discretion, with, in event of any Tenant reconstruction, such alterations as may be permitted under paragraph 12 hereof. In the event, subject to force majeure, the Premises, Common Areas and/or Additional Areas, as applicable, are not substantially repaired and reconstructed, and equipment, furniture and fixtures restored or replaced, by the party with repair and restoration obligations within two hundred forty (240) days after receipt of any required governmental permits, for which permits the party with repair obligations shall make prompt application following such destruction or damage, and insurance proceeds (if not self-insured), then the other party, at its option, by giving written notice to the party with repair obligations, within thirty (30) days after the expiration of said period, may undertake completion of such reconstruction, in which event the party with repair obligations shall make available to the notifying party all applicable insurance proceeds for such reconstruction (including any applicable deductible) or, if **self-**insured, the amount necessary for such reconstruction.

[J:\013363\170\LEASE8.V51]
[October 1, 1996; DiVita]

(i) **Application of Funds**. All insurance (or **self**-insurance) proceeds received on account of such damage or destruction, less the cost, if any, of such recovery, shall be applied pursuant to the terms of this Lease **to** the payment of the cost of such restoration, repair, replacement, rebuilding, or alteration (the **"Work"**), including expenditures made for temporary repairs or for the protection of property pending the completion of permanent **restoration**, repair, **replacement**, rebuilding, or alteration, and, if required by any Mortgagee, shall be **held by** a mutually agreeable third-party escrow agent (which is, for these purposes, the "Escrow Agent"), in an interest-bearing account in a federally insured financial institution or institutions such that all funds are deposit insured **(or** otherwise assured in **a** manner acceptable to the parties), to be paid out, as provided below, from time to time (but no more often than once monthly), as the Work progresses, upon Tenant's written request in event of work by Tenant, or Landlord's written request in event of work by Landlord, accompanied by a certificate of the architect or engineer in charge of the Work (the "Certificate"), dated not **more** than seven (7) days prior to such request, stating that the sum then requested either has been paid by Tenant or Landlord, as applicable, or is justly due to the named contractors, subcontractors, materialmen, engineers, architects, or other persons (whose addresses shall also be stated) who have rendered services or furnished materials for certain portions of the Work. The Certificate shall give a brief description of such services and materials, shall list the several amounts so paid or owing to each of such persons, shall state the cost of the Work at the date of the requisition, and shall state that no part of such expenditures has been or is being made the basis for any

33

other request for payment. The Certificate shall state also that, except for the amounts listed therein, **there** is no outstanding indebtedness known to such architect or engineer, after due inquiry, for labor, wages, materials, supplies, or services in connection with the Work which, if unpaid, might become the basis of a vendor's, mechanic's, laborer's, materialman's, or similar lien upon the Work or upon the Premises or any part thereof.

(ii) **Disbursement.** Upon compliance with the foregoing provisions of paragraph 15(a)(i), the Escrow Agent shall pay, out of the **escrowed** funds, to the persons named in the Certificate the respective amounts stated to be due to them or shall pay to Tenant, in the event of Tenant work, or Landlord, in the event of Landlord work, the amount stated to have been paid by Tenant or Landlord, as applicable; provided, however, that such payments shall not exceed in amount the cost of the relevant Work as stated in the Certificate. If the insurance proceeds or reconstruction funds paid by Tenant or Landlord, as applicable, to the Escrow Agent exceed the amount required to pay the total cost of the Work, the party paying such amount to the Escrow Agent, as applicable, after payment of all costs of the Work, shall be entitled to receive or retain, as applicable, such excess. ]

**(b)** **Thirty Percent (30%) or More**. In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Improvements, Common Areas and/or Additional Areas,' which has a repair and reconstruction cost of thirty percent (30%) or more of the then-total reconstruction cost of any of said areas, or in the event of any uninsured casualty, Tenant shall have the option **of** terminating this Lease. Tenant shall notify Landlord of its exercise of such option within sixty (60) days following the occurrence of such casualty and shall thereupon make available to

34

Landlord all insurance proceeds or reconstruction costs (including, any deductible or self insurance amounts) as set forth in subparagraph (a) above, no later than ten (10) days after the later of (i) Tenant's receipt of same or (ii) Tenant's vacating the Premises.  In the event Tenant does not elect to terminate this Lease as set forth above, then, subject to force majeure, within two hundred forty (240) days after receipt by Tenant of the required governmental permits for restoration, for which permits Tenant shall make prompt application following such destruction or damage, and insurance proceeds (if not self-insured) with regard to such damage or destruction, Tenant shall complete reconstruction of the Improvements to their condition existing immediately prior to such damage, in Tenant's reasonable discretion, with such alterations as may be permitted under paragraph 12, and shall restore the Premises (including equipment, furniture and fixtures). Should Tenant elect to maintain this Lease in full force and effect, Landlord shall reconstruct all Common Areas and Additional Areas in the manner specified by subparagraph (a) above regardless of the amount of damage to same. Additionally, Landlord shall assure (through maintaining or causing to be maintained similar insurance coverage) that all areas of the Shopping Center leased to third party tenants or sold to third party occupants are subject to substantially similar reconstruction obligations to those of the Premises, Common Areas and Additional Areas, such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever, in the event Tenant elects to maintain this Lease in force, Tenant shall be assured that the Shopping Center as a whole will be reconstructed in accordance with this paragraph 15.

(c) <u>Last Two (2) Years of Main Term or Option Period</u>. Notwithstanding the foregoing, if any such damage or destruction occurs within the last two (2) years of the Main Term or of any Option Period and has a material impact on Tenant's ability to conduct business, as reasonably determined by Tenant, Tenant shall be under no obligation to restore the Improvements, in which case

35

this Lease shall terminate at Tenant's option, such option to be
exercised by Tenant giving not less than thirty (30) days' prior
written notice to Landlord, and Landlord shall receive the proceeds
of any insurance (together with any applicable deductible or **self-**
insurance) which may be payable with regard to such destruction or
damage or, in the event Tenant self-insures, the amount necessary
for reconstruction of the Improvements.

16. **Condemnation**.

(a) Definition of **Taking and Substantial Taking**.  For the
purpose of this Lease, a **"Taking"** shall mean any condemnation or
exercise of the power of eminent domain by any authority vested
with such power or any other taking for public use, including a
private purchase **in** lieu of condemnation by an authority vested
with the power of eminent domain; the **"Date** of Taking" shall mean
the earlier of the **date** upon which title to the Premises, the
Shopping Center or any portion thereof so taken is vested in the
condemning authority or the date upon which possession of the
Premises, the Shopping Center, or any portion thereof is taken by
the condemning authority; and **"Substantially** All of the Premises"
shall **mean** a taking which materially affects access to, visibility
**of,** or Tenant's business operations at the Premises, including: (i)
so much of the Improvements and/or Shopping Center and Common Areas
**as,** when taken, leaves the untaken portion unsuitable, in Tenant's
reasonable opinion, for the continued feasible and economic
operation of the Premises by Tenant for the same purposes as
immediately prior to such Taking or as contemplated herein, (ii) so
many of the parking spaces within the Shopping Center as reduces
the parking ratio below the greater of five (5) spaces (for **full-**
sized automobiles) per 1000 square feet of ground-floor gross leas-
able area or that ratio which is required by the zoning ordinance
applicable to the Shopping center, and Landlord's failure to pro-
vide substantially equivalent alternative parking reasonably
acceptable to Tenant within sixty (60) days after such Taking, or

[J:\013363\170\LEASE8.W51]
[October 1, 1996; DiVita]

(iii) SO much of the Common Area Easement described in paragraph 6(d) above that access to the Premises is impeded.

(b)   **Tenant's Rights Upon Taking or Substantial Taking.**   In the event of a Taking of Substantially All of the Premises, Tenant, at its option upon thirty (30) days' written notice to Landlord, which shall be given no later than sixty (60) days following the Taking, shall have the right to terminate this Lease.   All Base Rent and other sums payable by .Tenant hereunder shall be apportioned and paid through and including the Date of Taking,  and neither Landlord nor Tenant shall have any rights in any compensation or damages payable to the other in connectionwith such Taking.

(c)   **Tenant's Rights Upon Less Than Substantial Taking.**   In the event of a Taking of less than Substantially All of the Premises, Base Rent and other charges shall be reduced fairly and equitably in accordance with the portion condemned or taken, effective as of the Date of Taking,  and Tenant shall make all necessary restorations to the Improvements so that the portions of the Improvements not taken constitute a complete architectural unit, provided that the cost thereof to Tenant shall not exceed the proceeds of Tenant's condemnation award (to the extent that such relates to the Improvements and not to Tenant's personal property, intangibles or out-of-pocket expenses unrelated thereto) and the portion of Landlord's award allocable to the Premises,. which Landlord shall make available to Tenant for such restoration. If required by a Mortgagee, such awards shall be **escrowed** and disbursed in accordance with the procedure set forth in paragraph 15(a)(ii) above.   If the Taking occurs within. the last two (2) years of the Main Term or of any Option Period and has a material **impact** on Tenant's ability to conduct business as reasonably determined by Tenant, this Lease shall terminate at Tenant's option, such option to be exercised by Tenant giving not less than thirty (30) days' prior written notice to Landlord.

[J:\013363\170\LEASE8.W51]
(October 1, 1996; DiVita]

**(d)  Landlord's Obligations Upon Any Taking**.  In the event of any Taking following which the Lease continues in effect, Landlord shall make all necessary restorations to all portions of the Common Areas and Additional Areas such that they each **constitute** a complete architectural unit and serve the function originally intended.  Additionally, Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center leased to third party **tenants or** sold to third party occupants are subject to substantially similar reconstruction obligations to those of the Premises, Common Areas and Additional Areas, such that in the event of any condemnation of any portion of the Shopping Center whatsoever, and in the event Tenant elects to maintain this Lease in force, Tenant shall be assured that the Shopping Center will be reconstructed to its former condition within reasonable time.

(e) **Rights Upon Temporary** Taking. In the event of a Taking **of** the Premises, the Common Areas and/or any other area within the Shopping Center, or any portion thereof, for temporary use (specifically one not exceeding 60 days in duration), without the taking of the fee simple title thereto, this Lease shall remain in full force and effect.  All awards, damages, compensation and proceeds payable by the condemnor by reason of such Taking relating to the Premises, or relating to the Common Areas but reasonably attributable to the Premises, for periods prior to the expiration of the Lease shall be payable to Tenant.  All such awards, damages, compensation and proceeds **for** periods after the expiration of the Lease shall be payable to Landlord.  Anything contained herein to the contrary notwithstanding, a temporary Taking for any period in excess of sixty (60) days may, at Tenant's option, be deemed a permanent Taking and shall be governed by subparagraph (b) or (c) above, as applicable.

**(f) Taking of the Pylon Sign(s)**. In the event of a taking, whether permanent or temporary, of any pylon or monument sign (as contemplated by paragraph 8) on which Tenant has installed

[J:\013363\170\LEASE8.v51]
[October 1, 1996: DiVita]

identification panels, Landlord shall provide a substitute site
(reasonably acceptable to Tenant) therefor, with adequate
electrical power, located so as to be visible to vehicular traffic
or roadways adjacent to the Shopping Center and/or at entrances to
the Shopping Center, and Landlord shall replace and/or rebuild any
of such **signage** so taken at its sole cost.

(g) **Tenant's Right Upon Condemnation**. In the event of a
Taking described in subparagraph **(b) or (c)** above, Tenant shall be
entitled to claim compensation from the condemning authority for
the value of its leasehold interest in the Premises, its
unamortized leasehold improvements paid for by Tenant, relocation
expenses and any other items to which Tenant is entitled under
applicable law.

17. **Assignment and Subletting.** Tenant shall have the right,
on written notice to Landlord, to sublet, assign, transfer,
reassign and grant concessions or licenses (a "Transfer") in all or
any part of the Premises and any of Tenant's rights and obligations
under this Lease during the Term, without Landlord's prior consent.
In the event of such a Transfer, Tenant shall remain liable for all
of Tenant's obligations to Landlord arising hereunder so long as
this Lease is not changed, modified or amended in any respect by
Landlord and any transferee.

18. **Use.**

(a) Tenant may initially maintain, use and operate the
Premises as a retail store for (i) the sale of consumer, office and
automotive electronics products (which include, but shall not be
limited to, televisions, stereos, speakers and video recorders and
**players),** computer hardware and software, entertainment software
and entertainment media (which include, but shall not be limited
to, records, game cartridges, video tapes, cassettes and compact
discs), cellular telephones, household appliances (which include,
but shall not be limited to, refrigerators, freezers, stoves,

[J:\013363\170\LEASE8.W51]
[October 1, 1996: DiVita]

microwave ovens, vacuum cleaners and dishwashers) and related goods and the sale and installation of motor vehicle audio, stereo and telephone systems (all of such items being herein collectively referred to as the "Products"), and (ii) renting, servicing, repairing and warehousing of the Products.

(b) Thereafter, Tenant shall have the right to use the Premises for any lawful retail use; provided, however, that the Premises shall not be used (i) for any illegal purpose, (ii) for any use prohibited under paragraph 19(a)(viii) below, or (iii) in violation of any other applicable provision of the "Permitted Encumbrances" contained in Exhibit "F". Notwithstanding the foregoing, if the Shopping Center (or any portion thereof) is being utilized for non-retail use, then Tenant shall have the right to use the Premises for any lawful non-retail use, subject to "(i)", "(ii)" and "(iii)" above.

(c) Provided that Landlord has delivered the Land to Tenant in accordance with the Construction Provisions by no later than December 2, 1996, Tenant agrees to use diligent and good faith efforts to substantially complete Tenant's Building by no later than May 15, 1997. If Tenant has failed to substantially complete Tenant's Building within one (1) year after Landlord's delivery of the Land to Tenant in accordance with the Construction Provisions hereof, then Landlord may terminate this Lease upon sixty (60) days prior written notice to Tenant, provided that Tenant may, prior to expiration of such sixty-day period, substantially complete Tenant's Building and cure any default hereunder. Notwithstanding the foregoing, Tenant will not be obligated to commence operation of business at the Premises until the Opening Co-Tenancy has been satisfied.

(d) Nothing contained in this Lease shall be construed to require Tenant to operate the Premises continuously either for the use stated in paragraph 18(a) or for any other use. However, (i) if Tenant has failed to open its store for business to the public within nine (9) months after the substantial completion of

[J:\013363\170\LEASE9.doc]
[November 22, 1996; DiVita]

Tenant's store and the satisfaction of the Opening Co-Tenancy requirement, or (ii) if after Tenant has opened its store for business to the public, operations shall permanently cease in all of the Premises for a continuous period of more than nine (9) months (excluding any period after fire, casualty or condemnation, any time during which Tenant's operations at the Premises are affected by force majeure, and any period during renovation or remodeling, including without limitation, in connection with, or subsequent to, an assignment of this Lease or subletting of the Premises, so long as such renovation or remodeling is being diligently prosecuted to completion), then Landlord shall have the right, to be exercised within sixty (60) days following the expiration of the nine-month period in "(i)" or "(ii)" above, as applicable, to recapture the Premises and terminate this Lease. In the event that the Landlord elects to terminate this Lease within such sixty-day period, Landlord shall pay to Tenant the unamortized value of its improvements made to the Premises, which amount shall include the unamortized amount of the Tenant Improvement Allowance if the Landlord has not paid such amount pursuant to the Construction Provisions (the "Unamortized Costs"). The Unamortized Costs shall be paid on the effective date of Lease termination. Notwithstanding the foregoing, if Landlord has paid the Tenant Improvement Allowance to Tenant, then the Unamortized Costs shall be reduced by the Tenant Improvement Allowance so paid, if any.

19. <u>Warranties and Representations</u>.

(a) Landlord represents, warrants and covenants to Tenant that:

(i) <u>Quiet and Peaceful Enjoyment</u>. Landlord and those persons executing this Lease on its behalf have the right and lawful authority to enter into this Lease and perform Landlord's obligations hereunder, and Landlord warrants, represents and covenants that, so long as Tenant is not in default hereunder beyond any applicable cure period,

[J:\013363\170\LEASE9.doc]
[October 29, 1996; DiVita]

Tenant shall have quiet and peaceful use, enjoyment and occupancy of the Premises.

(ii) **Title.** Landlord's fee simple interest in the Shopping Center is free and clear of any **mortgages**, deeds, encumbrances, declarations, easements, agreements, leases, tenancies or restrictions, except those matters set forth on **Exhibit "F"** attached hereto and entitled "Permitted Encumbrances", or any other **encumbrances** which would restrict Tenant's use of the Premises **for** the sale of Products or would restrict in any respect the right of Tenant, its employees, customers and invitees to use the Common Areas in accordance with the terms of this Lease. Nothing contained in this Lease, including the Permitted Encumbrances and other matters disclosed on **Exhibit "F"**, shall restrict Tenant's rights under this Lease, including but not limited to the right to operate its business in the Premises. Landlord specifically covenants and warrants that no third party, including but not limited to any other occupant of the Shopping Center, has the right to **object to** Tenant's **tenancy** hereunder, prohibit the selling, renting, servicing, repairing or warehousing of the Products, or the right to consent to any feature of the Improvements or Tenant's **signage,** except for the Resolution of the City of Beavercreek Planning Commission, adopted August 7, 1996, identified as PUD 94-4, MOD **4/96,** Shoppes of Beavercreek, Minor Modification" **("PUD")**. This representation and warranty is a material inducement to the Tenant's execution of this Lease.

(iii) **Certific e o f A u -.** Landlord covenants that it is a duly constituted limited liability company under the laws of the State of Ohio, and that its Member who is acting as its signatory in this Lease **is** duly authorized and empowered to act for and on behalf of the limited liability company. Landlord has furnished Tenant **prior** hereto with evidence of (a) the existence of the limited

42

liability company, and (b) the authority of the Member **to** bind the limited liability company as contemplated herein.

(iv) **No** Litiaation. There are no judicial, **quasi**-judicial, administrative or other orders, injunctions, moratoria or pending proceedings against Landlord or the Shopping Center which preclude or interfere with, or would preclude or interfere with, the construction contemplated in paragraph 2 hereof or the **occupàncy** and use of the Premises for the purposes herein contemplated, except for the May 22, 1996 Application to FEMA and Hydraulic Analysis Report (**"FEMA** Application").

(v) **Hazardous or** Toxic **Materials.** Landlord has not used, discharged, dumped, spilled or stored any Hazardous Substances (as defined in the Construction Provisions) on or about the Shopping Center, whether accidentally or intentionally, legally or illegally, and has received no notice and has no knowledge that any such condition exists at the Shopping Center. If any claim is ever made against Tenant relating to Hazardous Substances present at or around 'the Shopping Center, whether or not such substances are present as of the date hereof, or any Hazardous Substances are hereafter discovered at the Shopping Center (unless introduced by Tenant, its agents or employees), all costs of removal incurred by, all liability imposed upon, or damages suffered **by,** Tenant because of the same shall be borne by Landlord, and Landlord hereby indemnifies and agrees to defend and hold Tenant harmless from and against all such costs, losses, liabilities and damages, including, without limitation, all third-party claims (including sums paid in settlement thereof, with or without legal proceedings) for personal injury or property damage and other claims, actions, administrative proceedings, judgments, compensatory and punitive damages, lost profits, penalties, fines, costs, losses, attorneys' fees and expenses (through all levels of proceedings), consultants

[J:\013363\170\LEASE8.W51]
[October 1, 1996; DiVita]

or **experts** fees and all costs incurred in enforcing this
indemnity.   The representation, warranty and indemnity of
Landlord described in this paragraph 19(a)(v) shall survive
the termination or expiration of this Lease.

   (VI) <u>**No Exclusive Uses in Shopping  Center**</u>.  Landlord
has not and shall not grant exclusive use rights to any
tenants or occupants in the Shopping Center without Tenant's
express written consent, which Tenant may,  in its sole
discretion, withhold.

   (vii)      Intentionally deleted.

   (viii) **Prohibited Activities**.   Landlord shall not
operate or lease (or permit to be operated or leased) any
building or tenant space in the Shopping Center for use as:

   (A) a bar, pub, nightclub, music hall or disco in
which less than forty percent (40%) of its space or
revenue is devoted to and derived from food service;
   (B) a bowling alley;
   (C) a billiard or bingo parlor;
   (D) a flea market;
   (E) a massage parlor;
   (F) a funeral home;
   **(G)** a facility for the sale of paraphernalia for use
with illicit drugs;
   (H)  a facility  for  the  sale  or  display  of
pornographic material  (as determined by community
standards for the area in which the Shopping Center is
located);
   (I) an off-track betting parlor;
   (J) a carnival, amusement park or circus;
   **(K)** a gas station, car wash or auto repair or body
shop (the parties  specifically  acknowledging  that
**Tenant's car** stereo installation facility **is** not included
in this prohibition (K));
   (L) a facility for the sale of new or used motor
vehicles, trailers or mobile homes;
   **(M)** a facility for any use which is illegal or
dangerous, constitutes a nuisance or is inconsistent with
an integrated, community-oriented retail and commercial
shopping center;
   (N) a skating rink;
   **(O)** an arcade, pinball **or computer gameroom** or any
other  facility  operated  **solely  for  enter**tainment
purposes,  such as a "laser **tag**" or "virtual reality"
theme operation (provided that retail facilities in the

44

(J:\013363\170\LEASE8.W51)
(October 1, 1996: DiVita)

Shopping Center may operate no more than four (4) such electronic games incidentally to their primary. operations);

(P) service-oriented offices (such as, by way of example, medical or employment offices, travel agencies, real estate agencies or dry cleaning establishments) or other nonretail uses except for offices and storage facilities incidental to a primary retail operation;

(Q) a banquet hall, auditorium or other place of public assembly;

(R) a training or educational facility (including, without limitation, a beauty school, barber college, reading room, school or other facility catering primarily to students or trainees rather than customers);

(S) a theater of any kind;

(T) a facility for the sale or rental of used goods (including thrift shops, secondhand or consignment stores); or

(U) a gymnasium, sport or health club or spa.

In addition to the foregoing, Landlord shall not operate, lease or permit to be operated or leased any restaurant within any building on Landlord's Premises which is located within three hundred (300) feet of the front entrance to the Building; provided, however, a restaurant not to exceed 5,500 square feet may be located in the area shown on the Site Plan. In addition, no auction, fire or going-out-of-business sale shall be conducted in the Shopping Center (except if in connection with the legitimate cessation of operations by a tenant in the Shopping Center, provided same does not exceed thirty (30) days).

(ix) Site Covenants. With regard to the development of the Shopping Center and the uses and operations of the Common Areas, Landlord makes the following representations and warranties (the "Site Covenants'):

(A) Building Height and Location. The abutting wall of the building adjacent to the Premises shall not exceed the height of Tenant's Building, provided however, the entrance feature of said adjoining building may exceed the height of Tenant's Building but shall not exceed thirty-four feet six inched (34'6") in height above finished grade, nor shall it be positioned so as to project beyond the portion of the front wall of

[J:\013363\170\LEASE9.doc]
[October 29, 1996; DiVita]

the Building immediately adjacent thereto. No outparcels, barriers, buildings, kiosks or other structures, either temporary or permanent, shall be located within Tenant's Preferred Area (except as shown on the Site Plan), and no building located on an outparcel elsewhere in the Shopping Center shall exceed one story and eighteen (18) feet in height above finished grade, exclusive of architectural features, or twenty-two (22) feet in height above finished grade, inclusive of architectural features, nor shall any such exceed the size shown therefor on the Site Plan. No development shall occur within the Shopping Center except as shown on the Site Plan.

(B) <u>Construction and Alterations</u>. Following the end of the first Lease Year, no construction shall be permitted in the Shopping Center during the months of November and December, except for interior alterations not affecting the operations of any other occupant of the Shopping Center and except for emergency repairs. In the event of any construction within the Shopping Center, Landlord shall designate a construction access route, staging and parking areas located so as to minimize interference with customers or the operations of other occupants of the Shopping Center and shall require erection of safety barriers, as necessary, around the site of such construction. With regard to any construction on Landlord's Premises, Landlord shall be solely responsible for any governmentally imposed impact fees, hook-up, connection, installation or tap-in fees and other, similar construction-related charges. Landlord shall make no changes in "Tenant's Preferred Area" (as designated on the Site Plan) or the Common Areas providing access to the Premises (including, without limitation, changes in the location of curbcuts, drive aisles, roadways, sidewalks or parking spaces or reduction of the parking ratio specified in paragraph 5)

[J:\013363\170\LEASE9.doc]
[October 29, 1996; DiVita]

without Tenant's express written consent, which Tenant **may,** in its sole discretion, withhold. However, Tenant agrees not to unreasonably withhold its consent for changes which Landlord proposes to make to the **Common** Areas outside of Tenant's Preferred **Area**, provided that such proposed changes do not materially affect or interfere with Tenant's use and operation of the Premises. Tenant's **consent shall** be deemed given unless Tenant delivers written objection to Landlord within fifteen (15) days after Tenant's receipt of Landlord's notice (provided that Landlord's notice contains a statement that if Tenant fails to provide written objection within fifteen days Tenant's consent shall be deemed given).

(C) Prohibited **Areas.** Landlord covenants that it shall not, without Tenant's express written consent, permit the following uses or activities to occur in the Common Areas: (1) advertisements or signs except for the pylon and/or monument signs described in paragraph 8, the "for **rent**" signs 'described in paragraph 27 and traffic control signs; (2) display or sale of merchandise (not to exceed three times per year); **(3)** operation of loudspeakers or other sound electronically amplified so as to be heard in the Common Areas; or (4) imposition of a charge for parking. Landlord further covenants that it will not seek, nor permit any other occupant of the Shopping Center to seek, a variance or waiver from the minimum parking requirements applicable to the Shopping Center under the zoning code or other applicable ordinance establishing the ratio of parking spaces to building area or otherwise mandating the number of parking spaces required for the Shopping Center and the uses contained therein. Parking by employees of Tenant, Landlord and other occupants of

[J:\013363\170\LEASE8.W51]
[October 1, 1996; OiVita]

the Shopping Center shall **be in** designated "employee parking" areas, the location of which shall be agreed upon by Landlord and Tenant.

**(D)** Easements. Landlord shall not subdivide, parcel or otherwise divide the Shopping Center or create any easements in the Common Areas without Tenant's prior written consent, except for those non-exclusive easements granted to all tenants in the Shopping Center to use the Common Areas.

**(x)** **Interference** with **Tenant's Reception/Transmission**. Landlord shall not install and shall use diligent and good faith efforts to prevent the installation, by any tenants (except for Tenant) or other person anywhere in the Shopping Center, of any satellite dish (which sends or transmits signals), radio antenna or other transmitting equipment (collectively, "Transmitting Equipment") which would cause any interference with satellite, radio or television reception or transmission in or from the Building.

(xi) **Notices Affecting** the Premises. Landlord shall promptly forward to Tenant any notice or other communication affecting the Premises or the Shopping Center received by Landlord from any owner of property adjoining, adjacent or nearby to the Premises or the Shopping Center or from any municipal or governmental authority, in connection with any hearing or other administrative, procedure relating to the use or occupancy of the Premises, Shopping Center **or** any such neighboring **property.**

(xii) **Constructive Trust**. Landlord covenants that all sums paid by Tenant to Landlord'and intended for

[J:\013363\170\LEASE9.doc]
[November 2.2. 1996; DiVita]

payment by Landlord to a third party (such as, by way of example, taxes and certain elements of CAM Charges) are given to Landlord in trust and shall be applied only for such **third**-party payments, as and when due.

(b) Tenant represents, warrants and covenants **to** Landlord that:

(i) Tenant's **Authority**. Tenant is a duly constituted corporation organized under the laws of the Commonwealth of Virginia; it has the power to enter into this Lease and perform Tenant's obligations hereunder; and the Vice President executing this Lease on Tenant's behalf has the right and lawful authority to do so.

(ii) **Tenant's Warranty as to Hazardous or Toxic Materials**. As to Tenant's use and occupancy of the Premises and use of the Common Areas, Tenant will not introduce, discharge, dump, spill or store within the Premises or the Shopping Center any Hazardous Substances; and Tenant hereby indemnifies and agrees to defend and hold Landlord harmless from and against all costs, losses, liabilities and damages incurred by Landlord as a result thereof, to the same extent that Landlord indemnifies and holds Tenant harmless in subparagraph' (a)(v) above. The warranty and indemnity of Tenant described in this paragraph **19(b)(ii)** shall survive the termination of this Lease.

(c) In the event there is a condition at variance with the foregoing representations and warranties of Landlord with respect to the Premises or the Shopping Center which prevents or in any material way inhibits the use of the Premises or any part thereof or the Common Areas for their intended purposes by Tenant or Tenant's employees, licensees, agents, suppliers, customers or invitees, or if Landlord shall default in the observance or per-formance of any of the foregoing representations and warranties, then, in addition to such other remedies as may be accorded Tenant at law, in equity or under the terms of this Lease, Tenant may, in

[J:\013363\170\LEASE8.W51]
(October 1, 1996; DiVita]

addition to its other remedies under this Lease, after thirty **(30)** days' notice to Landlord, obtain an injunction or writ of specific performance to enforce such term or **Covenant**, the parties hereby acknowledging the inadequacy of Tenant's legal remedy and the irreparable harm which would be caused to Tenant by any such variance or default.    In addition, in the event that any of the representations, warranties and covenants set forth in this paragraph 19 are untrue or incorrect; **or** in the event that Tenant suffers any loss, cost, liability or damage as a result of the breach of any of such covenants, representations and warranties, Landlord shall defend, indemnify and hold Tenant harmless from any of such loss, costs, liability or damage incurred as a result of Landlord's breach hereunder.

(d)  In the event that any **of** Tenant's representations, warranties **and** covenants set forth in this paragraph' 19 are materially untrue or incorrect, or in the event that Landlord suffers any loss, cost, liability or damage as a result of the breach of any of such covenants, representations and warranties, Tenant shall defend, indemnify and hold Landlord harmless from any of such loss, costs, liability or damage incurred as a result of Tenant's breach hereunder.

20.  **Estoppel Certificates.**  Without charge, at any time and from time to time hereafter, within twenty (20) days after receipt of written request by either party, the other party shall certify, by written and duly executed instrument, to any other entity **("Person")** specified in such request:   (a) as to whether this Lease has been supplemented or amended, and, if so, the substance and manner of such supplement or amendment; **(b)** as to the validity,, force and effect **of** this Lease, to the certifying party's best knowledge; (c) as to the existence **of** any default hereunder, to the certifying party's best knowledge; (d) **as** to the existence of any offsets, counterclaims, or defenses hereto on the part of such other party, to the certifying party's best knowledge; (e) as to

50

force and effect as if the Successor were the landlord under the Lease, and Tenant hereby agrees to **attorn** to the Successor as its Landlord, such attornment to be effective upon written *notice* thereof given by Landlord to Tenant. In the event that Landlord's interest in the Premises passes to a. Successor and such Successor is bound unto Tenant as set forth above, Landlord shall be released from all obligations to Tenant hereunder arising after the date Landlord's interest so passes, except-as expressly provided herein.

23. **Tenant's Financing.** Notwithstanding any other provisions of this Lease, Tenant may, without Landlord's consent, from time to time, secure financing or general credit lines and grant the lenders thereof, as security therefor, (i) a security interest in Tenant's fixtures, personalty, inventory and equipment (collectively, "Personalty"), (ii) the right to enter the Premises to realize upon any Personalty so pledged, and/or (iii) a collateral assignment of Tenant's leasehold interest in the Premises, with rights of reassignment; provided, however, 'such collateral assignment may be made solely for the purpose of securing Tenant's indebtedness and shall be made in accordance with this Lease. Upon Tenant providing notice of such financing to Landlord, Landlord agrees to evidence its consent in writing to such security interest and *agreement* and to give such lenders the same notice and opportunity to cure any default of Tenant as is provided Tenant hereunder (including time to foreclose or otherwise take possession of the Premises, if necessary to effect such cure). In addition, Landlord agrees to cause any Mortgagee specifically to acknowledge the rights of Tenant's lenders described herein and in paragraph 24 below.

24. **Tenant's** Property and Waiver of **Landlord's Lien.** All of the Personalty shall be and remain the personal property of Tenant. Landlord expressly waives its statutory or common law landlord's liens (as same may be enacted or **may exist** from time to time) and

53

any and all rights granted under any present or future laws to levy
or distrain for rent (whether in arrears or in advance) against the
aforesaid property of Tenant on the Premises and **further** agrees to
execute any reasonable instruments evidencing such waiver, at any
time or times hereafter upon Tenant's request.   If Tenant's
Personalty is not removed from the Premises within thirty (30) days
after Tenant's receipt of written notice from Landlord, delivered
to Tenant after the expiration or **.earlier** termination of this
Lease, then Tenant's Personalty shall be deemed abandoned and
become the property of Landlord.

   25.  **Memorandum** of Lease: **Commencement** Date **Agreement**.
Landlord and Tenant agree, at the other's request and at the sole
expense of the requesting party, to execute a Memorandum of Lease
in recordable form, substantially similar to that attached hereto
**as Exhibit "H",** setting forth such provisions hereof as may be
required by State law.   In addition, Landlord and Tenant shall
execute a Commencement Date Agreement in the form attached hereto
**as Exhibit "I",** once the Commencement Date has been established.
Recording costs for either or both documents shall be borne by the
party requesting recordation of the same. The provisions of this
Lease shall control, however, with regard to any omissions from, or
provisions hereof which may be in conflict with, the Memorandum of
Lease or Commencement Date Agreement.

   26.  **Expiration** of **Term and** Holding **Over.**   All of the
Personalty shall be removable by Tenant any time prior to, or
within thirty (30) days after, the expiration or earlier
termination of this Lease and shall be so removed by Tenant at the
request of Landlord within thirty (30) days after the expiration or
termination of this Lease.   In the event Tenant fails to remove any
or all of its Personalty within the said thirty (30) day period,
Landlord may remove such Personalty, or the balance thereof, cause
such Personalty to be placed into storage and thereafter charge

[J:\013363\170\LEASE8.W51]
[October 1, 1996; DiVita]

Tenant the Cost of such removal and storage, together with interest thereon at the Default Rate.   Those improvements that are integrated into the physical structure of the Building, except any of Tenant's trade fixtures, shall not be removed and shall become the property of Landlord.'   (A nonexclusive list of Tenant's removable trade fixtures is attached hereto as **Exhibit "D".**) Tenant agrees promptly to repair any damage to the Premises occasioned by the removal of Tenant's trade fixtures, furnishings and equipment (except for small holes caused by nails, fasteners and the like) and to surrender the Premises broom clean, in as good condition as on the date of Tenant's opening for business therein, ordinary wear and tear, casualty and condemnation excepted.   Tenant agrees that at the expiration of this Lease, it will deliver to Landlord peaceable possession of the Premises.   No holding over by Tenant nor acceptance of Base Rent or other charges by **Landlord** shall operate as a renewal or extension of the Lease without the written consent of Landlord and Tenant. Should Tenant hold over without the consent of Landlord, this Lease shall continue in force from month to month, subject to all of the provisions hereof and at one hundred twenty percent (120%) of the monthly Base Rent Tenant had been paying during the preceding Lease Year plus any Additional Rent due and payable under this Lease.

27.   "F"o r .   Tenant hereby permits Landlord during the last ninety (90) days of the Main Term or of any Option Period, as the case may be (provided that no applicable Renewal Option has been exercised or deemed exercised), to place one (1) **"For Rent"** or **"For Sale"** sign, not exceeding four (4) feet by four (4) feet in size, on the parking lot of the Shopping Center.   Tenant will also allow Landlord or its agents, upon prior written notice and accompanied by a representative of Tenant designated by Tenant, to show the Premises, exterior and interior, to prospective tenants, purchasers, or mortgagees during reasonable business hours by prior

[J:\013363\170\LEASE8.W51]
[October 1. 1996; DiVita]

appointment, provided same does not interfere with the conduct of Tenant's business.

28. Force **Majeure**.   Except as otherwise specifically contemplated in this Lease or in paragraph 4 of the Construction Provisions, in the event that Landlord or Tenant shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, delay by the other party, failure of power or unavailability of utilities, restrictions imposed by governmental authorities or governmental approvals, riots, insurrection, war or other reason of a like nature not the fault of such party or not within its control, then performance of such act shall be excused for the period of delay, and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay; provided, however, that in connection with the construction of the Improvements, the consequences of delays by the other party shall be governed by paragraph 4 of the Construction Provisions.

29. **Events** of Tenant's **Default**.   Any of the following occurrences, conditions or acts by Tenant shall constitute an "Event of Default" under this Lease:

(a) **Failure to Pay Rent; Breach.** **(i)** Tenant's failure to make any payment of money required by this Lease (including without limitation Base Rent, CAM Charges or Real Estate Taxes), within ten (10) days after the receipt of written notice from Landlord to Tenant that same is overdue, plus late charges, if any; or (ii) Tenant's failure to observe or perform any other material provision of this Lease within thirty (30) days after receipt of written notice from Landlord to Tenant specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Tenant shall have such longer period as is reasonably

[J:\013363\170\LEASE8.W51]
[October 1, 1996; DiVita]

necessary to cure the default, so long as Tenant proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion and provided further that in the case of an emergency, Landlord shall be required to give only such notice as is reasonable under the circumstances.

(b) **Bankruptcy.** Tenant's adjudication as bankrupt or insolvent, or the appointment of a receiver, trustee in involuntary bankruptcy or other, similar officer to take charge of any substantial part of Tenant's property, which proceeding is not dismissed within one hundred twenty (120) days after it is begun.

30. L a n d l o r d ' s . After the occurrence of an Event of Default by Tenant, Landlord shall have the right to exercise the following remedies:

(a) **Continue Lease**. Landlord may, at its option, continue this Lease in full force and effect, without terminating Tenant's right to possession of the Premises, in which event Landlord shall have the right to collect Base Rent and other charges when due, including any sums due for any Option Period for which a Renewal Option has been exercised. In the alternative, Landlord shall have the right to peaceably re-enter the Premises on the terms set forth in subparagraph (b) below, without such re-entry being deemed a termination of the Lease or an acceptance by Landlord **of a** surrender thereof. Landlord shall also have the right, at its option, from time to time, without terminating this Lease, to relet the Premises, or any part thereof, with or without legal process, as the agent, and for the account, of Tenant upon such terms and conditions as Landlord **may** deem advisable, in which event the rents received on such reletting shall be applied (i) first to the reasonable and actual expenses of such reletting and collection, including without limitation necessary renovation and alterations of the Premises, reasonable and actual attorneys' fees and any reasonable and actual real estate commissions paid, and (ii) thereafter toward payment of all sums due or to become due

57

Landlord hereunder, including interest on such amount past due at the Default Rate. If a Sufficient amount to pay such expenses and sums shall not be realized or secured, in Landlord's exercise of reasonable efforts to mitigate its damages (which Landlord hereby agrees to make), then Tenant shall pay Landlord any such deficiency monthly, and Landlord may bring an action therefor as such monthly deficiency shall arise. Landlord shall not, in any event, be required to pay Tenant any sums received by Landlord on a reletting of the Premises in excess of the rent provided in this Lease, but such excess shall reduce any accrued present or future obligations of Tenant hereunder. Landlord's re-entry and reletting of the Premises without termination of this Lease shall not preclude Landlord from subsequently terminating this Lease as set forth below.

        (b) **Terminate Lease.** Landlord may terminate this Lease by written notice to Tenant specifying a date therefor, which shall be no sooner than thirty (30) days following receipt of such notice by Tenant, and this Lease shall then terminate on the date so specified as if such date had been originally fixed as the expiration date of the Term. In the event of such termination, Landlord shall be entitled to recover from Tenant all of the following:

        (i) The "worth at the time of the award" (defined below) of any obligation which has accrued prior to the date of termination; and

        (ii) The "worth at the time of the award" of the amount by which the unpaid Base Rent and all other charges which would have accrued after termination until the time of award exceeds the amount of any sums which Landlord has (or Tenant proves that Landlord could have) received in mitigation.

    As used in this paragraph 30(b), the term, "worth at the time of the award", shall be computed by allowing simple interest at the Default Rate for past due obligations, and a discount rate to net present value of twelve percent (12%) on anticipated future

(J:\013363\170\LEASEB.V51)
(October 1, 1996; DiVita)

obligations,  on the amount of the obligations payable on the date of such calculation.  In the event this Lease shall be terminated as provided above, by summary proceedings or otherwise, Landlord, its agents, servants or representatives may immediately or at any time thereafter peaceably re-enter and resume possession of the Premises and remove all persons and property therefrom, by summary dispossession  proceedings.  Landlord shall never be entitled to dispossess the Tenant of the Premises pursuant to any **"lock-out"** or other nonjudicial remedy.

(c)  Reimbursement **of Landlord's Costs in Exercising Remedies**. Landlord may recover from Tenant, and Tenant shall pay to Landlord upon demand, such reasonable and actual expenses as Landlord may incur in recovering possession of the Premises, placing the same in good order and condition and repairing the same for reletting,  and all other reasonable and actual expenses, commissions and charges incurred by Landlord in exercising *any* remedy provided herein or as a result of any Event of Default by Tenant hereunder (including without limitation attorneys' fees), provided that in no event shall Tenant be obligated to compensate Landlord for any speculative or consequential damages caused by Tenant's failure to perform its obligations under this Lease.

(d) **Remedies Are Cumulative.**  The various rights and remedies reserved to Landlord herein, are cumulative, and Landlord may pursue any and all such rights and remedies (but no others), whether at the same time or otherwise (to the extent not inconsistent  with  specific  provisions  of  this  Lease). Notwithstanding anything herein to the contrary, Landlord expressly waives its right to forcibly dispossess Tenant from the Premises, whether peaceably or otherwise, without judicial process, such that Landlord shall not be entitled to any "commercial lockout" or any other provisions of applicable law which permit landlords to dispossess tenants from commercial properties without the benefit of judicial review.

[J:\013363\170\LEASE8.W51]
[October 1, 1596: DiVita]

**Events** of **Landlord's Default; Tenant's Remedies.** Any of the following occurrences, conditions or acts by Landlord shall constitute an **"Event** of Default": a. Landlord's failure to make any payment of money due Tenant hereunder within ten (10) days after the receipt of written notice from Tenant that same is overdue (in which event the delinquent amount shall accrue interest at the Default Rate); or b. Landlord's failure to perform **any** nonmonetary obligation of Landlord hereunder within thirty (30) days after receipt of written notice from Tenant to Landlord specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Landlord shall have such longer period as may be reasonably necessary to cure the default, so long as Landlord proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion and provided further that in the case of an emergency, Tenant shall be required to give only such notice as is reasonable under the circumstances.

Upon the occurrence of an Event of Default by Landlord, at Tenant's option, in addition to any and all other remedies which it may have at law and/or in equity, and without its actions being deemed an election of remedies or a cure of Landlord's default, Tenant may do all or any of the following: (i) pay or perform such obligations and offset Tenant's reasonable and actual cost of performance, including any and all transaction costs and attorneys' fees, plus interest at the Default Rate, against fifty percent (50%) of the Base Rent (unless Landlord fails to pay Tenant the Tenant Improvement Allowance in which event Tenant shall be entitled to withhold the entire Base Rent), or (ii) withhold Base Rent until the earlier of (y) one (1) year from the date of the **Event** of Default or (z) such Event of Default is cured by Landlord, including payment of interest and transaction costs specified in subsection **"(i)"** above, provided that if the Event of Default is not cured at the end of such one (1) year period, Tenant shall

either resume the payment of Base Rent (not including amounts withheld from Landlord if the Event of Default is not yet cured) or terminate this Lease in which event Tenant **may** sue Landlord for damages including interest, transaction costs and attorneys' fees as specified in subsection **"(i)"**, or (iii) terminate this Lease and sue for damages, including interest, transaction costs and attorneys' fees as specified in subsection **"(i)"** above. If Landlord cures the Event of Default; then Tenant shall pay **to** Landlord the Base Rent withheld by Tenant, less any costs, fees and expenses (including, without limitation, reasonable attorney's fees) incurred by Tenant as a result of the Event of Default. If Landlord fails to pay Tenant the Tenant Improvement Allowance in a timely manner, Tenant shall be entitled to the rights and remedies set forth in the Construction Provisions in addition to those provided herein; and, as to a breach of the warranties and representations contained in paragraph 19, Tenant shall be entitled to the remedies provided therein, in addition to those remedies provided herein. All amounts, including interest, transaction costs and attorneys' fees, arising out of uncured defaults of Landlord shall constitute liens against Landlord's interest in the Shopping Center, which **may be** enforced **by** non-judicial means available under State law, or any other applicable proceedings. The various rights and remedies reserved to Tenant herein are cumulative, and Tenant may pursue any and all rights and remedies, whether at the **same** time or otherwise.

32. **Waiver**. If either Landlord or Tenant fails to insist **on** the strict observance by the other of any provisions of this Lease, neither shall thereby be precluded from enforcing **nor** be held to have waived any of the obligations, past, present or future, of this Lease. Either party **may** accept late payment or performance by the other without waiving any Event of Default which may then have accrued.

[J:\013363\170\LEASE8.W51]
[October 1, 1996; DiVita]

33. **Compliance** with **Applicable Laws**.    During the Term, Landlord and Tenant shall comply with all lawful requirements of the local, county and state health boards, police and **fire** departments, municipal and state authorities and **any** other governmental authorities with jurisdiction over the Improvements, and of the board of fire underwriters, respecting Tenant's use and occupancy of the Improvements.    In the event that Tenant, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Landlord or any such authority ordering performance of any such work which Tenant is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness,    Landlord may perform said work and collect the reasonable cost thereof plus interest at the Default Rate from Tenant with the next installment or installments of Ease Rent.    In the event that Landlord, within thirty (30) prior days' written notice (except in the case of an emergency, in which event **only such** notice as is reasonable under the circumstances shall be required) from Tenant or any such authority ordering performance of any such work which Landlord is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Tenant may perform said work and deduct the reasonable cost thereof plus interest at the Default Rate from Landlord with the next installment or installments of Base Rent.

34. **Notices**.    Any notice permitted or required to be given pursuant to this Lease shall be deemed to have been given upon receipt or refusal of a written notice sent by certified mail, postage prepaid, return receipt requested, Federal Express or other comparable overnight express courier service (with proof of receipt available), addressed to the parties as follows:

[J:\013363\170\LEASE8.W51]
[October 1, 1996; DiVita]

```
If to Tenant:          CIRCUIT CITY STORES, INC.
                       9950 Mayland Drive
                       Richmond, Virginia 23233
                       Attention: Corporate Secretary

with copies to:        CIRCUIT CITY STORES, INC.
                       9950 Mayland Drive
                       Richmond, Virginia 23233
                       Attention: Vice President of Real Estate

If to Landlord:        Shoppes of Beavercreek Ltd.
                       c/o Schottenstein-Management Company
                       1800 Moler Road
                       Columbus, Ohio 43207
                       Attention: Real Estate Department

with copies to:        Shoppes of Beavercreek Ltd.
                       c/o Schottenstein Management Company
                       1800 Moler Road
                       Columbus, Ohio 43207
                       Attention: Legal Department

                            - and -

                       Shoppes of Beavercreek Ltd.
                       c/o The Russ Group
                       635 West 7th Street
                       Cincinnati, Ohio 45203
                       Attention: Ron Russ
```

or to such other addressees as any party hereto shall from time to time give notice to the other party in accordance with this paragraph.

35. **Brokers.**  Landlord and Tenant each covenant that they have not dealt with any real estate broker or finder with respect to this Lease, except for The Russ Group, Inc. (Attn: Ron Russ), which shall be paid a commission by Landlord pursuant to a separate written agreement.  Except for the foregoing, each party shall hold the other party harmless from all damages, claims, liabilities or expenses, including reasonable and actual attorneys' fees (through all levels of proceedings), resulting from any claims that may be asserted against the other party by any real estate broker or

63

finder with whom the indemnifying party either has or is purported to have dealt.

36. **Miscellaneous**.

(a) **Headings and Gender**. All paragraph headings, titles or captions contained in this Lease are for convenience only and shall not be deemed a part of this Lease and shall not in any way limit or amplify the terms and **provisions** of this Lease.  The masculine, feminine or neuter gender and the singular or plural number shall be deemed to include the others whenever the context so requires or indicates.

(b) **Construction**. The parties hereto agree that all the provisions hereof are to be construed as covenants and agreements. as though the words importing such covenants and agreements were used in each separate paragraph hereof.

(c) **Waiver of Jury Trial**.  In the event of any court action arising out of this Lease,  each party hereby expressly waives its right to trial by jury.

(d) **Relationship of Landlord-Tenant**. Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent, partnership, joint venture, or any other association between Landlord and Tenant other than the landlord-tenant relationship described herein.

(e) **Entire Agreement; Merger**. This Lease, including all exhibits hereto (which are hereby incorporated herein by reference for all purposes), contains the full and final agreement of every kind and nature whatsoever between the parties hereto concerning the subject matter of this Lease, and all preliminary negotiations and agreements of whatsoever kind or nature between Landlord and Tenant are merged herein.  This Lease cannot be changed or modified in any manner other than by a written amendment or modification executed by Landlord and Tenant.

[J:\013363\170\LEASE8.W51]
[October 1, 1996; DiVita]

(f) **Attorneys' Fees.** In the event either party shall be required to commence or defend any action or proceeding against any other party by reason of any breach or claimed breach of any provision of this Lease, to commence or defend any action or proceeding in any way connected with this Lease or to seek a judicial declaration of rights under this Lease, the party prevailing in such action or proceeding shall be entitled to recover from or to be reimbursed by the other party for the prevailing party's reasonable and actual attorneys' fees and costs through all levels of proceedings.

(g) **Partial Invalidity.** If any provision of this Lease or the application thereof to any person or circumstance shall be deemed invalid or unenforceable, the remainder of this Lease and its application to other persons or circumstances shall not be affected by such partial invalidity but shall be enforced to the fullest extent permitted by law as though such invalid or unenforceable provision was never a part hereof.

(h) **Consents.** Any consent or approval granted by either party hereunder shall be deemed a consent only as to the matter on which such consent was requested and shall not waive the consenting party's right to give or withhold consent to any subsequent matter.

(i) **Holidays.** If the day on which rent or any other payment due hereunder is payable falls on a Sunday or on a legal holiday, it shall be payable on the following business day.

(j) **Applicable Law.** This Lease shall be construed in accordance with the laws of the State, and the parties agree that jurisdiction for all actions hereunder shall lie therein.

(k) Success- **Assigns.** All rights, obligations and liabilities herein given to or imposed upon any party hereto shall extend to the permitted successors and assigns of such party.

(l) **Counterparts.** This Lease may be executed in one or more identical counterparts, and as so executed by all parties hereto shall constitute a single instrument for purposes of the effectiveness of this Lease.

[J:\013363\170\LEASE8.W51]
[October 1, 1996; DiVita]

(m) **Trademarks and Trade Names.** All trademarks, trade names, service marks, signs and all other marks of identification used by Tenant in its business shall at all times remain the exclusive property of Tenant, and Landlord shall have no right, interest in, or title to any of Tenant's trademarks, trade names, service marks, signs or other marks of identification.

37. **Effectiveness** of Lease. Notwithstanding the execution of this Lease or any provision hereof to the contrary, the parties hereto agree that, in addition to the requirements and conditions set forth in **Exhibit "C",** Tenant's obligations under this Lease shall only become binding, effective and enforceable against Tenant upon the complete satisfaction (or waiver by Tenant) of the following conditions:

(a) Landlord's delivery of subordination, **non-**disturbance and attornment agreements executed by any and all existing Mortgagees and Ground Lessors in a form satisfactory to Tenant simultaneously with the execution hereof;

(b) Landlord's delivery of the Land to Tenant by the date and in the condition specified in the Construction Provisions;

(c) Landlord's completion of the Site Work and Common Area improvements in accordance with the Construction Provisions;

(d) Landlord's representations, warranties and covenants, including but not limited to those set forth in paragraph 19 herein, being true and accurate as of the date of delivery of the Land (as defined in the Construction Provisions);

(e) Tenant's obtaining from Landlord, prior to delivery of the Land to Tenant, copies of soils and Hazardous Substances reports satisfactory to Tenant;

(f) Tenant's obtaining satisfactory assurances that all necessary approvals and consents, including approvals or consents from other tenants in the Shopping Center, and all necessary reciprocal use and easement agreements have been obtained prior to the date of execution hereof;

[J:\013363\170\LEASEB.W51]
[October 1, 1996; DiVita]

(g) Tenant's obtaining a copy of Landlord's mortgage commitment or other satisfactory written assurances that Landlord has obtained financing adequate to fund the Tenant Improvement Allowance and development of the remainder of the Shopping Center;

(h) Prior to the Commencement Date, the following tenants/occupants shall have taken occupancy and/or opened for business to the public, as is applicable, at the Shopping Center pursuant to valid leases/purchase transactions (the "Opening Co-Tenancy") :

(1) a Value City Furniture Store of at least 32,226 square feet shall have opened for business to the public; and

(2)   another national/regional retailer of at least 20,000 square feet (the "Second Retailer") shall have entered into and taken occupancy of its premises.

(i) Tenant's receipt, simultaneously with or prior to the execution hereof of: (i) a copy of Landlord's current title policy and/or a commitment for leasehold policy of title insurance for the Shopping Center; (ii) copies of all underlying documents referred to in said commitment for title insurance, (iii) an ALTA survey of the Shopping Center in form and substance reasonably acceptable to Tenant, at a minimum identifying by metes and bounds or platted lot all of the real property within the Shopping Center, each of the parcels owned under every ground lease pertinent to the Shopping Center, and the Land; (iv) all instruments reasonably required by the title company issuing the commitment for leasehold policy of title insurance to issue a policy meeting Tenant's requirements; and (v) Tenant's approval of all of the foregoing in writing within ninety (90) days after receiving all of said documents (collectively the "Title Condition").

(j) The Premises and the Shopping Center being properly subdivided, in conformity with all applicable laws and zoned so as to permit (A) the development and operation of the Premises and the

67

Shopping Center in accordance with the provisions of this Lease; and (B) the initial use of the Premises described in paragraph 18 of this Lease.

The existence of the foregoing conditions is solely for the benefit of Tenant, and Tenant may waive any such condition at its sole discretion by delivering to Landlord a written notice signed by Tenant which specifically states the condition(s) being waived by Tenant.

Notwithstanding any other provision in this Lease to the contrary , in the event any of the foregoing conditions shall not be met, satisfied or waived within the earlier of (i) one (1) year after the Landlord's delivery of the Land or (ii) the date Tenant opens a store for business to the public on the Premises, the parties hereto expressly agree that Tenant shall have the right to terminate this Lease in its sole and absolute discretion at anytime prior to the satisfaction or waiver of any of the foregoing conditions or the occurrence of **"(i)"** or **"(ii)"** above, upon fifteen (15) days prior written notice to Landlord which **notice states** that the Lease shall terminate fifteen (15) days after Landlord's receipt thereof on account of the failure of one or more of the foregoing conditions.  In the event Landlord fails to cure or satisfy the condition(s) stated in Tenant's notice prior to the expiration of such fifteen-day period, this Lease shall terminate and the rights and obligations of the parties shall be of no further force and effect and the parties shall have no further liability one to the other (except that the indemnifications set forth in paragraphs 14(i), 19(a)(v) and **19(b)(ii)** hereof shall survive such termination).

The delivery of this executed Lease by Tenant to Landlord constitutes the offer of Tenant to Landlord to bind Landlord and Tenant to the provisions of this Lease.  It is a condition to the effectiveness of this Lease that upon receipt of the executed Lease from Tenant, the Landlord, without delay, execute and return same to Tenant in accordance with any instructions delivered by Tenant

[J:\013363\170\LEASE8.W51]
[October 1, 1596; DiVita]

or its legal.counsel. In the event Landlord fails to execute and return this Lease to Tenant within ten (10) days after Landlord's receipt thereof, Tenant may at any time thereafter provide written notice to Landlord that Tenant revokes its delivery of the executed Lease and thereupon Landlord shall be immediately obligated to return to Tenant all executed original counterparts as well as any copies of this Lease in the possession of Landlord, and this Lease shall thereafter be null and void.

38. **Confidentiality.** The parties hereto, including, but not limited to, their heirs, successors, assigns and legal representatives, agree that this Lease may not be recorded and that all such parties hereby agree to use their best reasonable efforts to preserve the confidentiality of this transaction. This confidentiality agreement extends to **any** developers, **bankers,** lawyers, accountants, employees, agents or any other persons acting on behalf of the parties hereto, provided that Landlord shall not be precluded from disclosing confidential information to such individuals so long as such individuals agree in writing to keep such information confidential. The parties hereto agree to use their best reasonable efforts to avoid discussing with, or disclosing to, any third parties (except those parties listed above) any of the terms, conditions or particulars in connection with this transaction. It is specifically agreed by way of illustration, but not by **limitation,** that the covenant of confidentiality set forth herein shall not be breached if such information is disclosed in connection **with** or due to any governmental law or ordinance, but this covenant of confidentiality shall be breached if Landlord, or any of Landlord's developers, bankers, accountants, agents, lenders, lawyers or other similar parties, discloses the content of, or delivers a copy of this Lease to, any third party without the express written consent of all parties to this Lease. **Any** breach of this confidentiality

[J:\013363\170\LEASE8.V51]
[October 1, 1996; DiVita]

agreement shall constitute an Event of Default under the terms and provisions of this Lease.

39. **Feasibility** Review. **Tenant's** Right to **Terminate**. Notwithstanding the execution of this Lease, or any provision hereof to the contrary, Tenant shall have ninety (90) days from the date this Lease is executed (the "Feasibility Period") to obtainevidence of **confirmation** from appropriate local authorities that current zoning and use regulations allow construction of the Improvements on the Premises.   In the event the foregoing condition is not satisfied on or before the expiration of the Feasibility Period, then Tenant shall have the right to terminate this Lease by notice to Landlord within five (5) days following the expiration of the Feasibility Period.   In the event Tenant terminates this Lease, the rights and obligations of the parties shall be of no further force and effect and the parties shall have no further liability one to the other (except that the indemnifications  set forth in paragraphs **14(i),** 19(a)(v) and **19(b)(ii)** hereof shall survive such termination).

Landlord understands and agrees that the foregoing conditions are not conditions precedent to Landlord's liability hereunder and such conditions may be waived by Tenant, in its sole and absolute discretion.

40. **Exculpation**.  If Landlord shall fail to perform any covenant, term or condition of this Lease upon Landlord's part to be performed and as a consequence of such default Tenant shall recover  a  money  judgment against Landlord,  Tenant  hereby acknowledges that it shall look solely to the leasehold interest of Landlord in the Shopping Center for the satisfaction or assertion of any such judgment, including, without limitation, the proceeds of same received upon execution of such judgment and levy thereon against the right, title and interest of Landlord in the Shopping Center, or any part thereof; and the rents, profits or other income

70

from the Shopping Center receivable by Landlord subsequent to the entry of such judgment, and Landlord shall not be liable for any deficiency; provided, however, in the event of Landlord's failure to perform any covenant or obligation of Landlord under paragraphs 15 and 16 hereof following damage to or destruction of or a Taking of all or any part of the Shopping Center, any judgment recovered by Tenant as a consequence thereof may also be satisfied out of insurance proceeds, or condemnation award, as the case may be, payable to Landlord. The provisions of this paragraph shall not be applicable to any risk assume by Landlord by electing to **self**-insure pursuant to the provisions of 14(f) hereof.  The provisions of this paragraph shall not be deemed to deny to Tenant, or limit its right to obtain, injunctive relief or specific performance of Landlord's covenants under this Lease or to avail itself of any other right or remedy (not involving a personal liability of Landlord in excess of the limits of personal liability fixed by

[HERE ENDS PAGE 71]

[J:\013363\170\LEASEB.W51]
[October 1, 1996; DiVita]

this paragraph) which may be accorded Tenant by law or equity by reason of Landlord's failure to perform its obligations thereunder including, but not limited to, the rights and remedies granted Tenant under this Lease.

WITNESS the following signatures and seals:

**LANDLORD**

SHOPPES OF BEAVERCREEK LTD., an Ohio limited liability company

ATTEST/(WITNESS):

By:   JUBILEE LIMITED PARTNERSHIP, Member

**By:** Schottenstein Management Company, its General Partner

By: _____
N&me:
Title:

By: _____
RON RUSS, Member

**TENANT**

CIRCUIT CITY STORES, INC., a Virginia corporation

ATTEST:

_____
Its:  Assistant  Secretary

By: _____
Benjamin B. Cummings, Jr.
Vice President - Real Estate

[J:\013363\170\LEASE8.W51]
[October 1, 1996; DiVita]

this paragraph) which may be accorded Tenant by law or equity by reason of Landlord's failure to perform its obligations thereunder including, but not limited to, the rights and remedies granted Tenant under this Lease.

WITNESS the following signatures and seals:

**LANDLORD**

SHOPPES OF BEAVERCREEK LTD., an Ohio limited liability company

**ATTEST/(WITNESS):**

By:  JUBILEE LIMITED PARTNERSHIP, Member

By: Schottenstein  Management Company, its General Partner

By: _____
   Name:
   Title:

_____

By: _____
   RON RUSS, Member

_____

**TENANT**

CIRCUIT CITY STORES, INC., a Virginia corporation

~~ATTEST:~~

~~Michael E. Freud~~
~~Its: Assistant Secretary~~

By: _Benjamin B. Cummings, Jr._
   Benjamin B. Cummings, Jr.
   Vice President - Real Estate

72

## EXHIBIT "A"

SITE PLAN

Components:

Premises (outlined in red)

Tenant's Preferred Area (hatched)

Permissible Building Areas (cross-hatched)

Pylon/Monument **Signage**

Truck **Well(s)/Trash** Compactor

Customer Pick-Up

Car Stereo Parking

Towne Drive

Restaurant 5,500 S.F.



## EXHIBIT "A-1"

SHOPPING   CENTER

LEGAL   DESCRIPTION


PARCEL I:

Situate in the City of Beavercreek, County of Greene, State of Ohio, and in Section 35, Town 3, Range 7 and being more fully described as follows:

Beginning at an iron pin being the southeast corner of Harold W. Kooglers 0.33 acres and bearing North 5° 24' 44" East, 1334.49 feet from a stone at the southeast corner of said Kooglers 143.401 acres ;

thence North 82° 46' 06" West, 981.17 feet to a point in the west line of North Fairfield Road;

thence  North  6° 54' 12" East, 167.39 feet;

thence North 19° 01' 50" East, 103.08 feet;

thence North 10° 11' 19" East, 111.64 feet;

thence North 73° 22' 26" East, 180.98 feet to an iron pin;

thence South 72° 11' 34" East, 793.50 feet to an iron pin;

thence South 5° 24' 44" West, 307.50 feet to the place of beginning and containing eight and fifty seven hundredths (8.57) acres of real estate be it the same more or less.

[J:\013363\170\LEASE7.W51]
[September 25, 1996; DiVita]

PARCEL II:

Situate in the City of Beavercreek, County of Greene, and State of Ohio and in Section 35, Town 3, Range 7 and being more fully described as follows:


Starting at the intersection of the centerline of New **Germany-Trebein** Road and **North** Fairfield Road; thence South **84° 21' 22"** East, 902.40 feet along New Germany-Trebein Road to a point a corner to **K.A. VanHoose** .692 acre tract; thence South 5° 38' 38" West, **25.00** feet to an iron pin in the line of said .692 acres and a corner to JARD Enterprises 148.709 acres and in the south line of New Germany-Trebein Road and the true place of beginning for the following described tract;

thence South 5° 24' **44"** West, 225.00 feet to an iron pin a corner to said .692 and 148.709 acre tracts;

thence South 84° 21' **22"** East, 120.60 feet to an iron pin a corner to said .692 and 148.709 acre tracts;

thence South 5° 24' 44" West. 824.90 feet to an iron pin a corner to said 148.709 acres and Doris M. **Koogler's** 8.57 acres;

thence North 72° 11' **34"** West, 793.50 **feet to** an iron pin a corner to said 148.709 and 8.57 acre tracts;

thence North 37° 06' 33" East, 767.94 feet 'to an iron pin;

thence North 5ᶜ 38' 38" ~~East~~, 201.03 feet to an iron pin in the south line of said New Germany-Trebein Road;

thence South 85° 04' **20"** East, 134.40 feet along said right of way line to a point;

thence North 83° 26' **29"** East, 118.28 feet to the place of beginning and containing **eleven** and three hundred and eleven thousandths (11.311) acres of land be it the same more or less.

[J:\013363\170\LEASE7.\51]
[September 25, 1996; DiVita]

EXHIBIT **"B"**

INDEX OF DEFINITIONS

| **Term** | **Paragraph** where **defined** |
|---|---|
| Adjacent Premises | **6(b)** |
| Adjacent Premises Items | **6(b** |
| Assessment(s) | Ex. **"C", para.** 1(a) |
| Base Rent | 4(a) |
| Building | 2 |
| CAM Charges | **7(b)** |
| CAM Year | 7(c) |
| Certificate | **15(a)(i)** |
| City | 1 |
| Commencement Date | 4 |
| Common Area Easement | **6(d)** |
| Common Area Maintenance | 7(a) |
| Common Areas | 7(a) |
| Concept Plans | Ex. **"C", para.** 2(b) |
| Construction Term | 3 |
| CPI-u | **4(a)(iii)** |
| Date of Taking | **16(a)** |
| Default Rate | **9(b)** |
| Delivery of the Land | Ex. **"C", para.** 1(b) |
| Escrow Agent | **15(a)(i)** |
| Event of Default (Landlord) | 31 |
| Event of Default (Tenant) | 29 |
| Final Plans | Ex. **"C", para.** 1(b)(c) |
| Foreclosure | **21(a)** |
| Ground Lessor | **21(a)** |
| Ground Rent | Ex. **"C", para.** 4(b) |
| Hazardous Substances | Ex. **"C", para.** 1(a) |
| Improvements | 2 |
| Land | 1 |

| Term | Paragraph where defined |
|------|-------------------------|
| Landlord | Introduction |
| Landlord's Premises | 1 |
| Landlord Work | Ex. "C", para. 1(d) |
| Lease Year | 3 |
| Main Term | 3 |
| Modified Proctor | EX. "C", para. 2(a) |
| Mortgage | 21(a) |
| Mortgagee | 21(a) |
| Option Periods | 3 |
| Other Improvements | 2 |
| Party Wall | 6(b) |
| Permissible Building Areas | Ex. "A" |
| Permitted Encumbrances | Ex. "F" |
| Person | 20 |
| Personalty | 23 |
| Plans and Specifications | Ex. "C", para. 2(b) |
| Premises | 1 |
| Real Estate Taxes | 9(a) |
| Renewal Option | 3 |
| Shared Footings | 6(b) |
| Shopping Center | 1 |
| Site Covenants | 19(a)(ix) |
| Site Work | Ex. "C", para. 1(b) |
| Site Plan | 1 |
| Soils Report | Ex. "C", para 1(b) |
| Staging Area | 6(a) |
| State | 1 |
| Substantial Completion | Ex. "C", para. 2(e) |
| Substantially All of the Premises | 16(a) |
| Successor | 22 |
| Taking | 16(a) |
| Tax Parcel | 9(b) |
| Tenant | Introduction |

[J:\013363\170\LEASE8.W51]
[October 1, 1996; DiVita]

| **Term** | **Paragraph** where **defined** |
|---|---|
| Tenant Improvement Allowance | Ex. "C", para. 3 |
| Tenant's Preferred Area | Ex. "A" |
| Tenant's Pro Rata Share | 7(c) |
| Term | 3 |
| Transfer | Ex. "C", para. 3 |
| Work | 15(a)(i) |
| Worth at the time of the award | 30(b) |

Beavercreek, OH

EXHIBIT **"C"**

CONSTRUCTION   PROVISIONS

**THESE** CONSTRUCTION PROVISIONS (herein so called) are hereby made a part of the Lease between Landlord and Tenant to which these Construction Provisions are attached as **Exhibit "C"**. All defined term shall have the meanings attributed to them in the Lease unless otherwise specifically defined in these Construction Provisions.

1.   **Landlord's Delivery of the Land·  her Landlord Work** .
Landlord shall deliver the Land to Tenant no later than December **2,** 1996 (subject to Landlord obtaining all required **governmental** approvals, consents and **permits)** in the manner and condition set forth herein.   If Landlord fails to obtain all required governmental approvals and deliver the Land to Tenant by December 2, 1996, then, in addition to Tenant's other rights and remedies contained herein, Tenant shall receive a rent abatement of two (2) days Base Rent for each day that Landlord's delivery of the Land is delayed beyond December 2, 1996.   All of the work set forth in subparagraphs (a), (b) and (c) below is, collectively, the "Landlord **Work":**

        **(a)  Hazardous Substances.**   Landlord shall deliver the Land to Tenant free of any pollution or contamination from toxic or hazardous substances, asbestos or any other chemicals or substances in amounts which exceed standards for public health or welfare as established and regulated by any local governmental authority, the State or the United States Government (herein collectively referred to as **"Hazardous** Substances").   Landlord hereby grants Tenant and its agent access to the Premises and Shopping Center to enable Tenant to conduct such soil and environmental tests as its deems necessary.

1

Landlord, at its sole cost and expense, shall provide a copy of Landlord's environmental site assessment(s) (the *'Assessment(s)'} of the Premises, prepared by a qualified **third-party** environmental engineer, in the form commonly known as a **"Phase I"** or **"Phase II"** assessment, as appropriate, including a concise presentation of all information gathered during the investigation and organized in a logical progression, as well as a description of the methodology use-d by the preparer.  The Assessment shall summarize the significant findings .**and** shall identify and evaluate actual and potential environmental impairment, risks and liabilities.  Landlord shall cause the preparer of the Assessment to provide a certification to Tenant substantially in the form attached hereto as **Attachment "1"**, on or before thirty (30) days following execution of this Lease.  If such certification is not timely received by Tenant, Tenant may obtain same at Landlord's expense.  At Tenant's election, Tenant may obtain an environmental assessment of the Premises and Landlord shall reimburse Tenant the cost thereof.

(b) <u>**Site Work**</u>.  Landlord, at its sole cost and expense, on or prior to delivery of the Land, shall: **(i)** verify its proposed development of the Shopping Center and compliance of its civil engineering plans with Tenant's geotechnical evaluation of the Land dated February **8**, 1996 and prepared by Law Engineering and Environmental Services, Inc. (the **"Soils** Report") with the "Scope of Geotechnical **Evaluation"** shown on <u>Attachment **"2"**</u> attached hereto; (ii) cause the Land to **be free** and clear of any known or unknown {which, but for Landlord's failure to discover some, should be removed prior to delivery of the Land to Tenant) obstructions, foundations, footings, utilities, easements, improvements and tenancies; {iii} complete grading of the Land and the Common Areas in accordance with the Soils Report and the "Standards for Grading **Work"** attached hereto as **<u>Attachment "3"</u>**, and with the Final Plans {hereinafter defined); {iv} complete Tenant's building pad strictly in accordance with the Soils Report and the "Standards for Grading

[J:\013363\170\LEASE8.W51}
[October i, 1996; DiVita]

**Work"** attached hereto as **Attachment "3";** (v) obtain approvals for all **curbcuts** indicated on the Final Plans and all on and off-site permits required for any work to be performed by Landlord necessary to develop the Shopping Center which permits may be a prerequisite for issuance of Tenant's building permit (but Tenant shall be responsible for obtaining Tenant's building permit); (vi) complete the following: (A) all **curbcuts** for Tenant's Preferred Area, **(B)** 20,000 square feet of Staging Area outside of but adjacent to the building pad area to either be paved or stone to provide for all weather use, and (C) an all-weather construction access road to the Land and around the Building no less than twenty-four (24) **feet in** width, connecting the existing dedicated roadway adjacent to the Shopping Center with the Land, all in accordance with the Final Plans; (vii) obtain site plan approval and conditional use approval, if any, from governmental authorities having jurisdiction over the Shopping Center, permitting Tenant's construction of the Premises (subject to issuance of Tenant's building permit); and (viii) providing utilities for use by **Tenant in** connection with construction of the Improvements in accordance with Attachment 6. All of the work described in (i) through (viii) above is, collectively, the **"Site Work".** No changes shall be made to any of the Site Work, including but not limited to any plans and specifications therefor, without Tenant's prior written consent. The Site Work shall be performed in accordance with the construction schedule attached hereto as Attachment **"4"** (sometimes referred to herein as the "Construction Schedule"). 'Landlord specifically covenants and agrees that any problems or delays it encounters in grading the Premises in satisfaction of the Site Work requirements set forth above in connection with the condition of the soils, including environmental or hazardous waste issues, subsidence sinking, surface waters, subsurface waters, unforeseen site conditions' or the like shall be its sole responsibility, shall not cause a force majeure delay, and in no event shall the cost

[J:\013363\170\LEASE8.W51]
[October 1, 1996; DiVita]

associated with such problems or conditions be passed on to **Tenant** in any manner.

Landlord will maintain the construction access road in good condition throughout the construction.of the Common Areas. If the items of Site Work to be performed on the Land are completed earlier than forty-five (45) days prior to Tenant's scheduled commencement of construction of the Improvements (as provided below), the Land shall be overbuilt and sloped to drain and, within such forty-five (45) day period, shall be regraded and recompacted.

Subject to force majeure, Landlord covenants and agrees to complete, at its sole cost and expense, each item of the Site Work and to bring telephone service to the Premises and the Staging Area (provided that Tenant must establish an account with the appropriate telephone company prior to utilizing such service), in accordance with the dates established **therefor** in **Attachment "4"**, to the end that promptly upon completion of such requirements (collectively "delivery of the Land"), Tenant shall be able, subject to issuance of its building permit and matters within Tenant's control, to commence construction of the Improvements.

Landlord acknowledges that Tenant's ability to obtain 'a building permit for its construction may be delayed due to the failure by Landlord to obtain necessary approvals or permits or to pay necessary fees for its construction and development of **the** Shopping Center. Landlord agrees that delivery of the Land shall not be deemed to have occurred until all such aforesaid approvals and permits shall have been obtained and all such fees, including but not limited to impact fees and assessments, shall have been paid, if and to the extent that such approvals, permits and fees for Landlord's construction shall be prerequisites to the issuance of Tenant's building permit. Landlord agrees to keep Tenant advised on a monthly basis as to Landlord's progress in completing the Site Work. Upon the delivery **of** the Land, Landlord shall certify to Tenant that all elements of the Site Work have been completed, in the form of the Site Work Certificate attached hereto

4

as Attachment **"5"**, and Landlord shall cause its soils engineer's written certification of pad preparation to be delivered in accordance with Attachment **"3"** hereto.

Should the Site Work require minor adjustments in order to be in accordance with **Attachment "3"**, the Soils Report or the Final Plans, Tenant may direct its contractor to make such adjustments, the total cost of which shall be reimbursed by Landlord to Tenant upon demand in a sum not to exceed Five Thousand **Dollars ($5,000.00)** in the aggregate.

(c) Paving. **Lighting,** ` ` ` ies. Landscaping and Drainage. Landlord shall deliver to Tenant full and complete civil engineering plans and architectural scale building elevations on or before the date set forth in Attachment **"4."**. Landlord, at its sole cost and expense, and in accordance with **Attachment "4"**, shall retain a contractor licensed in the State to complete (i) installation of temporary utilities, as described in the "Utilities Specifications" attached hereto as **Attachment "6"**; (ii) the construction and installation within five (5) feet of the Building, of permanent telephone service and permanent utilities, including but not limited to gas, electric, telephone, domestic water and fire water (in size sufficient to satisfy local fire codes), each at Tenant's required entry points shown in the Final Plans at depths adequate for Tenant's tie-in without additional cost above that contemplated by the "Plans and Specifications") (as defined in paragraph I.h) below); (iii) the construction and installation of the storm water drainage **system** at Tenant's required location shown on the Final Plans; (iv) the construction and installation of paving (including heavy-duty paving), and curbing **for** parking areas (including sidewalk curb in front of the Building), vehicular access and service roads, and driveways (including, without limitation, the construction of Towne Drive in the location shown on the Site Plan), in accordance with the "Paving **Specifications"** attached hereto as Attachment **"7"**; (v) the completion of landscaping at the Shopping Center in accordance with Landlord's

5

governmentally approved landscaping plan; **(VI)** the **construction and** installation of lighting in the Shopping **Center to** standards no less than those set forth in the "Shopping Center Lighting Specifications" attached hereto as **Attachment "8"** (unless otherwise required by governmental authority); and (vii) Landlord's installation of the pylon sign(s) identifying the Shopping Center as described in paragraph 8 of the Lease, all no later than the dates established **therefor** in **Attachment "4."**

    **(d)** L a n d l o r d . All of the work described to be performed by Landlord in this paragraph 1 is collectively referred to as the "Landlord **Work".** All Landlord Work shall be performed in accordance with all applicable laws and this Lease, in a good and workmanlike manner, as appropriate by engineers, surveyors, architects and consultants, who are bondable, licensed in the State and of good reputation. Landlord's general contractor shall **be** experienced in shopping center development and in phasing and coordinating construction schedules with major anchors and national retailers. All Landlord Work shall be completed in accordance with these Construction Provisions and all attachments hereto and Landlord's final and complete civil engineering plans, which shall be submitted to Tenant for review and written approval on or before the date set forth on Attachment **"4,"** and as so approved in writing by Tenant shall be referred to herein as the **"Final** Plans."  In the event that Landlord defaults at any time in completion of any component of the Landlord Work, Tenant shall have, the right, but not the obligation, to perform at Landlord's sole cost and expense, all or any part of Landlord Work. Tenant shall exercise this right by providing Landlord with written notice thereof, which notice shall reasonably detail those portions of the Landlord Work which Tenant elects to complete. Tenant **may** exercise the rights set forth in this paragraph 1(d) from **time to time** so long as Tenant provides Landlord notice specified herein (i) within a reasonable amount of **time** prior to the date upon which Landlord would otherwise commence that portion of the Landlord Work, or (ii) at

[J:\013363\170\LEASE8.W51]
[October 1, 1996; DiVita]

such other **time** where it is feasible for Tenant to take over that portion of the Landlord Work from Landlord.  In the event and to the extent that Tenant exercises its right hereunder, Landlord agrees to cooperate in good faith and provide Tenant with reasonable assistance so that Tenant can complete said portions of the Landlord Work.  Landlord agrees to reimburse Tenant for any and all costs incurred by Tenant in connection with any portion of the Landlord Work which Tenant is in the **process** of completing within fifteen (15) days after receipt of **written** request from Tenant, which request shall be reasonably supported by invoices and/or written description of the Landlord Work performed.  In the event that the Landlord does not timely reimburse Tenant as hereinabove contemplated, Tenant shall be entitled to deduct the costs of such Landlord Work from rentals and other payments due under the Lease, together with interest at the Default Rate from the. date of expenditure by Tenant until paid in full.

2. **Tenant Improvements**.

(a) **Building Construction**.  Upon completion of all requirements therefor, Landlord shall give Tenant written notice (which shall include any required certifications, including but not limited to those required by **Attachment "3")** of delivery of the Land in the form of Attachment **"5"**.  Tenant shall promptly notify Landlord if any such requirement has not been **met** to Tenant's reasonable satisfaction, provided the Tenant does not elect its self-help remedies set forth in this Lease.  Upon completion of any such previously unmet requirements, Tenant shall promptly commence and pursue to completion with due diligence the construction of the Improvements.  The construction work on the Improvements shall be performed by a duly licensed contractor chosen by Tenant, shall be done in a good and workmanlike manner, in compliance with all applicable laws and in substantial accordance with the **"Plans** and Specifications"  (defined below).  Provided that the Land is delivered on or before the date set forth on **Attachment "4"**, Tenant

7

covenants and agrees to use reasonable efforts and due diligence to achieve "Substantial Completion" (as defined below) on or before the date which is seven (7) months thereafter.

(b)  **Plans and Specifications**.  Tenant has prepared and furnished to Landlord for its approval the architectural **drawings** and specifications and building elevations (the "Plans and **Specifications**") for the construction of the Building and Other Improvements enumerated on Attachment **"9"which** are hereby approved by Landlord.   The Plans and Specifications shall not be substantially changed by Tenant without the prior written consent of the Landlord, which consent shall not be unreasonably withheld, conditioned or delayed.

(c) Permits.   Tenant, at its sole cost and expense, shall obtain or cause to be obtained those certain building permits, licenses, other governmental approvals and temporary and permanent certificates of occupancy which may be required for the lawful construction and occupancy of the Premises as a retail shopping facility in accordance with the Plans and Specifications. Tenant agrees to apply for such permits promptly, to use due diligence and to expend any necessary application or other fees to secure such permits and approvals; provided, however, that the foregoing shall not be deemed to require Tenant to initiate litigation or to agree to any conditions imposed upon issuance of any such permit or approval.   Landlord agrees **to** assist and cooperate fully with Tenant in obtaining such permits, licenses, approvals and certificates.  Landlord shall be responsible for any other permits necessary for the development of the Shopping Center.

(d)  **Landlord Inspections**.   During the course of construction of the Improvements, Landlord may, at its own risk and in cooperation with Tenant's **contractor,** enter upon the Land for purposes of inspecting the work, provided that such inspections shall not interfere with Tenant's construction.

(e)  **Substantial Completion**. Substantial completion of the Improvements ('*Substantial Completion") shall be deemed to

[J:\013363\170\LEASE8.W51]
[October 1, 1996; DiVita]

occur when a certificate of occupancy, whether temporary and subject to minor items to be completed, or permanent, as the case may be, has been issued by the applicable governmental authority. The foregoing shall not be deemed to relieve Tenant of its responsibility to complete the Improvements in accordance with the Plans and Specifications.

3. <u>Costs</u>. Within thirty (30) days after the earlier of (i) Tenant's opening for business to the public, or (ii) Substantial Completion (if Opening Co-Tenancy is not satisfied at time of Substantial Completion) and Tenant's furnishing to Landlord (i) an indemnity in the form of Attachment 10 hereto against any lien filed by any general contractor, subcontractor or material supplier against the Premises or the Shopping Center as a result of nonpayment for, or disputes with respect to, labor or materials furnished to the Premises in connection with construction of the Improvements, (ii) the certificates of insurance required under paragraph 14 of the Lease, and (iii) if requested by Landlord, confirmation from Tenant that Landlord holds title to the Improvements (in form reasonably acceptable to Landlord and Tenant), Landlord shall pay to Tenant a "Tenant Improvement Allowance" in an amount equal to $63.56 per square foot of gross leasable area of the Building (which shall be conclusively determined by the amount of gross leasable area shown in Tenant's final construction drawings). The Tenant Improvement Allowance shall be payable by wire transfer of funds by Landlord to Tenant's account. If the Base Rent is increased or decreased pursuant to paragraph 4(ii) of this Lease, the Tenant Improvement Allowance shall likewise be proportionately increased or decreased. If Landlord fails to pay the Tenant Improvement Allowance in full within thirty (30) days after Substantial Completion and receipt, of items (i), (ii) and (iii) above, then Landlord shall be in default hereunder, no Ground Rent (if then being paid pursuant to paragraph 4(b) of this Exhibit "C"), Base Rent, CAM Charges or Real Estate Taxes shall be due or owing to Landlord until the same is paid to

[J:\013363\170\LEASE9.doc]
[October 29, 1996; DiVita]

Tenant, and interest shall accrue on the unpaid Tenant Improvement Allowance at the Default Rate commencing on the thirty-first (31st) day following Substantial Completion until the date of payment of the Tenant Improvement Allowance; provided, however, that if Landlord has not tendered payment of the Tenant Improvement Allowance by that date which is one (1) year from Substantial Completion (the "Substantial Completion Anniversary"), then (i) such date shall become the Commencement Date; (ii) Base Rent shall be reduced to ground rent **equal** to Seventy-Five Thousand and **No/100** Dollars ($75,000.00) per annum during the first year following the Substantial Completion Anniversary, Fifty Thousand and **No/100** Dollars ($50,000.00) per annum during the second year following the Substantial Completion Anniversary, and Twenty-Five Thousand and **No/100** Dollars ($25,000.00) per annum thereafter during the Term of the Lease; and (iii) this Lease shall be converted to a ground lease, with ownership of the Improvements remaining with Tenant, and Landlord's and any Mortgagees' names being removed as additional insureds or mortgagees on any casualty insurance described in paragraph 14(a) of the Lease. Landlord and Tenant covenant and agree that upon the reasonable written request of either the Tenant or Landlord, the Landlord and Tenant shall execute such documentation as necessary to formalize the conversion of this Lease to a ground lease upon the Substantial Completion Anniversary.

[J:\013363\170\LEASE9.doc]
[October 29, 1996; DiVita]

4. <u>Construction Delays</u>.

(a) <u>Delays by Landlord</u>. In the event, subject to force majeure, Landlord shall fail to complete the Site Work and accomplish delivery of the Land in the condition specified by the date set forth on <u>Attachment "4"</u> hereto Landlord agrees that it shall reimburse Tenant for its 'fixed and ascertainable costs incurred as a result thereof in the exercise of all reasonable and diligent efforts to open for business by the date which is one hundred eighty (180) days following the date Landlord should have delivered the Land and completed the Site Work. Such costs shall be limited to Tenant's reasonable out-of-pocket expenses of construction overtime, acceleration charges and bonuses paid to Tenant's contractors or subcontractors, charges for the scheduling of construction crews on days on which work cannot be performed due to the delays by Landlord and construction period interest charges actually incurred to the extent that such charges exceed those which would have accrued without such delay.

In the event, subject to force majeure, Landlord shall fail to accomplish delivery of the Land by the date which is thirty (30) days following the date Landlord should have delivered the Land, or to complete any element of the Landlord Work by the completion date established therefor in Attachment, Tenant, at its option and upon five (5) days' prior written notice to Landlord, which notice may be given prior to or at any time after the applicable date for performance, may in addition to any other rights and remedies set forth herein, enter the Shopping Center and perform any task required for delivery of the Land or, as applicable, any element of

[J:\013363\170\LEASE9.doc]
[October 29, 1996; DiVita]

the Landlord Work which has not been timely completed, and Landlord shall reimburse Tenant for its reasonable and actual costs thereof, including interest on such costs at the Default Rate.    Landlord hereby grants Tenant the right, as its agent, to directly contact and contract with Landlord's contractors, on behalf of Landlord, to complete such work, all at Landlord's cost and expense.    Landlord covenants, upon Tenant's request, to provide Tenant with duplicate sets of all plans, specifications and contracts prepared in connection with the construction of the Shopping Center, as well as schedules of all contractors, subcontractors and suppliers. If such costs are not reimbursed to Tenant prior to the Commencement Date, Tenant may offset such amounts against Base Rent, CAM Charges and Real Estate Taxes otherwise due until such costs and accrued interest are reimbursed in full.

In the event, for any reason whatsoever and regardless of force majeure, Landlord shall fail to complete delivery of the Land to Tenant by the date which is sixty (60) days from the date set forth on Attachment "4", Tenant shall be entitled to terminate this Lease at any time prior to such delivery and receive from Landlord promptly thereafter a sum equal to the actual out-of-pocket and substantiated third-party legal, architectural and engineering costs incurred by Tenant to the date of termination, not to exceed One Hundred Thousand and No/100 Dollars ($100,000.00).    In addition to any other rights and remedies set forth herein, if the Landlord fails to timely deliver the Land or any element of the Site Work as of the forty-fifth (45th) day after the intended date of delivery, and regardless of force majeure, Tenant may elect to delay opening of its store facility for a period not to exceed nine (9) months, during which time Tenant shall pay no Base Rent, Real Estate Taxes or CAM Charges.    In such event, Landlord shall deliver the Land and complete the Site Work on the date required by Tenant, and Landlord shall pay to Tenant on demand an amount equal to all costs incurred by Tenant in the development of its store facility, including, but not limited to, costs of materials and all engineering,

[J:\013363\170\LEASE8.W51]
[October 1, 1996; DiVita]

architectural and legal fees, as compensation to Tenant for the loss of store revenues due to Landlord's delays hereunder.

(b) <u>Delays by Tenant</u>. If, subject to force majeure, Tenant shall fail to commence its construction by that date which is ninety (90) days following delivery of the Land, Landlord at its option, upon prior written notice to Tenant, may require Tenant to proceed with its construction and commence payment of Ground Rent (on the date which is one hundred eighty (180) days following delivery of the Land.

If, subject to force majeure, Tenant shall fail to achieve Substantial Completion by that date which is one hundred ninety-five (195) days following delivery of the Land, Landlord, at its option, upon prior written notice to Tenant, may require Tenant to proceed with its construction, commence payment of Ground Rent on the date which is one hundred ninety-five (195) days following delivery of the Land, and reimburse Landlord for its fixed and ascertainable costs incurred as a result thereof. Such costs shall be limited to Landlord's out-of-pocket expenses of construction overtime, acceleration charges and bonuses paid to Landlord's contractors or subcontractors, charges for the scheduling of construction crews on days on which work cannot be performed on account of the aforesaid delays by Tenant, the cost of erecting barricades around Tenant's unfinished work and construction period interest charges to the extent that such charges exceed those which would have accrued without such delay.

In the event, for any reason whatsoever and regardless of force majeure, Tenant shall fail to achieve Substantial Completion by that date which is one (1) year following delivery of the Land, Landlord shall be entitled to terminate this Lease upon sixty (60) days prior written notice to Tenant, during which sixty (60) day period Tenant may cure any such default hereunder.

For purposes hereof, "Ground Rent" shall equal a eleven percent (11%) per annum return to the Landlord on the Landlord's actual costs incurred in the delivery of the Land, including the

[J:\013363\170\LEASE9.doc]
[October 29, 1996; DiVita]

proportionate amount of land costs, construction costs and carrying costs incurred by the Landlord relating solely to delivery of the Land.

(c) **Mi scellaneous.** Notwithstanding the foregoing, a delay by any party in exercising its cure rights or other remedies hereunder shall not be deemed an event of force majeure for purposes of extending the date(s) established for performance by the party whose actions or omissions gave rise to such cure rights or remedies. All sums owing to Tenant under paragraph 1 hereof **and/or** subparagraph (a) above shall, to the extent applicable, be added to the Tenant Improvement Allowance and paid simultaneously therewith; and, if not so paid, Tenant shall be entitled to offset all such costs, plus interest at the Default Rate, against Base Rent. All sums owing to Landlord under subparagraph (b) above shall, to the extent applicable and except for Base Rent, CAM Charges and Real Estate Taxes, be deducted from the Tenant Improvement Allowance.

Notwithstanding anything contained herein to the contrary, Landlord covenants that it shall complete its construction and delivery obligations in accordance with the "Completion **Dates**" set forth in the Construction Schedule. In the event that the Landlord fails to complete its construction and delivery obligations in accordance with such Completion Dates, Tenant may, at its sole election, exercise such remedies as are set forth in this **Exhibit "C"** and the Lease.

5.    Attachments.

"1"    Environmental   Certification
"2"    Scope  of  Geotechnical  Evaluation
"3"    Standards  for  Grading  Work
"4"    Construction   Schedule
"5"    Site  Work  Certification
"6"    Utilities   Specifications
"7"    Paving   Specifications
"8"    Shopping  Center  Lighting  Specifications

14

"9"   Plans  and  Specifications

"10"   Indemnity

[J:\013363\170\LEASE8.W51]
[October 1, 1996; DiVita]

## Attachment "1"

Circuit City Stores, Inc.
9950 **Mayland** Drive
Richmond, VA **23233**

ATTN : _____

This letter is written with respect to paragraph 1(a) of Exhibit
**"C"**, which are the Construction Provisions to your lease with
Shoppes of Beavercreek Ltd., dated _____, 195___ (the
"Lease").   We have been retained by _____ **to provide** an
environmental site assessment **report concerning** any **potential**
environmental hazards present on or about the shopping center
property which is the subject of the Lease.   We understand that the
provision of a report in form and substance satisfactory to Circuit
City is a condition of the Lease.   Please be advised that Circuit
City can rely on our environmental site assessment report entitled
_____, dated _____, subject to the limitations and
**qualifications** contained **therein (the** "Report").   The **Report** meets
the requirements of the Phase **I (and/or** Phase II) Environmental
Assessment as described in the Lease, a copy of the relevant
portions of which have been delivered to us.   Attached to this
letter as Enclosure 1 is a description of our professional
liability insurance coverages, including the name of the carriers
and the amount of the coverages.

Sincerely,


_____    (Name of consultant)

1

## Attachment "2"

Scope of Geotechnical Evaluation

I. **GENERAL**

    A.    All borings shall comply with all applicable codes and regulations.

    B.    Circuit City shall be informed, by phone, of the job progress and of any unexpected or special conditions.

    C.    Soil samples shall be retained by the soil testing firm for at least: Six (6) months on projects where shallow foundations are recommended; twelve (12) months on projects where deep foundations are recommended. (Differing periods may be acceptable. If deviations from the specified periods are proposed, state proposed periods, and state any additional cost to comply with the specified periods).

    D.    The time required to complete the soil boring, testing, and investigation report following authorization to proceed shall be twenty-one (21) calendar days or less.

    E.    At the end of the agreed upon time period, submit to Circuit City six copies of the report including black line prints of all logs, charts, diagrams, drawings, etc. on **8-1/2"** x **11"** sheets.

    F.    All reports are to be sealed by an Engineer licensed in the State in which the work is performed.

    G.    Evidence of suitable levels of Professional Liability, General Liability and Workmen's Compensation Insurance Coverage is required before commencing work.

II.    Within 21 days after notification by Circuit City Stores, the developer or A/E firm shall furnish a Report of Subsurface Investigation, which shall be performed by an independent soils engineer approved by Circuit City, and shall include the following:

    A.    **Visual Description and Report:** Describe the Shopping Center site as to existing conditions noting in particular any unique or unusual features which might affect any proposed construction.

1

B. Soil borings shall be as follows:

1. In granular soils, borings shall be standard penetration tests employing a 140 lb. hammer having a free fall of **30"** and using a **2"** outside diameter **(1-3/8"** ID) split spoon, ASTM Method D-1586.

**2.** In cohesive soils, standard penetration test **ASTM-** D-1586 or thin wall tube sampling of soils ASTM **D-** 1587 **may be** employed. .

C. Soil samples shall **be** taken at **2'-6"** intervals up to **10'** depth and at **5'** or at each change of strata thereafter.

**D.** Indicate as accurately as possible the water line in all holes, at the time of boring and twenty-four (24) hours later.

E. Where fill is encountered trenching **or** other explanatory procedures should be employed. Fill shall be described in great detail, including such information as approximate amount of organic material, topsoil, wood, or other decaying matter, loose or well compacted, amount of moisture, amount and type of debris, where **compactible** or to be removed, etc.

**F.** Where rock is encountered, rock core samples of a minimum **1-1/4"** diameter **and** minimum **5'-0"** length shall be obtained, recovery ratios shall be given as well as a clear description of the type of rock, in particular, the means required to excavate **same.**

G. At least five (5) borings should be taken within the Building Area limit lines on the Circuit City Parcel (with one at each extreme corner). The specific information required includes:

1. Allowable bearing pressure under footings for dead load, dead plus live load and dead plus lateral loads.

**2.** Friction value for lateral load-soil to footing.

**3.** Friction value for drilled **caissons** for uplift.

**4.** Equivalent fluid pressure to be used for retaining wall design.

**5.** Allowable passive resistance of soil-for lateral loads on drilled caissons and footings.

[J:\013363\170\LEASE8.W51]
[October 1, 1596; DiVita]

6.   Evaluation of the suitability of on-site material for engineered fill.

7.   The typical loads for a Circuit City building vary from location to location; however, the following general criteria is provided:

| SNOW LOAD (PSF) | MAX. INT. COL. LOAD (KIPS) | MAX. EXT. COL. LOAD (KIPS) | MAX. EXT. NON-LOAD. BEARING WALL (KIPS/FT) |
|---|---|---|---|
| 0 | 46 | 26 | |
| 20 | 58 | 33 | |
| 25 | 65 | 37 | |
| 30 | 71 | 41 | 3.0 |
| 35 | 78 | 45 | |
| 40 | 85 | 48 | |

1.   Assumes tributary area of 1326 ft.
2.   Assumes tributary area of 750 ft.
3.   Assumes 12" normal weight block reinforced at 24" o.c.

8.   Comment on effect of expansive soil and recommended footing depth to minimize effect of expansive soil. When material has a plastic index greater than twenty, swell tests shall be performed.

9.   Recommendation for slab construction; including thickness, reinforcing, moisture barrier, and capillary break.

10.   Recommendations on the need for geological and/or seismic investigations of the site or surrounding area.

11.   Recommendations on the need for additional boring samples based on the consistency of the boring data previously obtained.

12.   The report shall include a statement describing the field investigation technique and laboratory procedures. Include a commentary on the site in general as well as on the subsurface conditions.

13. Test data shall be illustrated on table, charts, graphs, etc., as required to summarize the results.

14. Final boring logs shall give a detailed description of the various soil strata and they shall include the group symbol based on the Uniform Soil Classification System.

15. Recommended specification for **materials** and placement of any required off site fill including granular and cohesive materials. Estimated cost per cubic yard installed for these materials.

16. Provide an indication of how susceptible the **on-site** materials are to moisture damage during the construction season at the proposed **subgrade** elevations and what recommended procedures should be taken to alleviate possible problems.

c.  **Pavement Design**    Perform soils borings and any other field investigations necessary to provide a recommendation for the design of pavement sections for a 20 year life span and various traffic indices.

If poor **subgrade** material is encountered, recommend an alternate paving design using a reinforcing fabric (such as Mirafi 500X) and a thickened paving base, including thickness and material specifications for topping, asphaltic base, primer (if required) and reinforcing fabric and an estimated in-place cost per square yard for both the paving and fabric system.

Recommend both a heavy and light duty paving system, including thickness and material specification for topping, asphaltic base primer (if required) and granular sub-base. Light duty paving should be based on an estimated 500 automobiles per day and general parking. Heavy duty paving should be based on 500 automobiles per day, plus 3 tractor trailers per day with 9000 lb. wheel loads. Provide an estimated cost per square yard for both the paving and base in-place.

D.  **Foundation Investigation Recommendations and** E v a - :

1. Grading and Earthwork. Described recommended procedures relating to:

   (a) Stripping.
   **(b)** Excavations.
   (c) Fills (import and **On-Site** material).
   (d) Suitability of on-site top soil material for landscaping.

4

(e) Grading operations.
**(f)** Compaction.
(g) Stockpiling on-site materials.

2. Footings/Foundations:

   (a) Described suitable foundation systems and attendant requirements.
   (b) Describe advantages and disadvantages of any logical and/or feasible alternative systems.
   (c) Bearing values.
   (d) Setting depths.
   (e) Soil preparation.
   (f) Anticipated settlement or movement (in inches). The maximum differential **movement shall be 1/2** inch.
   (g) Foundation drainage system, if required.

3. Non-structural Slab on Grade.   Describe recommended procedures relating to:

   (a) Soil preparation.
   **(b)** Slab reinforcement.
   (c) Slab underlayment with particular attention to capillary breaks or moisture problems.
   (d) Anticipated settlement or movement (in inches). The maximum differential movement shall be **1/2** inch.
   (e) Underslab drainage **system**, if required.

4. Retaining Walls.   Design requirements/parameters for:

   (a) Equivalent fluid pressure.
   **(b)** Backfills.
   **(c) Drainage.**
   (d) Provide design requirements/parameters for capabilities of soil to support these structures.

5. Light pole bases or similar pole structures:   Provide design requirement/parameters for capabilities of soil to support these structures.

## Attachment "3"

Standards for Grading Work

1.    The Land and the Shopping Center shall be graded in accordance with the following:

(a) The Final Plans shall show contours in accordance with standard engineering practice and these contours shall be shown with the existing (shown as a dashed line) and final (shown as a solid line) elevations. Whether existing or proposed, all buildings, improvements, roads and highways, including those adjacent to the Shopping Center, shall be shown in their true locations.

(b) The Building will be accessible by grade level parking only. Steps and stairs are not permitted.

**(c)** Sidewalk at the Building will slope away from the Building with grade of no less than 1.5% and no more than 3.0%. All water shall be sheet drained away from the Tenant's doors.

(d) Asphalt paving areas will be graded to avoid ponding water with slopes no less than 1.5% and no more than 4.0%. Entrances and access drives shall have a maximum slope of 6.0%.

(e) Surface drainage swales will not be allowed without prior approval of Tenant. Such swales must have **a** grade of not less than 0.5% and no **more** than 3.5% and shall be constructed of concrete.

(f) The cut and fill on the Shopping Center site should be balanced, if practical. All fill material must be of a select grade and sources for acquisition of fill material, as well as locations for cut material, must be identified.

(g) **No** retaining walls or embankments causing breaks in grade shall be permitted unless specifically approved by Tenant.

2.    "Tenant's Pad **Area"** shall be defined as **the** area extending five (5) feet beyond the Building walls and truck dock and ramp area, or to the back of curbing around the Building,

1

whichever is further.   The Site Work shall comply with the
following additional requirements:

     (a) Landlord shall be responsible for preparing the
Tenant's Pad Area subgrades to within plus or minus one-tenth of a
foot as set by Tenant's architect.   Tenant's subgrades are
typically **8"-10"** below finished floor elevation.  Landlord will
complete compaction in accordance with the appropriate engineering
standards and building code requirements, but in no event less than
ninety-five percent (95%) of the modified proctor soil test for
water content and compaction levels ("Modified **Proctor")** on the
Land, so as to enable Landlord to perform construction work
necessary to provide completed Improvements in accordance with the
**"Plans** and Specifications" {defined in the Construction
Provisions), with standard footings and without the necessity of
pilings or spread footings or other extraordinary foundation work.
Tenant's minimum slab thickness and under slab fill will be
established in accordance with the report of an independent
professional soils engineer.   Such report will be obtained by
Landlord at its sole expense.   All compacted areas of the site
shall be verified by an independent professional soils engineering
test laboratory and a certificate from such independent laboratory
indicating compliance with the soils report shall be furnished to
Tenant upon completion of the Site Work.

     {b) Tenant's Pad Area soil shall have a minimum bearing
capacity of 2,500 pounds per square foot.   Earth stabilization
and/or replacement shall be performed by Landlord as necessary to
meet this minimum requirement.

     (c) During the preparation of Tenant's Pad Area,
Landlord shall at its expense have an independent professional
soils engineering test laboratory monitor and certify the
preparation of Tenant's Pad Area in accordance with the independent
soils engineer's report referenced in Attachment **"2" (II)** above.
The greater of three in-place compaction tests per work day or one

in-place compaction test per 5,000 square feet of pad area must be completed.

(d) On or before the date of delivery of the Land, Landlord shall provide Tenant with:

(i) An independent soils engineer's written certification that all pad work was completed in accordance with the Soils Report, Final Plans and the Plans and Specifications. This report shall include the results of all compaction and other tests performed during the pad preparation phase and any tests performed prior to the date of such certification. A copy of such certification shall be delivered to Tenant's Vice **President-**Construction at Tenant's address set forth in paragraph 34.

(ii) A surveyor's written elevation certification stating that Tenant's Pad Area is at the prescribed elevation within the stated tolerance of plus or minus one-tenth of a foot. This certification shall be based upon an "as-prepared" survey which shall accompany such certification' and shall show thereon elevation shots taken on a 50-foot-grid minimum including pad perimeter and building corners. Promptly upon completion of the Site Work, Landlord shall cause its surveyor or engineer to designate the corners of the Land by means of standard surveying monuments.

(e) Landscaping slopes and berms shall be set by Landlord to preserve the integrity of the slopes as determined by an independent soils engineer. However, in no case may the slope of a landscaping berm exceed 3 to 1 in turf areas, or 2 to 1 in ground cover and shrub areas.

(f) Top soil excavated during grading of the Shopping Center shall be stockpiled by Landlord and made available for use during final landscaping operations including landscaping inside perimeter sidewalks around the Building, if found agronomically suitable by an independent soils analysis lab. Other excavated soil material shall be stockpiled and made available for use as

[J:\013363\170\LEASE8.v51]
[October 1, 1996: DiVita]

backfill if required, but only if a soil report indicates it is suitable.

(g) All material, including native and fill, within 3 feet of any surface of the building including foundation **concrete,** shall be nonexpansive with a plasticity index of 12 or less. The material shall also have sufficient cohesion to stand vertically for 3 feet. No oversize material or lumps greater than **6"** in diameter will be allowed and not more than 15% of the material shall be greater than **2-1/2"** diameter.

(h) The Final Plans shall not be materially changed by Landlord without the prior consent of Tenant, which consent shall not be unreasonably withheld or delayed.

(i) All **outlots** or future building areas shall be rough graded and planted with grass seed.

[J:\013363\170\LEASE8.V51]
[October 1, 1996; DiVita]

## Attachment "4"

### Construction    Schedule

| Landlord's  Task | Completion Date |
|---|---|
| 1.    Landlord's  delivery  of  full  and complete  civil  engineering  plans  for  the Shopping  Center  and  architectural  scale building  elevations. | Sept.  15,  1996 |
| 2.    Landlord's  dates  for  offsite improvements/  obtaining  permits,  etc. | Jan.  15,  1997 |
| 3.    Construction  of  all-weather construction  access  to  the  Premises, staging  area  and  curbcuts  in  Tenant's Preferred  Area. | Dec.  2,  1996 |
| 4.    Completion  of  Site  work  including approval  for  all  curbcuts. | Dec.  2,  1996 |
| 5.    Installation  of  temporary utilities. | **Dec.2,  1996** |
| 6.    Landlord's  delivery  of  the  Land  to Tenant. | **Dec.  2,  1996** |
| 7.    Landlord's  delivery  of  pad certification  from  soils  engineer. | **Dec.  2,  1996** |
| 8.    Construction  and  installation  of permanent  utilities  including  permanent telephone  service  to  within  5  feet  of the  building  pad | **Dec.  2,  1996** |
| 9.    Construction  and  installation  of storm  water  drainage. | April  13,  1997 |
| 10.    Construction  and  installation  of paving  (including  heavy-duty  paving) and  curbing  for  parking  areas, vehicular  access  and  service  roads  and driveways. | April  13,  1997 |

[J:\013363\170\LEASE9.doc]
(November  22,  1996;  DiVita)

| **Landlord's Task** | **Completion Date** |
|---|---|
| 11.   Completion of landscaping at Shopping Center. | April 13, 1997 |
| 12.   Construction and installation of exterior lighting in the Shopping Center. | April 13, 1997 |
| 13.   Construction and installation of pylon and monument sign(s) identifying the Shopping Center. | April 13, 1997 |
| 14.   Construction of Towne Drive. | Earlier of April 13, 1997, or 30 days prior to opening of Tenant's store |

Attachment "5"

Site Work Certification

To:   Circuit City Stores
      9950 Mayland Drive
      Richmond, Virginia  23233
      Attention:  Vice President-Real Estate

          Re: Circuit City Store/Beavercreek, Ohio-Lease Agreement dated

Ladies and Gentlemen:

     The undersigned, as Landlord under the Lease has caused "delivery of the Land" to occur, and accordingly, completion of the Site Work, all in accordance with the terms of the Lease. Specifically the undersigned hereby certifies that:  (i) the grading of the Land and Common Areas has occurred in accordance with the Standards for Grading Work, attached as Attachment "3" to the Lease, and Tenant's building pad has been prepared strictly in accordance with your geotechnical report; (ii) the Staging Area has been completed and (iii) an all-weather construction access road to the Land no less than 24 feet width has been prepared and is ready for your use.

     All conditions precedent to issuance of your building permit have been satisfied by the Landlord (except for those items required to be furnished by Tenant such as Tenant's construction plans and specifications), and we certify that all elements of the Site Work and delivery of the Land have been satisfied in accordance with the Lease.

          [LANDLORD]

1

## Attachment "6"

Utilities    Specifications

Landlord will provide the following temporary utilities to within fifty (50) feet of the Premises no later than the date for completion of such temporary utilities set forth in the Construction Schedule:

> water (**2"** line, with sufficient pressure that pumping is not necessary), electric power (200 **amps,** 1-phase, 4-wire, 120 volts, with weatherproof **and** rainproof fused disconnect switch) and temporary telephone for use by Tenant in its construction of the Improvements.

Landlord will provide the following permanent utilities to within five (5) feet of the Premises at Tenant's identified entry points no later than the date for completion of such permanent utilities set forth in the Construction Schedule:

> **gas** (if available), telephone, permanent electricity (adequate for **800-amp** panel, **3-** phase, **277/480** volt), storm sewer system (in accordance with Final Plans), sanitary sewer (6" line), domestic water (**2"** line), fire protection water (**8"** line, 50 pounds per square inch residual pressure, 2000 gallons per minute or at least sufficient capacity to service Tenant's sprinkler system without the need for any fire pump, as approved by Tenant's fire protection consultant).

## Attachment "7"

Paving   Specifications

1.   With respect to parking area and roadway surfacing:

(a) Pavement design shall be based on a "Design Period" of twenty (20) years for the traffic indices specified by an independent civil engineer approved by Tenant and compensated by Landlord.

(b) All pavement design shall be subject to review and approval by Tenant, and shall conform to the recommendations of an independent soils engineer selected and compensated by Landlord.

(c) Consideration must be given to heavier use in main drives and service area.

2.   With respect to sidewalks and curbs:

(a) Landlord shall provide and install all curbs and sidewalks including perimeter curbs and sidewalks.

(b) All sidewalks and curbs shall be constructed of concrete and shall have a minimum slope of 1.5% and a maximum slope of 3.0% away from the Building.  All sidewalks and curbs shall be a minimum of four (4) inches thick, with a rough non-skid texture (as approved by the Landlord's architect with respect to the Common Area), over a suitable granular base.   Salt finish is not acceptable.

(c) Entrance and access roads and other areas as required for suitable drainage, shall have six (6) inch curbswith 18-inch gutters; however, next to sidewalks and buildings when drainage is not a factor a straight curb six (6) inches (without gutters) above the finished paving shall be permitted. Parking lot islands and landscape enclosures shall be vertical barrier-type curbs and all integral-type curbs and gutters and vertical barrier-type curbs shall be concrete.  Extruded asphalt or concrete curbing may not be used.

(d) All non-parking areas shall be clearly designated as such by the erection of signs.

(J:\013363\170\LEASE8.W51)
(October 1, 1996; DiVita)

## Attachment "8"
Shopping Center Lighting Specifications

Subject to the requirements contained in the PUD, **minimum** design standards for lighting of the Shopping Center are as follows:

1.  The Developer shall prepare and submit plans showing the location and height of all light poles\, fixtures, type of fixture shielding (if any), circuiting and details of the complete lighting arrangement and equipment.

2.  Illumination as measured at pavement shall be:

    a.   5.0 foot candles minimum maintained within **50'** of Tenant's entry.

    b.   2.0 foot candles minimum maintained throughout, measured at grade.

3.  Twenty-five percent (25%) of the overall lighting shall be designated as security lighting (i.e., remains on from dusk to dawn). The security lighting layout and pattern shall be subject to Tenant's approval.

4.  Selection of fixture types shall be subject to Tenant's review and approval prior to design and circuiting.

5.  Landlord shall install a seven-day time switch to control all parking area lighting wired to a common house panel. All security lighting shall be placed **on** photo-cell switching.

6.  The control of parking area lights shall be accessible to Tenant's local store management due to late-night and holiday sales.

7.  Entry canopy soffit: 40.0 foot candles. Landlord to provide (2) 1000 w. spot lights focused on Circuit City's entry canopy.

[J:\013363\170\LEASE8.\51]
[October 1. 1996; DiVita]

Attachment "9"

Plans Prepared by De Stefano and Partners dated October 4, 1996 for Circuit City, entitled 'Circuit City Store, Shoppes at Beaver Creek, Beaver Creek, OH"

List of Drawings

| | |
|---|---|
| T1.0 | TITLE SHEET |

**CIVIL**   (INCLUDED FOR REFERENCE ONLY)

| | |
|---|---|
| C1 | GRADING PLAN |
| C2 | SITE UTILITY PLAN |

**ARCHITECTURAL**

| | |
|---|---|
| A2.0 | LIFE SAFETY PLAN |
| A2.1 | FLOOR PLAN |
| A2.2 | FIXTURE PLAN |
| A2.3 | ROOF PLAN AND DETAILS |
| A2.4 | FINISH SCHEDULE |
| A2.5 | DOOR SCHEDULE & DETAILS |
| A2.6 | STOREFRONT ELEVATIONS & DETAILS |
| A2.7 | WAREHOUSE SHELVING & MISCELLANEOUS DETAILS |
| A3.1 | ELEVATIONS |
| A3.2 | EXTERIOR WALL SECTIONS |
| A3.3 | ENTRY TOWER SECTIONS & DETAILS |
| A4.1 | VESTIBULE PLAN & DETAILS |
| A4.2 | ENLARGED PLANS & DETAILS |
| A1.3 | FIXTURE SECTIONS & MILLWORK DETAILS |
| A5.1 | INTERIOR ELEVATIONS |
| A5.2 | INTERIOR ELEVATIONS |
| A6.1 | REFLECTED CEILING PLAN |

**STRUCTURAL**

| | |
|---|---|
| S0.1 | GENERAL NOTES AND TYPICAL DETAILS |
| S1.1 | FOUNDATION PLAN |
| S1.2 | FOUNDATION DETAILS |
| S2.1 | ROOF FRAMING PLAN |
| S2.2 | ROOF FRAMING DETAILS |

**MECHANICAL**

| | |
|---|---|
| M1.0 | ROOF PLAN AND SCHEDULES |
| M2.0 | HVAC PLAN |

**PLUMBING**

| | |
|---|---|
| P1.0 | GENERAL NOTES, SCHEDULES AND LEGEND |
| P2.0 | PLUMBING FLOOR PLAN |

**ELECTRICAL**

| | |
|---|---|
| E1.0 | LIGHTING AND SIGN PLAN |
| E2.0 | STS PLAN – ALARM, SOUND, POS AND TELEPHONE PROVISIONS |
| E2.1 | STS PLAN – ANTENNA AND CAMERA COAX CABLE PROVISIONS |
| E3.0 | STS – DIAGRAMS AND DETAILS |
| E4.0 | POWER P U N M D. DETAILS |
| E5.0 | UNDERFLOOR ROUGH-IN |
| E6.0 | RISER DIAGRAM AND PANEL SCHEDULE |
| E7.0 | ENERGY MANAGEMENT SYSTEM CONTROL WIRING |

Attachment "10"

INDEMNIFICATION   AGREEMENT


This Indemnification Agreement is made between SHOPPES OF BEAVERCREEE LTD, an Ohio limited liability company (hereinafter referred to as "Landlord") and CIRCUIT CITY STORES, INC., a Virginia corporation (hereinafter referred to as "Tenant").

WITNESSETH

WHEREAS, Landlord and Tenant have entered into a Lease (the "Lease") dated _____ whereby Landlord has leased to Tenant a portion of the real property located in at the intersection of North Fairfield Road and New Germany-Trebein Road, Greene County, Ohio (the "Shopping Center") and Tenant has constructed on such real property a store premises (the "Premises").

NOW, THEREFORE, in consideration of the payment of the Tenant Improvement Allowance as defined in the Lease and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

1. The Tenant hereby indemnifies and agrees to hold the Landlord harmless from any loss, payment, claim or expense as the result of any general contractor, subcontractors or material supplier filing mechanics or materialmen liens or otherwise making claims against Landlord's interest in the Premises and the Shopping Center in connection with construction of the Improvements (as such term is defined in the Lease) by Tenant. In the event that any contractor, subcontractor or material supplier makes claim against the Premises or Shopping Center based upon materials or services provided under contract with Tenant or its general contractor,

1

Tenant shall hold harmless and protect the Landlord from any loss, payment, claim or expense related thereto.

2.  Tenant reserves the right to contest in good faith the amount of any claim or lien assessed against the Premises or the Shopping Center by any of such subcontractor; provided, however, should the holder or holders of such claim or lien attempt to enforce their lien by foreclosure or by any other means, Tenant shall bond around, pay or remove such lien by any manner reasonably necessary to protect Landlord's interest in the Premises and the Shopping Center.  This indemnity and hold harmless shall not apply to any liens or claims caused by the Landlord or Landlord's agents.

EXECUTED this _____ day of _____, 199__.


LANDLORD                         SHOPPES OF BEAVERCREEK, LTD.,
                                 an Ohio limited liability company


                                 By: _____
                                      Name: _____
                                      Title: _____



TENANT                           CIRCUIT CITY STORES, INC.,
                                 a Virginia corporation



                                 By: _____
                                      Name: _____
                                      Title: _____


2

## EXHIBIT "D"

STORE FIXTURES

ALL STORAGE RACKING

ALL SECURITY SYSTEM ITEMS

TELEPHONES AND PAGING SYSTEMS

COMPUTER SYSTEM

OFFICE FURNITURE AND TRASH RECEPTACLES

BATTERY CHARGER

TRASH COMPACTOR

SIGNS (INTERIOR/EXTERIOR)

ANTENNA SYSTEM

ELECTRONIC SWITCHING

AIR COMPRESSOR (ROADSHOP)

SAFE

CONVEYOR

**MEDECO** CYLINDER LOCKS (5)

REFRIGERATOR AND MICROWAVE USED BY EMPLOYEES

TACK BOARDS

WATER COOLER

FIRE EXTINGUISHERS

AUDIO ROOM FIXTURES AND SWITCHGEAR

PICTURES

WAREHOUSE AND MATERIAL HANDLING EQUIPMENT (MOVABLE LADDERS,
DOLLIES, ETC.)

TRACK LIGHTS (CANS ONLY, NOT TRACKS)

[J:\013363\170\LEASE8.W51]
[October 1, 1996; DiVita]

## EXHIBIT "G"

### SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

(Mortgage)

THIS AGREEMENT, dated the _____ day of _____,
199 ____ , between _____, a
_____ ("Mortgagee"), and CIRCUIT CITY
STORES, INC., a Virginia corporation ("Tenant").

W I T N E S S E T H :

(a) Tenant has entered into a certain lease (the "Lease")
d a t e d   - - - - - - - - I   _ - _ - - - - -   w i t h
_____
("Landlord"), covering premises located within that certain
property known as _____ Shopping Center, located in
the City of _____, _____ County, _____,
and more particularly described in schedule hereto; and

(b) Mortgagee has made a loan to Landlord as evidenced and
secured by a Deed of Trust recorded _____, 199 ___ in the
land records of _____ County, _____, in Hook
_____ at page _____ (the "Mortgage"), encumbering the property
described in Schedule A; and the parties hereto desire to set forth
their agreement with regard to the priority of the Mortgage and the
effect thereof on Tenant and its leasehold interest in the
aforesaid premises, as set forth below.

NOW, THEREFORE, in consideration of the premises and of the
sum of One Dollar ($1.00) by each party in hand paid to the other,
the receipt of which is hereby acknowledged, the parties hereby
agree as follows:

1.     The Lease is and shall be subject and subordinate to the
       lien of the Mortgage insofar as it affects the real
       property of which the premises form a part, and to all
       renewals, modifications, consolidations, replacements and

1

extensions thereof, to the full extent of the principal sum secured thereby and interest thereon.

2.   Tenant agrees that it will **attorn** to and recognize **any** purchaser at a foreclosure sale under the Mortgage, any transferee who acquires the premises by deed in lieu of foreclosure, the successors and assigns of such purchasers, as its Landlord for the unexpired balance (and any extensions, **if** exercised) of the term of the **Lease** upon the same terms and conditions set forth in the Lease.

3.   In the event that it should become necessary to foreclose the Mortgage, Mortgagee thereunder will recognize this Lease and all of Tenant's rights hereunder, and Mortgagee will not terminate the Lease nor join Tenant in summary or foreclosure proceedings so long as Tenant is not in default under any of the material terms, covenants, or conditions of the Lease, beyond *any* applicable cure period provided in the Lease.

4.   Mortgagee consents to the application of casualty **and** condemnation proceeds in accordance with paragraphs 15 and 16 of the Lease between Landlord and Tenant, whether or not the Mortgage is then foreclosed.

5.   In the event that Mortgagee shall succeed to the interest of Landlord under the Lease, Mortgagee shall not be:
(a) liable for any act or omission of any prior lessor (including Landlord); or
(b) liable for the return of any security deposits unless delivered to Mortgagee; or

2

(c) bound by any rent or other periodic payments which Tenant might have paid for more than the current month to any prior lessor (including Landlord); **or**

(d) bound by any amendment or modification of the Lease made without its consent, which consent shall not be unreasonably withheld or delayed.

Notwithstanding the foregoing, Mortgagee acknowledges and agrees that if Mortgagee shall succeed to the *interest* of Landlord under this Lease, Mortgagee shall be subject to Tenant's rights of self-help and/or **setoff** for any default, obligation, act or omission of any prior lessor (including Landlord) as provided in the Lease and that such rights of Tenant are not limited or impaired in any way by the **terms** and provisions of this Agreement.

6. Notwithstanding anything contained herein to the contrary, it is expressly understood and agreed that in the event that Landlord defaults in the payment of the Tenant Improvement Allowance, as defined in the Lease, and Mortgagee acquires title to the Shopping Center by foreclosure or otherwise, Mortgagee shall become liable for payment of the Tenant Improvement Allowance to Tenant, and Tenant shall otherwise **be** entitled to effect a Transfer all in accordance with the terms of the Lease.,

7. Notwithstanding anything contained in this Agreement, Mortgagee acknowledges and agrees that if Mortgagee shall succeed to the interest of Landlord under this Lease, Mortgagee shall be subject to all of Tenant's remedies properly exercised under the Lease, including but not limited to Tenant's rights **of** self-help and/or **setoff** for any default, obligation, act or omission of any prior lessor (including Landlord) as provided in the' Lease and

3

[J:\013363\170\LEASEB.V51]
[October 1, 1996; DiVita]

that such rights of Tenant are not limited or impaired in any way by the terms and provisions of this Agreement,

8.  Mortgagee, Landlord and Tenant, respectively, represent and warrant to each other that each has the requisite power and authority to enter into this Agreement; **that** all necessary and appropriate approvals, authorizations and other steps have been **taken to** effect the legality of this Agreement; that the signatories executing this Agreement on behalf of Mortgagee, Landlord and Tenant have been duly authorized and empowered to execute this Agreement on behalf of Mortgagee, Landlord and Tenant, respectively; and that this Agreement is valid and shall be binding upon and enforceable against Mortgagee, Landlord and Tenant and their successors and assigns and shall insure to the benefit of Mortgagee, Landlord and Tenant and their successors and assigns.

[J:\013363\170\LEASE8.W51]
[October 1, 1996; DiVita]

IN WITNESS WHEREOF, the parties hereto have executed these presents the day and year first above written.


ATTEST:                           CIRCUIT CITY STORES, INC.,
                                  a Virginia corporation

_____           B               Y
_____


ATTEST:                           COMPANY **NAME**

_____           B           Y           :
_____


Note: Attach appropriate notary blocks for the State.

[J:\013363\170\LEASE8.v51]
[October 1, 1996; DiVita]

## EXHIBIT "H"

### MEMORANDUMOF LEASE

This Memorandum of Lease is made this _____ day of
_____, 199___, between
_____, a
_____ (hereinafter referred to as **"Landlord"**),
and CIRCUIT CITY STORES, INC., a Virginia corporation **(hereinafter
referred to as "Tenant").**

### W I T N E S S E T H :

Landlord and Tenant have **entered into** a Lease (the **"Lease"**)
**dated** _____, 199___, whereby Landlord has leased to
Tenant a portion of **the** real property (the "Property"), City of
Beavercreek, County of **Greene**, Ohio, the legal **description** of which
Property is set forth on **Exhibit "A-1"** attached hereto. The Lease
contains provisions and rights appurtenant to the Property, some of
which are as follows:

I.   **Term.** The term of the Lease is for a period of twenty
     (20) years, commencing on the Commencement Date [as
     established in the Lease based upon the first to occur of
     (i) one hundred eighty (180) days after Landlord's
     delivery of the Land (as defined in the Lease) to Tenant
     and Tenant's receipt of all required City, County and
     State permits and approvals to construct the Improvements
     (as defined in the Lease) on the Premises (as defined in
     the Lease), or (ii) the date Tenant first opens the
     Premises for business to the public; **provided, however,**
     in no event shall the Commencement Date occur until
     Landlord has paid to Tenant the Tenant Improvement
     Allowance (as defined **in** the Lease) and the "Opening **Co-
     Tenancy"** (as defined in paragraph 37(h) of the Lease) has
     been satisfied]. Thereafter, Tenant has the right under
     the Lease to renew and extend the term of the Lease for
     four (4) successive periods of five (5) years each.

II.  Intentionally   Omitted

III. **Successors.** The covenants, conditions and agreements
     made and entered into by the parties hereto shall be
     binding upon and inure to the benefits of their
     respective   heirs,   administrators,   executors,
     representatives, successors and assigns.

IV.  **Incorporation of Lease.** **All** terms **and conditions of the**
     Lease are hereby incorporated herein by reference as if
     fully set forth herein.

[J:\013363\170\LEASE9.doc]
[October 29, 1996; DiVita]

V.   **Conflicts with Lease**.  This Memorandum of Lease is solely
     for notice and recording purposes and shall not be
     construed to alter modify, expand, diminish or supplement
     the provisions of the Lease.   In the event of any
     inconsistency between the provisions of this Memorandum
     of Lease and the provisions of the Lease, the provisions
     of the Lease shall govern.

     IN WITNESS WHEREOF, this Memorandum of **Lease** has been duly
executed by the parties hereto as of the day and year first above
written.

|  |  |
|---|---|
| | SBOPPES OF BEAVERCREEX, LTD.,<br>an Ohio limited liability<br>company |
| Attest: | |
| | |
| By: _____<br>  **Secretary** | **By:**_____<br>**Name:**_____<br>**Title:**_____ |
| | CIRCUIT CITY STORES, INC.,<br>a Virginia corporation |
| Attest: | |
| | |
| By: _____<br>    Secretary | **By:**_____<br>**Name:**_____<br>Title: _____ |

     Note: Attach appropriate notary blocks for the State.

[J:\013363\170\LEASE9.doc]
[October 29, 1996; DiVita]

<u>EXHIBIT "I"</u>

COMMENCEMENT DATE AGREEMENT


THIS AGREEMENT, made as of this ____ day of _____, 19__, between _____ (herein called "Landlord"), and CIRCUIT CITY STORES, INC. (herein called "Tenant").

<u>W I T N E S S E T H:</u>

WHEREAS, Landlord is the owner of certain premises situated in _____, _____ County, _____ (herein called the "Premises"); and

WHEREAS, by that certain lease dated _____ __, 19__ (herein called the "Lease"), Landlord leased the Premises to Tenant; and

WHEREAS, a memorandum or short form lease in respect of the Lease was recorded in the office of the Clerk of _____ County, _____, on the ____ day of _____, 19__, in Book _____ at Page ____; and

WHEREAS, Tenant is in possession of the Premises and the term of the Lease has commenced; and

WHEREAS, under Paragraph 25 of the Lease, Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease;

NOW, THEREFORE, Landlord and Tenant agree as follows:

1. The term of the Lease commenced on, and the Commencement Date (as such term is defined in the Lease) was, _____, 19__. The term of the Lease shall expire on January 31, unless Tenant exercises any option to extend the term of the Lease or unless the Lease terminates earlier as provided in the Lease.

2. The date of commencement of the first "Option Period" (as such term is defined in the Lease) shall be February 1, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, ____, unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

3. The date of commencement of the second Option Period shall be February 1, if Tenant effectively exercises its option in respect thereof; and if Tenant does so, the term of the Lease shall

1

expire on January 31,       unless Tenant exercises any option to
further extend the term of the Lease or the Lease terminates
earlier as provided in the Lease.

4. The date of commencement of the third Option Period shall
be February 1,      if Tenant effectively exercises its option in
respect thereof, and if Tenant does so, the term of the Lease shall
expire on January 31, ____ unless Tenant exercises any option to
further extend the term of the Lease or the Lease terminates
earlier as provided in the Lease.

5. The date of commencement of the fourth Option Period shall
be February 1,      if Tenant effectively exercises its option in
respect thereof, and if Tenant does so, the term of the Lease shall
expire on January 31,      unless Tenant exercises any option to
further extend the term of the Lease or the Lease terminates
earlier as provided in the Lease.

6. The date of commencement of the fifth Option Period shall
be February 1,      if Tenant effectively exercises its option in
'respect thereof, and if Tenant does so, the term of the Lease shall.
expire on January 31,      unless the Lease terminates earlier as
provided in the Lease.

IN WITNESS WHEREOF, the parties hereto have caused this
Agreement to be executed the day and year first above written.

                              SHOPPES OF BEAVERCREEK, LTD.,
Attest or Witness:            _____

_____      By _____



Attest:                       CIRCUIT CITY STORES, INC.

_____      By _____
Assistant  Secretary                  Vice  President

[J:\013363\170\LEASE8.V51]
[October 1, 1996; DiV[ta]