WASHINGTON COUNTY, OREGON

# LEASE

between

## CIRCUIT CITY STORES, INC.,

as Tenant

and

## BEIM & JAMES PROPERTIES III,

as Landlord

dated April 1, 1994

## WASHINGTON GREEN SHOPPING CENTER

# TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | Leased Property | 1 |
| 2. | Construction of Building and Improvements | 2 |
| 3. | Lease Term | 2 |
| 4. | Base Rent | 3 |
| 5. | Development of Shopping Center by Landlord | 5 |
| 6. | Easements | 6 |
| 7. | Common Areas and Common Area Maintenance | 8 |
| 8. | Signs and Communications Equipment | 11 |
| 9. | Taxes | 13 |
| 10. | Maintenance, Repairs and Replacements | 15 |
| 11. | Payment of Utility Bills | 16 |
| 12. | Alterations | 16 |
| 13. | Mechanics' Liens | 17 |
| 14. | Insurance | 18 |
| 15. | Damages by Fire or Other Casualty | 22 |
| 16. | Condemnation | 24 |
| 17. | Assignment and Subletting | 27 |
| 18. | Use | 28 |
| 19. | Warranties and Representations | 29 |
| 20. | Estoppel Certificates | 37 |
| 21. | Subordination, Non-Disturbance and Attornment | 37 |
| 22. | Change of Landlord | 39 |
| 23. | Tenant's Financing | 39 |
| 24. | Tenant's Property and Waiver of Landlord's Lien | 39 |
| 25. | Memorandum of Lease; Commencement Date Agreement | 40 |
| 26. | Expiration of Term and Holding Over | 40 |
| 27. | "For Rent" Signs | 41 |
| 28. | Force Majeure | 41 |
| 29. | Events of Tenant's Default | 41 |
| 30. | Landlord's Remedies | 42 |

C:\CIRCUIT\BEAVERTON\LEASE.R10

31. Events of Landlord's Default; Tenant's Remedies . . . . . . . . . . . . . . . . . . . . . 44

32. Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

33. Compliance with Applicable Laws . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

34. Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

35. Brokers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

36. Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

37. Effectiveness of Lease; Tenant's Right to Terminate . . . . . . . . . . . . . . . . . 49

38. Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

C:\CIRCUIT\BEAVERTON\LEASE.R10

## EXHIBITS

| | |
|---|---|
| "A" | Site Plan |
| "A-1" | Shopping Center Legal Description |
| "B" | Index of Definitions |
| "C" | Construction Provisions |
| "D" | Removable Trade Fixtures |
| "E" | Sign Plans |
| "F" | Permitted Encumbrances |
| "G" | Subordination, Non-Disturbance and Attornment Agreement |
| "H" | Memorandum of Lease |
| "I" | Commencement Date Agreement |
| "J" | Indemnification Agreement |

C:\CIRCUIT\BEAVERTON\LEASE.R10

## LEASE

This LEASE is made as of the 1st day of April, 1994, by and between BEIM & JAMES PROPERTIES III, a California limited partnership, having an address at 15 S.W. Colorado Avenue, Suite G, Bend, Oregon 97702 ("Landlord"), and CIRCUIT CITY STORES, INC., a Virginia corporation having an address at 9950 Mayland Drive, Richmond, Virginia 23233 ("Tenant").

### W I T N E S S E T H :

That for and in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      Leased Property. Landlord demises and leases to Tenant and Tenant leases and takes from Landlord, commencing on Landlord's delivery of the "Land" (as defined below) to Tenant, all those certain "Premises" consisting of the "Building" and "Other Improvements" (both as defined in paragraph 2), as and when same are constructed or renovated and that approximately 56,510 square foot parcel (the "Land"), on which the Building and Other Improvements are or will be located, as more particularly shown (approximately) outlined in red on Exhibit "A" attached hereto (the "Site Plan"), together with exclusive rights in the three (3) parking spaces as the "Customer Pick-Up" adjacent to the Building with the easements described in paragraph 6 below, all located in the Washington Green Shopping Center (the "Shopping Center"), which consists of that certain real property with buildings and improvements constructed or to be constructed thereon, located at the intersection of S.W. Hall Boulevard, and Greenburg Road, lying and being in metropolitan Portland (for purposes of this Lease, all county and metropolitan governments which now or in the future may acquire jurisdiction over the Shopping Center shall collectively be referred to herein as the "City"), County of Washington, State of Oregon (the "State"), and more particularly shown on the Site Plan and described by metes and bounds or platted lot legal description on Exhibit "A-1" attached hereto and made a part hereof for all purposes.   All of the Shopping Center exclusive of the Premises is

1

"Landlord's Premises". The description of the Premises may be adjusted in accordance with Tenant's final bid set of Plans and Specifications as described in Exhibit "C" attached hereto.

2.    Construction of Building and Improvements.   Commencing immediately upon "delivery of the Land" (as defined in the Construction Provisions (herein so called) attached hereto as Exhibit "C" and incorporated herein by reference for all purposes), Tenant shall have the right to construct within the Shopping Center a one-story retail building, containing up to 56,510 square feet of ground-floor gross leasable area including mezzanine, if any, with provisions for customer pickup, delivery and car stereo installation facilities (the "Building"), approximately 41,510 square feet of which is intended initially for use as a Circuit City Superstore, and approximately 15,000 square feet of which is initially intended to be subleased by Tenant (the "Additional Retail") together with loading ramps, sidewalks, trash compactor, transformer pad and other such appurtenances and improvements (collectively, the "Other Improvements"), as more particularly set forth in the Construction Provisions. The Building and Other Improvements are sometimes collectively referred to herein as the "Improvements". The Improvements shall be constructed in accordance with the "Plans and Specifications" to be prepared by Tenant as specified in the Construction Provisions. Except as otherwise provided herein, title to the Improvements shall be deemed transferred to Landlord upon full payment of the "Tenant Improvement Allowance", as defined in the Construction Provisions.

3.    Lease Term.   Subject to the conditions to the effectiveness of this Lease set forth in paragraph 37, the construction term (the "Construction Term") of this Lease shall commence on the date of Landlord's delivery of the Land to Tenant in accordance with, and in the condition specified in, the Construction Provisions, and shall end on the "Commencement Date" (as defined in paragraph 4 below). The main term (the "Main Term") of the Lease shall commence on the Commencement Date and shall end on the last day of January following the twentieth (20th) anniversary of the Commencement Date.

In addition to the Main Term, Tenant shall have the option (a "Renewal Option") to renew and extend the Lease for two (2) consecutive ten (10) year periods (the "Option Periods") immediately following the Main Term, at the rent specified below. Tenant shall give Landlord written notice of its election to exercise any Renewal Option at least twelve (12) months prior to the expiration of the Main Term or any then-current Option Period.

C:\CIRCUIT\BEAVERTON\LEASE.R10

The Construction Term, Main Term and Option Periods are, collectively, the "Term". The term "Lease Year" shall mean each successive period of twelve (12) consecutive calendar months, commencing on the first day of each February during the Term, except that the first Lease Year shall commence on the Commencement Date and shall end on the last day of January following the first anniversary of the Commencement Date.

4.    **Base Rent**.    During the Construction Term, Tenant shall have no rental obligations nor shall Tenant be responsible for any Real Estate Taxes (as defined in paragraph 9) or CAM Charges (as defined in paragraph 7) or any similar costs, fees, rentals or expenses. Subsequent to the date (the "Commencement Date") which is the earlier to occur of (i) seven (7) months following the date of delivery of the Land in accordance with the Construction Provisions (subject to force majeure) or (ii) the date of Tenant's opening of its store facility for business with the public, but prior to payment of the Tenant Improvement Allowance, Tenant shall, in accordance with the Construction Provisions, pay Ground Rent. For purposes hereof, Ground Rent shall equal Three Hundred Forty-Seven Thousand, Seven Hundred Fifty and No/100 Dollars ($347,750.00) per annum. Tenant agrees to pay base rent ("Base Rent") for the Premises in the amounts and in the manner specified hereunder, commencing (subject to the provisions of paragraph 4 of the Construction Provisions) on the date on which Landlord makes payment of the Tenant Improvement Allowance as set forth in the Construction Provisions. In the event that the size of the buildings in the Shopping Center (including the Building) are not approved by applicable governmental authority and the reduced overall size of same prevents the Landlord from developing at least 23,500 square feet of gross leasable area in the remainder of the Shopping Center and the Building remains 56,510 square feet of leasable area, then the Base Rent shall increase proportionately by an amount equal to the decrease in size of the gross leasable area permitted to be developed by the Landlord. In order for such Base Rent increase to occur, there must be a bona fide rejection by applicable governmental authority of the Site Plan Submission by the Landlord, thus necessitating a redesign of the remainder of the Shopping Center to permit the size of the Building recited herein. The amount of the Base Rent increase shall be determined by the decrease in the gross rentals attributable to the remainder of the Shopping Center, as if the rental rate paid for such space was Fourteen and 50/100 Dollars ($14.50) per square foot.

C:\CIRCUIT\BEAVERTON\LEASE.R10

Tenant shall pay Ground Rent, or Base Rent, as applicable, in equal monthly installments, in advance on the first day of each succeeding calendar month throughout the Term, with appropriate proration for any partial calendar month or Lease Year, to the address given for Landlord in paragraph 34 hereof, unless Landlord shall give Tenant written notice of a change of address or of the party to whom such rents shall be payable along with written documentation reasonably satisfactory to Tenant of such party's right to receive payment hereunder. Unless adjusted as provided in paragraph 3 of the Construction Provisions, Base Rent shall be paid pursuant to the following schedule:

(i)    First Five Years. During the first five (5) Lease Years, Tenant shall pay annual Base Rent in the amount of Six Hundred Forty-Seven Thousand Five Hundred and No/100 Dollars ($647,500.00), payable in equal monthly installments of Fifty-Three Thousand Nine Hundred Fifty-Eight and 33/100 Dollars ($53,958.33).

(ii)    Adjustment in Base Rent. If any Lease Year is other than twelve (12) months in length, annual Base Rent during such Lease Year shall be the product of the applicable monthly Base Rent times the number of months in such Lease Year, with appropriate proration for any partial calendar month therein.

(iii)    Increases in Base Rent.

(A)    Annual Base Rent shall increase on the first day of the sixth Lease Year, over the initial Base Rent charged hereunder by the lesser of ten percent (10%) or two (2) times the increase in the "CPI-U" (as defined below) during the five (5) year period ending on October 31 of the fifth Lease Year.

(B)    Annual Base Rent shall increase on the first day of the eleventh Lease Year, over the prior year's Base Rent charged hereunder by the lesser of twelve and one-half percent (12½%) or two and a half (2½) times the increase in the "CPI-U" during the five (5) year period ending on October 31 of the tenth Lease Year.

(C)    Annual Base Rent shall increase on the first day of the sixteenth Lease Year, over the prior year's Base Rent charged hereunder by the lesser of twelve and one-half percent (12½%) or two and a half (2½) times the increase in the "CPI-U" during the five (5) year period ending on October 31 of the fifteenth Lease Year.

(D)    Annual Base Rent shall increase on the first day of the twenty-first Lease Year over the prior year's Base Rent charged hereunder by the lesser of fifteen

percent (15%) or three (3) times the increase in the "CPI-U" during the five (5) year period ending on October 31 of the twentieth Lease Year.

(E)    Annual Base Rent shall increase on the first day of the twenty-sixth and every succeeding fifth Lease Year over the prior year's Base Rent charged hereunder by the lesser of twelve and one-half percent (12½%) or two (2) times the increase in the "CPI-U" during the five (5) year period ending on October 31 of the twenty-fifth (or, as applicable, any succeeding fifth) Lease Year.

As used herein, the CPI-U shall be the United States Department of Labor, Bureau of Labor Statistics Consumer Price Index for All Urban Consumers, U.S. City Average. For purposes of any calculation hereunder, the CPI-U for any ending period shall be the CPI-U last published for the period immediately preceding the date of calculation. If at any time during the Term the CPI-U shall be discontinued, Landlord and Tenant shall mutually and reasonably agree to substitute an existing official index published by the Bureau of Labor Statistics or its successor or another, similar governmental agency, which index is most nearly equivalent to the CPI-U.

5.    Development of Shopping Center by Landlord. Landlord covenants to construct and develop a first-class shopping center. The location of buildings and other tenant space therein will only be within the "Permissible Building Areas" as shown on the Site Plan, and the parking ratio for the Shopping Center shall be at least as shown thereon, but in no event shall there exist less than two hundred seventy-nine (279) parking spaces in the Tenant's Preferred Area, nor shall the Landlord develop in excess of 23,850 square feet of improvements in the remainder of the Shopping Center. The Landlord shall at all times comply with applicable zoning requirements. All such parking shall be at ground level with respect to parking spaces for retail and related development. Tenant agrees that two hundred seventy-nine (279) spaces is sufficient for Tenant and will support Landlord's effort to obtain a favorable interpretation by the City that this configuration meets applicable codes (for hypothetical purposes only, Tenant's use of a portion of the Building as a furniture sales area may reduce Tenant's parking requirement significantly below the five (5) parking spaces per 1000 square feet of leasable area required by the code for Tenant's initial use). Landlord shall construct or cause such improvements to be constructed in a good and workmanlike manner, lien-free in accordance with paragraph 13 below, and Landlord hereby agrees to indemnify, defend and hold Tenant harmless

C:\CIRCUIT\BEAVERTON\LEASE.R10

from any loss or damage suffered by Tenant as a result of Landlord's construction. Landlord shall not permit construction traffic over the Premises, and Landlord shall refrain from interfering with the conduct of Tenant's business. Landlord shall keep and maintain or cause the improvements and the "Common Areas" (as defined in paragraph 7(a)) in the Shopping Center to be kept and maintained in good condition and repair and shall not operate, or permit to be operated, in the Shopping Center any activity which constitutes a nuisance under Oregon law, overburdens the available utilities, or violates any of the "Site Covenants" contained in subparagraph 19(a)(ix) or the prohibited activities set forth in subparagraph 19(a)(viii).

6.    Easements.  In addition to and simultaneously with the lease of the Premises, Landlord grants to Tenant certain nonexclusive leasehold easements over or upon certain areas of Landlord's Premises, as set forth below, which easements shall run as covenants with Landlord's Premises and the Premises during the Term and shall expire or terminate simultaneously with this Lease, except as provided below.

(a)    Construction Easements.  For the period of Tenant's construction of the Improvements, and any renovation or reconstruction thereof, Landlord grants to Tenant a nonexclusive easement across a mutually agreeable designated route, providing access to and from the public roadways nearest to the Land, over the Common Areas (as defined in paragraph 7(a) below) for the purpose of construction access to the Premises. In addition, Landlord grants to Tenant an exclusive easement for a construction staging area (the "Staging Area") of approximately 5000 square feet in the portion of the Common Areas as shown on page C-1 of the Site Plan Submission described in Exhibit "C".

(b)    Footing and Foundation Easements.  Landlord grants to Tenant, and Tenant grants to Landlord, easements and rights in Landlord's Premises and the Premises, as appropriate (i) for the construction and maintenance of foundations, footings, supports and demising walls; (ii) for roof projections, allowing the grantee to tie its building into the adjoining building by flashing and reglets; and (iii) for encroachments which reasonably occur in the construction of the building components set forth in subparagraphs (i) through (ii) above.

(c)    Utility Easements.  During the Term, upon prior reasonable request of Tenant (following the initial "Landlord Work" as set forth in the Construction Provisions), Landlord hereby grants Tenant such underground, public or private utility easements as Tenant deems necessary, without unreasonably interfering with the use by Landlord of the Common

C:\CIRCUIT\BEAVERTON\LEASE.R10

Areas, for the benefit of the Premises. For the purpose of exercising the rights granted in this subparagraph 6(c), Tenant and/or the utility provider shall have the right to enter upon and use the Common Areas to construct, repair or maintain the utility systems, to such extent and so long as reasonably necessary to accomplish such purpose, subject to restoration of the Common Areas following such installation and any other reasonable conditions and requirements imposed by Landlord.

(d)    Common Area Easement. During the Term, Landlord grants to Tenant, for the benefit of the Premises, the nonexclusive right, privilege and easement (the "Common Area Easement") to use the Common Areas for their intended purposes and to permit Tenant and its employees, agents, subtenants, assignees, licensees, suppliers, customers and invitees to use the same, in common with Landlord, its successors, assigns, employees, agents, lessees, licensees, suppliers, customers and invitees and all other persons claiming by or through them, for the purposes (without limitation) of parking and pedestrian, service and vehicular access, ingress and egress to, from and between the Premises and the Landlord's Premises and the streets and highways abutting and adjacent to the Shopping Center, in accordance with the Site Covenants, without payment of any fee or other charge therefor. It is specifically agreed that with respect to the parking spaces designated on the Site Plan as Tenant's "Customer Pick-Up", (i) Tenant shall have the right, from time to time, to relocate the same to other areas adjacent to the Improvements (provided that the Tenant forfeits the exclusive right to the parking spaces so vacated as a "Customer Pick-Up"), and (ii) notwithstanding the fact the same are in, and constitute a part of, the "Common Areas", such parking spaces shall be used exclusively by Tenant's customers, invitees and patrons. In addition, Tenant shall have the right to use such Common Areas which are both immediately adjacent to Tenant's Improvements and within the Tenant's Preferred Area as shown on the Site Plan for "sidewalk sales", seasonal and promotional sales and other sales customary to Tenant's business operations.

(e)    Non-Dedication. None of the easements granted by the parties to this Lease is intended, nor shall any of them be construed, as a dedication of any portion of the Shopping Center for public use, and the parties will refrain from taking any action which would cause such a dedication and will take whatever steps may be necessary to avoid any such dedication, except as may be agreed upon in writing by the parties hereto or their respective successors or assigns.

7.    Common Areas and Common Area Maintenance.

(a)    Definition of Common Areas. The term "Common Areas" shall be defined to include the parking areas, lanes, drives, entrances, truck passageways, sidewalks, ramps, stairways, landscaped and other unpaved areas, parking lot lighting facilities and equipment, Landlord's pylon sign(s), directional, traffic and monument sign structure(s) and shared utility facilities located in the Shopping Center and intended and available for the common use of all of the tenants within the Shopping Center, their subtenants, licensees, and business invitees. Landlord shall be responsible for operating, maintaining and repairing the Common Areas in a first-class manner, including cleaning, maintenance of Landlord's pylon and other sign structure(s), snow removal and ice treatment, removal of Common Area trash and garbage, lighting, repairing, repaving and restriping the parking area, and maintaining, replanting and replacing landscaping, all such work to be referred to collectively as "Common Area Maintenance".

(b)    CAM Charges. For the purpose of this paragraph 7, the cost of Common Area Maintenance (the "CAM Charges") shall include (i) Landlord's reasonable and proper direct costs and expenses of operating and maintaining the Common Areas and (ii) Landlord's overhead expenses for administering same (or in lieu thereof a management fee) in an amount not to exceed ten percent (10%) of the total of such costs (specifically excluding from such total the amounts paid by Landlord and Tenant for insurance, capital expenditures and real estate taxes). Notwithstanding the foregoing, the following shall not be included in the CAM Charges:

(1) real estate taxes paid, and maintenance performed, on separately assessed and/or maintained outparcels or other adjacent tracts not reserved to the benefit of the Shopping Center occupants;

(2) any dues or charges for a merchants' or other association of the tenants in the Shopping Center;

(3) maintenance, repairs or replacements to the Common Areas (but no other portions of the Shopping Center), necessitated by the negligent or wrongful act of the Landlord or made to correct any construction, defect or condition, to any interior mall space or to any buildings (including exterior walls thereof) or utility systems not part of the Common Areas;

(4) repairs or replacements necessitated under current law existing as of the date of this Lease, or which may be in the future required under changes in laws which affect areas other than the Common Areas, or by the negligence or the wrongful action of Landlord (including failure to construct any portion of the Shopping Center in accordance with plans or specifications therefor) or any other tenant or made to correct any initial construction defect or condition in existence prior to the Commencement Date of this Lease or to correct damage caused by subsidence or adverse or substandard soil conditions;

(5) amounts paid to entities related to Landlord in excess of the cost of such services from any competitive source;

(6) amounts reimbursable from insurance proceeds, under warranty or by Tenant, any other tenant in the Shopping Center or any other third party other than pursuant to a Common Area expense provision similar to this paragraph 7;

(7) premiums for Common Area liability insurance for coverage in excess of the limits established in paragraph 14(e) below;

(8) repairs or replacements of a capital nature (whether or not capitalized), provided that so long as such costs are amortized over the useful life of the improvements resulting therefrom, Landlord may so amortize such costs as a CAM Charge, provided in no event shall Tenant be charged amounts for the maintenance of other buildings in the Shopping Center if Tenant is solely responsible for maintenance of the same item relating to the Building which is set forth in paragraph 10 hereof;

(9) improvements, repairs or replacements (other than patching, striping, sealing and similar minor periodic maintenance) to the parking lot or other paved areas during the first ten (10) "CAM Years" (as defined below);

(10) reserves for anticipated future expenses;

(11) interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner;

(12) Landlord's personnel, overhead, home office or administrative expenses except as set forth in subparagraph (b)(ii) above;

C:\CIRCUIT\BEAVERTON\LEASE.R10

(13) amounts incurred to remediate any Hazardous Substances (as defined in the Construction Provisions) other than de minimis events of contamination which may occur within the Common Areas, such as oil leaking from vehicles in the ordinary course, as opposed to substantial events of contamination resulting from Hazardous Substances; or

(14) other maintenance expenses not considered normal and customary under generally accepted accounting principles or shopping center industry standards. CAM Charges shall be in an amount consistent with the costs incurred by other landlords of similar shopping centers in the Portland metropolitan area (but not greater than as described in this paragraph 7(b)), and in all events such charges shall be obtained at competitive rates pursuant to a proposed Common Area maintenance budget delivered to Tenant on or before the end of each CAM Year.

(c)     Tenant Payments.    Commencing on the Commencement Date and continuing until the expiration of the first calendar year of Common Area operations, Tenant shall pay to Landlord a fee (which Landlord estimates to be $1.00 per square foot of ground-floor gross leasable area in the Building per annum), payable in equal monthly installments, as its share of CAM Charges. Thereafter, the annual charge shall be computed on the basis of periods of twelve (12) consecutive calendar months, as designated by Landlord (each such period is a "CAM Year"), and shall be paid by Tenant in equal monthly installments, in advance, on the first day of each month during such CAM Year. In no event shall such CAM Charges for services performed by the Landlord or its affiliates exceed by more than four percent (4%) those in effect during the preceding CAM Year. For any period within the Term which is less than a full CAM Year, the annual charge shall be appropriately prorated. Within one hundred (100) days after the end of the first CAM Year and each CAM Year thereafter, Landlord will furnish to Tenant a statement showing in detail (with such substantiating documentation as Tenant may reasonably request) the amount of the CAM Charges for the preceding CAM Year and the then-current number of square feet of ground-floor gross leasable area in the Shopping Center. Any necessary adjustment with respect to amounts owed by either party for such preceding CAM Year shall thereupon be made; and the monthly payments to be made by Tenant for the ensuing year shall be estimated according to the Common Area maintenance budget prepared by

Landlord and delivered to Tenant. Subject to adjustments as herein contemplated, Tenant's share of CAM Charges after the first CAM Year shall always be the product of the CAM Charges multiplied by a fraction (such fraction being referred to herein as "Tenant's Pro Rata Share"), the numerator of which is the number of square feet of the ground-floor gross leasable area in the Building and the denominator of which is the number of square feet of the ground-floor gross leasable area (including the area of any permanent outside sales area exclusive to a single occupant) in the Shopping Center. In determining the ground-floor gross leasable area of any building in the Shopping Center (including the Building), measurement shall be made from the centerline of any common walls and from the outside of any exterior walls. The gross leasable area of any outside sales area shall be measured from the outside of the exterior wall of any adjacent building to the actual exterior perimeters of such outside sales area, including any aisles, fences or walls included therein. Changes in applicable floor areas shall result in corresponding adjustments of Tenant's Pro Rata Share, but in no event shall the denominator of the fraction by which Tenant's Pro Rata Share is determined be less than the gross leasable area of the Shopping Center as shown on the Site Plan (as the area of the Shopping Center may be reduced pursuant to paragraph 4 above). The remainder of CAM Charges shall be borne by Landlord and/or other tenants.

(d)    Examination of Landlord's Records. Tenant shall have the right, from time to time, but not more often than once as to any CAM Year and no later than two (2) years after the end of such CAM Year, to examine and make copies of the records pertaining to CAM Charges for such CAM Year. Tenant's right of examination shall be exercised during reasonable business hours at Landlord's principal records office on reasonable prior notice to Landlord. If such examination shall disclose any overcharge by Landlord, Landlord shall promptly reimburse Tenant for any overpayment of Tenant's Pro Rata Share of CAM Charges; and if such overpayment by Tenant is in excess of five percent (5%) of the actual Tenant's Pro Rata Share of CAM Charges, Landlord shall reimburse Tenant for the reasonable cost of such examination or audit. Tenant shall promptly reimburse Landlord for any underpayment disclosed by such examination.

8.    Signs and Communications Equipment.

(a)    Signs. Landlord, at its sole cost and expense, no later than the date set forth on Attachment "5" to the Construction Provisions, shall construct and install upon the

Common Areas at the location so shown on the Site Plan, a pylon sign structure (with electrical wired box installed) having sufficient space thereon in the top tenant position for inclusion of doublesided "face panels" and a "readerboard" identifying Tenant's store, which face panels and readerboard shall be constructed and installed at Tenant's sole cost and expense. Tenant's face panels (for Tenant, and any of its permitted tenants, assignees or subtenants) shall not exceed one-half (½) of the available pylon sign face panel area. Landlord shall submit to Tenant plans and specifications for such pylon sign (including colors, design, dimensions, type of lighting and position of tenant panels, including up to three other occupants' panels, provided such panels are cumulatively not greater than Tenant's in size) prior to construction and installation thereof for Tenant's written approval, which shall not be unreasonably withheld or delayed. The Tenant shall be responsible for the preparation of design drawings showing the fabrication of the Tenant's panels on such pylon signage. Attached as a portion of Exhibit "E" are plans and specifications for Tenant's current prototypical face panels and for Tenant's building signage, which Landlord hereby approves (subject to governmental approvals) upon its execution of this Lease. Notwithstanding the foregoing, Tenant shall be entitled without Landlord's consent, but subject to governmental requirements, as aforesaid, to replace any and all of its signs with signage consistent with Tenants's then-current prototypical sign plans. In the event of an assignment or subletting as a result of which Tenant is no longer occupying any portion of the Premises, Tenant's signs may be replaced by signs identifying the appropriate assignee or subtenant, provided that the specific design of such signage shall be subject to Landlord's consent, which consent shall not be unreasonably withheld, conditioned or delayed. The Landlord covenants and agrees that it shall support any application promoted by the Tenant for variances or other amendments to the signage permitted by applicable governmental authority with respect to Tenant's Building and pylon signage. At the request of Tenant, but at no cost to Landlord, the Landlord shall (i) do anything reasonable and necessary to cause the Shopping Center to be annexed by the municipality so designated by the Tenant and (ii) support the application of the Tenant for a second pylon sign, if Tenant deems such signage to be necessary.

(b)    Communications Equipment. Tenant may, from time to time, install, maintain and/or replace any satellite dishes or antennas on the roof and/or exterior walls or parapet of the Building as Tenant deems necessary or desirable, provided same shall not adversely and materially affect the roof or the structural elements thereof.    All such

C:\CIRCUIT\BEAVERTON\LEASE.R10

communication equipment shall be subject to applicable law and approval of local governmental authorities.  None of such communication equipment shall be visible from the ground at the boundary of the Shopping Center, and all such communication equipment shall be screened in a manner reasonably acceptable to the Landlord as necessary to accomplish such requirement. Upon removal by Tenant of any satellite dishes or antennas, Tenant shall repair any damage done in connection with such removal.

9.    Taxes.

(a)    Taxes Contemplated Hereunder.  The term "Real Estate Taxes" shall mean all general real estate taxes and assessments and other ad valorem taxes, rates and levies paid upon or with respect to the Shopping Center, including the Premises, for a governmental ad valorem tax year or a portion thereof to any governmental agency or authority and all charges specifically imposed in lieu of any such taxes.  Nothing contained in this Lease shall require Tenant to pay any local, county, municipal, state or federal income, franchise, corporate, estate, inheritance, succession, capital levy, business or transfer tax of Landlord, or any local, county, municipal, state or federal income, profits, gross receipts, sales or renewal tax or charge upon the rent or other charges payable by Tenant under this Lease.

(b)    Payment of Real Estate Taxes.  At such intervals as Landlord is permitted to obtain the maximum discount permissible for early payment of Real Estate Taxes, Tenant shall pay Tenant's Pro Rata Share of Real Estate Taxes (calculated in the same manner as Tenant's Pro Rata Share of CAM Charges in paragraph 7(c)) levied against the tax parcel or parcels comprising the Shopping Center (the "Tax Parcel").  Tenant's Pro Rata Share of Real Estate Taxes shall be net of any early-payment discounts available at the time Tenant's payment is due.  Tenant shall pay Tenant's Pro Rata Share of Real Estate Taxes on the earlier to occur of (i) thirty (30) days after Tenant's receipt of Landlord's statement therefor, accompanied by the tax bill on the basis of which such statement is rendered, or (ii) thirty (30) days after Tenant's receipt of notice of the payment of periodic deposits of Real Estate Taxes which will enable the Landlord to obtain the largest discount possible, but in such event the Landlord must ultimately supply the Tenant a tax bill on the basis of which such statement is rendered. Landlord shall pay, or cause the payment of, all Real Estate Taxes before any fine, penalty, interest or cost may be added thereto, become due or be imposed by operation of law for the nonpayment or late payment thereof.  In the event that there is a separate assessment for the

Building, apart from the Land, the Tenant shall pay its Pro Rata Share of Real Estate Taxes allocable to the real property upon which the Shopping Center is constructed, and all of the tax attributable to the Building.  In no event shall Tenant be liable for any discount forfeited or penalty incurred as a result of late payment by another tenant or by Landlord.  Taxes shall be prorated as of the Commencement Date and the expiration or earlier termination of this Lease, and Landlord shall promptly return to Tenant any overpayment made by Tenant not attributable to the period of Tenant's possession of the Premises.   Landlord shall remain primarily responsible for such payment notwithstanding the fact that such payment may be made by a tenant of Landlord's Premises or other third party pursuant to an agreement to which Tenant is not a party.  In addition, should Landlord fail to pay such Real Estate Taxes at the time same become delinquent, Tenant shall have the right, at its election, on the date which is at least twelve (12) months after the due date of such payment, but in any case, prior to a tax sale which would affect title to the Shopping Center, to cure such failure by payment of delinquent Real Estate Taxes and any interest and penalties due thereon provided that, except as necessary to prevent a tax sale, Tenant shall first give Landlord and its first lien Mortgagee notice of such election and five (5) days shall have elapsed thereafter without payment of Real Estate Taxes. In such event Tenant may deduct the cost thereof, plus interest at the lesser of fifteen percent (15%) per annum or the highest rate permitted by State law (the "Default Rate"), from the next installment(s) of Base Rent and other charges due hereunder.

(c)     Contest of Real Estate Taxes and/or Assessed Valuation of Property. Tenant shall have the right, at Tenant's sole expense, to contest the amount or validity, or otherwise seek an exemption or abatement, of any Real Estate Taxes or to seek a reduction in the valuation of the Premises assessed for Real Estate Tax purposes, by appropriate proceedings diligently conducted in good faith, provided that Tenant shall first have notified Landlord of its intent to do so and Landlord shall have failed to notify Tenant in writing, within five (5) days of receipt of Tenant's notice, that Landlord intends to contest such Real Estate Taxes or seek such a reduction.  In any instance where any such action or proceeding is being undertaken by Tenant, Landlord shall cooperate with Tenant at no cost to Landlord, execute any and all documents required in connection therewith and, if required by any law, rule or regulation of the taxing authority, shall join with Tenant in the prosecution thereof.

C:\CIRCUIT\BEAVERTON\LEASE.R10

(d)    <u>Payment Following Appeal</u>.  Upon the termination of the proceedings set forth in subparagraph (c) above (unless the taxing authority requires that Real Estate Taxes be paid under protest prior to commencement of such proceedings), Tenant shall pay Tenant's Pro Rata Share of such Real Estate Taxes as finally determined in such proceedings, the payment or partial payment of which may have been deferred during the prosecution of such proceedings. Tenant shall be entitled to a refund of any overpayment of Real Estate Taxes relating or allocable to the Premises, as well as a reimbursement of all costs, fees and expenses it incurs in such protest or reassessment, the sole source of which reimbursement shall be from any refund of over payment of Real Estate Taxes or from the applicable taxing authority.

10.    <u>Maintenance, Repairs and Replacements</u>.  Except (i) for costs covered by the Landlord's insurance required to be maintained hereunder, (ii) for condemnation proceeds to be received by Tenant, (iii) for obligations arising from the negligent acts or omissions or willful misconduct of Landlord (or its agents, employees or other tenants), or (iv) as otherwise set forth in this Lease, Tenant shall be solely responsible for maintenance of the exterior and interior non-structural elements of the Building, including, but not limited to, repairs and/or replacements to plumbing, heating, electrical and air conditioning systems and the roof membrane which serve only the Premises.  Landlord shall maintain all structural elements of the Premises (whether or not same serve only the Premises), including, without limitation, roof structure (but not the roof membrane), flooring system, floor slab, foundation, load bearing walls and exterior structural walls, but shall have no other responsibility for maintenance, repair or replacements to the Premises or any part thereof; provided, however, this provision is in no way intended to limit Landlord's obligation to maintain, repair and replace any and all elements, both structural and non-structural, of the Common Areas pursuant to the terms of this Lease.  In addition to the Landlord's maintenance and repair obligations set forth herein and otherwise set forth in this Lease, Landlord agrees to maintain the Other Improvements immediately surrounding the Building, including sidewalks and landscaping.  During the last five (5) years of the Term of the Lease (without consideration to the exercise of any additional Renewal Options) Tenant shall be obligated to so install or construct alterations or incur expenditures pursuant to this paragraph; provided, however, that if Tenant is required to expend any sum in satisfaction of its obligations hereunder, and if the resulting improvement to the Improvements cannot be fully amortized in accordance with generally accepted accounting principles, over the remainder of the Term

C:\CIRCUIT\BEAVERTON\LEASE.R10

(taking into consideration the exercise of any additional Renewal Options), then Tenant shall be reimbursed by Landlord by that amount of the cost associated with such repairs, construction or alteration for the period beyond the remainder of the Term (taking into consideration to the exercise of any additional Renewal Options).  Should either party fail to perform its obligations under this paragraph 10, the other party may, at its option, effect such maintenance, replacements or repairs, provided that such curing party shall have given the nonperforming party thirty (30) days' prior written notice, except in the case of emergencies (in which event only such notice as may be reasonable under the circumstances shall be required); but further provided that such thirty (30) day period (or reasonable period in event of emergencies) shall be extended in respect of any cure that cannot with reasonable diligence be accomplished within such period so long as the party required to effect such cure has commenced such cure within such thirty (30) day period (or reasonable period in event of emergencies) and thereafter diligently prosecutes such cure to completion.  The nonperforming party shall reimburse the other party on demand for the reasonable and actual amount so expended (as evidenced by detailed invoice), plus interest at the Default Rate.  However, in the event of emergency repairs, no interest shall accrue if reimbursed within thirty (30) days of request (including detailed invoice) for reimbursement.  All maintenance, repairs or replacements shall be done by Tenant or Landlord lien-free and in a good and workmanlike manner consistent with the quality of labor and materials used in originally constructing the Improvements and in accordance with all applicable law.  In order for Landlord and Tenant to effectively perform their maintenance, repair and replacement obligations hereunder, Tenant and Landlord, as applicable, shall assign to the other party any and all manufacturers' and contractors' warranties relating to such work performed on behalf of the other party to the party who is required to maintain same under the Lease.

11.    Payment of Utility Bills.   Tenant will pay directly to the appropriate utility company or governmental agency, when due, all bills for gas, water, sanitary sewer, electricity, telephone and other public or private utilities used by Tenant with regard to the Improvements. Landlord shall pay when due all utility charges incurred in the operation of the Common Areas and the Shopping Center.

12.    Alterations.   During the Term, Tenant shall have the right, at its discretion and its sole cost, without Landlord's consent, to make, provided Tenant is Circuit City Stores, Inc.

16