Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

---x
In re:          : Chapter 11
CIRCUIT CITY STORES, INC.,  : Case No. 08-35653
et al.,         :
     Debtors.: Jointly Administered
---x

December 22, 2008
Richmond, Virginia
VOLUME I (Morning Hearing)

Transcript of motions in the above when
heard before the Honorable Kevin R. Huennekens, Judge.

COOK & WILEY, INC.
Registered Professional Reporters
3751 Westerre Parkway, Suite D-1
Richmond, Virginia  23233
804.359.1984

Page 2

1   APPEARANCES:
2
3   Gregg M. Galardi, Esquire
    Ian S. Fredericks, Esquire
4   SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
    One Rodney Square
5   Wilmington, Delaware  19899-0636
    302.651.3000
6   Gregg.Galardi@skadden.com
    Counsel for the debtors
7   dfoley@mcguirewoods.com
8
9   Douglas M. Foley, Esquire
    MCGUIREWOODS LLP
10  One James Center
    901 East Cary Street
11  Richmond, Virginia  23219
    804.775.1000
12  Counsel for the debtors
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1   THE CLERK:  In the matter of Circuit City
2   Stores, Incorporated, Case Number 08-35653.
3   THE COURT:  Good morning.
4   MR. FOLEY:  Good morning, Your Honor.  Doug
5   Foley with McGuire Woods on behalf of the debtors.
6   With me today, co-counsel at the table, is Greg
7   Galardi and Ian Fredericks from the law firm of
8   Skadden Arps.  Also here today from the company,
9   Your Honor, is the general counsel, Reggie, sitting
10  in the front row.
11  Your Honor, we filed an amended agenda
12  yesterday, as we're trying to see if we can resolve
13  as many of these matters as we can.  What we would
14  propose to do, Your Honor, is to go through the
15  first few items -- which I believe most of which is
16  either uncontested or can be adjourned by
17  agreement -- and then spend most of the time on the
18  second half of the agenda this morning.
19  Your Honor, the first item on the agenda
20  actually should come off.  It's a resolution of the
21  outstanding issues with respect to Adequate
22  Assurance with respect to utilities.  I don't
23  believe there's anybody here that needs to address
24  that motion.  So that one should come off the
25  docket.

Page 4

1   THE COURT:  All right.
2   MR. FOLEY:  Your Honor, the next item is our
3   claims trading motion with respect to sell-down
4   procedures and equity and trading of claims.  Your
5   Honor, we're still working through final objections
6   with respect to that, and we'd ask the Court to
7   adjourn that to the January 16th omnibus hearing
8   date.
9   THE COURT:  All right.  It will be adjourned.
10  MR. FOLEY:  Your Honor, Item Number 3 is the
11  motion for relief from stay filed by Reverend
12  Funches.  We were here on that a month or so ago,
13  and set it down for a preliminary hearing today.
14  We're trying to work through some timing of
15  when certain testing might occur with respect to the
16  products involved in this accident.  We're working
17  with counsel to try to figure out what makes sense
18  in that regard.  What we have agreed to do, Your
19  Honor, is simply combine the preliminary and final
20  hearing for the January 29th hearing date.
21  THE COURT:  All right.
22  MS. HUDSON:  Good morning.  Lisa Hudson of
23  Sands Anderson here on behalf of the Funches family;
24  and actually, this Court joined orally at our last
25  hearing the Ollaway family.  So I'm here on both

## Page 5

1  regards. And Doug is correct. We did agree to set
2  this for final hearing 1-29 at 10, and are working
3  to resolve as much as possible.
4      And Your Honor, if I might have a brief
5  indulgence, I have with me Ashley Burgess today of
6  my firm who has been admitted recently to this
7  Court, and wanted to welcome him and introduce him
8  to the Bar. He was admitted to practice in 2004;
9  and will be joining the fun of LandAmerica, Circuit
10  City and Movie Gallery with the business and
11  bankruptcy team at Sands Anderson.
12      THE COURT: Very good. Welcome to the Court.
13      MR. BURGESS: Good morning, Your Honor.
14      MS. HUDSON: Thank you.
15      MR. FOLEY: Your Honor, the next item on the
16  docket is Item Number 4. This is a debtors' motion
17  to retain DJM Realty Services, LLC. We are working
18  through an informal response filed by the Committee.
19  We think we can work it out. We actually will
20  spend the afternoon -- what's left of the
21  afternoon -- to try to work it out with them and see
22  if we can't submit an order without actually setting
23  this down for another hearing; however, if we can't
24  resolve it in the next day or so, Your Honor, we
25  would contact the Court to have it set at the next

## Page 6

1  available hearing date. But we think we can work
2  through it today.
3      THE COURT: Very good.
4      MR. FOLEY: Your Honor, Item Number 5 is --
5  and 6 relate to a stipulation that we have Chase
6  Credit Card, Chase Bank USA, which is the issue of
7  the co-branded credit card for Circuit City stores.
8      Your Honor, most of the relief that we think
9  the stipulation provides for is consistent with the
10  customer programs order that Your Honor entered on
11  the first day. Basically, what is being protected
12  here is Chase's rights with respect to set-off and
13  recoupments as to any returns, charge-backs,
14  adjustments, and other credit related to cardholder
15  agreements.
16      What this stipulation also provides for is a
17  reserve that they can establish with respect to
18  money that they would otherwise have to pay us in
19  January.
20      There's been no objections to the form of the
21  order or the motion and -- acceptable, we'd like to
22  submit it to the Court after the hearing.
23      THE COURT: It will be received.
24      MR. FOLEY: Thank you. With respect to Item
25  Numbers 7 and 8, Your Honor, these are employment

## Page 7

1  applications with respect to E & Y that further
2  clarifies the scope of their tax advisory services
3  that they're providing to the company, as well as
4  the retention of KPMG, which is the company's
5  auditors. They also provide certain advice with
6  respect to the tax refund claim with the IRS.
7      We've spoken to the Office of the United
8  States Trustee, and we'd like to submit orders after
9  with his endorsement.
10      THE COURT: It will be approved.
11      MR. FOLEY: Thank you, Your Honor.
12      With respect to Item Number 9, Your Honor,
13  this is our motion to retain certain professionals
14  in the ordinary course of business under 327(e).
15      Your Honor, there's approximately 35
16  professionals. We tried to keep the list as small
17  as possible. There is a procedure set forth in
18  there as to how they get compensated. There is a
19  cap on monthly spend with respect to these
20  professionals. There are procedures for amending it
21  to the extent we need to add professionals or take
22  some off.
23      Again, we have consulted with the Office of
24  the United States Trustee. There has been no
25  objection to this motion. We would ask the Court to

## Page 8

1  enter the order that we will submit after the
2  hearing.
3      THE COURT: It will be approved.
4      MR. FOLEY: Your Honor, Item Number 10 is our
5  motion to reject certain personal property leases
6  pertaining to vehicles and equipment at leased store
7  locations that are going through the closing process
8  right now that are no longer necessary.
9      Your Honor, there has been no objection to
10  the motion. And we would ask to be able to submit
11  an order after the hearing.
12      One clarification with respect to the order
13  that we'll be submitting, Your Honor. We did agree
14  to carve out certain leases pertaining to General
15  Electric. And so, the order that we submit will not
16  go forward with this motion as to them.
17      THE COURT: All right. With that amendment,
18  it will be approved.
19      MR. FOLEY: Your Honor, Mr. Galardi will
20  address Items 11 through 17 on the balance of the
21  agenda.
22      THE COURT: All right. Thank you, Mr. Foley.
23      MR. GALARDI: Good morning, Your Honor.
24      THE COURT: Good morning.
25      MR. GALARDI: Your Honor, I'll take 11 and 12

Page 9

1   together, but I want to do a step back. This is the
2   time and place for the final hearing on the debtors'
3   proposed DIP financing order. Your Honor, we have
4   received a number of objections from many, many
5   parties; including landlords and other taxing
6   authorities. My understanding is we have resolved
7   all of those objections. I'll never know until
8   somebody comes up behind me, but we believe we have
9   resolved all of them.
10      One of the most significant objections, Your
11   Honor, just to sort of put it in the context, was
12   the one that was not filed by the Creditors'
13   Committee. And I know Your Honor was aware of that.
14      Your Honor, first, business has been -- and
15   Mr. Cullam (phonetic) is in the courtroom today;
16   and, if called as a witness, would testify to a
17   number of the facts that I am going to lay out for
18   Your Honor so Your Honor understands the need for
19   the final order, as well as the need for the
20   document to be filed under seal, as well as the
21   amendments so that we can put that in context.
22      Your Honor, just briefly: Since entering
23   into the bankruptcy case, the debtors' performance
24   -- as I think all retailers has -- has been off
25   significantly. The original budget had sales off 20

Page 10

1   percent, and they have gone more to 43 to 48 to 50
2   percent. Unfortunately, the business is not
3   performing for the holidays, probably due to the
4   general economic. Your Honor is familiar and reads
5   the papers about Best Buy and our competitors having
6   similar circumstances.
7      In that context, and with performance falling
8   off, the other aspect of the model that Your Honor
9   had seen was that in January we were hopeful that
10   vendors would come along and provide certain trade
11   terms. They have been slow coming. Some vendors
12   have supported; others have not. So the model
13   was -- as all models -- a projection of what we
14   hoped to do to get through what I called a bridge to
15   somewhere -- a sale, an exit, a vendor-supported
16   plan. And the idea was to give us roughly 60 days
17   to a date that we all targeted as January 16th
18   whereby we would either get a subordinated facility
19   of about 75 million dollars -- there was some
20   discussion of that -- or come up with a vendor plan,
21   or something like that. Though performance is off,
22   it is still our hope that we continue to do that.
23      The Committee, after being informed -- and
24   we've had many meetings with the Committee --
25   expressed its concern in an informal objection to us

Page 11

1   that they gave us a draft for. And I'll say seven
2   of the concerns that they had -- there were probably
3   more than that -- but there were seven major
4   concerns.
5      First, Your Honor will recall that we entered
6   into an agreement that the first day rolled up all
7   of the pre-petition debt into a post-petition debt.
8   And the debtors had taken the position that that was
9   appropriate under the circumstances both for
10   practical purposes, and because we believe that the
11   lenders were over-secured. Notwithstanding that,
12   the Committee had an objection to the roll-up, and
13   we had some standstill agreements during this period
14   of time with respect to that.
15      The second, Your Honor -- and I think I
16   emphasized this in the first day, and it was in our
17   first meeting with the Committee -- I guess the
18   slogan for the case is: You're paying 30 million
19   dollars for a 50 million dollar availability. They
20   had expressed the same concerns. Now, we've had our
21   stories about that and why it really isn't exactly
22   that, but that was a second concern that the
23   Committee had expressed loud and clear.
24      Third, the Committee -- as Committees
25   generally do -- wanted a longer investigation period

Page 12

1   with respect to evaluate the security interests of
2   the bank group, the time periods, and things of that
3   sort. Obviously, every Committee has a concern with
4   the debtors' 506(c) waiver, which was included in
5   it. In addition, especially in the context of the
6   roll-up, the Committee had expressed its concern
7   that the banks were taking not just the collateral
8   they had pre-petitioned, but expanding their
9   collateral to include such things as lease proceeds,
10   FF&E, Canada. And that was a concern that the
11   Committee had expressed. And so have other people,
12   but I think it's easier to focus on that.
13      In addition, as we had talked about the first
14   day, the Committee had concerns about the need to
15   have a 75 million dollar sub-debt facility; and,
16   indeed, what that facility would be could itself
17   hamper trade terms from vendors, because you would
18   just simply further subordinate ordinary trade
19   credit. There was that concern.
20      And then finally, the Committee also had
21   concerns about the timing of bid solicitations in
22   the plan. It was a relatively short timeframe; and
23   we had gotten, since the Committee was formed,
24   certain indications from landlords that they might
25   be willing to consider not only the

## Page 13

1   initial extension of time. We had meetings in New
2   York with the Committee about this, and
3   unfortunately we didn't come to an agreement
4   originally. And so, we began discovery, I guess it
5   was last week -- again, adjourning off the
6   Committee's deadline to file an objection.
7        Your Honor, with the amendments before Your
8   Honor today that we have filed, as well as the
9   motion under seal, we have resolved the Committee's
10  objections. Again, as any resolution, obviously,
11  they wished for some more things; the bank wished
12  for some less things or more things. But we think
13  we've resolved a fair settlement that's embodied in
14  the amendment.
15       In particular, Your Honor, from a factual
16  standpoint, as Mr. Cullam would testify, as we sit
17  here today, whether we had done a first-day roll-up
18  or a roll-up to this hearing, by now all of the
19  pre-petition debt would have been rolled up. So
20  that issue sort of died of its own accord. Although
21  the Committee had retained its rights to always
22  challenge that roll-up, today we are not having that
23  contested.
24       Your Honor, with respect to the cost and
25  availability factor, and given the performance, this

## Page 14

1   was a negotiation. And the Committee has now
2   agreed -- and we would still seek the approval of --
3   and it was still approved on the first day -- the
4   fees paid; however, Your Honor, we believe we now
5   have some additional substantial availability.
6   Though not obvious, what has been removed is the
7   minimum availability covenant. In the original DIP
8   financing agreement, as of December 20th, we had to
9   have minimum availability of 75 million dollars.
10  The next two weeks were 50 million dollars, and then
11  at a low in the week of January 12th, 35 million
12  dollars.
13       So essentially, whether you want to call it a
14  block or a covenant, we would have butted against
15  those terms. The banks have agreed in the amendment
16  that we have put forth, and for which we seek
17  approval today, that those covenants no longer
18  apply. There's still a 10 percent minimum
19  availability covenant, but there is not the 75, 50,
20  and 35 block.
21       In addition, Your Honor, the banks have
22  consented to extend the investigation period of the
23  Committee to March 1st, 2009.
24       The Committee has agreed that they do not
25  object now to the 506(c) waiver.

## Page 15

1        And importantly, Your Honor -- and this is
2   good for the estate -- the banks and the Committee
3   and we have agreed that there will be no liens
4   granted on the FF&E that was originally part of the
5   additional collateral and bootstrap collateral that
6   the banks were taking. And in addition, there is a
7   sharing of Canadian proceeds between this estate and
8   the banks. The banks also took a lien on Canadian
9   assets. It will have no affect -- I think counsel
10  for the monitor is here -- it will have no affect on
11  how the mechanics work in Canada. It only has an
12  effect for this estate, and what the proceeds from
13  any sale or proceeds that are to go to pay down the
14  debt will have with respect to this estate.
15       And then finally, as Your Honor knows, we
16  have addressed various timing issues with respect to
17  where this business is going. As I had mentioned --
18  and the reason that we had filed the motion under
19  seal is that we are seeking a bridge to somewhere.
20  We are in negotiations. As Mr. Cullam -- if called
21  as a witness -- would testify, we continue to pursue
22  a plan with vendors, although that has not gone as
23  fast as we would like it to. We are, in fact,
24  pursuing still sale of all of our assets.
25       And so, we continue to pursue that. As part

## Page 16

1   of this, we have asked now for Your Honor to approve
2   the amendment that sets up various timelines for
3   achieving certain of our goals with this
4   restructuring. We have asked Your Honor to grant a
5   motion to file an amendment, a side letter under
6   seal. We would ask Your Honor to do that. That's
7   obviously -- as Your Honor probably has read, it's
8   confidential and sensitive information, and may
9   affect the ultimate value that we get for these
10  assets. So we think it's important that that motion
11  be granted.
12       And in addition, Your Honor, we no longer
13  face that hurdle. As part of the quid pro quo for
14  that schedule, we no longer face that January 16th
15  or 17th deadline to have a subordinated loan
16  facility.
17       So we believe that with those amendments,
18  Your Honor, two things are very important: One,
19  that the company will have adequate availability to
20  be able -- that we have adequate availability to get
21  to the 16th -- and, indeed, maybe even later than
22  the 16th -- to be able to continue to explore the
23  restructuring alternative.
24       Two, that we have a consensual DIP, except
25  for I guess -- I've been passed a note -- that one

Page 17

1    of the objections may still be outstanding, but it
2    doesn't go to these terms -- that we have a
3    consensual DIP that the Committee and the banks and
4    we have all agreed to.  We have a structure and a
5    timeframe for proceeding with the restructuring of
6    these cases, all of the avenues that we are going
7    down, and that we have adequate availability.
8         And, indeed, Your Honor, without approval of
9    the facility today, we would have no further
10   financing.  And there's clearly an immediate need
11   for financing, as we make purchases every day; we
12   pay bills every day; we pay employees every day.  So
13   we would face -- though we don't need to say
14   immediate and irreparable harm in the context of the
15   final order, but the financing is in the best
16   interest of the creditors and the estates.  We
17   believe that it is supported by the Committee, and
18   the bank group has negotiated in good faith with
19   respect to the modifications that it has made.
20   Again, Your Honor, we had a meeting -- and I think
21   it's important to point out that many of the issues
22   are required 100 percent lender consent.  So that is
23   a very difficult thing in this time to have
24   financing.  So we are happy to still have that
25   financing.  And then with the help of the required

Page 18

1    lenders led by the agent B of A, the elimination of
2    that minimum availability or clean-down covenant has
3    significantly given us more certainty that we'll be
4    able to explore our restructuring alternatives
5    through the middle of January, and make some
6    determination as to where this case is going.
7         Your Honor, the one objection that is
8    outstanding here -- and we may just need a little
9    bit more time -- is the objection of Navarre, who is
10   a consignment vendor.  And we don't dispute it is --
11   that there are consigned goods.  They have also made
12   a motion for adequate protection.  We may be able to
13   resolve that separately.  I don't think it goes to:
14   We need a DIP.  It's more it goes to: What adequate
15   protection can be provided through a consigned
16   lender in the modern age of centralized cash
17   management and reserving rights.  We propose a
18   stipulation.
19        Your Honor, I could certainly put Mr. Cullam
20   on the stand to address that; but I think, if called
21   as a witness, he could verify the facts set forth in
22   the final order.  It is the result of arm's length
23   negotiations.  I think we can rest on the record.
24   And I don't know if there's parties that have an
25   objection, or other people who have comments.  I

Page 19

1    leave it to Your Honor as to how you'd like to
2    proceed with the rest of the final DIP hearing.
3         THE COURT:  All right.  Thanks.  Does any
4    party wish to examine the proffered witness for the
5    debtor?  All right.  The proffer will be accepted.
6         Does any party wish to speak in opposition to
7    the motion to approve the DIP financing?
8         MR. COLEMAN:  Your Honor, if I may briefly,
9    I'd like to be heard on this.  Ken Coleman of Allen
10   and Overy.  We represent Alvarez and Marxel, the
11   monitor appointed in the Canadian proceeding.  I
12   don't have an objection, per se, but I do have some
13   comments that I'd like to express to Your Honor, and
14   have on the record.
15        As I indicated at the last hearing, you know,
16   we do appreciate the difficult circumstances of the
17   U.S. company, and the difficult retail environment,
18   and the pressure that everybody is under in this
19   case to try to effect a restructuring.
20        The fact of the matter is that the monitor in
21   the Canadian proceeding is the only party that can
22   consider the interests of the Canadian unsecured
23   creditors without any conflict of interests.  The
24   Canadian company InterTAN does not have the
25   ability -- does not have an independent board of

Page 20

1    directors that can look solely to the interests of
2    the Canadian creditors.  It's a function of the
3    corporate governance of the system.  And those are
4    the facts that we have.  And that's why there's
5    additional pressure on the monitor to pay attention
6    to the interests of those creditors.  Yet the
7    monitor has been excluded from this process that has
8    led to this amendment.
9         I think Your Honor is aware of the
10   extraordinary nature of the relief that was
11   available in Canada in connection with the
12   post-petition financing.  For the first time, the
13   Canadian subsidiary was joined with the U.S. parent
14   in terms of its assets being directly available to
15   support this financing.  So therefore, what occurs
16   in the U.S. does have a direct impact on the
17   Canadian creditors.  Again, we appreciate that the
18   parties are trying to accomplish a number of things
19   here in a fairly short order, and in a very
20   difficult environment.
21        We think that this amendment -- while we
22   appreciate Mr. Galardi's comments that there should
23   be no impact on the Canadian creditors -- this
24   amendment, specifically in Section 5(b) -- which we
25   only received for the first time yesterday

Page 21

1   afternoon -- doesn't say that. It suggests that
2   after -- it says that after payment of specific
3   charges set forth in the Canadian initial order, 50
4   percent of the proceeds go to pay the DIP loan, and
5   the balance goes to the U.S. estate. Now, there may
6   well be -- depending on how the facts unfold and how
7   the Canadian sale process unfolds -- there may well
8   be Canadian unsecured creditors who are cut out of
9   those proceeds. Now, if that's not the intention,
10  that's fine. And there are words that can be used
11  to fix that.
12      But my point in rising today, Your Honor --
13  in addition to express our concern about this
14  process, my point in rising specifically is to
15  suggest to Your Honor that matters pertaining to
16  this amendment, matters that affect the priorities
17  of the Canadian court order, and the application of
18  the proceeds of the sale of Canadian assets, ought
19  to be addressed in the first instance by Justice
20  Morawetz in the Canadian court; and that this Court
21  should not today approve the amendment in those
22  respects as they affect Canada.
23      Justice Morawetz has been alerted to the
24  hearing today and to these provisions, and it is my
25  understanding that a hearing is being scheduled

Page 22

1   before him tomorrow to consider this. And what we
2   don't want to create is a sense that this Court has
3   somehow approved matters that relate to Canadian
4   priority and the application of Canadian assets,
5   when, in fact, out of deference to the Canadian
6   court whose order is really at stake here, that
7   Court ought to first consider those issues.
8       And frankly, there are concerns in Canada
9   expressed both last night and this morning about
10  various representations that were made to obtain the
11  financing in Canada on the first day: That the
12  terms were in inviable, that there was no time to
13  consider alternatives. And, indeed, there has been
14  substantial changes and substantial negotiations
15  over the past six weeks or so in which we just have
16  not been involved. And we think that --
17  understanding the circumstances that the parties are
18  under -- we think that we need to be involved in
19  that process so that we don't confront situations
20  where we're presented at the last minute with what
21  appears to be a fait accompli, which has a very
22  direct and material impact on Canadian creditors.
23      THE COURT: All right. Thank you.
24  Mr. Galardi?
25      MR. GALARDI: Yes, Your Honor. Two things.

Page 23

1   I think this may be more just a language issue; but
2   first, Your Honor, I want to be clear: We are not
3   asking Your Honor to do anything to change any
4   order -- the financing order in Canada; nor are we
5   saying that by doing this order we're going to turn
6   around in Canada and say, Well, this Court approved
7   it. That wasn't the intention of this.
8       Your Honor, there is an order -- and
9   Mr. Berman is familiar with it, and I am somewhat
10  familiar with it -- in Canada whereby there is a
11  charge, a payment, and then there is some money
12  that's been set aside for the unsecured creditors in
13  Canada. And then the banks would get their rights,
14  which were agreed to in the order that is before
15  Judge Morawetz.
16      All this order says, that when the banks
17  begin to take on that second part after the charges
18  and everything goes, is that they're sharing 50
19  percent of that with this estate. It's not changing
20  anything in that original order; nor was it our
21  intention to do so. Mr. Berman can certainly
22  describe that. If the language doesn't make that
23  clear, I understand.
24      Again, I'm not standing on the fact -- they
25  clearly have a voice in this case. They're not a

Page 24

1   party in interest in the sense of standing as a
2   creditor. But I do want to make it absolutely
3   clear: We are not asking this Court to say this is
4   an order, and has binding effect on Canada, or
5   changes anything about the Canadian order
6   whatsoever. That is not our intention here. And we
7   can work through with the monitor in this language.
8   Obviously, I wasn't aware of a hearing tomorrow.
9   But the idea is whatever the banks had with respect
10  to the Canadian collateral, all it's done is said,
11  We'll give 50 percent back to the estate. No change
12  of that Canadian order.
13      THE COURT: After payment of Canadian --
14      MR. GALARDI: After all of the agreed -- in
15  the Canadian first day order and the other financing
16  order, there was charges. There was this. And
17  there was a separate negotiation with the monitor to
18  allow a pot of money remain before the banks collect
19  on their lien above that for the unsecured
20  creditors. We have not altered that bucket
21  whatsoever. We have simply given the banks -- which
22  the Committee pointed out -- the banks were a
23  getting a part of their collateral, and they have
24  agreed to share. That's essentially what this
25  provision of 5(b) was intended to capture.

## Page 25

1    THE COURT: All right. Thank you.
2        MR. COLEMAN: Your Honor, I appreciate those
3    comments, but just so that I'm clear: The Canadian
4    order has six charges -- or as we would understand
5    it, priorities or carve-outs. Our difficulty is
6    that there may well be Canadian unsecureds who are
7    not paid after those six priorities are dealt with.
8    There are caps on each of those six priorities.
9        What this language purports to do is that
10   after you -- after the proceeds fall through that
11   waterfall of six priorities, the banks get half of
12   the remaining proceeds -- the DIP lender gets half
13   of those proceeds -- and the U.S. estate --
14   presumably for the benefit of the U.S. unsecureds --
15   gets the balance of the proceeds. So our concern is
16   not the six prior claims, but rather the Canadian
17   unsecureds who would be paid, if at all, from the
18   Canadian estates -- so, if you will, the seventh
19   bucket. That's the problem with this.
20       Now, we're happy to work on the order -- the
21   language for the amendment, because the way it's
22   drafted, it talks in terms not of the sharing of a
23   lien or a claim, but rather a sharing of proceeds.
24   So if a sharing of proceeds is not the intention,
25   but rather an assignment of the lien or an

## Page 26

1    assignment of the claim, you know, we can work with
2    that wording. But just so that I'm clear with Your
3    Honor, our difficulty is, if you will, the seventh
4    bucket, not the prior six.
5        THE COURT: All right. Thank you.
6        MR. BERMAN: Your Honor, David Berman for the
7    DIP lenders.
8        What we were trying to accomplish here, Your
9    Honor -- just so you understand the buckets that
10   have been referred to in a little more detail -- is
11   there are some priority Canadian claims,
12   administration expenses, directive charges which
13   will be paid first from the collateral. The lenders
14   have also made a direct loan to the Canadian
15   borrower to fund its operations. After those
16   priority charges are paid, the direct loan gets
17   paid. That's really the first four levels.
18       The fifth level was a carve-out that was
19   requested by counsel in Canada of 25 million dollars
20   for Canadian creditors to make sure that the
21   Canadian creditors had some recovery before the
22   cross guarantee of Canada was to apply, and the
23   money to come to pay the U.S. debt.
24       After a second hearing on December 5th, that
25   carve-out was increased. So it's 25 million, plus

## Page 27

1    any unused portion of the first priority carve-out.
2    So it could potentially be 40 or 45 million dollars.
3    So it's after the carve-outs, the banks paid its
4    direct loan. The court order says that at that
5    point in time the bank can get paid on its cross
6    guarantee with any remaining proceeds, if any.
7        And in our negotiations with the Committee
8    and the debtors, what we were saying is, Okay, we're
9    entitled to all of those proceeds until the U.S.
10   debt is paid off. What we'll do is we will --
11   rather than applying them all to the U.S. debt,
12   we'll leave some in the estate for the creditors.
13       So we're not changing the order. We're just
14   saying the money we get, rather than applying it all
15   to the debt, some is going to stay in the estate.
16   And that is really what we're trying to accomplish
17   here.
18       MR. GALARDI: Your Honor, let me also just
19   put my color on it. This is really a marshaling
20   argument in some -- and this was one of the
21   Committee's concerns. The banks always have a lien
22   in inventory. We believe the inventory will be
23   sufficient to pay it off. In this uncertain
24   environment, they took a couple of other pots of
25   collateral, including the Canadian collateral. As

## Page 28

1    Mr. Berman has just described, nothing has changed
2    as to what the banks have taken. But the Committee
3    was concerned that, Well, okay, you really don't
4    need that extra collateral if you're going to be
5    paid by the inventory.
6        So we had a long discussion back and forth
7    about what kind of -- for the collaterals, where
8    would you first look. What Mr. Berman and the
9    Committee and the debtors have agreed is essentially
10   that we are not going to look to the FF&E anymore.
11   Fine. That's marshaling. You still look to the
12   inventory. You always had, because that was the
13   deal.
14       And I understand the monitor may not like the
15   deal that was originally -- thinking that there
16   might have been more for them up there. But there's
17   an order up there that says the banks have 100
18   percent of those proceeds after the charges.
19       What Mr. Berman has done to resolve a
20   Committee objection here -- which we think is
21   perfectly appropriate -- is essentially said, That's
22   fine. If I took 100 percent, my debt goes down 100
23   percent. If I take 50 percent, my debt only goes
24   that. But the money still coming into the estate is
25   still to benefit -- whether it goes directly to pay

Page 29

1   down the secured, or whether it comes into this
2   estate as free cash for either the unsecureds or
3   administrative claims is really largely irrelevant.
4   The money was going to benefit this estate in either
5   way, which is why we think this particular B, one,
6   is very critical to us; two, it's critical to the
7   Committee because it was a way to resolve
8   essentially a marshaling argument. And since the
9   estate -- the company of the estate had already
10  negotiated through Canadian counsel and through the
11  Canadian order, they had this above the 25. We
12  don't think there's a change.
13       Now, we understand that they may go back to
14  court there and say, We didn't know that there was
15  something more we could have gotten -- which is what
16  this argument is about. Canada is now saying -- the
17  monitor is saying -- well, look we took 25; but if
18  the bank is willing to give 50 away, why couldn't we
19  get 35 or 45?
20       I understand that they may not like this
21  result, but that's not a reason to stop this
22  amendment. It's quite consistent with the order.
23  They can make the argument in equity up there. I'm
24  not asking Your Honor to say, Judge Morawetz, don't
25  decide this issue. Don't look at this issue.

Page 30

1   You're free to look at it. But this is entirely
2   consistent with the order. And if the monitor has a
3   problem with the deal they cut because they thought,
4   Maybe I could have gotten some more, that can be
5   brought before Judge Morawetz. But this is really
6   still estate property. Whether it goes to pay the
7   debt directly or it becomes funds and we make a
8   marshaling argument is really irrelevant. They were
9   going to this estate or for the benefit of this
10  estate under the Canadian order.
11       THE COURT: All right. Thank you.
12       MR. COLEMAN: Your Honor, I'm happy to leave
13  this with Justice Morawetz for tomorrow, but that is
14  not -- that is not our position. We're not here
15  saying, There's more to be had, and we'd like to
16  have it.
17       We disagree that the wording in this
18  amendment accomplishes what Mr. Galardi says it
19  accomplishes. We do believe that this wording does
20  purport to affect the priorities in the initial
21  order, and we think that Justice Morawetz should
22  have first crack at that issue.
23       THE COURT: Well, I certainly agree that the
24  Canadian Court should administer the property of the
25  Canadian company. But as I understand the way that

Page 31

1   this is working, these are the proceeds that come
2   from the order that's already been entered in the
3   Canadian Court governing that. And it's just a
4   matter of how it flows from that. And if the Court
5   amends the order in Canada, then, you know, this
6   Court won't interfere with that. The Canadian Court
7   can certainly do that.
8        MR. COLEMAN: Well, Your Honor, part of the
9   problem with this wording is if 50 percent of the
10  proceeds of the sale of the Canadian assets were
11  sufficient with other recoveries to pay off the
12  balance of the loan, the remaining 50 percent would
13  nonetheless go to the U.S. estate for payment to the
14  U.S. unsecured creditors; whereas, under the
15  previous regime, those funds would go to the
16  Canadian estate and be distributed to the U.S.
17  estate as an equity distribution, if at all.
18       THE COURT: Well, hasn't just -- the lender
19  just assigned 50 percent of its lien to this estate?
20       MR. COLEMAN: Again, Your Honor, this doesn't
21  say that. This talks about how the proceeds of the
22  sale will be distributed. And it talks about 50
23  percent of the proceeds of the sale going to the DIP
24  lender, and the remaining proceeds of the sale going
25  to the U.S. estate. This doesn't have any effect on

Page 32

1   the DIP lender's lien or claim. It just says,
2   you'll get 50 percent of the proceeds.
3        Now, they have other sources of recovery.
4   And undoubtedly there is a marshaling argument that
5   relates to all of this, which is unavoidable once
6   you have co-borrowers and cross-collateralization.
7        But the problem with the focus on pure
8   proceeds rather than the claim -- it would be one
9   thing if the lenders were saying, We are assigning
10  to the U.S. estate 50 percent of our lien. But
11  that's not what they're doing.
12       Again, Your Honor, I'm happy not to be the
13  tail wagging the dog on this issue here; but that's
14  not what this wording says.
15       THE COURT: Have you proposed language to
16  Mr. Galardi that would be acceptable?
17       MR. COLEMAN: That's part of the problem with
18  the process, Your Honor. We haven't had a chance
19  to. We just got this yesterday afternoon, despite
20  requests previously to be allowed into this process.
21  We're happy to propose language.
22       MR. GALARDI: Your Honor, there's a simple
23  answer, I think, to doing that. Clearly, a sentence
24  in our order that says nothing is intended by any of
25  the amendments to modify or change any of the terms

Page 33

1  of the Canadian order makes this language largely
2  irrelevant to them. And that's what I'm going to
3  suggest, is ultimately a paragraph in here.
4      THE COURT: And that would be acceptable to
5  the Court. I think that --
6      MR. GALARDI: Then we don't have to -- and we
7  can work on language. But as long as this order
8  says clearly we're not trying to amend a Canadian
9  order by way of a back door or otherwise, by
10  amendment or otherwise, I'm not sure that -- I think
11  this objection then can be overruled. And Judge
12  Morawetz can look and have whatever -- if it alters
13  it, he can interpret that. I think that's totally
14  appropriate. Thank you.
15      MR. BERMAN: Your Honor, just for
16  clarification in terms of what the DIP lenders were
17  believing that they were agreeing to is that we're
18  giving 50 percent of what we were entitled to
19  receive from Canada after the payment of the direct
20  loan and the other charges to the estate.
21      So in the example that was given, if we only
22  need 50 percent of the proceeds to -- we would only
23  need 50 percent of the proceeds to satisfy the U.S.
24  debt, then we get 50 percent. The other 50 percent
25  stays in Canada. And we take the 50 percent we

Page 34

1  receive and split it with the estate.
2      So we're not trying to -- or at least the DIP
3  lenders aren't trying to get more than we were
4  otherwise entitled to under the order. It's just:
5  How were those proceeds used? And we're basically
6  agreeing to release part of our collateral to the
7  estate.
8      THE COURT: All right. Thank you.
9      MR. FEINSTEIN: Your Honor, Reverend
10  Feinstein for the official Creditors' Committee.
11      I can confirm what Mr. Galardi and Mr. Berman
12  said about the nature of our negotiations in that
13  under the interim DIP, and under the DIP financing
14  agreements, the lenders were to get substantial
15  additional collateral -- new leases, a pledge of the
16  unpledged entered in the Canadian subsidiary, and
17  FF&E. As a part of the horse trading of negotiating
18  a consensual DIP resolution -- as Mr. Galardi
19  pointed out -- one of the items that was ceded by
20  the bank, as Mr. Berman described it, was giving up
21  half of what they were entitled to under the
22  Canadian order.
23      So there is no -- let me confirm: There is
24  no effort to modify the Canadian order at all. And
25  frankly, I'm quite concerned to hear that there is

Page 35

1  now some emergency proceeding in Canada to amend
2  that order in a way that might undermine the deal
3  that we struck here today, essentially on no notice
4  to this Creditors' Committee, which would be
5  fundamentally affected by any change. I just want
6  to express that concern on the record, and ask that
7  we be included in any proceedings of this type that
8  go forward in Canada tomorrow.
9      With respect to the remainder of the
10  resolutions, let me just -- I'll confirm what
11  Mr. Galardi laid out, that the efforts by the
12  Committee to negotiate -- and we did, as Mr. Galardi
13  said, meet in New York with the banks and with the
14  debtor, and have engaged in fairly round-the-clock
15  negotiations over the last several weeks -- have
16  resulted in a number of important protections from
17  the Committee's standpoint.
18      First, with regard to the roll-up, there is
19  now language in the final order that makes it clear
20  that if any successful challenge is brought, that
21  the roll-up will be rolled back to the extent that
22  there are defects in the liens, and things like
23  that.
24      We do have some concern about the size of it
25  being relative to availability. With the

Page 36

1  elimination of the minimum availability covenant,
2  there is now substantial more liquidity for the
3  debtor to operate as we go forward.
4      The challenge period has been moved out so
5  that we can all focus on restructuring this business
6  and maximizing value for creditors.
7      The additional collateral issue, again, has
8  been addressed by the ceding of half the bank's
9  recovery out of the Canadian proceeding, as well as
10  by not having a lien on the FF&E.
11      We also thought it was important to eliminate
12  the 75 million dollar sub-debt facility requirement.
13  That would have created a number of issues. That's
14  gone.
15      Lastly, two points that Mr. Galardi didn't
16  raise: We made it clear in this order that the
17  Super Priority claim that's being afforded to the
18  banks cannot be satisfied out of avoidance actions
19  or the items of collateral that have been freed up,
20  if you will -- the Canadian collateral, the FF&E.
21  And finally, we added a reporting provision for the
22  payment of banks' professional fees, that they
23  provide invoices to the Committee of the U.S.
24  Creditors. Thank you.
25      THE COURT: All right. Thank you.

Page 37

1    MR. COLEMAN: Just one last point, Your
2  Honor, if I may.
3    THE COURT: Yes.
4    MR. COLEMAN: I'm wearing out my welcome. I
5  read body language almost as well as English.
6    There's no intention to create emergency
7  hearings to anyone's surprise. If we had been
8  involved in the process, all of this could have been
9  avoided. Notice of that hearing is going out today.
10    One issue that we think is enormously
11  helpful -- the one way to approach these problems
12  that we think is enormously helpful is if the courts
13  are in communication with each other. And we're
14  happy to provide your chambers with Justice
15  Morawetz's phone number if Your Honor feels that a
16  conversation of that nature would be helpful to get
17  us over this hump.
18    THE COURT: All right. Thank you.
19    MR. COLEMAN: We'll do that today. Thank you
20  very much.
21    THE COURT: I'm going to request Mr. Galardi
22  include the language that you just mentioned in the
23  order to clarify that -- you know, affecting any
24  order that's been entered in the Canadian court.
25    And with that, then, did any other party wish

Page 38

1  to be heard on the motion to approve the DIP
2  financing?
3    >>: Good morning, Your Honor. Alan Notfeld
4  (phonetic) on behalf of Navarre.
5    We filed an objection to the DIP order, and
6  then we also filed a motion for adequate protection.
7  The relief in the motion and the relief requested in
8  the objection are kind of parallel. So I just
9  wanted to get an affirmative motion before the
10  Court; and, in particular, in light of the fact that
11  the DIP hearing was continued last time, and we
12  didn't have an opportunity to be heard.
13    The DIP order does now provide for a
14  carve-out for goods that are not properly in the
15  estate. And that would include goods such as the
16  Navarre property that has been delivered to the
17  debtors on consignment. We appreciate that; but in
18  our minds, that's the easy part.
19    The more difficult part is: What happens
20  with the proceeds from the sale of those goods? And
21  the DIP order in our minds does not sufficiently
22  address those proceeds. And as a result, we feel
23  the effect of that is that some rights that Navarre
24  has under the bankruptcy code; namely, under Section
25  363(c), are taken away because when the debtors sell

Page 39

1  the consigned goods and they receive the proceeds of
2  those, the proceeds get mixed in with the debtors'
3  accounts which are subject to the blanket lien by
4  the DIP lenders, and Navarre's rights to segregation
5  and its other rights in those proceeds can be lost.
6    As briefed in our papers, Navarre and the
7  debtors are party to a consignment agreement. And
8  under the ECC, that consignment agreement is treated
9  as a purchase money security interest. I won't go
10  into all the specifics, but we feel we have
11  sufficiently laid out the steps that we took to
12  perfect that security interest.
13    I note that the debtors in their response and
14  no other party has objected to the validity of the
15  steps that were taken; and, as such, the validity of
16  the consignment lien and the consigned goods. And I
17  also note that that's sufficiently covered in the
18  order right now.
19    With respect to the proceeds, we also look to
20  the UCC, and the UCC basically grants a lien on
21  proceeds that are from the sale of inventory that's
22  subject to a purchase money security interest to the
23  extent they're identifiable. And we think there is
24  a slight difference here between the goods on
25  consignment that were sold pre-petition and the

Page 40

1  goods on consignment that were sold post-petition,
2  but they ultimately get us to the same place.
3    With the goods-pre petition, essentially we
4  would have a lien on the proceeds to the extent that
5  those proceeds are identifiable. And as briefed in
6  our papers, the courts look at the lowest
7  intermediate balance, that it appears that the
8  burden here is initially on the secured party to
9  establish that where funds were co-mingled -- which
10  we suspect was the case here -- that they can be
11  traced, applying the lowest intermediate balance
12  test and the minimum information available to us.
13  The total dollar value of these goods is about 2.3
14  million, and the debtors' cash balances on hand
15  appears to have dropped no lower than 90 million
16  based on their public filings with the SEC. At
17  times, they seemed to be closer to 300 million in
18  the past year. It's really difficult for us to
19  pinpoint exactly what was on hand as of the petition
20  date, but we think it was well in excess of 2.3
21  million. And we think that we've, at a minimum,
22  demonstrated -- you know, established a prima facie
23  case that there are identifiable proceeds from the
24  sale of Navarre's consigned goods. We also note
25  that there was no objection to those claims in our

Page 41

1    motion.
2        For post-petition, the analysis is slightly
3    easier. Basically, when the goods are sold and the
4    proceeds hit the debtors' account, at that moment in
5    time they're identifiable proceeds; and, as such,
6    they're Navarre's cash collateral. And Section 363
7    kicks in, and Navarre would be afforded the rights
8    under the Bankruptcy Code.
9        Either way, the outcome is the same. To the
10    extent you have your identifiable pre-petition
11    proceeds or your post-petition proceeds, it's cash
12    collateral. And it cannot be used without Navarre's
13    consent which they have not asked for and we have
14    not granted, or without the court order upon a
15    motion and a notice of hearing. And they have not
16    done that, either.
17        So basically, what we're left with is a DIP
18    order that does sufficiently establish that the
19    debtors aren't trying to take any -- that the DIP
20    lenders -- sorry -- are not trying to take any liens
21    in consigned goods. But it does not, in our minds,
22    sufficiently establish how the proceeds will be
23    treated. And the effect that we see it is that it
24    will enable the debtors to use cash collateral of
25    Navarre without consent, and in violation of the

Page 42

1    provisions of the bankruptcy code.
2        What we would ask --
3        THE COURT: But the order doesn't say that,
4    though; does it? The order doesn't say that they
5    can use your cash collateral?
6        >>: The order does not say that they can use
7    our cash collateral, but the order -- but what's
8    going to happen is that when the proceeds hits the
9    debtors' accounts, the order which gives the DIP
10    lender the lien on all the debtors' assets,
11    including their account, is going to, in essence,
12    have that effect.
13        And upon information and belief, the balances
14    in the accounts are going to be swept on a daily
15    basis, and used to establish the daily -- and so,
16    those proceeds will then be used to pay down the DIP
17    lender's loan; and they will, in essence, be used.
18        THE COURT: So what does your objection go
19    to? The cash management system that they've got in
20    place, or does it go to the DIP financing order?
21        >>: Well, we don't have a problem with the
22    debtors obtaining their DIP financing. We think
23    that that's in the best interest for everyone. We
24    would just ask that the order recognize that to the
25    extent that Navarre has a lien on the proceeds, that

Page 43

1    it get afforded the proper treatment, and that those
2    proceeds get segregated in accordance with section
3    363(c)(2).
4        THE COURT: Well, given the cash management
5    system they have in place, how are they going to
6    segregate that? Because you're right. I mean,
7    everything is going to be swept into the centralized
8    account and such. But if there's a carve-out for
9    goods that are not property of the estate, why can't
10    that just apply to the proceeds, as well?
11        >>: Meaning that those proceeds would go
12    into a separate account?
13        THE COURT: No. They would just be deemed to
14    be not property of the bankruptcy estate, and not
15    subject to the bank's loans. Doesn't that solve the
16    problem?
17        >>: I guess that solves the problem as long
18    as we don't -- as long as we can be sure that we
19    don't find ourselves down the road a month or two
20    from now, and have there be insufficient cash to pay
21    those monies to the secured creditors in a
22    liquidation scenario, and basically have a situation
23    where the debtor hasn't already spent that money.
24    And that's the real concern.
25        THE COURT: Okay.

Page 44

1        >>: So now, just to address your question on
2    how it would work mechanically, I think with respect
3    to the pre-petition -- the sales from the
4    pre-petition goods that were on hand as of the
5    petition date, as well as the sales that have
6    occurred post-petition up until today, that's just a
7    number. I would submit that you could just do a
8    one-time payment into a segregated account, and then
9    those funds are blocked, and they're protected from
10    the debtors using them and from Navarre being
11    harmed.
12        With respect to sales going forward, we
13    understand that is a little bit more challenging.
14    We're open to working with the debtor. It would
15    seem to me, given the technology today, that they
16    could run an inventory report at the end of every
17    day; and whatever the dollar amount of the sales for
18    Navarre's goods are, just have those funds be wired
19    over into the segregated account before the sweep
20    occurs, and then there would be no harm.
21        THE COURT: How are you paid right now?
22        >>: Right now under the consignment -- well,
23    I'm not sure how they're getting paid right now.
24    Prior to the petition date the way it worked is they
25    would sell the goods, and then there would be

Page 45

1   periodic reporting on a weekly basis. And then
2   there would be payments that would follow the
3   delivery of those reports.
4       THE COURT: And is that still happening?
5       >>: I don't know that it has happened to the
6   full extent. I think there have been some small
7   payments received, but they're not in line with the
8   dollar amount of goods that have been sold.
9       THE COURT: Okay.
10      >>: But again, we would submit that
11  segregation of the funds is the best method -- and
12  the method that's mandated by the Bankruptcy Code --
13  to protect Navarre's interest in the cash
14  collateral.
15      THE COURT: Okay. Thank you.
16      >>: Thank you.
17      THE COURT: Mr. Galardi?
18      MR. GALARDI: Yes, Your Honor. Actually,
19  partially why I thought we could resolve most of
20  this was under the Navarre agreement, the first
21  thing I want to point out is there is no obligation
22  to segregate. So although they have -- and we don't
23  dispute the consignment. Mr. Feinstein and I have
24  already dealt with Panasonic.
25      So what we had proposed to Navarre -- I think

Page 46

1   we have no problem with the post-petition. We give
2   the weekly reports. And, indeed, although we give
3   weekly reports now and they get paid monthly, we
4   were going to do what we do with Panasonic at the
5   end of the week with the reconciliation: Pay them
6   over the proceeds and essentially unwind the
7   consignment. And that sort of takes care of the
8   modern cash management system of centralized cash
9   management, because even though the funds are
10  collected, if we pay them regularly, we do a
11  reconciliation, any disputes that come back to the
12  Court, we can unwind the post-petition. We need to
13  fix what the petition date is.
14      Your Honor, with respect to the pre-petition,
15  that's where we actually have the biggest concern.
16  Clearly, we sold goods prior to the bankruptcy. And
17  some of those goods have not been paid for. The
18  issue here is whether or not they actually have to
19  establish their burden, or we establish a reserve
20  for that. At this point, we would object to the
21  establishment of a reserve. Rather, they should
22  have to carry their burden.
23      As Your Honor knows, one, whether we did a
24  roll-up or otherwise, those proceeds have been in
25  the account, that account was paid off in full, and

Page 47

1   we borrowed. So there isn't going to be an argument
2   of whether their lien attached or they lost that
3   lien by intermingling, and we actually have to have
4   a factual hearing on with witnesses as to the lowest
5   common denominator -- if that's the approach -- and
6   whether those proceeds are still their property.
7       Clearly, the unsecured Creditors' Committee
8   -- as they would have with Panasonic last hearing --
9   want to weigh in on that issue as to whether they've
10  lost the lien because of comingling and centralized
11  cash management. Clearly, given that they didn't
12  require segregation of proceeds in their agreement,
13  clearly because we had a roll-up, and clearly
14  because we paid off our debts, there are significant
15  factual issues as to that.
16      So with respect to post-petition, we have no
17  objection to going back to the petition date, doing
18  a weekly report and reconciliation, and paying them
19  at the end of the week out of that. That eliminates
20  sort of the administrative insolvency at the end of
21  the day problem. They don't have to hold the bag
22  for 30 days. We should do that reconciliation and
23  turn over the proceeds.
24      With respect to the pre-petition, we oppose
25  any request for them to get adequate protection for

Page 48

1   pre-petition. We don't think they've established
2   the fact of the lowest common denominator. We'll
3   gladly have a hearing on whether or not those liens
4   attached, or whether those liens are lost, and that
5   money is simply property of the estate as a result
6   of events that have transpired for the last 30 to 45
7   days.
8       But I think from a DIP perspective we can
9   clearly give adequate protection in the form of
10  weekly reports and turning over proceeds on a weekly
11  basis subject to reconciliation -- with this Court
12  having authority, if there is a dispute about the
13  reconciliations, to come back on an expedited basis
14  to resolve any weekly reporting or reconciliation
15  issues.
16      THE COURT: And that's how you handled it
17  with Panasonic?
18      MR. GALARDI: That's exactly how we handled
19  it with Panasonic, with everybody reserving their
20  rights to assert the pre-petition claim as a secured
21  claim.
22      And obviously, it's the least involvement by
23  the lenders, because they don't want to have an
24  argument of conversion. So if it turns out they can
25  prove it, the lenders will make the payment. If it

Page 49

1  turns out that there is no liens, then it is
2  property of the estate; and that eliminates a lot of
3  the cost of having the lenders subject to a
4  conversion.
5       And that's what we did with Panasonic with
6  the Committee, Your Honor.
7       THE COURT: All right. Thank you.
8       MR. FEINSTEIN: Just briefly, Your Honor.
9  Yes, I want to confirm the Committee would be
10 supportive of the arrangement going forward to sell
11 down the remaining consigned inventory, to have
12 periodic reporting, and to turn over the proceeds of
13 newly-sold merchandise on a rolling basis.
14      But with respect to the pre-petition, we
15 don't think that Navarre has satisfied what will be
16 a substantial burden, which is to trace their
17 proceeds; and that they're not entitled to adequate
18 protection on that basis.
19      THE COURT: All right. Thank you.
20      >>: Your Honor, I would just like to note
21 with respect to the post-petition -- the proposal of
22 the post-petition payment of proceeds, I have not --
23 we discussed this with the debtor late last week and
24 over the weekend. I have not been able to confirm
25 with my client, due to their unavailability this

Page 50

1  weekend, as to whether or not that would be
2  acceptable, but I believe it would be. That seems
3  like a fair arrangement. I would certainly
4  recommend it to them.
5       With respect to the pre-petition -- the sales
6  from pre-petitioned goods -- we would just note that
7  we did affirmatively tee this issue up in our motion
8  for adequate protection. This is really the first
9  we're hearing that -- you know, that people would
10 need -- you know, need to respond to and determine
11 whether or not Navarre has carried its burden with
12 respect to identifying those proceeds. We believe
13 at a minimum we've made a prima facie case on that
14 issue. So we would submit that we have met our
15 burden there.
16      Notwithstanding that, we understand the fact
17 that everyone wants to get this order entered, and
18 that the Committee would -- you know, may want some
19 more time. And we would be willing to give
20 additional time, perhaps in the form of continuing
21 the motion for adequate protection as it relates to
22 the pre-petition receivables, until this Court's
23 next omnibus hearing date; however, what we would
24 like in the interim -- or what we would request --
25 is that that sum of money just gets segregated and

Page 51

1  put aside pending a determination so in the event we
2  find ourselves in a liquidity crisis one month from
3  now, we're not harmed because we agreed to continue
4  a hearing where we had already kind of teed it up
5  and properly noticed it, and no one responded.
6       THE COURT: All right. Thank you.
7       The Court will find that the proposal for
8  weekly reconciliations to provide adequate
9  protection to Navarre in connection with the
10 post-petition DIP financing order; with regard to
11 the pre-petition amounts, the Court will continue
12 the asset protection issue to the next omnibus date.
13 There will be no requirement of the debtor to
14 segregate funds, however.
15      >>: Your Honor, if I may just have one
16 clarification: To the extent that the motion for
17 adequate protection is continued with respect to
18 pre-petition sales, and the debtor has already
19 responded, is there -- would there be an expectation
20 that there would be additional briefing on the
21 subject, or could we just have that addressed at the
22 next --
23      THE COURT: Only if the parties want to have
24 additional briefing. I will read what you filed.
25      >>: Okay. Thank you.

Page 52

1       THE COURT: You'll need to be prepared to
2  present evidence, though.
3       >>: Okay.
4       MR. GALARDI: And Your Honor, my
5  understanding would be that that would be the
6  hearing -- the next omnibus hearing would be January
7  16th for that issue.
8       THE COURT: Correct.
9       MR. GALARDI: And Your Honor, we did file an
10 objection. We thought we had raised this issue;
11 obviously didn't do it as forcefully. So we may
12 want to supplement it. And I'm sure the Committee
13 may want to supplement it, as well. So I would
14 expect that to be the case.
15      Your Honor, I don't believe that there are
16 any other objections to the DIP, and I don't believe
17 there are any objections to our motion to file
18 documents under seal. So we would ask that Your
19 Honor approve those, and then work on a revised
20 order to address both the Navarre issue and the
21 monitor's issue long the lines that I described to
22 the Court to make sure that the language actually
23 works for those purposes. But we would ask Your
24 Honor to approve the financing and the motion to
25 file the documents under seal.

Page 53

1    THE COURT: Any party wish to be heard in
2  connection with either matter?
3      >>: One last point of clarification, Your
4  Honor. Would this -- in connection with this order,
5  would that be -- would there have to be a separate
6  notice and hearing to approve a settlement as it
7  relates to the treatment of -- and payment of a
8  post-petition sale?
9      THE COURT: No. We'll just include that in
10  the language of the order.
11      >>: All right. Thank you.
12      THE COURT: All right. It will be approved.
13      MR. GALARDI: Thank you, Your Honor.
14      Your Honor, that -- I believe that, then,
15  takes us to Matter 13 on the agenda for the 10 a.m.
16  hearing, which is the debtors' supplemental motion
17  to pay certain sales, trusts and other taxes.
18      Your Honor, as you may recall, on the first
19  day we got authority to pay various sales use and
20  other taxes. We then determined that because we
21  had -- the filing was a week later, perhaps, than we
22  first ran that budget, there was an additional
23  funding that we had sought approval to pay. The
24  Creditors' Committee had objected to that motion.
25      As Your Honor may recall, that motion, among

Page 54

1  other reasons, asserted that we should be authorized
2  to pay sales use and taxes because they were trust
3  fund taxes, or there were other reasons for paying
4  those. The Committee objected, and put us to our
5  proof on trust fund taxes. Again, we had said there
6  were other grounds.
7      After going through a long state-by-state
8  analysis with the Committee, we agreed with the
9  Committee on six states not being trust fund taxes.
10  And so, therefore, we had the authority with the
11  Committee's consent to go pay all the other taxes.
12  There's about six jurisdictions that are not trust
13  fund taxes. And given the need for liquidity that
14  we were facing at this time, we have agreed with the
15  Committee to not seek to pay those taxes during this
16  period of time.
17      Those jurisdictions, Your Honor, are Arizona
18  under the Arizona Statute 42-508; Arkansas under the
19  Statute ACA 2652-501; California we do not believe
20  is a trust fund state; the District of Columbia,
21  which is 47-2002; Hawaii, which is HRS 237-13; and
22  Michigan, which is MCLA 205-52.
23      Your Honor, I read those into the record
24  because what we have done with the Committee is
25  entered into a stipulation that essentially provides

Page 55

1  for the following: That we are authorized, and
2  indeed have paid, the taxes with respect to the
3  other jurisdictions; that we and the Committee agree
4  that the taxes for those jurisdictions under the
5  statutes that we have listed -- which we believe are
6  the statutes by which the taxes would be due and
7  payable -- are not trust fund taxes. We're asking
8  Your Honor to enter the stipulation that says that
9  they are not trust fund taxes.
10      And to give Your Honor an idea of why that's
11  important: One, if it's a trust fund tax, it's not
12  property of the estate. So we want to make sure
13  we've covered. Also, because a lot of these taxes
14  have fiduciary obligations behind them, we want to
15  be ordered not to pay them, and Your Honor to make a
16  finding that they're not trust fund taxes, because
17  if they were, we have to pay them.
18      So we entered into a stipulation where we're
19  asking Your Honor to make a finding, along with us
20  and the Committee, that they're not trust fund
21  taxes. At the same time, the stipulation
22  essentially provides a negative notice to those
23  jurisdictions with a right to challenge that. And
24  so, you know, it's an interim finding based upon our
25  review of this statute that these are not required.

Page 56

1  They're not required to be taken out of the
2  proceeds. There are various reasons in each of
3  these statutes that we've come to the same
4  conclusion as the Committee that they're not trust
5  fund taxes. The stipulation is that we will not be
6  paying those, but we give the jurisdictions the
7  notice provision. And if they want to take the
8  position that they are trust fund taxes; and,
9  therefore, not property of the estate, they come
10  back. So it's not that we're asking Your Honor to
11  make a final ruling on that.
12      With that stipulation, Your Honor, we would
13  resolve the Committee's objections. The money would
14  be held in advance subject to further order of the
15  Court. If Your Honor says they're trust funds, then
16  they can be paid. And then we've reserved our right
17  as the debtors. If there were other business
18  reasons -- for example, if the taxes, penalties,
19  etcetera, are greater than our borrowing under the
20  DIP, we've still reserved our rights, because there
21  may be other reasons which were set forth in our
22  first-day motion. But at this point, to get to the
23  next stage of this case at the beginning of January,
24  we've agreed with the Committee not to pay these
25  taxes. And that's what our stipulation provides.

## Page 57

1    That resolves the only objection that we know
2  of to this motion. We'd ask Your Honor to approve.
3  We can submit a stipulation that we and the
4  Committee have been working on to authorize the
5  payment of all other taxes, and not pay these taxes
6  subject to Your Honor's authority; and then finding
7  that they're not trust fund taxes; and then putting
8  it out on negative notice.
9    THE COURT: What was the notice period that
10  you'll be giving for the jurisdictions?
11    MR. GALARDI: I believe it is -- I think we
12  set it up for the January 16th hearing. So it's
13  January 6, Your Honor, that they would have to
14  object by.
15    THE COURT: And that notice would go out
16  when?
17    MR. GALARDI: If Your Honor enters the order
18  today, we would get it out the next day. So it's --
19  if we get the stipulation approved, we'd give notice
20  of the stipulation and serve it on them on the
21  22nd -- 23rd.
22    THE COURT: All right. Thank you.
23    MR. FEINSTEIN: Your Honor, I just want to
24  make it clear that this isn't simply our agreement.
25  We wanted a stipulated order for the reasons that

## Page 58

1  Mr. Galardi articulated, because it's been our
2  consistent view that trust funds can be paid out
3  because they're not property of the estate; but
4  otherwise, we were opposed to the payment of any
5  pre-petition taxes, including priority taxes.
6    And in regard to the other arguments about
7  fiduciary responsibilities, and criminal, and so
8  forth, you know, it's our view that the automatic
9  stay prohibits efforts to collect these taxes
10  directly or indirectly; and that there is no basis
11  at this point on the record shown to pay these
12  pre-petition taxes, and the stipulated order would
13  reflect that.
14    THE COURT: All right. Thank you.
15  Mr. Galardi, I would like to extend the notice
16  period --
17    MR. GALARDI: We were just going to say that.
18    THE COURT: -- because of the holidays and
19  such to the 13th; give the jurisdictions one extra
20  week.
21    MR. GALARDI: That's fine, Your Honor. We
22  were just mentioning with the holidays we think
23  that's the right thing. So we'll change the
24  stipulation to the 13th.
25    THE COURT: All right.

## Page 59

1    MR. GALARDI: Your Honor, again, the only
2  burden will be ultimately -- because I assume if
3  they brief, we'll probably want to respond. But if
4  that's fine with Your Honor with that schedule, it's
5  perfectly fine with us.
6    THE COURT: That's fine with me. I realize
7  that.
8    MR. GALARDI: Thank you, Your Honor. We will
9  finalize that stipulation, and make that change, and
10  submit it to resolve that issue.
11    THE COURT: With that change, it will be
12  approved.
13    MR. GALARDI: Thank you.
14    Your Honor, the next motion on the agenda was
15  the Committee's motion for privileged information.
16  So I'll turn the podium over to Mr. Feinstein.
17    THE COURT: All right.
18    MR. FEINSTEIN: Thank you, Your Honor.
19    We filed the -- what has become a customary
20  motion now in light of the amendment in BAPCPA to
21  Section 1102(b) to provide some limitations to what
22  would otherwise be an open-ended statutory
23  obligation on the Committee's part to share all
24  information with creditors at large. There is a
25  protocol that dates back to the Revco case that's

## Page 60

1  been followed by Judge Tyson, Movie Gallery, and
2  other Courts around in the country.
3    In response to the motion, we have received
4  informal comment from the debtor, informal comment
5  from the Office of the United States Trustee, and
6  one written objection.
7    The debtor -- and we have a couple of wording
8  issues that we may deal with after the hearing --
9  nothing that I think I would view as material, but
10  tinkering with one or two sentences.
11    With respect to the comments received by the
12  Office of the United States Trustee, through
13  inadvertence that I'll take responsibility for, the
14  provision in the order providing for creditor
15  challenge to withholding of information was omitted.
16  We've included it in a black-lined copy that I can
17  hand up to the Court. And it follows the Revco
18  protocol. We understand that that resolves the
19  concerns of the Office of the United States Trustee.
20    That leaves the filed objection of the United
21  States of America on behalf of the IRS. I want to
22  address the several arguments in there briefly;
23  first, with the observation that the IRS is not a
24  beneficiary of Section 1102(b). This was a
25  provision intended to deal with information flow to

Page 61

1   general unsecured creditors.
2       With that said, there are several points
3   raised by the IRS. One which we've dispensed with
4   is the notion of a challenge to the withholding of
5   information with the additional language that we
6   have put back in. We don't view that as being a
7   live issue anymore.
8       So that leaves the arguments that remain,
9   which are, number one, that the information
10  protocol, according to the IRS, creates some new
11  Debtor/Creditors' Committee privilege to
12  unilaterally withhold information. And I guess a
13  related argument is that if the information is to be
14  withheld, the IRS wants us to maintain a privilege
15  log.
16      Addressing both of these points: First,
17  there is no new or different privilege that is being
18  established here. The Revco protocol makes it very
19  clear that in order for a Committee to function, it
20  simply can't be required to turn over all
21  information to all creditors on demand; otherwise, a
22  creditors' committee would never get any
23  information, and committees couldn't perform their
24  statutory functions. So the Revco protocol has
25  developed a methodology for dealing with what is

Page 62

1   already a fairly conventional definition of
2   confidential information, and a definition of
3   privileged information that follows attorney-client
4   and attorney work product privilege. There are no
5   new privileges or categories of information being
6   created here, but simply an approach to dealing with
7   these existing categories of information in a
8   sensitive way that allows the Chapter 11 process to
9   function. So we don't view the argument that there
10  is an attempt to create a new debtor committee
11  privilege as having any merit. It's simply
12  factually untrue.
13      With respect to the management of the
14  information, what the IRS has asked for is that if
15  information is to be withheld, that a log of
16  confidential information be maintained. Your Honor,
17  it is -- it would be a tremendous burden on the
18  process for either the debtor or the Committee or
19  both to keep a log of every communication between
20  the debtor and the Committee, between the Committee
21  and its counsel, and otherwise. As it is, it's
22  difficult doing time in six-minute increments, but
23  to stop and make a log of every communication ever
24  had would grind the process to a halt. We've got
25  very important and challenging work to do in this

Page 63

1   case and in other cases. And the issue of a log has
2   to my knowledge never been raised in the three years
3   since BAPCPA was enacted. And we would oppose --
4   and grafting onto the Revco protocol -- an
5   additional requirement that would really bog down
6   the process.
7       The last argument raised by the IRS is
8   that -- is a criticism of the Committee's website.
9   Granted, it's not there for amusement or
10  entertainment. It's there for information. And it
11  does have the essential information regarding what's
12  on the Court's docket, the major matters in a case,
13  calendar, deadlines for filing a claim. It's not
14  clear what else the IRS would like to see in the
15  website. We're happy to take suggestions, but we do
16  think that what's on there is consistent with the
17  Revco protocol. We have also counsel's contact
18  information in case creditors have questions, which
19  is also in the Revco protocol, so that if
20  information that a creditor wants to learn about the
21  case isn't found on the website, they can always
22  call me or one of my colleagues, and we can answer
23  it.
24      So we would ask that that objection also be
25  overruled. Thank you.

Page 64

1       MR. GALARDI: Your Honor, part of the
2   debtors' perspective -- and we join the Committee,
3   and we're fine with U.S. Trustees -- we have to
4   remember we still are an SEC reporting company. And
5   I think that cannot be lost in the information that
6   we give. We've been struggling with the Committee
7   on confidentiality agreements. They have agreed to
8   keep everything confidential. And frankly, with the
9   kind of massive material and the timing of all of
10  this, we don't stamp everything confidential. We
11  treat it as confidential. And I'm sure Your Honor
12  from practice understands that if we had to sit
13  there and stamp, review, and say confidential,
14  highly confidential.
15      So we're comfortable working out our issues
16  with the Committee. But given that we are a public
17  company -- though our stock is not still listed --
18  it's still a concern for this board. So we agree
19  with the Committee that we can do what we can do
20  here, but it would be an incredible burden to make
21  us stamp everything, give it to the Committee. It
22  would just kill the discussions, which -- as Your
23  Honor is aware of the time frame -- have to take
24  place on an expedited time frame, and cannot be
25  slowed down, because it would be a detriment to all

Page 65

1  of the unsecured creditors. But we will provide as
2  much information as we can to the Committee on that.
3      THE COURT: All right. Thank you.
4      MR. STEIN: Good afternoon. Your Honor,
5  Richard Stein on behalf of the Internal Revenue
6  Service.
7      I think the major reason -- well, I know the
8  major reason that I filed this objection is that as
9  the initial order -- proposed order stood, there was
10 absolutely no provision for any type of review or
11 appeal from a decision by the Committee and/or the
12 debtor that something was confidential, and that --
13 or privileged; and, therefore, go away. Don't
14 bother us. Nobody can review it. It was a
15 unilateral act, and that is -- was not contemplated
16 by what they referred to as the Revco protocol, and
17 didn't seem to exist in any of the large cases since
18 Revco that had been reported.
19     The -- I do have a problem -- I understand
20 the requirements of secrecy -- well understand the
21 requirement of secrecy and confidentiality both in
22 terms of the SEC, and clearly in terms of
23 information that I obtain through my position with
24 the Internal Revenue Service.
25     I think, however, that what we have in this

Page 66

1  situation -- and maybe we're arguing semantics -- is
2  a difference between information that goes to the
3  Committee and an unsecured creditor makes a request,
4  which I view as something akin to an informal
5  discovery request, and the obligation of the party
6  refusing to disclose information to identify the
7  information and the type of information that they
8  are refusing to disclose so that there can be some
9  sort of rational basis for analyzing the alleged
10 confidentiality or the alleged privilege.
11     I mean, we're not dealing here with a parent
12 saying to a child, No, you can't do that. Why can't
13 I do it? Because I said so.
14     Well, you've got to have some sort of give
15 and take, and some sort of assertion of a privilege.
16 I mean, Judge Payne in the case of -- in the
17 Infineon case went into a very long -- which is
18 cited in my objection -- went through a very long
19 description of what the -- what type of -- when one
20 is asserting either a privilege or refusing to
21 disclose what is asserted to be confidential
22 information, the type of description of the
23 information that is being withheld, what type, so
24 that there can be some sort of identification.
25     Now, in the revised -- or the draft of the

Page 67

1  revised order that I was provided shortly before
2  9:30 this morning, there is language in that order
3  that says that the Committee -- on page 5 of the
4  order it says, "Nothing herein shall be deemed to
5  preclude the requesting creditor from requesting, or
6  the Committee objecting to such request, that the
7  Committee provide the requesting creditor along" --
8  I believe that's a typo and it should be a log --
9  "or other index of information specifically
10 responsive to the requesting creditor's request that
11 the Committee deems to be confidential or
12 privileged."
13     So they're saying, Well, we could or we
14 couldn't, but that's not: They need to. And in
15 discussions with the Committee's counsel -- or
16 co-counsel -- there was some question of the revised
17 order deals with the creditor asking, and then the
18 creditor and the Committee and the debtor get
19 together and have a discussion. And then at some
20 point if we can't get something resolved, we come to
21 the Court and we say, Your Honor, we want the
22 information, but we don't know what information they
23 have. The creditor is going to come to you and say,
24 We don't know what information they have that
25 they're not giving us, because they haven't given us

Page 68

1  a description of what it is.
2      So all I think that is required is that when
3  the denial -- when there is a denial of the
4  disclosure of information, that the type of
5  information -- if it's a document, that there be a
6  description of the document provided, the authority
7  -- or the privilege or the assertion of
8  confidentiality, why it is, just like we were in any
9  formal type of discovery situation. I think that
10 that's -- that's imperative.
11     Now, with respect to my last objection, I'm
12 not the only person who ever has raised in the large
13 context of these types of proposals the fact that
14 what the Committee -- when you read the motion and
15 the proposed order absent any kind of Court review,
16 which now has been resolved, and absent some sort of
17 maintenance and provision for a description of the
18 information -- a general description of the
19 information that is being withheld, so that, you
20 know, if they tell me it's entirely possible that if
21 you assert the attorney-client privilege and you
22 have some description of -- you know, a general
23 description, no problem. But if you just say it's
24 privileged or it's confidential, there's no way of
25 anybody analyzing it.

Page 69

1      But I'm not the only one who has ever stated
2  that what they're proposing on their website is
3  simply that which is available on the Court's CM/ECF
4  filing. And that's all I was saying, is that the
5  way the motion and the proposed order was initially
6  proposed, it's: We're not going to give you
7  anything; and our website is giving no more
8  information than what's already available.
9      THE COURT: What do you want on the website?
10     MR. STEIN: I don't want anything on the
11 website. What I really want is -- perhaps the
12 objection was inartfully drafted. Perhaps I
13 shouldn't have had a number 7, and simply included
14 that in my -- in paragraph 5 or paragraph 6 where
15 I'm talking about the maintenance of privilege and
16 the opportunity for judicial review. It's just that
17 the Committee says what we -- you know, everything
18 that is given to us is confidential, because when
19 you read the definition of what constitutes
20 confidential information, it's anything that's
21 non-public. Well, the only things that are
22 non-public are obviously sale prices, stuff readily
23 available to the media, or -- as what was pointed
24 out to me by co-counsel for the Creditors'
25 Committee -- is stuff that's on the Court website.

Page 70

1  Well, now they're giving no more than that. That's
2  all I was saying.
3      THE COURT: All right. I understand.
4      MR. STEIN: But I think that there is clearly
5  a need for some sort of description of either
6  privileged --
7      THE COURT: Well, now there is a provision,
8  though, for creditor challenge, as I understand, in
9  the black-lined version. And can't we take care of
10 the description issue, if there is a challenge, on a
11 case-by-case basis?
12     MR. STEIN: Well, I think we can. I think,
13 though --
14     THE COURT: Wouldn't that be more appropriate
15 than putting it into this order?
16     MR. STEIN: Well, it's in this order in
17 that -- it's sort of in the order; and then once
18 again sort of not in the order at the discretion of
19 the Committee or the debtor in that nothing in here
20 shall preclude the requesting creditor from asking
21 the Committee to provide. It doesn't say that the
22 Committee has got to provide it.
23     THE COURT: No. But if they don't, can't the
24 creditor come to me, then, and say: We want you to
25 provide it in this case because we have a specific

Page 71

1  need for it?
2      MR. STEIN: But how do I know? What I'm
3  saying is, yes, any creditor could certainly come to
4  Your Honor and say, The Committee has said we can't
5  provide you information because it's confidential.
6      And you say to me, Mr. Stein, what
7  information is it that you are asking for that they
8  have refused to disclose to you? Give me a
9  description of it.
10     Your Honor, I have no idea what information
11 it is or a description of the document, because they
12 haven't given that to me. That's all I'm saying.
13 If there's going to be judicial review of a
14 decision, then there needs to be some sort of
15 description of the item that is not being disclosed
16 so that Your Honor, as well as the party, can
17 analyze whether or not there may, indeed, be a very
18 valid assertion there, and then there is no need.
19     But if you don't have that description, then
20 initially the creditor can't make the analysis, and
21 certainly the creditor has no ability to articulate
22 to the Court what document it is that they're asking
23 for, because it hasn't -- even in the most general
24 terms -- been described.
25     THE COURT: Okay. Thank you.

Page 72

1      MR. STEIN: Thank you, Your Honor.
2      MR. FEINSTEIN: A couple of points, Your
3  Honor.
4      The Revco protocol language, which we have
5  now included, does say that the requesting creditor
6  can ask for a lot. Your Honor's suggestion of a
7  case-by-case approach -- which is in the Revco
8  protocol -- really makes the best sense, because
9  when you think about it, if a creditor asked me for
10 a log with respect to Navarre, I would have three
11 emails and an attachment. If a creditor asked for
12 everything regarding the DIP financing, I'd have to
13 shut down all of our work for the next week and try
14 to create a log, which is, you know, the sender, the
15 recipient, the subject matter, and so forth. It
16 would be unworkable.
17     So this approach allows the Committee in the
18 first instance to decide whether or not that's
19 feasible. If the Committee says, No, the creditor
20 has the right to come to you, to put the shoe on the
21 other foot would really create an undue burden on
22 the Committee than to ask Your Honor for relief from
23 an obligation, and a court order to create a log.
24     The other thing I would note is the citation
25 to the Infineon case. It's a pre-BAPCPA case; but

Page 73

1    more importantly, it's an actual litigation case --
2    two parties to a litigation fighting over Rule 26.
3    We're in a much different environment where, you
4    know, under 1102 we're supposed to provide
5    information. And we simply don't think that the
6    Rule 26 structure and privilege log applies.
7        THE COURT: All right. Thank you.
8        The Court also doesn't think that the Rule 26
9    structure applies. Just the give and take that the
10   Committee has to do in connection with a Chapter 11
11   case doesn't lend itself to that kind of a
12   procedure. And the Committee necessarily has to
13   have access to information that is going to be
14   confidential, and kept that way. I'm very familiar
15   with the protocol; and the Court will approve it as
16   amended.
17       MR. FEINSTEIN: Thank you, Your Honor. We'll
18   submit an order later today.
19       THE COURT: Thank you.
20       And the objection of the Internal Revenue
21   Service is overruled.
22       MR. GALARDI: Thank you, Your Honor. Moving
23   to matter Number 15 on the agenda, it's the motion
24   for relief from the automatic stay by US Signs.
25   I'll turn the podium to them. And Mr. Fredericks

Page 74

1    will be handling that.
2        THE COURT: All right. Thank you.
3        MR. HUDSON: Good morning, Your Honor.
4    Richard Hudson on behalf of US Signs.
5        Your Honor, this is a motion for relief from
6    the automatic stay. Just a little background, Your
7    Honor: US signs is a company out of Texas. It did
8    some work with the debtor, Circuit City, and has a
9    store in New Jersey.
10       A little background on the issue: They
11   supply labor and materials to the debtor. As you
12   know, 362 prevents the filing or creation of a lien
13   on the property of the debtor once the filing
14   occurs.
15       Now, there is an exception to this which --
16   in which if the -- based on the lien statute of the
17   estate, if the filing occurs -- relates back to the
18   first supplied material, it's not deemed to violate
19   the stay. Based on our reading of the New Jersey
20   statute, it does not relate back; and, therefore, we
21   wanted to be cautious, and go ahead and file this
22   and ask for relief.
23       Now, in the first instance, it's important
24   for us to understand that Circuit City is not the
25   owner of this property. They do have a leasehold

Page 75

1    interest. However, for all intents and purposes,
2    we're not sure whether or not by the very filing of
3    the bankruptcy it terminated that lease; and
4    therefore, it has a -- they terminated their
5    interest in that property.
6        Also, the second thing is the nature --
7        THE COURT: Well, filing this bankruptcy
8    doesn't terminate a lease. If it's a lease, the
9    debtor would have a right to either assume or reject
10   the lease.
11       MR. HUDSON: Well, that's my second point,
12   Your Honor. From my understanding, the debtor very
13   well may be rejecting this lease, as far as we know.
14   I have not seen this on the list of -- based on the
15   debtors' filings to assume this particular property.
16   For all we know, this lease will terminate by itself
17   by the end of December. However, in either case, it
18   would be based on the terms of the lease. And I'm
19   not sure what the terms of the lease are. I don't
20   believe the lease was ever recorded.
21       Our primary interest in filing this lien is
22   not simply against the leasehold interest. We plan
23   on arguing that the landlord may have benefited from
24   the labor and materials supplied to this property,
25   as well. So our claim is not solely against the

Page 76

1    leasehold, but the freehold estate as well. And
2    that's an argument we plan on making in the
3    appropriate circuit court in New Jersey. The right
4    of US Signs to assert this is clear on that point.
5        Now, Your Honor, also the -- it's also
6    important to understand that the importance of this
7    filing -- of preserving our rights under New Jersey
8    law. We have 90 days to file. I believe the last
9    filing -- the last supply of material was October
10   3rd. We have until the beginning of the year to
11   file our -- to file our lien, as well as to file a
12   complaint to establish the validity of the lien.
13       As I've stated in my motion, we are not
14   attempting to foreclose on this property or to sell
15   the property in any way. We're seeking to preserve
16   our rights, and preserve our rights only. And it's
17   under New Jersey law in which we will -- we can
18   establish not just the validity and priority of the
19   lien, but the amount of the lien as well. It's US
20   Sign's priority to -- or at least our prerogative to
21   do so. And the debtor has a right to challenge
22   that -- so does the landlord -- in which case we can
23   argue -- make our case that the landlord may have
24   benefited from the materials, as well.
25       THE COURT: Do you intend to put on evidence?

Page 77

1   MR. HUDSON: Your Honor, we do intend on
2   putting on evidence.
3       THE COURT: Today?
4       MR. HUDSON: Not today. Not today. Our
5   interest in this proceeding here is to seek -- show
6   that cause exists to lift stay so that we can pursue
7   our rights under New Jersey law in the appropriate
8   court in New Jersey.
9       It's a two-step process: We file the lien.
10  We then file our complaint to enforce that lien, and
11  to establish the validity of the lien in state
12  court.
13      THE COURT: You want to assert a mechanic's
14  lien?
15      MR. HUDSON: Exactly. And that's where the
16  evidence will be put on. Now, the debtor, as well
17  as the landlord, will be free to challenge that.
18  They can challenge whether or not we have a valid
19  lien once the lien is filed. They can then
20  challenge whether or not the amount of that lien is
21  appropriate. They can also challenge whether or not
22  the -- they can challenge the priority of the lien,
23  as well.
24      THE COURT: Well, don't you have to
25  establish, in order to get relief from the stay, one

Page 78

1   of the elements under 362-D to either cause, or one
2   of the other elements to show that you have the
3   title to relief?
4       MR. HUDSON: Yes, Your Honor. And we do
5   believe that cause exists.
6       THE COURT: What is the cause?
7       MR. HUDSON: Well, we -- right now, as far as
8   we know, this is -- may not be property of the
9   debtors' estate, as well as the fact that we're not
10  seeking a lien solely on the property of the
11  debtors' estate. It's also on the freehold estate,
12  as well.
13      THE COURT: But I'd have to have evidence of
14  that, wouldn't I, in order to rule on that?
15      MR. HUDSON: Well, we believe that merely
16  making that statement entitles us to at least
17  establish that in the state court proceeding; and in
18  doing so, be able to -- the debtor can certainly
19  make that argument in the state court proceeding
20  that we're not entitled to a lien. But we do
21  believe that at that point that's the proper
22  proceedings to handle that matter.
23      THE COURT: All right. Thank you. Let me
24  hear from the debtor.
25      MR. FREDERICKS: Good morning, Your Honor.

Page 79

1   Ian Fredericks of Skadden Arps on behalf of the
2   debtors.
3       I think -- I think first I'd just like to
4   point out, I believe under the bankruptcy code this
5   would just be a preliminary hearing. And the Court
6   is free to schedule a final hearing, which the
7   debtors would not have an objection to, on the 16th.
8       I think the second point is: Factually
9   everything you just heard is not one supported by an
10  affidavit, and there's no evidence before you. We
11  don't believe that US Signs has established cause to
12  lift the stay. All the information I have is that
13  this lease has not been rejected yet; and so, it
14  still is property of the estate. Thus, by them
15  filing a mechanic's lien against the property would
16  directly impact the estate.
17      Frankly, we just don't feel that cause has
18  been established; and, thus, the motion should be
19  denied. If the movement would like to move it over
20  to January 16th, we're certainly open to doing that.
21      THE COURT: Thank you.
22      MR. FREDERICKS: Thank you, Your Honor.
23      THE COURT: Do you wish to move it to January
24  16 so you can have an opportunity to put on
25  evidence?

Page 80

1       MR. HUDSON: Your Honor, we would love to do
2   that; however, the issue -- as I stated in my
3   motion -- was that by January 16th our rights -- our
4   lien rights to file a lien would expire.
5       THE COURT: Well, I can't grant your motion
6   today because I don't have any evidence. So you
7   have an opportunity -- you can either -- either I
8   can deny it today, or I can move it to a final
9   hearing on the 16th.
10      MR. HUDSON: We'd love to present evidence at
11  that time; however, you know, as I said, our lien
12  rights and my client will be irreparably harmed by
13  doing so.
14      We do believe that we have established that
15  even though it's a leasehold estate, the owner
16  possibly could have benefited from this, as well.
17  And had we known that we were required to file an
18  affidavit to that effect, we very well may have done
19  so; however, we didn't believe that this was the
20  proper forum to do so.
21      THE COURT: All right. So are you asking me
22  to continue it to the 16th or not?
23      MR. HUDSON: Yes, Your Honor. We --
24      THE COURT: Okay. We'll carry -- put that
25  down for final hearing on the 16th.

Page 81

1    Do you wish to be heard?
2         >>: Your Honor, actually, the landlord, the
3    missing piece, I'm here on behalf of North Playing
4    Field BF, LLC.
5         And on Friday, we filed a motion to compel
6    those post-petition obligations, and set that for
7    1-16 at 10.  So I believe the momentum of what's
8    happening here to have this continued to a final
9    hearing on 1-16 at 10 would address what we filed
10   Friday, December 19th, with regard to this same
11   property and US Sign's motion -- and other
12   mechanic's liens, candidly, against those properties
13   could all be addressed properly then.
14        THE COURT:  I'm going to set it down for the
15   16th.  If for some reason this becomes moot between
16   now and then, you can always withdraw it.
17        MR. FOLEY:  Your Honor, the last item on the
18   morning agenda is Item Number 17.  This is our
19   motion to reject certain executory contracts.
20        THE COURT:  We've already resolved Number 16
21   earlier when we heard the --
22        MR. FOLEY:  The Navarre matter.
23        THE COURT:  -- the DIP financing.
24        MR. FOLEY:  That's correct, Your Honor.
25   This is our motion to reject certain

Page 82

1    executory contracts with executive employees --
2    former executive employees, Your Honor.  There's
3    been a couple of objections filed.
4         There is one individual who would be
5    represented by Mr. Shaia, who called earlier this
6    week -- last week asking for additional time to file
7    a response.  We've agreed as to Patrick Longgood,
8    who was one of the counter-parties to a contract in
9    the motion, to provide Mr. Shaia until December 29th
10   to file a responsive pleading if he so chooses; and
11   that this motion as to that individual will go
12   forward on January 16.
13        Your Honor, I guess -- we're requesting
14   relief -- it's pretty straightforward -- in the
15   motion.  I guess it's probably better to let the
16   objectors raise their arguments first.  I don't
17   think there's any dispute as to the fact that the
18   two agreements in question are pre-petition.  To the
19   extent they are executory -- and we don't think they
20   are -- we think it's proper to reject them and
21   effectuate the pre-petition claim status from any
22   breach resulting from rejection under 365(g) and
23   502(g)(1).
24        But if Your Honor concludes that these are
25   not executory contracts and can't be rejected,

Page 83

1    they're still pre-petition contracts.  And a
2    breach -- to the extent it gives rise to any claim
3    at all, it's a pre-petition claim, which is really
4    what we're trying to seek to establish here, Your
5    Honor.
6         THE COURT:  All right.  Very good.
7         MR. MILLER:  Good morning, Your Honor.
8         THE COURT:  Good morning.
9         MR. MILLER:  Actually, good afternoon.  I
10   apologize.  Mike Miller with the law firm of
11   Christian Barton on behalf of two objecting
12   counter-parties to the contracts.  One is
13   Mr. Jeffrey Leopold, who is in the courtroom with
14   me.  And the other gentleman is Mr. James Wimmer,
15   who is also in the courtroom with me today, Your
16   Honor.  Thank you for your time.
17        Before I forget, Mr. Foley indicated that to
18   the extent that the Court determines that the
19   contracts are not executory, they're still under
20   their view pre-petition contracts such that they
21   would be pre-petition claims.  And that is not in
22   their motion, Your Honor.  To the extent that the
23   Court determines they are not executory today
24   subject to rejection, I would like to have the
25   opportunity at a later date to address those issues

Page 84

1    with respect to whether or not there are
2    post-petition obligations such as administrative
3    claims because there are payments that come due
4    under those post petition.
5         Your Honor, we submit that the contracts are
6    not executory.  As you know, a contract is executory
7    if performance is due to some extent on both sides.
8    This circuit, in the Lubrizol case, adopted the
9    Countryman test, which states that a contract is
10   executory if the obligations of both the debtor and
11   the non-debtor party are so far unperformed that the
12   failure of either party to complete the performance
13   would constitute a material breach excusing the
14   performancy of the other.
15        Here we believe that Mr. Leopold and
16   Mr. Wimmer's contracts are not executory.
17   Mr. Leopold's contract is actually a severance
18   agreement.  He was terminated effective July 18th by
19   agreement with Circuit City, and it was a severance
20   agreement.  And that contract is attached as an
21   exhibit to my objection on behalf of Mr. Leopold.
22   And there is not one single obligation that
23   Mr. Leopold has to perform.  The only remaining
24   obligations under that contract are the debtors'
25   obligations to continue to make severance payments.

Page 85

1    He is entitled to an additional six months, roughly
2    $55,000, in severance payments. But there is no
3    obligation of Mr. Leopold such that non-performance
4    would constitute a breach. There isn't even
5    non-compete obligations in that agreement.
6    Mr. Leopold's only obligation was to give the
7    debtors a release of any and all claims, which he
8    has done. So there are no obligations on behalf of
9    Mr. Leopold. And it's very, I believe, cut and dry
10   under the Countryman test that it's not executory;
11   and, therefore, not subject to rejection.
12       To the extent that there are additional
13   payments that come due post petition, we can argue
14   for another day, if Your Honor pleases, as to
15   whether or not they're pre-petition or post-petition
16   obligations subject to an administrative expense
17   claim.
18       Your Honor, we also submit that Mr. Wimmer's
19   employment agreement --
20       THE COURT: If it's not a contract, then he
21   would be a creditor; right?
22       MR. MILLER: He would be a creditor, correct,
23   Your Honor. The question is when the payments
24   become due, and whether they're post-petition
25   obligations or pre-petition obligations. But you're

Page 86

1    right; if it's not -- it wouldn't be an executory
2    contract, he would be a creditor.
3        THE COURT: And just help me: What is the
4    argument that says that it would possibly be a
5    post-petition obligation if it was an agreement that
6    was entered into pre-petition?
7        MR. MILLER: There are cases that suggest
8    that post-petition payments, even though they are
9    part of a pre-petition contract or obligation, if
10   the payments come due post petition, those payments
11   can be an administrative expense claim.
12       THE COURT: That's what you would like the
13   opportunity to brief?
14       MR. MILLER: Your Honor, I would. And, Your
15   Honor, on the expedited nature of the relief
16   requested, this was filed on a Friday night.
17   Objections were due the following Thursday. I
18   didn't get it until Tuesday, frankly. I know there
19   are a number of -- former employees in the courtroom
20   that actually didn't get served with the rejection
21   motion until after the deadline to respond. It just
22   so happens that Mr. Wimmer and Mr. Leopold had
23   contacted me prior. My office monitors all the
24   pleadings that are filed in the case. And we saw it
25   and filed an objection as quickly as we could within

Page 87

1    the time frames required.
2        Your Honor, we also submit that Mr. Wimmer's
3    agreement, which is an employment agreement and they
4    also seek to reject, is a termination letter that
5    was dated November 7th, three days before the
6    bankruptcy filing. Mr. Wimmer, after service in the
7    Air Force, started employment with Wards in 1968 at
8    the age of 22. He is the longest tenured employee.
9    He has been with the company for almost 40 years.
10   It will be 40 years in May of 1999. As a result of
11   his -- or pardon me, May of 2009.
12       As a result of his long, tenured service to
13   the company, and his faithful performance under the
14   agreements, he has earned significant benefits under
15   his employment contract. And we're not talking
16   about an insignificant sum here. Specifically, his
17   employment contract provides that he is entitled to
18   approximately $433,000 as a severance payment -- not
19   an insignificant amount of money to Mr. Wimmer and
20   his family.
21       Mr. Wimmer's only remaining obligation under
22   his employment agreement, frankly, is to work
23   another 15 days. He is terminated effective January
24   9th. The letter that came out to him on November
25   7th, three days before they filed, asked him to

Page 88

1    remain with the debtor until January 9th. So he's
2    got roughly 18 days left to perform, if you will,
3    under the employment agreement.
4        In addition, under the employment agreement,
5    which was dated his most recent one -- he's had
6    several over the last 40 years -- was dated
7    December 4th, 2003. And under that employment
8    agreement -- actually, the debtors only need to give
9    him 30 days notice where they terminate without
10   cause, and all of his severance obligations -- which
11   are a contingent obligation -- mature. So the fact
12   of the matter is if you looked at the 30 days that
13   was only required under the contract, his rejection
14   motion came after the anniversary date of his
15   employment contract.
16       We submit that the roughly 18 days that the
17   debtor have asked him to serve until January 9th --
18   in fact, part of his service is to assist with the
19   store closings -- is not material, and is not
20   executory under the Countryman test. That remaining
21   18 days after 40 years of service is not material.
22   On the other hand, the debtors' severance
23   obligations of $433,00, roughly, are very material
24   to Mr. Wimmer and to his family.
25       Your Honor, in the event that you determine

Page 89

1   that Mr. Wimmer or Mr. Leopold's agreements are, in
2   fact, executory -- still, and again, I just don't
3   see how Mr. Leopold's agreement could ever be
4   determined to be executory -- but if Mr. Wimmer's
5   employment agreement and the 18 days remaining under
6   that employment agreement are material such that
7   this Court determines that they are executory, we
8   would submit that the Court should nevertheless deny
9   the debtors' motion to reject the contract, because
10  any perceived benefits to the estate -- which are
11  minimal -- are greatly outweighed by the detrimental
12  effect to Mr. Wimmer and his family.
13       The same goes for Mr. Leopold, in our
14  opinion, because of the detrimental effect of
15  $55,000 to Mr. Leopold, and the minimal benefit that
16  would provide to the estate and the general
17  unsecured creditors. But --
18       THE COURT: You're suggesting that I should
19  require the debtor to assume the contract?
20       MR. MILLER: In the event that Mr. -- in the
21  event that you determine that they are executory, I
22  submit that you should deny their motion to reject
23  because of the effect it will have.
24       And I know that great deference is given to
25  the debtors' business judgment under the Business

Page 90

1   Judgment Rule in Lubrizol and other cases of that
2   ilk; however, it's not without its limitations. In
3   Track Auto, Judge Adams said that you have to look
4   at the totality of the circumstances to all
5   constituencies, not just to the creditors' estate,
6   and not just to the unsecured creditors; but also to
7   the non-debtor contracting party and the other
8   constituencies.
9        In Track Auto, Judge Adams stated that the
10  better reason viewed is to evaluate a debtors'
11  business judgment by considering the input -- pardon
12  me, the impact of the debtors' decision on a variety
13  of parties, as well as the impact on the debtors'
14  estate; i.e., a judicial review of the totality of
15  the circumstances surrounding the debtors' proposal.
16       Your Honor, the debtors' petition that they
17  filed on November 10th indicated that their
18  liabilities are 2.3 billion dollars. The payment to
19  Mr. Wimmer is $433,000. That is less than two
20  one-hundredths of a percent of their total
21  liabilities. Mr. Wimmer has worked for this company
22  for 40 years to earn these benefits. And he will
23  not be able, I'm sorry to say, at the age of 62, to
24  ever make up this money. This is not a situation in
25  the market -- in the economic times that we are in where

Page 91

1   we are all losing money in our 401(k)s and so forth
2   because we invested in the market, and as a result
3   some younger people such as myself hopefully will
4   see that turn around in my lifetime. These are
5   contractual benefits that Mr. Wimmer earned through
6   his dedicated service to the company over 40 years.
7   And at the age of 62, he will not make this up. And
8   he and his wife and family have depended upon and
9   relied upon his severance benefits under his
10  employment agreements in their long-term financial
11  planning for their family.
12       It's ironic, because had he left the
13  employment of the company a year or two ago and
14  start receiving these benefits, he would have been
15  paid out these benefits in the course -- the normal
16  course of the contract. But as someone who is
17  dedicated and stayed on -- they asked him to stay
18  on. They tried to give him retention bonuses for
19  staying on. They have asked him to stay on to help
20  with closed stores. The ultimate irony is he is
21  going to be penalized for doing so.
22       And if you look at the totality of the
23  circumstances, as the Track Auto case suggests, the
24  detrimental effect to Mr. Wimmer and his family --
25  and to Mr. Leopold -- greatly outweighs the minimal

Page 92

1   impact it will have to the debtors' estate. Again,
2   we're talking about 2.3 billion in liabilities.
3   433,000 -- I know that argument cuts against me in
4   that I'm arguing it's not an insignificant amount;
5   but to the debtors' estate by comparison, it is
6   insignificant as compared to the effect it will have
7   on Mr. Wimmer and his family.
8        Finally, Your Honor, the Lubrizol case also
9   says that the debtors' business judgment should not
10  be granted where it is taken in bad faith, or is an
11  abuse of that discretion. And Your Honor, I
12  appreciate counsel's efforts to rehabilitate this
13  debtor and reorganize this debtor. But when we were
14  here on December 5th, there was an impassioned plea
15  made by counsel to the debtors to allow severance
16  payments to the roughly 580 employees, I
17  believe it was, that were laid off on
18  November 7th -- the same day Mr. Wimmer received his
19  termination notice -- on the grounds that it was
20  important for employee morale to keep the people in
21  corporate headquarters, their heads in the game, and
22  the importance of the news in the community in terms
23  of treating their employees well. I can quote from
24  the arguments that were made by counsel to the
25  debtors at that hearing. And I won't -- I won't

COOK & WILEY, INC.

Page 93

1  repeat all of them, Your Honor. But they proffered
2  that Mr. Markem (phonetic) would testify that many
3  of the people had given significant time and effort,
4  and in some instances had worked their lives at
5  Circuit City.
6     Well, in nobody's case is that more true than
7  Mr. Wimmer. He has worked his entire professional
8  life, since getting out of the Air Force at the age
9  of 22, for Circuit City. And if you're going to do
10  that to the employee who is the most loyal employee
11  in the history of the company -- again, he is the
12  longest tenured employee -- to me, that suggests
13  that would not be good for employee morale. And on
14  December 5th they were here saying we need to do
15  this for employee morale; and today they're seeking
16  to reject the employment agreement of their most
17  loyal, tenured employee. And I'd submit that's in
18  bad faith, Your Honor. Thank you.
19     THE COURT: All right. Thank you.
20     MR. FOLEY: Your Honor, you did hit on the
21  relevant facts that are important here, that these
22  are pre-petition contracts; that as of the petition
23  date, they were executory. With respect to
24  Mr. Wimmer, I don't think that's even disputed that
25  it was executory as of the petition date.

Page 94

1     With respect to Mr. Leopold, there are
2  certain non-disclosure agreements in his contract
3  that the Court may or may not find to be material.
4  And we certainly have no intention of enforcing them
5  post-petition. But as of the petition date, there
6  are sufficient obligations running both ways with
7  Mr. Leopold's contract to render that executory. We
8  think it's subject to rejection of 365; and under
9  the Business Judgment Rule, ought to be rejected.
10  We're talking about a $126,000 payment with respect
11  to that contract. Also -- and that contract was
12  July 18th, 2008.
13     With respect to Mr. Wimmer's situation, just
14  to correct a factual assertion by counsel,
15  Mr. Wimmer was unfortunately one of the people that
16  was laid off on November 7th before the filing. And
17  that November 7th letter was the letter laying him
18  off. And he is a recipient of the warnack
19  (phonetic) payment that Your Honor has approved. He
20  is not working for the company right now. He hasn't
21  worked for the company since November 7th. He is
22  not working on any store closing arrangements, but
23  he is receiving payments.
24     So we did all we could for this individual,
25  as we did with the other employees that counsel

Page 95

1  referenced. That's what we're talking about. These
2  aren't -- these weren't special severance payments
3  made. He's talking about the warnack money that
4  Your Honor approved, actually, over the Committee's
5  objection.
6     So we did what we could for these employees,
7  Your Honor. And we believe both of these contracts
8  are subject to rejection under 365, and the Court
9  ought to approve the motion with respect to them.
10     THE COURT: All right. Thank you.
11     The Court is going to find that the contracts
12  are executory. Mr. Miller, I am going to give you
13  the opportunity, though, to brief the issue
14  regarding whether they're post-petition obligations
15  with the debtor or pre-petition. So I will withhold
16  that portion of the ruling until I've gotten your
17  papers, and any reply that either the debtor or the
18  Committee wish to make to them.
19     MR. MILLER: Your Honor, a point of
20  clarification. I understand that you're saying that
21  the contracts are executory. Is Your Honor ruling
22  today on whether or not you're going to approve the
23  debtors' motion to reject the contract?
24     THE COURT: Yes, I'm going to approve the
25  motion to reject the contracts. Under the Business

Page 96

1  Judgment Rule, I think that's up to the debtor to
2  do. I don't think this Court can force the debtor
3  to accept contracts. I think the debtor can come in
4  and request that. I think there is a legitimate
5  business reason to do the rejection.
6     But the consequences of the rejection is what
7  I'm going to give you the opportunity to brief,
8  because you said you had some law that you wanted me
9  to look at about whether or not these might be
10  post-petition obligations of the debtor.
11     MR. MILLER: Thank you, Your Honor. I
12  appreciate it.
13     THE COURT: All right. Does that take care
14  of everything that's on the morning agenda?
15     MR. FOLEY: Yes, Your Honor. I know it's
16  almost 1:00. I don't know how long you'd like to
17  take a break for.
18     THE COURT: Let's --
19     >>: Your Honor, can I speak to this issue
20  before you move on?
21     THE COURT: On the rejection?
22     >>: Yes.
23     THE COURT: Yes. Who are you?
24     >>: Thank you, Your Honor. My name is
25  Victor Engesser (phonetic). I was an employee of

Page 97

1   Circuit City for 17 years. I did not receive notice
2   of this motion or this hearing until Saturday,
3   December the 20th; and, therefore, did not have a
4   chance to object. I would like to request that I
5   have that opportunity to file an objection.
6          THE COURT: That will be granted. What I'll
7   do is I'll carry your objection orally today over to
8   the next omnibus date, which would be the 16th of
9   January. And I think we start at 10:00 that day.
10         MR. FOLEY: We do, Your Honor.
11         THE COURT: What I would suggest is you need
12  to file a written objection, and then they can
13  respond. You can also talk to them and see if you
14  can work it out.
15         MR. FOLEY: Your Honor, could we have that
16  objection filed at the same time as Mr. Longgood's,
17  which will be December 29th, the same as Mr. Shaia's
18  client.
19         THE COURT: Are you able to get it filed by
20  the 29th?
21         >>: Yes, Your Honor.
22         THE COURT: All right. That will be fine.
23  Yes, ma'am?
24         >>: Hello. My name is Lee Ann Moore, also
25  formerly employed with Circuit City. And I also

Page 98

1   didn't get the notification until Saturday. So I
2   request that I be allowed to make that objection and
3   file --
4          THE COURT: Your name again, ma'am?
5          >>: Lee Ann Moore.
6          THE COURT: Okay. Ms. Moore, the Court will
7   receive your oral objection. And I will do the same
8   thing: File a formal objection by the 29th of
9   December, and we'll carry this over -- your
10  objection over to the 16th.
11         >>: Okay. Great. Thank you.
12         MR. FOLEY: And for the record, Your Honor,
13  we will do that for anybody else that we hear from
14  before we submit the order, Your Honor.
15         THE COURT: All right. Thank you. Are there
16  any other employees in the courtroom?
17         Sir, if you would just state your name on the
18  record.
19         >>: My name is David Katchiatti (phonetic).
20         THE COURT: And we'll do the same for you,
21  sir.
22         >>: I was laid off on November the 7th, and
23  we were -- was not aware of what's going on here. I
24  was told by an HR employee on Friday that this was
25  occurring, and that we were not being paid our

Page 99

1   vacation pay, PTO; and that we have the right to
2   come down here to file a complaint.
3          THE COURT: All right. So what you need to
4   do is file your objection by the 29th of December,
5   and I'll carry this over -- your objection over to
6   the 16th of January.
7          >>: Thank you, sir.
8          THE COURT: All right. Mr. Foley, I think
9   what I'd like to do is to recess until 1:30.
10         MR. FOLEY: Okay.
11         THE COURT: And then we'll resume.
12         MR. FOLEY: Thank you, Your Honor.

14  (Recess, 1:00 p.m. to 1:39 p.m.)

16         * * * * * *

Page 100

1
2   CERTIFICATE OF COURT REPORTER
3
4          I, Lisa M. Blair, hereby certify that
5   I, having been duly sworn, was the court reporter in the
6   United States Bankruptcy Court for the Eastern District
7   of Virginia, Richmond Division, on December 22, 2008, at
8   the time of the hearing herein; further, that the
9   foregoing is a true and accurate record of the testimony
10  and other incidents of the hearing herein.
11         Given under my hand this 9th day of
12  January, 2009.
13
14
15         Lisa M. Blair, RPR
           Notary Public for the
16         State of Virginia at Large
17
18  My Commission expires:
    October 31, 2012
19  Notary registration #: 253150
20
21
22
23
24
25

COOK & WILEY, INC.