FILE COPY

LOCATION:  Lexington, KY

# LEASE

between

## CIRCUIT CITY STORES, INC.,

as Tenant

and

## SIR BARTON PLACE, LLC,

as Landlord

dated May __, 2003

## HAMBURG PLACE MALL

MW 4/21/03
\\REA\140800.6

# TABLE OF CONTENTS

**Paragraph**                                                                                                    **Page**

1.   Leased Property ................................................................................................ 1

2.   Construction of Building and Improvements; Tenant Improvement Allowance.................... 2

3.   Lease Term........................................................................................................ 3

4.   Base Rent; Ground Rent ...................................................................................... 3

5.   Development of Shopping Center by Landlord ...................................................... 5

6.   Easements ........................................................................................................ 5

7.   Common Areas and Common Area Maintenance. ................................................ 7

8.   Signs and Communications Equipment. ............................................................. 11

9.   Taxes. ............................................................................................................ 12

10.  Maintenance, Repairs and Replacements .......................................................... 14

11.  Utility Service Provider: Payment of Utility Bills................................................. 16

12.  Alterations...................................................................................................... 16

13.  Mechanics' Liens............................................................................................. 16

14.  Insurance. ...................................................................................................... 17

15.  Damages by Fire or Other Casualty................................................................... 22

16.  Condemnation. ............................................................................................... 24

17.  Assignment and Subletting .............................................................................. 26

18.  Use. .............................................................................................................. 27

19.  Warranties, Representations and Covenants........................................................ 28

20.  Estoppel Certificates ....................................................................................... 36

21.  Subordination, Non-Disturbance and Attornment. ............................................... 37

22.  Tenant's Financing .......................................................................................... 38

23.  Tenant's Property and Waiver of Landlord's Lien ................................................. 39

MW 4/21/03
\\REA\140800.6

24.  Memorandum of Lease; Commencement Date Agreement ................................... 39

25.  Expiration of Term and Holding Over ................................................................. 39

26.  Force Majeure ...................................................................................................... 39

27.  Events of Tenant's Default .................................................................................. 40

28.  Landlord's Remedies ............................................................................................ 40

29.  Events of Landlord's Default; Tenant's Remedies. .............................................. 42

30.  Waiver ................................................................................................................. 47

31.  Compliance with Applicable Laws ...................................................................... 47

32.  Notices ................................................................................................................. 48

33.  Brokers ................................................................................................................ 48

34.  Miscellaneous. .................................................................................................... 49

35.  Effectiveness of Lease; Tenant's Right to Terminate ......................................... 51

36.  Intentionally Deleted. .......................................................................................... 54

37.  Adjacent Tracts. .................................................................................................. 54

38.  Cotenancy Requirement. ..................................................................................... 54

39.  Importance of Each Covenant .............................................................................. 55

40.  "For Rent" Signs ................................................................................................. 55

## EXHIBITS

| | |
|---|---|
| "A" | Site Plan |
| "A-1" | Shopping Center Legal Description |
| "B" | Index of Definitions |
| "C" | Construction Provisions |
| | Attachment "1" Construction Schedule |
| | Attachment "2" Site Delivery Work Certification |
| | Attachment "3" Schematic Floor Plan and Elevations |
| "C-1" | Design and Construction Specifications |
| "D" | Intentionally Deleted |
| "E" | Sign Plans |
| "F" | Permitted Encumbrances |
| "G" | Subordination, Non-Disturbance and Attornment Agreement |
| "H" | Memorandum of Lease |
| "I" | Commencement Date Agreement |
| "J" | Indemnification Agreement |
| "K" | Rules and Regulations |
| "L" | Radius Restriction Area |

**LEXINGTON, KENTUCKY**

### LEASE

This LEASE ("Lease") is made as of the ____ day of May, 2003, by and between **SIR BARTON PLACE, LLC**, a Kentucky limited liability company, having an address at 2030 Winchester Road, Lexington, Kentucky 40505 ("Landlord"), and **CIRCUIT CITY STORES, INC.**, a Virginia corporation, having an address at Deep Run I, 9950 Mayland Drive, Richmond, Virginia 23233 ("Tenant").

### W I T N E S S E T H :

The parties hereto agree as follows:

1.    <u>Leased Property.</u>    Landlord leases to Tenant the "Premises" (as defined in paragraph 2), when constructed on that approximately 32,991 square foot parcel (the "Land") outlined in heavy black on Exhibit "A" (the "Site Plan"), together with exclusive rights to the six (6) parking spaces labeled "Car Stereo Parking" at the rear of the Building (as defined in paragraph 2), the three (3) parking spaces labeled "Customer Pick-Up" and the areas labeled as shopping cart "corrals," if any, all as shown on the Site Plan and with the easements described in paragraph 6 below; all located in the Hamburg Place Mall (herein referred to as the "Shopping Center"), located at 2321 Sir Barton  Way, in the City of Lexington (the "City"), County of Lexington-Fayette, State of Kentucky (the "State"), shown on the Site Plan and described by metes and bounds or platted lot legal description on Exhibit "A-1" attached hereto.  All of the Shopping Center exclusive of the Premises is "Landlord's Premises".  Landlord grants to Tenant all of those certain rights, in common with others, granted Landlord under that certain Reciprocal Construction, Operation and Easement Agreement, dated June 29, 1995, and recorded in the land records of Fayette County, Kentucky, in Book 1794, Page 1 (as amended by amendments dated April 28, 1998 and December 22, 1998, the "REA").  Landlord agrees that it will not consent to, approve, or otherwise agree to any modification of the REA at any time during the term of this Lease without Tenant's prior written approval (which may be withheld in Tenant's sole discretion), will enforce the terms of the REA for Tenant's benefit, and will exercise all approval rights granted to Landlord for the benefit of the Shopping Center under the REA in favor of enforcement of the terms hereof.  Landlord further agrees that it will not consent to, approve or establish any rules and regulations applicable to the Shopping Center, as permitted under the

REA other than those attached hereto as Exhibit "K", without Tenant's prior consent, which will not be unreasonably withheld.

2.    <u>Construction of Building and Improvements; Tenant Improvement Allowance</u>. Commencing immediately upon "Delivery of the Land" (as defined in the Construction Provisions (herein so called) attached hereto as <u>Exhibit "C"</u> and incorporated herein by reference for all purposes), Tenant shall have the right to construct on the Land a one-story retail building, containing approximately 32,991 square feet of ground-floor gross leasable area plus mezzanine, with provisions for car stereo installation facilities, initially for use as a Circuit City Superstore (the "Building"), together with loading ramps, sidewalks, trash compactor, transformer pad and other improvements (collectively, the "Other Improvements"), set forth in the Construction Provisions attached hereto as Exhibit "C". The Building and Other Improvements are sometimes collectively referred to herein as the "Improvements". The Improvements shall be constructed to completion with due diligence in accordance with the "Plans and Specifications" to be prepared by Tenant as specified in the Construction Provisions. Except as otherwise provided herein, title to the Improvements shall be deemed transferred to Landlord upon full payment of the "Tenant Improvement Allowance", as defined below. At Landlord's request, Tenant will execute a bill of sale memorializing such transfer of title to the Improvements in form satisfactory to Tenant. The Improvements and the Land are referred to herein as the "Premises".

Upon Substantial Completion Tenant will request a lien waiver from its general contractor, and will provide a copy of the same to Landlord if and when Tenant receives it. Upon Substantial Completion (as defined in the Construction Provisions) and Tenant's furnishing to Landlord (i) the certificates of insurance required under paragraph 14 of the Lease, (ii) an indemnity in the form of <u>Exhibit "J"</u> attached hereto against any exception in Landlord's or its Mortgagee's policy of title insurance with respect to mechanics' liens arising out of Tenant's construction, (iii) a square footage building perimeter survey certified to Tenant and Landlord, and (iv) if requested by Landlord, confirmation from Tenant that Landlord holds title to the Improvements (in form reasonably acceptable to Landlord and Tenant), Landlord shall pay to Tenant a "Tenant Improvement Allowance" in an amount equal to $55.00 per square foot of gross leasable area of the Building (which shall be conclusively determined by the amount of gross leasable area shown in Tenant's square footage building perimeter survey mentioned

MW 4/29/03
\\REA\140800.6

above), payable by wire transfer of funds by Landlord to Tenant's account no later than thirty (30) days after Substantial Completion and receipt of items (i), (ii), (iii) and (iv) above. If the Base Rent is increased or decreased pursuant to paragraph 4(b) of the Lease, the Tenant Improvement Allowance shall likewise be proportionately increased or decreased.

3.    Lease Term.  Subject to paragraph 35, the construction term (the "Construction Term") of this Lease shall commence on the date of Landlord's Delivery of the Land to Tenant in the condition specified in the Construction Provisions and shall end on the "Commencement Date" (as defined in paragraph 4 below).  The main term (the "Main Term") of the Lease shall commence on the Commencement Date and shall end on the last day of January following the fifteenth (15th) anniversary of the Commencement Date.

In addition to the Main Term, Tenant shall have the option (a "Renewal Option") to renew and extend the Lease for three (3) consecutive five (5) year periods (each period referred to as an "Option Period") immediately following the Main Term, at the rent specified below. Tenant shall give Landlord written notice of its election to exercise any Renewal Option at least one hundred eighty (180) days prior to the expiration of the Main Term or any then-current Option Period.  If, during such one hundred eighty (180) day period, Tenant does not give Landlord written notice of its intent not to exercise its Renewal Option, Tenant's right to exercise such Renewal Option shall continue, as shall its tenancy hereunder, until ten (10) business days after Landlord has given Tenant written notice of Landlord's election to terminate the Renewal Option, during which ten (10) business day period Tenant may exercise its Renewal Option whereupon the Term (defined below) of this Lease shall be renewed and extended as if such notice had been given prior to such expiration of the one hundred eighty (180) day period described above.

The Construction Term, Main Term and Option Periods are, collectively, the "Term". The term "Lease Year" shall mean each successive period of twelve (12) consecutive calendar months, commencing on the first day of each February during the Term, except that the first Lease Year shall commence on the Commencement Date and shall end on the last day of January following the first anniversary of the Commencement Date.

4.    Base Rent; Ground Rent.  During the Construction Term, Tenant shall pay no rent or Real Estate Tax or CAM Charges or any similar costs, fees, rentals or expenses.  Tenant

agrees to pay base rent ("Base Rent") for the Premises in the amounts and manner specified hereunder, commencing on the date (the "Commencement Date") on which Landlord makes payment of the Tenant Improvement Allowance. "Ground Rent," in lieu of Base Rent, shall be due under certain circumstances, as described in subparagraph 28(d) below, and when due, shall be payable in the same manner as Base Rent. Notwithstanding the foregoing, until Landlord has completed, executed and delivered to Tenant a W-9 form (the form of which will be delivered to Landlord by Tenant together with this Lease for execution), no Base Rent, Ground Rent or other sums shall be due Landlord by Tenant hereunder.

Landlord shall give Tenant written notice of a change of address or change of the party to whom such rents shall be payable along with written documentation reasonably satisfactory to Tenant of such party's right to receive payment hereunder. Unless adjusted as provided below or in paragraph 2 above relating to the Tenant Improvement Allowance (it being intended by Landlord and Tenant that the same square footage be used for purposes of determining the Base Rent and Tenant Improvement Allowance), Base Rent shall be paid in equal monthly installments in advance on the first day of each calendar month throughout the Term, to the address given for Landlord in paragraph 32, pursuant to the following schedule:

(a)    First Five Years.    During the first five (5) Lease Years, Tenant shall pay annual Base Rent in the amount of FOUR HUNDRED SEVENTY-EIGHT THOUSAND THREE HUNDRED SIXTY-NINE and No/100 Dollars ($478,369.00), payable in equal monthly installments of THIRTY-NINE THOUSAND EIGHT HUNDRED SIXTY-FOUR and 13/100 Dollars ($39,864.13).

(b)    Adjustment in Base Rent.    Notwithstanding the Base Rent provisions, in the event that the ground-floor gross leasable area of the Building when constructed does not equal 32,991 square feet, annual Base Rent during the first five (5) Lease Years shall be the product of the actual ground-floor gross leasable area of the Building (as evidenced by the square footage building perimeter survey described in paragraph 2 above), (but excluding pilasters) multiplied by $14.50. In determining the ground-floor gross leasable area, measurements shall be made in accordance with paragraph 7(c) below. If any Lease Year is other than twelve (12) months in length, annual Base Rent during such Lease Year shall be the product of the applicable monthly Base Rent times the number of months in such Lease Year, with appropriate proration

MW 4/29/03
\\REA\140800.6

4

for any partial calendar month therein.   In no event, however, shall the ground-floor gross leasable area of the Building upon which Base Rent is calculated be less than 32,000 square feet.

(c)    Increases in Base Rent. Annual Base Rent shall increase on the first day of the sixth and every succeeding fifth Lease Year over the Base Rent in effect for the previous 5-year period  by $1.00 per square foot of ground-floor gross leasable area of the Building.

5.    Development of Shopping Center by Landlord.  Landlord covenants to construct, develop and operate a first-class shopping center.  The location of buildings and other tenant space will only be within the "Permissible Building Areas" designated on the Site Plan.  The parking ratio for the Shopping Center shall be at least as shown thereon, but in no event shall said ratio be less than the greater of (i) five (5) spaces (no less than nine (9) feet wide and for full-sized automobiles) per 1,000 square feet of gross leasable area, or (ii) that required by applicable zoning requirements, without variance.   All parking shall be at ground level. Landlord shall construct all improvements in a good and workmanlike manner, lien-free and Landlord agrees to indemnify, defend and hold Tenant harmless from any loss or damage suffered by Tenant as a result of Landlord's construction.  Landlord's construction shall not unreasonably interfere with the conduct of Tenant's business. Subject to paragraph 16 below, if Landlord fails to maintain the above required parking ratio, Tenant shall, in addition to any other legal or equitable remedy, including specific performance, have the right to pay Base Rent in lieu of that provided for herein at the rate of one-half (1/2) of the fixed minimum rent, together with one-half (1/2) of all other charges otherwise payable under this Lease, until such time as the above-specified parking ratio is maintained.

6.    Easements.   Landlord also grants to Tenant those nonexclusive leasehold easements over Landlord's Premises, which shall run as covenants with Landlord's Premises and the Premises during the Term, as are useful and appropriate for the construction, operation and maintenance of the Premises, including but not limited to:

(a)    Construction Easements.  During the Construction Term, any period of renovation or reconstruction thereafter, and during any period which Tenant desires to install additional utility services including television cable, fiber optic line or other systems serving the Premises, Landlord grants to Tenant (i) a nonexclusive easement across a mutually agreeable designated route, providing access to and from the public roadways nearest to the Land, over the

MW 4/29/03
\\REA\140800.6

5

Common Areas (as defined in paragraph 7(a) below) for construction access to the Premises, as well as an exclusive easement for a construction staging area (the "Staging Area") of approximately 20,000 square feet, in a portion of the Common Areas in the location shown on the Site Plan for Tenant's use in constructing the Improvements, (ii) an easement to permit the Building to abut adjacent buildings, and the foundations, footings, common walls and roof projections to bear structurally upon Landlord's Premises, provided that no encroachment of the Premises upon Landlord's Premises shall exceed one (1) foot (except at those boundaries of the Building footprint at which there will be no adjacent building), (iii) an easement for such additional underground, public or private utility or cable, fiber optic or other easements as Tenant deems necessary in locations mutually agreed-upon by Landlord and Tenant, without unreasonably interfering with the use by Landlord of the Common Areas, for the benefit of the Premises. For the purpose of exercising the rights granted in this paragraph 6, Tenant and/or the utility or other service provider shall have the right to enter upon and use the Common Areas to install the utility systems, to such extent and so long as reasonably necessary to accomplish such purpose, and without unreasonably interfering with the use by Landlord of the Common Areas, subject to restoration of the Common Areas following such installation.

(b)   Common Area Easements.   Landlord grants to Tenant an easement (the "Common Area Easement") to use the Common Areas for their intended purposes and to permit Tenant and its employees, agents, subtenants, assignees, licensees, suppliers, customers and invitees to use the Common Areas for the purposes (without limitation) of parking and pedestrian, service and vehicular access, ingress and egress to, from and between the Premises and Landlord's Premises and the streets and highways abutting and adjacent to the Shopping Center, without payment of any fee or other charge. Tenant shall also have the right, subject to compliance with all zoning and other Lawful Requirements, to use such Common Areas immediately adjacent to Tenant's Improvements and within Tenant's Preferred Area as shown on the Site Plan for "sidewalk sales", seasonal and promotional sales and demonstrations and other sales customary to Tenant's business operations exclusively for Tenant's customers, invitees and patrons; provided, however, that Tenant will not block sidewalks to pedestrian traffic.

MW 4/29/03
\\REA\140800.6

6

(c)   Demising Wall.  Tenant recognizes and agrees that Landlord may connect its new construction to the north wall of the Building (but that no load from such adjacent building shall bear on the wall of the Building).

7.   Common Areas and Common Area Maintenance.

(a)   Definition of Common Areas.   The term "Common Areas" shall be defined to include the parking areas, lanes, drives, entrances, truck passageways, sidewalks, ramps, stairways, landscaped and other unpaved areas, parking lot lighting facilities and equipment, Landlord's pylon sign(s), directional, traffic and monument sign structure(s) and shared utility facilities located in all elements of the Shopping Center (including any such areas and facilities contained within outparcels and adjacent tracts but reserved for the benefit of the Shopping Center occupants) and which are intended and available for the common use of all of the tenants within the Shopping Center (including any outparcel and other adjacent occupants which contribute toward "CAM Charges" (as defined below) and which are not responsible for separate maintenance of such outparcels or tracts), their subtenants, licensees, and business invitees.  Landlord shall operate, maintain, repair and replace the Common Areas in a first-class manner, including, without limitation, sweeping and cleaning, maintenance of Landlord's pylon and other sign structure(s), including traffic directional signs, markers and lines and informational signs, snow removal and ice treatment, removal of Common Area trash, debris and garbage, lighting (including lighting of signage and Common Areas), repairing, repaving and restriping the parking area, and maintaining, replanting and replacing landscaping and sprinkler systems, storm drains, sewers and other utility lines and facilities not dedicated to the public or owned by a private utility company, which are necessary for the operation of the Shopping Center, customary and reasonable security services, and maintaining all insurance required under this Lease to be maintained by Landlord, all such work to be referred to collectively as "Common Area Maintenance".  Landlord shall accommodate Tenant's reasonable requests with respect to lighting portions of the Common Areas for extended hours on occasion to facilitate sales or special events staged by Tenant at the Premises.

(b)   CAM Charges.  For the purpose of this paragraph 7, the cost of Common Area Maintenance (the "CAM Charges") shall include (i) Landlord's reasonable direct costs and expenses of operating and maintaining the Common Areas, (ii) Landlord's overhead expenses for

MW 4/29/03
\\REA\140800.6

7

administering same, or in lieu thereof a management fee, neither of which shall exceed seven and one-half percent (7.5%) of the total of such costs (specifically excluding from such total the amounts paid by Landlord and Tenant for insurance, capital expenditures, Real Estate Taxes and utilities serving the Common Areas), and (iii) the share of the maintenance costs allocated to the Shopping Center pursuant to the REA. Notwithstanding the foregoing, the following shall not be included in the CAM Charges:

(1) real estate taxes paid, and maintenance performed, on separately assessed and/or maintained outparcels or other adjacent tracts not reserved to the benefit of the Shopping Center occupants;

(2) any dues or charges for a merchants' or other association of the tenants in the Shopping Center;

(3) maintenance, repairs or replacements to the Common Areas (but no other portions of the Shopping Center), necessitated by the negligent or wrongful act of Landlord or made to correct any construction defect or condition with respect to any buildings (including the roof and exterior walls) or to any utility systems not part of the Common Areas;

(4) repairs or replacements necessitated by any governmental entity or by the negligence or the wrongful action of Landlord (including failure to construct any portion of the Shopping Center in accordance with plans or specifications) or any other tenant or made to correct any initial construction defect or condition in existence prior to the Commencement Date of this Lease or to correct damage caused by subsidence or adverse or substandard soil conditions;

(5) amounts paid to entities related to Landlord in excess of the cost of such services from any competitive source;

(6) amounts reimbursable from insurance proceeds, under warranty or by Tenant, any other tenant in the Shopping Center or any other third party other than pursuant to a Common Area expense provision similar to this paragraph 7;

(7) premiums for Common Area liability insurance for coverage in excess of the limits established in paragraph 14(e) below;

(8) repairs or replacements of a capital nature (whether or not capitalized);

MW 4/29/03
\\REA\140800.6

8

(9)    improvements, repairs or replacements (other than patching and similar minor periodic maintenance) to the parking lot or other paved areas during the first ten (10) "CAM Years" (as defined below);

(10)    reserves for anticipated future expenses;

(11)    interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner;

(12)    Landlord's personnel, overhead, home office or administrative expenses, except as set forth in subparagraph (b)(ii) above;

(13)    amounts incurred to remediate any Hazardous Substances (as defined in the Construction Provisions);

(14)    any new improvements to the Shopping Center or Common Areas, including, but not limited to, renovations to the facade of the Shopping Center and improvements to landscaped areas of the Shopping Center;

(15)    amounts incurred to monitor or maintain fire protection systems in the Shopping Center if Tenant separately monitors and maintains the Premises;

(16)    costs for holiday or other decorations to the extent Tenant's share thereof would exceed $1,000 per year; or

(17)    other maintenance expenses not considered normal and customary under generally accepted accounting principles or shopping center industry standards.  CAM Charges shall be in an amount consistent with the costs incurred by other landlords of similar shopping centers in the City (but not greater than as described in this paragraph 7(b)), and in all events such charges shall be obtained at competitive rates pursuant to a proposed Common Area maintenance budget delivered to Tenant on or before the beginning of each CAM Year.

(c)    Tenant's Estimated Payments.  During each calendar year ("CAM Year"), Tenant shall make estimated payments of its Pro Rata Share (as hereinafter defined) of the CAM Charges incurred by Landlord.  Tenant's estimated payments of its Pro Rata Share of CAM Charges shall be paid by Tenant in equal monthly installments on the first day of each month during a CAM Year.  Commencing on the Commencement Date and continuing until the expiration of the first CAM Year, Tenant shall pay to Landlord One and 50/100 Dollars ($1.50) per square foot of ground-floor gross leasable area in the Building as Tenant's estimated Pro Rata Share of

CAM Charges. Tenant's estimated payments of its Pro Rata Share (and its actual Pro Rata Share) of CAM Charges shall not exceed by more than three percent (3%) those in effect during the preceding CAM Year; provided, however, Landlord's actual costs incurred for snow removal, Common Area taxes, Common Area insurance and Common Area utilities shall not be subject to the three percent (3%) cap. For any period within the Term which is less than a full CAM Year, Tenant's Pro Rata Share of CAM Charges shall be appropriately pro rated. Within sixty (60) days after the end of the first CAM Year and each CAM Year thereafter, Landlord will furnish to Tenant a statement showing in reasonable detail (with such substantiating documentation as Tenant may reasonably request) the amount of the CAM Charges for the preceding CAM Year and the then-current number of square feet of ground-floor gross leasable area in the Shopping Center. Any necessary adjustment with respect to amounts owed by either party based upon the actual amount of CAM Charges paid by Landlord for such preceding CAM Year shall be made; and the monthly payments to be made by Tenant for the next year shall be estimated according to the Common Area maintenance budget prepared by Landlord and delivered to Tenant.

Tenant's pro rata share of CAM Charges (herein referred to as "Pro Rata Share") shall always be the product of the CAM Charges multiplied by a fraction, the numerator of which is the number of square feet of the ground-floor gross leasable area in the Building and the denominator of which is the number of square feet of the ground-floor gross leasable area (including the area of any outside sales area exclusive to a single occupant) in the Shopping Center. In determining the ground-floor gross leasable area of any building in the Shopping Center (including the Building), measurement shall be made from the centerline of any common walls and from the outside of any exterior walls. The gross leasable area of any outside sales area shall be measured from the outside of the exterior wall of any adjacent building to the actual exterior perimeters of such outside sales area, including any aisles, fences or walls included therein. Changes in applicable floor areas shall result in corresponding adjustments of Tenant's Pro Rata Share, but in no event shall the denominator of the fraction by which Tenant's Pro Rata Share is determined be less than 250,000 square feet. The remainder of CAM Charges shall be borne by Landlord and/or other tenants.

(d)    Examination of Landlord's Records. Tenant shall have the right, once as to any CAM Year and no later than three (3) years after the end of such CAM Year, to examine

and make copies of the records pertaining to CAM Charges for such CAM Year. If following such examination, it is determined that there has been an overcharge by Landlord, Landlord shall reimburse Tenant within ten (10) days for any overpayment of Tenant's Pro Rata Share of CAM Charges; and if such overpayment by Tenant is in excess of four percent (4%) of the actual Tenant's Pro Rata Share of CAM Charges, Landlord shall reimburse Tenant for the actual cost of such examination or audit, together with interest thereon at the Default Rate (hereinafter defined) from the date paid by Tenant until reimbursement.

      8.     Signs and Communications Equipment.

      (a)     Signs. Landlord and Tenant acknowledge that as of the date of this Lease, local governmental requirements do not permit pylon or other free-standing tenant identification signs at the Shopping Center. In the event pylon or other free-standing tenant identification sign(s) are permitted at the Shopping Center, (i) Landlord, at its sole cost and expense, shall construct and install upon the Common Areas such sign structure(s) (with electrical wired box installed) having sufficient space thereon in the top tenant position for doublesided "face panels" identifying Tenant's store, which face panels shall be constructed and installed at Tenant's sole cost and expense and (ii) Tenant shall have the right to install its face panels in the highest position on such signs, such panels to be of a size at least as large as those panels of any other tenant or occupant of the Shopping Center. Landlord shall submit to Tenant plans and specifications for such sign(s) (including colors, design, dimensions, type of lighting and position of tenant panels) prior to construction and installation thereof for Tenant's written approval, which shall not be unreasonably withheld or delayed. Attached as a portion of Exhibit "E" are plans and specifications for Tenant's current prototypical face panels and for Tenant's building signage, which Landlord hereby approves. Tenant, its successors, subtenants and assigns shall be entitled without Landlord's consent, but subject to governmental requirements, to replace all of its signs with signage consistent with Tenant's (or its successors', subtenants' or assigns') then-current prototypical sign plans.

      (b)     Communications Equipment. Subject to compliance with all zoning and other Lawful Requirements, Tenant may install, maintain and/or replace any satellite dishes, antennas, cellular and PCS towers and poles on the roof and/or exterior walls or parapet of the

MW 4/29/03
\\REA\140800.6

11

Building as Tenant deems necessary or desirable, provided same shall not adversely and materially affect the roof or its structural elements.

9. Taxes.

(a) <u>Taxes Contemplated Hereunder</u>. The term "Real Estate Taxes" shall mean all general real estate taxes and assessments and other ad valorem taxes, rates and levies paid upon or with respect to the Shopping Center, including the Premises (but excluding any portion of the Shopping Center designated by Landlord as a "Separate Tax Lot" in written notice to Tenant provided, however, that no parcel may be so designated if the proportion of (a) gross leaseable area of building(s) constructed thereon (or to be constructed in the future) to (b) the square footage area of the land within such parcel exceeds the proportion, measured immediately prior to the establishment of the Separate Tax Parcel, of (x) the gross leaseable area of the Shopping Center, to (y) the square footage area of the land within the Shopping Center; provided, however, Landlord shall be entitled to create a Separate Tax Parcel containing all or a part of buildings H, I, J, K, L and M as shown on the Site Plan without regard to the foregoing limitation), for a calendar year or a portion thereof to any governmental agency or authority and all charges specifically imposed in lieu of any such taxes. Nothing contained in this Lease shall require Tenant to pay any local, county, municipal, state or federal income, franchise, corporate, estate, inheritance, succession, capital levy, business or transfer tax of Landlord, or any local, county, municipal, state or federal income, profits, gross receipts, sales or renewal tax or charge upon the rent or other charges payable by Tenant under this Lease.

(b) <u>Payment of Real Estate Taxes</u>. At such intervals as Landlord is required to pay the Real Estate Taxes, Tenant shall pay Tenant's Pro Rata Share of Real Estate Taxes (calculated in the same manner as Tenant's Pro Rata Share of CAM Charges in paragraph 7(c), but excluding for the denominator of the fraction referred to therein the number of square feet of gross leaseable area constructed on any Separate Tax Lot as defined above) levied against the tax parcel or parcels comprising the Shopping Center (the "Tax Parcel"). Tenant's Pro Rata Share of Real Estate Taxes shall be net of any early-payment discounts available at the time Tenant's payment is due. Tenant shall pay Tenant's Pro Rata Share of Real Estate Taxes within thirty (30) days after Tenant's receipt of Landlord's statement, accompanied by the tax bill on the basis of which such statement is rendered. Landlord shall pay, or cause the payment of, all Real Estate

Taxes before any fine, penalty, interest or cost are added, become due, or are imposed by operation of law for nonpayment or late payment. In no event shall Tenant be liable for any discount forfeited or penalty incurred as a result of late payment by another tenant or by Landlord. Real Estate Taxes shall be prorated as of the Commencement Date and the expiration or earlier termination of this Lease, and Landlord shall promptly return to Tenant any overpayment made by Tenant not attributable to the period of Tenant's possession of the Premises. Landlord shall remain primarily responsible for such payment notwithstanding the fact that such payment may be made by a tenant of Landlord's Premises or other third party pursuant to an agreement to which Tenant is not a party. In addition, should Landlord fail to pay such Real Estate Taxes before same become delinquent, Tenant shall have the right, at its election, to cure such failure by payment of delinquent Real Estate Taxes and any interest and penalties due and in such event Tenant may deduct the cost, plus interest at the lesser of fifteen percent (15%) per annum or the highest rate permitted by State law (the "Default Rate"), from the next installment(s) of Base Rent and other charges due.

        (c)     <u>Contest of Real Estate Taxes and/or Assessed Valuation of Property</u>. Tenant shall have the right, at Tenant's sole expense, to contest the amount or validity, or otherwise seek an exemption or abatement, of any Real Estate Taxes or to seek a reduction in the valuation of the Premises assessed for Real Estate Tax purposes, by appropriate proceedings diligently conducted in good faith, provided that Tenant shall first have notified Landlord of its intent to do so and Landlord shall have failed to notify Tenant in writing, within three (3) days of receipt of Tenant's notice, that Landlord intends to contest such Real Estate Taxes or seek such a reduction. In any instance where any such action or proceeding is being undertaken by Tenant, Landlord shall cooperate with Tenant, execute all documents required and, if required by any law, rule or regulation of the taxing authority, shall join with Tenant in the prosecution.

        (d)     <u>Payment Following Appeal</u>. Upon the termination of the proceedings set forth in subparagraph (c) above (unless the taxing authority requires that Real Estate Taxes be paid under protest prior to commencement of such proceedings), Tenant shall pay Tenant's Pro Rata Share of such Real Estate Taxes as finally determined in such proceedings, the payment of which may have been deferred during the prosecution of such proceedings. Tenant shall be entitled to a refund of any overpayment of Real Estate Taxes relating or allocable to the

Premises, as well as a reimbursement from the appropriate taxing authority of all costs, fees and expenses it incurs in such protest or reassessment.

10.    Maintenance, Repairs and Replacements.    Except (i) for costs covered by Landlord's insurance required to be maintained, (ii) for condemnation proceeds to be received by Tenant, (iii) for obligations arising from the negligent acts or omissions or willful misconduct of Landlord (or its agents, employees or other tenants), or (iv) as otherwise set forth in this Lease, Tenant shall be solely responsible for maintenance of the exterior and interior non-structural elements of the Building, including painting of the exterior of the Building. Notwithstanding the foregoing, Tenant shall have no obligation to install or construct alterations or incur expenditures pursuant to this paragraph during the last five (5) years of the Lease Term; provided, however, that if Tenant is required to expend any sum in satisfaction of its obligations relating to the HVAC system serving the Premises, and if the resulting improvement to the Improvements cannot be fully amortized in accordance with generally accepted accounting principles, or the Internal Revenue Code and Regulations, over the remainder of the Term, then Tenant shall be reimbursed by Landlord by that amount of the cost associated with such repairs, construction or alteration for the period beyond the remainder of the Term , so long as Tenant has (i) provided Landlord with ten (10) days' prior notice of such repairs, construction or alteration, and (ii) not received Landlord's disapproval of such repairs, construction or alteration by the end of such ten (10) day period. If Landlord notifies Tenant that it does not approve such repairs, construction or alteration and agree to reimburse Tenant, (i) Landlord shall not be obligated to so reimburse Tenant, (ii) Tenant shall not be obligated to make the repair, construction or alteration giving rise to the expenditure and shall not be in default of its obligations under this Lease as a result thereof, and (iii) Tenant shall, upon expiration of the Lease, have the right to remove the improvements (the "Tenant-Owned Additions") made with the unreimbursed expenditures (provided Tenant repairs any damage arising out of such removal and such removal does not in and of itself create a dangerous condition which could cause injury to persons or property and, provided further that Tenant reimburses Landlord for the value, if any, of any improvement or equipment that was removed from the Premises in connection with Tenant's previous installment or construction of Tenant-Owned Additions being removed by Tenant). Before Tenant removes any such Tenant –Owned Additions, however, Tenant shall give Landlord notice of its intent to

do so, and shall not remove such items if Landlord, within 15 days of receipt of such notice, agrees in writing to pay to Tenant the then fair market value of such items (which value shall be reasonably and promptly agreed between the parties) and actually pays such sum within thirty days of receipt of such notice. Landlord shall maintain all structural elements of the Premises (whether or not same serve only the Premises), including, without limitation, the roof, roof structure, floor slab and floor structure, foundation, load bearing walls and exterior structural walls. In addition, Landlord agrees to maintain the Other Improvements immediately surrounding the Building, as well as providing all maintenance and repairs to sidewalks and landscaping. Should either party fail to perform its obligations under this paragraph 10, the other party may, at its option, effect such maintenance, replacements or repairs, provided that curing party shall give the non-performing party thirty (30) days' prior written notice, except in the case of emergencies (in which event only such notice as may be reasonable under the circumstances shall be required); but further provided that the thirty (30) day period (or reasonable period in event of emergencies) shall be extended in respect of any cure that cannot with reasonable diligence be accomplished within such period so long as the party required to effect such cure has commenced such cure within the thirty (30) day period (or reasonable period in event of emergencies) and thereafter diligently prosecutes such cure to completion. The non-performing party shall reimburse the other party on demand for the reasonable and actual amount expended (as evidenced by detailed invoice), plus interest at the Default Rate. However, in the event of emergency repairs, no interest shall accrue if reimbursed within thirty (30) days of request (including detailed invoice) for reimbursement. All maintenance, repairs or replacements shall be done by Tenant or Landlord lien-free and in a good and workmanlike manner consistent with the quality of labor and materials used in originally constructing the Improvements and in accordance with all applicable law. In order for Landlord and Tenant to effectively perform their maintenance, repair and replacement obligations, Tenant and Landlord, as applicable, shall provide or assign, as applicable, to the other party all manufacturers' and contractors' warranties relating to such work performed on behalf of the other party to the party who is required to maintain same under the Lease; however, Tenant shall not be required to perform the foregoing obligation so long as the Tenant Improvement Allowance remains unpaid.

MW 4/29/03
\\REA\140800.6

15

11.    <u>Utility Service Provider: Payment of Utility Bills</u>.    Tenant shall be entitled, subject to State law, to select the utility service provider which shall provide water, electric, gas, cable, and telecommunication services to the Premises.    Tenant will pay directly to the appropriate utility company or governmental agency, when due, all tap and meter fees (but not "impact" or similar fees) bills for gas, water, sanitary sewer, electricity, telephone and other public or private utilities used by Tenant with regard to the Improvements.    Landlord shall pay when due all utility charges incurred in the operation of the Common Areas and the Shopping Center.    Landlord shall cause, at Landlord's expense, all utilities serving the Premises to be separately metered.

12.    <u>Alterations</u>.    During the Term, Tenant shall have the right, at its discretion and its sole cost, without Landlord's consent, to make (i) any alterations or modifications necessary or desirable in order to bring the Premises into conformity with Tenant's then-current prototype for similarly sized stores and (ii) any interior nonstructural alterations or modifications it may desire. With Landlord's consent, which shall not be unreasonably withheld, conditioned or delayed, Tenant shall have the right, at its sole cost, to otherwise alter, modify or reconstruct the exterior and/or structure of the Building or Other Improvements.    Following such time as 80% of the square footage of the Permissible Building Area has been constructed upon, Landlord's withholding of consent as to any exterior or structural alteration or modification shall be deemed reasonable only if same is materially inconsistent with the then-existing architecture of the Shopping Center.    Should Landlord's consent be required, conceptual plans and specifications for such work shall be provided to Landlord prior to commencement of any such work.    Landlord shall be deemed to have consented to such work if written notice of disapproval, with reasons specified, is not received by Tenant within twenty (20) days following Tenant's delivery of such plans and specifications to Landlord.    Without cost or expense to Landlord, Landlord shall cooperate with Tenant in the obtaining of any and all licenses, building permits, certificates of occupancy or other governmental approvals which may be required in connection with any such modifications or alterations, and Landlord shall execute, acknowledge and deliver any documents reasonably required by Tenant.

13.    <u>Mechanics' Liens</u>.    Landlord and Tenant covenant to each other that they will not permit any lien to be filed against the Premises or the Shopping Center as a result of nonpayment

MW 4/29/03
\\REA\140800.6

for, or disputes with respect to, labor or materials furnished to the Premises or the Shopping Center for or on behalf of Tenant, Landlord or any party claiming by, through, or under Tenant or Landlord, nor shall either party permit any judgment, lien or attachment to lie, as applicable, against the Premises or the Shopping Center.  Should any lien of any nature, including but not limited to the foregoing, be filed against the Premises or Shopping Center, the party on account of whose actions such lien has been filed shall, within thirty (30) days after receipt of written notice of such lien, or such sooner period of time after such notice as may be necessary to avoid the foreclosure of such lien, cause said lien to be removed, or otherwise protected against execution during good faith contest, by substitution of collateral, posting a bond, escrowing of adequate funds to cover the claim and related transaction costs or such other method as may be permissible under applicable title insurance regulations and reasonably acceptable to the other party.

      14.    <u>Insurance</u>.

      (a)    <u>Property Damage</u>.  During the Construction Term, Tenant shall keep or require its general contractor to keep, in full force and effect, a policy of builder's risk insurance covering loss or damage to the Improvements for the full replacement value of all construction. During the Term, Tenant shall keep the Premises insured against loss or damage by fire and the perils covered under standard "all risk" or "special form" coverage in the amount of full replacement value of the Building, exclusive of excavation, footings and foundations (which initial amount shall be not less than Tenant Improvement Allowance), with a commercially reasonable deductible, for which Tenant shall be fully responsible.  Landlord and Landlord's first "Mortgagee" (as defined in paragraph 21 below), shall be named in such policy as additional insureds as their respective interests may appear.  Landlord shall not construct, or permit to be constructed, any improvement in the Shopping Center, nor conduct or permit the conduct of any activity, in the Shopping Center which will prevent Tenant from being able to obtain insurance coverage at commercially reasonable rates.  Should Landlord cause or permit any insurance rate increase to occur, Landlord will reimburse Tenant for the additional premium required, subject to Tenant's right to self-insure (in which event Landlord will contribute to Tenant's self insurance fund to cover increased actuarial risks).

(b)     Liability Insurance.  During the Term, Tenant shall keep in full force a policy of commercial general liability insurance with bodily injury and property damage coverage with respect to the Premises and business operated by Tenant, which shall name Landlord and Landlord's first Mortgagee as additional insureds as their respective interests may appear.   The limits of such commercial general liability policy shall be not less than $3,000,000.00 combined single limit for bodily injury and property damage, with a commercially reasonable deductible.

(c)     Workers' Compensation Insurance.   To the extent required by law, Landlord and Tenant shall maintain workers' compensation insurance covering their respective employees in statutory limits, or maintain such alternate coverages or arrangements as legally permissible.

(d)     Self-Insurance.

(i)     Tenant shall, to the extent permitted by applicable laws, have the right to satisfy all or a portion of the requirements of Section 14 by means of self-insurance, subject to and in accordance with the following terms and conditions:

(A)     "Self-insurance" shall mean that Tenant is itself acting as though it were the insurance company providing the insurance policies required under Section 14, and Tenant shall pay any amounts due in lieu of insurance proceeds which would have been payable if such insurance policies had been carried, which amounts shall be treated as insurance proceeds for all purposes of this Lease.

(B)     All amounts which Tenant pays or is required to pay and all loss or damages resulting from risks for which Tenant has elected to self-insure shall be subject to the waiver of subrogation provisions of Section 14 (g).

(C)     Tenant's rights pursuant to this Section 14 (d) shall be conditioned upon and subject to (1) Tenant's now having and hereafter maintaining a tangible net worth of at least Seventy-five Million Dollars ($75,000,000) at the end of each quarterly reporting period and (2) Tenant's maintaining appropriate loss reserves for the aggregate amount of its insurance obligations under this Lease, as actuarially derived in accordance with the generally accepted standards of the insurance industry and accrued (i.e., charged against earnings) or otherwise funded.

MW 4/29/03
\\REA\140800.6

(ii)    In the event Tenant fails to continuously fulfill the requirements of Section 14 (d) (i)(C), then Tenant shall no longer have the right to satisfy the requirements of Section 14 by self-insurance, and shall thereupon be required to promptly (and in no case later than thirty (30) days thereafter) obtain and thereafter maintain the insurance identified in Section 14; provided, however, that Tenant shall continue its self-insurance in full force and effect until the insurance required by Section 14 is issued by a qualifying insurance company.

(iii)    In the event that Tenant elects to self-insure and an event or claim occurs for which a defense or coverage, or both, would have been provided by an insurance company had the insurance identified in Section 14 been maintained, Tenant shall (A) promptly undertake each such defense, including any defense of Landlord, at Tenant's sole cost and expense, and (B) pay each such claim or otherwise provide all funding which would have been available from insurance policy proceeds but for Tenant's election to self-insure.

(iv)    In the event that Tenant elects to self-insure, Tenant shall provide Landlord and any Mortgagee with certificates or other evidence of self-insurance in reasonable detail.

(e)    Common Area, Additional Area and Third Party Tenant Insurance and Insurance During Landlord's Construction. During the Term, Landlord shall keep in full force and effect, in form reasonably acceptable to Tenant, policies of (1) commercial general liability insurance, and (2) property insurance insuring against loss or damage by fire and the perils covered under standard "all risk" or "special form" coverage, with respect to the Common Areas and with respect to all other areas of the Shopping Center over which Landlord from time to time has present possessory rights (or has the right under any lease to provide insurance coverage because of a tenant's failure to maintain such required coverage) but which do not constitute a portion of the Common Areas (the "Additional Areas"); provided that Landlord need not maintain, with respect to parking and drive aisles, insurance intended to cover the cost of restoration of buildings. The Additional Areas shall include, without limitation: (i) as yet unconstructed portions of the Shopping Center intended for tenant occupancy, (ii) constructed but unoccupied portions of the Shopping Center, (iii) vacated or otherwise uninsured tenant space, whether by reason of lease expiration, default or otherwise, and (iv) constructed and occupied portions of the Shopping Center. Said policies shall name Tenant, and any lender,

MW 4/29/03
\\REA\140800.6

investor or other stakeholder which is designated by Tenant from time to time, as an additional insured to the fullest extent Tenant and such stakeholder have insurable interests. The limits of such policies shall be the same as those set forth in subparagraphs (a) and (b) above, as applicable. The premiums for coverages relating to Common Areas shall be an element of CAM Charges, provided that Tenant shall not be liable for its pro rata share of any premium for coverage in excess of that coverage which is customary among owners of like shopping centers in the City. Any deductible amount for Common Area insurance coverage shall be reasonable in amount given the nature of the risk insured and probable frequency of claims made under such coverage, but in no event shall such deductible amount exceed $5,000 for Common Area liability coverage. Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center, including the Additional Areas and areas leased to third party tenants or sold to third party occupants, are insured with coverages which are sufficient to assure Tenant that in the event of any destruction or damage to any portion of the Shopping Center whatsoever, the Shopping Center will be reconstructed in equal or superior condition within the time frame set forth in paragraph 15. During any period in which Landlord is conducting construction activities at the Shopping Center, Landlord shall keep, or cause its general contractor to keep, in full force and effect, with regard to the Shopping Center, in form reasonably acceptable to Tenant, at least the minimum insurance coverages set forth below:

(1)     Workers' Compensation - Statutory Limits;
        Employer's Liability - $500,000;

(2)     Automobile Liability for all vehicles with limits of $2,000,000; and

(3)     Commercial General Liability to include premises operations and products/completed operations coverage with limits of $2,000,000.

Additionally, Landlord shall keep or require its general contractor to keep in full force and effect a policy of builder's risk insurance covering loss or damage to the Shopping Center for the full replacement value of all such construction. To the fullest extent Tenant has an insurable interest, such liability policy shall name Tenant an additional insured and such builder's risk policy shall name Tenant a loss payee; provided that Tenant will promptly endorse any insurance proceeds

MW 4/29/03
\\REA\140800.6

20

check in respect of liability coverage it receives to Landlord as long as Landlord is not in default of its obligations hereunder.

(f)    Policy Provisions.  All policies of insurance (other than self-insurance) shall be provided by insurance carriers with a Best rating of not less than A-VIII.  Any insurance coverage may be effected by a blanket policy of insurance or under so-called "all risk" or "multi-peril" insurance policies, provided that the total amount of insurance available with respect to the Premises and Tenant's or Landlord's liability hereunder shall be at least the equivalent of separate policies in the amounts herein required, and provided further that in other respects any such policy shall comply with the provisions of this paragraph 14.  Landlord shall not be entitled to self-insure against any of the risks recited herein, except the amount of any commercially reasonable deductible shall not be deemed to be self-insurance.  An increased coverage or "umbrella" policy may be provided by either party to increase the coverage provided by individual or blanket policies in lower amounts, and the aggregate coverage provided by all such policies with respect to the limits required herein shall be satisfactory provided that such policies otherwise comply with the provisions of this paragraph 14.

(g)    Waiver of Right of Recovery and Subrogation.  To the extent that insurance proceeds are actually received in satisfaction of a loss which is required to be covered by insurance or is self-insured hereunder (with the deductible under any policy being deemed to be self-insured), Landlord and Tenant waive any and all rights of recovery against each other for any loss or damage to the Premises or the contents contained therein, for loss of income on account of fire or other casualty, or for injury sustained on the Premises or the Common Areas; and each party's policies of insurance shall contain provisions recognizing this mutual release and waiving all rights of subrogation by the respective insurance carriers.

(h)    Evidence of Insurance.  Subject to Tenant's right to self-insure, (i) upon commencement of the Main Term (as to property insurance), (ii) upon Delivery of the Land (as to liability insurance) and (iii) prior to expiration, Tenant and Landlord shall cause to be issued to each other in lieu of the original policy, a duplicate of such policy or certificates of insurance reasonably acceptable to the other party and evidencing compliance with the applicable covenants of this paragraph 14.  Each such certificate shall provide that coverage shall not be

cancelled without thirty (30) days notice to the certificate-holder (and any Mortgagee, if applicable).

   (i) <u>Indemnities</u>. Except if arising from the negligent or willful acts of Landlord or its agents or employees (to the extent that paragraph 14(g) is inapplicable), Tenant agrees to indemnify, defend and hold Landlord harmless from all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring on the Premises or resulting from Tenant's use.

  Except if arising from the negligent or willful acts of Tenant or its agents or employees (to the extent that paragraph 14(g) is inapplicable), Landlord agrees to indemnify, defend and hold Tenant harmless from any and all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring in, on or around the Shopping Center, exclusive of the Premises, or other buildings within Landlord's Premises or resulting from the use by Landlord, its agents or employees.

   15. <u>Damages by Fire or Other Casualty.</u>

   (a) <u>First Ten Lease Years</u>. In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Improvements, Common Areas and/or Additional Areas during the first ten (10) Lease Years, this Lease shall not terminate except as expressly set forth herein, and Base Rent and other charges shall continue to be paid by Tenant pursuant to the terms of paragraph 4.  Within a reasonable time after such casualty, subject to force majeure, applicable building codes, the procurement of building permits and the receipt of insurance proceeds (unless self-insured), Tenant shall complete reconstruction of the Building and Other Improvements, and Landlord shall complete reconstruction of the Common Areas and Additional Areas (including substantially equivalent value in equipment, furniture and fixtures), to that condition existing immediately prior to such casualty, in the reconstructing party's reasonable discretion, with, in event of any Tenant reconstruction, such alterations as may be permitted under paragraph 12.  In the event, subject to force majeure, the Premises, Common Areas and/or Additional Areas, as applicable, are not substantially repaired and reconstructed, and equipment, furniture and fixtures restored or replaced, by the party with repair and restoration obligations within two hundred forty (240) days after receipt of any required governmental permits, for which permits the party with repair obligations shall make prompt application following such

MW 4/29/03
\\REA\140800.6

destruction or damage, and insurance proceeds (if not self-insured), then the other party, at its option, by giving written notice to the party with repair obligations, within thirty (30) days after the expiration of said period, may undertake completion of such reconstruction, in which event the party with repair obligations shall make available to the notifying party all insurance proceeds received by the non-performing party for such reconstruction (including any applicable deductible) or, if self-insured, the amount necessary for such reconstruction.

(b)    Last Five Lease Years.  In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Improvements, Common Areas and/or Additional Areas, during (i) the last five (5) years of the Main Term or any Option Period which would require a restoration period in excess of one hundred eighty (180) days after any required governmental permits are obtained, or (ii) the last two (2) years of the Term, regardless of the duration of restoration activities, or in the event of any uninsured casualty, Tenant shall have the option of terminating this Lease.  Tenant shall notify Landlord of its exercise of such option within sixty (60) days following the occurrence of such casualty and shall thereupon make available to Landlord (i) all insurance proceeds paid by Tenant's insurance carrier, or (ii) if self-insured, an amount equal to the reconstruction costs of the Improvements or, if the Improvements are not being reconstructed, an amount equal to the actual value of the Improvements (not to exceed, however, an amount equal to the reconstruction costs of the Improvements), to the extent such amounts would have been payable under the insurance outlined in paragraph 14(a) above.  In the event Tenant does not elect to terminate this Lease, then, subject to force majeure, within two hundred forty (240) days after receipt by Tenant of the required governmental permits for restoration, for which permits Tenant shall make prompt application following such destruction or damage, and insurance proceeds (if not self-insured) with regard to such damage or destruction, Tenant shall complete reconstruction of the Improvements to substantially their condition existing immediately prior to such damage, with such alterations as may be permitted under paragraph 12, and shall restore the Premises (including equipment, furniture and fixtures).  Should Tenant elect to maintain this Lease in full force and effect, Landlord shall reconstruct all Common Areas and Additional Areas in the manner specified by subparagraph (a) above regardless of the amount of damage to same. Additionally, Landlord shall assure (through parallel lease provisions or otherwise) that all areas

of the Shopping Center leased to third party tenants or sold to third party occupants are subject to reconstruction obligations to those of the Premises, Common Areas and Additional Areas which are sufficient to assure Tenant that in the event of any destruction or damage to any portion of the Shopping Center whatsoever, in the event Tenant elects to maintain this Lease in force, the Shopping Center as a whole will be reconstructed in accordance with this paragraph 15.

16.    Condemnation.

(a)    Definition of Taking and Substantial Taking.    For the purpose of this Lease, a "Taking" shall mean any condemnation or exercise of the power of eminent domain by any authority vested with such power or any other taking for public use, including a private purchase in lieu of condemnation by an authority vested with the power of eminent domain; the "Date of Taking" shall mean the earlier of the date upon which title to the Premises, the Shopping Center or any portion so taken is vested in the condemning authority or the date upon which possession of the Premises, the Shopping Center, or any portion is taken by the condemning authority; and "Substantially All of the Premises" shall mean (i) so much of the Improvements and/or Shopping Center and Common Areas as, when taken, leaves the untaken portion unsuitable, in Tenant's reasonable opinion, for the continued feasible and economic operation of the Premises by Tenant for the same purposes as immediately prior to such Taking or as contemplated herein, (ii) so many of the parking spaces within the Shopping Center as reduces the parking ratio below the greater of five (5) spaces (no less than nine (9) feet wide for full-sized automobiles) per 1000 square feet of ground-floor gross leasable area (provided, that this number may be reduced to four (4) and three-fourth (4.75) spaces if the parties agree to an equitable reduction in Base Rent to offset this loss of parking), or that ratio which is required by the zoning ordinance applicable to the Shopping Center, and Landlord's failure to provide substantially equivalent alternative parking reasonably acceptable to Tenant within sixty (60) days after such Taking, or (iii) so much of the Common Area Easement described in paragraph 6 above that access to the Premises is impeded.

(b)    Tenant's Rights Upon Taking or Substantial Taking.    In the event of a Taking of Substantially All of the Premises, Tenant, at its option upon thirty (30) days' written notice to Landlord, which shall be given no later than sixty (60) days following the Taking, shall have the right to terminate this Lease. All Base Rent and other sums payable by Tenant shall be

MW 4/29/03
\\REA\140800.6

apportioned and paid through and including the Date of Taking, and neither Landlord nor Tenant shall have any rights in any compensation or damages payable to the other in connection with such Taking.

(c)    Tenant's Rights Upon Less Than Substantial Taking.  In the event of a Taking of less than Substantially All of the Premises, Base Rent and other charges shall be reduced fairly and equitably in accordance with the portion condemned or taken, effective as of the Date of Taking, and Tenant shall make all necessary restorations to the Improvements so that the portions of the Improvements not taken constitute a complete architectural unit, provided that the cost to Tenant shall not exceed the proceeds of Tenant's condemnation award (to the extent that such relates to the Improvements and Tenant's leasehold estate, and not to Tenant's personal property, intangibles or unrelated out-of-pocket expenses) and the portion of Landlord's award allocable to the Premises, which Landlord shall make available to Tenant for such restoration.  If the Taking occurs within the last two (2) years of the Term and has a material impact on Tenant's ability to conduct business as reasonably determined by Tenant, this Lease shall terminate at Tenant's option, such option to be exercised by Tenant giving not less than thirty (30) days' prior written notice to Landlord.

(d)    Landlord's Obligations Upon Any Taking.  In the event of any Taking following which the Lease continues in effect, Landlord shall make all necessary restorations to all portions of the Common Areas and Additional Areas such that they each constitute a complete architectural unit and serve the function originally intended.  Additionally, Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center leased to third party tenants or sold to third party occupants are subject to reconstruction obligations which are sufficient to assure Tenant that in the event of any condemnation of any portion of the Shopping Center whatsoever, and in the event Tenant elects to maintain this Lease in force, the  Shopping Center will be reconstructed to its former condition within reasonable time.

(e)    Rights Upon Temporary Taking.  In the event of a Taking of the Premises, the Common Areas and/or any other area within the Shopping Center, or any portion thereof, for temporary use (specifically one not exceeding sixty (60) days in duration), without the taking of the fee simple title thereto, this Lease shall remain in full force and effect.  All awards, damages,

MW 4/29/03
\\REA\140800.6

25

compensation and proceeds payable by the condemnor by reason of such Taking relating to the Premises, or relating to the Common Areas but reasonably attributable only to the Premises, for periods prior to the expiration of the Lease shall be payable to Tenant. All such awards, damages, compensation and proceeds for periods after the expiration of the Lease shall be payable to Landlord. Anything contained to the contrary notwithstanding, a temporary Taking for any period in excess of sixty (60) days may, at Tenant's option, be deemed a permanent Taking and shall be governed by subparagraph (b) or (c) above, as applicable.

(f)     Taking of the Pylon Sign(s). In the event of a taking, whether permanent or temporary, of any pylon or monument sign on which Tenant has installed identification panels, Landlord shall provide within ninety (90) days a substitute pylon or monument sign (reasonably acceptable to Tenant), with adequate electrical power, located so as to be visible to vehicular traffic or roadways adjacent to the Shopping Center and/or at entrances to the Shopping Center, at Landlord's sole cost.

(g)     Tenant's Right Upon Condemnation. In the event of a Taking described in subparagraph (b) or (c) above, Tenant shall be entitled to claim compensation from the condemning authority for the value of its leasehold interest in the Premises, its unamortized leasehold improvements paid for by Tenant, relocation expenses and any other items to which Tenant is entitled under applicable law.

17.     Assignment and Subletting. Tenant shall have the right to sublet, assign, transfer reassign and grant concessions or licenses (a "Transfer") in all or any part of the Premises and any of Tenant's rights and obligations under this Lease during the Term, without Landlord's prior consent. In the event of such a Transfer, Tenant shall remain liable for all of Tenant's obligations to Landlord provided that no amendment, extension, modification, renewal elections or other agreement between Landlord and any assignee shall be binding upon Tenant unless agreed to in writing by Tenant. Should Tenant wish to be relieved of its obligations upon a Transfer, Landlord's and Mortgagee's prior consent to a Transfer shall be required, which consent shall not be unreasonably withheld, conditioned or delayed. Notwithstanding the immediately preceding sentence, in the event any transferee subsequent to a Transfer has a net worth calculated in accordance with generally accepted accounting principles equal to or greater than Four Hundred Million and No/Dollars ($400,000,000.00), neither the consent of Landlord nor Mortgagee shall

MW 4/29/03
\\REA\\140800.6

26

be necessary to such Transfer, and Tenant shall thereafter be relieved of any further obligation under this Lease. Landlord acknowledges and agrees that it shall be unreasonable for Landlord to withhold its consent to any Transfer for the purpose of obtaining a material amendment or modification to the terms of this Lease. Transfers to subsidiaries, affiliates, or related parties, and Transfers involving beneficial ownership interests in Tenant, shall not be deemed a Transfer and may be effected without Landlord's knowledge or consent provided that Landlord shall not be in default of its obligation to provide Tenant with any notice required hereunder unless Tenant shall provide Landlord with written notice of the name and address of such assignee if such address is different from that set forth herein.

18.   Use.

(a)   Tenant may initially use and operate the Premises as a retail store for (i) the sale of consumer, business and automotive electronics products (which include, but shall not be limited to, televisions, stereos, speakers, video and audio recorders and players and cameras), computers and computer related hardware and software and related software services, including internet access services, entertainment software and entertainment media (which include, but shall not be limited to, records, game cartridges, video tapes, cassettes, compact discs, DVD's and DVD equipment), cellular and wireless telephones and telecommunication devices, and related goods and the sale and installation of motor vehicle audio, stereo and telephone systems and technological evolutions of the foregoing (all of such items are collectively referred to as the "Products"), and (ii) renting, servicing, repairing and warehousing of the Products.

(b)   Tenant shall also have the right to use the Premises for any lawful use; provided, however, that the Premises shall not be used (i) for any illegal purpose, (ii) for any use prohibited under paragraph 19(a)(viii) below, (iii) in violation of any exclusive use restriction granted a tenant or other occupant of the Shopping Center pursuant to a lease or restrictive covenants executed prior to this Lease and shown on Exhibit "F", or (iv) in violation of any other applicable provision of the "Permitted Encumbrances" contained in Exhibit "F". Notwithstanding the foregoing, (x) Tenant shall give Landlord at least 30 days' prior written notice before Tenant changes the primary use of the Premises to any purpose other than the purposes for which "Circuit City" stores are typically then being used, and (y) Tenant may not change its primary use to any Reserved Use (as defined below) (1) during the first two years of

the Term; or (2) during the third or any subsequent year of the Term if as of the time of such change (A) any other occupant's space at the Shopping Center is then being operated for the primary purpose of such Reserved Use pursuant to an "exclusive use" lease provision or agreement between such other occupant and Landlord, and (B) the agreement between Landlord and such occupant, containing such "exclusive use" provision, was executed within 18 months after the Commencement Date.    The "Reserved Uses" shall be a pet supply store such as PetSmart, a bookstore such as Barnes & Noble, a linens store such as Bed, Bath & Beyond, a sporting goods store such as Galyan's; and an office supply store such as Staples.    A Reserved Use that meets the requirements of subparagraphs (A) and (B) above shall be an "Active Reserved Use."

(c)    Nothing contained in this Lease shall be construed to require Tenant to operate the Premises continuously either for the use first stated or for any other use.

19.    Warranties, Representations and Covenants.

(a)    Landlord represents and warrants and, with respect to subparagraphs (v), (vi), (viii), (x), (xi) and (xii) below, additionally covenants, to Tenant that:

(i)    Quiet and Peaceful Enjoyment.    Subject to the terms of this Lease, Tenant shall have quiet and peaceful use, enjoyment and occupancy of the Premises as against any party claiming by, through or under Landlord as any predecessor, in title to Landlord.

(ii)    Title.    Landlord's fee simple interest in the Shopping Center is free and clear of any mortgages, deeds, encumbrances, declarations, easements, agreements, leases, tenancies or restrictions, except those matters set forth on Exhibit "F" attached and entitled "Permitted Encumbrances".    Nothing contained in any other agreement or instrument which encumbers Landlord or the Shopping Center shall restrict Tenant's rights under this Lease. Landlord specifically warrants that no third party has the right to (x) object to Tenant's tenancy, (y) prohibit the sale, rental, servicing, repair or warehousing of the Products, or (z) consent to any feature of the Improvements or Tenant's signage.    This representation and warranty and those following are a material inducement to Tenant's execution of this Lease.

Landlord represents and warrants to Tenant the following:

(1)    There are no unrecorded existing utility lines, easements or facilities or other easements of any kind located or proposed to be located in, on or under the Land, and no unrecorded blanket easement encumbers the Land.

(2)    There are no existing or proposed easements which conflict with or which are located under any access drive or drive aisle within the Shopping Center, which would prevent or hinder the use of same for vehicular and pedestrian traffic over same.

(3)    To the best of Landlord's knowledge, there are no covenants or restrictions of record or laws, codes or ordinances which would prohibit, restrict, hinder or limit Tenant's intended use of the Premises for the sale of electronic products (including the Products) or sale and installation of car stereos and other accessories, use of roof-mounted satellite equipment or installation of Tenant's proposed signage and subsequent rights to alter same to conform to Tenant's prototypical signage and/or design motif.

(4)    The Building and/or Other Improvements will not violate any unrecorded covenants, conditions or restrictions, (including those with respect to building setback lines, size, floor space or gross leasable area, height restrictions, or parking ratios) entered into by Landlord or any predecessor in title to Landlord, and there are no encroachments onto the Land.

(5)    Occupants of the Shopping Center have rights of ingress and egress to and from Sir Barton Way, Star Shoot Parkway and Vendor Way, which are publicly dedicated streets maintained by the City of Lexington, Kentucky, or, in the case of Vendor Way, private streets maintained by Meijers Realty Company.

(6)    No third party has rights to drill, mine, explore for or develop, produce or extract any minerals located on or beneath the Shopping Center pursuant to any unrecorded agreement and no drilling, mining, exploration for or production, development or extraction of any minerals pursuant to any unrecorded agreement shall be permitted on the Shopping Center.

(7)    With respect to the REA, Landlord is in good standing and there are no outstanding dues or assessments owing against the Land.

MW 4/29/03
\\REA\140800.6

(8)     No third party has any right of first refusal or repurchase or re-entry with respect to the Land and no third party has any prior approval of a future purchaser or tenant or occupant of the Land.

(9)     There are no unrecorded notices of violations of covenants, conditions, restrictions, laws or regulations relating to environmental protection and Landlord has not received any such notices from any state, federal or local governmental or quasi-governmental authority.

(10)     There are no mortgages encumbering the Land other than Fifth Third Bank.

(11)     There are no filed mechanic's, laborer's or materialmen's liens or judgments encumbering the Land and Landlord has not received notice of any impending or potential such liens or judgments to be filed against the Land.

(12)     There are no delinquent taxes, assessments or utility charges or fines or penalties related thereto owning against the Land and Landlord has not received any notice thereof.

(iii)     <u>Certificate of Authority</u>.  Landlord covenants that it is a duly constituted limited liability company under the laws of the State of Kentucky, and that its Managing Member, who is acting as its signatory in this Lease, is duly authorized and empowered to act on behalf of the limited liability company.  Landlord has furnished Tenant with evidence of (a) the existence of the limited liability company and (b) the authority of the Managing Member, Preston W. Madden, to bind the limited liability company as contemplated herein.

(iv)     <u>No Litigation</u>.  There are no judicial, quasi-judicial, administrative or other orders, injunctions, moratoria or pending proceedings against Landlord or the Shopping Center which would preclude or interfere with, the construction, occupancy and use of the Premises for the purposes contemplated.

(v)     <u>Hazardous or Toxic Materials</u>.  Landlord has not used, discharged, dumped, spilled or stored any Hazardous Substances (as hereinafter defined) on or about the Shopping Center, whether accidentally or intentionally, legally or illegally, and has received no notice and has no knowledge that any such condition exists at the Shopping Center.  If any claim

is ever made against Tenant relating to Hazardous Substances present at or around the Shopping Center, whether or not such substances are present as of the Effective Date, or any Hazardous Substances are discovered at the Shopping Center (unless introduced by Tenant, its agents or employees), all costs of removal incurred by, all liability imposed upon, or damages suffered by, Tenant because of the same shall be borne by Landlord, and Landlord indemnifies and agrees to defend and hold Tenant harmless from and against all such costs, losses, liabilities and damages, including, without limitation, all third-party claims (including sums paid in settlement thereof, with or without legal proceedings) for personal injury or property damage and other claims, actions, administrative proceedings, judgments, compensatory and punitive damages, lost profits, penalties, fines, costs, losses, attorneys' fees and expenses (through all levels of proceedings), consultants or experts fees and all costs incurred in enforcing this indemnity. Landlord shall deliver the Land to Tenant free of any pollution or contamination from toxic or hazardous substances, asbestos or any other chemicals or substances in amounts which exceed standards for public health or welfare as established and regulated by any local governmental authority, the State or the United States Government (herein collectively referred to as "Hazardous Substances"). Landlord hereby grants Tenant and its agent access to the Premises and Shopping Center to enable Tenant to conduct such soil and environmental tests as it deems necessary.

The representation, warranty and indemnity of Landlord described in this paragraph 19(a)(v) shall survive the termination or expiration of this Lease.

(vi)   <u>Tenant's Exclusive Use</u>.  So long as the Premises are used for the initial uses set forth in paragraph 18, no other tenant or occupant of the Shopping Center or any other property owned or controlled by Landlord or any member of Landlord within the area designated on <u>Exhibit "L"</u> attached hereto*, shall be entitled to sell or rent (or rent to own) any of the Products, subject only to rights granted any such tenants under leases in existence as of the date of this Lease and described on <u>Exhibit "F"</u>; provided, however, the foregoing exclusive shall not apply to any tenant or other occupant of the Shopping Center occupying over 80,000 square feet of gross leaseable area and the foregoing "exclusive" shall not be deemed to prohibit any occupant of the Shopping Center from operating its premises for the primary use of an Active Reserved Use (provided such Active Reserved Use is not then being conducted by another occupant of the Shopping Center).  Incidental Sale (as hereinafter defined) of the Products in

*property owned or controlled by Landlord or any member of Landlord shall not include any property shown on Exhibit "L" that is presently under lease to another tenant until the time such lease terminates.

MW 4/29/03
\\REA\140800.6

31

connection with the overall business of another occupant or tenant shall not be deemed a violation of the preceding sentence. As used herein, "Incidental Sale" shall mean the lesser of (i) five hundred (500) square feet, or (ii) ten percent (10%) of such occupant's or tenant's display area. In addition to any other remedies which Tenant may have in connection with a violation of the exclusive use right granted Tenant herein, payment of Base Rent, Ground Rent, CAM Charges, Real Estate Taxes and all other sums due Landlord hereunder shall abate (and shall not accrue) during any time in which such violation exists. During the first two years after the Commencement Date, upon Landlord's written request, Tenant shall use all commercially reasonable efforts to negotiate its standard side letter with respect to the exclusive uses with any of the following retailers occupying space at the Shopping Center and identified in Landlord's Notice: PetSmart, Barnes and Noble, Borders Books and Music, Linens 'N Things, Bed Bath & Beyond, Staples, Office Max, Toys 'R' Us and Office Depot.

        (vii)   <u>Zoning and Subdivision</u>. The Premises and the Shopping Center are presently properly subdivided, in conformity with all applicable laws and zoned so as to permit (A) the development and operation of the Premises and the Shopping Center in accordance with the provisions of this Lease; and (B) the initial use of the Premises described in paragraph 18 of this Lease.

        (viii)   <u>Prohibited Activities</u>.   Landlord shall not operate or lease (or permit to be operated or leased) any building or tenant space in the Shopping Center for use as:

      (A)    a bar, pub, nightclub, music hall or disco in which less than fifty percent (50%) of its space or revenue is devoted to and derived from food service;

      (B)    a bowling alley;

      (C)    a billiard or bingo parlor;

      (D)    a flea market;

      (E)    a massage parlor;

      (F)    a funeral home;

      (G)    a facility for the sale of paraphernalia for use with illicit drugs;

      (H)    a facility for the sale or display of pornographic material (as determined by community standards for the area in which the Shopping Center is located);

      (I)    an off-track betting parlor;

      (J)    a carnival, amusement park or circus;

      (K)    a gas station, car wash or auto repair or body shop (the parties specifically acknowledging that Tenant's car stereo installation facility is not included in this prohibition (K));

MW 4/29/03
\\REA\140800.6

(L)    a facility for the sale of new or used motor vehicles, trailers or mobile homes;

(M)    a facility for any use which is illegal or dangerous, constitutes a nuisance or is inconsistent with an integrated, community-oriented retail and commercial shopping center;

(N)    a skating rink;

(O)    an arcade, pinball or computer game room (provided that retail facilities in the Shopping Center may operate no more than four (4) such electronic games incidentally to their primary operations);

(P)    service-oriented offices (such as, by way of example, medical or employment offices, travel agencies, real estate agencies or dry cleaning establishments) or other non-retail uses except for offices and storage facilities incidental to a primary retail operation;

(Q)    a banquet hall, auditorium or other place of public assembly;

(R)    a training or educational facility (including, without limitation, a beauty school, barber college, reading room, school or other facility catering primarily to students or trainees rather than customers);

(S)    a theater of any kind;

(T)    a facility for the sale or rental of used goods (including thrift shops, secondhand or consignment stores) or any facility selling new or used merchandise as a wholesale operation, a liquidation operation, odd lots, lot sales, factory close-outs or imperfect goods (provided that this prohibition shall not preclude the operation of a Sam's Club or Costco store); or

(U)    a gymnasium, sport or health club or spa.

In addition to the foregoing, Landlord shall not operate, lease or permit to be operated or leased any restaurant or bookstore within any building within two hundred (200) feet of the front entrance to the Building (except that Borders may be placed within such area if Borders entrance is centered within its space). In addition, no auction, fire or going-out-of-business sale shall be conducted in the Shopping Center.

(ix)    <u>Site Covenants</u>.    Landlord makes the following covenants (the "Site Covenants"):

(A)    <u>Building Height and Location</u>.    No building immediately adjacent to the Premises shall exceed thirty-two feet in height above finished grade (except that the entrance feature thereof, extending across no more than 25% of the frontage of such store may be up to 40 feet in height above finished grade), nor shall it be positioned so as to project beyond the portion of the front wall of the Building immediately adjacent. No outparcels, barriers, buildings, kiosks or other structures, either temporary or permanent, shall be located

MW 4/29/03
\\REA\140800.6

33

within Tenant's Preferred Area, and no building located on an Outparcel identified on the Site Plan in the Shopping Center shall exceed one story, twenty-two (22) feet in height above 1023 feet in elevation, which is the established finished grade of the Premises, nor shall it exceed the size necessary for such outparcel to maintain, within its boundaries, the parking ratio required for its use under the applicable zoning code without use of parking spaces located in the Common Areas. No development shall occur within the Shopping Center except as shown on the Site Plan, except that Landlord may reconfigure the building mass shown on the Site Plan within 350 feet of the southern line of Star Shoot Parkway.

(B)     <u>Construction and Alterations</u>.  After December 31, 2005, no exterior construction and no construction staging shall be permitted in the Shopping Center during the months of October, November and December except for emergency repairs; provided, however, that, after December 31, 2005, such activities may be conducted in areas of the Shopping Center that are at least 150 feet removed from any portion of the Premised or the Tenant's Preferred Area. During October, November and December, no other occupant's (or Landlord's) construction staging area shall be located within Tenant's Preferred Area. In the event of any construction within the Shopping Center, Landlord shall designate a construction access route, staging and parking areas located so as to minimize interference with customers or the operations of other occupants of the Shopping Center and shall require erection of safety barriers as necessary and adequate screening around the site of such construction of a size necessary to screen such construction from ground level view, as requested by Tenant, in Tenant's reasonable judgment. With regard to any construction on Landlord's Premises, Landlord shall be solely responsible for any governmentally imposed impact fees, hookup, connection, installation or tap in fees and other similar construction-related charges. Landlord shall make no changes in Tenant's Preferred Area as shown on the Site Plan (including, without limitation, changes in the location of curbcuts, drive aisles, roadways, sidewalks or parking spaces or reduction of the parking ratio specified in paragraph 5) without Tenant's express written consent, which Tenant may, in its sole discretion, withhold. Landlord shall not make any other changes to the Common Areas which adversely affect Tenant's parking, visibility or access without Tenant's consent, which may be withheld in Tenant's sole discretion. Any other changes

MW 4/29/03
\\REA\140800.6

34

to the Common Areas may be made only upon receipt of Tenant's express written consent, which consent shall not be unreasonably withheld.

(C)     Prohibited Uses in Common Area. Landlord covenants that it shall not, without Tenant's express written consent, permit the following uses or activities to occur in the Common Areas: (1) advertisements or signs except for the pylon and/or monument signs described in paragraph 8, the "for rent" signs described in paragraph 40 and traffic control signs; (2) display or sale of merchandise on the sidewalk immediately adjacent to the Building or in the Tenant's Preferred Area; (3) operation of loudspeakers or other sound electronically amplified so as to be heard in the Common Areas; (4) imposition of a charge for parking; or (5) operation of cellular telephone or other telecommunication tower for use by any other party not an occupant of the Shopping Center. Landlord further covenants that it will not seek, nor permit any other occupant of the Shopping Center to seek, a variance or waiver from the minimum parking requirements applicable to the Shopping Center under the zoning code or other applicable ordinance establishing the ratio of parking spaces to building area or otherwise mandating the number of parking spaces required for the Shopping Center and the uses contained therein.

(D)     Easements. Landlord shall not subdivide, parcel or otherwise divide the Shopping Center or create any easements in the Common Areas.

(x)     Interference with Tenant's Reception/Transmission. Landlord shall not install or permit to be installed by any other tenant or other person anywhere in the Shopping Center, any structure or equipment which would cause any interference with satellite, radio, telecommunications or television reception or transmission in or from the Building.

(xi)     Notices Affecting the Premises. Landlord shall promptly forward to Tenant any notice or other communication affecting the Premises or the Shopping Center received by Landlord from any owner of property adjoining, adjacent or nearby to the Premises or the Shopping Center or from any municipal or governmental authority, in connection with any hearing or other administrative procedure relating to the use or occupancy of the Premises, Shopping Center or any such neighboring property.

(xii)     Constructive Trust. Landlord covenants that all sums paid by Tenant to Landlord and intended for payment by Landlord to a third party (such as, by way of

MW 4/29/03
\\REA\140800.6

35

example, taxes and certain elements of CAM Charges) are given to Landlord in trust and shall be applied only for such third-party payments when due.

(b)     Tenant represents and warrants and, with respect to subparagraph (ii) below also covenants, to Landlord that:

(i)     <u>Tenant's Authority</u>.   Tenant is a duly constituted corporation organized under the laws of the Commonwealth of Virginia; it has the power to enter into this Lease and perform Tenant's obligations; and the Vice President executing this Lease on Tenant's behalf has the right and lawful authority to do so.

(ii)     <u>Tenant's Warranty as to Hazardous or Toxic Materials</u>.   As to Tenant's use and occupancy of the Premises and use of the Common Areas, Tenant will not introduce, discharge, dump, spill or store within the Premises or the Shopping Center any Hazardous Substances; and Tenant indemnifies and agrees to hold Landlord harmless from and against all costs, liability and damages as a result thereof, to the same extent that Landlord indemnifies and holds Tenant harmless in subparagraph (a)(v) above.   The warranty and indemnity of Tenant described in this paragraph 19(b)(ii) shall survive the termination of this Lease.

(c)     In addition to such other remedies as may be accorded Tenant at law, in equity (including but not limited to an injunction or writ of specific performance) or under the terms of this Lease, (i) in the event that any of the representations, warranties and covenants in this paragraph 19 are materially untrue or incorrect, or (ii) in the event that Tenant suffers any material loss, cost, liability or damage as a result of the breach of any of such covenants, representations and warranties, Landlord shall defend, indemnify and hold Tenant harmless from any of such loss, costs, liability or damage incurred as a result of Landlord's breach.

20.     <u>Estoppel Certificates</u>.   Without charge, at any time within thirty (30) days after receipt of written request by either party, the other party shall certify, in writing, to any other entity ("Person") specified in such request:  (a) as to whether this Lease has been supplemented or amended, and, if so, the substance and manner of such supplement or amendment; (b) as to the validity, force and effect of this Lease, to the certifying party's best knowledge; (c) as to the existence of any default, to the certifying party's best knowledge; (d) as to the existence of any offsets, counterclaims, or defenses on the part of such other party, to the certifying party's best

MW 4/29/03
\\REA\140800.6

36

knowledge; (e) as to the commencement and expiration dates of the Term; and (f) as to any other
matters which may reasonably be requested. In addition, without charge, at any time within
thirty (30) days after receipt of written request of Tenant, Landlord shall deliver an estoppel
certificate to Tenant's assignee or subtenant that states in the event Tenant defaults under its
obligations under this Lease following the date of any assignment or subletting, Landlord will
permit such assignee or subtenant to satisfy obligations of Tenant, including but not limited to
the direct payment of rentals to Landlord. Any such certificate may be relied upon by the party
requesting it and any Person to whom the same may be exhibited or delivered, and the contents
of such certificate shall be binding on the party executing same.

21.   Subordination, Non-Disturbance and Attornment.

(a)   Within ten (10) days after the execution hereof, Landlord shall deliver to
Tenant with regard to any and all Ground Leases (as defined below), if applicable, and any and
all Mortgages (as defined below) encumbering the Shopping Center, a non-disturbance and
attornment agreement in the form and substance of Exhibit "G" attached, executed by the
landlord under any such Ground Lease ("Ground Lessor"), if applicable, or the holder of such
Mortgage ("Mortgagee"), as applicable. In addition, throughout the term, Landlord shall deliver
to Tenant a non-disturbance and attornment agreement in the form of Exhibit "G" executed by
Ground Lessor or Mortgagee (as applicable) with regard to all future Ground Leases and
Mortgages and with regard to all renewals, modifications, replacements and extensions of such
Ground Leases or Mortgages. Upon Tenant's execution of said non-disturbance and attornment
agreement, this Lease shall be subordinate to the corresponding Ground Lease or Mortgage, as
applicable. Landlord shall cause any present or future Mortgagee or Ground Lessor to deliver a
non-disturbance and attornment agreement in accordance with this paragraph 21 at or prior to the
time the lien of the Mortgage is filed against record title to the Shopping Center or Ground Lease
is executed, as applicable. As used in this paragraph 21, the term "Mortgage" shall mean any
mortgage, deed to secure debt, deed of trust, trust deed or other collateral conveyance of, or lien
or encumbrance against, the Shopping Center or any part thereof, and the term "Ground Lease"
shall mean any ground lease or master lease affecting the Shopping Center or any part thereof.
After the delivery by Landlord of the non-disturbance and attornment agreement issued by the
Mortgagee providing the Tenant Improvement Allowance, Landlord agrees to pay Tenant's

MW 4/29/03
\\REA\140800.6

37

reasonable attorney's fees incurred in negotiating any additional non-disturbance and attornment agreements, reciprocal easement agreements or other documents required in the event Landlord sells, finances (excluding Landlord's initial financing) or refinances the Premises or Shopping Center, or enters into any other transaction requiring the execution of same, including the reasonable equivalent of such fees in the event Tenant elects to utilize in-house legal counsel for the provision of such services, the payment of which fees shall be a condition precedent to the effectiveness of Tenant's execution of such non-disturbance and attornment agreement, reciprocal easement agreement or other document.

(b)     Landlord shall, from time to time, upon the request of Tenant, enter into agreements with Tenant and its subtenants providing, in part, that, in the event of any termination of this Lease, all of the rights of any such subtenant(s) under its sublease will be recognized so long as any such subtenant is not in default under its sublease beyond notice and cure periods, provided that as a pre-condition thereto such subtenant agrees that it will attorn to Landlord and will execute and deliver such instrument as Landlord shall reasonably request to confirm such attornment.

(c)     In the event of Landlord's failure to deliver to Tenant the non-disturbance and attornment agreements on a timely basis as required under paragraphs 21(a) and (b) above and in paragraph 35 hereof, Tenant shall be entitled to two (2) days' abatement of Base Rent for each day that the non-disturbance and attornment agreement is past due, notwithstanding any other remedies available to Tenant in connection therewith otherwise in this Lease. Such rental abatement shall be applied by Tenant as Tenant so desires, and if Base Rent is not then due, abatement in the amount of the Base Rent shall be applicable to Ground Rent if Ground Rent is then due, but in the amount of Base Rent as if Base Rent were due.

22.     Tenant's Financing. Notwithstanding any other provisions of this Lease, Tenant may, without Landlord's consent, secure financing or general credit lines and grant the lenders, as security, (i) a security interest in Tenant's fixtures, personalty, inventory and equipment (collectively, "Personalty"), (ii) the right to enter the Premises to realize upon any Personalty so pledged, and/or (iii) a collateral assignment of Tenant's leasehold interest in the Premises, with rights of reassignment; provided, however, such collateral assignment may be made solely for the purpose of securing Tenant's indebtedness. Upon Tenant providing notice of such financing

MW 4/29/03
\\REA\140800.6

38

to Landlord, Landlord agrees to consent in writing to such security interest and agreement and to give such lenders the same notice and opportunity to cure any default of Tenant as is provided Tenant hereunder (including time to foreclose or otherwise take possession of the Premises, if necessary to effect such cure). In addition, Landlord agrees to cause any Mortgagee specifically to acknowledge the rights of Tenant's lenders described in paragraph 23 below.

23.    <u>Tenant's Property and Waiver of Landlord's Lien</u>.  All of the Personalty shall be and remain the personal property of Tenant. Landlord expressly waives its statutory or common law landlord's liens (as same may be enacted or may exist from time to time) and any and all rights granted under any present or future laws to levy or distrain for rent against the Personalty of Tenant on the Premises and further agrees to execute any reasonable instruments evidencing such waiver, at any time upon Tenant's request.

24.    <u>Memorandum of Lease; Commencement Date Agreement</u>.  Landlord and Tenant agree, at the sole expense of the requesting party, to execute a Memorandum of Lease in recordable form, substantially similar to that attached <u>Exhibit "H"</u>, setting forth such provisions hereof as may be required by State law.  In addition, Landlord and Tenant shall execute a Commencement Date Agreement in the form attached as <u>Exhibit "I"</u>, once the Commencement Date has been established.  Recording costs for either or both documents shall be borne by the party requesting recordation of the same.  The provisions of this Lease shall control, however, with regard to any omissions from, or provisions which may be in conflict with, the Memorandum of Lease or Commencement Date Agreement.

25.    <u>Expiration of Term and Holding Over</u>.  At the expiration or earlier termination of the Lease, Tenant shall surrender the Premises in a broom clean condition.  Should Tenant hold over without the consent of Landlord, this Lease shall continue in force from month to month, subject to all of the provisions hereof and at one hundred twenty-five percent (125%) of the monthly Base Rent Tenant had been paying during the preceding Lease Year.

26.    <u>Force Majeure</u>.  Except as otherwise specifically contemplated in this Lease or in the Construction Provisions, in the event that Landlord or Tenant shall be delayed or prevented from, the performance of any act required by reason of strikes, lockouts, labor troubles, inability to procure materials, extreme inclement weather, delay by the other party, failure of power or unavailability of utilities, riots, insurrection, war or other reason of a like nature not the fault of

MW 4/29/03
\\REA\140800.6

39

such party or not within its reasonable control, then performance of such act shall be excused for the period of delay, and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay; provided, however, that in connection with the construction of the Improvements, the consequences of delays by the other party shall be governed by paragraphs 28(d) and 29(c) and (d) of this Lease.

27.    Events of Tenant's Default.  Any of the following occurrences by Tenant shall constitute an "Event of Default" under this Lease:

(a)    Failure to Pay Rent; Breach.  (i) Tenant's failure to make any payment of money required by this Lease (including without limitation Base Rent, CAM Charges or Real Estate Taxes) (subject to Tenant's right of good faith contest), within ten (10) days after the receipt of written notice from Landlord to Tenant that same is overdue; or (ii) Tenant's failure to observe or perform any other material provision of this Lease within thirty (30) days after receipt of written notice from Landlord to Tenant specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Tenant shall have such longer period as is reasonably necessary to cure the default, so long as Tenant proceeds promptly to commence the cure within such thirty (30) day period and diligently prosecutes the cure to completion.  In the case of an emergency, Landlord shall be required to give only such notice as is reasonable under the circumstances.

(b)    Bankruptcy.  Tenant's adjudication as bankrupt or insolvent, or the appointment of a receiver, trustee in involuntary bankruptcy or other, similar officer to take charge of any substantial part of Tenant's property, which proceeding is not dismissed within one hundred twenty (120) days after it is begun.

28.    Landlord's Remedies.  After the occurrence of an Event of Default by Tenant, Landlord shall have the right to exercise the following remedies:

(a)    Continue Lease.  Landlord may, at its option, continue this Lease in full force and effect, without terminating Tenant's right to possession of the Premises, in which event Landlord shall have the right to collect Base Rent and other charges when due.  Landlord shall also have the right, in Landlord's exercise of reasonable efforts to mitigate its damages (which Landlord agrees to make), at its option, from time to time, without terminating this Lease, to terminate Tenant's right to possession of the Premises and to relet the Premises, or any part

MW 4/29/03
\\REA\140800.6