thereof, with or without legal process, as the agent, and for the account, of Tenant upon such terms and conditions as Landlord may deem advisable, in which event the rents received on such reletting shall be applied (i) first to the reasonable and actual expenses of such reletting and collection, including without limitation necessary renovation and alterations of the Premises, reasonable and actual attorneys' fees and any reasonable and actual real estate commissions paid, and (ii) thereafter toward payment of all sums due or to become due Landlord.

(b)    Terminate Lease.  Landlord may terminate this Lease by written notice to Tenant specifying a date, which shall be no sooner than thirty (30) days following receipt of such notice by Tenant, and this Lease shall then terminate on the date so specified.  In the event of such termination, Landlord shall be entitled to accelerate the Base Rent.  If Landlord does accelerate the Base Rent due hereunder, then the accelerated Base Rent shall be equal to the Base Rent which accrued prior to the date of termination plus the Base Rent that would have accrued during the balance of the Lease Term (as if this Lease had not been terminated) less the fair rental value of the Premises for the corresponding period.  The accelerated Base Rent shall be discounted to present value at an annual interest rate equal to eight percent (8%).  Upon payment to Landlord of the accelerated Base Rent discounted to present value, Tenant shall be released from all further liability under this Lease.  Landlord shall never be entitled to recover from Tenant any consequential, punitive or incidental damages (including, without limitation, lost business opportunity), or to dispossess Tenant of the Premises pursuant to any "lock-out" or other non-judicial remedy.

(c)    Remedies Are Cumulative.  The various rights and remedies reserved to Landlord are cumulative, and Landlord may pursue any and all such rights and remedies (but no others), whether at the same time or otherwise (to the extent not inconsistent with specific provisions of this Lease).  Notwithstanding anything to the contrary, Landlord expressly waives its right to forcibly dispossess Tenant from the Premises, whether peaceably or otherwise, without judicial process, such that Landlord shall not be entitled to any "commercial lockout" or any other provisions of applicable law which permit landlords to dispossess tenants from commercial properties without the benefit of judicial review.

(d)    Additional Landlord Remedies Due to Construction Delays by Tenant.  If, subject to force majeure, Tenant shall fail to achieve Substantial Completion by that date which

MW 4/29/03
\\REA\140800.6

41

is two hundred forty (240) days following Delivery of the Land, Landlord, at its option, upon prior written notice to Tenant, may require Tenant to commence payment of Ground Rent on the date which is two hundred forty (240) days following Delivery of the Land.

In the event, for any reason and regardless of force majeure, Tenant shall fail to achieve Substantial Completion by that date which is one (1) year following Delivery of the Land, Landlord shall be entitled to terminate this Lease upon sixty (60) days prior written notice to Tenant, during which sixty (60) day period Tenant may cure any such default.

For purposes hereof, annual Ground Rent shall equal $8.00 per square foot of gross leasable area of the Premises, payable monthly in equal installments of 1/12 each of the amount of the annual Ground Rent, in lieu of Base Rent, for so long as Tenant's failure continues. Tenant shall continue to pay its Pro Rata Share of CAM Charges as provided herein.

(e)    Interest.  In addition to any other remedies Landlord may have under this Lease, and without reducing or adversely affecting any of Landlord's rights and remedies under this Section, if any Base Rent or amounts payable hereunder by Tenant to Landlord are not paid within ten (10) days after written demand therefor and such failure to pay by Tenant is the second such failure in any twelve (12) month period, the same shall bear interest at the Default Rate from the due date thereof until paid.

(f)    Late Charge. Tenant agrees that, subject to Tenant's right of good faith contest, a late charge equal to five percent (5%) of any late payment of money required by this Lease may be assessed by Landlord as additional rent if Landlord has not received any monthly installment of Base Rent or additional rent due pursuant to this Lease within ten (10) days after its due date and such failure to pay by Tenant is the second such failure in any twelve (12) month period.

29.    Events of Landlord's Default; Tenant's Remedies.

(a)    Default by Landlord.  Any of the following shall constitute an "Event of Default":  (i) Landlord's failure to make any payments of money due Tenant or any third party, including but not limited to the payment of the brokerage commissions pursuant to paragraph 33, within ten (10) days after the receipt of written notice from Tenant that same is overdue (in which event the delinquent amount shall accrue interest from the due date at the Default Rate); or (ii) Landlord's failure to perform any nonmonetary obligation of Landlord within thirty (30) days

MW 4/29/03
\\REA\140800.6

42

after receipt of written notice from Tenant to Landlord specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Landlord shall have such longer period as may be reasonably necessary to cure the default, so long as Landlord proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion. In the case of an emergency, Tenant shall be required to give only such notice as is reasonable under the circumstances. Notwithstanding the foregoing, with respect to any event of default described in subparagraph (c) below, Tenant shall not be obligated to deliver any notice of default nor any opportunity to cure such default, it being agreed that with respect to the dates set forth time is of the essence.

(b)    <u>Remedies Upon Landlord's Default</u>  Upon the occurrence of an Event of Default by Landlord, at Tenant's option, in addition to any and all other remedies which it may have at law and/or in equity, and without its actions being deemed an election of remedies or a cure of Landlord's default, Tenant may do all or any of the following: (i) pay or perform such obligations and offset Tenant's actual cost of performance, including any and all transaction costs and attorneys' fees, plus interest at the Default Rate, against the Base Rent, CAM Charges and all other amounts and charges due Landlord, or (ii) withhold Base Rent, CAM Charges and any other payments due to Landlord under this Lease until such Event of Default, including payment of interest, transaction costs and attorney's fees, is cured by Landlord, or (iii) terminate this Lease and sue for damages, including, without limitation, interest, transaction costs and attorneys' fees. If Landlord fails to pay Tenant the Tenant Improvement Allowance in a timely manner, Tenant shall be entitled to the rights and remedies set forth in this paragraph 29 and the Construction Provisions; and, as to a breach of the warranties and representations contained in paragraph 19, Tenant shall be entitled to the remedies provided therein, in addition to those remedies provided herein. All amounts, including interest, transaction costs and attorneys' fees, arising out of uncured defaults of Landlord shall constitute liens against Landlord's interest in the Shopping Center. The various rights and remedies reserved to Tenant are cumulative, and Tenant may pursue all rights and remedies, whether at the same time or otherwise.

(c)    <u>Additional Remedies For Delays in Delivery of the Land</u>. In addition to the remedies provided above, in the event, subject to force majeure, Landlord shall fail to

MW 4/29/03<br>\\REA\140800.6

43

accomplish Delivery of the Land by May 12, 2003 (the "Delivery Date"), Landlord agrees that it shall reimburse Tenant for its fixed and ascertainable costs incurred as a result thereof in the exercise of all reasonable efforts to open for business by October 15, 2003. Such costs shall be limited to Tenant's out-of-pocket expenses of construction overtime, acceleration charges and bonuses paid to Tenant's contractors or subcontractors, charges for the scheduling of construction crews on days on which work cannot be performed due to the delays by Landlord and construction period interest charges actually incurred to the extent that such charges exceed those which would have accrued without such delay.

In addition to the remedies set forth hereinabove, in the event, for any reason whatsoever and regardless of force majeure, Landlord shall fail to accomplish Delivery of the Land by the date which is eighteen (18) days following the Delivery Date, then Tenant shall receive two (2) "free" days of Base Rent for each day past said eighteenth (18th) day that Delivery of the Land occurs. Such days of "free" Base Rent shall occur at the beginning of the Lease Term.

Notwithstanding the foregoing and in addition to the remedies set forth hereinabove, in the event, for any reason whatsoever and regardless of force majeure, Landlord shall fail to complete Delivery of the Land to Tenant by the date which is forty (40) days from the Delivery Date, Tenant shall be entitled to terminate this Lease at any time prior to such delivery and receive from Landlord promptly thereafter a sum equal to the actual out-of-pocket expenses and substantiated third-party legal, architectural, engineering and other costs incurred by Tenant to the date of termination, or Tenant may elect to delay opening of its store facility for a period not to exceed nine (9) months, during which time Tenant shall pay no Ground Rent, Base Rent, Real Estate Taxes or CAM Charges, in which event Landlord shall deliver the Land and complete the Site Delivery Work on the date subsequently required by Tenant, and Landlord shall pay to Tenant on demand an amount equal to all costs incurred by Tenant in the development of its store facility, including, but not limited to, costs of materials and all engineering, architectural, legal fees, and costs of delay resulting from Landlord's failure to timely deliver.

(d)     Additional Tenant Self-help, Equitable and Legal Remedies Due to Construction Delays by Landlord. In the event that Landlord defaults at any time in completion of any component of the Landlord Work (as defined in Exhibit "C" attached hereto), including,

MW 4/29/03
\\REA\140800.6

without limitation, Delivery of the Land, in addition to any other rights and remedies set forth hereinabove, Tenant shall have the right, but not the obligation, to do any or all of the following:

(i)        perform at Landlord's sole cost and expense, all or any part of the Landlord Work; Tenant shall exercise this right by providing Landlord with five (5) days prior written notice thereof, which notice shall reasonably detail those portions of the Landlord Work which Tenant elects to complete, at any time following the date Landlord could reasonably have been expected to commence that portion of Landlord Work in order to complete said Landlord Work by the time required hereunder; in the event and to the extent that Tenant exercises its right hereunder, Landlord agrees to cooperate in good faith and provide Tenant with reasonable assistance so that Tenant can complete said portions of the Landlord Work; Landlord hereby grants Tenant the right, as its agent, to directly contact and contract with Landlord's contractors, on behalf of Landlord, to complete such work, all at Landlord's cost and expense;  Landlord covenants, upon Tenant's request, to provide Tenant with duplicate sets of all plans, specifications and contracts prepared in connection with the construction of the Shopping Center, as well as schedules of all contractors, subcontractors and suppliers; Landlord agrees to reimburse Tenant for any and all costs incurred by Tenant in connection with any portion of the Landlord Work which Tenant completes within ten (10) days after receipt of written request therefor from Tenant, which request shall be reasonably supported by invoices and/or written description of the Landlord Work performed; in the event that Landlord does not timely reimburse Tenant as hereinabove contemplated, Tenant shall be entitled to deduct the costs of such Landlord Work from rentals and other payments due under the Lease, together with interest at the Default Rate from the date of expenditure by Tenant until paid in full;

(ii)       seek injunctive relief, specific performance or other equitable remedies against Landlord to require Landlord to perform its obligations hereunder, all costs of which litigation (including Tenant's attorneys' fees and court costs) shall be borne by Landlord; and/or

(iii)      seek legal remedies available to Tenant, the costs of which shall be borne by Landlord, including, without limitation, attorneys' fees and court costs.

(e)        Tenant Remedies Due to Landlord's Failure to Pay the Tenant Improvement Allowance.  If Landlord fails to pay the Tenant Improvement Allowance in full on

MW 4/29/03
\\REA\140800.6

45

or before its due date, Landlord shall be in default hereunder, no Ground Rent, Base Rent or CAM Charges shall be due or owing to Landlord until the same is paid to Tenant, together with interest which shall accrue on the unpaid Tenant Improvement Allowance at the Default Rate commencing on the thirty-first (31st) day following Substantial Completion (as defined in the Construction Provisions) until the date of payment of the Tenant Improvement Allowance; provided, however, that if Landlord has not tendered payment of the Tenant Improvement Allowance and interest by that date which is one (1) year from Substantial Completion (the "Substantial Completion Anniversary"), then (i) such date shall become the Commencement Date; (ii) Base Rent shall be reduced to ground rent equal to Fifty Thousand and No/100 Dollars ($50,000.00) per annum during the Term of the Lease; and (iii) this Lease shall be converted to a ground lease, with ownership of the Improvements remaining with Tenant, and Landlord's and any Mortgagees' names being removed as additional insureds or mortgagees on any casualty insurance described in paragraph 14(a) of this Lease. Landlord and Tenant covenant and agree that upon the reasonable written request of either Tenant or Landlord, Landlord and Tenant shall execute such documentation as necessary to formalize the conversion of this Lease to a ground lease upon the Substantial Completion Anniversary.

At any time following the Substantial Completion Anniversary and upon thirty (30) days prior written notice, Tenant shall have the right at Tenant's sole election, but not the obligation, in lieu of the requirement that Landlord pay to Tenant the Tenant Improvement Allowance, to mortgage, sell, convey, assign, lease or otherwise encumber (collectively, a "Transfer") Tenant's interest in the Building, the Improvements and the Lease. Such right shall be in addition to the rights of Tenant set forth in paragraph 22 of this Lease.

Landlord covenants to (i) execute all documents necessary to permit Tenant to effect the Transfer described herein, and (ii) cause any Mortgagee to specifically acknowledge the rights of Tenant's lender and third parties arising as a result of such Transfer. Notwithstanding such Transfer, Tenant shall continue to pay the ground rentals described in this subparagraph (e) during the remainder of the Term.

(f)     Exercise of Remedies. Notwithstanding the foregoing, a delay by Tenant in exercising its cure rights or other remedies shall not be deemed an event of force majeure for purposes of extending the date(s) established for performance by Landlord. All sums owing to

MW 4/29/03
\\REA\140800.6

46

Tenant under paragraph 29 shall, to the extent applicable, be added to the Tenant Improvement Allowance and paid simultaneously; and, if not so paid, Tenant shall be entitled to offset all such costs, plus interest at the Default Rate, against Base Rent and CAM Charges otherwise due.

(g)    Time is of the Essence.    Notwithstanding anything contained to the contrary, Landlord covenants that it shall complete its construction and delivery obligations in accordance with the "Completion Dates" set forth in the Construction Schedule. In the event that Landlord fails to complete its construction and delivery obligations in accordance with such Completion Dates, Tenant may, at its sole election, exercise such remedies as are set forth in this Lease.

30.    Waiver.    If either Landlord or Tenant fails to insist on the strict observance by the other of any provisions of this Lease, neither shall be precluded from enforcing nor be held to have waived any of the obligations, past, present or future, of this Lease. Either party may accept late payment or performance by the other without waiving any Event of Default which may then have accrued.

31.    Compliance with Applicable Laws.    During the Term, Tenant shall comply with all lawful requirements of the local, county and state health boards, police and fire departments, municipal and state authorities and any other governmental authorities with jurisdiction over the Improvements, and of the board of fire underwriters (collectively, the "Lawful Requirements") respecting Tenant's use and occupancy of the interior of Improvements and Landlord shall comply with all Lawful Requirements relating to the exterior of the Building and Common Areas. In the event that Tenant, after thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Landlord or any such authority ordering performance of any such work which Tenant is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Landlord may perform said work and collect the reasonable cost thereof plus interest at the Default Rate from Tenant with the next installment or installments of Base Rent. In the event that Landlord, following thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Tenant or any such authority ordering performance of any such work which

MW 4/29/03
\\REA\140800.6

Landlord is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Tenant may perform said work and deduct the reasonable cost thereof plus interest at the Default Rate from Landlord with the next installment or installments of Base Rent.

32.    Notices.  Any notice permitted or required to be given pursuant to this Lease shall be deemed to have been given three (3) business days after mailing a written notice by certified mail, postage prepaid, return receipt requested, or one (1) business day after sending by Federal Express or other comparable overnight express courier service (with proof of receipt available), addressed to the parties as follows:

| | |
|---|---|
| If to Tenant: | CIRCUIT CITY STORES, INC.<br>Deep Run I<br>9950 Mayland Drive<br>Richmond, Virginia 23233<br>Attention: Vice President of Real Estate |
| with a copy to: | CIRCUIT CITY STORES, INC.<br>Deep Run I<br>9950 Mayland Drive<br>Richmond, Virginia 23233<br>Attention: Corporate Secretary |
| If to Landlord: | Sir Barton Place, LLC<br>c/o Patrick W. Madden<br>P. O. Box 12128<br>Lexington, Kentucky  40580-2128 |
| With a copy to: | Richard M. Hopgood, Esquire<br>771 Corporate Drive, Suite 650<br>P. O. Box 910416<br>Lexington, Kentucky  40591-0416 |

or to such other addressees as any party shall from time to time give notice to the other party in accordance with this paragraph.

33.    Brokers.  Landlord and Tenant each covenant that they have not dealt with any real estate broker or finder with respect to this Lease, except for The Russ Group (Steve Miller and Ron Russ) (the "Broker"), whom shall be paid a commission by Landlord as follows: $3 per square foot of ground-floor gross leaseable area of the Building, one-half of such commission

payable upon full execution of this Lease and one-half upon opening of the Circuit City Store for business to the public. Landlord agrees that the Broker is representing Tenant with respect to this leasing transaction, and, although Landlord is responsible for payment to Broker of the Broker's commission, the Broker owes no fiduciary's, agent's or other duty whatsoever to Landlord. Except for the foregoing, each party shall hold the other party harmless from all damages, claims, liabilities or expenses, including reasonable and actual attorneys' fees (through all levels of proceedings), resulting from any claims that may be asserted against the other party by any real estate broker or finder with whom the indemnifying party has purported to have dealt. If Landlord fails to timely pay the brokerage commissions described above, Tenant may, at Tenant's option, elect to do so, whereupon Landlord shall reimburse to Tenant the amount so paid within fifteen (15) days following receipt from Tenant of notification thereof, together with interest at the Default Rate from the date of Tenant's payment through the date of reimbursement. If Landlord has failed to pay such amount within such fifteen (15) day period, Tenant may, at its election, offset such amounts from its payments of Base Rent, Ground Rent, CAM Charges and other amounts due hereunder. Landlord represents to Tenant that Landlord has entered into a binding brokerage commission agreement in writing with Brokers and heretofore or simultaneously herewith delivered a copy thereof to Tenant.

34.     Miscellaneous.

(a)     Headings and Gender. All paragraph headings, titles or captions contained in this Lease are for convenience only and shall not be deemed a part of this Lease and shall not in any way limit or amplify the terms and provisions of this Lease. The masculine, feminine or neuter gender and the singular or plural number shall be deemed to include the others whenever the context so requires or indicates.

(b)     Construction. The parties agree that all the provisions are to be construed as covenants and agreements as though the words importing such covenants and agreements were used in each separate paragraph.

(c)     Waiver of Jury Trial. In the event of any court action arising out of this Lease, each party waives its right to trial by jury.

(d)     Relationship of Landlord-Tenant. Nothing contained in this Lease shall be deemed or construed by the parties or by any third person to create the relationship of principal

MW 4/29/03
\\REA\140800.6

49

and agent, partnership, joint venture, or any other association between Landlord and Tenant other than the landlord-tenant relationship described herein.

(e)  Entire Agreement; Merger. This Lease, including all exhibits (which are incorporated by reference for all purposes), contains the full and final agreement between the parties concerning the subject matter of this Lease, and all preliminary negotiations and agreements between Landlord and Tenant are merged herein. This Lease cannot be changed or modified in any manner other than by a written amendment or modification executed by Landlord and Tenant.

(f)  Attorneys' Fees. In the event either party shall be required to commence or defend any action or proceeding against any other party by reason of any breach or claimed breach of any provision of this Lease, to commence or defend any action or proceeding in any way connected with this Lease or to seek a judicial declaration of rights under this Lease, the party prevailing in such action or proceeding shall be entitled to recover from or to be reimbursed by the other party for the prevailing party's reasonable and actual attorneys' fees and costs through all levels of proceedings.

(g)  Partial Invalidity. If any provision of this Lease or the application to any person or circumstance shall be deemed invalid or unenforceable, the remainder of this Lease and its application to other persons or circumstances shall not be affected by such partial invalidity but shall be enforced to the fullest extent permitted by law as though such invalid or unenforceable provision was never a part.

(h)  Consents. Any consent or approval granted by either party shall be deemed a consent only as to the matter on which such consent was requested and shall not waive the consenting party's right to give or withhold consent to any subsequent matter.

(i)  Holidays. If the day on which rent or any other payment due date falls on a Saturday, Sunday or on a legal holiday, it shall be payable on the following business day.

(j)  Applicable Law. This Lease shall be construed in accordance with the laws of the State, and the parties agree that jurisdiction for all actions hereunder shall lie therein.

(k)  Successors and Assigns. All rights, obligations and liabilities given to or imposed upon any party shall extend to the permitted successors and assigns of such party.

MW 4/29/03
\\REA\140800.6

(l)     Counterparts.  This Lease may be executed in one or more identical counterparts, and as so executed by all parties shall constitute a single instrument for purposes of the effectiveness of this Lease.

(m)     Trademarks and Trade Names.  All trademarks, trade names, service marks, signs and all other marks of identification used by Tenant in its business shall at all times remain the exclusive property of Tenant, and Landlord shall have no right, interest in, or title to any of Tenant's trademarks, trade names, service marks, signs or other marks of identification.

(n)     Exhibits.  All of the exhibits to this Lease are incorporated by reference for all purposes and are part of this Lease.

(o)     No Construction Against Either Party.  This Agreement shall be interpreted to give it fair meaning and shall not be construed against either party.

(p)     Transfer of Landlord's Interest.  Landlord may not sell or transfer all or part of its ownership of the Shopping Center until and unless the Tenant Improvement Allowance is paid in full to Tenant, and thereafter, Landlord shall not transfer all or part of its ownership of the Shopping Center without delivering to Tenant evidence that the purchaser or assignee has assumed all obligations of Landlord under this Lease.

(q)     Effective Date.  This Lease shall be deemed executed on the date (the "Effective Date") on which it is fully executed by all parties.

35.     Effectiveness of Lease; Tenant's Right to Terminate.  Notwithstanding the execution of this Lease or any provision to the contrary, the parties agree that the effectiveness of this Lease is expressly conditioned upon the complete satisfaction (or waiver) of each and all of the following conditions:

(a)     Tenant's receipt, simultaneously with or prior to the execution of this Lease, of (i) a commitment for leasehold policy of title insurance for the Shopping Center, at Tenant's expense (Tenant also to bear the cost of any title policy issued pursuant to such comitment); (ii) copies of all underlying documents referred to in said commitment for title insurance; and (iii) a survey of the Shopping Center, at Landlord's expense, in form and substance acceptable to Tenant and sufficient for the issuance of Tenant's leasehold policy of title insurance, at a minimum identifying by metes and bounds or platted lot all of the real property within the Shopping Center, each of the parcels owned under every ground lease

MW 4/29/03
\\REA\140800.6

pertinent to the Shopping Center, and the Land, (iv) all instruments reasonably required by the title company issuing the commitment for leasehold policy of title insurance to issue a policy meeting Tenant's requirements, including, without limitation, an Owner's Affidavit and Indemnity in form acceptable to the title company; and (v) Tenant's approval of all of the foregoing in writing within thirty (30) days after receiving all of said documents, but in any event, prior to the Delivery Date.

(b)    Landlord's delivery of subordination, non-disturbance and attornment agreements and estoppel letters executed by any and all existing Mortgagees and Ground Lessors in a form satisfactory to Tenant simultaneously with the execution of this Lease.

(c)    Landlord's Delivery of the Land by the date and in the condition specified in the Construction Provisions.

(d)    Prior to the Delivery Date, Tenant's obtaining: the required City, County, State and other necessary governmental agency permits and approvals to construct said Improvements on the Premises no later than the Delivery Date. Tenant agrees to apply for such permits promptly as provided, to use due diligence and to expend any necessary application or other fees to secure such permits and approvals; provided, however, that the foregoing shall not be deemed to require Tenant to initiate litigation or to agree to any conditions imposed upon issuance of any such permit or approval.

(e)    Landlord's representations, warranties and covenants, including but not limited to those set forth in paragraph 19, being true and accurate in all material respects as of the date of Delivery of the Land (as defined in the Construction Provisions).

(f)    Prior to Delivery of the Land to Tenant, Tenant's obtaining soils and Hazardous Substances reports for the Shopping Center in Landlord's possession.

(g)    Prior to Delivery of the Land to Tenant, Tenant's obtaining satisfactory assurances, that adequate temporary utility services (including electricity, telephone, domestic water and fire protection water) for construction purposes are available for connection at the Premises or in close proximity in amounts sufficient to support Tenant's operations, and that permanent utility services will be available (assuming Tenant provides any required information in a timely manner) 60 days after the Delivery Date for connection at the Premises or in close proximity in amounts sufficient to support Tenant's operations.

MW 4/29/03
\\REA\140800.6

52

(h)     Tenant's obtaining satisfactory assurances that all necessary approvals and consents, including approvals or consents from other tenants in the Shopping Center, planned unit developmental boards and other necessary entities, and all necessary reciprocal use and easement agreements have been obtained prior to the Delivery Date.

(i)     Prior to the Delivery Date, Tenant's obtaining satisfactory written assurances that Landlord has obtained financing adequate to fund the Tenant Improvement Allowance and development of the remainder of the Shopping Center.

(j)     Intentionally deleted.

(k)     Upon execution of this Lease, Landlord's delivery to Tenant of the W-9 form, completed and executed by Landlord, submitted to Landlord by Tenant with the Lease.

The existence of the foregoing conditions is solely for the benefit of Tenant, and Tenant may waive any such condition at its sole discretion by delivering to Landlord a written notice signed by Tenant which specifically states the condition(s) being waived by Tenant.

Notwithstanding any other provision in this Lease to the contrary, in the event any of the foregoing conditions shall not be met, satisfied or waived, the parties expressly agree that Tenant shall have the right to terminate this Lease in its sole and absolute discretion at anytime prior to the satisfaction or waiver of any such condition by delivering to Landlord a written notice signed by Tenant which states that Tenant is terminating this Lease on account of the failure of one or more of the foregoing conditions; provided that, except with respect to a failure of the condition set out in subparagraph (c) above, Tenant shall, before exercising such termination right, give written notice upon Landlord of its intentions to do so and give Landlord ten (10) days in which to cause satisfaction of any unsatisfied conditions listed above.  In the event of any such termination, the rights and obligations of the parties shall be of no further force and effect and the parties shall have no further liability one to the other (except that the indemnifications set forth in paragraphs 14(i), 19(a)(v) and 19(b)(ii) shall survive such termination) upon Tenant's delivery of said notice to Landlord.   All conditions contained in this paragraph except subparagraphs (a) and (g) unless previously waived or satisfied shall expire as of the date of Tenant's store opening.

The delivery of this executed Lease by Tenant to Landlord constitutes the offer of Tenant to Landlord to bind Landlord and Tenant to the provisions of this Lease, subject to the conditions

MW 4/29/03
\\REA\140800.6

set forth in this paragraph 35. It is a further condition to the effectiveness of this Lease that upon receipt of the executed Lease from Tenant, Landlord execute and return same to Tenant within ten (10) days following receipt by Landlord. In the event Landlord fails to execute and return the Lease within such ten (10) day period, Tenant may at any time after delivery of the Lease provide written notice to Landlord that Tenant revokes its delivery of the executed Lease and Landlord shall be immediately obligated to return to Tenant all executed original counterparts as well as any copies of this Lease in the possession of Landlord, and this Lease shall be null and void.

36.   Intentionally Deleted.

37.   Adjacent Tracts. Landlord hereby agrees and covenants that should it or any entity, person or party affiliated or related to Landlord, or in which Landlord owns an interest, or any party owning an interest in Landlord (collectively hereinafter a "related entity"), ever own, lease or otherwise exercise any control over all or part of the land and/or improvements adjacent to the Shopping Center (an "Adjacent Tract"), it shall cause the Adjacent Tract and all occupants or tenants thereof to comply with the terms of this Lease relating to the Shopping Center, including without limitation the exclusive use granted to Tenant hereunder and prohibited uses set forth herein, and that the definition of "Shopping Center" as used herein shall, upon the vesting of any such interest in an Adjacent Tract in Landlord or a related entity, thereafter mean and include the Adjacent Tract(s).

38.   Cotenancy Requirement. Landlord acknowledges and agrees that it is a material inducement for Tenant to enter into this Lease that a sufficient number of nationally or regionally recognized retailers operate in the Shopping Center and other retail centers in the vicinity of the Premises during the Main Term and Option Periods, and that said stores continue to be open, occupied and operating for retail purposes at all times during the Term of this Lease. Accordingly, the parties agree that if any one or more of the following events occur: (i) at any time after the date which is three (3) years from the Commencement Date there is not at least one other national or Regional retailer in the Shopping Center open and operating in at least 15,000 square feet of space, (ii) at any time during the Term national or Regional (as defined below) retailers have not been open and operating in at least fifty percent (50%) of the gross leasable area identified in black hatching on the plan attached hereto as Exhibit "L" (the "Retail Area"),

*excluding the Meijer building

MW 4/29/03
\\REA\140800.6

54

for six (6) months or more; provided, however, that the Retail Area shall within the first three years after the Commencement Date, include only areas of the Shopping Center which have actually been constructed, or (iii) at any time during the Term (A) Meijers (or other comparable first-class national or regional retailer of comparable size such as WalMart, Costco or Home Depot) is not open and operating and (B) there are not open and operating retailers in at least 100,000 square feet of the Shopping Center, at least 50% of which space is operated by national or Regional retailers, then Base Rent (or Ground Rent, as applicable) shall be reduced by fifty percent (50%) commencing on the date of such event. If, at any time after the first five (5) years of the Term national or Regional retail businesses in at least fifty percent (50%) of the Retail Area are not open and operating for six (6) months or more, Tenant shall have the right, but not the obligation, to terminate this Lease upon ninety (90) days written notice to Landlord, whereupon Landlord shall pay to Tenant on the date of termination set forth in Tenant's notice the value of any unamortized leasehold improvements paid for by Tenant. If, prior to any such termination by Tenant, the event giving rise to such right to terminate ceases to exist, Tenant shall no longer have the right to terminate the Lease due to such event and the Base Rent (or Ground Rent, as applicable) shall resume in full as set forth in Section 4 hereof, but the foregoing cure shall not affect Tenant's similar rights with respect to subsequent events of the type described above. The time periods set forth above shall not include any time that any retailer is closed due to casualty damage (but such retailer's lease remains in force), provided that such retailer takes all steps commercially reasonable to rebuild such space or cause the same to be rebuilt and re-open such operation. For purposes of the above, a "Regional" retailer shall mean a retailer that has at least 20 stores in operation in a total of at least three states.

39.    Importance of Each Covenant    Each covenant and agreement on the part of one party hereto is understood and agreed to constitute an essential part of the consideration for each covenant and agreement on the part of the other party.

40.    "For Rent" Signs.    Tenant hereby permits Landlord during the last ninety (90) days of the Main Term or of any Option Period, as the case may be (provided that no applicable Renewal Option has been exercised or deemed exercised), to place one (1) "For Rent" or "For Sale" sign, not exceeding four (4) feet by four (4) feet in size, in the parking lot portion of Tenant's Preferred Area. During said ninety (90) day period, Tenant will also allow Landlord or

its agents, upon prior written notice and accompanied by a representative of Tenant designated by Tenant, to show the Premises, exterior and interior, to prospective tenants, purchasers, or mortgagees during reasonable business hours by prior appointment, provided same does not interfere with the conduct of Tenant's business.

WITNESS the following signatures and seals:

LANDLORD:

SIR BARTON PLACE, LLC, a
Kentucky limited liability company

Date: 5-9-03

By: _Preston W. Madden_
Name: _Preston W. Madden_
Title: _managing member_

Landlord's counsel:

_____
_____
_____

MW 4/29/03
\\REA\140800.6

TENANT:

CIRCUIT CITY STORES, INC.,
a Virginia corporation

Date: __5/7/03__          By: _____


Tenant's counsel:

McGuireWoods LLP
One James Center
901 E. Cary Street
Richmond, Virginia 23219
Attn: T. Craig Harmon, Esq.

Approved for Signature:

DPB  TCH   Responsible Atty.
DPB  TZH   Reviewing Atty.
           RE Manager

MW 4/29/03
\\REA\140800.6

## EXHIBIT "A"

### SITE PLAN

Components:       Premises (outlined in heavy black) – 32,991 square feet

Tenant's Preferred Area

Permissible Building Areas

Car Stereo Parking

Shopping Center

Human Resource Hiring Center

Outparcels

Retail Area

1 - Ex. "A"

**Exhibit A Site Plan - Key**

| | |
|---|---|
| **Premises** | |
| **Tenant Preferred Area** | |
| **Permissible Building Area** | |
| **Customer Pick Up** | |
| **Car Stereo Parking** | |
| **Human Resources Center** | |
| **Outparcels** | |
| **Retail Space** | |
| **Staging Area** | |



Q:\Projects\841\SCHEM\HAMBURG_KY\8414S01B.dwg, 10/22/02 10:15:13 AM, BrennerA



**Exhibit A Sheet 2**

AREA MAP

VICINITY MAP

HAMBURG PLACE MALL
DEVELOPMENT PLAN

## EXHIBIT "A-1"

## LEGAL DESCRIPTION

Being 29.73 acres of real property shown on Final Record Plat of Hamburg Place Mall Unit 1, Parcel 3 recorded in Plat Cabinet L, Slide 801, in the Fayette County Clerk's Office and known as Sir Barton Place Mall.

1 - Ex. "A-1"

# EXHIBIT "B"

## INDEX OF DEFINITIONS

| Term | Paragraph where defined |
|------|------------------------|
| Additional Areas | 14(e) |
| Adjacent Tract | 37 |
| Base Rent | 4 |
| Building | 2 |
| CAM Charges | 7(b) |
| CAM Year(s) | 7(c) |
| Circuit City Specifications | Ex. "C", para. 1(a) |
| City | 1 |
| Civil Plans | Ex. "C", para. 1(a) |
| Commencement Date | 4 |
| Common Area Easement | 6(b) |
| Common Area Maintenance | 7(a) |
| Common Areas | 7(a) |
| Construction Term | 3 |
| Cotenancy Requirement | 38 |
| Date of Taking | 16(a) |
| Default Rate | 9(b) |
| Delivery Date | 29(c) |
| Delivery of the Land | Ex. "C", para. 1(a) |

1 - Ex. "B"

MW 4/21/03
\\REA\140800.6

| Term | Paragraph where defined |
|------|-------------------------|
| Effective Date | 34(q) |
| Estimate | Ex. "C", para. 1 |
| Estimate Notice | Ex. "C", para. 1 |
| Event of Default (Landlord) | 29 |
| Event of Default (Tenant) | 27 |
| Ground Lease | 21(a) |
| Ground Lessor | 21(a) |
| Hazardous Substances | 19(a)(v) |
| Improvements | 2 |
| Land | 1 |
| Landlord | Introduction |
| Landlord Work | Ex. "C", para. 1 |
| Landlord's Premises | 1 |
| Lawful Requirements | 31 |
| Lease Year | 3 |
| Main Term | 3 |
| Measuring Period | 42 |
| Mortgage | 21(a) |
| Mortgagee | 21(a) |
| Offer | 36 |
| Option Period(s) | 3 |
| Other Improvements | 2 |
| Outparcel | 19(ix) |

2 - Ex. "B"

MW 4/21/03
\\REA\140800.6

| Term | Paragraph where defined |
|------|------------------------|
| Permissible Building Areas | Ex. "A" |
| Permitted Encumbrances | Ex. "F" |
| Person | 20 |
| Personalty | 22 |
| Plans and Specifications | Ex. "C", para. 2(b) |
| Premises | 2 |
| Pro Rata Share | 7(c) |
| Products | 18(a) |
| REA | 1 |
| Real Estate Taxes | 9(a) |
| Reduction Amount | 42 |
| Renewal Option | 3 |
| Schematic Floor Plan and Elevation | Ex. "C", para. 2(b) |
| Shopping Center | 1 |
| Site Covenants | 19(a)(ix) |
| Site Plan | 1 |
| Site Delivery Work | Ex. "C", para. 1(a) |
| Staging Area | 6(a) |
| State | 1 |
| Substantial Completion | Ex. "C", para. 2(d) |
| Substantial Completion Anniversary | 29(e) |
| Substantially All of the Premises | 16(a) |
| Taking | 16(a) |

3 - Ex. "B"

MW 4/21/03
\\REA\140800.6

| Term | Paragraph where defined |
|------|------------------------|
| Tax Parcel | 9(b) |
| Tenant | Introduction |
| Tenant Improvement Allowance | 2 |
| Tenant's Preferred Area | Ex. "A" |
| Tenant's Soils Report | Ex. "C", para. 1(a) |
| Term | 3 |
| Transfer | 17 |

4 - Ex. "B"

LEXINGTON, KENTUCKY

### "EXHIBIT "C"

### CONSTRUCTION PROVISIONS

These CONSTRUCTION PROVISIONS are made a part of the Lease between Landlord and Tenant and are attached as Exhibit "C".

1.       Landlord's Delivery of the Land; Other Landlord Work.  All of the work set forth in subparagraphs (a), (b) and (c) below is, collectively, the "Landlord Work":

(a)       Site Delivery Work.  Landlord acknowledges receipt of, and covenants to comply with Tenant's pad and common area improvements specifications set forth in the Circuit City Specifications attached hereto as Exhibit "C-1" (the "Circuit City Specifications") in the completion of the Landlord Work.  Landlord, at its sole cost and expense, shall: (i) verify that its proposed development of the Shopping Center and its civil engineering plans comply with Tenant's geotechnical evaluation of the Land dated January 22, 2003 and prepared by MACTEC Engineering and Consulting of Georgia, Inc., as amended by letter from MACTEC to Tenant dated April 15, 2003 (the "Tenant's Soils Report") and with the Circuit City Specifications; (ii) cause the Land to be free and clear of any known or unknown (which, but for Landlord's failure to discover same, should be removed prior to Delivery of the Land to Tenant) obstructions, foundations, footings, rock, utilities, easements, improvements and tenancies; (iii) complete grading of the Land and the Common Areas in accordance with Tenant's Soils Report and the "Circuit City Specifications", and with the final plans prepared by Landlord's civil engineer, which are subject to Tenant's written approval (the "Civil Plans"); (iv) complete Tenant's building pad strictly in accordance with Tenant's Soils Report and the Circuit City Specifications; (v) obtain approvals for all curbcuts indicated on the Civil Plans and all on and off-site permits required for any work to be performed by Landlord necessary to develop the Shopping Center which permits may be a prerequisite for issuance of Tenant's building permit; (vi) complete (A) all curbcuts for Tenant's Preferred Area, (B) 20,000 square feet of Staging Area outside of but adjacent to Tenant's building pad to either be paved or stone to provide for

1 – Ex. "C"

all weather use, and (C) an all-weather construction access road to the Land and around Tenant's building pad no less than twenty-four (24) feet in width, connecting the existing dedicated roadway adjacent to the Shopping Center with the Land, to be maintained by Landlord in good condition throughout the construction of the Common Areas; and (vii) obtain site plan approval and conditional use approval, if any, from governmental authorities having jurisdiction over the Shopping Center, permitting Tenant's construction of the Premises (subject to issuance of Tenant's building permit). All of the work described in (i) through (vii) above is, collectively, the "Site Delivery Work". No changes shall be made to any of the Site Delivery Work without Tenant's prior written consent. The Site Delivery Work shall be performed in accordance with the Construction Schedule attached hereto as Attachment "1". Landlord specifically covenants and agrees that any problems or delays it encounters in grading the Premises in satisfaction of the Site Delivery Work requirements set forth above in connection with the condition of the soils, including environmental or hazardous waste issues, subsidence sinking, surface waters, subsurface waters, unforeseen site conditions or the like shall be its sole responsibility, shall not cause a force majeure delay, and in no event shall the cost associated with such problems or conditions be passed on to Tenant in any manner.

Tenant shall have the right to temporarily locate a trailer in the Shopping Center during the eight (8) weeks prior to the store opening in a mutually agreeable location designated on the Site Plan which location shall be in accordance with Lawful Requirements, to be used as a Human Resource Hiring Center for Tenant's store employees.

If the items of Site Delivery Work to be performed on the Land are completed earlier than forty-five (45) days prior to Tenant's scheduled commencement of construction of the Improvements (as provided below), the Land shall be overbuilt and sloped to drain and, within such forty-five (45) day period, shall be regraded and recompacted.

Subject to force majeure, Landlord covenants and agrees to complete, at its sole cost and expense, each item of the Site Delivery Work and to provide temporary utilities to within five (5) feet of the building pad at Tenant's designated points of entry as set forth in the "Plans and Specifications" (as defined in paragraph 2(b) below) and temporary telephone service to the Premises and the Staging Area, in accordance with the dates established therefor in the

2 – Ex. "C"

MW 4/21/03
\\REA\140800.6

Construction Schedule, to the end that promptly upon completion of such requirements (collectively, "Delivery of the Land"), Tenant shall be able, subject to issuance of its building permit and matters within Tenant's control, to commence construction of the Improvements.

Landlord agrees that Delivery of the Land shall not be deemed to have occurred until all approvals and permits shall have been obtained and all fees, including but not limited to impact fees and assessments, shall have been paid, if and to the extent that such approvals, permits and fees for Landlord's construction shall be prerequisites to the issuance of Tenant's building permit. In addition, Landlord shall pay all impact fees assessed with respect to Tenant's construction of the Premises. Upon Delivery of the Land, Landlord shall certify to Tenant that all elements of the Site Delivery Work have been completed in the form of the Site Delivery Work Certificate attached to Exhibit "C" as Attachment "2". If, in performing its Landlord's Work, Landlord encounters any previously unknown soil defect, the remediation of which is required in order for Landlord to proceed with Landlord's Work, Landlord shall promptly advise Tenant of the same, and shall provide to Tenant any reports or materials in Landlord's possession identifying and/or quantifying such materials and requirements. In such event, Landlord shall procure from its geotechnical consultant and third party contractor as soon as possible, an estimate (the "Estimate") of the costs that will be incurred in the remediation of such unsuitable materials, and shall provide the same to Tenant in a written notice (the "Estimate Notice"). If the Estimate is $200,000 or less, Landlord shall proceed with such removal or remediation work, and shall bear the costs incurred in so doing. If the Estimate exceeds $200,000 and Tenant, within 20 days after delivery of the Estimate Notice, agrees in writing to pay such excess costs up to a maximum of the Estimate, Landlord shall proceed with remediation work, and the actual excess costs incurred by Landlord in so doing, up to a maximum of the Estimate, shall be paid by Tenant (that is, Tenant shall pay the actual costs over $200,000 but shall not be required to pay an amount greater than the difference between $200,000 and the Estimate. If Tenant does not so agree in writing within such 20-day period, then Tenant shall be deemed to have declined to pay the excess costs, and Landlord may either (x) proceed with such work, in which case, Landlord shall bear all costs associated with such soils remediation, or (y) terminate this Lease by giving Tenant

3 – Ex. "C"

written notice of its election to do so, whereupon Landlord shall reimburse Tenant for all costs theretofore incurred by Tenant in connection with this Lease.

Should the Site Delivery Work require minor adjustments in order to be in accordance with the Circuit City Specifications or the Civil Plans, Tenant may direct its contractor to make such adjustments ("Minor Corrections"), the total cost of which shall be reimbursed by Landlord to Tenant upon demand in a sum not to exceed Five Thousand Dollars ($5,000.00).

(b)    Paving, Lighting, Utilities, Landscaping and Drainage.   Landlord shall promptly deliver to Tenant full and complete civil engineering plans. Landlord, at its sole cost and expense, and in accordance with and on the date set forth in Attachment "1", shall cause a contractor licensed in the State to complete (i) installation of temporary utilities, as described in the Circuit City Specifications; (ii) the construction and installation within five (5) feet of the Building, of permanent telephone service and permanent utilities, including but not limited to gas, electric, a 2" domestic water and 8" fire protection water and sanitary sewer as described in the Circuit City Specifications, each at Tenant's required entry points shown in the Civil Plans, at depths adequate for Tenant's tie-in without additional cost above that contemplated by the Plans and Specifications; (iii) the construction and installation of the storm water drainage system as shown in the Civil Plans; (iv) the construction and installation of paving (including heavy-duty paving), and curbing for parking areas (including sidewalk curb in front of the Building), vehicular access and service roads, and driveways, in accordance with the Circuit City Specifications; (v) the completion of landscaping at the Shopping Center in accordance with Landlord's governmentally approved landscaping plan; (vi) the construction and installation of lighting in the Shopping Center to standards no less than those set forth in the "Shopping Center Lighting Specifications" as described in the Circuit City Specifications; and (vii) Landlord's installation of the pylon sign(s) identifying the Shopping Center as described in paragraph 8 of the Lease, all no later than the dates established therefor in the Construction Schedule.

(c)    Landlord Work.   All of the work described to be performed by Landlord in this paragraph 1 is collectively referred to as the "Landlord Work". All Landlord Work shall be performed in accordance with all applicable laws and this Lease, in a good and workmanlike manner, as appropriate, by engineers, surveyors, architects and consultants and contractors who

4 – Ex. "C"

MW 4/21/03
\\REA\140800.6

are bondable, all licensed in the State and of good reputation.  Landlord's general contractor shall be experienced in shopping center development and in phasing and coordinating construction schedules with major anchors and national retailers.  All Landlord Work shall be completed in accordance with these Construction Provisions and all attachments hereto (including but not limited to the Construction Schedule) and the Civil Plans.  In the event that Landlord defaults at any time in completion of any component of the Landlord Work, Tenant shall have the right after written notice to Landlord and allowance to Landlord of a reasonable period in which to cure the default (provided Landlord commences cure within three business days and diligently prosecutes the same to completion thereafter), but not the obligation, to perform at Landlord's sole cost and expense, all or any part of Landlord Work.  The notice and cure rights sent out in the preceding sentence shall not apply to the Minor Corrections.  Tenant shall be entitled to deduct the costs of such Landlord Work from rentals and other payments due under the Lease, together with interest at the Default Rate from the date of expenditure by Tenant until paid in full.

  2.   Tenant Improvements.

  (a)   Building Construction.  Upon completion of all of the Site Delivery Work, Landlord shall give Tenant written notice (which shall include any required certifications, including but not limited to those required by the Standard Specifications) of Delivery of the Land in the form of Attachment "2".  Tenant shall promptly notify Landlord if any such requirement has not been met to Tenant's reasonable satisfaction, provided Tenant does not elect its self-help remedies set forth in this Lease.  Upon completion of any such previously unmet requirements, Tenant shall within a reasonable time commence and pursue to completion with due diligence the construction of the Improvements and storefront sidewalk.  The construction work on the Improvements and storefront sidewalk shall be performed by a duly licensed contractor chosen by Tenant, shall be done in a good and workmanlike manner, in compliance with all applicable laws and in substantial accordance with the Plans and Specifications.  Tenant shall also be responsible for all local government building inspection fees of the Improvements.

  (b)   Plans and Specifications.  Tenant shall prepare and furnish to Landlord for its approval, not to be unreasonably withheld, conditioned or delayed, complete architectural drawings and specifications including building elevations (the "Plans and Specifications") for the

5 – Ex. "C"

construction of the Building and Other Improvements, incorporating therein the items specified and shown in the "Schematic Floor Plan and Elevation" (which are hereby approved by Landlord) attached hereto as <u>Attachment "3"</u>. Landlord agrees that it will approve the Plans and Specifications, so long as they are materially consistent with the Schematic Floor Plan and Elevation, within ten (10) business days after receipt thereof. If the Plans and Specifications are not disapproved by Landlord within such 10-day period, they will be deemed approved. The Plans and Specifications shall not be materially changed by Tenant without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed; provided, any changes made by Tenant to its prototypical store prior to commencement of construction by Tenant shall be deemed approved by Landlord. Any changes which Landlord desires to make to the Plans and Specifications which are different than a Building based on the Schematic Floor Plan and Elevation utilizing Tenant's prototypical elevations and building materials or different from the initial plans and specifications submitted by Tenant to Landlord shall be subject to Tenant's approval, which may be withheld in Tenant's sole discretion, and made at Landlord's sole cost and expense, and Tenant shall not be required to increase the Base Rent payable hereunder, or accept a reduction in the Tenant Improvement Allowance, as a result of such changes.

        (c)    <u>Permits</u>. Tenant, at its sole cost and expense, shall obtain or cause to be obtained those certain building permits, licenses, other governmental approvals and temporary and permanent certificates of occupancy which may be required for the lawful construction and occupancy of the Premises in accordance with the Plans and Specifications. Notwithstanding the foregoing, Landlord shall pay all costs necessary to satisfy conditions imposed by any governmental entity on Tenant's permit which are not the sole result of or solely related to Tenant's intended construction of the Improvements. Landlord agrees to assist and cooperate fully with Tenant in obtaining such permits, licenses, approvals and certificates. Landlord shall be responsible for any other permits necessary for the development of the Shopping Center.

        (d)    <u>Substantial Completion</u>. Substantial completion of the Improvements ("Substantial Completion") shall be deemed to occur when a certificate of occupancy, whether temporary and subject to minor items to be completed, or permanent, as the case may be, has

6 – Ex. "C"