LOCATION: EL PASO, TEXAS

LEASE

between

CIRCUIT CITY STORES, INC.,

as Tenant

and

A.D.D. HOLDINGS, L.P.,

as Landlord

dated April 16, 2001

LAS PALMAS MARKETPLACE SHOPPING CENTER

263761_8 (00051.42 [11992])



EXHIBIT A

TABLE OF CONTENTS

| Paragraph | | Page |
|---|---|---|
| 1. | Leased Property | 1 |
| 2. | Construction of Building and Improvements | 2 |
| 3. | Lease Term | 2 |
| 4. | Base Rent | 3 |
| 5. | Development of Shopping Center by Landlord | 4 |
| 6. | Easements | 5 |
| 7. | Common Areas and Common Area Maintenance | 6 |
| 8. | Signs and Communications Equipment | 10 |
| 9. | Taxes | 11 |
| 10. | Maintenance, Repairs and Replacements | 13 |
| 11. | Utility Service Provider; Payment of Utility Bills | 14 |
| 12. | Alterations | 14 |
| 13. | Mechanics' Liens | 15 |
| 14. | Insurance | 16 |
| 15. | Damages by Fire or Other Casualty | 20 |
| 16. | Condemnation | 22 |
| 17. | Assignment and Subletting | 24 |
| 18. | Use | 25 |
| 19. | Warranties, Representations and Covenants | 25 |
| 20. | Estoppel Certificates | 32 |

...

| Paragraph | | Page |
|---|---|---|
| 21. | Subordination, Non-Disturbance and Attornment | 33 |
| 22. | Tenant's Financing | 34 |
| 23. | Tenant's Property and Waiver of Landlord's Lien | 35 |
| 24. | Memorandum of Lease; Commencement Date Agreement | 35 |
| 25. | Expiration of Term and Holding Over | 35 |
| 26. | Force Majeure | 35 |
| 27. | Events of Tenant's Default | 36 |
| 28. | Landlord's Remedies | 36 |
| 29. | Events of Landlord's Default; Tenant's Remedies | 38 |
| 30. | Waiver | 41 |
| 31. | Compliance with Applicable Laws | 41 |
| 32. | Notices | 42 |
| 33. | Broker | 43 |
| 34. | Miscellaneous | 43 |
| 35. | Tenant's Right to Terminate | 45 |
| 36. | Landlord's Access | 47 |
| 37. | Confidentiality | 47 |

263761_8 (00051;42 {1199;})

## EXHIBITS

"A"    Site Plan

"A-1"    Shopping Center Legal Description

"B"    Index of Definitions

"C"    Construction Provisions

"C-1"    Design and Construction Specifications

"D"    Removable Trade Fixtures

"E"    Sign Plans

"F"    Permitted Encumbrances

"G"    Subordination, Non-Disturbance and Attornment Agreement

"H"    Memorandum of Lease

"I"    Commencement Date Agreement

"J"    Indemnification Agreement

EL PASO, TEXAS

## LEASE

This LEASE is made as of the 16th day of April, 2001, by and between A.D.D. HOLDINGS, L.P., a Texas limited partnership, having an address at 5823 N. Mesa, #195, El Paso, Texas 79912 ("Landlord"), and CIRCUIT CITY STORES, INC., a Virginia corporation, having an address at Deep Run I, 9950 Mayland Drive, Richmond, Virginia 23233 ("Tenant").

W I T N E S S E T H:

The parties hereto agree as follows:

1. <u>Leased Property</u>. Landlord leases to Tenant all those certain "Premises" (as defined in paragraph 2), when same are constructed or renovated on that approximately 33,398 square foot parcel (the "Land"), outlined in red on <u>Exhibit "A"</u> (the "Site Plan"), together with exclusive rights in the three (3) automobile loading stalls labeled "Customer Pick-Up" adjacent to the Premises as shown on the Site Plan, the exclusive rights in the six (6) parking spaces labeled "Car Stereo Parking" at the rear of the Building as shown on the Site Plan and with the easements described in paragraph 6 below; all located in the Las Palmas Marketplace Shopping Center (herein referred to as the "Shopping Center"), located at IH-10 and George Dieter Drive, in the City of El Paso (the "City"), County of El Paso, State of Texas (the "State"), shown on the Site Plan and described by metes and bounds or platted lot legal description on <u>Exhibit "A-1"</u> attached hereto. All of the Shopping Center exclusive of the Premises is "Landlord's Premises". Landlord hereby grants to Tenant all of those certain rights, in common with others, granted Landlord under that certain Reciprocal Easement Agreement dated October 15, 1996 and executed by Landlord and Cinemark USA, Inc. recorded against record title of the Shopping Center in Book 3122, Page 12, Real Property Records, El Paso County, Texas (the "REA") and that certain unrecorded Agreement (the "Agreement"), dated May 21, 1970, made and entered into by and between Fred Hervey, individually and as Trustee of the Frederick Taylor Hervey, Jr. Trust Estate #2, the Evelyn Diane Hervey Trust Estate #2, the Sheryl Dee Gillett Trust Estate, the John Alanson Gillett Trust Estate and the Helen Shirleen Hervey Gillett Trust Estate, and Hercules Development Company, as grantor, and El Paso Electric Company, as grantee, said rights under the Agreement having been assigned by grantors to

1

263761_8 100051 42 [11992].

Providence memorial Hospital by that certain unrecorded instrument dated January 14, 1994, as evidenced by that certain Assignment, dated April 10, 1996, executed and delivered by Paso Del Norte Helath Foundation, a Texas non-profit corporation, f/k/a Providence Memorial Hospital, as assignor, to Landlord, as assignee, recorded April 10, 1996, as Document No. 96021669 in Book 3036, beginning at Page 734 of the real property records of El Paso County, Texas, such assignment having been ratified by El Paso Electric Company as evidenced by that certain Easement Ratification Agreement, dated April 10, 1996, made and entered into by and between El Paso Electric Company and Landlord, recorded April 10, 1996, as Document No. 96021670 in Book 3036, beginning at page 745 of the real property records of El Paso County, Texas. Landlord agrees that it will not consent to any modification of the REA during the term of this Lease which is inconsistent with the terms of this Lease, and will exercise all approval rights granted Landlord under the REA in favor of enforcement of the terms hereof.

2.  **Construction of Building and Improvements.** Commencing immediately upon "Delivery of the Land" (as defined in the Construction Provisions (herein so called) attached hereto as Exhibit "C" and incorporated herein by reference for all purposes), Tenant shall have the right to construct within the Shopping Center a one-story retail building, containing approximately 33,398 square feet of ground-floor gross leasable area, with provisions for customer pickup, delivery and car stereo installation facilities, initially for use as a Circuit City Superstore (the "Building"), together with loading ramps, sidewalks, trash compactor, transformer pad and other such appurtenances and improvements (collectively, the "Other Improvements"), as more particularly set forth in the Construction Provisions. The Building and Other Improvements are sometimes collectively referred to herein as the "Improvements". The Improvements shall be constructed to completion with due diligence in accordance with the "Plans and Specifications" to be prepared by Tenant as specified in the Construction Provisions. Except as otherwise provided herein, title to the Improvements shall be deemed transferred to Landlord upon full payment of the "Tenant Improvement Allowance", as defined in the Construction Provisions. The Improvements and the Land are referred to herein as the "Premises".

3.  **Lease Term.** Subject to paragraph 35, the construction term (the "Construction Term") of this Lease shall commence on the date of Landlord's Delivery of the Land to Tenant in

2

263761_8 (00051/42 [11992])

accordance with, and in the condition specified in, the Construction Provisions, and shall end on the "Commencement Date" (as defined in paragraph 4 below). The main term (the "Main Term") of the Lease shall commence on the Commencement Date and shall end on the last day of January following the fifteenth (15th) anniversary of the Commencement Date.

In addition to the Main Term, Tenant shall have the option (each such right referred to herein as a "Renewal Option") to renew and extend the Lease for three (3) consecutive five (5) year periods (each such period referred to as an "Option Period" and collectively as the "Option Periods") immediately following the Main Term, at the rent specified below. Tenant shall give Landlord written notice of its election to exercise any Renewal Option at least one hundred eighty (180) days prior to the expiration of the Main Term or any then-current Option Period, as applicable, provided, however, if, during the aforementioned one hundred eighty (180) day period, Tenant does not give Landlord written notice of its intent not to exercise its Renewal Option, Tenant's right to exercise such Renewal Option shall continue, as shall its tenancy hereunder, until ten (10) business days after Landlord has given Tenant written notice of Landlord's election to terminate the Renewal Option, during which ten (10) business day period Tenant may exercise its Renewal Option, whereupon the Term (defined below) of this Lease shall be renewed and extended as if such notice had been given prior to such expiration of the one hundred eighty (180) day period described above.

The Construction Term, Main Term and Option Periods are, collectively, the "Term". The term "Lease Year" shall mean each successive period of twelve (12) consecutive calendar months, commencing on the first day of each February during the Term, except that the first Lease Year shall commence on the Commencement Date and shall end on the last day of January following the first anniversary of the Commencement Date.

4.  Base Rent. During the Construction Term, Tenant shall pay no rent or Real Estate Tax or CAM Charges or any similar costs, fees, rentals or expenses. Tenant agrees to pay base rent ("Base Rent") for the Premises in the amounts and in the manner specified hereunder, commencing (subject to paragraph 3 of the Construction Provisions) on the date on which Landlord makes payment of the Tenant Improvement Allowance as set forth in the Construction Provisions (the "Commencement Date").

3

263761_8 (000051-42 [11992])

Landlord shall give Tenant written notice of a change of address or change of the party to whom such rents shall be payable along with written documentation reasonably satisfactory to Tenant of such party's right to receive payment hereunder. Unless adjusted as provided below or in paragraph 3 of the Construction Provisions, Base Rent shall be paid in equal monthly installments in advance on the first day of each succeeding calendar month throughout the Term, without abatement or offset, except if expressly permitted under this Lease, to the address given for Landlord in paragraph 32 pursuant to the following schedule:

(i) <u>First Five Years</u>. During the first five (5) Lease Years, Tenant shall pay annual Base Rent in the amount of Four Hundred Thirty-Seven Thousand Five Hundred Thirteen and 80/100 Dollars ($437,513.80), payable in equal monthly installments of Thirty-Six Thousand Four Hundred Fifty Nine and 48/100 Dollars ($36,459.48).

(ii) <u>Adjustment in Base Rent</u>. Notwithstanding the Base Rent provisions, in the event that the ground-floor gross leasable area of the Building when constructed does not equal 33,398 square feet, annual Base Rent during the first five (5) Lease Years shall be the product of the actual ground-floor gross leasable area of the Building (as shown on the as-built survey in the Plans and Specifications), multiplied by $13.10. In determining the ground-floor gross leasable area, measurements shall be made in accordance with the specifications set forth in paragraph 7(c) below. If any Lease Year is other than twelve (12) months in length, annual Base Rent during such Lease Year shall be the product of the applicable monthly Base Rent times the number of months in such Lease Year, with appropriate proration for any partial calendar month therein.

(iii) <u>Increases in Base Rent</u>. Annual Base Rent shall increase on the first day of the sixth and every succeeding fifth Lease Year, over the then-current Base Rent by ten percent (10%).

5. <u>Development of Shopping Center by Landlord</u>. Landlord covenants to construct, develop and operate a first-class shopping center. The location of buildings and other tenant space therein will only be within the "Permissible Building Areas" designated on the Site Plan. The parking ratio for the Shopping Center shall be at least as shown thereon, but in no event shall said ratio be less than the greater of (i) five (5) spaces (for full-sized automobiles) per 1,000 square feet of gross leasable area, or (ii) that required by applicable zoning requirements. All parking shall be

4

at ground level except for the area located directly in front of Lowe's as shown on the Site Plan (the "Above Ground Parking Area"). Landlord shall construct or cause such improvements to be constructed in a good and workmanlike manner, lien-free and Landlord agrees to indemnify, defend and hold Tenant harmless from any loss or damage suffered by Tenant as a result of Landlord's construction. Landlord's construction shall not interfere with the conduct of Tenant's business.

6. Easements. Landlord also grants to Tenant those nonexclusive leasehold easements, including, without limitation, those contained in the REA, which shall run as covenants with Landlord's Premises and the Premises during the Term, over Landlord's Premises, which are useful and appropriate for the construction, operation and maintenance of the Premises, including, but not limited to:

(a) Construction Easements. During the Construction Term, and any period of renovation or reconstruction thereafter, Landlord grants to Tenant (i) a nonexclusive easement across a mutually agreeable designated route, providing access to and from the public roadways nearest to the Land, over the Common Areas (as defined in paragraph 7(a) below) for construction access to the Premises, as well as an exclusive easement for a construction staging area (the "Staging Area") that portion of the Common Areas at shown on the Site Plan for Tenant's use in constructing the Improvements, (ii) an easement to permit the Building to abut adjacent buildings, and the foundations, footings, common walls and roof projections to bear structurally upon Landlord's Premises, or (iii) an easement for such additional underground, public or private utility easements as Tenant deems necessary, without unreasonably interfering with the use by Landlord of the Common Areas, for the benefit of the Premises. For the purpose of exercising the rights granted in this paragraph 6, Tenant and/or the utility provider shall have the right to enter upon and use the Common Areas to install the utility systems, to such extent and so long as reasonably necessary to accomplish such purpose, subject to restoration of the Common Areas following such installation and any other reasonable conditions and requirements imposed by Landlord for the benefit of the Premises.

(b) Common Area Easements. Landlord does hereby additionally grant to Tenant an easement (the "Common Area Easement") to use the Common Areas for their intended purposes and to permit Tenant and its employees, agents, subtenants, assignees, licensees, suppliers, customers

5

263761_8 (00051-42 (11992))

and invitees to use the Common Areas for the purposes (without limitation) of parking and pedestrian, service and vehicular access, ingress and egress to, from and between the Premises and Landlord's Premises and the streets and highways abutting and adjacent to the Shopping Center, without payment of any fee or other charge therefor. It is specifically agreed that with respect to the automobile loading stalls designated on the Site Plan as Tenant's "Customer Pick-Up", (i) Tenant shall have the right, from time to time, to relocate the same to other areas adjacent to the Improvements mutually acceptable to Landlord and Tenant, and (ii) notwithstanding the fact the same are in, and constitute a part of, the "Common Areas", such automobile loading stalls shall be used exclusively by Tenant's customers, invitees and patrons. Tenant shall also have the right to use such Common Areas immediately adjacent to Tenant's Improvements and within Tenant's Preferred Area as shown on the Site Plan for promotional activities and demonstrations and other events customary to Tenant's business operations, provided (i) Tenant shall not conduct such promotions more frequently that four (4) times per Lease Year for no longer than seven (7) days in duration, (ii) such promotional activities shall consist of displays of new merchandise only, (iii) all displays must be consistent with displays conducted at Tenant's other locations, (iv) all displays must be neat and orderly, and (v) no sheds, tents, or other portable buildings may be used. Tenant shall also have the right to use a portion of the Common Area as shown on the Site Plan for Tenant's "Customer Pick Up" used exclusively for Tenant's customers, invitees and patrons.

7. Common Areas and Common Area Maintenance.

(a) Definition of Common Areas. The term "Common Areas" shall be defined to include the parking areas, lanes, drives, entrances, truck passageways, sidewalks, ramps, stairways, landscaped and other unpaved areas, parking lot lighting facilities and equipment, Landlord's pylon sign(s), directional, traffic and monument sign structure(s) and shared utility facilities located in all elements of the Shopping Center (including any such areas and facilities contained within outparcels and adjacent tracts but reserved to the benefit of the Shopping Center occupants) and which are intended and available for the common use of all of the tenants within the Shopping Center (including any outparcel and other adjacent occupants which contribute toward "CAM Charges" (as defined below) and which are not responsible for separate maintenance of such outparcels or tracts), their subtenants, licensees, and business invitees. Landlord shall be responsible

6

263761_8 (00051/42 [11992])

for operating, maintaining, repairing and replacing the Common Areas in a first-class manner, including cleaning, maintenance of Landlord's pylon and other sign structure(s), snow removal and ice treatment, removal of Common Area trash and garbage, lighting, repairing, repaving and restriping the parking area, and maintaining, replanting and replacing landscaping, all such work to be referred to collectively as "Common Area Maintenance".

    (b)  CAM Charges. For the purpose of this paragraph 7, the cost of Common Area Maintenance (the "CAM Charges") shall include (i) Landlord's reasonable and proper direct costs and expenses of operating and maintaining the Common Areas, and (ii) Landlord's overhead expenses for administering same (or in lieu thereof a management fee) which shall not exceed five percent (5%) of the total of such costs (specifically excluding from such total for purposes of calculating the management fee, the amounts paid by Landlord and Tenant for insurance, capital expenditures, Real Estate Taxes and utilities serving the Common Areas). Notwithstanding the foregoing, the following shall not be included in the CAM Charges:

    (1)  real estate taxes paid, and maintenance performed, on separately assessed and/or maintained outparcels or other adjacent tracts not reserved to the benefit of the Shopping Center occupants;

    (2)  any dues or charges for a merchants' or other association of the tenants in the Shopping Center;

    (3)  maintenance, repairs or replacements to the Common Areas (but no other portions of the Shopping Center), necessitated by the negligent or wrongful act of Landlord or made to correct any construction, defect or condition, to any interior mall space or to any buildings (including the roof or exterior walls thereof) or utility systems not part of the Common Areas;

    (4)  repairs or replacements necessitated by any governmental entity or by the negligence or the wrongful action of Landlord (including failure to construct any portion of the Shopping Center in accordance with plans or specifications) or any other tenant or made to correct any initial construction defect or condition in existence prior to the Commencement Date of this Lease or to correct damage caused by subsidence or adverse or substandard soil conditions;

    (5)  amounts paid to entities related to Landlord in excess of the cost of such services from any competitive source;

263761_8 (00051742 [11992])

(6) amounts reimbursable from insurance proceeds, under warranty or by Tenant, any other tenant in the Shopping Center or any other third party other than pursuant to a Common Area expense provision similar to this paragraph 7;

(7) premiums for Common Area liability insurance for coverage in excess of the limits established in paragraph 14(e) below subject to reasonable increases form time to time consistent with similar shopping centers in the City;

(8) repairs or replacements of a capital nature (whether or not capitalized);

(9) improvements, repairs or replacements (other than patching, striping and similar minor periodic maintenance) to the parking lot or other paved areas during the first ten (10) "CAM Years" (as defined below);

(10) reserves for anticipated future expenses;

(11) interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner;

(12) Landlord's personnel, overhead, home office or administrative expenses except as set forth in subparagraph (b)(ii) above;

(13) amounts incurred to remediate any Hazardous Substances (as defined in the Construction Provisions);

(14) any new improvements to the Shopping Center or Common Areas of a capital nature, including, but not limited to, renovations to the facade of the Shopping Center and new improvements to landscaped areas of the Shopping Center (but excluding repairs and replacements to existing landscaping);

(15) amounts incurred to monitor or maintain fire protection systems in the Shopping Center if Tenant separately monitors and maintains its own premises;

(16) Maintenance expenses related to any parking structure located in the Above Ground Parking Area; or

(17) other maintenance expenses not considered normal and customary under generally accepted accounting principles or shopping center industry standards. CAM Charges shall be in an amount consistent with the costs incurred by other landlords of similar shopping centers in the City (but not greater than as described in this paragraph 7(b)), and in all events such charges shall

be obtained at competitive rates pursuant to a proposed Common Area maintenance budget delivered to Tenant on or before the end of each CAM Year.

(c) <u>Tenant Payments</u>. Commencing on the Commencement Date and continuing until the expiration of the first Lease Year, Tenant shall pay to Landlord $1.50 per square foot of ground-floor gross leasable area in the Building per annum, payable in equal monthly installments, as its estimated share of CAM Charges. Thereafter, the annual charge shall be computed on the basis of periods of twelve (12) consecutive calendar months, as designated by Landlord (each such period, including the first Lease Year, is a "CAM Year"), and shall be paid by Tenant in equal monthly installments, on the first day of each month during such CAM Year. CAM Charges shall not exceed by more than three percent (3%) those in effect during the preceding CAM Year. The limits on CAM Charges in this section shall not apply to premiums for Common Area liability and casualty insurance and other normal coverages maintained by Landlord with respect to the Shopping Center and the Common Areas. Tenant shall pay its pro-rata share of such premiums in the same manner as CAM Charges are calculated and paid. For any period within the Term which is less than a full CAM Year, the annual charge shall be appropriately prorated. For any period within the Term which is less than a full CAM Year, the annual charge shall be appropriately prorated. Within sixty (60) days after the end of the first CAM Year and each CAM Year thereafter, Landlord will furnish to Tenant a statement showing in detail (with such substantiating documentation as Tenant may reasonably request) the amount of the CAM Charges for the preceding CAM Year and the then-current number of square feet of ground-floor gross leasable area in the Shopping Center. Any necessary adjustment with respect to amounts owed by either party for such preceding CAM Year shall be made; and the monthly payments to be made by Tenant for the ensuing year shall be estimated according to the Common Area maintenance budget prepared by Landlord and delivered to Tenant. Subject to adjustments as herein contemplated, Tenant's share (such fraction being referred to herein as "Tenant's Pro Rata Share") of CAM Charges shall always be the product of the CAM Charges multiplied by a fraction, the numerator of which is the number of square feet of the ground-floor gross leasable area in the Building and the denominator of which is the number of square feet of the ground-floor gross leasable area (including the area of any outside sales area exclusive to a single occupant) in the Shopping Center In determining the ground-floor gross

leasable area of any building in the Shopping Center (including the Building), measurement shall be made from the centerline of any common walls and from the outside of any exterior walls. The gross leasable area of any outside sales area shall be measured from the outside of the exterior wall of any adjacent building to the actual exterior perimeters of such outside sales area, including any aisles, fences or walls included therein. Changes in applicable floor areas shall result in corresponding adjustments of Tenant's Pro Rata Share, but in no event shall the denominator of the fraction by which Tenant's Pro Rata Share is determined be less than the actual number of square feet of the Shopping Center shown on the Site Plan attached hereto. The remainder of CAM Charges shall be borne by Landlord and/or other tenants.

(d) <u>Examination of Landlord's Records</u>. Tenant shall have the right, but not more often than once as to any CAM Year and no later than three (3) years after the end of such CAM Year, to examine and make copies of the records pertaining to CAM Charges for such CAM Year. If the examination discloses any overcharge by Landlord, Landlord shall reimburse Tenant within ten (10) days for any overpayment of Tenant's Pro Rata Share of CAM Charges; and if such overpayment by Tenant is in excess of five percent (5%) of the actual Tenant's Pro Rata Share of CAM Charges, Landlord shall reimburse Tenant for the reasonable cost of such examination or audit.

8. <u>Signs and Communications Equipment</u>.

(a) <u>Signs</u>. Landlord, at its sole cost and expense, no later than the date set forth on <u>Attachment "1"</u> to the Construction Provisions, shall construct and install upon the Common Areas at the location so shown on the Site Plan, two (2) pylon sign structure(s) (with electrical wired box installed) each one having sufficient space thereon for inclusion of doublesided "face panels" identifying Tenant's store in the positions shown on <u>Exhibit "E"</u> attached hereto, which face panels shall be constructed and installed at Tenant's sole cost and expense. Attached as a portion of <u>Exhibit "E"</u> are plans and specifications for Tenant's current prototypical face panels and for Tenant's building signage, which Landlord hereby approves upon its execution of this Lease. Tenant may not install any signs on the roof of the Building. Notwithstanding the foregoing, Tenant, its successors, subtenants and assigns shall be entitled without Landlord's consent, but subject to the terms of the REA and governmental requirements, as aforesaid, to replace any and all of its signs with signage

consistent with Tenant's (or its successors' subtenants' or assigns') then-current prototypical sign plans.

(b) <u>Communications Equipment</u>. Tenant may install, maintain and/or replace any satellite dishes, antennas cellular and PCS towers and poles on the roof and/or exterior walls or parapet of the Building as Tenant deems necessary or desirable, provided same shall not adversely and materially affect the roof or the structural elements thereof and in accordance with the terms of the REA.

9. <u>Taxes</u>.

(a) <u>Taxes Contemplated Hereunder</u>. The term "Real Estate Taxes" shall mean all general real estate taxes and assessments and other ad valorem taxes, rates and levies paid upon or with respect to the Shopping Center, including the Premises, for a calendar year or a portion thereof to any governmental agency or authority and all charges specifically imposed in lieu of any such taxes. Nothing contained in this Lease shall require Tenant to pay any local, county, municipal, state or federal income, franchise, corporate, estate, inheritance, succession, capital levy, business or transfer tax of Landlord, or any local, county, municipal, state or federal income, profits, gross receipts, sales or renewal tax or charge upon the rent or other charges payable by Tenant under this Lease.

(b) <u>Payment of Real Estate Taxes</u>. At such intervals as Landlord is required to pay the Real Estate Taxes, Tenant shall pay Tenant's Pro Rata Share of Real Estate Taxes (calculated in the same manner as Tenant's Pro Rata Share of CAM Charges in paragraph 7(c)) levied against the tax parcel or parcels comprising the Shopping Center (the "Tax Parcel"). Tenant's Pro Rata Share of Real Estate Taxes shall be net of any early-payment discounts available at the time Tenant's payment is due. Tenant shall pay Tenant's Pro Rata Share of Real Estate Taxes within thirty (30) days after Tenant's receipt of Landlord's statement therefor, accompanied by the tax bill on the basis of which such statement is rendered. Landlord shall pay, or cause the payment of, all Real Estate Taxes before any fine, penalty, interest or cost may be added thereto, become due or be imposed by operation of law for the nonpayment or late payment thereof. In no event shall Tenant be liable for any discount forfeited or penalty incurred as a result of late payment by another tenant or by