EXHIBIT "F"

PERMITTED ENCUMBRANCES

1. Tenant exclusive uses:

   A. <u>Bed, Bath & Beyond</u>. Landlord has agreed that (with certain exceptions set forth in the Lease) it will not lease, rent or occupy or permit any other premises in the Shopping Center to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, for the sale, rental or distribution, either singly or in any combination, of items contained in any of the following respective categories of items: (a) linens and domestics (excepting therefrom fabrics and cloths sold in bulk); (b) bathroom items (excluding therefrom consumable products and consumable personal care items [e.g., soap, shampoo, toothpaste, perfume, medicine, vitamins, nail products]); (c) housewares (excluding therefrom (i) so called "major electronics" [e.g., televisions, stereos], provided "major electronics" shall not include, without limitation, household appliances such as microwaves and coffee makers, (ii) so called "white goods" [e.g., washer/dryer, dishwasher, refrigerator], (iii) lighting fixtures permanently installed in buildings or houses, (iv) hardware [i.e., tools and construction supplies and materials normally sold in hardware stores], (v) furniture, (vi) auto products, (vii) garden products and (ix) consumable laundry products [e.g., laundry detergent]); (d) frames and wall art (excluding therefrom an art gallery featuring original works of art with no custom framing); (e) window treatments (excluding therefrom custom made wood shutters); and/or (f) closet, shelving and storage items.

   B. <u>Michael's</u>. Neither Landlord nor any entity controlled by Landlord will use, lease (or permit the use, leasing or subleasing of) or sell any space in or portion of the Shopping Center or any property contiguous to the Shopping Center owned or controlled now or at any time hereafter by Landlord or any affiliate of Landlord, to any "craft store", store selling arts and crafts, art supplies, craft supplies, picture frames or picture framing services, artificial flowers, artificial floral arrangements, or any store similar to Tenant in operation or merchandising. This exclusive shall not apply to (i) any lessee whose lease was fully executed on the effective date of the Michael's Lease and is identified on <u>Exhibit 1</u> thereto as an "Existing Lease Not Subject to Tenant's Exclusive;" provided, however, that this exception shall not apply if (a) Landlord permits or agrees to an expansion of the premises for any such permitted use which violates Tenant's exclusive, or (b) Landlord permits or agrees to the change of a permitted use by any such lessee or its successors or assigns, or (c) Landlord permits or agrees to an assignment or sublease of such existing lease if Landlord may avoid the granting of such permission, or (d) Landlord has the right, by virtue of the provisions of the existing lease, to cause said lessee to honor the exclusive granted to Tenant by giving said existing lessee notice of this exclusive or otherwise, or (ii) any lessee or occupant, selling as an incidental portion of its overall business, items among those excluded by this exclusive (except for custom framing services) so long as the area used for the sale of said items do not in the aggregate

1 - Ex. "F"                                                                                        263761_8 (00051.42 [11992])

exceed the lesser of (a) One Thousand Five Hundred (1,500) leasable square feet, or (b) ten percent (10%) of said premises, in each case including properly allocable aisle space, but in no event shall this exception apply to custom framing services, it being the intention that no other occupant or lessee of the Shopping Center shall be permitted to offer custom framing services, (iii) any lessee or occupant in excess of 50,000 leasable square feet who operates as a full-line department store such as, or similar to the operation of a "Target" or "Kohls" as same operate as of the effective date of the Lease, (iv) any lessee or occupant in excess of 50,000 leasable square feet who operates as a full-line home improvement store such as, or similar to the operation of "Home Depot" or "Lowes" as same operate as of the effective date of the Lease, (v) any lessee or occupant in excess of 50,000 leasable square feet who operates as a full-line general merchandise store such as, or similar to the operation of a "Wal-Mart" as same operates as of the effective date of the Lease, (vi) any lessee or occupant in excess of 50,000 leasable square feet who operates as a full-line grocery store such as, or similar to an Albertsons, as same operates as of the effective date of the Lease, (vii) intentionally deleted, and (viii) any lessee or occupant who operates as a typical "art gallery" (by way of example, to display art) operates as of the effective date of the Lease provided that such "art gallery" does not exceed 2,500 leasable square feet. Notwithstanding the foregoing, the following leases (excluding their respective assignee or sublessee) shall not be deemed in violation of this exclusive provided such lessees continue to operate in the same manner as they operate as of the effective date of the Lease, (a) a photo finishing store such as "Fox Photo", (b) "Cost Plus", (c) a full-line toy store such as a "Toys R' Us", and (d) a full-line drug store such as a "Wal-Greens" or "Eckerds". In no event shall any occupant or lessee of the Shopping Center other than Michael's be permitted to render custom framing services.

C.  Office Depot. So long as an office supply store has not ceased to be operating in the premises for a continuous period in excess of six (6) months (excepting any periods during which remodeling or restoration work is being conducted with due diligence), Landlord shall not permit any occupant of the Shopping Center, other than Office Depot, to: (i) use more than one thousand five hundred (1,500) square feet of floor area (in the aggregate) for the sale, leasing, distribution or display of office supplies, including office furniture, office fixtures, office machines and equipment/electronics, computers (P.C.), computer hardware, software and accessories, cellular telephones and telecommunications equipment and services, art supplies, architectural supplies, engineering supplies, photocopying services, facsimile services, or instant print shop services; or (ii) be primarily engaged in the sale, leasing, distribution or display of any of the items set forth in (i) above. The provision of this section will not prohibit the sale of such items in a consumer electronics store of twenty-five thousand (25,000) or more square feet of leasable floor area (e.g., - Best Buy or Circuit City) provided that such consumer electronics store enters into a letter agreement with Office Depot stating that each party shall not be prohibited from selling those items typically sold in their respective stores. In addition to the foregoing, the provisions of this section shall not apply to any department store or discount department store (e.g., - Target, Wal-Mart, Kmart) in excess of eighty thousand (80,000) square feet

2 - Ex. "F"    263761_8 (00051-42 (11992))

of leasable floor area. Further, this section shall not prohibit a full-line furniture store from selling office furniture, provided the sale of office furniture is an incidental part of such business and the sales area devoted to office furniture does not exceed the lesser of (x) fifteen percent (15%) of such tenant's leasable floor area; or (y) three thousand (3,000) square feet of leasable floor area in such premises.

D.  **Big Five Corp.** Big is hereby given the exclusive right and privilege in the Shopping Center of operating a sporting goods business (the "Sporting Goods Exclusive"), subject to the paragraphs below. Landlord covenants during the term of the Lease, with respect to the Sporting Goods Exclusive, not to permit any buildings or other improvements located in the Shopping Center to be used or occupied for the Sporting Goods Exclusive, subject to the following paragraphs.

Notwithstanding the foregoing, the Sporting Goods Exclusive shall not apply to the following:

(a)     the sale by other tenants or occupants in the Shopping Center of any goods which are covered by the Sporting Goods Exclusive so long as such sales are incidental to the primary use of any such other tenant or occupant in the Shopping Center (any such sales shall be deemed "incidental" if the gross sales of such items constitute no more than ten percent (10%) of the gross sales from the premises of such tenant or occupant). Notwithstanding the foregoing, no sale by any tenant or occupant in the Shopping Center of athletic shoes, athletic apparel or sports memorabilia shall be considered in determining whether such sales are "incidental", nor shall any sale of athletic shoes, athletic apparel or sports memorabilia constitute a violation of the Sporting Goods Exclusive;

(b)     two (2) specialty sporting goods stores (e.g., a golf store, tennis store, ski shop, or the like), so long as each such store shall not exceed 1,500 square feet;

(c)     two (2) additional specialty sporting good stores (e.g., a golf store, tennis store, ski shop, or the like), so long as each such store shall not exceed 3,000 square feet;

(d)     any store whose primary business is the sale of athletic apparel or athletic shores (such as Just for Feet, Footlocker, or the like);

(e)     any store whose primary business is the sale of sports memorabilia;

(f)     any department store or discount department store (e.g., Target, K-Mart, Wal-Mart, Marshall's, or the like);

(g)     any drug store, grocery store or supermarket (e.g., Walgreen's, Albertson's, or the like); and

(h)     any business occupying the premises designated as "Office Depot" on the Plot Plan under the Office Depot Lease.

2.     **Permitted Title Exceptions:**

3 - Ex. "F"                                        263761_8 (00051.42 (11992))

A.  Reciprocal Easement Agreement, dated October 15, 1996, made and entered into by and between A.D.D. Holdings, L.P., a Texas limited partnership, and Cinemark USA, Inc., a Texas corporation, recorded October 16, 1996, as Document No. 96064909 in Book 3122, beginning at Page 12 of the real property records of El Paso County, Texas.

B.  Easement appurtenant to the Property, as evidenced by that unrecorded Agreement (the "Agreement"), dated May 21, 1970, made and entered into by and between Fred Hervey, individually and as Trustee of the Frederick Taylor Hervey, Jr. Trust Estate #2, the Evelyn Diane Hervey Trust Estate #2, the Sheryl Dee Gillett Trust Estate, the John Alanson Gillett Trust Estate and the Helen Shirleen Hervey Gillett Trust Estate, and Hercules Development Company, as grantor, and El Paso Electric Company, as grantee, said rights under the Agreement having been assigned by grantors to Providence memorial Hospital by that certain unrecorded instrument dated January 14, 1994, as evidenced by that certain Assignment, dated April 10, 1996, executed and delivered by Paso Del Norte Helath Foundation, a Texas non-profit corporation, f/k/a Providence Memorial Hospital, as assignor, to A.D.D. Holdings, L.P., as assignee, recorded April 10, 1996, as Document No. 96021669 in Book 3036, beginning at Page 734 of the real property records of El Paso County, Texas, such assignment having been ratified by El Paso Electric Company as evidenced by that certain Easement Ratification Agreement, dated April 10, 1996, made and entered into by and between El Paso Electric Company and A.D.D. Holdings, L.P., recorded April 10, 1996, as Document No. 96021670 in Book 3036, beginning at page 745 of the real property records of El Paso County, Texas.

C.  Easement for overhang of service wires for pole type utilities and buried service wires, conduits and pipes for underground utilities, and rights of ingress/egress for service to or construction of same, and private drainage easements which may be required if the subject lot is further subdivided, as evidenced by that certain map entitled Unit Sixty Nine Replat E, recorded October 8, 1996, as Document No. 96063061 in Book 71, beginning at Page 70 of the real property records of El Paso County, Texas.

D.  Reservation of mineral interests reserved as a free royalty to the Sate of Texas in that certain Patent, dated February 16, 1953, executed and delivered by the State of Texas, as grantor, to Willie R. Timmins, as grantee, recorded February 20, 1953, as Document No. 98232 in Book 1104, beginning at Page 355 of the real property records of El Paso County, Texas.

E.  Reservation of mineral interests reserved as a free royalty to the State of Texas in that certain Patent, dated May 12, 1953, executed and delivered by the State of Texas, as grantor, to Robert L. Chinn, as grantee, recorded May 18, 1953, as Document No. 3233 in Volume 1117, beginning at Page 251 of te real property records of El Paso County, Texas.

F. Underground Utility Easement, dated October 15, 1998, executed and delivered by A.D.D. Holdings, L.P., as grantor, to the City of El Paso, Texas, for use by its Public Service Board (El Paso Water Utilities), El Paso Electric Company, Southern Union Gas Company and Southwestern Bell Telephone Company, as grantee, recorded October 21, 1998, as Document No. 98075619 in Book 3464, beginning at Page 1261 of the real property records of El Paso County, Texas.

G. Underground Utility Easement, dated October 15, 1998, executed and delivered by A.D.D. Holdings, L.P., as grantor, to the City of El Paso, Texas, for use by its Public Service Board (El Paso Water Utilities), El Paso Electric Company, Southern Union Gas Company and Southwestern Bell Telephone Company, as grantee, recorded October 21, 1998, as Document No. 98075620 in Book 3464, beginning at Page 1270 of the real property records of El Paso County, Texas.

H. Underground Utility Easement, dated November 24, 1998, executed and delivered by A.D.D. Holdings, L.P., as grantor, to the City of El Paso, Texas, for use by its Public Service Board (El Paso Water Utilities), as grantee, recorded October 24, 1998, as Document No. 98085193 in Book 3485, beginning at Page 280 of the real property records of El Paso County, Texas.

I. Easement, dated October 22, 1998, executed and delivered by A.D.D. Holdings, L.P., as grantor, to El Paso Electric Company, as grantee, recorded October 27, 1998, as Document No. 98076923 in Book 3467, beginning at Page 5 of the real property records of El Paso County, Texas, as partially released by that certain Partial Release of Easement, dated October 30, 1998, filed by El Paso Electric Company, recorded November 2, 1998, as Document No. 98078523 in Book 3471, beginning at Page 191 of the real property records of El Paso County, Texas.

J. Easement, dated October 30, 1998, executed and delivered by A.D.D. Holdings, L.P., as grantor, to El Paso Electric Company, as grantee, recorded November 2, 1998, as Document No. 98078524 in Book 3471, beginning at page 194 of the real property records of El Paso County, Texas.

K. Easement, dated October 22, 1998, executed and delivered by A.D.D. Holdings, L.P., as grantor, to El Paso Electric Company, as grantee, recorded December 17, 1998, as Document No. 98091418 in Book 3499, beginning at page 111 of the real property records of El Paso County, Texas.

L. Deed of Trust and Security Agreement, dated July 21, 2000, executed and delivered by A.D.D. Holdings, L.P., as mortgagor, to Michael J. Hutson, as trustee, for the benefit of A.D.D. Development, L.L.C., a Texas limited liability company, as mortgagee, recorded July 21, 2000, as Document No. 20000051034 in Book 3824, beginning at Page 677 of the real property records of El Paso County, Texas.

M. Right to occupy the "demised premises", as evidenced by that certain Memorandum of Lease, dated September 20, 1999, made and entered into by and between A.D.D.

5 - Ex. "F"    263761_8 (00051/42 [11992])

Holdings, L.P., as landlord, and Office Depot, Inc., a Delaware corporation, as tenant, recorded October 13, 1999, as Document No. 99076819 in Book 3674, beginning at Page 805 of the real property records of El Paso County, Texas.

N. Right to occupy the "demised premises", as evidenced by that certain Memorandum of Lease, dated September 29, 1999, made and entered into by and between A.D.D. Holdings, L.P., as landlord, and Big 5 Corp., a Delaware corporation, as tenant, recorded November 4, 1999, as Document No. 99082558 in Book 3686, beginning at Page 94 of the real property records of El Paso County, Texas.

O. Right to occupy the "demised premises", as evidenced by that certain Memorandum of Lease, dated April 10, 2000, made and entered into by and between A.D.D. Holdings, L.P., as landlord, and Bed Bath & Beyond, Inc., a New York corporation, recorded May 10, 2000, as Document No. 20000032388 in Book 3785, beginning at Page 1043 of the real property records of El Paso County, Texas.

P. Right to occupy the "demised premises", as evidenced by that certain Memorandum of Lease, dated November 16, 2000, made and entered into by and between A.D.D. Holdings, L.P., as landlord, and Lowe's Home Centers, Inc., a North Carolina corporation, as tenant, recorded November 28, 2000, as Document No. 20000082910 in Book 3893, beginning at Page 522 of the real property records of El Paso County, Texas.

Q. Right to occupy the "demised premises", as evidenced by that certain Memorandum of Shopping Center Lease, dated April 13, 2000, made and entered into by and between A.D.D. Holdings, L.P., as landlord, and Michaels Stores, Inc., a Delaware corporation, recorded April 19, 2001, as Document No. 20010027765 in Book 3977, beginning at Page 1006 of the real property records of El Paso County, Texas.

R. Right to occupy the "demised premises", as evidenced by that certain Memorandum of Lease, dated September 29, 2000, made and entered into by and between A.D.D. Holdings, L.P., as landlord, and Kohl's Department Stores, Inc., a Delaware corporation, recorded April 19, 2001, as Document No. in Book 3977, beginning at Page 989 of the real property records of El Paso County, Texas.

S. Restrictions, as evidenced by that certain Special Warranty Deed, dated November 6, 1998, executed and delivered by A.D.D. Holdings, L.P., as grantor, to De La Vega Corporation, a Texas corporation ("De La Vega"), as grantee, recorded November 11, 1998, as Document No. 98081234 in Book 3478, beginning at Page 62 of the real property records of El Paso County, Texas.

T. Restrictions, as evidenced by that certain Special Warranty Deed, dated December 14, 1998, executed and delivered by A.D.D. Holdings, L.P., as grantor, to De La Vega, as grantee, recorded December 16, 1998, as Document No. 98091331 in Book 3498, beginning at Page 1489 of the real property records of El Paso County, Texas.

U.  Restrictions, as evidenced by that certain Special Warranty Deed, dated March 12, 1999, executed and delivered by A.D.D. Holdings, L.P., as grantor, to De La Vega, as grantee, recorded March 12, 1999, as Document No.99018726 in Book 3548, beginning at Page 1446 of the real property records of El Paso County, Texas.

EXHIBIT "G"

After recording return to:

SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

(Mortgage)

This SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT, dated the _____ day of _____, 2001, between _____, a _____ ("Mortgagee"), and CIRCUIT CITY STORES, INC., a Virginia corporation ("Tenant").

WITNESSETH:

(a) Tenant has entered into a certain lease (the "Lease") dated April 16, 2001, with A.D.D. Holdings, L.P., a Texas limited partnership ("Landlord"), covering premises located within that certain property known as Las Palmas Marketplace Shopping Center, located in the City of El Paso, El Paso County, Texas, and more particularly described in Schedule A hereto; and

(b) Mortgagee has made a loan to Landlord as evidenced and secured by a Deed of Trust recorded _____, 2001 in the land records of El Paso County, Texas, in Book _____ at page _____ (the "Mortgage"), encumbering the property described in Schedule A; and the parties hereto desire to set forth their agreement with regard to the priority of the Mortgage and the effect thereof on Tenant and its leasehold interest in the aforesaid premises, as set forth below.

NOW, THEREFORE, in consideration of the premises and of the sum of One Dollar ($1.00) by each party in hand paid to the other, the receipt of which is hereby acknowledged, the parties hereby agree as follows:

1. The Lease is and shall be subject and subordinate to the lien of the Mortgage insofar as it affects the real property of which the premises form a part, and to all renewals, modifications, consolidations, replacements and extensions thereof, to the full extent of the principal sum secured thereby and interest thereon.

2. Tenant agrees that it will attorn to and recognize any purchaser at a foreclosure sale under the Mortgage, any transferee who acquires the premises by deed in lieu of foreclosure, the successors and assigns of such purchasers, as its Landlord for the unexpired balance (and any extensions, if exercised) of the term of the Lease upon the same terms and conditions set forth in the Lease.

1 - Ex. "G"    263761_8 (00051742 [11992]1

3. In the event that it should become necessary to foreclose the Mortgage, Mortgagee thereunder will not terminate the Lease nor join Tenant in summary or foreclosure proceedings so long as Tenant is not in default under any of the material terms, covenants, or conditions of the Lease, beyond any applicable cure period provided in the Lease.

4. Mortgagee consents to the application of casualty and condemnation proceeds in accordance with paragraphs 15 and 16 of the Lease between Landlord and Tenant, whether or not the Mortgage is then foreclosed.

5. In the event that Mortgagee shall succeed to the interest of Landlord under the Lease, Mortgagee shall not be:

    (a) liable for any act or omission of any prior lessor (including Landlord); or

    (b) liable for the return of any security deposits unless delivered to Mortgagee; or

    (c) bound by any rent or other periodic payments which Tenant might have paid for more than the current month to any prior lessor (including Landlord); or

    (d) bound by any amendment or modification of the Lease made without its consent, which consent shall not be unreasonably withheld or delayed.

6. Notwithstanding the foregoing, Mortgagee acknowledges and agrees that if Mortgagee shall succeed to the interest of Landlord under this Lease, Mortgagee shall be subject to Tenant's remedies properly exercised under the Lease, including, but not limited to, Tenant's rights of self-help and/or setoff for any default, obligation, act or omission of any prior lessor (including Landlord) as provided in the Lease and that such rights of Tenant are not limited or impaired in any way by the terms and provisions of this Agreement.

7. Notwithstanding anything contained herein to the contrary, it is expressly understood and agreed that in the event that Landlord defaults in the payment of the Tenant Improvement Allowance, as defined in the Lease, and Mortgagee acquires title to the Shopping Center by foreclosure or otherwise, Mortgagee shall become liable for payment of the Tenant Improvement Allowance to Tenant, and Tenant shall otherwise be entitled to effect a Transfer all in accordance with the terms of the Lease.

8. Mortgagee, Landlord and Tenant, respectively, represent and warrant to each other that each has the requisite power and authority to enter into this Agreement; that all necessary and appropriate approvals, authorizations and other steps have been taken to effect the legality of this Agreement; that the signatories executing this Agreement on behalf of Mortgagee, Landlord and Tenant have been duly authorized and empowered to execute this Agreement on behalf of Mortgagee, Landlord and Tenant, respectively; and that this Agreement is valid and shall be binding upon and enforceable against Mortgagee, Landlord and Tenant shall inure to the benefit of the parties hereto, and their successors and assigns and shall inure to the benefit of Mortgagee.

9. Tenant hereby agrees that, upon the occurrence of an Event of Default (as defined in the Lease), Mortgagee shall have the same time period for cure of such default as is given Landlord in accordance with the terms of the Lease, following notice given by Tenant to Mortgagee at the following address, in the same method for notice as is required under the Lease:

    _____

    _____

    _____

10. All notices between the parties hereto shall be in writing and comply with the terms of paragraph 34 of the Lease.

IN WITNESS WHEREOF, the parties hereto have executed these presents the day and year first above written.

MORTGAGEE:

COMPANY NAME

WITNESS:

_____          By: _____
                                Name: _____
_____          Title: _____

TENANT

3 - Ex. "G"                                    263761_8 (00051/42 (11992))