# Lease Synopsis 1/4/07

**PROPERTY:** Power Center

**SPACE #:** 00PC1

LEASE ID # PC00001  
TENANT ID # CIRCUITC  
UNIT ID # PC1

New Lease ☒  
Renewal ☐     Default History: ☐ Excellent  ☐ Poor  
Expansion ☐  
Relocation ☐   From: _____  To: _____  
Current Lease Expiration Date: 1/31/17  
Current Options: 4, 5-year options

**Person Requesting Lease:**

**Lease Type:**   Standard Lease ☒     Amendment ☐  
　　　　　　　　Kiosk ☐             Other (explain) ☐  
　　　　　　License Agreement ☐

1. A. Tenant's Full Name: Circuit City Stores, Inc.

   B. State of Incorporation or Residency: Virginia

   C. D/B/A: Circuit City #3246

   D. Social Security/ Federal Identification Number:

   E. Notice Address: Circuit City Stores, Inc. – 9950 Mayland Drive – Richmond, VA 23233 Attn: Corporate Secretary

   **Phone:** 804/527-4000; **Fax:** 804/527-4186

   Notice 2 Address: Circuit City Stores, Inc. – 9950 Mayland Drive – Richmond, VA 23233 Attn: Vice President of Real Estate

   **Phone:** 804/527-4000; **Fax:** 804/527-4186

   F. Billing Address: Circuit City Stores, Inc. d/b/a Circuit City # 3246 – 9950 Mayland Drive – Richmond, VA 23233

   **Phone:** 804/527-4000; **Fax:** 804/527-4186

   G. Guarantor: N/A

   H. Lien Holder: N/A

   I. Premise Phone/Fax: 843/444-2407

   J. Premise Address: 550 Seaboard Street – Myrtle Beach, SC 29577

   K. Contact Person:

2. **SQUARE FEET:** 31,443   Actual SF

3. **TERM:** 15 Years _____ Months _____ Target Open Date

4. **MINIMUM ANNUAL RENT:**

   | | | | | | | | | |
   |---|---|---|---|---|---|---|---|---|
   | $ 438,629.85 | Per year | $ 36,552.49 | Per month | For years: | 3/6/01 | - 1/31/07 | $ 13.95 | Per Sq. Ft. |
   | $ 482,492.84 | Per year | $ 40,207.74 | Per month | For years: | 2/1/07 | - 1/31/12 | $ 15.35 | Per Sq. Ft. |
   | $ CPI | Per year | $ | Per month | For years: | 2/1/12 | - 1/31/17 | $ | Per Sq. Ft. |

   §4 (iii) **Increases in Base Rent:** Annual Rent shall increase on the first day of the sixth and every succeeding fifth Lease Year, over the initial Base Rent by the lesser of ten percent (10%) or three (3) times the percentage increase in the "CPI-U" during the five (5) year period ending on October 31 of the fifth (or, applicable, any succeeding fifth) Lease Year, but in any event, shall not decrease from the Base Rent of the preceding five (5) year period.

5. **PERCENTAGE RENT:** N/A

   **SALES DUE:** N/A

6. **LATE CHARGES:** N/A

7. **RENTAL DEFAULT RATE:**
   Comments: landlord shall have the right to collect Base Rent and other charges when due (plus interest at the Default Rate to the extent Tenant fails to pay base rent and other charges due within 10 days after notice from LL that Tenant's payments are past due.

8. **EVENT OF DEFAULT (Cure Periods):**

Prepared by: K. Engelhardt 1/4/07

Monetary: 10 days after receipt of written notice from landlord to tenant that same is overdue (in which event the delinquent amount shall accrue interest from the expiration of the 10 day notice period at the Default Rate).
Non-Monetary: 30 days after receipt of written notice from Landlord to Tenant specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured, Tenant shall have such longer period as reasonably necessary to cure the default.

9. **REMEDIES:** see Page 43 -45; Section 28 (a-d)

10 **USE:** § 18 (a): For the use as a retail store for (i) the sale of consumer, office and automotive electronics products (which include, but shall not be limited to, televisions, stereos, speakers and video recorders and players), computer hardware and software, entertainment software and entertainment media (which include, but shall not be limited to, records, game cartridges, video tapes, cassettes and compact discs), cellular and wireless telephones and telecommunication devices, household appliances (which include, but shall not be limited to, refrigerators, freezers, stoves, microwave ovens, vacuum cleaners and dishwashers) and related goods and the sale and installation of motor vehicle audio, stereo and telephone systems and technological evolutions of the foregoing (all of such items being herein collectively referred to as the "Products"), and (ii) renting, servicing, repairing and warehousing of the Products.
**18 (b):** Tenant shall have the right to use the premises for any lawful use; provided, however, that the premises shall not be used for (i) any illegal purpose, (ii) for any use prohibited under paragraph 19(a)(viii), (iii) in violation of any exclusive use restriction granted a tenant or other occupants of the shopping center (not to exceed two (2) such tenants or occupants) pursuant to a lease or restrictive covenants executed within one (1) year after tenant opens for business to the public at the premises, which exclusive use restrictions shall be limited to any two (2) of the exclusive uses shown on Exhibit "F", paragraph I(A), or (iv) in violation of any other applicable provision of the "Permitted Encumbrances" contained in Exhibit "F".

**Exclusive:**
§ 19 (vi): So long as the premises are used for the initial uses set forth in paragraph 18, no other tenant or occupant of the Shopping center shall be entitled to sell or rent (or rent to own) any of the products, subject only to rights granted any such tenant under leases in existence as of this Lease date and described in Exhibit "F". The foregoing, however, shall not restrict (a) the incidental sale of products in any individual store within the shopping center as long as the sales area of the products, in each such individual store does not exceed the greater of two (2%) percent or five hundred (500) square feet, measured from the back of the display rack to the center of the aisle or (b) an office supply superstore merchandised and operated similar to an Office Depot as of the date of this Lease.
§ 1: Tenant shall the exclusive rights to six (6) parking spaces labeled "Car Stereo Parking" at the rear of the building as shown on the site plan.

*Conform with existing Property Exclusives:*  Yes ☒  No ☐

**Restrictions:** §14 (a) Landlord shall not construct, or permit to be constructed, any improvement in the shopping center, nor conduct any activity, or permit the conduct of any activity, in the shopping center which will prevent Tenant from being able to obtain insurance coverage at commercially reasonable rates.
§ 19 (viii) **Prohibited Activities:** Landlord shall not operate or lease (or permit to be operated or leased) any building or tenant space in the Tenant's Preferred Area or elsewhere in the shopping center (or, as to those set forth in clauses (a), (b), (c), (n), (o), (p), (r) and (u), within 125 feet of the front entrance to the Building, provided in all events that such uses are then-customarily found in first-class shopping centers) for use as: See this section for further details....(pages 33-34)
In addition to the foregoing, Landlord shall not operate, lease or permit to be operated or leased any restaurant or bookstore within any building on Landlord's Premises which is located within 125 feet of the front entrance to the building. In addition, no auction, fire or going-out-of business sale shall be conducted in the shopping center.
(ix)(a) **Building Height and Location:** No building adjacent to the premises or elsewhere in the shopping center (exclusive of the premises) shall exceed twenty-eight (28) feet in height above the finished grade, nor shall it be positioned so as to project beyond the portion of the front wall of the building immediately adjacent thereto. No outparcels, barriers, buildings, kiosks or other structures, either temporary or permanent, shall be located within Tenant's Preferred Area, and no building located on an outparcel in the shopping center shall exceed one story, twenty-two (22) feet in height, nor shall it exceed the size necessary for such outparcel to maintain, within its boundaries, the parking ratio required for its use under the applicable zoning code without use of parking spaces located in the common areas. No development shall occur within the shopping center except within the permissible building areas shown on the site plan.
(ix)(b) **Construction and Alterations:** Following the initial build out of the shopping center, no exterior construction and no construction staging, shall be permitted in the shopping center during the months of October, November and December, except for emergency repairs. In the event of any construction within the shopping center, LL shall designate a construction access route, staging and parking areas located so as to minimize interference with customers or the operations of other occupants of the shopping center and shall require erection of safety barriers as necessary and an opaque wall around the site of such construction of a size necessary to screen such construction from ground level view. Any other changes to the Common Areas which affect Tenant's parking, visibility or access may be made only upon Tenant's express written consent, which consent shall not be unreasonably withheld.
(ix)(c) **Prohibited Uses in Common Area:** Landlord covenants that it shall not, without Tenants express written consent (not to be unreasonably withheld), permit the following uses or activities to occur in the Common Areas: (1) advertisements or signs except for the pylon and/or monument signs, the "for rent" signs and traffic control signs except as shown on the site plan; (2) display or sale of merchandise (except for periodic outside sales not to exceed four (4) occurrences per year or fifteen (15) days per occurrence) provided, however, that this paragraph 19(a)(ix)(c) shall not be deemed violated if such sales are conducted by Michael's Inc or such sales occur within twenty (20) feet of a third party tenant's front entrance and extend no further than five (5) from the front wall of such tenant's space; (3) operation of loudspeakers or other sound electronically amplified so as to be heard in the Common Areas; (4) imposition of a charge for parking; or (5) operation of cellular telephone or other telecommunication tower for use by any other party not an occupant of the shopping center.
(x) **Interference with Tenant's Reception/Transmission:** Landlord shall not install or permit to be installed by any other tenant or other person anywhere in the shopping center, any structure or equipment which would cause any interference with satellite, radio or television reception or transmission in or from the building.

§19(a) (ix) (d)**Easements:** Landlord shall not subdivide, parcel, or otherwise divide the shopping center or create any easements in the Common Areas without Tenant's prior written consent except for utility and drainage easements necessary to facilitate LL's development of the shopping center, provided in all events Tenant's use and operation of the premises are not materially adversely affected (or, if such easements are to be located within the Tenant's Preferred Area, then provided Tenant's use and operation of the premises are not adversely affected).

Prepared by: K. Engelhardt 1/4/07

Operation (continuous/go dark) and Landlord's right to recapture:
18 (c) Nothing contained in this lease shall be construed to require Tenant to operate the premises continuously either for the use first state or for any other use. Without limiting the generality of the foregoing, if Tenant fails for a period of 270 days to be open for business in the premises (excluding a closing following a casualty or condemnation or in connection with remodeling of the premises), then LL shall have the right to terminate this lease at any time after the expiration of such 270 day period prior to Tenant reopening for business, by delivery to tenant of notice that the lease shall terminate if Tenant does not reopen for business within 45 days of receipt of such notice; Such notice shall be deemed null and void and no force and effect if, following receipt thereof and prior to the expiration of such forty-five (45) day period, Tenant either (i) reopens its business fully stocked, fixtured and staffed or (ii) delivers evidence to LL that Tenant has entered into an assignment of this lease or sublet of the premises and such assignee or sublessee uses its good faith, diligent efforts to open its business within one-hundred twenty (120) days of such assignment or sublet, and in all events, proceeds with due diligence and subsequently opens its business within one-hundred eighty (180) days of such assignment or sublet. If LL does so terminate this lease, LL shall reimburse to Tenant all of Tenant's unamortized costs of its improvements (including, without limitation tenant improvements and fixtures [other than removable trade fixtures], but excluding inventory) to the premises which have not been previously reimbursed to Tenant or included in the Tenant Improvement Allowance (unless not paid by LL) ("Unamortized Costs").

11  **MARKETING FUND / MERCHANTS' ASSOCIATION**: N/A

12  **SECURITY DEPOSIT:**       N/A

13  **RENT COMMENCEMENT DATE: RCD = 3/6/01**      ☒ On the date (subject to paragraph 3 of Construction Provisions) on which Landlord makes payment of the Tenant Improvement Allowance as set forth in the Construction Provisions (the "Commencement Date").

**DATE OF POSSESSION: 6/1/00**

**DATE OPENED FOR BUSINESS:**

14  **TAXES:**
☐ Monthly Pro Rata $ _____    ☐ Cap ____ %    ☒ Annual Billing
PILOT Included ☒ Yes ☐ No                         ☐ Other
TMS# 180-00-02-119
**Payment:** At such intervals as Landlord is required to pay Real Estate Taxes, Tenant shall pay its pro rata share of Real Estate Taxes within thirty (30) days after Tenant's receipt of Landlord's statement therefore, accompanied by the tax bill on the basis of which such statement is rendered. Should LL fail to pay such RE Taxes, Tenant shall have the right, at its election, to cure such failure by payment of delinquent RE Taxes and any interest and penalties due, and Tenant may deduct the cost, plus interest at the lesser of fifteen percent (15%) per annum or the highest rate permitted by State law (the "Default Rate"), from the next installment(s) of base rent and other charges due hereunder up to fifty percent (50%) of the base rent and additional rent due LL hereunder.
**Contest:** Tenant shall have the right, at Tenant's sole expense, to contest the amount and validity, or otherwise seek an exemption or abatement, of any Real Estate Taxes or to seek a reduction in the valuation of the premises assessed for RE Tax purposes, provided that Tenant shall first have notified Landlord of its intent to do so and LL shall have failed to notify Tenant in writing, within five (5) days of receipt of Tenant's notice, that LL intends to contest such RE Taxes or seek such reduction.

15  **OPERATING COST (CAM): Based on $1.75/SF**
☒ Monthly Pro Rata $  1956.64  ☐ Cap  5  %    ☐ Other _____
☒ Administrative Fee 7%
Exclusions ☒ Yes ☐ No    If yes, Page(s) 7-9; Section 1-16
**Comments:** The annual CAM charge shall be computed on the basis of twelve (12) consecutive calendar months, as designated by LL and shall be paid by Tenant in equal monthly installments, on the fist day of each month during such CAM year. CAM charges shall not exceed by more than five (5%) percent those in effect during the preceding CAM year (except to the extent insurance premiums are increased as a direct result of circumstances beyond LL control). For any period with the term which is not a full CAM year, the annual charge shall be appropriately prorated. In no event shall the dominator be less than the greater of 75000 sf or 90% of the actual leasable area. The balance of CAM charges shall be borne by LL and/or other Tenants.

**Reconciliation:** Within sixty (60) days after the end of the first CAM year and each CAM year thereafter, LL will furnish to Tenant a statement showing in detail (with such substantiating documentation as Tenant may reasonably request) the amount of the CAM charges for the preceding CAM year and the then-current number of square feet of ground floor leasable area in the shopping center. Any necessary adjustment with respect to amounts owed by either party for such preceding CAM year shall be made; and the monthly payments to be made by tenant for the ensuing year shall be estimated according to the common area maintenance budget prepared by LL and delivered to Tenant.

**Audit:** Tenant shall have the right, but not more than once as to any CAM year and no later that three (3) years after the end of such CAM year, to examine and make copies of the records pertaining to CAM charges for such CAM year. If the examination discloses any overcharge by Landlord, LL shall reimburse Tenant within ten (10) days for any overpayment of Tenant's prorata share of CAM charges; and if such overpayment by Tenant is in excess of three (3%) percent of the actual prorata share, LL shall reimburse Tenant for the reasonable cost of such examination or audit.

**Prohibited uses in Common Areas:** Landlord covenants that it shall not, without Tenant's express written consent (not to be unreasonably withheld), permit the following uses or activities to occur in the common areas: (1) advertisements or signs except for the pylon and/or monument signs described in paragraph 8, the "for rent" signs described in paragraph 27 and traffic control signs except as shown on the site plan; (2) display or sale of merchandise (except for periodic outside sales no to exceed for (4) occurrences per year of fifteen (15) days per occurrence) provided, however, that this paragraph 19(a)(ix)(c) shall not be deemed violated if such sales are conducted by Michael's Inc or such sales occur within twenty (20) feet of a third party tenant's front entrance and extend no further than five (5) from the front wall of such tenant's space; (3) operation of loudspeakers or other sound electronically amplified so as to be heard in the common areas; (4) imposition of a charge for parking; or (5) operation of cellular telephone or other telecommunications tower for use by any other party not an occupant of the shopping center. LL further covenants that it will not seek, nor permit any other

of tenant of the shopping center to seek a variance or waiver from the minimum parking requirements applicable with the shopping center under the zoning code or other applicable ordinance establishing the ratio of parking spaces to the building area or otherwise mandating the number of parking spaces required for the shopping center and the uses contained therein.

16 **OPERATING COST (INSURANCE):** Included in CAM
   **Reconciliation:**
   **Audit:** Tenant shall have the right, but not more than once as to any CAM Year and no later than three (3) years after the end of such CAM year, to examine and make copies of the records pertaining to CAM charges for such CAM year. If the examination discloses any overcharge by Landlord, LL shall reimburse Tenant within ten (10) days for any overpayment of Tenant's Pro Rata share of CAM charges; and if such overpayment by Tenant is in excess of three (3%) percent of the actual pro rata share of CAM charges, LL shall reimburse Tenant for the reasonable cost of such examination or audit.
   **14 (a) Property Damage:** Tenant shall keep the premise insured against loss or damage by fire and the perils covered under standard "all risk" or "special form" coverage in the amount of full replacement value of the building, exclusive of excavation, footings and foundations (which initial amount shall not be less than the Tenant Improvement Allowance), with a commercially reasonable deductible, for which Tenant shall be fully responsible. Landlord and Landlord's first "Mortgagee" shall be named in such policy or policies as additional insureds.
   **14 (b) Liability Insurance:** Tenant shall keep in full force a policy of commercial general liability insurance with bodily injury and property damage coverage with respect to the premises and business operated by Tenant, which shall name Landlord and Landlord's first "Mortgagee" as additional insureds.
   **14 (c) Workers' Compensation Insurance:** To the extent required by law, Landlord and Tenant shall maintain workers' compensation insurance covering their respective employees in statutory limits, or maintain such alternate coverage or arrangements as legally permissible.
   **14 (e) Common Area, Additional Area and Third Party Insurance:** Landlord shall keep in full force and effect, (1) commercially general liability insurance, (2) property insurance against loss or damage by fire and the perils covered under standard "al risk" or "special form" coverage, with respect to the Common Areas and other areas of the shopping center over which LL has possessory rights. The cost of premiums shall be included in CAM, provided Tenant shall not be liable for its prorate share of any premium for coverage in excess of that coverage which is customary among owners of like shopping centers in the city.
   **14 (f) Policy Provisions:** Landlord shall not be entitles to self-insure against any of the risks recited herein, except the amount of any commercially reasonable deductible shall be deemed to be self-insurance.

17 **RADIUS RESTRICTION LIMIT:**
   ☐ No Change    ☐ _____ Miles radius restrictions    ☒ None

18 **KIOSK/CART RESTRICTION** (Excluding existing):    ☐ Yes    ☒ No    If yes, how many feet? _____ Ft.

19 **OPTION:** **240** days prior to the end of the current Term, however, if Tenant does not give notice, Tenant's right to exercise shall continue until 10 business days after LL has given Tenant written notice of LL's option to terminate, during 10 days Tenant may exercise its option.
   Extension Option    ☒ Yes    ☐ No    If Yes, __4__ Option(s) of __5__ Year(s) each

   Option #1 Notification Date: 6/1/16      Option #1 Termination Date: 6/30/16
   Option #2 Notification Date: 6/1/21      Option #2 Termination Date: 6/30/21
   Option #3 Notification Date: 6/1/26      Option #3 Termination Date: 6/30/26
   Option #4 Notification Date: 6/1/31      Option #4 Termination Date: 6/30/31

   **MINIMUM ANNUAL RENT:**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| $ CPI | Per year | $ | Per month | For years: | 2/1/17 | - 1/31/22 | $ | Per Sq. Ft. |
| $ CPI | Per year | $ | Per month | For years: | 2/1/22 | - 1/31/27 | $ | Per Sq. Ft. |
| $ CPI | Per year | $ | Per month | For years: | 2/1/27 | - 1/31/32 | $ | Per Sq. Ft. |
| $ CPI | Per year | $ | Per month | For years: | 2/1/32 | - 1/31/37 | $ | Per Sq. Ft. |

Prepared by: K. Engelhardt 1/4/07

20 **CONSTRUCTION:** Tenant shall have the right to construct a one-story retail building with
§2. **Construction of Building and Improvements:** Tenant shall have the right to construct a one-story retail building with provisions for customer pick up, delivery and car stereo installation facilities, initially for use as a Circuit City Superstore (the "Building"), together with loading ramps, sidewalks, trash transformer pad and other such appurtenances and improvements (collectively, the "Other Improvements"), as more particularly set forth in the Construction Provisions. Title to the improvements shall be deemed transferred to Landlord upon full payment of the "Tenant Improvement Allowance", as defined in the Construction Provisions. The Improvements and the Land are referred to herein as the "Premises".

**Exhibit "C" Construction Provisions:**
1 **(b) Site Work:** Landlord acknowledges receipt of, and covenants to comply with the "Civil Plans" and with Circuit City Stores, Inc. standard construction specifications attached hereto as Exhibit "C-1" in the completion of Landlord Work.
**(d) Landlord Work:** All of the work described to be performed by Landlord in this paragraph 1 is collectively referred to as the "Landlord Work" and shall be performed in accordance with all applicable laws and this lease, in a good and workmanlike manner. See this section for further detail.....

2 **(a)** Upon completion of all requirements therefore, Landlord shall give Tenant written notice (which shall include any required certifications, including, but not limited to those required by the standard specifications) of delivery of the land in the form of Attachment "2". Tenant shall promptly notify LL if any such requirement as not been met to Tenant's reasonable satisfaction.

**(b) Plans and Specifications:** Tenant shall prepares and furnish to Landlord for its approval, not to be unreasonably withheld, conditioned or delayed, complete architectural drawings and specifications including building elevations for the construction of the building and other improvements, incorporating therein the items specified and shown in the "Schematic Floor Plan and Elevation" (which are hereby approved by LL) attached to Exhibit "C" as Attachment "3". LL agrees that it will approve the plans and specifications, within 10 days after receipt thereof. If plans and specifications are not disapproved by LL within 15 days of delivery thereof to LL, they will be deemed approved.

**(c) Permits:** Tenant, at its sole cost and expense, shall obtain or cause to be obtained those certain permits, licenses, other governmental approvals and temporary and permanent certificated of occupancy which may be required for the lawful construction and occupancy of the premises as a retail shopping facility in accordance with the plans and specifications. Landlord agree to assist and cooperate fully with Tenant in obtaining such permits, licenses, approvals and certificates, provided, LL shall not be obligated to make any payments to any applicable governmental authority except otherwise provided in this lease.

21 **CONSTRUCTION/TENANT ALLOWANCE:** §3 of Exhibit "C" Construction Provisions: Landlord shall pay to Tenant a "Tenant Improvement Allowance" in an amount equal to $60.00 psf of ground-floor gross leasable area of the building, payable by wire transfer of funds by Landlord to Tenant's account no later than thirty (30) days after Substantial Completion and receipt of items (i), (ii), and (iii) of this section. If LL fails to pay the Tenant Improvement Allowance in full within thirty (30) days after Substantial Completion and receipt of items (i), (ii), and (iii), the LL shall be in default, no ground rent, base rent or CAM charges shall be due owing to LL until same is paid to Tenant, together with interest which shall accrue on the unpaid allowance at the default rate commencing on the thirty-first (31st) day following Substantial Completion until the date of payment. If LL has not tendered payment of the allowance and interest by that date which is one (1) year from Substantial Completion, then (i) such date shall become the Commencement Date, (ii) Base Rent shall be reduced to ground rent equal to $75,000.00 per annum during the first year, $50,000.00 per annum during the second year, and $25,000.00 per annum thereafter during the term of the lease, (iii) this lease shall be converted to a ground lease, with ownership of the improvements remaining with Tenant, and LL's and any Mortgagees' names being removed as additional insureds or mortgagees on any casualty insurance described in paragraph 14 (a) of the lease.

Substantial Completion of the Improvements shall be deemed to occur when a certificate of occupancy, whether temporary and subject to minor items to be completed, or permanent, as the case may be, has been issued by the applicable governmental authority.

22 **DAMAGE/CONSTRUCTION DEPOSIT:** N/A

23 **CONSTRUCTION DELAY PENALTIES:**
In the event, for any reason whatsoever and regardless of force majeure, Landlord shall fail to complete delivery of the land to Tenant by the date which is thirty (30) days from the Delivery Date, Tenant shall be entitled to terminate this lease at any time prior to such delivery and receive from LL promptly thereafter a sum equal to the actual out-of-pocket expenses and substantiated third-party legal, architectural and engineering costs incurred by Tenant to the date of termination, not to exceed $100,000.00 or Tenant may elect to delay opening of its store for a period not to exceed nine (9) months, during which time, tenant shall pay no ground rent, base rents, real estate taxes or CAM charges. See § 29 (c) for further information.

24 **COMMISSION:** ☒ Yes ☐ No
Broker: Capital Centre Development, Ltd. and B&C Prudential Realty Co.
Payment Terms: Commission shall be paid pursuant to their separate written agreement

25 **PYLON SIGN** "tenant permitted on sign": ☒ Yes ☐ No ☐ N/A
§8: If (i) Landlord constructs and installs upon the common areas a pylon sign structure identifying the shopping center, and/or (ii) LL constructs and installs upon the common areas a pylon sign intended for purposes other than identifying the shopping center, but at least one (1) other occupant of the shopping center is identified on such pylon, and/or (iii) LL constructs and installs on a tract outside of the shopping center a pylon sign structure on which at least one (1) other occupant of the shopping center is identified, then LL shall ensure that such pylon sign(s) shall have sufficient space thereon in a mutually agreeable tenant position for inclusion of double-sided "face-panels" identifying tenant's store. Tenant's face panels shall be constructed and installed at tenant's sole cost and expense. Tenant shall also be responsible for reimbursing LL for Tenant's proportionate share of the cost of constructing, installing, illuminating, maintaining, repairing and/or replacing any such sign structure(s), based upon a fraction, the numerator of which is the square footage of the Tenant's face panel(s) and the denominator of which is the total square footage of all permissible face panels on the pylon sign structure(s).

Landlord hereby approves upon its execution of this lease, subject to satisfaction of the condition set forth in Section 3 of the REA to the effect that no sign panel on the pylon sign structure shall be larger than the sign panel identifying "Home Depot", an occupant of the tract adjacent to the shopping center. Notwithstanding the foregoing, Tenant, its successors, subtenants and assigns shall be entitled without LL consent, but subject to governmental requirements, as aforesaid, and to the terms and conditions of the REA, to replace any and all of its signs with signage consistent with tenant's then current prototypical sign plans.

**16 (f) Taking of the Pylon Sign:** In the event of taking, whether permanent or temporary, of any pylon or monument sign (as contemplated by paragraph 8) on which tenant has installed identification panels, LL shall provide within ninety (90) days a substitute site (reasonably acceptable to Tenant) therefor, with adequate electrical power, located so as to be visible to vehicular traffic or roadways adjacent to the shopping center and/or at entrances, and LL shall, subject to municipal and/or county regulation, replace and/or rebuild any of such signage so taken at its sole cost.

26  **SIGNAGE:** Tenant, its successors, subtenant and assigns shall be entitled without Landlord's consent, but subject to governmental requirements, as aforesaid, and to the terms and conditions of the REA, to replace any and all of its signs with signage consistent with Tenant's (or its successors' subtenants' of assigns') then-current prototypical sign plans.

27  **ASSIGNMENT/SUBLETTING:**
§17 Tenant shall have the right to sublet, assign, transfer reassign and grant concessions or licenses in all or any part of the premises and any of Tenant's rights and obligations under this lease during the term, without Landlord's prior consent; provided, however, LL shall not be obligated to enter into a "Sublease Recognition Agreement" in connection with a proposed subletting of all or any part of the premises by Tenant unless such subletting is made subject to LL's reasonable consent. In the event of a transfer, tenant shall remain liable for all of Tenant's obligations to LL arising hereunder, provided that in no event shall Tenant be liable for any obligation or liability arising out of any change, modification or amendment of the lease by LL and any transferee. Landlord shall have the right (except in connection with a corporate transfer), following receipt of written notice from tenant notifying LL of impending transfer, and identifying a proposed assignee or sublessee, to recapture the premises and terminate this lease upon payment to Tenant of a sum equal to the amount of Tenant's unamortized costs (as defined in paragraph 18(c) "Tenant Improvements"). If LL elects to terminate the lease, the lease shall terminate on the earlier of (i) the date tenant vacates the premises, or (ii) ninety (90 days following delivery of the transfer notice. The unamortized costs shall be paid to Tenant by LL on the date of termination.

28  **ESTOPPEL/SNDA:**
Estoppels: within thirty (30) days after written request by either party without charge.
SNDA: § 21 Simultaneously with the execution hereof, Landlord shall deliver to Tenant with regard to any and all mortgages encumbering the premises and placed thereon by LL, a non-disturbance and attornment agreement in the form of Exhibit "G", executed by the holder of such mortgage. Upon Tenant's receipt, this lease shall be subordinate to the corresponding mortgage. After the delivery by the LL of the non-disturbance and attornment agreement issued by the mortgagee providing the Tenant Improvement Allowance, LL agrees to pay Tenant's reasonable attorney's fees, to the extent in excess of $1,000.00 in the aggregate, incurred in negotiating any additional subordinations, non-disturbance and attornment agreements, reciprocal easement agreements or other documents required in the event LL sells, finances or refinances the premise of the shopping center, or enters into any other transaction requiring the execution of same, including the reasonable equivalent of such fees in the event Tenant elects to utilize in-house legal counsel.
§ 22 Tenant agrees to pay Landlord's reasonably attorney's fees incurred in negotiating any consents, lien waivers or other documents required in the event Tenant secures any financing or general credit lines as provided in paragraph 22 (but only in excess of $1,000.00).

29  **CONTINGENCIES / COMMENTS:**

30  **GENERAL RIDER:** ☐ Yes  ☒ No

31  **EXHIBITS TO LEASE:**

Exhibit "A" - Site Plan
Exhibit "A-1" - Legal Description
Exhibit "B" - Index of Definitions
Exhibit "C" - Construction Provisions
Attachments to Exhibit "C":
Attachment "1" - Construction Schedule
Attachment "2" - Site Work Certification
Attachment "3" - Schematic Floor Plan and Elevations
Exhibit "C-1" - Standard Design and Construction Specifications
Exhibit "D" - Removable Trade Fixtures, Prohibited Activities and Permitted Title Exceptions
Exhibit "E" - Sign Plans and Criteria
Exhibit "F" - Permitted Encumbrances
Exhibit "G" - SNDA Agreement (Mortgage)
Exhibit "H" - Memorandum of Lease
Exhibit "I" - Commencement Date Agreement
Exhibit "J" - Indemnification Agreement

**§ 5 Development of Shopping Center by Landlord:** Landlord covenants to construct, develop and operate a first-class shopping center. The location of buildings and other tenant space therein will only be within the "Permissible Building Areas" designated on the Site Plan, Exhibit "C" (Construction Provisions) and Exhibit "C-1" (Standard Design and Construction Specifications). The parking ratio for the shopping center shall be at least as shown thereon, but in no event shall said ratio be less than the greater of (i) five (5) spaces (for full sized automobiles) per 1,000 square feet of gross leasable area or (ii) that required by applicable zoning requirements, without application for variance. In constructing improvements adjacent to the premises, LL shall have the right to tie-into the roofline of the premises so long as any such construction does not bear structurally upon the premises and so long as any such

Prepared by: K. Engelhardt 1/4/07

construction activities are otherwise in accordance with this lease. LL's construction shall not unreasonably interfere with the conduct of Tenant's business.

**§ 6 Easements:** Landlord also grants to Tenant those non-exclusive leasehold easements which shall run as covenants with LL's premises and the premises during the term, over LL's premises, which are useful and appropriate for the construction, operation and maintenance of the premises, including, but not limited to: (a) During the construction term, and any period of renovation or reconstruction thereafter, LL grants to Tenant (i) a nonexclusive easement across a mutually agreeable designated route, providing access to and from the public roadways nearest to the land, over common areas (as defined in paragraph 7(a) below) for construction access to the premises, as well as an exclusive easement for construction for staging area of approximately 20,000 square feet, in a portion of the common areas at a mutually agreeable location for Tenant's use in constructing the improvements, (ii) an easement to permit the building to abut adjacent buildings, and the foundations, footings, common walls and roof projections to bear structurally upon LL's premises, (iii) an easement for such additional underground, public or private utility easements as tenant deems reasonably necessary, without unreasonably interfering with the use by LL of the common areas and to be located at mutually agreeable locations, for the benefit of the premises, (iv) Tenant shall also have the right, subject to applicable municipal or county ordinance, to use such common areas immediately adjacent to tenant's improvements and within the tenant's preferred area as shown on the site plan for "sidewalk sales", seasonal and promotional sales and other sales customary to tenant's business operations and for a "customer pick up" area to be used exclusively for tenant's customers, invitees and patrons. Landlord covenants and agrees to cooperate with tenant's efforts to seek a variance, as necessary, from the applicable municipal or county authority for such uses.

**§19(a) (ix) (d)Easements:** Landlord shall not subdivide, parcel, or otherwise divide the shopping center or create any easements in the Common Areas without Tenant's prior written consent except for utility and drainage easements necessary to facilitate LL's development of the shopping center, provided in all events Tenant's use and operation of the premises are not materially adversely affected (or, if such easements are to be located within the Tenant's Preferred Area, then provided Tenant's use and operation of the premises are not adversely affected).

**§ 8 (b) Communication Equipment:** Subject to the REA, Tenant may install, maintain and/or replace any satellite dishes, antennas cellular and PCS towers and poles on the roof and/or exterior walls or parapet of the building as Tenant deems necessary or desirable, provided same shall not adversely and materially affect the roof structural elements thereof. Such communications equipment shall be only for the use of Tenant and not for third party users.

**§ 12 Alterations:** During the term, Tenant shall have the right, at its discretion and its sole cost, without Landlord's consent, to make (i) any alterations or modifications necessary or desirable in order to bring premises into conformity with Tenant's then-current prototype for similarly sized stores and (ii) any interior nonstructural alterations or modifications it may desire. With LL's consent, which shall not be unreasonably withheld, conditioned or delayed, Tenant shall have the right, at its sole cost, to alter, modify or reconstruct the exterior and/or structure of the building or other improvements. LL's withholding of consent as to any structural alteration or modification shall be deemed reasonable only if same is materially inconsistent with the then-existing architecture of the shopping center or if such change would violate applicable building code requirements. Should LL's consent be required, conceptual plans and specifications for such work shall be provided to LL prior to the commencement of any such work.

**§ 35 Effectiveness of Lease; Tenant's Right to Terminate:** Notwithstanding any other provision in this lease to the contrary, in the event any of the foregoing conditions shall not be met, satisfied or waived, the parties hereto expressly agree that Tenant shall have the right to terminate this lease in its sole and absolute discretion at anytime prior to the satisfaction or waiver of any such condition by delivering to LL a written notice signed by Tenant which states that tenant is terminating this lease on account of the failure of one or more foregoing conditions. In the event of such termination, the rights and obligations of the parties shall be of no further force and effect and the parties shall have no further liability one to the other (except that the indemnifications set forth in paragraphs 14(i), 19(a) (v) and 19(b) (ii) hereof shall survive such termination) upon Tenant's delivery of said notice to landlord. See this section for further detail.

**§19(a) (ix) (d) (xiii) REA:** (A) The REA is in full force and effect and has not be modified or amended in any regard. (B) No party of the REA is in breach of default under the REA, and no such party has committed any act (or failed to perform any act) which, with notice or lapse of time, could become a breach of or default under the REA. See page 37 (C-G) for further detail...

**§ 36 Confidentially:** The parties hereto, including, but not limited to, their heirs, successors, assigns and legal representatives, agree that this lease may not be recorded and that all such parties hereby agree to use their best reasonable efforts to preserve the confidentially of this transaction. This confidentially agreement extends to any developers, bankers, lawyers, accountants, employees, agents or any other persons acting on behalf of the parties hereto. Any breach of this confidentially agreement shall constitute an automatic Event of Default without notice or cure provided, for which either party may recover damages as their sole remedy and for which neither party can terminate this lease.

Prepared by: K. Engelhardt 1/4/07