

LOCATION: Howland Commons

# LEASE

between

## CIRCUIT CITY STORES, INC.

as Tenant

and

## HOWLAND COMMONS PARTNERSHIP

as Landlord

dated November 15th 2004

### HOWLAND COMMONS
### NILES, OHIO

CircuitCity59-AandB.doc



EXHIBIT

A

ALL-STATE LEGAL®

# TABLE OF CONTENTS

Page

1. Leased Property ........................................................................................ 1
2. Construction of Building and Improvements ............................................... 1
3. Lease Term .............................................................................................. 2
4. Rent ......................................................................................................... 4
5. Operation of Shopping Center by Landlord ................................................ 8
6. Easements ............................................................................................... 9
7. Common Areas and Common Area Maintenance ...................................... 11
8. Signs and Communications Equipment .................................................... 12
9. Taxes ..................................................................................................... 14
10. Maintenance, Repairs and Replacements ............................................... 18
11. Utility Service Provider; Payment of Utility Bills .................................... 20
12. Alterations ............................................................................................. 20
13. Mechanics' Liens ................................................................................... 22
14. Insurance ............................................................................................... 22
15. Damages by Fire or Other Casualty ....................................................... 28
16. Condemnation ........................................................................................ 29
17. Assignment and Subletting .................................................................... 32
18. Use ........................................................................................................ 32
19. Warranties, Representations and Covenants ........................................... 34
20. Estoppel Certificates ............................................................................. 43
21. Subordination, Non-Disturbance and Attornment ................................... 44
22. Tenant's Financing ................................................................................. 45
23. Tenant's Property and Waiver of Landlord's Lien ................................... 45
24. Memorandum of Lease: Commencement Date Agreement ....................... 46
25. Expiration of Term and Holding Over ..................................................... 46
26. Force Majeure ........................................................................................ 47
27. Events of Tenant's Default ..................................................................... 47
28. Landlord's Remedies .............................................................................. 48
29. Events of Landlord's Default: Tenant's Remedies .................................. 50
30. Waiver ................................................................................................... 53
31. Compliance with Applicable Laws .......................................................... 53
32. Notices ................................................................................................... 54
33. Brokers ................................................................................................... 55
34. Miscellaneous ........................................................................................ 55
35. Construction, Operation and Reciprocal Easement Agreement ................ 57
36. Confidentiality ....................................................................................... 58
37. Recapture Right Failure to Operate ....................................................... 59
38. Landlord's Representation Regarding Adjacent Building .......................... 59
39. Cotenancy .............................................................................................. 59

## EXHIBITS

"A"    Site Plan
"A-1"  Legal Description of the Shopping Center
"A-2"  Legal Description of the Adjacent Center
"B"    Index of Definitions
"C"    Construction Provisions
"D"    Removable Trade Fixtures
"E"    Sign Plans and Criteria
"F"    Prohibited Activities, Permitted Encumbrances and Permitted Title Exceptions
"G"    Subordination, Non-Disturbance and Attornment Agreement
"H"    Memorandum of Lease
"I"    Commencement Date Agreement
"J"    Indemnification Agreement

[Howland Commons ]

## LEASE

This LEASE is made as of the 5th day of January ,2003 by and between

HOWLAND COMMONS PARTNERSHIP, an Ohio general partnership, having an address at

2445 Belmont Avenue, P.O. Box 2186, Youngstown, Ohio 44504-0186 ("Landlord"), and

CIRCUIT CITY STORES, INC., a Virginia corporation having an address at 9950 Mayland

Drive, Richmond, Virginia 23233 ("Tenant").

### WITNESSETH:

The parties hereto agree as follows:

1.    Leased Property.    Landlord leases to Tenant all those certain "Premises" (as

defined in paragraph 2), when same are constructed or renovated on the parcel (the "Land")

outlined in red on Exhibit "A" (the "Site Plan") attached hereto, together with the easements

described in paragraph 6 below; located in the "Shopping Center" (herein so called and outlined

in green on the Site Plan), located at Howland Commons Shopping Center, in the Township of

Howland (the "City"), County of Trumbull, State of Ohio (the "State"), shown on the Site Plan

and described by metes and bounds legal description on Exhibit "A-1" attached hereto. All of

the Shopping Center, exclusive of the Premises, is "Landlord's Premises".    Landlord hereby

grants to Tenant all of those certain rights, in common with others, granted Landlord under that

certain Reciprocal Easement and Operation Agreement dated and executed by Cafaro Ross

Partnership (nka Howland Commons Partnership) and K Mart Corporation (the REA).

2.    Construction of Building and Improvements.    Commencing immediately upon

"Delivery of the Land" (as defined in the Construction Provisions (herein so called) attached

hereto as Exhibit "C" and incorporated herein by reference for all purposes), Tenant shall

construct within the Shopping Center a one-story retail building, containing approximately

34,192 square feet of ground-floor gross leasable area plus mezzanine, with provisions for

customer pickup, delivery and car stereo installation facilities as shown on the Site Plan, initially

for use as a Circuit City Superstore (the "Building"), together with loading ramps, sidewalks and

curbs, concrete stoops and/or aprons, utility extensions from the point of Landlord's utility stubs,

utility meters, electric transformer, loading dock, trash compactor, transformer pad and other

such appurtenances and improvements, as well as Tenant's pylon sign cabinet, panels and any

CircuitCity59-AandB.doc
Howland Commons

Circuit City - Revs,

1   necessary appurtenances thereto, its directional signage and its shopping cart corrals

2   (collectively, the "Other Improvements"), as more particularly set forth in the Construction

3   Provisions. The Building and Other Improvements are sometimes collectively referred to herein

4   as the "Improvements".    As more particularly set forth in the Construction Provisions, the

5   Improvements shall be constructed to completion by Tenant with due diligence in accordance

6   with the "Plans and Specifications" to be prepared by Tenant and approved by Landlord as

7   specified in the Construction Provisions. Those Improvements situated on  the Land and the

8   Land as shown on the Site Plan are referred to herein as the "Premises". The Improvements and

9   appurtenances thereto situated on the Land and any permitted substitutions therefor shall be

10  deemed affixed to and a part of the Premises, the title to such improvements and appurtenances

11  being in Tenant until the payment by Landlord to Tenant of the Lease Incentive Payment (as

12  provided in paragraph 4(d) below), and upon such payment, title to all such Improvements and

13  appurtenances situated on the Land shall automatically vest in Landlord.

14      3.    Lease Term. Provided Landlord has delivered the Land to Tenant in the condition

15  set forth in the Construction Provisions, the construction term (the "Construction Term") of this

16  Lease shall commence upon such Delivery of the Land, which shall in no event be longer than

17  thirty (30) days after the date when Landlord and Tenant execute this Lease (the "Effective

18  Date"), and shall end on the "Commencement Date" (as defined in paragraph 4 below).  The

19  main term (the "Main Term") of the Lease shall commence on the Commencement Date and

20  shall end on the last day of January following the fifteenth (15th) anniversary of the

21  Commencement Date.

22      In addition to the Main Term, Tenant shall have the option (each such right referred to

23  herein as a "Renewal Option") to renew and extend the Lease for three (3) consecutive five (5)

24  year periods (each such period referred to as an "Option Period" and collectively as the "Option

25  Periods") immediately following the Main Term, at the rents specified below.  Tenant shall give

26  Landlord written notice of its election to exercise any Renewal Option at least two hundred

27  seventy (270) days prior to the expiration of the Main Term or any then-current Option Period,

28  as applicable, provided, however, if, prior to the aforementioned two hundred seventy (270) day

29   period, Tenant does not give Landlord written notice of its intent not to exercise its renewal

30  option, Tenant's right to exercise such renewal option shall continue, as shall its tenancy

1    hereunder, until the (10) business days after Landlord has given Tenant written demand

2    ("Renewal Option Demand") that Tenant exercise such renewal option within ten (10) business

3    days of Tenant's receipt of such demand or forfeit its right to exercise such renewal option,

4    during which ten (10) business day period Tenant may exercise its renewal option, whereupon

5    the Term (defined below) of this Lease shall be renewed and extended as if such notice had been

6    given prior to the two hundred seventy (270) day period described above.  Landlord may request

7    in a written notice delivered to Tenant at any time within four hundred and fifty (450) days prior

8    to the expiration of the Main Term or any then-current Option Period that Tenant notify

9    Landlord whether it has decided to exercise the next accruing Renewal Option; provided,

10    however, if Tenant does not  respond in writing to any such  Landlord request within two

11    hundred eighty (280) days prior to the expiration of the Main Term or any then-current Option

12    Period, then Landlord shall be required to give  the  Renewal Option  Demand in accordance

13    with the immediately preceding sentence.

14            Notwithstanding anything to the contrary provided in this paragraph 3, Tenant may not

15    exercise its option hereunder if, at the time of such exercise, (i) Tenant is in default of an

16    obligation hereunder to make any payment of money required by this Lease and has failed to

17    cure such default within the applicable notice period, or (ii) Tenant is in default with respect to

18    the observance or performance of any material non-monetary provision of this Lease and has

19    failed to cure such default within the applicable cure periods set forth in paragraph 27(ii) below,

20    or (iii) Tenant is not open for business in the Premises (excluding a temporary closing following

21    a casualty or condemnation, a temporary closing in connection with the remodeling of the

22    Premises, a temporary closing in connection with the subletting or assignment of the Premises or

23    any other temporary closing provided that, in each instance, Tenant delivers evidence reasonably

24    satisfactory to Landlord that the Premises will reopen for business prior to commencement of the

25    applicable Option Term).

26            The Construction Term, Main Term and Option Periods are, collectively, the "Term".

27    The term "Lease Year" shall mean each successive period of twelve (12) consecutive calendar

28    months, commencing on the first day of each February during the Term, except that the first

29    Lease Year shall commence on the Commencement Date and shall end on the last day of January

30    following the first anniversary of the Commencement Date.

1       4.      Rent.

2               (a)     Construction Term.  During the Construction Term, Tenant shall pay no

3       rent or Real Estate Taxes, Insurance Charges or CAM Charges or any other similar costs, fees,

4       rentals or expenses.

5               (b)     Interim Rent.  Tenant agrees to pay Interim Rent ("Interim Rent") for the

6       Premises in the amount of TWO HUNDRED FIVE THOUSAND ONE HUNDRED FIFTY-

7       TWO AND 00/100 DOLLARS ($205,152.00) per annum (calculated at the rate of Six and

8       00/100 Dollars ($6.00) per square foot of the ground floor gross leasable area of the Building, as

9       shown on the Plans and Specifications and adjusted in accordance with paragraph 4(c)(ii) below)

10      commencing upon the "Commencement Date" which is the first to occur, of (i) two hundred

11      forty (240) days following the beginning of the Construction Term, or (ii) the date of Tenant's

12      initial opening for business of the Premises, and ending on the "Base Rent Commencement

13      Date". Until the commencement of the Base Rent Commencement Date, the Interim Rent shall

14      be increased at the rate of 7.5% on the fifth (5th) anniversary of the Commencement Date and,

15      thereafter by an additional 7.5% of the amount payable during the immediately preceding period,

16      on each five (5) year anniversary of the Commencement Date until the occurrence of the Base

17      Rent Commencement Date.   The "Base Rent Commencement Date" shall occur upon the

18      payment by Landlord of the Lease Incentive Payment (as defined in paragraph 4(d) below).

19      Subject to the adjustments set forth above, Tenant shall pay Interim Rent in equal monthly

20      installments of SEVENTEEN  THOUSAND  NINETY-SIX  AND  00/100  DOLLARS

21      ($17,096.00), in advance on the first day of each calendar month, with appropriate proration for

22      any partial calendar month, to the address given for Landlord in paragraph 32 below.

23              (c)     Base Rent.  Tenant agrees to pay base rent ("Base Rent") for the Premises

24      in the amounts and in the manner specified hereunder (subject to 4(d) below), commencing on

25      the Base Rent Commencement Date.

26              Landlord shall give Tenant written notice of a change of address or change of the party to

27      whom such rents shall be payable along with written documentation reasonably satisfactory to

28      Tenant of such party's right to receive payment hereunder. Unless adjusted as provided below or

29      in paragraph 3 of the Construction Provisions, Base Rent shall be paid in equal monthly

30      installments in advance on the first day of each succeeding calendar month throughout the Term

1    with appropriate proration for any partial calendar month, to the address given for Landlord in

2    paragraph 32, pursuant to the following schedule:

3                (i)    Base Rent Schedule.

| Months Following Commencement Date | Rate PSF | *Annual Rent | Monthly Installments |
|---|---|---|---|
| From Base Rent Commencement Date thru 60th month after Commencement Date | $13.25 | $453,044.04 | $37,753.67 |
| From 61st month after Commencement Date thru 120th month after Commencement Date | 14.24 | $487,022.40 | $40,585.20 |
| 121-180** | 15.31 | $523,549.08 | $43,629.09 |
| 181-240** | 16.84 | $575,904.00 | $47,992.00 |
| 241-300** | 18.52 | $633,494.40 | $52,791.20 |
| 301- end of last Option Period, if exercised | 20.38 | $696,843.84 | $58,070.32 |

* assumes initial rental rate of $13.25 PSF and 7.5% cumulative increases to Base Annual Rent every sixty (60) months during the Main Term, and ten percent (10%) cumulative increases to Base Annual Rent for each Option Period (if exercised).

**Months after Commencement Date.

4

5                (ii)    Adjustment in Base Rent. Notwithstanding the Base Rent provisions, in the event

6    that the ground-floor gross leasable area of the Building when constructed exceeds 34,192 square

7    feet, annual Base Rent on the Base Rent Commencement Date through the end of the sixtieth

8    (60th) month following the Commencement Date shall be the product of the actual ground-floor

9    gross leasable area of the Building (as shown on the as-built survey in the Plans and

10   Specifications), multiplied by $13.25 and with this Annual Rent increased by 7.5% at the end of

11   the sixtieth (60th) month following the Commencement Date and by an additional 7.5% of the

12   amount payable during the immediately preceding period at the end of every sixtieth (60th)

13   month during the Main Term, and ten percent (10%) of the amount payable during the

14   immediately preceding period for each Option Period (if exercised). Notwithstanding the

15   Interim Rent provisions, in the event that the ground floor gross leasable area of the Building

16   when constructed exceeds Thirty-four Thousand One Hundred Ninety-two (34,192) square feet,

1    Interim Rent on the Commencement Date through the Base Rent Commencement Date shall be

2    the product of the actual ground floor gross leasable area of the Building (as shown on the as-

3    built survey in the Plans and Specifications) multiplied by Six and 00/100 Dollars ($6.00)  and

4    with this per square foot rate increased by 7.5% at the end of the sixtieth (60th) month by an

5    additional 7.5% of the amount payable during the immediately preceding period following the

6    Commencement Date and the end of every sixtieth (60th) month during the Main Term, and ten

7    percent (10%) of the amount payable during the immediately preceding period for each Option

8    Period (if exercised) .  In determining the ground-floor gross leasable area, measurements shall

9    be made in accordance with the specifications set forth in paragraph 9(b) below.

10              (d)    Lease Incentive Payment.  Upon Substantial Completion (as defined in

11    Paragraph 2(h) of Exhibit "C") and (i) Tenant's furnishing to Landlord the certificates of

12    insurance required under paragraph 14 of this Lease, (ii) Tenant's furnishing to Landlord and, if

13    requested, Landlord's title insurance company, an indemnity in the form of Exhibit "J" attached

14    hereto against any exception in Landlord's or its Mortgagee's policy of title insurance with

15    respect to mechanics' liens arising out of Tenant's construction, (iii) Tenant's furnishing to

16    Landlord, if required by Landlord, a statement from Tenant to Landlord that, upon the payment

17    by Landlord to Tenant of the Lease Incentive Payment [as provided in paragraph 4(d) below]

18    Landlord will hold title to the Improvements (in form reasonably acceptable to Landlord and

19    Tenant), (iv) Tenant's initial opening for business, (v) Tenant's payment to Landlord of any

20    Interim Rent and all other charges to the extent then due and payable, and (vi) Tenant's

21    furnishing to Landlord a certification of Tenant's construction manager, certifying to Landlord

22    that Substantial Completion has occurred (the date upon which all of the foregoing are satisfied

23    shall be known as the "Lease Incentive Payment Qualification Date"), Landlord shall pay to

24    Tenant a Lease Incentive Payment in an amount equal to ($60.00)  per square foot of ground

25    floor area of the Building, as constructed, payable by wire transfer of funds by Landlord to

26    Tenant's account, no later than thirty (30) days after the Lease Incentive Payment Qualification

27    Date.  If the Base Rent is increased pursuant to paragraph 4(c)(ii) of the Lease, the Lease

28    Incentive Payment shall likewise be proportionately increased.  If the Lease Incentive Payment

29    Qualification Date has not occurred within one (1) year following the Commencement Date,

30    unless such is due to the fault of Landlord, the action of other tenants in the Shopping Center or

1    force majeure (as defined in paragraph 26 below), then Tenant shall have no further right to the

2    Lease Incentive Payment and Tenant shall pay the Interim Rent for the remainder of the Term,

3    and references herein to the "Base Rent" shall, thereafter, be deemed to refer to the Interim Rent.

4    Landlord acknowledges that such one (1) year period shall be extended to the extent of any

5    delays arising out of the fault of Landlord, the actions of other tenants in the Shopping Center, or

6    force majeure.  If Landlord fails to pay the Lease Incentive Payment in full within thirty (30)

7    days after the Lease Incentive Payment Qualification Date, then Tenant shall notify Landlord of

8    such failure.  In the event that Landlord fails to pay the Lease Incentive Payment within five (5)

9    days of receipt of such notice, then any such unpaid amount shall accrue interest at the Default

10    Rate from the Lease Incentive Payment Qualification Date to the date when Landlord delivers

11    the Lease Incentive Payment to Tenant.  If Landlord has not tendered payment of the Lease

12    Incentive Payment by the date which is one (1) year after the Lease Incentive Payment

13    Qualification Date (the "Lease Incentive Payment Qualification Date Anniversary"), then, (i)

14    Interim Rent shall be reduced to ground rent equal to Seventy-Five Thousand and 00/100 Dollars

15    ($75,000.00) per annum during the first year following the first anniversary of the Lease

16    Incentive Payment Qualification Date, Fifty Thousand and 00/100 Dollars  ($50,000.00) per

17    annum during the year following the second anniversary of the Lease Incentive Payment

18    Qualification Date, and Twenty-five Thousand and 00/100 Dollars  ($25,000.00)  per annum

19    thereafter during the Term of the Lease; and (ii) this Lease shall be converted to a pure ground

20    lease, with ownership of the Improvements remaining with Tenant, and Landlord's and any

21    Mortgagees' names being removed as additional insured or mortgagees on any casualty

22    insurance described in paragraph 14(a) of the Lease.  Landlord and Tenant covenant and agree

23    that, if the Lease Incentive Payment Qualification Date has occurred but the Lease Incentive

24    Payment has not been disbursed, upon the reasonable written request of either the Tenant or

25    Landlord, the Landlord and Tenant shall execute such documentation as necessary to formalize

26    the conversion of this Lease to a pure ground lease upon the first anniversary of the Lease

27    Incentive Payment Qualification Date.

28        Notwithstanding the foregoing, at any time following the thirtieth (30th) day after the

29    Lease Payment Qualification Date Anniversary and upon the failure of Landlord to pay the Lease

30    Incentive Payment within fifteen (15) days of receipt of notice from Tenant of such failure,

1   Tenant shall have the right at Tenant's sole election, but not the obligation, in lieu of any

2   subsequent obligation that Landlord pay to Tenant the Lease Incentive Payment, to mortgage,

3   sell, convey, assign, lease or otherwise encumber (collectively, a "Post-Completion Transfer")

4   Tenant's interest in the Building, the Improvements and the Lease.   Such right shall be in

5   addition to the rights of Tenant set forth in paragraphs 17 and 22 of the Lease.   Such sale,

6   conveyance, assignment, lease, mortgage or encumbrance shall relate merely to Tenant's

7   leasehold interest and/or Tenant's Building. At all times, any such sale, conveyance, assignment,

8   lease, mortgage or encumbrance shall be subordinate to Landlord's interest in the fee and subject

9   to all of the terms of this Lease. Upon the expiration of this Lease, the termination of this Lease,

10   or the termination of Tenant's right of possession, the Building shall become the property of the

11   Landlord, free and clear of any such sale, conveyance, assignment, lease, mortgage or

12   encumbrance.

13        Landlord covenants to (i) execute all documents necessary to permit Tenant to effect the

14   Post-Completion Transfer described herein, and (ii) cause any Mortgagee to specifically

15   acknowledge the rights of Tenant's lender and third parties arising as a result of such Post-

16   Completion Transfer. Notwithstanding such Post-Completion Transfer, Tenant shall continue to

17   pay the ground rentals described in this paragraph 4(d) during the remainder of the Term.

18        5.   <u>Operation of Shopping Center by Landlord</u>.   Landlord covenants to operate a

19   first-class shopping center. All future development of the Shopping Center will be consistent

20   with a first-class shopping center.   The location of buildings and other tenant space in the

21   Shopping Center will only be within the "Permissible Building Areas" designated on the Site

22   Plan. Except as otherwise provided in paragraph 16 below, the number of parking spaces for the

23   Shopping Center shall at all times be at least as shown on the Site Plan, but in no event shall the

24   parking ratio for the Shopping Center be less than 4.75 cars per 1,000 square feet. All parking

25   shall be at ground level. The parking ratio in Tenant's Preferred Area (as identified on the Site

26   Plan) shall in no event be less than 5.25 cars per 1,000 square feet of gross leasable area of the

27   Building. Landlord shall construct or cause all improvements in the Shopping Center (other than

28   the Improvements to be constructed by Tenant) to be constructed in a good and workmanlike

29   manner, lien-free and Landlord agrees to indemnify, defend and hold Tenant harmless from any

30   loss or damage suffered by Tenant as a result of Landlord's construction, except to the extent

1   caused by Tenant's negligence. Landlord's construction shall not materially interfere with the
2   conduct of Tenant's business.

3     6. <u>Easements</u>. Landlord and Tenant also grant to each other those nonexclusive
4   leasehold easements which shall run as covenants with Landlord's Premises and the Premises
5   during the Term, over Landlord's Premises and the Premises which are useful and appropriate
6   for the construction, operation and maintenance of Landlord's Premises and the Premises,
7   including but not limited to:

8      (a) <u>Construction Easements</u>. During the Construction Term, and any period
9   of renovation or reconstruction thereafter, Landlord grants to Tenant (i) a nonexclusive easement
10  across a mutually agreeable designated route, providing access to and from the public roadways
11  nearest to the Land, over the Common Areas (as defined in paragraph 7(a) below) of the
12  Shopping Center for construction access to the Premises, as well as an exclusive temporary
13  easement for a construction staging area (the "Staging Area") of approximately 20,000 square
14  feet as shown on the Site Plan, solely for Tenant's use in initial construction of the
15  Improvements (ii) an easement to permit the Building to abut and flash into the adjacent
16  building, but the roof joists of the Building shall not bear upon the wall or structural frame of the
17  adjacent building, and (iii) an easement for the benefit of the Premises for such additional
18  underground, public or private utility, cable, fiber optic or other easements (within portions of
19  Common Areas of the Shopping Center not designated as Permissible Building Areas) as Tenant
20  deems necessary, without unreasonably interfering with the use by Landlord of the Common
21  Areas of the Shopping Center. For the purpose of exercising the foregoing rights granted to
22  Tenant, Tenant and/or the utility or other service provider shall have the right to enter upon and
23  use said Common Areas (exclusive of the Permissible Building Areas) to install said utility
24  systems for the benefit of the Premises, all of which utility systems are to be underground, to
25  such extent and so long as reasonably necessary to accomplish such purpose, subject to
26  restoration of said Common Areas by Tenant following such installation and any other
27  reasonable conditions and requirements imposed by Landlord such as location and depth.
28  During the Term Tenant grants to Landlord an easement for the benefit of Landlord's Premises
29  for such additional underground, public or private utility easements as Landlord deems
30  necessary, without unreasonably interfering with the use by Tenant of the Common Areas of the

1    Premises. For the purpose of exercising the foregoing rights granted to Landlord, Landlord

2    and/or the utility provider shall have the right to enter upon and use said Common Areas to

3    install said utility systems for the benefit of Landlord's Premises, all of which utility systems are

4    to be underground, to the extent and so long as reasonably necessary to accomplish such

5    purpose, subject to restoration of said Common Areas by Landlord following such installation

6    and any other reasonable conditions and requirements imposed by Tenant such as location and

7    depth.

8            (b)    Common Area Easements. In addition, during the Term Landlord grants

9    to Tenant a non-exclusive easement (the "Tenant Common Area Easement") to use the Common

10    Areas of the Shopping Center for their intended purposes and to permit Tenant and its

11    employees, agents, subtenants, assignees, licensees, suppliers, customers and invitees to use said

12    Common Areas for the purposes (without limitation) of parking and pedestrian service and

13    vehicular access, ingress and egress to, from and between the Premises and the Landlord's

14    Premises and the streets and highways abutting and adjacent to the Shopping Center , without

15    payment of any fee or other charge therefor except for the CAM charge. Tenant shall be

16    permitted, at Tenant's sole cost and expense, to install up to four (4) shopping cart corrals on the

17    parking lot located within Tenant's Preferred Area (at mutually agreeable locations), and Tenant

18    shall be permitted to store its shopping carts outside of the Premises in such cart corrals. Tenant

19    agrees to periodically remove its shopping carts from the Common Areas and to maintain said

20    cart corrals in good condition and repair. It is specifically agreed that with respect to the area

21    designated on the Site Plan as Tenant's "Customer Pick-Up Lane", (i) Tenant shall with

22    Landlord's consent, which shall not be unreasonably withheld or delayed, have the right, from

23    time to time, to relocate the same to other areas on the Land and adjacent to the Improvements

24    (along the front of the Building only) and (ii) Tenant may install signage designating such area

25    for exclusive use by Tenant's customers, invitees and patrons. Landlord shall have no obligation

26    to enforce such exclusive use    designation. Tenant shall also have the right to use such

27    "Customer Pick Up Lane" exclusively for Tenant's customers, invitees and patrons. Tenant

28    acknowledges that it shall not permit overnight truck or trailer storage on any portion of

29    Landlord's Premises (except for the Construction Term, during which overnight truck or trailer

30    storage shall be permitted, if necessary, within the Staging Area only). None of the easements

1    granted by the parties to this Lease is intended, nor shall any of them be construed, as a

2    dedication of any portion of the Shopping Center for public use, and Landlord may take

3    whatever reasonable steps may be necessary to avoid such dedication.

4        During the Term Tenant grants to Landlord a non-exclusive easement (the "Landlord

5    Common Area Easement") to use the Common Areas of the Premises for their intended purpose

6    and to permit Landlord and its respective employees, agents, tenants, assignees, licensees,

7    suppliers, customers and invitees to use said Common Areas for the purposes (without

8    limitation) of pedestrian service and access, ingress and egress to, from and between the

9    Premises and Landlord's Premises, without payment of any fee or other charge therefor.

10        7.    Common Areas and Common Area Maintenance.

11            (a)    Definition of Common Areas.  The term "Common Areas" shall be

12    defined to include, as they may from time to time exist, the parking areas, lanes, drives,

13    entrances, truck passageways, sidewalks, ramps, stairways, landscaped and other unpaved areas,

14    parking lot lighting facilities and equipment, Landlord's pylon sign(s), if any, directional, traffic

15    and monument sign structure(s) (excluding those dedicated exclusively to a Shopping Center

16    tenant or occupant) and shared utility facilities located in all elements of the Shopping Center

17    (including any such areas and facilities contained within the Land, outparcels and adjacent tracts

18    but reserved to the benefit of the Shopping Center occupants) and which are intended and

19    available for the common use of all of the tenants within the Shopping Center (including any

20    outparcel and other adjacent occupants which contribute toward "CAM Charges" (as defined

21    below) and which are not responsible for separate maintenance of such outparcels or tracts), their

22    subtenants, licensees, and business invitees. "Common Areas" exclude the Building.

23            (b)    Landlord's Obligations. Landlord shall be responsible for operating, maintaining,

24    repairing and replacing the Common Areas on Landlord's Premises in a first-class manner,

25    including:  cleaning, maintenance of Landlord's pylon and other sign structure(s), if any; snow

26    clearing, plowing and ice treatment; removal of Common Area trash and garbage; illuminating ,

27    repairing, repaving and restriping the parking area (excluding illumination of the Tenant Light

28    Poles, as defined below); maintaining, replanting and replacing landscaping and sprinkler system

29    (if any); repairing and maintaining storm drains, sewers and other utility lines and facilities not

30    dedicated to the public or owned by a private utility company, which are necessary for the

1    operation of the Shopping Center; providing customary and reasonable security services; and
2    maintaining all insurance required under this Lease to be carried by Landlord, all such work on
3    Landlord's Premises to be referred to collectively as "Landlord's Common Area Maintenance".
4    Notwithstanding anything to the contrary set forth above, Tenant shall be responsible to
5    maintain, repair and replace its pylon sign, directional signs and shopping cart corrals.

6    (c)    Tenant's Obligations.    Tenant shall be responsible for operating, maintaining,
7    repairing and replacing the Common Areas on the Premises in a first-class manner, including
8    cleaning, maintenance of any Improvements on said Common Areas; snow clearing, plowing and
9    ice treatment; removal of Common Area trash and garbage; and illumination of the Tenant Light
10   Poles.

11   (d)    Tenant Payments.    Commencing on the Commencement Date and continuing
12   until the first January 1st thereafter, Tenant shall pay to Landlord a fee of $1.55 per square foot of
13   ground-floor gross leasable area of the Building per annum (the "CAM Charge"), payable in
14   equal monthly installments in advance of the first day of each month, as its share of the cost
15   incurred by Landlord for Landlord's Common Area Maintenance.  (The CAM Charge shall not
16   include the cost of Common Area liability insurance carried by Landlord, which cost shall be
17   paid in accordance with paragraph 14(e) below.) The CAM Charge shall increase on a
18   cumulative basis each January 1st by an amount equal to the product of the CAM charge payable
19   during the previous year multiplied by three percent (3%).   For any partial calendar year during
20   the Main Term, or any Option Period, the annual CAM Charge during such partial calendar year
21   shall be the product of the applicable CAM Charge times the number of months in such  partial
22   calendar year, with appropriate proration for any partial calendar month therein.

23   8.    Signs and Communications Equipment.

24   (a)    Signs.    Attached as a portion of Exhibit "E" are plans and specifications
25   for Tenant's building-mounted signage, double faced pylon sign panel and directional signs,
26   which Landlord hereby approves upon its execution of this Lease. Tenant shall be responsible for
27   all maintenance, repairs and restoration of said signage. Assuming that the structure of said pylon
28   sign is sufficient to support same, Tenant shall have the right to construct and install, at Tenant's
29   expense, a pylon sign cabinet with double sided "face panels" identifying Tenant's store, and any
30   necessary appurtenances thereto, on the existing pylon structure, as identified on Exhibit A and

CircuitCity59-AandB.doc                    12

1   labeled "Unit 90/Tenant Pylon Sign". Tenant's sign cabinet and face panels shall be in the
2   location immediately below the Unit 90 sign cabinet and face panels (currently occupied by
3   Gander Mountain) and shall be no larger than 9'6" in width and shall have a maximum sign
4   panel area of no more than 38 square feet. Landlord shall obtain the requisite consent from the
5   current occupant of Unit 90 so as to permit Tenant to install its sign cabinet and face panels on
6   said existing pylon structure, provided: (i) all modifications to said pylon sign and structure shall
7   be at the sole cost of Tenant, (ii) Tenant's face panels do not exceed 9'6" in width and have a
8   maximum sign panel area of no more than 38 square feet, (iii) Tenant agrees to pay for all
9   electricity consumed by its sign on said pylon, (iv) Tenant's installation of its pylon sign
10  equipment does not in any way interfere with the current occupant's electrical power wiring or
11  control wiring to its pylon sign equipment, (v) Tenant maintains, repairs and/or replaces as
12  required the entirety of the foundation and structural system of the existing and/or modified
13  pylon sign structure, and (vi) Tenant maintains, repairs and/or replaces its pylon sign equipment
14  and panels as necessary.   In the event that the structure of the existing pylon sign referenced
15  above is not sufficient to support Tenant's pylon sign equipment and panels, in addition to
16  adhering to the criteria set forth above, Tenant, at its sole cost, shall (i) perform any work
17  necessary to ensure that said existing pylon sign structure is sufficient to support Tenant's pylon
18  sign equipment and panels prior to installation of same; or (ii) raze the existing pylon sign
19  structure and install a new pylon sign structure in the same location (including, but not limited to,
20  transferring or replacing the pylon sign equipment and panels of the current occupant of Unit 90
21  at the same position as it is currently situated).   Tenant, its successors, subtenants and assigns
22  shall be entitled without Landlord's consent, but subject to governmental requirements,  to
23  replace any and all of its signs with signage consistent with Tenant's (or its successors',
24  subtenants' or assigns') then-current prototypical sign plans provided that (i) such replacement
25  signage solely identifies Tenant's (or its successors', subtenants', or assigns') tradename(s), does
26  not increase the number of such signs in the aggregate or on any particular Building elevation,
27  does not extend above the top of the parapet wall, and does not increase the size of the panels or
28  the lettering on such previous signage and, (ii) if Tenant relocates such signage other than its
29  building-mounted signage, such relocation is subject to Landlord's approval, which may be
30  withheld in Landlord's sole discretion. Except as provided above, any modification of Tenant's

1   signage shall require Landlord's prior consent, which shall not be unreasonably withheld,

2   delayed or conditioned. Tenant agrees to provide Landlord with design plans and specifications

3   of any replacement signage permitted above upon installation thereof by Tenant.

4        (b)    Communications Equipment. Tenant may install, maintain and/or replace

5   any satellite dishes, antennas and cellular and PCS towers and poles on the roof and/or the

6   interior of the parapet of the Building as Tenant deems necessary or desirable, provided that any

7   such installation, maintenance and/or replacement shall not adversely and materially affect the

8   roof or the structural elements thereof and are located, to the extent practicable, to minimize

9   visibility thereof from the Common Areas. Upon removal by Tenant of any satellite dishes or

10  antennas, Tenant shall repair any damage done in connection with such removal. To the extent

11  Tenant installs any satellite dishes or antennas on the rood Tenant shall maintain same and

12  indemnify Landlord from any and all costs and expenses, including reasonable attorneys' fees,

13  arising from injury sustained by persons as a result of the presence of such satellite dishes or

14  antennas.

15       9.    Taxes.

16       (a)    Taxes Contemplated Hereunder. The term "Real Estate Taxes" shall mean

17  (i) all real estate taxes and assessments, both general and special and all ad valorem taxes, rates

18  and levies paid upon or with respect to the land, buildings and all other improvements on the tax

19  parcel in which the Premises are located (the "Tax Parcel"), (ii) rent taxes or gross receipts taxes

20  payable with respect to rental and other charges to be paid by Tenant under the terms of this

21  Lease, (iii) any business and occupation taxes payable with respect to the conduct by Tenant of

22  its business at the Premises for a calendar year or a portion thereof to any governmental agency

23  or authority, and (iv) all charges specifically imposed in lieu of any such taxes. Except as

24  specifically provided in clauses (i)- (iv) above, nothing contained in this Lease shall require

25  Tenant to pay any local, county, municipal, state or federal income, franchise, corporate, estate,

26  inheritance, succession, capital levy, business or transfer tax of Landlord, or any local, county,

27  municipal, state or federal income, profits, gross receipts (other than with respect to rental and

28  other charges as contemplated in clauses (ii), (iii) and (iv) above), sales or renewal tax or charge

29  upon the rent or other charges payable by Tenant under this Lease (other than with respect to

30  rental and other charges as contemplated in clauses (ii), (iii) and (iv) above). Further included

1   within the definition of "Real Estate Taxes" are all reasonable expenses incurred by Landlord in

2   reviewing, negotiating, appealing or contesting such taxes or assessments.  Tenant's pro rata

3   share of Real Estate Taxes shall not be increased by any additional charges or penalties incurred

4   by Landlord due to late payment of Real Estate Taxes or decreased by any reduction or

5   abatement otherwise received by Landlord due to early payment of Real Estate Taxes, if such

6   early payment is made prior to the date Tenant pays Tenant's "Pro Rata Share of Real Estate

7   Taxes" (as defined below).

8           (b)    Payment of Real Estate Taxes.  Within the later of (i) thirty (30) days of

9   receipt of Landlord's invoice for Tenant's Pro Rata Share of Real Estate Taxes, together with a

10  copy of the tax bill on the basis of which such invoice was rendered, if Tenant requests such

11  copy, or (ii) sixty (60) days prior to date on which such tax bill is payable by Landlord, Tenant

12  shall pay "Tenant's Pro Rata Share of Real Estate Taxes" (as defined below) levied against the

13  Tax Parcel.  "Tenant's Pro Rata Share of Real Estate Taxes" shall always be the product of the

14  Real Estate Taxes multiplied by a fraction, the numerator of which is the number of square feet

15  of gross leasable area in the Building, and the denominator of which is the number of square feet

16  of gross leasable building area (excluding the area of any outside sales area exclusive to a single

17  occupant) in the Tax Parcel.  In determining the gross leasable area of any building in the

18  Shopping Center (including the Building), measurement shall be made from the center line of

19  any common walls and the outside of any exterior walls.  Increases in applicable floor areas shall

20  result in corresponding adjustments of Tenant's Pro Rata Share and shall result in changes in the

21  calculation of ancillary charges based upon square footage.

22          Landlord agrees that if, as a result of the inclusion in the Tax Parcel of buildings outside

23  the Shopping Center or buildings developed in the currently undeveloped portions of the

24  Shopping Center, which buildings are utilized for purposes not customarily included in a retail

25  power center, the per square foot cost to Tenant of its Pro Rata Share of Real Estate Taxes

26  materially exceeds the per square foot cost Tenant would pay in a comparable retail power center

27  in the Niles, Ohio area, Landlord will reduce Tenant's per square foot cost of Real Estate Taxes

28  to an amount consistent with that which would be payable in such comparable retail power

29  center.  In the event of a dispute between Landlord and Tenant as to the appropriate per square

30  foot cost for Tenant's Pro Rata Share of Real Estate Taxes, Landlord and Tenant agree to submit

1    such dispute to a tax service (national or local) selected by Landlord and reasonably acceptable

2    to Tenant with not less than five (5) years experience in handling tax contests for retail properties

3    in the Niles, Ohio area and agree to be bound by such tax service's determination of what the per

4    square foot cost of Real Estate Taxes is for comparable retail centers in the Niles, Ohio area.  In

5    no event shall Tenant be obligated to pay as its Pro Rata Share of Real Estate Taxes an amount

6    greater than its Pro Rata Share of Real Estate Taxes as determined pursuant to the preceding

7    paragraph.

8          Provided Tenant pays its Pro Rata Share of Real Estate Taxes prior to the date upon

9    which Landlord may receive early payment discounts, Tenant's Pro Rata Share of Real Estate

10   Taxes shall be net of any early payment discounts available at the time Tenant's payment is due.

11   Landlord shall pay, or cause the payment of, all Real Estate Taxes before any fine, penalty,

12   interest or cost may be added thereto, become due or be imposed by operation of law for the

13   nonpayment or late payment thereof.  Provided Tenant timely pays Tenant's Pro Rata Share of

14   Real Estate Taxes, in no event shall Tenant be liable for any discount forfeited or penalty

15   incurred as a result of late payment by another tenant or by Landlord.  Real Estate Taxes shall be

16   prorated as of the Commencement Date and the expiration or earlier termination of this Lease,

17   and Landlord shall promptly return to Tenant any overpayment made by Tenant with respect to

18   the period prior to or subsequent to the Term.  Landlord shall remain primarily responsible for

19   such payment notwithstanding the fact that such payment may be made by a tenant of Landlord's

20   Premises or other third party pursuant to an agreement to which Tenant is not a party.  In

21   addition, should Landlord fail to pay such Real Estate Taxes before same become delinquent and

22   Tenant has a reasonable basis for concluding the governing taxing authority will, in the absence

23   of payment, foreclose its tax lien within forty-five (45) or less days, Tenant shall have the right,

24   at its election, to cure such failure by payment of delinquent Real Estate Taxes and any interest

25   and penalties due thereon and in such event Tenant may deduct the cost thereof, plus interest at

26   the Default Rate (defined in paragraph 28(a)), from the next installment(s) of Interim Rent or

27   Base Rent and other charges due hereunder.

28          (c)    Contest of Real Estate Taxes and/or Assessed Valuation of Property.

29   Tenant shall have the right, at Tenant's sole expense, to contest the amount or validity, or

30   otherwise seek an exemption or abatement, of any Real Estate Taxes or to seek a reduction in the

1    valuation of the Premises assessed for Real Estate Tax purposes, by appropriate proceedings

2    diligently conducted in good faith, provided that Tenant shall first have notified Landlord of its

3    intent to do so and Landlord shall have failed to notify Tenant in writing, within the earlier of (i)

4    thirty (30) days of receipt of Tenant's notice or (ii) the date which is ten (10) business days

5    before an appeal or contest must be filed, that Landlord intends to contest such Real Estate Taxes

6    or seek such a reduction.    In any instance where any such action or proceeding is being

7    undertaken by Tenant, Landlord shall cooperate with Tenant, execute any and all documents

8    reasonably required in connection therewith and, if required by any law, rule or regulation of the

9    taxing authority, shall join with Tenant in the prosecution thereof at the expense of Tenant.

10        (d)    Payment Following Appeal.    If no payment of Real Estate Taxes was

11    required by the taxing authority during the pendency of the proceedings set forth in paragraph

12    (c), upon the termination of such proceedings, Tenant shall pay Tenant's Pro Rata Share of such

13    Real Estate Taxes as finally determined in such proceedings, the payment or partial payment of

14    which may have been deferred during the prosecution of such proceedings.    Tenant shall be

15    entitled to a refund from the appropriate taxing authority of any overpayment of Real Estate

16    Taxes relating or allocable to the Premises, as well as a reimbursement from the appropriate

17    taxing authority of all costs, fees and expenses it incurs in such protest or reassessment.    In the

18    event the Real Estate Taxes are increased as a result of Tenant's real estate tax contest and/or the

19    valuation or assessment of the Premises or Shopping Center increases due to Tenant's contest of

20    Real Estate Taxes and Landlord is prohibited from passing such increase on to the other tenants

21    in the Shopping Center, Tenant and any other tenant contesting such taxes shall be solely

22    responsible for the additional tax liability arising out of same and will hold Landlord harmless

23    therefrom; such additional tax obligation being deemed as additional rent.    In the event that

24    Tenant fails to pay any portion of its responsibility of Real Estate Taxes, such amount shall be

25    considered as additional rent and subject to all of the provisions of this Lease as to default in the

26    payment of rent.

27        10.    Maintenance, Repairs and Replacements.    Except (i) for condemnation proceeds

28    to be received by Tenant; (ii) for repairs arising out of the negligent acts of Landlord, its agents

29    or employees; or (iii) as otherwise set forth in this Lease, Tenant shall be responsible for all

30    maintenance, repairs and replacements with respect to the Improvements.    Tenant shall also, at

1    its sole cost and expense, provide electric power to illuminate those two (2) parking lot light

2    poles in front of the Building which Tenant is required to connect to its electrical meter (as

3    shown on the Site Plan and labeled "Tenant Light Poles"), during all periods of darkness in

4    which the majority of the other parking lot lights in the Shopping Center are also illuminated (but

5    in no event later than 12 midnight, unless Tenant is open for business beyond 12 midnight).

6          If during the last three (3) years of any Option Period, Tenant is required to expend any

7    sum for a single item of maintenance, repair or replacement to the Building in excess of Ten

8    Thousand and No/100 Dollars ($10,000.00) in satisfaction of its obligations hereunder

9    (excluding expenditures incurred due to compliance with laws), and if the resulting improvement

10    to the Building is not permitted to be fully amortized in accordance with generally accepted

11    accounting principles or the Internal Revenue Code and Regulations (utilizing an amortization

12    period equal to the shortest useful life of the applicable improvement), over the remainder of the

13    Term (without consideration to the exercise of any additional Renewal Options), then Tenant

14    shall be reimbursed by Landlord in an amount equal to fifty percent (50%) of that portion of the

15    cost expended due to such maintenance, repairs or replacement, but only to the extent that same

16    is not permitted to be amortized during the remainder of the Term (without consideration to the

17    exercise of any additional Renewal Options) as specified above. Notwithstanding the foregoing,

18    prior to incurring any expenditures pursuant to the previous sentence which cannot be fully

19    amortized over the remainder of the Term, Tenant shall notify Landlord of the contemplated

20    expenditure and, except in the case of an emergency (e.g. a repair which, if not immediately

21    undertaken, could (a) adversely affect Tenant's ability to normally operate its business in the

22    Premises, or (b) result in injury to persons or property), Tenant shall not undertake the

23    maintenance, repair or replacement for ten (10) business days following delivery of such notice

24    to Landlord. During such ten (10) business day period, if requested by Landlord, Tenant shall in

25    good faith consider alternatives, if any, suggested by Landlord to Tenant's contemplated

26    expenditure (e.g. a less expensive repair versus replacement). The foregoing shall not, however,

27    require Tenant to accept or proceed with any alternative suggested by Landlord, provided that

28    Tenant in good faith evaluates the alternatives offered by Landlord and in good faith offers

29    reasonable explanations to support any rejection of Landlord's proposed alternatives.

1      On or before the expiration of such ten (10) business day period, Landlord shall notify

2    Tenant whether or not it agrees to reimburse Tenant for one-half (1/2) of the unamortizable

3    portion of the cost of the contemplated expenditure in excess of Ten Thousand and No/100

4    Dollars ($10,000.00).  Landlord's failure to respond on a timely basis shall be deemed its

5    agreement to reimburse Tenant.  If Landlord notifies Tenant that it does not agree to reimburse

6    Tenant, (i) Landlord shall not be obligated to so reimburse Tenant, (ii) Tenant shall not be

7    obligated to make the repair, construction or alteration giving rise to the expenditure and shall

8    not be in default of its obligations under this Lease as a result thereof, and (iii) Tenant shall, upon

9    expiration of the Lease, have the right to remove the improvements made with the unreimbursed

10    expenditures (provided Tenant repairs any damage arising out of such removal and such removal

11    does not in and of itself create a dangerous condition which could cause injury to persons or

12    property).  However, if Tenant subsequently exercises an additional Renewal Option (a) if

13    Landlord has reimbursed Tenant as provided above, then Tenant shall return to Landlord the

14    amount so reimbursed by Landlord, and (b) if, alternatively, Landlord had notified Tenant that it

15    would not agree to reimburse Tenant as provided above, then the provisions of items (ii) and (iii)

16    in this paragraph above shall be void and of no further force and effect as to the applicable

17    repair, construction or alteration.

18      Should either party fail to perform its obligations under this paragraph 10 with respect to

19    the Building, the other party may, at its option, effect such maintenance, replacements or repairs,

20    provided that such curing party shall have given the non-performing party thirty (30) days prior

21    written notice, except in the case of emergencies (in which event only such notices as may be

22    reasonable under the circumstances shall be required); but further provided that such thirty (30)

23    day period (or reasonable period in event of emergencies) shall be extended in respect of any

24    cure that cannot with reasonable diligence be accomplished within such period so long as the

25    party required to effect such cure has commenced such cure within such thirty (30) day period

26    (or reasonable period in event of emergencies) and thereafter diligently prosecutes such cure to

27    completion.  The non-performing party shall reimburse the other party within twenty (20) days

28    of written demand for the reasonable and actual amount so expended (as evidenced by detailed

29    invoices), plus interest from and after such twentieth (20th) day at the Default Rate.  However, in

30    the event of emergency repairs, no interest shall accrue if reimbursed within thirty (30) days of

1   request (including detailed invoices) for reimbursement.   All maintenance, repairs or
2   replacements shall be done by Tenant or Landlord lien-free and in a good and workmanlike
3   manner consistent with the quality of labor and materials used in originally constructing the
4   Improvements and in accordance with all applicable law.   In order to enable Landlord and
5   Tenant to effectively perform their maintenance, repair and replacement obligations hereunder,
6   Tenant and Landlord, as applicable, shall provide to the other party any and all manufacturers'
7   and contractors' warranties relating to such work performed on behalf of the other party to the
8   party who is required to maintain same under the Lease.

9        11.   <u>Utility Service Provider; Payment of Utility Bills</u>.   Tenant shall be entitled,
10   subject to State law, to select the utility service provider which shall provide water, electric, gas,
11   cable, and telecommunication services to the Premises.   Tenant will pay directly to the
12   appropriate utility company or governmental agency, when due, all bills (which includes all
13   taxes levied or other charges on such utilities, including any governmental or utility charges
14   based on utility consumption, standby utility capacity or potential utility use, provided such taxes
15   and charges relate only to the Term and not to periods prior to the commencement or subsequent
16   to the expiration of the Term) for gas, water, sanitary sewer, electricity, telephone and other
17   public or private utilities used by Tenant (including, but not limited to, electricity for the Tenant
18   Light Poles ).   If Landlord or any affiliate of Landlord shall supply any such services, Tenant
19   shall purchase same from Landlord at charges not in excess of the charges for the services in
20   question made by the unaffiliated utility corporation or governmental agency which would
21   otherwise be supplying such utilities to the Shopping Center.   Any such charges for services
22   supplied by Landlord, or charges for utilities which may be rebilled by the Landlord, shall be due
23   and payable as additional rent within thirty (30) days after billings therefor are rendered to
24   Tenant. Landlord shall pay when due all utility charges incurred in the operation of the Common
25   Areas on Landlord's Premises (excluding electricity for the Tenant Light Poles ).

26        12.   <u>Alterations</u>. During the Term, Tenant shall have the right, at its discretion and its
27   sole cost, without Landlord's consent, to make any interior nonstructural alterations or
28   modifications it may desire.   In addition, with Landlord's consent, which shall not be
29   unreasonably withheld, conditioned or delayed, Tenant shall have the right, at its sole cost, to
30   alter, modify or reconstruct the exterior and/or structure of the Building or Other Improvements

1  ("Exterior or Structural Modification").    Landlord shall be deemed to have unreasonably
2  withheld its consent to any Exterior or Structural Modification requested by Tenant unless same
3  (i) increases the height of the Building; (ii) modifies the size of the Building or Other
4  Improvements; (iii) adversely affects the structural integrity of the Building; or (iv) where the
5  Shopping Center has an architectural theme (e.g. white sparkle stone) to which the other major
6  tenants in the Shopping Center conform, is materially inconsistent with the then-existing
7  architecture of the Shopping Center.  Notwithstanding anything to the contrary contained herein,
8  during the period of time that Circuit City Stores, Inc. (or its successor by merger or acquisition)
9  is the occupant and operator of the Building (as opposed to a subsequent user, sublessee or
10  assignee), Landlord's consent shall not be required in connection with the replacement or
11  modification of the exterior entrance feature of the Building, provided that (i) such replacement
12  or modification is undertaken in order to bring such entrance feature into conformity with the
13  prototypical architectural design of entrance features then being utilized by Tenant on a majority
14  of its new or rehabilitated existing stores, (ii) the height of the entrance feature does not exceed
15  40 feet to its highest point, and (iii) the overall size of the entrance feature is not materially
16  increased.  Should Landlord's consent be required pursuant to this paragraph 12, conceptual
17  plans and specifications for such work shall be provided to Landlord prior to commencement of
18  any such work.  Landlord shall be deemed to have consented to such work if written notice of
19  disapproval, with reasons specified, is not received by Tenant within thirty (30) days following
20  Tenant's delivery of such plans and specifications to Landlord, provided Tenant's request for
21  approval references such thirty (30) day deemed approval period.  Without cost or expense to
22  Landlord, Landlord shall cooperate with Tenant, at Tenant's sole cost, in the obtaining of any
23  and all licenses, building permits, certificates of occupancy or other governmental approvals
24  which may be required in connection with any such modifications or alterations, and Landlord
25  shall execute, acknowledge and deliver any documents reasonably required in furtherance of
26  such purposes.  If Tenant adds any mezzanine area(s), the square footage thereof shall increase
27  the basis upon which ancillary charges set forth in this Lease are assessed.

28       13.     Mechanics' Liens.  Landlord and Tenant covenant to each other that they will not
29  permit any lien to be filed against the Premises or Shopping Center as a result of nonpayment for
30  or disputes with respect to labor or materials furnished to the Premises or the Shopping Center

1    for or on behalf of Tenant, Landlord or any party claiming by, through or under Tenant or

2    Landlord, nor shall either party permit any judgment, lien or attachment to lie, as applicable,

3    against the Premises or Shopping Center. Should any lien of any nature, including but not

4    limited to the foregoing, be filed against the Premises or Shopping Center, the party on account

5    of whose actions such lien has been filed shall, within thirty (30) days after receipt of written

6    notice of such lien, cause said lien to be removed, or otherwise protected against execution

7    during good faith contest, by substitution of collateral, posting a bond therefor, escrowing of

8    adequate funds to cover the claim and related transaction costs or such other method as may be

9    permissible under applicable title insurance regulations and reasonably acceptable to the other

10   party hereto. Notwithstanding the foregoing, Landlord shall not be required to remove a lien

11   unless such lien has priority over this Lease or adversely affects the tenancy rights of Tenant in

12   the Premises or Tenant's right to obtain financing secured by this Lease.

13       14.    Insurance.

14           (a)    Property Damage. During the Construction Term, Tenant shall keep or

15   require its general contractor to keep, in full force and effect, a policy of builder's risk insurance

16   covering loss or damage to the Improvements for the full replacement value of all such

17   construction. During the Main Term and all Option Periods, Tenant shall keep the Premises

18   insured against loss or damage by fire and the perils covered under standard "all risk" or "special

19   form" coverage in the amount of full replacement value of the Building, exclusive of excavation,

20   footings and foundations (which initial amount shall be not less than $2,000,000.00), with a

21   commercially reasonable deductible, for which Tenant shall be fully responsible. Landlord and

22   Landlord's first "Mortgagee" (as defined in paragraph 21 below), shall be named in such policy

23   or policies as additional insureds and loss payees as their respective interests may appear.

24   Landlord shall not construct, or permit to be constructed, any improvement in the Shopping

25   Center, nor conduct any activity, nor lease any property for or knowingly acquiesce in the

26   conduct of any activity, in the Shopping Center which will prevent Tenant from being able to

27   obtain insurance coverage at commercially reasonable rates. Should Landlord, in violation of the

28   preceding sentence, cause or permit any insurance rate increase to occur, Landlord will

29   reimburse Tenant for the additional premium required, subject to Tenant's right to self-insure (in

1   which event Landlord will contribute to Tenant's self insurance fund to cover increased actuarial

2   risks).

3           (b)    Liability Insurance.  During the Term, Tenant shall keep in full force a

4   policy of commercial general liability insurance with bodily injury and property damage

5   coverage with respect  the Premises and the business operated thereon by Tenant, which shall

6   name Landlord and Landlord's first Mortgagee as additional insureds as their respective interests

7   may appear.  The limits of such commercial general liability policy shall be not less than

8   $2,000,000.00 combined single limit for bodily injury and property damage, with a commercially

9   reasonable deductible.  Such liability insurance will provide coverage for exposures including,

10  but not limited to, (1) an accident occurring in, on or about the Premises; (ii) the sale or other

11  disposition of any good or service by Tenant; (iii) the consumption or existence on the Shopping

12  Center or the Premises of any product sold or otherwise disposed of by Tenant; (iv) any act or

13  omission of Tenant, its employees, servants, agent or invitees; and (v) broad form contractual

14  coverage in support of Tenant's indemnitees under this Lease.

15          (c)    Workers' Compensation Insurance.    To the extent required by law,

16  Landlord and Tenant shall maintain workers' compensation insurance covering their respective

17  employees in statutory limits, or maintain such alternate coverages or arrangements as legally

18  permissible.

19          (d)    Self-Insurance.  Notwithstanding anything to the contrary contained

20  herein, Tenant shall have the right to self-insure against any of the risks or portions thereof set

21  forth in subparagraphs (a) and (b) (and to the extent then permitted by law, (c)) above, provided

22  Tenant is then occupying the Premises and has a reported net worth, as of the end of Tenant's

23  most recent quarterly reporting period, of not less than One Hundred Ten Million Dollars

24  ($110,000,000.00) [in "2003 Constant Dollars" as hereinafter defined].

25          As used in this Lease, the term "[in 2003 Constant Dollars]" shall mean and refer to the

26  amount of the proportionate increase or decrease for each year during the Term of this Lease in

27  the Consumer Price Index, All Urban Consumers (U.S. City Average), as compiled and

28  published by the Bureau of Labor Statistics, United States Department of Labor (the "Index"), or

29  any successor index thereto, appropriately adjusted. In the event that the Index is converted to a

30  different standard reference base or otherwise revised, the determination of the adjustment to be

1    made with reference to the Index shall be made with the use of such conversion factor, formula

2    or table for converting the Index as may be published by the Bureau of Labor Statistics or, if said

3    Bureau shall not publish the same, then with the use of such conversation factor, formula or

4    table as may be published by Prentice Hall, Inc., or other nationally recognized publisher of

5    similar statistical information as may be agreed upon by the Landlord and Tenant. If the Index

6    ceases to be published, and there is no successor thereto, then a reasonable substitute index

7    selected by Landlord and approved by Tenant shall be utilized; or, if such a substitute index is

8    not available or may not lawfully be used for the purposes stated herein, then based upon a

9    reliable governmental or other nonpartisan publication, selected by Landlord and approved by

10   Tenant, evaluating changes in the cost of living or purchasing power of the consumer dollar, if

11   such a publication is available and may be lawfully used for the purposes stated herein. For the

12   purposes of calculating fluctuations in the Index, the calendar month of the date of this Lease

13   shall be considered to be the base index date (the "Base Index"). With respect to the minimum

14   net worth requirement referred to in this paragraph 14(d) to which the Index Adjustment is to be

15   made, such amount shall for the purpose of calculating such adjustment be referred to in this

16   paragraph 14(d) as the "Base Amount" and the Base Amount, as adjusted by the application of

17   this paragraph 14(d), shall be referred to herein as the "Adjusted Amount".

18          The Adjusted Amount shall be determined as follows:

19          With respect to each time at which the Index Adjustment is to be made, the Base Amount

20   shall be increased or decreased to equal the product obtained by multiplying the Base Amount by

21   a fraction, the numerator of which is the Index for the most recent calendar month, and the

22   denominator of which is the Base Index. For purposes of this paragraph 14(d), the Base Amount

23   utilized for any initial calculation made hereunder shall continue to be utilized as the Base

24   Amount for each subsequent application of this provision.

25          (e)    Common Area, Additional Area and Third Party Tenant Insurance and

26   Insurance During Landlord's Construction. During the Term, Landlord shall keep in full force

27   and effect (or cause to be maintained), in form reasonably acceptable to Tenant, policies of (1)

28   commercial general liability insurance with respect to the Common Areas on the Landlord's

29   Premises and (2) property insurance insuring against loss or damage by fire and the perils

30   covered under standard "all risk" or "special form" coverage, with respect to the improvements

1    in the Common Areas on the Landlord's Premises and with respect to all other building areas on

2    the Landlord's Premises over which Landlord from time to time has present possessory rights (or

3    has the obligation under any lease to provide such insurance coverage) but which do not

4    constitute a portion of the Common Areas (such areas here sometimes collectively referred to as

5    the "Additional Areas"). The Additional Areas shall exclude the Premises and include, without

6    limitation: (i) as yet unconstructed portions of the Landlord's Premises intended for tenant

7    occupancy, (ii) constructed but unoccupied portions of the Landlord's Premises, (iii) vacated or

8    otherwise uninsured tenant space, whether by reason of lease expiration, default or otherwise,

9    and (iv) constructed and occupied portions of the Landlord's Premises. Said commercial general

10    liability policies shall name Tenant, and any lender, investor or other stakeholder which is

11    designated by Tenant from time to time, as an additional insured to the fullest extent Tenant and

12    such stakeholder have insurable interests. The limits of such policies shall be the same as those

13    set forth in subparagraphs (a) and (b) above, as applicable. Landlord may, with respect to its

14    insurance obligations, self-insure or utilize deductibles, provided Landlord is an affiliate of The

15    Cafaro Company and Landlord or the general partner of Landlord maintains a net worth, as of

16    the end of such entity's most recent fiscal year, of not less than $110,000,000.00 (in 2003

17    Constant Dollars), as certified by the Chief Financial Officer(s) of The Cafaro Company and of

18    the entity to which the certification is applicable.

19             (f)    Commencing on the Commencement Date and continuing until the first

20    January 1st thereafter, Tenant shall pay an amount equal to the product of $.31 multiplied by the

21    ground floor gross leasable area of the Building (as calculated pursuant to 9(b) above) (the

22    "Insurance Charge"). The Insurance Charge shall increase on each January 1st in direct

23    proportion to the increase of the cost to Landlord for the insurance coverages set forth in this

24    paragraph 14(e). In the event that the increase in said cost to Landlord is zero or less than zero,

25    then the Insurance Charge for the succeeding calendar year shall be the same as the charge

26    payable during the preceding calendar year. For any period within the Term which is less than a

27    full calendar year, the annual Insurance Charge shall be appropriately prorated. If the

28    information necessary to make the adjustment contemplated above is not available at the end of a

29    calendar year, Tenant shall continue to pay on an interim basis the then applicable Insurance

30    Charge. Upon receipt of the information required to make the adjustment contemplated above, a

1   necessary adjustment with respect to amounts previously paid by Tenant shall thereupon be

2   retroactively made, and the monthly payments to be made by Tenant from the first day of the

3   calendar year and for the remainder of the calendar year shall be established. If the criteria for

4   Landlord's self-insurance is not met then any deductible amount or self-insured retention for the

5   Common Area and the property insurance coverage shall be reasonable in amount given the

6   nature of the risk insured, the probable frequency of claims made under such coverage, and the

7   overall insurance program of Landlord and its affiliates. Landlord shall use diligent efforts to

8   assure (through parallel lease provisions or otherwise) that all areas of the Landlord's Premises,

9   including the Additional Areas and areas leased to third party tenants or sold to third party

10   occupants, are insured with substantially similar coverages to those required for the Premises and

11   the Common Areas on the Landlord's Premises, such that in the event of any destruction or

12   damage whatsoever to any portion of the Landlord's Premises, Tenant may have a reasonable

13   expectation that the Landlord's Premises will be reconstructed in equal or superior condition

14   within the time frame set forth in paragraph 15. During any period in which Landlord is

15   conducting construction activities at the Shopping Center, Landlord shall keep, or cause its

16   general contractor to keep, in full force and effect, with regard to the Shopping Center, in form

17   reasonably acceptable to Tenant, at least the minimum insurance coverages set forth below.

18         1)   Workers' Compensation - Statutory Limits; Employer's Liability -
19               $500,000;

20         2)   Automobile Liability for all vehicles with limits of $2,000,000; and

21         3)   Commercial General Liability to include premises operations and
22               products/completed operations coverage with limits of $2,000,000.

23        Additionally, Landlord shall keep or require its general contractor to keep in full

24   force and effect a policy of builder's risk insurance covering loss or damage to the Landlord's

25   Premises for eighty percent (80%) of the replacement value of all such construction, with

26   appropriate deductibles or self-insured retention.

27        (g)   Policy Provisions. All policies of insurance (other than self-insurance)

28   enumerated above shall be provided by insurance carriers with a Best rating of not less than A-

29   VIII. Any insurance coverage enumerated above may be effected by a blanket policy or policies

30   of insurance or under so-called "all risk" or "multi-peril" insurance policies, provided that the

1    total amount of insurance available with respect to the Premises and Tenant's or Landlord's

2    liability hereunder shall be at least the equivalent of separate policies in the amounts herein

3    required, and provided further that in other respects any such policy or policies shall comply with

4    the provisions of this paragraph 14.   An increased coverage or "umbrella" policy may be

5    provided and utilized by either party to increase the coverage provided by individual or blanket

6    policies in lower amounts, and the aggregate coverage provided by all such policies with respect

7    to the limits required herein shall be satisfactory provided that such policies otherwise comply

8    with the provisions of this paragraph 14.

9            (h)    Waiver of Right of Recovery and Subrogation.   To the extent that

10    insurance proceeds are actually received in satisfaction of a loss which is required to be covered

11    by insurance or is self-insured hereunder (with the deductible under any policy being deemed to

12    be self-insured), Landlord and Tenant hereby waive any and all rights of recovery against each

13    other for any loss or damage to any area on the Shopping Center which is required to be insured

14    by the other party, or the contents contained therein, for loss of income on account of fire or

15    other casualty, or for injury sustained on any such area; and each party's aforesaid policies of

16    insurance shall contain appropriate provisions recognizing this mutual release and waiving all

17    rights of subrogation by the respective insurance carriers.

18            (i)    Evidence of Insurance.   Subject to each party's right to self-insure

19    hereunder, upon (i) commencement of the Main Term (as to property insurance), (ii) upon the

20    Effective Date (as to liability insurance) and (iii) prior to expiration thereof, Tenant and Landlord

21    shall cause to be issued to each other in lieu of the original policy, a duplicate of such policy or

22    appropriate certificates of insurance reasonably acceptable to the other party and evidencing

23    compliance with the applicable covenants of this paragraph 14.   Each such certificate shall

24    provide that coverage shall not be cancelled without thirty (30) days notice to the certificate-

25    holder (and any Mortgagee, if applicable).

26            (j)    Indemnities.   Except if arising from the negligent or willful acts of

27    Landlord or its agents or employees (to the extent that paragraph 14(h) is inapplicable thereto),

28    Tenant hereby agrees to indemnify, defend and hold Landlord harmless from all claims, costs,

29    liability, damage or expense, including attorneys' fees, for any death, damage or injury to

1    persons or property occurring on the Premises or resulting from the use thereof by Tenant, its

2    agents or employees.

3        Except if arising from the negligent or willful acts of Tenant or its agents or employees

4    (to the extent that paragraph 14(h) is inapplicable thereto), Landlord agrees to indemnify, defend

5    and hold Tenant harmless from any and all claims, costs, liability, damage or expense, including

6    attorneys' fees, for any death, damage or injury to persons or property occurring in, on or around

7    the Landlord's Premises, or other buildings within Landlord's Premises or resulting from the use

8    thereof by Landlord, its agents or employees.

9        15.    Damages by Fire or Other Casualty.

10        (a)    Damages Occurring During the Main Term.    Landlord's Restoration

11    Area shall mean the portion of the Shopping Center depicted as "Landlord's Restoration Area"

12    on the Site Plan (the "LRA").  In the event of an insured fire, earthquake or other casualty,

13    causing destruction or damage to the Improvements, Common Areas and/or the LRA, occurring

14    during the Main Term, this Lease shall not terminate except as expressly set forth herein, and

15    Base Rent, Interim Rent, and all other charges shall continue to be paid by Tenant pursuant to the

16    terms hereof.  Within a reasonable time after such casualty, subject to force majeure, applicable

17    building codes, the procurement of building permits and the receipt of insurance proceeds (unless

18    self-insured) to the extent of the damage to the Premises, or the Common Areas or the LRA, as

19    applicable, Tenant shall complete reconstruction of the Building and Other Improvements on the

20    Land, and Landlord shall complete reconstruction of the Common Areas on the Tenant's

21    Preferred Area and the LRA to that condition existing immediately prior to such casualty, in the

22    reconstructing party's reasonable discretion, with, in event of any Tenant reconstruction, such

23    alterations as may be permitted under paragraph 12 hereof.  In the event, subject to force

24    majeure, the Premises, Common Areas and/or LRA, as applicable, are not substantially repaired

25    and reconstructed, and equipment, furniture and fixtures restored or replaced, by the party with

26    repair and restoration obligations within two hundred forty (240) days after receipt of any

27    required governmental permits, for which permits the party with repair obligations shall make

28    prompt application following such destruction or damage, and insurance proceeds (if not self-

29    insured), and such party is not diligently undertaking such restoration, then the other party, at its

30    option, by giving written notice to the party with repair obligation, within thirty (30) days after

1    the expiration of said period, may undertake completion of such reconstruction, in which event
2    the party with repair obligations shall make available to the notifying party all insurance
3    proceeds received by the non-performing party for such reconstruction (including any applicable
4    deductible) or, if self-insured, the amount necessary for such reconstruction.

5            (b)    Damages Occurring During Any Option Period.    Notwithstanding the
6    foregoing, if any such damage or destruction occurs during any Option Period and has a repair
7    and reconstruction cost of twenty-five percent (25%) or more of the then total reconstruction cost
8    of the Improvements, Tenant shall be under no obligation to restore the improvements, in which
9    case this Lease shall terminate at Tenant's option, such option to be exercised by Tenant giving
10   not less than thirty (30) days' prior written notice to Landlord, and Landlord shall receive the
11   amount necessary for reconstruction of the Improvements, to the extent such amount would have
12   been payable under insurance as outlined herein.

13           (c)    Tenant's Termination Right.    Notwithstanding anything to the contrary
14   provided in this Lease, Tenant shall have the right to terminate this Lease following a casualty of
15   the Premises which has repair and reconstruction cost of forty percent (40%) or more of the then
16   total reconstruction cost of the Improvements, if following such casualty Landlord cannot
17   demonstrate to Tenant's reasonable satisfaction that the improvements in the LRA will be rebuilt
18   within six (6) months following the date on which Tenant reopens its Premises for business.

19   16.    Condemnation.

20           (a)    Definition of Taking and Substantial Taking.    For the purpose of this
21   Lease, a "Taking" shall mean any condemnation or exercise of the power of eminent domain by
22   any authority vested with such power or any other taking for public use, including a private
23   purchase in lieu of condemnation by an authority vested with the power of eminent domain; the
24   "Date of Taking" shall mean the earlier of the date upon which title to the Premises, the
25   Shopping Center, the Tenant's Preferred Area or any portion thereof so taken is vested in the
26   condemning authority or the date upon which possession of the Premises, the Shopping Center,
27   the Tenant's Preferred Area or any portion thereof is taken by the condemning authority; and
28   "Substantially All of the Premises" shall mean (i) so much of the Improvements and/or Shopping
29   Center and the Tenant's Preferred Area as, when taken, leaves the untaken portion unsuitable, in
30   Tenant's reasonable opinion, for the continued feasible and economic operation of the Premises

1    by Tenant for the same purposes as immediately prior to such Taking or as contemplated herein,

2    or (ii) so much of the Tenant Common Area Easement described in paragraph 6(b) above that

3    access to the Premises is permanently impeded.

4            (b)    Tenant's Rights Upon Taking or Substantial Taking.  In the event of a

5    Taking of Substantially All of the Premises, Tenant, at its option upon thirty (30) days' written

6    notice to Landlord, which shall be given no later than sixty (60) days following the Taking, shall

7    have the right to terminate this Lease.  All Base Rent and other sums payable by Tenant

8    hereunder shall be apportioned and paid through and including the Date of Taking, and neither

9    Landlord nor Tenant shall have any rights in any compensation or damages payable to the other

10    in connection with such Taking.

11            (c)    Tenant's Rights Upon Less Than Substantial Taking.  In the event of a

12    Taking of less than Substantially All of the Premises that has had an adverse affect on operations

13    of the Premises by Tenant, Base Rent and other charges shall be reduced fairly and equitably in

14    accordance with the portion condemned or taken, effective as of the Date of Taking, and Tenant

15    shall make all necessary restorations to the Improvements so that the portions of the

16    Improvements not taken constitute a complete architectural unit, provided that the cost thereof to

17    Tenant shall not exceed the proceeds of Tenant's condemnation award (to the extent that such

18    relates to the Improvements and not to Tenant's personal property, intangibles or out-of-pocket

19    expenses unrelated thereto) and the portion of Landlord's award allocable to the Premises (to the

20    extent that such relates to improvements constructed on the Premises versus the income stream

21    generated to Landlord by the Premises), which Landlord shall make available to Tenant for such

22    restoration.

23            If such Taking occurs within the last two (2) years of the Main Term or of any Option

24    Period and has a material impact on Tenant's ability to conduct business as reasonably

25    determined by Tenant, this Lease shall terminate at Tenant's option, such option to be exercised

26    by Tenant giving not less than thirty (30) days' prior written notice to Landlord.

27            (d)    Landlord's Obligations Upon Any Taking.  In the event of any Taking

28    following which the Lease continues in effect, Landlord shall make all necessary restorations to

29    all portions of the Common Areas on the Landlord's Premises, the Tenant's Preferred Area and

30    the LRA such that they each constitute a complete architectural unit and serve the function

1    originally intended.  Additionally, Landlord shall assure (through parallel lease provisions or

2    otherwise) that all areas of the Shopping Center leased to third party tenants or sold to third party

3    occupants are subject to substantially similar reconstruction obligations to those of the Common

4    Areas on Landlord's Premises, the Tenant's Preferred Area and the LRA, such that in the event

5    of any condemnation of any portion of the Shopping Center whatsoever, and in the event Tenant

6    elects to maintain this Lease in force, Tenant shall be assured that the Shopping Center will be

7    reconstructed to its former conditions within a reasonable time.

8              (e)    <u>Rights Upon Temporary Taking</u>.  In the event of a Taking of the Premises,

9    the Tenant's Preferred Area and/or the Common Areas on the Shopping Center, or any portion

10   thereof, for temporary use (specifically one not exceeding one hundred twenty (120) days in

11   duration), without the taking of the fee simple title thereto, this Lease shall remain in full force

12   and effect.  All awards, damages, compensation and proceeds payable by the condemnor by

13   reason of such Taking relating to the Premises, or relating to the Common Areas but reasonably

14   attributable to the Premises, for periods prior to the expiration of the Lease shall be payable to

15   Tenant.  All such awards, damages, compensation and proceeds for periods after the expiration

16   of the Lease shall be payable to Landlord.   Anything contained herein to the contrary

17   notwithstanding, a temporary Taking for any period in excess of one hundred twenty (120) days

18   may, at Tenant's option, be deemed a permanent Taking and shall be governed by subparagraph

19   (b) or (c) above, as applicable.

20             (f)    <u>Taking of the Pylon Sign</u>.  In the event of a taking, whether permanent or

21   temporary, of the pylon sign described in paragraph 8 on which Tenant has installed

22   identification panels, Tenant shall receive all proceeds attributable to such Taking (except those

23   attributable to the sign cabinet, face panels and any appurtenances thereto of the occupant of Unit

24   90), and Landlord shall use its best good faith efforts to provide, within ninety (90) days, a

25   substitute site reasonably acceptable to Tenant therefor.   The cost of relocating and/or

26   reconstructing said pylon sign shall be allocated as follows:  the occupant of Unit 90 shall pay all

27   costs attributable to its sign cabinet, face panels and any appurtenances thereto; Tenant shall pay

28   all costs attributable to its sign cabinet, face panels and any appurtenances thereto, as well as the

29   entire cost of the pylon sign foundation and structural supports.

1    (g)    <u>Tenant's Right Upon Condemnation</u>.  In the event of a Taking described
2    in subparagraph (b) or (c) above, Tenant shall be entitled to claim compensation from the
3    condemning authority for the value of its leasehold interest in the Premises, its unamortized
4    leasehold improvements paid for by Tenant, relocation expenses and any other items to which
5    Tenant is entitled under applicable law.

6    17.    <u>Assignment and Subletting</u>.  Tenant shall have the right to sublet, assign,
7    transfer, reassign and grant concessions or licenses (a "Transfer") in all or any part of the
8    Premises and any of Tenant's rights and obligations under this Lease during the Term, without
9    Landlord's prior consent; provided Tenant will notify Landlord of any such transfer within thirty
10    (30) days after it has been effected.  In the event of such a Transfer, Tenant shall remain liable
11    for all of Tenant's obligations to Landlord arising hereunder but shall not incur any additional
12    liability as a result of any change, modification or amendment to the Lease by Landlord and any
13    transferee.    Transfers to subsidiaries, affiliates, or related parties, and Transfers involving
14    beneficial ownership interests in Tenant, shall not be deemed a Transfer hereunder and same
15    may be effected without Landlord's consent; provided Tenant will notify Landlord of any such
16    transfer within thirty (30) days after it has been effected.

17    18.    <u>Use</u>.
18    (a)    Tenant may initially maintain, use and operate the Premises as a retail
19    store for (i) the sale of consumer, office and automotive electronics products (which include, but
20    shall not be limited to, televisions, stereos, speakers and video and audio recorders and players
21    and cameras), computer hardware and software and related software services, including internet
22    access services, entertainment software and entertainment media (which include, but shall not be
23    limited to, records, game cartridges, video tapes, cassettes and compact discs, DVD's and DVD
24    equipment), cellular and wireless telephones and telecommunication devices,  and the sale and
25    installation of motor vehicle audio, stereo and telephone systems and technological evolutions of
26    the foregoing (all of such items and any related goods being herein collectively referred to as the
27    "Products"), and (ii) renting, servicing, repairing and warehousing of the Products.
28    (b)    Thereafter, Tenant shall have the right to use the Premises  for any lawful
29    retail use; provided, however, that the Premises  shall not be used (i) for more than three (3)
30    separate retail stores (with each such store being operated under a single trade name), (ii) for any

1    illegal purpose, (iii) for any use prohibited under paragraph 19(a)(viii) entitled "Prohibited
2    Activities", (iv) in violation of any applicable provision of the "Permitted Encumbrances"
3    including any restrictive covenants, referenced in Exhibit "F", or (v) for a primary use (other
4    than the Tenant's contemplated initial use of the Premises as set forth in subparagraph (a) above)
5    which is duplicative of a primary use then being conducted in the Shopping Center by another
6    occupant of the Shopping Center.  Furthermore, Tenant shall not use or permit the Premises (or
7    any subdivided portion of the Premises) to be used for a primary use:

    i.   As a jewelry store (except in connection with a permitted catalog store);

    ii.   As a book superstore (only so long as a book superstore is operating in the Shopping Center or Adjacent Center (as described in Exhibit A-2) in a building exceeding 19,000 square feet, and in such event such prohibition shall terminate upon such store's ceasing to operate as described above for a period of three hundred sixty-five (365) consecutive days, regardless of such store's subsequent re-opening);

    iii.   As a supermarket;

    iv.   As an office products store (only so long as there is an office products store open for business in the Shopping Center or Adjacent Center, and in such event such prohibition shall terminate upon such store's ceasing to operate for such use for a period of three hundred sixty-five (365) consecutive days, regardless of such store's subsequent re-opening);

    v.   As a toy store (only so long as a toy store is open for business in the Shopping Center or Adjacent Center, and in such event such prohibition shall terminate upon such store's ceasing to operate for such use for a period of three hundred sixty-five (365) consecutive days, regardless of such store's subsequent re-opening);

    vi.   As a discount drugstore (only so long as there is a discount drugstore open for business in the Shopping Center or Adjacent Center, and in such event such prohibition shall terminate upon such store's ceasing to operate for such use for a period of three hundred sixty-five (365) consecutive days, regardless of such store's subsequent re-opening);

    vii.   As a restaurant and/or bar;

    viii.   As a shoe store (only so long as there is a shoe store open for business in the Shopping Center or the Adjacent Center, and in such event such prohibition shall terminate upon such store's ceasing to operate for such use for a period of three hundred sixty-five (365) consecutive days, regardless of such store's subsequent re-opening).