1        (c)    Except as may be expressly set forth in this paragraph 18, nothing

2  contained in this Lease shall be construed to require Tenant to operate the Premises continuously

3  but if used, such use will be in compliance with (a) or (b) above. Tenant shall be permitted to

4  conduct temporary outdoor promotional sales on the Common Areas on Landlord's Premises

5  only if (and only to the same extent as) other tenants or occupants of the buildings within the

6  Shopping Center are permitted to conduct such sales. Tenant shall be permitted to conduct

7  temporary outdoor promotional sales on the sidewalk area immediately in front of Tenant's

8  Premises, provided (i) Tenant is then operating as a Circuit City Superstore;   (ii) any such

9  outdoor sales displays allow at least a five foot (5') clear pedestrian pathway along the entirety of

10  said sidewalk area; and (iii) any such temporary outdoor promotional sales are conducted in a

11  professional manner (i.e.: consistent with the operation of a first-class retail power center).

12       19.    Warranties, Representations and Covenants.

13        (a)    Landlord represents, warrants and covenants to Tenant that:

14          (i)    Quiet and Peaceful Enjoyment.   Tenant shall have quiet and

15  peaceful use, enjoyment and occupancy of the Premises.

16          (ii)    Title. As of the date of this Lease, Landlord's fee simple interest

17  in the Shopping Center is free and clear of any mortgages, deeds, encumbrances, declarations,

18  easements, agreements; leases, tenancies or restrictions, except the REA and those matters set

19  forth on Exhibit "F" attached hereto and entitled "Permitted Encumbrances", or any other

20  encumbrances which would restrict Tenant's use of the Building for the sale of Products or

21  would restrict in any respect the right of Tenant, its employees, customers and invitees to use the

22  Common Areas in accordance with the terms of this Lease. Landlord specifically covenants and

23  warrants that, subject to the exclusives granted to other occupants of the Shopping Center  set

24  forth on Exhibit "F", no third party, including but not limited to any other occupant of the

25  Shopping Center , has the right to object to Tenant's tenancy hereunder (including, specifically,

26  its right to exercise the rights granted under this Lease and to operate its business in the

27  Premises), or to prohibit the selling, renting, servicing, repairing or warehousing of the Products,

1    or the right to consent to any feature of the Improvements or Tenant's signage.    The

2    representations, warranties, indemnifications and covenants contained in this paragraph are a

3    material inducement to Tenant's execution of this Lease.

4        (iii)    <u>Certificate of Authority</u>.    Landlord covenants that it is a duly

5    constituted general partnership under the laws of the State of Ohio, and that its authorized agent

6    who is acting as its signatory in this Lease is duly authorized and empowered to act for and on

7    behalf of the general partnership.    Landlord has furnished Tenant prior hereto with evidence of

8    (a) the existence of the general partnership, and (b) the authority of the agent to bind the general

9    partnership as contemplated herein.

10        (iv)    <u>No Litigation</u>.    As of the date of this Lease, there are no judicial,

11    quasi judicial, administrative or other orders, injunctions, moratoria or pending proceedings

12    against Landlord or the Shopping Center which preclude or interfere with, or would preclude or

13    interfere with, the construction contemplated herein or the occupancy and use of the Premises for

14    the purposes herein contemplated.

15        (v)    <u>Hazardous or Toxic Materials</u>.    To the best of Landlord's

16    knowledge, Landlord has not used, discharged, dumped, spilled or stored any Hazardous

17    Substances (as defined in paragraph 1(a) of the Construction Provisions) on or about the

18    Shopping Center, whether accidentally or intentionally, and has received no notice and has no

19    knowledge that any such condition exists at the Shopping Center.    If any claim is ever made

20    against Tenant by any third party (including, without limitation, any governmental agency)

21    relating to Hazardous Substances present at or around the Shopping Center, whether or not such

22    substances are present as of the date hereof, or any Hazardous Substances are hereafter

23    discovered at the Shopping Center (unless introduced by Tenant, its agents or employees), all

24    costs of removal incurred by, all liability imposed upon, or damages suffered by, Tenant because

25    of the same shall be borne by Landlord, and Landlord hereby indemnifies and agrees to defend

26    and hold Tenant harmless from and against all such costs, losses, liabilities and damages,

27    including, without limitation, all third-party claims (including sums paid in settlement thereof

28    with or without legal proceedings) for personal injury or property damage and other claims,

29    actions, administrative proceedings, judgments, compensatory and punitive damages, penalties,

30    fines, costs, losses, attorneys' fees and expenses (through all levels of proceedings), consultants

CircuitCity59-AandB.doc                    35

1    or experts fees and all costs incurred in enforcing this indemnity. The representation, warranty

2    and indemnity of Landlord described in this paragraph 19(a)(v) shall survive the termination or

3    expiration of this Lease. Tenant acknowledges that, based solely on the environmental

4    investigations conducted on its behalf, as of the date of this Lease, it is not aware of the presence

5    of any Hazardous Substance which Landlord is required to remediate under current law. Tenant

6    shall not cause or permit any Hazardous Substances to be upon, about, a part of, or beneath the

7    Premises or the Shopping Center. Subject to Landlord's obligation to indemnify Tenant as set

8    forth in this paragraph, Tenant shall, at its sole cost and expense, promptly take all actions to

9    comply fully with all present and future laws concerning Hazardous Substances arising as a

10    result of Tenant's breach of its obligation contained in the immediately preceding sentence.

11    Tenant hereby indemnifies and agrees to defend and hold Landlord harmless from and against all

12    costs, losses, liabilities and damages, including, without limitation, all third-party claims

13    (including without limitation any governmental agency and including sums paid in settlement

14    thereof, with or without legal proceedings) for personal injury or property damage, other claims,

15    actions, administrative proceedings, judgments, or compensatory and punitive damages,

16    penalties, fines, costs, losses, attorneys' fees and expenses (through all levels of proceedings),

17    consultants' or experts' fees, and all costs incurred in enforcing this indemnity should Tenant

18    use, discharge, dump, spill or store or knowingly permit any Hazardous Substance to be used,

19    discharged, dumped, spilled or stored, upon, about or a part or beneath the Premises or the

20    Shopping Center. The warranty, indemnity and obligations of Tenant described in this paragraph

21    shall survive the termination or expiration of this Lease. For purposes of this paragraph,

22    Hazardous Substances shall not include substances utilized in connection with the maintenance

23    and operation of Tenant's Building, provided such substances are utilized and stored in

24    compliance with all applicable environmental laws.

25              (vi)    <u>Tenant's Exclusive Use</u>. (A) For purposes of this Lease, an

26    "Electronic Superstore" shall be a retail facility (including a "wholesale club" or similar concept)

27    the primary use of which is for the sale of all or substantially all of the following: consumer,

28    office and/or automotive electronic products (which include, but shall not be limited to,

29    televisions, stereos, speakers and video and audio recorders and players and cameras and similar

30    related items).

CircuitCity59-AandB.doc                    

1          Subject to the rights granted to any tenants or occupants under leases or
2    agreements in existence as of the date of this Lease and listed on Exhibit F, so long as: (1)
3    Tenant is not in default of this Lease beyond any applicable cure period (except for any ongoing
4    bona fide dispute or litigation between the parties), and (2) the Premises is then being used as an
5    Electronic Superstore, no other tenant or occupant of the Shopping Center having a gross
6    leasable area in excess of 5,000 square feet shall be entitled to operate as an Electronic
7    Superstore.

8          Landlord hereby acknowledges that it has reserved the right in its Lease
9    with Kohl's (which is not otherwise restricted in changing its use), to designate exactly four (4)
10    specific use restrictions of other tenants or occupants of the Shopping Center which Kohl's may
11    not violate in the event that Kohl's elects to change its use.   Pursuant to the foregoing
12    acknowledgement, Landlord hereby agrees that, so long as: (1) Tenant is not in default of this
13    Lease beyond any applicable cure period (except for any ongoing bona find dispute or litigation
14    between the parties), and (2) the Premises is then being used as an Electronic Superstore, it shall
15    designate Tenant's use restriction against the operation of an Electronic Superstore [set forth in
16    this Section 19(a)(vi)(A) above] a use restriction that Kohl's may not violate in the event that
17    Kohl's elects to change its use.

18         (B)    For the purposes of this Lease, a "Computer Superstore" shall be a
19    retail facility the primary use of which is for the sale of computer hardware and software and
20    related software services, including internet access services, such as that operated as of the date
21    of this Lease by CompUSA.  Subject to the rights granted to any tenants or occupants under
22    leases or agreements in existence as of the date of this Lease and listed on Exhibit F, so long as:
23    (1)  Tenant is not in default of this Lease beyond any applicable cure period (except for any
24    ongoing bona fide dispute or litigation between the parties), and (2) at least twenty percent (20%)
25    of the Premises is then being used for the sale of computer hardware and software and related
26    software services (including internet access services), no tenant or occupant of the Shopping
27    Center having a gross area in excess of 5,000 square feet shall be entitled to operate as a
28    Computer Superstore.

29          Landlord hereby acknowledges that it has reserved the right in its Lease with
30    Kohl's (which is not otherwise restricted in changing its use), to designate exactly four (4)

1　specific use restrictions of other tenants or occupants of the Shopping Center which Kohl's may

2　not violate in the event that Kohl's elects to change its use.　Pursuant to the foregoing

3　acknowledgement, Landlord hereby agrees that, so long as: (1) Tenant is not in default of this

4　Lease beyond any applicable cure period (except for any ongoing bona fide dispute or litigation

5　between the parties), and (2) at least twenty percent (20%) of the Premises is then being used for

6　the sale of computer hardware and software and related software services (including internet

7　access services), it shall designate Tenant's use restriction against the operation of a Computer

8　Superstore [set forth in this Section 19(a)(vi)(B) above] as a use restriction that Kohl's may not

9　violate in the event that Kohl's elects to change its use.

10　　　　　　　(vii)　Zoning and Subdivision.　The Premises and the Shopping Center

11　are presently properly subdivided, in conformity with all applicable laws and zoned so as to

12　permit (A) the development and operation of the Premises and the Shopping Center in

13　accordance with the provisions of this Lease; and (B) the initial use of the Premises described in

14　paragraph 18 of this Lease.

15　　　　　　　(viii)　Prohibited Activities.

16　　　(1)　Landlord and Tenant shall not operate or lease (or permit to be operated or leased)

17　any building or tenant space in the Tenant's Preferred Area or in the Shopping Center, including

18　the Premises, for use as:

19　　　　　　　A.　a flea market;

20　　　　　　　B.　a massage parlor;

21　　　　　　　C.　a funeral home;

22　　　　　　　D.　a facility for the sale of paraphernalia for use with illicit drugs.

23　　　　　　　E.　a facility for the sale or display of pornographic material (as

24　determined by community standards for the area in which the Shopping Center is

25　located);

26　　　　　　　F.　a carnival, amusement park or circus;

27　　　　　　　G.　a facility for any use which is illegal or dangerous, constitutes a

28　nuisance or is inconsistent with an integrated, community-oriented retail and

29　commercial shopping center;

30　　　　　　　H.　a facility for the sale or rental of used goods (including thrift

31　shops, secondhand or consignment stores) or any facility selling new or used

32　merchandise as a wholesale operation, a liquidation operation, odd lots, lot sales,

33　factory close-outs or imperfect goods (excluding any of such sales as listed in this

34　subparagraph (H) which are conducted as an incidental part of a retail operation;

CircuitCity59-AandB.doc

38

1             I.      an off-track betting parlor which is greater than fifteen thousand (15,000) square feet or which utilizes less than one-third (1/3) of its gross leasable area for a restaurant;

J.      a gas station, auto repair or body shop; provided, however, the parties specifically acknowledge that Tenant's car stereo installation facility is not included in this subparagraph (J) and the type of operations generally conducted by regional or national automotive parts or tire chains such as, but not limited to, Pep Boys, Western Auto and NTB shall not be in violation of this prohibition; or

K.      a facility for the sale of new or used motor vehicles, boats, trailers or mobile homes (the parties specifically acknowledge that the foregoing shall not prohibit a new car dealership if such new car dealership stores and displays all of its inventory within its enclosed premises).

(2)     Landlord shall not operate or lease (or permit to be operated or leased) any building or tenant space within three hundred (300) feet (measured from the front entrance of the Building to the front entrance of the space in question) for use as, and Tenant shall not permit the Premises to be used as:

(A)     a bar, tavern, pub, nightclub, or dance hall or disco in which less than fifty percent (50%) of its space or revenue is devoted to and derived from food service;

(B)     a bowling alley;

(C)     a billiard or bingo parlor;

(D)     an off-track betting parlor (regardless of size or percentage of restaurant use);

(E)     a skating rink;

(F)     a laser tag or virtual reality facility, or for the primary use as an arcade or pinball or computer game room (provided that retail facilities may display electronic games or computer games for sale and for entertainment purposes [but said games may be used for entertainment purposes only incidental to another primary use]);

(G)     a banquet hall, auditorium or other place of public assembly (except in connection with the operation of a hotel/motel);

(H)     a training or educational facility (including, without limitation, a beauty school, barber college, reading room, school or other facility catering primarily to students or trainees rather than customers); or

(I)     a theater of any kind.

In addition, no auction, fire or going-out-of business sale shall be conducted in the Shopping Center.

1         (ix)   <u>Site Covenants</u>.  With regard to the development of the Shopping

2 Center and the uses and operations of the Common Areas, Landlord makes the following

3 representations, warranties and covenants (the "Site Covenants"):

4         (A)   <u>Building Location</u>.  There shall be no expansion of the building labeled

5 Unit 90 on the Site Plan beyond the Permissible Building Area as shown on the Site Plan.  No

6 outparcels, barriers, buildings, kiosks or other structures, either temporary or permanent, shall be

7 located within Tenant's Preferred Area, and no building located on an outparcel in the Shopping

8 Center including, but not limited to Unit 80 (as shown on the Site Plan), shall exceed the size

9 necessary for such outparcel to maintain, within its boundaries, the parking ratio required for it to

10 function as a self-contained unit without use of parking spaces located in the Common Areas.

11 No development shall occur within the Shopping Center except as shown on the Site Plan.

12         (B)   <u>Construction and Alterations</u>.  Following the end of the first Lease Year,

13 no exterior construction and no construction staging shall be permitted in the Tenant's Preferred

14 Area or on any service roads during the months of October, November and December except for

15 emergency repairs and interior alterations not affecting the operations of any other occupant of

16 the Shopping Center.  In the event of any construction within the Shopping Center, Landlord

17 shall designate a construction access route, staging and parking areas located so as to minimize

18 interference with customers or the operations of other occupants of the Shopping Center and

19 shall require erection of safety barriers as necessary and an opaque wall around the site of such

20 construction of a size necessary to screen such construction from ground level view.  With regard

21 to any construction on Landlord's Premises, Landlord shall be solely responsible for any

22 governmentally imposed impact fees, hookup, connection, installation or tap in fees and other

23 similar construction-related charges.  Other than de minimus changes which do not adversely

24 affect the Premises or Tenant's Preferred Area, Landlord shall make no changes in Tenant's

25 Preferred Area as shown on the Site Plan (including, without limitation, changes in the location

26 of curbcuts, drive aisles, roadways, sidewalks or parking spaces) without Tenant's express

27 written consent, which Tenant may, in its sole discretion, withhold.  With respect to portions of

28 the Common Areas on the Shopping Center outside of Tenant's Preferred Area, Landlord may

29 make other changes provided such changes do not materially and adversely affect Tenant's

30 parking, visibility or access.  Any changes which would cause a material adverse effect on

CircuitCity59-AandB.doc

1   Tenant's parking, visibility or access to said Common Areas may be made only upon receipt of

2   Tenant's express written consent.

3         (C)   <u>Prohibited Uses in Common Area</u>.  Landlord (as to the Common Areas on

4   Landlord's Premises and the Tenant's Preferred Area) and Tenant (as to the Common Areas on

5   the Premises) covenant that they shall not, without the other party's express written consent,

6   permit the following uses or activities to occur in said Common Areas: (1) advertisements or

7   signs except for pylon, under canopy and/or monument signs, "for rent" signs, traffic control

8   signs; (2) display or sale of merchandise (except as otherwise set forth in paragraph 18(c)

9   above); (3) operation of loudspeakers or other sound electronically amplified so as to be heard in

10  the Common Areas; (4) imposition of a charge for parking other than the CAM Charge; or (5)

11  operation of cellular telephone or other telecommunication tower for use by any other party not

12  an occupant of the Shopping Center. Landlord further covenants that it will not seek, nor permit

13  any other occupant of the Shopping Center to seek, a variance or waiver from the minimum

14  parking requirements applicable to the Shopping Center under the zoning code or other

15  applicable ordinance establishing the ratio of parking spaces to building area or otherwise

16  mandating the number of parking spaces required for the Shopping Center and the uses contained

17  therein. If reasonably required in Landlord's opinion, parking by employees of Tenant, Landlord

18  and other occupants of the Shopping Center shall be designated "employee parking" areas, the

19  location of which shall be agreed upon by Landlord and Tenant, but in no event shall such

20  designated areas be within the Tenant's Preferred Area.

21        (D)   <u>Easements</u>.  Except for occupants of the Shopping Center  and the

22  properties contiguous thereto, Landlord shall not grant any parking easements in the Common

23  Areas without Tenant's prior written consent.

24        (x)   <u>Interference with Tenant's Reception/Transmission</u>.   Landlord

25  shall not install or, to the extent it has the authority to do so, permit to be installed by any other

26  tenant or other person anywhere in the Shopping Center, any structure or equipment which, to

27  the best of Landlord's actual knowledge, would cause any interference with satellite, radio,

28  telecommunications, or television reception or transmission in or from the Building.

29        (xi)   <u>Notices Affecting the Premises</u>.  Landlord shall promptly forward

30  to Tenant any notice or other communication affecting the Premises received by Landlord from

1   any owner of property adjoining, adjacent or nearby to the Premises, the Shopping Center or

2   from any municipal or governmental authority, in connection with any hearing or other

3   administrative procedure relating to the use or occupancy of the Premises.

4               (xii)   Constructive Trust.   Landlord covenants that all sums paid by

5   Tenant to Landlord and intended for payment by Landlord to a third party (such as, by way of

6   example, taxes and certain elements of CAM Charges) are given to Landlord in trust and shall be

7   applied only for such third-party payments, as and when due.   Tenant acknowledges that

8   Landlord may commingle such funds with other funds of the Landlord, and Landlord does not

9   have to maintain a separate accounting therefor, nor pay any interest thereon, to Tenant.

10              (xiii)   Absence of Obstructions.   To Landlord's knowledge, the Land is

11  free of any obstructions, foundations or footings, utilities, improvements or tenancies (except for:

12  the column pads and footers for the adjacent building labeled Unit 90 on the Site Plan, which

13  partially encroach onto the Land; and the underground electrical conduit serving the pylon sign

14  for said adjacent building, which conduit shall be relocated to a mutually agreeable location by

15  Tenant). If in connection with Tenant's construction of the Improvements, Tenant discovers any

16  obstructions, foundations or footings, utilities or improvements in or on the Land (other than as

17  set forth above) which Tenant is required to either (A) remove; or (B) leave in place in

18  connection with its construction of the Improvements, Landlord agrees to reimburse Tenant for

19  (1) the cost of such removal; and/or (2) the cost to design and install the Improvements in order

20  to leave the encroachments in place to the extent such cost exceeds $2,000.00.

21              (b)   Tenant's Authority.   Tenant represents, warrants and covenants to

22  Landlord that Tenant is a duly constituted corporation organized under the laws of the

23  Commonwealth of Virginia; it has the power to enter into this Lease and perform Tenant's

24  obligations hereunder; and the Vice President executing this Lease on Tenant's behalf has the

25  right and lawful authority to do so.

26              (c)   Additional Remedies.   In addition to such other remedies as may be

27  accorded Tenant at law, in equity (including but not limited to an injunction or writ of specific

28  performance) or under the terms of this Lease, (i) in the event that any of the representations,

29  warranties and covenants set forth in paragraphs 19(a)(i), (ii), (iii), (iv), (vii) and (x) are untrue or

30  incorrect, or (ii) in the event that Tenant suffers any loss, cost, liability or damage as a result of

1    the breach of any of such covenants, representations and warranties, Landlord shall defend,

2    indemnify and hold Tenant harmless from any of such loss, costs, liability or damage incurred as

3    a result of Landlord's breach hereunder.

4         20.    <u>Estoppel Certificates</u>.   Without charge, at any time and from time to time

5    hereafter (but not more frequently than twice in one year), within thirty (30) days after receipt of

6    written request by either party, the other party shall certify, by written and duly executed

7    instrument, to any other entity ("Person") specified in such request: (a) as to whether this Lease

8    has been supplemented or amended, and, if so, the substance and manner of such supplement or

9    amendment; (b) as to the validity, force and effect of this Lease, to the certifying party's best

10    knowledge; (c) as to the existence of any default hereunder, to the certifying party's best

11    knowledge; (d) as to the existence of any offsets, counterclaims, or defenses hereto on the part of

12    such other party, to the certifying party's best knowledge; (e) as to the commencement and

13    expiration dates of the Term; and (f) as to any other matters which may reasonably be so

14    requested. In addition, without charge, at any time any from time to time hereafter (but not more

15    frequently than twice a year), within thirty (30) days after receipt of written request of Tenant,

16    Landlord shall deliver an estoppel certificate to Tenant's assignee or subtenant that states in the

17    event Tenant defaults under any of its obligations under this Lease following the date of any

18    assignment or subletting hereunder, Landlord will permit such assignee or subtenant to satisfy

19    obligations of Tenant hereunder, including but not limited to the direct payment of rentals to

20    Landlord. Any such certificate may be relied upon by the party requesting it and any Person to

21    whom the same may be exhibited or delivered, and the contents of such certificate shall be

22    binding on the party executing same. Any request for any such certificate by Tenant must

23    contain a reference to this paragraph 20 and the obligation of the applicable party to provide such

24    certificate.

25         21.    <u>Subordination, Non-Disturbance and Attornment</u>.   Simultaneously with the

26    execution hereof, Landlord shall deliver to Tenant with regard to any and all Mortgages (as

27    defined below) encumbering the Premises and placed thereon by Landlord, a non-disturbance

28    and attornment agreement substantially in the form of <u>Exhibit "G"</u> hereto attached, executed by

29    the holder of such Mortgage ("Mortgagee"), as applicable. In addition, throughout the Term,

30    Landlord shall deliver to Tenant a non-disturbance and attornment agreement substantially in the

1   form of Exhibit "G" executed by Mortgagee with regard to all future Mortgages and with regard
2   to all renewals, modifications, replacements and extensions of such Mortgages.  Such Agreement
3   shall contain, at a minimum, the following: (i) the Lease shall not terminate simply by reason of
4   a foreclosure or deed in lieu thereof ("Foreclosure"), (ii) Tenant's possession of the Premises
5   shall not be disturbed so long as Tenant is not in default under any of the material terms,
6   covenants or conditions of the Lease, beyond any applicable cure period provided in the Lease,
7   (iii) the Mortgagee or purchaser upon such Foreclosure shall recognize Tenant and all its rights
8   hereunder and shall be obligated to fully and completely perform Landlord's duties and
9   obligations under the Lease arising from and after the date of such Foreclosure, including but not
10  limited to an obligation to make all payments to Tenant and satisfy all construction obligations
11  set forth in this Lease, so long as Tenant is not in default under any of the material terms,
12  covenants or conditions of this Lease, beyond any applicable cure period provided in the Lease,
13  (iv) Tenant shall not be named as a party in any action for Foreclosure unless required by law,
14  (v) the Mortgagee, whether or not the Mortgage is foreclosed, shall make all proceeds arising
15  from a casualty or condemnation loss to the Premises available to Tenant for restoration of the
16  Improvements in accordance with the terms hereof, and (vi) in the event of a Foreclosure, Tenant
17  shall attorn to the Mortgagee or any purchaser at the Foreclosure sale.  Upon Tenant's receipt of
18  the non-disturbance and attornment agreement, this Lease shall be subordinate to the Mortgage.
19  Landlord shall cause any present or future Mortgagee to deliver a non-disturbance and
20  attornment agreement in accordance with this paragraph 21 at or prior to the time which the lien
21  of the Mortgage is filed against record title to the Premises. As used in this paragraph 21, the
22  term "Mortgage" shall mean any mortgage, deed to secure debt, deed of trust, trust deed or other
23  collateral conveyance of, or lien or encumbrance against, the Premises.  In the event of a
24  Foreclosure of any Mortgage, Tenant shall attorn to a Mortgagee or any purchaser at Foreclosure
25  of a Mortgage, and Landlord shall be released from all liability with respect to events occurring
26  from and after the date of such foreclosure.  In the event Landlord's interest in the Premises
27  passes to a successor (the "Successor") by sale, lease, Foreclosure or in any other manner,
28  provided such successor assumes Landlord's obligations hereunder, Tenant shall be bound to the
29  Successor under all of the terms of this Lease for the balance of the Term, with the same force
30  and effect as if the Successor were the initial Landlord under the Lease, and Tenant hereby

1    agrees to attorn to the Successor as its Landlord.  Such attornment to be effective upon written

2    notice thereof given by Landlord to Tenant.

3        22.    Tenant's Financing.  Notwithstanding any other provisions of this Lease, Tenant

4    may, without Landlord's consent, from time to time, secure financing or general credit lines and

5    grant the lenders thereof as security therefor, (i) a security interest in Tenant's trade fixtures,

6    personalty, inventory and trade equipment (collectively, "Personalty"), (ii) the right to enter the

7    Premises to realize upon any Personalty so pledged provided that such secured creditor agrees to

8    pay for any and all damages caused to the Premises in pursuit of its remedies against Tenant,

9    and/or (iii) a collateral assignment of Tenant's leasehold interest in the Premises, with rights of

10    reassignment (but in all events subject to the terms of this Lease, with no release of liability on

11    the part of Tenant or any future holders of Tenant's rights herein); provided, however, such

12    collateral assignment may be made solely for the purpose of securing Tenant's indebtedness.

13    Upon Tenant providing notice of such financing to Landlord, Landlord agrees to evidence its

14    consent in writing to such security interest and agreement and to give such lenders the same

15    notice and opportunity to cure any default of Tenant as is provided Tenant hereunder.   In

16    addition, Landlord agrees to cause any Mortgagee specifically to acknowledge the rights of

17    Tenant's lenders described herein and in paragraph 23 below.

18        23.    Tenant's Property and Waiver of Landlord's Lien.  All of the Personalty shall be

19    and remain the personal property of Tenant and shall be removable by Tenant any time prior to

20    the expiration or earlier termination of this Lease.  Landlord shall permit Tenant to enter the

21    Premises for thirty (30) days after the expiration of the Lease to remove its Personalty from the

22    Premises provided Tenant makes such request at least ninety (90) days prior to the expiration of

23    this Lease and, upon the expiration of the Lease, pays Landlord all charges that would have been

24    due Landlord with respect to such thirty (30) day period had the Lease continued through such

25    additional thirty (30) day period.  (A nonexclusive list of Tenant's removable trade fixtures is

26    attached hereto as Exhibit "D".)  Landlord expressly waives its statutory or common law

27    landlord's liens (as same may be enacted or may exist from time to time) and any and all rights

28    granted under any present or future laws to levy or distrain for rent (whether in arrears or in

29    advance) against the aforesaid property of Tenant on the Premises and further agrees to execute

30    any reasonable instruments evidencing such waiver, at any time or times hereafter upon Tenant's

1    request. In the event Tenant is authorized but fails to remove any and all of its Personalty within

2    thirty (30) days of the expiration or termination of this Lease or Tenant's right of possession

3    thereunder, Landlord may remove and take possession of such Personalty, or the balance thereof

4    and thereafter charge Tenant the reasonable cost of such removal. Those improvements that are

5    integrated into the physical structure of the Improvements shall not be removed and shall become

6    property of the Landlord. Tenant agrees to promptly repair any damage to the Improvements

7    occasioned by the removal of Tenant's trade fixtures, trade furnishings and trade equipment, and

8    to surrender the Premises in a broom-clean condition and otherwise maintained as contemplated

9    in Section 10 above. Tenant agrees that at the expiration of this Lease, it will deliver to Landlord

10    peaceable possession of the Premises.

11        24.    <u>Memorandum of Lease: Commencement Date Agreement</u>. Landlord and Tenant

12    agree, at the other's request and at the sole expense of the requesting party, to execute a

13    Memorandum of Lease in recordable form, substantially similar to that attached hereto as <u>Exhibit</u>

14    "<u>H</u>", setting forth such provisions hereof as may be required by State law. In addition, Landlord

15    and Tenant shall execute a Commencement Date Agreement in the form attached hereto as

16    <u>Exhibit "I"</u>, once the Commencement Date has been established. Recording costs for either or

17    both documents shall be borne by the party requesting recordation of the same. The provisions

18    of this Lease shall control, however, with regard to any omissions from, or provisions hereof

19    which may be in conflict with, the Memorandum of Lease or Commencement Date Agreement.

20        25.    <u>Expiration of Term and Holding Over</u>. Should Tenant hold over this Lease shall

21    continue in force from month to month, subject to all of the provisions hereof and at one hundred

22    twenty-five percent (125%) of the monthly Base Rent (or Interim Rent, as the case may be)

23    Tenant had been paying during the preceding Lease Year, plus Tenant shall pay all other charges

24    contained herein. No holding over by Tenant or acceptance of rent or other charges by Landlord

25    shall operate as a renewal or extension of the Lease without the written consent of Landlord and

26    Tenant. During the last year of the Term, Tenant will allow Landlord or its agents, upon

27    reasonable notice, to show the Premises to prospective tenants, purchasers, or mortgagees during

28    reasonable business hours provided the same does not interfere with the conduct of Tenant's

29    business.

1      26.   Force Majeure. Except as otherwise specifically contemplated in this Lease or in
2    the Construction Provisions, in the event that Landlord or Tenant shall be delayed or hindered in,
3    or prevented from, the performance of any act required hereunder by reason of strikes, lockouts,
4    labor troubles, inability to procure materials, delay by the other party, failure of power or
5    unavailability of utilities, riots, insurrection, war or other reason of a like nature not the fault of
6    such party or not within its control, then performance of such act shall be excused for the period
7    of delay, and the period for the performance of any such act shall be extended for a period
8    equivalent to the period of such delay; provided, however, that in connection with the
9    construction of the Improvements, the consequences of delays by the other party shall be
10   governed by the Construction Provisions. The provisions of this Lease related to force majeure
11   shall not operate to excuse Tenant from prompt payment of ground rent, Interim Rent, Base
12   Rent, additional rent or any other payments required by the terms of this Lease.

13      27.   Events of Tenant's Default. Any of the following occurrences, conditions or acts
14   by Tenant shall constitute an "Event of Default" under this Lease:

15          (a)   Failure to Pay Rent: Breach. (i) Tenant's failure to make any payment of
16   money required by this Lease (including without limitation Base Rent, Interim Rent, CAM
17   Charges or Real Estate Taxes), within ten (10) days after written notice is given (pursuant to
18   paragraph 32) from Landlord to Tenant that same is overdue; or (ii) Tenant's failure to observe
19   or perform any other material provision of this Lease within thirty (30) days after written notice
20   is given (pursuant to paragraph 32) from Landlord to Tenant specifying such default and
21   demanding that the same be cured; provided that, if such default is a non-monetary default and
22   cannot with due diligence be wholly cured within such thirty (30) day period, Tenant shall have
23   such longer period as is reasonably necessary to cure the default, so long as Tenant proceeds
24   promptly to commence the cure of same within such thirty (30) day period and diligently
25   prosecutes the cure to completion. In the case of an emergency, Landlord shall be required to
26   give only such notice as is reasonable under the circumstances.

27          (b)   Bankruptcy. Tenant's adjudication as bankrupt or insolvent, or the
28   appointment of a receiver, trustee in involuntary bankruptcy or other, similar officer to take
29   charge of any substantial part of Tenant's property, which proceeding is not dismissed within
30   one hundred twenty (120) days after it is begun.

1       28.    Landlord's Remedies. After the occurrence of an Event of Default by Tenant,
2    Landlord shall have the right to exercise the following remedies:

3              (a)    Continue Lease. Landlord may, at its option, continue this Lease in full
4    force and effect, without terminating Tenant's right to possession of the Premises, in which event
5    Landlord shall have the right to collect Base Rent, Interim Rent and all other charges when due.
6    Landlord shall also have the right, in Landlord's exercise of reasonable efforts to mitigate its
7    damages (which Landlord hereby agrees to make), at its option, from time to time, without
8    terminating this Lease or its right to collect Base Rent, Interim Rent and all other charges when
9    due, to re-enter and/or to relet the Premises, or any part thereof, with legal process, as the agent,
10   and for the account, of Tenant upon such terms and conditions as Landlord may deem advisable,
11   in which event the rents received on such reletting shall be applied (i) first to the reasonable and
12   actual expenses of such reletting and collection, including without limitation necessary
13   renovation and alterations of the Premises, reasonable and actual attorneys' fees and any
14   reasonable and actual real estate commissions paid, and (ii) thereafter toward payment of all
15   sums due or to become due Landlord hereunder. Any such reentry shall not be deemed a
16   termination of the Lease or an acceptance by Landlord of a surrender thereof with Landlord
17   retaining the right to collect all rent and all other charges when due. If due to such reletting a
18   sufficient amount to pay such expenses and sums shall not be realized or secured, then Tenant
19   shall pay Landlord any such deficiency monthly and Landlord may bring an action therefor for
20   all present and future monthly deficiencies. Landlord shall not, in any event, be required to pay
21   Tenant any sums received by Landlord on a reletting of the Premises in excess of the rent
22   provided in this Lease, but such excess shall reduce any accrued present or future obligations of
23   Tenant hereunder. Landlord's reentry and reletting of the Premises without termination of this
24   Lease shall not preclude Landlord from subsequently terminating this Lease as set forth below.
25   In the event that Tenant does not pay when due any sums due under this Lease, such unpaid
26   amounts shall bear interest from the due date thereof to the date of payment at the annual rate
27   (the "Default Rate") equal to four percent (4%) plus the "Prime Rate". In the event such rate is
28   prohibited by law, unpaid amounts shall bear interest at the maximum rate permitted by law. For
29   purposes hereof the "Prime Rate" shall be the Prime Rate as set forth from time to time in the
30   Money Section of The Wall Street Journal, or if such Prime Rate is not ascertainable as

CircuitCity59-AandB.doc                    48

1    aforesaid, Landlord and Tenant shall mutually agree upon a comparable rate as a substitute

2    therefor.

3           (b)    <u>Terminate Lease</u>.  Landlord may terminate this Lease by written notice to

4    Tenant specifying a date therefor, which shall be no sooner than thirty (30) days of Landlord

5    giving such notice to Tenant in accordance with paragraph 32, and this Lease shall then

6    terminate on the date so specified as if such date had been originally fixed as the expiration date

7    of the Term.  In the event of such termination, Landlord shall be entitled to recover from Tenant

8    all of the following:

9           (i)    The "worth at the time of the award" (defined below) of any

10    obligation which has accrued prior to the date of termination; and

11           (ii)    The "worth at the time of the award" of the amount by which the

12    unpaid Base Rent and all other charges which would have accrued after termination until the

13    time of award exceeds the amount of any sums which Landlord has (or Tenant proves that

14    Landlord could have) received in mitigation.

15        As used in this paragraph 28(b), the term, "worth at the time of the award", shall be

16    computed by allowing simple interest at an accrual rate of twelve percent (12%) for past due

17    obligations, and a discount rate to net present value of ten percent (10%) on anticipated future

18    obligations, on the amount of the obligations payable on the date of such calculation.  In the

19    event this Lease shall be terminated as provided above, by summary proceedings or otherwise,

20    Landlord, its agents, servants or representatives may immediately or at any time thereafter

21    peaceably re-enter and resume possession of the Premises and remove all persons and property

22    therefrom, by summary dispossession proceedings.

23           (c)    <u>Injunctive Relief and Specific Performance</u>.    Landlord shall also be

24    entitled to seek injunctive relief and/or specific performance as a remedy for an Event of Default

25    by Tenant.

26           (d)    <u>Additional Damage</u>.  Landlord may also recover from Tenant, and Tenant

27    shall pay to Landlord upon demand, such reasonable and actual expenses as Landlord may incur

28    in recovering possession of the Premises, placing the same in good order and condition, and

29    repairing the same for reletting, and all other reasonable and actual expenses, commissions and

30    charges incurred by Landlord in exercising any remedy provided herein or as a result of any

1    Event of Default by Tenant hereunder (including, without limitation, its reasonable attorney's
2    fees), provided that in no event shall Tenant be obligated to compensate Landlord for any
3    speculative or consequential damages caused by Tenant's failure to perform its obligations under
4    this Lease.

5        (e)    Remedies Are Cumulative.  The various rights and remedies reserved to
6    Landlord herein are cumulative, and Landlord may pursue any and all such rights and remedies
7    (but no others), whether at the same time or otherwise (to the extent not inconsistent with
8    specific provisions of this Lease).  Notwithstanding anything herein to the contrary, Landlord
9    expressly waives its right to forcibly dispossess Tenant from the Premises, whether peaceably or
10    otherwise, without judicial process, such that Landlord shall not be entitled to any "commercial
11    lockout" or any other provisions of applicable law which permit landlords to dispossess tenants
12    from commercial properties without the benefit of judicial review.

13        29.    Events of Landlord's Default: Tenant's Remedies.

14        (a)    Default by Landlord.  Any of the following occurrences, conditions or acts
15    by Landlord shall constitute an "Event of Default": (i) Landlord's failure to make any payments
16    of money due Tenant or any third party, including but not limited to the payment of the
17    brokerage commissions pursuant to paragraph 33 hereof, within thirty (30) days after the receipt
18    of written notice from Tenant that same is overdue (in which event the delinquent amount shall
19    accrue interest from the due date at the Default Rate); or (ii) Landlord's failure to perform any
20    nonmonetary obligation of Landlord hereunder within thirty (30) days after receipt of written
21    notice from Tenant to Landlord specifying such default and demanding that the same be cured;
22    provided that, if such default cannot with due diligence be wholly cured within such thirty (30)
23    day period, Landlord shall have such longer period as may be reasonably necessary to cure the
24    default, so long as Landlord proceeds promptly to commence the cure of same within such thirty
25    (30) day period and diligently prosecutes the cure to completion and provided further that in the
26    case of an emergency, Tenant shall be required to give only such notice as is reasonable under
27    the circumstances.

28        (b)    Remedies Upon Landlord's Default.  Upon the occurrence of an Event of
29    Default by Landlord, at Tenant's option, and without its actions being deemed an election of
30    remedies or a cure of Landlord's default, Tenant may do all or any of the following: (i) provided

1    Tenant has delivered not less than five (5) business days prior written notice of Tenant's intent to

2    pay or perform the obligation which gave rise to the Event of Default (which notice may be

3    included in the initial notice of default given to Landlord pursuant to paragraph 29(a) above), pay

4    or perform such obligations and invoice Landlord the amount of Tenant's actual cost of

5    performance, including any and all transaction costs and attorneys' fees, plus interest at the

6    Default Rate, (ii) if such default by Landlord effectively precludes Tenant from profitably

7    operating its business on the Premises, terminate this Lease and sue for damages, including

8    interest, transaction costs and attorneys' fees as specified in clause (i) above, (iii) recover from

9    Landlord damages Tenant incurs as a result of Landlord's default (including, without limitation,

10    its reasonable attorneys' fees), or (iv) seek injunctive relief and/or specific performance as a

11    remedy for an Event of Default by Landlord.  If Tenant elects its rights under clause (i) of this

12    paragraph 29(b) and Landlord fails, within thirty (30) days of receipt of such invoice, to

13    reimburse Tenant for the amounts set forth in the invoice delivered to Landlord pursuant to

14    clause (i), Tenant may offset the amount of such invoice against the Interim Rent, Base Rent,

15    CAM Charges and any and all other amounts or charges due Landlord hereunder until such

16    invoice has been paid in full.

17    Notwithstanding the foregoing paragraph, so long as the Landlord is an affiliate of The

18    Cafaro Company, Tenant may only exercise its right of offset with respect to costs incurred by

19    Tenant as a result of Landlord's failure to maintain the Common Areas on Landlord's Premises,

20    maintain the insurance coverages required hereunder or pay Real Estate Taxes as required

21    hereunder (unless Landlord has notified Tenant that it is in good faith protesting same and has

22    provided evidence reasonably satisfactory to Tenant that the Tax Parcel is not in imminent

23    danger of foreclosure), and may only exercise such offset right if Landlord has not notified

24    Tenant within thirty (30) days of receipt of Tenant's invoice that Landlord, in good faith,

25    contests the existence of the default giving rise to the work performed by Tenant or the validity

26    of the charges set forth in the invoice.

27    In the event Landlord so notifies Tenant, Tenant shall deposit the amount it seeks to

28    offset against the charges payable to Landlord into a third-party escrow account and initiate a

29    three arbitrator arbitration proceeding in accordance with the expedited arbitration procedures of

30    the American Arbitration Association.  In the event Tenant prevails in such arbitration, Tenant

1    shall be entitled to a return of the money deposited in escrow. In addition, Landlord shall pay for

2    the cost of the arbitration, including Tenant's reasonable attorneys' fees incurred in connection

3    therewith, and Tenant shall be entitled to interest on the amounts deposited in escrow by Tenant

4    at the Default Rate (reduced by any interest actually earned by such deposit while on deposit

5    with the third-party escrow agent). If Landlord does not pay such additional amounts within ten

6    (10) days after a decision in favor of Tenant by the arbitrator, Tenant shall have the additional

7    right to offset any such additional amounts against future amounts payable by Tenant to

8    Landlord under this Lease.

9          If Landlord prevails in the arbitration, the escrow agent shall pay the escrow deposit,

10    together with any interest earned thereon, to Landlord. Tenant shall be obligated to pay the costs

11    of arbitration, including Landlord's reasonable attorneys' fees, and Landlord shall be entitled to

12    interest at the Default Rate on the amounts which should have been paid to Landlord under the

13    Lease. Tenant shall pay all amounts due Landlord within ten (10) days after a decision in favor

14    of Landlord by the arbitrators. Tenant shall receive a credit against such amounts for any interest

15    earned on the escrow deposit and paid to Landlord.

16          If Landlord fails to pay Tenant the Lease Incentive Payment in a timely manner, Tenant

17    shall be entitled to the rights and remedies set forth in this Section 29(b) and the Construction

18    Provisions; and, as to a breach of the warranties and representations contained in paragraph 19,

19    Tenant shall be entitled to the remedies provided therein, in addition to those remedies provided

20    herein. The various rights and remedies reserved to Tenant herein are cumulative, and Tenant

21    may pursue any and all rights and remedies (but no others), whether at the same time or

22    otherwise.

23          (c)    Exculpation.  Notwithstanding anything to the contrary provided in this

24    Lease, except to the extent Landlord elects to self-insure, the liability of Landlord, its partners,

25    principals or joint venturers, under this Lease shall be limited to Landlord's interest in the

26    Shopping Center, including any rents and profits, insurance proceeds and condemnation awards

27    derived therefrom and further including any consideration received by Landlord, its partners,

28    principals or joint venturers, from the sale or other disposition of all or any part of the Shopping

29    Center (with regard to liability arising prior to such sale or disposition).  Tenant agrees to look

30    solely to Landlord's interest in the Shopping Center for satisfaction of any and all claims it may

1    have against Landlord, provided that nothing contained herein shall prevent Tenant from
2    bringing a suit for specific performance or seeking injunctive relief against Landlord in an
3    appropriate case, from attaching rents and profits, sale proceeds, insurance or condemnation
4    awards derived from the Shopping Center, nor limit Tenant's rights to any other action or
5    remedy (not involving the personal liability of Landlord, its partners, principals or joint
6    venturers) which may be accorded Tenant by law. Nothing contained herein shall be deemed a
7    waiver of any default by Landlord nor an assumption by Tenant of any liability of Landlord, its
8    partners, principals or joint venturers.

9              (d)    Time is of the Essence. Notwithstanding anything contained herein to the
10   contrary, Landlord covenants that it shall complete its delivery obligations in accordance with
11   Section 1 of the Construction Provisions. In the event that Landlord fails to complete its delivery
12   obligations in accordance with Section 1 of the Construction Provisions, Tenant may, at its sole
13   election, exercise such remedies as are set forth herein.

14       30.    Waiver. If either Landlord or Tenant fails to insist on the strict observance by the
15   other of any provisions of this Lease, neither shall thereby be precluded from enforcing nor be
16   held to have waived any of the obligations, past, present or future, of this Lease. Either party
17   may accept late payment or performance by the other without waiving any Event of Default
18   which may then have accrued.

19       31.    Compliance with Applicable Laws. During the Term, Landlord and Tenant shall
20   comply in accordance with paragraph 10 of this Lease with all lawful requirements of the local,
21   county and state health boards, police and fire departments, municipal and state authorities and
22   any other governmental authorities with jurisdiction over the Improvements, and of the board of
23   fire underwriters, respecting Tenant's use and occupancy of the Improvements. In the event that
24   Tenant, within thirty (30) prior days' written notice (except in the case of an emergency, in
25   which event only such notice as is reasonable under the circumstances shall be required) from
26   Landlord or any such authority ordering performance of any such work which Tenant is required
27   to perform in order to remain in, or come into, compliance with any such requirement, fails to
28   perform or diligently commence performance of same with reasonable promptness, Landlord
29   may perform said work and collect the reasonable cost thereof plus interest at the Default Rate
30   from Tenant with the next installment or installments of Base Rent. In the event that Landlord,

1    within thirty (30) prior days' written notice (except in the case of an emergency, in which event

2    only such notice as is reasonable under the circumstances shall be required) from Tenant or any

3    such authority ordering performance of any such work which Landlord is required to perform in

4    order to remain in, or come into, compliance with any such requirement, fails to perform or

5    diligently commence performance of same with reasonable promptness, Tenant may perform

6    said work and deduct the reasonable cost thereof plus interest at the Default Rate from Landlord

7    with the next installment or installments of Base Rent.

8        32.    Notices. Any notice permitted or required to be given pursuant to this Lease shall

9    be deemed to have been given three (3) business days after mailing a written notice by certified

10    mail, postage prepaid, return receipt requested, or one (1) business day after sending by Federal

11    Express or other comparable overnight express courier service (with proof of receipt available),

12    addressed to the parties as follows:

13

14    If to Tenant:        CIRCUIT CITY STORES, INC.
15                Deep Run I
16                9950 Mayland Drive
17                Richmond, Virginia 23233
18                Attention: Corporate Secretary

19    with a copy to:        CIRCUIT CITY STORES, INC.
20                Deep Run I
21                9950 Mayland Drive
22                Richmond, Virginia 23233
23                Attention: Vice President of Real Estate

24    If to Landlord:        HOWLAND COMMONS PARTNERSHIP
25                2445 Belmont Avenue
26                P. O. Box 2186
27                Youngstown, Ohio 44504-0186
28                Attention: Legal Department

29    or to such other addressees as any party hereto shall from time to time give notice to the other

30    party in accordance with this paragraph.

31        All payments required under this Lease to be paid to Landlord shall be delivered to

32    Landlord, in its name, at P.O. Box 714090, Columbus, Ohio  43271-4090, or to such other

33    address as Landlord may designate by written notice, except any payment containing a

34    conspicuous statement to the effect that the payment is being tendered as full satisfaction of any

CircuitCity59-AandB.doc                    54

1    obligation owed by Tenant to Landlord under this Lease. Any payment bearing a conspicuous

2    statement to the effect that the payment is being tendered as full satisfaction, such as "payment in

3    full" or the like, shall be delivered to Landlord, in its name, at 2445 Belmont Avenue, P. O. Box

4    2186, Youngstown, Ohio 44504-0186, Attention: Credit and Collections Manager.    Tenant

5    agrees that acceptance by Landlord of any payment containing such language shall not preclude

6    Landlord from collecting the full amount rightfully owed to it under the terms of the Lease.

7    Payment shall be deemed delivered when same are actually received by Landlord.

8        33.    Brokers.  Landlord and Tenant each covenant that they have not dealt with any

9    real estate broker or finder with respect to this Lease, except for Millenium Retail Partners, LLC

10    and Creative Realty Group, which the parties agree and acknowledge represents Tenant only,

11    and which shall be paid an aggregate commission by Landlord (payable to Creative Realty

12    Group) of $3.00 per square foot of ground floor building area pursuant to their separate written

13    agreement. Landlord agrees that said brokers are representing Tenant with respect to this leasing

14    transaction, and, although Landlord is responsible for payment of said commission, said brokers

15    owe no fiduciary's, agent's or other duty whatsoever to Landlord. Except for the foregoing, each

16    party shall hold the other party harmless from all damages, claims, liabilities or expenses,

17    including reasonable and actual attorneys' fees (through all levels of proceedings), resulting from

18    any claims that may be asserted against the other party by any real estate broker or finder with

19    whom the indemnifying party either has or is purported to have dealt.

20        34.    Miscellaneous.

21            (a)    Headings and Gender.  All paragraph headings, titles or captions contained

22    in this Lease are for convenience only and shall not be deemed a part of this Lease and shall not

23    in any way limit or amplify the terms and provisions of this Lease. The masculine, feminine or

24    neuter gender and the singular or plural number shall be deemed to include the others whenever

25    the context so requires or indicates.

26            (b)    Construction.  The parties hereto agree that all the provisions hereof are to

27    be construed as covenants and agreements as though the words importing such covenants and

28    agreements were used in each separate paragraph hereof.

29            (c)    Waiver of Jury Trial.  In the event of any court action arising out of this

30    Lease, each party hereby expressly waives its right to trial by jury.

CircuitCity59-AandB.doc            55

1          (d)    Relationship of Landlord-Tenant. Nothing contained in this Lease shall be

2 deemed or construed by the parties hereto or by any third person to create the relationship of

3 principal and agent, partnership, joint venture, or any other association between Landlord and

4 Tenant other than the landlord-tenant relationship described herein.

5          (e)    Entire Agreement; Merger. This Lease, including all exhibits hereto

6 (which are hereby incorporated herein by reference for all purposes), contains the full and final

7 agreement of every kind and nature whatsoever between the parties hereto concerning the subject

8 matter of this Lease, and all preliminary negotiations and agreements of whatsoever kind or

9 nature between Landlord and Tenant are merged herein. This Lease cannot be changed or

10 modified in any manner other than by a written amendment or modification executed by

11 Landlord and Tenant.

12          (f)    Attorneys' Fees. In the event either party-shall be required to commence

13 or defend any action or proceeding against any other party by reason of any breach or claimed

14 breach of any provision of this Lease, to commence or defend any action or proceeding in any

15 way connected with this Lease or to seek a judicial declaration of rights under this Lease, the

16 party prevailing in such action or proceeding shall be entitled to recover from or to be

17 reimbursed by the other party for the prevailing party's reasonable and actual attorneys' fees and

18 costs through all levels of proceedings.

19          (g)    Partial Invalidity. If any provision of this Lease or the application thereof

20 to any person or circumstance shall be deemed invalid or unenforceable, the remainder of this

21 Lease and its application to other persons or circumstances shall not be affected by such partial

22 invalidity but shall be enforced to the fullest extent permitted by law as though such invalid or

23 unenforceable provision was never a part hereof.

24          (h)    Consents. Any consent or approval granted by either party hereunder shall

25 be deemed a consent only as to the matter on which such consent was requested and shall not

26 waive the consenting party's right to give or withhold consent to any subsequent matter.

27          (i)    Holidays. If the day on which rent or any other payment due hereunder is

28 payable falls on a Saturday, Sunday or on a legal holiday, it shall be payable on the following

29 business day.

1            (j)     <u>Applicable Law</u>. This Lease shall be construed in accordance with the

2 laws of the State, and the parties agree that jurisdiction for all actions hereunder shall lie therein.

3            (k)     <u>Successors and Assigns</u>. All rights, obligations and liabilities herein given

4 to or imposed upon any party hereto shall extend to the permitted successors and assigns of such

5 party.

6            (l)     <u>Counterparts</u>. This Lease may be executed in one or more identical

7 counterparts, and as so executed by all parties hereto shall constitute a single instrument for

8 purposes of the effectiveness of this Lease.

9            (m)     <u>Trademarks and Trade Names</u>. All trademarks, trade names, service

10 marks, signs and all other marks of identification used by Tenant in its business shall at all times

11 remain the exclusive property of Tenant, and Landlord shall have no right, interest in, or title to

12 any of Tenant's trademarks, trade names, service marks, signs or other marks of identification.

13            (n)     <u>Exhibits.</u> All of the Exhibits to this Lease are incorporated by reference

14 for all purposes and are part of this Lease.

15            (o)     <u>No Construction Against Either Party</u>. This Agreement shall be

16 interpreted to give it fair meaning and shall not be construed against either party.

17      35.     <u>Construction, Operation and Reciprocal Easement Agreement</u>. This Lease is

18 subject and subordinate to the REA provided, that if there is any inconsistency between the REA

19 and the Lease, as between Landlord and Tenant, the Lease shall control. The provisions of this

20 clause shall be self-operative; however, Tenant, upon by request of any party in interest, shall

21 execute promptly such agreements or instruments to effectuate the intent of this clause.

22 Landlord agrees that, without first obtaining Tenant's prior written consent, it shall not amend or

23 modify the REA in any manner which adversely affects Tenant's rights or obligations with

24 respect to the Shopping Center.

25      Further, Landlord reserves the right to sever the ownership of or title to the various

26 sections of the Shopping Center and/or to place separate mortgages on said sections, in which

27 case the rights of Tenant, including, but not limited to, Tenant's rights under Section 29 hereof

28 will be preserved by a written declaration approved by Tenant, which approval shall not be

29 unreasonably withheld, delayed, or conditioned, to be executed by the Landlord and duly

30 recorded, creating mutual, reciprocal and interdependent rights to use the parking and other

1    Areas and the utilities and facilities needed for the full use and enjoyment of the Tenant and

2    without impairing any of the duties and obligations of the Landlord to Tenant under this Lease.

3    Tenant covenants to execute from time to time such instruments reasonably required by Landlord

4    and/or its Mortgagee to effectuate the provisions of this clause. Landlord covenants to reimburse

5    Tenant for all legal fees and other costs incurred by Tenant in connection with effectuating the

6    provisions of this clause.

7        36.    Confidentiality.    The parties hereto, including, but not limited to, their heirs,

8    successors, assigns and legal representatives, agree that this Lease may not be recorded and that

9    all such parties hereby agree to use their best reasonable efforts to preserve the confidentiality of

10   this transaction.    This confidentiality agreement extends to any developers, bankers, lawyers,

11   accountants, employees, agents or any other persons acting on behalf of the parties hereto.  Any

12   breach of this confidentiality agreement shall constitute an automatic Event of Default without

13   notice or cure provided, for which either party may recover damages as their sole remedy and for

14   which neither party can terminate this Lease.  Notwithstanding the foregoing, Landlord shall

15   have the right to make such disclosures regarding this Lease as are reasonably required in

16   connection with the sale of the Shopping Center, the financing or refinancing of the Shopping

17   Center, a governmental or judicial order or mandate, litigation, a condemnation proceeding, or to

18   an insurance carrier or broker, tax consultant or other party which customarily requires access to

19   such information and Tenant shall have the right to make such disclosures regarding this Lease

20   as are reasonably required in connection with any financing arrangements, a governmental or

21   judicial order or mandate, litigation, a condemnation proceeding, or to an insurance carrier or

22   broker, tax consultant or other party which customarily requires access to such information.

23       37.    Recapture Right/Failure to Operate.  If Tenant fails, for a period of three hundred

24   sixty-five (365) consecutive days, to be open for business in the Premises (excluding a closing

25   due to a casualty, condemnation or force majeure) Landlord shall have the right to terminate this

26   Lease at any time after the expiration of such one (1) year period and prior to Tenant reopening

27   for business, by delivery to Tenant of notice that the Lease shall terminate if Tenant does not

28   reopen for business within ninety (90) days of receipt of such notice; provided, however, such

29   notice shall be deemed to be null and void and no force and effect if, following receipt thereof

30   and prior to the expiration of such ninety (90) day period, Tenant either (i) reopens its business

1    fully stocked, fixtured and staffed or (ii) delivers evidence (in the form of at least a mutually

2    executed memorandum of such agreement setting forth a summary thereof) to Landlord that

3    Tenant has entered into a bona fide assignment or sublet of the Premises and such assignee or

4    sublessee subsequently opens its business fully stocked, fixtured and staffed within one-hundred

5    eighty (180) days of the date of such assignment or sublet. If Landlord does so terminate this

6    Lease, Landlord shall reimburse to Tenant all of Tenant's unamortized costs of its improvements

7    (including, without limitation tenant improvements and fixtures [other than removable trade

8    fixtures], but excluding inventory) to the Premises which have not been previously reimbursed to

9    Tenant or included in the Lease Incentive Payment. For purposes of calculating Tenant's

10    unamortized cost of an improvement to the Premises Tenant shall utilize an amortization period

11    equal to the lesser of (i) the remainder of Term (including all previously exercised option

12    Periods) when the improvement was put in service or (ii) the useful life of the applicable

13    improvement as determined for Tenant's federal income tax purposes. The parties hereby agree

14    that the provisions of the preceding two (2) sentences shall survive the termination of this Lease.

15    　　　38.    Landlord's Representation Regarding Adjacent Building.    Landlord    hereby

16    represents that the building adjacent to Tenant and labeled Unit 90 on the Site Plan is currently

17    leased to Gander Mountain, LLC, and that said Lease has a natural expiration date of July 31,

18    2014 (plus three [3] five-[5]-year option terms). In the event that Landlord should elect to lease

19    all (or any portion contiguous to Tenant's Building) of said Unit 90 during the Term of this

20    Lease, Landlord shall use commercially reasonable efforts to offer to lease same to Tenant upon

21    at least the same terms and conditions as any bona fide offer available to Landlord at such time.

22    In the event that Landlord shall fail to meet its obligation as set forth in the foregoing sentence,

23    Tenant shall have no remedy against Landlord for such failure, unless it can be conclusively

24    proven that Landlord has acted in bad faith in its failure to comply with said obligation.

25    　　　39.    Cotenancy.    If less than three (3) Anchor Stores are open for business for sixty

26    (60) consecutive days or longer during the Main Term of this Lease, then as of said sixtieth

27    (60th) day, such condition shall be deemed a "Cotenancy Deficiency", subject to the limitations

28    set forth herein.

1    Upon the occurrence of a Cotenancy Deficiency, Tenant shall have the right, exercisable
2    within ninety (90) days following such occurrence, to terminate this Lease by tendering written
3    notice to Landlord of its intention to so terminate, provided, however, that if Tenant has not
4    given written notice to Landlord of its intent to exercise said right to terminate within said ninety
5    (90) day period, Tenant's right to terminate shall continue, as shall its tenancy hereunder, until
6    thirty (30) days after Landlord has given Tenant written demand that Tenant exercise said
7    termination right within said thirty (30) day period or forfeit its right to do so. Should Tenant
8    elect to exercise said termination right within said thirty (30) day period, the Lease shall be
9    terminated as if Tenant had given such notice within the original ninety (90) day period stated
10    above. Should Tenant fail to exercise said termination right within said thirty (30) day period,
11    the Lease shall continue in full force and effect, except that this Section 39 shall thereafter be
12    deemed void. In the event that Tenant shall terminate this Lease as set forth in this Section 39,
13    such termination shall be effective one hundred eighty (180) days after Landlord's receipt of
14    Tenant's notice thereof, and upon such termination date, Tenant shall return possession of the
15    Premises to Landlord in accordance with the terms of this Lease. Notwithstanding the foregoing,
16    if Tenant shall properly exercise its right to terminate this Lease as set forth in this Section 39,
17    such termination shall be deemed ineffective in the event that Landlord cures the Cotenancy
18    Deficiency which gave rise to such termination no later than the nintienth (90th) day of said one
19    hundred eighty (180) day period, in which case the Lease shall continue in full force and effect
20    as if such termination notice had not been given.

21    Notwithstanding any provision herein to the contrary, a Cotenancy Deficiency shall not
22    be deemed to occur if: (i) the Tenant is in default of this Lease; (ii) the Main Term has been
23    renewed or extended (in accordance with the terms of Section 3 of this Lease or otherwise); (iii)
24    the Lease has been assigned (by operation of law or otherwise); (iv) the entirety of the Premises
25    or any substantial portion thereof has been sublet; or (v) Tenant has ceased the operation of its
26    business in the Premises (except if there are less than five [5] Anchor Stores open for business on
27    the date Tenant ceases operation of its business in the Premises, in which case Tenant shall retain
28    its right to terminate this Lease as set forth in this Section 39). For the purposes of this Section
29    39, no Anchor Store or Anchor Stores referred to in the first paragraph hereof shall be deemed to
30    be closed if such closure represents a temporary cessation of business due to fire or other

CircuitCity59-AmdB.doc

59-A

1   casualty, eminent domain, remodeling, inventory, transition period attributable to assignment or

2   acquisition, or any "force majeure" event.

3        For the purposes of this Section 39, "Anchor Store" is defined as any of the six (6) single

4   retail premises located on the Shopping Center which are occupied as of the date of this Lease by

5   Borders Books, Gander Mountain, Kohl's, Linens N Things, Office Depot and Super Kmart, plus

6   the single retail premises located on that portion of the Adjacent Center known as North

7   Commons which is occupied as of the date of this Lease by Home Depot, as well as any

8   replacement occupants therefor operating in at least twenty-four thousand (24,000) square feet.

9   Notwithstanding the foregoing, in the event that the single retail premises occupied by Super

10   Kmart as of the date of this Lease shall be subdivided at any time during the Main Term such

11   that it shall contain at least two (2) occupants operating in at least twenty-four  thousand (24,000)

12   square feet, for the purposes of this Section 39, such premises may be counted as no more than

13   two (2) Anchor Stores, such that the aggregate number of Anchor Stores located within the

14   Shopping Center and North Commons may not be more than eight (8).

1

2 .    WITNESS the following signatures and seals:

LANDLORD

WITNESS:                                HOWLAND COMMONS PARTNERSHIP,
                                        An Ohio  General Partnership

                                        By:
                                        Name:   Anthony M. Cafaro
                                        Title:     Authorized Agent

                                        TENANT

WITNESS:                                CIRCUIT CITY STORES, INC.,
                                        a Virginia corporation

                                        By:
                                        Name:
                                        Title:        Thomas C. Nolan
                                                       Vice-President
                                                       Real Estate

3

4    STATE OF OHIO              )
5                               )   SS:
6    COUNTY OF MAHONING         )

7          Personally appeared before me, the undersigned, a Notary Public in and for said County
8    and State, Anthony M. Cafaro, known to me to be the Authorized Agent of HOWLAND
9    COMMONS PARTNERSHIP, the Partnership, which executed the foregoing document, who
10   acknowledged that he did sign the foregoing instrument for and on behalf of said Partnership,
11   being thereunto duly authorized; that the same is his free act and deed as such Authorized Agent
12   and the free act and deed of said Partnership.

13         IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at
14   Youngstown, Ohio, this 5th  day of  January, 2004 .

15                                      Notary Public

                                        SUSAN T. MIRICH
                                        . Notary Public, State of Ohio
                                        My Commission Expires February 15, 2004

CircuitCity59-AandB.doc

60

**EXHIBIT 'I'**

**COMMENCEMENT DATE AGREEMENT**

THIS COMMENCEMENT DATE AGREEMENT, made as of this 7th day of March, 2005, between HOWLAND COMMONS PARTNERSHIP (herein called "Landlord"), and CIRCUIT CITY STORES, INC., (herein called "Tenant").

**WITNESSETH:**

WHEREAS, Landlord is the owner of certain premises situated in Howland Township, Trumbull county, Ohio (herein called the "Premises"); and

WHEREAS, by that certain Lease dated January 5, 2004 (herein called the "Lease"), Landlord leased the Premises to Tenant; and

~~WHEREAS, a memorandum or short form lease in respect of the Lease was recorded in the office of the recorder of deeds of _____ County, _____, on _____, 20 ___ as Document No. _____ in book _____ at page _____; and~~

WHEREAS, Tenant is in possession of the Premises and the term of the Lease has commenced; and

WHEREAS, under Paragraph 24 of the Lease, Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease;

NOW, THEREFORE, Landlord and Tenant agree as follows:

1. The term of the Lease commenced on, and the Commencement Date (as such term is defined in the Lease) was July 2, 04. The term of the Lease shall expire on January 31, 2020 unless Tenant exercises any option to extend the term of the Lease or unless the Lease terminates earlier as provided in the Lease.

2. The date of commencement of the first "Option Period" (as such term is defined in the Lease) shall be February 1, 2020 if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, 2025 unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

3. The date of commencement of the second Option Period shall be February 1, 2025 if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, 2030 unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

4.  The date of commencement of the third Option Period shall be February 1, 2030 if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, 2035 unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed the day and year first above written.

LANDLORD

HOWLAND COMMONS PARTNERSHP

By: _____
Authorized Agent

TENANT;

CIRCUIT CITY STORS, INC.
A Virginia corporation

By: _____
Michael F. Foss, Executive Vice President
And Chief Financial Officer