LOCATION:  Huntington Mall

# LEASE

between

## CIRCUIT CITY STORES, INC.,

as Tenant

and

## HUNTINGTON MALL COMPANY,

as Landlord

dated _12·29_, 1998

## HUNTINGTON MALL
## BARBOURSVILLE, WEST VIRGINIA



TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | Leased Property | 1 |
| 2. | Construction of Building and Improvements | 2 |
| 3. | Lease Term | 4 |
| 4. | Rent | 8 |
| 5. | Operation of Shopping Center by Landlord | 9 |
| 6. | Easements | 11 |
| 7. | Common Areas and Common Area Maintenance | 13 |
| 8. | Signs and Communications Equipment | 15 |
| 9. | Taxes | 19 |
| 10. | Maintenance, Repairs and Replacements | 22 |
| 11. | Utility Service Provider; Payment of Utility Bills | 22 |
| 12. | Alterations | 24 |
| 13. | Mechanics' Liens | 24 |
| 14. | Insurance | 30 |
| 15. | Damages by Fire or Other Casualty | 31 |
| 16. | Condemnation | 34 |
| 17. | Assignment and Subletting | 35 |
| 18. | Use | 37 |
| 19. | Warranties, Representations and Covenants | 46 |
| 20. | Estoppel Certificates | 47 |
| 21. | Subordination, Non-Disturbance and Attornment | 48 |
| 22. | Tenant's Financing | 49 |
| 23. | Tenant's Property and Waiver of Landlord's Lien | 50 |
| 24. | Memorandum of Lease; Commencement Date Agreement | 50 |
| 25. | Expiration of Term and Holding Over | 50 |
| 26. | Force Majeure | 51 |
| 27. | Events of Tenant's Default | 51 |
| 28. | Landlord's Remedies | 54 |
| 29. | Events of Landlord's Default; Tenant's Remedies | 57 |
| 30. | Waiver | 57 |
| 31. | Compliance with Applicable Laws | 58 |
| 32. | Notices | 59 |
| 33. | Brokers | 59 |
| 34. | Miscellaneous | 61 |
| 35. | Construction, Operation and Reciprocal Easement Agreement | 62 |
| 36. | Confidentiality | 62 |
| 37. | Recapture Right/Failure to Operate | 63 |
| 38. | Effectiveness of Lease; Tenant's Right to Terminate | |

V:\4342\circd\HUNTNGTN\lease9.doc

## EXHIBITS

| "A" | Site Plan |
|---|---|
| "A-1" | Legal Description of the Shopping Center |
| "A-2" | Legal Description of the Adjacent Center |
| "A-3" | Legal Description of the Land |
| "B" | Index of Definitions |
| "C" | Construction Provisions |
| "D" | Removable Trade Fixtures |
| "E" | Sign Plans and Criteria |
| "F" | Prohibited Activities, Permitted Encumbrances and Permitted Title Exceptions |
| "G" | Subordination, Non-Disturbance and Attornment Agreement |
| "H" | Memorandum of Lease |
| "I" | Commencement Date Agreement |
| "J" | Indemnification Agreement |
| "K" | Utility Plan |

U:\4545\docs\CHI\CHI\TNO\TN\lease\li.doc

[Huntington Mall]

## LEASE

This LEASE is made as of the ____ day of _____, 1998, by and between THE HUNTINGTON MALL COMPANY, a West Virginia general partnership, having an address at 2445 Belmont Avenue, P.O. Box 2186, Youngstown, Ohio 44504-0186 ("Landlord"), and CIRCUIT CITY STORES, INC., a Virginia corporation having an address at 9950 Mayland Drive, Richmond, Virginia 23233 ("Tenant").

### WITNESSETH:

The parties hereto agree as follows:

1.    Leased Property.  Landlord leases to Tenant all those certain "Premises" (as defined in paragraph 2), when same are constructed or renovated on that approximately 1.8073 acre parcel (the "Land"), outlined in red on Exhibit "A" (the "Site Plan") and described by metes and bounds legal description on Exhibit "A-3" attached hereto, together with exclusive rights in the three (3) automobile loading stalls labeled "Customer Pick-Up" on the Premises as shown on the Site Plan and with the easements described in paragraph 6 below, all located in the "Shopping Center" (herein so called and outlined in green on the Site Plan), located at Huntington Mall, in the City of Barboursville (the "City"), County of Cabell, State of West Virginia (the "State"), shown on the Site Plan and described by metes and bounds legal description on Exhibit "A-1" attached hereto. All of the Shopping Center, exclusive of the Premises, is "Landlord's Premises".  Landlord hereby grants to Tenant all of those certain rights, in common with others, granted Landlord under that certain Construction, Operation, and Reciprocal Easement Agreement dated June 7, 1979 and executed by Huntington Mall Company, Sears, Roebuck and Co., J. C. Penney Properties, Inc. and Federated Department Stores, Inc., as amended and supplemented by that Supplement dated December 30, 1981, Second Supplement dated October 17, 1983, Third Supplement dated March 12, 1984, Fourth Supplement dated June 2, 1989 and Fifth Supplement dated May 6, 1991 (collectively, the "REA").

2.    Construction of Building and Improvements.  Commencing immediately upon "Delivery of the Land" (as defined in the Construction Provisions (herein so called) attached hereto as Exhibit "C" and incorporated herein by reference for all purposes), Tenant shall construct within the Shopping Center a one-story retail building, containing approximately 29,693 square feet of ground-floor gross leasable area plus mezzanine, with provisions for customer pickup, delivery and car stereo installation facilities as shown on the Site Plan, initially for use as a Circuit City Superstore (the "Building"), together with loading ramps, sidewalks and curbs, concrete stoops and/or aprons, utility extensions from the existing utility locations,

utility meters, electric transformer, loading dock, parking lot lighting, paving, trash compactor, transformer pad and other such appurtenances and improvements (collectively, the "Other Improvements"), as more particularly set forth in the Construction Provisions. The Building and Other Improvements are sometimes collectively referred to herein as the "Improvements". As more particularly set forth in the Construction Provisions, the Improvements shall be constructed to completion by Tenant with due diligence in accordance with the "Plans and Specifications" to be prepared by Tenant and approved by Landlord as specified in the Construction Provisions. The Improvements and the Land as shown on the Site Plan are referred to herein as the "Premises". The Improvements and appurtenances thereto and any permitted substitutions therefor shall be deemed affixed to and a part of the Premises, the title to such Improvements and appurtenances being in Tenant until the expiration of the Term (as defined in paragraph 3 below) unless this Lease shall be sooner terminated as herein provided and upon such expiration or sooner termination, title to all such Improvements and appurtenances shall automatically vest in Landlord.

     3.    <u>Lease Term</u>. Subject to paragraph 38 and provided Landlord has delivered the Land to Tenant as provided in the Construction Provisions, the construction term (the "Construction Term") of this Lease shall commence on March 1, 1999 (the "Effective Date"), and shall end on the "Commencement Date" (as defined in paragraph 4 below). The main term (the "Main Term") of the Lease shall commence on the Commencement Date and shall end on the last day of January following the tenth (10th) anniversary of the Commencement Date.

     In addition to the Main Term, Tenant shall have the option (each such right referred to herein as a "Renewal Option") to renew and extend the Lease for one ten (10) year period immediately followed by four (4) consecutive five (5) year periods (each such period referred to as an "Option Period" and collectively as the "Option Periods") immediately following the Main Term, at the rents specified below. Tenant shall give Landlord written notice of its election to exercise any Renewal Option at least two hundred seventy (270) days prior to the expiration of the Main Term or any then-current Option Period, as applicable, provided, however, if, prior to the aforementioned two hundred seventy (270) day period, Tenant does not give Landlord written notice of its intent not to exercise its renewal option, Tenant's right

2

to exercise such renewal option shall continue, as shall its tenancy hereunder, until the (10) business days after Landlord has given Tenant written demand that Tenant exercise such renewal option within ten (10) business days of Tenant's receipt of such demand or forfeit its right to exercise such renewal option, during which ten (10) business day period Tenant may exercise its renewal option, whereupon the Term (defined below) of this Lease shall be renewed and extended as if such notice had been given prior to the two hundred seventy (270) day period described above.  Landlord may demand that Tenant exercise such renewal option within ten (10) business days of Tenant's receipt of such demand or forfeit its right to exercise such renewal option by delivery of such demand at any time within four hundred and fifty (450) days prior to the expiration of the Main Term or any then-current Option Period, provided that the delivery of such demand by Landlord shall not (a) trigger the ten (10) business day response period if such notice is given more than two hundred and eighty (280) days prior to the expiration of the Main Term or any then-current Option Period, nor (b) require Tenant to give its renewal notice earlier than two hundred and seventy (270) days prior to the expiration of the Main Term or any then-current Option Period, as applicable.

Notwithstanding anything to the contrary provided in this paragraph 3, Tenant may not exercise its option hereunder if, at the time of such exercise, (i) Tenant is in default of an obligation hereunder to make any payment of money required by this Lease and has failed to cure such default within the applicable notice period, or (ii) Tenant is in default with respect to the observance or performance of any material non-monetary provision of this Lease and has failed to cure such default within the applicable cure periods set forth in paragraph 27(a) below, or (iii) Tenant is not open for business in the Premises (excluding a temporary closing following a casualty or condemnation, a temporary closing in connection with the remodeling of the Premises, a temporary closing in connection with the subletting or assignment of the Premises or any other temporary closing provided that, in each instance, Tenant delivers evidence reasonably satisfactory to Landlord that the Premises will reopen for business prior to commencement of the applicable Option Term).

The Construction Term, Main Term and Option Periods are, collectively, the "Term". The term "Lease Year" shall mean each successive period of twelve (12) consecutive calendar

3

UM342\direct\HUNTINGTN\lease6.doc

months, commencing on the first day of each February during the Term, except that the first
Lease Year shall commence on the Commencement Date and shall end on the last day of
January following the first anniversary of the Commencement Date.

    4.    <u>Rent</u>

        (a)    <u>Construction Term.</u>  During the Construction Term, Tenant shall pay
no rent or Real Estate Tax or CAM Charges or any other similar costs, fees, rentals or
expenses.

        (b)    <u>Interim Rent.</u>  Tenant agrees to pay Interim Rent ("Interim Rent") for
the Premises in the amount of ONE HUNDRED SIXTY-ONE THOUSAND EIGHT
HUNDRED TWENTY-SIX and 85/100 Dollars ($161,826.85) per annum (calculated at the
rate of Five and 45/100 Dollars ($5.45) per square foot of the ground floor gross leasable area
of the Building, as shown on the Plans and Specifications and adjusted in accordance with
paragraph 4(c)(ii) below) commencing upon the "Commencement Date" which is the first to
occur of (i) two hundred ten (210) days following the beginning of the Construction Term, or
(ii) the date of Tenant's initial opening for business of the Premises, and ending on the "Base
Rent Commencement Date". Until the commencement of the Base Rent Commencement
Date, the Interim Rent shall be increased at the rate of 7.5% on the fifth (5th) anniversary of the
Commencement Date and, thereafter by an additional 7.5% of the amount payable during the
immediately preceding period, on each five (5) year anniversary of the Commencement Date
until the occurrence of the Base Rent Commencement Date. The "Base Rent Commencement
Date" shall occur upon the payment by Landlord of the Lease Incentive Payment (as defined in
paragraph 4(d) below). Subject to the adjustments set forth above, Tenant shall pay Interim
Rent in equal monthly installments of THIRTEEN THOUSAND FOUR HUNDRED
EIGHTY-FIVE and 57/100 Dollars ($13,485.57), in advance on the first day of each calendar
month, with appropriate proration for any partial calendar month, to the address given for
Landlord in paragraph 32 below.

        (c)    <u>Base Rent.</u>  Tenant agrees to pay base rent ("Base Rent") for the
Premises in the amounts and in the manner specified hereunder (subject to 4(d) below),
commencing on the Base Rent Commencement Date.

4

U:\MO472\Renk\BTJK\TN GTN\sas5.doc

Landlord shall give Tenant written notice of a change of address or change of the party to whom such rents shall be payable along with written documentation reasonably satisfactory to Tenant of such party's right to receive payment hereunder.  Unless adjusted as provided below or in paragraph 3 of the Construction Provisions, Base Rent shall be paid in equal monthly installments in advance on the first day of each succeeding calendar month throughout the Term with appropriate proration for any partial calendar month, to the address given for Landlord in paragraph 32, pursuant to the following schedule:

       (i)    Base Rent Schedule.

| Months Following Commencement Date | Rate PSF | *Annual Rent | Monthly Installments |
|---|---|---|---|
| From Base Rent Commencement Date thru 60th month after Commencement Date | $12.57 | $373,241.04 | $31,103.42 |
| From 61st month after Commencement Date thru 120th month after Commencement Date | 13.51 | $401,234.16 | $33,436.18 |
| 121-180** | 14.53 | $431,326.68 | $35,943.89 |
| 181-240** | 15.62 | $463,676.16 | $38,639.68 |
| 241-300** | 16.79 | $498,451.92 | $41,537.66 |
| 301-360** | 18.05 | $535,835.76 | $44,652.98 |
| 361-420** | 19.40 | $576,023.40 | $48,001.95 |
| 421**- end of last Option Period, if exercised | 20.85 | $619,225.20 | $51,602.10 |

*assumes initial rental rate of $12.57 PSF and 7.5% cumulative increases to Base Annual Rent every sixty (60) months.

**Months after Commencement Date.

       (ii)    Adjustment in Base Rent.  Notwithstanding the Base Rent provisions, in the event that the ground-floor gross leasable area of the Building when constructed exceeds 29,693 square feet, annual Base Rent on the Base Rent Commencement Date through the end of the sixtieth (60th) month following the Commencement Date shall be the product of the actual ground-floor gross leasable area of the Building (as shown on the as-built survey in

5

the Plans and Specifications), multiplied by $12.57 and with this Annual Rent increased by
7.5% at the end of the sixtieth (60th) month following the Commencement Date and by an
additional 7.5% of the amount payable during the immediately preceding period at the end of
every sixtieth (60th) month thereafter. Notwithstanding the Interim Rent provisions, in the
event that the ground floor gross leasable area of the Building when constructed exceeds
twenty-nine thousand six hundred ninety-three square feet (29,693) square feet, Interim Rent
on the Commencement Date through the Base Rent Commencement Date shall be the product
of the actual ground floor gross leasable area of the Building (as shown on the as-built survey
in the Plans and Specifications) multiplied by Five and 45/100 Dollars ($5.45) and with this per
square foot rate increased by 7.5% at the end of the sixtieth (60th) month by an additional 7.5%
of the amount payable during the immediately preceding period following the Commencement
Date and the end of every sixtieth (60th) month thereafter. In determining the ground-floor
gross leasable area, measurements shall be made in accordance with the specifications set forth
in paragraph 9(b) below.

(d)     Lease Incentive Payment. Upon Substantial Completion (as defined
in Paragraph 2(h) of Exhibit "C") and (i) Tenant's furnishing to Landlord the certificates
of insurance required under paragraph 14 of this Lease, (ii) Tenant's furnishing to
Landlord and, if requested, Landlord's title insurance company, an indemnity in the form
of Exhibit "J" attached hereto against any exception in Landlord's or its Mortgagee's
policy of title insurance with respect to mechanics' liens arising out of Tenant's
construction, (iii) Tenant's furnishing to Landlord, if required by Landlord, a statement
from Tenant to Landlord that, upon the expiration or earlier termination of the Term,
Landlord will hold title to the Improvements (in form reasonably acceptable to Landlord
and Tenant), (iv) Tenant's initial opening for business, (v) Tenant's payment to Landlord
of any Interim Rent and all other charges to the extent then due and payable, and (vi)
Tenant's furnishing to Landlord a certification of Tenant's construction manager,
certifying to Landlord that Substantial Completion has occurred (the date upon which all
of the foregoing are satisfied shall be known as the "Lease Incentive Payment Qualification
Date"), Landlord shall pay to Tenant a Lease Incentive Payment in an amount equal to

6

($55.00) per square foot of ground floor area of the Building, as constructed, payable by wire transfer of funds by Landlord to Tenant's account, no later than thirty (30) days after the Lease Incentive Payment Qualification Date. If the Base Rent is increased pursuant to paragraph 4(c)(ii) of the Lease, the Lease Incentive Payment shall likewise be proportionally increased. If the Lease Incentive Payment Qualification Date has not occurred within one (1) year following the Commencement Date, unless such is due to the fault of Landlord, the action of other tenants in the Shopping Center or force majeure (as defined in paragraph 26 below), then Tenant shall have no further right to the Lease Incentive Payment and Tenant shall pay the Interim Rent for the remainder of the Term, and references herein to the "Base Rent" shall, thereafter, be deemed to refer to the Interim Rent. Landlord acknowledges that such one (1) year period shall be extended to the extent of any delays arising out of the fault of Landlord, the actions of other tenants in the Shopping Center, or force majeure. If Landlord fails to pay the Lease Incentive Payment in full within thirty (30) days after the Lease Incentive Payment Qualification Date, then Tenant shall notify Landlord of such failure. In the event that Landlord fails to pay the Lease Incentive Payment within five (5) days of receipt of such notice, then any such unpaid amount shall accrue interest at the Default Rate. If Landlord has not tendered payment of the Lease Incentive Payment by the date which is one (1) year after the Lease Incentive Payment Qualification Date (the "Lease Incentive Payment Qualification Date Anniversary"), then (i) Interim Rent shall be reduced to ground rent equal to Seventy-Five Thousand and No/100 Dollars ($75,000.00) per annum during the first year following the first anniversary of the Lease Incentive Payment Qualification Date, Fifty Thousand and No/100 Dollars ($50,000.00) per annum during the year following the second anniversary of the Lease Incentive Payment Qualification Date, and Twenty-Five Thousand and No/100 Dollars ($25,000.00) per annum thereafter during the Term of the Lease; and (ii) this Lease shall be converted to a pure ground lease, with ownership of the Improvements remaining with Tenant, and Landlord's and any Mortgagees' names being removed as additional insured or mortgagees on any casualty insurance described in paragraph 14(a) of the Lease. Landlord and Tenant covenant and agree that, if the Lease Incentive

7

U:\ACME\wbrook\HUNTINGTN\lease8.doc

Payment Qualification Date has occurred but the Lease Incentive Payment has not been disbursed, upon the reasonable written request of either the Tenant or Landlord, the Landlord and Tenant shall execute such documentation as necessary to formalize the conversion of this Lease to a pure ground lease upon the first anniversary of the Lease Incentive Payment Qualification Date.

Notwithstanding the foregoing, at any time following the thirtieth (30th) day after the Lease Payment Qualification Date Anniversary and upon the failure of Landlord to pay the Lease Incentive Payment within fifteen (15) days of receipt of notice from Tenant of such failure, Tenant shall have the right at Tenant's sole election, but not the obligation, in lieu of any subsequent obligation that Landlord pay to Tenant the Lease Incentive Payment, to mortgage, sell, convey, assign, lease or otherwise encumber (collectively, a "Post-Completion Transfer") Tenant's interest in the Building, the Improvements and the Lease. Such right shall be in addition to the rights of Tenant set forth in paragraphs 17 and 22 of the Lease. Such sale, conveyance, assignment, lease, mortgage or encumbrance shall relate merely to Tenant's leasehold interest and/or Tenant's Building. At all times, any such sale, conveyance, assignment, lease, mortgage or encumbrance shall be subordinate to Landlord's interest in the fee and subject to all of the terms of this Lease. Upon the expiration of this Lease, the termination of this Lease, or the termination of Tenant's right of possession, the Building shall become the property of the Landlord, free and clear of any such sale, conveyance, assignment, lease, mortgage or encumbrance.

Landlord covenants to (i) execute all documents necessary to permit Tenant to effect the Post-Completion Transfer described herein, and (ii) cause any Mortgagee to specifically acknowledge the rights of Tenant's lender and third parties arising as a result of such Post-Completion Transfer. Notwithstanding such Post-Completion Transfer, Tenant shall continue to pay the ground rentals described in this paragraph 4(d) during the remainder of the Term.

5.    Operation of Shopping Center by Landlord. Landlord covenants to operate a first-class shopping center. All future development of the Shopping Center and the Adjacent

8

UM347clsm\HUNTINGTN\lease8.doc

Center (defined in Section 6 below) will be consistent with a first-class shopping center. The location of buildings and other tenant space in the Shopping Center will only be within the "Permissible Building Areas" designated on the Site Plan. Except as otherwise provided in paragraph 16 below, the number of parking spaces for the Shopping Center shall at all times be at least as shown on the Site Plan, but in no event shall the parking ratio for the Shopping Center and the Adjacent Center be less than that required by applicable zoning requirements. All parking shall be at ground level. Landlord shall construct or cause all improvements in the Shopping Center (other than the Improvements to be constructed by Tenant) to be constructed in a good and workmanlike manner, lien-free and Landlord agrees to indemnify, defend and hold Tenant harmless from any loss or damage suffered by Tenant as a result of Landlord's construction, except to the extent caused by Tenant's negligence. Landlord's construction shall not materially interfere with the conduct of Tenant's business.

      6.    <u>Easements</u>. Landlord and Tenant also grant to each other those nonexclusive leasehold easements which shall run as covenants with Landlord's Premises, the Adjacent Center (as shown on the Site Plan and described by metes and bounds on Exhibit "A-2") and the Premises during the Term, over Landlord's Premises, the Adjacent Center and the Premises which are useful and appropriate for the construction, operation and maintenance of Landlord's Premises, the Adjacent Center and the Premises, including but not limited to:

      (a)    <u>Construction Easements</u>. During the Construction Term, and any period of renovation or reconstruction thereafter, Landlord grants to Tenant (i) a nonexclusive easement across a mutually agreeable designated route, providing access to and from the public roadways nearest to the Land, over the Common Areas (as defined in paragraph 7(a) below) of the Shopping Center and the Adjacent Center for construction access to the Premises, (ii) an easement to build upon and improve the "Easement Area" on the Common Areas of the Adjacent Center (as shown outlined in yellow on the Site Plan), and (iii) an easement for the benefit of the Premises for such additional underground, public or private utility easements (within portions of Common Areas of the Shopping Center and the Adjacent Center not designated as Permissible Building Areas) as Tenant deems necessary, without unreasonably interfering with the use by Landlord of the Common Areas of the Shopping Center and the

9

Adjacent Center.  For the purpose of exercising the foregoing rights granted to Tenant, Tenant and/or the utility provider shall have the right to enter upon and use said Common Areas (exclusive of the Permissible Building Areas) to install said utility systems for the benefit of the Premises, all of which utility systems are to be underground, to such extent and so long as reasonably necessary to accomplish such purpose, subject to restoration of said Common Areas by Tenant following such installation and any other reasonable conditions and requirements imposed by Landlord such as location and depth.  During the Term Tenant grants to Landlord an easement for the benefit of Landlord's Premises and the Adjacent Center for such additional underground, public or private utility easements as Landlord deems necessary, without unreasonably interfering with the use by Tenant of the Common Areas of the Premises. For the purpose of exercising the foregoing rights granted to Landlord, Landlord and/or the utility provider shall have the right to enter upon and use said Common Areas to install said utility systems for the benefit of Landlord's Premises and the Adjacent Center, all of which utility systems are to be underground, to the extent and so long as reasonably necessary to accomplish such purpose, subject to restoration of said Common Areas by Landlord following such installation and any other reasonable conditions and requirements imposed by Tenant such as location and depth.

      (b)   Common Area Easements.  In addition, during the Term Landlord grants to Tenant a non-exclusive easement (the "Tenant Common Area Easement") to use the Common Areas of the Shopping Center and the Adjacent Center for their intended purposes and to permit Tenant and its employees, agents, subtenants, assignees, licensees, suppliers, customers and invitees to use said Common Areas for the purposes (without limitation) of parking and pedestrian, service and vehicular access, ingress and egress to, from and between the Premises and the Landlord's Premises and the streets and highways abutting and adjacent to the Shopping Center and the Adjacent Center, without payment of any fee or other charge therefor except for the CAM charge.  It is specifically agreed that with respect to the automobile loading stalls designated on the Site Plan as Tenant's "Customer Pick-Up", (i) Tenant shall with Landlord's consent, which shall not be unreasonably withheld or delayed, have the right, from time to time, to relocate the same

10

to other areas on the Land and adjacent to the Improvements and (ii) notwithstanding the fact the same are in, and constitute a part of, the "Common Areas", Tenant may install signage designating such automobile loading stalls for exclusive use by Tenant's customers, invitees and patrons.  Landlord shall have no obligation to enforce such exclusive use and Tenant shall cease such designation if such designation violates the terms of the lease (executed prior to this Lease) of another tenant in the Shopping Center or the Adjacent Center and such tenant notifies Landlord of its objection to such designation.  Tenant shall also have the right to use such Common Areas on the Premises for Tenant's "Customer Pick Up" used exclusively for Tenant's customers, invitees and patrons.  Tenant acknowledges that it shall not permit overnight truck or trailer storage on any portion of Landlord's Premises, the Adjacent Center or the Easement Area; and except during the Construction Term, Tenant shall not permit overnight truck or trailer storage on any portion of the Common Areas of the Premises.  None of the easements granted by the parties to this Lease is intended, nor shall any of them be construed, as a dedication of any portion of the Shopping Center or the Adjacent Center for public use, and Landlord may take whatever reasonable steps that may be necessary to avoid such dedication.

During the Term Tenant grants to Landlord a non-exclusive easement (the "Landlord Common Area Easement") to use the Common Areas of the Premises for their intended purpose and to permit Landlord, the Adjacent Center landlord and their respective employees, agents, tenants, assignees, licensees, suppliers, customers and invitees to use said Common Areas for the purposes (without limitation) of parking and pedestrian, service and vehicular access, ingress and egress to, from and between the Premises and both Landlord's Premises and the Adjacent Center, without payment of any fee or other charge therefor.

7.    Common Areas and Common Area Maintenance.

(a)    Definition of Common Areas.  The term "Common Areas" shall be defined to include, as they may from time to time exist, the parking areas, lanes, drives, entrances, truck passageways, sidewalks, ramps, stairways, landscaped and other unpaved areas, parking lot lighting facilities and equipment, Landlord's pylon sign(s), if any, directional,

11

traffic and monument sign structure(s) (excluding those dedicated exclusively to a Shopping Center or Adjacent Center tenant or occupant) and shared utility facilities located in all elements of the Shopping Center or Adjacent Center (including any such areas and facilities contained within the Land, outparcels and adjacent tracts but reserved to the benefit of the Shopping Center and Adjacent Center occupants) and which are intended and available for the common use of all of the tenants within the Shopping Center and the Adjacent Center (including any outparcel and other adjacent occupants which contribute toward "CAM Charges" (as defined below) and which are not responsible for separate maintenance of such outparcels or tracts), their subtenants, licensees, and business invitees. "Common Areas" exclude the Building.

(b)    Landlord's Obligations.  Landlord shall be responsible for operating, maintaining, repairing and replacing the Common Areas on Landlord's Premises in a first-class manner, including cleaning, maintenance of Landlord's pylon and other sign structure(s), if any, snow clearing and plowing and ice treatment, removal of Common Area trash and garbage, lighting, repairing, repaving and restriping the parking area, and maintaining, replanting and replacing landscaping, all such work on Landlord's Premises to be referred to collectively as "Landlord's Common Area Maintenance".

(c)    Tenant's Obligations.  Tenant shall be responsible for operating, maintaining, repairing and replacing the Common Areas on the Premises and on the Easement Area in a first-class manner, including cleaning, maintenance of Tenant's pylon and other sign structure(s), if any, snow clearing and plowing and ice treatment, removal of Common Area trash and garbage, lighting, repairing, repaving and restriping the parking area, and  maintaining, replanting and replacing landscaping.

(d)    Tenant Payments.  Commencing on the Commencement Date and continuing until the first January 1st thereafter, Tenant shall pay to Landlord a fee of $.30 per square foot of ground-floor gross leasable area of the Building per annum (the "CAM Charge"), payable in equal monthly installments in advance of the first day of each month, as its share of the cost incurred by Landlord for Landlord's Common Area Maintenance. (The CAM Charge shall not include the cost of Common Area liability insurance carried by

12

Landlord, which cost shall be paid in accordance with paragraph 14(e) below.) The CAM Charge shall increase on said first day of January by an amount equal to the product of $.30 and the percentage increase in the CPI-U from December, 1997 to such first day of January. For each calendar year thereafter, the CAM Charge shall be increased on the first day of such calendar year by an amount equal to the product of the CAM Charge for the immediately preceding calendar year and the percentage increase in the CPI-U during the immediately preceding calendar year. In the event that the percentage change in the CPI-U during the preceding calendar year is zero or less than zero, then the CAM Charge for the succeeding calendar year shall be the same as for the preceding calendar year. As used in this Lease, the CPI-U shall be the United States Department of Labor, Bureau of Labor Statistics Consumer Price Index for all Urban Consumers, U. S. City Average, as revised from time to time for base averages. If at any time during the Term the CPI-U shall be discontinued, Landlord and Tenant shall mutually and reasonably agree to substitute an existing official index published by the Bureau of Labor Statistics or its successor or another similar index most nearly equivalent to the CPI-U. For any period within the Term which is less than a full calendar year, the annual CAM Charge shall be appropriately prorated. If the information necessary to make the adjustment contemplated above is not available at the end of a given calendar year, Tenant shall continue to pay on an interim basis the then applicable CAM Charges. Upon receipt of the information required to make the adjustment contemplated above a necessary adjustment with respect to amounts previously paid by Tenant shall thereupon be retroactively made; and the monthly payments to be made by Tenant for from the first day of the calendar year and for the remainder of the calendar year shall be established.

    8.   Signs and Communications Equipment.

        (a)   Signs. Tenant, at its sole cost and expense, shall have the right to relocate its existing pylon sign from Parcel 30 to the location designated for "Tenant's Pylon Sign" on the Site Plan. Said pylon sign structure (which shall not exceed twenty (20) feet in height, measured from the highest point of the existing grade into which the footings of the pylon sign structure are installed) containing doublesided "face panels" (each of which panels shall be ten (10) feet wide by four (4) feet in height, with lettering thereon of twelve (12)

13

inches in height) solely identifying Tenant's store, which face panels shall also be constructed and installed at Tenant's sole cost and expense.  In addition, Landlord grants Tenant a license, at Tenant's option, to construct directional signage in the locations shown on the Site Plan and labeled as "Proposed Multi-Occupant Directional Signage" (or if Tenant is unable to obtain the necessary governmental approvals for such directional sign locations, then at such other locations as shall be provided by Landlord and approved by Tenant).  Any such directional signage installed by Tenant shall be maintained by Landlord in good condition during the Term. Landlord may, however, terminate this license should Landlord be notified by any other occupant of the Shopping Center or the Adjacent Center that such directional signage violates any terms of such occupant's occupancy agreement with Landlord, in which event Tenant shall immediately remove such directional signage.  Attached as a portion of Exhibit "E" are plans and specifications for Tenant's building-mounted signage and for the Multi-Occupant Directional Signage, each of which Landlord hereby approves upon its execution of this Lease.  Notwithstanding the foregoing, Tenant, its successors, subtenants and assigns shall be entitled without Landlord's consent, but subject to governmental requirements, as aforesaid, to replace any and all of its signs with signage consistent with Tenant's (or its successors', subtenants' or assigns') then-current prototypical sign plans provided that (i) such replacement signage solely identifies Tenant's (or its successors', subtenants', or assigns') tradename(s), does not increase the number of such signs in the aggregate or on any particular Building elevation, does not extend above the top of the parapet wall, and does not increase the size of the panels or the lettering on such previous signage and, (ii) if Tenant relocates such signage other than its building-mounted signage, such relocation is subject to Landlord's approval, which may be withheld in Landlord's sole discretion.  Except as provided above, any modification of Tenant's signage shall require Landlord's prior consent, which shall not be unreasonably withheld, delayed or conditioned. Tenant agrees to provide Landlord with design plans and specifications of any replacement signage permitted above upon installation

14

thereof by Tenant.

       (b)   <u>Communications Equipment</u>.  Tenant may install, maintain and/or replace any satellite dishes, antennas and cellular and PCS towers and poles on the roof and/or the interior of the parapet of the Building as Tenant deems necessary or desirable, provided that any such installation, maintenance and/or replacement shall not adversely and materially affect the roof or the structural elements thereof and are located, to the extent practicable, to minimize visibility thereof from the Common Areas.  Upon removal by Tenant of any satellite dishes or antennas, Tenant shall repair any damage done in connection with such removal.  To the extent Tenant installs any satellite dishes or antennas on the roof, Tenant shall maintain same and indemnify Landlord from any and all costs and expenses, including reasonable attorneys' fees, arising from injury sustained by persons as a result of the presence of such satellite dishes or antennas.

     9.   <u>Taxes</u>.

       (a)   <u>Taxes Contemplated Hereunder</u>.  The term "Real Estate Taxes" shall mean (i) all real estate taxes and assessments, both general and special and all ad valorem taxes, rates and levies paid upon or with respect to the land, buildings and all other improvements on the tax parcel in which the Premises are located (the "Tax Parcel"), (ii) rent taxes or gross receipts taxes payable with respect to rental and other charges to be paid by Tenant under the terms of this Lease, (iii) any business and occupation taxes payable with respect to the conduct by Tenant of its business at the Premises for a calendar year or a portion thereof to any governmental agency or authority, (iv) taxes payable to any governmental entity pursuant to the City of Barboursville Business and Occupation Privilege (Gross Sales) Tax, and (v) all charges specifically imposed in lieu of any such taxes.  Except as specifically provided in clauses (i)-(v) above, nothing contained in this Lease shall require Tenant to pay any local, county, municipal, state or federal income, franchise, corporate, estate, inheritance, succession, capital levy, business or transfer tax of Landlord, or any local, county, municipal, state or federal income, profits, gross receipts (other than with respect to rental and other charges as contemplated in clauses (ii), (iii) and (iv) above), sales or renewal tax or charge upon the

15

rent or other charges payable by Tenant under this Lease (other than with respect to rental and other charges as contemplated in clauses (ii), (iii) and (iv) above). Further included within the definition of "Real Estate Taxes" are all reasonable expenses incurred by Landlord in reviewing, negotiating, appealing or contesting such taxes or assessments. Tenant's pro rata share of Real Estate Taxes shall not be increased by any additional charges or penalties incurred by Landlord due to late payment of Real Estate Taxes or decreased by any reduction or abatement otherwise received by Landlord due to early payment of Real Estate Taxes, if such early payment is made prior to the date Tenant pays Tenant's "Pro Rata Share of Real Estate Taxes" (as defined below). Landlord warrants and represents that there is no existing special assessment applicable to Tenant's Tax Parcel by any governmental authority related to construction undertaken by a governmental agency in lieu of Landlord. Tenant shall not be obligated to pay any portion of any such existing special assessments.

(b)    Payment of Real Estate Taxes. Within the later of (i) thirty (30) days of receipt of Landlord's invoice for Tenant's Pro Rata Share of Real Estate Taxes, together with a copy of the tax bill on the basis of which such invoice was rendered, if Tenant requests such copy, or (ii) sixty (60) days prior to date on which such tax bill is payable by Landlord, Tenant shall pay "Tenant's Pro Rata Share of Real Estate Taxes" (as defined below) levied against the Tax Parcel. "Tenant's Pro Rata Share of Real Estate Taxes" shall always be the product of the Real Estate Taxes multiplied by a fraction, the numerator of which is the number of square feet of gross leasable area in the Building, and the denominator of which is the number of square feet of gross leasable building area (excluding the area of any outside sales area exclusive to a single occupant) in the Tax Parcel. In determining the gross leasable area of any building in the Shopping Center (including the Building), measurement shall be made from the center line of any common walls and the outside of any exterior walls. Increases in applicable floor areas shall result in corresponding adjustments of Tenant's Pro Rata Share and shall result in changes in the calculation of ancillary charges based upon square footage. In no event shall the gross leasable area of the Building be less than 29,693 or the denominator of the

16

fraction by which Tenant's Pro Rata Share is determined be less than ninety percent (90%) of the gross leasable area of all buildings located on the Tax Parcel as it may exist from time to time.

Landlord agrees that if, as a result of the inclusion in the Tax Parcel of buildings outside the Shopping Center or buildings developed in the currently undeveloped portions of the Shopping Center, which buildings are utilized for purposes not customarily included in a retail power center, the per square foot cost to Tenant of its Pro Rata Share of Real Estate Taxes materially exceeds the per square foot cost Tenant would pay in a comparable retail power center in the Huntington, West Virginia area, Landlord will reduce Tenant's per square foot cost of Real Estate Taxes to an amount consistent with that which would be payable in such comparable retail power center. In the event of a dispute between Landlord and Tenant as to the appropriate per square foot cost for Tenant's Pro Rata Share of Real Estate Taxes, Landlord and Tenant agree to submit such dispute to a tax service (national or local) selected by Landlord and reasonably acceptable to Tenant with not less than five (5) years experience in handling tax contests for retail properties in the Huntington, West Virginia area and agree to be bound by such tax service's determination of what the per square foot cost of Real Estate Taxes is for comparable retail centers in the Huntington, West Virginia area. In no event shall Tenant be obligated to pay as its Pro Rata Share of Real Estate Taxes an amount greater than its Pro Rata Share of Real Estate Taxes as determined pursuant to the preceding paragraph.

Provided Tenant pays its Pro Rata Share of Real Estate Taxes prior to the date upon which Landlord may receive early payment discounts, Tenant's Pro Rata Share of Real Estate Taxes shall be net of any early payment discounts available at the time Tenant's payment is due. Landlord shall pay, or cause the payment of, all Real Estate Taxes before any fine, penalty, interest or cost may be added thereto, become due or be imposed by operation of law for the nonpayment or late payment thereof. Provided Tenant timely pays Tenant's Pro Rata Share of Real Estate Taxes, in no event shall Tenant be liable for any discount forfeited or penalty incurred as a result of late payment by another tenant or by Landlord. Real Estate Taxes shall be prorated as of the

17

U:\M2\admin\HUNTNGTN\lease6.doc

Commencement Date and the expiration or earlier termination of this Lease, and Landlord shall promptly return to Tenant any overpayment made by Tenant with respect to the period prior to or subsequent to the Term. Landlord shall remain primarily responsible for such payment notwithstanding the fact that such payment may be made by a tenant of Landlord's Premises or other third party pursuant to an agreement to which Tenant is not a party. In addition, should Landlord fail to pay such Real Estate Taxes before same become delinquent and Tenant has a reasonable basis for concluding the governing taxing authority will, in the absence of payment, foreclose its tax lien within forty-five (45) or less days, Tenant shall have the right, at its election, to cure such failure by payment of delinquent Real Estate Taxes and any interest and penalties due thereon and in such event Tenant may deduct the cost thereof, plus interest at the Default Rate (defined in paragraph 28(a)), from the next installment(s) of Interim Rent or Base Rent and other charges due hereunder.

(c) Contest of Real Estate Taxes and/or Assessed Valuation of Property. Tenant shall have the right, at Tenant's sole expense, to contest the amount or validity, or otherwise seek an exemption or abatement, of any Real Estate Taxes or to seek a reduction in the valuation of the Premises assessed for Real Estate Tax purposes, by appropriate proceedings diligently conducted in good faith, provided that Tenant shall first have notified Landlord of its intent to do so and Landlord shall have failed to notify Tenant in writing, within the earlier of (i) thirty (30) days of receipt of Tenant's notice or (ii) the date which is ten (10) business days before an appeal or contest must be filed, that Landlord intends to contest such Real Estate Taxes or seek such a reduction. In any instance where any such action or proceeding is being undertaken by Tenant, Landlord shall cooperate with Tenant, execute any and all documents reasonably required in connection therewith and, if required by any law, rule or regulation of the taxing authority, shall join with Tenant in the prosecution thereof at the expense of Tenant.

(d) Payment Following Appeal. If no payment of Real Estate Taxes was required by the taxing authority during the pendency of the proceedings set forth in paragraph (c), upon the termination of such proceedings, Tenant shall pay Tenant's Pro

18

U:\4545\dmnt\HUNTNGTN\lease8.doc

Rata Share of such Real Estate Taxes as finally determined in such proceedings, the payment or partial payment of which may have been deferred during the prosecution of such proceedings. Tenant shall be entitled to a refund from the appropriate taxing authority of any overpayment of Real Estate Taxes relating or allocable to the Premises, as well as a reimbursement from the appropriate taxing authority of all costs, fees and expenses it incurs in such protest or reassessment. In the event the Real Estate Taxes are increased as a result of Tenant's real estate tax contest and/or the valuation or assessment of the Premises or Shopping Center or Adjacent Center increases due to Tenant's contest of Real Estate Taxes and Landlord is prohibited from passing such increase on to the other tenants in the Shopping Center or the Adjacent Center, Tenant and any other tenant contesting such taxes shall be solely responsible for the additional tax liability arising out of same and will hold Landlord harmless therefrom; such additional tax obligation being deemed as additional rent. In the event that Tenant fails to pay any portion of its responsibility of Real Estate Taxes, such amount shall be considered as additional rent and subject to all of the provisions of this Lease as to default in the payment of rent.

10.    _Maintenance, Repairs and Replacements_. Notwithstanding anything to the contrary provided herein, except for repairs arising out of the negligent acts of Landlord, its agents or employees, Tenant shall be responsible for all maintenance, repairs and replacements with respect to the Improvements on the Land and the Easement Area. Tenant shall also, at its sole cost and expense, provide electric power to illuminate those parking lot lights on the Land and the Easement Area which are connected to Tenant's meter during all periods of darkness in which the majority of the other parking lot lights in the Shopping Center are also illuminated.

If, during the last three (3) years of any Option Period, Tenant is required to expend any sum for a single item of maintenance, repair or replacement to the Building in excess of Ten Thousand and No/100 Dollars ($10,000.00) in satisfaction of its obligations hereunder (excluding expenditures incurred due to compliance with laws), and if the resulting improvement to the Building is not permitted to be fully amortized in accordance with generally accepted accounting principles or the Internal Revenue Code and

19

U:\542\demo\HUNTNGTN\lease8.doc

Regulations (utilizing an amortization period equal to the shortest useful life of the applicable improvement), over the remainder of the Term (without consideration to the exercise of any additional Renewal Options), then Tenant shall be reimbursed by Landlord in an amount equal to fifty percent (50%) of that portion of the cost expended due to such maintenance, repairs or replacement, but only to the extent that same is not permitted to be amortized during the remainder of the Term (without consideration to the exercise of any additional Renewal Options) as specified above. Notwithstanding the foregoing, prior to incurring any expenditures pursuant to the previous sentence which cannot be fully amortized over the remainder of the Term, Tenant shall notify Landlord of the contemplated expenditure and, except in the case of an emergency (e.g. a repair which, if not immediately undertaken, could (a) adversely affect Tenant's ability to normally operate its business in the Premises, or (b) result in injury to persons or property), Tenant shall not undertake the maintenance, repair or replacement for ten (10) business days following delivery of such notice to Landlord. During such ten (10) business day period, if requested by Landlord, Tenant shall in good faith consider alternatives, if any, suggested by Landlord to Tenant's contemplated expenditure (e.g. a less expensive repair versus replacement). The foregoing shall not, however, require Tenant to accept or proceed with any alternative suggested by Landlord, provided that Tenant in good faith evaluates the alternatives offered by Landlord and in good faith offers reasonable explanations to support any rejection of Landlord's proposed alternatives.

On or before the expiration of such ten (10) business day period, Landlord shall notify Tenant whether or not it agrees to reimburse Tenant for one-half (1/2) of the unamortizable portion of the cost of the contemplated expenditure in excess of Ten Thousand and No/100 Dollars ($10,000.00). Landlord's failure to respond on a timely basis shall be deemed its agreement to reimburse Tenant. If Landlord notifies Tenant that it does not agree to reimburse Tenant, (i) Landlord shall not be obligated to so reimburse Tenant, (ii) Tenant shall not be obligated to make the repair, construction or alteration giving rise to the expenditure and shall not be in default of its obligations under this Lease as a result thereof, and (iii) Tenant shall, upon expiration of the Lease, have the right to

20

remove the improvements made with the unreimbursed expenditures (provided Tenant repairs any damage arising out of such removal and such removal does not in and of itself create a dangerous condition which could cause injury to persons or property). However, if Tenant subsequently exercises an additional Renewal Option (a) if Landlord has reimbursed Tenant as provided above, then Tenant shall return to Landlord the amount so reimbursed by Landlord, and (b) if, alternatively, Landlord had notified Tenant that it would not agree to reimburse Tenant as provided above, then the provisions of items (ii) and (iii) in this paragraph above shall be void and of no further force and effect as to the applicable repair, construction or alteration.

Should either party fail to perform its obligations under this paragraph 10 with respect to the Building, the other party may, at its option, effect such maintenance, replacements or repairs, provided that such curing party shall have given the non-performing party thirty (30) days prior written notice, except in the case of emergencies (in which event only such notices as may be reasonable under the circumstances shall be required); but further provided that such thirty (30) day period (or reasonable period in event of emergencies) shall be extended in respect of any cure that cannot with reasonable diligence be accomplished within such period so long as the party required to effect such cure has commenced such cure within such thirty (30) day period (or reasonable period in event of emergencies) and thereafter diligently prosecutes such cure to completion. The non-performing party shall reimburse the other party within twenty (20) days of written demand for the reasonable and actual amount so expended (as evidenced by detailed invoices), plus interest from and after such twentieth (20th) day at the Default Rate. However, in the event of emergency repairs, no interest shall accrue if reimbursed within thirty (30) days of request (including detailed invoices) for reimbursement. All maintenance, repairs or replacements shall be done by Tenant or Landlord lien-free and in a good and workmanlike manner consistent with the quality of labor and materials used in originally constructing the Improvements and in accordance with all applicable law. In order to enable Landlord and Tenant to effectively perform their maintenance, repair and replacement obligations hereunder, Tenant and Landlord, as applicable, shall provide to

UM4345\circ\BURLINGTON\Lease6.doc

the other party any and all manufacturers' and contractors' warranties relating to such work performed on behalf of the other party to the party who is required to maintain same under the Lease.

11.    <u>Utility Service Provider; Payment of Utility Bills</u>.  Tenant shall be entitled, subject to State law, to select the utility service provider which shall provide water, electric, gas, cable, and telecommunication services to the Premises.  Tenant will pay directly to the appropriate utility company or governmental agency, when due, all bills (which includes all taxes levied or other charges on such utilities, including any governmental or utility charges based on utility consumption, standby utility capacity or potential utility use, provided such taxes and charges relate only to the Term and not to periods prior to the commencement or subsequent to the expiration of the Term) for gas, water, sanitary sewer, electricity, telephone and other public or private utilities used on the Premises and/or the Easement Area, excluding, however, consumption charges for utilities installed or maintained by Landlord pursuant to the utility easement granted to Landlord under Section 6(a) hereof.  If Landlord or any affiliate of Landlord shall supply any such services, Tenant shall purchase same from Landlord at charges not in excess of the charges for the services in question made by the unaffiliated utility corporation or governmental agency which would otherwise be supplying such utilities to the Shopping Center.  Any such charges for services supplied by the Landlord, shall be due and payable as additional rent within thirty (30) days after billings therefor are rendered to Tenant.  Landlord shall pay when due all utility charges incurred in the operation of the Common Areas on Landlord's Premises and the Adjacent Center (excluding the Easement Area).

12.    <u>Alterations</u>.  During the Term, Tenant shall have the right, at its discretion and its sole cost, without Landlord's consent, to make any interior nonstructural alterations or modifications it may desire. With Landlord's consent, which shall not be unreasonably withheld, conditioned or delayed, Tenant shall have the right, at its sole cost, to alter, modify or reconstruct the exterior and/or structure of the Building or Other Improvements (except that Landlord shall have the right, in its sole discretion, to approve or disapprove any proposed alterations or modifications by Tenant to the Easement Area or any improvements thereon).

22

Landlord's withholding of consent as to any structural or exterior alteration or modification shall be deemed reasonable only if same reduces the number of parking spaces on the Land, materially modifies the traffic flow on the Land, increases the height of the Building, modifies the size of the Building or Other Improvements, adversely affects the structural integrity of the Building, or (where the Shopping Center has an architectural theme [e.g. white sparkle stone] to which the other major tenants in the Shopping Center conform), is materially inconsistent with the then-existing architecture of the Shopping Center. Notwithstanding anything to the contrary contained herein, during the period of time that Circuit City Stores, Inc. (or its successor by merger or acquisition) is the occupant and operator of the Building (as opposed to a subsequent user, sublessee or assignee), Landlord's consent shall not be required in connection with the replacement or modification of the exterior entrance feature of the Building, provided that (i) such replacement or modification is undertaken in order to bring such entrance feature into conformity with the prototypical architectural design of entrance features then being utilized by Tenant on a majority of its new or rehabilitated existing stores, (ii) the height of the entrance feature does not exceed 31 feet to its highest point, and (iii) the overall size of the entrance feature is not materially increased. Should Landlord's consent be required, conceptual plans and specifications for such work shall be provided to Landlord prior to commencement of any such work. Except for any proposed work to be performed on the Easement Area (which shall require Landlord's express prior written consent), Landlord shall be deemed to have consented to such work if written notice of disapproval, with reasons specified, is not received by Tenant within thirty (30) days following Tenant's delivery of such plans and specifications to Landlord, provided Tenant's request for approval references such thirty (30) day deemed approval period. Without cost or expense to Landlord, Landlord shall cooperate with Tenant, at Tenant's sole cost, in the obtaining of any and all licenses, building permits, certificates of occupancy or other governmental approvals which may be required in connection with any such modifications or alterations, and Landlord shall execute, acknowledge and deliver any documents reasonably required in furtherance of such purposes. If Tenant adds any mezzanine area(s), the square footage thereof shall increase the basis upon which ancillary charges set forth in this Lease are assessed.

23

13.    <u>Mechanics' Liens</u>.  Landlord and Tenant covenant to each other that should any lien of any nature, including but not limited to the foregoing, be filed against the Premises or Shopping Center, the party on account of whose actions such lien has been filed shall, within thirty (30) days after receipt of written notice of such lien, cause said lien to be removed, or otherwise protected against execution during good faith contest, by substitution of collateral, posting a bond therefor, escrowing of adequate funds to cover the claim and related transaction costs or such other method as may be permissible under applicable title insurance regulations and reasonably acceptable to the other party hereto.  Notwithstanding the foregoing, Landlord shall not be required to remove a lien unless such lien has priority over this Lease or adversely affects the tenancy rights of Tenant in the Premises or Tenant's right to obtain financing secured by this Lease.

14.    <u>Insurance</u>.

(a)    <u>Property Damage</u>.  During the Construction Term, Tenant shall keep or require its general contractor to keep, in full force and effect, a policy of builder's risk insurance covering loss or damage to the Improvements for the full replacement value of all such construction.  During the Main Term and all Option Periods, Tenant shall keep the Premises insured against loss or damage by fire and the perils covered under standard "all risk" or "special form" coverage in the amount of full replacement value of the Building, exclusive of excavation, footings and foundations (which initial amount shall be not less than $1,500,000.00), with a commercially reasonable deductible, for which Tenant shall be fully responsible.  Landlord and Landlord's first "Mortgagee" (as defined in paragraph 21 below), shall be named in such policy or policies as additional insureds and loss payees as their respective interests may appear.  Landlord shall not construct, or permit to be constructed, any improvement in the Shopping Center, nor conduct any activity, nor lease any property for or knowingly acquiesce in the conduct of any activity, in the Shopping Center which will prevent Tenant from being able to obtain insurance coverage at commercially reasonable rates.  Should Landlord, in violation of the preceding sentence, cause or permit any insurance rate increase to occur, Landlord will reimburse Tenant for the additional premium required, subject to Tenant's right to self-insure (in which event Landlord will contribute to Tenant's self insurance fund to

24

cover increased actuarial risks).

      (b)   Liability Insurance. During the Term, Tenant shall keep in full force a policy of commercial general liability insurance with bodily injury and property damage coverage with respect to the Easement Area, the Premises and the business operated thereon by Tenant, which shall name Landlord and Landlord's first Mortgagee as additional insureds as their respective interests may appear. The limits of such commercial general liability policy shall be not less than $2,000,000.00 combined single limit for bodily injury and property damage, with a commercially reasonable deductible. Such liability insurance will provide coverage for exposures including, but not limited to, (i) an accident occurring in, on or about the Easement Area or Premises; (ii) the sale or other disposition of any good or service by Tenant; (iii) the consumption or existence on the Shopping Center, the Premises or the Adjacent Center of any product sold or otherwise disposed of by Tenant; (iv) any act or omission of Tenant, its employees, servants, agent or invitees; and (v) broad form contractual coverage in support of Tenant's indemnitees under this Lease.

      (c)   Workers' Compensation Insurance. To the extent required by law, Landlord and Tenant shall maintain workers' compensation insurance covering their respective employees in statutory limits, or maintain such alternate coverages or arrangements as legally permissible.

      (d)   Self-Insurance. Notwithstanding anything to the contrary contained herein, Tenant shall have the right to self-insure against any of the risks or portions thereof set forth in subparagraphs (a) and (b) (and to the extent then permitted by law, (c)) above, provided Tenant is then occupying the Premises and has a reported net worth, as of the end of Tenant's most recent quarterly reporting period, of not less than One Hundred Million Dollars ($100,000,000.00) (said amount, as adjusted, the "Net Worth Requirement"). Commencing on January 1, 1999 and annually thereafter, said amount shall be increased by an amount equal to the product of the Net Worth Requirement for the immediately preceding calendar year and the increase in the CPI-U during the immediately preceding calendar year.

      (e)   Common Area, Additional Area and Third Party Tenant Insurance and Insurance During Landlord's Construction. During the Term, Landlord shall keep in full force

25

and effect (or cause to be maintained), in form reasonably acceptable to Tenant, policies of (1) commercial general liability insurance with respect to the Common Areas on the Landlord's Premises and the Adjacent Center (excluding the Easement Area), and (2) property insurance insuring against loss or damage by fire and the perils covered under standard "all risk" or "special form" coverage, with respect to the improvements in the Common Areas on the Landlord's Premises and the Adjacent Center (excluding the Easement Area) and with respect to all other building areas on the Landlord's Premises over which Landlord from time to time has present possessory rights (or has the obligation under any lease to provide such insurance coverage) but which do not constitute a portion of the Common Areas (such areas here sometimes collectively referred to as the "Additional Areas"). The Additional Areas shall exclude the Premises and include, without limitation: (i) as yet unconstructed portions of the Landlord's Premises intended for tenant occupancy, (ii) constructed but unoccupied portions of the Landlord's Premises, (iii) vacated or otherwise uninsured tenant space, whether by reason of lease expiration, default or otherwise, and (iv) constructed and occupied portions of the Landlord's Premises. Said commercial general liability policies shall name Tenant, and any lender, investor or other stakeholder which is designated by Tenant from time to time, as an additional insured to the fullest extent Tenant and such stakeholder have insurable interests. The limits of such policies shall be the same as those set forth in subparagraphs (a) and (b) above, as applicable. Landlord may, with respect to its insurance obligations, self-insure or utilize deductibles, provided Landlord is an affiliate of The Cafaro Company and Landlord or the general partner of Landlord maintains a net worth, as of the end of such entity's most recent fiscal year, of not less than $100,000,000.00 (said amount, as adjusted, the "Landlord Net Worth Requirement"), as certified by the Chief Financial Officer(s) of The Cafaro Company and of the entity to which the certification is applicable. Commencing on January 1, 1999 and annually thereafter, said amount shall be increased by an amount equal to the product of the Landlord Net Worth Requirement for the immediately preceding calendar year and the increase in the CPI-U during the immediately preceding calendar year.

Commencing on the Commencement Date and continuing until the first January 1st thereafter, Tenant shall pay an amount equal to the product of $.19 multiplied by the ground

U:\C:\Cr\client\HUNTINGTN\lease6.doc

floor gross leasable area of the Building (as calculated pursuant to 9(b) above) (the "Insurance Charge"). The Insurance Charge shall increase on said first day of January by an amount equal to the product of $.19 and the percentage increase in the CPI-U from December 1997 to such first day of January. For each calendar year thereafter, the Insurance Charge shall be increased on the first day of such calendar year by an amount equal to the product of the insurance charge for the immediately preceding calendar year and the percentage increase in the CPI-U during the immediately preceding calendar year. In the event that the percentage change in the CPI-U during the preceding calendar year is zero or less than zero, then the Insurance Charge for the succeeding calendar year shall be the same as for the preceding calendar year. For any period within the Term which is less than a full calendar year, the annual Insurance Charge shall be appropriately prorated. If the information necessary to make the adjustment contemplated above is not available at the end of a calendar year, Tenant shall continue to pay on an interim basis the then applicable Insurance Charge. Upon receipt of the information required to make the adjustment contemplated above, a necessary adjustment with respect to amounts previously paid by Tenant shall thereupon be retroactively made; and the monthly payments to be made by Tenant from the first day of the calendar year and for the remainder of the calendar year shall be established. If the criteria for Landlord's self-insurance is not met then any deductible amount or self-insured retention for the Common Area and the property insurance coverage shall be reasonable in amount given the nature of the risk insured, the probable frequency of claims made under such coverage, and the overall insurance program of Landlord and its affiliates. Landlord shall use diligent efforts to assure (through parallel lease provisions or otherwise) that all areas of the Landlord's Premises, including the Additional Areas and areas leased to third party tenants or sold to third party occupants, are insured with substantially similar coverages to those required for the Premises, the Easement Area and the Common Areas on the Landlord's Premises and the Common Areas on Adjacent Center, such that in the event of any destruction or damage whatsoever to any portion of the Landlord's Premises or the Common Areas on the Adjacent Center (excluding the Easement Area), Tenant may have a reasonable expectation that the Landlord's Premises and the Common Areas on Adjacent Center (excluding the Easement Area) will be reconstructed in equal or superior condition

27

within the time frame set forth in paragraph 15. During any period in which Landlord is conducting construction activities at the Shopping Center or on the Common Areas on the Adjacent Center, Landlord shall keep, or cause its general contractor to keep, in full force and effect, with regard to the Shopping Center and the Common Areas on the Adjacent Center, in form reasonably acceptable to Tenant, at least the minimum insurance coverages set forth below:

    1)    Workers' Compensation - Statutory Limits;
          Employer's Liability - $500,000;

    2)    Automobile Liability for all vehicles with limits of $2,000,000; and

    3)    Commercial General Liability to include premises operations and
          products/completed operations coverage with limits of $2,000,000.

Additionally, Landlord shall keep or require its general contractor to keep in full force and effect a policy of builder's risk insurance covering loss or damage to the Landlord's Premises and the Common Areas on the Adjacent Center (excluding the Easement Area) for eighty percent (80%) of the replacement value of all such construction, with appropriate deductibles or self-insured retention.

    (f)    Policy Provisions. All policies of insurance (other than self-insurance) enumerated above shall be provided by insurance carriers with a Best rating of not less than A-VIII. Any insurance coverage enumerated above may be effected by a blanket policy or policies of insurance or under so-called "all risk" or "multi-peril" insurance policies, provided that the total amount of insurance available with respect to the Premises and Tenant's or Landlord's liability hereunder shall be at least the equivalent of separate policies in the amounts herein required, and provided further that in other respects any such policy or policies shall comply with the provisions of this paragraph 14. An increased coverage or "umbrella" policy may be provided and utilized by either party to increase the coverage provided by individual or blanket policies in lower amounts, and the aggregate coverage provided by all such policies with respect to the limits required herein shall be satisfactory provided that such policies otherwise comply with the provisions of this paragraph 14.

28

U:\4242\cbrmain\RTNTNGTN\lease8.doc

(g)    <u>Waiver of Right of Recovery and Subrogation.</u>  To the extent that insurance proceeds are actually received in satisfaction of a loss which is required to be covered by insurance or is self-insured hereunder (with the deductible under any policy being deemed to be self-insured), Landlord and Tenant hereby waive any and all rights of recovery against each other for any loss or damage to any area on the Shopping Center or Adjacent Center which is required to be insured by the other party, or the contents contained therein, for loss of income on account of fire or other casualty, or for injury sustained on any such area; and each party's aforesaid policies of insurance shall contain appropriate provisions recognizing this mutual release and waiving all rights of subrogation by the respective insurance carriers.

(h)    <u>Evidence of Insurance.</u>  Subject to each party's right to self-insure hereunder, upon (i) commencement of the Main Term (as to property insurance), (ii) upon the Effective Date (as to liability insurance) and (iii) prior to expiration thereof, Tenant and Landlord shall cause to be issued to each other in lieu of the original policy, a duplicate of such policy or appropriate certificates of insurance reasonably acceptable to the other party and evidencing compliance with the applicable covenants of this paragraph 14. Each such certificate shall provide that coverage shall not be cancelled without thirty (30) days notice to the certificate-holder (and any Mortgagee, if applicable).

(i)    <u>Indemnities.</u>  Except if arising from the negligent or willful acts of Landlord or its agents or employees (to the extent that paragraph 14(g) is inapplicable thereto), Tenant hereby agrees to indemnify, defend and hold Landlord harmless from all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring on the Easement Area and/or the Premises or resulting from the use thereof by Tenant, its agents or employees.

Except if arising from the negligent or willful acts of Tenant or its agents or employees (to the extent that paragraph 14(g) is inapplicable thereto), Landlord agrees to indemnify, defend and hold Tenant harmless from any and all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring in, on or around the Landlord's Premises and the Adjacent Center (exclusive of the Easement Area), or other buildings within Landlord's Premises or resulting from the use thereof by

29

UM347:deimih:HUNTINGTN:leaseA.doc

Landlord, its agents or employees.

15.    Damages by Fire or Other Casualty.

(a)    Damages Occurring Other Than During Last Five Years of Renewal
Option.

Landlord's Restoration Area shall mean the portion of the Shopping Center depicted as
"Landlord's Restoration Area" on the Site Plan (the "LRA"). In the event of an insured fire,
earthquake or other casualty, causing destruction or damage to the Improvements, Common
Areas and/or the LRA, other than during the last five (5) years of any Renewal Option, this
Lease shall not terminate except as expressly set forth herein, and Base Rent, Interim Rent, and
all other charges shall continue to be paid by Tenant pursuant to the terms hereof. Within a
reasonable time after such casualty, subject to force majeure, applicable building codes , the
procurement of building permits and the receipt of insurance proceeds (unless self-insured) to
the extent of the damage to the Premises, or the Common Areas or the LRA, as applicable,
Tenant shall complete reconstruction of the Building and Other Improvements on the Land
and/or the Easement Area, and Landlord shall complete reconstruction of the Common Areas
on the Tenant's Preferred Area and the LRA to that condition existing immediately prior to
such casualty, in the reconstructing party's reasonable discretion, with, in event of any Tenant
reconstruction, such alterations as may be permitted under paragraph 12 hereof. In the event,
subject to force majeure, the Premises, Common Areas and/or LRA, as applicable, are not
substantially repaired and reconstructed, and equipment, furniture and fixtures restored or
replaced, by the party with repair and restoration obligations within two hundred forty (240)
days after receipt of any required governmental permits, for which permits the party with repair
obligations shall make prompt application following such destruction or damage, and insurance
proceeds (if not self-insured), and such party is not diligently undertaking such restoration, then
the other party, at its option, by giving written notice to the party with repair obligation, within
thirty (30) days after the expiration of said period, may undertake completion of such
reconstruction, in which event the party with repair obligations shall make available to the
notifying party all insurance proceeds received by the non-performing party for such
reconstruction (including any applicable deductible) or, if self-insured, the amount necessary for

30

U:\347\draft\HUNTNGTN\exec3.doc

such reconstruction.

      (b)    <u>Last Five (5) Years of First Option Period or Any Subsequent Option Period.</u>  Notwithstanding the foregoing, if any such damage or destruction occurs within the last five (5) years of the first Option Period or at any time during any subsequent Option Period and has a repair and reconstruction cost of twenty-five percent (25%) or more of the then total reconstruction cost of the Improvements, Tenant shall be under no obligation to restore the Improvements, in which case this Lease shall terminate at Tenant's option, such option to be exercised by Tenant giving not less than thirty (30) days' prior written notice to Landlord, and Landlord shall receive the amount necessary for reconstruction of the Improvements, to the extent such amount would have been payable under insurance as outlined herein.

      (c)    <u>Tenant's Termination Right.</u>  Notwithstanding anything to the contrary provided in this Lease, Tenant shall have the right to terminate this Lease following a casualty of the Premises which has repair and reconstruction cost of forty percent (40%) or more of the then total reconstruction cost of the Improvements, if following such casualty Landlord cannot demonstrate to Tenant's reasonable satisfaction that the improvements in the LRA will be rebuilt within six (6) months following the date on which Tenant reopens its Premises for business.

    16.    <u>Condemnation.</u>

      (a)    <u>Definition of Taking and Substantial Taking.</u>  For the purpose of this Lease, a "Taking" shall mean any condemnation or exercise of the power of eminent domain by any authority vested with such power or any other taking for public use, including a private purchase in lieu of condemnation by an authority vested with the power of eminent domain; the "Date of Taking" shall mean the earlier of the date upon which title to the Premises, the Shopping Center, the Easement Area, the Tenant's Preferred Area or any portion thereof so taken is vested in the condemning authority or the date upon which possession of the Premises, the Shopping Center, the Easement Area, the Tenant's Preferred Area or any portion thereof is taken by the condemning authority; and "Substantially All of the Premises" shall mean (i) so much of the Improvements and/or Shopping Center, the Easement Area and the Tenant's Preferred Area as, when taken, leaves the untaken portion unsuitable, in Tenant's reasonable

31

opinion, for the continued feasible and economic operation of the Premises by Tenant for the same purposes as immediately prior to such Taking or as contemplated herein, or (ii) so much of the Common Area Easement described in paragraph 6(b) above that access to the Premises is permanently impeded.

(b)    Tenant's Rights Upon Taking or Substantial Taking.  In the event of a Taking of Substantially All of the Premises, Tenant, at its option upon thirty (30) days' written notice to Landlord, which shall be given no later than sixty (60) days following the Taking, shall have the right to terminate this Lease.  All Base Rent and other sums payable by Tenant hereunder shall be apportioned and paid through and including the Date of Taking, and neither Landlord nor Tenant shall have any rights in any compensation or damages payable to the other in connection with such Taking.

(c)    Tenant's Rights Upon Less Than Substantial Taking.  In the event of a Taking of less than Substantially All of the Premises that has had an adverse affect on operations of the Premises by Tenant, Base Rent and other charges shall be reduced fairly and equitably in accordance with the portion condemned or taken, effective as of the Date of Taking, and Tenant shall make all necessary restorations to the Improvements so that the portions of the Improvements not taken constitute a complete architectural unit, provided that the cost thereof to Tenant shall not exceed the proceeds of Tenant's condemnation award (to the extent that such relates to the Improvements and not to Tenant's personal property, intangibles or out-of-pocket expenses unrelated thereto) and the portion of Landlord's award allocable to the Premises (to the extent that such relates to improvements constructed on the Premises versus the income stream generated to Landlord by the Premises), which Landlord shall make available to Tenant for such restoration.

If such Taking occurs within the last two (2) years of the Main Term or of any Option Period and has a material impact on Tenant's ability to conduct business as reasonably determined by Tenant, this Lease shall terminate at Tenant's option, such option to be exercised by Tenant giving not less than thirty (30) days' prior written notice to Landlord.

(d)    Landlord's Obligations Upon Any Taking.  In the event of any Taking following which the Lease continues in effect, Landlord shall make all necessary restorations to

32

U:\4342\closing\HUNTINGTN\lease8.doc

all portions of the Common Areas on the Landlord's Premises, the Tenant's Preferred Area and the LRA such that they each constitute a complete architectural unit and serve the function originally intended.

(e)    Rights Upon Temporary Taking.  In the event of a Taking of the Premises, the Easement Area, the Tenant's Preferred Area and/or the Common Areas on the Shopping Center, or any portion thereof, for temporary use (specifically one not exceeding one hundred twenty (120) days in duration), without the taking of the fee simple title thereto, this Lease shall remain in full force and effect.  All awards, damages, compensation and proceeds payable by the condemnor by reason of such Taking relating to the Premises, or relating to the Common Areas but reasonably attributable to the Premises, for periods prior to the expiration of the Lease shall be payable to Tenant.  All such awards, damages, compensation and proceeds for periods after the expiration of the Lease shall be payable to Landlord.  Anything contained herein to the contrary notwithstanding, a temporary Taking for any period in excess of one hundred twenty (120) days may, at Tenant's option, be deemed a permanent Taking and shall be governed by subparagraph (b) or (c) above, as applicable.

(f)    Taking of the Pylon Sign.  In the event of a taking, whether permanent or temporary, of the pylon sign (as contemplated by paragraph 8) on which Tenant has installed identification panels, Tenant shall receive all proceeds attributable to such Taking and Landlord shall use its best good faith efforts to provide within ninety (90) days a substitute site (reasonably acceptable to Tenant) therefor, located so as to be visible to vehicular traffic on the ring road of the Adjacent Center.  Tenant shall pay all costs of relocating and/or reconstructing its pylon sign.

(g)    Tenant's Right Upon Condemnation.  In the event of a Taking described in subparagraph (b) or (c) above, Tenant shall be entitled to claim compensation from the condemning authority for the value of its leasehold interest in the Premises, its unamortized leasehold improvements paid for by Tenant, relocation expenses and any other items to which Tenant is entitled under applicable law.

(h)    Anticipated Taking.  Tenant acknowledges and agrees that Landlord has advised Tenant of a contemplated Taking of all or part of the ring road and all or part of

33

V:\A\Pelms\HUNTNGTN\leas9.doc