

LOCATION: South Hill Mall

LEASE

Between

CIRCUIT CITY STORES, INC.

as Tenant

and

THE CAFARO NORTHWEST PARTNERSHIP

as Landlord

dated September 20, 2005

SOUTH HILL MALL
PUYALLUP, WASHINGTON

SH Circuit City Clean 091505



EXHIBIT
A

# TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| 1. | Leased Property | 1 |
| 2. | Construction of Building and Improvements | 1 |
| 3. | Lease Term | 2 |
| 4. | Rent | 4 |
| 5. | Operation of Shopping Center by Landlord | 8 |
| 6. | Easements | 9 |
| 7. | Common Areas and Common Area Maintenance | 11 |
| 8. | Signs and Communications Equipment | 13 |
| 9. | Taxes | 14 |
| 10. | Maintenance, Repairs and Replacements | 17 |
| 11. | Utility Service Provider; Payment of Utility Bills | 20 |
| 12. | Alterations | 20 |
| 13. | Mechanics' Liens | 21 |
| 14. | Insurance | 22 |
| 15. | Damages by Fire or Other Casualty | 28 |
| 16. | Condemnation | 29 |
| 17. | Assignment and Subletting | 31 |
| 18. | Use | 32 |
| 19. | Warranties, Representations and Covenants | 33 |
| 20. | Estoppel Certificates | 41 |
| 21. | Subordination, Non-Disturbance and Attornment | 41 |
| 22. | Tenant's Financing | 42 |
| 23. | Tenant's Property and Waiver of Landlord's Lien | 43 |
| 24. | Memorandum of Lease; Commencement Date Agreement | 44 |
| 25. | Expiration of Term and Holding Over | 44 |
| 26. | Force Majeure | 44 |
| 27. | Events of Tenant's Default | 45 |
| 28. | Landlord's Remedies | 45 |
| 29. | Events of Landlord's Default; Tenant's Remedies | 48 |
| 30. | Waiver | 51 |
| 31. | Compliance with Applicable Laws | 51 |
| 32. | Notices | 52 |
| 33. | Brokers | 53 |
| 34. | Miscellaneous | 53 |
| 35. | Construction, Operation and Reciprocal Easement Agreement | 55 |
| 36. | Confidentiality | 56 |
| 37. | Recapture Right Failure to Operate | 56 |

## EXHIBITS

"A"    Site Plan
"A-1"  Legal Description of the Shopping Center

"B"    Index of Definitions
"C"    Construction Provisions
"D"    Removable Trade Fixtures
"E"    Sign Plans and Criteria
"F"    Prohibited Activities, Permitted Encumbrances and Permitted Title Exceptions
"G"    Subordination, Non-Disturbance and Attornment Agreement
"H"    Memorandum of Lease
"I"    Commencement Date Agreement
"J"    Indemnification Agreement

JDC:TJM:rc 072005, 090605, 090905, 091505

[South Hill Mall ]

## LEASE

This LEASE is made as of the 20th day of September, 2005 by and between  THE CAFARO NORTHWEST PARTNERSHIP, an Ohio general partnership, having an address at 2445 Belmont Avenue, P.O. Box 2186, Youngstown, Ohio 44504-0186 ("Landlord"), and CIRCUIT CITY STORES , INC., a  Virginia corporation having an address at 9950 Mayland Drive, Richmond, Virginia 23233 ("Tenant").

### W I T N E S S E T H:

The parties hereto agree as follows:

1.    Leased Property.  Landlord leases to Tenant all those certain "Premises" (as defined in paragraph 2 and known as Unit No. 760),  as same are constructed, expanded or renovated on the parcel (the "Land") outlined in red on Exhibit "A" (the "Site Plan") attached hereto, together with the easements described in paragraph 6 below; located in the "Shopping Center" (herein so called and outlined in green on the Site Plan), located at  South Hill Mall Shopping Center, in the  City of Puyallup (the "City"), County of Pierce, State of  Washington (the "State"), shown on the Site Plan and described by metes and bounds legal description on Exhibit "A-1" attached hereto.    Landlord hereby grants to Tenant all of those certain rights, in common  with  others,  granted  Landlord  under  that  certain  Construction,  Operation  and Reciprocal Easement  Agreement dated December 8, 1987, and executed by Landlord, Target Corporation and Mervyn's  (the REA).  Landlord warrants to Tenant that no consents are required from the parties to the REA concerning the construction of the Premises and its initial use as contemplated herein. Landlord further warrants to Tenant that it will obtain any consents required of "Old Country Buffet", "Champs", and any other applicable parties (including governmental approvals relating to Landlord Work) with respect to the construction activities set forth in Exhibit "C". All of the Shopping Center, exclusive of the Premises, the parcel owned in fee by Target Corporation and the parcel owned in fee by Mervyn's, is "Landlord's Premises".

2.    Construction of Building and Improvements.  Commencing immediately upon "Delivery of the Land" (as defined in the Construction Provisions (herein so called) attached hereto as Exhibit "C" and incorporated herein by reference for all purposes), Tenant shall renovate and expand the  existing one-story retail building, which shall upon completion contain

1     approximately 27,043 square feet of ground-floor gross leasable area plus mezzanine, if any,

2     with provisions for car stereo installation facilities as shown on the Site Plan, initially for use as

3     a Circuit City Superstore (the "Building"), together with loading ramps, sidewalks and curbs,

4     concrete stoops and/or aprons, utility extensions from the point of connection by Tenant, utility

5     meters, electric transformer, loading dock, trash compactor, transformer pad and other such

6     appurtenances and improvements, as well as Tenant's shopping cart corrals (Landlord represents

7     to Tenant that such corrals are permitted pursuant to the REA) (collectively, the "Other

8     Improvements"), as more particularly set forth in the Construction Provisions. The Building and

9     Other Improvements are sometimes collectively referred to herein as the "Improvements". As

10     more particularly set forth in the Construction Provisions, the Improvements shall be constructed

11     to completion by Tenant with due diligence in accordance with the "Plans and Specifications" to

12     be prepared by Tenant and approved by Landlord as specified in the Construction Provisions.

13     Those Improvements situated on the Land and the Land as shown on the Site Plan are referred to

14     herein as the "Premises". The Improvements and appurtenances thereto situated on the Land and

15     any permitted substitutions therefor shall be deemed affixed to and a part of the Premises, the

16     title to such improvements and appurtenances constructed by Tenant being in Tenant until the

17     payment by Landlord to Tenant of the Lease Incentive Payment (as provided in paragraph 4(d)

18     below), and upon such payment, title to all such improvements and appurtenances situated on the

19     Land shall automatically vest in Landlord.

20        Landlord represents to Tenant that the existing concrete slab floor, as of the Delivery of

21     the Land to Tenant, will be able to bear the weight of Tenant's typical store fixtures, inventory

22     rack system and inventory. If, as of the Delivery of the Land, such representation is not correct,

23     Landlord will reimburse Tenant the reasonable costs expended by Tenant to re-enforce such

24     concrete slab floor so as to cause such floor to bear the weight of Tenant's typical store fixtures,

25     inventory rack system and inventory, but only to the extent that such reasonable costs exceed

26     $75,000.00.

27        3.     Lease Term. Provided Landlord has delivered the Land to Tenant in the condition

28     set forth in the Construction Provisions, the construction term (the "Construction Term") of this

29     Lease shall commence upon such Delivery of the Land, which shall in no event be later than

30     February 28, 2006 (the "Effective Date"), and shall end on the "Commencement Date" (as

1    defined in paragraph 4 below). The main term (the "Main Term") of the Lease shall commence

2    on the Commencement Date and shall end on the last day of January following the fifteenth

3    (15th) anniversary of the Commencement Date.

4         In addition to the Main Term, Tenant shall have the option (each such right referred to

5    herein as a "Renewal Option") to renew and extend the Lease for three (3) consecutive five (5)

6    year periods (each such period referred to as an "Option Period" and collectively as the "Option

7    Periods") immediately following the Main Term, at the rents specified below. Tenant shall give

8    Landlord written notice of its election to exercise any Renewal Option at least two hundred

9    seventy (270) days prior to the expiration of the Main Term or any then-current Option Period,

10   as applicable, provided, however, if, prior to the aforementioned two hundred seventy (270) day

11   period, Tenant does not give Landlord written notice of its intent not to exercise its renewal

12   option, Tenant's right to exercise such renewal option shall continue, as shall its tenancy

13   hereunder, until the (10) business days after Landlord has given Tenant written demand

14   ("Renewal Option Demand") that Tenant exercise such renewal option within ten (10) business

15   days of Tenant's receipt of such demand or forfeit its right to exercise such renewal option,

16   during which ten (10) business day period Tenant may exercise its renewal option, whereupon

17   the Term (defined below) of this Lease shall be renewed and extended as if such notice had been

18   given prior to the two hundred seventy (270) day period described above. Landlord may request

19   in a written notice delivered to Tenant at any time within four hundred and fifty (450) days prior

20   to the expiration of the Main Term or any then-current Option Period that Tenant notify

21   Landlord whether it has decided to exercise the next accruing Renewal Option; provided,

22   however, if Tenant does not   respond in writing to any such  Landlord request within two

23   hundred  eighty (280) days prior to the expiration of the Main Term or any then-current Option

24   Period, then Landlord shall be required to give  the  Renewal Option  Demand in accordance

25   with the immediately preceding sentence.

26        Notwithstanding anything to the contrary provided in this paragraph 3, Tenant may not

27   exercise its option hereunder if, at the time of such exercise, (i) Tenant is in default of an

28   obligation hereunder to make any payment of money required by this Lease and has failed to

29   cure such default within the applicable notice period, or (ii) Tenant is in default with respect to

30   the observance or performance of any material non-monetary provision of this Lease and has

SH CircuitCity Clean 091505Clean 091505                    3

1   failed to cure such default within the applicable cure periods set forth in paragraph 27(ii) below,

2   or (iii) Tenant is not open for business in the Premises (excluding a temporary closing following

3   a casualty or condemnation, a temporary closing in connection with the remodeling of the

4   Premises, a temporary closing in connection with the subletting or assignment of the Premises or

5   any other temporary closing provided that, in each instance, Tenant delivers evidence reasonably

6   satisfactory to Landlord that the Premises will reopen for business prior to commencement of the

7   applicable Option Term).

8       The Construction Term, Main Term and Option Periods are, collectively, the "Term".

9   The term "Lease Year" shall mean each successive period of twelve (12) consecutive calendar

10  months, commencing on the first day of each February during the Term, except that the first

11  Lease Year shall commence on the Commencement Date and shall end on the last day of January

12  following the first anniversary of the Commencement Date.

13      4.    Rent.

14          (a)    Construction Term.  During the Construction Term, Tenant shall pay no

15  rent or Real Estate Taxes, Insurance Charges or CAM Charges or any other similar costs, fees,

16  rentals or expenses.

17          (b)    Interim Rent.  Tenant agrees to pay Interim Rent ("Interim Rent") for the

18  Premises in the amount of  THREE HUNDRED  TWELVE THOUSAND  SIX HUNDRED

19  SEVENTEEN AND 00/100 DOLLARS ($312,617.00) per annum (calculated at the rate of

20  Eleven and 56/100 Dollars ($11.56) per square foot of the ground-floor gross leasable area of the

21  Building, as shown on the Plans and Specifications and adjusted in accordance with paragraph

22  4(c)(ii) below) commencing upon the "Commencement Date" which is the first to occur, of (i)

23  one hundred eighty (180) days following the beginning of the Construction Term, or (ii) the date

24  of Tenant's initial opening for business of the Premises, and ending on the "Base Rent

25  Commencement Date".  Until the commencement of the Base Rent Commencement Date, the

26  Interim Rent shall be increased at the rate of 10% on the fifth (5th) anniversary of the

27  Commencement Date and, thereafter by an additional 10% of the amount payable during the

28  immediately preceding period, on each five (5) year anniversary of the Commencement Date

29  until the occurrence of the Base Rent Commencement Date.  The "Base Rent Commencement

30  Date" shall occur upon the payment by Landlord of the Lease Incentive Payment (as defined in

1   paragraph 4(d) below). Subject to the adjustments set forth above, Tenant shall pay Interim Rent

2   in equal monthly installments of TWENTY-SIX THOUSAND FIFTY-ONE AND 42/100

3   DOLLARS ($26,051.42), in advance on the first day of each calendar month, with appropriate

4   proration for any partial calendar month, to the address given for Landlord in paragraph 32

5   below.

6            (c)    Base Rent. Tenant agrees to pay base rent ("Base Rent") for the Premises

7   in the amounts and in the manner specified hereunder (subject to 4(d) below), commencing on

8   the Base Rent Commencement Date.

9            Landlord shall give Tenant written notice of a change of address or change of the party to

10  whom such rents shall be payable along with written documentation reasonably satisfactory to

11  Tenant of such party's right to receive payment hereunder. Unless adjusted as provided below or

12  in the Construction Provisions, Base Rent shall be paid in equal monthly installments in advance

13  on the first day of each succeeding calendar month throughout the Term with appropriate

14  proration for any partial calendar month, to the address given for Landlord in paragraph 32,

15  pursuant to the following schedule:

16           (i)    Base Rent Schedule.

| Months Following Commencement Date | Rate PSF | *Annual Rent | Monthly Installments |
|---|---|---|---|
| From Base Rent Commencement Date thru 60th month after Commencement Date | $15.00 | $405,645.00 | $33,803.75 |
| From 61st month after Commencement Date thru 120th month after Commencement Date | 16.50 | $446,209.56 | $37,184.13 |
| 121-180** | 18.15 | $490,830.48 | $40,902.54 |
| 181-240** | 19.97 | $540,048.72 | $45,004.06 |
| 241-300** | 21.97 | $594,134.76 | $49,511.23 |
| 301- end of last Option Period, if exercised | 24.17 | $653,629.32 | $54,469.11 |

\* assumes initial rental rate of $15.00 PSF and 10% cumulative increases to Base Annual Rent every sixty (60) months during the Main Term, and ten percent (10%) cumulative increases to Base Annual Rent for each Option Period (if exercised).

\*\*Months after Commencement Date.

    (ii)    <u>Adjustment in Base Rent.</u> Notwithstanding the Base Rent provisions, in the event that the ground-floor gross leasable area of the Building when constructed exceeds 27,043 square feet, annual Base Rent on the Base Rent Commencement Date through the end of the sixtieth (60th) month following the Commencement Date shall be the product of the actual ground-floor gross leasable area of the Building (as shown on the as-built survey in the Plans and Specifications), multiplied by $15.00 and with this Annual Rent increased by 10% at the end of the sixtieth (60th) month following the Commencement Date and by an additional 10% of the amount payable during the immediately preceding period at the end of every sixtieth (60th) month during the Main Term, and ten percent (10%) of the amount payable during the immediately preceding period for each Option Period (if exercised). Notwithstanding the Interim Rent provisions, in the event that the ground-floor gross leasable area of the Building when constructed exceeds Twenty-seven Thousand Forty-three (27,043) square feet, Interim Rent on the Commencement Date through the Base Rent Commencement Date shall be the product of the actual ground-floor gross leasable area of the Building (as shown on the as-built survey in the Plans and Specifications) multiplied by Eleven and 56/100 Dollars ($11.56) and with this per square foot rate increased by 10% at the end of every sixtieth (60th) month during the Main Term and Option Periods (if exercised) . In determining the ground-floor gross leasable area, measurements shall be made in accordance with the specifications set forth in paragraph 9(b) below.

    (d)    <u>Lease Incentive Payment.</u> Upon Substantial Completion (as defined in Paragraph 2(f) of Exhibit "C") and (i) Tenant's furnishing to Landlord the certificates of insurance required under paragraph 14 of this Lease, (ii) Tenant's furnishing to Landlord and, if requested, Landlord's title insurance company, an indemnity in the form of Exhibit "J" attached hereto against any exception in Landlord's or its Mortgagee's policy of title insurance with respect to mechanics' liens arising out of Tenant's construction, (iii) Tenant's furnishing to Landlord, if required by Landlord, a statement from Tenant to Landlord that, upon the payment by Landlord to Tenant of the Lease Incentive Payment [as provided in this paragraph 4(d) ] Landlord will hold title to the leasehold improvements (in form reasonably acceptable to Landlord and Tenant), (iv) Tenant's initial opening for business, (v) Tenant's payment to

1    Landlord of any Interim Rent and all other charges to the extent then due and payable, and (vi)
2    Tenant's furnishing to Landlord a certification of Tenant's construction manager, certifying to
3    Landlord that Substantial Completion has occurred (the date upon which all of the foregoing are
4    satisfied shall be known as the "Lease Incentive Payment Qualification Date"), Landlord shall
5    pay to Tenant a Lease Incentive Payment in an amount equal to ($30.00) per square foot of
6    ground-floor area of the Building, as constructed, less a credit of Ten Thousand Three Hundred
7    Fifty-nine and 88/100 Dollars ($10,359.88) for a portion of Landlord's costs in connection with
8    the demising wall separating the Premises from the adjacent Unit No. 600, payable by wire
9    transfer of funds by Landlord to Tenant's account, no later than thirty (30) days after the Lease
10   Incentive Payment Qualification Date. If the Base Rent is increased pursuant to paragraph
11   4(c)(ii) of the Lease, the Lease Incentive Payment shall likewise be proportionately increased. If
12   the Lease Incentive Payment Qualification Date has not occurred within one (1) year following
13   the Commencement Date, unless such is due to the fault of Landlord, the action of other tenants
14   in the Shopping Center or force majeure (as defined in paragraph 26 below), then Tenant shall
15   have no further right to the Lease Incentive Payment and Tenant shall pay the Interim Rent for
16   the remainder of the Term, and references herein to the "Base Rent" shall, thereafter, be deemed
17   to refer to the Interim Rent. Landlord acknowledges that such one (1) year period shall be
18   extended to the extent of any delays arising out of the fault of Landlord, the actions of other
19   tenants in the Shopping Center, or force majeure. If Landlord fails to pay the Lease Incentive
20   Payment in full within thirty (30) days after the Lease Incentive Payment Qualification Date,
21   then Tenant shall notify Landlord of such failure. In the event that Landlord fails to pay the
22   Lease Incentive Payment within five (5) days of receipt of such notice, then any such unpaid
23   amount shall accrue interest at the Default Rate from the Lease Incentive Payment Qualification
24   Date to the date when Landlord delivers the Lease Incentive Payment to Tenant. If Landlord has
25   not tendered payment of the Lease Incentive Payment by the date which is one (1) year after the
26   Lease Incentive Payment Qualification Date (the "Lease Incentive Payment Qualification Date
27   Anniversary"), then, Interim Rent shall be reduced to One Hundred Fifteen Thousand and
28   00/100 Dollars ($115,000.00) per annum during the first year following the first anniversary of
29   the Lease Incentive Payment Qualification Date, Seventy-Six Thousand and 00/100 Dollars
30   ($76,000.00) per annum during the year following the second anniversary of the Lease Incentive

1   Payment Qualification Date, and Thirty-Eight Thousand and 00/100 Dollars ($38,000.00) per

2   annum thereafter until the date Landlord tenders payment of the Lease Incentive Payment.

3   Landlord and Tenant covenant and agree that, if the Lease Incentive Payment Qualification Date

4   has occurred but the Lease Incentive Payment has not been disbursed, upon the reasonable

5   written request of either the Tenant or Landlord, the Landlord and Tenant shall execute such

6   documentation as necessary to formalize the modification of Interim Rent as stated above upon

7   the first anniversary of the Lease Incentive Payment Qualification Date.

8        Notwithstanding the foregoing, at any time following the thirtieth (30th) day after the

9   Lease Incentive Payment Qualification Date Anniversary and upon the failure of Landlord to pay

10   the Lease Incentive Payment within fifteen (15) days of receipt of notice from Tenant of such

11   failure, Tenant shall have the right at Tenant's sole election, but not the obligation, in lieu of any

12   subsequent obligation that Landlord pay to Tenant the Lease Incentive Payment, to mortgage,

13   sell, convey, assign, lease or otherwise encumber (collectively, a "Post-Completion Transfer")

14   Tenant's interest in the improvements which were constructed by Tenant and the Lease. Such

15   right shall be in addition to the rights of Tenant set forth in paragraphs 17 and 22 of the Lease.

16   Such sale, conveyance, assignment, lease, mortgage or encumbrance shall relate merely to

17   Tenant's leasehold interest and/or any improvements constructed by Tenant. At all times, any

18   such sale, conveyance, assignment, lease, mortgage or encumbrance shall be subordinate to

19   Landlord's interest in the fee and those improvements not constructed by Tenant, and subject to

20   all of the terms of this Lease. Upon the expiration of this Lease, the termination of this Lease, or

21   the termination of Tenant's right of possession, the improvements which were constructed by

22   Tenant shall become the property of the Landlord, free and clear of any such sale, conveyance,

23   assignment, lease, mortgage or encumbrance.

24        Landlord covenants to (i) execute all documents necessary to permit Tenant to effect the

25   Post-Completion Transfer described herein, and (ii) cause any Mortgagee to specifically

26   acknowledge the rights of Tenant's lender and third parties arising as a result of such Post-

27   Completion Transfer. Notwithstanding such Post-Completion Transfer, Tenant shall continue to

28   pay the ground rentals described in this paragraph 4(d) during the remainder of the Term.

29        5.   Operation of Shopping Center by Landlord.  Landlord covenants to operate a

30   first-class shopping center. All future development of the Landlord's Premises will be consistent

1   with a first-class shopping center. Landlord shall construct no buildings in Tenant's Preferred

2   Area. Except as otherwise provided in paragraph 16 below, the number of parking spaces for the

3   Shopping Center shall at all times be at least as shown on the Site Plan, but in no event shall the

4   parking ratio for the Shopping Center be less than 4.00 cars per 1,000 square feet. All parking

5   shall be at ground level. The parking ratio in Tenant's Preferred Area (as identified on the Site

6   Plan) shall in no event be less than 5.25 cars per 1,000 square feet of gross leasable area of the

7   Building. Landlord shall construct or cause all improvements in the Shopping Center (other than

8   the Improvements to be constructed by Tenant) to be constructed in a good and workmanlike

9   manner, lien-free and Landlord agrees to indemnify, defend and hold Tenant harmless from any

10  loss or damage suffered by Tenant as a result of Landlord's construction, except to the extent

11  caused by Tenant's negligence. Landlord's construction shall not materially interfere with the

12  conduct of Tenant's business.

13      6.      Easements. Landlord and Tenant also grant to each other those nonexclusive

14  leasehold easements which shall run as covenants with Landlord's Premises and the Premises

15  during the Term, over Landlord's Premises and the Premises which are useful and appropriate

16  for the construction, operation and maintenance of Landlord's Premises and the Premises,

17  including but not limited to:

18          (a)     Construction Easements. During the Construction Term, and any period

19  of renovation or reconstruction thereafter, Landlord grants to Tenant (i) a nonexclusive easement

20  across a mutually agreeable designated route, providing access to and from the public roadways

21  nearest to the Land, over the Common Areas (as defined in paragraph 7(a) below) of the

22  Shopping Center for construction access to the Premises, as well as an exclusive temporary

23  easement for a construction staging area (the "Staging Area") of approximately 15,000 square

24  feet as shown on the Site Plan, solely for Tenant's use in initial construction of the

25  Improvements, (ii)  a non-exclusive easement to permit Tenant to access the exterior and

26. interior portions of the roofing system of the Common Area and the adjacent unit to perform

27  maintenance as required by this Lease (provided all such maintenance is performed according to

28  prevailing industry standards and Tenant is responsible for any and all damage caused thereby),

29  and (iii) an easement for the benefit of the Premises for such additional underground, public or

30  private utility, cable, fiber optic or other easements (within portions of Common Areas of the

1  Landlord's Premises  as reasonably permitted by Landlord) as Tenant deems necessary, without
2  unreasonably interfering with the use by Landlord of the Common Areas of the Shopping Center.
3  For the purpose of exercising the foregoing rights granted to Tenant, Tenant and/or the utility or
4  other service provider shall have the right to enter upon and use said Common Areas  to install
5  said utility systems for the benefit of the Premises, all of which utility systems are to be
6  underground, to such extent and so long as reasonably necessary to accomplish such purpose,
7  subject to restoration of said Common Areas by Tenant following such installation and any other
8  reasonable conditions and requirements imposed by Landlord such as location and depth.
9  During the Term Tenant grants to Landlord an easement for the benefit of Landlord's Premises
10 for such additional underground, public or private utility easements as Landlord deems
11 necessary, without unreasonably interfering with the use by Tenant of the Common Areas of the
12 Premises.  For the purpose of exercising the foregoing rights granted to Landlord, Landlord
13 and/or the utility provider shall have the right to enter upon and use said Common Areas to
14 install said utility systems for the benefit of Landlord's Premises, all of which utility systems are
15 to be underground, to the extent and so long as reasonably necessary to accomplish such
16 purpose, subject to restoration of said Common Areas by Landlord following such installation
17 and any other reasonable conditions and requirements imposed by Tenant such as location and
18 depth.

19        (b)    Common Area Easements.  In addition, during the Term Landlord grants
20 to Tenant a non-exclusive easement (the "Tenant Common Area Easement") to use the Common
21 Areas of the Shopping Center for their intended purposes and to permit Tenant and its
22 employees, agents, subtenants, assignees, licensees, suppliers, customers and invitees to use said
23 Common Areas for the purposes (without limitation) of parking and pedestrian service and
24 vehicular access, ingress and egress to, from and between the Premises and the Landlord's
25 Premises and the streets and highways abutting and adjacent to the Shopping Center , without
26 payment of any fee or other charge therefor except for the CAM charge.  Tenant shall be
27 permitted, at Tenant's sole cost and expense, to install up to four (4) shopping cart corrals on the
28 parking lot located within Tenant's Preferred Area (at mutually agreeable locations), and Tenant
29 shall be permitted to store its shopping carts outside of the Premises in such cart corrals.  Tenant
30 agrees to periodically remove its shopping carts from the Common Areas and to maintain said

1    cart corrals in good condition and repair.  Tenant acknowledges that it shall not permit overnight

2    truck or trailer storage on any portion of Landlord's Premises (except for the Construction Term,

3    during which overnight truck or trailer storage shall be permitted, if necessary, within the

4    Staging Area only).  None of the easements granted by the parties to this Lease is intended, nor

5    shall any of them be construed, as a dedication of any portion of the Shopping Center for public

6    use, and Landlord may take whatever reasonable steps  may be necessary to avoid such

7    dedication.

8         During the Term Tenant grants to Landlord a non-exclusive easement (the "Landlord

9    Common Area Easement") to use the Common Areas of the Premises for their intended purpose

10    and to permit Landlord and its respective employees, agents, tenants, assignees, licensees,

11    suppliers, customers and invitees to use said Common Areas for the purposes (without

12    limitation) of pedestrian service and access, ingress and egress to, from and between the

13    Premises and Landlord's Premises, without payment of any fee or other charge therefor.

14        7.    <u>Common Areas and Common Area Maintenance</u>.

15        (a)   <u>Definition of Common Areas</u>.  The term "Common Areas" shall be

16    defined to include, as they may from time to time exist, the parking areas, lanes, drives,

17    entrances, truck passageways, sidewalks, ramps, stairways, landscaped and other unpaved areas,

18    parking lot lighting facilities and equipment, Landlord's pylon sign(s), if any, directional, traffic

19    and monument sign structure(s) (excluding those dedicated exclusively to a Shopping Center

20    tenant or occupant) and shared utility facilities located in all elements of the Shopping Center

21    (including any such areas and facilities contained within the Land, outparcels and adjacent tracts

22    but reserved to the benefit of the Shopping Center occupants) and which are intended and

23    available for the common use of all of the tenants within the Shopping Center (including any

24    outparcel and other adjacent occupants which contribute toward "CAM Charges" (as defined

25    below) and which are not responsible for separate maintenance of such outparcels or tracts), their

26    subtenants, licensees, and business invitees. "Common Areas" exclude the Building.

27        (b)   <u>Landlord's Obligations</u>. Landlord shall be responsible for operating, maintaining,

28    repairing and replacing the Common Areas on Landlord's Premises in a first-class manner,

29    including:  cleaning, maintenance of Landlord's pylon and other sign structure(s), if any; snow

30    clearing,  plowing and ice treatment; removal of Common Area trash and garbage; illuminating ,

1  repairing, repaving and restriping the parking area ; maintaining, replanting and replacing
2  landscaping and landscaping sprinkler system (if any); repairing and maintaining storm drains,
3  sewers and other utility lines and facilities not dedicated to the public or owned by a private
4  utility company, which are necessary for the operation of the Shopping Center; providing
5  customary and reasonable security services; and maintaining all insurance required under this
6  Lease to be carried by Landlord, all such work on Landlord's Premises to be referred to
7  collectively as "Landlord's Common Area Maintenance". Landlord will maintain, or cause to be
8  maintained, the roof over the adjacent Unit No. 600 and any roof abutting or adjacent to the
9  Premises. Notwithstanding anything to the contrary set forth above, Tenant shall be responsible
10  to maintain, repair and replace its shopping cart corrals.

11      (c)   Tenant's Obligations.  Tenant shall be responsible for operating, maintaining,
12  repairing and replacing the Common Areas on the Premises in a first-class manner, including
13  cleaning, maintenance of any Improvements on said Common Areas; snow clearing, plowing and
14  ice treatment; and removal of Common Area trash and garbage.

15      (d)   Tenant Payments.  Commencing on the Commencement Date and continuing
16  until the first January 1st thereafter, Tenant shall pay to Landlord a fee of $2.00 per square foot of
17  ground-floor gross leasable area of the Building per annum (the "CAM Charge"), payable in
18  equal monthly installments in advance of the first day of each month, as its share of the cost
19  incurred by Landlord for Landlord's Common Area Maintenance. (The CAM Charge shall not
20  include the cost of Common Area liability insurance carried by Landlord, which cost shall be
21  paid in accordance with paragraph 14(e) below.) The CAM Charge shall increase on a
22  cumulative basis each January 1st by an amount equal to the product of the CAM charge payable
23  during the previous year multiplied by three percent (3%).  For any partial calendar year during
24  the Main Term, or any Option Period, the annual CAM Charge during such partial calendar year
25  shall be the product of the applicable CAM Charge times the number of months in such partial
26  calendar year, with appropriate proration for any partial calendar month therein.

27      The CAM Charge represents Tenant's total financial obligation to Landlord for
28  Landlord's Common Area Maintenance and the foregoing does not relieve Tenant of
29  responsibility for any repair of the Common Area on Landlord's Premises caused by damage
30  attributable to Tenant.

8.    <u>Signs and Communications Equipment</u>.

(a)    <u>Signs</u>.    Landlord and Tenant have reached a conceptual agreement concerning the location, number, composition, design and content of Tenant's initial signage. Tenant's initial signage shall consist of two (2) exterior building-mounted signs, one (1) interior mall storefront-mounted sign, and one (1) interior mall sign to be mounted above the center court. Landlord and Tenant shall hereafter agree upon the dimensions of such permitted initial signage. Once such dimensions are mutually agreed upon they shall be placed in this Lease as Exhibit E. Tenant shall be responsible for all maintenance, repairs and restoration of said signage including all wiring thereto.    Tenant, its successors, subtenants and assigns shall be entitled without Landlord's consent, but subject to governmental requirements, to replace any and all of its signs with signage consistent with Tenant's (or its successors', subtenants' or assigns') then-current prototypical sign plans provided that (i) such replacement signage solely identifies Tenant's (or its successors', subtenants', or assigns') tradename(s), does not increase the number of such signs in the aggregate or on any particular Building elevation, does not extend above the top of the parapet wall, and does not increase the size of the panels or the lettering on such previous signage and, (ii) if Tenant relocates such signage , such relocation is subject to Landlord's approval, which may be withheld in Landlord's sole discretion.  Except as provided above, any modification of Tenant's signage shall require Landlord's prior consent, which shall not be unreasonably withheld, delayed or conditioned. Tenant agrees to provide Landlord with design plans and specifications of any replacement signage permitted above upon installation thereof by Tenant.

Reference is made to the Third Amendment to the REA with specific reference to Section 17 thereof. Provided Tenant and Landlord agree to the terms and conditions of Tenant's appearance on the North Pylon Sign (as defined therein), Tenant shall occupy a panel on said North Pylon Sign in accordance with the terms and provisions of a separate agreement executed by and between Landlord and Tenant.

(b)    <u>Communications Equipment</u>.  Tenant may install, maintain and/or replace any satellite dishes, antennas and cellular and PCS towers and poles on the roof and/or the interior of the parapet of the Building as Tenant deems necessary or desirable, provided that any such installation, maintenance and/or replacement shall not adversely and materially affect the

1   roof or the structural elements thereof and are located, to the extent practicable, to minimize
2   visibility thereof from the Common Areas.  Upon removal by Tenant of any satellite dishes or
3   antennas, Tenant shall repair any damage done in connection with such removal.  To the extent
4   Tenant installs any satellite dishes or antennas on the roof Tenant shall maintain same and
5   indemnify Landlord from any and all costs and expenses, including reasonable attorneys' fees,
6   arising from injury sustained by persons as a result of the presence of such satellite dishes or
7   antennas.

8       9.    Taxes.

9       (a)    Taxes Contemplated Hereunder.  The term "Real Estate Taxes" shall mean
10  (i) all real estate taxes and assessments then payable, both general and special, and all ad valorem
11  taxes, rates and levies paid upon or with respect to the land, buildings and all other
12  improvements on the tax parcel in which the Premises are located (the "Tax Parcel"), (ii) rent
13  taxes or gross receipts taxes payable with respect to rental and other charges to be paid by Tenant
14  under the terms of this Lease, (iii) any business and occupation taxes payable with respect to the
15  . conduct by Tenant of its business at the Premises for a calendar year or a portion thereof to any
16  governmental agency or authority, and (iv) all charges specifically imposed in lieu of any such
17  taxes. Except as specifically provided in clauses (i)- (iv) above, nothing contained in this Lease
18  shall require Tenant to pay any local, county, municipal, state or federal income, franchise,
19  corporate, estate, inheritance, succession, capital levy, business or transfer tax of Landlord, or
20  any local, county, municipal, state or federal income, profits, gross receipts (other than with
21  respect to rental and other charges as contemplated in clauses (ii), (iii) and (iv) above), sales or
22  renewal tax or charge upon the rent or other charges payable by Tenant under this Lease (other
23  than with respect to rental and other charges as contemplated in clauses (ii), (iii) and (iv) above).
24  Further included within the definition of "Real Estate Taxes" are all reasonable expenses
25  incurred by Landlord in reviewing, negotiating, appealing or contesting such taxes or
26  assessments.  Tenant's pro rata share of Real Estate Taxes shall not be increased by any
27  additional charges or penalties incurred by Landlord due to late payment of Real Estate Taxes or
28  decreased by any reduction or abatement otherwise received by Landlord due to early payment
29  of Real Estate Taxes, if such early payment is made prior to the date Tenant pays Tenant's "Pro
30  Rata Share of Real Estate Taxes" (as defined below).

1    (b)    <u>Payment of Real Estate Taxes</u>.  Within the later of (i) thirty (30) days of
2    receipt of Landlord's invoice for Tenant's Pro Rata Share of Real Estate Taxes, together with a
3    copy of the tax bill on the basis of which such invoice was rendered, if Tenant requests such
4    copy, or (ii) sixty (60) days prior to date on which such tax bill is payable by Landlord, Tenant
5    shall pay "Tenant's Pro Rata Share of Real Estate Taxes" (as defined below) levied against the
6    Tax Parcel.  "Tenant's Pro Rata Share of Real Estate Taxes" shall always be the product of the
7    Real Estate Taxes multiplied by a fraction, the numerator of which is the number of square feet
8    of gross leasable area in the Building, and the denominator of which is the number of square feet
9    of gross leasable building area (excluding the area of any outside sales area exclusive to a single
10    occupant) in the Tax Parcel.  In determining the gross leasable area of any building in the
11    Shopping Center (including the Building), measurement shall be made from the center line of
12    any common walls and the outside of any exterior walls.  Increases in applicable floor areas shall
13    result in corresponding adjustments of Tenant's Pro Rata Share and shall result in changes in the
14    calculation of ancillary charges based upon square footage.

15    Landlord agrees that if, as a result of the inclusion in the Tax Parcel of buildings outside
16    the Shopping Center or buildings developed in the currently undeveloped portions of the
17    Shopping Center, which buildings are utilized for purposes not customarily included in a retail
18    shopping center, the per square foot cost to Tenant of its Pro Rata Share of Real Estate Taxes
19    materially exceeds the per square foot cost Tenant would pay in a comparable retail shopping
20    center in the Seattle-Tacoma, Washington area, Landlord will reduce Tenant's per square foot
21    cost of Real Estate Taxes to an amount consistent with that which would be payable in such
22    comparable retail shopping center.  In the event of a dispute between Landlord and Tenant as to
23    the appropriate per square foot cost for Tenant's Pro Rata Share of Real Estate Taxes, Landlord
24    and Tenant agree to submit such dispute to a tax service (national or local) selected by Landlord
25    and reasonably acceptable to Tenant with not less than five (5) years experience in handling tax
26    contests for retail properties in the Seattle-Tacoma, Washington area and agree to be bound by
27    such tax service's determination of what the per square foot cost of Real Estate Taxes is for
28    comparable retail centers in the Seattle-Tacoma, Washington area.  In no event shall Tenant be
29    obligated to pay as its Pro Rata Share of Real Estate Taxes an amount greater than its Pro Rata
30    Share of Real Estate Taxes as determined pursuant to the preceding paragraph.

1    Provided Tenant pays its Pro Rata Share of Real Estate Taxes prior to the date upon
2    which Landlord may receive early payment discounts, Tenant's Pro Rata Share of Real Estate
3    Taxes shall be net of any early payment discounts available at the time Tenant's payment is due.
4    Landlord shall pay, or cause the payment of, all Real Estate Taxes before any fine, penalty,
5    interest or cost may be added thereto, become due or be imposed by operation of law for the
6    nonpayment or late payment thereof.  Provided Tenant timely pays Tenant's Pro Rata Share of
7    Real Estate Taxes, in no event shall Tenant be liable for any discount forfeited or penalty
8    incurred as a result of late payment by another tenant or by Landlord. Real Estate Taxes shall be
9    prorated as of the Commencement Date and the expiration or earlier termination of this Lease,
10   and Landlord shall promptly return to Tenant any overpayment made by Tenant with respect to
11   the period prior to or subsequent to the Term.  Landlord shall remain primarily responsible for
12   such payment notwithstanding the fact that such payment may be made by a tenant of Landlord's
13   Premises or other third party pursuant to an agreement to which Tenant is not a party.   In
14   addition, should Landlord fail to pay such Real Estate Taxes before same become delinquent and
15   Tenant has a reasonable basis for concluding the governing taxing authority will, in the absence
16   of payment, foreclose its tax lien within forty-five (45) or less days, Tenant shall have the right,
17   at its election, to cure such failure by payment of delinquent Real Estate Taxes and any interest
18   and penalties due thereon and in such event Tenant may deduct the cost thereof, plus interest at
19   the Default Rate (defined in paragraph 28(a)), from the next installment(s) of Interim Rent or
20   Base Rent and other charges due hereunder.
21        (c)    Contest of Real Estate Taxes and/or Assessed Valuation of Property.
22   Tenant shall have the right, at Tenant's sole expense, to contest the amount or validity, or
23   otherwise seek an exemption or abatement, of any Real Estate Taxes or to seek a reduction in the
24   valuation of the Premises assessed for Real Estate Tax purposes, by appropriate proceedings
25   diligently conducted in good faith, provided that Tenant shall first have notified Landlord of its
26   intent to do so and Landlord shall have failed to notify Tenant in writing, within the earlier of (i)
27   thirty (30) days of receipt of Tenant's notice or (ii) the date which is ten (10) business days
28   before an appeal or contest must be filed, that Landlord intends to contest such Real Estate Taxes
29   or seek such a reduction.   In any instance where any such action or proceeding is being
30   undertaken by Tenant, Landlord shall cooperate with Tenant, execute any and all documents

1    reasonably required in connection therewith and, if required by any law, rule or regulation of the

2    taxing authority, shall join with Tenant in the prosecution thereof at the expense of Tenant.

3        (d)    Payment Following Appeal.    If no payment of Real Estate Taxes was

4    required by the taxing authority during the pendency of the proceedings set forth in paragraph

5    (c), upon the termination of such proceedings, Tenant shall pay Tenant's Pro Rata Share of such

6    Real Estate Taxes as finally determined in such proceedings, the payment or partial payment of

7    which may have been deferred during the prosecution of such proceedings.    Tenant shall be

8    entitled to a refund from the appropriate taxing authority of any overpayment of Real Estate

9    Taxes relating or allocable to the Premises, as well as a reimbursement from the appropriate

10    taxing authority of all costs, fees and expenses it incurs in such protest or reassessment.    In the

11    event the Real Estate Taxes are increased as a result of Tenant's real estate tax contest and/or the

12    valuation or assessment of the Premises or Shopping Center increases due to Tenant's contest of

13    Real Estate Taxes and Landlord is prohibited from passing such increase on to the other tenants

14    in the Shopping Center, Tenant and any other tenant contesting such taxes shall be solely

15    responsible for the additional tax liability arising out of same and will hold Landlord harmless

16    therefrom; such additional tax obligation being deemed as additional rent.    In the event that

17    Tenant fails to pay any portion of its responsibility of Real Estate Taxes, such amount shall be

18    considered as additional rent and subject to all of the provisions of this Lease as to default in the

19    payment of rent.

20        10.    Maintenance, Repairs and Replacements.    Except (i) for condemnation proceeds

21    to be received by Tenant; (ii)  for repairs arising out of the negligent acts of Landlord, its agents

22    or employees; or (iii) as otherwise set forth in this Lease, Tenant shall be responsible for all

23    maintenance, repairs and replacements with respect to the Improvements.

24        If during the last three (3) years of any Option Period, Tenant is required to expend any

25    sum for a single item of maintenance, repair or replacement to the Building in excess of Ten

26    Thousand and No/100 Dollars ($10,000.00) (in 2005 Constant Dollars as hereinafter defined) in

27    satisfaction of its obligations hereunder (excluding expenditures incurred due to compliance with

28    laws), and if the resulting improvement to the Building is not permitted to be fully amortized in

29    accordance with generally accepted accounting principles or the Internal Revenue Code and

30    Regulations (utilizing an amortization period equal to the shortest useful life of the applicable

1  improvement), over the remainder of the Term (without consideration to the exercise of any
2  additional Renewal Options), then Tenant shall be reimbursed by Landlord in an amount equal to
3  fifty percent (50%) of that portion of the cost expended due to such maintenance, repairs or
4  replacement, but only to the extent that same is not permitted to be amortized during the
5  remainder of the Term (without consideration to the exercise of any additional Renewal Options)
6  as specified above.  Notwithstanding the foregoing, prior to incurring any expenditures pursuant
7  to the previous sentence which cannot be fully amortized over the remainder of the Term, Tenant
8  shall notify Landlord of the contemplated expenditure and, except in the case of an emergency
9  (e.g. a repair which, if not immediately undertaken, could (a) adversely affect Tenant's ability to
10 normally operate its business in the Premises, or (b) result in injury to persons or property),
11 Tenant shall not undertake the maintenance, repair or replacement for ten (10) business days
12 following delivery of such notice to Landlord.  During such ten (10) business day period, if
13 requested by Landlord, Tenant shall in good faith consider alternatives, if any, suggested by
14 Landlord to Tenant's contemplated expenditure (e.g. a less expensive repair versus replacement).
15 The foregoing shall not, however, require Tenant to accept or proceed with any alternative
16 suggested by Landlord, provided that Tenant in good faith evaluates the alternatives offered by
17 Landlord and in good faith offers reasonable explanations to support any rejection of Landlord's
18 proposed alternatives.

19      On or before the expiration of such ten (10) business day period, Landlord shall notify
20 Tenant whether or not it agrees to reimburse Tenant for one-half (1/2) of the unamortizable
21 portion of the cost of the contemplated expenditure in excess of Ten Thousand and No/100
22 Dollars ($10,000.00) (in 2005 Constant Dollars).  Landlord's failure to respond on a timely basis
23 shall be deemed its agreement to reimburse Tenant.  If Landlord notifies Tenant that it does not
24 agree to reimburse Tenant, (i) Landlord shall not be obligated to so reimburse Tenant, (ii) Tenant
25 shall not be obligated to make the repair, construction or alteration giving rise to the expenditure
26 and shall not be in default of its obligations under this Lease as a result thereof, and (iii) Tenant
27 shall, upon expiration of the Lease, have the right to remove the improvements made with the
28 unreimbursed expenditures (provided Tenant repairs any damage arising out of such removal and
29 such removal does not in and of itself create a dangerous condition which could cause injury to
30 persons or property).  However, if Tenant subsequently exercises an additional Renewal Option

SH CircuitCity Clean 091505Clean 091505            18

1   (a) if Landlord has reimbursed Tenant as provided above, then Tenant shall return to Landlord

2   the amount so reimbursed by Landlord, and (b) if, alternatively, Landlord had notified Tenant

3   that it would not agree to reimburse Tenant as provided above, then the provisions of items (ii)

4   and (iii) in this paragraph above shall be void and of no further force and effect as to the

5   applicable repair, construction or alteration.

6   Notwithstanding Tenant's responsibility for all maintenance, repairs, and replacements

7   with respect to the Improvements, and except as otherwise set forth in this Lease, Landlord shall

8   maintain the structural frame of the Building, including the structural frame which supports the

9   roof (but not the roof membrane, flashing nor drainage system therefor), the foundation system

10   of the Building and the structural elements of any load bearing walls; provided, however, that (i)

11   Landlord shall not be responsible for any maintenance, repairs or replacements to the structural

12   or non-structural elements of the Building arising from the negligent acts or omissions or willful

13   misconduct of Tenant (or its agents or employees) and (ii) Landlord's scope of responsibility

14   shall exclude those portions of the Building constructed or altered by Tenant (which repairs,

15   maintenance, and replacements, shall be the obligation of Tenant).   This provision is intended in

16   no way to limit Landlord's obligation to maintain, repair and replace any and all elements, both

17   structural and non-structural, of those portions of the Common Areas pursuant to the terms of

18   this Lease for which Landlord is responsible.

19   Should either party fail to perform its obligations under this paragraph 10 with respect to

20   the Building, the other party may, at its option, effect such maintenance, replacements or repairs,

21   provided that such curing party shall have given the non-performing party thirty (30) days prior

22   written notice, except in the case of emergencies (in which event only such notices as may be

23   reasonable under the circumstances shall be required); but further provided that such thirty (30)

24   day period (or reasonable period in event of emergencies) shall be extended in respect of any

25   cure that cannot with reasonable diligence be accomplished within such period so long as the

26   party required to effect such cure has commenced such cure within such thirty (30) day period

27   (or reasonable period in event of emergencies) and thereafter diligently prosecutes such cure to

28   completion.   The non-performing party shall reimburse the other party within twenty (20) days

29   of written demand for the reasonable and actual amount so expended (as evidenced by detailed

30   invoices), plus interest from and after such twentieth (20th) day at the Default Rate.   However, in

1    the event of emergency repairs, no interest shall accrue if reimbursed within thirty (30) days of
2    request (including detailed invoices) for reimbursement.    All maintenance, repairs or
3    replacements shall be done by Tenant or Landlord lien-free and in a good and workmanlike
4    manner consistent with the quality of labor and materials used in originally constructing the
5    Improvements and in accordance with all applicable law.    In order to enable Landlord and
6    Tenant to effectively perform their maintenance, repair and replacement obligations hereunder,
7    Tenant and Landlord, as applicable, shall provide to the other party any and all manufacturers'
8    and contractors' warranties relating to such work performed on behalf of the other party to the
9    party who is required to maintain same under the Lease.

10        11.    Utility Service Provider; Payment of Utility Bills.    Tenant shall be entitled,
11    subject to State law, to select the utility service provider which shall provide water, electric, gas,
12    cable, and telecommunication services to the Premises.    Tenant will pay directly to the
13    appropriate utility company or governmental agency, when due, all bills (which includes all
14    taxes levied or other charges on such utilities, including any governmental or utility charges
15    based on utility consumption, standby utility capacity or potential utility use, provided such taxes
16    and charges relate only to the Term and not to periods prior to the commencement or subsequent
17    to the expiration of the Term) for gas, water, sanitary sewer, electricity, telephone and other
18    public or private utilities used by Tenant .    If Landlord or any affiliate of Landlord shall supply
19    any such services, Tenant shall purchase same from Landlord at charges not in excess of the
20    charges for the services in question made by the unaffiliated utility corporation or governmental
21    agency which would otherwise be supplying such utilities to the Shopping Center.    Any such
22    charges for services supplied by Landlord, or charges for utilities which may be rebilled by the
23    Landlord, shall be due and payable as additional rent within thirty (30) days after billings
24    therefor are rendered to Tenant.    Landlord shall pay when due all utility charges incurred in the
25    operation of the Common Areas on Landlord's Premises .

26        12.    Alterations.    During the Term, Tenant shall have the right, at its discretion and its
27    sole cost, without Landlord's consent, to make any interior nonstructural alterations or
28    modifications it may desire.    In addition, with Landlord's consent, which shall not be
29    unreasonably withheld, conditioned or delayed, Tenant shall have the right, at its sole cost, to
30    alter, modify or reconstruct the exterior and/or structure of the Building or Other Improvements

1    ("Exterior or Structural Modification").    Landlord shall be deemed to have unreasonably

2    withheld its consent to any Exterior or Structural Modification requested by Tenant unless same

3    (i) increases the height of the Building; (ii) modifies the size of the Building or Other

4    Improvements; (iii) adversely affects the structural integrity of the Building; or (iv) where the

5    Shopping Center has an architectural theme (e.g. white sparkle stone) to which the other major

6    tenants in the Shopping Center conform, is materially inconsistent with the then-existing

7    architecture of the Shopping Center.    Notwithstanding anything to the contrary contained herein,

8    during the period of time that Circuit City Stores , Inc.  (or its successor by merger or

9    acquisition) is the occupant and operator of the Building (as opposed to a subsequent user,

10    sublessee or assignee), Landlord's consent shall not be required in connection with the

11    replacement or modification of the exterior entrance feature of the Building, provided that (i)

12    such replacement or modification is undertaken in order to bring such entrance feature into

13    conformity with the prototypical architectural design of entrance features then being utilized by

14    Tenant on a majority of its new or rehabilitated existing stores, (ii) the height of the entrance

15    feature will not exceed 34'(+/-), and (iii) the overall size of the entrance feature is not materially

16    increased.    Should Landlord's consent be required pursuant to this paragraph 12, conceptual

17    plans and specifications for such work shall be provided to Landlord prior to commencement of

18    any such work.    Landlord shall be deemed to have consented to such work if written notice of

19    disapproval, with reasons specified, is not received by Tenant within thirty (30) days following

20    Tenant's delivery of such plans and specifications to Landlord, provided Tenant's request for

21    approval references such thirty (30) day deemed approval period.    Without cost or expense to

22    Landlord, Landlord shall cooperate with Tenant, at Tenant's sole cost, in the obtaining of any

23    and all licenses, building permits, certificates of occupancy or other governmental approvals

24    which may be required in connection with any such modifications or alterations, and Landlord

25    shall execute, acknowledge and deliver any documents reasonably required in furtherance of

26    such purposes. If Tenant adds any mezzanine area(s), the square footage thereof shall increase

27    the basis upon which ancillary charges set forth in this Lease are assessed.

28         13.    Mechanics' Liens. Landlord and Tenant covenant to each other that they will not

29    permit any lien to be filed against the Premises or Shopping Center as a result of nonpayment for

1    or disputes with respect to labor or materials furnished to the Premises or the Shopping Center

2    for or on behalf of Tenant, Landlord or any party claiming by, through or under Tenant or

3    Landlord, nor shall either party permit any judgment, lien or attachment to lie, as applicable,

4    against the Premises or Shopping Center.  Should any lien of any nature, including but not

5    limited to the foregoing, be filed against the Premises or Shopping Center, the party on account

6    of whose actions such lien has been filed shall, within thirty (30) days after receipt of written

7    notice of such lien, cause said lien to be removed, or otherwise protected against execution

8    during good faith contest, by substitution of collateral, posting a bond therefor, escrowing of

9    adequate funds to cover the claim and related transaction costs or such other method as may be

10    permissible under applicable title insurance regulations and reasonably acceptable to the other

11    party hereto.  Notwithstanding the foregoing, Landlord shall not be required to remove a lien

12    unless such lien has priority over this Lease or adversely affects the tenancy rights of Tenant in

13    the Premises or Tenant's right to obtain financing secured by this Lease.

14          14.  Insurance.

15              (a)    Property Damage.  During the Construction Term, Tenant shall keep or

16    require its general contractor to keep, in full force and effect, a policy of builder's risk insurance

17    covering loss or damage to the Improvements for the full replacement value of all such

18    Improvements.  During the Main Term and all Option Periods, Tenant shall keep the Premises

19    insured against loss or damage by fire and the perils covered under standard "all risk" or "special

20    form" coverage in the amount of full replacement value of the Building, exclusive of excavation,

21    footings and foundations (which initial amount shall be not less than $3,000,000.00), with a

22    commercially reasonable deductible, for which Tenant shall be fully responsible.  Landlord and

23    Landlord's first "Mortgagee" (as defined in paragraph 21 below), shall be named in such policy

24    or policies as additional insureds and loss payees (but recognizing, however, Tenant's need to

25    use insurance proceeds to fulfill its restoration obligations) as their respective interests may

26    appear.  Landlord shall not construct, or permit to be constructed, any improvement in the

27    Shopping Center, nor conduct any activity, nor lease any property for or knowingly acquiesce in

28    the conduct of any activity, in the Shopping Center which will prevent Tenant from being able to

29    obtain insurance coverage at commercially reasonable rates. Should Landlord, in violation of the

30    preceding sentence, cause or permit any insurance rate increase to occur, Landlord will

1    reimburse Tenant for the additional premium required, subject to Tenant's right to self-insure (in
2    which event Landlord will contribute to Tenant's self insurance fund to cover increased actuarial
3    risks).

4        (b)    Liability Insurance.  During the Term, Tenant shall keep in full force a
5    policy of commercial general liability insurance with bodily injury and property damage
6    coverage with respect  the Premises and the business operated thereon by Tenant, which shall
7    name Landlord and Landlord's first Mortgagee as additional insureds as their respective interests
8    may appear.  The limits of such commercial general liability policy shall be not less than
9    $3,000,000.00 combined single limit for bodily injury and property damage, with a commercially
10    reasonable deductible.  Such liability insurance will provide coverage for exposures including,
11    but not limited to, (i) an accident occurring in, on or about the Premises; (ii) the sale or other
12    disposition of any good or service by Tenant; (iii) the consumption or existence on the Shopping
13    Center or the Premises of any product sold or otherwise disposed of by Tenant; (iv) any act or
14    omission of Tenant, its employees, servants, agent or invitees; and (v) broad form contractual
15    coverage in support of Tenant's indemnitees under this Lease.

16        (c)    Workers' Compensation Insurance.  To the extent required by law,
17    Landlord and Tenant shall maintain workers' compensation insurance covering their respective
18    employees in statutory limits, or maintain such alternate coverages or arrangements as legally
19    permissible.

20        (d)    Self-Insurance.  Notwithstanding anything to the contrary contained
21    herein, Tenant shall have the right to self-insure against any of the risks or portions thereof set
22    forth in subparagraphs (a) and (b) (and to the extent then permitted by law, (c)) above, provided
23    Tenant is then occupying the Premises and has a reported net worth, as of the end of Tenant's
24    most recent quarterly reporting period, of not less than One Hundred Twenty Million Dollars
25    ($120,000,000.00) [in "2005 Constant Dollars" as hereinafter defined].

26    As used in this Lease, the term "[in 2005 Constant Dollars]" shall mean and refer to the
27    amount of the proportionate increase or decrease for each year during the Term of this Lease in
28    the Consumer Price Index, All Urban Consumers (U.S. City Average), as compiled and
29    published by the Bureau of Labor Statistics, United States Department of Labor (the "Index"), or
30    any successor index thereto, appropriately adjusted.  In the event that the Index is converted to a

1    different standard reference base or otherwise revised, the determination of the adjustment to be

2    made with reference to the Index shall be made with the use of such conversion factor, formula

3    or table for converting the Index as may be published by the Bureau of Labor Statistics or, if said

4    Bureau shall not publish the same, then with the use of such conversion factor, formula or table

5    as may be published by Prentice Hall, Inc., or other nationally recognized publisher of similar

6    statistical information as may be agreed upon by the Landlord and Tenant. If the Index ceases to

7    be published, and there is no successor thereto, then a reasonable substitute index selected by

8    Landlord and approved by Tenant shall be utilized; or, if such a substitute index is not available

9    or may not lawfully be used for the purposes stated herein, then based upon a reliable

10    governmental or other nonpartisan publication, selected by Landlord and approved by Tenant,

11    evaluating changes in the cost of living or purchasing power of the consumer dollar, if such a

12    publication is available and may be lawfully used for the purposes stated herein.  For the

13    purposes of calculating fluctuations in the Index, the calendar month of the date of this Lease

14    shall be considered to be the base index date (the "Base Index").  With respect to the minimum

15    net worth requirement referred to in this paragraph 14(d) to which the Index Adjustment is to be

16    made, such amount shall for the purpose of calculating such adjustment be referred to in this

17    paragraph 14(d) as the "Base Amount" and the Base Amount, as adjusted by the application of

18    this paragraph 14(d), shall be referred to herein as the "Adjusted Amount".

19        The Adjusted Amount shall be determined as follows:

20        With respect to each time at which the Index Adjustment is to be made, the Base Amount

21    shall be increased or decreased to equal the product obtained by multiplying the Base Amount by

22    a fraction, the numerator of which is the Index for the most recent calendar month, and the

23    denominator of which is the Base Index.  For purposes of this paragraph 14(d), the Base Amount

24    utilized for any initial calculation made hereunder shall continue to be utilized as the Base

25    Amount for each subsequent application of this provision.

26        (e)    Common Area, Additional Area and Third Party Tenant Insurance and

27    Insurance During Landlord's Construction.  During the Term, Landlord shall keep in full force

28    and effect (or cause to be maintained), in form reasonably acceptable to Tenant, policies of (1)

29    commercial general liability insurance with respect to the Common Areas on the Landlord's

30    Premises and (2) property insurance insuring against loss or damage by fire and the perils

1   covered under standard "all risk" or "special form" coverage, with respect to the improvements

2   in the Common Areas on the Landlord's Premises and with respect to all other building areas on

3   the Landlord's Premises over which Landlord from time to time has present possessory rights (or

4   has the obligation under any lease to provide such insurance coverage) but which do not

5   constitute a portion of the Common Areas (such areas here sometimes collectively referred to as

6   the "Additional Areas"). The Additional Areas shall exclude the Premises and include, without

7   limitation: (i) as yet unconstructed portions of the Landlord's Premises intended for tenant

8   occupancy, (ii) constructed but unoccupied portions of the Landlord's Premises, (iii) vacated or

9   otherwise uninsured tenant space, whether by reason of lease expiration, default or otherwise,

10   and (iv) constructed and occupied portions of the Landlord's Premises. Said commercial general

11   liability policies shall name Tenant, and any lender, investor or other stakeholder which is

12   designated by Tenant from time to time, as an additional insured to the fullest extent Tenant and

13   such stakeholder have insurable interests. The limits of such policies shall be the same as those

14   set forth in subparagraphs (a) and (b) above, as applicable. Landlord may, with respect to its

15   insurance obligations, self-insure or utilize deductibles, provided Landlord is an affiliate of The

16   Cafaro Company and Landlord or the general partner of Landlord maintains a net worth, as of

17   the end of such entity's most recent fiscal year, of not less than $120,000,000.00 (in 2005

18   Constant Dollars), as certified by the Chief Financial Officer(s) of Cafaro Management

19   Company and of the entity to which the certification is applicable.

20          (f)     Commencing on the Commencement Date and continuing until the first

21   January 1st thereafter, Tenant shall pay an amount equal to the product of $.32 multiplied by the

22   ground-floor gross leasable area of the Building (as calculated pursuant to 9(b) above) (the

23   "Insurance Charge"). The Insurance Charge shall increase on each January 1st in direct

24   proportion to the increase of the cost to Landlord for the insurance coverages set forth in this

25   paragraph 14(e). In the event that the increase in said cost to Landlord is zero or less than zero,

26   then the Insurance Charge for the succeeding calendar year shall be the same as the charge

27   payable during the preceding calendar year. For any period within the Term which is less than a

28   full calendar year, the annual Insurance Charge shall be appropriately prorated. If the

29   information necessary to make the adjustment contemplated above is not available at the end of a

30   calendar year, Tenant shall continue to pay on an interim basis the then applicable Insurance

1    Charge. Upon receipt of the information required to make the adjustment contemplated above, a

2    necessary adjustment with respect to amounts previously paid by Tenant shall thereupon be

3    retroactively made, and the monthly payments to be made by Tenant from the first day of the

4    calendar year and for the remainder of the calendar year shall be established. If the criteria for

5    Landlord's self-insurance is not met then any deductible amount or self-insured retention for the

6    Common Area and the property insurance coverage shall be reasonable in amount given the

7    nature of the risk insured, the probable frequency of claims made under such coverage, and the

8    overall insurance program of Landlord and its affiliates. Landlord shall use diligent efforts to

9    assure (through parallel lease provisions or otherwise) that all areas of the Landlord's Premises,

10   including the Additional Areas and areas leased to third party tenants or sold to third party

11   occupants, are insured with substantially similar coverages to those required for the Premises and

12   the Common Areas on the Landlord's Premises, such that in the event of any destruction or

13   damage whatsoever to any portion of the Landlord's Premises, Tenant may have a reasonable

14   expectation that the Landlord's Premises will be reconstructed in equal or superior condition

15   within the time frame set forth in paragraph 15. During any period in which Landlord is

16   conducting construction activities at the Shopping Center, Landlord shall keep, or cause its

17   general contractor to keep, in full force and effect, with regard to the Shopping Center, in form

18   reasonably acceptable to Tenant, at least the minimum insurance coverages set forth below.

19         1)    Workers' Compensation - Statutory Limits; Employer's Liability -
20               $500,000;

21         2)    Automobile Liability for all vehicles with limits of $2,000,000; and

22         3)    Commercial General Liability to include premises operations and
23               products/completed operations coverage with limits of $2,000,000.

24         Additionally, Landlord shall keep or require its general contractor to keep in full

25   force and effect a policy of builder's risk insurance covering loss or damage to the Landlord's

26   Premises for eighty percent (80%) of the replacement value of all such construction, with

27   appropriate deductibles or self-insured retention.

28         (g)    Policy Provisions. All policies of insurance (other than self-insurance)

29   enumerated above shall be provided by insurance carriers with a Best rating of not less than A-

30   VIII. Any insurance coverage enumerated above may be effected by a blanket policy or policies

1    of insurance or under so-called "all risk" or "multi-peril" insurance policies, provided that the
2    total amount of insurance available with respect to the Premises and Tenant's or Landlord's
3    liability hereunder shall be at least the equivalent of separate policies in the amounts herein
4    required, and provided further that in other respects any such policy or policies shall comply with
5    the provisions of this paragraph 14.  An increased coverage or "umbrella" policy may be
6    provided and utilized by either party to increase the coverage provided by individual or blanket
7    policies in lower amounts, and the aggregate coverage provided by all such policies with respect
8    to the limits required herein shall be satisfactory provided that such policies otherwise comply
9    with the provisions of this paragraph 14.

10           (h)     Waiver of Right of Recovery and Subrogation.   To the extent that
11   insurance proceeds are actually received in satisfaction of a loss which is required to be covered
12   by insurance or is self-insured hereunder (with the deductible under any policy being deemed to
13   be self-insured), Landlord and Tenant hereby waive any and all rights of recovery against each
14   other for any loss or damage to any area on the Shopping Center which is required to be insured
15   by the other party, or the contents contained therein, for loss of income on account of fire or
16   other casualty, or for injury sustained on any such area; and each party's aforesaid policies of
17   insurance shall contain appropriate provisions recognizing this mutual release and waiving all
18   rights of subrogation by the respective insurance carriers.

19           (i)     Evidence of Insurance.   Subject to each party's right to self-insure
20   hereunder, upon (i) commencement of the Main Term (as to property insurance), (ii) upon the
21   Effective Date (as to liability insurance) and (iii) prior to expiration thereof, Tenant and Landlord
22   shall cause to be issued to each other in lieu of the original policy, a duplicate of such policy or
23   appropriate certificates of insurance reasonably acceptable to the other party and evidencing
24   compliance with the applicable covenants of this paragraph 14.  Each such certificate shall
25   provide that coverage shall not be cancelled without thirty (30) days notice to the certificate-
26   holder (and any Mortgagee, if applicable).

27           (j)     Indemnities.   Except if arising from the negligent or willful acts of
28   Landlord or its agents or employees (to the extent that paragraph 14(h) is inapplicable thereto),
29   Tenant hereby agrees to indemnify, defend and hold Landlord harmless from all claims, costs,
30   liability, damage or expense, including attorneys' fees, for any death, damage or injury to

1    persons or property occurring on the Premises or resulting from the use thereof by Tenant, its

2    agents or employees.

3    　　　Except if arising from the negligent or willful acts of Tenant or its agents or employees

4    (to the extent that paragraph 14(h) is inapplicable thereto), Landlord agrees to indemnify, defend

5    and hold Tenant harmless from any and all claims, costs, liability, damage or expense, including

6    attorneys' fees, for any death, damage or injury to persons or property occurring in, on or around

7    the Landlord's Premises, or other buildings within Landlord's Premises or resulting from the use

8    thereof by Landlord, its agents or employees.

9    　　　15.    Damages by Fire or Other Casualty.

10    　　　　　(a)    Damages Occurring During the Main Term.    Landlord's Restoration

11    Area shall mean the portion of the Shopping Center depicted as "Landlord's Restoration Area"

12    on the Site Plan (the "LRA").    In the event of an insured fire, earthquake or other casualty,

13    causing destruction or damage to the Improvements, Common Areas and/or the LRA, occurring

14    during the Main Term, this Lease shall not terminate except as expressly set forth herein, and

15    Base Rent, Interim Rent, and all other charges shall continue to be paid by Tenant pursuant to the

16    terms hereof.    Within a reasonable time after such casualty, subject to force majeure, applicable

17    building codes, the procurement of building permits and the receipt of insurance proceeds (unless

18    self-insured) to the extent of the damage to the Premises, or the Common Areas or the LRA, as

19    applicable, Tenant shall complete reconstruction of the Building and Other Improvements on the

20    Land, and Landlord shall complete reconstruction of the Common Areas on the Tenant's

21    Preferred Area and the LRA to that condition existing immediately prior to such casualty, in the

22    reconstructing party's reasonable discretion, with, in event of any Tenant reconstruction, such

23    alterations as may be permitted under paragraph 12 hereof.    In the event, subject to force

24    majeure, the Premises, Common Areas and/or LRA, as applicable, are not substantially repaired

25    and reconstructed, and equipment, furniture and fixtures restored or replaced, by the party with

26    repair and restoration obligations within two hundred forty (240) days after receipt of any

27    required governmental permits, for which permits the party with repair obligations shall make

28    prompt application following such destruction or damage, and insurance proceeds (if not self-

29    insured), and such party is not diligently undertaking such restoration, then the other party, at its

30    option, by giving written notice to the party with repair obligation, within thirty (30) days after

SH CircuitCity Clean 091505Clean 091505                28

1    the expiration of said period, may undertake completion of such reconstruction, in which event

2    the party with repair obligations shall make available to the notifying party all insurance

3    proceeds received by the non-performing party for such reconstruction (including any applicable

4    deductible) or, if self-insured, the amount necessary for such reconstruction.

5    (b)    Damages Occurring During Any Option Period.    Notwithstanding the

6    foregoing, if any such damage or destruction occurs during any Option Period and has a repair

7    and reconstruction cost of twenty-five percent (25%) or more of the then total reconstruction cost

8    of the Improvements, Tenant shall be under no obligation to restore the improvements, in which

9    case this Lease shall terminate at Tenant's option, such option to be exercised by Tenant giving

10    not less than thirty (30) days' prior written notice to Landlord, and Landlord shall receive the

11    amount necessary for reconstruction of the Improvements, to the extent such amount would have

12    been payable under insurance as outlined herein.

13    (c)    Tenant's Termination Right.    Notwithstanding anything to the contrary

14    provided in this Lease, Tenant shall have the right to terminate this Lease following a casualty of

15    the Premises which has repair and reconstruction cost of forty percent (40%) or more of the then

16    total reconstruction cost of the Improvements, if following such casualty Landlord cannot

17    demonstrate to Tenant's reasonable satisfaction that the improvements in the LRA will be rebuilt

18    within six (6) months following the date on which Tenant reopens its Premises for business.

19    16.    Condemnation.

20    (a)    Definition of Taking and Substantial Taking.    For the purpose of this

21    Lease, a "Taking" shall mean any condemnation or exercise of the power of eminent domain by

22    any authority vested with such power or any other taking for public use, including a private

23    purchase in lieu of condemnation by an authority vested with the power of eminent domain; the

24    "Date of Taking" shall mean the earlier of the date upon which title to the Premises, the

25    Shopping Center, the Tenant's Preferred Area or any portion thereof so taken is vested in the

26    condemning authority or the date upon which possession of the Premises, the Shopping Center,

27    the Tenant's Preferred Area or any portion thereof is taken by the condemning authority; and

28    "Substantially All of the Premises" shall mean (i) so much of the Improvements and/or Shopping

29    Center and the Tenant's Preferred Area as, when taken, leaves the untaken portion unsuitable, in

30    Tenant's reasonable opinion, for the continued feasible and economic operation of the Premises