1   by Tenant for the same purposes as immediately prior to such Taking or as contemplated herein,

2   or (ii) so much of the Tenant Common Area Easement described in paragraph 6(b) above that

3   access to the Premises is permanently impeded.

4        (b)    Tenant's Rights Upon Taking or Substantial Taking.  In the event of a

5   Taking of Substantially All of the Premises, Tenant, at its option upon thirty (30) days' written

6   notice to Landlord, which shall be given no later than sixty (60) days following the Taking, shall

7   have the right to terminate this Lease.  All Base Rent and other sums payable by Tenant

8   hereunder shall be apportioned and paid through and including the Date of Taking, and neither

9   Landlord nor Tenant shall have any rights in any compensation or damages payable to the other

10  in connection with such Taking.

11       (c)    Tenant's Rights Upon Less Than Substantial Taking.  In the event of a

12  Taking of less than Substantially All of the Premises that has had an adverse affect on operations

13  of the Premises by Tenant, Base Rent and other charges shall be reduced fairly and equitably in

14  accordance with the portion condemned or taken, effective as of the Date of Taking, and Tenant

15  shall make all necessary restorations to the Improvements so that the portions of the

16  Improvements not taken constitute a complete architectural unit, provided that the cost thereof to

17  Tenant shall not exceed the proceeds of Tenant's condemnation award (to the extent that such

18  relates to the Improvements and not to Tenant's personal property, intangibles or out-of-pocket

19  expenses unrelated thereto) and the portion of Landlord's award allocable to the Premises (to the

20  extent that such relates to improvements constructed on the Premises versus the income stream

21  generated to Landlord by the Premises), which Landlord shall make available to Tenant for such

22  restoration.

23      If such Taking occurs within the last two (2) years of the Main Term or of any Option

24  Period and has a material impact on Tenant's ability to conduct business as reasonably

25  determined by Tenant, this Lease shall terminate at Tenant's option, such option to be exercised

26  by Tenant giving not less than thirty (30) days' prior written notice to Landlord.

27       (d)    Landlord's Obligations Upon Any Taking.  In the event of any Taking

28  following which the Lease continues in effect, Landlord shall make all necessary restorations to

29  all portions of the Common Areas on the Landlord's Premises, the Tenant's Preferred Area and

30  the LRA such that they each constitute a complete architectural unit and serve the function

1    originally intended.  Additionally, Landlord shall assure (through parallel lease provisions or

2    otherwise) that all areas of the Shopping Center leased to third party tenants or sold to third party

3    occupants are subject to substantially similar reconstruction obligations to those of the Common

4    Areas on Landlord's Premises, the Tenant's Preferred Area and the LRA, such that in the event

5    of any condemnation of any portion of the Shopping Center whatsoever, and in the event Tenant

6    elects to maintain this Lease in force, Tenant shall be assured that the Shopping Center will be

7    reconstructed to its former conditions within a reasonable time.

8          (e)    Rights Upon Temporary Taking.  In the event of a Taking of the Premises,

9    the Tenant's Preferred Area and/or the Common Areas on the Shopping Center, or any portion

10    thereof, for temporary use (specifically one not exceeding one hundred twenty (120) days in

11    duration), without the taking of the fee simple title thereto, this Lease shall remain in full force

12    and effect.  All awards, damages, compensation and proceeds payable by the condemnor by

13    reason of such Taking relating to the Premises, or relating to the Common Areas but reasonably

14    attributable to the Premises, for periods prior to the expiration of the Lease shall be payable to

15    Tenant.  All such awards, damages, compensation and proceeds for periods after the expiration

16    of the Lease shall be payable to Landlord.    Anything contained herein to the contrary

17    notwithstanding, a temporary Taking for any period in excess of one hundred twenty (120) days

18    may, at Tenant's option, be deemed a permanent Taking and shall be governed by subparagraph

19    (b) or (c) above, as applicable.

20

21          (f)    Tenant's Right Upon Condemnation.  In the event of a Taking described

22    in subparagraph (b) or (c) above, Tenant shall be entitled to claim compensation from the

23    condemning authority for the value of its leasehold interest in the Premises, its unamortized

24    leasehold improvements paid for by Tenant, relocation expenses and any other items to which

25    Tenant is entitled under applicable law.

26          17.    Assignment and Subletting.  Tenant shall have the right to sublet, assign,

27    transfer, reassign and grant concessions or licenses (a "Transfer") in all or any part of the

28    Premises and any of Tenant's rights and obligations under this Lease during the Term, without

29    Landlord's prior consent; provided Tenant will notify Landlord of any such transfer within thirty

30    (30) days after it has been effected.  In the event of such a Transfer, Tenant and Guarantor shall

1   remain liable for all of Tenant's obligations to Landlord arising hereunder but shall not incur any

2   additional liability as a result of any change, modification or amendment to the Lease by

3   Landlord and any transferee. Transfers to subsidiaries, affiliates, or related parties, and Transfers

4   involving beneficial ownership interests in Tenant, shall not be deemed a Transfer hereunder and

5   same may be effected without Landlord's consent; provided Tenant will notify Landlord of any

6   such transfer within thirty (30) days after it has been effected.

7          18.   Use.

8          (a)   Tenant shall initially maintain, use and operate the Premises as a retail

9   store for (i) the sale of consumer, office and automotive electronics products (which include, but

10   shall not be limited to, televisions, stereos, speakers and video and audio recorders and players

11   and cameras), computer hardware and software and related software services, including internet

12   access services, entertainment software and entertainment media (which include, but shall not be

13   limited to, records, game cartridges, video tapes, cassettes and compact discs, DVD's and DVD

14   equipment), cellular and wireless telephones and telecommunication devices, and the sale and

15   installation of motor vehicle audio, stereo and telephone systems and technological evolutions of

16   the foregoing (all of such items and any related goods being herein collectively referred to as the

17   "Products"), and (ii) renting, servicing, repairing and warehousing of the Products.

18          (b)   Thereafter, Tenant shall have the right to use the Premises for any lawful

19   retail use; provided, however, that the Premises shall not be used (i) for more than two (2)

20   separate retail stores (with each separate store being operated under a single trade name), (ii) for

21   any illegal purpose, (iii) for any use prohibited under paragraph 19(a)(viii) entitled "Prohibited

22   Activities", (iv) in violation of any applicable provision of the "Permitted Encumbrances"

23   including any restrictive covenants, referenced in Exhibit "F", (v) for a primary use (other than

24   the Tenant's contemplated initial use of the Premises as set forth in subparagraph (a) above)

25   which is duplicative of a primary use then being conducted in the Shopping Center by another

26   occupant of the Shopping Center, or (vi) in violation of the REA. Furthermore, Tenant shall not

27   use or permit the Premises (or any subdivided portion of the Premises) to be used for a primary

28   use:

29              i.   As a jewelry store (except in connection with a permitted catalog
30                 store);

ii.    As a book superstore (only so long as a book superstore is operating in the Shopping Center in a building exceeding 8,500 square feet, and in such event such prohibition shall terminate upon such store's ceasing to operate as described above for a period of three hundred sixty-five (365) consecutive days, regardless of such store's subsequent re-opening);

iii.    As a supermarket;

iv.    As an office products store (only so long as there is an office products store open for business in the Shopping Center , and in such event such prohibition shall terminate upon such store's ceasing to operate for such use for a period of three hundred sixty-five (365) consecutive days, regardless of such store's subsequent re-opening);

v.    As a toy store (only so long as a toy store is open for business in the Shopping Center , and in such event such prohibition shall terminate upon such store's ceasing to operate for such use for a period of three hundred sixty-five (365) consecutive days, regardless of such store's subsequent re-opening);

vi.    As a discount drugstore (only so long as there is a discount drugstore open for business in the Shopping Center , and in such event such prohibition shall terminate upon such store's ceasing to operate for such use for a period of three hundred sixty-five (365) consecutive days, regardless of such store's subsequent re-opening);

vii.    As a restaurant and/or bar;

viii.    As a shoe store (only so long as there is a shoe store open for business in the Shopping Center , and in such event such prohibition shall terminate upon such store's ceasing to operate for such use for a period of three hundred sixty-five (365) consecutive days, regardless of such store's subsequent re-opening).

(c)    Except as may be expressly set forth in this paragraph 18, nothing contained in this Lease shall be construed to require Tenant to operate the Premises continuously but if used, such use will be in compliance with (a) or (b) above. Tenant shall be permitted to conduct temporary outdoor promotional sales on the Common Areas on Landlord's Premises only if (and only to the same extent as) other tenants or occupants of the buildings within the Shopping Center are permitted to conduct such sales.

19.    Warranties, Representations and Covenants.

(a)    Landlord represents, warrants and covenants to Tenant that:

1      (i)   <u>Quiet and Peaceful Enjoyment</u>.  Tenant shall have quiet and

2  peaceful use, enjoyment and occupancy of the Premises.

3      (ii)   <u>Title</u>.  As of the date of this Lease, Landlord's  fee simple interest

4  in the Landlord's Premises is free and clear of any mortgages, deeds, encumbrances,

5  declarations, easements, agreements; leases, tenancies or restrictions, except the REA and those

6  matters set forth on <u>Exhibit "F"</u> attached hereto and entitled "Permitted Encumbrances", or any

7  other encumbrances which would restrict Tenant's use of the Building for the sale of Products or

8  would restrict in any respect the right of Tenant, its employees, customers and invitees to use the

9  Common Areas in accordance with the terms of this Lease.  Landlord specifically covenants and

10  warrants that, subject to the exclusives granted to other occupants of the Shopping Center  set

11  forth on <u>Exhibit "F"</u>, no third party, including but not limited to any other occupant of the

12  Shopping Center , has the right to object to Tenant's tenancy hereunder (including, specifically,

13  its right to exercise the rights granted under this Lease and to operate its business in the

14  Premises), or to prohibit the selling, renting, servicing, repairing or warehousing of the Products,

15  or the right to consent to any feature of the Improvements or Tenant's signage.   The

16  representations, warranties, indemnifications and covenants contained in this paragraph are a

17  material inducement to Tenant's execution of this Lease.

18      (iii)   <u>Certificate of Authority</u>.  Landlord covenants that it is a duly

19  constituted general partnership under the laws of the State of Ohio, and that its authorized agent

20  who is acting as its signatory in this Lease is duly authorized and empowered to act for and on

21  behalf of the general partnership.  Landlord has furnished Tenant prior hereto with evidence of

22  (a) the existence of the general partnership, and (b) the authority of the agent to bind the general

23  partnership as contemplated herein.

24      (iv)   <u>No Litigation</u>.  As of the date of this Lease, there are no judicial,

25  quasi judicial, administrative or other orders, injunctions, moratoria or pending proceedings

26  against Landlord or the Shopping Center which preclude or interfere with, or would preclude or

27  interfere with, the construction contemplated herein or the occupancy and use of the Premises for

28  the purposes herein contemplated.

29      (v)   <u>Hazardous or Toxic Materials</u>.   To the best of Landlord's

30  knowledge, Landlord has not used, discharged, dumped, spilled or stored any Hazardous

1   Substances (as defined in paragraph 1(a) of the Construction Provisions) on or about the
2   Shopping Center, whether accidentally or intentionally, and has received no notice and has no
3   knowledge that any such condition exists at the Shopping Center. If any claim is ever made
4   against Tenant by any third party (including, without limitation, any governmental agency)
5   relating to Hazardous Substances present at or around the Shopping Center, whether or not such
6   substances are present as of the date hereof, or any Hazardous Substances are hereafter
7   discovered at the Shopping Center (unless introduced by Tenant, its agents or employees), all
8   costs of removal incurred by, all liability imposed upon, or damages suffered by Tenant because
9   of the same shall be borne by Landlord, and Landlord hereby indemnifies and agrees to defend
10  and hold Tenant harmless from and against all such costs, losses, liabilities and damages,
11  including, without limitation, all third-party claims (including sums paid in settlement thereof
12  with or without legal proceedings) for personal injury or property damage and other claims,
13  actions, administrative proceedings, judgments, compensatory and punitive damages, penalties,
14  fines, costs, losses, attorneys' fees and expenses (through all levels of proceedings), consultants
15  or experts fees and all costs incurred in enforcing this indemnity. The representation, warranty
16  and indemnity of Landlord described in this paragraph 19(a)(v) shall survive the termination or
17  expiration of this Lease.   Tenant acknowledges that, based solely on the environmental
18  investigations conducted on its behalf, as of the date of this Lease, it is not aware of the presence
19  of any Hazardous Substance which Landlord is required to remediate under current law. Tenant
20  shall not cause or permit any Hazardous Substances to be upon, about, a part of, or beneath the
21  Premises or the Shopping Center. Subject to Landlord's obligation to indemnify Tenant as set
22  forth in this paragraph, Tenant shall, at its sole cost and expense, promptly take all actions to
23  comply fully with all present and future laws concerning Hazardous Substances arising as a
24  result of Tenant's breach of its obligation contained in the immediately preceding sentence.
25  Tenant hereby indemnifies and agrees to defend and hold Landlord harmless from and against all
26  costs, losses, liabilities and damages, including, without limitation, all third-party claims
27  (including without limitation any governmental agency and including sums paid in settlement
28  thereof, with or without legal proceedings) for personal injury or property damage, other claims,
29  actions, administrative proceedings, judgments, or compensatory and punitive damages,
30  penalties, fines, costs, losses, attorneys' fees and expenses (through all levels of proceedings),

1   consultants' or experts' fees, and all costs incurred in enforcing this indemnity should Tenant

2   use, discharge, dump, spill or store or knowingly permit any Hazardous Substance to be used,

3   discharged, dumped, spilled or stored, upon, about or a part or beneath the Premises or the

4   Shopping Center. The warranty, indemnity and obligations of Tenant described in this paragraph

5   shall survive the termination or expiration of this Lease. For purposes of this paragraph,

6   Hazardous Substances shall not include substances utilized in connection with the maintenance

7   and operation of Tenant's Building, provided such substances are utilized and stored in

8   compliance with all applicable environmental laws.

9          (vi)   INTENTIONALLY DELETED.

10         (vii)   <u>Zoning and Subdivision</u>. The Premises and the Shopping Center

11   are presently properly subdivided, in conformity with all applicable laws and zoned so as to

12   permit (A) the development and operation of the Premises and the Shopping Center in

13   accordance with the provisions of this Lease; and (B) the initial use of the Premises described in

14   paragraph 18 of this Lease.

15          (viii)   <u>Prohibited Activities</u>.

16     (1)   Landlord and Tenant shall not operate or lease (or permit to be operated or leased)

17   any building or tenant space in the Tenant's Preferred Area or on the Landlord's Premises,

18   including the Premises, for use as:

19          A.   a flea market;

20          B.   a massage parlor;

21          C.   a funeral home;

22          D.   a facility for the sale of paraphernalia for use with illicit drugs.

23          E.   a facility for the sale or display of pornographic material (as

24   determined by community standards for the area in which the Shopping Center is

25   located);

26          F.   a carnival, amusement park or circus;

27          G.   a facility for any use which is illegal or dangerous, constitutes a

28   nuisance or is inconsistent with an integrated, community-oriented retail and

29   commercial shopping center;

30          H.   a facility for the sale or rental of used goods (including thrift

31   shops, secondhand or consignment stores) or any facility selling new or used

32   merchandise as a wholesale operation, a liquidation operation, odd lots, lot sales,

33   factory close-outs or imperfect goods (excluding any of such sales as listed in this

34   subparagraph (H) which are conducted as an incidental part of a retail operation;

35          I.   a facility for the sale of new or used motor vehicles, boats, trailers

36   or mobile homes (the parties specifically acknowledge that the foregoing shall not

prohibit a new car dealership if such new car dealership stores and displays all of its inventory within its enclosed premises).

(2)    Landlord shall not operate or lease (or permit to be operated or leased) any building or tenant space within three hundred (300) feet (measured from the front [i.e. parking lot] entrance of the Building to the front entrance of the space in question) for use as, and Tenant shall not permit the Premises to be used as:

(A)    a bar, tavern, pub, nightclub, or dance hall or disco in which less than fifty percent (50%) of its space or revenue is devoted to and derived from food service;

(B)    a bowling alley;

(C)    a billiard or bingo parlor;

(D)    an off-track betting parlor (regardless of size or percentage of restaurant use);

(E)    a skating rink;

(F)    a laser tag or virtual reality facility, or for the primary use as an arcade or pinball or computer game room (provided that retail facilities may display electronic games or computer games for entertainment purposes [but said games may be used for entertainment purposes only incidental to another primary use]);

(G)    a banquet hall, auditorium or other place of public assembly (except in connection with the operation of a hotel/motel);

(H)    a training or educational facility (including, without limitation, a beauty school, barber college, reading room, school or other facility catering primarily to students or trainees rather than customers); or

(I)    a theater of any kind.

(J)    a gas station, auto repair or body shop; provided, however, the parties specifically acknowledge that Tenant's car stereo installation facility is not included in this subparagraph (J) and the type of operations generally conducted by regional or national automotive parts or tire chains such as, but not limited to, Pep Boys and Western Auto shall not be in violation of this prohibition; or

In addition, no auction, fire or going-out-of business sale shall be conducted in the Shopping Center.

(ix)    <u>Site Covenants</u>.  With regard to the development of the Shopping Center and the uses and operations of the Common Areas, Landlord makes the following representations, warranties and covenants (the "Site Covenants"):

(A)    <u>Building Location</u>.  No outparcels, barriers, buildings, kiosks or other structures, either temporary or permanent, shall be located within Tenant's Preferred Area, and

1    no building located on an outparcel in the Shopping Center shall exceed the size necessary for

2    such outparcel to maintain, within its boundaries, the parking ratio required for it to function as a

3    self-contained unit without use of parking spaces located in the Common Areas.    No

4    development shall occur within Tenant's Preferred Area.

5             (B)    Construction and Alterations.  Following the end of the first Lease Year,

6    no exterior construction and no construction staging shall be permitted in the Tenant's Preferred

7    Area or on any service roads during the months of October, November and December except for

8    emergency repairs and interior alterations not affecting the operations of any other occupant of

9    the Shopping Center.  In the event of any construction within the Shopping Center, Landlord

10    shall designate a construction access route, staging and parking areas located so as to minimize

11    interference with customers or the operations of other occupants of the Shopping Center and

12    shall require erection of safety barriers as necessary and an opaque wall around the site of such

13    construction of a size necessary to screen such construction from ground level view.  With regard

14    to any construction on Landlord's Premises, Landlord shall be solely responsible for any

15    governmentally imposed impact fees, hookup, connection, installation or tap in fees and other

16    similar construction-related charges.  Other than de minimus changes which do not adversely

17    affect the Premises or Tenant's Preferred Area, Landlord shall make no changes in Tenant's

18    Preferred Area as shown on the Site Plan (including, without limitation, changes in the location

19    of curbcuts, drive aisles, roadways, sidewalks or parking spaces) without Tenant's express

20    written consent, which Tenant may, in its sole discretion, withhold.  With respect to portions of

21    the Common Areas on the Shopping Center outside of Tenant's Preferred Area, Landlord may

22    make other changes provided such changes do not materially and adversely affect Tenant's

23    parking, visibility or access.  Any changes which would cause a material adverse effect on

24    Tenant's parking, visibility or access to said Common Areas may be made only upon receipt of

25    Tenant's express written consent.

26             (C)    Prohibited Uses in Common Area.  Landlord (as to the Common Areas on

27    Landlord's Premises and the Tenant's Preferred Area) and Tenant (as to the Common Areas on

28    the Premises) covenant that they shall not, without the other party's express written consent,

29    permit the following uses or activities to occur in said Common Areas: (1)  signs except for

30    pylon, under canopy and/or monument signs, advertisements (provided such are not of

1    "billboard" dimensions,  provided that advertisements for "Best Buy" (or any other tenant which

2    sells all or substantially all of the Products) shall not be permitted unless such company becomes

3    an occupant of the Shopping Center, and further provided that any advertisements for Best Buy

4    are not situated immediately eastward of the eastern face of the enclosed mall building), "for

5    rent" signs, traffic control signs; (2) display or sale of merchandise (except as otherwise set forth

6    in paragraph 18(c) above); (3) operation of loudspeakers or other sound electronically amplified

7    so as to be heard in the Common Areas; (4) imposition of a charge for parking other than the

8    CAM Charge; or (5) operation of cellular telephone or other telecommunication tower in the

9    parking areas situated immediately eastward of the eastern face of the enclosed mall building for

10    use by any other party not an occupant of the Shopping Center.  Landlord further covenants that

11    it will not seek, nor permit any other occupant of the Shopping Center to seek, a variance or

12    waiver from the minimum parking requirements applicable to the Shopping Center under the

13    zoning code or other applicable ordinance establishing the ratio of parking spaces to building

14    area or otherwise mandating the number of parking spaces required for the Shopping Center and

15    the uses contained therein.  If reasonably required in Landlord's opinion, parking by employees

16    of Tenant, Landlord and other occupants of the Shopping Center shall be designated "employee

17    parking" areas, the location of which shall be agreed upon by Landlord and Tenant, but in no

18    event shall such designated areas be within the Tenant's Preferred Area.

19                    (D)    Easements.    Except for occupants of the Shopping Center  and the

20    properties contiguous thereto, Landlord shall not grant any parking easements in the Common

21    Areas without Tenant's prior written consent.

22                    (x)    Interference with Tenant's Reception/Transmission.    Landlord

23    shall not install or, to the extent it has the authority to do so, permit to be installed by any other

24    tenant or other person anywhere in the Shopping Center, any structure or equipment which, to

25    the best of Landlord's actual knowledge, would cause any interference with satellite, radio,

26    telecommunications, or television reception or transmission in or from the Building.

27                    (xi)    Notices Affecting the Premises.    Landlord shall promptly forward

28    to Tenant any notice or other communication affecting the Premises received by Landlord from

29    any owner of property adjoining, adjacent or nearby to the Premises, the Shopping Center or

1    from any municipal or governmental authority, in connection with any hearing or other
2    administrative procedure relating to the use or occupancy of the Premises.

3          (xii)    Constructive Trust.    Landlord covenants that all sums paid by
4    Tenant to Landlord and intended for payment by Landlord to a third party (such as, by way of
5    example, taxes and certain elements of CAM Charges) are given to Landlord in trust and shall be
6    applied only for such third-party payments, as and when due.    Tenant acknowledges that
7    Landlord may commingle such funds with other funds of the Landlord, and Landlord does not
8    have to maintain a separate accounting therefor, nor pay any interest thereon, to Tenant.

9          (xiii)    Absence of Obstructions.    To Landlord's knowledge, the land
10   upon which the Premises are located is free of any obstructions, foundations or footings, utilities,
11   improvements or tenancies other than those underground facilities shown on drawings previously
12   furnished by Landlord to Tenant.    If in connection with Tenant's construction of the
13   Improvements, Tenant discovers any obstructions, foundations or footings, utilities or
14   improvements in or on the Land (other than as set forth above) which Tenant is required to either
15   (A) remove; or (B) leave in place in connection with its construction of the Improvements,
16   Landlord agrees to reimburse Tenant for (1) the cost of such removal to the extent such cost
17   exceeds $2,000.00; and/or (2) the cost to design and install the Improvements in order to leave
18   the encroachments in place to the extent such cost exceeds $2,000.00.

19         (b)    Tenant's Authority.    Tenant represents, warrants and covenants to
20   Landlord that Tenant is a duly constituted corporation organized under the laws of the
21   Commonwealth of Virginia; it has the power to enter into this Lease and perform Tenant's
22   obligations hereunder; and the Vice President executing this Lease on Tenant's behalf has the
23   right and lawful authority to do so.

24         (c)    Additional Remedies.    In addition to such other remedies as may be
25   accorded Tenant at law, in equity (including but not limited to an injunction or writ of specific
26   performance) or under the terms of this Lease, (i) in the event that any of the representations,
27   warranties and covenants set forth in paragraphs 19(a)(i), (ii), (iii), (iv), (vii) and (x) are untrue or
28   incorrect, or (ii) in the event that Tenant suffers any loss, cost, liability or damage as a result of
29   the breach of any of such covenants, representations and warranties, Landlord shall defend,

1    indemnify and hold Tenant harmless from any of such loss, costs, liability or damage incurred as

2    a result of Landlord's breach hereunder.

3        20.    Estoppel Certificates.    Without charge, at any time and from time to time

4    hereafter (but not more frequently than twice in one year), within thirty (30) days after receipt of

5    written request by either party, the other party shall certify, by written and duly executed

6    instrument, to any other entity ("Person") specified in such request: (a) as to whether this Lease

7    has been supplemented or amended, and, if so, the substance and manner of such supplement or

8    amendment; (b) as to the validity, force and effect of this Lease, to the certifying party's best

9    knowledge; (c) as to the existence of any default hereunder, to the certifying party's best

10   knowledge; (d) as to the existence of any offsets, counterclaims, or defenses hereto on the part of

11   such other party, to the certifying party's best knowledge; (e) as to the commencement and

12   expiration dates of the Term; and (f) as to any other matters which may reasonably be so

13   requested. In addition, without charge, at any time any from time to time hereafter (but not more

14   frequently than twice a year), within thirty (30) days after receipt of written request of Tenant,

15   Landlord shall deliver an estoppel certificate to Tenant's assignee or subtenant that states in the

16   event Tenant defaults under any of its obligations under this Lease following the date of any

17   assignment or subletting hereunder, Landlord will permit such assignee or subtenant to satisfy

18   obligations of Tenant hereunder, including but not limited to the direct payment of rentals to

19   Landlord. Any such certificate may be relied upon by the party requesting it and any Person to

20   whom the same may be exhibited or delivered, and the contents of such certificate shall be

21   binding on the party executing same.   Any request for any such certificate by Tenant must

22   contain a reference to this paragraph 20 and the obligation of the applicable party to provide such

23   certificate.

24       21.    Subordination, Non-Disturbance and Attornment.    Tenant has agreed to execute

25   a SNDA substantially in the form of Exhibit G attached hereto.   Landlord shall obtain the

26   signature of the holder of the Mortgage ("Mortgagee") within ninety (90) days of the mutual

27   execution of this Lease.   Such Agreement shall contain, at a minimum, the following: (i) the

28   Lease shall not terminate simply by reason of a foreclosure or deed in lieu thereof

29   ("Foreclosure"), (ii) Tenant's possession of the Premises shall not be disturbed so long as Tenant

30   is not in default under any of the material terms, covenants or conditions of the Lease, beyond

1   any applicable cure period provided in the Lease, (iii) the Mortgagee or purchaser upon such
2   Foreclosure shall recognize Tenant and all its rights hereunder and shall be obligated to fully and
3   completely perform Landlord's duties and obligations under the Lease arising from and after the
4   date of such Foreclosure, including but not limited to an obligation to make all payments to
5   Tenant and satisfy all construction obligations set forth in this Lease, so long as Tenant is not in
6   default under any of the material terms, covenants or conditions of this Lease, beyond any
7   applicable cure period provided in the Lease, (iv) Tenant shall not be named as a party in any
8   action for Foreclosure unless required by law, (v) the Mortgagee, whether or not the Mortgage is
9   foreclosed, shall make all proceeds arising from a casualty or condemnation loss to the Premises
10  available to Tenant for restoration of the Improvements in accordance with the terms hereof, and
11  (vi) in the event of a Foreclosure, Tenant shall attorn to the Mortgagee or any purchaser at the
12  Foreclosure sale.  Upon Tenant's receipt of the non-disturbance and attornment agreement, this
13  Lease shall be subordinate to the Mortgage.   Landlord shall cause any present or future
14  Mortgagee to deliver a non-disturbance and attornment agreement in accordance with this
15  paragraph 21 at or prior to the time which the lien of the Mortgage is filed against record title to
16  the Premises. As used in this paragraph 21, the term "Mortgage" shall mean any mortgage, deed
17  to secure debt, deed of trust, trust deed or other collateral conveyance of, or lien or encumbrance
18  against, the Premises.  In the event of a Foreclosure of any Mortgage, Tenant shall attorn to a
19  Mortgagee or any purchaser at Foreclosure of a Mortgage, and Landlord shall be released from
20  all liability with respect to events occurring from and after the date of such foreclosure.  In the
21  event Landlord's interest in the Premises passes to a successor (the "Successor") by sale, lease,
22  Foreclosure or in any other manner, provided such successor assumes Landlord's obligations
23  hereunder, Tenant shall be bound to the Successor under all of the terms of this Lease for the
24  balance of the Term, with the same force and effect as if the Successor were the initial Landlord
25  under the Lease, and Tenant hereby agrees to attorn to the Successor as its Landlord.   Such
26  attornment to be effective upon written notice thereof given by Landlord to Tenant.

27      22.    Tenant's Financing.  Notwithstanding any other provisions of this Lease, Tenant
28  may, without Landlord's consent, from time to time, secure financing or general credit lines and
29  grant the lenders thereof as security therefor, (i) a security interest in Tenant's trade fixtures,
30  personalty, inventory and trade equipment (collectively, "Personalty"), (ii) the right to enter the

1   Premises to realize upon any Personalty so pledged provided that such secured creditor agrees to
2   pay for any and all damages caused to the Premises in pursuit of its remedies against Tenant,
3   and/or (iii) a collateral assignment of Tenant's leasehold interest in the Premises, with rights of
4   reassignment (but in all events subject to the terms of this Lease, with no release of liability on
5   the part of Tenant or any future holders of Tenant's rights herein); provided, however, such
6   collateral assignment may be made solely for the purpose of securing Tenant's indebtedness.
7   Upon Tenant providing notice of such financing to Landlord, Landlord agrees to evidence its
8   consent in writing to such security interest and agreement and to give such lenders the same
9   notice and opportunity to cure any default of Tenant as is provided Tenant hereunder.   In
10  addition, Landlord agrees to cause any Mortgagee specifically to acknowledge the rights of
11  Tenant's lenders described herein and in paragraph 23 below.

12      23.   Tenant's Property and Waiver of Landlord's Lien.  All of the Personalty shall be
13  and remain the personal property of Tenant and shall be removable by Tenant any time prior to
14  the expiration or earlier termination of this Lease.  Landlord shall permit Tenant to enter the
15  Premises for thirty (30) days after the expiration of the Lease to remove its Personalty from the
16  Premises provided Tenant makes such request at least ninety (90) days prior to the expiration of
17  this Lease and, upon the expiration of the Lease, pays Landlord all charges that would have been
18  due Landlord with respect to such thirty (30) day period had the Lease continued through such
19  additional thirty (30) day period.  (A nonexclusive list of Tenant's removable trade fixtures is
20  attached hereto as Exhibit "D".)  Landlord expressly waives its statutory or common law
21  landlord's liens (as same may be enacted or may exist from time to time) and any and all rights
22  granted under any present or future laws to levy or distrain for rent (whether in arrears or in
23  advance) against the aforesaid property of Tenant on the Premises and further agrees to execute
24  any reasonable instruments evidencing such waiver, at any time or times hereafter upon Tenant's
25  request.  In the event Tenant is authorized but fails to remove any and all of its Personalty within
26  thirty (30) days of the expiration or termination of this Lease or Tenant's right of possession
27  thereunder, Landlord may remove and take possession of such Personalty, or the balance thereof
28  and thereafter charge Tenant the reasonable cost of such removal.  Those improvements that are
29  integrated into the physical structure of the Improvements shall not be removed and shall become
30  property of the Landlord.  Tenant agrees to promptly repair any damage to the Improvements

1    occasioned by the removal of Tenant's trade fixtures, trade furnishings and trade equipment, and
2    to surrender the Premises in a broom-clean condition and otherwise maintained as contemplated
3    in Section 10 above. Tenant agrees that at the expiration of this Lease, it will deliver to Landlord
4    peaceable possession of the Premises.

5        24.    Memorandum of Lease: Commencement Date Agreement. Landlord and Tenant
6    agree, at the other's request and at the sole expense of the requesting party, to execute a
7    Memorandum of Lease in recordable form, substantially similar to that attached hereto as Exhibit
8    "H", setting forth such provisions hereof as may be required by State law. In addition, Landlord
9    and Tenant shall execute a Commencement Date Agreement in the form attached hereto as
10    Exhibit "I", once the Commencement Date has been established. Recording costs for either or
11    both documents shall be borne by the party requesting recordation of the same. The provisions
12    of this Lease shall control, however, with regard to any omissions from, or provisions hereof
13    which may be in conflict with, the Memorandum of Lease or Commencement Date Agreement.

14        25.    Expiration of Term and Holding Over. Should Tenant hold over this Lease shall
15    continue in force from month to month, subject to all of the provisions hereof and at one hundred
16    twenty-five percent (125%) of the monthly Base Rent (or Interim Rent, as the case may be)
17    Tenant had been paying during the preceding Lease Year, plus Tenant shall pay all other charges
18    contained herein. No holding over by Tenant or acceptance of rent or other charges by Landlord
19    shall operate as a renewal or extension of the Lease without the written consent of Landlord and
20    Tenant. During the last year of the Term, Tenant will allow Landlord or its agents, upon
21    reasonable notice, to show the Premises to prospective tenants, purchasers, or mortgagees during
22    reasonable business hours provided the same does not interfere with the conduct of Tenant's
23    business.

24        26.    Force Majeure. Except as otherwise specifically contemplated in this Lease or in
25    the Construction Provisions, in the event that Landlord or Tenant shall be delayed or hindered in,
26    or prevented from, the performance of any act required hereunder by reason of strikes, lockouts,
27    labor troubles, inability to procure materials, delay by the other party, failure of power or
28    unavailability of utilities, riots, insurrection, war or other reason of a like nature not the fault of
29    such party or not within its control, then performance of such act shall be excused for the period
30    of delay, and the period for the performance of any such act shall be extended for a period

SH CircuitCity Clean 091505Clean 091505                44

1    equivalent to the period of such delay; provided, however, that in connection with the

2    construction of the Improvements, the consequences of delays by the other party shall be

3    governed by the Construction Provisions. The provisions of this Lease related to force majeure

4    shall not operate to excuse Tenant from prompt payment of ground rent, Interim Rent, Base

5    Rent, additional rent or any other payments required by the terms of this Lease.

6    27.    Events of Tenant's Default. Any of the following occurrences, conditions or acts

7    by Tenant shall constitute an "Event of Default" under this Lease:

8    (a)    Failure to Pay Rent: Breach. (i) Tenant's failure to make any payment of

9    money required by this Lease (including without limitation Base Rent, Interim Rent, CAM

10    Charges or Real Estate Taxes), within ten (10) days after written notice is given (pursuant to

11    paragraph 32) from Landlord to Tenant that same is overdue; or (ii) Tenant's failure to observe

12    or perform any other material provision of this Lease within thirty (30) days after written notice

13    is given (pursuant to paragraph 32) from Landlord to Tenant specifying such default and

14    demanding that the same be cured; provided that, if such default is a non-monetary default and

15    cannot with due diligence be wholly cured within such thirty (30) day period, Tenant shall have

16    such longer period as is reasonably necessary to cure the default, so long as Tenant proceeds

17    promptly to commence the cure of same within such thirty (30) day period and diligently

18    prosecutes the cure to completion. In the case of an emergency, Landlord shall be required to

19    give only such notice as is reasonable under the circumstances.

20    (b)    Bankruptcy. Tenant's adjudication as bankrupt or insolvent, or the

21    appointment of a receiver, trustee in involuntary bankruptcy or other, similar officer to take

22    charge of any substantial part of Tenant's property, which proceeding is not dismissed within

23    one hundred twenty (120) days after it is begun.

24    28.    Landlord's Remedies. After the occurrence of an Event of Default by Tenant,

25    Landlord shall have the right to exercise the following remedies:

26    (a)    Continue Lease. Landlord may, at its option, continue this Lease in full

27    force and effect, without terminating Tenant's right to possession of the Premises, in which event

28    Landlord shall have the right to collect Base Rent, Interim Rent and all other charges when due.

29    Landlord shall also have the right, in Landlord's exercise of reasonable efforts to mitigate its

30    damages (which Landlord hereby agrees to make), at its option, from time to time, without

1    terminating this Lease or its right to collect Base Rent, Interim Rent and all other charges when

2    due, to re-enter and/or to relet the Premises, or any part thereof, with legal process, as the agent,

3    and for the account, of Tenant upon such terms and conditions as Landlord may deem advisable,

4    in which event the rents received on such reletting shall be applied (i) first to the reasonable and

5    actual expenses of such reletting and collection, including without limitation necessary

6    renovation and alterations of the Premises, reasonable and actual attorneys' fees and any

7    reasonable and actual real estate commissions paid, and (ii) thereafter toward payment of all

8    sums due or to become due Landlord hereunder.   Any such reentry shall not be deemed a

9    termination of the Lease or an acceptance by Landlord of a surrender thereof with Landlord

10    retaining the right to collect all rent and all other charges when due.  If due to such reletting a

11    sufficient amount to pay such expenses and sums shall not be realized or secured, then Tenant

12    shall pay Landlord any such deficiency monthly and Landlord may bring an action therefor for

13    all present and future monthly deficiencies.  Landlord shall not, in any event, be required to pay

14    Tenant any sums received by Landlord on a reletting of the Premises in excess of the rent

15    provided in this Lease, but such excess shall reduce any accrued present or future obligations of

16    Tenant hereunder.  Landlord's reentry and reletting of the Premises without termination of this

17    Lease shall not preclude Landlord from subsequently terminating this Lease as set forth below.

18    In the event that Tenant does not pay when due any sums due under this Lease, such unpaid

19    amounts shall bear interest from the due date thereof to the date of payment at the annual rate

20    (the "Default Rate") equal to four percent (4%) plus the "Prime Rate".  In the event such rate is

21    prohibited by law, unpaid amounts shall bear interest at the maximum rate permitted by law.  For

22    purposes hereof the "Prime Rate" shall be the Prime Rate as set forth from time to time in the

23    Money Section of The Wall Street Journal, or if such Prime Rate is not ascertainable as

24    aforesaid, Landlord and Tenant shall mutually agree upon a comparable rate as a substitute

25    therefor.

26            (b)    Terminate Lease.  Landlord may terminate this Lease by written notice to

27    Tenant specifying a date therefor, which shall be no sooner than thirty (30) days of Landlord

28    giving such notice to Tenant in accordance with paragraph 32, and this Lease shall then

29    terminate on the date so specified as if such date had been originally fixed as the expiration date

of the Term.  In the event of such termination, Landlord shall be entitled to recover from Tenant all of the following:

       (i)    The "worth at the time of the award" (defined below) of any obligation which has accrued prior to the date of termination; and

       (ii)    The "worth at the time of the award" of the amount by which the unpaid Base Rent and all other charges which would have accrued after termination until the time of award exceeds the amount of any sums which Landlord has (or Tenant proves that Landlord could have) received in mitigation.

As used in this paragraph 28(b), the term, "worth at the time of the award", shall be computed by allowing simple interest at an accrual rate of twelve percent (12%) for past due obligations, and a discount rate to net present value of ten percent (10%) on anticipated future obligations, on the amount of the obligations payable on the date of such calculation.  In the event this Lease shall be terminated as provided above, by summary proceedings or otherwise, Landlord, its agents, servants or representatives may immediately or at any time thereafter peaceably re-enter and resume possession of the Premises and remove all persons and property therefrom, by summary dispossession proceedings.

       (c)    <u>Injunctive Relief and Specific Performance</u>.  Landlord shall also be entitled to seek injunctive relief and/or specific performance as a remedy for an Event of Default by Tenant.

       (d)    <u>Additional Damage</u>.  Landlord may also recover from Tenant, and Tenant shall pay to Landlord upon demand, such reasonable and actual expenses as Landlord may incur in recovering possession of the Premises, placing the same in good order and condition, and repairing the same for reletting, and all other reasonable and actual expenses, commissions and charges incurred by Landlord in exercising any remedy provided herein or as a result of any Event of Default by Tenant hereunder (including, without limitation, its reasonable attorney's fees), provided that in no event shall Tenant be obligated to compensate Landlord for any speculative or consequential damages caused by Tenant's failure to perform its obligations under this Lease.

       (e)    <u>Remedies Are Cumulative</u>.  The various rights and remedies reserved to Landlord herein are cumulative, and Landlord may pursue any and all such rights and remedies

1   (but no others), whether at the same time or otherwise (to the extent not inconsistent with

2   specific provisions of this Lease). Notwithstanding anything herein to the contrary, Landlord

3   expressly waives its right to forcibly dispossess Tenant from the Premises, whether peaceably or

4   otherwise, without judicial process, such that Landlord shall not be entitled to any "commercial

5   lockout" or any other provisions of applicable law which permit landlords to dispossess tenants

6   from commercial properties without the benefit of judicial review.

7       29.    Events of Landlord's Default: Tenant's Remedies.

8           (a)    Default by Landlord. Any of the following occurrences, conditions or acts

9   by Landlord shall constitute an "Event of Default": (i) Landlord's failure to make any payments

10  of money due Tenant or any third party, including but not limited to the payment of the

11  brokerage commissions pursuant to paragraph 33 hereof, within thirty (30) days after the receipt

12  of written notice from Tenant that same is overdue (in which event the delinquent amount shall

13  accrue interest from the due date at the Default Rate); or (ii) Landlord's failure to perform any

14  nonmonetary obligation of Landlord hereunder within thirty (30) days after receipt of written

15  notice from Tenant to Landlord specifying such default and demanding that the same be cured;

16  provided that, if such default cannot with due diligence be wholly cured within such thirty (30)

17  day period, Landlord shall have such longer period as may be reasonably necessary to cure the

18  default, so long as Landlord proceeds promptly to commence the cure of same within such thirty

19  (30) day period and diligently prosecutes the cure to completion and provided further that in the

20  case of an emergency, Tenant shall be required to give only such notice as is reasonable under

21  the circumstances.

22          (b)    Remedies Upon Landlord's Default. Upon the occurrence of an Event of

23  Default by Landlord, at Tenant's option, and without its actions being deemed an election of

24  remedies or a cure of Landlord's default, Tenant may do all or any of the following: (i) provided

25  Tenant has delivered not less than five (5) business days prior written notice of Tenant's intent to

26  pay or perform the obligation which gave rise to the Event of Default (which notice may be

27  included in the initial notice of default given to Landlord pursuant to paragraph 29(a) above), pay

28  or perform such obligations and invoice Landlord the amount of Tenant's actual cost of

29  performance, including any and all transaction costs and attorneys' fees, plus interest at the

30  Default Rate, (ii) if such default by Landlord effectively precludes Tenant from profitably

1   operating its business on the Premises, terminate this Lease and sue for damages, including

2   interest, transaction costs and attorneys' fees as specified in clause (i) above, (iii) recover from

3   Landlord damages Tenant incurs as a result of Landlord's default (including, without limitation,

4   its reasonable attorneys' fees), or (iv) seek injunctive relief and/or specific performance as a

5   remedy for an Event of Default by Landlord.  If Tenant elects its rights under clause (i) of this

6   paragraph 29(b) and Landlord fails, within thirty (30) days of receipt of such invoice, to

7   reimburse Tenant for the amounts set forth in the invoice delivered to Landlord pursuant to

8   clause (i), Tenant may offset the amount of such invoice against the Interim Rent, Base Rent,

9   CAM Charges and any and all other amounts or charges due Landlord hereunder until such

10   invoice has been paid in full.

11        Notwithstanding the foregoing paragraph, so long as the Landlord is an affiliate of

12   Cafaro Management Company, Tenant may only exercise its right of offset with respect to costs

13   incurred by Tenant as a result of Landlord's failure to maintain the Common Areas on

14   Landlord's Premises, maintain the insurance coverages required hereunder or pay Real Estate

15   Taxes as required hereunder (unless Landlord has notified Tenant that it is in good faith

16   protesting same and has provided evidence reasonably satisfactory to Tenant that the Tax Parcel

17   is not in imminent danger of foreclosure), and may only exercise such offset right if Landlord

18   has not notified Tenant within thirty (30) days of receipt of Tenant's invoice that Landlord, in

19   good faith, contests the existence of the default giving rise to the work performed by Tenant or

20   the validity of the charges set forth in the invoice.

21        In the event Landlord so notifies Tenant, Tenant shall deposit the amount it seeks to

22   offset against the charges payable to Landlord into a third-party escrow account and initiate a

23   three arbitrator arbitration proceeding in accordance with the expedited arbitration procedures of

24   the American Arbitration Association.  In the event Tenant prevails in such arbitration, Tenant

25   shall be entitled to a return of the money deposited in escrow.  In addition, Landlord shall pay for

26   the cost of the arbitration, including Tenant's reasonable attorneys' fees incurred in connection

27   therewith, and Tenant shall be entitled to interest on the amounts deposited in escrow by Tenant

28   at the Default Rate (reduced by any interest actually earned by such deposit while on deposit

29   with the third-party escrow agent).  If Landlord does not pay such additional amounts within ten

30   (10) days after a decision in favor of Tenant by the arbitrator, Tenant shall have the additional

1 right to offset any such additional amounts against future amounts payable by Tenant to
2 Landlord under this Lease.

3       If Landlord prevails in the arbitration, the escrow agent shall pay the escrow deposit,
4 together with any interest earned thereon, to Landlord. Tenant shall be obligated to pay the costs
5 of arbitration, including Landlord's reasonable attorneys' fees, and Landlord shall be entitled to
6 interest at the Default Rate on the amounts which should have been paid to Landlord under the
7 Lease. Tenant shall pay all amounts due Landlord within ten (10) days after a decision in favor
8 of Landlord by the arbitrators. Tenant shall receive a credit against such amounts for any interest
9 earned on the escrow deposit and paid to Landlord.

10       If Landlord fails to pay Tenant the Lease Incentive Payment in a timely manner, Tenant
11 shall be entitled to the rights and remedies set forth in this Section 29(b) and the Construction
12 Provisions; and, as to a breach of the warranties and representations contained in paragraph 19,
13 Tenant shall be entitled to the remedies provided therein, in addition to those remedies provided
14 herein. The various rights and remedies reserved to Tenant herein are cumulative, and Tenant
15 may pursue any and all rights and remedies (but no others), whether at the same time or
16 otherwise.

17       (c)    Exculpation. Notwithstanding anything to the contrary provided in this
18 Lease, except to the extent Landlord elects to self-insure, the liability of Landlord, its partners,
19 principals or joint venturers, under this Lease shall be limited to Landlord's interest in the
20 Shopping Center, including any rents and profits, insurance proceeds and condemnation awards
21 derived therefrom and further including any consideration received by Landlord, its partners,
22 principals or joint venturers, from the sale or other disposition of all or any part of the Shopping
23 Center (with regard to liability arising prior to such sale or disposition). Tenant agrees to look
24 solely to Landlord's interest in the Shopping Center for satisfaction of any and all claims it may
25 have against Landlord, provided that nothing contained herein shall prevent Tenant from
26 bringing a suit for specific performance or seeking injunctive relief against Landlord in an
27 appropriate case, from attaching rents and profits, sale proceeds, insurance or condemnation
28 awards derived from the Shopping Center, nor limit Tenant's rights to any other action or
29 remedy (not involving the personal liability of Landlord, its partners, principals or joint
30 venturers) which may be accorded Tenant by law. Nothing contained herein shall be deemed a

1   waiver of any default by Landlord nor an assumption by Tenant of any liability of Landlord, its

2   partners, principals or joint venturers.

3   (d)   Time is of the Essence.  Notwithstanding anything contained herein to the

4   contrary, Landlord covenants that it shall complete its delivery obligations in accordance with

5   Section 1 of the Construction Provisions. In the event that Landlord fails to complete its delivery

6   obligations in accordance with Section 1 of the Construction Provisions, Tenant may, at its sole

7   election, exercise such remedies as are set forth herein.

8   30.   Waiver.  If either Landlord or Tenant fails to insist on the strict observance by the

9   other of any provisions of this Lease, neither shall thereby be precluded from enforcing nor be

10   held to have waived any of the obligations, past, present or future, of this Lease.  Either party

11   may accept late payment or performance by the other without waiving any Event of Default

12   which may then have accrued.

13   31.   Compliance with Applicable Laws.  During the Term, Landlord and Tenant shall

14   comply in accordance with paragraph 10 of this Lease with all lawful requirements of the local,

15   county and state health boards, police and fire departments, municipal and state authorities and

16   any other governmental authorities with jurisdiction over the Improvements, and of the board of

17   fire underwriters, respecting Tenant's use and occupancy of the Improvements.  In the event that

18   Tenant, within thirty (30) prior days' written notice (except in the case of an emergency, in

19   which event only such notice as is reasonable under the circumstances shall be required) from

20   Landlord or any such authority ordering performance of any such work which Tenant is required

21   to perform in order to remain in, or come into, compliance with any such requirement, fails to

22   perform or diligently commence performance of same with reasonable promptness, Landlord

23   may perform said work and collect the reasonable cost thereof plus interest at the Default Rate

24   from Tenant with the next installment or installments of Base Rent.  In the event that Landlord,

25   within thirty (30) prior days' written notice (except in the case of an emergency, in which event

26   only such notice as is reasonable under the circumstances shall be required) from Tenant or any

27   such authority ordering performance of any such work which Landlord is required to perform in

28   order to remain in, or come into, compliance with any such requirement, fails to perform or

29   diligently commence performance of same with reasonable promptness, Tenant may perform

1    said work and deduct the reasonable cost thereof plus interest at the Default Rate from Landlord

2    with the next installment or installments of Base Rent.

3       32.    Notices.  Any notice permitted or required to be given pursuant to this Lease shall

4    be deemed to have been given three (3) business days after mailing a written notice by certified

5    mail, postage prepaid, return receipt requested, or one (1) business day after sending by Federal

6    Express or other comparable overnight express courier service (with proof of receipt available),

7    addressed to the parties as follows:

8

9    If to Tenant:            CIRCUIT CITY STORES, INC.
10                            Deep Run I
11                            9950 Mayland Drive
12                            Richmond, Virginia 23233
13                            Attention: Corporate Secretary

14    with a copy to:         CIRCUIT CITY STORES, INC.
15                            Deep Run I
16                            9950 Mayland Drive
17                            Richmond, Virginia 23233
18                            Attention: Vice President of Real Estate

19    If to Landlord:          THE CAFARO NORTHWEST PARTNERSHIP
20                            2445 Belmont Avenue
21                            P. O. Box 2186
22                            Youngstown, Ohio 44504-0186
23                            Attention: Legal Department

24    or to such other addressees as any party hereto shall from time to time give notice to the other

25    party in accordance with this paragraph.

26       All payments required under this Lease to be paid to Landlord shall be delivered to

27    Landlord, in its name, at P.O. Box 714090, Columbus, Ohio  43271-4090, or to such other

28    address as Landlord may designate by written notice, except any payment containing a

29    conspicuous statement to the effect that the payment is being tendered as full satisfaction of any

30    obligation owed by Tenant to Landlord under this Lease.  Any payment bearing a conspicuous

31    statement to the effect that the payment is being tendered as full satisfaction, such as "payment in

32    full" or the like, shall be delivered to Landlord, in its name, at 2445 Belmont Avenue, P. O. Box

33    2186, Youngstown, Ohio 44504-0186, Attention: Credit and Collections Manager.  Tenant

34    agrees that acceptance by Landlord of any payment containing such language shall not preclude

SH CircuitCity rev pgs 101005CIean 091505                    52

1   Landlord from collecting the full amount rightfully owed to it under the terms of the Lease.

2   Payment shall be deemed delivered when same are actually received by Landlord.

3       33.    Brokers.  Landlord and Tenant each covenant that they have not dealt with any

4   real estate broker or finder with respect to this Lease, except for Millenium Retail Partners, LLC,

5   First American Properties, and The Equity Group , which the parties agree and acknowledge

6   represents Tenant only, and which shall be paid an aggregate commission by Landlord (payable

7   to First American Properties) of $4.00 per square foot of ground-floor building area pursuant to

8   their separate written agreement.  Landlord agrees that said brokers are representing Tenant with

9   respect to this leasing transaction, and, although Landlord is responsible for payment of said

10  commission, said brokers owe no fiduciary's, agent's or other duty whatsoever to Landlord.

11  Except for the foregoing, each party shall hold the other party harmless from all damages,

12  claims, liabilities or expenses, including reasonable and actual attorneys' fees (through all levels

13  of proceedings), resulting from any claims that may be asserted against the other party by any

14  real estate broker or finder with whom the indemnifying party either has or is purported to have

15  dealt.

16      34.    Miscellaneous.

17          (a)    Headings and Gender.  All paragraph headings, titles or captions contained

18  in this Lease are for convenience only and shall not be deemed a part of this Lease and shall not

19  in any way limit or amplify the terms and provisions of this Lease.  The masculine, feminine or

20  neuter gender and the singular or plural number shall be deemed to include the others whenever

21  the context so requires or indicates.

22          (b)    Construction.  The parties hereto agree that all the provisions hereof are to

23  be construed as covenants and agreements as though the words importing such covenants and

24  agreements were used in each separate paragraph hereof.

25          (c)    Waiver of Jury Trial.  In the event of any court action arising out of this

26  Lease, each party hereby expressly waives its right to trial by jury.

27          (d)    Relationship of Landlord-Tenant.  Nothing contained in this Lease shall be

28  deemed or construed by the parties hereto or by any third person to create the relationship of

29  principal and agent, partnership, joint venture, or any other association between Landlord and

30  Tenant other than the landlord-tenant relationship described herein.

1    (e) <u>Entire Agreement; Merger</u>.  This Lease, including all exhibits hereto

2 (which are hereby incorporated herein by reference for all purposes), contains the full and final

3 agreement of every kind and nature whatsoever between the parties hereto concerning the subject

4 matter of this Lease, and all preliminary negotiations and agreements of whatsoever kind or

5 nature between Landlord and Tenant are merged herein. This Lease cannot be changed or

6 modified in any manner other than by a written amendment or modification executed by

7 Landlord and Tenant.

8    (f) <u>Attorneys' Fees</u>.  In the event either party-shall be required to commence

9 or defend any action or proceeding against any other party by reason of any breach or claimed

10 breach of any provision of this Lease, to commence or defend any action or proceeding in any

11 way connected with this Lease or to seek a judicial declaration of rights under this Lease, the

12 party prevailing in such action or proceeding shall be entitled to recover from or to be

13 reimbursed by the other party for the prevailing party's reasonable and actual attorneys' fees and

14 costs through all levels of proceedings.

15    (g) <u>Partial Invalidity</u>.  If any provision of this Lease or the application thereof

16 to any person or circumstance shall be deemed invalid or unenforceable, the remainder of this

17 Lease and its application to other persons or circumstances shall not be affected by such partial

18 invalidity but shall be enforced to the fullest extent permitted by law as though such invalid or

19 unenforceable provision was never a part hereof.

20    (h) <u>Consents</u>.  Any consent or approval granted by either party hereunder shall

21 be deemed a consent only as to the matter on which such consent was requested and shall not

22 waive the consenting party's right to give or withhold consent to any subsequent matter.

23    (i) <u>Holidays</u>.  If the day on which rent or any other payment due hereunder is

24 payable falls on a Saturday, Sunday or on a legal holiday, it shall be payable on the following

25 business day.

26    (j) <u>Applicable Law</u>.  This Lease shall be construed in accordance with the

27 laws of the State, and the parties agree that jurisdiction for all actions hereunder shall lie therein.

28    (k) <u>Successors and Assigns</u>.  All rights, obligations and liabilities herein given

29 to or imposed upon any party hereto shall extend to the permitted successors and assigns of such

30 party.

1       (l)   <u>Counterparts</u>.  This Lease may be executed in one or more identical
2   counterparts, and as so executed by all parties hereto shall constitute a single instrument for
3   purposes of the effectiveness of this Lease.

4       (m)   <u>Trademarks and Trade Names</u>.  All trademarks, trade names, service
5   marks, signs and all other marks of identification used by Tenant in its business shall at all times
6   remain the exclusive property of Tenant, and Landlord shall have no right, interest in, or title to
7   any of Tenant's trademarks, trade names, service marks, signs or other marks of identification.

8       (n)   <u>Exhibits</u>. All of the Exhibits to this Lease are incorporated by reference
9   for all purposes and are part of this Lease.

10       (o)   <u>No Construction Against Either Party</u>.  This Agreement shall be
11   interpreted to give it fair meaning and shall not be construed against either party.

12      35.   <u>Construction, Operation and Reciprocal Easement Agreement</u>.  This Lease is
13   subject and subordinate to the REA provided, that if there is any inconsistency between the REA
14   and the Lease, as between Landlord and Tenant, the Lease shall control. The provisions of this
15   clause shall be self-operative; however, Tenant, upon by request of any party in interest, shall
16   execute promptly such agreements or instruments to effectuate the intent of this clause.
17   Landlord agrees that, without first obtaining Tenant's prior written consent, it shall not amend or
18   modify the REA in any manner which adversely affects Tenant's rights or obligations with
19   respect to the Shopping Center.

20      Further, Landlord reserves the right to sever the ownership of or title to the various
21   sections of the Shopping Center and/or to place separate mortgages on said sections, in which
22   case the rights of Tenant, including, but not limited to, Tenant's rights under Section 29 hereof
23   will be preserved by a written declaration approved by Tenant, which approval shall not be
24   unreasonably withheld, delayed, or conditioned, to be executed by the Landlord and duly
25   recorded, creating mutual, reciprocal and interdependent rights to use the parking and other
26   Areas and the utilities and facilities needed for the full use and enjoyment of the Tenant and
27   without impairing any of the duties and obligations of the Landlord to Tenant under this Lease.
28   Tenant covenants to execute from time to time such instruments reasonably required by Landlord
29   and/or its Mortgagee to effectuate the provisions of this clause. Landlord covenants to reimburse

1   Tenant for all legal fees and other costs incurred by Tenant in connection with effectuating the
2   provisions of this clause.

3        36.   Confidentiality.   The parties hereto, including, but not limited to, their heirs,
4   successors, assigns and legal representatives, agree that this Lease may not be recorded and that
5   all such parties hereby agree to use their best reasonable efforts to preserve the confidentiality of
6   this transaction.   This confidentiality agreement extends to any developers, bankers, lawyers,
7   accountants, employees, agents or any other persons acting on behalf of the parties hereto.   Any
8   breach of this confidentiality agreement shall constitute an automatic Event of Default without
9   notice or cure provided, for which either party may recover damages as their sole remedy and for
10  which neither party can terminate this Lease.   Notwithstanding the foregoing, Landlord shall
11  have the right to make such disclosures regarding this Lease as are reasonably required in
12  connection with the sale of the Shopping Center, the financing or refinancing of the Shopping
13  Center, a governmental or judicial order or mandate, litigation, a condemnation proceeding, or to
14  an insurance carrier or broker, tax consultant or other party which customarily requires access to
15  such information and Tenant shall have the right to make such disclosures regarding this Lease
16  as are reasonably required in connection with any financing arrangements, a governmental or
17  judicial order or mandate, litigation, a condemnation proceeding, or to an insurance carrier or
18  broker, tax consultant or other party which customarily requires access to such information.

19       37.   Recapture Right/Failure to Operate.   If Tenant fails, for a period of three hundred
20  sixty-five (365) consecutive days, to be open for business in the Premises (excluding a closing
21  due to a casualty, condemnation or force majeure) Landlord shall have the right to terminate this
22  Lease at any time after the expiration of such one (1) year period and prior to Tenant reopening
23  for business, by delivery to Tenant of notice that the Lease shall terminate if Tenant does not
24  reopen for business within ninety (90) days of receipt of such notice; provided, however, such
25  notice shall be deemed to be null and void and no force and effect if, following receipt thereof
26  and prior to the expiration of such ninety (90) day period, Tenant either (i) reopens its business
27  fully stocked, fixtured and staffed or (ii) delivers evidence (in the form of at least a mutually
28  executed memorandum of such agreement setting forth a summary thereof) to Landlord that
29  Tenant has entered into a bona fide assignment or sublet of the Premises and such assignee or
30  sublessee subsequently opens its business fully stocked, fixtured and staffed within one-hundred

1  eighty (180) days of the date of such assignment or sublet.  If Landlord does so terminate this
2  Lease, Landlord shall reimburse to Tenant all of Tenant's unamortized costs of its improvements
3  (including, without limitation tenant improvements and fixtures [other than removable trade
4  fixtures], but excluding inventory) to the Premises which have not been previously reimbursed to
5  Tenant or included in the Lease Incentive Payment.  For purposes of calculating Tenant's
6  unamortized cost of an improvement to the Premises Tenant shall utilize an amortization period
7  equal to the lesser of (i) the remainder of Term (including all previously exercised option
8  Periods) when the improvement was put in service or (ii) the useful life of the applicable
9  improvement as determined for Tenant's federal income tax purposes. The parties hereby agree
10  that the provisions of the preceding two (2) sentences shall survive the termination of this Lease.
11          This Lease may be signed by Landlord and Tenant using counterpart signature pages.
12  The Lease shall be deemed mutually executed upon each party's receipt of such counterpart
13  signature pages.
14
15          [BALANCE OF THIS PAGE INTENTIONALLY LEFT BLANK]
16
17
18
19

1   WITNESS the following signatures and seals:
2
3                                        **LANDLORD**
4
5   WITNESS:                             THE CAFARO NORTHWEST PARTNERSHIP,
6                                        an Ohio General Partnership
7
8                                        By:
9                                        Name:  Anthony M. Cafaro, Sr.
10                                       Title:   Authorized Agent
11
12
13  STATE OF OHIO           )
14                          ) SS:
15  COUNTY OF MAHONING  )
16
17       Personally appeared before me, the undersigned, a Notary Public in and for said County
18  and State, Anthony M. Cafaro, Sr., known to me to be the Authorized Agent of THE CAFARO
19  NORTHWEST PARTNERSHIP, the Partnership which executed the foregoing document, who
20  acknowledged that he did sign the foregoing instrument for and on behalf of said Partnership,
21  being thereunto duly authorized; that the same is his free act and deed as such Authorized Agent
22  and the free act and deed of said Partnership.
23
24
25                                       Notary Public
26                                                 **ROCHELLE L. CAVALIER**
27                                                 **Notary Public, State of Ohio**
28                                                 **My Commission Expires May 28, 2007**
29
30
31               [BALANCE OF THIS PAGE INTENTIONALLY LEFT BLANK]

```
1
2   WITNESS the following signatures and seals:
3
4                                       TENANT
5
6   WITNESS:                            CIRCUIT CITY STORES WEST COAST, INC.
7                                       an California Corporation
8                                          Virginia
9                                       By:
10                                      Name: Steven E. Jackson
11                                      Title:   Vice President of Real Estate Matters
12
13
14
15
16
17  STATE OF VIRGINIA )
18                   )              SS:
19  COUNTY OF HENRICO )
20
21        Personally appeared before me, the undersigned, a Notary Public in and for said County
22  and State, Steven E. Jackson    known to me to be the VP, Real Estate of
23  CIRCUIT CITY STORES WEST COAST, INC., a California corporation, the Corporation
24  which executed the foregoing document, who acknowledged that he/she did sign and seal the
25  foregoing instrument for and on behalf of said Corporation, being thereunto duly authorized by
26  its Board of Directors; that the same is their free act and deed as such officers and the free act
27  and deed of said Corporation.
28
29        - IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at
30  Henrico County, VA, this 20th day of September , 2005 .
31
32                                      Notary Public
                                        My Commission Expires May 31, 2007
33
34
35
36           [BALANCE OF THIS PAGE INTENTIONALLY LEFT BLANK]
```

## EXHIBIT 'I'

## COMMENCEMENT DATE AGREEMENT

THIS COMMENCEMENT DATE AGREEMENT, made as of this 19 day of January 2007 between THE CAFARO NORTHWEST PARTNERSHIP (herein called "Landlord"), and CIRCUIT CITY STORES, INC., (herein called "Tenant").

## WITNESSETH:

WHEREAS, Landlord is the owner of certain premises situated in the City of Puyallup, Pierce County, Washington (herein called the "Premises"); and

WHEREAS, by that certain Lease dated September 9, 2005 (herein called the "Lease"), Landlord leased the Premises to Tenant; and

WHEREAS, Tenant is in possession of the Premises and the term of the Lease has commenced; and

WHEREAS, under Paragraph 24 of the Lease, Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease;

NOW, THEREFORE, Landlord and Tenant agree as follows:

1.  The term of the Lease commenced on, and the Commencement Date (as such term is defined in the Lease) was, August 19, 2006. The term of the Lease shall expire on January 31, 2022 unless Tenant exercises any option to extend the term of the Lease or unless the Lease terminates earlier as provided in the Lease.

2.  The date of commencement of the first "Option Period" (as such term is defined in the Lease) shall be February 1, 2022 if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, 2027 unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

3.  The date of commencement of the second Option Period shall be February 1, 2027 if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, 2032 unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

4.  The date of commencement of the third Option Period shall be February 1, 2032 if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, 2037 unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed the day and year first above written.

LANDLORD:

THE CAFARO NORTHWEST PARTNERSHIP

By: _Cindy J Weatune_

TENANT:

CIRCUIT CITY STORES, INC.,
A Virginia corporation

By: _____  2/22/07
Name: John B. Mulready
Title:   Vice President, Real Estate and Construction



RECEIVED
FEB 2 8 2007