# LEASE

## between

## CIRCUIT CITY STORES, INC.,

### as Tenant

### and

## KENTUCKY OAKS MALL COMPANY,

### as Landlord

dated *May 6*, 1998

## KENTUCKY OAKS PLAZA, PADUCAH, KENTUCKY

478044.9



# TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | Leased Property | 1 |
| 2. | Construction of Building and Improvements | 2 |
| 3. | Lease Term | 2 |
| 4. | Rent | 4 |
| 5. | Operation of Shopping Center by Landlord | 8 |
| 6. | Easements | 9 |
| 7. | Common Areas and Common Area Maintenance | 11 |
| 8. | Signs and Communications Equipment | 14 |
| 9. | Taxes | 15 |
| 10. | Maintenance, Repairs and Replacements | 19 |
| 11. | Utility Service Provider; Payment of Utility Bills | 22 |
| 12. | Alterations | 23 |
| 13. | Mechanics' Liens | 24 |
| 14. | Insurance | 25 |
| 15. | Damages by Fire or Other Casualty | 30 |
| 16. | Condemnation | 32 |
| 17. | Assignment and Subletting | 35 |
| 18. | Use | 36 |
| 19. | Warranties, Representations and Covenants | 37 |
| 20. | Estoppel Certificates | 48 |
| 21. | Subordination, Non-Disturbance and Attornment | 48 |
| 22. | Tenant's Financing | 50 |
| 23. | Tenant's Property and Waiver of Landlord's Lien | 50 |
| 24. | Memorandum of Lease; Commencement Date Agreement | 51 |
| 25. | Expiration of Term and Holding Over | 51 |
| 26. | Force Majeure | 52 |
| 27. | Events of Tenant's Default | 52 |
| 28. | Landlord's Remedies | 53 |
| 29. | Events of Landlord's Default; Tenant's Remedies | 55 |
| 30. | Waiver | 59 |
| 31. | Compliance with Applicable Laws | 59 |
| 32. | Notices | 59 |
| 33. | Brokers | 61 |
| 34. | Miscellaneous | 61 |
| 35. | Construction, Operation and Reciprocal Easement Agreement | 63 |
| 36. | Effectiveness of Lease; Tenant's Right to Terminate | 63 |
| 37. | Confidentiality | 63 |
| 38. | Recapture Right/Failure to Operate | 64 |

## EXHIBITS

"A"    Site Plan
"A-1"  Shopping Center Legal Description
"A-2"  Alternate Site Plan
"B"    Index of Definitions
"C"    Construction Provisions
"D"    Removable Trade Fixtures
"E"    Sign Plans
"F"    Prohibited Activities, Permitted Encumbrances and Permitted Title Exceptions
"F-1"  Permitted Encumbrances
"G"    Subordination, Non-Disturbance and Attornment Agreement
"H"    Memorandum of Lease
"I"    Commencement Date Agreement
"J"    Indemnification Agreement

Kentucky Oaks Plaza

## LEASE

This LEASE is made as of the 6ᵗʰ day of _May_, 1998, by and between **KENTUCKY OAKS MALL COMPANY**, an Ohio limited partnership, having an address at 2445 Belmont Avenue, Youngstown, Ohio  44504-0186 ("Landlord"), and **CIRCUIT CITY STORES, INC.**, a Virginia corporation, having an address at 9950 Mayland Drive, Richmond, Virginia 23233 ("Tenant").

### W I T N E S S E T H :

The parties hereto agree as follows:

1.    <u>Leased Property</u>.  Landlord leases to Tenant all those certain "Premises" (as defined in paragraph 2), when same are constructed or renovated on that parcel (the "Land"), outlined in red on <u>Exhibit "A"</u> (the "Site Plan"), including exclusive rights in the two (2) automobile loading stalls labeled "Customer Pick-Up" within the Premises as shown on the Site Plan, the exclusive rights in the six (6) parking spaces labeled "Car Stereo Parking" adjacent to the approximately 20,831 square foot Building as shown cross-hatched on the Site Plan and with the easements described in paragraph 6 below; all located in the "Shopping Center" (herein so called), located at Kentucky Oaks Plaza, in the City of Paducah (the "City"), County of McCracken, Commonwealth of Kentucky (the "State"), shown on the Site Plan and described by metes and bounds or platted lot legal description on <u>Exhibit "A-1"</u> attached hereto. All of the Shopping Center, exclusive of the Premises and the areas designated as the "SM Parcel" and the "Wal-Mart Parcel", is "Landlord's Premises". Landlord hereby grants to Tenant all of those certain rights, in common with others, granted Landlord, as owner of the Shopping Center, under (i) that certain Easement and Restriction Agreement listed as Items 4, 8 and 12 of Schedule B, Section II on <u>Exhibit "F-1"</u> attached hereto; (ii) that certain Amended and Restated Declaration listed as Item 3 of Schedule B, Section II on <u>Exhibit "F-1"</u> attached hereto, as amended by unrecorded Supplements dated April 16, 1984, October 21, 1985, and September

27, 1993; and (iii) that certain Declaration of Easements listed as Item 6 of Schedule B, Section II of Exhibit "F-1" (collectively, the "REA").

2.   Construction of Building and Improvements.  Commencing promptly following the execution of this Lease, Tenant shall construct within the Shopping Center a one-story retail building, containing approximately 20,831 square feet of ground-floor gross leasable area, with provisions for customer pickup, delivery and car stereo installation facilities as shown on the Site Plan, initially for use as a Circuit City Superstore (the "Building"), together with loading ramps, sidewalks, trash compactor, concrete stoops and/or aprons, utility extensions from the point of Landlord's utility stubs, utility meters, electric transformer, loading docks, transformer pad, tie-in of new parking lot lighting to Tenant's electrical meter, and other such appurtenances and improvements (collectively, the "Other Improvements"), as more particularly set forth in the Construction Provisions.  The Building and Other Improvements are sometimes collectively referred to herein as the "Improvements".  As more particularly set forth in the Construction Provisions, the Improvements shall be constructed by Tenant to completion with due diligence in accordance with the "Plans and Specifications" to be prepared by Tenant and approved by Landlord as specified in the Construction Provisions. Except as otherwise provided herein, title to the Improvements shall be deemed transferred to Landlord upon the Base Rent Commencement Date, as defined in paragraph 4(b) below. The Land and the Improvements in the area marked in red on the Site Plan are referred to herein as the "Premises".

3.   Lease Term.  Subject to paragraph 36, the construction term (the "Construction Term") of this Lease shall commence on the date on which this Lease is finally executed by both Landlord and Tenant and three (3) fully executed originals are in possession of each of Landlord and Tenant (the "Effective Date"), and shall end on the "Commencement Date" (as defined in paragraph 4(b) below). The main term (the "Main Term") of the Lease shall commence on the Commencement Date and shall end on the last day of January following the twentieth (20th) anniversary of the Commencement Date.

In addition to the Main Term, Tenant shall have the option (each such right referred to herein as a "Renewal Option") to renew and extend the Lease for four (4) consecutive five (5) year periods (each such period referred to as an "Option Period" and collectively as the "Option Periods") immediately following the Main Term, at the rents specified below. Tenant shall give Landlord written notice of its election to exercise any Renewal Option at least two hundred seventy (270) days prior to the expiration of the Main Term or any then-current Option Period, as applicable, provided, however, if, prior to the aforementioned two hundred seventy (270) day period, Tenant does not give Landlord written notice of its intent not to exercise its renewal option, Tenant's right to exercise such renewal option shall continue, as shall its tenancy hereunder, until the (10) business days after Landlord has given Tenant written demand that Tenant exercise such renewal option within ten (10) business days of Tenant's receipt of such demand or forfeit its right to exercise such renewal option, during which ten (10) business day period Tenant may exercise its renewal option, whereupon the Term (defined below) of this Lease shall be renewed and extended as if such notice had been given prior to the two hundred seventy (270) day period described above. Landlord may demand that Tenant exercise such renewal option within ten (10) business days of Tenant's receipt of such demand or forfeit its right to exercise such renewal option by delivery of such demand at any time within four hundred and fifty (450) days prior to the expiration of the Main Term or any then-current Option Period, provided that the delivery of such demand by Landlord shall not (a) trigger the ten (10) business day response period if such notice is given more than two hundred and eighty (280) days prior to the expiration of the Main Term or any then-current Option Period, nor (b) require Tenant to give its renewal notice earlier than two hundred and seventy (270) days prior to the expiration of the Main Term or any then-current Option Period, as applicable.

Notwithstanding anything to the contrary provided in this paragraph 3, Tenant may not exercise its option hereunder if, at the time of such exercise, (i) Tenant is in default of an obligation hereunder to make any payment of money required by this Lease and has failed to cure such default within the applicable notice period, or (ii) Tenant is in default with respect to the observance or performance of any material non-monetary provision of this Lease and has

Lease Incentive Payment (as defined in paragraph 4(d) below). Tenant shall pay Interim Rent in equal monthly installments of Nine Thousand Four Hundred Sixty and 75/100 Dollars ($9,460.75), in advance on the first day of each calendar month, with appropriate proration for any partial calendar month, to the address given for Landlord in paragraph 32 below.

(c)   Base Rent.  Tenant agrees to pay base rent ("Base Rent") for the Premises in the amounts and in the manner specified hereunder, commencing (subject to paragraph 4(d) below) on the Base Rent Commencement Date.

Landlord shall give Tenant written notice of a change of address or change of the party to whom such rents shall be payable along with written documentation reasonably satisfactory to Tenant of such party's right to receive payment hereunder.   Unless adjusted as provided below or in paragraph 3 of the Construction Provisions, Base Rent shall be paid in equal monthly installments in advance on the first day of each succeeding calendar month throughout the Term, with appropriate proration for any partial calendar month, to the address given for Landlord in paragraph 32, pursuant to the following schedule:

(i)   Base Rent Schedule.

| Months Following Base Commencement Date | Rate | Annual Rent* | Monthly Installments |
|---|---|---|---|
| Base Rent | | | |
| Commencement Date - 60 | 11.90 | $247,888.92 | $20,657.41 |
| 61-120 | 12.69 | $265,614.48 | $22,134.54 |
| 121-180 | 13.48 | $280,801.92 | $23,400.16 |
| 181-240 | 14.27 | $297,258.48 | $24,771.54 |
| 241-300 | 15.06 | $313,714.92 | $26,142.91 |
| 301-360 | 15.85 | $331,756.44 | $27,646.37 |
| 361-420 | 16.64 | $346,627.92 | $28,885.66 |
| 421-end of last Option Period, if exercised | 17.43 | $363,084.36 | $30,257.03 |

*   assumes initial rental rate of $11.90 PSF and $.79 PSF increases every five (5) years

(ii)   Adjustment in Base Rent.   Notwithstanding the Base Rent provisions, in the event that the ground-floor gross leasable area of the Building when constructed exceeds

in paragraph 14(a) of the Lease.  Landlord and Tenant covenant and agree that, if the Lease Incentive Payment Qualification Date has occurred but the Lease Incentive Payment has not been disbursed, upon the reasonable written request of either the Tenant or Landlord, the Landlord and Tenant shall execute such documentation as necessary to formalize the conversion of this Lease to a ground lease upon the first anniversary of the Lease Incentive Payment Qualification Date.

Notwithstanding the foregoing, at any time following the thirtieth (30th) day after the Lease Payment Qualification Date Anniversary and upon the failure of Landlord to pay the Lease Incentive Payment within fifteen (15) days of receipt of notice from Tenant of such failure, Tenant shall have the right at Tenant's sole election, but not the obligation, in lieu of any subsequent obligation that Landlord pay to Tenant the Lease Incentive Payment, to mortgage, sell, convey, assign, lease or otherwise encumber (collectively, a "Post-Completion Transfer") Tenant's interest in the Building, the Improvements and the Lease.  Such right shall be in addition to the rights of Tenant set forth in paragraphs 17 and 22 of the Lease.  Such sale, conveyance, assignment, lease, mortgage or encumbrance shall relate merely to Tenant's leasehold interest and/or Tenant's Building.   At all times, any such sale, conveyance, assignment, lease, mortgage or encumbrance shall be subordinate to Landlord's interest in the fee and subject to all of the terms of this Lease.  Upon the expiration of this Lease, the termination of this Lease, or the termination of Tenant's right of possession, the Building shall become the property of the Landlord, free and clear of any such sale, conveyance, assignment, lease, mortgage or encumbrance.

Landlord covenants to (i) execute all documents necessary to permit Tenant to effect the Post-Completion Transfer described herein, and (ii) cause any Mortgagee to specifically acknowledge the rights of Tenant's lender and third parties arising as a result of such Post-Completion Transfer.  Notwithstanding such Post-Completion Transfer, Tenant shall continue to pay the ground rentals described in this paragraph 4(d) during the remainder of the Term.

5.    Operation of Shopping Center by Landlord.  Landlord covenants to operate a first-class shopping center.  All future development of the Shopping Center will be consistent with

a first-class shopping center. The location of buildings and other tenant space therein will only be within the "Permissible Building Areas" designated on the Site Plan. Except as otherwise provided in paragraph 16 below, the number of parking spaces and parking ratio for the Shopping Center shall at all times be at least as shown on the Site Plan, but in no event shall said ratio be less than that required by applicable zoning requirements. All parking shall be at ground level. Landlord shall construct or cause all improvements in the Shopping Center (other than the Improvements to be constructed by Tenant) to be constructed in a good and workmanlike manner, lien-free and Landlord agrees to indemnify, defend and hold Tenant harmless from any loss or damage suffered by Tenant as a result of Landlord's construction, except to the extent caused by Tenant's negligence. Landlord's construction shall not materially interfere with the conduct of Tenant's business. If, at any time during the Term, in Tenant's reasonable judgment, based upon actual operating experiences at the Shopping Center during previous Christmas holiday seasons, the then existing paved parking in the Shopping Center is inadequate for the conduct of Tenant's business at the Premises, then Landlord shall provide additional paved parking in the areas designated on the Site Plan as Overflow Parking Area C in order to provide adequate parking for the conduct of Tenant's business at the Shopping Center. If such additional paved parking is provided pursuant to the immediately preceding sentence, Tenant shall pay one-half of the cost of constructing such additional parking.

In addition to the foregoing restrictions, Landlord shall not be permitted to construct buildings in any Permissible Building Area unless supplemental parking is added to the Shopping Center utilizing a parking ratio of 5.0 parking spaces per 1,000 square feet of such new building area. Furthermore, all new parking constructed to meet such ratio requirements shall be adjacent to or within three hundred (300) feet of the newly constructed building areas. Notwithstanding the foregoing, Landlord may add up to an aggregate of 15,000 square feet to Units 920 and 950 (as shown on the Site Plan), provided the required additional parking spaces are located in Overflow Parking Areas A and/or B.

6.    Easements. Landlord also grants to Tenant those nonexclusive leasehold easements which shall run as covenants with Landlord's Premises and the Premises during the Term, over

Landlord's Premises, which are useful and appropriate for the construction, operation and maintenance of the Premises, including but not limited to:

(a)    Construction Easements.    During the Construction Term, and any period of renovation or permitted reconstruction thereafter, Landlord grants to Tenant (i) a nonexclusive easement across a mutually agreeable designated route, providing access to and from the public roadways nearest to the Land, over the Common Areas (as defined in paragraph 7(a) below) for construction access to the Premises, as well as an exclusive easement for a construction staging area (the "Staging Area") of approximately 10,000 square feet as shown on the Site Plan, in a portion of the Common Areas at a mutually agreeable location within a reasonable distance of the Land solely for Tenant's use in constructing the Improvements, (ii) an easement to permit the Building to abut and flash into adjacent buildings, but not bear upon the adjacent foundations, footings, common walls and roofs, (iii) an easement for such additional underground, public or private utility easements (within portions of Common Areas of the Shopping Center not designated as Permissible Building Areas) as Tenant deems necessary, without unreasonably interfering with the use by Landlord of the Common Areas, for the benefit of the Premises. For the purpose of exercising the rights granted in this subparagraph 6, Tenant and/or the utility provider shall have the right to enter upon and use the Common Areas (exclusive of the Permissible Building Areas) to install the utility systems, all of which are to be underground, to such extent and so long as reasonably necessary to accomplish such purpose, subject to restoration of the Common Areas by Tenant following such installation and any other reasonable conditions and requirements imposed by Landlord, such as location and depth, and (iv) a non-exclusive easement (the "Common Area Easement") to use the Common Areas for their intended purposes and to permit Tenant and its employees, agents, subtenants, assignees, licensees, suppliers, customers and invitees to use the Common Areas for the purposes (without limitation) of parking and pedestrian, service and vehicular access, ingress and egress to, from and between the Premises and the Landlord's Premises and the streets and highways abutting and adjacent to the Shopping Center, without payment of any fee or other charge therefor, except for the CAM Charge. It is specifically agreed that with respect to the automobile loading

478044.9                                    -10-

stalls designated on the Site Plan as Tenant's "Customer Pick-Up", (i) Tenant shall, with Landlord's consent, which shall not be unreasonably withheld or delayed, have the right, from time to time, to relocate the same to other areas adjacent to the Improvements and (ii) notwithstanding the fact the same are in, and constitute a part of, the "Common Areas", Tenant may install signage designating such automobile loading stalls for exclusive use by Tenant's customers, invitees and patrons. Landlord shall have no obligation to enforce such exclusive use and Tenant shall cease such designation if such designation violates the terms of the lease (executed prior to this Lease) of another tenant in the Shopping Center and such tenant notifies Landlord of its objection to such designation.  Tenant shall also have the right to use such Common Areas immediately adjacent to Tenant's Improvements for Tenant's "Customer Pick Up" used exclusively for Tenant's customers, invitees and patrons.  Tenant acknowledges that, except during the Construction Term, Tenant shall not permit overnight truck or trailer storage on any portion of the Common Areas.  None of the easements granted by the parties to this Lease is intended, nor shall any of them be construed, as a dedication of any portion of the Shopping Center for public use, and Landlord may take whatever reasonable steps that may be necessary to avoid such dedication.

      7.    <u>Common Areas and Common Area Maintenance</u>.

      (a)    <u>Definition of Common Areas</u>.  The term "Common Areas" shall be defined to include, as they may from time to time exist, the parking areas, lanes, drives, entrances, truck passageways, sidewalks, ramps, stairways, landscaped and other unpaved areas, parking lot lighting facilities and equipment (except to the extent of Tenant's obligations regarding Tenant's Supplemental Light Poles [as hereinafter defined in this paragraph 7(a)] and additional parking lot lighting), Landlord's pylon sign(s), if any, directional, traffic and monument sign structure(s) (excluding those dedicated exclusively to a Shopping Center tenant or occupant) and shared utility facilities located in all elements of the Shopping Center (including any such areas and facilities contained within outparcels and adjacent tracts but reserved to the benefit of the Shopping Center occupants) and which are intended and available for the common use of all of the tenants within the Shopping Center (including any outparcel and other adjacent occupants

which contribute toward "CAM Charges" [as defined below] and which are not responsible for separate maintenance of such outparcels or tracts), their subtenants, licensees, and business invitees. "Common Areas" excludes the Premises. Except as set forth in paragraph 10 hereof and except as set forth in this paragraph 7, Landlord shall be responsible for operating, maintaining, repairing and replacing the Common Areas in a first-class manner, including cleaning, maintenance of Landlord's pylon, if any, snow clearing and plowing and ice treatment, removal of Common Area trash and garbage, lighting (except for electricity consumed by the parking lot lighting and Tenant's Supplemental Light Poles tied exclusively to Tenant's meter), repairing, repaving and restriping the parking area, and maintaining, replanting and replacing landscaping (except if located on the Premises), all such work to be referred to collectively as "Common Area Maintenance". Relative to the sidewalks immediately adjacent to Tenant's Building, Landlord's only obligation shall be snow removal and sweeping of same; Tenant shall be responsible for all other maintenance, repair and replacement of such adjacent sidewalks, except that Landlord shall be responsible for maintenance arising out of Landlord's negligence or willful acts. As of the date of this Lease, the occupant of the SM Parcel and the occupant of the building labeled "OfficeMax Unit 985" on the Site Plan are responsible for the payment of the utility charges for the light poles situated within the parking field portion of Tenant's Preferred Area. In the event either or both of said parties no longer pays for such utility charges, Landlord shall extend an empty conduit from the light pole in Tenant's Preferred Area which is closest to the Building to, at Tenant's option, either (i) the front curb line of the Building or (ii) the Supplemental Light Pole in the front of the Building, and Tenant shall be responsible for extending the wiring from its electric panel through said conduit connected to said closest light pole. Thereafter, Tenant shall be responsible for the payment of utility charges with respect to the operation of such light poles. Reference is made to the REA, wherein it is stated that Service Merchandise must illuminate its common areas during the night hours in which the Shopping Center usually is open for business. Landlord will use its best efforts to enforce this obligation. Notwithstanding the foregoing, Tenant, at its option, may install light poles for the illumination

of its storefront and side yard at the two (2) locations shown on the Site Plan (the "Supplemental Light Poles"). If installed, Tenant shall be solely responsible for the maintenance, repair, operation (including all utility charges), and replacement of the Supplemental Light Poles and their components including, but not limited to, the concrete base, support pole, light bulbs and all other electric components of the Supplemental Light Poles.

       (b)   <u>Tenant Payments</u>.  Commencing on the Commencement Date and continuing until the first January 1st thereafter, Tenant shall pay to Landlord a fee of $1.05 per square foot of gross leasable area of the Building per annum (the "CAM Charge"), payable in equal monthly installments, in advance on the first day of each month, as its share of the cost of Common Area Maintenance. (The CAM Charge shall not include the cost of Common Area liability insurance carried by Landlord, which cost shall be paid in accordance with paragraph 14(e) below.) The CAM Charge shall increase on said first day of January by an amount equal to the product of $1.05 and the percentage increase in the CPI-U from December 31, 1997 to such first day of January. For each calendar year thereafter, the CAM Charge shall be increased on the first day of such calendar year by an amount equal to the product of the CAM Charge for the immediately preceding calendar year and the percentage increase in the CPI-U during the immediately preceding calendar year. In the event that the percentage change in the CPI-U during the preceding calendar year is zero or less than zero, then the CAM Charge for the succeeding calendar year shall be the same as for the preceding calendar year. As used in this Lease, the CPI-U shall be the United States Department of Labor, Bureau of Labor Statistics Consumer Price Index for All Urban Consumers, U.S. City Average, as revised from time to time for base averages. If at any time during the Term the CPI-U shall be discontinued, Landlord and Tenant shall mutually and reasonably agree to substitute an existing official index published by the Bureau of Labor Statistics or its successor or another similar index most nearly equivalent to the CPI-U. For any period within the Term which is less than a full calendar year, the annual CAM Charge shall be appropriately prorated. If the information necessary to make the adjustment contemplated above is not available at the end of a given calendar year, Tenant shall continue to pay on an interim basis the then applicable CAM Charges. Upon receipt of

478044.9

-13-

the information required to make the adjustment contemplated above a necessary adjustment with respect to amounts previously paid by Tenant shall thereupon be retroactively made; and the monthly payments to be made by Tenant for from the first day of the calendar year and for the remainder of the calendar year shall be established.

      8.     Signs and Communications Equipment.

      (a)     Signs.  Tenant, at its sole cost and expense, shall have the right to construct and install at the location designated for "Circuit City Pylon Sign" on the Site Plan, a pylon sign structure (which shall not exceed twenty (20) feet in height, measured from the highest point of the existing grade into which the footings of the pylon sign structure are installed) containing doublesided "face panels" (each of which panels shall be eighteen (18) feet wide by eight (8) feet four (4) inches in height, with lettering thereon of thirty (30) inches in height) solely identifying Tenant's store, which face panels shall also be constructed and installed at Tenant's sole cost and expense.  Attached as a portion of Exhibit "E" are plans and specifications for such pylon sign (including colors, design, dimensions and type of lighting), which Landlord hereby approves upon its execution of this Lease.  Attached as a portion of Exhibit "E" are plans and specifications for Tenant's face panels and for Tenant's building signage, which Landlord hereby approves upon its execution of this Lease.  Notwithstanding the foregoing, Tenant, its successors, subtenants and assigns shall be entitled without Landlord's consent, but subject to governmental requirements, as aforesaid, to replace any and all of its signs with signage consistent with Tenant's (or its successors' subtenants' or assigns') then-current prototypical sign plans provided that (i) such replacement signage solely identifies Tenant's (or its successors', subtenants', or assigns') tradename(s), does not increase the number of such signs in the aggregate or on any particular Building elevation, does not extend above the top of the parapet wall, and does not substantially increase the size of the previous signage and, (ii) if Tenant relocates such signage, such relocation is subject to Landlord's approval, which shall not be unreasonably withheld or delayed.  Except as provided above, any modification of Tenant's signage shall require Landlord's prior consent, which shall not be unreasonably withheld, delayed or conditioned.

(b)    <u>Communications Equipment</u>.  Tenant may install, maintain and/or replace any satellite dishes, antennas, cellular and PCS towers and poles on the roof and/or the interior of the parapet of the Building as Tenant deems necessary or desirable, provided same shall not adversely and materially affect the roof or the structural elements thereof and are located, to the extent practicable, to minimize visibility thereof from the Common Areas.  Upon removal by Tenant of any satellite dishes or antennas, Tenant shall repair any damage done in connection with such removal.  To the extent Tenant installs any satellite dishes or antennas on the roof, Tenant shall maintain same and indemnify Landlord from any and all costs and expenses, including reasonable attorneys fees, arising from injury sustained by persons as a result of the presence of such satellite dishes or antennas.

9.    <u>Taxes</u>.

(a)    <u>Taxes Contemplated Hereunder</u>.  The term "Real Estate Taxes" shall mean (i) all real estate taxes and assessments, both general and special, and all ad valorem taxes, rates and levies paid upon or with respect to the land, buildings and all other improvements on the tax parcel in which the Premises are located (the "Tax Parcel"), (ii) rent taxes or gross receipts taxes payable with respect to rental and other charges payable under the terms of this Lease paid by Tenant, (iii) any business and occupation taxes payable with respect to the conduct by Tenant of its business at the Premises for a calendar year or a portion thereof to any governmental agency or authority, and (iv) all charges specifically imposed in lieu of any such taxes. Except as specifically provided in clauses (i)-(iv) above, nothing contained in this Lease shall require Tenant to pay any local, county, municipal, state or federal income, franchise, corporate, estate, inheritance, succession, capital levy, business or transfer tax of Landlord, or any local, county, municipal, state or federal income, profits, gross receipts (other than with respect to rental and other charges as contemplated in clause (ii) above), sales or renewal tax or charge upon the rent other charges payable by Tenant under this Lease.  Further included within the definition of "Real Estate Taxes" are all reasonable expenses incurred by Landlord in reviewing, negotiating, appealing or contesting such taxes or assessments.  Tenant's pro rata share of Real Estate Taxes shall not be increased by any additional charges or penalties incurred by Landlord due to late

478044.9                                  -15-

payment of Real Estate Taxes or decreased by any reduction or abatement otherwise received by Landlord due to early payment of Real Estate Taxes, if such early payment is made prior to the date Tenant pays Tenant's "Pro Rata Share of Real Estate Taxes" (as defined below). Landlord warrants and represents that there is no existing special assessment applicable to Tenant's Tax Parcel by any governmental authority related to construction undertaken by a governmental agency in lieu of Landlord. Tenant shall not be obligated to pay any portion of any such existing special assessments.

(b)    Payment of Real Estate Taxes. Within the later of (i) thirty (30) days of receipt of Landlord's invoice for Tenant's Pro Rata Share of Real Estate Taxes, together with a copy of the tax bill on the basis of which such invoice was rendered, if Tenant requests such copy, or (ii) sixty (60) days prior to date on which such tax bill is payable by Landlord, Tenant shall pay "Tenant's Pro Rata Share of Real Estate Taxes" (as defined below) levied against the Tax Parcel. "Tenant's Pro Rata Share of Real Estate Taxes" shall always be the product of the Real Estate Taxes multiplied by a fraction, the numerator of which is the number of square feet of gross leasable area in the Building, and the denominator of which is the number of square feet of gross leasable area (excluding the area of any outside sales area exclusive to a single occupant) in the Tax Parcel. In determining the gross leasable area of any building in the Shopping Center (including the Building), measurement shall be made from the center line of any common walls and the outside of any exterior walls. Increases in applicable floor areas shall result in corresponding adjustments of Tenant's Pro Rata Share and shall result in changes in the calculation of ancillary charges based upon square footage. In no event shall the gross leasable area of the Building be less than 20,831 or the denominator of the fraction by which Tenant's Pro Rata Share is determined be less than ninety percent (90%) of the gross leasable area of all buildings located on the Tax Parcel as it may exist from time to time.

Landlord agrees that if, as a result of the inclusion in the Tax Parcel of buildings outside the Shopping Center or buildings developed in the currently undeveloped portions of the Shopping Center, which buildings are utilized for purposes not customarily included in a retail power center, the per square foot cost to Tenant of its Pro Rata Share of Real Estate Taxes

materially exceeds the per square foot cost Tenant would pay in a comparable retail power center in the Paducah, Kentucky area, Landlord will reduce Tenant's per square foot cost of Real Estate Taxes to an amount consistent with that which would be payable in such comparable retail power center.  In the event of a dispute between Landlord and Tenant as to the appropriate per square foot cost for Tenant's Pro Rata Share of Real Estate taxes, Landlord and Tenant agree to submit such dispute to a tax service (national or local) selected by Landlord and reasonably acceptable to Tenant with not less than five (5) years experience in handling tax contests for retail properties in the Paducah, Kentucky area and agree to be bound by such tax service's determination of what the per square foot cost of Real Estate Taxes is for comparable retail centers in the Paducah, Kentucky area.  In no event shall Tenant be obligated to pay as its Pro Rata Share of Real Estate Taxes an amount greater than its Pro Rata Share of Real Estate Taxes as determined pursuant to the preceding paragraph.

Provided Tenant pays its Pro Rata Share of Real Estate Taxes prior to the date upon which Landlord may receive early payment discounts, Tenant's Pro Rata Share of Real Estate Taxes shall be net of any early-payment discounts available at the time Tenant's payment is due.  Landlord shall pay, or cause the payment of, all Real Estate Taxes before any fine, penalty, interest or cost may be added thereto, become due or be imposed by operation of law for the nonpayment or late payment thereof.  Provided Tenant timely pays Tenant's Pro Rata Share of Real Estate Taxes, in no event shall Tenant be liable for any discount forfeited or penalty incurred as a result of late payment by another tenant or by Landlord.  Real Estate Taxes shall be prorated as of the Commencement Date and the expiration or earlier termination of this Lease, and Landlord shall promptly return to Tenant any overpayment made by Tenant with respect to the period prior to or subsequent to the Term.  Landlord shall remain primarily responsible for such payment notwithstanding the fact that such payment may be made by a tenant of Landlord's Premises or other third party pursuant to an agreement to which Tenant is not a party.  In addition, should Landlord fail to pay such Real Estate Taxes before same become delinquent and Tenant has a reasonable basis for concluding the governing taxing authority will, in the absence of payment, foreclose its tax lien within forty-five (45) or less

days, Tenant shall have the right, at its election, to cure such failure by payment of delinquent Real Estate Taxes and any interest and penalties due thereon and in such event Tenant may deduct the cost thereof, plus interest at the lesser of fifteen percent (15%) per annum or the highest rate permitted by State law (the "Default Rate"), from the next installment(s) of Interim Rent or Base Rent and other charges due hereunder.

(c)    Contest of Real Estate Taxes and/or Assessed Valuation of Property. Tenant shall have the right, at Tenant's sole expense, to contest the amount or validity, or otherwise seek an exemption or abatement, of any Real Estate Taxes or to seek a reduction in the valuation of the Premises assessed for Real Estate Tax purposes, by appropriate proceedings diligently conducted in good faith, provided that Tenant shall first have notified Landlord of its intent to do so and Landlord shall have failed to notify Tenant in writing, within the earlier of (i) thirty (30) days of receipt of Tenant's notice or (ii) the date which is ten (10) business days before an appeal or contest must be filed, that Landlord intends to contest such Real Estate Taxes or seek such a reduction. In any instance where any such action or proceeding is being undertaken by Tenant, Landlord shall cooperate with Tenant, execute any and all documents reasonably required in connection therewith and, if required by any law, rule or regulation of the taxing authority, shall join with Tenant in the prosecution thereof at the expense of Tenant.

(d)    Payment Following Appeal. If no payment of Real Estate Taxes was required by the taxing authority during the pendency of the proceedings set forth in paragraph (c), upon the termination of such proceedings, Tenant shall pay Tenant's Pro Rata Share of such Real Estate Taxes as finally determined in such proceedings, the payment or partial payment of which may have been deferred during the prosecution of such proceedings. Tenant shall be entitled to a refund from the appropriate taxing authority of any overpayment of Real Estate Taxes relating or allocable to the Premises, as well as a reimbursement from the appropriate taxing authority of all costs, fees and expenses it incurs in such protest or reassessment. In the event the Real Estate Taxes are increased as a result of Tenant's real estate tax contest and/or the valuation or assessment of the Premises or Shopping Center increases due to Tenant's contest of Real Estate Taxes and Landlord is prohibited from passing such increase on to the other

tenants in the Shopping Center, Tenant and any other tenant contesting such taxes shall be solely responsible for the additional tax liability arising out of same and will hold Landlord harmless therefrom; such additional tax obligation being deemed as additional rent. In the event that Tenant fails to pay any portion of its responsibility of Real Estate Taxes, such amount shall be considered as additional rent and subject to all of the provisions of this Lease as to default in the payment of rent.

10.    Maintenance, Repairs and Replacements.    Notwithstanding anything to the contrary provided herein, except for repairs arising out of the negligent acts of Landlord, its agents or employees, Tenant shall, during the first twelve (12) months following Substantial Completion of the Improvements, be responsible for all maintenance, repairs and replacements with respect to the Improvements. Thereafter, except (i) for condemnation proceeds to be received by Tenant, or (ii) for obligations arising from the negligent acts or omissions or willful misconduct of Landlord (or its agents or employees), Tenant shall be solely responsible for maintenance, repair and replacement of the non-structural elements of the Improvements, both interior and exterior, including, but not limited to, the roof membrane, flashing and drainage system therefor (but not the structural system which supports the roof), the plumbing, heating, electrical and air conditioning systems which serve only the Premises, the concrete slabs, the non-load bearing walls, and the canopies and similar architectural building features of the Premises. Tenant shall also, at its sole cost and expense, (i) provide electric power to illuminate those parking lot lights which are connected to Tenant's meter during all periods of darkness in which the majority of the other parking lot lights in the Shopping Center are also illuminated, and (ii) provide electric power to illuminate the Supplemental Light Poles which may be installed by Tenant, and maintain, repair and replace the base, pole, and other improvements constituting said Supplemental Light Poles.

Tenant shall also be responsible for any maintenance, repairs, replacement, and alterations to both the structural and non-structural elements of the Building required in order to comply with applicable local, state or federal laws. The Tenant shall initially pay all costs of such compliance, provided however, (i) Landlord shall reimburse Tenant for those compliance

478044.9                                                            -19-

costs specifically arising in connection with alterations to the structural elements of the Building, and (ii) such reimbursement shall be limited to fifty percent (50%) of such costs in excess of Twenty-Five Thousand and No/100 Dollars ($25,000.00) per occurrence.  Notwithstanding the above, if said compliance is precipitated by Tenant's remodeling or alteration to the Building, or as a direct result of a particular use of the Building by Tenant other than the initial use contemplated by this Lease, or is related to Tenant's reconstruction of the Building, then Landlord shall have no obligation to reimburse Tenant for compliance costs as set forth above.

If, during the last three (3) years of the Initial Term or during the last three (3) years of any Option Period, Tenant is required to expend any sum for a single item of maintenance, repair or replacement to the Building in excess of Ten Thousand and No/100 Dollars ($10,000.00) in satisfaction of its obligations hereunder (excluding expenditures incurred due to compliance with laws), and if the resulting improvement to the Building is not permitted to be fully amortized in accordance with generally accepted accounting principles or the Internal Revenue Code and Regulations (utilizing an amortization period equal to the shortest useful life of the applicable improvement), over the remainder of the Term (without consideration to the exercise of any additional Renewal Options), then Tenant shall be reimbursed by Landlord in an amount equal to fifty percent (50%) of that portion of the cost expended due to such maintenance, repairs or replacement, but only to the extent that same is not permitted to be amortized during the remainder of the Term (without consideration to the exercise of any additional Renewal Options) as specified above.  Notwithstanding the foregoing, prior to incurring any expenditures pursuant to the previous sentence which cannot be fully amortized over the remainder of the Term, Tenant shall notify Landlord of the contemplated expenditure and, except in the case of an emergency (e.g. a repair which, if not immediately undertaken, could (a) adversely affect Tenant's ability to normally operate its business in the Premises, or (b) result in injury to persons or property), Tenant shall not undertake the maintenance, repair or replacement for ten (10) business days following delivery of such notice to Landlord.  During such ten (10) business day period, if requested by Landlord, Tenant shall in good faith consider alternatives, if any, suggested by Landlord to Tenant's contemplated expenditure (e.g. a less

expensive repair versus replacement). The foregoing shall not, however, require Tenant to accept or proceed with any alternative suggested by Landlord, provided that Tenant in good faith evaluates the alternatives offered by Landlord and in good faith offers reasonable explanations to support any rejection of Landlord's proposed alternatives.

On or before the expiration of such ten (10) business day period, Landlord shall notify Tenant whether or not it agrees to reimburse Tenant for one-half (1/2) of the unamortizable portion of the cost of the contemplated expenditure in excess of Ten Thousand and No/100 Dollars ($10,000.00). Landlord's failure to respond on a timely basis shall be deemed its agreement to reimburse Tenant. If Landlord notifies Tenant that it does not agree to reimburse Tenant, (i) Landlord shall not be obligated to so reimburse Tenant, (ii) Tenant shall not be obligated to make the repair, construction or alteration giving rise to the expenditure and shall not be in default of its obligations under this Lease as a result thereof, and (iii) Tenant shall, upon expiration of the Lease, have the right to remove the improvements made with the unreimbursed expenditures (provided Tenant repairs any damage arising out of such removal, such removal does not in and of itself create a dangerous condition which could cause injury to persons or property). However, if Tenant subsequently exercises a Renewal Option (a) if Landlord has reimbursed Tenant as provided above, then Tenant shall return to Landlord the amount so reimbursed by Landlord, and (b) if, alternatively, Landlord had notified Tenant that it would not agree to reimburse Tenant as provided above, then the provisions of items (ii) and (iii) in this paragraph above shall be void and of no further force and effect as to the applicable repair, construction or alteration.

Commencing with the thirteenth (13th) month after Substantial Completion, and except for obligations specifically assumed by Tenant above or arising from the negligent acts or omissions or willful misconduct of Tenant (or its agents or employees), Landlord shall maintain the structural elements of the Building (whether or not same serve only the Premises), including, without limitation, the structural system which supports the roof, the foundation, the structural elements of the load bearing walls and structural elements of the exterior structural walls; provided, however, this provision is intended in no way to limit Landlord's obligation to

maintain, repair and replace any and all elements, both structural and non-structural, of those portions of the Common Areas pursuant to the terms of this Lease for which Landlord is responsible.

Should either party fail to perform its obligations under this paragraph 10 with respect to the Building, the other party may, at its option, effect such maintenance, replacements or repairs, provided that such curing party shall have given the non-performing party thirty (30) days prior written notice, except in the case of emergencies (in which event only such notice as may be reasonable under the circumstances shall be required); but further provided that such thirty (30) day period (or reasonable period in event of emergencies) shall be extended in respect of any cure that cannot with reasonable diligence be accomplished within such period so long as the party required to effect such cure has commenced such cure within such thirty (30) day period (or reasonable period in event of emergencies) and thereafter diligently prosecutes such cure to completion. The non-performing party shall reimburse the other party within twenty (20) days of written demand for the reasonable and actual amount so expended (as evidenced by detailed invoice), plus interest from and after such twentieth (20th) day at the Default Rate. However, in the event of emergency repairs, no interest shall accrue if reimbursed within thirty (30) days of request (including detailed invoice) for reimbursement. All maintenance, repairs or replacements shall be done by Tenant or Landlord lien-free and in a good and workmanlike manner consistent with the quality of labor and materials used in originally constructing the Improvements and in accordance with all applicable law. In order to Landlord and Tenant to effectively perform their maintenance, repair and replacement obligations hereunder, Tenant and Landlord, as applicable, shall provide to the other party any and all manufacturers' and contractors' warranties relating to such work performed on behalf of the other party to the party who is required to maintain same under the Lease.

11.    <u>Utility Service Provider; Payment of Utility Bills</u>.    Tenant shall be entitled, subject to State law, to select the utility service provider which shall provide water, electric, gas, cable, and telecommunication services to the Premises. Tenant will pay directly to the appropriate utility company or governmental agency, when due, all bills (which includes all taxes

levied or other charges on such utilities, including any governmental or utility charges based on utility consumption, standby utility capacity or potential utility use, provided such taxes and charges relate only to the Term and not to periods prior to the commencement or subsequent to the expiration of the Term) for gas, water, sanitary sewer, electricity, telephone and other public or private utilities used by Tenant. If Landlord or any affiliate of Landlord shall supply any such services, Tenant shall purchase same from Landlord at charges not in excess of the charges for the services in question made by the unaffiliated utility corporation or governmental agency which would otherwise be supplying such utilities to the Shopping Center. Any such charges for services supplied by Landlord, or charges for utilities which may be rebilled by the Landlord, shall be due and payable as additional rent within thirty (30) days after billings therefor are rendered to Tenant. Landlord shall pay when due all utility charges incurred in the operation of the Common Areas and the Shopping Center, except for those parking lot light standards and the Supplemental Light Poles that Tenant is obligated to illuminate at its own cost and expense.

12.    Alterations.  During the Term, Tenant shall have the right, at its discretion and its sole cost, without Landlord's consent, to make any interior nonstructural alterations or modifications it may desire. With Landlord's consent, which shall not be unreasonably withheld, conditioned or delayed, Tenant shall have the right, at its sole cost, to alter, modify or reconstruct the exterior and/or structure of the Building or Other Improvements. Landlord's withholding of consent as to any structural or exterior alteration or modification shall be deemed reasonable only if same increases the height of the Building, modifies the size of the Building or Other Improvements, adversely affects the structural integrity of the Building, or (where the Shopping Center has an architectural theme [e.g. white sparkle stone] to which the other major tenants in the Shopping Center conform), is materially inconsistent with the then-existing architecture of the Shopping Center. Notwithstanding anything to the contrary contained herein, during the period of time that Circuit City Stores, Inc. (or its successor by merger or acquisition) is the occupant and operator of the Building (as opposed to a subsequent user, sublessee or assignee), Landlord's consent shall not be required in connection with the

replacement or modification of the exterior entrance feature of the Building, provided that (i) such replacement or modification is undertaken in order to bring such entrance feature into conformity with the prototypical architectural design of entrance features then being utilized by Tenant on a majority of its new stores, (ii) the height of the entrance feature does not exceed 30 feet 4 inches to its highest point, and (iii) the overall size of the entrance feature is not materially increased. Should Landlord's consent be required, conceptual plans and specifications for such work shall be provided to Landlord prior to commencement of any such work. Landlord shall be deemed to have consented to such work if written notice of disapproval, with reasons specified, is not received by Tenant within thirty (30) days following Tenant's delivery of such plans and specifications to Landlord provided Tenant's request for approval references such thirty (30) day deemed approval period. Without cost or expense to Landlord, Landlord shall cooperate with Tenant, at Tenant's sole cost,  in the obtaining of any and all licenses, building permits, certificates of occupancy or other governmental approvals which may be required in connection with any such modifications or alterations, and Landlord shall execute, acknowledge and deliver any documents reasonably required in furtherance of such purposes. If Tenant adds any mezzanine area(s), the square footage thereof shall increase the basis upon which ancillary charges set forth in this Lease are assessed.

     13.   <u>Mechanics' Liens</u>. Landlord and Tenant covenant to each other that should any lien of any nature, including but not limited to the foregoing, be filed against the Premises or Shopping Center, the party on account of whose actions such lien has been filed shall, within thirty (30) days after receipt of written notice of such lien, cause said lien to be removed, or otherwise protected against execution during good faith contest, by substitution of collateral, posting a bond therefor, escrowing of adequate funds to cover the claim and related transaction costs or such other method as may be permissible under applicable title insurance regulations and reasonably acceptable to the other party hereto. Notwithstanding the foregoing, Landlord shall not be required to remove a lien unless such lien has priority over this Lease or adversely affects the tenancy rights of Tenant in the Premises or Tenant's right to obtain financing secured by this Lease.

478044.9

14.    <u>Insurance.</u>

(a)    <u>Property Damage.</u>  During the Construction Term, Tenant shall keep or require its general contractor to keep, in full force and effect, a policy of builder's risk insurance covering loss or damage to the Improvements for the full replacement value of all such construction.  During the Main Term and all Option Periods, Tenant shall keep the Premises insured against loss or damage by fire and the perils covered under standard "all risk" or "special form" coverage in the amount of full replacement value of the Building, exclusive of excavation, footings and foundations (which initial amount shall be not less than $1,250,000.00, with a commercially reasonable deductible, for which Tenant shall be fully responsible. Landlord and Landlord's first "Mortgagee" (as defined in paragraph 21 below), shall be named in such policy or policies as additional insureds and loss payees as their respective interests may appear.  Landlord shall not construct, or permit to be constructed, any improvement in the Shopping Center, nor conduct any activity, nor lease any property for or knowingly acquiesce in the conduct of any activity, in the Shopping Center which will prevent Tenant from being able to obtain insurance coverage at commercially reasonable rates.  Should Landlord, in violation of the preceding sentence, cause or permit any insurance rate increase to occur, Landlord will reimburse Tenant for the additional premium required, subject to Tenant's right to self-insure (in which event Landlord will contribute to Tenant's self insurance fund to cover increased actuarial risks).

(b)    <u>Liability Insurance.</u>  During the Term, Tenant shall keep in full force a policy of commercial general liability insurance with bodily injury and property damage coverage with respect to the Premises and the business operated thereon by Tenant, which shall name Landlord and Landlord's first Mortgagee as additional insureds as their respective interests may appear.  The limits of such commercial general liability policy shall be not less than $2,000,000.00 combined single limit for bodily injury and property damage, with a commercially reasonable deductible.  Such liability insurance will provide coverage for exposures including, but not limited to, (i) an accident occurring in, on or about the Premises; (ii) the sale or other disposition of any good or service by Tenant; (iii) the consumption or

existence on the Shopping Center or Premises of any product sold or otherwise disposed of by Tenant; (iv) any act or omission of Tenant, its employees, servants, agent or invitees; and (v) broad form contractual coverage in support of Tenant's indemnitees under this Lease.

(c)    Workers' Compensation Insurance.    To the extent required by law, Landlord and Tenant shall maintain workers' compensation insurance covering their respective employees in statutory limits, or maintain such alternate coverages or arrangements as legally permissible.

(d)    Self-Insurance.  Notwithstanding anything to the contrary contained herein, Tenant shall have the right to self-insure against any of the risks or portions thereof set forth in subparagraphs (a) and (b) (and to the extent then permitted by law, (c)) above, provided Tenant is then occupying the Premises and has a reported net worth, as of the end of Tenant's most recent quarterly reporting period, of not less than One Hundred Million Dollars ($100,000,000) (said amount, as adjusted, the "Net Worth Requirement").  Commencing on January 1, 1999 and annually thereafter, said amount shall be increased by an amount equal to the product of the Net Worth Requirement for the immediately preceding calendar year and the increase in the CPI-U during the immediately preceding year.

(e)    Common Area, Additional Area and Third Party Tenant Insurance and Insurance During Landlord's Construction.  During the Term, Landlord shall keep in full force and effect (or cause to be maintained), in form reasonably acceptable to Tenant, policies of (1) commercial general liability insurance with respect to the Common Areas, and (2) property insurance insuring against loss or damage by fire and the perils covered under standard "all risk" or "special form" coverage, with respect to the improvements in the Common Areas and with respect to all other building areas of the Shopping Center over which Landlord from time to time has present possessory rights (or has the obligation under any lease to provide such insurance coverage) but which do not constitute a portion of the Common Areas (such areas here sometimes collectively referred to as the "Additional Areas").  The Additional Areas shall exclude the Premises and include, without limitation: (i) as yet unconstructed portions of the Shopping Center intended for tenant occupancy, (ii) constructed but unoccupied portions of the

Shopping Center, (iii) vacated or otherwise uninsured tenant space, whether by reason of lease expiration, default or otherwise, and (iv) constructed and occupied portions of the Shopping Center excluding the Premises.  Said commercial general liability policies shall name Tenant, and any lender, investor or other stakeholder which is designated by Tenant from time to time, as an additional insured to the fullest extent Tenant and such stakeholder have insurable interests. The limits of such policies shall be the same as those set forth in subparagraphs (a) and (b) above, as applicable.  Landlord may, with respect to its insurance obligations, self-insure or utilize deductibles, provided the Landlord is an affiliate of The Cafaro Company and Landlord or the general partner of Landlord maintains a net worth, as of the end of such entity's most recent fiscal year, of not less than $100,000,000.00 (said amount, as adjusted, the "Landlord Net Worth Requirement"), as certified by the Chief Financial Officer(s) of The Cafaro Company and of the entity to which the certification is applicable.  Commencing on January 1, 1999 and annually thereafter, said amount shall be increased by an amount equal to the product of the Landlord Net Worth Requirement for the immediately preceding calendar year and the increase in the CPI-U during the immediately preceding calendar year.

Commencing on the Commencement Date and continuing until the first January 1st thereafter, Tenant shall pay an amount equal to the product of $.19 multiplied by the ground floor gross leasable area of the Building (as calculated pursuant to 9(b) above) (the "Insurance Charge").  The Insurance Charge shall increase on said first day of January by an amount equal to the product of $.19 and the percentage increase in the CPI-U from December 31, 1997 to such first day of January.  For each calendar year thereafter, the Insurance Charge shall be increased on the first day of such calendar year by an amount equal to the product of the insurance charge for the immediately preceding calendar year and the percentage increase in the CPI-U during the immediately preceding calendar year.  In the event that the percentage change in the CPI-U during the preceding calendar year is zero or less that zero, then the Insurance Charge for the succeeding calendar year shall be the same as for the preceding calendar year. For any period within the Term which is less than a full calendar year, the annual Insurance Charge shall be appropriately prorated.  If the information necessary to make the adjustment

contemplated above is not available at the end of a calendar year, Tenant shall continue to pay on an interim basis the then applicable Insurance Charge. Upon receipt of the information required to make the adjustment contemplated above, a necessary adjustment with respect to amounts previously paid by Tenant shall thereupon be retroactively made; and the monthly payments to be made by Tenant from the first day of the calendar year and for the remainder of the calendar year shall be established. If the criteria for Landlords' self-insurance is not met then any deductible amount or self-insured retention for the Common Area and property insurance coverage shall be reasonable in amount given the nature of the risk insured, the probable frequency of claims made under such coverage, and the overall insurance program of Landlord and its affiliates. Landlord shall use diligent efforts to assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center, including the Additional Areas and areas leased to third party tenants or sold to third party occupants, are insured with substantially similar coverages to those required for the Premises and the Common Areas, such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever Tenant may have a reasonable expectation that the Shopping Center will be reconstructed in equal or superior condition within the time frame set forth in paragraph 15. During any period in which Landlord is conducting construction activities at the Shopping Center, Landlord shall keep, or cause its general contractor to keep, in full force and effect, with regard to the Shopping Center, in form reasonably acceptable to Tenant, at least the minimum insurance coverages set forth below:

1) Workers' Compensation - Statutory Limits;
   Employers Liability - $500,000;

2) Automobile Liability for all vehicles with limits of $2,000,000; and

3) Commercial General Liability to include premises operations and products/completed operations coverage with limits of $2,000,000.

Additionally, Landlord shall keep or require its general contractor to keep in full force and effect a policy of builder's risk insurance covering loss or damage to the Shopping Center

(excluding the Premises) for eighty percent (80%) of the replacement value of all such construction, with appropriate deductibles or self-insured retention.

(f) <u>Policy Provisions.</u> All policies of insurance (other than self-insurance) enumerated above shall be provided by insurance carriers with a Best rating of not less than A-VIII. Any insurance coverage enumerated above may be effected by a blanket policy or policies of insurance or under so-called "all risk" or "multi-peril" insurance policies, provided that the total amount of insurance available with respect to the Premises and Tenant's or Landlord's liability hereunder shall be at least the equivalent of separate policies in the amounts herein required, and provided further that in other respects any such policy or policies shall comply with the provisions of this paragraph 14. An increased coverage or "umbrella" policy may be provided and utilized by either party to increase the coverage provided by individual or blanket policies in lower amounts, and the aggregate coverage provided by all such policies with respect to the limits required herein shall be satisfactory provided that such policies otherwise comply with the provisions of this paragraph 14.

(g) <u>Waiver of Right of Recovery and Subrogation.</u> To the extent that insurance proceeds are actually received in satisfaction of a loss which is required to be covered by insurance or is self-insured hereunder (with the deductible under any policy being deemed to be self-insured), Landlord and Tenant hereby waive any and all rights of recovery against each other for any loss or damage to the Premises or the contents contained therein, for loss of income on account of fire or other casualty, or for injury sustained on the Premises or the Common Areas; and each party's aforesaid policies of insurance shall contain appropriate provisions recognizing this mutual release and waiving all rights of subrogation by the respective insurance carriers.

(h) <u>Evidence of Insurance.</u> Subject to each party's right to self-insure hereunder, upon (i) commencement of the Main Term (as to property insurance), (ii) upon the Effective Date (as to liability insurance) and (iii) prior to expiration thereof, Tenant and Landlord shall cause to be issued to each other in lieu of the original policy, a duplicate of such policy or appropriate certificates of insurance reasonably acceptable to the other party and evi-

dencing compliance with the applicable covenants of this paragraph 14. Each such certificate shall provide that coverage shall not be cancelled without thirty (30) days notice to the certificate-holder (and any Mortgagee, if applicable).

(i) <u>Indemnities</u>. Except if arising from the negligent or willful acts of Landlord or its agents or employees (to the extent that paragraph 14(g) is inapplicable thereto), Tenant hereby agrees to indemnify, defend and hold Landlord harmless from all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring on the Premises.

Except if arising from the negligent or willful acts of Tenant or its agents or employees (to the extent that paragraph 14(g) is inapplicable thereto), Landlord agrees to indemnify, defend and hold Tenant harmless from any and all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring in the Shopping Center, exclusive of the Premises.

15. <u>Damages by Fire or Other Casualty.</u>

(a) <u>Damages Occurring Other Than During Last Five Years of Term.</u> Landlord's Restoration Area shall mean the portion of the Shopping Center depicted as "Landlord's Restoration Area" on the Site Plan (the "LRA"). In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Improvements, Common Areas and/or the LRA, other than during that last five (5) years of the Term, this Lease shall not terminate except as expressly set forth herein, and Base Rent, Interim Rent, and all other charges shall continue to be paid by Tenant pursuant to the terms hereof. Within a reasonable time after such casualty, subject to force majeure, applicable building codes, the procurement of building permits and the receipt of insurance proceeds (unless self-insured) to the extent of the damage to the Premises, or the Common Areas or the LRA, as applicable, Tenant shall complete reconstruction of the Building and Other Improvements, and Landlord shall complete reconstruction of the Common Areas and the LRA to that condition existing immediately prior to such casualty, in the reconstructing party's reasonable discretion, with, in event of any Tenant reconstruction, such alterations as may be permitted under paragraph 12 hereof. In the event, subject to force

majeure, the Premises, Common Areas and/or the LRA, as applicable, are not substantially repaired and reconstructed, and equipment, furniture and fixtures restored or replaced, by the party with repair and restoration obligations within two hundred forty (240) days after receipt of any required governmental permits, for which permits the party with repair obligations shall make prompt application following such destruction or damage, and insurance proceeds (if not self-insured), and such party is not diligently undertaking such restoration, then the other party, at its option, by giving written notice to the party with repair obligations, within thirty (30) days after the expiration of said period, may undertake completion of such reconstruction, in which event the party with repair obligations shall make available to the notifying party all insurance proceeds received by the non-performing party for such reconstruction (including any applicable deductible) or, if self-insured, the amount necessary for such reconstruction

(b)   Last Five (5) Years of Main Term or Option Period.   Notwithstanding the foregoing, if any such damage or destruction occurs within the last five (5) years of the Main Term or at any time during any Option Period and has a repair and reconstruction cost of twenty-five percent (25%) or more of the then total reconstruction cost of the Improvements, Tenant shall be under no obligation to restore the Improvements, in which case this Lease shall terminate at Tenant's option, such option to be exercised by Tenant giving not less than thirty (30) days' prior written notice to Landlord, and Landlord shall receive the amount necessary for reconstruction of the Improvements, to the extent such amount would have been payable under insurance as outlined herein.

(c)   Tenant's Termination Right.   Notwithstanding anything to the contrary provided in this Lease, Tenant shall have the right to terminate this Lease following a casualty of the Premises which has repair and reconstruction cost of forty percent (40%) or more of the then total reconstruction cost of the Improvements, if following such casualty (i) Landlord cannot demonstrate to Tenant's reasonable satisfaction that the improvements in the LRA will be rebuilt within six (6) months following the date on which Tenant reopens its Premises for business, or (ii) less than five hundred thousand (500,000) square feet of leasable area at the Kentucky Oaks Mall adjacent to the Shopping Center is occupied by retail tenants which are open and

conducting business.  Furthermore, if the Kentucky Oaks Mall is damaged by a casualty, Tenant
may terminate this Lease if the mall is not restored to a retail mall with at least 500,000 square
feet of gross leasable area.

16.  <u>Condemnation</u>.

(a)  <u>Definition of Taking and Substantial Taking</u>.  For the purpose of this Lease, a
"Taking" shall mean any condemnation or exercise of the power of eminent domain by any
authority vested with such power or any other taking for public use, including a private purchase
in lieu of condemnation by an authority vested with the power of eminent domain (excluding
only an Anticipated Taking, as defined in paragraph 16(h) below); the "Date of Taking" shall
mean the earlier of the date upon which title to the Premises, the Shopping Center or any portion
thereof so taken is vested in the condemning authority or the date upon which possession of the
Premises, the Shopping Center, or any portion thereof is taken by the condemning authority; and
"Substantially All of the Premises" shall mean (i) so much of the Improvements and/or Shopping
Center and Common Areas as, when taken, leaves the untaken portion unsuitable, in Tenant's
reasonable opinion, for the continued feasible and economic operation of the Premises by Tenant
for the same purposes as immediately prior to such Taking or as contemplated herein, (ii) so
many of the parking spaces within the Shopping Center and the parking fields immediately
adjacent to and serving Unit 995 as, when taken, reduces the aggregate parking ratio for said
areas below the greater of (x) 95% of the parking ratio (for full-sized automobiles) per 1000
square feet of ground-floor gross leasable area which existed prior to the Taking or (y) that ratio
which is required by the zoning ordinance applicable to the Shopping Center (subject to
exceptions granted by applicable governmental authorities as a result of such Taking), and
Landlord's failure to provide substantially equivalent alternative parking reasonably acceptable
to Tenant within one hundred and eighty (180) days after such Taking, or (iii) so much of the
Common Area Easement described in paragraph 6 above that access to the Premises is
permanently impeded.

(b)  <u>Tenant's Rights Upon Taking or Substantial Taking</u>.  In the event of a Taking of
Substantially All of the Premises, Tenant, at its option upon thirty (30) days' written notice to
Landlord, which shall be given no later than sixty (60) days following the Taking, shall have

478044.10                                    -32-

the right to terminate this Lease. All Base Rent and other sums payable by Tenant hereunder shall be apportioned and paid through and including the Date of Taking, and neither Landlord nor Tenant shall have any rights in any compensation or damages payable to the other in connection with such Taking.

(c)    <u>Tenant's Rights Upon Less Than Substantial Taking</u>. In the event of a Taking of less than Substantially All of the Premises that has had an adverse affect on operations of the Premises by Tenant, Base Rent and other charges shall be reduced fairly and equitably in accordance with the portion condemned or taken, effective as of the Date of Taking, and Tenant shall make all necessary restorations to the Improvements so that the portions of the Improvements not taken constitute a complete architectural unit, provided that the cost thereof to Tenant shall not exceed the proceeds of Tenant's condemnation award (to the extent that such relates to the Improvements and not to Tenant's personal property, intangibles or out-of-pocket expenses unrelated thereto) and the portion of Landlord's award allocable to the Premises (to the extent that such relates to improvements constructed on the Premises versus the income stream generated to Landlord by the Premises), which Landlord shall make available to Tenant for such restoration.

If such Taking occurs within the last two (2) years of the Main Term or of any Option Period and has a material impact on Tenant's ability to conduct business as reasonably determined by Tenant, this Lease shall terminate at Tenant's option, such option to be exercised by Tenant giving not less than thirty (30) days' prior written notice to Landlord.

(d)    <u>Landlord's Obligations Upon Any Taking</u>. In the event of any Taking following which the Lease continues in effect, Landlord shall make all necessary restorations to all portions of the Common Areas and the LRA such that they each constitute a complete architectural unit and serve the function originally intended.

(e)    <u>Rights Upon Temporary Taking</u>. In the event of a Taking of the Premises, the Common Areas and/or any other area within the Shopping Center, or any portion thereof, for temporary use (specifically one not exceeding one hundred twenty (120) days in duration), without the taking of the fee simple title thereto, this Lease shall remain in full force and effect. All

awards, damages, compensation and proceeds payable by the condemnor by reason of such Taking relating to the Premises, or relating to the Common Areas but reasonably attributable to the Premises, for periods prior to the expiration of the Lease shall be payable to Tenant. All such awards, damages, compensation and proceeds for periods after the expiration of the Lease shall be payable to Landlord. Anything contained herein to the contrary notwithstanding, a temporary Taking for any period in excess of one hundred twenty (120) days may, at Tenant's option, be deemed a permanent Taking and shall be governed by subparagraph (b) or (c) above, as applicable.

(f)    Taking of the Pylon Sign(s).   In the event of a taking, whether permanent or temporary, of any pylon or monument sign (as contemplated by paragraph 8) on which Tenant has installed identification panels, Tenant shall receive all proceeds attributable to such taking and Landlord shall use its best good faith efforts to provide within ninety (90) days a substitute site (reasonably acceptable to Tenant) therefor, located so as to be visible to vehicular traffic on Interstate 24. Tenant shall pay all costs of relocating and/or reconstructing its pylon sign.

(g)    Tenant's Right Upon Condemnation.   In the event of a Taking described in subparagraph (b) or (c) above, Tenant shall be entitled to claim compensation from the condemning authority for the value of its leasehold interest in the Premises, its unamortized leasehold improvements paid for by Tenant, relocation expenses and any other items to which Tenant is entitled under applicable law.

(h)    Contemplated Taking.   Tenant acknowledges that Landlord has advised Tenant of a contemplated taking related to the roadway extending from U.S. Route 60 in a northerly direction generally along the roadway portion of Tenant's Preferred Area to a point situated northerly of the Toys "R" Us building (the "Anticipated Taking"). The extent and impact of the Anticipated Taking is depicted on Exhibit "A-2" attached hereto. So long as the actual taking contemplated by this paragraph does not materially deviate from that depicted on Exhibit "A-2", such taking shall be deemed the Anticipated Taking. If such taking does materially deviate from that depicted on Exhibit "A-2", the taking shall be deemed a Taking governed by the other subparagraphs of this paragraph 16. Landlord and Tenant acknowledge

and agree that except as hereinafter set forth, Tenant shall not have any rights or remedies with respect to the Anticipated Taking and that the occurrence of the Anticipated Taking shall not in and of itself be a default under this Lease. Landlord agrees that if the Anticipated Taking occurs and the number of parking spaces located in the Tenant's Preferred Area (as depicted on the Site Plan) or the SM Parcel are reduced, Landlord will create a graveled parking area available for all weather use in Overflow Parking Area C. Such graveled parking area shall contain the lesser of ninety-eight (98) parking spaces or the aggregate number of parking spaces taken from the Tenant's Preferred Area and the SM Parcel. Landlord shall use its good faith efforts to cause such graveled parking spaces to be utilized by employees of tenants of the Shopping Center. Tenant shall instruct its employees to park in such graveled parking spaces. If, following the next Christmas season (i.e. November 15 through December 31) after the Anticipated Taking, Tenant reasonably determines that the parking demand during that Christmas season exceeded the parking spaces available on paved parking in Tenant's Preferred Area (e.g. the demand for parking spaces exceeds supply at some point during not less than ten (10) separate days during such Christmas season), Landlord, at its sole expense, shall pave so much of the previously graveled parking area as Tenant reasonably deems necessary to meet the demand for parking spaces available for use by customers at the Shopping Center. Tenant acknowledges the existence of such contemplated taking, and if such taking should occur, Tenant acknowledges that, except as specifically provided herein, it is not vested with any recourse or action arising from such contemplated taking.

17.    <u>Assignment and Subletting</u>. Tenant shall have the right to sublet, assign, transfer reassign and grant concessions or licenses (a "Transfer") in all or any part of the Premises and any of Tenant's rights and obligations under this Lease during the Term, without Landlord's prior consent, but upon notice to Landlord. In the event of such a Transfer, Tenant shall remain liable for all of Tenant's obligations to Landlord arising hereunder but shall not incur any additional liability as a result of any change, modification or amendment to the Lease by Landlord and any transferee. Transfers to subsidiaries, affiliates, or related parties, and Transfers involving beneficial ownership interests in the Tenant, shall not be deemed a Transfer

hereunder and same may be effected without Landlord's consent; provided Tenant will notify Landlord of any such transfer within thirty (30) days after it has been effected.

18.   Use.

(a)   Tenant may initially maintain, use and operate the Premises as a retail store for (i) the sale of consumer, office and automotive electronics products (which include, but shall not be limited to, televisions, stereos, speakers and video recorders and players), computer hardware and software, entertainment software and entertainment media (which include, but shall not be limited to, records, game cartridges, video tapes, cassettes and compact discs), cellular and wireless telephones and telecommunication devices, household appliances (which include, but shall not be limited to, refrigerators, freezers, stoves, microwave ovens, vacuum cleaners and dishwashers) and related goods and the sale and installation of motor vehicle audio, stereo and telephone systems and technological evolutions of the foregoing (all of such items being herein collectively referred to as the "Products"), and (ii) renting, servicing, repairing and warehousing of the Products.

(b)   Thereafter, Tenant shall have the right to use the Premises for any lawful retail use; provided, however, that the Premises shall not be used (i) for more than three (3) separate retail stores (with each such store being operated under a single trade name), (ii) for any illegal purpose, (iii) for any use prohibited under paragraph 19(a)(viii) entitled "Prohibited Activities", (iv) in violation of any applicable provision of the "Permitted Encumbrances", including any restrictive covenants, referenced in Exhibit "F", or (v) for a primary use (other than the Tenant's contemplated initial use of the Premises as set forth in subparagraph (a) above) which is duplicative of a primary use then being conducted in the Shopping Center by another occupant of the Shopping Center.  Furthermore, Tenant shall not use or permit the Premises (or any subdivided portion of the Premises) to be used for a primary use:

(i)    As a jewelry store (except in connection with a permitted catalog store);

(ii)   As a book superstore (provided the Landlord has previously leased or sold any part of the Shopping Center to a book superstore that is operating in a building exceeding 20,000 square feet);

(iii)    As a supermarket;

(iv)    As an office products store (only so long as there is an office products store in the Shopping Center);

(v)    As a toy store (only so long as a toy store is open for business on the adjacent shopping center);

(vi)    As a catalog showroom (only so long as there is a catalog showroom on the Shopping Center);

(vii)    A restaurant;

(viii)    As a shoe store (so long as a store operating for the primary sale of shoes is operating in the Shopping Center);

(ix)    As a lumber yard or a building materials store (only so long as the "Goody's" lease for Unit 950 of the Shopping Center is in effect).

(c)    Except as may be expressly set forth in this paragraph 18, nothing contained in this Lease shall be construed to require Tenant to operate the Premises continuously but if used, such use will be in compliance with (a) or (b) above.  So long as no other tenant or occupant of the Shopping Center (excluding the Outdoor Sales Area adjacent to Unit 900 as depicted on the Site Plan) has the right to conduct outdoor sales, Tenant shall not be permitted to conduct at any time any outdoor sales, which includes, but is not limited to, any sidewalk sales.

19.    <u>Warranties, Representations and Covenants.</u>

(a)    <u>Landlord's Warranties, Representations and Covenants.</u>  Landlord represents, warrants and covenants to Tenant that:

(i)    <u>Quiet and Peaceful Enjoyment.</u> Tenant shall have quiet and peaceful use, enjoyment and occupancy of the Premises.

(ii)    <u>Title.</u>  As of the date of this Lease, Landlord's fee simple interest in the Shopping Center is free and clear of any mortgages, deeds, encumbrances, declarations, easements, agreements, leases, tenancies or restrictions, except the REA and those matters set forth on <u>Exhibit "F"</u> attached hereto and entitled "Permitted

478044.9    -37-

Encumbrances", or any other encumbrances which would restrict Tenant's use of the Premises for the sale of Products or would restrict in any respect the right of Tenant, its employees, customers and invitees to use the Common Areas in accordance with the terms of this Lease. Landlord specifically covenants and warrants that, subject to the exclusives granted to other occupants of the Shopping Center set forth on Exhibit "F", no third party, including but not limited to any other occupant of the Shopping Center, has the right to object to Tenant's tenancy hereunder (including, specifically, its right to exercise the rights granted under this Lease and to operate its business in the Premises), or to prohibit the selling, renting, servicing, repairing or warehousing of the Products, or the right to consent to any feature of the Improvements or Tenant's signage. Landlord hereby agrees to indemnify and hold Tenant harmless from and against any loss, cost, liability or expense incurred by Tenant arising out of Service Merchandise Company, Inc. or any other party asserting that the proposed development of Tenant's Building is a violation of the terms and conditions of the REA. The representations, warranties, indemnifications and covenants contained in this paragraph are a material inducement to the Tenant's execution of this Lease.

(iii)    Certificate of Authority.    Landlord covenants that it is a duly constituted limited partnership under the laws of the State of Ohio, and that its authorized agent who is acting as its signatory in this Lease is duly authorized and empowered to act for and on behalf of the limited partnership. Landlord has furnished Tenant prior hereto with evidence of (a) the existence of the limited partnership, and (b) the authority of the agent to bind the limited partnership as contemplated herein.

(iv)    No Litigation.    As of the date of this Lease, except for the contemplated Taking described in paragraph 16(h) above, there are no judicial, quasi-judicial, administrative or other orders, injunctions, moratoria or pending proceedings against Landlord or the Shopping Center which preclude or interfere with, or would preclude or interfere with, the construction contemplated herein or the occupancy and use of the Premises for the purposes herein contemplated.

478044.9                                -38-

(v)   <u>Hazardous or Toxic Materials</u>.   To the best of Landlord's knowledge, Landlord has not used, discharged, dumped, spilled or stored any Hazardous Substances (as defined in paragraph 1(a) of the Construction Provisions) on or about the Shopping Center, whether accidentally or intentionally, and has received no notice and has no knowledge that any such condition exists at the Shopping Center.  If any claim is ever made against Tenant by any third party (including, without limitation, any governmental agency) relating to Hazardous Substances present at or around the Shopping Center, whether or not such substances are present as of the date hereof, or any Hazardous Substances are hereafter discovered at the Shopping Center (unless introduced by Tenant, its agents or employees), all costs of removal incurred by, all liability imposed upon, or damages suffered by, Tenant because of the same shall be borne by Landlord, and Landlord hereby indemnifies and agrees to defend and hold Tenant harmless from and against all such costs, losses, liabilities and damages, including, without limitation, all third-party claims (including sums paid in settlement thereof, with or without legal proceedings) for personal injury or property damage and other claims, actions, administrative proceedings, judgments, compensatory and punitive damages, penalties, fines, costs, losses, attorneys' fees and expenses (through all levels of proceedings), consultants or experts fees and all costs incurred in enforcing this indemnity.  The representation, warranty and indemnity of Landlord described in this paragraph 19(a)(v) shall survive the termination or expiration of this Lease.  Tenant acknowledges that, based solely on the environmental investigations conducted on its behalf, as of the date of this Lease, it is not aware of the presence of any Hazardous Substance which Landlord is required to remediate under current law.  Tenant shall not cause or permit any Hazardous Substances to be upon, about, a part of, or beneath the Premises, the Shopping Center or adjacent property.  Subject to Landlord's obligation to indemnify Tenant as set forth in the preceding paragraph, Tenant shall, at its sole cost and expense, promptly take all actions to comply fully with all present and future laws concerning Hazardous Substances.  Tenant hereby indemnifies and agrees to defend and

478044.9

hold Landlord harmless from and against all costs, losses, liabilities and damages, including, without limitation, all third-party claims (including without limitation any governmental agency and including sums paid in settlement thereof, with or without legal proceedings) for personal injury or property damage, other claims, actions, administrative proceedings, judgments, or compensatory and punitive damages, penalties, fines, costs, losses, attorneys' fees and expenses (through all levels of proceedings), consultants' or experts' fees, and all costs incurred in enforcing this indemnity should Tenant use, discharge, dump, spill or store or knowingly permit any Hazardous Substance to be used, discharged, dumped, spilled or stored, upon, about or a part of or beneath the Premises or the Shopping Center. The warranty, indemnity and obligations of Tenant described in this paragraph shall survive the termination or expiration of this Lease. For purposes of this paragraph, Hazardous Substances shall not include substances utilized in connection with the maintenance and operation of Tenant's Building, provided such substances are utilized and stored in compliance with all applicable environmental laws.

(vi)   Tenant's Exclusive Use.   For purposes of this Lease, an "Electronic Superstore" shall be a retail facility (including a "wholesale club" or similar concept) the primary use of which is for the sale of (i) consumer, office and/or automotive electronic products (which include, but shall not be limited to, televisions, stereos, speakers and video recorders and players, cellular and wireless telephones and telecommunications devices, and similar related items), and/or (ii) computer hardware and software and/or entertainment software and entertainment media (which includes records, game cartridges, video tapes, cassettes and compact discs and similar related items) and/or (iii) household appliances (which include, but shall not be limited to, refrigerators, freezers, stoves, microwave ovens, vacuum cleaners and dishwashers, and similar related items). For purposes hereof, "primary use" shall be defined as the allocation of the lesser of 4,000 square feet or 30% or more of a facility's sales floor area for the sale of any one or more of the items described in clauses (i)-(iii) above.

Subject to (a) the rights granted to Toys R Us and their successors and assigns pursuant to its current lease for Unit 995 as shown on the Site Plan, and (b) the rights granted to any tenants or occupants under leases or agreements in existence as of the date of this Agreement and listed on Exhibit "F", so long as the Premises is then being used for the sale or rental of any of the Products (as defined in paragraph 18(a) above), no other tenant or occupant of the Shopping Center or of Unit 995 or the Permissible Building Areas adjacent to Unit 995 shall be entitled to operate as an Electronic Superstore. Notwithstanding the foregoing, if Tenant ceases the sale at the Premises of any one or more of the Products (any Product(s) which are no longer being sold are hereinafter referred to as an "Excluded Product(s)") for a consecutive period of six (6) months, and, following receipt of notice from Landlord of Landlord's intent to permit an occupant of the Shopping Center to sell such Excluded Product(s), does not notify Landlord of its intent to reinstate the sale of such Excluded Products within fifteen (15) business days of receipt of such notice, and, in fact, reinstate (either by Tenant or a subtenant or licensee) the sale of such Excluded Product(s) within thirty (30) days (subject to an extension for up to an additional ninety (90) days if Tenant in good faith requires such additional time to remodel its Premises to accommodate such use or to finalize a sublease or assignment with a third party) of receipt of such notice, Landlord may, thereafter, at any time prior to the date Tenant notifies Landlord that it has reinstated the sale of such Excluded Product(s), permit an occupant of the Shopping Center to sell such Excluded Product(s). Any occupant granted the right to sell an Excluded Product(s), as aforesaid, shall be permitted to sell the designated Excluded Product(s) regardless of whether Tenant subsequently reinstates its sale of such Excluded Product(s). Furthermore, notwithstanding anything to the contrary provided herein, in no event shall the sale of such Excluded Product(s) by another tenant preclude Tenant from reinstating the sale of such Excluded Product(s) from its Premises.

(vii)    <u>Zoning and Subdivision</u>. The Premises and the Shopping Center are presently properly subdivided, in conformity with all applicable laws and zoned so