as to permit (A) the development and operation of the Premises and the Shopping Center in accordance with the provisions of this Lease; and (B) the initial use of the Premises described in paragraph 18 of this Lease.

(viii)   Prohibited Activities.

(1)   Landlord and Tenant shall not operate or lease (or permit to be operated or leased) any building or tenant space in the Tenant Preferred Area or elsewhere in the Shopping Center, including the Premises, for use as:

(A)   a flea market;

(B)   a massage parlor;

(C)   a funeral home;

(D)   a facility for the sale of paraphernalia for use with illicit drugs;

(E)   a facility for the sale or display of pornographic material (as determined by community standards for the area in which the Shopping Center is located);

(F)   a carnival, amusement park or circus;

(G)   a facility for any use which is illegal or dangerous, constitutes a nuisance or is inconsistent with an integrated, community-oriented retail and commercial shopping center;

(H)   a facility for the sale or rental of used goods (including thrift shops, secondhand or consignment stores) or any facility selling new or used merchandise as a wholesale operation, a liquidation operation, lot sales, factory close-outs or imperfect goods (excluding any of such sales as listed in this subparagraph (H) which are conducted as an incidental part of a retail operation);

(I)   an off-track betting parlor which is greater than fifteen thousand (15,000) square feet or which utilizes less than one-third (1/3) of its gross leasable area for a restaurant;

(J)   a gas station, car wash, or auto repair or body shop; provided, however, the parties specifically acknowledge that Tenant's car stereo installation facility is not included in this prohibition and the type of operations generally conducted by regional or national automotive parts or tire chains such as, but not limited to, Pep Boys, Western Auto and NTB shall not be in violation of this prohibition; or

(K)   a facility for the sale of new or used motor vehicles, boats, trailers or mobile homes (the parties specifically acknowledge that the foregoing shall not prohibit a new car dealership if such new car dealership stores and displays all of its inventory within its enclosed premises); notwithstanding the foregoing, this subparagraph (K) is inapplicable to Permissible Building Area A.

478044.9

-42-

(2)     Landlord shall not operate or lease (or permit to be operated or leased) any building of tenant space within three hundred (300) feet (measured from the front entrance of the Building to the front entrance of the space in question) for use as and Tenant shall not permit the Premises to be used as:

(A)     a bar, tavern, pub, nightclub, or dance hall or disco in which less than fifty percent (50%) of its space or revenue is devoted to and derived from food service;

(B)     a bowling alley;

(C)     a billiard or bingo parlor;

(D)     an off-track betting parlor (regardless of size or percentage of restaurant use);

(E)     a skating rink;

(F)     a laser tag or virtual reality facility, or for the primary use as an arcade or pinball or computer game room (provided that retail facilities may display electronic games or computer games for sale and/or for entertainment purposes [but said games may be used for entertainment purposes only incidental to another primary use]);

(G)     a banquet hall, auditorium, or other place of public assembly;

(H)     a training or educational facility (including, without limitation, a beauty school, barber college, reading room, school or other facility catering primarily to students or trainees rather than customers); or

(I)     a theater of any kind.

Notwithstanding anything to the contrary provided herein, in no event shall the aggregate of the uses contemplated under subparagraph (2) above exceed thirty percent (30%) of the gross leasable area of the Shopping Center. Furthermore, the prohibited uses set forth in subparagraph (2) shall not be applicable to Permissible Building Area "A" (as shown on the Site Plan) so long as both (i) the primary access to and from the Permissible Building Area "A" is west of the Office Max building shown on the Site Plan and (ii) the parking maintained on Permissible Building Area "A" meets applicable code requirements (without any variances) and (iii) no parking easements or rights have been granted to Permissible Building Area "A" with respect to the existing parking areas in other portions of the Shopping Center. In addition, notwithstanding the restriction contained in paragraph 19(a)(viii)(J), a car wash shall be permitted in Permissible Building Area A.

(ix)    Site Covenants.  With regard to the development of the Shopping Center and the uses and operations of the Common Areas, Landlord makes the following representations, warranties and covenants (the "Site Covenants"):

(A)    Building Height and Location.  Except for the buildings marked "Sam's Club" and "Service Merchandise" on the Site Plan which shall not be subject to a specific height restriction, but may not exceed one-story, no building adjacent to the Premises shall exceed 30 feet 4 inches, nor shall it be positioned so as to project beyond the front walls of the existing buildings in the Shopping Center or the Permissible Building Areas shown on the Site Plan.  No outparcels, barriers, buildings, kiosks or other structures, either temporary or permanent, shall be located within Tenant's Preferred Area, and no building located on an outparcel in the Shopping Center shall exceed the size necessary for such outparcel to maintain, within its boundaries, the parking ratio required for its use under the applicable zoning code without use of parking spaces located in the Common Areas.  No development shall occur within the Shopping Center except as shown on the Site Plan.  Notwithstanding the foregoing, Landlord shall not be deemed to be in violation of this paragraph if an entity which entered into an occupancy agreement at the Shopping Center prior to the date of this Lease has the right, without a requirement that such entity obtain Landlord's prior consent, to undertake an act which would otherwise be a violation of this paragraph.

(B)    Construction and Alterations.  Following the end of the first Lease Year, no exterior construction and no construction staging shall be permitted in the primary parking areas in the Shopping Center (i.e. the parking areas located in front of the buildings in the Shopping Center) or on any service roads during the months of October, November and December except for emergency repairs and interior alterations not affecting the operations of any other occupant of the Shopping Center.  In the event of any construction within the Shopping Center, Landlord shall designate a construction access route, staging

478044.9                                                        -44-

and parking areas located so as to minimize interference with customers or the operations of other occupants of the Shopping Center and shall require erection of safety barriers as necessary and a wall around the site of such construction of a size necessary to screen such construction from ground level view. With regard to any construction on Landlord's Premises, Landlord shall be solely responsible for any governmentally imposed impact fees, hookup, connection, installation or tap in fees and other similar construction-related charges. Other than de minimis changes which do not adversely affect Tenant's Preferred Area, Landlord shall make no changes in the Tenant's Preferred Area as shown on the Site Plan (including, without limitation, changes in the location of curbcuts, drive aisles, roadways, sidewalks or parking spaces or reduction of the parking ratio specified in paragraph 5) without Tenant's express written consent, which Tenant may, in its sole discretion, withhold. With respect to portions of the Common Areas outside of Tenant's Preferred Area, Landlord may make other changes provided such changes do not materially and adversely affect Tenant's parking, visibility or access. Any changes which would cause a material adverse effect on Tenant's parking, visibility or access to the Common Areas may be made only upon receipt of Tenant's express written consent. Reference is made to paragraph 16(h) which is incorporated herein as it relates to the Taking contemplated as of the execution of this Lease.

(C)     Prohibited Uses in Common Area. Landlord covenants that it shall not, without Tenant's express written consent, permit the following uses or activities to occur in the Common Areas: (1) advertisements or signs except for pylon, under canopy and/or monument signs, "for rent" signs, traffic control signs, and the Sam's Club cart corral and product signs; (2) display or sale of merchandise; (3) operation of loudspeakers or other sound electronically amplified so as to be heard in the Common Areas; (4) imposition of a charge for parking other than the CAM Charge; or (5) operation of cellular telephone or other

478044.9

-45-

telecommunication tower for use by any other party not an occupant of the Shopping Center except in Permissible Building Area "A". Landlord further covenants that it will not seek, nor permit any other occupant of the Shopping Center to seek, a variance or waiver from the minimum parking requirements applicable to the Shopping Center under the zoning code or other applicable ordinance establishing the ratio of parking spaces to building area or otherwise mandating the number of parking spaces required for the Shopping Center and the uses contained therein. If reasonably required in Landlord's opinion, parking by employees of Tenant, Landlord and other occupants of the Shopping Center shall be designated "employee parking" areas, the location of which shall be agreed upon by Landlord and Tenant.

(D)    Easements.    Except for occupants of the Shopping Center, Landlord shall not grant any parking easements in the Common Areas without Tenant's prior written consent.

(x)    Interference with Tenant's Reception/Transmission.  Landlord shall not install or, to the extent it has the authority to do so, permit to be installed by any other tenant or other person anywhere in the Shopping Center, any structure or equipment which, to the best of Landlord's actual knowledge, would cause any interference with satellite, radio or television reception or transmission in or from the Building.

(xi)    Notices Affecting the Premises.  Landlord shall promptly forward to Tenant any notice or other communication affecting the Premises received by Landlord from any owner of property adjoining, adjacent or nearby to the Premises or the Shopping Center or from any municipal or governmental authority, in connection with any hearing or other administrative procedure relating to the use or occupancy of the Premises.

(xii)    Constructive Trust.  Landlord covenants that all sums paid by Tenant to Landlord and intended for payment by Landlord to a third party (such as, by

way of example, taxes and certain elements of CAM Charges) are given to Landlord in trust and shall be applied only for such third-party payments, as and when due. Tenant acknowledges that Landlord may commingle such funds with other funds of the Landlord, and Landlord does not have to maintain a separate accounting therefor, nor pay any interest thereon, to Tenant.

(xiii)   Absence of Obstructions.   To the Landlord's knowledge, the Land is free of any obstructions, foundations or footings (excluding the footings installed by the occupant of the adjacent Unit 980, which shall remain in place), utilities (except for the existing storm sewer line described in paragraph 1(b) of Exhibit "C"), improvements or tenancies. If, in connection with Tenant's construction of the Improvements, Tenant discovers any obstructions, foundations or footings, utilities or improvements in or on the Land (other than those disclosed in the preceding sentence) which Tenant is required to remove in connection with its construction of the Improvements, Landlord agrees to reimburse Tenant for the cost of such removal to the extent such cost exceeds $2,000.00.

(b)   Tenant's Organizational Authority.   Tenant represents, warrants and covenants to Landlord that Tenant is a duly constituted corporation organized under the laws of the Commonwealth of Virginia; it has the power to enter into this Lease and perform Tenant's obligations hereunder; and the Vice President executing this Lease on Tenant's behalf has the right and lawful authority to do so.

(c)   Additional Remedies.   In addition to such other remedies as may be accorded Tenant at law, in equity (including but not limited to an injunction or writ of specific performance) or under the terms of this Lease, (i) in the event that any of the representations, warranties and covenants set forth in paragraphs 19(a)(i), (ii), (iii), (iv), (vii) and (x) are untrue or incorrect, or (ii) in the event that Tenant suffers any loss, cost, liability or damage as a result of the breach of any of such covenants, representations and warranties, Landlord shall defend, indemnify and hold Tenant harmless from any of such loss, costs, liability or damage incurred as a result of Landlord's breach hereunder.

20.    Estoppel Certificates.   Without charge, at any time and from time to time hereafter (but not more frequently than twice in one year), within thirty (30) days after receipt of written request by either party, the other party shall certify, by written and duly executed instrument, to any other entity ("Person") specified in such request: (a) as to whether this Lease has been supplemented or amended, and, if so, the substance and manner of such supplement or amendment; (b) as to the validity, force and effect of this Lease, to the certifying party's best knowledge; (c) as to the existence of any default hereunder, to the certifying party's best knowledge; (d) as to the existence of any offsets, counterclaims, or defenses hereto on the part of such other party, to the certifying party's best knowledge; (e) as to the commencement and expiration dates of the Term; and (f) as to any other matters which may reasonably be so requested.   In addition, without charge, at any time any from time to time hereafter (but not more frequently than twice in a year), within thirty (30) days after receipt of written request of Tenant, Landlord shall deliver an estoppel certificate to Tenant's assignee or subtenant that states in the event Tenant defaults under any of its obligations under this Lease following the date of any assignment or subletting hereunder, the Landlord will permit such assignee or subtenant to satisfy obligations of Tenant hereunder, including but not limited to the direct payment of rentals to the Landlord.   Any such certificate may be relied upon by the party requesting it and any Person to whom the same may be exhibited or delivered, and the contents of such certificate shall be binding on the party executing same.   Any request for any such certificate by Tenant must contain a reference to this paragraph 20 and the obligation of the applicable party to provide such certificate.

21.    Subordination, Non-Disturbance and Attornment.   Simultaneously with the execution hereof, Landlord shall deliver to Tenant with regard to any and all Mortgages (as defined below) encumbering the Premises and placed thereon by Landlord, a non-disturbance and attornment agreement substantially in the form of Exhibit "G" hereto attached, executed by the holder of such Mortgage ("Mortgagee").   In addition, throughout the term, Landlord shall deliver to Tenant a non-disturbance and attornment agreement substantially in the form of Exhibit "G" executed by Mortgagee with regard to all future Mortgages and with regard to all

478044.9                                   -48-

renewals, modifications, replacements and extensions of such Mortgages. Such Agreement shall contain, at a minimum, the following: (i) the Lease shall not terminate simply by reason of a foreclosure or deed in lieu thereof ("Foreclosure"), (ii) Tenant's possession of the Premises shall not be disturbed so long as Tenant is not in default under any of the material terms, covenants, or conditions of the Lease, beyond any applicable cure period provided in the Lease, (iii) the Mortgagee or purchaser upon such Foreclosure shall recognize Tenant and all its rights hereunder and shall be obligated to fully and completely perform Landlord's duties and obligations under the Lease arising from and after the date of such Foreclosure, including but not limited to an obligation to make all payments to Tenant and satisfy all construction obligations set forth in this Lease so long as Tenant is not in default under any of the material terms, covenants, or conditions of the Lease, beyond any applicable cure period provided in the Lease, (iv) Tenant shall not be named as a party in any action for foreclosure unless required by law, (v) the Mortgagee, whether or not the Mortgage is foreclosed, shall make all proceeds arising from a casualty or condemnation loss to the Premises available to Tenant for restoration of the Improvements in accordance with the terms hereof, and (vi) in the event of a foreclosure, Tenant shall attorn to the Mortgagee or any purchaser at the foreclosure sale. Upon Tenant's receipt of the non-disturbance and attornment agreement, this Lease shall be subordinate to the Mortgage. Landlord shall cause any present or future Mortgagee to deliver a non-disturbance and attornment agreement in accordance with this paragraph 21 at or prior to the time which the lien of the Mortgage is filed against record title to the Premises. As used in this paragraph 21, the term "Mortgage" shall mean any mortgage, deed to secure debt, deed of trust, trust deed or other collateral conveyance of, or lien or encumbrance against, the Premises. In the event of a foreclosure of any Mortgage, Tenant shall attorn to a Mortgagee or any purchaser at foreclosure sale of a Mortgage, and Landlord shall be released from all liability with respect to events occurring from and after the date of such foreclosure. In the event Landlord's interest in the Premises passes to a successor (the "Successor") by sale, lease, foreclosure or in any other manner, provided such successor assumes Landlord's obligations hereunder, Tenant shall be bound to the Successor under all of the terms of this Lease for the balance of the Term, with

the same force and effect as if the Successor were the initial Landlord under the Lease, and Tenant hereby agrees to attorn to the Successor as its Landlord. Such attornment to be effective upon written notice thereof given by Landlord to Tenant.

22.    Tenant's Financing.    Notwithstanding any other provisions of this Lease, Tenant may, without Landlord's consent, from time to time, secure financing or general credit lines and grant the lenders thereof, as security therefor, (i) a security interest in Tenant's trade fixtures, personalty, inventory and trade equipment (collectively, "Personalty"), (ii) the right to enter the Premises to realize upon any Personalty so pledged provided that such secured creditor agrees to pay for any and all damages caused to the Premises in pursuit of its remedies against Tenant, and/or (iii) a collateral assignment of Tenant's leasehold interest in the Premises, with rights of reassignment (but in all events subject to the terms of this Lease, with no release of liability on the part of Tenant or any future holders of Tenant's rights herein); provided, however, such collateral assignment may be made solely for the purpose of securing Tenant's indebtedness. Upon Tenant providing notice of such financing to Landlord, Landlord agrees to evidence its consent in writing to such security interest and agreement and to give such lenders the same notice and opportunity to cure any default of Tenant as is provided Tenant hereunder.   In addition, Landlord agrees to cause any Mortgagee specifically to acknowledge the rights of Tenant's lenders described herein and in paragraph 23 below.

23.    Tenant's Property and Waiver of Landlord's Lien.    All of the Personalty shall be and remain the personal property of Tenant and shall be removable by Tenant any time prior to the expiration or earlier termination of this Lease. Landlord shall permit Tenant to enter the Premises for thirty (30) days after the expiration of the Lease to remove its Personalty from the Premises provided Tenant makes such request at least ninety (90) days prior to the expiration of this Lease and, upon the expiration of the Lease, pays Landlord all charges that would have been due Landlord with respect to such thirty (30) day period had the Lease continued through such additional thirty (30) day period. (A nonexclusive list of Tenant's removable trade fixtures is attached hereto as Exhibit "D".) Landlord expressly waives its statutory or common law landlord's liens (as same may be enacted or may exist from time to time) and any and all rights

478044.9                                    -50-

granted under any present or future laws to levy or distrain for rent (whether in arrears or in advance) against the aforesaid property of Tenant on the Premises and further agrees to execute any reasonable instruments evidencing such waiver, at any time or times hereafter upon Tenant's request. In the event Tenant is authorized but fails to remove any and all of its personalty within thirty (30) days of the expiration or termination of this Lease or Tenant's right of possession thereunder, Landlord may remove and take possession of such personalty, or the balance thereof and thereafter charge Tenant the cost of such removal. Those improvements that are integrated into the physical structure of the improvement shall not be removed and shall become property of the Landlord. Tenant agrees to promptly repair any damage to the Improvements occasioned by the removal of Tenant's trade fixtures, trade furnishings and trade equipment, and to surrender the Premises in a broom-clean condition and otherwise maintained as contemplated in Section 10 above. Tenant agrees that at the expiration of this Lease, it will deliver to Landlord peaceable possession of the Premises.

24.    Memorandum of Lease; Commencement Date Agreement. Landlord and Tenant agree, at the other's request and at the sole expense of the requesting party, to execute a Memorandum of Lease in recordable form, substantially similar to that attached hereto as Exhibit "H", setting forth such provisions hereof as may be required by State law. In addition, Landlord and Tenant shall execute a Commencement Date Agreement in the form attached hereto as Exhibit "I", once the Commencement Date has been established. Recording costs for either or both documents shall be borne by the party requesting recordation of the same. The provisions of this Lease shall control, however, with regard to any omissions from, or provisions hereof which may be in conflict with, the Memorandum of Lease or Commencement Date Agreement.

25.    Expiration of Term and Holding Over. Should Tenant hold over this Lease shall continue in force from month to month, subject to all of the provisions hereof and at one hundred twenty-five percent (125%) of the monthly Base Rent Tenant had been paying during the preceding Lease Year, plus Tenant shall pay all other charges contained herein. No holding over by Tenant or acceptance of rent or other charges by Landlord shall operate as a renewal

or extension of the Lease without the written consent of Landlord and Tenant. During the last year of the Term, Tenant will allow Landlord or its agents, upon reasonable notice, to show the Premises to prospective tenants, purchasers, or mortgagees during reasonable business hours provided the same does not interfere with the conduct of Tenant's business.

26.   Force Majeure.   Except as otherwise specifically contemplated in this Lease or in the Construction Provisions, in the event that Landlord or Tenant shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, delay by the other party, failure of power or unavailability of utilities, riots, insurrection, war or other reason of a like nature not the fault of such party or not within its control, then performance of such act shall be excused for the period of delay, and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay; provided, however, that in connection with the construction of the Improvements, the consequences of delays by the other party shall be governed by the Construction Provisions. The provisions of this Lease related to force majeure shall not operate to excuse Tenant from prompt payment of ground rent, Interim Rent, Base Rent, additional rent or any other payments required by the terms of this Lease.

27.   Events of Tenant's Default.   Any of the following occurrences, conditions or acts by Tenant shall constitute an "Event of Default" under this Lease:

(a)   Failure to Pay Rent; Breach.   (i) Tenant's failure to make any payment of money required by this Lease (including without limitation Base Rent, Interim Rent, CAM Charges or Real Estate Taxes), within ten (10) days after written notice is given (pursuant to paragraph 32) from Landlord to Tenant that same is overdue; or (ii) Tenant's failure to observe or perform any other material provision of this Lease within thirty (30) days after written notice is given (pursuant to paragraph 32) from Landlord to Tenant specifying such default and demanding that the same be cured; provided that, if such default is a non-monetary default and cannot with due diligence be wholly cured within such thirty (30) day period, Tenant shall have such longer period as is reasonably necessary to cure the default, so long as Tenant proceeds promptly to commence the cure of same within such thirty (30) day period and diligently

prosecutes the cure to completion. In the case of an emergency, Landlord shall be required to give only such notice as is reasonable under the circumstances.

(b)    Bankruptcy.    Tenant's adjudication as bankrupt or insolvent, or the appointment of a receiver, trustee in involuntary bankruptcy or other, similar officer to take charge of any substantial part of Tenant's property, which proceeding is not dismissed within one hundred twenty (120) days after it is begun.

28.    Landlord's Remedies.    After the occurrence of an Event of Default by Tenant, Landlord shall have the right to exercise the following remedies:

(a)    Continue Lease.    Landlord may, at its option, continue this Lease in full force and effect, without terminating Tenant's right to possession of the Premises, in which event Landlord shall have the right to collect Base Rent, Interim Rent, and all other charges when due. Landlord shall also have the right, in Landlord's exercise of reasonable efforts to mitigate its damages (which Landlord hereby agrees to make), at its option, from time to time, without terminating this Lease or its right to collect Interim Rent, Base Rent, and all other charges when due, to re-enter and/or relet the Premises, or any part thereof, with or without legal process, as the agent, and for the account, of Tenant upon such terms and conditions as Landlord may deem advisable, in which event the rents received on such reletting shall be applied (i) first to the reasonable and actual expenses of such reletting and collection, including without limitation necessary renovation and alterations of the Premises, reasonable and actual attorneys' fees and any reasonable and actual real estate commissions paid, and (ii) thereafter toward payment of all sums due or to become due Landlord hereunder. Any such reentry shall not be deemed a termination of the Lease or an acceptance by Landlord of a surrender thereof, with Landlord retaining the right to collect all rent and all other charges when due. If due to such reletting a sufficient amount to pay such expenses and sums shall not be realized or secured, then Tenant shall pay Landlord any such deficiency monthly and Landlord may bring an action therefor for all present and future monthly deficiencies. Landlord shall not, in any event, be required to pay Tenant any sums received by Landlord on a reletting of the Premises in excess of the rent provided in this Lease, but such excess shall reduce any accrued present

or future obligations of Tenant hereunder. Landlord's reentry and reletting of the Premises without termination of this Lease shall not preclude Landlord from subsequently terminating this Lease as set forth below.

In the event that Tenant does not pay when due any sums due under this Lease, such unpaid amounts shall bear interest from the due date thereof to the date of payment at the annual rate (the "Default Rate") equal to four percent (4%) plus the "Prime Rate". In the event such rate is prohibited by law, unpaid amounts shall bear interest at the maximum rate permitted by law. For purposes hereof, the "Prime Rate" shall be the Prime Rate as set forth from time to time in the Money Section of The Wall Street Journal, or if such Prime Rate is not ascertainable as aforesaid, Landlord and Tenant shall mutually agree upon a comparable rate as a substitute therefor.

(b)   Terminate Lease.  Landlord may terminate this Lease by written notice to Tenant specifying a date therefor, which shall be no sooner than thirty (30) days of Landlord giving such notice to Tenant in accordance with paragraph 32, and this Lease shall then terminate on the date so specified as if such date had been originally fixed as the expiration date of the Term. In the event of such termination, Landlord shall be entitled to recover from Tenant all of the following:

(i)   The "worth at the time of the award" (defined below) of any obligation which has accrued prior to the date of termination; and

(ii)   The "worth at the time of the award" of the amount by which the unpaid Base Rent and all other charges which would have accrued after termination until the time of award exceeds the amount of any sums which Landlord has (or Tenant proves that Landlord could have) received in mitigation.

As used in this paragraph 28(b), the term, "worth at the time of the award", shall be computed by allowing simple interest at an accrual rate of twelve percent (12%) for past due obligations, and a discount rate to net present value of ten percent (10%) on anticipated future obligations, on the amount of the obligations payable on the date of such calculation. In the event this Lease shall be terminated as provided above, by summary proceedings or otherwise,

Landlord, its agents, servants or representatives may immediately or at any time thereafter peaceably re-enter and resume possession of the Premises and remove all persons and property therefrom, by summary dispossession proceedings.

      (c)    <u>Injunctive Relief and Specific Performance</u>.  Landlord shall also be entitled to seek injunctive relief and/or specific performance as a remedy for an Event of Default by Tenant.

      (d)    <u>Additional Damages</u>.  Landlord may also recover from Tenant, and Tenant shall pay to Landlord upon demand, such reasonable and actual expenses as Landlord may incur in recovering possession of the Premises, placing the same in good order and condition, and repairing the same for reletting, and all other reasonable and actual expenses, commissions and charges incurred by Landlord in exercising any remedy provided herein or as a result of any Event of Default by Tenant hereunder (including, without limitation, its reasonable attorney's fees), provided that in no event shall Tenant be obligated to compensate Landlord for any speculative or consequential damages caused by Tenant's failure to perform its obligations under this Lease.

      (e)    <u>Remedies Are Cumulative</u>.  The various rights and remedies reserved to Landlord herein are cumulative, and Landlord may pursue any and all such rights and remedies (but no others), whether at the same time or otherwise (to the extent not inconsistent with specific provisions of this Lease).  Notwithstanding anything herein to the contrary, Landlord expressly waives its right to forcibly dispossess Tenant from the Premises, whether peaceably or otherwise, without judicial process, such that Landlord shall not be entitled to any "commercial lockout" or any other provisions of applicable law which permit landlords to dispossess tenants from commercial properties without the benefit of judicial review.

    29.    <u>Events of Landlord's Default; Tenant's Remedies</u>.

      (a)    <u>Default by Landlord</u>.  Any of the following occurrences, conditions or acts by Landlord shall constitute an "Event of Default": (i) Landlord's failure to make any payments of money due Tenant or any third party, including but not limited to the payment of the brokerage commissions pursuant to paragraph 33 hereof, within thirty (30) days after the receipt

of written notice from Tenant that same is overdue (in which event the delinquent amount shall accrue interest from the due date at the Default Rate); or (ii) Landlord's failure to perform any nonmonetary obligation of Landlord hereunder within thirty (30) days after receipt of written notice from Tenant to Landlord specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Landlord shall have such longer period as may be reasonably necessary to cure the default, so long as Landlord proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion and provided further that in the case of an emergency, Tenant shall be required to give only such notice as is reasonable under the circumstances.

(b)     <u>Remedies Upon Landlord's Default.</u>   Upon the occurrence of an Event of Default by Landlord, at Tenant's option, and without its actions being deemed an election of remedies or a cure of Landlord's default, Tenant may do all or any of the following: (i) provided Tenant has delivered not less than five (5) business days prior written notice of Tenant's intent to pay or perform the obligation which gave rise to the Event of Default (which notice may be included in the initial notice of default given to Landlord pursuant to paragraph 29(a) above), pay or perform such obligations and invoice Landlord the amount of Tenant's actual cost of performance, including any and all transaction costs and attorneys' fees, plus interest at the Default Rate, against the Interim Rent, Base Rent, CAM Charges and any and all other amounts and charges due Landlord hereunder, (ii) if such default by Landlord effectively precludes Tenant from profitably operating its business on the Premises, terminate this Lease and sue for damages, including interest, transaction costs and attorneys' fees as specified in clause (i) above, (iii) recover from Landlord damages Tenant incurs as a result of Landlord's default (including, without limitation, its reasonable attorney's fees), or (iv) seek injunctive relief and/or specific performance as a remedy for an Event of Default by Landlord.   If Tenant elects its rights under clause (i) of this paragraph 29(b) and Landlord fails, within thirty (30) days of receipt of such invoice, to reimburse Tenant for the amounts set forth in the invoice delivered to Landlord pursuant to clause (i), Tenant may offset the amount of such invoice against the Interim Rent,

Base Rent, CAM Charges and any and all other amounts or charges due Landlord hereunder until such invoice has been paid in full.

Notwithstanding the foregoing paragraph, so long as the Landlord is Kentucky Oaks Mall Company or an affiliate of The Cafaro Company, Tenant may only exercise its right of offset with respect to costs incurred by Tenant as a result of Landlord's failure to maintain Tenant's Building and/or the Common Areas, maintain the insurance coverages required hereunder or pay Real Estate Taxes as required hereunder (unless Landlord has notified Tenant that it is in good faith protesting same and has provided evidence reasonably satisfactory to Tenant that the Tax Parcel is not in imminent danger of foreclosure), and may only exercise such offset right if Landlord has not notified Tenant within thirty (30) days of receipt of Tenant's invoice that Landlord, in good faith, contests the existence of the default giving rise to the work performed by Tenant or the validity of the charges set forth in the invoice.  In the event Landlord so notifies Tenant, Tenant shall deposit the amount it seeks to offset against the charges payable to Landlord into a third-party escrow account and initiate a three arbitrator arbitration proceeding in accordance with the expedited arbitration procedures of the American Arbitration Association. In the event Tenant prevails in such arbitration, Tenant shall be entitled to a return of the money deposited in escrow, together with interest thereon.  In addition, Landlord shall pay for the cost of the arbitration, including Tenant's reasonable attorneys' fees incurred in connection therewith, and interest on the amounts deposited in escrow by Tenant at the Default Rate (reduced by any interest actually earned by such deposit while on deposit with the third-party escrow agent).  If Landlord does not pay such additional amounts within ten (10) days after the decision by the arbitrator, Tenant shall have the additional right to offset any such additional amounts against future amounts payable by Tenant to Landlord under this Lease.  If Landlord prevails in the arbitration, the escrow agent shall pay the escrow deposit, together with any interest earned thereon, to Landlord.  Tenant shall be obligated to pay the costs of arbitration, including Landlord's reasonable attorneys' fees, and Landlord shall be entitled to interest at the Default Rate on the amounts which should have been paid to Landlord under the Lease.  Tenant shall pay all amounts due Landlord within ten (10) days after the decision by the arbitrators.  Tenant

478044.9

-57-

shall receive a credit against such amounts for any interest earned on the escrow deposit and paid to Landlord. If Landlord fails to pay Tenant the Tenant Improvement Allowance in a timely manner, Tenant shall be entitled to the rights and remedies set forth in this paragraph and the Construction Provisions; and, as to a breach of the warranties and representations contained in paragraph 19, Tenant shall be entitled to the remedies provided therein, in addition to those remedies provided herein. The various rights and remedies reserved to Tenant herein are cumulative, and Tenant may pursue any and all rights and remedies (but no others), whether at the same time or otherwise.

(c)    Exculpation. Notwithstanding anything to the contrary provided in this Lease, except to the extent Landlord elects to self-insure, the liability of Landlord, its partners, principals or joint venturers, under this Lease shall be limited to Landlord's interest in the Shopping Center, including any rents and profits, insurance proceeds and condemnation awards derived therefrom and further including any consideration received by Landlord, its partners, principals or joint venturers, from the sale or other disposition of all or any part of the Shopping Center (with regard to liability arising prior to such sale or disposition). Tenant agrees to look solely to Landlord's interest in the Shopping Center for satisfaction of any and all claims it may have against Landlord, provided that nothing contained herein shall prevent Tenant from bringing a suit for specific performance or seeking injunctive relief against Landlord in an appropriate case, from attaching rents and profits, sale proceeds, insurance or condemnation awards derived from the Shopping Center, nor limit Tenant's right to any other action or remedy (not involving the personal liability of Landlord, its partners, principals or joint venturers) which may be accorded Tenant by law. Nothing contained herein shall be deemed a waiver of any default by Landlord nor an assumption by Tenant of any liability of Landlord, its partners, principals or joint venturers.

(d)    Time is of the Essence. Notwithstanding anything contained herein to the contrary, Landlord covenants that it shall complete its construction and delivery obligations in accordance with the "Completion Dates" set forth in the Construction Schedule. In the event that the Landlord fails to complete its construction and delivery obligations in accordance with

478044.9                                  -58-

such Completion Dates, Tenant may, at its sole election, exercise such remedies as are set forth herein.

30.    Waiver. If either Landlord or Tenant fails to insist on the strict observance by the other of any provisions of this Lease, neither shall thereby be precluded from enforcing nor be held to have waived any of the obligations, past, present or future, of this Lease. Either party may accept late payment or performance by the other without waiving any Event of Default which may then have accrued.

31.    Compliance with Applicable Laws. During the Term, Landlord and Tenant shall comply in accordance with clause 10 of the Lease with all lawful requirements of the local, county and state health boards, police and fire departments, municipal and state authorities and any other governmental authorities with jurisdiction over the Improvements, and of the board of fire underwriters, respecting Tenant's use and occupancy of the Improvements. In the event that Tenant, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Landlord or any such authority ordering performance of any such work which Tenant is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Landlord may perform said work and collect the reasonable cost thereof plus interest at the Default Rate from Tenant with the next installment or installments of Base Rent. In the event that Landlord, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Tenant or any such authority ordering performance of any such work which Landlord is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Tenant may perform said work and deduct the reasonable cost thereof plus interest at the Default Rate from Landlord with the next installment or installments of Base Rent.

32.    Notices. Any notice permitted or required to be given pursuant to this Lease shall be deemed to have been given three (3) business days after mailing a written notice by certified

mail, postage prepaid, return receipt requested, or one (1) business day after sending by Federal Express or other comparable overnight express courier service (with proof of receipt available), addressed to the parties as follows:

If to Tenant:         CIRCUIT CITY STORES, INC.
                      9950 Mayland Drive
                      Richmond, Virginia 23233
                      Attention: Corporate Secretary

with a copy to:       CIRCUIT CITY STORES, INC.
                      9950 Mayland Drive
                      Richmond, Virginia 23233
                      Attention: Vice President of Real Estate

If to Landlord:       KENTUCKY OAKS MALL COMPANY
                      2445 Belmont Avenue
                      P.O. Box 2186
                      Youngstown, Ohio 44504-0186
                      Attention: Legal Department

or to such other addressees as any party hereto shall from time to time give notice to the other party in accordance with this paragraph.

All payments required under this Lease to be paid to Landlord shall be delivered to Landlord, in its name, at P.O. Box 75066, Cleveland, Ohio 44101-2199, or to such other address as Landlord may designate by written notice, except any payment containing a conspicuous statement to the effect that the payment is being tendered as full satisfaction of any obligation owed by Tenant to Landlord under this Lease. Any payment bearing a conspicuous statement to the effect that the payment is being tendered as full satisfaction, such as "payment in full" or the like, shall be delivered to Landlord, in its name, at 2445 Belmont Avenue, P.O. Box 2186, Youngstown, Ohio 44504-0186, Attention: Credit and Collections Manager. Tenant agrees that acceptance by Landlord of any payment containing such language shall not preclude Landlord from collecting the full amount rightfully owed to it under the terms of the Lease. Payment shall be deemed delivered when same are actually received by Landlord.

478044.9                          -60-

33.   Brokers.   Landlord and Tenant each covenant that they have not dealt with any real estate broker or finder with respect to this Lease, except for James B. Lauber of J.E. Lauber & Associates, which shall be paid a commission by Landlord of $2.00 per square foot of ground floor building area pursuant to their separate written agreement. Except for the foregoing, each party shall hold the other party harmless from all damages, claims, liabilities or expenses, including reasonable and actual attorneys' fees (through all levels of proceedings), resulting from any claims that may be asserted against the other party by any real estate broker or finder with whom the indemnifying party either has or is purported to have dealt.

34.   Miscellaneous.

(a)   Headings and Gender.   All paragraph headings, titles or captions contained in this Lease are for convenience only and shall not be deemed a part of this Lease and shall not in any way limit or amplify the terms and provisions of this Lease. The masculine, feminine or neuter gender and the singular or plural number shall be deemed to include the others whenever the context so requires or indicates.

(b)   Construction.   The parties hereto agree that all the provisions hereof are to be construed as covenants and agreements as though the words importing such covenants and agreements were used in each separate paragraph hereof.

(c)   Waiver of Jury Trial.   In the event of any court action arising out of this Lease, each party hereby expressly waives its right to trial by jury.

(d)   Relationship of Landlord-Tenant.   Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent, partnership, joint venture, or any other association between Landlord and Tenant other than the landlord-tenant relationship described herein.

(e)   Entire Agreement; Merger.   This Lease, including all exhibits hereto (which are hereby incorporated herein by reference for all purposes), contains the full and final agreement of every kind and nature whatsoever between the parties hereto concerning the subject matter of this Lease, and all preliminary negotiations and agreements of whatsoever kind or nature between Landlord and Tenant are merged herein. This Lease cannot be changed or

478044.9                                          -61-

modified in any manner other than by a written amendment or modification executed by Landlord and Tenant.

(f)     Attorneys' Fees.  In the event either party shall be required to commence or defend any action or proceeding against any other party by reason of any breach or claimed breach of any provision of this Lease, to commence or defend any action or proceeding in any way connected with this Lease or to seek a judicial declaration of rights under this Lease, the party prevailing in such action or proceeding shall be entitled to recover from or to be reimbursed by the other party for the prevailing party's reasonable and actual attorneys' fees and costs through all levels of proceedings.

(g)     Partial Invalidity.  If any provision of this Lease or the application thereof to any person or circumstance shall be deemed invalid or unenforceable, the remainder of this Lease and its application to other persons or circumstances shall not be affected by such partial invalidity but shall be enforced to the fullest extent permitted by law as though such invalid or unenforceable provision was never a part hereof.

(h)     Consents.  Any consent or approval granted by either party hereunder shall be deemed a consent only as to the matter on which such consent was requested and shall not waive the consenting party's right to give or withhold consent to any subsequent matter.

(i)     Holidays.  If the day on which rent or any other payment due hereunder is payable falls on a Sunday or on a legal holiday, it shall be payable on the following business day.

(j)     Applicable Law.  This Lease shall be construed in accordance with the laws of the State, and the parties agree that jurisdiction for all actions hereunder shall lie therein.

(k)     Successors and Assigns.  All rights, obligations and liabilities herein given to or imposed upon any party hereto shall extend to the permitted successors and assigns of such party.

(l)     Counterparts.  This Lease may be executed in one or more identical counterparts, and as so executed by all parties hereto shall constitute a single instrument for purposes of the effectiveness of this Lease.

(m)   <u>Trademarks and Trade Names</u>.   All trademarks, trade names, service marks, signs and all other marks of identification used by Tenant in its business shall at all times remain the exclusive property of Tenant, and Landlord shall have no right, interest in, or title to any of Tenant's trademarks, trade names, service marks, signs or other marks of identification.

35.   <u>Construction, Operation and Reciprocal Easement Agreement</u>.   This Lease is subject and subordinate to the REA provided, that if there is any inconsistency between the REA and the Lease, as between Landlord and Tenant, the Lease shall control.   The provisions of this clause shall be self-operative; however, Tenant, upon by request of any party in interest, shall execute promptly such agreements or instruments to effectuate the intent of this clause. Landlord agrees that, without first obtaining Tenant's prior written consent, it shall not amend or modify the REA in any manner which adversely affects Tenant's rights or obligations with respect to the Shopping Center.

Further, Landlord reserves the right to sever the ownership of or title to the various sections of the Shopping Center and/or to place separate mortgages on said sections, in which case the rights of Tenant will be preserved by a written declaration approved by Tenant, which approval shall not be unreasonably withheld, delayed, or conditioned, to be executed by the Landlord and duly recorded, creating mutual, reciprocal and interdependent rights to use the parking and other Common Areas and the utilities and facilities needed for the full use and enjoyment of the Demised Premises by Tenant and without impairing any of the duties and obligations of the Landlord to the Tenant under this Lease.   Tenant covenants to execute from time to time such instruments reasonably required by Landlord and/or its mortgagee to effectuate the provisions of this clause.   Landlord covenants to reimburse Tenant for all legal fees and other costs incurred by Tenant in connection with effectuating the provisions of this clause.

36.   <u>Effectiveness of Lease; Tenant's Right to Terminate</u>.   [Intentionally Deleted.]

37.   <u>Confidentiality</u>.   The parties hereto, including, but not limited to, their heirs, successors, assigns and legal representatives, agree that this Lease may not be recorded and that all such parties hereby agree to use their best reasonable efforts to preserve the confidentiality

of this transaction. This confidentiality agreement extends to any developers, bankers, lawyers, accountants, employees, agents or any other persons acting on behalf of the parties hereto. Any breach of this confidentiality agreement shall constitute an automatic Event of Default without notice or cure provided, for which either party may recover damages as their sole remedy and for which neither party can terminate this Lease. Notwithstanding the foregoing, Landlord shall have the right to make such disclosures regarding this Lease as are reasonably required in connection with a sale of the Shopping Center, the financing or refinancing of the Shopping Center, a governmental or judicial order or mandate, litigation, a condemnation proceeding, or to an insurance carrier or broker, tax consultant or other party which customarily requires access to such information.

　　　38.　　Recapture Right/Failure to Operate. If Tenant fails, for a period of one (1) year to be open for business in the Premises (excluding a closing due to a casualty or condemnation) Landlord shall have the right to terminate this Lease at any time after the expiration of such one (1) year period and prior to Tenant reopening for business, by delivery to Tenant of notice that the Lease shall terminate if Tenant does not reopen for business within ninety (90) days of receipt of such notice; provided, however, such notice shall be deemed to be null and void and of no force and effect if, following receipt thereof and prior to the expiration of such ninety (90) day period, Tenant either (i) reopens its business fully stocked, fixtured and staffed or (ii) delivers evidence (in the form of at least a mutually executed memorandum of such agreement setting forth a summary thereof) to Landlord that Tenant has entered into a bona fide assignment or sublet of the Premises and such assignee or sublessee subsequently opens its business fully stocked, fixtured and staffed within one-hundred eighty (180) days of the date of such assignment or sublet. If Landlord does so terminate this Lease, Landlord shall reimburse to Tenant all of Tenant's unamortized costs of its improvements (including, without limitation tenant improvements and fixtures [other than removable trade fixtures], but excluding inventory) to the Premises which have not been previously reimbursed to Tenant or included in the Lease Incentive Payment. For purposes of calculating Tenant's unamortized cost of an improvement to the Premises Tenant shall utilize an amortization period equal to the lesser of (i) the

remainder of Term (including all previously exercised Option Periods) when the improvement was put in service or (ii) the useful life of the applicable improvement as determined for Tenant's federal income tax purposes.

WITNESS the following signatures and seals:

**LANDLORD:**

KENTUCKY OAKS MALL COMPANY, an
Ohio limited partnership

By: _____
    Anthony M. Cafaro, Authorized Agent

By: _____

Name: _____

Title:  Authorized Agent

**TENANT:**

CIRCUIT CITY STORES, INC., a Virginia
corporation

By: _____
    Benjamin B. Cummings, Jr., Vice President of
    Real Estate

478044.9

STATE OF OHIO            )
                        )        SS:
COUNTY OF MAHONING       )

Personally appeared before me, the undersigned, a Notary Public in and for said County and State, Anthony M. Cafaro and _Timothy J Matese_, known to me to be the authorized agents of THE KENTUCKY OAKS MALL COMPANY, the limited partnership which executed the foregoing document, who acknowledged that they did sign the foregoing instrument for and on behalf of said limited partnership, acting as authorized agents of Kentucky Oaks Mall that _Company_ the same is their free act and deed as such authorized 'agents and the free act and deed of said limited partnership.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Youngstown, Ohio, this _24th_ day of _April_, 1998.

_Lori A Kish_
Notary Public

LORI A. KISH, Notary Public
State of Ohio
My Commission Expires December 19, 1998

STATE OF _____      )
                         )        SS:
COUNTY OF _____      )

Personally appeared before me, the undersigned, a Notary Public in and for said County and State, Benjamin B. Cummings, Jr., known to me to be the Vice President of Real Estate of CIRCUIT CITY STORES, INC., the Corporation which executed the foregoing document, who acknowledged that he did sign the foregoing instrument for and on behalf of said Corporation, being thereunto duly authorized by its Board of Directors; that the same is his free act and deed as such officer and the free act and deed of said Corporation.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at _____, _____, this _____ day of _____, 1998.

_____
Notary Public

478044.9

WITNESS the following signatures and seals:

<u>LANDLORD</u>:

KENTUCKY OAKS MALL COMPANY, an
Ohio limited partnership


By:_____

Name:_____

Title:_____


<u>TENANT</u>:

CIRCUIT CITY STORES, INC., a Virginia
corporation


By: _____

    Benjamin B. Cummings, Jr.
Name: Vice President

Title:   Vice President

STATE OF OHIO                    )
                                )    SS:
COUNTY OF MAHONING              )

Personally appeared before me, the undersigned, a Notary Public in and for said County and State, Anthony M. Cafaro and _____, known to me to be the authorized agents of THE KENTUCKY OAKS MALL COMPANY, the limited partnership which executed the foregoing document, who acknowledged that they did sign the foregoing instrument for and on behalf of said limited partnership, acting as authorized agents of Kentucky Oaks Mall; that the same is their free act and deed as such authorized agents and the free act and deed of said limited partnership.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Youngstown, Ohio, this _____ day of _____, 1998.

_____
Notary Public

STATE OF __VA__                 )
                                )    SS:
COUNTY OF Henrico               )

Personally appeared before me, the undersigned, a Notary Public in and for said County and State, Benjamin B. Cummings, Jr., known to me to be the Vice President of Real Estate of CIRCUIT CITY STORES, INC., the Corporation which executed the foregoing document, who acknowledged that he did sign the foregoing instrument for and on behalf of said Corporation, being thereunto duly authorized by its Board of Directors; that the same is his free act and deed as such officer and the free act and deed of said Corporation.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Richmond, VA, this 23 day of April, 1998.

_____
Notary Public        10/31/00

478044.8