**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

In re:

    Circuit City Stores, Inc., et al.,

                Debtors.

Case No. 08-35653-KRH
Chapter 11

**CONSUMER PRIVACY OMBUDSMAN**

**<u>INTERIM REPORT TO THE COURT</u>**

May 11, 2009

Lucy L. Thomson
Consumer Privacy Ombudsman

The Willard; Suite 400
1455 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
(703) 798-1001
lucythomson1@mindspring.com

I.      **Consumer Privacy Ombudsman Report to the Court**

Pursuant to Bankruptcy Code section 332(b), Lucy L. Thomson, the Consumer Privacy

Ombudsman ("the CPO") appointed in this case, submits this Interim Report to assist the Court in

evaluating and resolving issues related to the protection of the privacy of personally identifiable

information (PII) of Circuit City consumers.[1]  This Report will be updated after Monday, May 11,

2008, when a final Buyer of the Circuit City assets has been selected.

The Bankruptcy Code provides a framework in sections 332 and 363 for evaluating the sale of

personally identifiable consumer records in the context of a bankruptcy case.  11 U.S.C. §§ 101 *et. seq*.

Section 363(b) provides:

1) The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary
course of business, property of the estate     , except that if the debtor in connection with
offering a product or a service discloses to an individual a policy prohibiting the transfer of
personally identifiable information about individuals to persons that are not affiliated with the
debtor and if such policy is in effect on the date of the commencement of the case, then the
trustee may not sell or lease personally identifiable information to any person unless--

(A) such sale or such lease is consistent with such policy; or

(B) after appointment of a consumer privacy ombudsman in accordance with section 332, and
after notice and a hearing, the court approves such sale or such lease--

(i) giving due consideration to the facts, circumstances, and conditions of such sale or
such lease; and

(ii) finding that no showing was made that such sale or such lease would violate
applicable non-bankruptcy law.

Section 332(b) provides:

The consumer privacy ombudsman may appear and be heard at such hearing and shall provide
to the court information to assist the court in its consideration of the facts, circumstances, and
conditions of the proposed sale or lease of personally identifiable information under section
363(b)(1)(B). Such information may include presentation of--

---

[1]   The Court entered an order on April 10, 2009 authorizing the U.S. Trustee to appoint the CPO.

(1) the debtor's privacy policy;

(2) the potential losses or gains of privacy to consumers if such sale or such lease is approved by the court;

(3) the potential costs or benefits to consumers if such sale or such lease is approved by the court; and

(4) the potential alternatives that would mitigate potential privacy losses or potential costs to consumers.

This Report addresses each of the requirements for a bankruptcy sale of personally identifiable Circuit City consumer records.

The CPO will make a recommendation to the Court regarding approval of the sale of the consumer records after the Buyer has been selected.  This Interim Report outlines considerations that would need to be taken into account in making this decision.  It is recommended that the Court enter an appropriate Order mandating that conditions be established for the Debtors and for the Buyer.  The parties have recommended that these conditions be included in the final Sale Order that will be presented to the Court for approval at the May 13, 2009 hearing.

## II.    Request to Sell Personally Identifiable Consumer Information

Circuit City was a leading retailer of consumer electronics, home office products, entertainment software, and related services.  As of August 2008, the company operated 715 stores in 158 U.S. media markets.  The company maintained a website at www.circuitcity.com where it sold its merchandise online.  Circuit City, through non-debtor affiliates, also sold consumer electronics in 502 company-owned stores and 270 dealer outlets in Canada.  The international segment operated a website at www.thesource.ca.

Circuit City customers were able to shop in its stores, on the Web, and by telephone.  The major categories of products and services included video, information technology, audio, entertainment, warranty, services (mobile and home theatre installation and product repairs) and third

parties for services subscriptions.

On November 10, 2008, Circuit City Stores West Coast, Inc., and Circuit City Stores, Inc. (the "Sellers" and, collectively with the debtors and debtors in possession in the above-captioned jointly administered cases, the "Debtors"), filed a voluntary petition for relief under Chapter 11 of Title 11 of the United State Code, 11 U.S.C. §§ 101 *et. seq.* ("the Bankruptcy Code").  On January 16, 2009, Circuit City announced that it was shutting down.  Store closing sales were held from January 17, 2009 to March 8, 2009.

On April 5, 2009, the Sellers executed an Asset Purchase Agreement with Systemax Inc. (the potential "Purchaser" or Buyer"), the "Stalking Horse Bidder."  Systemax Inc. (NYSE: SYX), a Fortune 1000 company, is a leading retailer of brand name and private label products, including personal computers, notebook computers, consumer electronics, computer-related accessories, technology supplies and industrial products.

On April 16, 2009, the Court entered an order (I) approving procedures in connection with the sale of intellectual property, Internet-related property and customer information, (II) authorizing sellers to enter into a stalking horse agreement, (III) approving certain bid protections, (IV) approving the form and manner of sale notice, and (V) setting auction and sale hearing dates.

## III.    Debtors' Assets Containing Personally Identifiable Information [2] of Consumers

---

[2]  Section 101 (41A) of the Bankruptcy Code defines the term "personally identifiable information" to mean--
(A) if provided by an individual to the debtor in connection with obtaining a product or a service from the debtor primarily for personal, family, or household purposes--

    (i) the first name (or initial) and last name of such individual, whether given at birth or time of adoption, or resulting from a lawful change of name;

    (ii) the geographical address of a physical place of residence of such individual;

    (iii) an electronic address (including an e-mail address) of such individual;

    (iv) a telephone number dedicated to contacting such individual at such physical place of residence;

    (v) a social security account number issued to such individual; or

    (vi) the account number of a credit card issued to such individual; or

(B) if identified in connection with 1 or more of the items of information specified in subparagraph (A)--

## A.    Personally Identifiable Consumer Records to be Sold

The Debtors have requested approval to sell trademarks, service marks, Internet domain names, toll-free telephone numbers, website content and customer information (collectively, the "Intellectual Property and Internet Assets"). These Intellectual Property and Internet Assets are described in the Asset Purchase Agreement and on Schedule 1.02 to the Agreement.

Section 8.07 of the Asset Purchase Agreement defines the personally identifiable consumer information to be sold:

*Circuit City data* means "(a) the data collected by Sellers via the circuitcity.com website and (b) Data collected by Sellers via Sellers retail channels other than the circuitcity.com website, including without limitation historical sales data by SKU and via each of Sellers sales channels, and including retail store sales data by store and SKU that concerns consumers that have made a purchase via the circuitcity.com website, but does not mean (i) personally identifiable consumer records on backup tapes and on paper copies of sales tickets; (ii) credit card account numbers and other financial records; (iii) records of individuals whose addresses are outside the United States; and (iv) "cookie" information collected from persons visiting the circuitcity.com website.

*Alpine data* means the data collected by Sellers via the Sellers' retail channels other than the circuitcity.com website (including without limitation historical sales data via SKU and via each of the Sellers' sales channels, and including retail store sales data by store and SKU), and is commonly referred to by the Sellers as the "Alpine database," but does not mean (1) such data (a) as is included within the definition of "Circuit City data" or (b) that concerns consumers

---

(i) a birth date, the number of a certificate of birth or adoption, or a place of birth; or

(ii) any other information concerning an identified individual that, if disclosed, will result in contacting or identifying such individual physically or electronically.

whose Data is included within the definition of "Circuit City data"; (ii) personally identifiable consumer records on backup tapes and on paper copies of sales tickets; (iii) credit card account numbers and other financial records; and (iv) records of individuals whose addresses are outside the United States."

*Individual Consumer Records* – At my request, the Debtors reviewed the electronic and paper information collected and maintained by Circuit City in order to identify all personally identifiable consumer records in the company's possession.

Circuit City maintains approximately 14,000,000 records of Circuit City consumers who (i) transacted purchases on circuitcity.com at some point in time, even if also conducted in-store transactions; and (ii) other customers for whom Circuit City has an e-mail address without a web transaction, whether the customer created an account on the website or provided his/her e-mail address at point of sale in a store or phone transaction (the "Circuit City data").  The Circuit City data contains certain personally identifiable information, including: name and address, telephone number, e-mail address, information about products purchased from the Debtors, aggregated information about their browsing on the Circuit City website, and some demographic information.   These records are covered by the Circuit City Privacy Policy.  Circuit City is seeking approval to sell these records to one bidder to be selected at the Auction (subject to non-exclusivity as to service contract renewal sales as more particularly described in this Report).  These data do not include financial information, payment account numbers, or personal identification numbers of individuals.

Circuit City also maintains approximately 33,000,000 records of Circuit City consumers who made purchases in a retail store or by telephone, but for whom Circuit City has no valid e-mail address (the "Alpine data").  The Alpine data also contains certain personally identifiable information, including: name and address, telephone number, and information about products purchased from the

Debtors.  These records are not covered by the Circuit City Privacy Policy.  Circuit City is seeking

approval to sell these records to one bidder to be selected at the Auction with a non-exclusive right to

use this data perpetually.   These data do not include financial information, payment account numbers,

or personal identification numbers of individuals.

The CPO has reviewed the list of data items for these data files and verified that these are in

fact the records to be sold.

**B.        Records Not Included in the Sale – To Be Retained by the Debtors**

The CPO requested that Circuit City provide an inventory of any and all consumer and

employee records that will be retained in electronic and/or paper form, including on inventory of

backup tapes or any other media, the purpose for which they will be retained, how they will be

secured, and how and when they will be disposed of.  The Debtors have advised that the Bankruptcy

Court has approved a document destruction policy/process that will govern the destruction of Circuit

City records in the case.  The Debtors have retained the right to sell to other companies licenses to use

the *Alpine data* on a non-exclusive basis.  The Debtors have also retained the right to sell to other

companies licenses to solicit existing service contract customers within the *Circuit City data* for a

renewal of their service contract, and the Debtors have requested (or will request) that purchaser

covenant not to make any such solicitations of existing service contract customers within either the

*Circuit City Data* or within the *Alpine Data*.  Approval for this type of sale of personally identifiable

consumer records has not been requested of the Court and the sale of the Alpine Data other than as

specified in the Sale Order is not the subject of this CPO Report.

***Customer Financial Information and Credit Card Numbers*** -- Representatives of Circuit City

have confirmed that consumer financial information and credit card numbers are not included in this

sale.

*Service Contract Renewals* – The sale of service contract renewals from existing customers within both the *Circuit City Data* and *Alpine Data* will take place later and is not the subject of this Ombudsman Report.

*Private Label and co-branded Visa Credit Cards* -- Circuit City offered a rewards credit card in partnership with Chase Card Services. Customer financial information and credit card numbers related to the credit cards is owned by and is in the possession of Chase and is not the subject of this Ombudsman Report.

## IV.   Debtor's Privacy Policy

Circuit City published a Privacy Policy on its website at www.circuitcity.com. The policy was originally posted in 1999 when Circuit City launched its website; it has not been changed in any material way since that time. The Privacy Policy only pertains to information collected online. It does not apply to information collected from customers in the Circuit City retail stores.

This CPC Report highlights sections of the Privacy Policy that are pertinent to the analysis of potential privacy risks in connection with the sale of the consumer information and the privacy protections that are needed. (The Privacy Policy is attached to this Report as Exhibit A).

### *Purpose for Collection of Personal Information*

The Privacy Policy sets forth the reasons why personal information is collected from individuals shopping on the Circuit City website:

- *Fulfill and track your order:* name, address, phone number, e-mail address, and other personal information.

- *Billing*: credit card type, number, expiration date and billing address. "For your privacy and security, we do not store credit card or Gift Card numbers in your account."

- *Ship merchandise*: name, address and telephone number of the intended recipient.

- *Create an account through circuitcity.com*: e-mail address and unique access password.  This allows customers to track the status of their orders and to set ordering preferences.

- *Online surveys and contests*: Information to administer the contest and notify the winners.

- *Optional information requested*: gender, age, and previous shopping experience with Circuit City.

- *Website visitor activities and e-mail response and tracking*: collected through "Cookies" and "web beacon technology" and "web server logs": IP addresses, type of browser and operating system, domain name of customer's ISP, date and time of visits, pages viewed, time spent at the website, websites visited just before and just after our website.  This information may be associated with your personal information; it includes information about visitors to circuitcity.com who come to our site from another website by clicking on a Circuit City banner advertisement.

  The Privacy Policy points out that a consumer "can set your browser to refuse all cookies or to indicate when a cookie is being sent."

- *Administer the website, serve ads and provide analytics (*by third party companies specified in the Privacy Policy): Unless you opt out, these companies will place a cookie on your computer to collect computer information such as IP address, site navigation information and personal information, such as your e-mail address (if you have provided it).

### Uses of Personal Information

The Privacy Policy states that information collected on the Circuit City website may be used in the following ways:

- Schedule deliveries of merchandise purchased online
- Create a online account for customers at circuitcity.com
- Bill a credit card for purchases
- Confirm and track orders

- Make a product purchased online available for In-Store Pickup at a Circuit City store
- Respond to customer service inquiries
- Provide promotional communication and other information to consumers, if they choose to receive them
- Offer the products consumers want
- Customize consumers' shopping experience
- Improve the website design

### *Correction of Customer Information*

You may change saved account information at any time on the My Account page by clicking

"Edit or View Your Account."

### *Information Shared with Third Parties*

The Privacy Policy contains the following statement about sharing of consumer information

with third parties for their marketing purposes:

"We do not rent, sell or exchange your information or other personally-identifiable information

to third-party companies for their marketing purposes."

Circuit City engaged "reputable" third party organizations to perform services in connection

with the operation of the business.  The Privacy Policy specified these services performed by third

parties:

- fulfill merchandise orders
- verify and process credit card transactions
- deliver packages
- schedule and perform product installations
- administer service programs
- analyze sales data
- maintain Circuit City records
- collect site navigation information
- notify consumers of additional Circuit City products and services
- conduct customer satisfaction surveys
- manage other customer services and benefits

The Privacy Policy states that "these third parties are not authorized to use your information for

any reason other than to perform their contractually assigned functions."

*Promotional Communications and the Ability to Opt Out*

The Privacy Policy states that Circuit City may send promotional e-mails about Circuit City products, services or contests.

At any time, the customer can choose to discontinue receiving such promotional e-mail by:

(1)     Accessing the Preference Center and unchecking any of the subscription boxes

(2)     Clicking the "unsubscribe all" link

(3)     On each promotional e-mail, click on the link allowing you to discontinue future e-mails

(4)     Send a request to unsubscribe at any time to: mkt_unsubscribe@citcuitcity.com from the e-mail address you wish to unsubscribe

(5)     Call or write to Circuit City as provided in the Privacy Policy in the section titled "Whom do I contact with questions?"

*Third Party Cookies and the Ability to Opt Out*

"Our partners all offer you the opportunity to opt-out of being tracked by their cookies."

**Children's Online Policy**

"Circuit City is committed to preserving online privacy for all its website visitors, including children.  Circuitcity.com is a general audience site, and we do not knowingly collect information about children or sell products to children.  Consistent with the Children's Online Privacy Protection Act, we will not knowingly collect any information from or sell products to children under the age of 13.  If you are under the age of 13, you much ask your parent or guardian to assist you in using circuitcity.com."

**Security of Personal Consumer Information**

Circuit City posted a Security statement on its website advising consumers about how they would protect the sensitive personal information they received from customers.

V.      **Sale of the Circuit City Customer Information**

A.      **Sale to the "Stalking Horse Bidder"**

11

Systemax Inc., a Fortune 1000 company, sells personal computers, computer supplies,

consumer electronics and industrial products through a system of branded e-commerce web sites,

direct mail catalogs, relationship marketers and retail stores in North America and Europe.

(www.systemax.com)  It also manufactures and sells personal computers under the Systemax and Ultra

brands and develops and markets ProfitCenter Software, a web-based, on-demand application for

multi-channel direct marketing companies.

In public statements, the Systemax has provided the outlines of its business model.

We make it easy for our customers, with our multi-faceted marketing and distribution
that feature e-commerce websites, catalogs, retail stores and direct sales representatives.
The over 4,000 people we employ are dedicated to serving our customers across North
America and Europe.

**Our Strategy**
Through an efficient and diversified multi-channel marketing system, we provide
customers a unique shopping experience by offering the best prices and great service on a
broad selection of products and services.

**Our Customers**
Our clients span a wide range of groups including major corporations, small-to-medium sized
businesses, value added resellers, government organizations and individual consumers.

**B.      Sale to a Different Bidder**

It is very important that any Buyer of the personally identifiable Circuit City consumer records

be a reputable company and can demonstrate that it will abide by the Circuit City Privacy Policy, keep

consumer records secure, and abide by all applicable federal, state and international laws.  The CPO

recommends that the bidder selected after the auction must be a "qualified buyer" and meet the criteria

set forth in section VII of this Report.

**VI.     CPO Process and Applicable Non-Bankruptcy Laws**

Section 332 of the Bankruptcy Code makes the protection of consumer privacy an important

focus of all bankruptcy proceedings in which personally identifiable consumer records are to be sold.

The statute provides a broad mandate for the Consumer Privacy Ombudsman – to investigate and provide the Court with information relating to:

- The Debtor's Privacy Policy,

- Potential losses or gains of privacy to consumers if the sale is approved,

- Potential costs or benefits to consumers if the sale is approved, and

- Possible alternatives that would mitigate potential privacy losses or costs to consumers.

11 U.S.C. § 332 (2007).

### A.    Analytical Framework

Section 363 (b)(1) of the Bankruptcy Code provides that the Court must make a number of determinations before the Trustee is authorized to sell the personally identifiable Circuit consumer records.  More specifically:

- If the Debtor's Privacy Policy prohibits the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtor; and

- If the policy is in effect on the date of the commencement of the case,

- Then the trustee may not sell personally identifiable information to any person unless--

  (A) such sale is consistent with such policy; or

  (B) after appointment of a consumer privacy ombudsman in accordance with section 332, and after notice and a hearing, the court approves such sale or such lease --

    (i) giving due consideration to the facts, circumstances, and conditions of such sale; and

    (ii) finding that no showing was made that such sale would violate applicable non bankruptcy law.

### B.    Core Issues

Initially the analysis should focus on the Circuit City Privacy Policy and its legal ramifications. The Court must determine if the Privacy Policy has been violated.  If the Privacy has not been violated, the sale may simply proceed.  If the Privacy Policy has been violated, the sale may proceed only if no applicable non-bankruptcy law has been violated.

With the development of databases containing vast amounts of sensitive personal information, much is at stake in the potential sacrifice of personal privacy.  Until recently, personal information was kept in a number of smaller, limited-purpose databases that were not linked.  With ever more sophisticated technical capabilities for data aggregation and data mining, coupled with powerful business intelligence and analysis tools, the privacy of individuals could be jeopardized.

Identity theft, phishing attacks and other fraudulent activity by hackers and computer criminals in growing proportions threatens to seriously undermine trust in conducting business online and ultimately the future of electronic commerce. [3]  Protection of the privacy of personal records is crucial.

Consideration of whether the Privacy Policy has been violated should be evaluated in light of the Fair Information Practice Principles, widely-accepted principles concerning fair information practices which are relevant to the decision required here.  These are the principles established by the Federal Trade Commission that govern the collection, use, and transfer of personally identifiable

---

[3]  Peretti, Kimberly, "Data Breaches: What the Underground World of 'Carding' Reveals." Santa Clara Computer and High Technology Journal, Volume 25 (www.chtlj.org)
The Department of Justice website on Identity Theft describes the crime of identity theft:

> In recent years, the Internet has become an appealing place for criminals to obtain identifying data, such as passwords or even banking information. With enough identifying information about an individual, a criminal can take over that individual's identity to conduct a wide range of crimes: for example, false applications for loans and credit cards, fraudulent withdrawals from bank accounts, fraudulent use of telephone calling cards, or obtaining other goods or privileges which the criminal might be denied if he were to use his real name. If the criminal takes steps to ensure that bills for the falsely obtained credit cards, or bank statements showing the unauthorized withdrawals, are sent to an address other than the victim's, the victim may not become aware of what is happing until the criminal has already inflicted substantial damage on the victim's assets, credit, and reputation.  *available at* http://www.usdoj.gov/criminal/fraud/idtheft.html

In 1988, Congress passed the Identity Theft and Assumption Deterrence Act, 18 U.S.C. § 1028(a)(7).  This legislation created a new offense of identity theft, which prohibits:

> knowingly transfer[ring] or us[ing], without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law.

information.  They explain many important privacy concepts that govern the analysis.

### C.      Fair Information Practice Principles

The FTC has studied the manner in which entities collect and use personal information -- their

"information practices" -- and the safeguards required to assure those practices are fair and provide

adequate privacy protection.  The FTC has identified widely-accepted principles concerning fair

information practices. [4]  Common to these are five core principles of privacy protection.  These core

principles provide a useful framework for analyzing the privacy issues presented in this case.  This

section of the Privacy Ombudsman Report identifies each of the FTC principles and discusses the

practical considerations applicable to the facts of the Circuit City case.  The FTC principles and their

explanatory material are set forth in italics.

(1) *Notice/Awareness*

> *The most fundamental principle is notice.  Consumers should be given notice of an entity's information practices before any personal information is collected from them.  Without notice, a consumer cannot make an informed decision as to whether and to what extent to disclose personal information.  Moreover, three of the other principles discussed below -- choice/consent, access/participation, and enforcement/redress -- are only meaningful when a consumer has notice of an entity's policies, and his or her rights with respect thereto.*

**Circuit City**:  When it launched its e-commerce website in 1999, Circuit City published a

Privacy Policy on its website at www.circuitcity.com.  The CPO has been informed that other

than updating factual information such as the names of its business partners, the Privacy Policy

has not been changed in any material respect since that time.  Section IV of this Report

discusses the Privacy Policy in detail.  This Privacy Policy only pertains to information

collected online.

**Adherence to the Privacy Policy**: Once consumers are notified of their rights through the

Privacy Policy, these rights must be honored.  There are differing views about whether the sale

---

[4]   FTC, Fair Information Practice Principles, *available at* http://www.ftc.gov/reports/privacy3/fairinfo.shtm

of the personally identifiable Circuit City consumer records violates the Circuit City Privacy

Policy.  The operative language at issue is the following:

> "We do not rent, sell or exchange your information or other personally-identifiable
>
> information to third-party companies for their marketing purposes."

One interpretation of this language in the Privacy Policy is that the personally-identifiable

information may not be sold to any third-party company without the consent of each of the

consumers.

Another interpretation is that the information may not be sold to another company *for

marketing purposes*.  Here, the entire enterprise that constitutes Circuit City is in bankruptcy.

All the valuable assets are being sold or otherwise liquidated.

Even if that section of the Privacy Policy is violated, the Court can approve this sale of the

personally identifiable consumer records if:

- Consent is obtained from each customer, or

- The CPO process is followed, and

- The Court finds that no applicable non-bankruptcy law has been violated.

In addition to the Privacy Policy, consumers must be provided notice that their data is being

sold in the Circuit City bankruptcy case.  The CPO recommends that this be accomplished in

three ways:

**Notice to Consumers on the New Circuit City Website**:  Notice should be provided to all

consumers with a clear and conspicuous notice on the new Circuit City website of the change

of corporate ownership and management and of their right to Opt Out of the transfer of their

personally identifiable information and/or of receiving future e-mail communications.  The

notice should be posted for a period of one year.

**Notice to Consumers by e-Mail**:  Notice to customers with e-mail addresses should also be accomplished through an e-mail.  The practical details of this recommended notice are set forth below.

**Substitute Notice to Consumers**:  Although Circuit City has postal addresses for most of the individuals in its database, it does not have e-mail addresses for the consumers in the "Alpine Data."  Notice by postal mail would be prohibitively expensive. [5]  The CPO recommends that the consumers in the "Alpine Data" receive what is known as "substitute notice."  This concept is a central part of the state data breach notification statutes; it may be accomplished by a clear and conspicuous posting of a notice on the home page of the website; or publication in or broadcast through media.  It is justified if the cost of providing written notice is substantial, or the affected class to be notified is a large number of people (exceeds 500,000 people), or the organization does not have sufficient contact information to provide notice.

(2) *Choice/Consent*

*At its simplest, choice means giving consumers options as to how any personal information collected from them may be used. Choice relates to secondary uses of information -- i.e., uses beyond those necessary to complete the contemplated transaction.  Such secondary uses can be internal, such as placing the consumer on the collecting company's mailing list in order to market additional products or promotions, or external, such as the transfer of information to third parties.*

*Traditionally, two types of choice/consent regimes have been considered: opt-in or opt-out.*

***Opt-in*** *regimes require affirmative steps by the consumer to allow the collection and/or use of information*

***Opt-out*** *regimes require affirmative steps to prevent the collection and/or use of such information.*

---

[5]   It appears that notification by postal mail would not financially feasible -- bulk mail at $.40 per piece x 20,000,000 would cost $13,000,000 or at $.25 (postcard) would be $8,250,000.

*In order to be effective, any choice regime should provide a simple and easily-accessible way for consumers to exercise their choice.*

**On what basis should the decision be made about whether an Opt In or an Opt Out process should be selected?**

While Opt In provides the strictest protection for consumers, it would likely result in a huge and unwieldy undertaking in the context of this bankruptcy sale that might be cost-prohibitive and could result in a significant delay of the sale.

**Data Sensitivity**: An Opt In approach is usually reserved for the sale or transfer of the most sensitive types of consumer data. The State Attorneys General in the *Toysmart* case made the point in opposing the sale of data about children and of credit card records that "Because the information collected about consumers on Toysmart's Web site likely includes information collected from children, the information should be considered sensitive… For this reason, the higher, opt in standard should apply." [6]  In this Circuit City sale, the personal records are less sensitive – they include name, address, telephone number, e-mail address, and purchasing history.  Some of this information is available from public sources, including public telephone books.  For example, at www.whitepages.com, a user can enter a name and city and the website will provide the individual's address and telephone number.  The reverse can also done – entering a street address will produce the name and telephone number.

The State data breach notification laws are instructive in assessing sensitivity of the data.  These State laws were enacted to address breaches of sensitive personal information that if compromised could lead to identity theft and fraud.  This personal data includes (i) a person's first name or initial and last name, plus (ii) one of the following data elements:  social security number, driver's license number, or financial account or credit or debit card number.  Using the

---

[6]  In re Toysmart.com LLC, No. 00-13995-CJK (U.S. Bankruptcy Court, D. Mass.), Objection of the Commonwealth of Massachusetts and 46 States to the Debtor's Motion to Approve Settlement with Federal Trade Commission and for Authority to Enter in Consent Agreement, page 8.

States' definitions, the personal Circuit City data to be sold does not rise to the level of requiring an Opt In notification to consumers.

The CPO recommends Opt Out Notice to consumers as appropriate and practical in this case.  The Circuit City Privacy Policy provides five ways for consumer to Opt Out.  At any time, the customer can choose to discontinue receiving such promotional e-mails. Circuit City has provided statistics showing the thousands of consumers opt out each month from e-mails sent by the company.

**Practical Considerations in Implementing the Opt Out Notice**: Theoretically, onsumer Opt Out could be conducted by the Debtors, the Buyer, or a third party.

**Debtors**: As a practical matter, the Debtors have terminated their contract for IT support and their in-house business and IT teams are no longer in place and the members of those teams have left the company.

**Third Party**: A third party could be hired to do the Opt Out, with potentially significant cost to the estate.  IBM ran the Circuit City IT operations before the company filed for bankruptcy. An IT company of this type with familiarity with the Circuit City data would be an appropriate choice for this task.  However, it is not clear whether IBM could or would be willing to undertake this task or the timing or costs associated therewith.

**Buyer:** The "Stalking Horse Buyer" has the infrastructure in place to do the Opt Out, and has indicated a willingness to do so.  If a different Buyer is selected in the Auction on Monday, May 11, 2009, discussions would need to take place to determine the feasibility of having that company conduct the Opt Out.

The CPO recommends adoption of an Opt Out Process supervised by the Court (" *Supervised Opt Out Process")* designed to protect the privacy of all Circuit City customers – including

those in the "Circuit City data" as well as those in the "Alpine data," who currently have no privacy protections -- to the greatest extent possible under the circumstances of this bankruptcy sale. The goal is to ensure that the process is transparent, meaningful and effective. Notice would be provided to all consumers with a clear and conspicuous notice on the new Circuit City website of the change of corporate ownership and management and of their right to Opt Out of the transfer of their personally identifiable information and/or of receiving future e-mail communications if they have a Circuit City account.

Further notice to customers with e-mail addresses would also be accomplished through an e-mail. This Opt Out could be conducted by the Debtors, the Buyer, or a third party. As a practical matter, the Debtors have terminated their contract for IT support and their in-house business and IT teams are no longer in place and the members of those teams have left the company. A third party could be hired to do the Opt Out, with potentially significant cost to the estate. The "Stalking Horse Buyer" has the infrastructure in place to do the Opt Out, and has indicated a willingness to do so.

The recommended process is set forth in Section VII.B. of this Report – *Supervised Opt Out Process*. It would be incorporate in the Sale Order.

The Court may wish to consider establishing a formal due diligence process under the supervision of the U.S. Trustee if there are concerns about ensuring integrity and transferring the data to an unknown company before the Opt Out has been completed.

*(3) Access/Participation*

*This refers to an individual's ability both to access data about him or herself -- i.e., to view the data in an entity's files -- and to contest that data's accuracy and completeness.*

**Circuit City**: Under its Privacy Policy, Circuit City provides an opportunity for consumers to

create an Account on the website and to make changes to it.

(4) *Integrity/Security*

*To assure data integrity, collectors must take reasonable steps, such as using only reputable sources of data and cross-referencing data against multiple sources, providing consumer access to data, and destroying untimely data or converting it to anonymous form.*

*Security involves both managerial and technical measures to protect against loss and the unauthorized access, destruction, use, or disclosure of the data.*

**Circuit City**: The CPO has focused on information security as critical to protect the personally

identifiable consumer records and recommends that the Buyer agree to employ appropriate

information security controls (technical, operational and managerial) to protect the personally

identifiable customer information, including strong encryption**.**

(5) *Enforcement/Redress*

*The core principles of privacy protection can only be effective if there is a mechanism in place to enforce them.*

**Circuit City**:  Since the Court would be supervising the transaction, it has all the powers

available to the federal bankruptcy court to enforce it orders, and specifically over whatever

provisions are included in the Sale Order.  The recommendations in this CPO Report are

designed to enforce the core privacy principles.

**D.     Non-Bankruptcy Laws**

**1.     Unfair or Deceptive Practices**

Section 5 of the Federal Trade Commission (FTC) Act, which prohibits "unfair or deceptive

practices in or affecting commerce [.]", the Children's Online Privacy Protection Act (COPPA), and

the Gramm-Leach-Bliley (GLB) Act, provide privacy protections for the PII of consumers in the

United States.  Cases brought by the Federal Trade Commission (FTC) define the approach to privacy

that is analogous to the issues in this case.[7]  In this sale, the question may be posed as to whether the transfer of the records to the Buyer constitutes and unfair or deceptive business practice.

Section 5 of the FTC Act prohibits "unfair or deceptive practices in or affecting commerce [.]" 15 U.S.C. § 45(a).  "Unfair" practices are defined by the FTC as those that "cause[] or [are] likely to cause *substantial injury* to consumers which *is not reasonably avoidable* by consumers themselves and *not outweighed by countervailing benefits* to consumers or to competition" (15 U.S.C. Sec. 45(n)). [8]

There is no single definition for the phrase "unfair business practices."  It is an evolving concept reflecting the ingenuity of unscrupulous business persons in concocting new schemes to gain advantage at someone else's expense.  The existence of an unfair business practice is a question of fact determined in light of all the circumstances surrounding a case.

In an attempt to set some standards, the Federal Trade Commission identified several factors to be considered in determining whether a practice is unfair: (1) whether the practice offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers. These criteria have been accepted by states that have adopted their own counterparts to the FTCA.  *See, e.g., People v. Casa Blanca Convalescent Homes, Inc.,* 159 Cal. App. 3d 509, 530; 206 Cal. Rptr. 164 (1984); *Brown Daltas & Assocs. V. General Accident Ins. Co.,* 844 F. Supp. 58 (D. Mass. 1994), *rev'd. on other grounds,* 48 F.3d 30 (1st Cir. 1995), *cert. den.*, 516

---

[7]  *See generally* Federal Trade Commission, Privacy Initiatives, *available at* http://www.ftc.gov/privacy/index.html (last viewed November 26, 2008).  An analogous case to this one is *In re Toysmart.com*, in which the FTC and the Debtor filed a Stipulation and Order Establishing Conditions on the Sale of Customer Information with the United States Bankruptcy Court for the District of Massachusetts.  *In re Toysmart.com, available at* http://www.ftc.gov/os/2000/07/toysmarttbankruptcy.1.htm.   The State Attorneys General objected, arguing that because sensitve records about children and credit card numbers were being sold, consumers should be permitted to consent to the sale through an Opt In procedure.  Because the records were not sold within a specified period of time, they were destroyed.

[8]  *A Brief Overview of the Federal Trade Commission's Investigative and Law Enforcement Authority, Enforcement Authority*, Consumer Protection, *available at* http://www.ftc.gov/ogc/brfovrvw.shtm.

U.S. (1995); *Harris v. NCNB Nat'l. Bank*, 85 N.C. App. 669, 355 S.E.2d 838 (1987).

As specifically set forth in federal statute, *i.e*., 15 U.S.C. § 45 (n) granting the FTC its authority, an act or practice is unfair [9] if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition."  See, *Orkin Exterminating Co., Inc. v. FTC,* 849 F.2d 1354, 1363-66 (11th Cir. 1988)*; also see, FTC v. J.K. Publications, Inc.,* 99 F. Supp. 2d 1176, 1201 (C. D. Ca. 2000). [10]  Thus, to find unfairness, there must first be an identifiable injury.  If so, the injury must satisfy three tests: (1) it must be substantial; (2) it must not be outweighed by countervailing benefits to consumers or competition; and (3) it must be one that consumers themselves could not reasonably have avoided. [11] *Orkin* at 1364 (citing FTC's 1980 Policy Statement).  As such, the FTC is without authority to address unfair or deceptive business practices that do not meet these standards defining "injury."  In sum, the injury must be substantial, outweigh any countervailing benefit to the consumer, and be one the consumer cannot reasonably avoid.

In this sale, it is unclear if there is any injury at all.  If the privacy policy statement is read as not applying to a bankrupt Circuit City, there is no injury by virtue of the transfer of the records at issue here.  If the privacy policy statement is read as "precluding" the transfer, the injury cannot meet the test for unfairness established by the FTC because any such perceived injury cannot be viewed as "substantial."  No credit card numbers are involved; no social security numbers – only name, address, and e-mail address.

Here, the Buyer has agreed to post a notice advising all consumers that they may opt out from

---

[9]  Many cases use the terms "deceptive" and "unfair" synonymously -- without significant distinction.

[10] This definition is derived from a letter which the FTC wrote to Senators Danforth and Ford when Congress was considering an amendment to section 5 which would have defined unfair acts and practices.  *See A.F.S.,* 767 F.2d at 970 (D.C. Cir. 1995). Commonly referred to as the FTC's "Policy Statement" on the meaning of unfair acts and practices, the text of this letter is reprinted in H.R.Rep. No. 156, Pt. 1, 98th Cong., 1st Sess. 33-40 (1983), and Trade Reg.Rep. (CCH) ¶ 50,421 at 55,947-51.

[11]  15 U.S.C. 57(a)(1)(B) authorizes the FTC  to promulgate "rules which define with specificity acts or practices which are unfair or deceptive acts or practices in or affecting commerce."   The FTC has done so in many subject areas. *See, e.g.,* 16 CFR 18.3 (nursery industry).

their "Circuit City listing" and, therefore, receive no advertising or contact from the Buyer at all.

Thereafter, consumers may easily discard any mailings or "opt out" of any e-mails they may receive

from any Buyer as a result of yet further opt out provisions.  As such any "violation" of the privacy

policy statement is "minimal" or "technical" in nature – and cannot be viewed as "substantial," as

required by the FTC.

The second prong of the test focuses on countervailing benefits to the consumer or competition.

The Buyer represents that it will offer discounts and other benefits to consumers purchasing its

electronic products.  Such advertising may also serve to foster competition by encouraging other

electronic businesses to offer yet further benefits and price reductions.

Consumers may avoid contact with the Buyer by initially or later oping out of any contact with

the Buyer.  " 'Consumers may act to avoid injury before it occurs if they have reason to anticipate the

impending harm and the means to avoid it, or they may seek to mitigate the damage afterward if they

are aware of potential avenues toward that end.' " *Orkin* at 1365 (quoting *FTC v. Orkin Exterminating

Co.,* 108 F.T.C. 341, 366 (1986)).  Here, all consumers have the power to avoid contact with the Buyer

and any of its advertising.

Finally, a post sale op out provision makes sense in the circumstances of this case.   Before

filing for bankruptcy, Circuit City had outsourced its IT infrastructure operations to IBM.  Areas that

IBM managed for Circuit City included data center operations, e-commerce hosting operations, service

desk operations, network management, network services, desktop support, enterprise systems

management and IT security administration. [12]  This contract with IBM is no longer in effect.  As such

a pre-sale opt out procedure to be implemented by Circuit City is not practical.

### 2.        Financial Information and Credit Card Numbers

Federal law protects financial information, including credit card numbers, and provides certain

---

[12]   Circuit City, SEC Form 10-K (FY ended February 29, 2008) page 10.

requirements for providing notice of an organization's privacy policy and an opportunity for consumers to opt-out of changes to that policy.

Title V, subtitle A, of the Gramm-Leach-Bliley Act requires the FTC, along with several other agencies, to issue regulations (see 16 CFR Part 313) ensuring that financial institutions protect the privacy of consumers' personal financial information.  Such institutions must develop and give notice of their privacy policies to their own customers at least annually and before disclosing any consumer's personal financial information to an unaffiliated third party, must give notice and an opportunity for that consumer to "opt out" from such disclosure.  The subtitle also requires the FTC and other agencies to issue regulations (see 16 CFR Part 314) for the safeguarding of personal financial information. The Act also limits the sharing of account number information for marketing purposes.  Subtitle B of Title V prohibits obtaining customer information of a financial institution by false pretenses. [13]

In this case, Circuit City <u>does not retain any such information and are not subject to GLB.</u>  As such, the sale of credit card or other financial information is not an issue here.

### 3.   Children's Online Privacy Protection Act (COPPA)

COPPA prohibits unfair or deceptive acts or practices in connection with the collection, use, or disclosure of PII from or about children under age 13 obtained on the Internet.  Circuit City explicitly states on its website that it does not collect information from children.

> "Circuit City is committed to preserving online privacy for all its website visitors, including children.  Circuitcity.com is a general audience site, and we do not knowingly collect information about children or sell products to children.  Consistent with the Children's Online Privacy Protection Act, we will not knowingly collect any information from or sell product to children under the age of 13.   If you are under the age of 13, you much ask your parent or guardian to assist you in using circuitcity.com."

---

[13]   The Securities and Exchange Commission has proposed amendments to Gramm-Leach-Bliley and the Fair Credit Reporting Act entitled Privacy of Consumer Financial Information and Safeguarding Personal Information, Proposed Rule - - Part 248-Regulation S-P: RIN 3235-AK08, *available at* http://www.sec.gov/rules/proposed/2008/34-57427.pdf (last viewed November 26, 2008).

There is no evidence that Circuit City is not in compliance with the requirements of COPPA.

### 4.      State Laws

Many states have adopted "little FTCs."  Nearly all states that have enacted "Little FTC" statutes appear to predicate standing to maintain a private action on actual injury resulting from the alleged offending business practice.  Because some of these statutes provide for the recovery of compensatory or punitive damages, a party's ability to bring an action depends on showing an injury proximately caused by the defendant's conduct, as in any other tort action.  Typical of such statutes is Louisiana's, which confers a right of action on both a consumer and a business competitor "who suffers any ascertainable loss of money or movable property, corporeal or incorporeal" from unlawful business practices. LSA-RS § 51:1409; *see also, Monroe Medical Clinic, Inc. v Hospital Corp. of America,* 522 So. 2d 1362 (1988).

In general, harm is a core requirement of these statutes.  Since the sale of the relevant documents here does not result in harm to consumers, these laws cannot act as a bar to this sale.

### 5.      Data Breach Notification Laws

Forty four (44) states as well as the District of Columbia, Puerto Rico, and the U.S. Virgin Islands have enacted data breach notification laws that require any business in possession of certain sensitive personal information about a covered individual to disclose any breach of that information to the person affected. [14]  The laws are similar in structure, approach, content and terminology.  By requiring notice to persons who may be adversely affected by a security breach (e.g., persons whose compromised personal information may be used to facilitate identity theft), these laws seek to provide such persons an opportunity to take steps to protect themselves against the consequences of identity

---

[14]    National Conference of State Legislatures, *State Security Breach Notification Laws* (as of December 16, 2008), *available at* http://www.ncsl.org/programs/lis/cip/priv/breachlaws.htm.

theft.  There are several reasons why the state data breach notification laws do not apply in this case. [15]

■ *Information Being Sold by Circuit City is Not Within the Definition of Covered Personal Information*

The sensitive personal information covered by the breach notification laws is generally defined as information consisting of: (1) a person's first name or initial and last name, plus (2) any one of the following: social security number, drivers license or state ID number, or financial account number or credit or debit card number (along with any PIN or other access code where required for access to the account).  The personally identifiable consumer information being sold by Circuit City is limited to name, address, telephone number, e-mail address, purchasing history and some demographic data.  No financial information, payment card account numbers, or personal identification numbers are included in the sale.

■ *The Sale of Circuit City Consumer Information is not a "Breach" as Defined in the Statutes*

The state statutes require notice following the unauthorized acquisition of unencrypted computerized data that compromises the security, confidentiality or integrity of the personal information.  In some states, notice is not required unless there is a reasonable basis to believe that the breach will result in substantial harm or inconvenience to the customer.  Even if the sale of the personally identifiable Circuit City records were considered a "breach," notice to consumers is required *after* the breach has occurred, which in this case would be after the sale was completed.  As such, there is no basis to argue that the sale of the relevant documents here constitutes a "data breach."

    **6.**      **Do-Not-Call Registry Act of 2003**, 15 U.S.C. § 6102

---

[15]  The FTC has recently brought lawsuits in a number of cases involving data breaches that posed serious risks to consumers.  DSW Inc. Settles FTC Charges, *available at* http://www.ftc.gov/opa/2005/12/dsw.shtm; CardSystems Solutions Settles FTC Charges, *available at* http://www.ftc.gov/opa/2006/02/cardsystems_r.shtm; Agency Announces Settlement of Separate Actions Against Retailer TJX, and Data Brokers Reed Elsevier and Seisint for Failing to Provide Adequate Security for Consumers' Data, *available at* http://www.ftc.gov/opa/2008/03/datasec.shtm; Proposed settlement involving The TJX Companies, Inc. and Fifth Third Bancorp ("Defendants"), U.S. District Court for the District of Massachusetts, *available at* www.TJXsettlement.com.

The "Do-Not-Call" Act authorizes the FTC under section 3(a)(3)(A) of the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. § 6102(a)(3)(A), to implement and enforce a do-not-call registry.  The Act also ratified the do-not-call registry provision of the FTC's Telemarketing Sales Rule, 16 C.F.R. 310.4(b)(1)(iii), which became effective on March 31, 2003. [16]

The States have similar Do-Not-Call and "no spam" (unsolicited commercial or bulk e-mail) statutes.[17]  In this case, the Buyer has agreed to comply with the "do-not-call" and "no spam" laws by ensuring that they do not call any telephone numbers on the "do-not-call" and "no spam" lists for marketing.

These laws do not prohibit ownership of numbers on the do-not-call list.   It is the responsibility of the Buyer to use the numbers for a lawful purpose and in compliance with federal and state laws. Any Buyer will be under an obligation to comply with these laws – not merely with the purchased records but with any other records it may have or obtain containing any PII.

In my view, there is no legal impediment to the sale of telephone numbers of Circuit City consumers.

## VII.    Recommendations

### A.    "Qualified Buyer"

The Consumer Privacy Ombudsman recommends that the bidder selected after the auction must be a "qualified buyer" and meet the following criteria that were developed based upon relevant case law, and privacy and security best practices:

---

[16]  Federal Communications Commission, National Do-Not-Call Registry, *available at* http://www.fcc.gov/cgb/donotcall/.
[17]  National Conference of State Legislatures, State Do-Not-Call Statutes, *available at* http://www.ncsl.org/programs/lis/CIP/donotcall.htm; State Laws Relating to Unsolicited Commercial or Bulk E-mail (SPAM), *available at* http://www.ncsl.org/programs/lis/legislation/spamlaws02.htm

- A Buyer in materially the same line of business as Circuit City (*i.e.,* who concentrates its business in the sale of personal computers, computer supplies, and consumer electronics).

- With respect to both the Circuit City and the Alpine Data, a Buyer who agrees to use the personally identifiable consumer records for the same purpose(s) as are specified in the Circuit City Privacy Policy.

- With respect to both the Circuit City and the Alpine Data, a Buyer who agrees to comply with the Circuit City Privacy Policy and its specified policies and practices.

- A Buyer who agrees that prior to making any "material change" to the Privacy Policy, or the use or disclosure of personal information different from that specified in the Privacy Policy, the Buyer will notify consumers in the Circuit City Data by mail or e-mail (if available), as appropriate, and consumers in the Alpine Data by a notice on the website, and afford them an opportunity to "opt out" of the changes to those policies or the new uses of their personal information.

- A Buyer who agrees to notify Circuit City customers of the change in corporate ownership by placing a clear and conspicuous notice on the home page of the website. This notice will be maintained for one year from the date of the sale.  The Buyer will also notify the websites that maintain ratings (i.e., shopping.com, etc.) of the change in corporate ownership.

- A Buyer who agrees to continue the Circuit City practice of providing consumers with opportunities to opt-out of receiving e-mail and postal mailings of advertisements and notices of promotions and special product offerings.  With respect to consumers in both the Circuit City and Alpine Data, the Opt Out notices will be included in e-mails and on the web site. During any telephone solicitations, the Buyer will advise consumers that they may opt out of receiving future calls from Circuit City.

- A Buyer who agrees to employ appropriate information security controls (technical, operational and managerial)[18] to protect the personally identifiable customer information, including strong encryption**.**

- A Buyer who agrees to abide by any applicable federal, state or international laws, including laws prohibiting unfair or deceptive practices "UDAP," data breach, privacy, "do-not-call," and "no spam" laws.

**B.      Supervised Opt Out Process**

The CPO recommends adoption of a Supervised Opt Out Process designed to protect the privacy of all Circuit City customers – including those in the "Circuit City Data" as well as those in the "Alpine Data," who currently have no privacy protections -- to the greatest extent possible under the circumstances of this bankruptcy sale.  The goal is to ensure that the process is transparent, meaningful and effective.  Notice would be provided to all consumers with a clear and conspicuous notice on the new Circuit City website of the change of corporate ownership and management and of their right to Opt Out of the transfer of their personally identifiable information and/or of receiving future e-mail communications.  The Circuit City Privacy Policy provides that at any time, the customer can choose to discontinue receiving promotional e-mail by:

(1)      Accessing the Preference Center and unchecking any of the subscription boxes

(2)      Clicking the "unsubscribe all" link

(3)      On each promotional e-mail, click on the link allowing you to discontinue future e-mails

---

[18]    Appropriate information security controls and procedures (technical, operational and managerial) include user identification and authentication, user provisioning and identity management, authorization and access control, audit and logging, encryption, boundary protection, system monitoring, security incident handling, secure data storage, personnel security, and physical and environment protection.  A comprehensive discussion of information security controls and procedures is found in the National Institute of Standards and Technology (NIST) Special Publication 800-53 Rev. 2, *Recommended Security Controls for Federal Information Systems* (Dec. 2006).  While the recommendations in NIST Spec. Pub. 800-53 apply to federal government information systems, it is a useful resource of best practices for organizations seeking to implement appropriate information security controls and procedures.

(4)     Send a request to unsubscribe at any time to: mkt_unsubscribe@citcuitcity.com from

the e-mail address you wish to unsubscribe

(5)     Call or write to Circuit City as provided in the Privacy Policy in the section titled

"Whom do I contact with questions?"

Further notice to customers with e-mail addresses would also be accomplished through an e-

mail.

The recommended process would have the following provisions and steps.  They would be

incorporated in the Sale Order.

**The Supervised Opt Out Process**

*Notice to Consumers* -- As soon as the Buyer creates a new Circuit City website, it will post a

clear and conspicuous notice on a prominent part of the home page notifying all customers of

the change of corporate ownership and management of the website and of the customer's right

to Opt Out of the transfer of their personally identifiable information to the Buyer and/or of

receiving future e-mail communications from the Buyer.  The notice will be posted for a period

of one year.

*Secure Transfer of Data to Buyer with Accounting for the Data*

- An information security agreement between the Debtors and Buyer will be prepared to

  ensure the secure transfer and handling of the data; the data will be encrypted and transferred

  to the Buyer using S-FTP or physically in a separate file

- Controls over the data will be ensured; the Buyer will segregate the Circuit City records from

  all other customer records of the Buyer during the entire Opt Out period

- Data will be logged in by Buyer and accounted for with hashing and an appropriate chain of

  custody process at all times

31

*Notification to Customers with e-mail Addresses*

- Buyer will prepare the Opt Out message and circulate it to the CPO for review

- The Opt Out message will include the following items:

    Introduce customers to the new Circuit City e-commerce business; notify them of the change

    of ownership and management of the website business; tell them they are covered by the

    Circuit City Privacy Policy; outline their right to Opt Out of the transfer of their personally

    identifiable information to the Buyer and/or of receiving future e-mail communications from

    the Buyer, if they Opt Out the consumers will not hear from the Buyer again (except in

    connection with the renewal of service contracts); outline the benefits of continuing their

    relationship with the Buyer; include information about discounts or special offers if

    appropriate.  The notice should also provide that Circuit City (or its transferee) retained the

    right in very limited circumstances to contact the consumer.

- Allow customers 14 days to respond to the notification if they wish to Opt Out from the

    Buyer

- Buyer will provide an accounting to the Court  and the CPO of customers who have Opted

    Out; these records will be deleted from the acquired database obtained by Buyer and the

    Buyer will certify it had done so.   To the extent the accounting contains any PII, the

    accounting should be filed under seal.

- After the Opt Out Process has been completed and the Buyer has filed the certification with

    the Court, the Buyer will be authorized to use the data in accordance with the Sale Order

## VIII.   Conclusions

The issues related to the proposed sale of the personally identifiable Circuit City consumer

records required under sections 332 and 363 of the Bankruptcy Code have been addressed and

presented in this Ombudsman Report for the consideration of the Court.  A CPO has been appointed, a

hearing will be held after a Buyer is selected, the Court has been advised of the issues regarding

compliance with the Circuit City Privacy Policy, and an in-depth analysis has been provided of the

losses or gains, and costs or benefits to consumers if the sale is approved, and the application of non-

bankruptcy laws.

With respect to the section 332(b) provision that requires assessment of "possible alternatives

that would mitigate potential privacy losses or costs to consumers" from the sale, the CPO believes

that on balance and in the context of this bankruptcy sale, the recommendations proposed in this

Report would protect the privacy rights of all Circuit City consumers.

For the 14 million consumers who submitted their personal information on the Circuit City

website or from whom Circuit City otherwise obtained valid e-mail addresses in addition to certain

other personal information (i.e. the "*Circuit City data*"), the recommendations in this Report provide a

targeted, Opt Out process supervised by the Court.  While not providing consumers a right to Opt In to

the sale (Opt In is usually reserved for the sale or transfer of sensitive consumer records such as credit

card numbers, financial information, or information about children), or a right to Opt Out before the

sale, the Opt Out Process described in this Report should ensure that during the period of a few weeks,

all consumers would have the right to opt out of receiving any future communications with the new

Circuit City.

In addition, if the recommendations proposed in this Report are adopted, privacy protections

under the Circuit City Privacy Policy would be expanded to the consumers in the Circuit City Alpine

Data who were not covered previously by the Privacy Policy.

Further, the CPO process has ensured that strict limitations are imposed on data to be sold by

eliminating all records that could expose consumers to identity theft and fraud, including financial

records, and credit card and personal identification numbers.

In summary, the CPO believes that the Recommendations in this Report strike an appropriate balance between the privacy rights of consumers and practical considerations associated with this bankruptcy sale.

The CPO will provide further recommendations after the final bidder is chosen in the Auction, and whatever further analysis or recommendations the Court deems appropriate.

Respectfully submitted,

*/s/ **Lucy L. Thomson***

Lucy L. Thomson
Consumer Privacy Ombudsman