| | |
|---|---|
| Gregg M. Galardi, Esq. | Dion W. Hayes (VSB No. 34304) |
| Ian S. Fredericks, Esq. | Douglas M. Foley (VSB No. 34364) |
| SKADDEN, ARPS, SLATE, MEAGHER & | MCGUIREWOODS LLP |
| FLOM, LLP | One James Center |
| One Rodney Square | 901 E. Cary Street |
| PO Box 636 | Richmond, Virginia 23219 |
| Wilmington, Delaware 19899-0636 | (804) 775-1000 |
| (302) 651-3000 | |

- and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
333 West Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

Counsel to the Debtors and
Debtors in Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

- - - - - - - - - - - - - - x
In re:                          :    Chapter 11
                                :
CIRCUIT CITY STORES, INC.,      :    Case No. 08-35653 (KRH)
et al.,                         :
                                :
            Debtors.            :    Jointly Administered
- - - - - - - - - - - - - - x

**ORDER UNDER BANKRUPTCY CODE SECTIONS 105, 363 AND 503
AND BANKRUPTCY RULES 2002 AND 6004 APPROVING SALE BY
SELLER OF CERTAIN REAL PROPERTY LOCATED IN ARDMORE,
OKLAHOMA FREE AND CLEAR OF LIENS**

Upon the motion (the "Motion")[1] of Circuit City

Stores, Inc. (the "Seller," and collectively with the

debtors and debtors in possession in the above-captioned

---

[1] Capitalized terms not otherwise defined herein shall have the
meanings ascribed to such terms in the Motion.

jointly administered cases, the "Debtors") for orders

pursuant to Bankruptcy Code sections 105 and 363 and

Bankruptcy Rules 2002 and 6004 (A) authorizing the

Seller to enter into an agreement with the Purchaser for

Sale of the Property, subject to higher or otherwise

better proposals, (B) approving the Termination Fee in

connection therewith, (C) approving the Sale and of the

Property free and clear of all interests and

(D) granting related relief; and the Sale Hearing having

been held on May 13, 2009, at which time all interested

parties were offered an opportunity to be heard with

respect to the Motion, and at which counsel for the

Debtors advised the Court that the Debtors, after an

auction held on May 11, 2009 and the record thereof;

after consultation with representatives of the

Creditors' Committee, have determined in the exercise of

their business judgment that Shores Oilfield Equipment

Company, Inc. (the "Successful Bidder") submitted the

highest and best offer for the Property in the amount of

$8.2 million (the "Successful Bid") and that General

Mills Operations, LLC (the "Alternate Bidder") submitted

the second highest and best bid for the Property in the

amount of $8.1 million (the "Alternate Bid"); and the

Court having reviewed the Motion; and the Court having

determined that the relief requested in the Motion is in

the best interests of the Seller, its estate, its

creditors and other parties in interest; and it

appearing that proper and adequate notice of the Motion

has been given and that no other or further notice is

necessary; and upon the record herein; and after due

deliberation thereon; and good and sufficient cause

appearing therefor, it is hereby

**FOUND AND DETERMINED THAT:**[2]

A.    The Court has jurisdiction over the

Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this

matter is a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2)(A).

B.    Venue of these cases and the Motion in

this district is proper under 28 U.S.C. §§ 1408 and 1409.

---

2 Findings of fact shall be construed as conclusions of law and
  conclusions of law shall be construed as findings of fact when
  appropriate.  See Fed. R. Bankr. P. 7052.

C.   The notice of the Motion, the Bid
Deadline, the Auction and the Sale Hearing given by the
Seller constitutes due and sufficient notice thereof.

D.   The Bidding Procedures are reasonable and
appropriate and represent the best method for maximizing
the realizable value of the Property.

E.   The Seller and its professionals marketed
the Property and conducted a sale process as set forth
in and in accordance with the Motion.  Based upon the
record of these proceedings, all creditors and other
parties in interest and all prospective purchasers have
been afforded a reasonable and fair opportunity to bid
for the Property.

F.   The Seller has demonstrated good,
sufficient, and sound business purpose and justification
for the Sale because, among other things, the Seller and
its advisors diligently and in good faith analyzed all
other available options in connection with the
disposition of the Property and determined that (a) the
terms and conditions set forth in the Successful
Bidder's Agreement, (b) the transfer to the Successful
Bidder of the Property pursuant thereto and (c) the

purchase price agreed to by the Successful Bidder, $8.2 million are all fair and reasonable and together constitute the highest or otherwise best value obtainable for the Property.

G.   A reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities, including without limitation: (a) those parties entitled to notice under the Order Pursuant to Bankruptcy Code Sections 102 and 105, Bankruptcy Rules 2002 and 9007, and Local Bankruptcy Rules 2002-1 and 9013-1 Establishing Certain Notice, Case Management, and Administrative Procedures (D.I. 130; the "Case Management Order"), (b) all entities known to have expressed an interest in a transaction regarding the Property during the past three (3) months; (c) all entities known to have an interest in any of the Property; and (d) all federal, state, and local regulatory or taxing authorities or recording offices that have a reasonably known interest in the relief requested through the Motion.

H.   The Seller has full power and authority to execute the agreement submitted by the Successful Bidder, a copy of which is annexed hereto as Exhibit A (the "Successful Bidder's Agreement") and all other applicable documents contemplated thereby.  The transfer and conveyance of the Property by the Seller have been duly and validly authorized by all necessary action of the Seller.  The Seller has all of the power and authority necessary to consummate the transactions contemplated by the Successful Bidder's Agreement and has taken all action necessary to authorize and approve the Successful Bidder's Agreement and to consummate the transactions contemplated thereby.  No consents or approvals, other than those expressly provided for in the Successful Bidder's Agreement, are required for the Seller to consummate such transactions.

I.   The Successful Bidder is not an "insider" of any of the Debtors as that term is defined in 11 U.S.C. § 101(31).

J.   This Sale Order and the consummation of the contemplated transactions are supported by good business reasons, and will serve the best interests of

the Seller, its estate and creditors by maximizing the
value to be obtained from the Property.

K.   The Successful Bidder's Agreement was
negotiated, proposed, and entered into by the Seller and
the Successful Bidder without collusion, in good faith,
and from arm's-length bargaining positions.  Neither the
Seller nor the Successful Bidder has engaged in any
conduct that would cause or permit the Sale to be
avoidable under Bankruptcy Code section 363(n).

L.   The Successful Bidder is a good faith
purchaser under Bankruptcy Code section 363(m) and, as
such, is entitled to all of the protections afforded
thereby.  The Successful Bidder will be acting in good
faith within the meaning of Bankruptcy Code section
363(m) in closing the transactions contemplated by the
Successful Bidder's Agreement at all times after the
entry of this Sale Order.

M.   The consideration provided by the
Successful Bidder for the Property pursuant to the
Successful Bidder's Agreement and the Successful Bid
(i) is fair and reasonable, (ii) is the highest or
otherwise best offer for the Property, (iii) will

provide a greater recovery for the Seller's stakeholders
than would be provided by any other practical available
alternative and (iv) constitutes reasonably equivalent
value and fair consideration under the Bankruptcy Code
and under the laws of the United States, any state,
territory, or possession thereof, or the District of
Columbia.

N.   The Sale must be approved and consummated
promptly to obtain the value provided under the terms of
the Successful Bidder's Agreement and the Successful Bid.

O.   The transfer of the Property to the
Successful Bidder is a legal, valid, and effective
transfer of the Property, and shall vest the Successful
Bidder with all right, title, and interest of the Seller
to the Property free and clear of any lien (including
tax liens and any statutory or common law liens,
possessory or otherwise), charge, pledge, security
interest, conditional sale agreement or other title
retention agreement, lease, mortgage, security interest,
option or other encumbrance (including the filing of, or
agreement to give, any financing statement under the
Uniform Commercial Code of any jurisdiction) and any

monetary amounts which are secured by any lien

(collectively, the "Liens"), except for those items

defined in the Successful Bidder's  Agreement(and which

are referred to hereinafter) as the "Permitted

Encumbrances".

P.   If the Sale of the Property by the Seller

were not free and clear of any Liens, except for the

Permitted Encumbrances, as set forth in the Successful

Bidder's Agreement and this Sale Order, or if the

Successful Bidder would, or in the future could, be

liable for any of the Liens, the Successful Bidder would

not have entered into the Successful Bidder's Agreement

or submitted a bid for the Property and would not

consummate the Sale contemplated by the Successful

Bidder's Agreement, thus adversely affecting the Seller,

its estate, and its stakeholders.

Q.   The Seller may sell its interest in the

Property free and clear of all Liens (except the

Permitted Encumbrances) because, in each case, one or

more of the standards set forth in Bankruptcy Code

sections 363(f)(1)-(5) has been satisfied.  All holders

of Liens who did not object or withdrew their objections

to the Sale are deemed to have consented to the Sale
pursuant to 11 U.S.C. § 363(f)(2) and all holders of
Liens are adequately protected by having their Liens, if
any, attach to the cash proceeds of the Sale ultimately
attributable to the property against or in which they
claim an interest with the same priority, validity,
force, and effect as they attached to such property
immediately before the closing of the Sale.

R.   Approval of the Successful Bidder's
Agreement and consummation of the Sale of the Property
at this time are in the best interests of the Seller,
its estate, its stakeholders and other parties in
interest; and it is therefore

**ORDERED, ADJUDGED AND DECREED THAT:**

1.   The Motion is GRANTED as set forth herein.

2.   Any and all objections to the Motion not
waived, withdrawn, settled, adjourned or otherwise
resolved herein are hereby overruled on the merits and
denied with prejudice.

**A.   Approval Of The Successful Bidder's Agreement.**

3.    Pursuant to Bankruptcy Code section
363(b), the Successful Bidder's Agreement and all of the
terms and conditions thereof are hereby approved.

4.    Pursuant to Bankruptcy Code section
363(b), the Seller is authorized and directed, to
perform its obligations under the Successful Bidder's
Agreement and comply with the terms thereof and
consummate the Sale in accordance with and subject to
the terms and conditions of the Successful Bidder's
Agreement.

5.    The Seller is authorized, but not
directed, to execute and deliver, and empowered to
perform under, consummate, and implement, the Successful
Bidder's Agreement, together with all additional
instruments and documents as may be reasonably necessary
or desirable to implement the Successful Bidder's
Agreement, and to take all further actions as may be
requested by the Successful Bidder for the purpose of
assigning, transferring, granting, conveying, and
conferring to the Successful Bidder or reducing to
possession the Property as contemplated by the
Successful Bidder's Agreement.

6.    This Sale Order and the Successful Bidder's Agreement and the Successful Bid shall be binding in all respects upon the Seller, all stakeholders (whether known or unknown) of the Seller, all affiliates and subsidiaries of the Seller, and any subsequent trustees appointed in the Seller's chapter 11 case or upon a conversion to chapter 7 under the Bankruptcy Code.  To the extent that any provision of this Sale Order is inconsistent with the terms of the Successful Bidder's Agreement, this Sale Order shall govern.

7.    The Successful Bidder's Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court; <u>provided</u> that any such modification, amendment, or supplement is disclosed to the Creditors' Committee and does not have a material adverse effect on the Seller's estate, in the good faith business judgment of the Seller.

**B.    Sale And Transfer Of The Property.**

8.     Pursuant to Bankruptcy Code sections
363(b) and 363(f), upon the consummation of the
Successful Bidder's Agreement, the Seller's right, title,
and interest in the Property shall be transferred to the
Successful Bidder free and clear of all Liens except the
Permitted Encumbrances, with all such Liens to attach to
the cash proceeds of the Sale in the order of their
priority, with the same validity, force, and effect
which they had as against the Property immediately
before such transfer, subject to any claims and defenses
the Seller may possess with respect thereto.

9.     If any person or entity which has filed
financing statements, mortgages, mechanic's liens, <u>lis
pendens</u>, or other documents or agreements evidencing
Liens on or against the Property shall not have
delivered to the Seller prior to the Closing of the Sale,
in proper form for filing and executed by the
appropriate parties, termination statements, instruments
of satisfaction, releases of all Liens that the person
or entity has with respect to the Property, or otherwise,
then (a) the Seller is hereby authorized to execute and
file such statements, instruments, releases, and other

documents on behalf of the person or entity with respect
to the Property and (b) the Successful Bidder is hereby
authorized to file, register, or otherwise record a
certified copy of this Sale Order, which, once filed,
registered, or otherwise recorded, shall constitute
conclusive evidence of the release of all Liens on or
against the Property of any kind or nature whatsoever
except for the Permitted Encumbrances.

10.  This Sale Order (a) shall be effective as
a determination that, upon the Closing of the Sale, all
Liens of any kind or nature whatsoever existing as to
the Seller or the Property prior to the Closing of the
Sale, except for the Permitted Encumbrances, have been
unconditionally released, discharged, and terminated
(other than any surviving obligations), and that the
conveyances described herein have been effected and (b)
shall be binding upon and shall govern the acts of all
entities including, without limitation, all filing
agents, filing officers, title agents, title companies,
recorders of mortgages, recorders of deeds, registrars
of deeds, administrative agencies, governmental
departments, secretaries of state, federal, state, and

local officials, and all other persons and entities who
may be required by operation of law, the duties of their
office, or contract, to accept, file, register, or
otherwise record or release any documents or instruments,
or who may be required to report or insure any title or
state of title in or to any of the Property.

11.   All persons and entities, including, but
not limited to, all debt security holders, equity
security holders, governmental, tax, and regulatory
authorities, lenders, trade stakeholders, and other
stakeholders, holding Liens of any kind or nature
whatsoever against or in the Seller or the Property,
except the Permitted Encumbrances (whether legal or
equitable, secured or unsecured, matured or unmatured,
contingent or non-contingent, senior or subordinated)
arising under or out of, in connection with, or in any
way relating to the Property prior to the Closing of the
Sale, or the transfer of the Property to the Successful
Bidder, hereby are forever barred, estopped, and
permanently enjoined from asserting against the
Successful Bidder, its successors or assigns, its
property, or the Property, such persons' or entities'

Liens.  Nothing in this Sale Order or the Successful

Bidder's Agreement releases or nullifies any liability

to a governmental agency under any environmental laws

and regulations that any entity would be subject to as

owner or operator of any Property after the date of

entry of this Sale Order.  Nothing in this Sale Order or

the Successful Bidder's Agreement bars, estops, or

enjoins any governmental agency from asserting or

enforcing, outside the Court, any liability described in

the preceding sentence.  Notwithstanding the above,

nothing herein shall be construed to permit a

governmental agency to obtain penalties from the

Successful Bidder for days of violation of environmental

laws and regulations prior to Closing.

C.    **Additional Provisions**

12.  The consideration provided by the

Successful Bidder's for the Property under the

Successful Bidder's Agreement and the Successful Bid is

hereby deemed to constitute reasonably equivalent value

and fair consideration under the Bankruptcy Code, the

Uniform Fraudulent Conveyance Act, the Uniform

Fraudulent Transfer Act, and under the laws of the

United States, and any state, territory, or possession
thereof, or the District of Columbia.

13.   Upon the Closing of the Sale, this Sale
Order shall be construed as and shall constitute for any
and all purposes a full and complete general assignment,
conveyance, and transfer of all the Property or a bill
of sale transferring good and marketable title in the
Property to the Successful Bidder pursuant to the terms
of the Successful Bidder's Agreement.

14.   The transactions contemplated by the
Successful Bidder's Agreement are undertaken by the
Seller and the Successful Bidder at arm's-length,
without collusion and in good faith, as that term is
used in section 363(m) of the Bankruptcy Code, and
accordingly, the reversal or modification on appeal of
the authorization provided herein to consummate the sale
of the Property shall not affect the validity of the
Sale to the Successful Bidder, unless such authorization
is duly stayed pending such appeal.  The Successful
Bidder is a purchaser in good faith, within the meaning
of section 363(m) of the Bankruptcy Code, of the
Property, and is, and shall be, entitled to all of the

protections afforded by such section and in accordance
therewith.

15.   The consideration provided by the
Successful Bidder for the Property under the Successful
Bidder's Agreement and the Successful Bid is fair and
reasonable and the Sale may not be avoided under section
363(n) of the Bankruptcy Code.

16.   The failure specifically to include or to
reference any particular provision of the Successful
Bidder's Agreement in this Sale Order shall not diminish
or impair the effectiveness of such provision, it being
the intent of the Court that the Successful Bidder's
Agreement and the Successful Bid be authorized and
approved in their entirety.

17.   If the Successful Bidder fails to close
on the purchase of the Property in accordance with the
terms of the Successful Bidder's Agreement due to no
fault of and Seller is not in default of its obligations
under such Agreement, then Seller's counsel shall file
with the Court and serve upon the Successful Bidder,
the Alternate Bidder and their counsel, a notice of such
default, which shall include a copy of the Alternate

Bidder's agreement upon which the Seller will then close,
in which case (i) Seller shall be deemed authorized to
close on the sale of the Property with the Alternate
Bidder on ten (10) days' advance written notice to the
Alternate Bidder, and (ii) the Alternate Bidder shall be
afforded all of the protections originally afforded to
the Successful Bidder under this Sale Order and the
findings herein as to adequacy and fairness of
consideration paid and good faith shall be deemed to
apply to the Alternate Bidder, its Alternate Bid, and
its purchase and sale agreement with the Seller, without
the necessity of further order of this Court.

18.   All deposits submitted to the Seller for
the Property shall be returned to the bidder that
submitted it no later than (i) two business days after
the closing of the sale with the Successful Bidder (or
the Alternate Bidder, as the case may be) except in the
case of a bidder who closed on the sale of the Property
or who was required to close in accordance with the
terms of this Sale Order but failed to do so in breach
of its contractual obligations through no fault of the
Seller.

19.  The requirement under Local Bankruptcy
Rule 9013-1(G) to file a memorandum of law in connection
with the Motion is hereby waived.

20.  This Court retains exclusive jurisdiction
to interpret, construe, enforce, and implement the terms
and provisions of this Sale Order, the Successful
Bidder's Agreement, all amendments thereto, any waivers
and consents thereunder, and of each of the agreements
executed in connection therewith in all respects,
including, but not limited to, retaining jurisdiction to
(a) compel delivery of the Property to the Successful
Bidder, (b) compel delivery of the purchase price or
performance of other obligations owed to the Seller
pursuant to the Successful Bidder's Agreement,
(c) resolve any disputes arising under or related to the
Successful Bidder's Agreement, the Alternate Bid, and
any deposit delivered to Seller by a bidder for the
Property, (d) interpret, implement, and enforce the
provisions of this Sale Order, and (e) protect the
Successful Bidder against any Lien against the Seller or
the Property of any kind or nature whatsoever, except
for Permitted Encumbrances, which Liens, valid and

timely perfected, shall attach to the proceeds of the

Sale.

Dated:  Richmond, Virginia
        May __, 2009
        May 14 2009

                        /s/ Kevin Huennekens
                    _____
                    UNITED STATES BANKRUPTCY JUDGE

WE ASK FOR THIS:

                                        Entered on Docket: 5/15/09

Gregg M. Galardi, Esq.
Ian S. Fredericks, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
One Rodney Square
PO Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

        - and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
333 West Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

        - and -

/s/ Douglas M. Foley
_____
Dion W. Hayes (VSB No. 34304)
Douglas M. Foley (VSB No. 34364)
MCGUIREWOODS LLP
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

Counsel to the Debtors and Debtors in Possession

**CERTIFICATION OF ENDORSEMENT UNDER LOCAL RULE 9022-1(C)**

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

/s/ Douglas M. Foley

**Exhibit 1**

**(Successful Bidder's Agreement)**

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "Agreement"), dated as of April 23, 2009, is made by and between CIRCUIT CITY STORES, INC., a Virginia corporation ("Seller"), and SHORES OILFIELD EQUIPMENT CO., INC., an Oklahoma corporation ("Purchaser").

## RECITALS

Seller is a debtor in possession in a Chapter 11 bankruptcy case (the "Bankruptcy Case") that is pending in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "Bankruptcy Court"). Upon the terms and conditions of this Agreement, Seller desires to sell and convey, and Purchaser desires to purchase and acquire, the Property (as defined below). This Agreement and the purchase and sale of the Property are subject to the approval of the Bankruptcy Court. As contemplated by Section 9.2 of this Agreement, Seller will prepare and file the Sale Motion seeking approval of this Agreement.

In consideration of the mutual covenants and representations herein contained, intending to be legally bound, Seller and Purchaser agree as follows:

1.    **PURCHASE AND SALE**

1.1    Purchase and Sale.    Subject to the terms and conditions of this Agreement, Seller hereby agrees to sell and convey to Purchaser, and Purchaser hereby agrees to purchase from Seller, all of the Seller's right, title and interest in and to the property located at 1901 Cooper Drive, Ardmore, Oklahoma, comprising approximately 38 acres of land and improvements thereon, and being more particularly described on Exhibit A attached hereto and made a part hereof, together with (i) all the rights and appurtenances pertaining to such land, (ii) all buildings (including a warehouse building containing approximately 750,000 square feet), structures, and other improvements on said land, and (iii) all electrical, mechanical, air conditioning, plumbing and other fixtures attached thereto (herein collectively called the "Property"); provided, however, the Property shall not include any moveable personal property and equipment which shall be excluded from the sale (the "Excluded Personal Property"). Purchaser reserves the right to assign its interest in this Agreement to any other entity in which Purchaser or its shareholders own at least a fifty percent (50%) beneficial interest in order to close in such entity should Purchaser deem it desirable to do so for tax or business reasons, provided, in such event that any such assignee would be obligated in all respects hereunder as Purchaser, including all representations and warranties made by Purchaser herein. Purchaser shall provide prompt notice to Seller of any such assignment. Notwithstanding the foregoing permitted assignment, Purchaser shall remain liable for its obligations under this Agreement following an assignment unless Seller consents to such release.

2.    **PURCHASE PRICE**

\8870829.4

2.1    Purchase Price.    The purchase price (the "**Purchase Price**") for the Property shall be SIX MILLION AND NO/100 DOLLARS ($6,000,000.00). The Purchase Price, less the Deposit (as defined below) and as adjusted by prorations and payment of expenses as herein provided, shall be paid by Purchaser into the Escrow Agent's (as defined below) escrow account in cash by wire transfer in accordance with wire transfer instructions to be provided by the Escrow Agent.

3.    **DEPOSIT**

3.1    Deposit.    Concurrently with execution of this Agreement, Purchaser shall deliver to Stewart Title Guaranty Company (the "**Escrow Agent**"), c/o Stewart Title North Texas, 1717 Main Street, Suite 3500, Dallas, Texas 75201, Attention: Joe Grant, Phone: 214-220-2060, Email: jgrant@stewart.com, by wire transfer or cashier's check payable to Escrow Agent, an amount equal to SIX HUNDRED THOUSAND and 00/100 DOLLARS ($600,000.00) (which amount, and all interest accrued thereon, is herein called the "**Deposit**") to be held by the Escrow Agent in a federally insured, interest bearing money market account (the "**Escrow Account**") as the parties hereto shall direct.

3.2    Application of Deposit.    If the sale of the Property is consummated under this Agreement, the Deposit shall be paid to Seller and applied to the payment of the Purchase Price. If Purchaser terminates this Agreement in accordance with Section 7.1, Section 7.2, or Section 8.1 hereof, or if Purchaser or Seller terminates this Agreement in accordance with Section 9.4, the Deposit shall be returned promptly to Purchaser, and no party hereto shall have any further obligations under this Agreement except for such obligations that survive termination of this Agreement as expressly set forth in this Agreement (the "**Survival Obligations**"). If Seller terminates this Agreement in accordance with Section 8.2 or Section 10.11, the Deposit shall be retained by Seller and no party hereto shall have any further obligations under this Agreement except for the Survival Obligations. All interest earned on the Deposit shall be reported to the Internal Revenue Service as income of Purchaser and Purchaser shall promptly execute all forms reasonably requested by the Escrow Agent regarding such interest.

4.    **ITEMS DELIVERED; REPRESENTATIONS AND WARRANTIES**

4.1    Items Delivered.

(a)    Seller has, or within two (2) business days following the full execution of this Agreement by both parties shall cause to be, delivered to Purchaser's counsel a copy of the Commitment of Title Insurance (Order No. 9040204) dated April 3, 2009 and issued by Stewart Title Guaranty Company (the "**Title Commitment**") with respect to the Property together with all instruments referenced therein. Purchaser shall have one (1) week following its receipt of the Title Commitment to apprize Seller, in writing, of any objections to title. Notwithstanding any other provision in this Agreement to the contrary, Seller shall have no obligation to satisfy any of the requirements or cure any exceptions identified in the Title Commitment or objected to by Purchaser other than to

2

\8870829.4

obtain the release of the Indenture of Mortgage and Deed of Trust in favor of Manufacturers and Traders Trust Company and Stuart A. Mitchell, as Trustees, dated June 1, 1996 and recorded June 19, 1996 at Book 3020, Page 247 (the "Indenture") and the Assignment of Lease and Agreement dated June 1, 1996 and recorded June 19, 1996 at Book 3021, Page 1 and the termination of the Memorandum of Lease dated June 13, 1996 and recorded June 19, 1996 at Book 3020, Page 243, as amended at Book 3685, Page 152 (collectively, the "Basic Encumbrances"). Purchaser's right to review and object to matters contained in the Title Commitment shall not create or be deemed to create in Purchaser's favor a right to terminate this Agreement (regardless of Seller's response or failure to respond to the title objections) or otherwise obligate Seller to cure any such objections other than the Basic Encumbrances.

(b)    If Purchaser timely communicates to Seller, in writing, one or more objections, requirements or exceptions to title other than the Basic Encumbrances which Purchaser is unwilling to accept and Seller elects, in writing, to cure or satisfy any such requirements or exceptions identified by Purchaser, Seller shall have until the Closing Date to remedy the same. Seller also has, or within two business day following the full execution hereof shall, deliver to Purchaser's counsel any pin survey(s) or environmental audits or reports of any kind which Seller has in its possession.

4.2    Purchaser's Representations and Warranties.    Purchaser represents and warrants to Seller that (a) Purchaser is a corporation, duly organized and in good standing under the State of Oklahoma, is authorized to do business in the State of Oklahoma, and has the power to enter into this Agreement and to execute and deliver this Agreement and to perform all of its duties and obligations hereunder, and Purchaser has obtained all necessary authorizations required in connection with the execution, delivery and performance contemplated by this Agreement and has obtained the consent of all entities and parties necessary to bind Purchaser to this Agreement; (b) neither the execution nor the delivery of this Agreement, nor the consummation of the purchase and sale contemplated hereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement conflict with or will result in the breach of any of the terms, conditions, or provisions of any agreement or instrument to which Purchaser, or any partner or related entity or affiliate of Purchaser, is a party or by which Purchaser, any partner or related entity or affiliate of Purchaser, or any of Purchaser's assets is bound; and (c) this Agreement is the legal, valid and binding obligation of Purchaser and is enforceable against Purchaser in accordance with its terms. Purchaser's representations and warranties contained herein must be true and correct through the Closing Date, and Purchaser's failure to notify Seller prior to the Closing Date of any inaccuracies shall be a default by Purchaser under this Agreement. The Purchaser's representations and warranties set forth in this Section 4.2 shall survive the Closing or termination of this Agreement.

4.3    Seller's Representations and Warranties.    Seller represents and warrants to Purchaser that (a) Seller is a corporation duly organized and validly existing under the laws of the Commonwealth of Virginia; (b) Seller has the corporate power and authority to enter into,

3

\8870829.4

execute and deliver this Agreement and to perform all of its duties and obligations under this Agreement; (c) upon entry of the Sale Order (as defined hereinafter) in the Bankruptcy Case, this Agreement will be the legal, valid and binding obligation of Seller and will be enforceable against Seller in accordance with its terms; and (d) at the Closing, Seller shall convey to Purchaser fee simple title to the Property, free and clear of liens (including the liens of Seller's post-petition lenders and liens for past-due real property taxes), claims and encumbrances other than Permitted Encumbrances (as defined below). The representations and warranties contained in this Section 4.3 shall expire and be extinguished at the Closing.

4.4    Further Assurances.    Seller and Purchaser agree to execute and deliver at or prior to Closing any documents or instruments reasonably necessary to carry out the terms of this Agreement.

5.    **DISCLAIMER OF REPRESENTATIONS OR WARRANTIES BY SELLER; ACCEPTANCE OF PROPERTY**

5.1    Disclaimer.    PURCHASER ACKNOWLEDGES AND AGREES THAT SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES (OTHER THAN THE SPECIAL OR LIMITED WARRANTY OF TITLE AS SET OUT IN THE DEED, AS DEFINED BELOW), PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, STATUTORY, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO (A) THE VALUE, NATURE, QUALITY OR CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY, (B) THE INCOME TO BE DERIVED FROM THE PROPERTY, (C) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH PURCHASER OR ANY TENANT MAY CONDUCT THEREON, (D) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY, (E) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY, (F) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY, (G) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY, (H) COMPLIANCE WITH ANY ENVIRONMENTAL REQUIREMENTS (AS HEREINAFTER DEFINED), INCLUDING THE EXISTENCE IN OR ON THE PROPERTY OF HAZARDOUS MATERIALS (AS DEFINED BELOW), (I) THE STATUS, ACCURACY OR PROPRIETY OF ANY REAL ESTATE OR PERSONAL PROPERTY ASSESSMENT OR TAX LEVIED OR COLLECTED AGAINST ALL OR ANY PORTION OF THE PROPERTY OR (J) ANY OTHER MATTER WITH RESPECT TO THE PROPERTY. ADDITIONALLY, NO PERSON ACTING ON BEHALF OF SELLER IS AUTHORIZED TO MAKE, AND BY EXECUTION HEREOF PURCHASER ACKNOWLEDGES THAT NO PERSON HAS MADE, ANY

4

\8870829.4

REPRESENTATION, AGREEMENT, STATEMENT, WARRANTY, GUARANTY OR PROMISE REGARDING THE PROPERTY OR THE TRANSACTION CONTEMPLATED HEREIN; AND NO SUCH REPRESENTATION, WARRANTY, AGREEMENT, GUARANTY, STATEMENT OR PROMISE, IF ANY, MADE BY ANY PERSON ACTING ON BEHALF OF SELLER SHALL BE VALID OR BINDING UPON SELLER UNLESS EXPRESSLY SET FORTH HEREIN. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE PROPERTY, PURCHASER IS RELYING SOLELY ON ITS OWN INVESTIGATION OF THE PROPERTY AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY SELLER AND AGREES TO ACCEPT THE PROPERTY AT THE CLOSING AND WAIVE ALL OBJECTIONS OR CLAIMS AGAINST SELLER (INCLUDING, BUT NOT LIMITED TO, ANY RIGHT OR CLAIM OF CONTRIBUTION) ARISING FROM OR RELATED TO THE PROPERTY OR TO ANY HAZARDOUS MATERIALS ON THE PROPERTY. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT ANY INFORMATION PROVIDED OR TO BE PROVIDED WITH RESPECT TO THE PROPERTY WAS OBTAINED FROM A VARIETY OF SOURCES AND THAT SELLER HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND MAKES NO REPRESENTATIONS AS TO THE ACCURACY, TRUTHFULNESS OR COMPLETENESS OF SUCH INFORMATION. SELLER IS NOT LIABLE OR BOUND IN ANY MANNER BY ANY VERBAL OR WRITTEN STATEMENT, REPRESENTATION OR INFORMATION PERTAINING TO THE PROPERTY, OR THE OPERATION THEREOF, FURNISHED BY ANY REAL ESTATE BROKER, CONTRACTOR, AGENT, EMPLOYEE, SERVANT OR OTHER PERSON. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT, TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE SALE OF THE PROPERTY AS PROVIDED FOR HEREIN IS MADE ON AN "AS IS" "WHERE IS" CONDITION AND BASIS WITH ALL FAULTS. IT IS UNDERSTOOD AND AGREED THAT THE PURCHASE PRICE REFLECTS THAT THE PROPERTY IS BEING SOLD BY SELLER AND PURCHASED BY PURCHASER SUBJECT TO THE FOREGOING. PURCHASER HEREBY AGREES TO INDEMNIFY, PROTECT, DEFEND, SAVE AND HOLD HARMLESS SELLER FROM AND AGAINST ANY AND ALL DEBTS, DUTIES, OBLIGATIONS, LIABILITIES, SUITS, CLAIMS, DEMANDS, CAUSES OF ACTION, DAMAGES, LOSSES, FEES AND EXPENSES (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES AND EXPENSES AND COURT COSTS) IN ANY WAY RELATING TO, OR IN CONNECTION WITH OR ARISING OUT OF PURCHASER'S ACQUISITION, OWNERSHIP, LEASING, USE, OPERATION, MAINTENANCE AND MANAGEMENT OF THE PROPERTY; PROVIDED, HOWEVER, PURCHASER SHALL NOT BE REQUIRED TO INDEMNIFY SELLER WITH RESPECT TO MATTERS ARISING PRIOR TO THE CLOSING AND ATTRIBUTABLE SOLELY TO SELLER'S CONDUCT. THE PROVISIONS OF THIS SECTION 5.1 SHALL SURVIVE THE CLOSING OR ANY TERMINATION HEREOF.

     **5.2**   <u>Hazardous Materials</u>. **"Hazardous Materials"** shall mean any substance which is or contains (i) any "hazardous substance" as now or hereafter defined in §101 (14) of the

5

\8870829.4

Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. §9601 et seq.) ("CERCLA"), or any regulations promulgated under CERCLA; (ii) any "hazardous waste" as now or hereafter defined in the Resource Conservation and Recovery Act, as amended (42 U.S.C. §6901 et seq.) ("RCRA"), or regulations promulgated under RCRA; (iii) any substance regulated by the Toxic Substances Control Act (15 U.S.C. §2601 et seq.); (iv) gasoline, diesel fuel, or other petroleum hydrocarbons; (v) asbestos and asbestos containing materials, in any form, whether friable or non-friable; (vi) polychlorinated biphenyls; (vii) radon gas; and (viii) any additional substances or materials which are now or hereafter classified or considered to be hazardous or toxic under Environmental Requirements (as hereinafter defined) or the common law, or any other applicable laws relating to the Property. Hazardous Materials shall include, without limitation, any substance, the presence of which on the Property, (A) requires reporting, investigation or remediation under Environmental Requirements; (B) causes or threatens to cause a nuisance on the Property or adjacent property or poses or threatens to pose a hazard to the health or safety of persons on the Property or adjacent property; or (C) which, if it emanated or migrated from the Property, could constitute a trespass.

     **5.3**   <u>Environmental Requirements</u>.   **"Environmental Requirements"** shall mean all laws, ordinances, statutes, codes, rules, regulations, agreements, judgments, orders, and decrees, now or hereafter enacted, promulgated, or amended, of the United States, the states, the counties, the cities, or any other political subdivisions in which the Property is located, and any other political subdivision, agency or instrumentality exercising jurisdiction over the owner of the Property, the Property, or the use of the Property, relating to pollution, the protection or regulation of human health, natural resources, or the environment, or the emission, discharge, release or threatened release of pollutants, contaminants, chemicals, or industrial, toxic or hazardous substances or waste or Hazardous Materials into the environment (including, without limitation, ambient air, surface water, ground water or land or soil).

     **5.4**   <u>Purchaser's Independent Investigations</u>.   Purchaser is a sophisticated investor in, or purchaser of, properties similar in type or condition to the Property.  Purchaser acknowledges that Seller has provided Purchaser with a copy of an environmental site assessment and update letter prepared by ERM-Southeast, Inc. in satisfaction of the requirement in Section 4.1(b). Seller agrees to provide Purchaser with full access to the Property to conduct its own inspections, tests, investigations, environmental audits and other reviews of the Property as Purchaser deems necessary or appropriate, and Purchaser is relying on its own such inspections, tests, investigations, environmental audits and other reviews in determining the advisability of acquiring the Property.  Purchaser agrees to notify Seller in advance before accessing the Property pursuant to this Section 5.4 and to provide Seller with evidence of insurance coverage as reasonably requested by Seller. Notwithstanding the foregoing, Purchaser shall not be permitted to conduct any invasive tests or inspections, including but not limited to any Phase II environmental site assessments, without Seller's prior written consent (which Seller may withhold in its sole discretion).

**6.**    **CLOSING**

6

\8870829.4

**6.1**    Closing.    Unless otherwise agreed by the parties in writing or necessitated by operation of any terms herein, the closing of the purchase and sale of the Property (the "**Closing**") shall be conducted by mail or, if necessary, held at the offices of Escrow Agent not later than ten (10) days following entry by the Bankruptcy Court of the Sale Order (as defined below) (the date on which the Closing occurs is referred to as the "**Closing Date**").

**6.2**    Possession.    Possession of the Property shall be delivered to Purchaser at the Closing, subject to (i) liens for real property taxes, other governmental charges and assessments that are not yet due and payable, (ii) zoning ordinances, building codes and other land use laws and applicable governmental regulations, (iii) all covenants, agreements, conditions, easements, restrictions and rights, whether of record or otherwise including, without limitation, those matters identified in Schedule B-Section II of the Title Commitment attached to this Agreement as Schedule 6.2, except for those matters which Seller has agreed to release of record as provided in Section 4.1 above, and (iv) any and all matters that would be shown by a physical inspection or an accurate survey of the Property or were otherwise caused by or resulted from the acts of Purchaser (collectively, the "**Permitted Encumbrances**").    Any Excluded Personal Property present at the Property on the Closing Date shall be considered part of the Property.

**6.3**    Proration.    All utilities with respect to the Property for the month in which the Closing occurs, and real estate taxes and other assessments with respect to the Property for the year in which the Closing occurs, shall be prorated as of the Closing Date as follows:

(a)    All real estate taxes and assessments, both general and special, water charges and sewer rents, whether or not then due or payable, and all other normally proratable items shall be prorated to the Closing Date, based upon the latest assessments or actual invoices available.    Should any such proration be inaccurate based upon the actual tax bill or assessment when received, either party hereto may demand and shall be entitled to receive on demand, a payment from the other correcting such malapportionment. Seller shall pay all costs associated with any fees, taxes, impact fees, assessments, delinquent or otherwise, and any other land use charges attributable to a period prior to Closing.

(b)    Purchaser shall cause all utility meters to be read as of the Closing Date, shall cause the transfer of all utility services for the Property to Purchaser's name as of the Closing Date, and where necessary, shall post deposits with the utility companies; provided, however, Seller shall cooperate reasonably with Purchaser in connection with switching utility services over to Purchaser's name. Seller shall be entitled to a credit of whatever deposits Seller may have with any utility companies if Purchaser receives the benefit of such deposits.    If the Closing shall occur before the actual amount of utilities and all other operating expenses with respect to the Property for the month in which the Closing occurs are determined, the apportionment of such utilities and other operating expenses shall be upon the basis of an estimate by Seller of such utilities and other operating expenses for such month. Subsequent to the Closing, when the actual amount

7

\8870829.4

of such utilities and other operating expenses with respect to the Property for the month in which the Closing occurs are determined, the parties agree to adjust the proration of such utilities and other operating expenses and, if necessary, to refund or repay such sums as shall be necessary to effect such adjustment.

The agreements of Seller and Purchaser set forth in this Section 6.3 shall survive the Closing.

**6.4** <u>Closing Costs</u>.    Purchaser shall pay, on the Closing Date, any and all closing expenses and costs, including, without limitation, title insurance fees and premiums (including the fees of Stewart Title Guaranty Company, or its agent, in connection with the Title Commitment regardless of whether Purchaser elects to obtain a title policy from such company), survey costs, environmental and engineering costs, recordation fees, stamp tax and mortgage taxes and any and all other due diligence costs. Except as otherwise provided herein, each party shall pay its own attorneys' fees. The parties shall share equally in any escrow fee; and, with regard to other costs of Closing, the parties shall bear the costs of recording and settlement as is the custom in Oklahoma.

**6.5** <u>Seller's Obligations at the Closing</u>.    At the Closing, Seller shall deliver to Escrow Agent the following:

(a)    <u>Deed</u>. A special warranty deed, duly executed by Seller in a form mutually acceptable to the Parties and the Escrow Agent, conveying the Property in fee simple as contemplated by the Sale Order, subject to the Permitted Encumbrances.

(b)    <u>Foreign Person</u>.    An affidavit or certificate duly executed by Seller certifying that Seller is not a "foreign person," as defined in the federal Foreign Investment in Real Property Tax Act of 1980, and the 1984 Tax Reform Act, as amended.

**6.6** <u>Purchaser's Obligations at the Closing</u>.    At the Closing, Purchaser shall deliver to Escrow Agent the following:

(a)    <u>Purchase Price</u>.    The Purchase Price (less the amount of the Deposit, which shall be released separately by the Escrow Agent to Seller) by wire transfer of immediately available funds.

(b)    <u>Evidence of Authority</u>.    Such organizational and authorizing documents of Purchaser as shall be reasonably required by Seller authorizing Purchaser's acquisition of the Property pursuant to this Agreement and the execution of this Agreement and any documents to be executed by Purchaser at the Closing.

(c)    <u>Taxpayer I.D. Certificate</u>.    A certificate duly executed by Purchaser certifying Purchaser's address and Taxpayer I.D. Number and consenting to Seller's release of this information to any governmental authority.

8

\8870829.4

6.7    Commission. Seller and Purchaser represent that there are no real estate brokers or agents of record in this transaction, other than DJM Realty Services, LLC ("Broker"), and upon Closing, Seller shall pay Broker a commission pursuant to a separate written agreement. Neither Seller nor Purchaser shall be responsible for any other real estate commissions or fees of any kind or nature whatsoever. Seller and Purchaser each agrees to hold the other harmless against any claim made for brokerage commissions or finders' fees resulting from such parties' actions in this transaction. The provisions of the preceding sentence shall survive the Closing.

7.    **RISK OF LOSS; EXISTING INSURANCE PROCEEDS**

7.1    Condemnation.    If, prior to the Closing, action is initiated to take any material portion of the Property by eminent domain proceedings or by deed in lieu thereof, Purchaser may either at or prior to Closing (a) terminate this Agreement and receive a return of the Deposit and neither party will have any further right or obligation hereunder except for the Survival Obligations, or (b) consummate the Closing, in which latter event the award of the condemning authority shall be assigned to Purchaser at the Closing, and there shall be no reduction in the Purchase Price.

7.2    Casualty.    Seller assumes all risks and liability for damage to or injury occurring to the Property by fire, storm, accident, or any other casualty or cause until the Closing has been consummated. If the Property, or any part thereof, suffers any damage in excess of Six Hundred Thousand and No/100 Dollars ($600,000.00) after the date of this Agreement and prior to the Closing from fire or other casualty, which Seller, at its sole option, does not repair, Purchaser may either at or prior to Closing (a) terminate this Agreement and receive a refund of the Deposit and neither party will have any further right or obligation hereunder except for the Survival Obligations, or (b) consummate the Closing, in which latter event all of Seller's right, title and interest in and to the proceeds of any insurance covering such damage (less an amount equal to any expenses and costs incurred by Seller to repair or restore the Property or to be paid on account of the loss of rents or other income from the Property for the period prior to and including the Closing Date, all of which shall be payable to Seller), to the extent the amount of such insurance does not exceed the Purchase Price, plus Seller's deductible under its insurance policy, shall be assigned to Purchaser at the Closing. If the Property, or any part thereof, suffers any damage less than Six Hundred Thousand and No/100 Dollars ($600,000.00) after the date of this Agreement and prior to the Closing, Purchaser agrees that it will consummate the Closing and accept the assignment of the proceeds of any insurance covering such damage, plus Seller's deductible under its insurance policy, and there shall be no reduction in the Purchase Price. Seller shall maintain casualty insurance for the Property through the Closing Date and, if Purchaser is entitled to insurance proceeds pursuant to this Section 7.2, Seller shall cooperate with Purchaser in good faith in connection with the prosecution of any such insurance claim.

8.    **DEFAULT**

8.1    Breach by Seller.    In the event that Seller shall fail to consummate the transactions contemplated by this Agreement for any reason, except Purchaser's default or a

9

\8870829.4

termination of this Agreement by Purchaser or Seller pursuant to a right to do so under the provisions hereof, Purchaser, as its sole and exclusive remedy may terminate this Agreement and receive a refund of the Deposit. In no event shall Purchaser be entitled to any remedy other than the return of the Deposit and Seller shall not be liable to Purchaser for any actual, punitive, speculative or consequential damages. In no event shall Purchaser be entitled to the remedy of specific performance.

8.2    Breach by Purchaser. If Purchaser fails to comply with this Agreement for any reason, except Seller's default, Seller may terminate this Agreement and thereupon shall be entitled to the Deposit as Seller's full liquidated damages pursuant to applicable state statute (and not as a penalty) as Seller's sole remedy and relief hereunder and shall not be entitled to the remedy of specific performance. Seller and Purchaser have made this provision for liquidated damages because it would be impossible to estimate more precisely, on the date hereof, the amount of actual damages for such breach, and that these sums represent a reasonable pre-estimate of Seller's probable loss in the event of Purchaser's breach. PURCHASER WAIVES ANY CLAIM, RIGHT OR DEFENSE UNDER OKLAHOMA STATUTES, TITLE 15, SECTION 215 THAT THE DEPOSIT DOES NOT REPRESENT A REASONABLE AMOUNT FOR SELLER'S DAMAGES FOLLOWING A DEFAULT BY PURCHASER UNDER THIS AGREEMENT. SELLER AND PURCHASER HAVE NEGOTIATED THIS AGREEMENT AS AN ARMS-LENGTH TRANSACTION, HAVE BEEN REPRESENTED BY COUNSEL OF THEIR CHOOSING AND ACKNOWLEDGE THAT THE DEPOSIT IS A REASONABLE ESTIMATE OF SELLER'S DAMAGES TO FOREGO OTHER OFFERS IN ORDER TO BESTOW ONTO PURCHASER THE STATUS OF THE STALKING HORSE PARTY IN THE BANKRUPTCY AUCTION. Purchaser acknowledges that there is no other information with respect to the waiver contained in this Section 8.2 which if made available to Purchaser would have induced Purchaser to not have entered into this Agreement. Notwithstanding the foregoing, the provisions of this Section 8.2 shall not limit or affect any of Purchaser's indemnities as provided in any other Section of this Agreement. The provisions of this Section 8.2 shall survive the expiration or earlier termination of this Agreement.

Purchaser's Initials: _____

## 9.    BANKRUPTCY ISSUES

9.1    Generally.    Notwithstanding any other provision of this Agreement, the provisions of this Article 9 shall apply to the sale of the Property.

9.2    Filing a Sale Motion.    The obligation of Seller to sell and convey the Property to Purchaser, and the obligation of Purchaser to purchase the Property from Seller, are subject to the condition precedent that the Bankruptcy Court shall have entered an order in the Bankruptcy Case (the **"Sale Order"**) (i) approving the sale of the Property to Purchaser subject to the terms of this Agreement, free and clear of liens, claims and encumbrances other than Permitted Encumbrances, and (ii) authorizing Seller to consummate the transactions contemplated by this Agreement. Within two (2) business days after the date of this Agreement, Seller will file with the Bankruptcy Court a motion pursuant to section 363 of the Bankruptcy Code seeking approval of this Agreement, the consummation of the transactions contemplated hereby, the bidding

10

\8870829.4

procedures in connection with the qualification of bidders and the auction of the Property and entry of an order approving the foregoing (the "**Sale Motion**"). The Sale Motion shall be in form and substance consistent with this Agreement, and Seller shall be responsible for serving and providing notice of the Sale Motion.

**9.3**   Entry of Sale Order. The closing of the sale of the Property to Purchaser shall take place as provided in Section 6.1 above. Purchaser shall cooperate with the Seller in good faith to obtain entry by the Bankruptcy Court of the Sale Order as soon as reasonably practicable.

**9.4**   Termination. Purchaser acknowledges that the Seller intends to solicit "higher or better" offers for the Property, including entertaining other offers from competing bidders, and to conduct an auction on or around May 11, 2009. To facilitate this process, Seller agrees to the following procedures for responding to other offers that the Seller may receive for the Property: (a) an initial minimum overbid for the Property of at least $6,250,000.00; (b) each initial overbid must be accompanied by a deposit of at least $625,000.00; (c) each competing offer must have terms and conditions that are substantially identical to those set forth in this Agreement; and (d) if an acceptable competing offer is received by Seller, Seller shall conduct an auction among Purchaser and all qualified bidders (as determined by Seller pursuant to the bidding procedures) to determine the highest or best offer for the Property. The last day for submission of higher or better offers will be fixed by the Seller or established by order of the Bankruptcy Court; Seller shall request that the Bankruptcy Court accept May 6, 2009 as the due date for submission of competing bids. Notwithstanding any other provision of this Agreement, (i) Seller shall have the right to terminate this Agreement in order to permit Seller to accept a "higher or better" offer for the Property, and (ii) each of Seller and Purchaser shall have the right to terminate this Agreement if the Bankruptcy Court has not entered the Sale Order on or prior to the later of May 15, 2009 or twenty days after the date of the auction. In the event that Seller terminates this agreement pursuant to clause (i) in the preceding sentence, Seller agrees to pay Purchaser a breakup fee of $50,000.00 from the cash proceeds of a sale to the New Bidder approved by the Sale Order. If this Agreement is terminated by Seller as provided in this Section 9.4, or because the Bankruptcy Court will not enter the Sale Order prior to May 15, 2009, Escrow Agent shall disburse the Deposit to Purchaser.

## 10.   MISCELLANEOUS

**10.1**   Notices.   All notices, demands and requests which may be given or which are required to be given by either party to the other, and any exercise of a right of termination provided by this Agreement, shall be in writing and shall be deemed effective either: (a) on the date personally delivered to the address below, as evidenced by written receipt therefore, whether or not actually received by the person to whom addressed; (b) on the third (3rd) business day after being sent, by certified or registered mail, return receipt requested, addressed to the intended recipient at the address specified below; or (c) on the first (1st) business day after being deposited into the custody of a nationally recognized overnight delivery service such as Federal

11

\8870829.4

Express, addressed to such party at the address specified below. For purposes of this Section 10.1, the addresses of the parties for all notices are as follows:

If to Purchaser:

_____

_____

Attention: _____

with a copy to:      Richard C. Labarthe
                     1621 N. Classen Boulevard
                     Oklahoma City, Oklahoma 73106

If to Seller (prior to April 29, 2009):

                     CIRCUIT CITY STORES, INC.
                     9950 Mayland Drive
                     Richmond, Virginia 23233
                     Attention: Deborah Miller

If to Seller (after April 29, 2009):

                     CIRCUIT CITY STORES, INC.
                     4951 Lake Brook Drive, 5th Floor
                     Glen Allen, Virginia 23060-9279
                     Attention: Deborah Miller

and a copy to:       McGuireWoods LLP
                     901 East Cary Street
                     Richmond, Virginia 23219
                     Attention: T. Craig Harmon

The addresses to which notices and demands shall be delivered or sent may be changed from time to time by notice served, as hereinbefore provided, by either party upon the other party.

10.2    Entire Agreement.    This Agreement embodies the entire agreement between the parties relative to the subject matter hereof, and there are no oral or written agreements between the parties, nor any representations, promises or inducements made by either party relative to the subject matter hereof, which are not expressly set forth herein.

12

\8870829.4

**10.3** Amendment. This Agreement may be amended only by a written instrument executed by the party or parties to be bound thereby.

**10.4** Heading. The captions and headings used in this Agreement are for convenience of reference only and do not in any way limit, amplify, or otherwise modify the provisions of this Agreement.

**10.5** Time of Essence. Time is of the essence of this Agreement; however, if the final date of any period which is set out in any provision of this Agreement falls on a Saturday, Sunday or legal holiday under the laws of the United States, or the State where the Property is located, then, in such event, the time of such period shall be extended to the next day which is not a Saturday, Sunday or legal holiday.

**10.6** Governing Law. This Agreement shall be governed by the laws of the State of Oklahoma and the laws of the United States pertaining to transactions in such State.

**10.7** Successors and Assigns: Assignment. This Agreement shall bind and inure to the benefit of Seller and Purchaser and their respective heirs, executors, administrators, personal and legal representatives, successors and permitted assigns. Purchaser shall be permitted to assign Purchaser's rights under this Agreement as provided in Section 1.1 above; provided, however, any subsequent assignment may be made only with the prior written consent of Seller. No assignment of Purchaser's rights hereunder shall relieve Purchaser of its liabilities under this Agreement. This Agreement is solely for the benefit of Seller and Purchaser; there are no third party beneficiaries hereof. Any assignment of this Agreement in violation of the foregoing provisions shall be null and void.

**10.8** Invalid Provision. If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws, such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Agreement; and, the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by such illegal, invalid, or unenforceable provision or by its severance from this Agreement.

**10.9** Attorneys' Fees. In the event it becomes necessary for either party hereto to file suit to enforce this Agreement or any provision contained herein, the party prevailing in such suit shall be entitled to recover, in addition to all other remedies or damages, as provided herein, reasonable attorneys' fees incurred in such suit.

**10.10** Multiple Counterparts. This Agreement may be executed in a number of identical counterparts which, taken together, shall constitute collectively one (1) agreement; in making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart with each party's signature.

13

\8870829.4

**10.11**  No Recordation.    Seller and Purchaser hereby acknowledge that neither this Agreement nor any memorandum or affidavit thereof shall be recorded of public record in any real property or other public records. Should Purchaser ever record or attempt to record this Agreement, or a memorandum or affidavit thereof, or any other similar document, then, notwithstanding anything herein to the contrary, said recordation or attempt at recordation shall constitute a default by Purchaser hereunder, and, in addition to the other remedies provided for herein, Seller shall have the express right to terminate this Agreement by filing a notice of said termination in the county in which the Property is located or otherwise as may be necessary to give public notice of such termination.

**10.12**  Merger Provision.    Except as otherwise expressly provided herein, any and all rights of action of Purchaser for any breach by Seller of any representation, warranty or covenant contained in this Agreement shall merge with the Deed and other instruments executed at Closing, shall terminate at Closing and shall not survive Closing.

**10.13**  Brokers.    Except as contemplated by Section 6.7, no commissions, brokerage fees, finders' fees, or other similar fees shall be due in connection with this Agreement.

**10.14**  Consent to Jurisdiction of Bankruptcy Court.    THE   BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ALL MATTERS, INCLUDING ANY LEGAL ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY RELATED AGREEMENTS OR THE CONTEMPLATED TRANSACTIONS AND THE INTERPRETATION, IMPLEMENTATION AND ENFORCEMENT OF THIS AGREEMENT AND THE PARTIES HERETO IRREVOCABLY SUBMIT AND CONSENT TO SUCH JURISDICTION.

Buyer and Purchaser further agree that service of any process, summons, notice or document by U.S. registered mail to any such party's respective address set forth in Section 10.1 of this Agreement will be effective service of process for any action, suit or proceeding with respect to any matters to which it has submitted to jurisdiction as set forth above. Each of Buyer and Purchaser irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in the Bankruptcy Court.

*Signature Pages to Follow.*

14

\8870829.4

IN WITNESS WHEREOF, the parties hereto have executed this Purchase and Sale Agreement as of the date first written above.

SELLER

CIRCUIT CITY STORES, INC.,
a Virginia corporation

By: _Michelle Mosier_
Name: _Michelle Mosier_
Title: _VP & Controller_

PURCHASER

SHORES OILFIELD EQUIPMENT CO., INC.,
an Oklahoma corporation

By: _____
Name: _____
Title: _____

16

\8870829.4

IN WITNESS WHEREOF, the parties hereto have executed this Purchase and Sale Agreement as of the date first written above.

SELLER

CIRCUIT CITY STORES, INC.,
a Virginia corporation

By: _____
Name: _____
Title: _____

PURCHASER

SHORES OILFIELD EQUIPMENT CO., INC.,
an Oklahoma corporation

By: *Mark K Houser* _____
Name: MARK R. Houser _____
Title: Secretary _____

15

\8870829.4

The escrow terms and conditions of this Agreement are agreed to and accepted this _23rd_ day of _April_, 2009.

ESCROW AGENT:

STEWART TITLE GUARANTY COMPANY

By: _____

Name: _JOSEPH M. GRANT_

Title: _ESCROW OFFICER_

Mailing Address:

c/o Stewart Title North Texas
1717 Main Street, Suite 3500
Dallas, Texas 75201
Attention: Joe Grant

16

\8870820.4

EXHIBIT A

LEGAL DESCRIPTION OF PROPERTY

(See attached)

\8870829.4

LEGAL DESCRIPTION OF PROPERTY

Parcel 1

A tract of land lying in the East Half (E/2) Southwest Quarter (SW/4) of Section Twenty-Three (23), Township Four (4) South, Range One (1) East, Carter County, Oklahoma, described by metes and bounds as follows:

Part of Lot 3, Block 1 WESTPORT INDUSTRIAL PARK to Ardmore, Carter County, Oklahoma, described as beginning at a point on the west line of said E/2 SW/4, 455.00 feet north of southwest corner thereof, said point also being the southwest corner of said Lot 3, thence N 00°33'30' W along west line of said E/2 SW/4, 1182.00 feet to a point 126.00 feet south of northwest corner of said Lot 3; thence N 89°27'09" E, 961.71 feet to a point on the east line of Lot 3, 125.23 feet south of northeast corner thereof; thence S 00°33'30" E along said east line, 1182.77 feet to a point on the south line of said Lot 3, thence S 89°29'54" W, 961.71 feet to point of beginning.

Being a portion of the land vested in Grantor pursuant to Warranty Deed dated August 2, 1994 and recorded August 3, 1994 at Book 1905, Page 251 and Warranty Deed dated July 27, 1994 and recorded August 3, 1994 at Book 1905, Page 253.

Parcel 2

A tract of land lying in the Northeast Quarter (NE/4) Southwest Quarter (SW/4) of Section Twenty three (23), Township Four (4) South, Range One (1) East, Carter County, Oklahoma, described by metes and bounds as follows:

Part of Lot 3, Block 1 WESTPORT INDUSTRIAL PARK to Ardmore, Carter County, Oklahoma, described as beginning at the northwest corner of said Lot 3, thence N 89°29'54" E, 961.71 feet to the northeast corner

\8870829.4

thereof; thence S 00°33'30" E along east line thereof, 125.23 feet; thence S 89°27'09" W, 961.71 feet to a point of the west line of said Lot 3; thence N 00°33'30" W along said west line, 126.00 feet to point of beginning containing 2.773 acres.

Being the same property conveyed by Grantor to Grantee by General Warranty Deed dated August 1, 2001 and recorded at Book 3685, Page 150 with the County Clerk of Carter County, Oklahoma.

Parcel 3

A portion of the Northeast Quarter (NE/4) of the Southwest Quarter (SW/4) of Section Twenty-Three (23), Township Four (4) South, Range One (1) East, situated in the City of Ardmore, Carter County, Oklahoma, and being more particularly described as follows:

Commencing at the Southwest Corner of said Section 23; thence North 89°29'54" East along the South line of said Section 23, a distance of 1318.13 feet to the Southwest Corner of the SE/4 of the SW/4 of said Section 23; thence North 00°33'30" West along the West line of said SE/4 of the SW/4 of Section 23, a distance of 1763.00 feet to a ½" iron pin set for the point and place of BEGINNING of the herein described tract; thence North 00°33'30" West continuing along the West line of said NE/4 of the SW/4 of Section 23, a distance of 453.00 feet to a ½" iron pin set; thence North 89°29'54" East, a distance of 961.71 feet to a ½" iron pin set; thence South 00°33'30" East, a distance of 453.00 feet to a ½" iron pin set; thence South 89°29'54" West, a distance of 961.71 feet to the point of BEGINNING.

Also known as Lot 4 of Block 1 of Westport Industrial Park.

Being the same property conveyed by Grantor to Grantee by General Warranty Deed dated October 16, 2000 and recorded at Book 3582, Page 263 with the County Clerk of Carter County, Oklahoma.

\8870829.4

SCHEDULE 6.2

THE TITLE COMMITMENT

(see attached)

\8870829.4

American Land Title Association Commitment (6/17/06)

# ALTA COMMITMENT FORM

## COMMITMENT FOR TITLE INSURANCE

Issued by



Stewart Title Guaranty Company, A Texas Corporation, "Company", for a valuable consideration, commits to issue its policy or policies of title insurance, as identified in Schedule A, in favor of the Proposed Insured named in Schedule A, as owner or mortgagee of the estate or interest covered hereby in the land described or referred to in Schedule A, upon payment of the premiums and charges and compliance with the Requirements; all subject to the provisions of Schedules A and B and to the Conditions of this Commitment.

This Commitment shall be effective only when the identity of the Proposed Insured and the amount of the policy or policies committed for have been inserted in Schedule A hereof by the Company.

All liability and obligation under this Commitment shall cease and terminate six months after the Effective Date or when the policy or policies committed for shall issue, whichever first occurs, provided that the failure to issue the policy or policies is not the fault of the Company.

The Company will provide a sample of the policy form upon request.

Signed under seal for the Company, but this Commitment shall not be valid or binding until it bears an authorized Countersignature.

   IN WITNESS WHEREOF, Stewart Title Guaranty Company has caused its corporate name and seal to be hereunto affixed by its duly authorized officers on the date shown in Schedule A.

Countersigned by:

_____
Authorized Countersignature

Stewart Abstract & Title of Oklahoma
Oklahoma City, Oklahoma
(405) 232-6764

_____
Senior Chairman of the Board

_____
Chairman of the Board

_____
President

**Order No. 9040204**

American Land Title Association Commitment (6/17/06)

## CONDITIONS

1.  The term mortgage, when used herein, shall include deed of trust, trust deed or other security instrument.

2.  If the proposed Insured has or acquires actual knowledge of any defect, lien, encumbrance, adverse claim or other matter affecting the estate or interest or mortgage thereon covered by this Commitment other than those shown in Schedule B hereof, and shall fail to disclose such knowledge to the Company in writing, the Company shall be relieved from liability for any loss or damage resulting from any act or reliance hereon to the extent the Company is prejudiced by failure to so disclose such knowledge. If the proposed Insured shall disclose such knowledge to the Company, or if the Company otherwise acquires actual knowledge of any such defect, lien, encumbrance, adverse claim or other matter, the Company at its option may amend Schedule B of this Commitment accordingly, but such amendment shall not relieve the Company from liability previously incurred pursuant to paragraph 3 of these Conditions and Stipulations.

3.  Liability of the Company under this Commitment shall be only to the named proposed Insured and such parties included under the definition of Insured in the form of policy or policies committed for and only for actual loss incurred in reliance hereon in undertaking in good faith (a) to comply with the requirements hereof, or (b) to eliminate exceptions shown in Schedule B, or (c) to acquire or create the estate or interest or mortgage thereon covered by this Commitment. In no event shall such liability exceed the amount stated in Schedule A for the policy or policies committed for and such liability is subject to the insuring provisions, the Conditions and Stipulations, and the Exclusions from Coverage of the form of policy or policies committed for in favor of the proposed Insured which are hereby incorporated by reference and are made a part of this Commitment except as expressly modified herein.

4.  This Commitment is a contract to issue one or more title insurance policies and is not an abstract of title or a report of the condition of title. Any action or actions or rights of action that the proposed Insured may have or may bring against the Company arising out of the status of the title to the estate or interest or the status of the mortgage thereon covered by this Commitment must be based on and are subject to the provisions of this Commitment.

5.  *The policy to be issued contains an arbitration clause. All arbitrable matters when the Amount of Insurance is $2,000,000 or less shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties. You may review a copy of the arbitration rules at www.alta.org.*

stewart

→ title guaranty company

All notices required to be given the Company and any statement in writing required to be furnished the Company shall be addressed to it at P.O. Box 2029, Houston, Texas 77252.

# STEWART TITLE GUARANTY COMPANY

## COMMITMENT FOR TITLE INSURANCE

### SCHEDULE A

Order No. 9040204

Effective Date: April 3, 2009 at 7:59:00 AM

Closer: MARGARET HARKEY

Prepared
For:

Stewart Abstract & Title of Oklahoma
701 N. Broadway
Suite 300
Oklahoma City, Oklahoma 73102

Inquiries should be directed to:
Stewart Abstract & Title Company of Oklahoma, Inc.

1. Policy or Policies to be issued:

   (a) ☒   ALTA Owner's Policy             Amount   TO BE DETERMINED

   Proposed Insured: TBD

   (b) ☒   ALTA Loan Policy               Amount   TO BE DETERMINED

   Proposed Insured:

2. The estate or interest in the land described or referred to in this Commitment and covered herein is a Fee Simple

3. Title to said estate or interest in said land is at the effective date hereof vested in:
ARDMORE DEVELOPMENT AUTHORITY, pursuant to Warranty Deed dated August 2, 1994 and recorded August 3, 1994 at Book 1905, Page 251 (entry 712-A) and Warranty Deed dated July 27, 1994 and recorded August 3, 1994 at Book 1905, Page 253 (entry 714-A), as to the following legal description:

A tract of land lying in the East Half (E/2) Southwest Quarter (SW/4) of Section Twenty-three (23), Township Four (4) South, Range One (1) East, Carter County, Oklahoma, described by metes and bounds as follows:
Part of Lot 3, Block 1 WESTPORT INDUSTRIAL PARK to Ardmore, Carter County, Oklahoma, described as beginning at a point on the west line of said E/2 SW/4, 455.00 feet north of southwest corner thereof, said point also being the southwest corner of said Lot 3, thence N 00°33'30" W along west line of said E/2 SW/4, 1182.00 feet to a point 126.00 feet south of northwest corner of said Lot 3; thence N 89°27'09" E, 961.71 feet to a point on the east line of

April 15, 2009   Jennifer Moradi

ALTA Commitment (6/17/06)
This commitment is invalid unless the Insuring Provisions and Schedules B1 and B2 are attached.

Schedule A consists of 3 page(s)

# STEWART TITLE GUARANTY COMPANY
## COMMITMENT FOR TITLE INSURANCE

### SCHEDULE A

Order No. 9040204

Lot 3, 125.23 feet south of northeast corner thereof; thence S 00°33'30" E along said east line, 1182.77 feet to a point on the south line of said Lot 3; thence S 88°29'54" W, 961.71 feet to point of beginning.

**AND**

CIRCUIT CITY STORES, INC., pursuant to Warranty Deed dated October 16, 2000 and recorded October 24, 2000 at Book 3582, Page 263 (entry 288-B) and Warranty Deed dated August 1, 2001 and recorded August 7, 2001 at
Book 3685, Page 150 (entry 315-B), as to the following legal description:

Lot Four (4), Block One (1), WESTPORT INDUSTRIAL PARK to Ardmore, Carter County, Oklahoma, according to the recorded plat thereof.
AND
A tract of land lying in the Northeast Quarter (NE/4) Southwest Quarter (SW/4) of Section Twenty-three (23), Township Four (4) South, Range One (1) East, Carter County, Oklahoma, described by metes and bounds as follows:
Part of Lot 3, Block 1 WESTPORT INDUSTRIAL PARK to Ardmore, Carter County, Oklahoma, described as beginning at the northwest corner of Lot 3, thence N 89°29'54" E, 961.71 feet to the northeast corner thereof; thence S 00°33'30" E along east line thereof, 125.23 feet; thence S 89°27'09" W, 961.71 feet to a point on the west line of said Lot 3; thence N 00°33'30" W along said west line, 126.00 feet to the point of beginning.

4. The land referred to in the Commitment is located in the County of Carter State of Oklahoma and described as follows:

Lots Three (3) and Four (4), Block One (1), WESTPORT INDUSTRIAL PARK to Ardmore, Carter County, Oklahoma, according to the recorded plat thereof.

TAX ID #:

April 15, 2009    Jennifer Moradi

ALTA Commitment (6/17/06)
This commitment is invalid unless the Insuring Provisions and Schedules B1 and B2 are attached.

Schedule A consists of 3 page(s)

# STEWART TITLE GUARANTY COMPANY

## COMMITMENT FOR TITLE INSURANCE

### SCHEDULE A

Order No.  9040204

### CONTINUATION SHEET

Be advised that this title commitment is issued in pursuant to an examination of the following described materials, to-wit:

A)  Abstract Number: 9406144A (Volumes 1 & 2)
Compiled by:      Carter County Abstract Company, Inc.
Last Certified to:  August 3, 1994 at 10:19 a.m.
Consisting of      719 Entries

B)  Abstract Number: 9040204
Compiled by:      Stewart Abstract and Title of Oklahoma
Last Certified to:  April 3, 2009 at 7:59 a.m.
Consisting of:     394 Entries

April 15, 2009     Jennifer Moradi

ALTA Commitment (6/17/06)
This commitment is invalid unless the Insuring Provisions and Schedules B1 and B2 are attached.

Schedule A consists of 3 page(s)

# STEWART TITLE GUARANTY COMPANY
## COMMITMENT FOR TITLE INSURANCE

### SCHEDULE B - SECTION I

### REQUIREMENTS

The following are the requirements to be complied with:

1. Stewart Title requires **Certified Funds** at closing in the form of a Certified Check, Cashiers Check, U.S. Treasury Check or Wire Transfer into our escrow account.

2. Stewart Title requires all parties to present a valid Drivers License or other acceptable Photo I.D. at closing.

3. Payment to or for the account of the grantors or mortgagors of the full consideration for the estate or interest, mortgage or lien to be issued.

4. Furnish proof of payment of all bills for labor and material furnished or to be furnished in connection with improvements erected or to be erected.

5. Determine by gap check that no adverse documents, transactions, or other matters, affecting title, or as against insured owner(s) have been filed subsequent to the effective date of this commitment to actual date of closing.

6. Obtain affidavit of Seller (Borrower) that said Borrower or Seller is not a foreign person as that term is defined in Section 1445 of the Internal Revenue Code of 1954 as amended (the Code), and the applicable regulations. If a foreign person, then compliance is required with the Code, its rules and regulations pertaining thereto.

7. Obtain affidavit and indemnity agreement from Seller (Borrower) as to debts, liens and possession.

8. Have a certified survey performed by a registered land surveyor or civil engineer certifying that said survey was made on the ground of the subject property, that the same is correct and that there are no discrepancies, conflicts, shortages in area, boundary line conflicts, encroachments, overlapping or improvements, easements, or rights of way as shown herein, and that said property has access to and from a dedicated roadway, all conforming to ALTA/ACSM survey standards for an urban survey.

9. Ascertain the amount of, pay and satisfy 2008 ad valorem taxes, plus penalty and interest.

10. Obtain and file for record a properly executed Release of the Indenture of Mortgage and Deed of Trust, as to the subject premises, in favor of Manufacturers and Traders Trust Company and Stuart A. Mitchell, as Trustees, dated as of June 1, 1996 and recorded June 19, 1996 at Book 3020, Page 247 (entry 181-B) in the principal amount of $13,000,000.00, as partially released by Release of Part of Mortgaged Property recorded at Book 3685, Page 145 (entry 310-B).

ALTA Commitment (6/17/06)                                    File No.: 9040204

This commitment is invalid unless the Insuring Provisions and Schedules A and B-Section II are attached.

Schedule B-Section I consists of 2 page(s)

# STEWART TITLE GUARANTY COMPANY

## COMMITMENT FOR TITLE INSURANCE

### SCHEDULE B - SECTION I

### REQUIREMENTS

11. Obtain and file for record a properly executed Release of the Assignment of Lease and Agreement, as to the subject premises, in favor of Manufacturers and Traders Trust Company and Stuart A. Mitchell, as Trustees, dated as of June 1, 1996 and recorded June 19, 1996 at Book 3021, Page 1 (entry 240-B).

12. Obtain and file for record a properly executed Quit Claim Deed by Ardmore Development Authority in favor of Circuit City Stores, Inc., covering the portion of the subject premises owned by Circuit City Stores, Inc., required by virtue of the defective legal description contained in Warranty Deed recorded at Book 4433, Page 91 (entry 380-B).

13. Obtain and file for record a properly executed Warranty Deed by ARDMORE DEVELOPMENT AUTHORITY in favor of Circuit City Stores, Inc. covering the portion of the subject premises owned by Ardmore Development Authority.

14. The Company requires for its review satisfactory evidence of the approval of the Ardmore Development Authority to the transaction as well as satisfactory evidence of the authority of the individual executing the deed on behalf of the Development Authority. At the time the Company is furnished these items, the Company may make additional requirements or exceptions.

15. A portion of the property is subject to bankruptcy proceedings of Circuit City Stores, Inc., Debtor in United States Bankruptcy Court for the Eastern District of Virginia Richmond Division Case No. 08-35653 (KRH). The Company requires copies of the docket sheet, petition with schedules, and other satisfactory final nonappealable orders, plans, or documents in the bankruptcy proceedings authorizing the contemplated transaction. At the time the Company is furnished these items, the Company may make additional requirements or exceptions.

16. Obtain and file for record a properly executed Warranty Deed by CIRCUIT CITY STORES, INC. in favor of proposed purchaser, covering the subject premises.

17. The Company requires for its review a copy of the Articles of Incorporation, a satisfactory Board of Directors resolution authorizing the proposed transaction, Shareholders' Resolution where applicable, and verification of Good Standing Certificate evidencing that CIRCUIT CITY STORES, INC. is a company in good standing in the state of its incorporation. At the time the Company is furnished these items, the Company may make additional requirements or exceptions.

18. Be advised that this Commitment will remain effective for a period of 180 days commencing April 3, 2009 at 7:59 a.m.

19. The Company reserves the right to make additional requirements based upon additional information derived from our review of the transaction.

ALTA Commitment (6/17/06)

File No.: 9040204

This commitment is invalid unless the Insuring Provisions and Schedules A and B-Section II are attached.

Schedule B-Section I consists of 2 page(s)

# STEWART TITLE GUARANTY COMPANY
## COMMITMENT FOR TITLE INSURANCE

### SCHEDULE B – SECTION II

### EXCEPTIONS

The policy or policies to be issued will contain exceptions to the following unless the same are disposed of to the satisfaction of the Company.

1. Defects, liens, encumbrances, adverse claims or other matters, if any, created, first appearing in the public records or attaching subsequent to the effective date hereof but prior to the date the proposed insured acquires for value of record the estate or interest or mortgage thereon covered by this commitment.

2. Rights or claims of parties in possession.

3. Easements, or claims of easements, visible on the property or not shown by the public records.

4. Encroachments, overlaps, boundary line disputes, or other matters which would be disclosed by an accurate survey and inspection of the premises.

5. Any lien, or right to a lien, for services, labor, or material hereto or hereafter furnished, imposed by law and not shown by the public records.

6. Taxes or special assessments which are not shown as existing liens by the public records.

7. Taxes for the year 2009 the amount of which is not ascertainable or payable.

8. Title to the minerals within and underlying the subject premises; oil and gas leases and mineral grants affecting the subject premises; all rights, interest and privileges appurtenant thereto.

9. Statutory Section Line Road Easements in favor of the State of Oklahoma, where applicable.

10. Easement contained in Indenture Conveying Property, in favor of Oklahoma Natural Gas Company, recorded at Book Deed 79, Page 492 (entry 373-A).

11. Easement in favor of Southwester Bell Telephone Company recorded at Book 1934, Page 283 (entry 12-B).

12. Westport Industrial Park Protective Covenants recorded at Book 1939, Page 226 (entry 13-B).

ALTA Commitment (6/17/06)                                            File No.. 9040204

This commitment is invalid unless the Insuring Provisions and Schedules A and B-Section I are attached.

Schedule B- Section II consists of 2 page(s)

# STEWART TITLE GUARANTY COMPANY

## COMMITMENT FOR TITLE INSURANCE

### SCHEDULE B – SECTION II

### EXCEPTIONS

13. Westport Industrial Park Protective Covenants recorded at Book 1943, Page 244 (entry 19-B); Amended Protective Covenants recorded at Book 3239, Page 77 (entry 258-B).

14. Easement in favor of Circuit City Stores, Inc. recorded at Book 1943, Page 262 (entry 37-B).

15. Owner's Certificate, Dedication, Restrictions and Plat of Lot 3, Block 1 Westport Industrial Park recorded at Plat Book P165-A, Document No. 354 (entry 56-B).

16. Owner's Certificate, Dedication, Restrictions and Plat of Lot 4, Block 1 Westport Industrial Park recorded at Plat Book P190-B, Document No. 5469 (entry 297-B).

17. All easements, building set back lines, limitations on access, notes and other matters shown on or set forth in the recorded Plats (entries 56-B and 297-B).

18. Right of Way in favor of Oklahoma Natural Gas Company recorded at Book 1959, Page 136 (entry 73-B).

19. Easement in favor of Oklahoma Gas & Electric Company recorded at Book 2044, Page 199 (entry 154-B).

20. Terms, conditions and provisions contained in Lease by and between Ardmore Development Authority and Circuit City Stores, Inc., evidenced of record by Memorandum of Lease dated June 13, 1996 and recorded June 19, 1996 at Book 3020, Page 243 (entry 177-B), as amended by First Amendment to Memorandum of Lease recorded at Book 3685, Page 152 (entry 317-B).

21. Reciprocal Easement Agreement by and between The Ardmore Development Authority and Circuit City Stores, Inc., dated August 1, 2001 and recorded August 7, 2001 at Book 3685, Page 156 (entry 321-B).

22. Easement Agreement in favor of Chickasaw Telephone Company recorded at Book 4102, Page 277 (entry 356-B).

23. Rights of parties in possession as tenants under unrecorded leases and of parties claiming by, through or under them.

ALTA Commitment (6/17/06)                                                          File No.: 9040204

This commitment is invalid unless the Insuring Provisions and Schedules A and B-Section I are attached.

Schedule B- Section II consists of 2 page(s)

# CERTIFICATE OF NOTICE

```
District/off: 0422-7        User: jafarbayj        Page 1 of 1              Date Rcvd: May 15, 2009
Case: 08-35653             Form ID: pdforder       Total Served: 1

The following entities were served by first class mail on May 17, 2009.
aty         +Gregg M. Galardi,   Skadden Arps Slate Meagher,   & Flom LLP, One Rodney Sq.,   PO Box 636,
              Wilmington, DE 19899-0636

The following entities were served by electronic transmission.
NONE.                                                                      TOTAL: 0

          ***** BYPASSED RECIPIENTS *****
NONE.                                                                      TOTAL: 0

Addresses marked '+' were corrected by inserting the ZIP or replacing an incorrect ZIP.
USPS regulations require that automation-compatible mail display the correct ZIP.
```

**I, Joseph Speetjens, declare under the penalty of perjury that I have served the attached document on the above listed entities in the manner shown, and prepared the Certificate of Notice and that it is true and correct to the best of my information and belief.**

**Meeting of Creditor Notices only (Official Form 9): Pursuant to Fed. R. Bank. P. 2002(a)(1), a notice containing the complete Social Security Number (SSN) of the debtor(s) was furnished to all parties listed.  This official court copy contains the redacted SSN as required by the bankruptcy rules and the Judiciary's privacy policies.**

**Date: May 17, 2009**                **Signature:**   _Joseph Speetjens_