IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy No.  Case No. 08-35653-KRH |
| | ) | |
| CIRCUIT CITY STORES, INC., et al. | ) | CHAPTER 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| ————————————————— | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| on behalf of Its agency the U.S. Department | ) | |
| of Commerce, National Telecommunications | ) | |
| Information Administration, | ) | Contested Matter |
| | ) | |
| Movant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CIRCUIT CITY STORES, INC., | ) | |
| | ) | |
| Respondent. | ) | |

UNITED STATES' MOTION FOR COURT APPROVAL
OF RECOUPMENT, AND MEMORANDUM IN SUPPORT THEREOF

The United States of America, by counsel and pursuant to Rule 9013 of the Federal Rules

of Bankruptcy Procedure, and on behalf of its agency, the U.S. Department of Commerce,

National Telecommunications Information Administration ("NTIA"), moves the Court for an

Order approving the recoupment of post-petition reimbursements owed to the debtor against

credits owed to the United States by the debtor under the same contract.  The United States'

liability to the debtor arises under the Digital-to-Analog Converter Box Coupon Program (the

"Coupon Program") administered by NTIA pursuant to Digital Television Transition and Public

Robert P. McIntosh
Assistant United States Attorney
1800 Main Street Centre
600 East Main Street
Richmond, Virginia  23219
Tel. No. (804) 819-5400
Counsel for United States

Safety Act of 2005 (Pub. L. No. 109-171, Title III, 120 Stat. 4, 21 (Feb. 8, 2006)) (the "Act").

The debtor's liability to the United States arises under the same Coupon Program.  The liability

of both exists pursuant to the Retailer Agreement and Returns Addendum executed by Circuit

City in order to qualify as a participating retailer in the Coupon Program.

In support of its Motion, the United States submits the following Memorandum in

Support, and states as follows:

STATEMENT OF FACTS

1.      The Act requires television broadcasters to terminate transmission of analog

transmissions, and convert exclusively to digital broadcast transmission.  The Act, as amended,

established a deadline by which the conversion to digital transmission was to be completed.

Currently, that date is June 12, 2009.  Declaration of Anita L. Wallgren ("Wallgren Dec."), ¶ 2.

2.      In the Act, Congress provided for the Coupon Program to assist consumers in

purchasing converter boxes, which would operate to convert digital signals for use with the

consumers' current analog-capable television sets not hooked up to cable, satellite, or other pay

TV service.  The converter boxes would permit consumers who receive television programming

by means of the free, over-the-airwaves broadcasts to continue to receive usable television

broadcast signals after the conversion of full power television stations exclusively to digital

signals.  Id., ¶ 3.

3.      Specifically, Section 3005 of the Act directs NTIA to implement and administer

the Coupon Program through which eligible U.S. households may obtain a maximum of two

coupons of $40.00 each to be applied towards the purchase of Coupon-Eligible Converter Boxes

("CECB").  Coupons are used by consumers like gift cards.  The cards, however, are restricted to

a one-time use and may be used only to purchase CECBs.  With their coupons, consumers

–2–

receive a list of CECB brand and model numbers as well as a list of participating retailers.

Retailers set the CECB purchase price; consumers shop at their retailer of choice and pay any

amount over $40 by any means permitted by the retailer (e.g., cash, check, debit or credit card.)

Id., ¶ 4.

4.      Retailer participation in the Coupon Program–specifically the requirements with

which participating retailers are required to comply–are set forth in the implementing regulations

contained in Part 301 (47 C.F.R.) ("Final Rule"), together with the applicable Retailer

Agreement, and any addendums thereto. Id., ¶ 5.

5.      To help implement certain aspects of the Coupon Program, NTIA contracted with

IBM. IBM's subcontractor, Corporate Lodging Consultants, Inc. ("CLC"), is responsible for

administering retailer certification, management and redemptions. Under Section 1.3.3 of IBM's

Performance Work Statement incorporated into the NTIA/IBM contract, all retailers interested in

participating in the Coupon Program are required to execute a standard Retailer Agreement.

Every Retailer Agreement obtained by CLC from retailers participating in the Coupon Program

was obtained on behalf, and for the benefit of NTIA. Id., ¶ 6; Declaration of Kyle R. Rogg

("Rogg Dec."), ¶ 2.

6.      Based on information provided by IBM and CLC to NTIA, Circuit City became a

participating retailer in the Coupon Program under the terms of the Final Rule, together with its

Retailer Agreement dated December 10, 2007. Wallgren Dec., ¶ 8; Rogg Dec., ¶ 3.

7.      Under the terms of the Final Rule and the Retailer Agreement, Circuit City

acknowledged that: (1) NTIA administers the Coupon Program in accordance with the Final

Rule, and that the Final Rule sets forth the terms of retailer certification; (2) Circuit City desired

to participate as an approved retailer under the Coupon Program, and entered the Agreement

–3–

with NTIA's contractor team member, CLC, for that purpose; and (3) the Agreement described the obligations of Circuit City to participate in the Coupon Program.  Wallgren Dec., ¶ 9; Exhibit 3 attached to Rogg Dec.

8.       Under the Retailer Agreement, Circuit City agreed to present coupons for redemption using the "Sales Detail Reporting" redemption method (one of six redemption options offered to retailers) using the Visa Network through a "card swipe" that was supported by CLC as Service Provider.  The redemption information to be provided by Circuit City was to track each serialized coupon by number with a corresponding converter box purchase. Reimbursement for a redeemed coupon was made directly to Circuit City by the U.S. Treasury. Circuit City agreed that the Government could audit its converter box sales at any time during the term of the agreement, that it would perform its duties in accord with the NTIA Final Rule, and that Circuit City would indemnify and hold harmless the Government and its officers, agents, employees and contractors from any liability arising in connection with Circuit City's negligence, wrongful acts or omissions.  Wallgren Dec., ¶ 11; Exhibit 3.

9.       Subsequent to the execution of the Retailer Agreement, Circuit City electronically executed a "Returns Addendum to Retailer Agreement" on August 11, 2008.  Rogg Dec., ¶ 6; Exhibit 4 attached to Rogg Dec.  The Returns Addendum required Circuit City to:

(1)      *Report all Returned CECB Settlements[1] to the Coupon Program*;

(2)      *Have all Returned CECB Settlements credited against Coupon Program payments*;

(3)      Reimburse Service Provider for all Returned CECB Settlements *that have not been credited against Coupon Program Payments* at the conclusion of the Coupon Program;

---

[1]A "Returned CECB Settlement" is defined as "[t]he amount paid to the Retailer by the Coupon Program for a returned, but not exchanged, [coupon eligible converter box]."  Exhibit 4.

(4)     Report all Returned CECB Settlements at least monthly using one of the Coupon Program approved reporting methods.  Returned CECB Settlements can be reported using Retailer's Coupon Program web account or by using a batch file method;

(5)     Review the Returns Confirmation Page (Web reporting method) or Alert (Batch reporting method) and respond within one business day if any errors are observed.  After one business day, the Returned CECB Settlements reported by Retailer cannot be changed;

(6)     Report all Returned CECB Settlements by the Coupon Program deadline of Sept. 10, 2009.

Rogg Dec., ¶ 10; Exhibit 4 (emphasis added).  For its part, CLC agreed to "facilitate credit to the U.S. Treasury of any Returned CECB Settlement."  Exhibit 4, ¶ 3.(4).  See also Wallgren Dec., ¶ 12.

10.     Circuit City failed to report any Returned CECB Settlements to CLC as required by the Returns Addendum at any time prior to the date of its Chapter 11 bankruptcy petition in this case, which was filed on November 10, 2008.  Only after filing its petition did Circuit City provide any reporting of Returned CECB Settlements.  Rogg Dec., ¶ 11; See also Wallgren Dec., ¶ 13.

11.     From the start of Circuit City's participation in the Coupon Program and continuing through the present, Circuit City has reported receiving $347,879.80 in Returned CECB Settlements for which currently a credit is owed to the U.S. Treasury under the Retailer Agreement and Returns Addendum in the amount of $334,720.00.[2]  Wallgren Dec., ¶ 13; Rogg Dec., ¶¶ 12, 13.  Of this amount, $287,000.00 is the total amount reported by the debtor for pre-petition Returned CEBC Settlements.  Rogg Dec., ¶ 12.  The remaining $60,879.80 is the total

---

[2]The United States Treasury took a credit for the remaining $13,159.80 against coupon reimbursements owing to the debtor.  Wallgren Dec., ¶ 13.

post-petition Returned CEBC Settlements.  Rogg Dec., ¶ 14.  The post-petition total is broken

down as follows:  For December 2008, Circuit City reported Returned CEBC Settlements in the

amount of $23,800.00; For January 2009, Circuit City reported Returned CEBC Settlements in

the amount of $23,920.00.  Rogg Dec., ¶ 12.  Circuit City reported its post-petition November

2008 Returned CEBC Settlements in the amount of $13,159.80.  Rogg Dec., ¶ 13.

12.    On February 23, 2009, NTIA placed an administrative hold on coupon

reimbursements to the debtor, and from February 24 through March 4, 2009, it sequestered a

total of $334,720.00 in payments due to Circuit City in post-petition coupon reimbursement

claims in order to recoup the credit it is owed by Circuit City for the Returned CECB

Settlements.  Wallgren Dec., ¶ 13.  The United States requests that the court approve the United

States' recovery of $334,720.00, together with the $13,159.80, as a valid recoupment of the

amounts owed by the debtor under the Coupon Program and the agreements entered thereunder.

## ARGUMENT

I.    NTIA HAS THE RIGHT, UNAFFECTED BY THE AUTOMATIC STAY, TO
     RECOUP CREDITS FOR RETURNED CECB SETTLEMENTS AGAINST
     REIMBURSEMENT CLAIMS FOR REDEEMED COUPONS.

The United States seeks Court approval of its proposed recoupment of the full amount of

all Returned CECB Settlements against reimbursement claims by the debtor for redeemed CECB

coupons.  In this case, the government paid monies to the debtor pursuant to its claims for

reimbursement for redeemed coupons under the Coupon Program.  After claims for the

redeemed coupons were paid to the debtor, certain customers returned their converter boxes to

the debtor for a partial refund (less the $40 reimbursement from the Government coupon).

However, the government was not timely informed of these returns, and the debtor retained the

overpayments on the corresponding coupons that had been redeemed for the returned converter

boxes.  Under the terms of the Retailer Agreement and Returns Addendum, the government was

entitled to have all "Returned CECB Settlements *credited against Coupon Program payments*."

Statement of Fact ("SOF"), ¶9 (emphasis added).  Consequently, as of January 17, 2009, the

government overpaid the debtor under the Coupon Program in the amount of  $347,879.80.  In

response, the United States Treasury took a credit of $13,159.80, and NTIA seeks to recover the

balance owed by recoupment against the amount of $334,720.00, which has been sequestered

from post-petition CECB redemptions.

> A.    The Government has inherent authority, unaffected by bankruptcy, to recoup
> amounts paid by mistake.

As a preliminary matter, the United States notes that outside the bankruptcy context the

government can always recover overpayments mistakenly paid.  Wilson Clinic & Hospital, Inc.

v. Blue Cross of South Carolina, 494 F.2d 50, 52 (4th Cir. 1974).  It has "inherent authority" to

recover such sums and cannot be estopped from doing so by mistakes of its officers or agents.

E.g., Aetna Cas. & Sur. Co. v. United States, 526 F.2d 1127 (Ct. Cl. 1975).  Under the common-

law theory of recoupment of public funds paid by mistake, the government can recover funds

erroneously paid where the payments were made under an erroneous belief which was material

to the decision to pay.  Alsco-Harvard Fraud Litigation, 523 F. Supp. 790 (D. D.C. 1981) citing

United States v. Mead, 426 F.2d 118 (9th Cir. 1970).  The government's powers to collect such

overpayments are "broad."  Bechtel v. Pension Ben. Guar. Corp., 624 F. Supp. 590 (D. D.C.

1984).  It may file suit to collect erroneous payments, or collect the overpayments against current

or subsequent obligations owed to the payee by setoff or recoupment.  See, e.g., Wilson Clinic,

494 F.2d at 52; Maryland Small Business Development Financing Authority v. United States, 4

Cl. Ct. 76 (1983).  Based on the foregoing, the case for recoupment is even stronger where the

overpayment was induced by the debtor, Circuit City, by not providing credit information in a

timely manner, as required by the agreements.

   B.      Recoupment is permitted for debts that arise out of the same contract or
           transaction.

   The right of setoff (and, by extension, the related right of recoupment) "allow[ ] entities

that owe each other money to apply their mutual debts against each other, thereby avoiding 'the

absurdity of making A pay B when B owes A.'"  Citizens Bank of Maryland v. Strumpf, 516

U.S. 16, 18 (1995) (quoting Studley v. Boylston Nat. Bank, 229 U.S. 523, 528 (1913)).  The

fundamental distinction between the two rights is that in setoff, the mutual debts arise from

different transactions, while in recoupment the mutual claims must arise out of the same contract

or transaction.  See  First National Bank of Louisville v. Master Auto Service Corp., 693 F.2d

308, 310 fn. 1 (4th Cir. 1982) ("Recoupment is the right of the defendant to have the plaintiff's

monetary claim reduced by reason of some claim the defendant has against the plaintiff arising

out of the very contract giving rise to the plaintiff's claim");   Al-Abood v. El-Shamari, 217 F.3d

225, 234 fn. 5 (4th Cir. 2000) (affirming decision of the district court to strike defendant's

recoupment defense because it "[did] not arise out of any of the transactions or occurrences upon

which Al-Abood's complaint was based"); In re Tidewater Memorial Hospital, 106 B.R. 876,

882 (Bankr. E.D. Va. 1989) ("the doctrine of recoupment applies when the competing claims of

the debtor and creditor arise from the same contract or transaction").  As stated by this Court in

considering the Government's right of recoupment:

>          In order for the doctrine to apply, two threshold issues must be
>          satisfied.  First, the source of the defendant's claims must be a
>          contract, as opposed to a government entitlement program.
>          Second, the claims must arise out of the same contract.

In re Vance, 298 B.R. 262, 267 (Bankr. E.D. Va. 2003).

C.    <u>The Government's right of recoupment is unaffected by the debtor's bankruptcy</u>.

Furthermore, the right of recoupment is unaffected by bankruptcy. <u>E.g.</u>, <u>Westinghouse Electric Corp. v. Fidelity and Deposit Company of Maryland</u>, 63 B.R. 18, 20 (E.D. Pa. 1986); <u>In re Yonkers Hamilton Sanitarium Inc.</u>, 22 B.R. 427, 432 (Bankr. S.D.N.Y. 1982) (deductions in the nature of recoupments and are not governed by Code Section 553(b) governing right of setoff). Indeed, this Court has recognized the right of recoupment as a "non-statutory exception to the automatic stay." <u>Vance</u>, 298 B.R. at 267 (quoting <u>In re Thompson (Thompson v. Fairfax Cnty. Police Ofc. Retirement System)</u>, 182 B.R. 140, 147 (Bankr. E.D. Va. 1995)). Specifically, courts have recognized the government's right of recoupment in bankruptcy with respect to government overpayments. <u>E.g.</u>, <u>United States v. Consumer Health Services of America</u>, 108 F.3d 390 (D.C. Cir. 1997) (recoupment of Medicare overpayments allowed); <u>In re Ross</u>, 104 B.R. 171 (E.D. Mo. 1989) (allowing recoupment of unemployment compensation benefits); <u>In re Keisler</u>, 176 B.R. 605, 607 (Bankr. M.D. Fla. 1994) (Veterans Administration entitled to recoup prior overpayments from ongoing disability payments).

The distinction between recoupment and setoff is important in the bankruptcy context. "Unlike setoff, recoupment is not limited to pre-petition claims and thus may be employed to recover across the petition date." <u>In re TLC Hospitals, Inc.</u>, 224 F.3d 1008, 1011 (9th Cir. 2000) (citing 5 *Collier on Bankruptcy* ¶ 553.10 at 553-104); <u>In re Dist. Memorial Hosp. of Southwestern North Carolina, Inc.</u>, 297 B.R. 451, 454 (Bkrtcy W.D.N.C. 2002) (same). Consequently, the debtor's bankruptcy proceeding would not limit, or otherwise affect the government's "broad" powers of recoupment. Notwithstanding that the government's right of recoupment is unaffected by bankruptcy, and in an abundance of caution, the United States requests the Court to approve its proposed recoupment.

–9–

D.    <u>The requirments for recoupment by the Government are met in this case</u>.

In this case, the requirements for recoupment are met in that the claims of both the

Government and the debtor arise from the same contract.[3]  This Court has recognized two

prevailing standards for determining whether corresponding liabilities arise under the same

contract or transaction:  the "logical relationship test" and the "integrated transaction test."

<u>Vance</u>, 298 B.R. at 267-68.

The logical relationship test defines the transaction broadly and provides that the contract

or transaction "'may comprehend a series of many occurrences, depending not so much upon the

immediateness of their connection as upon their logical relationship.'" <u>Vance</u>, 298 B.R. at 268

(quoting <u>Newbery Corp. v. Fireman's Fund Ins. Co.</u>, 95 F.3d 1392, 1402 (9th Cir. 1996) (quoting

---

[3]Although CLC was the signatory to the Retailer Agreement with Circuit City, it was acting on
the Government's behalf.  <u>See</u> SOF ¶ 5.  While it is unusual that a contractor, or its
subcontractor, may enter into agreements on behalf of an agency of the United States and,
thereby, create privity of contract between the third-party and the agency, as the Federal Circuit
noted in <u>United States v. Johnson Controls, Inc.</u>, 713 F.2d 1541 (Fed.Cir. 1983), "although not
frequently encountered, [there] are situations in which privity results when prime contractors act
as Government agents."  <u>Id</u>. at 1551.  <u>Accord</u> <u>Flexfab v. United States</u>, 424 F.3d 1254, 1263
(Fed. Cir. 2005) ("for third-party beneficiary status to lie, the contracting officer must be put on
notice, by either the contract language or the attendant circumstances, of the relationship
between the prime contractor and the third-party subcontractor so that an intent to benefit the
third party is fairly attributable to the contracting officer.")

The Retailer Agreement along with the Returns addendum clearly creates privity between
the retailer (here Circuit City) and the Government both for purposes of redeeming the NTIA
coupons under the Coupon Program as well as crediting back to the Treasury amounts relating to
Returned CECB Settlements.  Indeed, the underlying contract with IBM (and, hence, through
CLC, as its subcontractor) clearly provides that they were entering into the various Retailer
Agreements as the agent for the Government, and that it was the Government (and neither CLC
nor IBM) which was responsible for transactions involving redemption of coupons under the
Coupon Program well as any subsequent returns of CECBs.  Walgren Decl. ¶¶ 6, 7 and 12.  <u>See
also</u> <u>Johnson Control</u>, <u>supra</u>, citing <u>Kern-Limerick, Inc. v. Scurlock</u>, 347 U.S. 110 (1954).  Thus,
the Government is the real party in interest under the Retailer Agreement, as amended.  <u>See also</u>
discussion at Part II.1 "There is a mutuality of obligations under the Retailer Agreement and
Returns Addendum as between NTIA and the debtor," *infra*, at pages 16-21.

Moore v. New York Cotton Exch., 270 U.S. 593, 610 (1926)).  Under this test, "'a debtor may

not assume the favorable aspects of a contract (post-petition payments) and reject the

unfavorable aspects of the same contract (the obligation to repay pre-petition overpayments by

means of recoupment).'" Id. (quoting Kosadnar v. Metropolitan Life Ins. Co. (In re Kosadnar),

157 F.3d 1011, 1016 (5th Cir. 1998) (quoting Aetna Life Ins. Co. v. Bram (In re Bram), 179 B.R.

824, 826 (Bankr. E.D. Tex. 1995)).

   The "integrated transaction test," on the other hand, requires that "both debts must arise

out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the

benefits of that transaction without also meeting its obligations." Id. (quoting University Med.

Ctr. v. Sullivan (In re University Med. Ctr.), 973 F.2d 1065, 1081 (3rd Cir. 1992).  The Third

Circuit stated further in explanation that a "non-statutory, equitable exception to the automatic

stay, should be narrowly construed." Id.  The "integrated transaction test" has been criticized as

being so restrictive that it "may be used to deny recoupment in virtually every case." Vance, 298

B.R. at 268 (quoting 5 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy, ¶ 553.10[1],

at 553-104 (15th ed. rev. 2002)).

   However, in this case, the Government satisfies the requirements for recoupment under

either test.  As in Vance, "[u]nder either the logical relationship or the integrated transaction

tests, the . . . overpayments to debtor and the [proposed] recovery of those overpayments . . .

occurred under the same transaction.  . . . Neither of these obligations would exist if the debtor

did not enter into [the Retailer Agreement and Returns Addendum] with [the Government]." See

Vance, 298 B.R. at 269.  The right to receive reimbursements for redeemed coupons and the

credits for Returned CECB Settlements arise from the same "contract" and "transaction."  The

–11–

Retailer Agreement, as amended by the Returns addendum, contemplated a series of many occurrences–the individual purchases of converter boxes.

The Returns Addendum was clear on the government's right to recover any overpayments as a "credit[ ] against Coupon Program payments." SOF, ¶ 9. It was a term the debtor explicitly agreed to. Id. Moreover, the Retailer Agreement specified that "the terms of retailer participation are set forth in § 301.6 of the Final Rule [47 CFR Part 301]." The regulation cited as the "Final Rule," wherein the terms of participation were set forth, specified that while participation by in the program by a retailer was voluntary, any retailer electing to participate is required to "cooperate with NTIA and its contractor in the administration of an effective and efficient program," 47 C.F.R. § 301.6, and that the retailer agrees, *inter alia*, that it will provide NTIA data on the redemption of coupons for CECB in a way that tracks each serialized coupon by number with a corresponding CECB purchase, 47 C.F.R. § 301.6 (b)(2)(E), that the government may audit its CECB at any time, 47 C.F.R. § 301.6 (b)(2)(D), and that NTIA may revoke its certification if it fails to comply with the regulations or its Retailer Agreement. 47 C.F.R. § 301.6 (b)(3).

The Agreement and Addendum were intended to, and established the relationship between Circuit City and the Government under the Coupon Program, and explicitly provided that Returned CECB Settlements were to be credited against future coupon payments by the Government. The credit for a Returned CECB Settlement was tied directly to the purchase of the CECB using the NTIA issued coupon under the Coupon Program. Thus, even though a credit for a Returned CECB Settlement might have arisen later time, each credit was directly tied to a specific reimbursement Circuit City had received from the Treasury under the same Retailer

Agreement for the subsequently returned CECB.[4]  Under the Coupon Program and Circuit City's

Agreement, final settlement of the Returned CECB Settlements and corresponding credits was

due September 10, 2009.  SOF, ¶ 9(6).

Thus, under either the logical relationship test or the integrated transaction test, NTIA is

entitled not only to recovery on post-petition credits, but also pre-petition credits for Returned

CECB Settlements through recoupment.  Based on the foregoing, the right of the debtor to

receive reimbursements for redeemed coupons and the right of the government to recover

overpayments for Returned CECB Settlements arise from the same contract or transaction.  The

Retailer Agreement and the Returns Addendum contemplated one agreement or "transaction"

between the debtor and the government under which all of the many individual purchases of

converter boxes under the Coupon Program were included.

In summary, the debtor by contractually entering the Retailer Agreement qualified as a

participating retailer under the Coupon Program.  Both as a matter of law, and as a contractual

obligation under the Retailer Agreement (which incorporated the Final Rule) and Returns

Addendum entered by the debtor, the United States has a right of recoupment to collect

overpayments it has made against the post-petition coupon redemption claims by the debtor.

---

[4]This distinguishes the current case from In re Thompson, 182 B.R. 140 and the cases cited
therein.  In Thompson, at issue was the right to recoup overpayments of disability benefits
(Thompson had failed to report excess income earned while on disability from illegally selling
drugs for which he later pled guilty) against future retirement benefits.  The Thompson court
found that recoupment was not available because they were separate transactions:  "Thompson's
right to disability benefits depended on his need at a given point in time," whereas his retirement
pay "does not hinge on medical examinations or the income statements submitted to the Board.
To qualify for retirement benefits, a police officer must only complete 25 years of creditable
service."  182 B.R. at 169.  Hence the court found that "his eligibility for retirement benefits
represents a transaction distinct from his eligibility for disability benefits."  Id.  Here a Returned
CECB Settlement ties directly to the use of a NTIA coupon and reimbursement received by
Circuit City in the first instance and are covered under the same integrated agreement.

Pursuant to the Retailer Agreement, the Final Rule, and the subsequent Returns Addendum, the

debtor became entitled to redeem coupons, and conversely was obligated to credit

reimbursements received under the program for returned converter boxes.

    E.    <u>Absent recoupment, the debtor and unsecured creditors would receive a
windfall–the classic case of unjust enrichment</u>.

Finally, "[w]hen applying the doctrine of recoupment, courts must be guided by basic

principles of equity." <u>In re Vance</u>, 298 B.R. at 269 (quoting <u>Tidewater Mem'l Hosp.</u>, 106 B.R.

at 882 (internal quotation marks omitted).  In cases such as the current case, "[t]he court must

consider whether any party would receive a windfall," and where (as here) the "[d]ebtor received

funds that did not belong to [it] through . . . lack of diligence by debtor."  Here, it was the

debtor's failure to timely notify the Government of the Returned CEBC Settlements, as required

by the terms of the Returns Addendum, which prevented the Government from seasonally

receiving credit for these returns.  <u>See</u> SOF, ¶ 10.  Thus, it would be "inequitable for the court to

require [the government] to disgorge the [sequestered amounts]." <u>Vance</u>, 298 B.R. at 269.  To

do so, "would be tantamount to forcing defendant to pay back its own money, which it

mistakenly paid to debtor, so that unsecured creditors may share in the distribution of an asset

that never belonged to debtor." <u>Id.</u>  To give the unsecured creditors such a windfall would be "a

classic case of unjust enrichment." <u>In re Peterson Distributing</u>, 82 F.3d 956, 960 (10th Cir. 1996)

(quoting <u>In re B&L Oil Co.</u>, 782 F.2d 155, 159 (10th Cir. 1986).

    II.    ADDITIONALLY, THE UNITED STATES SHOULD BE ALLOWED TO SET-
OFF̶ POST-PETITION RETURNED CECB SETTLEMENTS AGAINST
POST PETITION REIMBURSEMENTS.

Aside from its right to recoup pre-petition and post-petition overpayments, the United

States also is authorized to effect set-offs of post-petition Returned CECB Settlements against

post-petition reimbursements.  While the right of recoupment authorizes recovery of *all* pre-petition and post-petition overpayments by the government, the principle of set-off is an independent basis upon which the government can recover its post-petition overpayments.[5]

A valid claim for setoff exists where: (1) the creditor holds a prepetition claim against the debtor; (2) the creditor owes a prepetition debt to the debtor; (3) the claim and debt are mutual; and (4) the claim and debt are each valid and enforceable.  In re Koch, 224 B.R. 572, 576 (Bankr. E.D. Va. 1998) (citing 5 Collier on Bankruptcy ¶ 553.01[1], at 553-7 (Lawrence P. King, et al., eds., 15th ed. rev. 1997)).

The right of setoff also allows for the recovery post-petition claims as well as pre-petition claims.  In In re Ward, 210 B.R. 531 (Bankr. E.D. Va. 1997), a chapter 7 trustee sought to assert a right of setoff against an exemption claim of the debtors to proceeds from the sale of real property.  The chapter 7 trustee discovered that the debtors had hidden various assets.  One issue the Ward court addressed was whether, under bankruptcy, a creditor could assert a right of setoff as it related to mutual post-petition obligations.  The court said:

> While § 553 specifically addresses only setoff of pre-petition debts and is silent about post-petition debts, the general rule appears to be that so long as the requisite mutuality exists, post-petition debts may be set off against each other.  5 Collier on Bankruptcy § 553.03[6] at 553-56 to 57 (Lawrence P. King, Ed., 15th ed. Rev.1996) ("The position that mutual postpetition obligations may be offset one against the other is undoubtedly correct.  The fact that a debtor may be in bankruptcy does not, in and of itself, suspend the reasons for applying the doctrine, as section 553 well illustrates.")

210 B.R. at 536 (emphasis added).

---

[5]This argument presumes the possibility that at least some of the overpaid CECB settlements may have resulted from the sale of inventory that existed on the petition date, and that such amounts may be considered proceeds or profits from property of the estate under 11 U.S.C. § 541(a)(6).

That mutual post-petition debts may be setoff in bankruptcy was reasserted recently by the Bankruptcy Court in In re Price, 384 B.R. 407 (Bankr. E.D. Va. 2008) (Tice, C.J.)  Under facts very similar to those in Ward, Chief Judge Tice allowed the Chapter 7 trustee to setoff post petition claims against exemption claims of the debtor noting that the debtors were not being denied their exemption, but it was "'simply being applied by way of setoff to a mutual obligation arising post-petition.'"  384 B.R. at 410 quoting Ward, 210 B.R. at 538.

Of course, the United States is a unitary creditor, a status which allows mutuality to exist in a situation where different government agencies, departments or entities are involved and, hence, may set off its pre- or post-petition claim against the corresponding pre- or post-petition obligations owed by any other federal agency or instrumentality.  Lopes v. HUD, 211 B.R. 443, 445 (D. R.I. 1997) (citing Gratiot v. United States, 40 U.S. 336 (1841) and Cherry Cotton Mills, Inc. v. United States, 327 U.S. 536 (1946)).  See also  In re Britton, 83 B.R. 914, 919 (Bankr. E.D. N.C. 1988) ("The USA may act through a department, an agency within a department or a body corporate, or such other means as may be designated by the Congress and the necessary mutuality is present to permit set-off by the USA.")   Accord 31 U.S.C. § 3728.

1.    There is a mutuality of obligations under the Retailer Agreement and Returns Addendum as between NTIA and the debtor.

As a general rule, mutuality under section 553 requires that the debts be owed between the same parties acting in the same capacity.  In re Koch, 224 B.R. 572, 576 (Bankr. E.D. Va. 1998).  "This simply means that the creditor is indebted to the debtor who is similarly indebted to the creditor."  Id.  Mutuality does not mean that the debts necessarily be "of the same character."  Id. (citing Lubman v. Sovran Bank, N.A., 98 B.R. 243, 248 (Bankr. E.D. Va. 1989)).

–16–

That is, the debts "may arise from different transactions as long as there is a mutuality of obligations." In re Genuity, Inc., 323 B.R. 79, 83 (Bkrtcy. S.D.N.Y. 2005).

The "the concept of 'capacity' and the requirement that the obligations be owed between the 'same parties' is that the latter refers to the identity of the parties whereas the former refers to their relationship to each other." The concept of capacity "requires that the parties must each owe the other something in his or her own name, and not as a fiduciary." In other words, "if A in his individual capacity owes $100 to B, but B owes $50 to A in A's capacity as a trustee of a trust, or as a fiduciary or agent for some other party, the obligations are not mutual because they are not owed between the parties acting in the same 'capacity.'" In re New Haven Foundry, Inc., 285 B.R. 646, 648 (Bankr. E.D. Mich. 2002) (quoting In re Nuclear Imaging Sys., Inc., 260 B.R. 724, 734-35 (Bankr. E.D. Pa. 2000) (quoting 5 Collier on Bankruptcy, ¶ 553.03[3][c] at 553-32 (15th ed. 1999))).

In the instant matter, the mutual debts were between Circuit City and the government. The fact that CLC, as a subcontractor under NTIA's contracts under the Coupon Program signed the Retailer Agreement is immaterial where the mutual debts incurred were between the debtor and the government. Circuit City never *owed* CLC, and CLC never *owed* Circuit City. CLC merely acted in NTIA's behalf in establishing Circuit City's participation in the Coupon Program and as a facilitator of payments from the U.S. Treasury. See Wallgren Dec. ¶¶ 6, 11, 12; Rogg Dec., ¶ 10.

In Transit Casualty Co. v. Selective Insurance Co., 157 F.3d 540 (8th Cir. 1998), the Eighth Circuit considered whether setoff of debts with an insolvent insurer was allowable on a reinsurance claims. On the one hand Transit Casualty entered into retrocession contracts on reinsurance claims with Selective Insurance and, on the other, Transit acquired through a

–17–

broker/agent of Selective several reinsurance claims.  When Transit became insolvent, Selective

sought to setoff amounts it owed to Transit under the retrocession contracts as against the debt

owed it under the reinsurance contracts.  The district court disallowed the setoff as being against

Missouri insurance law.  On appeal the Eighth Circuit decided setoff was not contrary to

Missouri insurance law, but went on to consider whether these were "mutual debts" because

Selective was not a signatory to the reinsurance contracts – only its reinsurance underwriter,

Fortress Re, was.

The Eighth Circuit held that there was mutuality of debt as between Transit and Selective

because Fortress Re was acting as Selective's agent on the reinsurance contract:

> It is undisputed that Fortress acted as Selective's agent with
> respect to the reinsurance contracts.  More specifically, Selective
> was a partially disclosed principal with respect to the reinsurance
> contracts.  A "partially disclosed principal" is a party whose
> existence, but not identity, is disclosed to the other parties to the
> contract.  RESTATEMENT (SECOND) OF AGENCY § 42 (1958).  The
> Restatement (Second) of Agency provides that "[t]he other party to
> a contract made by an agent for a disclosed or partially disclosed
> principal . . . is liable to the principal as if he had contracted
> directly with the principal." RESTATEMENT (SECOND) OF AGENCY
> § 292 (1958).

Transit Casualty, 157 F.3d at 546.  The court thus concluded: "In short, Selective contracted both

as reinsurer and reinsured with Transit.  Accordingly, Transit and Selective are mutually

indebted, and Selective prevails on its affirmative defense of set-off."  Id.

Section 292 of the RESTATEMENT relied upon by the Transit Casualty court provides:

> The other party to a contract made by an agent for a disclosed or
> partially disclosed principal, acting within his authority, apparent
> authority or other agency power, is liable to the principal as if he
> had contracted directly with the principal, unless the principal is
> excluded as a party by the form or terms of the contract.

–18–

Id.  This principle – that a party to a contract made by an agent is liable to the agent's principal – has been accepted in Virginia.  In Equitable Variable Life Ins. Co. v. Wood, 234 Va. 535 (1987), a notice effecting cancellation of an insurance policy was deemed effective even though it was sent to an agent of the insurer, rather than, as directed, directly to the insurer.  The court found that the agent's apparent authority was sufficient to bind the parties to the cancelation:

> when an agent, acting within the scope of his apparent agency, enters into a contract with a third person "the principal becomes immediately a contracting party, with both rights and liabilities to the third person."

Id. at 539 quoting RESTATEMENT (SECOND) OF AGENCY § 8, comment d.  See also Acordia of Virginia Insurance Agency v. Genito Glenn LP, 263 Va. 377, 386 (2002).  Cf. Crawford v. Deutsche Bank, 244 F.Supp.2d 615 (E.D. Va. 2003) (where no allegation that Deutsche Bank had signed contract as agent for another, there was no contract with the third person and, hence, no privity of contract supporting a claim against third-party for economic loss.)  Thus, if an agent enters into an agreement consistent with its authority to the principal, the agreement may be treated as being with the principal.

        In the instant matter, the position of NTIA as the principal entity in connection with the Coupon Program was expressly made known to Circuit City and is manifest in the Retailer Agreement as well as the Returns Addendum.  The Retailer Agreement signed by Circuit City explains it is made in connection with the "[Digital–to–Analog] Converter Box Coupon Program" as prescribed in the Digital Television Transition and Public Safety Act of 2005, identified as the "Coupon Program" being administered by NTIA under its rules at 47 C.F.R. Part 301.  The role of CLC, otherwise known as "Service Provider," in connection with Coupon Program is likewise explained: "Service Provider is providing NTIA with certain service with

respect to the Coupon Program."  Exhibit 3, Recitals, p.1.  That among those services was to:

"Facilitate payment reimbursement for validly redeemed coupons from the U.S. Treasury within

five (5) business days of redemption transaction settlement."  Id. ¶ 3(4), p. 3 (emphasis added).

Indeed, the masthead of the Retailer Agreement form as signed by Circuit City, has NTIA's logo

and references the Digital Television Transition and Public Safety Act.  See Exhibit 3.

The Retailer Agreement also incorporated NTIA's "Final Rule," which were NTIA's

Coupon Program regulations codified at 47 C.F.R. Part 301.  Exhibit 3.  This Final Rule makes

clear that it is NTIA with whom the retailer is entering into a relationship.  Under Section 301.6

of those regulations, participation by a retailer is voluntary, but if a retailer elects to participate

the retailer is to "cooperate with NTIA and its contractor in the administration of an effective

and efficient program resulting in high customer satisfaction with a minimum of waste, fraud

and abuse."  Id.  The certification by the retailer that it is capable of participating in the Coupon

Program is made to NTIA.  Id. (b)(1) and (2).  Moreover, in the certification the retailer agrees,

*inter alia*, that it will provide NTIA data on the redemption of coupons for CECB in a way that

tracks each serialized coupon by number with a corresponding CECB purchase, id. (b)(2)(E),

agrees the Government may audit its CECB at any time, id. (b)(2)(D), that NTIA may revoke its

certification if it fails to comply with these regulations or its Retailer Agreement, see id. (b)(3),

and that the retailer is to contact NTIA to resolve any disputes it may have.  Id. (5).

Lastly, the Retailer Agreement, as amended by the Returns Addendum, expressly

provides that credits for Returned CECB Settlements may be charged against reimbursements

due Circuit City for redeemed coupons under the Coupon Program.  Exhibit 4, ¶ 2(2).

Consequently, there is mutuality of the obligations owing between Circuit City and NTIA under

the Coupon Program through the Retailer Agreement, as amended, based on the obligations existing between Circuit City and NTIA.

CONCLUSION

For the foregoing reasons, the Court should approve NTIA's exercising its right of recoupment.  In addition to the right of recoupment, NTIA has a right of set-off as among mutual post-petition debts between itself and the debtor.

DATED this   29   day of May, 2009.

Respectfully submitted,

DANA J. BOENTE
ACTING UNITED STATES ATTORNEY


By:   /s/Robert P. McIntosh
     Robert P. McIntosh
     Assistant United States Attorney

CERTIFICATE OF SERVICE

I hereby certify that on May 29, 2009, a true and correct copy of the foregoing UNITED

STATES' MOTION FOR COURT APPROVAL OF RECOUPMENT, AND MEMORANDUM

IN SUPPORT THEREOF was electronically filed with the Clerk of the Court using the CM/ECF

system, which will thereby cause the above to be electronically served on all registered users of

the ECF system that have filed notices of appearance in this matter, and mailed, by U.S. Mail,

first class, postage prepaid, to the foregoing Motion and Memorandum to the following:

> Daniel F. Blanks, Esq.
> Douglas M. Foley, Esq.
> McGuire Woods LLP
> 9000 World Trade Center
> 101 W. Main Street
> Norfolk, Virginia 23510
> *Counsel for Debtor*
>
> Dion W. Hayes, Esq.
> Joseph S. Sheerin, Esq.
> Sarah Becket Boehm, Esq.
> McGuire Woods LLP
> One James Center
> 901 East Cary Street
> Richmond, Virginia 23219
> *Counsel for Debtor*
>
> Greg M. Galardi, Esq.
> Ian S. Fredericks, Esq.
> Skadden, Arps, Slate, Meagher & Flom, LLP
> One Rodney Square
> P.O. Box 636 Wilmington, Delaware 19899-0636
> *Counsel for Debtor*
>
> Chris L. Dickerson, Esq.
> Skadden, Arps, Slate, Meagher & Flom, LLP
> 333 West Wacker Drive Chicago, Illinois 60606

Lynn L. Tavenner, Esq.
Paula S. Beran, Esq.
Tavenner & Beran, PLC
20 North Eighth Street, 2nd Floor
Richmond, Virginia 23219
*Co-counsel for Official Committee of Unsecured Creditors*

Jeffrey N. Pomerantz, Esq.
Brad R. Godshall, Esq.
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Boulevard, 11th Floor
Los Angeles, CA 90067-4100
*Counsel for Official Committee of Unsecured Creditors*

Robert J. Feinstein, Esq.
Pachulski Stang Ziehl & Jones LLP
780 Third Avenue, 36th Floor
New York, New York 10017-2024
*Counsel for Official Committee of Unsecured Creditors*

Robert B. Van Arsdale, Esq.
Office of the U. S. Trustee
701 E. Broad St., Suite 4304
Richmond, Virginia 23219
*Counsel for U.S. Trustee*

Bruce H. Besanko
9950 Mayland Drive
Richmond, VA 23233


    /s/Robert P. McIntosh
    Robert P. McIntosh
    Assistant U.S. Attorney

–23–