UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA


IN RE:                          . Case No. 08-35653(KRH)
                                .
 CIRCUIT CITY STORES, INC.,     .
                                .
                      Debtor.   . 701 East Broad Street
                                . Richmond, VA 23219
                                .
                                . May 13, 2009
. . . . . . . . . . . . . . . . . 2:35 p.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE KEVIN R. HUENNEKENS
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For Debtor:             McGuire Woods LLP
                        By:  DOUGLAS FOLEY, ESQ.
                             DANIEL BLANKS, ESQ.
                        9000 World Trade Center
                        101 W. Main Street
                        Norfolk, VA 23510

                        Skadden Arps Slate Meagher
                        & Flom LLP
                        By:  IAN FREDERICKS, ESQ.
                             GREGG M. GALARDI, ESQ.
                        One Rodney Square
                        Wilmington, DE 19899


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-Mail:  jjcourt@optonline.net**
**(609) 586-2311  Fax No.  (609) 587-3599**

2

APPEARANCES CON'T

For Creditors Committee:          Tavenner & Beran
                                  By:  LYNN TAVENNER, ESQ.
                                  20 North Eight St, 2nd Fl.
                                  Richmond, VA 23219

For National Association          National Association of
of Attorneys General:             Attorneys General
                                  By:  KAREN CORDRY, ESQ.
                                  2030 M Street NW, 8th Fl.
                                  Washington, DC 20036

For the U.S. Trustee:             Office of the U.S. Trustee
                                  By:  SHANNON PECORARO, ESQ.
                                  701 East Broad Street
                                  Suite 4304
                                  Richmond, VA 23219

For TJMaxx:                       Sands, Anderson, Marks
                                  & Miller
                                  By:  WILLIAM, GRAY, ESQ.
                                  801 E. Main Street
                                  Suite 1800
                                  Richmond, VA 23219

For Concor Enterprises:           Hunton & Williams
                                  By:  MICHAEL MUELLER, ESQ.
                                  1900 K Street NW
                                  Washington, DC 20006

## I N D E X

| **EXHIBIT** | | **ID** | **EVID** |
|---|---|---|---|
| D-1 | Auction Transcript | 5 | -- |
| D-2 | Auction Transcript | 35 | -- |
| D-3 | Landlord Auction Transcript | 38 | -- |

4

1            THE CLERK:  Court is now in session.  Please be

2    seated.   In the matter of Circuit City Stores Inc. hearing on

3    items one through 25 as set out on debtor's agenda.

4            MR. FOLEY:  Good afternoon, Your Honor.  Doug Foley

5    of McGuire Woods on behalf of the debtors.  With me at counsel

6    table is Greg Galardi from Skadden Arps and Ian Fredericks from

7    Skadden Arps.   Today in the courtroom as well from Circuit City

8    is Mr. Jim Markum, the CEO, and Michele Mozier who is CFO who

9    has been here in Court before.  Your Honor, we also have

10   various other professionals that have been working on

11   particular one transaction that is on the agenda today, which

12   is item number 24.  So if it pleases the Court, given the

13   collective cost to the estate of not taking that one first, we

14   would ask the Court if the Court would agree to hear matter 24

15   first so that we can proceed to clear out the courtroom for all

16   the professionals that don't need to stay for the rest of the

17   agenda.

18           THE COURT:  By all means that would be my preference.

19           MR. FOLEY:  Thank you, Your Honor.

20           MR. GALARDI:  In an effort to put us on travel time,

21   Your Honor, I think I will be rather brief.

22           Your Honor, number 24, Your Honor has approved a bid

23   procedures motion for the intellectual property.  The stalking

24   horse in that transaction was Sytemax.  I am pleased to say

25   that with respect to the transaction we received no objections.

5

1  That is not to mean that we haven't worked hard and Ms. Cordry

2  is in the courtroom today on behalf of the National Assocation

3  of Attorneys Generals that we have spent a lot of time with and

4  in particular Systemax has spent a lot time with.

5          Your Honor, just very briefly, I also have two other

6  gentlemen in the courtroom today in addition to Mr. Markum.  If

7  Your Honor had questions about the process that we went through

8  or the outcome of the auction, Mr. Nicholas Barnes of

9  Rothschild who has been involved as an investment banker is in

10 the courtroom today seated in the row right behind the counsel

11 table, as well as Mr. Gabe Fried of Stream Bank who is in the

12 last row.  Both gentlemen have worked in the IP realm and on

13 this particular sale throughout the process and just highlight

14 and probably contacted over 100 potential interested parties,

15 30 of whom sent confidentiality agreements and ultimately in

16 addition to Systemax there were three bidders at the auction,

17 two of whom we qualified, one of whom we did not qualify.

18         Your Honor, as a record of that auction, what I'd

19 like to do is have -- I've had marked, pre-marked, debtor's

20 exhibit 1 which is the transcript from that auction and hand it

21 up to Your Honor.

22         THE COURT:  You may.  Hand it to the court security

23 officer.

24         MR. GALARDI:  Your Honor, just very briefly since

25 there are no objections, what I've handed you up is a

6

1   transcript and two exhibits that recount the auction that we

2   conducted.   As I mentioned, pursuant to your bid procedures

3   order, we provided notice in accordance with the bid procedure

4   order and also engaged in a number of conversations with both

5   the U.S. Trustee's Office involved and a number of attorney

6   generals and the stalking horse at that time, Systemax, with

7   respect to the procedures.

8           In addition, as Your Honor knows, Ms. Lucy Thompson

9   served as the ombudsman, filed a report in this case and then

10  subsequently I understand has filed an amended report.   The two

11  exhibits to the transcript, to go through the process that we

12  went through, there are two exhibits to the transcript.   They

13  are the last -- well the last page is an addition to the sale

14  order which may have been modified and in addition Ms.

15  Thompson's interim report.

16          We went through the process of negotiating with the

17  potential bidders.   There were three bids submitted in addition

18  to the Systemax's bid.   One was from PC Connection, one was

19  from PC Mall and one was from Ultimate Electronics Acquisition

20  Company.   They were, for a combination of cash and/or an earn

21  out, very much like the structure of the Systemax deal except

22  with the exception of the Ultimate Electronics proposal which

23  really didn't contemplate an earn out structure.

24          The debtors and their professionals and the committee

25  and their professionals negotiated with the parties prior to

1   the auction to obtain what we call the highest and otherwise

2   best bid which was, again, a combination of cash and an earn

3   out.   But we looked at essentially four dimensions going into

4   the auction.   First was the cash component as you may recall.

5   Systemax started with a 6.5 cash bid and an earn out which the

6   debtors had a valuation on but we wanted to try to monetize

7   that.   So we asked for a guarantee.

8            We also asked for, and it was very important in this

9   whole process and you'll hear a little bit about this as other

10  counsel gets up, as Your Honor recalls we have done in the

11  Canadian transaction, the Canadian sale, and part of the IP

12  related to Canada which is the source by Circuit City and the

13  Canadian website.

14           In addition, Your Honor, we will soon be filing a

15  motion to approve a settlement with one of our warranty

16  providers that was concerned about IP and data information with

17  respect to that.   That is Assurant and there may be another

18  one, the Warranty Group.   So as we approach this auction we

19  wanted to make sure that we reserved our rights on those two

20  transactions which are very substantial transactions and

21  substantial benefit to the estate.   So we were concerned that

22  the bidder and including Sytemax who had already worked through

23  most of those issues would continue to be able to allow us to

24  consummate those transactions.

25           In addition, we wanted the minimum number of

8

1   objections and that was to be dealt with by way of one Ms.

2   Thompson's report on the interim and also to deal with the

3   attorney general so we spent a number of times on the phone

4   calls.

5        Prior to the beginning of the auction we received

6   cash bids from PC Mall and PC Connection in the $7 million

7   range and $6.9 million range.  And, in addition, they had

8   agreed to guarantee in cash their earn out.  As a result of

9   those two bids, we deemed that we had received a higher or

10  otherwise better bid from a competitive bidder which would

11  allow us to commence the auction.

12       Although Mr. Waddle's group, the Ultimate

13  Acquisition, also provided cash, we determined that that cash

14  bid was lower than or not a qualifying bid and advised Mr.

15  Waddles of that affect.  He left that bid on the table and said

16  if anybody wanted to team up, he would be available and left

17  the auction and so we proceeded with the auction with

18  essentially three bidders as the transcript would provide.

19       Commencing that auction critically all of the bidders

20  agree to the warranty language which is exhibit 2 to this

21  transcript, the very last page which is in the sale order which

22  essentially allows us to go forward with the Assurant and other

23  warranty deals.  It's a one page exhibit, the very last

24  language that we typed out.  All of the bidders agreed to that

25  language.  And, importantly, all of the bidders agreed with one

1  minor exception which I think now has been addressed to abide

2  by the recommendations of the ombudsman appointed in Ms.

3  Thompson's report.

4       So with those two agreements on the record we then

5  proceeded with cash bids, with cash and guarantee, there being

6  really very little economic difference or differences in the

7  contracts.  I mean everybody had their little tweak on an

8  agreement, but the material terms were really who was going to

9  bid the cash and whether they were going to backstop the earn

10  out with a guarantee.

11       We began, obviously, the first stalking horse bid was

12  6.5 from Sytemax and there was an earn out with no guarantee.

13  At the conclusion of the auction, Systemax was deemed to be the

14  highest and otherwise best bidder.  There was many rounds.  We

15  did in fact modify the procedures to go up in 100,000

16  increments with the right to go lower increments even though we

17  started with 25 in the sale procedures order.  All the parties

18  agreed that it was, given the lateness in time we started,

19  probably I think it was nine or ten o'clock at night and we

20  went through midnight, it was better to start with 100,000

21  increments until such time as we thought we could be back to go

22  down to the 25,000 or 50,000 increments.

23       We started with the bid at 6.5 and no guarantee on

24  the earn out.  I'm pleased to say at the end of the auction we

25  were at $14 million cash, a $3 million earn out, which earn out

1  is guaranteed by an LC, it's backstopped by an LC.  And the way

2  that the earn out works, Your Honor, is that it is a three

3  million earn out that is payable in 30 months.  So if the

4  company does better than the earn out, it really is what I will

5  call a top up provision.  If we earn out and make five million,

6  six million dollars, that's to the benefit of the estate.  But

7  in no event within 30 months will the estate make less than the

8  earn out of $3 million.  So that there is no collection risks,

9  Sytemax has agreed to backstop that with an LC for $3 million.

10        Your Honor, so the auction was very successful.

11 Again with respect to findings in the order as to good faith,

12 no collusive bidding and those sorts of things I think were two

13 things.  One, Your Honor has heard and approved in the stalking

14 horse bid that that was the result of arms length negotiations.

15 Two, Your Honor, we went and had a very successful auction back

16 and forth. With respect to the parties there was negotiations

17 over the contract.  There was one contract provision which we

18 had negotiations with.

19        In addition, Systemax, in particular, because they

20 are the successful bidder, has worked very lengthy hours to

21 accommodate both the state attorney generals as well as Ms.

22 Thompson and the ombudsman, of course, such that I'm pleased to

23 say we have no objections today.  So with respect to the

24 findings of good faith fair value, we think both the auction as

25 well as the negotiations, as well as the negotiations that took

1 place both with U.S. Trustee on the line and outside of the

2 U.S. Trustee with the state's attorney generals on privacy

3 policies and the recommendations, I think they are entitled and

4 Mr. Markum, Mr. Fried or Mr. Barnes could all testify that this

5 is the result of arms length negotiations that we believe the

6 market has, in fact, given us the highest or otherwise best

7 price.

8          And we would request Your Honor to approve the sale

9 and the sale order.  Your Honor, what I think we would propose

10 to do if Your Honor is so inclined to approve the sale, and

11 other people may want to speak on this matter, if Your Honor is

12 inclined to approve this sale there is a detail with respect to

13 the Canadian, interaction between the Canadian transaction and

14 this transaction.  There is a reference to the sale order with

15 respect to a side agreement between those parties to work out

16 the source by Circuit City.

17          I think there was a detail that is still being worked

18 out between the two parties based on Canadian common law as I

19 understand the issue.  So, I don't think we will submit the

20 order today for Your Honor's signature but that we will be

21 submitting it once those issues are in fact resolved along with

22 the two attached side letters so that everyone can have the

23 information.  We thought that that would be appropriate and the

24 two buyers are -- the Canadian buyer accepts that and the

25 buyer, Systemax, accepts that.

1      Your Honor, again, also just so the record is clear,

2 throughout the process the committee has been involved in this

3 process.  In fact, committee counsel -- I don't know if Mr.

4 Feinstein is on the phone, as well as their financial advisor,

5 Protivity, was at the auction.  They did participate in the

6 discussion strategies and working on all of these issues.  We

7 did, in fact, have their support for this transaction.

8      So I'd like to say it went seamlessly and there are

9 no objections and ask Your Honor to approve it subject to

10 comments from other people or questions that Your Honor may

11 have.  Mr. Barnes, Mr. Markum and Mr. Fried are here if you

12 wanted to have a record with respect to the findings, but each

13 would verify to the extent of their knowledge the findings and

14 everyone -- all of those findings, would be covered by one of

15 those witnesses.

16      THE COURT:  All right.  Very good.  Thank you, Mr.

17 Galardi.  Does any party wish to be heard in connection with

18 the debtor's motion?

19      MR. LESHAW:  Good afternoon, Your Honor.  Jim Leshaw

20 from Greenberg Traurig's Miami office.  I represent 445 --

21 sorry, 4458729 Canada Inc. and Bell Canada, the purchaser of

22 the Canadian assets.  I am joined by Virginia Robinson who is

23 admitted to practice before this Court.

24      I just want to expand a bit on what Mr. Galardi said

25 because there is one thing that Your Honor is going to be asked

13

1    to approve in connection with the Sytemax sale order that is

2    important to Bell Canada, and that is I believe Your Honor was

3    sent a copy of a Bell Canada Circuit City side letter earlier

4    today.  There is -- it's possible that there is going to be an

5    amendment to that order, but the --sorry, to that side letter,

6    but the gist of it is, is that the side letter will provide

7    either that common law rights, Canadian common law rights to

8    the name, the source by Circuit City, will either be conveyed

9    to the Canadian purchaser or will be conveyed to Systemax and

10   then licensed back to the Canadian purchaser.

11          And if the common law rights are conveyed to

12   Systemax, in addition to that Systemax will have to agree that

13   they won't use the common law rights after the Bell license

14   terminates and some other related matters.  We just wanted to

15   make that clear to Your Honor.

16          THE COURT:  All right.  Thank you.

17          MR. LESHAW:  Thank you.

18          THE COURT:  Does any other party wish to be heard?

19          MS. FREJKA:  Good afternoon, Your Honor.  My name is

20   Elise Frejka from Kramer, Levin, Neptiles and Franco.  I

21   represent Systemax.  You signed an order allowing me pro hac

22   vice yesterday.

23          I just wanted to make a statement on the record that

24   Systemax is the highest and best bidder and we have entered

25   into very extensive negotiations with the attorneys general as

14

1   well as the ombudsman regarding the procedures that we're going

2   to follow in connection with notifying consumers in this

3   proceeding.

4        Systemax has voluntarily entered into these.  We do

5   not feel that there is a precedent necessarily requiring us to

6   do this.  But we felt that to complete this sale it was in the

7   best interest of all parties to provide notice to consumers and

8   there is an extensive opt out process that will be in the order

9   that you receive.

10       I do have Richard Wallach from Systemax here today

11  who could testify to the purchaser's ability to comply with

12  these opt out provisions if there is any question by any of the

13  parties that are here.

14       THE COURT:  All right.  Thank you very much.

15       MS. FREJKA:  Thank you.

16       THE COURT:  Does any other party wish to be heard?

17       MS. TAVENNER:  Good afternoon, Your Honor.  Lynn

18  Tavenner from the law firm of Tavenner & Beran appearing on

19  behalf of the official committee of unsecured creditors.  I do

20  believe Mr. Feinstein is also appearing by telephone as well,

21  Your Honor.  He was on standby.

22       MR. FEINSTEIN;  Yes, I'm on.

23       MS. TAVENNER:  I did want to confirm that what Mr.

24  Galardi said is indeed correct.  The committee has been

25  participating and actively involved throughout this process and

1  does stand before Your Honor today supporting the sale.

2       THE COURT:  All right.  Thank you, Ms. Tavenner.

3  Does any other party wish to be heard?

4       MS. CORDRY:  Hi, my name is Karen Cordry.  I'm the

5  bankruptcy counsel at the National Association of Attorneys

6  General.  And I am here to speak to you just about the position

7  that the state attorney general did take in this matter.

8       It was a matter of great interest to them.  We've had

9  as many as 35 or 40 states on some of the calls and we've had

10 quite a number of calls with the debtor, the buyer, the

11 consumer privacy ombudsman, U.S. Trustee and the creditor's

12 committee at different times, and we would like to first say we

13 appreciate all that hard work, everyone's attention to the

14 concerns we raised.  We wanted to thank the debtor for serving

15 this motion and proposed order on the states in a timely

16 fashion.  That is something that I am coming to find out does

17 not always happen in some of these kinds of cases.  So we feel

18 like maybe we're coming a little late to this party, but it's

19 one we've been involved in since 2000 with the Toy Smart case

20 which I think you've seen reference to in the consumer privacy

21 ombudsman's report.

22      That one was a matter, of course, of great concern.

23 It's probably the real poster child for the problems in this

24 area where you had children's data and credit card data and

25 everything being sold.  The states took the position in that

16

1 case that selling that sort of data in violation of a privacy

2 policy would violate their state Unfair and Deceptive Acts and

3 Practices laws and that it couldn't be resolved simply by

4 having the notion of a qualified buyer.  It was a matter for

5 the consumers to choose.

6        And that's the position the states have continued to

7 take.  We worked with Senator Leahey and had the language put

8 into the bankruptcy act to make sure that it explicitly did not

9 preempt state law in those regards.  So when this case came up,

10 we again were somewhat concerned that the original proposal did

11 seem to go back to this notion of, well, if we just have a

12 qualified buyer we don't need to go back to the consumers and

13 there was no direct notice to consumers.  I mean there was

14 publication notice, but nothing was sent directly to consumers

15 about this.

16        So that was when we made contact with both the debtor

17 and then we eventually talked to the consumer privacy ombudsman

18 and we did work through these things and I think the order that

19 now is in place does have, as parties have said, extensive opt

20 out provisions.  All of the consumers that are subject to the

21 specific privacy policy will get notice and a chance to opt

22 out.  There was also added persons who did not come in through

23 the website and who may or may not have any sort of legal

24 privacy obligations there.  But to the extent that there are

25 email addresses, the buyer has again agreed to do that and,

1  again, we deeply appreciate those kind of rights also being

2  given to consumers.

3         And, again, because the debtor has had issues with,

4  at this point, really having the capacity to do the opt out

5  itself, we raised the view that we thought it should go through

6  a third party so that the information didn't actually transfer

7  to the buyer til the opt out process had been done.  And,

8  again, the buyer agreed to do that.  And, again, the states

9  talked about that and said that appeared to us to meet the

10  bases of the privacy policy that didn't have the transfer to an

11  entity for marketing purposes until the opt out had taken

12  place.

13         So, the net result of all of that is after a great

14  many conversations and a lot of late night work by a number of

15  people.  I think the order that is there is something that the

16  states have agreed is acceptable to them.  There were informal

17  objections in the sense of, you know, verbal discussions and

18  everything.  We never filed formal objections because as of

19  yesterday when the deadline came we did have these provisions

20  in place and they were acceptable to the states.  So they did

21  not feel a need to file objections and I think they do believe

22  that what is there does not violate their laws and that is one

23  of the criteria that you need to find in your order and the

24  order now so states that.

25         So, we appreciate the result of this.  We do think

1 that one of the reasons why this was -- that these sets of

2 provisions are appropriate is because this did not have the

3 most sensitive kinds of financial data being transferred.

4 Things like credit card numbers, social security numbers,

5 drivers licenses, those are subject in many states to a

6 different set of law, they're data breach laws.  But because

7 that kind of information is not being transferred, again, we

8 were able to verify that through these discussions, there is no

9 need for the states then to object to the transfer here.

10        So, other sales may raise other issues but for this

11 sale, this process, we are happy with the outcome and we

12 congratulate the parties on a successful transaction and a bid

13 process that seemed to have worked very well for them.  Thank

14 you, Your Honor.

15        THE COURT:  Thank you very much.  Any other party

16 wish to be heard?  Yes, ma'am.

17        MS. THOMSON:  Good afternoon, Your Honor.  My name is

18 Lucy Thomson.  I was appointed consumer privacy ombudsman by

19 the U.S. Trustee upon your order and I just wanted to highlight

20 a few things in the two reports that I filed.

21        I've been working steadily with the debtors, the

22 buyers, Systemax, and we've involved the state attorneys

23 general and Ms. Cordry.  And the U.S. Trustee has been involved

24 as you have heard.  For the last two weeks, I filed an interim

25 report on Monday which reflected the fact that the auction was

1  about to take place and four bidders were going to be

2  considered.  Then the report that I signed -- I submitted today

3  focused on the final agreement that we have all reached for

4  Your Honor's consideration with Systemax as the buyer.

5         As you can see from the report the bankruptcy code

6  lays out the analytical framework that Your Honor considers in

7  these kinds of cases and that is set out on page 13.  There is

8  several different steps to the process in the bankruptcy code.

9  The first being a consideration of the privacy policy and

10  whether it's been violated.  Then even if the privacy policy

11  has been violated, Your Honor can find that the sale can be

12  approved if the sale is consistent with the policy or a

13  consumer privacy ombudsman is appointed and after a hearing and

14  notice Your Honor finds that the facts and circumstances of the

15  sale would protect the privacy of the consumers, and there was

16  no showing that there was any violation of non-bankruptcy law.

17         With respect -- there is two categories of data.

18  The first one is the Alpine data.  The Alpine is referred to as

19  -- it's a server that Circuit City has.  There are 33 million

20  individuals involved in that group of data.  Those people

21  bought products from the Circuit City stores and did not have

22  any transactions on line.  So the privacy policy doesn't apply

23  to those people.  So there is no violation of the privacy

24  policy obviously because it doesn't apply.

25         So with respect to those 33 million, I think Your

1  Honor could find that there is no problem with them.  But I was

2  able to negotiate with the parties and reach agreement that

3  Systemax has agreed to apply the privacy policy to those 33

4  million individuals.  And in my opinion that is a huge step

5  that this buyer is willing to do because that gives people who

6  had no privacy protections before, the full privacy protections

7  of the Circuit City privacy policy.

8          I also went through the specific data items in the

9  data bases and worked very hard to make sure that the data to

10  be sold was limited so that the kinds of records that subject

11  people to identity theft or fraud are not included in this

12  sale.  So some of the information is actually found in public

13  phone books and there is email addresses there, but it's not

14  the most sensitive data that you could possibly have.

15          So with respect to those 33 million consumers in the

16  Alpine data we've had a huge step forward in terms of privacy

17  protection for those people.  Then the second group of

18  consumers are in the Circuit City data.  There is 14 million

19  individuals in that group.  The privacy policy does apply to

20  those people.

21          I analyzed in my report the privacy policy and I set

22  forth all of the aspects of it that are important for Your

23  Honor to consider.  There is one operative sentence there about

24  how information will not not be transferred to a third party

25  for marketing purposes and there is differences of opinion

1  about what that particular phrase means.

2        But Your Honor could find that the privacy policy is

3  violated or you could find that it's not violated.  In my

4  opinion, a reasonable interpretation of that particular phrase

5  would be that you wouldn't have concurrent sales of the data,

6  you wouldn't have Circuit City using the data to market and

7  then sell it to Macy's or a telemarketing firm for "marketing"

8  purposes.

9        But on the other hand you could also take a more

10 strict view.  But regardless of what Your Honor finds with

11 respect to the privacy policy, it's my recommendation that the

12 sale can still go through because we've -- I proposed a very

13 strict and supervised opt out process which provides notice for

14 the consumers and after much consideration and discussion, it

15 was agreed that the opt out process would be conducted before

16 the data is transferred to Systemax which means that the

17 consumers are protected 100 percent because their data is not

18 transferred until they are given an opportunity to opt out and

19 therefore they can decide and give consent to whether they want

20 their data to be used for -- in the E-commerce business that

21 Systemax is going to be pursuing under the "new" Circuit City.

22        As far as whether any non-bankruptcy laws have been

23 violated, I went through in quite a bit of detail each one of

24 the laws that would apply including the Federal Trade

25 Commission Act and there's analogous state laws there and there

1  is quite a bit of law in the area of what's an unfair or

2  deceptive business practice, and there's fairly strict

3  standards and you have to show harm and you have to show that

4  the consumers could have actually taken steps to avoid the

5  harm.  And in this agreement, Systemax has agreed to post a

6  clear and conspicuous notice on the website telling everybody

7  that this sale is taking place.  So there is notice that will

8  be given right after the sale is finished.

9         There's five ways that consumers can opt out of the

10  use of their data.  So in my opinion the consumers are

11  protected and there is no violations of the non-bankruptcy

12  laws.  So, in summary, the data to be transferred is very

13  limited.  The opt out process we all believe for Your Honor's

14  consideration is transparent and effective and will be very

15  robust.  It will be supervised for the next two or three weeks

16  and no non-bankruptcy law has been violated.

17         So those are my recommendations and I appreciate

18  having served in this position and I am happy to answer any

19  questions.

20         THE COURT:  Thank you very much, Ms. Thomson.  The

21  Court very much appreciates your report and the hard work that

22  you've done in making the sale happen.

23         MS. THOMSON:  Thank you.

24         THE COURT:  Does any other party wish to be heard?

25         MS. PECORARO:  Good afternoon, Your Honor.  Shannon

23

1   Pecoraro for the U.S. Trustee's Office.  I just wanted to state

2   for the record that we have reviewed the report of the

3   ombudsman.  We are also very aware of the extra measures that

4   have been taken by Systemax and we do not have any objection to

5   the sale.

6           THE COURT:  Thank you very much.  Does any other

7   party wish to be heard?

8           All right, Mr. Galardi, I -- the Court commends you

9   on conducting a very successful sale.  The Court will approve

10  the sale and grant the motion.  I am pleased that you've gotten

11  such a diverse interest all aligned in this process.  That

12  obviously demonstrates a very good working arrangement on your

13  part with all of the interested parties.  And the Court will

14  grant the motion.

15          MR. GALARDI:  Thank you, Your Honor.  We'll ask the

16  matter be excused, Your Honor, but I'd also -- it was Mr.

17  Fredericks who did most of the work.  Thank you.

18          THE COURT:  Well, of course, that went without

19  saying.

20          MR. GALARDI:  Thought I would at least say it on the

21  record.

22          THE COURT:  Very good.

23          MR. GALARDI:  Since I've given him a lot of abuse

24  this morning.  Thank you, Your Honor.

25          THE COURT:  All right.  And everybody that needs to

24

1  catch a flight, you may be excused.

2          MR. FOLEY:  Good afternoon, Your Honor.  Doug Foley

3  on behalf of the debtors.  With respect to the balance of the

4  agenda, Your Honor, just to go through the items, item number

5  one is the motion by Google for payment of administrative

6  claim.  We were able to resolve and reconcile the amounts with

7  them and they've advised us to report to the Court that they

8  are withdrawing that motion.

9          THE COURT:  All right.  Very good.

10         MR. FOLEY:  Your Honor, item number two is the matter

11 that was leftover to be resolved with respect to TomTom.  But

12 as Your Honor is aware from our last hearing we were able to

13 completely resolve things with them so we did not have to tee

14 up the issue with respect to 502(d).  That motion has been

15 filed recently and it is set for a hearing on the May 28th

16 omnibus hearing date.  So although this motion of theirs is

17 resolved by that when that resolution gets approved, if -- I

18 know the agenda says that we wanted to take it off -- if we

19 could actually carry item number two over to the May 28th

20 docket as well so it can be heard the same time as the global

21 approval that makes more sense.

22         THE COURT:  You may.

23         MR. FOLEY:  Thank you, Your Honor.

24         THE COURT:  So that will be continued to May 28th.

25         MR. FOLEY:  Your Honor, item number three again is

25

1  our motion with respect to setting sell down procedures and

2  trading equity and claims.  Again, we are still evaluating

3  whether or not the NOL has value here and with the committee,

4  and so we'd ask the Court to again adjourn that one til the May

5  28th hearing date.

6          THE COURT:  It will be adjourned to May 28.

7          MR. FOLEY:  Your Honor, similarly item number four,

8  this is our 9019 motion with respect to resolving all of our

9  issues with IBM.  As a result of some of the transactions --

10 the transaction that Your Honor just approved today and some

11 other issues that are still pending with them, we need a little

12 bit more time before we actually ask the Court to bless that

13 settlement.  Sure, go ahead.

14         MR. FREDERICKS:  Good morning, Your Honor.  Ian

15 Fredericks.  It's probably just easier if I give you a little

16 bit more of an update on that.  Given that the sale has been

17 approved to Systemax, once that one closes there will be no

18 need to go forward with this settlement with IBM.  And, in

19 fact, I believe we filed a stipulation with the Court last week

20 resolving some other issues with IBM.  One of them was that if

21 we don't go forward with this settlement at the May 28th

22 hearing, the motion will be automatically be deemed withdrawn

23 and the settlement will be off the table.

24         Given where we are with Systemax, that will occur by

25 the May 28th hearing.  So I just wanted to -- this should come

1  off the agenda next time.

2          THE COURT:  All right.  Very good.

3          MR. FREDERICKS:  Thank you, Your Honor.

4          THE COURT:  Thank you.

5          MR. FOLEY:  Your Honor, item number five, this is the

6  motion by Federal Warranty and Assurant.  There was some

7  reference -- there is a reference in the order that Your Honor

8  is going to approve with respect to the Systemax sale that

9  deals with some of the issues with Federal Warranty and

10 Assurant.  But we are working on documenting a global

11 transaction with them that will result in substantial sums

12 coming to the estate.  We hope to have that teed up in time to

13 be approved on the May 28th hearing date but in the meantime

14 they've consented to adjourn their matter until the May 28th

15 hearing date.

16         THE COURT:  All right.  So that will be adjourned to

17 May 28.

18         MR. FOLEY:  Your Honor, item number six, this is the

19 DirectTV motion for relief from stay that set off and recoup.

20 Again, we are evaluating a proposal we recently received from

21 them so they have agreed to continue their hearing on this

22 motion until May 28th.

23         THE COURT:  That will be continued to May 28.

24         MR. FOLEY:  Your Honor, similarly, the motion by Sony

25 on number seven, we are also evaluating a proposal we recently

27

1  received from them as well, and they've asked that their motion

2  be adjourned til the June 9th hearing date.

3          THE COURT:  All right.  So that will be adjourned to

4  June 9.

5          MR. FOLEY:  Your Honor, the Shannon Heiser (phonetic)

6  Electric Corporation motion for filing a late proof of claim

7  under 503b(9), they have agreed again based upon our

8  presentation to the Court at the last hearing about not having

9  to incur costs relating to these types of motions until we have

10 to, they have agreed to adjourn their motion until the May 28th

11 hearing day.

12         THE COURT:  All right.  That will be adjourned to May

13 28.

14         MR. FOLEY:  Your Honor, items number nine which is

15 South Peak Interactive LLC, motion for administrative claim, as

16 well as items number ten CC Kingsport 98 LLC, item number 11

17 which is Cardinal Capital Partners, item number 12 which is

18 Circuit Investors Number Two LTD, number 13 which is Bradywine

19 Grand C LP have all either 365(d)(3) motions or motions for

20 administrative claims under 503(b) and we're in the process of

21 reconciling various invoices with all of these parties, most of

22 which are landlords.  And they have all agreed to adjourn their

23 motions til the May 28 hearing date to give us more time to

24 complete those reconciliations.

25         THE COURT:  All right.  So items nine, ten, 11, 12,

1  13 will be adjourned to May 28.

2         MR. FOLEY:  Thank you, Your Honor.  Item number 14,

3  similar to number eight, this is the Veridus (phonetic) motion

4  for filing a late proof of claim.  They also have agreed not to

5  incur costs associated with this motion for the time being

6  until we know we have to do it.  They ask that their matter be

7  adjourned until the May 28 hearing date.

8         THE COURT:  That will be adjourned to May 28.

9         MR. FOLEY:  Similarly, Your Honor, Oceala County

10  Taxing Authority, a similar motion for administrative claim.

11  We are in the process of reconciling issues with them and

12  they've agreed to adjourn their motion til the May 28th hearing

13  date.

14         THE COURT:  All right.  Item number 15 will be

15  adjourned to May 28.

16         MR. FOLEY:  Your Honor, items number 16, 17 and 18

17  Polaris Advance Real Estate Management LLC, St. Cloud

18  Associates, these are all landlords that have some claims that

19  are leftover relating to attorneys' fees and some other issues

20  of the reconciliation.  They've all agreed and requested that

21  their motions be adjourned until the June 23rd hearing date.

22         THE COURT:  All right.  So those matters will be

23  adjourned to June 23.

24         MR. FOLEY:  Your Honor, the matter number 19 is a

25  procedural motion seeking approval to shorten the time period

29

1  for notice with respect to an auction sale of real estate.  The

2  distribution center in Ardmore, Oklahoma which we also

3  conducted on Monday with the other auctions.  Mr. Fredericks

4  will be addressing the actual motion itself which is item

5  number 20.  But unless -- we have not received any objections

6  to the motion to shorten notice period, we would ask the Court

7  to approve that.

8            THE COURT:  That will be approved.

9            MR. FOLEY:  Your Honor, I'll skip over number 20 for

10  a minute.  Mr. Fredericks will be addressing the Court on

11  number 20 as well as item matter number 25 which is the Sam

12  Atail (phonetic) lease.

13            Your Honor, item number 21 is our request for the

14  Court to enter an order to approve a bar date procedure for

15  filing administrative claims in the case.  As Your Honor is

16  aware, you already approved a 503b(9) bar date, December 19th.

17  We are not seeking to extend or revise or open that up again.

18  This is really just to set an administrative claim bar date for

19  the case, the collar around which we are asking the Court to

20  set is the petition date through April 30th.  So any claims

21  that would have arisen that people think they have

22  administrative expense for, they would be required to file

23  their administrative expense request with the claims noticing

24  agent.  And we're asking the Court to set that deadline to be

25  June 30th.

30

1          And the order also approves procedures, Your Honor,

2  to govern how we would object and resolve those types of

3  claims.  But as Your Honor is aware, this will allow us to get

4  a handle on sort of the complete picture of what the potential

5  administrative claim exposure is in the case.  There are some

6  exclusions from, obviously, exclusions from the requirement

7  here to file administrative expense claims by that date and

8  those would be parties who have obviously already filed one in

9  any format, parties who have already had administrative claims

10  allowed, intercompany administrative claims and professionals

11  which were governed by their own compensation monthly

12  procedures.  So we sort of got a handle on -- we know what

13  those are.

14          So other than that, Your Honor, we have not received

15  any objections.  The motion was broadly served on all parties

16  in interest and we would ask the Court to approve the

17  procedure.

18          THE COURT:  And what kind of notice will the

19  administrative claims be receiving of the bar date?

20          MR. FOLEY:  Your Honor, we will -- although the form

21  of the order when we filed it, we were expecting to file this

22  motion sooner, says that we will send out the notice to all

23  known and reasonably ascertainable creditors, holders of

24  administrative expenses by May 15th.  What we believe we can do

25  in talking with the claims agent is have, if Your Honor enters

1  an order today for example on this particular motion, we could

2  have the notices sent out within five business days of when

3  Your Honor enters the order so they would have 45 days notice

4  of the bar date.  Again, to cover the period from -- that ends

5  on April 30th.  So any claims that arose during that window,

6  petition date to April 30th, they would get notice by next

7  Wednesday that the form of which is attached to the order and

8  they would have until the end of June to file their

9  administrative expense requests.

10       THE COURT:  All right.  Very good.

11       MR. FOLEY:  And we would also obviously publish it by

12  the same date, Your Honor, in the <u>Richmond Times Dispatch</u> and

13  the <u>Wall Street Journal</u> and the <u>Financial Times</u>, as well.

14       THE COURT:  Does any party wish to be heard with the

15  debtor's motion to establish a bar date?  All right.  That

16  motion will be granted.

17       MR. FOLEY:  Thank you, Your Honor.  Mr. Blanks will

18  address the Court on items number 22 and 23 which are initial

19  omnibus claim objections to the 503b(9) claims.

20       MR. BLANKS:  Good morning, Your Honor.  Daniel Blanks

21  on behalf of the debtors.  The next two items on the agenda are

22  the debtor's second and third omnibus objections to the late

23  503(b)(9) claims.  As Your Honor is aware on November 12, 2008

24  Your Honor entered an order that established December 19th,

25  2008 as the deadline and bar date for all parties in interest

32

1  to file any and all 503(b)(9) claims.

2          In the debtor's second and third omnibus objection

3  all of those claims that are listed in there were all filed

4  after that date.  To the second omnibus objection, four parties

5  filed a formal response with the Court.  In addition to that,

6  we received two other requests from two parties.  Those two

7  parties are AMC and First Energy, both of whom requested that

8  their 503(b)(9) claims be reclassified as general unsecured

9  claims, and the debtors have consented to that

10 reclassification.

11         In addition, Your Honor, one party in interest filed

12 a formal objection to our third omnibus objection.  Your Honor,

13 at this time we would ask the Court to adjourn those hearings

14 for which we had the five responses to the June 23rd omnibus

15 hearing.  Also to reclassify the two claimants' claims that

16 requested such reclassification and for the Court to disallow

17 in their entirety all of the other remaining claims that are

18 the subject of the second and third omnibus objections.

19         THE COURT:  Does any party wish to be heard in

20 connection with the debtor's request?  All right, the matters

21 for which the Court has received a written response will be

22 continued to June 23.  The two other claims will be

23 reclassified and all of the other claims will be disallowed.

24         MR. BLANKS:  Thank you, Your Honor.

25         MR. FREDERICKS:  Good afternoon, again, Your Honor.

1    Ian Fredericks of Skadden, Arps, Slate, Meagher & Flom on

2    behalf of the debtors.  We'll, I believe, go back in the agenda

3    to item number 20 which is the debtor's motion to sell real

4    property located in Ardmore, Oklahoma.

5            When the motion was originally filed there was a

6    stalking horse agreement with Shore's Oil Field Equipment.

7    That agreement contemplated a $6 million purchase price.  The

8    procedures set forth in the motion acquired any competing bids

9    by May 6th with the first minimum overbid being 625 or -- I'm

10   sorry, $6,250,000.  You had to submit a deposit equal to ten

11   percent which was $625,000.  Prior to the bid deadline the

12   debtors received one additional bid.  That was a bid from

13   General Mills and it complied with the bid procedures including

14   that the deposit was made.

15           As a result, on May 11th the debtors held an auction

16   with respect to the real property.  Both General Mills and

17   Shore's Oil Field Equipment participated.  During the auction

18   there was a brief break to accommodate a request by Shore's to

19   visit the property because certain equipment located in the

20   distribution center had not been removed as it was supposed to.

21   The debtors have sold that equipment in the distribution center

22   pursuant to prior motions to sell FF&E and certain buyers of

23   that equipment hadn't come and picked it up to date.  And one

24   piece of equipment that the debtors had originally sold, a

25   buyer had decided not to take and so the debtors were going to

34

1  abandon it under the agreement upon the closing.

2           So Shore's, to take into consideration on what it was

3  going to bid, wanted to visit the site to take a look at it.

4  We accommodated that request, took a break.  There was one

5  other piece of information that came up during the process.  We

6  were speaking with the debtor's representative at the

7  distribution center and learned that the day before there was a

8  lightning strike very close to the distribution center that

9  activated the fire suppression system.  Thankfully, the

10 suppression system didn't entirely turn on so that water

11 flooded the building.  Rather the motor started and may have

12 burned out.  That is one item that will be addressed.  So the

13 suppression system may be broken in the sense that a motor that

14 operates the pumps may need to be replaced before the closing.

15          Under the agreement there is a casualty section where

16 if certain things happened who would bear the risk of loss,

17 what amounts and what the parties' rights were.  The parties

18 have all agreed that that provision will govern the parties'

19 rights.  For the Court's information it has a -- part of the

20 rights are that for any damage that occurred prior to closing

21 that resulted in loss of up to $600,000, the debtors would

22 either need to, you know, repair that or I believe have a

23 purchase price adjustment for the cost.  Where we've been told

24 that preliminarily if the damage is limited to the motor we are

25 talking about approximately $15,000.

**J&J COURT TRANSCRIBERS, INC.**

35

1          That's just to kind of give the Court all the

2    information that the bidders had.  During the auction there was

3    competitive bidding.  The bidding started at $6.25 million

4    which was the purchase price in the General Mills agreement.

5    At the conclusion of the auction the highest or otherwise best

6    bid was that presented by Shore's Oil Field in the amount of

7    $8.2 million.  The next highest or otherwise bid was in the

8    amount of $8.1 million by General Mills.

9          We did have a court reporter present at the auction,

10   Your Honor -- excuse me -- and I have a transcript of those

11   proceedings.  These have been marked as Debtor's Exhibit 2.

12   I'd like to introduce those into evidence.

13          THE COURT:  You may.

14          MR. FREDERICKS:  Thank you.  With that, Your Honor,

15   both Mr. Markham and the acting president and chief executive

16   officer, as well as Michele Mozier who is the principal

17   financial officer and controller and vice president, are both

18   in the courtroom.  They would testify to the factual findings

19   in the order.  With that, Your Honor, unless Your Honor would

20   like me to proffer their testimony or have them take the stand,

21   we would request that the Court approve the relief requested in

22   the motion.

23          THE COURT:  Does any party wish to be heard in

24   connection with the debtor's motion authorizing the sale of the

25   real property in Ardmore, Oklahoma?  All right.  There being no

36

1  objection, the Court will accept your statements and the Court

2  will approve the sale and grant your motion.

3        MR. FREDERICKS:  Thank you, Your Honor.  I believe

4  that brings us to matter number 25 which is the debtor's motion

5  to assume, assign and sell the lease associated with store

6  number 232 located in San Mateo, California.

7        By way of background, Your Honor, as you may recall

8  this was originally part of the overall lease procedures

9  motion.  Originally the debtors had received two bids.  One bid

10 from the landlord and one bid from the subtenant.  No other

11 bids were received.  Based on those two -- because the location

12 was cash flow positive to the estate, the debtors determined to

13 reject both of those bids, pull the San Mateo lease from the

14 auction, and proceed to continue to market the location.

15        Furthermore, in -- before the end of March which

16 would have been the automatic rejection date of that lease, the

17 debtors modified the lease procedures order to carve those

18 leases out of that provision and thus make them subject to

19 ultimately the 210 day, 365(b)(4) deadline.

20        Following that, the debtors continued to market the

21 location and ultimately received three bids, none of which were

22 acceptable to the debtors at the time they were submitted.

23 They negotiated with the parties and arrived at what we'll call

24 the stalking horse agreement with Merchant Equity that

25 provided, I believe, for a $235,000 purchase price.  It

37

1  contemplated a breakup fee of $25,000 and a minimum overbid, I

2  believe, of $10,000.

3       The debtors filed the motion to approve that

4  transaction subject to higher or otherwise better bids.  Prior

5  to the bid deadline the debtors received four additional bids.

6  Two of them were from the same third parties the debtors had

7  been negotiating with before the motion was filed.  One was

8  from the landlord, and one was from the subtenant.

9       The debtors reviewed those bids and determined that

10 the subtenant's bid had certain conditions in it.  As a result,

11 the debtors determined that was not a qualified bid and did not

12 allow the subtenant to participate in the auction.  The

13 landlord's bid was a credit bid in the amount of -- the

14 landlord asserted the credit bid in the amount of

15 approximately, $445,000.

16      The debtors, at the outset of the auction after

17 consultation with the creditors committee, determined that the

18 value of that bid was more appropriately what the debtors had

19 put in the motion as the proposed cure amount of $40,000,

20 approximately $40,000.  As a result, the landlord clarified its

21 bid on the record that its bid was $445,000 in either cash or

22 cure amount or some combination thereof after the Court

23 ultimately determined what the appropriate cure amount would

24 be.

25      With that, the debtors commenced the auction after a

1  consultation with the committee with the landlord's bid as the

2  highest or otherwise best bid.  The next closest bid, I

3  believe, was $280,000.  There was no other bidding at the

4  auction.  With that, the debtors determined that bid was the

5  highest and best bid and closed the auction.

6        I do have here, Your Honor, marked as Debtor's

7  Exhibit 3 a transcript of those proceedings which I would like

8  to introduce into evidence.

9        THE COURT:  Thank you.  So received.

10        MR. FREDERICKS:  Thank you, Your Honor.  Following

11  the auction the debtors negotiated with the landlord over what

12  -- to try to consensually resolve the cure amount and I'm happy

13  to report that as of today the debtors and the landlord have

14  consensually resolved what the cure amount would be.  The cure

15  amount is the difference between the landlord's bid and

16  $300,000.  So in other words the landlord has agreed to pay the

17  estate $300,000 in cash and the remainder of its bid -- the

18  remainder of its cure claim is a credit bid and, thus, the

19  estate will no longer have those claims.

20        We are currently memorializing that in a form of

21  order and assumption and assignment agreement.  We received

22  some comments from the subtenant and the parties are still

23  working through changes to the order.  We anticipate submitting

24  the order tomorrow to the Court.

25        With that, again, Mr. Markham and Ms. Mozier are both

1  present in the courtroom, they would testify to the findings of

2  fact in the order and the debtors thereby request that this

3  Court approve the sale to the landlord, the sale of both the

4  lease, the overlease with the landlord, and the sublease with

5  TJMaxx, the assumption, assignment and sale of those leases to

6  the landlord.

7          THE COURT:  Does any party wish to be heard in

8  connection with the debtor's motion?  Mr. Gray.

9          MR. GRAY:  Good afternoon, Your Honor.  William Gray

10  with Sands, Anderson, Marks & Miller on behalf of TJMaxx, the

11  subtenant here.  What Mr. Fredericks has represented is my

12  understanding and we are working on the order.  My client's

13  main interest in the order, probably two -- three interests.

14          First, as these orders normally have, there is a free

15  and clear of interest in the assignment, et cetera.  We just

16  want to make sure that our possessory rights are not free and

17  clear, that the order will reflect that Concor is taking the

18  obligations of our lease along and not -- that the possessory

19  interests are not being stripped from that.

20          Second, there is the year end reconciliations

21  currently that will come due at the end of this year.  That

22  will be between Concor and my client as far as who we might owe

23  or who might owe us back.  And lastly, since my client was

24  involved in the bidding there should just be a phrase about

25  there's no -- that we will get our bid back from -- as an

40

1  unsuccessful bidder -- deposit, excuse me, the deposit back for

2  the bid.  With that, I think we've got an agreement.

3        THE COURT:  All right.  Thank you, Mr. Gray.  Mr.

4  Mueller.

5        MR. MUELLER:  Good afternoon, Your Honor.  Michael

6  Mueller on behalf of Concor Enterprises, Inc., the landlord and

7  the proposed assignee.  As a result of the auction, I can

8  confirm both Mr. Fredericks' and Mr. Gray's comments to the

9  Court.  We are working on a proposed agreed order and the

10 language of the assignment agreement.  We hope to submit that

11 to the Court tomorrow.

12       Under the proposed order, the effective bid, I

13 believe, we have agreed is going to be today.  There are some

14 other reconciliations, but essentially with respect to payments

15 from the subtenant for sublease payments and with respect to

16 the debtor's overpayment of rent through May 15th, we owe them

17 a couple of days rent back from May 13th to May 15th.

18       We also can confirm that we obviously will recognize

19 TJMaxx's subtenant rights or possessory rights and we will

20 conform to the lease agreement with respect -- the sublease

21 agreement, with respect to the reconciliation at year end.

22 Thank you, Your Honor.

23       THE COURT:  All right.  Thank you.  Any other party

24 wish to be heard in connection with the debtor's motion?

25       MR. FREDERICKS:  There is one additional thing, Your

41

1  Honor, and I apologize for not mentioning this sooner.  That he

2  is correct there will be some reconciliations regarding

3  prorated rent payments.  The other thing is, as far as the

4  settlement goes with the landlord over the cure amount, we did

5  consult with the committee and the committee did agree with

6  that settlement.

7           THE COURT:  All right.  I assume you had no problem

8  with the statements of either Mr. Gray or Mr. Mueller.

9           MR. FREDERICKS:  No.  I concur with their statements.

10          THE COURT:  Okay, very good.  The Court then will

11 approve the motion and ask you to submit an order as has been

12 described to the Court.

13          MR. FREDERICKS:  Thank you very much, Your Honor.

14          THE COURT:  All right.  Are there any other matters

15 that we need to take up then this afternoon in connection with

16 Circuit City?

17          MR. FREDERICKS:  I do not believe so.  Unless Your

18 Honor has any questions about case status or things like that,

19 I'd be happy to answer them.

20          THE COURT:  Thank you very much.  The Court is

21 satisfied with the progress of this case.

22          MR. FREDERICKS:  Thank you, Your Honor.

23          THE CLERK:  Court is now adjourned.

24                         *  *  *  *  *

25

**J&J COURT TRANSCRIBERS, INC.**

42

1          **C E R T I F I C A T I O N**

2                I, LYNN SCHMITZ, court approved transcriber,

3    certify that the foregoing is a correct transcript from

4    the official electronic sound recording of the proceedings

5    in the above-entitled matter.

6    /s/ Lynn Schmitz                    Date:  May 27, 2009

7    LYNN SCHMITZ

8    J&J COURT TRANSCRIBERS, INC.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25