Gregg M. Galardi, Esq.
Ian S. Fredericks, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
One Rodney Square
PO Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

Dion W. Hayes (VSB No. 34304)
Douglas M. Foley (VSB No. 34364)
MCGUIREWOODS LLP
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

          - and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
333 West Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

Counsel to the Debtors and
Debtors in Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

- - - - - - - - - - - - - - x
In re:                        :   Chapter 11
                              :
CIRCUIT CITY STORES, INC.,    :   Case No. 08-35653 (KRH)
et al.,                       :
                              :
          Debtors.            :   Jointly Administered
- - - - - - - - - - - - - - x

**DEBTORS' MOTION FOR ORDER UNDER BANKRUPTCY CODE SECTIONS 105, 363, 365 AND 503 AND BANKRUPTCY RULES 2002, 6004 AND 6006 (A) AUTHORIZING SELLER TO ENTER INTO AGREEMENT FOR SALE OF CERTAIN REAL PROPERTY IN BALTIMORE, MARYLAND SUBJECT TO HIGHER OR OTHERWISE BETTER BIDS, (B) APPROVING TERMINATION FEE IN CONNECTION THEREWITH, (C) APPROVING SALE OF REAL PROPERTY FREE AND CLEAR OF ALL INTERESTS, (D) APPROVING ASSUMPTION, ASSIGNMENT AMD SALE OF CERTAIN UNEXPIRED LEASES OF NON-RESIDENTIAL REAL PROPERTY FREE AND CLEAR OF ALL INTERESTS AND (E) GRANTING RELATED RELIEF**

Circuit City Stores, Inc. (the "Seller," and

1

collectively with the debtors and debtors in possession

in the above-captioned jointly administered cases, the

"Debtors")[1] hereby move (the "Motion"), pursuant to

sections 105, 363, 365 and 503 of title 11 of the United

States Code (the "Bankruptcy Code") and Rules 2002, 6004

and 6006 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), for entry of an order

(A) authorizing the Seller to enter into an agreement

with the Purchaser (as defined herein) for the sale (the

"Sale") of certain of the Seller's real property located

at 8823 Pulaski Highway, Baltimore County, Maryland (the

"Property"), a copy of which is attached as <u>Exhibit A</u> to

the Sale Order (the "Agreement")[2], subject to higher or

---

[1]  The Debtors and the last four digits of their respective taxpayer
     identification numbers are as follows: Circuit City Stores, Inc.
     (3875), Circuit City Stores West Coast, Inc. (0785), InterTAN,
     Inc. (0875), Ventoux International, Inc. (1838), Circuit City
     Purchasing Company, LLC (5170), CC Aviation, LLC (0841), CC
     Distribution Company of Virginia, Inc. (2821), Circuit City
     Properties, LLC (3353), Kinzer Technology, LLC (2157), Abbott
     Advertising Agency, Inc. (4659), Patapsco Designs, Inc.(6796),
     Sky Venture Corp. (0311), PRAHS, Inc.(n/a), XSStuff, LLC (9263),
     Mayland MN, LLC (6116), Courchevel, LLC (n/a), Orbyx Electronics,
     LLC (3360), and Circuit City Stores PR, LLC (5512).  The address
     for Circuit City Stores West Coast, Inc. is 9250 Sheridan
     Boulevard, Westminster, Colorado 80031.  For all other Debtors,
     the address was 9950 Mayland Drive, Richmond, Virginia 23233 and
     currently is 4951 Lake Brook Drive, Glen Allen, VA 23060.

[2]  Capitalized terms used but not otherwise defined herein have the
     meanings ascribed to them in the Agreement.

otherwise better proposals, (B) approving the
Termination Fee (as defined below) in connection
therewith, (C) approving the Sale free and clear of all
Liens (as defined below), (D) approving the assumption,
assignment and sale (the "Assignment") of the Leases (as
defined below) associated with the Property free and
clear of all Liens and (E) granting related relief.  In
support of the Motion, the Seller respectfully
represents as follows:

**JURISDICTION AND VENUE**

1.    This Court has jurisdiction to consider
this Motion under 28 U.S.C. §§ 157 and 1334.  This is a
core proceeding under 28 U.S.C. § 157(b).  Venue of
these cases and this Motion in this District is proper
under 28 U.S.C. §§ 1408 and 1409.

2.    The statutory predicates for the relief
requested herein are Bankruptcy Code sections 105, 363,
365 and 503 and Bankruptcy Rules 2002, 6004 and 6006.

## BACKGROUND

**A.   The Bankruptcy Cases.**

3.     On November 10, 2008 (the "Petition Date"), the Debtors filed voluntary petitions in this Court for relief under chapter 11 of the Bankruptcy Code.

4.     The Debtors continue to manage and operate their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.

5.     On November 12, 2008, the Office of the United States Trustee for the Eastern District of Virginia appointed a statutory committee of unsecured creditors (the "Creditors' Committee").  To date, no trustee or examiner has been appointed in these chapter 11 cases.

6.     On January 16, 2009, the Court authorized the Debtors, among other things, to conduct going out of business sales at the Debtors' remaining 567 stores pursuant to an agency agreement (the "Agency Agreement") between the Debtors and a joint venture, as agent (the "Agent").  On January 17, 2009, the Agent commenced going out of business sales pursuant to the Agency Agreement at the Debtors remaining stores.  As of

on or about March 8, 2009, the going out of business
sales concluded.

**RELIEF REQUESTED**

7.   By this Motion, the Seller seeks an
order (A) authorizing the Seller to enter into the
Agreement in connection the Sale of the Property,
subject to higher or otherwise better proposals,
(B) approving the Termination Fee in connection
therewith, (C) approving the of the Sale of the Property
free and clear of all interests, (D) approving the
Assignment of the Leases free and clear of all interests
and (E) granting related relief (the "Sale Order").

8.   As more fully set forth below, after a
comprehensive review, the Seller believes that the Sale
of the Property and the Assignment of the Leases
represent its best opportunity under the circumstances
to maximize the value of the Property and the Leases.
Therefore, the Sale of the Property and Assignment of
the Leases are in the best interests of its estate and
stakeholders.

**BASIS FOR RELIEF**

**A.    The Property and the Leases.**

9.    The Seller owns the Property located in
Baltimore, Maryland, constituting the Golden Ring
shopping center.  In addition to operating a retail
store on the Property, the Seller leases certain
portions of the Property to two different tenants (the
"Tenants"):  the Seller is party to a lease dated March
23, 1995 with NTW Inc and the Seller is party to a lease
dated July 13, 1999 with Boat America Corporation
(together, the "Leases," copies of which are attached as
Exhibit A to the Agreement).  Accordingly, the Sale of
the Property would be subject to the Leases, which would
be assigned to any purchaser of the Property.

**B.    Events Leading To The Sale.**

10.    In light of the failure to obtain any
feasible going concern bids and the decision to
liquidate the Debtors' inventory through going-out-of-
business sales, as described above, the Seller has been
left with various assets -- including the Property --
for which it has no remaining use.  In contrast, the
sale of such assets, including the Sale of the Property,

6

would result in significant proceeds for the Seller's

estate and creditors.

11.   Since at or about the time the going-out-

of-business sales were commenced, the Seller, along with

its real estate advisor, DJM Realty, LLC ("DJM"), has

been marketing the Property.  As a result of these

marketing efforts, the Seller received various proposals

to purchase the Property.  Upon reviewing these

proposals, the Seller determined that the proposal

submitted by the Purchaser was considerably higher or

otherwise better than the alternate proposals received.

Thus, the Seller elected to proceed with the Sale of the

Property to the Purchaser.

**C.    The Agreement.**

12.   On February 19, 2009, Seller entered

into a contract (the "Initial Contract") with VEI

Circuit LLC (the "Purchaser") for the Sale of the

Property.  The Purchaser initially exercised its option

to terminate the Initial Contract prior to the

expiration of its due diligence period pursuant to a

right to do so set forth in the Initial Contract.

Subsequently, the Seller and the Purchaser have agreed

7

to reinstate the Initial Contract with certain

amendments and modifications thereto, including an

extension of the due diligence period, provision for the

Debtor to obtain an updated environmental assessment of

the Property, with the costs of such assessment to be

deducted from any break up fee payable to the Purchaser,

and an adjustment in the Purchase Price. (the Initial

Contract, as so amended and modified, the "Agreement").[3]

13.   Pursuant to the Agreement, the Seller

would sell the Property to the Purchaser for $4.65

million (the "Purchase Price").

14.   The significant terms of the Agreement

are as follows:[4]

---

[3]   More than 15 years ago, certain areas of the Property were deemed
to be contaminated, clean-up was performed and documentation
reflecting the successful elimination of contamination was filed
with the state of Maryland.  The Purchaser wished to obtain
copies of these records but was unable to obtain them because
they had been filed so many years ago.  Consequently, the only
way for the Seller to provide the Purchaser with a record of the
environmental status of the Property was to have a new
environmental assessment completed.  As part of the reinstatement
of the Agreement, the parties agreed upon a procedure for
obtaining a new environmental assessment.  The assessment was
completed and delivered to the Purchaser on May 20, 2009, showing
that the previous contamination area was in fact remediated in
accordance with applicable law so that the presence of
contaminants was below the level requiring further action.

[4]   In the event of any discrepancy between the Agreement and this
summary of the Agreement, the provisions of the Agreement are
controlling.

8

(a)  <u>General Terms</u>.  The Purchaser would acquire the Property, consisting solely of the Seller's right, title and interest in and to the property located at 8823 Pulaski Highway, Baltimore County, Maryland, comprising approximately 7.389 acres, together with (i) all rights and appurtenances pertaining to such land, (ii) all buildings, structures and other improvements on said land and (iii) electrical, mechanical, air conditioning and other fixtures attached thereto. The Property will not include any lifts or racking located in any of the buildings or any personal property, inventory, equipment or trade fixtures of the Tenants of the Leases.  Seller would assign each of the Leases to Purchaser.

(b)  <u>Sale and Assignment</u>.  The Property would be sold free and clear of all liens, charges, pledges, security interests, conditional sale agreements or other title retention agreements, leases, mortgages, security interests, options, or other encumbrances (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction) and any monetary amounts which are secured by any lien (collectively, the "Liens"), except for (i) the rights the Tenants under the Leases, (ii) liens for real property taxes that are not yet due and payable, (iii) zoning ordinances, building codes and other land use laws and applicable governmental regulations, (iv) all covenants, agreements, conditions, easements, restrictions and rights, whether of record or otherwise and (v) any and all matters that would be shown by a physical inspection of the Property (collectively, the "Permitted Encumbrances").

(c)  <u>Bankruptcy Court Approval</u>.  The Sale of the Property would be subject to approval by this Court and competitive bidding pursuant to the Bidding Procedures (as defined below).

(d)  <u>Documentation</u>.  The Sale would be effected pursuant to the Agreement and related documentation.

(e)  <u>Purchase Price</u>.  The Purchase Price to be paid by the Purchaser for the Property would be $4.65 million.

(f)  <u>Letters of Credit Escrow</u>.  In accordance with the Agreement, the Purchaser has previously delivered irrevocable letters of credit (the "Letters of Credit") payable to Seller in the amount of $500,000 to an escrow agent. If the Agreement is terminated prior to closing of the Sale and Assignment (the "Closing") because of the Purchaser's breach of the Agreement (on the terms as provided in the Agreement), the Seller would be entitled to draw upon the Letters of Credit as the Seller's sole recourse in such event.

(g)  <u>Representations And Warranties</u>.  Pursuant to the Agreement, the Seller would provide certain standard representations and warranties relating to the Sale of the Property and the Purchaser would provide representations and warranties generally standard in a transaction of this type.  The representations and warranties of the Purchaser survive indefinitely following the Closing or the termination of the Agreement.  The representations and warranties of the Seller shall expire and be extinguished at the Closing.

(h)  <u>Termination</u>.  The Agreement could be terminated prior to Closing in the following circumstances:  (i) by Purchaser, if an action is initiated to take any material portion of the Property by eminent domain proceedings, (ii) by Purchaser, in the event of damage to the Property exceeding $200,000 occurring during the period after the date of the Agreement and prior to Closing, if Seller does not repair such damage, (iii) by Purchaser, in the event that Seller shall fail to consummate the transactions contemplated by the Agreement, (iv) by Seller, in the event that Purchaser shall fail to comply with the Agreement and (v) by Seller, in order to permit Seller to accept a higher or better offer for the Property pursuant to the Bidding Procedures.

**D.    Termination Fee.**

15.    The Seller has agreed to pay the
Purchaser a break-up fee of $20,000.00, less costs
incurred by the Seller to obtain the environmental site
assessment (the "Termination Fee") if, and only if
(i) Purchaser is not in breach of or default under the
Agreement and (ii) the Seller consummates the Sale of
the Property with a higher or otherwise better bidder
following the Auction (as defined herein) and approval
by the Bankruptcy Court.

16.    The Purchaser has expended, and likely
will continue to expend, considerable time, money, and
energy pursuing the Sale and has engaged in arm's length
and good faith negotiations regarding a possible sale of
the Property.    The Agreement is the culmination of these
efforts.

17.    In recognition of this expenditure of
time, energy, and resources, the Seller has agreed to
the Termination Fee.    Specifically, the Agreement
provides for, and the Seller respectfully requests that
the Sale Order approve, the Termination Fee payable by
the Seller to the Purchaser in the amount of $20,000.00,

less costs incurred by the Seller to obtain the
environmental site assessment if the Seller terminates
the Agreement to close an alternative transaction, so
long as the Purchaser is not in breach of the Agreement.

18.   The Seller believes that the proposed
Termination Fee is fair and reasonable in view of
(a) the analysis, due diligence investigation, and
negotiation undertaken by the Purchaser in connection
with the Sale and (b) the fact that the Purchaser's
efforts would maximize the value of the Property and
Leases for the benefit of all stakeholders, whether as a
result of consummating the Sale pursuant to the
Agreement or by generating a higher or otherwise better
offer.

19.   The Purchaser is unwilling to keep open
its offer to purchase the Property under the terms of
the Agreement unless this Court authorizes payment of
the Termination Fee.   Thus, absent entry of the Sale
Order with approval of the Termination Fee, the Seller
may lose the opportunity to obtain what it believes to
be the highest or otherwise best offer for the Property.
And, as described below, the Agreement is subject to

higher or otherwise better proposals.  Approving the

Termination Fee will thus commit the Purchaser to

purchase the Property under the Agreement, and the

Agreement would serve to start any additional bidding

for the Property at a fair and reasonable purchase price.

20.  Payment of the Termination Fee will not

diminish the Seller's estate.  The Seller would not

expect to pay the Termination Fee unless it does so to

accept an alternative proposal, which would result in

even greater value to the Seller's estate and its

stakeholders.  This is particularly true given the

Initial Minimum Overbid requirement (as defined below),

which ensures that other proposals represent higher or

otherwise better offers for the Property taking into

account payment of the Termination Fee.  The Seller thus

requests that this Court authorize payment of the

Termination Fee pursuant to the terms and conditions of

the Agreement.

**E.    The Bidding Procedures.**

21.  To ensure the Seller receives the

highest or otherwise best proposal for the Property, the

Seller will entertain alternate proposals for the Sale

of the Property.   The Seller accordingly requests that

this Court order that any parties, including those

parties that previously submitted proposals, who wish to

submit an alternate proposal for consideration by the

Debtors be required to do so by June 16, 2009 at 4:00

p.m. (ET) (the "Bid Deadline").

22.   If the Seller receives any Qualified

Bids (as defined herein), the Seller would hold an

auction (the "Auction") on June 22, 2009 at 10:00 a.m.

(ET) at the offices of Skadden, Arps, Slate, Meagher &

Flom LLP, One Rodney Square, Wilmington, Delaware.   The

Seller will advise the Purchaser and all other parties

that submitted a Qualified Bid (as defined below) of the

Auction.

23.   At the conclusion of any Auction, the

Seller, in consultation with its advisors (and

representatives of the Creditors' Committee), would

determine the highest or otherwise best bid (the

"Successful Bid").

24.   Following the Auction, if any, the

Seller intends to proceed with a hearing to approve the

Sale of the Property on June 23, 2009 at 2:00 p.m. (ET)
(the "Sale Hearing").

25.   If no Qualified Bids other than the bid
of the Purchaser are received, the Seller would proceed
with the Sale to the Purchaser following entry of the
Sale Order.  If the Seller receives additional Qualified
Bids, then at the Sale Hearing, the Seller would seek
approval of the Successful Bid, as well as the second
highest or best Qualified Bid (the "Alternate Bid," and
such bidder, the "Alternate Bidder").  A bid would not
be deemed accepted by the Seller unless and until
approved by the Court.

26.   Following approval of the Sale to the
Successful Bidder, if the Successful Bidder fails to
consummate the sale for specified reasons, then the
Alternate Bid would be deemed to be the Successful Bid
and the Seller would be permitted to effectuate a sale
to the Alternate Bidder without further order of the
Court.

27.   To ensure that only bidders with a
serious interest in the purchase of the Property
participate in the bidding process, the Seller would

only consider the "Qualified Bids" of "Qualified

Bidders."  To be considered a "Qualified Bid" and a

"Qualified Bidder" for purposes of the Auction, the

person or entity submitting the bid would be required to

submit an offer by the Bid Deadline that includes:

> (a)   an executed copy of the Agreement marked
> to show those amendments and
> modifications to the Agreement that the
> Qualified Bidder proposes (such modified
> Agreement, a "Marked Agreement"),
> including modifications to the Purchase
> Price, which price must be at least
> $4,700,000.00 (the "Initial Minimum
> Overbid");
>
> (b)   the potential bidder and the officer(s)
> or authorized agent(s) who will appear on
> behalf of such bidder;
>
> (c)   a statement that the bid shall not be
> conditioned on the outcome of unperformed
> due diligence by the bidder or any
> financing contingency;
>
> (d)   a good faith deposit (the "Good Faith
> Deposit") equal to at least $500,000.00
> in cash or in the form of a letter of
> credit;
>
> (e)   an acknowledgement that the bidder's
> offer is irrevocable until two (2)
> business days after the closing of the
> Sale of the Property and Assignment of
> the Leases; and
>
> (f)   an acknowledgement that, in the event the
> bidder is the Alternate Bidder, the
> bidder will proceed with the purchase of

the Property pursuant to the terms the
Marked Agreement.

28.   The Seller reserves the right to
(i) determine in its reasonable discretion (after
consultation with representatives of the Creditors'
Committee) which offer is the highest or otherwise best
offer; (ii) reject at any time prior to the closing of a
Sale and Assignment, without liability, any offer that
the Seller in its reasonable discretion (after
consultation with representatives of the Creditors'
Committee) deems to be (x) inadequate or insufficient,
(y) not in conformity with the requirements of the
bidding procedures or applicable law or (z) contrary to
the best interests of the Seller and its estate; (iii)
re-open the Auction, (iv) withdraw the Property from the
Auction, and (v) waive the requirements of any of the
bidding procedures with respect to a potential or
Qualified Bidder if the Seller determines in its
business judgment (after consultation with
representatives of the Creditors' Committee) it is in
the best interests of its estate and creditors.

29.  Objections to the Sale, if any, shall be filed and served no later than 4:00 p.m. (ET) on June 16, 2009.

**APPLICABLE AUTHORITY**

**I.   APPROVAL OF THE TRANSACTIONS FOR THE SALE OF THE PROPERTY IS WARRANTED UNDER BANKRUPTCY CODE SECTION 363(b)(1).**

30.  As set forth above, Bankruptcy Code section 363(b)(1) authorizes a  trustee to "use, sell, or lease" property of the estate with the Court's approval.  11 U.S.C. § 363(b)(1).  Assets of the Debtors may be sold outside of the ordinary course of business, pursuant to Bankruptcy Code section 363(b)(1), if a sound business purpose exists for doing so.  In re WBQ P'ship, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995)(citing Stephens Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986)); see also In re W.A. Mallory Co., Inc., 214 B.R. 834, 836 (Bankr. E.D. Va. 1997).

31.  To satisfy the "sound business purpose test," the debtor must demonstrate that (1) a sound business reason or emergency justifies a pre-confirmation sale; (2) the sale was proposed in good faith; (3) the purchase price is fair and reasonable;

and (4) adequate and reasonable notice of the sale has
been provided.  In re WBQ P'ship, 189 B.R. at 102.

32.  Based upon the results of their analysis,
the Seller's management and advisors have concluded that
the Sale of the Property pursuant to the Agreement or a
higher or otherwise better offer would maximize the
value of the Property for the Seller's estate.
Maximizing asset value is a sound business purpose that
warrants authorizing the proposed Sale.

33.  The Sale of the Property will be subject
to competing bids, thereby enhancing the Seller's
ability to receive the highest or otherwise best value
for the Property.  Consequently, the fairness and
reasonableness of the consideration to be received by
the Seller will ultimately be demonstrated by a "market
check" through the auction process, which is the best
means for establishing whether a fair and reasonable
price is being paid.

34.  Moreover, the Seller proposes to provide
adequate notice of the Auction and the Sale Hearing as
set forth below.  In light of the circumstances, such
notice is reasonably calculated to provide timely and

adequate notice to the Seller's major creditor

constituencies, those parties most interested in these

cases, those parties potentially interested in bidding

on the Property and others whose interests are

potentially implicated by the proposed Sale and

Assignment.

## II.   THE SALE PROCESS IS REASONABLE AND APPROPRIATE.

35.   Bankruptcy Code section 363(b)(1)

provides that "[t]he trustee, after notice and a hearing,

may use, sell, or lease, other than in the ordinary

course of business, property of the estate." 11 U.S.C.

§ 363(b)(1).  Moreover, Bankruptcy Code section 105(a)

provides that "[t]he Court may issue any order, process,

or judgment that is necessary or appropriate to carry

out the provisions of this title." 11 U.S.C. § 105(a).

36.   The disposition of the Property and

Leases pursuant to the terms reflected in the Agreement

resulted from the bids submitted for the Property,

pursuant to a marketing process led by DJM.  Conducting

a marketing process through a third party broker

represents an accepted method of selling property.

Similar marketing processes have been approved in other

chapter 11 cases.  See, e.g., Ready v. Rice, 2006 WL
4550188 at *3 (D. Md. 2006); see also In re Reading
Broadcasting, Inc., 386 B.R. 562, 571-72 (Bankr. E.D. Pa.
2008); In re King-Wilson, 1998 WK 737887 at *4-5 (N.D.
Cal. 1998).

        37.  In addition, bid procedures similar those
Bid Procedures outlined above have been approved by this
Court in this case.  See Order Approving (I) Approving
Bidding Procedures and (II) Setting Auction and Sale
Hearing Dates in Connection With the Sale of Certain
Real Property Located in Phoenix, Arizona, (D.I. 2401).

        38.  Finally, the other interested parties are
provided with an opportunity to submit a higher or
otherwise better proposal and, if necessary, the Seller
will conduct an auction.

        39.  In light of the foregoing, the Seller
submits that the Sale process is reasonable and
appropriate.

## III. THE TERMINATION FEE REQUESTED HEREIN IS REASONABLE AND SHOULD BE APPROVED.

40.    In connection with Sale of the Property, the Court should authorize the Seller to pay the Termination Fee.

41.    Agreements to provide termination fees and other bidding incentives are designed to compensate a potential acquirer who serves as a catalyst that may attract higher and better offers, and have been approved in bankruptcy to encourage bidding.  See In re Ryan, 261 B.R. 867, 870 (Bankr. E.D. Va. 2001).  Termination fees can be advantageous to both buyers and sellers because they encourage bidding to ensure that sellers receive the highest or otherwise best offer while compensating the buyer for the risk of being outbid.  See id.

42.    Termination fee fees are allowed as an administrative expense claim against the estate if they satisfy the standard of section 503(b)(1).  In re Tropea, 352 B.R. 766, 768 (Bankr. N.D.W.Va. 2006).  Thus, the fee must reflect the actual and necessary cost of preserving the estate.  See 11 U.S.C. § 503(b)(1).  See also In re Tropea, 352 B.R. at 768.  In Calpine Corp. v.

22

O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy,
Inc.), 181 F.3d 527 (3d Cir. 1999), the United States
Court of Appeals for the Third Circuit explained how the
section 503(b)(1) standard applied to termination fees.
The Third Circuit Court of Appeals held that even though
bidding incentives are measured against a business
judgment standard in non-bankruptcy transactions, the
administrative expense provisions of Bankruptcy Code
section 503(b) govern in the bankruptcy context.
Accordingly, to be approved, bidding incentives must
provide some postpetition benefit to the debtor's estate.
See id. at 533; see also In re Lamb, 2002 WL 31508913
(Bankr. D. Md. 2002) (implicitly adopting the
administrative expense standard set forth in O'Brien).

        43.  The O'Brien Court identified at least two
instances in which bidding incentives may provide
benefit to the estate.  First, benefit may be found if
"assurance of a break-up fee promoted more competitive
bidding, such as by inducing a bid that otherwise would
not have been made and without which bidding would have
been limited."  Id. at 537.  Second, when the
availability of bidding incentives induce a bidder to

research the value of the debtor and submit a bid that
serves as a minimum or floor bid on which other bidders
can rely, "the bidder may have provided a benefit to the
estate by increasing the likelihood that the price at
which the debtor is sold will reflect its true worth."
Id.

44.   Here, the Seller seeks authority to pay
the Termination Fee in the event that the Purchaser is
not ultimately the Successful Bidder.  The proposed
Termination Fee is appropriate under Bankruptcy Code
section 503 as it is fair and reasonable in amount,
particularly in view of the efforts that will have to be
expended by the Purchaser.  Moreover, the Agreement,
including the Termination Fee provided for therein, will
enable the Seller to secure an adequate floor for an
auction and, thus, insist that competing bids be
materially higher or otherwise better than the purchase
price pursuant to the Agreement (as incorporated in the
Initial Minimum Overbid requirement), a clear benefit to
the Seller's estate.

45.   In sum, the Seller's ability to offer the
Termination Fee enables it to ensure the Sale of the

Property to a contractually-committed bidder at a price

that they believe to be fair while, at the same time,

providing them with the potential of even greater

benefit to the estates.

46.   Thus, the Termination should be approved.

**IV.   THE PURCHASER OR SUCCESSFUL BIDDER SHOULD BE
AFFORDED THE PROTECTIONS OF SECTION 363(m) OF THE
BANKRUPTCY CODE AND THE TRANSACTIONS CONTEMPLATED
BY THE AGREEMENT SHOULD CARRY THE PROTECTIONS OF
SECTION 363(n) OF THE BANKRUPTCY CODE.**

47.   Section 363(m) of the Bankruptcy Code

provides:

> The reversal or modification on appeal of
> an authorization under subsection (b) or
> (c) of this section of a sale or lease of
> Leases does not affect the validity of a
> sale or lease under such authorization to
> an entity that purchased or leased such
> property in good faith, whether or not
> such entity knew of the pendency of the
> appeal, unless such authorization and
> such sale or lease were stayed pending
> appeal.

11 U.S.C. § 363(m).  While the Bankruptcy Code does not

define "good faith," the Fourth Circuit Court of Appeals

has "adopt[ed] the traditional equitable definition that

has been adopted by various courts of appeal: 'one who

purchases the assets for value, in good faith, and

without notice of adverse claims.'"   <u>Willemain v. Kivitz</u>,

764 F.2d 1019, 1023 (4th Cir. 1985)(citations omitted).

48.   Section 363(n) of the Bankruptcy Code

further provides, in relevant part, that:

> The trustee may avoid a sale under this
> section if the sale price was controlled
> by an agreement among potential bidders
> at such sale, or may recover from a party
> to such agreement any amount by which the
> value of the property sold exceeds the
> price at which such sale was consummated,
> and may recover any costs, attorneys'
> fees, or expenses incurred in avoiding
> such sale or recovering such amount.

49.   The Seller submits, and will present

evidence at the Sale Hearing, that the Agreement

reflects an negotiated, arm's length transaction.

Throughout the negotiations, the Purchaser has at all

times acted in good faith.   Moreover, to the extent that

the assets are sold to a Successful Bidder, it will be

because of a well-planned competitive process and

negotiations at arm's length to be conducted at an

auction.   As a result of the foregoing, the Seller

requests that the Court make a finding that the Purchase

Price to be paid by the Purchaser or the Successful

Bidder constitutes reasonably equivalent value and fair consideration under any applicable law.

50.   The Seller, therefore, requests that this Court make a finding that the Purchaser or the Successful Bidder, as the case may be, has purchased the Property in good faith within the meaning of section 363(m) of the Bankruptcy Code.  Further, the Seller requests that this Court make a finding that the Agreement or any purchase agreement reached as a result of the bidding procedures necessarily will comprise an arm's length, negotiated transaction entitled to the protections of section 363(m) of the Bankruptcy Code. Because the Seller has shown that the Purchaser's or Successful Bidder's bid is not the product of fraud or collusion between the Purchaser or Successful Bidder and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders, the Seller furthers request that this Court make a finding that the transactions contemplated by the Agreement are not avoidable under section 363(n) of the Bankruptcy Code.

**V.    THE SALE OF THE PROPERTY AND ASSIGNMENT THE LEASES
FREE AND CLEAR OF ALL INTERESTS SHOULD BE
AUTHORIZED UNDER BANKRUPTCY CODE SECTION 363(f).**

51.   To facilitate a sale of the Property, the
Seller requests authorization to sell the Property and
the Leases free and clear of any and all Liens that may
be asserted against such property.

52.   Under section 363(f) of the Bankruptcy
Code, a debtor in possession may sell property free and
clear of any interest in such property if, among other
things:

> (1) applicable nonbankruptcy law permits sale
> of such property free and clear of such
> interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at
> which such property is sold is greater than
> the aggregate value of all liens on such
> property;
>
> (4) such interest is in bona fide   dispute;
> or
>
> (5) such entity could be compelled, in a legal
> or equitable proceeding, to accept a money
> satisfaction of such interest.

11 U.S.C. § 363(f).

53.   Section 363(f) permits the sale of estate
property free and clear of interests if any one of the

five conditions above is met.  See, e.g., In re Laines,

352 B.R. 410, 414-15 (Bankr. E.D. Va. 2005).

54.   Courts have held that the authority of a

debtor to sell assets free and clear of interests is

broad and should be read expansively.  See In re TWA,

Inc., 322 F.3d 283, 289 (3d Cir. 2003); see also United

Mine Workers of Am. 1992 Benefit Plan v. Leckie

Smokeless Coal Co. (In re Leckie Smokeless Coal Co.), 99

F.3d 573, 582 (4th Cir. 1996) (holding that the phrase

"any interest in property" includes more than just in

rem interests); In re P.K.R. Convalescent Centers, Inc.,

189 B.R. 90, 94 (Bankr. E.D. Va. 1995)("As the plain

meaning of the statute demonstrates, § 363 covers more

situations than just sales involving liens.").  Moreover,

courts have noted that the purpose of the "free and

clear" language is to allow the debtor to obtain a

maximum recovery on its assets in the marketplace.  See

In re TWA, Inc., 2001 Bankr. LEXIS 723, at *8-*10 (Bankr.

D. Del. Mar. 27, 2001).

55.   Accordingly, this Court should authorize

the Seller to sell the Property and the Leases free and

clear of any and all Liens that may be asserted by any

29

parties, with any such Liens attaching to the net
proceeds of the sale of the Property and the Leases in
the same order and priority and subject to the same
defenses as they exist against the Property and the
Leases.

**VII. APPROVAL OF ASSUMPTION AND ASSIGNMENT OF THE LEASES IS WARRANTED UNDER BANKRUPTCY CODE SECTION 365.**

56.   Under section 365(a) of the Bankruptcy
Code a debtor, "subject to the court's approval, may
assume or reject any executory contract or unexpired
lease of the debtor." 11 U.S.C. § 365(a).  Section
365(b)(1) of the Bankruptcy Code, in turn, codifies the
requirements for assuming an unexpired lease or
executory contract of a debtor.  It provides:

> If there has been a default in an
> executory contract or unexpired lease of
> the debtor, the trustee may not assume
> such contract or lease unless, at the
> time of the assumption of such contract
> or lease, the trustee –
>
> (A)  cures, or provides adequate
> assurance that the trustee will promptly
> cure, such default;
>
> (B)       compensates, or provides
> adequate assurance that the trustee will
> promptly compensate, a party other than
> the debtor to such contract or lease, for

> any actual pecuniary loss to such party
> resulting from such default; and
>
> (C)          provides adequate
> assurance of future performance under
> such contract or lease.

11 U.S.C. § 365(b)(1).

57.  Section 365(f)(2) of the Bankruptcy Code

provides that:

> The trustee may assign an executory contract
> or unexpired lease of the debtor only if –
>
> (A)  the trustee assumes such contract or
> lease in accordance with the provisions
> of this section; and
>
> (B)  adequate assurance of future
> performance by the assignee of such
> contract or lease is provided, whether or
> not there has been a default in such
> contract or lease.

11 U.S.C. § 365(f)(2).

58.  First, the Seller does not believe it is

in default under the either of the Leases.  However, to

the extent that any defaults exist under the Leases that

are to be assumed and assigned in connection with the

Sale, the Debtors (or the Successful Bidder) would cure

any such default.

59.  Second, Courts give the phrase "adequate

assurance of future performance" a "practical, pragmatic

construction." EBG Midtown S. Corp. v. Mcharen/Hart

Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139

B.R. 585, 592 (S.D.N.Y. 1992), aff'd, 993 F.2d 300 (2d

Cir. 1993) (presence of adequate assurance should be

"determined under the facts of each particular case").

Adequate assurance does not require a debtor to provide

a guarantee of future performance; assurance is deemed

adequate as long as performance is more probable than

not. See Cinicola v. Scharffenberger, 248 F.3d 110, 120

n. 10 (3d Cir. 2001) ("Although no single solution will

satisfy every case, the required assurance will fall

considerably short of an absolute guarantee of

performance." (quotations and citations omitted)); In re

Weirton Steel Corp., 2007 WL 2021896 at *5 (Bankr. N.D.

W. Va. July 6, 2007) ("Assurance is adequate if

performance is likely; that is more probable than not.").

60. Adequate assurance is generally

associated with assurance that the assignee, as tenant,

will perform payment obligations under the lease being

assigned. Here however, the Purchaser will be assigned

the obligations of the Seller as lessor, which are far

more limited than those of assignee as tenant. There

32

will be little practical change under the Leases as far
as the Tenants are concerned.  Consequently, the
financial wherewithal and diligence required to
negotiate and enter into the Agreement for the Sale of
the Property and the Assignment of the Leases and that
the Purchaser shall guarantee full and complete
performance of all obligations under the Leases on and
after the date of the Sale satisfy the standard set by
the Bankruptcy Code.

**VIII. WAIVER OF THE TEN-DAY STAY PROVIDED BY BANKRUPTCY
RULE 6004 SHOULD BE WAIVED FOR ANY ORDER APPROVING
THE SALE OF THE PROPERTY.**

61.  Bankruptcy Rule 6004(h) provides that:
"[a]n order authorizing the use, sale, or lease of
property of the estate is stayed until the expiration of
10 days after entry of the order, unless the court
orders otherwise." Fed. R. Bankr. P. 6004(h).

62.  The Seller requests that the Court waive
the ten-day stay of Bankruptcy Rule 6004 with respect to
the Sale of the Property and Assignment of the Leases
following the entry of the Sale Order.  By waiving such
requirements, the Seller and the Purchaser or the
Successful Bidder, as applicable, will be able to

immediately close the Sale, which will result in

immediate proceeds to the Seller's estate.

63.   Accordingly, the stay under Bankruptcy

Rule 6004(h) should be waived.

**NOTICE**

64.   Notice of this Motion has been provided

to those parties entitled to notice under the Order

Pursuant to Bankruptcy Code Sections 102 and 105,

Bankruptcy Rules 2002 and 9007, and Local Bankruptcy

Rules 2002-1 and 9013-1 Establishing Certain Notice,

Case Management, and Administrative Procedures (D.I. 130;

the "Case Management Order"), as well as (a) all

entities known to have expressed an interest in a

transaction regarding the Property during the past three

(3) months; and (b) all entities reasonably known to

have a Lien on the Property; and (c) all federal, state,

and local regulatory or taxing authorities or recording

offices that have a reasonably known interest in the

relief requested by the Motion.   The Seller submits that,

under the circumstances, no other or further notice need

be given.

## WAIVER OF MEMORANDUM OF LAW

65.   Pursuant to Local Bankruptcy Rule 9013-1(G), and because there are no novel issues of law presented in the Motion and all applicable authority is set forth in the Motion, the Seller requests that the requirement that all motions be accompanied by a separate memorandum of law be waived.

## NO PRIOR REQUEST

66.   No previous request for the relief sought herein has been made to this Court or any other court.

## CONCLUSION

WHEREFORE, the Seller respectfully request that the Court (i) enter an Order, substantially in the form annexed hereto, granting the relief requested herein, and (ii) such other and further relief as may be just and proper.

Dated: June 2, 2009
      Richmond, Virginia

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
Gregg M. Galardi, Esq.
Ian S. Fredericks, Esq.
P.O. Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

             - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
Chris L. Dickerson, Esq.
333 West Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

             - and -

MCGUIREWOODS LLP

_/s/ Douglas M . Foley_____
Dion W. Hayes (VSB No. 34304)
Douglas M. Foley (VSB No. 34364)
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

Counsel for Debtors and Debtors in Possession