## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "Agreement"), dated as of February 19th, 2009, is made by and between CIRCUIT CITY STORES, INC., a Virginia corporation, ("Seller") and VEI CIRCUIT LLC, a Maryland limited liability company ("Purchaser").

## RECITALS

Seller is a debtor in possession in a Chapter 11 bankruptcy case (the "Bankruptcy Case") that is pending in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "Bankruptcy Court"). Upon the terms and conditions of this Agreement, Seller desires to sell and convey, and Purchaser desires to purchase and acquire, the Property (as defined below). This Agreement and the purchase and sale of the Property are subject to the approval of the Bankruptcy Court. As contemplated by Section 9.2 of this Agreement, Seller will prepare and file the Sale Motion (as defined below) seeking approval of this Agreement.

In consideration of the mutual covenants and representations herein contained, intending to be legally bound, Seller and Purchaser agree as follows:

1.      PURCHASE AND SALE

1.1      Purchase and Sale.      Subject to the terms and conditions of this Agreement, Seller hereby agrees to sell and convey to Purchaser, and Purchaser hereby agrees to purchase from Seller, all of the Seller's right, title and interest in and to the property located at 8823 Pulaski Highway, Baltimore County, Maryland, comprising approximately 7.389 acres, referenced as MSDAT tax account numbers 15-1502190612, 15-1518474940, 15-1501500691 and 15-1501500690, together with (i) all the rights and appurtenances pertaining to such land including all rights, title and interest of Seller in and to any alleys, streets or other rights-of-way and all air and subsurface rights, (ii) all buildings, structures, and other improvements on said land, and (iii) electrical, mechanical, air conditioning and other fixtures attached thereto (herein collectively called the "Property"); provided, however, the Property shall not include any lifts or racking located in any of the buildings now occupied or previously occupied by Seller, if any (the "Excluded FF&E"), or any personal property, inventory, equipment or trade fixtures of any of the tenants under the Existing Leases (as defined below), all of which shall be excluded from the sale.

2.      PURCHASE PRICE

2.1    Purchase Price.    The purchase price (the "Purchase Price") for the Property shall be FIVE MILLION AND NO/100 DOLLARS ($5,000,000.00).    At Closing, the entire Purchase Price shall be paid into the Escrow Agent's escrow account in cash by Purchaser by wire transfer in accordance with wire transfer instructions to be provided by Escrow Agent, as adjusted by prorations and payment of expenses as herein provided.

3.    SECURITY FOR PURCHASER'S OBLIGATION TO PROCEED TO CLOSING

3.1    Letters of Credit.    In lieu of a cash deposit, concurrently with execution of this Agreement, Purchaser shall deliver to MidTown Agency, Inc. (the "Escrow Agent"), P.O. Box 250, 1430 Cardwell Road, Crozier, Virginia 23039, Attention: Poulson C. Reed,    Phone:    (804)    648-4853,    Fax:    (804)    784-4602,    Email: preed@midtownagency.com, as security for Purchaser's obligation to proceed to Closing in accordance with the terms of this Agreement, a letter of credit payable to Seller in the amount of ONE HUNDRED THOUSAND AND NO/100 DOLLARS ($100,000.00) (the "Initial Letter of Credit").    Within five (5) days after expiration of the Due Diligence Period (as defined below), Purchaser shall deliver to Escrow Agent, as additional security for Purchaser's obligation to proceed to Closing in accordance with the terms of this Agreement, an additional letter of credit payable to Seller in the amount of FOUR HUNDRED THOUSAND AND NO/100 DOLLARS ($400,000.00) (the "Additional Letter of Credit," and, together with the Initial Letter of Credit, the "Letters of Credit"). Each of the Letters of Credit shall be irrevocable, have a term of not less than six (6) months, be issued by a national bank having a regional office or other substantial presence in the Baltimore, Maryland metropolitan area and otherwise be reasonably acceptable to Seller, and contain trigger language requiring payment thereunder to Seller upon receipt by the issuer of a written statement from Seller that Purchaser has failed to close the purchase of the Property as required by this Agreement.    For purposes of the foregoing sentence, Seller acknowledges and agrees that the Letters of Credit may be issued by PNC Bank.

3.2    Draws Upon and Return of Letters of Credit.    If the sale of the Property is consummated under this Agreement, at Closing, the Letters of Credit shall be returned by Escrow Agent to Purchaser.    If Purchaser terminates this Agreement in accordance with Section 4.2, Section 4.3, Section 4.4, Section 4.7, Section 7.1, Section 7.2, or Section 8.1 hereof, or if Seller fails to perform its obligations under Section 6.5, or if Purchaser or Seller terminates this Agreement in accordance with Section 9.4, the Letters of Credit shall be returned promptly by Escrow Agent to Purchaser, and no party hereto shall have any further obligations under this Agreement except for such obligations that survive termination of this Agreement as expressly set forth in this Agreement (the "Survival

2

Obligations"). If Seller terminates this Agreement in accordance with Section 8.2 or Section 10.11, Escrow Agent shall deliver the Letters of Credit to Seller, Seller shall be entitled to draw upon the Letters of Credit in accordance with their terms, and no party hereto shall have any further obligations under this Agreement except for the Survival Obligations. Purchaser agrees to deliver to Seller copies of all Reports (as defined in Section 4.5 hereof) at the time the notice to terminate this Agreement is given. The obligations to deliver the Reports shall survive the termination of this Agreement. Purchaser shall not be entitled to the return of the Letters of Credit from Escrow Agent until all Reports have been delivered to Seller.

4.    ITEMS DELIVERED TO PURCHASER

    4.1    Items Delivered.    Within five (5) business days after the execution of this Agreement, Seller will deliver to Purchaser all relevant information and materials in Seller's possession regarding the Property. Pursuant to the foregoing obligation, Seller has already delivered to Purchaser complete copies of the existing leases with NTW Incorporated d/b/a Tire Kingdom and West Marine Products, Inc., successor in interest to Boat America Corporation (collectively, the "Existing Leases") which are further attached hereto as Exhibit A.

    4.2    Title Examination.    Purchaser shall have the right to have Seller's title to the Property examined and shall give written notice to Seller within thirty (30) days from and after the date of this Agreement (the "Due Diligence Period") of any objection thereto; provided, however, Seller shall have no obligation to satisfy any such objections. Purchaser must elect, on or before the expiration of the Due Diligence Period, one of the following: (i) to waive any such objections that Seller has not agreed to satisfy at or prior to the Closing and to close the transaction in accordance with the terms of this Agreement; or (ii) to terminate this Agreement, in which event Escrow Agent shall promptly return the Initial Letter of Credit to Purchaser as Purchaser's sole and exclusive remedy; provided, however, if Seller has agreed to cure or satisfy each such objection specified in the written notice, then no such election shall be required and Purchaser shall be obligated to close the transaction in accordance with the terms of this Agreement; provided, further, if Purchaser does not send a written notice of title objections prior to the expiration of the Due Diligence Period or does not make such an election on or before the expiration of the Due Diligence Period, then Purchaser shall be deemed to have waived irrevocably any and all title objections and shall be obligated to close the transaction in accordance with the terms of this Agreement. If Seller has agreed to cure or satisfy any title objection, then Purchaser's obligations under this Agreement shall be absolutely conditioned upon Seller's cure or satisfaction occurring at least five (5) days prior to the Closing Date, time being of the essence.

3

      4.3    <u>Property Inspection</u>.    Purchaser shall have through the last day of the Due Diligence Period to determine whether, in Purchaser's sole and absolute discretion, the Property is acceptable to Purchaser.    Notwithstanding anything to the contrary in this Agreement, Purchaser may terminate this Agreement by giving notice of termination to Seller on or before the last day of the Due Diligence Period if Purchaser determines that the Property is not acceptable for any reason, in which event Escrow Agent shall return the Initial Letter of Credit to Purchaser on demand and the parties shall have no further rights or obligations hereunder, except for the Survival Obligations.    If Purchaser does not give a notice of termination pursuant to Section 4.2 or this Section 4.3 at or prior to 5 p.m. (local time in Baltimore, Maryland) on the last day of the Due Diligence Period, this Agreement shall continue in full force and effect and Purchaser's right to terminate this Agreement pursuant to Section 4.2 and this Section 4.3 shall expire and be of no further force or effect.

      Subject to the rights of the tenants under the Existing Leases and subject to the further conditions set out in this Section 4.3, Purchaser shall have reasonable access to the Property during the Due Diligence Period for the purpose of conducting surveys, architectural, engineering, geotechnical, and environmental inspections and tests and any other inspections, studies, or tests reasonably required by Purchaser, all at Purchaser's sole expense.    Prior to entering upon the Property to perform any such inspections or tests, Purchaser shall notify Seller of the need for access to the Property in order to allow Purchaser to coordinate such access with the tenants under the Existing Leases. If any inspection or test disturbs the Property, Purchaser will (at its sole expense) restore the Property as soon as reasonably possible to the same condition as existed prior to any such inspection or test.    Notwithstanding anything to the contrary in this Agreement, Purchaser will not do, or cause or direct to be done, any subsurface testing or boring, or any testing of subsurface water, or any coring, boring or other intrusive testing, without first obtaining Seller's prior written consent which Seller may give or withhold in its absolute discretion; provided, however, all other inspections of or entry upon the Property by Purchaser shall occur only with the consent of Seller, which consent shall not be withheld unreasonably.    Purchaser hereby indemnifies Seller, and agrees to defend, protect and hold Seller harmless, from and against any and all claims, losses, damages and liabilities that may be asserted against or incurred by Seller for or in connection with any injuries or damage to any persons or property, which directly or indirectly are caused by or result from any entry, inspection, testing or other action done or caused or directed to be done by Purchaser or its representatives or contractors.    Purchaser agrees to cause all parties entering the Property at Purchaser's instance to maintain adequate and appropriate insurance to cover risks of the type described herein and, upon Seller's request, to deliver to Seller evidence establishing to Seller's reasonable satisfaction that adequate and appropriate insurance to cover risks of the types described herein is being maintained.

4

4.4    Additional Environmental Due Diligence.  Purchaser shall have a period
of sixty (60) days from and after the date of this Agreement (the "Additional
Environmental Due Diligence Period") to (i) obtain from the Maryland Department of
Environment ("MDE") a complete copy of the site closure letter previously issued by
MDE to Seller (the "Site Closure Letter") and (ii) review the Site Closure Letter and the
related MDE file with respect to the Property (the "MDE Property File").  Purchaser
represents and warrants that it filed a request with MDE seeking access to the MDE
Property File on January 16, 2009.  If Purchaser is unable to obtain the Site Closure
Letter from MDE and review the MDE Property File prior to the expiration of the
Additional Environmental Due Diligence Period, Purchaser may terminate this
Agreement by giving notice of termination to Seller on or before the last day of the
Additional Environmental Due Diligence Period.  If MDE provides Purchaser with a
copy of the Site Closure Letter and notifies Purchaser that it will provide Purchaser with
access to the MDE Property File during the Additional Environmental Due Diligence
Period, Purchaser shall promptly notify Seller of the same in writing, and Purchaser shall
provide a copy of the Site Closure Letter to Seller.  Notwithstanding the fact that there
may then be additional time remaining in the Additional Environmental Due Diligence
Period, Purchaser acknowledges and agrees that it shall only have a period of three (3)
business days after its receipt of the Site Closure Letter and its review of the MDE
Property File during which Purchaser shall have the right, in its sole and absolute
discretion, to terminate this Agreement by giving notice of termination to Seller.  If
Purchaser terminates this Agreement pursuant to this Section 4.4, Escrow Agent shall
return the Letters of Credit to Purchaser on demand and the parties shall have no further
rights or obligations hereunder, except for the Survival Obligations.  If Purchaser does
not give a notice of termination pursuant to this Section 4.4 at or prior to 5 p.m. (local
time in Baltimore, Maryland) on the last day of the Additional Environmental Due
Diligence Period or within three (3) business days after its receipt of the Site Closure
Letter and its review of the MDE Property File, as applicable, this Agreement shall
continue in full force and effect and Purchaser's right to terminate this Agreement
pursuant to this Section 4.4 shall expire and be of no further force and effect.

4.5    Reports.    All information provided by Seller to Purchaser or obtained
by Purchaser relating to the Property in the course of Purchaser's due diligence
investigation, whether before or after the date of this Agreement (collectively, the
"Reports"), shall be treated as confidential information and shall not be disclosed to any
third parties except for Purchaser's attorneys, engineers, lenders, real estate broker,
prospective tenants and other business associates who need to know the information in
furtherance of this transaction, and then only if they agree to maintain the information in
strict confidence as provided herein, provided that Purchaser shall be permitted to contact
and investigate environmental conditions with and through MDE as Purchaser deems
appropriate.  Purchaser shall be liable to Seller for any intentional or negligent

5

unauthorized disclosure of the confidential information by or through Purchaser and for all damage or injury to any person or property resulting from, relating to or arising out of any due diligence investigation, whether occasioned by the acts of Purchaser or any of its employees, agents, representatives or contractors, and Purchaser shall indemnify and agrees to defend, protect and hold harmless Seller and its agents, employees, officers, directors, representatives and affiliates from any liability resulting therefrom. This Section 4.5 shall survive the Closing or the termination of this Agreement, as applicable.

4.6     Purchaser's Representations and Warranties.     Purchaser represents and warrants to Seller that (a) Purchaser is a limited liability company, duly organized and in good standing under the laws of the State of Maryland, is authorized to do business in the State of Maryland, and has the power to enter into this Agreement and to execute and deliver this Agreement and to perform all of its duties and obligations hereunder, and Purchaser has obtained all necessary authorizations required in connection with the execution, delivery and performance contemplated by this Agreement and has obtained the consent of all entities and parties necessary to bind Purchaser to this Agreement; (b) neither the execution nor the delivery of this Agreement, nor the consummation of the purchase and sale contemplated hereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement conflict with or will result in the breach of any of the terms, conditions, or provisions of any agreement or instrument to which Purchaser, or any partner or related entity or affiliate of Purchaser, is a party or by which Purchaser, any partner or related entity or affiliate of Purchaser, or any of Purchaser's assets is bound; and (c) this Agreement is the legal, valid and binding obligation of Purchaser and is enforceable against Purchaser in accordance with its terms. Purchaser's representations and warranties contained herein must be true and correct through the Closing Date, and Purchaser's failure to notify Seller prior to the Closing Date of any inaccuracies shall be a default by Purchaser under this Agreement. The Purchaser's representations and warranties set forth in this Section 4.6 shall survive the Closing or termination of this Agreement.

4.7     Seller's Representations and Warranties.     Seller represents and warrants to Purchaser that (a) Seller is a corporation duly organized and validly existing under the laws of the State of Virginia; (b) Seller has the corporate power and authority to enter into, execute and deliver this Agreement and to perform all of its duties and obligations under this Agreement; (c) upon entry of the Sale Order in the Bankruptcy Case, this Agreement will be the legal, valid and binding obligation of Seller and will be enforceable against Seller in accordance with its terms; and (d) at the Closing, Seller shall convey to Purchaser fee simple title to the Property, free and clear of liens (including the liens of Seller's postpetition lenders and liens for past-due real property taxes), claims and encumbrances other than Permitted Encumbrances. The representations and warranties contained in this Section 4.7 shall expire and be extinguished at the Closing

6

provided that their accuracy as of Closing shall be an absolute condition to Purchaser's obligation to consummate this transaction at Closing.

4.8     Further Assurances.    Seller and Purchaser agree to execute and deliver at or prior to Closing any documents or instruments reasonably necessary to carry out the terms of this Agreement.

4.9     Waiver by Purchaser.    Purchaser, in its sole and absolute discretion, may waive any condition to Closing set forth in this Section 4, but no such waiver shall be effective unless affirmatively expressed in writing by Purchaser.

5.      DISCLAIMER OF REPRESENTATIONS OR WARRANTIES BY SELLER; ACCEPTANCE OF PROPERTY

5.1     Disclaimer.    PURCHASER ACKNOWLEDGES AND AGREES THAT SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES (OTHER THAN THE SPECIAL OR LIMITED WARRANTY OF TITLE AS SET OUT IN THE DEED, AS DEFINED BELOW), PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, STATUTORY, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO (A) THE VALUE, NATURE, QUALITY OR CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY, (B) THE INCOME TO BE DERIVED FROM THE PROPERTY, (C) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH PURCHASER OR ANY TENANT MAY CONDUCT THEREON, (D) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY, (E) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY, (F) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY, (G) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY, (H) COMPLIANCE WITH ANY ENVIRONMENTAL REQUIREMENTS (AS HEREINAFTER DEFINED), INCLUDING THE EXISTENCE IN OR ON THE PROPERTY OF HAZARDOUS MATERIALS (AS DEFINED BELOW) OR (I) ANY OTHER MATTER WITH RESPECT TO THE PROPERTY. ADDITIONALLY, NO PERSON ACTING ON BEHALF OF SELLER IS AUTHORIZED TO MAKE, AND BY EXECUTION HEREOF PURCHASER ACKNOWLEDGES THAT NO PERSON HAS MADE, ANY REPRESENTATION, AGREEMENT, STATEMENT, WARRANTY, GUARANTY OR PROMISE REGARDING THE PROPERTY OR THE

7

TRANSACTION CONTEMPLATED HEREIN; AND NO SUCH REPRESENTATION, WARRANTY, AGREEMENT, GUARANTY, STATEMENT OR PROMISE, IF ANY, MADE BY ANY PERSON ACTING ON BEHALF OF SELLER SHALL BE VALID OR BINDING UPON SELLER UNLESS EXPRESSLY SET FORTH HEREIN. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE PROPERTY, PURCHASER IS RELYING SOLELY ON ITS OWN INVESTIGATION OF THE PROPERTY AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY SELLER AND AGREES TO ACCEPT THE PROPERTY AT THE CLOSING, IN THE CONDITION EXISTING ON THE DATE HEREOF (REASONABLE WEAR AND TEAR EXCEPTED) AND WAIVE ALL OBJECTIONS OR CLAIMS AGAINST SELLER (INCLUDING, BUT NOT LIMITED TO, ANY RIGHT OR CLAIM OF CONTRIBUTION) ARISING FROM OR RELATED TO THE PROPERTY OR TO ANY HAZARDOUS MATERIALS ON THE PROPERTY. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT ANY INFORMATION PROVIDED OR TO BE PROVIDED WITH RESPECT TO THE PROPERTY WAS OBTAINED FROM A VARIETY OF SOURCES AND THAT SELLER HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND MAKES NO REPRESENTATIONS AS TO THE ACCURACY, TRUTHFULNESS OR COMPLETENESS OF SUCH INFORMATION. SELLER IS NOT LIABLE OR BOUND IN ANY MANNER BY ANY VERBAL OR WRITTEN STATEMENT, REPRESENTATION OR INFORMATION PERTAINING TO THE PROPERTY, OR THE OPERATION THEREOF, FURNISHED BY ANY REAL ESTATE BROKER, CONTRACTOR, AGENT, EMPLOYEE, SERVANT OR OTHER PERSON. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT, TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE SALE OF THE PROPERTY AS PROVIDED FOR HEREIN IS MADE ON AN "AS IS" "WHERE IS" CONDITION AND BASIS WITH ALL FAULTS. IT IS UNDERSTOOD AND AGREED THAT THE PURCHASE PRICE REFLECTS THAT THE PROPERTY IS BEING SOLD BY SELLER AND PURCHASED BY PURCHASER SUBJECT TO THE FOREGOING. PURCHASER HEREBY AGREES TO INDEMNIFY, PROTECT, DEFEND, SAVE AND HOLD HARMLESS SELLER FROM AND AGAINST ANY AND ALL DEBTS, DUTIES, OBLIGATIONS, LIABILITIES, SUITS, CLAIMS, DEMANDS, CAUSES OF ACTION, DAMAGES, LOSSES, FEES AND EXPENSES (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES AND EXPENSES AND COURT COSTS) IN ANY WAY RELATING TO, OR IN CONNECTION WITH OR ARISING OUT OF PURCHASER'S ACQUISITION, OWNERSHIP, LEASING, USE, OPERATION, MAINTENANCE AND MANAGEMENT OF THE PROPERTY; PROVIDED, HOWEVER, PURCHASER SHALL NOT BE REQUIRED TO INDEMNIFY SELLER WITH RESPECT TO ANY MATTERS ARISING PRIOR TO

THE CLOSING. THE PROVISIONS OF THIS SECTION 5 SHALL SURVIVE THE CLOSING OR ANY TERMINATION HEREOF.

5.2    Hazardous Materials. "Hazardous Materials" shall mean any substance which is or contains (i) any "hazardous substance" as now or hereafter defined in §101 (14) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. §9601 et seq.) ("CERCLA"), or any regulations promulgated under CERCLA; (ii) any "hazardous waste" as now or hereafter defined in the Resource Conservation and Recovery Act, as amended (42 U.S.C. §6901 et seq.) ("RCRA"), or regulations promulgated under RCRA; (iii) any substance regulated by the Toxic Substances Control Act (15 U.S.C. §2601 et seq.); (iv) gasoline, diesel fuel, or other petroleum hydrocarbons; (v) asbestos and asbestos containing materials, in any form, whether friable or non-friable; (vi) polychlorinated biphenyls; (vii) radon gas; and (viii) any additional substances or materials which are now or hereafter classified or considered to be hazardous or toxic under Environmental Requirements or the common law, or any other applicable laws relating to the Property. Hazardous Materials shall include, without limitation, any substance, the presence of which on the Property, (A) requires reporting, investigation or remediation under Environmental Requirements; (B) causes or threatens to cause a nuisance on the Property or adjacent property or poses or threatens to pose a hazard to the health or safety of persons on the Property or adjacent property; or (C) which, if it emanated or migrated from the Property, could constitute a trespass.

5.3    Environmental Requirements.    "Environmental Requirements" shall mean all laws, ordinances, statutes, codes, rules, regulations, agreements, judgments, orders, and decrees, now or hereafter enacted, promulgated, or amended, of the United States, the states, the counties, the cities, or any other political subdivisions in which the Property is located, and any other political subdivision, agency or instrumentality exercising jurisdiction over the owner of the Property, the Property, or the use of the Property, relating to pollution, the protection or regulation of human health, natural resources, or the environment, or the emission, discharge, release or threatened release of pollutants, contaminants, chemicals, or industrial, toxic or hazardous substances or waste or Hazardous Materials into the environment (including, without limitation, ambient air, surface water, ground water or land or soil).

5.4    Purchaser's Independent Investigations.    For all purposes of this Article 5, Purchaser acknowledges and agrees that Purchaser has been provided with adequate and sufficient access to the Property prior to the date of this Agreement, and Purchaser is entitled to access the Property during the Due Diligence Period, to conduct its own inspections, tests, investigations, environmental audits and other reviews of the Property as Purchaser deems necessary or appropriate, and Purchaser is relying on its

own such inspections, tests, investigations, environmental audits and other reviews in determining the advisability of acquiring the Property.

6.    CLOSING

      6.1    Closing.        Unless otherwise agreed by the parties in writing, the closing of the purchase and sale of the Property (the "Closing") shall be conducted by mail or, if necessary, held at the offices of Escrow Agent not later than (i) fifteen (15) business days after expiration of the Additional Environmental Due Diligence Period, or (ii) ten (10) days following entry by the Bankruptcy Court of the Sale Order, whichever is last to occur (the date on which the Closing occurs is referred to as the "Closing Date").

      6.2    Possession.        Possession of the Property shall be delivered to Purchaser at the Closing, subject to (i) the rights of the tenants under the Existing Leases, (ii) liens for real property taxes that are not yet due and payable, (iii) zoning ordinances, building codes and other land use laws and applicable governmental regulations, (iv) all covenants, agreements, conditions, easements, restrictions and rights, whether of record or otherwise (except as Seller has agreed to cure or satisfy pursuant to Section 4.2), and (v) any and all matters that would be shown by a physical inspection of the Property (collectively, the "Permitted Encumbrances"). Prior to the Closing, if applicable, Seller shall remove the Excluded FF&E from the Property and shall repair any material damage to the Property caused by the removal of the Excluded FF&E.

      6.3    Proration.        All utilities with respect to the Property for the month in which the Closing occurs, rents due and payable under the Existing Leases for the month in which the Closing occurs, and real estate taxes and other assessments with respect to the Property for the year in which the Closing occurs, shall be prorated as of the Closing Date as follows:

            (a)        All real estate taxes and assessments, both general and special, water charges and sewer rents, whether or not then due or payable, and all other normally proratable items shall be prorated to the Closing Date, based upon the latest assessments or actual invoices available. Should any such proration be inaccurate based upon the actual tax bill or assessment when received, either party hereto may demand and shall be entitled to receive on demand, a payment from the other correcting such malapportionment. Seller shall pay all costs associated with any fees, taxes, impact fees, assessments, delinquent or otherwise, and any other land use charges attributable to a period prior to Closing. In the event that Seller has received any reimbursement of such taxes, assessments and/or charges from tenants under the Existing Leases for periods extending after Closing, such reimbursements (to the extent applicable to periods after Closing) shall be credited against any adjustment otherwise due from Purchaser.

(b)    Except for any utilities that are separately metered and that are paid for directly by the tenants under the Existing Leases, Purchaser shall cause all utility meters to be read as of the Closing Date, shall cause the transfer of all utility services for the Property to Purchaser's name as of the Closing Date, and where necessary, shall post deposits with the utility companies; provided, however, Seller shall cooperate reasonably with Purchaser in connection with switching utility services over to Purchaser's name. Seller shall be entitled to a credit of whatever deposits Seller may have with any utility companies if Purchaser receives the benefit of such deposits.  If the Closing shall occur before the actual amount of utilities and all other operating expenses with respect to the Property for the month in which the Closing occurs are determined, the apportionment of such utilities and other operating expenses shall be upon the basis of an estimate by Seller of such utilities and other operating expenses for such month based on previous similar billing periods.  Subsequent to the Closing, when the actual amount of such utilities and other operating expenses with respect to the Property for the month in which the Closing occurs are determined, the parties agree to adjust the proration of such utilities and other operating expenses and, if necessary, to refund or repay such sums as shall be necessary to effect such adjustment.

(c)    All rent payments due and payable by the tenants under the Existing Leases for the month in which Closing occurs (including base rent and additional rent) shall be prorated to the Closing Date and all security deposits held by Seller under the Existing Leases (together with any interest obligation due through the date of Closing) shall be transferred to Purchaser or credited against the Purchase Price at Closing.

(d)    The agreements of Seller and Purchaser set forth in this Section 6.3 shall survive the Closing.

6.4    Closing Costs.        Purchaser shall pay all title examination costs, title insurance premiums, survey costs, environmental and engineering costs, and any and all other due diligence costs.  Except as otherwise provided herein, each party shall pay its own attorneys' fees.  The parties shall each pay one-half (1/2) of all transfer and recordation costs and any escrow fee charged by Escrow Agent; and, with regard to other costs of Closing, the parties shall bear the costs of recording and settlement as is the custom in Baltimore County, Maryland.

6.5    Seller's Obligations at the Closing.    At the Closing, Seller shall deliver to Escrow Agent the following:

(a)    Deed. A special or limited warranty deed, together with the affidavits of residency and total payment required by Maryland law, duly executed by

Seller, conveying the Property in fee simple as contemplated by the Sale Order, subject to the Permitted Encumbrances.

(b)    Foreign Person.    An affidavit or certificate duly executed by Seller certifying that Seller is not a "foreign person," as defined in the federal Foreign Investment in Real Property Tax Act of 1980, and the 1984 Tax Reform Act, as amended, which shall include Seller's Taxpayer I.D. Number.

(c)    Assignment of Leases.    Two (2) counterpart copies of the Assignment of Leases attached hereto as Exhibit B and made a part hereof, duly executed by Seller.

(d)    Tenant Estoppel Certificates.    Executed estoppel certificates from the tenants under the Existing Leases, in a form reasonably acceptable to Purchaser, confirming the rent, expense reimbursement obligations and other material terms of each of the Existing Leases and certifying that there are no current defaults by Seller under each of the Existing Leases.

6.6    Purchaser's Obligations at the Closing.    At the Closing, Purchaser shall deliver to Escrow Agent the following:

(a)    Purchase Price.    The Purchase Price, by wire transfer of immediately available funds.

(b)    Evidence of Authority.    Such organizational and authorizing documents of Purchaser as shall be reasonably required by Seller authorizing Purchaser's acquisition of the Property pursuant to this Agreement and the execution of this Agreement and any documents to be executed by Purchaser at the Closing.

(c)    Taxpayer I.D. Certificate.    A certificate duly executed by Purchaser certifying Purchaser's address and Taxpayer I.D. Number and consenting to Seller's release of this information to any governmental authority.

(d)    Assignment of Leases.    Two (2) counterpart copies of the Assignment of Leases attached hereto as Exhibit B and made a part hereof, duly executed by Purchaser.

6.7    Commission.    Seller and Purchaser represent that there are no real estate brokers or agents of record in this transaction, other than DJM Realty and Grubb & Ellis (collectively, the "Brokers"), and upon Closing, Seller shall pay Brokers a commission pursuant to a separate written agreement.    Neither Seller nor Purchaser shall be responsible for any other real estate commissions or fees of any kind or nature

12

whatsoever. Seller and Purchaser each agrees to hold the other harmless against any claim made for brokerage commissions or finders' fees resulting from such parties' actions in this transaction. The provisions of the preceding sentence shall survive the Closing.

7.      RISK OF LOSS; EXISTING INSURANCE PROCEEDS

        7.1      Condemnation.      If, prior to the Closing, action is initiated to take any material portion of the Property by eminent domain proceedings or by deed in lieu thereof, Purchaser may either at or prior to Closing (a) terminate this Agreement, in which case the Letters of Credit shall be returned to Purchaser by Escrow Agent and neither party shall have any further right or obligation hereunder except for the Survival Obligations, or (b) consummate the Closing, in which case the award of the condemning authority shall be assigned to Purchaser at the Closing, and there shall be no reduction in the Purchase Price.

        7.2      Casualty.      Seller assumes all risks and liability for damage to or injury occurring to the Property by fire, storm, accident, or any other casualty or cause until the Closing has been consummated. If the Property, or any part thereof, suffers any damage in excess of Two Hundred Thousand and No/100 Dollars ($200,000.00) after the date of this Agreement and prior to the Closing from fire or other casualty, which Seller, at its sole option, does not repair, Purchaser may either at or prior to Closing (a) terminate this Agreement, in which case the Letters of Credit shall be returned to Purchaser by Escrow Agent and neither party shall have any further right or obligation hereunder except for the Survival Obligations, or (b) consummate the Closing, in which case all of Seller's right title and interest in and to the proceeds of any insurance covering such damage (less an amount equal to any expenses and costs incurred by Seller to repair or restore the Property or to be paid on account of the loss of rents or other income from the Property for the period prior to and including the Closing Date, all of which shall be payable to Seller), to the extent the amount of such insurance does not exceed the Purchase Price, plus Seller's deductible under its insurance policy, shall be assigned to (or, in the case of Seller's deductible, paid to) Purchaser at the Closing. If the Property, or any part thereof, suffers any damage less than Two Hundred Thousand and No/100 Dollars ($200,000.00) after the date of this Agreement and prior to the Closing, Purchaser agrees that it will consummate the Closing and accept the assignment of the proceeds of any insurance covering such damage, plus Seller's deductible under its insurance policy, and there shall be no reduction in the Purchase Price. Seller shall maintain casualty insurance for the Property through the Closing Date and, if Purchaser is entitled to insurance proceeds pursuant to this Section 7.2, Seller shall cooperate with Purchaser in good faith in connection with the prosecution of any such insurance claim.

8.      DEFAULT

13

8.1    Breach by Seller.    In the event that Seller shall fail to consummate the transactions contemplated by this Agreement for any reason, except Purchaser's default or a termination of this Agreement by Purchaser or Seller pursuant to a right to do so under the provisions hereof, Purchaser, as its sole and exclusive remedy, (except as provided below) may terminate this Agreement and demand the return of the Letters of Credit from Escrow Agent. In no event, (except as provided below) shall Purchaser be entitled to any remedy other than the return of the Letters of Credit from Escrow Agent and Seller shall not be liable to Purchaser for any actual, punitive, speculative or consequential damages. In the event that the Sale Order has been obtained and Seller shall fail to consummate the transactions contemplated by this Agreement for any reason other than pursuant to a provision of this Agreement permitting Seller to do so, then (and only in such event) Purchaser shall be entitled to the remedy of specific performance.

8.2    Breach by Purchaser. In the event that Purchaser shall fail to consummate the transactions contemplated by this Agreement for any reason, except Seller's default or a termination of this Agreement by Purchaser or Seller pursuant to a right to do so under the provisions hereof, Seller, as its sole and exclusive remedy, may terminate this Agreement, demand that Escrow Agent deliver the Letters of Credit to Seller and, thereafter, draw upon the Letters of Credit and retain the proceeds received under the Letters of Credit as liquidated damages. Seller and Purchaser have made this provision for liquidated damages because it would be impossible to estimate more precisely, on the date hereof, the amount of actual damages for such breach, and because the parties believe that the proceeds that would be payable to Seller under the Letters of Credit represent a reasonable pre-estimate of Seller's probable loss in the event of Purchaser's breach. Notwithstanding the foregoing, the provisions of this Section 8.2 shall not limit or affect any of Purchaser's indemnities as provided in any other Section of this Agreement.

9.    BANKRUPTCY ISSUES

9.1    Generally.    Notwithstanding any other provision of this Agreement, the provisions of this Article 9 shall apply to the sale of the Property.

9.2    Filing a Sale Motion. The obligation of Seller to sell and convey the Property to Purchaser, and the obligation of Purchaser to purchase the Property from Seller, are subject to the condition precedent that the Bankruptcy Court shall have entered an order in the Bankruptcy Case (the "Sale Order") (i) approving this Agreement and the sale of the Property to Purchaser, free and clear of liens, claims and encumbrances other than Permitted Encumbrances, and (ii) authorizing Seller to consummate the transactions contemplated by this Agreement. Promptly following the execution by the parties of this Agreement and the delivery by Purchaser to Escrow Agent of the Initial Letter of Credit, Seller will file with the Bankruptcy Court a motion pursuant to section 363 of the Bankruptcy Code seeking approval of this Agreement and the consummation of the

14

transactions contemplated hereby and entry of the Sale Order (the "Sale Motion"). The Sale Motion shall be in form and substance consistent with this Agreement, shall be subject to reasonable review of Purchaser prior to submission to the Bankruptcy Court and Seller shall be responsible for serving and providing notice of the Sale Motion.

9.3    Entry of Sale Order.    The closing of the sale of the Property to Purchaser shall take place as provided in Section 6.1 above.  Purchaser shall cooperate with the Seller in good faith to obtain entry by the Bankruptcy Court of the Sale Order as soon as reasonably practicable.

9.4    Termination.  Purchaser acknowledges that the Seller intends to solicit "higher or better" offers for the Property, including entertaining other offers from competing bidders. To facilitate this process, Seller agrees to the following procedures for responding to other offers that the Seller may receive for the Property: (a) an initial minimum overbid for the Property of at least $5,250,000.00 shall be required; (b) each initial overbid must be accompanied by a deposit of at least $500,000.00 (in cash or in the form of a letter of credit); (c) each competing offer must have terms and conditions that are substantially identical to those set forth in this Agreement (except that no competing offer shall provide for any due diligence period or property inspection period); and (d) if an acceptable competing offer is received by Seller, Seller shall conduct an auction to determine the highest or best offer for the Property and Purchaser shall be entitled to participate in the auction. The last day for submission of higher or better offers will be fixed by Seller or established by order of the Bankruptcy Court. In evaluating whether an offer constitutes a "higher or better" offer, Seller may weigh such factors as the amount of any brokerage commissions that would be payable by Seller in accordance with the terms of such offer. Notwithstanding any other provision of this Agreement, (i) Seller shall have the right to terminate this Agreement in order to permit Seller to accept a "higher or better" offer for the Property (with a price of not less than $5,250,000.00) and (ii) each of Seller and Purchaser shall have the right to terminate this Agreement if the Bankruptcy Court has not entered the Sale Order on or prior to the date which is one hundred twenty (120) days after the date of this Agreement. Subject to the approval of the Bankruptcy Court, if this Agreement is terminated by Seller in order to permit Seller to accept a "higher or better" offer for the Property, Seller shall pay Purchaser a "break-up" fee of $20,000.00 upon the termination of this Agreement.

10.    MISCELLANEOUS

10.1    Notices.        All notices, demands and requests which may be given or which are required to be given by either party to the other, and any exercise of a right of termination provided by this Agreement, shall be in writing and shall be deemed effective either: (a) on the date personally delivered to the address below, as evidenced by written receipt therefore, whether or not actually received by the person to whom addressed; (b)

15

on the third (3rd) business day after being sent, by certified or registered mail, return receipt requested, addressed to the intended recipient at the address specified below; or (c) on the first (1st) business day after being deposited into the custody of a nationally recognized overnight delivery service such as Federal Express, addressed to such party at the address specified below. For purposes of this Section 10.1, the addresses of the parties for all notices are as follows:

| | |
|---|---|
| If to Purchaser: | c/o VANGUARD COMMERCIAL DEVELOPMENT, INC.<br>1500 Serpentine Road, Suite 100<br>Baltimore, Maryland 21209<br>Attention: Leonard Weinberg, II |
| with a copy to: | Eugene W. Cunningham, Jr., Esq.<br>Royston, Mueller, McLean & Reid, LLP<br>102 W. Pennsylvania Avenue, Suite 600<br>Towson, Maryland 21204 |
| If to Seller: | CIRCUIT CITY STORES, INC.<br>9950 Mayland Drive<br>Richmond, Virginia 23233<br>Attention: Vice President of Real Estate |
| with a copy to: | CIRCUIT CITY STORES, INC.<br>9950 Mayland Drive<br>Richmond, Virginia 23233<br>Attention: General Counsel |
| and a copy to: | MCGUIREWOODS LLP<br>One James Center<br>901 East Cary Street<br>Richmond, Virginia 23219<br>Attention: Edmund S. Pittman, Esq. |

The addresses to which notices and demands shall be delivered or sent may be changed from time to time by notice served, as hereinbefore provided, by either party upon the other party.

10.2   Entire Agreement.   This Agreement embodies the entire agreement between the parties relative to the subject matter hereof, and there are no oral or written agreements between the parties, nor any representations, promises or inducements made

16

by either party relative to the subject matter hereof, which are not expressly set forth herein.

10.3    Amendment.   This Agreement may be amended only by a written instrument executed by the party or parties to be bound thereby.

10.4    Heading.      The captions and headings used in this Agreement are for convenience of reference only and do not in any way limit, amplify, or otherwise modify the provisions of this Agreement.

10.5    Time of Essence.      Time is of the essence of this Agreement; however, if the final date of any period which is set out in any provision of this Agreement falls on a Saturday, Sunday or legal holiday under the laws of the United States, or the State where the Property is located, then, in such event, the time of such period shall be extended to the next day which is not a Saturday, Sunday or legal holiday.

10.6    Governing Law.      This Agreement shall be governed by the laws of the State of Maryland and the laws of the United States pertaining to transactions in such State.

10.7    Successors and Assigns: Assignment.      This Agreement shall bind and inure to the benefit of Seller and Purchaser and their respective heirs, executors, administrators, personal and legal representatives, successors and permitted assigns. Purchaser shall be permitted to assign Purchaser's rights under this Agreement to an affiliate of Purchaser without obtaining any consent of Seller; provided, however, any subsequent assignment may be made only with the prior written consent of Seller. No assignment of Purchaser's rights hereunder shall relieve Purchaser of its liabilities under this Agreement. This Agreement is solely for the benefit of Seller and Purchaser; there are no third party beneficiaries hereof. Any assignment of this Agreement in violation of the foregoing provisions shall be null and void.

10.8    Invalid Provision.      If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws, such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Agreement; and, the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by such illegal, invalid, or unenforceable provision or by its severance from this Agreement.

10.9    Attorneys' Fees.      In the event it becomes necessary for either party hereto to file suit to enforce this Agreement or any provision contained herein, the party

17

prevailing in such suit shall be entitled to recover, in addition to all other remedies or damages, as provided herein, reasonable attorneys' fees incurred in such suit.

10.10  <u>Multiple Counterparts.</u>    This Agreement may be executed in a number of identical counterparts which, taken together, shall constitute collectively one (1) agreement; in making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart with each party's signature.

10.11  <u>No Recordation.</u>    Seller and Purchaser hereby acknowledge that neither this Agreement nor any memorandum or affidavit thereof shall be recorded of public record in any real property or other public records. Should Purchaser ever record or attempt to record this Agreement, or a memorandum or affidavit thereof, or any other similar document, then, notwithstanding anything herein to the contrary, said recordation or attempt at recordation shall constitute a default by Purchaser hereunder, and, in addition to the other remedies provided for herein, Seller shall have the express right to terminate this Agreement by filing a notice of said termination in the county in which the Property is located or otherwise as may be necessary to give public notice of such termination.

10.12  <u>Merger Provision.</u>    Except as otherwise expressly provided herein, any and all rights of action of Purchaser for any breach by Seller of any representation, warranty or covenant contained in this Agreement shall merge with the Deed and other instruments executed at Closing, shall terminate at Closing and shall not survive Closing.

10.13  <u>Brokers.</u>    Except as contemplated by Section 6.7, no commissions, brokerage fees, finders' fees, or other similar fees shall be due in connection with this Agreement.

10.14  <u>Consent to Jurisdiction of Bankruptcy Court.</u>    THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ALL MATTERS, INCLUDING ANY LEGAL ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY RELATED AGREEMENTS OR THE CONTEMPLATED TRANSACTIONS AND THE INTERPRETATION, IMPLEMENTATION AND ENFORCEMENT OF THIS AGREEMENT AND THE PARTIES HEREO IRREVOCABLY SUBMIT AND CONSENT TO SUCH JURISDICTION.

Buyer and Purchaser further agree that service of any process, summons, notice or document by U.S. registered mail to any such party's respective address set forth in Section 10.1 of this Agreement will be effective service of process for any action, suit or proceeding with respect to any matters to which it has submitted to jurisdiction as set forth above. Each of Buyer and Purchaser irrevocably and unconditionally waives any

18

objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in the Bankruptcy Court.

[SIGNATURE PAGES ATTACHED]

IN WITNESS WHEREOF, each of the parties hereto have caused this Agreement to be executed by its duly authorized representatives as of the date set forth above.

SELLER

CIRCUIT CITY STORES, INC.,
a Virginia corporation

By: _Michell Mosier_
Name: _Ve@@n Michelle Mosier_
Title: _VP Controller_

PURCHASER

VEI CIRCUIT LLC,
a Maryland limited liability company

By: Vanguard Management Services, Inc., Manager

By: _____
Name: Leonard Weinberg, II
Title:   President

The escrow terms and conditions of this Agreement are agreed to and accepted this _____ day of February, 2009.

ESCROW AGENT:

MIDTOWN AGENCY, INC.

By: _____
Name: _____
Title: _____

Mailing Address:

P.O. Box 250
1430 Cardwell Road
Crozier, Virginia 23039

20

IN WITNESS WHEREOF, each of the parties hereto have caused this Agreement to be executed by its duly authorized representatives as of the date set forth above.

SELLER

CIRCUIT CITY STORES, INC.,
a Virginia corporation

By:      _____
Name:    _____
Title:   _____


PURCHASER

VEI CIRCUIT LLC,
a Maryland limited liability company

By: Vanguard Management Services, Inc., Manager

By:      _____
Name:    Leonard Weinberg, II
Title:   President


The escrow terms and conditions of this Agreement are agreed to and accepted this _20th_ day of February, 2009.

ESCROW AGENT:

MIDTOWN AGENCY, INC.

By:      _Paulson C. Reed_
Name:    _Paulson C. Reed_
Title:   _President_


Mailing Address:

P.O. Box 250
1430 Cardwell Road
Crozier, Virginia 23039

20

Attention: Poulson C. Reed

## EXHIBIT A

**COPIES OF EXISTING LEASES (See attached)**



## Ground Lease Agreement

THIS Ground Lease, made and entered into this 23rd day of March, 1995, by and between Circuit City Stores, Inc., (hereinafter called "LESSOR") and NTW Incorporated, a Delaware corporation (hereinafter called "LESSEE").


WITNESSETH:

1.   Description of Leased Premises

LESSOR hereby Leases to LESSEE and warrants that it has the ability to Lease for the term hereof, and LESSEE Leases from LESSOR on the terms and conditions hereinafter set forth, a parcel of real property, together with all easements, rights, privileges, appurtenances and the right of ingress and egress, more particularly described on Exhibit "A" which is attached hereto and by reference made a part hereof (hereinafter referred to as the "Property"). The described Property, together with the improvements to be constructed by LESSEE thereon, is hereinafter referred to as the "Leased Premises". The Property upon which the improvements are to be constructed shall contain not less than .749 acres.

The Leased Premises as shown on Exhibit "A" attached hereto and the associated common areas of LESSOR's Property as shown on Exhibit "B" attached hereto shall be known as Golden Ring Center (the Shopping Center), and shall be subject to a more definitive legal description from a survey acceptable to the LESSEE which survey shall be performed by LESSEE at LESSEE's sole cost and expense. The LESSOR hereby agrees that the LESSEE may enter upon the lands of the LESSOR to perform its suitability studies and survey work at any time after the full execution of this Ground Lease.

2.   TERM

This Ground Lease shall become effective upon full execution by the parties hereto, the initial term hereof to be for fifteen (15) years commencing on the first day of the first month following the date upon which LESSEE's obligation to pay rent commences. LESSOR and LESSEE agree, that this Ground Lease may be extended at the option of LESSEE for three (3) additional consecutive five (5) years periods beginning with the termination date of the initial term of this Ground Lease or the then existing extension period upon the same terms and conditions as in the initial term of this Ground Lease. This Ground Lease shall terminate automatically at the end of the initial term of this Ground Lease or any then existing extension period if LESSEE shall fail to give written notice to LESSOR one year (1) prior to the end of the initial term or then existing extension period that it does desire to extend this Ground Lease. LESSEE shall not have the right to extend the term of this Ground Lease if at the time notice of extension is

given either (a) LESSEE is in default hereunder beyond any applicable cure period, or (b) the Leased Premises are not then open and operating for business as a National Tire Warehouse or open and operating for an automotive use by any other related firm, corporation or entity. LESSOR and LESSEE shall execute a separate agreement evidencing the actual initial term of this Ground Lease, including the beginning and ending dates, at such time as said dates are known.

For purposes of the Lease commencement and rental commencement ("Commencement Date") of this Lease, LESSOR and LESSEE agree that the initial Lease term and LESSEE's rental obligation shall commence on the earlier of (i) ninety (90) days after LESSOR substantially completes its work with respect to the Leased Premises under Article 4(B) and delivers possession of the Leased Premises to LESSEE, or (ii) the date when LESSEE opens for business.

3.   RENT

LESSEE agrees to pay LESSOR as fixed rental on the Leased Premises the sum of __Fifty Thousand__ Dollars (_$50,000.00_) per annum. The rent shall be paid in equal monthly installments of _Four Thousand One hundred Sixty Six and 67/100_ Dollars ($4,166.67) on the first day of each month in advance commencing on the Commencement date as defined in Article 2 hereof for the first five years of this Lease. If the first day upon which rent becomes payable is other than the first day of any calendar month, the rent for the balance of said month shall be prorated at a daily rate based upon the base monthly rent, and shall be payable on the first day of the first month following the Commencement Date.

For the sixth (6th) through tenth (10th) years of the Lease, LESSEE agrees to pay LESSOR as fixed rental on the Leased Premises the sum of _Fifty Six Thousand Two Hundred Fifty_ Dollars ($56,250.00) per annum. The rent shall be paid in equal monthly installments of _Four Thousand Six Hundred Eighty Seven and 50/100_ Dollars ($4,687.50) on the first day of each month in advance commencing in the sixth year through the tenth year of this Lease.

For the eleventh (11th) through fifteenth (15th) years of the Lease, LESSEE agrees to pay to LESSOR as fixed rental on the Leased Premises the sum of _Sixty Three Thousand Two Hundred Eighty One and 25/100 dollars_ ($63,281.25) per annum. The rent for the eleventh through fifteenth years of the Lease shall be paid in equal monthly installments of _Five Thousand Two Hundred Seventy-Three and 44/100 Dollars_ ($5,273.44) on the first day of each month in advance commencing on the first day of the eleventh year and continuing through the end of the fifteenth year of the Lease.

A.   If LESSEE exercises its right to extend this lease as provided herein, fixed rental for the option periods shall be as provided in Paragraph 22.

B.   All amounts which LESSEE is required to pay under this Lease (including without limitations, the amounts payable under Articles 3, 12, 20 and 22) are rent, upon failure to pay any such amounts, LESSOR shall have all of the remedies available for the non-payment of rent.

C.   In the event LESSOR's title and right to receive rent and other payments hereunder is at any time placed in dispute by act of third party or operation of law, LESSEE may pay all rent and other payments thereafter accruing into the Circuit Court for Baltimore County, Maryland until such time as LESSEE is furnished satisfactory documentation establishing the party entitled thereto.

4.   OBLIGATION OF LESSOR AND CONSTRUCTION BY LESSEE

A.   LESSEE intends to construct upon the Property a building of _not more than 9,920_ square feet containing all sales service and enclosed storage requirements for the uses specified in Paragraph 5 and a parking lot containing a minimum of 35 parking stalls and associated improvements subject to the terms and conditions contained hereinafter as shown on Exhibit A.

B.   LESSOR shall be responsible, at LESSOR's sole cost and expense, for the following site preparation work on the Property: demolition of buildings and foundations, if any; grubbing; fill to grade at 95% compaction, with engineered fill prior to delivery of the leased premises to LESSEE for LESSEE's construction of its intended building and improvements, as determined by an engineer mutually acceptable to LESSOR and LESSEE; bringing water, sanitary sewer, storm sewer and electric utilities to those locations shown on the Utility Plan attached hereto as Exhibit C; construction of an entranceway for direct ingress and egress to the Leased Premises from Rossville Boulevard as shown on Exhibit B; and installation of a driveway providing access from the parking areas in front of the Circuit City store to the Leased Premises.  LESSOR agrees, subject to the provisions of paragraph J of this Article 4, to use reasonable efforts to complete the foregoing work within ninety (90) days after obtaining all necessary approvals with respect thereto, including, without limitation, development plan approval, C.R.G. plan approval, sediment control permits and grading permits.  LESSOR currently anticipates that it will obtain all such permits and approvals within approximately one hundred fifty (150) days from the date of execution of this Lease by all parties.

C.   LESSEE may, at LESSEE's sole option, obtain an ALTA title insurance policy, Form B, containing extended coverage insuring LESSEE's interest in the Leased Premises in the amount of the cost of improvements may be erected, said policy to be issued without encumbrances, except as may be approved by LESSEE in its sole discretion.  LESSEE may, at LESSEE's sole option, also obtain a survey certified by a licensed civil engineer which accurately locates and describes, among other things, the boundary lines of the Leased Premises, topographical elevations of the Leased Premises, established building lines, if any, grades and lines of

abutting streets and alleys and adjoining property, all rights-of-way, restrictions, easements, encroachments, zoning, deed restrictions and complete detail pertaining to existing buildings or other improvements and as to available services and utility lines. LESSOR hereby warrants that the boundary survey and title insurance report will show that there is included in the described Property as shown on the attached Exhibit A. The cost of said title policy and survey shall be paid by LESSEE. All expenses of placing title in marketable condition and acceptable to LESSEE shall be paid by LESSOR, if a defect can be cured with an expenditure of funds. However, LESSOR shall not be obligated to expend in excess of $10,000 for a defect which is not a lien or a deed of trust and shall not be required to remove any easement of record. LESSOR will defend title to the Property and will indemnify LESSEE against any loss, damage and expense arising out of any title defect not disclosed in the title commitment or policy originally obtained by LESSEE. LESSEE shall notify LESSOR in writing of any title or survey defects within thirty (30) days after the date of execution of this Lease, and LESSOR shall have a period of thirty (30) days after receipt of such notice within which to attempt to cure any such defects. If any such defect is not cured within such thirty (30) days, LESSEE, within a period of fifteen (15) days thereafter may, by written notice to LESSOR either terminate this Lease or waive such defect.

D.   In the event total costs for construction of LESSEE's intended improvements on the Leased Premises shall exceed an amount satisfactory to LESSEE, in LESSEE's sole opinion, then LESSEE shall have the right and option to terminate this Ground Lease by giving written notice thereof to LESSOR within sixty (60) days after the date of execution of this Lease.

E.   LESSEE shall verify (assuming LESSOR fulfills its obligations under paragraph B hereof) the availability of all public utilities providing storm and sanitary sewage disposal, water (including sufficient water line capacity to serve a building sprinkler system), electricity, gas and telephone are available in adequate capacity for LESSEE's intended use within sixty (60) days. If said utilities are not in the sufficient capacity as required herein, LESSEE shall have the right to terminate this Lease by giving written notice thereof to LESSOR within sixty (60) days after the date of execution of this Lease. LESSOR agrees to make grants of or join in applications for all utility easements necessary for the operation of LESSEE's business as shown on Exhibit A, so long as such grants do not adversely affect the shopping center, including ingress and egress.

F.   LESSEE shall be entitled to erect a sign on LESSOR'S pylon sign on U.S. Rte. 40 (Pulaski Highway) advertising LESSEE's proposed business, provided that the size of such sign shall not exceed eight percent (8%) of the size of the existing sign attached to the pylon.

G.    LESSEE acknowledges that the Leased Premises are not and will not be separately subdivided.

H.    This Ground Lease is specifically contingent upon LESSEE's receipt of the required permits, authorizations and approvals necessary for LESSEE's related improvements.    LESSEE agrees to promptly apply for and diligently seek to obtain all such permits, authorizations and approvals.    In the event LESSEE is unable to obtain the necessary permits.    LESSOR or LESSEE shall each have the right to terminate this Lease by giving written notice thereof to the other within 180 days after the date of execution of this Lease.

I.    Upon execution of this Ground Lease, LESSEE and its agents and independent contractors shall have the right to enter upon the Property to make test soil borings, undertake survey work and obtain such engineering and environmental data as LESSEE deems necessary to determine if the Property is suitable for LESSEE's intended use.    LESSEE shall defend, indemnify and hold LESSOR harmless from any and all loss, cost, damage, lien or expense (including reasonable attorney's fees) arising from any injury or death of any person or damage to property caused by LESSEE or its agents or contractors while exercising the right of entry given under this paragraph.    If any of said tests or data shall not be satisfactory to LESSEE for any reasons, in its sole opinion, LESSEE may terminate this Ground Lease without any obligation or liability on its part by giving written notice thereof to LESSOR within 60 days after the date of execution of this Lease.    The cost of said tests shall be paid by LESSEE.    LESSEE will return the soil, after such soil tests, to its original condition prior to such tests.

J.    In the event that either party shall be delayed or hindered in or prevented from the performance of any act (except for the payment of monies) required hereunder by reason of strikes, unavailability of materials, power failure, riots, insurrection, war or other reasons beyond the control of the parties, then the required performance of any such act shall be extended for a period equivalent to the period of such delay.    In no event shall this period exceed twelve (12) months.

K.    LESSOR agrees to cooperate and assist LESSEE in obtaining the necessary permits for LESSEE's intended use, operation and construction of its proposed improvements.

5.    USE

A.    The Leased Premises may be used for the sale, display, storage and installation of tires, batteries, shocks, automobile parts and accessories and other related goods and wares of any and all types (excluding electronic equipment, stereos, car phones, alarms and related products as typically sold and serviced by a Circuit City store in the Baltimore, Maryland area.    In addition, the Leased Premises may be used to install, service, remove and repair all automotive and light truck parts and to generally

service, repair and maintain automobiles and light trucks. However, LESSEE shall not be limited to these operations and may alter the interior of its building and diversify into any other retail use subject to the restriction of paragraph 5C and any existing tenancies, provided that any such further new operation, activity and business shall be permissible under and meet the requirements of all applicable laws, ordinances, rules and regulations of any duly constituted authority, including any restriction covenants which LESSOR shall hereinafter place upon the property. LESSEE shall not use the property for transmission or major engine repairs, overhauls or replacements. All automobile and light truck repairs shall be performed only inside the building located on the Leased Premises. The Leased Premises are part of a larger tract of land owned or controlled by LESSOR. LESSEE acknowledges that additional improvements may be erected by LESSOR on the balance of said common areas so long as the additions are not constructed in the area labelled "NO BUILD AREA" on Exhibit B and do not materially interfere, reduce or affect LESSEE's parking facilities, curb cuts, access ways and traffic flow to LESSEE's service bays. LESSEE acknowledges and agrees that LESSOR may construct or permit to be constructed a building near Pulaski Highway substantially as shown on Exhibit B without violating the foregoing restrictions. LESSOR further agrees not to permit the common areas to be used in such a way so as to cause a nuisance to LESSEE and to keep and maintain said additional property in good repair, including driveways, sidewalks and common areas, if any, clean and reasonably free from rubbish, refuse, dirt, snow and ice at all times. LESSEE will not change the use of the Leased Premises to a use which requires more parking than exists on the leased premises.

B. LESSOR covenants and agrees that, so long as the Leased premises are operated as National Tire Warehouse or for any automotive use by any related firm, corporation or entity, no portion of the shopping center (other than the Leased Premises), shall, during the term of this Lease and any extensions thereof, be Leased or sold, to any business entity whose primary business is the displaying, storing, selling or repairing of tires, automobile batteries, shocks, automobile parts and accessories of any type or kind for installation on premises provided, however tires are not to be sold under any circumstances, nor whose primary business is the servicing, maintaining or repairing automobiles and light trucks. It is agreed that this negative covenant shall run with the land and be binding upon LESSOR's successors and assigns. In the event LESSOR breaches the aforementioned negative covenant, LESSEE shall be entitled to a base rental reduction in the amount of fifty (50%) percent of all base rental required to be made by LESSEE hereunder, and such abatement shall continue until the breach has been remedied by LESSOR. In addition to this rent abatement, LESSEE shall be entitled to injunctive and other appropriate relief available at law or equity.

C.   Notwithstanding the provisions of Paragraph A of this Section 5, in no event shall the Leased Premises or the remainder of the shopping center be used for any of the following purposes:

(i)   Any nuisance or use causing excessively loud noises or offensive odors.

(ii)   Manufacturing facility (except for the manufacture of such goods which are required as a necessary incident to the conduct of a particular retail mercantile business).

(iii)   Thrift store, liquidation outlet, consignment store (excluding stores carrying incidental consignments) or pawn shop. However, a so-called "discount" or "off-price" store shall not violate this restriction.

(iv)   Massage parlor or modeling studio.

(v)   Adult book store or sexually-oriented shop or theater (such terms being defined as a bookstore, shop or theater, the primary business of which is one or more of the following (a) display for sale or exhibition of books, magazines or other publications containing any combination of photographs, drawings or sketches which are primarily and explicitly sexual in nature and which are not primarily scientific or educational, and (b) offering for exhibition, sale or rental video cassettes or other medium capable of projecting, transmitting or reproducing, independently or in connection with another device, machine or equipment, an image or series of images, the contents of which are generally advertised as rated "X" or "XXX" or which are primarily and explicitly sexual in nature and which are not primarily scientific or educational; provided that the incidental sale of lease of the foregoing items carried on as a part of the general merchandise and of the overall business of a tenant or occupant shall not violate the forgoing restriction).

(vi)   Cocktail lounge, bar or tavern.

(vii)   Movie theater, bowling alley, skating rink, carnival, game arcade, bingo parlor, amusement center or any other business using loud speakers within the Shopping Center. However, this restriction shall not apply to (i) the exhibition and retail sale of consumer electronic games carried on as a part of the

general merchandise and of the overall business of a tenant or occupant not otherwise prohibited hereunder.

(viii)   Church or similar use.

(ix)   Beauty school, barber college, reading room, place of instruction or any other operation catering primarily to students or trainees other than to retail customers.

(x)   Any fire, auction, lost lease, quitting business or bankruptcy sale, and any signage or advertisement of such. However, inventory liquidation sales are permitted.

(xi)   Any use incorporating the display of any flashing lights directed to the exterior of a building.

(xii)   Any use not permitted under applicable zoning or other ordinances, laws or regulations.

(xiii)   Any health club, spa or gymnasium.

(xiv)   Any mobile home park, trailer camp or junk yard.

(xv)   Any dumping, disposing, incineration or reduction of garbage (other than dumpsters located in the rear of any building and otherwise properly screened from view).

(xvi)   Any central laundry or dry cleaning plant or any laundromat.

(xvii)   Any automobile, truck, trailer or R.V. sales, leasing or display conducted in the common areas of the Shopping Center or outside of any building.

(xviii)   Any outdoor sale utilizing any portion of the parking areas of the Shopping Center.

(xix)   Any gas stations or car washes.

(xx)   Banquet halls, auditoriums and other places of public assembly.

D.   LESSEE shall not install or permit to be installed, any audio, video or radio transmitting equipment which causes any interference with radio or television reception or transmission in or from the existing Circuit City store in the Shopping Center, nor

shall any improvements on the Leased Premises exceed one story in height.

E. Notwithstanding the provisions of paragraph A of this Section 5, in no event shall the Leased Premises or any part thereof be used for the display, sale, service or warehousing of any form of consumer electronics, large or small household appliance, or business electronic equipment, including but not limited to audio or video hardware, computer hardware of software, entertainment software, entertainment media, compact discs, electronic software, cellular telephones, telefax machines or copiers, or other business software. LESSEE shall not use the name "Circuit City" or any variant or derivative thereof, in any of its advertising.

F. LESSEE shall initially open the Leased Premises for business with the public promptly on or before the Commencement Date in the name of National Tire Warehouse. Thereafter, if LESSEE does not continuously operate its business in the Leased Premises for any twelve (12) consecutive month period (excluding a cessation in operations due to fire or other casualty occurring upon the Leased Premises or due to a condemnation of the Leased Premises or a material portion thereof), LESSOR may elect to terminate this Lease upon thirty (30) days prior written notice to LESSEE. Notwithstanding the foregoing, if LESSEE enters into a sublease of the Leased Premises or an assignment of this Lease in accordance with the provisions hereof during such twelve (12) month period and notifies LESSOR of such fact, then such twelve (12) month period shall be extended by an additional period of time, not exceeding sixty (60) days, to allow the sublessee or assignee to reopen the Leased Premises for business. At the time of termination, LESSOR shall pay to LESSEE the unamortized cost of LESSEE's initial leasehold improvements (exclusive of all trade fixtures, machinery and equipment of LESSEE or which LESSEE is permitted or required to remove from the Leased Premises) amortized on a straight-line basis over the initial term of this Lease, provided that LESSEE shall have submitted to LESSOR, within thirty (30) days after the commencement date of this Lease, reasonably adequate documentation of such cost.

G. LESSEE, in its use of the Leased Premises and the surrounding Common Areas, covenants and agrees:

> (i)   to store all new and used tires and parts only in the interior of the Improvements on the Leased Premises (except that tires may be neatly stored inside storage sheds located outside of the exterior walls of the building on the side of the building adjacent to the railroad tracks), and not to permit any new or used tires or parts to be placed in the Common Areas adjacent to the Leased Premises; and

(ii) that no automobiles or light trucks of LESSEE or
its employees or customers shall be parked
overnight on the Leased Premises or the Common
Areas, except inside the Improvements on the Leased
Premises.

6.   INSURANCE

A.   From and after the Commencement Date until the
termination of this Lease, LESSEE agrees to maintain public
liability insurance covering the Leased Premises.  Said policy or
policies shall be for an amount of Two Million Dollars
($2,000,000.00) combined single limit coverage, which said policy
or said policies of insurance shall name LESSOR and any mortgagees
of LESSOR designated by LESSOR as an additional insured thereunder.
LESSEE agrees to maintain such policy at LESSEE's sole cost and
expense during the entire term of this Lease.  LESSEE shall furnish
LESSOR with a certificate of insurance from the company issuing
such insurance prior to entering into possession of the Leased
Premises and thereafter at least 15 days prior to the expiration
thereof.  LESSEE may, at its option, bring its obligations to
insure under any so-called blanket policy or policies of insurance;
provided, however, that the interests of LESSOR shall be as fully
protected thereby as if LESSEE obtained an individual policy of
insurance.

B.   From and after the Commencement Date until the termina-
tion of this Lease, LESSEE will, at LESSEE's own cost and expense,
carry and maintain fire and all risk casualty insurance with an
extended coverage endorsement, including vandalism and malicious
mischief coverage, on the Leased Premises in an amount equal to at
least ninety percent (90%) of the full replacement value thereof,
excluding foundation costs, site preparation and excavation costs.
LESSEE shall furnish LESSOR certificates of such insurance from
time to time upon written request by LESSOR.

C.   In the event of any damage to or destruction of the
building, or any part thereof, which damage or destruction is
covered and insured against by fire and casualty insurance with
extended coverage endorsement, this Ground Lease shall remain in
full force and effect, subject to the terms of Subparagraph D of
this Paragraph 6, and LESSEE shall continue to pay all rent and
other charges hereunder unless such fire or casualty was occasioned
by the negligent or intentional acts of LESSOR, in which case rent
and other charges shall abate during the period and to the extent
that the Leased Premises remain untenantable.  LESSOR shall have no
obligation or liability whatsoever to LESSEE by reason of such
damage, and LESSEE shall not be entitled to nor recover any damages
whatsoever against LESSOR for any loss occasioned by said injury,
destruction or damage and LESSEE shall, with reasonable diligence
after the occurrence of the event causing said damage, cause the
Leased Premises to be repaired and restored to the same general
condition to which it existed at the time of the occurrence of said
event.

D.   In the event the building is destroyed to the extent of fifty percent (50%) or more during the last three (3) years of the initial Ground Lease term, or any extension thereof, LESSEE may, at its option, terminate the Ground Lease.   Written notification of LESSEE's intent to terminate must be given to LESSOR within ninety (90) days after the occurrence.   Within thirty (30) days after giving notice of termination, LESSEE shall raze all improvements on the Leased Premises, remove all debris and surrender possession of the Leased Premises to LESSOR.

7.   WAIVER OF SUBROGATION

     LESSEE and LESSOR each release the other from and against any and all claims, demands, liabilities or obligations whatsoever for damage to the Leased Premises and for loss of rents or profits resulting from or in any way connected with any fire, accident or other casualty, whether or not such fire, accident or other casualty shall have been caused by the negligence or contributory negligence (but not the intentional or grossly negligent misconduct) of the other party, or by any agent, associate or employee of the other party, to the extent that the damage or loss is insured or required to be insured under any insurance contract which at the time of the damage of loss permits waiver of subrogation rights prior to a loss thereunder.

8.   HOLD HARMLESS

     Absent LESSOR's negligence or wrongful act, LESSEE covenants at all times to save LESSOR harmless from all loss, liability, costs or damages that may occur or be claimed with respect to any person or property on or about the Leased Premises or resulting from LESSEE's use or possession of the Premises, together with any and all loss, costs (including reasonable attorneys fees), liability or expense resulting therefrom.

9.   COVENANT AGAINST LIENS

     LESSEE expressly covenants and agrees that it will, during the term hereof, within  thirty (30) days remove or release, by the posting of a bond or otherwise, as required or permitted by law, any lien attached to or upon said Leased Premises or any portion thereof by reason of any act or omission on the part of LESSEE, or arising out of any contractual subcontractor or supplier providing work or supplying materials by or on behalf of LESSEE or anyone claiming by, through or under LESSEE and hereby expressly agrees to save and hold harmless LESSOR and the Leased Premises from or against any such lien or claim of lien; provided, however, that if LESSEE has reasonable cause to contest the validity, viability, or existence of any such lien, it may do so, and in such event, no breach of this Ground Lease shall result so long as the contest is conducted without expense to LESSOR and such contest operates to legally prevent the foreclosure or enforcement of such lien.

## 10. MORTGAGE AND LEASE RECOGNITION

If the Property is subject to a superior mortgage at the time this Ground Lease commences or at any time during the term of this Ground Lease or any extension thereof, LESSOR agrees to obtain from the mortgagee a non-disturbance agreement evidencing the mortgagee's recognition of this Ground Lease in substantially the form attached hereto as Exhibit D. Said agreement will include the mortgagee's agreement not to disturb LESSEE during the term of this Ground Lease or any extension thereof so long as LESSEE is not in default under this Lease beyond any applicable cure period. The term "mortgage" as used herein means any mortgage, assignment, deed of trust or other transfer of the Property in whole or in part made as security for any indebtedness of LESSOR. Upon written request of the holder of any mortgage now or hereafter covering the Leased Premises, LESSEE will subordinate its rights under this Ground Lease to the lien thereof. LESSEE shall execute, acknowledge and deliver an instrument, in a form subject to the reasonable approval of LESSEE, effecting such subordination so long as such subordination does not otherwise reduce the rights of LESSEE hereunder; provided, however, that as a condition of such subordination, the holder of such mortgage shall be required to execute a non-disturbance agreement in the form attached hereto as Exhibit D, which provides that LESSEE's occupancy of the Leased Premises shall not be disturbed so long as LESSEE is not in default hereunder beyond any applicable cure period.

## 11. ASSIGNMENT AND SUBLETTING

LESSEE shall have the right to assign this Ground Lease or sublet all or any part of the Leased Premises, without LESSOR's consent to any related person, firm, corporation or entity subject to Paragraph 5C and any existing tenancies. Upon any such assignment, assignee shall agree in writing to assume and perform all of the terms hereof; and, upon any such subLease, the subLESSEE shall acknowledge the existence of this senior Ground Lease and shall covenant not to do or permit anything to be done that would constitute a breach hereof. Without limitation, LESSEE shall have the right to mortgage or otherwise encumber the Leasehold estate granted hereunder. No assignment, subletting, mortgage or other encumbrance shall relieve LESSEE of its continuing liability hereunder.

## 12. TAXES, ASSESSMENTS AND UTILITIES

A. LESSOR hereby warrants that any and all taxes on the Leased Premises, excepting current taxes not delinquent, have been paid in full. Commencing upon the Commencement Date and continuing thereafter throughout the term, LESSEE shall pay, during the term of this Ground Lease as additional rent, all real estate taxes before delinquency and, upon demand, shall furnish to LESSOR receipts evidencing such payment. Anything to the contrary herein notwithstanding, it is understood and agreed that LESSOR shall forward to LESSEE, within thirty (30) days of LESSOR's receipt of

same, any real estate tax bill required to be paid directly by LESSEE and/or any notice of increase of assessment of the Leased Premises. In the event LESSOR does not forward such tax bills to LESSEE as provided herein, LESSOR shall be responsible for payment of any late penalty LESSEE is required to pay caused by LESSOR's failure to timely forward such bill. In the event LESSOR fails to timely forward such notice of increase of assessment to LESSEE as provided herein, and LESSEE is not allowed to contest such increase because of LESSOR's failure to timely forward such notice and LESSOR has not separately contested such increase, LESSOR shall reimburse LESSEE for any taxes paid by LESSEE, which said taxes are paid upon such increase in assessment. If by law any tax, assessment or other public charge may, at the option of the taxpayer, be paid in installments, LESSEE may exercise such option, and in such event, LESSEE shall pay such installments as they become due during the term of this Ground Lease or any extensions thereof, and LESSOR shall pay the remaining installments. Taxes for the first and last years shall be prorated. LESSOR hereby grants to LESSEE authority to protest any taxes which LESSEE believes to be unreasonable; provided, however, that LESSEE shall in no way encumber the property thereby.

B.    If the Leased Premises are treated as a separate tax lot by the assessing authority, the LESSEE shall pay all real estate taxes assessed against the Leased Premises, and against the Improvements and LESSEE's Property. If the Leased Premises are not treated as a separate tax lot by the assessing authority, LESSEE shall pay the sum of (a) all real estate taxes imposed on LESSEE's Property and on the Improvements, as computed from the assessed values therefor shown on the tax assessor's worksheets, plus (b) a pro rata share of the taxes assessed against the land (without the improvements) constituting the Shopping Center, which pro rata share shall be determined by dividing the gross leasable area of the improvements contained within the Leased Premises by the gross leasable area of all improvements contained within the Shopping Center. Regardless of the method of determining the portion of the Taxes payable by LESSEE, LESSEE shall pay to LESSOR such portion of the Taxes within thirty (30) days after receipt of an invoice therefor. LESSOR shall provide LESSEE with a copy of the tax bill and the calculation of the Taxes for which LESSEE is responsible thereof at the time of submission of the invoice. Said taxes shall be adjusted on a proportionate basis for any period which shall be less than a full Tax Year. Taxes for the first and last years shall be prorated.

C.    Nothing herein contained shall require LESSEE to pay municipal, state or federal income taxes assessed against LESSOR, or municipal, state or federal capital levy, estate, succession, inheritance or transfer taxes of LESSOR, or corporate franchise taxes imposed upon any corporate owner of the fee of the Leased Premises. LESSEE shall be required to pay any tax on rentals paid under this Lease regardless of whether such rental tax is assessed in lieu of property taxes.

D.    LESSEE shall promptly pay when due all charges for utility services rendered or furnished to the Leased Premises including, but not limited to, gas, electricity, water, sanitary sewer and telephone.

13.  MAINTENANCE AND REPAIR

A.    LESSEE shall, at its own cost and expense, maintain the interior of the Leased Premises and the HVAC systems during the term of this Lease, subject to normal wear and tear. LESSEE shall, at its own cost and expense, maintain in good order and condition, the building exterior, roof, foundation, sidewalks and structural portions of the building. LESSOR shall keep and maintain parking and drive areas of the leased premises free and clear of dirt, rubbish, trash, snow, and ice as provided in paragraph 20.

B.    LESSEE shall, throughout the term, at LESSEE's sole cost, promptly comply with all laws, ordinances, notices, orders, rules, regulations and requirements of all federal, state or municipal governments or the appropriate departments, commissions, boards and officers thereof, as well as any and all notices, orders, rules and regulations of the National Board of Fire Underwriters, or any other body now or hereafter constituted and exercising similar functions relating to the Leased Premises. LESSEE shall likewise observe and comply with the requirements imposed by any and all policies of public liability, fire and other insurance at any time in force with respect to the Leased Premises.

14.  SIGNAGE AND EQUIPMENT

A.    LESSEE shall be permitted to erect and install interior and exterior signs on the Improvements and other identification as shown on Exhibit E and consistent with local laws, ordinances and regulations.  All other exterior signage shall require LESSOR's prior written consent. LESSOR shall make available for LESSEE's use eight percent (8%) of the area currently occupied by LESSOR's existing sign attached to the pylon facing U.S. Rte. 40 (Pulaski Highway).

B.    All trade fixtures, machines, equipment, furniture and other personal property LESSEE kept or installed on the Leased Premises by LESSEE shall not become the property of LESSOR and may be removed by LESSEE at any time during the term of this Lease or extension thereof and shall be removed upon expiration or termination of this Lease.

15.  A.   ALTERATIONS AND TITLE TO IMPROVEMENTS

LESSEE shall have the right to make, or permit any subLESSEE or assignee to make interior alterations, and improvements to the Leased Premises from time to time, and all of such alterations, and improvements constructed by LESSEE during the term of this Lease and any extension thereof, shall be and remain the property of the LESSEE or subLESSEE, as the case may be, at all

times during the term of this Lease and any extensions or renewals
thereof.  If any such interior alterations involve changes in the
structure or mechanical systems of the Leased Premises, LESSEE
shall provide a copy of the plan for such alterations to LESSOR
prior to commencing work.  LESSEE and any subLESSEE shall have the
right to remove any such alterations, and improvements at any time
during the term of this Lease or any extension thereof.  However,
LESSEE shall not be required to remove any such alterations, or
improvements, and LESSEE's failure to do so after the expiration of
such period of thirty (30) days shall be deemed to be an
abandonment thereof, whereby the same shall, thereupon, be and
become part of the real estate with title hereto vesting in the
owner of the land.

B.    LESSEE shall not make major changes to the exterior
appearance of the building without LESSOR's approval except those
changes which are required to maintain consistent appearance with
other NTW stores in the Baltimore, MD area.  LESSEE will not expand
the area of the building footprint or foundation without LESSOR's
approval.

C.    Upon expiration of the Lease LESSEE shall remove any and
all trade fixtures, air lines, hydraulic systems (exclusive of fire
protection or standard plumbing fixtures) which are used in the
operation of LESSEE's business and described in paragraph 5.

16.  REMEDIES UPON DEFAULT

A.    Each of the following events shall constitute a default
by LESSEE under this Lease:

1.    LESSEE's failure to pay rent within five (5)
business days after its due date, provided LESSEE has been
notified in writing of LESSOR's nonreceipt of the rent and
given ten (10) business days from the date of receipt of said
notice to cure;

2.    LESSEE shall commit or allow to continue any other
non-monetary material breach of this Lease, which shall not
have been cured within thirty (30) days after written notice
from LESSOR specifying the breach; provided, however, that if
the breach cannot be cured within thirty (30) days, LESSEE
shall not be in default if, within such thirty (30) day
period, LESSEE shall have commenced to cure said breach and
shall continue its efforts with due diligence;

3.    LESSEE shall file, or a third party shall file
against LESSEE, a petition in bankruptcy, liquidation,
dissolution or reorganization that remains undismissed for
sixty (60) days; or

4.    LESSEE shall make a general assignment for the
benefit of all creditors of LESSEE.

Notwithstanding the notice and cure period provided in paragraph 1 above, any rent not paid within five (5) business days after its due date shall bear interest at the rate of fourteen percent (14%) per annum from the date due until paid in full.

B.    Upon the occurrence of a default, LESSOR shall have the right, at the option of LESSOR, to use any or all of the remedies below:

1.    Terminate this Lease and thereupon peaceably re-enter and take possession of the Leased Premises by any means provided by law; and/or

2.    From time to time, without terminating this Lease, peaceably re-enter (by any means provided by law) and relet the Leased Premises for the account of LESSEE, upon such reasonable terms and conditions as LESSOR may deem advisable or satisfactory, in which event rents received for such reletting shall be applied first to the expense of such reletting (including reasonable brokerage fees) and thereafter toward payment of all sums due or to become due LESSOR hereunder.    If a sufficient sum shall not be realized or secured from such reletting to pay such sums and other charges, LESSEE shall pay LESSOR any deficiency on a monthly basis.    LESSOR agrees to use reasonable efforts to relet the Leased Premises following such re-entry by LESSOR; provided, however, that LESSOR shall not be obligated to give preference to the Leased Premises over other space in the Shopping Center and shall not be obligated to expend any funds whatsoever to repair, improve, alter or renovate the Leased Premises in order to relet the Leased Premises.

3.    Continue this Lease in full force and effect to the end of the term notwithstanding the occurrence  of such default, and enforce, by all proper and legal means, LESSOR's rights herein, including the monthly collection of rent; and/or

4.    Cure such default of LESSEE and recover from LESSEE as additional rent all costs and expenses incurred in effecting such cure.

17.    LESSOR BREACH OF COVENANT:

In the event Lessor shall fail to perform the covenants and/or agreements of this lease which are required to be performed by LESSOR and/or there is a breach of any warranty made or implied herein by LESSOR, then in addition to damages (which LESSOR agrees LESSEE shall have the right to recover) LESSEE may require LESSOR to remedy said default or defaults by the service of written notice on LESSOR or LESSOR's agent at the address to which rent payments due under this lease are forwarded and if at the expiration of thirty (30) days from the receipt of said notice (provided, however, if the breach cannot be cured within 30 days, LESSOR shall

not be in default if it commenced to cure such breach in 30 days
and thereafter continues its efforts with due diligence), said
default or defaults have not been remedied, then LESSEE shall have
an election either to exercise such remedies as may be provided at
law or equity or LESSEE may remedy said breach of covenants,
agreements, and or warranties and, if LESSOR fails to reimburse
LESSEE for the cost of remedying such breach within thirty (30)
days after receipt of a demand therefor accompanied by reasonable
evidence of such costs, the costs of such action shall be deducted
by LESSEE from the unpaid charges which shall accrue under Section
20 of this Lease for the unexpired term of this Lease or any
extension thereof and, notwithstanding anything to the contrary
contained in this Lease, any such deduction property made by LESSEE
shall not constitute a default or event of default under this
Lease.

18.   CONDEMNATION

   A.   Total-Permanent:  If at anytime during the term of this
Lease or any extension or renewal thereof, all of the Property
described in Exhibit "A" attached hereto or the building located
thereon or the Leased Premises shall be taken or condemned or, in
the reasonable opinion of the LESSEE, such a substantial portion
thereof as would render the Leased Premises not suitable for the
use for which it was being utilized immediately prior thereto by
the LESSEE, shall be taken or appropriated by any governmental
authority, this Lease shall terminate upon the date that the
possession of the Property, building or Leased Premises or such
portion thereof is surrendered to the condemning authority, at
which time all rents and obligations between the parties hereto
shall cease and rights or easements for ingress and egress or
parking as may then be established or as may have been granted
herein, unless comparable access and parking can be supplied by
LESSOR, shall be considered such a substantial taking as would
render the use of the Leased Premises unsuitable for the LESSEE's
use.  Notwithstanding any provision of this Lease or by operation
of law that the Leasehold improvements may be or shall become the
property of the LESSOR at the expiration of the term hereof, the
value of the loss of any improvements on the Property and such
additional relief as may be provided by law shall be the basis of
the LESSEE's damages against the condemning authority, or the basis
of the LESSEE's damages to a portion of the total award if only one
award is made, but LESSEE shall not be entitled to any award for
the value of its leasehold estate and hereby assigns all of its
rights thereto to LESSOR.

   B.   Partial-Permanent:  In the event of a permanent partial
taking or appropriation not resulting in a termination of this
Lease, the LESSEE shall be entitled to a reduction of rent based
upon the square footage of the Leased Premises prior to the taking.
In consideration of such reduction of rent, the LESSEE waives any
claim for damage to or loss of its leasehold estate but shall be
entitled to all awards for the loss of its leasehold improvements.
LESSEE shall use so much of the awards as are payable to it as may

be necessary to restore the building or Leased Premises as nearly as possible to their original condition.

C.   Total-Temporary:   If the whole of the said Property, building or Leased Premises or such portion thereof as would render the use of the Leased Premises, in the LESSEE's sole opinion, not suitable for the LESSEE's use as set forth above, shall be taken for a period of one (1) year or less, the term of this Lease shall cease and all rent and other charges payable by the LESSEE hereunder shall abate from the time possession of the said Property, building or Leased Premises is surrendered to the taking authority and shall recommence when possession is restored to the LESSEE and LESSEE is open for business. The basis for the LESSEE's damages against the condemning authority or against the total award shall be the interruption of the LESSEE's business and such additional relief as may be provided by law, but all awards for the leasehold estate or loss of possession are waived by LESSEE and LESSEE hereby assigns all of its rights thereto to LESSOR. If such taking shall extend beyond one (1) year, the taking, for the purposes of this Lease and at the option of the LESSEE, shall be considered permanent with the basis of the LESSEE's damages computed as for a total permanent condemnation.

D.   Partial-Temporary:   If less than the whole of the building or Leased Premises or less than such portion thereof as would render the use of the Leased Premises unsuitable for the LESSEE's purposes is taken, the Lessee shall be entitled to a reduction of rental based upon the square footage of the Leased Property taken as said amount bears to the total square footage of the Leased Premises prior to the taking commencing upon such date as possession is surrendered to the taking authority and continuing until possession is restored to the LESSEE. In consideration of such reduction of rental, the LESSEE waives all rights to any portion of the award as may be payable to the LESSOR, unless LESSEE has a claim for interruption of LESSEE's business, which right LESSEE retains.

E.   General: The LESSEE shall be entitled to participate in all negotiations with any condemning authority and the LESSOR covenants and agrees not to finalize any agreement with the condemning authority without LESSEE's express written consent. Should the LESSOR and the LESSEE be unable to agree as to the division of any singular award or the amount of any reduction of rents and other charges, such dispute shall be submitted for resolve to the court exercising jurisdiction of the condemnation proceedings, each party bearing its respective costs for such determination.

The LESSOR covenants that as of the date of execution of this Ground Lease it has no actual or constructive knowledge of any proposed condemnation of any part of the Property described in Exhibit "A". In the event that subsequent to the Execution Date of this Lease,, but prior to the Lease Commencement Date, a total or partial condemnation, either temporary or permanent, is proposed by

any competent authority, LESSEE shall be under no obligations to commence or continue its obligations under this Lease. All obligations under this Lease shall terminate until such time as it can be reasonable ascertained that the building, Property or Leased Premises shall not be so affected. Provided, however, that in the event the said Property, building or Leased Premises is so affected prior to the Lease Commencement Date, the LESSEE shall be entitled to all rights and damages as provided above.

19.   NOTICE OR DEMANDS

Any notices or demands required or permitted by law, or by any provision of this Ground Lease, shall be in writing and shall be deposited in the United States mail, registered or certified, return receipt requested, postage prepaid or sent by receipted, overnight delivery service.

All notices or demand to LESSOR shall be addressed to LESSOR at Circuit City Stores, Inc., 9950 Maryland Drive, Richmond, VA 23233-1464, Attn: Vice President of Real Estate Dept. with a copy to James C. Oliver, Esq., Ballard Spahr Andrews & Ingersoll, Suite 1900, 300 East Lombard Street, Baltimore, Maryland 21202 with a copy to, or at such other address as LESSOR may designate in writing. LESSOR's Tax Identification Number for purpose of reporting rental payments to the Federal Government is 52-1669241.

Any such notice or demand to be served upon LESSEE shall be in writing at the following address by deposit in the United States mail, registered or certified, return receipt requested, postage prepaid sent receipted or by overnight delivery service and addressed to LESSEE at Western Auto Supply Company, Real Estate Department, 2107 Grand Avenue, Kansas City, MO 64108 and a copy to NTW, 2359 Research Court, Woodbridge, VA 22192, Attn: Brian A. Sexton.

20.   OPERATION AND MAINTENANCE OF COMMON AREAS

A.   LESSOR shall operate, manage and maintain during the Term, all parking areas, driveways, footways of LESSEE's leased premises and other common areas of the Shopping Center. During the Term, LESSEE and employees, agents and customers of LESSEE shall be entitled to non-exclusive vehicular ingress and egress to the Leased Premises over said common areas and to parking in such common areas in such locations as are from time to time designated by LESSOR for such purpose, but in common with others, in addition to parking on the Leased Premises dedicated exclusively for use by NTW, provided that such use shall be subject to such reasonable and non-discriminatory rules and regulations as LESSOR may from time to time prescribe; and provided further that LESSOR shall at all times have full and exclusive control, management and direction of said common areas. LESSOR shall further have the right to police the common areas; to close temporarily all or any portion of the parking areas or facilities as may be required for proper maintenance and/or repair which shall not unreasonably interfere

with LESSEE's use and occupancy; to discourage non-customer
parking; and to do and perform such other acts in and to such
common areas as in the use of its business judgement, the LESSOR
shall determine to be advisable in order to improve or make more
convenient the use thereof by tenants, their officers, agents,
employees and customers.  LESSOR may from time to time change the
location, layout and arrangement of the parking areas, driveways
and footways within the common areas and reduce them by erecting
thereon store buildings or other structures or improvements of any
kind including, but not limited to, extensions to the Shopping
Center; provided that, in so doing, LESSOR does not violate the
provisions of paragraph A of Article 5.  LESSOR shall provide
reasonable illumination for the driveways and parking areas in the
common areas until 10:00 p.m. and will keep them in reasonable
repair and reasonably free of litter and snow.

     B.   Commencing on the Commencement Date and continuing
thereafter throughout the Term, LESSEE shall pay to LESSOR in each
calendar year or other fiscal year selected by LESSOR, as
additional rent, a proportionate share of LESSOR's operating costs
for the common areas and LESSEE's leased premises.   LESSEE's
proportionate share shall be determined by dividing the gross
leasable area of the Leased Premises by the total amount of gross
leasable area of all improvements in the Shopping Center.  Such
amount shall be payable in equal monthly installments in advance
and shall be paid with each payment of base rent hereinbefore
described.  For the purpose hereof, the "LESSOR's operating costs"
means the sum of (i) the total cost and expense incurred by LESSOR
in operating, repairing, and maintaining or causing to be operated,
repaired, and maintained the common areas of the Shopping Center,
including, without limitation, the cost of cleaning, utilities,
snow and ice removal, painting, fire protection, resurfacing,
repairs, landscaping, policing and security charges; lighting,
maintaining, repairing and operating any pylon sign for the
Shopping Center; public liability, property damage and such other
insurance deemed prudent by LESSOR for the common areas, plus (ii)
fifteen percent (15%) of the total of all such costs and expense as
administrative overhead.   LESSOR's operating costs shall not
include taxes and insurance or any management fees payable to
LESSOR or the cost of any building constructed in the common areas,
nor shall LESSOR's operating costs include any other capital
expenses, except that LESSOR may amortize replacements of driveways
and parking areas over the useful life of such replacements and
include the annual amortization thereof in LESSOR's operating
costs.  "Common areas" means all areas, parking areas, driveways,
footways, space, equipment and special services provided by LESSOR
for the common use and benefit of tenants, their employees, agents,
servants, customers and other visitors.  Within approximately one
hundred twenty (120) days after the end of each calendar year or
fiscal year as selected by LESSOR, LESSOR shall submit to LESSEE a
reasonably detailed statement showing (1) LESSEE's proportionate
share of LESSOR's actual operating costs incurred during the
preceding calendar or fiscal year, and (2) the aggregate amount of
LESSEE's estimated payments during such year.  If such statement

indicates that the aggregate amount of such estimated payments exceeds LESSEE's actual liability, then LESSOR shall credit the overpayment toward LESSEE's next estimated payment(s) pursuant to this paragraph. If such statement indicates that LESSEE's actual liability exceeds the aggregate amount of such estimated payments, then LESSEE shall pay the amount of such excess as additional rent within thirty (30) days after receipt of such statement.

C.  Notwithstanding the provisions of paragraph B of this Section 20, and excluding all of LESSOR's operating costs attributable to snow removal and security (LESSOR's operating costs, exclusive of those attributable to snow removal and security, being hereinafter referred to as "Controllable Operating Charges"), LESSEE shall not be obligated to pay as LESSEE's proportionate share of Controllable Operating Charges in the first calendar or fiscal year of the Term any amount per square foot in excess of One Dollar ($1.00) per square foot (the "Capped Amount"). For each calendar or fiscal year thereafter, the Capped Amount shall be the sum of (i) the Capped Amount for the preceding calendar or fiscal year, plus (ii) six percent (6%) of the Capped Amount for the preceding calendar or fiscal year, and LESSEE's proportionate share of Controllable Operating Charges for each such year shall not exceed the applicable Capped Amount for such year. The Capped Amount shall be prorated for partial years. There shall be no limit on the amount of the LESSOR's operating costs attributable to snow removal and security which are to be paid by LESSEE.

D.  LESSOR and its tenants and their customers, employees and agents shall be entitled to non-exclusive pedestrian and vehicular ingress and egress over the driveways and footways of the Leased Premises, as such driveways and footways shall from time to time exist. LESSOR shall also have the right to install, use, maintain, repair and replace underground utility lines, conduits, pipes, cables and facilities beneath the driveways, footways, parking areas and other unimproved areas of the Leased Premises provided (i) the location does not materially interfere with the LESSEE's use of the Leased Premises, (ii) any installation, maintenance, repair or replacement shall be done in such a manner so as to minimize interference with LESSEE's use of the Leased Premises, and (iii) LESSOR shall repair any damage to the driveways, footways, parking areas or other unimproved areas caused by any installation, maintenance, repair or replacement.

21.  RIGHT OF REFUSAL

If, within six (6) months after the expiration of the term hereof or any exercised extension thereof, LESSOR shall desire to enter into a new lease with any third party covering the Leased Premises to an entity which intends to engage primarily in the sale of tires, automobile batteries, shocks, automobile parts and accessories for installation on premises or the servicing, maintaining and repairing of automobiles and light trucks, LESSEE shall have the right of first refusal as follows:  LESSOR shall

provide LESSEE with written notice of the terms and conditions
offered said third party and LESSEE shall, within fifteen (15) days
after receipt of said notice, either accept or reject said terms
and conditions.  Should LESSEE reject said offer, then LESSOR shall
be free to lease to any other person upon the terms and conditions
specified in said notice.  If the Leased Premises is to be leased
on terms and conditions other than as specified in LESSOR's notice
and such leasing occurs during the time and to an entity as to
which LESSEE's right of first refusal applies, then the right to
lease shall again be offered to LESSEE as set forth above.

## 22.  OPTION TO EXTEND

LESSOR does hereby grant to LESSEE the right, privilege and
option to extend this Lease in accordance with the provisions of
Article 2 hereunder.  Rent for said options shall be as listed
below:

1st Option - LESSEE agrees to pay LESSOR as fixed rental on
the Leased Premises the sum of  Seventy Two Thousand Seven Hundred
Seventy Three and 44/100 Dollars ($72,773.00) per annum, payable in
equal monthly installments of  Six Thousand Sixty Four and 45/100
Dollars ($6,064.45) as provided for in Paragraph 3.

2nd Option - LESSEE agrees to pay LESSOR as fixed rental on
the Leased Premises the sum of  Eighty three Thousand Six Hundred
Eighty Nine and 45/100 Dollars ($ 83,689.45 ) per annum, payable
in equal monthly installments of  Six Thousand Nine Hundred Seventy
Four and 12/100 Dollars ($6,974.12 ) payable as provided in
Paragraph 3.

3rd Option - LESSEE agrees to pay LESSOR as fixed rental on
the leased premises the sum of   Ninety Six Thousand Two Hundred
Forty Two and 87/100 Dollars ($96,242.87) per annum, payable in
equal monthly installments of  Eight Thousand Twenty and 23/100
Dollars ($8,020.23).

## 23.  LESSOR's TITLE AND COVENANT OF QUIET POSSESSION

LESSOR covenants that it has full right and power to execute
and perform this Lease, and that it will put LESSEE into possession
of the Leased Premises free from all orders and notices of
violations of any public or quasi-public authority.  LESSOR further
covenants that LESSEE, on paying the rents reserved herein and
performing the covenants and agreements hereof, shall peaceable and
quietly have, hold and enjoy the Leased Premises and all rights,
easements, appurtenances and privileges thereunto belonging or in
any way appertaining during the full term of this Lease (and any
extensions or renewals thereof) without hindrance or molestation by
anyone claiming by through or under LESSOR, subject, however, to
the reservations and conditions of this Lease.  LESSOR further
represents and warrants to LESSEE that there are no restrictive
agreements with other LESSEEs which will interfere or prohibit
LESSEE's use of the Leased Premises for the purpose stated herein.

24.  MISCELLANEOUS

    A.   No waiver of any breach of this Ground Lease by LESSOR or
LESSEE shall be considered to be a waiver of any other or
subsequent breach.  All of the covenants, agreements, provisions
and conditions of this Ground Lease shall inure to the benefit of
and be binding upon the parties hereto, their successors, legal
representatives and permitted assigns.  This Ground Lease and the
Exhibits and addenda, if any, attached hereto and forming a part
hereof, set forth all the covenants, promises, agreements, condi-
tions and understandings between LESSOR and LESSEE concerning the
Leased Premises.  There are no oral agreements or understandings
between the parties hereto affecting this Ground Lease, and this
Ground Lease supersedes and cancels any and all previous negotia-
tions, arrangements, agreements and understandings, if any, between
the parties hereto with respect to the subject matter hereof, and
none thereof shall be used to interpret or construe this Ground
Lease.  Except as herein otherwise expressly provided,  no
subsequent alteration, amendment, change or addition to this Ground
Lease, nor any surrender of the term, shall be binding upon LESSOR
or LESSEE unless reduced to writing and signed by them.  This
Ground Leases shall be governed and interpreted under the laws of
the state of <u>Maryland</u>.

    B.   Each party agrees to execute, upon request, a short form
of this Ground Lease for purposes of recordation.  All recording
costs, recordation taxes and transfer taxes shall be paid by the
party offering this Ground Lease or any short form thereof for
recording.

    C.   In the event of any litigation between the parties
arising out of this Ground Lease, the prevailing party shall be
entitled to recover, as part of its costs, the costs and expenses
of litigation, including reasonable attorney's fees.

    D.   In the event LESSEE remains in possession of the Leased
Premises with LESSOR's consent after the expiration of the tenancy
created hereunder, and without the execution of a new Ground Lease,
LESSEE shall be deemed to be occupying the Leased Premises as a
tenant from month-to-month and shall be subject to all the other
conditions, provisions and obligations of this Ground Lease insofar
as the same are applicable to a month-to-month tenancy except that
base rental during such holdover shall be 110% of the base rental
immediately prior to the expiration of the tenancy.

    E.   If any term, covenant, condition or provision of this
Ground Lease is held to be invalid or unenforceable, the remaining
terms, conditions, covenants and provisions shall not be affected
thereby and shall remain valid and enforceable.

    F.   Except as hereinafter provided, LESSEE and LESSOR each
hereby represent to the other that it has not employed or dealt
with any person, firm or corporation who may have a right to claim
real estate brokerage commissions or finder's fees in connection

with this Lease.  LESSEE and LESSOR each hereby agrees to indemnify
and hold harmless the other from and against any and all claims or
demands with respect to any real estate brokerage commissions or
finder's fees asserted by any person, firm or corporation in
connection with this Lease which constitutes a breach of the
foregoing representation by such party.   The parties recognize
Trout, Segall, & Doyle ("Broker") and KLNB ("Co-Broker")) as the
exclusive brokers for this transaction, and LESSOR hereby agrees to
pay all commissions due to Broker in connection with this Lease
pursuant to the separate agreement between broker and LESSOR.  All
commission due to Co-Broker shall be paid by Broker.  The parties
further acknowledge that Mark S. Segall and/or other principals of
Broker may become owners of or partners in a successor to LESSOR
hereunder.

      G.    LESSEE agrees that at any time and from time to time,
within twenty (20) days after written request by LESSOR, LESSEE
shall execute and deliver to the LESSOR, or others designated by
LESSOR, a written instrument certifying (i) that this Ground Lease
is unmodified and in full force and effect (or if there shall then
have been modifications, that the same is in full force and effect
as so modified, and setting forth such modifications); (ii) that
the Leased Premises have been completed by the LESSOR in accordance
with Article 4 hereof (but if not so completed, stating the
respects in which not completed); (iii) that the LESSEE has
accepted possession of the Leased Premises and the date upon which
the term shall have commenced; (iv) the dates to which base rent
and additional rent and other charges have been paid, if any; (v)
whether or not, to the best knowledge of LESSEE, LESSOR is then in
default in the performance of any covenant, agreement or condition
contained in this Lease and, if so, specifying in detail each such
default; and (vi) such other matters relating to the status of this
Ground Lease as LESSOR may reasonably request.

      H.    As used herein, the term "LESSOR" shall mean LESSOR named
hereinabove as well as its successors and assigns, and any other
subsequent owner of the leasehold estate or reversion in the Leased
Premises, as well as the successors and assigns of any such
subsequent owner, each of whom shall have the same rights,
remedies, powers, authorities and privileges and also the same
duties, obligations, liabilities and responsibilities as it would
have had had it originally signed this Lease as the original
LESSOR, but any such person or entity, whether or not named herein,
shall have no liability hereunder after it shall cease to hold the
title to said real estate, except for obligations which may have
theretofore accrued.  Neither LESSOR nor any principal, partner,
officer, director or stockholder of LESSOR, whether disclosed or
undisclosed, shall have any personal liability with respect to the
Ground Lease or the Leased Premises, and if LESSOR should breach or
default with respect to its obligations or otherwise under this
Lease, LESSEE shall be entitled to enforce any judgment obtained by
LESSEE only against the LESSOR's interest in the Leased Premises
and the Shopping Center and the rents, sales proceeds, profits and
issues to be received therefrom, and not against any other assets

of LESSOR or of any principal, partner, office, director or stockholder of LESSOR.

## 25.   NON-FOREIGN ENTITY ATTESTATION

LESSOR hereby certifies that LESSOR is not a non-resident alien or foreign corporation, a foreign partnership, a foreign trust or a foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations); that LESSOR's Social Security Number or Federal Income Tax Number is <u>54-0493875</u>, and that LESSOR's home or office address is as shown above. LESSOR acknowledges that this certification may be disclosed to the Internal Revenue Service pursuant to federal law.

## 26.   HAZARDOUS WASTE

A.   (1)   LESSEE shall not cause or permit any hazardous or toxic substance, material, or waste, including petroleum and petroleum by-products, ("Hazardous Materials") to be brought upon, kept, or used on the Leased Premises by tenant, its agents, employees, contractors, or invitees, without prior written consent of LESSOR. The foregoing restriction shall not preclude LESSEE from bringing onto the Leased Premises, using and selling motor oil, brake fluid, battery acid, power steering fluid and other items typically used or sold at a National Tire Warehouse operation or other automotive operation then being conducted at the Leased Premises which are handled and maintained in accordance with all applicable laws.

(2)   LESSEE shall not cause or permit the discharge, escape, dumping or release ("Release") of any Hazardous Material upon, under or from the Leased Premises by LESSEE, its agents, employees, contractors, or invitees. LESSEE shall notify LESSOR immediately of any breach of this paragraph.

(3)   LESSEE, at LESSEE's expense, shall comply with all laws, regulations, and requirements of federal, state, and local authorities, including all applicable permitting, monitoring and report requirements, pertaining to the environment, including the air, soil, surface and sub-surface waters, and to Hazardous Materials (the "Environmental Laws"). LESSEE shall provide LESSOR with copies of all correspondence to and from any governmental agency with respect to actual or alleged violations of Environmental Laws.

(4)   LESSOR shall have the right to enter the Leased Premises at reasonable times after providing LESSEE reasonable notice, to inspect the Leased Premises and to perform groundwater and soil tests. LESSEE shall bear the reasonable costs of such tests where a violation of the Environmental Laws is found and LESSOR has reason to believe the violation is due to LESSEE's operations and not to pre-existing groundwater conditions.

(5)   LESSEE shall indemnify, defend, and hold LESSOR harmless from all claims, judgements, damages, penalties, fines, costs, liabilities or losses (including, without limitation, costs incurred in connection with any investigation of site conditions or any cleanup, remedial, removal or restorations work required by any federal, state or local governmental agency or political subdivision because of Hazardous Material present in the soil or groundwater at, upon, under or from the Leased Premises), caused by or arising in connection with the use or occupancy of the Leased Premises during the term by LESSEE and subtenant or assignee or its or their agents, representatives, employees, or invitees, excluding, however any pre-existing groundwater conditions.  This provision shall survive the expiration or termination of this Lease.

B.   LESSOR hereby warrants and certifies to LESSEE that LESSOR has not contaminated, placed on or produced from the Leased Premises any petroleum product or by-product or any substance or material which is or might be considered to be hazardous materials, including underground storage tanks.   LESSOR agrees to indemnify and hold LESSEE harmless from and against any loss, liability, claim damages, costs and expenses, including reasonable attorney's fees and court costs, arising directly or indirectly out of the presence, existence or use of any such hazardous materials or underground storage tank upon, in, under or about the Leased Premises, in existence on or prior to the date of this Lease.  This indemnification and hold harmless provision shall survive the termination of this Lease.

LESSOR certifies that except as hereafter disclosed no claim, action, suit or proceeding is pending or threatened against LESSOR or any other party arising directly or indirectly out of the presence, use or existence of any such hazardous materials in, under, on or about the Leased Premises.

LESSOR hereby advises LESSEE that operations upon the Shopping Center prior to LESSOR's acquisition thereof resulted in contamination of the groundwater under the Shopping Center and, as a result thereof, LESSOR has performed environmental remediation at the Shopping Center in accordance with the requirements of federal, state and local authorities.  Such remediation is now complete, but there remain upon portions of the Shopping Center outside the LESSEE's building monitoring wells required for LESSOR to periodically test the groundwater.

C.   LESSEE warrants and agrees that it shall not install or permit to be installed any underground storage tank on the Leased Premises at any time during the term of this Lease.

IN WITNESS WHEREOF, the parties hereto have executed this
Ground Lease on the day and year first above written.

LESSOR

Circuit City Stores, Inc

(Seal)
Date: _3.23.95_

By _Benjamin B. Cummings d._

Title _V.P._

ATTEST: _Joseph V. Jagdman_

Title _Assistant Secretary_

Date of Execution _3/23/95_

LESSEE

NTW Incorporated

(Seal)
Date: _3/17/95_

By _____

Title _E.V.P. & C.O.O._

ATTEST:

Title _James J. Thurman_   Vice President

Date of Execution _3/17/95_