

## EXHIBIT D

WHEREAS, by a Ground Lease Agreement (hereinafter referred to as the "Lease") dated                    , 199 ,                    as landlord (the "Landlord") leased to Tenant that certain premises, (the "Premises") commonly known as                    in the City of                    , County of                    , State of                    which constitutes the property covered by the Mortgage, all as more particularly described in said Lease; and

WHEREAS, the Lease is or may become (subject to this Agreement) subordinate in priority to the Mortgage; and

WHEREAS, Tenant wishes to obtain from Mortgagee certain assurances that Tenant's possession of the Premises will not, subject to the terms and conditions of this Agreement, be disturbed by reason of the enforcement of the Mortgage covering the Premises or a foreclosure of the lien thereunder; and

WHEREAS, Mortgagee is willing to provide such assurances to Tenant upon and subject to the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the above, the reciprocal promises hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do mutually agree as follows:

1. **Ratification.** Tenant hereby ratifies the Lease and confirms that the Lease now is or shall become upon the mutual execution of this Agreement subject and subordinate in all respects to the Mortgage and to all renewals, modifications and extensions thereof, subject to the terms and conditions of this Agreement. Tenant hereby affirms that the Lease is in full force and effect and that the Lease has not been modified or amended. Mortgagee acknowledges receipt of a copy of the Lease and hereby approves the same.

2. **Landlord's Default.** Tenant agrees with Mortgagee that, from and after the date Tenant receives a fully executed copy of this Agreement, Tenant will not seek to terminate the Lease by reason of any act or omission of the Landlord until Tenant shall have given written notice of such act or omission to the holder of the Mortgage (at such holder's last address furnished to Tenant) and until a period of thirty days shall have elapsed. Such holder of the Mortgage shall have the right, but not the obligation, to remedy such act or omission, provided however that if the act or omission does not involve the payment of money from Landlord to Tenant and (i) is of such a nature that it could not be reasonably

K:\IXO\CLI\75775.2
January 31, 1995

D-1

remedied within the thirty (30) day period aforesaid, or (ii) the nature of the act or omission or the requirements of local law require the holder of the Mortgage to appoint a receiver or to foreclose on or commence legal proceedings to recover possession of the Property in order to effect such remedy and such legal proceedings and consequent remedy cannot reasonably be achieved within said thirty (30) days, then such holder of the Mortgage shall have such further time as is reasonable under the circumstances to effect such remedy provided that such holder shall notify Tenant within ten (10) days after receipt of Tenant's notice of such holder's intention to effect such remedy and provided further that such holder institutes immediate legal proceedings to appoint a receiver for the Property or to foreclose on or recover possession of the Property within said thirty (30) day period and thereafter prosecutes said proceedings and remedy with due diligence and continuity to completion.

3.  **Non-Disturbance and Attornment**.  So long as Tenant is not in default under the Lease (beyond any period given Tenant to cure such default) as would entitle Landlord to terminate the Lease or would cause, without any further action of Landlord, the termination of the Lease or would entitle Landlord to dispossess Tenant thereunder, Mortgagee agrees with Tenant that Mortgagee will not disturb the peaceful and quiet possession or right of possession of the Premises by Tenant nor shall the Lease or its appurtenances be extinguished by reason of any Foreclosure (as hereinafter defined) or otherwise, nor join Tenant as a party in any action or proceeding brought pursuant to the Mortgage.

In the event that Mortgagee or its successors or assigns, as defined in Paragraph 7 hereof, (herein called "Successor Landlord") acquires the interest of Landlord or comes into the possession of or acquires title to the Premises by reason of the foreclosure (judicial or non-judicial) or enforcement of the Mortgage (including a private power of sale) or the Note or obligations secured thereby or by a conveyance in lieu thereof or other conveyance or as a result of any other means (any or all of the foregoing hereinafter referred to as a "Foreclosure"), then the Lease and all appurtenances thereto shall remain in full force and effect and Tenant shall be bound to Successor Landlord under all of the provisions of the Lease for the balance of the term thereof (including any extensions or renewals thereof which may be effected in accordance with any options contained in the Lease) with the same force and effect as if Successor Landlord was the Landlord under the Lease, and Tenant hereby agrees to attorn to Successor Landlord as its landlord, such attornment to be effective and self operative, without the execution of any further instruments on the part of either of the parties hereto, immediately upon the succession by Successor Landlord to the interest of Landlord in the Premises; and further, in such event, Successor Landlord shall be bound to the Tenant under all of the provisions of the Lease, and

Tenant shall, from and after such event, have the same remedies against Successor Landlord for the breach of any agreement contained in the Lease that the Tenant might have had under the Lease against Landlord thereunder provided, however, that Successor Landlord shall not be:

(a)   liable for any act or omission of any prior landlord (including Landlord) unless Tenant shall have given notice (pursuant to Paragraph 2 hereof) of such act or omission to the party who was the then holder of the Mortgage (whether or not such holder elected to cure or remedy such act or omission);

(b)   subject to any offsets (except those expressly permitted under the Lease) or defenses which Tenant might have against any prior landlord (including Landlord) unless Tenant shall have given notice (pursuant to Paragraph 2 hereof) of the state of facts or circumstances under which such offset or defense arose to the party who was the then holder of the Mortgage (whether or not such holder elected to cure or remedy such condition); or

(c)   bound by any rent or additional rent which Tenant might have paid to any prior landlord (including Landlord) more than thirty (30) days in advance of the due date under the Lease; or

(d)   bound by any security deposit which Tenant may have paid to any prior landlord (including Landlord), unless such deposit is available to the party who was the holder of the Mortgage at the time of a Foreclosure; or

(e)   bound by any material amendment or material modification of the Lease made without the consent of the party who was the holder of the Mortgage at the time of such amendment or modification, unless such amendment or modification was subsequently affirmed by an intervening holder.

Tenant shall be under no obligation to pay rent to Successor Landlord until Tenant receives written notice from Successor Landlord stating that Successor Landlord is entitled to receive the rents under the Lease directly from Tenant and Successor Landlord hereby agrees to indemnify Tenant and hold Tenant harmless from all liability, costs, and expenses, including reasonable attorney's fees, arising out of any claims made by Landlord with respect to any rents paid by Tenant to Successor Landlord at the direction of Successor Landlord.

4.   **Intentionally Omitted.**

**5.   Agreement to Release Proceeds or Awards**
**(a) Destruction.**   In the event of a casualty at the Premises and:

(i)    in the further event the Lease is <u>not</u> terminated by reason thereof, Mortgagee agrees to release its interest in any insurance proceeds applicable to the improvements upon the Premises and payable under Tenant's insurance policies for the purpose of restoration, consistent with the parties' rights and obligations under the Lease; and

(ii)    <u>whether or not</u> the Lease is terminated by reason thereof, Mortgagee shall release its interest in any insurance proceeds applicable to improvements on the Leased Premises and payable under Tenant's insurance policies, consistent with Tenant's rights under the Lease.

<u>(b) Eminent Domain</u>.  In the event of a condemnation of all or a portion of the Premises and:

(i)    in the further event the Lease is <u>not</u> terminated by reason thereof, and provided both Landlord and Tenant have notified Mortgagee that they shall undertake to restore the Premises as provided in the Lease, Mortgagee agrees to release its interest in so much of the award applicable to improvements on the Leased Premises as shall be necessary for the purposes of restoration, consistent with Landlord's and Tenant's rights and obligations under the Lease; and

(ii)    <u>whether or not</u> the Lease is terminated by reason thereof, Mortgagee releases its interest in that portion of the award to which Tenant is entitled pursuant to the Lease.

6.    <u>Notices</u>.  All notices, demands, or requests, and responses thereto, required or permitted to be given pursuant to this Agreement shall be in writing and shall be sent postage prepaid by certified or registered mail return receipt requested, addressed as follows:

To Mortgagee:

To Tenant:

or to such other address as Mortgagee or Tenant may designate in writing. All such notices shall be deemed delivered when actually received or refused by the other party.

7. **Successors and Assigns**. This Agreement shall be binding upon and inure to the benefit of the parties hereto, their respective personal representatives, successors and assigns it being understood that the obligations herein of Mortgagee shall extend to it in its capacity as mortgagee under the Mortgage and to its successors and assigns, including anyone who shall have succeeded to its interest or to Landlord's interest in the Premises or acquired possession thereof by Foreclosure, purchase at a foreclosure sale or otherwise.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

<u>MORTGAGEE</u>

WITNESS OR ATTEST:

_____          _____

<u>TENANT</u>

WITNESS OR ATTEST:

_____          By _____



## AGREEMENT OF LEASE

**THIS AGREEMENT OF LEASE**, made this day of July 1999, between CIRCUIT CITY STORES, INC. (herein "Landlord"), and BOAT AMERICA CORPORATION, a Virginia corporation (herein "Tenant"),

**WITNESSETH, THAT FOR AND IN CONSIDERATION** of the rents, and of the mutual covenants and agreements of the parties hereto, as are hereinafter set forth, Landlord and Tenant do hereby agree as follows:

**SECTION 1.  THE PREMISES.**  The Landlord hereby leases to the Tenant and Tenant rents from the Landlord all that real property consisting of store premises containing approximately 9,000 leasable square feet, more or less, all as shown on <u>Exhibit A</u> attached hereto (herein "Premises"), to be located in the building shown on Exhibit A (the "Building"), in the shopping center known as Golden Ring Center located at the southeast corner of Pulaski Highway and Rossville Boulevard in Baltimore County, Maryland (the "Shopping Center"). As of the date of this Lease, the Shopping Center contains two buildings (not including the Premises) containing 54,694 leasable square feet. The Premises and the Shopping Center, together with all common areas of the Building and the real property on which the Building is located are collectively referred to as the "Property." Tenant's Proportionate Share (hereinafter referred to as Tenant's Proportionate Share) for purposes of computing Tenant's proportionate share of taxes, Landlord's operating costs and insurance shall be determined by dividing the leasable square footage of the Premises by the total leasable square footage of the Shopping Center, provided, however that if any tenant of the Shopping Center insures its own building or pays the taxes on its own building, then the leasable square footage of that tenant's building shall be excluded from the aforesaid denominator (and the taxes or insurance costs paid by such tenant shall not be included in taxes or insurance). Tenant's Proportionate Share shall be adjusted appropriately if the leasable square footage of the Shopping Center is increased or decreased.

**SECTION 2.  ORIGINAL TERM.**

(a)    **Original Term.**  This Lease shall be for a term (herein the "Original Term") commencing on the earlier of (i) thirty (30) days after Landlord notifies Tenant that the Premises are substantially complete and that possession of the Premises is delivered to Tenant, or (ii) when Tenant opens for business in the Premises (the "Commencement Date"); and terminating (unless sooner terminated pursuant to the provisions of this Lease) on the last day of the one hundred twentieth (120th) full calendar month occurring thereafter. Promptly upon the commencement of the Original Term, the parties hereto shall enter into a supplementary agreement, setting forth the dates of such commencement and termination. If Landlord has not substantially completed the Premises and delivered possession thereof to Tenant on or before March 7, 2000, then, for each day beyond March 7, 2000 until substantial completion and delivery of possession occurs, Tenant, as its sole right or remedy on account thereof (other than as provided in Section 2(b), shall be entitled to an abatement of one day of Minimum Rent.

(b)    **Termination.**  If Landlord has not commenced construction of the Premises within four (4) months from the date of this Lease, then Tenant, by notice to Landlord given within fifteen (15) days after the expiration of said four (4) month period, may terminate this Lease. Should Tenant fail to give notice of termination within said fifteen (15) day period, then Tenant shall be deemed to have forever waived and relinquished its right to terminate this Lease under the preceding sentence. If the Original Term has not commenced within twelve (12) months after the date of this Lease, then the Lease shall automatically terminate. Upon any termination of this Lease pursuant to this paragraph (c), neither Tenant nor Landlord shall have any further rights or obligations under this Lease or with respect to the Premises.

(c)    **Renewal Terms.**  Provided Tenant (as opposed to any assignee or subtenant) is in possession of the Premises and open for business and has not been in monetary default hereunder more than two (2) times within the preceding twelve (12) months and is otherwise not in default hereunder at the time of notice and at the commencement of the applicable Renewal Term, Tenant shall have two (2) options to renew this lease, each for an additional period of five (5) years following the Original Term or the first Renewal Term, as applicable (the "Renewal Terms"), by giving Landlord written notice of its intention to so renew this Lease at least nine (9) months prior to the termination of the Original Term, as to the first Renewal Term, and at least nine (9) months prior to the termination of the first Renewal Term, as to the second Renewal Term, upon the same terms and conditions provided herein, except that the Minimum Rent shall be in accordance with Section 4 herein. Following the two

Renewal Terms, Tenant shall have no additional renewals of this Lease. The Original Term and the Renewal Terms, if exercised, shall be collectively referred to as the "Term."

SECTION 3.    CONDITION OF PREMISES.

(a)    The Premises shall be constructed by Landlord in accordance with Exhibit B attached hereto, subject, however, to Landlord's right to substitute similar materials for those specified in *[handwritten: tho]* Exhibit B. Landlord currently anticipates substantial completion of its work occurring by ~~April 30,~~ MARCH 2000. Promptly after Landlord furnishes notice to Tenant that the Premises are substantially complete, Tenant shall, at its sole cost, prepare the interior of Premises for its use and occupancy by doing all work required of Tenant, including, without limitation, the installation of its trade fixtures, equipment and inventory. Tenant shall be entitled to possession of the Premises upon such notice, to complete the installation of its trade fixtures, equipment and inventory. Said entry and continued use without payment of rent by Tenant shall be contingent upon Tenant's meeting all of its other obligations set forth in this Lease including, but not by way of limitation, payment of all utility charges and furnishing of appropriate insurance certificates, to the same extent as though the Term of this Lease shall have commenced on the date of entry. Tenant's entry into possession shall be at the sole risk of Tenant.

(b)    Tenant agrees as soon as possible to submit its plans and specifications for the doing of Tenant's work. Upon approval thereof by Landlord, with such modifications as Landlord may require or approve, Tenant shall complete its work in the Premises in accordance with the approved plans and specifications.

(c)    By opening for business, Tenant shall be deemed to have accepted the Premises, to have acknowledged that the same are in the condition called for hereunder and to have agreed that the obligations of the Landlord imposed for the delivery of the Premises have been fully performed.

(d)    Measurement of Tenant's Floor Area. On, before or promptly after the Commencement Date, Landlord shall measure the Premises in the manner hereafter provided and shall give Tenant notice of the leasable square footage of the Premises so determined. The Premises shall be measured from the exterior face of the exterior walls, and the center line of common walls, if any, and in no case shall there be any deduction for columns or other structural elements or mechanical systems (including equipment and related duct work) within the Premises. Tenant may request that Landlord's architect, engineer or contractor re-measure the Premises and certify the same to the parties. If, after Tenant's request for re-measurement, the revised leasable square footage pursuant to such re-measurement is less than the leasable square footage as originally measured by Landlord, then Landlord shall pay the cost of the re-measurement. If said revised leasable square footage is equal to or greater than the original measurement by Landlord, then Tenant shall pay for the cost of re-measurement or shall reimburse Landlord for same, as the case may be. The leasable square footage of the Premises, as determined by Landlord, shall be used to adjust the Minimum Rent and any other provisions in this Lease based on the square footage of the Premises, if such figure varies from the original estimate set forth herein and shall be binding on the parties.

SECTION 4.    RENTAL. Tenant covenants and agrees to pay to Landlord during the Term, as rent for the Premises, the following:

(a)    Minimum Rent. A fixed guaranteed minimum rent (herein called "Minimum Rent") shall be paid during the Term in equal monthly installments as follows (with any partial month to be prorated accordingly):

(i)    During each lease year of the Original Term and, if exercised, the Renewal Terms, the annual Minimum Rent shall be as set forth below in the column labeled "Annual Minimum Rent" which shall be payable in equal monthly installments in the amounts set forth below in the column labeled "Monthly Installment":

| Lease Years | Annual Minimum Rent | Monthly Installment |
|---|---|---|
| 1-5 | $130,500.00 ($14.50 psf) | $10,875.00 |
| 6-10 | $150,120.00 ($16.68 psf) | $12,510.00 |

| | | |
|---|---|---|
| First Renewal Term<br>11-15 | $172,620.00<br>($19.18 psf) | $14,385.00 |
| Second Renewal Term<br>16-20 | $198,540.00<br>($22.06 psf) | $16,545.00 |

(b)   **Lease Year Defined.**   The first lease year of this Lease shall commence on the first (1st) day of the Term and shall end at the close of the twelfth (12th) full calendar month of the Term; thereafter, each lease year shall consist of periods of twelve (12) full calendar months commencing with each anniversary of the first (1st) day of the first (1st) full calendar month of the Term.

(c)   **Additional Rent.**   All additional sums, charges or amounts of whatever nature to be paid by Tenant to Landlord in accordance with the provisions of this Lease shall constitute additional rent, whether or not such sums, charges or amounts are referred to as additional rent ("Additional Rent").

(d)   All rent payable and all statements deliverable by Tenant to Landlord under this Lease shall be paid and delivered to the office of Landlord as herein set forth for notices, or any other address which Landlord may hereafter designate in writing to Tenant.

(e)   Minimum Rent shall be payable in equal monthly installments in advance on the first (1st) day of each full calendar month during the Term.  Minimum Rent and all Additional Rent shall be paid without any deduction or set off whatsoever, and without demand.  The first (1st) monthly payment of Minimum Rent shall include any prorated Minimum Rent for the period from the date of commencement of the Term to the first (1st) day of the first (1st) full calendar month.

(f)   Tenant hereby agrees that Landlord shall be entitled to charge a late payment fee any time that rent is not paid within five (5) days of the date when due (which fee shall be used to defray a portion of Landlord's costs) equal to a flat charge of five percent (5%) of the amount overdue plus interest at the rate of 18% per annum (the "Default Rate") for each day such payment is overdue.  The imposition of such late fees shall not deprive Landlord of any other rights and remedies Landlord may have.

(g)   If at any time during the Term of this Lease, a rent check is returned for insufficient funds, (a) Tenant shall pay the sum of $50.00 to Landlord to defray Landlord's costs and (b) thereafter, all rent and other amounts due under this Lease shall be paid by certified check.

**SECTION 5.  REAL ESTATE TAXES.**  (a)  Tenant shall pay in each Tax Year (as hereinafter defined) during the Term, as additional rent, Tenant's Proportionate Share of the total amount of all real estate and other ad valorem taxes (including, without limitation, general and special assessments) payable with respect to the total Shopping Center area and common areas, including all buildings and other improvements situate thereon (excluding, however, any buildings as to which the tenant thereof pays all taxes thereon).  These taxes shall include but are not limited to any real estate tax, real estate rental receipt or gross receipt tax or any other tax of Landlord (excluding Landlord's income taxes) now or hereafter imposed by Federal, State or local taxing authority whether as a substitution for or in addition to the current method of property taxation.  Taxes shall also include the reasonable cost, including attorney's and appraiser's fees, of any negotiation, contest or appeal pursued by Landlord in an effort to reduce taxes or assessments on which any tax or other imposition provided for in this paragraph is based.  Said term also shall be deemed to include any metropolitan district water and sewer charges and other governmental charges which customarily are part of the real estate tax bill issued by the governmental authorities charged with said responsibility.

(b)   Tenant will pay to Landlord as additional rent, Tenant's Proportionate Share of all taxes.  Such amount shall be payable in equal monthly installments in advance on the first day of each month during the Term.  The Tax Year shall be the year so established by the governmental authority charged with said responsibility.  Landlord shall provide Tenant with a copy of the tax bill and the calculation of Tenant's share thereof within a reasonable period of time.  Tenant's Proportionate Share of taxes shall be adjusted on a proportionate basis for any period during the Term which shall be less than a full Tax Year.  After receipt of all tax, assessment and expense bills attributable to any Tax Year, Landlord shall furnish Tenant with a written statement of the actual amount of Tenant's Proportionate Share of taxes.  If the total amount paid by Tenant under this Section for any Tax Year shall be less than the actual amount due from Tenant for such Tax Year as shown on such statement, Tenant shall pay to Landlord the difference between the amount paid by Tenant and the actual amount

due, such deficiency to be paid within fifteen (15) days after demand therefor by Landlord; and if the total amount paid by Tenant hereunder for any Tax Year shall exceed such actual amount due from Tenant for such Tax Year, such excess shall be credited against payments hereunder next due, or at the end of the Term, refunded to Tenant.

(c)     Landlord hereby advises Tenant that Landlord has estimated Tenant's Proportionate Share of Taxes for the entire 1999-2000 Tax Year to be $9,000.00 ($1.00 psf), and that this estimate will be used in establishing the monthly installments payable by Tenant during the 1999-2000 Tax Year, subject to adjustment and reconciliation between Landlord and Tenant after the end of such Tax Year. This estimate is not intended to be, and shall not be constitute, a guarantee, cap or ceiling on the Tenant's Proportionate Share of Taxes for the 1999-2000 Tax Year or any other Tax Year.

SECTION 6.   **PERMITTED USE AND CONTINUED OCCUPANCY.**

(a)     The Premises shall be used and occupied for the following purposes and none other: retail sale of boating equipment and accessories as sold in other Boat/U.S. stores in the United States.

(b)     Notwithstanding the foregoing, the Premises shall not be used for (i) the displaying, storing, selling or repairing of tires (other than tires for boat trailers), automobile batteries, shocks, automobile parts and accessories, automobile oils and lubricants of any type or kind, nor whose primary business is the servicing, maintaining or repairing of automobiles and light trucks, nor (ii) the sale or rental of consumer, office and automotive electronics products (which include, but shall not be limited to, televisions, stereos, speakers and video recorders and players, but excludes marine electronics), computer hardware and software, entertainment software and entertainment media (which include, but shall not be limited to, records, game cartridges, video tapes, cassettes and compact discs), cellular telephones, household appliances (which include, but shall not be limited to, refrigerators, freezers, stoves, microwave ovens, vacuum cleaners and dishwashers) and related goods and the sale and installation of motor vehicle audio, stereo and telephone systems, nor (iii) the sale or installation of carpet, rugs, floor tile or other floor treatments.

(c)     Tenant shall not use or allow the Premises to be used as (i) a bar, pub, nightclub, music hall, disco or restaurant; (ii) a bowling alley; (iii) a billiard or bingo parlor; (iv) a flea market or used goods and clothing store, or pawnshop; (v) a massage parlor or modeling studio; (vi) a funeral home; (vii) a facility for the sale of paraphernalia for use with illicit drugs; (viii)an adult book store or sexually-oriented shop or theater  (such terms being defined as a bookstore, shop or theater, the primary business of which is one or more of the following (x) displays for sale or exhibition of books, magazines or other publications containing any combination of photographs, drawings or sketches which are primarily and explicitly sexual in nature and which are not primarily scientific or educational, and (y) offering for exhibition, sale or rental video cassettes or other medium capable of projecting, transmitting or reproducing, independently or in connection with another device, machine or equipment, an image or series of images, the contents of which are generally advertised as rated "X" or "XXX" or which are primarily and explicitly sexual in nature and which are not primarily scientific or educational; (ix) an off-track betting parlor; (x) a carnival, amusement park, adult or children's indoor and/or outdoor amusement facility or circus; (xi) a gas station, car wash or auto repair or body shop ; (xii) a facility for the sale of new or used motor vehicles, trailers or mobile homes; (xiii) a facility for any use which is illegal or dangerous, constitutes a nuisance or is inconsistent with an integrated, community-oriented retail and commercial shopping center; (xiv) a skating rink; (xv) an arcade, pinball or computer game room  or other nonretail uses except for offices and storage facilities; (xvii) a banquet hall, auditorium, other place of public assembly or church; (xviii) a training or educational facility (including, without limitation, a beauty school, barber college, reading room, school or other facility catering primarily to students or trainees rather than customers); (xix) a theater of any kind; (xx) a facility for the sale or rental of used goods (including thrift shops, secondhand or consignment stores); (xxi) a gymnasium, sports or health club or spa; (xxii) central laundry or dry cleaning plant or any laundry; or (xiii) any auction, fire or going-out-of-business sale.

(d)     Tenant shall occupy the Premises promptly after the commencement of the Term and, thereafter, shall conduct in the Premises, continuously during the Term, the business permitted under Section 6(a). Tenant will cause the Premises to be open for business at least from 10:00 a.m. until 6:00 p.m. Monday through Friday and from 10:00 a.m. until 6:00 p.m. on Saturday unless other operating hours are approved by Landlord.  Tenant will conduct business on the Premises only in the name of "Boat/U.S." and under no other name or trade name unless and until the use of some other name is approved in writing by Landlord.

(e)     If Tenant shall, at any time during the Term, vacate the Premises or cease the operation of Tenant's business therein, Tenant shall pay to Landlord, in addition to the Minimum Rent provided for in this Lease, monthly in advance for each month or fraction thereof, during the Term, an amount equal to one-twelfth (1/12th) of the annual Minimum Rent then due, which said payment shall in no wise abridge impair, or affect any other right or remedy which Landlord may have on account of or in connection with such breach of condition by the Tenant, or limit or affect adversely the recovery by the Landlord of any damages the Landlord may have sustained by reason of such default of the Tenant, including, specifically the rights and remedies contained in Section 24, hereof.

(f)     Tenant shall not install or permit to be installed, any audio, video or radio transmitting equipment which causes any interference with radio or television reception or transmission in or from the existing Circuit City store in the Shopping Center.

### SECTION 7.   OPERATION AND MAINTENANCE OF COMMON AREAS.

(a)     Landlord shall operate, manage and maintain during the Term, all parking areas, driveways, footways and other common areas of the Shopping Center. During the Term, customers of Tenant shall be entitled to the non-exclusive use free of charge, but in common with others, of the parking areas, driveways, footways and common areas presently existing, provided that such use shall be subject to such reasonable rules and regulations as Landlord may from time to time prescribe; and provided further that Landlord shall at all times have full and exclusive control, management and direction of said parking areas, driveways, footways, and common areas. Landlord shall further have the right to police them; to restrict parking by tenants, their officers, agents and employees; to designate employee parking areas; to close temporarily all or any portion of the parking areas or facilities as may be required for proper maintenance and/or repair; to discourage non-customer parking; and to do and perform such other acts in and to such areas as, in the use of its business judgment, the Landlord shall determine to be advisable in order to improve or make more convenient the use thereof by Tenants, their officers, agents, employees and customers. Landlord may from time to time change the location, layout and arrangement of the parking areas, driveways, footways and common areas and reduce them by erecting thereon store buildings or other structures or improvements of any kind including, but not limited to, extensions to the Shopping Center; provided that in no event shall any such changes and/or additions unreasonably interfere with Tenant's or its customers' convenient access to, or use and enjoyment of the Premises. Landlord shall provide reasonable illumination for the driveways and parking areas, and will keep them in reasonable repair and reasonably free of litter and snow.

(b)     Tenant and its employees shall park their cars only in such areas designated by Landlord. Landlord agrees that it will not designate for employee parking by Tenant any areas behind the Building. Tenant shall furnish Landlord with license numbers of Tenant's car or cars and cars used by its employees within five (5) days after taking possession of the Premises and shall thereafter notify Landlord of any changes in such information within five (5) days after such changes occur. If Tenant or its employees shall fail to park their cars in the designated parking areas, then, without limiting any other remedy which Landlord may pursue, Landlord shall have the right to charge Tenant, as additional rent, the sum of Twenty-Five Dollars ($25.00) per day per car parked in violation of the provisions of this subsection.

(c)     In each lease year Tenant will pay to Landlord, as additional rent, Tenant's Proportionate Share of Landlord's operating costs. Such amount shall be payable in advance in equal monthly installments with each payment of Minimum Rent hereinbefore described. After the end of each calendar year, Landlord shall deliver to Tenant a statement of Landlord's operating costs for such period, and the amounts paid by Tenant shall be adjusted between Landlord and Tenant, the parties hereby agreeing that Tenant shall pay Landlord or Landlord shall credit Tenant's account, or (if such adjustment is at the end of the Term) pay Tenant, as the case may be, within fifteen (15) days after receipt of such statement, such amounts as may be necessary to effect adjustment to Tenant's Proportionate Share of Landlord's operating costs for such calendar year. For the calendar year or other period in which the Term commences or terminates, the provisions of this Section shall apply, but Tenant's Proportionate Share of Landlord's operating costs shall be subject to a pro rata adjustment based upon the number of days of such calendar year or other period within the Term. For the purpose of this subsection (c), the "Landlord's operating cost" means the total cost and expense incurred by Landlord in operating, repairing and maintaining or causing to be operated, repaired and maintained the common areas and the roof of the Shopping Center, including, without limitation, the cost of cleaning, utilities, snow and ice removal, resurfacing, painting, real estate taxes for the common areas, fire protection, repairs, landscaping, policing and security charges; public liability, property damage and such other insurance deemed prudent by Landlord for the common

areas, plus ten percent (10%) of the total of all such costs and expenses as administrative overhead. "Common areas" means all areas, parking areas, driveways, footways, pylon signs, space, equipment and special services provided by Landlord for the common use and benefit of tenants, their employees, agents, servants, customers and other visitors.

(d)      Landlord hereby advises Tenant that Landlord has estimated Tenant's Proportionate Share of Landlord's operating costs for the entire 1999 calendar year to be $7,650.00 ($.85 psf), and that this estimate will be used in establishing the monthly installments payable by Tenant during the 1999 calendar year, subject to adjustment and reconciliation after the end of the calendar year. This estimate is not intended to be, and shall not constitute, a guarantee, cap or ceiling on Tenant's Proportionate Share of Landlord's operating costs for 1999 or any other year.

SECTION 8.  **ASSIGNMENT AND SUBLETTING.**  Tenant shall not assign this Lease in whole or in part, nor sublease all or any part of the Premises, nor permit other persons to occupy said Premises or any part thereof, nor grant any license or concession for all or any part of said Premises, without the prior written consent of Landlord, which consent may be granted or denied in Landlord's sole and absolute subjective discretion. Any consent by Landlord to an assignment of subletting of this Lease shall not constitute a waiver of the necessity of obtaining such consent as to any subsequent assignment or subletting, and, in no event, shall it relieve Tenant of liability hereunder. An assignment for the benefit of Tenant's creditors or otherwise by operation of law shall not be effective to transfer or assign Tenant's interest under this Lease unless Landlord shall have first consented thereto in writing. Neither Tenant's interest in this Lease, nor any estate created hereby shall pass to any trustee or receiver or assignee for the benefit of creditors or otherwise by operation of law, except as may be specifically provided in the Bankruptcy Code. If any of the corporate shares of stock of Tenant are transferred, or if any partnership interests of Tenant are transferred, by sale, assignment, bequest, inheritance, operation of law or otherwise, so as to result in a change of the control, assets, value, ownership or structure of Tenant, same shall be deemed an assignment for the purposes of this Section 8 and shall require Landlord's prior consent, and Tenant shall notify Landlord of any such change or proposed change.

SECTION 9.  **REPAIRS.**

(a)      Landlord shall keep and maintain the structural integrity of the foundations, the exterior walls of the Premises, the roof, load-bearing walls and other exterior portions of the Premises (exclusive of any doors, windows and glass or nonstructural vandalism of the Premises, which shall be ~~Tenant's responsibility~~ *HEREBY AND NOT RESPONSIBILITY OF B.G.+B.* and the water and sanitary sewer lines serving the Premises located outside of the footprint of the Premises in repair, ordinary wear and tear excepted, provided that Tenant shall give Landlord written notice of the necessity for such repairs, and provided that the damage thereto shall not have been caused by Tenant, its agents, contractors, or employees, in which event Tenant shall be responsible therefor and shall promptly repair or replace it. Landlord shall be under no liability for repair or maintenance or replacement of the Premises, or any part thereof; nor shall Landlord be under any liability to repair or maintain or replace any electrical, plumbing, heating, air conditioning or other mechanical installation serving the Premises. *MOVED PARENTHESIS UP TO END OF BUILDING.* If Landlord fails to make any repairs to the Building, which repairs are specifically the responsibility of Landlord hereunder, then Tenant may, after thirty (30) days written notice and opportunity to cure is given to Landlord, make such repairs on Landlord's behalf, and Landlord shall reimburse Tenant for the reasonable cost thereof within thirty (30) days after receipt of an invoice therefor from Tenant.

(b)      Tenant shall keep the interior of the Premises, together with all electrical, plumbing (except to the extent such repairs are the responsibility of Landlord under Section 9(a) above), heating, air conditioning and other mechanical installations and equipment used by or in connection with the Premises (including specifically, all heating, ventilating and air conditioning equipment), in good order, repair and replacement; and promptly replace any plate glass which may be broken or damaged with glass of like kind or quality and surrender the Premises at the expiration of the Term in as good condition as when received, except for ordinary wear and tear and damage by fire and other casualty fully covered by Landlord's insurance policies. Tenant will not overload the electrical wiring or plumbing, and will not install any additional electrical wiring or plumbing unless it has first obtained Landlord's written consent, and if such consent is given, Tenant will install them at its own cost and expense. Tenant will repair promptly, at its own expense, any damage to the Premises caused by bringing into the Premises any property for Tenant's use, or by the installation, use or removal of such property, regardless of fault or by whom such damage shall be caused. In furtherance of the above, Tenant covenants and agrees to obtain a maintenance, repair and service contract on the HVAC system, said contract to be on such terms and with such company as shall be approved by Landlord.

Landlord shall assign to Tenant all warranties received by Landlord, if any, for any of the systems (including, but not limited to, the HVAC system) Tenant is required to maintain under this Lease.

(c)      If Tenant shall not proceed promptly and diligently to make any repairs or perform any obligations imposed upon it by the preceding subsections (or Tenant's obligation under Section 7 as to common areas) within three (3) days after receiving written notice from Landlord to make such repairs or perform such obligation, then and in such event Landlord may, at its option, enter the Premises and do and perform the things specified in said notice, without liability on the part of Landlord for any loss or damage resulting from any such action by Landlord, and Tenant agrees to pay promptly upon demand any cost or expense incurred by Landlord in taking such action.  Landlord agrees, after written notice from Tenant, to make such repairs for which it is required hereunder as promptly as reasonably possible under the circumstances.

SECTION 10.  UTILITIES.  Tenant shall pay promptly when due the charges for all utility services rendered or furnished to the Premises, including but without limitation, water, sewer, electricity and telephone, all of which shall be separately metered (or in the case of water, submetered) to the Premises.  All charges for water service shall be payable to Landlord as Additional Rent within fifteen (15) days after receipt of an invoice therefor from Landlord.  If Tenant defaults in the payment of any such charges, Landlord may, at its option, pay them for Tenant's account, in which event Tenant shall promptly reimburse Landlord as additional rent therefor.  Landlord shall not be liable to Tenant in damages or otherwise for any interruption in service of electricity, water, heat, telephone or air conditioning whether caused by the making of any repairs or improvements in the Shopping Center or otherwise.

SECTION 11.  COMPLIANCE WITH RULES, ORDINANCES, ETC.  (a)  The Tenant shall, throughout the Term, at the Tenant's sole cost, promptly comply with all laws, ordinances, notices, orders, rules, regulations and requirements of all federal, state or municipal governments or the appropriate departments, commissions, boards and officers thereof, as well as any and all notices, orders, rules and regulations of the National Board of Fire Underwriters, or any other body now or hereafter constituted and exercising similar functions, relating to the Premises.  The Tenant shall observe and comply with the requirements imposed by and all policies of public liability, fire and other insurance at any time in force with respect to the Shopping Center or Premises.  Tenant shall also comply with Landlord's rules and regulations attached hereto as Exhibit C and such reasonable amendments thereto as Landlord shall from time to time adopt.  Tenant shall at all times during the Term comply with all zoning laws that pertain to the Premises and Landlord makes no representation as to the zoning of the Premises for the uses contemplated by Tenant.

(b)      As part of its obligation to comply with laws, Tenant shall comply with all federal, state, and local environmental laws and regulations, such as the Clean Air Act, the Federal Water Pollution Control Act, the Resource Conservation and Recovery Act, the Superfund Law, and the Toxic Substances Control Act.  Tenant shall send Landlord copies of any reports or other filings required by environmental laws and regulations.  Tenant shall notify Landlord immediately if Tenant is notified of any potential violation of environmental laws and regulations by Tenant at the Shopping Center.  If Tenant becomes obligated under environmental laws and regulations to take any remedial action at the Shopping Center, Tenant may not take the action without obtaining Landlord's prior approval.

(c)      Tenant shall and hereby does agree to indemnify, protect, defend and hold harmless Landlord, and its partners, agents, employees and mortgagees from and against any and all claims, judgments, damages, penalties, fines, taxes, costs, liabilities, losses and expenses arising at any time during or after the Term as a result of or in connection with:  (i) Tenant's breach of any representation, warranty or covenant contained in this Section 11; or (ii) the presence of any hazardous or toxic substances or materials on, under or about the Shopping Center which are the result of Tenant's activities or those of its agents, contractors or employees on or in the Shopping Center.  The provisions of this Section 11(c) shall survive the expiration or termination of this Lease.

SECTION 12.  TENANT'S ALTERATIONS.  Tenant shall not paint or decorate the exterior of the Premises, or any portion of the interior visible outside of the Premises, or make any alterations, additions or improvements to the Premises without Landlord's prior written consent in each instance first had and obtained; provided, however, that Tenant may make non-structural interior alterations to the Premises without Landlord's consent.  Any alterations, additions or improvements made by Tenant shall immediately become the property of Landlord and shall remain upon the Premises, or Landlord, at its election, may require Tenant to remove same and restore the Premises to their original condition, in which event Tenant shall comply with such requirement prior to the expiration or other termination



of this Lease. Tenant shall cause to be removed within ten (10) days after notice thereof any lien, including any mechanic's lien asserted against work performed upon the Premises.

**SECTION 13. <u>INSURANCE</u>.**

(a)    The Tenant, at its sole cost and expense, shall maintain and keep in effect from the date of delivery of the Premises to Tenant, throughout the Term, the following types of insurance, in the amounts specified and in the form hereinafter provided:

(i)    <u>Tenant Public Liability and Property Damage</u>. A policy or policies of broad form commercial general liability insurance against loss or liability in connection with personal injury or death or property damage or destruction in or upon the Premises or arising out of the use of any portion of the Shopping Center by Tenant, its agents, employees, officers, invitees, visitors, guests and customers in which the limits of liability shall be not less than Two Million Dollars ($2,000,000) in respect of injury or death to any number of persons arising out of any one occurrence and such insurance against property damage to afford protection to the limit of Two Hundred Fifty Thousand Dollars ($250,000) in respect of any instance of property damage. The insurance coverage required under this Section 13(a) shall, in addition, extend to any liability of Tenant arising out of the indemnities provided for in Section 22.

(ii)    <u>Tenant Leasehold Improvements and Property</u>. Insurance covering all of the items included in Tenant's improvements to the Premises installed by Tenant, including, trade fixtures and personal property on or upon the Premises from time to time, and alterations, additions or changes to the Premises made by the Tenant, in an amount not less than one hundred percent (100%) of their full replacement cost from time to time during the Term, providing protection against perils included within the standard form of fire and extended coverage insurance policy, together with insurance against sprinkler damage, vandalism and malicious mischief.

(iii)    All policies of insurance provided for in Section 13(a) shall be issued in form acceptable to Landlord by insurance companies with a financial size of not less than A:XII as rated in the most current available "Best's Insurance Reports", and qualified to do business in Maryland. Each policy (A) shall be issued in the names of Landlord and Tenant and any other parties in interest designated in writing by notice from Landlord to Tenant; (B) shall be for the mutual and joint benefit and protection of Landlord and Tenant and any other such parties in interest; (C) shall (or a certificate thereof shall) be delivered to each of Landlord and any other such party in interest prior to delivery of possession of the Premises to Tenant and thereafter within thirty (30) days prior to the expiration of each such policy, and, as often as any such policy shall expire or terminate; (D) shall contain a provision that the insurer will give to Landlord and such other parties in interest at least thirty (30) days notice in writing in advance of any material change, cancellation, termination or lapse, or the effective date of any reduction in the amounts of insurance; (E) shall be written as a primary policy which does not contribute to and is not in excess of coverage which Landlord may carry; and (F) shall contain a provision that Landlord and any other parties interest, although named as an insured, shall nevertheless be entitled to recover under said policies for any loss occasioned to it, it servants, agents and employees by reason of the negligence of Tenant. Tenant agrees to permit Landlord at all reasonable times to inspect the policies of insurance of Tenant with respect to the Premises for which policies or copies thereof are not delivered to Landlord. If Tenant does not procure the policies required in Section 13(a), Landlord shall obtain the policies for the Tenant, and Tenant will pay the costs of these policies to the Landlord as additional rent.

(b)    Landlord shall maintain and carry, throughout the Term, the following insurance in addition to the insurance provided by Tenant:

(i)    <u>Landlord Public Liability</u>. Broad Form Commercial General Liability Insurance covering the Premises, Shopping Center and common areas against claims for bodily injury or death and property damage occurring upon, in or about the Shopping Center.

(ii)    <u>Landlord Real Property Damage</u>. Insurance covering the Landlord's interest in the Shopping Center, in such amount not less than one hundred percent (100%) of its full replacement cost from time to time during the Term, and providing protection against fire, vandalism, rental interruption and other perils as Landlord from time to time deems prudent.

(c)    Tenant shall pay to Landlord as additional rent, Tenant's Proportionate Share of all costs of insurance maintained by Landlord. The payment of such insurance cost shall be prorated and due and payable on a monthly basis, together with Minimum Rent throughout the Term. After the end

of each calendar year, Landlord shall deliver to Tenant a statement of such insurance costs for the calendar year. Any overpayment or deficiency in Tenant's payment of its Proportionate Share of such insurance costs shall be adjusted between Landlord and Tenant and Tenant shall pay Landlord or Landlord shall credit Tenant's account (or, if such adjustment is at the end of the Term, Landlord shall pay Tenant), as the case may be, within fifteen (15) days after receipt of such statement, such amounts as may be necessary to effect such adjustment. Landlord hereby advises Tenant that Landlord has estimated Tenant's Proportionate Share of Landlord's cost of insurance for the entire 1999 calendar year to be $1,350.00 ($.15 psf), and that this estimate will be used in establishing the monthly installments payable by Tenant during the 1999 calendar year subject to adjustment and reconciliation after the end of the calendar year. This estimate is not intended to be, and shall not constitute, a guarantee, cap or ceiling on Tenant's Proportionate Share of Landlord's insurance costs for 1999 or any other year. Tenant further agrees from time to time to pay to Landlord as Additional Rent hereunder, upon demand, the amount, if any, by which Landlord's premiums for insurance shall be increased as a result of Tenant's use of the Premises or failure to occupy or abandonment of the Premises.

(d)    Regardless of anything else in this Lease to the contrary, each of the parties hereto hereby releases the other for any loss or damage which may be inflicted upon the property of such party, even if such loss or damage shall have arisen out of the negligent or intentionally tortious act or omission of the other party, its agents or employees, and which is covered or required to be covered by insurance maintained by such party. Each party shall cause its respective insurance policies to contain such waiver of subrogation endorsements.

SECTION 14. **ROOF AND WALLS.** Landlord shall have the exclusive right to use all or any part of the roof and walls of the Premises for any purpose; to erect additional stores or other structures over all or any part of the Shopping Center; and to erect and maintain in connection with the construction thereof, temporary scaffolds and other aids to construction on the exterior of the Premises, provided that access to the interior of the Premises shall, not be denied, that there shall be no encroachment upon the interior of the Premises, and that Tenants and its customers use and enjoyment of the Premises shall not be unreasonably denied.

SECTION 15. **FIRE OR OTHER CASUALTY.**

(a)    If the Premises shall be damaged by fire, the elements, accident or other casualty ("Casualty"), but the Premises are not thereby rendered untenantable in whole or in part, Landlord shall promptly, at its expense to the extent of insurance proceeds recovered as a result of such Casualty, cause such damage to be repaired, without abatement of rent. If, as the result of Casualty, the Premises are rendered untenantable in part, Landlord shall at its expense cause such damage to be repaired to the extent of insurance proceeds recovered as a result of such Casualty, and rent shall abate proportionately as to the portion of the Premises rendered untenantable from the date of such Casualty until the Premises are rendered tenantable. If, as the result of Casualty, the Premises are rendered wholly untenantable, Landlord shall, at its expense to the extent of insurance proceeds received by Landlord as a result of such Casualty, cause such damage to be repaired and the rent shall abate from the date of such Casualty until the Premises, of any portion thereof, have been rendered tenantable. Subject to the provisions of Section 15(c), Landlord covenants that it will commence the repair as soon as reasonably possible under the circumstances and diligently proceed to complete same.

(b)    In no event shall Landlord be liable for interruption to Tenant's business or for damage to or replacement or repair of alterations made by Tenant to the Premises or Tenant's personal property, including inventory, trade fixtures, floor coverings, furniture and other property removable by Tenant under the provisions of this Lease. Landlord shall not be liable for any repairs or reconstruction in excess of actual insurance proceeds received as a result of such Casualty.

(c)    If the Premises are (1) rendered wholly untenantable, or (2) damaged as a result of any cause which is not covered by Landlord's insurance, or if such coverage is not sufficient to repair such Casualty, or (3) the Premises are substantially damaged during the last two years of the Original Term or any Renewal Term (unless Tenant, within fifteen (15) days of Landlord's notice, irrevocably and unconditionally exercises the next Renewal Term, if one remains to be exercised), or (4) if more than 25% of the building in which the Premises are a part, is damaged, then in any such events, Landlord may terminate this Lease by giving to Tenant notice within ninety (90) days after the occurrence of such Casualty. Rent and other charges shall be adjusted as of the date of such termination.

SECTION 16. **SIGNS.** The Tenant shall not erect or maintain any exterior sign anywhere upon the Shopping Center or Premises without first obtaining the Landlord's written approval as to the

size, projection, location, type of illumination and composition or material thereof.  If Tenant is required to apply for a variance in order to install its signs on the Building, Landlord agrees to cooperate with Tenant's efforts in obtaining such variance, at no cost to Landlord, provided that an approval of the variance for such sign does not reduce the signage allowed for the remainder of the Shopping Center.  Tenant shall install, at its sole cost an exterior sign on the Premises, which sign is to be the maximum size permitted for the Premises under applicable codes, and is to be constructed in accordance with Landlord's sign criteria attached hereto as Exhibit D, and is to be approved by Landlord prior to such installation.  Tenant shall, at its sole expense, install its standard facing (with a size of approximately 1 foot high by 11 feet wide) name on the pylon signs (in the third panel position from the top) on Pulaski Highway and Rossville Boulevard which currently serve the Shopping Center.  The sign facings installed by Tenant shall be approved by Landlord in writing prior to installation of such sign panels.  The Tenant shall maintain all such signs in good condition and repair at all times, and pay any taxes imposed thereon.  Tenant shall remove the facing of all of its signs, at Tenant's expense, at the end of the Term, and shall leave all sign boxes, bands, posts and pylons in good order and condition.

SECTION 17. EMINENT DOMAIN.  If the whole or any part of the Premises shall be taken under the power of eminent domain, this Lease shall terminate as to the part so taken on the date Tenant is required to yield possession thereof to the condemning authority.  The Landlord shall make such repairs and alterations as may be necessary in order to restore the part not taken to useful condition and the rent shall be reduced proportionately as to the portion of the Premises so taken.  If the amount of the Premises so taken substantially impairs the usefulness of the Premises for the purposes set forth in Section 6, either party may terminate this Lease as of the date when Tenant is required to yield possession.  All compensation awarded for any taking of the fee and the leasehold shall belong to and be the property of Landlord; provided, however, that Tenant, and not Landlord shall be entitled to that portion of the award made as a separate award to Tenant in reimbursement for Tenant's cost of removal of its stock, trade fixtures, moving and relocation costs.

SECTION 18. TRADE FIXTURES.  All trade fixtures installed by Tenant in the Premises other than improvements and alterations made by Tenant to the Premises, shall remain the property of Tenant and shall be removable from time to time and also at the expiration of the Term of this Lease or other termination thereof, provided Tenant shall not at such time be in default under any covenant or agreement contained in this Lease; otherwise such fixtures shall not be removable and Landlord shall have a lien thereon to secure itself against loss and damage resulting from such default.  Tenant further agrees to restore the Premises to their original condition, ordinary wear and tear excepted.

SECTION 19. RIGHT OF ENTRY.  Landlord and its representatives shall have the right at all reasonable times to enter the Premises for the purposes of (a) inspecting same; (b) making any repairs thereto or otherwise performing any work therein as herein provided; and (c) to exhibit same for purposes of sale, lease or financing; and Landlord shall not be liable in any manner for any entry into the Premises for the above purposes.

SECTION 20. SURRENDER.  Promptly upon the expiration or earlier termination of the Term, the Tenant shall yield up the Premises, clean and neat, and in the same condition, order and repair in which they are required to be kept throughout the period of this Lease, and Tenant shall remove therefrom the Tenant's signs, goods and effects and any machinery, fixtures and equipment used in the conduct of Tenant's trade or business, and shall repair any damage caused by the installation or the removal thereof.  Unless sooner terminated pursuant to the provisions hereof, this Lease shall expire absolutely upon the expiration of the Term without the necessity of any notice or other action from or by either party hereto.  In the event Tenant shall hold over in the Premises following expiration of the Term, Tenant agrees that it will be responsible for rental during such period of occupancy equal to twice the Minimum Rent that was due during the final permitted period of occupancy under this Lease plus all additional charges payable hereunder.  Tenant agrees that during the six (6) months preceding expiration of the Lease, Landlord may place a "for rent" sign upon the Premises.

SECTION 21. CURING THE TENANT'S DEFAULTS.  If the Tenant should default in the performance of any of its obligations hereunder, the Landlord shall be entitled (but shall not be obligated) in addition to any other rights it may have in law or equity, and after written notice to the Tenant except in the case of emergency, to cure such default, and the Tenant shall reimburse the Landlord for any sums paid or costs incurred by the Landlord in curing such default, plus interest thereon at the Default Rate, which sums, costs and interest shall be deemed to be additional rent hereunder and shall be payable by the Tenant upon demand by the Landlord.

SECTION 22. **RESPONSIBILITY OF THE TENANT.** The Tenant shall be responsible for, and shall relieve the Landlord from and agrees to indemnify and hold the Landlord harmless from and against, any and all liability by reason of any injury or damage to the Tenant or to any other person or property upon the Premises (or in the said common areas in connection with the Tenant's use and enjoyment thereof) caused by any fire, breakage, leakage, collapse or other event upon the Premises or any other portion of the Shopping Center, whether or not such event results from a condition which shall have existed prior to the execution of this Lease and whether or not such event results in the termination of this Lease by reason of damage to or destruction of the Premises or Shopping Center, unless such fire, breakage, leakage, collapse or other event, injury or damage be caused by or shall result from the grossly negligent or intentionally tortious act or omission of the Landlord or its agents, officers, invitees, visitors or guests.

SECTION 23. **SUBORDINATION AND ATTORNMENT.** This Lease shall be subject and subordinate at all times to the lien of any underlying ground leases, mortgages or deeds of trust now or hereafter placed by the Landlord upon the Shopping Center and to any and all advances to be made thereunder, and to all renewals, replacements and extensions thereof. This clause shall be self-operative, and no further instrument or act on the part of the Tenant shall be required to effectuate such subordination. In confirmation thereof, Tenant shall execute such further assurances as may be required. Any mortgagee or trustee under any deed of trust may elect that this Lease shall be deemed to have priority over such mortgage or deed of trust whether this Lease is dated prior to or subsequent to the date of such mortgage or deed of trust. If any proceedings are brought for the foreclosure of the Shopping Center, or if the power of sale under a mortgage or deed of trust is exercised, then Tenant shall attorn to the purchaser upon any such foreclosure or sale and recognize such purchaser as the Landlord under this Lease. Tenant hereby appoints Landlord to be the attorney-in-fact of Tenant (which appointment is irrevocable and coupled with an interest) to execute and deliver any such instrument or instruments for and on behalf of and in the name of Tenant.

SECTION 24. **DEFAULTS BY THE TENANT.**

(a)     If the Tenant should fail to pay Minimum Rent and additional rent or any other charges herein reserved as rent (herein collectively referred to as "rent"), on the days and time and at the place that the same are made payable hereunder, or if the Tenant shall in any respect violate any of the terms, conditions or covenants herein contained, or if a "Tenant's bankruptcy" (as hereinafter defined) has occurred, or if the Premises be levied upon or sold out by any sheriff's, marshall's or constable's sale, the Landlord may re-enter and repossess the Premises, together with any and all improvements thereon and additions thereto, and/or pursue any remedy permitted by law or equity for the enforcement of the provisions hereof; and/or at the election of the Landlord, the Landlord may give to the Tenant written notice of the Landlord's election to terminate this Lease on a date to be specified in said notice, and upon the date specified in said notice, this Lease and the Term shall (except for the continued liability of the Tenant as hereinafter provided) expire and come to an end as fully and completely as if the date specified in said notice were the date definitely fixed in this Lease for the expiration of the Term and the Tenant shall quit and surrender the Premises, on or before the said date, to the Landlord, without cost or charge to the Landlord.

(b)     If this Lease is terminated as herein provided, Tenant nevertheless shall remain liable for any rental and damages which may be due or sustained prior to such termination and all reasonable costs, fees and expenses including, but not limited to, attorney's fees incurred by Landlord in pursuit of its remedies hereunder, or in renting the Premises to others from time to time (all such rental, damages, costs, fees and expenses being referred to herein as "Termination Damages") and additional damages (the "Liquidated Damages"), which, at the election of Landlord, shall be either:

(i)     an amount or amounts equal to the rental which, but for termination of this Lease, would have become due during the remainder of the Term, less the amount or amounts of rental, if any, which Landlord shall receive during such period from others to whom the Premises may be rented, in which case such Liquidated Damages shall be computed and payable in monthly installments, in advance, on the first day of each calendar month following termination of the Lease and continuing until the date on which the Term would have expired but for such termination, and any suit or action brought to collect any such Liquidated Damages for any month shall not in any manner prejudice the right of Landlord to collect any Liquidated Damages for any subsequent month by a similar proceeding; or

(ii)     an amount equal to the present worth (as of the date of such termination) of rental which, but for termination of this Lease, would have become due during the remainder of the Term, less the fair rental value of the Premises, as determined by an independent real estate appraiser

named by Landlord, in which case such Liquidated Damages shall be payable to Landlord in one lump sum on demand and shall bear interest at the Default Rate until paid.

(c)    If this Lease or the Tenant's possession of the Premises should be terminated as herein provided or by re-entry, summary dispossession proceedings or any other method, the Landlord may, at the Landlord's option, as an additional or alternative remedy (i) re-let the Premises or any part or parts thereof for the account of the Tenant for the remainder of the Term as herein originally specified, or (ii) re-let the Premises or any part or parts thereof for a period extending beyond the date when this Lease would have expired but for such prior expiration on default or for such re-entry and termination, and deem that portion of the period within the Term, as a rental for the account of the Tenant (which such re-letting may provide for reasonable concessions in rent or a reasonable free rent period, but without thereby in any way affecting the Tenant's liability hereunder for the rent payable under this Lease for the period of such concession or free rent) and, in any of such events, the Landlord may receive the rent therefor, applying the same first to the payment of such reasonable expenses of every kind and nature as the Landlord may have incurred or assumed in recovering the possession of the Premises and in connection with the re-letting of the Premises, and then (to the extent of the remainder of so much of the said rent as shall have been received with respect to the Term) to the fulfillment of the covenants and agreements of the Tenant hereunder including the payment of the rent herein reserved, and the Tenant shall remain liable as herein provided, but there shall be no obligation on the part of the Landlord to re-let nor any liability on its part for failure to re-let, and the Tenant's liability shall not be diminished or affected by such failure to re-let, or the giving of such rent or other concessions in the event of any re-letting, as aforesaid.

(d)    In addition to Landlord's remedies under Section 24(b) and 24(c), Landlord may, at its sole discretion and without notice, invoke the following provisions:

(i)    Upon a Tenant's bankruptcy, this Lease and all rights of Tenant hereunder shall automatically terminate with the same force and effect as if the date of any such event were the date stated herein for the expiration of the Term, and Tenant shall vacate and surrender the Premises, but shall remain liable as herein provided.  Landlord reserves any and all remedies provided herein or at law or in equity.

(ii)    If this Lease is not terminated in accordance with (d)(i) above because such termination is not allowed under the Bankruptcy Code, upon the filing of a petition by or against Tenant under the Bankruptcy Code, Tenant, as debtor and as debtor in possession, and any trustee who may be appointed, agree:

(1)    To perform each and every obligation of Tenant under this Lease, including, but not limited to the obligations set forth in Section 6 of this Lease until such time as this Lease is either rejected or assumed by order of the United States Bankruptcy Code.

(2)    To pay monthly in advance on the first day of each month as reasonable compensation for use and occupancy of the Premises an amount equal to all Minimum Rent and all additional rent.

(3)    To reject or assume this Lease within sixty (60) days of the filing of such petition under Chapter 7 of the Bankruptcy Code or within thirty (30) days of the filing of a petition under any other Chapter.

(4)    To give Landlord at least forty-five (45) days prior written notice of any proceeding relating to any assumption of this Lease.

(5)    To give Landlord at least thirty (30) days prior written notice of any abandonment of the Premises, any such abandonment to be deemed conclusively a rejection of this Lease.

(6)    To be deemed conclusively to have rejected this Lease in the event of the failure to comply with any of the above.

(7)    To have consented to the entry of an order by an appropriate United States Bankruptcy Court providing all of the above, waiving notice and hearing of the entry of same.

(iii)    Notwithstanding anything in this Lease to the contrary, all amounts payable by Tenant to or on behalf of Landlord hereunder, whether or not expressly denominated as rent, shall

constitute "rent" for the purposes of Section 502(b)(7) of the Bankruptcy Code, including, without limitation, reasonable attorney's fees incurred by Landlord by reason of Tenant's bankruptcy.

(iv)     It is understood and agreed that this is a "lease of real property in a shopping center" as such term is used in Section 365(b)(3) of the Bankruptcy Code.

(v)     Included within and in addition to any other conditions or obligations imposed upon Tenant in the event of assumption and/or assignment are the following:

(1)     In the event of assignment, the execution and delivery to Landlord of an instrument by which the assignee assumes all of the obligations arising under this Lease from and after the date of assignment pursuant to the provisions of the Bankruptcy Code.

(2)     The cure of any monetary defaults and the reimbursement of pecuniary loss resulting from any such default within thirty (30) days of assumption and/or assignment.

(3)     The use of the Premises as set forth in Section 6 hereof and the maintenance of the quality, quantity and/or lines of merchandise of any goods or services required to be offered for sale, it being understood and agreed that compliance with the provisions of Section 6 is essential to preserve the tenant mix in the Shopping Center.

(4)     The adequate assurance and demonstration in writing by the reorganized debtor or assignee of such debtor in possession or of Tenant's trustee, of such party's sufficient background, including, but not limited to, substantial retailing experience in shopping centers of comparable size and financial ability to operate out of the Premises pursuant to the terms and conditions of this Lease and to meet all other reasonable criteria of Landlord as did Tenant upon execution of this Lease.

(5)     The Premises, at all times, remains a single store and no physical changes of any kind are made thereto unless in compliance with the applicable provisions of this Lease.

(vi)     Nothing contained in this Section 24 shall be deemed in any manner to limit Landlord's rights and remedies under the Bankruptcy Code, as presently existing or as may hereafter be amended.  In the event that the Bankruptcy Code is interpreted or amended during the term of this Lease to so permit, or is superseded by an act so permitting, the following additional acts shall be deemed an Event of Default under this Lease:  (i) if Tenant is adjudicated insolvent by the United States Bankruptcy Court or (ii) if a petition is filed by or against Tenant under the Bankruptcy Code and such petition is not vacated within thirty (30) days.  In either of such events, this Lease and all rights of Tenant hereunder shall automatically terminate with the same force and effect as if the date of either such event were the date stated herein for the expiration of the Term, and Tenant shall vacate and surrender the Premises, but shall remain liable as herein provided.  Landlord reserves any and all rights and remedies provided herein or at law.

(vii)     Neither Tenant's interest in this Lease, nor any estate created hereby in Tenant nor any interest herein or therein, shall pass to any trustee or receiver or assignee for the benefit of creditors or otherwise by operation of law except as may specifically be provided by the Bankruptcy Code, Title 11 U.S.C. (the "Bankruptcy Code").

(viii)     Tenant's "bankruptcy" means (1) the application by Tenant or its or their consent to the appointment of a receiver, trustee or liquidator of Tenant or any guarantor of Tenant or a substantial part of its or their assets, (2) the filing of a voluntary petition in bankruptcy or the admission in writing by Tenant or any guarantor of Tenant of its inability to pay its debts as they become due, (3) the making by Tenant of an assignment for the benefit of its creditors, (4) the filing of a petition or an answer seeking a reorganization or an arrangement with its creditors or an attempt to take advantage of any insolvency law, (5) the filing of an answer admitting the material allegations of a petition filed against Tenant or any guarantor of Tenant in any bankruptcy, reorganization or insolvency proceeding, (6) the entering of an order, judgment or decree by any court of competent jurisdiction adjudicating Tenant or any guarantor of Tenant a bankrupt or an insolvent, approving a petition seeking such a reorganization, or appointing a receiver, trustee or liquidator of Tenant or any guarantor of Tenant or of all or a substantial part of its or their assets, or (7) the commencing of any proceeding under any bankruptcy, reorganization, arrangement, insolvency, readjustment, receivership

or similar law, and the continuation of such order, judgment, decree or proceeding unstayed for any period of sixty (60) consecutive days after the expiration of any stay thereof.

(e)    If this Lease is terminated as herein provided, or if Tenant's possession is terminated by re-entry, summary dispossession proceedings or any other method, whether or not the Premises shall be re-let, the Tenant shall, until the time when this Lease would have expired but for such prior expiration or for such re-entry, summary dispossession or termination, continue to remain liable for the rent herein reserved less the avails of any such re-letting (after the deduction therefrom of all reasonable expenses incurred by the Landlord in recovering such possession and in re-letting including, but not by way of limitation, broker's fees, reasonable counsel fees and costs of renovation), if any, and the same shall be due and payable by the Tenant to the Landlord, at Landlord's option, either on the several days hereinabove specified for the payment thereof, so that upon each of such days the Tenant shall pay to the Landlord the amount of the deficiency then existing or in one lump sum on demand.  Upon such expiration, termination or re-entry as aforesaid, neither the Tenant nor the Tenant's creditors and representatives shall thereafter have any right, legal or equitable, in or to the Shopping Center, the Premises or any portion thereof, or in or to the repossession of same, or in, to or under this Lease, and the Tenant hereby waives any and all rights of redemption which may then be provided by law.  The words "re-enter" and "re-entry" as used in this Lease shall not be deemed to be restricted to their technical legal meaning.  In the event Landlord shall enforce any of the provisions hereof in any action at law or in equity, Tenant shall pay all costs, expenses and reasonable attorneys' fees incurred therein by Landlord, and such may be included in the judgment entered in such action, including attorneys' fees incurred by Landlord in connection with Tenant's bankruptcy proceedings.

(f)    Any and all mention in this Lease of the rent or rental before, at or after the termination of this Lease or before, at or after the termination of the Tenant's possession by re-entry, summary dispossession or other method as herein provided, shall be deemed to refer to the rent, plus all additional rent and such additional sums as the Tenant shall be obligated to pay to the Landlord under any of the terms, covenants and conditions to this Lease, whether or not designated or indicated herein to be payable as additional rent.

(g)    In addition to and not in substitution for the remedies hereinbefore provided, if Tenant shall fail to pay when due, beyond any applicable grace period, any rent or additional charges, Landlord shall have the right to distrain therefor.

(h)    The failure of the Landlord to insist in any one or more instances upon the performance of any of the covenants or conditions of this Lease or to exercise any right or privilege herein conferred shall not be construed as thereafter waiving or relinquishing the Landlord's right to the performance of any such covenants, conditions, rights or privileges, and the same shall continue and remain in full force and effect, and the waiver of one default or right shall not constitute a waiver of any other default.  The receipt of any rent by the Landlord from the Tenant or any assignee or subtenant of the Tenant, whether the same be rent that originally was reserved or that which may become payable under any covenants herein contained, or of any portion thereof, shall not operate as a waiver of the right of the Landlord to enforce the payment of the additional rent or of any of the other obligations of this Lease by such remedies as may be appropriate, and shall not waive or avoid the right of the Landlord at any time thereafter to elect to terminate this Lease, on account of such assignment, sub-letting, transferring of this Lease or any other breach of any covenant or condition herein contained, unless evidenced by the Landlord's written waiver thereof.  The acceptance of rent or any other sum due hereunder by Landlord at any time shall not be deemed an accord and satisfaction, and Landlord shall have the absolute discretion to apply same against any sum for any period or reason due hereunder without same constituting a release of any other sums remaining due and unpaid.  In the event that Landlord shall enforce any of the provisions hereof in any actions at law or in equity, Tenant shall pay all costs, expenses and reasonable attorneys' fees incurred therein by Landlord, and such may be included in the judgment entered in such action, including attorneys' fees incurred by Landlord in connection with Tenant's bankruptcy proceedings.

**SECTION 25.    GRACE PERIOD; FORCE MAJEUR**  (a) Except in connection with Tenant's obligation to pay Minimum Rent, additional rent or any other sums due under this Lease, in which event no notice is required, anything contained in any of the foregoing provisions of this Lease to the contrary notwithstanding, neither party hereto will exercise any right or remedy provided for in this Lease or allowed by law because of any default of the other, unless such party shall first have given written notice thereof by certified or registered mail to the other, and the other shall have failed, within fifteen (15) days thereafter, to begin, and actively and diligently in good faith to proceed with, the curing of the default and to continue with the same until it shall have been fully corrected;

provided, that no such notice from the Landlord shall be required, nor shall the Landlord be required to allow any part of the said notice period, (a) more than two (2) times during any twelve (12) month period, or (b) if the Tenant shall have removed from or shall be in the course of removing from the Premises, or (c) in the event of Tenant's Bankruptcy.

(b)     Except in connection with any party's obligation to pay any moneys due hereunder, if either Landlord or Tenant is delayed in performing any work or other obligation under this Lease as a result of causes beyond such party's control, including, but not limited to, labor disputes, governmental regulations or controls, delays in obtaining building permits, fire or other casualty, inability or delay in obtaining materials, or acts of god, then the time period for performing such work or other obligation and any time period after which a party may exercise any right or remedy (including, but not limited to, any right of termination) shall all be extended by the period of such delay.

**SECTION 26.     NOTICES.** All notices required or permitted to be given hereunder shall be in writing and shall be sent by registered or certified mail, return receipt requested, postage prepaid. Notices to the Tenant shall be addressed to Boat Owners Association, Marine Center Division, 880 South Pickett Street, Alexandria, Virginia 22304. Notices to the Landlord shall be addressed to Circuit City Stores, Inc., 9950 Mayland Drive, Richmond, Virginia 23233 Attn: Director of Real Estate, and to any other person or persons designated by the Landlord. Either party may, at any time, in the manner set forth for giving notices to the other, set forth a different address to which notices to it shall be sent.

**SECTION 27.     TENANT'S CERTIFICATE.** The Tenant agrees that at any time and from time to time, within ten (10) days after written request by Landlord, Tenant will execute and deliver to the Landlord, or others designated by Landlord a written instrument in recordable form certifying (a) that this Lease is unmodified and in full force and effect (or if there shall then have been modifications, that the same is in full force and effect as so modified, and setting forth such modifications); (b) that the Premises have been completed by Landlord in accordance with Section 3 (or stating the respects in which it is not complete); (c) the dates to which Minimum Rent and additional rent and other charges have been paid in advance, if any; (d) whether or not to the best knowledge of the signer of such certificate the Landlord is then in default in the performance of any covenant, agreement or condition contained in this Lease and, if so, specifying in detail each such default of which the signer may have knowledge; (e) that the Premises have been accepted by Tenant and the date upon which the Term shall have commenced, and (f) that it is understood that such instrument may be relied upon by any prospective purchaser or mortgagee or lessee or assignee of Landlord's interest in the Lease or Shopping Center.

**SECTION 28.     THE LANDLORD.** As used herein, the term "the Landlord" shall mean the Landlord named hereinabove as well as its successors and assigns, and any other subsequent owner of the fee simple estate in the Premises, as well as the heirs, personal representatives, successors and assigns of any such subsequent owner, each of whom shall have the same rights, remedies, powers, authorities and privileges as it would have had, had it originally signed this Lease as the Landlord, but any such person, whether or not named herein, shall have no liability hereunder after it shall cease to hold the title to or a fee interest in the said real estate, except for obligations which may have theretofore accrued. Neither the Landlord nor any principal or partner of the Landlord, whether disclosed or undisclosed, shall have any personal liability with respect to this Lease or the Premises, and if the Landlord should breach or default with respect to its obligations or otherwise under this Lease, the Tenant shall look solely to the Shopping Center and to the rents, profits and issues to be received therefrom.

**SECTION 29.     THE TENANT.** As used herein, the term "the Tenant" shall mean the Tenant named hereinabove as well as its heirs, personal representatives, successors and assigns, each of which shall be under the same obligations, liabilities, and disabilities and have only such rights, privileges and powers as it would have possessed had it originally signed this Lease as the Tenant. However, no such rights, privileges or powers shall inure to the benefit of any assignee of the Tenant, immediate or removed, unless the assignment to such assignee shall have been consented to in writing by the Landlord, as aforesaid.

**SECTION 30.     ENTIRE AGREEMENT.** This Lease and the Exhibits attached hereto set forth all the promises, agreements, conditions and understandings between the Landlord and the Tenant with respect to the Premises, and there are no promises, agreements, conditions or understandings, either oral or written, between them other than are herein set forth. No subsequent

alteration, amendment, change or addition to this Lease shall be binding upon the Landlord or the Tenant unless reduced to writing and signed and delivered by each of them.

SECTION 31.    **HEADINGS**.  The headings of the sections and subsections are provided herein for convenience of reference only, and shall not be considered in construing the contents of such sections or subsections.

SECTION 32.    **APPLICABLE LAW**.  This Agreement shall be given effect, and shall be construed, by application of the law of Maryland.

SECTION 33.    **ACCEPTANCE OF PREMISES**.  By its entry into this Lease, the Tenant represents and acknowledges to the Landlord that the Tenant has satisfied itself as to the use which it is permitted to make of the Premises and has inspected the Premises, and the streets, sidewalks, curbs, utilities and access way contiguous to or adjoining the same, that the same are in all ways acceptable to the Tenant for use by the Tenant pursuant to this Lease, in the condition or state in which they are now found (or will exist upon completion in accordance with Exhibit B), and that the Landlord has made no expressed or implied warranty, representation or covenant to or with the Tenant with respect to the same, other than as may be set forth expressly herein.

SECTION 34.    **FINANCING CONTINGENCY**.  If any lender with which Landlord has negotiated or may negotiate financing for the Shopping Center does not approve the financial and credit rating of Tenant for purposes of such financing, or if any such lender shall require as a condition of its approval of this Lease for such financing, a change or changes in this Lease which do not change the Term, location or size of the Demised Premises, or increase Tenant's financial obligations or liabilities and if within thirty (30) days after notice from Landlord, (i) Tenant fails or refuses to supply or execute assurances and/or guarantees which are stated by Landlord to be necessary to secure the approval of Tenant's financial and credit rating by any such lender, or (ii) Tenant fails or refuses to execute with Landlord the amendment or amendments to this Lease accomplishing the above-mentioned type of change or changes which are stated by Landlord to be needed in connection with approval of this Lease for purposes of such financing, or (iii) for any reason such financing in an amount and upon terms satisfactory to Landlord cannot be obtained, then in any of said instances Landlord shall have the right to cancel this Lease.  In the event of cancellation by Landlord hereunder, this Lease shall be and become null and void and both parties shall automatically be released as of the date of Landlord's cancellation notice from any and all liability or obligation hereunder.

SECTION 35.    **JURY TRIAL**.  Tenant and Landlord hereby waive any and all rights which it may have to request a jury trial in any proceeding at law or in equity in any court of competent jurisdiction.

SECTION 36.    **QUIET ENJOYMENT**.  Landlord hereby covenants and agrees that if Tenant shall perform all the covenants and agreements herein stipulated to be performed on Tenant's part, Tenant shall at all times during the continuance hereof have the peaceable and quiet enjoyment and possession of the Premises without any manner of hindrance from Landlord or any person or persons lawfully claiming through Landlord.

SECTION 37.    **BROKER'S COMMISSION**.  Each of the parties understands and agrees that Trout, Segall & Doyle LLC and Transwestern Carey Winston (the "Brokers") are the only brokers in connection with the execution of this Lease and that all brokerage commissions or finders' fees claimed by the Brokers in connection with the same shall be paid by Landlord.  Each of the parties represents and warrants to the other that, other than the Brokers, it has dealt with no broker, finder or other person who may be entitled to brokerage commissions or finder's fees in connection with the execution of this Lease, and Tenant hereby agrees to indemnify and hold harmless Landlord against and from all liability arising from any such claim including, without limitation, the cost of attorneys' fees in connection therewith.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement of Lease, or have caused the same to be executed and ensealed the date and year first above written.

WITNESS:                                    CIRCUIT CITY STORES, INC.

_____                        By: _____ (SEAL)
                                            Name: **Benjamin B. Cummings, Jr.**
                                            Title: **Vice President**

                                            - LANDLORD -


                                            BOAT AMERICA CORPORATION

                                            By: _____ (SEAL)
                                            Name: Richard Schwartz
                                            Title: Pres. / C.E.O.  Boat America Corp.

                                            - TENANT -



B

## "Exhibit A" Landlords Work

## A.    DOORS

**STOREFRONT/VESTIBULE DOORS**  One (1)
1.    Entrance — Set (1) single entry 3' –0" X 7' –0" aluminum and insulated glass doors(s) with closer and lockset per location on tenant's fixture plan.

One (1) 2.    Exit — Two (2) sets of double exit 3' –0" X 7' –0" aluminum and insulated glass door (s) with closer and lockset per location on tenant's fixture plan (NO HANDLES ON THE ONE SET OF OUTSIDE EXIT DOORS).   Store front per print.

**ADMINISTRATION/OFFICE DOOR**
1.    One (1) single 3' –0" X 7' –0" metal door and jamb with keyed lockset.

**STOCKROOM DOORS**
1.    Two (2) Eliason HCP #10 double action/double entry 3'-0" X 7' –0" door(s) (Color-Person Blue, D-26 W/24" flat plates, a 12" X 12" window).   (Spec Sheet Attached).

**OVERHEAD DOOR**
1.    One (1) insulated 8' –0" wide X 10' –0" high metal roll up door.

**EMERGENCY EXIT DOOR**
1.    Exterior rear door 3' –0" X 7' –0" metal door and jamb with keyed lockset and deadbolt lock.

**RESTROOM DOORS**
1.    Men's and Women's as per local code/ADA with privacy lockset(s).

**ELECTRONICS LOCKUP AREA DOOR**
1.    One (1) single 3' –0" X 7' –0" metal door and jamb door with keyed lockset and deadbolt lock.

## B.    FLOORS

**SALES, ADMINISTRATION/OFFICE AND RESTROOM FLOORS**
1.    Per specs on Blue Prints

**STOCKROOM AND ELECTRONICS LOCKUP FLOOR**
1.    Seal concrete floor.
         Sealed

## C.    CEILINGS

**SALES AND STOCKROOM**
1.    Ceiling system for the sales area and stockroom shall be exposed.

**ADMINISTRATION/OFFICE AND RESTROOMS**
1.    Ceiling system for the Administration/Office, Employee Area and Restroom(s) shall be a new suspend ceiling with 5/8" mineral fiber 2'X4' acoustical tile (Natural fissured w/flush edge). Finished ceiling to be at 9' height from finished floor.
    or drywall

**ELECTRONICS LOCKUP**
1.    Ceiling system for the electronics lockup area shall be drywall or drywall to be carried to roof deck with no ceiling.

## D.    INSULATION

    or roof
1.    Ceiling shall have a minimum composite R-value of 19.
2.    Exterior and demising walls shall be insulated.

## E.    LIGHTING

**1.        SALES AREA**
    Halophane Prismaire II 400 W MH Luminaire #RA40EMH00X31AX *(Quantity: 65 light fixtures).*

**STOCKROOM**
1.    Stockroom light fixtures shall be suspended 2 tube 8' long T8 fluorescent fixtures with electronic ballast's, 75 watts per bulb, color 4100 rendition bulbs or it's equivalent. *(Quantity: 15 light fixtures)*

**ADMINISTRATION/OFFICE, EMPLOYEE AREA AND RESTROOMS**
1.    Administration/Office, employee Area and Restroom(s) (see enclosed) shall have 24"X48" energy efficient florescent lighting lay in fixtures with two (2) T-8 bulbs and electronic ballast. Except for restroom (s), all light fixtures will be switched at the electrical panel. *(Quantity: 10 light fixtures)*

**ELECTRONICS LOCKUP AREA**   flush mounted or
1.    Light fixtures shall be suspended 2 tube 8' long T8 fluorescent fixtures with electronic ballast's, 75 watts per bulb, color 4100 rendition bulbs or it's equivalent. *(Quantity: 3 light fixtures)*
Except for restroom (s), electronics lockup area and administration/office, all light fixtures will be switched at the electrical panel.

**F.    LOADING RAMP**

1.    If loading area has a slope of greater than 1" in 10' from the loading area to the finished floor at the overhead door, then a concrete loading ramp shall be installed long enough to provide a slope no greater than 1" in 10' and will be eight (8') feet wide.

**G.    PAINTING**

**CEILING**
1.    Exposed ceiling system and HVAC distribution lines for the sales area shall be primed and sprayed flat white.

**SALES & STOCKROOM AREA**
1.    Walls to be primed and painted with an interior flat white latex.

**ADMINISTRATION/OFFICE AND RESTROOM WALLS**          or latex semigloss.
1.    All interior walls are to be primed and painted with an interior white enamel paint. Outside wall of Administration Office is to be painted yellow (PMS135) including door.

**INTERIOR DOORS**
1.    All doors are to be primed and painted with an interior white enamel paint. or latex semigloss.

**EXISTING COLUMN(S)**
1.    Prime and paint exposed columns in sales area with an interior white enamel paint.

**BUILDING EXTERIOR**
1.    The exterior of the building shall be painted prior to the opening of the BOAT/U.S. store.

**H.    WALLS**

**DEMISING WALL(S)**          ,if not concrete block,
1.    Interior demising wall(s) shall be constructed on metal studs, 5/8" fire-rated gypsum wallboard (GWB) and insulated with sound attenuation blankets. GWB shall be taped, sanded, primed and painted. Demising wall to extend to metal roof deck per code.

**INTERIOR PARTITION WALLS**
1.    Sales/Stockroom partition wall and the Display wall behind the parts counter shall extend from the finished floor to the bottom side of the ceiling joist (See floor plan for door and parts counter openings). All other partitions walls shall be at finished at a height of 9'-6". Partitions shall be constructed of 5/8" gypsum wallboard (GWB) on both sides of light gauge metal studs. GWB shall be taped, sanded primed and painted. See tenant's plan for dimensions.

3

## I. PLUMBING

**MEN'S AND WOMEN'S RESTROOMS**

or gas

1.    Handicapped accessible male and female restroom(s) with handicapped water closet(s) grab bars, handicapped lavatory(s) with faucets, electric/water heaters, toilet tissue dispensers and mirrors.  Restroom(s) shall be in compliance with all codes including, but not limited to the ADA.    ^Baltimore County Building

2.    Mop sink basin 24" W X 24' D X 10" H with single faucet and top brace. (Provide hot and cold water supply).

      If required by code, handicapped accessible drinking fountain.

## J. ELECTRICAL

1.    Electrical terminating in a circuit breaker panel (s) with a main disconnect breaker of sufficient capacity to supply a min. 400 amp service with 120/208 volts, 3 phase, and shall be located as per Tenant's plan,

2.    Conduit and wire shall be provided to service the following:
*   HVAC
*   Light fixtures
*   Signage junction box with timer at the storefront canopy and building signage area with a 20 amp circuit.
*   Duplex receptacles in walls and ceiling per plan.
*   Service door buzzer
*   Data/Phone receptacles (Provide Conduit Only).
*   Wall mounted emergency lights and exit signs.
*   Power Poles by check out counter, media center and engine parts counter.
*   LightStat Thermostat model #:TMC-AVU-HP thermostat installed 5' above finished floor with a lock box).

## K. HVAC

1.    Gas heating (if available) and electrical cooling HVAC system consisting of a combination roof mounted unit with a return air system and spiral supply ducts with diffusers at the appropriate locations.  HVAC system shall be engineered by HVAC consultant at 350 s.f./ton (27 tons).  A heating/cooling thermostat (LightStat model #TMCAVU-HP) will be provided and located per Tenant's plan.

## L. FIRE PROTECTION

1.    Provide sprinkler system for exposed ceiling system to code.  Electrical smoke detectors, fire extinguishers etc. as required by code.

4

**M.   COUNTERS & GATES**

~~1.   Service Boat, Office Counter & Parts Counter — as per BOAT/U.S. specs~~

**N.   COVERED WALKWAY**

1.   Building is to be opened up so as to provide a covered walkway along the storefront per drawings.

**O.   TRASH ENCLOSURE**

1.   If required by code

**P.   PARKING LOT**

1.   A portion of the ^ Parking lot shall ~~be sealed and restriped indicating a portion of the lot, which shall~~ be restriped and dedicated for ~~trailer boats.~~ 4 boat trailers.
2.   Signage shall be posted designating the trailer boat parking.

                                                    Baltimore County Building

All of the work performed by the Landlord shall be per ~~local, state, federal~~ codes and in accordance with the ADA and any other governing body which has jurisdiction over this property:

The Landlord shall also provide ingress and egress to the subject space, which is in accordance with the ADA.

## EXHIBIT C

## RULES AND REGULATIONS

Tenant agrees as follows:

(1)     All loading and unloading of goods shall be done only at such times, and through the entrances, designated for such purposes by Landlord.

(2)     The delivery or shipping of merchandise, supplies and fixtures to and from the Premises shall be subject to such rules and regulations as in the judgment of Landlord are necessary for the proper operation of the Shopping Center.

(3)     All garbage and refuse shall be kept in the kind of container specified by Landlord, and shall be placed outside of the Premises prepared for collection in the manner and at the times and places specified by Landlord.  If Landlord shall provide or designate a service for picking up refuse and garbage, Tenant shall use same at Tenant's cost.  Tenant shall pay the cost of removal of any of Tenant's refuse or rubbish.

(4)     No radio or television or other similar device shall be installed without first obtaining in each instance Landlord's consent in writing.  No aerial shall be erected on the roof or exterior walls of the Premises, or on the grounds, without in each instance, the written consent of Landlord.  Any aerial so installed without such written consent shall be subject to removal without notice at any time.

(5)     No loud speakers, televisions, phonographs, radios or other devices shall be used in a manner so as to be heard or seen outside of the Premises without the prior written consent of Landlord.

(6)     If the Premises are equipped with heating facilities separate from those in the remainder of the Shopping Center, Tenant shall keep the Premises at a temperature sufficiently high to prevent freezing of water in pipes and fixtures.

(7)     The outside areas immediately adjoining the Premises shall be kept clean and free from dirt and rubbish by Tenant to the satisfaction of Landlord, and Tenant shall not place or permit any obstructions or merchandise in such areas.

(8)     The plumbing facilities shall not be used for any other purpose than that for which they are constructed, and no foreign substance of any kind shall be thrown therein, and the expense of any breakage, stoppage, or damage resulting from a violation of this provision shall be borne by Tenant, who shall, or whose employees, agents or invitees shall have caused it.

(9)     Tenant shall use at Tenant's cost such pest extermination contractor and at such reasonable intervals as Landlord may require.

(10)     Tenant shall not burn any trash or garbage of any kind in or about the Premises, or the tract or areas adjacent thereto.

(11)     Not commit any waste upon the Premises nor create a nuisance nor cause or permit objectionable odors to emanate or be dispelled from the Premises.

(12)     Not solicit business in the common areas or distribute hand bills or other advertising material in the common areas, and if this provision is violated, in addition to other remedies of Landlord, Tenant shall pay Landlord the cost of collecting same for trash disposal.

(13)     Use, maintain and occupy the Premises and appurtenances thereto in clean, orderly, careful, safe, proper and lawful manner.

(14)     Tenant shall keep lights in the exterior display windows, exterior lights of the Premises, and sign lights, if any, of the  Premises lit during the hours from sundown to 10:00 p.m.

(15)     Tenant, upon written notice thereof, shall comply with all changes, modifications or amendments to these Rules and Regulations.



EXHIBIT D

FRONT ELEVATION

BOAT/U.S.

FRONT BUILDING ELEVATION

ED EDLUND & DRITENBAS
ARCHITECTS,  P.A.
180 S.E. 12TH AVENUE, SUITE 101-C
DEERFIELD BEACH, FLORIDA 33442
PHONE: (954) 429-0905

JOB #: 030199
DATE: 3/1/99
DESIGNED: GE
DRAWN: JS
SHEET: P-01
CHECKED: GE

## GENERAL INFORMATION

1.   Store Telephone Number:_____

2.   Tenant's Name and Address: *Boat America Corp.*
     *880 S. Pickett St. Alexandria Va 22304*

3.   Tenant's Address for Notices and Billing:

     Name: *Boat America Corp.*
     Address: *880 S. Pickett St.*
     *Alexandria Va 22304*
     Home Telephone Number:_____
     Office Telephone Number: *703-823-9550*

4.   Tenant, or if Corporation or Partnership, principal officer or partner:

     Name: *Richard Schwartz*
     Address: *880 S. Pickett St*
     *Alexandria Va 22304*
     Home Telephone Number:_____
     Office Telephone Number: *703-823-9550*

5.   Store Manager or (Other Contact):

     Name: *Dan Deegan*
     Address: *880 S. Pickett St*
     *Alexandria Va 22304*
     Home Telephone Number:_____
     Office Telephone Number: *703-823-9550 -Ext 3304*

6.   Person to call in case of emergency:

     Name: *Dan Deegan*
     Address: *880 S. Pickett St*
     *Alexandria Va 22304*
     Home Telephone Number:_____
     Office Telephone Number: *703-823-9550 - Ext 3304*

7.   Guarantor:

     Name:_____
     Address:_____
     _____
     Home Telephone Number:_____
     Office Telephone Number:_____

8.   Registered Agent, if Tenant is a Corporation:

     Name:_____
     Address:_____
     _____
     Home Telephone Number:_____
     Office Telephone Number:_____

9.   Accountant for Tenant:

     Name:_____
     Address:_____
     _____
     Home Telephone Number:_____
     Office Telephone Number:_____

<u>EXHIBIT B</u>

ASSIGNMENT OF LEASES

THIS ASSIGNMENT OF LEASES (this "Assignment") is made as of the ___ day of _____, 2009, by and between **CIRCUIT CITY STORES, INC.**, a Virginia corporation (the "Assignor"), and _____, a _____(the "Assignee").

RECITALS

1.      The Assignor is the owner of that certain real property located at 8823 Pulaski Highway in Baltimore County, Maryland and more particularly described on <u>Exhibit A</u> attached hereto and made a part hereof (the "Property").

2.      The Property is subject to the leases attached hereto as <u>Exhibit B</u> and made a part hereof (collectively, the "Leases").

3.      The Assignee is acquiring the Property from the Assignor on the date hereof, and, in connection therewith, the Assignor now desires to assign its interest in the Leases to the Assignee.

NOW, THEREFORE, for and in consideration of the sum of One Dollar ($1.00) and other valuable consideration, receipt of which is hereby acknowledged, the Assignor hereby assigns and transfers to the Assignee all of the Assignor's right, title and interest as landlord or lessor under the Leases.

`The Assignor represents and warrants to Assignee that the Leases are the sole leases affecting the Property and that true and complete copies of the Leases are attached hereto as Exhibit B and made a part hereof.  Except as provided for in the Leases, Assignor holds no security deposits with respect to the Leases.

The Assignee hereby assumes and agrees to be bound by all of the obligations of landlord or lessor arising under the Leases from and after the date hereof.

The Assignor hereby covenants and agrees to indemnify, defend and hold the Assignee harmless from any and all liabilities and obligations of landlord or lessor arising under the Leases prior to the date hereof, and the Assignee hereby covenants and agrees to indemnify, defend and hold the Assignor harmless from any and all liabilities and obligations of landlord or lessor arising under the Leases from and after the date hereof.

This Assignment shall be governed by and construed in accordance with the laws of the State of Maryland.

This Assignment may be executed in any number of counterparts, all of which shall constitute but one and the same document.

IN WITNESS WHEREOF, the Assignor and the Assignee have caused this instrument to be executed by their respective officers, duly authorized.

**ASSIGNOR**:

CIRCUIT CITY STORES, INC.,

a Virginia corporation

By: _____

Name: _____

Title: _____

**ASSIGNEE**:

_____,

a _____

By: _____

Name: _____

Title: _____

<u>EXHIBIT A</u>

<u>Legal Description of Property</u>

[TO BE ADDED]

## EXHIBIT B

### Leases

[TO BE ADDED]

## REINSTATEMENT OF AND FIRST AMENDMENT TO
## PURCHASE AND SALE AGREEMENT

THIS REINSTATEMENT OF AND FIRST AMENDMENT TO PURCHASE AND SALE AGREEMENT (this "Agreement") is made as of this 5th day of May, 2009 (the "Agreement Effective Date"), by and between CIRCUIT CITY STORES, INC., a Virginia corporation ("Seller"), and VEI CIRCUIT LLC, a Maryland limited liability company ("Purchaser").

### RECITALS

A.      Seller and Purchaser entered into that certain Purchase and Sale Agreement dated as of February 19, 2009 (the "Purchase Contract"), pursuant to which Seller agreed to sell to Purchaser and Purchaser agreed to purchase from Seller, subject to the terms and conditions set forth in the Purchase Contract, certain real property located at 8823 Pulaski Highway, Baltimore County, Maryland and more particularly described in the Purchase Contract (the "Property").

B.      Pursuant to a letter dated March 30, 2009, Purchaser notified Seller of Purchaser's election not to proceed with the purchase of the Property and to terminate the Purchase Contract (the "Termination Letter").

C.      Notwithstanding the Termination Letter, Seller and Purchaser have agreed to reinstate the Purchase Contract and to make certain amendments and modifications thereto that have been agreed upon by the parties.

### AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and the mutual provisions contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      Defined Terms.  Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned thereto in the Purchase Contract.

2.      Reinstatement of Purchase Contract. Effective as of the Agreement Effective Date, the Purchase Contract shall be reinstated, and the parties hereto shall each be bound by all of the terms and conditions set forth in the Purchase Contract, as the same may be amended by this Agreement, to the same extent the parties were bound thereby prior to Purchaser's delivery of the Termination Letter to Seller.

3.      Reduction in Purchase Price. Notwithstanding anything contained in Section 2.1 of the Purchase Contract to the contrary, the Purchase Price for the Property shall be reduced from Five Million and No/100 Dollars ($5,000,000.00) to Four Million Six Hundred Fifty Thousand and No/100 Dollars ($4,650,000.00).

4.     Extension of Due Diligence Period.   Notwithstanding anything contained in Section 4.2 of the Purchase Contract to the contrary, the Due Diligence Period shall be extended so that the expiration of the Due Diligence Period shall be the date which is seven (7) days following the Agreement Effective Date.

5.     Phase II Environmental Site Assessment.   Promptly following the Agreement Effective Date, Seller shall, at its sole cost and expense, engage Connor to perform a Phase II Environmental Site Assessment of the Property (the "Phase II Report") in accordance with the proposal previously prepared by Connor for Purchaser dated April 17, 2009, a copy of which is attached hereto as Exhibit A and made a part hereof (the "Phase II Proposal").   Both Seller and Purchaser shall be provided with an original copy of the Phase II Report in draft form. Purchaser shall have a period of three (3) business days after receipt of its original copy of the Phase II Report in draft form during which to review the Phase II Report and to elect, based solely on the results of the Phase II Report, to terminate the Purchase Contract by giving written notice of termination to Seller. If Purchaser terminates the Purchase Contract pursuant to this Paragraph 5, Escrow Agent shall return the Letters of Credit to Purchaser on demand, and the parties shall have no further rights or obligations under the Purchase Contract, except for the Survival Obligations.   If Purchaser does not give a written notice of termination to Seller pursuant to this Paragraph 5 within three (3) business days after its receipt of a copy of the Phase II Report, the Purchase Contract shall continue in full force and effect, and Purchaser's right to terminate the Purchase Contract pursuant to this Paragraph 5 shall expire and be of no further force and effect.   Thereafter, prior to Closing, Seller shall cause the Phase II Report to be issued by Connor in final form naming Purchaser as an addressee and beneficiary of the Phase II Report.

6.     Closing.   Notwithstanding anything contained in Section 6.1 of the Purchase Contract to the contrary, unless otherwise agreed by the parties in writing, Closing shall occur on the later of (i) fifteen (15) business days following Purchaser's receipt of the Phase II Report (provided Purchaser does not elect to terminate the Purchase Contract as set forth in Paragraph 5 above), or (ii) eleven (11) days following entry by the Bankruptcy Court of the Sale Order, provided no appeal thereof shall have been entered.

7.     Other Amendments.   In addition to the foregoing, the Purchase Contract shall be amended as follows:

(i)     Section 4.4 shall be deleted in its entirety.

(ii)     Section 9.2 is amended to provide that the Sale Motion shall be filed with the Bankruptcy Court as soon as reasonably possible after the Agreement Effective Date.

(iii)     Item (a) in the second sentence of Section 9.4 shall be amended and restated in its entirety as follows:

"(a)     an initial minimum overbid for the Property of at least $4,700,000.00 shall be required;".

2

(iv)    The last sentence of Section 9.4 shall be amended and restated in its entirety as follows:

"Subject to the approval of the Bankruptcy Court, if this Agreement is terminated by Seller in order to permit Seller to accept a "higher or better" offer for the Property, Seller shall pay Purchaser upon the termination of this Agreement a "break-up" fee of $20,000.00, less the costs incurred by Seller to obtain the Phase II Report, which, based on the Phase II Proposal, may result in Purchaser receiving a minimal "break-up" fee or no "break-up" fee."

7.    <u>Ratification of Purchase Contract</u>.    Except as expressly amended hereby, the provisions of the Purchase Contract shall remain in full force and effect in all respects.

8.    <u>Governing Law</u>.    This Agreement shall be governed by the laws of the State of Maryland and the laws of the United States pertaining to transactions in such State.

9.    <u>Multiple Counterparts</u>.    This Agreement may be executed in a number of identical counterparts which, taken together, shall constitute collectively one (1) agreement.

IN WITNESS WHEREOF, each of the parties hereto have caused this Agreement to be executed by its duly authorized representative as of the Agreement Effective Date.

SELLER:

CIRCUIT CITY STORES, INC.,
a Virginia corporation

By:     _Michelle Mosier_
Name:    _Michelle Mosier_
Title:    _VP & Controller_

PURCHASER:

VEI CIRCUIT LLC,
a Maryland limited liability company

By:    Vanguard Management Services, Inc.
Its:    Manager

By:    _____
Leonard Weinberg, II
President

3

(iv)    The last sentence of Section 9.4 shall be amended and restated in its entirety as follows:

"Subject to the approval of the Bankruptcy Court, if this Agreement is terminated by Seller in order to permit Seller to accept a "higher or better" offer for the Property, Seller shall pay Purchaser upon the termination of this Agreement a "break-up" fee of $20,000.00, less the costs incurred by Seller to obtain the Phase II Report, which, based on the Phase II Proposal, may result in Purchaser receiving a minimal "break-up" fee or no "break-up" fee."

7.    Ratification of Purchase Contract.    Except as expressly amended hereby, the provisions of the Purchase Contract shall remain in full force and effect in all respects.

8.    Governing Law.    This Agreement shall be governed by the laws of the State of Maryland and the laws of the United States pertaining to transactions in such State.

9.    Multiple Counterparts.    This Agreement may be executed in a number of identical counterparts which, taken together, shall constitute collectively one (1) agreement.

IN WITNESS WHEREOF, each of the parties hereto have caused this Agreement to be executed by its duly authorized representative as of the Agreement Effective Date.

SELLER:

CIRCUIT CITY STORES, INC.,
a Virginia corporation

By:       _____
Name:   _____
Title:     _____

PURCHASER:

VEI CIRCUIT LLC,
a Maryland limited liability company

By:      Vanguard Management Services, Inc.
Its:      Manager

By:      _____
            Leonard Weinberg, II
            President