Exhibit "C"

B 10 (Official Form 10) (12/07)

| UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF VIRGINIA | PROOF OF CLAIM |
|---|---|

**Debtor against which claim is asserted : (Check only one box below:)**

X Circuit City Stores, Inc. (Case No. 08-35653)
☐ Circuit City Stores West Coast, Inc. (Case No. 08-35654)
☐ InterTAN, Inc. (Case No. 08-35655)
☐ Ventoux International, Inc. (Case No. 08-35656)
☐ Circuit City Purchasing Company, LLC (Case No. 08-35657)
☐ CC Aviation, LLC (Case No. 08-35658)

☐ CC Distribution Company of Virginia, Inc. (Case No. 08-35659)
☐ Circuit City Stores PR, LLC (Case No. 08-35660)
☐ Circuit City Properties, LLC (Case No. 08-35661)
☐ Orbyx Electronics, LLC (Case No. 08-35662)
☐ Kinzer Technology, LLC (Case No. 08-35663)
☐ Courchevel, LLC (Case No. 08-35664)

☐ Abbott Advertising, Inc. (Case No. 08-35665)
☐ Mayland MN, LLC (Case No. 08-35666)
☐ Patapsco Designs, Inc. (Case No. 08-35667)
☐ Sky Venture Corporation (Case No. 08-35668)
☐ XSStuff, LLC (Case No. 08-35669)
☐ PRAHS, INC. (Case No. 08-35670)

NOTE: *This form should not be used to make a claim for administrative expenses arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| | |
|---|---|
| Name of Creditor (the person or other entity to whom the debtor owes money or property):<br>**TOWNE SQUARE PLAZA** | ☒ Check this box to indicate that this claim amends a previously filed claim. |
| Name and address where notices should be sent:<br>**Peter E. Meltzer, Esquire**<br>**1530 Locust St., Suite L**<br>**Philadelphia, PA 19102**    Telephone number: **215-545-3300** | Court Claim Number: _____<br>*(If known)*<br><br>Filed on: _____ |
| Name and address where payment should be sent (if different from above):<br>**Grubb and Ellis Management Services**<br>**401 Route 73N, Suite 120**<br>**40 Lake Center**<br>**Marlton, NJ, 08053**    Telephone number: **856-334-2109** | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br>☐ Check this box if you are the debtor or trustee in this case. |

**1. Amount of Claim as of Date Case Filed:** $ ~~544,451.04~~

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.

If all or part of your claim is entitled to priority, complete item 5.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

**2. Basis for Claim:** Lease rejection damages
(See instruction #2 on reverse side.)

**3.** Last four digits of any number by which creditor identifies debtor: _____

   **3a.** Debtor may have scheduled account as: _____
   (See instruction #3a on reverse side.)

**4. Secured Claim (See instruction #4 on reverse side.)**
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

Nature of property or right of setoff:  ☐ Real Estate  ☐ Motor Vehicle  ☐ Other
Describe:

Value of Property: $_____  Annual Interest Rate ____%

Amount of arrearage and other charges as of time case filed included in secured claim,

if any: $_____   Basis for perfection: _____

Amount of Secured Claim: $_____   Amount Unsecured: $_____

**6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements or running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. *(See definition of "redacted" on reverse side.)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

| | |
|---|---|
| Date: 6/1/09 | **Signature:** the person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>*[signature]* Peter Meltzer, Counsel for claimant |

**5. Amount of Claim Entitled to Priority under 11 U.S.C. § 507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(5).

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507(a)(8).

☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

**Amount entitled to priority:**

$_____

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

FOR COURT USE ONLY

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

Execution Copy



## LEASE AGREEMENT

by and between

## NEWMAN GLOUCESTER ASSOCIATES, LLC

as Landlord

and

## CIRCUIT CITY STORES, INC.

as Tenant

Town Square Plaza Shopping Center
Gloucester Township, New Jersey

Table of Contents

Page

ARTICLE I        FUNDAMENTAL LEASE PROVISIONS ...................................................... 1

Section 1.01        Definitions: ............................................................................................ 1

ARTICLE II        LEASE OF PREMISES - TERM OF LEASE ................................................. 4

Section 2.01        Demise ................................................................................................... 4

Section 2.02        Extension Periods .................................................................................. 5

Section 2.03        Commencement Date and Landlord Reimbursement ............................ 5

Section 2.04        Possession Date ..................................................................................... 7

Section 2.05        Expected Possession Date ...................................................................... 6

Section 2.06        Possession Date During Slack Period Delivery ..................................... 7

Section 2.07        Delayed Possession ............................................................................... 7

Section 2.08        Early Entry ............................................................................................ 7

Section 2.09        Measurement ......................................................................................... 9

Section 2.10        Commencement Date Agreement ........................................................... 8

ARTICLE III        INITIAL CONSTRUCTION ......................................................................... 8

Section 3.01        Landlord's and Tenant's Work ............................................................... 8

ARTICLE IV        RENT .......................................................................................................... 8

Section 4.01        Annual Minimum Rent ........................................................................... 8

Section 4.02        Additional Rent ...................................................................................... 9

Section 4.03        Rent; Method of Payment ....................................................................... 9

ARTICLE V        COMMON AREA MAINTENANCE AND COST ......................................... 9

Section 5.01        Maintenance ........................................................................................... 9

Section 5.02        Construction Clean-up and Post-Possession Work ................................ 9

Section 5.03        CAM Costs ............................................................................................ 10

Section 5.04        Tenant's Share of CAM Costs ................................................................ 11

Section 5.05        Payment of CAM Costs .......................................................................... 11

Section 5.06        CAM Costs Increases ............................................................................. 12

ARTICLE VI        TAXES ........................................................................................................ 12

Section 6.01        Taxes ...................................................................................................... 12

Section 6.02        Payment of Taxes ................................................................................... 12

Section 6.03        Exclusions from Taxes ........................................................................... 13

Section 6.04        Right to Contest ..................................................................................... 13

Table of Contents
(continued)

Page

ARTICLE VII    UTILITIES ............................................................................................ 14
    Section 7.01    Utilities .......................................................................................... 14
    Section 7.02    Interruption .................................................................................. 14
ARTICLE VIII    USE OF PREMISES ......................................................................... 14
    Section 8.01    Permitted Use ................................................................................ 14
    Section 8.02    Conduct of Operations ................................................................ 15
    Section 8.03    Leasing Restrictions ..................................................................... 15
    Section 8.04    Tenant's Exclusive ......................................................................... 16
    Section 8.05    Exclusives Applicable To Tenant ............................................... 17
    Section 8.06    Key Tenants ................................................................................... 19
ARTICLE IX    REPAIRS ............................................................................................ 19
    Section 9.01    Landlord Obligations ................................................................... 19
    Section 9.02    Tenant's Obligations .................................................................... 20
    Section 9.03    Hazardous Materials .................................................................... 20
    Section 9.04    Surrender of the Premises .......................................................... 22
ARTICLE X    REQUIREMENTS OF LAW ............................................................... 22
    Section 10.01    Landlord's Obligations ............................................................... 22
    Section 10.02    Tenant's Obligations .................................................................. 22
    Section 10.03    Right to Contest .......................................................................... 23
ARTICLE XI    INSURANCE ....................................................................................... 23
    Section 11.01    Landlord's Insurance .................................................................. 23
    Section 11.02    Tenant's Insurance ..................................................................... 23
    Section 11.03    Insurance Requirements Generally ......................................... 24
    Section 11.04    Landlord's Insurance Cost ........................................................ 25
    Section 11.05    Indemnity ..................................................................................... 25
    Section 11.06    Mutual Waiver of Subrogation ................................................. 26
    Section 11.07    Affiliate ........................................................................................ 26
ARTICLE XII    DAMAGE OR DESTRUCTION ....................................................... 26
    Section 12.01    Landlord's Obligation to Rebuild ............................................ 26
    Section 12.02    Tenant's Obligation to Rebuild ............................................... 27

ii

Table of Contents
(continued)

Page

Section 12.03   Termination................................................................................ 27
ARTICLE XIII   CONDEMNATION........................................................................ 28
Section 13.01   Taking ..................................................................................... 28
Section 13.02   Restoration and Rent Adjustment......................................... 29
Section 13.03   Award........................................................................................ 29
ARTICLE XIV   ALTERATIONS AND MECHANICS' LIENS ........................... 29
Section 14.01   Tenant's Alteration Rights.................................................... 29
Section 14.02   Mechanics' Liens .................................................................. 30
ARTICLE XV   SIGNS.......................................................................................... 31
Section 15.01   Tenant's Signs....................................................................... 31
Section 15.02   Pylon Signs ............................................................................ 31
Section 15.03   Replacement............................................................................ 32
ARTICLE XVI   TENANT'S PROPERTY................................................................ 32
Section 16.01   Tenant's Property.................................................................. 32
ARTICLE XVII   ASSIGNMENT AND SUBLETTING ........................................ 32
Section 17.01   Assignment and Subletting Rights....................................... 32
Section 17.02   Collateral Assignment.......................................................... 33
Section 17.03   Cure Rights of Original Tenant............................................ 33
Section 17.04   Recognition Agreement ........................................................ 34
ARTICLE XVIII   DEFAULT ................................................................................ 34
Section 18.01   Tenant's Default..................................................................... 34
Section 18.02   Additional Landlord Remedies Due to Construction Delays by Tenant ........................................................................................ 36
Section 18.03   Landlord's Default................................................................. 36
Section 18.04   Additional Tenant Self-help, Equitable and Legal Remedies Due to Construction Delays by Landlord ........................................... 37
Section 18.05   Additional Tenant Remedies Due to Landlord's Failure to Pay the Landlord Reimbursement.......................................................... 38
Section 18.06   Waiver; Non-Exclusive Remedies....................................... 39
ARTICLE XIX   SUBORDINATION, TRANSFER OF INTEREST ......................... 39
Section 19.01   Subordination......................................................................... 39

Table of Contents
(continued)

Page

| | | |
|---|---|---|
| Section 19.02 | Existing Mortgages and Ground Leases | 39 |
| Section 19.03 | Transfer of Interest | 40 |
| Section 19.04 | Tenant Estoppel Certificates | 40 |
| Section 19.05 | Landlord Estoppel Certificates | 40 |
| Section 19.06 | Payments | 40 |
| ARTICLE XX | LANDLORD'S REPRESENTATIONS, WARRANTIES AND COVENANTS | 41 |
| Section 20.01 | Quiet Enjoyment | 41 |
| Section 20.02 | Representations, Warranties and Covenants | 41 |
| Section 20.03 | Site Covenants | 42 |
| Section 20.04 | OEA | 43 |
| ARTICLE XXI | HOLDING OVER | 45 |
| Section 21.01 | Holding Over | 45 |
| ARTICLE XXII | NOTICE | 45 |
| Section 22.01 | Where and How Given | 45 |
| Section 22.02 | When Given | 46 |
| ARTICLE XXIII | MISCELLANEOUS | 46 |
| Section 23.01 | Rent Proration | 46 |
| Section 23.02 | Construction | 46 |
| Section 23.03 | Section Headings | 47 |
| Section 23.04 | Partial Invalidity | 47 |
| Section 23.05 | Waiver | 47 |
| Section 23.06 | Governing Law | 47 |
| Section 23.07 | Successors and Assigns | 47 |
| Section 23.08 | No Broker | 47 |
| Section 23.09 | Memorandum of Lease | 47 |
| Section 23.10 | Entire Agreement | 47 |
| Section 23.11 | Relationship of Parties | 48 |
| Section 23.12 | Force Majeure | 48 |
| Section 23.13 | Limitation of Landlord's Liability | 48 |

Table of Contents
(continued)

Page

| Section 23.14 | Limitation of Tenant's Liability | 48 |
|---|---|---|
| Section 23.15 | Consents | 48 |
| Section 23.16 | Costs | 49 |
| Section 23.17 | Attorneys' Fees | 49 |
| Section 23.18 | Survival of Obligations | 49 |
| Section 23.19 | Joint and Several Liability | 49 |
| Section 23.20 | Definition of Hereunder, Herein, etc. | 49 |
| Section 23.21 | Tenant's Trade Name | 49 |
| Section 23.22 | Counterparts | 49 |

## EXHIBITS

| | |
|---|---|
| EXHIBIT A | Site Plan |
| EXHIBIT B | Legal Description of the Shopping Center |
| EXHIBIT C | Site Design Requirements |
| EXHIBIT C-1 | Possession Date Notice |
| EXHIBIT D | W-9 Form |
| EXHIBIT E | Commencement Date and Expiration Date Agreement |
| EXHIBIT F | [Intentionally Omitted] |
| EXHIBIT G | Existing Leases |
| EXHIBIT H | Existing Exclusives and Prohibited Uses |
| EXHIBIT J | Recognition Agreement |
| EXHIBIT J | Subordination, Non-Disturbance and Attornment Agreement |
| EXHIBIT K | Permitted Exceptions |
| EXHIBIT L | Memorandum of Lease |
| EXHIBIT M | Indemnity Agreement |
| EXHIBIT N | Pylon Sign Rendering |

v

## LEASE AGREEMENT

THIS LEASE AGREEMENT (this "Lease"), dated as of the *th August* day of ___, 2006 ("Effective Date"), by and between **NEWMAN GLOUCESTER ASSOCIATES, LLC**, a New Jersey limited liability company ("Landlord") with an office at 1000 Germantown Pike, Suite E-2, Plymouth Meeting, Pennsylvania 19462, and **CIRCUIT CITY STORES, INC.** ("Tenant") with an office at, 9950 Mayland Drive, Richmond, Virginia 23233.

## W I T N E S S E T H:

In consideration of the rents and covenants set forth in this Lease, Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises (as defined in Section 1.01(P)) upon the following terms and conditions:

## ARTICLE I

## FUNDAMENTAL LEASE PROVISIONS

SECTION 1.01 Definitions:

A.   **Additional Charges:**

    1.    Initial CAM Costs:  Estimated at, but not to exceed, Two and 50/100 Dollars ($2.50) per square foot of Floor Area (as defined below), which includes the initial insurance cost of Thirty Cents ($0.30) per square foot of Floor Area (the "Initial Insurance Cost").

    2.    Initial Taxes:   Estimated at, but not to exceed, One and 50/100 Dollars ($1.50) per square foot of Floor Area.

B.   **Alternative Rent:**  An amount equal to fifty percent (50%) of the Annual Minimum Rent (as defined below) that would have otherwise been due during the period of time that Tenant is entitled to pay Alternative Rent.

C.   **Annual Minimum Rent** (subject to adjustment pursuant to Section 2.09):

| Period | Rent p.s.f. | Annual Rent | Monthly Installments |
|---|---|---|---|
| Initial Lease Term: | | | |
| Commencement Date through end of tenth (10th) Lease Year (as defined in Section 1.01(J)) | $15.50 | $468,828.50 | $39,069.04 |

| | | | |
|---|---|---|---|
| 1st Extension Period (as defined in Section 1.01(F)): | $16.50 | $499,075.50 | $41,589.63 |
| 2nd Extension Period: | $17.50 | $529,322.50 | $44,110.21 |
| 3rd Extension Period: | $18.50 | $559,569.50 | $46,630.79 |
| 4th Extension Period: | $19.50 | $589,816.50 | $49,151.38 |
| 5th Extension Period: | $20.50 | $620,063.50 | $51,671.96 |

D.   **Broker:**  Metro Commercial Real Estate, Inc..

E.   **Delivery Dates:**      1.     Anticipated Possession Date: August 21, 2006.

                             2.     Outside Possession Date:  September 30, 2006.

F.   **Extension Periods:**  Five (5) periods of five (5) years each.

G.   **Floor Area:**   The actual number of square feet of space contained on all floors within any building area in a particular leased premises (including the Premises) within the Shopping Center (as defined below), or in the Shopping Center, as applicable, and, with respect to exterior areas, including all exterior areas leased to or exclusively used by one (1) or more tenants (other than loading dock areas, trash compactor areas, and trash container areas); provided, however, that the Floor Area of the "Target Tract" and/or the "Lowe's Tract" (as such terms are defined in the OEA), as applicable, shall be computed in accordance with the definition of "Floor Area" set forth in the OEA. All measurements shall be from the exterior of outside walls or store front and/or to the centerline of any common walls, but in no event shall Floor Area include any non-selling or storage space areas within any mezzanine, lower floor, second floor or, except as set forth above, any exterior areas.

H.   **Initial Lease Term:** Ten (10) Lease Years, plus the partial Lease Year commencing on the Commencement Date and ending on the January 31 immediately thereafter.

I.   **Key Tenants:**    Retail tenants or operators consisting of Target and PETsMART.

J.   **Lease Year:** Each period within the Term (as defined below) commencing on February 1 and ending the next succeeding January 31, except that Lease Year 1 shall include the partial Lease Year commencing on the Commencement Date and ending on the January 31 immediately thereafter.

K.   **[Intentionally Omitted]**

2

L.    **Minimum Initial Cotenancy Requirement:**        Retail tenants or operators consisting of Target, and PETsMart or Lowe's open for business during normal business hours in the Shopping Center.

M.    **Minimum Parking Ratios:** Four and one half (4.5) full-size parking spaces for each one thousand (1,000) square feet of Floor Area in the Shopping Center, with each parking space being at least nine (9) feet in width and eighteen (18) feet in length and for full-sized automobiles.

N.    **Opening Requirement:** All of the Key Tenants are open for business and the Minimum Initial Cotenancy Requirement is met.

O.    **Permitted Use:** The sale, rental, installation, servicing and repairing of consumer, office and automotive electronics products (collectively, the "Products"); and/or for any other lawful retail use not specifically prohibited by the provisions of Section 8.01 which incorporates certain exclusive uses and prohibited uses contained in the OEA. The term "Products" shall include, without limitation, televisions, stereos, speakers, video and audio recorders and players and cameras; computer hardware and software and related software services (which include internet access services, entertainment software and entertainment media [such as, by way of example only, game cartridges, video tapes, cassettes, compact discs, DVD's and DVD equipment]); cellular and wireless telephones and telecommunication devices and related accessories; motor vehicle audio, stereo and telephone systems; and technological evolutions of the foregoing.

P.    **Premises:** The store building to be constructed by Tenant as part of Tenant's Work (as defined in Section 3.01), containing approximately 30,247 square feet of Floor Area, including 170 feet of frontage with a depth not to exceed 174 feet, as crosshatched on the site plan attached hereto as Exhibit A (the "Site Plan"), in the shopping center known as Town Square Plaza Shopping Center, containing approximately three hundred eighty-two thousand two hundred and fifty nine (382,259) square feet of Floor Area and a 31,179 square foot Garden Area on the Lowe's Parcel, and located to the North of Cross Keys Berlin Road partially intersected by and partially bounded by Independence Boulevard in Gloucester Township, New Jersey (the "State"), as more particularly described in Exhibit B and also consisting of the Developer Tract, the Target Tract and the Lowe's Tract (collectively, the "Shopping Center").

Q.    **Slack Delivery Period:** Periods of time beginning on May 5 and ending on the following July 5, and November 1 and ending on the following March 1.

R.    **Slack Season:** The period of time beginning on November 1st and ending on the following January 1.

S.    **Tenant' s Share:** A fraction, the numerator of which shall be the Floor Area of the Premises and the denominator of which shall be the Floor Area of all buildings in the Shopping Center or the Developer's Tract, as applicable. In no event shall the denominator of the fraction by which Tenant's Share is determined be less than ninety percent (90%) of the Floor Area of the building areas shown on the Site Plan in the

3

Shopping Center or the Developer's Tract, as applicable. The foregoing notwithstanding, the parties acknowledge that 38.34% of CAM Charges shall be allocable to the Developer Tract, 32.98% of CAM Charges are allocable to the Target Tract and 28.77% of CAM Charges are allocable to the Lowe's Tract; accordingly, unless Target and/or Lowe's exercises its takeover right as hereinafter described, Tenant's Share of CAM Costs shall be computed by multiplying the total CAM Charges allocable to the Developer Tract by a fraction, the numerator of which shall be the Floor Area of the Premises and the denominator of which shall be the Floor Area of all buildings to be located within the Developer's Tract.  Notwithstanding the foregoing, the parties acknowledge that Lowe's and/or Target and/or their successors and assigns may, pursuant to Section 4.2.7 of the OEA, take-over and assume certain maintenance obligations with respect to Common Area on its Tract (as defined in the OEA); and, in such event Tenant's Share of CAM Charges hereunder shall be adjusted to exclude the land area of the Take-Over Tract (as defined in the OEA) and reallocated based on the land area of the remaining Tracts (as defined in the OEA), but only with respect to any such portion of the CAM Charges and maintenance obligations which are assumed by and performed by the Take-Over Party (as defined in the OEA) and not incurred by the Landlord or its designee as CAM Charges hereunder.

T.      **Term**: The Initial Lease Term plus the Extension Periods, if the option for any such Extension Period is exercised.


## ARTICLE II

## LEASE OF PREMISES - TERM OF LEASE

SECTION 2.01 Demise.

(a)      Landlord does hereby lease and demise to Tenant, and Tenant does hereby hire from Landlord, the Premises, together with the licenses, rights, privileges and easements appurtenant to the Premises.

(b)      Subject to the OEA (as defined below), which does not prohibit the foregoing, Tenant and its employees, invitees, agents, customers, concessionaires and licensees shall have the nonexclusive right, in common with Landlord and other tenants of the Shopping Center, to use all Shopping Center sidewalks, paved parking areas, paved service areas, signs, traffic controls, lighting and all means of ingress, egress, acceleration, deceleration and stacking lanes and circulation for the aforesaid parking and service areas of the Shopping Center to and from public streets and roads bordering the Shopping Center (collectively, the "Common Areas") now or hereafter made available or maintained by Landlord in the Shopping Center.  Tenant's right to use the Common Areas may be subject to such reasonable regulations (consistent with Tenant's rights under this Lease) as may from time to time be imposed upon, and equally applicable to, all tenants of the Shopping Center by Landlord or its agents.  Landlord shall provide Tenant with at least sixty (60) days prior notice of any such rules and regulations, which notice shall contain a copy of such rules and regulations.

4

(c)    Subject to the terms and provisions of Section 2.01(d), the OEA (which does not prohibit the foregoing), and municipal regulations, (i) Tenant shall have the exclusive right to use, on a "24 hour a day", "365 days a year" basis and without any additional charge, the loading facilities serving the Premises, the customer pick-up area, car stereo parking areas, four (4) web order customer pick-up parking spaces, trash compactor area and transformer pad area (collectively, the "Other Improvements"), all as shown on the Site Plan; (ii) Tenant shall have the right to erect a sign identifying Tenant's customer pick-up area and/or Tenant's car stereo parking areas; (iii) Tenant shall also have the right to erect signage, stripe, and print on the four (4) web order customer pick-up parking spaces in order to so identify such parking spaces, which spaces shall be located within the area designated as the Outdoor Sales Area on the Site Plan; and (iv) Tenant shall have the right to have a truck or other vehicle parked in "Tenant's Preferred Area" as shown on the Site Plan ("Tenant's Preferred Area"), for up to five (5) consecutive days in duration for each occurrence, for the purpose of promoting and displaying merchandise (each occurrence up to five [5] days in duration is referred to as a "Tenant Promotion"); Tenant may have up to six (6) Tenant Promotions during Lease Year 1, and up to five (5) Tenant Promotions for each subsequent Lease Year.

(d)    Tenant hereby acknowledges that the rights granted to Tenant for the car stereo parking areas and four (4) web order customer pick-up parking spaces pursuant to Section 2.01(c), may to require additional approvals and consents pursuant to the OEA. Tenant may designate and use such areas for such purposes; provided, however, such use is undertaken at Tenant's sole risk and if any tenant or owner of a portion of the Shopping Center rightfully claiming under the OEA disputes Tenant's exclusive right to use such areas, or either of them, Tenant must resolve such complaint or cease to claim such exclusive use, in which latter event, Tenant shall have no claim against Landlord and no right to claim that it is entitled to terminate this Lease or to receive a reduction in the rent and other charges reserved hereby. In the event that a party objects to Tenant's use of such area, Landlord grants Tenant the right to pursue and obtain any necessary or appropriate consents under the OEA, at no cost to Landlord other than nominal out-of-pockets costs. In addition, Landlord, as the Approving Party with respect to the Developer Tract, hereby provides its consent and approval to Tenant's use of such areas, and that unless another party rightfully claiming under the OEA so demands, Landlord shall not disturb the Tenants rights for the car stereo parking areas and four (4) web order customer pick-up parking spaces granted to Tenant pursuant to Section 2.01(c).

SECTION 2.02  Extension Periods. Provided Tenant is not then in default of any material terms or provisions this Lease, after the lapse of all applicable grace periods, Tenant shall have the option to extend the Term for the number of Extension Periods shown in Section 1.01(F), upon all the terms and conditions contained in this Lease. Each such option is exercisable by Tenant giving notice to Landlord (a) at least one hundred eighty (180) days prior to the expiration of the Initial Lease Term, or of the preceding Extension Period, as the case may be, or (b) if Tenant fails to give Landlord such notice, then within twenty (20) days after receipt of notice from Landlord that Tenant has failed to exercise its option to extend within the time period provided in (a) above.

SECTION 2.03  Commencement Date and Landlord Reimbursement. "Commencement Date" shall mean the date on which Landlord makes payment of the Landlord Reimbursement in accordance with this Lease. "Landlord Reimbursement" shall mean (i) the product obtained by

5

multiplying Seventy Five Dollars ($75.00) by the Floor Area of the Premises as determined by the Floor Area Certification (as defined below). In addition, Tenant shall only be responsible for customary permit fees and impact fees related to utility hook-up at the Premises and any building permit fee for the Premises; Landlord shall be solely responsible for all other permit or impact fees relating to the Shopping Center. Notwithstanding the foregoing, Landlord, in addition to the Landlord Reimbursement, shall pay half of the impact fees for sewer and water hook-up for the Premises, and other fees owed to the Municipal Utility Authority, however, Landlord's contribution for such fees shall not exceed $19,000. Upon Substantial Completion (as defined in the site design requirements attached hereto as Exhibit C ["Site Design Requirements"]), and Tenant's furnishing to Landlord (a) certification from Tenant's general contractor, if any, and architect that Tenant's Work (as defined below) has been completed substantially in accordance with the plans and specifications, including delivery of AIA Form G704 (Certificate of Substantial Completion), (b) delivery to Landlord of a copy of the temporary or final certificate of occupancy for the Premises properly issued by the governmental body having jurisdiction thereof, provided however that if Tenant provides a temporary certificate of occupancy, Tenant shall diligently pursue receipt of a final certificate of occupancy, (c) the certificates of insurance required under Section 11.02 from the insurer or, if Tenant self-insures, documentation of such insurance from Tenant, (d)(i) receipt by Landlord from Tenant of final lien waivers from all architects, contractors and subcontractors and construction managers, if any, or such other documentation as Landlord may reasonably request in writing to show that all invoices have been paid for work done or authorized by Tenant or performed on Tenant's account in connection with the Premises, and/or (ii) an indemnity in the form of Exhibit M attached to this Lease with respect to mechanics' liens arising out of Tenant's construction, (e) a square footage building perimeter survey certified to Tenant and Landlord (the "Floor Area Certification"), and (f) an assignment of all construction-related warranties for the Building (as defined in the Site Design Requirements, but not including any of Tenant's Property, as defined in Section 16.01), including the roofing contract warranty with confirmation from the roof manufacturer, each for a period of at least one (1) year and a roofing manufacturer's warranty for a minimum of at leats ten (10) years, provided however, that if Tenant, despite using commercially reasonable efforts, is unable to assign a warranty or provide other confirmation hereunder, Tenant may satisfy the condition set forth in this subitem (f) by providing an indemnity to Landlord providing the same coverage as contemplated by this subitem (f), Landlord shall pay to Tenant the Landlord Reimbursement. The Landlord Reimbursement shall be payable by wire transfer of funds by Landlord to Tenant's account no later than thirty (30) days after Substantial Completion and receipt of items (a) through (f) above (items (a) through (f) hereinafter referred to as the "Landlord Reimbursement Deliverables"). However, if the Commencement Date shall occur during the Slack Season or prior to the date on which the Opening Requirement is met, and Tenant elects to delay the opening of its store, then, notwithstanding that the Commencement Date shall have occurred, Rent (as defined in Section 4.03) shall fully abate until the later to occur of (i) the first (1st) day following the end of the Slack Season, or (ii) the date on which the Opening Requirement is met. However, if Tenant elects, at its discretion, to open for business during the Slack Season or prior to the date that the Opening Requirement is met, then Tenant shall pay, in lieu of Annual Minimum Rent, Alternative Rent until the later to occur of (i) the first (1st) day following the end of the Slack Season, or (ii) the date on which the Opening Requirement is met. In no event shall Tenant's election to delay opening its store in any way delay or modify the date on which the Landlord Reimbursement is required to be paid by

6

Landlord to Tenant. Upon Substantial Completion and payment of the Landlord
Reimbursement from Landlord to Tenant, Landlord shall be the owner of the Building (but not
including any of Tenant's Property) and Landlord shall be entitled to depreciate the Building for
tax purposes. Tenant shall have the right to deliver to Landlord, a bill of sale evidencing the
conveyance of the Building from Tenant to Landlord and an assignment of warranties evidencing
the assignment of all construction warranties, including the roof warranty from Tenant to
Landlord. Landlord shall also have the right to require Tenant to deliver to Landlord such a bill
of sale and/or such assignment of warranties with confirmation from the roofing contractor of
such assignment. However, the conveyance of the Building and/or the assignment of warranties
shall be deemed to have occurred notwithstanding that a bill of sale was not so delivered.

SECTION 2.04 Possession Date. "Possession Date" shall mean the date on which the
last of the following conditions shall have been satisfied:

(a)    Landlord shall have caused the Delivery of the Land (as defined in the Site
Design Requirements) as contemplated by Attachment 2, Section 2 of the Site Design Criteria
(but only such portions of the Land as (i) are required to be delivered pursuant to Attachment 2,
Section 2 of the Site Design Criteria, and (ii) which are reasonably necessary for Tenant to
commence Tenant's Work), to occur, but, for purposes of satisfying the aforementioned
condition, excluding the Landlord's Additional Work as contemplated by Attachment 2, Section
3 of the Site Design Criteria;

(b)    Landlord shall have delivered the soils engineer's and surveyor's
certifications as required by Circuit City's Specifications (as defined in the Site Design
Requirements);

(c)    The representations and warranties of Landlord set forth in Sections 9.03
and 20.02 below shall then be true and in effect in all material respects, and Landlord shall not
then be in violation of any of the Site Covenants (as defined in Section 20.03);

(d)    Landlord shall have delivered to Tenant a fully-executed original
counterpart of a non-disturbance and/or recognition agreement, as applicable, from each
Mortgagee and Ground Lessor (as such terms are defined in Section 19.01), as more fully set
forth in Section 19.02;

(e)    Landlord shall have delivered to Tenant the W-9 form attached hereto as
Exhibit D.

Landlord currently anticipates that the Possession Date will occur on the Anticipated Possession
Date, subject to the provisions of Section 2.05 below. In no event shall the Possession Date
occur prior to the Expected Possession Date (as defined in Section 2.05).

SECTION 2.05 Expected Possession Date.

(a)    Landlord shall be deemed to have delivered the Possession Date Notice as
set forth in Exhibit C-1 (the "Possession Date Notice") to Tenant concurrent with the execution
and delivery this Lease, and Landlord hereby notifies Tenant that the Possession Date shall occur
on August 21, 2006 (the "Expected Possession Date").

7

(b)    If Landlord fails to accomplish the Possession Date by the Expected
Possession Date (subject to Force Majeure, as defined in Section 23.12, but in no event shall the
aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed a period of
thirty (30) days), then Landlord shall pay to Tenant on demand, as a liquidated reimbursement
(and not as a penalty) for all of the damages that Tenant will suffer as a result of any such delay,
an amount equal to the sum of: (i) Fifty Thousand Dollars ($50,000), plus (ii) an amount equal to
three (3) days of Annual Minimum Rent for each day that the Possession Date is delayed. If
Landlord fails to complete any other element of Landlord's Work (as defined in Section 3.01) on
or before the date required therefor in the Construction Schedule (as defined in the Site Design
Requirements), subject to Force Majeure (but in no event shall the aggregate of any and all
extensions as a result of a Force Majeure delay(s) exceed a period of thirty (30) days), then
Landlord shall pay to Tenant on demand, as a liquidated reimbursement (and not as a penalty)
for all of the damages that Tenant will suffer as a result of any such delay, an amount equal to
three (3) days of Annual Minimum Rent for each day that such component of Landlord's Work
is delayed. The foregoing liquidated reimbursements represent the parties' good faith agreement
as to an agreed upon amount which shall have been incurred by Tenant and which shall
otherwise not be susceptible of exact ascertainment.

SECTION 2.06  Possession Date During Slack Period Delivery. Anything contained in
this Lease to the contrary notwithstanding, if the Possession Date occurs during the Slack
Delivery Period, then Tenant may refuse to accept the Premises. In that event, the Possession
Date shall be delayed and shall not be deemed to occur until the first (1st) day following the end
of the applicable Slack Delivery Period, subject to the other provisions of this Lease (including,
without limitation, Sections 2.04 and 2.05).

SECTION 2.07  Delayed Possession. If the Possession Date does not occur before the
Outside Possession Date (subject to Force Majeure, but in no event shall the aggregate of any
and all extensions as a result of a Force Majeure delay(s) exceed a period of thirty (30) days),
then Tenant shall have the right to (a) terminate this Lease, or (b) delay opening its store facility
for a period of not to exceed nine (9) months, which right shall be exercised by Tenant upon
notice to Landlord at any time prior to the Possession Date. If Tenant terminates this Lease, then
there shall be no further liability on the part of Landlord or Tenant, except: (i) for those
obligations that expressly survive the expiration or other termination of this Lease, and (ii)
Landlord shall (which obligation shall survive the termination of this Lease), within three (3)
business days following Tenant's termination notice, reimburse Tenant for all its reasonable
third-party costs and expenses incurred in connection with this Lease (including, without
limitation, costs associated with the preparation and review of plans and specifications, and
attorneys' fees), not to exceed Fifty Thousand Dollars ($50,000). If Tenant elects to delay
opening its store facility, then Landlord shall cause the Possession Date (including, without
limitation, the Delivery of the Land) to occur on the date subsequently required by Tenant, and
Landlord shall pay to Tenant on demand an amount equal to all additional costs incurred by
Tenant in the development of its store facility including, but not limited to, costs of materials and
all engineering, architectural, legal fees, and costs of delay resulting from Landlord's failure to
timely deliver.

SECTION 2.08  Early Entry. Any time prior to the Delivery of the Land, Tenant shall
have the right to enter the Premises to (a) inspect the physical condition of the Land (as defined

8

in the Site Design Requirements) and conduct its due diligence investigation of the Land to determine the suitability of the Land for Tenant's intended development, construction, use and operation and (b) inspect Landlord's Work; provided, however, that such entry may not unreasonably interfere with Landlord's Work. Such entry shall not be construed as an acceptance of the Premises by Tenant under the provisions of this Lease or as a waiver of any of the provisions hereof.

SECTION 2.09 Measurement. If the Floor Area Certification shall disclose that the Premises contains more or less than the Floor Area shown in Section 1.01(P), then Landlord and Tenant agree to amend this Lease to adjust all Rent to account for the actual Floor Area of the Premises.

SECTION 2.10 Commencement Date Agreement. When the Commencement Date has been determined, Landlord and Tenant shall execute a memorandum, in the form of Exhibit E, which shall expressly confirm the Commencement Date and the expiration date of the Initial Lease Term, and which shall also ratify and affirm all of the terms and provisions of this Lease.

## ARTICLE III

## INITIAL CONSTRUCTION

SECTION 3.01 Landlord's and Tenant's Work. Landlord shall perform Landlord's work in accordance with the Site Design Requirements and as otherwise required by this Lease ("Landlord's Work"). Tenant shall construct the Building and storefront sidewalk in accordance with the Site Design Requirements ("Tenant's Work") for which Landlord shall pay to Tenant the Landlord Reimbursement. Landlord and Tenant acknowledge receipt of the Site Design Requirements and each agrees to comply with the provisions thereof relating to their respective work. In connection with Tenant's performance of Tenant's Work and during any other periods of construction during the Term, Tenant shall have the right to use as a construction staging area approximately 20,000 square feet of the Common Areas in the location identified on the Site Plan as "Staging Area."

## ARTICLE IV

## RENT

SECTION 4.01 Annual Minimum Rent. Commencing on the Commencement Date, Tenant shall pay to Landlord monthly installments of Annual Minimum Rent without setoff or deductions, except as otherwise provided for in this Lease, on the first (1st) day of each calendar month during the Term. However, if the Commencement Date occurs on a day other than the first (1st) day of a calendar month, then the monthly installment of Annual Minimum Rent and other charges shall be prorated for the remaining days of that calendar month. Anything contained in this Lease to the contrary notwithstanding, if Tenant shall be paying Alternative Rent, Ground Rent (as defined in Section 18.02(a)) or any other ground rent in lieu of Annual Minimum Rent as permitted under this Lease during such time as Tenant shall be entitled to an abatement of, deduction from or setoff against Annual Minimum Rent, then Tenant shall be

9

entitled to the same abatement of, deduction from or setoff against Alternative Rent, Ground Rent or the other ground rent.

SECTION 4.02  Additional Rent.  The term "Additional Rent" shall mean all amounts required to be paid by Tenant under this Lease other than Annual Minimum Rent. Wherever an item of Additional Rent is payable "on demand" or no time period for payment of an item of Additional Rent is specifically provided for in this Lease, such item of Additional Rent shall be paid by Tenant within thirty (30) days after Tenant's receipt of Landlord's invoice therefor, accompanied by the appropriate back-up documentation.

SECTION 4.03  Rent; Method of Payment.  The term "Rent" shall mean, collectively, Annual Minimum Rent and Additional Rent. All payments of Rent shall be made by check payable to Landlord, mailed or delivered to the address listed in Section 22.01 or to such other person or place as Landlord shall designate by notice to Tenant, or by such other reasonable method of payment (such as by wire transfer).

### ARTICLE V

### COMMON AREA MAINTENANCE AND COST

SECTION 5.01  Maintenance.  Subject to Section 4.2.7 of the OEA with respect to the Common Areas on the Target Tract and Lowe's Tract, Landlord shall operate, maintain, insure, repair and replace the Common Areas or cause the same to be done in a manner so as to maintain the Shopping Center in good, first-class order, repair and condition. Without limiting the generality of the foregoing, Landlord shall be solely responsible, and Tenant shall have no obligation (except to reimburse Landlord for Tenant's Share of the cost thereof, as provided below), for the maintenance, repair or replacement of the parking areas (including, without limitation, any necessary repaving and restriping), parking lot lighting, utility systems and connections, access ways, on-site and off-site water detention areas, the pump station on the Developer Tract which services the Premises, the proposed inline, adjacent retail stores and the outparcel to the south of the Premises which is leased to Applebee's (the "Pump Station"), and other Common Areas and for the clearing of snow and ice from the Common Areas. Landlord may at any time, except between October 1 and January 1, close temporarily any Common Areas to make repairs, to prevent the acquisition of public rights therein or discourage non-customer parking. Between October 1 and January 1, Landlord may temporarily close parts of the Common Areas, but only to make repairs of an emergency nature. However, in any instance of such emergency repairs Landlord shall use all reasonable efforts to perform the necessary repairs in the most expeditious manner possible and in such a way and at such times as to cause the least interference possible with ingress and egress to and from the Premises. In order to reduce interference with Tenant's business operation during such period, Landlord shall effect temporary repairs, where feasible, and complete the permanent repairs after January 1.

SECTION 5.02  Construction Clean-up and Post-Possession Work. Following the Possession Date, any construction by Landlord or other tenants or occupants of the Shopping Center affecting any portion of the Shopping Center shall be subject to the following terms and conditions (in addition if any other applicable provisions of this Lease, such as, by way of example only, Section 20.03(g)):

10

(a)     staging and storage of materials and parking of construction vehicles shall not occur in Tenant's Preferred Area;

(b)     Landlord shall diligently ensure that, from and after Tenant's opening for business to the public, no ingress, egress or passage of any construction, delivery and related vehicles engaged in the performance of such work or other construction activities shall take place except through the entrance/exit drive designated as the "Construction Drive" on the Site Plan;

(c)     Landlord shall maintain the Shopping Center in a clean, safe, and sightly condition, and shall use reasonable efforts to ensure that such construction shall not materially adversely interfere with the normal conduct of any business operations in the Premises; and

(d)     Landlord shall clear all rubble and debris from the Premises and Common Areas resulting from any construction by Landlord or any other tenant or occupant of the Shopping Center.

SECTION 5.03 CAM Costs.  "CAM Costs" shall mean the actual amount (without profit or "mark up" by Landlord or any Affiliate, as defined in Section 11.07, of Landlord) of all necessary, competitive and reasonable costs and expenses actually incurred by Landlord in operating, insuring and maintaining the Common Areas in an appropriate manner commensurate with good business practice and first-class shopping centers, and, in addition thereto, in lieu of any cost(s) or expense(s) relating to the administration and management of the Common Areas, an administrative fee (the "Administrative Fee") equal to five percent (5%) of the CAM Costs for the calendar year in question, but excluding from the computation of such Administrative Fee the cost of any replacement or improvement of a capital nature (to the extent otherwise permitted to be included in CAM Costs), the cost of electricity and other utilities, and the cost of insurance premiums.  In no event will CAM Costs include: (a) real estate taxes, (b) any costs associated with maintenance performed by another tenant or occupant of the Shopping Center on portions of the Common Areas separately maintained by such tenant or occupant; (c) any dues or charges for a merchants' or other association of occupants of the Shopping Center; (d) maintenance, repairs or replacements to the Common Areas: (i) necessitated by the negligent or wrongful act of Landlord or any tenant or occupant, other than Tenant, (ii) made to correct any construction defect, or (iii) relating to any improvements or utility systems not within the Common Areas (e.g. roofs, exterior walls, fire protection systems); (e) repairs or replacements necessitated by any governmental entity or made to correct any condition in existence prior to the Commencement Date, or to correct damage caused by subsidence or adverse or substandard soil conditions; (f) amounts reimbursable from insurance proceeds, under warranty, or by any tenant or occupant of the Shopping Center or any other third party other than pursuant to a Common Area expense provision similar to this Section 5.03, including, without limitation, any third party contributions for the use and maintenance of the detention pond; (g) premiums for insurance for coverage maintained by Landlord with respect to the Shopping Center (except that premiums for Common Areas liability insurance may be included as part of CAM Costs provided the coverage provided by such liability insurance policy is not in excess of the limits established in Section 11.01), any costs resulting from insurance deductibles under any insurance policy maintained by Landlord, any costs which would have been reimbursed or paid for by insurance proceeds had Landlord maintained the insurance required under Section 11.01, and the amount of any judgment or other charge entered, or costs assessed against, Landlord in excess of the policy

11

limits of the insurance maintained by Landlord under Section 11.01; (h) the cost of any replacements or capital improvements to the Common Areas, except that the cost of repaving the parking areas of the Shopping Center may be included within CAM Costs so long as such cost is otherwise permitted to be included within CAM Costs and is amortized on a straight-line basis over the useful life thereof under generally accepted accounting principles consistently applied, and is not incurred (i) prior to the expiration of the tenth (10th) full calendar year of the Term, or (ii) more than once during each ten (10) full calendar years of the Term; (i) reserves for anticipated future expenses; (j) interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner; (k) Landlord's personnel, overhead, home office or administrative expenses, except for the Administrative Fee; (l) amounts incurred to remediate any Hazardous Materials (as defined in Section 9.03(a)); (m) any new improvements to the Shopping Center or Common Areas including, but not limited to, renovations to the facade of the Shopping Center and improvements to landscaped areas of the Shopping Center (except for maintenance and replacements in the ordinary course within the landscaped areas, and subject to the provisions off section 5.06, the replacement of parking lot); (n) holiday or other decorations or other promotional expenses relating to the Shopping Center; or (o) any fees, costs or expenses not related to the operation, maintenance, insurance or repair of the Common Areas. Further, Landlord shall exclude from CAM Costs all costs or expenses in connection with any replacements to the Common Areas from the Commencement Date through the first (1st) anniversary of the Commencement Date, and Landlord shall also make an appropriate adjustment for the increase in CAM Costs attributable to tenants or occupants of the Shopping Center operating between the hours of 10 p.m. and 9 a.m.

SECTION 5.04  Tenant's Share of CAM Costs.  Tenant shall pay to Landlord Tenant's Share of CAM Costs in each calendar year during the Term. Tenant's Share of CAM Costs shall be appropriately prorated for partial calendar years at the beginning and at the end of the Term. Notwithstanding anything contained in this Lease to the contrary, in no event shall Tenant's Share of CAM Costs in the first (1st) full calendar year of the Term (including the prior partial year, if any) exceed the Initial CAM Costs, and in no event shall the component(s) thereof for Landlord's insurance obligations exceed the Initial Insurance Cost. With respect to the Pump Station, Tenant's Share of Cam Costs shall be a fraction, the numerator of which shall be the Floor Area of the Premises and the denominator of which shall be the Floor Area of all buildings in the Developer's Tract serviced by the Pump Station. Cam Costs shall also be adjusted to deduct any third party contributions for the detention pond.

SECTION 5.05  Payment of CAM Costs.  Tenant's Share of CAM Costs shall be payable in equal monthly installments on the first (1st) day of each month. Such monthly installments shall be at the rate of one-twelfth (1/12th) of Tenant's Share of CAM Costs for the preceding calendar year, subject to immediate adjustment when the actual amount of CAM Costs or a change in Tenant's Share thereof is determined. Within ninety (90) days after the end of each calendar year, Landlord shall furnish Tenant with a detailed statement certified by an authorized representative of Landlord of the actual amount of CAM Costs and of Tenant's Share thereof for the preceding calendar year (including the basis of allocation to Tenant). Within thirty (30) days after receipt of such statement by Tenant, Tenant shall pay to Landlord any deficiency due. Any surplus paid by Tenant shall, at Tenant's option, be credited against the next installment(s) of Rent or be refunded to Tenant forthwith. Landlord's records of CAM Costs for each year shall be available for inspection by Tenant for a period of three (3) years after Landlord notifies

12

Tenant of Tenant's Share of CAM Costs for the year in question. Tenant may, during such three (3) year period, upon twenty (20) days' prior notice to Landlord, have an audit made of CAM Costs and the allocations thereof to Tenant including, without limitation, reviewing copies of paid bills and other records substantiating its expenditures ("CAM Records"). In addition, Landlord agrees to forward copies of CAM Records to Tenant or its representative within ten (10) days of a request therefor. Any overcharges shown by any such audit shall, at Tenant's option, be credited against the next installment(s) of Rent or be refunded to Tenant forthwith. If any such audit shows that Tenant's Share of CAM Costs have been overstated by more than three percent (3%), then Landlord shall immediately pay to Tenant the reasonable cost of such audit.

SECTION 5.06  CAM Costs Increases.  Notwithstanding anything contained in this Lease to the contrary, for all calendar years subsequent to the first (1st) full calendar year of the Term, in no event shall Tenant's Share of CAM Costs increase, from any calendar year to the immediately succeeding calendar year, by more than five percent (5%), excluding from such calculation, the costs of snow removal, utility costs and insurance for the calendar years in question.  On or after the commencement of the First Extension Period, the replacement cost of the parking lot amortized on a straight line basis over a ten (10) year period shall be excluded from the aforementioned 5% annual increase cap on CAM Charges after and to the extent that the work is actually performed by Landlord.

## ARTICLE VI

## TAXES

SECTION 6.01  Taxes.  Landlord shall pay when due all real estate taxes and assessments levied and assessed against the land, improvements and buildings comprising the Developer Tract. Except as hereinafter provided to the contrary, for each calendar year or part thereof during the Term, Tenant shall pay Tenant's Share of the net amount (after reflecting all discounts for abatements, early payment, refunds and credits and after excluding all penalties, interest, late charges and real estate taxes and assessments levied against free-standing buildings which are separately assessed) of all real estate taxes and assessments (collectively, "Taxes") levied and assessed against the tax parcel which includes the Premises and the improvements and buildings thereon. Tenant's Share of Taxes shall be equitably adjusted if the use or value of any portion (other than the Premises) of any buildings in the Developer Tract included in computing Tenant's allocation cause Taxes attributable to such buildings to be assessed at a disproportionately higher rate. Notwithstanding anything contained in this Lease to the contrary, in no event shall Tenant's Share of Taxes for the first (1st) full calendar year of the Term (including the prior partial year, if any) exceed the Initial Taxes.

SECTION 6.02  Payment of Taxes.  Tenant shall be liable for and shall pay Tenant's Share of Taxes only with respect to Taxes accruing during the Term, regardless of when such Taxes are billed or become due and payable. Tenant's Share of Taxes shall be appropriately prorated for partial fiscal tax years at the beginning and at the end of the Term. Tenant shall pay Tenant's Share of Taxes (a) within thirty (30) days after Landlord submits to Tenant proof of payment of Taxes by Landlord, a tax bill for such Taxes and a statement setting forth the manner in which Tenant's Share of Taxes is calculated, or (b) ten (10) days before the same are due and

13

payable, whichever is later. Upon the Commencement Date, Tenant shall pay to Landlord any Taxes payable by Tenant hereunder which have been prepaid by Landlord.

SECTION 6.03 Exclusions from Taxes. Notwithstanding anything contained in this Lease to the contrary with respect to betterments or other extraordinary or special assessments, Tenant's obligations shall apply only to the extent such assessments (and interest thereon) are payable in respect of the Term, and Tenant's Share of any such assessments shall be determined as if such assessments are payable in installments over the longest payment period permitted by law for the particular assessment, in which case Tenant shall pay only those installments payable in respect of the Term. Landlord represents to Tenant that, as of the Effective Date and, to the best of Landlord's knowledge, as of the Possession Date, no portion of the Developer Tract is or will be (a) subject to or the beneficiary of an abatement, exemption and/or phase-in of Taxes, except that taxes on the building improvements on the Developer's Tract, including the Premises, shall be assessed at a portion of the full taxable value as follows: 1st year – 0%, 2nd year – not more than 30%, 3rd year not more than 50%, 4th year – not more than 70%, 5th year – not more than 90%, and 6th year – 100% (taxes attributable to the land are not abated), (b) subject to any special assessments or similar charges, or (c) included in any special improvement district(s) which would result in higher sales taxes or other similar impositions than would exist in the absence of such district(s). Further, Taxes shall not include any: (i) income, excise, profits, estate, inheritance, succession, gift, transfer, franchise, capital, or other tax or assessment upon Landlord or upon the rentals payable under this Lease; (ii) taxes on rents (other than to the extent that such taxes are customarily paid by retail tenants in the State), gross receipts or revenues of Landlord from the Premises; (iii) fine, penalty, cost or interest for any tax or assessment, or part thereof, which Landlord or its lender failed to timely pay, unless such late payment was solely attributable to late payment by Tenant of Tenant's Share of Taxes; (iv) assessment for a public improvement arising from the initial construction or expansion of the Shopping Center or the Premises; (v) Taxes resulting directly from an increase in the assessment caused by a sale or ground lease of all or any portion of the Shopping Center to an Affiliate of Landlord, or more than once every five (5) years; or (vi) fees imposed upon Landlord in connection with Landlord's development of the Shopping Center (including, without limitation, trip generation fees). All Taxes payable by Tenant pursuant to this Article VI shall be determined as if the Shopping Center was the only property owned by Landlord.

SECTION 6.04 Right to Contest. At Tenant's request, Landlord shall contest the amount or validity of any assessed valuation or Taxes, failing which Tenant may contest the assessed valuation or Taxes by appropriate proceedings conducted in good faith. If Tenant initiates such contest, then Landlord shall cooperate with Tenant including, without limitation, executing any and all documents required in connection therewith and, if required by any governmental authority having jurisdiction, joining with Tenant in the prosecution thereof. If any rebate or refund of Taxes is received as a result of any contest or otherwise, then Tenant shall be entitled to Tenant's Share thereof (after reasonable and customary expenses incurred by Landlord and/or Tenant in connection with such contest are paid to the party which incurred such expense). Tenant shall have the right to defer payment of Tenant's Share of Taxes during any such Tax contest if permitted under Laws (as defined in Section 10.01).

14

# ARTICLE VII

## UTILITIES

SECTION 7.01  Utilities.  Landlord covenants and agrees that the Premises shall be properly serviced with gas, electric, telephone, water, sewer and other utilities sufficient to meet Tenant's requirements in accordance with the Site Design Requirements. Landlord, as part of Landlord's Work, shall cause all such utilities to the Premises to be separately metered at Landlord's sole cost and expense. Tenant shall pay, as same become due and payable, all charges for utility services furnished to the Premises during the Term. If at any time during the Term, for any reason, Landlord shall provide utility service to the Premises, Tenant's cost for such utility service shall not exceed the lesser of (a) Landlord's actual cost for such utility service, or (b) the cost of the same service if Tenant had obtained such service directly from such utility provider. In addition, Tenant shall have the right to install a test meter to verify its utility usage. Notwithstanding anything contained in this Lease to the contrary, Tenant shall be entitled to select the utility service providers to the Premises including the telecommunication provider. Landlord shall permit full and free access to all available conduits in the Shopping Center for the applicable utility service subject to such reasonable requirements as Landlord may impose.

SECTION 7.02  Interruption.  If utilities serving the Premises are disrupted due to the acts or omissions of Landlord, its agents, contractors, servants or employees, then Landlord shall promptly restore the affected utilities at Landlord's sole cost and expense. If such disrupted utilities are not restored within twenty-four (24) hours after the Landlord has knowledge of such disruption and Tenant is unable to conduct its normal business in the Premises as a result of such disruption, then Rent shall be equitably abated during the period of disruption.

# ARTICLE VIII

## USE OF PREMISES

SECTION 8.01  Permitted Use.  The Premises may be used and occupied for any Permitted Use.  However, Tenant shall not use the Premises for any of the Prohibited Uses (as set forth on Exhibit H) or the Existing Exclusives (as defined in Section 8.05(a)), to the extent then applicable.

SECTION 8.02  Conduct of Operations.

(a)    Subject to the other provisions of this Lease (including, without limitation, Article II), Tenant shall diligently and good faith pursue the Substantial Completion on or before the two hundred seventieth (270th) day after the Possession Date, provided that such 270 day period shall be extended on a day for day basis to the extent Tenant incurs any delay on account of Force Majuere events and any delays caused by the acts or omissions of Landlord or its agents, employees or contractors, including Landlord's failure to complete any element of Landlord's Additional Work on or before the date such work is to be completed pursuant to the Site Design Criteria (herein, "Landlord Delay"). Except as set forth in Section 8.02(b), Tenant shall have no obligation to open or operate any business in the Premises, and shall have the right,

15

at any time, to cease to conduct any business operations in the Premises, and Tenant shall incur no liability to Landlord by reason thereof.

(b)    Subject to the other provisions of this Lease (including, without limitation, Article II), Tenant shall initially open for business with the public in the Premises as a so-called standard "Circuit City" in a manner that is substantially similar with Tenant's other new Circuit City store(s) in New Jersey for at least one (1) day not later than one (1) year after the Possession Date, provided that such one (1) year period shall be extended on a day for day basis to the extent Tenant incurs any delay on account of Force Majuere events or any Landlord Delay. Other than as expressly set forth in the preceding sentence, Tenant shall have no obligation to open or operate any business in the Premises, and shall have the right, at any time, to cease to conduct any business operations in the Premises, and Tenant shall incur no liability to Landlord by reason thereof.

SECTION 8.03  Leasing Restrictions.  Landlord shall construct, lease, operate, maintain and manage the Shopping Center as a first-class shopping center comparable to other first-class shopping centers in the State. In that regard, Landlord shall not lease, rent or occupy, or permit to be leased, rented or occupied, any portion of the Shopping Center or any Affiliated Land (as defined in Section 8.04(a)) which is adjacent to the Shopping Center for any of the Prohibited Uses. In addition, Landlord shall not lease, rent or occupy, or permit to be leased, rented or occupied, any building within three hundred (300) feet of the front entrance of the Premises for use as a restaurant; the foregoing restriction does not prohibit a coffee shop, snack shop or other business which serves food and beverage for on-premises consumption provided that: (a) such occupant is a National or Regional Tenant, and such activities are the same as generally exist in such tenant's other stores in the New Jersey area; (b) such activities are incidental to the primary use of such tenant, and (c) such non-retail use does not have a separate entrance to the exterior of the building. In addition, Landlord shall not lease, rent or occupy, or permit to be leased, rented or occupied any portion of the Developer Tract for use as a service-oriented office (such as, by way of example, medical or employment offices, travel agencies, real estate agencies or dry cleaning establishments) except as expressly permitted by the terms and provisions of the OEA; notwithstanding the forgoing, in no event shall Landlord lease, rent or occupy, or permit to be leased, rented or occupied any portion of the Developer Tract within three hundred (300) feet of the front entrance of the Premises for any service-oriented office use. Upon any breach of the foregoing Section 8.03(a), Tenant may elect to pay Alternative Rent in lieu of Annual Minimum Rent for so long as such violation shall continue.

SECTION 8.04  Tenant's Exclusive.

(a)    Landlord shall not lease, rent or occupy, or permit to be leased, rented, occupied, any other premises in the Developer Tract, or on any land owned or controlled by Landlord or any of its Affiliates within a one (1) mile radius of the Shopping Center during the Term ("Affiliated Land") for the sale, rental, installation, servicing and/or repairing, either singly or in any combination, of the Products. The Incidental Sale (as defined below) of the Products in connection with the overall business of another tenant shall not be deemed a violation this Section 8.04(a). "Incidental Sale" shall mean sales in the lesser of (i) two hundred (200) square feet, or (ii) ten percent (10%) of such tenant's or occupant's, or Landlord's or any of its Affiliate's display area. The exclusive use rights granted to Tenant in this Section 8.04(a) (the

16

"Exclusive Use Protection") shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of all or part of the Premises.

(b)    The Exclusive Use Protection shall also not apply to a full-line supermarket (for example, Safeway, Winn-Dixie, or Stop & Shop), department store or discount department store (for example, Wal-Mart, K-Mart, J.C. Penney, Macy's, Kohl's or Target), discount club (for example, Costco, BJ's Wholesale Club, or Sam's Club), or Lowe's; provided, however, that, as to each of the foregoing, such stores (i) are National Tenants or Regional Tenants (as such terms are defined in Section 8.06), (ii) are operated in substantially the same manner as same are operated as of the Effective Date, and (iii) contain at least 80,000 square feet of Floor Area.

(c)    Upon any violation of the Exclusive Use Protection, Tenant may elect to pay Alternative Rent in lieu of Annual Minimum Rent for so long as such violation shall continue. If such breach shall continue for more than sixty (60) days, then Tenant shall have the right to terminate this Lease at any time thereafter, in which event the applicable provisions of Section 8.04(e) shall control.

(d)    However, if any tenant or other occupant of the Shopping Center violates the Exclusive Use Protection and such violation also constitutes a default under its lease with Landlord, then Tenant's right to pay Alternative Rent pursuant to Section 8.04 (d) shall be tolled provided that Landlord shall have promptly commenced appropriate legal proceedings against such tenant or occupant, and shall thereafter diligently prosecute such proceedings to completion so as to enjoin and prohibit any such violation. If Landlord shall have failed to promptly commence such proceedings, or shall fail thereafter to diligently prosecute the same, or if the violation does not cease within one hundred eighty (180) days after Landlord shall have been made aware of such violation, then Tenant's right to pay Alternative Rent shall apply for as long as such violation exists. In addition, Tenant shall have the right (i) to conduct and prosecute such legal proceedings (including an action for injunctive relief) in its own name, at Landlord's expense, or (ii) in the event the right set forth in clause (i) above is not permitted to be exercised under Laws, to conduct and prosecute such legal proceedings in the name of Landlord, at Landlord's expense, and Landlord shall cooperate with Tenant with respect to such prosecution (including executing any documentation or authorization reasonably required by Tenant in connection with such prosecution and by appearing at any hearing or trial with respect to such prosecution). If Tenant shall have paid Alternative Rent pursuant to this Section 8.04(e) for twenty-four (24) consecutive months, then Tenant shall have the rights to terminate this Lease subject to and in accordance with the provisions of Section 8.04(f).

(e)    If Tenant shall have paid Alternative Rent pursuant to Sections 8.04(d) or (e) for twenty-four (24) full consecutive months, then Tenant must elect either to (i) terminate this Lease, or (ii) resume paying Annual Minimum Rent from and after the expiration of the thirty (30) day period following the end of such twenty-four (24) month period. Tenant shall make such election by notice to Landlord within thirty (30) days after the expiration of such twenty-four (24) month period. If Tenant fails to make such an election, then Tenant shall be deemed to have elected to proceed under clause (ii) above. If Tenant elects to terminate this Lease pursuant to Sections 8.04(d) or (e), then this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of Landlord or Tenant, except:

17

(x) for those obligations which expressly survive the expiration or other termination of this Lease, (y) Landlord shall (which obligation shall survive the termination of this Lease), within three (3) business days after receiving a statement from Tenant showing the Unamortized Costs, reimburse Tenant for the then unamortized costs (amortized on a straight-line basis over the Term) of any alterations or improvements made by Tenant to the Premises (the "Unamortized Costs"), and (z) Tenant reserves all claims against Landlord for damages resulting from the violation of the Exclusive Use Protection if caused by or not cured by Landlord, including, without limitation, failure to include in a new lease for the Developer's Tract (as defined in the OEA) or Affiliated Land, and failure to diligently enforce the Exclusive Use Protection.

SECTION 8.05  Exclusives Applicable To Tenant.

(a)    Tenant shall not use (or permit to used) the Premises in violation of those certain exclusives granted by Landlord to certain other tenants in the Shopping Center pursuant to the terms and provisions of leases which have been executed prior to the Effective Date and the OEA (the "Exclusives"), or which Landlord anticipates granting to other tenants in the Shopping Center within sixty (60) days of the Effective Day but only to the extent that Tenant has been notified of such contemplated exclusives on the Effective Date by the inclusion of such exclusives in Exhibit H attached hereto (the "Future Exclusives," together the Exclusives, the "Existing Exclusives"). Landlord represents and warrants that a true and complete listing and description of such Existing Exclusives is attached as Exhibit H. Notwithstanding the foregoing, Tenant shall be entitled to enter into a separate agreement with any tenant or other occupant for whose benefit the Existing Exclusive is granted which nullifies or modifies the corresponding Existing Exclusive with regard to the Premises.

(b)    Landlord represents and warrants that other than the Existing Exclusives there are (and will be) no exclusives or use restrictions in effect which would apply to Tenant or any other occupant of the Premises, and Landlord covenants to indemnify, defend and hold Tenant harmless from and against all loss, cost, liability or expense (including, without limitation, reasonable legal fees) incurred by Tenant by reason of the enforcement by any person or entity of such exclusive or other use restriction.

SECTION 8.06  Key Tenants. Landlord represents, warrants and covenants that it has entered into or will enter into leases and/or operating agreements with the Key Tenants, other than Target which owns the Target Tract, for initial terms of at least ten (10) years, and expiring at approximately the same time as the expiration of the Initial Lease Term. If, from and after the satisfaction of the Opening Requirement, fewer than all of the Key Tenants, including Target, are open for regular business, then Tenant shall have the option to pay Alternative Rent in lieu of Annual Minimum Rent until such time as all of the Key Tenants are open for regular business and the Minimum Ongoing Cotenancy Percentage is met. If such Key Tenant(s) ceases operations for a period of twelve (12) consecutive months or more, then Tenant shall have the right to terminate this Lease upon sixty (60) days notice to Landlord, such notice to be given at any time prior to the date the condition giving rise to such termination right has been satisfied. If Tenant shall elect to terminate this Lease, then this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of Landlord or Tenant, except: (a) for those obligations which expressly survive the expiration or other termination of this Lease, and (b) Landlord shall (which obligation shall survive the termination of this Lease),

18

within three (3) business days after receiving a statement from Tenant showing the Unamortized Costs, reimburse Tenant for the Unamortized Costs. If Tenant does not terminate this Lease within sixty (60) days after the expiration of such twelve (12) month period, then commencing on the day following the end of such sixty (60) day period, Tenant shall resume paying full Annual Minimum Rent; however, Tenant shall again be entitled to exercise its rights under this Section 8.06 to pay Alternative Rent in lieu of Annual Minimum Rent each time another Key Tenant ceases operations. It is hereby understood and acknowledged by Landlord that a Key Tenant may only be replaced, for the purposes of this Section 8.06 only, by a National Tenant(s) or Regional Tenant(s) of comparable size and quality of merchandise. "National Tenant(s)" shall mean a tenant(s) operating, as of the applicable date, at least seventy-five (75) retail stores in the continental United States under a single trade name in first-class shopping centers, and "Regional Tenant(s)" shall mean a tenant(s) operating, as of the applicable date, at least thirty-five (35) retail stores in first-class shopping centers in any of the following states under a single trade name: New Jersey, Pennsylvania, and Delaware. Subject to the provisions hereof, (x) Petsmart may be replaced as a Key Tenant by a National or Regional Tenant that occupies and operates a retail business in the entire premises now demised to Petsmart, and (y) Target may be replaced as a Key Tenant by up to two (2) National or Regional Tenant(s) provided that (i) one National or Regional Tenant occupies and operates a retail business in at least eighty thousand (80,000) square feet of Floor Area, excluding any outdoor sales areas, and (ii) the replacement Key Tenants in the aggregate occupy and operate a retail business in substantially all of the Floor Area of the building (or any replacement thereof) on the Target Tract.

## ARTICLE IX

## REPAIRS

SECTION 9.01 Landlord Obligations. Unless caused by Tenant, its agents, employees, servants, contractors and licensees, Landlord shall, at Landlord's sole expense (and not included in CAM Costs), keep and maintain in good order, condition and repair (including replacements, if necessary) and in a safe condition (a) the roof of the Premises (to be maintained in a watertight condition at all times), all utility systems and lines (including, without limitation, electrical, plumbing, mechanical and/or alarm systems) serving the Premises (from the point of connection at the Premises to the public utility mains), the exterior of the Premises (including, without limitation, the walls and Other Improvements, but excluding window glass, doors and frames) and the structural portions of the Premises including, without limitation, footings and foundation, floor slab, and structural walls, columns and beams, and (b) any damage to the Premises or the Shopping Center which is caused by (i) defects in Landlord's Work, or (ii) the act or omission of Landlord, its employees, agents or contractors. Landlord's obligations under this Section 9.01 shall be subject to the provisions of Articles XII and XIII. Landlord shall perform any and all repairs and replacements to be performed under this Lease without material interference with or disruption to the normal conduct of any business operations in the Premises. Landlord shall give Tenant at least five (5) days prior notice of any repairs or replacements to the Premises (except in the case of an emergency posing imminent risk of material harm to persons or property, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances). If, in Tenant's reasonable judgment, Landlord's repairs would materially interfere with or disrupt the normal conduct of any business operations in the Premises, then Landlord shall perform such repairs only after the regular hours of operation of the Premises.

19

SECTION 9.02  Tenant's Obligations.

(a)     Subject to Landlord's obligations under Section 9.01, Tenant shall at all
times during the Term, at Tenant's sole expense, keep and maintain in good order, condition and
repair and in a safe condition (i) the non-structural, interior elements of the Premises (including
painting, window glass, doors and frames, and the heating, ventilation and air conditioning
["HVAC"] units, and the electrical, plumbing, mechanical, and/or alarm systems located in and
serving exclusively the Premises), and any exterior signage affixed to the Building, and (ii) any
damage to the Premises or the Shopping Center which is caused by the act or omission of
Tenant, its employees, agents or contractors. Tenant's obligations under this Section 9.02 shall
also be subject to the provisions of Articles XII and XIII and to Landlord's obligation to clear the
Premises of all dirt and debris following completion of Landlord's Work pursuant to Section
5.02.

(b)     If any HVAC units must be repaired or replaced during the last three (3)
years of the Term, then in light of the fact that the same will require a substantial expenditure by
Tenant and will result in a benefit to Landlord following the expiration of the Term, upon the
expiration or earlier termination of this Lease (unless such termination results from Tenant's
default of its obligations under this Lease), Landlord shall reimburse Tenant for the unamortized
portion of the reasonable expenses incurred by Tenant in connection with the replacement of
such equipment during the last three (3) years of the Term, based on (i) the date of the
installation of such new equipment, and (ii) the useful life of said equipment and its current value
amortized on a straight-line basis. The provisions of this Section 9.02(b) shall survive the
expiration or earlier termination of this Lease.

SECTION 9.03  Hazardous Materials.

(a)     Landlord represents and warrants that, as of the Effective Date (and as of
the Possession Date), there are, to Landlord's knowledge, no Hazardous Materials present in the
Shopping Center, and Landlord agrees that the removal or neutralization of any Hazardous
Materials that become present at the Shopping Center during the Term shall be at the sole cost
and expense of Landlord (and not included in CAM Costs), other than Hazardous Materials
introduced by Tenant, its agents, servants, employees, contractors, licensees and invitees.
"Hazardous Materials" shall mean (i) any waste, material or substance (whether in the form of a
liquid, a solid, or a gas and whether or not air-borne) which is deemed to be a pollutant or a
contaminant, or to be hazardous, toxic, ignitable, reactive, infectious, explosive, corrosive,
dangerous, harmful or injurious to public health or to the environment, and which is now or
becomes regulated in the future by or under the authority of any applicable local, state or federal
laws, judgments, ordinances, orders, rules, regulations, codes or other governmental restrictions
or requirements, any amendments or successor(s) thereto, replacements thereof or publications
promulgated pursuant thereto (collectively, "Environmental Regulations", and individually,
"Environmental Regulation"); (ii) petroleum; (iii) asbestos and asbestos containing materials;
(iv) any polychlorinated biphenyl; and (v) any radioactive material.  In addition to the foregoing,
the term "Environmental Regulations" shall be deemed to include, without limitation, local, state
and federal laws, judgments, ordinances, orders, rules, regulations, codes and other governmental
restrictions and requirements, any amendments and successors thereto, replacements thereof and

20

publications promulgated pursuant thereto, which deal with or otherwise in any manner relate to, environmental matters of any kind.

(b)      Landlord and Tenant each agree that neither Landlord nor Tenant shall cause or permit any Hazardous Materials to exist on, or to escape, seep, leak, spill or be discharged, emitted or released from the Shopping Center during the Term in violation of any applicable Environmental Regulation.

(c)      Landlord hereby indemnifies Tenant and its successors and assigns, and agrees to hold Tenant and its successors and assigns harmless from and against any and all losses, liabilities, damages, injuries, penalties, fines, costs, expenses and claims of any and every kind whatsoever, including attorneys' fees and costs (collectively, "Environmental Liabilities") paid, incurred or suffered by, or asserted against, Tenant or its successors and assigns with respect to, or as a direct or indirect result of (i) the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission or release from the Shopping Center of any Hazardous Materials which were brought into the Shopping Center by Landlord, its agents, employees or their respective predecessors-in-interest, or (ii) a breach by Landlord, its agents, employees or their respective predecessors-in-interest of any Environmental Regulation to which Landlord is subject.

(d)      Tenant hereby indemnifies Landlord and its successors and assigns, and agrees to hold Landlord and its successors and assigns harmless from and against any and all Environmental Liabilities paid, incurred or suffered by, or asserted against, Landlord or its successors and assigns with respect to, or as a direct or indirect result of (i) the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission or release from the Premises of any Hazardous Materials which was brought into the Premises by Tenant, its agents, employees, servants, contractors, licensees and invitees, or (ii) a breach by Tenant, its agents or employees of any Environmental Regulation to which Tenant is subject.

(e)      With respect to Hazardous Materials which are or become present at the Shopping Center as the result of any cause whatsoever (other than Hazardous Materials which were brought into the Premises by Tenant, its agents, employees, servants, contractors, licensees and invitees), Landlord shall, at Landlord's sole cost (and not included in CAM Costs), in a good, workmanlike and expeditious manner, and in compliance with Environmental Regulations, perform all work necessary to clean-up, remove and otherwise remediate such Hazardous Materials in compliance with Environmental Regulations.  Should the presence of such Hazardous Materials render the Premises Unusable (as defined below) or should Tenant be required to close during the removal or neutralization of such Hazardous Materials by Landlord, Tenant shall notify Landlord and all Rent shall be immediately abated until such time as Tenant can safely resume normal business operations.  If such work is not commenced within thirty (30) days after the date (the "Notification Date") that Tenant notifies Landlord of Hazardous Materials rendering the Premises Unusable (or such additional period as may be reasonably required to engage environmental consultants and/or engineers and obtain permits and licenses) or if such work is not completed within ninety (90) days after the Notification Date (or such additional period as may reasonably be required given the nature of the work, provided that Landlord diligently pursues same to completion), then Tenant shall have the right, at any time thereafter, to terminate this Lease.  However, Tenant's option to terminate this Lease pursuant to

21

this Section 9.03(e) shall cease (if not exercised prior thereto) at any time the Premises are no longer Unusable. If Tenant shall elect to terminate this Lease, then the Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of Landlord or Tenant, except: (i) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, (ii) if Tenant terminates the Lease hereunder on account of breach of representation by Landlord, or the act or omission of Landlord, the Landlord shall (which obligation shall survive the termination of this Lease), within three (3) business days after receiving a statement from Tenant showing the Unamortized Costs, reimburse Tenant for the Unamortized Cost, and (iii) Tenant reserves all claims against Landlord for damages resulting from a default by Landlord under this Section 9.03. For the purpose of this Section 9.03(e), "Unusable" means that the Tenant does not have access to at least ninety percent (90%) of the Premises because of the enforcement of any Environmental Regulation or the remediation of any Hazardous Materials, or because use of the Premises would represent a risk to the health or safety of Tenant, Tenant's employees, agents or invitees.

SECTION 9.04 Surrender of the Premises. At the expiration or earlier termination of this Lease, Tenant shall surrender the Premises to Landlord in the same condition as it is required to be maintained by Tenant pursuant to Section 9.02 above; excepting, however, reasonable wear and tear, damage by fire or other casualty, and the effects of a Taking (as defined in Section 13.01).

## ARTICLE X

## REQUIREMENTS OF LAW

SECTION 10.01 Landlord's Obligations. As part of Landlord's Work and throughout the Term, Landlord shall be responsible, at Landlord's sole cost and expense (and not included in CAM Costs), for complying with all applicable laws, statutes, ordinances and regulations of federal, state, county and municipal authorities (collectively, "Laws") affecting the Shopping Center including, without limitation, the Premises, except as specifically provided in Section 10.02.

SECTION 10.02 Tenant's Obligations. Throughout the Term, Tenant shall be responsible, at Tenant's sole cost and expense, for complying with all Laws affecting the Premises if such compliance is required solely as a result of Tenant's specific manner of use of the Premises (as opposed to retailers in general) and relates to the interior elements of the Premises which do not pertain to the portions which the Landlord is obligated to repair hereunder.

SECTION 10.03 Right to Contest. The party responsible for compliance pursuant to Section 10.01 or 10.02 shall have the right to contest the validity of any Law at the expense of the party responsible for compliance, unless such contest would result in any criminal liability imposed upon the other party or subject such other party to any fine or penalty.

22

## ARTICLE XI

## INSURANCE

SECTION 11.01 Landlord's Insurance.

(a)     Landlord shall maintain in full force and effect from and after the Effective Date and throughout the Term:

(i)     Commercial general liability insurance with regard to the Common Areas protecting and insuring Landlord, naming Tenant as "additional insured-lessee" for claims arising out of the use or occupancy of the Common Areas and the obligations assumed by Landlord under this Lease, and having a combined single limit of liability of not less than Five Million Dollars ($5,000,000) for bodily injury, death and property damage liability; and

(ii)     Special Form (formerly known as "All-Risk") property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of the buildings (other than the Premises) and other insurable improvements in the Shopping Center, (exclusive of excavation, footings and foundations) including, without limitation, the Common Areas.

(b)     Landlord may carry any of its insurance under "blanket policies" covering the Shopping Center and other properties it or any Affiliate of Landlord owns, provided that: (i) the total amount of the insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article XI. All policies required to be maintained by Landlord pursuant to this Section 11.01 shall provide that any proceeds thereof shall be deposited with the Mortgagee, or if none, to Landlord, in either event to be held in trust by such party and disbursed only in accordance with the provisions of, and for the purposes set forth in, Article XII.

(c)     Landlord shall be permitted to maintain a deductible as a part of any insurance policy carried by it in compliance with this Section 11.01. However, in no event shall any deductible with regard to the insurance described in Sections 11.01(a)(i) or 11.01(a)(ii) exceed Twenty-Five Thousand Dollars ($25,000), without Tenant's consent.

SECTION 11.02 Tenant's Insurance.

(a)     Tenant shall maintain in full force and effect throughout the Term:

(i)     Commercial general liability insurance protecting and insuring Tenant, naming Landlord as "additional insured-lessor" for claims arising out of the use or occupancy of the Premises by Tenant and having a combined single limit of liability of not less than Three Million Dollars ($3,000,000) for bodily injury, death and property damage liability; and

23

(ii)    Special Form (formerly known as "All-Risk") property insurance, including flood, terrorism, and earthquake coverage, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of the Premises, exclusive of excavation, footings and foundations, naming Landlord as "additional insured-lessor".

Upon Landlord's request, Tenant shall also name the Mortgagee as an additional insured or first mortgagee, as its interest may appear, on the insurance policies described in Section 11.02(a).

(b)    Tenant may carry any of its insurance under "umbrella policies" and/or "blanket policies" covering the Premises and other locations it or any Affiliate of Tenant owns or leases, provided that: (i) the total amount of the insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article XI.

(c)    From and after the date that Landlord shall have caused the Delivery of the Land to occur and until Substantial Completion, Tenant shall maintain or require its general contractor to maintain, in full force and effect:

(i)    a policy of builder's risk insurance covering loss or damage to the Tenant's improvements for the full amount of the work the contractor is performing; and

(ii)    Commercial general liability insurance protecting and insuring Tenant, naming Landlord as "additional insured-lessor" for claims arising out of the work the contractor is performing on the Premises and having a combined single limit of liability of not less than Five Million Dollars ($5,000,000) for bodily injury, death and property damage liability.

(d)    All insurance required to be maintained under this Section 11.02 may be provided under a plan of self-insurance provided that Tenant maintains, during the period of such self-insurance, a tangible net worth of at least One Hundred Million Dollars ($100,000,000). To the extent any deductible is maintained as a part of any insurance policy carried by Tenant in compliance with this Section 11.02, Tenant shall be deemed to be covering the amount of that deductible under an informal plan of self-insurance.

SECTION 11.03  Insurance Requirements Generally.

(a)    All insurance required to be maintained by Landlord and Tenant under this Lease shall be maintained with insurance companies qualified to do business in the State, and rated at least A-/VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published). Each party shall use its diligent efforts to have its insurers provide thirty (30) days (ten (10) days in the event of non-payment of premium) prior notice to the other party of cancellation or non-renewal of any policy required hereunder. Each party shall provide to the other duly executed certificates other documentation thereof evidencing the insurance coverage described in Sections 11.01 and 11.02 above and obtained from an independent, third party insurer, respectively.

24

(b)    The liability insurance requirements under Sections 11.01(a)(i) and 11.02(a)(i) shall be reviewed by Landlord and Tenant every five (5) years for the purpose of mutually increasing (in consultation with their respective insurance advisors) the minimum limits of such insurance to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards. The replacement value of the buildings and other insurable improvements constituting the Shopping Center shall be re-evaluated from time to time at the request of either Landlord or Tenant.

SECTION 11.04    Landlord's Insurance Cost.

(a)    The reasonable insurance premiums attributable to the policies required to be maintained by Landlord pursuant to Section 11.01(a)(i) shall be included as part of CAM Costs. If Landlord carries blanket insurance covering the Shopping Center together with other property owned by Landlord, then Landlord shall obtain evidence reasonably satisfactory to Tenant of the cost of such insurance allocable to the Shopping Center and the amount so allocable shall be included in CAM Costs for the purposes of determining Tenant's Share of any insurance premium included in CAM Costs.

(b)    If the rates for any insurance Landlord is required to carry are increased as a result of the use or other activity of any other occupant of the Shopping Center, then the amount of such increase shall be excluded from CAM Costs. To the extent that Landlord receives a dividend, credit, rebate or other return of a premium which had previously been included in CAM Costs, Landlord shall promptly refund to Tenant Tenant's Share of such dividend, credit, rebate, or return.

(c)    The provisions of this Section 11.04 shall survive the expiration or earlier termination of this Lease.

SECTION 11.05    Indemnity.

(a)    Except as otherwise provided in Section 11.06, Tenant covenants to defend and indemnify Landlord and hold Landlord harmless from and against any and all claims, actions, damages, liabilities and expenses, including reasonable attorneys' fees, (i) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises, or any part thereof, or (ii) occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, licensees, or subtenants except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Landlord, its agents, contractors, licensees, employees, or other tenants and occupants, or for which any of said parties may be statutorily liable.

(b)    Except as otherwise provided in Section 11.06, Landlord covenants to defend and indemnify Tenant and hold Tenant harmless from and against any and all claims, actions, damages, liabilities and expenses, including reasonable attorneys' fees, (i) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon any portion(s) of the Shopping Center (excluding the Premises), or (ii) occasioned wholly or in part by any act or omission of Landlord, its agents, contractors, employees, servants, tenants (other than Tenant), occupants or licensees, except to the extent such claims, actions,

25

damages, liability and expense are caused by the acts or omissions of Tenant, its agents, contractors, licensees or employees, or for which any of said parties may be statutorily liable.

SECTION 11.06  Mutual Waiver of Subrogation.

(a)     Landlord and Tenant, on their own behalf and on behalf of anyone claiming under or through either one by way of subrogation, hereby release and waive all rights of recovery and causes of action against each other and their respective Affiliates arising from any and all liability for any loss or damage to property or resulting from damage to such property (and, in either case, any resulting loss of business or rental income), whether caused by the negligence or fault of the other party, which is normally insured under Special Form property insurance (formerly known as "All-Risk") and time element insurance required to be maintained hereunder or under any other property or time element insurance maintained by either party.  If either Landlord or Tenant is a self-insurer or maintains a deductible (as either may be permitted under this Lease), then the self-insuring party or the party maintaining the deductible hereby releases the other party from any liability arising from any event which would have been covered had the required insurance been obtained and/or the deductible not been maintained.

(b)     Landlord and Tenant shall cause each property insurance policy carried by either of them insuring the Premises, the contents thereof, or the Shopping Center, to provide that the insurer waives all rights of recovery by way of subrogation or otherwise against the other party hereto (and all of such other party's Affiliates) in connection with any loss or damage which is covered by such policy or that such policy shall otherwise permit, and shall not be voided by the releases provided above.

SECTION 11.07  Affiliate.  "Affiliate" shall mean a corporation, partnership, person or other entity which is controlling, controlled by, or under common control with, Landlord or Tenant, as the case may be.  As used in the definition of Affiliate, "control" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise.

## ARTICLE XII

## DAMAGE OR DESTRUCTION

SECTION 12.01  Landlord's Obligation to Rebuild.  Subject to the provisions hereinbelow, if all or any part of the Developer Tract (including, without limitation, the Premises) is damaged or destroyed by fire, the elements or other casualty, then Landlord shall promptly repair all damage and restore the Developer Tract, other than the Premises, to its condition immediately prior to such damage or destruction.  Without limiting Landlord's obligations under this Article XII, the proceeds of the policies required to be obtained and maintained by Landlord pursuant to Section 11.01 shall, to the extent necessary, be used for the performance of such rebuilding and restoration work.  The provisions of this Section 12.01 shall not apply if Landlord or Tenant terminates this Lease pursuant to provision this Article XII.  Notwithstanding the foregoing, Landlord's obligation to restore the Developer Tract shall be limited to restoring the (i) the Common Areas in the manner required above, and (ii) the Floor

26

Area of the Developer Tract (exclusive of the Premises) directly adjacent to the Premises, of which at least 40,000 square feet shall be located within the "Primary Restoration Area" designated on the Site Plan, in the manner required above so that same shall be occupied or ready for occupancy following such restoration (all of the foregoing work is referred to as the "Primary Restoration"). With respect to buildings or improvements within the Developer Tract which are damaged by fire or other casualty but which are not required to be restored by Landlord as part of the Primary Restoration, Landlord shall promptly either (x) restore all or portions of the same to substantially the condition in which they existed immediately prior to such fire or other casualty, (y) raze the remaining portions of such buildings or improvements not rebuilt, remove all debris resulting therefrom, and pave such areas for parking or landscape such areas in a sightly manner, or (z) with respect to the Target Tract or the Lowe's Tract, demand compliance with Section 4.3.2 of the OEA.

SECTION 12.02  Tenant's Obligation to Rebuild.  If all or any part of the Premises is damaged or destroyed by fire, the elements or other casualty, then Tenant shall promptly repair all damage and restore the Premises to its condition immediately prior to such damage or destruction (subject to any changes to the Premises that Tenant shall desire to make to the extent same shall otherwise be permitted under Section 14.01, and, with Landlord's consent under the OEA) to be completed within two hundred and (240) days of the date of the damage or destruction, subject to Force Majeure. Without limiting Tenant's obligations under this Article XII, the proceeds of the policies required to be obtained and maintained by Tenant pursuant to Section 11.02 shall, to the extent necessary, be used for the performance of such rebuilding and restoration work. Tenant shall be responsible for all costs to repair or restore the Premises including costs in excess of insurance. Except as otherwise set forth in the Lease, Tenant shall not be entitled to an abatement in Annual Minimum Rent or Ground Rent as the case may be, for any period following a casualty unless the Lease is terminated in accordance with the terms and provisions of the Lease. The provisions of this Section 12.02 shall not apply if Landlord or Tenant terminates this Lease pursuant to provision this Article XII.

SECTION 12.03  Termination.

(a)     Tenant shall have the right to terminate this Lease:

(i)     if all or any part of the Premises is damaged or destroyed by fire, the elements or other casualty during the last three (3) years of the Term, and the restoration period is reasonably estimated by Tenant to be in excess of two hundred ten (210) days,

(ii)     if all or any part of the Premises is damaged or destroyed by fire, the elements or other casualty during the last two (2) years of the Term, or

(iii)     if all or any part of the Premises is damaged or destroyed by fire, the elements or other casualty at any time during the Term and such damage or destructions is not covered under the insurance policy(ies) required to be maintained by Tenant under Sections 11.02(a)(ii) or 11.02(b) (regardless of whether Tenant actually maintains such insurance).

27

Tenant shall notify Landlord of its exercise of such option within forty-five (45) days following the occurrence of such casualty.

(b)     If (i) Landlord fails to commence in good faith Landlord's repair and restoration obligations within ninety (90) days after any damage or destruction, or (ii) Landlord fails to timely complete such repair and restoration within two hundred forty (240) days after such damage or destruction, then Tenant shall have the option, upon at least thirty (30) days notice to Landlord, provided that Landlord does not commence repair and restoration activity within such 30 day period and thereafter diligently pursue completion thereof, to elect (y) to complete the repair and restoration to the Primary Restoration Area, and (1) to receive reimbursement therefor in full from Landlord on demand and/or (2) to offset the cost and expense thereof against the payment of Rent and, at Tenant's option, to extend the Term until such time as Tenant, through such offsets, has recouped the entire cost and expense to Tenant of such repair and restoration, or (z) to terminate this Lease effective as of the date of such damage or destruction. The time periods referenced in this Section 12.03(b) shall be subject to Force Majeure, but in no event shall the aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed a period of ninety (90) days.

(c)     If (i) Tenant fails to commence in good faith Tenant's repair and restoration obligations within ninety (90) days after any damage or destruction, or (ii) Tenant fails to timely complete such repair and restoration within two hundred forty (240) days after such damage or destruction, then Landlord shall have the option, upon notice to Tenant, to elect to complete the repair and restoration to the Premises and to receive reimbursement therefor in full from Tenant on demand. Tenant shall make available to Landlord insurance proceeds for any insurance required to be maintained by Tenant hereunder. The time periods referenced in this Section 12.03(c) shall be subject to Force Majeure, but in no event shall the aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed a period of ninety (90) days.

(d)     If this Lease is terminated, then this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of either Landlord or Tenant, except: (i) for those obligations which expressly survive the expiration or other termination of this Lease, and (ii) only in the case where Tenant terminates this Lease, Tenant shall thereupon make available to Landlord (1) all insurance proceeds paid by Tenant's insurance carrier, or (2) if self-insured, an amount equal to the reconstruction costs of the Premises or, if the Premises are not being reconstructed, an amount equal to the actual value of the Premises (not to exceed, however, an amount equal to the reconstruction costs of the Premises), to the extent such amounts would have been payable under the insurance outlined in Section 11.02(a)(ii).

## ARTICLE XIII

## CONDEMNATION

SECTION 13.01    Taking.

(a)     In the event of condemnation by eminent domain or similar law, including a sale in lieu thereof to an authority or other entity having the power of eminent domain (a

28

"Taking"), of all or any portion of the Shopping Center, which (i) results in a Taking of (x) any part of the Premises, (y) more than ten percent (10%) of the Common Areas located on the portion of the Developer's Tract to the east of the portion Independence Boulevard which is perpendicular to Cross Keys Berlin Road, (z) less than 136 full size parking spaces being included within Tenant's Preferred Area, or reduces the parking ratio to less than Four and One-Tenths (4.1) full sized parking spaces for every 1,000 square feet of Floor Area in the entire Shopping Center, (ii) materially and adversely affects ingress or egress to the Premises or the Shopping Center other than the Lowe's Tract and the Target Tract, or (iii) materially prohibits or inhibits Tenant's use of the Premises for a period in excess of ninety (90) days, then Tenant may terminate this Lease by giving notice to Landlord not more than ninety (90) days after the later of the date on which title vests in the condemning authority or the date Tenant receives notice of said vesting.

(b)    In the event of a Taking of all of the Premises, this Lease shall terminate as of the date of vesting of title or transfer of the Premises, whichever is earlier, without further liability on the part of either Landlord or Tenant, except for those obligations which expressly survive the expiration or other termination of this Lease.

(c)    In the event of a Taking of the Premises, the Common Areas and/or any other area within the Shopping Center, or any portion thereof, for temporary use (specifically one not exceeding sixty (60) days in duration), without the taking of the fee simple title thereto, this Lease shall remain in full force and effect. All awards, damages, compensation and proceeds payable by the condemnor by reason of such Taking relating to the Premises, or relating to the Common Areas but reasonably attributable to the Premises, for periods prior to the expiration of the Lease shall be payable to Tenant. All such awards, damages, compensation and proceeds for periods after the expiration of the Lease shall be payable to Landlord. Anything contained to the contrary notwithstanding, a temporary Taking for any period in excess of sixty (60) days may, at Tenant's option, be deemed a permanent Taking and shall be governed by Section 13.01 (a) or (b), as applicable.

SECTION 13.02  Restoration and Rent Adjustment.  In the event of a Taking, if this Lease is not terminated by Tenant pursuant to Section 13.01, then (a) Landlord shall promptly restore the Shopping Center as nearly as practicable to a complete unit of like quality and character as existed prior to the Taking, which restoration shall, as applicable, include all of Tenant's Work and all other leasehold improvements performed by Tenant, but shall not include Tenant's Property, and (b) if a portion of the Premises is Taken, then from and after the date on which title vests in the condemning authority, the Rent shall be equitably reduced in proportion to the area of the Premises subject to the Taking.

SECTION 13.03  Award.  In the event of any Taking, Tenant shall be entitled to an amount of the award or compensation paid for such Taking equal to the Unamortized Costs, if any, and the balance shall belong to Landlord. Tenant shall also have the right to claim and recover from the condemning authority such compensation as may be separately awarded or recoverable by Tenant on account of any and all damage to Tenant's business by reason of the condemnation and for or on account of any cost or loss to which Tenant might be put in moving Tenant's Property, or for any other damages compensable separately to Tenant; provided, however, that no such award shall reduce the award payable to Landlord for its fee interest in the

29

Premises. The provisions of this Section 13.03 shall be subject to the provisions of Section 13.01(c) with respect to a temporary Taking.

## ARTICLE XIV

## ALTERATIONS AND MECHANICS' LIENS

SECTION 14.01 <u>Tenant's Alteration Rights</u>.

(a)    Tenant shall not perform any structural or exterior alterations or improvements to the Premises (except to the extent same pertain to Tenant's Work) without the prior approval of Landlord; provided, however, that Tenant's alteration of the exterior of the Premises to conform to Tenant's (or any subtenant's) then-current prototypical elevation shall not require Landlord's consent. Any such alteration of the exterior of the Premises to conform to Tenant's (or any subtenant's) then-current prototypical elevation shall be subject to the terms and provisions of the OEA, however, Landlord, at no cost to Tenant, agrees to use commercially reasonable efforts in assisting and cooperating with Tenant with any consents or approval required pursuant to the OEA. Notwithstanding the foregoing, any structural changes that materially and adversely affect the value of the Premises or the Shopping Center shall be subject Landlord's prior consent. The provisions of this Section 14.01(a) shall not apply to Tenant's building signage, which shall be governed by the applicable provisions of Article XV.

(b)    Tenant may, from time to time, without the prior approval of Landlord, make non-structural interior alterations and improvements to the Premises as Tenant deems necessary or desirable including, but not limited to, the electrical systems, the HVAC and other mechanical systems, installation of fixtures and equipment, painting, and wall and floor coverings.

(c)    Tenant shall have the right to erect and maintain an antenna, a satellite dish and/or related equipment on the roof of the Premises, provided that Tenant: (i) uses a contractor approved by Landlord for all roof penetrations so as not to violate or invalidate any roof warranties maintained by Landlord, (ii) repairs any damage to the roof caused by the making of the roof penetrations or removal of any such equipment, and (iii) erects and maintains such equipment in accordance with Laws.

(d)    Landlord shall execute and return to Tenant all appropriately completed building department or equivalent applications within ten (10) days after Tenant's request therefor, and will reasonably cooperate with Tenant in the permitting process. If any violation of Laws which is noted against the Shopping Center or the Premises (other than a violation caused by Tenant) prevents Tenant from obtaining a building permit for any alterations or a certificate of occupancy, then, upon request by Tenant, Landlord shall promptly and diligently cause such violation to be removed of record to the extent required to permit Tenant to obtain its building permit or certificate of occupancy, as the case may be. However, if the violation was not caused by Landlord (or any of Landlord's agents, contractors, employees or invitees), then Landlord's obligations under this Section 14.01(d) shall be satisfied by Landlord using diligent, good faith and commercially reasonable efforts to have the responsible party remove such violation of record.

30

(e)      Landlord shall not make any alterations to the Premises (including, without limitation, changing the design, color or materials of the exterior of the Premises) nor shall Landlord construct an additional floor or floors above or below the Premises. Subject to the terms and provisions of the OEA, Landlord shall neither make nor permit to be made any alterations to the exterior architectural theme of the remainder of the Shopping Center which would be inconsistent with a first-class shopping center in the State (exclusive of other National Tenants' or Regional Tenants' entrance features), without the prior consent of Tenant.

SECTION 14.02  Mechanics' Liens.  Tenant covenants that Tenant shall promptly discharge of record (by payment, bond, order of a court of competent jurisdiction or otherwise) any mechanic's lien filed against the Premises or all or any part of the Shopping Center for any work, labor, services or materials claimed to have been performed at, or furnished to, the Premises or the Shopping Center, for or on behalf of Tenant, or at the insistence of Tenant, or anyone acting for, through or under Tenant.  Similarly, Landlord covenants that Landlord shall promptly discharge of record (by payment, bond, order of a court of competent jurisdiction or otherwise) any mechanic's lien filed any lien against the Premises or all or any part of the Shopping Center for any work, labor, services, materials claimed to have been performed at, or furnished to, the Premises or the Shopping Center, for or on behalf of Landlord, or at the insistence of Landlord, or anyone acting for, through or under Landlord.  If either party shall fail to cause any such lien to be discharged within sixty (60) days after the other party shall demand that the former party remove same, then, the demanding party may discharge the same by paying the amount claimed to be due, by bonding or by any other proceeding deemed appropriate by such demanding party, and the amount so paid by such demanding party and/or all costs and expenses including reasonable attorneys' fees incurred by such demanding party in procuring the discharge of such lien shall be reimbursed by the other party upon demand.  Nothing contained in this Lease shall be construed as a consent on the part of the Landlord to subject Landlord's estate in the Premises to any lien or liability under any law relating to liens.

## ARTICLE XV

## SIGNS

SECTION 15.01  Tenant's Signs.  Tenant shall have the exclusive right during the Term to erect, maintain, and replace on the storefront and exterior walls of the Premises, and on the side walls of any entrance design element, if any, signs (including, without limitation, under-canopy or blade signs), banners (including temporary banners placed on the storefront of the Premises and such other walls of the Premises as selected by Tenant), awnings, and flags of such size, design and color as Tenant, from time to time, may desire, subject to compliance with Laws and the OEA.  Tenant may erect and maintain in the interior of the Premises any signs it may desire.

SECTION 15.02  Pylon Signs.  Landlord shall provide pylons and monuments at the two (2) locations shown on the Site Plan.  Landlord, as part of Landlord's Work, shall obtain all governmental approvals and permits for such pylons and monuments (including Tenant's sign panels on all sides of such pylons and monuments).  Tenant's sign panels shall be procured and installed at Tenant's cost.  A rendering of such pylon(s)/monument(s) showing the dimensions of the pylon/monument and the size and position of all panels to be installed thereon, including

31

Tenant's panel, is attached to this Lease as Exhibit N. Landlord shall not change or alter the pylons or monuments bearing Tenant's sign panel(s) without obtaining Tenant's prior consent which shall not be unreasonably withheld, delayed or conditioned. The cost of maintaining all pylons and monuments bearing Tenant's sign panel(s) (but not the cost of individual tenants' signs thereon or the cost of the construction of the pylons and monuments) and the cost of any electricity used to illuminate them, shall be includable in CAM Costs.

SECTION 15.03 Replacement. Tenant and its subtenants shall be entitled, without Landlord's consent but subject to complying with Laws and the OEA, to replace all of its signs with signage consistent with Tenant's and/or its subtenant's then-current prototypical sign plans. Any signage which is not consistent with such prototypical sign plans shall be subject to Landlord's approval.

## ARTICLE XVI

## TENANT'S PROPERTY

SECTION 16.01 Tenant's Property. All of Tenant's movable trade fixtures, ornate light fixtures, equipment, furniture, inventory and other property owned by Tenant and located at, on or in the Premises including, without limitation, computer display and storage area showcases, partitions, mezzanine, shelving, wall cases and signs (collectively, "Tenant's Property") shall remain the property of Tenant, exempt from the claims of Landlord or any Mortgagee or Ground Lessor, without regard to the means by which or the persons by whom Tenant's Property is installed or attached. Tenant shall have the right at any time and from time to time to remove Tenant's Property, provided that if removal of any of Tenant's Property permanently damages any part of the Premises, Tenant shall repair such damage.

## ARTICLE XVII

## ASSIGNMENT AND SUBLETTING

SECTION 17.01 Assignment and Subletting Rights. Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet, concession or license all or any portion of the Premises, subject to all of the terms and conditions of this Lease. Unless otherwise agreed to in writing by Landlord, no assignment, subletting, licensing or concessioning by Tenant shall reduce the liability of Tenant under this Lease to the extent that such liability is not increased as a result of any amendment or modification to this Lease between Landlord and any assignee. However, in the event of an assignment by Tenant to an assignee having an Adequate Net Worth (as defined below), or to an assignee whose obligations under this Lease are guaranteed by a guarantor having an Adequate Net Worth, all liability of the assigning Tenant under this Lease accruing from and after the effective date of such assignment shall terminate. "Adequate Net Worth" shall mean a tangible net worth, as of the effective date of such assignment, of at least Two Hundred Million Dollars ($200,000,000).

SECTION 17.02 Collateral Assignment. In addition to Tenant's other rights set forth in this Article XVII, a collateral assignment of Tenant's interest in this Lease by Tenant to one (1)

32

or more Lenders (hereinafter defined), as collateral security for an indebtedness or other obligation of Tenant or its Affiliates shall be permitted and Landlord shall execute all documentation reasonably requested by Tenant or any such Lender in connection therewith. In addition, Tenant shall have the right, without Landlord's consent, to grant to an Affiliate of Tenant a license to operate all of Tenant's business operations at the Premises, without such Affiliate having assumed any liability for the performance of Tenant's obligations under this Lease. "Lender" shall mean a state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender.

SECTION 17.03   Cure Rights of Original Tenant.   If Tenant assigns Tenant's interest in this Lease and the assignor remains liable under this Lease following such assignment, then Landlord, when giving notice to said assignee or any future assignee in respect of any default, shall also give a copy of such notice to the Tenant originally named in this Lease or its Affiliate (collectively, the "Original Tenant"), and no notice of default shall be effective until a copy thereof is so given to Original Tenant. Original Tenant shall have the right (but not the obligation) to cure such default, which cure period shall be thirty (30) days longer than the cure period applicable to Tenant.

SECTION 17.04   Recognition Agreement.   If Tenant subleases all or any portion of the Premises for a term of at least five (5) years, then, notwithstanding any other provisions of this Lease, Landlord shall, upon Tenant's request, execute and deliver an agreement among Landlord, Tenant and each such subtenant in the form of Exhibit 1, in recordable form (the "Recognition Agreement"). However, Landlord shall not obligated to enter into the Recognition Agreement unless: (i) the net worth of the subtenant (or any guarantor of the subtenant's obligations under the sublease) shall be at least Twenty-Five Million Dollars ($25,000,000.00) or the subtenant (or its parent who has guaranteed the sublease) is a National Tenant or Regional Tenant; (ii) Tenant agrees not to subdivide the Premises into more than two (2) stores; (iii) the subtenant will be occupying 10,000 square feet of Floor Area or more within the Premises and the portion of the Premises not being sublet shall be in a configuration that would make same commercially leasable for retail purposes (as reasonably determined by Landlord, not to be unreasonably withheld, delayed or conditioned); (iv) Landlord shall not be bound by any base or minimum rent or other payment payable in monthly installments which the subtenant might have paid for more than the current month to any third party (unless same was paid to Landlord); (v) Landlord shall not be liable for the return of any security deposits (unless delivered to Landlord); (vi) the sublease shall be expressly subject to the terms and conditions of this Lease and shall obligate the subtenant, or will obligate the subtenant upon implementation of the Recognition Agreement, to pay at least the same Annual Minimum Rent, on a square foot basis, as is payable under this Lease; (vii) the sublease is, or upon implementation of the Recognition Agreement will be, on terms and conditions which are no more onerous to the sublessor thereunder than those pertaining to Landlord under this Lease and are no more beneficial to the subtenant than those pertaining to Tenant under this Lease, and (viii) the term of the sublease shall expire on or before the expiration of the Term of this Lease.

33

## ARTICLE XVIII

## DEFAULT

SECTION 18.01  Tenant's Default.

(a)    If Tenant defaults in the payment of any installment of Rent and such default is not cured within fifteen (15) days after receipt of notice from Landlord thereof or if Tenant defaults in the observance of any other material covenant or agreement herein contained and Tenant shall not, within thirty (30) days after receipt of notice thereof from Landlord, cure or commence to cure such default (it being intended in connection with a default not susceptible of being cured with due diligence within said thirty (30) day period that the time allowed Tenant within which to cure same shall be extended for such period as may be necessary to complete same with all due diligence), then Landlord may, by giving notice to Tenant at any time thereafter during the continuance of such default:

(i)    terminate this Lease, without any right by Tenant to reinstate its rights by payment of Rent or other performance of the terms and conditions hereof and upon such termination Tenant shall immediately surrender possession of the Premises to Landlord, and Landlord shall immediately become entitled to receive from Tenant, as liquidated, agreed final damages, an amount equal to the difference between the aggregate of all rentals reserved under this Lease for the balance of the Term, and the fair rental value of the Premises for that period (both discounted to present value at an annual interest rate equal to eight percent (8%)), determined as of the date of such termination; or

(ii)    with or without terminating this Lease, as Landlord may elect, re-enter and repossess the Premises, or any part thereof, and lease them to any third-party upon commercially reasonable terms and conditions, for a term within or beyond the Term; provided, however, that any such reletting prior to termination shall be for the account of Tenant, and Tenant shall remain liable for (y) Annual Minimum Rent, Tenant's Share of CAM Costs, Tenant's Share of Taxes, and other sums which would be payable hereunder by Tenant in the absence of such expiration, termination or repossession, less (z) the net proceeds, if any, of any reletting effected for the account of Tenant after deducting from such proceeds all of Landlord's reasonable expenses (which expenses shall be amortized over the term of the new tenant's lease and only the portion thereof allocable to the balance of the Term shall be so deducted by Landlord hereunder) in connection with such reletting (including, without limitation, all repossession costs, reasonable brokerage commissions, reasonable attorneys' fees and expenses, reasonable alteration costs and expenses of preparation for such reletting).

(b)    If the Premises is at the time of default sublet or leased by Tenant to others, Landlord may, as Tenant's agent, collect rents due from any subtenant or other tenant and apply such rents to Rent due hereunder. Any monthly deficiencies payable by Tenant shall be paid monthly on the date herein provided for the payment of Annual Minimum Rent. If, after the lapse of all applicable grace periods, Landlord reasonably expends any money to cure a default by Tenant, then Tenant shall, on demand, pay Landlord the amount so paid by Landlord together

34

with interest thereon at the rate of two percent (2%) per annum in excess of the rate charged to Tenant for short-term borrowings by any bank with which Tenant regularly transacts business (the "Default Rate").

(c)    Landlord shall also be entitled to all other rights and remedies available to Landlord at law, in equity or otherwise, except as otherwise expressly set forth in this Lease. Landlord expressly waives (i) any right to accelerate any element of Rent except as expressly set forth in Section 18.01(a)(i) above, (ii) any right to recover consequential or punitive damages as a result of a Tenant default or any other act or omission of Tenant, and (iii) all rights to any so-called "landlord's lien" or any similar statutory lien, granting Landlord a lien on any of Tenant's Property for the performance of any obligations of Tenant. At the request of Tenant, Landlord shall promptly confirm such waiver(s) by a writing in form satisfactory to Tenant. Anything contained in this Lease to the contrary notwithstanding, Landlord shall use all reasonable efforts to relet the Premises or any portion thereof to mitigate Landlord's damages to which Landlord would otherwise be entitled to as a result of a Tenant default.

SECTION 18.02  Additional Landlord Remedies Due to Construction Delays by Tenant.

(a)    If Tenant shall fail to achieve Substantial Completion by that date which is two hundred forty (240) days following Delivery of the Land, then Landlord, at its option, upon prior notice to Tenant, may require Tenant to commence payment of Ground Rent (as defined below) on the date which is two hundred forty (240) days following Delivery of the Land. "Ground Rent" shall mean $196,605.50 annually, shall be payable in lieu of Annual Minimum Rent but in addition to Additional Rent, and shall be payable in equal monthly installments of 1/12 each and in the same manner as Annual Minimum Rent.

(b)    If Tenant fails to achieve Substantial Completion or fails to provide the Landlord Reimbursement Deliverables by that date which is three hundred (300) days following Delivery of the Land, which 300 day period shall be subject to extension on a day for day basis to the extent Tenant incurs any delay on account of Force Majeure events or any Landlord Delay (the date such period, as extended, expires being hereinafter referred to as the "Enhancement Date"), then Landlord may, upon prior notice to Tenant, require Tenant to commence payment of Enhanced Ground Rent (as defined below) effective as of the Enhancement Date until Substantial Completion occurs or until the Landlord Reimbursable Deliverables are furnished, as applicable. For purposes hereof, "Enhanced Ground Rent" shall mean the annual sum of $287,346.50, which amount shall be payable in lieu of Annual Minimum Rent and Ground Rent but in addition to Additional Rent, and shall be payable in equal monthly installments in the same manner as Annual Minimum Rent. In the event that the Landlord does not pay Tenant the Landlord Reimbursement within ten (10) days of the later of (i) Substantial Completion or (ii) delivery of the Landlord Reimbursement Deliverables, Tenant's obligation to pay Enhanced Ground Rent shall cease, and Tenant shall resume payment of Ground Rent in accordance with the provisions of Section 18.02(a).

(c)    If Tenant shall fail to achieve Substantial Completion by that date which is one (1) year following Delivery of the Land, then Landlord shall be entitled to terminate this Lease upon sixty (60) days prior notice to Tenant unless Tenant, within such sixty (60) day period, achieves Substantial Completion. If Landlord terminates this Lease, then there shall be

35

no further liability on the part of Landlord or Tenant, except for those obligations that expressly survive the expiration or other termination of this Lease.

SECTION 18.03  Landlord's Default.

(a)     If Landlord shall (i) default in the observance of any material covenant or agreement herein contained, breach any material representation or warranty under this Lease, or shall fail to pay any charges or other amounts required to be paid by Landlord under this Lease (including, without limitation, any insurance premiums or any reimbursements due to Tenant) and Landlord does not cure such default within fifteen (15) days (as to a monetary default) or thirty (30) days (as to a non-monetary default), as applicable, after notice thereof by Tenant (it being intended in connection with a non-monetary default not susceptible of being cured with due diligence within said thirty (30) day period that the time allowed Landlord within which to cure same shall be extended for such period as may be necessary to complete same with all due diligence), or (ii) fail to pay when due any Taxes, ground rent or any other charge or assessment, the lien of which is prior to the lien of this Lease, then Tenant shall have the right (but shall not be obligated) to:

(w)     perform such obligation(s) of Landlord in accordance with the applicable provisions of this Lease on behalf of, and at the expense of Landlord;

(x)     bring suit for the collection of any amounts for which Landlord is in default, seek injunctive relief, or seek specific performance for any other covenant or agreement of Landlord;

(y)     if Landlord fails to reimburse Tenant within thirty (30) days of notice together with appropriate documentation and evidence of payment by Tenant, offset against the Rent all amounts owed by Landlord to Tenant and/or the amounts reasonably expended by Tenant performing Landlord's obligations under this Lease, including costs and reasonable attorneys' fees, together with interest thereon at the Default Rate from the date of the outlay until paid, and, at Tenant's option, extend the Term if necessary for Tenant to fully recoup all amounts owed by Landlord to Tenant; and/or

(z)     terminate this Lease, without waiving its rights to damages for Landlord's Default, provided that: (1) Landlord's default materially interferes with the normal conduct of any business operations in the Premises, (2) Landlord's default is not reasonably capable of being cured by Tenant, and  (3) subject to Section 18.02(b), Tenant gives notice of Landlord's default to any Mortgagee of whom Landlord shall have previously given Tenant notice (including its address), and such Mortgagee shall not have cured Landlord's default within the time period provided in Section 18.02(b).

Notwithstanding the foregoing, Tenant's right of offset under clause (y) above shall be limited to fifty percent (50%) of each installment of Rent next becoming due unless insufficient Term remains to fully recoup the amounts owed by Landlord to Tenant on the amounts expended by Tenant, together with interest as provided above, in which event the amount of Tenant's offset shall be increased so that Tenant is able to fully recoup all such amounts expended by Tenant, together with interest as aforesaid, prior to the expiration of the Term.

36

(b)     If a Mortgagee shall have notified Tenant in writing that it is the holder of such lien on the Shopping Center and shall so request, then Tenant shall give a similar notice to such Mortgagee and such Mortgagee shall have the same time period allowed to Landlord under this Lease to correct or remedy such default.

(c)     Tenant shall also be entitled to all other rights and remedies available to Tenant at law, in equity or otherwise, except as otherwise expressly set forth in this Lease. Tenant expressly waives any right to recover consequential or punitive damages as a result of a Landlord default or any other act or omission of Landlord.

(d)     Notwithstanding the foregoing, if, in Tenant's reasonable judgment, a condition posing imminent risk of liability or material harm to persons or property or material disruption to the normal conduct of any business operations in the Premises shall exist, then Tenant may exercise, at its election and without prior notice to Landlord, any or all of the remedies set forth in clauses (w), (x) and (y) above.

SECTION 18.04  Additional Tenant Self-help, Equitable and Legal Remedies Due to Construction Delays by Landlord.  If Landlord defaults at any time in the timely completion of any component of Landlord's Work (including, without limitation, Delivery of the Land) and Landlord does not cure such default within ten (10) days after notice thereof by Tenant, then Tenant shall have the right, but not the obligation, to:

(a)     perform, at Landlord's sole cost and expense, all or any part of Landlord's Work.  If and to the extent that Tenant exercises its right under this Section 18.04(a), Landlord agrees to cooperate in good faith and provide Tenant with reasonable assistance so that Tenant can complete such portions of Landlord's Work.  Landlord hereby grants Tenant the right, as its agent, to directly contact and contract with Landlord's contractors, on behalf of Landlord, to complete such work, all at Landlord's cost and expense.  Landlord covenants, upon Tenant's request, to provide Tenant with duplicate sets of all plans, specifications and contracts prepared in connection with the construction of the Shopping Center, as well as schedules of all contractors, subcontractors and suppliers.  Landlord agrees to reimburse Tenant for any and all costs incurred by Tenant in connection with any portion of Landlord's Work which Tenant completes within ten (10) days after receipt of request therefor from Tenant, which request shall be reasonably supported by invoices and/or written description of Landlord's Work performed. If Landlord does not timely reimburse Tenant as contemplated above, then Tenant shall be entitled to deduct the costs of such work from Rent, together with interest at the Default Rate from the date of expenditure by Tenant, until paid in full;

(b)     seek injunctive relief, specific performance or other equitable remedies against Landlord to require Landlord to perform its obligations under this Lease (including, without limitation, the Site Design Requirements), the costs of which litigation shall be borne by Landlord including, without limitation, attorneys' fees and court's costs; and/or

(c)     seek legal remedies available to Tenant, the costs of which shall be borne by Landlord, including, without limitation, attorneys' fees and court costs.

37

SECTION 18.05 Additional Tenant Remedies Due to Landlord's Failure to Pay the Landlord Reimbursement.

(a)     If Landlord fails to pay the Landlord Reimbursement in full on or before its due date in accordance with Section 2.03, then Landlord shall be in default under this Lease, and no Rent shall be due or owing to Landlord until the Landlord Reimbursement is paid to Tenant, together with interest which shall accrue on the unpaid Landlord Reimbursement at the Default Rate commencing on the thirty-first (31st) day following Substantial Completion until the date of payment of the Landlord Reimbursement. However, if Landlord has not tendered payment of the Landlord Reimbursement and interest by that date which is one (1) year from Substantial Completion (the "Substantial Completion Anniversary"), provided that the conditions precedent to the payment of the Landlord Reimbursement set forth in Section 2.03 have been satisfied within such period, then (i) such date shall become the Commencement Date; (ii) Annual Minimum Rent shall be reduced to ground rent equal to Fifty Thousand and No/100 Dollars ($50,000.00) per annum during the Term; and (iii) this Lease shall be converted to a ground lease, with ownership of the Building remaining with Tenant, and Landlord's and any Mortgagees' names being removed as additional insureds or mortgagees on any casualty insurance described in Section 11.02. Landlord and Tenant covenant and agree that upon the reasonable written request of either Tenant or Landlord, Landlord and Tenant shall execute such documentation as necessary to formalize the conversion of this Lease to a ground lease upon the Substantial Completion Anniversary.

(b)     At any time following the Substantial Completion Anniversary provided that the conditions precedent to the payment of the Landlord Reimbursement set forth in Section 2.03 have been satisfied, and upon thirty (30) days prior notice, Tenant shall have the right at Tenant's sole election, but not the obligation, in lieu of the requirement that Landlord pay to Tenant the Landlord Reimbursement, to mortgage, sell, convey, assign, lease or otherwise encumber (collectively, a "Financing Transfer") Tenant's interest in the Building and this Lease, subject to the terms and provisions of this Lease as amended by this Section 18.05. Landlord covenants to (i) execute all documents necessary to permit Tenant to effect the Financing Transfer described herein, and (ii) cause any Mortgagee to specifically acknowledge the rights of Tenant's lender and third parties arising as a result of such Financing Transfer. Notwithstanding such Financing Transfer, Tenant shall continue to pay the ground rentals described in Section 18.05(a) during the remainder of the Term.

SECTION 18.06  Waiver; Non-Exclusive Remedies.  The parties hereby waive trial by jury in any action, proceeding or counterclaim brought by either of them against the other on any matters arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Premises, and/or any claim of injury or damage. Tenant hereby expressly waives any and all rights of redemption granted by or under any present of future law if this Lease is terminated or Tenant is evicted or dispossessed by reason of violation by Tenant of any of the provisions of this Lease. Except as otherwise expressly set forth in this Lease, no right or remedy herein conferred upon or reserved to Landlord or Tenant is intended to be exclusive of any other right or remedy in this Lease or by law or in equity provided, but each shall be cumulative and in addition to every other right or remedy given in this Lease or now or hereafter existing at law or in equity or otherwise.

38

## ARTICLE XIX

## SUBORDINATION, TRANSFER OF INTEREST

SECTION 19.01  Subordination.  Landlord reserves the right to subject and subordinate this Lease at all times to the lien of any first mortgage or deed of trust for the benefit of any Mortgagee hereafter encumbering or affecting all or any portion of the Shopping Center, as well as to any future ground or underlying leases encumbering or affecting all or any part of the Shopping Center; provided, however, that (a) each Mortgagee shall first execute and deliver to Tenant a subordination, non-disturbance and attornment agreement in substantially the form attached as Exhibit J hereto, in recordable form, and (b) any Ground Lessor shall execute (and shall obtain the written consent of any Mortgagee) and deliver to Tenant a fee owner recognition agreement in a form reasonably satisfactory to Tenant, which shall include the following provisions: (i) the Ground Lessor will not, in the exercise of any of the rights arising or which may arise out of such lease, disturb or deprive Tenant in or of its possession or its rights to possession of the Premises or of any right or privilege granted to or inuring to the benefit of Tenant under this Lease, provided that Tenant is not in default beyond any applicable notice and cure period; (ii) in the event of the termination of the Ground Lease (as defined below), Tenant shall not be made a party in any removal or eviction action or proceeding, nor shall Tenant be evicted or removed of its possession or its right of possession of the Premises, provided that Tenant is not in default beyond any applicable notice and cure period, and this Lease shall continue in full force and effect as a direct lease between the Ground Lessor and Tenant for the remainder of the Term and on the same terms and conditions as contained herein, without the necessity of executing a new lease; and (iii) Landlord and Tenant shall have the right to execute any amendment to this Lease which is specifically required hereunder and the Ground Lessor shall recognize and be bound thereto.  "Ground Lessor" shall mean the landlord under any existing or future ground or underlying lease(s) affecting all or any part of the Shopping Center (such ground or underlying lease(s) is referred to as the "Ground Lease(s)").  "Mortgagee" shall mean any state or federally regulated bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender, which is not an Affiliate of Landlord, and which holds a mortgage on the Shopping Center or is the beneficiary under a deed of trust encumbering the Shopping Center (such mortgage or deed of trust is referred to as the "Mortgage").

SECTION 19.02  Existing Mortgages and Ground Leases.  If a Mortgage or any Ground Lease encumbers the Shopping Center or any part thereof on the Effective Date, then, simultaneously with the execution of this Lease, Landlord shall deliver to Tenant, in recordable form: (a) a subordination, non-disturbance and attornment agreement substantially in the form attached as Exhibit J, in recordable form, executed by each and every Mortgagee, and (b) a fee owner recognition agreement in the form and content described in Section 19.01(b), in recordable form, executed by any Ground Lessor (and, as may be required, consented to by the Mortgagee).  Should Landlord fail to so deliver such instrument(s) as provided above, Tenant shall have the right, by notice given to Landlord at any time prior to the date on which such instrument(s) are delivered, to terminate this Lease without further liability on the part of Landlord or Tenant, except: (i) for those obligations which expressly survive the expiration or other termination of this Lease, and (ii) Landlord shall (which obligation shall survive the termination of this Lease), within three (3) business days following Tenant's termination notice,

39

reimburse Tenant for all its reasonable, third-party costs and expenses incurred in connection with this Lease (including, without limitation, costs associated with the preparation and review of plans and specifications, the performance of Tenant's Work, and attorneys' fees), not to exceed Fifty Thousand Dollars ($50,000).

SECTION 19.03  Transfer of Interest.  Landlord shall provide Tenant with notice upon or immediately after any sale or transfer of Landlord's interest in the Shopping Center. Landlord shall require the buyer or transferee to assume in writing all of the obligations of Landlord under this Lease. Notwithstanding Section 23.13, Landlord shall continue to remain liable for all accrued liability, if any, up to the date of such sale or transfer. Notwithstanding anything contained herein to the contrary, Landlord shall continue to remain liable hereunder after such sale or transfer unless the buyer or transferee has expressly assumed in writing all of the obligations of Landlord under this Lease.

SECTION 19.04  Tenant Estoppel Certificates.  Tenant agrees, within fifteen (15) business days of Landlord's request, to execute and deliver to Landlord or any Mortgagee, on a form prepared by or on behalf of the party so requesting, an estoppel certificate (a) ratifying this Lease and confirming that there are no modifications or amendments to this Lease, except as may be stated in the certificate, (b) confirming the commencement and expiration dates of this Lease, (c) certifying to Tenant's actual knowledge and belief that the Landlord is not in default under this Lease, and that there are no offsets or defenses to enforcement of this Lease, except as may be stated in the certificate, (d) stating the date through which Annual Minimum Rent and other charges payable by Tenant have been paid, and (e) confirming the amount of Annual Minimum Rent payable hereunder.

SECTION 19.05  Landlord Estoppel Certificates.  Landlord agrees, within fifteen (15) business days of Tenant's request, to execute and deliver to Tenant or any assignee, transferee, subtenant or Lender, on a form prepared by or on behalf of the party so requesting, an estoppel certificate (a) ratifying this Lease and confirming that there are no modifications or amendments to this Lease, except as may be stated in the certificate, (b) confirming the commencement and expiration dates of this Lease, (c) certifying to Landlord's actual knowledge and belief that Tenant is not in default under this Lease, and that there are no offsets or defenses to enforcement of this Lease, except as may be stated in the certificate, (d) stating the date through which Annual Minimum Rent and other charges payable by Tenant have been paid, and (e) confirming the amount of Annual Minimum Rent payable hereunder.

SECTION 19.06  Payments.  If Landlord shall request Tenant to execute more than two (1) subordination, attornment and recognition agreement or more than one (1) estoppel certificate in any twelve (12) month period after the first calendar year after the Commencement Date, then, as a condition to Tenant's obligations under Sections 19.01 or 19.04, as the case may be, Landlord shall pay to Tenant One Thousand Dollars ($1,000) for each subsequent request for a subordination, attornment and recognition agreement or an estoppel certificate within such twelve (12) month period. If Tenant shall request Landlord to execute more than one (1) estoppel certificate in any twelve (12) month period, then, as a condition to Landlord's obligations under Section 19.05, Tenant shall pay to Landlord One Thousand Dollars ($1,000) for each subsequent request for an estoppel certificate within such twelve (12) month period.

40

## ARTICLE XX

## LANDLORD'S REPRESENTATIONS, WARRANTIES AND COVENANTS

SECTION 20.01  Quiet Enjoyment.  Landlord covenants and agrees that Tenant, during the Term, shall freely, peacefully, and quietly occupy and enjoy the use and possession of the Premises without disturbance, molestation, hindrance or ejectment of any kind whatsoever.

SECTION 20.02  Representations, Warranties and Covenants.  In order to induce Tenant to execute this Lease and in consideration thereof, Landlord covenants, warrants and represents to Tenant as follows:

(a)   As of the Effective Date and as of the Possession Date, Landlord owns the fee simple title to the Developer Tract free and clear of all easements, restrictions, liens, encumbrances, leases and the like, except as described on Exhibit K; that the Developer Tract, as of the Effective Date (and as of the Possession Date), is not (and will not be) subject to the lien of any Mortgage (except such instruments where the lienor, including, Wachovia Bank, NA has entered into an agreement in favor of Tenant, as described in Sections 19.01 and 19.02); that Landlord has the full power, right and authority to make this Lease for the Term without the consent, joinder, or approval of any other party; and that Landlord will put Tenant into complete and exclusive possession of the Premises free from all orders, restrictions, covenants, agreements, leases, easements, laws, codes, ordinances, regulations or decrees (including, without limitation, those matters described on Exhibit K) but subject to the terms of the OEA which would, in any way, prevent or inhibit the use of the Premises for the uses thereof by Tenant as contemplated by this Lease, or prevent or restrict the use of the Common Areas or limit ingress and egress to and from Independence Boulevard, the public thoroughfares shown on the Site Plan, by Tenant, its agents, employees or invitees.

(b)   [Intentionally Omitted]

(c)   The Shopping Center shall, at the time of commencement of construction by Landlord, be properly zoned for the operation and maintenance of a store similar to other stores operated by Tenant and for its contemplated use, and that all necessary governmental consents, permits and approvals allowing for the Premises to be occupied for such use shall have been obtained by Landlord.

(d)   As of the Effective Date there is no Affiliated Land in existence and as of the Possession Date there will not be any Affiliated Land in existence (or, if there shall be Affiliated Land in existence, Landlord shall promptly notify Tenant thereof and promptly execute any recordable instrument reasonably requested by Tenant which memorializes the provisions of this Lease pertaining to or otherwise affecting Affiliated Land).

SECTION 20.03  Site Covenants.  In order to induce Tenant to enter into this Lease, Landlord covenants to Tenant as follows (the "Site Covenants"):

(a)   Landlord shall not construct (or permit to be constructed) any buildings or other improvements in the area identified on the Site Plan as the "No-Build Area" (the "No-Build Area").

41

WO 500055.6

(b)     Except as shown on the elevation and site plan attached hereto as part of the Site Plan, Landlord shall not construct (or permit to be constructed) any projections either vertical or horizontal (other than Tenant's signs or identifications) which will project along the front or rear of the building in which the Premises are situated in such a manner as to obstruct the view of Tenant's signs or its store front in any manner.

(c)     The number of paved, full-size parking spaces in the Shopping Center shall be the greater of (i) the ratio listed in Section 1.01(M) or (ii) the amount of spaces required by Laws (without variance), and, without limiting the generality of the foregoing, the number of spaces contained in Tenant's Preferred Area shall be the same number of spaces as shown on the Site Plan.

(d)     Landlord shall not erect (or permit to be erected) any building or other structures (including, without limitation, kiosks) in any outparcel on the Developer Tract except as and where shown on the Site Plan, and all outparcel buildings constructed shall (i) not be exceed a height of twenty-eight (28) feet above the finished floor of such building (inclusive of all roof top mechanicals, all projections and all architectural treatments and embellishments), (ii) not exceed the Floor Area shown on the Site Plan, (iii) satisfy all parking requirements (without variance) using the parking spaces located within each such outparcel, and (iv) be used solely for retail purposes except as permitted by the OEA, however, the inline space adjacent to the Premises shall be used exclusively for retail purposes and ancillary uses related to retail purposes.

(e)     Except with respect to (i) the Outside Sales Area (as defined in the OEA) for the Lowe's Tract and the Target Tract, and (ii) outdoor sales area(s) for the adjacent retail tenants (Petsmart and Michael's) in the inline space provided however, that such area utilized by either tenant shall be no larger than the Outdoor Sales Area designated for Tenant on the Site Plan, and in no event shall any such outdoor sales area be located within the Tenant's Preferred Area, Landlord shall not use (or permit the use of) all or any portion of the Common Areas for retail sales or for promotional purposes, subject to Tenant's rights under Section 2.01(c).

(f)     Landlord shall not make (and shall not permit there to made) any material changes to those Common Areas identified as "No-Change Area" on the Site Plan (the "No-Change Area") including, without limitation, changes in the location of curbcuts, drive aisles, entrances, access points, roadways, sidewalks or parking spaces or reduction of the parking ratio specified in Section 20.03(c), without Tenant's consent, which may be withheld in Tenant's sole discretion. Landlord shall not make (and shall not permit to be made) any other changes to the Common Areas which adversely affects Tenant's access to the Premises or the Shopping Center or the visibility of the Premises or of any of Tenant's signage, without Tenant's consent, which may be withheld in Tenant's sole discretion. Any other changes to the Common Areas may be made only upon receipt of Tenant's consent.

(g)     Following Tenant's opening for business at the Premises, (a) Landlord shall use its best efforts to control any noise and dust at the Shopping Center (including, without limitation, during any periods of permitted construction within the Shopping Center) such that neither interferes with the normal operation of Tenant's business, and (b) Landlord shall not perform (and shall not permit there to be performed) any exterior construction in the Developer's

42

Tract during the months of October, November, December and January, except to the extent permitted under Section 5.01.

(h)     Landlord shall not permit any solicitation, distribution of handbills, picketing, or other public demonstration in the Common Areas, except as otherwise may be mandated by Laws.

(i)     No transmission and/or reception towers for wireless telephone or internet communications shall be permitted within the Developer Tract.

(j)     Landlord shall not knowingly install or permit to be installed by any other tenant or other person anywhere in the Shopping Center, other than the Target tract or the Lowe's Tract, or any Affiliated Land any structure or equipment which would cause any interference with satellite, radio, telecommunications or television reception or transmission in or from the Building.

SECTION 20.04 OEA.

(a)     The term "OEA" shall mean that certain Operation and Easement Agreement by and between Target Corporation and Newman Gloucester Associates, LLC, dated as of January 11, 2006 and recorded on January 18, 2006 in the County Clerk Office of Camden County, State of New Jersey in Book 08083, Page 0113, as amended by that certain First Amendment to Operation and Easement Agreement between Target Corporation, Newman Gloucester Associates, LLC, and Lowe's Home Centers, Inc. dated as of May 11, 2006 and recorded May 19, 2006 in Book 08209, Page 1110 in the aforementioned records.

(b)     Landlord covenants, represents and warrants to Tenant that: (i) the OEA has not been modified, amended or terminated; (ii) the OEA is currently in full force and effect; (iii) to its actual knowledge as of the Effective Date, no default under the OEA exists beyond any applicable notice and cure period; and (iv) the OEA is, and shall remain, superior in lien to all mortgages and related liens affecting the Shopping Center and all other land which is encumbered by the OEA. Landlord and Tenant each acknowledge that this Lease is made and shall continue to be subject and subordinate to the OEA, subject to the provisions of this Section 20.04. Tenant shall comply with the terms and conditions of the OEA to the extent same affects the Premises (it being agreed that Tenant shall not be obligated to expend any sums in connection with such compliance except as set forth in this Lease).

(c)     Landlord shall, during the Term: (i) perform and observe all of the terms, covenants, provisions and conditions of the OEA on Landlord's part to be performed and observed; (ii) defend, indemnify and hold harmless Tenant from and against any and all claims, demands, causes of action, suits, damages, liabilities, and expenses of any nature arising out of or in connection with the enforcement of, or a claimed breach by, Landlord of any covenant, term, condition, or provision of the OEA; and (iii) diligently enforce, at its sole expense, the covenants, agreements, and obligations of the OEA.

(d)     Whenever, pursuant to the OEA, the consent or approval of Landlord shall be required or requested, and such consent or approval could diminish the rights or increase the obligations of Tenant under the OEA or under this Lease, or could adversely affect Tenant's use

43

or occupancy of the Premises, or the conduct of Tenant's business therein, such consent or approval shall not be granted without the prior consent of Tenant, which consent may be withheld in its sole and absolute discretion.

(e)     Landlord shall, immediately upon receipt, forward to Tenant and Tenant's leasehold mortgagee, if any, a copy of any and all notices and/or demands received by Landlord under or pursuant to the OEA, which relate to, or could adversely affect, Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or Tenant's rights pursuant to this Lease.

(f)     Landlord shall not amend or modify (or permit an amendment to or modification of) the OEA if such amendment or modification could diminish the rights or increase the obligations of Tenant under the OEA or under this Lease, or could adversely affect Tenant's use or occupancy of the Premises or the conduct of Tenant's business therein, nor shall Landlord terminate the OEA.

(g)     In the event Landlord defaults in the performance of any of its obligations under the OEA or fails to enforce the obligations of any other obligee under the OEA, and such default or failure to enforce could adversely affect Tenant's rights under the OEA or under this Lease, Tenant's Work, Tenant's use or occupancy of the Premises or the conduct of Tenant's business therein, Tenant may, but shall not be obligated to, after thirty (30) days notice (except in the event of emergency, in which case no notice shall be required) cure any default by Landlord under the OEA and/or enforce, in its own name, at Landlord's expense, the obligations of any other obligee under the OEA. Landlord shall, upon demand, reimburse Tenant for the costs incurred by Tenant in performing any of Landlord's obligations under the OEA or enforcing the obligations of any obligee under the OEA, together with interest thereon at the Default Rate.

(h)     As between Landlord and Tenant, in the event of any conflict between the OEA and this Lease, this Lease shall in all respects control.

(i)     Landlord represents and warrants that no third-party approvals are required under the OEA, except under Section 3.3.2 of the OEA which have been obtained by Landlord.

(j)     Landlord hereby warrants, covenants and represents to Tenant that Landlord shall not assign its rights as an "Approving Party" under the OEA separate and apart from its interest as Landlord under this Lease. Landlord further warrants, covenants and represents to Tenant that any assignment of its rights as an Approving Party under the OEA shall be set forth in a written instrument.

## ARTICLE XXI

## HOLDING OVER

SECTION 21.01 Holding Over. If Tenant remains in possession of the Premises after the expiration of the Term without having duly exercised its right, if any, to extend or further extend the Term, such continuing possession shall create a month-to-month tenancy on the terms herein specified and such tenancy may be terminated at the end of any month thereafter by either

44

party by giving at least thirty (30) days notice thereof to the other party. During such holdover and provided that Landlord and Tenant are not in good faith negotiations with regard to the renewal or extension of this Lease or the entering into a new lease for premises within the Shopping Center, Tenant shall be liable for Annual Minimum Rent on a monthly basis (or, if applicable, on a prorated daily basis) in an amount equal to one hundred fifteen percent (115%) of the amount thereof payable by Tenant for the month immediately preceding the last day of the Term, as well as for all Additional Rent payable by Tenant under this Lease.

## ARTICLE XXII

### NOTICE

SECTION 22.01  Where and How Given.  All notices or demands which either party hereto either is required to or may desire to serve upon the other shall be in writing and shall be sufficiently served upon such other party, by (a) mailing a copy thereof by certified or registered mail, postage prepaid, return receipt requested, addressed to the party to whom the notice is directed at the "Notice Address" of such party, or (b) by a reliable overnight courier (such as Federal Express), all charges prepaid, furnishing a receipt upon delivery, and addressed to the party to whom the notice is addressed at the Notice Address of the part.  The Notice Address of each party is:

a) Landlord:

NEWMAN GLOUCESTER ASSOCIATES, LLC
1000 Germantown Pike, Suite E-2
Plymouth Meeting, Pennsylvania 19462
Attention: David Newman

with a copy to:

NEWMAN GLOUCESTER ASSOCIATES, LLC
3101 Shippers Road
Vestal, New York 13850
Attention: Marc Newman

with a copy to:

Levene, Gouldin, & Thompson, LLP
450 Plaza Drive
450 Vestal New York, 13850
Attention: Howard, Rittberg

b) Tenant:

CIRCUIT CITY STORES, INC.
9954 Mayland Drive
Richmond, Virginia 23233
Attention: Vice President of Real Estate

with a copy to:

CIRCUIT CITY STORES, INC.
9950 Mayland Drive
Richmond, Virginia 23233
Attention: General Counsel

with a copy to:

Sutherland Asbill & Brennan LLP

45

1114 Avenue of the Americas
40th Fl.
New York, New York 10036
Attn: David Rabinowitz, Esq.

The addresses to which notices and demands shall be delivered or sent may be changed from time to time by notice served, as hereinbefore provided, by either party upon the other party.

SECTION 22.02  When Given.  Unless otherwise provided for herein, notice shall be deemed to have been served at the earlier of the date received, refused or returned as undeliverable.  However, if such notice pertains to the change of address of either of the parties hereto, then such notice shall be deemed to have been served upon receipt thereof by the party to whom such notice is given.

## ARTICLE XXIII

## MISCELLANEOUS

SECTION 23.01  Rent Proration.  If this Lease is terminated prior to its natural expiration date for any reason other than a Tenant default, then Landlord shall promptly reimburse Tenant for any Rent prepaid by Tenant for periods subsequent to such termination date.  This Section 23.01 shall survive the termination of this Lease.

SECTION 23.02  Construction.  In construing this Lease, feminine or neuter pronouns shall be substituted for those masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place in which the context so requires.  This Lease shall be construed without regard to: (a) the identity of the party who drafted the various provisions hereof, and (b) the addition or deletion of text made during the negotiation of this Lease.  Moreover, each and every provision of this Lease shall be construed as though all parties hereto participated equally in the drafting thereof.  As a result of the foregoing, any rule or construction that a document is to be construed against the drafting party shall not be applicable hereto.

SECTION 23.03  Section Headings.  The section headings in this Lease are for convenience only and do not in any way limit or simplify the terms and provisions of this Lease, nor should they be used to determine the intent of the parties.

SECTION 23.04  Partial Invalidity.  If any term, covenant, condition or provision of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, then the remainder of this Lease or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby and each term, covenant, condition and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

SECTION 23.05  Waiver.  The failure of either party to seek redress for violation of, or to insist upon strict performance of, any term, covenant or condition contained in this Lease shall not prevent a similar subsequent act from constituting a default under this Lease.

46

SECTION 23.06 <u>Governing Law</u>. This Lease shall be governed and construed in accordance with the laws of the State.

SECTION 23.07 <u>Successors and Assigns</u>. This Lease shall inure to the benefit of and be binding upon the heirs, executors, administrators, successors and assign of Landlord and the successors and assigns of Tenant.

SECTION 23.08 <u>No Broker</u>. Landlord and Tenant represent to each other that no broker or person is entitled to any commission by reason of the negotiation and execution of this Lease, other than the Broker identified in Section 1.01(D), and Landlord agrees that Landlord shall be solely responsible for the fees and commissions of the Broker. Landlord and Tenant agree to indemnify, defend and hold each other harmless against any and all claims by any other person for brokerage commissions or fees arising out of any conversation, negotiations or other dealings held by the other party with any other broker regarding this Lease.

SECTION 23.09 <u>Memorandum of Lease</u>. Landlord and Tenant agree to execute a Memorandum of Lease in recordable form, substantially similar to that attached as <u>Exhibit L</u>, setting forth such provisions hereof as may be required by State law. If so requested by Tenant, Landlord shall execute such Memorandum of Lease simultaneously with the execution of this Lease. Recording costs shall be borne by the party requesting recordation of same; however, any transfer taxes or other fees charged by any local or state governmental authorities in connection with such recordation shall be split evenly between the Landlord and Tenant. The provisions of this Lease shall control with regard to any omissions from, or provisions which may be in conflict with, the Memorandum of Lease.

SECTION 23.10 <u>Entire Agreement</u>. This instrument contains the entire and only agreement between the parties and no oral statements or representations or written matter not contained in this instrument shall have any force or effect. This Lease shall not be amended or modified in any way except by a writing executed by both parties. All of the exhibits attached to this Lease are incorporated into this Lease by reference and for all purposes are a part of this Lease.

SECTION 23.11 <u>Relationship of Parties</u>. The relationship between the parties hereto is solely that of landlord and tenant and nothing in this Lease shall be construed as creating a partnership or joint venture between the parties hereto, it being the express intent of Landlord and Tenant that the business of Tenant on the Premises and elsewhere, and the good will thereof, shall be and remain the sole property of Tenant.

SECTION 23.12 <u>Force Majeure</u>. If either party hereto shall be delayed or hindered in, or prevented from, the performance of any act required under this Lease by reason of strikes, lockouts, labor troubles, failure of power, riots, insurrection, war, floods, hurricanes or tropical storms, tornados, or other unusually inclement weather but not inclement weather generally, or other reasons of a like nature beyond the reasonable control of the party delayed in performing works or doing acts required under the terms of this Lease (any such delay, hindrance or prevention is referred to as "<u>Force Majeure</u>"), then performance of such act shall be excused for the period of the delay, and the period of the performance of any such act shall be extended for a period equivalent to the period of such delay, except as otherwise specifically provided herein to

47

the contrary. The provisions of this Section 23.12 shall not be applicable to delays resulting from the inability of a party to obtain financing or to proceed with its obligations under this Lease because of a lack of funds.

SECTION 23.13  Limitation of Landlord's Liability. Except with respect to (a) insurance proceeds or condemnation awards received by Landlord which are required by the terms of this Lease to be applied to the repair or restoration of the Premises or the Shopping Center, (b) Landlord's failure to pay the Landlord Reimbursement in accordance with this Lease, and (c) any monies owed by Landlord to Tenant in connection with Landlord's default in performing Landlord's Work, Tenant shall, on and after the Commencement Date, look only to Landlord's estate and property in the Shopping Center (or the proceeds from the sale, financing or refinancing of all or any portion thereof) and net income derived from the Shopping Center for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord hereunder, and no other property or assets of Landlord, its officers, directors, stockholders, members or partners shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease. Except with respect to the limitation on personal liability hereinabove set forth, the provisions of this Section 23.13 shall not be deemed or construed to limit Tenant's rights and remedies pursuant to this Lease or which may be available at law, in equity or otherwise.

SECTION 23.14  Limitation of Tenant's Liability. Landlord, its successors and assigns, shall look solely to the assets, if any, of Tenant and its successors and assigns, for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director, member or employee of Tenant or any of its Affiliates.

SECTION 23.15  Consents. Except as may be otherwise expressly set forth in this Lease, whenever under this Lease provision is made for either party's securing the consent or approval of the other party, (a) such consent or approval shall be in writing and shall not be unreasonably withheld, delayed or conditioned, and (b) in all matters contained herein, both parties shall have an implied obligation of reasonableness.

SECTION 23.16  Costs. Whenever this Lease requires the performance of an act by party, such party shall perform the act at its own cost and expense, unless otherwise expressly provided to the contrary in this Lease.

SECTION 23.17  Attorneys' Fees. In any action or proceeding hereunder (whether to enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall be entitled to recover from the other party the prevailing party's reasonable costs and expenses in such action or proceeding, including reasonable attorneys' fees, costs and expenses. Except as otherwise set forth herein, if either party is sued by a third party as a result of a violation of a covenant, representation or warranty herein contained by the other party hereto, then the party who has violated the covenant, representation or warranty shall be responsible for the reasonable costs and expenses in such action or proceeding against the non-violating party, including reasonable attorneys' fees, costs and expenses.

48

SECTION 23.18 <u>Survival of Obligations</u>. The obligation to pay any sums due to either party from the other that by the terms herein would not be payable, or are incapable of calculation, until after the expiration or sooner termination of this Lease shall survive and remain a continuing obligation until paid. All indemnity obligations under this Lease shall survive the expiration or earlier termination of this Lease.

SECTION 23.19 <u>Joint and Several Liability</u>. If either party consists of more than one person, then the persons constituting such party shall be jointly and severally liable hereunder.

SECTION 23.20 <u>Definition of Hereunder, Herein, etc.</u>. Unless the context clearly indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar import refer to this Lease and all of the Exhibits attached hereto as a whole and not to any particular section, subsection, or paragraph hereof.

SECTION 23.21 <u>Tenant's Trade Name</u>. Landlord shall not make use of Tenant's trade name (*i.e.*, "Circuit City"®) in any advertising or marketing material including, without limitation, on any internet website, without obtaining Tenant's prior written approval, which may be withheld in Tenant's sole and absolute discretion. Notwithstanding the foregoing, Landlord may use Tenant's trade name on Landlord's website and in informational brochures, but only for the purposes of identifying Tenant as a tenant of the Shopping Center.

SECTION 23.22 <u>Counterparts</u>. This instrument may be executed in several counterparts, each of which shall be deemed an original. The signatures to this instrument may be executed and notarized on separate pages, and when attached to this instrument, shall constitute one complete document.

[Signature page follows]

49

IN WITNESS WHEREOF, Landlord and Tenant have caused this Lease to be duly executed and delivered in their respective names as of the date first above written.

LANDLORD:

NEWMAN GLOUCESTER ASSOCIATES, LLC

By:    Newman Development Group of Gloucester, LLC

Attest:

By:
Name:    Barry G. Newman
Title:    member

TENANT:

CIRCUIT CITY STORES, INC.

By:
Name:    John A. Mulleady
Title:    Vice President
Real Estate & Construction

50